# Exhibit 8

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF NEW JERSEY

3

4     IN RE JOHNSON & JOHNSON TALCUM,)

5     POWDER PRODUCTS MARKETING,     ) MDL NO.

6     SALES PRACTICIES, AND PRODUCTS ) 16-2738 (MAS)

7     LIABILITY LITIGATION           ) (RLS)

8     -------------------------      )

9

10    ---  This is the Deposition of GEORGE NEWMAN,

11    M.D., taken at the offices of Loopstra Nixon,

12    130 Adelaide Street West, Toronto, Ontario, on

13    the 15th day of May, 2024.

14                    ------------

15

16

17

18

19

20

21

22

23

24

25        REPORTED BY:  LEILA HECKERT, CVR, RCP-M

Page 2

1  A P P E A R A N C E S :
2  FOR THE PLAINTIFF,
3  STEERING COMMITTEE AND THE MDL:
4  ASHCRAFT & GEREL, LLP
5  PER:  MICHELLE A. PARFITT, ESQ.,
6  & PER: CHRIS TISI (via Zoom)
7  1825 K STREET NW,
8  SUITE 700,
9  WASHINGTON, DC 20006
10  Email: mparfitt@ashcraftlaw.com
11  Tel:  202-783-6400
12
13  & LUNDY LLP
14  PER:  RUDIE R. SOILEAU, JR., ESQ.
15  501 BROAD ST,
16  LAKE CHARLES, LA 70601
17  Email: rudiesoileau@gmail.com
18  Tel:  337-439-0707
19
20  & BEASLEY ALLEN
21  PER:  LEIGH O'DELL (via Zoom)
22  218 COMMERCE STREET,
23  MONTGOMERY, ALABAMA 36103
24  Email: Leigh.odell@beasleyallen.com(334)
25  Tel: 334-269-2343

Page 3

1  FOR THE DEFENDANT,
2  JOHNSON & JOHNSON:
3  KING & SPALDING
4  PER:  JOHN EWALD, ESQ.
5  1185 6th AVE,
6  NEW YORK, NY 10036
7  Email:  jewald@kslaw.com
8  Tel:  212 790 5341
9
10  FOR THE PLAINTIFFS,
11  DIANA & GILBERT BALDERRAMA,
12  & BRANDI & JOEL CARL,
13  ANAPOL WEISS
14  PER:  TRACY FINKEN (via Zoom)
15  130 N 18th St #1600
16  Tel: (215) 929-8822
17  tfinken@anapolweiss.com
18
19  FOR PERSONAL CARE PRODUCTS COUNCIL,
20  REILLY, MCDEVITT & HENRICH, P.C.
21  PER:  KEVIN KOTCH, ESQ., (via Zoom)
22  3 EXECUTIVE CAMPUS, SUITE 310,
23  CHERRY HILL, NEW JERSEY, 08002
24  Email: kkotch@rmh-law.com
25  Tel: (856) 317-7180

Page 4

1            I N D E X
2  WITNESS:  GEORGE NEWMAN, M.D.
3  Examination by Mr. Ewald.....................8
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

1          INDEX OF EXHIBITS
2  NO./DESCRIPTION                    PAGE
3  1     Dr. Newman's invoice to Ashcraft &    20
4        Gerel, LLP - August 2023 to
5        November 2023.
6  2     Invoice from Dr. Newman to         21
7        Ashcraft & Gerel, LLP - November
8        2023 to December 2023.
9  3     Dr. Newman's CV, updated April     34
10       2024.
11  4    Dr. Newman's November 2023 report.  51
12  5    "Table of Contents George Newman -  51
13       Expert Report."
14  6    June 17, 1966 memo.  J&J            97
15       000235850.  To Dr. Hildick-Smith,
16       Subject: Johnson's Baby Powder
17       Talc Aspiration.  June 17, 1966.
18  7    Food and Drug Administration        127
19       Certificate - D-7214 (1986 FDA).
20  8    Johnson & Johnson internal memo,    132
21       "Windsor minerals and talc."
22       April 26, 1973.
23
24
25

2 (Pages 2 - 5)

Page 6

INDEX OF EXHIBITS

NO./DESCRIPTION                                    PAGE

9    "Review On The Present Status Of      146
     Talc Safety Substantiation
     Activities And Update Of
     Contingency Plans," January 1975,
     Bates Number of J&J000026987.

10   Johnson & Johnson document,           163
     Management Authorization for
     Additional Talc Safety Studies,
     March 3, 1975.

11   Dr. Newman's notes.                   178

12   Letter from Alfred Wehner to          187
     Michael Chudkowski at J&J Consumer
     Products.  J&J Bates Number
     000040596, September 17, 1997.

13   Studies - Facts About Talc.           200

14   American Cancer Society Cancer -      201
     Facts and Figures 2024.

15   Campaign for Safe Cosmetics from      212
     safecosmetics.org site.

16   "Is Talc in Makeup Safe?" from        213
     drugwatch.com site.

Page 7

INDEX OF EXHIBITS

NO./DESCRIPTION                                    PAGE

17   Dr. O'Brien's article published in    237
     JAMA, "Association of Powder Use
     in the Genital Area With Risk of
     Ovarian Cancer."

Page 8

1    --- Upon commencing at 9:24 A.M.
2    (WHEREUPON, the witness was duly sworn.)
3    GEORGE NEWMAN, M.D.,
4    called as a witness herein,
5    was examined and testified as follows:
6    EXAMINATION BY MR. EWALD:
7    Q.  Dr. Newman, we met off the record
8    and my name is John Ewald and we are having, I
9    think, some connection issues, and so, please,
10   if it any point in time you are not hearing, or
11   need me to repeat anything, just let me know and
12   I'll do my best to try to repeat the question,
13   okay?
14   A.  Sounds great.
15   Q.  Is this (inaudible) before?
16   A.  Sorry.  You broke up there.  Can
17   you repeat the question?
18   Q.  Have you been deposed before?
19   A.  No, I have not.
20   Q.  It seems like you've -- from the
21   materials that you've reviewed, at least a
22   couple of depositions, during your process in
23   this case?
24   A.  Yes, I have.
25   Q.  So it seems like you probably

Page 9

1    have a general idea of -- just to give you a
2    couple of things on my end, especially with the
3    connection issues.  It's really important to try
4    to make sure that I finish my question, and I'll
5    try the same to make sure you've finished your
6    answers so the court reporter can get everything
7    down.  Does that make sense?
8    A.  Sounds great.
9    Q.  And certainly, if at any point in
10   time, you need to take a break, please just let
11   me know.  And the major point I make on that,
12   though, is if there's a question pending, if
13   I've asked you something, it makes sense to
14   answer the question and then I'll give you a
15   chance to take a break.
16   A.  Sounds great.
17   Q.  And do you understand that you
18   are under oath and just like you would be if you
19   were appearing in a trial?
20   A.  Yeah, I understand.
21   Q.  And the last little intro, if
22   there's any question, even if you can hear me
23   now to clear but the question doesn't make
24   sense, please let me know and I'll do my best to
25   rephrase because we want to make sure that you

3 (Pages 6 - 9)

Page 10

1 understand the questions, okay?
2     A. Okay. I appreciate that. Thank
3 you.
4     Q. So for the record, (inaudible).
5     A. Mr. Ewald, I believe you broke
6 up.
7     Q. For the record, where are you
8 located today?
9     A. In Toronto, Ontario at the law
10 offices of Loopstra Nixon.
11     Q. And I think the stenographic
12 record will reflect that counsel Michelle
13 Parfitt and a few folks in the room. As we're
14 working through the deposition, Dr. Newman, it
15 will be helpful for me to understand what
16 materials you have with you.
17     Can you tell me what you have in paper
18 form, for example, with you.
19     A. Sure. I'm looking at a window
20 and there is a small desk there that has nine
21 binders. And so those binder are all of the
22 materials that I cite in my report. In front of
23 me I have a copy of my report, a recent copy of
24 my CV, a table of contents for my report, three
25 pages of typewritten notes, and all of those

Page 11

1 notes are just excerpts from materials so all of
2 that material is verbatim from materials that
3 I'm citing. And then I just have a blank
4 notepad so I can take notes during our
5 conversation.
6     Q. That's helpful. And, Michelle,
7 it may be helpful maybe during a break to give a
8 copy of the three pages of the separate notes.
9     MS. PARFITT: John, what I can do is
10 get that in the chat maybe during the break.
11 How does that work?
12     MR. EWALD: Perfect.
13     MS. PARFITT: Thank you.
14     BY MR. EWALD:
15     Q. I think as a matter, as we're
16 going forward, Dr. Newman, that largely I'm
17 going to be asking questions about the report.
18 There are going to be some documents, most of
19 them cited in your report, and I'll talk about
20 and put up a screen, but certainly if you need
21 time to pull something from the binder or
22 anything like that, just let me know, okay?
23     A. Sure. Just a question about
24 protocol. When we do reference those documents,
25 is it better for me to look at them on the

Page 12

1 screen or do you want me to pull the hard copy
2 form here?
3     Q. So that is really -- it's totally
4 your preference as long as you feel comfortable.
5     A. Okay.
6     Q. And so, you know, I think, I
7 will -- I'll probably not put on the screen your
8 report as you have in front of you, so we can
9 see each other as easily as possible. But if
10 it's a document, I'll put it on the screen,
11 sometimes it's a document that's one-page and,
12 you know, that's all you need to look at. But
13 if you're more comfortable looking at what's in
14 the paper form, please just let me know, and
15 we'll make sure you have it, okay?
16     A. Great.
17     MS. PARFITT: Hey, John, I'll also add
18 that in addition to the materials, I wanted to
19 make sure that you received a copy of the
20 Dropbox that we sent last Friday. And then --
21     MR. EWALD: Yes.
22     MS. PARFITT: -- yesterday, there were
23 a couple of websites that were in the Dropbox.
24 I just wanted to make sure they found their way.
25 I know we are different examiners, not everyone

Page 13

1 has received what they need, so I just want to
2 make sure you have those. Very good.
3     MR. EWALD: No. I definitely
4 appreciate that, Michelle. And I did -- I think
5 I received everything. We will see if I didn't
6 as we proceed --
7     MS. PARFITT: Let me know.
8     MR. EWALD: Yep, great. Thank you.
9     MS. PARFITT: Of course.
10     BY MR. EWALD:
11     Q. So, Dr. (inaudible) with --
12 you're telling me how you got involved as an
13 expert in this litigation?
14     A. Sure. I received a call from
15 Michelle Parfitt.
16     Q. Okay. And, so, you received a
17 call from Michelle Parfitt.
18     And approximately when was that?
19     A. Roughly June or July of last year
20 of 2023.
21     Q. All right. And (inaudible) you
22 broke up a (inaudible). Did you say June or
23 July 2023?
24     A. Correct, yes.
25     Q. I don't want to get to the

4 (Pages 10 - 13)

Page 14

1  specifics of the conversation that you had with
2  Ms. Parfitt.
3        But you agreed to be retained at or
4  shortly after the time you spoke with her in
5  June or July of 2023?
6        A.  Yeah, yeah.  That's correct.
7        Q.  In you report, and we'll get to
8  it.  You talk about question or what you were
9  asked to review in connection in this case, if
10  you want to look at paragraph 9 of your report
11  on paper.
12        A.  Great, yeah.
13        Q.  When you were first retained in
14  this case, was the direction to you on what you
15  were going to review the same as what is
16  reflected in paragraph 9?
17        A.  When I first spoke to
18  Ms. Parfitt, the -- it was basically just to
19  look into marketing and advertising as it
20  pertained to Johnson's talcum powder products.
21        Q.  And, again, although there's a
22  slight breakup, I think I got it.  When you
23  spoke with Ms. Parfitt, the initial (inaudible)
24  and advertising of Johnson & Johnson was that
25  specifically as it relates to talc?

Page 15

1        A.  To talc and talcum powder
2  products and also the associated products,
3  cornstarch, et cetera.
4        Q.  Right.  So how did you go about
5  that first when (inaudible) into that issue,
6  what did you do?
7        THE REPORTER:  Sorry.  He needs to
8  repeat that.  There was a word, I didn't catch.
9        THE WITNESS:  Mr. Ewald, could you
10  repeat that question?
11        BY MR. EWALD:
12        Q.  When you were first -- so when
13  you were asked (inaudible) the issue that we
14  just talked about in June, July of 2023, what
15  did you do?
16        A.  Sure.  So I looked at a bunch of
17  different categories of information.  So, I
18  searched online, looked at, kind of, materials
19  that were out there from facts about talc, from
20  Health Canada, from, you know, some of the
21  Google Scholar, looking at some of the epi
22  studies, and then, you know, I also requested
23  documents from counsel.
24        Q.  So did you get any guidance from
25  counsel on where to look in connection with your

Page 16

1  research on this topic?
2        A.  No, I didn't.
3        Q.  And when you are starting to do
4  this research in June, July of 2023 -- maybe
5  just because you broke up earlier, can you just
6  repeat what was the specific issue that you were
7  looking at?
8        A.  Sure.  Generally, it was anything
9  related to the marketing of Johnson & Johnson
10  powder products, so the talcum powder products,
11  Johnson's Baby Powder, Shower to Shower,
12  Johnson's Baby Powder with cornstarch, and then
13  I was looking at documents relevant to, you
14  know, broadly the advertising, sale and
15  distribution of those products, also any, kind
16  of, consumer research that Johnson & Johnson had
17  done about those products or contracted with, so
18  I wanted -- those were other materials that I
19  wanted to look at.
20        Q.  (Inaudible) initial review in
21  June, July 2023, you mentioned you received some
22  documents from counsel.  Is that right?
23        A.  Correct.  Yes, so we would have
24  conversations periodically on the phone or Zoom,
25  and then I would indicate categories of

Page 17

1  documents that I was interested in reviewing.
2  And then, I would receive a link to a Dropbox
3  folder.  And I would look at the documents in
4  that Dropbox folder.  Many of the documents were
5  relevant, some weren't relevant to the things
6  that I was looking at.  And so then I would just
7  focus on my attention, you know, on the
8  documents that were relevant to the marketing
9  issues.
10        MR. EWALD:  We can go off the record
11  for just one moment.
12        -- OFF THE RECORD AT 9:38 A.M.
13        -- RESUME AT 9:55 A.M.
14        BY MR. EWALD:
15        Q.  All right.  Thank you, Dr. Newman
16  and Ms. Parfitt for your assistance.  And I
17  think right now we are in a much better place
18  technology-wise.  But my comment earlier,
19  Dr. Newman, remains the same:  If at some point
20  in time I cut out or you don't heard me, just
21  let me know, okay?
22        A.  Sounds great.
23        Q.  Sure.  When we went off the
24  record, we were talking at a high level of what
25  you started doing once you were engaged in the

Page 18

1  case in June, July of 2023, you were talking
2  about some work that you had done. And at what
3  point in time, did you understand the question
4  that you were going to be answering would be
5  what is written out in paragraph 9 that we
6  talked about?
7       A.  Maybe just ask for a bit of
8  clarification. By question, you mean, is there
9  a specific part of that statement?
10      Q.  Right. Fair enough. So when I
11 started asking questions about this, you
12 indicated that the initial part of the retention
13 in June, July 2023, you are looking into the
14 marketing and sales practices of J&J, and it
15 wasn't necessarily being asked to do what is
16 stated in paragraph 9 as your task. Is that
17 fair?
18      A.  Correct. If you are referring to
19 part, you know, were there aspects of the
20 marketing that were misleading or created
21 confusion.
22      Q.  Right.
23      A.  I would say that's something that
24 I couldn't give you an exact time at which that
25 happened, but it's something that evolved as I

Page 19

1  was reviewing materials. You know, I was
2  beginning to form theories or an understanding
3  about what happened. And, so, I couldn't put it
4  at an exact point in time. But, you know,
5  something that evolved over time.
6       Q.  So when we were talking about the
7  timeline overall, approximately when did you
8  start preparing the report?
9       A.  It wasn't long after. Again, I
10 would say probably in October. But I don't know
11 for certain.
12      Q.  Without getting into any
13 specifics, did anybody assist you in the
14 drafting of the report?
15      A.  No.
16      Q.  I'm going to mark a couple of
17 documents, to start us off, as exhibits that
18 were produced to me by counsel. I'm going put
19 up on the screen. And let me know if you have a
20 problem seeing it. Do you see that, Doctor?
21      A.  Yep.
22      Q.  Okay. And we'll mark this as
23 Exhibit 1. It is an invoice dated 11/21/23 from
24 Dr. Newman to the Ashcraft Law firm. And the
25 first entry here, Doctor, is August 8, 2023,

Page 20

1  document, reviewed, two and half hours. Do you
2  see that?
3       EXHIBIT NO. 1:  Dr. Newman's invoice
4       to Ashcraft & Gerel, LLP - August
5       2023 to November 2023.
6       THE WITNESS:  Yes.
7       BY MR. EWALD:
8       Q.  And would that be the start date
9  for when you started your work on this project
10 in earnest?
11      A.  That's when I started this
12 litigation, yeah.
13      Q.  And if we scroll down through the
14 first page, it's all document review, phone
15 meeting. And then we get to October 27, '23 on
16 the second page. And it's the first entry of a
17 number of entries that's labelled "Draft
18 comment," do you see that?
19      A.  Correct, yes.
20      Q.  And what do you mean by "draft
21 comment"?
22      A.  Just that I was working on the
23 comment that I was drafting the comment.
24      Q.  And when you're -- understanding
25 that this may be your first rodeo in litigation,

Page 21

1  you're talking about comment, are you referring
2  to the expert report that you issued in November
3  2023?
4       A.  Yes. That was my understanding
5  of what it was called, yeah.
6       Q.  Sure. And then, let me mark next
7  as Exhibit 2 another invoice from Dr. Newman to
8  the Ashcraft firm. This one is -- appears to be
9  undated, but last time-entry is starting in
10 November of '23, and ending in December of '23,
11 correct?
12      EXHIBIT NO. 2:  Invoice from
13      Dr. Newman to Ashcraft & Gerel, LLP -
14      November 2023 to December 2023.
15      THE WITNESS:  Correct, yes.
16      BY MR. EWALD:
17      Q.  And, so, your report is issued on
18 November 15th, 2023, correct?
19      A.  Yes. That's correct.
20      Q.  When you are reviewing documents
21 in the month or so following the issue -- the
22 issuance of your report, what were you looking
23 at?
24      A.  So there were -- there were like
25 a couple of other experts, Dr. Kessler, in

6 (Pages 18 - 21)

Page 22

1 particular, that I wanted to look at his report.
2 And then also the deposition when it was
3 available. So I remember I read that very
4 closely. And I believe that there might have
5 been a few other documents that I requested that
6 you know, as I continued to think about the
7 case, and my opinion is still evolving, right,
8 I'm still learning about the case, you know,
9 that I requested additional documents.
10      Q. So if I'm understanding you
11 correctly, it's one of the things you were
12 looking at in the month following issuance of
13 your report or other reports that have been
14 issued by plaintiff's experts around the same
15 time as yours in November of 2023?
16      A. And Dr. Kessler in particular,
17 yeah.
18      Q. And so you said that,
19 particularly interested in what Dr. Kessler had
20 to say, and why is that in connection with your
21 opinion here?
22      MS. PARFITT: Objection, broad.
23      THE WITNESS: Can you just restate the
24 question. I got a little confused there for a
25 second.

Page 23

1      BY MR. EWALD:
2      Q. Sure. No problems.
3      Is what, if any, impact does
4 Dr. Kessler's report and deposition have on the
5 opinions that you are offering in this case?
6      A. Well, given his position, and
7 given that he was speaking to some of the
8 regulatory issues and some of the issues that I
9 think, overlap with the marketing issues that I
10 was looking at, you know, I was curious to
11 better understand, you know, some of these
12 specific arguments that he was making in his
13 report.
14      Q. Are you relying on any of
15 Dr. Kessler's opinions for your opinions in this
16 case?
17      A. I wouldn't say that. I formed my
18 opinion, written my opinion, you know, when I
19 submitted my report. And, so, the things I
20 found were kind of consistent with my opinion,
21 but I wouldn't say that I relied on, you know,
22 his report at all in drafting mine.
23      Q. And we'll probably get more to
24 it.
25      But you had reviewed Dr. Kessler's

Page 24

1 deposition more recently, right?
2      A. That's right. When it became
3 available. I don't recall exactly when that
4 was.
5      Q. Sometime approximately within the
6 last month or so, something like that?
7      A. I think that's right, yeah.
8      Q. Was there anything in
9 Dr. Kessler's deposition that modified the
10 opinions that you offer in your report dated
11 November 2023?
12      A. No.
13      Q. Now, I just showed you two
14 invoices.
15      Have you issued to Ms. Parfitt any
16 other invoices so far in this litigation?
17      A. No, I have not.
18      Q. And I could bring it back up, but
19 the second invoices ended with a time entry
20 sometime in December 2023, right?
21      A. Correct, yes.
22      Q. So if we are basically catching
23 us up to present, do you have an estimate of how
24 many hours you have spent on the case from,
25 let's say, end of December to today?

Page 25

1      A. You know, I don't know exactly,
2 so I can venture a guess. But, you know, I
3 actually I don't -- I don't know exactly. I
4 wouldn't want to guess.
5      Q. You're learning fast, and I don't
6 want you to guess either. But if you had to
7 give a range, for example, if I were to say do
8 you have a reasonable sense that you billed
9 since the end of December 2023 over 100 hours,
10 does that sound right?
11      A. I don't think it would be over
12 100, no.
13      Q. Over 50?
14      A. Possibly, possibly. But I'm not
15 sure. Just to clarify, I mean, I haven't
16 billed, I haven't sent an invoice or anything,
17 yet, yeah.
18      Q. Okay. Just looking for an
19 estimate.
20      A. Sure.
21      Q. And if you had to break down into
22 different buckets, basically, how he spent your
23 time on this case from the beginning of the year
24 until today, what would you say?
25      A. Again, I would say the majority

7 (Pages 22 - 25)

Page 26

1  is document review, just continuing to read and
2  understand and going back and revisiting
3  documents that I had read before, requesting new
4  documents, reading those, like the deposition
5  that we talked about.
6      Q.  Without getting into any of the
7  specifics, did you meet with counsel in
8  preparation for your deposition today?
9      A.  I did, yes.
10      Q.  And who did you meet with?
11      A.  I met with Michelle Parfitt and
12  Rudie Soileau.
13      Q.  How many times did you meet with
14  them in preparation for today's deposition?
15      A.  Met yesterday, and then there
16  were a few phone meetings.
17      Q.  And how long did you meet with
18  counsel yesterday?
19      A.  It was over half a day.  I don't
20  know the exact number of hours.
21      Q.  And apologies, sometimes "half a
22  day" means something different to some people.
23      If you guys say how many hours half a
24  day is, and how many is that?
25      A.  Sorry.  I was thinking about a

Page 27

1  workday.  More than four and under eight.
2      Q.  And, fortunately, I think
3  Ms. Parfitt and I sometime have days that are
4  longer than eight hours.
5      MS. PARFITT:  I agree, John.
6      MR. EWALD:  You're on the same page.
7      MS. PARFITT:  Yes.
8      BY MR. EWALD:
9      Q.  You mentioned that you've never
10  been deposed before.
11      Have you ever given testimony of any
12  kind before?
13      A.  No, I haven't.
14      Q.  In this case you are disclosed as
15  an expert.
16      Have you ever been retained as what
17  you understood to be a confidential consulting
18  expert, before today, in litigation?
19      A.  Yes.
20      Q.  And I don't want to get into
21  specifics.  But let's get a little bit more info
22  on that so we will see.
23      Approximately when did you get
24  retained for this confidential consulting
25  matter?

Page 28

1      A.  Roughly, August, 20 -- July,
2  August 2021.
3      Q.  Were you retained by a company
4  for this purpose?
5      A.  No.
6      Q.  Were you retained by governmental
7  body?
8      A.  No.
9      Q.  Retained by an individual?
10      A.  Yes.
11      Q.  Did that retention have anything
12  to do with talc?
13      A.  It did, yes.
14      Q.  Are you relying, in part, on what
15  you learned during that consulting arrangement
16  for your opinion today?
17      A.  Yes, I am.
18      Q.  And do you understand that prior
19  consulting arrangement is confidential?
20      A.  I do, yes.  I signed an NDA.
21      Q.  Did the work have to do with
22  potential health effects associated with talc?
23      A.  It did, yes.
24      Q.  And if I ask you who retained
25  you, would you be able to tell me as part of

Page 29

1  your NDA?
2      A.  I believe so, yeah.
3      Q.  So who would be --
4      A.  Michelle Parfitt.
5      Q.  Can you describe to me what work
6  you did back in July, August 2021 relating to
7  talc?
8      A.  Again, looking at very similar
9  issues.  Looking into, basically, the marketing
10  issues pertaining to talc, talcum powder
11  products, you know, the associated products, but
12  focused on advertising, distribution, sale,
13  consumer research, that type of stuff.
14      Q.  Approximately how many hours did
15  you bill on the consulting project in 2021?
16      A.  Again, this would be a rough
17  estimate.  But using the benchmarks that we
18  established before, I would say over 100 hours.
19      Q.  When did all that work happen
20  2021?
21      A.  I don't recall exactly.  The bulk
22  of it, yeah, happened in 2021, probably spanning
23  it to 2022 a little bit as well, yeah.
24      Q.  Did that work result in any kind
25  of written work product?

8 (Pages 26 - 29)

Page 30

1     A.  No, it did not.
2         Q.  When you started work in 2023 on
3  what ended up in your current report, did you,
4  as part of your work, go back to the materials
5  that you reviewed in 2021?
6     A.  Yeah.  Yes, that's right.
7         Q.  And are those -- are any of the
8  materials that you consider to be your opinions
9  in this case - that you reviewed first in 2021 -
10  reflected on your preference list and report?
11     A.  If I understand the question
12  right, everything --
13     Q.  Right.
14     A.  -- that is in -- that is
15  referenced in my report would be inclusive of,
16  basically, everything that I was learning, all
17  the material that I reviewed, 2021 up until, you
18  know, present-day.
19         Q.  When Ms. Parfitt reached out to
20  you in 2021, did you have an understanding about
21  how she connected with you?
22     A.  I don't -- actually, I have no
23  idea.
24         Q.  Do you recall what rate -- hourly
25  rate you charged for your time in 2021?

Page 31

1     A.  It was the same rate, $600 an
2  hour.
3         Q.  While we're on that topic, is
4  that $600 an hour for document review,
5  deposition today, trial if it's happening,
6  everything?
7     A.  Not for, like, the deposition
8  today.  My hourly is 750.
9         Q.  And what about trial testimony,
10  if it happens?
11     A.  It would also be 750.  But,
12  again, I'm new to all of this, but so that
13  hasn't happened.
14     Q.  That's fair.
15         What was the process in 2021 for your
16  review of materials?
17     A.  Like we discussed before, I mean,
18  it was the same process as in 2023.  So I was
19  looking at different categories of information,
20  so, you know, looking for resources online,
21  looking to the literature, the scientific
22  literature, both, you know, epidemiological
23  studies, as well as relevant work in my area of
24  expertise, consumer behaviour and psychology.
25  Looking at advertisements, which came from a

Page 32

1  variety of sources, some from the Kilmer House
2  website, some from eBay, and other kinds of
3  secondhand retailers.  And then, you know, there
4  are the documents that I requested of counsel.
5         Q.  When you are looking for
6  resources online, were you using any -- let me
7  withdraw it.
8         When you were looking at resources
9  online, were you making any kind of an
10  assessment as to whether or not the information
11  being provided was reliable?
12     A.  Yes, to the best of my ability, I
13  was, yes.
14     Q.  So to the best of your ability,
15  to extent that you're reviewing information
16  online about alleged health risks associated
17  with ovarian cancer, what, if any, expertise do
18  you have to assess whether or not what is being
19  asserted is reliable?
20     MS. PARFITT:  Objection, form.
21     THE WITNESS:  My training is in
22  cognitive science, so I'm not an epidemiologist
23  or a medical doctor of any kind.  But I am
24  trained as a scientist, I practice as a
25  scientist, so, you know, I can understand

Page 33

1  scientific writing, understand, you know, basic
2  statistics and that sort of thing.
3     BY MR. EWALD:
4         Q.  And understanding that you can
5  understand the scientific writing, do you have
6  the expertise, in your view, to assess whether
7  or not a scientific statement about health risk
8  associated with talc is based on reliable
9  information?
10     A.  Not at that kind of granularity,
11  no.  I would say reading it as a scientist from
12  an adjacent field, and I would say that that is,
13  kind of, the limit of my expertise there.
14     Q.  At any point in time from 2021
15  when you were first retained by Ms. Parfitt
16  until today, have you spoken with anyone that
17  you understand to be a plaintiff expert in this
18  MDL?
19     A.  No, I haven't.
20     Q.  And have you sought guidance from
21  any scientist in connection with the opinions
22  that you are offering in your November 2023
23  report?
24     A.  When you say "scientist", could
25  you be more specific?

9 (Pages 30 - 33)

Page 34

1      Q.   Well, I'm assuming based on your
2  time entries and what you've said that you have
3  conferred with counsel in connection with the
4  preparation of your November 2023 report, right?
5      A.   Sure, yes, that's right.
6      Q.   And maybe a better way to ask it
7  is have you conferred with anyone, either
8  counsel, in connection with the opinions that
9  you are offering in your November 2023 report?
10      A.   No.
11      Q.   Let's pull up and mark as
12  Exhibit 3 your CV that I received from counsel.
13  Can you see that, Doctor?
14      EXHIBIT NO. 3:  Dr. Newman's CV,
15      updated April 2024.
16      THE WITNESS:  Yes.
17      BY MR. EWALD:
18      Q.   And this CV has a date in the
19  upper left corner of April 2024.  Is it your
20  current CV?
21      A.   It is, yes.
22      Q.   So, your current position is
23  Associate Professor of Organizational Behaviour
24  in Human Resource Management and Marketing
25  Rotman School of Management in the University of

Page 35

1  Toronto.  Is that correct?
2      A.   That is correct, yes.
3      Q.   And does -- you were not a
4  tenured professor at the University of Toronto?
5      A.   No, I'm not.
6      Q.   Do they have a tenure-track at
7  the University of Toronto?
8      A.   Yes, they do.
9      Q.   Are you on the tenure-track?
10      A.   Well, it's a complicated
11  question.  When I was hired, it was during a
12  hiring freeze, essentially, at the university,
13  and so the position I'm on is not, but as a line
14  opens up, then I would convert to that.  And so
15  that's what the designation of the associate
16  professor rank, kind of, signifies which is
17  that, you know, I would be moving into that role
18  on the tenure line once a tenure line position
19  is open.
20      Q.   But as of right now, you're not
21  tenure-track at the University of Toronto?
22      A.   Correct, that's right.
23      Q.   What was the reason for the
24  change from Yale in 2022 to the University of
25  Toronto?

Page 36

1      A.   My wife is also a professor, and
2  so we had what's called the two-body problem,
3  and just trying to be at the same place, and so
4  we were able to -- she had a position at the
5  University of Toronto, and so they were able to
6  make a position for me, and so I joined last
7  year.
8      Q.   Okay.  I believe you mentioned in
9  your report on paragraph 2 that when you were at
10  Yale, you were tenure-track faculty.  Is that
11  correct?
12      A.   That's correct, yes.
13      Q.   You did not make tenure while you
14  were at Yale?
15      A.   No, no.
16      Q.   Correct?
17      A.   Correct, that's right.
18      Q.   In your CV, you have a change in
19  title in 2016 from Associate Professor of
20  Management at Yale School of Management to
21  Associate Professor of Management and Marketing,
22  right?
23      A.   Correct.  Yes, that's right.
24      Q.   What was that change about?
25      A.   So there's a promotion, so that

Page 37

1  would be the next step and then maybe just
2  trying to anticipate your -- a question.  So
3  tenure is at the full level at Yale, so I was
4  not -- you know, was not full professor at Yale,
5  but was associate then came to Rotman.
6      Q.   Are you currently teaching
7  classes?
8      A.   I am.
9      Q.   In Toronto?
10      A.   Yes.  Not currently, but, yes.
11      Q.   I always forget when the school
12  year ends.
13      But for the last semester, for
14  example, what classes did you teach?
15      A.   I taught the Intro to
16  Organizational Behaviour course.
17      Q.   And if you had to give me a brief
18  overview of what that class is about, what would
19  you say?
20      A.   Largely, it's the study of people
21  working together in groups and teams and
22  organizations.  And so it's a broad overview of
23  the psychology and sociology in trying to
24  understand those dynamics.
25      Q.   Since you've been at Toronto,

Page 38

1  have you taught any other classes?
2      A.  Not at Toronto, no.
3      Q.  What are the types of classes
4  that you taught while you were at Yale?
5      A.  I taught consumer behaviour.  And
6  then I also taught a class that was very similar
7  to Intro to Organizational Behaviour there, it
8  was called "The Employee," but essentially, the
9  same kind of class.
10     Q.  Consumer behaviour, what sorts of
11 topics did you cover?
12     A.  So consumer behaviour is,
13 basically, the psychological and strategy issues
14 around marketing, but, you know, taught from the
15 perspective or from the vantage of the consumer,
16 so trying to understand the nature of consumer
17 perceptions and how that intersects with a
18 company's marketing strategy.
19     Q.  Typically, how do you understand
20 the nature of consumer perceptions?
21     A.  You'll have to be a little bit
22 more specific.
23     Q.  Well, what are -- in your class,
24 what do you teach the students about how are
25 some different ways to understand the nature of

Page 39

1  consumer protections -- oh, perceptions, sorry.
2      A.  Sure.  Well, I mean, you know,
3  one, you know, we would, kind of, talk about it
4  in terms of important psychological principles.
5  But, you know, one, you know, big topic is the
6  role of expectation of people's prior
7  expectations and beliefs, and how that changes
8  things.  And so, you know, people might express
9  a strong preference for Coke over Pepsi, but in
10 a blind taste test, they can't distinguish them
11 apart.  So trying to understand how things like
12 brand or brand awareness change consumer
13 psychology, change purchase habits.
14     Q.  And so if you're trying to
15 understand the consumers' prior expectations and
16 beliefs, for example, in your Coke example, how
17 would you go about determining those consumer
18 perceptions?
19     A.  So I'm an experimental
20 psychologist, so the work that I'm talking about
21 in my classes and the work that I'm doing as
22 part of my day-to-day are all psychology
23 experiments, essentially.
24     Q.  And as an experimental
25 psychologist, are there established buckets, for

Page 40

1  lack of a better term, of different types of
2  experimental work?
3      A.  Yeah, sure.  So, typically, you
4  would divide up a psychology department into
5  cognitive psychology, which is what my training
6  is in, it's basically the study of thinking;
7  social psychology, which is all about
8  interpersonal and group relationships.  A lot of
9  my work also dovetails with social psychology;
10 then, you know, you might have personality
11 psychology, you might have clinical psychology
12 as part of that track.  You might have
13 neuroscience or behavioural neuroscience that
14 would be part of a psychology department.  But
15 those are all, would be, you know, experimental
16 fields within psychology.
17     Q.  And, so, within specifically, you
18 talked about cognitive psychology and social
19 psychology, are they different types of accepted
20 empirical methods that psychologist use to find
21 out about consumer perceptions?
22     A.  Absolutely, yes.
23     Q.  And what are those?
24     A.  There's a variety of methods.  I
25 would say some of the most common ones would be

Page 41

1  an experiment, or maybe you are familiar with
2  A/B testing, I think is the way that idea has
3  spilled over into the broader public.  But you
4  would expose two different randomly assigned
5  groups to similar information that differs in
6  one important way, and then look at some outcome
7  measure to see how that variables then affected
8  whatever dependent measure you were interested
9  in.
10     Another method would be looking at
11 kind of regression, using regression analyses to
12 understand larger patterns of behaviour.  So you
13 might get data from SKUs in a store, or you
14 might be taking some other kind of behavioural
15 measure; how often people donate to this
16 particular cause, and you'd say, Well, I've got
17 a hypothesis about some of the predicting
18 factors.
19     Another method would be a field
20 experiment where you're making some kind of
21 random assignment in the field.  You know, and
22 then a lot of the other methodologies are
23 directly overlapping with -- all of the
24 methodologies, to be clear, that I talked about,
25 are directly overlapping with psychology; those

11 (Pages 38 - 41)

Page 42

1  are psychological methods. And then there might
2  be, kind of, more nuanced methods, like using
3  eye-tracking software or using -- you know,
4  doing fMRI work, or something like that that
5  would all be part of, you know, research in
6  marketing or research in consumer behaviour but
7  using psychology.
8       Q.  Thank you. Very helpful.
9       A.  Sure.
10      Q.  Didn't even have to take the
11  class.
12      Have you ever published on how
13  companies communicate with consumers with
14  respect to health risks of their products?
15      A.  I apologize for pausing for a
16  second. I'm just trying to think. Not -- not
17  directly on -- not directly on health risks.
18      Q.  Anything indirectly on health
19  risks?
20      A.  Sure, I mean, I've published a
21  lot on what companies communicate about
22  production methods, about things like
23  sustainability, various kinds of environmental
24  methods, things like manufacturing location. So
25  these additional features about a product, and,

Page 43

1  you know, I have collected data and been
2  involved in collaborations where we have looked
3  at the communication regarding corporate crises
4  and health risks specifically. I was just
5  pausing because I don't think we published those
6  studies. But a lot of studies that are very
7  related to that idea.
8       Q.  The corporate crisis health risk
9  data that you collected but was not published,
10  what did that relate to?
11      A.  That was different responses to a
12  corporate crisis. So does a company respond in
13  an engaged manner, in a defensive manner, or
14  with no comment? So we were looking at those
15  different strategies. These are all for
16  hypothetical companies, so we're stripping
17  information about the company away, and just
18  using, kind of, the bare facts of what happened
19  and then we are tweaking the company response
20  and looking to how that influences consumer
21  perceptions.
22      Q.  And so when you say "hypothetical
23  company", am I understanding you correctly that
24  it is based on actual companies and what
25  occurred, but you were not attributing that data

Page 44

1  to any particular company. Is that fair?
2       A.  That's right, yeah. And it's a
3  very common method in these studies is that you
4  would, kind of, blind the company so you're not
5  drawing on people's pre-existing beliefs about a
6  particular organization.
7       Q.  You said that that work has not
8  been published.
9       Was it submitted for publication?
10      A.  No. It wasn't. It was --
11  sometimes you have it that graduate students
12  will often be the lead on a project, and then
13  sometimes graduate students go elsewhere and,
14  kind of, disappear, and with that goes the
15  project. And so, it's one of those kind of
16  languishing things but, yeah.
17      Q.  So, approximately, what time did
18  you work on this project with the graduate
19  students?
20      A.  I would say that was probably six
21  years ago or so.
22      Q.  Have you ever -- apart from your
23  work since 2021 with Ms. Parfitt, have you done
24  any work related to Johnson & Johnson?
25      A.  No.

Page 45

1       Q.  Before being retained in 2021,
2  what, if anything, did you know about talc?
3       A.  Virtually nothing. I just knew
4  that it was a product.
5       Q.  Did you know at the time in 2021
6  of any alleged health risks with the use of
7  talc?
8       A.  Not really, no.
9       Q.  Before being retained in 2021,
10  what, if anything, did you know about asbestos?
11      A.  Very little.
12      Q.  And though it's hard to cast your
13  mind back, but if you had to say what you knew
14  in 2021 what very little was, what did you know
15  about asbestos?
16      MS. PARFITT:  Objection, form.
17      THE WITNESS:  That it was harmful.
18      BY MR. EWALD:
19      Q.  Anything else?
20      A.  You know that it used to -- was
21  used in some manufacturing, and so that you
22  could get asbestos in an old building, and that
23  kind of thing.
24      Q.  When you got retained in 2021
25  before today, did you do any background research

12 (Pages 42 - 45)

Page 46

1  for yourself relating to asbestos specifically?
2      A.  I did a little bit of reading,
3  yeah.
4      Q.  And what do you recall looking
5  at?
6      A.  Well, and I don't remember, you
7  know, I'm looking at a variety of sources online
8  and trying to just educate myself.  But
9  learning, for instance, about the co-occurrence
10  of asbestos in natural formations, understanding
11  that or what I believe to understand that
12  asbestos refers to a certain shape of a
13  particle, that's kind of like needle-like fibre.
14  I wasn't really aware of that with that kind of
15  specificity before.
16      Q.  When you say that, to your
17  understanding, that asbestos refers to shape and
18  needle-like fibre, where did you get that
19  understanding?
20      A.  Again, I don't know.  I
21  couldn't -- I couldn't say.  I mean, at some
22  point in doing research and just trying to read
23  about what asbestos is online, you know, my
24  go-to usually is Google Scholar, that's where I
25  try to get a lot of my information, and so it

Page 47

1  was consulting materials there, but I don't
2  remember exactly which ones.
3      Q.  And that's fair.  But as you sit
4  here today, can you point me to any particular
5  source that you were using your definition of
6  asbestos?
7      A.  You know, and, I wouldn't -- I
8  wouldn't even say that I have a definition of
9  asbestos, at all.  I interpreted your question
10  as, you know, what did you know before and what
11  do you know now?  I would describe my knowledge
12  now as very, very limited, and would just
13  describe it as an understanding of something
14  that changed prior; I just didn't know what
15  asbestos was at all and think that I have at
16  least some slight idea of what it might be now.
17      Q.  Do you have an understanding as
18  to whether or not there is a debate among
19  scientists as to the definition of asbestos?
20      A.  No.  I'm not aware of that.
21      Q.  Are you offering any opinions
22  about whether or not Johnson & Johnson talc
23  products has ever contained asbestos?
24      A.  No, I am not.
25      Q.  Are you making any assumptions in

Page 48

1  issuing your opinions in this case about whether
2  or not Johnson & Johnson talc has ever been
3  contaminated with asbestos?
4      A.  No, I am not.
5      Q.  Has counsel asked you to make any
6  assumptions in connection with the opinions that
7  you're offering in this matter?
8      MS. PARFITT:  Objection, form.
9      BY MR. EWALD:
10      Q.  I saw in your materials reviewed
11  references to certain plaintiff expert reports
12  including Dr. William Longo.  Do you know who
13  that is?
14      A.  Only that he is another expert
15  witness in this litigation.
16      Q.  Have you reviewed any of his
17  reports?
18      A.  Not closely at all, no.
19      Q.  Are you relying, in any way, on
20  the opinions that Dr. Longo is offering in his
21  reports?
22      A.  No, I am not.
23      Q.  Do you recall reviewing expert
24  reports of Dr. Plunkett and Dr. McTiernan?
25      A.  I recall the name Plunkett,

Page 49

1  Dr. Plunkett.  And, again, that might be one of
2  those reports that I glanced at, but I did not
3  review carefully.
4      Q.  Are there any expert reports that
5  you reviewed, as you say, carefully or more
6  detail apart from Dr. Kessler's?
7      A.  Sage.
8      Q.  And do you rely on the opinions
9  in Dr. Sage's reports for your opinions here?
10      A.  No.
11      Q.  Did anything that you reviewed in
12  Dr. Sage's report or deposition modify the
13  opinions that are articulated in your November
14  2023 report?
15      A.  No, not that I can recall.
16      Q.  Are you going to be offering any
17  opinions as to whether or not Johnson & Johnson
18  complied with its regulatory obligations over
19  the years as it relates to talc?
20      A.  No.
21      Q.  Are you going to be offering any
22  opinions about what, if any, changes should have
23  been made to the product warning label?
24      A.  No.
25      Q.  Are you going to be offering any

13 (Pages 46 - 49)

Page 50

1  opinions as to what specific language should
2  have been included in advertisements to warn of
3  potential health risks?
4      A.  No.  Not specific language.
5      Q.  Do you have any expertise in
6  assessing the benefits and health risks of a
7  product in determining whether or not it should
8  be marketed?
9      A.  No, not -- as I understand your
10  question, you know, in the way that, like, a
11  regulatory body would make that judgment, no, I
12  don't have any experience to that effect.
13      MR. EWALD:  So, we have been going for
14  about an hour.  I'm about to change topics.  I
15  am happy to keep going.  But I'm also happy to
16  take a break if folks want to take a break.
17      MS. PARFITT:  Doctor, it's up to you.
18  If you're good --
19      THE WITNESS:  Will the next road stop
20  be another hour from now?
21      MR. EWALD:  No.  I mean, that's
22  completely up to you and the court reporter.  If
23  anyone needs the restroom or anything like that,
24  let me know.
25      THE WITNESS:  I'm good to keep going

Page 51

1  right now.  I just didn't want to -- you know,
2  not driving through Kansas or something.
3      BY MR. EWALD:
4      Q.  Let's keep going then.  I will
5  mark as Exhibit 4 your November 2023 report.
6  And, Doctor, if you flip near the end to Exhibit
7  B, there's a references list.
8      EXHIBIT NO. 4:  Dr. Newman's
9      November 2023 report.
10      THE WITNESS:  Yeah, okay.
11      BY MR. EWALD:
12      Q.  And I'm also going to mark as
13  Exhibit 5 what we received called "Table of
14  Contents.  George Newman - Expert Report."  I'll
15  put this up on the screen.  This is Exhibit 5.
16  Our Exhibit B to your November 2023 report, is
17  that the same as this table of contents?
18      EXHIBIT NO. 5:  "Table of Contents
19      George Newman - Expert Report."
20      THE WITNESS:  My understanding is that
21  those should be very, very similar, and the --
22  if there are any additional documents, they
23  would be in that "Table of Contents" document,
24  which would reflect things that I have reviewed
25  since I submitted my report.

Page 52

1      BY MR. EWALD:
2      Q.  Got it.  Makes sense.  Let's talk
3  about your report, and if you have it in front
4  of you -- I can also put it up on the screen if
5  you need any help in pointing to the right
6  direction.  I want to start at paragraph 9.  Let
7  me know when you're there.
8      A.  Yep, I'm here.
9      Q.  So in paragraph 9, first sentence
10  states:
11          "I was asked to review Johnson &
12      Johnson's practices regarding the
13      promotion and sale (i.e., marketing)
14      of Johnson's talcum powder products,
15      and to assess whether the company
16      engaged in misleading and deceptive
17      conduct that created confusion and
18      misunderstanding among consumers by
19      failing to communicate and
20      appropriately inform consumers of
21      health risks associated with Johnson's
22      talcum powder products."
23      First question, did I read that,
24  correctly?
25      A.  Yes.

Page 53

1      Q.  And then you go on to say in
2  paragraph 9 and:
3          "I was not asked to give an
4      opinion as to whether talcum powder
5      products cause cancer."
6      Is that correct?
7      A.  That's correct, yes.
8      Q.  And when you're talking about in
9  that first sentence of paragraph 9, "health
10  risks associated with Johnson's talcum powder
11  products," is that, in your review, limited to
12  ovarian cancer health risk or is it broader?
13      A.  You know, I -- it is -- no, it's
14  not limited to ovarian cancer.  So I would say
15  that it's broader than ovarian cancer, yeah.
16      Q.  And does it encompass any
17  possible health risk, as you understand it,
18  associated with the talc?
19      A.  Well, the -- no, the other cancer
20  risk associated with talc, although, you know, I
21  would say the same -- the same behaviours also
22  apply in the inhalation concerns, as well.
23      Q.  So when you say "behaviours,"
24  you're talking about behaviours of Johnson &
25  Johnson or behaviours of consumers?

14 (Pages 50 - 53)

Page 54

1    A.  Sorry.  Behaviours of Johnson &
2 Johnson.  Yeah, the actions.
3    Q.  And when you're talking about
4 inhalation -- that applies to the inhalation
5 concern, what is your understanding of that
6 inhalation concern?
7    A.  My understanding is that there
8 was a concern raised about the inhalation risk
9 in a few different medical journals, The Journal
10 of Pediatrics is one that I recall.  And then --
11 and then from what the -- the documents that I
12 reviewed, you know, those risks were not
13 communicated and those concerns were not
14 communicated directly to consumers.
15    Q.  And when you're talking about
16 risk, you understand that the inhalation risk
17 was specific to infants?
18    A.  I do understand that, yes.
19    Q.  When you say that that concern
20 was not communicated to consumers, is that your
21 understanding as to the present day?
22    A.  I'm sorry.  I'm getting tripped
23 up.  What do you mean by --
24    Q.  Yeah, that was a little vague,
25 and unintentionally.  So, do you have an

Page 55

1 understanding as to whether or not there is --
2 well, let me withdraw the question again.
3    You've indicated, I believe, that
4 risks about inhalation with infants had not been
5 communicated.  Is that you're understanding?
6    A.  That's my understanding, yes.
7    Q.  And is that you're understanding
8 that as of today, J&J still has not communicated
9 any risk associated with inhalation of its
10 product by infants?
11    A.  Again, that is my understanding.
12 In terms of the risks that I'm focusing on in my
13 report and the bulk of my report, really are the
14 cancer issue, ovarian cancer, mesothelioma.
15    Q.  So we have, you reported health
16 risks associated with talcum powder products in
17 paragraph 9, and when you were asked to review,
18 am I understanding you correctly that when
19 you're talking about health risks there, you're
20 talking about cancer inhalation?
21    A.  I think it's most accurate just
22 to say cancer, cancer, yeah.
23    Q.  Now, in assessing whether Johnson
24 & Johnson engaged in misleading and deceptive
25 conduct, did you reach a conclusion in this case

Page 56

1 that, indeed, Johnson & Johnson engaged in
2 misleading and deceptive conduct?
3    A.  Yes, that's my opinion.
4    Q.  And so is it your opinion that
5 Johnson & Johnson knew that there were health
6 risks associated with a talc product and
7 intentionally did not disclose those?
8    A.  It's my opinion that there were
9 risks in the general public.  Let me correct
10 that.  That there was -- you know, there was
11 peer-reviewed science from various credible
12 sources; there were risks raised about Johnson's
13 Baby Powder and Johnson's Baby Powder products,
14 and that, you know, internally, there are a lot
15 of documents which show that the company was
16 aware of those concerns, and then none of those
17 concerns were disclosed to the public, and, in
18 effect, a very different kind of message was
19 given to the public, which was, you know, the
20 product is completely safe, there's no problem,
21 you know, scientifically proven that it's safe.
22 And so that's the disconnect that I'm referring
23 to in terms of the statements being misleading.
24    Q.  I want you to assume for purposes
25 of my question that talc -- that Johnson &

Page 57

1 Johnson talc does not cause ovarian cancer,
2 okay?  That's just an assumption I'm asking you
3 to make.  Fair?
4    A.  Okay, sure.
5    Q.  If that assumption is correct
6 that J&J talc does not cause ovarian cancer,
7 what is left of the opinions that you are
8 offering in this case?
9    MS. PARFITT:  Objection, form.
10    You may answer.
11    THE WITNESS:  I still believe that
12 they did something wrong, that, you know, you
13 have a long history of internal documents
14 talking about these health risks.  You know,
15 there's language in those documents like, in --
16 you know, in the inevitability that talc
17 products are banned, you know, there were --
18 there was a very specific effort to develop an
19 alternative product, the cornstarch product,
20 over many years, which they product-tested and
21 there's a lot of internal documents that show
22 that the purpose of that cornstarch product was
23 to address the health risks associated with
24 talcum powder, and replace talcum powder.  That
25 never happened.

15 (Pages 54 - 57)

Page 58

1    And so there are a lot of actions on
2 behalf of the company which I -- that, you know,
3 I think, lend credence to the idea that they
4 were treating these as serious and credible
5 risks internally and having lots of discussions
6 about them, and, yet, a very different story was
7 told to the public through advertising.
8    BY MR. EWALD:
9    Q.   And you were talking about
10 potential banning of talc product, there can be
11 a government ban of a product but it doesn't
12 establish that the project is dangerous,
13 correct?
14    MS. PARFITT:  Objection, form.
15    THE WITNESS:  I mean, I think anything
16 is possible.  You know, in -- in my review, you
17 know, it's not just a consideration of some bad
18 things might happen because people are saying
19 bad things.  There are very deliberate actions
20 to try to find an alternate source of revenue.
21 And, you know, I think there is a larger story
22 here that, you know, I'm trying to communicate
23 with my report about the importance of talcum
24 powder products to the brand strategy, not just
25 for Johnson's Baby but for Johnson & Johnson

Page 59

1 overall, you know, this concept of a golden egg
2 that comes up in a lot of different materials.
3    And so what I read is a lot of
4 internal discussion about concerns of
5 potentially replacing or acknowledging a problem
6 with Johnson's Baby Powder, and none of those
7 concerns, none of those potential risks are
8 communicated.
9    BY MR. EWALD:
10    Q.   And we talked about, you're not
11 in a position to assess whether or not there are
12 any, in fact, potential health risks associated
13 with talc products, correct?
14    MS. PARFITT:  Objection, misstates his
15 testimony.
16    THE WITNESS:  You know, I can review
17 their internal documents which talk about the
18 risks that are -- that have been raised about
19 the product, some of the documents which point
20 to, you know, the possibility of asbestos, and
21 the failure of the quoted-quote "clean mine"
22 approach.  I'm drawing on Johnson & Johnson's
23 own words, but I think I can interpret those
24 words to say that they understood that there was
25 some kind of problem or at least some kind of

Page 60

1 risk or concern associated with the product.
2    BY MR. EWALD:
3    Q.   You said a couple of different
4 things there, "problem, concern, risk."
5    My initial question is:  Am I correct
6 that you are not in a position to assess whether
7 or not there are any potential health risks
8 associated with the use of the talc?
9    MS. PARFITT:  Objection.  Misstates
10 his testimony.  Asked and answered.
11    THE WITNESS:  I think, I mean, I
12 just -- you know, what I just said in reviewing
13 those documents, I do believe I'm able to reach
14 a conclusion about what I would call a credible
15 risk or, you know, was the company treating this
16 as a credible risk?  Were they taking actions
17 that suggested that they thought there was some
18 kind of potential problem or risk associated
19 with the product?
20    BY MR. EWALD:
21    Q.   And when you say "credible risk,"
22 are you saying that -- well, what do you mean by
23 "credible risk"?
24    A.   Something that had enough
25 substance to spur actions and internal memos and

Page 61

1 discussions and meetings about it.
2    Q.   If there is a risk associated --
3 if there's a concern that is raised about the
4 safety of a product, would you expect that a
5 good company would investigate whether or not
6 that risk has any credibility?
7    A.   Sure.
8    Q.   And the fact that they went
9 through that investigation to determine whether
10 or not the concern raised was credible, does
11 that have bearing, in your mind, as to whether
12 or not it's a scientifically viable risk?
13    A.   But that's not what they told
14 consumers.  They didn't tell consumers, Hey, we
15 looked at some evidence and then we looked at
16 other evidence, and we did our testing and
17 here's what we found.  They just said, It's 100
18 percent safe, there's no problem whatsoever, you
19 can trust us.  And there's 100 years of
20 advertising that literally are built around the
21 concept of trust, that, this is our trust mark,
22 this is why you should purchase our product
23 because you can trust us more than our
24 competitors.
25    So that statement carried with it

16 (Pages 58 - 61)

Page 62

1  enormous gravity for consumers and, frankly,
2  then consumers weren't, I think, given the fair
3  opportunity to really make up their own mind
4  about the potential risks.
5       Q.  So you say that it carried
6  enormous gravity for consumers and consumers
7  weren't able to make up their own mind about the
8  risk.  What do you rely on for that conclusion?
9       A.  Johnson & Johnson's own market
10  research.
11       Q.  Point me to market research of
12  Johnson & Johnson that concludes that consumers
13  were not able to make up their own mind about
14  the product risk because of the trust they had
15  in Johnson & Johnson.
16       A.  You know, if -- that's verbatim
17  what I said that it misstates my point, that the
18  consumer research from Johnson & Johnson shows
19  that trust in the company is the primary
20  attribute that is leading consumers to purchase
21  Johnson & Johnson products over the competitors.
22  So if you give me a minute, I can find the exact
23  reference.  But, for instance, there's a study
24  that they conducted which said, Would you
25  purchase Walmart brand talcum powder versus

Page 63

1  Johnson & Johnson talcum powder.  So consumers
2  were twice as likely to purchase Johnson &
3  Johnson talcum powder, and the number one reason
4  they cited is because it's a trustworthy brand
5  because they have trust in the company.
6       And then there's a lot of market
7  research in that same slide deck talking about
8  what does trust mean?  Well, trust isn't the
9  product attributes, it's the emotional weight,
10  it's the emotional association, it's the 100
11  years of advertising that we have about the
12  product.
13       Q.  Would you agree with that me that
14  any company in the marketing context would love
15  to have the trust of its consumers?
16       MS. PARFITT:  Objection, form.
17       THE WITNESS:  I would agree that it
18  was a very specific strategy that was incredibly
19  successful for Johnson & Johnson.  I mean, they
20  talk explicitly of this is what built a global
21  brand, is this association, the mother-infant
22  bond, the golden egg.  This is what built
23  Johnson's Baby, this is what built Johnson &
24  Johnson, this is what allowed us to expand
25  globally.  So, that's their own analysis of the

Page 64

1  work that is doing for them, so in that case, it
2  was central to their marketing strategy.
3       BY MR. EWALD:
4       Q.  So, I understand your point about
5  the trust aspect in J&J's research.  But then,
6  as I understand it, what you just said and what
7  you say in the report, you go a step further and
8  say that the nature of that trust relationship
9  prevented consumers from making up their own
10  mind about the risks associated with the
11  product.  Is that your testimony?
12       A.  No.  I --
13       MS. PARFITT:  Objection.  Misstates
14  his testimony.
15       Please, Doctor, you may answer.
16       THE WITNESS:  I would --
17       MR. EWALD:  I'm sorry.  Michelle, what
18  did you say?
19       MS. PARFITT:  I said it misstates his
20  testimony, John.
21       You may answer.
22       BY MR. EWALD:
23       Q.  Right.  Go ahead.
24       A.  Okay.  I believe that misstates
25  my testimony, so I don't -- I don't think it's

Page 65

1  the trust that was misleading.  I think saying,
2  "Our product is safe, it's 100 percent safe, we
3  know it with certainty," and using language like
4  "it's scientifically proven that it's safe," and
5  so there's no mention of competing risks --
6  competing evidence, and the point about the
7  trust and the advertising is that statement
8  isn't inert, it's not like the consumers are
9  considering it in some vacuum, they are actually
10  considering it with this legacy that goes back
11  100 years of what they believe to be true about
12  the brand, that this is a very trustworthy
13  brand.  And, hey, if they're telling us that
14  it's safe and they've never detected any kind of
15  problem whatsoever, then it must be.  And I
16  think there's a direct conflict between that
17  message and what consumers concluded from that
18  message and then what the internal documents
19  show about the nature of the conversation they
20  were really having.
21       Q.  Well, when you talk about what
22  consumers concluded from that message, what, if
23  any, data do you rely on for that opinion?
24       A.  Again, I would cite Johnson &
25  Johnson's own market research about why

17 (Pages 62 - 65)

Page 66

1 consumers are preferring Johnson & Johnson. The
2 reason why they're going to Johnson & Johnson is
3 because of this trust factor.
4       Q.   I understand the trust factor,
5 but there's that other piece of -- you are
6 making opinions about what Johnson & Johnson was
7 or was not saying about potential health risk
8 associated with talc and the impact that it has
9 on consumers. Correct?
10      A.   Correct. Yeah, yeah, that's
11 right.
12      Q.   And so what, if any, data do you
13 rely on for what Johnson & Johnson's conduct and
14 statements relating to potential health risk of
15 talc had on consumer choice?
16      A.   Again, I mean, maybe I'm just not
17 fully understanding the question, and I
18 apologize, but I would come back to Johnson &
19 Johnson's own market research data. The data
20 are telling you that, Oh, look, the reason why
21 people are going to us is because of this trust,
22 because we have -- and there's language in there
23 that this is our most precious asset. Not
24 Johnson's Baby Powder, the trust itself. The
25 trust is the most precious asset. This is kind

Page 67

1 of what's making the whole marketing or
2 advertising machine go.
3       And so, I mean, and then that is my
4 expertise as somebody who is a psychologist and
5 somebody who has expertise in market research,
6 is that the effect of that kind of messaging
7 over a very long time changes the nature of
8 people's perceptions. Just like we talked about
9 before with the Coke versus Pepsi example,
10 right? That brand and that messaging starts to
11 mean something. And even though the soda
12 doesn't taste any different, people think
13 there's a difference. And I think that's also
14 true, a similar kind of idea is very much true
15 in this case.
16      Q.   Now, you said before you're an
17 experimental psychologist, right?
18      A.   Correct, yes.
19      Q.   But you've not conducted any kind
20 of empirical tests to support your opinions in
21 this case, correct?
22      A.   Actually, I wouldn't say that
23 that's correct. Nothing that I included in my
24 report, but I have, yeah.
25      Q.   Okay. What empirical tests did

Page 68

1 you conduct that you didn't include your report?
2       A.   Well, I became specifically
3 interested in, actually, the current
4 communication around talc products and the
5 health risks. And, you know, were those -- even
6 today, is that potentially misleading consumers?
7 And so I conducted at least a pilot study just
8 to inform myself about whether there was the
9 potential for that relationship to exist.
10      Q.   What was the nature of this pilot
11 study?
12      A.   Sure. I took just language from
13 the facts about talc website. And there's one
14 paragraph in particular which talks about, if
15 you don't mind, I could just read --
16      Q.   Yeah.
17      A.   -- the paragraph that I focused
18 on. Okay, so the paragraph was the most recent
19 cohort study published --
20      Q.   I'm sorry. Sorry to interrupt
21 you. But, just, it's important for the record,
22 that's clear where you're reading from. So can
23 you tell me where you're reading from?
24      A.   Oh, these -- yeah, of course.
25 These are the notes that I brought with me.

Page 69

1       Q.   Okay.
2       A.   Okay. Yeah.
3       Q.   And does it say, like, what page
4 or paragraph they're taken from?
5       A.   This is just taken from --
6 directly from the website on the Facts About
7 Talc. If you like, I can make a note and I know
8 about where it's located.
9       Q.   No, that's fine. I think
10 Michelle's gonna give me a copy of that three
11 pager during, maybe, the next break, so that's
12 fine. Go ahead.
13      A.   Okay, so there's a paragraph that
14 reads:
15          "The most recent cohort study
16          published in JAMA...
17      And I'm just using the abbreviation:
18          "...pulled a high number of high
19          level epidemiological studies and
20          found no statistically significant
21          increased risk of ovarian cancer with
22          talc use. The study reconfirms that a
23          statistical association between
24          ovarian cancer and powder users --
25      MS. PARFITT: Dr. Newman, she has to

18 (Pages 66 - 69)

Page 70

1  take down what you're saying.  If you can slow
2  it just a little bit.  Okay.
3          THE WITNESS:  Sorry, yes.
4          MS. PARFITT:  Thank you.
5          THE WITNESS:  I'll just pick up "The
6  study reconfirms," okay, my apologies:
7              "The study reconfirms that a
8          statistical association between
9          ovarian cancer and powder users is not
10         found in large prospective cohort
11         studies, although some, but not all
12         case controlled studies do indicate a
13         slight statistical association."
14         And my opinion in reading that was the
15 way in which that, essentially, that there is a
16 statistical association, there is evidence of a
17 statistical association is buried at the end of
18 a paragraph, in a sense, that's difficult, I
19 think, for the average person to actually parse
20 and make sense of.  You have to jump back a
21 couple of sentences to know exactly what that's
22 referring to.
23         So in the pilot study that I ran, just
24 trying to inform my own perceptions, I randomly
25 assigned one group of people to read exactly the

Page 71

1  information as it appears verbatim on the
2  website, and a different group of people read
3  the same information, except for I changed the
4  phrase "studies do not indicate a slight
5  statistical association" to "studies do not
6  indicate a slight statistical association
7  between talcum use and ovarian cancer."
8          And in this study, like we talked
9  about before, I did not mention Johnson &
10 Johnson at all.  I used a hypothetical company
11 name, and then I asked, how much do you trust
12 this company on a Likert scale?  And found that
13 even disambiguating that sentence very slightly
14 reduced how much people said they trusted the
15 company.  Which suggested to me, again, it's not
16 conclusive.  But you're asking, well, did you
17 test any of your ideas about this?  It suggested
18 to me that even to this day, burying that kind
19 of information, burying the lead, so to speak,
20 is distorting things for consumers and making it
21 more difficult for them to understand the
22 totality of what's out there.
23         BY MR. EWALD:
24         Q.  So are you relying on your pilot
25 study for your opinions in this case?

Page 72

1          A.  No, I'm not.
2          Q.  Okay.  And when you say that the
3  change version reduced -- sorry.  What was the
4  change version reduced the number of people that
5  trusted the company?
6          A.  Or how much they reported
7  trusting the company on a one to five Likert
8  scale, yeah.
9          Q.  And what was the difference
10 between the two groups?
11         A.  I don't recall exactly the
12 magnitude of -- I mean, it was below a .05 p
13 threshold, but I don't remember the effect size
14 exactly or anything like that.  And again, I
15 base my opinions just on my expertise in doing
16 this for a very long time and understanding how
17 consumers respond to information.  But with
18 respect to this specific issue, I was just
19 curious, does that check out even in this very
20 kind of nuanced example?
21         Q.  Okay.  When you go on in
22 paragraph 10 of your report to say that:
23             "The methodology I employ, the
24         purposes of this report use the same
25         objectivity and systematic analysis I

Page 73

1          apply in my professional academic
2          career."
3          Isn't it true that in your
4  professional academic career, when you publish
5  articles that are posing hypothetical, you are
6  then backing your conclusion up with
7  experimental analysis?
8          MS. PARFITT:  Objection, form.
9          THE WITNESS:  There might be a
10 terminology issue here, so maybe we could -- you
11 could say a little bit more about -- I'm not
12 getting the distinction between hypothetical and
13 experimental.
14         BY MR. EWALD:
15         Q.  Well, when you are offering a
16 conclusion in the scientific literature --
17         A.  Yes.
18         Q.  You've published a number of
19 articles, correct?
20         A.  Yes, yeah.
21         Q.  And when you're offering a
22 conclusion in the published literature, you
23 support that conclusion with experimental data,
24 correct?
25         A.  Correct, yes.

19 (Pages 70 - 73)

Page 74

1    Q.  And you are not doing that here,
2    correct?
3        A.  Yeah.  But what I mean by
4    applying the same systematic analysis is I think
5    that the bedrock of what I'm doing
6    experimentally is starting from a null
7    hypothesis, which is exactly what I did here.
8    And I started with a null hypothesis that there
9    wasn't anything misleading about the marketing
10   communications, that there wasn't any kind of
11   disconnect between what the company was
12   discussing internally and what they were telling
13   consumers.  And so just in the same way that I
14   would look for experimental evidence that would
15   lead me to reject that null hypothesis, you
16   know, I was looking:  Well, is there evidence in
17   this case that leads me to reject the null
18   hypothesis that there wasn't kind of any
19   disconnect there, any kind of misleading
20   statements.
21       Q.  Now, in that same paragraph 10,
22   you talk about documents that you requested of
23   counsel relevant to the promotion and sale of
24   Johnson's Baby Powder, and Shower to Shower,
25   right?

Page 75

1        A.  That's right, yeah.
2        Q.  You talk about marketing
3    materials and communications directed to
4    consumers, corporate documents discussing these
5    products, testimony from former employees of
6    Johnson & Johnson, publicly available
7    information, and the peer-reviewed scientific
8    literature relevant to talking about our use,
9    right?
10       A.  Correct, yes.
11       Q.  What about documents related to
12   potential health risk associated with talc?  How
13   did you get your hand on those?
14       A.  I searched Google Scholar.
15       Q.  Okay.  But when we're talking
16   about -- what about -- that's a fair question.
17   And on that one, what did you search
18   Google Scholar for?
19       A.  I don't remember the exact search
20   terms, but talcum powder, cancer, ovarian
21   cancer.
22       Q.  Or internal Johnson & Johnson
23   documents, though, not something that would be
24   on Google Scholar, correct?
25       A.  Yeah.  Correct, yes.

Page 76

1        Q.  Yeah.  And I understand from
2    paragraph 10 what you asked plaintiff's counsel
3    to give you on the marketing materials and
4    communications.
5        What, if anything, did you ask
6    plaintiff's counsel to give you as it related to
7    internal Johnson & Johnson documents that relate
8    to potential health effects associated with the
9    use of talc?
10       A.  I was -- that wasn't really a
11   focus of my inquiry.  I was looking at marketing
12   communications, which -- I'm sorry, internal
13   documents which discussed marketing issues.
14   Now, a number of the documents that I reviewed
15   did discuss marketing issues in the context of
16   health concerns.  So, for instance, when you
17   know they're talking about developing a
18   cornstarch product, there are documents which
19   talk about developing that cornstarch product
20   specifically to address the health concerns
21   associated with talc.  So that would be an
22   instance in which a document mentioned both
23   things.
24       Q.  Okay.  So if I'm understanding
25   you correctly, to the extent that there are

Page 77

1    documents from Johnson & Johnson that you
2    reviewed in connection with your opinions that
3    relate to potential health risks associated with
4    talc, you had those in your possession because
5    they also relate to marketing issues?
6        A.  Correct, yeah.
7        Q.  So, for example, you made
8    reference earlier to the top asbestos
9    controversies referenced in a document or two
10   that you reviewed.
11       You didn't ask counsel for documents
12   that gave a full picture on how the history of
13   that top asbestos controversy played out?
14       MS. PARFITT:  Objection, form.
15       THE WITNESS:  I wouldn't agree with
16   that.  I mean, again, I was really restricted in
17   looking or -- sorry, I restricted my analysis in
18   looking at marketing issues.  And so if -- it
19   was getting into testing and internal testing
20   and external testing, that was beyond my
21   expertise and beyond what I felt like I was able
22   to properly evaluate.  So I'm evaluating at the
23   level of the word and the internal discussions
24   that Johnson & Johnson is having about these
25   controversies with respect to their products and

20 (Pages 74 - 77)

Page 78

1 various types of strategy decisions that they
2 seem to be making.
3     BY MR. EWALD:
4     Q.  So if we look at 10(e) as an
5 Edward, the:
6       "Product Risks.  Assessing the
7       timing and nature of health concerns
8       regarding talcum powders by consulting
9       publicly available information in
10       scientific literature."
11     Did I read that correctly?
12     A.  Yeah.
13     Q.  And so explain to me what you
14 mean by that in 10(e).
15     A.  Basically, my strategy is what
16 would somebody be able to find out if -- what
17 would they be able to find out about the product
18 and what science is out there?  I mean, I
19 recognize that most consumers do not have the
20 same scientific training that I do, but I'm also
21 not an epidemiologist.  And so if they were to
22 go on to Google Scholar and start reading
23 studies, what kinds of things would they learn?
24 Or if they were to consult other types of
25 information, what would they learn about those

Page 79

1 risks?  So that's the level at which I'm
2 interacting with it.
3     Q.  At 11 you say:
4       "In forming my opinion, I
5       consider the totality of evidence."
6     What do you mean by that?
7     A.  Well, I mean, I tried to take
8 into account everything that, that I was looking
9 at, that I wanted to understand, well, the full
10 scope of the things that I was seeing about
11 Johnson & Johnson, what they were saying, what
12 was being said in the public, what the
13 advertising was saying in trying to understand
14 how those different timelines or those different
15 kind of streams of information related to one
16 another.  So kind of trying to get a more global
17 perspective about what was happening broadly,
18 both within the company and externally, with
19 respect solely to the marketing issues and
20 marketing communication.
21     MS. PARFITT:  John, when you get to a
22 comfortable place, let us know.  We've gone --
23 it's almost 11:30 and beyond, but you let us
24 know when you get to a break.
25     MR. EWALD:  Yeah.  Let's go off the

Page 80

1 record now.
2     MS. PARFITT:  We'll take like five
3 minutes, everyone.  All right?
4     -- RECESS TAKEN AT 11:26 A.M.
5     -- RESUME AT 11:38 A.M.
6     BY MR. EWALD:
7     Q.  Dr. Newman, one other question
8 for now at least on materials that you reviewed,
9 I saw on your updated list some testimony with
10 Dr. Friedenfelds.  Does that sound familiar?
11     A.  Yes, yes.
12     Q.  And why did you review her
13 testimony?
14     A.  I believe -- I became aware that
15 there was somebody testifying too broadly to
16 some of the marketing issues.  And so I was just
17 curious about what they were saying and their
18 testimony.
19     Q.  Are you relying on any of the
20 opinions that you -- from Dr. Friedenfelds, that
21 you reviewed in her testimony for your opinions?
22     A.  No, not at all.
23     Q.  On paragraph 11, carry over from
24 4 to 5, you cite to a Matthew Rabin 1998
25 article.

Page 81

1     A.  Yeah.
2     Q.  Are you, lack of a better phrase,
3 are you relying on Rabin as a general
4 proposition on the approach you're taking here?
5     A.  Yeah, yeah.  That Rabin article
6 is a very famous one, which connects kind of
7 psychological bias to economic principles.  And
8 so it's kind of a landmark paper where he
9 outlines and says, Hey, people aren't so
10 rational when it comes to consumer decision
11 making.  And so here's a bunch of principles
12 from psychology that, as an economist, I think
13 have an important role in the market.
14     Q.  When you were talking - on the
15 next page in paragraph 17 and 18 - about the
16 cornstarch product, what opinion are you
17 offering as to how cornstarch impacted, if at
18 all, the, in your view, misleading, the type of
19 conduct that J&J communicated to consumers?
20     MS. PARFITT:  Objection, form.
21     You may answer.
22     THE WITNESS:  Okay, yeah.  I think it
23 speaks to the strategy of the company.  In the
24 documents that I reference relevant to
25 cornstarch, there are a lot of communications

21 (Pages 78 - 81)

Page 82

1  about why they're developing this cornstarch
2  product.  And in multiple documents, across
3  multiple years, just I'm paraphrasing here, is
4  basically there are concerns about talcum powder
5  and we need a replacement.
6        And then there's a lot of test
7  marketing to make sure that it's going to be an
8  effective replacement.  They go through that,
9  they confirm there's a lot of powder forecasts
10 which predict, hey, in the future, consumers
11 aren't going to be buying talc products because
12 of these health concerns.  Cornstarch is the way
13 of the future.  And then it's informative to my
14 opinions because that decision to replace talc
15 with cornstarch is never made.  The products are
16 just launched side by side and sold
17 concurrently.
18       BY MR. EWALD:
19       Q.  So is it your opinion that even
20 though Johnson & Johnson had an effective
21 replacement in the market for talc powder, that
22 it nevertheless continued to market talc powder
23 knowing that there were risks of cancer
24 associated with its use?
25       A.  I'm taking it as evidence that,

Page 83

1  you know, we talked before about the term
2  credible, that they were taking it seriously,
3  that they were taking a lot of actions at, what
4  I'm presuming, is great expense to develop and
5  test mark a replacement product.  To the extent
6  that they're debating how are we going to
7  replace it?  Can we replace it without consumers
8  knowing the difference, et cetera, et cetera.
9  They even develop advertising that they're going
10 to send to their distributors, which says, hey,
11 this is a change for the better.
12       And so that, to me, communicates that
13 they were taking those health concerns very
14 seriously and taking actions in response to
15 that.
16       Q.  So having reviewed those
17 documents and concluding that Johnson & Johnson
18 was taking the health concerns with the product
19 seriously, what is your opinion on why they
20 continue to market the talc product even though
21 they were supposedly taking the concern
22 seriously?
23       A.  I think that is a big question in
24 this case that there are -- I can cite some
25 documents which I think provide some insight,

Page 84

1  but I should say that is one area where I made
2  numerous requests of documents over a very
3  specific time period.  We're talking about, I
4  believe it's like 1986, where, you know, a
5  company as large as Johnson & Johnson, I imagine
6  that there was some kind of, you know, internal
7  document, internal communication, which said,
8  hey, we're not going with this replacement
9  strategy.  We're just going to sell both
10 products.  I never encountered such document.
11       And so because of that, I never found
12 any kind of explicit justification for why the
13 two products would be sold side by side.  I will
14 say that in some of the powder -- the powder
15 forecasts that they're doing around this time,
16 1985, 1986, there's a lengthy discussion,
17 basically, about the strategy and about
18 competitive advantage.  And the argument,
19 essentially - and we can talk about those
20 specific documents - but essentially, the
21 argument is, look, we -- we own talc.  We own
22 the talc market.  We are the talc product.  But
23 because cornstarch is a consumer product, sorry,
24 I meant a consumable product - I might be
25 getting the exact designation wrong, but we can

Page 85

1  look at it - we have no ownership.  And so
2  basically, it's going to be fair game for all of
3  our competitors.
4        And so this presents a real challenge
5  for us.  And we either have to find out a way to
6  elevate this cornstarch product so that we can
7  do something different with it, or who knows?
8  And so it's my -- that, and then I think,
9  coupled with all the discussions we were having
10 before about this idea of a golden egg and that
11 Johnson's Baby Powder is the first to consumer
12 product, and there's a lot of internal
13 discussion about even, like, these PR documents,
14 anticipating, well, what are consumers going to
15 think if we replace talc with cornstarch?  What
16 are they going to think about us?  And are we
17 admitting that there's a health risk?
18       And so, you know, that, to me, again,
19 signals that those kinds of issues were very top
20 of mind for a company.  And all I can conclude
21 is that ultimately somebody or a group of
22 somebodies with power said, you know what?  The
23 risks don't outweigh the benefits, even though
24 we were planning to replace it.  Let's go ahead,
25 because either we're not going to be able to

Page 86

1  maintain our share of the market or because
2  we're going to be opening up ourselves to these
3  types of criticisms.
4      So again, I can't point to any
5  specific document which shows me that decision
6  making, but then -- that has been a continued
7  source of kind of frustration on my part of not
8  being able to find documents which communicate
9  that change of strategy.
10     Q.  Well, when you have a gap in the
11  historical record such as you have identified,
12  is one possibility that you don't have enough
13  information to offer an opinion to a reasonable
14  degree, professional certainty, correct?
15     MS. PARFITT:  Objection.  Misstates
16  him testimony.
17     THE WITNESS:  No, I wouldn't say that.
18  I mean, what happened is what happened, which is
19  that there are documents which clearly show that
20  they were going with this replacement strategy,
21  and then that replacement strategy never
22  happened.  What I'm not able to find in the
23  record is some communication of that decision.
24  And I just find it, frankly, implausible that a
25  company as large as Johnson & Johnson, with as

Page 87

1  many varied departments, you'd have to send out
2  some kind of communication to say, hey, we're
3  doing something different here.  I never found
4  any of those documents.  It's not -- it doesn't
5  give me question marks about what actually
6  happened.  It just is curious to me that there's
7  not any kind of discussion of that change since
8  a change took place.
9      BY MR. EWALD:
10     Q.  Well, I understand the part about
11  it is a fact that in the eighties, talc was not
12  replaced, but on the market at the same time as
13  cornstarch.  But on the factual question of why
14  that decision was made, I heard you say that
15  basically the only opinion you can really reach
16  is that there was a decision made that the risk
17  didn't outweigh the benefits, right?
18     MS. PARFITT:  Objection.  Misstates
19  his testimony.
20     THE WITNESS:  Yeah.  Again, there are
21  documents which talk about their competitive
22  strategy and what's defensible from a marketing
23  standpoint.  And so I think that that's more
24  than just a hunch or a guess.  It's kind of
25  outlining the logic of the decision.  It's just

Page 88

1  that there's never, I can never find a place in
2  black and white that they say, hey, we were -- I
3  should clarify, there are lots of places that I
4  believe in black and white say our plan is to
5  replace talc with cornstarch leading up to 1986,
6  and then that never happens.
7      And so I never find evidence of the
8  communication which directs the various
9  marketing departments of this change.  You know,
10  for example, there are advertisements which were
11  developed, which never seem to be released,
12  which say, like literally a change for the
13  better, announcing to retailers that this is
14  going to be a better product.  We're changing to
15  a better product.  But those advertisements
16  are -- you know, so they go through all of the
17  work of producing these advertisements but then
18  those advertisements are never distributed and
19  the change never happens.
20     So again, I don't think the facts are
21  in dispute about a replacement strategy and then
22  a different strategy.  Just the thing that is
23  very puzzling to me is how does that happen.
24  Even just from kind of a corporate governance
25  and operations standpoint, how do you direct as

Page 89

1  many people as were needed, that, hey, we're
2  still going to continue to sell talc powder.
3      BY MR. EWALD:
4      Q.  So is it your opinion that
5  Johnson & Johnson decided in the eighties that,
6  Yeah, there might be a risk that selling the
7  talc product can cause cancer, and, yeah, we
8  have an effective replacement, but we're gonna
9  go ahead and market talc still anyway.  Is that
10  your opinion?
11     A.  No, I --
12     MS. PARFITT:  Objection, misstates his
13  opinion.
14     THE WITNESS:  Again, I would disagree
15  with that.  I think what I'm able to conclude,
16  looking at the documents that I reviewed, is
17  that the strategy for why the cornstarch product
18  was being developed was very clear as a
19  replacement.  And then we're able to see after
20  1986 that that replacement doesn't happen.  I
21  don't know -- I don't know what that calculus
22  was.  Again, I've offered some suggestions from
23  documents.  One, there's the idea of what
24  Johnson's Baby Powder means to the brand, and
25  how central it is to the brand.  There are

23 (Pages 86 - 89)

Page 90

1  documents which discuss that.
2      Then there's this idea about
3  competitive strategy, and the fact that they
4  can, quote-unquote, own talc but not own
5  cornstarch. And so that leads me to think that
6  because it's mentioned in those documents that
7  that factored into the decision making, but I
8  don't know beyond that, exactly, how that
9  decision was made.
10     BY MR. EWALD:
11     Q. But you are concluding that
12  Johnson & Johnson, over the years, with its talc
13  marketing, engaged in misleading and deceptive
14  conduct, correct?
15     A. Correct. Correct. And so, for
16  example, I think it is misleading to
17  purposefully develop a replacement product
18  because of health risks, and then never mention
19  any of those health risks to consumers. For --
20     Q. Well --
21     MS. PARFITT: Wait, wait. He's not
22  done, John. I'm sorry.
23     MR. EWALD: I know. I wasn't -- go,
24  let him go.
25     MS. PARFITT: You may complete your

Page 91

1  sentence, Dr. Newman.
2      THE WITNESS: Okay, yeah. So I do
3  think it's misleading to not reflect the
4  decision making to -- to consumers. Especially
5  when you have things like these -- when they're
6  doing studies in New Orleans, and I believe
7  another one was in Indiana, test marketing the
8  feasibility of cornstarch, and you have
9  consumers, even at that point saying, that they
10  would rather purchase a cornstarch product. And
11  so I find that very puzzling.
12     BY MR. EWALD:
13     Q. So, well, you do acknowledge in
14  your report that there was a first phase of the
15  cornstarch product development that was not
16  geared towards it being a replacement, correct?
17     A. That's correct, yes.
18     Q. Okay. And so when you're saying
19  that Johnson & Johnson should have disclosed to
20  consumers that it considered a cornstarch
21  alternative first to be side by side with talc,
22  then to replace it, and ended up going side by
23  side, but should have said that we think there
24  are health concerns.
25     A. I think --

Page 92

1      MS. PARFITT: Objection.
2      You may answer.
3      THE WITNESS: I believe that misstates
4  the facts of what happened. So you have a brief
5  period of time, I believe they called it Formula
6  31, that they say, Okay, well, maybe we can win
7  on absorbency and we can make it a more
8  absorbent powder. And that doesn't work.
9      And then there are concerns that
10  arise, 1970, 1973, about -- specifically about
11  asbestos and about health concerns related to
12  talc products. So this is like what I cite in
13  paragraph 50, for example. And so at that
14  point, then they say, okay, well, maybe we
15  should go back to this cornstarch idea because
16  it could be a replacement, because there are
17  these health concerns about talc. And then from
18  1973 through the eighties, they develop a
19  product and they obtain patents.
20     And I would disagree with your
21  characterization that they're considering it.
22  They're not just considering it. It's over a
23  decade. They're investing a lot of money and
24  making a lot of plans into the strategy that:
25  We're going to replace this product. There are

Page 93

1  problems with the product we have in market.
2  We've got to come up with a new product, and
3  we're going to replace it, and how best to do
4  that.
5      And so I wouldn't say that's just like
6  they're kind of weighing options like in a
7  boardroom. I mean, they're taking a lot of very
8  concrete actions over a long period of time.
9      BY MR. EWALD:
10     Q. Okay. And to your mind, those
11  concrete actions over a long period of time,
12  including things like patents and money invested
13  in alternatives, means that Johnson & Johnson
14  considered the cancer threat to be credible?
15     A. Yes. I think they took it --
16  they were taking it seriously, yeah, yeah.
17     Q. And so then, if I'm hearing you
18  correctly, what came out of that process is
19  Johnson & Johnson knew they had an effective
20  replacement for talc in cornstarch, correct?
21     A. Correct, yes.
22     Q. They had marketing -- you know,
23  in the field, materials -- sorry. They had
24  studies that in the field, that gave back
25  feedback that customers actually preferred the

24 (Pages 90 - 93)

Page 94

1  cornstarch to the talc. Correct?
2      A.  Correct, yes.
3      Q.  And that given those first two
4  and the importance, as you say, of the trust and
5  the golden egg importance of the talc franchise,
6  right? That's something that went into the
7  thinking, correct?
8      A.  And I would add a fourth bullet
9  point there, which is that the cornstarch was
10 developed because of the health concerns. So,
11 like, you know, in 54, in paragraph 54, they
12 consult with a market research company to do the
13 testing in Wayne, Indiana, for the cornstarch
14 product. And they say:
15      "In view of possible government
16      legislation banning the cosmetic use
17      of talcum powder, the brand is test
18      marketing Johnson's Baby Powder with
19      cornstarch as a possible product
20      replacement formula."
21      And that kind of language about this
22 is a replacement, how are we going to replace
23 it? What are consumers going to think about it?
24 Is this a viable replacement? And connecting it
25 to the health issues, I think, is really central

Page 95

1  here and is really central to that argument.
2  It's not just that it's a viable product because
3  it's a viable product. It's a viable product
4  because it addresses the health risks and the
5  health concerns about talc.
6      Q.  And so in your opinion, to a
7  professional degree of certainty, is that
8  Johnson & Johnson in the eighties decided, Never
9  mind, we're going to continue marketing talc
10 even though we think there's a credible risk of
11 cancer with its use and even though we have an
12 effective replacement that our market data
13 suggests consumers prefer.
14      A.  Yeah. In short, yes. I mean, I
15 would parse that a little bit, which is part of
16 that is just fact. That's just what happened.
17 And then what I think lends a lot of support to
18 the idea that these were -- they were credible,
19 that they were taking it seriously, is all of
20 the actions that they're taking ahead of time
21 and that they're framing those actions in the
22 context of health concerns, right? It's that
23 those documents are mentioning health concerns
24 alongside the development of cornstarch product.
25 That's why we're engaging in this activity. And

Page 96

1  I think that's very important to understand
2  about, Well, did Johnson & Johnson ever take
3  these health concerns seriously? And, yeah, it
4  looks like there's a lot of evidence that they
5  did. And yet none of those -- none of that
6  gravity was ever communicated.
7      Q.  Go to paragraph 20.
8      A.  Sure.
9      Q.  Let's jump ahead to paragraph 45.
10     A.  Okay.
11     Q.  And you say:
12     "By as early as 1966, Johnson &
13     Johnson was aware of health risks
14     associated with the use of talcum
15     powder products. In response to these
16     safety concerns, Johnson & Johnson
17     began developing a replacement powder
18     that was made of cornstarch instead of
19     talc."
20     Did I read that correctly?
21     A.  Yes, that's right.
22     Q.  And you cited in paragraph 45 a
23 1966 internal memo, correct?
24     A.  Yes, that's right.
25     Q.  I am going to mark what I think

Page 97

1  you're referring to as Exhibit 6, I believe.
2  For the record, this is a June 17, 1966 memo.
3  It has a Bates number at the bottom right of J&J
4  000235850?
5      EXHIBIT NO. 6:  June 17, 1966 memo.
6      J&J 000235850. To Dr. Hildick-Smith,
7      Subject: Johnson's Baby Powder Talc
8      Aspiration. June 17, 1966.
9      THE WITNESS:  Yes.
10     BY MR. EWALD:
11     Q.  Doctor, is this the document that
12 you're referring to in paragraph 45?
13     A.  Yes, it is.
14     Q.  So, setting the scene here a
15 little bit, we talked about internal Johnson &
16 Johnson document, and the subject line, it's
17 Johnson's Baby Powder, Talc Aspiration, right?
18     A.  Yep.
19     Q.  This is not about cancer,
20 correct.
21     A.  Understood. Yes.
22     Q.  So:
23     "Reference is made to the
24     attached note from Mr. J. Dettre
25     forwarding an article by Drs. Hughes

25 (Pages 94 - 97)

Page 98

1    and Kalmer which appeared in June 1966
2    American Journal of Diseases of
3    Children.
4        Baby Powder represents the
5    cornerstone of our baby products
6    franchise."
7        That's something that you've mentioned
8    before, right, Doctor?
9        A.  Yes.
10       Q.  Okay:
11           "In addition, we have a large
12       investment in top mine."
13       Do you see that?
14       A.  Yes.
15       Q.  And so you do quote that in your
16   report, and you put that, I believe, in your
17   Appendix 1 timeline.
18       So what importance does the statement
19   "We have a large investment in talc mine" have
20   to your opinions?
21       A.  Well, I think that it clearly
22   connects the safety concern to the economic
23   concern, which you see -- why I include it in
24   this section about cornstarch development is
25   because in the documents that discuss the

Page 99

1    cornstarch replacement, they're discussing it in
2    the context of what are the economic
3    repercussions?  And this document does a very
4    similar kind of thing.  Hey, there's a health
5    concern about our product.  What's going to be
6    the economic fallout?  But one problem for us is
7    that we have a large investment in talc mine.
8    And so we can't just stop selling talc.  Let's
9    figure out what we're going to do about it.
10       And so to me, it's very informative
11   because it starts to connect these ideas, which,
12   you know, quite frankly, is different than the
13   credo of the company.  The credo isn't like,
14   your health and safety is number one, unless it
15   has negative economic repercussions for us.
16   It's just health and safety is number one.  And
17   that quote, even to me, says, well, look, our
18   interests are more complicated than that.  It's
19   not just health and safety, it's health and
20   safety and the fact that we own a talc mine.
21       Q.  Well, are you -- what evidence do
22   you have that Johnson & Johnson's response to
23   this talc aspiration issue was tied to a concern
24   over his investment in the talc mine.
25       A.  Well, I mean, that's just how I'm

Page 100

1    reading that paragraph.  You know, I'm
2    paraphrasing, I read this saying, this article
3    just came out which says that people should stop
4    using talcum powder because there's a health
5    risk.  Talc powder is the cornerstone of our
6    franchise, and we have a large investment in
7    talc mine.  We better figure out what to do
8    about it.  And so, I mean, I don't know how to
9    answer that other than just like, the person
10   who's writing this is directly connecting those
11   ideas.
12       Q.  Okay.  And so, by the way, are
13   you suggesting or are you offering the opinion
14   rather, that this type of economic analysis to
15   safety issues is something that is pervasive
16   throughout the entire time period when J&J's
17   marketing its talc.
18       A.  I mean, in -- I'm able to -- I
19   would say that I observed it over a very long
20   time period.  I would say that there are many
21   documents, especially from this period of, you
22   know, the sixties through the eighties, which
23   continually make a link between different
24   strategies they could take with talc powder and
25   replacement products and what would be the

Page 101

1    economic repercussions of doing so.  So that's
2    how I fundamentally interpret all those
3    documents.  And so, you know, at least for those
4    two decades or so, you see a strong connection
5    between those ideas.
6        Q.  Okay.  And so this is the kind of
7    thing, in your mind, this kind of risk
8    articulated in the 1966 document is the kind of
9    risk that could threaten the golden egg?
10       A.  Yeah, I mean, that's like a word
11   like "cornerstone of our baby product
12   franchise," that's how I would interpret that
13   phrase, yeah.
14       Q.  Okay.  And so then your criticism
15   of Johnson & Johnson for this talc aspiration
16   risk that's identified in this 1966 document is
17   they don't tell consumers about it?
18       MS. PARFITT:  Objection, form.
19       THE WITNESS:  Yeah, no, I'm not
20   hanging my opinion on any one single document.
21   And we kind of talked before about the totality,
22   you know, looking at all of the documents in sum
23   that you see this document and then you see
24   another, you know, I could count them up, but
25   let's just say another ten or a dozen documents

26 (Pages 98 - 101)

Page 102

1  afterwards which make a similar kind of argument
2  about different types of health issues. So, you
3  know, aspiration risk turns out not to be
4  something that the company is concerned about,
5  but then new concerns get raised around
6  asbestos; first asbestos and lung cancer, and
7  then asbestos and ovarian cancer. And those are
8  continually connected then to these replacement
9  products. So I would say that it's indicative
10 of a strategy or an approach that is consistent
11 across time, but it's not that -- that it all
12 boils down to this one issue of aspiration in my
13 mind.
14      BY MR. EWALD:
15      Q. Well, did you say that the
16 company was not concerned about the aspiration
17 risk? Is that what you said?
18      MS. PARFITT: Objection, misstates his
19 testimony.
20      THE WITNESS: No, I --
21      BY MR. EWALD:
22      Q. That's literally what he said.
23      A. No, I don't say that they're not
24 concerned about it. They are concerned, but the
25 way in which they're concerned about it -- look,

Page 103

1  I mean the company could said, Wow, this might
2  be a real problem. I hope babies aren't choking
3  on this stuff. But that's not what the first
4  paragraph says. The first paragraph says, Look,
5  we have a financial interest in this mine, we
6  have a financial interest to this product.
7      And I think, importantly, drawing it
8  back to the larger argument, that's not what
9  they're telling consumers. Over 100 years
10 they're saying, Your health and safety are our
11 number one priority. You can trust us. The
12 reason why you're going to come to Johnson &
13 Johnson is because of this trust mark that we
14 put on every product." And a paragraph like
15 that seems to run counter, in my view, to that
16 very idea.
17      Q. So you talk about the first
18 paragraph after the quote. The second paragraph
19 says:
20      "Would it be possible for us to
21      initiate basic work to explore this
22      phenomenon, either obtain data to
23      refute this problem or develop
24      mechanisms to reduce the hazard."
25      That's what Mr. Steinberg says, right?

Page 104

1      A. Agreed. Yes, absolutely.
2      Q. And so they're saying there's a
3  problem here and we're going to look into it to
4  see whether there's a basis for it, right?
5      MS. PARFITT: Objection, misstates
6  testimony.
7      THE WITNESS: Again, I would just add
8  to that, there's a problem here that might
9  really hurt our wallet and we should look into
10 it. And I think that's the larger point.
11 That's the important point.
12      BY MR. EWALD:
13      Q. Well, and you're drawing that
14 because the paragraph that you referenced comes
15 before the "Would it be possible for us to
16 initiate basic work"? It's a structural memo,
17 intuition of importance because it comes first?
18      MS. PARFITT: Objection. Misstates hi
19 testimony. He's talking about the totality of
20 the documents.
21      THE WITNESS: Yeah, I mean, again, I
22 don't want to hang it all on one document. I
23 think this document is indicative of a larger
24 pattern, is representative of several other
25 documents that you see over this time period of,

Page 105

1  as I said before, connecting a safety issue to
2  an economic concern. And I don't know what the
3  speaker, you know, what Steinberg, you know, was
4  thinking, I couldn't possibly know that or where
5  he wanted to place emphasis.
6      But you know, in black and white, the
7  connection between those ideas is there, and in
8  directing other folks at Johnson & Johnson why
9  we should be concerned about this, to me, I read
10 that as we should be concerned about this
11 because it has an economic impact. And you see
12 that same kind of idea in several other
13 documents.
14      BY MR. EWALD:
15      Q. Okay, so you may not be able to
16 get into Mr. Steinberg's head, but you are able
17 to conclude or figure out whether or not any
18 changes were made to the product or its labeling
19 to address the aspiration risk, correct?
20      MS. PARFITT: Objection. Misstates
21 his testimony. In fact, I'm going to broad --
22 I'm not sure I even understand it.
23      Doctor, if you can.
24      THE WITNESS: I got a little bit mixed
25 up here. Can you just repeat that?

27 (Pages 102 - 105)

Page 106

1    BY MR. EWALD:
2        Q.  Sure.  Whatever Mr. Steinberg was
3    thinking in 1966, you, Dr. Newman, have the
4    capability to figure out whether or not any
5    changes were made to the Johnson's talc
6    products, labels and/or packaging because of
7    those concerns, right?
8        A.  Yeah.  Yes, I am.  Yeah.
9        Q.  And your position is that nothing
10   was done?
11       A.  Well, I mean, that wasn't my --
12   no, that's not my understanding exactly.  I
13   thought there was a modification to the cap or
14   something like that, which changed it.  But I
15   mean, again, the focus of my inquiry was around
16   cancer, largely.  And so I focused there.  I
17   find this document informative for the reasons
18   that we talked about already, but, you know,
19   yeah.
20       Q.  Well, when I asked you earlier
21   about it, before the break, you didn't mention
22   anything about a modification of a cap.
23       Did you do further research over the
24   break to remind yourself of that?
25       A.  No --

Page 107

1        MS. PARFITT:  Objection.
2        THE WITNESS:  Not at all.  No, I just
3    used the restroom.
4        BY MR. EWALD:
5        Q.  Okay.  It could be a real
6    generator of ideas.
7        A.  No, I think this is really
8    important.  If I didn't say something -- I mean,
9    I do have that knowledge.  If I didn't say
10   something like that before, it's just because I
11   misunderstood your question.  I'm really --
12   like, there's, you know -- I'm certainly not
13   doing homework when we're not talking, and that
14   is knowledge that I have.  I just didn't
15   understand it as being relevant to the question
16   you're asking.  So I apologize.  I'm sorry.
17       Q.  Don't apologize.
18       So as part of the materials you
19   reviewed, you also reviewed deposition testimony
20   from Frederick Koberna, right?
21       A.  I did, yes.
22       Q.  I believe one of the counsel in
23   that room was also at the Frederick Koberna
24   deposition.  But that's neither here nor there.
25       Do you recall reading testimony in the

Page 108

1    Frederick Koberna deposition about this
2    aspiration risk issue?
3        A.  I do recall that, yes.
4        Q.  So let's look at -- here, we have
5    from your reliance materials, it's the July 2021
6    deposition of Frederick Koberna.  And if we go
7    to --
8        MS. PARFITT:  John, if you will, I'll
9    grab that deposition.  We should have it.  I'm
10   just looking quickly through the index to try to
11   find out what --
12       MR. EWALD:  Sure.
13       MS. PARFITT:  -- bucket it's in.  Let
14   me -- give me one moment so I can do that.
15       MR. EWALD:  Sure.
16       MS. PARFITT:  You won't have to,
17   maybe, show as much as you wish.
18       MR. EWALD:  Take your time.
19       MS. PARFITT:  John, just give us a
20   moment.  Fifty-four and 55.  Okay, John, just so
21   you know, I'm just handing him the volume that
22   has the depositions.  Okay.
23       MR. EWALD:  Great.  Thank you.  And so
24   this is the -- yeah, this is the first day of
25   deposition.  I'm looking at --

Page 109

1        MS. PARFITT:  July 8, I believe.  Let
2    me just double-check here.  Yes, July 8.  The
3    second one was September 14.
4        MR. EWALD:  Yes.
5        MS. PARFITT:  Okay, very good.  Thank
6    you.
7        MR. EWALD:  Of course.
8        BY MR. EWALD:
9        Q.  And going to 173.  Let me know
10   when you're there.
11       A.  Okay.  Yeah.
12       Q.  Okay.  If you look at -- it's
13   actually 172, I'm sorry, it starts on my 19
14   question:
15           "QUESTION:  Okay.  Did Johnson &
16       Johnson ultimately warn against
17       inhalation of Johnson's Baby Powder by
18       babies?
19           ANSWER:  Yes, that's on our
20       labeling."
21       And if you go down a little bit
22   further, it says -- going now on page 174, line
23   6.  And then it -- onto the bottle says:
24           "...quote, 'Keep powder away from
25       child's face to avoid inhalation,

28 (Pages 106 - 109)

Page 110

1  which can cause breathing problems.'
2  Close quotes.  Do you see that?"
3      ANSWER: Yes.
4      QUESTION:  So this is a warning
5  that was added in response to the
6  concerns about inhalation of Johnson's
7  Baby Powder by infants, right?"
8  There's an objection.  And witness:
9      "ANSWER:  Yes, it was something
10  that we would be responsive to
11  doctors, and we would put that on
12  there.  Now, I'm not sure when it was
13  added."
14  Okay?
15      A.  Yep.
16      Q.  You see that?
17      A.  Yes.
18      Q.  Does that refresh your
19  recollection that, in fact, there was a warning
20  put on the bottle relating to inhalation in
21  infants?
22      A.  Yes, yes.
23      Q.  So that is an instance in which a
24  concern was raised relating to the safety of
25  Johnson's Baby Powder, and Johnson & Johnson

Page 111

1  acted in response to that concern, correct?
2      A.  Yes.  Although I would argue that
3  it's a false equivalence to -- to -- the
4  inhalation warning to pulling a product and
5  replacing it with a cornstarch product.  Those
6  aren't the same.  You know, when there are
7  internal conversations talking about how talc
8  itself is central to the business, is the golden
9  egg, is the cornerstone of our franchise, we
10  have an investment in a talc mine.  That's
11  not -- and so we should put a warning on it, is
12  that we're going to pull the product and replace
13  it with cornstarch.
14      And so, you know, that they were
15  responsive about this does not, in my mind,
16  imply that they are responsive in all health
17  issues or something like that.
18      Q.  Well, this is their response in
19  the document that we were just talking about
20  from 1966, where you noted that they have an
21  investment in a talc mine and that it's a
22  cornerstone of our franchise, right?
23      A.  Yeah.  If we're talking about,
24  just in reference to that 1966 document we were
25  talking about before, sure, yeah.

Page 112

1      Q.  Do you have any opinions that
2  Johnson & Johnson's response to the aspiration
3  concern that was raised in the 1960s was
4  inadequate?
5      A.  No, I don't.
6      Q.  So you don't think that Johnson &
7  Johnson response misled and confused consumers?
8      A.  No.  Mr. Ewald, are we all set
9  with the Koberna deposition?
10      Q.  Oh, yeah.
11      A.  Okay.
12      MS. PARFITT:  I'm going to take it
13  away.  Thank you.
14      BY MR. EWALD:
15      Q.  Now, you also, on page 15,
16  paragraph 57, talk about the Daniel Cramer
17  study, 1982, correct?
18      A.  Correct, yes.
19      Q.  And you note that the study is
20  significant, paragraph 57, because it raised the
21  possibility that the link between talc and
22  cancer could be caused by a), fibers and talc
23  itself, and b), those fibers could implant in
24  the body via process of translocation, moving
25  from the perineal area to the ovaries, right?

Page 113

1      A.  Correct, yes.
2      Q.  And do you feel like you have the
3  expertise to offer an opinion as to whether a
4  particular epidemiological study is significant?
5      A.  No, I --
6      MS. PARFITT:  Object to form.
7      THE WITNESS:  No, I do not.  I do not.
8  And that's not why I'm citing it here.
9      BY MR. EWALD:
10      Q.  Okay.  Well, you said those
11  very -- those are your words, correct?  The
12  Cramer study is significant because it raised
13  the possibility about the link?
14      A.  Yes.  It's significant because it
15  raised -- publicly, it raised a link between
16  talc and cancer use.  And my understanding is
17  that it is one of the first mentions in the
18  peer-reviewed literature that prior to then,
19  that the concern about talc had been asbestos,
20  but asbestos as it related to lung cancer.  And
21  then after the Cramer study, it wasn't lung
22  cancer, it was potentially ovarian cancer.
23      And you see documents, internal
24  documents from J&J which reflect that kind of
25  shift about, Well, what's the relevant health

29 (Pages 110 - 113)

Page 114

1  concern?  So significant for that reason in
2  trying to understand this timeline of events.
3      Q.   And it's your opinion that J&J
4  misled, deceived consumers by not letting them
5  know that the Cramer study had been published in
6  1982 and raised the possibility of a link
7  between talc and ovarian cancer?
8      A.   No.  I think what is -- talking
9  about this very specific time period, let's say
10  1982 to 1987, is now there are conversations
11  about asbestos and ovarian cancer in the
12  discussions about cornstarch.  And so, okay,
13  we've got this cornstarch replacement and it's
14  going to address these health concerns about
15  talc and ovarian cancer.  And so we're going to
16  replace the products.  Let's do all this market
17  research to replace the products.  And then that
18  never happens.
19      And so that, in my mind, is the
20  misleading or deceptive part is that the company
21  has very deliberately taken a strategy to
22  address the health concerns through product
23  replacement, and then that replacement never
24  happens and the reason for it isn't communicated
25  to consumers.

Page 115

1      Q.   But you also don't know the
2  reason for it, do you?
3      MS. PARFITT:  Objection, form.
4      THE WITNESS:  Again, I mean, we can --
5  no, I don't -- no, I don't.  Just to be fair, I
6  don't know.  Yeah.
7      BY MR. EWALD:
8      Q.   And do you know, in assessing
9  whether a particular epidemiological study is
10  significant, do you think that the FDA is better
11  situated than you in making that assessment?
12      MS. PARFITT:  Objection, form.
13      THE WITNESS:  Yeah.  You know, it's
14  just an area that I'm not well -- I know what I
15  don't know.  And so that's outside my expertise.
16  So I wouldn't be able to comment on which
17  regulatory body is better than which, or what
18  kind of standard or anything like that, yeah.
19      BY MR. EWALD:
20      Q.   Well, you say which regulatory
21  body is better than which, but you cite a lot in
22  your document to Health Canada, correct?
23      A.   Because you do have a national
24  health service that is saying we have a concern
25  about this product.  I mean, as a current

Page 116

1  Canadian resident, I take things that Health
2  Canada says seriously, yeah.
3      Q.   Fair enough.  But you don't, I
4  don't believe, cite in your report other
5  regulatory bodies, for example, what the various
6  FDA -- various us federal regulatory bodies have
7  said about the potential link between talc and
8  ovarian cancer, do you?
9      MS. PARFITT:  Objection.
10      THE WITNESS:  Again, but I would come
11  back to, but what are they telling consumers?
12  And they're not communicating to consumers in,
13  look, there's conflicted evidence.  They're
14  telling consumers, absolutely not.  Don't worry
15  about it.  Trust us.  You can trust us in the
16  same way that you've trusted us for 100 years.
17  And just, there's a mounting pile of information
18  that's out there that at least is raising
19  questions about that.  Internally, they're
20  having discussions about those questions, but
21  then the communication to consumers is very,
22  very different.
23      BY MR. EWALD:
24      Q.   Okay.  So there's a scientific
25  question raised about the safety of the product

Page 117

1  externally.  There are discussions about that
2  question that's been raised.  There are
3  discussions within Johnson & Johnson about the
4  question that's been raised externally.  And
5  it's your opinion then that if such discussions
6  take place that should be communicated to
7  consumers, correct?
8      A.   It's my opinion that if there
9  are -- there are credible risks, and I'm coming
10  back to, you know, we talked a lot about
11  cornstarch, and I think cornstarch and the
12  history of cornstarch is exemplary because it --
13  it shows that the company was taking those risks
14  seriously, that they spent over a decade trying
15  to develop a replacement product.  So it's not
16  just at the level of, do you have to communicate
17  everything you discuss internally to the public?
18  That's not what I'm saying.
19      But if you take actions over a decade
20  because you think there's a health risk, then
21  there is some responsibility to communicate some
22  portion of that to consumers and not just say,
23  absolutely, without a question, without a doubt,
24  it's safe.
25      Q.   What expertise/training do you

30 (Pages 114 - 117)

Page 118

1  have just to make the opinion that you just did?
2       A.  I mean, my years of training as
3  an expert in consumer behavior and consumer
4  psychology, that when you speak to consumers in
5  absolutes, that it's very different than talking
6  about even a glimmer of a possibility otherwise.
7       And I'll just give an example.  So
8  this is one of the papers I published.  If you
9  talk about pure natural spring water versus
10  spring water with 0.001 percent additive or
11  impurity, you get an enormous drop off in
12  people's willingness to buy the product, that
13  it's not linear, that any shred of a doubt or a
14  possibility of impurity or something not being
15  quite right with the product is enough to
16  dramatically change consumers' perceptions.
17       And so I think in this case, by not at
18  least acknowledging the possibility and that
19  there was evidence and evidence that they were
20  taking seriously, seriously enough to take
21  actions to develop a replacement product, to me,
22  is misleading.
23       Q.  Well, what -- can you identify
24  any peer-reviewed published paper that states
25  that there's a glimmer of possibility of a

Page 119

1  health risk associated with a product, the
2  company should communicate that to consumer.
3       A.  If there's -- I don't know
4  what -- I mean, we would talk about best
5  practices, you know, if I'm teaching intro to
6  marketing, intro to consumer behavior, we would
7  talk about best practices.  And certainly up
8  there with best practices are, you know, you
9  can't engage in false advertising, you can't
10  mislead, you can't misstate product benefits,
11  those kinds of things.  So, I mean, those --
12  these -- if you were to enter business school,
13  this is kind of foundational to the training
14  about what are, you know, acceptable principles
15  or guiding principles or best practices.
16       Q.  Well, are you -- is it your
17  opinion that it is misleading to customers and
18  deceptive to customers not to provide them
19  information about the glimmer of a possibility
20  that a product could cause harm?
21       A.  It is, yes.  Yes, that is my
22  testimony, yes.
23       Q.  And then what do you rely on that
24  form?
25       MS. PARFITT:  Objection.  Asked an

Page 120

1  answer.
2       You can try again, Doctor.
3       BY MR. EWALD:
4       Q.  Well, I heard -- no, I mean, what
5  I heard, that's fair.  I heard what you tell
6  your intro class, what else?
7       A.  And again, coming back to the
8  example of spring water, that there is a
9  qualitative difference between saying this is
10  pure natural spring water and spring water with
11  0.01 percent additive, and that's not a linear
12  change.  And so just the same way that saying,
13  Well, there is the potential for a health risk,
14  and you know, we're kind of talking about the
15  study that I conducted on my own earlier, right?
16  Just even disambiguating things and
17  acknowledging that there is evidence which finds
18  a link changes how much people trust the
19  company.  And yes, absolutely, I think that is
20  misleading or potentially confusing.  Mr. Ewald,
21  you froze.
22       Q.  Dr. Newman, you froze after
23  saying "acknowledging."  I'm sorry, I didn't
24  hear anything after that.  That was the first
25  hiccup.

Page 121

1       A.  It was probably very smart.
2       Q.  I'm sure it was.  The court
3  reporter, if she got it, can read it back.  It
4  was literally after the word "acknowledging."
5       A.  I'll just restate it just to make
6  it easier on everybody.  But just what we're
7  talking about with the spring water example,
8  there's a difference between communicating in
9  absolutes and presenting a fuller picture of the
10  information.  And that it's misleading to not
11  acknowledge these risks that the company was
12  taking seriously, as evidenced by all of the
13  work that they're doing on replacement products,
14  et cetera.
15       Q.  Okay.  I saw in your reliance
16  list or reference list a couple of documents
17  related to FDA citizen petition in 2008, 2000,
18  1994 and the response in 2014.  I didn't see
19  reference to FDA's 1986 response to a citizen
20  petition related to talc.  Is that something
21  that you've seen before?
22       THE REPORTER:  I'm sorry.  I'm not
23  catching what he's saying.
24       MS. PARFITT:  John, unfortunately, the
25  reporter was unable to catch your question.  If

31 (Pages 118 - 121)

Page 122

1  you wouldn't mind repeating that.
2       MR. EWALD:  No worries.
3       MS. PARFITT:  Thank you.
4       BY MR. EWALD:
5       Q.  So I'll break this down.  You
6  recall, Dr. Newman, that in your reference list,
7  you include, some documents relating to FDA
8  citizen petitions and responses in the 2000s?
9       A.  Yes, correct.  Yeah.
10      Q.  And are you familiar with an FDA
11 response in 1986 to a talc related citizen
12 petition?
13      A.  I believe I am familiar with that
14 document, yes.
15      Q.  Well, I'm going to pull it up
16 now.  I'll mark it an exhibit.  And, Michelle, I
17 don't know if it's something you guys set up, or
18 there's only a couple parts in the show, but
19 what do you need me to do?
20      MS. PARFITT:  John, I'm not -- it is
21 not in our notebook.
22      MR. EWALD:  All right, so let me first
23 put it in the chat.
24      MS. PARFITT:  John, I'm just going to
25 swing around so I can see it as well.  Okay.

Page 123

1       MR. EWALD:  Sure.  Okay, let me know
2  when it's uploaded.  It's looks like it's got
3  across the wire.  Should have a fancy red ribbon
4  on the front.
5       MS. PARFITT:  There you go.
6       THE WITNESS:  Yes.
7       BY MR. EWALD:
8       Q.  All right.  And any point in time
9  if you need to review part of it, let me know.
10 I'm just going to talk about a couple of pages
11 to get started, we'll mark this.
12      MS. PARFITT:  Yeah, if I could just
13 ask.  Can just run down to the Bates number on
14 that.  That may be why I wasn't able to find the
15 document.
16      MR. EWALD:  Yeah, no worries.  This
17 one actually just a "D."  It's an internal
18 document.  It's D-7214, Exhibit number.
19      MS. PARFITT:  D 7214.
20      MR. EWALD:  Yes.
21      MS. PARFITT:  Thank you.
22      BY MR. EWALD:
23      Q.  Yes, and what we see here on page
24 3 of the PDF, it is a letter from the FDA to
25 Mr. Phillippe.  I don't know how to say his

Page 124

1  name, Douillet, with a date of July 11, 1986.
2  Let me look at it a little bit bigger.
3       A.  Yep.
4       Q.  And it says:
5       "This responds to your November
6       8, 1983 petition requesting that
7       cosmetic talc be labeled with an
8       asbestos warning statement,
9       information on asbestos particle size
10      and the proportion of talc impurities
11      in the product."
12      Is this ringing any bell?  Is this
13 something that you've seen, Dr. Newman?
14      A.  I don't believe I have ever seen
15 this document.
16      Q.  Okay.  Goes on to state:
17      "You assert that, because the
18      mine of talc almost invariably
19      includes the mining of asbestos as
20      well, cosmetic talc may contain
21      significant amounts of asbestos
22      particles that present inhalation
23      hazard to humans.  Also, you cite
24      references to substantiate that
25      significant amounts of asbestos have

Page 125

1  been found in commercial talc samples,
2  that asbestos inhalation is hazardous
3  to humans, and that asbestos
4  contaminants in talc will produce
5  toxicological responses when inhaled."
6  Goes on to say that:
7       "However, your petition has not
8  persuaded us that cosmetic talc that
9  is presently being produced contains
10 significant amounts of asbestiform
11 minerals."
12 Then it talks about:
13      "During the early 1970s, FDA
14 became concerned about the possibility
15 that cosmetic talc did contain
16 significant amounts of this material.
17 The agency received several reports
18 about such contamination.  However, at
19 that time, the analytical procedures
20 for determining asbestos in talc were
21 not fully developed and most of the
22 analytical work was conducted without
23 scientific agreement as to which
24 methods were well-suited for the
25 identification of asbestiform minerals

32 (Pages 122 - 125)

Page 126

1    in talc."
2        Let me stop there for a moment. Did I
3    read that correctly?
4        A. Yeah. Yeah.
5        MS. PARFITT: And, John, may I ask a
6    favor, if you will? The Doctor has indicated
7    he's never seen this document before. I don't
8    have it in his exhibit list, as well. So if he
9    could have an opportunity, and you can either
10   come back to it, or he can read it now, to read
11   the entire doc -- he's never seen this document
12   and I know we're reading parts for it and you're
13   being very fair about that, but he's never seen
14   the document before and I can't tell from what's
15   on the screen what's before and what's after.
16       MR. EWALD: Fair. And maybe one way
17   to do it, the letters, I see two pages, I also
18   want to show him something else about it, but
19   there's also a lot of analytical data in the
20   back part.
21       MS. PARFITT: Yes.
22       MR. EWALD: So if you want, one idea
23   was considering if you want to look at it over
24   the lunch break.
25       MS. PARFITT: Yes.

Page 127

1        MR. EWALD: I'd be happy to go back to
2    it.
3        MS. PARFITT: Yeah. If we can move on
4    from this, John, 'til we get a copy of it, he
5    can take a look at it and then we can come back
6    to it.
7        MR. EWALD: Sure.
8        MS. PARFITT: Because it's got a lot
9    of information at the very end.
10       MR. EWALD: Yeah. No, no, I agree.
11   Before I forget, Leila, it's Exhibit 7, right?
12       THE REPORTER: Yes, it is, counsel.
13       EXHIBIT NO. 7: Food and Drug
14   Administration Certificate - D-7214
15   (1986 FDA).
16       MS. PARFITT: All right. Thank you.
17       MR. EWALD: Sure. And let me know if
18   you have any problems accessing it from the
19   chat.
20       MS. PARFITT: Very good.
21       MR. EWALD: I'm going to make a
22   Post-It note, because if I don't, I'm not going
23   to go back to it. Hold on. We will get back to
24   that one. Although, let me pause. It is 12:41
25   where I am. We've gone another hour. I am

Page 128

1    happy to break now for lunch or continue on,
2    whatever you guys prefer, and whatever the court
3    reporter prefers.
4        MS. PARFITT: Do you want to take a
5    quick break now or can you go a little longer?
6        THE WITNESS: I can go -- yeah. You
7    know, I'm a late lunch eater. So I can go a
8    little bit longer and then maybe 30 minutes or
9    something like that.
10       MS. PARFITT: Yeah, John. If we can
11   do this: Give us three minutes. We're going to
12   see if we can get something ordered here so we
13   can keep moving here, just give us three
14   minutes.
15       -- LUNCH TAKEN AT 12:42 P.M.
16       -- RESUME AT 1:43 P.M.
17   BY MR. EWALD:
18       Q. All right. Dr. Newman, did you
19   have a chance to take a look at the 1986 FDA
20   response to citizens petition?
21       A. I read the first two pages and
22   then there was a bunch of material at the end
23   that I wasn't able to review.
24       Q. Well, we will get to that in a
25   moment, but set it aside, but not too far from

Page 129

1    where you are.
2        A. Okay.
3        Q. And if you look at your report.
4        A. Yeah.
5        Q. On paragraph 52, which is on page
6    13.
7        A. Okay, I'm there. Yep.
8        Q. And you see that says:
9            "In 1974 it was noted by
10           executives at Johnson & Johnson that
11           'During the past couple of years, our
12           need for a non-talc dusting powder has
13           increased as a direct result of the
14           talc/asbestos controversy.'"
15       That's what it says, right?
16       A. Yes, that's what it says.
17       Q. What, based on your review of
18   documents in this case, what is your
19   understanding of the talc/asbestos controversy
20   that's referred to happening in the early 1970s?
21       A. Based on my understanding, the
22   talc/asbestos controversy was regarding the
23   presence of asbestos in talc.
24       Q. Okay. And do you have an
25   understanding as to any details relating to that

33 (Pages 126 - 129)

Page 130

1  controversy?
2      A.  Yeah, so there are -- I mean,
3  again, this wasn't the, you know, the focus of
4  my review.  But I did encounter documents, you
5  know, which talked about there being J&J,
6  internal documents about the detection of
7  asbestos.  I believe there's a document from
8  right around the same time, I think, 1975 or
9  something, which talks about the potential for,
10 you know, asbestiform fibers to be detected.
11 And so, yeah those kinds of documents.  That's
12 about it.
13     Q.  Is the document that you're
14 referring to, asbestiform fibers, is that the
15 one you're quoting, a couple paragraphs up in
16 50?
17     A.  No.  This is -- yeah, okay.  I
18 mean, yeah, that's definitely one of them.  I
19 think there was another one that I have -- I
20 made note of that the last five -- you have to
21 forgive me, I'm new to the Bates numbering
22 system.  But the last five are 26989, I believe
23 that's a review of present status of talc
24 safety.
25     Q.  Yep.  Okay, so on that one, we're

Page 131

1  actually going to talk about that one next.
2  Let's first, though, let's talk about the
3  document you're referring to in paragraph 50.
4  It is J&J 0025188.  I will mark it as an
5  exhibit.  If it helps at all, that was also in
6  your materials.  It was -- starts with the
7  number 0242, if that means anything to you.
8      MS. PARFITT:  Yeah, just give me a
9  moment here, John, and we'll try and pull it up
10 for him.
11     MR. EWALD:  Sure.
12     MS. PARFITT:  And I'm sorry, John,
13 again, you said 25188?
14     MR. EWALD:  Yep.
15     MS. PARFITT:  Just give me one minute
16 here.  Yeah.  242.  Ready?
17     THE WITNESS:  Yes.
18     MS. PARFITT:  242.
19     THE WITNESS:  Mr. Ewald, I'm going to
20 go ahead and pull that full document because I
21 know that there's some text at the end, too,
22 that that is important to my opinion.
23     BY MR. EWALD:
24     Q.  And, yeah, I'm going to talk
25 about a couple different parts of the document,

Page 132

1  including that.
2      A.  Yeah.
3      Q.  Just starting on page one.  And
4  for the record, we are marking - I don't think I
5  said this - as Exhibit 8 a Johnson & Johnson
6  internal memo dated April 26, 1973, with subject
7  line "Windsor minerals and talc."
8          EXHIBIT NO. 8:  Johnson & Johnson
9          internal memo, "Windsor minerals and
10         talc."  April 26, 1973.
11 BY MR. EWALD:
12     Q.  And paragraph 1 states that:
13         "It is our joint conclusion that
14      we should not rely on the 'Clean Mine'
15      approach as a protective device for
16      Baby Powder in the current Asbestos or
17      Asbestos-Form controversy.  We believe
18      this mine to be very clean; however,
19      we are also confident that fiber
20      forming or fiber type materials could
21      be found.  The usefulness of the
22      'clean mine' approach for asbestos
23      only is over."
24 Did I read that correctly?
25     A.  Yes.

Page 133

1      Q.  How do you interpret that
2  paragraph?
3      A.  We're going to detect some stuff
4  that looks like asbestos.
5      Q.  And when they say "The usefulness
6  of the 'clean mine' for asbestos only is over,"
7  what do they mean in your view?
8      A.  I interpret that as -- as
9  referring to some kind of claim that you're not
10 going to find anything here that looks like
11 asbestos; we shouldn't take this strategy in
12 talking about our mine this way, and instead we
13 should acknowledge that you might find some
14 stuff that looks like asbestos.
15     Q.  When you say "stuff that looks
16 like asbestos," you're talking about the shape?
17     A.  I was just responding to how --
18 you're asking me, kind of, how I interpret
19 paragraph 1 --
20     Q.  Yeah.
21     A.  -- and I was paraphrasing it,
22 that we're going to find, you know, we're going
23 to find some fibers that look like asbestos.
24     Q.  Right?  And I'm not -- you cited
25 this document in your report and you quote from

34 (Pages 130 - 133)

Page 134

1 it, right?
2        A.  That's correct, yes.
3        Q.  Right.  So I am only asking
4 what -- how you interpreted it when you reviewed
5 it --
6        A.  Sure.
7        Q.  -- you included it in your
8 report.  And so when you're saying looks like
9 asbestos, are you saying that it has the
10 morphology of asbestos?  Is that what you're
11 saying?
12        MS. PARFITT:  Objection, form.
13        THE WITNESS:  Yeah, I'm not -- I'm not
14 able -- you know, I am not well-versed enough in
15 this issue to know, you know, when whether --
16 you know, kind of different types of morphology
17 and categorization.  All I could say is that I
18 interpret that in plain language to say, you
19 know, the chances that we detect something that
20 registers as asbestos is high enough that we
21 shouldn't claim that our minds never have
22 anything that looks like asbestos in them.
23        BY MR. EWALD:
24        Q.  Right.  So if you go to the next
25 page 2, and it's paragraph b., do you see that,

Page 135

1 as in "boy"?
2        A.  Yeah.  This is like 4 b?
3        Q.  Yes, sir.
4        A.  Yeah.  Okay.
5        Q.  And so it says:
6        "As for Baby Powder, the entire
7        thrust of our communications with the
8        FDA is concentrated on asbestos as
9        harmful fiber-like material.
10        Sophisticated techniques have been
11        proposed to make sure that fiber
12        formed materials present in samples
13        were identified as being asbestos.
14        The implications that all other fiber
15        forms, if present, were talc or other
16        minerals and these were safe.  This
17        posture will no longer be satisfactory
18        if the FDA...Division, which is moving
19        more rapidly than Cosmetic Division,
20        publishes a standard, it will probably
21        be to ban asbestos-form or fibrous
22        material in talc.  That could
23        eliminate the current uses of talc in
24        packaging materials.  These talcs
25        contain widely varying amounts of

Page 136

1        tremolite or fibrous talc.  Our Baby
2        Powder contains talc fragments
3        classifiable as fiber.  Occasionally
4        sub-trace quantities of tremolite or
5        actinolite are identifiable (optical
6        Microscope) and these might be
7        classified as asbestos fiber."
8        How do you interpret that?  What's
9 being said in that paragraph?
10        A.  Well, there's a few different
11 ideas.  But the first part of that paragraph, I
12 interpret it as the testing guidelines at the
13 FDA are changing and we shouldn't rely on what
14 has escaped detection before to continue to
15 escape detection.  And so that as the standard
16 shifts, there is likely to be detection of
17 tremolite and actinolite, you know, if they use
18 a standard or a procedure of using an optical
19 microscope.
20        Q.  Well, and then does it also talk
21 about there in the middle that if talc, in the
22 form of fiber, is identified, it could be
23 included within the cosmetic division in the FDA
24 food division ban?  That's what they're saying
25 there.  Do you agree?

Page 137

1        MS. PARFITT:  Objection, form.
2        THE WITNESS:  I would -- again, I
3 would interpret that, yeah, as that the FDA
4 could categorize it that way using essentially a
5 different method or standard.
6        BY MR. EWALD:
7        Q.  Right.  When we say categorize it
8 a different way, they could categorize talc in
9 the shape of a fiber as something that would be
10 banned, right?
11        MS. PARFITT:  Objection, form.  And
12 again, John, I think he's indicated that this is
13 not the different fiber types, it's not
14 something that is his expertise.
15        BY MR. EWALD:
16        Q.  I understand.  But he does cite
17 to it, and I have some questions on how it
18 impacts his opinion.  So I want to get
19 appreciation of how he understands it.
20        A.  Sure.  I would say that my
21 interpretation of how this is worded is, again,
22 solely around, kind of, outward appearances,
23 right?  I mean, kind of going back to this idea
24 that health and safety are our number one
25 concerns, right?  There's like nothing about

35 (Pages 134 - 137)

Page 138

1  that here. It's just like, well, how's it going
2  to look if now suddenly there's detection of
3  asbestos in our product? And so there's a
4  subtext here to this document that I think is
5  important to my opinion.
6      Q.  Okay, well, they say if the FDA
7  food division standard is adopted, that could
8  eliminate the current uses of talc and packaging
9  materials, right?
10     A.  Yes.
11     Q.  And so if a business is trying to
12  be proactive and is identifying that a current
13  product that's currently constituted may be
14  banned by a changing regulation, it makes sense
15  to explore opportunities, other opportunities,
16  right?
17     MS. PARFITT:  Objection, form.
18     THE REPORTER:  Sorry. Could you just
19  repeat the last part, counsel? I didn't quite
20  catch you.
21     BY MR. EWALD:
22     Q.  Sure. If a company -- isn't
23  it -- withdrawn.
24     Wouldn't a prudent company who
25  identifies the possibility that a standard

Page 139

1  change may result in a product that's currently
2  constituted being banned look at alternative
3  options if that ban came to fruition?
4      MS. PARFITT:  Objection, form.
5      THE WITNESS:  I'm having a little bit
6  of trouble parsing it, but the way that I'm
7  interpreting that question is like in what I
8  mention in my report is I go to five sub point
9  C, which is, Okay, well, let's use cornstarch.
10 It doesn't have any of these health risks. It's
11 not going to have any fibers that could be
12 potentially harmful and it's assimilated into
13 the body. So that could be a good option for
14 us.
15     BY MR. EWALD:
16     Q.  Well, where does it say in 4 b.
17 that the company, i.e. Johnson & Johnson, is
18 worried about the safety of its talc products?
19     A.  I don't think it says that
20 they're worried about the safety of their
21 product. They're worried about -- I interpret
22 4 b. as they're worried about detection.
23 They're worried about the detection of asbestos
24 in their product.
25     Q.  Well, they talk about asbestos.

Page 140

1  They also talk about the detection of talc in
2  their talc product, right?
3      A.  Yes, correct. Yes.
4      Q.  And so if there's going to be a
5  standard that is potentially promulgated that
6  would ban the current product as manufactured,
7  it makes sense to identify potential
8  alternatives to the currently constituted
9  product, correct?
10     MS. PARFITT:  Objection, form.
11     THE WITNESS:  Yeah, I mean, again,
12 maybe I'm getting a little bit confused by the
13 question. So I just interpret b. as saying,
14 4 b. as the standards are shifting and there may
15 be detection of things, there may be detection
16 of asbestos in our product. And then it goes on
17 to 5 to say, Well, what are we going to do about
18 it? And part of what they're considering is 5
19 c., Well, an obvious answer would be cornstarch.
20     BY MR. EWALD:
21     Q.  Okay. You talked about, again,
22 your understanding. You didn't include the part
23 where they say that there's a definition that
24 could be promulgated, that would include banning
25 products that have talc in the shape of fibers,

Page 141

1  right?
2      MS. PARFITT:  Objection, form.
3      THE WITNESS:  I mean, I think this
4  might be drifting into a degree of expertise
5  that I'm really not qualified to speak on in
6  things that, for instance, may look like
7  asbestos but aren't really asbestos. And I'm
8  not able to make those kinds of distinctions or
9  ferret that out here.
10     And I just -- in as plain of English
11 as I can interpret that -- that paragraph, it's,
12 you know, there's going to be detection and
13 just, I mean, to kind of go back to the
14 beginning of the document, it seems to be framed
15 right around what we're telling people. You
16 know, are we -- are we using this kind of "clean
17 mine" approach? Should we be telling people
18 there's no asbestos in our product? And then I
19 interpret 4 b. as, Well, one thing that could
20 change is that with these new standards, there's
21 going to be detection of asbestos in our
22 product. And I would say, that's really the
23 limit of my understanding of that document.
24     BY MR. EWALD:
25     Q.  Well, I understand that the

36 (Pages 138 - 141)

Page 142

1  limitations that you're talking about, and what
2  I'm trying to figure out is what you understand
3  about the controversy in the early 1970s,
4  because what you've stated many times, I
5  believe, just tell me I'm right, and my
6  understanding that J&J's response to what is
7  referred to as sometimes as talc/asbestos
8  controversy in the early 1970s is proof that the
9  risk presented was credible, right?
10     A.  I would say that their actions
11  over -- beginning in the 1970s through the
12  1980s, in my mind, lend credence to the idea
13  that they believe that the risks were credible.
14  Yeah.
15     Q.  Okay.  And so in trying to
16  understand what that talc/asbestos controversy
17  is, we're talking about a document that you cite
18  and quote from in your report.  And if we go
19  back to paragraph 1, it talks about clean mine
20  approach.  It says:
21        "We believe this mine to be very
22        clean; however, we are also confident
23        that fiber forming or fiber type
24        minerals could be found."
25     In that phrase, starting with,

Page 143

1  "however," do you see asbestos anywhere in that
2  phrase?
3     MS. PARFITT:  Objection, form.
4     THE WITNESS:  I do recognize the word
5  "however," yes.
6     BY MR. EWALD:
7     Q.  Do you see that phrase:
8        "however, we are also confident
9        that fiber forming or fiber type
10        minerals could be found."
11     Do you see the word "asbestos" appear
12  anywhere?
13     A.  No.  Not in that part of the
14  sentence, no.
15     Q.  Right.  And the next sentence
16  says:
17        "The usefulness of the 'Clean
18        Mine' approach for asbestos only is
19        over."
20     That's what it says, right?
21     A.  Right, correct.  Yes.
22     Q.  "Asbestos only," right?
23     A.  Correct, yes.
24     Q.  And then when we scroll back to
25  4 b., and it talks about the fact that there's a

Page 144

1  possible regulation that's out there that could
2  be promulgated from FDA food division that
3  include not only asbestos, but also talc in a
4  fibrous form, correct?
5     MS. PARFITT:  And you're asking him,
6  is that what it says?  Is that the question,
7  John?  Is that what that says?
8     BY MR. EWALD:
9     Q.  Yeah, is that how he understands
10  it?
11     MS. PARFITT:  Well, that's a
12  different --
13     THE WITNESS:  Yeah.  That's not --
14     MS. PARFITT:  -- question.
15     THE WITNESS:  That's now exactly how I
16  understand that sentence.  I mean -- or sorry,
17  that paragraph that I interpreted that paragraph
18  as, We might detect stuff that registers as
19  asbestos; this new method might detect stuff
20  which could -- again, we're getting outside my
21  expertise.  But as you could consider me a
22  layperson on this issue, and as a layperson, I
23  interpret that as saying, Maybe it actually is
24  asbestos, you know, or it's something that
25  registers asbestos, but we're going to get a

Page 145

1  positive hit with this new method.
2     BY MR. EWALD:
3     Q.  I want to talk about the other
4  document that you mentioned --
5     A.  Sure.
6     Q.  -- a moment ago.  And that one is
7  the January 1975 one.  If it helps you, I
8  believe the doc number that you guys put,
9  probably by tab or index, is 128.
10     MS. PARFITT:  One, two, eight, okay.
11  One, two, eight.  Just give us one moment, John.
12  We'll grab it.
13     MR. EWALD:  Sure.
14     MS. PARFITT:  And, John, again, it's
15  review of the present status of talc, January
16  1975.
17     MR. EWALD:  Yes.
18     MS. PARFITT:  Okay, very good.  Thank
19  you.
20     BY MR. EWALD:
21     Q.  Okay, for the record, we're
22  marking as Exhibit 9 a January 1975 document
23  titled "Review On The Present Status Of Talc
24  Safety Substantiation Activities And Update Of
25  Contingency Plans,"  Bates Number of

37 (Pages 142 - 145)

Page 146

1  J&J000026987.
2      EXHIBIT NO. 9: "Review On The Present
3      Status Of Talc Safety Substantiation
4      Activities And Update Of Contingency
5      Plans," January 1975, Bates Number of
6      J&J000026987.
7  BY MR. EWALD:
8      Q.  And, Doctor, this is a document
9  that you reviewed and cite and quote in your
10  report, correct?
11      A.  Yes.
12      Q.  And if we turn to page 2, you'll
13  see there is a historical review on page 7. I'd
14  like to turn there. Let me know when you're
15  there.
16      A.  Let me see. It's page 7 in the
17  document. Yeah. Okay.
18      Q.  So this 1975 document starts with
19  on the "Historical Review" bullet point that:
20          "Researchers and consumerists
21      first raised questions on talc several
22      years ago. The most vocal of these
23      was the Tenovus Group in England and
24      the Mount Sinai Hospital Group in New
25      York City."

Page 147

1      It goes on to say:
2          "One of their first publications
3      asserted that they found talc and
4      ovarian cancer tissue. Subsequent to
5      this publication their laboratory was
6      examined by Dr. Pooley, consultant of
7      Johnson & Johnson, and Dr. Geoffrey
8      Lord. Through the Medical Research
9      Council in England they were
10      criticized for their techniques. That
11      is, the individuals who examined their
12      laboratory found very high backgrounds
13      of talc in the processing solutions
14      and paraffin baths which made the
15      occurrence of any talc on histological
16      slides highly suspect."
17      Are you familiar at all with the
18  Tenovus Group findings that are referred to
19  here?
20      A.  Not really, no.
21      Q.  Right. If, indeed -- well, let
22  me put it this way. I want you to assume that
23  Johnson & Johnson scientific assessment of
24  Tenovus Group's first publication is correct,
25  that they were criticized for their techniques

Page 148

1  and the identification of the issues in this
2  paragraph. Assuming that's correct, is that
3  something that Johnson & Johnson should have
4  reported to consumers, otherwise, it would be
5  misleading and deceptive?
6      MS. PARFITT: Objection. Misstate the
7  evidence.
8      THE WITNESS: You know, it's hard for
9  me to comment on a specific event, especially
10  because I'm just not familiar with this report
11  from Mount Sinai, and then the inspection of the
12  individuals, and it's mentioned here, Medical
13  Research Council in England. So it would be
14  hard for me to form an opinion of that specific
15  event. But just to situate this historically,
16  then you have a whole lot of actions post-1975
17  that seem to be taking the health concerns
18  pretty darn seriously, as evidenced by all the
19  cornstarch discussion that we were having
20  earlier.
21      So those are all documents and market
22  research testing that's coming way after 1975.
23  And I just -- if this is an open and shut, kind
24  of, issue in 1975, then why are they spending so
25  much time and money thinking about a replacement

Page 149

1  product afterwards?
2      BY MR. EWALD:
3      Q.  Do you know who Dr. Selikoff is?
4      A.  No, I don't.
5      Q.  By the way, did you read this
6  part of the document that you cited and quoted
7  in your report?
8      A.  I did, yes, I believe so, yeah.
9      Q.  All right. So this goes on in
10  the second bullet on page 7, carrying over to
11  page 8:
12          "Dr. Selikoff, Director of
13      Environmental Sciences Laboratory,
14      Mount Sinai School of Medicine has
15      been a vocal leader in environmental
16      pollution and is presently stationed
17      at Mount Sinai Hospital in New York
18      City. He has with him Dr. Langer, who
19      is a mineralogist. They concentrated
20      on the asbestos issue and contend that
21      the presence, even a single fiber
22      could cause cancer. In the press they
23      have established considerable
24      confusion by linking talc with
25      asbestos using terminology stemming

38 (Pages 146 - 149)

Page 150

1    from geological origin. They have
2    been responsible for erroneous
3    statements to the New York Times
4    regarding the content of asbestos in
5    talcum powders. These statements were
6    later retracted in subsequent New York
7    Times publications."
8        Did I read that correctly?
9        A.  You did read it correctly, yes.
10       Q.  So here we have an internal
11   document, Johnson & Johnson, 1975. It's Johnson
12   & Johnson saying that in the press, it is people
13   like New York Times and Dr. Langer who are
14   establishing considerable confusion by linking
15   talc with asbestos, correct?
16       MS. PARFITT: Objection, form.
17       THE WITNESS: That's what it appears
18   to say, yes.
19       BY MR. EWALD:
20       Q.  And you don't have the expertise,
21   one way or another, to know whether Johnson &
22   Johnson is right in that the conclusions of
23   Dr. Langer and Dr. Selikoff are erroneous nor
24   retracted, right?
25       A.  No.

Page 151

1        MS. PARFITT: Objection, form.
2        THE WITNESS: I'm not able to evaluate
3    that.
4        BY MR. EWALD:
5        Q.  It goes on to say on page 9:
6            "Johnson & Johnson has always
7        taken a position of cooperation."
8        And the top question, Food and Drug
9    Administration notes. You know anything about
10   Dr. Lewin's testing, know anything about that?
11       A.  I know the name. But no, not
12   really it. Mr. Ewald, I just -- I do want to --
13   because that's not the only aspect of the
14   document that I discussed. And I think there is
15   a really informative part of the document on the
16   last page, on page 18 where they talk about
17   strategy, which is most germane to what I
18   reviewed, certainly where I focused my efforts
19   and my reading of that last page is, Look, our
20   best bet is to go with cornstarch. The first
21   sentence is:
22           "Cornstarch appears to be the
23       number one answer to any alternates to
24       talcum powder. We presently have..."
25       Something that's ready to go. Then

Page 152

1    they talk about some of the potential problems
2    which we talked about in other documents seem to
3    be economic problems. Here, they're mentioning
4    some other potential medical problems. Those
5    didn't bear out -- I don't see those in any
6    other documents post that point.
7        But even in the context of all of
8    these health issues, they're talking about,
9    okay, well, cornstarch seems to be a really good
10   alternative solution. We think it's the number
11   one answer. And I think that's very important
12   to understanding at least the marketing strategy
13   and what -- what I'm speaking to.
14       Q.  And I appreciate your point on
15   that. Do you think that it is appropriate,
16   scientifically, to take a look at the talc
17   strategy conclusion on page 18 to 19 without
18   understanding or having the ability to
19   understand the historical context that is
20   communicated in the preceding 18 pages.
21       MS. PARFITT: Objection, form.
22       THE WITNESS: Are you saying, is it --
23   is it -- I don't -- is the question about
24   whether it's scientifically valid for J&J or...
25       BY MR. EWALD:

Page 153

1        Q.  For you. Reach conclusions that
2    you do about what this paragraph means about
3    cornstarch alternatives without understanding
4    the context in which it is written?
5        MS. PARFITT: Objection, misstates,
6    what is earlier testimony.
7        THE WITNESS: Again, just to clarify,
8    my position is, you know, if I were to, at a
9    high level, summarize how I interpret this
10   document is there are a lot of concerns about
11   the safety of talc. We have some studies that
12   are out -- currently underway. Some of those
13   seem to be sponsored by Johnson & Johnson. All
14   of these, as I interpret them, are, again,
15   concerns about asbestos and lung cancer.
16       And so when -- again, I'm not -- this
17   is outside my expertise, but when I look at
18   something like the Rubino studies that's talking
19   about lung cancer, not ovarian cancer or
20   anything like that, and then they're saying,
21   Okay, well, there are all of these problems and
22   one obvious solution here is to go with
23   cornstarch. And that began -- that's one
24   document in a long line of documents which
25   reinforces this idea that I think culminates in

39 (Pages 150 - 153)

Page 154

1  some documents later on where they say things
2  like, it's an inevitability that corn, excuse
3  me, talc is going to be removed from the market.
4  How should we figure out how to replace it, et
5  cetera, et cetera.  So -- yeah.
6        BY MR. EWALD:
7        Q.  So you mean --
8        MS. PARFITT:  Please.  Are you done?
9  Are you done?
10       THE WITNESS:  I'm done, yeah.  Yeah,
11 go ahead.
12       BY MR. EWALD:
13       Q.  You made reference to some of the
14 studies being funded by J&J is -- are you
15 offering an opinion that it was bad corporate
16 practice to fund studies going to whether or not
17 the products that are being used are safe?
18       MS. PARFITT:  Objection, misstates his
19 testimony.
20       THE WITNESS:  My understanding, again,
21 this is outside my area of expertise.  My
22 understanding is that that is a common practice
23 for companies to sponsor medical research.  But
24 my problem with it is then what they tell the
25 public, because they don't communicate that to

Page 155

1  the public at all.  They say, you know,
2  independent scientists have concluded that this
3  is safe.  And, no, it's not true that these
4  scientists were working completely
5  independently.  And I think yet another instance
6  in which they're misleading the public,
7  misleading consumers, and not allowing people to
8  really make up their own mind about the issue.
9        BY MR. EWALD:
10       Q.  What about, you talked about
11 Health Canada.  Do you know whether any of the
12 studies that were relied on by Health Canada
13 were funded by some of the plaintiff's law firms
14 that are on this very deposition.
15       MS. PARFITT:  Object, form.
16       THE WITNESS:  No, I don't know about
17 any of the specifics of those.
18       BY MR. EWALD:
19       Q.  Does that matter to you?
20       A.  I'm sorry?
21       Q.  Does it matter to you whether or
22 not the -- some of the studies relied on by
23 Health Canada are funded by plaintiff law firms?
24       MS. PARFITT:  Objection, misstates the
25 evidence.

Page 156

1        THE WITNESS:  You know, I would have
2  to -- I would have to look at it.  But, I mean,
3  I guess if you want to talk about specifics --
4  I'm not aware of that.  Again, I can't comment
5  on that right now because you're just telling me
6  about it.  But I haven't verified it in any way
7  for myself or looked into it.
8        BY MR. EWALD:
9        Q.  I guess -- I understand that.
10 I'm asking whether, if what I'm saying is true,
11 does that matter to you?
12       MS. PARFITT:  Object, does it matter
13 to him.
14       THE WITNESS:  Again, I thought -- I'll
15 just kind of restate, hopefully, to clarify.
16 That funding for research comes from somewhere,
17 to me, isn't necessarily problematic when we're
18 talking about the consumer-related issues, is,
19 what do you then communicate to the public.  In
20 this case, Johnson & Johnson, we could look at a
21 1985 press release document where they're
22 coaching -- what seems to be to coach PR people
23 within the organization about how to talk about
24 Johnson's Baby Powder.  And they use words like
25 "independent scientists."  So that part is

Page 157

1  misleading, and that's really what I'm talking
2  about.
3        BY MR. EWALD:
4        Q.  So if a scientist completes a
5  study and that study is funded by a party
6  interested in the result, you wouldn't call that
7  person an independent scientist?
8        MS. PARFITT:  Objection.
9        THE WITNESS:  I wouldn't say that
10 those scientists have worked independently.
11       BY MR. EWALD:
12       Q.  Okay.  Let's look at another
13 document around the same time.  This was one
14 that I don't think I saw in your report.  I
15 could be wrong, but was in the additional
16 documents reviewed.  It is 0419 in your indexing
17 system.  Let me know when you've got it.
18       MS. PARFITT:  John, again, if you give
19 us just a moment.
20       MR. EWALD:  Sure.
21       MS. PARFITT:  And John, again.  0419.
22 That's just four letters, right?
23       MR. EWALD:  0419 is the four numbers,
24 yeah.
25       MS. PARFITT:  John, I'm looking at his

40 (Pages 154 - 157)

Page 158

1 references and Dropbox, and I'm not seeing 0419,
2 so may can either come back --
3 MR. EWALD: If it makes any difference
4 this was from the production you guys made a day
5 or two ago.
6 MS. PARFITT: The only addition we
7 made the other day were websites.
8 MR. EWALD: It's also in the
9 additional -- maybe it's in the additional
10 document review folder. I think that's where I
11 remember seeing it.
12 MS. PARFITT: So I may have to have
13 you put that in the chat because I don't see a
14 copy of that. Okay, I'm going in -- and I don't
15 have my computer to go into the Dropbox.
16 MR. EWALD: No worries.
17 MS. PARFITT: John, if you can give me
18 a date of the report, that may be helpful, too.
19 MR. EWALD: Yeah., It's just, if it
20 helps at all, I found it looking right now in
21 the folder that was request numbers, 5 to 19,
22 materials reviewed, additional materials
23 considered, 0419 pops up there, but the date is
24 March 3, 1975.
25 MS. PARFITT: Again, John, I hate to

Page 159

1 make you do that, but I can't get into my
2 computer right now since you're using it, or I'd
3 go through the Dropbox. I may have to have you
4 put that in the chat.
5 MR. EWALD: That's fine. What I'm
6 doing right now, it's just a two pager.
7 MS. PARFITT: If you'd be kind enough,
8 when you put it in, unless he recognizes it
9 right away, give him a couple minutes to refresh
10 his memory on it, since I don't have anything to
11 put in front of him.
12 MR. EWALD: Sure.
13 MS. PARFITT: Thank you.
14 THE WITNESS: I think just to make
15 it -- I'll open it, but I'm just going to
16 minimize that so I can just look it, because I
17 think it's going to be too much to try to go
18 back and forth. So I'll just look off of the
19 screen and then I'll let you know if I've got a
20 break from that.
21 BY MR. EWALD:
22 Q. So, sorry. Are you reviewing it
23 now?
24 A. I'm sorry. Yeah, so I just
25 finished reading the first paragraph.

Page 160

1 Q. Yeah, yeah. Take your time. I
2 just want to make sure, on the same page.
3 A. Okay. I've completed the second
4 paragraph. Okay. I've completed that
5 paragraph.
6 Right. And I think this is at least,
7 maybe, one of the things in the previous
8 document where, you know, I was -- led me to
9 believe that some of the studies were paid for
10 by J&J. Okay, I finished reading it. Yeah.
11 Q. This wasn't the additional
12 documents considered folder, at least when I
13 looked at it.
14 And is it fair to say that the
15 document in that folder would not have been
16 included in your report?
17 A. I think that's fair to say. I
18 had assistance putting those folders together.
19 I didn't assemble those folders myself. But,
20 yeah, I think that's probably fair.
21 Q. By the way, on that front,
22 besides assistance -- all the assistance at
23 University of Toronto?
24 A. No, no.
25 Q. Assistance with the law firm?

Page 161

1 A. Correct, yes. Yes.
2 Q. Do you know, or do you have
3 any -- let me say it this way.
4 How does this document, if at all,
5 inform your opinions in this case?
6 A. Again, I don't remember this
7 being a part of my opinions. In reading it,
8 now, to be quite candid, I do not interpret it
9 favorably to Johnson & Johnson.
10 Q. Do you think I'm only going to
11 put documents in front of you that are favorable
12 to Johnson & Johnson?
13 A. No, no. I mean, but you're
14 just -- well, I don't think that's an
15 unreasonable assumption, actually. But, you
16 know, my reading of this is, you know, what
17 we -- if you want to talk about specifics, I'm
18 happy to. But it is, you know, essentially the
19 first part is, you know, we've only responded
20 and looked for data when people have found
21 something bad about our product. And part of
22 the reason why we didn't do that is because we
23 might find something -- part of the reason why
24 we weren't more proactive is that we didn't --
25 might find something bad ourselves. And, man,

41 (Pages 158 - 161)

Page 162

1 that would be even more embarrassing than
2 somebody else finding something bad.
3        And then, there's some discussion
4 about, Well, maybe we should take an alternative
5 strategy, and if we're able to sponsor some
6 research proactively that finds negative
7 effects, that would be good, because now we're
8 not just responding in kind. But to me, as a
9 scientist and a researcher, this reads a little
10 bit like, We've reached our conclusion, and how
11 best to strategize on looking for evidence
12 that's going to best support that conclusion
13 with the general public, is how I interpret that
14 document.
15        Q. Okay. And do you know, for
16 example, whether Johnson & Johnson funded the
17 NIOSH study of talc mine workers, as referred to
18 here and at the end?
19        A. I don't know that. No, no.
20        Q. Do you know whether or not the
21 study, you see it's reference there, was
22 ultimately published in the literature for
23 anyone to review?
24        A. Again, I don't know. That might
25 have been one of the studies that I looked at,

Page 163

1 in looking at many studies, but I don't recall.
2        Q. Do you recall reviewing the final
3 published study of Professor Rubino by the
4 Italian talc millers and miners?
5        A. Again, I -- not well, and
6 certainly that I couldn't speak to its merits or
7 dis-merits. But I do, I think, remember reading
8 that study, yes.
9        Q. All right. Let's go back to FDA
10 1986. We marked it as Exhibit 7 before the
11 lunch break.
12        MS. PARFITT: If you can give me a
13 minute. I put it in the exit screen and let me
14 see if I can get it.
15        THE REPORTER: Sorry, counsel, did you
16 want to mark that previous document?
17        MR. EWALD: I meant to say Exhibit 10.
18 If I didn't, that document, March 3, 1975.
19        EXHIBIT NO. 10: Johnson & Johnson
20        document, Management Authorization for
21        Additional Talc Safety Studies, March
22        3, 1975.
23        THE REPORTER: Okay, perfect. Thank
24 you.
25        MR. EWALD: Thank you for the

Page 164

1 reminder.
2        MS. PARFITT: Oh, John. Oh, you have
3 it up?
4        THE WITNESS: Yeah.
5        MS. PARFITT: Okay.
6        THE WITNESS: I'm comfortable. Yeah,
7 yeah, yeah. I'm comfortable.
8        BY MR. EWALD:
9        Q. So when we were talking about
10 this document, we were reading from its response
11 to the citizen petition about talc and asbestos.
12 And I believe we left off saying:
13        "In addition...
14        This is on page 2 of the letter, 4 the
15 PDF:
16        "...FDA surveillance activities
17        that were conducted in the latter
18        portion of the 1970s showed that the
19        quality --
20        Actually, I took a little bit --
21        A. Mr. Ewald, just for context,
22 because I'm looking at it for the first time.
23 Can you just explain to me the origin of this
24 document, who's producing it, and who's
25 intended audience?

Page 165

1        Q. Sure. Well, the first page is a
2 certificate that has an official red ribbon from
3 the Department of Health and Human Services.
4 And this affidavit talking about that this is
5 from the custody of official records of the US
6 FDA.
7        A. Yes.
8        Q. Certified copy signed from
9 December 2015. And this is a letter response
10 July 1986 to the individual who submitted the
11 November 8, 1983 petition requesting that
12 cosmetic talc be labeled within asbestos warning
13 statement. Do you see that?
14        A. Correct, yes. Okay.
15        Q. And, actually, I was on the wrong
16 page when we left off. We were talking about
17 this paragraph from the FDA about the early
18 1970s, and the FDA stating that:
19        "...the analytical procedures for
20        determining asbestos in talc were not
21        fully developed, and most of the
22        analytical work was conducted without
23        scientific agreement as to which
24        methods were well-suited for the
25        identification of asbestiform minerals

42 (Pages 162 - 165)

Page 166

1    and talc.  Consequently, FDA
2    considered all analytical results to
3    be a questionable reliability."
4    Did I read that correctly?
5        A.  You did read it correctly.
6        Q.  And do you have any basis to
7    disagree with the FDA statement on that.
8        MS. PARFITT:  Objection, form.
9        THE WITNESS:  I don't have any basis
10   to offer an opinion one way or the other.
11   BY MR. EWALD:
12       Q.  And when you are -- sorry.  When
13   you are reviewing documents from the early 1970s
14   that talk about testing results of asbestos, is
15   it important to you, as a scientist, to know
16   whether or not the test methods that are being
17   used are reliable?
18       A.  I mean, if you're asking me,
19   generally, of course.  If I'm evaluating
20   research in my own area where I have expertise,
21   you know, I serve as a reviewer almost weekly,
22   you know, at all of our top journals, some at
23   general science journals.  Yeah, I mean, of
24   course, I'm attending very carefully to
25   methodology, but I also know what I don't know,

Page 167

1    and I'm not able to evaluate methodology in this
2    case.
3        If you wouldn't mind, I don't want to
4    take us off course.  But for my purposes, when I
5    look at a document like this and I read a
6    sentence that's in the previous paragraph that
7    says:
8            "The agency is also aware that
9        some cosmetic talc produced in the
10       1960s and early 1970s did contain
11       asbestiform minerals."
12       And then I read Johnson & Johnson
13   marketing materials that say no asbestos ever,
14   right?  That's the kind of incongruency that is
15   really setting off alarm bells for me.  So I'm
16   not able to evaluate the science of detection,
17   but I can say, well, look, the FDA is saying it
18   used to contain asbestos, at least.  And
19   Johnson, and Johnson is telling consumers:
20   Never contained asbestos.  And that is the kind
21   of disconnect that I'm really concerned with.
22       Q.  Well, so now we're -- it doesn't
23   say -- well, specifically what it says on page 1
24   of the letter is the agency is also aware that
25   some cosmetic talc produced in the 1960s and

Page 168

1    early 1970s did contain asbestos form mineral.
2    That's what it says, right?
3        A.  Correct?  Yes.
4        Q.  Does it say cosmetic talc
5    produced by Johnson & Johnson?
6        A.  No, it doesn't.
7        Q.  And if I'm remembering correctly,
8    you stated earlier that you're not offering an
9    opinion whether or not Johnson & Johnson talc
10   products have ever had asbestos, correct?
11       A.  Correct, correct.  Yes.  And
12   again, I'm not citing this document.  This isn't
13   a document that I relied on, and so I'm not
14   making broad conclusions.  But if we're pointing
15   to what's inside the scope of my expertise
16   versus not, that statement is much more in the
17   scope of my expertise in evaluating the
18   marketing materials than would be
19   classifications of different kinds of fibers.
20       Q.  It goes on in the second page of
21   the letter to state:
22           "Consequently...
23       The FDA says:
24           "...we find that there is no
25       basis at this time for the agency to

Page 169

1            conclude that there is a health hazard
2        attributable to asbestos in cosmetic
3        talc.  Without evidence of such
4        hazard, the agency concludes that
5        there is no need to require a warning
6        label on cosmetic talc."
7        Did I read that correctly?
8        A.  Yes, you did read it correctly.
9        Q.  I know you didn't see this before
10   issuing your report, but does that conclusion by
11   the FDA have any impact on your opinions?
12       A.  No.  But also, doesn't the same
13   logic apply as -- so we just said before, it
14   doesn't say Johnson & Johnson.  It also doesn't
15   say Johnson & Johnson here, right?  So in saying
16   that there used to be talc in it -- used to
17   be asbestos in it, and it's not singling out
18   Johnson & Johnson.  It's also, in this sentence,
19   not saying, you know, Johnson & Johnson in
20   particular is free from this.
21       Q.  But do you understand that this
22   was a request for the FDA to change -- to
23   require certain hazardous label warning, and
24   that they are rejecting that for all cosmetic
25   talc?

43 (Pages 166 - 169)

Page 170

1    MS. PARFITT: Objection, form.
2    THE WITNESS: Again, I mean, I can
3  start to form an impression of this document
4  based on reading it. It's harder for me to put
5  it into a larger context. But --
6    BY MR. EWALD:
7    Q. Now, another part of the
8  document, if we go a little bit further, this is
9  a June 6, 1985 memorandum, Department of Health
10  and Human Services. "Asbestos in Talc" from
11  Quantitative Risk Assessment Committee, Gary
12  Flamm, Office of Toxicological Sciences. And
13  there's some discussion of asbestos and lung
14  cancer.
15    I want to ask you about ovarian talc
16  study:
17    "For completeness, a discussion
18    is presented on a human
19    epidemiological study purporting to
20    show an association between talc use,
21    (talcum powder used for genital
22    dusting on the perineum or on sanitary
23    napkins) and ovarian cancer.
24    The Cramer et al. study [2],
25    which purported to show a

Page 171

1    significantly increased relative risk
2    for ovarian cancer associated with
3    talc use, 1) appears to have been
4    misinterpreted statistically, 2) was
5    uncorrected for several likely biasing
6    factors and 3) appears to have been
7    strongly contradicted by another study
8    showing a reduced relative risk as
9    significant in the negative direction
10    as the Cramer study was in the
11    positive direction."
12    Did I read that correctly?
13    A. You did read it correctly, yes.
14    Q. You've seen this before?
15    A. No, I've never seen this.
16    Q. Is it -- if the FDA is correct,
17  that the Cramer 1982 study has the three
18  deficiencies that I just identified, is it still
19  your position that when Johnson & Johnson
20  becomes aware of a publicly available Cramer
21  study in 1982, it should have communicated that
22  to consumers?
23    MS. PARFITT: Objection to form.
24    THE WITNESS: I mean, again, the basis
25  of my opinion isn't around one single study or

Page 172

1  one moment in time. I would put this document
2  in context with my reading right, that was like
3  1986. But then you also have 1986 documents
4  that are right around the same time which are
5  advocating for the replacement of talc powder
6  with cornstarch when they're doing market
7  analyses, when they're evaluating safety
8  hazards, et cetera. And so, I mean, my take
9  would be, if it's such a non-issue, why are they
10  continuing to speculate on it and consider
11  alternatives?
12    BY MR. EWALD:
13    Q. You cite in your report, the
14  FDA -- let's go there. Hold on. So, in page
15  19, including paragraph 75, you reference a
16  citizens petitions to the FDA from 1994. And
17  then on page 21, starting on paragraph 82, you
18  also mention a second citizens petition,
19  relating to talc 2008, right?
20    A. Correct, yes.
21    Q. And I saw on your reference list
22  that you're aware of the 2014 decision denying
23  the citizen petition request, correct?
24    A. I am aware of that, yes.
25    Q. Is there any reason why you

Page 173

1  didn't include that in your report?
2    A. No. I mean, it wasn't -- you
3  know, I'm not -- my report isn't about the FDA.
4  My report is about Johnson & Johnson and how
5  they talk to consumers.
6    Q. Okay. Well, a citizen submits --
7  well, actually, it says, this is a cancer
8  prevention coalition submits a petition to the
9  FDA saying, requiring a warning label relating
10  to talc, ovarian cancer, and that is rejected by
11  the FDA. And you're saying that that has no
12  relevance to your opinions?
13    MS. PARFITT: Objection, misstates
14  stasis testimony.
15    THE WITNESS: Well, I mean, again, my
16  understanding of the timeline here is that
17  there's first a petition in 1994 and then -- and
18  then another petition in 2008. And so there's
19  no response to the '94 or 2008 until 2014. And
20  so, you know, that's 14 years, you know, by my
21  count, where there's no response at all, right,
22  from the FDA.
23    BY MR. EWALD:
24    Q. Understood. But does it have no
25  relevance to you -- does it not have any impact

44 (Pages 170 - 173)

Page 174

1  on your opinion that the citizens petitions that
2  you cite and quote from in your report were
3  ultimately denied by the FDA?
4        MS. PARFITT:  Objection, form.
5        THE WITNESS:  You know, again, I'm
6  mostly interested in what Johnson & Johnson is
7  telling their consumers.  And so there's a
8  period of time, like everything before 2014,
9  there's a lot of marketing actions that are
10 happening.  And so if you want to say, okay,
11 well, that was an important period in which the
12 FDA has a decision about it, there's still this
13 huge stretch of time where there's citizen
14 positions [sic], there's more and more studies
15 that are coming out that are finding an
16 association.
17       There are these internal discussions
18 about translocation and ovarian cancer.  There
19 are these emails that are exchanged between
20 people at Johnson & Johnson saying, I don't feel
21 comfortable selling this or having it in the
22 baby aisle, or, we never told women to put it on
23 their perineal area.  And so all of that is
24 happening prior to 2014.  So in terms of, is
25 there evidence that J&J didn't get consumers a

Page 175

1  fair shake?  I think there's lots of evidence of
2  that.
3        BY MR. EWALD:
4        Q.  Well, so are you suggesting that
5  if the science -- if the science -- that's
6  wrong.
7        Are you suggesting that if the side of
8  the science that Johnson & Johnson has
9  steadfastly stated it believes is accurate, that
10 its talc does not cause cancer, if that science
11 is ultimately proven correct, your opinion is
12 still, they've engaged in misleading and
13 deceptive conduct because they didn't express
14 the alternative viewpoint in previous years?
15       MS. PARFITT:  Objection, form.
16       THE WITNESS:  Yes.  Yeah, yeah, yeah.
17 Short answer, yes.
18       BY MR. EWALD:
19       Q.  Right.  Now, you mentioned the
20 baby aisle thing.
21       And specifically, are you talking
22 about the Todd True emails?
23       A.  Yeah.
24       Q.  Okay.  And so we're all on the
25 same page.  It's referred to 84 through 86

Page 176

1  paragraphs, on page 22, is that right?
2        A.  Yes, that's correct.  Yeah.
3        Q.  Okay.  And so how do you
4  interpret what Mr. True is saying in those two
5  emails that you quote at length in your report?
6        A.  Well, I think there's a few
7  things that are going on here that are really
8  important.  One, you know, you have somebody
9  within the company that seems to be taking these
10 health concerns very seriously.  You know:
11        "The reality that talc is unsafe
12        for use on or around babies is
13        disturbing.  You know:
14        "I don't think we can...keep it
15        in the baby aisle."
16       And so there's raising those concerns
17 internally, which is not inconsistent with other
18 periods of time.  But then there's, there's also
19 some kind of severe institutional amnesia in the
20 responses, right, about, for instance, why
21 cornstarch was developed.
22       And like in Fred Koberna's reply on
23 April 18th, okay, well, the reason why we
24 launched cornstarch is because women prefer the
25 feel of it.  Well, that's not true at all,

Page 177

1  because we can look back to all of the documents
2  that we were talking about in the early eighties
3  where it was about addressing these health
4  concerns.  There was nothing about women might
5  like the feel better.  That's not in any of the
6  testing.
7        And so not only are there concerns
8  about the product, but then there's kind of this
9  institutional amnesia about why alternatives
10 were developed, what potential health risks
11 might be.  Yeah, I'll stop there.
12       Q.  Okay.  And so when you say about
13 Todd True -- first of all, Todd True, you have
14 it there in parentheses is the global creative
15 director at J&J?
16       A.  That's my understanding, yes.
17       Q.  Fair to say that at least you
18 wouldn't expect the global creative director to
19 have any scientific medical background, correct?
20       MS. PARFITT:  Objection, form.
21       THE WITNESS:  I would expect that
22 person to have a high touch with consumers.
23       BY MR. EWALD:
24       Q.  Okay.  And when you talked about
25 these health concerns that are raised by

45 (Pages 174 - 177)

Page 178

1  Mr. True, what health concerns is he referring
2  to?
3        A.  I can only assume that it is the
4  same health concerns that we've been talking
5  about.
6        Q.  Having what?
7        A.  I guess, relating to ovarian
8  cancer or cancer.
9        Q.  Right.  And in fact, in your --
10  we'll mark it as Exhibit 11, your three page
11  intro -- three page set of notes that
12  Ms. Parfitt helpfully sent over, you have
13  different sections, you have inhalation, you
14  have inhalation and cancer, asbestos.  And you
15  have a section where you have some excerpts
16  under ovarian cancer, correct?
17        EXHIBIT NO. 11:  Dr. Newman's notes.
18        THE WITNESS:  Correct, yes.
19        BY MR. EWALD:
20        Q.  And you include the Todd True
21  excerpts under the ovarian cancer section,
22  right?
23        A.  Yeah.  And to be clear, this is
24  just my categorization.
25        Q.  Right.  And you said you're

Page 179

1  making an assumption that he's referring to
2  ovarian cancer, right?
3        A.  Correct.  My understanding from
4  all of the materials that I reviewed is that at
5  that point in time, in the early 2000s, the main
6  health risk that we're talking about with talcum
7  powder is associated with cancer, ovarian
8  cancer.
9        Q.  So if that's the case, and you
10  said that you expect Mr. True to have a high
11  touch with customers, why would he be saying we
12  should move this cancer causing powder from the
13  baby aisle to the adult aisle?
14        A.  I find that very -- I mean, I
15  find it very disturbing.
16        Q.  So now you're disturbed by
17  Mr. True's email that you're saying that he is
18  suggesting that we need to be -- make sure we're
19  killing adults and not babies?
20        A.  I don't know how else to
21  interpret that sentence.
22        Q.  Well, remember that when we
23  talked about aspiration and that risk to infants
24  earlier?
25        A.  Sure, yeah.

Page 180

1        Q.  This maybe be referring to a risk
2  of aspiration with babies that's warned on the
3  label?
4        MS. PARFITT:  Objection, misstates the
5  evidence.
6        THE WITNESS:  Yeah, I don't -- you
7  know, I don't see evidence of that.  I mean,
8  also the last sentence is, given the number of
9  other ingredient issues we were facing, just
10  seems like an easy fix and win.  So this isn't
11  talking about inhalation risk, this is talking
12  about what's in the product, what's in the
13  ingredients, right?
14        BY MR. EWALD:
15        Q.  Well, you tell me.
16        A.  So the next -- okay:
17            "I don't mind selling talc, I
18        just don't think we can continue to
19        call it Baby Powder and keep it in the
20        baby aisle.  Have we done any research
21        to determine the potential negative
22        impact to our brand or best for baby
23        strategy by maintaining this
24        ingredient?"
25        So it isn't by this aeration method or

Page 181

1  type of cap or -- they're talking about an
2  ingredient that's in there.  So I would assume
3  that to be talc or talc that contains asbestos.
4        Q.  Doctor, can you state to a
5  reasonable degree, degree of professional
6  certainty that the health risk that Todd True is
7  talking about in his emails that you referred to
8  and quote, in paragraphs 84 and 85, is ovarian
9  cancer?
10        A.  No.  I mean, I can't -- very,
11  very little you could say for certain.  I think
12  it is more probable than not, in my reading,
13  that he is talking about an ingredient issue
14  with the product since he uses the word
15  ingredient a number of times and not some other
16  health risk.  In Koberna's reply, he
17  spontaneously -- they're both talking about
18  cornstarch, right?  I mean, again, I don't know
19  how this -- it's difficult for me to substitute
20  a theory in which they're talking about
21  inhalation because it just doesn't fit the
22  language that's used there.
23        Q.  Well, in paragraph 86,
24  Mr. Koberna is talking about how:
25            "...we introduced the cornstarch

46 (Pages 178 - 181)

Page 182

1    variant as an alternative to talc for
2    use on babies.  Due to the talc issue
3    and some doctors recommending for moms
4    not to use powder on their babies, we
5    don't promote powder to moms."
6        You're telling me that you can't
7    reasonably read that couple of sentences to mean
8    that the recommendation by doctors that you
9    referenced, all the way back in 1966, not to use
10   baby powder on infants because of the risk of
11   aspiration?
12       MS. PARFITT:  Objection.
13       BY MR. EWALD:
14       Q.  Is that not what they're
15   referring to there?
16       MS. PARFITT:  Sorry, John.  Objection,
17   form, misstates the evidence.
18       THE WITNESS:  No, I don't read it that
19   way at all because there's nothing that I
20   encountered in any of the evidence that I
21   reviewed which suggested that one of the
22   benefits of the cornstarch variant had to do
23   with inhalation.  And so I don't know why he
24   would mention a cornstarch variant in reference
25   to inhalation.  There are other aspects of

Page 183

1    Koberna's reply that are concerning, right,
2    because he says, if I'm not wrong, he's the
3    director of, basically, marketing public
4    insights, strategic insights, right?  He says,
5    we don't promote powders to moms.  That's not
6    true at all.  They advertise powders to moms.
7    There's a long history of them advertising to
8    adult women.  And they created special lines
9    around that.
10       So I think there's a lot that, in his
11   reply, that's just factually not correct.  And
12   the only way I can make sense of it is that he's
13   talking about talc as an ingredient and
14   cornstarch as an alternative ingredient.
15       BY MR. EWALD:
16       Q.  Right.  And so you're -- and
17   again you're reading of 84 and 85, paragraphs,
18   and 86, I guess, too.
19       A.  Yeah.
20       Q.  The Todd True emails is that Todd
21   True is saying we can't have products that can
22   cause ovarian cancer used on babies.  We need to
23   move that cancer causing product to the adult
24   aisle.  That's your testimony?
25       A.  Just to quote -- yeah, that is my

Page 184

1    testimony.  85 reads:
2        "Basically, I'm thinking it would
3        be in the brand's...interest to
4        develop a strategy to move out of the
5        baby aisle for our talc product and
6        either create a direct Adult
7        proposition or simply replace the talc
8        ingredient with cornstarch."
9        So that, to me, says he's talking
10   about an ingredient issue.  The ingredient he's
11   worried about is talc.  And should we replace it
12   with cornstarch?  And so I -- and don't know --
13   I can't guess at what exactly is in Todd True's
14   head and if he wants to give cancer to adults or
15   something like that.  I don't know at all.  But
16   you know, yeah.
17       Q.  All right.  We talked about a
18   little bit earlier on paragraph 75.
19       A.  Yeah.
20       Q.  One second.  I'll get back to
21   that one.  Let's talk about -- oh, we've going
22   about hour, twelve minutes.  I'm happy to keep
23   on going, but if people want to take a break,
24   I'm happy to take a break.
25       A.  Yeah, take a break.  I could use

Page 185

1    the restroom.
2        -- RECESS TAKEN AT 2:56 P.M.
3        -- RESUME AT 3:07 P.M.
4        BY MR. EWALD:
5        Q.  Dr. Newman, if you can turn
6    please to page 19 of your report, paragraph 75.
7        A.  Yes.
8        Q.  And you talk here about certain
9    statements from Dr. Alfred Wehner.  And can you
10   explain to me why you included these two
11   paragraphs in your report?
12       A.  Because -- so my understanding is
13   Alfred Wehner is a consultant of Johnson &
14   Johnson.  And then he is raising issues, two
15   people at Johnson & Johnson, to say that, you
16   know, I mean, I could just quote it directly,
17   but that, you know, to say that:
18       "'industrial exposure to talc,
19       both by skin contact and
20       20 inhalation...presents no
21       significant risk' is 'outright
22       false.'"
23       And so it's certainly relevant to, you
24   know, what -- what does Johnson & Johnson know
25   or internally, what are some of the discussions

47 (Pages 182 - 185)

Page 186

1  versus what are they telling people since this
2  mentions directly kind of what's communicated
3  publicly.
4      Q.  Okay.  And so is it your
5  interpretation of that document that Dr. Wehner
6  is somebody who believes there is a link between
7  talc and ovarian cancer?
8      A.  Yes, that's how I interpret it.
9      Q.  Let's look at the document itself
10 that you're citing to.  It is -- you cite to the
11 one Bates base number of J&J000040596, dated
12 9/17/97.  And, Michelle, I'll give you a chance
13 to find that.
14     MS. PARFITT:  Thank you.  I appreciate
15 that.  John, for some reason, it is not coming
16 up, and I can't search, again, on my computer.
17     MR. EWALD:  For whatever reason, it
18 might have been just me, I couldn't find it in
19 the...
20     MS. PARFITT:  In the Dropbox.
21     MR. EWALD:  In the Dropbox.  I'll put
22 it in the chat.
23     MS. PARFITT:  I'm still looking to see
24 whether or not we got a bad number on it.
25     MR. EWALD:  I'll put it in the chat.

Page 187

1      MS. PARFITT:  I appreciate that.
2      THE WITNESS:  I'm just gonna do the
3  same thing as before.  I'll open it here, but
4  I'll just read off of yours.  I think it should
5  be fine.
6      BY MR. EWALD:
7      Q.  Yes.  It's a two page document,
8  so hopefully it works, okay.  And so I don't
9  forget, we are marking this as Exhibit 12.
10     EXHIBIT NO. 12:  Letter from Alfred
11         Wehner to Michael Chudkowski at J&J
12         Consumer Products.  J&J Bates Number
13         000040596, September 17, 1997.
14     BY MR. EWALD:
15     Q.  And this is not me being the
16 grammar or typo police.  But just so you
17 know, you have Alfred Werner and it's Wehner.
18 W-E-H.  It's kind of hard to read a little bit.
19 Just trying to help you out.
20     A.  Thank you.  I just completely --
21 I read that as an "R."  My apologies.
22     Q.  No, doesn't matter to me.  And
23 September 17, 1997, J&J Bates Number 000040596,
24 and it's directed to Michael Chudkowski at J&J
25 Consumer Products.  And I will now give the

Page 188

1  witness a moment to read.  And please let me
2  know, Doctor, when you want me to scroll down.
3      A.  Okay.  Sorry.  That was the first
4  paragraph.  This one's a little dense.  Yeah.
5  Okay.  I finished that first page.
6      MS. PARFITT:  You might want to read
7  the whole thing.
8      THE WITNESS:  Yep.  Okay.  And I'm
9  just now at the paragraph that begins, "Mike."
10 Okay, all set.
11     BY MR. EWALD:
12     Q.  So after reviewing this two page
13 document again, is it still your opinion that
14 Dr. Wehner has concluded that cosmetic talc does
15 not cause ovarian cancer?  Causes ovarian
16 cancer?
17     A.  That's not --
18     MS. PARFITT:  Objection to form.
19 Please.
20     THE WITNESS:  Sorry.  That's how I'm
21 interpreting what he's saying.
22     BY MR. EWALD:
23     Q.  How are you interpreting it?
24     A.  Sure.  The way that I interpret
25 it is he's critiquing the messaging, which is

Page 189

1  in -- at multiple points, he's saying that you
2  have either denied associations or have said
3  that there is no evidence whatsoever and that's
4  simply false.  Or you said that translocation is
5  possible.  That is false.  To me, I interpret
6  that not as a statement about causality, but
7  about messaging, and that he is critiquing the
8  message of the CFTA, sorry, CTFA, and, you know,
9  in conjunction, Johnson & Johnson.
10     Q.  And so then with that
11 interpretation, how does that impact your
12 opinions in this matter such that you've quoted
13 a couple of different sentences in your report?
14     A.  So my understanding, and this is
15 based on the last paragraph in that document, is
16 that he's a consultant with Johnson & Johnson
17 under retainer.  So at some level, this is
18 somebody whose opinion that they respect and is
19 able to comment on these issues.  And then he's
20 basically saying, Hey, as a friend, I gotta let
21 you know the way that you're handling this is
22 all wrong because you're denying any kind of
23 relationship whatsoever, and you just don't have
24 the footing to say that, which is, you know,
25 exactly what I observe in, kind of, looking at

48 (Pages 186 - 189)

Page 190

1　many, many documents over a long period of time
2　is that, you know, Johnson & Johnson is saying
3　one thing to consumers that's very definitive,
4　where behind the scenes internally, there are a
5　lot more questions and debate.
6　　　Q.　All right.  Let's talk a little
7　bit about Facts About Talc, and in particular
8　your discussion in paragraph 95 on page 3 and 4.
9　　　A.　Okay, sure.
10　　　Q.　You there?
11　　　A.　Yes.
12　　　Q.　Okay.  And you state:
13　　　　"To this day, the company
14　　　maintains that asbestos in talc is
15　　　nothing more 'an urban legend.'
16　　　[company's website, 'Facts about
17　　　Talc']. The company highlights four
18　　　studies which do not find an elevated
19　　　risk of cancer among cosmetic talcum
20　　　powder users.  However, it does not
21　　　discuss the dozens of peer-reviewed
22　　　studies and meta-analyses which do
23　　　find evidence of a statistically
24　　　significant relationship between
25　　　talcum powder use and cancer. Such

Page 191

1　　　biased sampling of the peer-reviewed
2　　　literature is in direct contradiction
3　　　to universally accepted scientific
4　　　practices as well as company's
5　　　invitation for consumers to 'review
6　　　the evidence and make up your mind.'"
7　Did I read that correctly?
8　　　A.　Yes.
9　　　Q.　And do you stand by that?
10　　　A.　I do, yeah.
11　　　Q.　How -- when you said you reviewed
12　Facts About Talc, what parts did you review?
13　　　A.　I went through all of the
14　separate pages, and then, there within the
15　litigation section, there is a documents folder.
16　And I downloaded that documents folder.  You
17　know, there are thousands of documents there.  I
18　didn't read all of those documents.  I looked at
19　many documents in those folders, but that was
20　one of the earlier sources that I consulted.
21　　　Q.　And on the documents that you
22　downloaded and searched through, what sort of
23　searches did you conduct to, kind of, wade your
24　way through them?
25　　　A.　Again, I was looking for things

Page 192

1　that were really relevant to marketing issues,
2　and I didn't find a lot.  Most of the documents
3　that I observed on the Facts About Talc site
4　were about testing and, like, there the presence
5　of asbestos and actually pretty technical
6　documents that, you know, I wasn't able to
7　interpret.  So, you know, I didn't find a lot
8　relevant to marketing.
9　　　Q.　So, then, is it fair to say that
10　the -- well, let me ask you the question.  Do
11　you have a sense of the J&J internal documents
12　with Bates numbers that you include in your
13　table of contents list, how many of those you
14　identified yourself through searching facts
15　about talc?
16　　　A.　I couldn't say for certain.
17　　　Q.　Yeah, but from what you were
18　saying before, you would expect a very large
19　number of them?
20　　　A.　My recollection is that there
21　weren't a lot of marketing documents there.
22　　　Q.　And on the documents that
23　plaintiff's counsel provided you, I understand
24　the request that you gave them of what you were
25　looking for.  How did they provide the documents

Page 193

1　to you?
2　　　A.　So I was provided with a link to
3　Dropbox, and then there would be folders within
4　the Dropbox that would correspond to the
5　categories of documents that I had asked about.
6　And then I would just go through, kind of, one
7　by one.  And as I mentioned before, you know,
8　some of those documents were relevant, some of
9　them weren't relevant.  And so then I would just
10　focus on the ones that pertain to the marketing
11　issues.
12　　　Q.　All right.  I'm gonna share my
13　screen.  For the record, I do have a PDF of this
14　part I'm going to be talking about.  I'm going
15　to start -- the current version of the live
16　website.  Do you have a sense of the last time
17　you looked at Facts About Talc, Doctor?
18　　　A.　I've definitely looked at it
19　since I submitted my report, but I couldn't say
20　exactly how long ago it was.
21　　　Q.　But -- fair enough.  And when you
22　talk about the company highlighting four studies
23　and not discussing the case control studies are
24　trying to find what -- what do you think you're
25　referring to?

49 (Pages 190 - 193)

Page 194

1        A.  I believe it's under the studies
2    tab, is my memory.  Okay.  And then, so then
3    those are the four studies, I believe, that are
4    mentioned.  So it highlights the results of
5    those studies.  But in my search online, I think
6    I identified, I don't know, probably between 30
7    something studies that I found, you know, and so
8    that's what I was referring to.
9        Q.  Okay.  Did you see the part where
10   it's right below it says "Other Studies"?
11       A.  Yes, yes.
12       Q.  Okay.  And talks about the fact
13   that there's a -- not that.  Sorry:
14            "...reconfirms that a statistical
15       association between ovarian cancer and
16       powder users is not found in large,
17       prospective cohort studies, although
18       some, but not all, case-control
19       studies do indicate a slight
20       statistical association.  Case-control
21       studies are studies where groups of
22       people with a history of a specific
23       disease are asked questions about
24       different possible risk factors.
25       These risk factors can include use of

Page 195

1       certain products in the past.  One
2       potential reason that some have found
3       slight statistical associations is the
4       potential for an overestimation of the
5       true association due to 'recall bias.'
6       Recall bias is when people with a
7       disease are more likely to
8       overestimate their exposure to these
9       risk factors than people without that
10      disease.  In these studies, women who
11      know they have ovarian cancer will try
12      hard to remember anything that might
13      be important to explain why they got
14      this terrible disease, which can
15      artificially make it appear that women
16      with cancer use more talcum powder."
17   Did I read that correctly?
18       A.  You read it correctly, yes.
19       Q.  And so you acknowledge that on
20   Facts About Talc section about studies, they
21   discussed the case-control studies?
22       MS. PARFITT:  I'm going to object to
23   the question, John, as I appreciate.  Is he
24   acknowledging that that's what you just read is
25   what appears on Facts About Talc?  Is that the

Page 196

1    question?
2        MR. EWALD:  Yes.
3        MS. PARFITT:  Thank you.
4        THE WITNESS:  Yes, I acknowledge
5    that's what it says, but that's actually the
6    exact text that I used for the study that I
7    conducted, that we talked about earlier.  So
8    when I read this information, I said, Wow,
9    they're really burying that information in the
10   paragraph.  It's tucked away in the middle of
11   the paragraph.  And as a reader, just
12   linguistically, it's a very complicated
13   sentence.  You have to do a lot of work to
14   decode what that sentence means.  And so the
15   question was, if you disambiguate that sentence
16   for consumers, for a reader, do they come to a
17   different impression?  And at least I found
18   initial pilot evidence to suggest, yeah, that
19   even today, presenting it as just, oh, and by
20   the way, there's, this statistical association
21   masks a reality for consumers that appears to
22   change their beliefs and their trust in the
23   company.
24       BY MR. EWALD:
25       Q.  Now, hold on.  You were -- when I

Page 197

1    asked you earlier about this pilot study that
2    you termed it, that you didn't include in your
3    report whether you're relying on it for your
4    opinions, you said no, correct?
5        A.  No, I'm not relying on it for my
6    opinions.  No, no.  But I think that -- you're
7    asking, do I acknowledge that they're saying
8    that, oh, okay, there are some studies that find
9    it.  But, yes, even here, as they're saying it,
10   they're burying the lead.  The way that
11   information is presented is confusing.  And I
12   don't, given my years of doing this, my many
13   years of doing this, I don't think I needed to
14   run a study to confirm that fact.  I did because
15   I was curious and I was interested.  But after a
16   very long time of understanding how people
17   decipher information and make decisions based on
18   that information, I thought, Wow, this is a
19   really convoluted way to present this
20   information.
21       Q.  So you said "burying the lead."
22   Are you suggesting that the only appropriate way
23   to convey this information is if it precedes the
24   cohort study discussion?
25       MS. PARFITT:  Objection.  Misstates

50 (Pages 194 - 197)

Page 198

1  his testimony.
2      THE WITNESS:  No, that wouldn't be my
3  claim.  My claim is just that you have the
4  majority of the page that is saying there's no
5  effect, no effect, no effect.  And basically
6  makes it read like these are the only studies
7  out there.  And then there's a very technical,
8  difficult to read paragraph that says, well, and
9  there might be some other studies that find
10 something different.  But even in acknowledging
11 that there's counter evidence, you know, they're
12 creating confusion for consumers.
13     BY MR. EWALD:
14     Q.  Right.  So in your report, on
15 page -- on paragraph 95, you say:
16         "However, it...
17     As in Facts About Talc
18         "...does not discuss the dozens
19     of peer-reviewed studies and
20     meta-analyses which do find evidence
21     of a statistically significant
22     relationship between talcum powder use
23     and cancer."
24     And that's not correct, right?
25     MS. PARFITT:  Objection, misstates his

Page 199

1  testimony and the evidence in this report.
2      THE WITNESS:  Yeah, I would say, you
3  know, there is -- you know, I would -- I stand
4  by that comment because there is no kind of
5  equal treatment or acknowledgment, and, you
6  know, we could do more studies.  But my strong
7  suspicion is that, you know, the majority of
8  consumers don't even scroll that far down the
9  page or read that paragraph in its entirety.
10 And somebody just looking at this information
11 would get a very different impression than what
12 I believe the truth is.
13     BY MR. EWALD:
14     Q.  I want to be clear on this one,
15 Doctor.  So when, in your mind, because the
16 website does not give equivalent space to the
17 case-control studies as it does the cohort
18 studies, it is equivalent to, as you state in
19 your report, it does not discuss the case
20 control studies at all?
21     MS. PARFITT:  Objection to form.
22     BY MR. EWALD:
23     Q.  That's the same?
24     MS. PARFITT:  Objection to form.
25     THE WITNESS:  Yeah, you know, I might

Page 200

1  add the word "adequately" or "fairly" or
2  something like that.  I think that's fair.
3  Yeah.
4      BY MR. EWALD:
5      Q.  All right.  Doctor, have you seen
6  what the American Cancer Society has to say
7  about the question of whether or not talc causes
8  of ovarian cancer?
9      A.  The document that you have on the
10 screen, I don't recall ever seeing this document
11 before.
12     Q.  Have you reviewed others --
13     MS. PARFITT:  John, are you marking
14 this?
15     MR. EWALD:  I am marking this.  Hold
16 on one second.
17     MS. PARFITT:  I wasn't looking at
18 screen.  I didn't even know it came up.  So
19 sorry.
20     MR. EWALD:  I'm going to mark Exhibit
21 13, PDF of the Facts About Talc studies page.
22     EXHIBIT NO. 13:  Studies - Facts About
23     Talc.
24     MS. PARFITT:  Okay.
25     MR. EWALD:  And we'll mark this as

Page 201

1  Exhibit 14.  And "this" being American Cancer
2  Society Cancer Facts and Figures 2024.
3      EXHIBIT NO. 14:  American Cancer
4      Society Cancer - Facts and Figures
5      2024.
6      BY MR. EWALD:
7      Q.  Doctor, you said you don't think
8  you've seen this one.
9      Have you seen any other statements by
10 the American Cancer Society as it relates to
11 talc and ovarian cancer?
12     A.  I don't know.
13     Q.  And if we look at the different
14 cancers --
15     MS. PARFITT:  Just again, if I -- he
16 has not seen this document before, the 2024
17 cancer.  So I know you want to take him to,
18 probably, a page.  I bet we could bet money on
19 which one you're taking him to, but he hasn't
20 seen the document at all.  So maybe if you can
21 give us some guidance.  It's multi -- as we both
22 know, it's a lot of pages.
23     MR. EWALD:  Yeah, hold on.
24     MS. PARFITT:  And so unless I can.
25     MR. EWALD:  Put it in the chat?

51 (Pages 198 - 201)

Page 202

1    MS. PARFITT:  I can provide him with a
2  copy of the whole document.
3    MR. EWALD:  That's fine.  I'll put the
4  full document in the chat.
5    MS. PARFITT:  Give me a moment and
6  I'll give him a copy as well.  John, for the
7  record, I'm showing the doctor a copy of the
8  Cancer Facts and Figures, 2024.
9    MR. EWALD:  Great.
10    THE WITNESS:  Okay.
11    MS. PARFITT:  Okay.  And just for the
12  record, it is -- he's not seen this before, and
13  it's 82 pages.
14    MR. EWALD:  Okay.  Hold on one second.
15  Okay.  So for this, and it is 82 pages, it
16  talked about a lot of different cancers.  We are
17  going to focus on ovary, which is on page 22.
18    THE WITNESS:  You said 82?
19    MS. PARFITT:  No.
20    MR. EWALD:  22.
21    THE WITNESS:  Twenty-two.  Okay.
22    BY MR. EWALD:
23    Q.   And if I put it up on the screen
24  so everybody can see.  All right.  And starts on
25  page 22, talks about incidents trends, and new

Page 203

1  cases and deaths and risk factors.  And under
2  "Risk factors," that's where it talks about a
3  variety of them.  The final sentence, do you see
4  that?  Where it says:
5        "The weight of the evidence does
6        not support an association between
7        ovarian cancer and genital exposure to
8        talc based powder."
9    A.  I do see where it says that
10  under -- you're talking about the paragraph that
11  starts with "Risk factors"?
12    Q.  Yes, sir.
13    A.  Yes.  Okay.  Yep, I see that.
14    Q.   And does a determination by an
15  organization like the American Cancer Society
16  the weight of evidence does not support an
17  association between ovarian cancer and genital
18  exposure talc based powder, have any impact on
19  your opinions in this case?
20    MS. PARFITT:  Object to the question
21  that misrepresents what that document is and
22  what that document actually says and who
23  sponsored that document.
24    THE WITNESS:  So I don't know anything
25  about the origin, but -- but I think I can still

Page 204

1  answer your question, which is, no, it doesn't.
2  I've lost the screen here.  Oh, here you are.
3  Okay.
4        No, it doesn't change my conclusion,
5  because that's not what Johnson & Johnson is
6  telling people.  The public statements are not:
7  The weight of the evidence does not support.
8  They're saying: Does not support.  You know,
9  there's no evidence.  And that's very different.
10  You know, as we've talked about already, I think
11  it's very different to say there is no evidence
12  or, you know, it's perfectly safe than to make a
13  statement like "the weight of the evidence does
14  not support."  So, no, for what I'm speaking
15  to -- and obviously, I'm not speaking to
16  causation at all.
17    BY MR. EWALD:
18    Q.   And in making that and offering
19  that opinion as to what is the appropriate way
20  to articulate the state of the science to
21  consumers, what authorities do you rely on?
22    A.  Again --
23    MS. PARFITT:  Objection, form.
24    THE WITNESS:  -- that's directly my
25  expertise.  And so that when consumers

Page 205

1  understand statements, they treat absolute
2  statements very differently than statements that
3  are hedging or conditional or something like
4  that.  So we talked before about, you know, pure
5  natural spring water versus pure natural spring
6  water with 0.001 percent additives, that people
7  treat those qualitatively different.  They're on
8  completely opposite sides of the scale of, would
9  you be interested in purchasing this product?
10  And so there -- there's -- and that's just not
11  my own -- I mean, that is a published study that
12  I authored, but there are dozens of studies
13  which make very similar points about, you know,
14  how consumers understand information.
15    BY MR. EWALD:
16    Q.   Well, I understand that from a --
17  well, let me ask you this.  When you said
18  exactly what your expertise is in, when we
19  talked about your expertise earlier in the day,
20  you testified that you have not published on any
21  article in the peer-reviewed literature that
22  discusses how a company should articulate to its
23  consumers potential health risk of its product,
24  right?
25    MS. PARFITT:  Objection.

52 (Pages 202 - 205)

Page 206

1    THE WITNESS: And just to clarify, we
2  would never make any kind of -- in the kind of
3  research that I do, we would never make
4  normative statements. We would never make, you
5  know, here's an empirical result telling
6  companies what they ought to do. We're
7  investigating the underlying psychology.
8    So what are the rules by which, or the
9  underlying psychological mechanisms that people
10  use to navigate the world around them, to decide
11  what kind of products they want to purchase, to
12  evaluate all kinds of information. And so we
13  would talk about a more generalized principle.
14  And one principle here that's really relevant is
15  people treat absolutes very different than they
16  treat, you know, non-absolutes, even if it's a
17  shred of difference. And we know that to be
18  true in lots of different domains and would also
19  apply to something like health information or
20  risks.
21    BY MR. EWALD:
22    Q. Okay. And when you talk about
23  it, you wouldn't have a normative statement like
24  you're making here, are you -- you would also
25  agree, though, that you have not published any

Page 207

1  paper in the scientific literature that
2  discusses any empirical data of how companies
3  communicate with their customers about health
4  risk of a product, fair?
5    MS. PARFITT: Objection.
6    THE WITNESS: Just so I understand.
7  So you're asking, have I published on the
8  communication of health risks specifically?
9    BY MR. EWALD:
10    Q. Yes.
11    A. No, I have not. But I have
12  published many papers that are relevant to how
13  consumers interpret information and specifically
14  the kinds of information that they might weigh
15  in this exact case. Like, for instance,
16  statements about absolutes, or the origin of a
17  product, or the production process, et cetera.
18    Q. And in those papers that you
19  published, you provided experimental research to
20  support your findings, correct?
21    MS. PARFITT: Objection, misstates his
22  testimony.
23    THE WITNESS: Yeah, I conducted
24  experiments, correct, yes.
25    BY MR. EWALD:

Page 208

1    Q. Yes. All right. So on --
2    MS. PARFITT: John, are you done with
3  the Facts about -- or cancer facts?
4    MR. EWALD: I am. Thank you.
5    MS. PARFITT: Thank you.
6    BY MR. EWALD:
7    Q. So, Doctor, yesterday, and I
8  believe Ms. Parfitt referred to this earlier,
9  that we received an email from her firm that
10  included some website links reflecting -- well,
11  let me put it -- some website links in
12  connection with your review in this case. Is
13  that fair?
14    A. Yeah.
15    Q. Let me start all over again.
16    You would look at some websites and
17  provide those links to Ms. Parfitt in connection
18  with your work here.
19    A. That's correct, yes.
20    Q. I want to get into -- there's --
21  you don't know whether probably Ms. Parfitt sent
22  the email or who sent the email. So that's why
23  I was trying to get away from that.
24    I want to get a little bit sense of
25  some of those and how, if at all, they impacted

Page 209

1  your review. And first one that I want to ask
2  you about...
3    MS. PARFITT: Hey John.
4    MR. EWALD: Yes.
5    MS. PARFITT: A quick question. And
6  I'm sorry, I'm sitting down at the end of the
7  table. I don't have a computer, so it's a
8  little bit hard for me to hear as well at times.
9  Did you -- when you were talking about the
10  websites, that was something we gave you
11  yesterday, but that was something that we
12  realized was omitted from the Dropbox, but not
13  something that was just recently pulled by
14  Dr. Newman. You understand that. If you want
15  to ask --
16    MR. EWALD: Yes.
17    MS. PARFITT: I just wanted to be
18  careful. That's our error. We didn't do a very
19  good administrative job of collecting
20  everything.
21    MR. EWALD: And I wasn't my point, my
22  lack of articulateness --
23    MS. PARFITT: No, you're fine. I
24  can't hear down here, so no worries. We're a
25  good team together. You can speak and I can't

53 (Pages 206 - 209)

Page 210

1 hear. Okay.
2     BY MR. EWALD:
3     Q.   Okay.  So if I look at, one of
4 them was for the website safecosmetics.org, is
5 that one of them?
6     A.   I believe so.
7     MS. PARFITT:  John, again, just for
8 the record, I'm going to just hand him what we
9 sent to you.
10     MR. EWALD:  Yeah.
11     MS. PARFITT:  If that's all right.
12 That will probably make it a little bit easier,
13 but I wanted to let you know.
14     MR. EWALD:  Well, and actually I
15 appreciate that because the email that I have
16 was forwarded with lots of other people,
17 internal names on it, so I was trying to avoid
18 having to show that.  So if you have that email,
19 that'd be great.
20     MS. PARFITT:  Yes.  There you go.  I
21 have the email but I've got the document that
22 was sent.
23     BY MR. EWALD:
24     Q.   And so the first one that I want
25 to talk about, I'm not going to talk about all

Page 211

1 of them, is the safecosmetics.org website, which
2 at least has a name, Campaign For Safe
3 Cosmetics, CSC, and it talks about talc.  Do you
4 see that?
5     A.   Yeah.
6     Q.   This is something that you
7 reviewed in connection with your opinions in
8 this case.
9     A.   Yeah, I wouldn't say that I
10 relied on it maybe, to, for reference, those
11 websites that I identified, basically, I was
12 trying to simulate, okay, if a consumer wanted
13 to understand this issue and went online and
14 Googled "talcum powder" or "talcum powder and
15 cancer," what would come up?  And at least the
16 way that the Google algorithm understands me,
17 these are some of the initial websites that came
18 up.  Kilmer House is not one of those, but these
19 are basically, okay, well, what would be the
20 exercise of a person who's trying to educate
21 themselves about this issue?
22     Q.   Do you have any understanding of
23 Campaign for Safe Cosmetics' reputation for
24 reliable statements of the scientific
25 literature?

Page 212

1     MS. PARFITT:  Objection, form.
2     THE WITNESS:  None whatsoever.  I know
3 very little about this organization.  And again,
4 this wasn't used to inform my opinions.  This
5 was like, in trying to understand, okay, well,
6 what would somebody -- what kind of search
7 results would somebody get if they just typed in
8 these issues?  And that is one of the first
9 websites that appears in search.  And so my
10 understanding of this, the reference list is
11 just everything that -- or, you know, the things
12 that I looked at but weren't necessarily things
13 that I directly relied my opinion on.
14     BY MR. EWALD:
15     Q.   Another one I want to ask you
16 about was Drug Watch.  And this one, we have a
17 site, so I'll mark as Exhibit 15 the part of the
18 webpage, safecosmetics.org, that we were looking
19 at on chemicals/talc.
20     EXHIBIT NO. 15:  Campaign for Safe
21 Cosmetics from safecosmetics.org site.
22     BY MR. EWALD:
23     Q.   And for Exhibit 16 for
24 drugwatch.com, I'll have a PDF of this webpage,
25 Talcum Powder - "Is Talc in Makeup Safe?"  This

Page 213

1 is also something that you looked at?
2     EXHIBIT NO. 16:  "Is Talc in Makeup
3     Safe?" from drugwatch.com site.
4     THE WITNESS:  Again, not something
5 that I used to form my opinion, but in trying to
6 understand what would a consumer learn about
7 this issue, it's a website that I looked at,
8 yes.
9     BY MR. EWALD:
10     Q.   Okay.  And if we go down, it says
11 an ad:
12         "See if you qualify for a
13     lawsuit.  Were you diagnosed with
14     ovarian cancer or mesothelioma after
15     using talcum powder.  Get a free case
16     review."
17 Do you see that?
18     A.   I do see it, yes.
19     Q.   And you have an understanding as
20 to who Drug Watch's partners are and which law
21 firms are involved in this joint endeavor?
22     A.   None whatsoever.
23     Q.   Yeah.  Do you have an
24 understanding of -- well, let me put this
25 way.  One of the materials that I saw in your

54 (Pages 210 - 213)

Page 214

1 reference list is one of the complaints, legal
2 complaints for the MDL. Did you review that?
3     A. Yes, I did. Yeah.
4     Q. Do you have an understanding as
5 to how many cases are part of this MDL
6 proceeding?
7     A. Not with any kind of specificity,
8 no.
9     Q. Do you have an understanding as
10 to the amount and coverage of marketing by
11 plaintiff's firms about talc and ovarian cancer
12 that has happened over the years?
13     A. No, I do not.
14     Q. Do you take that into account at
15 all when you were considering impressions that
16 Johnson & Johnson's statements may have on
17 consumers?
18     MS. PARFITT: Objection.
19     THE WITNESS: Again, I mean, what I
20 was asked to review and to look into in this
21 case are, you know, essentially, what did J&J
22 communicate about their products and what did
23 they know internally? And so, you know, I
24 didn't really start to look at all of the other
25 bodies and players that are involved. I

Page 215

1 understand there's a lot of complexity on this
2 issue. I was looking at a very narrow segment.
3     BY MR. EWALD:
4     Q. Well, then let's look at your
5 report. Hold on. And I want to look at the
6 very end of the substantive report. I have it
7 up here. You can also look at your paper copy.
8     A. Yeah.
9     Q. You state on page 25, paragraph
10 99:
11     "The marketing issues in this
12     case are of central importance to
13     understanding how the company affected
14     and continues to affect consumers'
15     beliefs about JBP and the health
16     concerns regarding talc. The
17     company's marketing strategy for JBP
18     was not simply to make consumers aware
19     of products and communicate the
20     product's benefits. Rather Johnson &
21     Johnson acted to target consumers'
22     emotions and their core appreciations
23     of trust, rooted in the sacred bond
24     between mother and child. As the
25     company's documents indicate, what

Page 216

1 consumers believed about Johnson's
2 Baby Powder was central to what they
3 believed about the Johnson's Baby
4 brand; and what they believed about
5 the Johnson's Baby brand was central
6 to what they believed about Johnson &
7 Johnson. At the core of all that was
8 not a belief about Johnson Baby
9 Powder's smoothness, or absorbency, or
10 fragrance; rather, it was trust.
11 Trust in the product and more
12 importantly, trust in the company."
13 I read that correct so far?
14     A. Yeah, absolutely.
15     Q. Then you say:
16     "And the effects of that trust in
17     this case are immense. When consumers
18     may have encountered concerns about
19     the safety of JBP and talc, those
20     concerns were not evaluated tabula
21     rasa - devoid of any pre-existing
22     expectations. Rather, those concerns
23     were evaluated against generations of
24     advertising which strategically
25     portrayed the company as trustworthy,

Page 217

1     innocent, and first and foremost,
2     concerned about customers' safety and
3     wellbeing. As a result, the company's
4     unequivocal denials of any wrongdoing
5     or potential harm from talc had, and
6     continue to have, an outsized impact
7     on consumers' beliefs and behaviors."
8     Did I read that correctly?
9     A. You did, yes.
10     Q. And so there you were talking
11 about that second segment that I read, just
12 read, when consumers may have encountered
13 concerns about the safety of JBP, how the
14 consumers evaluated those concerns, and the
15 results of the company's unequivocal denials on
16 consumers' beliefs and behaviors, right?
17     A. That's correct, yes.
18     Q. What, if any, evidence do you
19 have with those conclusions that I just stated?
20     A. I mean, that is speaking to my
21 expertise. That is the value of what a
22 psychological understanding of consumer behavior
23 provides that it's not, you know, going way back
24 to some of the conversations that we were having
25 this morning about, you know, the blind taste

55 (Pages 214 - 217)

Page 218

1    test, Coke versus Pepsi, or the Rabin article,
2    that, you know, I think there's a general
3    perception in the public that, you know, what
4    companies are essentially doing is just talking
5    about the product attributes, and consumers are
6    perfectly rational, and they're just buying
7    based on that.
8          And the reality is something very
9    different.  And that's what decades of
10   psychology have taught us about the nature of
11   consumer behavior.  And so when Johnson &
12   Johnson says, Hey, our product is safe, because
13   there is that trust that's been developed for
14   decades and decades, that carries with it an
15   enormous amount of weight, and I think it's
16   important to acknowledge that Johnson & Johnson
17   is aware of this fact, right.  They're in their
18   own marketing meetings.  They're talking about,
19   Look, trust is the number one reason why people
20   are buying our products; it's central to our
21   brand; it's central to our brand strategy.  And
22   in fact, even in one of the documents they
23   mentioned, and one of the benefits is that it
24   protects us in cases of crises.  And in cases of
25   crises, then that trust really pays off for us.

Page 219

1    So this is a smart strategy.
2          And so, you know, consumers aren't
3    able to fairly evaluate, okay, what's all of the
4    evidence out there?  And just like the exercise
5    that we went through where they're looking at
6    different websites, Well, okay, I'm looking at
7    different information, but if Johnson & Johnson
8    is telling me that it's safe, it must be safe,
9    because they've been telling me I can trust them
10   for 100 years.  And that, you know, that is, I
11   think, the real value of what psychology
12   provides in understanding this case and the
13   marketing issues at play.
14         Q.  Well, you talked again about the
15   Coke example, but as we discussed, for those
16   types of published studies, there is empirical
17   evidence, experimental studies that are
18   conducted to support those conclusions, correct?
19         A.  Correct, yes.
20         Q.  Okay.  And when you say here:
21         "As a result, the company's...
22   That is, Johnson & Johnson's:
23         "...unequivocal denials of any
24   wrongdoing or potential harm from talc
25   had, and continue to have, an outsized

Page 220

1          impact on consumers' beliefs and
2          behaviors."
3          What, if anything, do you have in the
4    way of specific data to support that statement?
5          A.  Sure.  There are a number of
6    peer-reviewed studies which have looked
7    precisely at the issue of, for instance,
8    communications about public health crises and
9    what is the role of trust?  And to summarize
10   many studies in this literature, basically,
11   trust is the critical factor.  So if there's a
12   potential crisis about a product, the thing that
13   makes or breaks whether or not the consumers
14   believe the statements of the company is
15   completely explained by their trust, and that
16   trust in the company has an outside effect than
17   on their purchase decision.  So that's not
18   directly data that I collected, but those are
19   kind of well-established patterns in the
20   literature.
21         Q.  Okay, tell me what article you're
22   referring to.
23         A.  Sure.  Okay, let's see.  At some
24   point, I did make note of -- okay, so there's a
25   2008 "Risk aversion and brand loyalty:  The

Page 221

1    mediating role of brand trust and brand affect."
2    And that's in the Journal of Product and Brand
3    Management.  Specifically on the issues of
4    trust, another article, 2016 "Brand
5    relationships and risk:  Influence of risk
6    avoidance and gender on brand consumption."  You
7    know, those are -- those are a couple, but we're
8    not talking about boutique or bespoke findings.
9    I mean, it's part of a much larger pattern that
10   what consumers understand to be true about what
11   companies say about their products is determined
12   by trust.  That if we want to say, well, what's
13   the psychological factor that really explains
14   it?  Well, it's trust.  And I don't think that's
15   a controversial point about the nature of
16   psychology or consumer behavior.
17         Q.  Well, if we're talking about the
18   specific facts that you're discussing in this
19   case, and that you are offering opinions to a
20   reasonable degree of professional certainty
21   about, is it your position that this assertion:
22         "As a result, the company's
23   unequivocal denials, any wrongdoing or
24   potential harm from talc, had
25   continued to have, an outsized impact

56 (Pages 218 - 221)

Page 222

1     on consumers beliefs and behaviors."
2          Is true for what period of time?
3          A.  Well, I would -- I mean, I would
4     say starting, you know, in 1982.  And I don't
5     know, I don't know about the -- you know,
6     currently if you looked at things -- but again,
7     you know, the study that we were, were talking
8     about before, where the information about, well,
9     there's some studies that find a statistical
10    association would suggest that even currently to
11    this day.
12         But it's very complicated.  One thing
13    that we would do in any kind of psychological
14    study is remove information about the company
15    itself so it's not influencing people.  We don't
16    want people's preexisting beliefs to come to the
17    table.  So he would say, in the absence of that
18    information, what kinds of psychological
19    principles are at play.  And so it would be hard
20    to conduct the study in the appropriate manner,
21    using Johnson & Johnson specifically, or naming
22    Johnson & Johnson, because I think he would
23    bring into that a lot of other preexisting, you
24    know, beliefs from consumers.
25         Q.  So I'm a little confused.  I

Page 223

1     thought I heard you say that you couldn't say
2     currently or not whether it's true, but your
3     sentence that I just read said "the company's
4     unequivocal denials of any wrongdoing or
5     potential harm from talc had, and continue to
6     have, an outsized impact on consumers' beliefs."
7     And do you agree with me that "continue to have"
8     means it's still happening?
9          A.  Yeah.  That is my expert opinion,
10    yes.
11         Q.  Okay.  And in doing that, for
12    example, let's go back to the MDL litigation
13    example.  I'll represent to you that there are
14    thousands of plaintiffs that have filed lawsuits
15    against Johnson & Johnson over their talc use
16    and subsequent ovarian cancer.
17         Are all of those individuals, do they
18    have an outsized impact on their consumer
19    beliefs?
20         MS. PARFITT:  Objection, form.
21         THE WITNESS:  I don't -- you know,
22    again, I'm thinking here about the way in which
23    the company is communicating information.  And
24    if we were going to talk about currently, then
25    it's like, what information is available to

Page 224

1     consumers on the Facts About Talc website.  And,
2     as we discussed before, you know, I think even
3     now, the way that that information is
4     communicated to consumers is not giving them the
5     fair ability to make up their own minds about
6     the issue; that it's presenting things in a very
7     skewed way.
8          BY MR. EWALD:
9          Q.  Okay.  But you -- so you're
10    talking about, on one end, what is happening
11    from what Johnson & Johnson is projecting.  But
12    there's the other piece here that we're talking
13    about, right, which is, what level of trust do
14    consumers currently have in the Johnson &
15    Johnson brand and specifically the talc product,
16    fair.
17         A.  Sure, yes.
18         Q.  Right.  And so what do you know
19    about what currently is the state of consumer
20    trust in Johnson & Johnson and specifically the
21    talc brand?
22         MS. PARFITT:  Objection to form.
23         THE WITNESS:  The market research data
24    that I reviewed isn't current data.  But I can
25    answer your question for periods of time that

Page 225

1     are basically through the eighties, through the
2     early 2000s, where Johnson & Johnson is
3     collecting their own data about how do people
4     perceive our brand?  Why are people purchasing
5     Johnson & Johnson?  What do they say about it?
6     And at the very top of that list is trust.
7     People perceive Johnson & Johnson as
8     trustworthy, as a caregiver, as synonymous with
9     safety, a brand that's not going to hurt me.
10    These are all directly quotes from Johnson &
11    Johnson's market research.  So I'm just going
12    back to the data that they collected, which
13    said, Look, what's central to our brand is
14    trust; that's why people are coming to us.
15         BY MR. EWALD:
16         Q.  Okay.  We're talking about the
17    data that Johnson & Johnson collected, and
18    they're saying -- let's take a look at paragraph
19    91 of your report.  Let me know when you're
20    there.
21         A.  Yes.  Okay, I'm here.
22         Q.  States, "In 2020..." or you
23    state:
24              "In 2020, Johnson & Johnson
25         announced the discontinuation of

57 (Pages 222 - 225)

Page 226

1  Talc-based Johnson's Baby Powder in
2  U.S. and Canada [J&J Media Statement
3  May 19, 2020]. The stated reason for
4  discontinuing the product was
5  declining demand 'due in large part to
6  changes in consumer habits and fueled
7  by misinformation around the safety of
8  the product and a constant barrage of
9  litigation advertising.'"
10  Did I read that correctly?
11  A. You did, yes.
12  Q. And do you have any basis to
13  disagree with Johnson & Johnson's statement that
14  "the change in consumer habits...fueled by
15  misinformation around the safety of the product
16  and a constant barrage of litigation
17  advertising."?
18  A. Yeah. I mean, decades of
19  internal documents which suggest something very
20  different, right? I mean, I read this
21  statement, as, you know, there's a bunch of
22  people out there that are spreading lies. And,
23  you know, because of all their lies, we had to
24  pull this product. And that creates a lot of
25  confusion and tells a very different kind of

Page 227

1  story than what's happening behind the scenes
2  where, you know, for a decade and a half, let's
3  say, they're, Well, look, there are safety
4  concerns about our product. We should develop
5  this cornstarch alternative. How do we replace
6  it? Et cetera, et cetera.
7  So to say that it's just a bunch of
8  smoke in the air that has eventually caused us
9  to do this, I think, communicates something very
10  different than the reality to consumers.
11  Q. Well, again, you're talking about
12  what Johnson & Johnson's mindset may or may not
13  be. I'm talking about the other piece of the
14  puzzle, which is what the consumers are hearing,
15  what they're thinking. And from what you've
16  said, you have not taken into account what
17  impact the constant barrage of litigation
18  advertising has had on consumers' views of
19  Johnson & Johnson and talc products, correct?
20  MS. PARFITT: Objection, mistakes is
21  testimony. Done just the opposite.
22  BY MR. EWALD:
23  Q. You have? Tell me.
24  MS. PARFITT: Ask the question. Ask
25  the question, John.

Page 228

1  BY MR. EWALD:
2  Q. I did. Tell me.
3  A. I'm sorry. Can you please
4  repeat. I'm getting lost here.
5  Q. Okay. So according to counsel,
6  you have taken into account. So you've taken
7  into account the impact on consumers of the
8  constant barrage of litigation advertising with
9  respect to their view of Johnson & Johnson's
10  talc.
11  A. Well, I mean, in the sense that
12  if a consumer were to look at the issue today
13  and look at what kind of evidence is available
14  to them or readily available to them, and then,
15  you know, you might say, Oh, well, then they
16  would just kind of add it up. But that's, you
17  know, what my opinion is, is that's not what's
18  happening, because people are comparing that to
19  a century of advertising that says Johnson &
20  Johnson is a trustworthy brand; it's synonymous
21  with health and safety; it's -- you know, our
22  number one priority is your safety. And that
23  advertising message worked. Johnson & Johnson
24  knows that that advertising message worked.
25  And so, you know, it's not like the

Page 229

1  scale is an accurate measurement, that, you
2  know, that advertising puts its thumb on the
3  scale and tips things so where people aren't
4  able to fairly evaluate. So I think you could
5  say, Well, I'm taking into account, yeah, that
6  there's litigation out there, but are consumers
7  able to accurately balance that against what
8  Johnson & Johnson are telling them? My opinion
9  is not.
10  Q. And what data do you rely on for
11  the proposition that plaintiff litigation,
12  advertising of talc and ovarian cancer claims is
13  not having an outsized impact on consumers'
14  views about talc.
15  MS. PARFITT: Objection, form.
16  THE WITNESS: I mean, again, we're
17  kind of circling back to the same -- in my mind
18  -- so I don't know how to answer the question
19  any differently, that people are not, you know,
20  I'd used the term tabula rasa; they're not
21  evaluating it blank slate. And so I would -- to
22  be fair, I haven't looked directly at litigation
23  and how litigation impacts consumers' mindset
24  now.
25  And my understanding of the time

58 (Pages 226 - 229)

Page 230

1  period that, you know, I was really
2  investigating is not present day and things that
3  are happening after 2020 or after the onset of
4  litigation. I'm really trying to understand,
5  well, what happened in the hundred years before
6  then. So I couldn't, you know -- I guess, to be
7  fair, I can't speak directly to how that is
8  changing consumers' mindset now, but I also
9  don't think that's very germane to my opinion.
10       BY MR. EWALD:
11       Q.  Well, are you walking back your
12  opinions in your report? Because we just talked
13  about how you said, "As a result, the company's
14  unequivocal denials of any wrongdoing or
15  potential harm from talc had, and continue to
16  have, an outsized impact on consumers' beliefs
17  and behaviors."
18       "Continue to have" clearly means
19  present day, right?
20       A.  Yes, yes, yes. Yeah, yeah.
21       Q.  So you're saying that that wasn't
22  part of your opinion?
23       MS. PARFITT:  Objection.
24       MR. EWALD:  So you misspoke?
25       THE WITNESS:  No, no. It's very

Page 231

1  much -- it's very much part of my opinion.
2       BY MR. EWALD:
3       Q.  Right. You just said a moment
4  ago that you weren't really focused on present
5  day or when litigation was; you were focusing on
6  earlier stuff over the past 100 years.
7       A.  I --
8       Q.  (Inaudible) --
9       MS. PARFITT:  Objection.
10       BY MR. EWALD:
11       Q.  -- you answer?
12       MS. PARFITT:  Objection.
13       THE WITNESS:  Mr. Ewald, I believe
14  that misstates what I was saying. I was
15  responding specifically to, you said, how do you
16  know how litigation and all of this litigation
17  is impacting people? And I admitted that, you
18  know, I don't know exactly how litigation is
19  changing people's mindset in the present.
20       But I can, as an expert in this area,
21  say that there is a long legacy of beliefs about
22  the trustworthiness of Johnson & Johnson that
23  has an effect on people's psychology, that had
24  an effect of people's psychology, and I have
25  every reason to believe continues to have an

Page 232

1  effect on their psychology today.
2       BY MR. EWALD:
3       Q.  So I would like the court
4  reporter to, please, read back the question and
5  answer that preceded, I think it was one before
6  that where we just talked about where he talked
7  about 100 years.
8       And do you have a sense of what I'm
9  talking about, Leila?
10       THE REPORTER:  I can check for you. I
11  would rather play it back than read it back, if
12  that's okay.
13       MR. EWALD:  Whatever you find easier.
14  I hate listening to my voice. But go ahead.
15       THE REPORTER:  One second. Did you
16  want just the answer, counsel?
17       MR. EWALD:  Question and answer.
18       THE REPORTER:  Okay, let me know if
19  this is correct. One second.
20       [Audio played from 229;10 to 230;9]
21       MR. EWALD:  Thank you, Leila.
22       BY MR. EWALD:
23       Q.  Okay. So I want to be real
24  clear, because this is important on the scope of
25  your opinions.

Page 233

1       Do your opinions that you're offering
2  in this case go to the present day?
3       A.  In what sense?
4       Q.  Are you offering opinions about
5  the impact that Johnson & Johnson's statements
6  have had on consumers up to the present day?
7       A.  You know, I realize I'm also
8  getting a little bit tired, and I should
9  probably take a break because I'm stammering.
10  But I definitely want to answer your question.
11       Q.  Please do and then you can take a
12  break.
13       A.  What's that?
14       Q.  Please do, and then you can take
15  a break.
16       A.  Sure. Of course. With respect
17  to talc products, so I wasn't asked to review
18  perceptions of Johnson & Johnson, the brand, or
19  litigation about Johnson & Johnson, or what's
20  happening in, you know, public opinion about
21  Johnson & Johnson or the litigation. I was
22  asked to review materials related to the
23  marketing of talc products.
24       Talc products were discontinued in
25  2020 in Canada and the US; and then 2022

59 (Pages 230 - 233)

Page 234

1 globally. And so the timeline that I'm talking
2 about in terms of how does their advertising and
3 how do their marketing messages impact people is
4 really relevant up to that point. I do think
5 that even today, the way that the information is
6 communicated to consumers is still biased in the
7 same way that it was historically, and that
8 there's nothing about J&J's strategy of
9 communication that seems to have changed that
10 whereas there might have been conflicting
11 evidence, or a lot of evidence, or evidence of
12 risk that they were acknowledging and taking
13 seriously for a very long time.
14        They communicated to consumers in
15 absolutes, and today continue to communicate to
16 consumers in absolutes about the safety of their
17 products. So that's the sense in which I mean
18 that things continue into present day is
19 referring to their communication about the
20 safety of their products. And I'm not able to
21 speak to what the average consumer believes
22 about Johnson & Johnson, the brand, you know, as
23 we sit here in 2024.
24    Q.  Okay. Take a break.
25    MS. PARFITT:  Thank you.

Page 235

1    -- RECESS TAKEN AT 4:17 P.M.
2    -- RESUME AT 4:33 P.M.
3    BY MR. EWALD:
4    Q.  Taking a little bit of a step
5 back.
6        Do you agree that an important aspect
7 of marketing is knowing who your consumers are
8 and what their needs are?
9    MS. PARFITT:  Objection, form.
10    THE WITNESS:  Yes, I would agree.
11    BY MR. EWALD:
12    Q.  And you also agree that, as a
13 general matter, part of marketing is targeting
14 different markets -- markets and demographics
15 where you believe you have current consumers or
16 potential consumers, fair?
17    A.  Fair, yes.
18    Q.  And so if you look at page 20 of
19 your report and the whole paragraph that
20 precedes paragraph 77 going through 81, can you
21 walk me through on your opinions in those
22 paragraphs.
23        Is it your opinion that Johnson &
24 Johnson wrongfully targeted certain
25 demographics?

Page 236

1    A.  So there's nothing about
2 targeting per se that is wrong. What I take
3 issue with, in this case, is that Johnson &
4 Johnson had this credible evidence or credible
5 concerns about the safety of the product, and in
6 order to compensate for a loss of sales with one
7 market, they just tried to shift to a different
8 market. And there are a number of places where
9 in those marketing meetings, they're talking
10 about health concerns being a reason for the
11 powder decline.
12        So that's the main issue that I take,
13 or the main issue that I have with the use of
14 targeting here; it was targeting in light of the
15 fact that people are buying less of the product
16 and the company knows that health concerns are a
17 reason why.
18    Q.  So if -- so, you're saying that
19 the -- well, wouldn't what you just said suggest
20 that the outsized impact, that the trust between
21 Johnson & Johnson and consumer that you speak
22 about in your report had already been broken
23 because of safety concerns?
24    MS. PARFITT:  Objection.
25    THE WITNESS:  No, I wouldn't conclude

Page 237

1 that. I would say that you had a trend over
2 time where you had a large population of
3 consumers that are buying less of the product,
4 and they're saying that health concerns are a
5 reason. You know, we can look to -- I'd have to
6 see when the last consumer research study that I
7 had access to is. But, you know, certainly, as
8 late as the 1990s, there's market research that
9 shows that there's still considerable trust in
10 the brand. I would say that in my reading, it
11 was shifting, but there's nothing that I
12 encountered which would suggest to me that that
13 trust was, as you said, broken.
14    BY MR. EWALD:
15    Q.  On another topic, one of the --
16 hold on.
17    -- OFF THE RECORD AT 3:48 P.M.
18    -- RESUME AT 3:49 P.M.
19    BY MR. EWALD:
20    Q.  On Exhibit 17, I'm marking a copy
21 of O'Brien 2020. And this is one of the
22 epidemiological articles that you have on your
23 reference list, correct?
24    EXHIBIT NO. 17:  Dr. O'Brien's article
25    published in JAMA, "Association of

60 (Pages 234 - 237)

Page 238

1    Powder Use in the Genital Area With
2    Risk of Ovarian Cancer."
3        THE WITNESS:  I believe so, yes.
4        MS. PARFITT:  And, John, give me a
5    moment.
6        MR. EWALD:  Sure.
7        MS. PARFITT:  I'll get him a copy.
8    I'm going to look for one here, but right now,
9    I'm handing him mine for just speed, if that's
10    okay.  I am going to tell you mine is
11    highlighted, but I don't think it will mean
12    anything to him.  But I just want to be
13    transparent.
14        MR. EWALD:  I definitely appreciate
15    that.  Thank you.  And you know, I don't think
16    to ask you certainly logical questions or much
17    about this, but I do have a couple of questions.
18    And if we go to -- all the way through to the
19    discussion section, which at least on the PDF is
20    on page 8 of 11, it's page 56 of the journal.
21    And then actually go a little bit further on the
22    following page.  Do you see the paragraph that
23    starts "One of the main concerns..."?
24        A.  Yes.
25        Q.  And it states:

Page 239

1        "One of the main concerns about
2    previous case-control studies on this
3    topic is the possibility for recall
4    bias, which will result in if case
5    participants were more likely to
6    report using powder than control
7    participants.  As highlighted by
8    Trabert, the African American Cancer
9    Epidemiology Study found evidence
10    supporting this phenomenon.  Based on
11    the timing of the first major talc
12    lawsuits, Schildkraut et al stratified
13    their results by year of interview
14    (earlier than 2014 versus 2014 or
15    later), observing that among women
16    interviewed earlier, ever use of
17    powder in the genital area was
18    less-strongly associated with ovarian
19    cancer (odds ratio [OR], 1.19 [95
20    percent confidence interval, 0.87 to
21    1.63]), than among women interviewed
22    later (OR, 2.91 [95 percent CI 1.70 to
23    4.97])."
24        I read all that, but there's only one
25    part where I wanted to just get your take on.

Page 240

1    And that is -- well, first of all, have you
2    encountered this concept of recall bias and the
3    debate over it in connection with the talc case
4    control studies?
5        MS. PARFITT:  Objection.
6        THE WITNESS:  I've read it before,
7    yes.
8        BY MR. EWALD:
9        Q.  And it says here in the
10    Schildkraut studies where they are stratifying
11    the results by year interview based on timing of
12    the first major talc lawsuits, describing the
13    major talc lawsuits happen in 2014 or later.  Is
14    that consistent with your understanding?
15        MS. PARFITT:  Objection.
16        THE WITNESS:  My understanding is:
17    That's the words that you're reading or...?
18        BY MR. EWALD:
19        Q.  No.  Is that consistent with do
20    you have an understanding of when the first
21    major talc lawsuits were filed?
22        A.  I don't know.
23        Q.  And if we scroll down, it's
24    referencing footnote 30, and you see where it
25    has article by Hsu, "Risk on all sides as 4800

Page 241

1    women sue over Johnson's Baby Powder in cancer",
2    dated September 28, 2017.  Do you see that?
3        A.  I'm sorry, which reference was
4    it?  Oh, 30, okay.  Yes, I see that.
5        Q.  Give me one second.  Okay,
6    Dr. Newman, that is all the questions I have for
7    you.
8        A.  Okay.
9        MS. PARFITT:  John, could you give us
10    just a few minutes and we'll see if there's any
11    further redirect on our end, okay?
12        MR. EWALD:  Sure.
13        MS. PARFITT:  All right.  Thank you.
14    Just a few minutes.
15        -- RECESS TAKEN AT 4:45 P.M.
16        -- RESUME AT 4:50 P.M.
17        MS. PARFITT:  We have now concluded
18    the deposition.  Thank you, all.
19        (Whereupon this examination concludes
20    at 4:51 P.M.)
21
22
23
24
25

61 (Pages 238 - 241)

Page 242

1  CERTIFICATE OF REPORTER
2  CANADA
3  PROVINCE OF ONTARIO
4      I, Leila Heckert, CVR, the officer
5  before whom the foregoing deposition was taken,
6  do hereby certify that the witness whose
7  testimony appears in the foregoing deposition
8  was duly sworn by me; that the testimony of said
9  witness was taken by me in shorthand using
10 Computer Aided Realtime, to the best of my
11 ability, and thereafter reduced to written
12 format under my direction; that I am neither
13 counsel for, related to, nor employed by any of
14 the parties to the action in which the
15 deposition was taken, and further that I am not
16 related or any employee of any attorney or
17 counsel employed by the parties thereto, nor
18 financially or otherwise interested in the
19 outcome of the action.
20
21
22
23
24 Leila Heckert, CVR
25

Page 244

1      *** ERRATA SHEET ***
2
3  NAME OF CASE:  In re. JOHNSON & JOHNSON TALCUM
4  POWDER PRODUCTS MARKETING,
5  SALES PRACTICIES, AND PRODUCTS.
6  LIABILITY LITIGATION
7  DATE OF DEPOSITION:  May 15th, 2024
8  NAME OF WITNESS:  GEORGE NEWMAN, M.D.
9
10 PAGE  LINE  FROM          TO
11 ____|____|_____|_____
12 ____|____|_____|_____
13 ____|____|_____|_____
14 ____|____|_____|_____
15 ____|____|_____|_____
16 ____|____|_____|_____
17 ____|____|_____|_____
18 ____|____|_____|_____
19 ____|____|_____|_____
20 ____|____|_____|_____
21 ____|____|_____|_____
22 ____|____|_____|_____
23
24      _____
25      GEORGE NEWMAN, M.D.

Page 243

1      INSTRUCTIONS TO WITNESS
2
3  Read your deposition over carefully.  It is your
4  right to read your deposition and make changes
5  in form or substance.  You should assign a
6  reason in the appropriate column on the erratum
7  sheet for any change made.
8  After making any changes in form or substance,
9  and which have been noted on the following
10 erratum sheet, along with the reason for any
11 change, sign your name on the erratum sheet and
12 date it.
13     Then sign your deposition at the end of
14 your testimony in the space provided.  You are
15 signing it subject to the changes you have made
16 in the erratum sheet, which will be attached to
17 the deposition before filing.  You must sign it
18 in front of a witness.  The witness need not be
19 a notary public.  Any competent adult may
20      witness your signature.
21  Return the original erratum sheet promptly.
22 Court rules require filing within 30 days after
23      you receive the deposition.
24
25

Page 245

1  PROVINCE OF ONTARIO
2  TORONTO REGION
3
4      I, the undersigned, declare under
5  penalty of perjury that I have read the
6  foregoing transcript, and I have made any
7  corrections, additions or deletions that I was
8  desirous of making;
9      That the foregoing is a true and
10 correct transcript of my testimony contained
11 therein.
12
13      _____
14      GEORGE NEWMAN, M.D.
15
16 Subscribed and sworn to before me this _____ day
17 of _____, 2024, at
18 _____, _____.
19 (City)        (Province)
20
21 _____
22 (Notary Public)
23 My Commission Expires: _____
24
25

62 (Pages 242 - 245)

[& - 19]                                                                Page 1

| & | | | |
|---|---|---|---|
| **&**  1:4 2:4,6,13 | 163:19 167:12 | 158:23 | **128**  145:9 |
| 2:20 3:2,3,11 | 168:5,9 169:14 | **05**  72:12 | **12:42**  128:15 |
| 3:12,12,20 5:3 | 169:15,18,19 | **08002**  3:23 | **13**  6:17 129:6 |
| 5:7,20 6:8 | 171:19 173:4 | **1** | 200:21,22 |
| 14:24 16:9,16 | 174:6,20 175:8 | | **130**  1:12 3:15 |
| 20:4 21:13 | 185:13,15,24 | **1**  5:3 19:23 20:3 | **132**  5:20 |
| 44:24 47:22 | 189:9,16 190:2 | 98:17 132:12 | **14**  6:18 109:3 |
| 48:2 49:17 | 204:5 214:16 | 133:19 142:19 | 173:20 201:1,3 |
| 52:11 53:24 | 215:20 216:6 | 167:23 171:3 | **146**  6:3 |
| 54:1 55:24 56:1 | 218:11,16 | **1.19**  239:19 | **15**  6:20 112:15 |
| 56:5,25 58:25 | 219:7,22 | **1.63**  239:21 | 212:17,20 |
| 59:22 62:9,12 | 222:21,22 | **1.70**  239:22 | **15th**  1:13 21:18 |
| 62:15,18,21 | 223:15 224:11 | **10**  6:8 72:22 | 244:7 |
| 63:1,2,19,23 | 224:14,20 | 74:21 76:2 78:4 | **16**  6:22 212:23 |
| 65:24 66:1,2,6 | 225:2,5,7,10,17 | 78:14 163:17 | 213:2 |
| 66:13,18 71:9 | 225:24 226:13 | 163:19 232:20 | **16-2738**  1:6 |
| 75:6,22 76:7 | 227:12,19 | **100**  25:9,12 | **1600**  3:15 |
| 77:1,24 79:11 | 228:9,19,23 | 29:18 61:17,19 | **163**  6:8 |
| 82:20 83:17 | 229:8 231:22 | 63:10 65:2,11 | **17**  5:14,17 6:16 |
| 84:5 86:25 89:5 | 233:5,18,19,21 | 103:9 116:16 | 7:3 81:15 97:2 |
| 90:12 91:19 | 234:22 235:23 | 219:10 231:6 | 97:5,8 187:13 |
| 93:13,19 95:8 | 236:3,21 244:3 | 232:7 | 187:23 237:20 |
| 96:2,12,16 | **0** | **10036**  3:6 | 237:24 |
| 97:15 99:22 | | **11**  6:12 79:3 | **172**  109:13 |
| 101:15 103:12 | **0.001**  118:10 | 80:23 124:1 | **173**  109:9 |
| 105:8 109:15 | 205:6 | 178:10,17 | **174**  109:22 |
| 110:25 112:2,6 | **0.01**  120:11 | 238:20 | **178**  6:12 |
| 117:3 129:10 | **0.87**  239:20 | **11/21/23**  19:23 | **18**  81:15 151:16 |
| 132:5,8 139:17 | **000040596**  6:16 | **1185**  3:5 | 152:17,20 |
| 147:7,23 148:3 | 187:13,23 | **11:26**  80:4 | **1825**  2:7 |
| 150:11,12,21 | **000235850**  5:15 | **11:30**  79:23 | **187**  6:13 |
| 151:6 153:13 | 97:4,6 | **11:38**  80:5 | **18th**  3:15 |
| 156:20 161:9 | **0025188**  131:4 | **12**  6:13 187:9 | 176:23 |
| 161:12 162:16 | **0242**  131:7 | 187:10 | **19**  109:13 |
| | **0419**  157:16,21 | **127**  5:18 | 152:17 158:21 |
| | 157:23 158:1 | | 172:15 185:6 |

[19 - 334-269-2343]                                                Page 2

226:3
**1960s**  112:3
167:10,25
**1966**  5:14,17
96:12,23 97:2,5
97:8 98:1 101:8
101:16 106:3
111:20,24
182:9
**1970**  92:10
**1970s**  125:13
129:20 142:3,8
142:11 164:18
165:18 166:13
167:10 168:1
**1973**  5:22 92:10
92:18 132:6,10
**1974**  129:9
**1975**  6:6,11
130:8 145:7,16
145:22 146:5
146:18 148:16
148:22,24
150:11 158:24
163:18,22
**1980s**  142:12
**1982**  112:17
114:6,10
171:17,21
222:4
**1983**  124:6
165:11
**1985**  84:16
156:21 170:9
**1986**  5:19 84:4
84:16 88:5

89:20 121:19
122:11 124:1
127:15 128:19
163:10 165:10
172:3,3
**1987**  114:10
**1990s**  237:8
**1994**  121:18
172:16 173:17
**1997**  6:16
187:13,23
**1998**  80:24
**1:43**  128:16

**2**

**2**  5:6 21:7,12
36:9 134:25
146:12 164:14
170:24 171:4
**2.91**  239:22
**20**  5:3 28:1 96:7
185:20 235:18
**200**  6:17
**2000**  121:17
**20006**  2:9
**2000s**  122:8
179:5 225:2
**2008**  121:17
172:19 173:18
173:19 220:25
**201**  6:18
**2014**  121:18
172:22 173:19
174:8,24
239:14,14
240:13

**2015**  165:9
**2016**  36:19
221:4
**2017**  241:2
**202-783-6400**
2:11
**2020**  225:22,24
226:3 230:3
233:25 237:21
**2021**  28:2 29:6
29:15,20,22
30:5,9,17,20,25
31:15 33:14
44:23 45:1,5,9
45:14,24 108:5
**2022**  29:23
35:24 233:25
**2023**  5:4,5,8,8
5:11 13:20,23
14:5 15:14 16:4
16:21 18:1,13
19:25 20:5,5
21:3,14,14,18
22:15 24:11,20
25:9 30:2 31:18
33:22 34:4,9
49:14 51:5,9,16
**2024**  1:13 5:10
6:19 34:15,19
201:2,5,16
202:8 234:23
244:7 245:17
**21**  5:6 172:17
**212**  3:8 6:20
**213**  6:22

**215**  3:16
**218**  2:22
**22**  176:1 202:17
202:20,25
**229**  232:20
**23**  20:15 21:10
21:10
**230**  232:20
**237**  7:3
**242**  131:16,18
**25**  215:9
**25188**  131:13
**26**  5:22 132:6
132:10
**26989**  130:22
**27**  20:15
**28**  241:2
**29102**  242:23
**2:56**  185:2

**3**

**3**  3:22 5:9 6:11
34:12,14
123:24 158:24
163:18,22
171:6 190:8
**30**  128:8 194:6
240:24 241:4
243:22
**31**  92:6
**310**  3:22
**317-7180**  3:25
**334**  2:24
**334-269-2343**
2:25

**[337-439-0707 - accurate]**                                                    Page 3

**337-439-0707**
2:18
**34**   5:9
**36103**   2:23
**3:07**   185:3
**3:48**   237:17
**3:49**   237:18

**4**

**4**   5:11 51:5,8
80:24 135:2
139:16,22
140:14 141:19
143:25 164:14
190:8
**4.97**   239:23
**45**   96:9,22
97:12
**4800**   240:25
**4:17**   235:1
**4:33**   235:2
**4:45**   241:15
**4:50**   241:16
**4:51**   241:20

**5**

**5**   5:12 51:13,15
51:18 80:24
140:17,18
158:21
**50**   25:13 92:13
130:16 131:3
**501**   2:15
**51**   5:11,12
**52**   129:5
**5341**   3:8

**54**   94:11,11
**55**   108:20
**56**   238:20
**57**   112:16,20

**6**

**6**   5:14 97:1,5
109:23 170:9
**600**   31:1,4
**6th**   3:5

**7**

**7**   5:18 127:11
127:13 146:13
146:16 149:10
163:10
**700**   2:8
**70601**   2:16
**7214**   5:19
123:18,19
127:14
**75**   172:15
184:18 185:6
**750**   31:8,11
**77**   235:20
**790**   3:8

**8**

**8**   4:3 5:20 19:25
109:1,2 124:6
132:5,8 149:11
165:11 238:20
**81**   235:20
**82**   172:17
202:13,15,18
**84**   175:25 181:8
183:17

**85**   181:8 183:17
184:1
**856**   3:25
**86**   175:25
181:23 183:18

**9**

**9**   6:3 14:10,16
18:5,16 52:6,9
53:2,9 55:17
145:22 146:2
151:5 232:20
**9/17/97**   186:12
**91**   225:19
**929-8822**   3:16
**94**   173:19
**95**   190:8 198:15
239:19,22
**97**   5:14
**99**   215:10
**9:24**   8:1
**9:38**   17:12
**9:55**   17:13

**a**

**a.m.**   8:1 17:12
17:13 80:4,5
**abbreviation**
69:17
**ability**   32:12,14
152:18 224:5
242:11
**able**   28:25 36:4
36:5 60:13 62:7
62:13 77:21
78:16,17 85:25
86:8,22 89:15

89:19 100:18
105:15,16
115:16 123:14
128:23 134:14
141:8 151:2
162:5 167:1,16
189:19 192:6
219:3 229:4,7
234:20
**absence**   222:17
**absolute**   205:1
**absolutely**
40:22 104:1
116:14 117:23
120:19 216:14
**absolutes**   118:5
121:9 206:15
206:16 207:16
234:15,16
**absorbency**
92:7 216:9
**absorbent**   92:8
**academic**   73:1
73:4
**acceptable**
119:14
**accepted**   40:19
191:3
**access**   237:7
**accessing**
127:18
**account**   79:8
214:14 227:16
228:6,7 229:5
**accurate**   55:21
175:9 229:1

[accurately - alarm]    Page 4

**accurately**
229:7
**acknowledge**
91:13 121:11
133:13 195:19
196:4 197:7
218:16
**acknowledging**
59:5 118:18
120:17,23
121:4 195:24
198:10 234:12
**acknowledg...**
199:5
**acted** 111:1
215:21
**actinolite** 136:5
136:17
**action** 242:14
242:19
**actions** 54:2
58:1,19 60:16
60:25 83:3,14
93:8,11 95:20
95:21 117:19
118:21 142:10
148:16 174:9
**activities** 6:5
145:24 146:4
164:16
**activity** 95:25
**actual** 43:24
**actually** 25:3
30:22 65:9
67:22 68:3
70:19 87:5

93:25 109:13
123:17 131:1
144:23 161:15
164:20 165:15
173:7 192:5
196:5 203:22
210:14 238:21
**ad** 213:11
**add** 12:17 94:8
104:7 200:1
228:16
**added** 110:5,13
**addition** 12:18
98:11 158:6
164:13
**additional** 6:10
22:9 42:25
51:22 157:15
158:9,9,22
160:11 163:21
**additions** 245:7
**additive** 118:10
120:11
**additives** 205:6
**address** 57:23
76:20 105:19
114:14,22
**addresses** 95:4
**addressing**
177:3
**adelaide** 1:12
**adequately**
200:1
**adjacent** 33:12
**administration**
5:18 127:14

151:9
**administrative**
209:19
**admitted**
231:17
**admitting**
85:17
**adopted** 138:7
**adult** 179:13
183:8,23 184:6
243:19
**adults** 179:19
184:14
**advantage**
84:18
**advertise** 183:6
**advertisements**
31:25 50:2
88:10,15,17,18
**advertising**
14:19,24 16:14
29:12 58:7
61:20 63:11
65:7 67:2 79:13
83:9 119:9
183:7 216:24
226:9,17
227:18 228:8
228:19,23,24
229:2,12 234:2
**advocating**
172:5
**aeration** 180:25
**affect** 215:14
221:1

**affected** 41:7
215:13
**affidavit** 165:4
**african** 239:8
**agency** 125:17
167:8,24
168:25 169:4
**ago** 44:21 145:6
146:22 158:5
193:20 231:4
**agree** 27:5
63:13,17 77:15
127:10 136:25
206:25 223:7
235:6,10,12
**agreed** 14:3
104:1
**agreement**
125:23 165:23
**ahead** 64:23
69:12 85:24
89:9 95:20 96:9
131:20 154:11
232:14
**aided** 242:10
**air** 227:8
**aisle** 174:22
175:20 176:15
179:13,13
180:20 183:24
184:5
**al** 170:24
239:12
**alabama** 2:23
**alarm** 167:15

[alfred - article]                                                Page 5

**alfred** 6:13
  185:9,13
  187:10,17
**algorithm**
  211:16
**alleged** 32:16
  45:6
**allen** 2:20
**allowed** 63:24
**allowing** 155:7
**alongside** 95:24
**alternate** 58:20
**alternates**
  151:23
**alternative**
  57:19 91:21
  139:2 152:10
  162:4 175:14
  182:1 183:14
  227:5
**alternatives**
  93:13 140:8
  153:3 172:11
  177:9
**american** 6:18
  98:2 200:6
  201:1,3,10
  203:15 239:8
**amnesia** 176:19
  177:9
**amount** 214:10
  218:15
**amounts**
  124:21,25
  125:10,16
  135:25

**analyses** 41:11
  172:7 190:22
  198:20
**analysis** 63:25
  72:25 73:7 74:4
  77:17 100:14
**analytical**
  125:19,22
  126:19 165:19
  165:22 166:2
**anapol** 3:13
**anapolweiss....**
  3:17
**announced**
  225:25
**announcing**
  88:13
**answer** 9:14
  57:10 64:15,21
  81:21 92:2
  100:9 109:19
  110:3,9 120:1
  140:19 151:23
  152:11 175:17
  204:1 224:25
  229:18 231:11
  232:5,16,17
  233:10
**answered** 60:10
**answering** 18:4
**answers** 9:6
**anticipate** 37:2
**anticipating**
  85:14
**anybody** 19:13

**anyway** 89:9
**apart** 39:11
  44:22 49:6
**apologies** 26:21
  70:6 187:21
**apologize** 42:15
  66:18 107:16
  107:17
**appear** 143:11
  195:15
**appearances**
  137:22
**appeared** 98:1
**appearing** 9:19
**appears** 21:8
  71:1 150:17
  151:22 171:3,6
  195:25 196:21
  212:9 242:7
**appendix** 98:17
**applies** 54:4
**apply** 53:22
  73:1 169:13
  206:19
**applying** 74:4
**appreciate** 10:2
  13:4 152:14
  186:14 187:1
  195:23 210:15
  238:14
**appreciation**
  137:19
**appreciations**
  215:22
**approach** 59:22
  81:4 102:10

  132:15,22
  141:17 142:20
  143:18
**appropriate**
  152:15 197:22
  204:19 222:20
  243:6
**appropriately**
  52:20
**approximately**
  13:18 19:7 24:5
  27:23 29:14
  44:17
**april** 5:9,22
  34:15,19 132:6
  132:10 176:23
**area** 7:5 31:23
  84:1 112:25
  115:14 154:21
  166:20 174:23
  231:20 238:1
  239:17
**argue** 111:2
**argument**
  84:18,21 95:1
  102:1 103:8
**arguments**
  23:12
**arrangement**
  28:15,19
**article** 7:3
  80:25 81:5
  97:25 100:2
  205:21 218:1
  220:21 221:4
  237:24 240:25

**[articles - assuming]**                                                                Page 6

**articles** 73:5,19
  237:22
**articulate**
  204:20 205:22
**articulated**
  49:13 101:8
**articulateness**
  209:22
**artificially**
  195:15
**asbestiform**
  125:10,25
  130:10,14
  165:25 167:11
**asbestos** 45:10
  45:15,22 46:1
  46:10,12,17,23
  47:6,9,15,19,23
  48:3 59:20 77:8
  77:13 92:11
  102:6,6,7
  113:19,20
  114:11 124:8,9
  124:19,21,25
  125:2,3,20
  129:14,19,22
  129:23 130:7
  132:16,17,22
  133:4,6,11,14
  133:16,23
  134:9,10,20,22
  135:8,13,21
  136:7 138:3
  139:23,25
  140:16 141:7,7
  141:18,21

142:7,16 143:1
  143:11,18,22
  144:3,19,24,25
  149:20,25
  150:4,15
  153:15 164:11
  165:12,20
  166:14 167:13
  167:18,20
  168:1,10 169:2
  169:17 170:10
  170:13 178:14
  181:3 190:14
  192:5
**ashcraft** 2:4 5:3
  5:7 19:24 20:4
  21:8,13
**ashcraftlaw.c...**
  2:10
**aside** 128:25
**asked** 9:13 14:9
  15:13 18:15
  48:5 52:11 53:3
  55:17 60:10
  71:11 76:2
  106:20 119:25
  193:5 194:23
  197:1 214:20
  233:17,22
**asking** 11:17
  18:11 57:2
  71:16 107:16
  133:18 134:3
  144:5 156:10
  166:18 197:7
  207:7

**aspect** 64:5
  151:13 235:6
**aspects** 18:19
  182:25
**aspiration** 5:17
  97:8,17 99:23
  101:15 102:3
  102:12,16
  105:19 108:2
  112:2 179:23
  180:2 182:11
**assemble**
  160:19
**assert** 124:17
**asserted** 32:19
  147:3
**assertion**
  221:21
**assess** 32:18
  33:6 52:15
  59:11 60:6
**assessing** 50:2
  55:23 78:6
  115:8
**assessment**
  32:10 115:11
  147:23 170:11
**asset** 66:23,25
**assign** 243:5
**assigned** 41:4
  70:25
**assignment**
  41:21
**assimilated**
  139:12

**assist** 19:13
**assistance**
  17:16 160:18
  160:22,22,25
**associate** 34:23
  35:15 36:19,21
  37:5
**associated** 15:2
  28:22 29:11
  32:16 33:8
  52:21 53:10,18
  53:20 55:9,16
  56:6 57:23
  59:12 60:1,8,18
  61:2 64:10 66:8
  75:12 76:8,21
  77:3 82:24
  96:14 119:1
  171:2 179:7
  239:18
**association** 7:4
  63:10,21 69:23
  70:8,13,16,17
  71:5,6 170:20
  174:16 194:15
  194:20 195:5
  196:20 203:6
  203:17 222:10
  237:25
**associations**
  189:2 195:3
**assume** 56:24
  147:22 178:3
  181:2
**assuming** 34:1
  148:2

[assumption - basically]                                        Page 7

**assumption**
  57:2,5 161:15
  179:1
**assumptions**
  47:25 48:6
**attached**  97:24
  243:16
**attending**
  166:24
**attention**  17:7
**attorney**
  242:16
**attributable**
  169:2
**attribute**  62:20
**attributes**  63:9
  218:5
**attributing**
  43:25
**audience**
  164:25
**audio**  232:20
**august**  5:4
  19:25 20:4 28:1
  28:2 29:6
**authored**
  205:12
**authorities**
  204:21
**authorization**
  6:9 163:20
**available**  22:3
  24:3 75:6 78:9
  171:20 223:25
  228:13,14

**ave**  3:5
**average**  70:19
  234:21
**aversion**
  220:25
**avoid**  109:25
  210:17
**avoidance**
  221:6
**aware**  46:14
  47:20 56:16
  80:14 96:13
  156:4 167:8,24
  171:20 172:22
  172:24 215:18
  218:17
**awareness**
  39:12

**b**

**b**  41:2 51:7,16
  112:23 134:25
  135:2 139:16
  139:22 140:13
  140:14 141:19
  143:25
**babies**  103:2
  109:18 176:12
  179:19 180:2
  182:2,4 183:22
**baby**  5:16
  16:11,12 56:13
  56:13 58:25
  59:6 63:23
  66:24 74:24
  85:11 89:24

94:18 97:7,17
98:4,5 101:11
109:17 110:7
110:25 132:16
135:6 136:1
156:24 174:22
175:20 176:15
179:13 180:19
180:20,22
182:10 184:5
216:2,3,5,8
226:1 241:1
**back**  24:18 26:2
29:6 30:4 45:13
65:10 66:18
70:20 92:15
93:24 103:8
116:11 117:10
120:7 121:3
126:10,20
127:1,5,23,23
137:23 141:13
142:19 143:24
158:2 159:18
163:9 177:1
182:9 184:20
217:23 223:12
225:12 229:17
230:11 232:4
232:11,11
235:5
**background**
45:25 177:19
**backgrounds**
147:12

**backing**  73:6
**bad**  58:17,19
  154:15 161:21
  161:25 162:2
  186:24
**balance**  229:7
**balderrama**
  3:11
**ban**  58:11
  135:21 136:24
  139:3 140:6
**banned**  57:17
  137:10 138:14
  139:2
**banning**  58:10
  94:16 140:24
**bare**  43:18
**barrage**  226:8
  226:16 227:17
  228:8
**base**  72:15
  186:11
**based**  33:8 34:1
  43:24 129:17
  129:21 170:4
  189:15 197:17
  203:8,18 218:7
  226:1 239:10
  240:11
**basic**  33:1
  103:21 104:16
**basically**  14:18
  24:22 25:22
  29:9 30:16
  38:13 40:6
  78:15 82:4

**[basically - body]**                                                                 Page 8

| | | | |
|---|---|---|---|
| 84:17 85:2 | **behaviour** | 231:25 235:15 | **biased**  191:1 |
| 87:15 183:3 | 31:24 34:23 | 238:3 | 234:6 |
| 184:2 189:20 | 37:16 38:5,7,10 | **believed**  216:1 | **biasing**  171:5 |
| 198:5 211:11 | 38:12 41:12 | 216:3,4,6 | **big**  39:5 83:23 |
| 211:19 220:10 | 42:6 | **believes**  175:9 | **bigger**  124:2 |
| 225:1 | **behavioural** | 186:6 234:21 | **bill**  29:15 |
| **basis**  104:4 | 40:13 41:14 | **bell**  124:12 | **billed**  25:8,16 |
| 166:6,9 168:25 | **behaviours** | **bells**  167:15 | **binder**  10:21 |
| 171:24 226:12 | 53:21,23,24,25 | **benchmarks** | 11:21 |
| **bates**  6:7,15 | 54:1 | 29:17 | **binders**  10:21 |
| 97:3 123:13 | **belief**  216:8 | **benefits**  50:6 | **bit**  18:7 27:21 |
| 130:21 145:25 | **beliefs**  39:7,16 | 85:23 87:17 | 29:23 38:21 |
| 146:5 186:11 | 44:5 196:22 | 119:10 182:22 | 46:2 70:2 73:11 |
| 187:12,23 | 215:15 217:7 | 215:20 218:23 | 95:15 97:15 |
| 192:12 | 217:16 220:1 | **bespoke**  221:8 | 105:24 109:21 |
| **baths**  147:14 | 222:1,16,24 | **best**  8:12 9:24 | 124:2 128:8 |
| **bear**  152:5 | 223:6,19 | 32:12,14 93:3 | 139:5 140:12 |
| **bearing**  61:11 | 230:16 231:21 | 119:4,7,8,15 | 162:10 164:20 |
| **beasley**  2:20 | **believe**  10:5 | 151:20 162:11 | 170:8 184:18 |
| **beasleyallen....** | 22:4 29:2 36:8 | 162:12 180:22 | 187:18 190:7 |
| 2:24 | 46:11 55:3 | 242:10 | 208:24 209:8 |
| **bedrock**  74:5 | 57:11 60:13 | **bet**  151:20 | 210:12 233:8 |
| **began**  96:17 | 64:24 65:11 | 201:18,18 | 235:4 238:21 |
| 153:23 | 80:14 84:4 88:4 | **better**  11:25 | **black**  88:2,4 |
| **beginning**  19:2 | 91:6 92:3,5 | 17:17 23:11 | 105:6 |
| 25:23 141:14 | 97:1 98:16 | 34:6 40:1 81:2 | **blank**  11:3 |
| 142:11 | 107:22 109:1 | 83:11 88:13,14 | 229:21 |
| **begins**  188:9 | 116:4 122:13 | 88:15 100:7 | **blind**  39:10 |
| **behalf**  58:2 | 124:14 130:7 | 115:10,17,21 | 44:4 217:25 |
| **behavior**  118:3 | 130:22 132:17 | 177:5 | **boardroom** |
| 119:6 217:22 | 142:5,13,21 | **beyond**  77:20 | 93:7 |
| 218:11 221:16 | 145:8 149:8 | 77:21 79:23 | **bodies**  116:5,6 |
| **behaviors** | 160:9 164:12 | 90:8 | 214:25 |
| 217:7,16 220:2 | 194:1,3 199:12 | **bias**  81:7 195:5 | **body**  28:7 36:2 |
| 222:1 230:17 | 208:8 210:6 | 195:6 239:4 | 50:11 112:24 |
| | 220:14 231:13 | 240:2 | 115:17,21 |

[body - capability]                                                        Page 9

139:13
**boils** 102:12
**bond** 63:22
215:23
**bottle** 109:23
110:20
**bottom** 97:3
**boutique** 221:8
**boy** 135:1
**brand** 39:12,12
58:24 62:25
63:4,21 65:12
65:13 67:10
89:24,25 94:17
180:22 216:4,5
218:21,21
220:25 221:1,1
221:2,4,6
224:15,21
225:4,9,13
228:20 233:18
234:22 237:10
**brand's** 184:3
**brandi** 3:12
**break** 9:10,15
11:7,10 25:21
50:16,16 69:11
79:24 106:21
106:24 122:5
126:24 128:1,5
159:20 163:11
184:23,24,25
233:9,12,15
234:24
**breaks** 220:13

**breakup** 14:22
**breathing**
110:1
**brief** 37:17 92:4
**bring** 24:18
222:23
**broad** 2:15
22:22 37:22
105:21 168:14
**broader** 41:3
53:12,15
**broadly** 16:14
79:17 80:15
**broke** 8:16 10:5
13:22 16:5
**broken** 236:22
237:13
**brought** 68:25
**bucket** 108:13
**buckets** 25:22
39:25
**building** 45:22
**built** 61:20
63:20,22,23
**bulk** 29:21
55:13
**bullet** 94:8
146:19 149:10
**bunch** 15:16
81:11 128:22
226:21 227:7
**buried** 70:17
**burying** 71:18
71:19 196:9
197:10,21

**business** 111:8
119:12 138:11
**buy** 118:12
**buying** 82:11
218:6,20
236:15 237:3

**c**

**c** 2:1 139:9
140:19
**calculus** 89:21
**call** 13:14,17
60:14 157:6
180:19
**called** 8:4 21:5
36:2 38:8 51:13
92:5
**campaign** 6:20
211:2,23
212:20
**campus** 3:22
**canada** 15:20
115:22 116:2
155:11,12,23
226:2 233:25
242:2
**canadian** 116:1
**cancer** 6:18,18
7:6 32:17 53:5
53:12,14,15,19
55:14,14,20,22
55:22 57:1,6
69:21,24 70:9
71:7 75:20,21
82:23 89:7
93:14 95:11

97:19 102:6,7
106:16 112:22
113:16,20,22
113:22 114:7
114:11,15
116:8 147:4
149:22 153:15
153:19,19
170:14,23
171:2 173:7,10
174:18 175:10
178:8,8,14,16
178:21 179:2,7
179:8,12 181:9
183:22,23
184:14 186:7
188:15,16
190:19,25
194:15 195:11
195:16 198:23
200:6,8 201:1,2
201:3,4,10,11
201:17 202:8
203:7,15,17
208:3 211:15
213:14 214:11
223:16 229:12
238:2 239:8,19
241:1
**cancers** 201:14
202:16
**candid** 161:8
**cap** 106:13,22
181:1
**capability**
106:4

[care - chudkowski]                                              Page 10

care   3:19
career   73:2,4
careful   209:18
carefully   49:3,5
　166:24 243:3
caregiver   225:8
carl   3:12
carried   61:25
　62:5
carries   218:14
carry   80:23
carrying
　149:10
case   8:23 14:9
　14:14 18:1 22:7
　22:8 23:5,16
　24:24 25:23
　27:14 30:9 48:1
　55:25 57:8 64:1
　67:15,21 70:12
　71:25 74:17
　83:24 118:17
　129:18 156:20
　161:5 167:2
　179:9 193:23
　194:18,20
　195:21 199:17
　199:19 203:19
　207:15 208:12
　211:8 213:15
　214:21 215:12
　216:17 219:12
　221:19 233:2
　236:3 239:2,4
　240:3 244:3

cases   203:1
　214:5 218:24
　218:24
cast   45:12
catch   15:8
　121:25 138:20
catching   24:22
　121:23
categories
　15:17 16:25
　31:19 193:5
categorization
　134:17 178:24
categorize
　137:4,7,8
causality   189:6
causation
　204:16
cause   41:16
　53:5 57:1,6
　89:7 110:1
　119:20 149:22
　175:10 183:22
　188:15
caused   112:22
　227:8
causes   188:15
　200:7
causing   179:12
　183:23
central   64:2
　89:25 94:25
　95:1 111:8
　215:12 216:2,5
　218:20,21
　225:13

century   228:19
certain   19:11
　46:12 48:11
　169:23 181:11
　185:8 192:16
　195:1 235:24
certainly   9:9
　11:20 107:12
　119:7 151:18
　163:6 185:23
　237:7 238:16
certainty   65:3
　86:14 95:7
　181:6 221:20
certificate   5:19
　127:14 165:2
　242:1
certified   165:8
certify   242:6
cetera   15:3
　83:8,8 121:14
　154:5,5 172:8
　207:17 227:6,6
cfta   189:8
challenge   85:4
chance   9:15
　128:19 186:12
chances   134:19
change   35:24
　36:18,24 39:12
　39:13 50:14
　72:3,4 83:11
　86:9 87:7,8
　88:9,12,19
　118:16 120:12
　139:1 141:20

169:22 196:22
　204:4 226:14
　243:7,11
changed   47:14
　71:3 106:14
　234:9
changes   39:7
　49:22 67:7
　105:18 106:5
　120:18 226:6
　243:4,8,15
changing   88:14
　136:13 138:14
　230:8 231:19
characterizati...
　92:21
charged   30:25
charles   2:16
chat   11:10
　122:23 127:19
　158:13 159:4
　186:22,25
　201:25 202:4
check   72:19
　109:2 232:10
chemicals
　212:19
cherry   3:23
child   215:24
child's   109:25
children   98:3
choice   66:15
choking   103:2
chris   2:6
chudkowski
　6:14 187:11,24

**ci** 239:22
**circling** 229:17
**cite** 10:22 65:24
  80:24 83:24
  92:12 115:21
  116:4 124:23
  137:16 142:17
  146:9 172:13
  174:2 186:10
**cited** 11:19 63:4
  96:22 133:24
  149:6
**citing** 11:3
  113:8 168:12
  186:10
**citizen** 121:17
  121:19 122:8
  122:11 164:11
  172:23 173:6
  174:13
**citizens** 128:20
  172:16,18
  174:1
**city** 146:25
  149:18 245:19
**claim** 133:9
  134:21 198:3,3
**claims** 229:12
**clarification**
  18:8
**clarify** 25:15
  88:3 153:7
  156:15 206:1
**class** 37:18 38:6
  38:9,23 42:11
  120:6

**classes** 37:7,14
  38:1,3 39:21
**classifiable**
  136:3
**classifications**
  168:19
**classified** 136:7
**clean** 59:21
  132:14,18,22
  133:6 141:16
  142:19,22
  143:17
**clear** 9:23
  41:24 68:22
  89:18 178:23
  199:14 232:24
**clearly** 86:19
  98:21 230:18
**clinical** 40:11
**close** 110:2
**closely** 22:4
  48:18
**coach** 156:22
**coaching**
  156:22
**coalition** 173:8
**cognitive** 32:22
  40:5,18
**cohort** 68:19
  69:15 70:10
  194:17 197:24
  199:17
**coke** 39:9,16
  67:9 218:1
  219:15

**collaborations**
  43:2
**collected** 43:1,9
  220:18 225:12
  225:17
**collecting**
  209:19 225:3
**column** 243:6
**come** 66:18
  93:2 103:12
  116:10 126:10
  127:5 158:2
  196:16 211:15
  222:16
**comes** 59:2
  81:10 104:14
  104:17 156:16
**comfortable**
  12:4,13 79:22
  164:6,7 174:21
**coming** 117:9
  120:7 148:22
  174:15 186:15
  225:14
**commencing**
  8:1
**comment** 17:18
  20:18,21,23,23
  21:1 43:14
  115:16 148:9
  156:4 189:19
  199:4
**commerce** 2:22
**commercial**
  125:1

**commission**
  245:23
**committee** 2:3
  170:11
**common** 40:25
  44:3 154:22
**communicate**
  42:13,21 52:19
  58:22 86:8
  117:16,21
  119:2 154:25
  156:19 207:3
  214:22 215:19
  234:15
**communicated**
  54:13,14,20
  55:5,8 59:8
  81:19 96:6
  114:24 117:6
  152:20 171:21
  186:2 224:4
  234:6,14
**communicates**
  83:12 227:9
**communicating**
  116:12 121:8
  223:23
**communication**
  43:3 68:4 79:20
  84:7 86:23 87:2
  88:8 116:21
  207:8 234:9,19
**communicati...**
  74:10 75:3 76:4
  76:12 81:25
  135:7 220:8

**[companies - concurrently]**                                    Page 12

| | | | |
|---|---|---|---|
| **companies** | 215:25 | 186:16 209:7 | 215:16 216:18 |
| 42:13,21 43:16 | **comparing** | 242:10 | 216:20,22 |
| 43:24 154:23 | 228:18 | **concentrated** | 217:13,14 |
| 206:6 207:2 | **compensate** | 135:8 149:19 | 227:4 236:5,10 |
| 218:4 221:11 | 236:6 | **concept**   59:1 | 236:16,23 |
| **company**   28:3 | **competent** | 61:21 240:2 | 237:4 238:23 |
| 43:12,17,19,23 | 243:19 | **concern**   54:5,6 | 239:1 |
| 44:1,4 52:15 | **competing**   65:5 | 54:8,19 60:1,4 | **conclude**   85:20 |
| 56:15 58:2 | 65:6 | 61:3,10 83:21 | 89:15 105:17 |
| 60:15 61:5 | **competitive** | 98:22,23 99:5 | 169:1 236:25 |
| 62:19 63:5,14 | 84:18 87:21 | 99:23 105:2 | **concluded** |
| 71:10,12,15 | 90:3 | 110:24 111:1 | 65:17,22 155:2 |
| 72:5,7 74:11 | **competitors** | 112:3 113:19 | 188:14 241:17 |
| 79:18 81:23 | 61:24 62:21 | 114:1 115:24 | **concludes** |
| 84:5 85:20 | 85:3 | **concerned** | 62:12 169:4 |
| 86:25 94:12 | **complaints** | 102:4,16,24,24 | 241:19 |
| 99:13 102:4,16 | 214:1,2 | 102:25 105:9 | **concluding** |
| 103:1 114:20 | **complete**   90:25 | 105:10 125:14 | 83:17 90:11 |
| 117:13 119:2 | **completed** | 167:21 217:2 | **conclusion** |
| 120:19 121:11 | 160:3,4 | **concerning** | 55:25 60:14 |
| 138:22,24 | **completely** | 183:1 | 62:8 73:6,16,22 |
| 139:17 176:9 | 50:22 56:20 | **concerns**   53:22 | 73:23 132:13 |
| 190:13,17 | 155:4 187:20 | 54:13 56:16,17 | 152:17 162:10 |
| 193:22 196:23 | 205:8 220:15 | 59:4,7 76:16,20 | 162:12 169:10 |
| 205:22 215:13 | **completeness** | 78:7 82:4,12 | 204:4 |
| 216:12,25 | 170:17 | 83:13,18 91:24 | **conclusions** |
| 220:14,16 | **completes** | 92:9,11,17 | 150:22 153:1 |
| 222:14 223:23 | 157:4 | 94:10 95:5,22 | 168:14 217:19 |
| 236:16 | **complexity** | 95:23 96:3,16 | 219:18 |
| **company's** | 215:1 | 102:5 106:7 | **conclusive** |
| 38:18 215:17 | **complicated** | 110:6 114:14 | 71:16 |
| 217:3,15 | 35:10 99:18 | 114:22 137:25 | **concrete**   93:8 |
| 219:21 221:22 | 196:12 222:12 | 148:17 153:10 | 93:11 |
| 223:3 230:13 | **complied**   49:18 | 153:15 176:10 | **concurrently** |
| **company's** | **computer** | 176:16 177:4,7 | 82:17 |
| 190:16 191:4 | 158:15 159:2 | 177:25 178:1,4 | |

**[conditional - consumers]**    Page 13

**conditional**
 205:3
**conduct**   52:17
 55:25 56:2
 66:13 68:1
 81:19 90:14
 175:13 191:23
 222:20
**conducted**
 62:24 67:19
 68:7 120:15
 125:22 164:17
 165:22 196:7
 207:23 219:18
**conferred**   34:3
 34:7
**confidence**
 239:20
**confident**
 132:19 142:22
 143:8
**confidential**
 27:17,24 28:19
**confirm**   82:9
 197:14
**conflict**   65:16
**conflicted**
 116:13
**conflicting**
 234:10
**confused**   22:24
 112:7 140:12
 222:25
**confusing**
 120:20 197:11

**confusion**
 18:21 52:17
 149:24 150:14
 198:12 226:25
**conjunction**
 189:9
**connect**   99:11
**connected**
 30:21 102:8
**connecting**
 94:24 100:10
 105:1
**connection**   8:9
 9:3 14:9 15:25
 22:20 33:21
 34:3,8 48:6
 77:2 101:4
 105:7 208:12
 208:17 211:7
 240:3
**connects**   81:6
 98:22
**consequently**
 166:1 168:22
**consider**   30:8
 79:5 144:21
 172:10
**considerable**
 149:23 150:14
 237:9
**consideration**
 58:17
**considered**
 91:20 93:14
 158:23 160:12
 166:2

**considering**
 65:9,10 92:21
 92:22 126:23
 140:18 214:15
**consistent**
 23:20 102:10
 240:14,19
**constant**   226:8
 226:16 227:17
 228:8
**constituted**
 138:13 139:2
 140:8
**consult**   78:24
 94:12
**consultant**
 147:6 185:13
 189:16
**consulted**
 191:20
**consulting**
 27:17,24 28:15
 28:19 29:15
 47:1 78:8
**consumable**
 84:24
**consumer**   6:14
 16:16 29:13
 31:24 38:5,10
 38:12,15,16,20
 39:1,12,17
 40:21 42:6
 43:20 62:18
 66:15 81:10
 84:23 85:11
 118:3,3 119:2,6

 156:18 187:12
 187:25 211:12
 213:6 217:22
 218:11 221:16
 223:18 224:19
 226:6,14
 228:12 234:21
 236:21 237:6
**consumerists**
 146:20
**consumers**
 39:15 42:13
 52:18,20 53:25
 54:14,20 61:14
 61:14 62:1,2,6
 62:6,12,20 63:1
 63:15 64:9 65:8
 65:17,22 66:1,9
 68:6 71:20
 72:17 74:13
 75:4 78:19
 81:19 82:10
 83:7 85:14
 90:19 91:4,9,20
 94:23 95:13
 101:17 103:9
 112:7 114:4,25
 116:11,12,14
 116:21 117:7
 117:22 118:4
 118:16 148:4
 155:7 167:19
 171:22 173:5
 174:7,25
 177:22 190:3
 191:5 196:16

**[consumers - corporate]**                                                    Page 14

196:21 198:12
199:8 204:21
204:25 205:14
205:23 207:13
214:17 215:14
215:18 216:1
216:17 217:7
217:12,14,16
218:5 219:2
220:1,13
221:10 222:1
222:24 223:6
224:1,4,14
227:10,14,18
228:7 229:6,13
229:23 230:8
230:16 233:6
234:6,14,16
235:7,15,16
237:3
**consumers'**
215:21
**consumption**
221:6
**contact**   185:19
**contain**   124:20
125:15 135:25
167:10,18
168:1
**contained**
47:23 167:20
245:10
**contains**   125:9
136:2 181:3
**contaminants**
125:4

**contaminated**
48:3
**contamination**
125:18
**contend**   149:20
**content**   150:4
**contents**   5:12
10:24 51:14,17
51:18,23
192:13
**context**   63:14
76:15 95:22
99:2 152:7,19
153:4 164:21
170:5 172:2
**contingency**
6:6 145:25
146:4
**continually**
100:23 102:8
**continue**   83:20
89:2 95:9 128:1
136:14 180:18
217:6 219:25
223:5,7 230:15
230:18 234:15
234:18
**continued**   22:6
82:22 86:6
221:25
**continues**
215:14 231:25
**continuing**   26:1
172:10
**contracted**
16:17

**contradicted**
171:7
**contradiction**
191:2
**control**   193:23
194:18,20
195:21 199:17
199:20 239:2,6
240:4
**controlled**
70:12
**controversial**
221:15
**controversies**
77:9,25
**controversy**
77:13 129:14
129:19,22
130:1 132:17
142:3,8,16
**conversation**
11:5 14:1 65:19
**conversations**
16:24 111:7
114:10 217:24
**convert**   35:14
**convey**   197:23
**convoluted**
197:19
**cooperation**
151:7
**copy**   10:23,23
11:8 12:1,19
69:10 127:4
158:14 165:8
202:2,6,7 215:7

237:20 238:7
**core**   215:22
216:7
**corn**   154:2
**corner**   34:19
**cornerstone**
98:5 100:5
101:11 111:9
111:22
**cornstarch**
15:3 16:12
57:19,22 76:18
76:19 81:16,17
81:25 82:1,12
82:15 84:23
85:6,15 87:13
88:5 89:17 90:5
91:8,10,15,20
92:15 93:20
94:1,9,13,19
95:24 96:18
98:24 99:1
111:5,13
114:12,13
117:11,11,12
139:9 140:19
148:19 151:20
151:22 152:9
153:3,23 172:6
176:21,24
181:18,25
182:22,24
183:14 184:8
184:12 227:5
**corporate**   43:3
43:8,12 75:4

**[corporate - ctfa]**

Page 15

88:24 154:15
**correct** 13:24
14:6 16:23
18:18 20:19
21:11,15,18,19
24:21 35:1,2,22
36:11,12,16,17
36:23 53:6,7
56:9 57:5 58:13
59:13 60:5 66:9
66:10 67:18,21
67:23 73:19,24
73:25 74:2
75:10,24,25
77:6 86:14
90:14,15,15
91:16,17 93:20
93:21 94:1,2,7
96:23 97:20
105:19 111:1
112:17,18
113:1,11
115:22 117:7
122:9 134:2
140:3,9 143:21
143:23 144:4
146:10 147:24
148:2 150:15
161:1 165:14
168:3,10,11,11
171:16 172:20
172:23 175:11
176:2 177:19
178:16,18
179:3 183:11
197:4 198:24

207:20,24
208:19 216:13
217:17 219:18
219:19 227:19
232:19 237:23
245:10
**corrections**
245:7
**correctly** 22:11
43:23 52:24
55:18 76:25
78:11 93:18
96:20 126:3
132:24 150:8,9
166:4,5 168:7
169:7,8 171:12
171:13 191:7
195:17,18
217:8 226:10
**correspond**
193:4
**cosmetic** 94:16
124:7,20 125:8
125:15 135:19
136:23 165:12
167:9,25 168:4
169:2,6,24
188:14 190:19
**cosmetics** 6:20
211:3,23
212:21
**council** 3:19
147:9 148:13
**counsel** 10:12
15:23,25 16:22
19:18 26:7,18

32:4 34:3,8,12
48:5 74:23 76:2
76:6 77:11
107:22 127:12
138:19 163:15
192:23 228:5
232:16 242:13
242:17
**count** 101:24
173:21
**counter** 103:15
198:11
**couple** 8:22 9:2
12:23 19:16
21:25 60:3
70:21 121:16
122:18 123:10
129:11 130:15
131:25 159:9
182:7 189:13
221:7 238:17
**coupled** 85:9
**course** 13:9
37:16 68:24
109:7 166:19
166:24 167:4
233:16
**court** 1:1 9:6
50:22 121:2
128:2 232:3
243:22
**cover** 38:11
**coverage**
214:10
**cramer** 112:16
113:12,21

114:5 170:24
171:10,17,20
**create** 184:6
**created** 18:20
52:17 183:8
**creates** 226:24
**creating** 198:12
**creative** 177:14
177:18
**credence** 58:3
142:12
**credibility** 61:6
**credible** 56:11
58:4 60:14,16
60:21,23 61:10
83:2 93:14
95:10,18 117:9
142:9,13 236:4
236:4
**credo** 99:13,13
**crises** 43:3
218:24,25
220:8
**crisis** 43:8,12
220:12
**critical** 220:11
**criticism**
101:14
**criticisms** 86:3
**criticized**
147:10,25
**critiquing**
188:25 189:7
**csc** 211:3
**ctfa** 189:8

**[culminates - department]**                                      Page 16

**culminates**
153:25
**curious**  23:10
72:19 80:17
87:6 197:15
**current**  30:3
34:20,22 68:3
115:25 132:16
135:23 138:8
138:12 140:6
193:15 224:24
235:15
**currently**  37:6
37:10 138:13
139:1 140:8
153:12 222:6
222:10 223:2
223:24 224:14
224:19
**custody**  165:5
**customers**
93:25 119:17
119:18 179:11
207:3 217:2
**cut**  17:20
**cv**  5:9 10:24
34:12,14,18,20
36:18
**cvr**  1:25 242:4
242:24

**d**

**d**  4:1 5:19
123:17,18,19
127:14

**dangerous**
58:12
**daniel**  112:16
**darn**  148:18
**data**  41:13 43:1
43:9,25 65:23
66:12,19,19
73:23 95:12
103:22 126:19
161:20 207:2
220:4,18
224:23,24
225:3,12,17
229:10
**date**  20:8 34:18
124:1 158:18
158:23 243:12
244:7
**dated**  19:23
24:10 132:6
186:11 241:2
**day**  1:13 26:19
26:22,24 30:18
39:22,22 54:21
71:18 108:24
158:4,7 190:13
205:19 222:11
230:2,19 231:5
233:2,6 234:18
245:16
**days**  27:3
243:22
**dc**  2:9
**deaths**  203:1
**debate**  47:18
190:5 240:3

**debating**  83:6
**decade**  92:23
117:14,19
227:2
**decades**  101:4
218:9,14,14
226:18
**deceived**  114:4
**december**  5:8
21:10,14 24:20
24:25 25:9
165:9
**deceptive**  52:16
55:24 56:2
90:13 114:20
119:18 148:5
175:13
**decide**  206:10
**decided**  89:5
95:8
**decipher**
197:17
**decision**  81:10
82:14 86:5,23
87:14,16,25
90:7,9 91:4
172:22 174:12
220:17
**decisions**  78:1
197:17
**deck**  63:7
**declare**  245:4
**decline**  236:11
**declining**  226:5
**decode**  196:14

**defendant**  3:1
**defensible**
87:22
**defensive**  43:13
**deficiencies**
171:18
**definitely**  13:3
130:18 193:18
233:10 238:14
**definition**  47:5
47:8,19 140:23
**definitive**  190:3
**degree**  86:14
95:7 141:4
181:5,5 221:20
**deletions**  245:7
**deliberate**
58:19
**deliberately**
114:21
**demand**  226:5
**demographics**
235:14,25
**denials**  217:4
217:15 219:23
221:23 223:4
230:14
**denied**  174:3
189:2
**dense**  188:4
**denying**  172:22
189:22
**department**
40:4,14 165:3
170:9

**[departments - disclose]**                                              Page 17

**departments**
87:1 88:9
**dependent**  41:8
**deposed**  8:18
27:10
**deposition**  1:10
10:14 22:2 23:4
24:1,9 26:4,8
26:14 31:5,7
49:12 107:19
107:24 108:1,6
108:9,25 112:9
155:14 241:18
242:5,7,15
243:3,4,13,17
243:23 244:7
**depositions**
8:22 108:22
**describe**  29:5
47:11,13
**describing**
240:12
**description**  5:2
6:2 7:2
**designation**
35:15 84:25
**desirous**  245:8
**desk**  10:20
**detail**  49:6
**details**  129:25
**detect**  133:3
134:19 144:18
144:19
**detected**  65:14
130:10

**detection**  130:6
136:14,15,16
138:2 139:22
139:23 140:1
140:15,15
141:12,21
167:16
**determination**
203:14
**determine**  61:9
180:21
**determined**
221:11
**determining**
39:17 50:7
125:20 165:20
**dettre**  97:24
**develop**  57:18
83:4,9 90:17
92:18 103:23
117:15 118:21
184:4 227:4
**developed**
88:11 89:18
94:10 125:21
165:21 176:21
177:10 218:13
**developing**
76:17,19 82:1
96:17
**development**
91:15 95:24
98:24
**device**  132:15
**devoid**  216:21

**diagnosed**
213:13
**diana**  3:11
**difference**
67:13 72:9 83:8
120:9 121:8
158:3 206:17
**different**  12:25
15:17 25:22
26:22 31:19
38:25 40:1,19
41:4 43:11,15
54:9 56:18 58:6
59:2 60:3 67:12
71:2 79:14,14
85:7 87:3 88:22
99:12 100:23
102:2 116:22
118:5 131:25
134:16 136:10
137:5,8,13
144:12 168:19
178:13 189:13
194:24 196:17
198:10 199:11
201:13 202:16
204:9,11 205:7
206:15,18
218:9 219:6,7
226:20,25
227:10 235:14
236:7
**differently**
205:2 229:19
**differs**  41:5

**difficult**  70:18
71:21 181:19
198:8
**direct**  65:16
88:25 129:13
184:6 191:2
**directed**  75:3
187:24
**directing**  105:8
**direction**  14:14
52:6 171:9,11
242:12
**directly**  41:23
41:25 42:17,17
54:14 69:6
100:10 185:16
186:2 204:24
212:13 220:18
225:10 229:22
230:7
**director**  149:12
177:15,18
183:3
**directs**  88:8
**dis**  163:7
**disagree**  89:14
92:20 166:7
226:13
**disambiguate**
196:15
**disambiguating**
71:13 120:16
**disappear**
44:14
**disclose**  56:7

**[disclosed - documents]**                                      Page 18

| | | | |
|---|---|---|---|
| **disclosed**  27:14 | **disease**  194:23 | 146:8 181:4 | 164:10,24 |
| 56:17 91:19 | 195:7,10,14 | 188:2 193:17 | 167:5 168:12 |
| **disconnect** | **diseases**  98:2 | 199:15 200:5 | 168:13 170:3,8 |
| 56:22 74:11,19 | **dispute**  88:21 | 201:7 202:7 | 172:1 186:5,9 |
| 167:21 | **distinction** | 208:7 | 187:7 188:13 |
| **discontinuation** | 73:12 | **doctors**  110:11 | 189:15 200:9 |
| 225:25 | **distinctions** | 182:3,8 | 200:10 201:16 |
| **discontinued** | 141:8 | **document**  6:8 | 201:20 202:2,4 |
| 233:24 | **distinguish** | 12:10,11 20:1 | 203:21,22,23 |
| **discontinuing** | 39:10 | 20:14 26:1 31:4 | 210:21 |
| 226:4 | **distorting** | 51:23 76:22 | **documents** |
| **discuss**  76:15 | 71:20 | 77:9 84:7,10 | 11:18,24 15:23 |
| 90:1 98:25 | **distributed** | 86:5 97:11,16 | 16:13,22 17:1,3 |
| 117:17 190:21 | 88:18 | 99:3 101:8,16 | 17:4,8 19:17 |
| 198:18 199:19 | **distribution** | 101:20,23 | 21:20 22:5,9 |
| **discussed**  31:17 | 16:15 29:12 | 104:22,23 | 26:3,4 32:4 |
| 76:13 151:14 | **distributors** | 106:17 111:19 | 51:22 54:11 |
| 195:21 219:15 | 83:10 | 111:24 115:22 | 56:15 57:13,15 |
| 224:2 | **district**  1:1,2 | 122:14 123:15 | 57:21 59:17,19 |
| **discusses** | **disturbed** | 123:18 124:15 | 60:13 65:18 |
| 205:22 207:2 | 179:16 | 126:7,11,14 | 74:22 75:4,11 |
| **discussing** | **disturbing** | 130:7,13 131:3 | 75:23 76:7,13 |
| 74:12 75:4 99:1 | 176:13 179:15 | 131:20,25 | 76:14,18 77:1 |
| 193:23 221:18 | **divide**  40:4 | 133:25 138:4 | 77:11 81:24 |
| **discussion**  59:4 | **division**  135:18 | 141:14,23 | 82:2 83:17,25 |
| 84:16 85:13 | 135:19 136:23 | 142:17 145:4 | 84:2,20 85:13 |
| 87:7 148:19 | 136:24 138:7 | 145:22 146:8 | 86:8,19 87:4,21 |
| 162:3 170:13 | 144:2 | 146:17,18 | 89:16,23 90:1,6 |
| 170:17 190:8 | **doc**  126:11 | 149:6 150:11 | 95:23 98:25 |
| 197:24 238:19 | 145:8 | 151:14,15 | 100:21 101:3 |
| **discussions** | **doctor**  19:20,25 | 153:10,24 | 101:22,25 |
| 58:5 61:1 77:23 | 32:23 34:13 | 156:21 157:13 | 104:20,25 |
| 85:9 114:12 | 50:17 51:6 | 158:10 160:8 | 105:13 113:23 |
| 116:20 117:1,3 | 64:15 97:11 | 160:15 161:4 | 113:24 121:16 |
| 117:5 174:17 | 98:8 105:23 | 162:14 163:16 | 122:7 129:18 |
| 185:25 | 120:2 126:6 | 163:18,20 | 130:4,6,11 |

**[documents - eighties]**                                                    Page 19

148:21 152:2,6
153:24 154:1
157:16 160:12
161:11 166:13
172:3 177:1
190:1 191:15
191:16,17,18
191:19,21
192:2,6,11,21
192:22,25
193:5,8 215:25
218:22 226:19
**doing**  17:25
39:21 42:4
46:22 64:1
72:15 74:1,5
84:15 87:3 91:6
101:1 107:13
121:13 159:6
172:6 197:12
197:13 218:4
223:11
**domains**
206:18
**donate**  41:15
**double**  109:2
**doubt**  117:23
118:13
**douillet**  124:1
**dovetails**  40:9
**downloaded**
191:16,22
**dozen**  101:25
**dozens**  190:21
198:18 205:12

**dr**  5:3,6,9,11,15
6:12 7:3 8:7
10:14 11:16
13:11 17:15,19
19:24 20:3 21:7
21:13,25 22:16
22:19 23:4,15
23:25 24:9
34:14 48:12,20
48:24,24 49:1,6
49:9,12 51:8
69:25 80:7,10
80:20 91:1 97:6
106:3 120:22
122:6 124:13
128:18 147:6,7
149:3,12,18
150:13,23,23
151:10 178:17
185:5,9 186:5
188:14 209:14
237:24 241:6
**draft**  20:17,20
**drafting**  19:14
20:23 23:22
**dramatically**
118:16
**drawing**  44:5
59:22 103:7
104:13
**drifting**  141:4
**driving**  51:2
**drop**  118:11
**dropbox**  12:20
12:23 17:2,4
158:1,15 159:3

186:20,21
193:3,4 209:12
**drs**  97:25
**drug**  5:18
127:13 151:8
212:16 213:20
**drugwatch.com**
6:23 212:24
213:3
**due**  182:2 195:5
226:5
**duly**  8:2 242:8
**dusting**  129:12
170:22
**dynamics**  37:24

**e**

**e**  2:1,1 4:1 78:4
78:14 187:18
**earlier**  16:5
17:18 77:8
106:20 120:15
148:20 153:6
168:8 179:24
184:18 191:20
196:7 197:1
205:19 208:8
231:6 239:14
239:16
**early**  96:12
125:13 129:20
142:3,8 165:17
166:13 167:10
168:1 177:2
179:5 225:2

**earnest**  20:10
**easier**  121:6
210:12 232:13
**easily**  12:9
**easy**  180:10
**eater**  128:7
**ebay**  32:2
**economic**  81:7
98:22 99:2,6,15
100:14 101:1
105:2,11 152:3
**economist**
81:12
**educate**  46:8
211:20
**edward**  78:5
**effect**  50:12
56:18 67:6
72:13 198:5,5,5
220:16 231:23
231:24 232:1
**effective**  82:8
82:20 89:8
93:19 95:12
**effects**  28:22
76:8 162:7
216:16
**effort**  57:18
**efforts**  151:18
**egg**  59:1 63:22
85:10 94:5
101:9 111:9
**eight**  27:1,4
145:10,11
**eighties**  87:11
89:5 92:18 95:8

[eighties - evidence]                                                    Page 20

100:22 177:2
225:1
**either** 25:6 85:5
85:25 103:22
126:9 158:2
184:6 189:2
**elevate** 85:6
**elevated** 190:18
**eliminate**
135:23 138:8
**email** 2:10,17
2:24 3:7,24
179:17 208:9
208:22,22
210:15,18,21
**emails** 174:19
175:22 176:5
181:7 183:20
**embarrassing**
162:1
**emotional** 63:9
63:10
**emotions**
215:22
**emphasis** 105:5
**empirical** 40:20
67:20,25 206:5
207:2 219:16
**employ** 72:23
**employed**
242:13,17
**employee** 38:8
242:16
**employees** 75:5
**encompass**
53:16

**encounter**
130:4
**encountered**
84:10 182:20
216:18 217:12
237:12 240:2
**endeavor**
213:21
**ended** 24:19
30:3 91:22
**ends** 37:12
**engage** 119:9
**engaged** 17:25
43:13 52:16
55:24 56:1
90:13 175:12
**engaging** 95:25
**england** 146:23
147:9 148:13
**english** 141:10
**enormous** 62:1
62:6 118:11
218:15
**enter** 119:12
**entire** 100:16
126:11 135:6
**entirety** 199:9
**entries** 20:17
34:2
**entry** 19:25
20:16 21:9
24:19
**environmental**
42:23 149:13
149:15

**epi** 15:21
**epidemiologi...**
31:22 69:19
113:4 115:9
170:19 237:22
**epidemiologist**
32:22 78:21
**epidemiology**
239:9
**equal** 199:5
**equivalence**
111:3
**equivalent**
199:16,18
**errata** 244:1
**erratum** 243:6
243:10,11,16
243:21
**erroneous**
150:2,23
**error** 209:18
**escape** 136:15
**escaped** 136:14
**especially** 9:2
91:4 100:21
148:9
**esq** 2:5,14 3:4
3:21
**essentially**
35:12 38:8
39:23 70:15
84:19,20 137:4
161:18 214:21
218:4
**establish** 58:12

**established**
29:18 39:25
149:23 220:19
**establishing**
150:14
**estimate** 24:23
25:19 29:17
**et** 15:3 83:8,8
121:14 154:4,5
170:24 172:8
207:17 227:6,6
239:12
**evaluate** 77:22
151:2 167:1,16
206:12 219:3
229:4
**evaluated**
216:20,23
217:14
**evaluating**
77:22 166:19
168:17 172:7
229:21
**event** 148:9,15
**events** 114:2
**eventually**
227:8
**everybody**
121:6 202:24
**evidence** 61:15
61:16 65:6
70:16 74:14,16
79:5 82:25 88:7
96:4 99:21
116:13 118:19
118:19 120:17

[evidence - exemplary]                                              Page 21

| | | | |
|---|---|---|---|
| 148:7 155:25 | 93:9 97:10 | 177:23 178:19 | **exactly**  24:3 |
| 162:11 169:3 | 102:14,21 | 180:14 182:13 | 25:1,3 29:21 |
| 174:25 175:1 | 104:12 105:14 | 183:15 185:4 | 47:2 70:21,25 |
| 180:5,7 182:17 | 106:1 107:4 | 186:17,21,25 | 72:11,14 74:7 |
| 182:20 189:3 | 108:12,15,18 | 187:6,14 | 90:8 106:12 |
| 190:23 191:6 | 108:23 109:4,7 | 188:11,22 | 144:15 184:13 |
| 196:18 198:11 | 109:8 112:8,14 | 196:2,24 | 189:25 193:20 |
| 198:20 199:1 | 113:9 115:7,19 | 198:13 199:13 | 205:18 231:18 |
| 203:5,16 204:7 | 116:23 120:3 | 199:22 200:4 | **examination** |
| 204:9,11,13 | 120:20 122:2,4 | 200:15,20,25 | 4:3 8:6 241:19 |
| 217:18 219:4 | 122:22 123:1,7 | 201:6,23,25 | **examined**  8:5 |
| 219:17 228:13 | 123:16,20,22 | 202:3,9,14,20 | 147:6,11 |
| 234:11,11,11 | 126:16,22 | 202:22 204:17 | **examiners** |
| 236:4 239:9 | 127:1,7,10,17 | 205:15 206:21 | 12:25 |
| **evidenced** | 127:21 128:17 | 207:9,25 208:4 | **example**  10:18 |
| 121:12 148:18 | 131:11,14,19 | 208:6 209:4,16 | 25:7 37:14 |
| **evolved**  18:25 | 131:23 132:11 | 209:21 210:2 | 39:16,16 67:9 |
| 19:5 | 134:23 137:6 | 210:10,14,23 | 72:20 77:7 |
| **evolving**  22:7 | 137:15 138:21 | 212:14,22 | 88:10 90:16 |
| **ewald**  3:4 4:3 | 139:15 140:20 | 213:9 215:3 | 92:13 116:5 |
| 8:6,8 10:5 | 141:24 143:6 | 224:8 225:15 | 118:7 120:8 |
| 11:12,14 12:21 | 144:8 145:2,13 | 227:22 228:1 | 121:7 162:16 |
| 13:3,8,10 15:9 | 145:17,20 | 230:10,24 | 219:15 223:12 |
| 15:11 17:10,14 | 146:7 149:2 | 231:2,10,13 | 223:13 |
| 20:7 21:16 23:1 | 150:19 151:4 | 232:2,13,17,21 | **except**  71:3 |
| 27:6,8 33:3 | 151:12 152:25 | 232:22 235:3 | **excerpts**  11:1 |
| 34:17 45:18 | 154:6,12 155:9 | 235:11 237:14 | 178:15,21 |
| 48:9 50:13,21 | 155:18 156:8 | 237:19 238:6 | **exchanged** |
| 51:3,11 52:1 | 157:3,11,20,23 | 238:14 240:8 | 174:19 |
| 58:8 59:9 60:2 | 158:3,8,16,19 | 240:18 241:12 | **excuse**  154:2 |
| 60:20 64:3,17 | 159:5,12,21 | **exact**  18:24 | **executive**  3:22 |
| 64:22 71:23 | 163:17,25 | 19:4 26:20 | **executives** |
| 73:14 78:3 | 164:8,21 | 62:22 75:19 | 129:10 |
| 79:25 80:6 | 166:11 170:6 | 84:25 196:6 | **exemplary** |
| 82:18 87:9 89:3 | 172:12 173:23 | 207:15 | 117:12 |
| 90:10,23 91:12 | 175:3,18 | | |

**[exercise - fair]**

**exercise** 211:20
219:4
**exhibit** 19:23
20:3 21:7,12
34:12,14 51:5,6
51:8,13,15,16
51:18 97:1,5
122:16 123:18
126:8 127:11
127:13 131:5
132:5,8 145:22
146:2 163:10
163:17,19
178:10,17
187:9,10
200:20,22
201:1,3 212:17
212:20,23
213:2 237:20
237:24
**exhibits** 5:1 6:1
7:1 19:17
**exist** 68:9
**existing** 44:5
216:21
**exit** 163:13
**expand** 63:24
**expect** 61:4
177:18,21
179:10 192:18
**expectation**
39:6
**expectations**
39:7,15 216:22
**expense** 83:4

**experience**
50:12
**experiment**
41:1,20
**experimental**
39:19,24 40:2
40:15 67:17
73:7,13,23
74:14 207:19
219:17
**experimentally**
74:6
**experiments**
39:23 207:24
**expert** 5:13
13:13 21:2
27:15,18 33:17
48:11,14,23
49:4 51:14,19
118:3 223:9
231:20
**expertise** 31:24
32:17 33:6,13
50:5 67:4,5
72:15 77:21
113:3 115:15
117:25 137:14
141:4 144:21
150:20 153:17
154:21 166:20
168:15,17
204:25 205:18
205:19 217:21
**experts** 21:25
22:14

**expires** 245:23
**explain** 78:13
164:23 185:10
195:13
**explained**
220:15
**explains** 221:13
**explicit** 84:12
**explicitly** 63:20
**explore** 103:21
138:15
**expose** 41:4
**exposure**
185:18 195:8
203:7,18
**express** 39:8
175:13
**extent** 32:15
76:25 83:5
**external** 77:20
**externally**
79:18 117:1,4
**eye** 42:3

**f**

**face** 109:25
**facing** 180:9
**fact** 59:12 61:8
87:11 90:3
95:16 99:20
105:21 110:19
143:25 178:9
194:12 197:14
218:17,22
236:15

**factor** 66:3,4
220:11 221:13
**factored** 90:7
**factors** 41:18
171:6 194:24
194:25 195:9
203:1,2,11
**facts** 6:17,19
15:19 43:18
68:13 69:6
88:20 92:4
190:7,16
191:12 192:3
192:14 193:17
195:20,25
198:17 200:21
200:22 201:2,4
202:8 208:3,3
221:18 224:1
**factual** 87:13
**factually**
183:11
**faculty** 36:10
**failing** 52:19
**failure** 59:21
**fair** 18:10,17
31:14 44:1 47:3
57:3 62:2 75:16
85:2 115:5
116:3 120:5
126:13,16
160:14,17,20
175:1 177:17
192:9 193:21
200:2 207:4
208:13 224:5

224:16 229:22
230:7 235:16
235:17
**fairly** 200:1
219:3 229:4
**fallout** 99:6
**false** 111:3
119:9 185:22
189:4,5
**familiar** 41:1
80:10 122:10
122:13 147:17
148:10
**famous** 81:6
**fancy** 123:3
**far** 24:16
128:25 199:8
216:13
**fast** 25:5
**favor** 126:6
**favorable**
161:11
**favorably**
161:9
**fda** 5:19 115:10
116:6 121:17
122:7,10
123:24 125:13
127:15 128:19
135:8,18
136:13,23
137:3 138:6
144:2 163:9
164:16 165:6
165:17,18
166:1,7 167:17

168:23 169:11
169:22 171:16
172:14,16
173:3,9,11,22
174:3,12
**fda's** 121:19
**feasibility** 91:8
**features** 42:25
**federal** 116:6
**feedback** 93:25
**feel** 12:4 113:2
174:20 176:25
177:5
**felt** 77:21
**ferret** 141:9
**fiber** 132:19,20
135:9,11,14
136:3,7,22
137:9,13
142:23,23
143:9,9 149:21
**fibers** 112:22
112:23 130:10
130:14 133:23
139:11 140:25
168:19
**fibre** 46:13,18
**fibrous** 135:21
136:1 144:4
**field** 33:12
41:19,21 93:23
93:24
**fields** 40:16
**fifty** 108:20
**figure** 99:9
100:7 105:17

106:4 142:2
154:4
**figures** 6:19
201:2,4 202:8
**filed** 223:14
240:21
**filing** 243:17,22
**final** 163:2
203:3
**financial** 103:5
103:6
**financially**
242:18
**find** 40:20
58:20 62:22
78:16,17 85:5
86:8,22,24 88:1
88:7 91:11
106:17 108:11
123:14 133:10
133:13,22,23
161:23,25
168:24 179:14
179:15 186:13
186:18 190:18
190:23 192:2,7
193:24 197:8
198:9,20 222:9
232:13
**finding** 162:2
174:15
**findings** 147:18
207:20 221:8
**finds** 120:17
162:6

**fine** 69:9,12
159:5 187:5
202:3 209:23
**finish** 9:4
**finished** 9:5
159:25 160:10
188:5
**finken** 3:14
**firm** 19:24 21:8
160:25 208:9
**firms** 155:13,23
213:21 214:11
**first** 14:13,17
15:5,12 19:25
20:14,16,25
30:9 33:15 52:9
52:23 53:9
85:11 91:14,21
94:3 102:6
103:3,4,17
104:17 108:24
113:17 120:24
122:22 128:21
131:2 136:11
146:21 147:2
147:24 151:20
159:25 161:19
164:22 165:1
173:17 177:13
188:3,5 209:1
210:24 212:8
217:1 239:11
240:1,12,20
**fit** 181:21
**five** 72:7 80:2
130:20,22

[five - full]                                                    Page 24

139:8
**fix** 180:10
**flamm** 170:12
**flip** 51:6
**fmri** 42:4
**focus** 17:7
76:11 106:15
130:3 193:10
202:17
**focused** 29:12
68:17 106:16
151:18 231:4
**focusing** 55:12
231:5
**folder** 17:3,4
158:10,21
160:12,15
191:15,16
**folders** 160:18
160:19 191:19
193:3
**folks** 10:13
50:16 105:8
**following** 21:21
22:12 238:22
243:9
**follows** 8:5
**food** 5:18
127:13 136:24
138:7 144:2
151:8
**footing** 189:24
**footnote** 240:24
**forecasts** 82:9
84:15

**foregoing** 242:5
242:7 245:6,9
**foremost** 217:1
**forget** 37:11
127:11 187:9
**forgive** 130:21
**form** 10:18
12:2,14 19:2
32:20 45:16
48:8 57:9 58:14
63:16 73:8
77:14 81:20
101:18 113:6
115:3,12
119:24 132:17
134:12 135:21
136:22 137:1
137:11 138:17
139:4 140:10
141:2 143:3
144:4 148:14
150:16 151:1
152:21 155:15
166:8 168:1
170:1,3 171:23
174:4 175:15
177:20 182:17
188:18 199:21
199:24 204:23
212:1 213:5
223:20 224:22
229:15 235:9
243:5,8
**format** 242:12
**formations**
46:10

**formed** 23:17
135:12
**former** 75:5
**forming** 79:4
132:20 142:23
143:9
**forms** 135:15
**formula** 92:5
94:20
**forth** 159:18
**fortunately**
27:2
**forward** 11:16
**forwarded**
210:16
**forwarding**
97:25
**found** 12:24
23:20 61:17
69:20 70:10
71:12 84:11
87:3 125:1
132:21 142:24
143:10 147:3
147:12 158:20
161:20 194:7
194:16 195:2
196:17 239:9
**foundational**
119:13
**four** 27:1
108:20 157:22
157:23 190:17
193:22 194:3
**fourth** 94:8

**fragments**
136:2
**fragrance**
216:10
**framed** 141:14
**framing** 95:21
**franchise** 94:5
98:6 100:6
101:12 111:9
111:22
**frankly** 62:1
86:24 99:12
**fred** 176:22
**frederick**
107:20,23
108:1,6
**free** 169:20
213:15
**freeze** 35:12
**friday** 12:20
**friedenfelds**
80:10,20
**friend** 189:20
**front** 10:22
12:8 52:3 123:4
159:11 160:21
161:11 243:18
**froze** 120:21,22
**fruition** 139:3
**frustration**
86:7
**fueled** 226:6,14
**full** 37:3,4
77:12 79:9
131:20 202:4

**[fuller - going]**                                                  Page 25

| | | | |
|---|---|---|---|
| **fuller**  121:9 | 203:17 238:1 | **given**  23:6,7 | 232:14 233:2 |
| **fully**  66:17 | 239:17 | 27:11 56:19 | 238:18,21 |
| 125:21 165:21 | **geoffrey**  147:7 | 62:2 94:3 180:8 | **goes**  44:14 |
| **fund**  154:16 | **geological** | 197:12 | 65:10 124:16 |
| **fundamentally** | 150:1 | **giving**  224:4 | 125:6 140:16 |
| 101:2 | **george**  1:10 4:2 | **glanced**  49:2 | 147:1 149:9 |
| **funded**  154:14 | 5:12 8:3 51:14 | **glimmer**  118:6 | 151:5 168:20 |
| 155:13,23 | 51:19 244:8,25 | 118:25 119:19 | **going**  11:16,17 |
| 157:5 162:16 | 245:14 | **global**  63:20 | 11:18 14:15 |
| **funding**  156:16 | **gerel**  2:4 5:4,7 | 79:16 177:14 | 18:4 19:16,18 |
| **further**  64:7 | 20:4 21:13 | 177:18 | 26:2 49:16,21 |
| 106:23 109:22 | **germane** | **globally**  63:25 | 49:25 50:13,15 |
| 170:8 238:21 | 151:17 230:9 | 234:1 | 50:25 51:4,12 |
| 241:11 242:15 | **getting**  19:12 | **gmail.com**  2:17 | 66:2,21 82:7,11 |
| **future**  82:10,13 | 26:6 54:22 | **go**  15:4 17:10 | 83:6,9 84:8,9 |
| | 73:12 77:19 | 30:4 39:17 | 85:2,16,25 86:2 |
| **g** | 84:25 140:12 | 44:13 46:24 | 86:20 88:14 |
| | 144:20 228:4 | 53:1 64:7,23 | 89:2 91:22 |
| **game**  85:2 | 233:8 | 67:2 69:12 | 92:25 93:3 |
| **gap**  86:10 | **gilbert**  3:11 | 72:21 78:22 | 94:22,23 95:9 |
| **gary**  170:11 | **give**  9:1,14 11:7 | 79:25 82:8 | 96:25 99:5,9 |
| **geared**  91:16 | 18:24 25:7 | 85:24 88:16 | 103:12 104:3 |
| **gender**  221:6 | 37:17 53:3 | 89:9 90:23,24 | 105:21 109:9 |
| **general**  9:1 | 62:22 69:10 | 92:15 96:7 | 109:22 111:12 |
| 56:9 81:3 | 76:3,6 87:5 | 108:6 109:21 | 112:12 114:14 |
| 162:13 166:23 | 108:14,19 | 123:5 127:1,23 | 114:15 122:15 |
| 218:2 235:13 | 118:7 128:11 | 128:5,6,7 | 122:24 123:10 |
| **generalized** | 128:13 131:8 | 131:20 134:24 | 127:21,22 |
| 206:13 | 131:15 145:11 | 139:8 141:13 | 128:11 131:1 |
| **generally**  16:8 | 157:18 158:17 | 142:18 151:20 | 131:19,24 |
| 166:19 | 159:9 163:12 | 151:25 153:22 | 133:3,10,22,22 |
| **generations** | 184:14 186:12 | 154:11 158:15 | 137:23 138:1 |
| 216:23 | 187:25 199:16 | 159:3,17 163:9 | 139:11 140:4 |
| **generator** | 201:21 202:5,6 | 170:8 172:14 | 140:17 141:12 |
| 107:6 | 238:4 241:5,9 | 193:6 210:20 | 141:21 144:25 |
| **genital**  7:5 | | 213:10 223:12 | 154:3,16 |
| 170:21 203:7 | | | |

[going - health]                                                              Page 26

158:14 159:15
159:17 161:10
162:12 176:7
184:21,23
193:14,14
195:22 200:20
202:17 210:8
210:25 217:23
223:24 225:9
225:11 235:20
238:8,10
**golden** 59:1
63:22 85:10
94:5 101:9
111:8
**gonna** 69:10
85:14 89:8
187:2 193:12
**good** 13:2 50:18
50:25 61:5
109:5 127:20
139:13 145:18
152:9 162:7
209:19,25
**google** 15:21
46:24 75:14,18
75:24 78:22
211:16
**googled** 211:14
**gotta** 189:20
**governance**
88:24
**government**
58:11 94:15
**governmental**
28:6

**grab** 108:9
145:12
**graduate** 44:11
44:13,18
**grammar**
187:16
**granularity**
33:10
**gravity** 62:1,6
96:6
**great** 8:14 9:8
9:16 12:16 13:8
14:12 17:22
83:4 108:23
202:9 210:19
**group** 40:8
70:25 71:2
85:21 146:23
146:24 147:18
**group's** 147:24
**groups** 37:21
41:5 72:10
194:21
**guess** 25:2,4,6
87:24 156:3,9
178:7 183:18
184:13 230:6
**guidance** 15:24
33:20 201:21
**guidelines**
136:12
**guiding** 119:15
**guys** 26:23
122:17 128:2
145:8 158:4

**h**

**h** 187:18
**habits** 39:13
226:6,14
**half** 20:1 26:19
26:21,23 227:2
**hand** 75:13
210:8
**handing** 108:21
238:9
**handling**
189:21
**hang** 104:22
**hanging** 101:20
**happen** 29:19
58:18 88:23
89:20 240:13
**happened**
18:25 19:3
29:22 31:13
43:18 57:25
86:18,18,22
87:6 92:4 95:16
214:12 230:5
**happening** 31:5
79:17 129:20
174:10,24
223:8 224:10
227:1 228:18
230:3 233:20
**happens** 31:10
88:6,19 114:18
114:24
**happy** 50:15,15
127:1 128:1

161:18 184:22
184:24
**hard** 12:1 45:12
148:8,14
187:18 195:12
209:8 222:19
**harder** 170:4
**harm** 119:20
217:5 219:24
221:24 223:5
230:15
**harmful** 45:17
135:9 139:12
**hate** 158:25
232:14
**hazard** 103:24
124:23 169:1,4
**hazardous**
125:2 169:23
**hazards** 172:8
**head** 105:16
184:14
**health** 15:20
28:22 32:16
33:7 42:14,17
42:18 43:4,8
45:6 50:3,6
52:21 53:9,12
53:17 55:15,19
56:5 57:14,23
59:12 60:7 66:7
66:14 68:5
75:12 76:8,16
76:20 77:3 78:7
82:12 83:13,18
85:17 90:18,19

**[health - ideas]**                                                      Page 27

91:24 92:11,17
94:10,25 95:4,5
95:22,23 96:3
96:13 99:4,14
99:16,19,19
100:4 102:2
103:10 111:16
113:25 114:14
114:22 115:22
115:24 116:1
117:20 119:1
120:13 137:24
139:10 148:17
152:8 155:11
155:12,23
165:3 169:1
170:9 176:10
177:3,10,25
178:1,4 179:6
181:6,16
205:23 206:19
207:3,8 215:15
220:8 228:21
236:10,16
237:4
**hear**  9:22
120:24 209:8
209:24 210:1
**heard**  17:20
87:14 120:4,5,5
223:1
**hearing**  8:10
93:17 227:14
**heckert**  1:25
242:4,24

**hedging**  205:3
**help**  52:5
187:19
**helpful**  10:15
11:6,7 42:8
158:18
**helpfully**
178:12
**helps**  131:5
145:7 158:20
**henrich**  3:20
**hey**  12:17 61:14
65:13 81:9
82:10 83:10
84:8 87:2 88:2
89:1 99:4
189:20 209:3
218:12
**hi**  104:18
**hiccup**  120:25
**high**  17:24
69:18,18
134:20 147:12
153:9 177:22
179:10
**highlighted**
238:11 239:7
**highlighting**
193:22
**highlights**
190:17 194:4
**highly**  147:16
**hildick**  5:15
97:6
**hill**  3:23

**hired**  35:11
**hiring**  35:12
**histological**
147:15
**historical**  86:11
146:13,19
152:19
**historically**
148:15 234:7
**history**  57:13
77:12 117:12
183:7 194:22
**hit**  145:1
**hold**  127:23
172:14 196:25
200:15 201:23
202:14 215:5
237:16
**homework**
107:13
**hope**  103:2
**hopefully**
156:15 187:8
**hospital**  146:24
149:17
**hour**  31:2,4
50:14,20
127:25 184:22
**hourly**  30:24
31:8
**hours**  20:1
24:24 25:9
26:20,23 27:4
29:14,18
**house**  32:1
211:18

**how's**  138:1
**hsu**  240:25
**huge**  174:13
**hughes**  97:25
**human**  34:24
165:3 170:10
170:18
**humans**  124:23
125:3
**hunch**  87:24
**hundred**  230:5
**hurt**  104:9
225:9
**hypothesis**
41:17 74:7,8,15
74:18
**hypothetical**
43:16,22 71:10
73:5,12

**i**

**i.e.**  52:13
139:17
**idea**  9:1 30:23
41:2 43:7 47:16
58:3 67:14
85:10 89:23
90:2 92:15
95:18 103:16
105:12 126:22
137:23 142:12
153:25
**ideas**  71:17
99:11 100:11
101:5 105:7
107:6 136:11

[identifiable - inform]                                                    Page 28

**identifiable**
  136:5
**identification**
  125:25 148:1
  165:25
**identified**  86:11
  101:16 135:13
  136:22 171:18
  192:14 194:6
  211:11
**identifies**
  138:25
**identify**  118:23
  140:7
**identifying**
  138:12
**imagine**  84:5
**immense**
  216:17
**impact**  23:3
  66:8 105:11
  169:11 173:25
  180:22 189:11
  203:18 217:6
  220:1 221:25
  223:6,18
  227:17 228:7
  229:13 230:16
  233:5 234:3
  236:20
**impacted**  81:17
  208:25
**impacting**
  231:17
**impacts**  137:18
  229:23

**implant**  112:23
**implausible**
  86:24
**implications**
  135:14
**imply**  111:16
**importance**
  58:23 94:4,5
  98:18 104:17
  215:12
**important**  9:3
  39:4 41:6 68:21
  81:13 96:1
  104:11 107:8
  131:22 138:5
  152:11 166:15
  174:11 176:8
  195:13 218:16
  232:24 235:6
**importantly**
  103:7 216:12
**impression**
  170:3 196:17
  199:11
**impressions**
  214:15
**impurities**
  124:10
**impurity**
  118:11,14
**inadequate**
  112:4
**inaudible**  8:15
  10:4 13:11,21
  13:22 14:23
  15:5,13 16:20

  231:8
**incidents**
  202:25
**include**  68:1
  98:23 122:7
  140:22,24
  144:3 173:1
  178:20 192:12
  194:25 197:2
**included**  50:2
  67:23 134:7
  136:23 160:16
  185:10 208:10
**includes**  124:19
**including**  48:12
  93:12 132:1
  172:15
**inclusive**  30:15
**incongruency**
  167:14
**inconsistent**
  176:17
**increased**  69:21
  129:13 171:1
**incredibly**
  63:18
**independent**
  155:2 156:25
  157:7
**independently**
  155:5 157:10
**index**  5:1 6:1
  7:1 108:10
  145:9
**indexing**
  157:16

**indiana**  91:7
  94:13
**indicate**  16:25
  70:12 71:4,6
  194:19 215:25
**indicated**  18:12
  55:3 126:6
  137:12
**indicative**
  102:9 104:23
**indirectly**
  42:18
**individual**  28:9
  165:10
**individuals**
  147:11 148:12
  223:17
**industrial**
  185:18
**inert**  65:8
**inevitability**
  57:16 154:2
**infant**  63:21
**infants**  54:17
  55:4,10 110:7
  110:21 179:23
  182:10
**influence**  221:5
**influences**
  43:20
**influencing**
  222:15
**info**  27:21
**inform**  52:20
  68:8 70:24
  161:5 212:4

**[information - investigation]**                                        Page 29

| | | | |
|---|---|---|---|
| **information** | 178:13,14 | **interested** 17:1 | 162:13 176:4 |
| 15:17 31:19 | 180:11 181:21 | 22:19 41:8 68:3 | 179:21 186:8 |
| 32:10,15 33:9 | 182:23,25 | 157:6 174:6 | 188:24 189:5 |
| 41:5 43:17 | 185:20 | 197:15 205:9 | 192:7 207:13 |
| 46:25 71:1,3,19 | **inhaled** 125:5 | 242:18 | **interpretation** |
| 72:17 75:7 78:9 | **initial** 14:23 | **interests** 99:18 | 137:21 186:5 |
| 78:25 79:15 | 16:20 18:12 | **internal** 5:20 | 189:11 |
| 86:13 116:17 | 60:5 196:18 | 57:13,21 59:4 | **interpreted** |
| 119:19 121:10 | 211:17 | 59:17 60:25 | 47:9 134:4 |
| 124:9 127:9 | **initiate** 103:21 | 65:18 75:22 | 144:17 |
| 196:8,9 197:11 | 104:16 | 76:7,12 77:19 | **interpreting** |
| 197:17,18,20 | **innocent** 217:1 | 77:23 84:6,7 | 139:7 188:21 |
| 197:23 199:10 | **inquiry** 76:11 | 85:12 96:23 | 188:23 |
| 205:14 206:12 | 106:15 | 97:15 111:7 | **interrupt** 68:20 |
| 206:19 207:13 | **inside** 168:15 | 113:23 123:17 | **intersects** 38:17 |
| 207:14 219:7 | **insight** 83:25 | 130:6 132:6,9 | **interval** 239:20 |
| 222:8,14,18 | **insights** 183:4,4 | 150:10 174:17 | **interview** |
| 223:23,25 | **inspection** | 192:11 210:17 | 239:13 240:11 |
| 224:3 234:5 | 148:11 | 226:19 | **interviewed** |
| **informative** | **instance** 46:9 | **internally** | 239:16,21 |
| 82:13 99:10 | 62:23 76:16,22 | 56:14 58:5 | **intro** 9:21 |
| 106:17 151:15 | 110:23 141:6 | 74:12 116:19 | 37:15 38:7 |
| **ingredient** | 155:5 176:20 | 117:17 176:17 | 119:5,6 120:6 |
| 180:9,24 181:2 | 207:15 220:7 | 185:25 190:4 | 178:11 |
| 181:13,15 | **institutional** | 214:23 | **introduced** |
| 183:13,14 | 176:19 177:9 | **interpersonal** | 181:25 |
| 184:8,10,10 | **instructions** | 40:8 | **intuition** |
| **ingredients** | 243:1 | **interpret** 59:23 | 104:17 |
| 180:13 | **intended** | 101:2,12 133:1 | **invariably** |
| **inhalation** | 164:25 | 133:8,18 | 124:18 |
| 53:22 54:4,4,6 | **intentionally** | 134:18 136:8 | **invested** 93:12 |
| 54:8,16 55:4,9 | 56:7 | 136:12 137:3 | **investigate** 61:5 |
| 55:20 109:17 | **interacting** | 139:21 140:13 | **investigating** |
| 109:25 110:6 | 79:2 | 141:11,19 | 206:7 230:2 |
| 110:20 111:4 | **interest** 103:5,6 | 144:23 153:9 | **investigation** |
| 124:22 125:2 | 184:3 | 153:14 161:8 | 61:9 |

**[investing - johnson]**                                                Page 30

| | | | |
|---|---|---|---|
| **investing**  92:23 | 29:9,10 38:13 | **jama**  7:4 69:16 | 49:17,17 52:11 |
| **investment** | 76:13,15 77:5 | 237:25 | 53:24,25 54:1,2 |
| 98:12,19 99:7 | 77:18 79:19 | **january**  6:6 | 55:23,24 56:1,1 |
| 99:24 100:6 | 80:16 85:19 | 145:7,15,22 | 56:5,5,25 57:1 |
| 111:10,21 | 94:25 100:15 | 146:5 | 58:25,25 59:22 |
| **invitation** | 102:2 111:17 | **jbp**  215:15,17 | 62:9,12,12,15 |
| 191:5 | 148:1 152:8 | 216:19 217:13 | 62:15,18,18,21 |
| **invoice**  5:3,6 | 156:18 180:9 | **jersey**  1:2 3:23 | 62:21 63:1,1,2 |
| 19:23 20:3 21:7 | 185:14 189:19 | **jewald**  3:7 | 63:3,19,19,23 |
| 21:12 25:16 | 192:1 193:11 | **job**  209:19 | 63:24 65:24 |
| **invoices**  24:14 | 212:8 215:11 | **joel**  3:12 | 66:1,1,2,2,6,6 |
| 24:16,19 | 219:13 221:3 | **john**  3:4 8:8 | 66:13,18 71:9 |
| **involved**  13:12 | **issuing**  48:1 | 11:9 12:17 27:5 | 71:10 75:6,6,22 |
| 43:2 213:21 | 169:10 | 64:20 79:21 | 75:22 76:7,7 |
| 214:25 | **italian**  163:4 | 90:22 108:8,19 | 77:1,1,24,24 |
| **issuance**  21:22 | **j** | 108:20 121:24 | 79:11,11 82:20 |
| 22:12 | | 122:20,24 | 82:20 83:17,17 |
| **issue**  15:5,13 | **j**  97:24 | 126:5 127:4 | 84:5,5 86:25,25 |
| 16:6 21:21 | **j&j**  5:14 6:14 | 128:10 131:9 | 89:5,5 90:12,12 |
| 55:14 72:18 | 6:15 18:14 55:8 | 131:12 137:12 | 91:19,19 93:13 |
| 73:10 99:23 | 57:6 81:19 97:3 | 144:7 145:11 | 93:13,19,19 |
| 102:12 105:1 | 97:6 113:24 | 145:14 157:18 | 95:8,8 96:2,2 |
| 108:2 134:15 | 114:3 130:5 | 157:21,25 | 96:12,13,16,16 |
| 144:22 148:24 | 131:4 152:24 | 158:17,25 | 97:15,16 99:22 |
| 149:20 155:8 | 154:14 160:10 | 164:2 182:16 | 101:15,15 |
| 172:9 181:13 | 174:25 177:15 | 186:15 195:23 | 103:12,13 |
| 182:2 184:10 | 187:11,12,23 | 200:13 202:6 | 105:8,8 109:15 |
| 211:13,21 | 187:24 192:11 | 208:2 209:3 | 109:16 110:25 |
| 213:7 215:2 | 214:21 226:2 | 210:7 227:25 | 110:25 112:2,6 |
| 220:7 224:6 | **j&j's**  64:5 | 238:4 241:9 | 112:7 117:3,3 |
| 228:12 236:3 | 100:16 142:6 | **johnson**  1:4,4 | 129:10,10 |
| 236:12,13 | 234:8 | 3:2,2 5:20,20 | 132:5,5,8,8 |
| **issued**  21:2,17 | **j&j000026987** | 6:8,8 14:24,24 | 139:17,17 |
| 22:14 24:15 | 6:7 146:1,6 | 16:9,9,16,16 | 147:7,7,23,23 |
| **issues**  8:9 9:3 | **j&j000040596** | 44:24,24 47:22 | 148:3,3 150:11 |
| 17:9 23:8,8,9 | 186:11 | 47:22 48:2,2 | 150:11,11,12 |

**[johnson - kind]**                                                                          Page 31

| | | | |
|---|---|---|---|
| 150:21,22 | 228:23 229:8,8 | **jr** 2:14 | **kind** 15:18 |
| 151:6,6 153:13 | 231:22,22 | **judgment** | 16:15 23:20 |
| 153:13 156:20 | 233:5,18,18,19 | 50:11 | 27:12 29:24 |
| 156:20 161:9,9 | 233:19,21,21 | **july** 13:19,23 | 32:9,23 33:10 |
| 161:12,12 | 234:22,22 | 14:5 15:14 16:4 | 33:13 35:16 |
| 162:16,16 | 235:23,24 | 16:21 18:1,13 | 38:9 39:3 41:11 |
| 163:19,19 | 236:3,4,21,21 | 28:1 29:6 108:5 | 41:14,20 42:2 |
| 167:12,12,19 | 244:3,3 | 109:1,2 124:1 | 43:18 44:4,14 |
| 167:19 168:5,5 | **johnson's** 5:16 | 165:10 | 44:15 45:23 |
| 168:9,9 169:14 | 14:20 16:11,12 | **jump** 70:20 | 46:13,14 56:18 |
| 169:14,15,15 | 52:21 53:10 | 96:9 | 59:25,25 60:18 |
| 169:18,18,19 | 56:12,13 58:25 | **june** 5:14,17 | 65:14 66:25 |
| 169:19 171:19 | 59:6,22 62:9 | 13:19,22 14:5 | 67:6,14,19 |
| 171:19 173:4,4 | 63:23 65:25 | 15:14 16:4,21 | 71:18 72:20 |
| 174:6,6,20,20 | 66:13,19,24 | 18:1,13 97:2,5 | 74:10,18,19 |
| 175:8,8 185:13 | 74:24 85:11 | 97:8 98:1 170:9 | 79:15,16 81:6,8 |
| 185:14,15,15 | 89:24 94:18 | **justification** | 84:6,12 86:7 |
| 185:24,24 | 97:7,17 99:22 | 84:12 | 87:2,7,24 88:24 |
| 189:9,9,16,16 | 106:5 109:17 | | 93:6 94:21 99:4 |
| 190:2,2 204:5,5 | 110:6,25 112:2 | **k** | 101:6,7,8,21 |
| 214:16 215:20 | 156:24 214:16 | | 102:1 105:12 |
| 215:21 216:6,7 | 219:22 225:11 | **k** 2:7 | 113:24 115:18 |
| 216:8 218:11 | 226:13 227:12 | **kalmer** 98:1 | 119:13 120:14 |
| 218:12,16,16 | 228:9 233:5 | **kansas** 51:2 | 133:9,18 |
| 219:7,7,22 | 241:1 | **keep** 50:15,25 | 134:16 137:22 |
| 222:21,21,22 | **johnson's** | 51:4 109:24 | 137:23 141:13 |
| 222:22 223:15 | 52:12,14 216:1 | 128:13 176:14 | 141:16 148:23 |
| 223:15 224:11 | 216:3,5 226:1 | 180:19 184:22 | 156:15 159:7 |
| 224:11,14,15 | **joined** 36:6 | **kessler** 21:25 | 162:8 167:14 |
| 224:20,20 | **joint** 132:13 | 22:16,19 | 167:20 176:19 |
| 225:2,2,5,5,7,7 | 213:21 | **kessler's** 23:4 | 177:8 186:2 |
| 225:10,17,17 | **journal** 54:9 | 23:15,25 24:9 | 187:18 189:22 |
| 225:24,24 | 98:2 221:2 | 49:6 | 189:25 191:23 |
| 226:13 227:12 | 238:20 | **kevin** 3:21 | 193:6 199:4 |
| 227:19,19 | **journals** 54:9 | **killing** 179:19 | 206:2,2,11 |
| 228:9,19,20,23 | 166:22,23 | **kilmer** 32:1 | 212:6 214:7 |
| | | 211:18 | |

**[kind - label]**                                    Page 32

220:19 222:13
226:25 228:13
228:16 229:17
**kinds**  32:2
42:23 78:23
85:19 119:11
130:11 141:8
168:19 206:12
207:14 222:18
**king**  3:3
**kkotch**  3:24
**knew**  45:3,13
56:5 93:19
**know**  8:11 9:11
9:24 11:22 12:6
12:12,14,25
13:7 15:20,22
16:14 17:7,21
18:19 19:1,4,10
19:19 22:6,8
23:10,11,18,21
25:1,1,2,3
26:20 29:11
30:18 31:20,22
32:3,25 33:1
35:17 37:4
38:14 39:2,3,5
39:5,8 40:10,15
41:21 42:3,5
43:1 45:2,5,10
45:14,20 46:7
46:20,23 47:7
47:10,10,11,14
48:12 50:10,24
51:1 52:7 53:13
53:20 54:12

56:10,14,19,21
57:12,14,16,17
58:2,16,17,21
58:22 59:1,16
59:20 60:12,15
62:16 65:3 68:5
69:7 70:21
74:16 76:17
79:22,24 83:1
84:4,6 85:18,22
88:9,16 89:21
89:21 90:8,23
93:22 94:11
99:12 100:1,8
100:22 101:3
101:22,24
102:3 105:2,3,3
105:4,6 106:18
107:12 108:21
109:9 111:6,14
114:5 115:1,6,8
115:13,14,15
117:10 119:3,5
119:8,14
120:14 122:17
123:1,9,25
126:12 127:17
128:7 130:3,5
130:10 131:21
133:22 134:14
134:15,15,16
134:19 136:17
141:12,16
144:24 146:14
148:8 149:3
150:21 151:9

151:10,11
153:8 155:1,11
155:16 156:1
157:17 159:19
160:8 161:2,16
161:16,18,19
162:15,19,20
162:24 166:15
166:21,22,25
166:25 169:9
169:19 173:3
173:20,20
174:5 176:8,10
176:13 179:20
180:7 181:18
182:23 184:12
184:15,16
185:16,17,24
185:24 187:17
188:2 189:8,21
189:24 190:2
191:17 192:6,7
193:7 194:6,7
195:11 198:11
199:3,3,6,7,25
200:18 201:12
201:17,22
203:24 204:8
204:10,12
205:4,13 206:5
206:16,17
208:21 210:13
212:2,11
214:21,23,23
217:23,25
218:2,3 219:2

219:10 221:7
222:4,5,5,5,7
222:24 223:21
224:2,18
225:19 226:21
226:23 227:2
228:15,17,21
228:25 229:2
229:18,19
230:1,6 231:16
231:18,18
232:18 233:7
233:20 234:22
237:5,7 238:15
240:22
**knowing**  82:23
83:8 235:7
**knowledge**
47:11 107:9,14
**knows**  85:7
228:24 236:16
**koberna**  107:20
107:23 108:1,6
112:9 181:24
**koberna's**
176:22 181:16
183:1
**kotch**  3:21
**kslaw.com**  3:7

**l**

**la**  2:16
**label**  49:23
169:6,23 173:9
180:3

**labeled**  124:7
165:12
**labeling**  105:18
109:20
**labelled**  20:17
**labels**  106:6
**laboratory**
147:5,12
149:13
**lack**  40:1 81:2
209:22
**lake**  2:16
**landmark**  81:8
**langer**  149:18
150:13,23
**language**  50:1,4
57:15 65:3
66:22 68:12
94:21 134:18
181:22
**languishing**
44:16
**large**  70:10
84:5 86:25
98:11,19 99:7
100:6 192:18
194:16 226:5
237:2
**largely**  11:16
37:20 106:16
**larger**  41:12
58:21 103:8
104:10,23
170:5 221:9
**late**  128:7 237:8

**launched**  82:16
176:24
**law**  10:9 19:24
155:13,23
160:25 213:20
**law.com**  3:24
**lawsuit**  213:13
**lawsuits**  223:14
239:12 240:12
240:13,21
**layperson**
144:22,22
**lead**  44:12
71:19 74:15
197:10,21
**leader**  149:15
**leading**  62:20
88:5
**leads**  74:17
90:5
**learn**  78:23,25
213:6
**learned**  28:15
**learning**  22:8
25:5 30:16 46:9
**led**  160:8
**left**  34:19 57:7
164:12 165:16
**legacy**  65:10
231:21
**legal**  214:1
**legend**  190:15
**legislation**
94:16
**leigh**  2:21

**leigh.odell**  2:24
**leila**  1:25
127:11 232:9
232:21 242:4
242:24
**lend**  58:3
142:12
**lends**  95:17
**length**  176:5
**lengthy**  84:16
**letter**  6:13
123:24 164:14
165:9 167:24
168:21 187:10
**letters**  126:17
157:22
**letting**  114:4
**level**  17:24 37:3
69:19 77:23
79:1 117:16
153:9 189:17
224:13
**lewin's**  151:10
**liability**  1:7
244:6
**lies**  226:22,23
**light**  236:14
**likely**  63:2
136:16 171:5
195:7 239:5
**likert**  71:12
72:7
**limit**  33:13
141:23
**limitations**
142:1

**limited**  47:12
53:11,14
**line**  35:13,18,18
97:16 109:22
132:7 153:24
244:10
**linear**  118:13
120:11
**lines**  183:8
**linguistically**
196:12
**link**  17:2
100:23 112:21
113:13,15
114:6 116:7
120:18 186:6
193:2
**linking**  149:24
150:14
**links**  208:10,11
208:17
**list**  30:10 51:7
80:9 121:16,16
122:6 126:8
172:21 192:13
212:10 214:1
225:6 237:23
**listening**
232:14
**literally**  61:20
88:12 102:22
121:4
**literature**  31:21
31:22 73:16,22
75:8 78:10
113:18 162:22

191:2 205:21
207:1 211:25
220:10,20
**litigation**   1:7
13:13 20:12,25
24:16 27:18
48:15 191:15
223:12 226:9
226:16 227:17
228:8 229:6,11
229:22,23
230:4 231:5,16
231:16,18
233:19,21
244:6
**little**   9:21 22:24
27:21 29:23
38:21 45:11,14
46:2 54:24 70:2
73:11 95:15
97:15 105:24
109:21 124:2
128:5,8 139:5
140:12 162:9
164:20 170:8
181:11 184:18
187:18 188:4
190:6 208:24
209:8 210:12
212:3 222:25
233:8 235:4
238:21
**live**   193:15
**llp**   2:4,13 5:4,7
20:4 21:13

**located**   10:8
69:8
**location**   42:24
**logic**   87:25
169:13
**logical**   238:16
**long**   12:4 19:9
26:17 57:13
67:7 72:16 93:8
93:11 100:19
153:24 183:7
190:1 193:20
197:16 231:21
234:13
**longer**   27:4
128:5,8 135:17
**longo**   48:12,20
**look**   11:25
12:12 14:10,19
15:25 16:19
17:3 22:1 41:6
66:20 74:14
78:4 84:21 85:1
99:17 102:25
103:4 104:3,9
108:4 109:12
116:13 124:2
126:23 127:5
128:19 129:3
133:23 138:2
139:2 141:6
151:19 152:16
153:17 156:2
156:20 157:12
159:16,18
167:5,17 177:1

186:9 201:13
208:16 210:3
214:20,24
215:4,5,7
218:19 225:13
225:18 227:3
228:12,13
235:18 237:5
238:8
**looked**   15:16,18
43:2 61:15,15
156:7 160:13
161:20 162:25
191:18 193:17
193:18 212:12
213:1,7 220:6
222:6 229:22
**looking**   10:19
12:13 15:21
16:7,13 17:6
18:13 21:22
22:12 23:10
25:18 29:8,9
31:19,20,21,25
32:5,8 41:10
43:14,20 46:4,7
74:16 76:11
77:17,18 79:8
89:16 101:22
108:10,25
157:25 158:20
162:11 163:1
164:22 186:23
189:25 191:25
192:25 199:10
200:17 212:18

215:2 219:5,6
**looks**   96:4
123:2 133:4,10
133:14,15
134:8,22
**loopstra**   1:11
10:10
**lord**   147:8
**loss**   236:6
**lost**   204:2 228:4
**lot**   40:8 41:22
42:21 43:6
46:25 56:14
57:21 58:1 59:2
59:3 63:6 81:25
82:6,9 83:3
85:12 92:23,24
93:7 95:17 96:4
115:21 117:10
126:19 127:8
148:16 153:10
174:9 183:10
190:5 192:2,7
192:21 196:13
201:22 202:16
215:1 222:23
226:24 234:11
**lots**   58:5 88:3
175:1 206:18
210:16
**love**   63:14
**loyalty**   220:25
**lunch**   126:24
128:1,7,15
163:11

**[lundy - masks]**

Page 35

**lundy**  2:13
**lung**  102:6
 113:20,21
 153:15,19
 170:13

**m**

**m**  1:25
**m.d.**  1:11 4:2
 8:3 244:8,25
 245:14
**machine**  67:2
**made**  49:23
 77:7 82:15 84:1
 87:14,16 90:9
 96:18 97:23
 105:18 106:5
 130:20 147:14
 154:13 158:4,7
 243:7,15 245:6
**magnitude**
 72:12
**main**  179:5
 236:12,13
 238:23 239:1
**maintain**  86:1
**maintaining**
 180:23
**maintains**
 190:14
**major**  9:11
 239:11 240:12
 240:13,21
**majority**  25:25
 198:4 199:7

**make**  9:4,5,7,11
 9:23,25 12:15
 12:19,24 13:2
 36:6,13 48:5
 50:11 57:3 62:3
 62:7,13 69:7
 70:20 82:7 92:7
 100:23 102:1
 118:1 121:5
 127:21 135:11
 141:8 155:8
 159:1,14 160:2
 179:18 183:12
 191:6 195:15
 197:17 204:12
 205:13 206:2,3
 206:4 210:12
 215:18 220:24
 224:5 243:4
**makes**  9:13
 52:2 138:14
 140:7 158:3
 198:6 220:13
**makeup**  6:22
 212:25 213:2
**making**  23:12
 32:9 41:20
 47:25 64:9 66:6
 67:1 71:20 78:2
 81:11 86:6 90:7
 91:4 92:24
 115:11 168:14
 179:1 204:18
 206:24 243:8
 245:8

**man**  161:25
**management**
 6:9 34:24,25
 36:20,20,21
 163:20 221:3
**manner**  43:13
 43:13 222:20
**manufactured**
 140:6
**manufacturing**
 42:24 45:21
**march**  6:11
 158:24 163:18
 163:21
**mark**  19:16,22
 21:6 34:11 51:5
 51:12 61:21
 83:5 96:25
 103:13 122:16
 123:11 131:4
 163:16 178:10
 200:20,25
 212:17
**marked**  163:10
**market**  62:9,11
 63:6 65:25
 66:19 67:5
 81:13 82:21,22
 83:20 84:22
 86:1 87:12 89:9
 93:1 94:12
 95:12 114:16
 148:21 154:3
 172:6 224:23
 225:11 236:7,8
 237:8

**marketed**  50:8
**marketing**  1:5
 14:19 16:9 17:8
 18:14,20 23:9
 29:9 34:24
 36:21 38:14,18
 42:6 52:13
 63:14 64:2 67:1
 74:9 75:2 76:3
 76:11,13,15
 77:5,18 79:19
 79:20 80:16
 82:7 87:22 88:9
 90:13 91:7
 93:22 94:18
 95:9 100:17
 119:6 152:12
 167:13 168:18
 174:9 183:3
 192:1,8,21
 193:10 214:10
 215:11,17
 218:18 219:13
 233:23 234:3
 235:7,13 236:9
 244:4
**markets**  235:14
 235:14
**marking**  132:4
 145:22 187:9
 200:13,15
 237:20
**marks**  87:5
**mas**  1:6
**masks**  196:21

[material - methods]                                              Page 36

**material**  11:2
  30:17 125:16
  128:22 135:9
  135:22
**materials**  8:21
  10:16,22 11:1,2
  12:18 15:18
  16:18 19:1 30:4
  30:8 31:16 47:1
  48:10 59:2 75:3
  76:3 80:8 93:23
  107:18 108:5
  131:6 132:20
  135:12,24
  138:9 158:22
  158:22 167:13
  168:18 179:4
  213:25 233:22
**matter**  11:15
  27:25 48:7
  155:19,21
  156:11,12
  187:22 189:12
  235:13
**matthew**  80:24
**mcdevitt**  3:20
**mctiernan**
  48:24
**mdl**  1:5 2:3
  33:18 214:2,5
  223:12
**mean**  18:8
  20:20 25:15
  31:17 39:2
  42:20 46:21
  50:21 54:23

58:15 60:11,22
63:8,19 66:16
67:3,11 72:12
74:3 77:16
78:14,18 79:6,7
86:18 93:7
95:14 99:25
100:8,18
101:10 103:1
104:21 106:11
106:15 107:8
115:4,25 118:2
119:4,11 120:4
130:2,18 133:7
137:23 140:11
141:3,13
144:16 154:7
156:2 161:13
166:18,23
170:2 171:24
172:8 173:2,15
179:14 180:7
181:10,18
182:7 185:16
205:11 214:19
217:20 221:9
222:3 226:18
226:20 228:11
229:16 234:17
238:11
**means**  26:22
89:24 93:13
131:7 153:2
196:14 223:8
230:18

**meant**  84:24
  163:17
**measure**  41:7,8
  41:15
**measurement**
  229:1
**mechanisms**
  103:24 206:9
**media**  226:2
**mediating**
  221:1
**medical**  32:23
  54:9 147:8
  148:12 152:4
  154:23 177:19
**medicine**
  149:14
**meet**  26:7,10,13
  26:17
**meeting**  20:15
**meetings**  26:16
  61:1 218:18
  236:9
**memo**  5:14,20
  96:23 97:2,5
  104:16 132:6,9
**memorandum**
  170:9
**memory**
  159:10 194:2
**memos**  60:25
**mention**  65:5
  71:9 90:18
  106:21 139:8
  172:18 182:24

**mentioned**
  16:21 27:9 36:8
  76:22 90:6 98:7
  145:4 148:12
  175:19 193:7
  194:4 218:23
**mentioning**
  95:23 152:3
**mentions**
  113:17 186:2
**merits**  163:6,7
**mesothelioma**
  55:14 213:14
**message**  56:18
  65:17,18,22
  189:8 228:23
  228:24
**messages**  234:3
**messaging**  67:6
  67:10 188:25
  189:7
**met**  8:7 26:11
  26:15
**meta**  190:22
  198:20
**method**  41:10
  41:19 44:3
  137:5 144:19
  145:1 180:25
**methodologies**
  41:22,24
**methodology**
  72:23 166:25
  167:1
**methods**  40:20
  40:24 42:1,2,22

42:24 125:24
165:24 166:16
**michael** 6:14
187:11,24
**michelle** 2:5
10:12 11:6 13:4
13:15,17 26:11
29:4 64:17
122:16 186:12
**michelle's**
69:10
**microscope**
136:6,19
**middle** 136:21
196:10
**mike** 188:9
**millers** 163:4
**mind** 45:13
61:11 62:3,7,13
64:10 68:15
85:20 93:10
95:9 101:7
102:13 111:15
114:19 122:1
142:12 155:8
167:3 180:17
191:6 199:15
229:17
**minds** 134:21
224:5
**mindset** 227:12
229:23 230:8
231:19
**mine** 23:22
59:21 98:12,19
99:7,20,24

100:7 103:5
111:10,21
124:18 132:14
132:18,22
133:6,12
141:17 142:19
142:21 143:18
162:17 238:9
238:10
**mineral** 168:1
**mineralogist**
149:19
**minerals** 5:21
125:11,25
132:7,9 135:16
142:24 143:10
165:25 167:11
**miners** 163:4
**minimize**
159:16
**mining** 124:19
**minute** 62:22
131:15 163:13
**minutes** 80:3
128:8,11,14
159:9 184:22
241:10,14
**misinformation**
226:7,15
**misinterpreted**
171:4
**mislead** 119:10
**misleading**
18:20 52:16
55:24 56:2,23
65:1 68:6 74:9

74:19 81:18
90:13,16 91:3
114:20 118:22
119:17 120:20
121:10 148:5
155:6,7 157:1
175:12
**misled** 112:7
114:4
**misrepresents**
203:21
**misspoke**
230:24
**misstate** 119:10
148:6
**misstates** 59:14
60:9 62:17
64:13,19,24
86:15 87:18
89:12 92:3
102:18 104:5
104:18 105:20
153:5 154:18
155:24 173:13
180:4 182:17
197:25 198:25
207:21 231:14
**mistakes**
227:20
**misunderstan...**
52:18
**misunderstood**
107:11
**mixed** 105:24
**modification**
106:13,22

**modified** 24:9
**modify** 49:12
**moment** 17:11
108:14,20
126:2 128:25
131:9 145:6,11
157:19 172:1
188:1 202:5
231:3 238:5
**moms** 182:3,5
183:5,6
**money** 92:23
93:12 148:25
201:18
**montgomery**
2:23
**month** 21:21
22:12 24:6
**morning**
217:25
**morphology**
134:10,16
**mother** 63:21
215:24
**mount** 146:24
148:11 149:14
149:17
**mounting**
116:17
**move** 127:3
179:12 183:23
184:4
**moving** 35:17
112:24 128:13
135:18

**mparfitt**  2:10
**multi**  201:21
**multiple**  82:2,3
  189:1

**n**

**n**  2:1 3:15 4:1
**name**  8:8 48:25
  71:11 124:1
  151:11 211:2
  243:11 244:3,8
**names**  210:17
**naming**  222:21
**napkins**  170:23
**narrow**  215:2
**national**  115:23
**natural**  46:10
  118:9 120:10
  205:5,5
**nature**  38:16
  38:20,25 64:8
  65:19 67:7
  68:10 78:7
  218:10 221:15
**navigate**
  206:10
**nda**  28:20 29:1
**near**  51:6
**necessarily**
  18:15 156:17
  212:12
**need**  8:11 9:10
  11:20 12:12
  13:1 52:5 82:5
  122:19 123:9
  129:12 169:5

179:18 183:22
243:18
**needed**  89:1
  197:13
**needle**  46:13,18
**needs**  15:7
  50:23 235:8
**negative**  99:15
  162:6 171:9
  180:21
**neither**  107:24
  242:12
**neuroscience**
  40:13,13
**never**  27:9
  57:25 65:14
  82:15 84:10,11
  86:21 87:3 88:1
  88:1,6,7,11,18
  88:19 90:18
  95:8 114:18,23
  126:7,11,13
  134:21 167:20
  171:15 174:22
  206:2,3,4
**nevertheless**
  82:22
**new**  1:2 3:6,23
  26:3 31:12 91:6
  93:2 102:5
  130:21 141:20
  144:19 145:1
  146:24 149:17
  150:3,6,13
  202:25

**newman**  1:10
  4:2 5:6,12 8:3,7
  10:14 11:16
  17:15,19 19:24
  21:7,13 51:14
  51:19 69:25
  80:7 91:1 106:3
  120:22 122:6
  124:13 128:18
  185:5 209:14
  241:6 244:8,25
  245:14
**newman's**  5:3,9
  5:11 6:12 20:3
  34:14 51:8
  178:17
**nine**  10:20
**niosh**  162:17
**nixon**  1:11
  10:10
**non**  129:12
  172:9 206:16
**normative**
  206:4,23
**notary**  243:19
  245:22
**note**  69:7 97:24
  112:19 127:22
  130:20 220:24
**notebook**
  122:21
**noted**  111:20
  129:9 243:9
**notepad**  11:4
**notes**  6:12
  10:25 11:1,4,8

68:25 151:9
178:11,17
**november**  5:5,7
  5:11 20:5 21:2
  21:10,14,18
  22:15 24:11
  33:22 34:4,9
  49:13 51:5,9,16
  124:5 165:11
**nuanced**  42:2
  72:20
**null**  74:6,8,15
  74:17
**number**  6:7,15
  20:17 26:20
  63:3 69:18 72:4
  73:18 76:14
  97:3 99:14,16
  103:11 123:13
  123:18 131:7
  137:24 145:8
  145:25 146:5
  151:23 152:10
  180:8 181:15
  186:11,24
  187:12,23
  192:19 218:19
  220:5 228:22
  236:8
**numbering**
  130:21
**numbers**
  157:23 158:21
  192:12
**numerous**  84:2

**nw**  2:7
**ny**  3:6

**o**

**o'brien**  237:21
**o'brien's**  7:3
  237:24
**o'dell**  2:21
**oath**  9:18
**object**  113:6
  155:15 156:12
  195:22 203:20
**objection**  22:22
  32:20 45:16
  48:8 57:9 58:14
  59:14 60:9
  63:16 64:13
  73:8 77:14
  81:20 86:15
  87:18 89:12
  92:1 101:18
  102:18 104:5
  104:18 105:20
  107:1 110:8
  115:3,12 116:9
  119:25 134:12
  137:1,11
  138:17 139:4
  140:10 141:2
  143:3 148:6
  150:16 151:1
  152:21 153:5
  154:18 155:24
  157:8 166:8
  170:1 171:23
  173:13 174:4

175:15 177:20
180:4 182:12
182:16 188:18
197:25 198:25
199:21,24
204:23 205:25
207:5,21 212:1
214:18 223:20
224:22 227:20
229:15 230:23
231:9,12 235:9
236:24 240:5
240:15
**objectivity**
  72:25
**obligations**
  49:18
**observe**  189:25
**observed**
  100:19 192:3
**observing**
  239:15
**obtain**  92:19
  103:22
**obvious**  140:19
  153:22
**obviously**
  204:15
**occasionally**
  136:3
**occurred**  43:25
**occurrence**
  46:9 147:15
**october**  19:10
  20:15

**odds**  239:19
**offer**  24:10
  86:13 113:3
  166:10
**offered**  89:22
**offering**  23:5
  33:22 34:9
  47:21 48:7,20
  49:16,21,25
  57:8 73:15,21
  81:17 100:13
  154:15 168:8
  204:18 221:19
  233:1,4
**office**  170:12
**officer**  242:4
**offices**  1:11
  10:10
**official**  165:2,5
**oh**  39:1 66:20
  68:24 112:10
  164:2,2 184:21
  196:19 197:8
  204:2 228:15
  241:4
**okay**  8:13 10:1
  10:2 11:22 12:5
  12:15 13:16
  17:21 19:22
  25:18 36:8
  51:10 57:2,4
  64:24 67:25
  68:18 69:1,2,13
  70:2,6 72:2,21
  75:15 76:24
  81:22 91:2,18

92:6,14 93:10
96:10 98:10
100:12 101:6
101:14 105:15
107:5 108:20
108:22 109:5
109:11,12,15
110:14 112:11
113:10 114:12
116:24 121:15
122:25 123:1
124:16 129:2,7
129:24 130:17
130:25 135:4
138:6 139:9
140:21 142:15
145:10,18,21
146:17 152:9
153:21 157:12
158:14 160:3,4
160:10 162:15
163:23 164:5
165:14 173:6
174:10 175:24
176:3,23
177:12,24
180:16 186:4
187:8 188:3,5,8
188:10 190:9
190:12 194:2,9
194:12 197:8
200:24 202:10
202:11,14,15
202:21 203:13
204:3 206:22
210:1,3 211:12

**[okay - overestimate]**                                                      Page 40

| | | | |
|---|---|---|---|
| 211:19 212:5 | 70:14 79:4 | 235:21 | **outsized** 217:6 |
| 213:10 219:3,6 | 81:16 82:19 | **opportunities** | 219:25 221:25 |
| 219:20 220:21 | 83:19 86:13 | 138:15,15 | 223:6,18 |
| 220:23,24 | 87:15 89:4,10 | **opportunity** | 229:13 230:16 |
| 223:11 224:9 | 89:13 95:6 | 62:3 126:9 | 236:20 |
| 225:16,21 | 100:13 101:20 | **opposite** 205:8 | **outward** |
| 228:5 232:12 | 113:3 114:3 | 227:21 | 137:22 |
| 232:18,23 | 117:5,8 118:1 | **optical** 136:5 | **outweigh** 85:23 |
| 234:24 238:10 | 119:17 131:22 | 136:18 | 87:17 |
| 241:4,5,8,11 | 137:18 138:5 | **option** 139:13 | **ovarian** 7:6 |
| **old** 45:22 | 148:14 154:15 | **options** 93:6 | 32:17 53:12,14 |
| **omitted** 209:12 | 166:10 168:9 | 139:3 | 53:15 55:14 |
| **once** 17:25 | 171:25 174:1 | **order** 236:6 | 57:1,6 69:21,24 |
| 35:18 | 175:11 188:13 | **ordered** 128:12 | 70:9 71:7 75:20 |
| **one's** 188:4 | 189:18 204:19 | **organization** | 102:7 113:22 |
| **ones** 40:25 47:2 | 212:13 213:5 | 44:6 156:23 | 114:7,11,15 |
| 193:10 | 223:9 228:17 | 203:15 212:3 | 116:8 147:4 |
| **online** 15:18 | 229:8 230:9,22 | **organizational** | 153:19 170:15 |
| 31:20 32:6,9,16 | 231:1 233:20 | 34:23 37:16 | 170:23 171:2 |
| 46:7,23 194:5 | 235:23 | 38:7 | 173:10 174:18 |
| 211:13 | **opinions** 23:5 | **organizations** | 178:7,16,21 |
| **onset** 230:3 | 23:15,15 24:10 | 37:22 | 179:2,7 181:8 |
| **ontario** 1:12 | 30:8 33:21 34:8 | **origin** 150:1 | 183:22 186:7 |
| 10:9 242:3 | 47:21 48:1,6,20 | 164:23 203:25 | 188:15,15 |
| 245:1 | 49:8,9,13,17,22 | 207:16 | 194:15 195:11 |
| **open** 35:19 | 50:1 57:7 66:6 | **original** 243:21 | 200:8 201:11 |
| 148:23 159:15 | 67:20 71:25 | **orleans** 91:6 | 203:7,17 |
| 187:3 | 72:15 77:2 | **ought** 206:6 | 213:14 214:11 |
| **opening** 86:2 | 80:20,21 82:14 | **outcome** 41:6 | 223:16 229:12 |
| **opens** 35:14 | 98:20 112:1 | 242:19 | 238:2 239:18 |
| **operations** | 161:5,7 169:11 | **outlines** 81:9 | **ovaries** 112:25 |
| 88:25 | 173:12 189:12 | **outlining** 87:25 | **ovary** 202:17 |
| **opinion** 22:7,21 | 197:4,6 203:19 | **outright** 185:21 | **overall** 19:7 |
| 23:18,18,20 | 211:7 212:4 | **outside** 115:15 | 59:1 |
| 28:16 53:4 56:3 | 221:19 230:12 | 144:20 153:17 | **overestimate** |
| 56:4,8 65:23 | 232:25 233:1,4 | 154:21 220:16 | 195:8 |

[overestimation - parfitt]                                    Page 41

**overestimation**
195:4
**overlap**  23:9
**overlapping**
41:23,25
**overview**  37:18
37:22
**own**  59:23 62:3
62:7,9,13 63:25
64:9 65:25
66:19 70:24
84:21,21 90:4,4
99:20 120:15
155:8 166:20
205:11 218:18
224:5 225:3
**ownership**  85:1

**p**

**p**  2:1,1 72:12
**p.c.**  3:20
**p.m.**  128:15,16
185:2,3 235:1,2
237:17,18
241:15,16,20
**packaging**
106:6 135:24
138:8
**page**  5:2 6:2 7:2
12:11 20:14,16
27:6 69:3 81:15
109:22 112:15
123:23 129:5
132:3 134:25
146:12,13,16
149:10,11

151:5,16,16,19
152:17 160:2
164:14 165:1
165:16 167:23
168:20 172:14
172:17 175:25
176:1 178:10
178:11 185:6
187:7 188:5,12
190:8 198:4,15
199:9 200:21
201:18 202:17
202:25 215:9
235:18 238:20
238:20,22
244:10
**pager**  69:11
159:6
**pages**  10:25
11:8 123:10
126:17 128:21
152:20 191:14
201:22 202:13
202:15
**paid**  160:9
**paper**  10:17
12:14 14:11
81:8 118:24
207:1 215:7
**papers**  118:8
207:12,18
**paraffin**  147:14
**paragraph**
14:10,16 18:5
18:16 36:12 52:6
52:9 53:2,9

55:17 68:14,17
68:18 69:4,13
70:18 72:22
74:21 76:2
80:23 81:15
92:13 94:11
96:7,9,22 97:12
100:1 103:4,4
103:14,18,18
104:14 112:16
112:20 129:5
131:3 132:12
133:2,19
134:25 136:9
136:11 141:11
142:19 144:17
144:17 148:2
153:2 159:25
160:4,5 165:17
167:6 172:15
172:17 181:23
184:18 185:6
188:4,9 189:15
190:8 196:10
196:11 198:8
198:15 199:9
203:10 215:9
225:18 235:19
235:20 238:22
**paragraphs**
130:15 176:1
181:8 183:17
185:11 235:22
**paraphrasing**
82:3 100:2
133:21

**parentheses**
177:14
**parfitt**  2:5
10:13 11:9,13
12:17,22 13:7,9
13:15,17 14:2
14:18,23 17:16
22:22 24:15
26:11 27:3,5,7
29:4 30:19
32:20 33:15
44:23 45:16
48:8 50:17 57:9
58:14 59:14
60:9 63:16
64:13,19 69:25
70:4 73:8 77:14
79:21 80:2
81:20 86:15
87:18 89:12
90:21,25 92:1
101:18 102:18
104:5,18
105:20 107:1
108:8,13,16,19
109:1,5 112:12
113:6 115:3,12
116:9 119:25
121:24 122:3
122:20,24
123:5,12,19,21
126:5,21,25
127:3,8,16,20
128:4,10 131:8
131:12,15,18
134:12 137:1

**[parfitt - percent]**

137:11 138:17
139:4 140:10
141:2 143:3
144:5,11,14
145:10,14,18
148:6 150:16
151:1 152:21
153:5 154:8,18
155:15,24
156:12 157:8
157:18,21,25
158:6,12,17,25
159:7,13
163:12 164:2,5
166:8 170:1
171:23 173:13
174:4 175:15
177:20 178:12
180:4 182:12
182:16 186:14
186:20,23
187:1 188:6,18
195:22 196:3
197:25 198:25
199:21,24
200:13,17,24
201:15,24
202:1,5,11,19
203:20 204:23
205:25 207:5
207:21 208:2,5
208:8,17,21
209:3,5,17,23
210:7,11,20
212:1 214:18
223:20 224:22

227:20,24
229:15 230:23
231:9,12
234:25 235:9
236:24 238:4,7
240:5,15 241:9
241:13,17
**parse** 70:19
95:15
**parsing** 139:6
**part** 18:9,12,19
28:14,25 30:4
39:22 40:12,14
42:5 86:7 87:10
95:15 107:18
114:20 123:9
126:20 136:11
138:19 140:18
140:22 143:13
149:6 151:15
156:25 161:7
161:19,21,23
170:7 193:14
194:9 212:17
214:5 221:9
226:5 230:22
231:1 235:13
239:25
**participants**
239:5,7
**particle** 46:13
124:9
**particles**
124:22
**particular** 22:1
22:16 41:16

44:1,6 47:4
68:14 113:4
115:9 169:20
190:7
**particularly**
22:19
**parties** 242:14
242:17
**partners**
213:20
**parts** 122:18
126:12 131:25
191:12
**party** 157:5
**past** 129:11
195:1 231:6
**patents** 92:19
93:12
**pattern** 104:24
221:9
**patterns** 41:12
220:19
**pause** 127:24
**pausing** 42:15
43:5
**pays** 218:25
**pdf** 123:24
164:15 193:13
200:21 212:24
238:19
**pediatrics**
54:10
**peer** 56:11 75:7
113:18 118:24
190:21 191:1
198:19 205:21

220:6
**penalty** 245:5
**pending** 9:12
**people** 26:22
37:20 39:8
41:15 58:18
66:21 67:12
70:25 71:2,14
72:4 81:9 89:1
100:3 120:18
141:15,17
150:12 155:7
156:22 161:20
174:20 184:23
185:15 186:1
194:22 195:6,9
197:16 204:6
205:6 206:9,15
210:16 218:19
222:15 225:3,4
225:7,14
226:22 228:18
229:3,19
231:17 234:3
236:15
**people's** 39:6
44:5 67:8
118:12 222:16
231:19,23,24
**pepsi** 39:9 67:9
218:1
**perceive** 225:4
225:7
**percent** 61:18
65:2 118:10
120:11 205:6

239:20,22
**perception**
218:3
**perceptions**
38:17,20 39:1
39:18 40:21
43:21 67:8
70:24 118:16
233:18
**perfect**  11:12
163:23
**perfectly**
204:12 218:6
**perineal**  112:25
174:23
**perineum**
170:22
**period**  84:3
92:5 93:8,11
100:16,20,21
104:25 114:9
174:8,11 190:1
222:2 230:1
**periodically**
16:24
**periods**  176:18
224:25
**perjury**  245:5
**person**  70:19
100:9 157:7
177:22 211:20
**personal**  3:19
**personality**
40:10
**perspective**
38:15 79:17

**persuaded**
125:8
**pertain**  193:10
**pertained**
14:20
**pertaining**
29:10
**pervasive**
100:15
**petition**  121:17
121:20 122:12
124:6 125:7
128:20 164:11
165:11 172:18
172:23 173:8
173:17,18
**petitions**  122:8
172:16 174:1
**phase**  91:14
**phenomenon**
103:22 239:10
**phillippe**
123:25
**phone**  16:24
20:14 26:16
**phrase**  71:4
81:2 101:13
142:25 143:2,7
**pick**  70:5
**picture**  77:12
121:9
**piece**  66:5
224:12 227:13
**pile**  116:17
**pilot**  68:7,10
70:23 71:24

196:18 197:1
**place**  17:17
36:3 79:22 87:8
88:1 105:5
117:6
**places**  88:3
236:8
**plain**  134:18
141:10
**plaintiff**  2:2
33:17 48:11
155:23 229:11
**plaintiff's**
22:14 76:2,6
155:13 192:23
214:11
**plaintiffs**  3:10
223:14
**plan**  88:4
**planning**  85:24
**plans**  6:6 92:24
145:25 146:5
**play**  219:13
222:19 232:11
**played**  77:13
232:20
**players**  214:25
**please**  8:9 9:10
9:24 12:14
64:15 154:8
185:6 188:1,19
228:3 232:4
233:11,14
**plunkett**  48:24
48:25 49:1

**point**  8:10 9:9
9:11 17:19 18:3
19:4 33:14
46:22 47:4
59:19 62:11,17
64:4 65:6 86:4
91:9 92:14 94:9
104:10,11
123:8 139:8
146:19 152:6
152:14 179:5
209:21 220:24
221:15 234:4
**pointing**  52:5
168:14
**points**  189:1
205:13
**police**  187:16
**pollution**
149:16
**pooley**  147:6
**pops**  158:23
**population**
237:2
**portion**  117:22
164:18
**portrayed**
216:25
**posing**  73:5
**position**  23:6
34:22 35:13,18
36:4,6 59:11
60:6 106:9
151:7 153:8
171:19 221:21

[positions - pretty]                                                      Page 44

| | | | |
|---|---|---|---|
| **positions** | 235:16 | 212:25 213:15 | **preferred** |
| 174:14 | **potentially** 59:5 | 216:2 226:1 | 93:25 |
| **positive** 145:1 | 68:6 113:22 | 236:11 238:1 | **preferring** 66:1 |
| 171:11 | 120:20 139:12 | 239:6,17 241:1 | **prefers** 128:3 |
| **possession** 77:4 | 140:5 | 244:4 | **preparation** |
| **possibility** | **powder** 1:5 | **powders** 78:8 | 26:8,14 34:4 |
| 59:20 86:12 | 5:16 7:4 14:20 | 150:5 183:5,6 | **preparing** 19:8 |
| 112:21 113:13 | 15:1 16:10,10 | **powder's** 216:9 | **presence** |
| 114:6 118:6,14 | 16:11,12 29:10 | **power** 85:22 | 129:23 149:21 |
| 118:18,25 | 52:14,22 53:4 | **pr** 85:13 156:22 | 192:4 |
| 119:19 125:14 | 53:10 55:16 | **practice** 32:24 | **present** 6:3 |
| 138:25 239:3 | 56:13,13 57:24 | 154:16,22 | 24:23 30:18 |
| **possible** 12:9 | 57:24 58:24 | **practices** 18:14 | 54:21 124:22 |
| 53:17 58:16 | 59:6 62:25 63:1 | 52:12 119:5,7,8 | 130:23 135:12 |
| 94:15,19 | 63:3 66:24 | 119:15 191:4 | 135:15 145:15 |
| 103:20 104:15 | 69:24 70:9 | **practicies** 1:6 | 145:23 146:2 |
| 144:1 189:5 | 74:24 75:20 | 244:5 | 197:19 230:2 |
| 194:24 | 82:4,9,21,22 | **pre** 44:5 216:21 | 230:19 231:4 |
| **possibly** 25:14 | 84:14,14 85:11 | **preceded** 232:5 | 231:19 233:2,6 |
| 25:14 105:4 | 89:2,24 92:8 | **precedes** | 234:18 |
| **post** 127:22 | 94:17,18 96:15 | 197:23 235:20 | **presented** |
| 148:16 152:6 | 96:17 97:7,17 | **preceding** | 142:9 170:18 |
| **posture** 135:17 | 98:4 100:4,5,24 | 152:20 | 197:11 |
| **potential** 28:22 | 109:17,24 | **precious** 66:23 | **presenting** |
| 50:3 58:10 59:7 | 110:7,25 | 66:25 | 121:9 196:19 |
| 59:12 60:7,18 | 129:12 132:16 | **precisely** 220:7 | 224:6 |
| 62:4 66:7,14 | 135:6 136:2 | **predict** 82:10 | **presently** 125:9 |
| 68:9 75:12 76:8 | 151:24 156:24 | **predicting** | 149:16 151:24 |
| 77:3 116:7 | 170:21 172:5 | 41:17 | **presents** 85:4 |
| 120:13 130:9 | 179:7,12 | **preexisting** | 185:20 |
| 140:7 152:1,4 | 180:19 182:4,5 | 222:16,23 | **press** 149:22 |
| 177:10 180:21 | 182:10 190:20 | **prefer** 95:13 | 150:12 156:21 |
| 195:2,4 205:23 | 190:25 194:16 | 128:2 176:24 | **presuming** 83:4 |
| 217:5 219:24 | 195:16 198:22 | **preference** | **pretty** 148:18 |
| 220:12 221:24 | 203:8,18 | 12:4 30:10 39:9 | 192:5 |
| 223:5 230:15 | 211:14,14 | | |

[prevented - project]                                    Page 45

| | | | |
|---|---|---|---|
| **prevented** 64:9 | 104:3,8 154:24 | 82:2 83:5,18,20 | 15:2,2 16:10,10 |
| **prevention** | **problematic** | 84:22,23,24 | 16:15,17 29:11 |
| 173:8 | 156:17 | 85:6,12 88:14 | 29:11 42:14 |
| **previous** 160:7 | **problems** 23:2 | 88:15 89:7,17 | 47:23 52:14,22 |
| 163:16 167:6 | 93:1 110:1 | 90:17 91:10,15 | 53:5,11 55:16 |
| 175:14 239:2 | 127:18 152:1,3 | 92:19,25 93:1,2 | 56:13 57:17 |
| **primary** 62:19 | 152:4 153:21 | 94:14,19 95:2,3 | 58:24 59:13 |
| **principle** | **procedure** | 95:3,24 99:5 | 62:21 68:4 75:5 |
| 206:13,14 | 136:18 | 101:11 103:6 | 77:25 82:11,15 |
| **principles** 39:4 | **procedures** | 103:14 105:18 | 84:10,13 92:12 |
| 81:7,11 119:14 | 125:19 165:19 | 111:4,5,12 | 96:15 98:5 |
| 119:15 222:19 | **proceed** 13:6 | 114:22 115:25 | 100:25 102:9 |
| **prior** 28:18 | **proceeding** | 116:25 117:15 | 106:6 114:16 |
| 39:6,15 47:14 | 214:6 | 118:12,15,21 | 114:17 121:13 |
| 113:18 174:24 | **process** 8:22 | 119:1,10,20 | 139:18 140:25 |
| **priority** 103:11 | 31:15,18 93:18 | 124:11 138:3 | 154:17 168:10 |
| 228:22 | 112:24 207:17 | 138:13 139:1 | 183:21 187:12 |
| **proactive** | **processing** | 139:21,24 | 187:25 195:1 |
| 138:12 161:24 | 147:13 | 140:2,6,9,16 | 206:11 214:22 |
| **proactively** | **produce** 125:4 | 141:18,22 | 215:19 218:20 |
| 162:6 | **produced** 19:18 | 149:1 161:21 | 221:11 227:19 |
| **probable** | 125:9 167:9,25 | 177:8 180:12 | 233:17,23,24 |
| 181:12 | 168:5 | 181:14 183:23 | 234:17,20 |
| **probably** 8:25 | **producing** | 184:5 205:9,23 | 244:4,5 |
| 12:7 19:10 | 88:17 164:24 | 207:4,17 | **product's** |
| 23:23 29:22 | **product** 29:25 | 216:11 218:5 | 215:20 |
| 44:20 121:1 | 42:25 45:4 | 218:12 220:12 | **professional** |
| 135:20 145:9 | 49:23 50:7 | 221:2 224:15 | 73:1,4 86:14 |
| 160:20 194:6 | 55:10 56:6,20 | 226:4,8,15,24 | 95:7 181:5 |
| 201:18 208:21 | 57:19,19,20,22 | 227:4 236:5,15 | 221:20 |
| 210:12 233:9 | 58:10,11 59:19 | 237:3 | **professor** 34:23 |
| **problem** 19:20 | 60:1,19 61:4,22 | **production** | 35:4,16 36:1,19 |
| 36:2 56:20 59:5 | 62:14 63:9,12 | 42:22 158:4 | 36:21 37:4 |
| 59:25 60:4,18 | 64:11 65:2 | 207:17 | 163:3 |
| 61:18 65:15 | 76:18,19 78:6 | **products** 1:5,6 | **project** 20:9 |
| 99:6 103:2,23 | 78:17 81:16 | 3:19 6:15 14:20 | 29:15 44:12,15 |

**[project - qualitatively]**                                               Page 46

44:18 58:12
**projecting**
224:11
**promote** 182:5
183:5
**promotion**
36:25 52:13
74:23
**promptly**
243:21
**promulgated**
140:5,24 144:2
**proof** 142:8
**properly** 77:22
**proportion**
124:10
**proposed**
135:11
**proposition**
81:4 184:7
229:11
**prospective**
70:10 194:17
**protections**
39:1
**protective**
132:15
**protects** 218:24
**protocol** 11:24
**proven** 56:21
65:4 175:11
**provide** 83:25
119:18 192:25
202:1 208:17
**provided** 32:11
192:23 193:2

207:19 243:14
**provides**
217:23 219:12
**province** 242:3
245:1,19
**prudent** 138:24
**psychological**
38:13 39:4 42:1
81:7 206:9
217:22 221:13
222:13,18
**psychologist**
39:20,25 40:20
67:4,17
**psychology**
31:24 37:23
39:13,22 40:4,5
40:7,9,11,11,14
40:16,18,19
41:25 42:7
81:12 118:4
206:7 218:10
219:11 221:16
231:23,24
232:1
**public** 41:3
56:9,17,19 58:7
79:12 117:17
154:25 155:1,6
156:19 162:13
183:3 204:6
218:3 220:8
233:20 243:19
245:22
**publication**
44:9 147:5,24

**publications**
147:2 150:7
**publicly** 75:6
78:9 113:15
171:20 186:3
**publish** 73:4
**published** 7:3
42:12,20 43:5,9
44:8 68:19
69:16 73:18,22
114:5 118:8,24
162:22 163:3
205:11,20
206:25 207:7
207:12,19
219:16 237:25
**publishes**
135:20
**pull** 11:21 12:1
34:11 111:12
122:15 131:9
131:20 226:24
**pulled** 69:18
209:13
**pulling** 111:4
**purchase** 39:13
61:22 62:20,25
63:2 91:10
206:11 220:17
**purchasing**
205:9 225:4
**pure** 118:9
120:10 205:4,5
**purported**
170:25

**purporting**
170:19
**purpose** 28:4
57:22
**purposefully**
90:17
**purposes** 56:24
72:24 167:4
**put** 11:20 12:7
12:10 19:3,18
51:15 52:4
98:16 103:14
110:11,20
111:11 122:23
145:8 147:22
158:13 159:4,8
159:11 161:11
163:13 170:4
172:1 174:22
186:21,25
201:25 202:3
202:23 208:11
213:24
**puts** 229:2
**putting** 160:18
**puzzle** 227:14
**puzzling** 88:23
91:11

**q**

**qualified** 141:5
**qualify** 213:12
**qualitative**
120:9
**qualitatively**
205:7

**[quality - ready]**

**quality**  164:19
**quantitative**
  170:11
**quantities**
  136:4
**question**  8:12
  8:17 9:4,12,14
  9:22,23 11:23
  14:8 15:10 18:3
  18:8 22:24
  30:11 35:11
  37:2 47:9 50:10
  52:23 55:2
  56:25 60:5
  66:17 75:16
  80:7 83:23 87:5
  87:13 107:11
  107:15 109:14
  109:15 110:4
  116:25 117:2,4
  117:23 121:25
  139:7 140:13
  144:6,14 151:8
  152:23 192:10
  195:23 196:1
  196:15 200:7
  203:20 204:1
  209:5 224:25
  227:24,25
  229:18 232:4
  232:17 233:10
**questionable**
  166:3
**questions**  10:1
  11:17 18:11
  116:19,20

137:17 146:21
  190:5 194:23
  238:16,17
  241:6
**quick**  128:5
  209:5
**quickly**  108:10
**quite**  99:12
  118:15 138:19
  161:8
**quote**  59:21
  90:4 98:15
  99:17 103:18
  109:24 133:25
  142:18 146:9
  174:2 176:5
  181:8 183:25
  185:16
**quoted**  59:21
  149:6 189:12
**quotes**  110:2
  225:10
**quoting**  130:15

**r**

**r**  2:1,14 187:21
**rabin**  80:24
  81:3,5 218:1
**raised**  54:8
  56:12 59:18
  61:3,10 102:5
  110:24 112:3
  112:20 113:12
  113:15,15
  114:6 116:25
  117:2,4 146:21

177:25
**raising**  116:18
  176:16 185:14
**ran**  70:23
**random**  41:21
**randomly**  41:4
  70:24
**range**  25:7
**rank**  35:16
**rapidly**  135:19
**rasa**  216:21
  229:20
**rate**  30:24,25
  31:1
**rather**  91:10
  100:14 215:20
  216:10,22
  232:11
**ratio**  239:19
**rational**  81:10
  218:6
**rcp**  1:25
**reach**  55:25
  60:13 87:15
  153:1
**reached**  30:19
  162:10
**read**  22:3 26:1
  26:3 46:22
  52:23 59:3
  68:15 70:25
  71:2 78:11
  96:20 100:2
  105:9 121:3
  126:3,10,10
  128:21 132:24

149:5 150:8,9
  166:4,5 167:5
  167:12 169:7,8
  171:12,13
  182:7,18 187:4
  187:18,21
  188:1,6 191:7
  191:18 195:17
  195:18,24
  196:8 198:6,8
  199:9 216:13
  217:8,11,12
  223:3 226:10
  226:20 232:4
  232:11 239:24
  240:6 243:3,4
  245:5
**reader**  196:11
  196:16
**readily**  228:14
**reading**  26:4
  33:11 46:2
  68:22,23 70:14
  78:22 100:1
  107:25 126:12
  151:19 159:25
  160:10 161:7
  161:16 163:7
  164:10 170:4
  172:2 181:12
  183:17 237:10
  240:17
**reads**  69:14
  162:9 184:1
**ready**  131:16
  151:25

**[real - region]**                                                          Page 48

**real**  85:4 103:2
    107:5 219:11
    232:23
**reality**  176:11
    196:21 218:8
    227:10
**realize**  233:7
**realized**  209:12
**really**  9:3 12:3
    45:8 46:14
    55:13 62:3
    65:20 76:10
    77:16 87:15
    94:25 95:1
    104:9 107:7,11
    141:5,7,22
    147:20 151:12
    151:15 152:9
    155:8 157:1
    167:15,21
    176:7 192:1
    196:9 197:19
    206:14 214:24
    218:25 221:13
    230:1,4 231:4
    234:4
**realtime**  242:10
**reason**  35:23
    63:3 66:2,20
    103:12 114:1
    114:24 115:2
    161:22,23
    172:25 176:23
    186:15,17
    195:2 218:19
    226:3 231:25

    236:10,17
    237:5 243:6,10
**reasonable**
    25:8 86:13
    181:5 221:20
**reasonably**
    182:7
**reasons**  106:17
**recall**  24:3
    29:21 30:24
    46:4 48:23,25
    49:15 54:10
    72:11 107:25
    108:3 122:6
    163:1,2 195:5,6
    200:10 239:3
    240:2
**receive**  17:2
    243:23
**received**  12:19
    13:1,5,14,16
    16:21 34:12
    51:13 125:17
    208:9
**recent**  10:23
    68:18 69:15
**recently**  24:1
    209:13
**recess**  80:4
    185:2 235:1
    241:15
**recognize**  78:19
    143:4
**recognizes**
    159:8

**recollection**
    110:19 192:20
**recommendat...**
    182:8
**recommending**
    182:3
**reconfirms**
    69:22 70:6,7
    194:14
**record**  8:7 10:4
    10:7,12 17:10
    17:12,24 68:21
    80:1 86:11,23
    97:2 132:4
    145:21 193:13
    202:7,12 210:8
    237:17
**records**  165:5
**red**  123:3 165:2
**redirect**  241:11
**reduce**  103:24
**reduced**  71:14
    72:3,4 171:8
    242:11
**reference**  11:24
    62:23 77:8
    81:24 97:23
    111:24 121:16
    121:19 122:6
    154:13 162:21
    172:15,21
    182:24 211:10
    212:10 214:1
    237:23 241:3
**referenced**
    30:15 77:9

    104:14 182:9
**references**
    48:11 51:7
    124:24 158:1
**referencing**
    240:24
**referred**  129:20
    142:7 147:18
    162:17 175:25
    181:7 208:8
**referring**  18:18
    21:1 56:22
    70:22 97:1,12
    130:14 131:3
    133:9 178:1
    179:1 180:1
    182:15 193:25
    194:8 220:22
    234:19
**refers**  46:12,17
**reflect**  10:12
    51:24 91:3
    113:24
**reflected**  14:16
    30:10
**reflecting**
    208:10
**refresh**  110:18
    159:9
**refute**  103:23
**regarding**  43:3
    52:12 78:8
    129:22 150:4
    215:16
**region**  245:2

**registers**
134:20 144:18
144:25
**regression**
41:11,11
**regulation**
138:14 144:1
**regulatory** 23:8
49:18 50:11
115:17,20
116:5,6
**reilly** 3:20
**reinforces**
153:25
**reject** 74:15,17
**rejected** 173:10
**rejecting**
169:24
**relate** 43:10
76:7 77:3,5
**related** 16:9
43:7 44:24
75:11 76:6
79:15 92:11
113:20 121:17
121:20 122:11
156:18 233:22
242:13,16
**relates** 14:25
49:19 201:10
**relating** 29:6
46:1 66:14
110:20,24
122:7 129:25
172:19 173:9
178:7

**relationship**
64:8 68:9
189:23 190:24
198:22
**relationships**
40:8 221:5
**relative** 171:1,8
**release** 156:21
**released** 88:11
**relevance**
173:12,25
**relevant** 16:13
17:5,5,8 31:23
74:23 75:8
81:24 107:15
113:25 185:23
192:1,8 193:8,9
206:14 207:12
234:4
**reliability**
166:3
**reliable** 32:11
32:19 33:8
166:17 211:24
**reliance** 108:5
121:15
**relied** 23:21
155:12,22
168:13 211:10
212:13
**rely** 49:8 62:8
65:23 66:13
119:23 132:14
136:13 204:21
229:10

**relying** 23:14
28:14 48:19
71:24 80:19
81:3 197:3,5
**remains** 17:19
**remember** 22:3
46:6 47:2 72:13
75:19 158:11
161:6 163:7
179:22 195:12
**remembering**
168:7
**remind** 106:24
**reminder** 164:1
**remove** 222:14
**removed** 154:3
**repeat** 8:11,12
8:17 15:8,10
16:6 105:25
138:19 228:4
**repeating** 122:1
**repercussions**
99:3,15 101:1
**rephrase** 9:25
**replace** 57:24
82:14 83:7,7
85:15,24 88:5
91:22 92:25
93:3 94:22
111:12 114:16
114:17 154:4
184:7,11 227:5
**replaced** 87:12
**replacement**
82:5,8,21 83:5
84:8 86:20,21

88:21 89:8,19
89:20 90:17
91:16 92:16
93:20 94:20,22
94:24 95:12
96:17 99:1
100:25 102:8
114:13,23,23
117:15 118:21
121:13 148:25
172:5
**replacing** 59:5
111:5
**reply** 176:22
181:16 183:1
183:11
**report** 5:11,13
10:22,23,24
11:17,19 12:8
14:7,10 19:8,14
21:2,17,22 22:1
22:13 23:4,13
23:19,22 24:10
30:3,10,15
33:23 34:4,9
36:9 49:12,14
51:5,9,14,16,19
51:25 52:3
55:13,13 58:23
64:7 67:24 68:1
72:22,24 91:14
98:16 116:4
129:3 133:25
134:8 139:8
142:18 146:10
148:10 149:7

157:14 158:18
160:16 169:10
172:13 173:1,3
173:4 174:2
176:5 185:6,11
189:13 193:19
197:3 198:14
199:1,19 215:5
215:6 225:19
230:12 235:19
236:22 239:6
**reported** 1:25
55:15 72:6
148:4
**reporter** 9:6
15:7 50:22
121:3,22,25
127:12 128:3
138:18 163:15
163:23 232:4
232:10,15,18
242:1
**reports** 22:13
48:11,17,21,24
49:2,4,9 125:17
**represent**
223:13
**representative**
104:24
**represents** 98:4
**reputation**
211:23
**request** 158:21
169:22 172:23
192:24

**requested**
15:22 22:5,9
32:4 74:22
**requesting** 26:3
124:6 165:11
**requests** 84:2
**require** 169:5
169:23 243:22
**requiring** 173:9
**research** 16:1,4
16:16 29:13
42:5,6 45:25
46:22 62:10,11
62:18 63:7 64:5
65:25 66:19
67:5 94:12
106:23 114:17
147:8 148:13
148:22 154:23
156:16 162:6
166:20 180:20
206:3 207:19
224:23 225:11
237:6,8
**researcher**
162:9
**researchers**
146:20
**resident** 116:1
**resource** 34:24
**resources** 31:20
32:6,8
**respect** 42:14
72:18 77:25
79:19 189:18
228:9 233:16

**respond** 43:12
72:17
**responded**
161:19
**responding**
133:17 162:8
231:15
**responds** 124:5
**response** 43:19
83:14 96:15
99:22 110:5
111:1,18 112:2
112:7 121:18
121:19 122:11
128:20 142:6
164:10 165:9
173:19,21
**responses**
43:11 122:8
125:5 176:20
**responsibility**
117:21
**responsible**
150:2
**responsive**
110:10 111:15
111:16
**restate** 22:23
121:5 156:15
**restricted**
77:16,17
**restroom** 50:23
107:3 185:1
**result** 29:24
129:13 139:1
157:6 206:5

217:3 219:21
221:22 230:13
239:4
**results** 166:2,14
194:4 212:7
217:15 239:13
240:11
**resume** 17:13
80:5 128:16
185:3 235:2
237:18 241:16
**retailers** 32:3
88:13
**retained** 14:3
14:13 27:16,24
28:3,6,9,24
33:15 45:1,9,24
**retainer** 189:17
**retention** 18:12
28:11
**retracted** 150:6
150:24
**return** 243:21
**revenue** 58:20
**review** 6:3 14:9
14:15 16:20
20:14 26:1 31:4
31:16 49:3
52:11 53:11
55:17 58:16
59:16 80:12
123:9 128:23
129:17 130:4
130:23 145:15
145:23 146:2
146:13,19

| | | | |
|---|---|---|---|
| 158:10 162:23 | **right** 13:21 | 168:2 169:15 | 179:6,23 180:1 |
| 191:5,12 | 15:4 16:22 | 172:2,4,19 | 180:11 181:6 |
| 208:12 209:1 | 17:15,17 18:10 | 173:21 175:19 | 181:16 182:10 |
| 213:16 214:2 | 18:22 22:7 24:1 | 176:1,20 178:9 | 185:21 190:19 |
| 214:20 233:17 | 24:2,7,20 25:10 | 178:22,25 | 194:24,25 |
| 233:22 | 30:6,12,13 34:4 | 179:2 180:13 | 195:9 203:1,2 |
| **reviewed** 8:21 | 34:5 35:20,22 | 181:18 183:1,4 | 203:11 205:23 |
| 20:1 23:25 30:5 | 36:17,22,23 | 183:16 184:17 | 207:4 220:25 |
| 30:9,17 48:10 | 44:2 51:1 52:5 | 190:6 193:12 | 221:5,5 234:12 |
| 48:16 49:5,11 | 64:23 66:11 | 194:10 198:14 | 238:2 240:25 |
| 51:24 54:12 | 67:10,17 74:25 | 198:24 200:5 | **risks** 32:16 |
| 56:11 75:7 | 75:1,9 80:3 | 202:24 205:24 | 42:14,17,19 |
| 76:14 77:2,10 | 87:17 94:6 | 208:1 210:11 | 43:4 45:6 50:3 |
| 80:8,21 83:16 | 95:22 96:21,24 | 217:16 218:17 | 50:6 52:21 |
| 89:16 107:19 | 97:3,17 98:8 | 224:13,18 | 53:10 54:12 |
| 107:19 113:18 | 103:25 104:4 | 226:20 230:19 | 55:4,12,16,19 |
| 118:24 134:4 | 106:7 107:20 | 231:3 238:8 | 56:6,9,12 57:14 |
| 146:9 151:18 | 110:7 111:22 | 241:13 243:4 | 57:23 58:5 59:7 |
| 157:16 158:22 | 112:25 118:15 | **ringing** 124:12 | 59:12,18 60:7 |
| 179:4 182:21 | 120:15 122:22 | **risk** 7:5 33:7 | 62:4 64:10 65:5 |
| 190:21 191:1 | 123:8 127:11 | 43:8 53:12,17 | 68:5 77:3 78:6 |
| 191:11 198:19 | 127:16 128:18 | 53:20 54:8,16 | 79:1 82:23 |
| 200:12 205:21 | 129:15 130:8 | 54:16 55:9 60:1 | 85:23 90:18,19 |
| 211:7 220:6 | 133:24 134:1,3 | 60:4,15,16,18 | 95:4 96:13 |
| 224:24 | 134:24 137:7 | 60:21,23 61:2,6 | 117:9,13 |
| **reviewer** | 137:10,23,25 | 61:12 62:8,14 | 121:11 139:10 |
| 166:21 | 138:9,16 140:2 | 66:7,14 69:21 | 142:13 177:10 |
| **reviewing** 17:1 | 141:1,15 142:5 | 75:12 85:17 | 206:20 207:8 |
| 19:1 21:20 | 142:9 143:15 | 87:16 89:6 | **rls** 1:7 |
| 32:15 48:23 | 143:20,21,22 | 95:10 100:5 | **rmh** 3:24 |
| 60:12 159:22 | 147:21 149:9 | 101:7,9,16 | **road** 50:19 |
| 163:2 166:13 | 150:22,24 | 102:3,17 | **rodeo** 20:25 |
| 188:12 | 156:5 157:22 | 105:19 108:2 | **role** 35:17 39:6 |
| **revisiting** 26:2 | 158:20 159:2,6 | 117:20 119:1 | 81:13 220:9 |
| **ribbon** 123:3 | 159:9 160:6 | 120:13 142:9 | 221:1 |
| 165:2 | 163:9 167:14 | 170:11 171:1,8 | |

**room** 10:13 107:23
**rooted** 215:23
**rotman** 34:25 37:5
**rough** 29:16
**roughly** 13:19 28:1
**rubino** 153:18 163:3
**rudie** 2:14 26:12
**rudiesoileau** 2:17
**rules** 206:8 243:22
**run** 103:15 123:13 197:14

**s**

**s** 2:1
**sacred** 215:23
**safe** 6:20,22 56:20,21 61:18 65:2,2,4,14 117:24 135:16 154:17 155:3 204:12 211:2 211:23 212:20 212:25 213:3 218:12 219:8,8
**safecosmetic...** 6:21 210:4 211:1 212:18 212:21

**safety** 6:4,10 61:4 96:16 98:22 99:14,16 99:19,20 100:15 103:10 105:1 110:24 116:25 130:24 137:24 139:18 139:20 145:24 146:3 153:11 163:21 172:7 216:19 217:2 217:13 225:9 226:7,15 227:3 228:21,22 234:16,20 236:5,23
**sage** 49:7
**sage's** 49:9,12
**sale** 16:14 29:12 52:13 74:23
**sales** 1:6 18:14 236:6 244:5
**samples** 125:1 135:12
**sampling** 191:1
**sanitary** 170:22
**satisfactory** 135:17
**saw** 48:10 80:9 121:15 157:14 172:21 213:25
**saying** 58:18 60:22 65:1 66:7 70:1 79:11,13

80:17 91:9,18 100:2 103:10 104:2 115:24 117:18 120:9 120:12,23 121:23 134:8,9 134:11 136:24 140:13 144:23 150:12 152:22 153:20 156:10 164:12 167:17 169:15,19 173:9,11 174:20 176:4 179:11,17 183:21 188:21 189:1,20 190:2 192:18 197:7,9 198:4 204:8 225:18 230:21 231:14 236:18 237:4
**says** 81:9 83:10 99:17 100:3 103:4,4,19,25 109:22,23 116:2 124:4 129:8,15,16 135:5 139:19 142:20 143:16 143:20 144:6,7 167:7,23 168:2 168:23 173:7 183:2,4 184:9 194:10 196:5 198:8 203:4,9

203:22 213:10 218:12 228:19 240:9
**scale** 71:12 72:8 205:8 229:1,3
**scene** 97:14
**scenes** 190:4 227:1
**schildkraut** 239:12 240:10
**scholar** 15:21 46:24 75:14,18 75:24 78:22
**school** 34:25 36:20 37:11 119:12 149:14
**science** 32:22 56:11 78:18 166:23 167:16 175:5,5,8,10 204:20
**sciences** 149:13 170:12
**scientific** 31:21 33:1,5,7 73:16 75:7 78:10,20 116:24 125:23 147:23 165:23 177:19 191:3 207:1 211:24
**scientifically** 56:21 61:12 65:4 152:16,24
**scientist** 32:24 32:25 33:11,21 33:24 157:4,7

162:9 166:15

**scientists** 47:19
155:2,4 156:25
157:10

**scope** 79:10
168:15,17
232:24

**screen** 11:20
12:1,7,10 19:19
51:15 52:4
126:15 159:19
163:13 193:13
200:10,18
202:23 204:2

**scroll** 20:13
143:24 188:2
199:8 240:23

**se** 236:2

**search** 75:17,19
186:16 194:5
212:6,9

**searched** 15:18
75:14 191:22

**searches**
191:23

**searching**
192:14

**second** 20:16
22:25 24:19
42:16 103:18
109:3 149:10
160:3 168:20
172:18 184:20
200:16 202:14
217:11 232:15
232:19 241:5

**secondhand**
32:3

**section** 98:24
178:15,21
191:15 195:20
238:19

**sections** 178:13

**see** 12:9 13:5
19:20 20:2,18
27:22 34:13
41:7 89:19
98:13,23 101:4
101:23,23
104:4,25
105:11 110:2
110:16 113:23
121:18 122:25
123:23 126:17
128:12 129:8
134:25 143:1,7
143:11 146:13
146:16 152:5
158:13 162:21
163:14 165:13
169:9 180:7
186:23 194:9
202:24 203:3,9
203:13 211:4
213:12,17,18
220:23 237:6
238:22 240:24
241:2,4,10

**seeing** 19:20
79:10 158:1,11
200:10

**seem** 78:2
88:11 148:17
152:2 153:13

**seems** 8:20,25
103:15 141:14
152:9 156:22
176:9 180:10
234:9

**seen** 121:21
124:13,14
126:7,11,13
171:14,15
200:5 201:8,9
201:16,20
202:12

**segment** 215:2
217:11

**selikoff** 149:3
149:12 150:23

**sell** 84:9 89:2

**selling** 89:6
99:8 174:21
180:17

**semester** 37:13

**send** 83:10 87:1

**sense** 9:7,13,24
25:8 52:2 70:18
70:20 138:14
140:7 183:12
192:11 193:16
208:24 228:11
232:8 233:3
234:17

**sent** 12:20
25:16 178:12
208:21,22

210:9,22

**sentence** 52:9
53:9 71:13 91:1
143:14,15
144:16 151:21
167:6 169:18
179:21 180:8
196:13,14,15
203:3 223:3

**sentences** 70:21
182:7 189:13

**separate** 11:8
191:14

**september** 6:16
109:3 187:13
187:23 241:2

**serious** 58:4

**seriously** 83:2
83:14,19,22
93:16 95:19
96:3 116:2
117:14 118:20
118:20 121:12
148:18 176:10
234:13

**serve** 166:21

**service** 115:24

**services** 165:3
170:10

**set** 112:8
122:17 128:25
178:11 188:10

**setting** 97:14
167:15

**several** 104:24
105:12 125:17

146:21 171:5
**severe** 176:19
**shake** 175:1
**shape** 46:12,17
  133:16 137:9
  140:25
**share** 86:1
  193:12
**sheet** 243:7,10
  243:11,16,21
  244:1
**shift** 113:25
  236:7
**shifting** 140:14
  237:11
**shifts** 136:16
**short** 95:14
  175:17
**shorthand**
  242:9
**shortly** 14:4
**show** 56:15
  57:21 65:19
  86:19 108:17
  122:18 126:18
  170:20,25
  210:18
**showed** 24:13
  164:18
**shower** 16:11
  16:11 74:24,24
**showing** 171:8
  202:7
**shows** 62:18
  86:5 117:13
  237:9

**shred** 118:13
  206:17
**shut** 148:23
**sic** 174:14
**side** 82:16,16
  84:13,13 91:21
  91:21,22,23
  175:7
**sides** 205:8
  240:25
**sign** 243:11,13
  243:17
**signals** 85:19
**signature**
  242:23 243:20
**signed** 28:20
  165:8
**significant**
  69:20 112:20
  113:4,12,14
  114:1 115:10
  124:21,25
  125:10,16
  171:9 185:21
  190:24 198:21
**significantly**
  171:1
**signifies** 35:16
**signing** 243:15
**similar** 29:8
  38:6 41:5 51:21
  67:14 99:4
  102:1 205:13
**simply** 184:7
  189:4 215:18

**simulate**
  211:12
**sinai** 146:24
  148:11 149:14
  149:17
**single** 101:20
  149:21 171:25
**singling** 169:17
**sir** 135:3
  203:12
**sit** 47:3 234:23
**site** 6:21,23
  192:3 212:17
  212:21 213:3
**sitting** 209:6
**situate** 148:15
**situated** 115:11
**six** 44:20
**sixties** 100:22
**size** 72:13 124:9
**skewed** 224:7
**skin** 185:19
**skus** 41:13
**slate** 229:21
**slide** 63:7
**slides** 147:16
**slight** 14:22
  47:16 70:13
  71:4,6 194:19
  195:3
**slightly** 71:13
**slow** 70:1
**small** 10:20
**smart** 121:1
  219:1

**smith** 5:15 97:6
**smoke** 227:8
**smoothness**
  216:9
**social** 40:7,9,18
**society** 6:18
  200:6 201:2,4
  201:10 203:15
**sociology** 37:23
**soda** 67:11
**software** 42:3
**soileau** 2:14
  26:12
**sold** 82:16
  84:13
**solely** 79:19
  137:22
**solution** 152:10
  153:22
**solutions**
  147:13
**somebodies**
  85:22
**somebody** 67:4
  67:5 78:16
  80:15 85:21
  162:2 176:8
  186:6 189:18
  199:10 212:6,7
**sophisticated**
  135:10
**sorry** 8:16 15:7
  26:25 39:1 54:1
  54:22 64:17
  68:20,20 70:3
  72:3 76:12

**[sorry - statements]**                                                    Page 55

77:17 84:23
90:22 93:23
107:16 109:13
120:23 121:22
131:12 138:18
144:16 155:20
159:22,24
163:15 166:12
182:16 188:3
188:20 189:8
194:13 200:19
209:6 228:3
241:3
**sort**  33:2
191:22
**sorts**  38:10
**sought**  33:20
**sound**  25:10
80:10
**sounds**  8:14 9:8
9:16 17:22
**source**  47:5
58:20 86:7
**sources**  32:1
46:7 56:12
191:20
**space**  199:16
243:14
**spalding**  3:3
**spanning**  29:22
**speak**  71:19
118:4 141:5
163:6 209:25
230:7 234:21
236:21

**speaker**  105:3
**speaking**  23:7
152:13 204:14
204:15 217:20
**speaks**  81:23
**special**  183:8
**specific**  16:6
18:9 23:12
33:25 38:22
50:1,4 54:17
57:18 63:18
72:18 84:3,20
86:5 114:9
148:9,14
194:22 220:4
221:18
**specifically**
14:25 40:17
43:4 46:1 68:2
76:20 92:10
167:23 175:21
207:8,13 221:3
222:21 224:15
224:20 231:15
**specificity**
46:15 214:7
**specifics**  14:1
19:13 26:7
27:21 155:17
156:3 161:17
**speculate**
172:10
**speed**  238:9
**spending**
148:24

**spent**  24:24
25:22 117:14
**spilled**  41:3
**spoke**  14:4,17
14:23
**spoken**  33:16
**sponsor**  154:23
162:5
**sponsored**
153:13 203:23
**spontaneously**
181:17
**spreading**
226:22
**spring**  118:9,10
120:8,10,10
121:7 205:5,5
**spur**  60:25
**st**  2:15 3:15
**stammering**
233:9
**stand**  191:9
199:3
**standard**
115:18 135:20
136:15,18
137:5 138:7,25
140:5
**standards**
140:14 141:20
**standpoint**
87:23 88:25
**start**  19:8,17
20:8 52:6 78:22
170:3 193:15
208:15 214:24

**started**  17:25
18:11 20:9,11
30:2 74:8
123:11
**starting**  16:3
21:9 74:6 132:3
142:25 172:17
222:4
**starts**  67:10
99:11 109:13
131:6 146:18
202:24 203:11
238:23
**stasis**  173:14
**state**  124:16
168:21 181:4
190:12 199:18
204:20 215:9
224:19 225:23
**stated**  18:16
142:4 168:8
175:9 217:19
226:3
**statement**  18:9
33:7 61:25 65:7
98:18 124:8
165:13 166:7
168:16 189:6
204:13 206:23
220:4 226:2,13
226:21
**statements**
56:23 66:14
74:20 150:3,5
185:9 201:9
204:6 205:1,2,2

**[statements - subsequent]**                                             Page 56

206:4 207:16
211:24 214:16
220:14 233:5
**states**  1:1 52:10
118:24 132:12
225:22 238:25
**stating**  165:18
**stationed**
149:16
**statistical**  69:23
70:8,13,16,17
71:5,6 194:14
194:20 195:3
196:20 222:9
**statistically**
69:20 171:4
190:23 198:21
**statistics**  33:2
**status**  6:3
130:23 145:15
145:23 146:3
**steadfastly**
175:9
**steering**  2:3
**steinberg**
103:25 105:3
106:2
**steinberg's**
105:16
**stemming**
149:25
**stenographic**
10:11
**step**  37:1 64:7
235:4

**stop**  50:19 99:8
100:3 126:2
177:11
**store**  41:13
**story**  58:6,21
227:1
**strategic**  183:4
**strategically**
216:24
**strategies**  43:15
100:24
**strategize**
162:11
**strategy**  38:13
38:18 58:24
63:18 64:2 78:1
78:15 81:23
84:9,17 86:9,20
86:21 87:22
88:21,22 89:17
90:3 92:24
102:10 114:21
133:11 151:17
152:12,17
162:5 180:23
184:4 215:17
218:21 219:1
234:8
**stratified**
239:12
**stratifying**
240:10
**streams**  79:15
**street**  1:12 2:7
2:22

**stretch**  174:13
**stripping**  43:16
**strong**  39:9
101:4 199:6
**strongly**  171:7
239:18
**structural**
104:16
**students**  38:24
44:11,13,19
**studies**  6:10,17
15:22 31:23
43:6,6 44:3
69:19 70:11,12
71:4,5 78:23
91:6 93:24
153:11,18
154:14,16
155:12,22
160:9 162:25
163:1,21
174:14 190:18
190:22 193:22
193:23 194:1,3
194:5,7,10,17
194:19,21,21
195:10,20,21
197:8 198:6,9
198:19 199:6
199:17,18,20
200:21,22
205:12 219:16
219:17 220:6
220:10 222:9
239:2 240:4,10

**study**  37:20
40:6 62:23 68:7
68:11,19 69:15
69:22 70:6,7,23
71:8,25 112:17
112:19 113:4
113:12,21
114:5 115:9
120:15 157:5,5
162:17,21
163:3,8 170:16
170:19,24
171:7,10,17,21
171:25 196:6
197:1,14,24
205:11 222:7
222:14,20
237:6 239:9
**stuff**  29:13
103:3 133:3,14
133:15 144:18
144:19 231:6
**sub**  136:4 139:8
**subject**  5:16
97:7,16 132:6
243:15
**submits**  173:6,8
**submitted**
23:19 44:9
51:25 165:10
193:19
**subscribed**
245:16
**subsequent**
147:4 150:6
223:16

**[substance - talc]**

substance
  60:25 243:5,8
substantiate
  124:24
substantiation
  6:4 145:24
  146:3
substantive
  215:6
substitute
  181:19
subtext   138:4
successful
  63:19
suddenly   138:2
sue   241:1
suggest   196:18
  222:10 226:19
  236:19 237:12
suggested
  60:17 71:15,17
  182:21
suggesting
  100:13 175:4,7
  179:18 197:22
suggestions
  89:22
suggests   95:13
suite   2:8 3:22
suited   125:24
  165:24
sum   101:22
summarize
  153:9 220:9
support   67:20
  73:23 95:17

162:12 203:6
203:16 204:7,8
204:14 207:20
219:18 220:4
supporting
  239:10
supposedly
  83:21
sure   9:4,5,25
  10:19 11:23
  12:15,19,24
  13:2,14 15:16
  16:8 17:23 21:6
  23:2 25:15,20
  34:5 39:2 40:3
  42:9,20 57:4
  61:7 68:12 82:7
  96:8 105:22
  106:2 108:12
  108:15 110:12
  111:25 121:2
  123:1 127:7,17
  131:11 134:6
  135:11 137:20
  138:22 145:5
  145:13 157:20
  159:12 160:2
  165:1 179:18
  179:25 188:24
  190:9 220:5,23
  224:17 233:16
  238:6 241:12
surveillance
  164:16
suspect   147:16

suspicion   199:7
sustainability
  42:23
swing   122:25
sworn   8:2
  242:8 245:16
synonymous
  225:8 228:20
system   130:22
  157:17
systematic
  72:25 74:4

**t**

tab   145:9 194:2
table   5:12
  10:24 51:13,17
  51:18,23
  192:13 209:7
  222:17
tabula   216:20
  229:20
take   9:10,15
  11:4 42:10
  50:16,16 70:1
  79:7 80:2 96:2
  100:24 108:18
  112:12 116:1
  117:6,19
  118:20 127:5
  128:4,19
  133:11 152:16
  160:1 162:4
  167:4 172:8
  184:23,24,25
  201:17 214:14

225:18 233:9
233:11,14
234:24 236:2
236:12 239:25
taken   1:11 69:4
  69:5 80:4
  114:21 128:15
  151:7 185:2
  227:16 228:6,6
  235:1 241:15
  242:5,9,15
talc   5:17,21 6:4
  6:10,17,22
  14:25 15:1,19
  28:12,22 29:7
  29:10 33:8 45:2
  45:7 47:22 48:2
  49:19 53:18,20
  56:6,25 57:1,6
  57:16 58:10
  59:13 60:8 66:8
  66:15 68:4,13
  69:7,22 75:12
  76:9,21 77:4
  82:11,14,21,22
  83:20 84:21,22
  84:22 85:15
  87:11 88:5 89:2
  89:7,9 90:4,12
  91:21 92:12,17
  93:20 94:1,5
  95:5,9 96:19
  97:7,17 98:19
  99:7,8,20,23,24
  100:5,7,17,24
  101:15 106:5

111:7,10,21
112:21,22
113:16,19
114:7,15 116:7
121:20 122:11
124:7,10,18,20
125:1,4,8,15,20
126:1 129:12
129:14,19,22
129:23 130:23
132:7,10
135:15,22,23
136:1,2,21
137:8 138:8
139:18 140:1,2
140:25 142:7
142:16 144:3
145:15,23
146:3,21 147:3
147:13,15
149:24 150:15
152:16 153:11
154:3 162:17
163:4,21
164:11 165:12
165:20 166:1
167:9,25 168:4
168:9 169:3,6
169:16,25
170:10,15,20
171:3 172:5,19
173:10 175:10
176:11 180:17
181:3,3 182:1,2
183:13 184:5,7
184:11 185:18

186:7 188:14
190:7,14,17
191:12 192:3
192:15 193:17
195:20,25
198:17 200:7
200:21,23
201:11 203:8
203:18 211:3
212:19,25
213:2 214:11
215:16 216:19
217:5 219:24
221:24 223:5
223:15 224:1
224:15,21
226:1 227:19
228:10 229:12
229:14 230:15
233:17,23,24
239:11 240:3
240:12,13,21
**talcs** 135:24
**talcum** 1:4
14:20 15:1
16:10 29:10
52:14,22 53:4
53:10 55:16
57:24,24 58:23
62:25 63:1,3
71:7 75:20 78:8
82:4 94:17
96:14 100:4
150:5 151:24
170:21 179:6
190:19,25

195:16 198:22
211:14,14
212:25 213:15
244:3
**talk** 11:19 14:8
39:3 52:2 59:17
63:20 65:21
74:22 75:2
76:19 84:19
87:21 103:17
112:16 118:9
119:4,7 123:10
131:1,2,24
136:20 139:25
140:1 145:3
151:16 152:1
156:3,23
161:17 166:14
173:5 184:21
185:8 190:6
193:22 206:13
206:22 210:25
210:25 223:24
**talked** 15:14
18:6 26:5 40:18
41:24 59:10
67:8 71:8 83:1
97:15 101:21
106:18 117:10
130:5 140:21
152:2 155:10
177:24 179:23
184:17 196:7
202:16 204:10
205:4,19
219:14 230:12

232:6,6
**talking** 17:24
18:1 19:6 21:1
39:20 53:8,24
54:3,15 55:19
55:20 57:14
58:9 63:7 75:8
75:15 76:17
81:14 84:3
104:19 107:13
111:7,19,23,25
114:8 118:5
120:14 121:7
133:12,16
142:1,17 152:8
153:18 156:18
157:1 164:9
165:4,16
175:21 177:2
178:4 179:6
180:11,11
181:1,7,13,17
181:20,24
183:13 184:9
193:14 203:10
209:9 217:10
218:4,18 221:8
221:17 222:7
224:10,12
225:16 227:11
227:13 232:9
234:1 236:9
**talks** 68:14
125:12 130:9
142:19 143:25
194:12 202:25

**[talks - think]**                                                          Page 59

| | | | |
|---|---|---|---|
| 203:2 211:3 | 74:12 103:9 | 59:15 60:10 | 241:18 |
| **target** 215:21 | 116:11,14 | 64:11,14,20,25 | **that'd** 210:19 |
| **targeted** 235:24 | 141:15,17 | 75:5 80:9,13,18 | **theories** 19:2 |
| **targeting** | 156:5 167:19 | 80:21 86:16 | **theory** 181:20 |
| 235:13 236:2 | 174:7 182:6 | 87:19 102:19 | **thereto** 242:17 |
| 236:14,14 | 186:1 204:6 | 104:6,19 | **thing** 33:2 |
| **task** 18:16 | 206:5 219:8,9 | 105:21 107:19 | 45:23 88:22 |
| **taste** 39:10 | 229:8 | 107:25 119:22 | 99:4 101:7 |
| 67:12 217:25 | **tells** 226:25 | 153:6 154:19 | 141:19 175:20 |
| **taught** 37:15 | **ten** 101:25 | 173:14 183:24 | 187:3 188:7 |
| 38:1,4,5,6,14 | **tenovus** 146:23 | 184:1 198:1 | 190:3 220:12 |
| 218:10 | 147:18,24 | 199:1 207:22 | 222:12 |
| **teach** 37:14 | **tenure** 35:6,9 | 227:21 242:7,8 | **things** 9:2 17:5 |
| 38:24 | 35:18,18,21 | 243:14 245:10 | 22:11 23:19 |
| **teaching** 37:6 | 36:10,13 37:3 | **testing** 41:2 | 39:8,11 42:22 |
| 119:5 | **tenured** 35:4 | 61:16 77:19,19 | 42:24 44:16 |
| **team** 209:25 | **term** 40:1 83:1 | 77:20 94:13 | 51:24 58:18,19 |
| **teams** 37:21 | 229:20 | 136:12 148:22 | 60:4 71:20 |
| **technical** 192:5 | **termed** 197:2 | 151:10 166:14 | 76:23 78:23 |
| 198:7 | **terminology** | 177:6 192:4 | 79:10 91:5 |
| **techniques** | 73:10 149:25 | **tests** 67:20,25 | 93:12 116:1 |
| 135:10 147:10 | **terms** 39:4 | **text** 131:21 | 119:11 120:16 |
| 147:25 | 55:12 56:23 | 196:6 | 140:15 141:6 |
| **technology** | 75:20 174:24 | **tfinken** 3:17 | 154:1 160:7 |
| 17:18 | 234:2 | **thank** 10:2 | 176:7 191:25 |
| **tel** 2:11,18,25 | **terrible** 195:14 | 11:13 13:8 | 212:11,12 |
| 3:8,16,25 | **test** 39:10 71:17 | 17:15 42:8 70:4 | 222:6 224:6 |
| **tell** 10:17 28:25 | 82:6 83:5 91:7 | 108:23 109:5 | 229:3 230:2 |
| 61:14 68:23 | 94:17 166:16 | 112:13 122:3 | 234:18 |
| 101:17 120:5 | 218:1 | 123:21 127:16 | **think** 8:9 10:11 |
| 126:14 142:5 | **tested** 57:20 | 145:18 159:13 | 11:15 12:6 13:4 |
| 154:24 180:15 | **testified** 8:5 | 163:23,25 | 14:22 17:17 |
| 220:21 227:23 | 205:20 | 186:14 187:20 | 22:6 23:9 24:7 |
| 228:2 238:10 | **testifying** 80:15 | 196:3 208:4,5 | 25:11 27:2 41:2 |
| **telling** 13:12 | **testimony** | 232:21 234:25 | 42:16 43:5 |
| 65:13 66:20 | 27:11 31:9 | 238:15 241:13 | 47:15 55:21 |

**[think - totally]**

| | | | |
|---|---|---|---|
| 58:3,15,21 | 204:10 218:2 | 72:16 84:3,15 | 28:16 31:5,8 |
| 59:23 60:11 | 218:15 219:11 | 87:12 92:5 93:8 | 33:16 45:25 |
| 62:2 64:25 65:1 | 221:14 222:22 | 93:11 95:20 | 47:4 55:8 68:6 |
| 65:16 67:12,13 | 224:2 227:9 | 100:16,20 | 196:19 228:12 |
| 69:9 70:19 74:4 | 229:4 230:9 | 102:11 104:25 | 232:1 234:5,15 |
| 81:12,22 83:23 | 232:5 234:4 | 108:18 114:9 | **today's** 26:14 |
| 83:25 85:8,15 | 238:11,15 | 123:8 125:19 | **todd** 175:22 |
| 85:16 87:23 | **thinking** 26:25 | 130:8 148:25 | 177:13,13 |
| 88:20 89:15 | 40:6 94:7 105:4 | 157:13 160:1 | 178:20 181:6 |
| 90:5,16 91:3,23 | 106:3 148:25 | 164:22 168:25 | 183:20,20 |
| 91:25 93:15 | 184:2 223:22 | 172:1,4 174:8 | 184:13 |
| 94:23,25 95:10 | 227:15 | 174:13 176:18 | **together** 37:21 |
| 95:17 96:1,25 | **thought** 60:17 | 179:5 190:1 | 160:18 209:25 |
| 98:21 103:7 | 106:13 156:14 | 193:16 197:16 | **told** 58:7 61:13 |
| 104:10,23 | 197:18 223:1 | 222:2 224:25 | 174:22 |
| 107:7 112:6 | **thousands** | 229:25 234:13 | **took** 68:12 87:8 |
| 114:8 115:10 | 191:17 223:14 | 237:2 | 93:15 164:20 |
| 117:11,20 | **threat** 93:14 | **timeline** 19:7 | **top** 77:8,13 |
| 118:17 120:19 | **threaten** 101:9 | 98:17 114:2 | 85:19 98:12 |
| 130:8,19 132:4 | **three** 10:24 | 173:16 234:1 | 151:8 166:22 |
| 137:12 138:4 | 11:8 69:10 | **timelines** 79:14 | 225:6 |
| 139:19 141:3 | 128:11,13 | **times** 26:13 | **topic** 16:1 31:3 |
| 151:14 152:10 | 171:17 178:10 | 142:4 150:3,7 | 39:5 237:15 |
| 152:11,15 | 178:11 | 150:13 181:15 | 239:3 |
| 153:25 155:5 | **threshold** 72:13 | 209:8 | **topics** 38:11 |
| 157:14 158:10 | **thrust** 135:7 | **timing** 78:7 | 50:14 |
| 159:14,17 | **thumb** 229:2 | 239:11 240:11 | **toronto** 1:12 |
| 160:6,17,20 | **tied** 99:23 | **tips** 229:3 | 10:9 35:1,4,7 |
| 161:10,14 | **time** 8:10 9:10 | **tired** 233:8 | 35:21,25 36:5 |
| 163:7 175:1 | 11:21 14:4 | **tisi** 2:6 | 37:9,25 38:2 |
| 176:6,14 | 17:20 18:3,24 | **tissue** 147:4 | 160:23 245:2 |
| 180:18 181:11 | 19:4,5 21:9 | **title** 36:19 | **totality** 71:22 |
| 183:10 187:4 | 22:15 24:19 | **titled** 145:23 | 79:5 101:21 |
| 193:24 194:5 | 25:23 30:25 | **today** 10:8 | 104:19 |
| 197:6,13 200:2 | 33:14 34:2 | 24:25 25:24 | **totally** 12:3 |
| 201:7 203:25 | 44:17 45:5 67:7 | 26:8 27:18 | |

**[touch - uncorrected]**                                                    Page 61

| | | | |
|---|---|---|---|
| **touch** 177:22 | **tried** 79:7 236:7 | 237:13 | **twice** 63:2 |
| 179:11 | **tripped** 54:22 | **trusted** 71:14 | **two** 20:1 24:13 |
| **towards** 91:16 | **trouble** 139:6 | 72:5 116:16 | 36:2 41:4 72:10 |
| **toxicological** | **true** 65:11 | **trusting** 72:7 | 77:9 84:13 94:3 |
| 125:5 170:12 | 67:14,14 73:3 | **trustworthiness** | 101:4 126:17 |
| **trabert** 239:8 | 155:3 156:10 | 231:22 | 128:21 145:10 |
| **trace** 136:4 | 175:22 176:4 | **trustworthy** | 145:11 158:5 |
| **track** 35:6,9,21 | 176:25 177:13 | 63:4 65:12 | 159:6 176:4 |
| 36:10 40:12 | 177:13 178:1 | 216:25 225:8 | 185:10,14 |
| **tracking** 42:3 | 178:20 179:10 | 228:20 | 187:7 188:12 |
| **tracy** 3:14 | 181:6 183:6,20 | **truth** 199:12 | 202:21 |
| **trained** 32:24 | 183:21 195:5 | **try** 8:12 9:3,5 | **type** 29:13 |
| **training** 32:21 | 206:18 221:10 | 46:25 58:20 | 81:18 100:14 |
| 40:5 78:20 | 222:2 223:2 | 108:10 120:2 | 132:20 142:23 |
| 117:25 118:2 | 245:9 | 131:9 159:17 | 143:9 181:1 |
| 119:13 | **true's** 179:17 | 195:11 | **typed** 212:7 |
| **transcript** | 184:13 | **trying** 36:3 | **types** 38:3 40:1 |
| 245:6,10 | **trust** 61:19,21 | 37:2,23 38:16 | 40:19 78:1,24 |
| **translocation** | 61:21,23 62:14 | 39:11,14 42:16 | 86:3 102:2 |
| 112:24 174:18 | 62:19 63:5,8,8 | 46:8,22 58:22 | 134:16 137:13 |
| 189:4 | 63:15 64:5,8 | 70:24 79:13,16 | 219:16 |
| **transparent** | 65:1,7 66:3,4 | 114:2 117:14 | **typewritten** |
| 238:13 | 66:21,24,25 | 138:11 142:2 | 10:25 |
| **treat** 205:1,7 | 71:11 94:4 | 142:15 187:19 | **typically** 38:19 |
| 206:15,16 | 103:11,13 | 193:24 208:23 | 40:3 |
| **treating** 58:4 | 116:15,15 | 210:17 211:12 | **typo** 187:16 |
| 60:15 | 120:18 196:22 | 211:20 212:5 | **u** |
| **treatment** | 215:23 216:10 | 213:5 230:4 | |
| 199:5 | 216:11,12,16 | **tucked** 196:10 | **u.s.** 226:2 |
| **tremolite** 136:1 | 218:13,19,25 | **turn** 146:12,14 | **ultimately** |
| 136:4,17 | 219:9 220:9,11 | 185:5 | 85:21 109:16 |
| **trend** 237:1 | 220:15,16 | **turns** 102:3 | 162:22 174:3 |
| **trends** 202:25 | 221:1,4,12,14 | **tweaking** 43:19 | 175:11 |
| **trial** 9:19 31:5 | 224:13,20 | **twelve** 184:22 | **unable** 121:25 |
| 31:9 | 225:6,14 | **twenty** 202:21 | **uncorrected** |
| | 236:20 237:9 | | 171:5 |

**[undated - vantage]**                                    Page 62

| | | | |
|---|---|---|---|
| **undated** 21:9 | 22:10 30:20 | **unfortunately** | 238:1 239:16 |
| **under** 9:18 27:1 | 33:4 43:23 | 121:24 | **used** 45:20,21 |
| 178:16,21 | 46:10,17,19 | **unintentionally** | 71:10 107:3 |
| 189:17 194:1 | 47:13,17 51:20 | 54:25 | 154:17 166:17 |
| 203:1,10 | 54:5,7,21 55:1 | **united** 1:1 | 167:18 169:16 |
| 242:12 245:4 | 55:5,6,7,11,18 | **universally** | 169:16 170:21 |
| **underlying** | 66:17 72:16 | 191:3 | 181:22 183:22 |
| 206:7,9 | 76:24 106:12 | **university** | 196:6 212:4 |
| **undersigned** | 113:16 129:19 | 34:25 35:4,7,12 | 213:5 229:20 |
| 245:4 | 129:21,25 | 35:21,24 36:5 | **usefulness** |
| **understand** | 140:22 141:23 | 160:23 | 132:21 133:5 |
| 9:17,20 10:1,15 | 142:6 152:12 | **unquote** 90:4 | 143:17 |
| 18:3 23:11 26:2 | 152:18 153:3 | **unreasonable** | **users** 69:24 |
| 28:18 30:11 | 154:20,22 | 161:15 | 70:9 190:20 |
| 32:25 33:1,5,17 | 173:16 177:16 | **unsafe** 176:11 | 194:16 |
| 37:24 38:16,19 | 179:3 185:12 | **update** 6:5 | **uses** 135:23 |
| 38:25 39:11,15 | 189:14 197:16 | 145:24 146:4 | 138:8 181:14 |
| 41:12 46:11 | 211:22 212:10 | **updated** 5:9 | **using** 29:17 |
| 50:9 53:17 | 213:19,24 | 34:15 80:9 | 32:6 41:11 42:2 |
| 54:16,18 64:4,6 | 214:4,9 215:13 | **uploaded** 123:2 | 42:3,7 43:18 |
| 66:4 71:21 76:1 | 217:22 219:12 | **upper** 34:19 | 47:5 65:3 69:17 |
| 79:9,13 87:10 | 229:25 240:14 | **urban** 190:15 | 100:4 136:18 |
| 96:1 105:22 | 240:16,20 | **use** 7:4 40:20 | 137:4 141:16 |
| 107:15 114:2 | **understands** | 45:6 60:8 69:22 | 149:25 159:2 |
| 137:16 141:25 | 137:19 144:9 | 71:7 72:24 75:8 | 213:15 222:21 |
| 142:2,16 | 211:16 | 76:9 82:24 | 239:6 242:9 |
| 144:16 152:19 | **understood** | 94:16 95:11 | **usually** 46:24 |
| 156:9 169:21 | 27:17 59:24 | 96:14 113:16 | |
| 192:23 205:1 | 97:21 173:24 | 136:17 139:9 | **v** |
| 205:14,16 | **underway** | 156:24 170:20 | **vacuum** 65:9 |
| 207:6 209:14 | 153:12 | 171:3 176:12 | **vague** 54:24 |
| 211:13 212:5 | **unequivocal** | 182:2,4,9 | **valid** 152:24 |
| 213:6 215:1 | 217:4,15 | 184:25 190:25 | **value** 217:21 |
| 221:10 230:4 | 219:23 221:23 | 194:25 195:16 | 219:11 |
| **understanding** | 223:4 230:14 | 198:22 206:10 | **vantage** 38:15 |
| 19:2 20:24 21:4 | | 223:15 236:13 | |

**[variables - wellbeing]**                                                       Page 63

| | | | |
|---|---|---|---|
| **variables**  41:7 | **voice**  232:14 | 211:12 239:25 | 224:3,7 234:5,7 |
| **variant**  182:1 | **volume**  108:21 | **wants**  184:14 | 238:18 |
| 182:22,24 | **w** | **warn**  50:2 | **wayne**  94:13 |
| **varied**  87:1 | | 109:16 | **ways**  38:25 |
| **variety**  32:1 | **w**  187:18 | **warned**  180:2 | **we've**  79:22 |
| 40:24 46:7 | **wade**  191:23 | **warning**  49:23 | 93:2 114:13 |
| 203:3 | **wait**  90:21,21 | 110:4,19 111:4 | 127:25 161:19 |
| **various**  42:23 | **walk**  235:21 | 111:11 124:8 | 162:10 178:4 |
| 56:11 78:1 88:8 | **walking**  230:11 | 165:12 169:5 | 184:21 204:10 |
| 116:5,6 | **wallet**  104:9 | 169:23 173:9 | **webpage** |
| **varying**  135:25 | **walmart**  62:25 | **washington**  2:9 | 212:18,24 |
| **venture**  25:2 | **want**  9:25 12:1 | **watch**  212:16 | **website**  32:2 |
| **verbatim**  11:2 | 13:1,25 14:10 | **watch's**  213:20 | 68:13 69:6 71:2 |
| 62:16 71:1 | 25:4,6 27:20 | **water**  118:9,10 | 190:16 193:16 |
| **verified**  156:6 | 50:16 51:1 52:6 | 120:8,10,10 | 199:16 208:10 |
| **versed**  134:14 | 56:24 104:22 | 121:7 205:5,6 | 208:11 210:4 |
| **version**  72:3,4 | 126:18,22,23 | **way**  12:24 34:6 | 211:1 213:7 |
| 193:15 | 128:4 137:18 | 41:2,6 48:19 | 224:1 |
| **versus**  62:25 | 145:3 147:22 | 50:10 70:15 | **websites**  12:23 |
| 67:9 118:9 | 151:12 156:3 | 74:13 82:12 | 158:7 208:16 |
| 168:16 186:1 | 160:2 161:17 | 85:5 100:12 | 209:10 211:11 |
| 205:5 218:1 | 163:16 167:3 | 102:25 116:16 | 211:17 212:9 |
| 239:14 | 170:15 174:10 | 120:12 126:16 | 219:6 |
| **viable**  61:12 | 184:23 188:2,6 | 133:12 137:4,8 | **weekly**  166:21 |
| 94:24 95:2,3,3 | 199:14 201:17 | 139:6 147:22 | **wehner**  6:13 |
| **view**  33:6 81:18 | 206:11 208:20 | 148:22 149:5 | 185:9,13 186:5 |
| 94:15 103:15 | 208:24 209:1 | 150:21 156:6 | 187:11,17 |
| 133:7 228:9 | 209:14 210:24 | 160:21 161:3 | 188:14 |
| **viewpoint** | 212:15 215:5 | 166:10 182:9 | **weigh**  207:14 |
| 175:14 | 221:12 222:16 | 182:19 183:12 | **weighing**  93:6 |
| **views**  227:18 | 232:16,23 | 188:24 189:21 | **weight**  63:9 |
| 229:14 | 233:10 238:12 | 191:24 196:20 | 203:5,16 204:7 |
| **virtually**  45:3 | **wanted**  12:18 | 197:10,19,22 | 204:13 218:15 |
| **vocal**  146:22 | 12:24 16:18,19 | 204:19 211:16 | **weiss**  3:13 |
| 149:15 | 22:1 79:9 105:5 | 213:25 217:23 | **wellbeing**  217:3 |
| | 209:17 210:13 | 220:4 223:22 | |

**[went - x]**

**went**  17:23
61:8 94:6
191:13 211:13
219:5
**werner**  187:17
**west**  1:12
**whatsoever**
61:18 65:15
189:3,23 212:2
213:22
**white**  88:2,4
105:6
**widely**  135:25
**wife**  36:1
**william**  48:12
**willingness**
118:12
**win**  92:6 180:10
**window**  10:19
**windsor**  5:21
132:7,9
**wire**  123:3
**wise**  17:18
**wish**  108:17
**withdraw**  32:7
55:2
**withdrawn**
138:23
**witness**  4:2 8:2
8:4 15:9 20:6
21:15 22:23
32:21 34:16
45:17 48:15
50:19,25 51:10
51:20 57:11
58:15 59:16

60:11 63:17
64:16 70:3,5
73:9 77:15
81:22 86:17
87:20 89:14
91:2 92:3 97:9
101:19 102:20
104:7,21
105:24 107:2
110:8 113:7
115:4,13
116:10 123:6
128:6 131:17
131:19 134:13
137:2 139:5
140:11 141:3
143:4 144:13
144:15 148:8
150:17 151:2
152:22 153:7
154:10,20
155:16 156:1
156:14 157:9
159:14 164:4,6
166:9 170:2
171:24 173:15
174:5 175:16
177:21 178:18
180:6 182:18
187:2 188:1,8
188:20 196:4
198:2 199:2,25
202:10,18,21
203:24 204:24
206:1 207:6,23
212:2 213:4

214:19 223:21
224:23 229:16
230:25 231:13
235:10 236:25
238:3 240:6,16
242:6,9 243:1
243:18,18,20
244:8
**women**  174:22
176:24 177:4
183:8 195:10
195:15 239:15
239:21 241:1
**word**  15:8
77:23 101:10
121:4 143:4,11
181:14 200:1
**worded**  137:21
**words**  59:23,24
113:11 156:24
240:17
**work**  11:11
18:2 20:9 28:21
29:5,19,24,25
30:2,4 31:23
39:20,21 40:2,9
42:4 44:7,18,23
44:24 64:1
88:17 92:8
103:21 104:16
121:13 125:22
165:22 196:13
208:18
**workday**  27:1
**worked**  157:10
228:23,24

**workers**  162:17
**working**  10:14
20:22 37:21
155:4
**works**  187:8
**world**  206:10
**worried**  139:18
139:20,21,22
139:23 184:11
**worries**  122:2
123:16 158:16
209:24
**worry**  116:14
**wow**  103:1
196:8 197:18
**writing**  33:1,5
100:10
**written**  18:5
23:18 29:25
153:4 242:11
**wrong**  57:12
84:25 157:15
165:15 175:6
183:2 189:22
236:2
**wrongdoing**
217:4 219:24
221:23 223:4
230:14
**wrongfully**
235:24

**x**

**x**  4:1

**[yale - zoom]**                                                    Page 65

| y | 132:2 133:20 | 116:16 118:2 |
|---|---|---|
| **yale**   35:24 | 134:13 135:2,4 | 129:11 146:22 |
| 36:10,14,20 | 137:3 140:11 | 173:20 175:14 |
| 37:3,4 38:4 | 142:14 144:9 | 197:12,13 |
| **yeah**   9:20 14:6 | 144:13 146:17 | 214:12 219:10 |
| 14:6,12 20:12 | 149:8 154:5,10 | 230:5 231:6 |
| 21:5 22:17 24:7 | 154:10 157:24 | 232:7 |
| 25:17 29:2,22 | 158:19 159:24 | **yep**   13:8 19:21 |
| 29:23 30:6 40:3 | 160:1,1,10,20 | 52:8 97:18 |
| 44:2,16 46:3 | 164:4,6,7,7 | 110:15 124:3 |
| 51:10 53:15 | 166:23 175:16 | 129:7 130:25 |
| 54:2,24 55:22 | 175:16,16,23 | 131:14 188:8 |
| 66:10,10 67:24 | 176:2 177:11 | 203:13 |
| 68:16,24 69:2 | 178:23 179:25 | **yesterday** |
| 72:8 73:20 74:3 | 180:6 183:19 | 12:22 26:15,18 |
| 75:1,25 76:1 | 183:25 184:16 | 208:7 209:11 |
| 77:6 78:12 | 184:19,25 | **york**   3:6 146:25 |
| 79:25 81:1,5,5 | 188:4 191:10 | 149:17 150:3,6 |
| 81:22 87:20 | 192:17 196:18 | 150:13 |
| 89:6,7 91:2 | 199:2,25 200:3 | z |
| 93:16,16 95:14 | 201:23 207:23 | **zoom**   2:6,21 |
| 96:3 101:10,13 | 208:14 210:10 | 3:14,21 16:24 |
| 101:19 104:21 | 211:5,9 213:23 | |
| 106:8,8,19 | 214:3 215:8 | |
| 108:24 109:11 | 216:14 223:9 | |
| 111:23,25 | 226:18 229:5 | |
| 112:10 115:6 | 230:20,20 | |
| 115:13,18 | **year**   13:19 | |
| 116:2 122:9 | 25:23 36:7 | |
| 123:12,16 | 37:12 239:13 | |
| 126:4,4 127:3 | 240:11 | |
| 127:10 128:6 | **years**   44:21 | |
| 128:10 129:4 | 49:19 57:20 | |
| 130:2,11,17,18 | 61:19 63:11 | |
| 131:8,16,24 | 65:11 82:3 | |
| | 90:12 103:9 | |

Federal Rules of Civil Procedure

Rule 30


(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2)  Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.



DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.