# Exhibit 2

```
                                              Page 1

 1              UNITED STATES DISTRICT COURT
 2                DISTRICT OF NEW JERSEY
 3     ----------------------------
 4     IN RE:  JOHNSON & JOHNSON     MDL NO.:
       TALCUM POWDER PRODUCTS        16-2738 (MAS)(RLS)
 5     MARKETING, SALES PRACTICES,
       AND PRODUCTS LIABILITY
 6     LITIGATION
 7     ----------------------------
 8               SUPERIOR COURT OF NEW JERSEY
 9             LAW DIVISION, ATLANTIC COUNTY
10     ----------------------------------
11     BRANDI CARL,                    DOCKET NO.
               Plaintiff,              ATL-L-06546-14
12
       V.                              TALC-BASED POWDER
13
       JOHNSON & JOHNSON, ET AL.,    PRODUCTS LITIGATION
14         Defendants.                 CASE NO. 300
       ----------------------------------
15
       DIANA BALDERRAMA,               DOCKET NO.
16         Plaintiff,                  ATL-L-6540-14
17     V.                              TALC-BASED POWDER
18     JOHNSON & JOHNSON, ET AL.,    PRODUCTS LITIGATION
           Defendants.                 CASE NO. 300
19     ----------------------------------
20                 EXPERT DEPOSITION OF
21             KATHLEEN M. SUTCLIFFE, PHD
22          Tuesday, May 28, 2024, 9:11 a.m.
23
       Reported by:  Denise Dobner Vickery, CRR, RMR
24     JOB NO.: 6717900
```

Page 14

```
 1              P R O C E E D I N G S
 2                      - - -
 3              KATHLEEN M. SUTCLIFFE, PHD
 4    called for examination, and, after having been
 5    duly sworn, was examined and testified as
 6    follows:
 7                      - - -
 8                  EXAMINATION
 9                      - - -
10   BY MR. TISI:
11        Q.      Good morning.
12        A.      Good morning.
13        Q.      Please state your name.
14        A.      Kathleen M. Sutcliffe.
15        Q.      And are you what's called a -- you
16   have a PhD in Organization Theory and Behavior?
17        A.      Correct.
18        Q.      And would it be fair that you
19   describe yourself as an expert in what is called
20   organization behavior and theory?
21        A.      Organization science, organization
22   behavior, organization theory.  Correct.
23        Q.      Okay.  And you are designated in
24   this case as an expert in that field, correct?
```

```
                                            Page 15

1        A.      Correct.
2                      MR. TISI:  All right.  I'd
3          like to hand you what is marked as
4          Exhibit Number 1, which is a copy of your
5          report but I -- excuse me.  A copy of
6          your curriculum vitae.
7                      (Document marked for
8          identification as Sutcliffe Exhibit 1.)
9    BY MR. TISI:
10       Q.      And this is -- this is curriculum
11   vitae.
12                  Is this your professional resumé?
13       A.      Correct.
14       Q.      Is it complete as of today?
15       A.      Let me just check one thing.
16                  If it was -- came from the report,
17   it is complete as of today.
18                      MR. TISI:  Okay.  And Exhibit
19          Number 2 I'm going to have marked,
20          although I see you have in front of you,
21          your expert report with appendices and
22          exhibits.
23                      (Document marked for
24          identification as Sutcliffe Exhibit 2.)
```

Page 19

1          Q.        Now, in your report, Exhibit
2   Number 2, you have a section entitled "Plaintiffs'
3   Causal Narrative" where you characterize what you
4   believe to be the plaintiffs' claims, correct?
5          A.        Correct.
6          Q.        All right.  And you call us and our
7   expert's interpretation of the data and the
8   evidence cherry-picking, don't you?
9          A.        Yes.
10          Q.        And you mention that several times
11   in your report, correct?
12          A.        Yes.
13          Q.        You would never want to be accused
14   of that, correct?
15          A.        It is a bad practice.
16          Q.        And you believe that your
17   methodology does not -- accounts for
18   cherry-picking, correct?
19          A.        My methodology is a well-known,
20   established qualitative methodology that is very
21   -- that is excellent for the kind of work that I
22   have done.
23          Q.        Okay.  And you call that sensemaking
24   methodology, correct?

Page 20

1          A.          No, that's not correct.

2          Q.          What is the methodology called?

3          A.          The methodology is a qualitative

4    methodology.

5          Q.          What is it called?

6          A.          It is called a qualitative

7    methodology.

8          Q.          That doesn't have a name in your --

9    in your field of practice?

10                      Qualitative methodology is something

11   that can be used across -- across disciplines.

