# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE: JOHNSON & JOHNSON TALCUM POWER PRODUCTS MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | No. 3:16-md-02738-MAS-RLS<br><br>MDL No. 16–2738 (MAS) (RLS) |

## DEFENDANTS JOHNSON & JOHNSON AND LLT MANAGEMENT LLC'S OPPOSITION TO THE PLAINTIFFS' STEERING COMMITTEE'S MOTION TO EXCLUDE THE ASBESTOS TESTING OPINIONS OF MATTHEW S. SANCHEZ, PH.D., ANN G. WYLIE, PH.D. AND SHU-CHUN SU, PH.D.

# TABLE OF CONTENTS

**Page(s)**

INTRODUCTION ...................................................................................................1

BACKGROUND ...................................................................................................4

ARGUMENT ........................................................................................................6

I.  Dr. Su's Opinions Are Scientifically Valid And Should Not Be Excluded. .......................................................................................................6

  A.  Dr. Su and His Opinions..........................................................................6

  B.  Dr. Su's did not offer new opinions beyond the scope of his report in violation of Rule 26...........................................................8

    1.  The out-of-context deposition testimony on Becke Lines is no reason to exclude any aspect of Dr. Su's opinion. ............9

    2.  Dr. Su's demonstratives were not produced late and do not warrant exclusion. ............................................................11

    3.  Dr. Su's demonstratives are no basis to exclude his entire report. ...................................................................................15

  C.  Plaintiffs' "reproducibility" argument is in fact an argument against Dr. Longo, not Dr. Su............................................................16

  D.  Dr. Su did not cherry-pick evidence and did not rely on speculation or *ipse dixit*.......................................................................17

II.  Dr. Sanchez's Opinions Are Scientifically Valid And Should Not Be Excluded. .....................................................................................................21

  A.  Dr. Sanchez, His Opinions, and Background On Asbestos................21

  B.  Dr. Sanchez will not offer any testimony on health effects. ..............22

  C.  Dr. Sanchez uses the established definition of asbestos and a reliable methodology.............................................................................23

  D.  Dr. Sanchez completed a robust analysis of historical test results of J&J talc. ...................................................................................27

E.    Dr. Sanchez's opinions regarding source mines are based on empirical evidence. ............................................................28

F.    Dr. Sanchez Appropriately Critiques Drs. Kessler and Sage's Geological and Mineralogical Opinions ...............................31

III.    Dr. Wylie's Opinions Are Scientifically Valid And Should Not Be Excluded. .........................................................................32

A.    Dr. Wylie and Her Opinions. .................................................32

B.    Any criticisms Dr. Wylie's prior *outside-of-litigation* tests of Johnson's Baby Powder are not relevant. ...........................33

C.    Plaintiffs' hodgepodge of criticisms are incorrect and serve as no basis to exclude any portion of Dr. Wylie's opinions. ...................34

CONCLUSION .......................................................................38

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Abilify (Aripiprazole) Prods. Liab. Litig.*,
    299 F. Supp. 3d 1291 (N.D. Fla. 2018) .............................................................34

*Dal-Far Realty, LLC v. Peerless Indem. Ins.*,
    2017 WL 11476223 (D.N.J. June 12, 2017)................................................14, 15

*Holbrook v. Lykes Bros. S.S. Co.*,
    80 F.3d 777 (3d Cir. 1996) ...............................................................................34

*In re Paoli R.R. Yard PCB Litig.*,
    35 F.3d 717 (3d Cir. 1994) ...............................................................................14

*In re Zyprexa Prods. Liab. Litig.*,
    489 F. Supp. 2d 230 (E.D.N.Y. 2007) ..............................................................34

**Statutes**

15 USC § 2642(3) (federal Toxic Substances Control Act) ....................................23

**Other Authorities**

29 CFR § 1910.1001(b) ...........................................................................................23

30 CFR § 56.5001(b) ...............................................................................................23

40 CFR § 763.163 .............................................................................23, 25, 26, 28

39 Fed. Reg. 24317 ..................................................................................................23

FRCP 26 ....................................................................................................3, 8, 11, 13

Defendants Johnson & Johnson and LLT Management LLC submit this Opposition to The Plaintiffs' Steering Committee's Motion To Exclude The Asbestos Testing Opinions Of Matthew S. Sanchez, Ph.D., Ann G. Wylie, Ph.D. And Shu-Chun Su, Ph.D. (ECF No. 33006).

## INTRODUCTION

While Plaintiffs' motion targets Defendants' experts Dr. Su, Dr. Sanchez, and Dr. Wylie, the real focus of the issues Plaintiffs raised in their motion is their own expert Dr. William Longo. Dr. Longo is Plaintiffs' main testing expert who tests samples of Defendants' talc products and purports to find asbestos.

Dr. Longo uses a type of polarized light microscopy technique and claims to find a type of asbestos known as "chrysotile." This method turns on ascertaining the color that various particles appear under a microscope when coated in a particular oil. Talc should appear a pale yellow, and chrysotile asbestos should appear purple. But Dr. Longo is not accurately reporting the color of the particles he examines. For example, Dr. Longo calls the particle below purple, and therefore concludes it is asbestos, even though it is plainly yellow.

1



Dr. Su, Dr. Sanchez, and Dr. Wylie all explain why Dr. Longo's testing is wrong, including the fact that his lab is simply misreporting the colors of the particles. There are no methodological flaws with their opinions about why Dr. Longo's testing is unreliable. Dr. Sanchez has also conducted his own testing of Defendants' products. Rather than go after the core of these experts' opinions, Plaintiffs raise a number of small criticisms regarding issues peripheral to Defendants' experts' reports. All are meritless and none are a reason to exclude any component of any expert's opinion.

**Dr. Su.** Dr. Su did not offer any new opinion at his deposition. He simply produced images that illustrated the opinions he already had. For example, he produced images showing how Dr. Longo's lab is suppressing the illumination in

their microscope, an opinion expressly disclosed in his report. Nor would any of Plaintiffs' Rule 26 arguments lead to exclusion in any event. That extreme Rule 26 sanction is limited to situations of "willful deception or "flagrant disregard" of the rules. Moreover, Plaintiffs never objected to the images at the time of disclosure, and they proceeded to depose him not just for one full day but for *another full* day a week later. Plaintiffs never suggested their deposition of Dr. Su was not sufficient to address these images or that they needed additional time. They only first raised the supposed disclosure issue in their motion seeking the most extreme remedy possible. Plaintiffs were simply not prejudiced since they had ample time to depose Dr. Su on these images well after they were produced.

**Dr. Sanchez.** Dr. Sanchez uses the established definition of asbestos that is reflected in every federal statute and regulation. For his testing, he—unlike Dr. Longo—uses one of only three generally accepted testing methodologies to determine if a sample is composed of minerals with an asbestiform habit and are therefore asbestos. His method is unquestionably reliable.

**Dr. Wylie.** Plaintiffs chiefly raise criticisms of Dr. Wylie's documentation procedures for testing she conducted of talc products *outside of litigation* that she is not relying on in any way. That testing is totally irrelevant.

This Court should deny Plaintiffs' motion in its entirety.

