# EXHIBIT  14

Confidential - Pursuant to Protective Order

Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

IN RE: JOHNSON &              )
JOHNSON TALCUM POWDER         )
PRODUCTS MARKETING            )
SALES PRACTICES AND           )   MDL 16-2738
PRODUCT LIABILITY             )   (FLW)(LHG)
LITIGATION                    )
_____       )
THIS DOCUMENT                 )
PERTAINS TO ALL CASES         )

WEDNESDAY, DECEMBER 19, 2018

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

- - -

Videotaped deposition of Laura
Plunkett, Ph.D., DABT, held at the Four
Seasons Hotel, 999 North 2nd Street, St.
Louis, Missouri, commencing at 9:12 a.m., on
the above date, before Carrie A. Campbell,
Registered Diplomate Reporter, Certified
Realtime Reporter, Illinois, California &
Texas Certified Shorthand Reporter, Missouri
& Kansas Certified Court Reporter.
- - -
GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Confidential - Pursuant to Protective Order

```
                                                             Page 2
   1            A P P E A R A N C E S :
   2
        BEASLEY, ALLEN, CROW, METHVIN,
   3    PORTIS & MILES, P.C.
        BY:  TED MEADOWS
   4         Ted.Meadows@BeasleyAllen.com
             RYAN BEATTIE
   5         Ryan.Beattie@BeasleyAllen.com
        218 Commerce Street
   6    Montgomery, Alabama 36104
        (334) 269-2343
   7
   8    ASHCRAFT & GEREL, LLP
        BY:  MICHELLE A. PARFITT
   9         mparfitt@ashcraftlaw.com
        4900 Seminary Road, Suite 650
  10    Alexandria, VA 22311
        (703) 931-5500
  11
  12    LEVIN, PAPANTONIO, THOMAS, MITCHELL,
        RAFFERTY & PROCTOR, P.A.
  13    BY:  CHRISTOPHER V. TISI
             ctisi@levinlaw.com
  14    316 South Baylen Street, Suite 600
        Pensacola, Florida 32502
  15    (850) 435-7000
  16
        GOLOMB & HONIK, P.C.
  17    BY:  RICHARD GOLOMB
             rgolomb@golombhonik.com
  18    1835 Market Street, Suite 2900
        Philadelphia, Pennsylvania 19103
  19    (215) 278-4449
        Counsel for Plaintiffs
  20
  21    KIRKLAND & ELLIS LLP
        BY:  KIMBERLY OLVEY BRANSCOME
  22         kimberly.branscome@kirkland.com
             WILLIAM SMITH
  23    333 South Hope Street
        Los Angeles, California 90071
  24    (213) 680-8370
        Counsel for Defendant Johnson &
  25    Johnson
```

Confidential - Pursuant to Protective Order

Page 3

```
 1       DYKEMA
         BY:  JANE E. BOCKUS
 2            jbockus@dykema.com
              RYAN J. SULLIVAN
 3            rsullivan@dykema.com
         112 East Pecan Street, Suite 1800
 4       San Antonio, Texas 78205
         (210) 554-5500
 5       Counsel for the Defendant Imerys
         Talc America
 6
 7       SEYFARTH SHAW LLP
         BY:  THOMAS T. LOCKE
 8            tlocke@seyfarth.com
         975 F Street, N.W.
 9       Washington, DC 20004
         (202) 463-2400
10       Counsel for Defendant Personal Care
         Products Council
11
12       TUCKER ELLIS LLP
         BY:  CAROLINE M. TINSLEY
13            caroline.tinsley@tuckerellis.com
         100 South Fourth Street, Suite 600
14       St. Louis, Missouri 63102
         (314) 571-4965
15       Counsel for PTI Union, LLC and PTI
         Royston, LLC
16
17
     ALSO PRESENT:
18       KATIE TUCKER, Beasley Allen
19
     V I D E O G R A P H E R :
20       JACOB ARNDT,
         Golkow Litigation Services
21
                         - - -
22
23
24
25
```

Confidential - Pursuant to Protective Order

Page 4

```
 1                       INDEX
 2                                      PAGE
 3  APPEARANCES...................................  2
 4  EXAMINATIONS
 5    BY MS. BRANSCOME..........................  8
 6    BY MS. BOCKUS............................ 287
 7    BY MR. LOCKE............................. 319
 8
 9                     EXHIBITS
10   No.  Description                         Page
11  1     Notice of Oral and Videotaped         8
            Deposition of Plaintiffs' Expert
12          and Duces Tecum
13  2     Expert Report of Laura M. Plunkett,  13
            Ph.D., DABT, October 5, 2016
14
     3     Supplemental Expert Report of Laura  13
15          M. Plunkett, Ph.D., DABT, August
            29, 2018
16
     4     Rule 26 Expert Report of Laura M.    13
17          Plunkett, Ph.D., DABT, November 16,
            2018
18
     5     "Systematic Review and               16
19          Meta-Analysis of the Association
            between Perineal Use of Talc and
20          Risk of Ovarian Cancer," Taher, et
            al.
21
     6     Printout of Health Canada's risk     17
22          assessment of talcum powder
23  7     "Ovarian, Fallopian Tube, and        111
            Primary Peritoneal Cancer
24          Prevention (PDQ)-Health
            Professional Version," National
25          Cancer Institute
```

Confidential - Pursuant to Protective Order

                                                          Page 5

  1    8        "Weight of Evidence:  General         211
                Principles and Current Applications

  2             at Health Canada"

  3         (Exhibits attached to the deposition.)

  4

  5

  6

  7

  8

  9

 10

 11

 12

 13

 14

 15

 16

 17

 18

 19

 20

 21

 22

 23

 24

 25

Confidential - Pursuant to Protective Order

                                              Page 6

    1              VIDEOGRAPHER:  We are now on

    2        the record.

    3              My name is Jacob Arndt.  I'm a

    4        videographer for Golkow Litigation

    5        Services.

    6              Today's date is December 19,

    7        2018, and the time is 9:12 a.m.

    8              This deposition is being held

    9        in St. Louis, Missouri, In Re: Johnson

   10        & Johnson Products Marketing Sales

   11        Practices, for the United States

   12        District Court for the District of

   13        New Jersey.

   14              The deponent is Dr. Laura

   15        Plunkett.

   16              Will counsel please identify

   17        themselves?

   18              MR. MEADOWS:  Ted Meadows for

   19        plaintiffs.

   20              MS. PARFITT:  Michelle Parfitt

   21        for the plaintiffs.

   22              MR. BEATTIE:  Ryan Beattie for

   23        plaintiffs.

   24              MR. TISI:  Chris Tisi for

   25        plaintiffs.

Confidential - Pursuant to Protective Order

```
                                              Page 7
 1              MR. GOLOMB:  Richard Golomb for
 2         plaintiffs.
 3              MR. LOCKE:  Tom Locke for the
 4         Personal Care Products Council.
 5              MS. TINSLEY:  Caroline Tinsley
 6         for PTI Union, LLC, and PTI Royston,
 7         LLC.
 8              MR. SULLIVAN:  Ryan Sullivan
 9         for Imerys.
10              MS. BOCKUS:  Jane Bockus for
11         Imerys.
12              MR. SMITH:  William Smith for
13         Johnson & Johnson.
14              MS. BRANSCOME:  Kimberly
15         Branscome for Johnson & Johnson.
16              VIDEOGRAPHER:  Thank you.
17              The court reporter is Carrie
18         Campbell and will now swear in the
19         witness.
20           LAURA PLUNKETT, Ph.D., DABT,
21      of lawful age, having been first duly sworn
22      to tell the truth, the whole truth and
23      nothing but the truth, deposes and says on
24      behalf of the Defendant Johnson & Johnson, as
25      follows:
```

Confidential - Pursuant to Protective Order

Page 8

 1                    DIRECT EXAMINATION

 2    QUESTIONS BY MS. BRANSCOME:

 3         Q.     All right.  Good morning,

 4    Dr. Plunkett.  I introduced myself right

 5    before we started, but my name is Kimberly

 6    Branscome, and I am here on behalf of Johnson

 7    & Johnson.

 8                    Is it your understanding today

 9    that you are giving your deposition for the

10    purpose of a Daubert analysis in the MDL

11    related to Johnson's baby powder?

12         A.     That's my understanding, yes.

13                    (Plunkett Exhibit 1 marked for

14         identification.)

15    QUESTIONS BY MS. BRANSCOME:

16         Q.     I want to start by handing you

17    what I will mark as Plunkett Deposition

18    Exhibit 1.

19                    Do you recognize the document

20    that I just handed you?

21         A.     Yes.

22         Q.     Okay.  Have you seen this

23    document before?

24         A.     Yes.

25         Q.     All right.  When was this

Confidential - Pursuant to Protective Order

Page 9

1    document provided to you?

2         A.      Either earlier this -- this

3    week or late last week.  I don't recall if it

4    was Friday or Monday.

5         Q.      Okay.  For the purposes of the

6    record, could you just identify what the

7    document is that I just handed you as

8    Plunkett Deposition Exhibit Number 1?

9         A.      It's a notice of oral and

10   videotaped deposition for myself, dated -- I

11   don't see the date, but probably on the very

12   last -- do you need that or just -- is that

13   enough of an identification?

14        Q.      That's all right.

15               Now, contained within the

16   deposition notice there is a reference to a

17   request for materials that are identified in

18   more detail in Schedule A.

19               Do you see that?

20        A.      Yes.

21        Q.      Have you reviewed Schedule A?

22        A.      Yes.

23        Q.      Did you bring any documents

24   with you in response to the request in

25   Schedule A?

Confidential - Pursuant to Protective Order

Page 10

1          A.      The only thing that I believe
2    that I had to bring that had not already been
3    provided was additional billing since the
4    time of my last deposition.
5          Q.      Okay.  And is it my
6    understanding that the documentation related
7    to additional billing that you have done
8    since your prior deposition was produced
9    yesterday at the deposition in the Forrest
10   case?
11         A.      That's correct.
12         Q.      All right.  And the information
13   contained in the documents produced at the
14   Forrest deposition yesterday, do those
15   contain an up-to-date record of the billing
16   that you have submitted for your work in
17   connection with the litigation against
18   Johnson & Johnson?
19         A.      Yes, with the understanding
20   that I haven't submitted a bill for December
21   yet.
22         Q.      Okay.  How much time have you
23   spent working in connection with your
24   opinions in the case against Johnson &
25   Johnson related to its baby powder in the

Page 11

1   month of December?

2        A.    So I'm -- on all the cases that

3   I am involved in that are pending, not just

4   this deposition?

5        Q.    I'll ask first all cases and

6   then we'll narrow it to the deposition.

7        A.    So in all --

8        Q.    I mean to the MDL, I'm sorry.

9        A.    Okay.  So in all cases this

10  month, probably eight hours so far, maybe

11  ten.

12       Q.    Does that include the time that

13  you've spent attending deposition?

14       A.    No, that's not including

15  yesterday's deposition time.  I apologize.  I

16  forgot about that.

17       Q.    And how much of the eight to

18  ten hours that you have spent this month

19  working on these cases against Johnson &

20  Johnson, setting aside the time you spent in

21  deposition yesterday, relate to the MDL

22  specifically?

23       A.    So it will probably be

24  billed -- it will be one bill for the

25  preparation time because the prep overlapped,

Confidential - Pursuant to Protective Order

Page 12

1    but I'll bill separately for the time I spent

2    yesterday right before the deposition and

3    then at the deposition, so...

4           Q.      What did you do to prepare for

5    your deposition today?

6           A.      I reviewed my reports, the

7    three reports that I filed in the litigation.

8    I had a meeting with attorneys on Monday, and

9    then we had a short meeting yesterday evening

10   because some attorneys arrived that were not

11   here on Monday.

12               And essentially went through

13   some of the documents that -- went through

14   some of the documents that I had cited in the

15   report in certain paragraphs, just to refresh

16   my memory of what they were.  So if you want

17   me to tell you which paragraphs, I can do

18   that.

19          Q.      I will in just a moment.  Okay.

20          A.      Want me to repeat that?  I'm

21   sorry.

22          Q.      That's all right.

23               Dr. Plunkett, you referenced

24   the fact that you reviewed specific

25   paragraphs of your expert reports in

Confidential - Pursuant to Protective Order

Page 13

1    preparation for today's deposition.

2                   Could you identify those

3    paragraphs for me?

4                   And it's helpful to you, we can

5    go ahead and mark your three expert reports,

6    if you're referring to all three.

7         A.     I'm going to refer just to the

8    MDL report because that's what we're here to

9    talk about.  I mean, if you want to talk

10   about what I did to get ready for yesterday

11   separately or --

12                  MR. MEADOWS:  Might be helpful

13        to go ahead and mark them.

14                  MS. BRANSCOME:  Why don't we go

15        ahead and just mark the three reports,

16        and then we can walk through.

17                  (Plunkett Exhibits 2, 3 and 4

18        marked for identification.)

19   QUESTIONS BY MS. BRANSCOME:

20        Q.     So, Dr. Plunkett, do you have a

21   copy of your three reports in front of you?

22        A.     Yes, I do.

23        Q.     Do those contain any markings,

24   highlightings or flags?

25        A.     No, they don't.

Confidential - Pursuant to Protective Order

Page 14

1          Q.      Okay.  Do you mind if we mark

2    your copies as the official records?

3          A.      No, that's fine.

4          Q.      So we will mark -- well, let's

5    do this in chronological order.  So I am

6    marking as Plunkett Deposition Exhibit

7    Number 2 the expert report of Dr. Plunkett

8    dated October 5, 2016.

9                  Could you confirm,

10   Dr. Plunkett, that that's what I marked as

11   Deposition Exhibit Number 2?

12         A.      Yes, it is.

13         Q.      And then we will mark as

14   Deposition Exhibit Number 3 supplemental

15   expert report of Dr. Laura Plunkett dated

16   August 29, 2018.

17                 Dr. Plunkett, could you confirm

18   that I marked that as Exhibit Number 3?

19         A.      Yes, that's correct.

20         Q.      And then Exhibit Number 4, we

21   will mark the expert report dated

22   November 16, 2018, by Dr. Plunkett that was

23   produced in the MDL.

24                 Could you confirm that I marked

25   that as Deposition Exhibit Number 4?

Confidential - Pursuant to Protective Order

Page 15

1          A.     Yes, that's correct.

2          Q.     All right.  And so now back to

3    the question of you referenced the fact that

4    you looked at specific paragraphs of your

5    expert report in preparation for today's

6    deposition.  If you could, using Deposition

7    Exhibit Number 4, identify which paragraphs

8    you looked at specifically in preparation for

9    the deposition.

10          A.     So it wasn't the paragraphs.

11   There were certain documents in paragraphs,

12   so that's what I was referring to, so...

13                So starting in paragraph 38

14   where I'm talking about sort of the timeline

15   of information about human health hazards and

16   talc dust.  So I just went back and refreshed

17   on a few of the older papers.

18                I looked again at the patent

19   documents that are cited in the first bullet.

20                I looked again at a paper by

21   Eberl, 1948, which is in the last bullet.

22   The patent documents are also there as well.

23                And that -- so that would be

24   all I pulled in that paragraph.

25                I believe that those documents

Confidential - Pursuant to Protective Order

Page 16

1    are also cited in paragraph 39 as well, some

2    of those same ones that are...

3              And then in Section 5 of my

4    report where I'm talking about exposure, I

5    looked again at Parmley and Woodruff.  I

6    looked again at Vetner and Iturrulde and Egli

7    and Newton last night.

8              And the only other thing I

9    looked at is not cited in this report because

10   it came out after the report was filed, and

11   that was -- and I did bring a copy of that.

12   That was the risk assessment that was done in

13   Canada.  Some people refer to it as -- by the

14   first author's last name, Taher, T-a-h-e-r.

15   And I may be pronouncing that wrong, but...

16             (Plunkett Exhibit 5 marked for

17        identification.)

18   QUESTIONS BY MS. BRANSCOME:

19        Q.    All right.  And I see that you

20   brought a copy of that document with you.

21   Just for the purposes of the record, let's

22   mark that as Plunkett Deposition Exhibit

23   Number 5.

24             Are there any markings,

25   highlightings or notations on that document?

Confidential - Pursuant to Protective Order

Page 17

1          A.      No, there's not.

2                  And then the other document I

3    looked at that was not cited in the report,

4    there is a printout from the government of

5    Canada website that talks about some

6    statements on talc, and so I printed that out

7    as well.  This was published at the same time

8    that the risk assessment was published.

9                  (Plunkett Exhibit 6 marked for

10          identification.)

11   QUESTIONS BY MS. BRANSCOME:

12          Q.      All right.  We'll mark that for

13   purposes of the record as Plunkett Deposition

14   Exhibit Number 6.  We might come back to

15   those documents.

16                  So returning briefly to the

17   deposition notice and the requests in

18   Schedule A, the billing information you

19   produced yesterday and then we just discussed

20   additional information with respect to that,

21   are there any other documents that you have

22   in your possession that are responsive to

23   requests identified in Schedule A that have

24   not been produced?

25          A.      I don't believe so, no.

Confidential - Pursuant to Protective Order

Page 18

1    Everything -- I do believe that there were

2    some objections filed to this, so there's

3    some things that I did not provide based on

4    that.

5              Some of the things I don't

6    have, too.  I think you asked for -- maybe

7    you didn't ask for that.  Usually people ask

8    for copies of old depositions, and I don't

9    keep those.  And maybe you didn't ask for

10   that, but that's usually a request.

11             Let me see.

12        Q.    Okay.  Now, you mentioned that

13   you met with attorneys on Monday.  And who

14   was present at that meeting?

15        A.    So on Monday it was

16   Mr. Meadows, sitting here.  Ms. Tucker,

17   Mr. Beattie, were at the meeting on Monday.

18        Q.    All right.  And how long did

19   that meeting last?

20        A.    Probably six hours, I guess,

21   six hours with them, and then I also did some

22   other work on my own, but...

23        Q.    Okay.  And then you mentioned

24   that you had another meeting last night.

25             Who was present at that

Confidential - Pursuant to Protective Order

Page 19

1    meeting?

2         A.    So that was probably about an

3    hour, and that would have been Mr. Tisi -- or

4    maybe two hours.  Mr. Tisi joined us

5    yesterday afternoon.  And Mr. Golomb, too,

6    I'm sorry.

7         Q.    All right.  Okay.  Now, looking

8    at the three reports that you have produced

9    in the litigation involving Johnson's baby

10   powder, I wanted to get an understanding of

11   how those three reports relate to one

12   another.

13           So you have the first report

14   that you produced that was dated October 5,

15   2016.  I believe that was originally produced

16   in the Uhl case; is that correct?

17        A.    I'm not sure the name of the

18   first case, but it was in the -- some of the

19   St. Louis cases, yes.

20        Q.    All right.  And when did you

21   begin work on that report?

22        A.    You'd have to look at my

23   billing record, which I know was an exhibit

24   to yesterday's deposition.  I believe they

25   started in 2015.

Confidential - Pursuant to Protective Order

Page 20

1         Q.      All right.  And then you

2    produced a supplemental report earlier this

3    year, on August 29, 2018, and that's been

4    marked as Deposition Exhibit Number 3,

5    correct?

6         A.      Yes.

7         Q.      When did you begin work on the

8    supplemental report that you produced at the

9    end of August in 2018?

10        A.      I want to say -- let's see.  I

11   want to say sometime in the summer.  Maybe as

12   early as May, but I believe May -- May, June

13   time frame of 2018.

14              My billing would reflect that,

15   so, again, we can pull my billing.  And I

16   would have called it preparation of the

17   supplemental report in my billing.

18        Q.      Okay.  Why did you choose to

19   draft a supplemental expert report?

20        A.      So over the time I had worked

21   on different trials here in St. Louis

22   particularly, additional documents that were

23   not cited in my original report became

24   reliance materials based on their

25   presentation at trial.  So there were enough

Confidential - Pursuant to Protective Order

Page 21

1    of those that I thought it was important to

2    add to the original report with additional

3    documents that I had reviewed over time.

4              Since October of 2016 through,

5    let's say, the summer of 2018, there were a

6    variety of additional documents that I had --

7    I had seen.

8              It was also my understanding

9    that during that time period Johnson &

10   Johnson had provided additional documents

11   that weren't provided or available to me in

12   2016, so additional discovery that was now

13   available to look at.  So some of this is a

14   matter of additional evidence that wasn't

15   available when I wrote my initial -- my

16   initial report.

17        Q.    All right.  Now when you say

18   the additional documents became reliance

19   materials in trial, what do you mean by that?

20        A.    So additional documents that we

21   refer to in trial that I use to support

22   opinions that weren't necessarily

23   specifically cited within the body of my

24   report or described within the body of my

25   report.  They were likely on my larger

Confidential - Pursuant to Protective Order

Page 22

1    reliance list, but they weren't things that

2    were cited.

3              In other words, if you look at

4    my original report in -- when I say the body,

5    the paragraphs.  I always put a reference

6    list and then I'll have Bates numbers.  So

7    during trial, things that were from my larger

8    reliance list that weren't specifically

9    discussed in my report became support for

10   different opinions that -- based on questions

11   at trial.

12        Q.    Okay.  When you say these were

13   documents that "we" refer to at trial, you're

14   referring to yourself and attorneys

15   representing the plaintiffs?

16        A.    Yes, that's correct.

17        Q.    Okay.  And understanding that

18   the purpose of today's deposition is focused

19   specifically on the MDL, then you produced a

20   report specific to the MDL on November 16,

21   2018, that we've marked as Exhibit 4,

22   correct?

23        A.    Yes.

24        Q.    When did you begin work on the

25   report that you produced specifically in the

Confidential - Pursuant to Protective Order

Page 23

1    MDL?

2         A.      Sometime right after -- I would

3    say early fall of 2018, sometime after

4    this -- the supplemental report was filed.

5    Probably right after that.

6         Q.      Okay.  So is it fair to say

7    that you began work on your MDL report after

8    completing the supplemental expert report

9    that has been marked as Exhibit 3?

10        A.      Yes, that's correct.

11        Q.      Okay.  Who was involved in the

12   drafting of the report that's been identified

13   as Exhibit 4?

14             MR. MEADOWS:  Objection.  Hang

15        on a second.

16             Are you asking about

17        communications between attorneys and

18        Dr. Plunkett?

19   QUESTIONS BY MS. BRANSCOME:

20        Q.      Dr. Plunkett, none of the

21   questions I will ask you here today are

22   intended to elicit information that's

23   protected by the attorney-client privilege.

24             So setting that aside, anything

25   that you understand to be privileged, I can

Confidential - Pursuant to Protective Order

Page 24

1  ask who the -- who was involved in the

2  drafting of the report that was produced in

3  the MDL?

4             MR. MEADOWS:  Hold on just one

5        second.

6             Ask the question one more time.

7        I want to make sure we're not

8        venturing into attorney work product

9        realm here.

10  QUESTIONS BY MS. BRANSCOME:

11        Q.    Dr. Plunkett, do you consider

12  the report that you have issued in the MDL

13  which is identified as Exhibit 4 to be

14  attorney work product?

15             MR. MEADOWS:  Objection.  Don't

16        answer that.  That calls for a legal

17        conclusion, and at this point I'm

18        going to instruct you not to answer

19        questions about how the report came

20        into be.

21             MS. BRANSCOME:  Are you

22        instructing her to refuse to answer

23        any questions that involve the

24        development of her expert report?

25             MR. MEADOWS:  I'm instructing

Confidential - Pursuant to Protective Order

1       her not to answer your last question.

2    QUESTIONS BY MS. BRANSCOME:

3       Q.    Are you following your

4    attorney's instructions, Dr. Plunkett?

5       A.    Yes.

6            MS. BRANSCOME:  At this point I

7       would like to go off the record,

8       please.

9            VIDEOGRAPHER:  Okay.  We are

10      going off the record at 9:30 a.m.

11      (Off the record at 9:30 a.m.)

12           VIDEOGRAPHER:  We are back on

13      the record at 9:32 a.m.

14   QUESTIONS BY MS. BRANSCOME:

15      Q.    Dr. Plunkett, other than

16   attorneys, if attorneys were involved -- I am

17   not asking questions about that -- were there

18   any individuals who assisted you in preparing

19   the report that has been marked as Exhibit 4?

20      A.    There was no one that actually

21   assisted in writing the report.  I do -- when

22   I did my literature searches, I had my

23   husband help me retrieve articles that I

24   identified for retrieval, but certainly there

25   was no -- he doesn't participate in the

Confidential - Pursuant to Protective Order

Page 26

1    actual review of articles or in drafting of
2    the report.  That's all my work.
3             Q.      Okay.  And when you say that
4    your husband retrieved articles, was this
5    simply -- what information did you provide
6    him in order to enable him to retrieve a
7    particular article?
8             A.      So we use a service in Houston
9    called Loansome Doc, which is affiliated with
10   our local medical library system and also
11   with the National Library of medicine and NIH
12   libraries.  So I give him an online search
13   that I put into a clipboard.  He takes that,
14   makes the request or retrieves -- some of
15   them will be free, and so he'll actually go
16   to the websites for the -- and then put them
17   into a folder for me.
18                   So he does that physical part
19   of it through the computer, but he doesn't --
20   he doesn't do the searches or decide which
21   ones to retrieve.  I do that.
22            Q.      Okay.  Did you have any
23   discussions with your husband about the
24   substantive content of the report that's
25   identified as Exhibit 4?

Confidential - Pursuant to Protective Order

Page 27

1          A.      No.

2          Q.      Does he do any evaluation --

3    for example, if you were to provide him a

4    search and it generates multiple documents by

5    a given author, does he identify additional

6    articles that you might want to consider?

7          A.      Only -- he has done that, but

8    only with the streams of letters to the

9    editor.  So I ask him always if I'm pulling

10   an article.  Happens a lot at the New England

11   Journal of Medicine or some of the other

12   medical journals where there's pretty active

13   letter to the editor correspondence that

14   happens.

15               So I always say to him, "If

16   there's any citation to this through the

17   letter to the editor comments, would you

18   please retrieve those," and so he will do

19   that search to look for that.

20         Q.      Okay.

21         A.      And I'm not sure that that

22   happened in any of these articles, but I'm

23   talking my general process that we use.

24         Q.      Okay.  In terms of the

25   relationship of the three reports that have

Confidential - Pursuant to Protective Order

Page 28

1    been marked as Exhibits 2, 3 and 4 to each

2    other, what is your -- what is your position

3    with respect to opinions that you have stated

4    or language you have used in Exhibits 2 and 3

5    that may not appear in Exhibit 4?

6          A.    I don't think I understand what

7    your -- what you mean by my position.  Are

8    you asking --

9              MS. PARFITT:  And I'll object

10         to that question.

11             THE WITNESS:  Are you asking me

12         to describe -- I mean, I could

13         describe for you the overlap.  I mean,

14         there's not complete overlap.  Is that

15         what you're asking me or --

16   QUESTIONS BY MS. BRANSCOME:

17         Q.    I am.  Why don't you take a

18   shot at it and then I may narrow my question,

19   but I'm just trying to understand how the

20   reports relate to one another.

21             MR. MEADOWS:  Objection.

22             THE WITNESS:  So they relate to

23         each other, I would say, based on

24         timing first, because obviously the

25         first report was two years ago, and

Confidential - Pursuant to Protective Order

Page 29

1              then many more documents.  So that's

2              how the 1 and 2 relate -- or Exhibit 2

3              and 3 relate to each other.

4                   In the MDL litigation, I was

5              asked to address very specific topics

6              and things because there's a -- it's a

7              different -- I don't know all of them,

8              but there's a different set of experts

9              that work in different litigations.

10                  So my role in the MDL, I

11             believe, is set out based on this

12             report, whereas in the original

13             reports I may have had -- I did have a

14             broader role in some of those cases.

15    QUESTIONS BY MS. BRANSCOME:

16             Q.    Okay.  Can you describe for me

17    your understanding of your role in the MDL?

18             A.    It's my understanding that I

19    have been asked to provide opinions related

20    to the -- generally the toxicology of talcum

21    powder products, including all the individual

22    constituents that make up that product; to

23    look historically back in time about what was

24    known and when about the toxic effects of

25    talc and different constituents within talc.

Confidential - Pursuant to Protective Order

Page 30

 1    And that was sort of the -- that's been --
 2    I consider that sort of the meat of what I've
 3    been asked to do.
 4                But separate from that, another
 5    part important part of my testimony or things
 6    I was asked to provide was an overview of the
 7    regulatory process for cosmetics and then the
 8    information that accumulated scientifically,
 9    how that related to what a company is
10    required to do under the regulations in order
11    to provide consumers with appropriate
12    information about the safety of the product.
13    So kind of the regulatory opinions, I guess
14    you want to call it, that area.
15                I have sections on that, and I
16    think you can see that by the different
17    sections in my report where I set out
18    different general topics.
19                And then I was also asked to
20    address some of the issues related to how the
21    information on the safety of talc has been
22    disseminated publicly and also based on my
23    review of different internal company
24    documents, both from Johnson & Johnson -- or
25    from Johnson & Johnson, Imerys, as well as

Confidential - Pursuant to Protective Order

Page 31

1    the PCPC, which is the Personal Care Products

2    Council, formerly known as the CTFA, to look

3    at those interactions and how those companies

4    set about to influence the process around the

5    safety assessment of talc over the years.  So

6    different activities that happened with

7    respect to the ISRTP meetings in the '90s,

8    with respect to the NTP process at different

9    points in time.

10             The CIR process, I think I

11   cover, and I also talk a little bit about

12   IARC, I believe, as well.

13             So the interactions of the

14   industry with the science and then how that

15   science ends up getting described within --

16   either to regulators or to bodies that are

17   reviewing the science related to the

18   products.

19        Q.    You mentioned as one of the

20   categories that you were asked to opine about

21   in the MDL that you were looking to set about

22   the influence that companies may have exerted

23   over the regulatory process or PCPC.

24             When you began that analysis,

25   did you start with the predicate belief that

Confidential - Pursuant to Protective Order

Page 32

1    the companies had, in fact, influenced the

2    regulators or PCPC?

3                    MR. MEADOWS:  Objection.

4                    THE WITNESS:  Not in my -- not

5         when I first started this process.  So

6         that is -- those opinions actually go

7         back into my original report.  So

8         that's not something, I don't believe,

9         that was not covered in my original

10        report or even in my supplemental

11        report.  I just have different -- some

12        additional documents that I have

13        reviewed.

14   QUESTIONS BY MS. BRANSCOME:

15        Q.    Okay.

16        A.    And this is something when I

17   first evaluated the case and first started

18   looking at the documents, those are opinions

19   that I had formed based on my review.

20                    Certainly by the time I drafted

21   the MDL report, I think if you listened to

22   my -- read my trial testimony, you understand

23   I had those opinions at the time I started

24   writing this report.

25        Q.    Now, what I'd like to

Confidential - Pursuant to Protective Order

Page 33

1   understand next is, are there -- of the

2   topics that you just identified that you

3   understand that you're offering opinions

4   about in the MDL, which, if any, of those

5   topics are in your view new as compared to

6   the opinions that you have offered that are

7   contained in Exhibits 2 and 3?

8           MS. PARFITT:  Objection.

9           THE WITNESS:  So I don't think

10      any of the MDL opinions are new.

11  QUESTIONS BY MS. BRANSCOME:

12      Q.    Okay.

13      A.    I think that they may have --

14  they may -- they may cite to additional

15  documents that haven't been cited to in the

16  first two reports, but I believe there's a

17  significant overlap even on the documents

18  that are cited.

19      Q.    And you mentioned that your

20  role in the MDL is more narrow than the role

21  you've served in other cases.

22          What topics have you opined

23  about in other cases that you are not

24  intending to opine about in the MDL?

25      A.    So I am not doing general

Confidential - Pursuant to Protective Order

Page 34

1    causation in the MDL, although I am indeed

2    providing opinions on certain aspects of the

3    cause and effect relationship such as -- you

4    know, I talk about biologic plausibility,

5    underlying knowledge about different

6    toxicities of the compounds over time, but

7    I'm not doing a full causation analysis in my

8    MDL report, and hopefully you see that when

9    you read the report.

10        Q.    So as you sit here today,

11   Dr. Plunkett, you are not intending to offer

12   the opinion in the MDL that Johnson's baby

13   powder causes ovarian cancer; is that

14   correct?

15        A.    Not in those words.  I think if

16   you read my report, I talk about the

17   fact that Johnson -- it's my opinion that

18   Johnson's baby powder increases the risk of

19   cancer -- ovarian cancer, which is a

20   different assessment than the way you stated

21   it.

22        Q.    All right.  And it is -- as you

23   sit here today, Dr. Plunkett, it is your

24   understanding that you are not being offered

25   to give a, as you termed it, a general

Confidential - Pursuant to Protective Order

Page 35

1    causation opinion in the MDL, correct?

2         A.      That's my understanding, yes.

3         Q.      Now, you mentioned that the

4    analysis as to whether a substance increases

5    the risk of a particular outcome is different

6    than a causation analysis.

7              Can you explain to me what you

8    meant by that?

9         A.      So I discussed this yesterday

10   in my deposition.  There's -- there's a

11   process called risk assessment.  Sometime --

12   in the area of consumer products you can also

13   refer to it as safety assessment.  And then

14   there's the process of what I call general

15   causation analysis, or full causation

16   analysis.

17             So even though the types of

18   information that are considered may overlap

19   between those two, the outcome or the

20   statements or the -- the way you go about

21   assessing the information is a bit different.

22        Q.      Explain to me how they're

23   different.

24        A.      So in a risk assessment, the

25   process starts with setting out some basic

Confidential - Pursuant to Protective Order

Page 36

1    principles of, first, is there a hazard, is

2    the first step.  Is there a hazard that would

3    be relevant to human health.

4                    Then looking at the data and

5    determining whether that -- that body of data

6    allows you to either quantify risk in some

7    way or to qualitatively shows you that

8    there's a change in risk based on exposure to

9    the product.

10                   So your statement may be as

11   simple as there's an increased risk, or you

12   can take data in a risk assessment and do a

13   quantification such as in a -- a cancer risk

14   assessment based on an animal data set.  You

15   might actually calculate a cancer potency

16   factor, for example.  Those kinds of things.

17   That's another application of risk

18   assessment.  Same basic process but focusing

19   just, for example, on one study.

20                   My human health risk assessment

21   or safety assessment, like the causation

22   analysis, does look across all kinds of data,

23   but my goal was not to analyze the data under

24   the Hill considerations, which is what I

25   would typically do, in order to go through

Confidential - Pursuant to Protective Order

Page 37

1    the process of making that final opinion that
2    indeed baby powder -- exposure to baby powder
3    through genital application is a cause of
4    ovarian cancer in women.  That's -- to me,
5    that's a different way to go about thinking
6    about the question that you have to answer.
7                 And also the -- some of the
8    data that you evaluate is evaluated a bit
9    differently.  So, for example, in my
10   increase -- in my issue of increased risk, I
11   use the epidemiology as supporting evidence,
12   but I'm really focused on -- on -- more on
13   the underlying sort of the biologic
14   information that we have that identifies
15   hazard and risk.  So looking at the animal
16   data, the exposure potential for the product,
17   and then using that along with what we know
18   with the human experience to characterize
19   risk.
20        Q.    Is there a different level of
21   certainty required to render a causation
22   opinion than to render an opinion that
23   there's an increased risk?
24        A.    I don't know that I'd describe
25   it quite that way but -- because to me it's a

Confidential - Pursuant to Protective Order

Page 38

1    different process.  I certainly have to be

2    just as certain about what I say about risk

3    when I do a risk assessment as I do about --

4    as I do when I'm doing a causation analysis.

5             I don't -- maybe you mean

6    something else, so maybe you can -- I mean,

7    I -- I certainly use the same basic standards

8    in my mind, how I weigh evidence to do the

9    different processes, but I go about them in a

10   little bit different way when I do a risk

11   assessment versus -- versus a causation

12   analysis.

13        Q.    In your view, does the strength

14   of the evidence have to be greater in order

15   to determine that an agent causes a disease,

16   for example, than it does simply to say that

17   an agent increases the risk of a particular

18   outcome?

19             MR. MEADOWS:  Objection.

20             THE WITNESS:  I don't think

21        I've ever thought about it that way.

22        I would say to you that strength --

23        the strength of the association is a

24        consideration under Hill that you

25        apply the epidemiology data mainly, so

Confidential - Pursuant to Protective Order

Page 39

```
 1          that is a different consideration
 2          under causation than you do -- as you
 3          would do it in a risk assessment.
 4              But the strength of the
 5          evidence, it's still a judgment based
 6          on your experience and training as far
 7          as whether or not there is enough
 8          information to be able to say that you
 9          believe that there is -- enough
10          information to say that the risk is
11          increased based on that exposure and
12          those conditions and whatever the
13          toxicity profile of that compound is.
14   QUESTIONS BY MS. BRANSCOME:
15          Q.    Okay.  We'll get into this more
16   a little bit later, but when you say that a
17   risk is increased, is there a threshold level
18   of increase that you need to see in order to
19   render an opinion in a court of law that an
20   agent increases the risk of a particular
21   outcome?
22              MR. MEADOWS:  Objection.
23              THE WITNESS:  So I need you to
24          define what you mean by threshold.
25          Are you asking me a specific
```

Confidential - Pursuant to Protective Order

Page 40

1          statistical test you would apply, or

2          what are you asking?

3     QUESTIONS BY MS. BRANSCOME:

4          Q.     So understanding that for the

5     most part if you're looking at statistical

6     significance, you're looking whether the

7     confidence interval crosses 1.

8                Are you following?

9          A.     Yes, I know that, yeah.

10         Q.     All right.  And so when you're

11    evaluating, though, whether a particular

12    substance, in this case Johnson's baby

13    powder, increases the risk of an outcome,

14    again, in this case ovarian cancer, would it

15    be sufficient for you if that increase was

16    .01 percent, for example?

17               MR. MEADOWS:  Objection.

18               THE WITNESS:  That doesn't make

19          sense to me, an increase of .01

20          percent, but maybe I can answer it

21          this way for you based on what you've

22          laid out there.

23               Certainly when I do a risk

24          assessment and I make it -- if I'm

25          going to make the conclusion that I

Confidential - Pursuant to Protective Order

Page 41

1        believe that it's my opinion to a

2        reasonable degree of scientific

3        certainty that exposure to baby powder

4        in women increases the risk of cancer,

5        I'm having to rely on -- I do rely on

6        data that allows me to draw

7        conclusions because either there's a

8        statistical significant finding found

9        or the -- there's a consistency among

10       the pattern of the data that shows

11       there's information that fits together

12       consistently.  And maybe -- you want

13       me to explain what I mean by that?

14       No?

15             Whereas I think what you're

16       asking is when an epidemiologist

17       applies -- looks at a body of -- in a

18       causation analysis looks at a body --

19       and I do this, too -- looks at a body

20       of epidemiological studies and you

21       weight the studies, obviously you're

22       weighting the studies differently

23       based on whether they have shown

24       statistical significance or not,

25       right?

Confidential - Pursuant to Protective Order

Page 42

1            And it isn't that it's a one to

2       one.  If you have one positive and one

3       negative, that isn't how you may

4       decide to finally weight that

5       evidence, but certainly you have to

6       consider whether or not what was seen

7       or reported is showing you something

8       reliable -- or you can make a

9       statement reliably about whether or

10      not that finding was biologically

11      significant.  And biologically

12      significant would typically be linked

13      to a finding that has statistical

14      significance in an epi study unless

15      the study was not designed to be able

16      to answer the question properly.

17           So -- and I've discussed that a

18      little bit yesterday with Mr. Smith on

19      the issue of power to detect.  So

20      that's something you do consider in

21      epi.

22           But, yes, statistical

23      significance certainly goes into your

24      weight of the evidence there.

25

Confidential - Pursuant to Protective Order

Page 43

1    QUESTIONS BY MS. BRANSCOME:

2        Q.      Okay.  You talked about you're

3    intending to offer an opinion with respect to

4    what a company is required to do under the

5    regulations; is that correct?

6        A.      Yes.

7        Q.      Okay.  What regulations are you

8    specifically referring to?

9        A.      So cosmetic regulations that

10   exist within -- so it's the entire process as

11   I describe how cosmetic -- what -- are

12   cosmetics subject to regulation by FDA?  Yes.

13   What are the types of things that companies

14   have to do before they're marketed, what does

15   the company have to do once the product is on

16   the market, those kinds of things.

17       Q.      Have you ever worked directly

18   for any regulatory agency?

19       A.      No, I have not.

20       Q.      And suffice it to say you have

21   never been in a decision-making position

22   within a regulatory agency, correct?

23       A.      That's correct, I have not.

24       Q.      Have you ever been in a

25   decision-making position with respect to a

Confidential - Pursuant to Protective Order

Page 44

1    company evaluating compliance with FDA

2    regulations with respect to cosmetics?

3            A.      Yes.

4            Q.      Okay.  What is your experience

5    with respect to that?

6            A.      So that's -- one of the clients

7    that I currently work for where I am asked to

8    provide input on advertising, promotion and

9    labeling of some of the products and then

10   also some of the ingredients that are being

11   promoted for use to -- to produce cosmetic

12   products.  So it's the idea of providing that

13   advice over my understanding of the

14   regulations what can be said and can't be

15   said about certain ingredients.

16                  This company is involved in

17   making both ingredients but also some

18   finished products now based on -- it's a

19   large company that owns a lot of little

20   subsidiaries.

21           Q.      My question, though,

22   Dr. Plunkett, was, have you ever been in a

23   decision-making position for a company

24   evaluating compliance with FDA regulations

25   with respect to cosmetics?

Confidential - Pursuant to Protective Order

Page 45

1            MS. PARFITT:  Objection.  Asked
2       and answered.
3            THE WITNESS:  So that's what
4       I'm saying.  They're relying on my
5       input to make a decision on what will
6       go in the materials.
7   QUESTIONS BY MS. BRANSCOME:
8       Q.    Do you have decision-making
9   authority within that company or, as you
10  described it, are you providing advice and
11  input?
12      A.    I'm providing advice, but the
13  things I'm advising on are the things that
14  happened.  So in other words, they don't have
15  anybody in the company that understands the
16  process of what they can say.  So I -- I
17  advise them that you need to remove this
18  language or that this is more appropriate
19  language.  They make those changes, and then
20  that is what is done.
21            So I agree, I'm not an employee
22  of that company.  I am a consultant working
23  with the company, but it is a little
24  different than some of the work that I do
25  where I -- what I -- the advice that I'm

Confidential - Pursuant to Protective Order

Page 46

1    giving is actually something that I know

2    actually happened.  Sometimes you give advice

3    to companies, but it doesn't -- we have no

4    idea whether the company actually follows our

5    advice.

6            Q.    My question is slightly

7    different, Dr. Plunkett.

8                 If you were to give advice to

9    the company that you've referenced as having

10   experience with cosmetic regulation

11   compliance that that company chose not to

12   follow, that company has the ability to

13   ignore your advice, correct?

14           A.    Yes, I would imagine that they

15   could do that.

16           Q.    Okay.  Have you ever drafted

17   regulations that relate to cosmetics?

18           A.    Actually drafted a regulation?

19   No, I have not.

20           Q.    All right.  You reference in

21   your report language out of 21 CFR 740.1, and

22   specifically -- you reference it in a few

23   places.  And I can direct you specifically to

24   paragraph 22 in Exhibit 4.

25           A.    Yes.  I'm there.

Confidential - Pursuant to Protective Order

Page 47

```
 1          Q.      All right.  And do you see here
 2     you have replicated language from 21 CFR
 3     740.1 that reads, "The label of a cosmetic
 4     product shall bear a warning statement
 5     whenever necessary or appropriate to prevent
 6     a health hazard that may be associated with
 7     the product"?
 8                  Do you see that?
 9          A.      Yes.
10          Q.      And you added emphasis on
11     particular portions of this sentence,
12     correct?
13          A.      Yes, I did that, exactly.
14          Q.      All right.  Now there's a
15     clause in this sentence that states,
16     "Whenever necessary or appropriate."
17                  Do you see that?
18          A.      Yes.
19          Q.      You did not emphasize that
20     language; is that correct?
21          A.      That's correct, I did not.
22          Q.      What is your understanding
23     as -- what you describe as an FDA regulatory
24     specialist of the meaning of "whenever
25     necessary or appropriate" in 21 CFR 740.1?
```

Confidential - Pursuant to Protective Order

Page 48

1          A.     So it's -- first off, you would

2     use the common English language definition.

3     I don't believe that those -- I haven't seen

4     a definition separate within the regulations.

5     Sometimes there will be.

6                So based on that and my

7     experience and the looking into what others

8     have described about this, this is the idea

9     of considering how the product is used, is

10    one of the -- one of the concerns that you

11    have, and whether or not the -- based on how

12    the product is used and how the product is

13    being sold, that in order to prevent a health

14    hazard, a warning hazard -- a warning

15    statement would be needed.

16         Q.     Can you cite to me any language

17    within the regulation or even supporting

18    documentation, a comment, something of that

19    nature, that would define "whenever necessary

20    or appropriate" with respect to how the

21    product is used?

22               MS. PARFITT:  Objection.

23               THE WITNESS:  I don't think I

24         understand your question.

25               Are you asking me to cite to a

Confidential - Pursuant to Protective Order

Page 49

1           reference or a part of the regulation

2           where they explain it, or what are you

3           asking me?  Guidance document or --

4    QUESTIONS BY MS. BRANSCOME:

5           Q.    Yes.  Can you point me to

6    anything other than your personal view of the

7    interpretation of this language that would

8    tie the requirement "whenever necessary or

9    appropriate" to how a product is used?

10                MS. PARFITT:  Objection.  Form.

11                THE WITNESS:  I'll have to go

12          look for you whether there's a

13          guidance that states it that way.

14          This is based on my experience in

15          dealing with the products in the past.

16                I think that's also consistent

17          with what is described, I would say to

18          you, within -- it's consistent -- what

19          I'm describing to you, it's consistent

20          as well with how the CIR standard for

21          safety assessment is done, looking at

22          the issue of the -- of the -- of the

23          use.

24   QUESTIONS BY MS. BRANSCOME:

25          Q.    When you say that you're basing

Confidential - Pursuant to Protective Order

Page 50

1    your interpretation of the clause "whenever

2    necessary or appropriate" on your personal

3    experience, can you point me to something

4    specific?

5                    MS. PARFITT:  Objection.

6                    THE WITNESS:  Are you asking

7          me -- are you asking me if I've ever

8          had a company that I worked for that

9          that particular clause in here was

10         extremely important to how we

11         interpreted it?  I don't think I can

12         point you to that.  I don't recall

13         ever having to do that specifically.

14                    Or is it something different

15         you're asking me?

16    QUESTIONS BY MS. BRANSCOME:

17         Q.    Dr. Plunkett, I asked you what

18    your basis was for interpreting the language

19    "whenever necessary or appropriate" means

20    that it's related to how a product is being

21    used, and the answer that you provided was

22    that it was based off of your personal

23    experience.

24                    So I'm asking you, what is that

25    personal experience that gives you the basis

Confidential - Pursuant to Protective Order

Page 51

1    for that specific interpretation?

2                    MR. MEADOWS:  Objection.

3                    MS. PARFITT:  Objection.

4                    THE WITNESS:  So it's in my

5           experience in dealing with companies

6           that make products and what types of

7           warnings are put or not put onto -- or

8           not -- or on labeling.  So I don't

9           know how else to answer it other than

10          that.

11                   I can go back and look at the

12          guidance documents to see if that is

13          described in another way, but I don't

14          recall that.

15   QUESTIONS BY MS. BRANSCOME:

16          Q.    So as you sit here today,

17   you're not able to provide me either with a

18   third-party document or an independent

19   document interpreting "whenever necessary or

20   appropriate" as you've suggested today, nor

21   can you give me specific example from your

22   personal experience; is that correct?

23                   MS. PARFITT:  Objection.

24                   THE WITNESS:  Well, I

25          certainly -- I'd have to go back and

Confidential - Pursuant to Protective Order

Page 52

1          look at my documents in order -- the
2          first part of your question, I'd have
3          to go back and look.  Off the top of
4          my head, I can't tell what I would
5          point you to.
6                On the second one, I think I
7          was telling you, is I don't -- I've
8          never -- I don't have a client that
9          I've worked for where that part of the
10         language was the only issue that I had
11         to deal with when I'm looking at
12         whether or not the product needs a
13         warning or not.
14               So typically -- I'm just
15         telling you that when I have looked at
16         labeling for products and looked at
17         the issue of does it need a warning
18         statement, when I'm reading it as
19         "whenever necessary or appropriate,"
20         I'm looking at whether or not the
21         ingredient that I'm concerned about
22         within the product, how that is used
23         or what the exposure pattern would be,
24         route of exposure, how those things
25         might relate to how I would assess the

Confidential - Pursuant to Protective Order

Page 53

1          safety issue at hand.  And so that's

2          what I'm trying to tell you.

3      QUESTIONS BY MS. BRANSCOME:

4          Q.     Okay.  You also have --

5      changing topics a little bit, in this -- in

6      your report marked as Exhibit 4, if you could

7      turn to paragraph 10.

8                 On page 7, you state on the

9      first paragraph on page 7, "In other

10     instances I have directed others to perform

11     searches on my behalf," and this is with

12     respect to identifying documents for review

13     in forming your opinions.

14                What did you mean by that?

15         A.     So in addition to doing my own

16     searches of the database, sometimes I -- I

17     have called the attorney's office and asked

18     them to -- to do a search for certain things

19     that I'm looking for to add to.  So in other

20     words, I have a document I've identified.

21     I'm looking for other documents like that in

22     the large millions and millions of documents

23     that are available.  And so sometimes I will

24     ask attorneys to do -- to look in the

25     database for other documents like the ones

Confidential - Pursuant to Protective Order

Page 54

1   that I've identified.

2         Q.      And without getting into

3   anything that would be -- that would call for

4   information protected by the attorney/client

5   privilege or attorney work product, what

6   percentage of the overall searches for

7   relevant documents from these particular

8   databases that are discussed in paragraph 10

9   would you say that you have done yourself as

10  opposed to directed others to do?

11        A.      Well, initially when I first

12  started searching, those were my own searches

13  exclusively.  I would say that more recently,

14  in the last year, since I haven't added any

15  real new areas but there's new documents that

16  have become available, so anything -- any of

17  the searches probably in the last year that

18  dealt with new discovery that was produced, I

19  would have asked the attorneys to do some of

20  the searching in that for me.  Like I'm

21  looking for documents that are similar to

22  this document that I cited in my original

23  report around this same frame that may be

24  discussing this same topic area.

25                 So in the last year I have

Confidential - Pursuant to Protective Order

Page 55

1    asked them to do that more than I have done

2    it, but initially it was what I did

3    initially.

4           Q.     Okay.  Do you keep any records

5    of the various document searches either that

6    you have performed or you have asked to be

7    performed?

8           A.     No, I don't.  My record would

9    be -- the initial -- the record would have

10   been what I listed in my reliance list for

11   you in the initial report, but since then it

12   would just be what is going to be changing

13   within my reliance list, looking at

14   additional documents.  That's the only way I

15   could identify for you.  That would be my --

16   my trail to know what was new and what was

17   not.

18          Q.     My question is slightly

19   different.  Understanding that you have

20   provided to some extent a record of the

21   documents, my question is:  Do you have any

22   type of record for the nature of the

23   searches, what it was that you set out to

24   identify in the database and how did you go

25   about finding those documents?

Confidential - Pursuant to Protective Order

Page 56

 1        A.     So that might cross over into

 2   work product because it's not my database,

 3   but I don't know how to answer that.  I mean,

 4   I'm sure -- it's very possible that in the

 5   database you can track that, but I -- I don't

 6   know.

 7                MR. MEADOWS:  Okay.

 8                THE WITNESS:  I don't have

 9           anything saved on my computer that

10           way, but when you go to the database

11           itself, it's possible you could track

12           that.  I just don't have a record on

13           my computer in my office.

14   QUESTIONS BY MS. BRANSCOME:

15        Q.     When you made the decision at

16   some point in time -- it may have been even

17   prior to you issuing your first report --

18   that you wanted to look at company documents,

19   did you set out specific categories of

20   documents that you wanted to review?

21        A.     Not so much categories but key

22   words.  So -- and areas.  I guess areas is

23   what I -- yes, I was focusing, for example,

24   in my initial report on documents that

25   described what was known -- what the company

Confidential - Pursuant to Protective Order

Page 57

1    was discussing about cancer, ovarian cancer,

2    cancer generally.  So that was a key word

3    used.

4                    And then I also was linking

5    that in different searches with different

6    time periods such as the NTP review process

7    and dates.  You can, you know, narrow down by

8    dates or by the CIR process.  Those kinds of

9    things.

10                    So I did start with that,

11    trying to understand what -- what is -- what

12    was in the company files or in the files I

13    had access to, the database, that dealt with

14    those kinds of things because those aren't

15    things that I could get to publicly.

16    Obviously in the literature.  So I had to --

17    if I wanted to understand what the company

18    knew, I had to go into their database to find

19    out, you know, what they knew -- what they

20    knew or were discussing over time about the

21    ovarian cancer issue or about asbestos in

22    talc or about CIR process, things like that.

23         Q.    Using the reports that you have

24    produced, Exhibits 2, 3 and 4, really, and

25    the full -- the entirety of the materials

Confidential - Pursuant to Protective Order

Page 58

1    that you have produced in the MDL, is there

2    any way that someone reviewing those

3    documents, and those documents alone, could

4    replicate the searches that you have

5    conducted in the company databases?

6              MR. MEADOWS:  Objection.

7              THE WITNESS:  I don't know.

8         That's a good question.  I've never

9         thought about whether you could

10         replicate or not.

11              I mean, I think I've told you

12         what I did.  My strategy was to focus

13         on topic areas.  So I think you

14         might -- by topic areas, if you use

15         the same kinds of topics areas as

16         described, I think you would come up

17         with documents that -- what it focused

18         down to.

19              For example, I also would

20         sometimes, as linking those words, I

21         might put in J&J documents only or

22         Imerys documents only, because the

23         database has a variety -- and the

24         PCPC.  There's some different ways by

25         the Bates numbers that you can

Confidential - Pursuant to Protective Order

Page 59

1        segregate documents as well.  But I
2        don't know other than that.  That's
3        all I can tell you.
4    QUESTIONS BY MS. BRANSCOME:
5        Q.    You would agree with me that
6    your report does not contain a complete
7    explanation of the process by which you
8    identify company documents to review,
9    correct?
10       A.    I haven't laid out my search
11   structure, that is true.
12       Q.    All right.  Now, the articles
13   that you have listed on your reliance list,
14   have you read each and every one of those
15   articles?
16       A.    Unfortunately, yes, over time I
17   have.  Some of them I have only read parts of
18   them.  For example, if I started reading a
19   document and I felt that it was something I
20   pulled that really wasn't directly on point
21   for an area I'm covering, I may not have read
22   every word, but certainly I have been through
23   each of those, yes.
24       Q.    Are there any articles in your
25   reliance list, that you maintained on your

Confidential - Pursuant to Protective Order

Page 60

1    reliance list, that you read, but then once

2    you started reading decided weren't relevant

3    to the opinions that you were offering?

4         A.    I would have to look to answer

5    that for you.  I don't know.  If you want me

6    to do that, I'd have to look.

7         Q.    I ask you more as a process

8    matter.

9         A.    Oh.

10        Q.    If you pull an article and you

11   start reading it and you realize that it is

12   not relevant to the opinions that you offered

13   in this case, the example that you just gave,

14   is it something that you would include in

15   your reliance list?

16        A.    Yes, I -- I have given you

17   everything I retrieved.  So if I retrieved

18   it, you would have, yes, absolutely.

19        Q.    Okay.  So it's fair to say of

20   the articles that are on your reliance list,

21   you could not say as you sit here today that

22   you have read each and every word of each and

23   every one of them, correct?

24        A.    That's correct.  And I could

25   probably tell you -- I could give you a

Confidential - Pursuant to Protective Order

Page 61

1   little guidance in that possibly if I went to

2   my list, I could try to pull some out that I

3   recognize, but that's all I would be able to

4   do for you.

5        Q.    Okay.  How did you go about

6   identifying what articles you wanted to

7   review in forming your opinions in the MDL?

8        A.    So first off, I went back to

9   what I already had.  So my MDL report is a --

10  is a compilation of a lot of material that's

11  in my first few reports.  That was the basis

12  for some of the things that went into it.

13              So I didn't -- I did do,

14  though, a updating on literature searches for

15  the MDL report, looking for anything new, for

16  example, in the area, especially the area of

17  cancer data or reports of dealing with

18  ovarian cancer either -- or any articles

19  dealing with the link between inflammation

20  and cancer, ovarian cancer, generally.

21  That's one of the areas I updated looking at.

22              And then I did -- I don't think

23  I did any large, new searches, however,

24  because honestly the areas covered here are a

25  little narrower than what was covered here.

Confidential - Pursuant to Protective Order

Page 62

1    I don't believe that there was any from the

2    published -- the publicly available medical

3    literature.  There wasn't a need to do a

4    whole new area of search.  It was more

5    updating the things that I've done in the

6    past.

7              So it's a real easy search to

8    update because you can just put in talc and

9    cancer and just look at -- get lots, but you

10   can then just start chronologically and look

11   what was published in the last year, for

12   example.

13        Q.    Okay.  Earlier when we were

14   discussing the fact that you in some

15   instances have asked your husband to pull

16   articles, have you maintained any records of

17   the searches that you have done with respect

18   to scientific literature, including the

19   searches that you have asked your husband to

20   do?

21        A.    I have not.  It's possible that

22   there are records on billing from the library

23   that tells you how many I ordered at

24   different times, but that is the only

25   records, because we do have to pay the

Confidential - Pursuant to Protective Order

Page 63

1    library for the retrieval.

2         Q.    Okay.  And if I understood what
3    you said earlier correctly, you indicated
4    that any article you have ever pulled for
5    review, you have listed on your reliance
6    list; is that correct?

7         A.    Yes.  And when I -- and let's
8    just make sure we're talking about the same
9    thing.

10             So, you know, in my reports I
11   typically have articles cited in the report
12   separate from the reliance list.  So I'm
13   talking about the reliance list, right?
14   Okay.

15             So -- because I do -- I do
16   usually -- I don't know whether I did that in
17   this report, but I typically have a list of
18   articles cited at the back called references,
19   that is, things that you're actually seeing
20   in the report body, and then there should be
21   a separate reliance list sent to you as an
22   appendix.  I don't know what the appendix
23   was.

24        Q.    Well, so then let's clarify
25   that.  So, Dr. Plunkett, when you're

Confidential - Pursuant to Protective Order

Page 64

1    referring to the reliance list, are you

2    referring to the list of articles that begins

3    on page 40 of Exhibit 4, or is there a

4    separate document?

5         A.      There's a separate document.

6    So it -- that's -- I usually call reliance

7    list the separate document.  I call this

8    references cited.  So I apologize for that

9    confusion.

10                So these, I have read every

11   word.  If it's in my reference list, those

12   are not an issue of not having read every

13   word, and these should all be cited somewhere

14   in the report.

15        Q.     Okay.  If you could turn to

16   paragraph 21 in your initial report.

17        A.     Yes, I'm there.

18        Q.     Okay.  So we're looking at

19   paragraph 21 in Exhibit 2.  This is on

20   page 10.

21                Do you see there is a sentence

22   here that refers to -- it's referring

23   generally to the topic of the ability of talc

24   to migrate from the site of application to

25   the ovaries.

Confidential - Pursuant to Protective Order

Page 65

1                    Do you see that?

2         A.      Yes.

3         Q.      And then the next sentence

4    states, "This issue was discussed by

5    scientific and regulatory bodies that review

6    the toxicokinetics of talc."

7                    Do you see that?

8         A.      Yes.

9         Q.      And in parentheses it

10   identified EPA 1992, IARC 2010, and CIR 2013.

11                   Do you see that?

12        A.      Yes.

13        Q.      Okay.  And then if you could

14   turn to Exhibit 4, which is your MDL report,

15   at paragraph 43.  It's on page 28.

16                   Are you with me?

17        A.      Yes, I am.

18        Q.      You see that the exact same

19   sentence appears -- well, not the exact same.

20   It's been slightly modified to combine the

21   first two sentences.  But here you cite only

22   to EPA 1992 and IARC 2010.

23                   Why did you remove CIR 2013?

24        A.      Because of my further

25   evaluation since my initial report in 2016 of

Confidential - Pursuant to Protective Order

Page 66

1    the process that was involved in the drafting

2    of the CIR and the actual production of the

3    report.

4        Q.    Is it your position that the

5    migration of talc was not evaluated as part

6    of CIR 2013?

7        A.    No.  That's not my position,

8    no.

9        Q.    Okay.  And so would the

10   sentence that's contained in paragraph 43 in

11   Exhibit 4, which is your MDL report, if you

12   cited to CIR 2013 in the parenthetical there,

13   would that not be an accurate citation?

14       A.    I believe it would not be an

15   accurate citation because I have formed

16   opinions about the reliability of that

17   document at this point in time.

18            So it has to do with -- I'm

19   citing to authorities here that I believe are

20   reliable as far as the discussion that I see,

21   and it's a different -- I have a different

22   opinion now about the CIR report, which I lay

23   out in pretty detail, I think.

24            In fact, if you go to my

25   section following this now in -- you'll

Confidential - Pursuant to Protective Order

Page 67

1  understand one of the issues I had was the --

2  the difference in the evidence that was

3  actually available once you dig into it a

4  little further versus what they actually

5  reviewed.  That's one of the issues.

6         Q.    And I'll follow up with some

7  more questions about the CIR, but my question

8  here is, the sentence in your report simply

9  states, "The migration of talc internally

10  after perineal application was discussed by

11  scientific and regulatory bodies that review

12  the toxicokinetics of talc."

13              Would it be inaccurate to say

14  that as part of the CIR 2013 process that

15  body did, in fact, discuss the migration of

16  talc internally after perineal application?

17         A.    It is true that they did

18  discuss it.  I just have an issue with the

19  reliability of their findings.

20         Q.    And so you made the decision to

21  just remove it from the citation; is that

22  correct?

23         A.    Yes, at this point -- at this

24  point, at this report, that's exactly right.

25         Q.    All right.  And then I had

Confidential - Pursuant to Protective Order

Page 68

1    another question.  In paragraph 43, you added

2    two studies from your prior -- that were --

3    that did not appear in your prior report, and

4    it was Gardner 1981 and Edelstam 1997.  This

5    related to animal studies showing that in

6    some species talc can migrate from the lower

7    to the upper genital tract?

8         A.     Yes.

9         Q.     Okay.  Were those studies that

10   you were aware of before drafting your prior

11   reports?

12        A.     I don't know that they -- I

13   can't answer that without looking at my

14   reliance materials for the original report.

15   I did identify additional articles, and

16   there's also additional articles cited here

17   in earlier paragraph 43 that were not cited

18   in my original report as well.  I don't think

19   I had the -- the Kunz article then cited.

20   I'd have to go back and look.

21              So it's possible that they were

22   in my -- when I say my reliance materials, my

23   original report also had a larger list of

24   literature I didn't cite.  So I'd have to

25   look.  I can't tell you whether I had them or

Confidential - Pursuant to Protective Order

Page 69

1    I did not.

2         Q.    Okay.  With respect to Edelstam

3    1997 study, do you happen to know the title

4    of that article?  Even an approximation would

5    work.

6         A.    It'll be -- should be back

7    here.  Just a second.  If it's not here,

8    that's a mistake.

9              Oh, here it is.  "Retrograde

10   migration of starch in the genital tract of

11   rabbits."

12        Q.    So you are citing that article

13   for the proposition that animal studies have

14   demonstrated that talc can migrate from the

15   lower to upper genital tract?

16        A.    Yes, I'm citing it because it's

17   relevant to the issue of particle migration,

18   which talc is a particle.  So, yes, that's

19   correct.

20        Q.    Okay.  But that study did not

21   specifically deal with talc migration,

22   correct?

23        A.    No.  Well, it -- it's relevant

24   to talc migration, but you're exactly right,

25   they looked at the starch migration, yes.  Or

Confidential - Pursuant to Protective Order

Page 70

1    particles that were starch, yes.

2         Q.    We'll cover this in more

3    detail, but is it your opinion that all

4    particles have similar characteristics with

5    respect to their ability to migrate in the

6    genital tract?

7         A.    It's my -- I don't know if I'd

8    state it quite that way.  What I would say is

9    that the evidence shows that particles

10   generally have the ability to move up the

11   reproductive tract in women, yes, and that if

12   a particle is one that is similar to talc or

13   some of the other ones where the information

14   has been collected, I would characterize that

15   as being within that, quote/unquote,

16   relevance of particles.

17              That doesn't mean all

18   particles, but certainly in the ones that I

19   have looked at and the data I've relied upon,

20   there's a variety of different types of

21   particles or substances that have been

22   studied and shown to be able to migrate.

23        Q.    So let's take Edelstam 1997 as

24   an example.

25              Did you do any analysis that

Confidential - Pursuant to Protective Order

Page 71

1  you can point me to that establishes that

2  starch would have a similar migration pattern

3  as talc?

4       A.    So I would say that the paper

5  itself shows -- talks about the movement of

6  starch, but are you asking something

7  different?

8            Are you asking me have I done a

9  specific analysis of any differences that may

10  occur between the migration pattern of starch

11  and talc?  Is that what you're asking me?

12       Q.    That is what I'm asking you.

13       A.    I certainly didn't do an

14  in-depth analysis of the differences, no, but

15  based upon my review of the literature, I

16  believe that that paper is relevant to the

17  overall question of migration of particulate

18  through the reproductive tract, including

19  particles of talc.

20       Q.    Regardless of whether or not it

21  was an in-depth analysis, can you point me to

22  anything other than just your belief after

23  having read these articles that starch and

24  talc would have similar migratory

25  characteristics in the human or animal

Confidential - Pursuant to Protective Order

Page 72

1   genital tract?

2              MS. PARFITT:  Objection.

3              THE WITNESS:  Again, I haven't

4        done an in-depth analysis.  I mean, as

5        a toxicologist, there are differences

6        between starch and talc, absolutely.

7        For example, starch would -- I would

8        expect to be more easily solubilized

9        within fluids, and so that could

10       affect the ability of them to actually

11       not migrate as well as a talc

12       particle, which would be less soluble

13       than the starch would be.

14              And there's -- I even --

15       there's a paper I have in here, and I

16       can look for it if you want, that

17       talks about that difference, and it's

18       one of the issues of cornstarch versus

19       talc, on whether or not you would

20       expect to get the long-term chronic

21       responses with the difference between

22       those two substances.

23              So I do think there's

24       difference, absolutely, as

25       toxicologists generally.  And the only

Confidential - Pursuant to Protective Order

Page 73

1          reason I'm citing this paper is

2          because I'm trying to be complete

3          about people that have looked at this

4          issue.  And certainly it was a study

5          that looked at this issue and talks

6          about the movement.

7               But I wouldn't expect starch

8          and the talc to have the same

9          liabilities, and I also wouldn't

10         expect them to move exactly the same

11         speed maybe.  That's very true.

12  QUESTIONS BY MS. BRANSCOME:

13         Q.    So you would agree with me that

14  Edelstam is not a study demonstrating that

15  talc can migrate from the lower to upper

16  genital tract, correct?

17               MS. PARFITT:  Objection.  Form.

18               THE WITNESS:  I wouldn't say it

19         that way.  What I would say instead is

20         that Edelstam is a study that forms

21         the overall weight of the evidence for

22         the ethics -- for the studies that are

23         available that address the issue of

24         migration, but certainly it is not

25         studying talc.  So I don't disagree

Confidential - Pursuant to Protective Order

Page 74

1          with you there.

2                    Unfortunately, the majority of

3          the information that I have relied

4          upon, and others such as the FDA in

5          making their statements about

6          migration, is not all directed studies

7          just to talc.  It's looking at the

8          issue of particle movement.

9     QUESTIONS BY MS. BRANSCOME:

10         Q.    Now, in terms of doing your

11    risk assessment -- well, let me get back.  We

12    covered this earlier, and I want to return to

13    it for a moment.  Just to confirm:  For your

14    work in the MDL, you did not do a Bradford

15    Hill analysis, correct?

16         A.    I did not sit down and do a

17    Bradford Hill analysis when I started writing

18    this report.  I have done a Bradford Hill

19    analysis in the past, which is in my original

20    reports, but I certainly did not redo a

21    Bradford Hill when I sat down to draft my MDL

22    report, that is true.

23         Q.    Okay.  Let me be more precise.

24                    In the report that you have

25    produced that contains a description of your

Confidential - Pursuant to Protective Order

Page 75

1    opinions in the MDL, you have not set forth a

2    Bradford Hill analysis in that document which

3    is identified as Exhibit 4, correct?

4         A.    That is true, yes.

5              MS. PARFITT:  Objection.

6    QUESTIONS BY MS. BRANSCOME:

7         Q.    And in fact, the paragraph that

8    you -- or paragraphs that you have in your

9    prior reports that reference a Bradford Hill

10   analysis, those have not -- those have

11   actually not been replicated in any form in

12   Exhibit 4, correct?

13        A.    Yes, because, again, it was not

14   my role to do general cause.

15        Q.    Okay.  So then when we look at

16   the methodology that you employed in reaching

17   your opinions that are contained here in

18   Exhibit 4, how would you characterize the

19   methodology?

20        A.    As I have in the report.  I

21   talk about it being a risk assessment or a

22   safety assessment, that you could use those

23   terms interchangeably here.  And then I've

24   also used a weight of the evidence as a tool

25   to go through the different steps of the risk

Confidential - Pursuant to Protective Order

Page 76

1    assessment.

2          Q.      Okay.  What publication would

3    you direct me to that has used the same

4    methodology that you have used to reach your

5    opinions in Exhibit 4?

6          A.      I think I cite you to -- cite

7    you to some of those.  You could -- well, the

8    directly relevant one would be looking at the

9    chapter on risk -- toxicology in the

10   reference manual on scientific evidence.

11             You can also go to the NRC

12   report where they -- it lays out the

13   different steps that you use when you kind of

14   break data apart into exposure versus

15   response information.

16             And then I cite to -- there are

17   some guidance documents that I cite to, and

18   this is in paragraph 13.  And I'd have to

19   pull them out again to tell you which ones

20   relate to different pieces because some of

21   these are -- some of these documents are

22   specific to only, for example, maybe one part

23   of what I did.

24             But certainly the risk

25   assessment process at IARC is -- they do what

Confidential - Pursuant to Protective Order

Page 77

1    I call a hazard assessment.  They identify

2    hazard and they couldn't quantify risk, but

3    the steps they go through are essentially the

4    same types of steps that I went through as

5    far as gathering data on not just response

6    but also the potential for exposure and how

7    that relates to the response.

8                    And then also the data that

9    I've collected on the biologic effects of

10   talc, toxicology of talc, are also discussed

11   within that document as well.

12       Q.    Okay.  Focusing specifically on

13   the weight of the evidence tool, as you

14   describe it, is there a particular document

15   or publication that I would go to that could

16   lay out the same process that you used for

17   how you weighted certain pieces of evidence?

18       A.    So the documents that I've

19   cited for you in paragraph 13 talk about what

20   weight of the evidence is generally, but if

21   you read what it is, it's essentially a

22   process that each scientist brings their

23   experience, training and judgment to.

24                    So I try to lay out for you in

25   my discussion of the literature my thought

Confidential - Pursuant to Protective Order

Page 78

1    process as I review each piece of

2    information, and that is what you do as part

3    of weight of the evidence.  You gather all of

4    the relevant information that you can find

5    that address the question you're trying to

6    answer, and since I'm looking at both

7    exposure and response, I gather different

8    pools of information.

9          Q.    You would agree that there are

10   ways to do a weight of the evidence

11   assessment of published literature that

12   assign, for example, quantitative values to

13   particular pieces of evidence, correct?

14         A.    Certain individuals have put

15   together, but there's no one general accepted

16   process that everyone uses.  So I -- that's

17   the issue.  Again, there are certain --

18   certain cases where I've seen that done, and

19   then there are many -- most cases that it's

20   not what's done.

21         Q.    Okay.

22         A.    Another body, by the way, that

23   I -- it's new.  It's not in paragraph 13.  I

24   just want to make sure I tell you that so

25   we're clear.  If you look at the Canadian

Confidential - Pursuant to Protective Order

Page 79

1    document, they also -- in fact, a lot of what

2    they have, you'll see the same literature

3    described within my assessment as well.

4         Q.    So using the Canadian

5    assessment as an example, for instance, in

6    that assessment there were actually values

7    assigned to particular pieces of literature,

8    correct?

9         A.    Mainly the epidemiological

10   literature, that is true.  Again, but I'm not

11   doing causation, so I didn't approach it that

12   way.

13             But certainly if you look at

14   what I did, it's consistent with that because

15   I talk about the differences between the

16   limitations of a case-control versus a

17   prospective study.  I talk about both the

18   positives and the negatives within the

19   database, but I don't lay it out in a table

20   like they do.  But it's certainly the same

21   basic process.

22             I was actually quite surprised

23   at how similar the database of information

24   that they reviewed was to what I honed in on

25   as well.

Confidential - Pursuant to Protective Order

Page 80

1          Q.     Okay.  As you were forming your

2     opinions, Dr. Plunkett, about whether or not

3     there is a risk associated with the use of

4     Johnson's baby powder with respect to ovarian

5     cancer, how do you keep track of the pieces

6     of scientific evidence that you have reviewed

7     and the respective weight that you give to

8     them?

9                   Presumably you did not read

10    everything in one day, for example?

11         A.     No.  That's correct.  So I

12    typically will -- I typically will save the

13    papers -- when I read the papers, I will

14    often highlight in yellow information that I

15    think is going to -- will be extremely

16    relevant.  I don't put notes on the document.

17    I highlight in yellow on the PDF file to use

18    that to write.

19                   And I also start drafting

20    report very early, which then gets

21    overwritten and actually ends up looking like

22    an outline that eventually becomes the

23    report.

24                   So one of the ways I keep track

25    of things is I may put a paragraph name that

Confidential - Pursuant to Protective Order

Page 81

1    I know I'm going to write, such as exposure

2    migration, and then I -- as I'm reading a

3    paper, I'll type in a paper -- the ones that

4    I believe are important to my overall

5    assessment.  So I will do that as I'm -- as

6    I'm going through the evidence.

7              So that's one of the tools I

8    use, but I don't keep notes.  I just kind of

9    use that as a living document that eventually

10   becomes a report.

11        Q.    Do your opinions ever change as

12   you read additional pieces of scientific

13   evidence?

14        A.    Yes, it does.  It may change.

15   And it often -- often the changes, though,

16   are not that I believe -- with the exception

17   of epidemiology.  In other areas.

18   Epidemiology is a little bit different issue

19   when you're reviewing studies.

20              But on toxicology I always

21   start with reviews and regulatory

22   authorities, looking at what others have said

23   generally about the toxicology.  And so even

24   though I may refine opinions differently or I

25   might change, I certainly wouldn't agree to

Confidential - Pursuant to Protective Order

Page 82

1    work on a project to start with if my initial

2    reviews on hazard, for example, didn't

3    convince me that I believe that there is a

4    hazard.  But you refine it from there.

5    That's exactly right.

6                    So there are cases, however,

7    where I'm asked to work on a project where

8    there is no review or regulatory authority or

9    any kind of assessment over a period of

10   years, and in those cases there are times

11   when I start working on a project and I stop

12   and say, "I can't do this."  Because that

13   happens, yes.

14                   So opinions do change sometimes

15   based on review of additional information.

16        Q.     Is there any documentation that

17   you've produced either in your report or

18   otherwise in the MDL that would allow someone

19   reviewing the material to understand the

20   order in which you reviewed materials or the

21   specific weight that you assign them?

22        A.     So order of review, no.  I

23   don't think you would know that other than --

24   you will note order of review if you look at

25   the differences in the literature cited in my

Confidential - Pursuant to Protective Order

Page 83

1    original report versus in the MDL.

2                   So in my original reliance

3    list, if there were documents that weren't

4    there and they're now here, obviously that

5    tells you it was a review.

6                   On the issue of a -- of the

7    weight of the evidence process, the only

8    answer I can give you for that is that

9    articles that I believe are -- are reliable,

10   are relevant and are -- those are kind of

11   the -- you look at the reliability of the

12   studies, whether they're peer-reviewed or not

13   or if they have proper controls put into

14   place, things like that, whether or not

15   the -- they're relevant to the question at

16   hand.  That you can get from looking at how I

17   discuss them in the document.  But certainly

18   there's no, like, summary of that.

19                  But certainly -- I think you

20   understand -- you should understand when you

21   read my report what weight I'm giving based

22   on how I'm describing those -- those

23   materials.  I mean, it's --

24       Q.    Well, for example, you do have

25   different studies that you've identified in

Confidential - Pursuant to Protective Order

Page 84

1    your report that have been criticized by

2    others at some point in time, correct?

3         A.     Yes, that's true.

4         Q.     Okay.  Now, in some instances

5    you state that you then give little weight to

6    those studies, correct?

7         A.     Yes.

8         Q.     But in other instances you find

9    the criticized study to be helpful and

10   informative, correct?

11        A.     That's true.  Because, again,

12   judgment -- as anybody does weight of the

13   evidence, different scientists can have

14   different judgment.

15             Mainly, I think, when I look at

16   the differences in that -- in that regard, I

17   think you should pay attention to what the

18   person is.  So as a toxicologist, I may view

19   a certain type of -- piece of data very

20   differently than an epidemiologist may view

21   it, as far as the reliability or the

22   relevance, because we're coming at it from a

23   different training and experience and

24   judgment -- set of judgment on what is

25   important to a toxicologist when I'm talking

Confidential - Pursuant to Protective Order

Page 85

1    about risk versus how an epidemiologist might

2    talk about risk.

3          Q.    Could two different

4    toxicologists review the same piece of

5    literature and give it very different weight?

6          A.    I don't know about different

7    weight, but they certainly -- I know people

8    come to different conclusions based on their

9    overall assessments.  That happens,

10   definitely.  I mean, there are always going

11   to be individuals that look at things

12   differently.

13               I know in this case there are

14   people -- I've seen defense experts that

15   reports in -- not in the MDL but in other

16   cases, where people disagree with some of my

17   opinions, and I disagree with their opinions.

18   That happens.

19         Q.    Okay.  And so if I were --

20   well, let me just ask something.  You have

21   not provided any sort of quantitative

22   assessment of the weight that you gave

23   different pieces of evidence that you cite in

24   forming your opinions in the MDL, correct?

25               MS. PARFITT:  Objection.

Confidential - Pursuant to Protective Order

Page 86

1          Misstates her testimony.

2                MR. MEADOWS:  Objection.

3                THE WITNESS:  So I don't report

4          for you a table where I quantify that,

5          that is correct, but certainly that

6          is -- because, again, based upon

7          looking at the way that I was trained

8          and the documents that I'm talking --

9          I'm pointing you to to describe how to

10         do weight of the evidence, it is

11         not -- it is not a numerical exercise,

12         how many here, how many there, this

13         one gets 5 points because of this or

14         6 points because of this.

15               It's more an issue, again, of

16         judgment.  It's the idea of looking

17         across all of the available

18         information and determining whether or

19         not, based on that, it's your opinion

20         that there -- that, for example,

21         talc -- talc's toxicity profile

22         includes cancer.  That's one of the

23         judgments -- weight of the evidence

24         judgments you make, for example.

25

Confidential - Pursuant to Protective Order

Page 87

1    QUESTIONS BY MS. BRANSCOME:

2         Q.    So -- but, Dr. Plunkett, just

3    to be clear, you do not provide a numerical

4    value to the particular pieces of evidence

5    that you have considered as part of your

6    weight of the evidence assessment in the MDL,

7    correct?

8              MS. PARFITT:  Objection.  Form.

9              THE WITNESS:  So I do not

10             provide a numerical value as you see

11             it laid out, for example, in the

12             Canadian table, but certainly I do

13             judge articles that I include in my

14             weight of the evidence based on a

15             system that includes different

16             considerations such as -- like I said,

17             peer-reviewed or not, that makes an

18             issue.

19             Whether or not the study that's

20             being reported is the only one -- the

21             first or is this something that is --

22             that is describing an assessment

23             that's been done by someone else and

24             so you see a repetition or a

25             consistency among the studies that

Confidential - Pursuant to Protective Order

Page 88

1          you're looking at.

2                  The robustness of the data.

3          For example, the NTP GLP quality

4          animal study, very high quality in the

5          weight of the evidence.  And I talked

6          to you about that.  In fact, it --

7          even though people criticize that

8          study, that study is very valuable for

9          looking at biologic changes that are

10         consistent with a carcinogenic

11         mechanism being initiated.

12                 So even though you may say that

13         you can't quantify risk from that

14         animal study as far as calculating a

15         cancer potency factor, what you can do

16         is use that study of high quality to

17         make judgments within a weight of the

18         evidence for risk.

19    QUESTIONS BY MS. BRANSCOME:

20         Q.    Dr. Plunkett, you understand I

21    have seven hours today, and I -- while I'm

22    very interested in the answers that you give,

23    if we could just -- we will get to things

24    like NTP when we get there, if you could just

25    attempt to answer the question that I've

Confidential - Pursuant to Protective Order

Page 89

1    asked.

2                I simply asked the question:

3    Are there numerical values assigned to the

4    particular pieces of evidence that you have

5    considered as part of your weight of the

6    evidence assessment in reaching your opinions

7    in the MDL; yes or no?

8         A.      And I said to you, not in the

9    way that it's done -- I assume you're

10   referring to something like what was done --

11   what's in the Canadian epidemiology table.  I

12   have not done that, no.

13        Q.      Okay.

14        A.      That's exactly right.

15        Q.      Have you provided a qualitative

16   chart, for example, of the evidence that you

17   have considered in forming your opinions in

18   the MDL?

19                MS. PARFITT:  Objection.  Form.

20                THE WITNESS:  I don't know what

21        you mean by qualitative chart.  I

22        certainly have -- I certainly, I

23        believe, have given you qualitative

24        descriptions of my weight within my

25        discussions of each study, yes, I have

Confidential - Pursuant to Protective Order

Page 90

1        done that.

2    QUESTIONS BY MS. BRANSCOME:

3        Q.    You mention in response to the

4    prior question that you have a system for

5    weighting the pieces of evidence that you

6    have reviewed.

7              Can you point me to paragraphs

8    in your report marked Exhibit 4 that would

9    outline in detail the system that you used to

10   apply different weight analysis to different

11   pieces of evidence?

12              MS. PARFITT:  Objection.  Form.

13              THE WITNESS:  And I think I

14          answered that, that there's no system

15          written down by anyone.  But what

16          there is, instead, is if you read

17          these -- if you read these

18          descriptions of use of weight of the

19          evidence that I've cited in

20          paragraph 13 as well as the discussion

21          of methodology in the Canadian

22          document, that is consistent with what

23          I do.  It's the idea that you start

24          with a literature search for

25          peer-reviewed, publicly available

Confidential - Pursuant to Protective Order

Page 91

1              information.  You look at the quality
2              of the studies, the statistically
3              significant findings.  Those are all
4              things that are discussed within these
5              documents I'm pointing you to.
6      QUESTIONS BY MS. BRANSCOME:
7              Q.    Now, you --
8              A.    But it's -- it's -- I don't
9      know of anyone who has written down a
10     specific system that applies in all
11     circumstances, no.
12             Q.    Okay.  Have you written down a
13     system that applies specifically in this
14     case?
15             A.    I think I have tried to do that
16     for you when I describe what I did.
17             Q.    Okay.  You just referenced the
18     fact that your system can be found in the
19     Canadian document.
20                   You agree that the Canadian
21     analysis was actually published or produced
22     after you had completed your report in the
23     MDL, correct?
24                   MS. PARFITT:  Objection.  Form.
25                   THE WITNESS:  Certainly it was

Confidential - Pursuant to Protective Order

Page 92

1    published afterwards, and what I

2    thought I said to you was that if you

3    look at that document -- it's not in

4    paragraph 13, but if you look at that

5    document, it lays out a process.  And

6    I wouldn't call it a system.  It's a

7    process.  It's a process by which you

8    screen information for relevance to

9    the question being asked and how,

10   then, based on that, you look at

11   characteristics of that information

12   such as -- and I tried to give you

13   some of those.

14        And I've said this before in

15   depositions in these cases.  You know,

16   you look at the issue of whether or

17   not the study was peer-reviewed,

18   whether or not there was

19   statistically -- statistical

20   significance or at least statistics

21   applied to the data.  What was the

22   quality of the study as far as the

23   size in order to be able to answer the

24   question being asked.  Those are the

25   kinds of things that you look at.

Confidential - Pursuant to Protective Order

Page 93

 1                  And then also the question --
 2          when you're looking at a specific
 3          question, you may pull in -- like you
 4          asked me about the starch particle.
 5          You may pull in things that you give
 6          less weight because obviously that's
 7          not just talc, that's starch, and you
 8          have to consider that.  So that is
 9          part of the process.
10    QUESTIONS BY MS. BRANSCOME:
11          Q.    Dr. Plunkett, the question I
12    asked you simply was:  The paper that you
13    reference that contains some detail about the
14    Canadian analysis, that was published after
15    you completed your report that's marked here
16    as Exhibit 4; is that correct?
17                  MR. MEADOWS:  Objection.
18                  THE WITNESS:  Yes, and I
19          believe I answered that at the start.
20          I usually try to answer your question,
21          and then I try to explain further some
22          details I think are important context
23          on my answer.
24    QUESTIONS BY MS. BRANSCOME:
25          Q.    I understand that,

Confidential - Pursuant to Protective Order

Page 94

1    Dr. Plunkett.  You have given many

2    depositions.  You understand I can ask you

3    for more detail if that would be helpful to

4    me.

5              If you could, just focus on the

6    question that I asked, and we can explore

7    additional areas if that's something I'm

8    interested in doing.

9              Okay?

10             MR. MEADOWS:  Objection.

11             She's --

12             MS. BOCKUS:  Break?

13             MR. MEADOWS:  After I finish my

14        objection.

15             She's going to answer the

16        question as thoroughly as she feels

17        like she needs to answer the question

18        based on the way you ask it.

19             Want to take a break now?

20             MS. BRANSCOME:  We can go off

21        the record.

22             VIDEOGRAPHER:  We're going off

23        the record at 10:41 a.m.

24        (Off the record at 10:41 a.m.)

25             VIDEOGRAPHER:  We are back on

Confidential - Pursuant to Protective Order

Page 95

1          the record at 10:56 a.m.

2     QUESTIONS BY MS. BRANSCOME:

3          Q.     All right.  Dr. Plunkett, we

4     started talking a little bit about the CIR

5     analysis that was done in 2013.

6               Am I correct you no longer

7     consider that reliable?  Is that your

8     opinion?

9          A.     Yes.

10         Q.     Okay.  And you identify in your

11    report marked as Exhibit 4, I believe it's

12    paragraph 56?

13         A.     Yes, that's correct.  And I

14    think I talked about it later on as well, but

15    definitely I do here.

16         Q.     Okay.  And in paragraph 56, you

17    state that the CIR panel failed to account

18    for all the studies that informed on the

19    issue of migration of particles such as talc

20    upwards through the reproductive tract.

21               Is that your opinion?

22         A.     Yes.

23         Q.     Okay.  And then you state that

24    because of that you assign, quote, little

25    weight to the conclusions reached by the CIR

Confidential - Pursuant to Protective Order

Page 96

1    panel; is that correct?

2        A.    Yes.

3        Q.    And so is it your view that a

4    study or an analysis that reaches a

5    particular conclusion should be assigned

6    little weight if it fails to consider all

7    relevant scientific evidence to the issue

8    that it's evaluating?

9            MS. PARFITT:  Objection.

10           THE WITNESS:  I think it

11       depends on the situation, but that

12       could be the case, yes.  It depends

13       on -- on the -- depends on -- I think

14       it would depend on each case, the

15       question being asked, and what was

16       omitted.  But, yes, I think it could.

17   QUESTIONS BY MS. BRANSCOME:

18       Q.    Okay.  And in this situation

19   you identify -- I believe you claimed that

20   eight human studies were not considered by

21   the CIR 2013 panel; is that correct?

22       A.    Let me look at the number, but

23   that sounds about right.  Yes.

24       Q.    All right.  And returning,

25   actually, to your prior answer, you said that

Confidential - Pursuant to Protective Order

Page 97

1    the failure to consider all relevant

2    scientific evidence on a topic would lead you

3    to assign little weight to a particular

4    conclusion.  You said that that could happen.

5                Under what circumstances would

6    you assign a conclusion little weight for

7    failing to consider what you consider to be

8    all relevant pieces of scientific literature?

9         A.    Well, I think it depends --

10   well, the reason I specifically addressed

11   that in this case is because that was -- the

12   conclusions about migration is the main

13   reason why the CIR panel then draws

14   additional conclusions later on.

15               So my issue is, migration was

16   key to what -- the decisions they made about

17   the safety issues of talc.  And so in that

18   particular case, this -- this failure to

19   consider all the evidence was extremely

20   important, in my view, and I gave it little

21   weight.

22               There might be a situation

23   where some -- for example, you may only look

24   at six or eight studies, even though there

25   may be dozens out there.  You may have a

Confidential - Pursuant to Protective Order

Page 98

1    reason for why you only looked at six or
2    eight, or it may be -- and as a result you
3    may lay that out and, therefore, you may
4    still give weight to conclusions drawn.  Or
5    it may be that the six or eight are --
6    studies that you discuss are not -- the
7    weight is not affected by what you've
8    omitted.
9                   I believe that the weight is
10   affected by what is omitted when you look at
11   some of the articles being review articles,
12   which give you an understanding of what was
13   generally accepted within the scientific
14   community when you get to reviews, those
15   kinds of things.  So it really is a
16   case-by-case basis.
17                  But certainly I do believe that
18   it is possible that in another circumstance
19   where things are omitted you would come to
20   the same conclusion, that you give those
21   conclusions less weight.
22        Q.    Is there a way, if someone were
23   try to replicate the weighting of particular
24   evidence based upon your process, for them to
25   know whether or not the omission of a

Confidential - Pursuant to Protective Order

Page 99

1    citation of certain studies means that a

2    study should be given little weight or

3    whether it wouldn't affect the weighting of

4    that scientific article?

5                    MS. PARFITT:  Objection.  Form.

6                    THE WITNESS:  So I think this

7            is the issue of judgment, training and

8            experiencing that is applied to all

9            such assessments, and this is why

10           different scientists may come to

11           different conclusions.  But certainly

12           it is -- it was important to my

13           assessment on this issue because of

14           the prominent role that the CIR report

15           gives to their conclusions here for

16           why they then drew conclusions about

17           safety.  And so that link was

18           extremely important.

19                    MS. BRANSCOME:  Can we pause

20           for just a moment?

21                    VIDEOGRAPHER:  We are going off

22           the record at 11:00 a.m.

23                    (Off the record at 11:00 a.m.)

24                    VIDEOGRAPHER:  We are back on

25           the record at 11:01 a.m.

Confidential - Pursuant to Protective Order

Page 100

1    QUESTIONS BY MS. BRANSCOME:

2         Q.     Okay.  Of the eight studies

3    that you identify on page 37 of your report

4    that you contend the CIR panel did not

5    account for, do any of those eight studies

6    specifically discuss the migration of talc in

7    human subjects?

8         A.     No, I don't believe they do,

9    but there are a couple of these studies that

10   I found to be extremely important if you want

11   me to explain that to you.

12        Q.     Do you break out in your report

13   in any other paragraphs which of these eight

14   articles you consider to be extremely

15   important?

16             And if you could just point me

17   to paragraph numbers, that's good enough if

18   you have, in fact, broken them out.

19        A.     I have.  I -- this whole

20   section I break -- I talk about each one

21   individually.  So I think you can tell by

22   what I read -- what I'm discussing what I

23   thought was important and informative about

24   each of those.

25        Q.     Do you rank the eight studies

Confidential - Pursuant to Protective Order

Page 101

1   in any way by their importance to you?

2        A.     Not with any numerical rank,

3   no, but certainly I think I do that for you

4   when I talk about the studies.  I give you an

5   understanding of ones that I think are

6   particularly informative and ones that are

7   not.

8               So, for example, I weight the

9   human data -- I think I tell you that -- more

10  than the animal data because of the

11  differences between the reproductive tracts

12  of humans versus animals generally, upright

13  versus -- upright and habits and things that

14  humans do that relate to insertions in and

15  out of the reproductive tract, I guess is a

16  nice way to describe it, versus an animal,

17  that those can have, and then also the

18  differences between animals and humans in

19  terms of bursal sac around the ovary, those

20  kinds of things.

21              So I do -- that -- I guess that

22  ranking I do give you here.  I tell you that

23  I think these -- I think that the most

24  relevant are going to be the human studies

25  versus the animal studies.

Confidential - Pursuant to Protective Order

Page 102

1          Q.     Right.

2                 So my question specifically is,

3     where would you point me to in your report to

4     understand the weight that you gave each of

5     these particular eight studies?

6          A.     At my descriptions of those

7     studies and what I describe.  That's all I

8     can tell you.

9          Q.     And I'm just asking,

10    Dr. Plunkett, can you point me in the report

11    to where that discussion takes place?

12         A.     It takes place -- I have a

13    discussion for each study, and I would -- and

14    if you read what I say about each study, I

15    try to go through what the strengths and

16    weaknesses of those studies are.

17                And so those -- that would be,

18    let's see -- you want me to give you the

19    starting paragraph?

20         Q.     So, for example, Parmley and

21    Woodruff.  Can you point me to where in your

22    report you discuss Parmley and Woodruff, such

23    that I can understand the weight that you

24    gave that particular study?

25         A.     So the year of it is...

Confidential - Pursuant to Protective Order

Page 103

```
 1              So I think I discuss it in
 2    paragraph 44, and so I describe for you what
 3    important information is in there, which is
 4    the information that I take as forming part
 5    of my weight of the evidence.
 6              So one of the most important
 7    things is what -- they have a figure they
 8    show, and they're showing -- which is one of
 9    the unique figures in all of the published
10    literature.  But it talks about the
11    differences between the female reproductive
12    tract and the male reproductive tract, and it
13    shows the actual -- it talks about a
14    discussion of movement from substance in the
15    environment through -- into the vagina, into
16    the fallopian tubes.  So it's a paper that
17    addresses that very specific issue.
18         Q.    So my question to you, though,
19    is, where do you have a discussion of the
20    weight that you give to these particular
21    articles?
22         A.    So the discussion of the weight
23    has to do with the information described.  I
24    don't give them a numerical ranking.  I told
25    you that.
```

Confidential - Pursuant to Protective Order

Page 104

1              So what I do is, when I'm

2    discussing about these -- all of these papers

3    here contribute to my weight of the evidence.

4    And if it's a human study, I'm giving those

5    more weight than I'm giving animal studies.

6    And that's described.

7                  And then within papers I'm

8    pulling out information that contributes to

9    what I think is important about what the

10   study says, and that -- and the importance of

11   what is described within the study

12   contributes to my weight.

13                 And I don't know how else to

14   describe it to you.  That is the process that

15   scientists go through when they evaluate

16   data.

17      Q.    And so my question to you:

18   Earlier you said of these eight studies, some

19   of them were particularly important to you.

20                 How would I, using only what's

21   written in your report, understand which of

22   those eight studies was of particular

23   importance to you?

24      A.    So it would have to do with

25   what I discuss about the study.  So I'm

Confidential - Pursuant to Protective Order

Page 105

1   telling you, when I -- if you look through

2   this entire section, this is the Parmley and

3   Woodruff paper.  It is important because it

4   addresses the specific issue of movement of

5   environmental substances from the outside to

6   the inside.  So I'm giving that importance in

7   my evaluation because of what that author is

8   actually discussing.

9                I don't know how else to

10  describe that.  I apologize.  I mean, to me,

11  weight of the evidence is a process that

12  scientists use bringing their training and

13  experience and judgment, and it's not a

14  numerical process across the board, it just

15  is not, based on the way weight of the

16  evidence is used within science.

17       Q.    Now, Dr. Plunkett, though, you

18  would acknowledge that if you wanted to

19  assign numerical values to the studies, that

20  has been something that has been done by

21  other authors and other authors on whom you

22  rely, correct?

23                MS. PARFITT:  Objection.  Form.

24                THE WITNESS:  I don't believe

25       that's true.  I'll need to look -- I

Confidential - Pursuant to Protective Order

Page 106

1          don't believe that's true with respect

2          to the biological information.  I

3          believe it may be true with respect to

4          the epidemiology studies.

5                    You want me to look real quick

6          to confirm that?  I can do that really

7          quick, but...

8     QUESTIONS BY MS. BRANSCOME:

9          Q.     I'm simply saying, could you

10    assign a numerical value if you chose to do

11    so?

12                    MR. MEADOWS:  Objection.

13          Objection.  Form.

14                    THE WITNESS:  And I'm -- what

15          I'm trying to say to you is I think

16          that I -- that there is no one set of

17          rules that you would assign in order

18          to do that for all the types of

19          studies that you weigh.

20                    I would agree that I have seen

21          it routinely done -- well, not

22          routinely, but I've seen it done

23          within the epidemiological community

24          when they go through the epi data.

25          But not -- it's not something that

Confidential - Pursuant to Protective Order

Page 107

```
 1          I've seen done when you talk about
 2          weight of the evidence as part of a
 3          human health risk assessment.  That is
 4          not something that scientists
 5          typically do as far as giving
 6          numerical rankings.
 7     QUESTIONS BY MS. BRANSCOME:
 8          Q.     You're familiar with the
 9     National Cancer Institute, correct?
10          A.     Yes, I am.
11          Q.     All right.  They are considered
12     to be the nation's leader in cancer research,
13     correct?
14               MS. PARFITT:  Objection to
15          form.
16               THE WITNESS:  The National
17          Cancer Institute?
18               Yes, they are.  I don't know if
19          they're "the" leading, but they're one
20          of the leading, that's true.
21     QUESTIONS BY MS. BRANSCOME:
22          Q.     Okay.  And you're familiar with
23     publications that they issue called physician
24     data queries?
25          A.     Yes, I am.
```

Confidential - Pursuant to Protective Order

Page 108

1        Q.      All right.  And you are aware

2    that there is, in fact -- called PDQs,

3    correct?

4        A.      That's the abbreviation, yes.

5        Q.      Right.  And you're aware that

6    the National Cancer Institute has in fact

7    published a PDQ that addresses a potential

8    connection between talc and ovarian cancer,

9    correct?

10       A.      I'm aware of several that have

11   been done over the years, but, yes, I'm aware

12   of that.

13       Q.      And have you reviewed those?

14       A.      Yes, I have.

15       Q.      Are they listed on your

16   reliance list?

17       A.      No, but they're listed within

18   the materials as discussed within my

19   depositions, and I thought -- and my

20   testimony.  I thought that was part of my

21   reliance list.  I believe that it -- it was

22   in my reliance list, is encompassing all of

23   the testimony as well as the actual

24   documents.  Maybe I'm mistaken, but that was

25   my understanding.

Confidential - Pursuant to Protective Order

Page 109

 1         Q.      Okay.  If they are not on your
 2    reliance list, should they be?
 3         A.      I believe that they are on my
 4    reliance list by it having been pointed to as
 5    part of the testimony that I have given and
 6    the documents that I have relied upon during
 7    testimony.
 8         Q.      Okay.  And you are aware that
 9    they have issued a PDQ that -- on the website
10    as of today, correct?
11         A.      I haven't looked today, so I'm
12    sure -- but I know that -- I don't believe it
13    has been removed, so I believe that there is
14    something there, yes.
15         Q.      All right.  And what is your
16    understanding of the position stated in the
17    PDQ with respect to a possible link between
18    talc and ovarian cancer?
19         A.      So I'd have to look at the one
20    today to tell you what it says, but it's
21    evolved over time and it's changed over time,
22    and I have specific opinions that I've
23    expressed at trial about that issue.
24                 Do you want me to go into that
25    details or I mean --

Confidential - Pursuant to Protective Order

Page 110

1          Q.    I'm not asking about your

2    opinions about what their position is.  I'm

3    simply asking you, Dr. Plunkett, the most

4    recent NCI PDQ that you have reviewed, what

5    is the position that the National Cancer

6    Institute has taken with respect to the

7    relationship between talc and ovarian cancer?

8          A.    So I would want to pull it out

9    to give you the specific statement of their

10   position, but their position has changed such

11   that later in time they've weakened the

12   link -- their statements about the link

13   between ovarian cancer and genital talc use.

14              So it used to be seen as a

15   cause, and now I believe it's not seen as a

16   cause.  I don't know the exact language,

17   though.  I'd have to look at it as -- maybe

18   risk factor is the better word to use.

19              And I need to look at the most

20   recent one.  And that would be the best way.

21   Let's just see what it says.

22         Q.    Okay.  'Cause is it your

23   position as you sit here today that the

24   National Cancer Institute has ever issued a

25   statement that talc causes ovarian cancer?

Confidential - Pursuant to Protective Order

Page 111

```
 1        A.     I believe it was listed as a
 2   risk factor for ovarian cancer in the older
 3   PDQs.
 4              (Plunkett Exhibit 7 marked for
 5        identification.)
 6   QUESTIONS BY MS. BRANSCOME:
 7        Q.     I do have a copy here.  Just
 8   for the sake of the record, we will mark this
 9   as Plunkett Deposition Exhibit Number 7.
10              Handing a copy to you,
11   Dr. Plunkett, do you recognize the document
12   that I just handed you that's marked as
13   Exhibit 7?
14              MR. LOCKE:  What's the date of
15        that?
16              MS. BRANSCOME:  This was
17        printed on December 14, 2018.
18              THE WITNESS:  It's -- the
19        updated date is June 22, 2018, if that
20        helps.
21              MR. LOCKE:  Yes, thank you.
22              THE WITNESS:  I have seen this
23        one, yes.
24   QUESTIONS BY MS. BRANSCOME:
25        Q.     All right.  And you can review
```

Confidential - Pursuant to Protective Order

Page 112

1    any -- whatever portion of this is helpful to

2    you.

3              And then if you could answer my

4    question, Dr. Plunkett, of what is the

5    position as stated in Deposition Exhibit

6    Number 7 of the National Cancer Institute

7    with respect to the relationship between talc

8    and ovarian cancer?

9        A.    So I would be looking at the

10   section on page 12 of 18, and maybe you're

11   looking somewhere else, but that's where they

12   actually talk about perineal talc exposure.

13   And it's under the section where they have

14   now moved into factors with an adequate

15   evidence of an association and they describe

16   it here.  So they're calling it an

17   association where the weight of the evidence

18   is not adequate to support that association.

19       Q.    All right.  And so the first

20   sentence of the section under perineal talc

21   exposure states, "The weight of the evidence

22   does not support an association between

23   perineal talc exposure and an increased risk

24   of ovarian cancer."

25              Did I read that correctly?

Confidential - Pursuant to Protective Order

Page 113

1          A.      You did read that correctly.

2          Q.      All right.  And it indicates

3    that "results from case-control and cohort

4    studies are inconsistent."

5                  Did I read that correctly,

6    Dr. Plunkett?

7          A.      You did.

8          Q.      And the question that I would

9    ask simply is, do you discuss the National

10   Cancer Institute PDQ in the report that

11   you've issued in the MDL, which is identified

12   as Exhibit 4?

13         A.      I don't specifically discuss

14   this document, no, I do not.

15         Q.      Okay.  And you understand that

16   the NCI PDQ did a weight of the evidence

17   analysis that followed a formal evidence

18   ranking system, correct?

19                 MS. PARFITT:  Objection.

20                 THE WITNESS:  So I -- it's not

21         laid out here, but they do have a

22         process they use.

23                 Is that what you're asking me?

24   QUESTIONS BY MS. BRANSCOME:

25         Q.      Yes.

Confidential - Pursuant to Protective Order

Page 114

1        A.    Yes.  And again, they're

2    ranking the epidemiological data, and so I

3    understand that that is there, yes.

4        Q.    Now, you've said a few times

5    that you could qualitative -- you could give

6    a quantitative weight to an epidemiological

7    study, somehow suggesting that it is

8    different from other types of studies.

9              What is it about a

10   toxicological study, for example, that would

11   prevent someone from giving a quantitative

12   weight in a weight of the evidence analysis?

13       A.    Because it is just what is

14   typically done and not done.  There are

15   certain practices within the community, what

16   is kind of -- I would say that scientists use

17   routinely, or scientists have used.  Not all

18   scientists give numerical rankings to

19   epidemiological data either, because even

20   within a Bradford Hill assessment, when you

21   use the considerations, there's no

22   requirement for ranking studies in order to

23   meet the requirements of use of that

24   methodology.

25       Q.    Okay.

Confidential - Pursuant to Protective Order

Page 115

1          A.     But I have seen it done in the

2     epidemiology community, and that is the most

3     common place I see it.  I do not see other

4     toxicologists that are assessing animal

5     studies and in vitro studies doing it that

6     same way.

7                 When you do a human health risk

8     assessment, that isn't routine practice to do

9     numerical rankings on studies.

10         Q.     Okay.

11         A.     At least in my experience and

12    in my training, and I was trained in the use

13    of risk assessment by one of the individuals

14    who actually invented the process.

15         Q.     Okay.  Okay.  But do you

16    consider the epidemiological evidence as part

17    of your risk assessment in the MDL?

18         A.     I do, because I'm looking at it

19    in the context of what is out there and

20    what's available.  I don't always have human

21    data when I do risk assessments, but in this

22    one I do.  So I do consider them, yes.

23         Q.     Okay.  Did anything prevent you

24    from doing a quantitative assessment of the

25    weight that you were giving different pieces

Confidential - Pursuant to Protective Order

Page 116

1  of epidemiological evidence?

2      A.    If by -- you mean prevent, was

3  someone stopping me from doing that, no.  But

4  if you ask what would be standard practice

5  based on my experience, I would not be doing

6  that.

7      Q.    Has anyone -- and I'm not

8  referring in this case to any attorneys.  But

9  has anyone reviewed your -- the weighting

10 that you gave specific pieces of evidence as

11 essentially a form of a peer review process?

12     A.    If by that you mean have I

13 submitted my opinions for publication, no, I

14 have not done that.  Part of -- that's partly

15 driven by my understanding of the evidence

16 that I reviewed, that some of it may not be

17 something that I should be discussing

18 necessarily in a public form outside of the

19 cases I'm working in.

20          But certainly I have not

21 submitted it for publication, if that's what

22 you mean.  No, I have not done that.

23     Q.    Okay.  Has the methodology that

24 you have used in the MDL, has that been --

25 have you submitted any type of analysis using

Confidential - Pursuant to Protective Order

Page 117

1    that methodology for publication even outside

2    of particularly looking at Johnson's baby

3    powder, for example?

4         A.    Yes, in -- if you look at my

5    publications that describe risk assessments

6    that I have done.  So the one that would come

7    to -- to play that's similar as far as the

8    scope of the weight of the evidence would --

9    at least with the animal and the in vitro

10   studies, would be the paper that I published

11   on copper, looking at the database of copper

12   and identifying points of departure and

13   target organs and risk -- risk issues based

14   on copper use in humans, trying to set a --

15   understand what a safe exposure level could

16   be to copper in water.  And that was

17   published -- that actually was one of the

18   papers that's published with Dr. Krewski, who

19   is one of the authors of this risk assessment

20   in Canada.

21        Q.    And is it your position that

22   you follow the same methodology in what

23   you've reported in the MDL with respect to

24   Johnson's baby powder that you did in your

25   analysis of copper?

Confidential - Pursuant to Protective Order

Page 118

1          A.     Yes, with the process of going

2     through all of the publicly available

3     information, putting it together based on its

4     relevancy and reliability.

5                We did a process where we

6     grouped it based on animal versus human, just

7     like I've done here.  And we call it the

8     bins, but it's the same idea.  I have a bin

9     of human idea, I have a bin of animal data

10    and a bin of in vitro data.  And so, yes, the

11    process was very, very similar.

12         Q.     Okay.  Returning back to some

13    documents that you chose not to cite in your

14    report, you do not discuss the Gonzales 2016

15    study in your report for the MDL, correct?

16                MS. PARFITT:  Objection.  Form.

17                THE WITNESS:  I'll have to

18          look.  It is not cited in the

19          reference list to my report, that is

20          true.  So that means it would not be

21          mentioned specifically in the body of

22          the report.

23    QUESTIONS BY MS. BRANSCOME:

24         Q.     You're familiar with the

25    Gonzalez 2016 study, correct?

Confidential - Pursuant to Protective Order

Page 119

1          A.     If you want me to talk about

2     it, you'd have to pull it out for me, but I

3     know the name, yes.

4          Q.     Okay.  And it was looking at an

5     association between the perineal use of talc

6     and ovarian cancer, correct?

7          A.     That, I'd have to look at it to

8     tell you.  I believe it was a human study

9     that would be consistent with that, but I

10    need to pull it out to look at it.

11         Q.     All right.  Do you, as you sit

12    here today, do you know why you did not

13    discuss it in your report?

14         A.     I wasn't doing a full causation

15    analysis in this report, so as a result I'm

16    not trying to characterize every piece of

17    human data.  But I certainly am looking at

18    the consistency across the studies, and

19    that's what I've done.

20               And I mention it here.  I do

21    think I mention here that there are studies

22    that came to different conclusions than the

23    ones that I'm specifically describing.

24         Q.     Okay.  And so why is it that --

25    why is it acceptable for you to choose not to

Confidential - Pursuant to Protective Order

Page 120

1    include something like the Gonzales 2016

2    study, but yet you will disagree the

3    2013 -- the CIR 2013, you will give it little

4    weight for not discussing particular studies?

5         A.    So that's a very different

6    exercise.  You want me to explain my thinking

7    on that?  I can do that for you, but I

8    believe that's apples and oranges question.

9              My reasons for giving little

10   weight to the CIR overall assessment versus

11   my weight or the assessment I make of an

12   individual piece of data, that's different.

13   And that's what you're describing for me.

14             And I believe Gonzales is in my

15   overall reliance list, so I have read

16   Gonzales.  It is something that I have

17   considered; it's not something that I've

18   cited in my paragraphs.  So it doesn't mean

19   it didn't go into my weight of the evidence,

20   because I do have it and I have reviewed it.

21   I just don't recall the details on it.

22        Q.    Is it your position as you sit

23   here today that you know for sure that the

24   CIR panel did not -- was not aware of or even

25   considered any of the eight studies that you

Confidential - Pursuant to Protective Order

Page 121

1    contend the omission of which makes it of

2    little weight?

3                    MS. PARFITT:  Objection.  Form.

4                    THE WITNESS:  I would say I'm

5              99.9 percent sure, based on the

6              process that is -- that goes in.  And

7              if you want me to explain, I'll tell

8              you why I feel that level of surety.

9                    You know, I can always say that

10             maybe there was someone that came to

11             the panel that did a search on their

12             own, but that is not what's done.  The

13             individuals that come to the panel are

14             given a body of information provided

15             to them in written form that they

16             review.  So it's not like they -- they

17             have access to anything that isn't

18             cited in the actual report.

19    QUESTIONS BY MS. BRANSCOME:

20        Q.    Okay.  The eight articles that

21    you discuss that are not mentioned in the CIR

22    panel's work, they are publicly available

23    pieces of scientific literature, correct?

24        A.    Yes, which was why it's

25    interesting to me that those were not grabbed

Confidential - Pursuant to Protective Order

Page 122

1    and included within -- within the assessment

2    done by the -- by the PCPC's group that

3    handles CIR -- handled the CIR process here.

4          Q.    Okay.  We received just before

5    your deposition, a few days in advance, a

6    list of materials that have been added to

7    your reliance list since you produced your

8    report in this case.

9          Did you provide that list of

10   materials to counsel to -- are you aware of

11   the materials that were identified?

12         A.    Yes, I am.  They're ones that I

13   have reviewed since my report and -- yes,

14   which would have been, I believed, important

15   for you to know about, because obviously you

16   wouldn't know if I hadn't provided that to

17   you, and fair game for you to ask me about.

18         Q.    On that list was contained a

19   number of news articles.

20         A.    Uh-huh.

21         Q.    Are news articles pieces of

22   scientific information that you typically

23   consider in performing a risk assessment?

24         A.    No, they're not part of my risk

25   assessment, but they -- but they were

Confidential - Pursuant to Protective Order

Page 123

1    relevant to -- they were relevant to my

2    overall assessment of the issue of what the

3    company is doing with regard to public

4    dissemination of information.

5              So it's not the risk assessment

6    part.  It's more on the issue of the -- when

7    I talk about the different influences of the

8    company on public dissemination of

9    information, I went through the different

10   specific issues.  So this would be a specific

11   issue related to a news report that someone

12   comes out with, the Reuters report, and then

13   looking at what the company is saying in

14   addition to that.

15             So it's understanding -- for

16   example, the documents that Reuters

17   discusses, many of those I'm sure I have

18   seen, although I don't have access to -- I

19   wasn't able to go on websites and download

20   everything that they cite.  But certainly

21   they looked familiar, some of the ones I did

22   see.

23             So it's that issue of -- the

24   last part of my report, I think.  Want me to

25   tell you the section?  It would be in the

Confidential - Pursuant to Protective Order

Page 124

1    section on the role of the industry in

2    Section 7.

3        Q.    Okay.  So the newspaper

4    articles are not something that you are

5    considering as part of your analysis of

6    whether there is a risk of ovarian cancer

7    from Johnson's baby powder, correct?

8        A.    No, that's a separate issue

9    because it's not -- it's not scientific data,

10   per se.

11       Q.    Okay.  All right.  Now, if you

12   could turn to paragraph 31 in your report.

13             Okay.  You discuss the

14   biological effects of talc in this paragraph

15   and in others, correct?

16       A.    Yes, I would call this my

17   introductory paragraph to transition into a

18   specific topic, yes.

19       Q.    Okay.  And you talk here about

20   the structure and size of talc affecting its

21   properties.

22             What do you mean by that?

23       A.    So whether it's fibrous enough,

24   platy, fibrous.  Whether it is particle sizes

25   of less than 10 microns, less than 5 microns,

Confidential - Pursuant to Protective Order

Page 125

1    greater than 75 microns.  There's

2    different -- certain pieces of literature

3    deal with different size ranges of talc.  The

4    smaller the size range, the more toxic it is,

5    for example, to lung tissue; the more likely

6    it is to be able to move, based upon the

7    size, versus being engulfed by a macrophage

8    if it's a larger particle, things like that.

9         Q.    So focusing specifically on

10   ovarian cancer, what role does size and

11   structure of a talc particle play with

12   respect to a risk of ovarian cancer in your

13   opinion?

14        A.    I don't think I formed a

15   opinion that it has to be a specific size or

16   structure, because the -- my opinions are

17   related to the fact that we have a complex

18   mixture of ingredients within the body

19   powder, and my assessment's been on the

20   overall consumer product, not on any one

21   particular ingredient only within it.

22             So it's the idea of just

23   understanding that size and structure of

24   these particles are general principles that

25   affect toxicology.  So a larger particle or a

Confidential - Pursuant to Protective Order

Page 126

1   fibrous particle may have a different tissue

2   toxicity response than a smaller particle.

3              So in other words -- I think I

4   discuss this later in a paragraph about

5   pleurodesis, the idea that you can get acute

6   versus chronic inflammation, or respiratory

7   distress or not.  So it's just this idea of a

8   general principle that outlines how you would

9   think about particles generally as a

10  toxicologist.

11       Q.    Well, okay.  So you said that

12  your assessment is based on the overall

13  consumer product.  That would be Johnson's

14  baby powder or SHOWER TO SHOWER®, correct?

15       A.    Yes.

16       Q.    All right.

17       A.    Or Shimmer.  I think that's the

18  other name.  There's a third product.

19       Q.    Okay.  But my question to you

20  is, you actually cite a number of pieces of

21  literature in the section about the alleged

22  toxicity of talc that don't relate to the

23  overall consumer products at issue in this

24  case, correct?

25              MS. PARFITT:  Objection.  Form.

Confidential - Pursuant to Protective Order

Page 127

1              THE WITNESS:  No, I would

2         disagree with that when you use the

3         word "relate."  Relate to me means is

4         it relevant to the assessment, and

5         they are, even if they're not just on

6         the finished product.

7              But if what you mean is that

8         there are studies that did not test

9         the consumer product but individual

10         ingredients or -- that is true, yes,

11         but all of that is relevant or relates

12         to the overall risk assessment.

13    QUESTIONS BY MS. BRANSCOME:

14         Q.    Okay.  So given your view that

15    information about the individual constituents

16    is relevant to evaluating the overall

17    toxicity of the ultimate consumer products,

18    then my question to you is:  How does the

19    structure and size of the component talc

20    particles play a role in toxicity with

21    respect to ovarian cancer?

22         A.    Just generally -- it's not

23    just -- well, with respect to ovarian cancer,

24    we start with irritation, inflammation

25    potential.  Size of particles and shape are

Confidential - Pursuant to Protective Order

Page 128

1   known to affect tissue toxicity as far as

2   adverse events like inflammation and/or

3   irritation.

4        Q.   Okay.  So that's -- that's what

5   I'm trying to understand in more detail.

6             What is your opinion with

7   respect to -- let's take size to start with.

8   Is there a particular size talc particle that

9   is more or less likely to cause inflammation,

10  in your opinion?

11       A.   It depends whether you're

12  talking about acute or chronic.  I would say

13  for acute inflammation the larger particles,

14  such as some of the particle sizes that are

15  used in the pleurodesis products, are more

16  likely to initiate an acute inflammatory

17  response due to the fact that they're large

18  enough that the body will recognize them with

19  a fairly robust foreign body response.

20       Q.   What is your definition of

21  large?

22       A.   So the literature varies, but

23  certainly particles that are above -- some of

24  the literature talks about particles that are

25  in the range of 25 to 75.  Some of them talk

Confidential - Pursuant to Protective Order

Page 129

```
 1    about larger particles even than that.
 2                    It has to do with the fact
 3    that -- this is complicated by the fact that
 4    any consumer product -- or any talc sample
 5    will have a range of sizes because they don't
 6    select for one size.  They select for smaller
 7    than.  So a 200 mesh, a 400 mesh, that has do
 8    with what will filter through.
 9                    So pleurodesis, they try to
10    avoid for those products the really small --
11    large amounts of less than 10 because that
12    leads to respiratory distress, whereas many
13    of the consumer talc products are using much
14    smaller, finer particles to get that feel and
15    performance they want from the consumer body
16    powders.
17        Q.    Have you reviewed -- focusing
18    specific on Johnson & Johnson's products,
19    have you reviewed the documents that relate
20    to the specifications for the Johnson's
21    products with respect to the size of the
22    plate particles?
23        A.    I have seen those, yes.  I
24    can't tell you what each of them says without
25    pulling them out, but, yes, that is certainly
```

Confidential - Pursuant to Protective Order

Page 130

1    documents I have seen and relied upon.

2          Q.    Is it consistent with your

3    understanding that it was Johnson & Johnson's

4    intention to select large platy talc

5    particles for its products?

6                MS. PARFITT:  Objection to

7          form.

8    QUESTIONS BY MS. BRANSCOME:

9          Q.    Have you seen that in the

10   documents?

11         A.    I don't know that it's

12   described quite that way, but they certainly

13   were doing a 200 mesh selection.  So -- for

14   their body powders products.  So -- and they

15   were trying -- and they did make attempts to

16   look for sources that were more platy talc

17   than other forms, but that doesn't ensure

18   that everything is platy talc.

19         Q.    Are you familiar with the term

20   "fines"?

21         A.    Yes, generally, but I'm not --

22   but I'm not an expert in the processing of

23   talc as far as how you would go about

24   choosing an ore or a mine.  There's others

25   that will be addressing that.  That's not my

Confidential - Pursuant to Protective Order

Page 131

1    area.

2        Q.      What is your understanding of

3    the term "fines"?

4        A.      My understanding of the term

5    "fines" has to be looking for a sample or a

6    group that has been processed such that it

7    has certain characteristics.

8              Other than that, I would refer

9    you to the individuals in litigation that are

10   going to be dealing with the processing.

11       Q.      Okay.  Have you taken into

12   account in your analysis in any way the

13   beneficiation process that occurs between the

14   time that the talc is mined and it ends up in

15   one of the consumer products that is relevant

16   to your analysis?

17              MR. MEADOWS:  Objection.

18              THE WITNESS:  So what do you

19         mean by taking it into account?  Am I

20         aware that they have something that's

21         in place for that?  Yes.

22              But take into account, what do

23         you mean by that?

24   QUESTIONS BY MS. BRANSCOME:

25       Q.      Are you familiar with the

Confidential - Pursuant to Protective Order

Page 132

1    effects that beneficiation can have on the

2    level of the component -- the components in

3    talc and what ultimately ends up in one of

4    Johnson & Johnson's consumer products?

5            MR. MEADOWS:  Objection.

6            THE WITNESS:  So I'm not -- I'm

7        not familiar with all the details, but

8        I am familiar that it is a process

9        they're using to attempt to result in

10       a product that has characteristics

11       that would be desirable for a consumer

12       product.

13           Again, there is my

14       understanding that others are going to

15       be discussing the geology or the

16       processing, and that is not something

17       I'm looking at.

18           The literature as it relates to

19       what has been tested in the public

20       literature in particular, and that

21       would be either an ingredient or a --

22       or a consumer product or a -- they may

23       discuss exposure occupationally to

24       mining or milling, which is -- which

25       is an issue that you can consider when

Confidential - Pursuant to Protective Order

Page 133

1          you're reviewing that literature as

2          well.

3      QUESTIONS BY MS. BRANSCOME:

4          Q.     Okay.  And so when you cite --

5      for example, you have a significant number

6      of -- I'm trying to find the right paragraph.

7               You have a section in your

8      report where you discuss a number of

9      different articles that relate to talc, and

10     in parentheses you identify that the talc

11     source might be cosmetic, it might be

12     industrial, things of that nature, correct?

13         A.     Yes, I do that on purpose

14     because I wanted -- I did look at the

15     literature to understand what they were --

16     what they were -- what type of exposure they

17     were describing.

18         Q.     Okay.  And so understanding

19     that some of those products are not

20     representative of what ultimately is in

21     Johnson's baby powder, do you have anything

22     in your report that explains how you did or

23     did not give weight to those particular

24     studies?

25               MS. PARFITT:  Objection.  Form.

Confidential - Pursuant to Protective Order

Page 134

1                    THE WITNESS:  Let me look and
2          see what I say.
3                    If the question has to do with
4          numerical rankings, no, I did not do
5          that.  But you're asking something
6          else, right, broader than that,
7          correct?
8    QUESTIONS BY MS. BRANSCOME:
9          Q.    The question that I have is,
10   how did -- is there somewhere in this report
11   that I can understand the weight that you
12   assigned to say a study that related to
13   industrial talc as opposed to information
14   about cosmetic talc, for example?
15                   MR. MEADOWS:  Objection.
16                   THE WITNESS:  So I -- I'm -- I
17         believe I address that.  I don't know
18         it's exactly answering your question,
19         but I lay out for you the
20         characteristics of the literature in
21         paragraph 37, and I point out that the
22         scientific literature varies.
23                   And the fact -- and I point --
24         and I admit -- I'm not admitting.  I'm
25         stating the fact that in some cases

Confidential - Pursuant to Protective Order

Page 135

```
 1          the authors will not describe it
 2          specifically as the type of talc, but
 3          just talc, whereas -- with no
 4          description of purity or state, for
 5          example.  But in cases where the
 6          literature does, I did consider that
 7          in my weight of the evidence.
 8                So, for example, when I -- when
 9          I lay it out here in these bullets
10          where I'm putting for you tremolite
11          mining industrial grade cosmetic, it
12          certainly is something that I weighed.
13          And obviously as much information as I
14          can get on cosmetic-grade talc is
15          going to be most important in the
16          assessment, but that doesn't mean the
17          other information isn't relevant.
18                You want me to explain why?
19   QUESTIONS BY MS. BRANSCOME:
20          Q.    Well, so, for example, you
21   describe the Dreessen article that related to
22   trimellitic talc that's mined out of
23   New York.
24                You would agree that
25   trimellitic talc from New York is not
```

Confidential - Pursuant to Protective Order

Page 136

1    something that ever ended up in Johnson's

2    products, correct?

3                    MR. MEADOWS:  Objection.

4                    THE WITNESS:  I don't think I

5            can answer that yes or no.  I haven't

6            done an assessment to see whether it

7            ever ended up in the products.  That's

8            a different question.

9                    I certainly am aware of the

10           fact that was not a primary source of

11           their talc, that is true.  I do know

12           that.

13                   In other words, I don't have

14           records from -- going back from 1894

15           on what the source of their talc was.

16           So I can't tell you over time.

17                   What I do know, what's been put

18           into depositions and testimony of

19           company employees more recently, where

20           it's my understanding that the

21           principal sources over the years were

22           either the Vermont mine, the Italian

23           mine or the Chinese mine.  And there

24           were different interruptions in time

25           where different mines were used,

Confidential - Pursuant to Protective Order

Page 137

1          depending on sourcing.

2     QUESTIONS BY MS. BRANSCOME:

3          Q.     So as part of your expert

4     analysis where you are evaluating articles

5     that relate to different types of talc from

6     different sources of talc, have you done an

7     analysis of how those particular types of

8     talc do or do not relate to what is in the

9     consumer product manufactured by Johnson &

10    Johnson?

11              MS. PARFITT:  Objection.  Form.

12              THE WITNESS:  The first part of

13         your question, again?  I'm sorry.

14              MS. BRANSCOME:  Would you read

15         it back?

16              THE WITNESS:  Could you read it

17         back to me again?  I didn't mean to

18         wander, but the first few words I

19         missed.

20              (Court Reporter read back

21         question.)

22              THE WITNESS:  Okay.  So I

23         certainly did, which is why I'm

24         breaking this out here for you this

25         way.

Confidential - Pursuant to Protective Order

Page 138

1           So I am -- I am certainly

2       recognizing, and I analyzed on the

3       paper -- through the papers what type

4       of product, if available, that the

5       data is on.

6           But if you read my report in

7       the process of risk assessment, all of

8       these categories of papers are

9       relevant to telling you something

10      about what talc can do.  And then when

11      you talk about drawing final

12      conclusions, I'm looking for

13      information, if I can, and I have it,

14      that is on point to the product that

15      was sold.

16          So certainly the studies that

17      give me information on cosmetic-grade

18      talc are extremely important to my

19      assessment, and they're ones that I've

20      discussed or we've even used in trial

21      before when we've talked about putting

22      together a timeline.

23          That's what this is about, by

24      the way.  This discussion here, I'm

25      starting to lay out what information

Confidential - Pursuant to Protective Order

Page 139

1              was available over time, and that's

2              simply what this is.  It's a survey of

3              the literature that talks about

4              adverse effects of talc, and if I can,

5              I separate it into different qualities

6              or purities.

7        QUESTIONS BY MS. BRANSCOME:

8              Q.      Dr. Plunkett, respectfully, I

9        don't believe you answered my question.

10             Can you point me to anywhere in

11       your expert report that's been produced in

12       this MDL where you do an analysis of how the

13       different talc types and sources that you are

14       citing as support for the toxicity of talc

15       generally relate to the products manufactured

16       by Johnson & Johnson?

17             MR. MEADOWS:  Objection.

18             THE WITNESS:  So I don't know

19             how else to answer that but to tell

20             you I think that's what this whole

21             section is about.  I step you

22             through -- I identify different types

23             of evidence.  I identify for you what

24             was tested in those different pieces

25             of evidence, and then I step through

Confidential - Pursuant to Protective Order

Page 140

1           that to draw conclusions based upon

2           what was available for me to assess.

3     QUESTIONS BY MS. BRANSCOME:

4           Q.      Okay.

5           A.      I don't know how else to answer

6     it for you.  That's what the section is meant

7     to do, and that's why I broke it out that

8     way.  You know, I recognize that there is

9     data on different things.

10                  What's interesting about even

11    the data on different things, there's a

12    common mechanism that is involved with the

13    type of tissue toxicity you get, and that's

14    irritation and inflammation.  Regardless of

15    whether it is of a certain grade or not, you

16    get certain types of adverse reactions.  May

17    be a more sustained reaction with a

18    industrial grade versus cosmetic grade, but

19    they all have the capability to produce that

20    type of adverse effect.

21          Q.      Dr. Plunkett, where can you

22    point me to in your report that you discuss

23    the weight that you give studies that relate

24    to talc from New York as opposed to studies

25    that relate to cosmetic talc that ultimately

Confidential - Pursuant to Protective Order

Page 141

1    ended up in Johnson's baby powder?

2                    MS. PARFITT:  Objection.  Form.

3                    THE WITNESS:  I've tried to

4           answer that for you.  The weight that

5           I'm giving -- the weight that I'm

6           giving is part of my assessment.  So,

7           again, I don't give numerical

8           rankings.  I've answered that for you.

9           I don't do that.

10                   What I instead do is I'm

11          looking at everything that's relevant,

12          everything that's available.  I do

13          categorize it, so I am selecting -- I

14          am identifying or analyzing the

15          information for what it describes.

16          And then if you go further on down, I

17          try to tell you what I think is

18          important about that information.

19                   The overall conclusions I'm

20          drawing in the report, though, when I

21          cite to specific studies in the risk

22          assessment, the majority of those

23          studies I believe that I'm citing for

24          you, outside of notice, have to do

25          with -- that's more of a warnings

Confidential - Pursuant to Protective Order

Page 142

1          issue -- have to do with the issue of

2          cosmetic talc.  Because the human

3          studies are describing cosmetic talc.

4          The NTP studies is a pure talc.  Many

5          of the in vitro studies and other

6          animal studies are looking at,

7          quote/unquote, a talc that is not an

8          industrial grade or from a mine that

9          would have -- be looked at in that

10         way.  So --

11   QUESTIONS BY MS. BRANSCOME:

12         Q.     You understand that there are

13   different types of cosmetic talc, correct?

14         A.     Yes, I am aware.

15         Q.     And cosmetic talc can be mined

16   from a number of different mines globally,

17   correct?

18         A.     That's correct.

19         Q.     And some of the studies that

20   you cite in your report are testing cosmetic

21   talc from other consumer products, for

22   example, Cashmere Bouquet, correct?

23         A.     Some.  The majority of them are

24   not, but I would agree that some do, yes.

25         Q.     Okay.  Have you done an

Confidential - Pursuant to Protective Order

Page 143

1    analysis of how the talc that is used in

2    Cashmere Bouquet, for example, relates to the

3    talc that is used in Johnson's baby powder?

4                Is that an analysis that you

5    have done before relying on that information

6    in your report?

7                MR. MEADOWS:  Objection.

8                MS. PARFITT:  Objection.

9                THE WITNESS:  My analysis -- I

10        did do an analysis to look at what was

11        described, what products are

12        described, but I certainly -- I

13        certainly did not throw out studies

14        that described Cashmere Bouquet

15        because I would -- I still believe as

16        a toxicologist and a risk assessor

17        that those types of products are

18        important to the overall weight of the

19        evidence about the hazard and the

20        risks posed by talc.

21                You know, I just -- I just -- I

22        guess I disagree with you if you're

23        saying they're irrelevant.  I don't

24        believe that they are.

25

Confidential - Pursuant to Protective Order

Page 144

1    QUESTIONS BY MS. BRANSCOME:

2         Q.    I was simply asking:  Did you

3    do an analysis that would allow you to

4    compare the ingredients in another product,

5    like consumer Cashmere Bouquet, before you

6    rendered an opinion with respect to Johnson's

7    baby powder based on tests of Cashmere

8    Bouquet?  Did you do that analysis?

9              MR. MEADOWS:  Objection.

10             THE WITNESS:  I do not have

11        access to internal company documents

12        for the manufacturers of Cashmere

13        Bouquet, so I certainly couldn't do

14        the analysis in the same way that I

15        can do it here, where I can identify

16        what Johnson & Johnson and Imerys

17        describe as sources of the talc that

18        was used for the Johnson & Johnson

19        baby powder, without --

20   QUESTIONS BY MS. BRANSCOME:

21        Q.    So you have no way of knowing

22   one way or the other whether that talc is

23   similar, correct?

24             MR. MEADOWS:  Objection.

25             MS. PARFITT:  Objection.

Confidential - Pursuant to Protective Order

Page 145

1              THE WITNESS:  Well, I think I

2         do know it's similar, if you look on

3         the bottle as far as what is described

4         it being, but if you're asking me --

5         if you're asking did we fingerprint it

6         to only a particular mine, this is the

7         beauty of the data.  The data shows

8         that regardless of the type of product

9         you're looking at, there's consistency

10        across the study.

11             So -- but I did not try to

12        segregate out studies that only dealt

13        with Cashmere Bouquet, no, I did not

14        do that.

15   QUESTIONS BY MS. BRANSCOME:

16        Q.     Okay.  As you sit here today as

17   a toxicologist, is it your position that

18   industrial-grade talc that might contain up

19   to 70 percent tremolite presents the same

20   level of toxic effect as cosmetic talc that

21   may contain no tremolite or tremolite at a

22   very, very low level?

23             MS. PARFITT:  Objection.  Form.

24             THE WITNESS:  I haven't formed

25        that opinion, no.

Confidential - Pursuant to Protective Order

Page 146

1    QUESTIONS BY MS. BRANSCOME:

2         Q.    Okay.  And so have you formed

3    an opinion that I could find in your report

4    that discusses in any way the relative

5    toxicity of different types of talc?

6         A.    That, you may find.  I need to

7    go back and look how I set it out, but I

8    think I -- I talked with you about the

9    difference between fibrous versus platy.  I

10   do discuss that.

11              And I talk about the problems

12   when you have a complex mixture that has

13   added to it things like asbestos and heavy

14   metals, because I talk about the additivity

15   issue that can come to play.  So that -- in

16   other words, increased risk when you have a

17   complex mixture with additional components

18   that all share the same toxic properties as

19   far as target organs or types of effects or

20   mechanisms that are triggered in the body.

21   That's what I point you to.

22              I -- I don't -- that's the only

23   way I can answer that for you, I think, based

24   on what I know I have in here.

25        Q.    Okay.  You talk about the term

Confidential - Pursuant to Protective Order

Page 147

1    "asbestiform talc."

2              You talk about asbestiform

3    talc.

4              Are you familiar with that?

5         A.    I do mention that in my report,

6    yes.

7              Where are you?

8         Q.    At paragraph 30.  It's on

9    page 19 of your report.

10        A.    Yes, I'm here.

11        Q.    Okay.  And the first sentence

12   in paragraph 30 you state, "In the published

13   medical literature, there is often discussion

14   of talc using terms such as fibrous talc,

15   asbestiform talc, non-asbestiform talc or

16   tremolite."

17             Do you see that?

18        A.    Yes, I do.

19        Q.    Okay.  Is it your opinion that

20   tremolite is a form of talc?

21        A.    So tremolite is a -- is a -- is

22   a type of fiber or a -- tremolite is a -- is

23   a substance or a entity that has been

24   identified as a specific morphology, I guess,

25   identified characteristics of a -- it has

Confidential - Pursuant to Protective Order

Page 148

1    identified characteristics.

2              There's -- within the

3    asbestos -- the asbestos literature

4    there's -- it's one of the forms -- forms of

5    asbestos that's described.  For example, in

6    IARC, they describe all of the ones that have

7    carcinogenic properties.  It's one of them.

8              Within the literature within

9    Johnson & Johnson's documents, there's

10   tremolite discussed as -- I assume them

11   referring to asbestos tremolite, asbestos in

12   a tremolite characteristic.  I have seen

13   tremolite talc also mentioned in the

14   literature.

15             If you want a specific

16   discussion of each of those, again,

17   there's -- I understand there's experts that

18   are going to describe the distinguishing

19   characteristics of each of those.

20             I'm only setting out this is

21   what I have seen, talked about, in the

22   literature.

23        Q.    So you are not an expert on the

24   differences between fibrous talc, asbestiform

25   talc, non-asbestiform talc and tremolite as

Confidential - Pursuant to Protective Order

Page 149

1    it relates to toxicity.  Is that your opinion

2    today?

3          A.     No, that's not what I'm saying.

4    I'm saying that if you want me to -- I'm --

5    if you want me to describe the

6    characteristics and the morphology of each of

7    those individually, that's something a

8    geologist would do.

9                But certainly as far as the

10   toxicity assessment I did, each of these

11   types of -- each of these words, I guess, or

12   names have been applied in the literature

13   when they talk about toxicity of talc.  Some

14   of the literature talks about fibrous talc or

15   just -- other literature just talks about

16   talc.  Some of it, for example, the IARC

17   monographs, distinguish between asbestiform

18   talc and non-asbestiform talc in their

19   assessments of the cancer risk.

20               And then tremolite is discussed

21   as a component of talc.  And I have seen

22   papers that talk about tremolite --

23   nontremolite talc or tremolite-containing

24   talc.  That's how you most often see it.

25               So it's the idea that it is a

Confidential - Pursuant to Protective Order

Page 150

1    constituent of certain mines that -- and

2    that's my understanding of it.  But if you

3    want -- and they all -- they all certainly do

4    show that the toxicity can be affected,

5    whether it's a fiber or a platy particle.  So

6    tremolite being a fiber would certainly

7    affect my overall assessment of risk.  The

8    more tremolite that you would have would

9    make -- would make it more likely to be

10   reactive in terms of a foreign body response,

11   depending on the size.

12        Q.    What's your basis for saying

13   that?

14        A.    That's based on a fibrous form

15   versus a platy particle form.  That's the

16   issue of -- I have that paragraph where I

17   talk about what macrophages look for, can

18   engulf or not engulf.  So those are all

19   things that are important to a toxicologist

20   to understand exist.

21             But certainly within my

22   assessment I have to include literature from

23   all of those because of the fact that all of

24   those are relevant to the toxicity profile,

25   since I know that the cosmetic baby powders

Confidential - Pursuant to Protective Order

Page 151

1    and the data I've seen shows detection of

2    something called fibrous talc.

3              I see detection of tremolite

4    within certain samples of baby powder.

5              And then I have just the

6    general category of asbestiform versus

7    non-asbestiform when I consider the way, for

8    example, IARC has reviewed the

9    carcinogenicity.

10              So those are -- those are terms

11    that I'm laying out because I think they are

12    something you need to understand exists in

13    the literature.

14    Q.    Okay.  But I'm trying to

15    understand, not helping me understand the

16    literature.  I'm trying to understand your

17    opinions with respect to toxicity.

18              Is it, for example, your

19    opinion that fibrous talc has the same toxic

20    potential -- let's focus specifically with

21    respect to ovarian cancer -- as tremolite?

22    A.    I haven't formed that opinion,

23    but, again, I would -- my opinion has been

24    formed on the fact that we have complex

25    mixture that includes all of these things.

Confidential - Pursuant to Protective Order

Page 152

1        Q.     Okay.  And so when you're

2   looking at a complex mixture, you would agree

3   as a toxicologist it would be important to

4   understand the constituent elements of that

5   mixture, correct?

6        A.     Yes, it is important to

7   understand that this is -- what is in the

8   mixture, and that's -- that's part of what I

9   try to do.

10        Q.     Okay.  And it would be

11   important before drawing conclusions from one

12   study that might have different constituent

13   components, it's important to understand the

14   relative toxicity of individual constituent

15   elements, correct?

16        A.     Depends if you can or not.  I

17   mean, there's certain types of studies you

18   can, where in the published literature that's

19   been described.  That's why I'm pointing this

20   out.  It's the idea that within the

21   literature, when you go through, it's

22   important to understand what you can say

23   about the consistency across the literature

24   where maybe different types of talc are

25   discussed.

Confidential - Pursuant to Protective Order

Page 153

1                   And that's what I -- I think I

2       lay out for you.  I tell you there's

3       consistency in certain toxic effects that are

4       seen.  Regardless of the form that you're

5       looking at, talc has certain properties, and

6       all of these things are -- been shown to be

7       in the complex mixture, so I have -- as a

8       result, all of that literature has relevance

9       to at least the hazard part of my assessment,

10      and certainly have relevance to -- when you

11      want to talk about warning and the final risk

12      assessment, they're definitely relevant, but

13      certainly the -- when I go through this

14      process, I am trying to focus as much as I

15      can on a product that is most similar to the

16      one I'm assessing.

17                  So obviously that's why --

18      that's one of the reasons I do look at the

19      human data, because the human data is

20      involving a consumer product use, which is

21      what I'm talking about here.

22          Q.      Is it using specifically

23      Johnson's baby powder?

24          A.      Many of them are, yes.

25          Q.      Okay.

Confidential - Pursuant to Protective Order

Page 154

1          A.     Based on my understanding of
2     what I see discussed within the literature.
3          Q.     Did you identify in your report
4     specifically which report -- which studies
5     have used a consumer product manufactured by
6     Johnson & Johnson?
7          A.     I haven't laid them out
8     individually, no, but I am aware of
9     discussions of this general issue within some
10    of the documents I've seen, and essentially
11    Johnson's body powders products were the
12    overwhelming share of the market.
13         Q.     But you would agree that
14    studies that did not involve the consumer
15    product manufactured by Johnson & Johnson
16    should be given less weight when analyzing
17    whether or not there are risks associated
18    specifically with Johnson & Johnson's
19    products?
20              MS. PARFITT:  Objection.  Form.
21              MR. MEADOWS:  Objection.
22              THE WITNESS:  It depends on the
23         question being asked within the
24         assessment, the risk assessment.  It
25         really does, I mean, because each of

Confidential - Pursuant to Protective Order

Page 155

```
 1          these studies brings a piece of
 2          evidence to the risk assessment.
 3                 And so the question is -- for
 4          each one, you consider it on a
 5          case-by-case basis.  It is possible,
 6          yes, that you would give less weight.
 7          It's also possible that you would not,
 8          dependent upon what you know about
 9          that study and how it relates to other
10          studies that are out there.
11  QUESTIONS BY MS. BRANSCOME:
12          Q.   So methodologically, how would
13  I understand from your report marked as
14  Exhibit 4 under what circumstances to give a
15  study that relates to, for example,
16  industrial talc less weight than a study that
17  actually used Johnson's baby powder?
18                 MR. MEADOWS:  Objection.
19                 THE WITNESS:  Well, I've tried
20          to tell you that.  That's what I said
21          for you.  That's why I am doing it.  I
22          certainly am trying to focus in on
23          studies that deal with the consumer
24          product.
25                 But what I find when I look
```

Confidential - Pursuant to Protective Order

Page 156

1          across the studies that are dealing

2          with not the consumer product but

3          other descriptions, there is a

4          consistency in the types of effects

5          you see.

6                    And since I'm not quantifying

7          the risk but identifying it as being

8          increased or not, in other words, is

9          it more likely than not that someone

10         exposed in this way could be at a risk

11         of ovarian cancer, that's what I'm

12         talking about.

13                   So again, it's -- if I was

14         trying to identify differences in

15         cancer potency factors for different

16         types, then, yes, if I had an animal

17         study on each of those, I could

18         compare potency for cancer, but that

19         hasn't been done.

20    QUESTIONS BY MS. BRANSCOME:

21         Q.    Okay.

22         A.    So instead, what I have to do

23    is rely on what is available to me.  And

24    based on my judgment, that's how I review the

25    studies.

Confidential - Pursuant to Protective Order

Page 157

1          Q.     And so for the opinions that

2     you are offering in the MDL, you agree that

3     you are not quantifying the risk associated

4     with Johnson's baby powder, SHOWER TO SHOWER®

5     or Shimmer with respect to the potential for

6     causing ovarian cancer?

7                    MS. PARFITT:  Objection.  Form.

8                    THE WITNESS:  In terms of a

9           cancer potency factor, that is true, I

10          am not.  Instead, what I am doing is I

11          am quantifying whether or not I

12          believe that the risk is increased

13          above a background risk.

14                  That has to do with -- that's

15          where I bring in, in my risk

16          assessment, the human data, because

17          the human data is showing

18          statistically significant increases in

19          risk in populations using the consumer

20          product.

21                  So I have a quantification

22          where I'm using the word "increased,"

23          and I believe to a reasonable degree

24          of medical certainty that indeed the

25          risk is increased.  So I'm quantifying

Confidential - Pursuant to Protective Order

Page 158

1          in that way, but I'm not giving it a

2          number.  I'm not saying that the

3          cancer potency factor is such that you

4          increase the risk from one in a

5          million to 10 in a million to 1 in a

6          thousand.  That I have not done

7          because I don't have the data, the

8          studies.  The company has not done

9          studies on each of these to allow me

10         to do that.

11    QUESTIONS BY MS. BRANSCOME:

12         Q.    Okay.  The reference that you

13    made to the human data that you believe shows

14    a statistically increased risk in populations

15    using the consumer product, have -- which --

16    have you identified in your report which of

17    those studies are specifically using a

18    product that was manufactured by Johnson &

19    Johnson?

20         A.    I don't lay that out for my

21    report, I do not, but certainly it is

22    something that for some of the studies I

23    believe you can -- you might be able to get

24    some of that information from.  But certainly

25    I have not laid that out individually in my

Confidential - Pursuant to Protective Order

Page 159

1    report, no.

2          Q.      And you would agree that for

3    some of those studies there is no information

4    as to the specific type of consumer talc that

5    the individuals who are being studied used,

6    correct?

7                    MS. PARFITT:  Objection.  Form.

8                    THE WITNESS:  I would agree

9          that in some of those studies they're

10         not saying, but that is why you look

11         at the evidence overall.

12               And what's important to look at

13         in terms of now -- if you wanted to go

14         to Bradford Hill, that's why you look

15         at things such as consistency.  So

16         what do the studies show.  We see a

17         certain level of increased risk across

18         studies, regardless of who did the

19         study or what population was being

20         looked at.

21               So that's the best way I can

22         answer that for you.  That is -- that

23         is part of the -- of the assessment

24         that you look at.

25

Confidential - Pursuant to Protective Order

Page 160

1   QUESTIONS BY MS. BRANSCOME:

2          Q.      In reaching your opinion in the

3   MDL that there is an increased risk above

4   background of ovarian cancer from the use of

5   products manufactured by Johnson & Johnson,

6   have you made an attempt to identify

7   specifically which studies, the human studies

8   on which you rely, test or look at people who

9   have used Johnson & Johnson's products?

10                 MS. PARFITT:  Objection.  Form.

11                 THE WITNESS:  It's my -- my

12          review of the study indicates that I

13          would say for the vast majority of

14          them you cannot do that.

15                 But you can take what is

16          reported and look at things such as

17          market share and those kind of things

18          to get an idea of what you believe the

19          exposure would have been.

20                 But certainly I have not -- I

21          have not tried to apply some kind of a

22          numerical value to how many people in

23          the study may have used Johnson's baby

24          powder or not, no, that has not been

25          done.  I don't think anybody -- any of

Confidential - Pursuant to Protective Order

Page 161

1           the bodies that have looked at this

2           have done that.

3      QUESTIONS BY MS. BRANSCOME:

4           Q.    You have not done a market

5      share analysis, correct?

6           A.    No, I've seen this in documents

7      only.  I have not done my own.  There are

8      company documents that talk about their

9      market share.

10          Q.    Okay.  Have you made an attempt

11     to examine the levels of fibrous talc or

12     asbestiform talc that are in different

13     consumer products, aside from Johnson's baby

14     powder or SHOWER TO SHOWER® or Shimmer?

15          A.    So for that are you referring

16     to things such as -- other types of cosmetics

17     like foundations or lipsticks or --

18          Q.    I'll rephrase.

19                Have you made any attempt to

20     examine whether other cosmetic talc body

21     powders have a different percentage of

22     fibrous, or what you refer to as asbestiform

23     talc, from the Johnson & Johnson products?

24                Have you done any analysis to

25     make that comparison one way or the other?

Confidential - Pursuant to Protective Order

Page 162

1               MS. PARFITT:  Objection.  Form.

2               THE WITNESS:  I certainly

3          haven't done -- I certainly didn't do

4          a directed analysis to try to

5          determine that, but there is

6          information, I believe, in -- I think

7          if you look at some of Dr. Longo's

8          work, that may be there.

9               And I believe in Dr. Blount's

10         published paper there may be a

11         discussion of the type of powder

12         product used, where she was looking

13         for -- at least for asbestiform --

14         asbestos within the talc.  It may be

15         tremolite as well, but -- if you want

16         me to look, I can do that.  I just

17         don't recall whether -- I think she

18         did talk about sources of the talc,

19         where it came from, so...

20    QUESTIONS BY MS. BRANSCOME:

21         Q.    Okay.  But as you sit here

22    today, you can't point me to any analysis

23    that you did or an analysis that you relied

24    on that would relate different brands of

25    cosmetic talc body powders with respect to

Confidential - Pursuant to Protective Order

Page 163

1    their constituent components?

2              MS. PARFITT:  Objection.

3         Completely misstates her testimony.

4         She mentioned Dr. Blount.  She

5         mentioned others.

6              THE WITNESS:  So I think what I

7         started with, I said I haven't done a

8         directed analysis to try to determine

9         specifically how this product versus

10        this product versus this product may

11        have looked over time, because I don't

12        have access to a full data to do that.

13             But what I do have is data that

14        has -- I do see published data, for

15        example, Blount and maybe some of the

16        other published studies, that looked

17        at this issue, at least of asbestos

18        presence in talc.  And I believe

19        Dr. Longo also had things that weren't

20        just Johnson's.  I believe he had

21        Cashmere Bouquet, for example, samples

22        in some of the things he looked at.

23             So I can point you to those

24        things that I have reviewed, but I

25        haven't -- there's nowhere in here

Confidential - Pursuant to Protective Order

Page 164

1          that I state for you that it's my

2          opinion that Cashmere Bouquet has this

3          specific pattern of constituents as

4          compared to Johnson & Johnson's.  No,

5          I have not done that.

6     QUESTIONS BY MS. BRANSCOME:

7          Q.    Okay.  And that would be true

8     for any other brand of cosmetic talc, body

9     powders, Jean Nate, Lily of the Valley, not

10    just Cashmere Bouquet, correct?

11              MS. PARFITT:  Objection.

12              THE WITNESS:  That is correct,

13         I don't have access to that

14         information.

15    QUESTIONS BY MS. BRANSCOME:

16         Q.    Have you done any analysis of

17    the constituent components of talc and how

18    they have changed even within Johnson's --

19    Johnson & Johnson's manufactured products,

20    how the constituents of the consumer products

21    may or may not have changed over time?

22         A.    I've done some of that, yes,

23    and I laid that out, I think, for you, when I

24    talk about the differences in the products

25    that are described within the documents, the

Confidential - Pursuant to Protective Order

Page 165

1    company documents, from the '70s versus the

2    '80s versus later on, as far as the changes

3    that were made to specifications of the

4    product, for example.  That's something --

5    and I think I've talked about that a bit at

6    trial as well.

7         Q.    Okay.  And is it your view that

8    the risk potential for Johnson & Johnson's

9    manufactured products have changed at all

10   over time with respect to ovarian cancer?

11              MS. PARFITT:  Objection.

12              THE WITNESS:  I have not -- I

13        have not attempted to differentiate a

14        risk potential at only one point in

15        time.

16              What I have done over points of

17        time is looked at the issue of

18        warnings and what should be warned

19        about.

20              But my analysis related to the

21        hazard or the risk assessment of the

22        products is considering all of the

23        available information, which would be

24        all of that information over time.

25

Confidential - Pursuant to Protective Order

Page 166

1    QUESTIONS BY MS. BRANSCOME:

2         Q.    Okay.  You talk about, in

3    paragraph 35 primarily -- we'll talk about

4    the fragrance components in more detail, but

5    you talk about the idea of chemicals being a

6    potential irritant.

7              Are you familiar with that?

8         A.    Yes, that's correct.

9         Q.    Is it your position that any

10   product that contains chemicals that could be

11   an irritant should be labeled with a health

12   warning?

13             MS. PARFITT:  Objection.

14             MR. MEADOWS:  Okay.

15             THE WITNESS:  I don't think

16        that's -- no, I don't think I've

17        formed that specific opinion.

18             But the opinion that I think

19        I'm expressing here is that when you

20        have a -- the information that I have,

21        which unfortunately the company hasn't

22        given us percentages or actual levels,

23        instead, what I do as a toxicologist,

24        I look at what is there.  And when I

25        see over a hundred chemicals there,

Confidential - Pursuant to Protective Order

Page 167

1           that 70 percent of them have been

2           linked as an irritant hazard, there is

3           the issue of toxicological additivity

4           to consider.

5                 So certainly as a risk

6           assessor, when I have that many

7           potential sources of irritation as far

8           as chemicals going into a complex

9           mixture, certainly I think I have

10          formed the opinion that I think that

11          is something that needs to be

12          considered when you're talking about

13          providing information to consumers,

14          yes.

15   QUESTIONS BY MS. BRANSCOME:

16          Q.    As a toxicologist, would it be

17   important to you to understand the exact

18   percentages of all of the constituent

19   components of, say, Johnson's baby powder,

20   for example?

21          A.    Are you talking about just the

22   fragrance or are you talking about everything

23   that's in it?

24          Q.    Dr. Plunkett, you referenced

25   the fact that the company has not provided

Confidential - Pursuant to Protective Order

Page 168

1    you with specific percentages, and so I'm

2    asking you, is that something that as a

3    toxicologist would be important information

4    to you?

5         A.    Depends.  Certainly with the

6    fragrance -- and I'm talking about the

7    conversation about this paragraph is focusing

8    on the fragrance components.

9              So, yes, I mention that it

10   would be nice to know, it would be good to

11   know, if we could, exactly what was in there,

12   because I could quantify the hazard or

13   quantify the risk, actually.  So instead, I

14   have -- I identify it as a hazard, but I

15   can't quantify it without those levels.

16             But does that change -- make a

17   difference in the overall conclusions I draw?

18   No, it doesn't affect the overall conclusions

19   that I have drawn, but it adds that other

20   piece of the puzzle that deals with the fact

21   that we have a complex mixture that have a

22   combination of ingredients that target

23   irritation.

24             And irritation and the

25   potential to produce an inflammatory

Confidential - Pursuant to Protective Order

Page 169

1    response, in my -- if you've read my report,

2    you understand that I think that's a key

3    factor in increasing the risk for ovarian

4    cancer.

5         Q.      Understanding the percentages

6    of the constituent components, is that

7    limited only to fragrance, or would it also

8    be important to understand the percentages

9    for the heavy metals that you contend are in

10   Johnson's baby powder?

11        A.      So if I was trying to define

12   the hazard of each component, I would

13   certainly want one to know that.  As a

14   result, what I'm doing instead is looking at

15   the complex mixture.  In other words, this is

16   a mixture of all these things.

17               I break out those individual

18   components, or constituents, to tell you

19   about the hazard that is brought to play or

20   the toxicity profiles that exists.  And

21   what's important about that in my overall

22   evaluation of the end product, which is what

23   my risk assessment is based on, the end

24   product, shows that I have multiple

25   components with similar types of effects.

Confidential - Pursuant to Protective Order

Page 170

1    And as a toxicologist, when you do that, that

2    affects the conclusion that you can draw

3    about a body of literature.

4         Q.    Okay.  You do understand that

5    there is testing data available about the

6    percentages of the constituent components

7    with respect to heavy metals, et cetera, that

8    have been in Johnson's baby powder over time,

9    correct?

10        A.    There is some information.

11   Unfortunately, the information is not

12   complete as to every lot or every sample, as

13   far as what I have seen.  And also, there's

14   some -- some of the sampling is reported as

15   more of a limit versus an actual

16   quantification.  So it depends upon which --

17   which result, study result or document,

18   you're looking at.

19              There is some there, yes, and

20   that's one of the reasons why I identified

21   these as part of my risk assessment, because

22   I look for a pattern of these metals that are

23   known to carry a hazard and whether or not

24   these are ones I'm seeing detected time and

25   time again.

Confidential - Pursuant to Protective Order

Page 171

1          Q.      But you made no attempt to
2     quantify the risk with respect to any of
3     those components or use that data in any way,
4     correct?
5                    MS. PARFITT:  Objection.  Form.
6                    THE WITNESS:  No, I used
7               that -- that data as part of -- my
8               risk assessment as part of my hazard
9               assessment, absolutely.  It's part of
10              the hazard assessment.
11                   But as far as quantifying them
12              individually, no.  I am quantifying
13              the risk and looking at the risk of
14              the entire product, not of just one
15              individual component of the product.
16    QUESTIONS BY MS. BRANSCOME:
17         Q.      Well, we already discussed
18    you're not quantifying the risk with respect
19    to the entire product, correct?
20         A.      Well, I'm quantifying it in
21    terms of an increase above background, which
22    I'm not giving you a -- I told you I wasn't
23    giving you a cancer potency factor.  That is
24    true.  That I am not doing.
25                   But I am quantifying it by

Confidential - Pursuant to Protective Order

Page 172

1    using a word such as an increase -- an

2    increased risk.

3                    Is that a specific number?  Am

4    I telling you that it's increased by two

5    times or four times or six times?  No.  The

6    data available did not allow us to do that,

7    with the exception of the epidemiological

8    data.  And the epidemiological data can show

9    you that in that piece of evidence there

10   appears to be a 30 percent increased risk

11   above background.

12        Q.    Did you make an attempt to

13   quantify the risk with the data that you had

14   available to you with respect to the final

15   consumer product?

16        A.    I could not, based on the data

17   I had, because I didn't have a

18   well-controlled animal study to be able to

19   pull that out that way.

20                    Instead, what I -- in this type

21   of weight of the evidence, you look at what

22   you might be able to quantify based on the

23   human data.  And certainly the human data

24   showing the statistically significant

25   consistent findings across studies for that

Confidential - Pursuant to Protective Order

Page 173

1    30 percent increased risk, that is part of my

2    overall weight of the evidence for me making

3    the statement the risk is increased.

4              But you'll notice I don't say

5    increased risk of 30 percent, because I don't

6    believe that I can state that with certainty

7    in the way I do a risk assessment.  But

8    certainly as any one individual -- any one

9    individual piece of evidence or any one body,

10   like the epi data, others have made -- other

11   bodies who have looked at the -- talked about

12   the consistency of the increased risk signal

13   in the epi studies as being in the range of

14   30 percent.

15        Q.    Okay.  But you would agree that

16   based on the methodology that you applied in

17   this case, you could not say to a reasonable

18   degree of scientific certainty that there is

19   an increased risk of, for example, 30 percent

20   with respect to use of Johnson's baby powder

21   and ovarian cancer, correct?

22              MR. MEADOWS:  Objection.

23              THE WITNESS:  I have not done

24        that.  And I'm not saying that

25        somebody else couldn't do that.  I

Confidential - Pursuant to Protective Order

Page 174

1          have not -- I have not chosen to do

2          that based on my evaluation of the

3          data.

4     QUESTIONS BY MS. BRANSCOME:

5          Q.     And the same would be true if I

6     asked that question and substituted any

7     particular number, a 10 percent increased

8     risk, a 20 percent increased risk, correct?

9                    MR. MEADOWS:  Objection.

10                   THE WITNESS:  I haven't given a

11         specific number in my final opinions,

12         that is true.

13    QUESTIONS BY MS. BRANSCOME:

14         Q.     Okay.

15         A.     I've tried to explain to you

16    what evidence I do think is there, however.

17         Q.     Now, we've talked about

18    different types of talc that might have

19    different constituent components, but you

20    also look at exposure to talc in an

21    occupational setting.

22                   Do you recall that?

23         A.     Some of the studies that I've

24    relied upon, yes, some of them were

25    occupational.

Confidential - Pursuant to Protective Order

Page 175

1        Q.      Okay.  And you understand that

2    in an occupational setting, you would agree

3    that the exposure, particularly via

4    inhalation, would be much higher than it

5    would be through the use of a consumer

6    product, correct?

7        A.      It depends on the occupation,

8    but, yes.  For example, I would agree a miner

9    would be expected to have that, but there are

10   certain, quote/unquote, occupational studies

11   where the exposure levels that -- for

12   example, there are -- I believe there's at

13   least one study that looked at application of

14   talc powders in -- maybe in a material,

15   coating materials in a factory.  Those kinds

16   of studies would be different than a mining

17   study.

18              But, certainly, yes, I

19   understand that occupational studies, the

20   inhalation exposure is the pathway that would

21   be predominant versus in the consumer body

22   powder use, I'm talking about the predominant

23   exposure pathway in my opinion is going to be

24   through perineal use, even though inhalation

25   exposure can occur.

Confidential - Pursuant to Protective Order

Page 176

 1        Q.     Is it your opinion as you sit
 2   here today that someone could develop ovarian
 3   cancer through -- exclusively through the
 4   inhalation of Johnson's baby powder?
 5             MS. PARFITT:  Objection.
 6             THE WITNESS:  I haven't formed
 7        that opinion at this point in time.
 8   QUESTIONS BY MS. BRANSCOME:
 9        Q.     Have you done any analysis or
10   can you point me to any analysis in your
11   report that makes a comparison of the
12   exposure levels that might be seen in an
13   occupational setting to what would be seen by
14   a consumer?
15        A.     Are you asking me for a piece
16   of evidence that does that comparison, or is
17   there evidence that allows you to do that
18   comparison?
19        Q.     Have you cited or discussed any
20   of the evidence or done an analysis in any
21   way that would compare exposure levels in an
22   occupational setting to what you would
23   anticipate a consumer using Johnson's baby
24   powder might be exposed to?
25        A.     I don't think I did it as a

Confidential - Pursuant to Protective Order

Page 177

1    separate analysis, but as part of my analysis
2    I considered evidence that showed -- provided
3    me with such data.  So, for example, if you
4    want, I can point you to a -- I have an
5    inhalation paragraph, I think.
6              Let me look for it real quick.
7    See if I can find it quickly for you.  I
8    don't want to waste your time.
9         Q.    Sure.
10        A.    So there's -- I don't see it
11   cited here, but there's at least one document
12   I reviewed where the company themselves made
13   a comparison, and I have seen that, of
14   inhalation exposure to talc suspended in air
15   with diapering.  Dr. Longo has done a
16   measurement of exposure in air with perineal
17   application of talc.  So I'm aware of those
18   studies.
19             And then I certainly am aware
20   of the fact that those numbers are different,
21   or smaller, than many of the numbers I see
22   reported in some of the occupational studies.
23   But I can't say that's true for all.
24             I would certainly, though, say
25   that if you're just talking inhalation, I

Confidential - Pursuant to Protective Order

Page 178

1    certainly would expect a miner or a miller to

2    have a greater potential for inhalation

3    exposure than routine use of the consumer

4    product, with the exception of the studies --

5    the reports of large amounts of exposure in

6    children where the inhalation -- where they

7    were inhaling large amounts of powder.

8                    And so that's a different

9    story.  That's sort of an acute overdose

10   exposure, I guess, versus the typical daily

11   exposure through occupational or consumer

12   use.

13        Q.     And that raises an interesting

14   question.  You discuss health hazards

15   associated with talc being known, and in some

16   cases deaths had been reported.

17                    You're aware that those relate

18   to asphyxiation deaths, correct?

19        A.     Or long-term injury to lungs.

20   Maybe not an immediate asphyxiation, but lung

21   damage produced by large amounts -- some of

22   the children would go to the hospital and be

23   sick for a while and then die.  So they

24   didn't asphyxiate immediately, right?  But

25   some of them did.  You're exactly right.

Confidential - Pursuant to Protective Order

Page 179

1                    Both of those things occur, and
2    I address that also in my warning section
3    about the fact that that warning didn't --
4    was not put on the product for a long period
5    of time even though those types of reports
6    were coming in early.
7          Q.    You would agree that that is a
8    completely different biologic mechanism than
9    what you are proposing the biological
10   mechanism is for ovarian cancer to develop
11   with respect to talc use, correct?
12               MR. MEADOWS:  Objection.
13               THE WITNESS:  I would agree
14        that it's an acute response versus
15        chronic, yes, that I agree with.
16               It's not entirely different in
17        some cases because some of the tissue
18        reactions you saw were indicative of
19        irritation when some of the lung
20        samples were looked at.  But
21        certainly, yes, that's acute exposure
22        versus chronic exposure, and I'm
23        focusing on ovarian cancer on chronic
24        exposure scenarios.
25

Confidential - Pursuant to Protective Order

Page 180

1    QUESTIONS BY MS. BRANSCOME:

2         Q.    Okay.  Now, you would agree

3    that -- so let's set aside inhalation.

4              You agree that for talc -- for

5    Johnson's baby powder or another one of

6    Johnson & Johnson's consumer talc products to

7    reach an individual's ovaries, it must pass

8    from the perineum, through the vagina and the

9    cervical canal, move across the uterus -- and

10   again, it's the ciliary motion of the

11   fallopian tubes -- cross the peritoneal space

12   between the fimbriae and ovaries, escape

13   phagocytosis in the peritoneal space, and

14   then attach to the surface of the ovaries,

15   correct?

16              MS. PARFITT:  Objection.  Form.

17              MR. MEADOWS:  Okay.

18              THE WITNESS:  If the issue is

19         attaching to the surface, yes.

20         There's also some information

21         indicates the site of attack may be

22         actually at the fallopian tube exit to

23         the peritoneum.  But, yes, that's

24         correct, there's been some discussion

25         in the literature on ovarian cancer

Confidential - Pursuant to Protective Order

Page 181

1          about whether the tumors are arising

2          in the tubes versus the ovaries.

3               But I would agree, I think

4          both -- I think both of those

5          things -- those things -- there is a

6          passage that has to happen, regardless

7          of whether the end point is at the

8          fallopian tube or at the ovary.

9    QUESTIONS BY MS. BRANSCOME:

10        Q.    Okay.  Is it your view that the

11   consensus has been reached that ovarian

12   cancer can be caused by talc landing in the

13   fallopian tubes?

14        A.    I haven't formed that opinion,

15   though I do believe this will be discussed by

16   some of the other experts.

17        Q.    Okay.  Have you personally

18   conducted any tests or experiments to confirm

19   the theory that talc migrates from

20   application at the perineum to the ovaries?

21        A.    If by that you mean something

22   where I performed a laboratory test myself,

23   no, I have not done that.

24        Q.    As a toxicologist, are you

25   capable of doing that?

Confidential - Pursuant to Protective Order

Page 182

1        A.      Yes, I believe if asked I

2   could -- I could attempt to design something

3   to look at that issue.

4        Q.      Okay.

5        A.      But I would argue that I think

6   it doesn't make a lot of sense to revisit

7   based upon what we already know from the

8   scientific literature and the review papers

9   from the gynecological community.  I believe

10   it's -- it's understood that it can migrate.

11        Q.      In your opinion, has an animal

12   model been successfully developed that would

13   allow the testing of talc migration in humans

14   from the perineum to the ovaries?

15        A.      I think I tell that you in my

16   report.  I believe that the human data is the

17   relevant data to look at this issue.

18              So it would be very difficult

19   to design a study to do this based on the

20   typical laboratory species that are used in

21   toxicology testing.  Even -- even the monkeys

22   have issues, and the biggest issues with

23   monkeys is the ethicality of using a monkey

24   to settle -- to address a question that I

25   believe is settled within the gynecological

Confidential - Pursuant to Protective Order

Page 183

1    and scientific community.

2        Q.    Now, you state in your report

3    that talc that's applied through perineal

4    use -- I believe the term you use --

5    routinely migrates to the ovaries.

6            Is that your opinion?

7        A.    Are you reading from my report?

8            MR. MEADOWS:  To the extent

9        that question is still lingering, I

10       object to it.

11   QUESTIONS BY MS. BRANSCOME:

12       Q.    On paragraph 43 on page 29.

13       A.    So I think as I've stated it,

14   the studies that I have reviewed demonstrate

15   that inert particles routinely move from the

16   lower female reproductive tract up into

17   fallopian tubes and towards the ovaries.

18       Q.    What do you mean by routinely?

19       A.    It's the percentages of

20   movement that are reported in the patients.

21   In other words, if you look at some of the

22   individual studies -- if you want we can pull

23   them out, but, you know, eight of ten

24   patients, nine of ten patients, all the

25   patients showed movement of the particles.

Confidential - Pursuant to Protective Order

Page 184

1                    And then on top of that, you
2      have the review articles that talk about
3      migration of particles in the female
4      reproductive tract and are describing it as
5      an event that is known to occur.  So it's
6      those things weighed together.
7                    But certainly routine could be
8      supported by the observations where the
9      majority of the patients in the studies were
10     showing movement of inert particles.
11         Q.    Is it your opinion that every
12     perineal application of cosmetic talc powder
13     results in talc being deposited on the
14     ovaries?
15         A.    I have not formed that opinion,
16     no.
17         Q.    Have you formed an opinion as
18     to with what frequency -- so let's say
19     someone uses a cosmetic talc on a perineal
20     application ten times.  Out of those ten
21     times, have you formed an opinion as to how
22     many of those instances would talc deposit on
23     the ovaries?
24                    MS. PARFITT:  Objection.
25                    THE WITNESS:  I haven't formed

Confidential - Pursuant to Protective Order

Page 185

1          an opinion in that particular way, no.

2          I think what I've -- I've tried to

3          describe to you in my report is that I

4          believe it is known that inert

5          particles have the ability to migrate.

6          And based on that, I form the opinion

7          that it's my opinion to a reasonable

8          degree of scientific certainty, which

9          would be a more likely than not

10         standard, that particles of talc would

11         be migrating when women are using them

12         perineally.  But I haven't told you

13         that it has to be a specific number,

14         no.

15    QUESTIONS BY MS. BRANSCOME:

16         Q.    Have you done any analysis to

17    establish over a lifetime use of cosmetic

18    talc where the app -- the perineal

19    application, with what frequency during a

20    lifetime the talc may have been deposited on

21    that individual's ovaries?

22         A.    So I certainly looked for

23    information to allow me to assess that, but

24    unfortunately those kinds of studies would be

25    unethical to do.  Because that would be a

Confidential - Pursuant to Protective Order

Page 186

1    matter of sampling women during -- using them

2    and then taking biopsies, and that's

3    something that would be difficult to do.  I

4    would say impossible to get approval to do

5    under human testing guidelines.

6         Q.    Okay.  So it's your opinion

7    that it is possible for talc that is applied

8    through a perineal application to reach the

9    ovaries, but you cannot say with what

10   frequency that occurs?

11              MS. PARFITT:  Objection.  Form.

12         Misstates her testimony.

13              THE WITNESS:  That's not --

14         what I'm telling you is, I think it --

15         that to a reasonable degree of

16         scientific certainty that it migrates,

17         and that would be the standard of more

18         likely than not.  I think it's more

19         likely than not that the talc is

20         reaching the ovaries when people are

21         using it perineally.

22              I did form the opinion -- and

23         I've talked about this at trial and

24         yesterday.  I have formed the opinion

25         that this is a issue of chronic or --

Confidential - Pursuant to Protective Order

Page 187

1          or use of the products.  In other
2          words, people aren't just using it
3          once, but people are using it -- you
4          can use the word "routinely," as a
5          habit, in their daily life perineally.
6          And that would be consistent with the
7          studies that have been done that have
8          looked at the issue of dose response.
9               And I discuss that in my
10         report, too.
11    QUESTIONS BY MS. BRANSCOME:
12         Q.    Okay.  But you have not made an
13    attempt to quantify, nor have you seen it in
14    the literature, the overall dose of talc that
15    someone might be exposed to in terms of
16    contact with the ovaries throughout their
17    lifetime, chronic use of cosmetic talc?
18              MS. PARFITT:  Objection.  Form.
19              THE WITNESS:  Those -- that's
20         the kinds of studies that have not
21         been done and I believe could not be
22         done based upon ethics of human
23         testing.  But certainly I -- that --
24         that data is not available that I'm
25         aware of.

Confidential - Pursuant to Protective Order

Page 188

1                MS. BRANSCOME:  Okay.  Can we

2        just go off the record for a second?

3                VIDEOGRAPHER:  We are going off

4        the record at 12:23 p.m.

5         (Off the record at 12:23 p.m.)

6                VIDEOGRAPHER:  We are back on

7        the record at 12:24 p.m.

8    QUESTIONS BY MS. BRANSCOME:

9        Q.    As you sit here today, how

10   would you characterize the biological

11   mechanism by which you claim Johnson's baby

12   powder, their other cosmetic talc products,

13   present a risk of ovarian cancer?

14       A.    So I outline this for you in

15   the MDL report.  I think I have a section

16   on -- let's see if I can -- you want me to

17   tell you where or...

18                So paragraph 65, I think I set

19   out part of this argument or part of this.

20   And then also in paragraph -- I believe in

21   67.

22       Q.    All right.  Well, let me take a

23   step back.

24                Is it your opinion that the

25   biological mechanism by which talc, cosmetic

Confidential - Pursuant to Protective Order

Page 189

1    talc, can in your view cause ovarian cancer,

2    is that something that has been definitively

3    established?

4         A.     What do you mean by

5    definitively?  I mean, I think -- I believe

6    more likely than not that -- so I believe I

7    have reached a conclusion that I think what

8    the most likely biologically plausible

9    mechanism, but maybe you're ask -- meaning

10   something else.

11        Q.     Okay.  Well, let's start with

12   specifically you discuss a number of

13   different potential mechanisms in your

14   report.  So if you believe you have reached

15   an opinion more likely than not about the

16   specific biological mechanism by which

17   cosmetic talc and specifically Johnson &

18   Johnson's products can cause ovarian cancer,

19   can you describe that for me?

20        A.     So it's a chronic inflammatory

21   process, and so -- but like all compounds,

22   constituents, even drugs that we look at, we

23   don't know each individual step within the

24   molecular mechanism.

25               Instead, what we know is that

Confidential - Pursuant to Protective Order

Page 190

1    there are certain components to the process

2    of cancer that are consistent with the

3    effects produced by talc, and we know that

4    talc can produce a chronic inflammatory

5    process.

6                And so that's why I was

7    pointing you to the paragraph 65 and I think

8    67.

9        Q.    Is it your opinion that

10   consensus has been reached in the scientific

11   community that cosmetic talc can cause

12   ovarian cancer through a chronic inflammatory

13   response?

14              MS. PARFITT:  Objection.

15              THE WITNESS:  I don't know that

16         that's exactly the opinion I've

17         formed.

18              Would you like me to -- I could

19         restate what I believe, but I don't

20         think that's exactly how I would state

21         it, no.

22   QUESTIONS BY MS. BRANSCOME:

23       Q.    Okay.  So then yes or no:  Has

24   consensus been reached in the scientific

25   community that cosmetic talc can cause

Confidential - Pursuant to Protective Order

Page 191

1    ovarian cancer through a chronic inflammatory

2    process?

3         A.    I don't believe I formed the

4    opinion either way, that it's yes or no,

5    because I haven't tried to -- I haven't tried

6    to form the opinion about what the -- in

7    other words, I haven't -- I can't say for

8    every scientist out there.

9              I certainly can tell you what I

10   believe based on what the consensus of

11   science says about mechanisms underlying

12   cancer and the consistency of those

13   mechanisms with talc, and then I have an

14   opinion about what I believe that information

15   says.

16             I do believe my opinions,

17   however, are consistent with some consensus

18   statements, such as the issue on the

19   mechanism is consistent with consensus

20   opinion reached by IARC, where they discuss

21   the inflammatory process as an underlying

22   biologically plausible mechanism that can

23   lead to ovarian cancer.

24             I think it's consistent with

25   the Canadian risk assessment where they

Confidential - Pursuant to Protective Order

Page 192

1    discuss those issues.

2              I think it's consistent with --

3    I don't know if the ACOG statement goes that

4    far on mechanism, but it does talk about

5    ovarian cancer.  That's a recent statement.

6              And I believe it's consistent

7    with some of the -- I believe my opinions are

8    consistent with some of the opinions reached

9    by others in science, but that's the only way

10   I can answer that for you.

11        Q.    Okay.  Because you have not,

12   one way or the other, done an evaluation of

13   whether or not chronic inflammatory process

14   is a biological mechanism on which the

15   scientific community has reached general

16   consensus with respect to the causation of

17   ovarian cancer; is that correct?

18              MR. MEADOWS:  Objection.

19              THE WITNESS:  I can't tell you

20         that -- I can't tell you that every

21         body that's looked at it, but I have

22         tried to point you to evidence that I

23         believe is consistent with that.

24              For example, the IARC would be

25         a good example of consensus on

Confidential - Pursuant to Protective Order

Page 193

```
 1          biologic mechanism because they have a
 2          whole part of their assessment of
 3          non-asbestiform talc and perineal
 4          cancer -- of perineal use and ovarian
 5          cancer that discusses mechanism.  And
 6          that is consistent with what I have
 7          said.  So there is a consensus
 8          opinion.
 9               But I guess what I'm saying to
10          you is I can't tell you that all --
11          all people who have put statements
12          have come to that exact opinion.  But
13          there aren't that many places out
14          there that are addressing that issue
15          as far as the consensus on a
16          mechanism.  There's more statements
17          about the relationship between ovarian
18          cancer and talc use than there are
19          drilling down to what the mechanism
20          must be.
21     QUESTIONS BY MS. BRANSCOME:
22          Q.    Okay.
23          A.    So that's the issue.  It's a
24     little -- it's a little hard to answer that
25     yes or no because of that.
```

Confidential - Pursuant to Protective Order

Page 194

1           Q.      Okay.  When we talk about the
2    idea of biologic -- a biologically plausible
3    mechanism, what is your understanding of the
4    term "plausible" in that expression?
5           A.      When I use the word
6    "biologically plausible mechanism" or
7    "biologic plausibility," I'm using it
8    consistent with what Bradford Hill uses,
9    that's it's the idea that the evidence that
10   available makes -- the evidence that
11   available supports a pathway where you can go
12   to exposure to response.
13             So in other words, there's a --
14   the biological information is consistent with
15   how we know cancer can develop.  That's the
16   response we're looking at.  And the exposure
17   we're looking at is known to produce those
18   kind of biologic events.
19             So as a result, based upon
20   knowing that there's a consistency between
21   the data that we have on the -- on the
22   exposure and the data that we have on the way
23   cancer can occur, those things -- those
24   things align.  So that makes it biologically
25   plausible that that could occur.

Confidential - Pursuant to Protective Order

Page 195

1          Q.     But you would agree that

2    biological plausibility suggests that it is a

3    plausible explanation, but it may not have

4    been established as the definitive pathway by

5    which a disease is caused, correct?

6                    MS. PARFITT:  Objection.  Form.

7                    THE WITNESS:  Well, I would

8              agree that in the discussion of

9              biologic plausibility in the Bradford

10             Hill paper that is true.  But if you

11             look at people's discussion of the use

12             of -- I want to say "biological

13             mechanism" rather than the word

14             "biologic plausibility," because

15             really as a toxicologist I'm trying to

16             understand whether there's a biologic

17             mechanism that makes sense.  Those are

18             words I like to use.  Does it make

19             sense that this exposure could lead to

20             this response.

21                  And that involved looking at

22             the mechanistic data or the data on

23             the way toxic responses are produced

24             by talc, and whether or not they align

25             with the types of toxic insults that

Confidential - Pursuant to Protective Order

Page 196

1          are known to be able to produce,

2          specifically, ovarian cancer.

3   QUESTIONS BY MS. BRANSCOME:

4          Q.     Is it your opinion that IARC,

5   for example, has concluded that the

6   biological mechanism by which talc may cause

7   ovarian cancer is chronic inflammation?

8               MS. PARFITT:  Objection.

9               THE WITNESS:  I don't know that

10          they have used -- they've described it

11          quite that way, but they do describe

12          what they believe is the biologically

13          plausible mechanism.  Because they do

14          organize and use within the

15          definitions of how they describe some

16          things that are consistent with what

17          Bradford Hill uses.

18  QUESTIONS BY MS. BRANSCOME:

19         Q.     Okay.  And obviously you're

20  familiar with the IARC evaluation of talc

21  with respect to the possibility of causing

22  ovarian cancer, correct?

23         A.     Yeah.  If you mean the recent

24  one, yes, the most recent assessment.

25         Q.     Yes.

Confidential - Pursuant to Protective Order

Page 197

1                    And that IARC has in fact

2    classified cosmetic talc not containing

3    asbestos as possibly carcinogenic to humans,

4    correct?

5         A.    It's a possible human

6    carcinogen 2B, that's correct.

7         Q.    Okay.  And if a product is

8    listed in the 2B category, does that

9    necessarily mean the product, in your view,

10   is carcinogenic?

11        A.    Not always, because that comes

12   down to an assessment of -- then you're

13   putting together a -- a risk assessment that

14   looks at -- looks at -- across the

15   information that you have available.  And

16   that may be that -- that the -- the possible

17   is all you can say, or it may be that you

18   believe that the information -- there's

19   enough information there to take it further.

20                    Has a possibility -- that's

21   what I said, they do a hazard assessment.

22   They rank things on hazard based on -- on

23   unlikely -- not enough evidence, less -- the

24   possibility, the probability or it's known.

25        Q.    In your opinion, is your

Confidential - Pursuant to Protective Order

Page 198

1    characterization of the risk of Johnson's

2    baby powder or talcum powder products with

3    respect to ovarian cancer, are you in the MDL

4    characterizing that risk as a higher level of

5    risk than what IARC characterized it, or do

6    you agree with the 2B characterization of

7    possibly carcinogenic?

8              MS. PARFITT:  Objection.  Form.

9              THE WITNESS:  So I'm not IARC,

10         so I don't try to second-guess there.

11         They have reached a conclusion, and I

12         use that as part of my weight of the

13         evidence.  So I haven't formed the

14         opinion they're right or wrong.

15              But I have done a different

16         assessment.  My assessment, first off,

17         includes more information than IARC

18         had, so as a result, I have formed the

19         conclusion that I believe that it's

20         more likely than not that exposure

21         to -- perineal exposure to talc body

22         powders increases the risk of ovarian

23         cancer in women who use that product.

24              And I will put the caveat this

25         has to be chronic use or repeated use,

Confidential - Pursuant to Protective Order

Page 199

```
 1        because I've gone -- I've said that
 2        many times.
 3              So that -- that is my opinion.
 4        So that's a different statement and a
 5        different assessment than what IARC
 6        does.
 7              But -- so I don't disagree with
 8        their possible -- I weigh that, but I
 9        believe the evidence for the risk
10        assessment shows me that it's more
11        likely than not that this -- this
12        exposure will increase the risk above
13        a background risk for women who are
14        using this product.
15  QUESTIONS BY MS. BRANSCOME:
16        Q.    And how do you define chronic
17  or repeated use?
18        A.    Well, that is variable within
19  the literature.  For me, chronic is
20  exposure -- if as a toxicologist, I would
21  typically say chronic use is years of use.
22  It doesn't have to be daily, but it would be
23  years.  That's the most common description
24  you see in toxicology, so I would say that's
25  fair.  That's a fair assessment of my
```

Confidential - Pursuant to Protective Order

Page 200

1    opinion.

2         Q.    Is there a threshold of the use

3    of Johnson & Johnson's talcum powder products

4    below which there is no increased risk, in

5    your opinion, of ovarian cancer?

6         A.    We have not identified that

7    threshold.  That's what's missing within

8    the -- the literature that exists today.  So

9    I can't tell you whether or not with only a

10   thousand applications over a lifetime that

11   is -- is not enough for every individual or

12   not, but certainly I do believe that the --

13   that the exposure has to be habit, routine,

14   chronic, something that is done maybe not on

15   a daily basis but on a routine basis in a

16   woman's life.

17             So that is consistent, I think,

18   with the literature.

19             MS. BRANSCOME:  Okay.  We can

20        go off the record.

21             VIDEOGRAPHER:  We are going off

22        the record at 12:36 p.m.

23        (Off the record at 12:36 p.m.)

24             VIDEOGRAPHER:  We are back on

25        the record at 1:35 p.m.

Confidential - Pursuant to Protective Order

Page 201

1    QUESTIONS BY MS. BRANSCOME:

2        Q.    Good afternoon again,

3    Dr. Plunkett.

4        A.    Good afternoon.

5        Q.    I want to talk a little bit

6    about the Health Canada assessment.

7              We talked about this before,

8    but this is something that you reviewed after

9    you completed your report which has been

10   marked as Exhibit 4, correct?

11       A.    Yes, and I wanted to tell you,

12   I did not bring all those documents printed.

13   I apologize.  So there is a separate Health

14   Canada draft risk assessment that I didn't

15   print.

16       Q.    Okay.  So when you're referring

17   to the Health Canada analysis, what document

18   are you specifically referring to?

19       A.    So I'm referring to the -- the

20   combined documents, but there are times when

21   you've asked me questions that I've been

22   referring -- and I tried to say, I believe,

23   Taher.

24             But, yes, some of the questions

25   you asked me when I said Health Canada, I was

Confidential - Pursuant to Protective Order

Page 202

1    talking about the combined documents, which

2    would include their -- I guess it's called a

3    draft risk assessment document, yeah, which

4    refers to this document but is a separate --

5    is their own separate statement.

6         Q.    As you sit here today, what is

7    your understanding of the current position

8    that has been articulated in the collection

9    of documents that you refer to as Health

10   Canada with respect to any potential

11   relationship between cosmetic talc and

12   ovarian cancer?

13        A.    So that's why I did print out

14   the small one, because I think it summarized

15   it.  So here, if you look at this Exhibit 6,

16   it makes specific conclusions or draws --

17   makes statements.  And essentially it talks

18   about talc being a possible risk of ovarian

19   cancer, but then it gives women specific

20   advice about what to do in order to minimize

21   exposure to the products, and some of that

22   was relevant as well.

23             Just one reason I printed it

24   out, it has to do with either choosing an

25   alternative product or avoiding genital

Confidential - Pursuant to Protective Order

Page 203

1    exposure to talc.

2                    And let me see the exact words

3    that they use, but --

4         Q.    Before you do that, do you

5    agree with the characterization that cosmetic

6    talc presents a possible risk of ovarian

7    cancer?

8         A.    No, I don't think that's my

9    opinion.  I think my opinion is stronger than

10   that.

11                   But are you talking about my

12   causation analysis opinion or just my risk

13   assessment opinion?

14        Q.    I'm asking about any opinion

15   you intend to offer in the MDL.

16        A.    Okay.  So I will not be giving

17   the causation analysis opinion, so that -- I

18   will take that off the table.

19                   So I think my opinion is a

20   little stronger because I say that the

21   exposure to the perineal -- the talc by

22   perineal application in women increases the

23   risk.  So I'm not saying it's a possible

24   risk.  I'm actually -- I believe that it

25   increases the risk.  And I do believe that

Confidential - Pursuant to Protective Order

Page 204

1    there is a association between those two

2    things, the exposure and the response, which

3    is more than a possible association, if you

4    want to use those words.

5              But my assessment that I've

6    done is not exactly the same, for example, as

7    IARC does, which is more of just a hazard

8    assessment.

9         Q.    Right.

10             So I'm focusing my questions

11   now on your risk assessment as compared to

12   the documents that you've supplied us with

13   with respect to Health Canada.  And if I

14   understand it correctly, are you stating that

15   your opinion with respect to the relationship

16   between cosmetic talc and ovarian cancer, you

17   believe that it is an association that is

18   stronger than a possible risk; is that

19   correct?

20        A.    Well, I don't say it's a

21   possible risk; I say there is an increased

22   risk.  So I think it's a different statement,

23   yes, absolutely.

24             Of course, I'm not Health

25   Canada, so, you know, they have a framework

Case 3:16-md-02738-MAS-RLS    Document 33120-17    Filed 08/22/24    Page 206 of 377
PageID: 236410

Confidential - Pursuant to Protective Order

Page 205

```
 1   upon which they make decisions, and I'm doing
 2   an analysis based on what I have done.  And
 3   so it's not exactly the same, although some
 4   of the same documents and information is
 5   weighed within -- and then that's when you
 6   have the issue of what Health Canada does
 7   versus what they rely upon.
 8            But this Taher risk assessment
 9   is just one piece of information that Health
10   Canada has weighed in their assessment if you
11   read their -- their draft risk assessment.
12        Q.    So the question I have about
13   the Taher risk assessment, earlier you were
14   referring to the fact that you have only seen
15   a quantitative assessment of the weight of
16   particular components of scientific evidence
17   in evaluating epidemiological studies; is
18   that correct?
19        A.    So that's what I typically see,
20   yes.  And I don't know that -- I've never
21   seen it.  But the typical approach would be
22   to use it there as opposed to using it in the
23   context of a human health risk assessment
24   based on animal in vitro data.
25        Q.    All right.  Are you familiar
```

Confidential - Pursuant to Protective Order

Page 206

1    with something called the Klimisch scoring

2    system?

3          A.    I don't know if I am now.

4    You'll need to show me what it is you're

5    referring to.  The name doesn't ring a bell,

6    no.

7          Q.    Okay.  So it's not something

8    that you've used in the past?

9          A.    No, not that I recall using.

10         Q.    All right.

11         A.    Unless it has another name, and

12   that's why I'm asking you.

13         Q.    All right.  So if you have

14   actually -- it's the document in front of you

15   that we've already marked as Deposition

16   Exhibit 5, I believe.

17         A.    Yes.

18         Q.    And that is the Taher study

19   that we were discussing and is cited by the

20   Health Canada risk assessment.

21               If you turn to page 5 -- well,

22   actually beginning on page 4, do you see

23   there is a section entitled "Literature

24   Search and Identification of Relevant

25   Nonhuman Studies"?

Confidential - Pursuant to Protective Order

Page 207

1                Do you see that?

2        A.      Yes.

3        Q.      And this is related to an

4    analysis that these authors performed on

5    potentially relevant animal and in vitro

6    studies, correct?

7        A.      Yes, that is true.

8        Q.      All right.  And it states here

9    that "all retrieved studies were examined for

10   relevance, reliability and overall quality

11   using the Klimisch scoring system."

12               Do you see that?

13       A.      Yes, I do see that.  So I have

14   seen that before.  I just didn't -- I didn't

15   recall it.

16       Q.      Okay.  And so would you agree

17   that it is possible and in fact has been done

18   in a study that you rely on to apply a

19   quantitative scoring system to animal and in

20   vitro studies, particularly in the context of

21   looking at the relationship between talc and

22   ovarian cancer?

23       A.      Well, I didn't say it was

24   impossible.  I said I don't believe it's

25   routine based on my experience.

Confidential - Pursuant to Protective Order

Page 208

1                  So, yes, if they stated they've

2    done -- we'd have to pull the supplementary

3    materials out, but I recall them doing

4    scoring based on epi studies but not on

5    the -- all of the animal studies that they

6    talk about.  But we can pull it out and look.

7    I could be wrong.

8          Q.     Okay.  Did you review the

9    supplementary material 7, 8 and 9?

10         A.     Yes, I did, and we'd have to

11   pull them out because I don't recall the

12   details.

13         Q.     All right.  We may take a look

14   at those in a minute.

15                It talks about them classifying

16   the animal and in vitro studies into four

17   categories of reliability.

18                Do you see that?

19         A.     Yes.

20         Q.     So did you make any attempt,

21   when you were reviewing the various studies

22   in reaching your opinion about the potential

23   risk of talc in causing ovarian cancer, did

24   you make any attempt to separate out the

25   different pieces of evidence into categories

Confidential - Pursuant to Protective Order

Page 209

1    of reliability like the authors of this paper

2    have done?

3          A.    I didn't do it exactly the way

4    they did it, but I certainly do do that as

5    part of my screening.

6               I told you one of the

7    characteristics or one of the assessments I

8    make is whether I believe the data is

9    reliable data that I can -- that I can use in

10   a weight of the evidence.  So I make a -- and

11   when I talk about reliability, I'm talking

12   then about things such as I mentioned, peer

13   review, whether or not there is statistical

14   analysis, whether or not the study is

15   designed in a way that's consistent with

16   general principles of toxicology, control

17   groups or not control groups.

18              Those kinds of things I do -- I

19   do consider when I am assessing the use of a

20   study or not.

21         Q.    Is it your testimony here today

22   that contained within your report that's

23   marked as Exhibit 4, I could find

24   categorization of reliability of each of the

25   pieces of scientific literature that you have

Confidential - Pursuant to Protective Order

Page 210

1    included in your weight of the evidence

2    analysis?  Is that your testimony today?

3         A.    No, that's not what I'm telling

4    you, no.

5         Q.    Okay.  So you would agree that

6    you did not -- first of all, did you develop

7    categories of reliability in which you

8    separated the particular scientific studies

9    into as part of your weight of the evidence

10   analysis?

11        A.    I do look at -- I do categorize

12   studies based upon my assessment of their

13   reliability and their ability to be used to

14   answer the question I'm asking, but I -- I

15   already told you, I didn't do it the way it's

16   set out here.  I didn't have these specific

17   five categories, no.  That's not what I did.

18        Q.    Okay.  Other than the CIR 2013

19   publication, which you have said that you do

20   not find reliable and you assign little

21   weight to it, can you point me to another

22   place in Exhibit 4 where you assign a

23   specific category of weight that you have

24   given to a particular study that you include

25   in your weight of the evidence analysis?

Confidential - Pursuant to Protective Order

Page 211

1          A.      If what you're asking me is do

2    I make a specific statement next to each

3    study that I discuss about little weight or

4    great weight, no, I don't do that, if that's

5    what you're asking me.

6          Q.      Okay.  As part of the

7    collection of documents that relate to Health

8    Canada that was provided to us as part of

9    your new reliance list, did you review a

10   document entitled weight of the evidence --

11   or "Weight of evidence:  General principles

12   and current applications of Health Canada"?

13         A.      Yes, I've seen that.

14                 (Plunkett Exhibit 8 marked for

15                 identification.)

16   QUESTIONS BY MS. BRANSCOME:

17         Q.      All right.  We will mark this

18   as Plunkett Deposition Exhibit Number 8.

19                 All right.  The document that I

20   just handed you that's marked as Plunkett

21   Deposition Exhibit Number 8, are you familiar

22   with that document, Dr. Plunkett?

23         A.      Yep, I've seen this before.

24         Q.      Is this listed among the new

25   materials that have been added to your

Confidential - Pursuant to Protective Order

Page 212

1    reliance list?

2        A.    I believe it was, yes.

3        Q.    Okay.  And so for this one I

4    just want to direct your attention to the

5    conclusion section -- well, let me ask you

6    first:  How does this document relate to the

7    collection of documents with respect to

8    Health Canada that you identified as relevant

9    to your opinion?

10       A.    It was one of the materials

11   that they rely upon or they cite.  That's the

12   reason I pulled it.  It was -- I pulled

13   documents that they provided on the website

14   that were cited.

15       Q.    Okay.  And if you could turn to

16   page 11 of that document, there's a

17   conclusion section.  The first sentence of

18   the third paragraph reads, "The given --

19   given the context-specific nature of each

20   risk assessment and the diversity of tools

21   and criteria applicable, transparent

22   documentation of the specific application of

23   the WOE approach is especially important."

24              Did I read that correctly?

25       A.    Yes, you did.

Confidential - Pursuant to Protective Order

Page 213

1          Q.      And is your understanding of

2   WOE that it is weight of evidence?

3          A.      Yes, that's correct.

4          Q.      Do you agree with this

5   statement?

6          A.      In a regulatory context, I do

7   believe that that is true, because within the

8   regulatory context when they do the risk

9   assessment, there's a need to understand why

10  decisions are made.  So, absolutely, in a

11  regulatory context, I would agree that this

12  kind of transparency is even being adopted by

13  EPA.

14         Q.      And is it your opinion then

15  that a different level of transparency is

16  needed for expert testimony in court?

17         A.      No, that's not what I'm saying.

18  I'm saying that's a different process.  And

19  that's what part of this process is.  It's

20  understanding the ability to provide a dialog

21  about what was done.

22              So as a result, this is

23  something that is common to the work that

24  I've done in the past.  Even in a

25  nonlitigation context with my regulatory

Confidential - Pursuant to Protective Order

Page 214

1   clients, doing a risk assessment doesn't

2   necessarily involve the same level of detail

3   that a regulatory -- a regulator would apply

4   to the transparency of the assessment.  Not

5   to say that it couldn't be done, but it's

6   just -- I would say it's not necessarily

7   typical.

8       Q.    So this specifically refers to

9   transparent documentation.

10              Do you see that?

11      A.    Yes.

12      Q.    Would you agree that the report

13  that you have produced in the MDL does not

14  have documentation of the specific

15  application of the weight of evidence

16  approach?

17              MS. PARFITT:  Objection.

18          Excuse me, objection.  Form.

19              THE WITNESS:  I disagree to an

20          extent because I did attempt to

21          provide in my report a description of

22          the methods that I used and the

23          resources that I've relied upon for a

24          discussion of how those methods are

25          used.

Confidential - Pursuant to Protective Order

Page 215

1                      And then in addition to that,

2              I've attempted to lay out for you in

3              my report a discussion of the pieces

4              of evidence that I've relied upon,

5              including some -- for some of those --

6              that's one of the reasons I got so

7              detailed in the section on migration

8              and providing you an analysis of each

9              of the papers that I relied upon and

10             what I thought was important within

11             them that led to my -- the formation

12             of my opinions.

13                     So I disagree to some extent.

14     QUESTIONS BY MS. BRANSCOME:

15             Q.     Okay.  Turning back to what

16     Taher did in classifying different studies

17     into different categories of reliability.

18     Have you done that type of analysis in the

19     past where you have separated out different

20     studies into different categories of weight

21     or reliability as part of an overall

22     analysis?

23             A.     Well, I do that every time I do

24     a weight of the evidence when I separate into

25     categories first based upon the type of

Confidential - Pursuant to Protective Order

Page 216

1    study.  In other words, as I discussed many

2    times in deposition, when you're talking

3    about doing a human health risk assessment,

4    there's certain types of data that are most

5    relevant.  I mean, when they use the word

6    "reliable" -- I don't know that many of these

7    studies have the same level of reliability as

8    far as peer review, but they're -- for

9    example, on the issue of migration, it's my

10   opinion that the data from the human studies

11   is a more reliable or relevant source of

12   information.  And I've laid out why, because

13   of differences in the anatomy, things like

14   that, with the data.

15        Q.    Are you familiar with the term

16   "binning exercise"?

17        A.    Yes, I am.  And that is

18   certainly something that I have used in other

19   aspects of work that I have done.

20        Q.    Did you do a binning exercise

21   in rendering your opinions and what you've

22   provided to us in the context of your

23   opinions in the MDL?

24        A.    Yes, that's the exercise I

25   start with.  I'm binning them into human,

Confidential - Pursuant to Protective Order

Page 217

1  animal, mechanistic, in vitro data.  That's

2  the first bins.

3              In fact, in the copper work we

4  did, that's what we did.  We separated the

5  data into in vitro/only mechanistic

6  information, animal studies, did we have

7  human studies.

8              And we also looked at

9  studies -- we had a separate bin of exposures

10 like I do.  I have studies that just address

11 the issue of exposure potentially.

12             So, yes, it's -- it's

13 consistent with doing that.  It's --

14 essentially binning is just separating the

15 information into groups based on what

16 questions those -- those data can answer.

17      Q.    Okay.  Have you ever -- do you

18 ever separate them into bins based on the

19 level of weight that you would give a

20 particular study?

21      A.    I do that when I'm analyzing

22 each of the studies within that group or that

23 bin.  That's what I do.  I give them -- in my

24 weight -- in my analysis, I weigh those

25 studies based upon my judgment on the

Confidential - Pursuant to Protective Order

Page 218

1    relevance, the reliability, the power of the

2    study, the statistical analysis that's done,

3    the inclusion in animal studies, in

4    particular, of controls.  Those are all parts

5    of that analysis that I do.  So, yes, I do do

6    that.

7                 And then in -- there have been

8    exercises that I've done in the past with

9    other individuals where we may have taken a

10   yellow sticky note and put down on top of it

11   animal data with exposure information, animal

12   data without exposure information.  That's

13   the process that I'm doing when I am looking

14   across the data.  I'm separating those pieces

15   of data into groups and what types of

16   questions they can answer.

17                 So that is consistent with what

18   I do when I do a weight of analysis approach

19   in the work that I do in both nonlitigation

20   and litigation context.

21        Q.    Okay.  But we have no specific

22   documentation of the different ratings that

23   you gave the various pieces of evidence that

24   you included in your weight of the evidence

25   analysis, aside from occasional references to

Confidential - Pursuant to Protective Order

Page 219

 1   giving something less or more weight,

 2   correct?

 3        A.    Well, I certainly -- I told you

 4   I have not given numerical values that you're

 5   asking me, but I've attempted to do that when

 6   I have described them in groups, when I talk

 7   about human versus animal versus in vitro.

 8   Because I've already told you, I believe,

 9   it's my opinion that certain types of

10   information are more informative than others.

11   And so the more informative it is, the more

12   weight you're giving it in -- obviously in

13   your analysis.

14            But it is a different exercise

15   than what is described here.  And here I'm

16   pointing to Exhibit 8.  And it's a different

17   exercise, obviously, than what a regulatory

18   body is required to do where they are trying

19   to come up with ways to increase the

20   transparency when no one can go and actually

21   talk to each of the regulators individually

22   to understand what their thinking was.

23        Q.    Okay.  Returning to biological

24   mechanism for a minute, why doesn't

25   inflammation generally, including chronic

Confidential - Pursuant to Protective Order

Page 220

1    inflammation, cause ovarian cancer?

2         A.      Because it doesn't change the

3    phenotype of the cell.  It has to -- the --

4    and I discuss that.  You have to -- you have

5    to set up a chronic inflammatory process that

6    leads to changes within the cellular

7    phenotype to go from a cell that is -- that

8    is -- is dividing normally to a cell that

9    isn't.

10              So it's -- it's the same issue

11   that you address even in a study in animals.

12   Why do not all animals exposed to -- exposed

13   to a chemical develop tumors.  It's the idea

14   that something has to be initiated beyond the

15   exposure or maybe beyond inflammation to lead

16   to the series of events.

17              And so, yes, it's recognized

18   that you can get inflammation, and

19   inflammation can go down the road in becoming

20   a carcinogenic process, or inflammation can

21   no longer -- can stay where it is.  It

22   doesn't progress beyond just a chronic

23   inflammatory process.

24         Q.      And so if you had a study that

25   demonstrated that a particular agent causes

Confidential - Pursuant to Protective Order

Page 221

1    inflammation, you would need more information

2    in order to make the conclusion that that

3    agent can in fact cause cancer, correct?

4                MR. MEADOWS:  Objection.

5                THE WITNESS:  You would look

6          for more informative information,

7          exactly, which is why, when I've

8          talked about the individual

9          constituents in the context of

10         consistency on mechanism for cancer,

11         I've pointed to documents where that

12         information has been discussed.

13               So like when I talk about

14         asbestos or cobalt or I point to

15         the -- for example, the IARC

16         assessment where they go through

17         that -- that discussion of the fact

18         that there's not just data showing

19         that a biologically plausible

20         mechanism may be inflammation, but

21         there's also data to show that that

22         can lead to tumor development as well.

23   QUESTIONS BY MS. BRANSCOME:

24         Q.    Okay.  How does talc change the

25   phenotype of the ovarian cell?

Confidential - Pursuant to Protective Order

Page 222

```
 1        A.     So this is one of the details
 2   we don't know, other than generally it's
 3   changing the phenotype to go from a normal
 4   cell to a tumor cell.  That is being
 5   observed.  When you find the presence of the
 6   tumor, that is what you're observing.
 7        Q.     Does pure talc with no other
 8   constituent components, can it change the
 9   phenotype of an ovarian cell?
10             MR. MEADOWS:  Objection.
11             THE WITNESS:  So that's a
12        difficult question to answer with
13        certainty because of the fact that I
14        don't believe that we have assurance
15        that any of the studies are done with
16        essentially pure talc.
17             However, in the studies that
18        claim to have been done with pure
19        talc -- for example, the NTP study
20        claims to have been done with pure
21        talc.  So if that is pure talc, truly
22        is, then that study is an example of
23        evidence for the chronic inflammatory
24        process leading to preneoplastic
25        lesions that are setting down the road
```

Confidential - Pursuant to Protective Order

Page 223

1           mechanism towards cancer.

2                   So there are data out there.

3           The problem you have, I believe, in

4           the literature is whether or not,

5           based on the discussion that is

6           becoming apparent now with sensitivity

7           and ability to take the natural

8           product and actually determine exactly

9           what's in it, that I don't think there

10          is the ability to assure that any --

11          any of these studies with the samples

12          of talc they're using is absolutely,

13          100 percent, only platy talc.  I think

14          there's -- there's some concern about

15          that.  But certainly you will take --

16          you have to take what is discussed

17          within the study as evidence from what

18          they're claiming.

19                  So many of the studies say we

20          used asbestos-free talc or platy --

21          pure platy talc and we got a toxic

22          response.

23     QUESTIONS BY MS. BRANSCOME:

24          Q.    Would it be possible to design

25     an experiment -- and now I'm talking about an

Confidential - Pursuant to Protective Order

Page 224

1    in vitro or an animal experiment -- by which

2    you would expose either cells or animal to

3    talc with different constituent products to

4    identify or separate out the individual

5    effects of the components?  Is that a study

6    that you could design as a toxicologist?

7         A.    I think that would be difficult

8    to do, but I'm not saying impossible to do.

9    And here's the -- there are some very

10   specific considerations you'd have to put

11   into that design.

12              I would argue that some of that

13   is already available, where we have studies

14   that have looked at the dose-response effects

15   for toxicity with cobalt, with chromium, with

16   asbestos.

17              When you get to asbestos and

18   talc, it's more problematic because then the

19   question is what is -- what is it?  What are

20   the specific characteristics in all the

21   different studies of exactly what the

22   asbestos was versus exactly what the talc

23   was.

24              But I think you could attempt

25   to do that, and then the question would be,

Confidential - Pursuant to Protective Order

Page 225

1   being able to use that data not so much to --
2   not so much to identify a dose response for a
3   certain insult, but to look at the fact --
4   look at potency differences across the
5   compounds.  And then there's the issue of
6   then looking at additivity when you know you
7   have a complex mixture.
8              So that could be done, but,
9   again, it would be difficult to do based on
10  what we know about talc, being able to really
11  know that -- you would have to really be very
12  careful that what it is that you're looking
13  at is -- is not containing any of those
14  things that we unfortunately know co-occur
15  with constituents within the natural product.
16             But no one has done those
17  studies.  I point that out.  I haven't seen
18  that study that you're asking for.  I have
19  not seen somebody do that.
20      Q.    And a study like that would be
21  relevant in evaluating the potency of the
22  individual constituents and what might
23  actually be the driving factor for phenotypic
24  change, correct?
25      A.    Not necessarily.  I would argue

Confidential - Pursuant to Protective Order

Page 226

1    that we already have an answer to that by

2    looking at the data that's been collected on

3    the complex mixture itself.  So the issue

4    would be why -- the question is what do you

5    gain by being able to say that we're only

6    pointing to this constituent or that

7    constituent.  That isn't what is occurring.

8                    What people are exposed to is

9    the complex mixture, not just each one of

10   those individual components.  To me this is

11   not a case of asbestos-only exposure.  This

12   is a case of exposure to consumer products

13   that are talc that may have within them at

14   any given time -- and data indicates that

15   there are substantial chance that asbestos

16   may be in -- is in certain of these products.

17                    But my opinions are not

18   dependent on there being asbestos there at a

19   particular level or copper there -- or, I'm

20   sorry, cobalt there at a particular level

21   because my opinions are based on the

22   observations we have on the complex product

23   as it exists.

24        Q.    And you recognize that

25   different types of talc and different talc

Confidential - Pursuant to Protective Order

Page 227

1   products have different constituent

2   components in different amounts, correct?

3          A.     Some can.  I agree with that.

4   That is true.

5              So if you're being broad, as in

6   pharmaceutical-grade versus industrial-grade

7   or chemical-grade, yeah, because they'll have

8   a purity level assigned.

9              But as far as what the -- what

10  the components are, it isn't always defined

11  even specifically within that.

12         Q.    Okay.  And does the presence of

13  oxidative stress in a tissue indicate that

14  cancer will develop in that tissue?

15         A.     Will definitively develop?

16  Not -- I don't think you could say

17  definitively develop, but it's certainly in

18  the biologically plausible mechanism that's

19  been understood to lead to chronic

20  inflammation and also has been linked to

21  cancer.

22              So that's the issue of not

23  necessarily saying it has to be there, but it

24  certainly is something that is observed

25  routinely in cases where carcinogenesis has

Confidential - Pursuant to Protective Order

Page 228

1    been linked to an inflammatory response.

2    Oxidative stress is often a triggering

3    mechanism.

4         Q.    Does the body have protective

5    mechanisms that limit tissue damage from

6    oxidative stress?

7         A.    Yes, which is why not everybody

8    that's exposed to any particular chemical is

9    going to get cancer.  Some people will

10   respond better.  Some cells will respond

11   better.  Some individuals in a population at

12   one time in their life may respond better.

13        Q.    You would agree that in vitro

14   studies do not account for the body's natural

15   defenses outside of what exists at the

16   cellular level, correct?

17        A.    Depends on the in vitro study

18   that's being done and whether or not there is

19   components added.

20              So I've seen studies done where

21   they take cells and then add extra levels of

22   glutathione to try to protect the cells from

23   certain stressors that could lead to damage,

24   but I agree with you that an isolated cell on

25   its own is a different microenvironment than

Confidential - Pursuant to Protective Order

Page 229

1   an intact tissue, which is a different

2   environment than an intact animal, which is

3   even different than an intact human being.

4   Yes, they're all -- you look at those levels

5   of evidence or those types of evidence

6   differently, depending upon the end points

7   you're collecting.

8          Q.     And so you would give lower

9   weight to an in vitro study as compared to an

10  in vivo study, for example?

11         A.     Depends on the question you're

12  asking.  I would give a lot of weight if the

13  question is what do I know -- if I want to

14  try to understand the biologically plausible

15  mechanism, some of those in vitro studies are

16  some of the most important, because it's the

17  only ones that allow us to answer a question.

18              If the question is higher level

19  about what is the evidence to show that

20  there's an increased risk overall for cancer

21  or a hazard for cancer, then certainly you

22  need to have more than an in vitro study.

23              So as -- so on -- if you want

24  to layer it up, obviously, if all you had was

25  in vitro data, you'd have much less

Confidential - Pursuant to Protective Order

Page 230

1    confidence in the conclusions you can draw
2    unless you had some in vivo data.  In vivo
3    data is going to allow you to interpret the
4    in vitro data.
5              So certainly there would be
6    more weight given in that assessment to the
7    fact that you had in vivo data.
8         Q.    And so when you made the
9    statement that, for instance, you always give
10   more weight to human data, is that true, or
11   does that also depend?
12        A.    Well, it depends on whether you
13   have human data.  So if I have human data and
14   I have a doubt, any doubts at all, about
15   whether or not the exposure-response
16   relationship would be affected by the way the
17   animal studies are designed, then, yes, I
18   would give more weight to the human studies.
19             In a case, however, such as
20   inhalation exposure assessments where
21   there -- it's much better, actually, to do an
22   animal study where we can do a dose response
23   across different sizes of particles and
24   actually observe lesions as they develop over
25   time, which is why I love -- I love the NTP

Confidential - Pursuant to Protective Order

Page 231

1    93 study of interim sacrifices, looking at

2    that issue.  That data is very reliable in

3    order to understand the risk of lung damage

4    as compared to a human study where we don't

5    have those serial time points, doses that are

6    defined tightly.

7              So -- and the relevance between

8    those kinds of initial lung injury in certain

9    animals versus humans match fairly well.

10             That's my problem, though, in

11   the case with the perineal exposure.  I'm

12   saying to you, because of the route of

13   contact -- we need to be able to get it there

14   to the tissue -- the human data is extremely

15   important.

16        Q.    So is it fair to say that in

17   some circumstances animal data gets more

18   weight than human data and in other

19   circumstances human data gets more weight

20   than animal data?  It is circumstance

21   dependent?

22        A.    I would put it a different way.

23   I would say in some cases animal data is

24   weighted in a similar manner to human data.

25   I don't necessarily say it would get more

Confidential - Pursuant to Protective Order

Page 232

1    weight, but it could if you only had one

2    crappy human study, one really badly designed

3    human study, and I had a GLP quality cancer

4    bioassay then, absolutely.  I mean, IARC does

5    this.  They look at that animal data and say,

6    "This one tells us -- answers the questions

7    we want to answer, and this very poorly

8    designed case series isn't going to allow us

9    to do that."

10            So you could, but I would say

11   it's more the other issue, that you look at

12   animal and human more on an equal basis if

13   the relevance and the extrapolation can be

14   done reliably.

15            And that's the question you

16   have to ask, can I extrapolate from animals

17   to humans in a reliable manner.

18        Q.    Okay.  Would you agree that the

19   response to cosmetic talc can vary depending

20   on tissue type in the body?

21        A.    Yes, I would say that that is

22   true, whether or not there's certain

23   protective barriers in place, for example,

24   yes.

25        Q.    And so in order to draw

Confidential - Pursuant to Protective Order

Page 233

1    conclusions based on a study of one cell

2    type's reaction to cosmetic talc to another,

3    you would need to understand the differences

4    in similarities between those two cell types,

5    correct?

6              MS. PARFITT:  Objection.

7              THE WITNESS:  It's a different

8         question.  So you were asking me

9         about -- I didn't think you were just

10        asking about cells.  I thought you

11        were asking me about like routes of

12        exposure, dermal versus inhalation.

13        Those things differ.

14             Cell types may or may not.

15        That may or may not be true.  Because

16        if two cells -- two different cell

17        types in the body share similar

18        characteristics as far as the -- for

19        example, if they're both epithelial

20        cells or mesothelial cells, those type

21        of cells you would expect to respond

22        the same way.

23             But I would agree that, for

24        example, a neuronal cell versus a GI

25        cell versus a liver cell, there could

Confidential - Pursuant to Protective Order

Page 234

```
 1         be differences in how they would
 2         respond, yes, and so you would -- you
 3         would look at those things
 4         individually.
 5    QUESTIONS BY MS. BRANSCOME:
 6         Q.    And so it's important to
 7    understand the differences and the
 8    similarities between the different cell types
 9    before drawing conclusions using studies from
10    different cell types?
11              MS. PARFITT:  Objection.
12              MR. MEADOWS:  Objection.
13              THE WITNESS:  I certainly think
14         you should consider the cell types
15         that are being used and whether or not
16         those cell types are ones that are
17         relevant to your risk assessment
18         question you're asking, yes.
19    QUESTIONS BY MS. BRANSCOME:
20         Q.    Okay.  You would agree as a
21    toxicologist, dose is an important part of a
22    toxicological analysis of an agent, correct?
23         A.    If you're doing risk, yes.  If
24    you're only doing hazard, it may not be as
25    important.  It depends upon the question
```

Confidential - Pursuant to Protective Order

Page 235

1    you're asking about hazard.

2              Do you want me to explain?

3        Q.    I do want you to explain the

4    difference between a risk analysis and a

5    hazard analysis.

6        A.    Okay.  So in an initial hazard

7    analysis, if the question is, is there a

8    hazard associated with exposure, let's say,

9    by inhalation, it may not matter whether it

10   was a high dose or a low dose study.  Both of

11   those can identify hazard.

12             Then you ask the question:  Is

13   there a dose-response relationship?  That's

14   the next step beyond hazard.

15             So hazard is -- to me is

16   identifying the end points that you're going

17   to monitor for toxicity, sort of the target

18   organs, those things, and so whether or not

19   there's a dose-response study available, it

20   wouldn't be as important.

21             But certainly when you go to

22   that next step to assess risk, you'd like to

23   be able to see whether or not there is a

24   dose-response relationship in the effect that

25   you're assessing.

Confidential - Pursuant to Protective Order

Page 236

1        Q.      Okay.  And in your -- in your

2    report, as part of your risk assessment that

3    you did in the MDL -- this is paragraph 12 on

4    page 8.

5        A.      Yes, I'm there.

6        Q.      Okay.  You state about

7    two-thirds of the way down the paragraph that

8    "weight of the evidence methods were critical

9    to defining the literature that identified

10   the hazards of talc exposure as well as

11   defining the dose-response relationship

12   between talc exposure and the risk of adverse

13   health effects."

14              Did I read that correctly?

15       A.      You did.  That's correct.

16       Q.      All right.  Is it your view

17   that in the case you have reached an opinion

18   that defines the dose-response relationship

19   between talc exposure and the risk of ovarian

20   cancer?

21       A.      It depends what you mean by

22   define.  I can tell you what I mean in this

23   sentence, and maybe that would help you.

24       Q.      Dr. Plunkett, it is your

25   report.  And so I am asking you, using your

Confidential - Pursuant to Protective Order

Page 237

1    own definition of "define," have you rendered

2    an opinion that defines the dose-response

3    relationship between talc exposure and the

4    risk of ovarian cancer?

5         A.      I have formed opinions about

6    the dose-response relationship generally, but

7    unfortunately -- I answered that question for

8    you earlier when you asked me, I think, about

9    is there -- I don't know if you used the word

10   "threshold," but I did.

11              So the available information

12   doesn't allow us to identify an ultimate

13   threshold, for example, in the case of women

14   exposed to talc perineally and their -- and

15   their development of ovarian cancer.

16              Instead, in defining the dose

17   response, what we can do with the data -- and

18   that is what I attempted to do.  This is

19   where you look at defining the dose response

20   in the animal studies, which we can look at,

21   or defining dose response in cell studies,

22   showing that as the dose increases, the

23   hazard and the risk increase.  So risk

24   actually you quantify.  There's a certain

25   response at this dose and a different

Confidential - Pursuant to Protective Order

Page 238

1    response at the next dose, or have we

2    plateaued, that the responses are the same as

3    dose increases.

4                So that, I did do that as part

5    of my assessment, trying to define the dose

6    as far as how that linked to the responses in

7    each of the studies I looked at.

8         Q.    You would agree, though, that

9    some studies did not show a dose relationship

10   between talc and ovarian cancer or the

11   clinical signs that were indicative of the

12   potential for development into ovarian

13   cancer, correct?

14              MS. PARFITT:  Objection.

15              THE WITNESS:  If you're talking

16        about the human data; is that what

17        you're referring to?  Or are you

18        talking about all -- any of the data?

19   QUESTIONS BY MS. BRANSCOME:

20        Q.    Any of the data.

21        A.    So I would disagree on the

22   animal data.  I think on the animal data they

23   often -- most of the animal studies I've

24   relied upon have looked at more than one dose

25   or at least looked a no exposure versus a

Confidential - Pursuant to Protective Order

Page 239

1   dose, and most of them have looked at more

2   than one dose.

3                 In the case of the human

4   studies, unfortunately, some of those studies

5   were not designed to be able to define dose.

6   In other words, the questions weren't asked,

7   for example, of the individuals even in the

8   prospective studies.  Some of those

9   included -- did not include the information

10  collected on frequency and duration of use.

11                So if it's not collected,

12  obviously, I don't have it to look at.  And

13  that's one of the limitations of human

14  epidemiological investigations, is that it

15  often is not designed appropriately to look

16  at dose response.

17       Q.    Is it your opinion that there

18  are no studies looking at talc and the risk

19  of ovarian cancer in which the authors of the

20  study have concluded there was no clear

21  pattern of increased risk with dose?

22                MS. PARFITT:  Objection.

23                THE WITNESS:  No, that's not

24       what I've said.  No.  It's very

25       possible that an individual paper

Confidential - Pursuant to Protective Order

Page 240

1      or -- that they may make a -- an

2      author may make a statement, but I'm

3      talking about looking -- this is

4      weight of the evidence.  I'm looking

5      across.  And I'm saying, across the

6      data, when I look at the human data

7      versus the animal data, for example,

8      versus in vitro studies, the in vitro

9      studies and the animal studies allow

10     you to look at dose response for talc

11     toxicity.

12           The -- even the animal studies

13     allow you to look at dose response for

14     development of precancerous lesions,

15     you're on the way to cancer, for

16     example, in the NTP studies.

17           And then in the human studies,

18     some of those studies are designed

19     such that the authors could draw

20     conclusions about dose response and

21     some are not.

22           Even in some of the studies

23     where they attempted to look at dose

24     response, some of the authors indicate

25     they don't see an effect.  So that is

Confidential - Pursuant to Protective Order

Page 241

1          true.  And part of that may be driven

2          by the design of the study, the number

3          of individuals in the study, the way

4          that the questions were asked.

5          There's limitations on the way that

6          information is collected.

7                  If you want to look at each

8          study, we can, but --

9    QUESTIONS BY MS. BRANSCOME:

10         Q.     So my question to you, whether

11   you agree or disagree with the author's

12   conclusion, is simply that if you look at the

13   overall animal and human studies that you

14   cite in your report or have considered on

15   your reliance list that look at a potential

16   dose-response relationship for talc toxicity,

17   do some of those studies conclude that there

18   is not a dose-response relationship?

19                 MS. PARFITT:  Objection.

20                 THE WITNESS:  I disagree for

21         talc toxicity, but I would say if

22         you're going to limit it to the issue

23         of the ovarian cancer response, I

24         would agree.  I have seen that in some

25         of the studies.

Confidential - Pursuant to Protective Order

Page 242

1               I think talc toxicity, I don't

2          know if anybody has made the

3          comment -- I would doubt it -- that

4          there is no dose response for toxic

5          effects of talc.

6     QUESTIONS BY MS. BRANSCOME:

7          Q.     Okay.  You discuss in your

8     report -- wait a moment.  It's in

9     paragraph 58 on page 38.  And I just want to

10    make sure I understood what you were citing

11    here.

12               In paragraph 58 you state that

13    "It is important to remember that

14    administration of even a single dose of talc

15    in animals has been shown to produce adverse

16    effects locally at the site of the exposure."

17               What are you referring to

18    there?

19         A.     Acute doses.  In other words,

20    in studies that have described installation

21    of a single dose of talc in some form into a

22    tissue, that they are observing adverse

23    responses.

24               An example of that may be

25    the -- I think it's Hamilton.  Is that the

Confidential - Pursuant to Protective Order

Page 243

1    one where they stilled it into the ovaries
2    with a single dose?
3         Q.    So these are large-dose
4    exposures?
5         A.    Well, not all --
6         Q.    Or are they, I should say?
7         A.    I don't know that they all are,
8    no.  There are -- there are -- I don't think
9    I have attempted to quantify large in this
10   sentence.
11              What I'm stating here is not an
12   issue of large versus small.  It's an issue
13   of the fact that there are toxic effects with
14   single exposures.  And I'm just making the
15   comment -- this has to do with hazard, right?
16   It's the idea even a single dose -- or a
17   single exposure you can get irritant,
18   inflammatory reactions at the site of
19   exposure.  And that's all I'm trying to say.
20   That's why I'm citing as reviewed by EPA.  I
21   believe EPA even makes a very similar
22   statement.
23        Q.    Okay.  Do you take into
24   account -- there are some studies for
25   which -- at least my reading of your report

Confidential - Pursuant to Protective Order

Page 244

1    is that you give them less weight because you

2    believe that the individuals who conducted

3    the study had been paid by either a company

4    or agencies that had some investment in the

5    outcome of the study; is that correct?

6            A.      Is that my opinion?

7            Q.      Yes.

8            A.      For any particular study,

9    you'll need to show me what you're pointing

10   to.  I do have opinions about some of the

11   work by Drs. Huncharek and Muscat, yes.  I

12   think I address that specifically, and that

13   has -- that's not so much to do with my

14   weight of the evidence; that has more to do

15   with transparency and what was being

16   disseminated to the public and disseminated

17   to the FDA as far as evaluations.

18                  That's a different issue than

19   the weight of -- the weight of -- the weight

20   of the evidence assessment for risk.  I think

21   those were separate.

22           Q.      So then I'll ask you that.

23                  In doing your weight of the

24   evidence analysis for risk, have you

25   discounted the weight that you've given to

Confidential - Pursuant to Protective Order

Page 245

1    any particular piece of scientific evidence

2    based off of potential affiliations of the

3    authors?

4         A.      I certainly did with the CIR

5    review document.  I've already told you that.

6    And that's because I have evidence that shows

7    it's not just an affiliation issue, but it's

8    actually -- it's more -- it's more important

9    than that.

10        Q.      Are there any other examples?

11        A.      I think that's the only one

12   right now as I sit here that I can tell you

13   that I had identified as carrying little

14   weight because of an issue of either

15   authorship or input in the way it was

16   described.

17              There are certainly studies

18   within my weight of the evidence evaluation,

19   some of which were performed by industry.  I

20   certainly look at that issue, but unless I

21   have -- have a reason to believe that there's

22   an inherent bias based on something I know,

23   they go into the weight of the evidence

24   without making a correction for that.

25              In many cases that I work in

Confidential - Pursuant to Protective Order

Page 246

1    litigation, I will find situations like the

2    situation here with Huncharek and Muscat

3    where I have, for example -- I think this

4    came up in the Risperdal litigation for me.

5    It's the idea that there was a series of

6    papers put out by an individual investigator

7    where documents that I could get access to

8    show me that indeed their analysis was not

9    done by them but it was ghostwritten by

10   somebody else.  So that gives me pause,

11   although I would never have known that unless

12   I had access to internal documents.

13            So initial weight of the

14   evidence I did not discount it, but then I

15   went back and had to reevaluate the role

16   those studies played in my overall

17   assessment.

18       Q.    Do you take into account in any

19   way in evaluating the weight of a study if it

20   is conducted by someone who serves as an

21   expert on behalf of the plaintiffs in the

22   active litigation?

23       A.    It would be the same -- same

24   issue.  I certainly consider it as part of

25   what I look at, but just like if they were an

Confidential - Pursuant to Protective Order

Page 247

1    expert for the defense versus an expert for
2    the plaintiff, you judge that information
3    based on what you know.  And if I don't have
4    information to discount it, I will not
5    discount it.
6                    But absolutely, I understand.
7    Just as people we all -- look at some of the
8    things I've published where I have said my
9    work was sponsored by the American Chemistry
10   Council.  You know, people -- that's why you
11   disclose the conflicts.  You put it there so
12   people can weigh it if they want, but it
13   doesn't mean you discount the work
14   automatically.
15                   And so I think for any paper,
16   plaintiff, defense, whoever it is that's
17   writing it, you need to consider it based on
18   the information you have.  And if you believe
19   that you have information to indicate that
20   there's some issue with the reliability of
21   the analysis, then absolutely you consider
22   that.
23        Q.    So, for example, when you rely
24   on Dr. Longo's characterization of the
25   constituent components in samples that he has

Confidential - Pursuant to Protective Order

Page 248

1    tested, that he reports are Johnson's baby

2    powder, did you also consider the work that

3    was done by experts that have been retained

4    on behalf of the defendants to characterize

5    the components of Johnson's baby powder?  Do

6    you give them equal weight?

7         A.    So I haven't seen a variety of

8    the documents that you're talking about,

9    so -- because I have not worked in the

10   litigation cases that have involved asbestos

11   only.  So -- which I think is where those

12   documents are.

13              In the litigation I -- in the

14   litigation I worked in, I am aware of what

15   other experts on both sides have said.  I

16   don't believe I've seen an analysis from a

17   defense expert that is -- that is like

18   Dr. Longo's, at least in the litigation I've

19   worked in.  Certainly I would consider that

20   and look at that if it's available, and I

21   would consider it.

22              I would point out, Dr. Longo's

23   analysis is not the piece of evidence that

24   you start with, though.  You start with what

25   I discuss in the published literature first,

Confidential - Pursuant to Protective Order

Page 249

1    because there are published documents out

2    there in the literature that describe exactly

3    what Dr. Longo is now describing.

4         Q.    What published documents are

5    those?

6         A.    Those are Dr. Blount's reports

7    in 1991, which is before the litigation came

8    about, is my understanding.

9              There's also -- there's five or

10   six.  I can tell you the paragraph.

11        Q.    For Johnson's baby powder, I

12   would be interested in that, yes.

13        A.    So I -- I'll have to look and

14   see if it's Johnson's baby powder only, but

15   certainly there is other evidence on the

16   issue of asbestos contamination and

17   specifically in talc.

18             So I -- you want me to find the

19   paragraph for you?

20        Q.    Please.  If you think there is

21   published literature documenting asbestos in

22   Johnson's baby powder, I would like to see

23   that.

24        A.    So this is my paragraph 32.

25   And I'd have to pull each of these articles

Confidential - Pursuant to Protective Order

Page 250

1    out because I don't recall what each of them

2    says.  But I'm pointing to Paoletti, Blount,

3    Mattenklott, Moon, Gordon, Anderson, Rohl,

4    Pooley and Rowlands, Blejer and Arlon,

5    Cralley, Millman.

6              And then I cite -- and then of

7    course the next piece of evidence is there

8    are actually documents from J&J and Imerys

9    that show detection of asbestos or

10   asbestos-like minerals in talc.

11        Q.    As you sit here today, can you

12   identify which of these published articles

13   that you list in paragraph 32 relate to

14   Johnson's baby powder?

15        A.    I would have to pull them to

16   answer that.

17        Q.    Okay.

18        A.    As I sit here, I'd have to pull

19   them.  But I would refer you -- I know at

20   least some of them do based on the statement

21   I've made, but...

22        Q.    So you did not make an attempt

23   in this paper to identify which products were

24   being analyzed in these specific articles.

25   It's not indicated on the face of this

Confidential - Pursuant to Protective Order

Page 251

1    paragraph, correct?

2          A.      I don't tell you on the face,

3    but you if read the sentence I said, "When

4    commercially available, talcum powder

5    products were analyzed, including powders

6    sold by Johnson & Johnson.  The data has

7    shown that the powders contained varied

8    levels" -- and I'm saying "fibers," so it's

9    just asbestos -- "including fibers that

10   stated to be asbestos."

11               So to tell you which of those,

12   I'd have to pull them.  And I apologize, I

13   didn't bring them all with me.

14         Q.      Have you been provided --

15   you're aware that Dr. Blount's paper does not

16   identify Johnson's baby powder in the face of

17   the article, correct?

18         A.      I believe that's true.  You'd

19   have to go to her deposition, I believe,

20   where she's given -- where she discusses what

21   the source of that was, and maybe even a --

22   there may even be a separate document,

23   actually, not a deposition, that was -- that

24   was in the files of Johnson & Johnson that

25   goes along with that, but I'd have to go

Confidential - Pursuant to Protective Order

Page 252

1   look.

2        Q.      Have you reviewed Dr. Blount's

3   deposition?

4        A.      I have reviewed a -- something

5   by Dr. Blount.  Whether it was trial

6   testimony or deposition, I have seen

7   something, yes, that she has said regarding

8   this issue.

9        Q.      To the extent that there is

10  confusion about whether or not a sample

11  tested by Dr. Blount is in fact Johnson's

12  baby powder, would you reduce the weight that

13  you give that particular piece of evidence in

14  evaluating whether asbestos has been present

15  in Johnson's baby powder?

16              MS. PARFITT:  Objection.  Form.

17              MR. MEADOWS:  Objection.

18              THE WITNESS:  I don't know

19         reduce the weight because -- because

20         there's -- there are plenty of

21         documents here that talk about that.

22              I would consider it --

23         certainly it would -- it's not so much

24         weight.  It's a different bin.  We'll

25         call it a bin, a different bin of

Confidential - Pursuant to Protective Order

Page 253

1          information.  There's information on
2          talc powders generally, and then
3          there's some information that's
4          specific to certain body powders.
5                  So certainly -- would I pay
6          attention if they identified it?  Yes.
7                  But in the statement I'm making
8          here, I'm not claiming that every one
9          of these is relating to just the
10         powder sold by Johnson & Johnson.
11         This is across the available
12         information that's public and then
13         also the information that's available
14         in the files of Johnson & Johnson.
15    QUESTIONS BY MS. BRANSCOME:
16         Q.    What is your definition of
17    asbestos?
18         A.    My definition of asbestos is
19    exactly what the different documents describe
20    it typically.  It's a fibrous mineral,
21    typically.  It occurs in a variety of
22    different forms.  Most of the times they'll
23    say "asbestos."  Sometimes they'll say
24    "chrysotile."  Sometimes they'll say
25    "tremolite."  Sometimes they'll say

Confidential - Pursuant to Protective Order

Page 254

1    "anthophyllite."  Those are the three most

2    common ones I see.  But those are all mineral

3    forms of asbestos.

4                So just like IARC puts those

5    all within one bin, I'm putting those all in

6    one bin because they have a similar toxicity

7    profile.

8         Q.      Is it your view that each of

9    the different types of asbestos has the same

10    toxicity profile?

11        A.      They all have the same ability

12    to cause cancer, but they have different

13    potencies.  So they do have -- there will be

14    some differences in the dose response and the

15    potency of them, but certainly they've all

16    been linked as being carcinogens by IARC.

17                And I would agree, when you

18    look at their data, there is data and

19    evidence to indicate that.

20        Q.      Which type of asbestos is the

21    most potent?

22        A.      For which end point?  For lung

23    cancer?  I believe chrysotile is.  For other

24    end points, I'd have to go look.  I mean,

25    chrysotile is the sharp -- is the sharp --

Confidential - Pursuant to Protective Order

Page 255

1    the sharded-type structure.

2              But there's data on fibrous --

3    the fiber -- the fibrous forms of asbestos

4    rather than the -- or the amphibole forms of

5    asbestos as opposed to chrysotile, which is

6    the serpentine form.

7         Q.    Do you consider yourself an

8    expert in asbestos?

9         A.    Not in --

10             MS. PARFITT:  Objection.

11             THE WITNESS:  Not the geology

12        of asbestos, no.

13             I have expertise in toxicology

14        as it relates to interpretation of the

15        data related to asbestos.  I have

16        never give -- given testimony in a

17        case on asbestos, but it's something

18        I've studied in the past in my work as

19        a toxicologist, not as a testifying

20        expert.

21    QUESTIONS BY MS. BRANSCOME:

22        Q.    What role does your analysis of

23    the possibility that there may be asbestos in

24    Johnson's talcum powder products play in your

25    risk assessment in the MDL?

Confidential - Pursuant to Protective Order

Page 256

1        A.      Has to do with the fact that we
2    have a complex mixture that has multiple
3    carcinogenic substances.
4                And asbestos is important from
5    the aspect of the way that it has been
6    assessed even by regulatory bodies, the idea
7    that even very low levels of fibers pose a
8    cancer hazard and a cancer risk in
9    individuals have been shown to be
10   carcinogenic.
11               So that's what I'm saying about
12   potency of asbestos is different than potency
13   of some other carcinogens that you might look
14   at.  But the importance of it is it's a
15   complex mixture, talc, body powders, a
16   complex mixture that includes constituents
17   that are known human carcinogens as well as
18   some that are -- been ranked other ways by
19   regulatory bodies.
20       Q.      If Johnson's talcum powder
21   products do not contain asbestos, does that
22   change your opinion with respect to the risk
23   they pose with respect to ovarian cancer?
24       A.      No, and I think that was very
25   clear if you looked at my first report.  So

Confidential - Pursuant to Protective Order

Page 257

1    even -- there's -- I don't think in any of my

2    reports I've opined that without looking at

3    the complex mixture that we wouldn't be here.

4                In other words, I have not

5    opined that if it doesn't have -- if it

6    doesn't have asbestos, it's not a risk.  I

7    have not opined that, and I don't believe

8    that, because I think there is independent

9    risk for the fact that we have a complex

10   mixture of talc that has been tested and

11   shown to be carcinogenic.

12               It's my opinion, I told you --

13   maybe it wasn't you.  I may have told this

14   yesterday, I'm sorry, to Mr. Smith that I

15   believe that there is evidence to show that

16   there is a significant exposure to asbestos

17   based on the data that's been collected.

18               But certainly, you know, in

19   some -- the data has shown that in the assays

20   that have been done or the analyses that have

21   been done that you can't say that talc is

22   asbestos-free.

23        Q.    Well, so --

24        A.    So --

25        Q.    -- the question I have

Confidential - Pursuant to Protective Order

Page 258

1    specifically relates to ovarian cancer.

2              Is it your view that through an

3    exposure route that is relevant for ovarian

4    cancer, that the use of Johnson's talcum

5    products involve a substantial exposure to

6    asbestos?

7         A.    I believe based on the use of

8    the products that -- where the data has been

9    collected that there would be a substantial

10   exposure to asbestos, regardless of how

11   you're exposed, perineal -- perineally or by

12   inhalation.

13        Q.    What is your basis for reaching

14   that conclusion?

15        A.    It's looking at the number of

16   fibers that have been detected in the

17   products, in looking at the -- the widespread

18   nature of the presence of asbestos fiber --

19   asbestos in the talcum powder products and

20   the fact that even though it's at a very low

21   level by their -- their level of detection,

22   again, can't be said to be asbestos-free.

23             So regardless of whether it's

24   talc that's being applied perineally or a

25   talc that you're inhaling while you're

Confidential - Pursuant to Protective Order

Page 259

1    applying it perineally, the fibers are still

2    going to be present within that talc.

3         Q.      Have you or anyone done an

4    analysis of the dose of asbestos to which

5    someone might be exposed perineally?

6         A.      I haven't done a specific

7    calculation, no.

8         Q.      Has anyone done that

9    calculation?

10            MS. PARFITT:  Objection.  Form.

11   QUESTIONS BY MS. BRANSCOME:

12        Q.      That you have seen?

13            MS. PARFITT:  Objection.

14            THE WITNESS:  I'm trying to

15        remember whether I saw that done in

16        any of the documents related to

17        Dr. Longo.

18            I don't know.  I'd have to go

19        look.

20   QUESTIONS BY MS. BRANSCOME:

21        Q.      Okay.  So as you sit here

22   today, can you give an opinion to a

23   scientific degree of certainty, reasonable

24   degree of scientific certainty, that an

25   individual would be exposed to a dose of

Confidential - Pursuant to Protective Order

Page 260

```
 1   asbestos above background through the

 2   perineal use of Johnson's talcum powder

 3   products?

 4              MR. MEADOWS:  Objection.

 5              MS. PARFITT:  Objection.

 6              THE WITNESS:  I don't think

 7         that's the opinion I have formed to

 8         date, but certainly the opinion I have

 9         formed is that the data I have seen

10         indicates that you can't separate out

11         talc without asbestos versus talc with

12         asbestos in the information that's

13         been collected.  Because there's --

14         all -- the information that's been

15         collected has shown there's no

16         evidence that asbestos-free talc is

17         available.

18              If by asking that question

19         you're trying to say that it's the

20         asbestos alone that's causing the

21         cancer, that is not my opinion.  So

22         that is when the dose issue would

23         become very important for asbestos.

24   QUESTIONS BY MS. BRANSCOME:

25         Q.    Okay.
```

Confidential - Pursuant to Protective Order

Page 261

1        A.    So that's -- so that's a

2    different question I have not answered.

3        Q.    And in reaching your opinion

4    that there is no evidence that asbestos-free

5    talc exists, you have not been provided with

6    the reports by the defense experts, including

7    Dr. Matthew Sanchez, analyzing Johnson's

8    talcum powder products for the presence or

9    absence of asbestos, correct?

10              MS. PARFITT:  Objection.  Form.

11              I think you're aware that the

12         MDL expert reports have not yet been

13         provided to us.

14              MS. BRANSCOME:  Yeah.

15              MS. PARFITT:  I'm just making a

16         point.

17              THE WITNESS:  I have not seen a

18         report by Dr. Sanchez.  I assume I

19         will, because typically after -- later

20         in the litigation, once all experts

21         have been deposed or revealed, I'm

22         usually given defense expert reports

23         and their deposition testimony.  So I

24         expect to see that; I just haven't

25         seen it yet.

Confidential - Pursuant to Protective Order

Page 262

1    QUESTIONS BY MS. BRANSCOME:

2         Q.     And you haven't seen it in any

3    of the cases in which you've rendered an

4    opinion, correct, not just the MDL?

5         A.     Well, none of the cases that I

6    have worked in have involved the issue of

7    looking for asbestos exposure.

8              The cases I have worked on have

9    been talking about talc exposure that may

10   include asbestos as a constituent, but it

11   wasn't focused on asbestos exposure.

12             So, no, none of the cases I

13   worked on have provided testimony in that

14   area.

15             You understand what I'm saying?

16        Q.     Let me just make it clear.  You

17   have not, in any of the cases in which you

18   have offered opinions with respect to the

19   contents of talc, been provided with an

20   expert report or testimony by Dr. Sanchez

21   about what he did or did not find in

22   Johnson's talcum powder products with respect

23   to asbestos?

24             MS. PARFITT:  Objection.  Form.

25             THE WITNESS:  So I can't tell

Confidential - Pursuant to Protective Order

Page 263

1           you that I have not.  I don't recall
2           it.  That's all I can say.  I don't
3           recall that name.
4      QUESTIONS BY MS. BRANSCOME:
5           Q.     It's certainly not something
6      you discuss in your report, correct?
7           A.     No, I do not.  And I don't know
8      that it's in my reliance materials.  That's
9      why I'd ask you to look there, because if
10     it's in my reliance materials, then I've seen
11     it.
12          Q.     Okay.
13          A.     And I mean big reliance
14     material list, not my reference list.
15          Q.     All right.  With respect to the
16     other potential constituents of talc, have
17     you done any analysis to provide an answer as
18     to how much -- what dose of chromium, for
19     example, an individual might be exposed to
20     through the perineal use of Johnson's talcum
21     powder products over a lifetime?
22          A.     No, and I have -- well, I know
23     it's a separate deposition.  We discussed
24     this yesterday.  No, I have not done a -- a
25     calculation of a potential dose with perineal

Confidential - Pursuant to Protective Order

Page 264

1    application for any of the heavy metals.  So

2    the three that I've mentioned, no, I have not

3    done that calculation.

4         Q.    You would agree, based on your

5    training and experience as a toxicologist,

6    that in order for an agent -- and we can talk

7    specifically about a metal -- to present a

8    risk of cancer it needs to be bioaccessible,

9    correct?

10        A.    If by bioaccessible you are not

11   limiting that definition to solubilized into

12   the blood and carried systematically, yes, I

13   would agree with that.  Bioaccessible meaning

14   it has to be in a form that can somehow

15   interact with the tissue, yes, I agree with

16   that.  But it could be as simple as tissue

17   contact versus needing to be solubilized.

18        Q.    Okay.  Is silica bioaccessible?

19        A.    It depends on the form of the

20   silica.  So silica particles can be

21   bioaccessible if inhaled and found on the

22   surface of the lung.  That can cause injury

23   at the site of the lung.  So that's an

24   accessibility to that particular tissue that

25   it contacts.

Confidential - Pursuant to Protective Order

Page 265

1          Q.     We talked earlier -- it's

2    somewhat related to bioaccessibility, but we

3    talked about the way in which different

4    particles might move specifically through the

5    genital tract in women.

6                 Do you recall that?

7          A.     Yes.  A general discussion.

8          Q.     Yes.

9                 And when you testified that

10   starch and talc might not move at the same

11   rate, do you have an opinion as to which

12   might move more quickly through the tract?

13         A.     I haven't formed that opinion,

14   no.

15         Q.     Okay.  And do both talc and

16   starch particles remain in the body for the

17   same length of time?

18         A.     I haven't done an analysis to

19   see if the data tells us what the -- what the

20   differences might be.  I would expect there

21   to be differences, which is what I told you

22   earlier, because I would expect the starch to

23   be able to be solubilized, where I would not

24   necessarily expect the talc to act in that

25   same manner.

Confidential - Pursuant to Protective Order

Page 266

1          Q.      Is cornstarch capable of

2    causing an inflammatory process?

3          A.      It can.  It is -- but it is --

4    it's a different level of risk for

5    inflammatory responses than is talc, just by

6    its chemical nature.

7          Q.      Have you done an analysis in

8    your report that examines the differences

9    between the inflammatory response that can be

10   triggered by talc as opposed to cornstarch?

11         A.      I haven't analyzed inflammatory

12   response.  Instead, what I've done is done a

13   comparison of what the toxicity -- the

14   differences in the toxicity potential have

15   been described in medical literature, and I

16   cite -- I have a paragraph where I cite to

17   some sources that talk about the differences

18   in the toxicity potential or biocompatibility

19   of starch versus talc.

20         Q.      Now, I had a question about

21   your supplemental report that was marked as

22   Exhibit 3 to the deposition.

23                 At paragraph 67...

24         A.      Okay.

25         Q.      You identify here six heavy

Confidential - Pursuant to Protective Order

Page 267

1   metals - arsenic, chromium, lead, cobalt,

2   cadmium and nickel - that in your

3   supplemental report dated August 29, 2018,

4   you say have been reported across lots of

5   talc powders.

6              Do you see that?

7        A.    Are you in -- now you're in my

8   MDL report or here?

9        Q.    No.

10       A.    Oh, so where are you?  I'm

11   sorry.

12       Q.    Same report.  It's the sentence

13   that begins at the bottom of page 6.

14       A.    Okay.  Hold on.

15             About that they have varied at

16   the levels --

17       Q.    Yes.  So you identify six

18   different types of heavy metals.

19             Do you see that there?

20       A.    Yes, I do.

21       Q.    Okay.  And the question I had

22   for you was that in your report in the MDL,

23   if you look at paragraph 36 --

24       A.    Yes.

25       Q.    -- you identify -- you identify

Confidential - Pursuant to Protective Order

Page 268

1    only three heavy metals:  chromium, cobalt

2    and nickel.

3              Do you see that?

4         A.    Yes.

5         Q.    Why did you remove three of the

6    heavy metals?

7         A.    It's not so much removing.

8    Those three heavy metals that I focused on in

9    my MDL report are ones that have been talked

10   about with a similar mechanism of action as

11   far as irritation and biologic -- biologic

12   plausibility mechanism being irritation and

13   inflammation.

14             So that's why I focus on those

15   three, which may not -- which is not

16   necessarily the case for some of the others,

17   even though they're also -- have a

18   carcinogenic hazard, pose a risk.

19        Q.    So in your -- as part of your

20   risk assessment that you performed in the

21   MDL, are you offering the opinion that to the

22   extent they exist in any of the Johnson

23   talcum powder products, that arsenic, lead --

24        A.    Cadmium.

25        Q.    -- and cadmium play any role in

Confidential - Pursuant to Protective Order

Page 269

1   the risk of developing ovarian cancer?

2        A.      That is not an opinion that I

3   would be offering in the MDL.

4        Q.      Okay.  Now, you talk about

5   these heavy metals having been classified by

6   different agencies as either known probable

7   or possible human carcinogens, correct?

8        A.      You're in my MDL report again?

9        Q.      Oh, yes.

10       A.      Okay.  I'm sorry.  Okay.  Let

11  me get there.

12              Yeah, I do have that

13  discussion.  I'm just trying to find it.

14       Q.      Sure.

15       A.      Okay.  Yes, I'm there.

16       Q.      Is it your view, based on your

17  expertise, that because a compound can cause

18  one type of cancer, it can cause all types of

19  cancer?

20       A.      No, not necessarily.  It

21  depends on the -- well, it depends on a

22  couple of things.  It depends on what's been

23  studied.  Have all types of cancer even been

24  studied.  And then it also -- it also depends

25  upon, I believe, the route of exposure as

Confidential - Pursuant to Protective Order

Page 270

1    well.  So can it get to where it could cause

2    that, could it distribute there.  And then in

3    addition to that, what data has been

4    collected.  Is there enough data, for

5    example, to show that there's extrapolation

6    from animals to humans in the types of tumors

7    or is it -- or if we have good human data,

8    then we would focus on the types of cancers

9    that you're seeing in humans, for example.

10        Q.    Okay.  But you recognize even

11   where there is complete data some compounds

12   can cause one type of cancer and they are

13   incapable of causing another type, correct?

14            MS. PARFITT:  Objection.  Form.

15            THE WITNESS:  I don't know

16        about incapable, but I would agree

17        that you certainly would see -- you

18        could potentially see different

19        observations.

20            If you're talking about animals

21        versus humans, or are you talking

22        about --

23   QUESTIONS BY MS. BRANSCOME:

24        Q.    If humans.

25        A.    Based on what you had seen in

Confidential - Pursuant to Protective Order

Page 271

1    the animals; is that what you're asking me?

2         Q.    Yes.

3         A.    Yes.  So, yes, there is not

4    always a one-to-one concordance.  So that's

5    why -- that's why I made the comment that

6    it's important to have some human data or

7    experience, so that you can put in context

8    the data you collected in animals.

9              I would say to you there are

10   certain kinds of tumors in animals, for

11   example, that are shown to be not relevant at

12   all to human risk assessment.  Like four

13   stomach tumors in rats is an example.  I've

14   dealt with that one a lot.

15        Q.    What types of cancer -- type or

16   types of cancer are the basis for the

17   classification of chromium as a known human

18   carcinogen by IARC?

19        A.    So I have to pull it out, but I

20   believe that there may be some GI cancers and

21   maybe some skin cancers, but I'm not sure.

22   I've got it pull it out.  It's been a while

23   since I've looked at it.

24        Q.    Okay.  Have you done an

25   analysis to evaluate whether or not the types

Confidential - Pursuant to Protective Order

Page 272

1    you can extrapolate with scientific basis

2    from one type of cancer cause to ovarian

3    cancer with respect to the heavy metals

4    specifically?

5         A.     Well, I haven't attempted to

6    that, because I haven't attempted to define a

7    independent risk for each of those metals

8    individually.

9              The issue -- the issue I have

10   with those metals is -- there's a paragraph

11   here where I talk about pathogenesis of

12   carcinogenesis, where I talk about different

13   stages of cancer development and the fact

14   that inflammatory responses may be operating

15   at all those different stages.

16              So the issue is you have

17   potential -- you have compounds that are

18   known to produce cancer or have been shown to

19   have a potential risk of cancer.  They share

20   a similar mechanism to talc, so as a result

21   of that, they factor into your risk

22   assessment as far as there being an exposure

23   to a mixture.

24              But on the issue of ovarian

25   cancer, I'm looking at the data that's been

Confidential - Pursuant to Protective Order

Page 273

1    collected on talc itself, which would be talc

2    with the constituents that could include the

3    metals.  But certainly I'm not saying that it

4    is -- without the presence of one or the

5    other of these there would be no risk of

6    ovarian cancer.  I'm not saying that either.

7         Q.    So my question is, though, can

8    you point me either to scientific literature

9    directly documenting that these heavy metals

10   can cause ovarian cancer or to scientific

11   literature that enables you to extrapolate

12   from the types of cancer that they are known

13   or believed to cause to ovarian cancer?

14        A.    So I -- on the issue of can I

15   point you to the data on ovarian cancer, I'd

16   have to go back.  I can't answer that without

17   looking at the assessments.

18             But on the other -- second

19   question you asked me, that's the question I

20   was just trying to answer before.  It's the

21   idea that regardless of where the cancer is

22   developing, the fact that these compounds

23   have the ability to stimulate similar toxic

24   responses in tissues could lead to a --

25   setting up a situation where the -- where the

Confidential - Pursuant to Protective Order

Page 274

1    tissue is primed for cancer development.

2        Q.    And do you have --

3        A.    And so that --

4        Q.    Sorry.

5        A.    And that has to do with the

6    basic science of carcinogenesis when you look

7    at underlying mechanisms, especially with

8    tissue contact, direct tissue contact, with

9    irritants or inflammatory processes.

10              But I would -- I am not -- I

11    have not formed the opinion, again, that with

12    or without either one of these that I would

13    expect ovarian cancer to be the target.  I'm

14    saying that ovarian cancer risk is increased

15    based on exposure to talc, which includes a

16    variety of constituents.

17        Q.    Okay.  And do you cite anywhere

18    in your report to studies documenting -- I

19    know you said you'd need to go look at them,

20    but I'm asking if it's in your report

21    anywhere a discussion of any studies showing

22    that the particular heavy metals that you

23    cite as potential constituents of Johnson &

24    Johnson's products have been demonstrated to

25    increase a risk for ovarian cancer on their

Confidential - Pursuant to Protective Order

Page 275

1    own?

2         A.     So, no, I haven't addressed

3    that in my report.  And again, I think that's

4    inconsistent with the way I'm using these

5    data.  But that's fine.  I mean, no, I

6    haven't done a specific assessment of ovarian

7    cancer risk with each of those metals

8    individually.

9         Q.     I would ask the same questions

10   for the different fragrance constituents that

11   you allege in your report are potential

12   carcinogens.

13               Have you done any analysis, and

14   can you point me to any scientific studies

15   that establish that those particular

16   compounds are capable of causing ovarian

17   cancer?

18        A.     No, I haven't done that

19   analysis, but, again, general principles of

20   toxicology and cancer risk assessment, when

21   you look at the presence of multiple --

22   excuse me, multiple carcinogens with similar

23   mechanisms of action, you would assume in

24   your risk assessment that those risks could

25   be additive.

Confidential - Pursuant to Protective Order

Page 276

1                    So, again, that's what I'm
2      pointing to and why I have cited the data.
3           Q.      Now, you talked about -- when
4      we were discussing mechanism, you said that
5      inflammation alone is not necessarily
6      sufficient to cause cancer, correct?
7           A.      Yes, I did.
8           Q.      All right.  Do you have
9      scientific studies that show that any of the
10     heavy metals or the fragrance constituents
11     that you identify as potential carcinogens
12     create -- generate phenotypic changes like
13     you discussed were next for the formation of
14     cancer?
15          A.      I believe that data is
16     available on nickel.  I need to go back and
17     look at chromium and cobalt, but I do believe
18     with nickel you'll find similar data on
19     tissue irritation and inflammatory processes.
20                  Nickel is also a sensitizer, so
21     it has interaction with the immune system, so
22     I do believe that for nickel you can find
23     some of that data.
24          Q.      Okay.  But as you sit here
25     today, can you point me into any of that

Confidential - Pursuant to Protective Order

Page 277

1    that's discussed in your report?

2         A.    No specific discussion other

3    than, again, all -- the IARC -- I'm citing to

4    the IARC assessments, and the IARC

5    assessments for each of those discuss

6    carcinogenesis and a biologically plausible

7    mechanism being linked to the ability of

8    these compounds to induce oxidative stress

9    and/or inflammatory processes.

10        Q.    Okay.  In your opinion, you

11   talk about the mixture of constituents that

12   are involved in talc.

13             Have you done any analysis to

14   look at how the different constituents

15   interact with each other?

16        A.    Well, yes, that's my issue at

17   looking at underlying mechanism.

18             But are you asking me -- I

19   certainly don't have a -- the only studies

20   that I have to rely upon on the interaction

21   of the mixture is the actual studies on the

22   powders themselves, where we know that the

23   powders contain constituents other than just

24   platy talc.

25        Q.    Okay.  And do the constituents

Confidential - Pursuant to Protective Order

Page 278

1    need to have the same underlying potential

2    carcinogenic mechanism for them to have an

3    additive effect?

4         A.    By general principles of

5    toxicology, yes, you look at mode -- mode of

6    action or mechanism of action before you

7    apply that additivity principle to the cancer

8    risk assessment.

9         Q.    And so as you sit here, you

10   believe there have been scientific

11   documentation that nickel might operate

12   through the same biological mechanism as you

13   purport talc to operate, but you're not sure

14   about the other heavy metals or the fragrance

15   constituents; is that correct?

16              MS. PARFITT:  Objection.

17              THE WITNESS:  For the fragrance

18         constituents, I'd definitely have to

19         pull because I haven't looked at that

20         individual assessment in a while.

21              For these three, what I do know

22         is that they do share the ability to

23         at least induce oxidative stress.

24              What I can't recall for

25         chromium and for cobalt is whether

Confidential - Pursuant to Protective Order

Page 279

1              they're taking it the next step from

2              oxidative stress to inflammatory

3              process.  I believe that they do, but

4              I'd have to check, whereas I know

5              nickel has been shown to lead to an

6              inflammatory process after oxidative

7              stress has been induced.

8     QUESTIONS BY MS. BRANSCOME:

9         Q.    And you would agree, even more

10    than requiring an inflammatory process, you

11    would actually have to see that these

12    compounds can generate phenotypic changes,

13    correct?

14              MS. PARFITT:  Objection.

15              THE WITNESS:  Well, we know

16              they do because they've been shown to

17              be carcinogenic.  If you've been shown

18              to be carcinogenic, you've done a

19              phenotypic change in the cell from a

20              normal cell to a cancer cell.

21              So we know they have the

22              capability to induce tumors, or

23              cancer, all three of those, at least

24              in animals if not in humans as well,

25              because two of them are known human.

Confidential - Pursuant to Protective Order

Page 280

1          So those two -- we'd have human data

2          to show that.

3              But on the issue of cobalt, it

4          may only be -- I need to go back and

5          look, but it may indeed just be animal

6          data.

7    QUESTIONS BY MS. BRANSCOME:

8          Q.    And so your basis for that

9    would be the IARC classification?

10             Is that where I would go to

11   look if I wanted to look at it after this

12   deposition?

13        A.    I'd go to the IARC reviews.

14   I'd go to those three which I believe I have

15   cited down here for you and given you where

16   to go to find them.

17        Q.    Okay.  You discuss in your

18   report -- and if you'd like to reference it,

19   it's paragraph 69 on page 47 -- the concept

20   of genotoxic and nongenotoxic carcinogens.

21             Do you recall that?

22        A.    Yes.

23        Q.    And as you sit here today, is

24   it your opinion that talc is more likely a

25   nongenotoxic carcinogen?

Confidential - Pursuant to Protective Order

Page 281

1          A.     As the direct insult, yes.  And
2    I would like to -- I would like to point out
3    that in the literature -- the reason I have
4    this paragraph here is because in the
5    literature in the past, in the area of
6    chemicals, it's been -- toxicologists have
7    attempted to put two bins, direct genotoxic
8    insult versus nondirect genotoxic.  It
9    doesn't mean you can't get a genotoxic event
10   after the initiation.
11              So I want to make sure you
12   understand that.  I'm not saying that there
13   is no possibility of this chemical in its --
14   in its process of inducing cancer leading to
15   indirect genotoxicity, but I'm talking about
16   the direct mechanism at the site of the cell.
17              So talc, for example, has been
18   shown to not be genotoxic in cells.  And so
19   that's why I believe, then, when I look at
20   the rest of the data that fits, that it fits
21   the definition of a nongenotoxic carcinogen
22   by its initial mechanisms to induce cancer.
23        Q.     Okay.  And if talc is, in fact,
24   a nongenotoxic carcinogen, it would suggest
25   that there is likely a threshold dose below

Confidential - Pursuant to Protective Order

Page 282

1    which it does not have a carcinogenic effect,

2    correct?

3                    MS. PARFITT:  Objection.

4                    THE WITNESS:  It is possible,

5            and that's the problem.  In order to

6            fully assess that, you would have to

7            have the data to prove it.

8                    But that's the assumption.  You

9            assume with nongenotoxic carcinogens

10           that you could identify a level where

11           you wouldn't turn on that indirect

12           mechanism.  So that -- yes, that is

13           true.

14   QUESTIONS BY MS. BRANSCOME:

15           Q.    And you have not been able to

16   identify, nor can you point to, scientific

17   literature that identifies a threshold -- a

18   threshold dose for talc with respect to its

19   carcinogenic potential for ovarian cancer,

20   correct?

21           A.    Not a specific dose, but I

22   think that's why I mentioned to you -- and

23   I -- I think that's why Canada, when you look

24   at their document, they talk about

25   discouraging routine use generally.  So it's

Confidential - Pursuant to Protective Order

Page 283

1    the issue of what -- single use of a body

2    powder or an occasional use is a different

3    risk assessment than routine use.

4              So if you want to talk about

5    thresholds that way, that's very imprecise,

6    but you could do that.  You can talk about

7    whether or not there -- I do believe there's

8    a different risk profile for one or two uses

9    of talc body powder versus a risk profile of

10   somebody who uses it routinely, because I

11   think that fits that threshold definition.

12   It's the idea that you have limited

13   availability for enough particles to migrate

14   to lead to the tissue toxicity that it cannot

15   be recovered from or repair.

16        Q.    You're familiar with the

17   concept of the precautionary principle,

18   correct?

19        A.    Yes.

20        Q.    All right.  And you understand

21   that Health Canada may have made

22   recommendations with respect to product usage

23   that are purely precautionary, correct?

24              MS. PARFITT:  Objection.  Form.

25              THE WITNESS:  I disagree that's

Confidential - Pursuant to Protective Order

Page 284

1          what they've done, but is it possible

2          that they would do it?  Any regulatory

3          agency, it's possible they could do

4          it, yes.

5    QUESTIONS BY MS. BRANSCOME:

6          Q.     Do you have any information

7    with respect to Health Canada's

8    decision-making, other than what you have

9    read on the face of the documents?

10         A.     That is all I have to look at

11   is what is provided on the website.

12         Q.     Okay.  And so the statement

13   that you think Health Canada was suggesting a

14   dose threshold by their statement of

15   discouraging routine use, you're basing that

16   entirely on what you read on the piece of

17   paper, correct?

18              MS. PARFITT:  Objection.  Form.

19              THE WITNESS:  Well, that's what

20         they state.  So, yes, I'm -- I am

21         telling you what I see on their

22         website.  If that's what you're asking

23         me, yes, that is true.

24   QUESTIONS BY MS. BRANSCOME:

25         Q.     Okay.  Can you point me --

Confidential - Pursuant to Protective Order

Page 285

1    well, do you discuss -- have you looked at,

2    as part of your opinion specifically in the

3    MDL, the studies exploring a potential link

4    between asbestos and ovarian cancer?  Just

5    asbestos.

6          A.    Some of the studies, yes, but I

7    have not -- I have not done a separate risk

8    assessment just for asbestos by itself,

9    because I have not assumed that there is

10   asbestos-only exposure.

11               Does that make sense?

12               But I do cite -- for example, I

13   cite to some of the early literature on -- so

14   this -- I guess where this opinion comes in

15   is on hazard and warning.  So in the warnings

16   I talk about when it was known that asbestos

17   was linked with cancer, because the warning

18   standard is not causation proven but the

19   identification of the potential.  And so that

20   is in my report on warnings, but that is not

21   within my discussion of the weight of the

22   evidence for risk assessment of the talc

23   product.

24         Q.    Okay.

25         A.    Does that make sense?

Confidential - Pursuant to Protective Order

Page 286

1          Q.      Uh-huh.

2                  For example, have you rendered

3    an opinion about what dose of asbestos

4    exposure would be necessary to cause ovarian

5    cancer in an individual?

6          A.      No, I have not formed that

7    opinion at this time.

8          Q.      Okay.  Do you have an opinion

9    about the background level of asbestos to

10   which individuals are exposed with no

11   increased risk of any type of cancer?

12         A.      No, I do not have an opinion.

13   I do believe others do, but I do not.

14         Q.      Okay.  You may have been asked

15   some of these questions before, but I will

16   keep them brief.

17                 Have you ever published any

18   articles that state that talc causes ovarian

19   cancer?

20         A.      No, I have not.

21         Q.      Have you ever publicly

22   expressed the opinion that talc increases the

23   risk of ovarian cancer outside of literature?

24         A.      No.  My work has been in the --

25   in the courtroom.

                    Confidential - Pursuant to Protective Order

                                                                    Page 287

1              MS. BRANSCOME:  I think we can

2         take a break.

3              VIDEOGRAPHER:  We are going off

4         the record at 2:57 p.m.

5          (Off the record at 2:57 p.m.)

6              VIDEOGRAPHER:  We are back on

7         the record at 3:13 p.m.

8              MS. BRANSCOME:  Dr. Plunkett, I

9         have no more questions for you on

10        behalf of Johnson & Johnson, subject

11        to your counsel doing a direct of any

12        kind.

13             THE WITNESS:  Sure.  Thank you.

14                  EXAMINATION

15   QUESTIONS BY MS. BOCKUS:

16        Q.    Good afternoon, Dr. Plunkett.

17   You and I have met before.  My name is Jane

18   Bockus, and as you know, I represent Imerys

19   in this case.

20        A.    Yes.

21        Q.    Correct?

22              I want to go back to just touch

23   briefly on a couple of issues that have

24   already been addressed.

25              Would you agree that IARC has

Confidential - Pursuant to Protective Order

Page 288

1    not classified any of the heavy metals that

2    you've identified in your MDL report as

3    carcinogenic to the ovary?

4         A.     So the answer is I'd have to

5    look.  I don't recall that, but I'd have to

6    look to confirm.

7         Q.     Okay.

8         A.     That's the answer I believe I

9    gave a few minutes ago, yes.

10        Q.     So if I look at the IARC

11   website, then I can confirm whether or not

12   they have identified any of those as

13   carcinogenic to the ovary?

14        A.     Not so much the web -- well,

15   the website or the actual documents.  I think

16   I would actually point you to the actual

17   monograph --

18        Q.     To the monograph.

19        A.     -- because there may be

20   evidence in there of ovarian cancer as being

21   seen in studies.  And I'd have to go look.

22        Q.     Okay.  That was not part of

23   your consideration here, correct?

24        A.     So ovarian cancer is part of my

25   consideration, but I didn't -- in this part

Confidential - Pursuant to Protective Order

Page 289

1    of my evaluation I'm trying to -- trying to

2    describe these metals.  And this is really

3    about mechanism of biologic plausibility and

4    the fact that these two things can go

5    together, and then the concept of additivity

6    is they're on hazard.  The idea if you have a

7    cancer hazard generally and you have similar

8    mode of action, regardless of the tissue, you

9    would be expected to have a potential

10   additive effect when you do a risk

11   assessment.

12              So that's my use of that data,

13   which is why I didn't do a separate ovarian

14   cancer assessment for each of the each

15   constituents but just on powder.

16       Q.    And you discuss that topic on

17   page 47, paragraph 68, of your report,

18   correct, the -- whether there's an additive

19   effect?

20              And you cite to Casarett and

21   Doull.  I don't know if I'm pronouncing those

22   names correctly.

23       A.    I'm sorry, on what page?

24       Q.    I'm on page 47, paragraph 68.

25       A.    Okay.  Sorry.  I should know

Confidential - Pursuant to Protective Order

Page 290

1    where it is, but...

2              Okay.  I'm there, yes.  Okay.

3              Yes, I do cite to a chapter in

4    Casarett and Doull, yes.

5        Q.    Okay.  And Casarett and Doull

6    is a resource that you cite to for a couple

7    of different toxicological principles that

8    you discuss in your -- in your report,

9    correct?

10       A.    Yes, because it's one of the

11   most well-recognized textbooks that is used

12   across different either universities or

13   schools or even in regulatory agencies.

14             I would also say I cite EPA

15   2000 there.  I'm not citing just Casarett,

16   but I am citing Casarett as well as an EPA

17   guidance document.

18       Q.    In Casarett and Doull, do they

19   actually discuss talcum powder in Chapter 2,

20   or is it more just the concept of the

21   potential of the effects when you have two

22   different chemicals that you're exposed to at

23   once or three or four?

24       A.    It's the latter.  It's the --

25   because you'll notice the title is

Page 291

1    "Principles of Toxicology," so it's the

2    general chapter teaching principles for risk

3    assessment and toxicology as used in risk

4    assessment.

5         Q.    And whether there is an

6    additive effect of, say, talc and nickel,

7    that's something that an experiment could be

8    designed to study, correct?

9              MS. PARFITT:  Objection.

10             THE WITNESS:  If you're talking

11         generally for cancer and not worried

12         about the issue of ovarian cancer, if

13         you're talking about cancer, like

14         doing an inhalation experiment to look

15         what happens to the lung, that you

16         could do.

17             The problem with the animal

18         studies and ovarian cancer due to

19         perineal exposure is it's very

20         difficult to understand how you design

21         a study to expose the animals that way

22         reliably in the way that humans are

23         exposed.

24             But generally you could

25         study -- you might even be able to do

Confidential - Pursuant to Protective Order

Page 292

1          a genetically susceptible mouse study

2          to hurry the process along to look at,

3          but you might not be able to do it

4          through perineal exposure.  You might

5          have to do it through another route

6          such as either inhalation or maybe

7          even you could -- you could look at it

8          through intraperitoneal injections,

9          for example.

10    QUESTIONS BY MS. BOCKUS:

11          Q.     Well, and what the textbook

12    talks about is the fact that you need to

13    study it to find out whether the effects are

14    additive, whether the effects are something

15    that multiply the risk, you know, so that the

16    two together are greater than either one

17    alone, or do the effects offset each other

18    and reduce the risk, correct?

19          A.     That is discussed there --

20               MS. PARFITT:  Objection.

21               THE WITNESS:  -- which is why

22          I've cited the EPA document.  Because

23          the EPA document addresses the issue

24          of mixtures, and this is the issue of

25          mode of action.  If you have chemicals

Confidential - Pursuant to Protective Order

Page 293

1           that you're looking at on the issue of

2           additivity or no effect, you will --

3           you look at that issue of how they're

4           affecting the tissue and underlying

5           mechanism.

6                  But the only way to look at the

7           magnitude absolutely of how the risk

8           would change is by doing an

9           experiment.  That is true.

10   QUESTIONS BY MS. BOCKUS:

11        Q.      And to your knowledge, that

12   experiment has never been done; is that

13   correct?

14        A.      I can't guarantee that it's

15   only been done for nickel and talc alone, but

16   I would -- I would state that based on --

17   there are studies out there that have been

18   done where they've used the body powder that

19   we know have metals -- a variety of things

20   within it that are not just platy talc, but

21   those experiments are that kind of data.

22                  But as far as gathering

23   dose-response information or teasing out

24   individual components, that is not available.

25        Q.      Do you agree that dose response

Confidential - Pursuant to Protective Order

Page 294

1   is the fundamental principle of toxicology
2   that underpins the effects that chemicals can
3   have on living organisms?
4         A.      When you're talking general
5   toxicology, yes, I think it's talked about in
6   the textbook.
7         Q.      And you agree that it is the
8   dose of the chemical and the pattern of
9   exposure that determines whether a chemical
10  produces an adverse effect on an organism,
11  not simply the presence of the chemical?
12        A.      For a typical dose-response
13  relationship for non -- for nongenotoxic
14  events, absolutely, I would agree that is
15  probably true.  And I don't mean nongeno --
16  noncancer events.
17                In the issue of cancer biology,
18  some of those issues don't hold all the time.
19  In other words, there are certain chemicals
20  and certain ways of looking at cancer risk
21  assessment where you can't assume where the
22  threshold is or identify what a safe dose
23  would be.  But certainly I agree on the issue
24  of noncancer risk assessment generally, or
25  general end points of toxicity, that is true.

Confidential - Pursuant to Protective Order

Page 295

1          Q.      And again, do you agree that in

2    general toxicology the effects that might be

3    reported at high doses will not occur at

4    lower doses if the concentration at the site

5    of action falls below the threshold for

6    toxicity?

7          A.      Yes, that could -- that could

8    be possible, yes.

9          Q.      And do you agree that

10   evidence-based toxicology and epidemiology

11   dictates that the dose of the chemical is the

12   critical factor when examining the risk posed

13   by a chemical, not just its presence even in

14   the human body?

15         A.      I would say that's generally

16   true, yes, which is why I have attempted to

17   look at the dose-response relationship as

18   well as the prevalence of the contact.

19         Q.      And with regard to the human

20   studies that you cite, would you agree that

21   none of the studies that you cite in your

22   report that have to do with migration of

23   particles within the genital tract of the

24   female involve applications to the perineum

25   or outside of the genital tract?

Confidential - Pursuant to Protective Order

Page 296

1          A.      That is true with the exception
2    of Parmley and Woodruff, which addresses this
3    issue of --
4                   MS. PARFITT:  Objection.
5                   THE WITNESS:  Talks about the
6          issue of exposure from the outside to
7          the inside.
8                   But the data that is collected
9          with the different studies they have
10         deposited at some point -- at some
11         position within the vagina, that is
12         true.
13   QUESTIONS BY MS. BOCKUS:
14         Q.      And that is not how talc is
15   deposited in women who use it regularly in
16   their daily routine, correct?
17                  MS. PARFITT:  Objection.
18         Misstates the evidence.
19                  THE WITNESS:  So I would say
20         that depends on what women are doing.
21         Perineal application, for example,
22         application on the underwear, can lead
23         to contact of the vaginal opening
24         depending on the woman.
25                  For example, a woman who has

Confidential - Pursuant to Protective Order

Page 297

```
 1        a -- had many children has a tract
 2        that is stretched.  There, indeed, you
 3        can have more direct contact than you
 4        can with a very tight -- so I would
 5        say it depends on the woman and it
 6        depends on the situation.
 7             But I do think it's generally
 8        accepted, based on my review of the
 9        literature, that there is the
10        opportunity for exposure internally
11        from perineal application.
12   QUESTIONS BY MS. BOCKUS:
13        Q.    And if I understand what you
14   testified to earlier today and yesterday, you
15   don't have any data that would advise on --
16   out of the talc that is deposited in the
17   underwear, what percentage of it makes it
18   into the reproductive tract?
19        A.    That's the data that's missing,
20   that is true.  And unfortunately, no one has
21   done a study.  It would be -- if there was a
22   way to do that, it would be interesting to do
23   that.  I just don't see how you design that
24   study, especially knowing the hazard of talc
25   at this point.  I think that would be a
```

Confidential - Pursuant to Protective Order

Page 298

1    difficult study to get approval for.

2         Q.     And do you have an opinion as

3    to whether it is even correct that each day

4    that a woman uses talc in her underwear, that

5    some of the talc makes its way to the ovary?

6                   MS. PARFITT:  Objection.  Form.

7                   THE WITNESS:  Have I -- can I

8          quantify that?

9                   No, I haven't quantified it.  I

10         think I got asked that earlier.  I

11         can't quantify the amount that gets

12         there.  Or, I'm sorry, I may have

13         misheard the start of your question.

14         I apologize.

15   QUESTIONS BY MS. BOCKUS:

16        Q.     Yeah, I'm really asking:  Do

17   you have an opinion as to whether it happens

18   every single time a woman applies talc to her

19   perineal area?  Does some of that talc make

20   it to her ovary?

21                   MR. MEADOWS:  Objection.

22                   MS. PARFITT:  Objection.

23                   THE WITNESS:  I don't think I

24         stated it quite that way, but

25         certainly I think the opportunity is

Confidential - Pursuant to Protective Order

Page 299

1        there with every application.  And of

2        course it would depend upon the amount

3        of time that the contact may be in

4        place.  But the opportunity is there.

5              So, for example, if you applied

6        it to your underwear and 30 minutes

7        later you go to the bathroom, it's

8        very possible that you will have wiped

9        away, and so that that application may

10       have taken an opportunity away.  But I

11       do believe that the opportunity is

12       there based on the literature I have

13       seen.

14             And so I haven't formed the

15       opinion, though, that it's absolutely

16       every time.  My opinion, I think, is

17       based on the fact that I believe that

18       there is data to indicate that

19       exposure occurs, and that with

20       routine, continual habit, sort of a

21       habit exposure, that indeed that there

22       was some migration that occurs.

23   QUESTIONS BY MS. BOCKUS:

24       Q.    And is it fair to say that you

25   don't have an opinion as to whether that

Confidential - Pursuant to Protective Order

Page 300

1    migration occurs every day, once a week, once

2    a month?

3                    MS. PARFITT:  Objection.  Form.

4                    THE WITNESS:  I haven't

5           formulated my point -- my opinion

6           quite that way; however, I do believe

7           that it is something that is going to

8           happen routinely with exposure.  I do

9           believe that migration is something

10          that is going on routinely with

11          application.

12                    So with applications, I do

13          believe that that is, but I can't tell

14          you that this amount has migrated on

15          this particular day with this

16          particular application, no.  That --

17          the data that we have collected is not

18          there to allow us to do that.

19    QUESTIONS BY MS. BOCKUS:

20          Q.    How do you define the word

21    "routinely" as you're using it in that

22    answer?

23          A.    So that would be the idea of

24    repeated exposures, you know, within a week,

25    within a month, within a year.  So not --

Confidential - Pursuant to Protective Order

Page 301

1  routine to me would not be -- would not be

2  applying it once a month one month, waiting

3  six months, doing it again, and then not

4  doing it until the next year.

5           Again, it's the idea -- some

6  people may -- routine may be during the hot

7  season of the year, they're routinely getting

8  daily exposures when it's warm, and during

9  the cold weather not applying.  But then the

10  next year doing -- that's a routine for them

11  and their habits based on their pattern of

12  exposure.

13           Again, we know that talc, when

14  it -- when it migrates and gets into the

15  body, we have data to show that it is -- it

16  is able to persist in the body.  The fact

17  that you may have not been exposed for three

18  months because it was cold doesn't mean that

19  you -- that that changes the fact that you're

20  still at risk with additional exposures the

21  next -- the next time that that habit

22  becomes -- comes into place.

23           So I think there's multiple

24  exposure patterns that are possible, but when

25  I use routine, it's something that people are

Confidential - Pursuant to Protective Order

Page 302

1    doing throughout their -- a period of their

2    life.  And so it would be something that

3    happens either on a weekly basis for a good

4    part of the year.  I haven't defined it with

5    a particular number, though, no.

6         Q.    And my question had to do with

7    out of the number of times a given woman --

8    or an average woman uses talc, what

9    percentage of the time does talc make its way

10   into her reproductive tract?

11        A.    So I don't think that

12   anybody -- anybody can point to a piece of

13   data that tells you that, but, again, it's

14   based upon the anatomy, I would expect there

15   to be the potential each time it's applied.

16              And on your question on

17   routine, when I'm talking routine, I'm

18   looking at not just frequency but also

19   duration.  So when I'm talking about dose,

20   it's the fact that they do it on a repeated

21   basis for a number of -- a period of years as

22   well.

23              That's what the data shows in

24   the human studies.  It's not something,

25   again, that may have been done routinely for

Confidential - Pursuant to Protective Order

Page 303

1    one year, but it does appear to be something

2    that's done more -- longer term than that.

3                But we can't give a number.  We

4    have no threshold.  We don't know exactly

5    what that minimum number is.

6         Q.    Do you think that the minimum

7    number is greater than a year?

8                MS. PARFITT:  Objection.  Form.

9                THE WITNESS:  I haven't formed

10        that opinion, no.

11   QUESTIONS BY MS. BOCKUS:

12        Q.    Do you think it's greater than

13   a month?

14                MR. MEADOWS:  Objection.

15                THE WITNESS:  Greater than a

16        month?

17   QUESTIONS BY MS. BOCKUS:

18        Q.    Yes.

19        A.    One month in their life?

20        Q.    One month in their life, where

21   they're using it every day for a month.

22        A.    So I haven't formed that

23   opinion at this point in time, but I'd say

24   it's more likely to occur when you do it more

25   than a month.  But I haven't formed an

Confidential - Pursuant to Protective Order

Page 304

1   opinion on a set number, no.  I can't --
2   can't point you a specific number.
3              I'm not doing case-specific, so
4   I've not looked at any of those pieces of
5   information for any given plaintiff.
6        Q.    And I'm just trying to get the
7   threshold.
8        A.    Uh-huh.
9        Q.    As I understand it, that is
10  part of a toxicological evaluation, is the
11  threshold below which there's not an issue.
12             So I think you've said you
13  don't know if it's less than a year, but you
14  think it's more likely than not that it's
15  greater than one month.
16             MR. MEADOWS:  Objection.
17  QUESTIONS BY MS. BOCKUS:
18       Q.    Is that fair?
19       A.    No, that's not exactly what I'm
20  saying.  I'm saying we don't know the
21  threshold.  So as a result, I'm not of the
22  opinion that it absolutely can't -- it only
23  has to be this long.
24             What I'm saying to you is per
25  general principles of toxicology and based on

Confidential - Pursuant to Protective Order

Page 305

1    the human data that we have, it indicates

2    that it's more frequent than just one month,

3    but I can't tell you that it's absolutely not

4    possible.

5              That's where -- I do think when

6    you're talking about those kinds of patterns,

7    that's a case-specific issue for individuals,

8    because I think that would have to be

9    considered for each individual.  But

10   certainly as a toxicologist, I'm using the

11   words "routine," "repeated," "longer

12   duration," "chronic exposure."  And when I

13   defined "chronic" earlier, I talked about

14   years of exposure versus just one month.

15             That would be consistent with

16   what I have said, yes, but I'm not -- I -- I

17   certainly don't want to rule out that there

18   couldn't be somebody out there that could

19   show something different, because it may very

20   well be that there are people that you can

21   identify with the presence of talc in their

22   ovaries and all of their other case-specific

23   things that could -- could make that pattern

24   a -- make someone be able to draw a

25   case-specific, reliable conclusion.

Confidential - Pursuant to Protective Order

Page 306

1                    But that's not my role.  I

2    don't do case-specific.

3         Q.    And I am simply trying to get

4    the parameters of your opinions with regard

5    to the amount of talc use one would need to

6    have before you would feel comfortable --

7    well, that in your opinion would be

8    sufficient to create a toxic environment.

9                    MR. MEADOWS:  Objection.

10                   THE WITNESS:  Well, that's a

11          different question.  So toxic

12          environment could be with a much

13          shorter time exposure, okay?

14    QUESTIONS BY MS. BOCKUS:

15         Q.    Right.

16         A.    So but if you're talking

17    about -- the opinion that I have formed has

18    to do with an increased risk of ovarian

19    cancer.  So with that opinion, that's the

20    description, I believe, I was giving this

21    morning.  It's the idea that the data that

22    I've seen indicates that my opinion that

23    perineal use of talc body powder products

24    increases your risk for ovarian cancer above

25    that background level that you know exists.

Confidential - Pursuant to Protective Order

Page 307

1                    That opinion is based on data

2    that is -- is -- the supporting data would

3    indicate that it has to be a habit, routine,

4    a chronic exposure.  And so as a

5    toxicologist, I've tried to put that in

6    context.

7                    I don't know what else to tell

8    you.  That's the opinions I have formed to

9    date.

10        Q.    A chronic -- a habit, routine,

11   a chronic exposure for years?

12        A.    Well, chronic --

13                MR. MEADOWS:  Objection.

14                THE WITNESS:  -- is defined as

15        years, typically, by a toxicologist,

16        and so that's what I -- that's what I

17        told you.

18   QUESTIONS BY MS. BOCKUS:

19        Q.    Shifting to your regulatory

20   opinions, you would agree that Imerys is a

21   raw material supplier to J&J; is that

22   correct?

23                MR. MEADOWS:  Objection.

24                THE WITNESS:  I would call them

25        an ingredient supplier, yes.

Confidential - Pursuant to Protective Order

Page 308

1    QUESTIONS BY MS. BOCKUS:

2         Q.    Okay.  An ingredient supplier.

3               And you agree that Imerys does

4    not sell any products to the general public,

5    correct?

6               MR. MEADOWS:  Objection.

7               THE WITNESS:  I don't know

8         that's definitely true, but I'm not

9         aware that they do.

10   QUESTIONS BY MS. BOCKUS:

11        Q.    And what Imerys supplies to

12   Johnson & Johnson is not a finished cosmetic

13   that is ready to be sold on the market,

14   correct?

15              MR. MEADOWS:  Objection.

16              MS. PARFITT:  Objection.

17              THE WITNESS:  I don't know that

18        I can answer that except in the

19        context of Johnson & Johnson's baby

20        powder, SHOWER TO SHOWER® and Shimmer,

21        it's my understanding that Johnson &

22        Johnson mixes -- has some fragrance

23        added to the talc.

24              I don't believe Imerys does

25        that, but I don't know for sure.

Confidential - Pursuant to Protective Order

Page 309

 1                    So based on what I know -- I'm
 2          telling you what I know, and I would
 3          call them, again, an ingredient
 4          supplier, and I would call Johnson &
 5          Johnson a cosmetic manufacturer.
 6                    Does that answer the question?
 7    QUESTIONS BY MS. BOCKUS:
 8          Q.     It does.
 9                    Would you agree that the
10    minerals that you have identified in your
11    report, that the documents that you have
12    seen, would classify their -- to the extent
13    that they are ever in the powder, that
14    they're trace ingredients?
15                    MS. PARFITT:  Objection.
16                    MR. MEADOWS:  Objection.
17                    THE WITNESS:  So which
18          ingredients are you referring to?
19                    So some of the metals, no, are
20          not trace ingredients.
21                    Are you talking about the --
22          are you talking about the -- like the
23          presence of tremolite or the presence
24          of chrysotile --
25

Confidential - Pursuant to Protective Order

Page 310

1    QUESTIONS BY MS. BOCKUS:

2         Q.    No.  No, I'm sorry.  I'm

3    talking about the three metals that you

4    identify in your report.  Those are trace

5    elements that are -- that are sometimes

6    detected in the studies of the -- of the

7    talc.

8              MR. MEADOWS:  Objection.

9              THE WITNESS:  It's not how I

10         would say it.  I would say they're

11         heavy metal components that are

12         naturally occurring within the product

13         that are sometimes -- sometimes

14         detectable at levels that are reported

15         as trace based on the detection limit

16         within the analysis, but at other

17         times they're not listed as trace.

18         They're actually listed with a

19         specific amount.

20              So that's what -- how I would

21         define what I call trace.  Usually

22         that's how it will be reported in the

23         lab, trace, which means below the

24         limit of quantification, but it's

25         there.  You're detecting it.

Confidential - Pursuant to Protective Order

Page 311

1                    I would agree that -- that

2           there are other descriptions of heavy

3           metals in the heavy metal literature

4           that talk about trace amounts being

5           found in -- naturally occurring in

6           food, for example, and I agree that

7           that does occur.  But in the case of

8           this product, we actually have

9           often -- we actually have a -- a limit

10          that is set for acceptability in the

11          specification.

12                   And so I would think it's more

13          proper to call it a level of the heavy

14          metal that is allowable by the purity

15          specifications set by the product.

16          And sometimes those levels may be

17          above, and most of the times those

18          levels are below, which is why it's

19          cleared.  Because I've seen some

20          analyses where different products may

21          have been, I guess, turned away or

22          considered not acceptable based on the

23          analysis of certain types of minerals

24          or metals.

25

Confidential - Pursuant to Protective Order

Page 312

1    QUESTIONS BY MS. BOCKUS:

2         Q.      Have you seen any studies where

3    women's blood has reflected the presence of

4    nickel or cobalt or chromium?

5                    MR. MEADOWS:  Objection.

6    QUESTIONS BY MS. BOCKUS:

7         Q.      Who are parts of these

8    studies -- these ovarian cancer studies?

9                    MR. MEADOWS:  Objection.

10                   THE WITNESS:  The

11             epidemiological literature you're

12             asking me?

13    QUESTIONS BY MS. BOCKUS:

14        Q.      Yes, ma'am.

15        A.      It's possible in the Nurses'

16    Health Study that we can go to that, because

17    I know they do collect some heavy metal

18    levels.  I've done that for other clients on

19    other issues.

20                   Most of the others, I doubt

21    that we have heavy metal levels in blood.

22    But certainly there are levels of heavy metal

23    in blood, especially things like lead, for

24    example, that we have very limited capacity

25    to eliminate.

Confidential - Pursuant to Protective Order

Page 313

1                    So whether or not you carry

2    around a significant body burden of a heavy

3    metal in your blood is somewhat driven by the

4    exposure pattern you get.  It's something

5    that's commonly -- or can you excrete it

6    quickly or not.  So...

7          Q.    And are you familiar with any

8    studies that have suggested that the use of

9    body powders leads to a heavy burden of

10   nickel, chromium or cobalt in the blood?

11         A.    So I have not seen such

12   analysis done, no, I have not.

13         Q.    In paragraph 67 of your report,

14   which is on page 46 -- I'm sorry, on -- oh,

15   I'm sorry.  Paragraph 64, I apologize.

16         A.    No.  No, that's fine.

17         Q.    It's on page 44.

18               You cite to two abstracts --

19         A.    Yes.

20         Q.    -- one by Fletcher and one by

21   Fletcher and Saed.

22               Do you consider these abstracts

23   to be reliable sources of data?

24         A.    They're not as reliable at all

25   as a peer-reviewed article.  So there's a

Confidential - Pursuant to Protective Order

Page 314

1    difference in the weight you give an

2    abstract, absolutely.

3              However, knowing the papers

4    that Dr. Saed has actually published in the

5    peer-reviewed literature, I have -- I have

6    mentioned them in here because I do believe

7    that they are -- they are pieces of

8    information that are highly relevant to some

9    of the issues raised in other cellular

10   studies, and so that's why they're here.  But

11   certainly I do not give them the same weight

12   as in my assessment of overall risk.

13             And I would say that I had the

14   same opinions on risk before I had these

15   studies.  Because in my original reports,

16   obviously, I have gone further than risk and

17   talked about cause, and I didn't have the

18   Fletcher studies.

19             The Fletcher studies are more

20   on the issue of biologic plausibility and

21   mechanism versus being important

22   underpinnings, for example, for a hazard

23   assessment.

24        Q.    Is there any way that someone

25   reading your report could tell that you

Confidential - Pursuant to Protective Order

Page 315

1    attribute less weight to the abstracts by

2    Saed and Fletcher just by reading your

3    report?

4              MR. MEADOWS:  Objection.

5              THE WITNESS:  I don't know if

6         they could or not.  Hopefully they

7         would based upon where they appear in

8         the report.  They're not cited a lot

9         of other places, but they certainly

10        are cited.

11             So that's why I'm here today,

12        though.  You're asking me these

13        questions; I'm telling you.  That's

14        how I look at these studies.  That's

15        all I can say.

16             I haven't -- I haven't,

17        certainly, as I've told you, given

18        things numerical weight throughout my

19        report.

20    QUESTIONS BY MS. BOCKUS:

21        Q.    Looking at paragraph 118...

22              Well, when you were preparing

23    your report, were you careful with the

24    language that you used in it to be precise

25    and accurate?

Confidential - Pursuant to Protective Order

Page 316

1         A.      I attempted to do that.  I
2    can't tell that you there isn't something in
3    here I've missed.  But, yes, I read this
4    report six or seven times before I finalized
5    it, trying to make sure that the language I
6    was using was an accurate reflection of the
7    opinion I'm expressing.
8               But it's possible, if you want
9    to point to something that you want to ask me
10   about, I can tell you whether or not that was
11   something that I would change.
12        Q.      So on page 77, paragraph 118 in
13   the middle of it, you say, "Based on the
14   knowledge available by the 1950s, talc body
15   powders manufactured and sold by Imerys and
16   Johnson & Johnson."
17               And that's the question that I
18   have for you.
19        A.      I see what you're saying.
20        Q.      Was Imerys selling anything to
21   Johnson & Johnson in the 1950s?
22               MR. MEADOWS:  Objection.
23               THE WITNESS:  I'm thinking.
24        It's possible they did not.  That may
25        be true.

Confidential - Pursuant to Protective Order

Page 317

1    QUESTIONS BY MS. BOCKUS:

2        Q.      Well, and actually --

3        A.      You know what?  When I wrote

4    this sentence, I assumed that they did, but

5    if that is not true, then certainly this

6    sentence should be just Johnson & Johnson.

7        Q.      Well, earlier in your report,

8    in a footnote you indicate that Imerys began

9    supplying talc to Johnson & Johnson in 1989

10   or the late 1980s.

11              Do you remember making that

12   notation?

13       A.      So let me look.  So if that's

14   an inconsistency, then that should change.

15   Let me look.

16       Q.      And that's all I want to know,

17   if it's an inconsistency, should it change.

18       A.      If it is an inconsistency --

19   certainly if Imerys was not selling talc to

20   Johnson & Johnson in 19 -- the 1950s, then --

21   then certainly Johnson & Johnson's products

22   would not -- would not be affected by Imerys'

23   activity.

24              However, if Imerys is selling

25   talc to anyone that makes a consumer product

Confidential - Pursuant to Protective Order

Page 318

1    in the 1950s, then -- or a precursor company

2    to Imerys is making talc that's selling for

3    body powder to somebody other than Johnson &

4    Johnson, then that opinion would still hold.

5             So -- but I certainly agree, I

6    think I -- you're right, I think I have a

7    statement about the link between the two in

8    '89.  So in that case, then certainly the --

9    the link here would be related to Johnson &

10   Johnson's products.

11       Q.    Okay.  Yeah.

12       A.    Whether or not -- if they

13   weren't sourced from Imerys, then that's a

14   separate duty on a product, not this product.

15       Q.    If you look on the bottom of

16   page 7, I think you'll see the footnote I was

17   referencing.

18             And with regard to your last

19   answer, you don't have any information as to

20   whether Imerys existed and, if it did,

21   what -- who its customers were in 1950s,

22   correct?

23       A.    I don't believe I do, no.

24             MS. BOCKUS:  I think that's all

25       that I have.  Thank you.

Confidential - Pursuant to Protective Order

Page 319

1            MR. LOCKE:  I've got a few
2       questions.
3                    EXAMINATION
4   QUESTIONS BY MR. LOCKE:
5       Q.     Doctor, my name's Tom Locke.  I
6   represent the Personal Care Products Council.
7   We met a couple of times before, I think.
8       A.     I apologize, I don't recall
9   your name at least.  The face looked
10  familiar, though.  I apologize.
11      Q.     I try to maintain a low
12  profile.
13             I have relatively few
14  questions.  I wanted to ask you overall about
15  your opinion.
16             Would you agree that reasonable
17  scientists can disagree with your opinion
18  that talc increases the risk of ovarian
19  cancer?
20      A.     I'd say I wouldn't say it quite
21  that way.  I'd say that I agree that
22  scientists can disagree on conclusions they
23  draw, depending on the -- depending on the
24  way that they have assessed.
25             So certainly based on a

Confidential - Pursuant to Protective Order

Page 320

1    complete assessment the way I did, then I

2    would agree that other people could come to a

3    different conclusion, absolutely.

4              So I think it depends what you

5    mean by "reasonable scientist."  But I would

6    agree that individuals can look at the same

7    body of data and, based on their judgment and

8    experience, based on looking at that same

9    body of data, could come to a different

10   conclusion, yes.  That's true.

11        Q.    You've been involved in this

12   talc litigation for at least a couple of

13   years, right?

14        A.    Yes.

15        Q.    And you know that various

16   defendants have offered experts who disagree

17   with your conclusions, right?

18        A.    Some of my conclusions, yes.  I

19   don't know that there is somebody that's in

20   the litigation that does exactly what I do

21   across all the opinions I've expressed, but,

22   yes, certain parts of my opinions there are

23   other experts I'm aware of, yes.

24        Q.    Well, they -- you're aware that

25   there are defense experts who disagree with

Confidential - Pursuant to Protective Order

Page 321

1   your opinion that talc increases the risk of

2   ovarian cancer; is that correct?

3        A.    Yes, I -- I am aware of that

4   fact.

5        Q.    And in your review of the

6   records that go back or the scientific

7   materials that go back 35 years or more,

8   you've seen that there's disagreement

9   regarding that issue; is that correct?

10       A.    So what documents are you

11  referring to?  Are you asking me about a

12  specific -- just the published medical

13  literature?  Are you asking about documents

14  like internal company documents, reviews by

15  others?  What are you asking me about?

16       Q.    Well, let's focus on the

17  published medical literature.

18             There are scientists who have

19  disagreed with your opinion; is that correct?

20             MS. PARFITT:  Objection.

21             THE WITNESS:  I'm not aware of

22        a paper in the published medical

23        literature that has done the exact

24        assessment I have done.

25             So I am aware of the fact,

Confidential - Pursuant to Protective Order

Page 322

1          however, that there are individual

2          papers by scientists that, for

3          example, have concluded that there is

4          no association between exposure to

5          talc perineally and ovarian cancer,

6          yes.  Individual papers, I am aware of

7          that, but that's different than what I

8          have done.

9    QUESTIONS BY MR. LOCKE:

10         Q.    Let me just ask you about what

11   you were requested to do on behalf of

12   plaintiff's counsel.

13              Plaintiff's counsel asked you

14   to provide opinions related to the human

15   health hazards posed by exposure to talcum

16   powder products and how those hazards relate

17   to the regulatory requirements for marketing

18   cosmetic ingredients and cosmetic products in

19   the United States; is that correct?

20              MR. MEADOWS:  Objection.

21              THE WITNESS:  I didn't write

22         that, but that sounds like an accurate

23         reflection of what -- what we -- what

24         I have done at least in parts of my

25         report, yes.

Confidential - Pursuant to Protective Order

Page 323

1    QUESTIONS BY MR. LOCKE:

2          Q.     Well, if you look at your

3    report, I think you go to part where you were

4    asked to provide -- and I just pulled it from

5    what you said.

6          A.     So I did write it, I apologize.

7    It didn't sound like me.

8          Q.     It started with "to provide

9    opinions related to the human health hazards"

10   and so forth, so I just wanted to make sure

11   we're clear on that.

12         A.     Sure.

13         Q.     So does that sound right in

14   terms of what you were asked to do?

15         A.     I said I -- certainly those are

16   the kinds of things that I was definitely

17   asked to do.  I was asked to do two basic --

18   two basic things, which was having to do with

19   toxicology and risk assessment, and then a

20   separate issue related to regulatory

21   concerns.

22                So, yes, those are the two

23   basic, I guess, buckets of information and

24   documents that I reviewed and opinions I've

25   expressed, and I think that's consistent with

Confidential - Pursuant to Protective Order

Page 324

1    what I've been doing in the litigation.

2          Q.    Okay.  As to that second

3    bucket, the US regulatory requirements for

4    marketing cosmetic ingredients and products,

5    that's not relevant to the scientific

6    question whether talc may cause ovarian

7    cancer; am I right?

8          A.    No.  I disagree with that based

9    on the fact that a company that markets a

10   cosmetic product is required to do a safety

11   assessment.  And if in that safety assessment

12   issues relate to cancer or ovarian cancer and

13   the use of talc, then those two things are

14   related.

15               But I would agree that -- that

16   doing a risk assessment like I've done is a

17   separate issue from doing a safety assessment

18   for a product, because there's actually even

19   a lesser standard for an issue of looking at

20   a safety assessment for a product versus

21   actually forming the opinion that there is an

22   increased risk of cancer with exposure to

23   talc.

24         Q.    Now, did IARC in 2006, did it

25   look at the US regulatory process in

Confidential - Pursuant to Protective Order

Page 325

1    considering whether talc may cause ovarian

2    cancer?

3                    MR. MEADOWS:  Objection.

4                    THE WITNESS:  I don't think I

5            understand what you mean.  It's not a

6            US regulatory process, no, if that's

7            what you're asking me.

8                    They have a -- they have a

9            discussion of what the products are,

10           which is part of the way they're sold.

11           But I don't think they're discussing

12           the duty of a company under the

13           regulatory process, no, that's a

14           separate issue.

15   QUESTIONS BY MR. LOCKE:

16           Q.    So their analysis of whether

17   talc may cause ovarian cancer, that's

18   different than the analysis of whether a

19   company may have a duty, whatever that duty

20   may be?

21                   MR. MEADOWS:  Objection.

22                   THE WITNESS:  It's a different

23           process, absolutely.  IARC is a

24           separate, independent body that does

25           an assessment looking at the issue of

Confidential - Pursuant to Protective Order

Page 326

1          cancer hazard and looking at whether

2          or not there is sufficient evidence to

3          categorize that hazard, whereas a duty

4          of a company under the regulatory

5          situation is broader than just cancer

6          hazard; it's a whole different thing.

7          It's what you do internally before you

8          market a product.  Totally different.

9                And so certainly when I --

10         that's why I have separate sections in

11         my report, and that's why I even

12         have -- I've had discussions about the

13         difference between the regulatory

14         standard for warning versus the

15         assessment of risk that may be

16         required in order to start to produce

17         a -- identify a association or an

18         increased risk or even if you did a

19         causation analysis.  Totally different

20         type of exercise.

21    QUESTIONS BY MR. LOCKE:

22         Q.    Do you first, in that exercise,

23    look at the scientific issue of whether talc

24    may cause ovarian cancer?

25         A.    Are you asking me in either of

Confidential - Pursuant to Protective Order

Page 327

 1   these exercises?

 2        Q.    Well, let's say when you're

 3   getting to -- you mentioned the duty to warn.

 4   So if you're looking at the duty to warn, do

 5   you first have to look at does talc cause

 6   ovarian cancer?

 7              MR. MEADOWS:  Objection.

 8              THE WITNESS:  That's not the

 9         question you asked.  No.  I would

10         argue, based on the regulations, if

11         you look at the standard, the question

12         is, is there evidence to indicate that

13         there is a chance, there is a

14         potential -- not that it does, but is

15         there a potential for that type of

16         hazard to be posed to consumers who

17         use the product.

18              It's a possibility versus being

19         a -- I'm taking it beyond possibility

20         when I'm doing my assessment for

21         increased risk.  And I talked about

22         that this morning, and I can't

23         remember her last name.  The

24         Johnson -- I apologize.  But I -- with

25         Johnson & Johnson.  I talked about

Confidential - Pursuant to Protective Order

Page 328

1          this is a different assessment and

2          different standard.  It's a much lower

3          standard on cosmetics for what needs

4          to be done as far as warning.

5                  Now, when a company comes and

6          initiates a safety assessment on their

7          product, before they even think about

8          what am I going to warn, they should

9          be doing a comprehensive assessment of

10         safety based on what's available

11         publicly, knowing what others have

12         reported and then what data they've

13         collected.

14                 If they don't have data at all

15         on the safety of the product, then the

16         product has to say that.  We don't

17         know.  We do not know if this product

18         is safe.  And that's one of the things

19         that is allowed under FDA -- under FDA

20         regulations as well.

21                 But essentially some -- some

22         assessment must be done to understand

23         from the perspective of the company

24         that this product is safe for

25         consumers to use as -- under the

Confidential - Pursuant to Protective Order

Page 329

 1          directions of use.
 2                So in the case of this, it
 3          would be a body powder being used on
 4          the body surface but also perineally
 5          because -- because that was an
 6          exposure pattern that was understood.
 7    QUESTIONS BY MR. LOCKE:
 8          Q.    Okay.  You described two
 9    different buckets.  They're independent
10    assessments; is that correct?
11                MR. MEADOWS:  Objection.
12                THE WITNESS:  Initially that's
13          where I started, and now I'm talking
14          two different duties.  There's a duty
15          to warn, but there's first a duty to
16          collect information before you market
17          it.  It's your premarket safety
18          assessment.
19    QUESTIONS BY MR. LOCKE:
20          Q.    Okay.  I'm not actually talking
21    about the manufacturer's duty.  I wanted to
22    just first address your scientific analysis.
23                That's a separate question that
24    led you to your opinion on the -- your
25    opinion that talc increases the risk of

Confidential - Pursuant to Protective Order

Page 330

1    ovarian cancer, correct?

2                    MR. MEADOWS:  Objection.

3                    THE WITNESS:  Yes, that's what

4            I described.  And I thought you were

5            talking about duty of the company, and

6            so I apologize.  I didn't mean to go

7            off on a tangent.

8                    If you want to focus just on

9            the risk assessment -- is that what

10           you want to do? -- that's what I'm

11           doing.

12   QUESTIONS BY MR. LOCKE:

13           Q.    No, I just want to understand,

14   those are two different things, though,

15   right?

16           A.    Those are two different --

17   those are two different tasks that I

18   undertook, yes.  I undertook a risk

19   assessment task to form opinions based on

20   what I can say about risk, and then I

21   separately -- and I had done this earlier on

22   the issue of warnings, looking at what do we

23   know about the product and whether or not --

24   and when did we know it, and what should

25   consumers have been warned about based on the

Confidential - Pursuant to Protective Order

Page 331

1    safety information that was available over

2    time.

3         Q.     The risk assessment task,

4    that's what you mean by your analysis that

5    talc increases the risk of ovarian cancer?

6         A.     That's correct.

7         Q.     You could have stopped at that,

8    but then you performed an additional task; is

9    that right?

10        A.     Well, actually, no, because the

11   first task I actually started with was the

12   regulatory task.  When I first started

13   getting involved in the litigation very --

14   before I wrote my first report, one of the

15   first things I was looking at was the issue

16   of the duty of the manufacturer to provide

17   warnings.

18              And then after that, I expanded

19   that role to be an inclusion as well of a

20   causation analysis.

21              And then now I'm not doing a

22   full causation analysis in this litigation,

23   but I'm using essentially some of the same

24   information to provide you with a description

25   of a -- a health risk assessment, which was

Confidential - Pursuant to Protective Order

                                                      Page 332

1    also sort of -- that's a piece along the way

2    to doing a causation analysis, but it's not

3    the same.

4          Q.    Your opinion regarding the

5    FDA's responsibilities and functions, that's

6    not related to your opinion that talc may

7    cause an increased risk in ovarian cancer; is

8    that correct?

9               MR. MEADOWS:  Objection.

10              THE WITNESS:  I don't think

11         that's true the way you're asking that

12         question, because I don't know how you

13         divorce the fact that as a -- in a

14         regulatory assessment, if I identify

15         cancer hazard, I have identified a

16         duty to warn.  That's certainly

17         something that should be warned about

18         when I understand that there's not

19         only the potential, but I believe

20         there's an increased risk.

21              But I would agree with you that

22         in my report, I'm laying out for you

23         even different bodies of information

24         that -- as I step through it.

25              Does that make sense to you?

Confidential - Pursuant to Protective Order

Page 333

1    QUESTIONS BY MR. LOCKE:

2         Q.    Not really.

3         A.    I'm sorry.

4         Q.    I'm talking about your

5    scientific analysis here, not your regulatory

6    analysis.

7              To do your scientific analysis,

8    you looked at scientific materials, right?

9         A.    Yes, but I do the same thing

10   for my regulatory analysis.  That's why I'm

11   confused.  I -- to me they are connected.

12             But I would agree with you, I

13   had an analysis.  Let's just talk about that,

14   my analysis on risk assessment and my

15   opinions that I've expressed.  Those are laid

16   out in a separate section of my report,

17   absolutely.  So we could talk about that if

18   you'd like.

19        Q.    Well, I just want to

20   understand, and I think I do now, that's a

21   separate issue from your regulatory opinion?

22        A.    It's not a separate issue.

23   That's where I'm having trouble with your

24   language.

25             It's a separate task because,

Confidential - Pursuant to Protective Order

Page 334

1    for example, I may have only been asked, but

2    I wasn't, to just describe whether or not, as

3    a human risk assessor and toxicologist, there

4    is a hazard or a risk posed by the product,

5    and I could stop there.

6              But I was asked, based on --

7    based on my experience working in the area of

8    regulatory toxicology but also on regulatory

9    issues for clients where I give advice, I was

10   asked to look at how does that scientific

11   information impact what the company should be

12   doing.

13             And so that's -- that's why I'm

14   saying you can't divorce them, because the

15   warning issue I'm talking about is intimately

16   tied into the human health risk assessment

17   results.

18        Q.    So do you consider yourself

19   primarily here as a warning expert?

20             MR. MEADOWS:  Objection.

21             THE WITNESS:  I consider that

22        one of my roles, yes, absolutely.

23             It depends upon how individual

24        cases, individual attorneys, will --

25        will ask -- decide to use me.  For

Confidential - Pursuant to Protective Order

Page 335

1          example, I have been used in one trial

2          to only talk about the toxicology.

3          Other trials, I've talked about

4          toxicology as well as regulatory

5          issues.  So I think it just depends on

6          the case.

7                   In the MDL, I am prepared,

8          however, to come to talk at a trial on

9          the regulatory system that guides

10         cosmetics as well as provide opinions

11         that talk about what are the hazards

12         of talc, what is the toxicology of

13         talc, what do -- how can you be

14         exposed to talc, that migration issue,

15         and then my opinions about whether or

16         not I believe that there is an

17         increased risk of ovarian cancer.

18                   So I would be -- be prepared to

19         talk about both of those things.

20         That's why I said I do think I'm a

21         little different than some of the

22         other experts that you may encounter,

23         for example, in the defense side,

24         where someone may just do regulatory

25         or somebody may just do toxicology.

Confidential - Pursuant to Protective Order

Page 336

1           But I practice in both those areas in

2           my consulting practice and in my

3           experience.

4      QUESTIONS BY MR. LOCKE:

5           Q.    Let me ask you a few questions

6      about your cosmetic ingredient review

7      statements, CIR.

8                We can agree to call it that,

9      right?

10          A.    Yes, that's fine.

11          Q.    In parts of your report, you

12     cite the CIR as an authoritative source on

13     cosmetic ingredients; is that correct?

14          A.    So where are you looking at,

15     the background information on the CIR?

16                Yes, they certainly are a

17     source of information that FDA relies upon as

18     far as assessments, yes, that's true.

19          Q.    Well, and on page -- or

20     paragraph 35, page 23, you cite to the CIR

21     on, for example, chemicals purportedly in

22     cosmetics.  You have a footnote there.

23          A.    So --

24          Q.    I believe it's footnote 31.

25          A.    Yes, I have looked at -- looked

Confidential - Pursuant to Protective Order

Page 337

1    at the CIR as a source of information because

2    many of the chemicals, many of the

3    ingredients within the fragrance of Johnson &

4    Johnson, the only available information may

5    be found within the CIR that's publicly

6    available.

7         Q.    And you rely on the report of

8    Dr. Cralley; is that correct?

9              MR. MEADOWS:  Objection.

10              MS. PARFITT:  Objection.

11   QUESTIONS BY MR. LOCKE:

12        Q.    You reference Appendix D to

13   your report.  I believe if you stay on the

14   same page you'll see that, the same

15   paragraph.

16        A.    I wouldn't say I rely on the

17   report of Dr. Cralley because I form my

18   opinions independent of Dr. Cralley, but

19   certainly his -- I believe if you go to his

20   reports, his report is supportive of my

21   opinions in this area.

22        Q.    Did you read his report?

23        A.    I have read it now, but I did

24   not read it before I -- before I formed my

25   opinions in this particular paragraph, yes.

Confidential - Pursuant to Protective Order

Page 338

1          Q.     I'm a little confused because

2     you're citing to his report.

3                 You read it or you didn't read

4     it before you wrote this paragraph?

5          A.     I read it before I wrote the

6     paragraph.  I didn't read it before I had

7     formed the opinion.  Do you understand what

8     I'm saying?

9                 I did my review of the irritant

10    chemicals independently before I looked at

11    Dr. Cralley's report.  So I had formed the

12    opinion that -- of the chemicals I had

13    searched for that this is what I identified.

14    And that's what this is talking about, right?

15                I'm saying here that of the

16    more than 100 chemicals included, over

17    70 percent are compounds linked with some

18    level of irritant hazard.  That was done on

19    my own.

20                Then, if you go to look at

21    Dr. Cralley's report, I cite it here because

22    it's consistent.  That is, his report

23    provides support additionally for the

24    statement I'm making.

25                So I'm not relying on his

Confidential - Pursuant to Protective Order

Page 339

1   conclusions to make my opinion, but it's
2   certainly -- I am citing it here as it being
3   a piece of evidence that is consistent with
4   my opinions.
5        Q.    Sorry, I seem to have messed up
6   my microphone.  I'll try to hold it for a
7   little bit then.
8             Do you disagree with
9   Dr. Cralley's report?
10       A.    I have not formed an opinion
11  that I agree or disagree.  He -- with his --
12  I believe he has information that is
13  consistent with the opinion I'm expressing in
14  the sentence, however.
15       Q.    And do you know that
16  Dr. Cralley repeatedly cites to the CIR as an
17  authoritative source regarding cosmetic
18  ingredients?
19       A.    I don't know that he uses that
20  exact language, but he does cite to it, yes,
21  in his report.  Certainly he does.
22       Q.    More than 20 times, right?
23       A.    That, I have not counted.  I
24  can't tell you that.  But he does, just like
25  I do, as a source of information when there

Confidential - Pursuant to Protective Order

Page 340

1    is no other source available.

2        Q.    Okay.  In your report you state

3    that the CIR process is administered

4    independent of the FDA.

5              But the FDA is on the CIR

6    steering committee; is that correct?

7        A.    That is correct.

8        Q.    You don't mention that in your

9    report, although you mention others who were

10    on the CIR steering committee, correct?

11        A.    Yes, there's a paragraph where

12    I talk about others, yes.

13        Q.    But you don't mention that the

14    FDA is on the steering committee?

15        A.    I believe I -- I believe I've

16    been asked that question before, and I said

17    yes, but certainly in this report I don't

18    believe I state that, that is true.

19        Q.    CIR solicits input from the

20    public; is that correct?

21              MS. PARFITT:  Objection.

22              THE WITNESS:  I would say they

23        solicit input from industry, yes.

24    QUESTIONS BY MR. LOCKE:

25        Q.    Well --

Confidential - Pursuant to Protective Order

Page 341

1          A.      But they -- and they do have a
2    public comment period, which is mainly input
3    from industry.
4                  But I agree that they do -- and
5    if what you're referring to is a public
6    comment period, yes, there is that for the
7    documents.
8          Q.      You can go on the website and
9    see what ingredients CIR is going to review,
10   right?
11         A.      Yes, you can.
12         Q.      Have you done that?
13         A.      Yes, I've done it many times
14   before.
15         Q.      Okay.  And did you submit
16   comments on talc in 2012?
17         A.      No, I did not.
18         Q.      Okay.  You could -- the public
19   can submit comments many times during the
20   process of an ingredient review; is that
21   correct?
22         A.      There are different --
23   different stages of the draft document.  Is
24   that what you're asking me?  Yes, that can be
25   done.

Confidential - Pursuant to Protective Order

Page 342

1          Q.     Well, even before it's a draft,
2    CIR is soliciting information about the
3    ingredient to include in the initial
4    materials provided to the expert panel; isn't
5    that correct?
6          A.     Technically I believe that is
7    true, but I would disagree that that is
8    something that happens routinely.  But I
9    would agree that -- I would say technically
10   you may be -- that is something that could
11   occur, yes, but that is not the situation,
12   for example, in the case of talc.
13         Q.     Why not?
14         A.     Based upon what I have seen
15   described as how the review was done, and
16   that has to do with the testimony of
17   different -- or different documents that I've
18   reviewed and the testimony of individuals
19   related to this document.
20         Q.     Well, Dr. Cramer could have
21   submitted comments to the CIR regarding talc,
22   couldn't he?
23                MR. MEADOWS:  Objection.
24                MS. PARFITT:  Objection.
25                THE WITNESS:  You'd have to ask

Confidential - Pursuant to Protective Order

Page 343

```
 1          Dr. Cramer if he was aware that they
 2          were reviewing it.  I can't answer
 3          that for Dr. Cramer.
 4              But if he was aware of it,
 5          certainly -- if you're aware of the
 6          process going on and the timing of it,
 7          certainly you can submit comments.
 8          I'm not disagreeing with you on that.
 9          That is true.
10  QUESTIONS BY MR. LOCKE:
11          Q.    CIR publishes in advance what
12  it's going to review; isn't that correct?
13          A.    What is coming up for review?
14          Q.    Yes.
15          A.    Yes, things that are proposed
16  for the next meeting, yes, that's true.
17          Q.    And you could submit comments
18  to the first draft of the CIR report; isn't
19  that correct?
20          A.    I would agree that that is
21  possible to happen, yes.
22          Q.    And you can submit comments
23  before the final report is drafted, correct?
24          A.    Yes, as long as it's still in
25  draft form, yes, those comments can be
```

Confidential - Pursuant to Protective Order

Page 344

1    submitted.

2           Q.      And CIR meetings are open to

3    the public, right?

4           A.      That is true, they are open to

5    the public, but in my experience it -- they

6    are not meetings that are heavily attended by

7    the public but indeed are -- tend to be

8    meetings attended by industry stakeholders

9    within the ingredients that are being

10    reviewed.

11          Q.      You know Mr. Steinberg here.

12    He was a plaintiff's expert for a while?

13          A.      I don't know him personally,

14    but I know his name and I know he was a

15    plaintiff's expert, yes.

16          Q.      You know he attended the talc

17    meeting, right?

18          A.      Yes, I believe he was working

19    with indus -- he works with industry, so I

20    believe indeed he did attend that meeting.

21          Q.      You're not claiming he was

22    working with any industry member regarding

23    talc, are you?

24          A.      That's not what I stated.  I

25    know he's a consultant to the cosmetic

Confidential - Pursuant to Protective Order

Page 345

1    industry, so it doesn't surprise me.  And I

2    believe he lives in the area, so it doesn't

3    surprise me that he attended.

4                    I haven't spoken to him about

5    any of that, though, so I have no specific

6    details of that.

7         Q.    Transcripts of the meeting are

8    available to the public, right?

9         A.    You can download the

10   transcripts, yes.

11        Q.    They're on the website?

12        A.    That's what I said.  You can

13   download.  I'm sorry.

14        Q.    Okay.

15        A.    Yes, you can download them from

16   the website.

17        Q.    Did you submit comments to the

18   CIR regarding talc?

19        A.    No, I did not.

20        Q.    Why not?

21        A.    I wasn't aware of the process

22   that was going on in the draft form at the

23   time.

24        Q.    Why is that?

25        A.    I was not following the CIR for

Confidential - Pursuant to Protective Order

Page 346

1    talc at that particular time.  I have a lot
2    of other clients and a lot of other issues
3    that go on on a routine basis, and I -- I
4    literally would not have time to follow every
5    assessment they do, considering that they do
6    thousands of chemicals.
7          Q.    Did you know of the CIR prior
8    to your retention by plaintiff's counsel?
9          A.    Yes.  In fact, I -- one of the
10   journals that I receive, International
11   Journal of Toxicology, maybe, publishes many
12   of their safety assessments.  So I certainly
13   am, yes.
14                I was aware -- when I was at
15   Eviron, I was aware of the existence of CIR.
16         Q.    Have you ever provided prior to
17   this litigation -- and by "this litigation" I
18   mean any aspect of the talc litigation -- an
19   expert opinion on cosmetics' ingredients?
20         A.    You're asking me in any other
21   litigation on a cosmetic ingredient?
22                I'm thinking back to the cases
23   I've worked on.  Not as a -- not as a
24   testifying expert.
25                At Eviron, though, we worked on

Confidential - Pursuant to Protective Order

Page 347

1    litigation involving cosmetic ingredients,

2    thought I was not the testifying expert.

3          Q.     In your report you talk about

4    the percentage of -- or the number of

5    ingredients that the CIR listed as unsafe.

6                 Do you recall that?

7          A.     Yes.  I mean, if you want me to

8    verify the number, I need to go there.  But,

9    yes.

10         Q.     You don't mention that CIR has

11   put limitations on approximately 50 percent

12   of the ingredients that it has reviewed, do

13   you?

14         A.     I don't mention that, but they

15   do.  They have -- they have -- when they have

16   a statement about safety, they will -- they

17   will often talk about the limitations from

18   the safe use based on either concentration or

19   even maybe route of exposure, that is true.

20         Q.     Why don't you do that?  Why

21   didn't you include that in your report?

22         A.     No particular reason.  I mean,

23   the point I'm trying to make is really the

24   workload that's going on here and the

25   impossibility of the task of providing the

Confidential - Pursuant to Protective Order

Page 348

1    same level of review of any of these

2    ingredients as can be provided -- as was

3    provided by the IARC.

4              And so, again, that's one of

5    the comparisons I'm doing.  I'm talking about

6    the difference in the time, the effort, the

7    difference in the independence of the

8    reviews.  And so that -- when I'm talking

9    about, those numbers, that's what I'm

10   focusing on.  I'm focusing on the fact that

11   you have so many reviews in a very short

12   period of time, with a one-expert panel, it's

13   impossible for that level of analysis and

14   review to be anywhere near what IARC panels

15   do, and also nowhere near the level of review

16   that I have done based on the number of

17   documents that I have analyzed and looked at.

18   So it's a different type of review.

19        Q.    Let me ask you a few questions

20   because you have criticized the panel.

21              You would agree with that,

22   correct?

23        A.    Yes.  Oh, absolutely.  This

24   particular analysis I have.  I have made some

25   general criticisms of the overall process,

Confidential - Pursuant to Protective Order

Page 349

1    and then I made some specific criticisms of

2    this particular review.

3         Q.    And one of your criticisms is

4    that the CIR -- I think you said two CIR

5    expert panelists had conflicts of interest;

6    is that correct?

7         A.    Yes, that -- they did, that

8    were not -- that were not -- I believe not

9    understood even by Dr. Andersen at that time.

10   I think these are things brought up to him

11   that he was not aware of.

12        Q.    All right.  Now, you read his

13   testimony in one of the trials in California,

14   right?

15        A.    Yes, that's the -- in fact,

16   that's the source of the information where

17   I'm citing to those names of those

18   individuals.  I think I refer to that, his

19   trial testimony.

20        Q.    And didn't he, though, say,

21   well, he didn't view it as a conflict of

22   interest because the money wasn't going to

23   them personally, it was going to their

24   organizations?

25        A.    He did make that statement,

Confidential - Pursuant to Protective Order

Page 350

1   yes.

2        Q.     And you disagree with that
3   statement?

4        A.     I don't -- I mean, his
5   testimony is what it is.

6               Are you asking me do I disagree
7   that that's a conflict of interest?

8               I disagree that you shouldn't
9   disclose that as a potential conflict in the
10  documents that are produced, just like I do
11  when I write an article and I disclose that
12  I've had funding.  I don't say what the
13  funding specifically paid for, but I've had
14  funding or support from this industry
15  individual or that industry individual.
16  It's -- it's something that just is about
17  transparency.

18       Q.     So when you write articles, you
19  say that you've been paid a lot of money by
20  plaintiffs' lawyers?

21               MR. MEADOWS:  Objection.

22               MS. PARFITT:  Objection.

23               THE WITNESS:  Well, I haven't

24          written an article that overlaps with

25          an issue that I've addressed in

Confidential - Pursuant to Protective Order

Page 351

```
 1        plaintiffs' litigation, but I
 2        certainly have given my conflict of
 3        interest statements that relate to the
 4        issue in the article.
 5              I do that -- I've done that
 6        with -- on my work -- several of my --
 7        several of my assessments talking
 8        about risks of pesticides.  I've done
 9        it with the work that I've done that
10        that's been sort of, I guess,
11        policy-type work on behalf of the
12        American Chemistry Council.
13              So absolutely I do.
14   QUESTIONS BY MR. LOCKE:
15        Q.    Okay.  You don't think it's
16   relevant that you receive 50 percent of your
17   money solely from plaintiffs' products
18   liability lawyers?
19              MR. MEADOWS:  Objection.
20              MS. PARFITT:  Objection.  Form.
21              THE WITNESS:  If it has nothing
22        to do with the issue that I'm
23        addressing in the paper, no, I do not
24        think that.
25              But when you're accepting money
```

Confidential - Pursuant to Protective Order

1           from an industry or a company that has

2           to do with the issue you're looking

3           at, yes, a conflict -- a conflict of

4           interest absolutely needs to be

5           described.

6      QUESTIONS BY MR. LOCKE:

7           Q.    And that would -- well, let me

8      just ask you:  You're not an ethicist, are

9      you?

10          A.    No, I'm not trained as an

11     ethicist.

12          Q.    And you're not a lawyer, are

13     you?

14          A.    Well, no, but I have passed the

15     patent bar, but I'm not trained as a lawyer.

16          Q.    That doesn't make you an

17     ethicist, right?

18          A.    No, it does not.

19          Q.    Okay.  Let's talk about one of

20     the people you criticized, Dr. Wilma

21     Bergfeld.

22               Did you know she was the first

23     woman who was the president -- to be the

24     president of the American Academy of

25     Dermatology?

Confidential - Pursuant to Protective Order

Page 353

```
 1        A.     No, I don't know her
 2    personally, so, no, I did not know that.
 3        Q.     Did you investigate her at all
 4    when you criticized her?
 5        A.     I wasn't criticizing her, I was
 6    criticizing the CIR process for failing to
 7    disclose the conflicts of interest of
 8    individuals that were involved in their
 9    assessment.
10            I certainly am not giving
11    personal criticism to either of those
12    individuals.
13        Q.     You would agree that the
14    American Academy of Dermatology is a
15    reputable organization?
16        A.     I haven't formed an opinion one
17    way or the other; however, I'm aware of them,
18    and certainly I know individuals that are
19    members of it, yes.
20        Q.     Are those individuals reputable
21    people?
22            MS. PARFITT:  Objection.
23            THE WITNESS:  They are people
24        that practice medicine that certainly
25        I would go see.  I mean, you're asking
```

Confidential - Pursuant to Protective Order

Page 354

```
1          me if I formed a very specific opinion
2          about them as individuals, and I
3          haven't done that.
4     QUESTIONS BY MR. LOCKE:
5          Q.     Do you have any reason to
6     believe that the American Academy of
7     Dermatology is disreputable?
8          A.     No.  Again, I haven't formed an
9     opinion one way or the other.  I'm aware of
10    the organization, and it certainly is one
11    that is -- has within its members a number of
12    people that I know that practice in
13    dermatology.
14         Q.     Did you know that Dr. Bergfeld
15    was the first woman to be president of the
16    Cleveland Academy of Medicine?
17         A.     To the what?  What was the
18    first word?
19         Q.     Cleveland Academy of Medicine?
20         A.     No.  Again, I'm not aware of
21    her CV specifically, other than what may have
22    been discussed -- it's possible her -- I know
23    her affiliation will be listed in some of the
24    documents as to where she is today, but I do
25    not know her CV and her history.
```

Confidential - Pursuant to Protective Order

Page 355

1          Q.     Are you aware that she was the

2     first president -- or she was a president of

3     the American Society of Dermatopathology?

4          A.     No.  Same thing.  If I'm not

5     aware of her CV, I wouldn't know that.

6          Q.     How about that she was the

7     former chair to the FDA's drug -- FDA's

8     Dermatology and Ophthalmology Advisory

9     Committee?

10         A.     Same answer.  I don't know her

11    CV, so I have no knowledge.

12         Q.     Is it your opinion that

13    Dr. Bergfeld was not qualified to chair the

14    CIR panel that considered talc?

15         A.     I don't think I formed that

16    specific opinion.  Instead, what I have --

17    the opinions I formed relate to the overall

18    makeup of the panel that failed to include

19    individuals with expertise that were -- that

20    are really key to assessing the safety of

21    talc.  And that had to do with the issues of,

22    as I discuss it, epidemiology -- oh, I'm

23    sorry, I think I need to put this back --

24    period -- sorry.  In the area of epidemiology

25    is one that I talked about it specifically,

Confidential - Pursuant to Protective Order

Page 356

1    and also gynecological -- gynecological

2    sciences on the issue of migration.

3         Q.    You're not a epidemiologist,

4    are you?

5         A.    Not by training.  It's a tool I

6    use all the time, but I'm not an

7    epidemiologist by training.

8         Q.    And panel members on the CIR,

9    they might have used the same tool that

10   you're using to form your opinion about talc,

11   correct?

12                MR. MEADOWS:  Objection.

13                THE WITNESS:  Based on what

14        I've reviewed from the minutes and the

15        write-up, I would disagree that that

16        is -- they have done -- they've used

17        the tools in the same way I have.  I

18        disagree with that.

19   QUESTIONS BY MR. LOCKE:

20        Q.    No, but I'm saying their

21   epidemiology could be the same background

22   that you have.  You haven't reviewed who they

23   are, so you really don't really know.

24                MR. MEADOWS:  Objection.

25                THE WITNESS:  Well, I do

Confidential - Pursuant to Protective Order

Page 357

1          know -- I do know Dr. Klaassen, who I
2          believe was on the panel as a
3          toxicologist.  He is not somebody
4          that -- he is not somebody that I
5          understand does a significant amount
6          of evaluation in risk assessment for
7          epidemiological studies.  He has done
8          some of that, yes, I agree, but it's
9          different training than mine.
10    QUESTIONS BY MR. LOCKE:
11          Q.     You're better qualified than he
12    is?
13          A.     No, that's not what I'm saying.
14    I'm saying it's different background.
15              The question that I heard you
16    ask me, I believe, was directed towards the
17    differences in my background versus somebody
18    else's.
19              And I'm saying that I'm not
20    aware that he has the same background I do,
21    but there is not -- there was not somebody on
22    the panel that had specific expertise and
23    analysis of epidemiological studies as an
24    epidemiologist.  And I think that's important
25    in this case where you're analyzing in a

Confidential - Pursuant to Protective Order

Page 358

1    causation analysis a wide variety of studies.

2    So I do think it's important.

3         Q.    You're not a gynecological

4    oncologist, are you?

5         A.    No, I'm not.  But again, that

6    would have been an important expertise to

7    have on the panel when --

8         Q.    And yet you formed your opinion

9    with --

10              MR. MEADOWS:  Hold on.

11              MR. LOCKE:  No.  No.  Go ahead.

12              You can ask follow-up questions

13         if you want.

14              MR. MEADOWS:  You're

15         interrupting her.

16              MR. LOCKE:  Well, I've got a

17         limited amount of time, and I've got

18         to keep moving.

19              MR. MEADOWS:  Well --

20              MR. LOCKE:  They're very long

21         answers to questions that I'm not

22         asking.  So I -- you follow up if you

23         would like with your questions, but I

24         got to keep moving.

25              MR. MEADOWS:  Well, I'm sorry,

Confidential - Pursuant to Protective Order

Page 359

```
1           but you're not going to be allowed to

2           interrupt her.

3                   MR. LOCKE:  Okay.  Then we'll

4           go longer.  If she's going to answer

5           questions I'm not asking, then I need

6           to go -- I need to be able to go

7           longer.

8                   MR. MEADOWS:  You're not going

9           to be allowed to interrupt her.

10          That's just the bottom line.

11   QUESTIONS BY MR. LOCKE:

12          Q.    You're not a gynecological

13   oncologist, right?

14          A.    I'm not trained as a

15   gynecologic oncologist, that is true.

16          Q.    You're not a medical doctor,

17   correct?

18          A.    I am not a physician, that is

19   correct.

20          Q.    Let's talk about the citizens

21   petition.

22                  The FDA frequently seeks

23   scientific information from cosmetic

24   manufacturers; is that correct?

25          A.    First part of the question?
```

Confidential - Pursuant to Protective Order

Page 360

1    I'm sorry.

2         Q.     The FDA frequently seeks

3    information, scientific information, from

4    cosmetic manufacturers; is that correct?

5         A.     I don't understand what you

6    mean by "frequently seeks."  They rely on

7    cosmetic manufacturers to do their own safety

8    assessments.

9                Is that what you're referring

10   to?

11        Q.     Well, they ask PCPC to comment

12   on scientific issues, correct?

13        A.     Yes, I would agree that that

14   interaction has happened, but that's not

15   where the responsibility lies.  But I agree,

16   they have.

17        Q.     I'm not asking about

18   responsibility.  I'm asking:  Has the FDA

19   asked cosmetic manufacturers for scientific

20   information?

21        A.     Yes, they have in this case.  I

22   discuss some of that, yes.

23        Q.     And they do that frequently,

24   right?  Not just in this case, but generally?

25        A.     I can't answer that for all

Confidential - Pursuant to Protective Order

Page 361

1    situations.  I have seen it happen before,

2    yes.

3         Q.     The FDA asked, for example, for

4    then CTFA to cosponsor the 1994 workshop on

5    talc, correct?

6         A.     Yes, they did.

7         Q.     The FDA knew that the report

8    prepared by Dr. Huncharek and Dr. Muscat was

9    based on PCPC's retention of those

10   consultants, correct?

11        A.     So what are you -- what time

12   period are you talking about?

13        Q.     Well, now, there was only one

14   time that Drs. Huncharek and Muscat submitted

15   a report to the FDA regarding talc, correct?

16        A.     So I need to look to confirm

17   that.  Which time period are you talking

18   about?

19        Q.     2009.  Citizens petition.

20        A.     Oh, that is true.  In the

21   citizens petition, that is true, yes.  But

22   I -- but...

23        Q.     I mean, it says in the letter,

24   "We're submitting a report written by Drs.

25   Huncharek and Muscat," correct?

Confidential - Pursuant to Protective Order

Page 362

1          A.      In the cover letter from the
2    CRE?
3          Q.      From -- not CRE, from PCPC.
4          A.      Okay.  So let -- I need to -- I
5    need to refresh my memory on the way the
6    submissions were made.  I apologize.
7                  Do you remember which paragraph
8    that you're referring to?
9          Q.      Well, it's throughout your
10   report you're talking about the citizens
11   petition.
12         A.      So it's my recollection, based
13   upon the documents that I have seen, that it
14   was not a transparent process at all times
15   that Drs. Huncharek and Muscat were being
16   identified as independent consultants and
17   were not ones that were being actually paid
18   by the industry for some of the work that
19   they did.  And I think that's discussed in my
20   report.
21         Q.      Well, let's break that down.
22         A.      If you want me to confirm the
23   issue of the 2009 -- if you will point me to
24   where you say I discuss this, I will confirm
25   that or not.

Confidential - Pursuant to Protective Order

Page 363

1          Q.     Well, let me break it down.

2                 Citizens petition submitted in

3     2008, right?

4          A.     Well, there were two:  one in

5     1994 and another -- I'm sorry, 1992, and

6     another in 2008.

7          Q.     Well, there are actually

8     several more than that, but let's just focus

9     on the 2008.

10                In 2008, a citizens petition

11    was submitted?

12         A.     Yes, that is true.

13         Q.     And PCPC responded to that

14    citizens petition in 2009, correct?

15         A.     They submitted comments.  Is

16    that what you're asking me?  Yes, they did.

17         Q.     Yes.

18                And that was a cover letter,

19    correct?

20         A.     A cover letter -- that's all it

21    was was a cover letter?

22         Q.     Well, attached to the cover

23    letter was a report from Drs. Huncharek and

24    Muscat?

25         A.     Yes, that is true.

Confidential - Pursuant to Protective Order

Page 364

1          Q.     And you're not aware of any
2    other document indicating that PCPC ever
3    hired Drs. Huncharek or Muscat?
4          A.     So that's where I'll need to go
5    back and look at the documents, because --
6    that I have discussed.  So I need to find
7    that on my paragraph.
8                 If you want to go off the
9    record for a minute so I don't waste your
10   time, I will look.
11         Q.     Sure.
12         A.     It's up to you.  Or we can stay
13   on the record.
14                MR. LOCKE:  I'm fine going off.
15                VIDEOGRAPHER:  We are going off
16        the record at 4:23 p.m.
17        (Off the record at 4:23 p.m.)
18                VIDEOGRAPHER:  We are back on
19        the record at 4:25 p.m.
20   QUESTIONS BY MR. LOCKE:
21         Q.     The question I asked:  Are you
22   aware of any other document indicating that
23   PCPC ever hired Dr. Huncharek and Muscat
24   other than for the 2009 response or
25   submission to the citizens petition?

Confidential - Pursuant to Protective Order

Page 365

1          A.    I would have to pull this

2    document, but in paragraph 90 I make a

3    statement:  A 2005 response written by

4    Dr. Muscat says -- this is not '09, this is

5    2005, and Dr. Huncharek critiqued the work of

6    Dr. Cramer, who also failed to disclose the

7    financial relation -- I'll start over.

8                Okay.  So I'm sorry to repeat

9    myself, but there was a little noise.

10                You asked 2009.  So the other

11    time period I have in my report in

12    paragraph 90 talks about 2005, but I'd have

13    to pull this document.

14                But I am citing to the

15    deposition of Dr. Loretz, who was a PCPC

16    employee, so I think I would need to pull

17    this in order to confirm.

18                But I see depositions of her

19    and Dr. Nicholson as talking about them

20    failing to disclose the financial

21    relationship between their work and industry.

22          Q.    So if Dr. Loretz did not

23    testify that PCPC had retained Drs. Huncharek

24    and Muscat in 2005, you'd have no other

25    evidence?

Confidential - Pursuant to Protective Order

Page 366

1        A.        I can't answer that

2   definitively, but this is what I would point

3   you to.  So I'd have to pull these documents

4   to confirm, but I have -- both paragraphs 89

5   and 90 address these general issues for you,

6   but I think that's the sentence and the

7   documents that I think would be relevant.

8   But I'd have to pull them to fully answer

9   your question.

10        Q.        The reason I ask the question

11   is because you frequently say "the cosmetics

12   industry" without identifying a party or a

13   person.  And -- well, I'll just leave it at

14   that.

15        A.        And I guess the reason I'm

16   saying I need to -- I'm questioning that it

17   doesn't have to do with PCPC is because I am

18   citing to a deposition of their employee.  So

19   I need to -- I would -- to affirm it, though,

20   I'd need to -- I don't want to say that

21   100 percent the answer to your question is

22   this is the evidence, but I believe that I

23   would need to go here to confirm one way or

24   the other.  But certainly I would -- this

25   raises suspicion about that for me.

Confidential - Pursuant to Protective Order

Page 367

1          Q.      You have no evidence that PCPC

2     ever retained the Center for Regulatory

3     Effectiveness; is that correct?

4          A.      I believe my evidence is hiring

5     through Imerys, but let me look to make sure

6     that is true.

7          Q.      Why don't you look at page --

8     or I'm sorry, paragraph 95, page 63.

9          A.      That's where I am.  That's

10    where I am, so let me read what I have here

11    because it's been a while since I've read

12    this paragraph.

13              So the question is, do I have

14    in evidence this paragraph that PCPC directly

15    hired the CRE?

16              No, that is not provided by

17    this paragraph.

18         Q.      Okay.

19         A.      However, in this paragraph,

20    based on these documents that I'm seeing and

21    I'm -- my memory of what is discussed,

22    certainly I believe PCPC would have been

23    aware of the interaction of CRE at these time

24    points when I'm talking about this event --

25    these events.

Confidential - Pursuant to Protective Order

Page 368

1        Q.      What evidence do you have of

2    that?

3        A.      Based upon the close

4    interaction between PCPC, Imerys and Johnson

5    & Johnson throughout these time periods when

6    different actions were being taken to comment

7    or to submit information on behalf of

8    industry.

9        Q.      Do you have a single document

10   you can point to or is that an assumption?

11       A.      That is something I seem to

12   remember based on my review of these

13   documents, but if you need a document, I

14   would have to -- have to go and look for it.

15       Q.      Sitting here today, you can't

16   recall?

17       A.      I can't give you a specific

18   document as I sit here today, no.

19            MR. LOCKE:  I have no further

20       questions.

21            MR. MEADOWS:  Yeah, short

22       break.  Maybe we're done, maybe we're

23       not.

24            VIDEOGRAPHER:  We are going off

25       the record at 4:30 p.m.

Confidential - Pursuant to Protective Order

                                                    Page 369

 1              (Off the record at 4:30 p.m.)
 2                   VIDEOGRAPHER:  We are back on
 3          the record at 4:45 p.m.
 4                   CROSS-EXAMINATION
 5     QUESTIONS BY MS. PARFITT:
 6          Q.     All right.  Dr. Plunkett, good
 7     afternoon.  I know it's been a long day.
 8                   Dr. Plunkett, you were asked
 9     throughout the course of the day about
10     different constituents which are part of the
11     talcum powder products.
12                   Do you recall those questions?
13          A.     Yes.
14          Q.     All right.  If -- without going
15     through each and every one of different
16     constituents that we've talked about that are
17     contained or could be contained in the talcum
18     powder products, if they are present, do
19     those various constituents present and
20     provide biologically plausible evidence that
21     talcum powder products can increase the risk
22     of ovarian cancer?
23                   MS. BOCKUS:  Object to the
24          form.
25                   THE WITNESS:  Yes, which is --

Confidential - Pursuant to Protective Order

Page 370

1          I think I have a couple of paragraphs
2          where I talk about that issue.  It has
3          to do -- there's other information as
4          well, but that is a key piece of that
5          information.  And I focused on mode of
6          action and additivity.  That's on
7          mechanism, biologic plausibility.
8               So the fact that you have a
9          variety of constituents that have a
10         known cancer hazard that share a mode
11         of action, that increases your
12         confidence in the biologic
13         plausibility of that relationship
14         between ovarian cancer and exposure to
15         talc body powders, yes.
16               MS. PARFITT:  Thank you.  I
17         have no further questions.  Thank you
18         very much, Dr. Plunkett.  And a happy
19         holiday to you.
20               THE WITNESS:  Thank you.
21               MS. BRANSCOME:  I have no
22         questions.
23               MS. BOCKUS:  No questions.
24               VIDEOGRAPHER:  The time now is
25         4:47 p.m.  This concludes the

Confidential - Pursuant to Protective Order

Page 371

1          deposition, and we are going off the

2          record.

3      (Deposition concluded at 4:47 p.m.)

4                 - - - - - - -

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Confidential - Pursuant to Protective Order

Page 372

1                    CERTIFICATE
2
3           I, CARRIE A. CAMPBELL, Registered
   Diplomate Reporter, Certified Realtime
4  Reporter and Certified Shorthand Reporter, do
   hereby certify that prior to the commencement
5  of the examination, Laura Plunkett, Ph.D.,
   DABT was duly sworn by me to testify to the
6  truth, the whole truth and nothing but the
   truth.
7
           I DO FURTHER CERTIFY that the
8  foregoing is a verbatim transcript of the
   testimony as taken stenographically by and
9  before me at the time, place and on the date
   hereinbefore set forth, to the best of my
10 ability.
11          I DO FURTHER CERTIFY that I am
   neither a relative nor employee nor attorney
12 nor counsel of any of the parties to this
   action, and that I am neither a relative nor
13 employee of such attorney or counsel, and
   that I am not financially interested in the
14 action.
15
16
17     _____
       CARRIE A. CAMPBELL,
18     NCRA Registered Diplomate Reporter
       Certified Realtime Reporter
19     California Certified Shorthand
       Reporter #13921
20     Missouri Certified Court Reporter #859
       Illinois Certified Shorthand Reporter
21     #084-004229
       Texas Certified Shorthand Reporter #9328
22     Kansas Certified Court Reporter #1715
       Notary Public
23
       Dated:  12/20/18
24
25

Golkow Litigation Services - 877.370.DEPS

Confidential - Pursuant to Protective Order

Page 373

1                    INSTRUCTIONS TO WITNESS

2

3              Please read your deposition over
4    carefully and make any necessary corrections.
5    You should state the reason in the
6    appropriate space on the errata sheet for any
7    corrections that are made.
8                    After doing so, please sign the
9    errata sheet and date it.  You are signing
10   same subject to the changes you have noted on
11   the errata sheet, which will be attached to
12   your deposition.
13                   It is imperative that you return
14   the original errata sheet to the deposing
15   attorney within thirty (30) days of receipt
16   of the deposition transcript by you.  If you
17   fail to do so, the deposition transcript may
18   be deemed to be accurate and may be used in
19   court.
20

21

22

23

24

25

Page 374

1                  ACKNOWLEDGMENT OF DEPONENT

2

3

4           I,_____, do
    hereby certify that I have read the foregoing
5   pages and that the same is a correct
    transcription of the answers given by me to
6   the questions therein propounded, except for
    the corrections or changes in form or
7   substance, if any, noted in the attached
    Errata Sheet.

8

9

10

11

12   _____

    Laura Plunkett, Ph.D., DABT          DATE
13

14

15   Subscribed and sworn to before me this
16   _____ day of _____, 20 _____.
17   My commission expires: _____

18

19   Notary Public

20

21

22

23

24

25

Confidential - Pursuant to Protective Order

Page 375

1                    - - - - - - -

                        ERRATA

2                    - - - - - - -

3    PAGE     LINE    CHANGE/REASON

4    _____    _____   _____

5    _____    _____   _____

6    _____    _____   _____

7    _____    _____   _____

8    _____    _____   _____

9    _____    _____   _____

10   _____    _____   _____

11   _____    _____   _____

12   _____    _____   _____

13   _____    _____   _____

14   _____    _____   _____

15   _____    _____   _____

16   _____    _____   _____

17   _____    _____   _____

18   _____    _____   _____

19   _____    _____   _____

20   _____    _____   _____

21   _____    _____   _____

22   _____    _____   _____

23   _____    _____   _____

24   _____    _____   _____

25

Confidential - Pursuant to Protective Order

Page 376

1                          - - - - - - -

                        LAWYER'S NOTES

2                          - - - - - - -

3      PAGE    LINE

4      _____   _____   _____

5      _____   _____   _____

6      _____   _____   _____

7      _____   _____   _____

8      _____   _____   _____

9      _____   _____   _____

10     _____   _____   _____

11     _____   _____   _____

12     _____   _____   _____

13     _____   _____   _____

14     _____   _____   _____

15     _____   _____   _____

16     _____   _____   _____

17     _____   _____   _____

18     _____   _____   _____

19     _____   _____   _____

20     _____   _____   _____

21     _____   _____   _____

22     _____   _____   _____

23     _____   _____   _____

24     _____   _____   _____

25