# EXHIBIT 48

Michael Crowley, Ph.D.

```
1           IN THE UNITED STATES DISTRICT COURT
2        FOR THE EASTERN DISTRICT OF NEW JERSEY
3                        - - -
4

   IN RE:  JOHNSON &          :
5  JOHNSON TALCUM POWDER       :
   PRODUCTS MARKETING,         :
6  SALES PRACTICES, AND        :  NO. 16-2738
   PRODUCTS LIABILITY          :  (FLW)(LHG)
7  LITIGATION                  :
                               :
8  THIS DOCUMENT RELATES       :
   TO ALL CASES                :
9

10                       - - -
11              January 4, 2019
12                       - - -
13

14           Videotaped deposition of Michael
   Crowley, Ph.D., produced as a witness at the
15 instance of the Defendant, Johnson & Johnson
   entities, and duly sworn, was taken in the
16 above-styled and numbered cause on the 4th
   day of January, 2019, from 9:07 a.m. to
17 5:59 p.m., before Steven Stogel, CSR in and
   for the State of Texas and Certified LiveNote
18 Reporter, reported by machine shorthand the
   Hilton Austin Hotel, 500 East 4th Street,
19 Austin, Texas, pursuant to the Federal Rules
   of Civil Procedure and the provisions stated
20 on the record or attached hereto.

21                       - - -
22

            GOLKOW LITIGATION SERVICES
23     877.370.3377 ph | 917.591.5672 fax
                  deps@golkow.com
24
```

Page 2

1  APPEARANCES:
2
   BEASLEY ALLEN LAW FIRM
3  BY: P. LEIGH O'DELL, ESQ.
   BY: MARGARET M. THOMPSON, ESQ.
4  218 Commerce Street
   Montgomery, Alabama 36104
5  (800) 898-2034
   leigh.odell@beasleyallen.com
6  Margaret.Thompson@BeasleyAllen.com
7    - and -
8  BURNS CHAREST, LLP
   BY: AMANDA KLEVORN, ESQ.
9  365 Canal Street, Suite 1170
   New Orleans, Louisiana 70130
10 (504) 799-2847
   aklevorn@burnscharest.com
11 Representing the Plaintiffs'
   Steering Committee
12
13 TUCKER ELLIS, LLP
   BY: MICHAEL C. ZELLERS, ESQ.
14 515 South Flower Street
   Forty Second Floor
15 Los Angeles, California 90071-2223
   (213) 430-3301
16 michael.zellers@tuckerellis.com
17   - and -
18 SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
   BY: GEOFFREY M. WYATT, ESQ.
19 1440 New York Avenue N.W.
   Washington, DC 20005
20 (202) 371-7008
   geoffrey.wyatt@skadden.com
21 Representing the Defendant, Johnson &
   Johnson entities
22
23
24

Page 3

1  APPEARANCES: (Cont'd)
2
3  GORDON & REES, LLP
   BY: KENNETH J. FERGUSON, ESQ.
4  816 Congress Avenue, Suite 1510
   Austin, Texas 78701
5  (512) 391-0197
   kferguson@gordonrees.com
6    - and -
7  COUGHLIN DUFFY, LLP
   BY: JONATHAN F. DONATH, ESQ.
8  350 Mount Kemble Avenue
   Morristown, New Jersey 07962
9  (973) 267-0058
   jdonath@coughlinduffy.com
10 Representing the Defendant, Imerys
   Talc America, Inc.
11
12 TUCKER ELLIS, LLP
   BY: SANDRA J. WUNDERLICH, ESQ.
13 100 South Fourth Street, Suite 600
   Saint Louis, Missouri 63102
14 (314) 256-2550
   sandra.wunderlich@tuckerellis.com
15 Representing the Defendant, PTI
   Royston LLC and PTI Union LLC
16
17 SEYFARTH SHAW, LLP
   BY: RENEE APPEL, ESQ.
18 (Via Telephone)
   975 F Street, N.W.
19 Washington, DC 20004
   (202) 828-5371
20 rappel@seyfarth.com
   Representing the Defendant, Personal
21 Care Products Counsel (PCPC)
22
   ALSO PRESENT:
23 MR. SHANE RAMIREZ, Videographer
24

Page 4

1         - - -
2       I N D E X
3         - - -
4
   Testimony of:     MICHAEL CROWLEY, Ph.D.
5
6    By Mr. Zellers          9, 364
7    By Mr. Ferguson       333, 367
8    By Ms. Appel            339
9    By Ms. O'Dell         341, 367
10
11        - - -
12      E X H I B I T S
13        - - -
14 NO.      DESCRIPTION           PAGE
15 1.   Notice of Deposition      11
16 2.   Invoices from Theridian    13
        Technologies
17
   3.   Cross-Reference of CAS    18
18      Numbers
19 4.   FDA Guidance Document     21
20 5.   Book Entitled "Excipient   22
        Toxicity and Safety"
21
22 6.   Thumb Drive with Report of  23
        Dr. Crowley and Underlying
23      Data
24 7.   Report of Dr. Crowley     25

Page 5

1         - - -
2       E X H I B I T S (Cont'd)
3         - - -
4 NO.      DESCRIPTION           PAGE
5 8.   Curriculum Vitae of       26
        Dr. Crowley
6
7 9.    Reference Section from     26
        Dr. Crowley's Report
8 10.   Sources Considered Section  29
        from Dr. Crowley's Report
9
10 11.  EPA Article Entitled "Basic  85
        Information about Scientific
11      Integrity
12 12.  Office of Research Integrity  89
        Article Entitled "Definition
13      of Research Misconduct"
14 13.  Anne C. Steinemann Article   96
        Entitled "Fragranced Consumer
15      Products and Undisclosed
        Ingredients"
16 14.  Wikipedia Entry for "Mucous  100
        Membrane"
17
18 15.  The MSDS HyperGlossary:    103
        Sensitizer
19 16.  EPA Article Entitled "The   120
        NRC Risk Assessment Paradigm
20
21 17.  Cosmetic Ingredient Review   155
        Procedures June 2018
22 18.  IFRA Document Entitled      157
        "About the Standards"
23
24



Page 6

- - -
E X H I B I T S  (Cont'd)
- - -

NO.      DESCRIPTION                    PAGE
19.    Index of IFRA Standards -        163
       48th Amendment

20.    IFRA Standard - Peru Balsam      167
       Extracts and Distillates
21.    IFRA Standard - Peru Balsam      171
       Crude

22.    Article Entitled "FDA            173
       Removes 7 Synthetic Flavoring
       Substances from Food
       Additives List"
23.    Article Entitled "Evaluating     177
       the Potential Genotoxicity
       of Phthalates Esters (PAEs)
       in Perfumes Using In Vitro
       Assays
24.    GHS Info Sheet No. 7 -           203
       Carcinogenicity

25.    IARC Monographs on the           239
       Evaluation of Carcinogenic
       Risks to Humans - Preamble

26.    IARC Monograph Excerpts for      245
       Styrene
27.    IARC Monograph Excerpts for      258
       d-Limonene

28.    IARC Monograph Excerpts for      263
       Coumarin
29.    IARC Monograph Excerpts for      269
       Eugenol

Page 7

- - -
E X H I B I T S  (Cont'd)
- - -

NO.      DESCRIPTION                    PAGE
30.    IARC Monograph Excerpts for      275
       Benzophenone

31.    SCHER Opinion on                 290
       Classification of Musk Ketone
32.    Defendant Johnson & Johnson      346
       Consumer Inc.'s Supplemental
       Answer to Plaintiffs' Second
       Set of Interrogatories No. 19

33.    Johnson's Baby Powder            349
       Fragrance Ingredients
34.    Shower to Shower Fragrance       351
       Ingredients

35.    Changes to Johnson's Baby        352
       Powder Fragrance Ingredients

Page 8

- - -
DEPOSITION SUPPORT INDEX
- - -

Direction to Witness Not to Answer
PAGE   LINE
None.

Request for Production of Documents
PAGE   LINE
16    11

Stipulations
PAGE   LINE
None.

Questions Marked
PAGE   LINE
None.

Page 9

- - -
1   THE VIDEOGRAPHER:  Here begins
2   the deposition of Dr. Michael Crowley.
3   Today's date is January 4th, 2019.  The
4   time is 9:07 a.m.
5       Will the court reporter please
6   swear in the witness?
7       (Witness sworn)
8       MR. ZELLERS:  At the outset, the
9   Johnson & Johnson defendants make an
10  objection to anyone attending this
11  deposition remotely as the deposition
12  protocol order does not provide for
13  remote attendance.  We can begin.
14      MICHAEL CROWLEY, Ph.D.,
15  having been first duly sworn, testified as
16  follows:
17          - - -
18        EXAMINATION
19          - - -
20  BY MR. ZELLERS:
21      Q.    Can you state your name, please?
22      A.    Michael Crowley.
23      Q.    Dr. Crowley, you are here to

Page 10

1  provide a deposition as an expert witness on
2  behalf of the plaintiffs.  Is that right?
3      A.    Yes.
4      Q.    You've given deposition
5  testimony in the past?
6      A.    Yes.
7      Q.    On how many occasions?
8      A.    I believe four.
9      Q.    What types of cases were those?
10      A.    Patent disputes and one contract
11  dispute.
12      Q.    You are familiar with the
13  general rules we're going to follow.
14  Correct?
15      A.    Yes.
16      Q.    If at any time I ask you a
17  question or any of the counsel ask you a
18  question that you don't understand, please
19  don't answer it.  Tell us you don't
20  understand, and I will repeat or rephrase the
21  question so it is clear to you.  Can you do
22  that?
23      A.    Yes.
24      Q.    If you answer a question, then

Page 11

1  we will assume that you understood it.  Is
2  that fair?
3      A.    Yes.
4      Q.    You are here today pursuant to a
5  notice of deposition.  Is that right?
6      A.    I was never given a notice.
7      Q.    Let me provide you with a notice
8  of deposition, which we'll mark as Deposition
9  Exhibit 1.
10          (Exhibit No. 1 marked)
11          MS. O'DELL:  We'll just add that
12      objections to the notice have been --
13      objections have been served to certain
14      document requests that have been issued
15      in the notice, so I would just reassert
16      those objections at this point.
17          Prior to the beginning of the
18      deposition, I provided materials in
19      response to the document request that
20      plaintiffs deem non-objectionable, so
21      just so the record is clear on that.
22  BY MR. ZELLERS:
23      Q.    Dr. Crowley, you have not seen
24  the notice of deposition, Exhibit 1, before.

Page 12

1  Is that correct?
2      A.    That's correct.
3      Q.    At some point today on a break,
4  if you could just read through the document
5  request and the notice of deposition, because
6  I'd like to ask you the question, "Have you
7  produced all responsive documents?"  Can you
8  do that at some point today?
9      A.    Yes.
10      Q.    You have in front of you your
11  computer.  For what purpose do you have your
12  computer open today?
13      A.    My report and the materials that
14  I viewed generating that report on it.
15      Q.    Anything else on the computer
16  that you have with you here today --
17      A.    Well, yes.
18      Q.    -- that's pertinent to this
19  deposition?
20      A.    I don't think so.  I mean, I
21  have scientific information on there that I
22  use in the normal course of doing my business
23  that are on the computer.
24      Q.    Prior to the start of the

Page 13

1  deposition, Counsel for the plaintiffs
2  produced to us certain documents.  I will
3  mark those.
4          (Exhibit No. 2 marked)
5  BY MR. ZELLERS:
6      Q.    First is a series of invoices.
7  We'll mark your invoices as Deposition
8  Exhibit 2.
9          Just quickly going through the
10  invoices, it appears that the initial
11  invoice -- or at least the top invoice is for
12  Wednesday, May 30th, 2018.
13          Is that around the time that you
14  were retained in this matter?
15      A.    I believe so.
16      Q.    The invoices are addressed to
17  Ms. O'Dell at the Beasley Allen firm.  Is
18  that the firm that has retained you with
19  respect to the work you've done in the talc
20  MDL?
21      A.    Yes.
22      Q.    The first page of Exhibit 2 is
23  Invoice 8015.  We have Invoice 800 -- strike
24  that -- 8022, Invoice 8027, Invoice 8035,

Page 14

1  Invoice 8041, Invoice 8043, with the last
2  time entry on Invoice 8043 being October of
3  2018.
4          Are these all of the invoices
5  that you have generated in the talc MDL
6  matter?
7      A.  No.
8      Q.  What additional invoices have
9  you generated in the talc MDL matter?
10     A.  Since that time, I've done some
11 more work in preparing the document, my
12 report, that I haven't submitted yet.  I'll
13 submit an invoice for appearing here today.
14         MS. O'DELL:  I think there was
15     some confusion there.
16         MR. ZELLERS:  I'll clear it up.
17 BY MR. ZELLERS:
18     Q.  It appears that you are a
19 regular biller in that each of the invoices
20 are done at the end of each month.  Is that
21 your typical billing practice?
22     A.  Yes.
23     Q.  So we have invoices that are
24 generated on a monthly basis through the

Page 15

1  invoices that -- or invoice that was
2  generated on November 1st of 2018.  Is that
3  right?
4      A.  Yes.
5      Q.  Did you generate an invoice on
6  December 1st of 2018?
7      A.  I believe I have, yeah.
8      Q.  Do you have that here with you
9  today?
10     A.  I have it on my computer.
11     Q.  All right.  You can print it
12 here today?
13     A.  I believe so.  I don't have
14 access to a printer, but if you can get me
15 access to a printer, I'll print it.
16         MS. O'DELL:  I thought we had
17     all the invoices in the stack I gave
18     you.  I will endeavor at a break to get
19     the second -- the last invoice.  Just
20     an oversight.
21 BY MR. ZELLERS:
22     Q.  Dr. Crowley, did you issue an
23 invoice on or about January 1st or 2nd --
24     A.  No.

Page 16

1      Q.  -- of 2019?
2      A.  No.
3      Q.  The last invoice --
4      A.  I'd have to go check when my
5  last invoice was.  We sent the report in in
6  November, I think, so it was probably at the
7  end of November.
8      Q.  What I would like to do is to
9  come back to this set of questions after the
10 break.
11         MR. ZELLERS:  And, Ms. O'Dell,
12     if you could just check to see if there
13     are additional invoices.
14 BY MR. ZELLERS:
15     Q.  What is your recollection of the
16 amount of time that you've spent on this
17 matter, the talc MDL matter, during the month
18 of November?
19     A.  I have no recollection.  I'd
20 have to go check the document.
21     Q.  Are you able to give me an
22 estimate?
23     A.  Well, I'll pull up the document
24 if you'd like.

Page 17

1      Q.  My question is:  Can you give us
2  an estimate?
3      A.  I'd prefer not.  I'd prefer just
4  to look at my invoice and tell you what it
5  says.
6      Q.  Can you give us an estimate as
7  to the amount of time that you spent in
8  December of 2018 relating to the talc MDL
9  matter?
10     A.  (No audible response)
11     Q.  You're pulling something up on
12 your computer.  Is that correct?
13     A.  Uh-huh.
14     Q.  Okay.  Do you need to do that in
15 order to try to answer that question?
16     A.  I do.  I don't recall -- I don't
17 think there were many hours in December.
18         MS. O'DELL:  Just testify to
19     your recollection, Dr. Crowley, and to
20     the degree there's been an invoice
21     produced -- or given to us that I
22     haven't produced, as I mentioned to
23     Counsel, that's an oversight.  It was
24     not intentional.  I'll get that to you.

Michael Crowley, Ph.D.

Page 18

1    But to the degree you have a
2    memory or an estimate of hours, that's
3    fine.  Just give an estimate.
4        A.    Yeah.  I think in December it
5    was less than hours.
6    BY MR. ZELLERS:
7        Q.    Do you have an estimate for
8    November?
9        A.    I really -- I mean, I don't.
10        Q.    How much time have you spent
11    during the first few days of this year, 2019,
12    in preparation for the deposition here today?
13        A.    Less than ten.
14        Q.    The next document that you
15    brought with you today -- or that has been
16    produced by counsel for the plaintiffs
17    appears to be a supplement to your report.
18    We will mark that as Deposition Exhibit 3.
19            (Exhibit No. 3 marked)
20    BY MR. ZELLERS:
21        Q.    Deposition Exhibit 3 consists
22    of -- it appears to be nine pages of
23    information.  The first page at the top has
24    got a fragrance chemical description.  The

Page 19

1    next column, J&J CAS number.  The next
2    column, Crowley CAS number, and then
3    comments.
4            Can you tell us what Exhibit 3
5    is?
6        A.    Yes.  I think two or three days
7    prior to submission of my expert report, we
8    were provided with a document from J&J that
9    disclosed the chemical abstract service
10    numbers for all of the fragrance chemicals.
11    When I initiated work on this, I didn't have
12    CAS numbers, so I had to identify them for
13    the chemicals as I had been given them.
14            So this document is a
15    cross-reference that compares the CAS numbers
16    provided by J&J to those that I identified
17    for the fragrance chemicals and describes if
18    there is a dif- -- what these differences are
19    and if it has any bearing on the data in my
20    report.
21        Q.    How, if at all, does the
22    information contained in Deposition Exhibit 3
23    change or alter any of the opinions that
24    you're offering in this matter?

Page 20

1        A.    No changes to my opinions.
2        Q.    When did you prepare Deposition
3    Exhibit 3?
4        A.    It was before Christmas, I
5    believe.
6        Q.    Can you be any more precise than
7    that?
8        A.    Yes.  I'll tell you the date.
9        Q.    Well, again, we don't want you
10    to make this an exercise where you try to
11    look up each answer.  If you have a rough --
12        A.    I finished it on December 18th.
13        Q.    Thank you.  Have you made any
14    other changes or updates to your report?
15        A.    No.
16        Q.    You said that information was
17    provided to you shortly before you produced
18    your report.  Is that right?
19        A.    Yes.
20        Q.    My recollection is that you
21    produced a report in this matter and then a
22    week or two later you produced an updated
23    report.  Is that right?
24        A.    No.

Page 21

1        MS. O'DELL:  No.  Object to the
2    form.
3        MR. ZELLERS:  All right.  I'll
4    ask some specific questions when I get
5    to that.
6    BY MR. ZELLERS:
7        Q.    Your recollection is you have
8    only produced one report --
9        A.    That's --
10        Q.    -- in this matter?
11        A.    That's correct.
12        Q.    The next item that was produced
13    today in connection with your deposition by
14    counsel for plaintiffs is Deposition
15    Exhibit 4.
16            (Exhibit No. 4 marked)
17    BY MR. ZELLERS:
18        Q.    It appears to be an -- well, the
19    title of Deposition Exhibit 4 is "Guidance
20    for Industry Nonclinical Studies for the
21    Safety Evaluation of Pharmaceutical
22    Excipients."
23            What is Deposition Exhibit 4?
24        A.    This is an FDA guidance document

Page 22

1 describing how pharmaceutical excipients
2 are -- inactive ingredients are to be
3 examined for safety.
4    Q.    For what purpose did you bring
5 Deposition Exhibit 4 today?
6    A.    This represents the FDA's
7 current thinking on how to examine inactive
8 ingredients for safety.
9    Q.    What's the date of --
10    A.    This was issued in May of 2005.
11    Q.    That is the most up-to-date
12 guidance document from the FDA.  Is that
13 right?
14    A.    I believe so.
15    Q.    Do you believe that that
16 document applies to fragrance chemicals that
17 you're talking about here today?
18    A.    Yes.
19    Q.    Deposition Exhibit No. 5 is a
20 textbook.
21        MR. ZELLERS:  We'll make
22    arrangements or figure out how to make
23    this a part of the record.
24        (Exhibit No. 5 marked)

Page 23

1 BY MR. ZELLERS:
2    Q.    But it's titled "Excipient
3 Toxicity and Safety," edited by Myra Weiner
4 and Lois Kotkoskie, Volume 103.
5    A.    Marcel Dekker is the publisher.
6    Q.    It appears to be a 2007
7 publication.  Can you tell us generally what
8 Exhibit 5 is?
9    A.    It's a book describing how
10 toxicity and safety studies are to be
11 conducted for inactive ingredients.
12    Q.    For what purpose have you
13 brought with you Exhibit 5 today?
14    A.    For reference.
15    Q.    Finally, you have brought with
16 you -- or has been produced through counsel
17 for plaintiffs a thumb drive, which we will
18 mark as Deposition Exhibit 6.
19        (Exhibit No. 6 marked)
20 BY MR. ZELLERS:
21    Q.    Are you familiar with Deposition
22 Exhibit 6?
23    A.    Yes.
24    Q.    Can you tell us what documents

Page 24

1 or information is contained on Exhibit 6?
2    A.    This has my expert report and
3 the underlying data upon which I relied to
4 generate that report.
5        Is it okay if I go ahead and
6 plug it in, or is that for you?
7    Q.    Do you need to plug it in, or is
8 it already on your computer?
9    A.    It's already there.
10    Q.    No.  Put that aside, and we'll
11 have the court reporter make a copy of that,
12 and that will be a part of this record.
13        Is there anything new or
14 additional on the thumb drive which we have
15 marked as Exhibit 6 that has either not been
16 produced here today or was a part of your
17 report?
18    A.    I don't believe so.
19        MR. O'DELL:  No.  I can just say
20    that because I prepared the jump drive.
21        I think it might be just quicker
22    to use the jump drive to pull up
23    documents because of the internet
24    access in this room.  So I'll just make

Page 25

1    that as an observation.  If you don't
2    have any objection to him using the
3    jump drive -- you're welcome to -- to
4    look at it in advance, but --
5 BY MR. ZELLERS:
6    Q.    Dr. Crowley, if, as we go along,
7 you need to make reference to the jump drive,
8 you know, please do.  Tell us that you're
9 going to be making a reference to it so we're
10 all aware as to what you're doing and what
11 documents you are reviewing.
12        I do intend to give you hard
13 copies of the documents that I have questions
14 about, but if you need to plug in the jump
15 drive and refer to it, it's okay with me, as
16 long as you state on the record what it is
17 you're doing.
18    A.    Okay.
19    Q.    Your report in this matter we
20 will mark as Deposition Exhibit 7.
21        (Exhibit No. 7 marked)
22 BY MR. ZELLERS:
23    Q.    Can you review Deposition
24 Exhibit 7 and tell us if that is your report?

Page 26

1    A.    It looks like it, yes.
2         MS. O'DELL:  You're happy to
3    offload whatever you have?
4         MR. ZELLERS:  Exactly.  I'm
5    going to insist that you all take a
6    copy of Dr. Crowley's report.
7    BY MR. ZELLERS:
8    Q.    A part of your report is your
9    curriculum vitae or CV.  Let's mark that as
10   Deposition Exhibit 8.
11        (Exhibit No. 8 marked)
12   BY MR. ZELLERS:
13   Q.    And if you will just identify
14   for us what Deposition Exhibit 8 is?
15   A.    It's my CV.
16   Q.    Is Deposition Exhibit 8 your
17   current and up-to-date curriculum vitae?
18   A.    Yes.
19        (Exhibit No. 9 marked)
20   BY MR. ZELLERS:
21   Q.    Deposition Exhibit 9 is a
22   four-page document.  It is from your report,
23   which is Exhibit 7.  Deposition 9 are
24   Pages 66 through 69 of your report, and the

Page 27

1    caption at the top is "References."
2         Can you look at Deposition
3    Exhibit 9 and tell us what that is?
4    A.    This appears to be the reference
5    section from my report.
6    Q.    What -- strike that.
7         How do you use the term
8    "reference"?  What do you mean by "reference"
9    when you put that --
10   A.    These are items that I cited
11   within the report.
12        MS. O'DELL:  Do you need me to
13   give something back?
14        MR. ZELLERS:  No.  But this will
15   be 10 as well as what I'm handing to
16   you.
17        MS. O'DELL:  Okay.
18        MR. ZELLERS:  The witness just
19   has 9 right now, which is the first
20   document.
21        MS. O'DELL:  Okay.
22   BY MR. ZELLERS:
23   Q.    References to you, in which
24   you're referring to, are the materials that

Page 28

1    you cite to in your report.  Is that right?
2    A.    In the body of the report,
3    that's correct.  There were more things that
4    I cited in the appendices.
5    Q.    Are the appendices a part of
6    your report?
7    A.    Yes.
8    Q.    The references, what we have
9    marked as Exhibit 9, is that a complete
10   listing of all the citations in your report,
11   including appendices?
12   A.    No.
13        MS. O'DELL:  Object to form.
14   A.    Yeah.  No.  There were reports
15   from the literature, internet links within
16   the appendices that do not appear in
17   Section 7 of my report.
18   BY MR. ZELLERS:
19   Q.    In order, then, for counsel in
20   this case to understand what is cited in your
21   report, we need to look at the body of the
22   report and take a look at the list of
23   references.  Is that correct?
24   A.    You need to look at the entire

Page 29

1    report, the body of the report and the
2    appendices.
3    Q.    Did you prepare the reference
4    list?
5    A.    I did.
6         (Exhibit No. 10 marked)
7    BY MR. ZELLERS:
8    Q.    Deposition Exhibit 10 also comes
9    from your report, Pages 15, 16, and 17.  I'm
10   looking at the section of Deposition
11   Exhibit 10 that begins "Sources Considered."
12        Can you take a look at
13   Exhibit 10 and tell us what that refers to?
14   A.    This is a list of sources that I
15   considered during the generation of my
16   report.
17   Q.    What is the difference between
18   the references and the sources that you
19   considered?
20   A.    Well, references are things that
21   I cited, and sources considered are things
22   that I looked at.
23   Q.    Is the listing of sources
24   considered, Deposition Exhibit 10, a complete

Michael Crowley, Ph.D.

Page 30

1 listing of the materials and sources that you
2 considered in preparing your report and in
3 developing your opinions in this case?
4     A.    I believe so.  I tried to
5 capture them all.  I may have missed a few.
6     Q.    How would you define the area of
7 expertise in which you're offering opinions
8 in this case?
9     A.    Chemistry, molecular
10 pharmaceutics, formulation science,
11 pharmacology, toxicology.
12     Q.    You consider yourself to be an
13 expert in each of those subject areas?
14     A.    I consider myself to be an
15 expert in chemistry and pharmaceutical
16 science, as well as formulation matters.
17     Q.    Anything else?
18     A.    I think that's a pretty good
19 descriptor.
20     Q.    Deposition Exhibit 7 is your
21 report in this case.  Does that report
22 contain all of the opinions that you intend
23 to offer as a witness in this matter?
24     A.    Yes.

Page 31

1     Q.    Is the report accurate?
2     A.    I believe it is.
3     Q.    Is it complete?
4     A.    I believe so.
5     Q.    Appendix A, which is a baby
6 powder fragrance chemical review, what was
7 the purpose of you preparing that appendix?
8     A.    I was asked to review the
9 physical and chemical properties of each of
10 these fragrance chemicals, and I created that
11 list to capture the results of the evidence
12 that I found.
13     Q.    How did you decide what
14 information to include in Appendix A?
15     A.    Well, I was asked a couple of
16 questions, as described in my report, and
17 that seemed to be a logical framework in
18 which to collate the information.
19         And, frankly, it's consistent
20 with how a formulation scientist would
21 consider inactive ingredients when creating a
22 new composition.  So you consider what are
23 the properties of these materials, both from
24 a chemical and biological perspective, what

Page 32

1 is the safety profile, and what's known about
2 it.
3     Q.    Are the opinions which you're
4 rendering in this case limited to the
5 fragrance components of the talcum powder
6 products manufactured by Johnson & Johnson
7 Consumer Products, Inc.?
8         MS. O'DELL:  Object to form.
9     A.    I'm not sure I understand your
10 question.
11 BY MR. ZELLERS:
12     Q.    The opinions that you are
13 rendering in this case, are they limited to
14 the fragrance components of the talcum powder
15 products manufactured by Johnson & Johnson
16 Consumer Products, Inc.?
17     A.    Yes.
18     Q.    And -- I'll strike that.
19         Can we agree that when I refer
20 to either products or talc products or baby
21 powder or Shower to Shower, that I'm
22 referring to the baby powder product
23 manufactured by Johnson & Johnson Consumer
24 Products, Inc., and the Shower to Shower

Page 33

1 product formerly manufactured by Johnson &
2 Johnson Consumer Products, Inc.?
3         MS. O'DELL:  Object to form.
4     A.    I can agree to that
5 understanding.
6 BY MR. ZELLERS:
7     Q.    You do not have an opinion -- or
8 not expressing any opinions in this case as
9 to whether or not talc products are
10 contaminated with asbestos.  Is that right?
11     A.    I was not asked to consider
12 that.
13     Q.    Do you think you have produced
14 in this matter all of your file relating to
15 the expert work that you have done?  And by
16 "produced," I mean in your report and as
17 supplemented by the exhibits that we've
18 marked here today.
19     A.    I believe so.
20     Q.    Did anyone assist you in
21 preparing your report?
22     A.    Yes.
23     Q.    Who assisted you in preparing
24 your report?

Page 34

1    A.    My wife.
2    Q.    Your wife's name is?
3    A.    Carrie, C-A-R-R-I-E, Asher,
4 A-S-H-E-R, Crowley.
5    Q.    What did Ms. Asher Crowley do to
6 assist you in preparing your report in this
7 matter?
8    A.    So she helped me identify some
9 of the fragrance chemicals.
10   Q.    Anything else?
11   A.    No.
12   Q.    Do you bill separately for the
13 services of your wife, Ms. Asher Crowley?
14   A.    Yes.
15   Q.    When I go back and I look
16 through the invoices that have been produced
17 and that we've marked as Exhibit 2, will I
18 see references to Ms. Asher Crowley?
19   A.    I think you'll see a different
20 bill rate for her time.
21   Q.    Your bill rate is what?
22   A.    $600 an hour.
23   Q.    Is your bill rate the same for
24 doing the review and preparation of the

Page 35

1 report as it is for sitting for a deposition
2 here today?
3    A.    Yes.
4    Q.    Is your hourly rate of $600 an
5 hour the same for any trial testimony or
6 hearing testimony that you may provide?
7    A.    Yes.
8    Q.    Ms. Asher Crowley, what is her
9 billing rate?
10   A.    I think it was $300 an hour.
11   Q.    Any other services or assistance
12 that Ms. Crowley provided to you in terms of
13 preparing your report and developing your
14 opinions in this matter?
15   A.    The opinions are mine.  She did
16 not provide any opinions.  She just simply
17 helped me identify some of the fragrance
18 chemicals.
19   Q.    Is there anything else that she
20 did other than help to identify some of the
21 fragrance chemicals?
22   A.    No.
23   Q.    Anyone else who assisted you in
24 the preparation of your report?

Page 36

1    A.    No.
2    Q.    Are you aware of any documents
3 relating to your review in this matter that
4 have not been identified either as sources
5 considered or in your reference list?
6    A.    I don't think so.  I mean, I've
7 seen some things in the news recently, but
8 they didn't impact my report.
9         MS. O'DELL:  I'll just add for
10        the record:  Other than what's been
11        marked as an exhibit here, just to make
12        it clear.
13        MR. ZELLERS:  Yes.
14   A.    I did my best to keep track of
15 and provide either -- in the references or,
16 you know, disclosed within sources considered
17 or within the appendices everything that I
18 looked at.
19 BY MR. ZELLERS:
20   Q.    When you were -- strike that.
21        Were you first contacted by
22 Ms. O'Dell to become involved as an expert in
23 this matter?
24   A.    No.  Margaret Thompson initially

Page 37

1 contacted me.
2    Q.    When Ms. Thompson contacted you,
3 you believe it was either April or May --
4 strike that.
5        You believe it was May of 2018?
6    A.    That's about the right
7 timeframe.
8    Q.    I'm looking at --
9    A.    I don't recall the exact date.
10   Q.    I'm looking at Deposition
11 Exhibit 2, and that appears to be the first
12 time entry that you have on this matter.
13 Does that refresh your recollection?
14   A.    I got a contact.  We went and
15 talked by phone and had a few additional
16 conversations before I agreed to take this
17 particular matter on.  So that would
18 represent -- what you're looking at is the
19 first item I billed.
20        And at the time that we first
21 met, I was very busy with some other
22 projects, and I couldn't start working on
23 this immediately.  So I don't recall the
24 exact date that we first met.  I signed a

Michael Crowley, Ph.D.

Page 38

1 protective order and engagement letter. I
2 would consider that when we first got
3 engaged. We can get you, you know, those
4 dates if you'd like.
5    Q.    Does April or spring -- strike
6 that.
7         Does April or May of 2018 sound
8 about right?
9    A.    Yes.
10    Q.    What did Ms. Thompson ask you to
11 do with respect to this matter?
12    A.    She indicated that she and her
13 colleagues were looking for an expert to
14 review the fragrance chemicals in the talcum
15 powder products and provide some additional
16 information.
17    Q.    When were you first asked to
18 prepare a report?
19    A.    I would say midsummer, June,
20 July.
21    Q.    Were you given any additional
22 instruction in terms of what plaintiffs'
23 counsel wanted you to do or were requesting
24 that you do in this matter around the time

Page 39

1 that you were asked to prepare a report?
2    A.    I mean, the two questions that
3 appear in my report were the instructions.
4    Q.    Did plaintiffs' counsel in the
5 talc MDL ask you to address any other
6 questions?
7    A.    I was briefly asked to consider
8 reviewing the flotation process used in the
9 talc manufacturing.
10    Q.    Did you decline that?
11    A.    I ran out of time. I didn't
12 have time.
13    Q.    You are expressing no opinions,
14 then, with respect to the flotation process
15 involved in the talc processing. Is that
16 right?
17         MS. O'DELL:  Object to form.
18    You may answer.
19    A.    Sorry. I couldn't hear you.
20         MS. O'DELL:  You may answer.
21 BY MR. ZELLERS:
22    Q.    Yeah. As we go along today,
23 Counsel will make some objections. She's
24 doing that just to protect the record. We'll

Page 40

1 deal with those objections at a later time.
2 So, once she has made her objection, you can
3 go ahead and answer the question as long as
4 you understand it.
5    A.    Okay. I'm sorry. Can you
6 repeat the question?
7    Q.    Sure. This additional topic
8 that you were asked to consider by
9 plaintiffs' counsel, you never got to the
10 point of considering it or formulating any
11 opinions. Is that right?
12    A.    I did put some time in
13 considering it, but I ran out of time to
14 properly research it, and I think I won't be
15 rendering an opinion on it today.
16    Q.    Any other topics that you were
17 asked to address by either Ms. Thompson or
18 any of the counsel for plaintiffs in this
19 matter?
20    A.    No.
21    Q.    Originally defense counsel were
22 provided with a report that was dated
23 November 12th of 2018. We then received a
24 second slightly revised report around

Page 41

1 December 4th of 2018. Are you familiar with
2 that?
3    A.    No. I think -- I think
4 Ms. O'Dell told me that they originally
5 submitted an unsigned copy, and when they
6 recognized that, they resubmitted the signed
7 copy, something to that effect.
8         MS. O'DELL:  I would just state
9    for the record the incorrect PDF was
10    put in the Dropbox. That's what
11    happened. So -- and then once we
12    realized that, we provided the correct
13    version.
14 BY MR. ZELLERS:
15    Q.    Deposition Exhibit 7 is your
16 final report with respect to this matter. Is
17 that right?
18    A.    I believe so.
19    Q.    That is the report that contains
20 all of the opinions that you intend to
21 express in the talc MDL. Is that right?
22    A.    Yes.
23    Q.    Have you been disclosed as an
24 expert in any other talcum powder proceeding

Michael Crowley, Ph.D.

Page 42

1  aside from this matter, the talc MDL?
2      A.   No.
3      Q.   Have you done any expert work or
4  consulting work in any other talcum powder
5  matters?
6      A.   No.
7      Q.   What percentage -- well, strike
8  that.
9          You work for a consulting firm.
10 Is that right?
11     A.   I own a consulting firm.
12     Q.   The name of that consulting firm
13 is what?
14     A.   Theridian Technologies, LLC.
15     Q.   Do you devote 100 percent of
16 your professional time to your work for that
17 consulting firm?
18     A.   No.
19     Q.   What percent or -- strike that.
20         What percent of your
21 professional time do you devote to your
22 consulting firm Theridian Technologies?
23     A.   Somewhere between two-thirds and
24 three-quarters, I would say.

Page 43

1      Q.   How do you spend your other
2  professional time?
3      A.   I co-founded a startup called --
4  it was originally called Oticus Laboratories.
5  It's -- it's been renamed Oticara
6  Corporation.  I've recently closed a
7  significant funding round.  We're doing
8  clinical studies.
9          And I serve on the board of
10 another company, so --
11         THE REPORTER:  Of another
12     company?
13         THE WITNESS:  Yes.
14         THE REPORTER:  Try to keep your
15     voice up for me.
16         THE WITNESS:  Sorry.
17 BY MR. ZELLERS:
18     Q.   What is the name of the company
19 that you serve on the board of?
20     A.   Texas EnteroSorbents.
21     Q.   Is it accurate that anywhere
22 from two-thirds to three-quarters of your
23 professional time are spent by you working as
24 a consultant?

Page 44

1      A.   Yes.
2      Q.   Are there any employees of
3  Theridian Technologies, LLC, other than
4  yourself?
5      A.   My wife.
6      Q.   Any others?
7      A.   No.
8      Q.   You -- strike that.
9          What percent of your time at
10 Theridian Technologies involves legal or
11 litigation consulting?
12     A.   Time, probably 25 percent.
13     Q.   In terms --
14     A.   I mean, it varies.  I mean,
15 sometimes it's more than others, but over the
16 course of a year, maybe 25 percent.
17     Q.   In terms of income of Theridian
18 Technologies, what percent of income is
19 accounted for by legal consulting work?
20     A.   Again, it varies year to year.
21 It's probably somewhere in the 10 to
22 20 percent range.
23     Q.   You told us that you serve as an
24 expert in other cases.  Is that right?

Page 45

1      A.   Yes.
2      Q.   Is this the first time that you
3  have served as an expert in a case involving
4  an allegation of personal injuries?
5      A.   Yes.
6      Q.   Is this the first time that you
7  have served as an expert in a product
8  liability matter?
9      A.   Yes.
10     Q.   The depositions that you have
11 given -- strike that.
12         You have given, you thought,
13 four or five depositions previously?
14     A.   I think four.
15     Q.   Two of the matters you've
16 identified.  One as Grunenthal versus --
17     A.   It's pronounced Grunenthal.
18     Q.   Grunenthal versus Teva, and then
19 a second matter of Ciprodex.  What types of
20 matters were those?
21     A.   Patent disputes.
22     Q.   What areas of expertise were you
23 testifying in?
24     A.   Chemistry, formulation,

Page 46

1 stability.
2     Q.    Were you serving as an expert
3 for the plaintiff or the defense in those
4 matters?
5     A.    One was plaintiff.  The other
6 was defense.
7     Q.    Which one was plaintiff?
8     A.    So the Grunenthal case I was --
9 the generic companies were suing Grunenthal,
10 so I was working for the generic companies.
11 I presume that's the plaintiffs.
12         In the Ciprodex matter, I was --
13 Alcon Laboratories, I was working on their
14 behalf.  They were the innovator company.
15     Q.    What other matters have you
16 provided deposition testimony in?
17     A.    I was an expert on behalf of
18 Novartis.  The drug was Myfortic.  That was
19 more than five -- five years ago, though.
20     Q.    Okay.  That testimony was where?
21     A.    The deposition was in -- in
22 Canada in February.
23     Q.    Do you remember approximately
24 when?

Page 47

1     A.    I remember it was, like, minus
2 70 degrees outside, and I can't tell you what
3 year it was.
4     Q.    Can you estimate for us?
5     A.    I think it was somewhere around
6 2011 or '12, perhaps.
7     Q.    That also was a patent dispute?
8     A.    Patent dispute, yeah.
9     Q.    The fourth case that you've
10 rendered testimony in, was that a contract
11 case?
12     A.    Yes.
13     Q.    When did you provide that
14 testimony?
15     A.    2010, I believe.
16     Q.    What was the matter name, if you
17 remember?
18     A.    Michael Crowley v. PharmaForm
19 and Akela.
20     Q.    That was a personal contract
21 dispute that you had?
22     A.    Yeah.
23     Q.    Any other deposition testimony
24 you have provided?

Page 48

1     A.    No.  I'll be getting deposed on
2 January 23rd in another patent dispute in San
3 Francisco.
4     Q.    The name of that matter is what?
5     A.    The product is Niaspan.  I'm
6 working on behalf of the innovator company,
7 AbbVie.  It is also a patent dispute.
8     Q.    Any other testimony that you
9 have provided?
10     A.    I don't think so.
11     Q.    Any trial testimony?
12     A.    Never been at trial.
13     Q.    Any of the matters in which you
14 previously provided testimony, have they
15 involved fragrance chemicals?
16     A.    No.
17     Q.    Have they involved any issues
18 relating to fragrance chemicals?
19         MS. O'DELL:  Object to form.
20     A.    No.
21 BY MR. ZELLERS:
22     Q.    Are you serving presently as an
23 expert in any other matters?
24     A.    Yes.

Page 49

1     Q.    How many?
2     A.    Well, I just told you about the
3 Niaspan matter.  I'm also working on -- it's
4 called IPR, inter partes review, which is
5 also a patent dispute, on behalf of Pfizer.
6 The defendant is Intellipharmaceutics, and
7 the product is called Evzio.  It's a
8 naloxone --
9     Q.    Any other expert matters?
10         MS. O'DELL:  Excuse me, sir.
11 Were you finished?
12         THE WITNESS:  No.
13         MS. O'DELL:  Okay.  You may
14 finish your answer.  I'm sorry.
15     A.    Yeah.  The product is Evzio.  I
16 have been engaged on another matter.  I have
17 not yet agreed to take it.
18 BY MR. ZELLERS:
19     Q.    What matter is that?
20     A.    It's a pharmaceutical patent
21 dispute.  I don't know the name of the
22 product.  I've just looked at the patent, and
23 I'm going to talk to the counsel that's
24 engaged me to learn more to decide on whether

Page 50

1 or not I think they have a position that I
2 can support.
3    Q.    All of the expert witness work
4 that you have done has related to patent
5 disputes.  Correct?
6    A.    That's correct.
7    Q.    None of the expert witness work
8 that you have been engaged in other than this
9 matter relates to or involves fragrance
10 chemicals.  Correct?
11        MS. O'DELL:  Object to form.
12    A.    I have not provided testimony
13 regarding fragrance chemicals before.
14 BY MR. ZELLERS:
15    Q.    Have you ever been retained in a
16 case involving asbestos?
17    A.    No.
18    Q.    Have you ever been retained in a
19 case involving cosmetic products?
20    A.    No.
21    Q.    Your curriculum vitae accurately
22 describes your education background.  Is that
23 right?
24    A.    Yes.

Page 51

1    Q.    You majored in chemistry at the
2 University of Missouri.  Correct?
3    A.    Yes.
4    Q.    You received a Master of Arts in
5 organic chemistry at Washington University
6 St. Louis in 1991.  Is that right?
7    A.    Yes.
8    Q.    And a Ph.D. in molecular
9 pharmaceutics in 2003.  Is that right?
10    A.    Yes.
11    Q.    Any other former -- strike that.
12        Any additional formal education?
13    A.    No.
14    Q.    None of the companies that you
15 currently work for or serve on the board of
16 directors manufacture and produce cosmetic
17 products.  Is that right?
18    A.    No.  I worked at Warner-
19 Jenkinson.  Warner-Jenkinson is now known as
20 Sensient Technologies.  Warner-Jenkinson is
21 the world's largest manufacturer of
22 colorants, that includes D&C colorants used
23 for cosmetics.  Warner-Jenkinson is where the
24 flavor for 7-Up was invented, and they have a

Page 52

1 flavor division -- actually, multiple flavor
2 divisions, and I worked as a chemist there.
3        Texas EnteroSorbents makes a
4 clay product that is used in facial masks.  I
5 helped formulate that clay.
6    Q.    Any other involvement that
7 you've had with any type -- well, strike
8 that.
9        Would you describe those
10 chemicals as fragrance chemicals?
11    A.    I've used fragrance chemicals.
12    Q.    In terms of the work that you've
13 just described for us?
14    A.    Well, there's no fragrance in
15 the facial mask.  Warner-Jenkinson made
16 fragrances.  I've used fragrances in
17 pharmaceutical products.
18        I've formulated a prenatal
19 vitamin that we put ethyl vanillin in to add
20 a scent -- an agreeable scent because the
21 minerals present were unpleasant to pregnant
22 moms.  So I have experience working with
23 fragrances and flavors.
24    Q.    The company was Warner- --

Page 53

1    A.    Yeah, Warner-Jenkinson.  If you
2 turn to Page 207, Warner-Jenkinson Company in
3 St. Louis.
4    Q.    You worked at Warner-Jenkinson
5 from January of 1992 to July of 1995.  Is
6 that right?
7    A.    Yes.
8    Q.    That was your first position
9 after completing your education.  Is that
10 right?
11    A.    After I received my Master's
12 degree.
13    Q.    Your position at Warner-
14 Jenkinson was what?
15    A.    After I received my Master's
16 degree, my position was chemist.
17    Q.    That was your experience with
18 cosmetic products other than the facial mask
19 that you described for us.  Is that correct?
20        MS. O'DELL:  Object to form.
21    A.    That wasn't the only experience
22 I had with cosmetic products.
23 BY MR. ZELLERS:
24    Q.    What other experience other

Page 54

1 than -- and let me make sure that I
2 understand. The facial product that you had
3 some involvement with, where was that at?
4    A.   So Texas EnteroSorbents sells a
5 natural product, clay. It's actually a
6 silicate -- calcium aluminum silicate that's
7 used in facial masks.
8    Q.   Okay. You serve on the board of
9 directors at Texas EnteroSorbents. Is that
10 right?
11   A.   Yes.
12   Q.   Have you ever been an employee
13 for that company?
14   A.   No.
15   Q.   Have you ever been a consultant
16 for that company?
17   A.   Yes.
18   Q.   And what was your contribution
19 to the facial clay that they sell?
20   A.   An investor wanted to create
21 products -- facial clay products and other
22 cosmetics with the clay, and I connected him
23 with subcontracting companies that could help
24 facilitate the development of those and

Page 55

1 served as a technical consultant to the
2 creation of compositions.
3    Q.   Is that a commercial product?
4    A.   It is.
5    Q.   The brand name is what?
6    A.   I don't know. They -- it's
7 called Reavari (phonetic). I understand you
8 can go buy the facial masks and Neiman Marcus
9 and some other places. It's sold under
10 multiple names, but I can't -- I couldn't
11 tell you the name of the end user product.
12   Q.   What other experience other than
13 what you've described for us have you had
14 with cosmetic products?
15   A.   I think that's most of it.
16   Q.   You are not a medical
17 toxicologist. Correct?
18   A.   That's correct.
19   Q.   You do not have a Ph.D. in
20 toxicology. Correct?
21   A.   That's correct.
22   Q.   You do not hold yourself out as
23 a toxicologist. Is that right?
24   A.   Yes.

Page 56

1    Q.   You have no formal training in
2 toxicology?
3        MS. O'DELL: Object to form.
4    A.   I took tox classes in grad
5 school.
6 BY MR. ZELLERS:
7    Q.   Other than that, you have no
8 formal training. Correct?
9        MS. O'DELL: Object to form.
10   A.   That sounds like training to me.
11 BY MR. ZELLERS:
12   Q.   Other than what you testified
13 to, you have no formal training in
14 toxicology. Correct?
15   A.   I don't think that question is
16 appropriate.
17   Q.   You don't understand that
18 question?
19   A.   I would consider taking graduate
20 level classes as formal training.
21   Q.   Other than the graduate level
22 class or classes that you've described for
23 us, have you had any other formal education
24 in toxicology?

Page 57

1    A.   Yes.
2    Q.   Tell us what that is.
3    A.   So I was a co-owner of a company
4 called PharmaForm, and we worked with
5 pharmaceuticals. We used a company called
6 SafeBridge out of the Bay area, San
7 Francisco, to evaluate the safety, toxicity,
8 and pharmacology of new molecular entities
9 prior to us bringing them in-house and
10 working with them.
11        So SafeBridge came in and did
12 some industrial safety and toxicology
13 training with our team, and we would engage
14 them on each new drug substance prior to
15 working on it.
16   Q.   You had a toxicologist come in
17 and provide you and others with additional
18 training. Is that right?
19   A.   Yes.
20   Q.   You are not a regulatory expert.
21 Is that right?
22   A.   No.
23   Q.   You are not --
24   A.   Well, actually -- I mean, how do

Michael Crowley, Ph.D.

Page 58

1  you want to define "expert"?  I write
2  submissions to the FDA.
3      Q.    Are you an expert in terms --
4  well, strike that.
5          Do you consider yourself to be a
6  regulatory expert?
7          MS. O'DELL:  Object to form.
8      A.    I'm more than competent in
9  regulations.
10 BY MR. ZELLERS:
11     Q.    Okay.
12     A.    And my wife is a regulatory
13 affairs and quality assurance --
14     Q.    You're being deposed here today.
15     A.    Yeah.
16     Q.    My question is:  Do you consider
17 yourself to be a regulatory expert?
18     A.    I consider myself --
19         MS. O'DELL:  Objection -- excuse
20 me.
21     A.    -- to be very competent in
22 understanding regulations.
23         MS. O'DELL:  Let me just
24 insert -- object to the form of the

Page 59

1      question.  Sorry.  Excuse me.  Give me
2      just a second to get that in there.
3  BY MR. ZELLERS:
4      Q.    Is that a "yes" or is that a
5  "no"?
6      A.    I think I answered your
7  question, Counselor.
8      Q.    Do you consider yourself to be a
9  regulatory expert, yes or no?
10     A.    I'm more than competent in
11 understanding regulations.
12     Q.    I understand you consider
13 yourself competent to understand regulations.
14 Has anybody come to you and asked you to
15 serve as a regulatory expert in any legal
16 matter?
17     A.    Not in any legal matter, but in
18 June of this year I was presenting to the
19 FDA.
20     Q.    What did you present to the FDA
21 on in June?
22     A.    A new drug application.
23     Q.    And this was a new drug
24 application for your company?

Page 60

1      A.    No.
2      Q.    For what company?
3      A.    Pain Therapeutics.  They're a
4  consulting client.  They're not on my CV.
5      Q.    What product were you testifying
6  to before the FDA on?
7      A.    It's a new form of oxycodone.
8      Q.    Was the company attempting to
9  obtain regulatory approval?
10     A.    Yes.
11     Q.    What hearing or type of
12 proceeding was this before the FDA?
13     A.    It was an FDA advisory committee
14 meeting.
15     Q.    You presented on behalf of your
16 client at the FDA advisory committee meeting.
17 Is that right?
18     A.    That's correct.
19     Q.    Do you believe that qualifies
20 you as a regulatory expert?
21     A.    I have said this, I think, three
22 times now, Counselor.  I am more than
23 competent in understanding regulations.
24     Q.    You are not an expert in the FDA

Page 61

1  regulatory process for cosmetic products.
2  Correct?
3          MS. O'DELL:  Object to form.
4      A.    The FDA has very limited
5  cosmetic regulations.
6  BY MR. ZELLERS:
7      Q.    I need you to answer my question
8  as best you can.
9          You are not an expert in the FDA
10 regulatory process for cosmetic products.  Is
11 that correct?
12         MS. O'DELL:  Object to form.
13     You may answer.
14     A.    I've read them, and I understand
15 them, and I expect to opine on them today,
16 so --
17 BY MR. ZELLERS:
18     Q.    That is the extent of your
19 expertise with respect to the FDA regulatory
20 process for cosmetic products.  Correct?
21         MS. O'DELL:  Object to form.
22     A.    I've certainly applied them in
23 creating cosmetic products, Counselor.
24

Page 62

1  BY MR. ZELLERS:
2      Q.    Anything else?
3      A.    Anything else with regard to?
4      Q.    Yes.  FDA regulatory expertise
5  with cosmetic products.
6          MS. O'DELL:  Object to form.
7      A.    I don't understand your
8  question.
9  BY MR. ZELLERS:
10      Q.    You're not a medical doctor.
11  Correct?
12      A.    No.
13      Q.    You don't treat patients?
14      A.    No.
15      Q.    You are not a pathologist?
16      A.    No.
17      Q.    You have no formal training or
18  education in pathology.  Correct?
19      A.    That's correct.
20      Q.    You've never done a pathological
21  exam.  Correct?
22      A.    No.
23      Q.    And you have never authored a
24  pathology report involving ovarian cancer.

Page 63

1  Is that right?
2      A.    That's correct.
3      Q.    Have you ever worked with a
4  cosmetic product that is applied in the
5  peroneal region?
6      A.    No.
7      Q.    Before being contacted by
8  Ms. Thompson and the attorneys for plaintiffs
9  in the talc MDL litigation, did you keep up
10  to date on the topic of fragrance chemicals
11  by reviewing peer-reviewed literature?
12      A.    When I needed to.  I mean, at
13  various times I would reach out and see what
14  I needed to know about certain fragrances.
15      Q.    Would you do that on a routine
16  basis, or would you do that in connection
17  with a particular project or assignment?
18      A.    In a particular -- in connection
19  with a project.
20      Q.    What journals would you review
21  to try to educate yourself on the topic of
22  fragrance chemicals?
23      A.    I looked at books.
24      Q.    What books did you review other

Page 64

1  than the book that we marked as Deposition
2  Exhibit 5?
3      A.    Flavors and Flavonoids was a
4  book that I recall looking at several years
5  ago.  Generally, you know, you pick up the
6  phone, and you call International Flavors &
7  Fragrances or any number of fragrance houses.
8  Also there are some consultants that we would
9  engage.  We developed oral compositions that
10  we would do e-tongue studies with to
11  understand taste profiles of new drugs and if
12  flavors or sweeteners were required to help
13  with palatability.  I've done work with
14  pediatric compositions, and those are often
15  flavored.
16      Q.    What experts or consultants
17  would you go to if you had questions about
18  fragrance chemicals?
19      A.    There's a guy named David Tze.
20  I can't remember his company, but they're
21  well-known for, you know, using e-tongue and
22  flavoring assistance with compositions.
23      Q.    Anyone else or any other
24  companies or groups?

Page 65

1      A.    I mean, we contacted a number of
2  different flavor companies that have got
3  excellent technical service to help identify,
4  you know, flavors and products available.
5      Q.    You have never written or
6  published on the topic of fragrance
7  chemicals.  Is that right?
8      A.    That's correct.
9      Q.    You have never written or
10  published on the topic of talcum powder.
11  Correct?
12      A.    No.
13      Q.    What writings or publications
14  have -- do you have with respect to talcum
15  powder?
16      A.    Well, I've formulated products
17  that are approved by the FDA that have talcum
18  powder in it.
19      Q.    What products?
20      A.    I would have to -- well, Thiola.
21  It dissolves kidney stones.  It's a film
22  coating.  We put talc in the film coating.
23      Q.    Is that a marketed product?
24      A.    Yes, it's commercially

Michael Crowley, Ph.D.

Page 66

1  available.
2      Q.    Who is the manufacturer of
3  Thiola?
4      A.    Mission Pharmacal in San
5  Antonio.
6      Q.    When -- strike that.
7          What was your involvement with
8  that product?
9      A.    I was the formulator.
10     Q.    When were you involved with the
11 formulation of Thiola?
12     A.    That would have been sometime
13 between 1995 and 2000.
14     Q.    What company were you with at
15 the time?
16     A.    Mission Pharmacal, the owner of
17 the product.
18     Q.    My question to you, though, was:
19 Have you ever written or published on talcum
20 powder or any issues relating to talcum
21 powder?
22     A.    I have -- I'm almost certain
23 that some of my patents disclose the use of
24 talcum powder, but I have not authored any

Page 67

1  papers specific to, you know, concerns with
2  asbestos and ovarian cancer and so forth,
3  so --
4      Q.    Or inflammation or irritation.
5  Correct?
6          MS. O'DELL:  Object to form.
7      A.    I haven't -- I haven't published
8  on that with respect to talcum powder, no.
9  BY MR. ZELLERS:
10     Q.    You also have not, with respect
11 to all of those subjects, done any
12 independent research.  Fair?
13         MS. O'DELL:  Object to the form.
14     A.    I have reviewed the literature.
15 BY MR. ZELLERS:
16     Q.    Other than going out and
17 reviewing articles or reviewing textbooks,
18 you have not done any independent research
19 with respect to fragrance chemicals, cancer,
20 asbestos, inflammation?
21     A.    No, I have not.
22     Q.    You have -- strike that.
23         You had formulated no opinions
24 regarding the ingredients in talcum powder

Page 68

1  before getting involved in this litigation.
2  Correct?
3      A.    That's correct.
4      Q.    You -- strike that.
5          Have you ever -- other than your
6  involvement with Thiola and helping Mission
7  Pharmacal back in 1995 to January of 2000
8  with respect to this product Thiola, you've
9  had no communications with the FDA regarding
10 talcum powder.  Correct?
11         MS. O'DELL:  Object to the form.
12     A.    I don't believe I've ever had a
13 communication with the FDA about talcum
14 powder.  I mean, I've met with FDA on
15 multiple occasions, and I have worked on
16 products that have talcum powder in it, but I
17 don't believe that -- I've certainly never
18 had a discussion with the FDA about any of
19 the issues with respect to talcum powder
20 safety.
21 BY MR. ZELLERS:
22     Q.    Or anything else other than
23 perhaps in connection with Thiola back in
24 1995 to 2000?

Page 69

1          MS. O'DELL:  Excuse me.  Object
2      to form.
3      A.    I don't believe so.
4  BY MR. ZELLERS:
5      Q.    What product have you been
6  involved in that contains talcum powder other
7  than Thiola?
8      A.    Warner-Jenkinson made film
9  coatings -- it's called SpectraBlend and
10 SpectraSpray, and talc was a component of
11 those products.
12     Q.    Were you --
13     A.    Talc was also used in their
14 cosmetics.
15     Q.    Were you personally involved in
16 any products involving talcum powder at
17 Warner-Jenkinson?
18     A.    Yes.
19     Q.    What products -- or strike that.
20         In what way were you personally
21 involved with talcum powder?
22     A.    Just SpectraBlend and
23 SpectraSpray had talcum powder in it.
24     Q.    What was your involvement in

Page 70

1  that?
2      A.    I was providing technical
3  service, product development support for
4  those two products.
5      Q.    Did those products ever become
6  marketed?
7      A.    Well, I don't know how to answer
8  your question.  So those would be used by
9  Warner-Jenkinson's customers in their
10  products that were marketed.  So, for
11  example, we worked with, you know, McNeil on
12  the Tylenol gel caps.  SpectraBlend and
13  SpectraSpray were used as part of those
14  products.  We worked on Tylenol PM, which
15  are --
16      Q.    You would sell to folks who
17  would use the --
18      A.    Spectra --
19      Q.    -- Warner-Jenkinson product in
20  their product?
21      A.    Yeah, that's correct.
22      Q.    Any other talcum powder
23  experience other than what you've told me?
24      A.    I mean, it's been used in a

Page 71

1  number -- I mean, it's been used as a glider
2  for making tablets and filling capsules and
3  so forth.  I feel confident we used it at
4  PharmaForm, too.
5      So, I mean, it's -- it's
6  something I've used at multiple points during
7  my 20-plus years experience.
8      Q.    Have you ever been involved in a
9  safety or risk assessment analysis of talcum
10  powder other than in this case?
11      A.    No.
12      Q.    Have you ever communicated with
13  the FDA regarding any issues relating to
14  ovarian cancer?
15      A.    No.
16      Q.    Any communications with Health
17  Canada regarding talcum powder?
18      A.    No.
19      Q.    Any communications with Health
20  Canada regarding ovarian cancer?
21      A.    No.
22      Q.    I did not tell you this in the
23  beginning, but anytime you or any counsel
24  need to take a break, speak up.

Page 72

1      MR. ZELLERS:  Mr. Court
2  Reporter, you speak up as well if you
3  need to take a break.
4  BY MR. ZELLERS:
5      Q.    Are we good?
6      A.    Let's go another ten minutes and
7  take a break at 10:30.  Does that sound
8  reasonable?
9      Q.    Yes, although I've got a topic
10  here that I want to finish.
11      A.    Okay.
12      Q.    So it may take me 15 minutes or
13  20 minutes.
14      A.    That's okay.
15      Q.    But let me just finish this
16  topic, and then --
17      MS. WUNDERLICH:  Can I just ask
18  that you keep your voice up.  I can't
19  hear you very well down here,
20  especially with a lot of noise from
21  outside.
22      MS. O'DELL:  Are you referring
23  to the witness or --
24      MS. WUNDERLICH:  The witness,

Page 73

1  yes.
2      THE WITNESS:  If you can't hear
3  me, just give me a cue, and I'll try to
4  repeat.  Are you able to hear me okay?
5  Can you hear me okay?
6  BY MR. ZELLERS:
7      Q.    Were you under any time pressure
8  in terms of analyzing the issues that you
9  were asked to analyze in this case by
10  plaintiffs in developing your opinions and
11  preparing your report?
12      MS. O'DELL:  Object to form.
13      A.    I wish I would have had more
14  time.  There was an awful lot of stuff to
15  review.  There was approximately 175
16  fragrance chemicals between the two of them,
17  and I tried to review as much of the
18  available information as I could find.
19  BY MR. ZELLERS:
20      Q.    Do you have an estimate as to
21  the amount -- total amount of time that
22  you've spent on this matter?
23      A.    No.  I'd have to look at those
24  invoices and sum it all up, which I have not

Page 74

1 done.
2    Q.    Would you have spent more time
3 if you had more time in terms of doing
4 research and reviewing matters to prepare
5 your opinions in this matter?
6    A.    Yeah.  I mean, I -- I would have
7 liked a little bit more time, but I'm
8 comfortable with the opinions.
9    Q.    Did plaintiffs' counsel provide
10 you with any of the articles or data or
11 documents that you referenced in your report?
12    A.    Yes.  So I -- you know, I did
13 all the primary literature searching and
14 searched the databases and so forth.  The
15 documents in the sources relied upon list
16 that -- that are from the case -- you know,
17 I-M-E-R-Y -- the Imerys documents and the J&J
18 numbered documents, those were produced by
19 counsel.  But everything else I found on my
20 own.
21    Q.    If we look, then, at your
22 report, which includes Deposition Exhibits 9
23 and 10, your reference list and your sources
24 considered list, the only documents and

Page 75

1 materials that were provided to you by
2 plaintiffs' counsel were the Johnson &
3 Johnson documents and the Imerys documents.
4 Correct?
5    A.    I believe so.  Well, they gave
6 me the Thomas Dydek report.  And I think at
7 one point I was given the Canadian Ministry
8 of Health or Health Ministry review of talcum
9 powder.  And --
10    Q.    Anything else?
11    A.    I think that is everything.
12       MS. O'DELL:  Just for the
13 record, I would add the supplemental
14 answers to plaintiffs' second set of
15 interrogatories from the Ingram case
16 were also litigation materials that
17 were provided to Dr. Crowley, and those
18 are the list of fragrance chemicals.
19       THE REPORTER:  I'm sorry.  The
20 list of what?
21       MS. O'DELL:  Fragrance
22 chemicals.
23    A.    Yeah.
24

Page 76

1 BY MR. ZELLERS:
2    Q.    Is that correct --
3    A.    Yes.
4    Q.    -- Dr. Crowley?
5    A.    Yeah.
6    Q.    Any other articles, data,
7 documents, or materials that were provided to
8 you by plaintiffs' counsel in connection with
9 your review of this matter?
10    A.    They may have emailed me some
11 information along the way, but to the best of
12 my recollection, that's the key pieces.
13    Q.    If they emailed you any articles
14 or data or documents, would you have included
15 those in your sources considered list?
16    A.    I think so.  I mean, at one
17 point I received an email that pointed to the
18 J&J website in which, you know, the quality
19 and purity of the ingredients and the quality
20 process at J&J was disclosed, but I don't
21 think that's in my sources considered list.
22    Q.    Anything else that -- strike
23 that.
24       Any other source that you

Page 77

1 considered in preparing your report in this
2 matter that is not identified in either the
3 reference list, the body of the report, or
4 your sources considered?
5    A.    I think I may have looked at a
6 toxicology book or two just to refresh myself
7 on some of those things.  These are textbooks
8 that I had from graduate school.
9       I probably looked at -- you
10 know, refreshed myself on a few items, but
11 I -- as I've said previously, I believe I
12 made every effort to disclose everything that
13 I considered and relied upon.
14    Q.    What toxicology books did you
15 look at to refresh your recollection on those
16 issues?
17    A.    They're sitting on my bookshelf
18 at home.  I'd have to go look.  I can't even
19 remember who the authors are right now.
20    Q.    Anything else that you reviewed
21 or considered other than what's contained in
22 your report, the reference list, and the
23 sources considered list?
24       MS. O'DELL:  Object to the form.

Page 78

1    In addition to --
2        MR. ZELLERS:  In addition to his
3    testimony.
4        MS. O'DELL:  His testimony and
5    the appendices?
6        MR. ZELLERS:  Yes.  And he told
7    me early on that he considers the
8    appendices to be part of his report.
9        MS. O'DELL:  Fair enough.  I
10   just wanted to make that clear.
11   A.    As I said, I've made every
12   effort to, you know, make sure that the stuff
13   I relied upon is in that list and/or cited.
14   BY MR. ZELLERS:
15   Q.    Did you --
16   A.    I don't believe there's anything
17   that I've missed.
18   Q.    Did you -- are you finished?
19   A.    Yeah.
20   Q.    Did you review any expert
21   reports from any other plaintiff expert in
22   the talc MDL?
23   A.    After I submitted my report,
24   they were circulated -- some of the other

Page 79

1    experts were circulated.  I -- to say
2    "review" would be an overstatement.  I think
3    I looked at title pages to see what people
4    opined on.
5        I think there was one report
6    that I even kind of flipped through the whole
7    thing.  Most of mine I did not read anything
8    other than the title page.
9    Q.    What expert report did you at
10   least flip through?
11   A.    I don't remember the name of the
12   expert, but he was opining on detection
13   methods and testing methods.
14   Q.    Any other expert reports that
15   you reviewed relating to the talcum powder
16   issues?
17   A.    No, I don't think so.
18   Q.    Did you review any expert
19   reports other than Dr. Dydek's report from
20   any of the other talcum powder cases?
21   A.    No.
22   Q.    Have you reviewed any deposition
23   or trial transcripts from any of the talcum
24   powder cases?

Page 80

1    A.    No.
2    Q.    Did you review Dr. Plunkett's
3    deposition transcript, which was taken in
4    December of 2018.
5    A.    Yesterday they read --
6    Ms. O'Dell --
7        MS. O'DELL:  Don't --
8        THE WITNESS:  That's privileged?
9        MS. O'DELL:  That's privileged.
10   Don't disclose anything that we've
11   discussed.
12       THE WITNESS:  Okay.
13   BY MR. ZELLERS:
14   Q.    My question is:  Have you
15   reviewed Dr. Plunkett's deposition
16   transcript?
17   A.    No.
18   Q.    Do you have a general
19   understanding of who Dr. Plunkett is?
20   A.    No.
21   Q.    Do you have a general
22   understanding of her opinions in this matter?
23   A.    No.
24   Q.    You were asked to make certain

Page 81

1    assumptions in forming your opinions.  Is
2    that right?
3    A.    Yes.
4    Q.    On Page 11 of your report -- and
5    feel free to refer to it if you need to --
6    you were asked to assume that talcum powder
7    can migrate from the perineum to the upper
8    genital tract.  Is that right?
9    A.    Yes.
10   Q.    Your opinion that fragrance
11   chemicals contribute to the inflammatory
12   properties, toxicity, or potential
13   carcinogenicity of the products is dependent
14   on plaintiffs' ability to prove that talcum
15   powder can migrate from the vagina to the
16   upper genital tract.  Correct?
17       MS. O'DELL:  Object to form.
18   A.    No, not necessarily.  A number
19   of these fragrance chemicals are absorbed
20   through skin, and several of them are
21   permeation enhancers, which means that they
22   will actually help promote other things from
23   being absorbed, metabolized, distributed, and
24   eliminated.  So, regardless of whether that

Michael Crowley, Ph.D.

Page 82

1 assumption holds or not, it doesn't affect my
2 opinion.
3 BY MR. ZELLERS:
4     Q.    Is it your testimony that a skin
5 irritant can produce or increase the risk for
6 ovarian cancer?
7         MS. O'DELL:  Object to the form.
8     A.    It's certainly possible, yeah.
9 BY MR. ZELLERS:
10     Q.    Explain how a skin irritant can
11 be associated with an increased risk of
12 ovarian cancer?
13     A.    An irritation produces an
14 inflammatory response.
15     Q.    It produces an inflammatory
16 response in the area of the irritation.  Is
17 that right?
18     A.    Yes.  But also, I mean, those
19 inflammatory chemicals travel throughout the
20 human body.  So increased levels of
21 inflammation have been associated with a
22 higher risk of cancers.
23     Q.    Skin irritation, has it been
24 associated with an increased risk of ovarian

Page 83

1 cancer?
2     A.    Skin irritation?
3     Q.    Yes.
4     A.    I wasn't asked to opine --
5     Q.    Inflammation of the skin, has
6 that been associated with an increased risk
7 of ovarian cancer?
8         MS. O'DELL:  Object to form.
9     A.    I wasn't asked to offer that
10 opinion.
11 BY MR. ZELLERS:
12     Q.    And you're not offering those
13 opinions.  Correct?
14     A.    That's correct.
15     Q.    Any other assumptions that
16 you're making in forming your opinions here
17 today?
18     A.    No.
19     Q.    In reaching your opinions, would
20 you agree it's important for you to address
21 the questions asked and review the data in a
22 fair and impartial way?
23     A.    Yes.
24     Q.    Why is that important?

Page 84

1     A.    Just report the facts and rely
2 upon the facts to form the basis of the
3 opinion.  There's no bias here, Counselor.
4     Q.    Was there any additional
5 information that you need to fully and fairly
6 evaluate the questions that are set forth in
7 your report?
8     A.    I don't believe so.  I did my
9 best to examine the totality of the evidence.
10     Q.    Do you agree that if you did not
11 have all the information, that your opinions
12 could be biased?
13         MS. O'DELL:  Object to form.
14     A.    I don't believe that they are.
15 BY MR. ZELLERS:
16     Q.    If you didn't have all the
17 relevant information, could your opinions be
18 unfounded or incomplete?
19         MS. O'DELL:  Object to --
20     A.    I --
21         MS. O'DELL:  Excuse me.  Object
22     to the form.
23     A.    I'm very comfortable that I
24 examined and used generally accepted

Page 85

1 practices to gather the information and then
2 form opinions upon which that evidence is
3 based.
4 BY MR. ZELLERS:
5     Q.    I --
6     A.    So there is no biased -- bias
7 associated with understanding facts.
8     Q.    Do you agree that scientists and
9 experts in litigation should be ethical and
10 honest?
11     A.    Yes.
12     Q.    You reference sources from the
13 EPA in your report.  Is that right?
14     A.    Yes.
15     Q.    Is the EPA a reputable
16 organization?
17         MS. O'DELL:  Object to the form.
18     It's a governmental organization, but
19     go on.
20     A.    I have no issue with the EPA.  I
21 find them to be reputable.
22         (Exhibit No. 11 marked)
23 BY MR. ZELLERS:
24     Q.    Deposition Exhibit 11 --

Michael Crowley, Ph.D.

Page 86

1    MS. O'DELL: Thank you.
2  BY MR. ZELLERS:
3    Q.  -- is from the EPA website, and
4  it sets forth the standards for scientific
5  integrity.  Is that right?
6    MS. O'DELL: &Object to the
7    form.
8    A.  That's what it looks like.
9  BY MR. ZELLERS:
10   Q.  Do you see that the EPA explains
11 that scientific integrity is highly important
12 to insulate the scientific community from
13 things such as bias, falsification, and
14 plagiarism?
15   MS. O'DELL: What page are you
16   reading from?
17   MR. ZELLERS: Page 2.
18 BY MR. ZELLERS:
19   Q.  I'm looking at the middle of the
20 page.  "Scientific integrity is important
21 because it provides insulation from
22 plagiarism" -- correct?
23   A.  That's what it says, yeah.
24   Q.  It also provides insulation from

Page 87

1  research misconduct.  Is that right?
2    MS. O'DELL: Object to the form.
3    I don't see where it says "misconduct"
4    on the document.  I may be --
5    MR. ZELLERS: Sure.
6    MS. O'DELL: I may be missing
7    it.
8    MR. ZELLERS: Okay.  And,
9    actually, I'd rather the witness ask me
10   questions, but I'll try to help you
11   here.
12 BY MR. ZELLERS:
13   Q.  "Why is scientific integrity
14   important?"
15   The second bullet point says,
16 "Scientific integrity, along with federal
17 policies on research misconduct" -- it gets
18 to the point where scientists such as
19 yourself can be held accountable.  Do you
20 agree?
21   MS. O'DELL: Excuse me.  Object
22   to the form, misstates the document.
23   You can answer if you understand the
24   question.

Page 88

1    A.  Held accountable for what?
2  BY MR. ZELLERS:
3    Q.  You have no issue that you, as
4  an expert, need to be free from bias,
5  falsification, and plagiarism in your review
6  analysis and preparation of your report in
7  this matter.  Correct?
8    MS. O'DELL: Object to the form.
9    A.  I think you're asking me, you
10 know, if I maintain scientific integrity.  Is
11 that right?  If that's your question, the
12 answer is yes.
13 BY MR. ZELLERS:
14   Q.  And the EPA, which you cite and
15 rely on, cites standards for scientific
16 integrity.  Correct?
17   A.  Yeah.
18   Q.  And those standards state that
19 scientific integrity is important because it
20 provides insulation from bias, falsification,
21 and plagiarism.  Correct?
22   A.  That's what it says.
23   Q.  You agree with that?
24   A.  Yeah.

Page 89

1    Q.  Correct?
2    A.  Yeah.
3    Q.  All right.  Are you familiar
4  with the Office of Research Integrity?  And
5  let me hand you a page from their website
6  that we'll mark as Exhibit 12.
7    (Exhibit No. 12 marked)
8    A.  No, I am not.
9  BY MR. ZELLERS:
10   Q.  You've never heard of the Office
11 of Research Integrity?
12   A.  No, I haven't.
13   Q.  Are you aware that the federal
14 government has an Office of Research
15 Integrity?
16   A.  No.
17   Q.  Do you see from Deposition
18 Exhibit 12 that plagiarism is defined as the
19 appropriation of another person's ideas,
20 processes, results, or words without giving
21 appropriate credit?
22   A.  Yes.
23   Q.  Do you agree with that
24 definition of plagiarism?

Michael Crowley, Ph.D.

Page 90

1    A.    It seems like a reasonable
2   definition of plagiarism.
3    Q.    Are you aware that several
4   paragraphs from your report were copied and
5   pasted from various websites and articles?
6    A.    Yes.
7    Q.    Can you tell us where in your
8   report you copied and pasted statements from
9   other websites and articles?
10    A.    I mean, a good majority of the
11   report was drawn from those sources.
12    Q.    It would be wrong for you to
13   simply lift or copy and paste the text from
14   other sources and include it in your report
15   without giving attribution to those sources.
16   Correct?
17    MS. O'DELL:  Object to form.
18    A.    I did every -- I made every
19   effort to cite where I drew information from.
20   And, Counselor, if you're going to suggest
21   that copying and pasting information into
22   that report, specifically in the appendices,
23   represents plagiarism, that was a collation
24   of the information from which I formed the

Page 91

1   basis of that report and the opinion.
2   BY MR. ZELLERS:
3    Q.    Would it be wrong, in the body
4   of your report, not speaking of the
5   appendices, for you to copy and paste
6   statements from other authors and websites
7   and materials without giving attribution to
8   those sources?
9    MS. O'DELL:  Object to the form.
10    A.    I don't think so.
11   BY MR. ZELLERS:
12    Q.    You think it would be
13   permissible to take quotes from other
14   articles, websites, and sources, include them
15   in the body of your report, and pretend that
16   they are your words?
17    MS. O'DELL:  Object to the form.
18    A.    I don't believe I did that.  I
19   believe that what I did was either paraphrase
20   or cite to a source.  And if I have missed a
21   citation, then, you know, it's easily
22   corrected.
23   BY MR. ZELLERS:
24    Q.    My question is a little

Page 92

1   different.  I'm not talking about
2   paraphrasing.  I'm not talking about where
3   you do cite to a source.
4    It would be wrong for you as an
5   expert witness in this case to lift, word for
6   word, text from other articles and other
7   sources and include those in your report.
8   Correct?
9    A.    I did not --
10    MS. O'DELL:  Excuse me.  Object
11   to the form.
12    A.    No.  I disagree.
13   BY MR. ZELLERS:
14    Q.    It would be appropriate for --
15    MS. O'DELL:  Excuse me, sir.
16    MR. ZELLERS:  Sure.
17    MS. O'DELL:  If you're not
18   finished, you may finish your answer.
19    A.    I wasn't finished.  I had to
20   gather information on these chemicals, and I
21   relied upon several sources to do so.  The
22   appendices were created by examining those
23   sources, collating that information, which
24   included copying and pasting it in the

Page 93

1   report.  So, no, it's absolutely not
2   inappropriate to do so.
3   BY MR. ZELLERS:
4    Q.    I am not speaking of the
5   appendices.  I'm speaking of the body of your
6   report where you set forth your opinions.
7    It would be wrong in the body of
8   your report to lift and copy and paste text
9   from other articles or from other sources
10   without giving attribution to those sources.
11   Correct?
12    MS. O'DELL:  Object to the form.
13    A.    No, I don't believe so.  I don't
14   believe I did that.  I believe that in some
15   of the tables I recite some of the items from
16   the appendices word for word.  So --
17    MS. O'DELL:  Excuse me.  Let
18   him -- you may finish.
19    A.    Yeah.  So let's be very clear
20   about this, Counselor.  If you're going to
21   suggest that my report is anything less than
22   ethical and that there's plagiarism or this
23   or that, I was relying upon that information
24   to draw, you know, the conclusions and the

Page 94

1 opinions that I drew.
2 BY MR. ZELLERS:
3    Q.    So I understand your testimony,
4 you do not believe that it is wrong for you
5 to take, word for word, information --
6    A.    Why don't you show me where that
7 is.
8       MS. O'DELL:  Excuse me.  Let him
9 finish.
10 BY MR. ZELLERS:
11    Q.    Let me finish my question.
12       MS. O'DELL:  And then let me
13    object.  So you can finish your --
14 BY MR. ZELLERS:
15    Q.    Would it be wrong for you, in
16 the body of your report, to go to other
17 articles or other sources and lift that
18 information word for word and include it in
19 your report without attribution to other
20 sources?  Would that be wrong?
21       MS. O'DELL:  Object to the form,
22    asked and answered, misstates his prior
23    testimony.  You may answer the question
24    as you understand it.

Page 95

1    A.    Yeah.  I don't believe I did it.
2 If I did, it was an oversight.  Okay?  And
3 I'll state again --
4       MS. O'DELL:  There's no --
5 BY MR. ZELLERS:
6    Q.    Turn to --
7       MS. O'DELL:  There's no question
8    pending.
9 BY MR. ZELLERS:
10    Q.    Turn to Page 18 of your report.
11 Do you see Page 18?
12    A.    Yes.
13    Q.    Paragraph 2.  Are those your
14 words?  And I'm sorry.  So it's clear,
15 Paragraph 2 underneath Section 4.2, fragrance
16 chemical regulatory review.
17       MS. O'DELL:  Just so I'm clear,
18    the paragraph beginning "Regulation of
19    consumer products"?
20       MR. ZELLERS:  Yes.
21 BY MR. ZELLERS:
22    Q.    Are those your words?
23    A.    I believe I typed them, yeah.
24    Q.    Are you aware that nearly that

Page 96

1 entire paragraph -- second paragraph under
2 Section 4.2 on Page 18 -- is copied and
3 pasted word for word from an article written
4 by Anne Steinemann and published in
5 Environmental Impact Assessment Review, 2008?
6    A.    I may have reviewed that and
7 gotten it from there and, you know, didn't do
8 an adequate job of paraphrasing.  May I see
9 the article, please?
10    Q.    Sure.  Because it's your
11 testimony it would be okay if you paraphrased
12 statements from Ms. Steinemann in her paper.
13 Is that right?
14       MS. O'DELL:  Object to the form.
15    A.    Yes.
16       (Exhibit No. 13 marked)
17 BY MR. ZELLERS:
18    Q.    I'm going to hand you what we'll
19 mark as Deposition Exhibit 13.
20    A.    Okay.
21    Q.    Which is the Steinemann article.
22 Your first sentence of this paragraph starts
23 with, "Regulation of consumer products
24 largely falls under the Consumer Products

Page 97

1 Safety Act."
2       Is that right?
3    A.    Yes.
4    Q.    Go to Page 2 of the Steinemann
5 article underneath the regulatory analyses,
6 the third paragraph, second sentence,
7 "Regulation of consumer products largely
8 falls under the Consumer Products Safety
9 Act," and I eliminated the statement in
10 parens.
11       That's word for word.  Correct?
12    A.    No, it's not.
13    Q.    What -- other than the omitted
14 paren which states "other than food, drugs
15 cosmetics, tobacco, and pesticides" that --
16    A.    Yeah, those are the same words,
17 that's correct.  Without the parens, that's
18 right.
19    Q.    Then we go to the second
20 sentence, and go down to the next paragraph
21 in Dr. Steinemann's report, the one that
22 starts "notably."  Do you see that?
23    A.    Yes.
24    Q.    Then it continues, "The CPSA

Michael Crowley, Ph.D.

Page 98

¹ does not require disclosure of all
² ingredients in products," and it continues
³ for several more sentences.
⁴          Those sentences appear, word for
⁵ word, in your second paragraph on Page 18.
⁶ Correct?
⁷          MS. O'DELL: Object to the form.
⁸     A.    I believe I paraphrased it.  I
⁹ don't think it's word for word.
¹⁰ BY MR. ZELLERS:
¹¹     Q.    Well, I don't want to take the
¹² time to go through and do a word-for-word
¹³ analysis.
¹⁴          Go to, then, if you will, Page 3
¹⁵ of the Steinemann article, and the first
¹⁶ sentence on Page 3, "Ingredients can also be
¹⁷ exempt from disclosure."
¹⁸          You state that sentence as the
¹⁹ next sentence in your report.  Right?
²⁰     A.    Yep.
²¹          MS. O'DELL: Object to the form.
²² BY MR. ZELLERS:
²³     Q.    Then if we go to the next
²⁴ paragraph, several sentences in where it

Page 99

¹ says, "Under the FFDCA, fragrance ingredients
² that qualify," that sentence appears verbatim
³ in your report.  Is that right?
⁴          MS. O'DELL: Object to the form.
⁵     A.    Where is this?
⁶ BY MR. ZELLERS:
⁷     Q.    So you go to the second
⁸ paragraph on Page 3 of the Steinemann
⁹ article.  The sentence starts -- and this is
¹⁰ about three or four sentences in -- "Under
¹¹ the FFDCA, fragrance ingredients that qualify
¹² as trade secrets," that is your last sentence
¹³ in Paragraph 2 of your report.  Is that
¹⁴ right?
¹⁵     A.    Yeah, that's consistent.
¹⁶          MS. O'DELL: Object to the form.
¹⁷ BY MR. ZELLERS:
¹⁸     Q.    All right.  Have you read the
¹⁹ Consumer Product Safety Act, the Federal
²⁰ Hazardous Substances Act, or the Toxic
²¹ Substances Control Act?
²²     A.    I did go pull them up on the
²³ internet and took a look at them.  I didn't
²⁴ read them in total.

Page 100

¹     Q.    Go to Page 27 of your report.
² Do you see the last full paragraph?
³     A.    Yes.
⁴     Q.    Are you aware that the last full
⁵ paragraph on Page 27 of your report, all but
⁶ the first sentence was copied and pasted from
⁷ a Wikipedia entry on mucus membrane?
⁸          MS. O'DELL: Object to form.
⁹     A.    I believe I paraphrased it.
¹⁰ BY MR. ZELLERS:
¹¹     Q.    Well, I will let the record
¹² speak for itself in terms of doing the
¹³ word-by-word comparison.  I don't believe
¹⁴ that you did, but we'll let the record,
¹⁵ again, speak for itself.
¹⁶          Look at Page -- strike that.
¹⁷          (Exhibit No. 14 marked)
¹⁸ BY MR. ZELLERS:
¹⁹     Q.    Look at Exhibit 14, which is the
²⁰ Wikipedia entry or statement on mucous
²¹ membrane.
²²          MS. O'DELL: Is this 14?
²³          MR. ZELLERS: Yes, 14.
²⁴

Page 101

¹ BY MR. ZELLERS:
²     Q.    You are -- and specifically you
³ have lifted verbatim in the second to last
⁴ paragraph or the last full paragraph on
⁵ Page 27 the Wikipedia statement as to what a
⁶ mucous membrane or mucosa is.  And I'm
⁷ looking at the very first page, the
⁸ introductory paragraph of Exhibit 14.  Is
⁹ that right?
¹⁰          MS. O'DELL: Object to form.
¹¹     A.    I believe I paraphrased it, as
¹² I've said.
¹³ BY MR. ZELLERS:
¹⁴     Q.    Well, you start with -- and I'm
¹⁵ looking at the second sentence -- "A mucous
¹⁶ membrane or mucosa is a membrane," and then
¹⁷ you end the paragraph, four or five sentences
¹⁸ later, by stating, "prevent bodily tissues
¹⁹ from becoming dehydrated."
²⁰          At least those words are the
²¹ same words.  Correct?
²²     A.    I will take --
²³          MS. O'DELL: Object to the form.
²⁴     A.    I will have to take a look at

Michael Crowley, Ph.D.

Page 102

1 it.
2 BY MR. ZELLERS:
3     Q.    You are aware that Wikipedia is
4 not a peer-reviewed source.  Correct?
5     A.    I believe that it's reviewed by
6 anyone who wants to, yeah.
7     Q.    Anyone can update a Wikipedia
8 entry?
9     A.    I believe so, yeah.
10     Q.    Go to Page 32 of your report.
11 I'm looking at the second to last full
12 paragraph that starts with "traditionally."
13 Do you see where I'm at?  This is in Section
14 4.5.
15     A.    Yeah.
16     Q.    It would be the second to last
17 full paragraph on Page 32 of your report.
18         Are you aware that that
19 paragraph is taken directly from a website
20 called Interactive Learning Paradigms,
21 Incorporated?
22     A.    No.
23         MS. O'DELL:  And excuse me.
24 Just -- so you're talking about the

Page 103

1     sentence -- the paragraph beginning
2 "traditionally"?
3         MR. ZELLERS:  Yes.
4 BY MR. ZELLERS:
5     Q.    You are unaware of that, Doctor?
6     A.    I don't think so.
7     Q.    Well, it would be wrong for you
8 to lift statements from other articles or
9 other authors or Wikipedia and include them
10 in your report word for word without
11 attribution.  Correct?
12         MS. O'DELL:  Object to the form.
13     A.    You know, I tried to paraphrase
14 where appropriate.  If I missed -- missed
15 something and didn't cite it, it was an
16 oversight.
17 BY MR. ZELLERS:
18     Q.    Take a look at Page 15 -- strike
19 that.
20         Take a look, if you will, at
21 Exhibit 15.
22         (Exhibit No. 15 marked)
23 BY MR. ZELLERS:
24     Q.    This is the ILPI website.  Do

Page 104

1 you have Exhibit 15 in front of you?
2     A.    Yes.
3     Q.    Do you have your report in front
4 of you, Page 32?
5     A.    Yes.
6     Q.    Do you see the last paragraph of
7 Deposition Exhibit 15, the website for
8 Interactive Learning Paradigms, Incorporated,
9 that begins, "Traditionally, sensitization
10 has been determined"?
11         Do you see that?
12     A.    Yes.
13     Q.    Would you agree that that
14 paragraph, excluding the very last sentence
15 that is the citation to the EPA, is exactly
16 the same paragraph as appears in your report
17 on Page 32?
18         MS. O'DELL:  Object to the form.
19     A.    Yeah, it looks like it.
20         MR. ZELLERS:  Let's take a
21 break.  Thank you.
22         THE VIDEOGRAPHER:  Going off the
23 record, the time is 10:50 a.m.
24         (Recess from 10:50 a.m. to

Page 105

1     11:07 a.m.)
2         THE VIDEOGRAPHER:  This marks
3 the beginning of Disc 2.  Back on the
4 record, the time is 11:07 a.m.
5 BY MR. ZELLERS:
6     Q.    Dr. Crowley, your first opinion
7 is that the fragrance chemicals in baby
8 powder and Shower to Shower are not in
9 compliance with governmental and industry
10 standards.  Correct?
11     A.    Yes.
12     Q.    Your second opinion is that the
13 fragrance chemicals in these talcum powder
14 products contribute to the inflammatory
15 properties, toxicity, and potential
16 carcinogenicity of these products.  Is that
17 right?
18     A.    Yes.
19     Q.    Is it your opinion that the
20 fragrance chemicals alone can cause cancers?
21         MS. O'DELL:  Objection; form.
22     A.    I was not asked to make that
23 consideration.
24

Page 106

BY MR. ZELLERS:

Q.    You are not expressing an opinion as to whether or not the fragrance chemicals alone can either cause cancer or increase the risk of cancer.  Correct?

MS. O'DELL:  Object to the form.

A.    That's -- that's correct.

BY MR. ZELLERS:

Q.    It also -- strike that.

You also are not expressing any opinion that the fragrance chemicals alone can cause or increase the risk for ovarian cancer.  Correct?

A.    That's correct.

Q.    Are you aware of any epidemiology that substantiates the theory that fragrance chemicals in talc can either cause cancer or increase the risk of cancer?

MS. O'DELL:  Object to the form.

A.    Yeah.  As I cited in my report, there's a number of fragrance chemicals with demonstrated in vitro and in vivo studies that demonstrated a higher risk or, in fact, in which cancer occurred.

Page 107

BY MR. ZELLERS:

Q.    Those studies you cite to --

A.    Yes.

Q.    -- are reference -- let me finish.

Those studies you cite to are referenced in your report.  Is that right?

A.    Yes.

Q.    For any individual plaintiff in this litigation, do you know what amount of fragrance chemicals individual plaintiffs were exposed to?

MS. O'DELL:  Object to the form.

A.    No, I do not.

BY MR. ZELLERS:

Q.    Did you make any effort to discern any individual plaintiff's level of exposure?

A.    No.  I wasn't asked to consider that.

Q.    Did you make any effort to discern whether any individual plaintiff was actually exposed to harmful levels of fragrance chemicals?

Page 108

MS. O'DELL:  Object to the form, asked and answered.  You may answer the question.

A.    No, I did -- I wasn't asked to consider that.

BY MR. ZELLERS:

Q.    You are not rendering any opinion that fragrance chemicals plus talc cause ovarian cancer.  Correct?  You leave that to other experts?

A.    That's correct.

Q.    You are not offering any opinions about the inhalation exposure to fragrance chemicals.  Is that right?

A.    That's correct.

Q.    You're not providing any opinions relating to asbestos.  Correct?

A.    That's correct.

Q.    Your opinions in this matter, other than putting them in your report, have you published on them?

A.    No.

Q.    What methodology -- strike that.

Why haven't you published on

Page 109

your opinions that you're expressing in this case?

A.    I signed a protective order.  This is all confidential information.

Q.    What methodology did you use in reaching your opinions in this case?

A.    I was given the list of fragrance chemicals.  I set about identifying them.  The names of the chemicals were in the Thomas Dydek report.  That often started by just plugging that into Google or PubChem to see what I could find.

After doing that, I would then try to identify a CAS number so I could cross-reference it into various databases and gather the physical and chemical properties, as well as the safety profile, in vitro or in vivo studies, and any published or known pharmacological properties.

I would then go to IFRA and CIR websites and look at their -- the information they had on it, the FDA website, in particular the Inactive Ingredient Database.

I looked in some of the

Michael Crowley, Ph.D.

Page 110

1 journals, specifically Food and Chemical
2 Toxicology, to see what the studies were. I
3 looked at the EFSA website, the European Food
4 Safety Authorities, you know, all the
5 different places that I've identified in my
6 report and gathered as much information as I
7 could on it.
8         Once Appendix A and Appendix B
9 were built, then I started classifying them.
10 How many of them are considered -- are
11 classified as irritants? Which ones are
12 allergens? Which ones are eye irritants?
13 And so forth.
14         I also looked at, you know, the
15 RTECS database, the Registry of Toxic Effects
16 of Chemical Substances, and so forth.
17         There's a tremendous amount of
18 work to identify some of these chemicals
19 because the names given to me, you know,
20 aren't the standard chemical names. So there
21 was a significant effort just to try and
22 figure out what they were.
23     Q.    Essentially what you have done
24 in this case is to take the list of fragrance

Page 111

1 chemicals or fragrance ingredients and then
2 Google them or ChemPub them and go to
3 websites, FDA and IFRA and others, to catalog
4 or to list out information about the
5 fragrance chemicals. Is that right?
6         MS. O'DELL: Object to the form.
7     A.    That's -- that's generally
8 correct. I also, you know, like I said,
9 looked at the technical literature. I mean,
10 it wasn't just websites, databases. I tried
11 to examine the totality of the evidence for
12 each and every chemical and collate that into
13 a meaningful -- in a meaningful way to
14 examine their properties and to answer the
15 questions that were posed to me.
16 BY MR. ZELLERS:
17     Q.    Do you know whether the
18 methodology that you've used, whether that's
19 been published anywhere?
20     A.    The methodology that I used to
21 gather the information, whether --
22     Q.    Yes.
23     A.    -- that's been published?
24     Q.    Used to gather the information

Page 112

1 and to render your opinions.
2     A.    I mean, there's books on how you
3 formulate and the steps that you take to
4 gather the information on the materials and
5 chemicals that you're going to use to create
6 a composition and how you go about doing
7 that. So I imagine that it's been published
8 in one way or another.
9     Q.    To your knowledge, the
10 methodology that you have used in reviewing
11 the information relating to fragrance
12 chemicals and arriving at your opinions has
13 not been subject to peer review. Correct?
14         MS. O'DELL: Object to the form.
15     A.    I'm not sure I understand your
16 question. Look, these are chemicals. Okay?
17 I mean, they happen to be fragrances, but
18 they're really no different than a chemical
19 used to make a food or a pharmaceutical.
20 They're chemicals.
21         When you're doing a safety
22 assessment of them, there's a number of ways
23 to collect and collate that information. I
24 don't think that anything that I did is

Page 113

1 different than what a standard formulator
2 would use in putting a product together for
3 examining the safety of a -- of a commercial
4 product.
5 BY MR. ZELLERS:
6     Q.    Do you believe the standard for
7 proving causation in the scientific
8 literature is the same as the one that
9 applies in litigation?
10         MS. O'DELL: Object to the form.
11     Are you talking about for a specific
12     disease or --
13         MR. ZELLERS: I'm just asking
14     the questions. If you can, just limit
15     your objection to form.
16 BY MR. ZELLERS:
17     Q.    So I'm asking you that question,
18 Doctor. If you can answer it, please do. If
19 you can't, okay.
20     A.    Could --
21         MS. O'DELL: I object to the
22     form of the question. It's vague.
23     It's unclear. But if you understand
24     it, you may answer it.

Michael Crowley, Ph.D.

Page 114

1    A.    I was going to ask him to repeat
2  it, please.
3  BY MR. ZELLERS:
4    Q.    Sure.  Do you believe the
5  standard for proving causation in the
6  scientific literature is the same as the one
7  that applies in litigation?
8    A.    I'm not sure.
9    Q.    Are you aware of any publication
10 that links the fragrance chemicals in baby
11 powder and Shower to Shower to ovarian
12 cancer?
13        MS. O'DELL:  Object to the form.
14    A.    I don't believe I found a source
15 that made that association.  However, you
16 know, as I said earlier, a number of these
17 chemicals have demonstrated studies against
18 Chinese hamster ovary cells or in vivo animal
19 studies in which cancers in the ovaries were
20 found.
21 BY MR. ZELLERS:
22    Q.    Doctor, you have found no
23 publication that links the fragrance
24 chemicals in baby powder and Shower to Shower

Page 115

1  and human ovarian cancer.  Correct?
2    A.    Human ovarian cancer?
3    Q.    Yes.
4        MS. O'DELL:  Excuse me.  Object
5  to the form.  You may answer.
6    A.    Not humans, no.  Animal models,
7  yes.
8  BY MR. ZELLERS:
9    Q.    What animal models are you
10 referring to that relate to fragrance
11 chemicals?
12    A.    I'm going to refer to my report.
13    Q.    Sure.
14    A.    So benzaldehyde, sister
15 chromatid exchange, which is a mutation, in
16 Chinese hamster ovary cells.  That was
17 published by Galloway in '87.
18    Q.    What reference is that?
19    A.    Galloway, et al., 1987.
20    Q.    You're reading from your report.
21    A.    That's correct.
22    Q.    What page of your report are you
23 reading from?
24    A.    Page 22.

Page 116

1    Q.    Any others?
2    A.    Yes.  d-Limonene was found to
3  be cytotoxic against Chinese hamster ovary
4  cells.  I'm not sure how to pronounce the
5  name of this author, but it's
6  K-P-O-V-I-E-S-S-I, et al., from 2014.
7    Q.    What page of your report?
8    A.    Page 22.
9    Q.    All right.  Any other articles
10 or publications that link the fragrance
11 chemicals or a fragrance chemical that you
12 believe is in baby powder and Shower to
13 Shower to ovarian cancer?
14    A.    There's a bunch of them.
15 Page 22, Skatole, cytotoxic against Chinese
16 hamster ovary cells.  That was in Reddy,
17 2002.
18    Q.    Any others?
19    A.    Yes.  Styrene, cytogenic DNA
20 damage, DNA inhibition, sister chromatid --
21        THE REPORTER:  I'm sorry.  Try
22    to slow down for me.  I've got to write
23    what you're saying.
24        THE WITNESS:  I'm sorry.

Page 117

1        THE REPORTER:  That's okay.
2    A.    Cytogenic DNA damage, DNA
3  inhibition, sister chromatid exchange, un --
4  BY MR. ZELLERS:
5    Q.    And that relates to ovarian
6  cancer.  Correct?
7    A.    Yes.
8        MS. O'DELL:  Please finish,
9    Dr. Crowley.
10    A.    Benzyl alcohol, cytogenic in
11 Chinese hamster ovary cells, National
12 Toxicology Program, 1989.
13        Citral, selective oocyte
14 degeneration and impaired fertility in female
15 rats.  Toaff, which is spelled T-O-A-F-F,
16 Abramovici, Sporn & Liban, 1979.
17        Valid genotoxic (induction of
18 sister chromatid exchange) in Chinese hamster
19 ovary cells, National Toxicology Program,
20 2003.  And same author as before,
21 K-P-O-V-I-E-S-S-I, 2014.
22        Coumarin, sister chromatic
23 exchange in Chinese hamster ovary cells,
24 Galloway, 1987.

Page 118

BY MR. ZELLERS:

Q.    Are you finished?

A.    No.  Ethyl methylphenylglycidate sister chromatid exchange and chromosomal aberrations in Chinese hamster ovary cells, Galloway, 1987.

European Food Safety Authority, same substance.  There's substantial evidence of a genotoxic potential from the available in vitro and in vivo studies.

Eugenol, sister chromatid exchange and chromosomal aberrations in Chinese hamster ovary cells, Galloway, 1987.

Styrax oil, sister chromatid exchange in Chinese hamster ovary cells, Gulati, Witt, Anderson, Zeiger & Shelby, 1989.

para-Cresol, cytogenetic in Chinese hamster ovary cells, DNA damage in human lymphocytes, morphologic transformations in mice, RTECS, the Cosmetic Ingredient Review Panel, 2006.

para-Cresol was considered positive for reducing chromosomal aberrations

Page 119

in Chinese hamster ovary cells under both activation and non-activation conditions.

para-Cymene, cytotoxic against Chinese hamster ovary cells.

Q.    Are you finished?

A.    Propanedioic acid, diethyl ester, tumorigenic in mice following oral dosing, RTECS.

Q.    Are you finished?

A.    That's -- that's the baby powder product.  I'd like to go to Shower to Shower, if you'd like.

Q.    Is it all listed in your report?

A.    Yes.

Q.    All right.  Let's move on, and we'll incorporate, as we have, your report into your response.

You are familiar -- strike that.

Are you familiar with a human health risk assessment?

MS. O'DELL:  Object to the form of -- to the preamble to the question.

A.    Yes.

Page 120

BY MR. ZELLERS:

Q.    Are you familiar with a paradigm developed by the National Academy Of Sciences, also known as the NRC?

A.    I have heard of the NRC.  I'm trying to remember what the acronym stands for.  Would you please enlighten me?

Q.    Let's go step by step.

(Exhibit No. 16 marked)

BY MR. ZELLERS:

Q.    Deposition Exhibit 16 is an EPA NRC Risk Assessment Paradigm.  Is that right?

MS. O'DELL:  If you haven't seen this before, Doctor --

THE WITNESS:  I haven't --

MS. O'DELL:  -- feel free to take a few minutes and --

A.    I haven't seen this particular document before.

BY MR. ZELLERS:

Q.    Are you generally familiar with risk assessment?

A.    Yes.

Q.    Are you aware and do you agree

Page 121

that there's different stages or steps to a risk assessment?

A.    Yes.

Q.    Look at the bottom of Page 16.

A.    I only have three pages here.

Q.    I'm sorry.  That's a bad question.  Let me withdraw it.

Look at the bottom of the first page of Deposition Exhibit 16, which sets forth the National Academy of Sciences' risk assessment steps.

Do you see that at the bottom of the first page of Exhibit 16?

A.    Yes.

Q.    Do you agree that the steps in a risk assessment are; No. 1, hazard identification; No. 2, dose response assessment; No. 3, exposure assessment, and, No. 4, risk characterization?

MS. O'DELL:  Objection; form.

A.    That's what it says.

BY MR. ZELLERS:

Q.    Are you generally familiar with these steps of a risk assessment?

Michael Crowley, Ph.D.

Page 122

1    A.    Yes.
2    Q.    All four steps are necessary to
3 complete a full risk assessment.  Is that
4 right?
5          MS. O'DELL:  Object to the form.
6    A.    According to this paradigm and
7 this model.
8 BY MR. ZELLERS:
9    Q.    And according to your
10 background, your training, your education.
11 Is that right?
12         MS. O'DELL:  Object to form.
13 BY MR. ZELLERS:
14    Q.    Or do you have any background
15 training in risk assessment?
16    A.    I do have background in it,
17 and --
18    Q.    Do you agree that generally --
19         MS. O'DELL:  Excuse me, sir.  I
20 don't think he was finished.
21    A.    Yeah.  I would have to study
22 this in greater detail to ensure that it's
23 consistent with how I've seen it done.  I'm
24 more familiar with the FDA's risk assessment

Page 123

1 models.  And there's another model called the
2 Muller model that's been used in toxicology
3 and pharmacology.
4 BY MR. ZELLERS:
5    Q.    Did you attempt to do a risk
6 assessment analysis in this case?
7    A.    I wasn't asked to do a risk
8 assessment.
9    Q.    Do you think it would be
10 important in terms of arriving at your
11 opinions in this case to do a risk
12 assessment?
13         MS. O'DELL:  Object to the form.
14    A.    Not necessarily.
15 BY MR. ZELLERS:
16    Q.    All right.  You have not done a
17 risk assessment in this case.  Correct?
18         MS. O'DELL:  Excuse me.  Object
19 to the form.
20    A.    No, I have not.
21 BY MR. ZELLERS:
22    Q.    You identified a potential
23 hazard.  Is that right?
24    A.    I was not asked to identify a

Page 124

1 hazard.  I was provided with a list of
2 chemicals and asked two questions.
3    Q.    You have not done a dose
4 response assessment in this case for any of
5 the fragrance chemicals in either the talc
6 powder or the Shower to Shower powder.
7 Correct?
8    A.    I was unable to do it because I
9 wasn't given, No. 1, the information to know
10 how much of each fragrance chemical was
11 present in the composition, and when we were
12 given that information, there's no units
13 there.
14         More importantly, you know, as I
15 just cited from my report, some of these
16 fragrance chemicals are genotoxic.  You don't
17 need to do a dose response relationship for a
18 genotoxic material, because genotoxins you
19 need one molecule for there to be an
20 increased risk, one.
21    Q.    You have not done any exposure
22 assessment in this case.  Correct?
23    A.    That's correct.  I was not asked
24 to do so.

Page 125

1    Q.    You have not done a risk
2 characterization or analysis in this case.
3 Correct?
4    A.    That's correct.  And I wasn't
5 asked to do that.
6    Q.    Are you familiar with --
7         MS. O'DELL:  Excuse me.
8 Counsel, with your permission, can I
9 lodge my objection?  I was slow off the
10 mark to that question.
11 BY MR. ZELLERS:
12    Q.    Are you familiar with the
13 concept of dose response?
14    A.    Yes.
15    Q.    The science of toxicology is
16 based on the principle that there is a
17 relationship between a toxic reaction and the
18 amount of a substance received.  Correct?
19    A.    That's only partially correct,
20 Counselor.  As I just indicated, genotoxic
21 materials do not -- are not thresholded.
22 They don't have a threshold.  One molecule is
23 enough to cause an increased risk.
24         Non-genotoxic carcinogens do

Michael Crowley, Ph.D.

Page 126

1  have the dose response relationship.
2      Q.    You've not considered dose
3  response in this case.  Correct?
4      A.    I wasn't asked --
5          MS. O'DELL:  Excuse me.  Object
6  to the form, misstates his testimony.
7          You may answer the question.
8  BY MR. ZELLERS:
9      Q.    Go ahead.
10     A.    I was not asked to, and I was
11 unable to based on the information that I was
12 given.
13     Q.    Those fragrance chemicals that
14 you believe are capable of a genotoxic
15 response, have you identified those in your
16 report?
17     A.    First of all, I don't believe
18 they are.  I didn't to do the research.  I'm
19 simply reporting what I found in the
20 research.  Those conclusions were drawn by
21 the authors of those studies.  I'm simply
22 reporting that they were found to have valid
23 genotoxic results.
24     Q.    What you did is you went out and

Page 127

1  you were asked by counsel for plaintiffs to
2  catalog the information relating to these
3  fragrance chemicals.  Is that right?
4          MS. O'DELL:  Object to the form.
5      A.    I reviewed the totality of the
6  evidence on the chemicals.
7  BY MR. ZELLERS:
8      Q.    You then have reported that
9  information in your report.  Correct?
10         MS. O'DELL:  Object to the form.
11     A.    Yes.
12 BY MR. ZELLERS:
13     Q.    Any genotoxic characteristic of
14 any of the fragrance chemicals would be set
15 forth in the information you've collected in
16 your report.  Fair?
17         MS. O'DELL:  Object to the form.
18     A.    Yeah.  If I found a genotoxic
19 result, I would report it unless, of
20 course -- and there were some instances --
21 for example, the European Food Safety
22 Authority was actually quite good about
23 saying, you know, "This result was positive
24 for genotoxicity, but we are dismissing it

Page 128

1  because it couldn't be reproduced or the
2  study design is not consistent with
3  established standard."
4          So I certainly took those into
5  consideration as well.  So if it was a study
6  that was not considered to be valid, I didn't
7  report it.
8  BY MR. ZELLERS:
9      Q.    There is a difference between
10 animal studies and human studies.  Correct?
11     A.    That's correct.
12     Q.    You can't just apply an animal
13 study or results of an animal study to a
14 human study.  Correct?
15         MS. O'DELL:  Object to the form.
16     A.    I don't know how to answer that
17 question.  What do you mean by "apply"?
18 BY MR. ZELLERS:
19     Q.    I will withdraw the question.
20         Do you agree that all substances
21 can be potentially hazardous if the dose is
22 too high?
23         MS. O'DELL:  Object to the form.
24     A.    I mean, that's sort of a

Page 129

1  hypothetical.  What if -- fairytale land.  So
2  I suppose, if you have too much water, you
3  could drown, or too much salt, that could
4  cause problems.
5          Generally speaking, poisons are,
6  you know, dose-and-exposure relationship.
7  So, in that context, yes, most materials
8  could be hazardous if too much is consumed or
9  if the exposure is too great.
10 BY MR. ZELLERS:
11     Q.    Do you agree that for chemicals
12 and substances there can be multiple routes
13 of exposure?
14     A.    I'm not sure what you're asking
15 me.  Yes, you know, you can inhale air and
16 you can also have transdermal absorption.
17     Q.    You can also have ingestion.
18 Correct?
19     A.    Yeah.
20     Q.    Those are all different routes
21 of exposure?
22     A.    Yes.
23     Q.    Is that right?
24     A.    I prefer to call them routes of

Michael Crowley, Ph.D.

Page 130

1 administration, typically, is the
2 nomenclature used.
3     Q.    Do you agree that if a person is
4 exposed to a substance by ingestion, they
5 will absorb a different amount of a substance
6 than if the substance is applied to the skin,
7 a dermal exposure?
8     A.    So you're speaking in
9 generalities, and it varies from substance to
10 substance.  The bioavailability is, I think,
11 what you're referring to.  So you may eat
12 something and only half of it is absorbed
13 into the body, a portion of it may be
14 metabolized in the stomach or not absorbed at
15 all.
16         It would have a different
17 pharmacokinetic profile when absorbed through
18 the skin, perhaps.  So route of
19 administration does impact pharmacokinetics
20 and biological activity, including toxicology
21 and pharmacology.
22     Q.    Can the route of exposure have
23 an impact on the amount of a substance that
24 is absorbed by the body?

Page 131

1     A.    Yes.
2     Q.    Do you agree that it is not
3 scientifically valid to only identify a
4 hazard and then try to formulate conclusions
5 about the risk of a particular contaminant
6 without going through a full risk assessment?
7         MS. O'DELL:  Object to the form.
8     A.    Can you repeat the question?
9 BY MR. ZELLERS:
10     Q.    Sure.  Do you agree that in
11 order to have a scientifically valid opinion
12 with respect to the risk of a particular
13 contaminant, it is important to go through a
14 full risk assessment?
15     A.    No.
16         MS. O'DELL:  Object to the form.
17 BY MR. ZELLERS:
18     Q.    It's not necessary?
19     A.    No.
20     Q.    It's not necessary to look at
21 dose response in that relationship.  Correct?
22     A.    As I told you earlier, genotoxic
23 materials do not live under a dose response
24 relationship.  If it's been classified as

Page 132

1 genotoxic, one molecule is enough to cause an
2 increase in risk associated with that
3 particular compound.
4         So there's general principles
5 that a person of skill can look at, and they
6 don't need to do a full risk assessment to
7 draw a conclusion as to its safety or risk
8 associated with an exposure.
9     Q.    Your answer to my question
10 relates to genotoxic materials.  Correct?
11     A.    All substances, in general.
12     Q.    So it is not necessary, in order
13 to assess the risk of a substance, to do a
14 dose response assessment.  Is that your
15 testimony?
16         MS. O'DELL:  Object --
17     A.    No.  I think --
18         MS. O'DELL:  Excuse me.  Object
19 to the form, misstates his testimony.
20     A.    Yeah, you're misstating what I
21 just said.  I can read an MSDS and have a
22 very good sense on how to handle a chemical
23 or a SafeBridge assessment or any number of
24 safety assessments.  I don't need to do a

Page 133

1 risk analysis.  That's already been done and
2 published in the literature.
3 BY MR. ZELLERS:
4     Q.    Someone, though, has to do -- as
5 part of a risk assessment to understand the
6 risk of a particular, in this case, fragrance
7 chemical, someone needs to do a dose response
8 assessment.  Correct?
9         MS. O'DELL:  Object to the form.
10     A.    Are you asking me how data
11 inside an MSDS or a tox study is -- I mean,
12 I'm not sure what you're asking me.  If
13 you're asking me how tox studies are done and
14 how safety information on chemicals is
15 created, they generally are done.  I don't
16 need to do one to review the data available
17 on something to understand the risk
18 associated with that particular chemical.
19 BY MR. ZELLERS:
20     Q.    My question is:  Someone, in
21 order to assess the risk of a particular
22 chemical, needs to do a risk assessment.
23 Correct?
24     A.    They can do -- certainly do

Michael Crowley, Ph.D.

Page 134

1  that.
2      Q.    The risk assessment, one element
3  or part of it, would be to do a dose response
4  assessment.  Correct?
5      A.    That is often done with new
6  molecular entities and chemicals to establish
7  their safety profile.
8      Q.    Another part of a risk
9  assessment would be an exposure assessment.
10 Correct?
11     A.    Yes.
12     Q.    There then would be a risk
13 characterization.  Is that right?
14         MS. O'DELL:  Object to the form.
15     A.    Yes.
16 BY MR. ZELLERS:
17     Q.    All right.  You have not done
18 that analysis for the fragrance chemicals
19 identified in the talcum powder in this case.
20 Correct?
21         MS. O'DELL:  Objection.
22     A.    No.  I relied upon the available
23 information for the chemicals from, you know,
24 MSDS sheets and the published studies that

Page 135

1  did do those things.
2  BY MR. ZELLERS:
3      Q.    In your report, you state that
4  there are 141 fragrance chemicals in baby
5  powder.  Is that right?
6      A.    Yes.
7      Q.    Where did you get that number
8  from?
9      A.    I counted the ones that were
10 disclosed to me in the Dydek report, and I
11 noted that some of those fragrances are
12 actually mixtures of chemicals themselves.
13 So, for example, certain gums are actually --
14 or resins are actually crude extracts that
15 are actually a combination.  And I think I
16 used the word "at least."
17     Q.    You did not do any independent
18 testing of the baby powder to try to
19 determine what fragrance chemicals were
20 included in the powder.  Correct?
21     A.    No, I did not do any testing.
22     Q.    In your report, you say there
23 are 53 fragrance chemicals in Shower to
24 Shower.  Where did you get that number from?

Page 136

1      A.    I counted.  The same way for
2  baby powder.  I counted based off of the
3  information disclosed.
4      Q.    In Dr. Dydek's report?
5      A.    Yeah.
6         MS. O'DELL:  Object to the form.
7  BY MR. ZELLERS:
8      Q.    Does the list of fragrance
9  chemicals that you relied on indicate the
10 amount of each chemical in baby powder?
11     A.    No.
12     Q.    Does it indicate the amount of
13 each chemical in baby powder -- strike that.
14 Withdraw.
15         Does it indicate the amount of
16 each chemical in Shower to Shower?
17     A.    No.
18     Q.    What is the concentration of
19 each of the fragrance chemicals that you have
20 identified in a bottle of baby powder?
21         MS. O'DELL:  Object to the form.
22     A.    I don't know.  I wasn't provided
23 that information.
24

Page 137

1  BY MR. ZELLERS:
2      Q.    What is the concentration of
3  each of the fragrance chemicals that you have
4  identified in a bottle of Shower to Shower?
5      A.    I don't know.  I wasn't provided
6  that information.
7      Q.    Can you tell me how much of each
8  fragrance chemical is in one ounce of baby
9  powder?
10     A.    No, I cannot.
11     Q.    In one ounce of Shower to
12 Shower?
13     A.    No, I can't.  In part, it would
14 have been nice to have seen where -- in
15 industry standard content uniformity studies.
16 So the fragrance is blended with talcum
17 powder, and it's industry standard to take
18 aliquots of the blend and test them to verify
19 that they're uniformly and homogeneously
20 mixed, but that information wasn't made
21 available to me.
22     Q.    Did you ask counsel for that
23 information?
24     A.    I did.

Michael Crowley, Ph.D.

Page 138

1    Q.    Did you do any independent
2  testing to determine the concentration of the
3  fragrance chemicals?
4    A.    No.
5    Q.    In what other products are any
6  of these ingredients used?  Are you --
7    A.    I wasn't asked to consider that.
8        MS. O'DELL:  Excuse me.  Excuse
9    me.  When you say "ingredients," you're
10   talking about the totality of all the
11   chemicals that are listed in his
12   report, or are you asking just
13   generally are there other products that
14   they're used in?
15       MR. ZELLERS:  Counsel, I'm more
16   concerned if the witness doesn't
17   understand the question than whether
18   you understand the question.  My
19   question --
20       MS. O'DELL:  I understand that,
21   but I need to understand in order to
22   object and make my record, so --
23 BY MR. ZELLERS:
24   Q.    My question is:  Did you attempt

Page 139

1  to look or make a determination as to in what
2  other products any of these fragrance
3  chemicals are used?
4    A.    Yes, I did.  I looked on the FDA
5  Inactive Ingredients Database.
6    Q.    Did you make a determination as
7  to in what other products they are used
8  vaginally?
9    A.    Yes.
10   Q.    Did you include that in your
11 report?
12   A.    Yes.
13   Q.    What fragrance chemicals did you
14 identify that are used vaginally?
15   A.    I'm going to have to go look at
16 the report, because I don't have that
17 committed to memory, but --
18   Q.    Well, do you state it or set it
19 forth in the report?
20   A.    Yes.
21   Q.    Just tell me the page or where I
22 can look for that notation.
23       MS. O'DELL:  You -- you may tell
24   him the page, certainly, but if you

Page 140

1    want to complete your answer, Doctor,
2    you are welcome to do that.
3    A.    Yeah.  So it's disclosed in
4  my -- in my report.  I reviewed the FDA's
5  Inactive Ingredient Database for each one of
6  these chemicals, and on Page 43, Table 14
7  lists those chemicals that are listed on the
8  Inactive Ingredient Database.
9        Those chemicals listed for
10 topical administration -- in other words, to
11 the skin -- and those chemicals that are
12 listed for vaginal administration.  According
13 to paragraph -- or Table 14 on Page 43,
14 benzyl alcohol present in baby powder is
15 listed for vaginal administration.  That's
16 the only one in baby powder.
17       In Shower to Shower, that
18 information is in Table 23 on Page 61, the
19 same type of table with IID listed, topical
20 administration and vaginal administration.
21 In Shower to Shower, propylene glycol and
22 t-butyl hydroquinone are the only two that
23 are in approved products for vaginal
24 administration.

Page 141

1  BY MR. ZELLERS:
2    Q.    Do you know when the list of
3  fragrance chemicals that you relied on from
4  Dr. Dydek's report was produced?
5        MS. O'DELL:  Object to the form.
6    A.    Do I know when I received it?
7  Are you asking when I got it or --
8  BY MR. ZELLERS:
9    Q.    My question is:  Do you know for
10 what period of time that list of fragrance
11 ingredients was for?
12       MS. O'DELL:  Object to the form.
13   A.    I'm not sure I understand what
14 you're asking me.
15 BY MR. ZELLERS:
16   Q.    Sure.
17   A.    Are you asking me do I know what
18 time period that fragrance composition was
19 used in those products?
20   Q.    Let me try to ask a better
21 question.
22       Do you know if the list of
23 fragrance chemicals for the baby powder is
24 the list of current fragrance ingredients?

Michael Crowley, Ph.D.

Page 142

1    A.   No, I --
2         MS. O'DELL:  Objection --
3    objection to form.  You can answer.
4    A.   Yeah, I don't know with
5    certainty.  We did ask for the list of
6    fragrance chemicals and all change control
7    documents associated with that composition.
8    So the presumption is that the information
9    that we were given is current.
10        As I was finishing this report,
11   we were provided some information that showed
12   a few compositional changes over the years.
13   For example, styrene, I believe, was removed
14   in, I think, 2014.
15   BY MR. ZELLERS:
16   Q.   Do you know if the list of
17   fragrance chemicals in Shower to Shower that
18   you relied on is the current list of
19   fragrance chemicals?
20        MS. O'DELL:  Object to the form.
21   A.   Yeah, same answer.
22   BY MR. ZELLERS:
23   Q.   Do you know if the list of
24   fragrance chemicals for either baby powder or

Page 143

1    Shower to Shower has changed over time?
2         MS. O'DELL:  Object to the form,
3    asked and answered.
4    A.   I answered that.  We were
5    provided with one document that showed a
6    history of changes, and it did show some
7    changes over time.
8    BY MR. ZELLERS:
9    Q.   That is the only information you
10   have in terms of how the composition of
11   fragrance chemicals has changed relating to
12   either baby powder or Shower to Shower.  Is
13   that correct?
14   A.   Yes.
15        MS. O'DELL:  Object to the form.
16   BY MR. ZELLERS:
17   Q.   Do you know whether the
18   concentration of the fragrance chemicals has
19   changed over time for either baby powder or
20   Shower to Shower?
21   A.   I do not know.
22   Q.   If the list or concentration of
23   the fragrance chemicals changed over time,
24   would that impact your analysis regarding any

Page 144

1    potential harm caused by the fragrance
2    chemicals in the products?
3    A.   You know, I would have to review
4    those changes and take that into
5    consideration.  To be able to provide an
6    open-ended answer without reviewing the
7    underlying information and what those changes
8    were I think would be inappropriate.  So I'd
9    be happy to take that into consideration and
10   be given an opportunity to study it.
11   Q.   Let me ask you about your first
12   opinion, and that is that several of the
13   chemicals used in the J&J Consumer Products,
14   Inc., talc products are not in compliance
15   with governmental and industry standards.
16   That's your opinion.  Is that right?
17   A.   Correct.
18   Q.   As part of that opinion, you
19   identify 22 fragrance chemicals in baby
20   powder with a regulatory concern.  Is that
21   right?
22   A.   Yes.
23   Q.   And 20 fragrance chemicals in
24   Shower to Shower with a regulatory concern.

Page 145

1    Is that right?
2    A.   Yes.
3    Q.   You define regulatory concern as
4    seven different categories on Page 18 of your
5    report.  Is that right?
6    A.   Yes.
7    Q.   Is regulatory concern a
8    recognized term in the field of toxicology?
9         MS. O'DELL:  Object to the form.
10   A.   I mean, toxicology and
11   regulations are two different things, so I
12   think you're sort of confusing two very
13   different subjects, so --
14   BY MR. ZELLERS:
15   Q.   You're the one who is opining
16   that there is regulatory concern with regard
17   to certain of the fragrance chemicals.
18   Correct?
19   A.   So, yes, I am summarizing review
20   of the compliance of these particular
21   chemicals.  And I'd just like to add that I
22   was provided with some documents where J&J
23   did their own regulatory review of these
24   chemicals, and the words they used were

Michael Crowley, Ph.D.

Page 146

1  "regulatory concern." So I borrowed that --
2  I don't think that's plagiarism, but I
3  borrowed the use of those two words to title
4  this section.
5      Q.    In the couple of courses that
6  you took on toxicology, do you recall being
7  taught that regulatory concern is a
8  recognized term in that field?
9          MS. O'DELL: Object to the form.
10     A.    You're confusing two completely
11 different things.
12 BY MR. ZELLERS:
13     Q.    Can you answer my question?
14     A.    And I am answering. And, you
15 know, apples and oranges are both fruits, but
16 they have different colors. Your question
17 doesn't make any sense at all.
18          Regulations and toxicology are
19 two different things.
20     Q.    Is regulatory concern a
21 recognized term in the field of regulations?
22          MS. O'DELL: Object to the form.
23     A.    I suppose you could ask the FDA.
24

Page 147

1  BY MR. ZELLERS:
2      Q.    You list all the fragrance
3  chemicals in baby powder that you believe
4  present a regulatory concern in Table 6 of
5  your report. Is that right?
6      A.    Yes, as they've been defined
7  within the report.
8      Q.    You list all the chemicals that
9  you believe present a regulatory concern
10 relating to Shower to Shower in Table 15 of
11 your report. Is that right?
12     A.    I believe so, yes.
13     Q.    If a fragrance chemical is
14 included in Table 6 or Table 15, does that
15 mean it causes cancer?
16     A.    No. You know, again, you're
17 confusing regulations with toxicology. So
18 the first question relates to do regulatory
19 bodies, trade groups, say you can use these
20 things. Okay? Those regulations are often
21 based on toxicology, but you seem to be
22 confused on how they're applied and how this
23 information is to be understood.
24     Q.    Take a look, if you will, at

Page 148

1  Table 6. Do you have Table 6 in front of
2  you?
3      A.    I do. Page 18 and 19 and 20.
4      Q.    The column to the right,
5  regulatory concern -- in that column, you
6  list the reasons you believe the specific
7  chemicals you list constitute a regulatory
8  concern. Is that right?
9      A.    Yes.
10     Q.    You did the same thing for
11 Shower to Shower in Table 15?
12     A.    Yes.
13     Q.    Is that right?
14     A.    Yes.
15     Q.    The reasons that you include in
16 this column are the same seven categories
17 that you include in your definition of
18 regulatory concern from Page 18 of your
19 report. Is that right?
20     A.    Yes.
21     Q.    You only -- strike that.
22          In Table 6 and Table 15, you
23 only identify three specific statutory and/or
24 regulatory sources in the regulatory concern

Page 149

1  column. Is that right?
2          MS. O'DELL: Object to the form.
3      A.    I'd have to go check that.
4  BY MR. ZELLERS:
5      Q.    You list CFR Title 21, CIR,
6  which is Cosmetic Ingredient Review, and
7  IFRA, International Fragrance Association.
8  Is that right?
9          MS. O'DELL: Object to the form.
10     A.    I think, actually, there's four.
11 The Code of Federal Regulations, IFRA, CIR,
12 and the EU Annex, which I think is from -- is
13 that from European Food Safety -- you know, I
14 didn't -- I didn't count it up. Like I said,
15 I tried to look at all the different sources,
16 and these were the primary regulatory bodies
17 that make (inaudible) --
18     Q.    The other --
19          THE REPORTER: I'm sorry. The
20 regulatory bodies that?
21          THE WITNESS: That make those
22 regulations.
23 BY MR. ZELLERS:
24     Q.    The other four categories of

Michael Crowley, Ph.D.

Page 150

1 potential regulatory concern that come from
2 your report, Page 18, those are not listed as
3 reasons for regulatory concern in the table.
4 Is that right?
5        MS. O'DELL: Object to the form.
6        A.   I'm sorry. I'm not sure I
7 follow your question.
8 BY MR. ZELLERS:
9        Q.   And let me ask a better
10 question.
11              The other four categories that
12 you include in the regulatory concern column
13 do not cite or reference any regulations or
14 databases. Is that right?
15        A.   Well, for example, not permitted
16 for cosmetic use. Copper chlorophyll, it is
17 an approved colorant by FDA, but it's not
18 allowed for use in cosmetics. So I didn't
19 cite to the specific source of that
20 information here in this table, but if you go
21 to the Appendix A, you can click a hyperlink
22 and it will take you right to the citation in
23 the Code of Federal Regulations.
24        Q.   What I'm trying to identify are

Page 151

1 just the regulations or databases that you're
2 relying on with respect to regulatory
3 concern. So, No. 1, you looked at Code of
4 Federal Regulations, Title 21. Is that
5 right?
6        A.   Yeah.
7        Q.   And one of the reasons that you
8 list for various fragrance chemicals is that
9 the chemical is not listed in Code of Federal
10 Regulations, Title 21. Is that right?
11        A.   That's right. And the reason
12 for that is when formulation scientists,
13 whether they be a cosmetic chemist, a food
14 scientist, or a pharmaceutical scientist, is
15 going to create a product, use those that are
16 approved. And one of the first places you
17 look is the Code of Federal Regulations on
18 how they can be used, what they can be used
19 in, and how much they can be used for a given
20 route of administration. Now you start
21 looking at some of these other regulatory
22 bodies for specifications. So this --
23        Q.   Doctor --
24        MS. O'DELL: Excuse me. Let him

Page 152

1        finish his answer.
2 BY MR. ZELLERS:
3        Q.   You can finish your answer, but
4 I need you to just answer my questions or
5 we'll be here forever.
6              My question simply was: Did you
7 use the Code of Federal Regulations? Finish
8 your answer, and then I'll ask another
9 question, but I want to try to move this
10 along.
11        MS. O'DELL: He's answering the
12        question. Answer it fully.
13        A.   I've got all day, so we -- we
14 can be here as long as we need to.
15        MS. O'DELL: We're going to be
16        here for seven hours on the record, but
17        keep -- you may answer his question.
18        A.   So all these things are
19 considered by a scientist when creating a
20 product, and that includes looking at what
21 the government says is allowed to be used,
22 how it can be used, what kind of products it
23 can be used in, how much it can be used for
24 which given route of administration. And

Page 153

1 then you go and start looking below that at
2 the regulatory bodies in the world of
3 cosmetics. That includes CIR and IFRA -- or
4 the Food Chemicals Codex if it's something
5 used in foods, or the pharmacopeias, if
6 there's a standard for that.
7              So, you know, when I'm hired to
8 help create a product, these are all things
9 that we consider when we build it.
10        MR. ZELLERS: Move to strike as
11        nonresponsive.
12 BY MR. ZELLERS:
13        Q.   To what section of CFR Title 21
14 are you referring to?
15        A.   I'm sorry? You're asking me
16 which section?
17        Q.   Yes. Which -- CFR Title 21 is
18 big. Right?
19        A.   Yeah.
20        Q.   What section did you look at in
21 terms of your analysis in this case in
22 determining that the absence of a listing of
23 a fragrance chemical in CFR Title 21 is a
24 regulatory concern?

Page 154

1    A.    So if you go to the government's
2 website, you can pull up Part 21 of the Code
3 of Federal Regulations, and you can type in
4 something and search for it.  So I searched
5 for the whole thing.
6         Generally speaking, GRAS-listed
7 chemicals are -- have a little monograph
8 there or a section or code.  I looked in the
9 entirety of Title 21, which covers food,
10 drugs, and cosmetics.
11    Q.    Do all fragrance chemicals in
12 the United States need to be listed in Code
13 of Federal Regulations, Title 21?
14    A.    No.
15         MS. O'DELL:  Object to the form.
16 BY MR. ZELLERS:
17    Q.    Why does not being listed in CFR
18 Title 21 present a regulatory concern?
19    A.    It means the FDA has not
20 reviewed the data on it.
21    Q.    One way or the other.  Correct?
22    A.    Correct.
23    Q.    Look at -- strike that.
24         You also identify as a

Page 155

1 regulatory concern if a fragrance chemical is
2 not listed by CIR, the Cosmetic Ingredient
3 Review.  Is that right?
4    A.    Yes.
5    Q.    Are you familiar with CIR's
6 review procedures?
7    A.    I have read about them, yeah.
8         (Exhibit No. 17 marked)
9 BY MR. ZELLERS:
10    Q.    Deposition Exhibit 17.  Are
11 these the Cosmetic Ingredient Review
12 procedures that you reviewed in connection
13 with your analysis of this matter?
14         MS. O'DELL:  Object to form.
15    A.    I don't know.
16 BY MR. ZELLERS:
17    Q.    Are you familiar with these
18 procedures?
19    A.    I believe I've read a few
20 articles that have been published about the
21 CIR QRA system and so forth, but I don't know
22 that I've reviewed this specific document, to
23 be candid with you.
24    Q.    Do you agree that fragrance

Page 156

1 ingredients may be excluded from evaluation
2 by the CIR expert panel if their safety is
3 being determined by the Research Institute
4 for Fragrance Materials?
5    A.    Yes.
6    Q.    So the CIR may not even review
7 fragrance chemicals if RIFM --
8    A.    And REXPAN have done that.
9    Q.    Have done that.  Is that right?
10    A.    Yeah, that's correct.
11    Q.    Why, then, is -- if a fragrance
12 chemical is not listed in CIR, why does that
13 present a regulatory concern?
14    A.    Because some of the chemicals
15 are not fragrances.
16    Q.    Do you identify which chemicals
17 are not fragrances in your report?
18    A.    Yes.
19    Q.    Take a look at IFRA.  You list
20 as an additional reason in Table 6 for
21 regulatory concern if there is no IFRA -- and
22 IFRA is International Fragrance Association.
23 Is that right?
24         MS. O'DELL:  Object to the form.

Page 157

1    A.    International -- I have the name
2 of IFRA in my report.  I think you got it
3 right.  International Fragrance -- is it
4 Research Association?
5 BY MR. ZELLERS:
6    Q.    Well, whether it's International
7 Fragrance Research Association or
8 International Fragrance Association, we both
9 know what --
10    A.    IFRA is, yes.
11    Q.    -- IFRA is.  Is that right?
12    A.    I think -- I think we can agree
13 upon that, yeah.
14    Q.    IFRA makes usage standards for
15 fragrance chemicals.  Is that right?
16    A.    I think they also make purity
17 standards as well.
18    Q.    Is that a yes?
19    A.    Yes.  Sorry about that.
20    Q.    It's okay.
21         (Exhibit No. 18 marked)
22 BY MR. ZELLERS:
23    Q.    Deposition Exhibit 18.
24 Deposition Exhibit 18, if you look at the

Page 158

1 second paragraph, are those the standards for
2 the IFRA expert panel?
3         MS. O'DELL:  I just object to
4     this exhibit to the degree it seems to
5     be an incomplete copy of whatever is
6     being presented.
7 BY MR. ZELLERS:
8     Q.    The top of the document,
9 Exhibit 18, says, "about the standards -
10 IFRA, International Fragrance Association,"
11 and at the bottom there's a citation to the
12 IFRA website.  Is that right?
13    A.    Yes.
14         MS. O'DELL:  I stand on my
15     objection of the document itself.
16 BY MR. ZELLERS:
17    Q.    In order for IFRA -- let me
18 withdraw that.
19         To make usage standards, there
20 is an independent expert panel that performs
21 a safety assessment for and as part of IFRA.
22 Correct?
23    A.    Yeah, that's correct.
24    Q.    And if the safety assessment

Page 159

1 does not support the current use of the
2 chemical, the panel instructs IFRA to issue a
3 standard either restricting or banning a
4 material.  Is that correct?
5    A.    That's what it says.
6    Q.    So that means that if the safety
7 assessment does support the current use of a
8 chemical, IFRA does not issue a standard.
9 Correct?
10         MS. O'DELL:  Object to the form.
11    A.    I'm sorry.  Can you repeat the
12 question?
13 BY MR. ZELLERS:
14    Q.    Sure.
15    A.    It's a little confusing.
16    Q.    We started this day today by my
17 telling you not to answer a question you
18 didn't understand.
19    A.    Yeah.
20    Q.    Do you agree that if the safety
21 assessment by the expert panel supports the
22 current use of a chemical, IFRA does not
23 issue a standard?  Correct?
24         MS. O'DELL:  Object to the form.

Page 160

1         And if you need to read the document
2     he's referring to, feel free to do
3     that.
4    A.    It says -- reading Item No. 3,
5 it says, "if the safety assessment does not
6 support the current use, the panel instructs
7 IFRA to issue a standard."
8         If you're asking me about that,
9 then that's what it says.  That's how they do
10 it.
11 BY MR. ZELLERS:
12    Q.    So in your report, when you list
13 "No IFRA standard" next to an ingredient,
14 that actually means that IFRA has neither
15 restricted nor banned the chemical.  Correct?
16    A.    Not necessarily.  They have --
17 it appeared to me that they have published
18 standards on purity, providing specifications
19 and usage levels, regardless of whether it's
20 restricted or not.  They all have -- all the
21 fragrance chemicals that I examined have some
22 sort of usage level.
23    Q.    Looking at Deposition
24 Exhibit 18 --

Page 161

1    A.    Yeah.
2    Q.    -- this appears to be from the
3 IFRA website.  Correct?
4    A.    Yeah.
5    Q.    This describes how the expert
6 panel is used.  Is that right?
7         MS. O'DELL:  Objection.
8    A.    Yes.
9 BY MR. ZELLERS:
10    Q.    The expert panel is made up of
11 renowned independent experts in the fields of
12 dermatology, toxicology, pathology, and
13 environmental sciences.  Is that right?
14         MS. O'DELL:  Object to form.
15    A.    That's what it says.
16 BY MR. ZELLERS:
17    Q.    Their role is to evaluate the
18 data on a fragrance ingredient to see if it
19 supports the current use level to make sure
20 that there are no risks for the consumer.  In
21 cases where the safety assessment does not
22 support the current use, the panel then
23 instructs IFRA to issue a standard either
24 restricting or banning a material.  Did I

Page 162

1  read that correctly?
2     A.   I believe so.
3     Q.   And that is your understanding
4  of how the expert panel is used with respect
5  to the IFRA standards.
6     A.   That's --
7     Q.   Is that correct?
8     A.   Yes.
9     Q.   I'm going to ask you about some
10 of the chemicals that you identify in
11 Tables 6 and 15 as a regulatory concern.
12       No. 1, balsam Peru.  Do you see
13 that?
14    A.   Yes.
15    Q.   Myroxylon pereirae oil, or
16 balsam Peru, was on a list of ingredients
17 that you reviewed.  Is that right?
18    A.   Yes.
19    Q.   That is one of the ingredient --
20 one of the ingredients that you say is not in
21 regulatory compliance.  Is that right?
22    A.   Yes.
23    Q.   You claim that IFRA prohibits
24 its use as a fragrance.  Is that right?

Page 163

1     A.   That's what I found.
2     Q.   Take a look at the Index of IFRA
3  Standards, which we will mark as Deposition
4  Exhibit 19.
5          (Exhibit No. 19 marked)
6  BY MR. ZELLERS:
7     Q.   Are you familiar, generally,
8  with these standards?
9     A.   Yes.
10    Q.   The IFRA recommendations are
11 grouped into three categories; P for
12 prohibited, R for restricted, and S for
13 specified.  Is that right?
14    A.   Yes.
15    Q.   Prohibited is material should
16 not be used as a fragrance ingredient.  Is
17 that right?
18    A.   That's what it says, yes.
19    Q.   R, the use of the material
20 should be limited quantitatively?
21    A.   Yes.
22    Q.   S for specified, the material
23 should only be used if it meets certain
24 purity criteria or if it is used in

Page 164

1  conjunction with other materials.  Is that
2  right?
3     A.   Yes.
4     Q.   So P means chemicals should not
5  be used as a fragrance ingredient.  Correct?
6     A.   Yes.
7     Q.   R means that IFRA has set a
8  limit as to how much of an ingredient should
9  be used.  Is that right?
10    A.   Yes.
11    Q.   Turn to 163, which is on Page 9
12 of Deposition Exhibit 19.  Do you see that?
13    A.   No.  There's ten pages here, and
14 they're numbered 1 through 10.
15    Q.   Go to Page 9.
16    A.   Oh.  Okay.
17    Q.   Entry 163 lists Peru balsam
18 crude as prohibited.  Is that right?
19    A.   Yes.
20    Q.   The next line, Entry 164, it
21 lists Peru balsam extracts and distillates as
22 restricted.  Is that right?
23    A.   Yes.
24    Q.   Restricted means that IFRA has

Page 165

1  set a level for safe use.  Correct?
2     A.   Restricted means the material
3  should be limited quantitatively.  That's the
4  argument.  You've read that to me, and that's
5  right there on your own document.
6     Q.   Exactly.  So there is a limit in
7  terms of what a level would be for safe use.
8  Correct?
9     A.   You're adding words to the
10 definition of what R means.  It says, "The
11 use of the material should be limited
12 quantitatively."  I don't hear the words or
13 see the words "safe use" there.  So you're
14 mischaracterizing what R means.
15    Q.   R means that up to a certain
16 limit, it is acceptable to use the chemical
17 according to IFRA?
18    A.   That's correct.
19    Q.   All right.  Do you agree or do
20 you know if balsam Peru oil refers to the
21 extract or distillate?
22       MS. O'DELL:  Object to the form.
23 BY MR. ZELLERS:
24    Q.   And let me withdraw that.  Let

Michael Crowley, Ph.D.

Page 166

1 me ask a better question.
2         Balsam Peru oil refers to the
3 extract or distillate.  Is that right?
4     A.    They both have the same CAS
5 number.  Interesting.  I want to go to my
6 report and look and see what I wrote, if you
7 don't mind, and that's going to take me a
8 moment to get there.  Let me pull it up on
9 the computer.  That would be faster.
10     Q.    Well, here.  I can help you, I
11 think.  Let me give you a document, and if
12 you need to look at something else, you can
13 look at something else.
14         MS. O'DELL:  Yeah.  Feel free to
15 keep --
16         THE WITNESS:  I'm going to,
17 yeah.
18         MS. O'DELL:  Keep reviewing what
19 you'd like to review.
20     A.    I will tell you what I relied
21 upon.
22 BY MR. ZELLERS:
23     Q.    Well, my question isn't what you
24 relied upon.  My question is:  Do you agree

Page 167

1 that the substance that the fragrance
2 chemical that you identified is not
3 prohibited by IFRA?
4         MS. O'DELL:  Object to the form.
5 BY MR. ZELLERS:
6     Q.    And I think I can make it easy
7 for you.
8     A.    So the source I relied upon said
9 both resins, essential oils, and that was
10 TSCA.
11         (Exhibit No. 20 marked)
12 BY MR. ZELLERS:
13     Q.    Deposition Exhibit 20 --
14         MS. O'DELL:  Are you referring
15 to a particular page in your report?
16     A.    It's on Page 152.
17 BY MR. ZELLERS:
18     Q.    Deposition Exhibit 20 is the
19 IFRA standard --
20     A.    And that is -- I did look at
21 that, yeah.
22     Q.    Deposition Exhibit 20 is the
23 IFRA standard for Peru balsam extracts and
24 distillates.  Is that right?

Page 168

1     A.    Yes.
2     Q.    The ingredient that you
3 reference in your report is Myroxylon
4 pereirae oil or balsam Peru oil.  Correct?
5     A.    Yep.
6     Q.    That is listed by IFRA in its
7 standards as a Peru balsam extract and
8 distillate.  Is that right?
9     A.    Yes.
10     Q.    If we look at the IFRA standard,
11 Exhibit 19, and we go back to Page 9 of 10,
12 Entry 164, Peru balsam extract and distillate
13 is a restricted but not prohibited item.  Is
14 that right?
15     A.    That's what it says.
16     Q.    You do not know the level or
17 amount or concentration of Peru balsam
18 extract and distillate in the baby powder or
19 Shower to Shower powder.  Is that correct?
20     A.    I do not --
21         MS. O'DELL:  Object to the form.
22     A.    I do not know the amount.
23 BY MR. ZELLERS:
24     Q.    Take a look at Table 6.  You

Page 169

1 list a fragrance chemical benzene, ethenyl-.
2     A.    Uh-huh.
3     Q.    Is that "yes"?
4     A.    Yes.
5     Q.    You claim in your report,
6 Table 6, that benzene, ethenyl- is not
7 permitted for flavor or fragrance use.  Is
8 that right?
9     A.    That's correct.
10     Q.    What is that opinion based on?
11     A.    FDA recently delisted it.
12     Q.    Isn't it true the FDA only
13 removed it from its list of approved
14 flavorings because companies stopped using it
15 as a flavoring, but it is not banned as a
16 fragrance?
17         MS. O'DELL:  Object to the form.
18     A.    To the best of my knowledge -- I
19 mean, I read the same, probably, report that
20 you did when FDA removed it.  I don't believe
21 that it's allowed to be used as a fragrance.
22         I also want to go back to the
23 Peru balsam.  I pulled up the IFRA standard
24 that I looked at, and it was described as

Michael Crowley, Ph.D.

Page 170

1 Peru balsam crude, is listed as prohibited,
2 and the synonyms are the same my -- how do
3 you say it? Myroxylon pereirae?
4 BY MR. ZELLERS:
5     Q.    That's absolutely not true, is
6 it?
7     A.    I'm looking at it right here.
8     Q.    All right. Then let's mark as
9 Deposition Exhibit --
10     A.    It's from the 42nd amendment.
11     Q.    And it's your testimony under
12 oath that Peru balsam crude is the same as
13 Myroxylon pereirae oil? Is that your
14 testimony under oath?
15     A.    No. That's what I'm telling you
16 I drew the conclusion from. I relied upon
17 that.
18     Q.    And what you know is that Peru
19 balsam crude is not the ingredient that is in
20 the baby powder or Shower to Shower powder.
21 Correct?
22         MS. O'DELL: Object to the form.
23     A.    I don't know that.
24

Page 171

1 BY MR. ZELLERS:
2     Q.    Let me help you.
3     A.    Let me -- and let me point you
4 to what I'm looking at, because it also
5 describes it exactly as it was described in
6 what I was given, and it says it's
7 prohibited. Balsam oil Peru -- balsam Peru,
8 Myroxylon pereirae balsam Peru oil.
9         (Exhibit No. 21 marked)
10 BY MR. ZELLERS:
11     Q.    Okay. Deposition Exhibit 21 is
12 the IFRA standard for Peru balsam crude. Is
13 that right?
14     A.    Yes.
15     Q.    Peru balsam crude is -- they
16 give a synonym of exudation of Myroxylon
17 pereirae Klotsch. Is that right?
18     A.    Yeah, that's what it says right
19 there.
20     Q.    Exudation is different than a
21 extract and distillate. Correct?
22         MS. O'DELL: Object to the form.
23     A.    Yeah, so let me just point one
24 thing out to you. The CAS number of the

Page 172

1 crude is the same exact CAS number as the
2 oil. Do you see that? So do you now
3 understand how I drew my conclusion?
4 BY MR. ZELLERS:
5     Q.    I'm not -- yes. I'm not -- all
6 I care about is that we now have clarified
7 that the fragrance chemical in the baby
8 powder and Shower to Shower powder is the
9 Peru balsam extract and distillate. Correct?
10         MS. O'DELL: Object to the form.
11     A.    I'll take your word for it.
12 BY MR. ZELLERS:
13     Q.    There is a --
14         MS. O'DELL: Object to the form.
15 BY MR. ZELLERS:
16     Q.    There is a separate substance,
17 which is the Peru balsam crude, which is
18 described in IFRA standard that we've marked
19 as Exhibit 21, and that is the prohibited
20 substance. Correct?
21     A.    Yeah, and they're both listed
22 Myroxylon pereirae Klotsch. I mean, those
23 three words appear on both. They have the
24 same CAS number. So if what is being used in

Page 173

1 the baby powder is the restricted material
2 instead of the prohibited material, then I'll
3 be happy to update my report.
4     Q.    Take a look, then -- so let's go
5 back to my question about benzene, ethenyl-
6 from your report at Table 6, Page 18, and
7 specifically look at Exhibit --
8         MS. O'DELL: Would you mind just
9     saying that chemical again, because I
10     missed it?
11         MR. ZELLERS: Sure. Benzene,
12     ethenyl-, E-T-H-Y --
13         MS. O'DELL: I got it.
14         MR. ZELLERS: -- or maybe
15     E-N-Y-L.
16         MS. O'DELL: Thank you.
17         (Exhibit No. 22 marked)
18 BY MR. ZELLERS:
19     Q.    Deposition Exhibit 22, this is
20 the FDA's announcement as to the reason that
21 it was removing benzene, ethenyl- from its
22 list of food additives. Is that right?
23     A.    That's what it says, yeah.
24     Q.    If you --

Michael Crowley, Ph.D.

Page 174

1      A.    Why don't we call it styrene.
2  It's a little bit easier to pronounce.
3      Q.    If we go to the second page of
4  Exhibit 22, the first paragraph, the reason
5  the FDA gives for removing styrene as a food
6  additive is, "In response to a separate food
7  additive petition from the Styrene
8  Information and Research Center, the FDA is
9  granting the petition by amending its food
10 additive regulations to no longer allow for
11 the use of styrene as a synthetic flavoring
12 substance and adjuvant because industry has
13 abandoned this use."
14      Is that right?
15      A.    I believe that you faithfully
16 read that.
17      Q.    Okay.  This statement says
18 nothing about banning its use as a fragrance.
19 Is that right?
20      A.    That's correct.
21      Q.    All right.  Take a look at your
22 report and your reference to diethyl
23 phthalate.  You identified that as a
24 fragrance chemical with a regulatory concern.

Page 175

1  Is that right?  And I'm looking at Pages 46
2  and 47 of your report, Table 15.
3      A.    It's not a fragrance chemical.
4  Yeah, it's listed there.
5      Q.    Diethyl phthalate is not a
6  fragrance.  Is that right?
7      A.    That's correct.
8      Q.    For that reason, there is no
9  IFRA standard.  Is that right?
10      A.    That would probably be why the
11 IFRA folks wouldn't create a standard for it.
12      Q.    All right.  Diethyl phthalate is
13 listed on the IFRA transparency list.  Is
14 that right?
15      A.    I am not sure.  I'd have to
16 check that.
17      Q.    Do you agree that each fragrance
18 ingredient that is included on the
19 transparency list is included in the RIFM
20 safety assessment program?
21      MS. O'DELL:  Object to form.
22      A.    I'm sorry.  Repeat the question.
23 BY MR. ZELLERS:
24      Q.    Sure.  Do you agree that each

Page 176

1  fragrance ingredient that is included on the
2  transparency list is included in the RIFM
3  safety assessment program?
4      A.    I haven't --
5      MS. O'DELL:  Object to form.
6      A.    Yeah.  I haven't examined the
7  transparency list and checked to see if RIFM
8  has done a safety assessment on it.  So I
9  cannot opine or answer your question.
10 BY MR. ZELLERS:
11      Q.    If RIFM has done a safety
12 assessment on diethyl phthalate, then it
13 would be a fragrance.  Correct?
14      MS. O'DELL:  Object to the form.
15      A.    No.
16 BY MR. ZELLERS:
17      Q.    Does RIFM -- well, let me
18 withdraw that.
19      You list as a reference an
20 article on the genotoxicity of phthalate
21 esters.  Is that right?
22      A.    Which one are you referring to?
23      Q.    The Al-Saleh, A-L, hyphen,
24 S-A-L-E-H article.

Page 177

1      MS. O'DELL:  Are you referring
2  to a particular page in the report?
3      MR. ZELLERS:  I will.  Yeah,
4  Page 66.
5      MS. O'DELL:  Okay.  Thank you.
6  Page 66 in the report?
7      THE WITNESS:  Yes.  It's the
8  first reference.
9      MS. O'DELL:  Okay.
10 BY MR. ZELLERS:
11      Q.    You're generally familiar with
12 the paper.  Correct?
13      A.    Yeah.  I read -- read and
14 reviewed it.
15      (Exhibit No. 23 marked)
16      Q.    Take a look -- is Deposition
17 Exhibit 23 that article that you reference in
18 your report.
19      A.    I believe so.  Yeah.
20      Q.    Look at the first page in the
21 left column under introduction.  Do you see
22 at the very bottom, the last full sentence,
23 "PAEs, most commonly diethyl phthalate (DEP),
24 are also used as solvents and fixatives in

Michael Crowley, Ph.D.

Page 178

1 fragrant products such as perfumes,
2 cosmetics, and personal care products"?
3          Did I read that correctly?
4     A.   Where were you?  I --
5     Q.   I'm sorry.
6     A.   Yeah.
7     Q.   I thought we were together.
8     A.   Yeah.
9     Q.   Exhibit 23.
10    A.   Yeah.
11    Q.   Introduction on the right-hand
12 side of the first page.
13    A.   Yeah.
14    Q.   The very last sentence.  Do you
15 need me to read it again or --
16    A.   No.
17    Q.   -- did I read that correctly?
18    A.   Yeah, I believe that you used it
19 faithfully.
20    Q.   The authors in this article
21 indicate that diethyl phthalate is a
22 fragrance.  Correct?
23    A.   No, they do not.
24    Q.   Tell me how I'm misreading so --

Page 179

1     A.   It's a solvent.
2     Q.   Let's look again at the article
3 that you cited for support.  Exhibit 23, last
4 sentence under introduction on the first
5 page, "PAEs, most commonly diethyl phthalate,
6 or DEP, are also used as solvents and
7 fixatives in fragrant products such as
8 perfumes, cosmetics, and personal care
9 products."
10          Did I read it correctly?
11    A.   Yes.
12    Q.   And is that your understanding?
13    A.   Yes.  It's a solvent, and a
14 solvent and a fragrance are two different
15 things.  So phthalate esters, PAEs, and
16 diethyl phthalate do not have a fragrant odor
17 associated with them.  They are solvents for
18 the fragrances.
19    Q.   They are used in personal care
20 products.  Is that right?
21    A.   That's what it says, yeah.
22    Q.   According to the article that
23 you have cited -- and I'm looking at the next
24 page of the introduction, the second

Page 180

1 sentence, "The oversight of the U.S. Food and
2 Drug Administration" --
3     A.   I'm sorry.  Where are you?
4     Q.   Page 2.
5     A.   Yeah.
6     Q.   Exhibit 23.
7     A.   Yeah.
8     Q.   Second sentence, "The
9 oversight" --
10    A.   On the left column?
11    Q.   Yes, on the left column.
12    A.   First paragraph?  Okay.  "The
13 U.S. Food and Drug Administration" -- okay.
14    Q.   "The oversights of the U.S. Food
15 and Drug Administration (FDA) claim that DEP
16 does not pose a risk to human health."
17          Did I read that correctly?
18    A.   I think so.
19    Q.   Going down and skipping one
20 sentence, but the next sentence states, "The
21 Cosmetic Ingredient Review (CIR) expert
22 panel, an industry-sponsored organization
23 that regularly reviews the safety of
24 cosmetics supported the FDA claim."

Page 181

1          Did I read that correctly?
2     A.   Yes.
3          MS. O'DELL:  Object to the form
4 to the extent you left out a portion of
5 that paragraph, but --
6          MR. ZELLERS:  What did I
7 leave -- I left out the cite to the
8 website.  Is that right?
9          MS. O'DELL:  No.  Actually, you
10 left out a sentence, but, you know,
11 keep going.
12          MR. ZELLERS:  I don't believe I
13 left out anything material.
14 BY MR. ZELLERS:
15    Q.   The next sentence, "The CIR
16 panel reaffirmed the safe use of DEP, DMP,
17 and DBP in cosmetics in 2005."
18          Is that right?
19          MS. O'DELL:  Object to the form.
20    A.   Yeah, that's what it says.
21 BY MR. ZELLERS:
22    Q.   Okay.  Going to the next
23 paragraph, "The Scientific Committee on
24 Cosmetics Products and Non-Food Products,

Page 182

¹ however, did not recommend restrictions on
² the use of DEP and DMP in cosmetics."
³         Is that right?
⁴     MS. O'DELL:  Objection; form.
⁵     A.    That's what it says.  And let's
⁶ just get something sorted out, because you
⁷ can read this to me and cite all these
⁸ regulatory bodies.  Diethyl phthalate is not
⁹ approved for vaginal administration, nor did
¹⁰ I find, you know, any safety studies done by
¹¹ any of those bodies that demonstrated that
¹² DEP is safe for administration to the vagina.
¹³        So, you know, earlier you talked
¹⁴ about risk assessments.  It seems to me you
¹⁵ want to ignore route of administration and
¹⁶ exposure.  These are all for cosmetic use,
¹⁷ which is topical to the skin.  This speaks
¹⁸ nothing to vaginal administration.
¹⁹     MR. ZELLERS:  Move to strike as
²⁰ nonresponsive.
²¹ BY MR. ZELLERS:
²²     Q.    What evidence are you relying on
²³ to say that this chemical, diethyl phthalate,
²⁴ causes or increases the risk of ovarian

Page 183

¹ cancer in humans?
²         MS. O'DELL:  Object to the form.
³     A.    Let me go to my report.
⁴ BY MR. ZELLERS:
⁵     Q.    Well, did you -- and you heard
⁶ my question, in humans.  Correct?  I don't
⁷ need you to read your list of animal studies
⁸ again.
⁹         MS. O'DELL:  He can read
¹⁰     whatever he'd like to in response to
¹¹     your question, Counsel.  You know that.
¹²     So you've asked him a question.  It's
¹³     pending.  He's going to respond to it.
¹⁴         MR. ZELLERS:  And he needs to
¹⁵     respond to it.  That's my question.
¹⁶         MS. O'DELL:  You may not like
¹⁷     his response, but he's free to respond
¹⁸     to it, so --
¹⁹     A.    RTECS demonstrate -- you know,
²⁰ stated -- not me, RTECS -- "Diethyl esters
²¹ can cause reproductive and developmental
²² toxicity.  The NTP program found that in
²³ cultured Chinese hamster ovary cells, both
²⁴ diethyl phthalate and dimethyl phthalate

Page 184

¹ induced sister chromatid exchanges."  Okay?
² "And the NTP program also stated" -- and this
³ is a quote -- "there was equivocal evidence
⁴ of carcinogenic activity of diethyl phthalate
⁵ in male and female mice based on increases --
⁶ increased incidences of hepatocellular
⁷ neoplasms, primarily adenomas," so --
⁸         MR. ZELLERS:  Move to strike as
⁹     nonresponsive.
¹⁰     A.    You asked me about human.
¹¹ Right?
¹² BY MR. ZELLERS:
¹³     Q.    Yes.
¹⁴     A.    That's the basis for -- from
¹⁵ which the information I relied upon, so --
¹⁶ you can pick human, but there's animal data
¹⁷ that suggests this is a problem.
¹⁸     Q.    Just to be clear --
¹⁹         MS. O'DELL:  Excuse me, sir.
²⁰     Have you not -- if you're finished,
²¹     fine, but if you're not finished, you
²²     may finish your answer.
²³ BY MR. ZELLERS:
²⁴     Q.    Just to be clear, and so we have

Page 185

¹ a clear record, you are referencing animal
² studies.  Correct?
³     A.    Yeah.
⁴     Q.    My question is:  Are you aware
⁵ of any human studies that demonstrate or
⁶ provide data that diethyl phthalate causes
⁷ ovarian cancer in humans?
⁸     A.    No, I'm not.  And, you know, as
⁹ I was saying, there's also not any studies
¹⁰ demonstrating the safety in vaginal
¹¹ administration.
¹²     Q.    Let me ask you about a couple
¹³ more, and then we'll take a break.
¹⁴     A.    Okay.
¹⁵     Q.    Citrus Medica Limonum, Pages 18
¹⁶ and 19, Table 6.  Do you see that?
¹⁷     A.    There's Citrus Medica Limonum,
¹⁸ lemon peel oil, yeah.
¹⁹     Q.    Yes.  And you list that as a
²⁰ fragrance with a regulatory concern.  Is that
²¹ right?
²²     A.    Yes.
²³     Q.    You also list this as a
²⁴ fragrance chemical as one with IFRA critical

Page 186

1  effects.  Is that right?
2          MS. O'DELL:  Object to the form.
3  BY MR. ZELLERS:
4      Q.    On Page 11 -- I'm sorry.
5  Page 37, Table 11.
6      A.    Yeah, phototoxicity.
7      Q.    Citrus Medica Limonum is lemon
8  peel oil.  Is that right?
9      A.    Yes, that's my understanding.
10     Q.    Citrus Medica Limonum is listed
11 on the IFRA transparency list.  Correct?
12     A.    I would have to check it.
13     Q.    We discussed before that CIR
14 does not evaluate fragrances.  Is that right?
15         MS. O'DELL:  Object to the form.
16     A.    They do in some cases, but they
17 don't always.  That's my understanding.
18 BY MR. ZELLERS:
19     Q.    Would you agree that the absence
20 of an evaluation by CIR is not a regulatory
21 concern?
22     A.    So, I mean, let's be clear about
23 this.  When companies engage me to help them
24 build products, they don't want me to take

Page 187

1  any unnecessary risks.  Right?
2          So, ideally, you use excipients
3  and active ingredients that are listed by the
4  FDA, have a CIR monograph or safety study,
5  you know, are listed in the Food Chemical
6  Codex, have a full -- published in a
7  peer-reviewed journal safety study.
8          So more often than not, the
9  generally-accepted standard is to go use
10 chemicals that meet all those criteria.  So
11 there's risk associated with using things
12 that don't.
13         MR. ZELLERS:  Move to strike as
14     nonresponsive.
15 BY MR. ZELLERS:
16     Q.    Try, if you can, to answer my
17 question.
18         CIR, the Cosmetic Ingredient
19 Review, does not evaluate fragrances.
20 Correct?
21         MS. O'DELL:  Object to the form,
22     asked and answered.
23     A.    Yeah.  I answered that
24 previously and said not always.

Page 188

1  BY MR. ZELLERS:
2      Q.    Therefore, the absence of an
3  evaluation by CIR, that fact that there is
4  not an evaluation by CIR, is not a regulatory
5  concern in and of itself.  Correct?
6          MS. O'DELL:  Object to the form.
7      A.    That's a generalization.  So
8  diethyl phthalate, again, not a fragrance,
9  there is a CIR on it.  Right?  Okay.  You
10 just pointed to the balsam Peru.  That's a
11 fragrance.  Did CIR have something to say
12 about that?
13         So the absence of something from
14 CIR doesn't mean that, you know -- I forgot
15 how you asked your question.
16 BY MR. ZELLERS:
17     Q.    That's all right.  The absence
18 may or may not be a regulatory concern?  Can
19 we agree on that?
20     A.    I guess it depends on who --
21         MS. O'DELL:  Objection; form.
22     A.    -- on whose product it is.
23 BY MR. ZELLERS:
24     Q.    Why would phototoxicity have

Page 189

1  anything to do with peroneal exposure?
2      A.    Well, I personally don't sun
3  bathe in the nude, but I suppose some people
4  do.  But sunlight can enter through windows.
5  I get your point, taken.
6          MS. O'DELL:  Hey, Mike, we've
7      been going about -- Michael, excuse
8      me -- we've been going about an hour
9      and 45 minutes, which I think is
10     gracious of --
11         MR. ZELLERS:  If you could give
12     me five minutes.  I just have one -- I
13     mean, and if you have to take a break
14     now, then okay.
15         MS. O'DELL:  I just don't want
16     to continue this on -- it's quite a
17     long time we've been going.  If you've
18     got five minutes, please finish.
19         MR. ZELLERS:  Yeah, let's try to
20     finish this section and decide what
21     we're going to do.
22         MS. O'DELL:  But 12:45, an hour
23     and 45 minutes in, it's quite a long
24     time.

Page 190

1    MR. ZELLERS:  Understood.
2 BY MR. ZELLERS:
3    Q.    Methyl Hydrogenated Rosinate,
4 you list that as a fragrance chemical with a
5 regulatory concern.  Is that right?
6    A.    It's not a fragrance chemical.
7 It's a chemical.
8    Q.    So it's your opinion that Methyl
9 Hydrogenated Rosinate is not a fragrance.  Is
10 that right?
11    A.    That's correct.
12    Q.    Would you agree that Methyl
13 Hydrogenated Rosinate is listed on the IFRA
14 transparency list?
15    A.    I would have to check.
16    Q.    Do you agree that each fragrance
17 ingredient that is included on the IFRA
18 transparency list is included in the RIFM
19 safety assessment program?
20    MS. O'DELL:  Object to form.
21    A.    I think you asked that of me --
22 BY MR. ZELLERS:
23    Q.    I did of another chemical --
24 another ingredient.

Page 191

1    A.    Right.  I'm sorry.  I thought it
2 was open-ended.  You know, like I said, I
3 haven't done that cross-reference, so I would
4 have to check that.
5    Q.    And the same set of questions
6 with respect to the CIR not evaluating
7 fragrances and not having an evaluation by
8 CIR is not a regulatory concern, you'd give
9 me all the same answers again?
10    A.    Pretty much, yeah.
11    MS. O'DELL:  Object to form.
12    A.    It depends on who is willing to
13 take on that risk.
14 BY MR. ZELLERS:
15    Q.    Last question.  Not having an
16 IFRA standard means that IFRA has neither
17 restricted nor banned the chemical.  Correct?
18    MS. O'DELL:  Object to the form.
19    A.    Well, it could also mean they
20 haven't done one, that they haven't done a
21 safety assessment.
22    MR. ZELLERS:  Let's take a
23 break.
24    THE WITNESS:  Okay.

Page 192

1    THE VIDEOGRAPHER:  Going off the
2 record, the time is 12:47 p.m.
3    (Recess from 12:47 p.m. to
4 1:55 p.m.)
5    THE VIDEOGRAPHER:  This marks
6 the beginning of Disc 3.  Back on the
7 record, the time is 1:55 p.m.
8 BY MR. ZELLERS:
9    Q.    Dr. Crowley, your second opinion
10 is that the fragrance chemicals in baby
11 powder and Shower to Shower contribute to the
12 inflammatory properties, toxicity, and
13 potential carcinogenicity of these products.
14 Is that right?
15    A.    Yes.
16    Q.    In your report, you state that
17 35 of the fragrance chemicals in baby powder
18 have a safety/toxicology concern.  Correct?
19    A.    35?
20    Q.    Yes.  Page 11.
21    A.    34.
22    Q.    And 12 of the fragrance
23 chemicals in Shower to Shower have a
24 safety/toxicology concern.  Is that right?

Page 193

1    A.    Yes.
2    Q.    You define safety/toxicology
3 concern as any fragrance chemical that is
4 listed on the Registry of Toxic Effects of
5 Chemical Substances, or the RTECS list, or
6 has safety in use concerns.  Is that right?
7    MS. O'DELL:  Object to the form.
8    A.    I think I've got a little bit
9 broader definition than that.  It's really I
10 considered the totality of the evidence, so
11 certainly RTECS or other toxic, you know,
12 reports from the literature.
13 BY MR. ZELLERS:
14    Q.    You list the fragrance chemicals
15 in baby powder, Table 7, that you believe
16 have a safety/toxicology concern.  Is that
17 right?
18    A.    Well, I don't believe -- I'm
19 reporting work that someone else has done.
20    Q.    Right.
21    A.    Right.
22    Q.    As we established earlier, you
23 personally did not do the review and
24 analysis.  You've gone out and you've googled

Michael Crowley, Ph.D.

Page 194

1 it or you've PubChem'd it to collect that
2 information?
3      A.    Yeah.
4           MS. O'DELL:  Object to the form.
5 Misstates his methodology.
6      A.    I gathered the information from
7 a number of sources.
8 BY MR. ZELLERS:
9      Q.    Is safety/toxicology concern a
10 recognized term in the field of toxicology?
11      A.    I mean, it's a term of art, I
12 think, that, you know, adequately describes
13 what I was asked to do.
14      Q.    I asked you earlier what
15 methodology you followed.  The methodology
16 you followed for your second opinion is the
17 methodology you described for us earlier.
18 Correct?
19      A.    Yes.
20      Q.    You are not rendering an opinion
21 that if a fragrance chemical is included in
22 either Table 7 or Table 16 of your report,
23 that that means it causes cancer in humans.
24 Correct?

Page 195

1           MS. O'DELL:  Object to the form.
2      A.    That's not necessarily true.
3 BY MR. ZELLERS:
4      Q.    That's not --
5      A.    I mean, this isn't a yes or no
6 question.  As I understand your question, a
7 number of these chemicals have validated
8 studies that they are carcinogens.
9      Q.    What epidemiologic studies in
10 humans substantiate the theory that the
11 fragrance chemicals included in Table 7 and
12 Table 16 cause ovarian cancer?
13      A.    Well, I read to you some studies
14 previously.  You just rephrased your question
15 to human studies and ovarian cancer.  You
16 know, your question prior to that was not
17 specific to ovarian.  It was just cancer.
18 Limonene is an IARC potential carcinogen.
19 You know, we've talked about styrene.
20      Q.    And I'm sorry to interrupt you.
21 My question is:  Are you aware of any
22 epidemiologic studies that associate those
23 fragrances to ovarian cancer in humans?
24           MS. O'DELL:  Object to the form.

Page 196

1      That's a different question than you
2 asked before.  You're welcome to answer
3 it.
4      A.    Not in humans, but we have
5 in vitro studies and animal studies.
6 BY MR. ZELLERS:
7      Q.    Is there any epidemiology
8 substantiating the theory that any of the
9 fragrance chemicals used in baby powder or
10 Shower to Shower cause cancer in humans?
11           MS. O'DELL:  Object to the form.
12      A.    I think that's the same question
13 you just asked, so it's the same answer.
14 BY MR. ZELLERS:
15      Q.    No.  Correct?
16           MS. O'DELL:  Object to the form.
17      A.    No, that's not my answer.  Not
18 in humans.  There are animal and in vitro
19 studies.
20 BY MR. ZELLERS:
21      Q.    You are not aware of any
22 epidemiologic studies that establish that any
23 of the fragrance ingredients that you've
24 listed out cause cancer in humans.  Correct?

Page 197

1           MS. O'DELL:  Object to the form.
2      And if you need to, you're welcome to
3      look at the real-time if you need to
4      look at the question.
5      A.    Okay.  So that was -- your last
6 question was not specific to ovarian cancer.
7 You said cancer in humans.  So I'd like to
8 answer that.
9           Four chemicals in the baby
10 powder have been identified by the
11 International Agency for Research on Cancer
12 as potential carcinogens.  Benzene, ethenyl-,
13 also known as styrene, has been implicated as
14 a reproductive toxicant, neurotoxicant, and
15 has been demonstrated to be a carcinogen both
16 in vivo and in vitro.
17 BY MR. ZELLERS:
18      Q.    Is that a human study?
19      A.    I would have to check the
20 underlying studies.
21           The National Toxicology Program
22 considers styrene to be reasonably
23 anticipated to be a human carcinogen.  EPA
24 considers para-Cresol to be possibly

Page 198

1 carcinogenic.
2        IARC has also stated that
3 coumarin, eugenol, and d-Limonene are not
4 classifiable as to their carcinogenicity.
5      Q.    We --
6      A.    The --
7      Q.    And I'm sorry.  You're referring
8 to IARC and to its various analyses.  Is that
9 correct?
10     A.    That's correct.
11     Q.    And I'm going to ask you about
12 that in a bit.
13     A.    Okay.
14     Q.    All right.
15     A.    And I haven't answered your
16 question with respect to Shower to Shower,
17 but there's also similar verbiage, as you're
18 well aware, with respect to Shower to Shower.
19 The chemicals there include benzophenone,
20 which is an IARC Group 2B, coumarin and
21 eugenol are not classifiable, and musk ketone
22 has been suspected of being a carcinogen.  It
23 has been classified as a Category 3
24 carcinogen by SCHER, which is the European

Page 199

1 folks.
2      Q.    To be clear -- and I understand
3 this is a different question, but there are
4 no epidemiologic studies which substantiate
5 the theory that the fragrance chemicals that
6 you include in either Table 7 or Table 16
7 cause or increase the risk of ovarian cancer
8 in humans.  Correct?
9        MS. O'DELL:  Object to form.
10     A.    I would have to check that, but,
11 you know, I wasn't asked to consider that,
12 so --
13 BY MR. ZELLERS:
14     Q.    At least as you sit here, you
15 are not aware of any.  Correct?
16     A.    I am not aware of an
17 epidemiological study substantiating the
18 causation of ovarian cancer from the
19 so-called fragrance chemicals.  Let's just
20 call them chemicals, because not all of them
21 are fragrances.
22     Q.    You believe that the use of the
23 chemicals, including fragrance chemicals,
24 that you've listed in Tables 7 and 16 in the

Page 200

1 products present a health risk for women that
2 use the products?  And by "products," I'm
3 including baby powder and Shower to Shower.
4 Is that right?
5      A.    Yeah.  I believe that peroneal
6 application of the talc products is
7 associated with a higher risk of cancer.
8      Q.    You have --
9      A.    And I believe that the fragrance
10 chemicals, as they are so called by Johnson &
11 Johnson -- that's not my choice of words, but
12 they're chemicals -- contribute to that.
13     Q.    You have not done a full human
14 health risk assessment, correct, as we
15 discussed earlier today?
16     A.    I --
17        MS. O'DELL:  Object to form.
18     A.    I was unable to do a risk
19 assessment because I was never provided with
20 the composition of the fragrances.  So, in
21 order to do that, you need that information.
22 It was asked for, and it was never provided.
23 BY MR. ZELLERS:
24     Q.    You have not been able to do a

Page 201

1 dose response analysis.  Correct?
2        MS. O'DELL:  Object to the form.
3      A.    Again, I couldn't do it because
4 I didn't have the information from J&J, I
5 suppose, to enable doing that.
6 BY MR. ZELLERS:
7      Q.    What dose of the chemicals
8 listed in Table 7 and 16 does a woman receive
9 from one application of baby powder in her
10 peroneal region?
11     A.    It's unknown to me.  That
12 information was requested and not provided.
13     Q.    If I asked you what dose there
14 would be for two applications or five or any
15 number, it --
16     A.    I couldn't answer.
17        MS. O'DELL:  Object to the form.
18 BY MR. ZELLERS:
19     Q.    Do you have any information or
20 are you able to tell me the cumulative dose
21 that a woman would receive if she used baby
22 powder once a day for a year?
23        MS. O'DELL:  Object to the form.
24     A.    I don't have the information to

Page 202

1 make that judgment.
2 BY MR. ZELLERS:
3     Q.    If she used it once a day for
4 five years or ten years?
5         MS. O'DELL:  Object to the form.
6     A.    Same answer.
7 BY MR. ZELLERS:
8     Q.    Are you familiar with the
9 standards released by the Globally Harmonized
10 System of Classification and Labeling of
11 Chemicals, or GHS?
12     A.    Yes.
13     Q.    You rely on the GHS standards in
14 your report.  Is that right?
15     A.    Yes.
16     Q.    It's true, is it not, that for
17 carcinogens, the GHS does not require a
18 hazard statement regarding an ingredient if
19 that ingredient makes up less than
20 0.1 percent of the entire product?
21         MS. O'DELL:  Object to form.
22     A.    I'd have to check the GHS
23 standards on that.
24

Page 203

1 BY MR. ZELLERS:
2     Q.    Take a look at Deposition
3 Exhibit 24.
4         (Exhibit No. 24 marked)
5 BY MR. ZELLERS:
6     Q.    Exhibit 24 are the GHS standards
7 of classification and labeling of chemicals.
8 Is that right?
9     A.    It's labeled GHS Info Sheet
10 No. 7 on carcinogenicity.
11     Q.    All right.  If you go to Table 2
12 on Page 2 of Exhibit 24, it provides the
13 cut-off values or concentration limits that
14 trigger the classification of mixtures.
15     A.    Okay.
16     Q.    Do you see that?
17     A.    Yes.
18     Q.    And for both Category 1 and
19 Category 2 carcinogens, the cut-off is
20 greater than -- equal to or greater than
21 0.1 percent.  Is that right?
22     A.    That's what it says.
23     Q.    Do you have any science that
24 ingredients can have a critical effect on

Page 204

1 human health if the ingredient represents
2 less than 0.1 percent of the total product
3 other than the genotoxicity issue we talked
4 about earlier?
5         MS. O'DELL:  Object to the form.
6     A.    Okay.  So, as we talked about
7 earlier, genotoxins don't have a threshold.
8 Right?  They are -- I'd have to go look at
9 other known carcinogens and what the -- what
10 the -- that are thresholded to answer that
11 question.  So it's so open-ended, I couldn't
12 answer without reviewing the literature.
13 BY MR. ZELLERS:
14     Q.    One of -- strike that.
15         We talked about exposure and
16 exposure assessments earlier today.  Is that
17 right?
18     A.    Yes.
19     Q.    You've not done an exposure
20 assessment in this case.  Right?
21     A.    Right.  I couldn't because I
22 didn't have the information.
23     Q.    Have you ever evaluated a
24 vaginal product?

Page 205

1     A.    I've developed vaginal products.
2 There's a product called Crinone.  It's
3 commercially available.  It's a vaginal cream
4 containing progesterone.  It's administered
5 to women to prevent them from going into
6 preterm labor.
7         I've also developed vaginal
8 bacteria -- vaginosis and fungal vaginosis
9 products.
10     Q.    When did -- which products?
11     A.    So the company that makes
12 Thiola, Mission -- I, for God's sake, cannot
13 think of the name of that product right now.
14 It's escaping me.  But they have a bacterial
15 vaginosis product that I helped formulate.
16     Q.    And you --
17     A.    We also --
18     Q.    Go ahead and finish, please.
19     A.    Yeah.  There's also a company
20 called Columbia Laboratories.  They've been
21 bought and sold I don't know how many times.
22 They're the makers of Crinone.
23         We also looked at other products
24 for them based on the, you know, Crinone drug

Michael Crowley, Ph.D.

Page 206

1 delivery system.
2     Q.    With which company were you
3 with?
4     A.    I was with Mission Pharmacal and
5 PharmaForm.
6     Q.    PharmaForm is the company you
7 had a disagreement with.  Is that right?
8     A.    Yeah.
9     Q.    What, generally, was the
10 disagreement?
11    A.    I was an owner.  We sold it.
12 Part of the sale was they wanted us to stay
13 and run it, and there was an employment
14 agreement with -- associated with the sale
15 where they would pay out some money over
16 time.  So, after a couple of years, they
17 didn't want to pay.
18    Q.    In order for a fragrance
19 chemical or a chemical to get from the
20 peroneal region to the ovaries, they have to
21 get past a number of other structures.  Is
22 that right?
23        MS. O'DELL:  Object to the form.
24    A.    I -- I will defer to the other

Page 207

1 experts to opine on that matter.
2 BY MR. ZELLERS:
3     Q.    The female reproductive system
4 has a number of defense mechanisms that
5 prevent most foreign particles from getting
6 from the peroneal region to the ovaries.
7        MS. O'DELL:  Object --
8 BY MR. ZELLERS:
9     Q.    Is that your understanding?
10        MS. O'DELL:  Object to the form.
11 BY MR. ZELLERS:
12    Q.    Or do you defer to other experts
13 on that?
14    A.    I think I'll defer to other
15 experts there.
16    Q.    Have you done any testing to
17 quantify the difference between the dose
18 applied to the peroneal region and the dose
19 that would reach the ovaries, assuming that
20 baby powder or Shower to Shower powder can
21 reach the ovaries?
22    A.    No, I have not.
23    Q.    You would defer to other
24 experts --

Page 208

1     A.    I would.
2     Q.    -- in terms of that?
3     A.    Yeah.
4        THE REPORTER:  Try to let him
5 finish his question for me, please.
6 BY MR. ZELLERS:
7     Q.    Do you know whether or not the
8 cervix is more or less sensitive than the
9 ovaries to the impact of foreign particles?
10        MS. O'DELL:  Object to the form.
11    A.    I do not know.
12 BY MR. ZELLERS:
13    Q.    You're expressing no opinions
14 and have not considered inhalation exposure.
15 Correct?
16    A.    I am not --
17        MS. O'DELL:  Object to the form.
18    A.    Yeah, I am not opining on
19 inhalation.
20 BY MR. ZELLERS:
21    Q.    In Section 3.9 of your report,
22 you identify a number of components or
23 ingredients for which IREF -- strike that --
24 IFRA has developed an exposure limit.  Is

Page 209

1 that right?
2     A.    Which page?  Table 13 on
3 Page 41?
4     Q.    Yes.
5     A.    Yeah, some of these are older
6 standards that -- you know, they've -- IFRA's
7 has moved to this QRA.  So some of them have
8 been replaced by QRAs, but these are -- some
9 of these are historical.
10    Q.    Looking at Page 39, the
11 restriction means that IFRA has recommended
12 that exposure to the ingredient be limited to
13 a specific dose or amount.  Is that right?
14    A.    Category 5 restriction is
15 defined in my report, yeah.
16    Q.    Is that correct?
17    A.    Yeah.  I mean, there's a
18 percentage there that you're not to exceed.
19 So that's the limitation.
20    Q.    Do you have any opinion that the
21 amount of these ingredients in baby powder or
22 Shower to Shower exceed the IFRA
23 recommendations?
24    A.    I wasn't able to tell because

Michael Crowley, Ph.D.

Page 210

1 I've never been provided the composition,
2 so --
3    Q.    In their recommendations, does
4 IFRA say that any of these ingredients
5 contribute to ovarian cancer if they exceed
6 the exposure limit?
7    A.    I don't believe IFRA stated
8 that.
9    Q.    You referred to the RTECS
10 database.  Is that right?  And I'm looking at
11 your report, Page 21.
12    A.    Yes.
13    Q.    What does RTECS stand for?
14    A.    The Registry of Toxic Effects of
15 Chemical Substances.
16    Q.    Do you know who maintains the
17 RTECS database?
18    A.    It was initially maintained by
19 the Center for Disease Control, and I believe
20 it's been sold or outlicensed to other
21 companies.
22    Q.    There's now a third party
23 contractor that --
24    A.    Yes.

Page 211

1    Q.    -- maintains the RTECS database?
2    A.    Yes.
3    Q.    Are you familiar with NIOSH, the
4 National Institute for Occupational Safety
5 and Heath?
6    A.    Yes.
7    Q.    Are you aware that NIOSH on its
8 website states that it cannot attest to the
9 accuracy of RTECS?
10    A.    No, I wasn't aware of that.
11    Q.    Does being on RTECS mean that a
12 chemical is -- strike that.
13        Being listed on RTECS does not
14 mean that a chemical is harmful.  Correct?
15    A.    Not necessarily.  I mean,
16 there's a set of circumstances where it could
17 be and other circumstances it may not be.
18    Q.    Being listed on the RTECS
19 database just means that toxicological data
20 that's been published about the ingredient?
21    A.    Yes.
22    Q.    Prescription and
23 non-prescription drugs are listed on RTECS.
24 Correct?

Page 212

1    A.    That's correct.
2    Q.    Food additives are listed on
3 RTECS.  Is that right?
4    A.    Yes.
5    Q.    It's your opinion that fragrance
6 chemicals and chemicals in the talc products
7 contribute to the potential carcinogenicity
8 of the products.  Is that right?
9    A.    That's correct.  Several of --
10 several of the fragrance chemicals are
11 co-carcinogic, which means they were found
12 to, you know, promote tumors in animals when
13 co-administered with a known carcinogen.
14    Q.    Do you agree that it's possible
15 that an ingredient can cause or contribute to
16 the development of one type of cancer but not
17 to another type of cancer?
18    A.    Yeah, that's a --
19        MS. O'DELL:  Object to the form.
20    A.    That's a true statement.
21 BY MR. ZELLERS:
22    Q.    Do you agree that it's possible
23 that an ingredient can cause or contribute to
24 the development of cancer or a cancer in an

Page 213

1 animal but not in humans?
2    A.    Yes.
3    Q.    Smoking is -- strike that.
4        Smoking is associated with lung
5 cancer.  Is that right?  If you know.
6    A.    Yes.
7    Q.    Smoking has not been found to be
8 associated with malignant melanoma.  Do you
9 agree?
10        MS. O'DELL:  If you know.  Don't
11 guess.
12    A.    I don't know.  My dad has
13 multiple myeloma, and -- and he was a smoker,
14 but I don't know the etiology of -- well, did
15 you say malignant myeloma or --
16 BY MR. ZELLERS:
17    Q.    Malignant melanoma.
18    A.    Yeah.  I don't know if there's
19 an established connection between smoking and
20 that.
21    Q.    You're not an expert in cancer.
22 Correct?
23    A.    I would not consider myself to
24 be an expert in cancer.

Michael Crowley, Ph.D.

Page 214

1    Q.    You are not an expert in ovarian
2  cancer.  Correct?
3    A.    I am not an expert in ovarian
4  cancer.
5    Q.    Do you agree that fragrances are
6  generally broken down quickly in the body?
7        MS. O'DELL:  Object to the form.
8    A.    I don't know that I can agree to
9  a general statement like that.  I would have
10  to examine the route of administration.  So
11  whether they're applied to the skin or if
12  they're swallowed, as we discussed earlier,
13  the kinetics of how they're metabolized,
14  distributed, and eliminated are a function of
15  those things.
16  BY MR. ZELLERS:
17    Q.    Those are all important
18  components.  Correct?
19    A.    Yes.
20    Q.    And you have not done an
21  analysis of that type in this case.  Correct?
22    A.    That's correct.
23    Q.    Do you agree that the primary
24  effects of exposure to fragrance chemicals

Page 215

1  are acute, like headache or skin irritation?
2        MS. O'DELL:  Object to the form.
3    A.    Again, it's a general statement.
4  You know, my son is allergic to certain
5  fragrance chemicals, and so you can have an
6  allergic response.  Right?  I think you
7  mentioned irritation and what else?
8  BY MR. ZELLERS:
9    Q.    Do you agree that the primary
10  effects of exposure to fragrance chemicals
11  are acute, like headaches or skin irritation?
12        MS. O'DELL:  Object to the form.
13    A.    You know, I --
14  BY MR. ZELLERS:
15    Q.    Or do you defer on that?
16    A.    I think I would do it on a
17  case-by-case basis.  I would look at each
18  fragrance chemical and do what I did here.
19  You know, there could be chronic effects from
20  repeat administration.  So, no, I wouldn't
21  characterize them as only acute.
22    Q.    My question was "are primarily
23  acute."
24        MS. O'DELL:  Object to the form.

Page 216

1    A.    Yeah.  I think I answered that I
2  would take that on a case-by-case basis.
3  There could be chronic effects, especially
4  with respect to sensitizers.
5  BY MR. ZELLERS:
6    Q.    You have not done that type of
7  analysis at least with respect to any
8  potential relationship between the fragrance
9  chemicals or chemicals you've identified in
10  baby powder or Shower to Shower and ovarian
11  cancer.  Correct?
12        MS. O'DELL:  Objection to form.
13    A.    Well, several of them did have
14  published chronic dosing studies, and I
15  certainly looked at those.  No, I have not
16  done a deep-dive analysis on that.
17  BY MR. ZELLERS:
18    Q.    What, if anything, does
19  irritation have to do with the development of
20  ovarian cancer?
21    A.    Irritation causes an
22  inflammatory response.  Inflammatory
23  responses are associated with a higher risk
24  of developing cancers, and specific --

Page 217

1    Q.    That's a general statement.
2  Correct?
3    A.    It is a general statement.  But
4  also, with respect to the vagina, insults to
5  the vagina do, in fact, generate certain
6  proteins that are part of the inflammatory
7  response, and those have been positively
8  linked with higher incidences of cancers in
9  the reproduction -- female reproductive
10  organs.
11    Q.    Let me go back to my original
12  question.  You are not aware of any
13  epidemiologic studies that associate the
14  fragrance chemicals or the chemicals that you
15  identified in Shower to Shower or baby powder
16  with an increased risk of ovarian cancer.
17  Correct?
18        MS. O'DELL:  Object to form.
19  BY MR. ZELLERS:
20    Q.    In humans.
21        MS. O'DELL:  Object to form.
22    A.    I mean, you keep tagging on the
23  "in human" part of it.  I mean, we have
24  animal studies that show toxicity issues with

Michael Crowley, Ph.D.

Page 218

1 cells in animal models, like Chinese hamster
2 ovary cell models, oocyte degeneration that
3 are associated with female reproductive
4 organs. So, no, not in humans, but we've
5 seen in vitro and in vivo animal studies.
6 BY MR. ZELLERS:
7    Q.    Take a look, if you will, at
8 your report, Table 7, Page 21. The first
9 ingredient you list is d-Limonene?
10    A.    Limonene, I believe, is how it's
11 pronounced.
12    Q.    Limonene?
13    A.    Yeah.
14    Q.    That's a chemical found in the
15 peels of citrus fruit. Is that right?
16    A.    I don't know if it comes from
17 the peels. I read that a while back. I'll
18 take your word for it. I know it's in
19 lemons. I believe it's in oranges, too, and
20 other citrus fruits.
21        And I know that there's a
22 cleanser that's got it in there.
23    Q.    I misstated. For our record,
24 it's Page 22 where Table 7 begins.

Page 219

1    A.    Oh.
2    Q.    Is that right?
3    A.    Yeah.
4    Q.    d-Limonene is used as both a
5 fragrance and a flavoring. Is that right?
6    A.    I believe so.
7    Q.    If d-Limonene were associated
8 with the development of ovarian cancer,
9 wouldn't you expect to see higher rates of
10 ovarian cancer among people who handle fruit?
11        MS. O'DELL: Object to the form.
12        MR. ZELLERS: What are you
13    objecting to? That was a good
14    question.
15    A.    So again we get to route of
16 exposure. I mean, the presumption is that
17 handling fruit, you know, doesn't transfer
18 the d-Limonene through the skin into the
19 blood and ultimately reach the ovaries.
20        And, you know, this matter --
21 peroneal application, that's awfully close to
22 the ovaries, and, you know, as I said, I've
23 been asked to assume that it does enter the
24 vaginal cavity.

Page 220

1        And I'd like to add one quick
2 point. You mentioned the rosin earlier,
3 Methyl Hydrogenated Rosinate. That's glue.
4 It's a film former. It adheres the fragrance
5 chemicals to the talc particles. So where
6 the talc particles go, the fragrance
7 chemicals will go.
8        We have a result here in which
9 d-Limonene was found to be cytotoxic against
10 Chinese hamster ovary cells in which the
11 inhibitory concentration of 50 percent was 50
12 micrograms per mL. That is a very, very low
13 concentration.
14        So, if there was d-Limonene
15 attached to a talc particle with the rosin
16 and that particular talc particle entered the
17 vagina and landed next to an ovary, I think
18 that data strongly suggests that those two
19 materials are not compatible and there would
20 be problems. That study makes it clear and
21 equivocal that d-Limonene is not compatible
22 with Chinese hamster ovary cells. I wouldn't
23 put my daughter's ovary at risk with it.
24

Page 221

1 BY MR. ZELLERS:
2    Q.    In order to do a proper
3 scientific analysis, you have to make an
4 assessment of concentration. Correct?
5    A.    Uh-huh.
6    Q.    Yes?
7    A.    Yes.
8        MS. O'DELL: Object to form.
9 BY MR. ZELLERS:
10    Q.    You have to makes an assessment
11 of dose response. Correct?
12        MS. O'DELL: Object to the form.
13    A.    It depends. Again, I keep
14 telling you genotoxic materials -- they are
15 not thresholded.
16 BY MR. ZELLERS:
17    Q.    It is --
18    A.    One molecule is enough to cause
19 an increased risk and carcinogenicity.
20    Q.    Is d-Limonene a genotoxic
21 material?
22    A.    I don't believe it's been
23 classified as that, but cytotoxicity against
24 Chinese hamster ovary cells indicates that it

Michael Crowley, Ph.D.

Page 222

1 could be against ovaries, at least in this
2 animal model.
3     Q.   And what --
4     A.   And you don't do those kind of
5 studies against humans. They're unethical.
6 Right? So the safety of d-Limonene has not
7 been established in human vaginas.
8     Q.   In order to do a scientific
9 study, d-Limonene -- you would need to also
10 do an exposure analysis. Correct?
11         MS. O'DELL: Object to the form.
12     A.   Not necessarily.
13 BY MR. ZELLERS:
14     Q.   You would not need to do an
15 exposure analysis in order to lead to a
16 scientifically valid conclusion of the effect
17 of d-Limonene on a human?
18         MS. O'DELL: Object to the form.
19     A.   You could, but you don't have
20 to. What kind of -- I mean, I guess in the
21 model that you want to rely upon, it seems to
22 be an important fact to you. But the fact is
23 it hasn't been done in humans in the vagina.
24

Page 223

1 BY MR. ZELLERS:
2     Q.   An exposure analysis is an
3 important part of a risk assessment.
4 Correct?
5         MS. O'DELL: Object to the form,
6     asked and answered.
7     A.   You've asked the question. I've
8 answered it previously.
9 BY MR. ZELLERS:
10     Q.   And I'm assuming and recalling
11 your answer was "yes." Is that right?
12         MS. O'DELL: That's not correct.
13     Misstates his testimony.
14 BY MR. ZELLERS:
15     Q.   Is an exposure analysis an
16 important part of a risk assessment?
17     A.   The risk assessment --
18         MS. O'DELL: Objection; form.
19     A.   -- that you presented in one of
20 your earlier exhibits says it is, but that's
21 not the only risk assessment model that there
22 is.
23 BY MR. ZELLERS:
24     Q.   Tell me what risk assessment

Page 224

1 model you are familiar with to assess the
2 risk in humans that does not include any type
3 of exposure assessment or analysis?
4         MS. O'DELL: Object to the form.
5 BY MR. ZELLERS:
6     Q.   I don't want to sit here and
7 have you --
8     A.   You asked --
9     Q.   -- internet research --
10     A.   -- the question. I'm going to
11 get you the answer.
12     Q.   Well, I'm not asking you to do
13 internet research. What I'm asking you to
14 do --
15     A.   This isn't -- it's not internet
16 research.
17     Q.   Well, you're doing something on
18 your computer.
19     A.   I'm looking for the name of the
20 Klimisch rating --
21     Q.   Well, I'm okay if you supplement
22 your answer later on in the deposition.
23     A.   Okay. That's fine.
24     Q.   I just want to --

Page 225

1         MS. O'DELL: Well, and if you
2     want to explain what you were doing and
3     respond, you're welcome to do that.
4     A.   Klimisch rating is an evaluation
5 approach. It's a systemic approach for
6 evaluation of data, and it's got reliability
7 categories, so -- and that is a risk
8 assessment model.
9 BY MR. ZELLERS:
10     Q.   That involves no exposure
11 assessment. Is that right?
12     A.   It does not involve an exposure
13 assessment.
14     Q.   Do you know the concentration of
15 d-Limonene in either baby powder or Shower to
16 Shower?
17     A.   No.
18         MS. O'DELL: Object to the form.
19     A.   It was not provided to me.
20 BY MR. ZELLERS:
21     Q.   Similarly, you don't know what
22 dose of d-Limonene a woman would be exposed
23 to if she utilized either Shower to Shower or
24 baby powder. Correct?

Page 226

1      MS. O'DELL:  Object to the form.
2      A.    That's right.  I wasn't provided
3  with that information.
4  BY MR. ZELLERS:
5      Q.    In your list, you give us
6  benzaldehyde?
7          MS. O'DELL:  Which list are you
8      referring to?
9          MR. ZELLERS:  Page 22, Table 7.
10         MS. O'DELL:  Fair enough.  I
11     just didn't know --
12         MR. ZELLERS:  That's okay.
13     A.    Benzaldehyde.  That's correct.
14 BY MR. ZELLERS:
15     Q.    Benzaldehyde.  Do you know what
16 benzaldehyde is?
17     A.    Yes.
18     Q.    What is it?
19     A.    It's aldehyde of benzene.
20     Q.    Artificial almond oil.  Correct?
21     A.    Yeah.
22     Q.    It's used as a fragrance in
23 lotions.  Is that right?
24         MS. O'DELL:  Object to the form.

Page 227

1      A.    I don't know where it's used or
2  not used.
3  BY MR. ZELLERS:
4      Q.    Assuming that it's used as a
5  lotion, lotions are applied topically to the
6  skin.  Is that right?
7          MS. O'DELL:  Object to the form.
8      A.    Generally, yeah.  And we keep
9  going down this rabbit hole.  Just because
10 you can rub it on the skin or swallow it
11 doesn't mean it's safe for your eyes or, in
12 the case of females, vaginas.
13 BY MR. ZELLERS:
14     Q.    At some point Ms. O'Dell is
15 going to have a chance to ask you questions,
16 and you can pontificate as much as you want.
17 I need, right now, if you can, just to try to
18 answer my questions.  Okay?
19         MS. O'DELL:  He answered your
20     question.
21         MR. ZELLERS:  He's not answering
22     my question, and I move to strike as
23     nonresponsive.
24         MS. O'DELL:  Fair enough.  I

Page 228

1  oppose your motion to strike, and I
2  object to your preamble and to
3  directing the witness to answer a
4  certain way.  Dr. Crowley is
5  endeavoring to answer your questions.
6  BY MR. ZELLERS:
7      Q.    If -- assuming that benzaldehyde
8  is artificial almond oil and is used as a
9  fragrance in lotions, if it were associated
10 with ovarian cancer, you would expect to see
11 higher rates of ovarian cancer among users of
12 almond-scented lotion.  Correct?
13         MS. O'DELL:  Object to the form,
14     incomplete hypothetical.
15     A.    Not necessarily.
16 BY MR. ZELLERS:
17     Q.    Are you aware that benzaldehyde
18 is also used as the flavoring in artificial
19 almond extract?
20     A.    No.
21     Q.    Assuming that's true, if
22 benzaldehyde were associated with the
23 development of ovarian cancer, wouldn't you
24 expect to see higher rates of ovarian cancer

Page 229

1  among people who use artificial almond
2  extract?
3          MS. O'DELL:  Object to the form.
4      A.    Again, artificial almond extract
5  is generally eaten.  We put it in cookies.
6  We have a cooking -- by the way, I love
7  almond flavor.  You know, it's not being
8  applied to the peroneal area, and it's
9  also -- you know, it had to check its
10 permeability and absorption through the skin.
11         Just, you know, sort of blanket
12 statements that are broad like that don't put
13 the analysis that I've done in the proper
14 perspective.
15 BY MR. ZELLERS:
16     Q.    Is there -- are you finished?
17     A.    Yes.
18     Q.    Is there any evidence that
19 exposure to artificial almond extract
20 contributes to the development of ovarian
21 cancer?
22         MS. O'DELL:  Object to the form.
23     A.    You asked about ovarian cancer.
24

Page 230

BY MR. ZELLERS:
Q. Well --
A. Here is what the data that I did find stated, was that there was a positive in sister chromatid exchange, which is genotoxicity, with human lymphocytes from healthy non-smoking donors. It was also found to induce formulation of stable DNA-protein cross-links in cultured human lymphoma cells. That's from TOXNET.
Demir -- I don't know how to pronounce it -- Kocaoglu and Kaya reported that it may have significant genotoxic effects.
It was cytogenic at 50 nanomoles per liter in 24 hours against Chinese hamster ovary cells. Nanomoles per liter. That's a very low concentration.
Sister chromatid exchange in Chinese hamster ovary cells published by Galloway.
So again, that's -- that's a direct -- direct evidence of benzaldehyde interacting with a cell, and that's different

Page 231

than cells on your tongue, and that's different than cells on your skin.
BY MR. ZELLERS:
Q. It is not a --
A. So --
Q. I'm sorry. Finish your answer.
A. So that's what I'm reporting. And companies that are going to develop products that are intended for topical administration take those kinds of things into consideration. That's why they do eye irritation and eye sens- -- you know, skin sensitization studies.
If a product is going to be applied to the peroneal area, companies are going to consider, well, that may enter the anus. It could enter the vagina. What is a potential outcome?
Those are standard and typical considerations when companies develop products.
Q. Routes of exposure are important. Correct?
A. Yes.

Page 232

Q. You have not done an analysis with respect to routes of exposure with regard to benzaldehyde. Correct?
MS. O'DELL: Object to the form.
A. I did. I did look at all the available information on pharmacokinetics; absorption, distribution, metabolism, and elimination. And --
BY MR. ZELLERS:
Q. Where is that in your report?
A. It would be in the appendices.
Q. All right.
A. So the PubChem link, it lists all of that.
Q. Do you know --
A. The pharmacologies -- I'm sorry. I wasn't done.
Q. All right. Please finish your answer.
A. Yeah. The pharmacology for each and every one of those chemicals I looked at in depth.
Q. Do you know the concentration of benzaldehyde in baby powder or Shower to

Page 233

Shower?
A. I think you've asked me this question now at least a half dozen times. I have not been provided with the compositions.
Q. The same thing for what dose of this chemical a woman would be exposed to if she used baby powder or Shower to Shower. Correct?
MS. O'DELL: Object to the form of that question and the question before.
A. Again, that information was requested and was not provided.
BY MR. ZELLERS:
Q. Looking at Table 7, Pages 21 to 26, can you point to any chemical where there is evidence that the chemical contributes to ovarian cancer in humans?
MS. O'DELL: Object to the form.
A. Give me a minute.
para-Cresol. Women exposed in their workplace to varnishes that contained mixed Cresols had increased gynecological problems such as menstrual disorders and hormonal

Michael Crowley, Ph.D.

Page 234

1  disturbances.  An increased frequency of
2  perinatal mortality and abnormal development
3  of newborn infants was also reported.
4  BY MR. ZELLERS:
5      Q.    Do any of those studies relate
6  to or reference an increased risk of ovarian
7  cancer?
8          MS. O'DELL:  Object to the form.
9      A.    Ovarian cancer in humans or in
10 animals?  I feel like --
11 BY MR. ZELLERS:
12     Q.    In humans, yes.
13     A.    -- we keep going back and forth
14 here.
15     Q.    Let's limit it to humans.
16     A.    Pardon me?
17     Q.    In humans.
18         MS. O'DELL:  Object to the form.
19     A.    No, they have not been studied
20 for ovarian cancer in humans.
21 BY MR. ZELLERS:
22     Q.    I want to ask you the same
23 question with respect to Shower to Shower.
24 So Table 16, can you point to any chemical

Page 235

1  where there is evidence that the chemical
2  contributes to ovarian cancer in humans?
3      A.    A human study?  You want to --
4      Q.    Yes.
5      A.    You're choosing to ignore all
6  the animal studies and in vitro studies?
7  Just --
8      Q.    I'm not asking --
9      A.    Just so we're clear on that.
10     Q.    I'm not looking to argue with
11 you.  Okay?  I've asked you a question.  I'd
12 like you to try to answer to the best of your
13 ability?
14         MS. O'DELL:  I will object.  I'm
15         going to object to the form of the
16         question and just ask if you would let
17         Dr. Crowley finish.
18     A.    Yeah.  So you're asking for
19 human studies only.
20 BY MR. ZELLERS:
21     Q.    Yes.
22     A.    Right?  There isn't one because
23 these haven't been studied in human vaginas.
24     Q.    In your -- are you finished with

Page 236

1  your answer?
2      A.    Yeah.
3      Q.    In your report, you claim that
4  four chemicals in baby powder have been
5  identified by IARC, the International Agency
6  for Research on Cancer, as potential
7  carcinogens.  Is that right?  And I'm looking
8  at Page 12.
9      A.    Yes.
10     Q.    You list styrene, d-Limonene,
11 coumarin --
12     A.    Yes.
13     Q.    -- and eugenol?
14     A.    Yes.
15     Q.    You also claim, on Page 12, that
16 three chemicals in Shower to Shower have been
17 identified by IARC as possible carcinogens.
18 Is that right?
19     A.    Yes.
20     Q.    Benzophenone, coumarin, and
21 eugenol.  Is that right?  Those are the three
22 that you identified for Shower to Shower?
23     A.    Benzophenone, coumarin, and
24 eugenol.  I also identified musk ketone.

Page 237

1  That's the Scientific Committee on Health and
2  Environmental Risks in Europe.  You also
3  didn't mention para-Cresol, which the EPA
4  considers to be possibly carcinogenic.
5      Q.    I'm going to get to musk ketone
6  and para-Caresol -- or Cresol, but right now
7  I want to just limit my questions to the IARC
8  references that you make.
9      A.    Okay.
10     Q.    Understood?
11     A.    Sure.
12     Q.    You're familiar with the --
13 well, and so our record is clear, you
14 identified four chemicals or fragrance
15 chemicals with baby powder that are
16 potentially -- that are potential carcinogens
17 according to IARC.  Is that right?  Styrene,
18 d-Limonene, coumarin, and eugenol.
19     A.    Isn't that the same question you
20 just asked me?
21     Q.    Yes, but you then added in musk
22 ketone and para-Cresol.  Those two you cite
23 other sources for them being identified as a
24 possible or potential carcinogen.  Is that

Page 238

1 right?
2    A.    Yes.
3        MS. O'DELL:  Object to the form.
4 BY MR. ZELLERS:
5    Q.    I just want, right now, to talk
6 about the IARC references that you make.
7 You're familiar with the classification
8 system that IARC has established.  Is that
9 right?
10    A.    Yes.
11    Q.    Group 4 chemicals are probably
12 not carcinogenic to humans.  Is that right?
13    A.    Is that a question?
14    Q.    Yes.
15    A.    Yeah, Group 4 is probably not
16 carcinogenic to humans.
17    Q.    Group 3 chemicals are not
18 classifiable as to the carcinogenicity to
19 humans.  Right?
20    A.    Yes.
21    Q.    That category is used where the
22 evidence of carcinogenicity is inadequate in
23 humans and inadequate or limited in
24 experimental animals.  Correct?

Page 239

1    A.    No.  That's only half of it.
2 The other part of that is evidence of
3 carcinogenicity is inadequate in humans but
4 sufficient in experimental animals, but
5 strong evidence that the mechanism of
6 carcinogenicity in experimental animals may
7 not operate in humans, or agents that don't
8 fall into any other group.
9        (Exhibit No. 25 marked)
10 BY MR. ZELLERS:
11    Q.    So we have a clear record,
12 Deposition Exhibit 25 is the preamble to the
13 IARC monographs on the human evaluation of
14 carcinogenic risks to humans.  Is that right?
15    A.    That's what it says.
16        MS. O'DELL:  You said 25?
17        MR. ZELLERS:  25.
18        MS. O'DELL:  Thank you.
19 BY MR. ZELLERS:
20    Q.    Are you familiar with this --
21    A.    I have seen --
22    Q.    -- preamble?
23    A.    I have seen this.  I also have
24 the IARC classifications from their website

Page 240

1 on my computer.
2    Q.    If you look at Deposition
3 Exhibit 25, the classification system in the
4 preamble, for Group 3, the chemical is not
5 classifiable as to its carcinogenicity to
6 humans.  That's the title of that group.  Is
7 that right?
8    A.    That's what it says, "The agent
9 is not classifiable as to its carcinogenicity
10 to humans."
11    Q.    The description -- at least the
12 first paragraph of the description for
13 Group 3, "This category is used most commonly
14 for agents for which the evidence of
15 carcinogenicity is inadequate in humans and
16 inadequate or limited in experimental
17 animals."
18        Did I read this correctly?
19        MS. O'DELL:  Object to the form.
20    A.    Yeah, I believe you read that
21 faithfully.
22 BY MR. ZELLERS:
23    Q.    All right.  Group 2B --
24    A.    Well, wait a minute.  You need

Page 241

1 to read the next paragraph, because that's
2 important, in Group 3.  "Exceptionally,
3 agents for which the evidence of
4 carcinogenicity is inadequate in humans but
5 sufficient in experimental animals may be
6 placed in this category when there is strong
7 evidence that the mechanism of
8 carcinogenicity in experimental animals does
9 not operate in humans."
10    Q.    Are you done?
11    A.    So -- yeah.
12    Q.    Okay.
13    A.    So --
14    Q.    I don't want to have a
15 discussion -- I mean, I just asked for the
16 definition.
17    A.    Well, your only picking half of
18 it is part of the problem.
19    Q.    Is there anything else you want
20 to read into the record for the definition of
21 a Group 3 IARC chemical?
22    A.    Yep.
23    Q.    Read what you want to read, and
24 let's move on.

Page 242

1    A.    The third part of that is agents
2 that don't fall into any other group.  Those
3 are the three criteria.
4    Q.    Group 2B under the IARC
5 classification is the agent is possibly
6 carcinogenic to humans.  Is that right?
7    A.    There's three parts to Group 2B.
8 Limited evidence of carcinogenicity in humans
9 and less than sufficient evidence of
10 carcinogenicity in experimental animals or --
11 operative word "or" -- inadequate evidence of
12 carcinogenicity in humans but sufficient
13 evidence of carcinogenicity in experimental
14 animals.
15         And Part 3 is also an "or."
16 Inadequate evidence of carcinogenicity in
17 humans and less than sufficient evidence of
18 carcinogenicity in experimental --
19    THE REPORTER:  I'm sorry.  Read
20 that -- read that slower again, the
21 last --
22    THE WITNESS:  I'm sorry.  I'll
23 start it --
24    THE REPORTER:  "In humans."

Page 243

1    A.    Inadequate evidence of
2 carcinogenicity in humans and less than
3 sufficient evidence of carcinogenicity in
4 experimental animals but with supporting
5 evidence from mechanistic and other relevant
6 data.
7 BY MR. ZELLERS:
8    Q.    Group 2B, the classification by
9 IARC, is the agent is possibly carcinogenic
10 to humans.  Is that right?
11    A.    Yes.
12    Q.    Group 2A chemicals are probably
13 carcinogenic to humans.  Is that right?
14    A.    Yes.
15    Q.    Group 1 chemicals are
16 carcinogenic to humans.  Is that right?
17    A.    Yes.
18    Q.    To be clear, none of the
19 fragrance chemicals in baby powder or Shower
20 to Shower have been classified as a Group 1
21 agent by IARC.  Is that right?
22    A.    That's correct.
23    Q.    The first fragrance chemical
24 that you claim IARC has classified as

Page 244

1 potential carcinogen is -- strike that.
2         The first fragrance chemical
3 that you claim IARC has classified as a
4 potential carcinogen is styrene.  Is that
5 right?
6    A.    Yeah.
7    Q.    Potential carcinogen is not a
8 category recognized by IARC.  Is that right?
9    A.    No.  No.  They have the
10 categories that we --
11    Q.    What we just talked about?
12    A.    Yeah.
13    Q.    Styrene has been classified by
14 IARC as a 2B chemical.  Is that right?
15    A.    I believe that's correct.  Yeah,
16 2B.
17    Q.    As we discussed, this category
18 is used when there is limited evidence of
19 carcinogenicity in humans and less than
20 sufficient evidence of carcinogenicity in
21 experimental animals.  Is that right?
22    MS. O'DELL:  Object to the form.
23    A.    Again, only partially correct.
24 It can also be a circumstance where there's

Page 245

1 inadequate evidence of carcinogenicity in
2 humans but sufficient evidence of
3 carcinogenicity in animals.
4 BY MR. ZELLERS:
5    Q.    Would you agree IARC has not
6 concluded that styrene is carcinogenic in
7 humans?  Correct?
8    A.    Okay.  They've concluded it's in
9 Group 2B, which is possible carcinogenic to
10 humans.
11         And I need to request a break
12 because I need to blow my nose.
13    MR. ZELLERS:  Let's take a
14 break.
15    THE WITNESS:  Is that all right?
16    MR. ZELLERS:  That's a very
17 legitimate reason.
18    THE VIDEOGRAPHER:  Going off the
19 record, the time is 2:53 p.m.
20    (Recess from 2:53 p.m. to
21 3:05 p.m.)
22    THE VIDEOGRAPHER:  Back on the
23 record, the time is 3:05 p.m.
24    (Exhibit No. 26 marked)

Michael Crowley, Ph.D.

Page 246

BY MR. ZELLERS:

1   Q.   Dr. Crowley, Deposition
2   Exhibit 26 is the IARC monograph with respect
3   to styrene.  Is that correct?
4       A.   I think I found more than one of
5   them.  Which one is this?  This is Volume 82?
6       Q.   Is Exhibit 26 a -- an IARC
7   document?
8           MS. O'DELL:  Object to the form.
9       A.   I'm going to take your word for
10  it, but I can't say with certainty because I
11  don't see IARC -- oh, there it is on the
12  second page.  It says "IARC monograph
13  Volume 82."  So, yeah, it sure looks like it.
14  BY MR. ZELLERS:
15      Q.   As we discussed before, an
16  ingredient can cause or contribute to the
17  development of one type of cancer but not
18  another type of cancer.  Correct?
19      A.   Yeah, that's -- that's true.
20      Q.   Isn't it true that in human
21  studies, styrene exposure has only been
22  associated with an increased risk in
23  lymphatic and hematopoietic neoplasms?  And

Page 247

1   I'm looking at the IARC monograph,
2   Exhibit 26, at Page 520.
3           MS. O'DELL:  Object to the form.
4       A.   Can you direct me to --
5   BY MR. ZELLERS:
6       Q.   Sure.
7       A.   -- where on Page 520?  I'm going
8   to trust that you're faithful in reading it
9   to me.
10          The one thing I'd like to verify
11  is there are multiple IARC examinations of
12  styrene, so do you know which -- this is from
13  Volume 82, but which year is that?  Do you
14  know?
15      A.   Well, looking at the cover page
16  of Exhibit 26, the IARC monograph states,
17  "This substance was considered by previous
18  working groups in 1978, 1987, and 1994.
19  Since that time, new data have become
20  available, and these have been incorporated
21  into the monograph and taken into
22  consideration in the present evaluation."
23          That's what I know with respect
24  to the year.

Page 248

1           MS. O'DELL:  So you do not know
2   the year of this publication?
3           MR. ZELLERS:  I do not know the
4   year of this other than I believe it to
5   be the most recent IARC monograph with
6   respect to styrene.  All I can tell you
7   is it's after 1994, and it is part of
8   the IARC monographs in Volume 82.
9       A.   So I'm looking at the copy I
10  found, and it --
11  BY MR. ZELLERS:
12      Q.   Oh, I'm sorry.  So I can
13  identify Deposition Exhibit 26 as a 2002 IARC
14  monograph.
15      A.   Okay.  So this is only part of
16  it, because I also considered this particular
17  document.  It looks to me like you've
18  provided me with copies up through 520 --
19  Page 522.  The actual report I found was 114
20  pages long, and it contains -- it goes up to
21  Page 550.
22      Q.   I have just given you, in
23  Exhibit 26, excerpts from the monograph.  The
24  first page of the exhibit was 437.  The last

Page 249

1   page I provided you was 522, so I will
2   acknowledge these are just excerpts --
3       A.   Okay.
4       Q.   -- from the monograph.
5           MS. O'DELL:  Well, fair enough.
6   Thank you for acknowledging that.  And
7   I'll just note for the record, so it's
8   clear, Exhibit 26 skips from Page 438
9   to 517, and then it's 517 to 522, and
10  the remainder is omitted.
11  BY MR. ZELLERS:
12      Q.   Doctor, I'm ready to continue.
13  Are you ready?
14      A.   All right.
15      Q.   I'm pointing you to, in
16  Exhibit 26, the section on human
17  carcinogenicity data, Section 5.2 that begins
18  on Page 518.  Do you see that?
19      A.   Yes.
20      Q.   Are you aware of any human
21  studies associating styrene exposure with an
22  increased risk of -- well, let me withdraw
23  that question.
24          In this section, IARC references

Page 250

1 a human study relating to an increased risk
2 of lymphatic and hematopoietic neoplasm with
3 styrene exposure.  Is that generally
4 accurate?
5      MS. O'DELL:  Object to the form.
6      A.    I mean, they -- they talk about
7 a number of studies.  If you go to Page 519,
8 the second to last paragraph, "There have
9 also been reports of increased risks of
10 rectal, pancreatic, and nervous system
11 cancers in some of the cohort and
12 case-control studies.  The numbers of cases
13 were quite small in these studies, and most
14 of the larger cohort studies have not yielded
15 similar findings.  Many of the cohort studies
16 did not examine these sites in detail."
17      So I don't think it's just
18 limited to those.
19 BY MR. ZELLERS:
20      Q.    Let me cut to the chase and ask
21 you my question --
22      A.    Okay.
23      Q.    -- and then we can hopefully
24 move along.

Page 251

1      There are no human studies that
2 associate styrene exposure with an increased
3 risk of ovarian cancer in humans.  Is that
4 right?
5      MS. O'DELL:  Object to the form.
6      A.    I'm going to take my new copy,
7 and I'm going to do a search.
8 BY MR. ZELLERS:
9      Q.    Again, I'm objecting to you
10 doing internet research to try to answer my
11 questions.
12      MS. O'DELL:  Excuse me.  He's
13      not doing internet research.  As he's
14      noted to you, that he was provided, in
15      Exhibit 26, an incomplete monograph,
16      and he has the full monograph before
17      him.  And so it's very fair to answer
18      your question --
19      MR. ZELLERS:  Ms. O'Dell.
20      MS. O'DELL:  No, no, no.  Let me
21      finish.
22      MR. ZELLERS:  If he is
23      referring --
24      MS. O'DELL:  No.  Let me finish.

Page 252

1      It's very fair for -- you've asked him
2      does the monograph refer to ovarian
3      cancer, and it's very fair for him to
4      be able to examine that document and
5      answer your question and not rely on
6      this truncated, incomplete exhibit.
7      MR. ZELLERS:  The exhibit I
8      provided to him was the summary of data
9      reported in evaluation for human
10      carcinogenicity data.
11 BY MR. ZELLERS:
12      Q.    But my question to you,
13 Dr. Crowley, is:  Are you aware of any study
14 that associates styrene exposure with an
15 increased risk of ovarian cancer in humans?
16      MS. O'DELL:  Object to the form.
17      A.    No.
18 BY MR. ZELLERS:
19      Q.    If I ask you the same questions
20 as I asked before, you don't know the dose or
21 the amount or the concentration of styrene in
22 the baby powder or Shower to Shower product.
23 Correct?
24      MS. O'DELL:  Object to the form.

Page 253

1      A.    Johnson & Johnson did not
2 provide that information to enable that kind
3 of assessment.
4 BY MR. ZELLERS:
5      Q.    The same --
6      A.    It was requested.
7      Q.    The same statement:  You do not
8 know the amount of exposure or the duration
9 of exposure of any individual in this case.
10 Correct?
11      MS. O'DELL:  Object to the form.
12      A.    The same answer:  Information
13 was requested, and Johnson & Johnson did not
14 provide that to enable that kind of analysis.
15 BY MR. ZELLERS:
16      Q.    Do you agree that the studies --
17 the human studies with respect to styrene are
18 characterized by IARC as generally small,
19 statistically unstable, and often based on
20 subgroup analyses?
21      MS. O'DELL:  Object to the form.
22      A.    Could you please point me to
23 where you read that?
24

Page 254

1  BY MR. ZELLERS:
2      Q.    Sure.  Take a look --
3      A.    Which page?
4      Q.    Yes.  Page 520.  So at the very
5  top of 520 -- this, again, is in the section
6  on human carcinogenicity data -- IARC states,
7  "The increased risks for lymphatic and
8  hematopoietic neoplasms observed in some of
9  the studies are generally small,
10 statistically unstable, and often based on
11 subgroup analyses.  These findings are not
12 very robust."
13         Did I read that correctly?
14     A.    I believe so.
15     Q.    All right.
16     A.    I think one other thing we
17 should talk about with respect to styrene is
18 its metabolite.
19         MR. ZELLERS:  Doctor, I'm going
20     to object because I just need you to
21     answer my questions.
22 BY MR. ZELLERS:
23     Q.    And my question was:  Did I read
24 that correctly?

Page 255

1      A.    The answer --
2          MS. O'DELL:  Object to the form.
3      A.    Yeah.  You did read it
4  correctly, but as long as we're talking about
5  the safety of styrene in human studies, we
6  can't ignore its metabolite.
7          Styrene-7,8-oxide has been
8  implicated and found to be carcinogenic and
9  genotoxic in virtually every study that has
10 ever been done with it.  Metabolism of
11 styrene to those metabolites have also been
12 demonstrated both in humans and in animals to
13 be carcinogenic.
14         So while you're picking and
15 choosing certain portions of the IARC
16 monograph, let's consider the thing in total,
17 all of the evidence.
18         MR. ZELLERS:  Move to strike as
19     nonresponsive.
20 BY MR. ZELLERS:
21     Q.    I have not -- my question was:
22 Did I read that statement correctly from
23 IARC?  This is not your opportunity to just
24 pontificate.  I'll move on, but I need you to

Page 256

1  try to answer my questions as best you can.
2          Is it true that in animal
3  studies styrene exposure has only been
4  associated with an increased incidence of
5  pulmonary adenomas and carcinomas in mice?
6          MS. O'DELL:  Object to the form.
7      A.    Can you please --
8  BY MR. ZELLERS:
9      Q.    Sure.
10     A.    -- direct me to where you're --
11     Q.    Take a look at the IARC
12 monograph.  I'm now looking at the Section
13 5.3, Exhibit 26, Page 520, animal
14 carcinogenicity data.
15         Do you see that?
16     A.    Yes.  So styrene was tested for
17 carcinogenicity in mice in an inhalation
18 study and four oral gavage studies.  That's
19 what you're talking about.  Right?
20     Q.    Yes.
21     A.    All right.
22     Q.    It was only associated with an
23 increased incidence of pulmonary adenomas and
24 carcinomas in mice.  Is that right?

Page 257

1      A.    That's what it says.  But let's
2  also jump down two paragraphs.  "Styrene-7,8-
3  oxide is a major metabolite of styrene and
4  has been previously evaluated by IARC.  The
5  evaluation at that time was that there was
6  sufficient evidence in experimental animals
7  for the carcinogenicity of styrene-7,8-
8  oxide."
9      Q.    What is styrene-7,8-oxide?
10     A.    It's the metabolite.  So when
11 styrene is absorbed, it's metabolized to the
12 7,8-oxide.
13         So this is very similar to
14 certain drugs.  There are drugs called
15 prodrugs.  The chemical that you swallow has
16 zero biological activity.  However, once it's
17 been metabolized, the metabolite is
18 pharmacologically active.  That's the case
19 here with styrene.
20     Q.    This is an animal study.
21 Correct?
22     A.    It's an animal study.
23     Q.    All right.  d-Limonene.  You
24 claim that IARC has identified d-Limonene as

Page 258

1 a potential carcinogen. Is that right? And
2 I'm looking at your report. I believe it was
3 Page 12.
4     A.    Yes.
5     Q.    d-limonene -- strike that.
6         (Exhibit No. 27 marked)
7 BY MR. ZELLERS:
8     Q.    Exhibit 27 is again excerpts
9 from the IARC monograph on d-Limonene?
10     A.    I'm going to pull up the entire
11 monograph.
12         MS. O'DELL:  So just for the
13     record, Exhibit 27 starts at Page 307
14     and goes to 308, then skips to 320
15     and --
16         MR. ZELLERS:  It's just as with
17     the styrene monograph.  What I have
18     done here is to photocopy the sections
19     relating to human carcinogenicity data
20     and animal carcinogenicity data.
21         MS. O'DELL:  And feel free to
22     look at the whole monograph if you need
23     to, Dr. Crowley.
24         THE WITNESS:  I have it.

Page 259

1 BY MR. ZELLERS:
2     Q.    Dr. Crowley, IARC has classified
3 d-Limonene as a Group 3 agent.  Is that
4 right?
5     A.    I believe that's correct.
6     Q.    The first sentence, as we read
7 before, of the definition of a Group 3
8 classification means that the chemical is not
9 classifiable as to its carcinogenicity in
10 humans.  Is that right?
11         MS. O'DELL:  Object to the form.
12 BY MR. ZELLERS:
13     Q.    That's what the Group 3
14 classification means?
15     A.    That's correct, not
16 classifiable.
17     Q.    Do you agree that IARC has not
18 identified d-Limonene as a potential
19 carcinogen, but really what IARC has done is
20 determined there is no adequate evidence to
21 say that it is a carcinogen?
22     A.    I would state that IARC has
23 classified it as Group 3, which means there's
24 evidence of -- the evidence of

Page 260

1 carcinogenicity is inadequate in humans and
2 inadequate or limited in animals, or the
3 evidence of carcinogenicity in humans is
4 inadequate but sufficient in experimental
5 animals with strong evidence that the
6 mechanism doesn't relate.  That's what the
7 classification -- which we've read into the
8 record previously.
9     Q.    The summary of Group 3
10 classification by IARC is that the agent is
11 not classifiable as to its carcinogenicity to
12 humans.  Is that right?
13         MS. O'DELL:  Object to form.
14 BY MR. ZELLERS:
15     Q.    That is -- I'm reading from
16 Exhibit 25.
17     A.    Yeah.  There's three elements
18 that go into the group classifications, and
19 you're only reading the first one.  You're
20 not reading all three.
21     Q.    Now, Doctor, in fairness --
22         MS. O'DELL:  Let him finish,
23     sir.
24     A.    Excuse me.  I wasn't finished.

Page 261

1 BY MR. ZELLERS:
2     Q.    You have to answer my question.
3 I'm reading the title.  Is that right?
4         I'm not reading the definitions.
5 I'm reading the title.  Did I read the title
6 correctly?
7     A.    I think so.
8     Q.    All right.  And I don't mean to
9 unnecessarily cut you off, but we have had an
10 extensive discussion, both of us, in terms of
11 the definitions.  Correct?
12     A.    Right.
13     Q.    All right.
14     A.    And we have.  And I think that
15 it's pretty clear that IARC considers both
16 human and animal studies when they come up
17 with these classifications.
18     Q.    Isn't it true that there are no
19 human studies linking the use of d-Limonene
20 to any type of cancer?
21     A.    The IARC monograph states that
22 there was no data available to the working
23 group on studies of cancer in humans with
24 d-Limonene.  That's correct.

Michael Crowley, Ph.D.

| Page 262 |
| --- |

1    Q.    Isn't it also true that in
2  animal studies the only potential association
3  between d-Limonene was found in renal tubular
4  tumors?
5    A.    Renal tubular adenomas and
6  carcinomas, but I believe that there was a
7  co-carcinogen effect demonstrated, if my
8  memory is correct, in a lung model.
9    Q.    In an animal study.  Correct?
10    A.    Yeah, that was an animal study.
11    Q.    Let me ask you a couple --
12    A.    So --
13    Q.    Are you done?
14    A.    I was just going to say, you
15  know, what that means is that if it's present
16  with a known carcinogen, it promotes
17  carcinogenesis.
18    Q.    In animals.  Correct?  Or in
19  the -- in the particular animal study --
20    A.    Yeah, in that particular study.
21    MS. O'DELL:  Object to the form.
22  BY MR. ZELLERS:
23    Q.    Coumarin.  You state in your
24  report that coumarin is both a potential

| Page 263 |
| --- |

1  carcinogen and a possible carcinogen.  Is
2  that right?
3    A.    I believe so.
4    Q.    In fact, though, according to
5  IARC, coumarin is also a Group 3 agent.  Is
6  that right?
7    A.    That's correct, it's Group 3.
8    (Exhibit No. 28 marked)
9  BY MR. ZELLERS:
10    Q.    Deposition Exhibit 28 is the
11  IARC coumarin monograph excerpts.  If I asked
12  you all the same set of questions --
13    A.    I'm probably going to give you
14  the same answers.
15    Q.    -- with respect to coumarin that
16  I asked you with d-Limonene, we'd get the
17  same answers.  Correct?
18    MS. O'DELL:  Object --
19    A.    Yes.
20    MS. O'DELL:  Object to the form.
21  BY MR. ZELLERS:
22    Q.    I'll ask you a couple --
23    MS. O'DELL:  Maybe.  Maybe not.
24

| Page 264 |
| --- |

1  BY MR. ZELLERS:
2    Q.    Well, I'll ask you a couple
3  specifically.
4    MS. O'DELL:  You know, that's a
5  little unfair.
6    A.    Do you trust me enough to
7  anticipate?
8  BY MR. ZELLERS:
9    Q.    No, I don't.
10    MS. O'DELL:  I would say, from
11  my standpoint, listen to his questions,
12  answer the questions, and we'll be
13  better off.
14  BY MR. ZELLERS:
15    Q.    It's true, correct, that there
16  are no human studies linking use of coumarin
17  to any type of cancer?
18    MS. O'DELL:  Object to the form.
19    A.    I don't know that I would phrase
20  it that way.  The IARC monograph says that no
21  data were available to the working group on
22  studies of cancer in humans for -- for
23  coumarin.
24

| Page 265 |
| --- |

1  BY MR. ZELLERS:
2    Q.    Isn't it also true that in
3  animal studies, the only potential
4  association that has been found is lung -- or
5  strike that -- are lung tumors,
6  hepatocellular tumors, and renal tubal
7  adenomas?
8    A.    Alveolar/bronchiolar tumors,
9  adenomas, and carcinomas in both males and
10  females, hepatocellular adenomas in females,
11  and marginal incidence in squamous cell
12  papillomas and carcinomas of the stomach.
13    Q.    Those are all animal studies.
14  Correct?
15    A.    Correct.  I'm going to look at
16  this second one.
17    Hepatocellular tumors, and --
18  that's in mice.  Now, I spent my New Year's
19  down at the coast, and I did -- at the beach,
20  and I did thumb through these, and I feel
21  like there was another one that demonstrates
22  that here, and I want to go look at it.
23    In rats, non-neoplastic
24  cholangiofibrosis, non-bile duct carcinomas.

Page 266

1    Q.    What type of animal study was
2  that?
3    A.    That was a rat.
4    Q.    With any of these animal
5  studies, do you know the dose of the chemical
6  that the animals were exposed to?
7    A.    Yeah.  They're present here in
8  the -- in the report.
9    Q.    Eugenol.  Eugenol is -- strike
10  that.
11        You state in your report that
12  eugenol is both a potential carcinogen and a
13  possible carcinogen.  Is that right?
14  Page 12.
15    A.    I'm actually on Page 21.  I'm
16  sorry.
17        Coumarin and eugenol are not
18  classifiable.  I think that's the word I
19  used.
20    Q.    In fact, as with d-Limonene and
21  coumarin, eugenol is classified by IARC as a
22  Group 3 agent.  Is that right?
23    A.    Yes.
24    Q.    At the risk of drawing another

Page 267

1  objection from counsel for the plaintiffs, if
2  I ask you the same questions regarding
3  eugenol that I have asked relating to
4  coumarin and d-Limonene, as relates to the
5  meaning of a Group 3 classification by IARC,
6  you'd give me the same answers.  Right?
7        MS. O'DELL:  Object to the form.
8        And because I don't believe that's a
9        fair way to ask those questions.  If
10        you've got the questions, ask him, but,
11        you know --
12  BY MR. ZELLERS:
13    Q.    You can answer.
14        MS. O'DELL:  It's a different --
15        it's a different monograph.  It's a
16        different circumstance, and he should
17        be able to have the opportunity to
18        clarify.
19  BY MR. ZELLERS:
20    Q.    And he does have every
21  opportunity.  But assuming I'm asking you all
22  the same set of questions with respect to
23  eugenol as I asked you with d-Limonene and
24  with coumarin, at least as it relates to

Page 268

1  IARC's assessment and classification, you'd
2  give me the same answers.  Correct?
3        MS. O'DELL:  Object to the form.
4    A.    Yeah, so, I mean, the entire
5  IARC monograph is lengthy.  In the case of
6  coumarin, they -- they actually have
7  Section 4, other data relevant to an
8  evaluation of carcinogenicity and its
9  mechanism.  And so there they looked at the
10  pharmacokinetics; absorption, distribution,
11  metabolism, and excretion.  That's on
12  Page 202 of the coumarin monograph, which I
13  don't think you had in your cut.
14        So, you know, there's a lot of
15  factors that go into these carcinogenicity
16  examinations by IARC or even NTP.
17  BY MR. ZELLERS:
18    Q.    IARC is made up of a number of
19  experts who come together to look at the
20  carcinogenicity of certain chemicals.  Is
21  that right?  And ingredients?
22    A.    It's an expert group, yeah.
23    Q.    Yeah.  And at least with respect
24  to IARC and the experts that are a part of

Page 269

1  IARC's analysis for d-Limonene, coumarin, and
2  eugenol, they have determined that those are
3  all Group 3 chemicals, and the definition --
4  or at least the statement of a Group 3 is
5  that the agent is not classifiable as to its
6  carcinogenicity to humans.  Correct?
7        MS. O'DELL:  Object to the form.
8    A.    Yeah, that's right.  And you've
9  also got to consider what routes of
10  administration they examined.  Right?
11        So, you know, if you look at the
12  coumarin monograph, you don't find where it's
13  been administered vaginally in any animal to
14  ascertain whether that would pose a risk.
15        (Exhibit No. 29 marked)
16  BY MR. ZELLERS:
17    Q.    Exhibit 29 are the excerpts from
18  the IARC eugenol monograph.
19    A.    Is this Monograph 36?  Yeah,
20  Volume 36.
21        So, again, the entire monograph
22  that I have is 363 pages long.
23    Q.    You have that, and you have that
24  in front of you.  Is that right?

Page 270

1    A.    I have my PDF open on my
2  computer.
3    Q.    All right.  It's true, is it
4  not, that there are no human studies linking
5  use of eugenol to any type of cancer?  Is
6  that right?
7         MS. O'DELL:  Object to the form.
8    A.    I'd need to take a closer look
9  at the monograph, if you don't mind.
10  BY MR. ZELLERS:
11    Q.    Are you aware of any human
12  studies linking the use of eugenol to any
13  type of cancer?
14         MS. O'DELL:  Object to form.
15    A.    I need to take a --
16         THE REPORTER:  Was there an
17  objection?  I couldn't hear you.
18         MS. O'DELL:  Yes.
19  BY MR. ZELLERS:
20    Q.    When you're ready, I'd like to
21  direct you to --
22    A.    I'm still looking at the
23  monograph.  Sorry.
24         So they found incidences of

Page 271

1  hepatocellular carcinoma in males in an oral
2  administration study.
3    Q.    In human males?
4    A.    In mice.
5    Q.    Right.  My question to you is:
6  There are no human studies that were
7  identified by IARC linking the use of eugenol
8  to any type of cancer.  Correct?
9         MS. O'DELL:  Object to the form.
10    A.    I'm looking.  Is there a section
11  on human?  Because I haven't found it yet.
12  BY MR. ZELLERS:
13    Q.    If you take a look at the
14  monograph, Exhibit 29, go to Page 89, 4.3,
15  human data, states -- and this is the --
16    A.    Yep.
17    Q.    -- IARC monograph.
18    A.    That's correct.  There is no
19  human data.
20    Q.    With respect to animal studies,
21  the only potential association that has been
22  found relates to liver tumors.  Is that
23  right?
24    A.    I would need to check that

Page 272

1  monograph.
2    Q.    If you --
3    A.    Endometrial stromal polyps were
4  observed in treated females.
5    Q.    Mice.  Correct?
6    A.    Rats.
7    Q.    Rats.  That's what you see in
8  your --
9    A.    Yeah, that's --
10    Q.    -- evaluation of the IARC
11  monograph.  Right?
12    A.    Yeah.  That's on Page 84.  And
13  that's part of the female reproductive
14  system.
15    Q.    Do you know the dose of eugenol
16  those animals -- those rats were exposed to?
17    A.    It was USP grade eugenol, so
18  greater than 99 percent purity at
19  concentrations of -- it looks like 3,000 to
20  6,000 migs per kig of diet for 103 weeks.
21  There's also a skin application study here on
22  mice that I want to take a quick look at.
23         So 19 mice had papillomas, three
24  had carcinomas following dermal application,

Page 273

1  and that was 0.1 -- sorry -- 150 micrograms.
2         IP administration, which is
3  intraperitoneal, group of mice there, the
4  study was -- no incidence of tumors in that
5  one.
6         They also looked at metabolites,
7  which is also done --
8    Q.    Okay.  Doctor, I've not asked
9  you anything about metabolites.  I asked you
10  about human studies.  I asked you about
11  animal studies.
12         MS. O'DELL:  Well, he's talking
13    about the animal studies, so that's a
14    fair response.  I mean, if you can
15    finish your answer, sir.
16    A.    Yeah.  And metabolites are
17  considered.  Right?  I mean, what the body
18  turns it into matters, so --
19  BY MR. ZELLERS:
20    Q.    Okay, Doctor.  I want to finish,
21  so please finish your answer and let me ask
22  my next question.
23    A.    So --
24         MS. O'DELL:  Finish your answer

Page 274

1    if you --
2    A.    Yeah.  I mean, each of these
3 IARC monographs needs to be considered in
4 whole, not just which parts suit your
5 position, that the absence of human studies
6 means that somehow these are safe.  That's
7 not the conclusion that a person of skill in
8 the art would conclude.
9        So there were carcinogenicity
10 studies on the metabolites, and other
11 bio-relevant factors are considered.
12 BY MR. ZELLERS:
13    Q.    You're referring to the animal
14 study in rats.  Is that right?
15    A.    Mice, rats, guinea pigs.  They
16 did IV admin of multiple different doses in
17 dogs.  All of that is considered when these
18 monographs are generated.
19    Q.    And after all of that analysis
20 and after all of that review, the IARC expert
21 panel determined that eugenol was a Group 3
22 agent that was not classifiable as to its
23 carcinogenicity to humans.  Correct?
24    A.    That was the conclusion, yeah.

Page 275

1    Q.    Let me --
2    A.    And the conclusion in the
3 monograph actually states it very clearly as
4 to why they drew that conclusion.  It says,
5 "The evaluation is there is limited evidence
6 for carcinogenicity of eugenol in
7 experimental animals.  In the absence of
8 epidemiological data, no evaluation can be
9 made of the carcinogenicity of eugenol in
10 humans."
11    Q.    Let me ask you now about
12 benzophenone.  That is the last agent that
13 you cite or reference IARC as a source for
14 its carcinogenicity.  Is that right?
15    A.    I think I also cited the
16 national -- the NTP technical report, which
17 is 267 pages long, and --
18    Q.    Take a look at --
19    A.    -- the IARC monograph.
20    Q.    All right.  Take a look, if you
21 will, at the IARC monograph, the excerpts,
22 relating to benzophenone, Exhibit 30.
23        (Exhibit No. 30 marked)
24    A.    Yeah.  It looks like we've got

Page 276

1 the same -- so this is from 101.  Mine is
2 also 101.  Yeah.
3 BY MR. ZELLERS:
4    Q.    We're in sync?
5    A.    Yeah.  Mine -- you know, again,
6 I think you've got snips here.  You've only
7 got a few pages of the entire report.
8    Q.    You, though, have the full
9 report on --
10    A.    I do.
11    Q.    -- your computer.  Is that
12 right?
13    A.    I do.
14    Q.    IARC has classified benzophenone
15 as a 2B chemical.  Is that right?
16    A.    I believe so.
17    Q.    2B, according to IARC, means the
18 agent is possibly carcinogenic to humans.  Is
19 that right?
20    A.    Yes, 2B means possibly
21 carcinogenic to humans.
22    Q.    It's true, is it not, that there
23 are no human studies linking the use of
24 benzophenone to any type of cancer.  Correct?

Page 277

1        MS. O'DELL:  Object to the form.
2    A.    Yeah, the IARC monograph says no
3 data were available to the working group.
4 BY MR. ZELLERS:
5    Q.    With respect to animal studies,
6 benzophenone exposure has only been
7 associated with an increased incidence of
8 hepatocellular cancer, histiocystic sarcoma,
9 leukemia, and renal tubal adenoma.  Correct?
10    A.    Let's see here.  Hepatoblastoma
11 in male mice, histiocystic sarcoma in
12 females -- female mice, increased incidence
13 of mononuclear cell leukemia in male and
14 female rats.  Renal tube adenoma in male
15 rats, histiocytic sarcoma in female rats, and
16 tumors in the kidney, yeah.
17    Q.    There are no animal studies
18 linking the use of benzophenone with an
19 increased risk of ovarian cancer.  Correct?
20        MS. O'DELL:  Object to the form.
21    A.    Just a moment.  There's more
22 because don't forget there's an NTP report,
23 too.  And, frankly, NTP is extraordinarily
24 thorough.  So let's go look at that.

Page 278

1    So according to the National
2 Toxicology Program, male rats receiving
3 benzophenone had severe kidney nephropathy,
4 kidney tumors, and leukemia.  Female rats had
5 higher rates of leukemia, liver tumors,
6 increased severities of kidney nephrology,
7 metaplasia, epithelia of the nose and
8 hyperplasia of the spleen.  Some female mice
9 also developed rare histiocytic sarcomas.  I
10 believe those were associated with the
11 repro- -- female reproductive organs.
12    The NTP program also concluded
13 that benzophenone caused cancer -- kidney
14 cancer in male rats, liver tumors in male
15 mice, and histiocytic sarcomas in female
16 mice.
17 BY MR. ZELLERS:
18    Q.    At least based upon the
19 information you have available to you and
20 that you're reading from, there is not an
21 animal study cited by NTP that associates
22 benzophenone in animals with an increased
23 risk of ovarian cancer.  Correct?
24    A.    Yeah, so, you know --

Page 279

1    Q.    Is that correct?
2    A.    That's correct, but the question
3 really requires some qualification.  There is
4 no ovarian cancer animal model that I am
5 aware of.  And if you look in the report
6 issued by Canada and their health ministry,
7 they state that.  There is no animal model
8 for ovarian cancer.
9    Q.    Are you ready for my next
10 question?
11    A.    Yes.  Just one moment, please.
12    You were asking about
13 benzophenone, and I knew there was an
14 association with ovaries.  So this is from
15 the NTP report, and I'm going to read it.
16 Histiocytic sarcoma in females.  There was a
17 positive trend in the incidence of
18 histiocytic sarcomas, all organs.  The
19 evidence in 625 part per million females was
20 significantly greater than that in the
21 controls.
22    That's from Table 17 in D3 of
23 that particular report.  Only two histiocytic
24 sarcomas have been observed in historical

Page 280

1 feed study controls, and the incidence in the
2 625 part per million group exceeded the
3 historical control range for all routes.
4    In the current two-year study,
5 only females were affected, and the liver and
6 lung were involved in all affected females.
7    The histiocytic sarcomas were
8 highly invasive in all three 1,250 PPM mice.
9 Multiple organs throughout the body had
10 neoplastic histiocytic legions; ovaries,
11 uterus, spleen, adrenal gland, kidney,
12 urinary bladder, and multiple lymph nodes
13 were affected in all three animals.
14    MR. ZELLERS:  Move to strike as
15 nonresponsive.
16 BY MR. ZELLERS:
17    Q.    Doctor --
18    MS. O'DELL:  I oppose the
19 motion.
20 BY MR. ZELLERS:
21    Q.    On Page --
22    THE REPORTER:  I did not hear
23 you.
24    MS. O'DELL:  I oppose the

Page 281

1 motion.
2 BY MR. ZELLERS:
3    Q.    On Page 21, you state that the
4 Environmental Protection Agency designated
5 p-Cresol, or para-Cresol, as possibly
6 carcinogenic.  Is that right?
7    A.    Yes.
8    Q.    Do you know what studies the EPA
9 reviewed in determining that p-Cresol is a
10 potential carcinogen?
11    A.    I believe that I found a report
12 to support that, and it was the -- also in
13 the NTP report.  I also found "The tumor-
14 promoting -- tumor-promoting action of phenol
15 and related compounds" --
16    THE REPORTER:  Doctor.
17    THE WITNESS:  I'm sorry.
18    THE REPORTER:  I don't know if
19    I'm going to have that, so can you try
20    to read a little slower?
21    THE WITNESS:  Yeah.
22    A.    The report titled "The
23 tumor-promoting action of phenol and related
24 compounds for mouse skin" by Boutwell and

Michael Crowley, Ph.D.

Page 282

1 Bosch.
2    Q.    Again, you're referencing animal
3 studies.  Correct?
4    A.    Yeah.
5    Q.    You are not aware of any human
6 studies relating p-Cresol as a potential
7 carcinogen.  Correct?
8        MS. O'DELL:  Object to the form.
9    A.    Just so we're clear, it's
10 unethical to infuse human ovaries with
11 para-Cresol or any of these.  That's just not
12 done.
13 BY MR. ZELLERS:
14    Q.    The answer to my question is,
15 yes, it's correct, you are not aware of any
16 human studies.  Right?
17        MS. O'DELL:  No.  Object to the
18    form.  You don't get to rephrase his
19    answer.
20        MR. ZELLERS:  I'm not --
21        MS. O'DELL:  He responded to
22    your question.  If you want to ask him
23    another question, Dr. Crowley is --
24        MR. ZELLERS:  I want him to

Page 283

1    answer my --
2        MS. O'DELL:  -- willing to
3    respond to you.  But you don't get to
4    dictate what his response is going to
5    be.
6        MR. ZELLERS:  But I do get to
7    ask him for a response.
8        MS. O'DELL:  And he gave you
9    one.
10        MR. ZELLERS:  Well --
11 BY MR. ZELLERS:
12    Q.    Doctor, you are not aware of any
13 human study associating p-Cresol with any
14 type of ovarian cancer.  Correct?
15        MS. O'DELL:  Object to the form,
16    asked and answered.
17    A.    So, as I said, I don't think
18 that any regulatory authority in the world
19 would allow me to administer para-Cresol to a
20 human ovary.  It wouldn't happen.
21 BY MR. ZELLERS:
22    Q.    Are you --
23    A.    So to make that assertion in
24 humans is not ethically possible.  These

Page 284

1 studies are done in animals.
2    Q.    Do you know whether
3 carcinogenicity with p-Cresol has been
4 observed in humans?
5        MS. O'DELL:  Object to the form.
6    A.    I'm sorry.  Can you please
7 repeat the question?
8 BY MR. ZELLERS:
9    Q.    Sure.  Are you aware of any
10 study or finding of carcinogenicity observed
11 in humans with p-Cresol or para-Cresol?
12        MS. O'DELL:  Object to the form.
13    A.    So I have a journal article here
14 that I believe I cited, "The International
15 Journal of Toxicology," from 2006, Volume 25,
16 Supplement 1, Pages 29 through 127.  "The
17 safety of Cresols was reviewed by the World
18 Health Organization in 1995.  The WHO report
19 concluded there is clear evidence in humans
20 that during dermal or oral exposure, high
21 concentrations of Cresols are corrosive,
22 absorb rapidly, and produce severe toxicity
23 that may result in death."
24

Page 285

1 BY MR. ZELLERS:
2    Q.    Is there --
3    A.    So --
4    Q.    -- any study that associates
5 p-Cresol or para-Cresol with ovarian
6 cancer in humans?
7    A.    That study would never be done.
8 So, no, that doesn't exist.  It is unethical
9 to dose ovaries with para-Cresol.
10    Q.    Are you aware of any observation
11 of an increased risk of ovarian cancer with
12 exposure to para-Cresol or para-Cresol in
13 humans?
14        MS. O'DELL:  Object to the form.
15    A.    So I believe I mentioned this
16 before.  There was a positive validated
17 cytogenic response in Chinese hamster ovary
18 cells, including DNA damage to human
19 lymphocytes, and morphological
20 transformations in mouse fibroblasts.
21        All three of those studies are
22 done with cell lines.  They are in vitro,
23 because we don't ethically endanger humans,
24 and those are all types of things that are

Page 286

1 considered by IARC, NTP, and so forth.
2 According to this report, Derek
3 and Lewis studied the cellular toxicity
4 effects against CHO cells in a culture for 20
5 hours with para-Cresol at a concentration
6 of 1,000 micrograms per mil, and they -- they
7 found these results, which are indicative of
8 toxicity.
9 BY MR. ZELLERS:
10 Q. You do not know the
11 concentration or the amount of p-Cresol or
12 para-Cresol in baby powder or Shower to
13 Shower. Correct?
14 MS. O'DELL: Object to the form.
15 A. Again, Johnson & Johnson never
16 provided the information in order to do any
17 kind of analysis like that.
18 BY MR. ZELLERS:
19 Q. You also have not made any
20 estimate or evaluation and have no
21 information as to the exposure of women to
22 either baby powder or Shower to Shower.
23 Correct?
24 MS. O'DELL: Object to the form.

Page 287

1 A. Yeah, so I can't do that without
2 the information that Johnson & Johnson did
3 not provide, so --
4 BY MR. ZELLERS:
5 Q. On Page 21 of your report, you
6 state that the European Food Safety Authority
7 found that there is substantial evidence that
8 ethyl methylphenylglycidate --
9 A. I'm sorry. What page did you
10 say?
11 Q. Page 21 -- has genotoxic
12 potential from the available in vitro and
13 in vivo studies.
14 Did you make that statement?
15 A. I didn't make that statement.
16 The European Food Safety Authority did.
17 Q. Do you know whether these
18 studies were conducted on animals or humans?
19 A. Usually those studies are
20 conducted on animals.
21 Q. Do you know what doses of the
22 chemical the study subjects, the animals,
23 were exposed to?
24 A. I didn't commit them to memory,

Page 288

1 but we could go check the underlying study.
2 Q. What evidence are you relying on
3 that this molecule is associated with ovarian
4 cancer?
5 A. Let's go take a look. So sister
6 chromatid exchange and chromosomal
7 aberrations in Chinese hamster ovary cells,
8 the concentration was 16 to 160 micrograms
9 per milliliter in the Galloway study.
10 Let's go take a look at the
11 European Food Safety Authority studies if you
12 like.
13 Q. Any human study or study of
14 ethyl methylphenylglycidate --
15 A. Human tox studies aren't
16 performed, as we've discussed.
17 Q. So the answer is no. Correct?
18 No human toxicology study. Correct?
19 MS. O'DELL: Object to the form.
20 A. That's correct.
21 BY MR. ZELLERS:
22 Q. Juniperus communis fruit oil.
23 You state that the CIR expert panel concluded
24 that there is insufficient information

Page 289

1 available to support the safety of juniperus
2 communis fruit oil for use in cosmetics.
3 Did you make that statement?
4 A. I believe I quoted the CIR
5 review panel.
6 Q. Do you know what --
7 A. So it's not really a statement.
8 It's -- it's a citation to those folks.
9 Q. Do you know what information the
10 CIR expert panel considered?
11 A. Yeah, I read the report.
12 Q. Do you know if it was related to
13 any type of cancer?
14 A. I would have to go back and
15 review the report.
16 Q. Juniperus communis fruit oil is
17 fruit oil. Correct?
18 A. It's juniper fruit oil, I
19 believe, which -- I mean, it's a -- it's an
20 extract. Right? So I think, actually,
21 that's one that's actually a combination of
22 many things. I don't think it's one unique
23 chemical, if my memory serves me.
24 Q. On Page 48, you state that the

Page 290

1  European Scientific Committee on Health and
2  Environmental Risk has classified musk ketone
3  as a Category 3 carcinogen.  Is that right?
4      A.   I'm sorry.  What page did you
5  say?
6      Q.   Page 48.
7      A.   Again, I didn't state it.  I'm
8  just citing the source.
9      Q.   You went out and you did your
10  search and collected information, and here
11  you're citing from an entity called SCHER,
12  S-C-H-E-R, which is the Scientific Committee
13  on Health and Environmental Risk with the
14  European Commission.  Is that right?
15      A.   Yes.
16          (Exhibit No. 31 marked)
17  BY MR. ZELLERS:
18      Q.   Take a look at Deposition
19  Exhibit 31.  This document sets forth the
20  classification of a musk ketone.  Is that
21  right?  And again --
22      A.   Yep.
23      Q.   Strike that.
24          Turning to the third page in the

Page 291

1  second paragraph under background, it states,
2  "The recommendation for carcinogenic
3  Category 3 was obtained by reading-across
4  from musk xylene (which is classified as such
5  since the 29th ATP), since there are no test
6  data on carcinogenicity on musk ketone
7  itself."
8          Is that right?
9      A.   That's right.
10      Q.   So the classification was based
11  on studies of a chemical that is similar to
12  musk ketone, but not on studies that actually
13  involved musk ketone.  Correct?
14          MS. O'DELL:  Objection to form.
15      A.   That's correct.  And you make
16  a -- this is, I think, an important
17  circumstance here.  Because this is how the
18  SafeBridge folks classify compounds.  They do
19  a read-across.
20          What does this particular
21  compound have in common with others that are
22  like it?  And as part of that, they examine
23  the available literature in animal studies
24  and in vitro studies to make that sort of

Page 292

1  assessment.
2          So this is consistent with how I
3  have worked in the past in doing safety
4  analyses on other compounds.
5  BY MR. ZELLERS:
6      Q.   What the Scientific Committee on
7  Health and Environmental Risk looked at was a
8  chemical called musk xylene.  Is that right?
9      A.   That's what it says.
10      Q.   If you take a look at the
11  information that they considered in
12  classifying musk ketone as a Category 3
13  carcinogen -- look on Page 3, under opinion,
14  the second paragraph of 3.1, introduction.
15  Do you see that?
16      A.   Yes.
17      Q.   What SCHER -- the committee
18  states, "Musk xylene has been classified as
19  'Category 3 carcinogen'" --
20      A.   Uh-huh.
21      Q.   -- "based on an 80-week oral
22  carcinogenicity study in mice and absence of
23  genotoxicity.  The classification of musk
24  xylene as 'Category 3 carcinogen' is

Page 293

1  considered as a borderline case since an
2  increase in liver tumors in the highly
3  sensitive B6C3F1 mouse is considered of
4  little relevance for human hazard
5  assessment."
6          Did I read that correctly?
7      A.   Yes, I believe you did.
8      Q.   All right.  Musk xylene is
9  classified as a Category 3 carcinogen based
10  on this study of mice.  Correct?
11      A.   Well, I mean, you just read the
12  paragraph to me.  It's an 80-week oral study.
13  Now, in this -- in this case, I'd like to see
14  an 80-week vaginal study.
15      Q.   Okay.  You've got to answer --
16  please answer my questions.
17          This classification was based
18  upon an animal study; in this case, mice.  Is
19  that correct?
20      A.   Yes.
21      Q.   The mice were highly predisposed
22  to cancer.  Is that right?
23      A.   I mean, they said highly
24  sensitive.  I don't know that that means

Michael Crowley, Ph.D.

Page 294

1  they're predisposed or not, but --
2      Q.    This animal study does not
3  relate in any way to ovarian cancer.
4  Correct?
5      A.    I wouldn't --
6          MS. O'DELL:  Object to the form.
7          THE WITNESS:  Sorry.
8      A.    Yeah, I wouldn't call it that.
9  BY MR. ZELLERS:
10     Q.    You would agree with me that it
11  doesn't relate to ovarian cancer?
12     A.    No, not really.  No.
13         MR. ZELLERS:  Let's take a break
14  so we can change our disc.
15         THE WITNESS:  Okay.
16         THE VIDEOGRAPHER:  Going off the
17  record, the time is 4:01 p.m.
18         (Recess from 4:01 p.m. to
19  4:21 p.m.)
20         THE VIDEOGRAPHER:  This marks
21  the beginning of Disc 4.  Back on the
22  record, the time is 4:21 p.m.
23  BY MR. ZELLERS:
24     Q.    Dr. Crowley, I want to go back

Page 295

1  just to the Deposition Exhibit 31.  I thought
2  I asked you a couple of questions at the end
3  of our last session which were clear, but
4  when I glanced back at our real-time
5  transcript, they did not look clear.
6          MS. O'DELL:  The last exhibit I
7  have is 30.  Am I wrong?
8          THE WITNESS:  It's the musk
9  ketone.
10         MS. O'DELL:  Musk ketone.
11  Excuse me.  Okay.  Sorry.
12  BY MR. ZELLERS:
13     Q.    My only question that I want to
14  clarify is we had some discussion about a
15  study involving mice and musk xylene.  That
16  study did not -- was an animal study, but it
17  did not relate in any way to ovarian cancer.
18  Is that correct?
19         MS. O'DELL:  Object to the form.
20     A.    Yeah.  I mean, that was a --
21  where was it?  I'm sorry.  We were on Page 3.
22  Where was the dadgum thing?  It was --
23  BY MR. ZELLERS:
24     Q.    I was looking on Page 3.  The

Page 296

1  only thing I want to clarify is that you and
2  I were in agreement that at least with musk
3  xylene, there was no animal study associating
4  that chemical or musk ketone with ovarian
5  cancer.  Correct?
6      A.    That's correct.
7      Q.    All right.
8      A.    It's got similar properties to
9  musk xylene, but it does not have
10  carcinogenic studies in animals.
11     Q.    In your report, Section 4.4, you
12  discuss the fragrance chemicals that are
13  classified as irritants.  Is that right?
14  This is Page 27.
15     A.    I think so, yes.
16     Q.    You rely on hazard statements
17  from the GHS.  Is that right?
18     A.    GHS and -- and OSHA.
19     Q.    You have a discussion here about
20  whether the GHS classifies the chemical as an
21  irritant or sensitizer.  Is that right?
22     A.    I'm sorry.  What's your --
23  what's your question?
24     Q.    Sure.  My question is --

Page 297

1      A.    Are you asking me if I described
2  them?  Yes, I did.
3      Q.    All right.  GHS also has
4  classifications for the carcinogenicity of
5  chemicals.  Is that right?
6      A.    I believe so, yes.
7      Q.    Those categories are H350, may
8  cause cancer; H350i, may cause cancer by
9  inhalation; and H351, suspected of causing
10  cancer?
11         MS. O'DELL:  Object to the form.
12  BY MR. ZELLERS:
13     Q.    Is that right?
14     A.    That is consistent with my
15  recollection.  I think they may have a few
16  more, but I could be wrong.  I'd have to look
17  at it.
18     Q.    The GHS, to your knowledge, has
19  not classified any of these chemicals as may
20  cause cancer or suspected of causing cancer.
21  Correct?
22         MS. O'DELL:  Object to the form.
23     A.    I don't believe that I looked
24  for that.

Page 298

BY MR. ZELLERS:
Q. Are you aware of any classification by GHS with respect to any of the chemicals that you identify in your report where GHS has classified the chemicals as either may cause cancer or suspected of causing cancer?
A. I think there were --
MS. O'DELL: Object to the form, asked and answered.
THE WITNESS: Sorry.
A. I think there were some that were marked as suspected, and they --
BY MR. ZELLERS:
Q. Are those in your report?
A. I believe they're in the appendices. I think I put them in there. Do you want me to search for them?
Q. No. What I want you to do, though, is -- you collected this information regarding the different chemicals. Correct?
A. Yes.
MS. O'DELL: Object to the form.

Page 299

BY MR. ZELLERS:
Q. That would have included any GHS assessments of the chemicals, including whether they may cause cancer or are suspected of causing cancer. Correct?
A. No. I looked at MSDS sheets, and I also looked at fragrance companies that had some of that information on their websites.
So the -- if I found the information in an MSDS, I recorded it. If it was listed on the fragrance company website, you know, I recorded that as well.
I didn't buy access to the GHS system that has those listings for each and every chemical. I don't know how to do -- how to get that access, so --
Q. To the extent you found any information, you would have included it in your --
A. Yes.
Q. -- appendices. Correct?
A. Yes.
Q. MSDS, those sheets or that

Page 300

information is a predecessor to the GHS system. Correct?
MS. O'DELL: Object to the form.
A. I don't know which came first, to be candid with you, so --
BY MR. ZELLERS:
Q. They contain similar type information?
A. Yeah.
Q. What methodology did you use to determine that chemicals that GHS classifies as irritants or sensitizers but not carcinogens contribute to cancer?
MS. O'DELL: Object to the form, mis- -- lack of foundation.
A. So, you know, as I was stating previously, irritants, sensitizers, allergens, and so forth all elicit immune responses -- I'm sorry -- inflammatory responses, and increases in inflammation have been associated with a higher risk for cancer.
BY MR. ZELLERS:
Q. For each of the chemicals that

Page 301

you list in Section 4.4 that are classified as irritants, do you know how much exposure is necessary to cause irritation?
MS. O'DELL: Object to the form.
A. It varies on a case-by-case basis. I did make every effort to identify and find those underlying studies, including studies that were published, you know, 70 years ago in the 1950s. Many of those studies were included in the fragrance monograph book that I purchased that outlined them that described the thresholds.
And, in addition, several of these compounds, as we talked about previously, have usage restrictions described by any number of authorities like the European Food Safety Authority or the FDA. And then, you know, the trade groups, you know, IFRA and CIR have also, you know, published levels.
BY MR. ZELLERS:
Q. With irritants, threshold levels or dosage is a necessary part of the analysis. Correct?

Page 302

1    MS. O'DELL: Object to the form.
2    A.    Yes. Irritants are threshold
3 based. You know, the important thing to
4 understand there is it's usually done on a
5 fairly small pool of people, and the
6 threshold is sort of an average of a group,
7 so it may vary from person to person.
8 BY MR. ZELLERS:
9    Q.    As we discussed earlier, you did
10 not consider how much of each chemical is in
11 the finished product, either baby powder or
12 Shower to Shower. Correct?
13    MS. O'DELL: Object to the form.
14    A.    So we -- we've talked about this
15 a lot. We asked for the information from J&J
16 to enable doing that, and it was never
17 provided. So I was unable to do that kind of
18 thing.
19 BY MR. ZELLERS:
20    Q.    You did not consider how much of
21 each chemical actually reached the ovary in
22 women. Correct?
23    MS. O'DELL: Object to the form.
24    A.    Yeah, I've answered that

Page 303

1 question previously.
2 BY MR. ZELLERS:
3    Q.    And that was not information
4 that you had available. Correct?
5    MS. O'DELL: Object to the form.
6    A.    I wasn't asked to consider it,
7 and it wasn't available to me.
8 BY MR. ZELLERS:
9    Q.    And at least on how much of a
10 chemical may reach the ovary, you'll defer to
11 other experts. Is that correct?
12    MS. O'DELL: Object to the form.
13    A.    Yeah, potentially. I may get
14 reengaged to provide more testimony there.
15 BY MR. ZELLERS:
16    Q.    What studies are you relying on
17 in classifying these chemicals in Section 4.4
18 as irritants? Are they referenced in your
19 report?
20    A.    Yeah, they're predominantly
21 listed in the appendices. So, for example,
22 if you go to Page 70, that's the Appendix A,
23 and it starts with d-Limonene. You'll see
24 that the fourth column there's a PubChem link

Page 304

1 and then the GHS classifications; H315,
2 causes skin irritation; H317, causes an
3 allergic skin reaction; R 36/38, irritating
4 the skin and eyes; R 43 --
5    THE REPORTER: Skin what?
6    Irritating the skin --
7    THE WITNESS: And eyes.
8    THE REPORTER: You're facing
9 that way. Thank you.
10    Q.    If you make reference to a GHS
11 classification in the appendices, you had
12 access, then, to the GHS classifications for
13 that chemical. Correct?
14    MS. O'DELL: Object to the form.
15    A.    I got the information from a
16 number of sources. So MSDS sheets, fragrance
17 company websites, the -- a number of sources,
18 including the monograph of fragrance and
19 flavors also had some of those.
20    So, you know, if it's been
21 disclosed as an irritant or a skin sensitizer
22 but I was unable to find, you know, an MSDS
23 that stated it as such -- you know, so, for
24 example, I think that -- I mean, the balsam

Page 305

1 Peru, one of the reasons it's restricted is
2 because so many people are sensitive to it.
3 I didn't need a GHS to know that it was a
4 sensitizer.
5 BY MR. ZELLERS:
6    Q.    My question is a little
7 different.
8    If you reference a GHS
9 category --
10    A.    Yeah.
11    Q.    -- for a chemical in your
12 appendix, does that mean, for that chemical,
13 that you had access to the GHS data?
14    A.    No. So you're asking did I look
15 at the underlying data from an MSDS sheet?
16 Not necessarily.
17    You know, I did a literature
18 review. I used Web of Science. I used
19 Google Scholar. You know, a number of these
20 sources, including that monograph book,
21 provide the underlying data that you can go
22 to.
23    And so I cited that where
24 possible inside the report and in the

Michael Crowley, Ph.D.

Page 306

1 appendices, and in many cases I did go read
2 the underlying reports if I could get them.
3     Q.    Do you know whether, in the
4 reports that you looked at, that there was a
5 pure concentration of the substance used or a
6 diluted chemical?
7         MS. O'DELL:  Objection to the
8     form.
9     A.    Yeah, almost always in the early
10 studies they were mixing it with Vaseline and
11 diluting it.  And they, in some cases, would
12 do multiple strengths.  They were not
13 applying it at a 100 percent concentration,
14 nor were they applying it after it had been
15 blended with talc.
16         So the utility of those, you
17 know, studies could certainly vary.  There
18 could be, certainly, instances where, you
19 know, blending with talc reduces the
20 likelihood of irritation or sensitization or
21 an allergic response, and, to the contrary,
22 there may be circumstances where blending
23 with talc could produce a stronger irritation
24 or what have you.

Page 307

1 BY MR. ZELLERS:
2     Q.    Those types of studies or
3 information was not available to you.
4 Correct?
5         MS. O'DELL:  Objection to form.
6     A.    No.  Some of them were.  I did
7 go look at several of them.
8 BY MR. ZELLERS:
9     Q.    And you referenced them in the
10 appendices.  Is that right?
11     A.    Yeah.
12     Q.    You have not done any scientific
13 analyses yourself as to whether or not a skin
14 or eye irritant can cause or contribute to
15 ovarian cancer in humans.  Correct?
16         MS. O'DELL:  Object to the form.
17     A.    I have not done that study.
18 BY MR. ZELLERS:
19     Q.    You also have not found any
20 studies on humans that support the statement
21 that irritation can lead to inflammation and
22 can contribute to ovarian cancer with respect
23 to the chemicals you identify as irritants.
24 Is that right?

Page 308

1         MS. O'DELL:  Object to the form.
2     A.    I have found studies that link
3 inflammation to cancer.  That's an
4 established link.  That's indisputable.  The
5 Canadians stated as much in their assessment
6 on peroneal application of talc, and these
7 fragrance chemicals are part of that product.
8 BY MR. ZELLERS:
9     Q.    How --
10     A.    It's all -- it's all part of one
11 product.
12     Q.    How do you define inflammation?
13     A.    An inflammatory response.
14     Q.    How do the ingredients you
15 identify as irritants cause inflammation?
16         MS. O'DELL:  Object to the form.
17     A.    I can't believe I'm going to
18 have to explain how an irritant causes
19 inflammation.
20         Inflammation is the result of
21 any number of insults to a tissue.  Cell
22 death results in inflammation just as much as
23 a burn does.  So there's all sorts of
24 chemicals, including cytokines and so forth,

Page 309

1 associated with inflammation.  It's so well
2 understood, you can draw blood and mesh
3 concentrations in plasma and get a sense of
4 how inflamed someone is.
5 BY MR. ZELLERS:
6     Q.    At what dose does an irritant
7 cause inflammation?
8         MS. O'DELL:  Object to the form.
9     A.    That varies on a case-by-case
10 basis.
11 BY MR. ZELLERS:
12     Q.    As we discussed earlier, you
13 have not done any type of dose analysis with
14 respect to the chemicals or fragrance
15 chemicals that you have identified in the
16 baby powder or Shower to Shower.  Correct?
17         MS. O'DELL:  Object to the form.
18     A.    Yeah, I was unable to do it
19 because J&J didn't provide the information to
20 enable such an analysis.
21 BY MR. ZELLERS:
22     Q.    In your opinion, do both acute
23 and prolonged inflammation contribute to
24 ovarian cancer?

Page 310

1    A.    That's my understanding, yes.
2    Q.    What study or studies are you
3 relying on for that statement?
4    A.    Okay.  Ness and Cottreau from
5 1999 -- these are from Dydek's paper.  I can
6 also point you to the Canadian assessment on
7 the safety of talc where they also stated
8 that chronic inflammation and oxidative
9 stress are important factors in the
10 development and behavior of cancer, including
11 ovarian cancer.
12         But it might be better to rely
13 upon some of the other experts to address
14 that.  But since you asked, I can list the
15 papers that I looked at.
16    Q.    Okay.  I don't need you to read
17 me the papers that are referenced in
18 Dr. Dydek's report.  That's what you're
19 referring to.  Is that right?
20         MS. O'DELL:  Object to the form.
21    I don't think that's what he was -- he
22    was saying.
23    A.    No.  I mentioned Dydek and the
24 Canadian Department of -- or Ministry of

Page 311

1 Health report.
2 BY MR. ZELLERS:
3    Q.    Your methodology here, again,
4 was to go out and, you know, to do a search
5 of the literature and to read the literature
6 and to provide the opinions that you're
7 providing today.  Correct?
8    A.    That was one part of it, yeah.
9    Q.    You've identified ingredients as
10 skin and eye irritants for which IFRA has
11 established acceptable levels of use.  Is
12 that right?
13    A.    I'm sorry.  What page are you
14 on?
15    Q.    Well, look at Page 30 of your
16 report, Table 8.  You identify methyl
17 salicylate as a skin and eye irritant.  Is
18 that right?
19    A.    Methyl salicylate, yeah.
20    Q.    Then on Page 42 of your report,
21 you show that IFRA has established acceptable
22 levels of use in dermal cosmetics.
23    A.    Sorry.
24    Q.    Is that --

Page 312

1    A.    42?
2    Q.    Yes.
3         MS. O'DELL:  I don't think
4    that's the right page.
5         MR. ZELLERS:  We looked at this
6    earlier today.  It was --
7 BY MR. ZELLERS:
8    Q.    So on Page 42 for methyl
9 salicylate --
10    A.    Salicylate.
11    Q.    -- salicylate, you identify the
12 IFRA acceptable level of use in dermal
13 cosmetics, the amount.  Is that right?
14    A.    I have listed the use level for
15 cosmetics and the dermal systemic exposure in
16 cosmetic products.  There's two of them.
17    Q.    We had the discussion before.
18 You don't know the amount or the
19 concentration that is in the talc powder or
20 Shower to Shower product in this case.
21 Correct?
22    A.    That's correct.
23         MS. O'DELL:  Object to the form.
24

Page 313

1 BY MR. ZELLERS:
2    Q.    In your report, you opine that
3 the eye and the vagina are similar because
4 they are both mucous membranes.  That's on
5 Page 12.  Is that right?
6    A.    I think you've mischaracterized.
7 So most of these cosmetic chemicals have eye
8 irritation studies because a lot of them go
9 in cosmetics, so they end up near the eye.
10 And so the exposure to the eye is considered
11 as part of the safety program.
12         Vaginal applications, not so
13 much, because very few cosmetics are applied
14 to the vaginal area.  Usually those are
15 drugs.
16    Q.    You would agree, then, that the
17 eye and the vagina are not the same in terms
18 of mucous membranes and any irritation from
19 the chemicals you've identified?
20         MS. O'DELL:  Object to the form.
21    A.    They are both mucous membranes,
22 and what I've suggested is that which
23 irritates the eye is also very likely to
24 irritate the vagina.  The difficulty proof

Michael Crowley, Ph.D.

| Page 314 | Page 316 |
|---|---|

**Page 314**

1 would be to do that study, but, again, there
2 are some ethics involved in that.
3 BY MR. ZELLERS:
4    Q.    What study are you relying on to
5 make the statement that fragrances that are
6 identified as eye irritants are likely to
7 irritate the vaginal mucosa?
8    A.    It's common general knowledge.
9 The same thing -- I mean, the same thing --
10 usually those that irritate eyes also
11 irritate lungs.  They're both mucous
12 membranes.  Not always, but it's a good and
13 safe generalization.
14    Q.    Are there studies that you are
15 aware of with respect to the irritation of
16 the chemicals that you identified in your
17 report as irritants to the vaginal mucosa?
18    A.    I would have to check.  I think,
19 like I said, I found three out of the 175
20 that have been studied in the -- for safety
21 in the vagina.  So only three out of the 175
22 have been examined in those studies.  I'd
23 need to go check and find out if any of them
24 were found to be vaginal irritants.

**Page 315**

1    Q.    If any were vaginal irritants,
2 that would be information in your appendices.
3 Correct?
4    A.    Presuming I found that, yeah.
5    Q.    As you sit here, you're not --
6 you don't at least have a recollection of
7 having found that?
8    A.    There was --
9        MS. O'DELL:  Object to the form.
10    A.    Yeah, there was such little
11 information available on vaginal
12 administration of this, I don't recall that
13 any -- if any of them were vaginal irritants.
14 BY MR. ZELLERS:
15    Q.    Sensitizers.  In your report,
16 Section 4.5, you discuss the fragrance
17 chemicals that are classified as sensitizers.
18 Is that right?
19    A.    Section 4.5 is on sensitizers,
20 that's right.
21    Q.    What does sensitization have to
22 do with the development of ovarian cancer?
23    A.    If you are exposed to a
24 sensitizer and you're sensitive to it, it can

**Page 316**

1 cause inflammation and oxidative stress.
2    Q.    Are you aware of any studies
3 which have looked at the use of sensitizers
4 in the development of ovarian cancer?
5        MS. O'DELL:  Object to the form.
6    A.    To the best of my knowledge,
7 there is no good animal study for ovarian
8 cancer.  So I kind of feel like we keep
9 getting some of the same questions to which I
10 feel like I've already answered.
11    Q.    What --
12    A.    So --
13    Q.    Go ahead.  Finish.
14    A.    So, no, I don't think there are,
15 because there isn't a model that's
16 acceptable.
17    Q.    What does sensitization have to
18 do with the development of cancer?
19    A.    I just stated that sensitizers
20 can cause inflammation and oxidative stress,
21 which are associated with a greater risk of
22 cancer.
23    Q.    Are you aware of any studies
24 relating to how sensitizers are related to

**Page 317**

1 the development of cancer in humans?
2        MS. O'DELL:  Object to the form,
3    asked and answered.
4    A.    I feel like I just answered that
5 question, so same answer.  They cause
6 oxidation -- oxidative stress and
7 inflammation.
8 BY MR. ZELLERS:
9    Q.    My question, though, is:  Are
10 you aware of any studies that demonstrate
11 that, sensitizers and the development of
12 cancer?
13    A.    I would have --
14        MS. O'DELL:  Asked and answered.
15    A.    Yeah.  I would have to provide
16 the same response, and I feel like I've
17 answered the question, so --
18 BY MR. ZELLERS:
19    Q.    And I don't --
20    A.    In humans?
21    Q.    -- mean to be disrespectful --
22    A.    Are you asking in humans?
23    Q.    In humans, yes.  In humans,
24 you're not aware of any studies.  Correct?

Page 318

1    A.    You know, again, this is an
2  ethics question.  I -- I don't think the FDA
3  would let me take, for example, Peru balsam
4  and, you know, gavage a female's ovaries.  I
5  don't think that they would ever approve that
6  protocol, and I think if I did submit one to
7  them like that, I don't think any of my
8  subsequent protocols would ever be
9  considered.
10    MR. ZELLERS:  Move to strike as
11  nonresponsive.
12  BY MR. ZELLERS:
13    Q.    My question simply was:  Are you
14  aware of any human study of sensitizers and
15  the development of cancer?
16    I believe your answer is "no."
17  Correct?
18    A.    No.  You're not ethically
19  allowed to do that.
20    Q.    Are you aware of any studies?
21    MS. O'DELL:  He just answered
22  it.
23    MR. ZELLERS:  What did he say,
24  Ms. O'Dell?  What was his answer?

Page 319

1    MS. O'DELL:  His answer, "No.
2  You're not ethically allowed to do
3  that."
4    MR. ZELLERS:  All right.  Is his
5  answer, no, there are no such studies?
6    MS. O'DELL:  I think he said,
7  "No," period, "You're not ethically
8  allowed to do that."
9    MR. ZELLERS:  Okay.  If he
10  said --
11    MS. O'DELL:  I'm reading back
12  his answer from the court reporter.
13    MR. ZELLERS:  If he said, "No,"
14  period, then I'm okay with that.
15    MS. O'DELL:  Do you need to
16  clarify that, Dr. Crowley?
17    A.    There are no studies because
18  you're not allowed to do the study.
19  BY MR. ZELLERS:
20    Q.    Thank you.  For each of these
21  chemicals, these sensitizers, do you know how
22  much exposure is necessary to cause
23  sensitization?
24    A.    It varies on a case-by-case

Page 320

1  basis.  Some of that information was made
2  available in the underlying data that I
3  looked at where they published the -- the
4  no-adverse-event level.
5    I did find some where it varied
6  study to study.  So it -- it, again, is -- is
7  information that was available in some of the
8  reports.  Some of it, the underlying data
9  wasn't present.
10    Q.    The studies that you found for
11  each of the chemicals you referenced in the
12  appendices.  Correct?
13    A.    Where I found them, yes, sir.
14    Q.    You did not make any
15  determination that a sensitizer can cause or
16  contribute to ovarian cancer in humans.  Is
17  that right?
18    MS. O'DELL:  Object to the form,
19  asked --
20    A.    The same question that I've
21  answered previously.  The same answer.
22  BY MR. ZELLERS:
23    Q.    And the answer is "no."
24  Correct?

Page 321

1    A.    We can go back through my
2  testimony.
3    Q.    Well, I'm talking about --
4    A.    There are no studies --
5    Q.    Go ahead.
6    A.    There are no studies because
7  they are unethical.
8    Q.    What is the basis for your
9  opinion that chemicals that cause
10  sensitization cause inflammation?
11    MS. O'DELL:  Object to the form,
12  asked and answered.
13    A.    It's an insult to tissue or a
14  cell, and inflammation is a response as part
15  of that, as is, in many cases, oxidative
16  stress.
17  BY MR. ZELLERS:
18    Q.    Section 4.6 of your report, you
19  discuss that -- the fragrance chemicals that
20  are classified as allergens.  Is that right?
21    A.    Yep.
22    Q.    Allergens only produce a
23  response in individuals who are allergic to
24  the substance.  Is that right?

Michael Crowley, Ph.D.

Page 322

1    A.    That's correct.
2    Q.    You did not make any assessment
3  as to how much exposure is necessary to cause
4  an allergic response with these allergens.
5  Is that right?
6         MS. O'DELL:  Object to the form.
7    A.    Yeah.  I couldn't do that
8  because J&J didn't provide the information,
9  as we've discussed.
10 BY MR. ZELLERS:
11   Q.    Any studies that you're relying
12 on to classify these chemicals as allergens,
13 would they be referenced in your appendices?
14   A.    Yes, where -- where identified,
15 yeah.
16   Q.    You are not expressing an
17 opinion that exposure to an allergen can
18 cause or contribute to ovarian cancer.
19 Correct?
20   A.    That's --
21        MS. O'DELL:  Object to the form.
22   A.    Yeah, that's correct.  I'm not
23 expressing that opinion.
24

Page 323

1  BY MR. ZELLERS:
2    Q.    Section 4.7, you identify a
3  number of components that IFRA has designated
4  as having a critical effect.  Is that right?
5    A.    Yes.
6    Q.    According to Table 11, those
7  critical effects are sensitization, dermal
8  sensitization, and phototoxicity.  Correct?
9    A.    There's also one with a
10 potential for nitrosamine formation.
11        THE REPORTER:  I'm sorry.  Say
12   it again.
13        THE WITNESS:  Potential for
14   nitrosamine formation.
15 BY MR. ZELLERS:
16   Q.    For each of these chemicals, do
17 you know how much exposure is necessary to
18 cause the given critical effect?
19   A.    Are you asking about from baby
20 powder or Shower to Shower, or are you asking
21 about pure chemical?
22   Q.    The first question is pure
23 chemical.
24   A.    Yeah, some of that was in the

Page 324

1  studies that I looked at.
2    Q.    If it was referenced in the
3  studies you looked at, you would include it
4  in your appendices?
5    A.    I tried to, yeah.
6    Q.    With respect to Shower to Shower
7  or baby powder, you did not make any
8  assessment as to whether there was sufficient
9  exposure to result in a critical effect.
10 Correct?
11   A.    Yeah, I couldn't --
12        MS. O'DELL:  Object to the form.
13   A.    I couldn't do that because I
14 didn't have the information from J&J to
15 enable to do that.
16        THE REPORTER:  Try and keep your
17   voice up when giving your answer,
18   please.
19        THE WITNESS:  Sorry about that.
20 BY MR. ZELLERS:
21   Q.    As best you can tell,
22 phototoxicity is not related to ovarian
23 cancer.  Correct?
24   A.    I'm sorry.  Say that again.

Page 325

1    Q.    Phototoxicity is not related to
2  ovarian cancer.  Correct?
3    A.    To the best of my knowledge,
4  yeah.
5    Q.    IFRA Category 5 restriction,
6  Section 4.8, you identify a number of
7  components for which IFRA has established a
8  Category 5 restriction.  Is that right?
9    A.    Yes.
10   Q.    That means IFRA has capped the
11 usage levels due to concerns about dermal
12 sensitization or allergic response.  Is that
13 right?
14   A.    I don't know that that's the
15 only two concerns that they cited in putting
16 these Category 5 caps in place, because
17 Category 5 includes not just baby powder and
18 talcs, but facial creams, facial makeup, hand
19 creams, facial masks, hair -- hair permanent.
20 I think there are a lot of factors.
21   Q.    For each of these chemicals, do
22 you know how much exposure is necessary to
23 cause an allergic or sensitization response?
24   A.    Again, it's case by case, and

Page 326

1 the underlying information is, generally
2 speaking, available.
3    Q.    You have no opinion, though,
4 with respect to any of these chemicals in
5 baby powder or Shower to Shower as to whether
6 or not there is a sufficient exposure to
7 cause an allergic or sensitization response.
8 Correct?
9        MS. O'DELL:  Object to the form.
10    A.    You know, if your client wants
11 to provide me that information, perhaps I
12 could make that judgment, but I don't have
13 it.
14 BY MR. ZELLERS:
15    Q.    If IFRA relied on studies in
16 setting these Category 5 restrictions on the
17 chemicals you identify in your report, you
18 attempted to include that in your appendices?
19        MS. O'DELL:  Object to the form.
20    A.    Yes, I did.
21 BY MR. ZELLERS:
22    Q.    Do you know whether the studies
23 that IFRA looked at on setting these
24 Category 5 restrictions were studies

Page 327

1 involving a pure concentration of the
2 substance or a diluted substance?
3    A.    You know, it was both.  I mean,
4 IFRA publishes a lot of these studies in
5 peer-reviewed journals, you know, as opposed
6 to CIR, which doesn't always do that.  So, I
7 mean, there's some transparency there with
8 IFRA.  So you can go read those in the
9 Journal of Food Science and Toxicology,
10 whatever it's called.
11        So, yeah, all those are
12 disclosed in the peer-reviewed literature.  I
13 did review them where possible.
14    Q.    You're not expressing an opinion
15 as to whether or not the chemical substances
16 that you identify in this section of your
17 report, 4.8, either cause or contribute to
18 ovarian cancer.  Correct?
19        MS. O'DELL:  Object to the form.
20    A.    Actually, I am.  I mean, I've
21 stated fairly clearly, I feel, that, you
22 know, you've got a whole bunch of irritants,
23 you've got a whole bunch of sensitizers, and
24 you've got a whole bunch of allergens that

Page 328

1 have been glued to talc particles,
2 administered to the peritoneal area, which
3 subsequently enters the vagina, and where
4 that talc particle goes, those fragrance
5 chemicals go with it.  They have
6 demonstrated -- many of them -- demonstrated
7 biological activity in animal and in vitro
8 cell models that demonstrates toxicity and
9 carcinogenicity.
10        And so -- excuse me.  I'm not
11 done yet.  I don't know how else to state it.
12 I think they can absolutely contribute to the
13 carcinogenicity of the product in total.
14 BY MR. ZELLERS:
15    Q.    In this section, in terms of the
16 carcinogenicity, you do not know or have any
17 information as to whether any of these
18 ingredients in Johnson's baby powder or
19 Shower to Shower exceed the IFRA
20 restrictions.  Correct?
21        MS. O'DELL:  Object to the form.
22    A.    Yeah, I don't know because I was
23 never given the composition by Johnson &
24 Johnson.

Page 329

1 BY MR. ZELLERS:
2    Q.    With respect to the chemicals
3 that are identified in this section of your
4 report dealing with the IFRA Category 5
5 restrictions, you have no information that
6 the amount of the chemical in baby powder or
7 Shower to Shower exceeded the IFRA
8 restrictions.  Correct?
9        MS. O'DELL:  Object to the form.
10    A.    Isn't that the same question you
11 just asked?
12 BY MR. ZELLERS:
13    Q.    Can you answer the question?
14        MS. O'DELL:  He previously
15    answered the question.  I'll object as
16    asked and answered.  You may repeat
17    your answer, Dr. Crowley.  You can
18    refer back and ask the court reporter
19    to repeat the answer, whichever you
20    prefer.
21    A.    I think that -- I believe that
22 I've answered this close to 15 times today,
23 maybe -- maybe nearly 20.
24        I've not been provided with the

Page 330

1  quantitative composition of the Johnson &
2  Johnson fragrance mix in the baby powder or
3  Shower to Shower product.  I can't make any
4  judgments to that without that, as I think
5  you well know.
6  BY MR. ZELLERS:
7      Q.    In this section --
8      A.    So I can't determine if the
9  Category 5 restrictions have been exceeded or
10 not without that information.  Right?
11     Q.    In the Category 5 restrictions,
12 dose or concentration would be important to
13 your analysis.  Is that right?
14          MS. O'DELL:  Objection to form.
15     A.    So, for example, cinnamal has a
16 Category 5 restriction of 0.05 percent.
17 Since I don't know how much is present, I
18 can't make a judgment as to whether the
19 cinnamal present in baby powder exceeds
20 0.05 percent or not.  There's a bunch of
21 other fragrance chemicals here too that have
22 these restrictions similar to Shower to
23 Shower.  Let's save each other some time.  I
24 can't make that judgment because your client

Page 331

1  hasn't given me the information to be able to
2  do that.
3  BY MR. ZELLERS:
4      Q.    In your report, Section 4.10,
5  you discuss the FDA inactive ingredient list.
6  Is that right?
7      A.    Yes.
8      Q.    The ingredients that you list
9  are only included if they are used in
10 FDA-approved drug products.  Is that right?
11     A.    That's correct.
12     Q.    Most FDA-approved drug products
13 do not use fragrances.  Is that right?
14          MS. O'DELL:  Object to the form.
15     A.    You know, I don't know what
16 percentage use a fragrance.  They're all
17 chemicals.  Right?  So they're inactive
18 ingredients, supposedly, right, or inert --
19 although, certainly not all of them, but many
20 of them have buffers, and film formers are
21 often used, too.
22 BY MR. ZELLERS:
23     Q.    You're not expressing an opinion
24 that if an ingredient is not listed on the

Page 332

1  FDA inactive ingredient list, it is likely to
2  contribute to the development of ovarian
3  cancer.  Correct?
4          MS. O'DELL:  Object to the form.
5      A.    So I can't understand the
6  question because you've got two nots, so
7  maybe just ask me what my opinion is.
8  BY MR. ZELLERS:
9      Q.    Well, you expressed your opinion
10 in your report.  Is that right?
11     A.    Yes.
12     Q.    Is it your opinion that an
13 ingredient that's not listed on the FDA
14 inactive ingredient list is likely to
15 contribute to the development of ovarian
16 cancer?
17     A.    You asked me if it's my opinion
18 that if it's absent from that IID it's likely
19 to cause ovarian cancer?
20     Q.    Correct.
21          MS. O'DELL:  Object to the form.
22 BY MR. ZELLERS:
23     Q.    That's not your opinion, is it?
24     A.    No.

Page 333

1          MR. ZELLERS:  I have no further
2  questions.  Thank you.
3          MR. FERGUSON:  Why don't we go
4  off the record for a second, please.
5          MS. O'DELL:  Yeah.
6          THE VIDEOGRAPHER:  Going off the
7  record, the time is 5:04 p.m.
8          (Recess from 5:04 p.m. to
9  5:18 p.m.)
10         THE VIDEOGRAPHER:  Back on the
11 record.  The time is 5:18 p.m.
12              ---
13         EXAMINATION
14              ---
15 BY MR. FERGUSON:
16     Q.    Dr. Crowley, my name is Ken
17 Ferguson, and along with Mr. Donath to my
18 right, I represent Imerys.  Do you understand
19 that?
20     A.    Yes.
21     Q.    Do you know who Imerys is?
22     A.    Yes.
23     Q.    Tell me what your understanding
24 is.

Michael Crowley, Ph.D.

Page 334

1    A.    It's a company that mines talc
2  and sells talc.
3    Q.    So over the course of the day,
4  we've been discussing your opinions as
5  expressed in your testimony today and your
6  report relating to the fragrance chemicals
7  that you stated are included in Johnson's
8  baby powder and formerly Shower to Shower.
9  Correct?
10    A.    Yes.
11    Q.    And would you agree your
12  opinions in this case that you will express
13  in your testimony as well as your report only
14  relate to fragrance chemicals?
15    A.    Yes, to a certain extent.
16    Q.    All right.  Well, I better ask
17  about that.  What do you mean by "to a
18  certain extent"?
19    A.    Yeah.  So some of these
20  fragrance chemicals have been identified as
21  carcinogens, meaning if another material is
22  present that is carcinogenic, they promote
23  its carcinogenic activity.
24    Q.    Well, let me put it this way.

Page 335

1  First of all, your -- title of your
2  report says "Rule 26 Report of Michael M.
3  Crowley, Ph.D. Regarding the Fragrance
4  Chemical Constituents in Johnson & Johnson
5  Talcum Powder Products."  Correct?
6    A.    Yes.
7    Q.    And you stand by that title for
8  your report.  Correct?
9    A.    Yes.
10        MS. O'DELL:  Object to the form.
11    A.    Yeah.
12  BY MR. FERGUSON:
13    Q.    You have no opinions that relate
14  to the talc as it was supplied to Johnson &
15  Johnson Consumer Companies.  Correct?
16    A.    That's correct.
17    Q.    So no opinions about the talc
18  before the fragrance chemicals were added.
19  Fair?
20    A.    That's correct.
21    Q.    Now, at one point in your
22  testimony earlier today, you said that you
23  had -- and I'm not sure exactly how you put
24  it.  You were intending to look at the

Page 336

1  flotation process as you described it, but
2  you ran out of time.  Correct?
3    A.    That's correct.
4    Q.    And I think in your testimony,
5  the way you put it -- I just want to make
6  sure I understand -- you said you won't be
7  expressing an opinion on the flotation
8  process today.  Is it fair there's nothing
9  about the flotation process in your report?
10  Correct?
11    A.    That's correct.
12    Q.    And in this case -- for purposes
13  of your testimony in this case, you don't
14  intend to address the flotation process.
15  Correct?
16    A.    I suppose if I'm asked I'll
17  answer the questions based on what I did
18  review.
19    Q.    Well, since it's not contained
20  in your report, I'm sure the attorneys would
21  not want us to ask you questions about it in
22  that sense, but let me -- well, let me put it
23  this way.
24        You did not complete your work

Page 337

1  that you were considering doing regarding the
2  flotation process.  Correct?
3    A.    That's correct.
4    Q.    Because you ran out of time.
5  Correct?
6    A.    Yes.
7    Q.    And so your work with regard to
8  the flotation process as it relates to the
9  talc was not -- was not completed?
10        MS. O'DELL:  Object to the form,
11        asked and answered.
12    A.    Yeah, that's correct.
13  BY MR. FERGUSON:
14    Q.    You indicated earlier that your
15  initial contact on -- regarding this case was
16  from Margaret Thompson.  Correct?
17    A.    Yes.
18    Q.    Did you know Margaret Thompson
19  before you were contacted about working on
20  this case?
21    A.    No.
22    Q.    You talked about the fact that
23  you had read Dr. Thomas Dydek's report.
24  Correct?

Michael Crowley, Ph.D.

Page 338

1    A.    Yes.
2    Q.    Before you read Dr. Dydek's
3 report, were you acquainted with him at all?
4    A.    No.
5    Q.    Since you've read his report,
6 have you been -- have you met him? Have you
7 talked to him at all?
8    A.    No.
9    Q.    How about a Dr. Alan Campion who
10 is at The University of Texas, I believe? Do
11 you know Dr. Campion?
12    A.    I have met Dr. Campion.
13    Q.    Okay. Can you just tell me in
14 general what the circumstances were?
15    A.    I met him when I was in graduate
16 school, and shockingly I ended up sitting
17 next to him on a plane on our way to a
18 conference about ten years ago.
19    Q.    Have you had any discussions
20 with Dr. Campion regarding your work in this
21 matter?
22    A.    No.
23    Q.    Do you know whether or not he is
24 an expert witness who has been listed in this

Page 339

1 matter?
2    A.    I believe he has.
3    MR. FERGUSON: I think that's
4 all I have. Thank you, Dr. Crowley.
5    THE WITNESS: You're welcome.
6    MR. ZELLERS: Apparently --
7 Ms. Appel, do you have some questions
8 or any questions?
9    MS. APPEL: Yes, please, very
10 briefly.
11    - - -
12    EXAMINATION
13    - - -
14 BY MS. APPEL:
15    Q.    Hi, again, Dr. Crowley. Renee
16 Appel. I represent Personal Care Products
17 Counsel. I just had a few questions for you.
18    A.    Okay.
19    Q.    Can you hear me okay?
20    MS. O'DELL: Actually, we
21 couldn't hear that, so if you could
22 speak up, please. Thank you.
23 BY MS. APPEL:
24    Q.    Did you hear anything I just

Page 340

1 said, or would you like me to repeat myself?
2    A.    I heard you okay, but it did get
3 muffled at a few points, so we should
4 probably take our time.
5    Q.    Okay. Thank you, Dr. Crowley.
6 So what I said before is that I am Renee
7 Appel, and I represent Personal Care Products
8 Counsel, and I had a few follow-up questions
9 for you.
10    A.    Okay.
11    Q.    The CIR is not a federal agency.
12 Correct?
13    A.    That's correct.
14    Q.    So the CIR has no regulatory
15 authority. Correct?
16    A.    That's correct.
17    MS. APPEL: Okay. That's it.
18    MR. ZELLERS: Anyone else?
19    MS. O'DELL: I have questions,
20 so --
21    MR. ZELLERS: Go ahead.
22    MS. O'DELL: Do you have an
23 objection to that?
24    MR. ZELLERS: Well -- no, I

Page 341

1 don't have an objection.
2    MS. O'DELL: Did you expect -- I
3 was just wondering why you -- if
4 anybody else has questions. I'm going
5 to ask Dr. Crowley some questions,
6 but -- okay? All right. Great.
7    - - -
8    EXAMINATION
9    - - -
10 BY MS. O'DELL:
11    Q.    Dr. Crowley, I have a few
12 questions I'd like to ask you just to clarify
13 some of your testimony from earlier today.
14    Let me just start at the
15 beginning and just ask for you to tell us a
16 little bit about your qualifications in terms
17 of chemicals and chemicals that are used in
18 fragrances, pharmaceuticals, other
19 flavorants.
20    A.    Sure. I have a Bachelor's
21 degree in chemistry, a Master's degree in
22 organic chemistry. My Doctorate is in
23 molecular pharmaceutics. All three of those
24 disciplines deal with chemicals and their

Page 342

1 biological properties. I have worked with
2 flavors and fragrances throughout my career,
3 although the primary focus has been on drug
4 development. I have worked on the
5 development of foods, nutritional supplements
6 which are regulated as foods, and I've worked
7 on cosmetic products as well.
8         All of those chemicals that go
9 into those types of products are in fact
10 chemicals. Whether you call them a flavor or
11 a fragrance, they are chemicals.
12     Q.    And in terms of -- of your
13 report, you reference in your report
14 fragrance chemicals, but by using that
15 terminology, what were you really referring
16 to?
17     A.    Well, Johnson & Johnson calls
18 them fragrance chemicals, so I utilized their
19 term, but they're -- they're chemicals.
20     Q.    And, in fact, are some of those
21 chemicals not actually, quote, fragrance
22 chemicals in the technical sense?
23     A.    That's correct.
24         MR. ZELLERS:  Objection; form.

Page 343

1     A.    That's correct, they aren't --
2 there are some that are clearly not
3 fragrances.
4 BY MS. O'DELL:
5     Q.    And -- and what were you asked
6 to do in giving your opinions in this case?
7     A.    So the two questions in my
8 report. You know, are the products in
9 compliance with established industry and
10 regulatory standards, the first question.
11 And the second question was what are the
12 properties of the fragrance chemicals, and do
13 they contribute to the inflammatory
14 properties, toxicity, and potential
15 carcinogenicity of the talcum powder
16 products.
17         So that included looking at the
18 physical and chemical properties, reviewing
19 all of the available literature, including
20 some literature that was only available via
21 purchase or access to proprietary databases.
22 Reviewing that, and then forming my opinion
23 based upon that.
24         The regulation portion of this

Page 344

1 wasn't very hard because the government makes
2 those rules pretty clear, and the industry
3 trade groups like IFRA and CIR also, you
4 know, provide information to support the use
5 of those chemicals in an appropriate fashion.
6         THE REPORTER:  In an appropriate
7     fashion?
8         THE WITNESS:  Yes.
9 BY MS. O'DELL:
10     Q.    Did you outline the results of
11 your review of the evidence in your report as
12 well as the appendices that's attached to
13 your report?
14     A.    Yes.
15     Q.    And you referred to data in your
16 appendices earlier today -- actually,
17 throughout your testimony. And would that
18 data include the information that is located
19 at the links that you provided in your
20 appendices?
21     A.    Yes.
22     Q.    So in addition to what's
23 actually listed in the appendices, the data
24 that is contained in the link that you

Page 345

1 included would also be material that you
2 reviewed and considered in reaching your
3 opinions?
4     A.    Yes.
5     Q.    Now, in reviewing the list of
6 chemicals or starting with that list of
7 chemicals, I mean -- let me just -- let me
8 back up and just strike that and start again.
9         Are fragrance formulas closely
10 held trade secrets?
11         MR. ZELLERS:  Objection; form.
12     A.    Yes, oftentimes they are.
13 BY MS. O'DELL:
14     Q.    In the case of Johnson's baby
15 powder's fragrance, as well as Shower to
16 Shower's fragrance, is that -- the
17 information about the formula that you used
18 for those fragrances something that
19 necessarily would have to be provided by
20 Johnson & Johnson?
21     A.    It would have been useful, but
22 it wasn't.
23     Q.    In the data that you were
24 provided initially to undertake the work that

Page 346

1 you've done in this case was actually
2 provided through a pleading that was issued
3 by Johnson & Johnson in a state court case in
4 St. Louis.  Correct?
5      A.   Is that the Ingham --
6           MS. O'DELL:  Yeah.  Let me ask
7      if I can have some exhibit stickers,
8      please?
9           MR. ZELLERS:  Oh, yes, exhibit
10     stickers.  Yes.
11          MS. O'DELL:  Thank you.
12          (Exhibit No. 32 marked)
13 BY MS. O'DELL:
14     Q.    Let me show you what I'm marking
15 as Exhibit 32.  Is this information that was
16 provided to you in order to learn the
17 chemicals that were included in both Shower
18 to Shower and Johnson's baby powder?
19     A.    Yes.
20     Q.    And if you'll turn to Page 2 of
21 the document, according to this answer to
22 Interrogatory 19, this is -- this list of
23 chemicals provided was the current fragrance
24 composition for Johnson's baby powder?

Page 347

1      A.    That's correct.
2      Q.    And this listing does not
3 include information about the concentration
4 of the particular chemicals in the baby
5 powder fragrance?
6      A.    That's correct.
7      Q.    And is that also true as it
8 relates to this answer to interrogatory
9 regarding Shower to Shower?
10     A.    Yes.
11     Q.    And is this information that was
12 provided to the plaintiffs and to the Court
13 in the Circuit Court of the City of St. Louis
14 by attorneys for Johnson & Johnson and
15 Johnson & Johnson Consumer, Inc.?
16          MR. ZELLERS:  Objection; form,
17     foundation.
18 BY MS. O'DELL:
19     Q.    Well, I'll just ask you -- I'll
20 address the objection.  If you'll look at
21 Page --
22     A.    I don't understand the question.
23     Q.    Well, let me ask it again.
24     A.    Okay.

Page 348

1      Q.    It was a bad question.  Look at
2 Page 7, if you don't mind.
3      A.    Okay.
4      Q.    Was the information provided in
5 Exhibit 32 information that attorneys for
6 Johnson & Johnson provided to the plaintiffs
7 in that case?
8           MR. ZELLERS:  Form and
9      foundation objection.
10     A.    That's what it looks like.  It
11 says, "Respectfully submitted" by the names
12 of three attorneys who are labeled as
13 attorneys for defendants Johnson & Johnson
14 and Johnson & Johnson Consumer Companies, now
15 known as Johnson & Johnson Consumer,
16 Incorporated.
17 BY MS. O'DELL:
18     Q.    Was this the list of chemicals
19 that you utilized for the majority of the
20 time you were doing your evaluation of these
21 chemical components?
22          MR. ZELLERS:  Objection; form.
23     A.    Yes.
24

Page 349

1 BY MS. O'DELL:
2      Q.    And shortly prior to the
3 disclosure of your report, did you receive
4 another list of fragrance ingredients for
5 both baby powder and Shower to Shower?
6      A.    I don't know if I'd call it
7 another list.  I received a second list.
8 Yeah, I guess another list.
9      Q.    Yeah.  Fair, it's hard to know
10 how to characterize it.  But I'll represent
11 to you --
12          (Exhibit No. 33 marked)
13 BY MS. O'DELL:
14     Q.    This is Exhibit 33.  This is a
15 list of chemicals that were provided by
16 Johnson & Johnson's lawyer, Mr. Wyatt's
17 partner, Richard Bernardo, after plaintiffs,
18 in the multi-district litigation, had asked
19 for the formula itself, including the
20 concentration of chemicals.
21          This -- would you just describe
22 for the jury and the Judge, certainly, what
23 this -- the information in this list contains
24 or this exhibit contains for the chemicals in

Michael Crowley, Ph.D.

Page 350

1 Johnson's baby powder?
2      A.    Okay.  So there's -- there's
3 four columns.  The first column is a
4 description of the fragrance chemical.  The
5 second column is labeled "minimum," the third
6 column is labeled "maximum," and the fourth
7 column is the CAS number that we spoke about
8 earlier today.
9      Q.    And are there units that have
10 been supplied in order to understand what the
11 minimum and maximum amount --
12      A.    No.  You don't know whether
13 that's parts per million, percent,
14 milligrams, micrograms, femtograms, or some
15 other unit of measure.
16      Q.    Would that information be
17 critical in order to understand the
18 concentrations of the specific chemicals in
19 the fragrance?
20      A.    Yes, along with other pieces of
21 information, too.  That would be one -- one
22 important part of doing that analysis.
23      Q.    And is that information that
24 could only be provided by Johnson & Johnson,

Page 351

1 who is essentially the owner of the
2 fragrance?
3          MR. ZELLERS:  Form, objection.
4      A.    I suppose so.
5          (Exhibit No. 34 marked)
6 BY MS. O'DELL:
7      Q.    I want to show you what I've
8 marked as Exhibit 34.  This is a listing of
9 chemicals very similar to Exhibit 34.  And
10 just to make sure I didn't misstate that,
11 this is Exhibit 35 that I handed to you.  Is
12 that a list of chemicals --
13      A.    It's Exhibit 34.
14      Q.    Is it?
15      A.    The first one was 33, and this
16 one is 34.
17      Q.    All right.  Thank you.  Is
18 Exhibit 34 a similar list of chemicals
19 that -- for Shower to Shower?
20      A.    Yes.
21      Q.    And does it provide essentially
22 the same information?
23      A.    Yes.
24      Q.    And is that information also

Page 352

1 insufficient to understand the concentrations
2 or other relevant facts about the chemicals?
3      A.    Yes.
4          (Exhibit No. 35 marked)
5 BY MS. O'DELL:
6      Q.    Okay.  Now, I want to show you
7 one last document -- and I'm marking that as
8 Exhibit 35 -- and ask you to identify that.
9      A.    Exhibit 35 is titled "Changes to
10 Johnson & Johnson's Baby Powder Fragrance
11 Ingredients."
12      Q.    Did you take into consideration
13 these historical changes in the baby powder
14 formulation when you reached your opinions in
15 this case?
16      A.    Yes.  I mean, I only had -- I
17 think I had them for three days before the
18 report was due, so it was kind of rushed.
19 But what I saw was that from 2008 to 2014,
20 there were only minimal changes, and even
21 with this information, it didn't look like
22 there was any substantial change other than
23 styrene was changed styrax oil.  You know,
24 Galaxolide 50 DEP I presumed to mean that it

Page 353

1 was the Galaxolide dissolved at a 50 percent
2 level in diethyl phthalate, and that it was
3 replaced by Galaxolide 50 BB.  I didn't know
4 what BB was, but I presumed it was a
5 different solvent than diethyl phthalate.
6          So even with this information,
7 there was not a whole lot that I could
8 ascertain from it, but it didn't change my
9 opinions.
10      Q.    And certainly the schedule in
11 producing your report was intense, but did
12 you have sufficient time to do what was
13 necessary to render your opinions in this
14 case?
15      A.    Yes, I did.  I mean, more time
16 would have been nice, but I was able to get
17 the information that I needed to form my
18 opinions and had more than sufficient
19 information on which to base them.
20          I did want to make one last
21 comment about Exhibit 35.
22      Q.    Go ahead.
23      A.    It looks likes styrene --
24          MR. ZELLERS:  Objection.

Michael Crowley, Ph.D.

Page 354

BY MS. O'DELL:

Q.   If you have comments about Exhibit 35, please share them with us.

A.   Yeah.  It looks like styrene was removed from the formula twice, about a week apart.  So it got removed on April 8th of 2014, and then it got removed again on April 17th.  So I didn't know if that meant that the amount was just reduced or if it was completely replaced, and the information really is insufficient to make that judgment.

Q.   You were asked a number of questions today regarding dose, the amount of a particular concentration of a chemical, and the impact of a dose of that chemical in your analyses.

Is -- is information regarding dose essential for your opinions in this case?

A.   No.

Q.   Why?

A.   Well, as I said a bunch of times, I was not provided the information to be able to ascertain a dose.  Even more

Page 355

importantly, the safety studies are absent for vaginal administration.  So it's not just, you know, give a certain amount to, you know, the skin or the vaginal area.  You do safety studies in animals for the intended route of administration.

In addition, content uniformity studies on the fragrance haven't been provided.  We asked for those as well.  In other words, if you're adding, you know, 0.5 -- 0.05 percent styrene to the talc and you make 1,000 kilos of baby powder and you sample the top, middle, and bottom, left, right, and middle, and you draw a sample and measure the uniformity and homogeneity of the baby powder or Shower to Shower, is that fragrance chemical present in a uniform manner in each?

Another consideration is, you know, the safety studies are usually single ingredient safety studies.  So, you know, if we were to do a safety study of para-Cresol in an animal, it would be simply that.  It wouldn't be para-Cresol and another 142 other

Page 356

chemicals.  Right?  So very likely there's additive effects.

And then I talked about the fact that the fragrance chemicals have film formers like rosin and Chem 4 present and that they will help adhere the fragrance chemical to the talc product.

The rosin was used as a sustained release matrix in the pharmaceutical world to make extended release tablets.  It's also being used as a film coating to delay the release of drugs.  So that fragrance chemical is going to go with that talc particle wherever it may land, and it's also going to sustain the exposure of the fragrance chemical that may be attached to it.

And lastly, you know, I was also asked about the routine, you know -- the exposure, you know, and could I determine, you know, how much was, you know, applied.  Typical tox studies and safety studies are short term.  They might be multi-day, sometimes up to a couple of weeks or a month.

Page 357

The FDA has recently published guidances that request safety studies in accord with the frequency of administration -- short term, intermediate and long term.  And for chronic administration, the expectation is that they'll do two years.

So there have been repeated doses, repeated exposures, and thousands of applications.

And lastly, in this matter, baby powder is directed to infants.  Shower to Shower is directed towards women.  We have two very different anatomies and physiologies in terms of most babies are a little bit smaller than adult women.  So all those considerations need to be taken into -- into consideration.

Lastly, you know, the question about dose is immaterial with genotoxic materials.  As I said earlier, a genotoxic material, there is no threshold for it.  A single molecule is sufficient to cause harm.

Q.   You were asked a series of questions about styrene, and the suggestion

Page 358

1 was made by counsel for J&J that styrene has
2 not been determined to be harmful in humans.
3 Do you recall that line of questions?
4    A.    Yes.
5    Q.    You know, has -- what's the
6 current IARC classification for styrene?
7    A.    It was recently updated.  I
8 think it's now a 2A.
9    Q.    And what's a 2A?
10    A.    IARC 2A is probably carcinogenic
11 to humans.  It means limited evidence of
12 carcinogenicity in humans and sufficient
13 evidence of carcinogenicity in animal studies
14 or inadequate evidence of carcinogenicity in
15 humans and sufficient evidence of
16 carcinogenicity in animals, and strong
17 evidence that the carcinogen is meted by a
18 mechanism that does operate in humans.
19    Q.    Has the National Toxicology
20 Program evaluated styrene?
21    A.    Yes.
22    Q.    And what was their determination
23 in terms of its potential ability to cause
24 cancer?

Page 359

1        MR. ZELLERS:  Objection; form,
2    foundation.
3 BY MS. O'DELL:
4    Q.    I'll restate the question.  What
5 was the National Toxicology's
6 determination -- Program's determination
7 regarding styrene?
8    A.    I'm on Page -- Page -- are you
9 talking about IARC or NTP?
10    Q.    NTP.  Sorry.
11    A.    Sorry.  I'm going to have to
12 pull up that.
13    Q.    Let me just ask you this
14 question and see if it -- has styrene been
15 determined by NTP to reasonably -- as
16 reasonably anticipated to be a human
17 carcinogen?
18    A.    Yes.
19        MR. ZELLERS:  Form, foundation,
20    objection.
21 BY MS. O'DELL:
22    Q.    You were asked questions, also,
23 in the last segment of J&J's examination
24 about a database that is -- the acronym for

Page 360

1 which is GHS.  Do you recall that?
2    A.    Yes.
3    Q.    Is that a commercial database
4 that requires some type of payment in order
5 to be able to obtain all the information?
6    A.    I believe so.
7    Q.    And that's not information that
8 you had access to.  Correct?
9    A.    No.  I just -- I looked at that
10 work that was in the public domain.
11    Q.    And is the information in the
12 public domain that you had available to you
13 the MSDS sheets that were produced by the
14 manufacturers of those substances?
15    A.    Yes.
16    Q.    And so to the degree that J&J's
17 counsel suggested that somehow you had access
18 to that database, that's not correct?
19    A.    That's correct.
20    Q.    And that would be something,
21 typically, that would be available only to
22 manufacturers?
23        MR. ZELLERS:  Objection; form,
24    foundation.

Page 361

1    A.    That's correct, it would be
2 available to those that want to pay for it.
3 BY MS. O'DELL:
4    Q.    You were asked questions
5 about -- I believe you referenced this
6 earlier in your testimony, and you used the
7 term "co-carcinogen."  What's a
8 co-carcinogen?
9    A.    A co-carcinogen is a chemical
10 that by itself may not be carcinogenic, but
11 when administered in the presence of a
12 carcinogen, it increases the carcinogen's
13 activity.
14    Q.    Were you asked to do an exposure
15 assessment for any individual plaintiffs?
16    A.    No.
17    Q.    Were you asked to do any type of
18 an exposure analysis generally?
19    A.    No.
20    Q.    And as I believe you've
21 testified, that wasn't necessarily --
22 necessary for the opinions you've rendered in
23 this case?
24    A.    No.

Michael Crowley, Ph.D.

Page 362

1    Q.    Do your opinions in this case
2  include those that you've expressed in your
3  report as well as your deposition here today?
4    A.    Yes.
5    Q.    Do you hold those opinions to a
6  reasonable degree of scientific certainty?
7    A.    I believe so, yes.
8    Q.    In reaching those opinions, have
9  you used the methodology that's generally
10  accepted in your field as a chemist?
11    A.    Yes.
12    Q.    And have you used the same rigor
13  and attention to detail in this exercise in
14  your work in this case as you use in your
15  practice in consulting and formulating drugs
16  and other compounds?
17    A.    Yes.
18    Q.    You were asked questions by
19  Imerys' counsel regarding the flotation
20  process and the chemicals involved in the
21  flotation process.  Would it be fair to say
22  that your work is ongoing in relation to that
23  question?
24    A.    Yes.

Page 363

1    MR. FERGUSON:  Object to form.
2    THE REPORTER:  Who was the
3  objection?
4    MR. FERGUSON:  Sorry.
5    THE REPORTER:  Thank you.
6  BY MS. O'DELL:
7    Q.    You were -- you cite in your
8  report the CIR analyses of certain chemicals,
9  to the degree they were available.  Why did
10  you include CIR as a part of the data you
11  reported?
12    MR. ZELLERS:  Objection; form.
13    A.    They're an industry trade group
14  that examines the safety of cosmetic
15  ingredients, and Johnson & Johnson is a
16  member.
17  BY MS. O'DELL:
18    Q.    Do you -- excuse me.  Sorry.
19    A.    And they're expected to follow
20  CIR rules.
21    Q.    Do you consider the CIR
22  authoritative?
23    A.    No.
24    MS. O'DELL:  I don't have

Page 364

1  anything further at the moment,
2  Dr. Crowley.
3    - - -
4    FURTHER EXAMINATION
5    - - -
6  BY MR. ZELLERS:
7    Q.    Dr. Crowley, are you aware of
8  any study that establishes styrene exposure
9  as a cause or a contributing cause to ovarian
10  cancer in humans?
11    MS. O'DELL:  Objection; asked
12  and answered.
13    A.    Yeah, so as we've talked about,
14  those studies are unethical, and that's why
15  there aren't any.
16    MR. ZELLERS:  I have no further
17  questions.  I do just want to put a
18  notation on the record that at the
19  start of the deposition we received
20  this update.  It's Exhibit -- we've
21  marked it as Exhibit 3.  I have not had
22  a chance to look at it.  It's possible
23  that I may have some questions relating
24  to Exhibit 3, once I do have a chance

Page 365

1  to look at it and study.  I just want
2  to put that notation on the record.
3  I'm not asking for an agreement.
4    MS. O'DELL:  Well, no agreement.
5  This is your opportunity.  I think,
6  Counsel, you have time available to you
7  if you want to take a break and look at
8  it.  It's a six-page document.  It's
9  very straightforward, and you're
10  welcome to ask Dr. Crowley questions,
11  but he's -- he's here today to answer
12  them.
13    MR. ZELLERS:  It's a nine-page
14  document.  It's very technical in
15  nature.  I am not capable to sit here
16  on the fly and to go through and review
17  and analyze this document and this
18  material.
19    It may be that I have no further
20  questions relating to this document,
21  but the Doctor indicated that he had
22  completed this document on December
23  18th.  It was not produced to the
24  defendants until today, right when we

Michael Crowley, Ph.D.

Page 366

1   walked into the deposition.
2           So I'm just making a note that I
3   do want to go look at it, and at least
4   reserving the opportunity to raise it
5   with the Court if we feel we need time
6   to ask questions about it.
7           The other thing that I will ask
8   is that -- I'll request that you update
9   Deposition Exhibit 2, which are the
10  invoices, with whatever invoices have
11  been submitted by Dr. Crowley that have
12  not been produced here today.
13          MS. O'DELL:  Let me just respond
14  to that, because I've checked our
15  files.  We don't have another invoice.
16  To the degree that there's an invoice
17  in the future, which I'm sure there
18  will be, obviously we'll give that to
19  you, but it's not deficient as we stand
20  here today.  Just to point that out.
21
22
23
24

Page 367

1           - - -
2        FURTHER EXAMINATION
3           - - -
4   BY MR. FERGUSON:
5       Q.    I have what I hope is just one
6   question, which is:  With regard to the
7   question you just answered that Ms. O'Dell
8   asked you regarding the flotation process and
9   your answer that your work is ongoing, I just
10  want to make clear, in your 200-page or so
11  report, there's not one word about anything
12  relating to the flotation process that you
13  evaluated.  Correct?
14      A.    That's correct.
15          MR. FERGUSON:  That's all.
16          MS. O'DELL:  I have one last
17  question.
18          - - -
19       FURTHER EXAMINATION
20          - - -
21  BY MS. O'DELL:
22      Q.    Dr. Crowley, can you turn to
23  Exhibit 3, because I want to try to address
24  the issue that's been raised by Johnson &

Page 368

1   Johnson's counsel?  And it's the --
2       A.    I don't know if I still have it.
3   Hang on.
4       Q.    I'll be happy to provide you my
5   copy.
6       A.    Okay.
7       Q.    Would you explain what Exhibit 3
8   is?
9       A.    Exhibit 3 is a comparison of the
10  chemical abstract numbers that I found based
11  upon the information that was provided to me
12  at the outset of my work on this matter with
13  those disclosed in the Exhibits 33 and 34 by
14  J&J.  Out of 175 chemicals, I think we had
15  different CAS numbers for 11, and it turns
16  out that some of the CAS numbers provided by
17  J&J are effectively the same as mine, just
18  multiple numbers for the same chemical.
19          For example, the first item was
20  Boswellia carterii oil.  We have two
21  different CAS numbers.  When I searched what
22  the J&J CAS number was, I found that it -- it
23  says that that number refers to Boswell --
24  Boswellia carterii resin.  The CAS number I

Page 369

1   found was for Boswellia carterii oil,
2   according to PubChem and the FDA website.
3           I also checked fragrance
4   companies and verified that.  So in this
5   case, it didn't represent any changes in my
6   report.
7           Some of the CAS numbers that
8   were provided by J&J are clearly wrong.
9   They're -- I think there are some errors
10  there.  For example, for Cedrus Atlantic
11  cedarwood bark oil -- I'm sorry.  That's not
12  the one I was thinking of.
13          Well, copper chlorophyll.  The
14  J&J CAS number does not correspond to copper
15  chlorophyll under any of the search engines
16  that I looked at.
17          The J&J CAS number provided for
18  gamma-Undecalactone does not correspond to
19  that chemical.  It's peppermint oil, so I
20  think that that's a typo or mistake either in
21  the name or the CAS number.
22      Q.    And so --
23      A.    That's what the document is.
24  It's a comparison of the CAS numbers in

Michael Crowley, Ph.D.

Page 370

1  Exhibits 33 and 34 to those that are in my
2  report.
3      Q.    Earlier in the deposition, J&J's
4  counsel suggested that -- that you
5  plagiarized some of the general definitions
6  that were contained in your report.  Do you
7  recall that line of questioning?
8      A.    Yes.
9      Q.    Any of that information that
10 J&J's counsel showed you today, did that
11 change your opinions?
12     A.    No.
13     Q.    Have any impact on your
14 opinions?
15     A.    No.
16     Q.    Were they anything more than
17 general definitions?
18         MR. ZELLERS:  Objection; form,
19 foundation.
20     A.    Just foundational information,
21 you know, background information.  I thought
22 I got the definition of an irritant or a
23 sensitizer from a medical dictionary.  The
24 fact that it's evidently word for word from

Page 371

1  Wikipedia is really immaterial to how I
2  formed my opinion.
3         MS. O'DELL:  No further
4  questions.
5         MR. ZELLERS:  No further
6  questions.  Thank you.
7         MR. FERGUSON:  Nothing further.
8         MS. O'DELL:  Thank you.
9         THE VIDEOGRAPHER:  This
10 concludes the deposition of Dr. Michael
11 Crowley.  Going off the record, the
12 time is 5:59 p.m.
13         (Deposition concluded at
14 5:59 p.m.)
15
16
17
18
19
20
21
22
23
24

Page 372

1
2             CERTIFICATE
3
4
5         I HEREBY CERTIFY that the
   witness was duly sworn by me and that the
6  deposition is a true record of the testimony
   given by the witness.
7
         It was requested before
8  completion of the deposition that the
   witness, MICHAEL CROWLEY, Ph.D., have the
9  opportunity to read and sign the deposition
   transcript.
10
11
         _____
12     STEVEN STOGEL
       Certified LiveNote Reporter
13     Certified Shorthand Reporter
       CSR No. 6174-Expires 12/31/20
14     Dated:  January 7, 2019
15
16
         (The foregoing certification
17 of this transcript does not apply to any
   reproduction of the same by any means, unless
18 under the direct control and/or supervision
   of the certifying reporter.)
19
20
21
22
23
24

Page 373

1      INSTRUCTIONS TO WITNESS
2
3         Please read your deposition
4  over carefully and make any necessary
5  corrections.  You should state the reason in
6  the appropriate space on the errata sheet for
7  any corrections that are made.
8         After doing so, please sign
9  the errata sheet and date it.
10        You are signing same subject
11 to the changes you have noted on the errata
12 sheet, which will be attached to your
13 deposition.
14        It is imperative that you
15 return the original errata sheet to the
16 deposing attorney within thirty (30) days of
17 receipt of the deposition transcript by you.
18 If you fail to do so, the deposition
19 transcript may be deemed to be accurate and
20 may be used in court.
21
22
23
24

Michael Crowley, Ph.D.

Page 374

```
 1         - - - - - -
              E R R A T A
 2         - - - - - -
 3
 4  PAGE  LINE  CHANGE
 5  ____  ____  _____
 6     REASON: _____
 7  ____  ____  _____
 8     REASON: _____
 9  ____  ____  _____
10     REASON: _____
11  ____  ____  _____
12     REASON: _____
13  ____  ____  _____
14     REASON: _____
15  ____  ____  _____
16     REASON: _____
17  ____  ____  _____
18     REASON: _____
19  ____  ____  _____
20     REASON: _____
21  ____  ____  _____
22     REASON: _____
23  ____  ____  _____
24     REASON: _____
```

Page 376

```
 1           LAWYER'S NOTES
 2  PAGE  LINE
 3  ____  ____  _____
 4  ____  ____  _____
 5  ____  ____  _____
 6  ____  ____  _____
 7  ____  ____  _____
 8  ____  ____  _____
 9  ____  ____  _____
10  ____  ____  _____
11  ____  ____  _____
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16  ____  ____  _____
17  ____  ____  _____
18  ____  ____  _____
19  ____  ____  _____
20  ____  ____  _____
21  ____  ____  _____
22  ____  ____  _____
23  ____  ____  _____
24  ____  ____  _____
```

Page 375

```
 1
 2        ACKNOWLEDGMENT OF DEPONENT
 3
 4        I, _____, do
 5  hereby certify that I have read the foregoing
 6  pages, 1 - 376, and that the same is a
 7  correct transcription of the answers given by
 8  me to the questions therein propounded,
 9  except for the corrections or changes in form
10  or substance, if any, noted in the attached
11  Errata Sheet.
12
13
14  _____
15  MICHAEL CROWLEY, Ph.D.          DATE
16
17
18  Subscribed and sworn
    to before me this
19  _____ day of _____, 20___.
20  My commission expires:_____
21
    _____
22  Notary Public
23
24
```