Exhibit 12

Daniel L. Clarke-Pearson, M.D.

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                 FOR THE DISTRICT OF NEW JERSEY
 3
       --------------------------------X
 4
       IN RE:  JOHNSON & JOHNSON
 5
       TALCUM POWDER PRODUCTS
 6                                      MDL No.:
       MARKETING, SALES PRACTICES,
 7                                      16-2738 (FLW)(LHG)
       AND PRODUCTS LIABILITY
 8
       LITIGATION
 9
       --------------------------------X
10
11              ORAL AND VIDEOTAPED DEPOSITION OF
12               DANIEL L. CLARKE-PEARSON, M.D.
13  _____
14                   MONDAY, FEBRUARY 4, 2019
15                        9:03 A.M.

    _____
16
                     Taken by the Defendants
17                    at The Carolina Inn
                        211 Pittsboro Street
18             Chapel Hill, North Carolina 27516
19
20                       -  -  -
21        Reported by Sophie Brock, RPR, RMR, RDR, CRR
22                       -  -  -
23
24              GOLKOW LITIGATION SERVICES
           877.370.3377 ph | 917.591.5672 fax
25                  deps@golkow.com
```

## Page 2

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFFS:

BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P.C.
218 Commerce Street
Montgomery, Alabama 36104
Telephone: (334) 269-2343
By:  LEIGH O'DELL, ESQ.
     leigh.odell@beasleyallen.com
     MARGARET THOMPSON, MD, JD, MPAff
     margaret.thompson@beasleyallen.com
- and -
BLOOD, HURST & O'REARDON, LLP
501 West Broadway, Suite 1490
San Diego, California 92101
Telephone: (619) 338-1100
By:  PAULA R. BROWN, ESQ.
     pbrown@bholaw.com

ON BEHALF OF THE DEFENDANT
JOHNSON & JOHNSON:

TUCKER ELLIS, LLP
515 South Flower Street
Forty-Second Floor
Los Angeles, California 90071
Telephone: (213) 430-3301
By:  MICHAEL C. ZELLERS, ESQ.
     michael.zellers@tuckerellis.com

- and -

DRINKER BIDDLE & REATH, LLP
600 Campus Drive
Florham Park, New Jersey 07932-1047
Telephone: (973) 549-7164
By:  JESSICA L. BRENNAN, ESQ.
     jessica.brennan@dbr.com

## Page 3

A P P E A R A N C E S (Continued)

ON BEHALF OF THE DEFENDANT
IMERYS TALC AMERICA, INC.:

DYKEMA GOSSETT, PLLC
112 E. Pecan Street, Suite 1800
San Antonio, Texas 78205
Telephone: (210) 554-5549
By:  JANE E. BOCKUS, ESQ.
     jbockus@dykema.com
- and -
COUGHLIN DUFFY LLP
350 Mount Kemble Avenue
Morristown, New Jersey 07962
Telephone: (973) 267-0058
By:  MARYAM M. MESEHA, ESQ.
     mmeseha@coughlinduffy.com

ON BEHALF OF THE DEFENDANT
PERSONAL CARE PRODUCTS COUNCIL:

SEYFARTH SHAW LLP
975 F Street, N.W.
Washington, DC 20004-1454
Telephone: (202) 463-2400
By:  JAMES R. BILLINGS-KANG, ESQ.
     jbillingskang@seyfarth.com

ON BEHALF OF THE DEFENDANT PTI:

TUCKER ELLIS
233 South Wacker Drive
Chicago, Illinois 60606
Telephone: (312) 624-6300
By:  JAMES W. MIZGALA, ESQ.
     james.mizgala@tuckerellis.com

VIDEOGRAPHER:
Brad Smith

## Page 4

INDEX OF EXAMINATIONS
                                     PAGE
BY MR. ZELLERS . . . . . . . . . . . . . . . .9, 345
BY MS. BOCKUS  . . . . . . . . . . . . . .308, 345
BY MR. MIZAGALA . . . . . . . . . . . . . . . . 341
BY MS. O'DELL . . . . . . . . . . . . . . . . . 343

INDEX OF EXHIBITS
NUMBER        DESCRIPTION            MARKED
Exhibit 1   Notice of Deposition of . . . . . . . .11
            Daniel L. Clarke-Pearson

Exhibit 2   Invoice from UNC School of  . . . . . .16
            Medicine to Beasley Allen Law
            Firm, dated January 4, 2019

Exhibit 3   Dr. Clarke-Pearson's list of  . . . . .26
            medicolegal cases in the past
            five years

Exhibit 4   Exhibit C:  . . . . . . . . . . . . . .26
            Daniel Clarke-Pearson, MD,
            Prior Testimony

Exhibit 5   Rule 26 Expert Report of  . . . . . . .30
            Daniel L. Clarke-Pearson, MD
Exhibit 6   Exhibit B: Listing of additional  . . .33
            materials considered

Exhibit 7   Article titled "Epidemiology of . . . .36
            Commonly Used Statistical Terms
            and Analysis of Clinical
            Studies," by Wendy R. Brewster,
            MD, PhD

Exhibit 8   UpToDate reprint of article . . . . . .36
            titled "Evidence-based medicine,"
            authored by Arthur T. Evans, MD,
            MPH, and Gregory Mints, MD, FACP

## Page 5

INDEX OF EXHIBITS (Continued)
NUMBER        DESCRIPTION            MARKED
Exhibit 9   Article titled "Emerging Themes . . . .36
            in Epidemiology," by Fedak et al.

Exhibit 10  Folder marked "ASBESTOS OV CA"  . . . .37

Exhibit 11  Folder marked "EPI" . . . . . . . . . .47

Exhibit 12  Folder titled "ANIMALS" . . . . . . . .49

Exhibit 13  Folder titled "LATENCY" . . . . . . . .51

Exhibit 14  Folder titled "ASBESTOS FIBROUS . . . .53
            TALK LONGO, ETC"
Exhibit 15  Exhibit A: Curriculum Vitae of  . . . .54
            Daniel Lyle Clarke-Pearson, M.D.

Exhibit 16  Article titled "Spectrum of . . . . . .99
            Mutation and Frequency of Allelic
            Deletion of the p53 Gene in
            Ovarian Cancer," by Matthew F.
            Kohler, et al.

Exhibit 17  Article titled "Screening for . . . . 102
            Ovarian Cancer," published by
            Daniel L. Clarke-Pearson, M.D.,
            in The New England Journal of
            Medicine

Exhibit 18  Article from the National . . . . . . 110
            Cancer Institute website titled
            "Ovarian, Fallopian Tube, and
            Primary Peritoneal Cancer
            Prevention (PDQ®) - Health
            Professional Version"
Exhibit 19  Letter from FDA Department of . . . . 113
            Health and Human Services, dated
            April 1, 2014, to Samuel S.
            Epstein, M.D.

Exhibit 20  International Agency for  . . . . . . 124
            Research on Cancer printout
            listing agents classified by the
            IARC Monographs, Volumes 1-123

Daniel Clarke-Pearson, M.D.

Page 6

          INDEX OF EXHIBITS (Continued)
NUMBER        DESCRIPTION        MARKED
Exhibit 21  Article titled "Perineal Use of . . . 136
            Talc and Risk of Ovarian Cancer,"
            by H. Langseth, et al.
Exhibit 22  Article titled "Genital Use of . . . 152
            Talc and Risk of Ovarian Cancer:
            A Meta-Analysis," by Wera Berge,
            et al.

Exhibit 23  Ovid SP printout of article . . . . . 152
            titled "Genital Use of Talc and
            Risk of Ovarian Cancer: A
            Meta-Analysis," by Wera Berge,
            et al.

Exhibit 24  Article titled "Perineal Talc . . . . 153
            Use and Ovarian Cancer A
            Systematic Review and
            Meta-Analysis," by Ross
            Penninkilampi and Guy D. Eslick
Exhibit 25  Article titled "Association . . . . . 159
            between Body Powder Use and
            Ovarian Cancer: The African
            American Cancer Epidemiology
            Study (AACES)," by Joellen M.
            Schildkraut, et al.
Exhibit 26  Article titled "The Association . . . 190
            Between Talc Use and Ovarian
            Cancer A Retrospective
            Case-Control Study in Two US
            States," by Daniel W. Cramer, et
            al.
Exhibit 27  Article titled "The . . . . . . . . 230
            Relationship Between Perineal
            Cosmetic Talc Usage and Ovarian
            Talc Particle Burden," by
            Debra S. Heller, MD, et al.

Page 7

          INDEX OF EXHIBITS (Continued)
NUMBER        DESCRIPTION        MARKED
Exhibit 28  Article titled "Talcum Powder, . . . 238
            Chronic Pelvic Inflammation and
            NSAIDs in Relation to Risk of
            Epithelial Ovarian Cancer," by
            Melissa A. Merritt, et al.
Exhibit 29  Health Canada Decision-Making . . . . 292
            Framework for Identifying,
            Assessing, and Managing Health
            Risks, dated August 1, 2000

Exhibit 30  Systematic Review and . . . . . . . . 300
            Meta-Analysis of the Association
            between Perineal Use of Talc and
            Risk of Ovarian Cancer, by
            Mohamed Kadry Taher, et al.

Page 8

                P R O C E E D I N G S
        THE VIDEOGRAPHER:  We are now on
record.  Today's date is February 4, 2019, and the
time is approximately 9:03 a.m.
        This is the videotaped deposition of
Dr. Daniel Clarke-Pearson.  It's being taken in
regards to the Talcum Powder Litigation, MDL No. 2738.
        Would counsel please now introduce
themselves for the record, and then our court reporter
will swear in the witness.
        MS. O'DELL:  Leigh O'Dell from
Beasley Allen, on behalf of the plaintiffs.
        MS. THOMPSON:  Margaret Thompson,
Beasley Allen, on behalf of the plaintiffs.
        MS. BROWN:  Paula Brown from Blood,
Hurst & O'Reardon, on behalf of the plaintiffs.
        MR. ZELLERS:  Michael Zellers, on
behalf of the Johnson & Johnson defendants.
        MS. BRENNAN:  Jessica Brennan, on
behalf of the Johnson & Johnson defendants.
        MR. BILLINGS-KANG:  James
Billings-Kang, Seyfarth Shaw, on behalf of Personal
Care Products Council.
        MS. BOCKUS:  Jane Bockus, on behalf of
Imerys.

Page 9

        MS. MESEHA:  Maryam Meseha, on behalf
of Imerys.
        MR. MIZGALA:  James Mizgala, on behalf
of PTI.
Whereupon,
        DANIEL L. CLARKE-PEARSON, MD,
        having first been duly sworn/affirmed,
        was examined and testified as follows:
        EXAMINATION BY COUNSEL FOR THE
        JOHNSON & JOHNSON DEFENDANTS
BY MR. ZELLERS:
    Q.  Can you state your name, please.
    A.  Yes.  Daniel Lyle Clarke-Pearson.
    Q.  Dr. Clarke-Pearson, we're here to take your
deposition in the talcum powder MDL litigation.
        You're aware of that?
    A.  Yes, sir.
    Q.  You've given a number of depositions in the
past; is that right?
    A.  I have.
    Q.  You are familiar with the rules that we're
going to follow here today?
    A.  Yes.
    Q.  If I ask you a question or if any counsel
asks you a question that you don't understand, tell us

Page 10

1  you don't understand and we'll repeat or rephrase the
2  question so it's clear to you.
3       Can you do that?
4    A. Yes, sir.
5    Q. If you answer a question, we're going to
6  assume that you understood it.  Is that fair?
7    A. Fair.
8       MS. O'DELL:  Objection.
9  BY MR. ZELLERS:
10   Q. As we go along, only one of us can speak at a
11 time.  So please try to let me finish my question
12 before you answer.  I will try to allow you to finish
13 your answer so that we can get the best record
14 possible.
15      Is that agreeable?
16   A. Agreeable.
17   Q. All right.  You are following this,
18 apparently, on the realtime; is that right?
19   A. Yes.
20   Q. Is that going to be distracting to you?
21   A. It might be.
22   Q. All right.  Well, have you ever done that
23 before in a deposition?
24   A. No, sir.
25   Q. Well, if it becomes distracting, then we'll

Page 11

1  deal with it.
2       You are here pursuant to a notice of
3  deposition.  We've marked the notice of deposition as
4  Exhibit 1.
5    (Exhibit No. 1 was marked for identification.)
6  BY MR. ZELLERS:
7    Q. Can you take a look at that and let us know
8  if you've seen that before?
9       MS. O'DELL:  I would just reassert that
10 the objections to certain document requests in the
11 notice, I think those were previously served.
12      MR. ZELLERS:  Yes, we did receive the
13 objections of plaintiffs.
14      THE WITNESS:  Yes, I've seen this.
15 BY MR. ZELLERS:
16   Q. If you go to -- beginning on page 3, there
17 are a number of documents that are requested to be
18 produced here today.
19      Have you either brought with you here today
20 or supplied to counsel for plaintiffs all of the
21 documents and materials in your possession that are
22 requested in the deposition notice?
23      MS. O'DELL:  To the degree that they
24 are not objectionable --
25      MR. ZELLERS:  No.  My question goes,

Page 12

1  you know, across the board.  If there is a document
2  that he has in his possession that may be
3  objectionable, then he can tell us what it is and you
4  can assert your objection.
5       MS. O'DELL:  Well, you asked if he had
6  brought them here, and Dr. Clarke-Pearson has only
7  brought materials subject to requests that are not
8  objectionable, which include the materials listed in
9  his materials-considered list that are in the binders
10 behind me on the table.
11      They also include binders of cited
12 materials, his report, invoices, and the cases in
13 which he has provided testimony within the last five
14 years.  I think he has a copy of his report in front
15 of him.
16      Those are the materials we view to be
17 nonobjectionable, and those are what
18 Dr. Clarke-Pearson has brought with him today.
19      MR. ZELLERS:  Okay.  Ms. O'Dell, as
20 we -- I would appreciate it if you let the witness
21 answer the questions.  I do appreciate the
22 clarification.  But, as we go along today, if you'll
23 do your best, you know, to follow the rules.  I mean,
24 the both of us need to follow in terms of objections.
25 I'd appreciate it.

Page 13

1       MS. O'DELL:  Well, certainly, I'm going
2  to follow the rules today, but it's because of the
3  objections asserted and because it's unclear to what
4  degree Dr. Clarke-Pearson is familiar with all the
5  requests and all the objections, then that was just a
6  difficult question for him -- maybe an unfair question
7  for him.  And so I have responded in keeping with our
8  previously served objections.
9       MR. ZELLERS:  I don't think asking him
10 if he's gone through the request for production of
11 documents and can identify for us any documents that
12 are in your possession that are responsive that you've
13 not brought here today, I don't think that is a
14 difficult question.  But let's have Dr. Clarke-Pearson
15 answer it.
16      THE WITNESS:  I don't think I've
17 brought any of these documents here today.  Counsel
18 has some of them, like my curriculum vitae.
19 BY MR. ZELLERS:
20   Q. My question, I guess, goes to -- so that we
21 can identify whether there's anything at all for us
22 that we need to fight about should be produced.
23      Are there documents that are responsive to
24 the notice of deposition that are not being produced
25 here today, to your knowledge, that originated from

Daniel L. Clarke-Pearson, M.D.

Page 14

1  you and are in your possession?
2       A.  I think let's just walk through the list,
3  then.  I don't have a CV in my possession, but counsel
4  does --
5       Q.  And, Doctor, to shortcut this, I don't need
6  to go through and ask you, you know, what documents
7  are being produced.
8            Are you aware of documents that are called
9  for in the notice of deposition that are not being
10  produced today?
11       A.  I don't -- I would have to go through this
12  list.  I don't have any documents with me aside from
13  what you've just described.
14       Q.  So you've reviewed the notice of deposition
15  in preparation for today; correct?
16       A.  Yes.
17       Q.  You knew that was important; correct?
18       A.  Yes.
19       Q.  And yet you're unable to tell us whether or
20  not there are documents that are in your possession
21  that are called for in the notice of deposition that
22  you are not producing today; is that right?
23            MS. O'DELL:  Objection.  That's not
24  correct, but --
25            MR. ZELLERS:  Well, he can answer.

Page 15

1            MS. O'DELL:  I've made my objection --
2            MR. ZELLERS:  Understood.
3            MS. O'DELL:  -- which I'm perfectly
4  entitled to do that, as you know.
5            MR. ZELLERS:  You certainly are.  You
6  certainly are.
7            MS. O'DELL:  So, Dr. Clarke-Pearson,
8  just answer to the best of your knowledge, and, of
9  course, there are objections that have been asserted;
10  and to the degree you're not familiar with those
11  details, then counsel and I can sort that out later.
12            THE WITNESS:  So documents -- I do not
13  have any of these documents in my possession.  For
14  example, I thought I saw -- passed you a document
15  showing my billing and collections to date.  Isn't
16  that right on top?
17  BY MR. ZELLERS:
18       Q.  My question was are you aware, as you sit
19  here right now, of any documents that you have that
20  are responsive to the notice of deposition that are
21  not in the large pile of materials that we have here
22  today?
23       A.  I'm not aware of any.
24       Q.  All right.  Ms. O'Dell produced for us or
25  provided to me two documents prior to the deposition

Page 16

1  and then has advised me that you have reviewed a
2  number of additional materials since you prepared your
3  report.  So I'd like to go through those now, if we
4  can.
5            Notice of deposition, Exhibit 2, is a copy,
6  it appears, of your invoices in this matter.  Is that
7  right?
8       (Exhibit No. 2 was marked for identification.)
9            THE WITNESS:  Yes, sir.
10  BY MR. ZELLERS:
11       Q.  You have spent a total of 20 hours working on
12  this matter since being retained back in April of
13  2017; is that right?
14            MS. O'DELL:  Object to the form.
15            THE WITNESS:  Up until the preparation
16  of -- and submission of my report, I spent 20 hours.
17  BY MR. ZELLERS:
18       Q.  All right.  You prepared your report, you
19  edited your report, and you submitted your report on
20  November 4th of 2018; is that right?
21       A.  I believe it was -- I submitted it, but
22  I think it was November 16th, 2018.
23       Q.  Did you bill any time or spend any time on
24  the MDL talcum powder litigation between
25  November 4th of 2018 and the end of the year,

Page 17

1  December 31st of 2018?
2       A.  Yes.
3       Q.  How much additional time did you spend during
4  that time?
5       A.  I don't know exactly.  I'd have to go back to
6  several notes that I have on records and papers and
7  that sort of thing.  I would say between
8  November 4th and today, it's been about 60 hours.
9       Q.  60 additional hours?
10       A.  Yes, sir.
11       Q.  So you spent 20 hours talking with counsel,
12  doing whatever research and analysis you needed to do,
13  and writing your report; is that right?
14       A.  Yes.
15       Q.  You have spent an additional 60 hours since
16  that time; is that right?
17       A.  Yes.
18       Q.  If your invoice is dated January 4th of 2019,
19  Exhibit 2, why does none of that time appear on your
20  invoice?
21       A.  Because my accounting office turned this over
22  on January 4th.  I submitted -- I submitted this
23  invoice to my business manager, and this is when it
24  was submitted from our office.
25       Q.  I guess I don't understand.  You tell me that

Daniel L. Clarke-Pearson, M.D.

Page 18

1  you have worked a considerable amount of time between
2  November 4th of 2018 and the end of 2018; correct?
3      A.  Yes.
4      Q.  Why is that time and those hours not
5  reflected on your invoice which is dated January 4th
6  of 2019?
7      A.  Because I hadn't submitted the request for my
8  business manager to submit the invoice to the
9  attorneys.
10     Q.  Why did you cut off your time entry as of
11 November 4th, 2018?
12         MS. O'DELL:  Object to the form.
13         THE WITNESS:  I think there was a gap.
14 I can't tell you when I picked up again after
15 November 4th, after I did the report.  There was a
16 time when I wasn't actively involved reading,
17 preparing.
18 BY MR. ZELLERS:
19     Q.  Do you keep track of the time that you spend
20 doing activities as an expert witness in the MDL
21 talcum powder litigation?
22     A.  Yes.
23     Q.  And do you keep that on a regular, systematic
24 basis?
25     A.  Not so much.

Page 19

1      Q.  Were you first retained back in April of 2017
2  by Ms. O'Dell and by Ms. Thompson?
3      A.  Yes, I believe so.
4      Q.  Had you known Ms. O'Dell or any attorneys
5  from her office, the Beasley Allen office, prior to
6  being contacted in this litigation?
7      A.  I had not known Ms. O'Dell.  I knew
8  Dr. Thompson.
9      Q.  How did you know Dr. Thompson?
10     A.  Dr. Thompson and I were residents at Duke
11 University Medical Center.  I was a few years ahead of
12 her, but we were in the residency training program.
13 And then I began my fellowship and gynecologic
14 oncology at Duke, and I believe Dr. Thompson was still
15 a resident during part of that time.
16     Q.  Did you make -- maintain contact with
17 Dr. Thompson over the years?
18     A.  Off and on.  Probably on average about once a
19 year at an alumni meeting that we attended, although
20 neither one of us attended every year, but...
21     Q.  These were alumni meetings at Duke
22 University; is that right?
23     A.  With regard to the obstetrical and
24 gynecological department.
25     Q.  Other contacts that you had with

Page 20

1  Ms. O'Dell -- strike that -- with Dr. Thompson over
2  the years?
3      A.  I believe she probably called me somewhere
4  before April 17th when I was retained and described
5  work that was ongoing with talcum powder.  So we had a
6  conversation.  I didn't bill for that.
7      Q.  You knew Dr. Thompson socially before being
8  retained; is this correct?
9      A.  Yes.
10     Q.  Other than --
11     A.  And -- excuse me.  And professionally.
12     Q.  Socially and professionally.
13         What professional interaction did you have
14 with Dr. Thompson since the time that you were a
15 resident and a fellow at Duke University?
16     A.  Okay.  So since that time -- I mean,
17 throughout her residency, we were professionally
18 involved with training and taking care of patients.
19 Subsequent to her completing her residency, I've not
20 had any professional interaction with her per se.
21     Q.  Were you socially involved with Dr. Thompson
22 while the two of you were at Duke?
23     A.  No.
24     Q.  You might go to events and see one another,
25 but in terms of any relationship between the two of

Page 21

1  you, there was none; is that fair?
2      A.  I guess you'll have to define "relationship"
3  for me.
4      Q.  Well, I was trying to make it easy.
5          Did you socialize with other persons in the
6  internship and residency programs while you were at
7  Duke?
8      A.  Yes.  And faculty and spouses, yes.
9      Q.  And Dr. Thompson was one of those persons; is
10 that right?
11     A.  Yes, sir.
12     Q.  Do you know Dr. Thompson's husband or former
13 husband?
14     A.  I did not.
15     Q.  All right.  Your contact was solely with
16 Dr. Thompson; is that right?
17     A.  Yes.
18     Q.  Over the years, prior to being retained by
19 Dr. Thompson in this litigation, did you review any
20 medicolegal matters for her?
21     A.  No, sir.
22     Q.  Were you asked to review any medicolegal
23 matters for her?
24     A.  You just asked that question, I think.
25     Q.  No --

Daniel L. Clarke-Pearson, M.D.

Page 22

1    A.  Did I misunderstand?
2    Q.  Well, and at least what I had hoped was the
3  distinction is that I had asked you if you had
4  reviewed any matters, and then the second question was
5  whether or not Dr. Thompson had requested that you
6  review any medicolegal matters for her.
7    A.  Okay.  So it's a two-part question.  I did
8  not review any matters, and Dr. Thompson hadn't
9  requested me to review any medicolegal matters.
10    Q.  When -- well, strike that.
11       What did Dr. Thompson ask you to do with
12  respect to the MDL talcum powder litigation?
13    A.  At the time of the conference call with
14  Ms. O'Dell and Dr. Thompson, I was asked to evaluate
15  and offer my opinion regarding talcum powder and
16  whether it was causative to the occurrence of ovarian
17  cancer in women who use talcum powder on their
18  perineum.
19    Q.  Were you asked to research or answer any
20  other question than that?
21    A.  So in my report, I think I make it clearer
22  than what I just described.  So "Can the use of talcum
23  powder in the perineal area cause epithelial ovarian
24  cancer?" and also, "If so, what biologic mechanism did
25  this -- by which did this occur?" were the two key

Page 23

1  questions I was asked to form an opinion on.
2    Q.  You mentioned that you did speak with
3  Dr. Thompson prior to the conversation with Ms. O'Dell
4  and Dr. Thompson.
5       What, at that time, did Dr. Thompson tell
6  you about the litigation?
7    A.  I don't recall details.  It was that she was
8  working on cases that had to do with talcum powder and
9  ovarian cancer.
10    Q.  Do you recall any other background that you
11  were provided?
12    A.  Not at that time.
13    Q.  Did you understand that Dr. Thompson was
14  representing the plaintiffs in this matter, along with
15  a number of other attorneys?
16    A.  Yes.
17    Q.  Prior to being contacted by Dr. Thompson and
18  by Ms. O'Dell, had you formed opinions in terms of
19  whether or not talcum powder was causally related to
20  ovarian cancer for women who used it in the perineal
21  region?
22    A.  So that's an interesting question, because it
23  goes back to my training.  And throughout the years,
24  since 1975, when I began my residency training, the
25  conversation in the gynecologic community and the

Page 24

1  GYN oncology community has been one of could talcum
2  powder be associated with the occurrence of ovarian
3  cancer?
4       And, in fact, I think, in the early '70s, we
5  believed it did; and then I was told as a trainee that
6  talcum powder previously had had asbestos in it, and
7  then we were told it was taken out.  So that was very
8  reassuring.
9       Yet periodically over the years, papers came
10  out -- case-control studies, cohort studies -- off and
11  on that continued to raise the question.
12       So the question has been in my mind.  And,
13  really, it wasn't until I really started thinking
14  about this and gathered up all the literature that it
15  became clear to me, and I formed my opinion.
16    Q.  That was my question.  When did you form your
17  opinion that talcum powder is causally related to
18  ovarian cancer when used by women in the genital area?
19    A.  Well, some -- I'm not sure there was a
20  particular day when the light bulb went off.  I think
21  in the process of digging into this issue in more
22  detail and putting together all the case-control
23  trials that had come out over a period of time and the
24  meta-analysis that had come out over a period of time
25  that kept raising questions, when I started to put

Page 25

1  that all together, it became clear to me that, in my
2  opinion, talcum powder causes ovarian cancer.
3    Q.  That was sometime after you were contacted
4  and retained in this matter back in April of 2017 as
5  an expert for the plaintiffs; correct?
6    A.  It was the request to provide opinions and to
7  develop an opinion, and I -- yes.
8    Q.  All right.  Do you agree that the medical
9  community as a whole has not reached a consensus that
10  talcum powder causes ovarian cancer?
11       MS. O'DELL:  Object to the form.
12  Excuse me.
13       THE WITNESS:  I think we're at a
14  tipping point in that question.
15  BY MR. ZELLERS:
16    Q.  Can you answer that question?
17    A.  Well, I think you would have to define "the
18  medical community" for me.
19    Q.  Well, let's be more specific.
20       Has the gynecologic oncologist medical
21  community reached a consensus that talcum powder
22  causes ovarian cancer?
23    A.  As best I know, not at this time.
24    Q.  All right.  You also -- Ms. O'Dell provided
25  me with an updated list of your testimony; is that

Daniel L. Clarke-Pearson, M.D.

Page 26

1  right?
2        MR. ZELLERS:  We'll mark that as
3  Exhibit 3.
4        (Exhibit No. 3 was marked for identification.)
5        THE WITNESS:  Yes, sir.
6  BY MR. ZELLERS:
7     Q.  The testimony that you provided back in
8  November of 2017 -- strike that -- November of 2018,
9  when you submitted your report, Exhibit C -- we'll
10  mark that as Deposition Exhibit 4 --
11        (Exhibit No. 4 was marked for identification.)
12     Q.  -- contained just one listing of testimony;
13  is that right?
14     A.  Yes.
15     Q.  What has changed since you prepared your
16  report in November of 2018 and today with respect to
17  deposition and trial testimony that you have provided?
18     A.  I believe simply an oversight on my part.
19     Q.  The oversight was not listing at least two of
20  the matters that you had testified in in the past five
21  years as of November of 2018; is that right?
22     A.  Yes, sir.
23     Q.  The Edmonson matter that you testified in
24  December of 2014, was that a medical malpractice
25  action?

Page 27

1     A.  Yes, it was a malpractice action.
2     Q.  And September 1st of 2015, the Rappaport
3  matter, that was a physician who was losing his or her
4  privileges?
5     A.  He was being fired from his practice.
6     Q.  The Pizzirusso case or matter that you
7  provided testimony in March of 2015, what was that?
8     A.  That was a medical malpractice case in
9  Brooklyn, New York.
10     Q.  January of 2019, Paduda, what type of matter
11  was that?
12     A.  This was -- I need to make sure I've got the
13  two straight here.  Yes, it's a medical malpractice
14  case.
15     Q.  And then, finally, you were deposed on
16  January 22nd of 2009 in a matter called Cutsinger.
17  What type of matter was that?
18     A.  It was 2019.
19        MS. O'DELL:  '19.
20        MR. ZELLERS:  Thank you, Counsel.
21  BY MR. ZELLERS:
22     Q.  January 22nd of 2019.
23     A.  This is a product liability suit.
24     Q.  Involving what product?
25     A.  A morcellator manufactured by Gyrus.

Page 28

1  BY MR. ZELLERS:
2     Q.  The medical malpractice cases that you have
3  listed -- Edmonson, Pizzirusso, and Paduda -- were you
4  serving as an expert for plaintiff or defense in those
5  cases?
6     A.  In all three of those cases, for the defense.
7     Q.  Over the years, you have done a lot of
8  testifying in medical malpractice cases.  Is that
9  fair?
10        MS. O'DELL:  Object to the form.
11        THE WITNESS:  I don't know how you
12  define "a lot."
13  BY MR. ZELLERS:
14     Q.  Have you given -- at least up until 2005 or
15  so, did you give about three depositions a year in
16  medical malpractice cases?
17     A.  Probably three or more.  Three to six, maybe.
18     Q.  Since 2005, you've cut back some in terms of
19  your medicolegal work; is that right?
20     A.  Yes.
21     Q.  Is it accurate to say that, over the years,
22  you've testified about 50 percent for plaintiff and
23  about 50 percent for defendants in litigation matters?
24     A.  Yes.
25     Q.  Is the only product liability matter that you

Page 29

1  have testified in, other than the MDL talcum powder
2  litigation, the morcellator deposition that you gave
3  earlier in -- this year, in January?
4     A.  Yes, sir.
5     Q.  Ms. O'Dell advised us at the start of the
6  deposition that, in addition to the materials that you
7  cite in your report and in your additional materials
8  list, that you have now reviewed a number of
9  additional materials prior to today; is that right?
10     A.  Yes.
11     Q.  Do those additional materials that you have
12  reviewed change in any respect the opinions that you
13  have set forth in your report?
14     A.  They reinforce and enhance or support my
15  opinion.
16     Q.  As we go through today, I may refer to talc,
17  I may refer to talcum powder, I may refer to talc
18  products or to baby powder or to Shower to Shower.
19  I intend, when I use those terms, to be referring to
20  the baby powder product manufactured by Johnson &
21  Johnson Consumer Products Inc. and the Shower to
22  Shower product formerly manufactured by Johnson &
23  Johnson Consumer Products Inc.
24        Do you understand that?
25     A.  I understand.

Daniel J. Clarke-Pearson, M.D.

Page 30

1    Q.  Your report which was provided to us, we will
2  mark as Deposition Exhibit 5.
3    (Exhibit No. 5 was marked for identification.)
4  BY MR. ZELLERS:
5    Q.  Can you just take a quick look at that and
6  confirm for us that that is Deposition Exhibit 5?
7    A.  It is.
8    Q.  Your report, which we have marked as
9  Deposition Exhibit 5, does that contain all of the
10  opinions that you intend to offer at any trial or
11  hearing in this matter?
12    A.  I believe so, yes.
13    Q.  Does your report identify everything that you
14  are relying on in forming your opinions in this
15  matter?
16    MS. O'DELL:  Object to the form.
17    THE WITNESS:  Obviously, we just talked
18  about some additional information -- materials that
19  I've reviewed since writing that report, so they would
20  be included in my opinion.
21  BY MR. ZELLERS:
22    Q.  We'll go through in a moment the additional
23  materials that you have reviewed.
24    If we look at your report and if we look at
25  the additional materials that you have reviewed in

Page 31

1  preparation for the deposition, does that include all
2  of the materials that you are relying on in forming
3  your opinion?
4    A.  To be clear, you're saying what I have
5  included in my report plus my additional materials,
6  that's what I relied on?
7    Q.  Yes.
8    Is that correct?
9    A.  Yes.
10    Q.  Is your report accurate?
11    A.  Yes.
12    Q.  Is your report complete?
13    A.  I believe it is.
14    Q.  Let's try to quickly go through, if we can,
15  the additional materials that you have reviewed since
16  you prepared your report, Exhibit 5.
17    Ms. O'Dell stated that you have reviewed the
18  Health Canada risk assessment; is that right?
19    A.  Yes.
20    Q.  You have reviewed the Taher, T-A-H-E-R, 2018
21  publication; is that right?
22    A.  Yes.
23    Q.  You have reviewed the 2019 Saed paper?
24    A.  Yes.
25    Q.  You have reviewed the Longo supplemental

Page 32

1  report?
2    A.  Yes.
3    Q.  You've reviewed a chapter of a book by
4  Creasman that was authored by Dr. Brewster; is that
5  right?
6    A.  That's correct.
7    Q.  Is there anything else that you have reviewed
8  and are relying on in preparation for your deposition
9  today and in providing us with your opinions?
10    A.  So all these references here (indicating),
11  I've reviewed.  I believe they're listed as part of an
12  exhibit.
13    Q.  And let's, you know, be as systematic as we
14  can be.
15    Your report, Exhibit 5, has a list of
16  references; is that right?
17    A.  Yes.
18    Q.  What do you intend -- or what is the meaning
19  of the references that appear as pages 11 through 14
20  in your report?
21    A.  Those references support what I quote -- not
22  quotes, but facts that are in my report.  They don't
23  include everything that I used in my consideration of
24  coming to my opinion.
25    Q.  Deposition Exhibit 6 is Exhibit B to your

Page 33

1  report.
2    (Exhibit No. 6 was marked for identification.)
3  BY MR. ZELLERS:
4    Q.  Is that correct?
5    Is Deposition Exhibit B a listing of
6  additional materials considered?
7    A.  Yes, it is.
8    Q.  Did you actually read and consider all of the
9  materials that are cited as Exhibit B to your report?
10    A.  I would say I did not read every word of
11  every paper.  I reviewed them, many times reading the
12  abstract.
13    Q.  Did you read at least the abstract of each of
14  the references contained as Exhibit B to your report,
15  going from page 1 through page 28?
16    A.  I believe so.
17    Q.  Exhibit B is meant to be materials that you
18  considered but are not directly relying on in
19  formulating your opinions; is that fair?
20    MS. O'DELL:  Object to the form.
21    THE WITNESS:  That's fair.
22  BY MR. ZELLERS:
23    Q.  In addition to the references that are
24  attached to your report, Exhibit 5 to the deposition,
25  and Exhibit B, which we've marked as Exhibit 6 to the

Daniel L. Clarke-Pearson, M.D.

Page 34

1  deposition, are there any other materials that you
2  have reviewed and relied upon in formulating the
3  opinions you're going to give today other than the
4  additional materials that we discussed a moment ago?
5      A.  No.
6      Q.  Are there any additional materials that you
7  have reviewed and relied upon since the time of your
8  report other than the materials that have been
9  identified by Ms. O'Dell?
10      A.  No.
11      Q.  Did you bring those additional materials with
12  you in the folders that you have in front of you?
13      Some of them.  I have the Longo updated
14  report, for example.
15      Q.  All right.  I'd like to just mark, so that we
16  have a record of what it is you have reviewed, to the
17  extent there's any ambiguity in the record.  And, for
18  example, I'm looking at --
19      MS. O'DELL:  Mike, excuse me.  Can
20  I just mention one thing?
21      MR. ZELLERS:  Yes.
22      MS. O'DELL:  Because when you were
23  going through your list, I had mentioned before an
24  UpToDate reference.  It's in the stack I think you
25  have in your hand.  But you didn't mention that in

Page 35

1  your sort of questions to Dr. Clarke-Pearson.  So
2  I don't want there to be a misrepresentation --
3      MR. ZELLERS:  Understood.
4      MS. O'DELL:  -- on the -- I didn't mean
5  it that way.  I didn't want there to be a
6  misunderstanding on the record.
7      MR. ZELLERS:  I do understand.
8  I appreciate the clarification.
9  BY MR. ZELLERS:
10      Q.  What I had been given was a clip with the
11  Brewster chapter from the Creasman textbook.  But in
12  addition to what was on top, there is an UpToDate
13  official reprint that states at the top
14  "Evidence-based medicine," and then it lists several
15  authors, the first of which is Arthur T. Evans; is
16  that correct?
17      A.  Yes.
18      Q.  That's an additional set of materials that
19  you have reviewed and relied upon?
20      A.  Yes.
21      Q.  Also in the stack, and something that I did
22  not mention earlier, is "Emerging Themes in
23  Epidemiology, Analytical Perspective."  First author
24  is Fedak.  And this appears to be a 2015 publication.
25      Is that also something that you reviewed and

Page 36

1  you relied upon?
2      A.  Yes, sir.
3      Q.  We'll mark the Brewster chapter as Exhibit 7.
4      (Exhibit No. 7 was marked for identification.)
5      MR. ZELLERS:  We will mark the UpToDate
6  reprint as Exhibit 8.
7      (Exhibit No. 8 was marked for identification.)
8      MR. ZELLERS:  We will mark the Emerging
9  Themes in Epidemiology, 2015, Fedak, as Exhibit 9.
10      (Exhibit No. 9 was marked for identification.)
11  BY MR. ZELLERS:
12      Q.  I'll return these to you, Doctor.
13      Can you show me or provide to me whatever
14  folders you have brought.  I don't need the binders,
15  but just whatever additional materials you have
16  brought with you.
17      (Document was handed to counsel.)
18  BY MR. ZELLERS:
19      Q.  And then it looks like you have IARC
20  monographs; is that right?
21      A.  Yes.
22      Q.  Are those IARC monographs that you have
23  brought with you, is that something that's either on
24  your reference list or your reliance list?
25      A.  I believe it is.

Page 37

1      Q.  Can you just tell us the title of the IARC
2  monograph that you have brought with you?
3      A.  "IARC Monographs on the Evaluation of
4  Carcinogenic Risks to Humans, Volume 93, Carbon Black,
5  Titanium Dioxide, and Talc," dated 2010.
6      Q.  The next set of materials, I'll mark these
7  collectively as Exhibit 10 so we can keep them in the
8  same order that we have brought them with you.
9      (Exhibit No. 10 was marked for identification.)
10  BY MR. ZELLERS:
11      Q.  Exhibit 10, the first page is a listing of
12  handwritten notes.  Can you read just the first line
13  to us.
14      A.  "Exposure IARC 100C page 232."
15      Q.  What does that refer to?
16      A.  I put these together, if I can explain, so
17  that we might facilitate this discussion and be able
18  to find documents a little bit more quickly.
19      Q.  What discussion does Exhibit 10 relate to?
20      A.  Could I see the front of the folder, please?
21      Q.  Sure.
22      A.  It has to do with asbestos and ovarian
23  cancer.
24      Q.  I will re-mark Deposition Exhibit 10.
25  Instead of putting the sticker on your page of

Daniel J. Clarke-Pearson, M.D.

| Page 38 |
| --- |

1 handwritten notes, I'll put it on the outside of the
2 folder, which are your references on asbestos and
3 ovarian cancer; is that right?
4 　　　　MS. O'DELL: Object to the form.
5 　　　　THE WITNESS: They are some of my
6 references.
7 BY MR. ZELLERS:
8 　　Q. These are the references, though, that you
9 chose to bring with you today to be prepared to answer
10 questions that the lawyers may ask?
11 　　　　MS. O'DELL: Object to the form. He
12 brought other references as well.
13 　　　　THE WITNESS: All of these references
14 here are -- also could support the question in that
15 folder about asbestos and ovarian cancer.
16 BY MR. ZELLERS:
17 　　Q. Who prepared the folder "Asbestos on Ovarian
18 Cancer"?
19 　　A. I did.
20 　　Q. Whose notes are the first page of this
21 folder?
22 　　A. That's mine.
23 　　Q. Who chose to include and to write down the
24 references that you did on this piece of paper?
25 　　A. I did.

| Page 39 |
| --- |

1 　　Q. The other exhibits that you have today, the
2 exhibits that we marked, was it -- Exhibit 9, is that
3 the Brewster chapter?
4 　　A. Exhibit 7 is the Brewster chapter.
5 　　Q. Okay, Exhibit 7. Who provided those
6 materials to you?
7 　　A. This is from a textbook in my office.
8 　　Q. Okay. Did you obtain that -- you know, that
9 information?
10 　　A. I'm not quite sure -- so I wrote a chapter
11 for this textbook myself on surgical complications.
12 It's a textbook that's in my office. This particular
13 document, if you will, or reprint from that chapter,
14 I'm not sure if I produced it or counsel did.
15 　　Q. Well, it's clear at the bottom that it was
16 produced by counsel; correct?
17 　　A. Okay.
18 　　Q. There's a notation that Dr. Thompson
19 downloaded that reference back in January of this
20 year; is that right?
21 　　A. I see that, yes.
22 　　Q. Are many of the materials that you've looked
23 at, including those on your reference list, your
24 additional materials-considered list, materials that
25 were provided to you by counsel for the plaintiffs?

| Page 40 |
| --- |

1 　　　　MS. O'DELL: Object to the form.
2 　　　　THE WITNESS: Many of them were
3 reprints that I created, and some were given to me by
4 counsel.
5 BY MR. ZELLERS:
6 　　Q. Are you able -- if we went through your list
7 of references that are attached to your report,
8 Exhibit 5, are you able to tell me easily which ones
9 came from counsel and which ones you may have found on
10 your own?
11 　　A. No, not easily.
12 　　Q. All right. Same question with respect to
13 Exhibit B, this 28 pages of additional materials. Are
14 you able to separate out for us easily what materials
15 came from counsel and what materials you found on your
16 own?
17 　　　　MS. O'DELL: Object to the form.
18 　　　　THE WITNESS: No, I can't.
19 BY MR. ZELLERS:
20 　　Q. The materials that are included in Deposition
21 Exhibit 10, the articles that you list on your sheet
22 of paper and have brought with you, there is a -- it
23 looks like an excerpt from the IARC working group
24 relating to asbestos and different types of asbestos;
25 is that right?

| Page 41 |
| --- |

1 　　A. Yes.
2 　　Q. You're not an expert in asbestos; correct?
3 　　　　MS. O'DELL: Object to the form.
4 　　　　THE WITNESS: It seems like I've become
5 pretty good at it after reading all of this material.
6 BY MR. ZELLERS:
7 　　Q. Well, I understand that. But you do not hold
8 yourself out or consider yourself to be an expert in
9 asbestos; is that right?
10 　　A. I think I've made it part of my job as an
11 expert to become very familiar with the issues
12 regarding asbestos and ovarian cancer.
13 　　Q. Do you consider yourself to be an expert in
14 asbestos?
15 　　A. Can you define "expert," please.
16 　　Q. Sure. Are you an expert in the different
17 types of asbestos: chrysotile, amosite,
18 crocidolite, tremolite, actinolite, and anthophyllite?
19 　　A. I'm aware that there are different types of
20 asbestos.
21 　　Q. Are you an expert in it?
22 　　　　MS. O'DELL: Object to the form.
23 　　　　THE WITNESS: I'm not sure I understand
24 what an expert is.
25

Page 42

1  BY MR. ZELLERS:
2      Q.  You're testifying as an expert gynecologist
3  oncologist in this case; is that right?
4      A.  Yes.
5      Q.  You consider yourself to be an expert in that
6  field; is that right?
7      A.  Of course.
8      Q.  Do you consider yourself to be an expert, to
9  provide expert testimony to the jury, on asbestos and
10  the different forms of asbestos?
11      A.  I think I can testify to the jury what is in
12  the literature and the impact that asbestos has on
13  ovarian cancer risk.
14      Q.  Prior to being retained by Dr. Thompson and
15  Ms. O'Dell, did you have professional experience with
16  asbestos?
17      A.  I'm not sure what you mean by "professional
18  experience."  I don't use it in my practice.
19      Q.  Did you research it?
20      A.  As I said, back in 1975, when I was a
21  resident, there was discussion about asbestos in
22  talcum powder.
23      Q.  Did you consider yourself to be an expert in
24  asbestos before you were retained by Dr. Thompson and
25  Ms. O'Dell?

Page 43

1          MS. O'DELL:  Object to the form.
2          THE WITNESS:  I was aware of issues
3  with asbestos in terms of carcinogenic potential for
4  mesothelioma and ovarian cancer.
5  BY MR. ZELLERS:
6      Q.  Is that a yes, you considered yourself to be
7  an expert in asbestos prior to being retained in this
8  matter?
9          MS. O'DELL:  Object to the form.
10  I think he stated he was an expert in the health
11  effects.
12          MR. ZELLERS:  The doctor can answer the
13  questions.
14          MS. O'DELL:  He did answer the
15  question.
16          THE WITNESS:  That's what I was trying
17  to say.  It was the health effects, carcinogenic
18  potential of asbestos in talcum powder and other
19  industrial exposures.
20  BY MR. ZELLERS:
21      Q.  Are you familiar with at least what the
22  different types of claimed asbestos is in talcum
23  powder?
24      A.  Yes.
25      Q.  And are you familiar with the health effects

Page 44

1  or alleged health effects of those different types of
2  asbestos?
3      A.  Yes.
4      Q.  Did you consider yourself to be an expert in
5  asbestos prior to being retained in this litigation in
6  2017?
7          MS. O'DELL:  Objection.  Asked and
8  answered.
9          THE WITNESS:  I don't know when
10  I morphed into feeling I knew more about asbestos than
11  I did in 1975.
12  BY MR. ZELLERS:
13      Q.  Your -- the -- strike that.
14          What gives you expertise, in your view, as
15  an expert in asbestos is the reading that you have
16  done since being retained in this matter; is that
17  right?
18          MS. O'DELL:  Objection to the form.
19  Misstates his testimony.
20          THE WITNESS:  The knowledge that I've
21  gained over time, including during this preparation
22  for this deposition and my report.
23  BY MR. ZELLERS:
24      Q.  When you were contacted by Dr. Thompson, did
25  you consider yourself to be an expert in asbestos at

Page 45

1  that time?
2          MS. O'DELL:  Object to the form.
3          THE WITNESS:  Again, I've told you what
4  I knew about asbestos at that time, and I've learned
5  more since then.
6  BY MR. ZELLERS:
7      Q.  Can you answer my question?
8          Did you consider yourself to be an expert in
9  asbestos when you were first contacted by
10  Dr. Thompson?
11      A.  Again, I'm stuck with what -- how you define
12  asbestos -- how you define an expert.
13      Q.  You're expert who -- an expert is someone
14  who has a special expertise in a matter that peers
15  would look to as a person and a resource.
16          Do people look to you as a resource on
17  asbestos?
18      A.  People looked to me for a long time with
19  regard to -- as a resource with regard to asbestos and
20  its effects on the female genital tract and ovarian
21  cancer.
22      Q.  So that's a yes, people have come to you for
23  some number of years as an expert on asbestos?
24      A.  Patients have.
25          MS. O'DELL:  Object to the form.  It

Daniel J. Clarke-Pearson, M.D.

Page 46

1  misstates his testimony.
2         MR. ZELLERS:  Well, I'm trying to get
3  an answer to my question.
4         MS. O'DELL:  I think he answered your
5  question.
6         THE WITNESS:  Patients have come to me
7  as an expert in this topic as it relates to their
8  health.
9  BY MR. ZELLERS:
10     Q.  How about your peers?  Do your peers come to
11  you as an expert in asbestos at any time?
12     A.  I have different groups of peers.  My
13  gynecologic oncology colleagues, I don't think I'm any
14  more of an expert than they are.
15        On the other hand, a general obstetrician
16  and gynecologist, an internist, a family medicine
17  physician, a pediatrician would consider me an expert.
18     Q.  And that -- so my question very simply is do
19  your peers come to you as an expert in asbestos?
20        MS. O'DELL:  Object to the form.  Asked
21  and answered.
22        THE WITNESS:  I have lots of different
23  levels of peers, is what I was trying to describe.
24  BY MR. ZELLERS:
25     Q.  The second article that you brought and

Page 47

1  placed in your "Asbestos Ovarian Cancer" folder is an
2  article by Reid.  States at the top, published online
3  first May 24, 2011, in Cancer Epidemiology,
4  "Biomarkers & Prevention"; is that right?
5     A.  Yes.
6     Q.  The third article is "Occupational Exposure
7  to Asbestos and Ovarian Cancer."  This is a paper with
8  the first author of Camargo.  It appears that it was
9  published in Environmental Health Perspectives,
10  September 2011; is that right?
11     A.  Yes.
12     Q.  The last paper that you included in your
13  folder was an article on ovarian cancer and asbestos,
14  first named author Graham.  It was received -- is this
15  1967?
16     A.  Yes, sir.
17     Q.  You brought with you, which we will mark as
18  Exhibit 11, a folder captioned "EPI."  Is that right?
19     A.  Yes.
20     (Exhibit No. 11 was marked for identification.)
21  BY MR. ZELLERS:
22     Q.  The first page, are these your notes to help
23  you in terms of answering my questions relating to the
24  epidemiology of ovarian cancer and talcum powder?
25     A.  Yes, sir.

Page 48

1     Q.  Did you prepare these notes?
2     A.  Yes.
3     Q.  First paper you list here is -- or have
4  brought with you included in this folder and
5  highlighted is Gates, which was published
6  November 12th of 2009; is that right?
7     A.  Yes.
8     Q.  You also have brought a paper, HHS Public
9  Access, "Douching, Talc Use," Epidemiology, 2016.
10  First author is Gonzalez; is that right?
11     A.  Yes, sir.
12     Q.  Then you have another collection of materials
13  with some additional handwritten notes, also in what
14  we have marked as Exhibit 11, your "EPI" folder.  And
15  at the top of your handwritten notes, which appear on
16  two Post-its, it's "Penninkilampi."
17        That is a study that you have written down
18  along with some other notes, and you have brought that
19  with you in your folder; is that right?
20     A.  Yes.
21     Q.  You have brought the Berge paper, dated
22  May 18, 2018, European Journal of Cancer Prevention.
23  You have that in your folder; correct?
24     A.  Yes.
25     Q.  You have the Langseth paper that was accepted

Page 49

1  for -- well, strike that -- that was published in
2  Journal of Epidemiol. Community Health, 2008; is that
3  right?
4     A.  Yes.
5     Q.  And then finally, you have in your folder the
6  Taher -- T-A-H-E-R -- paper, which appears to be -- is
7  this a 2018 or 2019 paper, if you know?
8     A.  I don't know.
9     Q.  Was the Taher paper something that was
10  provided to you by counsel for the plaintiffs?
11     A.  Yes.
12     Q.  Was the Health Canada assessment something
13  that was provided to you by counsel for plaintiffs?
14     A.  Yes.
15     Q.  You've got a folder on animals with a couple
16  of very brief notes.  We've marked your folder on
17  animals as Exhibit 12.
18     (Exhibit No. 12 was marked for identification.)
19  BY MR. ZELLERS:
20     Q.  First paper we have is the Keskin article
21  from Gynecologic Obstetrics, 2009.  Keskin is spelled
22  K-E-S-K-I-N.  Is that right?
23     A.  Yes, the spelling's correct.
24     Q.  The next paper is the Hamilton paper.  It
25  looks like it was published in 1984.  The other

Daniel L. Clarke-Pearson, M.D.

---

Page 50

1  authors are Fox, Buckley, Henderson, and Griffiths.
2  It was received for publication in 1983.
3      Is that right?
4      A.  Yes.
5      Q.  Are these studies that you found, these
6  animal studies, or are these studies that were
7  provided to you by counsel for the plaintiffs?
8          MS. O'DELL:  Object to the form.
9          THE WITNESS:  I think it's some of
10  both.
11  BY MR. ZELLERS:
12      Q.  Well, there's only two that are here.  So did
13  you find and review the Keskin paper?
14      A.  I found it and reviewed it, yes.
15      Q.  Not provided to you by counsel; is that
16  right?
17      A.  Can I see them both?
18      Q.  Sure.  Of course.
19      (Document was handed to the witness.)
20          THE WITNESS:  I think I printed this
21  online, off of PubMed.
22  BY MR. ZELLERS:
23      Q.  And my question is a little different.
24      Are these articles that you were made aware
25  of by plaintiffs' counsel, or are these articles that

---

Page 51

1  you found in any research that you did after being
2  retained in this matter?
3      A.  I understand your question.
4      Yes, I researched and found these as I did
5  my PubMed search.
6      Q.  All right.  Latency, Exhibit 13.
7      (Exhibit No. 13 was marked for identification.)
8  BY MR. ZELLERS:
9      Q.  You've got a couple of handwritten notes,
10  just a couple of articles in here.  One is "The
11  latency period of mesothelioma among a cohort of
12  British asbestos workers (1978-2005)"; and also
13  "Latency Period for Malignant Mesothelioma" by
14  Dr. Lanphear, which is dated -- well, we'll have to
15  just let the record -- it was uploaded in 2016 by the
16  author.
17      Are these materials that you found in your
18  search and have put together, or are these articles
19  that were provided to you by counsel?
20          MS. O'DELL:  Object to the form.
21          THE WITNESS:  May I see that again?
22  BY MR. ZELLERS:
23      Q.  Sure.
24      (Document was handed to the witness.)
25          THE WITNESS:  I believe these are both

---

Page 52

1  articles that I identified in my literature search.
2  BY MR. ZELLERS:
3      Q.  Did you find any articles on the latency
4  period of ovarian cancer in women?
5      A.  The latency at the time of exposure to
6  asbestos or talcum powder?
7      Q.  Yes.
8      A.  I think it's clear that there has to be a
9  latency period, and it's probably very parallel, in my
10  opinion, to the latency period for mesothelioma and
11  many other cancers that requires decades of exposure
12  before one develops ovarian cancer.
13      Q.  Can you be any more precise than "decades of
14  exposure"?
15          MS. O'DELL:  Object to the form.
16          THE WITNESS:  No more precise than
17  these papers that talk about the latency for
18  mesothelioma --
19  BY MR. ZELLERS:
20      Q.  You believe --
21      A.  -- which run the gamut from 22 to 32 years in
22  one paper and 20 to 40 years in another paper.
23      Q.  You believe that the latency period for
24  ovarian cancer is the same as the latency period for
25  mesothelioma; is that right?

---

Page 53

1          MS. O'DELL:  Object to the form.
2          THE WITNESS:  I believe it should be
3  very close.
4  ///
5  ///
6      (Exhibit No. 14 was marked for identification.)
7  BY MR. ZELLERS:
8      Q.  The last folder that you brought with you is
9  the -- is titled or captioned "Asbestos Fibers Talc
10  Longo, etc."
11      Is this also a folder that you prepared?
12      A.  Yes, sir.
13      Q.  You've got a number of handwritten notes and
14  calculations here; is that right?
15          MS. O'DELL:  Object to the form.
16          THE WITNESS:  I'm not sure it's
17  calculations.  It's notes taken from the papers.
18  BY MR. ZELLERS:
19      Q.  You cite and have brought with you a report,
20  Longo, January 15th, 2019.
21      Is that the updated report that was referred
22  to earlier?
23      A.  That's my understanding.
24      Q.  You've got, looks like, an exhibit from the
25  Hopkins deposition; is that right?

---

Daniel L. Clarke-Pearson, M.D.

Page 54

1    A.  Yes.
2    Q.  You have an article by Blount, "Amphibole
3  Asbestos in Vermont Talc"; is that correct?
4    A.  Yes.
5    Q.  That's got an Imerys Bates number on it.
6      Is that where you obtained that document?
7      MS. O'DELL:  Object to the form.
8      THE WITNESS:  I obtained it from
9  counsel.
10 BY MR. ZELLERS
11   Q.  And then you also have the Pier deposition
12 exhibit in your folder; is that right?
13   A.  Yes.
14   Q.  Have we now identified all of the materials
15 that you have reviewed and relied upon in formulating
16 your opinions in this matter?
17   A.  Above and beyond these folders, the other
18 folders that we have here are included in my reliance.
19   Q.  Your reliance list and your reference list;
20 is that right?
21   A.  Yes.
22   Q.  Exhibit A, just so we are complete here, is
23 your CV, or curriculum vitae, as of the time that your
24 report was published; is that right?
25   (Exhibit No. 15 was marked for identification.)

Page 55

1  BY MR. ZELLERS:
2    Q.  And your report was published or provided and
3  signed in November of 2018?
4      And that's too many questions in one.
5      You attached an exhibit, Exhibit A, to your
6  report, which we have marked as Exhibit 5; is that
7  right?
8      MS. O'DELL:  Is it -- Exhibit 15 is
9  the --
10     MR. ZELLERS:  So Exhibit 15 is --
11 Deposition Exhibit 15 is a copy of Exhibit A to
12 Dr. Clarke-Pearson's report, which we marked as
13 Exhibit 5.
14 BY MR. ZELLERS:
15   Q.  Number one, is that correct?  Is this your
16 CV?
17   A.  This is my CV at the time my report was
18 submitted.
19   Q.  Is there a date on this curriculum vitae?
20   A.  I don't believe so.
21   Q.  Was it accurate and complete as of November
22 of 2018?
23   A.  I'm just checking to see what my most recent
24 reference was in here.  I try to keep it up to date.
25     Yes, I believe it was correct at the time

Page 56

1  that this was submitted in November 2018.
2    Q.  Are there any updates to your curriculum
3  vitae that you believe in any way are relevant to the
4  opinions you're giving here today?
5    A.  I understand.  No, there's no -- nothing
6  relevant to add.
7    Q.  I did not tell you at the beginning, but if
8  at any time you need to take a break and get up and
9  stretch, just tell me and we'll do that.
10   A.  Okay.
11     MR. ZELLERS:  Same goes for you as
12 well, Counsel.
13     MS. O'DELL:  Thank you.
14 BY MR. ZELLERS:
15   Q.  Did anyone assist you with your review and
16 research and preparation of your report in this matter
17 other than counsel?
18   A.  No, sir.
19   Q.  You were able to do the research that you
20 felt you needed to do to answer the questions that
21 were posed to you by counsel for the plaintiffs within
22 the 20 hours that are identified in your invoice,
23 Exhibit 2, between April 17th of 2017 and
24 November 4th of 2018?
25   A.  That's what I billed for.  As I sort of

Page 57

1  indicated earlier, I'm not very diligent on marking
2  down every minute or every hour that I spend.  So
3  that's what I billed for.  It's close to what time
4  I spent.
5    Q.  That's your best estimate of the time that
6  you had spent on this matter through the preparation
7  of your report, which we marked as Exhibit 5; is that
8  right?
9    A.  That's correct.
10   Q.  When were you first asked to prepare a
11 report?
12   A.  I'm not sure I can answer that question.  It
13 was obviously after I'd been retained and after I'd
14 had the opportunity to review materials to be able to
15 formulate an opinion.
16   Q.  Other than Ms. O'Dell and Dr. Thompson, what
17 other attorneys for the plaintiffs in the MDL talcum
18 powder litigation have you met with or communicated
19 with?
20   A.  I met Ms. Brown yesterday for the first time.
21   Q.  Anyone else?
22   A.  No, sir.
23   Q.  Do the -- strike that.
24     Does your invoice, Exhibit 2, approximate
25 the meetings and discussions that you had with

Daniel Clarke-Pearson, M.D.

Page 58

1 Dr. Thompson and Ms. O'Dell up and through the
2 production of your report in November of 2018?
3        MS. O'DELL: Objection. Form.
4        THE WITNESS: I believe so.
5 BY MR. ZELLERS:
6     Q. Since then, what other time have you spent
7 with the attorneys for plaintiffs relating to this
8 matter?
9     A. I've had one meeting, I believe in early
10 January, for an hour and a half or two --
11     Q. Was that an in-person meeting or --
12     A. Yes, it was in person.
13     Q. Was that here in Chapel Hill?
14     A. Yes.
15     Q. Was that with Ms. O'Dell and Dr. Thompson?
16     A. Yes.
17     Q. Anyone else?
18     A. No.
19     Q. Any other meetings that you've had with
20 counsel preparing for your deposition?
21     A. This past Saturday and Sunday.
22     Q. Did you meet with the three plaintiffs'
23 counsel who are here today?
24     A. Ms. O'Dell and Dr. Thompson on Saturday, and
25 Ms. Brown joined us on Sunday.

Page 59

1     Q. What amount of time did you spend, total, on
2 Saturday and Sunday with counsel preparing for the
3 deposition?
4     A. I'd estimate probably four to five hours on
5 Saturday and about five to six hours on Sunday.
6     Q. Anything else you did to prepare for your
7 deposition?
8     A. I reviewed a lot of materials here to be
9 really fresh on it. That's why you see these folders.
10     Q. Anything else you did to prepare for your
11 deposition?
12     A. I'm not sure I understand what else I might
13 do.
14     Q. Did you talk to anyone other than counsel for
15 plaintiffs?
16     A. I see. No, I didn't.
17     Q. Did you speak to any of your colleagues about
18 this?
19     A. No, sir.
20     Q. The total amount of time that you've spent,
21 you would approximate to be the 20 hours that are
22 reflected on Exhibit 2, plus an additional 60 hours up
23 until today when we started your deposition?
24     A. That would be my approximation, yes.
25     Q. Have you been retained in any other talcum

Page 60

1 powder proceeding, aside from the talcum powder MDL?
2     A. No.
3     Q. What percent of your professional time do you
4 spend working as a consultant?
5     A. With regard to medicolegal expert witness
6 work?
7     Q. Yes.
8     A. What percent? I'd say probably 5 percent in
9 this past year, less than that in the preceding
10 several years.
11     Q. What percent of your income is from
12 consulting on litigation matters?
13     A. None of my income.
14     Q. You receive no income as an expert witness
15 consultant on litigation?
16     A. No.
17     Q. Where does the money that you're billing for
18 your services as an expert witness in this case go?
19     A. The rules that we have at University of North
20 Carolina is that any revenue, if you will, from expert
21 witness work is considered clinical revenue and is
22 sent to the practice plan.
23     Q. Does your income, at least in part -- is it
24 determined by the income you bring into the
25 university?

Page 61

1     A. The compensation plan doesn't account for the
2 income we bring in.
3     Q. Your testimony is that doesn't matter what
4 grants you may bring in, it doesn't matter what expert
5 witness consulting you may do or what income you may
6 generate, it has no effect on your compensation; is
7 that right?
8        MS. O'DELL: Object to the form.
9        THE WITNESS: The Department of
10 Obstetrics & Gynecology at the University of North
11 Carolina, of which I'm the chair, the compensation
12 plan, the base salary is based on the AAMC median
13 income based on subspecialty.
14        So a maternal-fetal medicine physician,
15 based on their rank -- assistant, associate, and full
16 professor -- has a different median income than does a
17 gynecologic oncologist, but it's pegged to national
18 standards.
19 BY MR. ZELLERS:
20     Q. Is there any type of bonus or additional
21 compensation that someone in your department,
22 including yourself, can earn?
23     A. Yes.
24     Q. How or what are the factors in terms of bonus
25 compensation or additional compensation?

Daniel H. Clarke-Pearson, M.D.

Page 62

1    A.  Clinical relative value units that are
2  generated by a faculty member that exceed the
3  60th percentile are then attributed to that faculty
4  member.  The percent of the number of faculty members'
5  RVUs that are generated as a whole are then divided
6  out amongst the pot of money, if you will, that's
7  available for incentive distribution.  And that amount
8  of money depends upon the department's overall
9  financial status.
10    Q.  Do grants that are brought into the
11  university by members of your department have any
12  impact or part in this incentive distribution
13  calculation?
14    A.  Yes.
15    Q.  Do -- or strike that.
16        Does any income from litigation consulting
17  have a part in this incentive distribution?
18    A.  No.
19    Q.  Are you -- you are in charge of the
20  department; is that right?
21    A.  I'm the chair of the department.
22    Q.  Do you have to balance the books in terms of
23  money in and money out?
24    A.  Yes, sir.
25    Q.  Does income that you generate from litigation

Page 63

1  consulting help you balance the books of the
2  department?
3    A.  Yes.
4    Q.  The Deposition Exhibit 3, your list of
5  testimony that you've given in the past five years, is
6  that now accurate and complete?
7    A.  Yes, sir.
8    Q.  Have all of the testimonies you've given that
9  are listed on Exhibit 3, are those all deposition
10  testimony?  Or have you testified at trial?
11    A.  Let me take a look at them.
12        The Edmonson and Lee, I testified at trial.
13  Rappaport, I testified at trial.  Pizzirusso, I
14  testified at trial.  The latter two that I -- are just
15  depositions.
16    Q.  Is it accurate you did not give deposition
17  testimony in Edmonson, Rappaport, and Pizzirusso?
18    A.  No, that's not accurate.
19    Q.  Well, should those depositions also be
20  included in this list of testimonies?
21    A.  I don't know exactly what you asked for.
22  I -- this is either depositions or testimony that
23  I made in court.
24    Q.  Did you give a deposition in Edmonson in the
25  past five years?

Page 64

1    A.  Yes.
2    Q.  Is that included in the disclosure that was
3  given to us today, Exhibit 3?
4    A.  I considered it as deposition and trial
5  testimony.
6    Q.  So there were two testimonies, both of which
7  you gave on December 12th of 2014; is that right?
8    A.  No.  That was probably when we submitted our
9  invoice.  I got this information from my billing
10  department.
11    Q.  So Edmonson really should be two testimonies;
12  is that right?
13    A.  Yes.  Deposition --
14    Q.  And the deposition --
15    A.  A deposition and trial testimony.
16    Q.  And the date you've given here relates to
17  your invoice, not to when you provided the testimony?
18    A.  I believe so.
19    Q.  And the same answer with respect to
20  Rappaport.  The date on Exhibit 3 doesn't relate to
21  when you provided the testimony; is that right?
22    A.  That's right.  And I had a deposition and
23  trial.
24    Q.  And, lastly, with respect to the Pizzirusso
25  matter, the date doesn't relate to when you provided

Page 65

1  the testimony; correct?
2    A.  That's correct.
3    Q.  And it was actually a deposition and trial
4  testimony in those matters; is that right?
5    A.  Yes.
6    Q.  Have you ever been retained in a case
7  involving asbestos?
8    A.  No.
9    Q.  Have you ever been retained in a case
10  involving cosmetic products?
11    A.  No, sir.
12    Q.  Did you review any of the expert reports of
13  the other experts that have been retained by the
14  plaintiffs in the MDL talcum powder litigation?
15        MS. O'DELL:  Other than Dr. Longo,
16  which he's testified to.
17        MR. ZELLERS:  I'd like to hear it from
18  the doctor, but, yes, other than Dr. Longo.
19        THE WITNESS:  I've read a lot of
20  things.  Not many reports, so I don't recall exactly
21  if I -- may I ask counsel, since we've been working?
22  BY MR. ZELLERS:
23    Q.  Well, no, because I really want it to be your
24  testimony.  If you don't understand -- and I should
25  have told you this up front.  If you have to guess or

Daniel L. Clarke-Pearson, M.D.

| Page 66 | Page 68 |
|---|---|
| 1 speculate to answer my question, tell me you can't<br>2 answer it because it would call for a guess or<br>3 speculation.<br>4     A. Okay. I can't answer that.<br>5     Q. You don't recall, as you sit here, other than<br>6 Dr. Longo's updated report, reviewing any other expert<br>7 reports in this litigation; correct?<br>8     MS. O'DELL: Object to the form.<br>9     THE WITNESS: I reviewed Dr. Longo's<br>10 original report and now the updated report.<br>11 BY MR. ZELLERS:<br>12     Q. Other than those reports, at least as you sit<br>13 here, you don't have a memory of reviewing other<br>14 expert reports in this matter; is that right?<br>15     A. I don't recall.<br>16     Q. Do you recall reviewing any defense expert --<br>17 or strike that.<br>18     Do you recall reviewing any other expert<br>19 reports in any talcum powder litigation other than the<br>20 MDL?<br>21     A. No.<br>22     Q. Have you communicated about the litigation --<br>23 the MDL talcum powder litigation -- with anyone other<br>24 than plaintiffs' counsel?<br>25     A. I'm required to communicate that to the | 1     A. Sometime after I formed my opinion. I'm not<br>2 sure. I'm in communication with Dr. Rice quite often.<br>3 She's a friend of mine.<br>4     Q. Was it before or after you prepared your<br>5 report --<br>6     A. It was after my report.<br>7     Q. So sometime after November --<br>8     A. 16th.<br>9     Q. -- 16th of 2018; is that right?<br>10     A. Yes.<br>11     Q. Any other communication you've had with<br>12 anyone other than counsel for plaintiffs regarding<br>13 your opinion that talc is a cause of ovarian cancer?<br>14     A. No.<br>15     Q. Have you reviewed any deposition or trial<br>16 testimony from any of the talcum powder cases?<br>17     A. Yes. I'm blanking on her name. The GYN<br>18 oncologist, Judy -- one of the experts on the<br>19 plaintiffs' side that --<br>20     Q. Judy Wolf?<br>21     A. Yeah, Judy Wolf.<br>22     Q. Do you know Dr. Wolf?<br>23     A. I've met her once.<br>24     Q. Have you had any discussions with her about<br>25 the subject matter of your opinions in this case with |

| Page 67 | Page 69 |
|---|---|
| 1 hospital counsel, and I have.<br>2     Q. Who is the hospital counsel?<br>3     A. Her name is Glenn -- G-L-E-N-N -- George.<br>4     Q. Does she work for the university directly or<br>5 is she in private practice, if you know?<br>6     A. She works for the University of North<br>7 Carolina Hospital as the head counsel.<br>8     Q. Have you communicated about talc as a cause<br>9 of ovarian cancer with anyone other than the<br>10 plaintiffs' counsel?<br>11     A. As it regards to this case?<br>12     Q. Yes, as it regards to this case and your<br>13 opinion that talcum powder used in the perineal region<br>14 by women is a cause of ovarian cancer.<br>15     A. I've communicated to the immediate past<br>16 president of the Society of Gynecologic Oncology that<br>17 I think that they should investigate and offer a<br>18 committee opinion on the topic.<br>19     Q. Who is the -- past president you said you<br>20 communicated with?<br>21     A. Past president.<br>22     Q. Who is that?<br>23     A. Her name is Laurel Rice, R-I-C-E.<br>24     Q. When did you have that communication with<br>25 Dr. Rice? | 1 Dr. Wolf?<br>2     A. I've had no communication with Dr. Wolf<br>3 whatsoever.<br>4     Q. You reviewed her deposition transcript in<br>5 preparation for today; correct?<br>6     A. Yes.<br>7     Q. Any other deposition transcripts or trial<br>8 transcripts in the talcum powder litigation or any<br>9 talcum powder case that you have reviewed?<br>10     A. Reviewed -- I can't remember the name --<br>11 Pinkerton, maybe. It was a toxicologist that had a<br>12 deposition.<br>13     Q. Do you remember the name or do you -- did you<br>14 know this toxicologist?<br>15     A. I don't know the toxicologist. I think the<br>16 name was Pinkerton.<br>17     Q. Any other deposition transcripts or trial<br>18 transcripts that you have reviewed?<br>19     A. No, sir.<br>20     Q. Were the transcripts of Dr. Wolf and<br>21 Pinkerton, the toxicologist, provided to you by<br>22 counsel for the plaintiffs?<br>23     A. Yes.<br>24     Q. Did you request any information or material<br>25 from counsel for the plaintiffs that was not provided |

Daniel L. Clarke-Pearson, M.D.

Page 70

1 to you?

2    A. No. I think everything was provided to me
3 that I requested.

4    Q. In your report and in one of your file
5 folders, you have exhibits from the deposition of John
6 Hopkins. And let me rephrase that. You have an
7 exhibit from a witness by the name of John Hopkins.
8 Are you aware of that?

9    A. Yes.

10    Q. Who is Mr. Hopkins?

11    A. I've been -- it's my understanding -- and
12 I may be wrong -- that he is a former employee of
13 Johnson & Johnson.

14    Q. Do you know what he did for Johnson &
15 Johnson?

16    A. I believe somehow he was involved with
17 testing of talcum powder to evaluate for products such
18 as fibrous talc and asbestos.

19    Q. Do you know anything else that Mr. Tom --
20 Mr. Hopkins did for Johnson & Johnson?

21    A. No.

22    Q. Did you review or read his deposition?

23    A. I did not.

24    Q. Do you know who Julie Pier is?

25    A. Vaguely.

Page 71

1    Q. Who is Julie Pier?

2    A. My understanding is that she has also done
3 testing on Johnson & Johnson products.

4    Q. Do you know where she works or by whom she is
5 employed?

6    A. No.

7    Q. Did you read her deposition transcript?

8    A. No.

9    Q. Have you reviewed any other exhibits to the
10 deposition of John Hopkins?

11    A. No, sir.

12    Q. Have you reviewed any other exhibits to the
13 deposition of Julie Pier?

14    A. No.

15    Q. Is it your practice outside of litigation to
16 rely on isolated exhibits from deposition testimony?

17         MS. O'DELL: Object to the form.

18         THE WITNESS: I think sometimes if
19 they're meaningful, yes.

20 BY MR. ZELLERS:

21    Q. Have you ever, in any of the peer-reviewed
22 publications that are listed in Exhibit A, cited to
23 isolated exhibits from deposition testimony of
24 depositions that you didn't read?

25         MS. O'DELL: Object to the form.

Page 72

1         THE WITNESS: I'm sorry. You're asking
2 me about peer-reviewed publications?

3 BY MR. ZELLERS:

4    Q. Yes, and whether or not you have ever relied
5 upon isolated exhibits provided to you by counsel from
6 depositions that you have never read as support for
7 any of your peer-reviewed publications.

8    A. In a peer-reviewed publication, one on
9 occasion will cite a personal communication from a
10 colleague or an expert.

11    Q. Can you answer my question?

12    A. "In a peer-reviewed publication, one on
13 occasion will cite a personal communication" -- okay.
14 So your question was -- all right.

15         So in my peer-reviewed publications, I would
16 say the answer is no.

17    Q. What is the difference between the references
18 which are at the end of your report that we marked as
19 Exhibit 5 and the list of additional materials which
20 we marked as Deposition Exhibit 6 and you included as
21 Exhibit B to your report?

22    A. Those are additional materials that
23 I reviewed in formulating my opinion, but I felt that
24 they didn't need to be included in my report.

25    Q. Were the references that you listed in your

Page 73

1 report, Exhibit 5, the key primary materials that
2 you're relying on?

3         MS. O'DELL: Object to the form.

4         THE WITNESS: I think that's fair to
5 say, yes.

6 BY MR. ZELLERS:

7    Q. If you go to Exhibit 6 -- could you find that
8 in front of you. This, again, is Exhibit B to your
9 report. Go to page 11.

10         And you see, starting at the bottom of page
11 11 carried over to page 12, there are a number of
12 documents that begin with "Imerys" and then have a
13 number following them.

14         Do you see that?

15    A. Yes.

16    Q. Did you rely on those documents in forming
17 your opinions?

18    A. I reviewed them.

19    Q. Can you identify for us here what those
20 documents are?

21    A. I would have to go to the books to review
22 them.

23    Q. Do you know how those documents were
24 compiled?

25    A. They were supplied by counsel.

Daniel L. Clarke-Pearson, M.D.

Page 74

1    Q.  Turning to page 13, there's a series of
2    documents that begin with "J&J" followed by numbers.
3        Do you see that?
4    A.  Yes.
5    Q.  Did you rely on those documents in forming
6    your opinions?
7    A.  I reviewed them, and they probably served as
8    part of my overall opinion; but I'm not referencing
9    them per se in my report.
10   Q.  Can you identify or tell us what those
11   documents are?
12   A.  These were internal documents from J&J.
13   I don't recall specifically what each one of these
14   numbers represent.
15   Q.  Do you know how they were compiled?
16   A.  They were provided to me by counsel.
17   Q.  Plaintiffs' counsel provided you with these
18   select company documents that you have identified in
19   your additional materials list; is that right?
20   A.  Yes.
21       MS. O'DELL:  Object to the form.
22   BY MR. ZELLERS:
23   Q.  Were you provided with any documents of
24   either Imerys or J&J by counsel for plaintiffs that
25   you did not include or list in your additional

Page 75

1    materials-considered list?
2    A.  No.  I believe I've listed everything that we
3    saw.
4    Q.  Based upon -- well, strike that.
5        Did you review each of these documents of
6    Imerys and J&J that are identified in your
7    materials-reviewed list?
8        MS. O'DELL:  Objection.  Asked and
9    answered.
10       THE WITNESS:  Yes.
11   BY MR. ZELLERS:
12   Q.  Based upon that review, did you ask
13   plaintiffs' counsel if there were any additional
14   documents or documents that might put in context the
15   documents that were selected by plaintiffs' counsel
16   for you to review?
17       MS. O'DELL:  Object to the form.
18       THE WITNESS:  No, I didn't ask for
19   that.
20   BY MR. ZELLERS:
21   Q.  Outside of your work in litigation, do you,
22   with respect to your scientific publications and work,
23   rely on small subsets of internal company documents?
24       MS. O'DELL:  Object to the form.
25       THE WITNESS:  I believe this is the

Page 76

1    first time I've been shown internal documents in a
2    litigation.
3    BY MR. ZELLERS:
4    Q.  Do you have any knowledge as to what
5    percentage of the internal documents that have been
6    produced in this litigation were actually provided to
7    you and appear in your materials-considered list,
8    Exhibit 6 to this deposition?
9        MS. O'DELL:  Object to the form.
10       THE WITNESS:  I do not.
11   BY MR. ZELLERS:
12   Q.  Is it fair to say, Dr. Clarke-Pearson, that
13   the only company documents that you reviewed -- either
14   Imerys or Johnson & Johnson -- are the ones that were
15   hand-selected by plaintiffs' lawyers and provided to
16   you?
17   A.  Yes, that's fair to say.
18   Q.  Do you agree, based upon your experience and
19   the studies that you've reviewed, that most women who
20   used talcum powder in their perineal region begin that
21   use before age 30?
22       MS. O'DELL:  Object to the form.
23       THE WITNESS:  I believe that's
24   reasonable.  I'm not aware of any data that
25   specifically says that.

Page 77

1    BY MR. ZELLERS:
2    Q.  Well, the Cramer 2016 paper actually goes
3    through and lists out the age for the folks that were
4    included in that study first used genital powder.  Is
5    that generally familiar to you?
6    A.  I can pull the paper if we're going to need
7    to discuss it more, but...
8    Q.  Well, my question is -- and you can decide if
9    you need to pull the paper.  But do you agree that,
10   based upon your review of the literature, your
11   personal experience, that the vast majority of women
12   who use talcum powder in their perineal region begin
13   that use before the age of 30?
14       If you need to take a look at the Cramer
15   paper, go to page 336.  This is Cramer 2016, Table 1.
16   A.  So --
17   Q.  I think it's a simple question --
18   A.  Probably so.
19       So can you restate the question?  I've lost
20   it on the screen.
21   Q.  Sure.
22       Do you agree that most women who use talcum
23   powder in their perineal region begin that use before
24   age 30?
25   A.  Yes.

Daniel L. Clarke-Pearson, M.D.

| Page 78 | Page 80 |
|---|---|

**Page 78**

1    Q. Do you agree that, on average, women who use
2  talcum powder in their perineal region continue that
3  use for over 20 years?
4    A. Yes.
5    Q. It's your opinion that talcum powder causes
6  ovarian cancer; is that right?
7    A. Yes, sir.
8    Q. What are the other causes of ovarian cancer?
9    A. We can talk about risk factors --
10    Q. No, I don't want to talk about risk factors.
11  You have identified talcum powder as a causative
12  factor in ovarian cancer; is that right?
13    A. Right.
14    Q. That's different than being a risk factor for
15  ovarian cancer; is that right?
16      MS. O'DELL: Object to the form.
17      THE WITNESS: I'm not sure that's true.
18  BY MR. ZELLERS:
19    Q. Well, is it your opinion that ovarian cancer
20  is caused by talcum powder or that talcum powder is a
21  risk factor for ovarian cancer?
22    A. Ovarian cancer is caused by talcum powder.
23    Q. What other causes of ovarian cancer are
24  there, in your opinion?
25    A. Fair enough.

**Page 79**

1      Age, lack of exposure to birth control
2  pills, lack of being pregnant -- so nulliparity --
3  obesity, women that have had pelvic inflammatory
4  disease, women who use a nonhormonal-producing
5  intrauterine device, women who have gene mutations for
6  BRCA1, 2, or Lynch syndrome.
7      There are probably others; but, off the top
8  of my head, I think that's a fairly complete list.
9    Q. Each of the items that you have mentioned, in
10  your opinion, those are causes of ovarian cancer; is
11  that right?
12    A. Yes.
13    Q. What is the difference between a risk factor
14  and a cause?
15    A. They're virtually the same. A risk factor
16  describes a cause. It does not affect every woman
17  that has that risk factor.
18    Q. Is that true for all of the risk factors that
19  you just identified?
20    A. Yes.
21    Q. Is that true for talcum powder?
22    A. Yes.
23    Q. What makes a factor cross the line from being
24  a risk factor to being a cause?
25    A. Well, I think that the risk factor is the

**Page 80**

1  cause, but the cause doesn't -- but the risk factor
2  doesn't cause the cancer in every instance.
3    Q. Talcum powder is a risk factor for ovarian
4  cancer; is that right?
5    A. And it causes ovarian cancer.
6    Q. Every factor that you identified for us --
7  age, pelvic inflammatory disease, obesity -- those are
8  all risk factors for ovarian cancer and, in your
9  opinion, causes of ovarian cancer; is that right?
10    A. Yes.
11    Q. If a study shows a statistically significant
12  relationship between a risk factor and a disease, is
13  that enough for the factor to be classified as a
14  cause?
15    A. In my opinion, yes.
16    Q. Just takes one study; is that right?
17      MS. O'DELL: Object to the form.
18      THE WITNESS: No. Now we're talking
19  about the totality of the evidence, and nearly all of
20  those -- all those risk factors that I described to
21  you that are causative for ovarian cancer, including
22  talcum powder, there's more than just one study.
23  BY MR. ZELLERS:
24    Q. Let me ask my question again because I may
25  not have been clear.

**Page 81**

1      If a study shows a statistically significant
2  relationship between a risk factor and a disease, is
3  that enough for the factor to be classified as a
4  cause?
5    A. I see what you're saying.
6      So, no, one study is not sufficient, in my
7  opinion.
8    Q. Other than your discussion with Dr. Rice
9  sometime after November 16th of 2018, what have you
10  done to alert the medical community about the
11  relationship between talcum powder and ovarian cancer?
12      MS. O'DELL: Object to the form.
13      THE WITNESS: That's all I've done
14  right now.
15  BY MR. ZELLERS:
16    Q. What was your methodology for concluding that
17  talcum powder causes ovarian cancer?
18    A. All right. So then we get into what
19  I describe as my methods to come to this conclusion.
20  And I was asked by counsel to form an opinion one way
21  or the other.
22      To do that, I used very similar techniques
23  that I use in doing peer-reviewed publications, of
24  which I have over 250 and over 50 book chapters.
25  I need to research the literature.

Daniel L. Clarke-Pearson, M.D.

Page 82

1    In this case, I used a PubMed search.
2  I also used a Google search.  And I reviewed a number
3  of textbooks.  In my PubMed search, many times there
4  were references that then I would turn to and also
5  pull up to review; and that's where many of these
6  publications over here in these binders come from.
7    As I then start working my way through it,
8  we start -- you know, in medicine, I would call it
9  evidence-based medicine.  In this particular
10 circumstance, Bradford Hill criteria are used to come
11 to a conclusion.  And I have my Bradford Hill summary
12 in the back of my -- at the end of my report to show
13 you how I came to my conclusions that talcum powder
14 causes ovarian cancer.
15   Q.  Anything else that you did in terms of your
16 methodology for concluding that talcum powder causes
17 ovarian cancer?
18   A.  I, you know, of course, in looking at
19 publications come to try to put some weight on the
20 publications, whether this is something that should be
21 given more weight or less weight.
22   I don't have a scoring system per se, but
23 evaluating the size of the study, the statistical
24 analysis, the study design, the credibility of the
25 author, the quality of the journal that the

Page 83

1  publication is printed in are all things that come to
2  my -- fit into my evaluation and help me come to
3  conclusion.
4    Q.  Anything else?
5    A.  In the end, it's a matter of the totality of
6  what I've reviewed to bring forward my opinion based
7  on the Bradford Hill criteria.
8    Q.  Anything else?
9    A.  Not that I'm aware of except for my own
10 personal experience as a gynecologic oncologist for
11 nearly 40 years.  And I've harkened back several times
12 already to my early training and then subsequent to
13 that.
14   Q.  Did you follow this same methodology with
15 regard to the other question that you addressed,
16 whether or not there was a biologic mechanism by which
17 talcum powder could cause ovarian cancer?
18   A.  Yes, sir.
19   Q.  Do you believe that the standard for proving
20 causation in the medical literature is the same as the
21 one that applies in litigation?
22   MS. O'DELL:  Object to the form.
23   THE WITNESS:  I think that we use --
24 whether you want to call it Bradford Hill or whether
25 we want to call it evidence-based medicine, those are,

Page 84

1  I think, pretty much interchangeable terms.
2    I think in evidence-based medicine probably
3  fits more into my clinical practice, and it's my
4  understanding Bradford Hill fits more into litigation.
5  BY MR. ZELLERS:
6    Q.  Try to answer my question if you can.
7    Do you believe that the standard for proving
8  causation in the medical and scientific literature is
9  the same as the one that applies in litigation?
10   MS. O'DELL:  Object to the form.  Asked
11 and answered.
12   THE WITNESS:  I believe so.
13 BY MR. ZELLERS:
14   Q.  Is it generally known among gynecological
15 oncologists that talcum powder causes ovarian cancer?
16   A.  Not until recently.  I think I referred to a
17 tipping point that's happening right now that will
18 make more gynecologic oncologists aware of the
19 problem.
20   Q.  At least as of now, though, the answer would
21 be no based upon your experience; correct?
22   A.  My experience at the moment is that many
23 gynecologic oncologists are starting to suspect that
24 there is an association and that talcum powder causes
25 ovarian cancer based on the literature and then also,

Page 85

1  importantly, on what the news media has been
2  reporting.
3    Q.  What was your methodology for focusing on
4  certain studies and excluding or not addressing other
5  studies in your review?
6    MS. O'DELL:  Object to the form.
7    THE WITNESS:  Well, I think I tried to
8  answer that before.  I was trying to put a weight to
9  those studies that are more or less strong, if you
10 will, and -- and others that are there but really
11 don't have any input or bearing on my decision.
12 BY MR. ZELLERS:
13   Q.  You do not discuss or address the cohort
14 studies in your report; is that right?
15   A.  That's true.
16   MS. O'DELL:  Object to the form.
17 BY MR. ZELLERS:
18   Q.  Would you agree that, if you had only looked
19 at the cohort studies in this case, that you would not
20 have been able to opine that talcum powder causes
21 ovarian cancer?
22   MS. O'DELL:  Object to the form.
23   THE WITNESS:  Exactly why I tried to do
24 a full literature search and included case-control
25 studies.

Daniel L. Clarke-Pearson, M.D.

Page 86

1  BY MR. ZELLERS:
2     Q. You believe -- well, strike that.
3        You have published a number of articles on
4  ovarian cancer; is that right?
5     A. I believe so.
6     Q. In any of those articles, have you published
7  your theory that baby powder causes ovarian cancer?
8        MS. O'DELL: Object to the form.
9        THE WITNESS: The intention of those
10 articles was not to address causation or risk factors.
11 BY MR. ZELLERS:
12    Q. Is the answer no, that you have not, at least
13 in those publications, discussed your theory that baby
14 powder causes ovarian cancer?
15       MS. O'DELL: Object to the form.
16       THE WITNESS: Those papers were not
17 intended to discuss risk factors associated with
18 talcum powder, so the answer is no.
19 BY MR. ZELLERS:
20    Q. Have you conducted any tests or experiments
21 to confirm your theory that talc migrates from the
22 perineum to the ovaries?
23       MS. O'DELL: Object to the form.
24       THE WITNESS: It's my opinion -- and
25 this is not a theory -- that it's well established in

Page 87

1  the gynecologic community that talc can migrate along
2  with other particles from the perineum to the ovarian
3  surface and fallopian tube.
4  BY MR. ZELLERS:
5     Q. Try and answer my question if you can.
6        Have you, Dr. Clarke-Pearson, conducted any
7  tests or experiments to confirm the theory that talc
8  migrates from the perineum to the ovaries?
9        MS. O'DELL: Object to the form.
10       THE WITNESS: No, I have not.
11 BY MR. ZELLERS:
12    Q. Have you, Dr. Clarke-Pearson, conducted any
13 tests or experiments to confirm your theory that talc
14 causes cancer via inflammation?
15       MS. O'DELL: Object to the form.
16       THE WITNESS: It's not my theory; it's
17 my opinion that talc causes ovarian cancer through
18 inflammation.
19       I have not done any studies to confirm my
20 opinion.
21 BY MR. ZELLERS:
22    Q. Can you identify a single article that
23 identifies inflammation anywhere in a woman's
24 reproductive tract resulting from external genital
25 talc application?

Page 88

1        MS. O'DELL: Mike, after
2  Dr. Clarke-Pearson answers this question, we've been
3  going about an hour and 50 minutes. If we could take
4  a break, that would be great.
5        MR. ZELLERS: That's fine. I've got
6  one more after this, and then would be glad to take a
7  break.
8  BY MR. ZELLERS:
9     Q. Dr. Clarke-Pearson, can you answer that?
10    A. I thought I had a folder on inflammation
11 here. I don't think you put it under your pile. But,
12 at any rate, I think I have seen evidence that talc
13 can cause inflammation in the ovary.
14    Q. Let me ask my question again.
15       Can you identify a single article that
16 identifies inflammation anywhere in a woman's
17 reproductive tract resulting from external genital
18 talc application?
19       MS. O'DELL: Object to the form.
20       THE WITNESS: I don't believe so, that
21 I can quote for you right now.
22 BY MR. ZELLERS:
23    Q. Can you cite a single study, animal or human,
24 that traces externally applied talc up through the
25 reproductive tract to the ovaries?

Page 89

1     A. I think that's well accepted, as I said, in
2  the gynecologic community, that the vagina is open to
3  the outside world, if you will, there's no lid at the
4  opening of the vagina, and that particles of talc can
5  migrate from the vulva and perineum up through the
6  uterus and onto the ovaries.
7     Q. Now I need you to answer my question. Do you
8  need me to repeat it?
9        MS. O'DELL: Well, Counsel, won't you
10 be courteous of the witness. He answered your
11 question. You may not have liked the answer. And you
12 happy to ask another question.
13       MR. ZELLERS: No, he did not answer my
14 question.
15       MS. O'DELL: He did answer your
16 question.
17       MR. ZELLERS: The record will reflect
18 he did not. And I think both of us, all of us, are
19 being cordial and professional.
20       If, at any time, Dr. Clarke-Pearson, you
21 don't think I'm being professional, let me know.
22 Okay?
23       THE WITNESS: Sure.
24 BY MR. ZELLERS:
25    Q. My specific question to you is can you cite

Daniel L. Clarke-Pearson, M.D.

| Page 90 |
| --- |

1 any study, animal or human, that traces externally
2 applied talc up through the reproductive tact to the
3 ovaries?
4          MS. O'DELL: Object to the form.
5          THE WITNESS: So by study, you mean a
6 peer-reviewed publication?
7 BY MR. ZELLERS:
8     Q. Yes.
9     A. I cannot.
10          MR. ZELLERS: Let's take a break.
11          THE VIDEOGRAPHER: Going off the record
12 at 10:50 a.m.
13     (Recess taken from 10:50 a.m. to 11:04 a.m.)
14          THE VIDEOGRAPHER: Back on record at
15 11:04 a.m.
16 BY MR. ZELLERS:
17     Q. Dr. Clarke-Pearson, do you treat women who
18 have ovarian cancer and other gynecological disease?
19     A. I've treated hundreds of women with ovarian
20 cancer, put them through radical surgical procedures,
21 including bowel resections and removing their spleen
22 to get their cancer out. I've given them
23 chemotherapy. We've had some successes. I've taken
24 care of a lot of patients throughout the remainder of
25 their life as they died from ovarian cancer.

| Page 91 |
| --- |

1          So to answer your question, yes.
2     Q. Do you also counsel women who are at high
3 risk for ovarian cancer?
4          MS. O'DELL: Object to the form.
5          THE WITNESS: Yes.
6 BY MR. ZELLERS:
7     Q. Ovarian cancer is a complex disease; correct?
8     A. Cancer, in general, is a complex disease.
9 I wish we knew more about it.
10     Q. No one knows for sure how ovarian cancer
11 develops; is that right?
12          MS. O'DELL: Object to the form.
13          THE WITNESS: I think we have some
14 strong opinions based on scientific research, and we
15 continue to research further in terms of the genetics
16 and mutations that go along with developing ovarian
17 cancer.
18 BY MR. ZELLERS:
19     Q. Is it true that no one knows for sure how
20 ovarian cancer develops?
21          MS. O'DELL: Object to the form.
22          THE WITNESS: I guess no one knows for
23 sure.
24 BY MR. ZELLERS:
25     Q. You refer in your report to there being

| Page 92 |
| --- |

1 several theories as to the origin of ovarian cancer;
2 is that right?
3          MS. O'DELL: Object to the form.
4          THE WITNESS: Yes.
5 BY MR. ZELLERS:
6     Q. Do you agree that, although some risk
7 factors, like age or BRCA genetic mutations have been
8 identified, it's impossible to say for sure what the
9 cause of ovarian cancer was for any individual woman?
10          MS. O'DELL: Object to the form.
11          THE WITNESS: Well, we know that the
12 cause is a genetic mutation that allows the ovarian
13 cancer -- that ovarian cell that was normal to become
14 a malignant cell and loses its regulation and growth.
15 BY MR. ZELLERS:
16     Q. Do you agree, though, that it is impossible
17 to say for sure what the cause of ovarian cancer was
18 for any individual woman?
19          MS. O'DELL: Object to the form.
20          THE WITNESS: The cause is always a
21 gene mutation.
22 BY MR. ZELLERS:
23     Q. Is it your testimony that you are able to
24 identify the cause of ovarian cancer in all cases?
25          MS. O'DELL: Object to the form.

| Page 93 |
| --- |

1          THE WITNESS: I can't identify the gene
2 mutation in all cases, no.
3 BY MR. ZELLERS:
4     Q. Is it impossible to say for sure what gene
5 mutation or other cause of ovarian cancer was for any
6 individual woman?
7          MS. O'DELL: Object to the form.
8          THE WITNESS: In some individual women,
9 we can identify the cause, for example, the mutation
10 of the BRCA1 and 2 gene. We can also do genetic
11 profiling more and more these days, identifying a
12 number of gene mutations that then lead to the
13 malignancy.
14 BY MR. ZELLERS:
15     Q. Other than BRCA1 and 2, do you agree that it
16 is impossible to say for sure what the cause of
17 ovarian cancer was for any individual woman?
18          MS. O'DELL: Object to the form.
19          THE WITNESS: There are more gene
20 mutations than BRCA 1 and 2. There's PD1 and others
21 that I don't have off the top of my head that are now
22 being identified.
23 BY MR. ZELLERS:
24     Q. Other than when a specific gene mutation can
25 be identified, is it impossible to say for sure what

Page 94

1 the cause of ovarian cancer was for any individual
2 woman?
3        MS. O'DELL:  Object to the form.
4        THE WITNESS:  In -- to answer your
5 question, what I think I understand your question
6 being, if we can't identify a gene mutation, then we
7 don't know what caused it.  Is that what you're asking
8 me?
9 BY MR. ZELLERS:
10    Q.  Yes.
11    A.  Then the answer would be, yes, we don't know.
12    Q.  In your practice, do you diagnose what caused
13 your patients' ovarian cancer?
14    A.  We do genetic profiling, as is a relatively
15 new approach to trying to approach causes, and also
16 personalized treatment for patients with ovarian
17 cancer.
18    Q.  Other than genetic profiling, in your
19 practice do you diagnose what caused your patients'
20 ovarian cancer?
21        MS. O'DELL:  Object to the form.
22        THE WITNESS:  We don't.  There's no --
23 I don't think anybody can.
24 BY MR. ZELLERS:
25    Q.  In your practice, do you tell your patients

Page 95

1 what caused their ovarian cancer other than with
2 respect to genetic profiling?
3        MS. O'DELL:  Object to the form.
4        THE WITNESS:  No.
5 BY MR. ZELLERS:
6    Q.  Have you ever given any presentation on the
7 relationship between talcum powder and ovarian cancer?
8    A.  No.
9    Q.  Have you ever spoken at a conference or
10 meeting of the American College of Obstetricians and
11 Gynecologists, or ACOG, about the relationship between
12 talcum powder and ovarian cancer?
13    A.  Not that I recall.
14    Q.  Have you ever spoken at a conference or
15 meeting of the Society of Gynecologic Oncology, or
16 SGO, about the relationship between talcum powder and
17 ovarian cancer?
18    A.  No.
19    Q.  Does your institution, the University of
20 North Carolina, advise women that perineal use of
21 talcum powder causes ovarian cancer?
22    A.  Well, again, back to my point of the tipping
23 point in this whole discussion.  And so at this
24 juncture, we are considering adding that to our
25 patient intake form, to ask for that information, and

Page 96

1 then also advise.
2    Q.  As of today, it's not part of the patient
3 intake form; is that right?
4    A.  As of today, no.
5    Q.  As of today, the University of North Carolina
6 and the department that you chair do not advise women
7 that perineal use of talcum powder causes ovarian
8 cancer; correct?
9        MS. O'DELL:  Object to the form.
10        THE WITNESS:  That's correct.
11 BY MR. ZELLERS:
12    Q.  Do you teach residents about talc as a
13 potential risk factor?
14    A.  It is listed as a potential risk factor
15 today, and I think in the very near future it will be
16 considered a risk factor and a causative factor.
17    Q.  When did you first start doing that, teaching
18 residents about talc as a potential risk factor?
19    A.  Well, I think it's been in the literature for
20 a good while as a potential risk factor.
21    Q.  My question is when did you first begin
22 teaching residents about talc as a potential risk
23 factor?
24    A.  I think from the time that I was starting to
25 teach residents in 1975 -- well, I was a resident in

Page 97

1 '75 -- 1979 when I finished my residency and started
2 teaching residents.
3    Q.  Do you today ask any of your own patients if
4 they used talcum powder as a routine screening
5 question?
6    A.  I think that would be very inappropriate for
7 a woman who has advanced ovarian cancer to try to find
8 and cause her to feel guilt that she did something to
9 cause ovarian cancer.  My situation is one of trying
10 to take care of women that have ovarian cancer.
11    Q.  Have you ever told a patient that talcum
12 powder caused her ovarian cancer?
13    A.  No.
14    Q.  Have you ever recommended increased screening
15 or monitoring for ovarian cancer based on a patient's
16 prior use of talcum powder products?
17    A.  Not yet.
18    Q.  Have you ever recommended that a patient who
19 had a history of using talcum powder undergo
20 prophylactic surgery to remove the fallopian tubes or
21 ovaries because of her talcum powder use?
22    A.  I think that is likely to become a discussion
23 in the near future, and we would have to balance the
24 risks of surgery versus the risks of developing
25 ovarian cancer.

Daniel Clarke-Pearson, M.D.

| | Page 98 |
|---|---|

1    Q. As of today, you have not; is that right?

2    A. That's correct.

3    Q. Have you ever asked your patients about their

4  exposure to asbestos in the course of taking their

5  medical histories?

6    A. No.

7    Q. Are you familiar with screenings for asbestos

8  exposure?

9    A. I'm not familiar with that.

10    Q. Do you ask your patients about their

11  occupational history?

12    A. I often -- yes, most of the time I find out

13  what the patient does outside the home.

14    Q. Do you ask your patients about the

15  occupational history of their parents?

16    A. I do not.

17    Q. Do you ask your patients about their spouse's

18  occupational history?

19    A. Sometimes.

20    Q. Do you ask what kind of buildings your

21  patients have either lived in or do live in?

22    A. No.

23    Q. Do you ask about the kind of buildings that

24  your patients either work in or have worked in?

25    A. Have not.

| | Page 99 |
|---|---|

1    Q. In 1993 you coauthored an article on the

2  mutations of the p53 gene and ovarian cancer; is that

3  right?

4    A. I believe so. I was a coauthor.

5    Q. That study concluded that p53 mutations in

6  ovarian cancer arise because of spontaneous errors in

7  DNA synthesis and repair rather than direct

8  interaction with -- strike that -- rather than the

9  direct interaction of carcinogens with DNA; is that

10  right?

11        MS. O'DELL: He needed --

12        THE WITNESS: I would have to see that

13  paper. 1993 was a long time ago. It was kind of our

14  lab. And I was not in the lab, but I was a coauthor.

15        MR. ZELLERS: Deposition Exhibit 16 is

16  the paper on which you were an author. First named

17  author was Kohler.

18    (Exhibit No. 16 was marked for identification.)

19  BY MR. ZELLERS:

20    Q. Take just a quick look at that, and I have a

21  specific question for you.

22        This is your paper that you were a coauthor

23  on back in 1993; is that right?

24    A. Allow me to read this a little bit more.

25    Q. Sure.

| | Page 100 |
|---|---|

1    A. All right. I think I can answer this. This

2  is a long time ago.

3    Q. As -- and let me just repeat my question, and

4  I'm specifically looking at the statement toward the

5  bottom of the third column on page 1 of the

6  publication.

7        The study concluded that p53 mutations in

8  ovarian cancer arise because of spontaneous errors in

9  DNA synthesis and repair rather than the direct

10  interaction of carcinogens with DNA; is that right?

11    A. That's what it reads.

12    Q. That would be inconsistent with the idea that

13  exposure to talcum powder causes errors in DNA

14  synthesis and repair that lead to cancer; is that

15  right?

16        MS. O'DELL: Object to the form.

17        THE WITNESS: No, that's not -- that's

18  not correct.

19  BY MR. ZELLERS:

20    Q. Why is that not correct?

21    A. So the inflammatory response of the ovarian

22  epithelium to talcum powder then leads to gene

23  mutations, and there is mounting evidence that that's

24  happening in work that's being written and presented

25  by Dr. Saed in particular.

| | Page 101 |
|---|---|

1    Q. Does your paper -- the 1993 paper -- discuss

2  inflammation?

3    A. No. That wasn't part of the question that

4  was being pursued in this laboratory investigation.

5    Q. Your paper in 1983 [sic] states that

6  (as read):

7        "Consistent with data from

8        epidemiologic studies that failed

9        to demonstrate a convincing

10        relationship between ovarian

11        cancer and exposure to

12        environmental carcinogens."

13    Is that right?

14        MS. O'DELL: Object to the form.

15  BY MR. ZELLERS:

16    Q. And I'm looking again at the first page of

17  your article at the bottom -- or right above the line

18  in the third column.

19    A. You've read that correctly. I would have to

20  reread this paper -- it's more than 20 years old --

21  because I'm not continue -- I'm not currently aware of

22  the investigation that we did looking at carcinogens.

23    Q. In 2009, you published an article entitled

24  "Screening for Ovarian Cancer." Is that right?

25    A. I'd have to see the article.

Daniel L. Clarke-Pearson, M.D.

Page 102

1       MR. ZELLERS:  We'll mark your 2009
2  article as Deposition Exhibit 17.
3       (Exhibit No. 17 was marked for identification.)
4       THE WITNESS:  Yes.  Okay.
5  BY MR. ZELLERS:
6       Q.  This is an article that you authored; is that
7  right?
8       A.  Yes, it was printed in The New England
9  Journal.  I was invited to write this clinical review.
10      Q.  This is an article that is captioned
11 "Screening for Ovarian Cancer."  Is that right?
12      A.  Yes.
13      Q.  This is many years before you were retained
14 by Dr. Thompson and plaintiffs' counsel in the talcum
15 powder litigation; is that right?
16      A.  Yes.
17      Q.  In this article, you discussed risk factors
18 for ovarian cancer.  And I'm looking at the second
19 paragraph on page 1.
20      A.  The first page of -- page 170?
21      Q.  Yes.  And my question, specifically, is you
22 only discussed in this article the risk factors of
23 family history of ovarian or breast cancer and the
24 BRCA genetic mutations; is that right?
25      MS. O'DELL:  Object to the form.

Page 103

1       THE WITNESS:  That's what appears to
2  be, yes.
3  BY MR. ZELLERS:
4       Q.  You did not mention talcum powder in this
5  article; is that right?
6       A.  It appears I didn't mention several other
7  risk factors.  That wasn't the intent of this article.
8       Q.  Well, in July of 2014, you appeared on a FOX
9  News station to discuss ovarian cancer; do you
10 remember that?
11      A.  Vaguely.
12      Q.  That was before you were retained by
13 Dr. Thompson and by plaintiffs' counsel in this case;
14 correct?
15      MS. O'DELL:  Object to the form.
16      THE WITNESS:  Yes.
17 BY MR. ZELLERS:
18      Q.  As part of that discussion, you were asked
19 and talked about risk factors for ovarian cancer.
20      Do you recall that?
21      A.  No.
22      Q.  Do you recall that, in that interview in
23 2014, July, you only mentioned age, family history of
24 breast or ovarian cancer, and BRCA genetic mutations
25 as risk factors?

Page 104

1       A.  I don't recall that, but it may be on the
2  videotape that you probably have.
3       Q.  You did not tell the viewers that talcum
4  powder was associated with or a cause of ovarian
5  cancer; is that right?
6       A.  That's correct, because at that point in time
7  I didn't believe it was causative.
8       Q.  It wasn't until after being retained in this
9  case, and around the time that you concluded your
10 review in November of 2018, that you formed that
11 opinion; correct?
12      MS. O'DELL:  Object to the form.
13      Excuse me.  Go ahead.
14      THE WITNESS:  As I was preparing to
15 offer an opinion, I did this review and came to that
16 opinion, yes.
17 BY MR. ZELLERS:
18      Q.  If we try to put a time on it, it would be
19 toward the latter part of 2018, once you had completed
20 your review that you've told us about in connection
21 with this litigation; correct?
22      A.  Yes.
23      MS. O'DELL:  Object to the form.
24 BY MR. ZELLERS:
25      Q.  Where do practicing gynecological oncologists

Page 105

1  look for guidance on what the risk factors are for
2  ovarian cancer?
3       A.  I think a variety of sources, from --
4  published in many textbooks, review articles.
5       Q.  Well, just as you don't have the time to go
6  and research each and every potential risk factor for
7  ovarian cancer in depth, you rely on certain
8  organizations to do that research for you; right?
9       MS. O'DELL:  Object to the form.
10      THE WITNESS:  And other researchers,
11 yes.
12 BY MR. ZELLERS:
13      Q.  One organization would be the American
14 College of Obstetricians and Gynecologists, or ACOG;
15 is that right?
16      A.  Yes.
17      Q.  Another organization would be the Society of
18 Gynecologic Oncology, or SGO; is that right?
19      A.  Yes.
20      Q.  Another would be the National Cancer
21 Institute's physician data queries?
22      A.  I probably wouldn't turn to that, but it's
23 information available to the public.
24      Q.  That's generally thought to be reliable
25 information; correct?

Daniel L. Clarke-Pearson, M.D.

Page 106

1      MS. O'DELL: Object to the form.
2      THE WITNESS: I'm not quite certain.
3 I'm not familiar with that. Is this a PDQ you're
4 talking about?
5 BY MR. ZELLERS:
6      Q. A PDQ. But you're familiar, certainly, with
7 the National Cancer Institute; right?
8      A. Yes.
9      Q. The National Cancer Institute has funded at
10 least some of the studies that you have been involved
11 in; is that right?
12     A. As basic research and research into ovarian
13 cancer treatment, not necessarily risk factors.
14     Q. Is it a reputable organization, the National
15 Cancer Institute?
16     A. It's an agency that sponsors cancer research,
17 by and large.
18     Q. Is that a "yes"?
19     A. There -- they're reputable in terms of
20 sponsoring cancer research.
21     Q. You're a member of ACOG; is that right?
22     A. Yes, sir.
23     Q. You're a member of SGO; is that right?
24     A. Yes.
25     Q. You were the president of SGO from 2009 to

Page 107

1 2010; is that right?
2      A. Yeah.
3      Q. You've served on a number of committees for
4 both ACOG and SGO; is that right?
5      A. Yes.
6      Q. Do you agree, generally, that the doctors and
7 scientists in organizations like ACOG and SGO are
8 working very hard to protect women's health?
9      A. Yes.
10     MS. O'DELL: Object to the form.
11 BY MR. ZELLERS:
12     Q. And, in forming your opinions in this case,
13 did you consider the risk factors that ACOG and SGO
14 recognized for ovarian cancer?
15     A. I was familiar with the existing risk factors
16 that had been identified.
17     Q. Are you aware that, even as of today, in
18 their patient-facing websites as well as in their
19 publicly available information about ovarian cancer,
20 neither ACOG nor SGO identify perineal use of talcum
21 powder as a risk factor for ovarian cancer?
22     A. Again, I'm getting back to my point that
23 we're at a point in time where it's a tipping point.
24 And so, yes, right now, that's not posted. And
25 I would imagine that my opinion that ovarian cancer is

Page 108

1 caused by talcum powder will be reflected in those
2 statements in the future.
3      Q. You don't have any reason to believe that the
4 physicians at ACOG and SGO have not kept up to date
5 with the talc and ovarian cancer epidemiology, do you?
6      MS. O'DELL: Object to the form.
7      THE WITNESS: I think that they haven't
8 looked at this question as in depth as I have.
9 BY MR. ZELLERS:
10     Q. How do you know that?
11     A. I'm quite certain of that.
12     Q. Well --
13     A. This is a huge amount of work, to spend 80
14 hours reviewing materials to come to my opinion. I'm
15 not aware of any other physician that's been tasked
16 with that job, if you will.
17     Q. Are there not committees on both ACOG and SGO
18 that look into risk factors and potential causes for
19 ovarian cancer?
20     A. I have served as the committee chair for the
21 GYN Management Committee at ACOG, which publishes
22 committee opinions. And I've also served on the
23 practice committee, which puts out technical
24 bulletins, now called practice bulletins.
25     In both cases, ACOG is asked by a member to

Page 109

1 consider investigating and writing an opinion about
2 that. So if the opinion was requested by an ACOG
3 member, that committee would then decide whether they
4 wanted to pursue that or not.
5      Q. Does ACOG and SGO have committees who
6 generally look at the risk factors for ovarian cancer?
7      A. Only if that committee is asked to look at
8 that question.
9      Q. Any member of ACOG or any member of SGO can
10 ask either ACOG or SGO and their respective committees
11 to look at and evaluate a particular risk factor;
12 correct?
13     A. Yes. Sure.
14     Q. And it's your testimony that that's never
15 ever been done up until today?
16     MS. O'DELL: Object to the form.
17     THE WITNESS: No, it's not my
18 testimony. I don't know what's been requested of ACOG
19 in the past or currently.
20 BY MR. ZELLERS:
21     Q. Would it be important to you to know that
22 Centers for Disease Control and Prevention, the CDC,
23 does not list talcum powder or talc as a risk factor
24 for ovarian cancer?
25     A. That doesn't surprise me.

Daniel L. Clarke-Pearson, M.D.

Page 110

1    Q.  The same for the Mayo Clinic.  The Mayo
2  Clinic does not list talc as a risk factor for ovarian
3  cancer; correct?
4    A.  I'll take your word for it.
5    Q.  Have you received funding from the National
6  Institutes of Health?
7    A.  I've received funding from the National
8  Cancer Institute, and I have received funding for
9  physician training through the National Institutes of
10  Health for a women's reproductive health research
11  grant.
12    Q.  Are you aware that NIH does not list talc as
13  a risk factor for ovarian cancer?
14    A.  I would have to look at their publications.
15  That wouldn't surprise me, along with all the other
16  agencies and foundations and organizations that you've
17  listed previously.
18    Q.  With respect to the National Cancer
19  Institute, they do publish guidance for physicians on
20  risk factors for cancer; is that right?
21    A.  I believe so.
22    Q.  Take a look at Deposition Exhibit 18.
23    (Exhibit No. 18 was marked for identification.)
24  BY MR. ZELLERS:
25    Q.  Are you familiar with this publication of the

Page 111

1  National Cancer Institute?
2    A.  No.
3    Q.  This is not something that you reviewed in
4  all of your preparation and research for rendering
5  your opinions in this case?
6    A.  I may have seen it, but I'm not familiar with
7  all the details of it.
8    Q.  Well, did you review and rely on this
9  statement by the National Cancer Institute with regard
10  to ovarian, fallopian tube, and primary peritoneal
11  cancer prevention in your review of this matter?
12    MS. O'DELL:  Object to the form.
13    THE WITNESS:  It did not contribute to
14  my formation of my opinion, if that's what you're
15  asking.
16  BY MR. ZELLERS:
17    Q.  Well, take a look, if you will, on page 12,
18  12 of 18, at the section "Perineal Talc Exposure."
19    Do you see that?
20    A.  Yes.
21    Q.  The National Cancer Institute states
22  (as read):
23    "The weight of evidence does not
24    support an association between
25    perineal talc exposure and an

Page 112

1    increased risk of ovarian cancer."
2    Is that right?
3    A.  That's what they say.
4    Q.  If you go to 18 of 18, this statement was
5  updated as of January 4th of 2019; is that right?
6    MS. O'DELL:  Object to the form.
7    THE WITNESS:  Yes, I see they updated
8  that.
9    And I think that I do recall having seen
10  this.  And my recollection is that their references
11  are not fully up to date too.  And also, it befuddles
12  me that the National Cancer Institute -- is that
13  right? -- National Cancer Institute, going back to
14  page 12, would take statistically significant clinical
15  studies and dismiss that clinical significance -- a
16  relative risk of 1.44, a relative risk of 1.26 -- I'm
17  sorry -- 1.71, a relative risk of 1.2 -- and say that
18  they're not important.
19  BY MR. ZELLERS:
20    Q.  You have no personal knowledge of the
21  analysis done by the National Cancer Institute that
22  underlie this statement; correct?
23    A.  I don't, and I have a hard time understanding
24  how they came to the conclusions they have.
25    Q.  Well, let's look at the FDA.  The FDA has

Page 113

1  also looked at this issue, has looked at the Bradford
2  Hill factors, and has concluded that causation has not
3  been established as between talcum powder use --
4  peritoneal -- perineal talcum powder use and ovarian
5  cancer; is that right?
6    MS. O'DELL:  Object to the form.
7    THE WITNESS:  I'd have to see the
8  publication.
9  BY MR. ZELLERS:
10    Q.  Well, let's take a look.
11    I'm handing you what we have marked as
12  Deposition Exhibit 19.
13    (Exhibit No. 19 was marked for identification.)
14  BY MR. ZELLERS:
15    Q.  This is a letter from the FDA.  It has a date
16  stamp at the top, April 1, 2014.  It's addressed to
17  Dr. Epstein at the University of Illinois in Chicago.
18    A.  I think I have seen this one.
19    Q.  FDA is another governmental entity; is that
20  right?
21    A.  Yes.
22    Q.  As far as you know, the FDA is not biased one
23  way or the other with respect to the food and drug
24  issues that they research and opine on; is that right?
25    MS. O'DELL:  Object to the form.

Daniel J. Clarke-Pearson, M.D.

Page 114

1    THE WITNESS:  No, that's incorrect.  In
2  my personal experience, the FDA has done a bad job in
3  evaluating the risk of morcellation of uterine
4  fibroids.  The data that they based their black box
5  opinion on in November of 2014 was based on inadequate
6  review of the medical literature.  And it was biased
7  and I think clearly influenced by some outside
8  sources.
9  BY MR. ZELLERS:
10    Q.  Do you have criticisms of the FDA's review
11  and investigation of talcum powder products?
12    A.  I would like to reread this, because I did
13  have some criticism in reading this.
14    Q.  Well, my question is more general.  But you
15  would agree --
16    A.  Yes, I have criticism.  I think that they're
17  not sufficiently evaluating all the data and evidence
18  that's here.
19    Q.  Does the FDA have qualified scientists and
20  medical professionals that look at various issues,
21  including talcum powder?
22    MS. O'DELL:  Object to the form.
23    THE WITNESS:  They probably have
24  qualified people that sometimes make mistakes or
25  sometimes have biases of their own.

Page 115

1  BY MR. ZELLERS:
2    Q.  But do you agree that, on scientific issues,
3  including the one that we're here to talk about today,
4  whether or not talcum powder -- genital use of talcum
5  powder is a risk factor for ovarian cancer, that's a
6  topic on which well-qualified scientists and
7  physicians may have differing views?
8    MS. O'DELL:  Object to the form.
9    THE WITNESS:  They may have differing
10  views, yes.
11  BY MR. ZELLERS:
12    Q.  Let's look at this publication from the FDA.
13  Turn to page 4, if you will.  And we are looking at
14  Deposition Exhibit 21.  Are you at page 4?
15    MS. O'DELL:  Are we at 21 or 19?
16    MR. ZELLERS:  Oh, I'm sorry.
17  I misspoke.  Thank you, Ms. O'Dell.  Yes.  So let me
18  ask that question again.
19  BY MR. ZELLERS:
20    Q.  Turn, if you will, Doctor, to page 4 of
21  Deposition Exhibit 19.
22    THE WITNESS:  Ms. O'Dell, may I have --
23  I have some notes on this letter.
24    MS. O'DELL:  Is it in your --
25    THE WITNESS:  No, I don't think it's in

Page 116

1  the pile.
2  BY MR. ZELLERS:
3    Q.  You have notes that are other than what you
4  brought here today?
5    MS. O'DELL:  I think it's in -- may be
6  in your stack, Doctor.  I'm not sure.  I don't have
7  it --
8    THE WITNESS:  Well, I'll go through it.
9  My recall of this is this letter is all over
10  the place in terms of pros and cons and pros and cons.
11  So we can work my way through it, but -- go ahead.
12  I'm on page 4.
13  BY MR. ZELLERS:
14    Q.  All right.  The FDA goes through and reviews
15  epidemiology and etiology findings; is that right?
16    A.  That's where they start, yes.
17    Q.  The FDA noted, in reviewing this issue,
18  genital use of talcum powder and ovarian cancer, that
19  "selection bias and/or uncontrolled confounding result
20  in spurious positive associations" --
21    A.  I'm sorry.  Can you just take me to where you
22  are on page 4?
23    Q.  Sure.  Let's look -- if we're on page 4,
24  right above the findings or conclusion, it says
25  (as read):

Page 117

1    "After consideration of the" --
2    A.  My page 4 doesn't have findings and
3  conclusions.  "Epidemiology and etiology findings"?
4    Q.  Yes.  So we're on the same page --
5    A.  Above this (indicating)?
6    Q.  Underneath "epidemiology and etiology
7  findings" --
8    A.  Okay.
9    Q.  -- if we go to the second paragraph, it
10  states (as read):
11    "After consideration of the
12    scientific literature submitted in
13    support of both citizen petitions,
14    FDA found..."
15    Are you with me?
16  A.  Yes, I am.
17  Q.  All right.  No. 2 (as read):
18    "The FDA noted that no single
19    study has considered all the
20    factors that potentially
21    contribute to ovarian cancer,
22    including selection bias and/or
23    uncontrolled confounding that
24    result in spurious positive
25    associations between talc use and

Daniel L. Clarke-Pearson, M.D.

Page 118

1    ovarian cancer."
2        Did I read that correctly?
3    A.  Yes.
4    Q.  You would agree that there are limitations on
5  case-control studies; is that right?
6    A.  Yes, there are.
7    Q.  There are difficulties in interpreting a
8  retrospective case-control study; is that right?
9        MS. O'DELL:  Object to the form.
10       THE WITNESS:  I'm not sure what you
11  mean by "difficulties."
12  BY MR. ZELLERS:
13   Q.  Well, are there limitations in interpreting a
14  retrospective case-control study?
15   A.  There can be.
16   Q.  What are those limitations that you're aware
17  of based upon your experience?
18   A.  Well, it depends upon how the study is
19  designed, in terms of the size of the study, the --
20  how the -- you know, recall issue is always an issue
21  when you're dealing with patients retrospectively.
22       There are similar problems in cohort studies
23  as well.
24   Q.  My question is very simple.
25       What are you aware of in terms of

Page 119

1  limitations of retrospective case-control studies?
2        MS. O'DELL:  Object to the form.  Asked
3  and answered.
4  BY MR. ZELLERS:
5    Q.  That generally apply to case-control studies.
6        MS. O'DELL:  Object to the form.  Asked
7  and answered.
8        THE WITNESS:  Well, there are
9  limitations in probably -- there's a variety of
10  limitations, depending upon the particular studies.
11  So I think we would have to get down to a particular
12  study.  And I don't hang my weight -- or hang my hat
13  or put the weight of my opinion on a single study.
14  BY MR. ZELLERS:
15   Q.  Well, you would agree that selection bias is
16  a potential concern in case-control studies; correct?
17   A.  It can be.
18   Q.  And uncontrolled confounding is a potential
19  concern in case-control studies; is that right?
20   A.  Yes.  But if your controls are well selected,
21  then that negates much of the bias.
22   Q.  And, at least in this document, the FDA
23  states that "those result in spurious positive
24  associations between talc use and ovarian cancer
25  risk"; is that right?

Page 120

1    A.  That's with regard -- in the first part of
2  their sentence to "no single study."
3    Q.  Let's look at Conclusion 3.
4        "The FDA concludes that results of
5        case-control studies do not
6        demonstrate a consistent positive
7        association across studies."
8        Is that right?
9        MS. O'DELL:  Objection.
10       THE WITNESS:  That's wrong.  You read
11  it right; it's wrong.
12  BY MR. ZELLERS:
13   Q.  You disagree with the FDA's conclusion; is
14  that right?
15   A.  Yes.
16   Q.  And I'm going to ask you all about that
17  today --
18   A.  Okay.
19   Q.  -- so you'll have to chance to tell me why
20  you disagree.
21       Did the FDA also state that, at least based
22  upon its review of the epidemiology and etiology
23  findings, that a dose response -- strike that -- that
24  dose response evidence is lacking?
25       MS. O'DELL:  Object to the form.

Page 121

1        THE WITNESS:  And can you show me where
2  you're reading that?
3  BY MR. ZELLERS:
4    Q.  Sure.  Conclusion 3, last part of the
5  statement.
6    A.  There is dose response evidence.  It's not in
7  every single study, but we are aware of dose
8  response --
9    Q.  Doctor, my question was, was it the FDA's
10  conclusion, based upon the epidemiology that it
11  reviewed as of 2014, that dose response evidence is
12  lacking?
13   A.  That's the FDA's opinion; that's not my
14  opinion.
15   Q.  Finally, the FDA found that "a cogent
16  biological mechanism was lacking."  And I'm looking at
17  number 4, "A cogent biological mechanism by which talc
18  might lead to ovarian cancer is lacking."
19       Is that the statement of the FDA, at least
20  as of 2014?
21   A.  The statement goes on in the same sentence to
22  say (as read):
23       "Exposure to talc does not account
24       for all cases of ovarian cancer."
25       Nothing accounts for all cases of ovarian

Daniel L. Clarke-Pearson, M.D.

Page 122

1  cancer.  I can't believe the FDA would even say
2  something like this.
3      Q.  Are you able to answer my question without
4  editorializing?
5      A.  I answered your question.  I have to finish
6  the whole sentence that you want me to read.
7      Q.  Did the FDA state, as of 2014, that "a cogent
8  biological mechanism by which talc might lead to
9  ovarian cancer is lacking"?
10         MS. O'DELL:  Object to the form.  Asked
11  and answered.
12         THE WITNESS:  That's what half of the
13  sentence says.  That's what the FDA wrote.
14  BY MR. ZELLERS:
15      Q.  All right.  IARC, you're certainly familiar
16  with IARC.  You brought your whole monograph here with
17  you today; is that right?
18      A.  Yes.
19         MS. O'DELL:  Object to the form.  It's
20  not his monograph; it's not the whole monograph --
21  it's multiple monographs, as you know.  So don't --
22  don't be --
23         MR. ZELLERS:  I haven't gone through it
24  page by page, but it looks like it's about a
25  2-inch-thick monograph that he brought with him today.

Page 123

1  BY MR. ZELLERS:
2      Q.  My question is, are you familiar with IARC?
3      A.  I am.
4      Q.  All right.  IARC has addressed Bradford Hill
5  considerations with respect to talc used in a perineal
6  manner with respect to women -- is that right? -- in
7  ovarian cancer?
8         MS. O'DELL:  Object to the form.
9         THE WITNESS:  You're asking me a
10  question, not what the FDA is writing here now but
11  what IARC has said?
12  BY MR. ZELLERS:
13      Q.  I'm now on to IARC.  So let me ask my
14  question.
15         Based upon your review of the IARC
16  monographs, it has addressed the Bradford Hill
17  considerations; is that right?
18         MS. O'DELL:  Object to the form.
19         Are you referring to all the monographs?
20  Are you referring to a certain topic that's --
21  because, as you know, there are multiple monographs
22  and they relate to different substances.  So, for your
23  specific question, that might be helpful.
24  BY MR. ZELLERS:
25      Q.  Are you aware, Dr. Clarke-Pearson, that IARC

Page 124

1  rejected classification of talc as carcinogenic and
2  instead assigned it to the classification of possibly
3  carcinogenic to humans?
4         MS. O'DELL:  Object to the form.
5         THE WITNESS:  I think that was an IARC
6  publication in the mid 2000s.  And I'm aware of it,
7  yes.
8  BY MR. ZELLERS:
9      Q.  Are you generally familiar with the IARC
10  categories?
11      A.  Generally, but I'm happy to walk through them
12  with you.
13      Q.  Sure.  Doctor, I show you Exhibit 20.
14      (Exhibit No. 20 was marked for identification.)
15  BY MR. ZELLERS:
16      Q.  This is a one-page listing of the agents
17  classified by the IARC monographs, Volumes 1 to 123,
18  and it lists out the different categories that IARC
19  classifies agents within.
20         You're generally familiar with --
21      A.  Yes.
22      Q.  -- with these classifications; is that right?
23      A.  Yes, sir.
24      Q.  Looking at Exhibit 20, there are 120 agents
25  in Group 1, "carcinogenic to humans"; is that right?

Page 125

1      A.  Yes.
2      Q.  That's the only category in which IARC finds
3  sufficient evidence in humans; is that right?
4      A.  That's my understanding.
5      Q.  And there's 82 agents in Group 2A, "probably
6  carcinogenic to humans"; is that right?
7      A.  I see that.
8      Q.  It appears that IARC isn't shy about
9  declaring something to be either a known or a probable
10  carcinogen; is that right?
11         MS. O'DELL:  Object to the form.
12         THE WITNESS:  I don't know about being
13  shy.  They have their listing from their --
14  BY MR. ZELLERS:
15      Q.  Well, they have over 200 agents in those two
16  categories; is that right?
17      A.  Yes.
18      Q.  There's only one agent in Group 4, "probably
19  not carcinogenic to humans"; is that right?
20         MS. O'DELL:  Object to the form.
21         THE WITNESS:  That's what it says.
22  BY MR. ZELLERS:
23      Q.  So out of the over a thousand agents that
24  IARC has reviewed, IARC has placed only one agent in
25  Group 4, "probably not carcinogenic"?

Daniel J. Clarke-Pearson, M.D.

Page 126

1    A. Yes.
2    Q. IARC doesn't have a Group 5, "not
3 carcinogenic," do they?
4    A. Not on this sheet.
5    Q. With genital talc, IARC has classified
6 genital talc as a Group 2B category agent; is that
7 right?
8        MS. O'DELL:  Object to the form.
9        THE WITNESS:  I'm not sure.  It's just
10 genital talc.  Isn't the talcum powder of all forms?
11 BY MR. ZELLERS:
12    Q. Talcum powder is a Group 2B agent, "possibly
13 carcinogenic to humans"; is that right?
14    A. Yes.
15    Q. That designation is based, according to the
16 IARC definitions, on limited evidence in humans; is
17 that right?
18        MS. O'DELL:  Object to the form.
19        THE WITNESS:  I would have to read what
20 is written.
21 BY MR. ZELLERS:
22    Q. Is it your understanding that, in classifying
23 talcum powder as a Group 2B agent, that IARC cannot
24 rule out chance, bias, or confounding with reasonable
25 confidence; correct?

Page 127

1    A. I suppose you're reading that from some IARC
2 statement that I don't have, but...
3    Q. That's generally your understanding; correct?
4    A. That would be generally my understanding,
5 yes.
6    Q. Are you aware of some of the other agents
7 that have been designated as 2B agents by IARC as
8 possibly carcinogenic?
9    A. I am not.
10    Q. Ginkgo biloba?  Are you familiar with that?
11    A. No.
12    Q. Occupational carpentry and joinery?
13        MS. O'DELL:  I'm sorry.  I missed that
14 last one.  What did you say?
15 BY MR. ZELLERS:
16    Q. Occupational carpentry and joinery.
17    A. I was not aware of that.
18    Q. Pickled vegetables?
19    A. I've heard that.
20    Q. All right.  What association does the
21 literature report between talc use and ovarian cancer?
22    A. Well, now we move into looking at
23 epidemiology, in my opinion.
24    Q. Well, these are just a few general questions.
25 If you need to look at your folders, please do.  But

Page 128

1 I just have a few general questions.
2    A. All right.  Well, please go ahead.
3    Q. Well, are you able to tell me, generally,
4 what association the literature reports between talc
5 use and ovarian cancer?
6    A. The literature consistently shows an
7 increased risk of developing ovarian cancer in women
8 that are exposed to talcum powder.
9    Q. Generally, it's around a 1.3 odds ratio in
10 the case-control studies; is that fair?
11        MS. O'DELL:  Object to the form.
12        THE WITNESS:  I would acknowledge that,
13 yes.
14 BY MR. ZELLERS:
15    Q. All right.  Do you also acknowledge that the
16 epidemiologists consider a 1.3 odds ratio in
17 case-control studies to be a weak or modest
18 association?
19        MS. O'DELL:  Object to the form.
20        THE WITNESS:  I'm not sure what they
21 mean by "weak" or "modest."
22 BY MR. ZELLERS:
23    Q. Would you categorize it as a weak or modest
24 association?
25    A. No.  I would call it a statistically

Page 129

1 significant observation that impacts the lives of
2 thousands of women that I've taken care of over the
3 years and that, if talcum powder were not on the
4 market and being used in perineal hygiene, for lack of
5 a better word, many other women would not have died of
6 ovarian cancer that I've taken care of.
7        MR. ZELLERS:  Move to strike as
8 nonresponsive.
9 BY MR. ZELLERS:
10    Q. You are unaware as to whether or not an
11 epidemiologist would consider a 1.3 odds ratio in a
12 case-control study to be a weak or modest association;
13 is that right?
14    A. I don't understand the definition of "weak"
15 or "modest."
16    Q. You're not an epidemiologist; is that right?
17    A. That's correct.
18    Q. Can you point to any peer-reviewed literature
19 on talc and ovarian cancer that states that 1.3 odds
20 ratio is a strong association?
21    A. I think --
22        MS. O'DELL:  Object to the form.
23        THE WITNESS:  -- it's a statistically
24 significant association that's been consistently
25 reported in case-control studies and in meta-analyses.

Daniel L. Clarke-Pearson, M.D.

Page 130

BY MR. ZELLERS:
1
2    Q. I take it that's no to my question. Is that
3 right? And I'll ask it again if you'd like me to.
4         MS. O'DELL: Object to the form.
5 I think he answered your question.
6         THE WITNESS: I'm not aware that it's a
7 strong association or a weak association. It's a
8 statistically significant association.
9 BY MR. ZELLERS:
10    Q. You cannot point me to any peer-reviewed
11 literature on talc and ovarian cancer that states that
12 1.3 is a strong association; correct?
13        MS. O'DELL: Object to the form. Asked
14 and answered.
15        THE WITNESS: That's correct.
16 BY MR. ZELLERS:
17    Q. IARC does not refer to this as a strong
18 association; correct?
19    A. I'm not familiar with what IARC says.
20    Q. FDA does not refer to this as a strong
21 association; correct?
22    A. I'm not aware.
23    Q. The National Cancer Institute does not refer
24 to this as a strong association; correct?
25    A. I'm not aware what they said about strong or

Page 131

1 weak.
2    Q. Do your opinions on causation and strength of
3 association apply equally to all forms of ovarian
4 cancer?
5    A. No.
6    Q. Are you able to break down your opinion with
7 respect to ovarian cancer?
8    A. Yeah. So there are three types of ovarian
9 cancer: germ cell, sex cord-stromal, and epithelial
10 ovarian cancers. I have no evidence that sex
11 cord-stromal tumors or germ cell tumors are associated
12 with the use of talcum powder, although they are rare
13 cancers, so it would take much larger populations to
14 really fully investigate that issue.
15    Q. Do you -- strike that.
16        Does your opinion on strength of association
17 and causation apply equally to all forms of epithelial
18 ovarian cancer?
19    A. Reading the literature, it appears that there
20 is some variation in terms of impact that talcum
21 powder might have on some forms of ovarian cancer.
22    Q. Tell us what your opinions with the different
23 subtypes of epithelial ovarian cancer and whether or
24 not they are either a risk factor or a causative
25 factor for ovarian cancer.

Page 132

1         MS. O'DELL: Object to the form.
2         THE WITNESS: I'm not sure that
3 question --
4 BY MR. ZELLERS:
5    Q. I thought it was a good question. I can try
6 to do it again, but, did you not understand that
7 question?
8    A. I think what you're trying to get at is does
9 talcum powder have equal carcinogenic effect resulting
10 in different types of epithelial ovarian cancers?
11    Q. Yes.
12    A. Okay. So different types of epithelial
13 ovarian cancers are separated into several -- and we
14 believe there are several different mechanisms that
15 cause them. So in the past, they've been lumped into
16 epithelial ovarian cancers; but, in fact, the biology
17 of mucinous tumors -- cancers -- are different than
18 serous cancers.
19         Based on the epidemiologic evidence that
20 I've seen, there is a preponderance of impact on women
21 that have serous carcinomas of the ovary, which is the
22 most common ovarian cancer; and because it is the most
23 common, it's more likely we're going to see a
24 statistical association as opposed to a rarer cancer
25 like a mucinous cancer.

Page 133

1         So that is my answer to your question.
2    Q. Do your opinions as to talcum powder used in
3 the perineal area being a risk factor and/or a
4 causative factor for serous ovarian cancer also apply
5 to mucinous ovarian cancer?
6    A. I think the association is weaker for
7 mucinous.
8    Q. How about for endometrioid?
9    A. I think some studies have suggested
10 endometrioid is increased risk with talcum powder.
11    Q. Is it weaker?
12    A. Is it weaker?
13    Q. Than serous.
14    A. Than serous? I'm not certain of that.
15    Q. Clear cell, is it weaker than serous?
16    A. I'm not certain of that because clear cell is
17 a very rare cancer.
18    Q. On page 8 of your report, you say that
19 (as read):
20        "The strength of association
21        between talcum powder and ovarian
22        cancer is critically important
23        because of severity and frequency
24        of ovarian cancer."
25        Is that right?

Daniel L. Clarke-Pearson, M.D.

Page 134

1   A. That's what I say.
2   Q. Do you believe that ovarian cancer is a
3  frequently occurring disease?
4   A. In my practice it is. It occurs in 22,400
5  women a year in the United States, and about 14,000 of
6  those women will ultimately die of their cancer.
7   Q. What is your support for that?
8   A. My support for that data, the incidence of
9  ovarian cancer?
10   Q. Yes.
11   A. Well, I may have rounded it off and it may
12  not be exact, but the American -- I mean the American
13  Cancer Society, the SEER database. Those would be two
14  sources of information that count the annual incidence
15  of ovarian cancer and the mortality from ovarian
16  cancer.
17   Q. When you examine a causation, are you more
18  likely to consider a lower association causal if the
19  disease is severe or frequent?
20   MS. O'DELL: Object to the form.
21   THE WITNESS: Let me read your question
22  again.
23   I'm not sure what you mean by "lower
24  association."
25

Page 135

1  BY MR. ZELLERS:
2   Q. You have told us in your report that "the
3  strength of association between talcum powder and
4  ovarian cancer is critically important because of the
5  severity and frequency of ovarian cancer."
6   Is that right?
7   A. Yes, that's right.
8   Q. My question is, when you examine causation,
9  are you more likely to consider a lower association
10  causal if the disease is severe or frequent?
11   MS. O'DELL: Object to the form.
12   THE WITNESS: No, it doesn't have
13  anything to do with my opinion as to what the
14  causation is.
15  BY MR. ZELLERS:
16   Q. Langseth, 2008, that is a study that you have
17  reviewed and that you rely upon for your opinions in
18  this case; is that right?
19   A. I believe so. It's one of the meta-analyses,
20  as I recall.
21   Q. Are you familiar with the Langseth
22  publication?
23   A. I have read it, and I think it's of value,
24  but --
25   Q. Take a look at -- I'm going to hand you the

Page 136

1  exhibit copy.
2   A. Sure.
3   Q. We have marked this one as Exhibit 21.
4   (Exhibit No. 21 was marked for identification.)
5   THE WITNESS: Okay.
6   MS. O'DELL: Feel free to look at your
7  own copy if you'd rather, Doctor.
8  BY MR. ZELLERS:
9   Q. Do you have Exhibit 21?
10   A. Yes. You gave me two copies. Here, let me
11  give you one back.
12   Q. Ah, okay.
13   You have both the exhibit copy I gave you,
14  which is not highlighted, and you have your own
15  personal highlighted copy of the study; is that right?
16   A. Yes, sir.
17   Q. On page 7 of your report, you address this
18  meta-analysis by Langseth; is that right?
19   A. I've lost track of my report, but as soon as
20  I get to it -- here we go.
21   Q. Your report is Exhibit 5; is that right?
22   A. I have one that's not marked, but go ahead.
23   Q. Well, turn to page 7.
24   A. Mm-hmm.
25   Q. And do you see in your chart you have

Page 137

1  identified Langseth as one of the six articles that
2  you have pulled out and highlighted in your paper; is
3  that right?
4   A. Yes.
5   Q. And you list the odds ratio found by Langseth
6  and the other authors in that paper to be 1.40; is
7  that right?
8   A. That's correct.
9   Q. Go to Figure 1 on page 359 of the Langseth
10  article, Exhibit 21.
11   Do you have that?
12   A. Yes.
13   Q. And Langseth lists 20 case-control studies;
14  is that right?
15   A. I believe so.
16   Q. Of those 20 studies, only 10 have
17  statistically significant results; is that right?
18   A. I'm going to have to go through each one, so
19  give me a moment here.
20   I count 11.
21   Q. You count 11 that found a statistical
22  significance?
23   A. Where the confidence interval does not
24  overlap 1.
25   Q. Well, we have Cramer; correct?

Daniel L. Clarke-Pearson, M.D.

Page 138

1    A. Yes.
2    Q. Second, Harlow; correct?
3    A. Yes.
4    Q. Cramer again; correct?
5    A. Yes.
6    Q. Purdie; is that right?
7    A. Yes.
8    Q. Chang?
9    A. Yes.
10   Q. Cook?
11   A. Yes.
12   Q. Green?
13   A. Yep.
14   Q. Cramer?
15   A. Yep.
16   Q. Ness?
17   A. Yes.
18   Q. Mills?
19   A. Yes.
20   Q. That's 10. You see another one?
21   A. Okay. I'm sorry. I counted the pooled odds
22   ratio population-based studies. So 10. Yes, I agree
23   with you.
24   Q. So out of the 20 case-control studies that
25   are cited by Langseth and that you rely on for your

Page 139

1    opinions in this matter, only 10 of the 20 have
2    statistically significant results; is that right?
3    A. Yes.
4    Q. Is this the first time that you've done that
5    exercise, that you've actually looked at the 20
6    studies and determined that only 10 of them have
7    statistically significant results?
8        MS. O'DELL: Object to the form.
9        THE WITNESS: No. I didn't go through
10   every -- to count -- let me read your question again.
11       I was not aware of the exact count that you
12   brought to my attention. On the other hand, I think
13   that this paper results in a statistically significant
14   finding. That's the beauty of a meta-analysis.
15   BY MR. ZELLERS:
16   Q. Would you agree that 10 out of 20 is no
17   better than a coin toss?
18       MS. O'DELL: Object to the form.
19       THE WITNESS: You're misusing
20   epidemiologic data.
21   BY MR. ZELLERS:
22   Q. Would you agree that 10 out of 20 is no
23   better than a coin toss?
24       MS. O'DELL: Object to the form.
25       THE WITNESS: You'll have to tell me

Page 140

1    what 10 out of 20 we're talking about.
2        MS. O'DELL: Sorry, Doctor. Object to
3    the form. Asked and answered.
4        You may answer his question.
5    BY MR. ZELLERS:
6    Q. Generally, if you flip a coin 20 times, are
7    you going to get 10 heads and 10 tails?
8        MS. O'DELL: Object to the form.
9        THE WITNESS: Statistically, yes.
10   BY MR. ZELLERS:
11   Q. All right. Is it your opinion that 10 out of
12   20 means there are consistent results across
13   studies --
14   A. That's where a meta-analysis puts weight onto
15   some studies more than others.
16   Q. The --
17   A. -- and comes up with a conclusion that this
18   is a statistically significant finding, pooling all of
19   these papers.
20   Q. Langseth is just looking at the case-control
21   studies; is that right?
22   A. Yes.
23   Q. Langseth concluded -- and the authors
24   concluded -- that causation should be rejected and
25   that more study is needed; is that right?

Page 141

1        MS. O'DELL: Object to the form.
2        THE WITNESS: I'd have to see where
3    that's written.
4    BY MR. ZELLERS:
5    Q. Well, look under -- so same page, underneath
6    our table, see where it says "Proposal to research
7    community"?
8    A. Yes.
9    Q. (As read):
10       "The current body of experimental
11       and epidemiological evidence is
12       insufficient to establish a causal
13       association between perineal use
14       of talc and ovarian cancer risk."
15       Did I read that correctly?
16   A. You read that correctly.
17   Q. Would you agree that you're drawing
18   conclusions from this study that are broader than the
19   study authors' own conclusions?
20       MS. O'DELL: Object to the form.
21       THE WITNESS: My opinion is not based
22   on just this study; it's based on all of the studies
23   that I have in my report where there's a consistency
24   across all meta-analyses that there's a statistically
25   increased risk of ovarian cancer in women exposed to

Daniel J. Clarke-Pearson, M.D.

| Page 142 | Page 144 |
|---|---|

**Page 142**

1 perineal talc. Those confidence intervals in all of
2 those meta-analyses are statistically significant.
3          MR. ZELLERS: Move to strike as
4 nonresponsive.
5 BY MR. ZELLERS:
6    Q. Are these -- at least with the Langseth
7 paper, you've gone further than what the authors have
8 concluded; correct?
9          MS. O'DELL: Object to the form.
10          THE WITNESS: I'm developing my opinion
11 on the totality of the evidence that I have reviewed.
12 BY MR. ZELLERS:
13    Q. Please answer my question. Just on the
14 Langseth paper --
15    A. My opinion is not based on the Langseth
16 paper.
17    Q. I understand. But with respect to Langseth
18 and the opinions that you've drawn from Langseth,
19 you've gone further in your conclusions than the
20 Langseth paper authors; correct?
21    A. No, I do not.
22          MS. O'DELL: Excuse me.
23     Object to the form. Misstates his
24 testimony.
25     You may repeat your answer if you'd like.

**Page 143**

1          THE WITNESS: My conclusions are not
2 based on only Langseth. That is a piece of
3 information that I've used in formulating my opinion.
4 BY MR. ZELLERS:
5    Q. Consistency is one of the Bradford Hill
6 factors; is that right?
7    A. Yes, sir.
8    Q. On page 6 of your report, you discuss the
9 epidemiological studies on talcum powder and ovarian
10 cancer; is that right?
11    A. Yes.
12    Q. In the second paragraph, under
13 "Epidemiology," you state (as read):
14          "When looking at these
15          epidemiologic studies and their
16          totality, the data shows a
17          consistent statistically
18          significant increased risk of
19          developing EOC [epithelial ovarian
20          cancer] with perineal talcum
21          powder use."
22     Is that right?
23    A. Yes, sir.
24    Q. In looking at this section, you don't discuss
25 or address the cohort studies at all; is that right?

**Page 144**

1    A. That's right.
2    Q. You just discuss the case-control studies and
3 then the meta-analyses; is that right?
4    A. That's correct.
5          MS. O'DELL: Object to the form.
6 BY MR. ZELLERS:
7    Q. The cohort studies do not show a
8 statistically significant association between talc use
9 and ovarian cancer; is that right?
10    A. The cohort studies were not designed to
11 answer that question. They're poorly done and I don't
12 think contribute to this discussion.
13    Q. Is that a "yes," that the cohort studies do
14 not show a statistically significant association
15 between talc use and ovarian cancer?
16    A. The way they're written and studied and
17 reported, you're correct.
18    Q. Berge 2017, that's a paper you've got in one
19 of your folders that we went through earlier today.
20 And you're generally familiar with that study; is that
21 right?
22    A. Yes.
23    Q. In Berge, the authors concluded that
24 (as read):
25          "The positive association between

**Page 145**

1          talc use and ovarian cancer
2          appears to be limited to serous
3          histologic type and to
4          case-control studies."
5     Do you agree with that?
6    A. Yes.
7    Q. How can you validate completely excluding
8 cohort studies from your discussion?
9          MS. O'DELL: Object to the form.
10          THE WITNESS: Because I don't think
11 they contribute one way or the other. They're poorly
12 designed, poorly executed, and the data that they
13 provide does not inform us at all.
14          And, in fact, these meta-analyses, in many
15 cases, included the cohort studies and still came out
16 with statistically significant increased risk of
17 ovarian cancer.
18 BY MR. ZELLERS:
19    Q. It was appropriate for you to exclude the
20 cohort studies from your discussion; correct?
21          MS. O'DELL: Object --
22          THE WITNESS: I did --
23          MS. O'DELL: Excuse me. Object to the
24 form. Misstates his testimony.
25     You may answer.

Daniel L. Clarke-Pearson, M.D.

Page 146

1    THE WITNESS:  This table back here
2  that's got all these papers on it, we excluded.
3  They're not in my discussion.  I considered them, and
4  I didn't think that they contributed to the
5  information that I needed to present in my report.
6  BY MR. ZELLERS:
7    Q.  You state that Penninkilampi shows that the
8  cohort studies support a statistically -- well, strike
9  that.
10    I want to ask you a few questions about the
11  cohort studies.
12    Did you review the Gates 2010 cohort study?
13    A.  Yes.
14    Q.  The Gates 2010 cohort study found that there
15  was not a statistically significant relationship for
16  the serous invasive subtype of ovarian cancer; is that
17  right?
18    A.  I believe that's true, from my recollection.
19    Q.  Berge 2017 shows that the cohort studies do
20  not support a statistically significant relationship
21  between perineal talc use and ovarian cancer for any
22  subtype; is that right?
23    MS. O'DELL:  Object to the form.
24    THE WITNESS:  This is Berge's analysis
25  of the cohort studies and Berge's meta-analysis.  Is

Page 147

1  that the paper you're talking about?
2  BY MR. ZELLERS:
3    Q.  Yes.  2017.
4    A.  I presume, if you're reading it, that's what
5  he says.
6    Q.  Well, I'm looking at Berge 2017, page 6, left
7  column, at the bottom (as read):
8    "This positive association appears
9    to be limited to serous histologic
10    type and the case-control
11    studies."
12    We covered that earlier; correct?
13    A.  Yes.
14    MS. O'DELL:  What page, please?
15    MR. ZELLERS:  Page 6.
16  BY MR. ZELLERS:
17    Q.  We're in agreement on that; correct, Doctor?
18    MS. O'DELL:  Object to the form.  Give
19  him a moment.
20    THE WITNESS:  Yes, he says that in his
21  abstract.
22  BY MR. ZELLERS:
23    Q.  You were aware that Berge 2017 included the
24  Gates 2010 cohort study; is that right?
25    A.  Yes.  It's in Figure 2.

Page 148

1    Q.  You're aware that one of the studies --
2  another one of the meta-analyses that you cite to,
3  Penninkilampi 2018, excludes the Gates 2010 cohort
4  study; right?
5    A.  I believe so.
6    Q.  How did you make a determination to weigh
7  Penninkilampi more heavily than Berge?
8    They're both meta-analyses; correct?
9    A.  Right.
10    Q.  Why did you make a determination to weigh
11  Penninkilampi 2018 and place greater weight on it than
12  the Berge study?
13    MS. O'DELL:  Object to the form.
14    THE WITNESS:  I don't think
15  I necessarily placed greater weight on it.  I've told
16  you how I weight studies, and they all contribute to
17  the totality of my opinion.
18  BY MR. ZELLERS:
19    Q.  Did you -- well, strike that.
20    Isn't it a problem that Penninkilampi 2018
21  does not factor in the data from the Gates 2010 study,
22  given that the Gates study tends to negate an
23  association between perineal talc use and ovarian
24  cancer?
25    MS. O'DELL:  Object to the form.

Page 149

1    THE WITNESS:  I can't explain to you
2  what Penninkilampi was thinking or why he chose to
3  exclude it.
4  BY MR. ZELLERS:
5    Q.  Did you verify that the data that
6  Penninkilampi reports is accurate?
7    A.  Have I gone through every single case-control
8  study and verified every number that's in his tables?
9    Q.  Have you -- strike that.
10    Penninkilampi purports to report odds
11  ratios, lower limits and upper limits, for the
12  individual studies; is that right?
13    A.  Yes.
14    Q.  Did you go back to verify that Penninkilampi
15  was correct in his reporting of the results of those
16  individual studies?
17    A.  Yeah, that's the question I was just asking
18  you.
19    No, I did not go back.
20    Q.  In determining the study is of high quality,
21  would it be important to you that the authors are
22  accurately reporting the odds ratios and the
23  confidence intervals?
24    MS. O'DELL:  Object to the form.
25    THE WITNESS:  I trust the peer review

Daniel L. Clarke-Pearson, M.D.

| Page 150 |
| --- |

1 process that resulted in this publication.
2 BY MR. ZELLERS:
3    Q.  If there were errors in reporting of the odds
4 ratios or the confidence intervals, would that call
5 into question the reliability of the study?
6         MS. O'DELL:  Object to the form.
7         THE WITNESS:  It might.
8 BY MR. ZELLERS:
9    Q.  Of the histological subtypes for epithelial
10 ovarian cancer, do you consider endometrioid and clear
11 cell to be related?
12    A.  No.
13    Q.  You do not consider endometrioid and clear
14 cell ovarian cancer to be related?
15    A.  Only related in they fall into the
16 classification of epithelial ovarian cancers.
17    Q.  Penninkilampi only found a statistically
18 significant increased risk for serous and endometrioid
19 ovarian cancers; is that right?
20    A.  Okay.  Yes.
21         MS. O'DELL:  Let -- excuse me, Doctor.
22         If you need to look at the --
23 BY MR. ZELLERS:
24    Q.  You have Penninkilampi in front of you,
25 right, Doctor?

| Page 151 |
| --- |

1    A.  I have.
2    Q.  And if you need to take any more time to
3 answer any of my questions, please do.
4    A.  Okay.
5    Q.  Penninkilampi did not find a statistically
6 significant increased risk for clear cell or mucinous
7 ovarian cancer; is that right?
8    A.  Can you show me where you're reading it from?
9    Q.  Sure.  Take a look at the abstract for the
10 results.
11    A.  He says he found an increased risk of serous
12 and endometrioid but not mucinous or clear cell.
13    Q.  And that's where I was going to.  So our
14 record is complete, let's mark -- well, let's mark
15 both Berge 2017 -- we'll mark Berge 2017.
16         MS. O'DELL:  Mike, I think there's an
17 updated Berge publication, 2018.  Do you have the most
18 up to date?
19         MR. ZELLERS:  Asking him a question
20 about the Berge publication copyrighted 2017 that
21 appeared in "Genital Use of Talc and Risk of Ovarian
22 Cancer, a Meta-analysis."  That's the one that I'm
23 referring to and I believe the one that the doctor has
24 identified in his materials.
25         THE WITNESS:  Actually, mine is from

| Page 152 |
| --- |

1 May of 2018, European Journal of Cancer Prevention.
2 BY MR. ZELLERS:
3    Q.  Okay.  So let's do this:  Doctor, if you
4 don't mind, hand me your copy.  We'll mark that as
5 Deposition Exhibit 23.
6         MR. ZELLERS:  For right now, I'm going
7 to just put a No. 23.  And, Ms. Court Reporter, if, at
8 a break, you can put an official sticker on it.
9         MS. O'DELL:  I hate to even say this,
10 but did we mark 22?
11         MR. ZELLERS:  Yes.  So Deposition
12 Exhibit 22 is the Berge 2017 paper.
13         Deposition Exhibit 23 is the Berge
14 publication that appeared in the European Journal of
15 Cancer Prevention, dated May 2018.
16         (Exhibit Nos. 22 and 23 were marked for
17              identification.)
18 BY MR. ZELLERS:
19    Q.  So I'm going to hand both of these back to
20 you, Dr. Clarke-Pearson.
21         MR. ZELLERS:  I'm going to hand out my
22 exhibit copies to counsel.
23         Let me also, just so we have it in the
24 record, we'll mark as Deposition Exhibit 24 the
25 Penninkilampi meta-analysis that's referred to in the

| Page 153 |
| --- |

1 doctor's report.
2    (Exhibit No. 24 was marked for identification.)
3 BY MR. ZELLERS:
4    Q.  All right, Doctor.  Can I ask you some more
5 questions?
6    A.  Let's go for it.
7    Q.  Does it make sense that an environmental
8 exposure could increase the risk for endometrioid
9 ovarian cancer but not clear cell ovarian cancer?
10         MS. O'DELL:  Object to the form.
11         THE WITNESS:  Yes.
12 BY MR. ZELLERS:
13    Q.  How do you explain that finding?
14    A.  Well, we've talked about mutations
15 previously, and I'll bring it up again, that different
16 mutations occur that result in different types of
17 cancers.  And so the ovarian epithelium being exposed
18 to talcum powder may develop different cancers,
19 depending upon the impact that that talcum powder and
20 its products have on that particular cell.
21    Q.  Do you believe -- and, I think, as you told
22 us earlier -- that you find a stronger association
23 between perineal talcum powder use and serous ovarian
24 cancer than you find for endometrioid, clear cell, or
25 mucinous ovarian cancer; is that right?

Daniel L. Clarke-Pearson, M.D.

| Page 154 | Page 156 |
|---|---|

**Page 154**

1    MS. O'DELL: Object to the form.
2    THE WITNESS: I think serous has the
3  strongest association. But in some studies we see,
4  just as you're quoting from the -- whichever the study
5  is that we're looking at, that endometrioid -- the
6  Penninkilampi study -- so serous and endometrioid is
7  increased.
8  BY MR. ZELLERS:
9    Q. But not clear cell or mucinous; correct?
10    A. That's correct in this one study.
11    Q. Do you believe that Penninkilampi 2018
12  provides evidence that there's a biologically
13  plausible mechanism by which talc can cause ovarian
14  cancer?
15    A. I don't recall, and I'm not seeing it as I do
16  a quick scan, that he addresses mechanisms of
17  cancer -- carcinogenesis. I wouldn't expect that in
18  an epidemiologic study.
19    Q. Penninkilampi specifically states that
20  (as read):
21        "A certain causal link between
22        talc use and ovarian cancer has
23        not been established."
24    Correct?
25    MS. O'DELL: Object to the form.

**Page 155**

1    THE WITNESS: That's what he has
2  written, and you've read it correctly.
3    MS. O'DELL: Are you reading at a
4  certain page, Counsel?
5    MR. ZELLERS: Yes. I was reading from
6  page 42, the end of the first paragraph.
7    THE WITNESS: Okay. Right.
8  BY MR. ZELLERS:
9    Q. Did I read that correctly? It's the last
10  statement in the first paragraph in the left-hand side
11  (as read):
12        "A certain causal link between
13        talc use and ovarian cancer has
14        not yet been established."
15    Did I read that correctly?
16    A. I'm sorry. I'm losing track of where you
17  are. Are you up here?
18    Q. Right here (indicating).
19    A. Okay. Yes, you read it correctly.
20    Q. Cohort studies are not affected by recall
21  bias; is that right?
22    A. Not by recall bias, no.
23    Q. All of the cohort studies were prospective as
24  opposed to retrospective; is that right?
25    A. The cohort studies gathered information about

**Page 156**

1  exposure at one point in time and never followed the
2  patients subsequent to that to get some idea of
3  frequency of use, whether the patient continued to use
4  the talcum powder so that the real question is ever
5  use. We don't know duration and frequency from these
6  cohort.
7    MR. ZELLERS: Move to strike as
8  nonresponsive.
9    MS. O'DELL: Oppose the motion.
10    MR. ZELLERS: And, Counsel,
11  I understand that anytime I do that, you will oppose
12  it.
13    MS. O'DELL: I just wanted to make it
14  clear. Didn't want you to think I was asleep over
15  here.
16    MR. ZELLERS: I'm going to ask my
17  question again.
18  BY MR. ZELLERS:
19    Q. Dr. Clarke-Pearson, all of the cohort studies
20  were prospective as opposed to retrospective; correct?
21    A. They're prospective except for the fact that
22  they don't continue to evaluate the ongoing use of
23  talc in these patients. It was a point in time that
24  the patient was asked whether she did or didn't use
25  talc.

**Page 157**

1    Q. The cohort studies were not subject to the
2  same selection bias as retrospective case-control
3  studies; is that right?
4    A. That's true.
5    Q. Recall bias is a concern in every
6  retrospective study; correct?
7    A. Yes.
8    Q. Recall bias can distort a scientific
9  evaluation of whether an exposure is actually related
10  to a disease; correct?
11    MS. O'DELL: Object to the form.
12    THE WITNESS: Let me read your question
13  again.
14    Recall bias has that risk of not being able
15  to analyze the data.
16  BY MR. ZELLERS:
17    Q. For example, recall bias could distort
18  results if women with ovarian cancer were more likely
19  to remember their exposure to talc than women without
20  ovarian cancer; is that right?
21    MS. O'DELL: Object to the form.
22    THE WITNESS: The issue in these large
23  case-control trials is that we have many, many more
24  women in them that have ovarian cancer. And,
25  therefore, those potentially confounding factors get

Daniel L. Clarke-Pearson, M.D.

Page 158

1 worked out in most cases, and there is a consistency
2 across all of these studies.
3 BY MR. ZELLERS:
4     Q. I'm going to ask you about consistency. I'm
5 going to ask you about confounding factors. But, for
6 right now, please try to answer my question.
7         Recall bias could distort results if women
8 with ovarian cancer were more likely to remember their
9 exposure to talc than women without ovarian cancer;
10 correct?
11     A. Yes, that could distort the results.
12     Q. Recall bias could explain the fact that some
13 retrospective case-control studies have found a
14 statistically significant relationship between talcum
15 powder and ovarian cancer but the cohort studies have
16 not; correct?
17         MS. O'DELL: Object to the form.
18         THE WITNESS: (As read):
19         "Recall bias could explain the
20         fact that some retrospective
21         case-control studies have found a
22         statistically significant
23         relationship between talcum powder
24         and ovarian cancer?"
25         Yes, that's true.

Page 159

1         And then you go on to say "but the cohort
2 studies have not."
3         Have not found a statistically significant
4 relationship? That's true. The cohort studies
5 haven't found a statistically -- because the cohort
6 studies have many other confounding and inadequate
7 parts of their evaluation.
8         MR. ZELLERS: Move to strike as
9 nonresponsive.
10 BY MR. ZELLERS:
11     Q. You rely on the Schildkraut case-control 2016
12 study for your opinions about dose response; is that
13 right?
14     A. About what response?
15     Q. About dose response.
16     A. Dose response? That's one of the studies.
17     Q. All right. Take a look, if you will, please,
18 at Deposition Exhibit 25, which is the Schildkraut
19 2016 study cited and relied upon by you.
20     (Exhibit No. 25 was marked for identification.)
21 BY MR. ZELLERS:
22     Q. Do you have that in front of you?
23     A. Yes. You just handed it to me.
24     Q. And this is a study that you have previously
25 reviewed and you cite to in your materials in this

Page 160

1 case; is that right?
2     A. Yes.
3     Q. Schildkraut 2016 looked at, among other
4 things, what impact, if any, lawsuit filings in 2014
5 had had on whether women recalled using talc in the
6 past; is that right?
7     A. I think she tried to evaluate that, yes.
8     Q. The authors thought that the publicity from
9 the lawsuits might influence the participants' recall
10 of prior body powder use; is that right?
11     A. Yes.
12     Q. If we go to page 4 of Exhibit 25 --
13     A. Page 1414, Table 2?
14     Q. Yeah. Page 1414, Table 2, the second column
15 shows the number of cases. That's women with ovarian
16 cancer; is that right?
17     A. Yes.
18     Q. The third column shows the controls. Those
19 are the women who do not have ovarian cancer; is that
20 right?
21     A. That's correct.
22     Q. Looking at this data, before 2014, before the
23 lawsuits, the percentage of controls -- meaning women
24 without ovarian cancer -- who said they used talc on
25 their genitals was 34 percent; is that right?

Page 161

1     A. That's not in this table, I don't think, is
2 it?
3     Q. Take a look -- do you see, under "Exposure,"
4 "Body powder use by location"? It's about eight lines
5 down, "Interview date, less than or earlier than
6 2014."
7     A. I'm with you, yeah. Okay.
8     Q. All right. So the percentage of controls --
9 meaning women without ovarian cancer -- who said they
10 used talc on their genitals was 34 percent; is that
11 right?
12     A. I'm not seeing that. I see "interview date
13 less than 2014, never used."
14     Q. Then you go down to "any genital use."
15     A. Okay. "Any genital use, 34 percent," yes.
16 I see what you're saying.
17     Q. And then the percentage of cases -- meaning
18 women with ovarian cancer -- that they said used talc
19 on their genitals who were interviewed before 2014 was
20 36.5 percent; is that right?
21     A. Right. That's correct.
22     Q. So roughly the same reporting of genital talc
23 use between women with and without ovarian cancer
24 before the lawsuits were filed; is that right?
25     A. Yes.

Daniel F. Clarke-Pearson, M.D.

| Page 162 | Page 164 |
|---|---|
| 1    Q.  Now, look at what happened after the lawsuits | 1   BY MR. ZELLERS: |
| 2  were filed. | 2    Q.  At least according to the author, the women, |
| 3    A.  I see. | 3  after a lawsuit was filed, with ovarian cancer |
| 4    Q.  After 2014, what percent of women without | 4  remembered using talc much more than the women without |
| 5  ovarian cancer said they used talc on their genitals? | 5  ovarian cancer; correct? |
| 6    A.  34.4 percent. | 6    A.  Yes. |
| 7    Q.  So essentially the same as before; is that | 7       MS. O'DELL:  Object to the form. |
| 8  right? | 8   BY MR. ZELLERS: |
| 9    A.  Yes. | 9    Q.  Those findings would be an example of the |
| 10    Q.  So, based on this data, the lawsuits had | 10  potential effect of recall bias; is that right? |
| 11  essentially no effect on how many of the women without | 11    A.  Yes. |
| 12  ovarian cancer, the controls, remembered or recalled | 12       MS. O'DELL:  Object to the form. |
| 13  using baby powder; is that right? | 13   BY MR. ZELLERS: |
| 14    A.  That seems to be true. | 14    Q.  What was your methodology for discounting the |
| 15    Q.  For women with ovarian cancer, as we | 15  effect of recall bias in the population-based |
| 16  discussed, before the lawsuits were filed, | 16  case-control studies? |
| 17  36.5 percent of them said they recalled using baby | 17    A.  My methodology was to rely on a skilled |
| 18  powder; is that right? | 18  epidemiologist like Dr. Schildkraut to work her way |
| 19    A.  Yes. | 19  through all of the data and come up to her |
| 20    Q.  But after the lawsuits were filed, | 20  conclusions. |
| 21  the percent of women with ovarian cancer who said they | 21    Q.  Is there a rate of error in such a |
| 22  used baby powder went up to 51.5 percent; is that | 22  methodology? |
| 23  right? | 23       MS. O'DELL:  Object to the form. |
| 24    A.  That's correct. | 24       THE WITNESS:  I'm not sure I know what |
| 25    Q.  So after the lawsuits were filed, the percent | 25  you mean by "rate of error." |

| Page 163 | Page 165 |
|---|---|
| 1  of women with ovarian cancer who said they used baby | 1   BY MR. ZELLERS: |
| 2  powder jumped by over 40 percent; is that right? | 2    Q.  Didn't the cohort studies involve a much |
| 3    A.  It went from 36.5 to 51.5. | 3  greater number of women than the case-control studies? |
| 4    Q.  That's just over 40 percent; correct?  That | 4    A.  More women altogether, but less cancer cases. |
| 5  increase? | 5    Q.  What was your methodology for weighing the |
| 6    A.  From 36 to 51? | 6  power of the cohort of studies versus the case-control |
| 7    Q.  Yes. | 7  studies? |
| 8    A.  You're doing the math, but -- | 8    A.  My methodology was to look at the issues |
| 9    Q.  Well, it's a substantial increase. | 9  regarding cohort studies that are at fault, that are |
| 10    A.  Yes. | 10  defective in their trial design and the reporting of |
| 11    Q.  Would you agree with that? | 11  their data. |
| 12       MS. O'DELL:  Object to the form. | 12    Q.  You're speaking about cohort studies in |
| 13       THE WITNESS:  Yes. | 13  general; is that right? |
| 14   BY MR. ZELLERS: | 14    A.  Well, three cohort studies. |
| 15    Q.  All right.  So, looking at this data, lawsuit | 15    Q.  Is that right?  But you're talking about the |
| 16  filings affected how many women with ovarian cancer | 16  studies in general as opposed to specific aspects of |
| 17  remembered using talc on their genitals but basically | 17  the individual cohort studies? |
| 18  had no effect on the memory of women without ovarian | 18    A.  We can go through the specifics of these |
| 19  cancer; correct? | 19  three studies. |
| 20       MS. O'DELL:  Object to the form. | 20    Q.  Well, Gates 2010, the Nurses' Health Study, |
| 21       THE WITNESS:  I don't know that it -- | 21  did you review that? |
| 22  the hypothesis that Dr. Schildkraut puts out there is | 22    A.  Yes. |
| 23  that the lawsuit filings may have changed women's | 23    Q.  It was a follow-up to the cohort study Gertig |
| 24  recall, if you will.  There may be other factors that | 24  2000; is that right? |
| 25  are involved here too. | 25    A.  Yes. |

Daniel L. Clarke-Pearson, M.D.

Page 166

1    Q.  It's an analysis of data collected in the
2  Nurses' Health Study; correct?
3    A.  Yes.
4    Q.  The analysis included over 100,000 women; is
5  that right?
6    A.  I believe so.
7    Q.  The women in the Nurses' Health Study were
8  followed from 1976 to 2006, so for 30 years; is that
9  right?
10   A.  The knowledge in this study by the study --
11 the researchers doing the study did not gain any
12 information about exposure until 1982.
13   Q.  After following over 100,000 women for three
14 decades, the data did not show a statistically
15 significant relationship between talcum powder use and
16 any type of epithelial ovarian cancer; is that
17 correct?
18       MS. O'DELL:  Object to the form.
19       THE WITNESS:  That's correct, and
20 there's many defects in the design of this study.
21       For example, the patients were never asked,
22 once again after 1982, whether they used or didn't use
23 talc or how frequently they used talc.
24 BY MR. ZELLERS:
25   Q.  Well, let me ask you questions about that.

Page 167

1       The Nurses' Health Study participants were
2  between the ages of 30 to 55 at the start of the study
3  in 1976; is that right?
4    A.  I believe so.
5       MS. O'DELL:  If you need to see it --
6       THE WITNESS:  I don't have -- well,
7  maybe I do have it here.
8  BY MR. ZELLERS:
9    Q.  If you need to take a look at it -- do you
10 have it in front of you?  I can give it to you if you
11 need it.
12   A.  Okay.
13   Q.  So my question is the Nurses' Health Study
14 participants were between the ages of 30 to 55 at the
15 start of the study in 1976; is that right?
16   A.  Yes.
17   Q.  They were asked about their talcum powder use
18 in 1982; is that right?
19   A.  That's my understanding, yes.
20   Q.  So they would have been between the ages of
21 36 and 61 when they were asked about their talcum
22 powder use; is that right?
23   A.  Yes.
24   Q.  Most women, as we have discussed, who used
25 talc in their perineal region start that use before

Page 168

1  age 30; right?
2    A.  That's what we've seen in other studies.
3    Q.  So if a study asks women ages 36 to 61 if
4  they use talcum powder, it would capture the majority
5  of women who use genital powder during the follow-up
6  period; correct?
7       MS. O'DELL:  Objection to form.
8       THE WITNESS:  During the follow-up
9  period?
10 BY MR. ZELLERS:
11   Q.  Yes.
12   A.  No.  It's a point in time.  The question was
13 ever used up to 1982.
14   Q.  It would capture the majority of women who
15 use, genital powder use; is that right?  In this
16 study.
17       MS. O'DELL:  Object to the form.
18       THE WITNESS:  Up till 1982.
19 BY MR. ZELLERS:
20   Q.  Houghton, 2014, the Women's Health Initiative
21 Study, did you review that study?
22   A.  I did.
23   Q.  That study involves over 61,000 women; is
24 that right?
25   A.  And only 429 cases of ovarian cancer.

Page 169

1    Q.  Houghton 2014 did not find a statistically
2  significant relationship between perineal talc use and
3  ovarian cancer among women who had ever used talc; is
4  that right?
5    A.  Yes.  And this study was not powered to
6  identify --
7       MS. O'DELL:  If you need it.
8       THE WITNESS:  -- the relative risk that
9  we're talking about in the cohort studies -- I mean
10 the case-control studies.  Excuse me.
11 BY MR. ZELLERS:
12   Q.  Or among women who had fewer than nine years
13 of perineal talc use; right?
14   A.  That's what I believe.
15   Q.  I'm looking at page 4, Houghton 2014,
16 Table 2.
17   A.  Okay.  The question again?  Table 2?
18   Q.  Yeah.  The question is Houghton did not find
19 a statistically significant relationship between
20 perineal talc use and ovarian cancer among women who
21 had fewer than nine years of perineal talc use; right?
22   A.  Yes.  That sort of exposure is minimal.
23   Q.  Or among women who had more than ten years of
24 perineal talc use; is that right?
25   A.  Yes.

Daniel L. Clarke-Pearson, M.D.

| Page 170 | Page 172 |
|---|---|
| 1    Q.  And the same results for talcum powder on a | 1    Q.  Sure. |
| 2  sanitary napkins or diaphragms; is that right? | 2    A.  So he is saying that the cohort studies are |
| 3    A.  Yes. | 3  not powered to detect 1.25. |
| 4    Q.  Isn't it true that, when combined in a | 4    Q.  What he is saying, I believe, is that the |
| 5  meta-analysis, these cohort studies, the three that | 5  cohort studies are powered to detect a relative risk |
| 6  we're talking about, have sufficient power to detect a | 6  of 1.25, which was the basis for his conclusion in the |
| 7  relative risk of 1.25? | 7  last sentence (as read): |
| 8    A.  I'm not aware that that -- how that | 8        "Thus low power of cohort studies |
| 9  calculation was made. | 9    cannot be invoked as explanation |
| 10    Q.  Did you consider the published power | 10    of the heterogeneity of results." |
| 11  calculation by Berge? | 11      MS. O'DELL:  Object to the form. |
| 12      And so if you look at the Berge 2017 paper, | 12      THE WITNESS:  I read that with a |
| 13  page 6, second column, first paragraph, Berge and his | 13  different understanding. |
| 14  coauthor states (as read): | 14      What he's saying is that the ability of the |
| 15        "The statistical power of the | 15  cohort study is to detect a relative risk of 1.25 that |
| 16    meta-analysis of these cohort | 16  is similar to the results of the meta-analyses |
| 17    studies" -- | 17  case-control studies was only .99. |
| 18      MS. O'DELL:  I'm sorry, Mike.  Where | 18      So those cohort studies aren't powered to |
| 19  are you reading?  Page 6? | 19  detect 1.25. |
| 20      MR. ZELLERS:  Page 6, second column, | 20  BY MR. ZELLERS: |
| 21  first paragraph. | 21    Q.  Does Berge conclude "Thus low power of cohort |
| 22      MS. O'DELL:  Thank you. | 22  studies cannot be invoked as explanation of the |
| 23      MR. ZELLERS:  Sure. | 23  heterogeneity of results"? |
| 24      THE WITNESS:  Second column.  That's | 24    A.  And I'm not sure what I mean -- what you mean |
| 25  what this looks like to me (indicating). | 25  by -- what he means by "heterogeneity of results." |

| Page 171 | Page 173 |
|---|---|
| 1  BY MR. ZELLERS: | 1    Q.  Did I read it correctly? |
| 2    Q.  Looking at Exhibit 22. | 2    A.  Yes, you read it correctly. |
| 3    A.  I've got 23, which is the more recent paper. | 3    Q.  All right. |
| 4    Q.  Well, take a look at 22, which is the year | 4      You're familiar with the hospital-based |
| 5  before, 2017.  And I'm looking at page 6.  And I'm | 5  case-control studies; is that right? |
| 6  looking at the last part of the first full paragraph | 6    A.  They are part of the case-control studies, |
| 7  in the right-hand column. | 7  yes. |
| 8      Are you with me? | 8    Q.  You agree with me that none of the |
| 9    A.  "The important feature of the present | 9  hospital-based case-control studies show a |
| 10  meta-analysis"? | 10  statistically significant association between talc use |
| 11    Q.  Yes. | 11  and ovarian cancer; is that right? |
| 12    A.  Okay. | 12      MS. O'DELL:  Object to the form. |
| 13    Q.  And so if we go down about two-thirds of the | 13      THE WITNESS:  I would have to go back |
| 14  way, Berge and the authors conclude (as read): | 14  to each one of those studies, sir. |
| 15        "The statistical power of the | 15  BY MR. ZELLERS: |
| 16    meta-analysis of these cohort | 16    Q.  Well, let's -- do you have Langseth there? |
| 17    studies to detect a relative risk | 17  That might be an easy way to -- |
| 18    of 1.25, similar to the result of | 18    A.  I do. |
| 19    the meta-analysis of case-control | 19    Q.  -- take a look at this. |
| 20    studies, was 0.99.  Thus low power | 20      We looked at the Langseth as Deposition |
| 21    of cohort studies cannot be | 21  Exhibit 21. |
| 22    invoked as an explanation of the | 22    A.  I have it. |
| 23    heterogeneity of results." | 23    Q.  And if we look at his table on page 359, he |
| 24      Do you see that? | 24  lists out each of the hospital-based case-control |
| 25    A.  Let me read it one more time, please. | 25  studies. |

Daniel L. Clarke-Pearson, M.D.

Page 174

1      Do you see that?
2      A.  Right.  Those are in the forest plot, yes.
3      Q.  None of the hospital-based case-control
4  studies show a statistically significant association
5  between talc use and ovarian cancer; correct?
6      A.  Yes.
7      Q.  The results of the hospital-based
8  case-control studies are not consistent with the
9  results of the population-based case-control studies;
10  correct?
11      A.  That's right.  That's why they're combined.
12      Q.  What methodology did you use to account for
13  this lack of consistency between the population-based
14  case-control studies and the hospital-based
15  case-control studies?
16      A.  This is what the beauty of a meta-analysis
17  is, where it brings together all the studies and comes
18  to a conclusion.  And the conclusion here is that
19  there's a 1.35 risk of developing ovarian cancer in
20  women who receive perineal talc.
21      Q.  Which Langseth and the other authors
22  concluded was "insufficient to establish a causal
23  association between perineal use of talc and ovarian
24  cancer risk"; correct?
25          MS. O'DELL:  Object to the form.

Page 175

1          THE WITNESS:  It's statistically
2  significant, which to a clinician means that we could
3  reduce the risk of ovarian cancer if we eliminated
4  talcum powder from the patients that are being exposed
5  to it.
6          MS. BOCKUS:  Object.  Nonresponsive.
7          MR. ZELLERS:  Joined.
8  BY MR. ZELLERS:
9      Q.  Are you familiar with the term "selection
10  bias"?
11      A.  Yes.
12      Q.  What does "selection bias" mean?
13      A.  Means that the selection of the patients in a
14  particular study may be inappropriate, that they may
15  not be the proper controls or the proper candidates to
16  be included in the study.
17      Q.  You agree that hospital-based case-control
18  studies may be less susceptible to selection bias than
19  population-based case-control studies; correct?
20          MS. O'DELL:  Object to the form.
21          THE WITNESS:  I'm not sure I believe
22  that.
23  BY MR. ZELLERS:
24      Q.  Well, hospital-based case-control studies,
25  you're more likely to be comparing hospitalized

Page 176

1  patients to hospitalized patients; is that right?
2      A.  Yes.
3      Q.  Whereas in a population-based study, you're
4  more likely to be comparing ill people to healthy
5  people; is that right?
6          MS. O'DELL:  Object to the form.
7          THE WITNESS:  In a hospital-based
8  study, the people are ill.  That's why they're in the
9  hospital.
10  BY MR. ZELLERS:
11      Q.  And they're compared to other ill people,
12  other hospitalized patients; is that right?
13      A.  Yes.
14      Q.  There's a difference in the populations that
15  are being studied between a hospital-based
16  case-control study and a population-based case-control
17  study; correct?
18      A.  Yes.
19      Q.  How did you account for selection bias in
20  population case-control studies?
21      A.  I think if there was selection bias -- and
22  I didn't control for selection bias, but if there was
23  selection bias, first of all, it would be usually
24  negated by the large number of patients in that study.
25      Q.  Even among the population-based case

Page 177

1  controls, some studies have shown statistically
2  significant findings and some have not; is that right?
3      A.  Yes.
4      Q.  What is your methodology for weighing the
5  lack of consistency in statistical significance across
6  case-control studies?
7          MS. O'DELL:  Objection to form.
8          THE WITNESS:  That's where a
9  meta-analysis becomes a very valuable tool.
10  BY MR. ZELLERS:
11      Q.  You agree that, if a study does not show a
12  statistically significant association, it could mean
13  that no risk exists; is that right?
14      A.  It's a possibility, yes.
15          MS. O'DELL:  Excuse me, Mike.  When you
16  get to a -- we've been going an hour and 45 minutes or
17  so.
18          MR. ZELLERS:  Let's take a break.
19          THE VIDEOGRAPHER:  Going off the record
20  at 12:46 p.m.
21      (Recess taken from 12:46 p.m. to 1:45 p.m.)
22          THE VIDEOGRAPHER:  Back on record at
23  1:45 p.m.
24  BY MR. ZELLERS:
25      Q.  Dr. Clarke-Pearson, in your report, page 7,

Daniel L. Clarke-Pearson, M.D.

Page 178

1  you have a table where you state that you reviewed six
2  meta-analyses reported between 1995 and 2018; is that
3  right?
4      A. Yes. I overlooked adding Berge to this list.
5      Q. What other studies did you overlook adding to
6  this list?
7      A. Subsequent to my report, there's also a
8  meta-analysis by Taher.
9      Q. Any other studies that you omitted from your
10  report and specifically the table on page 7?
11          MS. O'DELL: Object to the form.
12          THE WITNESS: No, not that I'm aware
13  of.
14  BY MR. ZELLERS:
15      Q. What's the difference -- well, strike that.
16          In your report, page 7, you list out five
17  meta-analyses and a pooled analysis; is that right?
18      A. Yes.
19      Q. What is the difference between a pooled
20  analysis and a meta-analysis?
21      A. You know, I really can't give you a good
22  definition of that.
23      Q. How did you select these five studies to set
24  forth in your report?
25      A. I think these were all of the meta-analyses

Page 179

1  that I was aware of.
2      Q. Did you only review the studies that showed a
3  statistically significant relationship between
4  perineal talc use and ovarian cancer?
5      A. I believe I included all the meta-analyses
6  that I could identify.
7      Q. Meta-analyses and pooled analyses combine the
8  work of other published studies into one study; is
9  that right?
10      A. Yes.
11      Q. If there are biases and confounding in the
12  underlying studies, the meta-analysis or pooled
13  analysis will reflect the biases and confounding;
14  correct?
15          MS. O'DELL: Object to the form.
16          THE WITNESS: It obviously varies from
17  one study to another. I would be very surprised if
18  all studies included in the meta-analysis had the same
19  errors, if you will.
20  BY MR. ZELLERS:
21      Q. Well, can you answer that question?
22          If there are biases and confounding in the
23  underlying studies, the meta-analysis or pooled
24  analysis will reflect the biases and confounding;
25  correct?

Page 180

1          MS. O'DELL: Object to the form.
2          THE WITNESS: To some degree.
3  BY MR. ZELLERS:
4      Q. A proper meta-analysis or pooled analysis
5  must analyze the sources of heterogeneity across the
6  studies; right?
7      A. Yes.
8      Q. And a proper meta-analysis or pooled analysis
9  must examine the methodology that lead to the
10  underlying studies; right?
11      A. Yes. I think that's where the weighting done
12  in the meta-analysis helps.
13      Q. Did you examine the methodology in the
14  studies underlying these meta-analyses and pooled
15  analyses?
16      A. Not in detail.
17      Q. Do you agree that consistency exists when
18  different studies look at different populations --
19  strike that. Let me ask that question again.
20          Do you agree that consistency exists when
21  different studies looking at different populations
22  reach consistent results?
23          MS. O'DELL: Object to the form.
24          THE WITNESS: Yes. It seems to be what
25  I would consider consistency.

Page 181

1  BY MR. ZELLERS:
2      Q. A meta-analysis does not demonstrate whether
3  similar results were replicated across different
4  populations; correct?
5      A. Yes. It combines all the papers that were
6  considered in the meta-analysis.
7      Q. It combines study results into one risk
8  calculation; is that right?
9      A. After weighting the different studies in
10  terms of the number of patients and the statistics.
11      Q. Therefore, meta-analyses themselves cannot
12  demonstrate consistency of results across different
13  populations; correct?
14          MS. O'DELL: Object to the form.
15          THE WITNESS: They could demonstrate
16  consistency.
17  BY MR. ZELLERS:
18      Q. How could they demonstrate consistency of
19  results across different populations if what they're
20  doing is combining the study results into one risk
21  calculation?
22          MS. O'DELL: Object to the form.
23          THE WITNESS: I don't understand what
24  you mean by them not being able to demonstrate
25  consistency across different populations.

Daniel L. Clarke-Pearson, M.D.

| Page 182 | Page 184 |
|---|---|
| 1  BY MR. ZELLERS: | 1  can let the record -- correct this later if need be. |
| 2      Q.  In your report, you claim that Penninkilampi | 2      Doctor -- |
| 3  and every meta-analysis before 2018 report a similar | 3          MS. O'DELL:  I'll have it in front of |
| 4  increase in the risk of epithelial ovarian cancer with | 4  you in one moment, Doctor. |
| 5  the use of talcum powder; is that right? | 5  BY MR. ZELLERS: |
| 6      A.  Yes. | 6      Q.  Okay.  Dr. Clarke-Pearson, you now have |
| 7      Q.  But each of these meta-analyses that you set | 7  Langseth 2008 and Cramer 1999 in front of you; is that |
| 8  forth on page 7 of your report use many of the same | 8  right? |
| 9  studies as the other meta-analyses; is that right? | 9      A.  Yes. |
| 10     A.  Yes.  Over time, new case-control studies | 10     Q.  Langseth 2008 included all but one of the 14 |
| 11  were added to the meta-analyses. | 11  studies that were included in Cramer 1999; is that |
| 12     Q.  Well, for instance, Langseth 2008 and Graham | 12  right? |
| 13  1999 each include all nine of the studies that were | 13     A.  This is the Cramer case-control study. |
| 14  included in Gross and Berg 1995; is that right? | 14     Q.  Let me ask you the question this way, Doctor: |
| 15         MS. O'DELL:  Object to the form. | 15  Do you have any reason to doubt as you sit here or |
| 16         THE WITNESS:  I believe -- | 16  dispute as you sit here that Langseth 2008 did not |
| 17         MS. O'DELL:  Did you say Graham '99? | 17  include all but one of the 14 studies that were |
| 18         MR. ZELLERS:  No, I said Cramer '99. | 18  included in Cramer 1999? |
| 19         MS. O'DELL:  Okay.  I thought you said | 19     A.  I would accept that as the truth. |
| 20  Graham. | 20     Q.  Thank you.  As you sit here, do you have any |
| 21         THE WITNESS:  It says Graham on the | 21  reason to doubt or dispute that Langseth 2008 included |
| 22  transcription. | 22  all but one of the 15 studies that were included in |
| 23         MS. O'DELL:  So Cramer is what you're | 23  Huncharek 2003? |
| 24  referring to, '99? | 24         I understand you don't have the studies in |
| 25         MR. ZELLERS:  Yes.  I'll ask that | 25  front of you to be able to make that -- |

| Page 183 | Page 185 |
|---|---|
| 1  question again if it was unclear. | 1          MS. O'DELL:  Let me just -- I would |
| 2  BY MR. ZELLERS: | 2  just object to the line of questions.  If you're going |
| 3      Q.  For instance, Langseth 2008 and Cramer 1999 | 3  to ask the specific studies that are listed in the |
| 4  each included all nine of the studies that were | 4  table and ask him to compare -- |
| 5  included in Gross and Berg 1995; correct? | 5          MR. ZELLERS:  No.  What I'm asking him, |
| 6      A.  I believe so. | 6  Counsel -- |
| 7      Q.  Langseth 2008 included all but one of the 14 | 7          MS. O'DELL:  Let me finish. |
| 8  studies that were included in Cramer 1999; correct? | 8          It's unfair to ask him to make comparisons |
| 9          MS. O'DELL:  And if you need to | 9  regarding the studies included in the meta-analyses |
| 10  compare -- | 10  without affording him the opportunity to look at the |
| 11         THE WITNESS:  I need to see the paper. | 11  articles themselves. |
| 12  I have Langseth; if I can see Cramer's. | 12         MR. ZELLERS:  And, Counsel, as you |
| 13  BY MR. ZELLERS: | 13  know, we've got limited time, and I don't want to sit |
| 14     Q.  Well, did you consider this in terms of | 14  here -- |
| 15  analyzing the information and data? | 15         MS. O'DELL:  It's still an unfair |
| 16     A.  No. | 16  question. |
| 17     Q.  Take a look, then, if you need to, at the | 17         MR. ZELLERS:  It is not an unfair |
| 18  Cramer 1999 paper. | 18  question to ask this witness if he has any reason as |
| 19         MS. O'DELL:  Just a moment.  I'm sorry. | 19  he sits here to dispute or to doubt that Langseth 2008 |
| 20  BY MR. ZELLERS: | 20  included all but one of the 15 studies that were |
| 21     Q.  We're still just looking at your folders from | 21  included in Huncharek 2003. |
| 22  earlier today that you have in front of you; right, | 22         MS. O'DELL:  Well, that's not a fair |
| 23  Doctor? | 23  question when you're not providing him an opportunity |
| 24     A.  Yes. | 24  to compare the two. |
| 25     Q.  Let me phrase it a different way, and then we | 25         And so if Dr. Clarke-Pearson wants to see a |

Daniel L. Clarke-Pearson, M.D.

Page 186

1  copy of the study, then we'll put it in front of him,
2  because that's not a fair analysis, particularly when
3  you're talking about multiple -- more than 10 to 15
4  meta-analyses -- excuse me -- cohorts over time.
5      MR. ZELLERS:  Counsel, I've asked you a
6  number of times not to make speaking objections.  All
7  that I am doing is asking the doctor questions about
8  the studies included in the six meta-analyses and
9  pooled analysis that he sets out in a chart.
10     If he doesn't have the answer, my question
11  is framed as to whether or not he has any reason to
12  dispute or doubt the overlap of studies.
13     MS. O'DELL:  Well, I would just say,
14  Dr. Clarke-Pearson, to the degree you remember, you
15  can answer his questions.  But, to the degree he asks
16  you to assume something, don't assume that what
17  counsel is stating correct because it may or may
18  not be true.
19     MR. ZELLERS:  And I'm not asking the
20  doctor to assume.
21     MS. O'DELL:  Yes, you did.
22     MR. ZELLERS:  I did not ask him to
23  assume, Counsel.  You can go back and read the
24  question, but it did not ask him to assume that.  It
25  asked him if he was aware of there being any

Page 187

1  difference in terms of Langseth including all but one
2  of the 15 studies that were included in Huncharek
3  2003.
4      MS. O'DELL:  I stand corrected.  You
5  said "Do you have any reason to doubt or dispute,"
6  which I took to be --
7      MR. ZELLERS:  "Do you have any reason
8  to" --
9      MS. O'DELL:  -- which I took to be
10  assume.
11     And I'm asking you to assume that counsel is
12  not being accurate.
13  BY MR. ZELLERS:
14     Q.  Can you answer my question, Doctor?
15     And here's my question:  Do you have any
16  reason to believe that Langseth 2008, which you cite,
17  included all but one of the 15 studies that were
18  included in Huncharek 2003, which you cite?
19     A.  Without reading and going through the table
20  of the 'teen or so studies, I would have to assume
21  that you're representing properly what --
22     Q.  That is not a comparison that you have made
23  personally; correct?
24     A.  I have not.  And if I did, I can't remember
25  now.

Page 188

1      Q.  Okay.
2      A.  I mean, if this is a quiz about memorizing
3  details of clinical studies, then...
4      Q.  I don't want it to be a quiz.  Let me ask you
5  a new question.
6      If the meta-analyses are all combining the
7  same set of studies, you would expect them to yield
8  similar results; correct?
9      A.  If they only contain the same set of studies
10  but each one had slightly different, and the more
11  recent ones added studies to them.
12     Q.  Have you attempted to quantify how much
13  talcum powder reaches a woman's ovaries when they use
14  a talcum powder product?
15     A.  Have I done some experiment?
16     Q.  Yes.
17     A.  I know that talcum powder gets there; I have
18  not done any experimentation to that question.
19     Q.  Do you have any -- were you finished?
20     A.  Yes.
21     MS. BOCKUS:  Object as nonresponsive.
22  BY MR. ZELLERS:
23     Q.  Do you have any idea how much talcum powder
24  reaches a woman's ovaries each time she uses it?
25     A.  I'm sure it varies depending upon the

Page 189

1  menstrual cycle, the age of the patient, the patient's
2  anatomy.
3      Q.  It's fair to say you don't know and have not
4  done any type of calculation or experiment to
5  determine the answer to that question; correct?
6      MS. O'DELL:  Object to the form.
7      THE WITNESS:  That's correct.
8  BY MR. ZELLERS:
9      Q.  Isn't the biological mechanism dependent on
10  how much talc a woman's ovaries are exposed to?
11     A.  Which biological mechanism are you talking
12  about?
13     Q.  Dose response.
14     MS. O'DELL:  Object to the form.
15     THE WITNESS:  So, then, rephrasing your
16  question, isn't the dose response dependent upon how
17  much talc a woman's ovaries are exposed to?
18  BY MR. ZELLERS:
19     Q.  I'll accept that.
20     A.  That sounds like the answer -- you answered
21  your own question.
22     Q.  Well, I need you to answer the question.  The
23  answer is a yes to that question; correct?
24     A.  The dose is dependent upon how much talc gets
25  to the ovaries, yes.

Daniel I. Clarke-Pearson, M.D.

Page 190

1    Q.  And you've not done a calculation or
2  experiment to determine what that amount is; correct?
3    A.  That's correct.
4    Q.  All right.
5        Let me mark Cramer 2016.  We discussed it
6  earlier, but we'll mark it for the record.  This is a
7  study that you cite in your materials.  We'll mark it
8  as Exhibit 26.
9    (Exhibit No. 26 was marked for identification.)
10 BY MR. ZELLERS:
11   Q.  You recognize this paper; correct?
12   A.  I've reviewed it.
13   Q.  This is a retrospective case-control study
14 published in 2016; correct?
15   A.  Yes.
16   Q.  You discuss this study in your report on
17 page 9; is that right?
18   A.  Let me turn to page 9.
19   Q.  Sure.  I'm looking under "Biologic
20 Gradient/Dose-response" right in the middle.
21       You claim that (as read):
22       "A number of studies have
23       demonstrated an association
24       between 'dose' and the occurrence
25       of EOC [or epithelial ovarian

Page 191

1       cancer] (response)."
2       Is that right?
3    A.  That's correct.
4    Q.  Let's look at what the Cramer study shows.
5        Turn to page 337 of the Cramer paper, if you
6  will, Exhibit 26 to the deposition.
7        Do you see Table 1?
8    A.  Yes, sir.
9    Q.  Table 1 shows the risk of ovarian cancer for
10 women who use talc daily for different periods of
11 time -- 1 year, 1 to 5 years, 5 to 20 years, and more
12 than 20 years.  Is that right?
13   A.  Yes.
14   Q.  There was only statistical significance for
15 one to five years of use and for more than 20 years of
16 use; is that right?
17   A.  According to the odds ratio and the
18 confidence intervals, yes.
19   Q.  If there is a dose response, shouldn't there
20 continue to be statistical significance with increased
21 exposure?
22   A.  In general, you would think that.  But, on
23 the other hand, maybe we don't have to have a dose
24 response to cause cancer.
25   Q.  Well, certainly you've opined in your report

Page 192

1  that there is a dose response; is that right?
2    A.  Yes.
3    Q.  And, in fact, at least looking at Table 1 of
4  the Cramer study, this does not show a dose response;
5  correct?
6        MS. O'DELL:  Object to the form.
7        THE WITNESS:  So, going down that
8  table, there is more of a dose response as we get
9  under the second half of that table, toward "general
10 talc applications."
11 BY MR. ZELLERS:
12   Q.  There is not a consistent dose response;
13 correct?
14   A.  Not a consistent.
15   Q.  Yes.  I mean, you get a statistically
16 significant finding and then a period of time where
17 there's not a statistically significant finding and
18 then another period of time where there is a
19 statistically significant finding; is that right?
20       MS. O'DELL:  Object to the form.
21       THE WITNESS:  As I read through the
22 second half of this table, there's a consistent
23 statistically significant finding beginning after less
24 than 360 applications, equivalent to one year of daily
25 use.

Page 193

1  BY MR. ZELLERS:
2    Q.  Well, when you review, you consider all of
3  the data; correct?
4    A.  Yes.
5    Q.  The top of the Table 1 is not consistent with
6  the bottom of Table 1, at least in terms of
7  statistically significant findings; is that right?
8    A.  The two -- the two vary, depending upon how
9  you quantitate dose.
10   Q.  Another criteria or factor for Bradford Hill
11 is biological plausibility; is that right?
12   A.  Yes.
13   Q.  The biological mechanisms of cancer are not
14 your area of expertise; is that correct?
15       MS. O'DELL:  Object to the form.
16       THE WITNESS:  I think, as a gynecologic
17 oncologist, I have a good understanding of the
18 biological mechanisms of cancer.  For example, human
19 papillomavirus causes cervical cancer, vaginal cancer,
20 vulvar cancer, anal cancer, oropharyngeal cancer.
21 BY MR. ZELLERS:
22   Q.  Do you defer to other experts on the topic of
23 biologic plausibility?
24   A.  I think there are some that know more than
25 I know about it.  But I know that, for example, in

Daniel L. Clarke-Pearson, M.D.

Page 194

1  this disease of ovarian cancer caused by talcum
2  powder, inflammation is the most likely cause.
3      Q.  And do you consider yourself to be an expert
4  on the topic of biologic plausibility as it relates to
5  talcum powder and ovarian cancer?
6          MS. O'DELL:  Objection to form.  Asked
7  and answered.
8          THE WITNESS:  I think I have a very
9  good understanding of that, and I'm not sure how you
10 define an expert.
11 BY MR. ZELLERS:
12     Q.  Is all epithelial ovarian cancer caused by
13 the same mechanism?
14     A.  I don't think so.
15     Q.  You stated before that there are different
16 mechanisms; is that right?
17     A.  I said -- yes.
18     Q.  What is the biologic mechanism for serous
19 ovarian cancer?
20     A.  There could be several biological mechanisms
21 for any of the ovarian cancers.
22     Q.  Well, what biologic mechanisms are there,
23 based upon your experience, for serous cancer --
24 ovarian cancer?
25     A.  One of the biologic mechanisms are BRCA1 to 2

Page 195

1  mutations.  And, as I discussed previously, all
2  cancers are caused by mutations of genes that regulate
3  cell growth and result in invasion and metastases.
4      Q.  Any others?
5      A.  Anything else beside gene mutations?
6      Q.  Gene mutations, yes, for serous ovarian
7  cancer.
8      A.  There are always gene mutations causing the
9  cancer.  And, therefore, if you're just specifically
10 talking about serous cancers, then gene mutations for
11 all serous cancers occur.  They are not normal cells.
12     Q.  Does talcum powder increase all subtypes of
13 ovarian cancer?
14         MS. O'DELL:  Objection.  Asked and
15 answered.
16         THE WITNESS:  I think the epidemiologic
17 data would suggest that serous cancers are the most
18 common but endometrioid are there.
19         And the other study -- other types of
20 epithelial ovarian cancers -- clear cell and
21 mucinous -- are so infrequent -- they're rare cancers.
22 And, therefore, we don't have statistical power to
23 decide whether they're caused by talc or not.
24 BY MR. ZELLERS:
25     Q.  Different subtypes of epithelial ovarian

Page 196

1  cancer have different biological mechanisms; correct?
2      A.  Again, I'm not sure what you mean by
3  "biological mechanism."
4      Q.  You're not familiar with biological
5  mechanisms that cause ovarian cancer?
6      A.  The biological mechanism that I've been
7  trying to explain to you is gene mutation.
8      Q.  That's the only biological mechanism that
9  causes ovarian cancer, in your experience; is that
10 right?
11     A.  You're talking about what causes ovarian
12 cancer, not the mechanism that becomes ovarian cancer
13 or what ovarian cancer represents.
14     Q.  I'm asking you the mechanism that causes
15 ovarian cancer.  And you have told me that, with
16 talcum powder, it is gene mutation; is that right?
17         MS. O'DELL:  Object to the form.
18         THE WITNESS:  As it is for all cancers.
19 As it is for all ovarian cancers.
20 BY MR. ZELLERS:
21     Q.  If talc is associated with all subtypes of
22 epithelial ovarian cancer or with different subtypes
23 in different studies, doesn't that suggest that the
24 association is by chance?
25         MS. O'DELL:  Object to the form.

Page 197

1          THE WITNESS:  So no carcinogen is going
2  to cause cancer in every circumstance in every
3  patient.  Some patients may be more susceptible to a
4  carcinogen; others may be more resistant.
5          Women with BRCA1 mutations don't always
6  develop ovarian cancer, but they are at much higher
7  risk.  It usually causes -- it requires a number of
8  mutations before a malignancy occurs, not just one.
9  BY MR. ZELLERS:
10     Q.  You would agree that different studies have
11 found different associations between talcum powder use
12 and different types of epithelial ovarian cancer; is
13 that right?
14     A.  The -- yes, and because possibly many of
15 those rare cancers, like mucinous cancers and clear
16 cell cancers, are not -- the studies aren't powered to
17 identify those.  So we don't know, I guess would be my
18 answer.
19     Q.  Putting aside inhalation for the moment, your
20 opinion is that talcum powder travels from the
21 perineal region to the ovaries through the woman's
22 reproductive tract; is that right?
23     A.  Yes, sir.
24     Q.  So the talcum powder must travel across the
25 vulva, through the labia majora, through the labia

Daniel H. Clarke-Pearson, M.D.

Page 198

1  minora, across the -- and clitoris, across the
2  perineal body, up into the vagina, into the cervical
3  canal, through the cervix and cervical mucosa, or
4  mucus, into the endometrial cavity, through the
5  uterus, into the fallopian tube opening, across the
6  entire length of the fallopian tube to the fimbria,
7  and then into the ovary; is that right?
8       A. Yes, sir.
9       Q. If talcum powder can make this migration, can
10 other substances also make the same migration?
11      A. I presume so.
12      Q. Sand from the beach?
13      A. I think the particle size may have some
14 bearing on how far it can get up the reproductive
15 tract.
16      Q. Toilet paper particles?
17           MS. O'DELL: Object to the form.
18           THE WITNESS: Again, depends upon the
19 particle size.
20 BY MR. ZELLERS:
21      Q. There is no human study that demonstrates the
22 migration of any particulate matter from the perineum
23 to the ovaries; correct?
24           MS. O'DELL: Object to the form.
25           THE WITNESS: Number of studies that

Page 199

1  show that once it's in the vagina, it can migrate --
2  BY MR. ZELLERS:
3       Q. There is --
4       A. -- to the ovary.
5       Q. But the answer to my question is correct.
6  There are no human studies that demonstrate the
7  migration of any particulate matter from the perineum
8  to the ovaries; correct?
9            MS. O'DELL: Object to the form.
10           THE WITNESS: Nobody has studied it
11 that I'm aware of.
12 BY MR. ZELLERS:
13      Q. None of the articles you cite in your report
14 actually looked at whether talc can migrate from
15 perineal application through the fallopian tubes to
16 the ovaries; correct?
17           MS. O'DELL: Object to the form.
18           THE WITNESS: Well, if you go to
19 Langseth, for example, on the second page underneath
20 the forest plot at the end of the second full
21 paragraph -- I'm sorry. I've got your exhibit.
22 BY MR. ZELLERS:
23      Q. Well, you have the exhibit. I should have a
24 copy.
25      A. Okay.

Page 200

1       Q. And my question to you is --
2            MS. O'DELL: I think he was finished --
3  he wasn't finished.
4            THE WITNESS: I was going to read this
5  to you from Langseth. And the sentence says
6  (as read):
7            "The evidence of talc migrating to
8            the ovaries lends credibility to
9            such a possible association."
10 BY MR. ZELLERS:
11      Q. Can you answer my question?
12      A. I was reporting to you a study.
13      Q. I need you to answer my question if you can.
14      A. Okay.
15      Q. I'll ask it again.
16           Is there any human study that demonstrates
17 the migration of any particulate -- and let me
18 withdraw that, because I think I moved on to the next
19 question.
20           None of the articles that you cite actually
21 looked at whether talc can migrate from the perineal
22 application through the fallopian tubes to the
23 ovaries; correct?
24           MS. O'DELL: Object to the form.
25           THE WITNESS: That's correct.

Page 201

1  BY MR. ZELLERS:
2       Q. All right. You also cannot cite any article
3  that shows granulomas, fibrosis, or adhesions anywhere
4  up the reproductive tract of a woman as a result of
5  her external genital talc application, can you?
6            MS. O'DELL: Object to the form.
7            THE WITNESS: No.
8  BY MR. ZELLERS:
9       Q. Let's talk about the studies that you cite in
10 your report in support of your theory of migration.
11           MS. O'DELL: Object to -- excuse me.
12 Sorry.
13           MR. ZELLERS: It's okay.
14           MS. O'DELL: I apologize.
15 BY MR. ZELLERS:
16      Q. In support of your theory of migration, you
17 discuss sperm. I'm looking at page 7, last paragraph
18 that carries over onto page 8. Is that right?
19      A. I have it.
20           MS. O'DELL: Object to form.
21 BY MR. ZELLERS:
22      Q. Sperm have tails and motility; is that right?
23      A. Yes, and that's acknowledged in my report.
24      Q. Sperm affirmatively move themselves up the
25 reproductive tract; is that right?

Daniel L. Clarke-Pearson, M.D.

Page 202

1    A.  They can.
2    Q.  You cite Egli, 1961, the carbon particle
3  study.  Are you familiar with that, or do you need me
4  to hand you another copy?
5    A.  I've reviewed it before.  It's been a little
6  while.
7    Q.  Well, let me ask you a couple of questions.
8    A.  Sure.
9    Q.  And if you need the study, then I'll be happy
10 to have you take a look at it.
11       Egli did not involve talcum powder; correct?
12   A.  No.  These are carbon particles.
13   Q.  Egli used carbon particles that were
14 suspended in a solution that had the consistency of
15 seminal fluid; is that right?
16       MS. O'DELL:  If you need to take a
17 moment to review, Doctor, feel free to do that.
18       THE WITNESS:  They were suspended in
19 dextran suspension.
20 BY MR. ZELLERS:
21   Q.  Is that seminal fluid, fluid that sperm are
22 suspended in?
23   A.  No.
24   Q.  What solution were they suspended in?
25   A.  Dextran.

Page 203

1    Q.  What support do you have for the proposition
2  that talcum powder behaves similarly to carbon
3  particles suspended in a dextran fluid-like substance?
4    A.  I think it's very similar to talcum powder
5  particles progressing up.  Dextran is a thick,
6  glucose-rich medium that is much like vaginal fluid,
7  if you will.
8    Q.  It's a fluid; right?
9    A.  Yes.
10   Q.  Talcum powder is a particle; correct?
11   A.  Once talcum powder gets into the vagina, it
12 becomes part of the vaginal fluid.
13   Q.  The Egli study involved three women; is that
14 right?
15   A.  Yes.
16   Q.  Tiny sample size; correct?
17   A.  Yes.
18   Q.  They used intramuscular oxytocin to aid the
19 transport of the particles; is that right?
20   A.  Yes.  It stimulated the uterus to contract.
21   Q.  And for the administration of the carbon
22 particles, the women were laying on their backs with
23 their heads tilted at a downward angle; is that right?
24   A.  That's what it says.
25   Q.  Do you agree that laying down with their

Page 204

1  heads tilted downward is a very -- is very different
2  from the way in which women generally apply talcum
3  powder to their perineal region?
4    A.  Honestly, I don't know how they apply talcum
5  powder to their perineal region.  I would imagine
6  they're not with their head down, but they may be
7  sitting, they may be standing, they may be lying.
8    Q.  Based upon your experience, it's different;
9  correct?
10   A.  I don't have any experience with talcum
11 powder application.
12   Q.  Right.  So you don't know whether or not most
13 women apply talcum powder to their perineal region
14 with their head toward the ground and their legs up in
15 the air?
16       MS. O'DELL:  Object to the form.
17       THE WITNESS:  I think it's unlikely
18 that they have their heads to the ground and legs in
19 the air, but they have probably multiple positions
20 they could apply it in.
21 BY MR. ZELLERS:
22   Q.  Even with these artificial conditions, the
23 researchers only found carbon particles in the
24 fallopian tubes of two of the three women; is that
25 right?

Page 205

1    A.  I think that's what the results said.
2    Q.  Are you familiar with the Venter 1979 study
3  that you cite?
4    A.  I'll have to pull it back out to refresh my
5  memory.  It's been a few months since I looked at
6  that.
7    Q.  Well, can I ask you a few questions about it?
8    A.  If I can answer them, I will.  Sure.
9    Q.  Is this the radioactive marker study?
10   A.  Yes.
11   Q.  That study did not involve talcum powder; it
12 involved a particle with a radioactive tracer.  Is
13 that right?
14   A.  Yes.  Technetium albumin in microspheres.
15   Q.  What support do you have for the proposition
16 that talcum powder behaves similarly to this kind of
17 particle?
18   A.  I think that talcum powder is similar to
19 these particles.  It's small and can migrate.
20   Q.  In the study it involved a small sample size;
21 right?  Only 24 women?
22       MS. O'DELL:  Object to the form.
23       THE WITNESS:  Yes.
24 BY MR. ZELLERS:
25   Q.  The women laid on their backs with their

Daniel L. Clarke-Pearson, M.D.

**Page 206**

1 buttocks elevated; is that right?
2   A. When it was applied, and then the patients
3 didn't undergo surgery until the next day. So the
4 patients, after being in the position where the
5 talc -- where the radioactive tracer was applied, were
6 then up and about until they came in for surgery the
7 next day. So they were in different positions.
8   Q. Is that really what you think, based upon
9 your review of the study?
10   A. You don't think that the patient was laying
11 in bed for 24 hours until she had surgery?
12   Q. Doctor, your recollection of this study is
13 that the radioactive tracer marker was used and then
14 the women were up and around?
15     MS. O'DELL: Object to the form.
16 BY MR. ZELLERS:
17   Q. In fact, after the radioactive marker was
18 administered, the women remained laying in the
19 position with their -- on their backs with their
20 buttocks elevated for two hours, with their legs
21 pressed together; is that right?
22   A. I would have to find it to refresh my memory.
23   Q. If that's true, that would be different than
24 your understanding of how women use talcum powder in
25 the genital area; correct?

**Page 207**

1     MS. O'DELL: Objection. Misstates the
2 doctor's testimony.
3     If you need to review --
4     THE WITNESS: Again, I don't think that
5 we know -- I know how many apply talcum powder. But
6 these women didn't lay supine for 24 hours until they
7 had their surgery, when they found the radioactive
8 microspheres in the ovary.
9 BY MR. ZELLERS:
10   Q. Do you know whether or not they laid supine
11 for two hours after the radioactive marker was
12 administered with their legs pressed together?
13   A. Yes.
14   Q. Yes, you agree with that; correct?
15   A. Yes.
16   Q. And even under these artificial conditions,
17 the researchers only found radioactive activity in the
18 fallopian tubes or ovaries of 9 of the 21 women; is
19 that right?
20     MS. O'DELL: Object to the form.
21     THE WITNESS: That's what they reported
22 in 24 hours.
23 BY MR. ZELLERS:
24   Q. You cite Sjosten, 2004, the glove study; is
25 that right?

**Page 208**

1   A. I did.
2   Q. That study did not involve talcum powder; it
3 involved starch. Is that right?
4   A. Yes.
5   Q. Sjosten involved the researchers examining
6 the women's cervix with their fingers; is that right?
7     Are you able to answer that question?
8   A. I need to read along with you.
9     So they examined -- they did a pelvic exam,
10 a bimanual exam on the patients.
11   Q. Examining the women's cervix with their
12 fingers; is that correct?
13   A. And examining the vagina.
14   Q. What is your basis for saying that pressing
15 gloved fingers against the cervix is comparable to an
16 external dusting of talcum powder?
17     MS. O'DELL: Object to form.
18     THE WITNESS: I think it deposits the
19 substance, the powder, against the cervix.
20 BY MR. ZELLERS:
21   Q. And the study found particles in the
22 reproductive tract of women who were examined with
23 powder-free gloves; is that right?
24   A. I believe so.
25   Q. You cite the Heller study of women's ovaries

**Page 209**

1 after surgical oophorectomy; is that right?
2   A. Yes.
3   Q. Didn't Heller find talc in tissues of all 24
4 patients, including the 12 who did not use perineal
5 talc?
6   A. Give me a moment.
7   Q. Let me try to ask it this way so that we can
8 move on.
9     Do you have any reason to dispute that
10 Heller found talc in tissues of all 24 patients,
11 including the 12 who did not use perineal talc?
12     MS. O'DELL: Object to the form.
13     THE WITNESS: Yes, as long as there's
14 not an issue with recall bias.
15 BY MR. ZELLERS:
16   Q. If talcum powder migrates from the perineal
17 region to the ovaries, shouldn't exposure to talc be
18 far greater in concentration in the rectal, vulvar,
19 vaginal, cervical, and uterine tissues which are
20 closer to the area of initial exposure?
21     MS. O'DELL: Object to the form.
22     THE WITNESS: I'm not sure what the
23 basis of that observation is. The urethra and anus
24 have sphincters. The urethra and anus also have an
25 exit mechanism by urination or defecation.

Daniel L. Clarke-Pearson, M.D.

Page 210

BY MR. ZELLERS:
1 Q. So you -- I just want to make sure I'm clear.
2 You disagree that -- if talcum powder migrates from
3 the perineal region to the ovaries, you disagree that
4 exposure to talc would be greater in concentration in
5 the rectal, vulvar, vaginal, cervical, and uterine
6 tissues; correct?
7 MS. O'DELL: Objection. Asked and
8 answered.
9 THE WITNESS: I'm not understanding
10 your question. Would be greater where?
11 BY MR. ZELLERS:
12 Q. Would be greater in the rectal, vulvar,
13 vaginal, cervical, and uterine tissues than in the
14 ovaries.
15 MS. O'DELL: Objection. Asked and
16 answered.
17 THE WITNESS: I don't have any evidence
18 about the rectum or the urethra. And it would be --
19 yes, more likely than not, there would be more on the
20 vulva than on the ovaries. All of it that goes on the
21 vulva does not land on the ovaries.
22 BY MR. ZELLERS:
23 Q. Talc particles should be causing inflammation
24 in all those organs and areas if your theory is

*(Line numbers as printed: 1-25)*

Page 211

1 correct; is that right?
2 A. No.
3 MS. O'DELL: Object to the form.
4 BY MR. ZELLERS:
5 Q. Why would you not expect inflammation in the
6 rectal, vulvar, vaginal, cervical, and uterine
7 tissues?
8 MS. O'DELL: Object to the form.
9 THE WITNESS: So there's no -- no
10 evidence that this talc gets into the rectum that I'm
11 aware of, unless you have some evidence that I'm not
12 seeing.
13 BY MR. ZELLERS:
14 Q. Why do talc particles not cause inflammation
15 in the other organs and areas?
16 A. I think the other organs -- the vagina,
17 cervix, uterus, and fallopian tubes -- are different
18 tissues; and different tissues have different
19 susceptibility, if you will, to the impact of talcum
20 powder and its contents.
21 Q. What is it about the tissues of the vulvar,
22 vaginal, cervical, and uterine areas that would result
23 in talc not causing inflammation to those tissues but
24 causing, at least under your theory, inflammation to
25 the ovary?

Page 212

1 MS. O'DELL: Object to the form.
2 THE WITNESS: Because the ovary has a
3 different epithelium, a different surface. The
4 vagina -- I'm sorry -- the vulva, vagina, and
5 exocervix are all squamous epithelium. They are much
6 more susceptible to HPV. So I can turn around the
7 explanation and say HPV doesn't infect the
8 endometrium -- the uterus, fallopian tubes, or
9 ovaries. So some tissues are more susceptible to a
10 carcinogen than others.
11 BY MR. ZELLERS:
12 Q. What study are you referring to for that
13 proposition?
14 A. About HPV?
15 Q. No. About the tissue being the same --
16 strike that.
17 Tissue being different and not susceptible
18 to inflammation from talc in the human vulvar,
19 vaginal, cervical, and uterine tissues.
20 MS. O'DELL: Object to the form.
21 THE WITNESS: They are all different
22 tissues, and we have not seen any inflammation or
23 cancer associated with talcum powder in those organs.
24 BY MR. ZELLERS:
25 Q. Is there a study that you're referring to

Page 213

1 that finds that there is not inflammation from talc to
2 those tissues?
3 MS. O'DELL: Object to the form.
4 THE WITNESS: I don't have a study,
5 but, obviously, it's not associated with cancers of
6 those tissues.
7 BY MR. ZELLERS:
8 Q. There are no studies that show inflammation
9 as a result of genital talc use result in cancer in
10 those areas; is that right?
11 MS. O'DELL: Objection to form.
12 THE WITNESS: In what areas now are you
13 talking about?
14 BY MR. ZELLERS:
15 Q. Let me make it even simpler.
16 There's no studies that show inflammation as
17 a result of genital talc use in the vulvar, vaginal,
18 cervical, and uterine areas; is that right?
19 A. That's correct.
20 MS. O'DELL: Object to the form.
21 BY MR. ZELLERS:
22 Q. There are no studies that show a link between
23 external genital talc use and rectal, vulvar, vaginal,
24 cervical, or uterine cancer; is that right?
25 A. That's correct.

Daniel L. Clarke-Pearson, M.D.

Page 214

1    Q.  In Exhibit B of your report, you include a
2  study published by Huncharek in 2007.  That's page 11.
3        Do you recall that study?
4    A.  No, but I'd like to refresh my memory.
5        MS. O'DELL:  Which Huncharek?
6        MR. ZELLERS:  2007.
7  BY MR. ZELLERS:
8    Q.  Do you have that easily available?
9        This is a study that you cite in your
10  materials reviewed; is that right?
11    A.  Yes.
12    Q.  It's a meta-analysis of studies and the
13  relationship between ovarian cancer and using
14  diaphragms that are dusted with talcum powder; is that
15  right?
16    A.  Yes.
17    Q.  A diaphragm is inserted directly onto a
18  woman's cervix; is that right?
19    A.  Yes.
20    Q.  You did not include Huncharek 2007 in your
21  list of meta-analyses regarding talc and ovarian
22  cancer on page 7 of your report, did you?
23        MS. O'DELL:  Object to the form.
24        THE WITNESS:  No, because it wasn't
25  dealing with applying talcum powder to the vulva,

Page 215

1  perineum.
2  BY MR. ZELLERS:
3    Q.  Well, your theory, putting aside inhalation,
4  is that the talcum powder travels from the perineal
5  region through the vagina through the cervix through
6  the uterus and then into the fallopian tubes; is that
7  right?
8    A.  Yes.
9    Q.  How, then, do you validate excluding data
10  about the relationship between ovarian cancer and
11  talcum powder that is applied directly to the cervix?
12        MS. O'DELL:  Object to the form.
13        THE WITNESS:  Because it's not the
14  volume of talcum powder that is used on the vulva.
15  And, over a period of time, application of diaphragms
16  is most likely much less likely than somebody using
17  talcum powder on the vulva on a daily basis.
18  BY MR. ZELLERS:
19    Q.  On what study are you relying for that
20  statement?
21    A.  My clinical experience of understanding the
22  sexual lives of women.  They don't use diaphragms
23  every day, in most cases.
24    Q.  Are you aware of any study that talcum powder
25  affects the body differently when it is applied to the

Page 216

1  perineal region and travels to the cervix compared to
2  when it is applied directly to the cervix?
3        MS. O'DELL:  Object to the form.
4        THE WITNESS:  I'm not aware of any
5  study, no.
6  BY MR. ZELLERS:
7    Q.  When applied to the perineal region, the
8  talcum powder would also be in close contact with a
9  woman's urethra; correct?
10    A.  Yes.
11    Q.  Substances are capable of traveling up the
12  urethra; right?
13    A.  Not that I know of, except for bacteria.
14    Q.  Women get urinary tract infections when
15  bacteria travels up the urethra; right?
16    A.  I recognize that as a modal -- motile, like
17  sperm and bacteria, when I discuss lower genital tract
18  migration from the vagina up into the tubes and
19  ovaries with sperm and sexually transmitted infection.
20  So, yes, women get urinary tract infections.
21    Q.  Studies do not show an increase in bladder
22  cancer with talcum powder use; is that right?
23    A.  That's right.  The bladder is a different
24  epithelium than the ovary.
25    Q.  And studies do not show an increase in rectal

Page 217

1  cancer with talcum powder use; is that right?
2    A.  That's correct.
3        MS. O'DELL:  Objection.  Asked and
4  answered.
5  BY MR. ZELLERS:
6    Q.  Are you opining on inhalation exposure as a
7  plausible mechanism for talcum powder to reach the
8  ovaries, or do you defer to other experts on that?
9    A.  I think there's literature that suggests that
10  it's a lower possibility, but inhalation of asbestos
11  can increase the risk of ovarian cancer.
12    Q.  Well, you rely in part on Steiling 2018; is
13  that right?  This is at page 8 of your report.
14    A.  IARC and the Steiling.
15    Q.  Right.  Steiling 2018 deals generally with
16  cosmetic powders, not talcum powder; correct?
17    A.  I need to look at the paper again.
18    Q.  Well, either your counsel can hand it to you
19  or I can hand it to you.
20        MR. ZELLERS:  Did you find it, Counsel?
21  BY MR. ZELLERS:
22    Q.  Do you have the Steiling paper in front of
23  you?
24    A.  Yes --
25        MS. O'DELL:  Do you have a copy for me,

Daniel J. Clarke-Pearson, M.D.

Page 218

1 please, if you don't mind. Thank you.
2      Are you going to mark that, Mike, or are
3 you --
4      MR. ZELLERS: If you want me to mark
5 it, I can. I think we all know what it is.
6      MS. O'DELL: I'm just asking.
7      MR. ZELLERS: Would you like it marked?
8      MS. O'DELL: Only if you were going to
9 mark it, I was just going to put a number on it.
10      MR. ZELLERS: Well, I just have a few
11 basic questions.
12 BY MR. ZELLERS:
13      Q. So, Doctor, my first question is the Steiling
14 2018 deals generally with cosmetic powders, not talcum
15 powder specifically; is that right?
16      A. Apparently so, yes.
17      Q. And Steiling 2018 just discusses the fact
18 that particles can be inhaled; is that right?
19      A. Yes.
20      MS. O'DELL: Object to the form.
21 BY MR. ZELLERS:
22      Q. It says nothing about inhaled particles
23 migrating to the ovaries, does it?
24      A. No.
25      Q. In fact, it says nothing about inhaled

Page 219

1 particles migrating anywhere, does it?
2      MS. O'DELL: Objection.
3      THE WITNESS: It doesn't talk about
4 migration. You're right.
5 BY MR. ZELLERS:
6      Q. And it also says nothing about inhaled
7 particles causing ovarian cancer; is that right?
8      A. In this particular study, although we know
9 from asbestos studies that it does.
10      Q. Well, don't studies of talcum powder use fail
11 to show statistically significant association between
12 nongenital use of talcum powder and ovarian cancer?
13      A. I believe so.
14      Q. If inhaled talc could migrate to the ovaries,
15 wouldn't you expect to see increased ovarian cancer
16 risk with nongenital use of talcum powder?
17      MS. O'DELL: Object to the form.
18      THE WITNESS: In other words, inhaled.
19 I think the inhalation is much smaller, but, to date,
20 we haven't seen an increased risk of ovarian cancer.
21 BY MR. ZELLERS:
22      Q. With inhaled talcum powder; correct?
23      A. With inhaled talcum powder.
24      Q. And that was a finding that you read about in
25 Cramer 2016 as well as other places; correct?

Page 220

1      MS. O'DELL: Object to the form.
2 BY MR. ZELLERS:
3      Q. I'll withdraw the question and move on.
4      Do you agree -- well, strike that.
5      You assert that talcum powder, when it
6 reaches the ovaries, it elicits an inflammatory
7 response that is linked to ovarian cancer; is that
8 right?
9      A. Yes. I think that's the mechanism by which
10 gene mutation occurs.
11      Q. Is it your opinion -- strike that.
12      Is your opinion related to all of the
13 different histologic types of epithelial ovarian
14 cancer?
15      MS. O'DELL: Objection. Asked and
16 answered.
17      THE WITNESS: I think an inflammatory
18 response happens on the ovarian epithelium, and some
19 ovarian cancers -- some epithelial ovarian cancers are
20 more common, serous carcinoma being the most common.
21 BY MR. ZELLERS:
22      Q. Is it your opinion that inflammation is a
23 cause of clear cell and mucinous ovarian cancer? Or
24 do you not have an opinion?
25      A. I don't have an opinion.

Page 221

1      Q. You have not done an expert review of the
2 inflammation evidence yourself, have you?
3      MS. O'DELL: Object to the form.
4      THE WITNESS: I'm aware of -- I've done
5 a review and have been aware of inflammation in
6 gynecologic cancers, especially ovarian cancer, with
7 elevated serum biomarkers suggesting inflammation and
8 also more biologic -- the laboratory work that
9 Dr. Saed and others have done.
10 BY MR. ZELLERS:
11      Q. You do know that not all inflammatory
12 conditions lead to cancer; correct?
13      A. Yes.
14      Q. There's conditions that are inflammatory
15 reactions that all of us may have -- or that folks may
16 have that don't lead to cancer, such as rheumatoid
17 arthritis; is that right?
18      A. That's, best as I understand, rheumatoid
19 arthritis.
20      Q. Same with psoriasis; is that right?
21      A. Yes.
22      Q. Those are chronic inflammatory diseases;
23 correct?
24      A. Of the skin.
25      Q. Rheumatoid arthritis is a chronic

Page 222

1 inflammatory disease of the skin?
2    A. It can have -- in joints.  There can be a
3 skin component to rheumatoid arthritis.  I thought you
4 were talking about psoriasis.
5    Q. How does an acute inflammatory response lead
6 to cancer?
7    A. An acute inflammatory response, I don't
8 believe, leads to cancer.
9    Q. You have -- well, strike that.
10    On page 9 of your report, you conclude that
11 (as read):
12       "Talcum powder products is a
13       causative factor in the
14       development of epithelial ovarian
15       cancer."
16    Is that right?
17    A. Yes.
18    Q. We can change that now based upon your
19 testimony that talcum powder products is a causative
20 factor in the development of serous ovarian cancer;
21 correct?
22       MS. O'DELL:  Object to the form.
23       THE WITNESS:  I think I would stay with
24 epithelial ovarian cancer till we have more data.
25

Page 223

1 BY MR. ZELLERS:
2    Q. How do you define the term "talcum powder
3 products"?
4    A. Talcum powder products are Johnson's baby
5 powder and Shower to Shower.
6    Q. Are other consumer talcum powder products
7 included in your conclusions?
8    A. Yes, but Johnson & Johnson has the market
9 share, as I understand it.
10    Q. Do you understand that some of the talc
11 epidemiology separates use by type of talcum powder
12 product?
13       MS. O'DELL:  Object to the form.
14       THE WITNESS:  I'm not sure what you
15 mean by type of talcum powder.
16 BY MR. ZELLERS:
17    Q. Do you include talc-containing deodorizing
18 sprays in your definition of talcum powder products?
19       THE WITNESS:  No.  We've been talking
20 today, I thought, about Johnson -- as you defined it
21 to start the day as Johnson & Johnson baby powder and
22 Shower to Shower.
23 BY MR. ZELLERS:
24    Q. Is there a certain amount of talcum powder
25 that a product must contain to cause inflammation?

Page 224

1    A. We don't know that information.
2    Q. Do you consider cornstarch to be a talcum
3 powder product that causes inflammation?
4       MS. O'DELL:  Object to the form.
5       THE WITNESS:  It's not a talcum powder
6 product.
7 BY MR. ZELLERS:
8    Q. What about a product like Shower to Shower,
9 which contains cornstarch and talcum powder?
10    A. And your question is?
11    Q. My question is, is there a certain amount of
12 talcum powder that a product must contain to cause
13 inflammation?
14    A. Not that we're aware of.
15    Q. 1 percent talcum powder, 99 percent
16 cornstarch, that could cause inflammation resulting in
17 epithelial ovarian cancer.  Is that your testimony?
18    A. I think that's possible.
19    Q. What methodology have you arrived -- strike
20 that.
21       What methodology have you employed to arrive
22 at the conclusion that the Shower to Shower product
23 causes inflammation?
24    A. It has talcum powder in it.
25    Q. Your opinion that talcum powder products

Page 225

1 cause inflammation is not based on the determination
2 that there is a threshold amount of talcum powder that
3 is required to be in the product before you can
4 conclude that the product will cause chronic
5 inflammation; correct?
6       MS. O'DELL:  Object to the form.
7       THE WITNESS:  I think there's no
8 threshold amount that -- below which the patient
9 that's exposed to talcum powder is safe.
10 BY MR. ZELLERS:
11    Q. Is there a study that you can cite me to for
12 that proposition?
13    A. No, except that, overall, women that have
14 been exposed to talcum powder in the perineum have an
15 increased risk of ovarian cancer.  And we don't know
16 the quantity in each individual patient.  So some
17 patients may have had a small amount and developed
18 ovarian cancer, unfortunately.
19    Q. If inflammation is the issue, why would
20 cornstarch be a superior alternative to talc?
21    A. Because I don't believe cornstarch causes
22 chronic inflammation.  It's absorbed by the body.
23 Macrophages come in and clear it out.  It's not a
24 permanent mineral like talc is.
25    Q. Are you aware that the FDA banned the use of

Daniel H. Clarke-Pearson, M.D.

| Page 226 | Page 228 |
|---|---|
| 1 cornstarch on surgical gloves because of the risk of<br>2 inflammation, granulomas, fibrosis, adhesions, and<br>3 irritation?<br>4     A. Yes, because that was causing an acute<br>5 inflammation, not a chronic inflammation.<br>6     Q. Are you aware, though, that that was the<br>7 reason the FDA banned the use of cornstarch on<br>8 surgical gloves?<br>9     A. They were trying to stop adhesion formation<br>10 after surgery.<br>11     Q. So you are aware of that; is that right?<br>12     A. Yes. When I was coming up, we had to wash<br>13 our gloves before we operated, for that reason.<br>14     Q. How many patients with ovarian cancer have<br>15 you operated on over the course of your career?<br>16     A. I would say probably 30 women a year over 40<br>17 years.<br>18     Q. For those patients that had nonendometrioid<br>19 ovarian cancer, have you seen evidence of inflammation<br>20 when you operated?<br>21     MS. O'DELL: Object to the form.<br>22     THE WITNESS: When I operated,<br>23 75 percent of these patients have cancer all over<br>24 their abdominal and peritoneal cavity, and identifying<br>25 inflammation visually from the cancer is something a | 1     A. That's about the only thing that I can<br>2 determine with my naked eye as to what looks like<br>3 inflammation.<br>4     Q. You see that in some patients but not all<br>5 patients with ovarian cancer; correct?<br>6     A. That's true. That's not the only thing that<br>7 is related to inflammation.<br>8     Q. For your patients with a nonendometrioid<br>9 ovarian cancer, has microscopic examination of their<br>10 tissues shown evidence of activation of an<br>11 inflammatory cascade?<br>12     MS. O'DELL: Object to the form.<br>13     THE WITNESS: I don't think that<br>14 pathologists look at that. And I'm not sure exactly<br>15 what you would identify histologically in an<br>16 inflammatory cascade. I described to you lymphocytes,<br>17 for example, that represent inflammation.<br>18 BY MR. ZELLERS:<br>19     Q. Has it shown evidence of granulomas?<br>20     A. No.<br>21     MS. O'DELL: Object to the form.<br>22 BY MR. ZELLERS:<br>23     Q. Has it shown evidence of foreign body or<br>24 giant cell reactions?<br>25     A. Not that I'm aware of. |

| Page 227 | Page 229 |
|---|---|
| 1 surgeon or any doctor can't do.<br>2     If you look at histologic specimens of the<br>3 tumor -- the cancer, we see inflammation, we see<br>4 lymphocytes and other inflammatory cells. And, in<br>5 addition, you see inflammatory biomarkers like CA-125.<br>6 BY MR. ZELLERS:<br>7     Q. At least grossly, when you operate on<br>8 patients with nonendometrioid ovarian cancer, you do<br>9 not see evidence of inflammation; correct?<br>10     MS. O'DELL: Object to the form.<br>11     THE WITNESS: Well, I see --<br>12     MS. O'DELL: I'm sorry.<br>13     THE WITNESS: -- probably more acute<br>14 inflammation. We do see additional increased<br>15 peritoneal fluid, what's called ascites, which is<br>16 probably an inflammatory response to the cancer.<br>17 BY MR. ZELLERS:<br>18     Q. Do you see adhesions?<br>19     A. Sometimes.<br>20     Q. So it's your testimony that, when you operate<br>21 on patients with nonendometrioid ovarian cancer, you<br>22 do see evidence of inflammation grossly; is that<br>23 right?<br>24     A. Yes, with ascites.<br>25     Q. What else? | 1     Q. Do you believe that every time a talc<br>2 particle enters the human body, it produces an<br>3 inflammatory response?<br>4     A. A talc particle? Are we talking about platy<br>5 talc or fibrous talc or what kind of talc --<br>6     Q. Talcum powder. Do you believe that every<br>7 time a talc particle -- talcum powder enters the human<br>8 body, it produces an inflammatory response?<br>9     A. I think it does on a microscopic basis, yes.<br>10     Q. You rely on Heller 1996 for the idea that<br>11 talc can migrate to the ovaries. We talked about the<br>12 Heller paper; right?<br>13     A. Yes.<br>14     Q. And, in fact, didn't Heller find that there<br>15 was no reaction in the ovaries to the talc particles?<br>16     A. I'd like to look at that paper again --<br>17     Q. Sure. Take --<br>18     A. -- because we were talking along the lines of<br>19 what ovarian cancer patients look like and now we're<br>20 back to --<br>21     Q. I can get it for you or your counsel can show<br>22 you.<br>23     I'm looking at Heller 1996, page 1508, right<br>24 column, second-to-last paragraph.<br>25     Counsel, is it easier for me to find it? |

Daniel J. Clarke-Pearson, M.D.

Page 230

1        MS. O'DELL:  Yeah, why don't you do
2   that?
3        MR. ZELLERS:  All right.  We'll mark
4   the Heller paper that we discussed previously as
5   Exhibit 27.
6        (Exhibit No. 27 was marked for identification.)
7   BY MR. ZELLERS:
8        Q.  Doctor, is this the paper we talked about
9   previously and that you reviewed and are relying on in
10  this case?
11       A.  Yes.
12       Q.  Turn, if you will, to page 1508, the second
13  page.  And I'm looking on the right-hand column just
14  two sentences above "Comment" (as read):
15            "There was no evidence of response
16            to talc, such as foreign body
17            giant cell reactions or fibrosis
18            in the tissue."
19       Did I read that correctly?
20       A.  Yes.
21       Q.  What evidence is there that externally
22  applied talcum powder causes chronic inflammation?
23       A.  Again, I think we see increased biomarkers.
24  I think Dr. Saed's research using ovarian cancer cells
25  shows the inflammatory response that results in gene

Page 231

1   mutations.
2        Q.  Well, we talked a bit ago, you're unaware of
3   any reports or studies in the literature of externally
4   applied talc leading to inflammation, granulomas,
5   fibrosis, or adhesions anywhere along a woman's
6   reproductive tract; is that right?
7        MS. O'DELL:  Object to the form.
8        THE WITNESS:  So what you're describing
9   with adhesions is a reaction -- is an acute
10  reaction -- acute inflammatory reaction, not a chronic
11  reaction.
12  BY MR. ZELLERS:
13       Q.  My question is if up to 50 percent of US
14  women have used genital talc, shouldn't this be a
15  common finding, inflammation, granulomas, fibrosis
16  along a woman's reproductive tract?
17       MS. O'DELL:  Object to the form.
18       THE WITNESS:  Those conditions you're
19  describing are the reaction to an acute inflammation.
20  We're talking about chronic inflammation.
21  BY MR. ZELLERS:
22       Q.  So your testimony is inflammation,
23  granulomas, fibrosis, or adhesions are inconsistent
24  with and not associated with chronic inflammation in
25  your experience; is that right?

Page 232

1        MS. O'DELL:  Object to the form.
2        THE WITNESS:  That's correct.
3   BY MR. ZELLERS:
4        Q.  In your report, you state (as read):
5            "An inflammatory reaction caused
6            by talcum powder on the tube and
7            surface of the ovary results in
8            genetic mutations and
9            carcinogenesis."
10       Is that right?
11       A.  Yes.
12       Q.  And you cite on page 9 in your report --
13  well, strike that.
14       So what authority supports that statement?
15       A.  What was the question again?
16       Q.  Sure.  In your report, page 9, under
17  "Plausibility," second sentence, you state (as read):
18            "An inflammatory reaction caused
19            by talcum powder on the tube and
20            surface of the ovary results in
21            genetic mutations and
22            carcinogenesis."
23       What authority supports that statement?
24       A.  The sequence of events from perineal talc
25  exposure to ovarian cancer and the mechanism of

Page 233

1   chronic inflammation on that ovary over a period of
2   time results in the gene mutation which then becomes
3   ovarian cancer.
4        Q.  On what authority, on what study, are you
5   relying for that statement?
6        A.  On the epidemiologic data showing that the
7   use of perineal talc results in ovarian cancer.
8        Q.  But those studies don't state and find that
9   it's an inflammatory reaction caused by talcum powder
10  on the tube and the ovary, do they?
11       A.  By the time the patient has ovarian cancer,
12  you don't see that.
13       Q.  So my question is you've made the statement,
14  "An inflammatory reaction caused by talcum powder on
15  the tube and surface of the ovary results in genetic
16  mutations and carcinogenesis."
17       What study can I go look at, what study can
18  I read, what study are you relying on for that
19  statement?
20       A.  What I just described to you.  The study is
21  that the patients have ovarian cancer.
22       Q.  Please name the study that you're relying on
23  for that proposition.
24       A.  All the epidemiologic studies that we've been
25  talking about today in totality show the association

Daniel I. Clarke-Pearson, M.D.

Page 234

1 between the exposure of talcum powder to women's
2 perineum and ovarian cancer.
3     Q. And it's your testimony that all of those
4 studies discuss the inflammatory reaction as the
5 causal mechanism; is that right?
6         MS. O'DELL: Object to the form.
7         THE WITNESS: Those studies do not
8 discuss the mechanism in all studies. Some do.
9 BY MR. ZELLERS:
10    Q. So here's what I want: You're saying here
11 "An inflammatory reaction caused by talcum powder on
12 the tube and surface of the ovary results in genetic
13 mutations and carcinogenesis."
14        What study are you referring to, are you
15 relying on, for that statement?
16    A. That the patient got ovarian cancer. She had
17 carcinogenesis. She had gene mutations caused by
18 chronic inflammation that led to cancer. And then we
19 operated on the patient and found she had cancer.
20    Q. What is the study that says that the
21 mechanism, the biologic mechanism, was an inflammatory
22 reaction caused by talcum powder on the tube and
23 surface of the ovary?
24    A. Would you like to turn to laboratory studies?
25    Q. Is there a study that you're relying on for

Page 235

1 that statement?
2    A. There's no way somebody could do a study.
3    Q. All right.
4    A. They do serial biopsies of the ovary, watch
5 for those gene mutations, and then watch for cancer to
6 occur, and then say, hey, chronic inflammation led to
7 cancer several years later. I don't know how anybody
8 could do such a study.
9    Q. In your report, you state -- this is also on
10 page 9, under "Coherence" (as read):
11        "Epidemiologic data, in vitro and
12        in vivo research, are consistent
13        in explaining the pathogenesis of
14        epithelial ovarian cancer through
15        the inflammatory methods described
16        above."
17        Did I read that correctly?
18    A. Yes, sir.
19    Q. How does epidemiological data support your
20 inflammation theory?
21        MS. O'DELL: Objection to the form.
22        THE WITNESS: The inflammation theory
23 is the only plausible theory that I think we have to
24 explain why talcum powder can cause ovarian cancer.
25        And we see, then, in Dr. Saed's laboratory

Page 236

1 that inflammation is occurring when Johnson's baby
2 powder is put into culture with a very normal ovarian
3 cancer -- normal ovarian cells.
4 BY MR. ZELLERS:
5    Q. You'd agree that the research regarding
6 whether chronic inflammation can cause ovarian cancer
7 is ongoing; is that right?
8    A. I think cancer research in general is
9 ongoing.
10    Q. Most of the studies that you cite talking
11 about chronic inflammation refer to chronic
12 inflammation as a hypothesis of one of the ways cancer
13 might form in the ovary; is that right?
14        MS. O'DELL: Object to the form.
15        THE WITNESS: I think it's the most
16 likely -- more likely than not that's the reason that
17 ovarian cancer forms on the ovary.
18 BY MR. ZELLERS:
19    Q. But it is a hypothesis which scientists and
20 medical professionals are studying; is that right?
21        MS. O'DELL: Objection to form.
22        THE WITNESS: It's being studied, and
23 evidence coming out of laboratories is confirming that
24 hypothesis that we have in human beings.
25

Page 237

1 BY MR. ZELLERS:
2    Q. You are familiar with a paper published by
3 Merritt in 2008, "Talcum Powder, Chronic Pelvic
4 Inflammation, and NSAIDs in Relation to Risk of
5 Epithelial Ovarian Cancer"; is that right?
6    A. I've seen it.
7    Q. All right. And you cite that in Exhibit B to
8 your report. We've marked that as Exhibit 6 to this
9 deposition.
10        That's an Australian-wide case-control study
11 of around 1500 women with invasive and low malignant
12 potential ovarian tumors and 1500 population-based
13 controls.
14        Does that refresh your recollection?
15        MS. O'DELL: Are you speak of Merritt
16 2007?
17        MR. ZELLERS: I thought I was speaking
18 of Merritt 2008, which the doctor refers to in his
19 additional materials-considered list on page 17.
20        MS. O'DELL: Let's make sure we've got
21 that. And that's "Talcum Powder, Chronic
22 Inflammation, NSAIDs in Relation to the Risk of
23 Epithelial Ovarian Cancer"?
24        MR. ZELLERS: That's correct.
25        MS. O'DELL: Okay.

Daniel L. Clarke-Pearson, M.D.

Page 238

BY MR. ZELLERS:
1  Q.  And let me try to cut to the chase, Doctor,
2 so when you look at it, we can --
3       The study concludes that, on balance,
4 chronic inflammation does not play a major role in the
5 development of ovarian cancer; is that right?
6  A.  I would have to reread this study if you're
7 reading from some particular place.  I don't recall
8 exactly how this study was even designed or executed.
9  Q.  Take a look -- and we'll mark this as an
10 exhibit.  Deposition Exhibit 28 is the Merritt paper.
11  (Exhibit No. 28 was marked for identification.)
12 BY MR. ZELLERS:
13  Q.  Doctor, is this the same as what you're
14 looking at there?
15  A.  Yes.
16  Q.  This is a study that you cite in support of
17 your opinions; is that right?
18       MS. O'DELL:  Object to the form.
19 I think it's referenced in his materials list.  It's
20 not cited in his report.
21 BY MR. ZELLERS:
22  Q.  It's a study that you felt was at least
23 important enough to refer to in your
24 materials-considered list; is that right?
25

Page 239

1  A.  Along with all these other materials, yes.
2  Q.  Well, if we go to the "Discussion" on
3 page 174 of Deposition Exhibit 28 -- are you with me
4 on 174?
5  A.  I'm on 174.  Which paragraph?
6  Q.  Well, the very first --
7  A.  Can I back up?  I'd like to refresh my memory
8 of what this study was about.
9       It was a case-control study, 1500 patients.
10 Confirmed statistical significance of increased
11 ovarian cancer risk associated with use of talc.
12 Relative risk 1.17.  Strongest were serous.  I'm
13 trying to get down to your inflammation question.
14  Q.  Well, it also talks about --
15       MS. O'DELL:  I don't think the doctor
16 was finished.
17       MR. ZELLERS:  Okay.  If the doctor
18 wasn't finished, what else do you need to say, Doctor,
19 before --
20       THE WITNESS:  I'm trying to find out
21 where -- all's I'm reading is the abstract, not even
22 the details of the study so far.
23 BY MR. ZELLERS:
24  Q.  So I'd like you to go to "Discussion," which
25 is on page 174.

Page 240

1  A.  Okay.  Without knowing what -- how we got to
2 this discussion, go right ahead.
3  Q.  Well, I'm citing your paper or at least one
4 of the papers you read and considered.
5  A.  I have not read every word of every one of
6 these papers.  And you can imagine that, and you can
7 appreciate that.
8  Q.  You've not read the studies that are
9 contained in your materials-considered list --
10       MS. O'DELL:  Objection.
11 BY MR. ZELLERS:
12  Q.  -- Exhibit 6 to the deposition?
13       MS. O'DELL:  Excuse me.  Objection.
14 Misrepresents his testimony.
15       What's your question?
16 BY MR. ZELLERS:
17  Q.  Well, do you want to answer that question?
18 You've not read each and every one of the studies;
19 correct?
20       MS. O'DELL:  Objection.  Misrepresents
21 his testimony.  I think what he had testified to
22 earlier is that he had not read every word of every
23 study but had read the abstracts of -- certainly of
24 every one.
25       THE WITNESS:  Right.  And I haven't

Page 241

1 committed every abstract to memory.  I'm sure you can
2 appreciate that too.
3 BY MR. ZELLERS:
4  Q.  I can, and that's why you have it in front of
5 you.
6  A.  Okay.
7  Q.  So if we go to page 174, "Discussion," do you
8 see that?  See that paragraph on the left-hand side?
9  A.  I see the page.  Which paragraph do you want
10 to see?
11  Q.  Well, do you see the word "Discussion"?
12  A.  Yes.
13  Q.  All right.  The first paragraph under
14 "Discussion," the last sentence (as read):
15       "These results, in combination
16       with previous studies, suggest
17       that chronic inflammation is
18       unlikely to play a major role in
19       the development of ovarian
20       cancer."
21       Is that the statement -- did I read that
22 correctly?
23  A.  I don't think so.  Says (as read):
24       "May be linked to increased risk
25       of developing ovarian cancer."

Daniel L. Clarke-Pearson, M.D.

Page 242

1      Are we reading the same -- you're reading
2  the first sentence under "Discussion"?
3      Q.  No.  I'm reading the last sentence of
4  "Discussion" -- last sentence of the first paragraph.
5      A.  Okay.  You read it correctly.
6      Q.  All right.  And then if we go to the
7  right-hand side, on the same page of the last
8  paragraph, the first two sentences state (as read):
9           "If inflammation plays a role in
10           the etiology of ovarian cancer,
11           then it would be expected that PID
12           would be associated with increased
13           risk of ovarian cancer.  PID was
14           not associated with elevated risk
15           of ovarian tumors in our data,
16           confirming several previous
17           reports of no association with PID
18           in studies of all subtypes of
19           ovarian cancer."
20      Did I read that correctly?
21      A.  You did.
22      Q.  So this study concludes that, on balance,
23  chronic inflammation does not play a major role in the
24  development of ovarian cancer; correct?
25      A.  So PID is pelvic inflammatory disease.  Is

Page 243

1  that what you understand it?
2      Q.  Yes.
3      A.  So pelvic inflammatory disease is an acute
4  infection treated with antibiotics and usually
5  resolves with proper treatment.  So it's not a chronic
6  infection.  Having said that, PID is recognized as a
7  risk factor in many of the studies -- many of the
8  documents that you've referred to earlier this
9  morning.
10      So this particular case-control study
11  doesn't identify PID as a risk; but, in totality,
12  pelvic inflammatory disease is considered a risk
13  factor for ovarian cancer.
14      Q.  What study do you rely on for your opinion
15  that pelvic inflammatory disease is a risk factor or
16  causative of ovarian cancer?
17      A.  If I could turn back to the documents you
18  were using earlier today from either the CDC or --
19      Q.  And just refer to them generally, and then
20  we'll take a look.  The CDC --
21      A.  Well, I mean, the risk -- I'm not sure which
22  one it was, but they are --
23      Q.  Let me ask another question, then.
24      What methodology did you employ to consider
25  the findings of the Merritt paper in coming to the

Page 244

1  opinions contained in your report?
2           MS. O'DELL:  Objection to form.
3           THE WITNESS:  That it is well
4  established, in my opinion, that pelvic inflammatory
5  disease is a risk factor for ovarian cancer.
6  BY MR. ZELLERS:
7      Q.  Do you agree you cannot ignore the data that
8  doesn't support your opinion and are only relying or
9  looking at data that does support your opinion?
10           MS. O'DELL:  Object to the form.
11           THE WITNESS:  My opinion is based on a
12  larger body of evidence and that other authorities,
13  not my opinion, have established that PID is a risk
14  factor.
15           MS. BOCKUS:  Object.  Nonresponsive.
16           MR. ZELLERS:  Move to strike as
17  nonresponsive.
18  BY MR. ZELLERS:
19      Q.  Do you agree that in doing a proper expert
20  analysis, you need to review and consider the studies
21  that both support your opinions and the studies that
22  do not support your opinions?
23      A.  Absolutely.  That's my methodology.
24      Q.  And you believe that you have done that in
25  the discussion in your report; is that right?

Page 245

1      A.  I believe so.
2      Q.  All right.  Do you agree that the studies
3  relating to NSAIDs are not consistent in terms of
4  establishing that NSAIDs, which reduce inflammation,
5  are associated with reduced ovarian cancer risk?
6      A.  That's my understanding.
7      Q.  Wouldn't you expect, if your theory of
8  inflammation is correct, that there would be
9  consistency among the NSAID studies and that they
10  would be consistently associated with reduced ovarian
11  cancer risk?
12      A.  I'd have to review those studies in more
13  detail.  I don't know what the doses of the NSAIDs
14  were, how chronically they were used, whether they
15  started at the time the chronic inflammation started
16  or later.
17      Q.  Would you agree that the literature that you
18  cite and that you rely upon for your inflammation
19  theory cites and just shows inflammation, not chronic
20  inflammation, leading to cancer?
21           MS. O'DELL:  Object to the form.
22           THE WITNESS:  I'm talking about chronic
23  inflammation, to be clear.
24  BY MR. ZELLERS:
25      Q.  Let's take a quick look at your report.

Daniel L. Clarke-Pearson, M.D.

Page 246

1        Page 4, you cite Eberl 1948, Redic 1988, and
2   1993 NTP study of rats and mice for the proposition
3   that talcum powder is known to elicit an inflammatory
4   response in animals and humans.  Is that right?
5        A.  Yes.
6        Q.  Those studies just show an acute inflammatory
7   response; is that right?
8             MS. O'DELL:  Object to the form.
9             THE WITNESS:  I don't recall that,
10  but...
11  BY MR. ZELLERS:
12       Q.  Well, are you familiar with the FDA's 2014
13  response to the citizens petition which we talked
14  about earlier?
15       A.  Yeah.  Let me pull that out again.
16       Q.  Sure.  Do you have that available?
17       A.  There's an exhibit here.
18       Q.  I have it as Exhibit 19.
19          Do you see that -- do you have that in front
20  of you?
21       A.  I have the exhibit.
22       Q.  So go to page 3, where the authors talk about
23  the toxicologic findings.
24          Do you see that?
25       A.  I'll get there in a second.

Page 247

1        Q.  Sure.
2           Can I ask you a question?
3        A.  Just give me one minute, please.
4           Okay.
5        Q.  The FDA, in reviewing the toxicology findings
6   and specifically commenting on the 1993 National
7   Toxicology Program, published a study, they state --
8   and I'm reading now the last paragraph (as read):
9           "The study lacks convincing
10             scientific support because of
11             serious flaws in its design and
12             conduct, including the
13             investigators used micronized talc
14             instead of consumer-grade talc,
15             resulting in the experimental
16             protocol not being reflective of
17             human exposure conditions in terms
18             of particle size."
19          Did I read that correctly?
20       A.  Well, yes.  But that's taken out of context
21  to what's above here from the NTP report.
22       Q.  Have you made a determination in this case
23  about the size of the particles in talcum powder
24  products?
25       A.  They vary in size, from my understanding.

Page 248

1        Q.  But the FDA noted -- and I'm looking at
2   page 4 -- that (as read):
3           "The investigators conceded that
4             they had problems with the aerosol
5             generation system and that the
6             study did not include positive and
7             negative dust controls."
8           Is that right?
9        A.  That's what it says.
10       Q.  The FDA went on to conclude that (as read):
11          "In light of these shortcomings, a
12             panel of experts at the 1994
13             ISRTP/FDA workshop declared that
14             the 1993 NTP study had no
15             relevance to human risk."
16          Did I read that correctly?
17             MS. O'DELL:  Object to the form.
18             THE WITNESS:  You read that correctly,
19  and this -- that study was -- that workshop was
20  convened a decade before this letter was written.
21  There was definitely more information available that
22  the FDA, once again, chose to not include or ignore.
23  BY MR. ZELLERS:
24       Q.  Well, let's take a look at just a couple of
25  the studies that you refer to in your report.

Page 249

1           You cite to the Buz'Zard 2007 study; is that
2   right?
3        A.  Yes.
4        Q.  You rely on the Buz'Zard study to support
5   your view that talcum powder causes chronic
6   inflammation that leads to ovarian cancer.  This is
7   page 4 of your report, second-to-last paragraph.
8        A.  Yes.  I'm trying to pull out the Buz'Zard
9   paper here.
10       Q.  Do you need me to give it to you, or do you
11  have it in front of you?
12       A.  I have it, sir.
13       Q.  All right.  So this study was conducted in a
14  nutritional lab, not a cancer lab; is that right?
15       A.  Yes.
16       Q.  The purpose of the study was to assess
17  whether there was a certain effect from pine bark
18  supplements; is that right?
19       A.  There was an effect to neutralize the impact
20  of talcum powder.
21       Q.  Did you consider the type of cells that were
22  evaluated in the Buz'Zard study?
23          And let me make it easy for you.  The
24  Buz'Zard study used immortalized cells; is that right?
25  I'm looking at the second page, left column, "Cell

Daniel L. Clarke-Pearson, M.D.

Page 250

1 culture and treatment."
2     A.  I'm trying to find where they talk about
3 human origin.  Temperatures.  Immortalized, yes.
4 Normal ovarian epithelium and normal granulosa cells.
5 It's not just generic immortalized cells.
6     Q.  But the study used immortalized cells; is
7 that correct?
8     A.  Immortalized ovarian cells.
9     Q.  Did you investigate whether the ovarian cells
10 that they used were genetically altered?
11     A.  Did I investigate whether they were
12 genetically altered?
13     Q.  Yes.
14     A.  I had no opportunity to investigate that
15 question.
16     Q.  If the Buz'Zard study used genetically
17 altered ovarian cells that did not have the p53
18 protein, would that affect your analysis of Buz'Zard?
19     A.  I would have to turn to a molecular biologist
20 to tell me what impact that might have had on the
21 impact of this study.
22     Q.  Well, you yourself, as we talked about in the
23 very beginning today in one of your early
24 publications, a cell missing the p53 protein is not a
25 normal human ovarian cell; is that right?

Page 251

1         MS. O'DELL:  Object to the form.
2         THE WITNESS:  No, that's not what we
3 were talking about this morning in the one 1993 study
4 that I was a coauthor on.  P53 mutation is what we
5 were talking about.
6 BY MR. ZELLERS:
7     Q.  Right.  Well, looking at the Figure 3 of the
8 Buz'Zard study 2007, "The inflammatory response does
9 not increase with increasing doses of talcum powder."
10     Is that right?
11         MS. O'DELL:  Object to the form.
12         THE WITNESS:  It does up to a point.
13 BY MR. ZELLERS:
14     Q.  Then stops; is that right?
15     A.  That's right.  And then it goes down,
16 probably because the talcum powder was killing the
17 cells.
18         MR. ZELLERS:  Move to strike as
19 nonresponsive.
20 BY MR. ZELLERS:
21     Q.  In fact, the study shows that higher doses of
22 talcum powder are associated with lower ROS
23 generation; is that right?
24         MS. O'DELL:  Object to the form.
25         THE WITNESS:  That's what it says.

Page 252

1 BY MR. ZELLERS:
2     Q.  Saed.  You were citing the Saed studies, both
3 2018, and now the Harper and Saed 2009 -- strike
4 that -- 2019 abstract; is that right?
5     A.  Repeat the first one.
6     Q.  Sure.  You're relying, in part, for your
7 inflammation theory on Saed 2018, that chapter, and
8 the Harper and Saed 2019 abstract; is that right?
9         MS. O'DELL:  Object to the form.
10         THE WITNESS:  I'm relying on a paper --
11 a review paper published in Gyn Oncology in 2017.  Is
12 that what you're talking about?
13 BY MR. ZELLERS:
14     Q.  Well, I thought Saed that you cite in your
15 paper -- or your report -- was Saed 2018 and Harper
16 and Saed 2019.
17     Are you relying on a Saed 2017 paper as
18 well?
19     A.  There's a review paper, "Updates on Oxidative
20 Stress in Pathogenesis of Ovarian Cancer" that I am
21 familiar with and is a very nice review paper
22 describing oxidative stress and gene mutation.
23     Q.  Well, let me ask you a --
24     A.  But there's two other abstracts here that
25 I think you're talking about.

Page 253

1     Q.  Do you know that Dr. Saed is a paid expert
2 for the plaintiffs' lawyers in this litigation?
3     A.  No.
4     Q.  Did you consider that fact in evaluating
5 Dr. Saed's work?
6     A.  I believe he's an honest scientist and is
7 doing good scientific work.
8     Q.  What is your basis for concluding that he's
9 an honest scientist?
10     A.  He has a good reputation in the gynecologic
11 oncology community.  He's published peer review
12 publications that have been -- undergone critical peer
13 review.
14     Q.  Did Dr. Saed, in any of the publications that
15 you have reviewed -- 2017, 2018, and 2019 -- disclosed
16 that he's a paid expert for the plaintiff lawyers in
17 this litigation?
18         MS. O'DELL:  Object to the form.
19         THE WITNESS:  Not exactly in those
20 words.
21 BY MR. ZELLERS:
22     Q.  Have you spoken with Dr. Saed?
23     A.  No.  I've never met him.
24     Q.  Have you ever requested any information from
25 Dr. Saed?

Daniel L. Clarke-Pearson, M.D.

Page 254

1    A.  No, I have not.

2    Q.  The Saed study looked at immortalized cell

3  lines; is that right?

4          MS. O'DELL:  Which study are you

5  referring to?

6          MR. ZELLERS:  I'm referring to the 2018

7  and 2009 publications that you have referenced with

8  the doctor.

9          MS. O'DELL:  You said 2009 --

10          MR. ZELLERS:  I'm sorry.  2019.  Excuse

11  me.

12          THE WITNESS:  Just to be clear, just so

13  we know the authors, so you're talking about Fletcher

14  and Saed, the abstract?

15  BY MR. ZELLERS:

16    Q.  I was referring to what you cite and

17  reference in your report, which, at least in part, is

18  Saed 2018 and Harper and Saed 2019.

19        Did you review those studies and are you

20  relying, at least in part, on those studies?

21    A.  Those studies and then with the subsequent

22  full-length manuscript by Dr. Saed.

23    Q.  All right.  And you're aware that Dr. Saed

24  looked at immortalized cell lines; is that right?

25    A.  That is about the only way to do that kind of

Page 255

1  research, is with immortalized cells.

2    Q.  Are you aware that Dr. Saed has testified

3  that the cells were modified with a virus to make them

4  undergoing -- strike that -- to make them keep

5  undergoing division in vitro?

6    A.  I was not aware of that, but it may be a

7  laboratory technique that's necessary to do continuous

8  studies on the same cell line.

9    Q.  Are you aware that Dr. Saed testified that

10  the p53 gene was turned off in those cells?

11          MS. O'DELL:  Object to the form.

12          THE WITNESS:  I was not aware of his

13  testimony at all.  I've not read his deposition.

14  BY MR. ZELLERS:

15    Q.  What methodology did you use to apply the

16  Saed results to normal cells in actual organs?

17          MS. O'DELL:  Object to the form.

18          THE WITNESS:  I think this is the best

19  one can do, I presume -- I'm not a laboratory

20  scientist, but the best they can do to replicate

21  in vitro the impact of talcum powder on ovarian cells.

22  BY MR. ZELLERS:

23    Q.  Can you cite any data showing that the

24  concentrations of exposure used in the Saed study are

25  the same as would be encountered in cosmetic use?

Page 256

1          MS. O'DELL:  Object to the form.

2          THE WITNESS:  I think we don't know how

3  much talcum powder gets to the ovary.

4  BY MR. ZELLERS:

5    Q.  Can you cite any data showing that the level

6  of concentration of exposure used in the Saed study

7  has ever occurred in women with perineal talc use?

8    A.  I think that's an unknown answer.

9    Q.  Do you know what SNPs are, S-N-P-S?

10    A.  Yes.  Single-nucleotide polymorphisms.

11    Q.  The Saed abstract and article looked at

12  single-nucleotide polymorphisms, or SNPs; is that

13  right?

14    A.  That's correct.

15    Q.  They are changes to the individual building

16  blocks of DNA; is that right?

17    A.  Yes.

18    Q.  SNPs can be caused by a number of agents or

19  factors; is that right?

20    A.  I believe so.

21    Q.  Most SNPs have no effect on health or

22  development; is that right?

23          MS. O'DELL:  Object to the form.

24          THE WITNESS:  Individual SNPs.  So SNPs

25  do represent a gene mutation, and they do have impact

Page 257

1  on the carcinogenesis, if you will, or development of

2  cancer.  Not in all cases.

3  BY MR. ZELLERS:

4    Q.  What evidence do you have that the SNPs that

5  Dr. Saed observed are associated with ovarian cancer?

6    A.  We see that this chronic inflammation caused

7  by talcum powder in his laboratory is creating SNPs,

8  gene mutations.  Gene mutations then become cancer.

9    Q.  What studies can you cite that show that

10  those SNPs have a statistically significant

11  association with ovarian cancer?

12          MS. O'DELL:  Object to the form.

13          THE WITNESS:  I would have to return to

14  the literature.  There's a broad literature about SNPs

15  that are more than the laboratory right now.  But the

16  combination of different SNPs is recognized as causing

17  cancer.

18        I don't know the specific SNPs that you're

19  referring to.

20  BY MR. ZELLERS:

21    Q.  Other SNPs have no effect on health or

22  development; correct?

23    A.  Some.

24          MS. O'DELL:  Object to the form.

25

Daniel L. Clarke-Pearson, M.D.

Page 258

1  BY MR. ZELLERS:
2    Q. Oxidative stress, would you agree that
3  reactive oxygen species are a normal part of cell
4  physiology?
5    A. To some degree.
6    Q. Do all substances that cause oxidative stress
7  also cause cancer?
8    A. No.
9    Q. Does the presence of oxidative stress in
10 tissue indicate that cancer will develop in that
11 tissue?
12   A. It can develop in that tissue.
13       MS. O'DELL: Excuse me, Mike. Whenever
14 you get to a breaking -- stopping point, we've been
15 going about an hour and 40 minutes, I think, something
16 like that.
17       MR. ZELLERS: Sure. Let me just finish
18 a couple of questions here.
19 BY MR. ZELLERS:
20   Q. The presence of oxidative stress in a tissue
21 may or may not indicate that cancer will develop in
22 that tissue; is that fair?
23   A. Yes, that's correct.
24   Q. If exposure to a substance causes oxidative
25 stress in a certain tissue, does that mean that the

Page 259

1  substance will cause oxidative stress in all types of
2  tissues?
3    A. Not necessarily.
4    Q. Does the body have protective mechanisms that
5  can limit tissue damage from oxidative stress?
6    A. Yes.
7    Q. What publications indicate that oxidative
8  stress is involved in the development of ovarian
9  cancer?
10   A. We're again talking about the evidence that
11 there's gene mutations being caused by oxidative
12 stress.
13   Q. Can you cite to me a publication?
14   A. That results in ovarian cancer?
15   Q. Yes.
16   A. No, I can't cite that to you. I can show you
17 the laboratory evidence that's leading to that
18 conclusion that it will happen one day.
19       MR. ZELLERS: Let's take a break.
20       THE VIDEOGRAPHER: Going off the record
21 at 3:22 p.m.
22     (Recess taken from 3:22 p.m. to 3:38 p.m.)
23       THE VIDEOGRAPHER: Back on the record
24 at 3:38 p.m.
25

Page 260

1  BY MR. ZELLERS:
2    Q. Dr. Clarke-Pearson, are you familiar with the
3  term "confounding"?
4    A. Yes.
5    Q. That's where the presence of another
6  association confuses the relationship between the
7  exposure and disease being studied; correct?
8    A. That sounds like a reasonable definition.
9    Q. For example, if you're studying the
10 association between coffee and pancreatic cancer, you
11 need to be mindful of whether cigarette smoking is
12 more common in coffee drinkers than in the rest of the
13 population; correct?
14   A. And if there's some synergism between the
15 two.
16   Q. Cigarette smoking could be a confounder in
17 that situation; is that right?
18   A. Yes.
19   Q. Because if more coffee drinkers are smokers
20 than non-coffee drinkers, an association between
21 coffee drinking and pancreatic cancer might be due to
22 the smoking, not the coffee drinking; correct?
23       MS. O'DELL: Object to the form.
24       THE WITNESS: That's where a researcher
25 would need to control for those variables.

Page 261

1  BY MR. ZELLERS:
2    Q. Confounding can distort results in
3  epidemiologic studies; is that right?
4    A. Yes.
5    Q. You agree that residual confounding is
6  possible in every observational study; correct?
7    A. I'm not sure I understand what "residual
8  confounding" is.
9    Q. Well, residual confounding is confounding
10 that remains even after you have controlled for known
11 confounders.
12       MS. O'DELL: Object to the form.
13       THE WITNESS: So let me read your
14 question.
15 BY MR. ZELLERS:
16   Q. Or I can ask it again.
17   A. Okay.
18   Q. I'll ask it again.
19       You agree that residual confounding is
20 possible in every observational study; correct?
21       MS. O'DELL: Object to the form.
22       THE WITNESS: That is possible.
23 BY MR. ZELLERS:
24   Q. You agree that it's possible that unmeasured
25 confounders may be present in every observational

Daniel L. Clarke-Pearson, M.D.

Page 262

1  study; correct?
2          MS. O'DELL:  Objection to form.
3          THE WITNESS:  Yes, that's possible.
4  BY MR. ZELLERS:
5      Q.  It's impossible to say that all known and
6  unknown confounding factors have been controlled for
7  in any given study; is that right?
8          MS. O'DELL:  Object to the form.
9          THE WITNESS:  That's why we do
10  randomized control trials if possible.
11  BY MR. ZELLERS:
12      Q.  Many new factors possibly involved in ovarian
13  cancer are just being published in the literature; is
14  that right?
15          MS. O'DELL:  Object to the form.
16          THE WITNESS:  What's being -- what
17  I was referring to as new factors are really the
18  biological mechanisms by which ovarian cancer occurs.
19  BY MR. ZELLERS:
20      Q.  Well, through time, there have been different
21  factors or potential factors involved in ovarian
22  cancer; is that right?
23          MS. O'DELL:  Object to the form.
24          THE WITNESS:  Yes.
25

Page 263

1  BY MR. ZELLERS:
2      Q.  Some of those are borne out and some are not;
3  is that right?
4      A.  I'm not sure what you mean --
5          MS. O'DELL:  Object to the form.
6          THE WITNESS:  -- by factors aren't
7  borne out.
8  BY MR. ZELLERS:
9      Q.  Well, at one point, was it thought that a
10  mumps virus was a potential viral etiology of ovarian
11  cancer?
12      A.  Not that I'm aware of.  When was that?
13      Q.  You're not aware of that?
14      A.  I'm not aware of it.
15      Q.  All right.  Well, how about Chlamydia
16  infection, a history of Chlamydia infection and a
17  history of weight gain during adolescence are two
18  recent examples of potentially new factors involved
19  with ovarian cancer; correct?
20          MS. O'DELL:  Object to the form.
21          THE WITNESS:  Well, we just finished
22  talking about pelvic inflammatory disease, and
23  Chlamydia is a pelvic inflammatory disease, so that
24  may be a specific new factor.  But we already have
25  accepted PID as a risk factor.

Page 264

1          Obesity in adolescence may or may not be.
2  I'm not aware of the data on that.
3  BY MR. ZELLERS:
4      Q.  Factors weren't controlled for, Chlamydia
5  infection, history of weight gain, those are factors
6  that were not controlled for -- strike that.  Let me
7  be more precise.
8          A history of Chlamydia infection and a
9  history of weight gain during adolescence are two
10  recent factors that are being discussed among the
11  gynecologic oncology community; correct?
12          MS. O'DELL:  Object to the form.
13          THE WITNESS:  I'm not aware of the
14  obesity in adolescence.  It may be.
15  BY MR. ZELLERS:
16      Q.  Those factors were not controlled for in any
17  of the published talc ovarian cancer studies; correct?
18      A.  That's correct.
19      Q.  You rely on Terry 2013 in your report.  It's
20  part of your graph on -- or your table on page 7; is
21  that right?
22      A.  Yes.
23      Q.  Terry 2013 did not adjust for hormone
24  replacement therapy usage; is that right?
25      A.  I would have to look to see what he did and

Page 265

1  didn't adjust for.
2      Q.  Is that easy for you to do?
3      A.  I'm sorry?
4      Q.  Is that easy for you to do?
5      A.  It's buried in here under fine print, I'm
6  sure.
7      Q.  Let me -- let me ask the question this way:
8  If hormone replacement therapy is a risk -- well,
9  strike that.
10          Is hormone replacement therapy a risk factor
11  for ovarian cancer?
12      A.  We believe it is.
13      Q.  If Terry 2013 -- and I'm asking you to assume
14  this.
15          If Terry 2013 did not account for that
16  potential confounding factor, then we wouldn't know
17  whether the odds ratio in the study would have been
18  lower if the authors had made that adjustment;
19  correct?
20          MS. O'DELL:  Object to the form.
21          THE WITNESS:  Or it may have been
22  higher.
23  BY MR. ZELLERS:
24      Q.  We don't know; correct?
25          MS. O'DELL:  Object to the form.

Daniel L. Clarke-Pearson, M.D.

| Page 266 |
|---|

1    THE WITNESS:  We don't know.
2  BY MR. ZELLERS:
3    Q.  Asbestos.  You're, as you've told us today,
4  an expert in asbestos; is that right?
5    A.  I feel comfortable talking about asbestos.
6    Q.  You feel comfortable, as you told us and
7  testified earlier, testifying as an expert on
8  asbestos; is that right?
9    MS. O'DELL:  Object to the form.
10    THE WITNESS:  I don't think I said
11  I was an expert in asbestos.
12  BY MR. ZELLERS:
13    Q.  Well, on page 9 of your report, you say
14  (as read):
15    "There are numerous reports in the
16    medical literature of minerals
17    similar to talc causing cancer.
18    Probably the most significant
19    example is asbestos and lung
20    cancer/mesothelioma."
21    Is that right?
22    A.  Yes.  I'm trying to find where I say that.
23  I -- it sounds perfectly right.
24    I'm sorry.  I'm having a hard time finding
25  it.  I looked under -- which topic are you reading

| Page 267 |
|---|

1  from?
2    Q.  All right.  You got page 9, under "Analogy"?
3  Or --
4    A.  Yes.
5    Q.  "There are numerous reports in the medical
6  literature of minerals similar to talc causing cancer.
7  Probably the most significant example is asbestos and
8  lung cancer/mesothelioma."
9    Did I read that correctly --
10    A.  Yes.
11    Q.  -- from your report?
12    A.  That's correct.
13    Q.  How is talc similar to asbestos?
14    A.  First of all, the -- a number of components
15  in talcum powder have carcinogens in them.  There's
16  evidence that we haven't talked about yet that
17  Johnson & Johnson baby powder and Shower to Shower had
18  asbestos in it, that fibrous talc is a carcinogen
19  according to IARC.
20    And, in addition, heavy metals that are
21  contained in Johnson & Johnson baby powder, two of
22  them are considered carcinogens also.
23    MR. ZELLERS:  Move to strike as
24  nonresponsive.
25

| Page 268 |
|---|

1  BY MR. ZELLERS:
2    Q.  How is talc similar to asbestos?
3    A.  Talc has fibrous talc in it.  Assuming
4  there's -- let me just make an assumption that there's
5  no asbestos in talc.  So that's what you're asking me
6  about.
7    Q.  I'm asking you --
8    A.  A hypothetical that talc doesn't have --
9  talcum powder doesn't have asbestos in it.
10    Q.  My question to you is that you state here
11  that there are minerals similar to talc causing
12  cancer.  And what I want to know is how is talc as a
13  mineral similar to asbestos?
14    A.  Talc has a fiber in it.  Fibrous talc is
15  similar to asbestos.
16    Q.  Can you be any more specific?
17    MS. O'DELL:  Object to the form.
18    THE WITNESS:  It's considered a
19  carcinogen.  It's a long bundle of fibers.
20  BY MR. ZELLERS:
21    Q.  Talc is a long bundle of fibers?
22    A.  Fibrous talc is.
23    Q.  Well, I'm asking you about talc right now.
24  Is talc different than fibrous talc?
25    A.  If you are talking hypothetically about platy

| Page 269 |
|---|

1  talc only --
2    Q.  I'm talking about you as an expert and
3  describing for us the differences in the minerals
4  talc, fibrous talc, and asbestos.
5    A.  So platy talc hypothetically is probably not
6  like asbestos, but it contains fibrous talc, which is
7  a long, elongated mineral that can act in the human
8  body similar to asbestos.
9    Q.  Can you be any more descriptive, or is that
10  as far as you can go in terms of explaining how
11  fibrous talc is similar to asbestos?
12    A.  Both cause a chronic inflammation in normal
13  tissues and then go on to cause oxidative stress and
14  mutations.
15    Q.  I'm talking more about the minerals.  Can you
16  be any more descriptive about how fibrous talc, the
17  mineral, is similar to asbestos?
18    MS. O'DELL:  Objection to form.
19    THE WITNESS:  Pictures I've seen look
20  like asbestos particles, and fibrous talc looked very
21  similar.
22  BY MR. ZELLERS:
23    Q.  What other minerals that are similar to talc
24  cause cancer?
25    MS. O'DELL:  Object to the form.

Daniel L. Clarke-Pearson, M.D.

Page 270

1        THE WITNESS: I'm not aware of any.
2   BY MR. ZELLERS:
3        Q. Are your opinions in this case dependent on
4   talcum powder containing asbestos?
5        A. No.
6        Q. Do you believe that talcum powder that does
7   not contain asbestos causes ovarian cancer?
8        A. Yes.
9        Q. If your -- if your assumption about
10  contamination of talcum powder products with asbestos
11  were not true, would that change your opinion in this
12  case?
13       A. No.
14       MS. O'DELL: Object to the form.
15  BY MR. ZELLERS:
16       Q. Is it fair to say that you have not made any
17  independent determination that the Johnson's baby
18  powder and talcum powder products are contaminated
19  with asbestos?
20       MS. O'DELL: Objection to form.
21       THE WITNESS: The only determination
22  I've had is the evidence that I've seen.
23  BY MR. ZELLERS:
24       Q. You don't have the personal expertise to make
25  that determination; is that right?

Page 271

1        A. I have the personal expertise to read reports
2   from experts and --
3        Q. Do you have the personal expertise to do the
4   testing necessary to determine whether or not talc is
5   contaminated with asbestos?
6        A. No, I do not.
7        Q. You're relying on the reports of Longo for
8   that information; is that right?
9        MS. O'DELL: Object to the form.
10       THE WITNESS: And I think also testing
11  that was performed by Johnson & Johnson, reported in
12  the John Hopkins deposition.
13  BY MR. ZELLERS:
14       Q. Well, you're talking about the two exhibits
15  that you looked at, one exhibit in John Hopkins'
16  deposition and one exhibit in Julie Pier deposition;
17  is that right?
18       A. Yes.
19       Q. You were given those documents by
20  Dr. Thompson and counsel for plaintiffs; is that
21  right?
22       A. Or by Ms. O'Dell, I'm not sure who.
23       Q. Or by Ms. O'Dell. I'll put her in the
24  counsel of plaintiffs.
25       You did not undertake a review of the

Page 272

1   literature on the topic of the alleged presence of
2   asbestos in talcum powder; is that right?
3        MS. O'DELL: Object to the form.
4        THE WITNESS: The literature?
5   BY MR. ZELLERS:
6        Q. You're relying for their -- strike that.
7        For the proposition that there is asbestos
8   in the Johnson's baby powder and Shower to Shower
9   product, your reviewing on the documents you were
10  provided by counsel, the exhibit from John Hopkins
11  deposition, the exhibit from Julie Pier, and from the
12  selected company documents they provided to you;
13  correct?
14       A. I'm also relying on a publication by A.M.
15  Blount.
16       Q. That's what we identified earlier; is that
17  right?
18       A. I believe so.
19       Q. The A.M. Blount article deals with
20  mesothelioma, not ovarian cancer; is that right?
21       MS. O'DELL: Objection to form.
22       THE WITNESS: It talks about the
23  presence of asbestos in talcum powder.
24  BY MR. ZELLERS:
25       Q. Do you know that the deposition exhibits that

Page 273

1   you were given -- the exhibit to John Hopkins'
2   deposition and the exhibit to Julie Pier's
3   deposition -- that they were tables and exhibits that
4   were created by the plaintiff attorneys?
5        MS. O'DELL: Objection to form.
6        THE WITNESS: I'm not aware of how
7   these tables were created.
8   BY MR. ZELLERS:
9        Q. Do you know where the data in those exhibits
10  came from?
11       A. I do not.
12       Q. Are you -- strike that.
13       Have you made any effort to investigate any
14  alternative explanations for the data in those charts?
15  And I'm talking about the Hopkins and Pier deposition
16  exhibits.
17       A. No.
18       Q. If scientists with Johnson & Johnson
19  companies and Imerys scientists say that those tests
20  don't actually show asbestos, you have no expertise to
21  dispute that personally, do you?
22       MS. O'DELL: Object to the form.
23       THE WITNESS: Personally, no.
24  BY MR. ZELLERS:
25       Q. Have you looked at the evidence or been

Daniel L. Clarke-Pearson, M.D.

Page 274

1  provided with the evidence of Johnson & Johnson
2  companies and Imerys that, in fact, those tests do not
3  show asbestos?
4       MS. O'DELL: Object to the form.
5       THE WITNESS: You're referring to the
6  charts that I have?
7  BY MR. ZELLERS:
8    Q. Yes.
9    A. I'm not aware of that.
10   Q. Have you confirmed that any of the talc
11 samples mentioned in those charts, the two exhibits of
12 Hopkins deposition and Pier deposition, were actually
13 from talc that was used in body powder?
14   A. I believe the testing that was reported in
15 Hopkins was from Johnson & Johnson.
16   Q. Number one, have you confirmed that any of
17 the talc samples mentioned in those charts were
18 actually from talc that was used in body powder?
19      MS. O'DELL: Objection to form.
20      THE WITNESS: I can't confirm that.
21 BY MR. ZELLERS:
22   Q. You realize that the vast majority of talc
23 isn't used for body powder; correct?
24      MS. O'DELL: Objection to form.
25      THE WITNESS: I don't know.

Page 275

1  BY MR. ZELLERS:
2    Q. Did you consider any testing of Johnson &
3  Johnson or Imerys that found no asbestos in the talcum
4  powder?
5    A. I presume there is. The report by Dr. Longo
6  didn't show it in every single sample.
7    Q. Well, did you consider -- did you review any
8  of that testing of either Johnson & Johnson companies
9  or Imerys that found no asbestos?
10   A. I was not aware of any data on that to that
11 point.
12   Q. Were you provided that data or those test
13 results by counsel for plaintiffs?
14   A. No.
15   Q. Have you reviewed the FDA's testing of talcum
16 powder products?
17   A. You'd have to show me that evidence.
18   Q. Do you recall, sitting here, whether or not
19 you have been provided with the FDA's testing of
20 talcum powder products?
21   A. I believe I've seen it.
22   Q. Have you made any effort -- well, strike
23 that.
24      The FDA's testing, do you recall whether it
25 found asbestos or did not find asbestos?

Page 276

1    A. My recollection was, whatever technique they
2  used, they didn't find asbestos.
3    Q. Have you made any effort to quantify the
4  amount of any alleged contaminant in the Johnson's
5  baby powder products?
6       MS. O'DELL: Objection to form.
7       THE WITNESS: What contaminant are you
8  talking about?
9  BY MR. ZELLERS:
10   Q. Well, let's start with asbestos.
11   A. I haven't made any effort to quantify aside
12 from what's in the reports.
13   Q. Have you made any effort to quantify the
14 trace amounts of heavy metals that you contend are in
15 the baby powder?
16   A. I have not tried to quantitate that except
17 for what's in the reports.
18   Q. Have you attempted to quantify in any manner
19 the fragrance chemicals that you believe are contained
20 in the baby powder?
21      MS. O'DELL: Objection to form.
22      THE WITNESS: The fragrance chemicals
23 that I know are contained in the baby powder?
24 BY MR. ZELLERS:
25   Q. Well, you don't really know if any fragrance

Page 277

1  chemicals are contained in the baby powder. You have
2  reviewed some documents and materials prepared by
3  others which talk about that; right?
4    A. Yes.
5    Q. All right. Do you have an opinion on what
6  type of asbestos, if any, is in the Johnson's baby
7  powder?
8    A. Looking at the reports, there are several
9  types.
10   Q. Tell us what types you believe -- what types
11 of asbestos are found or -- strike that.
12      What types of asbestos are found in the baby
13 powder?
14   A. So this is from the Hopkins Report.
15 Tremolite. Crystalline. Some more crystalline.
16 Crystalline. Crystalline. Tremolite. Actinolite.
17 Actinolite.
18      Would you like me to go on?
19   Q. Well, you're just reading down from the
20 Hopkins, Exhibit 47; is that right?
21   A. That's correct.
22   Q. Do you know what type of asbestos is most
23 commonly associated with ovarian cancer?
24      MS. O'DELL: Object to the form.
25      THE WITNESS: I think they all are.

Daniel J.    Clarke-Pearson, M.D.

Page 278

BY MR. ZELLERS:

Q. That's your belief?  That all types of asbestos are equally associated with ovarian cancer?

A. I think they're all carcinogens.

Q. Am I correct that, at least as you sit here, you believe that all forms of asbestos are associated with ovarian cancer?

A. There's never been a randomized trial exposing women to different forms of asbestos to determine whether one is more carcinogenic than the other.

Q. So your answer is yes; is that right?

MS. O'DELL:  Object to the form.

MS. BOCKUS:  I was going to object to his prior answer as nonresponsive.

THE WITNESS:  Your question was, "Am I correct?"

BY MR. ZELLERS:

Q. What I want to know --

A. Do I believe that all forms of asbestos are associated with ovarian cancer?  And the answer is yes.

Q. Is there a particular type of asbestos that is primarily associated with ovarian cancer?

MS. O'DELL:  Objection.  Asked and

Page 279

answered.

THE WITNESS:  Not that I'm aware of.

BY MR. ZELLERS:

Q. What dose of asbestos is associated with ovarian cancer?

A. We don't know.  Possibly any dose.

Q. What type of ovarian cancer is asbestos associated with?

I guess that goes back to the answer before. You don't know.  Is that right?

MS. O'DELL:  Objection to form.  That's not what he said.

THE WITNESS:  It's associated with epithelial ovarian cancer.

BY MR. ZELLERS:

Q. Does the type of ovarian cancer vary based on the type of asbestos?

MS. O'DELL:  Objection.  Asked and answered.

THE WITNESS:  I don't think anybody knows that.

BY MR. ZELLERS:

Q. You've looked at studies that have explored the potential link between asbestos and ovarian cancer; is that right?

Page 280

A. Yes.

Q. Are you familiar with the limitations of that research?

MS. O'DELL:  Objection.  Vague.

THE WITNESS:  I'm not quite sure --

BY MR. ZELLERS:

Q. I'm sorry.  Did you finish?

A. Yes.

Q. One of the papers you looked at -- and I think it's contained in one of your folders -- was the Reid 2011 paper.  Is that right?

A. Yes.

Q. That was research on the potential relationship between asbestos and ovarian cancer.  One of the limitations as discussed by Reid is that there's a very small number of cases.

Is that right?

MS. O'DELL:  Object to the form.

THE WITNESS:  I believe so.

BY MR. ZELLERS:

Q. Is it true that most, if not all, of the studies that you have reviewed with respect to asbestos and ovarian cancer involve occupational exposure?

MS. O'DELL:  Object to the form.

Page 281

THE WITNESS:  That's correct.

BY MR. ZELLERS:

Q. Did any of the nonoccupational asbestos studies reach statistical significance?

A. No.

Q. Do you know how many women have been studied in nonoccupational settings?

A. In this particular study, it looks like Italian wives of asbestos factory workers would be in nonindustrial settings is 1780 women.

Q. Are you aware of the difficulties that have existed over time in distinguishing between peritoneal mesothelioma and ovarian cancer?

A. I'm aware that there are some uncertainty in some pathologic diagnoses, yes.

Q. Those difficulties potentially affect the reliability of the studies; is that right?

A. Well, I think both epithelial ovarian cancer and mesothelioma of the ovary or peritoneum are both malignancy.

Q. Well, the studies have acknowledged that it's difficult to distinguish between the two, between peritoneal mesothelioma and ovarian cancer; is that right?

A. Pathologically, that's correct.

Daniel L. Clarke-Pearson, M.D.

Page 282

1    Q. And the Reid study, again, makes that
2 finding.  On the first page, in the right-hand column,
3 Number 2, "Difficulties with Diagnosis"; is that
4 right?
5    A. Yes.
6    Q. Have the studies addressed confounding and
7 independent risk factors?
8        MS. O'DELL:  Object to the form.
9        THE WITNESS:  Well, I'm certain that --
10 I would be quite confident that they didn't evaluate
11 these women, whether they had a BRCA1 or 2 mutation or
12 not, and other risk factors were not included.
13 BY MR. ZELLERS:
14    Q. Well, Camargo 2011.  That's another study
15 that you put in one of your folders in preparation for
16 today; is that right?
17    A. Yeah.
18    Q. That study acknowledged an inability to
19 account for nonoccupational risk factors for ovarian
20 cancer other than age; is that right?
21    A. Yes.
22    Q. These researchers conducted a meta-analysis
23 to evaluate the association between asbestos and
24 ovarian cancer; is that right?
25    A. Yes.

Page 283

1    Q. And they acknowledge, as we spoke just a
2 moment ago, that they could not account for
3 nonoccupational risk factors for ovarian cancer other
4 than age; is that right?
5    A. I believe so.
6    Q. Also looking at Camargo, wouldn't you expect
7 to find higher rates of other cancers in women using
8 talc, like mesothelioma, if they are being exposed to
9 substantial amounts of asbestos?
10        MS. O'DELL:  Object to the form.
11        THE WITNESS:  They would be -- they
12 would have to inhale it to a quantity enough to cause
13 mesothelioma of the lung.
14 BY MR. ZELLERS:
15    Q. Are women who use talc in the perineal region
16 at greater risk of mesothelioma?
17    A. Not that I'm aware of.
18    Q. Are women who use talc in the perineal region
19 at greater risk of asbestosis?
20    A. Not that I'm aware of.
21    Q. If there was more asbestos in talcum powders
22 in the 1970s, shouldn't we have seen higher rates of
23 ovarian cancer in the earlier studies?
24        MS. O'DELL:  Object to the form.
25        THE WITNESS:  I think getting back to

Page 284

1 your point about confounding issues, the risk factors
2 in the 1970s above and beyond exposure to talc were
3 not always controlled for.  I think we know more about
4 that today in ongoing studies.
5 BY MR. ZELLERS:
6    Q. You'd agree that exposure to asbestos through
7 the perineal cosmetic talc use, assuming that talc
8 contains asbestos fibers, is different from the heavy
9 occupational exposure that's primarily been
10 researched; is that right?
11        MS. O'DELL:  Object to the form.
12        THE WITNESS:  Yes, I would agree with
13 that.
14 BY MR. ZELLERS:
15    Q. Is the asbestos that women are exposed to
16 from using cosmetic talc qualitatively the same as the
17 raw asbestos encountered at a factory, if you know?
18        MS. O'DELL:  Object to the form.
19        THE WITNESS:  The raw asbestos
20 encountered at a factory before it's processed?
21 BY MR. ZELLERS:
22    Q. Yes.
23    A. I don't know the answer to that.
24    Q. Do you know what a cleavage fragment is?
25    A. It's part of platy talc.

Page 285

1    Q. Do you know how a cleavage fragment differs
2 from an asbestos fiber?
3    A. It has to do with the size of the fiber.
4    Q. Do you have any opinions about cleavage
5 fragments in this case?
6    A. What case are we talking about?
7    Q. You serving as an expert witness in the --
8    A. I guess I think of a case as a patient.
9    Q. Well, you're here today talking generally
10 about the risk of ovarian cancer from talcum powder
11 use; is that right?
12    A. Yes.
13    Q. Do you intend to express any expert opinions
14 in this matter about cleavage fragments?
15        MS. O'DELL:  Objection to form.
16        THE WITNESS:  If asked.
17 BY MR. ZELLERS:
18    Q. Okay.  What opinions do you have about
19 cleavage fragments?  And, specifically, how does a
20 cleavage fragment differ from an asbestos fiber?
21    A. So it has to do with the ratio of length to
22 width, and a cleavage factor has a less than 6:1
23 proportion.
24    Q. Anything else?
25    A. You were asking about cleavage fragments?

Daniel L. Clarke-Pearson, M.D.

Page 286

1    Q.  Yes.  And I'm asking how it differs from an
2  asbestos fiber --
3    A.  Asbestos needle is longer.  It's either a
4  ratio of 6:1 up to less than 15:1.
5    Q.  Anything else?
6    A.  And then fibers are considered greater than
7  15:1 ratio.
8    Q.  Asbestos fibers or cleavage fragments?
9    A.  Asbestos fibers.
10    Q.  How does a cleavage fragment differ from
11  fibrous talc?
12    A.  I'm not sure I know the difference.
13    Q.  Does it make a difference to your theory and
14  your opinions if it turns out that talc contains
15  cleavage fragments of nonasbestiform amphiboles
16  instead of asbestiform amphiboles?
17      MS. O'DELL:  Objection.
18      THE WITNESS:  I'm going to have to read
19  your question.
20  BY MR. ZELLERS:
21    Q.  Sure.  And if you don't have opinions, that's
22  okay.  I'm just trying to find out what you have
23  opinions about.
24    A.  No, I don't have an opinion.
25    Q.  You don't have opinions about whether or not

Page 287

1  regulatory action in this area rejects the idea that
2  science has established that cleavage fragments or
3  nonasbestiform amphiboles pose the same risk as
4  asbestos; correct?  You leave that to other experts to
5  address?
6    A.  The regulatory portion, yes.
7    Q.  How, if at all, did you factor the difference
8  between asbestiform and nonasbestiform minerals into
9  your analysis of the relationship between talcum
10  powder use and ovarian cancer?
11      MS. O'DELL:  Objection to the form.
12  Compound.
13      You may answer the question if you
14  understand it.
15      THE WITNESS:  Well, I'm quite certain,
16  based on IARC, that asbestiform minerals are
17  carcinogenic.
18  BY MR. ZELLERS:
19    Q.  That is your answer to my question?
20    A.  Yes.
21    Q.  All right.  Fragrance chemicals and heavy
22  metals, you're aware those are addressed in
23  Dr. Crowley's report; is that right?
24      MS. O'DELL:  Objection.  Form.
25      THE WITNESS:  Yes.  I don't have that

Page 288

1  in front of me, though.
2  BY MR. ZELLERS:
3    Q.  You're not expressing opinions in this case
4  on fragrance chemicals and heavy metals and any
5  association fragrance chemicals and heavy metals may
6  have on ovarian cancer; correct?
7      MS. O'DELL:  Objection.  Form.
8      THE WITNESS:  No.  I am expressing an
9  opinion about that.
10  BY MR. ZELLERS:
11    Q.  What research have you done with respect to
12  the fragrance chemical and trace amounts of heavy
13  metals that are contained in the talcum powder?
14      MS. O'DELL:  Objection to the form.
15  Compound.
16      THE WITNESS:  It's my opinion that
17  talcum powder causes ovarian cancer, that talcum
18  powder contains platy talc, fibrous talc, asbestos,
19  heavy metals -- three of them -- and fragrances.
20      I'm not necessarily saying one of that list
21  is causing the cancer.  It's the talcum powder -- the
22  baby talc -- baby powder and the Shower to Shower --
23  that's causing the ovarian cancer.
24  BY MR. ZELLERS:
25    Q.  I understand that, and I think I've asked you

Page 289

1  my questions with respect to that.
2      What I'm asking about now is whether or not
3  you have made a separate analysis as to whether one or
4  more of the fragrance chemicals or one or more of the
5  trace heavy metals that have been reported to be
6  contained in talcum powder, whether those are causally
7  associated or a causal factor for ovarian cancer?
8    A.  In combination with the commercial product
9  called baby powder and Shower to Shower, I think they
10  all contribute to the outcome, which is ovarian
11  cancer.
12    Q.  Are you relying on any scientific literature
13  to support your opinion that some of the chemicals in
14  Johnson's baby powder cause ovarian cancer?
15      MS. O'DELL:  Object to the form.
16      THE WITNESS:  We know that they can be
17  carcinogenic.
18  BY MR. ZELLERS:
19    Q.  With respect to ovarian cancer.
20    A.  Not specifically to ovarian cancer.  We
21  haven't studied that.
22    Q.  Do you have any evidence that the fragrance
23  chemicals and trace heavy metals contained in
24  Johnson's baby powder have been tested in human beings
25  and found to cause inflammation?

Daniel L. Clarke-Pearson, M.D.

| Page 290 | Page 292 |
|---|---|
| 1   A. I'm not aware of those studies. | 1   Q. Or Shower to Shower? |
| 2   Q. Is there any epidemiology, human studies, | 2   A. No. |
| 3 substantiating the theory that fragrance ingredients | 3   Q. You've not done any independent testing of |
| 4 can cause ovarian cancer? | 4 that; correct? |
| 5   A. Fragrance ingredients by themselves? | 5   A. That's correct. |
| 6   Q. Yes. | 6   Q. How, if at all, did you factor the dose |
| 7   A. I'm not aware of any study that's evaluated | 7 fragrances and heavy -- or trace heavy metals into |
| 8 that. | 8 your analysis of the potential relationship between |
| 9   Q. Is there any epidemiology study | 9 those compounds and ovarian cancer? |
| 10 substantiating the theory that fibrous talc is | 10   A. I didn't factor in. |
| 11 carcinogenic? | 11   Q. Let me ask you a couple of questions about |
| 12   A. IARC claims it is carcinogenic. | 12 the Health Canada assessment and the Taher article. |
| 13   Q. That it causes ovarian cancer, specifically? | 13 Those are new materials that you reviewed between the |
| 14   A. I believe so. | 14 time of your report and appearing here today; is that |
| 15   Q. You'd defer to IARC on that; is that right? | 15 right? |
| 16      MS. O'DELL: Object to the form. | 16   A. That's correct. |
| 17      THE WITNESS: Yes. | 17   Q. Have you read the draft Health Canada risk |
| 18 BY MR. ZELLERS: | 18 assessment -- I'll provide you with a copy so we know |
| 19   Q. Is there any epidemiology substantiating the | 19 what we're speaking of. |
| 20 theory that exposures to trace amounts of heavy | 20   (Exhibit No. 29 was marked for identification.) |
| 21 metals, allegedly, or that you believe are contained | 21      MR. ZELLERS:  Deposition Exhibit 29 is |
| 22 in the Johnson's baby powder can cause ovarian cancer? | 22 the draft Health Canada decision framework -- strike |
| 23   A. I'm not aware that anybody's done a | 23 that. |
| 24 randomized trial in human beings with carcinogen -- | 24      Exhibit 29 is the Health Canada |
| 25 carcinogenic heavy metals to evaluate whether ovarian | 25 Decision-Making Framework for Identifying, Assessing, |

| Page 291 | Page 293 |
|---|---|
| 1 cancer or any other cancer might occur. | 1 and Managing Health Risks. |
| 2   Q. Well, aside from a randomized clinical trial, | 2      Is that not what he's reviewed? |
| 3 are you aware of any other epidemiology substantiating | 3      MS. O'DELL:  If you're handing him that |
| 4 the theory that exposures to trace amounts of the | 4 and suggesting, that's not the health assessment that |
| 5 heavy metals that are reported to be in the Johnson's | 5 he's reviewed. |
| 6 baby powder can cause ovarian cancer? | 6      MR. ZELLERS:  So do we have the health |
| 7      MS. O'DELL: Object to the form. | 7 assessment here?  And, if not, we can just identify |
| 8      THE WITNESS: I don't think that | 8 it.  But I do want to ask him a few questions about |
| 9 anybody's ever studied that as a separate entity of | 9 the -- |
| 10 metals only exposed to the ovary. | 10      MS. O'DELL:  I do think we have it |
| 11 BY MR. ZELLERS: | 11 here.  But, if you're going to ask him questions, |
| 12   Q. You have no evidence that the blood or tissue | 12 I would put it in front of him.  So, if we don't have |
| 13 levels of any trace heavy metals are higher in genital | 13 a hard copy, I'm happy to put my electronic copy in |
| 14 talc users as compared to nonusers; is that right? | 14 front of him. |
| 15   A. That's correct. | 15      MR. ZELLERS:  Well, please put whatever |
| 16   Q. Are your opinions in this case depending on | 16 you think you need to put in front of the witness so |
| 17 talc containing carcinogenetic [sic] metals? | 17 he can answer a couple of questions about the Health |
| 18   A. Not necessarily. | 18 Canada risk assessment. |
| 19   Q. Are your opinions in this case dependent on | 19      MS. O'DELL:  Sure.  Give me just a |
| 20 talc containing carcinogenetic [sic] fragrances? | 20 moment -- |
| 21   A. Not necessarily. | 21      MR. ZELLERS:  Sure. |
| 22   Q. Do you have any opinions or knowledge as to | 22      MS. O'DELL:  -- because the copy I have |
| 23 the concentration of each of the fragrance chemicals | 23 is marked up, and I know you prefer for me not to hand |
| 24 that are contained in Johnson's baby powder? | 24 him my marked-up copy. |
| 25   A. No. | 25      MR. ZELLERS:  I would prefer that. |

Daniel L. Clarke-Pearson, M.D.

Page 294

1    MS. O'DELL: Doctor, if you want to
2  just use my computer, feel free to --
3    THE WITNESS: Okay. I'm not real fast
4  at running through a computer, but --
5  BY MR. ZELLERS:
6    Q. Hopefully, my questions will be pretty
7  high-level.
8    You have in front of you the draft Health
9  Canada risk assessment; is that right?
10   A. On my tablet, yes.
11   Q. Have you looked into what other public health
12  authorities have had to say about talc and ovarian
13  cancer?
14   A. Except for what the FDA has had to say.
15   Q. The answer is, no, other than with respect to
16  what the FDA has said; is that right?
17   A. The answer is no.
18   Q. Why would you rely on Health Canada but not
19  other public health organizations?
20   MS. O'DELL: Object to the form.
21   THE WITNESS: It's my understanding
22  that this is very recent analysis of the issues
23  regarding talcum powder and ovarian cancer and other
24  harms.
25

Page 295

1  BY MR. ZELLERS:
2    Q. You understand it's a draft assessment; is
3  that right?
4    A. That's correct.
5    Q. You understand that we're at the very
6  beginning of the public comment period; is that right?
7    MS. O'DELL: Object to the form.
8    THE WITNESS: I don't know that.
9  BY MR. ZELLERS:
10   Q. Are you aware that Health Canada can take up
11  to two years to take any action or no action at all?
12   MS. O'DELL: Object to the form.
13   THE WITNESS: I was not aware.
14  BY MR. ZELLERS:
15   Q. How did you come to learn of the Health
16  Canada risk assessment?
17   A. It was brought to my attention by counsel.
18   Q. By counsel for plaintiffs; is that right?
19   A. That's correct.
20   Q. Were you involved in the risk assessment
21  prior to its publication?
22   A. Was I involved?
23   Q. Yes.
24   A. No.
25   Q. Have you submitted any comments to Health

Page 296

1  Canada?
2    A. I wasn't aware -- as I said, I wasn't aware
3  that there were comments that could be made.
4    Q. Outside of your litigation consulting work,
5  do you generally rely on draft assessments by
6  regulatory agencies?
7    MS. O'DELL: Object to the form.
8    THE WITNESS: I think it's something
9  that's worth looking at. It doesn't necessarily sway
10  my opinion, but could be useful additional information
11  that might be cutting edge.
12  BY MR. ZELLERS:
13   Q. You don't cite or -- strike that.
14   You do not rely on draft regulatory
15  assessments in your peer-reviewed publications and
16  studies; is that right?
17   MS. O'DELL: Object to the form. Asked
18  and answered.
19   THE WITNESS: Not usually, but don't
20  know what -- there's information there. If there's
21  information I can extract from a draft of something
22  that's useful, I can use it.
23  BY MR. ZELLERS:
24   Q. Are you familiar with the precautionary
25  principle?

Page 297

1    A. Slightly.
2    Q. Basically, that means taking a precautionary
3  approach to decision-making that emphasizes the need
4  to take timely preventative action even in the absence
5  of a full scientific demonstration of cause and
6  effect.
7    Does that sound right?
8    A. Sounds very reasonable, yeah.
9    Q. You understand that Health Canada may have
10  made recommendations that are purely precautionary; is
11  that right?
12   MS. O'DELL: Object to the form.
13   THE WITNESS: That's what I've read,
14  yes.
15  BY MR. ZELLERS:
16   Q. I can go through the document for it if need
17  be, but in the -- its publication -- I'll hand it to
18  you -- which we've marked as Exhibit 29, it is
19  captioned "Health Canada Decision-Making Framework for
20  Identifying, Assessing, and Managing Health Risks."
21   Do you have that in front of you?
22   A. You've handed it to me, yes.
23   Q. If you go to page 5, Health Canada sets out
24  the bases for its risk assessments; is that right?
25   A. Let me get to page 5 here.

Daniel J. Clarke-Pearson, M.D.

| Page 298 | Page 300 |
|---|---|
| 1   Q. Sure. | 1   BY MR. ZELLERS: |
| 2   A. In the black box "Underlying Principles"? | 2     Q. All right.  Thayer 2018, that's a new and |
| 3   Q. Yes, "Underlying Principles." | 3   additional meta-analysis that you have reviewed? |
| 4     One of the underlying principles is "use a | 4     A. Yes. |
| 5   precautionary approach"; is that right? | 5     Q. Let's mark Thayer 2018 as Deposition |
| 6   A. That's what it says. | 6   Exhibit 30. |
| 7   Q. If you go, then, to page 8, second paragraph, | 7     (Exhibit No. 30 was marked for identification.) |
| 8   second sentence, where Health Canada sets forth "use | 8   BY MR. ZELLERS: |
| 9   of a precautionary approach," the second sentence | 9     Q. And you can tell us if this is -- |
| 10   reads (as read): | 10     A. I've got a copy. |
| 11     "A precautionary approach to | 11     Q. Well, take, if you will, the court -- |
| 12     decision-making emphasizes the | 12   deposition exhibit number.  Just put it in your pile |
| 13     need to take timely and | 13   there so we can make sure we all understand what we're |
| 14     appropriately preventative action | 14   talking about. |
| 15     even in the absence of a full | 15     You have seen this review before; is that |
| 16     scientific demonstration of cause | 16   right? |
| 17     and effect." | 17     A. Yes, I have. |
| 18   Did I read that correctly? | 18     Q. The Health Canada risk assessment that you |
| 19   A. Yes, sir. | 19   looked at a few moments ago relies on this |
| 20   Q. So a recommendation by Health Canada does not | 20   meta-analysis by Thayer and others; is that right? |
| 21   require a finding of causation like is required in a | 21     A. That's my understanding.  They may use other |
| 22   court.  Does that sound right based upon what we have | 22   information too. |
| 23   reviewed here? | 23     Q. Do you know whether or not Thayer 2018 has |
| 24     MS. O'DELL:  Object to the form. | 24   been peer-reviewed? |
| 25     THE WITNESS:  I'm not sure what the | 25     A. I'm not aware of that. |

| Page 299 | Page 301 |
|---|---|
| 1   requirements are for court.  I understand the | 1     Q. Do you know if it has been submitted for |
| 2   precautionary portion here. | 2   publication? |
| 3   BY MR. ZELLERS: | 3     A. I do not know. |
| 4     Q. And you also understand that, with the use of | 4     Q. How can you rely on the Health Canada risk |
| 5   a precautionary approach, that action can be taken | 5   assessment without assessing the quality of one of the |
| 6   even in the absence of a full scientific demonstration | 6   major studies on which they rely? |
| 7   of cause and effect? | 7     MS. O'DELL:  Objection to form. |
| 8     MS. O'DELL:  Objection to form. | 8     THE WITNESS:  And the major study |
| 9     THE WITNESS:  What action are you | 9   you're referring to is Thayer? |
| 10   talking about? | 10   BY MR. ZELLERS: |
| 11   BY MR. ZELLERS: | 11     Q. Yes. |
| 12     Q. Well, decision-making, any sort of | 12     A. Let me read the first part of your question |
| 13   assessment. | 13   here. |
| 14     MS. O'DELL:  Objection to form. | 14     So I'm not saying that I rely on the Health |
| 15     THE WITNESS:  I'm still not | 15   Canada risk for my total opinion.  It's another piece |
| 16   understanding. | 16   of evidence and information that's helpful in me |
| 17   BY MR. ZELLERS: | 17   coming to my opinion.  And this only supports my |
| 18     Q. Sure.  Health Canada -- | 18   opinion. |
| 19     A. Yes. | 19     Bradford Hill's breakdown is very similar to |
| 20     Q. -- does not need, in terms of its risk | 20   my opinion.  I didn't see this before I created my |
| 21   assessment, to have a full scientific demonstration of | 21   opinion. |
| 22   cause and effect? | 22     Q. Do you know if Thayer 2018 employed a |
| 23     A. I understand. | 23   reliable methodology? |
| 24     MS. O'DELL:  Objection to form. | 24     A. I believe it's very similar to other |
| 25 | 25   methodology and systematic reviews and meta-analyses. |

| Page 302 | Page 304 |
|---|---|

**Page 302**

1 Q. Did you have access to the appendices or
2 supplemental tables referenced in the Thayer
3 meta-analysis?
4 A. I did not.
5 Q. Do you know the source of funding for Thayer
6 2018 meta-analysis?
7 A. If it was listed on here, I should have
8 picked it up. If not, then I don't know the answer to
9 your question.
10 Q. Do you know the credentials of the authors of
11 Thayer 2018?
12 A. None other than what are listed on the cover
13 sheet of this paper.
14 Q. Do you personally know any of the authors of
15 Thayer 2018?
16 A. No, sir.
17 Q. Do you know whether or not any of those
18 authors have conflicts of interest or potential
19 conflicts of interest?
20 A. Do not know.
21 Q. In Thayer 2018, the authors concluded that
22 "The evidence suggests that asbestos contamination
23 does not explain the positive association between
24 perineal use of talc powder and ovarian cancer."
25 Is that right?

**Page 303**

1 MS. O'DELL: Mike, what page are you
2 reading from?
3 MR. ZELLERS: Page 41, last sentence.
4 So we're on Deposition Exhibit 30, the Thayer
5 meta-analysis, page 41, last part.
6 MS. O'DELL: Thank you.
7 BY MR. ZELLERS:
8 Q. Doctor, I really just have a really simple
9 question.
10 A. Okay.
11 Q. So the authors conclude -- or state that
12 (as read):
13 "The similarity of findings
14 between studies published prior to
15 and after this point suggest
16 asbestos contamination does not
17 explain the positive association
18 between perineal use of talc
19 powder and risk of ovarian
20 cancer."
21 Is that right?
22 MS. O'DELL: Object to the form.
23 THE WITNESS: That's what they say.
24 BY MR. ZELLERS:
25 Q. Do you disagree with the authors on that

**Page 304**

1 point?
2 A. I do not disagree with the author on that
3 point.
4 Q. One of the Bradford Hill criteria that we've
5 discussed is consistency; is that right?
6 A. Yes.
7 Q. Look at Thayer 2018. So Exhibit 30, page 25,
8 Table 2.
9 Do you have that?
10 A. Yes.
11 Q. Table 2 is entitled "Summary of Evidence for
12 Each of the Hill Criteria of Causation as Applied to
13 Perineal Application of Talc and Ovarian Cancer."
14 Is that right?
15 A. I'm sorry. What were you reading -- where
16 were you reading from?
17 Q. Sure. Table 2 on page 25 --
18 A. Right.
19 Q. -- is captioned "Summary of Evidence for Each
20 of the Hill Criteria of Causation as Applied to
21 Perineal Application of Talc and Ovarian Cancer."
22 A. Yes.
23 Q. And they kind of go through the same Bradford
24 Hill factors that you do; is that right?
25 A. Yes.

**Page 305**

1 Q. Under "Consistency," they said that
2 (as read):
3 "15 out of 30 studies reported
4 positive and significant
5 associations."
6 Is that right?
7 A. That's right.
8 Q. We're back to, similar with Langseth, half
9 the studies showing significant associations and half
10 the studies don't. Thayer reports that same findings
11 here; is that right?
12 A. Yes, but not all studies have the same
13 weight.
14 Q. And we've discussed that before; is that
15 right?
16 A. Yes. I just wanted to bring it up again,
17 since we're talking about that topic.
18 Q. Let's go to "no dose response." And that was
19 your -- well, let me withdraw that statement.
20 Go to page 21, if you will, second
21 paragraph, last few sentences.
22 Do you have that?
23 MS. O'DELL: What page are you on?
24 MR. ZELLERS: Page 21.
25

Daniel L. Clarke-Pearson, M.D.

| Page 306 | Page 308 |
|---|---|
| 1 BY MR. ZELLERS:<br>2    Q. The authors here in this section are<br>3 discussing whether or not there is a dose response and<br>4 dose response findings in the studies; is that right?<br>5    A. Yes.<br>6    Q. They conclude at the very end -- and I'm<br>7 looking on page 21, the last sentence above 3.3.2<br>8 (as read):<br>9       "When conducted, findings from<br>10       trend analyses were not<br>11       consistent."<br>12    Do you see that?<br>13    A. Yes, I do.<br>14    Q. The authors recognize that there's no<br>15 consistent dose response across studies, and you agree<br>16 with that; is that right?<br>17       MS. O'DELL:  Objection to form.<br>18       THE WITNESS:  I think there's some<br>19 evidence there's dose response.  Some studies don't do<br>20 enough to evaluate for dose response, especially the<br>21 cohort studies that are pretty well destroyed back on<br>22 page 43.<br>23 BY MR. ZELLERS:<br>24    Q. Some studies find dose response and some<br>25 studies don't; correct? | 1       THE VIDEOGRAPHER:  Going off the record<br>2 at 4:36 p.m.<br>3    (Recess taken from 4:36 p.m. to 4:44 p.m.)<br>4       THE VIDEOGRAPHER:  Back on the record<br>5 at 4:44 p.m.<br>6 CROSS-EXAMINATION BY COUNSEL FOR THE DEFENDANT IMERYS<br>7 BY MS. BOCKUS:<br>8    Q. Doctor, I just want to be sure that what we<br>9 have marked so far will provide us with copies of all<br>10 of your handwritten notes.<br>11    A. Certainly.<br>12    Q. Okay.  Are there some handwritten notes that<br>13 are not on the table in front of you right now?<br>14    A. Yeah.  There's some in these files and<br>15 some -- like this, with sticky notes.<br>16    Q. And that's what I'm looking for.  I want to<br>17 make sure I get all your sticky notes and all of the<br>18 notations that you have made in your review of the<br>19 articles.<br>20       And so when we get -- it looks like there<br>21 are two binders that have flags and that sort of thing<br>22 in them.  Are there notes in the binders that are over<br>23 on the table?<br>24    A. No, ma'am.<br>25    Q. Okay.  So other than the binders and the |

| Page 307 | Page 309 |
|---|---|
| 1       MS. O'DELL:  Objection to form.<br>2       THE WITNESS:  That's correct.<br>3 BY MR. ZELLERS<br>4    Q. And that's true of case-control studies; is<br>5 that right?<br>6    A. Yes.<br>7    Q. I want to go back to a question I had asked<br>8 you earlier.<br>9       When you do surgery and you see<br>10 inflammation, would you agree that inflammation that<br>11 you see is likely related to the cancer itself?<br>12    A. So let me clarify so we don't get confused.<br>13       The inflammation that I see is purely<br>14 ascites.  The rest -- which is fluid in the abdomen<br>15 either caused by the cancer or by inflammation.<br>16    Q. The ascites can be caused by the cancer<br>17 itself; correct?<br>18    A. Yes.<br>19       MR. ZELLERS:  I have no further<br>20 questions.  Some of my colleagues may have questions<br>21 for you.  Thank you for your time.<br>22       THE WITNESS:  Thank you.<br>23       MS. BOCKUS:  Could we take a quick<br>24 break so that we can change places?<br>25       MS. O'DELL:  Sure. | 1 materials that are on the table, do you have<br>2 handwritten notes somewhere else?<br>3    A. No.<br>4    Q. Earlier today, you were asked a question --<br>5 I think it was about the FDA letter -- and you thought<br>6 you had some handwritten notes on that.  Do you know<br>7 where those might be?<br>8    A. I don't recall now.  You know, it was a<br>9 sticky note.  Just what I've been trying to do is<br>10 abstract these papers to a few facts that I think are<br>11 important.  It's not personal opinions or other things<br>12 like that; it's just trying to move the conversation<br>13 along.<br>14    Q. Would you agree that in general ovarian<br>15 cancer is a disease of aging?<br>16       MS. O'DELL:  Objection to form.<br>17       THE WITNESS:  That is one of the risk<br>18 factors, yes.<br>19 BY MS. BOCKUS:<br>20    Q. That very few women are diagnosed with<br>21 ovarian cancer who are under 30 years of age; correct?<br>22    A. With epithelial ovarian cancer, yes.<br>23    Q. And that risk -- so the numbers are different<br>24 depending which type of ovarian cancer you're talking<br>25 about; correct? |

Daniel L. Clarke-Pearson, M.D.

| Page 310 | Page 312 |
|---|---|
| 1    A. Yes. | 1  tell them what caused the genetic mutation that caused |
| 2    Q. So confining it to epithelial ovarian cancer, | 2  their cancer? |
| 3  that risk starts to rise in the 30s and rises even | 3        MS. O'DELL: Object to the form. |
| 4  more in the 40s, 50s, and 60s; correct? | 4        THE WITNESS: Aside from the inherited |
| 5    A. Yes, that's my understanding. | 5  BRCA mutations and Lynch syndrome, in general, no, we |
| 6    Q. And in the 60s, it kind of levels off -- | 6  can't. |
| 7    A. In the 60s or 70s. I've forgotten what the | 7  BY MS. BOCKUS: |
| 8  curves look like exactly. | 8    Q. Would you agree that what we know today about |
| 9    Q. And other than being female of a certain age, | 9  what causes ovarian cancer is actually dwarfed by what |
| 10  most patients who you see, you don't have any idea of | 10  we don't yet know about the cause of ovarian cancer? |
| 11  what caused their ovarian cancer; correct? | 11        MS. O'DELL: Object to form. |
| 12        MS. O'DELL: Object to the form. | 12        THE WITNESS: I think it's fair to say |
| 13        THE WITNESS: Again, I get back to my | 13  we know some risk factors. |
| 14  theme about gene mutation. Something caused the gene | 14  BY MS. BOCKUS: |
| 15  mutation to cause that normal cell that's mutated now | 15    Q. But we're learning new risk factors and new |
| 16  to become malignant. | 16  genetic mutations all the time; correct? |
| 17  BY MS. BOCKUS: | 17        MS. O'DELL: Object to the form. |
| 18    Q. Exactly. Somewhere along the aging process, | 18        THE WITNESS: In general, we're moving |
| 19  perhaps, or through some exposure, there's been a gene | 19  along those lines in research. |
| 20  mutation and -- well, let me stop there. Scratch all | 20  BY MS. BOCKUS: |
| 21  that. | 21    Q. I just want to be clear. Is it your position |
| 22        It actually takes multiple gene mutations | 22  that being powdered as an infant with talc increases |
| 23  for a cancer to begin, does it not? | 23  that person's risk of being diagnosed with ovarian |
| 24    A. That's our understanding. | 24  cancer as a woman? |
| 25    Q. Our understanding is that several things | 25    A. I think it's the sustained exposure more than |

| Page 311 | Page 313 |
|---|---|
| 1  happen -- have to happen before a cancer cell is | 1  if an infant was just -- received talcum powder and |
| 2  formed; correct? | 2  then never continued to use it into her 20s, 30s, 40s, |
| 3    A. That's our usual understanding of what the | 3  and 50s, my opinion would be that infant is not at |
| 4  onset of cancer is. | 4  particularly high risk. |
| 5    Q. And our general understanding is that it | 5    Q. Is it your opinion that powdering one's baby |
| 6  takes decades for that to happen, generally speaking; | 6  with talcum powder increases the mother's risk of |
| 7  correct? | 7  ovarian cancer? |
| 8    A. It depends upon what the mutations are. A | 8        MS. O'DELL: Object to the form. |
| 9  woman that's born with a genetic mutation of BRCA1, | 9        THE WITNESS: So just -- just through |
| 10  for example, already has some mutations. So that's | 10  inhaled? I believe that there's not enough evidence |
| 11  why we believe they develop ovarian cancer at an | 11  to say that. |
| 12  earlier age. Just a couple more mutations, and then | 12  BY MS. BOCKUS: |
| 13  the ovarian cancer starts. | 13    Q. Okay. And so fair to say that you're truly |
| 14        Whereas a woman that doesn't have a BRCA1 | 14  confining your opinion to the theory that talc can |
| 15  mutation, as she gets older, she obtains or gets | 15  travel from the perineum to the ovary and cause |
| 16  mutations over time. And the longer you live, the | 16  ovarian cancer that way; is that correct? |
| 17  more likely you are to have those mutations to become | 17    A. And cause -- |
| 18  ovarian cancer. | 18        MS. O'DELL: Object to the form. |
| 19    Q. And one of the things that happens over time | 19    Excuse me. |
| 20  is our body's ability to fight off detected mutations | 20        THE WITNESS: -- cause chronic |
| 21  decreases; correct? | 21  irritation and inflammation, yes. |
| 22    A. Yes, in general. | 22  BY MS. BOCKUS: |
| 23    Q. So back to my prior question, when patients | 23    Q. In order for a cancer to be called a cancer, |
| 24  come to you who have ovarian cancer, other than being | 24  it has to evolve in such a way that it has limitless |
| 25  female and over a certain age, are you ever able to | 25  replicative potential; correct? |

Daniel L. Clarke-Pearson, M.D.

Page 314

1    MS. O'DELL:  Object to the form.
2    THE WITNESS:  I think cancers -- if
3 I understand what you're saying, some cancers also
4 replicate rapidly and then slow down and may be
5 indolent for a period of time.
6    So the timeline of onset of cancer to death,
7 which is, I guess, the timeline, can vary from one
8 patient to another.
9 BY MS. BOCKUS:
10   Q.  Cancer needs to develop the ability to evade
11 apoptosis; correct?
12   A.  I'm sorry?
13   Q.  Evade apoptosis.
14   A.  Yeah, that's sort of -- by definition, cancer
15 has already evaded apoptosis.
16   Q.  Exactly.
17   Cancer also needs to develop sustained
18 angiogenesis; correct?
19   A.  It needs to derive a blood supply, and
20 angiogenesis is the blood supply.
21   Q.  It needs the ability to invade other tissue
22 and metastasize; correct?
23   MS. O'DELL:  Object to the form.
24   THE WITNESS:  I'm not sure it needs to.
25 I mean, in general, the time course is one of invasion

Page 315

1 or metastasis or both.
2 BY MS. BOCKUS:
3    Q.  Okay.  Which of those steps do you believe
4 talc contributes to?
5    MS. O'DELL:  Objection to form.
6    THE WITNESS:  I believe talc
7 contributes to the first onset -- or the additional or
8 first onset of mutations that then lead on to cancer.
9 BY MS. BOCKUS:
10   Q.  What -- in what gene does the mutation occur
11 in that talc impacts?
12   MS. O'DELL:  Object to the form.
13   THE WITNESS:  Some genes -- SNPs that
14 Dr. Saed has identified are what we know, I think, to
15 date.  We know there's other genetic mutations that
16 are present in the somatic form of ovarian cancer as
17 well as the inherited genes.
18   But I don't think anybody has studied that
19 in correlation with talc exposure, so that would be an
20 interesting investigation to undertake.
21 BY MS. BOCKUS:
22   Q.  Inflammation -- chronic inflammation, is that
23 associated with pain?
24   A.  With pain?
25   Q.  Yes.

Page 316

1    A.  It might be.
2    Q.  Is chronic inflammation associated -- well,
3 let me back up.
4    You testified earlier that you would not
5 expect to see signs of chronic inflammation at the
6 time you operate on a woman with ovarian cancer; is
7 that correct?
8    MS. O'DELL:  Object to the form.
9    THE WITNESS:  Yes, that's true.
10 BY MS. BOCKUS:
11   Q.  Why would you no longer see the signs of
12 chronic inflammation at the time of her surgery for
13 ovarian cancer?
14   A.  One, I'm not sure we know the signs that a
15 surgeon would identify as chronic inflammation to my
16 naked eye or to my field.
17   Two, most of the time in women with ovarian
18 cancer, three-quarters of the women I take care of
19 have cancer spread throughout their abdomen and
20 pelvis, with cancer everywhere, so that -- I mean, we
21 don't -- I don't know how to identify chronic
22 inflammation.  I suggested that ascites has something
23 to do with inflammation but not always.
24   Q.  And the ascites could come from the cancer
25 itself; correct?

Page 317

1    A.  Yes.
2    Q.  What would signs of chronic inflammation in
3 the fallopian tubes be?
4    MS. O'DELL:  Object to the form.
5    THE WITNESS:  I don't think there's any
6 signs that I'm aware of that recognize -- or would be
7 identified as chronic inflammation.
8 BY MS. BOCKUS:
9    Q.  Is chronic inflammation something that could
10 be identified by a pathologist?
11   A.  It might be.
12   Q.  Do you know whether there have been any
13 studies looking at -- looking for signs of chronic
14 inflammation in women whose fallopian tubes have been
15 removed as part of any of the studies that you cite?
16   MS. O'DELL:  Object to the form.
17   THE WITNESS:  I'm sorry.  They've had
18 their fallopian tubes removed?
19 BY MS. BOCKUS:
20   Q.  And looked at by a pathologist, yes.  And
21 it's reported in the studies.
22   A.  Signs of chronic inflammation of the
23 fallopian tube?  I'm not aware of that, no.
24   Q.  Okay.  Would you expect a woman who is using
25 talcum powder regularly to have signs of inflammation

Daniel L. Clarke-Pearson, M.D.

Page 318

1 in her fallopian tubes?
2      MS. O'DELL: Objection. Form.
3      THE WITNESS: Again, the signs of
4 chronic inflammation are vague and not well defined in
5 terms of what a pathologist would see. If they did
6 molecular testing -- for example, the reason we now
7 believe that most ovarian cancers arise in the
8 fallopian tube is by doing molecular testing of the
9 fallopian tube and seeing p53 mutations and early
10 cancers arising from the fallopian tube that then
11 metastasize to the ovary in the peritoneal cavity. So
12 that's a molecular biology approach that pathologists
13 don't usually do unless it's in a research setting.
14 BY MS. BOCKUS:
15     Q. Is it your belief that pathologists cannot
16 identify chronic inflammation in tissue samples that
17 they examine?
18      MS. O'DELL: Objection. Form.
19      THE WITNESS: I think they can identify
20 it on some occasions on H&E slides. Is that what
21 you're talking about?
22 BY MS. BOCKUS:
23     Q. Yes.
24     A. I think they can see it sometimes.
25     Q. And do you know if chronic inflammation is

Page 319

1 reported as existing in the fallopian tubes in any of
2 the studies that you have cited in your report?
3      MS. O'DELL: Objection. Asked and
4 answered.
5      THE WITNESS: Not that I'm aware of,
6 no.
7 BY MS. BOCKUS:
8     Q. I'm going to be jumping around a lot, and I'm
9 just going to apologize in advance for that --
10     A. Okay.
11     Q. -- but so much of what I was going to ask you
12 has already been covered.
13     Did I understand you correctly to say that
14 it is your belief that age causes ovarian cancer?
15     A. Age causes ovarian cancer?
16     Q. Yes.
17     A. Age allows time for mutations to occur; and,
18 therefore, ovarian cancer comes from that.
19     Q. Do you know what the relative risk of ovarian
20 cancer is for a woman in her 60s compared to a woman
21 in her 30s?
22     A. I'd have to look at some statistical tables.
23 I'm sure it's available.
24     Q. But it's greater than three or four; correct?
25      MS. O'DELL: Object to the form.

Page 320

1      THE WITNESS: I'm not sure how much
2 greater. It's greater as women age.
3 BY MS. BOCKUS:
4     Q. You indicated that not using birth control
5 pills causes ovarian cancer.
6     Did I understand you correctly?
7      MS. O'DELL: Object to the form.
8      THE WITNESS: It allows, more likely
9 than not, more mutations to occur as the patient
10 ovulates rather than having ovulation suppression by
11 birth control pills.
12 BY MS. BOCKUS:
13     Q. Okay. Do you believe that that mechanism is
14 supported in light of the fact that it is now believed
15 that cancers originate in the fallopian tubes?
16     A. Yes, I think it's hormonal changes in the
17 fallopian tubes as well as the ovary.
18     Q. Okay. Do you know to what -- what are the
19 odds ratios for a woman developing ovarian cancer who
20 has never used birth control pills compared to women
21 who have?
22     A. There's one statistic, I think, that is
23 pretty well agreed upon is that women who used birth
24 control pills for five years have about a 50 percent
25 reduction in the lifetime risk of ovarian cancer.

Page 321

1     Q. In your report on page 4, at the bottom, you
2 talk about EOC risk factors.
3     Can you see where I'm talking about?
4     A. Yes, ma'am.
5     Q. And you say (as read):
6      "The lifetime risk of developing
7      ovarian cancer is 39 to 46 percent
8      in BRCA1 carriers."
9     Did I read that correctly?
10     A. Yes.
11     Q. So does that come out to 390 to 460 women per
12 thousand who carry the BRCA1 gene mutation will
13 develop ovarian cancer in their lifetime?
14      MS. O'DELL: Objection to form.
15      THE WITNESS: Give me a second to do
16 the math. So if we had a thousand women, in their
17 lifetime, 390 would develop ovarian cancer.
18 BY MS. BOCKUS:
19     Q. Okay. Somewhere between 390 and 460?
20     A. Yes. I just did the math for one, but yes.
21     Q. Okay. And then going on, women who carry the
22 BRCA2 mutation, it would be 110 to 270 out of 1,000 in
23 their lifetime would develop ovarian cancer; is that
24 correct?
25     A. Yes.

Daniel L. Clarke-Pearson, M.D.

Page 322

1    MS. O'DELL: For women with BRCA2?
2    MS. BOCKUS: Yes. For women with
3  BRCA2. I thought I made that qualification.
4  BY MS. BOCKUS:
5    Q. And then you say (as read):
6        "This is compared to the
7        1.3 percent lifetime risk in
8        noncarriers."
9    Correct?
10   A. That's correct.
11   Q. So in other words, 13 women out of 1,000,
12 approximately, in the US will develop ovarian cancer
13 in their lifetime?
14   MS. O'DELL: Objection to form.
15 BY MS. BOCKUS:
16   Q. Is that what that means?
17   A. Yes.
18   MS. O'DELL: Objection to form.
19 BY MS. BOCKUS:
20   Q. And it's your opinion that -- and that's
21 all-comers; right? That's women who have had
22 children, women who haven't had children, et cetera?
23   A. Yes.
24   Q. That's the entire population?
25   A. But that don't have these BRCA mutations.

Page 323

1    Q. Correct. Fair enough.
2    So, as I understand it, it is your opinion
3  that the use of body powders, talcum body powders,
4  increases a woman's risk by about 30 percent. Is that
5  correct?
6    A. That's what the epidemiology says, yes.
7    Q. Okay. So does that mean that, instead of 13
8  out of 1,000 women who use talcum powder, then you
9  would expect to see 17 out of 1,000 who would develop
10 ovarian cancer in their lifetime?
11   MS. O'DELL: Object to the form.
12   THE WITNESS: I'd have to do the math,
13 but that sounds about right.
14 BY MS. BOCKUS:
15   Q. And out of those 17 per thousand, 13 would
16 have developed it anyway; correct?
17   MS. O'DELL: Object to the form.
18   THE WITNESS: Yes.
19 BY MS. BOCKUS:
20   Q. And do you know of any methodology that would
21 allow you to identify which of the 4 out of 17
22 developed ovarian cancer because of their use of talc
23 as opposed to just being on this planet and living a
24 certain number of years?
25   MS. O'DELL: Object to the form.

Page 324

1    THE WITNESS: Being on the planet is
2  the 1.3 percent, or the 13 out of 1,000.
3  BY MS. BOCKUS:
4    Q. Correct.
5    A. Being exposed to talc adds the other 4, if
6  your math is right --
7    Q. Okay. But do you know of any way that you or
8  anyone else can say, in this group of 17 women who
9  have ovarian cancer who used talcum powder, it's these
10 4 who developed it because of their talcum powder use
11 versus the 13 that we know would have been diagnosed
12 with ovarian cancer whether they ever used talc or
13 not?
14   MS. O'DELL: Objection. Incomplete
15 hypothetical.
16   THE WITNESS: So this is a hypothetical
17 that 1,000 women used talcum powder, and we knew, if
18 they hadn't used talcum powder, that 1 point -- that
19 13 of them would develop it, and then the other 4
20 develop it because, in my opinion, they used talcum
21 powder?
22 BY MS. BOCKUS:
23   Q. Right, because that's the difference between
24 the background rate and the rate that, it's your
25 opinion, is associated with talc use; correct?

Page 325

1    A. So do I know which one of those -- what
2  number are we up to now?
3    Q. The 4 out of 17.
4    A. -- the 4 out of 17 --
5    Q. Yes.
6    A. -- was caused by talcum powder?
7    Q. Right.
8    A. I don't think I can say that.
9    Q. Do you know of any methodology that would
10 allow someone to identify which of the 4 out of 17
11 were associated with their talc use versus associated
12 with just living that long?
13   MS. O'DELL: Objection to form.
14   THE WITNESS: I'm not aware of any --
15 if you're talking about biomarkers or something else,
16 I'm not aware of any that would distinguish between
17 cancer caused by talc and cancer caused by age alone.
18 BY MS. BOCKUS:
19   Q. Okay. And if one were to guess, they would
20 be mistaken two times out of three; correct?
21   MS. O'DELL: Object to the form.
22   THE WITNESS: To guess about what?
23 BY MS. BOCKUS:
24   Q. Which of the 17 had ovarian cancer because of
25 their talc use as opposed to because they would have

Daniel T. Clarke-Pearson, M.D.

Page 326

1 gotten it anyway?
2           MS. O'DELL: Object to the form.
3           THE WITNESS: I'm not quite sure
4 I understand where you're going or what the question
5 is. I think the answer is we don't -- we won't -- we
6 can't identify which one of those patients that have
7 ovarian cancer because they all -- your hypothetical
8 is that they all were exposed to talc.
9           MS. O'DELL: I don't think that was her
10 hypothetical.
11           THE WITNESS: Okay. Well, then I've
12 lost this.
13 BY MS. BOCKUS:
14     Q. As I under -- well, let me just move on.
15        When women go swimming in a swimming pool,
16 does chlorinated water go into their uterus?
17     A. Goes into their vagina.
18     Q. That wasn't my question. Does it go to their
19 uterus?
20     A. Probably not.
21     Q. Why not?
22     A. I don't know the answer to that question.
23     Q. When women go swimming in the ocean, does
24 saltwater go into their uterus?
25     A. Not usually, no.

Page 327

1     Q. Why not?
2     A. It just doesn't.
3     Q. Is there something blocking the uterus from
4 the vagina?
5     A. The cervix is there, and there is mucus in
6 the cervix at certain times. I think the other, to
7 follow up on your question with a little bit better
8 answer, is that exposure to the water is limited.
9 It's not like the patient's in the water for hours,
10 day after day after day.
11     Q. That really wasn't my question.
12     A. Okay.
13     Q. My question has to do with the passage of any
14 kind of particles from outside the human body to
15 inside the human body -- the female body.
16     A. Okay.
17     Q. Is it your opinion that particles contained
18 in bathwater make their way into the fallopian tubes?
19     A. I don't have an answer -- answer or opinion
20 on that.
21     Q. Same question for swimming pool water.
22     A. Likewise.
23           MS. O'DELL: Objection to form.
24 BY MS. BOCKUS:
25     Q. Do you know whether there's an increased

Page 328

1 incidence of ovarian cancer in women who have been
2 competitive swimmers?
3     A. Not that I'm aware of.
4     Q. Those women clearly will have spent hours a
5 day, every day, in a swimming pool for many years of
6 their life; correct?
7     A. Yes.
8     Q. And you would expect, would you not, if
9 particles from outside a woman's body could freely
10 move into the inside of her body, that the chlorine
11 and other particles found in a swimming pool would
12 make their way to their ovaries; correct?
13     A. They could. But if they're not carcinogens,
14 then they wouldn't cause any problem.
15     Q. Would any foreign body that makes its way to
16 its ovary -- to a woman's ovary cause a foreign body
17 reaction?
18     A. Not necessarily.
19     Q. What foreign particle could make its way to a
20 woman's ovary and not cause a foreign body reaction?
21           MS. O'DELL: Objection to the form.
22           THE WITNESS: I think that those that
23 don't cause inflammation, those that are not cleared.
24 We talked about cornstarch earlier in today's
25 proceedings, and cornstarch seems not to cause an

Page 329

1 inflammatory reaction. It gets cleared by the immune
2 system, and it dissolves.
3 BY MS. BOCKUS:
4     Q. Does cornstarch make it to the ovary?
5     A. Cornstarch has been documented to get to the
6 ovary, yes.
7     Q. Has it been associated with foreign body
8 reaction in the ovary?
9     A. Not that I'm aware of.
10     Q. Do you know whether pelvic mesh causes
11 ovarian cancer?
12     A. Mesh?
13     Q. Yes.
14     A. Not that I'm aware of.
15     Q. Is pelvic mesh a foreign body?
16     A. Yes. It's in the vagina or -- yeah, it's
17 placed in the vagina, not in the peritoneal cavity per
18 se.
19     Q. Does pelvic mesh cause chronic inflammation?
20     A. Not that I'm aware of. I think it causes
21 acute inflammation and an ingrowth of fibroblasts and
22 fibrous tissue to cause -- to get the result that the
23 surgeon wants and the patient wants.
24     Q. Just because something is classified as a
25 carcinogen doesn't mean it's carcinogenic to every

Daniel L. Clarke-Pearson, M.D.

Page 330

1  organ in the body; correct?
2      A.  I think that's fair to say.
3      Q.  And I think you told us previously that, to
4  your knowledge, you're not aware of nickel, chromium,
5  or cobalt ever being identified as carcinogenic to the
6  ovary; correct?
7      A.  I'm not aware that anybody's ever tested that
8  hypothesis.
9      Q.  Did you look at the IARC classifications of
10  those three heavy metals?
11      A.  Yes.
12      Q.  And did you see where IARC did not identify
13  that they were carcinogenic to the ovary?
14          MS. O'DELL:  Objection to form.
15          THE WITNESS:  Right.  I'm not sure that
16  there's any data, going back to my answer to my last
17  question, where that's ever been tested.  So two of
18  those heavy metals are considered carcinogens, but not
19  specifically to the ovary because they haven't been
20  tested in the ovary.
21  BY MS. BOCKUS:
22      Q.  So without that -- without those tests, you
23  can't say one way or the other whether those heavy
24  metals, the three you identify in your report,
25  increase the risk of ovarian cancer, can you?

Page 331

1          MS. O'DELL:  Object to the form.
2          THE WITNESS:  I think they're contained
3  within Johnson's baby powder.
4  BY MS. BOCKUS:
5      Q.  That wasn't my question.
6          Without science to support that, you cannot
7  say that these three heavy metals that you identify in
8  your report cause or contribute to cause ovarian
9  cancer; correct?
10          MS. O'DELL:  Object to the form.
11          THE WITNESS:  I think they're in
12  Johnson baby powder and the baby powder causes ovarian
13  cancer.  So something amongst that, including the
14  heavy metals, is contributing to the onset of ovarian
15  cancer.
16  BY MS. BOCKUS:
17      Q.  And you're comfortable saying that without
18  any science to support it; correct?
19          MS. O'DELL:  Objection to form.
20          THE WITNESS:  The science is the
21  epidemiology of increased risk of ovarian cancer in
22  women that are exposed to Johnson baby powder.
23  BY MS. BOCKUS:
24      Q.  Did I understand your testimony previously
25  that it is your opinion that the Women's Health

Page 332

1  Initiative is a poorly designed, poorly executed
2  study?
3          MS. O'DELL:  Object to the form.
4          THE WITNESS:  Yes.
5  BY MS. BOCKUS:
6      Q.  Is it your opinion that the Nurses' Health
7  Study is a poorly designed, poorly executed study?
8          MS. O'DELL:  Object to the form.
9          THE WITNESS:  With regard to the
10  detection of ovarian cancer being caused by perineal
11  use of talcum powder, yes.
12  BY MS. BOCKUS:
13      Q.  Is it your opinion that the Gonzalez Sister
14  Study is a poorly designed, poorly executed study?
15      A.  Yeah.  That's the worst one.
16      Q.  You have testified -- and this certainly
17  would be part of your practice to understand -- that
18  we now know that HPV causes cervical cancer; correct?
19      A.  That's correct.
20      Q.  What is the odds ratio of developing cervical
21  cancer in women who have HPV -- or who have had HPV
22  versus those who have not?
23      A.  HPV is nearly 100 percent -- let me turn this
24  back around.
25          Women with squamous cell carcinoma of the

Page 333

1  cervix, which is the most common type, almost all --
2  as close to 100 percent as possible -- have been
3  infected with HPV.
4      Q.  And that allows the scientific and medical
5  community to conclude with consensus that HPV causes
6  cervical cancer; correct?
7      A.  Yes, but not in all women that are infected
8  with HPV.
9      Q.  There is no similar factor for ovarian cancer
10  as closely linked as HPV is to cervical cancer, is
11  there?
12          MS. O'DELL:  Objection to form.
13          THE WITNESS:  I'm not sure I understand
14  the question.
15  BY MS. BOCKUS:
16      Q.  Because it wasn't a very good one.
17      A.  Okay.
18      Q.  You indicated that close to 100 percent of
19  all women who develop a specific -- the most common
20  type of cervical cancer have had HPV; correct?
21      A.  That's correct.
22      Q.  There is nothing even close to that in terms
23  of an exposure and ovarian cancer; correct?
24      A.  Yes, I would agree.
25      Q.  Do you know what percentage of sperm make it

Page 334

1  to the fallopian tube from a single ejaculation?
2      A. I don't.
3      Q. You know that that's been studied; correct?
4      A. I don't know that. The last time I did any
5  reproductive endocrinology was in 1975. So I don't
6  know what's --
7      Q. Let me ask you --
8      A. -- been studied.
9      Q. I apologize. I didn't mean to interrupt.
10     A. Yes.
11     Q. Do you have any reason to believe that a talc
12  particle would fare better than a sperm in terms of
13  its chances of making it from the vagina to the ovary?
14         MS. O'DELL: Object to the form.
15         THE WITNESS: No.
16 BY MS. BOCKUS:
17     Q. Do you think that it's probably that fewer
18  talc particles -- or a smaller percentage of talc
19  particles deposited into the vagina would make it to
20  the ovary than percentage of sperm?
21     A. I don't have an opinion.
22     Q. Okay. With regard to studies by Dr. Saed, do
23  you believe that it would have been appropriate for
24  Dr. Saed to indicate on those studies that his
25  research was being funded by plaintiffs' lawyers in

Page 335

1  this litigation?
2         MS. O'DELL: Object to the form.
3         THE WITNESS: I'm not sure I understand
4  exactly what was his funding.
5  BY MS. BOCKUS:
6      Q. For the studies that you're relying on, the
7  Saed studies that you have relied on in your report.
8      A. I'm not aware of the extent of the funding,
9  if it was from the attorneys -- the plaintiffs'
10  attorneys.
11     Q. Assuming that the evidence will show that the
12  funding for Dr. Saed's experiments came from
13  plaintiffs' attorneys, would it be appropriate and
14  ethical for a physician to reveal that that's the
15  source of their funding?
16         MS. O'DELL: Objection to form.
17         THE WITNESS: So peer-reviewed journals
18  have certain conflict of interest statements and
19  disclosures that are asked as part of the peer review
20  process of accepting a manuscript. So I'm not sure
21  what the policies are of this particular journal.
22 BY MS. BOCKUS:
23     Q. So does such a conflict of interest only have
24  to be revealed if it's the policy of the journal?
25         MS. O'DELL: Objection to form.

Page 336

1         THE WITNESS: I think the journal, if
2  it's going to publish, would want to make sure that
3  they are publishing information that's correct and,
4  you know, through the peer review process, and also
5  any conflicts of interest are declared, any sources of
6  funding are usually declared, including grants from
7  National Institutes of Health, for example.
8  BY MS. BOCKUS:
9      Q. When Dr. Saed placed talc on these cultured
10  ovarian cancer cells, one of the findings that he
11  reported was that it increased the level of CA-125;
12  correct?
13     A. Yes.
14     Q. You would agree that CA-125 is raised by many
15  things; correct?
16     A. Yes, including inflammation -- in particular
17  inflammation in terms of a false positive CA-125.
18     Q. It can be raised by pregnancy; is that right?
19     A. Yes.
20     Q. Can be raised by cirrhosis of the liver?
21     A. Yes.
22     Q. Can be raised by uterine fibroids; correct?
23     A. Yeah --
24     Q. By all kinds of things?
25     A. -- among other things, yes.

Page 337

1      Q. And Dr. Saed did not use any positive or
2  negative controls in his study, did he?
3         MS. O'DELL: Objection. Form.
4         THE WITNESS: He did use controls in
5  his study.
6  BY MS. BOCKUS:
7      Q. Did Dr. Saed use any controls in which he
8  applied a -- something like glass beads to the same
9  tissue to see what the reaction would be compared to
10  the talc he was applying?
11         MS. O'DELL: Objection to form.
12         THE WITNESS: So applying glass -- I'm
13  not a laboratory scientist, but putting glass beads
14  into a culture plate, for example? So that would be
15  potentially another inflammatory product, so I don't
16  know why one would put glass beads into the control
17  plate.
18         He has controls in all of his tables here
19  (indicating). It's just the medium that the talc is
20  suspended in. So the medium didn't cause the changes
21  that he demonstrates in these cancer cells and these
22  epithelial cells. It was the talc that caused the
23  changes. That's why you do a control.
24  BY MS. BOCKUS:
25     Q. But a -- but to do a control with regard

Daniel L. Clarke-Pearson, M.D.

| Page 338 | Page 340 |
|---|---|

Page 338

1 to -- to determine whether talc causes these cells to
2 react differently than other items that have
3 previously been shown not to cause inflammation in the
4 cells, you would need to add something in addition to
5 the medium; correct?
6          MS. O'DELL:  Objection to form.
7          THE WITNESS:  No.  That's what a
8 control is.  Why would you add anything?  That would
9 be a third experiment.  You've got your controls and
10 now your glass beads and now your talc.
11 BY MS. BOCKUS:
12      Q.  Is it your understanding that glass beads
13 would cause inflammation to the ovarian epithelial?
14      A.  I don't know what they do.  I don't know why
15 one would put glass beads in a control.
16      Q.  Other than the medium, did Dr. Saed
17 include -- did he do any test to determine whether
18 other particulate would cause the exact same reaction
19 as the talc?
20      A.  I don't think that was part of his
21 experimental design.
22      Q.  Do you think that would have been an
23 appropriate experimental design to determine if talc
24 elicited a response different than any other foreign
25 particulate?

Page 340

1 that that particulate -- in this case, talc -- causes
2 cancer; correct?
3          MS. O'DELL:  Object to the form.
4          THE WITNESS:  It doesn't -- it's not
5 conclusive, but it certainly is a step in the process
6 leading towards cancer.
7 BY MS. BOCKUS:
8      Q.  And there are specific tests that can be done
9 for genotoxicity; correct?
10          Are you familiar with those --
11      A.  I'm not familiar with what that exactly
12 means.
13      Q.  Have you seen studies where, in the lab, they
14 have started this process, such as Dr. Saed did with
15 causing a single gene mutation, and then implanting
16 that tissue into a lab animal to see if it actually
17 grows into a cancer?
18          MS. O'DELL:  Object to the form.
19          THE WITNESS:  I'm not aware of that,
20 but it's certainly -- I presume it's possible to do
21 something like that, but I'm not sure.
22 BY MS. BOCKUS:
23      Q.  I think you've answered this question.  And
24 if you have, I apologize.
25          What is the threshold response for talc?

Page 339

1          MS. O'DELL:  Object to the form.
2          THE WITNESS:  Oh, you could do an
3 extensive experiment of all kinds of particulates and
4 compare it with talc.  That wasn't the question he was
5 trying to ask.  I'm not quite sure where you're going
6 with this.  I mean...
7 BY MS. BOCKUS:
8      Q.  To determine whether the changes that he
9 noted actually cause cancer would take more steps;
10 correct?
11      A.  Yes.  He's showing --
12          MS. O'DELL:  Object to the form.
13          THE WITNESS:  -- that there's gene
14 mutations.  They are the first step -- or the next
15 step towards cancer.
16 BY MS. BOCKUS:
17      Q.  And all of our -- we all have gene mutations
18 going on in our bodies every day; correct?
19      A.  Yes.  A little scary.
20      Q.  And we all have -- thank God, the way we're
21 put together, there are systems in place that detect
22 gene mutations and kill them; correct?
23      A.  Apoptosis.  Yes.
24      Q.  And so the fact that a gene mutation is
25 caused in a Petri dish is a long ways from proving

Page 341

1          MS. O'DELL:  Object to the form.
2          THE WITNESS:  The threshold response
3 that would induce cancer, I presume is what you're
4 really asking?
5 BY MS. BOCKUS:
6      Q.  Yes, sir.  Thank you.
7      A.  I don't think we know that.
8          MS. BOCKUS:  That's all that I have.
9 Thank you.
10          THE WITNESS:  Thank you.
11          MS. BOCKUS:  I'll cede back my last 15
12 minutes to the other defense counsel who are here.
13          MS. O'DELL:  Do you have questions?
14          MR. BILLINGS-KANG:  I don't think so,
15 no.
16          MS. O'DELL:  Do you have questions?
17          MR. ZELLERS:  No further questions.
18          MR. MIZGALA:  I want to ask a question.
19          MR. ZELLERS:  Please do.
20 CROSS-EXAMINATION BY COUNSEL FOR THE DEFENDANT PTI
21 BY MR. MIZGALA:
22      Q.  Doctor, on page 2 of your report, at the
23 bottom --
24      A.  Yes.
25      Q.  -- you write (as read):

Daniel L. Clarke-Pearson, M.D.

Page 342

1    "I approached each article
2    objectively and critically,
3    assessing for factors such as
4    design, power, reputation of the
5    authors, quality of the journal,
6    and potential biases."
7    Correct?
8    A. Yes, that's what I wrote.
9    Q. Where is that -- where is that written down?
10   Where is it compiled?
11   A. Where is what compiled?
12   Q. All those things that you assessed?  Did you
13   reduce that to writing anywhere?
14   A. No.  I mean, these are the articles
15   I identified and reviewed and assessed (indicating).
16   Q. Okay.  So you don't have a spreadsheet or
17   something of all these factors that you assessed?
18   A. No.
19        MS. O'DELL:  Objection to form.
20        THE WITNESS:  No.
21   BY MR. MIZGALA:
22   Q. In your head?
23   A. In my head at the time, and I chose articles
24   that I thought were appropriate to put into my report.
25        MR. MIZGALA:  Okay.  No further

Page 343

1    questions.
2        MS. O'DELL:  Let's go off the record.
3        THE VIDEOGRAPHER:  Going off record at
4    5:23 p.m.
5        (Recess taken from 5:23 p.m. to 5:40 p.m.)
6        THE VIDEOGRAPHER:  Back on the record
7    at 5:40 p.m.
8    CROSS-EXAMINATION BY COUNSEL FOR THE PLAINTIFFS
9    BY MS. O'DELL:
10   Q. Dr. Clarke-Pearson, I have just a few
11   questions to ask you.
12       First, let me ask you, in regard to
13   asbestos, can asbestos be inhaled and cause ovarian
14   cancer?
15       MR. ZELLERS:  Objection to form.
16       THE WITNESS:  Yes.
17       Yes.  IARC has deemed that true, to be the
18   case that it can cause ovarian cancer by inhalation.
19   BY MS. O'DELL:
20   Q. And, similarly, can fibrous talc be inhaled
21   and cause ovarian cancer?
22       MR. ZELLERS:  Objection.  Form.
23       THE WITNESS:  Yes.  The same answer.
24   BY MS. O'DELL:
25   Q. You were asked a series of questions about --

Page 344

1    and they were hypotheticals, as I recall -- regarding
2    specific patients and the cause or causes of their
3    ovarian cancer.
4        In regard to a woman who has potentially,
5    say, a BRCA mutation -- maybe she's of a certain
6    age -- and she's a routine user of talcum powder such
7    as Johnson's baby powder, do you have an opinion as to
8    what the causes of her cancer would be?
9        MR. ZELLERS:  Objection.  Form.
10       THE WITNESS:  So several causes, but
11   the talcum powder would have to be considered a
12   contributing cause to her ovarian cancer.
13   BY MS. O'DELL:
14   Q. For a woman who has -- in whom there's not
15   been identified a known risk factor but she is a
16   routine user of talcum powder such as baby powder or
17   Shower to Shower, do you have an opinion as to what
18   one of the causes of her cancer -- ovarian cancer
19   would be?
20       MR. ZELLERS:  Objection.  Form.
21       THE WITNESS:  What I've been trying to
22   say all day is the Johnson & Johnson baby powder
23   causes ovarian cancer.  In this particular patient, it
24   is a significant contributing cause.
25       MS. O'DELL:  I have nothing further,

Page 345

1    Doctor.  Thank you.
2        THE WITNESS:  Okay.  Thank you.
3        FURTHER EXAMINATION BY COUNSEL FOR THE
4        JOHNSON & JOHNSON DEFENDANTS
5    BY MR. ZELLERS:
6    Q. The asbestos studies that you referred to
7    earlier dealing with inhalation, those were
8    occupational studies; correct?
9        MS. O'DELL:  Object to the form.
10       THE WITNESS:  Yes.
11       MR. ZELLERS:  Okay.  I have no further
12   questions.
13       MS. BOCKUS:  I have one.
14       FURTHER EXAMINATION BY COUNSEL FOR THE
15       DEFENDANT IMERYS
16   BY MS. BOCKUS:
17   Q. Doctor, are you aware of any study that
18   indicates that women who carry a BRCA gene mutation
19   and uses -- and has a lifetime history of using talcum
20   powder is at a higher risk of developing ovarian
21   cancer than women who have the BRCA gene mutation and
22   have never used talcum powder?
23       MS. O'DELL:  Objection to form.
24       THE WITNESS:  It would be my opinion
25   that talcum powder would increase the patient's chance

Daniel L. Clarke-Pearson, M.D.

## Page 346

1 of having ovarian cancer.  I'm not aware of any study
2 that's been able to investigate that to date.
3 BY MS. BOCKUS:
4    Q.  That is something that could be investigated;
5 correct?
6         MS. O'DELL:  Object to the form.
7         THE WITNESS:  In a case-control study,
8 yes.
9 BY MS. BOCKUS:
10    Q.  But to your knowledge, it's never been
11 reported; correct?
12    A.  Not that I'm aware of.
13         MS. BOCKUS:  That's all I have.
14         THE WITNESS:  Thank you, everybody.
15         MR. ZELLERS:  Thank you, Doctor.
16         THE VIDEOGRAPHER:  Just one second.
17     This concludes the deposition of Dr. Daniel
18 Clarke-Pearson.  Time going off the record is
19 5:44 p.m.
20    (Whereupon, at 5:44 p.m., the deposition ceased.
21         Signature was reserved.)
22
23
24
25

## Page 347

1         ACKNOWLEDGMENT OF DEPONENT
2         I, DANIEL L. CLARKE-PEARSON, M.D., do hereby
3 acknowledge that I have read and examined the foregoing
4 testimony, and the same is a true, correct, and complete
5 transcription of the testimony given by me, and any
6 corrections appear on the attached errata sheet signed
7 by me.
8
9 _____   _____
10   (DATE)              (SIGNATURE)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 348

1         E R R A T A
2 CASE NAME:  TALCUM POWDER LITIGATION MDL NO. 2738CASE
3 WITNESS NAME:  DANIEL L. CLARKE-PEARSON, M.D.
4 CASE NUMBER:  16-2738 (FLW)(LHG)
5 PAGE LINE      READS        SHOULD READ
6 ___ ___ _____ _____
7 ___ ___ _____ _____
8 ___ ___ _____ _____
9 ___ ___ _____ _____
10 ___ ___ _____ _____
11 ___ ___ _____ _____
12 ___ ___ _____ _____
13 ___ ___ _____ _____
14 ___ ___ _____ _____
15 ___ ___ _____ _____
16 ___ ___ _____ _____
17 ___ ___ _____ _____
18 ___ ___ _____ _____
19 ___ ___ _____ _____
20 ___ ___ _____ _____
21 ___ ___ _____ _____
22 ___ ___ _____ _____
23 ___ ___ _____ _____
24 ___ ___ _____ _____
25 ___ ___ _____ _____

## Page 349

1 STATE OF NORTH CAROLINA  )
                          ) C E R T I F I C A T E
2 COUNTY OF ORANGE       )
3       I, Sophie Brock, Court Reporter and Notary
4 Public, the officer before whom the foregoing proceeding
5 was conducted, do hereby certify that the witness(es)
6 whose testimony appears in the foregoing proceeding were
7 duly sworn by me; that the testimony of said witness(es)
8 were taken by me to the best of my ability and
9 thereafter transcribed under my supervision; and that
10 the foregoing pages, inclusive, constitute a true and
11 accurate transcription of the testimony of the
12 witness(es).
13       I do further certify that I am neither counsel
14 for, related to, nor employed by any of the parties to
15 this action, and further, that I am not a relative or
16 employee of any attorney or counsel employed by the
17 parties thereof, nor financially or otherwise interested
18 in the outcome of said action.
19       This, the 6th day of February, 2019.
20
21
22
      _____
23
      Sophie Brock, RPR, RMR, RDR, CRR
24    Notary Number: 200834000001
25