12                      Do you have anything in your field

13   where you identify it as a methodology?

14         A.          A qualitative methodology can be

15   used across disciplines, and it is used in the

16   area of organization science.

17         Q.          Okay.  Now, particularly you

18   reviewed the reports of David Kessler, former FDA

19   Commissioner, correct?

20         A.          I have looked at many -- at many

21   reports.  I'm not sure what you're asking.

22         Q.          I'm asking you:  You've reviewed the

23   expert report of David Kessler, an FDA

24   Commissioner, correct?

Page 21

1      A.      Yes, I did.

2      Q.      Okay.

3      A.      Which did not include any kind of

4  methodology.

5      Q.      Okay.  That wasn't my question.

6  Please answer my questions, ma'am.

7      A.      I reviewed the report, and as I

8  said, it didn't contain a methodology.

9      Q.      That wasn't my question.

10              Did you review the report?

11     A.      I reviewed the report.

12              MR. EWALD:  She answered your

13      question.

14  BY MR. TISI:

15     Q.      Okay.  Did you -- did you review the

16  report of George Newman, an expert in marketing

17  and a psychologist, correct?

18     A.      I did.

19     Q.      Okay.  Did you review any other

20  reports that you can remember of any other

21  plaintiffs' experts?

22     A.      I do not.  I may have reviewed

23  reports over the five years I've been studying

24  this.  I don't remember.

Page 22

1              Oh, yeah.  I reviewed David or --

2    oh, my gosh.  Now I'm blocking on his name but,

3    anyway, I reviewed reports last fall.

4         Q.    Do you remember who it was?

5         A.    David Michaels.

6         Q.    Okay.  And have you reviewed any

7    depositions --

8         A.    I --

9         Q.    -- of any experts?

10        A.    I reviewed Dr. Kessler's deposition.

11        Q.    Okay.  Did you review Dr. Newman's

12   deposition?

13        A.    No.

14        Q.    And you believe their analysis is

15   flawed because they engage in what you call

16   hindsight bias, correct?

17        A.    Correct.

18        Q.    Okay.  And to combat hindsight bias,

19   you say your methodology considers what was being

20   said and done in the medical and scientific

21   community and by other stakeholders and what they

22   did at the time, correct?

23        A.    Correct.

24        Q.    Okay.  And not with the benefit of

Page 23

1    what we know now, correct?

2          A.      Not -- not with the benefit of what

3    we know now.

4          Q.      All right.  So --

5          A.      I wanted to understand the context

6    of action from the perspective of the

7    participants.

8          Q.      At the time?

9          A.      What was happening at the time.

10         Q.      And so it's important for you as an

11   expert to actually look at the data as it

12   developed over time, correct?

13         A.      I looked at a large amount of data

14   over time.  In fact, a large amount of data over

15   decades.

16         Q.      Perfect, and we're going to ask --

17   I'm going to ask some of those questions.

18                 Okay?

19         A.      (Nods head).

20         Q.      Okay.  So what is sensemaking?

21   We've talked about that as part of your process.

22                 What is sensemaking?

23         A.      Sensemaking is a well-established

24   conceptual framework in organization theory.

Page 24

```
 1        Q.        Okay.  And what is sensemaking?
 2   Explain it to me as if I was your Uncle Charlie.
 3   Tell me in a very basic way.
 4        A.        In a basic way, sensemaking is the
 5   process of how information enters an organization,
 6   how it's interpreted, how it's acted upon, how it
 7   is reaffirmed.  Essentially, it answers two
 8   questions:  What's the story?  And now what?
 9        Q.        Okay.  What's the story?  And now
10   what?
11                  And that's dependent upon the things
12   that were available, for example, in this case,
13   the medical and scientific literature, correct?
14        A.        It's dependent on many kinds of
15   things.
16        Q.        Okay.  I'm asking you the kinds of
17   examples.
18                  What was being said in the medical
19   and scientific committee -- scientific community
20   one of the things that would come into an
21   organization like this?
22        A.        It's -- I guess I would back up --
23        Q.        Uh-huh.
24        A.        -- and I would say that it's
```

Page 49

1    of the asbestos.  True?

2          A.        Asbestos is part of my report,

3    correct.

4          Q.        Okay.  And in addition to your

5    report, there are numerous tables to your report.

6    For example, there are tables that deal with

7    mining, the characteristics of asbestos, testing

8    methods, test results.

9                    You have all kinds of tables and

10   appendices related to those issues, correct?

11         A.        Correct.

12         Q.        All right.  You're not a

13   mineralogist, are you?