3

# BACKGROUND

Plaintiffs' expert Dr. Longo is Plaintiffs' main testing expert. An analyst at his lab—Material Analytical Services (known as "MAS")—tested bottles of Defendants' talc products and claims he found asbestos in the bottles. The method MAS uses that is primarily at issue in Plaintiffs' motion is his polarized light microscopy ("PLM") method to test for the presence of a type of asbestos known as "chrysotile."

Under the type of PLM analysis Dr. Longo uses, the mineral type of a particle is determined by identifying the color that the particle appears under the microscope after coating it in a particular oil.[1] This is sometimes known as "central stop dispersion staining" or just "dispersion staining." More precisely, the color is matched to a wavelength of light (in nanometers) which in turn is matched to a chart that provides an associated "refractive index value" or "R.I" Value.[2]

---

[1]    (See Tr. 279:3-5, *Clark v. Johnson & Johnson*, No. MID-L-003809-18AS (N.J. Super. Ct. May 30, 2024) ("Longo Clark Hr'g Vol. II") (attached as Ex. 1 to the declaration of Matthew Bush ("Bush Decl."); Dep. of William E. Longo, Ph.D. 72:15-17, 75:23-76:9, *Forrest v. Johnson & Johnson*, No. 1522-CC00419-02 (Mo. Cir. Ct. Feb. 8, 2021) ("Longo 2/8/2021 Forrest Dep.") (attached as Ex. 2 to Bush Decl.)

[2]    (*Clark v. Johnson & Johnson* at 48:9-49:1, 113:12-18, No. MID-L-003809-18AS (N.J. Super. Ct. May 29, 2024) ("Longo Clark Hr'g Vol. I") (attached as Ex. 3 to Bush Decl.); *see also* R.I. Value Demonstrative (attached as Ex. 4 to Bush Decl.)

But as discussed at length in Defendants motion to exclude Plaintiffs' experts' asbestos related opinions, MAS is misreporting the colors of the particles. Take for example this particle below:

**Dr. Longo's Claimed "Chrysotile" Asbestos (Ex. 7 at 33)**

**Dr. Longo's Claimed Color**





Dr. Longo admitted that particle is "brownish gold."[3] (Talc should appear yellow.) However, Dr. Longo treats that particle as the purple color depicted on the right for purposes of his analysis—the color chrysotile should look like.[4]

---

[3]    (Dep. of William E. Longo, Ph.D. 263:5-18, *Eagles v. Arvinmeritor, Inc.*, No. 22-CV-018294 (Cal. Super. Ct. October 23, 2023) ("Longo Eagles Dep. (Vol. II)") (attached as Ex. 5 to Bush Decl.).)

[4]    (Dep. of William E. Longo, Ph.D. 308:4-309:7, *Eagles v. Arvinmeritor, Inc.*, No. 22-CV-018294 (Cal. Super. Ct. Nov. 3, 2023) ("Longo Eagles Dep. (Vol. III)") (attached as Ex. 6 to Bush Decl.). Dr. Longo's analyst reports a numerical "refractive index" or "R.I." for the color of the particle he claims to see. Those

Dr. Su, Dr. Wylie, and Dr. Sanchez's qualifications and opinions are discussed in more detail below. Fundamentally, Dr. Su and Dr. Wylie are rebuttal experts to Dr. Longo. While they did not test talc themselves, they explain the flaws in Dr. Longo's methodology, including the fact that he is simply misreporting the colors of the particles. Dr. Sanchez also critiques Dr. Longo's method but additionally has tested numerous samples of Defendants' talc products and concludes they do not contain asbestos.

## ARGUMENT

### I.    Dr. Su's Opinions Are Scientifically Valid And Should Not Be Excluded.

#### A.    Dr. Su and His Opinions

Dr. Su is an expert in optical minerology and microscopy.[5] He majored in geochemistry at the department of Geology at Peking University for his bachelor's degree.[6] He received a master's degree at the Minerology Institute of Geology,

---

indices correspond to particular colors. Dr. Longo's report lists this particle as R.I. 1.564, which corresponds to a purple of 560 nanometers depicted above. (Report of William E. Longo, Ph.D. at 33, Feb. 28, 2023 ("Longo 2/28/23 Rpt.") (attached as Ex. 7 to Bush Decl.); Longo *Clark* H'rg Vol. 1 at 48:9-49:1, 113:12-18.)

[5]    (Expert Report of Shu-Chun Su dated May 21, 2024 at Ex. A. pg. 1 ("Su Rpt.") (attached as Exhibit 6 to the to the Certification of Leigh O'Dell, Esq. ("O'Dell Decl.").)

[6]    (*Id.* at 1.)

Chinese Academy of Science.[7] And he received a Ph.D. in geology from Virginia Institute of Technology in 1985.[8]

In 1988, Dr. Su became a technical expert in bulk and airborne asbestos programs at the National Voluntary Laboratory Accreditation Program.[9] In that role, he has conducted "approximately one thousand on-site audits of asbestos laboratories, mainly in the United States but also in Canada, Japan, and Korea."[10] He has authored 29 publications on asbestos analysis. His most well-known is a "standard operating procedure to quickly and accurately measure the refractive index (RI) of asbestos minerals."[11]

Dr. Longo himself testified that Dr. Su is a "well respected scientist," "an authority in terms of mineral identification through staining techniques," and that essentially "every lab in the country" uses Dr. Su's methods for their PLM analysis.[12]

---

[7]    (*Id.*)

[8]    (*Id.*)

[9]    (*Id.*)

[10]   (*Id.*)

[11]   (*Id.* at 2.)

[12]   (*Prudencio v. Johnson & Johnson* at 5133:11-5134:11, No. RG20061303 (Cal. Super. Ct. July 7, 2021) ("Longo Prudencio 7/7/2021 Tr.")) (attached as Ex. 8 to Bush Decl.)

In fact, Dr. Su even authored the method that Dr. Longo purports at least in part to rely on.[13]

Dr. Su offers numerous opinions explaining the methodological flaws in Dr. Longo's work. Most relevant here, Dr Su explains that "MAS's procedure for measuring refractive index values is inaccurate and unreliable."[14] The "refractive index value" is a number assigned to the particle that is derived from its color (based charts authored by Dr. Su) and is used to identify the mineral type of a particle.

Dr. Su offers many reasons for his opinion, most relevant for purposes of the motion before the Court is that MAS is both not using proper illumination settings on the microscope to distort the colors of the particles and that MAS is also simply misreporting the colors that appear on the images.[15]

### B. Dr. Su's did not offer new opinions beyond the scope of his report in violation of Rule 26.

Plaintiffs' lead with a mishmash of different points that seem to boil down to three arguments: (1) Dr. Su's testimony regarding "Becke lines" went beyond his report; (2) Dr. Su's demonstratives showing lighting changes on a microscope went beyond his report; and (3) that the fact that Dr. Su produced demonstratives before

---

[13]    (Dep. of William E. Longo at 229:21-25, *Reyes v. Johnson & Johnson*, No. RG20052391 (Cal. Super. Ct. Sept. 25, 2020) ("Longo Reyes 09/25/2020 Dep.") (attached as Ex. 9 to Bush Decl.); Longo *Prudencio* 7/7/2021 Tr. 5133:11-19; 5146:23-5147:7.)

[14]    (Su. Rpt. at 3 (capitalization altered).)