14         A.        I'm not a mineralogist.

15         Q.        You're not a geologist?

16         A.        I'm not a geologist.

17         Q.        You're not an expert in mining?

18         A.        Correct.

19         Q.        You're not an expert in mining for

20   talc?

21         A.        Correct.

22         Q.        You're not an expert in testing talc

23   for the presence of asbestos or any unwanted

24   constituents, correct?

Page 50

1        A.        I am not a toxicologist or a

2   microscopist.

3        Q.        That wasn't my question.

4                  You're not an expert in testing for

5   talc?

6        A.        I am not a testing, correct.

7        Q.        Actually, you know nothing, you have

8   known nothing.  You're not an expert in PLM, XRD,

9   or any other testing that you referred to in your

10  report, correct?

11       A.        No.  What I know of these fine

12  details are what I've learned over five years.

13       Q.        Right.

14                 In the context of the litigation?

15       A.        In studying this project.

16       Q.        Right.

17       A.        In studying -- in studying thousands

18  of pages of data.

19       Q.        Would you -- would you characterize

20  yourself now as an expert in testing?

21       A.        I'm not an expert on testing, and

22  I'm not opining in this -- in this matter.

23       Q.        Okay.  Now, I've reviewed all the

24  references in your CV.

Page 51

1        A.        Uh-huh.

2        Q.        Done a word search of that.

3                  Would it surprise you that the word

4    "asbestos" doesn't appear in any of your published

5    literature?

6        A.        Okay.

7        Q.        Does it?

8        A.        Not that I recall.

9        Q.        Now, in your report, Exhibit

10   Number 2, there's a Figure 1.

11                 Do you see that?

12       A.        Oh, maybe I should look at your

13   exhibit.

14       Q.        It's on F-1.i.

15                 Here I can show you?

16       A.        Yeah.

17       Q.        Okay.  It talks about serpentine and

18   amphiboles and asbestiform and non-asbestiform and

19   tremolite and chrysotile.

20                 You see all those characterizations?

21       A.        Yes.

22       Q.        You've never used those words in

23   your professional practice outside of this

24   litigation, have you?

                                        Page 52

1          A.       I have not written about these

2     things, correct.

3          Q.       You've never even probably said

4     those words.  True?  Have you --

5          A.       I have said them a lot, actually.

6          Q.       Have you ever used the word

7     "chrysotile" outside of litigation?

8          A.       I've -- first of all, I don't use it

9     inside litigation but, no, I don't think I've

10    talked about it.

11         Q.       Well, it's in your report?

12         A.       Yes.

13         Q.       Okay.  Do you know whether or not

14    any of the testing that J&J did was specifically

15    designed to test for chrysotile?

16         A.       I believe that TEM is -- is -- is a

17    sensitive method.

18         Q.       Okay.  Before this case, before

19    being involved in this project, did you know what

20    an amphibole is?

21         A.       I do not remember whether I knew or

22    I didn't know.

23         Q.       Do you know -- did you know whether

24    or not you knew what chrysotile was?

Page 53

1          A.        I honestly do not remember whether I
2     did or not.
3          Q.        You're not a toxicologist, ma'am.
4     True?
5          A.        I am not a toxicologist, correct.
6          Q.        Have you ever taken a course in
7     toxicology?
8          A.        I am not a toxicologist, correct.
9          Q.        Okay.  That wasn't my question.
10                   Did you ever take a course in
11    toxicology?
12         A.        Again, I haven't studied toxicology.
13         Q.        Have you ever -- can you answer my
14    question?
15                   Have you ever taken -- I'm not a
16    statistician, but I took statistics in college.
17         A.        Uh-huh.
18         Q.        My question is:  Did you take --
19    have you ever taken a course in toxicology?
20         A.        I have not taken a course in
21    toxicology.
22         Q.        Thank you.
23                   Have you ever -- you are not an
24    epidemiologist?

Page 54

1          A.      I'm not an epidemiologist.  Of

2     course, I have read the literature.  In my last

3     book, I drew a lot on epidemiology of medical

4     mistakes.

5          Q.      Ma'am, that wasn't my question.

6                    MR. TISI:  Could you please

7          read back my question.

8                    (The reporter read the record

9          on page 53 lines 23-24.)

10                   THE WITNESS:   Again, I'm not

11         an epidemiologist --

12    BY MR. TISI:

13         Q.      Thank you.

14         A.      -- but I certainly have read many

15    epidemiological studies.

16         Q.      Except not the epidemiology studies

17    in this case?

18         A.      In this case, that was not my

19    assignment.

20         Q.      All right.  And have you ever taken

21    a course in epidemiology?