[15]    (Su. Rpt. at 3-4; *see also* Su Rpt. Ex. C. at 2-14.)

his deposition somehow means his report must have been fatally flawed. All three are wrong.

**1.    The out-of-context deposition testimony on Becke Lines is no reason to exclude any aspect of Dr. Su's opinion.**

Plaintiffs argue that Dr. Su's deposition testimony regarding Becke Lines went beyond the scope of his report. But they take his testimony out of context. A Becke Line analysis is simply another way to analyze a particle using polarized light microscopy. Dr. Su's only point was that if "you're in doubt" about the color of the particle, an analyst could "check with another method" to confirm the results.[16] But Dr. Su's criticism is not that MAS failed to confirm their results with a Becke Line analysis for an ambiguous particle or a close call. It's that MAS is completely misreporting the colors of the particles in the dispersion staining analysis MAS actually conducts.

Dr. Su even expressly testified he was not saying a lack of Becke Line analysis was a reason Dr. Longo's method was incorrect. He was asked "One of the ways that you believe he was incorrect is because he didn't follow the methodology of switching to no-stop in evaluating where the Becke line was," and Dr. Su responded:

---

[16]    (Dep. of Shu-Chun Su, Ph.D. 130:23-131:9, *In Re: Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs., and Prods. Liability Litig.*, MDL No. 16-2738 (D.N.J. July 11, 2024) (attached as Ex. 7 to O'Dell Decl.)

"No I'm not saying that. I'm saying that -- I said he is incorrectly performing the dispersion staining technique."[17]

To be clear, it is not Dr. Su's opinion that "the 'central stop dispersion staining technique' could not accurately measure the RI values of the particles."[18] Dr. Su was instrumental in *creating* the methodology for central stop dispersion staining. Dr. Su's opinion is that Dr. Longo is not reliably or correctly *applying* that methodology.

Here is one example in Dr. Su's report. Dr. Su evaluates this particle that Dr. Longo claims is "chrysotile"[19]:



Dr. Su explains that while the color of this particle is pale yellow, Dr. Longo reports the particle to be a purple-magenta color[20]:

---

[17]    (Dep. of Shu-Chun Su, Ph.D. 204:5-14, *In Re: Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs., and Prods. Liability Litig.*, MDL No. 16-2738 (D.N.J. July 18, 2024) (attached as Ex. 8 to O'Dell Decl.)

[18]    (Pls.' Steering Committee's Mem. of Law in Supp. of Mot. to Exclude the Asbestos Testing Opinions of Matthew S. Sanchez, Ph.D., Ann G. Wylie, Ph.D. and Shu-Chun Su, Ph.D. ("Pls.' Br.") at 16, July 23, 2024 (ECF No. 33006-1).) Pl. Br. at 16.)

[19]    (Su Rpt. Ex. C at 8.)

[20]    (*Id.*)



This example demonstrates that the problem with Dr. Longo's testing per Dr. Su is that Dr. Longo is grossly misidentifying the color—not the lack of a cross-check. No mention of Becke Lines is necessary to demonstrate that Dr. Longo's analysis is plain wrong. Plaintiffs' argument on Becke Lines is just a red herring.

**2.    Dr. Su's demonstratives were not produced late and do not warrant exclusion.**

***Dr. Su's Demonstratives Do Not Violate Rule 26.*** In conjunction with Dr. Su's deposition, Dr. Su produced demonstratives that are visual aids for the opinions in his report. But he does not have any *new opinion*. For example, Plaintiffs focus

11

on Dr. Su's opinion that MAS used "insufficient lighting" with their microscope.[21]
But Dr. Su disclosed in his report that one of many flaws in Dr. Longo's testing is
that "MAS used suppressed light intensity, leading to inaccurate and unreliable
refractive index value determination."[22]

Prior to his deposition, Dr. Su took images of a talc sample on a microscope
(the same one MAS used) using different light intensities to help visually
demonstrate that opinion[23]:

**Dr. Su Talc Image**  **Dr. Su Talc Image**
*(Normal Illumination)*  *(Suppressed Illumination)*    **Dr. Longo Talc Image**



These demonstratives *illustrate* Dr. Su's existing opinion in his report that Dr. Longo
is artificially suppressing the light intensity of his images, which is distorting his
results. But it is simply not true that Dr. Su "went beyond simply clarifying his

---

[21]    (Pl. Br. 17.)

[22]    (Su Rpt. at 3 (capitalization altered).)

[23]    (1.560 Oil Normal Illumination Demonstrative (attached as Ex. 10 to Bush
Decl.); 1.560 Oil Suppressed Illumination Demonstrative (attached as Ex. 11 to
Bush Decl.); Longo 2/28/23 Rpt. at 33.)

opinions to changing them"—as Plaintiffs contend.[24] The opinion is laid out in his report.

Plaintiffs' argument is also hypocritical. Dr. Longo came to his deposition with results from tests of samples from *two new bottles* for the presence of the asbestos that were not listed on his operative 4th Supplemental Report.[25]

***Exclusion Is Not Appropriate.*** At most, these new images constitute supplemental reliance material. Rule 26(e) specifically permits supplemental disclosures and Rule 26(a)(2) governing expert disclosures states that "[t]he parties must supplement these disclosures when required under Rule 26(e)." Fed. R. Civ. Prod. 26(a)(2)(E).

Plaintiffs themselves acknowledge that even if the Court were to conclude any disclosure were improper, exclusion is not automatic. In fact, "the exclusion of critical evidence is an 'extreme' sanction, not normally to be imposed absent a showing of willful deception or 'flagrant disregard' of a court order by the proponent

---

[24]    (*See* Pl. Br. at 18-19). Plaintiffs also mention in passing images related to Calidria (a unique form of chrysotile). Again, Dr. Su already disclosed in his report that "MAS's claim that the particle sizes and RI values of the 'chrysotile' it found in PLM analyses of Johnson's Baby Powder are a match for Calidria chrysotile are inaccurate and not supported by the data." (Su Rpt. at 4.). The images do not represent any new opinion in that regard.

[25]    (Dep. of William E. Longo, Ph.D. 130:11-131:10, *In Re: Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs., and Prods. Liability Litig.*, MDL No. 16-2738 (D.N.J. May 2, 2024) ("Longo MDL (Vol. I) Dep.") (attached as Ex. 12 to Bush Decl.)

of the evidence." *In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717, 791–92 (3d Cir. 1994). It "should not be imposed where an untimely or improper expert disclosure amounts to only a slight deviation from pre-trial notice requirements or occasions only slight prejudice to the movant." *Dal-Far Realty, LLC v. Peerless Indem. Ins.*, 2017 WL 11476223, at *3 (D.N.J. June 12, 2017) (internal quotation marks and brackets omitted). "The Third Circuit has manifested a distinct aversion to the exclusion of important testimony absent evidence of extreme neglect or bad faith on the part of the proponent of the testimony." *Id.* (internal quotation marks omitted).