22         A.      It's hard to remember whether or not

23    in my nursing studies.  I -- I don't recall

24    whether I did or not.

Page 55

1        Q.        Let's talk a bit about cosmetics.

2                   We talked about the Food, Drug, and

3    Cosmetic Act.

4                   You are not an expert in FDA

5    regulations, are you?

6        A.        I'm not a regulatory expert,

7    correct.

8        Q.        Okay.  You're not an expert in FDA

9    regulations as they pertain to Johnson's Baby

10   Powder or Shower to Shower, are you?

11       A.        I am not -- again, I'm not a

12   regulatory expert and I'm not opining on that in

13   this case.

14       Q.        Do you know the standard for adding

15   a warning to a cosmetic?

16       A.        I do not.

17       Q.        Do you know the standard for

18   adulteration or misbranding?

19       A.        I am not opining in this case on --

20   on any regulatory standards.

21       Q.        Okay.  Have you ever drafted or

22   participated in the drafting of a label for a

23   cosmetic product?

24       A.        Again, I'm not a regulatory expert.

Page 56

1    I have not done --

2          Q.        That wasn't my question.

3          A.        I have not done anything related

4    to -- to warnings.

5          Q.        Okay.  So my question is:  Have you

6    ever drafted a label of any kind for a cosmetic

7    product?

8          A.        I have not.

9          Q.        Okay.  Have you ever drafted

10   instructions for a cosmetic product?

11         A.        I have not.

12         Q.        Have you ever participated in

13   drafting warnings or instructions for any product

14   covered by the Food, Drug, and Cosmetic Act?

15         A.        I am not a regulatory expert and I

16   have not done -- I have not created a warning.

17         Q.        Okay.  Have you ever participated in

18   any way, outside of this litigation, in

19   sensemaking with respect to drafting a warning or

20   an instruction for a product covered by the Food,

21   Drug, and Cosmetic Act?

22         A.        I don't -- in your -- could you --

23   could you --

24                        MR. EWALD:  Yeah.

Page 72

1    culture in the time leading up to the Deepwater

2    Horizon.

3         Q.    And your conclusion was they did

4    everything right?

5         A.    I had, you know, broad conclusions,

6    and I don't believe -- I think you're

7    mischaracterizing what I -- what I said.

8         Q.    You said they had good safety

9    culture.  True?

10        A.    I am saying that BP was enacting,

11   enabling, and elaborating a safety culture and it

12   was -- and they -- and they were taking actions to

13   do that.

14        Q.    And you were designated by BP,

15   correct?

16        A.    I -- I beg your pardon?

17             MR. EWALD:  Objection to form.

18   BY MR. TISI:

19        Q.    You were designated as an expert?

20   You worked for BP in that litigation?

21        A.    Yes, I worked for BP.

22        Q.    And your testimony was struck in

23   that case, wasn't it?

24        A.    No, that -- my testimony in the --

Page 73

1    in the -- there were two phases.  I think it was

2    the -- I can't remember what the names of them

3    are.

4                    My testimony was struck because

5    another expert, his testimony was struck and so

6    mine was not needed.

7            Q.      Okay.  Why was his testimony struck?

8            A.      I have no idea.

9            Q.      Okay.  So your testimony was not

10   needed?

11           A.      My testimony was not needed.

12           Q.      Have you ever been struck in any

13   other case involving -- in litigation as either

14   being not qualified, not applying appropriate

15   methodology, or your testimony doesn't fit the

16   case?

17           A.      Are you asking about a Daubert

18   motion?

19           Q.      Not necessarily.  I'm asking struck

20   for any reason.

21           A.      As far as I know, my testimony has

22   never been struck.

23           Q.      Other than BP?

24           A.      Aside from when the expert was

Page 74

1   eliminated and my testimony wasn't needed.

2         Q.      Okay.  All right.  Do you have a

3   copy of that order?

4         A.      Do I?  No.

5                      MR. TISI:  All right.  Let me

6            go to Exhibit Number 3, which is the

7            notice of deposition.

8                      (Document marked for

9            identification as Sutcliffe Exhibit 3.)

10  BY MR. TISI:

11        Q.      Now, there's a lot to cover here,

12  but I'm going to kind of cut it down to the -- to

13  the minimum here.

14                 Have you seen this document before?

15        A.      Yes.

16        Q.      Okay.  Have you reviewed documents?

17  Have you reviewed your files for complying with

18  this subpoena, this notice of deposition?

19        A.      I believe that I have.

20        Q.      Okay.  First of all, you charge

21  $1100 an hour to do your work.  True?