Any lateness in the disclosure is harmless and certainly does not come anywhere close to "willful deception" or "flagrant disregard" for the rules. While Plaintiffs pay lip service to the factors courts consider, they never actually *apply* them: "(1) the surprise or prejudice to the moving party; (2) the ability of the moving party to cure any such prejudice; (3) the extent to which allowing the testimony would disrupt the order and efficiency of trial; (4) bad faith or willfulness in failing to comply with the court's order; and (5) the importance of the testimony sought to be excluded." *Id.*

***One,*** there was no surprise or prejudice to the moving party. Defendants disclosed the material three days advance of the first day of Dr. Su's deposition pursuant to the agreed-upon deposition protocols so that Plaintiffs were fully aware of these new materials. ***Two,*** to the extent Plaintiffs claim any minimal prejudice

14

existed (which they do not even argue), they had complete ability to cure that prejudice. The second day of Dr. Su's deposition took place a full week later, so Plaintiffs had time to prepare to question Dr. Su about the topic and never requested further additional time due to demonstratives.[26] A common remedy in this situation is simply deposition of the expert. *See Dal-Far Realty,* 2017 WL 11476223, at *6. But Plaintiffs have already received that. They questioned him in depth about the topic.

**Three,** ample time exists before bellwether trials are scheduled to begin, so these new materials would not disrupt the order and efficiency of trial. **Four**, Defendants did not act in bad faith. As discussed above, Defendants disclosed this material in advance. **Finally**, the material help illustrate Dr. Su's opinions on a critical issue in the case: whether Dr. Longo is finding asbestos. No exclusion is warranted.

### 3.  Dr. Su's demonstratives are no basis to exclude his entire report.

Finally, Plaintiffs appear to argue that because he produced his demonstratives after issuing his report, it somehow must be the case that his report was "based on speculation and that lacking any data."[27] That fails as both a matter of logic and fact.

---

[26]     (*See* O'Dell Cert. Ex. 7 (7/11/24 deposition); O'Dell Cert. Ex. 8 (7/18/2024 deposition)

[27]     (Pl. Br. 13.)

Just because he produced demonstratives to *illustrate* his opinion does not mean his opinion must have been flawed. His opinions are all supported by a lengthy report, and Plaintiffs offer no explanation why the bases stated in his report are insufficient to support his opinion. Dr. Su—an undisputed authority on dispersion staining techniques with decades of experience—could tell that MAS illumination settings were low based on the images of that testing MAS produced.

### C. Plaintiffs' "reproducibility" argument is in fact an argument against Dr. Longo, not Dr. Su.

Plaintiffs' next argument is self-defeating. As discussed at length in Defendants' motion to exclude Plaintiffs' experts' asbestos related opinions, Dr. Longo uses a method known as "central stop dispersion staining" which turns on ascertaining the color that the particles appear under a microscope when coated in a particular oil. Dr. Longo relies at least in part on the methods Dr. Su himself authored.[28]

Plaintiffs argue: "Asked whether an analyst following the Su Method could 'get to a point . . . where the analyst has to make an interpretation of what they are seeing,' Dr. Su said 'yes.'"[29] To be clear, what Plaintiffs refer to as the "Su

---

[28]    (Dep. of William E. Longo, Ph.D. 229:21-25, *Reyes v. Johnson & Johnson*, No. RG20052391 (Cal. Super. Ct. Sept. 25, 2020) ("Longo Reyes 09/25/2020 Dep.") (attached as Ex. 9 to Bush Decl.); (Longo *Prudencio* 7/7/2021 Tr. 5133:11-19; 5146:23-5147:7.)

[29]    (Pl. Br. 19.)

Method" is what *Dr. Longo* is using to test talc for the presence of asbestos. Dr. Su did not test talc for the presence of asbestos himself—his report merely responds to Dr. Longo's testing and explains the flaws in that testing. It is not clear what point Plaintiffs are trying to make with the quote discussed above, but if they are trying to argue that the color-identification methodology is incapable of being reproduced, then that means *their own expert* is the one who should be excluded. He is the one using that method.

### D. Dr. Su did not cherry-pick evidence and did not rely on speculation or *ipse dixit*.

Plaintiffs finally raise a hodgepodge of challenges to small issues on the periphery of Dr. Su's opinions that are all meritless.

*"Vermont" Chrysotile.* Plaintiffs first criticize Dr. Su for not knowing off the top of his head any published refractive index range for chrysotile specifically from Vermont. This supposed criticism is not valid for numerous reasons. Plaintiffs appear to be trying to suggest that refractive index values for the particles that Dr. Longo claims are "chrysotile" could be within some sort of established range of "Vermont chrysotile." But Plaintiffs put forward *no published literature whatsoever* showing that the refractive indices that Dr. Su claims falls outside the range for chrysotile are, in fact, within the range of chrysotile from Vermont or any other region. Dr. Longo *himself* does not purport to use any sort of "Vermont chrysotile" literature reference to support this opinion. As Dr. Su explained, "there

has never been any report of the existence of such a unique type of chrysotile with such peculiar optical properties" as what Dr. Longo claims is "chrysotile" in Defendants' talc products.[30] And Plaintiffs also ignore that Dr. Longo is claiming to find chrysotile in Defendants' talc sourced from Italy and China as well—yet Dr. Longo is not claiming the refractive index values for these sources is any different.

Moreover, Dr. Su's criticism of Dr. Longo's testing is not a question of particles falling only slightly outside established ranges. Recall that the refractive index value is derived from the color of the particles.[31] The more to the yellow end of the light spectrum, the higher the R.I. value:



---

[30]    (*Id.* at 7.)

[31]    (Longo Clark Hr'g Vol. 1 at 48:9-49:1, 113:12-18; see also R.I. Value Demonstrative.)

As discussed above (at § I.B.1), among Dr. Su's many criticisms of Dr. Longo are that Dr. Longo is calling particles purple that are actually yellow. In other words, Dr. Longo's reported R.I. values are *nowhere close* to accurate and not near the correct color on the light spectrum.

This means that the true R.I. value for the particles Dr. Longo is finding not only fall outside any established range for chrysotile, but also correspond to the range for talc.[32] In other words, Dr. Longo is finding talc and calling it chrysotile. None of Plaintiffs' arguments change that fact.

***"Calidria" Chrysotile.*** In a single sentence, Plaintiffs argue that "before issuing his report, [Dr. Su] had never tested a sample of Calidria"—a unique form of chrysotile found in a deposit in California.[33] Dr. Su did not need to have previously *personally* tested a sample of Calidria chrysotile. As he explained in his report, he relies on *published* refractive index ranges for Calidria chrysotile which do not match what Dr. Longo is finding.[34]

***Supposed "Chrysotile Naturally In Talc."*** Plaintiffs' criticism that "Dr. Su has never measured the refractive index of 'chrysotile found naturally in a cosmetic

---

[32]    (*Id.*)

[33]    (*Id.*)

[34]    (Su Rpt. at 4.) As Dr. Su points out, the published ranges for Calidria chrysotile are only slightly different than the published ranges for standard chrysotile. (*Id.*)

talc product'" is nonsensical. The question at hand is whether chrysotile is present in cosmetic talc in the first place. The whole point of Dr. Su's report is that Dr. Longo is *not*, in fact, finding chrysotile and so there is no such thing "chrysotile found naturally in a cosmetic talc product." So of course he hasn't measured it—it doesn't exist. And no one other than Dr. Longo is claiming to find chrysotile in cosmetic talc by polarized light microscopy.