22        A.      Correct.

23        Q.      All right.  And how many hours have

24  you devoted to this project over the years?

Page 98

1    for a moment.  We've talked about your

2    qualifications.  Let's talk about your

3    methodology.

4                    You used the word "sensemaking."

5                    Would you explain that in layman's

6    term for Uncle Charlie?

7         A.        I believe I answered that question

8    earlier today.

9         Q.        Enlighten me again, please.

10        A.        Again, it is a well-established

11   framework in organization studies, organization

12   behavior, organization theory.

13        Q.        And what does it attempt to do?

14        A.        It attempts to provide insight into

15   how people -- how organizations size up the

16   situation.  How they understand what they're

17   facing.  Before people and organizations take

18   action, they have to understand what they're

19   facing.  This is a way of understanding the

20   institutionalized knowledge that is developed in

21   an organization.

22        Q.        Okay.  So I'm just a layperson here.

23   I have to confess.  This is the first time I've

24   ever deposed a behavioral, organizational expert.

Page 99

1              Sensemaking is an attempt to -- and
2     what's the phrase you just used?  I wish I had it
3     in front of me.  It's an attempt to look at what
4     they're facing at the time?
5          A.      Sensemaking is a way to understand
6     the process of how entities come to understand and
7     how they develop their institutionalized knowledge
8     about particular situations.
9          Q.      Okay.  So if we are to use the word,
10    what are they facing?  Okay?  We talked about
11    before.
12             One of the things we're trying to
13    figure out, for example, what J&J was facing in
14    terms of -- I'm not talking about disruptive
15    ambiguity, but in terms of what they're facing on
16    the issues relating to the safety of talc, that
17    could come from various sources both external and
18    internal, correct?
19         A.      It's a process --
20         Q.      Right.
21             And what they're facing --
22         A.      -- of how --
23         Q.      I'm sorry.
24         A.      Can I just continue?

Page 107

1   well-being of its consumers.

2          Q.      Over time?

3          A.      Its patterns.  I said earlier that I

4   was looking at patterns of action over decades.

5          Q.      That's what I want to know.  Okay?

6                  It's not limited to a particular

7   month or a day.  It's looking at the lifecycle of

8   the product, and in this case, we're talking

9   about, let's say, from the late '60s, early '70s

10  through the present.  True?

11         A.      I am not -- I am not thinking about

12  it as a lifecycle of the product.  I am thinking

13  about it as a process --

14         Q.      Okay.

15         A.      -- of understanding and creating

16  institutionalized knowledge over time.

17         Q.      Now, you talked about disruptive

18  ambiguity several times.  Let me get a definition

19  of what that means.

20         A.      It means that there's something

21  that, you know, surprised us that we weren't

22  expecting.

23         Q.      Okay.

24         A.      It just means uncertainty.

Page 108

1    Ambiguity means that there are multiple and
2    conflicting interpretations of what's going on.
3         Q.        Okay.  So uncertainty would, for
4    example, the Cramer study, the publication of the
5    Cramer study and the subsequent epidemiologies
6    that came out, be part of raising questions that
7    would be disruptive ambiguity?
8         A.        I think any -- any -- any study or
9    any piece of information that conflicts with what
10   our -- what we think would be considered --
11   considered that.  I mean, it's not black and
12   white.  I mean, it's --
13        Q.        Okay.
14        A.        There are interpretations.
15        Q.        It happens over time.  Things
16   happen, and I get it.  Look, this part of it I'm
17   really just trying to understand.  Okay?
18        A.        Yeah.
19        Q.        So -- so over time things happen
20   that cause people to react and evaluate.  True?
21        A.        Over time things happen that aren't
22   consistent with our -- with the way we think the
23   world is working and so they -- you know, it's a
24   surprise.

Page 137

1    not in your report is what did the epidemiology

2    studies say, correct?

3        A.        Again, you know, I was not -- I was

4    not charged with looking at the epidemiology

5    studies.  I'm not opining on epidemiology.

6        Q.        But you're not -- but you're not an

7    expert in asbestos either, and you do a lot of

8    opining on that.  True?

9        A.        I am --

10                    MR. EWALD:  Objection to form.

11                    THE WITNESS:    I am not

12          opining on asbestos either.

13    BY MR. TISI:

14        Q.        Go to paragraph 12, if you could, of

15    your report.

16                    Okay.  Your Summary of Opinions

17    section.  I just want to make sure I understand

18    the scope of your report.

19                    It says you were retained by J&J and

20    you list what you were retained to do here,

21    correct?