***Sample Preparation.*** Plaintiffs also state that Dr. Su's criticisms of Dr. Longo's sample preparation are based on "speculation." That is just not the case. As background, Dr. Longo uses a sample preparation method known has heavy liquid separation. The idea is that if the sample is suspended in a special liquid, minerals that are more dense will sink to the bottom and minerals that are less dense will float to the top. Dr. Longo has (at times) claimed this sample preparation method is important to separating talc (which will float to the top) from its alleged contaminants (which will supposedly sink to the bottom)

Dr. Su points out that it does not make sense that percent of the sample that floats to the top has been "extremely inconsistent" in Dr. Longo's testing— "ranging from 13.4% to 24.2%."[35] Dr. Su explained that the "extremely high degree of volatility in weight recovery is not only a result of the deficiency in MAS's sample preparation procedure but also a clear indication of the non-

---

[35]    (*Id.* at 11.)

existence of chrysotile. There is no chrysotile to concentrate regardless of the heavy liquid density separation process used."[36] That is no speculation and has nothing to do with potential trace amounts of nickel. All components of Dr. Su's opinions are based on a reliable methodology and should not be excluded.

## II.    Dr. Sanchez's Opinions Are Scientifically Valid And Should Not Be Excluded.

### A.    Dr. Sanchez, His Opinions, and Background On Asbestos.

Dr. Sanchez is a trained geologist with an emphasis in mineralogy; he has earned a B.S., M.A., and Ph.D. in Geology all from the University of Idaho. For the past 16 years, he has dedicated himself to studying asbestos in raw materials and mine and quarry sites.[37] Dr. Sanchez is also on the United States Pharmacopeia ("USP") Talc Expert Panel, which collaborates with the American Society for Testing and Materials ("ASTM") to draft asbestos testing methods specific to cosmetic and pharmaceutical grade talc.[38] He has authored numerous publications regarding geology and microscopy relating to asbestos.[39]

In addition to criticizing Dr. Longo's method, Dr. Sanchez has himself tested hundreds of samples of cosmetic talc for the presence of asbestos, reviewed the

---

[36]    (*Id.* at 12.)

[37]    (Curriculum Vitae of Matthew S. Sanchez, Ph.D.) (attached as O'Dell Cert. Ex. 11)

[38]    (*Id.*)

[39]    (*Id.*)

relevant scientific literature and records. It is Dr. Sanchez's conclusion that "Johnson & Johnson talcum-based products do not contain asbestos."[40]

### B. Dr. Sanchez will not offer any testimony on health effects.

Defendants first argue that "Dr. Sanchez is not qualified to opine on whether 'asbestiform' and 'non-asbestiform' particles have different health effects."[41] He is not offering that opinion, and Plaintiffs cite no part of this report where he does.[42] Moreover, Dr. Sanchez makes clear in both testimony and his report that his opinions relate to his expertise in minerology and geology, as opposed to a providing medical opinion.[43] Indeed, Dr. Sanchez repeatedly testified repeatedly he is not providing medical opinions and did not look at the health effects of minerals, which is not his expertise.[44] This is no more than a strawman argument.

---

[40]    (Report of Dr. Matthew Sanchez, Ph.D., March 26, 2024 ("Sanchez 3/26/24 Rpt.") at 1 (attached as O'Dell Cert. Ex. 11)

[41]    (Pl. Br. at 23.)

[42]    Dr. Sanchez briefly discusses four epidemiological studies—not to offer opinions on any differing health effects among minerals—but because they inform his *geological* opinion. As he explains: "epidemiological studies are relevant to my opinion that the source talc mines at issue did not contain asbestos" because "four epidemiological studies have followed thousands of talc miners and millers from Val Germanasca" where Defendants sourced their talc for a period of time and "found that there were no deaths among the miners and millers as a result of mesothelioma." (Sanchez 3/26/24 Rpt. at 5.)

[43]    (Dep. Of Matthew Sanchez, Ph.D. dated June 25, 2024 at 16:13-21; 64:4-65:5 ("6/25/24 Sanchez Dep.") (attached as O'Dell Cert. Ex. 12)

[44]    (*Id.*)

### C.    Dr. Sanchez uses the established definition of asbestos and a reliable methodology.

***Definition Of Asbestos.*** Plaintiffs' argument that the definition of asbestos used by Dr. Sanchez is limited to bulk building samples is simply wrong. As explained at length in Defendants' motion to exclude Plaintiffs' experts' asbestos related opinions, the definition of asbestos that Dr. Sanchez uses—that it must be the "asbestiform" variety of six relevant minerals—is the definition that has been adopted by IARC, the Occupational Safety & Health Administration ("OSHA"), the EPA, the U.S. Mine Safety and Health Administration ("MSHA"), the National Institute for Occupational Safety & Health ("NIOSH") and Congress.[45] Every federal regulation or statute defines asbestos in this way. Dr. Sanchez uses *the* uniform definition of asbestos.

---

[45] Int'l Agency for Research on Cancer, World Health Org., 93 *Monographs on the Evaluation of Carcinogenic Risks to Humans: Carbon Black, Titanium Dioxide, and Talc* 277 (2010) ("IARC 2010 Monograph") (attached as Ex. 13 to Bush Decl.) 40 CFR § 763.163 (EPA); 29 CFR § 1910.1001(b) (OSHA); 15 USC § 2642(3) (federal Toxic Substances Control Act); 30 CFR § 56.5001(b) (MSHA); Ex. I, Asbestos Exposure Limit, 73 Fed. Reg. 11,284, 11,292 (Feb. 29, 2008) (MSHA definition "does not include . . . nonasbestiform minerals") (citation omitted); Nat'l Inst. for Occupational Health and Safety, *Asbestos Fibers and Other Elongate Mineral Particles: State of the Science and Roadmap for Research* 7-8 (2011) ("NIOSH Roadmap") (stating that "nonasbestiform minerals are not 'asbestos' or 'asbestos minerals'") (attached as Ex. 14 to Bush Decl.); *see also* 39 Fed. Reg. 24317 ("Tremolite of a nonasbestiform which occurs in talc deposits is not mentioned in the definition [of asbestos] and, therefore, is not covered.").

*Testing Methodologies.* Plaintiffs' arguments regarding Dr. Sanchez's testing methodology are equally flawed. Plaintiffs' chief complaint appears to be that Dr. Sanchez is not relying on a method designed specifically for testing talc. But *neither is Dr. Longo*. Dr. Longo is relying on AHERA regulations which are not designed for distinguishing asbestiform from non-asbestiform particles, are for situations where asbestos is known or assumed to be present, and are designed for *airborne* asbestos detection.

The EPA R-93 method that Dr. Sanchez relies on, by contrast, is one of only three generally accepted testing methodologies to determine if a sample is composed of minerals with an asbestiform habit.[46] The counting rules Plaintiffs' experts use to identify asbestos using a transmission electron microscope, however, are incapable of differentiating asbestos from non-asbestiform minerals.[47] By way of one example, even Plaintiffs' expert Dr. Longo agrees that if you break up a non-asbestos rock of tremolite it does not magically, in fact, become asbestos.[48] However, because of the way amphibole rocks break, you can get some pieces that would be longer and thinner and could resemble asbestos fibers if examined individually.[49] Even though

---

[46]    (Sanchez 3/26/24 Rpt. at 3.)

[47]    (*Id*. at 19.)