22        A.        Correct.

23        Q.        Okay.  And after you talk about

24    Ms. Carl and Ms. Balderrama, you say that

Page 159

1          Q.       And J&J also knew that its test

2    could not guarantee that talc was 100 percent

3    asbestos-free.  True?

4          A.       Again, I am not opining.  I'm not a

5    -- I'm not a --

6          Q.       Yeah.

7          A.       -- microscopist or a toxicologist.

8                   What I do know is that J&J adopted a

9    technique that went beyond the industry standard

10   to test its products over decades.

11         Q.       You test -- in one of the very last

12   footnotes in one of your appendices -- and I'll

13   get it in a moment because it's a little bit out

14   of order of where I was going to go.

15                  You acknowledge that there were

16   detection limits of the tests that they -- that

17   they -- that they employed.  True?

18         A.       Again, I -- I am not opining on

19   testing.  I'm not a testing expert.

20         Q.       Okay.

21         A.       That is better left -- that question

22   is better left for somebody else.

23         Q.       Next thing it says here -- we'll

24   talk about that.  FDA.  Next sentence.

Page 175

1    a safety culture, have a defined set of procedures

2    to follow --

3          A.      Uh-huh.

4          Q.      -- enact them, and then continue to

5    elaborate on them over time.  True?

6          A.      That's what the -- the process that

7    I've outlined for safety culture, which of course,

8    you know, in this case, I didn't -- I wasn't

9    analyzing the safety culture.

10         Q.      Okay.  So as part of your analysis,

11   did you notice that there were clear guidelines in

12   the '70s, '80s, '90s, and 2000s as to whether or

13   not there were policies and procedures, for

14   example, to analyze potential risks?

15         A.      My role in this -- in this case was

16   different than my role in the BP case.

17                 I was not analyzing the safety

18   culture of J&J over time.

19                 What I was doing is what I've said

20   earlier is trying to understand what J&J knew and

21   when about the potential safety -- safety of its

22   product and whether or not their actions were

23   consistent with what I would expect to see in a

24   company that cared about the well-being of its

Page 176

1    consumers.

2          Q.      Well, I think you said "and how they

3    respond to that information."  I'm looking for the

4    words you used, but I wrote them down.  I think

5    you said how they actually.

6          A.      The actions that they take --

7          Q.      Okay.

8          A.      -- in response to developing their

9    institutionalized knowledge.

10          Q.      But the action --

11          A.      For example -- I can give you an

12    example.

13          Q.      I don't really want an example.  I

14    want you to answer my questions.

15          A.      Okay.

16          Q.      So if a company takes actions,

17    oftentimes actions are in a company like this you

18    would expect there to be a policies and procedure

19    that would describe what actions should be taken

20    and when.  True?

21                      MR. EWALD:  I'm sorry.  When

22          you're talking about "this," you're

23          talking about BP?  J&J?

24                      MR. TISI:  J&J.

Page 233

1   light of the ambiguity of the -- of the studies,

2   disruptive ambiguity of the studies, maybe we

3   ought to take risk mitigation"?  Did you see any

4   discussion about that?

5           A.      What I saw is that J&J was closely

6   following the research, that it was paying

7   attention to regulatory bodies, that it was

8   engaging with people in workshops, and that it was

9   being aware of what was -- what regulatory bodies

10  were saying.

11          Q.      So other than being aware, you're

12  not -- move to strike the answer because it's not

13  responsive.

14                  My question was:  other than being

15  aware of the literature, which I agree that they

16  were aware of everything, my question is:  Other

17  than being aware, would you tell me whether or not

18  there was any discussion about whether on balance

19  warnings, instructions or perhaps a change in

20  design ought to -- ought to occur?

21          A.      I was not looking at -- at a single

22  event or whatever.  I'm looking at J&J's pattern

23  of actions over time.

24          Q.      And I'm asking -- I'm asking you

Page 234

1    about actions.

2                    Do you see any actions within J&J

3    where they actively considered whether or not to

4    change to cornstarch?

5                    Let's take it one at a time.

6         A.       First of all, J&J had cornstarch

7    on -- on --

8         Q.       Withdraw.  Excuse me.  Withdraw.

9    Withdraw because I'm going to talk about this as

10   well.

11                   Withdraw Johnson's Baby Powder with

12   talc in favor of its cornstarch.

13                   Do you see any discussion about

14   that?

15        A.       I did not examine that issue.

16        Q.       Okay.  So the answer would be no,

17   you saw no discussion?

18        A.       I can't say that I did or that I

19   didn't.

20        Q.       Well, this is your time to actually

21   answer that question.  Okay?