[48]    (Tr. 149:11-17, *Rimondi v. BASF Catalysts LLC*, No. MID-L-2912-17 (N.J. Super. Ct. Law Div. Mar. 5, 2019) ("Longo Rimondi Tr. Vol. I") (attached as Ex. 15 to Bush Decl.)

[49]    (*Id*. 148:8-10.)

he agrees that that is not asbestos, Dr. Longo would use his "counting criteria" to call it asbestos.[50] Unlike Plaintiffs' experts, Dr. Sanchez applies approved methods for identifying asbestos, based on his decades of experience and adherence to standardized testing protocols.

Plaintiffs also incorrectly state that "EPA has indeed rejected Dr. Sanchez's position."[51] As a threshold issue, the document Plaintiffs cite was issued by Region 9, not the EPA itself.[52] Region 9 is one of ten regional EPA offices around the country, with jurisdiction over California, Arizona, Hawaii, and Nevada.[53] The EPA has never endorsed the positions taken by Region 9 or otherwise weighed in on the matter. The Region 9 response is expressly preliminary, stating that "[a] more detailed analysis [is to] be completed after additional information is received."[54] The Region 9 document is also no longer maintained by the EPA on its current website and has been archived with a banner that states, "This content is not maintained and may no longer apply."[55] Dr. Sanchez was not employed by R.J. Lee at the time.

---

[50]     (*Id.* 149:18-20.)

[51]     (Pl. Br. 26

[52]     (O'Dell Decl. Ex. 28 at 1.)

[53]     https://www.epa.gov/aboutepa/regional-and-geographic-offices

[54]     (O'Dell Decl. Ex. 28 at 1.)

[55]     (EPA Southwest Region 9, Naturally Occurring Asbestos El Dorado Hills, Interim Final Report) (last accessed January 24, 2024) (attached as Ex. 16 to Bush Decl.)

Subsequent to the publication of the Region 9 Response, EPA commissioned the U.S. Geological Survey ("USGS") to independently study the El Dorado Hills matter, including evaluating RJ Lee's critiques. The USGS published its resulting report (the "USGS Report") later in 2006, vindicating many of RJ Lee's criticisms of Region 9's analytical methods.[56] The Region 9 document is no basis to exclude Dr. Sanchez's opinions.

**Population Analysis.** Plaintiffs' argument that Dr. Sanchez is applying an inappropriate or "shifting" definition of population is meritless.[57] Population-based analysis is required in the standardized testing protocols that both plaintiff and defense experts rely on in talc litigation, including the ISO 22262-1 protocol principally relied upon by a frequent Plaintiffs' expert in talc litigation, Dr. Longo, and the EPA R-93 protocol relied upon by Dr. Sanchez. Population-based analysis is an important and reliable component of testing talc samples for asbestos. To the extent that Plaintiffs' experts here failed to conduct population analysis, which

---

[56]    G.P. Meeker et al., *Mineralogy and Morphology of Amphiboles Observed in Soils and Rocks in El Dorado Hills, California*, U.S. Geological Survey Open-File Report 2006-1362 at vii (2006) (attached as Ex. 17 to Bush Decl.) ("[M]any of the amphibole particles examined in this study meet the counting rule criteria used by USEPA from both chemical and morphological requirements. However, most of these particles do not meet the morphological definitions of commercial-grade asbestos. . . ."); *id at* 42 ("[T]he majority of the particles are prismatic, not fibrous . . . it is not possible to categorically discount this material as benign from a health standpoint, nor is there direct evidence in the literature that particles of this type pose a health hazard.").

[57]    (Pl. Br. 28.)

renders their own testing unreliable and those experts incapable of concluding that Defendants' talc products contain asbestos. Indeed, long-time Plaintiffs' microscopy expert, and Plaintiffs' expert here, Dr. William Longo, admits that if one is only looking at a single fiber under a microscope—as opposed to a population—it is not possible to determine if that fiber is asbestiform or non-asbestiform.[58]

### D. Dr. Sanchez completed a robust analysis of historical test results of J&J talc.

Plaintiffs' assertion that Dr. Sanchez is "cherry picking" test results inexplicably ignores the thousands of documents cited by Dr. Sanchez dating back to the 1940s (attached to Dr. Sanchez's expert report and aptly titled "Materials Reviewed and/or Relied Upon...")[59] As addressed in his report, Dr. Sanchez reviewed "decades-long testing record, including historical testing by Johnson & Johnson and its suppliers, independent, third-party testing, and historical government testing" and concluded "Johnson & Johnson's talcum powder did not contain asbestos."[60] Plaintiffs' refusal to acknowledge Dr. Sanchez's analysis of decades-long history of documents, is certainly not a reason to exclude his opinions.

---

[58] (Trial Tr. Of William Longo, Ph.D. 3021:4-3021:9, *Lanzo v. Cyprus Amax Minerals, Co., No*. MID-L-7385-16AS (N.J. Super. Ct. February 20, 2018) ("Longo Lanzo Tr.) (attached as Ex. 18 to Bush Decl.)

[59] (Sanchez 3/26/24 Rpt. at 35.)

[60] (*Id*. ("Review of the entire testing record leads me to conclude Johnson & Johnson's talcum powder did not contain asbestos.").)

Plaintiffs also criticize Dr. Sanchez for "ignore[ing]" specific test results and cite to a chart *created by plaintiff lawyers for litigation*.[61] As an initial matter, the vast majority of documents cited by Plaintiffs are included in his list of historical documents reviewed and relied on.[62] Further, Plaintiffs' implication that these particular documents evidence "findings of chrysotile" in J&J talc products is patently false. For example, the March 11, 1974 McCrone document cited by Plaintiffs refers to a document regarding testing of a talc sample from the Frostbite Deposit – a talc source that was never used to make Johnson's Baby Powder or Shower to Shower.[63]

Plaintiffs further dispute Dr. Sanchez's analysis of the 2019 EPA findings. As described in his expert report, Dr. Sanchez details the *155 independent tests* conducted by R.J. Lee Group and Bureau Veritas, where the presence of chrysotile could not be confirmed.[64]

**E.    Dr. Sanchez's opinions regarding source mines are based on empirical evidence.**

Plaintiffs entirely misrepresent Dr. Sanchez's testimony regarding the quality of talc mined from Vermont. Plaintiffs imply that because asbestos contamination

---

[61]    (Pl. Br. at 29-30 n.14.)

[62]    (*See* Sanchez 3/26/24 Rpt. at 35.)

[63]    (March 11, 1974 McCrone Letter, JNJTALC000286990-992) (attached as Ex. 19 to Bush Decl.)

[64]    (Sanchez 3/26/24 Rpt. at 13-15.)

may occur in the Appalachian chain of mountains in *northern* Vermont, that entirely separate mines in *southern* Vermont necessarily contains asbestos.[65] Dr. Sanchez's opinion that cosmetic talc mined in southern Vermont is free of asbestos contamination is based on extensive analysis of the geological formations in the area. Indeed, as Dr. Sanchez explained, "to draw equivalencies between an asbestos mine in the northern part of the state and say it's equivalent to a talc mine in the southern part of the state is grossly inappropriate… and not based on any sound scientific reasoning."[66]

Unfortunately, Plaintiffs' motion is utterly devoid of any background or context of the selection progress for sourcing of talc free of asbestos. Based on an extensive analysis, Dr. Sanchez will opine that Defendants' products do not contain asbestos, but at the same time, he acknowledges that "[n]on-talc minerals do occur within talc deposits," and that in some instances, amphibole or serpentine minerals have been found in discrete locations in the regions surrounding the talc ore that was mined in Italy and Vermont.[67] But areas containing non-talc minerals can be identified and avoided—and mining efforts concentrated in areas of talc ore that do

---

[65]    (Pl. Br. at 31-32.)