22        A.       Yeah.

23        Q.       Honestly.

24                   So my question is:  As you sit here

Page 235

1    today, do you remember seeing any discussion in

2    that 15-year period about whether or not you ought

3    to switch -- J&J ought to switch or withdraw its

4    product or at least put a warning label on it?

5           A.      What I saw is that J&J was following

6    the research, was paying attention --

7           Q.      Okay.

8           A.      -- to regulators, and I did not -- I

9    can't say whether they did or they didn't because

10   I wasn't looking at that.

11                        MR. TISI:   Okay.  Let's go to

12         2004, Exhibit Number 25.

13                        Excuse me.

14                        (Document marked for

15         identification as Sutcliffe Exhibit 18.)

16   BY MR. TISI:

17          Q.      This is a different group of

18   researchers from Dr. Mills.

19                        MR. EWALD:   Is that 18?

20                        MR. TISI:   This is Exhibit

21         Number 18, yes, please.

22   BY MR. TISI:

23          Q.      If you look at the left-hand side,

24   it says:

Page 236

```
 1                    "This study provides some support
 2      for the hypothesis that perineal talc use is
 3      associated with an increased risk of EOC."
 4                    Do you see that?  Left-hand side.
 5      Excuse me.  In the abstract.
 6           A.      Where is it?  Left-hand side?
 7           Q.      Left-hand side.  The bolded part,
 8      last sentence.
 9           A.      Oh, okay.  I see it.
10           Q.      See that?
11           A.      "Some support for the hypothesis."
12      I see it.
13           Q.      Now, it also talks about -- if you
14      go halfway down the first full paragraph of the
15      article, it says:
16                    "Collectively, these studies point
17      to a possible etiologic role of talc in ovarian
18      cancer via an inflammatory process at the site of
19      the ovarian epithelium."
20                    Do you see that?
21           A.      I see that.
22           Q.      It goes on in the next paragraph.
23      It says:
24                    "The role of cornstarch powder on
```

Page 237

1    ovarian cancer has also been evaluated in

2    epidemiologic research and a recent review

3    concluded that there is no association between

4    this type of powder and increased risk of ovarian

5    cancer."

6                    Do you see that?

7         A.        I see that.

8         Q.        But then it goes on to say:

9                    "Cornstarch is also not thought to

10   exert the same toxicologic reaction in human

11   tissues as does talc."

12                   Do you see that?

13        A.        I see that.

14        Q.        So they're making a comparison

15   between the risk-benefit of cornstarch and talc in

16   this article, correct?

17        A.        They're raising the issue of

18   cornstarch in the article.  I see where it's

19   written.

20        Q.        And at the very last page of the

21   article, they say the question, however -- the

22   second sentence starts:

23                   "However, given the suggestive

24   though uncertain role of talcum powder and EOC

Page 238

 1    found in epidemiologic studies, including the

 2    present study, users should exercise prudence in

 3    reducing or eliminating use.  In this instance,

 4    the precautionary principle should be invoked,

 5    especially given that this is a serious form of

 6    cancer, usually associated with a poor prognosis,

 7    with no current effective screening tool, steady

 8    incidence rates during the last quarter century

 9    and no prospect for successful therapy.  Unlike

10    other forms of environmental exposures, talcum

11    powder use is easily avoidable."

12                  Do you see that?

13         A.       I see what you're reading, correct.

14         Q.       Is any part of that untrue at the

15    time?  Not with hindsight, but looking at it like

16    right at that snapshot in time in 2004, is any

17    part of that not true from your perspective?

18         A.       I'm just -- I see what's written

19    here.  I can't say whether it's true or not true.

20    It is what the researchers wrote.

21         Q.       Okay.  This isn't referred to in

22    your -- in your sensemaking report, is it?

23         A.       I wasn't looking at -- number one,

24    I've already said that I wasn't looking at a

Page 239

1  systematic analysis of all the studies I looked

2  through.

3      Q.      I'm not asking you to analyze the

4  study.  I'm asking you -- look, and I really want

5  to be fair to you here.

6          We have now gone through several

7  articles and we're going to go through several

8  more where issues are saying not only is there a

9  potential association, which I'm not asking you to

10 do.  You're not an epidemiologist.

11          But as somebody concerned with

12 safety, they're raising questions about whether or

13 not women should be warned, cornstarch ought to be

14 used, women should be instructed not to use it,

15 and studies be done.

16          All those things are being raised in

17 realtime.  True?

18     A.      The research was happening when it

19 was happening.  And at the same time, you know,

20 what I have shown in my analysis is that J&J was

21 paying attention to the scientific research, that

22 it was paying attention to what regulators were

23 saying, that it was paying attention to -- to what

24 was happening.