[66]    (6/25/24 Sanchez Dep. 282:14-283:7.)

[67]    (April 16, 2024 Report of Matthew Sanchez p. 3, *Newton v. Johnson & Johnson*, No. DC-19-09317-M (District of Dallas County, Texas) (attached as Ex. 20 to Bush Decl.).)

not contain these minerals—through "selective mining" techniques. Selective mining is a term that has appeared in historical documents in this litigation and encompasses two broad components of talc mining: (1) surveying and testing a talc mine in advance to assess whether any sections of the mine potentially contain non-talc minerals; and (2) avoiding any such areas during the mining process.

Those practices comprise only some of the numerous steps in J&J Defendants' process for ensuring that JBP has been asbestos-free during the time period at issue in this litigation. Broadly, these steps included: (1) selecting only high-quality talc mines known for talc purity; (2) surveying and testing those mines prior to mining, including drilling deep into the rock at numerous locations and collecting and testing samples from those areas; (3) mining only from the areas shown to contain pure talc; (4) processing the mined talc at a mill, which involves crushing and sorting the talc to remove impurities; (5) additional techniques such as washing the processed talc and "floating" it in a solution to further remove impurities (processes referred to as "beneficiation"); and (6) frequent testing of both raw talc and fully processed talc to ensure the absence of asbestos.[68]

---

[68]    (Trial Tr. Vol. 12, *Forrest v. Johnson & Johnson*, No. 1522-CC0419-02 (Mo. Cir. Ct. Dec. 17, 2017), at 2340:14-2341:24, 2342:25-2343:17 (Dr. Susan Nicholson generally describing these steps)) (attached as Bush Cert. Ex. 21.)

**F.    Dr. Sanchez Appropriately Critiques Drs. Kessler and Sage's Geological and Mineralogical Opinions**

Plaintiffs improperly attempt to exclude Dr. Sanchez's opinions of Drs. Kessler and Sage by mischaracterizing his well-reasoned critiques as "regulatory opinions."[69] Plaintiffs miss the point entirely. As made abundantly clear in his report, Dr. Sanchez was asked to provide comments regarding the *geological, mineralogical and analytical testing* opinions of Drs. Kessler and Sage.[70] Dr. Sanchez's qualifications in these fields are unquestioned, and he is undoubtedly competent to offer opinions in his area of expertise. For example, Dr. Sanchez explains that Drs. Kessler and Sage are incorrect in suggesting that J&J only relied on CTFA J4-1 methodology to examine talc for asbestos.[71] Dr. Sanchez explains that since the early 1970s, transmission electron microscopy (TEM) was used by J&J to examine talc for the presence of chrysotile and asbestos.[72] Similarly, Dr. Sanchez explains that Dr. Sage improperly suggests that Dr. J. L. Cralley (author of 1968 article "Fibrous and Mineral Content of Cosmetic Talcum Products") found amphibole asbestos using polarized light microscopy (PLM) because PLM testing is incapable is of mineral identification. [73] Neither Drs. Kessler nor Sage have expertise in fields of

---

[69]    (Pl. Br at 33.)

[70]    (*See* Sanchez 3/26/24 Rpt. at 131-132.)

[71]    (*Id.*)

[72]    (*Id.*)

[73]    (*Id* at 131.)

minerology and geology and Dr. Sanchez – who has spent his career testing materials for the presence of asbestos – is eminently qualified to critique their opinions in his field of expertise.

## III.    Dr. Wylie's Opinions Are Scientifically Valid And Should Not Be Excluded.

### A.    Dr. Wylie and Her Opinions.

Dr. Wylie received her undergraduate degree in geology from Wellesley college in 1966 and her Ph.D. from Columbia University in 1972 with a major in economic geology, and minors in mineralogy, petrology and mining engineering.[74] She was a professor of geology for decades at the University of Maryland, along with administrative appoints including Assistant President and Chief of Staff, Vice President for Administrative Affairs, and Senior Vice President and Provost.[75] In that role, she taught polarized light microscopy and optical minerology for nearly 30 years.[76] She has also published 47 articles on talc, amphibole and/or asbestos and her work on mineral fiber and human health has been recently recognized by the United States Congress.[77]

Like Dr. Su, Dr. Wylie did not test any talc but rather explains the flaws in Dr. Longo's testing and methodology. She explains that Dr. Longo's testing suffers

---

[74]    (Wylie Rpt. at 1.)

[75]    (*Id.*)

[76]    (*Id.*)

[77]    (*Id.*)

from a host of problems, perhaps most notably that "MAS incorrectly interpreted the dispersion staining colors to derive an index of refraction. The correct interpretation of the dispersion staining colors would result in indices of refraction that are inconsistent with chrysotile but consistent with talc."[78] In short: "[T]he particles identified as chrysotile are not chrysotile at all. The particles should be objectively identified as talc, and not chrysotile, because they are identical to other talc particles in the samples, and there is no scientific data that would suggest otherwise."[79]

Rather than discuss the core of Dr. Wylie's opinion, Plaintiffs instead attack irrelevant tests she conducted outside of litigation and raise numerous minor criticisms that are not actually supported by the evidence and the science.

**B.    Any criticisms Dr. Wylie's prior *outside-of-litigation* tests of Johnson's Baby Powder are not relevant.**

Plaintiffs begin their argument regarding Dr. Wylie by focusing heavily on criticism of her testing of two samples of Johnson's Baby Powder she previously conducted *outside of litigation*.[80] But that testing has nothing to do with her report in this MDL. As she explained, she examined Johnson's Baby powder when she was "going to use it as background material to spike that [she] was doing for some ASTM

---

[78]    (*Id.* at 5; *see also id.* at 38. (conclusion with summary of opinions).)

[79]    (*Id.* at 14.)

[80]    (Pl. Br. at 36-39.)

testing."[81] Counsel asked Dr. Wylie at her deposition if she had ever previously tested Johnson & Johnson talc using PLM and she truthfully answered that she had.[82] But that testing is not part of her report, which simply responds to Dr. Longo's methodology and explains why it is flawed.[83] It is of course completely legitimate for a defense expert's methodology to be limited to a critique an opposing expert.[84] Plaintiffs' chief criticism of Dr. Wylie is simply irrelvent.

### C. Plaintiffs' hodgepodge of criticisms are incorrect and serve as no basis to exclude any portion of Dr. Wylie's opinions.

Finally, Plaintiffs raise a number of minor criticisms of Dr. Wylie's report which are simply not correct.

***Blue Filter***. For his initial PLM-chrysotile testing, Dr. Longo's lab used a microscope with a tungsten lightbulb which emitted a yellow/orange-hued light that

---

[81]   (6/24/2024 Wylie Dep. 13:13-17) ASTM is a standards organization.

[82]   (*Id.* at 13:6-9.)

[83]   *See generally* Wylie Rpt.