Page 250

1    accelerated shift from talc to cornstarch.)"

2                    You see that?

3         A.        I see that.

4         Q.        Okay.  Did you see from your review

5    at any time that actually in this time frame J&J

6    was considering changing from talc to

7    cornstarch --

8         A.        That's --

9         Q.        -- in light of what was going on?

10        A.        As I've said before, I have not

11   analyzed any single event or any single issue.

12        Q.        Now, what they're forwarding here is

13   a company -- a press release from the American

14   Cancer Society and other organizations, correct?

15        A.        I don't -- I see what's on here, but

16   I don't know what they're doing with this.  I

17   can't say.

18        Q.        It says:

19                   "Medical Experts Recommend Women Use

20   Cornstarch Powder."

21        A.        I see that.

22        Q.        Realtime, not hindsight bias, right?

23        A.        I see that.

24        Q.        Okay.  1999 internal to J&J.  True?

Page 305

1    either be warned or they should not use talc in

2    their genital area, correct?

3                        MR. EWALD:  Objection.

4          Mischaracterizes the documents.

5                        THE WITNESS:  First of all, I

6          did not do a systematic review of all the

7          studies.  There were many studies we

8          know.  There are many studies, and that

9          wasn't my role here.

10                        My role was to establish that

11         J&J's institutional knowledge about the

12         safety of its product and to determine

13         the extent to which they were taking

14         actions that would show that they're a

15         company that cares about consumers.

16   BY MR. TISI:

17         Q.       And the institutional knowledge of

18   the safety of the products would include documents

19   that include the kinds of things I talked -- I

20   showed you today that, number one, that people

21   were recommending risk mitigation in the '90s and

22   2000s.  True?

23         A.       Again, there were multiple studies

24   that were going on --

Page 391

1   whether it's a lot or a little.

2        Q.      It's a majority of what you've

3   discussed?

4        A.      I've discussed lots of things in

5   here.

6        Q.      Okay.  All right.  We'll let the

7   judge understand and take a look at your report

8   and see how much asbestos you have discussed.

9                But based upon everything that you

10  know, distilling it in its most clear form, is the

11  testing methodology used by J&J -- this really is

12  a yes or no question -- a hundred percent

13  sensitive for the detection of asbestos?  100

14  percent.

15                    MR. EWALD:  Objection to form.

16                    THE WITNESS:   I am not

17        opining on testing or sensitivity,

18        reliability or validity of the testing.

19  BY MR. TISI:

20       Q.      Okay.  Well, that cuts about -- out

21  about 90 percent of your report.  So thank you.

22                    MR. EWALD:  Objection to form.

23        Mischaracterizes testimony.

24  BY MR. TISI:

Page 396

1                    "There is a difference between those
2       two, two statements, yes."
3            A.        I see what's written.
4            Q.        Okay.  So you would agree with
5       Dr. Hopkins that there's a difference between
6       saying something is asbestos-free and something
7       saying that there's no detectable asbestos,
8       correct?
9            A.        Again, I am not a toxicologist, and
10      I am not opining on that.
11                   What I do know is that premier
12      scientists in the world -- Dr. Pooley, for
13      example -- examined Italian talc, examined Vermont
14      talc and found no asbestos, as well as other --
15      other experts as well.
16           Q.        Honestly, again, not answering my
17      question.
18                   My question is:  Is there a
19      difference between saying talc is asbestos-free
20      and talc -- there's no detectable level of --
21      there's no detectable talc?
22           A.        Again --
23           Q.        Asbestos.
24                   I'm asking:  Is there a difference,

Page 502

1                    CERTIFICATE OF REPORTER

2    DISTRICT OF COLUMBIA        )

3                    I, Denise Dobner Vickery, a

4    Registered Court Reporter and Notary Public of

5    the District of Columbia, do hereby certify that

6    the witness was first duly sworn by me.

7                    I do further certify that the

8    foregoing is a verbatim transcript of the

9    testimony as taken stenographically by me at the

10   time, place and on the date herein set forth, to

11   the best of my ability.

12                   I do further certify that I am

13   neither a relative nor employee nor counsel of

14   any of the parties to this action, and that I am

15   neither a relative nor employee of such counsel,

16   and that I am not financially interested in the

17   outcome of this action.

18

19                        _Denise D. Vickery_

20

21                   DENISE DOBNER VICKERY, CRR,RMR

                     Notary Public in and for the

22                   District of Columbia

23

24   My Commission expires:  March 14, 2028