[84]   *See Holbrook v. Lykes Bros. S.S. Co.*, 80 F.3d 777, 786 (3d Cir. 1996) (noting that the test for the admissibility of defense experts is "different" because "the defense d[oes] not bear" the burden of proof); *In re Abilify (Aripiprazole) Prods. Liab. Litig.*, 299 F. Supp. 3d 1291, 1368 (N.D. Fla. 2018) (finding it "entirely appropriate" that defendants' experts' opinions "were, essentially, critiques of [p]laintiffs' experts' evidence, methodologies, and conclusions"); *In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d 230, 285 (E.D.N.Y. 2007) ("It is worth noting in this respect that defendants' experts have a less demanding task, since they have no burden to produce models or methods of their own; they need only attack those of plaintiffs' experts.").

distorted the color of his imaging—the key component of identifying the mineral.[85]
The very methodology that Dr. Longo claims to follow states that using a blue-light
or daylight filter is required.[86]

As Dr. Wylie explained in her report, Dr. Longo's images were "are a bit more
orange than [she] would expect" which she attributed "either due to the fact that the
voltage of the tungsten light source was too low, or a blue filter, which must be
present in the optical system to properly interpret the dispersion staining colors, is
missing."[87] Plaintiffs point to no flaw whatsoever in that opinion.

They only criticize her supposed "lack of proof" of the absence of a blue light
filter. First of all, she gave *two* possible options for the fact that the images were all
skewed orange. And more importantly, any lack of proof is due to Plaintiffs
obstructing Defendants' ability to depose the actual analyst at MAS who is at the
microscope (Paul Hess). After Plaintiffs opposed the deposition, it finally took place
after Dr. Wylie's report was issued and deposition taken. When Mr. Hess's
deposition finally occurred, in one of the small percentage of questions counsel
actually permitted Mr. Hess to answer, he admitted that he did not "recall ever

---

[85]    (Dep. of William E. Longo, Ph.D. 55:17-56:14, *Valadez v. Johnson & Johnson*, No. 22-cv-012759 (Cal. Super. Ct. March 3, 2023) ("Longo 3/3/23 Valadez Dep.") (attached as Ex. 22 to Bush Decl.) (emphasis added).)

[86]    ISO 22262-1 at 15, 25 (attached as Ex. 23 to Bush Decl.).

[87]    (Wylie Rpt. at 10; *see also* Wylie Dep. at 27:12-20.)

dealing with" a blue-light or daylight filter on the microscope with the tungsten bulb despite the methodology requiring it.[88]

***Heating To 485°C.*** The method Dr. Longo claims to follow specifically states that "samples should be heated to 485 degrees C before examination" to remove organic fibers that can be confused with chrysotile.[89] In a section entitled "Other Issues," Dr. Wylie explains that Dr. Longo did not adhere to this component of the method he claims to follow, but rather heats the samples to a variety of lower degrees.[90] That Dr. Longo did not follow his own methodology is a completely legitimate criticism and Plaintiffs do not identify why this point is wrong in any way.

***Calidria Chrysotile.*** MAS took images of a unique form of chrysotile known as Calidria which they claim to use as "reference sample." Dr. Longo has claimed that this Calidria reference sample is what unlocked MAS's ability to identify chrysotile in talc.[91]

---

[88]    (Hess MDL Dep. 68:3-7 (attached as Ex. 24 to Bush Decl.); *see also id*. at 65:5-11 (similar).)

[89]    (Wylie Rpt. 37.)

[90]    (*Id.*)

[91]    (Dep. of William E. Longo, Ph.D. 75:24-76:3, *Powers v. Beacon CMP Corp, et al.*, No. 2016-0983 (Parish of Lafayette, La.) (attached as Ex. 25 to Bush Decl.); Dep. Of William E. Longo, Ph.D. 22:7-15, *Weiss, et al, v. Albertsons Companies, Inc.*, et al., No. CV2021-090946 (Superior Court of Arizona, Maricopa County) (attached as Ex. 26 to Bush Decl.); Longo *Clark* Hr'g (Vol. 1) 36:10-15, 159:8-16, 160:1-8.)

One of the problems with the reference sample is that while the image contains huge swathes of chrysotile particles that appear blue, MAS chose as its point of comparison an outlier particle that is a different, yellower color that is likely an impurity in the sample (i.e. no chrysotile)[92]:



Dr. Wylie explained that the particle MAS is using as a reference is not, in fact, Calidria chrysotile because chrysotile should appear "blue and blue magenta" (as the rest of the chrysotile in the image above) and because the Calidria product is known to "contain[] minerals other than chrysotile."[93] All Calidria comes from the

---

[92]    (Caldaria Reference Sample (attached as Exhibit 27 to Bush Decl.); *see also* Hess Dep. 177:9-11 (acknowledging that all the blue is chrysotile).)

[93]    (Wylie Rpt. 32.)

same deposit in California called New Idria (hence the name Cal-Idria).[94] Dr. Wylie did not need to have access to the *precise Calidria chrysotile sample Dr. Longo used* to form this opinion. The reference sample imaging makes plain the particle Dr. Longo is claiming is chrysotile is the wrong color.

***Milling Process.*** Plaintiffs' final arguments regarding the effect on milling are misleading. The particles Dr. Longo is calling chrysotile do not match the color chrysotile should appear under the microscope. One way Dr. Longo attempts to explain that away is that Defendants' milling process which would have potentially reduced the size of any chrysotile present which in turn, according to Dr. Longo, changed the color the particle appears under the microscope. But as Dr. Wylie explains, "Index of refraction" (which is derived from the color) is dependent on the atomic structure and chemical composition, neither of which is normally altered by size reduction." In other words, Dr. Longo's excuse makes no sense.[95] Cutting a particle in half would not change its color. This has nothing to do with whether or not milling would reduce the size of any chrysotile particles present to a point where they would be picked up by PLM at all—the issue Plaintiffs raise.

## CONCLUSION

Plaintiffs' motion should be denied in its entirety.

---

[94]    (Longo Clark Hr'g 36:10-15.)
[95]    (Wylie Rpt. at 32.)

Dated: August 22, 2024

Respectfully submitted,

*/s/ Kristen R. Fournier*

Kristen R. Fournier
Matthew L. Bush
**KING & SPALDING LLP**
1185 Avenue of the Americas
34th Floor
New York, NY 10036
(212) 556-2100
kfournier@kslaw.com
mbush@kslaw.com

Susan M. Sharko
**FAEGRE DRINKER BIDDLE &
REATH LLP**
600 Campus Drive
Florham Park, NJ 07932
susan.sharko@faegredrinker.com

Allison M. Brown
Jessica Davidson
**SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP**
One Manhattan West
New York, New York 10001
212-735-3000

*Attorneys for Defendants Johnson &
Johnson and LLT Management, LLC*

## CERTIFICATION OF SERVICE

I hereby certify that on August 22, 2024, a true and correct copy of the

foregoing opposition was filed electronically. Notice of this filing will be sent by

operation of the Court's electronic filing system to all parties indicated on the

electronic filing receipt. Parties may access this filing through the Court's system.

/s/ *Kristen R. Fournier*
Kristen R. Fournier
**KING & SPALDING LLP**
1185 Avenue of the Americas
34th Floor
New York, NY 10036
(212) 556-2100
kfournier@kslaw.com