Exhibit 26

Arch I. "Chip"  Carson, M.D., Ph.D.

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW JERSEY


------------------------ )
IN RE JOHNSON & JOHNSON  )
TALCUM POWDER PRODUCTS   )
MARKETING, SALES         )  MDL NO.
PRACTICES, AND PRODUCTS  )  16-2738 (FLW) (LHG)
LIABILITY LITIGATION     )
                         )
------------------------ )
                         )
THIS DOCUMENT RELATES TO )
ALL CASES                )
                         )
------------------------

— — —

Saturday, January 19, 2019
— — —


        Videotaped Deposition of ARCH I. "CHIP"

CARSON, M.D., Ph.D., held at the Marriott

Houston Medical Center, 6580 Fannin Street,

Houston, Texas, commencing at 9:02 a.m., on

the above date, before Michael E. Miller,

Fellow of the Academy of Professional

Reporters, Certified Court Reporter,

Registered Diplomate Reporter, Certified

Realtime Reporter and Notary Public.


— — —

GOLKOW LITIGATION SERVICES
877.370.DEPS | fax 917.591.5672
deps@golkow.com

## Arch I. "Chip" Carson, M.D., Ph.D.

| Page 2 | |
|---|---|
| 1 | A P P E A R A N C E S: |
| 2 | BEASLEY ALLEN, PC |
|  | BY: P. LEIGH O'DELL, ESQUIRE |
| 3 | leigh.odell@beasleyallen.com |
|  | MARGARET M. THOMPSON, ESQUIRE |
| 4 | margaret.thompson@beasleyallen.com |
|  | 234 Commerce Street |
| 5 | Montgomery, Alabama 36103-4160 |
|  | (334) 269-2343 |
| 6 | Counsel for Plaintiffs' Steering |
|  | Committee |
| 7 | |
| 8 | BURNS CHAREST LLP |
|  | BY: AMANDA KLEVORN, ESQUIRE |
| 9 | aklevorn@burnscharest.com |
|  | 365 Canal Street |
| 10 | Suite 1170 |
|  | New Orleans, Louisiana 70130 |
| 11 | (504) 799-2845 |
|  | Counsel for Plaintiffs |
| 12 | |
| 13 | TUCKER ELLIS LLP |
|  | BY: MICHAEL C. ZELLERS, ESQUIRE |
| 14 | michael.zellers@tuckerellis.com |
|  | 515 South Flower Street |
| 15 | 42nd Floor |
|  | Los Angeles, California 90071 |
| 16 | (213) 430-3400 |
|  | Counsel for Johnson & Johnson |
| 17 | Defendants |
| 18 | |
| 19 | DRINKER BIDDLE & REATH, LLP |
|  | BY: KATHERINE MCBETH, ESQUIRE |
| 20 | katherine.mcbeth@dbr.com |
|  | One Logan Square, Suite 2000 |
| 21 | Philadelphia, Pennsylvania 19103 |
|  | (215) 988-2706 |
| 22 | Counsel for Johnson & Johnson |
|  | Defendants |
| 23 | |
| 24 | |

| Page 4 | | |
|---|---|---|
| 1 | INDEX | |
| 2 | | |
| 3 | APPEARANCES | 2 |
| 4 | PROCEEDINGS | 8 |
| 5 | | |
| 6 | EXAMINATION OF ARCH I. "CHIP" CARSON, M.D., Ph.D.: | |
| 7 | BY MR. ZELLERS | 9 |
| 8 | BY MS. BOCKUS | 284 |
| 9 | BY MS. APPEL | 343 |
| 10 | | |
| 11 | CERTIFICATE | 364 |
| 12 | ERRATA | 366 |
| 13 | ACKNOWLEDGMENT OF DEPONENT | 367 |
|  | LAWYER'S NOTES | 368 |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |

| Page 3 | |
|---|---|
| 1 | A P P E A R A N C E S: |
| 2 | DYKEMA GOSSETT PLLC |
|  | BY: JANE E. BOCKUS, ESQUIRE |
| 3 | jbockus@dykema.com |
|  | 112 East Pecan Street |
| 4 | Suite 1800 |
|  | San Antonio, Texas 78205 |
| 5 | (210) 554-5500 |
|  | Counsel for Imerys Talc America |
| 6 | |
| 7 | COUGHLIN DUFFY LLP |
|  | BY: JONATHAN F. DONATH, ESQUIRE |
| 8 | jdonath@coughlinduffy.com |
|  | 350 Mount Kemble Avenue |
| 9 | Morristown, New Jersey 07962 |
|  | (973) 267-0058 |
| 10 | Counsel for Imerys Talc America |
| 11 | |
| 12 | TUCKER ELLIS LLP |
|  | BY: CAROLINE M. TINSLEY, ESQUIRE |
| 13 | caroline.tinsley@tuckerellis.com |
|  | 100 South Fourth Street, Suite 600 |
| 14 | St. Louis, MO 63102 |
|  | (216) 696-3675 |
| 15 | Counsel for PTI Royston LLC and PTI |
|  | Union LLC |
| 16 | |
| 17 | SEYFARTH SHAW, LLP |
|  | BY: RENEE B. APPEL, ESQUIRE |
| 18 | rappel@seyfarth.com |
|  | 975 F Street, N.W. |
| 19 | Washington, D.C. 20004-1454 |
|  | (202) 463-2400 |
| 20 | Counsel for Personal Care Products |
| 21 | |
| 22 | VIDEOGRAPHER: |
| 23 | DOUG OVERSTREET, |
|  | Golkow Litigation Services |
| 24 | |

| Page 5 | | | |
|---|---|---|---|
| 1 | DEPOSITION EXHIBITS | | |
|  | ARCH I. "CHIP" CARSON, M.D., Ph.D. | | |
| 2 | January 19, 2019 | | |
| 3 | NUMBER | DESCRIPTION | PAGE |
| 4 | Exhibit 1 | Notice of Deposition | 10 |
| 5 | Exhibit 2 | 11/16/18 Carson Expert Report | 15 |
| 6 | | | |
| 7 | Exhibit 3 | Carson Curriculum Vitae | 21 |
| 8 | Exhibit 4 | Listing of Literature Reviewed | 21 |
| 9 | Exhibit 5 | 2019 Longo et al Publication | 26 |
| 10 | | | |
| 11 | Exhibit 6 | 2019 Fletcher et al Publication | 26 |
| 12 | Exhibit 7 | Undated Taher et al Publication | 26 |
| 13 | | | |
| 14 | Exhibit 8 | 1952 Graham et al Publication | 29 |
| 15 | Exhibit 9 | 12/18 Health Canada Draft Screening Assessment | 30 |
| 16 | | | |
| 17 | Exhibit 10 | 1/1/14 FDA Letter to Epstein | 31 |
| 18 | Exhibit 11 | 1991 Blount et al Publication | 32 |
| 19 | | | |
| 20 | Exhibit 12 | 1974 Parmley et al Publication | 32 |
| 21 | Exhibit 13 | USB Drive Containing Materials Reviewed | 36 |
| 22 | | | |
| 23 | Exhibit 14 | 8/1/00 Health Canada Decision-Making Framework | 98 |
| 24 | | | |

Arch I. "Chip"  Carson, M.D., Ph.D.

Page 6

DEPOSITION EXHIBITS

Exhibit 15  Handwritten List of        124
Materials Reviewed by
Dr. Carson

Exhibit 16  1979 Chappell et al        130
Publication
Exhibit 17  2011 Reid et al Publication    159
Exhibit 18  2011 Camargo et al        163
Publication

Exhibit 19  2013 Terry et al        192
Publication
Exhibit 20  2016 Cramer et al        195
Publication

Exhibit 21  IARC Classification Groups    225
Document
Exhibit 22  2017 Berge et al        243
Publication

Exhibit 23  2007 Langseth et al        247
Publication
Exhibit 24  2016 Schildkraut et al        271
Publication

Exhibit 25  Excerpt from IARC        289
Monograph 93

Page 7

REFERENCED EXHIBITS

NUMBER                          PAGE

Exhibit        .....................    148
Hopkins-28
Exhibit        .....................    148
Pier-47

Exhibit        .....................    28
P-346

--o0o--

Page 8

PROCEEDINGS
(January 19, 2019 at 9:02 a.m.)
THE VIDEOGRAPHER:  We are now on the record.  My name is Doug Overstreet.  I'm the videographer for Golkow Litigation Services.  Today is January 19th, 2019.  The time is 9:02 a.m.
This video deposition is being held in Houston, Texas in the matter of Talcum Powder Litigation MDL No. 2738.
The deponent is Dr. Chip Carson.
Will counsel please identify themselves for the record.
MS. O'DELL:  Leigh O'Dell, Beasley Allen, for the plaintiffs.
DR. THOMPSON:  Margaret Thompson, Beasley Allen, for the plaintiffs.
MS. KLEVORN:  Amanda Klevorn, Burns Charest, for the plaintiffs.
MR. ZELLERS:  Michael Zellers

Page 9

for the Johnson & Johnson defendants.
MS. McBETH:  Katherine McBeth, Drinker Biddle & Reath, for the Johnson & Johnson defendants as well.
MS. BOCKUS:  Jane Bockus for Imerys.
MR. DONATH:  Jonathan Donath from Coughlin Duffy for Imerys.
MS. APPEL:  Renée Appel from Seyfarth Shaw for Personal Care Products.
MS. TINSLEY:  Caroline Tinsley, Tucker Ellis, for PTI Union, LLC and PTI Royston, LLC.
THE VIDEOGRAPHER:  The court reporter today is Mr. Mike Miller, and he will now swear in the witness.
ARCH I. "CHIP" CARSON, M.D., Ph.D.,
having been duly sworn,
testified as follows:
EXAMINATION
BY MR. ZELLERS:
Q.    Can you state your name, please.

3  (Pages 6 to 9)

Arch I. "Chip" Carson, M.D., Ph.D.

Page 10

1    A.    Arch Carson.
2    Q.    You are a physician; is that
3  right?
4    A.    I am.
5    Q.    A medical toxicologist?
6    A.    Yes.
7    Q.    We are here today to take your
8  deposition in the talc MDL litigation
9  proceedings; is that right?
10    A.    As far as I know, yes.
11    Q.    You are an expert witness for
12  the plaintiffs in that litigation; is that
13  right?
14    A.    Yes.
15    Q.    Did you receive a notice of
16  deposition, which we'll mark as Exhibit 1, to
17  appear here today?
18        (Carson Deposition Exhibit 1
19    marked.)
20    A.    Yes, I received a copy of this
21  document.
22        MS. O'DELL:  And, Michael, just
23    for the record, we just reassert all
24    our previously served objections to

Page 11

1    the notice.
2        MR. ZELLERS:  Thank you.
3  BY MR. ZELLERS:
4    Q.    You have given deposition
5  testimony in the past; is that right?
6    A.    I have.
7    Q.    On how many occasions?
8    A.    Probably 30, 35.
9    Q.    You are familiar with the
10  procedures we're going to follow today?
11    A.    More or less, I think.
12    Q.    If at any time I ask you a
13  question and you don't understand it, tell me
14  you don't understand it and I'll repeat it or
15  rephrase it to try to make it clear to you.
16        Can you do that?
17    A.    Yes, I think.
18    Q.    If you answer a question that I
19  ask or that any of the counsel ask, we're
20  going to assume that you understood it; is
21  that fair?
22        MS. O'DELL:  Object to form.
23    A.    That's fair.
24        ///

Page 12

1  BY MR. ZELLERS:
2    Q.    As best we can, let me finish
3  my question before you start to give your
4  answer.  I'll do the same and allow you to
5  finish your answer before I ask you another
6  question so our court reporter can take down
7  what each of us say.
8        Can you do that?
9    A.    Yes.
10    Q.    In response to the notice of
11  deposition, which we've marked as Exhibit 1,
12  have you brought with you certain documents
13  here today?
14    A.    I have a collection of
15  documents that in part respond to these
16  requests, yes.
17    Q.    Do you have any documents in
18  your possession that are responsive to the
19  notice of deposition, Exhibit 1, that you
20  have not brought here today?
21    A.    I would have to go through
22  these things one by one, but --
23    Q.    You didn't do that before we
24  came here today?

Page 13

1    A.    I did, but the plaintiffs'
2  attorneys --
3        MS. O'DELL:  Let me just stop
4    you, Dr. Carson, just because
5    discussing what we've discussed is not
6    within the purview of this deposition.
7    That's privileged.  Let me just say --
8        THE WITNESS:  All right.
9        MS. O'DELL:  -- Dr. Carson, in
10    response to the notice, has brought
11    with him copies of the cited materials
12    in his report, and that's in the
13    binder that is to his left.
14        He's brought with him copies of
15    certain documents that were listed on
16    his materials considered list.  He
17    doesn't have a physical copy of
18    everything on his materials considered
19    list.
20        I brought today a thumb drive
21    that has a copy of all the items on
22    his materials considered list.  If you
23    would like access to that, it's
24    available to you.

4 (Pages 10 to 13)

Arch I. "Chip"  Carson, M.D., Ph.D.

Page 14

1          And then in addition, he has
2    brought some additional materials that
3    he has reviewed since the service of
4    his report.
5          The only other item, as I
6    recall, on the notice of deposition
7    request for documents that has not
8    been brought to the deposition is
9    copies of invoices and Dr. Carson has
10   not sent us an invoice.  That's why we
11   don't have a copy.
12         So to try to short-circuit
13   this, just to make sure since we made
14   decisions about what's produced and
15   what's not, I'll just say all that for
16   the record.  And if you'd like that,
17   you're welcome to it.
18   BY MR. ZELLERS:
19      Q.    Dr. Carson, you heard
20   Ms. O'Dell describe what you brought here
21   today.  Is all of that accurate?
22      A.    It is.
23      Q.    Are you aware of there being
24   any documents or materials that are

Page 15

1    responsive to the deposition notice that you
2    have not brought with you here today?
3       A.    No.
4       Q.    I'm trying to understand what
5    counsel for plaintiffs, Ms. O'Dell, has said,
6    so let me ask you some questions.
7           You have brought with you today
8    in a binder some of the cited materials in
9    your report; is that right?
10      A.    Yes.  This is intended to be a
11   complete set of the cited references, with
12   one exception.
13      Q.    When you say cited
14   references --
15      A.    From my report.
16      Q.    Your expert report, we will
17   mark as Exhibit 2.
18           (Carson Deposition Exhibit 2
19   marked.)
20   BY MR. ZELLERS:
21      Q.    Is Deposition Exhibit 2 your
22   report in this matter?
23      A.    It is.  It also has
24   attachments.

Page 16

1       Q.    I'll ask you about the
2    attachments in a moment.
3           Does this report,
4    Deposition Exhibit 2, contain all of the
5    opinions that you intend to offer at any
6    trial or hearing of this matter?
7       A.    In general, it contains all of
8    my opinions.  I expect to expand on those
9    opinions possibly in this deposition or in
10   the future.
11      Q.    Today's my opportunity to ask
12   you what your opinions are in this matter.
13          As of today, are the opinions
14   that you expressed to us set forth at any
15   trial or hearing in this matter, are they
16   contained in your report, Exhibit 2?
17      A.    I have seen information that
18   has become available recently that I did not
19   have at that time this report was finalized,
20   and I have modified my opinions very slightly
21   as a result of that information.
22      Q.    How have you modified your
23   opinions?
24      A.    My opinions have essentially

Page 17

1    been strengthened as they relate to the
2    causation question between perineal talcum
3    powder use and the occurrence of ovarian
4    cancers.
5       Q.    Other than you believing that
6    your opinions are strengthened with respect
7    to the association between perineal talcum
8    powder use and ovarian cancer, have your
9    opinions changed at all since you prepared
10   your report, Exhibit 2?
11      A.    No.
12      Q.    Are there any new or additional
13   opinions as of today that you expect to
14   testify to at trial or any hearing of this
15   matter other than your report, Exhibit 2, and
16   as you have qualified that report by stating
17   that your opinions on association are
18   stronger today?
19      A.    No.
20          MS. O'DELL:  Object to the
21   form.
22   BY MR. ZELLERS:
23      Q.    Okay.  Your report has a list
24   of references that begin on page 11.

5 (Pages 14 to 17)

Arch I. "Chip"  Carson, M.D., Ph.D.

Page 18

1          Do you see that?
2     A.    Yes.
3     Q.    What are the references?  What
4  do they relate to?  And by that, I mean --
5  I'm just trying to understand what this list
6  is.
7     A.    This is a list of references
8  from which I gleaned information that were
9  important to my forming opinions regarding
10  the question that was given to me, and they
11  contribute to pieces of the report in various
12  ways.
13          They don't represent a complete
14  review that I made in preparing my report,
15  but all are important in some way in terms of
16  coming to my conclusions.
17     Q.    Are the references that you
18  list in your report from page 11 up and
19  through page 16, are those the materials that
20  you are relying on in terms of your opinions
21  that you're expressing in your report?
22          MS. O'DELL:  Objection to form.
23     A.    Yes.
24          ///

Page 19

1  BY MR. ZELLERS:
2     Q.    What, then, is the difference
3  between the references to your report and
4  Exhibit B, which has a caption, Literature?
5     A.    The Exhibit B represents a
6  larger set of documents, including scientific
7  literature, technical reports, and so forth
8  that I reviewed in preparation of my report
9  and the formation of my opinions; but they
10  did not contain information that I felt
11  necessary to cite in my report.
12     Q.    The literature that you cite to
13  as Appendix B of your report are materials
14  that you reviewed but are not the materials
15  that you're specifically relying on.  The
16  materials that you're specifically relying on
17  are set forth in your references list; is
18  that right?
19          MS. O'DELL:  Excuse me.  Object
20  to the form, misstates his testimony.
21     A.    My opinions are based on my
22  total review of the literature as well as my
23  training, my professional experience and many
24  other factors.

Page 20

1          I produced a report that I
2  thought was responsive to the question that
3  was given to me by the plaintiffs' attorneys,
4  and within that report I felt it necessary to
5  cite specific key references that contributed
6  to items in that report.
7  BY MR. ZELLERS:
8     Q.    And those are --
9          MS. O'DELL:  Excuse me, sir.
10  Are you finished, Dr. Carson?
11          THE WITNESS:  Yes.
12          MS. O'DELL:  Okay.  Sorry.
13  BY MR. ZELLERS:
14     Q.    Those are the items that you've
15  listed under References; is that right?
16     A.    Yes.
17     Q.    Literature are other materials
18  that you have reviewed but didn't rise to the
19  level of you citing them as a reference for
20  your report, correct?
21     A.    That is correct, but they do
22  contribute information that I utilize in
23  terms of the whole to formulate my opinions.
24     Q.    Let me mark several of the

Page 21

1  attachments to your report as separate
2  exhibits.
3          (Carson Deposition Exhibit 3
4  marked.)
5  BY MR. ZELLERS:
6     Q.    Exhibit 3 is your curriculum
7  vitae that was attached to your report; is
8  that right?
9     A.    Yes.
10          (Carson Deposition Exhibit 4
11  marked.)
12  BY MR. ZELLERS:
13     Q.    Exhibit 4 is a copy of your
14  literature list that we just discussed that
15  is in your report; is that right?
16     A.    Yes.
17          MS. O'DELL:  Thank you.
18  BY MR. ZELLERS:
19     Q.    The one difference with
20  Exhibit 4, your literature list that's
21  attached to your report as Appendix B is not
22  numbered.  I've gone ahead and numbered the
23  pages on Exhibit 4, your literature list, in
24  case we want to refer to a specific page.

Arch I. "Chip" Carson, M.D., Ph.D.

Page 22

1    Today, when I refer to
2  products, talc products, baby powder or
3  Shower to Shower, I'm referring to the baby
4  powder product manufactured by Johnson &
5  Johnson Consumer Products Inc. and the Shower
6  to Shower product formerly manufactured by
7  Johnson & Johnson Consumer Products Inc.
8        Do you understand that?
9    A.   Yes.
10   Q.   Is your report, Exhibit 2,
11 accurate?
12   A.   I believe so.
13   Q.   Do you believe it's complete?
14   A.   In terms of its focus, yes.
15   Q.   What do you mean in terms of
16 its focus?
17   A.   It covers specific aspects of a
18 larger question, and regarding those specific
19 aspects, I believe it is complete.
20   Q.   It covers the aspects of the
21 question that you intend to offer opinions
22 on, correct?
23   A.   That is correct.
24   Q.   What is the question that was

Page 23

1  given to you by counsel for plaintiffs in
2  this litigation?
3    A.   The question is do the -- does
4  the habitual use of talcum powder products
5  cause ovarian cancer.
6    Q.   Were you given any other
7  questions to answer or opine on in this
8  litigation?
9    A.   Not specifically.
10   Q.   What do you understand habitual
11 use of talcum powder to refer to?
12   A.   It means routine use, periodic
13 use.
14   Q.   Over any period of time?
15   A.   Over an extended period of
16 time.
17   Q.   What is an extended period of
18 time?
19   A.   Months or years.
20   Q.   Any other definition that you
21 have of habitual use?
22   A.   No.
23   Q.   Today, in response to the
24 notice of deposition, you did bring the

Page 24

1  binder of materials; is that right?
2    A.   Yes.
3    Q.   The binder of materials, did
4  you prepare that, or was it prepared for you?
5    A.   Well, I uploaded documents to a
6  share file, and the plaintiffs' attorneys
7  were kind enough to print those for me and
8  assemble them in the binder.
9    Q.   In addition, you have brought
10 with you a stack of eight or so additional
11 references that you have on the table in
12 front of you; is that right?
13   A.   Yes.
14   Q.   Are those materials that were
15 cited either as references in your report or
16 in the literature section of your report?
17   A.   I think they're all included in
18 one or the other of those lists.
19   Q.   Your testimony under oath is
20 that all of the additional materials you
21 brought here today are referred to either in
22 your reference list, which is -- begins at
23 page 11 of your report, or your literature
24 list, which we've marked as Exhibit 4 and is

Page 25

1  Exhibit B to your report; is that right?
2        MS. O'DELL:  Objection to the
3    form.
4        Go ahead.
5    A.   There are a couple of new
6  articles here that were not available at the
7  time that I submitted my report, and I
8  believe the literature list was also created.
9  BY MR. ZELLERS:
10   Q.   Were those new materials
11 provided to you by plaintiffs' counsel or are
12 those materials that you did some type of
13 literature search and found?
14   A.   One of them was provided to me
15 by plaintiffs' counsel, but I was aware that
16 it was coming.  And -- actually, two of them
17 were provided by plaintiffs' counsel.
18   Q.   All right.  The two additional
19 documents that were provided to you by
20 plaintiffs' counsel, can you show those to
21 me?
22   A.   Okay.  One is the Longo report.
23   Q.   We will mark as
24 Deposition Exhibit 5 the Longo report dated

7 (Pages 22 to 25)

Arch I. "Chip"  Carson, M.D., Ph.D.

Page 26

1    January 15th of 2009 [sic].
2        (Carson Deposition Exhibit 5
3    marked.)
4        A.    The other is the recent
5    Fletcher, et al article.
6        (Carson Deposition Exhibit 6
7    marked.)
8    BY MR. ZELLERS:
9        Q.    The Fletcher article dated
10   January 3rd of 2019 we'll mark as Exhibit 6.
11   This is an article from Reproductive
12   Sciences; is that right?
13       A.    Yes.  And I actually have a
14   third.
15       Q.    All right.  You have a third
16   article that was provided to you by
17   plaintiffs' counsel?
18       A.    Yes.
19       (Carson Deposition Exhibit 7
20   marked.)
21   BY MR. ZELLERS:
22       Q.    Let's mark that as
23   Deposition Exhibit 7.  Can you tell us what
24   article that is?

Page 27

1        A.    This is a meta-analysis.
2    It's -- the title is Systematic Review and
3    Meta-Analysis of the Association Between
4    Perineal Use of Talc and Risk of Ovarian
5    Cancer.  The lead author is Mohamed Taher.
6        Q.    The Taher paper we have marked
7    as Exhibit 7; is that right?
8        A.    Yes.
9        Q.    This is something that you were
10   provided by plaintiffs' counsel; is that
11   right?
12       A.    Yes.
13       Q.    Exhibit 6, Reproductive
14   Sciences, are you familiar with that journal?
15       A.    I'm aware that it exists.
16       Q.    Do you review that journal on a
17   regular basis as a part of your clinical and
18   research activities?
19       A.    No, I don't.
20       Q.    Is Reproductive Sciences a
21   peer-reviewed journal?
22       A.    I believe it is.
23       Q.    The Exhibit 6 has as a
24   corresponding author, Dr. Saed, S-A-E-D, a

Page 28

1    Ph.D.; is that right?
2        A.    Yes.
3        Q.    What additional articles have
4    you brought here with you today separate and
5    apart from your binder of materials?
6        A.    There's a copy of the IARC
7    monographs preamble.
8        Q.    For what purpose did you bring
9    that article?
10       A.    This discusses the general
11   process that IARC uses in approaching a
12   putative carcinogenic material.
13       Q.    That has previously been marked
14   as Plaintiff Exhibit P-346 in another
15   proceeding; is that right?
16       A.    I don't know.
17       Q.    Well, the document we're
18   looking at has that exhibit sticker on it; is
19   that right?
20       A.    It does.
21       Q.    What else have you brought here
22   with you today?
23       A.    This is an article from
24   The Lancet from 1952 titled Value of Modified

Page 29

1    Starch as a Substitute for Talc, and the
2    first author is J.D.P. Graham.
3        Q.    Why did you bring that article?
4        A.    This is an older article that
5    discusses the suitability of substituting
6    cornstarch materials for talc due to
7    perceived issues with talc.
8        Q.    Is this an article that you had
9    cited previously, either in your references
10   or your list of literature?
11       A.    I did not cite it in my report.
12   I don't know -- I don't recall if it's in the
13   literature list or not.
14       (Carson Deposition Exhibit 8
15   marked.)
16   BY MR. ZELLERS:
17       Q.    Why did you decide to bring
18   that with you here today?
19       A.    It is in the literature list.
20       I ran across it last night, and
21   I thought I might need to refer to it during
22   the deposition.
23       Q.    What other documents or
24   materials have you brought other than your

8 (Pages 26 to 29)

Arch I. "Chip" Carson, M.D., Ph.D.

Page 30

1  binder of materials?
2      A.    I have here a copy of the
3  recent Canadian position on the safety of
4  talcum powder and its relationship to ovarian
5  cancer.
6      Q.    When did you review that
7  document?
8      A.    A couple weeks ago, I think.
9      Q.    Is that a document that you
10  were provided by plaintiffs' counsel?
11      A.    It was.
12      Q.    Can I see the document, please?
13  We'll mark the draft screening assessment
14  from Health Canada dated December 18th of
15  2018 as Exhibit 9.
16          (Carson Deposition Exhibit 9
17      marked.)
18  BY MR. ZELLERS:
19      Q.    Any other documents?
20      A.    I have a copy of the letter
21  from the FDA from April 1st, 2014 responding
22  to positions -- petitions for labeling.
23      Q.    This is a letter that has a
24  stamp on it on the first page, April 1st,

Page 31

1  2014, from -- or strike that -- to
2  Dr. Epstein from the FDA; is that right?
3      A.    Yes.
4      Q.    Let's mark that as Exhibit 10.
5          (Carson Deposition Exhibit 10
6      marked.)
7  BY MR. ZELLERS:
8      Q.    What else?
9      A.    I have an article authored by
10  A.M. Blount which is titled Amphibole Content
11  of Cosmetic and Pharmaceutical Talcs that was
12  published in Environmental Health
13  Perspectives in 1991.
14      Q.    Is that a journal that you
15  review on a regular basis as part of either
16  your clinical practice or your research
17  activities?
18      A.    That one I do look at pretty
19  much.
20      Q.    Is this an article you were
21  aware of back in 1991?
22      A.    No.  At least I don't recall.
23      Q.    Is it fair that your review of
24  this literature, the literature relating to

Page 32

1  talcum powder and ovarian cancer, is
2  something that you undertook when you were
3  retained by plaintiffs' counsel and asked to
4  address the question they gave to you?
5      A.    Yes, it is.
6      Q.    We will mark the article by
7  Blount as Exhibit 11.
8          (Carson Deposition Exhibit 11
9      marked.)
10  BY MR. ZELLERS:
11      Q.    And you have one more; is that
12  right?
13      A.    Yes, one more, which is -- this
14  is an article from the American Journal of
15  Obstetrics and Gynecology from 1974 titled
16  The Ovarian Mesothelioma.  It's authored by
17  Parmley and Woodruff.
18      Q.    We'll mark that as Exhibit 12.
19          (Carson Deposition Exhibit 12
20      marked.)
21  BY MR. ZELLERS:
22      Q.    Exhibit 12, is this an article
23  that was cited previously by you in either
24  your references or your literature list?

Page 33

1      A.    Yes.
2      Q.    For what -- strike that.
3          Is this a document that you
4  chose to bring today or were you provided it
5  by plaintiffs' counsel?
6      A.    This is another one I ran
7  across last night and decided to bring along
8  to the depo.
9      Q.    Same questions with respect to
10  the Blount article, Exhibit 11:  Is this an
11  article you cite in your references or
12  literature?
13      A.    In the literature, yes.
14      Q.    For what purpose have you
15  brought this with you today?
16      A.    I thought I might want to refer
17  to it in response to questions here.
18      Q.    Exhibit 10, the letter from the
19  FDA to Dr. Epstein, April of 2014, for what
20  purpose have you brought that here with you
21  today?
22      A.    I thought I might want to refer
23  to it in response to questioning.
24      Q.    The documents that you have

9 (Pages 30 to 33)

Arch I. "Chip"  Carson, M.D., Ph.D.

Page 34

1  brought here with you today are documents
2  that you wanted to have available to try to
3  respond to the questions that I may ask you?
4      A.    Yes.
5      Q.    These documents you all
6  believe -- strike that.
7          The documents that you've
8  identified and you've brought with you --
9  have brought with you today, you believe
10 those are supportive of the opinions that you
11 are rendering in this matter; is that right?
12     A.    Yes.
13     Q.    The documents on your
14 literature list, what we have marked as
15 Exhibit 4, are those documents that were
16 provided to you by plaintiffs' counsel?
17     A.    Some were.
18     Q.    The documents on this list that
19 were not provided by plaintiffs' counsel, did
20 you find those through a literature search?
21     A.    Yes.
22     Q.    Are you able to distinguish for
23 us which documents on your literature list,
24 Exhibit 4, came from plaintiffs' counsel and

Page 35

1  which items on the literature list you came
2  up with?
3      A.    To some extent.
4      Q.    So if we went through item by
5  item, you believe you could distinguish
6  between what was provided to you by
7  plaintiffs and what you found on your own?
8      A.    For some, but not all of them.
9      Q.    Have you reviewed all of the
10 materials that are listed on your literature
11 list?
12     A.    I have reviewed all of them,
13 yes.
14     Q.    Have you reviewed all of the
15 materials that are on your reference list?
16     A.    Yes.
17     Q.    The materials on your reference
18 list, is it the same that some were provided
19 to you by plaintiffs' counsel and some you
20 found on your own?
21     A.    I think there may be one or two
22 references that I didn't have before I saw
23 them in the share file that may have been
24 provided by plaintiffs' counsel, but I

Page 36

1  wouldn't be able to tell you for sure.  I'm
2  sure I ran across these in my own literature
3  search.
4      Q.    Deposition Exhibit 13, we will
5  mark the thumb drive that plaintiffs' counsel
6  has brought here today.
7          (Carson Deposition Exhibit 13
8  marked.)
9  BY MR. ZELLERS:
10     Q.    Do you, Dr. Carson, have an
11 understanding of what's on the thumb drive
12 we've marked as Exhibit 13?
13     A.    My understanding is this is
14 copies of the documents on the literature
15 list.
16     Q.    When were you first retained by
17 anyone regarding the talc/ovarian cancer
18 litigation?
19     A.    In October of 2018.
20     Q.    Who contacted you?
21     A.    I was contacted by an attorney
22 named Russ Abney.
23     Q.    Who is Mr. Abney, if you know?
24     A.    Mr. Abney is a lawyer who used

Page 37

1  to work in the Houston area and with whom I
2  had some dealings years ago; and since that
3  time he has become involved in this talc
4  litigation in some way, was aware of me as a
5  potential expert witness, and contacted me
6  regarding my interest and availability.
7      Q.    What matters have you worked on
8  with Mr. Abney in the past?
9      A.    I think it would have been back
10 in the 1990s, and I frankly don't recall what
11 cases we worked on, but there were one or
12 maybe two cases.
13     Q.    When in October of 2018 were
14 you contacted by Mr. Abney?
15         MS. O'DELL:  Object to the
16     form.
17     A.    I believe it was either the
18 14th or 15th of October.
19 BY MR. ZELLERS:
20     Q.    How do you remember with that
21 precision?
22     A.    I have an e-mail that relates
23 to a phone call which was our initial
24 contact.

10  (Pages 34 to 37)

Arch I. "Chip"  Carson, M.D., Ph.D.

Page 38

1     Q.    Mr. Abney at some point asked
2  you to address the question that you told us
3  before:  Does the habitual use of talcum
4  powder cause ovarian cancer?
5           Is that right?
6           MS. O'DELL:  Object to the
7  form.
8     A.    Well, he talked to me generally
9  about the case that was proceeding, and I
10 discussed with him what my understanding of
11 those things was and what the kind of
12 opinions I would be able to render would be.
13 And he suggested that he set up a meeting
14 between me and members of plaintiffs'
15 counsel.
16 BY MR. ZELLERS:
17    Q.    When Mr. Abney called you
18 middle of October of 2018, talcum powder and
19 any relationship or association that it may
20 have to ovarian cancer had not been a focus
21 of your research or study; is that right?
22    A.    That's right.
23    Q.    It had not been a part of your
24 clinical practice, right?

Page 39

1     A.    That's correct.
2     Q.    When did you meet with the
3  larger group of plaintiffs' counsel?
4     A.    I believe we had a telephone
5  meeting on the 16th of October.  I'm not
6  sure.  I have to --
7     Q.    That's -- right now I just want
8  estimates.
9     A.    Okay.
10    Q.    And so I don't -- as long as
11 you're reasonably comfortable that it was in
12 that time frame.
13    A.    It was mid October.
14    Q.    That's fine.
15          When were you asked the
16 question that the plaintiffs' lawyers wanted
17 you to try to answer in this litigation?
18    A.    Well, after the meeting we
19 parted ways and then made contact again a few
20 days later, and I was told that they were
21 interested in me going ahead and doing a
22 review and starting to establish opinions.
23    Q.    What do you mean by they
24 authorized you or were comfortable with you

Page 40

1  doing a review?  What does that mean?
2     A.    Well, I felt that I was hired
3  as a witness at that point and that's when I
4  would begin my billable hours on this case.
5     Q.    When was that?  Sometime in
6  later October of -- late October of 2018?
7     A.    It was within a few days after
8  our first meeting, still in October.
9     Q.    What did you do to answer the
10 question?  What was your methodology?
11    A.    Well, initially I decided to do
12 a general literature search on the question
13 to see what research had been performed, what
14 reports had been written, what the quality of
15 that research was.
16    Q.    When did you start that?
17    A.    Immediately.  I was curious.
18          I began to assemble the
19 available literature and review it on a
20 piecemeal basis through the subsequent time
21 period; the next couple of weeks I reviewed a
22 lot of it.
23    Q.    What did you search for when
24 you did this general literature search?

Page 41

1     A.    I searched under various search
2  terms, including "talc," including "ovarian
3  cancer," the relationship between the two.
4  As I became more familiar with the
5  literature, I expanded that search into other
6  topics.
7           As I became -- I was already
8  aware of issues related to the inclusion of
9  asbestos in talc deposits, and so I expanded
10 my search into that part of the literature
11 that relates to asbestos in talc or asbestos
12 in ovarian cancer.
13          As I felt my opinions would
14 need to extend into cancer and carcinogenesis
15 in general, I did some search into ovarian
16 cancer specifically and general
17 carcinogenesis to see what the current state
18 of the art was regarding that in the
19 literature.
20          I looked at some issues of
21 mining practices.
22          I looked at the Johnson &
23 Johnson website.  There's a webpage regarding
24 talc and ovarian cancer that I looked at.

11  (Pages 38 to 41)

Arch I. "Chip"  Carson, M.D., Ph.D.

|  | Page 42 |
| --- | --- |

1        I looked through old notes and
2  lecture files that I had for information that
3  I've used or accessed previously in my
4  professional capacity for information that
5  was pertinent.
6            Just a very dendritic kind of
7  extensive search.
8        Q.   You reviewed these materials
9  that you have told us about and then did you
10  prepare your report?
11      A.   At that point I -- well, the
12  literature review took several stages.
13  Typically when you perform a review like
14  this, you end up with a -- I do a very
15  general sort of approach to a review, so I
16  get much more than will be pertinent to my
17  review eventually.
18          I find that a valuable approach
19  because it allows me to find things I
20  wouldn't otherwise find or look for or know
21  to look for.
22          And then I'm able to cull
23  through that information and discard pieces
24  of the search materials that are not relevant

|  | Page 43 |
| --- | --- |

1  or interesting to me and then refine my
2  search and redo it, extending it into
3  different areas that have now become
4  pertinent in my opinion, until I satisfy
5  myself that I have pretty much covered the
6  waterfront so to speak in terms of a
7  literature review.
8        Q.   You did your literature review.
9  You reviewed the Johnson & Johnson website
10  and the other materials that you have told us
11  about.
12          Did you then formulate your
13  opinions and set them down in your report
14  which we marked as Exhibit 2?
15      A.   I did.  I began writing as I
16  reviewed the literature and continued to take
17  notes which, through a continuous editing
18  process, eventually became my report.
19      Q.   Did you prepare your report?
20      A.   I did.
21      Q.   Did anyone assist you in the
22  preparation of your report?
23      A.   No one assisted me in the
24  preparation of my report.  I did receive

|  | Page 44 |
| --- | --- |

1  review of draft versions of my report and
2  comments, in particular --
3        Q.   Don't tell me about the
4  comments.
5        A.   Okay.
6        Q.   I don't want to know what the
7  lawyers may have told you.
8            Did the comments come from the
9  lawyers for plaintiffs or did they come from
10  other people?
11      A.   They came from the lawyers.
12  They also came from a few of my colleagues.
13      Q.   Did you share your report with
14  some of your colleagues?
15      A.   I let a few people read it and
16  I talked to them about it.
17      Q.   Are the opinions your opinions?
18      A.   Yes, they are.
19      Q.   Have you told me, you know,
20  generally what you have done to formulate
21  your opinions in this matter?
22      A.   Yes, I think so.
23      Q.   You did all of this over a
24  30-day period; is that right?

|  | Page 45 |
| --- | --- |

1        A.   Yes.
2        Q.   All right.  You have no
3  invoices, correct?
4        A.   That's correct.
5        Q.   Is it typical that you'll work
6  on a matter for some number of months and not
7  generate any invoices?
8        A.   Yes.
9        Q.   You are billing your time at
10  what rate?
11      A.   $450 per hour.
12      Q.   Can you estimate for us the
13  number of hours that you have spent doing
14  your literature review, formulating your
15  opinions, and writing your report?
16      A.   There's still some tallying I
17  need to do from my calendar, but it's between
18  150 and 180 hours.
19      Q.   Does that include your meetings
20  and communications with plaintiffs' counsel?
21      A.   Yes, that's up until today.
22      Q.   Other than meeting with
23  Mr. Abney or talking with Mr. Abney -- did
24  you ever meet with Mr. Abney face-to-face?

12 (Pages 42 to 45)

Arch I. "Chip"  Carson, M.D., Ph.D.

Page 46

1    A.   No.
2    Q.   What other plaintiff lawyers
3  have you met with or talked with as part of
4  your formulating your opinions and doing your
5  literature review?
6    A.   We've had a number of
7  conference calls where there were several of
8  these attorneys' colleagues on the line, but
9  in terms of in-person meetings, those have
10  been with Ms. O'Dell and Ms. Thompson,
11  Dr. Thompson.
12    Q.   How many meetings have you had
13  with Ms. O'Dell?
14    A.   Three.
15    Q.   How many meetings have you had
16  with Dr. Thompson?
17    A.   Three.
18    Q.   Did you know Dr. Thompson
19  before you were retained in this matter?
20    A.   I did not.
21    Q.   Any other plaintiff lawyers in
22  this litigation that you are aware of --
23  strike that.
24         Any other plaintiff lawyers in

Page 47

1  this matter that you've had communications
2  with other than what you have told us?
3    A.   No.
4    Q.   Do you have any social
5  relationship with any of the plaintiffs'
6  counsel?
7    A.   No.
8    Q.   Your relationship with
9  Dr. Thompson is just the three meetings that
10  you have been involved in with her?
11    A.   Well, we've exchanged e-mail
12  communications, but other than that, no.
13    Q.   Have you met with or talked
14  with any other expert witness for plaintiffs?
15    A.   No, I have not.
16    Q.   Do you know who Thomas Dydek
17  is?
18    A.   Yes.
19    Q.   Who is Thomas Dydek?
20    A.   He is a toxicologist.
21    Q.   Where does he practice?
22    A.   I don't recall.
23    Q.   Have you had any discussions
24  with Dr. Dydek?

Page 48

1    A.   I have not had any discussions
2  with Dr. Dydek.  We may have met previously,
3  but I don't recall.
4    Q.   Any previous meeting with
5  Dr. Dydek, did it relate to this litigation?
6    A.   No.
7    Q.   Did it relate to expert witness
8  work that you were doing?
9    A.   No.
10    Q.   Do you know what the
11  relationship is, if any, between Dr. Thompson
12  and Dr. Dydek?
13    A.   I don't know of any
14  relationship outside of his work as an expert
15  witness in related litigation.
16    Q.   Dr. Crowley, do you know
17  Michael Crowley?
18    A.   I know of Dr. Crowley.
19    Q.   Did you know of Dr. Crowley
20  before you were retained in the talcum powder
21  litigation?
22    A.   No.
23    Q.   Have you ever met with
24  Dr. Crowley?

Page 49

1    A.   I have not.
2    Q.   Ever talked with Dr. Crowley?
3    A.   I have not.
4    Q.   You reviewed his report as part
5  of your review in this matter; is that right?
6    A.   That's correct.
7    Q.   Do you know who any of the
8  other experts are in this litigation for
9  plaintiffs?
10    A.   Well, I know there are a number
11  of people who have generated reports that I
12  have also reviewed.
13    Q.   What reports have you reviewed
14  from plaintiffs' other experts?
15    A.   Well, I've reviewed several
16  reports from Dr. Longo, who's done work on
17  the presence of asbestos in talc products and
18  related things.  I think he's the only other
19  expert that I'm aware of at this point.
20    Q.   Well, you're aware of
21  Dr. Crowley?
22    A.   Well, Dr. Crowley, Dr. Longo,
23  and Dr. Dydek that you mentioned before.
24    Q.   Have you reviewed any reports

13 (Pages 46 to 49)

Arch I. "Chip"  Carson, M.D., Ph.D.

Page 50

1  or transcripts from Dr. Dydek?
2      A.    Yes, I reviewed an expert
3  report that he provided before I got involved
4  in this case.
5      Q.    Did you review that report
6  before you prepared your report?
7      A.    Yes.
8      Q.    Did you review Dr. Crowley's
9  report before you prepared your report?
10     A.    Yes.
11     Q.    And you reviewed Dr. Longo's
12 report before you prepared your report; is
13 that right?
14     A.    I've reviewed one report.
15 There was another one that became available
16 after.
17     Q.    The second report is what you
18 brought here with you today and you marked as
19 Exhibit 5; is that right?
20     A.    Yes.
21     Q.    Any other plaintiff experts
22 that you're aware of?
23     A.    Not that I can think of, no.
24     Q.    Any other reports from

Page 51

1  plaintiffs' experts that you have reviewed?
2      A.    Well, there's a -- there is an
3  article that's been submitted for publication
4  which I consider a piece of the scientific
5  literature.  You mentioned Dr. Saed earlier,
6  and I know that he has a relationship with
7  this case as well.
8      Q.    What is his relationship with
9  this case, Dr. Saed?
10     A.    He's provided some work at the
11 request of the attorneys here.
12     Q.    Have you reviewed that work?
13     A.    That's the subject of several
14 articles he's published previously, he and
15 his colleagues, as well as the additional one
16 that I brought today.
17     Q.    Other than the articles that
18 you have listed on your reference and
19 literature list and the Saed article that you
20 brought with you today, are you aware of any
21 other work that Dr. Saed has done in this
22 matter?
23     A.    No.
24     Q.    Any other plaintiff experts

Page 52

1  that you're aware of?
2      A.    No.
3      Q.    Are you aware of any of the
4  experts for defendants in the talcum powder
5  litigation?
6      A.    No.
7      Q.    Have you reviewed any reports
8  from any of the experts in the talcum powder
9  litigation?
10     A.    I have not.
11     Q.    Have you reviewed any of the
12 transcripts of defense experts in the talcum
13 powder litigation?
14     A.    I've reviewed some deposition
15 transcripts of various witnesses.
16     Q.    Those witnesses are all listed
17 in either your references or your literature;
18 is that right?
19     A.    Yes.
20     Q.    Did you review the entire
21 transcripts of the witnesses that you've
22 identified?
23     A.    I think for the most part I
24 would say yes.

Page 53

1      Q.    Did you review the exhibits to
2  those depositions?
3      A.    Yes.  If they were provided to
4  me, I did, yes.
5      Q.    Did you believe that it was
6  your job to do an independent assessment as
7  to whether or not the habitual use of talcum
8  powder causes or can cause ovarian cancer?
9          MS. O'DELL:  Object to the
10 form.
11     A.    Could you repeat the question,
12 please.
13 BY MR. ZELLERS:
14     Q.    Sure.
15          Plaintiffs asked you to --
16 strike that.
17          Plaintiffs' counsel asked you
18 to answer that question; is that right?
19     A.    Yes.
20     Q.    You understood that they were
21 looking to develop an association or a causal
22 relationship between the habitual use of
23 talcum powder and ovarian cancer, correct?
24     A.    Yes.

14 (Pages 50 to 53)

Arch I. "Chip" Carson, M.D., Ph.D.

1    MS. O'DELL: Object to the
2 form.
3    Excuse me, I'm sorry,
4 gentlemen. Give me just one second to
5 object if I need to.
6    THE WITNESS: Sure.
7    MS. O'DELL: Thank you.
8 BY MR. ZELLERS:
9    Q.    Did you consider the literature
10 and the sources that refuted that association
11 or causal relationship?
12    A.    I tried to consider all the
13 available literature.
14    Q.    When you wrote your report
15 setting forth your opinions, did you set
16 forth the sources that refuted the
17 propositions you were making?
18    A.    I cited several sources that on
19 the surface might seem to refute my opinions.
20    Q.    And you believe that is
21 contained in your report which we marked as
22 Exhibit 2; is that right?
23    A.    Yes.
24    Q.    Have you been involved in any

1    A.    Probably 5%.
2    Q.    What percent of your income
3 comes from the work that you do as a
4 consultant?
5    A.    Of course it varies quite a bit
6 from moment to moment, but it would be less
7 than 10%.
8    Q.    Have you ever testified at
9 trial?
10    A.    Yes.
11    Q.    On how many occasions?
12    A.    Probably ten.
13    Q.    The 30 to 35 depositions that
14 you've given previously, those have been in
15 the context of you providing litigation
16 consulting services; is that right?
17    A.    In terms of expert testimony,
18 yes.
19    Q.    The trial appearances that
20 you've made, are those also in your capacity
21 as an expert witness?
22    A.    Yes.
23    Q.    Have you been involved in other
24 litigations?

1 other talcum powder litigation other than
2 this talc MDL matter that Mr. Abney talked to
3 you about?
4    A.    No, I haven't.
5    Q.    In the 30 to 35 occasions that
6 you've testified in the past, have any of
7 those been on issues relating to talcum
8 powder and any association between talcum
9 powder and ovarian cancer?
10    A.    No.
11    Q.    You are not an expert in
12 asbestos, correct?
13    MS. O'DELL: Object to the
14 form.
15    A.    I'm an occupational medicine
16 physician, and I have a significant amount of
17 awareness and training regarding asbestos as
18 it relates to occupational exposures and
19 general environmental exposures, but I don't
20 consider myself an asbestos expert.
21 BY MR. ZELLERS:
22    Q.    What percentage of your time do
23 you spend working as a consultant? And I'm
24 talking about your professional time.

1    A.    Yes.
2    Q.    What other litigations have you
3 been involved in as an expert?
4    A.    Well, I've been asked to
5 provide opinions and testify in a number of
6 cases, most of which involved personal injury
7 in the occupational setting or environmental
8 exposures.
9    Q.    Has the majority of your expert
10 work in the occupational setting and for
11 environmental exposures been on behalf of
12 plaintiffs?
13    A.    No, it's been split about
14 50/50, plaintiff and defense.
15    Q.    Have you ever been retained in
16 a case involving cosmetic products?
17    A.    No.
18    Q.    Your curriculum vitae that we
19 marked as Exhibit 3, is it correct and up to
20 date?
21    A.    It was up to date at the time
22 of submission of my report in the end of
23 2018.
24    Q.    What additions need to be made

Arch I. "Chip"  Carson, M.D., Ph.D.

Page 58

1   or corrections need to be made to your CV,
2   Exhibit 3, to bring it up to date?
3        A.    Well, I've terminated a
4   relationship with the University of Texas
5   Medical Branch in Galveston where I was
6   their -- the medical director of their
7   Employee Health Services Clinic.  I continue
8   to be -- serve as an assistant clinical
9   professor of preventive medicine and family
10  medicine at that institution.
11        I have terminated my
12  relationship with the Enbridge Corporation as
13  their medical director.
14        The Spectra Energy entry, which
15  is about the seventh on the list of
16  professional activities, is also terminated
17  as that was a company that was merged and
18  became Enbridge.
19        Q.    Any other corrections or
20  updates to your curriculum vitae that we've
21  marked as Exhibit 3?
22        A.    No.
23        Q.    Why are you no longer serving
24  as medical director, Employee Health Services

Page 59

1   with the University of Texas?
2        MS. O'DELL:  Objection to form.
3        A.    That was a contract that I had
4   through the University of Texas Houston
5   College of Nursing that provided those
6   services to UTMB, and UTMB decided to make a
7   change and go with another contractor.
8   BY MR. ZELLERS:
9        Q.    Why are you no longer serving
10  as medical director for Spectra Energy
11  Corporation and Enbridge Corporation?
12        A.    Well, Spectra Energy no longer
13  exists; it became Enbridge Corporation.  And
14  in October of 2018, I determined that I did
15  not -- I no longer had sufficient time to
16  provide that service.
17        Q.    Your undergraduate degree was
18  in biologic sciences with a concentration in
19  engineering; is that right?
20        A.    Yes.
21        Q.    You received a Ph.D. in
22  toxicology; is that right?
23        A.    Yes.
24        Q.    And then later an M.D. degree;

Page 60

1   is that right?
2        A.    Yes.
3        Q.    What percentage of your time is
4   spent in the clinical practice of medicine?
5        A.    Currently I see patients
6   one-half day a week and work as a supervisor
7   of the occupational medicine residents for
8   additional time during the week, so clinical
9   activities would be about probably 12 hours a
10  week.
11        Q.    Do you see or treat women for
12  gynecologic cancer?
13        A.    I do not.
14        Q.    You have never worked for a
15  company that manufactures cosmetic products,
16  correct?
17        A.    That's correct.
18        Q.    You're not a gynecologist or an
19  oncologist, correct?
20        A.    That's correct.
21        Q.    You're not a cancer biologist?
22        MS. O'DELL:  Object to the
23  form.
24        A.    That's correct.

Page 61

1   BY MR. ZELLERS:
2        Q.    You are not a geologist,
3   mineralogist or microscopist?
4        A.    That's correct.
5        Q.    You're not an epidemiologist?
6        A.    Well, I may be considered an
7   epidemiologist simply by my appointment as an
8   associate professor in the Department of
9   Epidemiology at the School of Public Health
10  here in Houston.
11        Q.    Do you have any professional
12  education in the field -- well, strike that.
13        Have you ever published or
14  conducted a meta-analysis?
15        A.    I have conducted meta-analyses.
16  I've not published them.
17        Q.    You did not do any type of
18  fellowship in epidemiology, correct?
19        A.    That's correct.
20        Q.    You're not board certified in
21  epidemiology; is that right?
22        A.    I don't believe there is a
23  board certification in epidemiology.
24        Q.    You're not a biostatistician or

16  (Pages 58 to 61)

Arch I. "Chip"  Carson, M.D., Ph.D.

|  | Page 62 |
|---|---|

1  a pulmonologist?
2      A.    That's correct.
3      Q.    You're not a material
4  scientist?
5      A.    That's correct.
6      Q.    Nor are you a pathologist?
7      A.    Correct.
8      Q.    You've never been involved in
9  any pathological exam or research relating to
10  ovarian cancer; is that right?
11          MS. O'DELL:  Object to the
12      form.
13      A.    I'm not sure exactly what you
14  mean by your question.
15  BY MR. ZELLERS:
16      Q.    Sure.  Let me withdraw that.
17          You've never been involved in
18  terms of the research relating to ovarian
19  cancer, correct?
20      A.    Not specifically, no.
21      Q.    You've never authored any
22  literature or publications relating to talcum
23  powder?
24      A.    No.

|  | Page 63 |
|---|---|

1      Q.    Or relating to ovarian cancer,
2  correct?
3      A.    No.
4      Q.    Okay.  What journals -- well,
5  strike that.
6          You have never published on
7  fragrance chemicals; is that right?
8          MS. O'DELL:  Object to the
9      form.
10      A.    That's correct.
11  BY MR. ZELLERS:
12      Q.    Never done any research on
13  fragrance chemicals, correct?
14      A.    I've done some work with
15  fragrance chemicals and health effects that
16  are associated with them, but I have not -- I
17  would not classify that as research or
18  publication.
19      Q.    You had no opinions regarding
20  talcum powder or any of its constituent
21  components before getting involved in this
22  litigation; is that right?
23          MS. O'DELL:  Object to the
24      form.

|  | Page 64 |
|---|---|

1      A.    I think I had opinions about
2  talcum powder and its constituents, but if
3  you could be more specific, I might be able
4  to give you a more specific answer.
5  BY MR. ZELLERS:
6      Q.    Did you ever, before getting
7  involved in this litigation in October of
8  2018, do research -- strike that.
9          You've never published on
10  talcum powder, correct?
11      A.    That's correct.
12      Q.    You have never published on the
13  constituent components of talcum powder,
14  correct?
15      A.    That may not be the case.  I've
16  done work in some other minerals which have
17  resulted in publications, for example,
18  vermiculite, which have touched the issues
19  of asbestos, association with talc,
20  association with other minerals, but never
21  specifically regarding talc.
22      Q.    Are those publications on your
23  CV?
24      A.    They are.

|  | Page 65 |
|---|---|

1      Q.    That we marked as Exhibit 3?
2      A.    Yes.
3      Q.    Okay.  Have you ever
4  communicated with the FDA regarding talcum
5  powder?
6      A.    I've not.
7      Q.    Have you ever communicated with
8  Health Canada regarding talcum powder?
9      A.    No.
10      Q.    When did you first start
11  preparing your report which we've marked as
12  Exhibit 2?
13      A.    Well, I began a literature
14  review immediately after talking to
15  Mr. Abney.
16      Q.    My question, I guess, is:  When
17  did you start writing your report?
18      A.    Well, technically I started
19  writing my report after I was retained by
20  plaintiffs' counsel.
21      Q.    Late October, early
22  November 2018?
23          MS. O'DELL:  Object to the
24      form, misstates his prior testimony.

17 (Pages 62 to 65)

Arch I. "Chip"  Carson, M.D., Ph.D.

Page 66

1      A.    In October of 2018.
2  BY MR. ZELLERS:
3      Q.    Have you reviewed any of the
4  deposition transcripts of any of the experts
5  that have been deposed in this litigation?
6      A.    Yes.
7      Q.    What deposition transcripts of
8  experts have you reviewed?
9      A.    Oh, of experts?  No, I have not
10  reviewed -- well, I've reviewed -- I've
11  reviewed expert depositions, but I don't know
12  what case they were deposed in, but it
13  relates to talcum powder and ovarian cancer
14  issue.
15      Q.    What expert depositions have
16  you reviewed?
17      A.    They're all cited in the
18  literature exhibit.
19      Q.    All of the deposition
20  transcripts that you've reviewed are cited in
21  Exhibit 4?
22      A.    I think any of the transcripts
23  that I review are -- reviewed are probably
24  included in here.

Page 67

1      Q.    Are you aware of reviewing any
2  transcripts that you did not include in your
3  literature statement?
4      A.    I'm not aware, but I can't tell
5  you as I'm sitting here right now whether all
6  of those are included in this literature
7  statement or not.
8      Q.    You -- looking at page --
9      MS. O'DELL:  I'm sorry.  Go
10  ahead.
11  BY MR. ZELLERS:
12      Q.    Are there any that you believe
13  you have reviewed that are not included in
14  the literature statement?
15      A.    Well, let me just see here.
16      There are --
17      MS. O'DELL:  I think they're at
18  the end, Dr. Carson.
19      THE WITNESS:  At the very end.
20      A.    Beginning on page 27 is a list
21  of the depositions, transcripts and reports
22  that I've reviewed, which include some of the
23  expert witnesses, but again, I would have to
24  say I'm -- I'm sort of unaware of the nuts

Page 68

1  and bolts of what goes on legally in this
2  case.  I know there are multiple lawsuits,
3  and I'm not sure which ones those -- these
4  are pertinent to.
5  BY MR. ZELLERS:
6      Q.    My question is a little
7  different and I hope pretty simple:  In
8  addition to the depositions, transcripts and
9  reports that you have listed on pages 27 and
10  28 of Exhibit 4, your literature list, are
11  there any additional depositions or
12  transcripts that you've reviewed?
13      A.    Pardon me for a moment while I
14  review this.
15      (Document review.)
16      A.    No, I'm not aware that there
17  are.
18  BY MR. ZELLERS:
19      Q.    Your testimony earlier was that
20  you have reviewed each of those depositions
21  in their entirety; is that right?
22      A.    Yes.
23      Q.    You have also reviewed the
24  exhibits to those depositions; is that right?

Page 69

1      A.    If they were made available to
2  me, I've looked at all those exhibits as
3  well.
4      Q.    On page 27 of Exhibit 4, who is
5  Annie Yessaian?
6      A.    On page 24?
7      Q.    Strike that.  I'm sorry.  On
8  page 27 of Exhibit 4 --
9      A.    I see.
10      Q.    -- at the bottom, who is Annie
11  Yessaian?
12      A.    I don't recall.
13      Q.    You reviewed her entire
14  transcript and you don't recall who she is?
15      A.    I don't.
16      Q.    Well, go to the next page.  Who
17  is Pat Downey?
18      A.    I believe Pat Downey is an
19  operative of the Imerys company.
20      Q.    Do you know what Mr. Downey's
21  position is?
22      A.    It's a supervisory position
23  regarding -- regarding quality of the talc
24  product.

18 (Pages 66 to 69)

Arch I. "Chip"  Carson, M.D., Ph.D.

Page 70

1    Q.    Who is John Hopkins?
2    A.    John Hopkins is an official, I
3  believe, of -- I'm not sure -- of Johnson &
4  Johnson, I believe, who has some oversight of
5  talc quality as well.
6    Q.    Susan Nicholson, who is she?
7    A.    I don't recall.
8    Q.    Who is Julie Pier?
9    A.    Julie Pier is another scientist
10  who works for Imerys, who is responsible for
11  testing and quality.
12    Q.    In your clinical and academic
13  practice, do you typically rely upon
14  depositions of company witnesses or experts?
15        MS. O'DELL:  Object to the
16    form.
17    A.    If there's pertinent
18  information in there that leads me to other
19  areas or helps me formulate my opinions, then
20  yes.
21  BY MR. ZELLERS:
22    Q.    In the papers and publications
23  that you have identified in your curriculum
24  vitae, Exhibit 3, do you ever recall citing

Page 71

1  to company witness deposition testimony?
2    A.    I don't typically cite
3  deposition testimonies in published papers.
4    Q.    You cite to various company
5  documents.  This is on pages 29 to 30 of
6  Exhibit 4, your list of literature; is that
7  right?
8    A.    Yes.
9    Q.    Did you rely on these documents
10  in formulating your opinions?
11    A.    Yes.
12    Q.    Were these documents selected
13  for you by plaintiffs' counsel?
14    A.    Yes, they were.
15    Q.    Are you able to identify what
16  each of the documents are?
17        MS. O'DELL:  Based on the Bates
18    number?
19        MR. ZELLERS:  Based on the
20    Bates numbers.
21    A.    No, I am not.  I would have to
22  look at each individual document to refresh
23  my memory as to what it contains.
24        ///

Page 72

1  BY MR. ZELLERS:
2    Q.    Once you looked at these
3  documents, the Imerys documents and the
4  documents produced by the Johnson & Johnson
5  companies, did you ask plaintiffs' counsel
6  for any additional documents?
7    A.    I did not.  My understanding is
8  that most of these are reports, testing
9  reports, and most of them are positive
10  results regarding the presence of asbestos or
11  fibers in the product.  And I know that there
12  were many others that may not have shown
13  positive results that I did not look at.
14    Q.    Did you ask the plaintiff
15  attorneys to show you or provide you with the
16  testing documentation that showed an absence
17  of asbestos or asbestos fibers in the talcum
18  powder?
19    A.    Regarding the test results that
20  are equivalent to these that were negative,
21  no, I did not request those.
22    Q.    Did you review documents
23  relating to any fragrance chemicals that are
24  contained in or that you believe are

Page 73

1  contained in the talcum powder?
2    A.    Yes.  I did review some lists
3  and, of course, Dr. Crowley's report.
4    Q.    Do you have any idea or
5  understanding as to the amount or amounts of
6  the fragrance chemicals that are contained in
7  the talcum powder in either the Johnson &
8  Johnson Consumer company talcum powder that's
9  involved in this litigation?
10        MS. O'DELL:  Object to the
11    form.
12        MR. ZELLERS:  Let me withdraw
13    that.
14  BY MR. ZELLERS:
15    Q.    Do you know or have any
16  understanding as to the amounts of fragrance
17  chemicals that are in the talcum powder?
18    A.    I do not have the specific
19  formulation or quantities of those substances
20  that contributed to the products.
21    Q.    Do --
22        MS. O'DELL:  Excuse me.
23        MR. ZELLERS:  Ms. O'Dell,
24    please, I'm going to let the doctor

19 (Pages 70 to 73)

Arch I. "Chip"  Carson, M.D., Ph.D.

Page 74

1  finish.
2      MS. O'DELL:  In that instance,
3  I don't know that he was, and so if he
4  was, my apologies.
5      MR. ZELLERS:  It's okay.
6      MS. O'DELL:  I've been on my
7  best behavior today, as you know,
8  so -- but I don't want the witness to
9  feel as if they're being cut off, and
10  because Dr. Carson is a very polite
11  gentlemen, he would let you interrupt
12  him.
13      MR. ZELLERS:  Of course.
14      MS. O'DELL:  And I don't think
15  that's fair.
16      So, Dr. Carson, if you're
17  finished, great.  If you're not, you
18  may continue.
19      A.    Well, I was going to say that
20  my opinion is that there are very small
21  quantities of those substances that
22  contribute to the fragrance component.
23  BY MR. ZELLERS:
24      Q.    Do you know how those

Page 75

1  quantities of fragrance chemicals may have
2  changed over the years?
3      A.    My understanding is they have
4  not changed dramatically, but there have been
5  certain substitutions over time.
6      Q.    Do you agree that to the extent
7  that you have reviewed internal documents,
8  either of Imerys or from Johnson & Johnson
9  companies, that you have only reviewed the
10  documents that were hand-selected by the
11  plaintiff lawyers for you to review?
12      MS. O'DELL:  Object to the
13  form.
14      A.    I agree that the only documents
15  that I've reviewed regarding the internal
16  products of Johnson & Johnson or Imerys are
17  the ones that were provided by the
18  plaintiffs' attorneys.
19  BY MR. ZELLERS:
20      Q.    Do you know what percentage of
21  the documents that have been produced in this
22  litigation by the Johnson & Johnson companies
23  and by Imerys you have reviewed?
24      A.    Well, based on my general

Page 76

1  understanding of business practices and these
2  types of industries, I've reviewed an
3  extremely small percentage of those.
4      Q.    Is it your practice in your
5  academic work or your clinical research work
6  to rely on internal company documents?
7      A.    Yes, it is.
8      Q.    Do you rely on internal company
9  documents when you publish papers?
10      A.    In some cases.
11      Q.    Can you tell me in what cases
12  or instances you have relied on internal
13  company documents in your publications?
14      A.    Well, for example, I did -- I
15  was involved in some research work in
16  conjunction with NIOSH at the O.M. Scott
17  Company at Marysville, Ohio, where we did
18  a -- we performed a research in the company
19  and relied on some internal documents in
20  terms of gauging concentrations, industrial
21  hygiene records and so forth, in order to
22  draw conclusions that were pertinent to those
23  publications.
24      Q.    Was that data or were those

Page 77

1  internal communications that you relied on?
2      A.    They were both.
3      Q.    What is the publication on your
4  CV where you relied on those materials?
5      A.    Well, let me see here.  I think
6  the first author -- looking back here -- the
7  first author would be Jim Lockey.
8      Q.    Looking at page 6?
9      A.    It's on page 6, and the --
10  there are two publications there.  One is
11  Pulmonary Changes After Exposure to
12  Vermiculite Contaminated With Fibrous
13  Tremolite that appeared in the American
14  Review of Respiratory Disease in 1984.
15      There's another publication
16  which is a book chapter called Pulmonary
17  Hazards From Vermiculite that appeared in a
18  book titled Health Issues Related to Metal
19  and Nonmetallic Mining.
20      Q.    Do you agree that when you have
21  been provided only a small subset of the
22  documents of a company relating to a
23  particular product, that those documents can
24  potentially be misleading?

20  (Pages 74 to 77)

Arch I. "Chip"  Carson, M.D., Ph.D.

Page 78

1          MS. O'DELL: Object to the
2     form.
3     A.   I don't agree that that's the
4  case because I am capable of understanding
5  that it's a subset of available information,
6  and I can make a reliable determination on
7  the pertinence of that material regardless.
8  BY MR. ZELLERS:
9     Q.   Without looking at any other
10 documents or any documents that may put the
11 documents you were provided in context?
12         MS. O'DELL: Object to the
13     form.
14     A.   It depends on the specific
15 case, but I would say in most cases, yes.
16 BY MR. ZELLERS:
17     Q.   In this case, it was not
18 necessary for you to look at any documents
19 other than those specific documents the
20 plaintiffs provided to you; is that your
21 testimony?
22         MS. O'DELL: Object to the
23     form.
24     A.   Regarding the contribution to

Page 79

1  my opinions, I would say, yes, it was not
2  necessary.
3  BY MR. ZELLERS:
4     Q.   Did you do any independent
5  investigation to reach your opinions, other
6  than the literature search and review of
7  websites that you told us about earlier?
8     A.   Other than just general
9  discussion with colleagues, no.
10     Q.   Did any of the colleagues that
11 you spoke with provide you with any
12 substantive support for your opinions?
13     A.   Not that I can recall.  It was
14 mostly just helpful feedback.
15     Q.   The colleagues that you spoke
16 with were who?
17     A.   Various colleagues in my
18 department or in the School of Public Health.
19     Q.   Who?
20     A.   Well, Dr. George Delclos, who
21 is a pulmonologist; Dr. Brett Perkison, who
22 is an occupational medicine physician;
23 Roberta Ness, who is an epidemiologist.
24     Q.   Roberta Ness is in your

Page 80

1  department?
2     A.   She's in my department, yes.
3     Q.   You understand she's a
4  lawyer -- strike that.
5         You understand she's an expert
6  for the plaintiffs in this litigation?
7     A.   I didn't know that.
8     Q.   Dr. Ness never told you that
9  she was an expert witness for plaintiffs in
10 this matter?
11     A.   No, we didn't discuss this
12 case.  We only discussed the issue.
13     Q.   Any other colleagues that you
14 discussed your report and opinions with?
15         MS. O'DELL: Object to the
16     form.
17     A.   I think I shared some of my
18 thinking with the occupational medicine
19 residents as a group and asked them to
20 consider certain issues in the case.
21 BY MR. ZELLERS:
22     Q.   Did they contribute to your
23 review and analysis and opinions?
24     A.   We had an interesting

Page 81

1  discussion, but I don't think that changed my
2  opinions in any way.
3     Q.   The opinions that you're
4  expressing in this case are your opinions; is
5  that right?
6     A.   That's correct.
7     Q.   Your opinions you set forth in
8  your report beginning on page 7; is that
9  right?
10     A.   Let me refer to my report, if
11 you don't mind.
12         MS. O'DELL: Object to the
13     form.
14     A.   I would say -- I would say in
15 answer to that question that, yes, my
16 opinions do begin on page 7 of the report.
17 BY MR. ZELLERS:
18     Q.   Your first opinion set forth on
19 page 7 is that talcum powder is immunogenic
20 and carcinogenic; is that right?
21     A.   Yes.
22         MS. O'DELL: Excuse me.
23 BY MR. ZELLERS:
24     Q.   Your second opinion is that

21 (Pages 78 to 81)

Arch I. "Chip"  Carson, M.D., Ph.D.

Page 82

1  perineal use of talcum powder results in
2  direct exposure to the ovaries either via
3  inhalation or migration through the female
4  reproductive tract, correct?
5       A.   I would not phrase the opinion
6  in that way, but in general, that is my
7  opinion, yes.
8       Q.   How would you phrase your
9  second opinion?
10       A.   I think my second opinion
11  relates mostly to the direct exposure to the
12  reproductive tract that perineal use of
13  talcum powder produces.
14       Q.   Are you opining as to
15  inhalation as an exposure of talcum powder to
16  women's ovaries?
17          MS. O'DELL:  Object to the
18  form.
19       A.   Only as a secondary route of
20  exposure.
21  BY MR. ZELLERS:
22       Q.   Is it part of your opinions or
23  do you defer to other experts on inhalation?
24       A.   I would include that as my

Page 83

1  opinion.
2       Q.   So you're testifying here today
3  that the perineal use of talcum powder
4  results in direct exposure to the ovaries
5  through migration through the female
6  reproductive tract and that inhalation also
7  results in exposure of talcum powder to the
8  ovaries; is that right?
9       A.   That is correct, but my basic
10  opinion is that perineal use of talcum powder
11  exposes the entire reproductive tract,
12  including the pelvic cavity.  So it's a bit
13  more extensive than your phrasing.
14       Q.   Your third opinion is very
15  similar to your first opinion, except that
16  here you add that it's your opinion that the
17  ovaries are particularly susceptible to the
18  carcinogenicity of talcum powder because they
19  have, in your words, "no intrinsic
20  elimination system"; is that right?
21       A.   That's correct.
22       Q.   Is that something you came up
23  with on your own, no intrinsic elimination
24  system?

Page 84

1          MS. O'DELL:  Object to the
2  form.
3       A.   It's an anatomical fact.  The
4  physiology of the reproductive system does
5  not provide the ovaries with the kind of
6  clearance system that, for example, the lungs
7  would have for inhaled exposures.
8  BY MR. ZELLERS:
9       Q.   The words "no intrinsic
10  elimination system," are those your words or
11  are those words that you've seen reported in
12  another study or another paper?
13       A.   I think that's a fairly generic
14  description, that those are my words.
15       Q.   Your fourth opinion is that you
16  believe that the epidemiological studies on
17  talcum powder and ovarian cancer show about a
18  30% increased risk; is that right?
19       A.   Correct.
20          MS. O'DELL:  Object to the
21  form.
22  BY MR. ZELLERS:
23       Q.   As you told us at the outset,
24  those are all still your opinions, although

Page 85

1  you do believe even stronger that there is a
2  causal association between talcum powder and
3  ovarian cancer; is that right?
4       A.   That's correct.
5       Q.   Have you published on your
6  theory that baby powder causes ovarian
7  cancer?
8       A.   No.
9       Q.   Do you have plans to do that?
10       A.   Not presently.
11       Q.   Have you conducted any tests or
12  experiments to confirm your theory that talc
13  migrates to the ovaries?
14          MS. O'DELL:  Object to the
15  form.
16       A.   These are conclusions that I
17  have drawn based on published literature.  I
18  wouldn't characterize them as a theory.  I
19  think they're pretty much established fact.
20  BY MR. ZELLERS:
21       Q.   I'm going to ask you about all
22  these opinions, and so we'll go through the
23  literature and determine -- or at least I'll
24  ask you questions about why you think that

22 (Pages 82 to 85)

Arch I. "Chip"  Carson, M.D., Ph.D.

Page 86

1    some of these matters are established fact.
2        My question is:  Did you do any
3    tests or experiments as part of your review
4    and analysis in this matter?
5        A.    I did not.
6        Q.    Did you do any tests or
7    experiments relating to your opinion that
8    talc causes cancer via inflammation?
9        A.    I did not.
10       Q.    Can you identify any article
11   that identifies inflammation anywhere in a
12   woman's reproductive tract that results from
13   external genital talc application?
14           MS. O'DELL:  Object to the
15       form.
16       A.    I think there are a number of
17   published articles that allude to that
18   relationship and draw a fairly strong
19   conclusion that it exists.
20           MS. O'DELL:  Mike, excuse me,
21       and I'm sorry to interrupt.  We've
22       been going over an hour and a half.
23       Are you at a point where we can take
24       just a short break for...

Page 87

1           MR. ZELLERS:  Sure, we can.
2       Let me just ask these couple of
3       questions, and then we'll take a
4       break.
5           MS. O'DELL:  Sure.
6    BY MR. ZELLERS:
7        Q.    So please identify for me any
8    articles that you have reviewed that identify
9    inflammation anywhere in a woman's
10   reproductive tract resulting from external
11   genital talc application.
12           MS. O'DELL:  Objection to form.
13       A.    I think -- I think the research
14   evidence that includes the epidemiology
15   piece, which is limited to external
16   application of talcum powder, has significant
17   enough correspondence with the biological
18   experimentation literature that it allows us
19   to draw those conclusions.
20   BY MR. ZELLERS:
21       Q.    I understand you've drawn some
22   conclusions here, and I'm going to ask you
23   about these conclusions.
24           But what my question is:  Are

Page 88

1    you aware of any article that identifies
2    inflammation in a woman's reproductive tract
3    resulting from external genital talc
4    application?
5           MS. O'DELL:  Object to the
6       form.
7        A.    I would say that the studies
8    which have looked at that have relied on the
9    result of internal application to show
10   migration.  There have been studies that have
11   shown inflammation as the result of talc, and
12   in my opinion, external application is the
13   same as internal application in the
14   reproductive tract.
15   BY MR. ZELLERS:
16       Q.    I don't mean to be
17   argumentative, and I don't want to be, but
18   can you name me an article that identifies
19   inflammation in a woman's reproductive tract
20   resulting from external genital talc
21   application?
22           MS. O'DELL:  Objection, asked
23       and answered.
24       A.    I can't specifically.

Page 89

1           MR. ZELLERS:  Let's take a
2       break.
3           THE VIDEOGRAPHER:  We're off
4       the record, 10:37, end of Tape 1.
5           (Recess taken, 10:37 a.m. to
6       10:55 a.m.)
7           THE VIDEOGRAPHER:  We're on the
8       record at 10:55, beginning of Tape 2.
9    BY MR. ZELLERS:
10       Q.    Dr. Carson, two of the things
11   that you have reviewed since authoring your
12   report in November of 2018 that you believe
13   support your conclusions in this matter and
14   your opinions in this matter are the draft
15   screening assessment from Health Canada,
16   which we marked as Exhibit 9, and the Taher
17   paper, which has been marked as Exhibit 7; is
18   that right?
19       A.    Yes.
20       Q.    Have you looked into what other
21   public health authorities, other than
22   Health Canada, have had to say about talc and
23   ovarian cancer?
24       A.    Yes, I have.

23 (Pages 86 to 89)

Arch I. "Chip"  Carson, M.D., Ph.D.

Page 90

1    Q.    Did you -- strike that.
2         Are you familiar with the
3    Center for Disease Control in the United
4    States?
5    A.    Yes.
6    Q.    Did you review the CDC and its
7    position on any relationship between talcum
8    powder and ovarian cancer?
9    A.    That may have been part of my
10   review, but I don't specifically recall now
11   what the CDC has on that issue.
12   Q.    CDC does not list talc or
13   talcum powder as a risk factor for ovarian
14   cancer, correct?
15   A.    It's quite possible.
16   Q.    Mayo Clinic and a number of
17   medical centers do not list talc as a risk
18   factor for ovarian cancer, correct?
19   A.    That may be true.
20   Q.    Did you consider, or are you
21   familiar with the National Cancer Institute?
22   A.    I am.
23   Q.    National Cancer Institute is a
24   leading health authority in the United

Page 91

1    States; is that right?
2    A.    Yes.
3    Q.    Particularly in the area of
4    cancer and materials that may or may not be
5    carcinogenic; is that right?
6    A.    Well, the National Cancer
7    Institute is responsible for guiding national
8    research policies as it relates to cancers,
9    and that's one of their considerations is
10   substances that may be related to cancer.
11   Q.    When you reviewed what the
12   National Cancer Institute has determined with
13   respect to talcum powder and whether or not
14   it is a risk factor for ovarian cancer, what
15   did you find?
16   A.    The most recent publication
17   that I viewed discounts the relationship.
18   Q.    In fact, the National Cancer
19   Institute has concluded that the weight of
20   the evidence does not support an association
21   between perineal talc exposure and increased
22   risk of ovarian cancer; is that right?
23   MS. O'DELL:  Are you reading a
24   quote from the document?

Page 92

1    MR. ZELLERS:  I'm asking the
2    doctor a question.
3    MS. O'DELL:  Okay.
4    MR. ZELLERS:  So --
5    MS. O'DELL:  That's specific
6    language, and if you have specific
7    language that you're reading from the
8    report or you've taken from the
9    report, I would just ask that you show
10   the doctor.
11   MR. ZELLERS:  Ms. O'Dell, I
12   have my question.  I'm asking my
13   question.  The doctor can either
14   answer my question or not answer my
15   question.  I'm not reading from a
16   document.  I'm reading from my notes.
17   MS. O'DELL:  I object to the
18   form of the question.  I think it's
19   unfair.
20   MR. ZELLERS:  Can you answer
21   that question, Doctor?
22   A.    I would agree that that
23   restates the general opinion of the NCI as
24   published, but in order to verify the

Page 93

1    specific wording, I would need to look at the
2    document.
3    BY MR. ZELLERS:
4    Q.    Why would you rely on
5    Health Canada but not these other public
6    health organizations, including Center for
7    Disease Control and the National Cancer
8    Institute?
9    A.    Well, there are a number of
10   reasons.  There are lots of public health
11   organizations.  Many of them have different
12   interests and different approaches in the way
13   that they address problems.  For example,
14   discussing the National Cancer Institute, its
15   primary focus is on research and treatments
16   regarding cancers, not necessarily causes,
17   but it is a funder of basic research in the
18   United States.
19   Health Canada is an
20   organization whose charge is to -- is to
21   synthesize public health-related positions
22   based on evidence and disseminate those to
23   public -- the public through various
24   healthcare organizations or agencies.  And

24 (Pages 90 to 93)

Arch I. "Chip" Carson, M.D., Ph.D.

Page 94

1  for that reason, I think it's important to
2  look at the different focus.
3       Also, the Health Canada report
4  is a more contemporaneous report, which has
5  been based on more recent science than has
6  been considered either by the NCI or some of
7  the other public health organizations.
8       Q.   The NCI's most recent update to
9  its publication was January of 2019; is that
10 right?
11      MS. O'DELL:  Object to the
12 form.
13      A.   It's current in terms of its
14 publication.  I don't know that it's January
15 of '19; it may be.  But it's still not based
16 on the most recently available literature.
17 BY MR. ZELLERS:
18      Q.   But Health Canada is; is that
19 right?
20      A.   Health Canada is based on more
21 recent literature than the NCI position.
22      Q.   Health Canada and its
23 assessment is based upon the meta-analysis by
24 Taher that we've marked as Exhibit 7; is that

Page 95

1  right?
2       A.   It is.
3       MS. O'DELL:  Object to the
4  form.
5  BY MR. ZELLERS:
6       Q.   You have reviewed that paper
7  and you believe it supports and strengthens
8  your opinions in this case; is that right?
9       A.   Yes.
10      Q.   Does the National Cancer
11 Institute review the peer-reviewed literature
12 as it relates to risk factors for ovarian
13 cancer?
14      A.   They have a number of
15 committees that are set up for that purpose,
16 and it is -- it's a committee approach which
17 is handled by a committee chairperson.  The
18 National Cancer Institute itself has some
19 oversight of that process, but they defer to
20 the committee chairs.
21      Q.   You understand that the Health
22 Canada assessment is a draft; is that right?
23      A.   Yes.
24      Q.   You understand that it's at the

Page 96

1  very beginning of the public comment period,
2  correct?
3       A.   Yes.
4       Q.   You agree that Health Canada
5  can take up to two years to either take
6  action or no action at all; is that right?
7       A.   I don't know that to be the
8  case, but it very well could be.
9       Q.   How did you come to learn of
10 the Health Canada risk assessment?
11      A.   I believe the attorneys let me
12 know about it.
13      Q.   The attorneys for plaintiffs in
14 this matter that retained you?
15      A.   Yes.
16      Q.   Were you involved in the Health
17 Canada risk assessment prior to its
18 publication?
19      A.   No.
20      Q.   Have you submitted any comments
21 to Health Canada?
22      A.   Not yet.
23      Q.   Do you intend to submit
24 comments to Health Canada?

Page 97

1       A.   I might.
2       Q.   What comments do you intend to
3  submit to Health Canada?
4       A.   I haven't formulated them yet.
5       Q.   Outside of litigation, do you
6  generally rely on draft assessments by
7  regulatory agencies?
8       MS. O'DELL:  Object to the
9  form.
10      A.   Yes.
11 BY MR. ZELLERS:
12      Q.   Are you familiar with the
13 precautionary principle?
14      A.   I am.
15      Q.   What is the precautionary
16 principle?
17      A.   The precautionary principle
18 states that changes should take place in the
19 face of a potential hazard until that hazard
20 is proved not to exist.  It's a general
21 precept that's used in the EU, for example,
22 and very different from the one that operates
23 in this country.
24      Q.   The principle in this country

25 (Pages 94 to 97)

Arch I. "Chip"  Carson, M.D., Ph.D.

Page 98

1  is that there needs to be scientific evidence
2  in order to take action; is that right?
3           MS. O'DELL:  Object to the
4        form.
5      A.   Yes, that's correct.
6  BY MR. ZELLERS:
7      Q.   The precautionary principle
8  says even before there's full or complete
9  scientific demonstration of cause and effect,
10 it is appropriate to take a precautionary
11 approach; is that right?
12     A.   That's right.
13     Q.   The Health Canada follows --
14 strike that.
15          Health Canada follows and has
16 adopted a precautionary approach; is that
17 right?
18     A.   Yes.
19     Q.   Please review
20 Deposition Exhibit 14.
21          (Carson Deposition Exhibit 14
22 marked.)
23 BY MR. ZELLERS:
24     Q.   Deposition Exhibit 14 is the

Page 99

1  Health Canada Decision-Making Framework for
2  Identifying, Assessing and Managing Health
3  Risk.
4           Do you see that?
5      A.   Yes.
6      Q.   If you go to page 5 of
7  Exhibit 14 --
8           MS. O'DELL:  Feel free to
9        take -- review the document if you're
10       not familiar with it, Dr. Carson.
11 BY MR. ZELLERS:
12     Q.   One of the underlying
13 principles in the Health Canada
14 decision-making framework is use a
15 precautionary approach; is that right?
16     A.   That's right.
17     Q.   If we go to page 8, Health
18 Canada defines the use of a precautionary
19 approach, and looking at the second sentence:
20 A precautionary approach to decision-making
21 emphasizes the need to take timely and
22 appropriate preventative action, even in the
23 absence of a full scientific demonstration of
24 cause and effect.

Page 100

1           Did I read that correctly?
2      A.   You did.
3      Q.   Is that your understanding of
4  what a precautionary approach is?
5      A.   Yes.  In general, the
6  precautionary principle can be restated that
7  an ounce of prevention is worth a pound of
8  cure.
9      Q.   Health Canada does not require
10 a finding of causation such as required in
11 litigation matters in this country, the
12 United States; is that right?
13     A.   In order to adopt a document
14 that has a significant effect on general
15 public health practices, no, it does not.
16     Q.   The Taher paper, that's another
17 paper that you have reviewed since you
18 published your report; is that right?
19     A.   Which paper?  I'm sorry.
20     Q.   This is what we've marked as
21 Exhibit 7.  You brought it with you here
22 today?
23     A.   Okay.  Yes.
24     Q.   You've read the Taher 2018

Page 101

1  manuscript; is that right?
2      A.   Yes.
3      Q.   Where did you obtain that
4  manuscript from?
5      A.   This was obtained directly from
6  one of the coauthors on this study to the
7  plaintiffs' attorneys, who passed it along to
8  me.
9      Q.   So one of the coauthors on this
10 study gave it to the plaintiffs' counsel, who
11 then gave it to you; is that right?
12     A.   That's correct.
13     Q.   Who was the author of this
14 publication, Exhibit 7, that provided the
15 paper to plaintiffs' counsel, if you know?
16     A.   I don't recall.
17     Q.   But one of these authors; is
18 that right?
19     A.   It would -- yes.
20     Q.   Why did you not include this
21 paper on either your reliance list or your
22 literature list?
23     A.   I didn't have it at the time
24 that those were formulated.

26 (Pages 98 to 101)

Arch I. "Chip"  Carson, M.D., Ph.D.

Page 102

1    Q.    Did you have access to the
2  appendices and supplemental tables that are
3  referred to in the Taher 2018 publication
4  which we've marked as Exhibit 7?
5    A.    The ones that are not in
6  this -- in this document or --
7    Q.    Yes.
8    A.    Those -- I have not thoroughly
9  examined those, but I do have access to them.
10    Q.    How do you have access to those
11  appendices and supplemental tables?
12    A.    They were also provided to me
13  by plaintiffs' counsel.
14    Q.    Has the Taher publication,
15  which we've marked as Exhibit 7, been peer
16  reviewed?
17    A.    It's in the process.  This is a
18  manuscript that's just been accepted for
19  publication, so it has gone through peer
20  review.
21    Q.    It has gone through peer
22  review --
23    A.    That's my understanding.
24    Q.    -- and Exhibit 7 is the article

Page 103

1  that you believe will be published; is that
2  right?
3    A.    This is a -- this is a working
4  manuscript which has gone through at least
5  part of the peer-review process.  There may
6  be minor edits that occur to this, but this
7  is substantially the final article.
8    Q.    How do you know that?
9    A.    That's the general process of
10  submitting publications to peer-reviewed
11  article -- journals.
12    Q.    How do you know -- I'm sorry,
13  did you finish?
14    A.    I'm finished.
15    Q.    How did you know the status of
16  the peer-review process with respect to
17  Exhibit 7?
18    A.    Because it's been accepted for
19  publication.
20    Q.    How do you know that?
21    A.    That, I was told by the
22  plaintiffs' attorneys.
23    Q.    And you've accepted that; is
24  that right?

Page 104

1    A.    Yes, I have.
2    Q.    Do you know any of the authors
3  of this paper, Exhibit 7?
4    A.    No, I don't.
5    Q.    Do you know the source of
6  funding for this paper?
7    A.    I -- I think the sources of
8  funding are mentioned in here.
9    Q.    Other than what's mentioned in
10  the paper, Exhibit 7, do you have any
11  knowledge as to the sources of funding?
12    A.    There's a combination of
13  sources.  In part, this work is funded
14  through the plaintiffs' attorneys.
15    Q.    Have you communicated with any
16  of the authors of this paper?
17    A.    No.
18    Q.    Do you know the credentials of
19  any of the authors of this paper?
20    A.    I haven't investigated that.
21    Q.    In your epidemiological work
22  outside of litigation, do you rely on
23  articles that are funded at least in part by
24  plaintiffs' counsel in litigation?

Page 105

1    A.    If the articles represent good
2  science, I don't really pay much attention or
3  worry about the funding source.
4    Q.    Do you know what conflicts of
5  interest any of the authors have?
6    A.    I don't know specifically.  I
7  can't recall if they're outlined in here.
8  But the -- those are also evaluated based on
9  the peer-review process.
10    Q.    Do you know whether some of the
11  authors are serving as consultants to
12  plaintiffs' counsel in this litigation?
13    A.    I know that -- no, I don't know
14  that.  Excuse me, I gave an incorrect answer.
15    Q.    Sure.  Correct it, please.
16    A.    I mentioned that part of the
17  funding for this research came from
18  plaintiffs' counsel, and I'm not -- I don't
19  know that that's the case.  I was thinking of
20  another research report when I said that.
21    Q.    Do you know whether or not, at
22  least in part, funding for this paper, the
23  Taher paper, came from plaintiffs' counsel?
24    A.    No, I don't.

27 (Pages 102 to 105)

Arch I. "Chip"  Carson, M.D., Ph.D.

Page 106

1     Q.    Taher, this paper, Exhibit 7,
2  concludes that asbestos contamination does
3  not explain ovarian cancer, correct?
4     A.    It does come to that general
5  conclusion.
6     Q.    That's a different conclusion
7  than you have formulated in this matter; is
8  that right?
9     A.    No, it's not.
10    Q.    You agree that asbestos
11 contamination does not explain ovarian
12 cancer; is that right?
13    A.    It doesn't completely explain
14 ovarian cancer.
15    Q.    Does it explain ovarian cancer?
16       MS. O'DELL:  Objection, asked
17   and answered.
18    A.    I -- I don't believe it
19 completely explains ovarian cancer, no.
20 BY MR. ZELLERS:
21    Q.    Turn to page 41 of Exhibit 7.
22 Look at the last three lines of the paper.
23 The authors of the Taher publication state:
24 The similarity of findings between studies

Page 107

1  published prior to and after this point
2  suggest asbestos contamination does not
3  explain the positive association between
4  perineal use of talc powder and the risk of
5  ovarian cancer.
6       Did I correctly state their
7  conclusion?
8     A.    Well, there was a final clause
9  of the sentence, but yes, you correctly read
10 that.
11    Q.    The Taher authors also
12 discussed the lack of consistency among the
13 various talcum powder studies; is that right?
14       MS. O'DELL:  Object to the
15   form.
16    A.    I'm sorry, could you repeat
17 that question?
18 BY MR. ZELLERS:
19    Q.    Sure.
20       You looked at the Bradford Hill
21 factors in formulating your opinion; is that
22 right?
23    A.    Yes.
24    Q.    One of the Bradford Hill

Page 108

1  factors is consistency; is that right?
2     A.    Yes.
3     Q.    You, in fact, are opining in
4  this case that there is consistency among the
5  talcum powder ovarian cancer studies and
6  publications; is that right?
7     A.    Yes.
8     Q.    The authors of the Taher paper
9  disagree with that conclusion; is that right?
10       MS. O'DELL:  Object to the
11   form.
12    A.    I don't think they disagree
13 with that.
14 BY MR. ZELLERS:
15    Q.    Turn to page 25, Table 2.  This
16 is, again, something that you have reviewed
17 in preparation for your deposition; is that
18 right?
19    A.    Well, I didn't review it in
20 preparation for the deposition, but I've
21 reviewed it recently.
22    Q.    At the request of plaintiffs'
23 counsel, correct?
24    A.    Yes.

Page 109

1     Q.    Table 2 is a summary of
2  evidence for each of the Hill criteria of
3  causation as applied to perineal application
4  of talc and ovarian cancer.
5       Do you see that?
6     A.    Yes.
7     Q.    Under Consistency, they state
8  that 15 out of 30 studies reported positive
9  and significant associations; is that right?
10    A.    Yes.
11    Q.    15 out of 30, that's 50%,
12 right?
13    A.    Yes.
14    Q.    50% is no better than a coin
15 toss; is that right?
16       MS. O'DELL:  Object to the
17   form.
18    A.    Well, I would have to also
19 mention that the majority of those 30 studies
20 found positive associations.  These are the
21 ones that showed positive associations that
22 rose to the level of statistical
23 significance.
24       ///

28 (Pages 106 to 109)

Arch I. "Chip"  Carson, M.D., Ph.D.

1  BY MR. ZELLERS:
2      Q.   If an association is not
3  statistically significant, then it can be due
4  to chance; is that right?
5      A.   But if it's due to chance over
6  and over and over again, and you keep getting
7  a positive association, that argues very
8  strongly against the chance as being the only
9  factor.
10     Q.   Can you answer my question: A
11  lack of a statistically significant
12  association is consistent with or can be
13  consistent with no risk, correct?
14         MS. O'DELL:  Objection to form,
15     asked and answered.
16     A.   If you're referring to an
17  individual study, that might be the case;
18  however, when considering the Bradford Hill
19  criterion of consistency, you look at the
20  overall body of the literature and what it
21  tells you.
22         There's an obvious statistical
23  trend toward positive connection between
24  talcum powder perineal application and the

1  occurrence of ovarian cancer, and the more
2  evidence that mounts, the more strongly that
3  association is proven.
4  BY MR. ZELLERS:
5      Q.   Would you say that 15 out of 30
6  means there are consistent results across
7  studies?
8      A.   I think I've just explained to
9  you how I believe there are consistent
10  results across studies.
11     Q.   The authors of the Taher paper
12  also conclude that they do not find a
13  consistent dose-response in the papers that
14  look at perineal application of talc and
15  ovarian cancer; is that right?
16         MS. O'DELL:  Object to the
17     form.
18     A.   Well, what they actually say is
19  that about half of the epidemiological
20  studies assess only one level of talc
21  exposure, ever versus never.  So it's not
22  possible from those studies to establish a
23  biological gradient.
24         However, there are a number of

1  studies that have shown a biological gradient
2  at -- especially in relation to some of the
3  subtypes of ovarian cancer.
4  BY MR. ZELLERS:
5      Q.   And I'm going to ask you about
6  those questions, but right now I'm just
7  asking you about the Taher paper.
8      A.   Well, I'm trying to just
9  completely answer your question.
10     Q.   I'm asking you about the Taher
11  paper.  You understand?
12     A.   Yes.  This is all from the
13  Taher paper that I read you.
14     Q.   Section 3.3.1 talks about
15  evidence from human studies.  That's on
16  page 20; is that right?
17     A.   Yes.
18     Q.   This section talks about
19  whether or not there is a consistent
20  dose-response found in those studies; is that
21  right?
22         MS. O'DELL:  What sentence are
23     you pointing to?
24         MR. ZELLERS:  I'm asking the

1  doctor questions based upon his review
2  of the paper, Ms. O'Dell.
3         MS. O'DELL:  Okay.  Feel free
4     to review it, Doctor, if you need to.
5         THE WITNESS:  I'm just taking a
6     look at this section.
7  BY MR. ZELLERS:
8      Q.   And if it helps you, look on
9  page 21, lines 174 through 177.
10         (Document review.)
11  BY MR. ZELLERS:
12     Q.   I only want to ask you about
13  two sentences.  Are you ready for me to ask
14  you my question?
15     A.   Just one moment, please.
16     Q.   Sure.
17         (Document review.)
18         THE WITNESS:  All right, I'm
19     ready for your question.
20  BY MR. ZELLERS:
21     Q.   The Taher paper states that
22  many of the studies only reported on the
23  ovarian cancer risk assessing one exposure
24  category and that exposure response analyses

29 (Pages 110 to 113)

Arch I. "Chip" Carson, M.D., Ph.D.

Page 114

1  were not done in all studies; is that right?
2      A.  Yes.
3      Q.  When conducted, findings from
4  trend analyses were not consistent; is that
5  correct?
6          MS. O'DELL:  Object to the
7      form.
8      A.  Yes.
9  BY MR. ZELLERS:
10     Q.  All right.  With respect -- I'm
11 done with that paper.
12         You discuss your opinion
13 number 1 on page 7 of your report; is that
14 right?
15     A.  Yes.
16     Q.  You first state on page 7 that
17 you believe talcum powder is immunogenic and
18 produces chronic inflammation in the tissues;
19 is that right?
20     A.  Yes.
21     Q.  You state that other components
22 in talcum powder, including mineral fibers,
23 asbestos, fibrous talc, carcinogenic metals
24 and other chemicals intensify the

Page 115

1  inflammatory response and stimulate cell
2  growth and proliferation; is that right?
3      A.  Yes.
4      Q.  Other than asbestos, what
5  mineral fibers in talc intensify the
6  inflammatory response?
7      A.  Well, the endogenous fibrous
8  talc fibers also intensify the response.
9      Q.  Other than asbestos and fibrous
10 talc fibers, what mineral fibers in talc do
11 you believe intensify the inflammatory
12 response?
13     A.  I'm not really able to answer
14 that question because I don't have a specific
15 opinion about it.  I'm not a geologist.
16     Q.  Are the other chemicals that
17 you refer to in this section fragrance
18 chemicals?
19     A.  Yes.
20     Q.  Any others?
21     A.  None that are intentionally
22 added.
23     Q.  You claim, again on page 7,
24 that talcum powder produces chronic

Page 116

1  inflammation in the tissues in which it
2  sequesters; is that right?
3      A.  Yes.
4      Q.  Assuming for the moment that
5  talc can reach the ovaries, is it your
6  opinion that talc produces chronic
7  inflammation in the ovaries and that this
8  somehow leads to ovarian cancer?
9      A.  It is my opinion that talc
10 produces chronic inflammation in the
11 epithelial tissues of the ovaries and
12 surrounding epithelial tissues and leads to
13 both carcinogenesis initiation and promotion.
14     Q.  There are no reports in the
15 literature of externally applied talc leading
16 to inflammation, granulomas, fibrosis or
17 adhesions anywhere along a woman's
18 reproductive tract, correct?
19         MS. O'DELL:  Object to the
20     form, asked and answered.
21     A.  Well, that's similar to the
22 question that you asked earlier, and although
23 I'm not aware of experimental reports that
24 specifically jive with that condition,

Page 117

1  certainly there are a lot of theoretical
2  reports that have been published.
3          For example, Dr. Ness' article
4  from '99 lays out the theory of inflammation
5  and relates that to talc exposure from
6  perineal application.
7  BY MR. ZELLERS:
8      Q.  This is your colleague,
9  Dr. Ness; is that right?
10     A.  Ness, and Coussens, when she
11 was at Pittsburgh.
12     Q.  Dr. Ness, you showed her your
13 report and asked for her comments; is that
14 right?
15     A.  I didn't show her the report.
16     Q.  Well, you talked to her about
17 and showed her your conclusions and your
18 opinions; is that right?
19     A.  No, I talked to her about the
20 paper.
21     Q.  Her paper?
22     A.  Yes.
23     Q.  Did you share with her that you
24 were going to be an expert for the plaintiffs

30 (Pages 114 to 117)

Arch I. "Chip"  Carson, M.D., Ph.D.

Page 118

1  in this litigation?
2      A.    No, I didn't.
3      Q.    Did she wonder or ask why it
4  was that you were researching or looking into
5  this issue?
6      A.    She -- I think she may have,
7  yeah.
8      Q.    And what did you tell her?
9      A.    I told her I had been recently
10  asked to look into it.
11      Q.    Did you tell her that you'd
12  been asked to look into it by counsel for
13  plaintiffs in the talc litigation?
14      A.    No, I didn't.
15      Q.    And that never came up; is that
16  right?
17      A.    It didn't.
18      Q.    And she never talked to you or
19  told you about her experience and her work as
20  counsel -- strike that, as an expert for
21  plaintiffs; is that your testimony?
22      A.    Yes.  It was a very brief
23  conversation.
24      Q.    If up to 50% of all U.S. women

Page 119

1  have used genital talc, shouldn't there be
2  studies which have shown inflammation,
3  granulomas, fibrosis or adhesions in a
4  woman's reproductive tract?
5          MS. O'DELL:  Object to the
6      form.
7      A.    Well, there are studies that
8  show those things.
9  BY MR. ZELLERS:
10      Q.    Please, tell me the published
11  studies that demonstrate inflammation,
12  granulomas, fibrosis or adhesions in a
13  woman's reproductive tract from externally
14  applied talc?
15      A.    Well, you're adding a new
16  condition now.
17      Q.    I'm sorry if I didn't add that
18  before.
19      A.    There are multiple studies that
20  show inflammation and other inflammatory
21  reactions in connection with the occurrence
22  of ovarian cancer.
23          The piece that you're now
24  asking for is the external application of

Page 120

1  talc relating to that, and to my knowledge,
2  there are no experimental reports or case
3  reports that can document that at the current
4  time.
5      Q.    Granulomas, fibrosis and
6  adhesions do not cause ovarian cancer,
7  correct?
8          MS. O'DELL:  Object to the
9      form.
10      A.    The inflammatory process that
11  is intimately connected with granuloma
12  formation may well be the same process that
13  results in mutation and promotion of ovarian
14  cancer.  So I -- I could not agree completely
15  with your statement.
16  BY MR. ZELLERS:
17      Q.    Is there a good scientific
18  basis today to opine that granulomas,
19  fibrosis or adhesions cause ovarian cancer?
20          MS. O'DELL:  Object to the
21      form.
22      A.    No, I don't think they cause
23  ovarian cancer.
24          ///

Page 121

1  BY MR. ZELLERS:
2      Q.    Would you agree that not all
3  inflammatory conditions lead to cancer?
4      A.    Yes.
5      Q.    It's true that all of us
6  experience inflammatory reactions of one sort
7  or another, including chronic conditions,
8  that do not lead to cancer, correct?
9      A.    That's correct.  Although there
10  is a strong relationship between inflammatory
11  processes and the occurrence of cancers, and
12  some of those inflammatory diseases that
13  you're referring to also have associations
14  with increased rates of cancers.
15          MR. ZELLERS:  Move to strike as
16      nonresponsive.
17  BY MR. ZELLERS:
18      Q.    Rheumatoid arthritis is an
19  inflammatory condition; is that right?
20      A.    Yes, it is.
21      Q.    Does it increase the risk of
22  ovarian cancer?
23      A.    I think I -- it does -- it's
24  not associated with ovarian cancer, but I

31 (Pages 118 to 121)

Arch I. "Chip"  Carson, M.D., Ph.D.

Page 122

1  think it may be associated with other
2  cancers.
3      Q.   Does -- strike that.
4          Is psoriasis an inflammatory
5  condition?
6      A.   Generally, it is.
7      Q.   Is it associated with an
8  increased risk of ovarian cancer?
9      A.   Not that I'm aware.
10     Q.   In your report you state that
11  inflammation is a normal body process that
12  leads to the thwarting of infection and rapid
13  healing; is that right?
14     A.   That's correct.
15     Q.   If your inflammation theory is
16  correct, why doesn't inflammation generally,
17  such as in pelvic inflammatory disease, cause
18  ovarian cancer?
19     A.   It may do so.
20     Q.   You are opining under oath here
21  that pelvic inflammatory disease causes
22  ovarian cancer?
23     A.   I think there are experts who
24  have concluded that.

Page 123

1      Q.   What study are you relying on
2  for that opinion or statement?
3      A.   That's not part of the opinions
4  that I've been asked to consider in this --
5  in this case.
6      Q.   As you sit here, can you cite
7  me a publication or a study that finds that
8  pelvic inflammatory disease causes ovarian
9  cancer?
10         MS. O'DELL:  Object to the
11     form.
12     A.   Well, I have -- I have a list
13  of studies that relate inflammation to
14  ovarian cancer and other cancers.
15  BY MR. ZELLERS:
16     Q.   Can you name me a study or a
17  publication?
18     A.   Okay.  I think I have my list
19  here.
20     Q.   You brought other materials
21  with you?
22     A.   I brought this list.
23     Q.   All right.  Well, what list are
24  you pulling out of your pocket?

Page 124

1      A.   This is a list that I've put
2  together of some of the studies I've
3  considered and how they relate to things I
4  might testify to today.
5      Q.   Why did you not tell me about
6  your list that you brought with you today
7  before now?
8      A.   Well, I'm telling you about it
9  now.
10     Q.   My question is why did you not,
11  when I asked you what you brought to the
12  deposition today, not take the list out and
13  show us the list?
14     A.   I didn't think of it.
15     Q.   Okay.  We'll mark your list as
16  Deposition Exhibit 15.
17         (Carson Deposition Exhibit 15
18     marked.)
19  BY MR. ZELLERS:
20     Q.   These are a number of notes,
21  four pages of notes.  Are these all your
22  notes?
23     A.   Yes.
24     Q.   First page has got a section of

Page 125

1  articles on asbestos and ovarian cancer; is
2  that right?
3      A.   Yes.
4      Q.   It also has inflammation and
5  cancer and a number of studies; is that
6  right?
7      A.   Yes.
8      Q.   Second page has got cohort,
9  where you've listed out the four cohort
10  studies; is that right?
11     A.   Yes.
12     Q.   Beneath that are the
13  meta-analyses where you've listed those out
14  and made some notes on those, correct?
15     A.   Yes.
16     Q.   The back page of the second
17  page has got a listing of a number of the
18  case-control studies, correct?
19     A.   Yes.  Those are duplicated on
20  another page.
21     Q.   The third page has got a
22  section on migration and studies that you're
23  looking at for that proposition, correct?
24     A.   Correct.

32 (Pages 122 to 125)

Arch I. "Chip"  Carson, M.D., Ph.D.

Page 126

1    Q.    Underneath that, ovarian cancer
2  risk; is that right?
3    A.    Yes.
4    Q.    Underneath that, talc and other
5  cancer; is that right?
6    A.    Yes.
7    Q.    And then on the last page,
8  page 4, is a listing of the case-control
9  studies with the odds ratios and confidence
10  intervals; is that right?
11    A.    For the most part, yes.
12    Q.    All right.  So looking now at
13  your list of studies that you have prepared,
14  which study demonstrates or supports the
15  proposition that pelvic inflammatory disease
16  causes ovarian cancer?
17    A.    Looking through here, I don't
18  have that item specifically in my notes, but
19  I'm just using my notes to refresh my memory
20  about the individual research report.  I
21  think the Coussens and Werb paper from 2010
22  talks about general mechanisms of
23  inflammation in relation to the occurrence of
24  ovarian cancer.

Page 127

1        And there's the Ness and
2  Cottreau paper from '99.
3        Okada has discussed it in the
4  2007 paper.  And there's a paper from 2001
5  which is Balkwill and Mantovani which
6  discusses the relationship between talc and
7  ovarian cancer and also discusses the
8  relationship to other sources of
9  inflammation.
10    Q.    Each of those papers that
11  you've identified you believe state that
12  pelvic inflammatory disease is a cause of
13  ovarian cancer, correct?
14        MS. O'DELL:  Object to the
15    form.
16    A.    Well, I don't think they state
17  that in so many words, but if you read the
18  paper and you understand that -- what pelvic
19  inflammatory disease is and its relationship
20  to inflammatory processes in general, yes,
21  that's what they're saying.
22  BY MR. ZELLERS:
23    Q.    Doctor, my question to you was:
24  Are you aware of any papers in which the

Page 128

1  authors conclude that pelvic inflammatory
2  disease causes ovarian cancer?  Do you
3  believe each of the authors in the studies
4  that you've identified, that their studies
5  stand for that proposition?
6        MS. O'DELL:  Object to form,
7    asked and answered.
8    A.    I think all of the studies that
9  I've identified for this question do allude
10  to that, yes.
11  BY MR. ZELLERS:
12    Q.    That pelvic inflammatory
13  disease causes ovarian cancer, correct?
14    A.    That it is a -- it's a factor,
15  yes.
16    Q.    It's a cause.  That's what they
17  state in those papers, right?
18        MS. O'DELL:  Object to the
19    form.
20  BY MR. ZELLERS:
21    Q.    That's your testimony?
22        MS. O'DELL:  Excuse me,
23    misstates his testimony.  Object to
24    the form.

Page 129

1    A.    I would say it's a factor and
2  leave it at that.
3  BY MR. ZELLERS:
4    Q.    All right.  Are you familiar
5  with pleurodesis?
6    A.    I am.
7    Q.    Does a pleurodesis cause
8  cancer?
9    A.    It is not known to, although it
10  might.
11    Q.    Are you familiar with the
12  study, 1979, A survey of the long-term
13  effects of talc and kaolin pleurodesis?
14    A.    Can tell me who the author of
15  that was?
16    Q.    Sure.  The author is -- this is
17  from the Research Committee of the British
18  Thoracic Association.  The members of the
19  subcommittee were Chappell, Johnson, Charles,
20  Wagner, Seal, Berry and Nicholson.
21        Are you familiar with that
22  paper?
23    A.    I'm not familiar with the
24  paper.  I may have looked at it in the past.

33 (Pages 126 to 129)

Arch I. "Chip"  Carson, M.D., Ph.D.

Page 130

1    Q.    We'll take a look at it.  We'll
2   mark it as Deposition Exhibit 16.
3        (Carson Deposition Exhibit 16
4   marked.)
5    A.    Thank you.
6        MS. O'DELL:  Thank you.
7   BY MR. ZELLERS:
8    Q.    This was a study that looked at
9   the association between pleurodesis and lung
10  cancer; is that right?
11   A.    Yes.
12   Q.    It's a study that you cite on
13  page 1 of your literature list; is that
14  right?
15   A.    Okay.  Yes.
16   Q.    So you've read it; is that
17  right?
18   A.    I have.
19   Q.    You've considered it; is that
20  right?
21   A.    Yes.
22   Q.    They looked at 210 patients
23  that underwent a pleurodesis with talc or
24  kaolin 14 to 40 years before; is that right?

Page 131

1    A.    That's correct.
2    Q.    And they found that there was
3   no increased incidence of lung cancer and no
4   cases of mesothelioma; is that right?
5    A.    That's correct.
6    Q.    Why don't -- well, strike that.
7        You're aware of the studies
8   that have looked at antiinflammatory drugs
9   and aspirin use with respect to whether or
10  not they're associated with -- let me
11  withdraw that.
12       Are you familiar with the NSAID
13  and aspirin use studies relating to the
14  incidence of ovarian cancer in chronic users?
15   A.    I'm familiar with some of
16  those, yes.
17   Q.    If your theory is correct that
18  inflammation causes ovarian cancer, then you
19  would expect that the studies of NSAIDs and
20  aspirin use, antiinflammatory drugs that
21  reduce inflammation, would consistently
22  reduce the incidence of ovarian cancer,
23  correct?
24       MS. O'DELL:  Object to the

Page 132

1   form.
2    A.    I think that was the hypothesis
3   of those research reports.
4   BY MR. ZELLERS:
5    Q.    And, in fact, the NSAID studies
6   do not find a consistent causal reduction in
7   the risk of ovarian cancer; is that right?
8    A.    I think that's correct.
9    Q.    In your report you also state
10  that studies show that use of cornstarch
11  instead of talcum powder reduces the risk of
12  ovarian cancer; is that right?
13   A.    Yes.
14   Q.    If inflammation causes cancer,
15  why would cornstarch be a superior
16  alternative to talc?
17   A.    The reason is that cornstarch,
18  being a biological product, is much -- it
19  does have a rapid clearance from the body,
20  even when sequestered, in comparison with a
21  mineral substance like talc.
22   Q.    Well, in fact, cornstarch
23  causes or increases the risk of inflammation,
24  granulomas, fibrosis and adhesions, correct?

Page 133

1    A.    It may, yes.
2    Q.    Just like you claim talcum
3   powder increases the risk of inflammation,
4   granulomas, fibrosis and adhesions; is that
5   right?
6        MS. O'DELL:  Object to the
7   form.
8    A.    I think you are -- you're
9   parsing terms here.  That list of things were
10  your words.  I was agreeing with the
11  relationship between talc and inflammation in
12  ovarian epithelial tissue and the production
13  or granulomas.  I did not discuss the
14  relationship between talc and adhesions or
15  fibrosis.  There was one other thing on your
16  list.
17  BY MR. ZELLERS:
18   Q.    Well, in fact, the FDA has
19  banned the use of cornstarch as a powder for
20  lubricating surgical gloves; is that right?
21   A.    It has, but that's not the
22  reason.
23   Q.    Well, the reason that they
24  banned the use of cornstarch is because it

34 (Pages 130 to 133)

Arch I. "Chip"  Carson, M.D., Ph.D.

Page 134

1    presented an unreasonable and substantial
2    risk of illness or injury and that that risk
3    cannot be corrected or eliminated by
4    labeling, correct?
5        A.    I don't know the specific
6    language.  It looks like you're reading from
7    a Federal Register document.
8        The main reason that cornstarch
9    has been banned as a lubricant in gloves is
10   because of the potential for transmission of
11   primarily respiratory problems through
12   inhalation, mostly by co-workers, not by
13   patients.
14       Q.    You do agree that cornstarch
15   has been banned by the FDA for use in
16   surgical gloves; is that right?
17       A.    All powdered gloves have been
18   essentially banned from hospitals and
19   operating rooms now.
20       Q.    You also talk about
21   inflammation and oxidative stress; is that
22   right?
23       A.    Yes.
24       Q.    Does the presence of oxidative

Page 135

1    stress in a tissue indicate that cancer will
2    develop in that tissue?
3        A.    No.
4        Q.    If exposure to a substance
5    causes oxidative stress in certain tissue,
6    does that mean exposure of all other tissues
7    to that substance will cause oxidative stress
8    in those tissues?
9        A.    Not necessarily.
10       Q.    Does the body have protective
11   mechanisms that can limit tissue damage from
12   oxidative stress?
13       A.    Yes.
14       Q.    Do all substances that cause
15   oxidative stress also cause cancer?
16       A.    I'm not sure the answer to that
17   question is known.
18       Q.    Are there any studies or
19   publications that indicate that oxidative
20   stress is involved in the development of
21   ovarian cancer?
22       A.    If I can define the term
23   "oxidative stress," I could give you an
24   answer to that, that question.

Page 136

1        Q.    Why do you have to have a
2    special definition of "oxidative stress"?
3    I'm asking simply:  Is there a publication or
4    a study which documents that oxidative stress
5    is involved in the development of ovarian
6    cancer?
7        MS. O'DELL:  Object to the
8    form.
9        A.    Sure.
10   BY MR. ZELLERS:
11       Q.    And what paper are you going to
12   point me to?
13       A.    Well, I'll point you to the
14   Ness paper to begin with, because it was one
15   of the earlier papers that related oxidative
16   stress from talc to the occurrence of ovarian
17   cancer.  But the relationship between
18   inflammation, which essentially is the source
19   of the oxidative stress, and cancer goes all
20   the way back into the 19th Century in terms
21   of its proposal as a rationale.
22       Q.    Is oxidative stress a variation
23   of inflammation as you're using that term
24   relating to a potential cause of ovarian

Page 137

1    cancer?
2        A.    It's a component of
3    inflammation.
4        Q.    As a toxicologist, how would
5    you define fibrous talc?
6        A.    Fibrous talc is a form of talc
7    that is conformed into elongated structures
8    that have an aspect ratio of length greater
9    than width that is different from the
10   majority of talc which is the platy form.
11       Q.    Do you consider yourself to be
12   an expert on fibrous talc?
13       A.    No, I don't.
14       Q.    Do you consider yourself to be
15   an expert on oxidative stress?
16       A.    I have dealt a lot with issues
17   of oxidative stress and health effects
18   resulting from it.
19       Q.    Do you consider yourself to be
20   an expert in oxidative stress?
21       MS. O'DELL:  Objection, asked
22   and answered.
23       A.    I'm not a specific expert in
24   oxidative stress, but I can -- I can opine

Arch I. "Chip" Carson, M.D., Ph.D.

Page 138

1  regarding my professional understanding and
2  training.
3  BY MR. ZELLERS:
4      Q.    You've never been involved in
5  terms of any research or publication on the
6  subject of oxidative stress and any
7  association with ovarian cancer, correct?
8      A.    Not in terms of ovarian cancer,
9  no.
10     Q.    You have not been involved in
11 any research or publication relating to the
12 subject of inflammation and its association
13 with ovarian cancer, correct?
14     A.    No. All right. Yes, correct.
15     Q.    Yes, it is correct? Okay.
16          You claim that the presence of
17 asbestos and fibrous talc further intensifies
18 the carcinogenic effect of talc; is that
19 right?
20     A.    Yes.
21     Q.    Is that statement different
22 from the statement directly above where you
23 allege that asbestos and mineral fibers
24 intensify the inflammatory response and

Page 139

1  stimulate the cell growth and proliferation?
2      A.    It's not different, no.
3      Q.    Are your opinions dependent on
4  talc containing carcinogenic asbestos and/or
5  fibrous talc?
6      A.    No.
7      Q.    Do you believe that talcum
8  powder without asbestos causes ovarian
9  cancer?
10     A.    I believe talcum powder causes
11 ovarian cancer. I have not seen any research
12 done on talcum powder that has been shown not
13 to contain asbestos.
14     Q.    Your assumption that you have
15 made in formulating your opinions here is
16 that talcum powder contains asbestos; is that
17 right?
18     A.    No.
19     Q.    What assumption have you made
20 as to whether or not talcum powder contains
21 either asbestos or fibrous talc?
22          MS. O'DELL: Object to the
23 form.
24     A.    Looking at the research

Page 140

1  reports, the epidemiology first, is looking
2  at the relationship between perineal use of
3  dusting powders, talcum powders and ovarian
4  cancer.
5          Although there have been
6  efforts in some of those studies to
7  characterize the proportion or the
8  ingredients that would be either asbestos or
9  fibers, that's not done in all cases, and
10 it's not ruled out in any cases.
11         The -- also, the research
12 studies that have been performed, the
13 testing, for example, of the products
14 themselves are replete with reports of
15 components of these powders that are fibrous
16 in nature.
17         MR. ZELLERS: Move to strike as
18 nonresponsive.
19 BY MR. ZELLERS:
20     Q.    Do you believe that all talcum
21 powder products that are on the market
22 contain asbestos?
23         MS. O'DELL: Object to the
24 form.

Page 141

1      A.    I don't know.
2  BY MR. ZELLERS:
3      Q.    Does it matter to your opinion
4  as to whether or not the talcum powder
5  products, and particularly the talcum powder
6  products involved in this case, contain
7  asbestos?
8      A.    I wouldn't have a way to be
9  able to answer that yes or no.
10     Q.    Do you -- strike that.
11         Have you reached a conclusion
12 as to whether or not the talcum powder
13 products involved in this case contain
14 fibrous talc?
15     A.    I think that most of them do.
16     Q.    Does all of the talcum powder
17 contain fibrous talc or just some of it?
18     A.    Certainly a lot of it does.
19     Q.    The basis for your conclusion
20 that the talcum powder at issue in this case
21 contains fibrous talc is the testing reports
22 that plaintiffs' attorneys gave you?
23         MS. O'DELL: Object to the
24 form.

Arch I. "Chip"  Carson, M.D., Ph.D.

Page 142

1    A.    Yes.  Also Longo's publications
2 and reports.
3 BY MR. ZELLERS:
4    Q.    You have reviewed the Longo
5 reports; is that right?
6    A.    Yes.
7    Q.    Have you ever met with him?
8    A.    No.
9    Q.    Do you know his qualifications?
10    A.    I looked at his qualifications
11 at one point, but I don't recall exactly what
12 it is at this stage.
13    Q.    Ever hear of him before this
14 lawsuit, your getting involved in the talc
15 litigation back in October of 2018?
16    A.    No.
17    Q.    Have you reviewed any of
18 Longo's testing where he did not find
19 asbestos?
20    A.    I -- the only thing I've
21 reviewed are what's present in those reports
22 that I cited.
23    Q.    Were you provided by counsel
24 for plaintiffs with any testing reports from

Page 143

1 Longo where he did not find asbestos?
2    A.    There are some of those listed
3 in his reports.
4    Q.    Have you reviewed the FDA's
5 testing of talcum powder products?
6    A.    The FDA didn't really do much
7 testing of talcum powder products.
8    Q.    Have you reviewed the FDA's
9 testing of talcum powder products?
10    MS. O'DELL:  Objection, vague.
11    A.    The only FDA testing that I
12 looked at was the -- I have it referenced in
13 my list, but the FDA, based on a
14 recommendation, requested samples from
15 various companies, I think nine different
16 sources of talc.  They received four and
17 tested those.  And based on their test method
18 determined that there was not a -- not
19 evidence of a significant hazard.
20 BY MR. ZELLERS:
21    Q.    Have you made any effort to
22 quantify the amount of any alleged
23 contaminant in the Johnson & Johnson Consumer
24 talcum powder?

Page 144

1    MS. O'DELL:  Object to the
2 form.
3    A.    That wasn't my charge.  I defer
4 to the other experts in this case.
5 BY MR. ZELLERS:
6    Q.    Do you have an opinion on what
7 type of asbestos you believe is in the talcum
8 powder products at issue in this case?
9    A.    Well, there have been various
10 types shown, but I think for the most part
11 it's tremolite and anthophyllite.
12    Q.    Are you familiar with
13 crocidolite?
14    A.    Yes.
15    Q.    Is crocidolite found in talcum
16 powder or baby powder?
17    A.    It's not commonly found in it.
18    Q.    You believe that the
19 asbestos -- types of asbestos that may be in
20 the talcum powder at issue in this case is
21 tremolite and acidolite [sic]?
22    MS. O'DELL:  Objection.
23    A.    Anthophyllite.  There are
24 others found, but you asked for most common.

Page 145

1 BY MR. ZELLERS:
2    Q.    Most common you believe are
3 tremolite and anthophyllite?
4    A.    Anthophyllite.
5    Q.    Anthophyllite.  Those two; is
6 that right?
7    A.    Yes.
8    Q.    What types of asbestos are
9 associated with ovarian cancer?
10    A.    Well, I'll go back to my list
11 again.  Crocidolite is associated with
12 ovarian cancer in the Acheson report from
13 1982, which was from female gas mask
14 manufacturers in England who made gas masks
15 during the period of the Second World War,
16 and crocidolite is associated with that with
17 a fairly high relative risk of 2.96.
18 Chrysotile asbestos had also a positive
19 relative risk of 1.74.
20    There was a study of factory
21 workers and pipe laggers in east London,
22 which is the Berry report from 2000, that
23 showed a relative risk of 2.53, and those
24 workers were exposed to primarily asbestos

37 (Pages 142 to 145)

Arch I. "Chip"  Carson, M.D., Ph.D.

Page 146

1     cement products and plasters, so the --
2         Q.    What type of asbestos, if you
3     know?
4         A.    That would have been primarily
5     amphibole asbestos types, which would include
6     crocidolite and tremolite and anthophyllite,
7     amosite is in that category.
8             Bertolotti in 2008 published a
9     report -- actually, there were several
10    reports that resulted from the Eternit
11    factory studies in Casale Monferrato in
12    Italy, which was a plant that manufactured
13    cement sheet and corrugated tubing, and there
14    were a number of studies that showed elevated
15    relative risks in persons exposed to asbestos
16    in that work, and that would also have been
17    amphibole asbestos types.
18        Q.    The studies that you've recited
19    for us, those are all occupational studies;
20    is that right?
21        A.    Yes.  I've got a lot more.
22        Q.    Well, and it's on your list,
23    which we marked as Exhibit 15; is that right?
24        A.    That's correct.

Page 147

1         Q.    All right.  Those studies did
2     not involve the perineal application of
3     talcum powder products; is that right?
4             MS. O'DELL:  Object to the
5     form.
6         A.    It was not a factor in the
7     study.
8     BY MR. ZELLERS:
9         Q.    Crocidolite and chrysotile
10    asbestos has generally not been found in
11    talcum powder products, correct?
12        A.    In general, that's the case.
13        Q.    Was there ever a point in time
14    where you believe that the talcum powder
15    products involved in this case were not
16    contaminated with asbestos?
17            MS. O'DELL:  Objection to form,
18    vague as to time.
19        A.    My understanding is that Imerys
20    and their predecessors and Johnson & Johnson
21    made significant efforts to reduce components
22    of asbestos in their talc products over a
23    number of years and made step-wise progress
24    in doing that.

Page 148

1             But based on my current
2     understanding, I don't believe they've ever
3     been totally successful in doing so.
4             So in answer to your question,
5     which I think was, was there ever a point in
6     time where you believe the talcum powder
7     products involved in this case were not
8     contaminated with asbestos, no.
9     BY MR. ZELLERS:
10        Q.    You cite in your report,
11    page 5, to two exhibits to the depositions of
12    John Hopkins and Julie Pier in support of
13    your opinion that talcum powder products
14    contain asbestos; is that right?
15        A.    That's correct.
16        Q.    Looking at page 5, footnote 1,
17    you cite to Exhibit Hopkins-28 in the Hopkins
18    deposition and Exhibit Pier-47 in the Pier
19    deposition; is that right?
20        A.    That's correct.
21        Q.    Are you aware that those
22    exhibits were created by plaintiffs' counsel?
23            MS. O'DELL:  Objection to form.
24        A.    I didn't -- I -- I don't know

Page 149

1     that and doesn't matter to me.
2     BY MR. ZELLERS:
3         Q.    Do you know where the data in
4     those exhibits come from?
5         A.    Well, they come from the two
6     persons who are testifying who have produced
7     them from their -- mostly from their business
8     records.
9         Q.    Okay.  So you believe that
10    Exhibit Hopkins-28 to the Hopkins deposition
11    and Exhibit Pier-47 to the Pier deposition
12    come from the business records of the
13    Johnson & Johnson Company and Imerys?
14        A.    From the most part, there was
15    a -- there was a table that was constructed
16    during the deposition which was sort of a
17    piece of summary information.  I don't know
18    if it's an exhibit to the deposition or if
19    it's something separate from that, but it
20    would not have been from business records,
21    but occurred at the deposition itself.
22            MS. O'DELL:  Excuse me,
23    Dr. Carson, would you like to see a
24    copy of exhibit -- of the Hopkins

38 (Pages 146 to 149)

Arch I. "Chip"  Carson, M.D., Ph.D.

| Page 150 | Page 152 |
|---|---|
| 1    Exhibit Hopkins-28 and Pier | 1    exhibits you're looking at, |
| 2    Exhibit Pier-47 in answering these | 2    Exhibit Hopkins-28 and Exhibit Pier-47, were |
| 3    questions? | 3    included in talcum powder product sold by J&J |
| 4         THE WITNESS:  If that's easy to | 4    Consumer Products? |
| 5    do, yes. | 5         MS. O'DELL:  Objection to the |
| 6         MS. O'DELL:  It's very easy to | 6    form, asked and answered. |
| 7    do.  This is a copy of | 7    A.    No, I don't. |
| 8    Exhibit Hopkins-28 of the Hopkins | 8    BY MR. ZELLERS: |
| 9    deposition and Exhibit Pier-47 of the | 9    Q.    Have you confirmed -- strike |
| 10   Pier deposition. | 10   that. |
| 11        THE WITNESS:  Okay. | 11        What amount of asbestos |
| 12   BY MR. ZELLERS: | 12   exposure is associated with ovarian cancer? |
| 13   Q.    Dr. Carson? | 13   A.    Any. |
| 14   A.    Yes, sir. | 14   Q.    Your testimony under oath is |
| 15   Q.    Did you make any effort to | 15   that any asbestos exposure is associated with |
| 16   investigate the alternative explanations for | 16   ovarian cancer? |
| 17   the data that's contained in those two | 17   A.    Any asbestos exposure and any |
| 18   exhibits, Exhibit Hopkins-28 and | 18   perineal application of talcum powder is |
| 19   Exhibit Pier-47? | 19   associated with an increased risk for ovarian |
| 20   A.    Alternative explanations, I'm | 20   cancer. |
| 21   not sure what you mean by that. | 21   Q.    The amount of asbestos |
| 22   Q.    If the Johnson & Johnson | 22   contained -- or allegedly contained within |
| 23   company -- companies' scientists and Imerys' | 23   the baby powder is of no consequence, |
| 24   scientists opined that those tests don't | 24   correct? |

| Page 151 | Page 153 |
|---|---|
| 1    actually show asbestos, you have no expertise | 1         MS. O'DELL:  Object to the |
| 2    to dispute that, do you? | 2    form. |
| 3         MS. O'DELL:  Object to the | 3    A.    No, it is of consequence, and a |
| 4    form. | 4    larger dose would be a greater hazard.  But |
| 5    A.    No, I don't have any personal | 5    that doesn't mean that a low dose is not a |
| 6    expertise to dispute that. | 6    hazard. |
| 7    BY MR. ZELLERS: | 7    BY MR. ZELLERS: |
| 8    Q.    Do you know whether or not any | 8    Q.    My question is:  Do you know |
| 9    of the talc product that is identified on | 9    the amount of alleged asbestos exposure |
| 10   Exhibit Hopkins-28 and Exhibit Pier-47 was | 10   that's associated with ovarian cancer? |
| 11   actually used in the talcum powder products | 11   A.    No. |
| 12   that were sold by the Johnson & Johnson | 12   Q.    Do you know the type of ovarian |
| 13   Consumer Products company? | 13   cancer that asbestos is associated with? |
| 14        MS. O'DELL:  Objection to form. | 14        MS. O'DELL:  Object to the |
| 15   A.    I -- it's my understanding that | 15   form. |
| 16   some of these results, at least -- in | 16   A.    It's associated mostly with the |
| 17   particular from the Pier deposition, that | 17   collection of epithelial ovarian cancers -- |
| 18   some of these results were from testing that | 18   BY MR. ZELLERS: |
| 19   was done on material that had already been | 19   Q.    What -- |
| 20   shipped and probably incorporated into | 20   A.    -- primarily serous. |
| 21   products. | 21   Q.    Does the type of ovarian cancer |
| 22   BY MR. ZELLERS: | 22   vary based upon the type of asbestos? |
| 23   Q.    Do you know whether or not any | 23   A.    Not that I'm aware of. |
| 24   of the talc that is referred to on the two | 24   Q.    You believe that all types of |

Arch I. "Chip"  Carson, M.D., Ph.D.

Page 154

1  asbestos can produce all types of ovarian
2  cancer; is that correct?
3          MS. O'DELL:  Object to the
4  form.
5      A.   I suspect that some forms of
6  asbestos are much more carcinogenic than
7  others, and that would be true for the
8  ovaries as well as other structures in the
9  body.
10 BY MR. ZELLERS:
11     Q.   Are you able to distinguish for
12 us what types of asbestos cause or are
13 associated with what types of ovarian cancer?
14     A.   I don't think I'm able to make
15 those distinctions, but the studies I just
16 read to you regarding the relationship
17 between asbestos and ovarian cancer and the
18 others on my list do indicate that there are,
19 for example, in the Acheson study, there
20 were -- there was a positive relationship
21 between both crocidolite and chrysotile
22 exposure, and the crocidolite had a greater
23 effect on ovarian cancer than the chrysotile,
24 but did not have -- they were both positive.

Page 155

1      Q.   What type of ovarian cancer?
2      A.   That, I don't know at the
3  moment.  I could look in the paper and see if
4  it's listed.
5      Q.   There are a number of different
6  types of ovarian cancer; is that right?
7      A.   That's correct.
8      Q.   You are not familiar with J&J
9  Consumer Products' procedures for milling or
10 mining; is that right?
11         MS. O'DELL:  Object to the
12 form.
13     A.   I'm familiar with some of their
14 procedures, yes.
15 BY MR. ZELLERS:
16     Q.   Are you familiar with their
17 testing of source mines?
18     A.   To some extent.
19         MS. O'DELL:  Object to the
20 form.
21 BY MR. ZELLERS:
22     Q.   Is it set forth in your report,
23 or is that just background information that
24 you looked at?

Page 156

1      A.   That's background information
2  and my personal knowledge.
3      Q.   You are not going to give an
4  opinion on mines, mining or milling in this
5  case; is that right?
6      A.   Depends on the questions.
7      Q.   Well, as you sit here today, do
8  you intend to give opinions on talc mining,
9  mines or milling?
10     A.   It wasn't my intention, but if
11 asked a question that I think I'm qualified
12 to answer, I'll try to do it.
13     Q.   Are you an expert on talc
14 mining and milling?
15     A.   I'm an expert on industrial
16 processes in general, and if -- I have some
17 personal understanding of talc mining and
18 milling.
19     Q.   Have you been personally
20 involved in talc mining and milling?
21     A.   I haven't been involved in it;
22 I've observed it.
23     Q.   Do you consider yourself to be
24 an expert in talc mining and milling?

Page 157

1          MS. O'DELL:  Objection, asked
2  and answered.
3      A.   No, I don't.
4  BY MR. ZELLERS:
5      Q.   You have no independent basis
6  to say that cosmetic talc contains asbestos,
7  correct?
8          MS. O'DELL:  Object to the
9  form.
10     A.   What do you mean by independent
11 basis?
12 BY MR. ZELLERS:
13     Q.   You have not done any testing
14 of talcum powder to determine whether it
15 contains asbestos or not; is that right?
16     A.   No.  All of my understanding is
17 based on other sources.
18     Q.   And those other sources would
19 be, in part, the testing that was done by
20 Longo; is that right?
21     A.   Yes, as well as the testing
22 that's reported in the -- in the literature
23 section as the Imerys test results and
24 quality control materials.

40 (Pages 154 to 157)

Arch I. "Chip" Carson, M.D., Ph.D.

Page 158

1    Q.   You're looking now back at the
2  Pier Exhibit Pier-47 and the Hopkins
3  Exhibit Hopkins-28; is that right?
4    A.   I was actually referring to the
5  Imerys documents that are referenced toward
6  the end of the literature exhibit to my
7  report, but certainly the Exhibit Pier-47
8  would be included there.
9    Q.   You have no independent basis
10  to say that cosmetic talcum powder contains
11  fibrous talc, correct?
12    MS. O'DELL:  Object to the
13  form.
14    A.   I have no independent basis,
15  no.
16  BY MR. ZELLERS:
17    Q.   You're familiar with the
18  limitations of the research on a potential
19  link between asbestos and ovarian cancer; is
20  that right?
21    MS. O'DELL:  Object to the
22  form.
23    A.   I'm familiar with some research
24  limitations in that question, yes.

Page 159

1  BY MR. ZELLERS:
2    Q.   You agree that research on the
3  potential relationship between asbestos and
4  ovarian cancer has only considered a small
5  number of cases; is that right?
6    MS. O'DELL:  Object to the
7  form.
8    A.   Well, it's considered thousands
9  of cases.  Certainly in terms of the number
10  of women who have experienced ovarian cancer
11  it's small, but it's significant, and that's
12  where we get research from that answers
13  important questions.
14  BY MR. ZELLERS:
15    Q.   Are you familiar with the Reid
16  paper, 2011?
17    A.   Yes, but it's been a while
18  since I've looked at it.
19    Q.   Well, I'll hand you a copy.
20  We'll mark it as Exhibit 17.
21    (Carson Deposition Exhibit 17
22  marked.)
23    MS. O'DELL:  Thank you.
24    ///

Page 160

1  BY MR. ZELLERS:
2    Q.   The Reid paper that I've handed
3  you, what we've marked as Exhibit 17, looks
4  at the issue:  Does exposure to asbestos
5  cause ovarian cancer.
6    Is that right?
7    A.   Yes.
8    Q.   They talk about in terms of
9  limitations on the first page, right-hand
10  column, they say:  Studies that have examined
11  this issue have been limited for two major
12  reasons.
13    Is that right?
14    A.   Yes.
15    Q.   Number one, small number of
16  cases, much fewer women than men have been
17  exposed to asbestos, particularly in more
18  heavily exposed occupational settings where
19  relative risks are higher; is that right?
20    A.   Yes.
21    Q.   How many of these studies --
22  well, strike that.
23    Would you agree that the
24  studies in this area have been primarily

Page 161

1  related to occupational exposure?
2    A.   Primarily, yes.
3    Q.   How many total women have been
4  studied?
5    MS. O'DELL:  Object to the
6  form.  In this study, in this paper,
7  or are you talking about in general?
8    MR. ZELLERS:  In general.
9    A.   I don't know the answer to
10  that.
11  BY MR. ZELLERS:
12    Q.   How many women have been
13  studied in nonoccupational studies?
14    A.   Well, very few in comparison to
15  the occupational studies.
16    Q.   Are you aware of the
17  difficulties that have existed over time in
18  distinguishing between peritoneal
19  mesothelioma and ovarian cancer?
20    A.   Yes.
21    Q.   What are those difficulties?
22    A.   There is a potential
23  misclassification of one as the other because
24  they have very common habits.  They look very

41 (Pages 158 to 161)

Arch I. "Chip" Carson, M.D., Ph.D.

Page 162

1  similar under light microscopy, and they're
2  often difficult to distinguish, even by a
3  pathologist, unless special tests are used.
4      Often these cases occur in
5  places where they don't have the access to
6  special test equipment that can definitively
7  distinguish, and so they are classified and
8  we move on.
9      Q.    Another limitation of any
10 studies in this area relate to the inability
11 to account for nonoccupational risk factors
12 for ovarian cancer other than age; is that
13 right?
14     MS. O'DELL:  Object to the
15 form.
16     A.   Are you reading also from this
17 paper or --
18 BY MR. ZELLERS:
19     Q.   I was looking now at the
20 Camargo paper.  Are you familiar with the
21 Camargo paper?
22     A.   If you have a copy of that, I'd
23 like to look at it, if I'm going to answer
24 questions about it.

Page 163

1      Q.    All right.  This is a paper in
2  2011.  We'll mark it as Exhibit 18.
3      (Carson Deposition Exhibit 18
4  marked.)
5  BY MR. ZELLERS:
6      Q.    Here the authors also looked at
7  the issue of occupational exposure to
8  asbestos and ovarian cancer; is that right?
9      A.   Yes.
10     Q.   If you turn to page 216 -- I'm
11 sorry, 1216, second-to-last paragraph before
12 the conclusion:  A further limitation of our
13 analysis was its inability to account for
14 nonoccupational risk factors for ovarian
15 cancer other than age.
16     Is that identified by the
17 authors as a limitation?
18     A.   Yes, it is.
19     Q.   Under -- if you go a page back,
20 1215, under Discussion, in the second
21 paragraph, the authors talk about other
22 studies that have been done in this area,
23 including Edelman; is that right?
24     MS. O'DELL:  If you need to

Page 164

1  take a minute to refresh yourself on
2  the page --
3      MR. ZELLERS:  I'm looking under
4  Discussion.
5      MS. O'DELL:  -- please feel
6  free to do that.
7      Excuse me, sir, I was talking.
8  If you need to review the paper,
9  Dr. Carson, please feel free to do
10 that.
11     MR. ZELLERS:  This doctor has
12 given 35 depositions.  He is perfectly
13 capable of handling himself.  He does
14 not need your advice as we go along.
15     MS. O'DELL:  Nor do I, Michael.
16 So I'm going to deal with this witness
17 in the way I choose, which is
18 perfectly appropriate.  If Dr. Carson
19 needs to review the paper, he's going
20 to review the paper.  You may ask him
21 questions, he'll be happy to respond.
22     MR. ZELLERS:  Your job is not
23 to coach the witness; your job is to
24 make objections as to form or

Page 165

1  foundation, not to make speaking
2  objections and coaching of the
3  witness.
4      MS. O'DELL:  If you have a
5  question, I'm sure Dr. Carson would be
6  happy to address it.
7      MR. ZELLERS:  I've asked him
8  the question.
9      MS. O'DELL:  Would you mind
10 repeating the question, please?
11     MR. ZELLERS:  Sure.
12     THE WITNESS:  I don't remember
13 the question.
14     MR. ZELLERS:  Okay.  I'll be
15 happy to repeat it.
16 BY MR. ZELLERS:
17     Q.   Dr. Carson, you've looked at
18 this Camargo paper; is that right?
19     A.   Yes.
20     Q.   In their discussion, they talk
21 about other research, including research done
22 by Edelman; is that right?
23     A.   Are you at the top of the
24 middle column on --

42 (Pages 162 to 165)

Arch I. "Chip"  Carson, M.D., Ph.D.

Page 166

1    Q.    I'm looking under Discussion.
2    A.    Yes.
3    Q.    The first -- well, the second
4  paragraph.
5    A.    Second paragraph, yes.
6    Q.    The magnitude of the pooled
7  estimate is similar to that reported by
8  Edelman; is that right?
9    A.    Correct.  Correct.
10    Q.    Then they state:  They
11  concluded, however, that despite the positive
12  and significant association, there was
13  insufficient information to infer that
14  ovarian cancers were caused by occupational
15  exposure to asbestos because of concerns
16  about tumor misclassification, inappropriate
17  comparison populations and the failure to
18  take into account for known risk factors.
19         Did I read that --
20    A.    You read that correctly.
21    Q.    All right.  Are women who use
22  talc perineally at greater risk of
23  mesothelioma?
24    A.    I can't say that they are, but

Page 167

1  they may be.
2    Q.    Wouldn't you expect to find
3  higher rates of other cancers in women using
4  talc like mesothelioma if they are being
5  exposed to substantial amounts of asbestos?
6    A.    Well, we may -- we may be
7  seeing some mesotheliomas that are
8  misclassified as ovarian cancers, or we may
9  be seeing mesotheliomas and not relating talc
10  application as a pertinent contributor to
11  that case.
12    Q.    You told us earlier that you
13  thought that there may have been more
14  asbestos in talcum powders in the 1970s; is
15  that right?
16         MS. O'DELL:  Objection to form.
17    A.    I think I said there have been
18  step-wise improvements, and I -- but I agree
19  with that statement.
20  BY MR. ZELLERS:
21    Q.    Shouldn't we have seen higher
22  rates of ovarian cancer in the earlier
23  studies --
24         MS. O'DELL:  Object --

Page 168

1  BY MR. ZELLERS:
2    Q.    -- if your theory is correct?
3         MS. O'DELL:  Object to the
4  form.
5    A.    There may have been higher
6  rates of ovarian cancers, but you have to
7  also understand that the latency period for
8  ovarian cancer is pretty long.  It's greater
9  than 20 years, often as long as 40 years.
10  And so we're still dealing with cancers that
11  may have started back in the '70s.
12  BY MR. ZELLERS:
13    Q.    Would you agree that exposure
14  to asbestos through a perineal cosmetic talc
15  use is different from the heavy occupational
16  exposure that has primarily been researched?
17         MS. O'DELL:  Objection to form.
18    A.    Yes.  I agree with that.
19  BY MR. ZELLERS:
20    Q.    Are you an expert and
21  knowledgeable about cleavage fragments?
22    A.    I'm not.
23    Q.    If I went through a series of
24  questions and asked you to differentiate

Page 169

1  between cleavage fragments and asbestos
2  fibers, you would defer that to other
3  experts?
4    A.    I would.
5    Q.    You also claim that the
6  presence of carcinogenic metals, including
7  chromium, cobalt and nickel in talc, adds to
8  its carcinogenicity; is that right?
9    A.    That is right.
10    Q.    Do you have an opinion or
11  knowledge as to the amounts of chromium,
12  cobalt and nickel, if any, in talc?
13    A.    Those metal elements are
14  included as -- usually as impurities or in
15  very small quantities in some deposits and
16  are present in small amounts.
17    Q.    Do you have any idea how much
18  of these metals, if any, reaches a woman's
19  ovaries each time they use talc?
20    A.    I can't tell you how much, but
21  I can tell you that some does, and it is --
22  it remains in the talc until long after it
23  reaches the ovaries.
24    Q.    Chromium, cobalt and nickel are

43 (Pages 166 to 169)

Arch I. "Chip" Carson, M.D., Ph.D.

Page 170

1 natural elements; is that right?
2     A.    Yes.
3     Q.    They are naturally in our
4 bodies; is that right?
5     A.    That's correct.
6     Q.    They are present in food,
7 drinking water, bottled water, vitamins; is
8 that right?
9     A.    To some extent.
10     Q.    Do you have any evidence that
11 the blood or tissue levels of any trace heavy
12 metals are higher in genital talc users
13 compared to nonusers?
14         MS. O'DELL:  Object to the
15     form.
16     A.    I do not.
17 BY MR. ZELLERS:
18     Q.    As we discussed when we talked
19 about asbestos, you cannot evaluate the
20 potential effects of exposure to a substance
21 without factoring in the amount of exposure;
22 is that right?
23         MS. O'DELL:  Object to the
24     form.

Page 171

1     A.    It's useful to factor in the
2 amount if the amount is known.  If the amount
3 is not known, it's not necessarily required
4 to draw conclusions.
5 BY MR. ZELLERS:
6     Q.    In this case, you do not know
7 the amount, be it chromium, cobalt and/or
8 nickel; is that right?
9         MS. O'DELL:  Objection to the
10     form.
11         Excuse me.  Dr. Carson, as you
12     know, is not being offered as a
13     case-specific expert, so that question
14     sounds like a specific patient, and so
15     I would -- that's my objection.
16     A.    I do not know the amount, but
17 my opinion is that any within the
18 microenvironment of the inflammatory process
19 that is occurring due to talc sequestration
20 is contributing to the carcinogenic
21 potential.
22 BY MR. ZELLERS:
23     Q.    But you don't know for any
24 individual plaintiff their level of exposure

Page 172

1 to chromium, cobalt or nickel or any other
2 heavy metal; is that right?
3     A.    That is correct.
4     Q.    That answer to that question
5 would be true if I asked you about the
6 different fragrance chemicals, correct?
7         MS. O'DELL:  Object to the
8     form.
9     A.    Also true.
10 BY MR. ZELLERS:
11     Q.    You did a risk assessment in
12 this matter; is that right?
13     A.    Yes.
14     Q.    Do you agree that a complete
15 and proper risk assessment involves four
16 elements?
17         MS. O'DELL:  Object to the
18     form.
19     A.    Not necessarily.
20 BY MR. ZELLERS:
21     Q.    Well, you have to identify a
22 potential hazard; is that right?
23     A.    Yes.
24     Q.    You've got to do some type of

Page 173

1 dose-response assessment; is that right?
2     A.    Not necessarily.
3     Q.    You --
4         MS. O'DELL:  Excuse me.  If you
5     finished -- if you need to,
6     Dr. Carson, if you're not finished.
7     If you're finished, fine.  Sorry.
8     A.    A qualitative risk assessment
9 does not necessarily require a dose-response
10 in order to reach valid conclusions.
11 BY MR. ZELLERS:
12     Q.    It is not necessary to do a
13 dose-response assessment as part of a risk
14 assessment.  Is that your testimony under
15 oath?
16     A.    It's not always necessary.
17     Q.    Was it necessary in this case?
18     A.    Well, I think there is an
19 aspect of dose-response that was performed in
20 the risk assessment process here.
21     Q.    What dose-response assessment
22 did you make with respect to chromium, cobalt
23 and nickel and any other heavy metal?
24     A.    There's no information

44 (Pages 170 to 173)

Arch I. "Chip" Carson, M.D., Ph.D.

Page 174

1  available to do a dose-response estimate for
2  those metals.
3         Q.   What information did you rely
4  or use, if any, to make a dose-response
5  assessment with respect to any fragrance
6  chemicals?
7         MS. O'DELL:  Objection, form.
8         A.   There is no information
9  available to do a dose-response estimate for
10 the fragrances.
11 BY MR. ZELLERS:
12        Q.   Did you do any type of exposure
13 assessment in this case?
14        MS. O'DELL:  Object to the
15        form, vague.
16        A.   I'm not sure exactly what
17 you're -- what you're asking by exposure
18 assessment.
19 BY MR. ZELLERS:
20        Q.   Well, an exposure assessment is
21 also part of a risk assessment; is that
22 right?
23        A.   In this risk assessment, I
24 considered studies that are reported in the

Page 175

1  scientific and medical literature which have
2  reported the assessment of exposure in these
3  cases in various forms, and I considered
4  those exposure assessments as being valid as
5  reported and considered them as a whole.
6         Q.   Did you look at any exposure
7  assessment specific to the alleged heavy
8  metals contained in talcum powder?
9         MS. O'DELL:  Object to the
10        form.
11        A.   No, I did not.
12 BY MR. ZELLERS:
13        Q.   Did you look at any exposure
14 assessment with respect to any fragrance
15 chemicals contained within talcum powder?
16        MS. O'DELL:  Object to the
17        form.
18        A.   With respect to the fragrance
19 chemicals and the heavy metals, the only
20 exposure assessment that I was able to do was
21 verify that these things were present in
22 materials.
23        The fragrances are always
24 present in whatever form they were added in,

Page 176

1  and the metals were there as the baseline
2  component of the talc formation that they
3  came from.
4  BY MR. ZELLERS:
5         Q.   You do not know the amounts of
6  either the heavy metals or the fragrance
7  chemicals in the talcum powder at issue in
8  this case, correct?
9         A.   That's -- that's correct, I
10 don't.
11        Q.   You do not know -- well, strike
12 that.  I'll withdraw that.
13        You brought with you an IARC
14 monograph; is that right?
15        A.   I have a couple of them.
16        Q.   All right.
17        MS. O'DELL:  Are we going to --
18        are you going to move to --
19        MR. ZELLERS:  We can take a
20        break if you'd like.
21        MS. O'DELL:  Yeah, it's been
22        about an hour and a half.
23        MR. ZELLERS:  Sure.
24        THE VIDEOGRAPHER:  We're off

Page 177

1  the record 12:32, end of Tape 2.
2         (Recess taken, 12:32 p.m. to
3  1:38 p.m.)
4         THE VIDEOGRAPHER:  We're on the
5  record, 1:38, beginning of Tape 3.
6  BY MR. ZELLERS:
7         Q.   Dr. Carson, when we left, we
8  were talking about the trace metals and
9  fragrance chemicals in talcum powder,
10 correct?
11        A.   Yes.
12        Q.   You do not know how much of
13 these trace metals or fragrance chemicals
14 reach the ovaries, correct?
15        A.   I don't know specifically how
16 much reaches it, but if I know it's a
17 component of the talc, and if I know the talc
18 reaches it, then I know some of the metals
19 and the fragrances reach it.
20        Q.   You don't know the component or
21 the amount of either the trace metals or the
22 fragrance chemicals in the baby powder,
23 correct?
24        A.   That's correct.

45 (Pages 174 to 177)

Arch I. "Chip"  Carson, M.D., Ph.D.

Page 178

1      Q.     You do not know the exposure of
2    any of the women who are plaintiffs in this
3    litigation to the talcum powder, correct?
4            MS. O'DELL:  Individual women?
5            MR. ZELLERS:  Yes, individual
6    women.
7      A.   I don't, no.
8    BY MR. ZELLERS:
9      Q.   You brought with you an IARC
10   monograph, and I think you've got several
11   monographs that are on your literature list;
12   is that right?
13     A.   That's correct.
14     Q.   Generally, IARC classifies
15   chemicals and agents from Group 1,
16   carcinogenic to humans, down to Group 4,
17   probably not carcinogenic to humans; is that
18   right?
19     A.   That's correct.
20     Q.   Does the classification of a
21   substance as a known probable or possible
22   carcinogen by IARC, and IARC is International
23   Agency for Research on Cancer, or by the
24   National Toxicology Program or the U.S.

Page 179

1    Environmental Protection Agency, mean that
2    the substance can cause all types of cancers
3    in humans by any exposure route?
4            MS. O'DELL:  Object to the
5    form.
6      A.   No.
7    BY MR. ZELLERS:
8      Q.   There are different cancers
9    that may be associated with different
10   chemicals or agents; is that right?
11     A.   And different routes of
12   exposure.
13     Q.   You can have an agent that is a
14   carcinogen or a probable or possible
15   carcinogen for one type of cancer, but not
16   for another type of cancer, correct?
17     A.   That's correct.
18     Q.   You can have an agent or a
19   chemical that's a carcinogen for one route of
20   exposure for a chemical or agent but is not
21   carcinogenic for a different route of
22   exposure, correct?
23           MS. O'DELL:  Objection to form.
24     A.   Yes.

Page 180

1    BY MR. ZELLERS:
2      Q.   What -- would you agree that,
3    in general, metals can differ in their
4    toxicity and potential carcinogenicity based
5    on their form?
6      A.   Yes.
7      Q.   Do you know the forms of
8    chromium, nickel and cobalt detected in
9    cosmetic talc?
10     A.   There's -- metal ions are
11   usually incorporated in the mineral lattice,
12   and so they are part of the magnesium
13   silicate crystal.
14     Q.   I'm not sure if that answers my
15   question, and if it does, I don't understand,
16   so let me ask again.
17           Do you know the forms, and by
18   that I mean valence state, of chromium or
19   nickel or cobalt that have been detected in
20   cosmetic talc?
21     A.   Oh, the valence state?
22     Q.   Yes, sir.
23     A.   I don't know specifically, but
24   that's dependent on the surrounding structure

Page 181

1    that the metals are contained in, and metals
2    can assume a different valence state
3    depending on the redox environment.
4      Q.   You are not, at least in this
5    litigation today, expressing any opinion as
6    to the valence state of chromium that may be
7    found in cosmetic talc, correct?
8            MS. O'DELL:  Object to the
9    form.
10     A.   No, I'm not.
11   BY MR. ZELLERS:
12     Q.   Your second opinion is that the
13   perineal use of talcum powder results in
14   direct exposure to the ovaries either via
15   inhalation or migration through the female
16   reproductive tract; is that right?
17     A.   Well, it's primarily through
18   the female reproductive tract.  The
19   inhalation exposure would be a secondary
20   route.
21     Q.   Let me ask you a couple of
22   questions about inhalation exposure.
23           You do not cite any studies that
24   in the body of your report evidencing that

46 (Pages 178 to 181)

Arch I. "Chip"  Carson, M.D., Ph.D.

Page 182

1    talcum powder can reach the ovaries through
2    inhalation, correct?
3            MS. O'DELL:  Object to the
4    form.
5        A.    That is correct, although
6    there -- yes, that's correct.
7    BY MR. ZELLERS:
8        Q.    You have never performed any
9    study yourself pertaining to whether inhaled
10   talc can migrate to the ovaries; is that
11   right?
12       A.    I have not, although it has
13   been used as an explanation of how talc
14   particles might have reached the ovaries in
15   persons who did not have another form of
16   exposure.
17       Q.    If inhalation is the exposure
18   path for talc, shouldn't the lungs bear more
19   of a burden?
20       A.    Yes.
21       Q.    Why, then, isn't there an
22   epidemic of mesothelioma in women who use
23   talcum powder?
24       A.    Because the primary route is

Page 183

1    perineal via the reproductive tract.
2        Q.    You discuss that on page 7 of
3    your report; is that right?
4        A.    Yes.
5        Q.    You cite a number of studies
6    for the proposition that talc can be
7    transported from the perineum to the upper
8    reproductive tract and body cavity; is that
9    right?
10       A.    That's correct.
11       Q.    None of the articles that you
12   cite actually looked at whether talc can
13   migrate from perineal application through the
14   fallopian tubes to the ovaries, did they?
15       A.    Let me just refresh my memory
16   for a moment here.  Egli was carbon black.
17   Venter was radioactive technetium labeled
18   albumin.  Let me see.  Blumenkrantz -- I have
19   my notes here.
20            Yeah, I can't remember what the
21   substance was in Blumenkrantz.  Sjösten,
22   starch -- yeah, Blumenkrantz was retrograde
23   menstruation.  Halme was talc.
24       Q.    Which study was talc?

Page 184

1        A.    The -- I'm sorry.  The Heller
2    study was talc, which I didn't cite here.
3    Halme was a retrograde menstruation study via
4    the fallopian tubes, and Sjösten was starch
5    particles.
6        Q.    The only study -- and this is
7    not one that you cited, but you've now
8    referred to that involved talc, was Heller;
9    is that right?
10       A.    Well, it looked at -- it didn't
11   look at transport inasmuch as it looked at
12   the presence of talc particles in the ovaries
13   and found them with or without the history of
14   talc powder use.
15       Q.    Heller looked at 24 patients;
16   is that right?
17       A.    I don't know, but that sounds
18   about right.
19       Q.    Half of them had a history of
20   using talc products, half did not?
21            MS. O'DELL:  Object to form.
22       A.    That's correct.
23   BY MR. ZELLERS:
24       Q.    Heller found talc in the

Page 185

1    tissues of all 24 patients; is that right?
2        A.    That is correct.
3        Q.    I believe we covered this
4    before, but just to confirm:  There are no
5    published articles that you're aware of that
6    show granulomas, fibrosis or adhesions
7    anywhere in the reproductive tract of a woman
8    as a result of external genital talc
9    application, correct?
10           MS. O'DELL:  Object to the
11   form.
12       A.    I believe that's the case,
13   although there have been granulomas found in
14   some cases of cancer where they reported
15   having used talc.
16   BY MR. ZELLERS:
17       Q.    Of the cases or the studies you
18   cited here, Egli, that involved just three
19   women, correct?
20       A.    That was just -- that was an
21   experimental study of the transport of carbon
22   particles.
23       Q.    The women were in a lithotomy
24   position; is that right?

47 (Pages 182 to 185)

Arch I. "Chip"  Carson, M.D., Ph.D.

Page 186

1    A.    That's correct.
2    Q.    And that means that they had
3 their legs up in the air, correct?
4    A.    Correct.
5    Q.    Those conditions -- well,
6 strike that.
7         They were injected with
8 oxytocin; is that right?
9    A.    It is.
10    Q.    That was to aid in the
11 transport of the particles, correct?
12         MS. O'DELL:  Object to the
13         form.
14    A.    I believe that was the author's
15 theory.
16 BY MR. ZELLERS:
17    Q.    Those are different
18 circumstances or conditions from a woman who
19 would apply a talc to her genital area
20 standing up, correct?
21    A.    Well, they are, but I'm not
22 sure that that position is really pertinent
23 to the migration of particles through the
24 reproductive tract.

Page 187

1    Q.    Is it your pos- -- is it your
2 testimony that if a woman is in a lithotomy
3 position with their legs up into the air,
4 that that is comparable with respect to the
5 migration of talc to a woman who's standing
6 up and using it in her perineal region?
7    A.    It may be.
8    Q.    Are you an expert on that?
9    A.    I'm not.
10    Q.    The authors in Egli, they
11 stated it was possible that the study
12 observed false positives due to sample
13 contamination because they failed to use
14 liquid or filter blanks as negative controls,
15 correct?
16    A.    I don't recall that, but that
17 may be the case.
18    Q.    You refer to a study by Venter.
19 That involved a radioactive particulate
20 matter, correct?
21    A.    Yes.
22    Q.    Did not involve talc particles,
23 correct?
24    A.    The point of the study was --

Page 188

1 of all these studies -- that they were using
2 various particles that could be detected at
3 the other end, and so this was an attempt to
4 do an experimental study which would cause no
5 harm that would give them an answer regarding
6 transport through the reproductive tract.
7    Q.    In this study, particles were
8 introduced into the reproductive tract, not
9 externally; is that right?
10         MS. O'DELL:  Object to the
11         form.
12    A.    That is correct.
13 BY MR. ZELLERS:
14    Q.    Women were given Pitocin to
15 stimulate uterine contractions; is that
16 right?
17    A.    That's the same as oxytocin.
18    Q.    And that's a yes, correct?
19    A.    Yes.
20    Q.    Again, as with the Egli study,
21 the women were inverted in the Trendelenburg
22 position with their head down, legs up when
23 the particles were administered; is that
24 right?

Page 189

1    A.    I believe so.
2    Q.    Is it possible that the
3 radionuclides can leach from the particles?
4    A.    I don't know the answer to
5 that, but it was radioactive technetium that
6 was bound to albumin.
7    Q.    The Sjösten study that you
8 cite, that did not use -- involve the
9 perineal use of talc, but an exam with a
10 force to the cervix; is that right?
11    A.    Excuse me.  An exam with what?
12    Q.    So it involved an exam with
13 force to the cervix?
14         MS. O'DELL:  Object to the
15         form.
16    A.    Well, this was -- this was done
17 as an experimental study on women who were
18 scheduled to get hysterectomies and they did
19 it on some women one day prior to the
20 hysterectomy and another group of women four
21 days prior to the hysterectomy, and they used
22 gloves that were powdered with starch and
23 gloves that were not powdered with starch.
24         And so they had what's called a

48 (Pages 186 to 189)

Arch I. "Chip" Carson, M.D., Ph.D.

Page 190

1    Latin square design, and they were able at
2    the point of the hysterectomy of taking
3    samples of the fallopian tubes and washing
4    them to determine whether or not particles
5    were found in the tubes.
6    BY MR. ZELLERS:
7        Q.    What they actually found was
8    that, whether the women were examined with
9    gloves with the starch particles or not, they
10   found starch particles in both, both groups,
11   correct?
12       A.    It is true.
13       Q.    Tubal ligation, you refer to
14   tubal ligation and use that or purport to say
15   that that supports your migration theory,
16   correct?
17       A.    It does.
18       Q.    Your testimony is that for
19   patients who have had a tubal ligation, that
20   they are at a lesser risk of the talc -- let
21   me withdraw that.
22           Explain to us very briefly why
23   you believe that tubal ligation supports your
24   migration theory.

Page 191

1        A.    If the pathway of exposure of
2    the ovaries that results in ovarian cancer is
3    via the reproductive tract, then tubal
4    ligation, which closes off the fallopian
5    tubes, would interrupt that pathway and
6    result in reduced exposure; therefore, you
7    would expect a reduced incidence of cancer in
8    those women.
9        Q.    In fact, though, that is not
10   what has been reported or at least that has
11   not been consistently reported in the
12   studies; is that right?
13       A.    Well, it actually has been a
14   positive factor in a number of the
15   epidemiologic studies that have looked at the
16   ovarian cancer incidence and have been able
17   to include tubal ligation as a historical
18   factor in their analysis.
19       Q.    Did you look at the Terry 2013
20   meta-analysis?
21       A.    Yes.
22       Q.    You cite that in support of
23   your positions in this case; is that right?
24       A.    I did.

Page 192

1        Q.    In fact, in Terry -- well, and
2    let me mark it for you so you've got it in
3    front of you.
4            THE WITNESS:  Okay.  I'm going
5    to move this binder for the time
6    being, if you don't mind.
7            MR. ZELLERS:  Oh, yes, I'll
8    hand you the articles that I refer to,
9    but if you need it, just pull it out.
10           THE WITNESS:  Thank you.
11           (Carson Deposition Exhibit 19
12   marked.)
13   BY MR. ZELLERS:
14       Q.    Deposition Exhibit 19 is the
15   2013 Terry meta-analysis that you referred to
16   in your report; is that right?
17       A.    Yes.
18       Q.    That's a pooled analysis of
19   eight studies; is that right?
20       A.    Yes.
21       Q.    Okay.  This pooled analysis of
22   eight studies relating to genital powder use
23   and the risk of ovarian cancer shows no
24   variation in the risk in talc users based on

Page 193

1    whether they had a tubal ligation or
2    hysterectomy; is that right?
3        A.    I think that's the conclusion
4    of the authors here, but it's not the
5    conclusion of the individual authors of the
6    studies who did the original investigations.
7        Q.    Well, it is the conclusion of
8    the authors based upon their meta-analysis of
9    eight studies; is that right?
10           MS. O'DELL:  Object to the
11   form.
12       A.    Let me just check that.
13           (Document review.)
14       A.    Yes.
15   BY MR. ZELLERS:
16       Q.    If you look at pages 819,
17   carried over to 820, I'm reading:  Our
18   finding of slightly attenuated associations
19   following exclusion of women with powder
20   exposure after tubal ligation or hysterectomy
21   are not supportive of this hypothesis, but
22   risk estimates in this subgroup analysis may
23   have randomly differed from those including
24   all women because of the reduction in sample

49 (Pages 190 to 193)

Arch I. "Chip"  Carson, M.D., Ph.D.

Page 194

1  size.
2        Is that right?
3     A.   Yes.
4     Q.   Essentially, looking at these
5  eight studies in this meta-analysis, Terry
6  did not find that exposure to genital powder
7  applications that occurred before tubal
8  ligation or hysterectomy made any substantive
9  difference in the results; is that right?
10    A.   Yes, but the point is that the
11  authors didn't find that it did not make a
12  difference either.  They -- they ended up
13  with a study with reduced numbers that they
14  couldn't make determinations about.
15    Q.   If, though, the migration
16  theory is correct, you would expect that
17  there would be a reduction in the incidence
18  of ovarian cancer for women who have had a
19  tubal ligation or hysterectomy; is that
20  right?
21        MS. O'DELL:  Object to the
22    form.
23    A.   Yes, that is correct.
24        ///

Page 195

1  BY MR. ZELLERS:
2     Q.   And that was not found in the
3  Terry meta-analysis that you cite; is that
4  right?
5        MS. O'DELL:  Object to the
6    form.
7     A.   That is correct, but it was
8  found in the baseline studies that were, in
9  part, included in this meta-analysis.
10  BY MR. ZELLERS:
11    Q.   Are you -- you also cite the
12  Cramer study, 2016; is that right?
13    A.   Yes.
14    Q.   I've got a few questions for
15  you on the Cramer study, but let me just ask,
16  since we're at this part right now.
17        Do you have the Cramer study?
18  I'll hand it to you.
19    A.   If you have a copy, I'd
20  appreciate it.
21        MR. ZELLERS:  Sure.  We'll mark
22    the Cramer study as Exhibit 20.
23        (Carson Deposition Exhibit 20
24    marked.)

Page 196

1        THE WITNESS:  Thank you.
2        MS. O'DELL:  Thank you.
3  BY MR. ZELLERS:
4     Q.   This is also a study,
5  Exhibit 20, Cramer 2016, that you cite as
6  supportive of your opinions in this case,
7  correct?
8     A.   Correct.
9     Q.   Cramer actually looked at
10  whether or not there was any greater
11  association of talc use and ovarian cancer
12  and whether or not women who had a tubal
13  ligation or hysterectomy had a reduced
14  incidence of the disease; is that correct?
15    A.   Yes.
16    Q.   Turn to page 337, and then it
17  carries over to 339.  They're talking --
18  they, being the authors -- of their results,
19  and I'm reading just at the very bottom of
20  337, carried over to 339:  By test for
21  interaction, column 3, the association was
22  significantly greater for women who were
23  African-American, had no personal history of
24  breast cancer, had a tubal ligation or

Page 197

1  hysterectomy.
2        Is that right?
3        MS. O'DELL:  Object to the
4    form.
5     A.   Beginning on page 337?
6  BY MR. ZELLERS:
7     Q.   Yes.
8     A.   I'm sorry, if you could --
9     Q.   Sure.  At the very end of 337.
10    A.   Okay.
11    Q.   So they're looking at --
12    A.   Oh, by tests for interaction.
13    Q.   Yes.
14    A.   Yeah.
15    Q.   So if your migration theory is
16  correct, you would expect there to be a lower
17  incidence of ovarian cancer in women who have
18  had a tubal ligation or hysterectomy,
19  correct?
20        MS. O'DELL:  Object to the
21    form.
22    A.   That is correct.
23  BY MR. ZELLERS:
24    Q.   All right.  Cramer finds by

50 (Pages 194 to 197)

Arch I. "Chip"  Carson, M.D., Ph.D.

Page 198

1  test for interaction the association was
2  significantly greater for women who -- and
3  then I'm skipping African-American, but I'm
4  coming down to -- have a tubal ligation or
5  hysterectomy.
6         Is that correct?
7    A.   Yes.
8    Q.   All right.  If talcum powder
9  migrates from the perineal region to the
10 ovaries, shouldn't exposure to -- exposure to
11 talc be far greater in concentration in the
12 rectal, vulvar, vaginal, cervical and uterine
13 tissues which are closer to the area of
14 initial exposure?
15        MS. O'DELL:  Objection to form.
16    A.   Well, the acute exposure would
17 be greater.
18 BY MR. ZELLERS:
19    Q.   You would expect because the
20 acute exposure is greater, that there should
21 be inflammation caused in these organs and
22 areas, correct?
23    A.   No.  The inflammation and
24 oxidative stress is an ongoing process that

Page 199

1  has to develop over time, and it occurs on a
2  chronic basis in areas where foreign bodies
3  locate and reside.  And talc and talcum
4  powder are examples of foreign bodies that
5  have the right characteristics to cause
6  chemotaxis in reactive oxygen species and
7  oxidative status.
8    Q.   Well, in fact, there would be
9  chronic exposure, so if we're dealing with,
10 as you described in the very beginning, which
11 you were asked, to look at the habitual use
12 of talcum powder, that would create exposure
13 on a chronic basis to the rectal area and
14 tissues, vulvar, vaginal, cervical and
15 uterine tissues; is that right?
16        MS. O'DELL:  Object to the
17 form.
18    A.   I suspect if one doesn't bathe,
19 that would be more of an issue, but most
20 people bathe regularly as well.
21 BY MR. ZELLERS:
22    Q.   And bathing regularly
23 eliminates any exposure in the rectal,
24 vulvar, vaginal, cervical and uterine tissues

Page 200

1  to talcum powder?
2        MS. O'DELL:  Object to the
3  form.
4    A.   It doesn't -- it doesn't
5  eliminate exposure, but it does remove
6  residual exposure, as does sweating, other
7  body secretions and so forth.
8  BY MR. ZELLERS:
9    Q.   Are you aware of any studies
10 that show inflammation or oxidative stress as
11 a result of genital talc use in the rectal,
12 vulvar, vaginal, cervical and uterine
13 tissues?
14    A.   No, I'm not.
15    Q.   Under your theory or belief
16 that talcum powder travels from the perineal
17 region to the ovaries through the woman's
18 reproductive tract, talcum powder must travel
19 past the labia, through the vagina, through
20 the cervix, and then to the uterus; is that
21 right?
22    A.   That's correct.
23    Q.   And then the powder travels
24 through the uterus and into the fallopian

Page 201

1  tubes to reach the ovaries; is that right?
2    A.   Yes.
3    Q.   On what studies are you relying
4  to say that talcum powder affects the body
5  differently when it's applied to the perineal
6  region and travels to the cervix compared to
7  when it is applied directly to the cervix?
8    A.   I don't think --
9        MS. O'DELL:  Object to the
10 form.
11    A.   -- there is much of a
12 difference.
13 BY MR. ZELLERS:
14    Q.   You would expect there to be a
15 comparable similar result whether talcum
16 powder is applied directly to the cervix
17 through the use of dusting of a diaphragm as
18 there is to the use of talcum powder in the
19 genital areas; is that right?
20    A.   That is correct.  I think the
21 two differ probably in terms of quantity very
22 significantly.  But other than that, they
23 would be the same.
24    Q.   When applied to the perineal

51 (Pages 198 to 201)

Arch I. "Chip" Carson, M.D., Ph.D.

Page 202

1  region, talcum powder would also be in close
2  contact with a woman's urethra; is that
3  right?
4      A.   Yes.
5      Q.   Substances, and in your view,
6  talcum powder, are capable of traveling up
7  the urethra; is that right?
8          MS. O'DELL:  Object to the
9      form.
10     A.   The urethra has a sphincter
11  which prevents transport beyond that point.
12  BY MR. ZELLERS:
13     Q.   Women get urinary tract
14  infections when bacteria travels up the
15  urethra; is that right?
16     A.   That's correct.
17     Q.   Studies, though, do not show an
18  increase in bladder cancer with talcum powder
19  use; is that right?
20     A.   I don't believe that talcum
21  powder transports in any appreciable amount
22  up the urethra into the bladder.
23     Q.   Studies do not show an increase
24  in rectal cancer with talcum powder use, do

Page 204

1  about to reconsider that?
2      A.   Because the chatter is that
3  this is something that's on their radar
4  screen currently.
5      Q.   What chatter are you aware of?
6  And what is chatter?
7      A.   It's discussion among -- within
8  the scientific and healthcare community of
9  things that are on the drawing board for
10  IARC.
11     Q.   Do you know whether or not
12  IARC -- well, strike that.
13          IARC has not changed its
14  position that the migration theory and
15  evidence for the migration theory is weak; is
16  that right?
17          MS. O'DELL:  Object to the
18      form.
19     A.   They have not changed their
20  position that was published in the 2010
21  monograph.
22  BY MR. ZELLERS:
23     Q.   All right.  You have heard
24  chatter that they may look at it again; is

Page 203

1  they?
2      A.   No.
3      Q.   Are you aware that that IARC --
4  and you're familiar with IARC, right?
5      A.   Yes.
6      Q.   Are you aware that IARC rejects
7  this migration theory and calls the evidence
8  weak?
9          MS. O'DELL:  Object to the
10     form.
11     A.   The IARC has made that
12  statement in their -- I think the 2006 review
13  that resulted in their recent monograph, but
14  I think they're about to reconsider that.
15  BY MR. ZELLERS:
16     Q.   Well, they also have stated
17  that in 2010; is that right?
18     A.   Well, that's the --
19          MS. O'DELL:  Object to the
20     form.
21     A.   That's the monograph from the
22  2006 review.
23  BY MR. ZELLERS:
24     Q.   Why do you believe that they're

Page 205

1  that right?
2      A.   Yes.
3      Q.   Other than this chatter, you're
4  unaware of any other -- well, strike that.
5          You're unaware of any change in
6  IARC's position with respect to migration,
7  correct?
8      A.   Well, an example of what I'm
9  talking about is the Health Canada report,
10  which has contradicted what is found in the
11  IARC monograph and is more current and
12  considers information that will probably go
13  into the next IARC review.
14          MR. ZELLERS:  Move to strike as
15      nonresponsive.
16  BY MR. ZELLERS:
17     Q.   Does IARC review and rely on
18  draft assessments in formulating their
19  positions?
20     A.   IARC relies on primary studies.
21     Q.   Not draft assessments, correct?
22     A.   Well, the draft assessment that
23  I guess you're referring to, the Health
24  Canada draft assessment, is derived from

52 (Pages 202 to 205)

Arch I. "Chip"  Carson, M.D., Ph.D.

Page 206

1  primary studies, the same ones that will be
2  considered by IARC.
3      Q.    All right.  As of today, IARC's
4  published position is that evidence of a
5  migration theory of talcum powder migrating
6  to the ovaries is weak, correct?
7      A.    Yes.
8      Q.    Have you conducted any tests or
9  experiments with respect to your theory or
10  position that talc migrates to the ovaries
11  through the reproductive tract?
12      A.    No, I haven't.
13      Q.    How much talc actually reaches
14  the ovaries in your opinion?
15      A.    I can't answer that question
16  because the dose has not been quantified.
17      Q.    Does it only reach the ovaries
18  during certain times?
19      A.    I don't believe so.  I think
20  there are many circumstances whereby that
21  migration pathway is functional, and in my
22  belief, the pathway from the perineum to the
23  cervix is pretty much an open channel, and
24  then it continues to be open pretty much all

Page 207

1  the way into the pelvic cavity.
2      Q.    You are not a specialist in
3  women's health issues, correct?
4          MS. O'DELL:  Object to the
5      form.
6      A.    Well, I'm a doctor.  I've
7  examined a lot of women.
8  BY MR. ZELLERS:
9      Q.    Are you --
10          MS. O'DELL:  Excuse me.  Are
11      you finished, sir?
12          THE WITNESS:  Yes, I'm
13      finished.
14          MS. O'DELL:  Okay.
15  BY MR. ZELLERS:
16      Q.    Are you an expert in the
17  women's reproductive tract?
18      A.    I've taken it apart and put it
19  back together again in medical school, and in
20  other settings I've done OB/GYN rotations.
21  I've participated in pelvic surgeries.  I
22  understand the anatomy.
23      Q.    There are physicians who are
24  specialists in the female reproductive tract;

Page 208

1  is that right?
2      A.    That is correct.
3      Q.    You are not one of those
4  physicians, correct?
5      A.    I don't claim to be a
6  specialist in gynecology.
7      Q.    Your third opinion is that the
8  ovaries lack an intrinsic elimination system;
9  is that right?
10      A.    That's correct.
11      Q.    Is "intrinsic elimination
12  system" a recognized term of art that's used
13  by gynecologists?
14      A.    I don't think so.  It was just
15  the term I used to describe the situation.
16      Q.    Is "intrinsic elimination
17  system" a term of art used by oncologists?
18      A.    The same answer.
19      Q.    Have you seen published studies
20  that use that term?
21      A.    I don't know.  I suspect I
22  could have.  It's apparently a small number
23  of ways to describe that in a few words.
24      Q.    You do not cite to any studies

Page 209

1  in the body of your report to support your
2  theory that the ovaries do not have an
3  intrinsic elimination system, correct?
4      A.    That's correct.
5      Q.    You have not conducted any
6  tests to show that exposure to the ovaries to
7  particulate matter, if any, is longer than
8  exposure to other parts of the female
9  anatomy; is that right?
10          MS. O'DELL:  Object to the
11      form.
12      A.    I have not conducted any such
13  tests.
14  BY MR. ZELLERS:
15      Q.    Is the cervix more or less
16  sensitive to the impact of foreign particles
17  than the ovaries?
18          MS. O'DELL:  Object to the
19      form.
20      A.    I think that the important
21  point is the residence time that exists, and
22  the cervix is not presented with things for
23  an extended time like the ovaries are in
24  relation to things like talc.  But it is

53 (Pages 206 to 209)

Arch I. "Chip" Carson, M.D., Ph.D.

Page 210

1  sensitive.
2  BY MR. ZELLERS:
3      Q.   All right.  Your fourth
4  theory -- or strike that.
5          Your fourth opinion is that the
6  epidemiological studies show a positive
7  relationship between regular perineal
8  application of talcum powder and ovarian
9  cancer; is that right?
10     A.   That's correct.
11     Q.   The studies that you reference
12  in this opinion are referred to on pages 6
13  and 7 of your report; is that right?
14         MS. O'DELL:  Object to the
15     form.
16     A.   Most of them, yes.
17  BY MR. ZELLERS:
18     Q.   You conclude that when
19  confounding and bias are exhaustively
20  considered -- and do you believe you've done
21  that here?
22     A.   I am restating what authors of
23  the primary studies have done.  I'm
24  evaluating the consistency of the evidence,

Page 211

1  not the basic evidence itself.
2      Q.   The apparent cause and effect
3  relationship between perineal talcum powder
4  use and ovarian cancer amounts to about a 30%
5  increased risk of ovarian cancer in talcum
6  powder users.
7          Is that your opinion in this
8  case?
9      A.   It is.
10     Q.   And that is your opinion from
11  reviewing the epidemiologic studies that you
12  cite in your report?
13     A.   Yes.
14     Q.   When epidemiologists refer to
15  the statistical power of a study, what are
16  they referring to?
17     A.   Statistical power refers to the
18  ability of a study design, if carried out, to
19  detect a signal in the data of a particular
20  magnitude.
21     Q.   In plain English, statistical
22  power is the likelihood that a study will
23  detect an effect when there is an effect to
24  be detected; is that fair?

Page 212

1      A.   Yes.
2          MS. O'DELL:  Object to the
3      form.
4  BY MR. ZELLERS:
5      Q.   Are you familiar with the term
6  "person-years" as it relates to
7  epidemiological study?
8      A.   Yes, I am.
9      Q.   What is -- strike that.
10         How are person-years
11  calculated?
12     A.   They are calculated by -- in
13  relation to an exposure or to an existing
14  treatment, they're calculated by multiplying
15  the duration of the treatment or exposure in
16  years by the number of people being studied.
17  And that -- the result is person-years.
18     Q.   Can you explain the difference
19  between high-grade serous and low-grade
20  serous cancer?
21     A.   High-grade serous cancer has
22  a -- is less differentiated and has a greater
23  propensity for metastasis and invasion.
24     Q.   Are you aware that the

Page 213

1  epidemiological literature shows that these
2  are very different cancers?
3      A.   They behave quite differently,
4  yes.
5      Q.   Do you know what publication
6  bias is?
7      A.   Yes.
8      Q.   What is publication bias?
9      A.   Publication bias is the
10  tendency to -- to spin a certain argument
11  in -- in order to influence acceptance of
12  publications.
13     Q.   Is that a recognized issue in
14  the field of epidemiology, at least as you've
15  observed?
16     A.   It's a -- it's not necessarily
17  recognized in the field of epidemiology.  It
18  exists in all scientific endeavors.
19     Q.   Is it something that you and
20  other physicians and experts and scientists
21  need to be aware of?
22     A.   Yes.  I think we're all exposed
23  to the effects of that and warned about it as
24  we go through our careers.

54 (Pages 210 to 213)

Arch I. "Chip"  Carson, M.D., Ph.D.

Page 214

1     Q.    When I asked you early on what
2  your methodology was, you looked at the
3  published literature, you looked at some
4  websites I think that you told us about
5  earlier, and then you performed a risk
6  assessment and considered whether perineal
7  use of talc products poses a safety risk to
8  consumers; is that right?
9        MS. O'DELL:  Object to the
10  form.
11     A.    Well, that's a gross
12  oversimplification of the risk assessment
13  process that I performed.
14        The review of the literature,
15  which was based on the question that I was
16  asked to address, was a fairly exhaustive one
17  which incorporated a search for every
18  pertinent publication that was available and
19  included multiple languages.
20        It then was -- proceeded into a
21  distillation of the facts that were -- that
22  were claimed based on those individual
23  studies and investigations, and a comparison
24  of those, one with another, eventually

Page 215

1  considering them all as a whole to arrive at
2  conclusions that addressed the question.
3  BY MR. ZELLERS:
4     Q.    That was your methodology; is
5  that right?
6     A.    That is the methodology, yes.
7     Q.    Did you consider the Bradford
8  Hill criteria or factors in reaching your
9  conclusions and opinions in this matter?
10     A.    That's part of the methodology
11  which is outlined in my report.
12     Q.    In analyzing the Bradford Hill
13  criteria, did you conduct a meta-analysis of
14  the available data to reach a conclusion
15  about the relative risk?
16     A.    No, I did not.
17     Q.    Why didn't you conduct a
18  meta-analysis for this case?
19     A.    I did not have the time to do a
20  meta-analysis in this case, first of all.
21  Secondly, there have been a number of other
22  meta-analyses performed, and I had those
23  results available to me in addition to
24  various reviews of the literature that have

Page 216

1  been published as well.  And I felt that was
2  sufficient to be able to produce this report
3  that addressed the question I was asked.
4     Q.    As you told us earlier, you
5  have never published a meta-analysis on any
6  topic; is that right?
7     A.    That's correct.
8     Q.    You cite to some of the
9  available studies on talcum powder use in
10  ovarian cancer, but not to all of the
11  studies, correct?
12        MS. O'DELL:  Object to the
13  form.
14     A.    That's true.
15  BY MR. ZELLERS:
16     Q.    What was your reasoning for
17  focusing on certain studies and excluding
18  other studies?
19     A.    The studies that I referenced
20  were those that had specific aspects that
21  directly influenced my report or my
22  conclusions or that I felt were illustrative
23  of comments I was making in the report, and
24  that's why they were referenced.

Page 217

1        All of the studies may not have
2  risen to that -- the level of requiring being
3  referenced, but pretty much all the studies
4  are included in the literature that I
5  reviewed.
6     Q.    You cite in the report the
7  studies that were favorable or supportive of
8  your opinions, correct?
9     A.    Well, I cited a number of
10  studies, not all of which were favorable to
11  my overall opinions, at least not on the
12  surface.
13     Q.    Did you cite all of the studies
14  that you believe in one way or another
15  support your opinions in this case?
16     A.    I don't think so.
17     Q.    You believe there are
18  additional studies that support your opinions
19  that you did not cite?
20     A.    They're in the literature list.
21     Q.    Did you cite the opinions that
22  refuted -- strike that.
23        Did you cite the studies that
24  refuted your opinions in this matter?

55 (Pages 214 to 217)

Arch I. "Chip"  Carson, M.D., Ph.D.

Page 218

1      A.    I cited some studies that had
2  opinions that -- or that had conclusions that
3  did not necessarily agree with mine, but I
4  don't think they refuted my conclusions.
5      Q.    Do you believe the standard for
6  proving causation in the scientific
7  literature is the same one that applies in
8  this litigation?
9          MS. O'DELL:  Object to the
10  form.
11      A.    I don't know that.
12  BY MR. ZELLERS:
13      Q.    A document you brought here
14  today was an FDA letter?
15      A.    Yeah, I think you marked it.
16      Q.    I did mark it.  Why don't you
17  see if you could find it so I can ask you a
18  couple of questions about it.
19      A.    There it is.  That one?
20      Q.    Yes.  Exhibit 10 is an FDA
21  letter dated April 1st of 2014 to a
22  Dr. Epstein; is that right?
23      A.    Yes.
24      Q.    That is a document that you

Page 219

1  reviewed and considered as part of your
2  analysis of this case; is that right?
3      A.    Yes.
4      Q.    Do you believe that that
5  exhibit, Exhibit 10, is supportive of your
6  opinions in this matter?
7      A.    I don't think it's very
8  supportive.  It's -- it's in response to a
9  proposal from a citizens voluntary agency to
10  provide more stringent labeling on talcum
11  powder products, and the agency rejected
12  the -- that petition.
13      Q.    The FDA is the regulatory body
14  in the United States that oversees food, drug
15  and cosmetics; is that right?
16          MS. O'DELL:  Object to the
17  form.
18      A.    Yes.
19  BY MR. ZELLERS:
20      Q.    This letter -- strike that.
21          In this letter the FDA goes
22  through and analyzes some of the Bradford
23  Hill factors; is that right?
24      A.    I'd have to look at this in

Page 220

1  more detail to be able to answer that
2  specifically.
3      Q.    Well, essentially, based upon
4  its analysis as of 2014, the FDA concluded
5  that causation had not been established as
6  between genital talcum powder use and ovarian
7  cancer or an increased risk of ovarian
8  cancer, correct?
9      A.    Well, it said that an updated
10  review failed to identify any new compelling
11  literature data or new scientific evidence.
12  I don't think they indicate here that they
13  actually did a standard review of that
14  literature.
15      Q.    Well, take a look, if you will,
16  at page 4.  The FDA sets forth its
17  epidemiology and etiology findings; is that
18  right?
19      A.    Yes.
20      Q.    The FDA has a number of very
21  capable physicians, scientists,
22  toxicologists, pharmacologists and medical
23  professionals; is that right?
24          MS. O'DELL:  Object to the

Page 221

1  form.
2      A.    I don't know if they're still
3  working, but they have good people on staff.
4  BY MR. ZELLERS:
5      Q.    And just so, a year or two or
6  three, if this transcript is ever reviewed,
7  we are in the midst of a shutdown of at least
8  portions of the government; is that right?
9      A.    That's correct.
10      Q.    And that is what your comment
11  was directed to, correct?
12      A.    That is correct.
13      Q.    On page 4 the FDA states:
14  After consideration of the scientific
15  literature submitted in support of both
16  citizens' petitions, FDA found.
17          And then, number 2, that
18  several of the studies acknowledge biases in
19  the study design and no single study has
20  considered all the factors that potentially
21  contribute to ovarian cancer, including
22  selection bias and/or uncontrolled
23  confounding that result in spurious positive
24  associations between talc use and ovarian

56 (Pages 218 to 221)

Arch I. "Chip"  Carson, M.D., Ph.D.

Page 222

1  cancer risk.
2       Did I read that correctly?
3    A.    You did read it correctly.
4    Q.    Does that appear to be at least
5  one of the conclusions of the FDA after
6  considering the scientific literature as of
7  early 2014?
8       MS. O'DELL:  Object to the
9    form.
10   A.    Yes, that is listed as an FDI
11  finding -- FDA finding.
12  BY MR. ZELLERS:
13   Q.    The FDA noted that a
14  dose-response -- strike that.
15       The FDA noted that
16  dose-response evidence is lacking; is that
17  right?
18   A.    A dose-response --
19   Q.    Two things.  The FDA notes that
20  there's a lack of consistency in the study
21  results, correct?
22       MS. O'DELL:  Where are you
23    reading?  I'm sorry.
24       MR. ZELLERS:  I'm looking at

Page 223

1       Conclusion 3.
2       THE WITNESS:  Point 3.
3    A.    They found that the
4  case-control studies did not demonstrate a
5  consistent positive association across
6  studies; although some studies have found
7  small positive associations between talc and
8  ovarian cancer, but lower confidence limits
9  are often close to 1, and dose-response
10  evidence is lacking.
11  BY MR. ZELLERS:
12   Q.    That was FDA's conclusion
13  number 3 based upon its review of the
14  scientific literature; is that right?
15       MS. O'DELL:  Object to the
16    form.
17   A.    It's correct.  It's not a valid
18  interpretation of the statistical results,
19  but that was one of their findings.
20  BY MR. ZELLERS:
21   Q.    Well, that was their finding.
22  You disagree at least in part with their
23  finding; is that right?
24       MS. O'DELL:  Object to the

Page 224

1  form.
2    A.    That is correct.
3  BY MR. ZELLERS:
4    Q.    You are a paid expert for the
5  plaintiffs in this litigation; is that right?
6    A.    That is correct.
7    Q.    To your knowledge, the FDA is
8  not paid -- well, let me withdraw that.
9    A.    I wouldn't go out on a limb
10  there.
11   Q.    Number 4, Conclusion 4, a
12  cogent biological mechanism by which talc
13  might lead to ovarian cancer is lacking.
14  Exposure to talc does not account for all
15  cases of ovarian cancer and there was no
16  scientific consensus on the proportion of
17  ovarian cancer cases that may be caused by
18  talc exposure.
19       Was that a conclusion of the
20  FDA based upon its review of the
21  epidemiologic literature?
22       MS. O'DELL:  Object to the
23    form.
24   A.    Yes, it was, and it's one that

Page 225

1  I also disagree with.
2  BY MR. ZELLERS:
3    Q.    IARC also considered the
4  Bradford Hill considerations; is that right?
5    A.    Yes, it did.
6    Q.    IARC rejected classification of
7  talc as a carcinogenic, instead assigning it
8  to the classification of possibly
9  carcinogenic to humans; is that correct?
10   A.    That's correct.
11   Q.    We've already discussed the
12  IARC categories briefly, but let's mark a
13  document from the IARC website as to the
14  classifications, Exhibit 21.
15       (Carson Deposition Exhibit 21
16    marked.)
17  BY MR. ZELLERS:
18   Q.    Tell me if you recognize that.
19   A.    Yes.
20   Q.    Exhibit 21 is from the IARC
21  website, and it goes through the
22  classifications of different agents that have
23  been made by the International Agency for
24  Research on Cancer; is that right?

57 (Pages 222 to 225)

Arch I. "Chip"  Carson, M.D., Ph.D.

Page 226

1       A.    Yes, that's correct.
2       Q.    It has studied and included 120
3   agents in the Group 1 category, which is
4   carcinogenic to humans, correct?
5       A.    That's correct.
6       Q.    That's the only category in
7   which IARC finds sufficient evidence in
8   humans, correct?
9           MS. O'DELL:  Object to the
10   form.
11      A.    That's the category that
12   represents substances for which there is
13   sufficient and irrefutable evidence of human
14   carcinogenesis.
15   BY MR. ZELLERS:
16      Q.    It lists 82 agents in Group 2A
17   as being probably carcinogenic to humans; is
18   that right?
19      A.    That's correct.
20      Q.    IARC is certainly willing to
21   declare agents as either a known or probable
22   carcinogen; is that right?
23      A.    That's correct.
24      Q.    There is only one agent in

Page 227

1   Group 4, probably not carcinogenic to humans,
2   correct?
3       A.    Yes.  I thought that number had
4   gone up recently, but the date here is
5   November 2018, so some may have been moved
6   back into Group 3.
7       Q.    So out of the over 1,000 agents
8   that IARC has reviewed, it's only placed one
9   agent in the Group 4 category, probably not
10   carcinogenic; is that right?
11      A.    That's correct.
12      Q.    There is no Group 5, not
13   carcinogenic; is that right?
14      A.    That's correct.
15      Q.    With genital talc, IARC
16   Group 2B designation -- well, strike that.
17          Genital talc is listed as an
18   IARC Group 2B designated substance; is that
19   right?
20      A.    That's correct.
21      Q.    That's based on limited
22   evidence in humans, which means that IARC
23   cannot rule out chance, bias or confounding
24   with reasonable confidence, correct?

Page 228

1           MS. O'DELL:  Object to the
2   form.
3       A.    I think limited evidence also
4   refers to just the number of studies that
5   have been performed as well as the quality of
6   the studies.
7   BY MR. ZELLERS:
8       Q.    Well, based upon the evidence
9   that is available, the studies that are
10   available, a 2B designation by IARC means
11   that IARC cannot rule out chance, bias or
12   confounding with reasonable confidence,
13   correct?
14          MS. O'DELL:  Objection, asked
15   and answered.
16      A.    Not always the case.
17   BY MR. ZELLERS:
18      Q.    That's part of the definition,
19   isn't it?
20      A.    I don't believe it applies to
21   every agent or every evaluation.
22      Q.    Well, I'll not take the time to
23   go through the IARC definitions; if we at the
24   end of the day have extra time, we'll go back

Page 229

1   and we'll take a look.
2           What else is in the Class 2B,
3   possibly carcinogenic.  Ginkgo biloba, is
4   that something you're aware of that's in that
5   category?
6           MS. O'DELL:  Object to the
7   form.
8       A.    That's a biological material.
9   BY MR. ZELLERS:
10      Q.    Pickled vegetables?
11      A.    That may be in Group 2B.
12      Q.    Occupational carpentry and
13   joinery?
14          MS. O'DELL:  Objection to form.
15      A.    That's wood dust exposure.
16   BY MR. ZELLERS:
17      Q.    Also 2B; is that right?
18      A.    Wood dust itself is Group 1.
19   The occupation is Group 2B.
20      Q.    Let me ask you about some
21   individual Bradford Hill criteria.  On
22   page 10 of your report, you state that you
23   gave the most weight to strength of
24   association, consistency and biologic

58 (Pages 226 to 229)

Arch I. "Chip"  Carson, M.D., Ph.D.

Page 230

1  plausibility; is that right?
2      A.    That's correct.
3      Q.    How much weight did you give to
4  the other six factors?
5      A.    Sufficient.
6      Q.    Why did you put less weight on
7  those?
8      A.    Because the strength of
9  association, the consistency of the evidence
10 and the biological plausibility of perineal
11 talc, talcum powder application as
12 responsible for the occurrence of ovarian
13 cancer was compelling.
14     Q.    FDA focused on dose, correct?
15     A.    Yes.
16     Q.    You did not; is that right?
17     A.    That's right.
18     Q.    The first Bradford Hill factor
19 that you focused on was strength of
20 association.
21          What association does the
22 literature report between talc use and
23 ovarian cancer?
24     A.    Overall, evaluating the

Page 231

1  universe of research, epidemiologic research
2  that's been done on this, it shows an average
3  30% increase in ovarian cancer risk for those
4  who regularly apply talcum powder to the
5  perineum.
6      Q.    Regular application of talcum
7  powder means what?
8      A.    It -- I believe that it means
9  daily or thereabouts.
10     Q.    In what form of application?
11     A.    Talcum powder.
12     Q.    In what amount?
13     A.    Whatever is necessary or
14 desired by the user.
15     Q.    Does that vary from woman to
16 woman?
17     A.    It does.
18     Q.    Did you make any attempt to
19 assess what regular use of talcum powder was?
20          MS. O'DELL:  Object to the
21 form.
22     A.    There have been a couple of
23 attempts to try to quantify what -- what that
24 means.  I think for the most part they've

Page 232

1  been failed attempts, but they have been
2  attempts to estimate the quantity of powder
3  that you start with and the amount that
4  results in the application to the perineum by
5  using models and actually doing some
6  measurements and recording activities.
7  BY MR. ZELLERS:
8      Q.    You did not do any modeling or
9  any assessment of the quantity of baby powder
10 that was involved with daily use; is that
11 right?
12     A.    No, I relied on those others.
13     Q.    When you say 30% increased
14 risk, that's a 1.3 odds ratio; is that right?
15     A.    That's correct.
16     Q.    And that comes largely from the
17 case-control studies, correct?
18          MS. O'DELL:  Object to the
19 form.
20     A.    Yes, but it's also consistent
21 with some of the information from the cohort
22 studies.
23 BY MR. ZELLERS:
24     Q.    Epidemiologists consider a 1.3

Page 233

1  odds ratio in a case-control study to be a
2  weak or modest association; is that right?
3          MS. O'DELL:  Object to the
4  form.
5      A.    That's correct.
6  BY MR. ZELLERS:
7      Q.    Where here we're talking only
8  about statistical associations, not
9  causation, correct?
10          MS. O'DELL:  Object to the
11 form.
12     A.    Well, association eventually
13 becomes causation when the -- when the
14 evidence mounts to a point where it becomes
15 recognized by all of the players that this is
16 what's going on.
17          A 30% increase may be
18 classified by epidemiologists as weak or
19 modest, but if you look at the number of
20 women in this country who die each year from
21 this fatal disease, that represents about
22 3,000 lives that could potentially be saved
23 through prevention.
24     Q.    There is not a --

59 (Pages 230 to 233)

Arch I. "Chip" Carson, M.D., Ph.D.

Page 234

1          MS. BOCKUS:  Excuse me, I need
2    to object as nonresponsive.
3          MR. ZELLERS:  Yes, join.
4    BY MR. ZELLERS:
5          Q.    There is not a consensus at
6    this time with respect to any causation
7    relating to genital talc and ovarian cancer,
8    is there?
9          MS. O'DELL:  Objection to the
10   form.
11         A.    I believe that that consensus
12   is building.
13   BY MR. ZELLERS:
14         Q.    FDA -- that's not FDA's
15   position, correct?
16         MS. O'DELL:  Object to the
17   form.
18         A.    Not at the moment.
19   BY MR. ZELLERS:
20         Q.    That's not the position of the
21   National Cancer Institute; is that right?
22         A.    That's correct.
23         Q.    That's not the position of the
24   CDC; is that correct?

Page 235

1          A.    That's correct.
2          Q.    IARC does not refer to any
3    association between perineal talc use and
4    ovarian cancer as a strong association, does
5    it?
6          MS. O'DELL:  Object to the
7    form.
8          A.    It calls it a Group 2B
9    carcinogen, which is fairly significant.
10   BY MR. ZELLERS:
11         Q.    Well, we discussed a few
12   minutes ago that if an agent is a Group 2B
13   carcinogen, that is based on limited evidence
14   in humans; is that right?
15         A.    That's correct.
16         Q.    All right.  Your opinions on
17   strength of association, do they apply
18   equally to all forms of ovarian cancer?
19         A.    No, they don't.  These apply to
20   the epithelial ovarian cancer spectrum.
21         Q.    Your opinions in terms of there
22   being a -- well, let me withdraw that.
23         We've agreed that 1.3 is not a
24   strong association, at least insofar as

Page 236

1    epidemiologists are concerned, correct?
2          MS. O'DELL:  Object to --
3    object to the form.
4          A.    It's an increased risk that
5    translates into human lives, so it depends on
6    your point of view.
7          MS. BOCKUS:  Object to form --
8    I mean, sorry, nonresponsive, move to
9    strike.
10         MR. ZELLERS:  Join.
11         MS. O'DELL:  Oppose.
12         DR. THOMPSON:  Agreed.
13   BY MR. ZELLERS:
14         Q.    The 1.3 relative risk that you
15   believe generally applies, that would relate
16   to epithelial cancers; is that right?
17         A.    Yes.
18         Q.    That's what you're limiting
19   your opinions to in this case, correct?
20         MS. O'DELL:  Object to the
21   form.
22         A.    Well, these opinions relate to
23   several of the cancers that have shown
24   increases in these background epidemiologic

Page 237

1    studies, which include the epithelial ovarian
2    cancers, including the serous; the borderline
3    cancers are also showing increases in some of
4    the studies.  So it's the group of those
5    cancers, yes.
6    BY MR. ZELLERS:
7          Q.    The cohort studies, prospective
8    cohort studies, have not shown an association
9    between talc and ovarian cancer, correct?
10         MS. O'DELL:  Object to the
11   form.
12         A.    They have in some subtypes.
13   BY MR. ZELLERS:
14         Q.    There was an initial
15   description with respect to the first Nurses'
16   study that was not supported in the update of
17   that study; is that correct?
18         A.    The Nurses' Health Study?
19         Q.    Yes.
20         A.    Yes, that's correct.
21         Q.    Let's look at a different
22   criteria, consistency.  The literature does
23   not show a consistent association between
24   talc use and ovarian cancer, correct?

60 (Pages 234 to 237)

Arch I. "Chip"  Carson, M.D., Ph.D.

Page 238

1        MS. O'DELL:  Object to the
2    form.
3        A.    I believe that, in fact,
4    research shows -- does show a consistent
5    pattern.
6    BY MR. ZELLERS:
7        Q.    The cohort studies do not show
8    an association between talc use and ovarian
9    cancer as we just discussed, correct?
10        A.    The basic cohort studies that
11    look at all of the subjects and all of the
12    cancers together typically do not rise to the
13    level of significance.
14        Q.    The hospital-based case-control
15    studies collectively do not show an
16    association between talc use and ovarian
17    cancer, correct?
18        A.    I sort of discount the
19    distinction between the hospital-based
20    studies and the community-based studies.  I'm
21    not sure whether there are valid reasons to
22    consider those differently.
23        Q.    We've discussed earlier that
24    you are not an epidemiologist; is that right?

Page 239

1        MS. O'DELL:  Object to the
2    form, misstates his testimony.
3        A.    I don't think I necessarily
4    agreed to that characterization because I
5    deal a lot with epidemiologic work. I'm a
6    faculty member in the Department of
7    Epidemiology at the University of Texas
8    School of Public Health, and some may
9    consider me an epidemiologist.
10    BY MR. ZELLERS:
11        Q.    Do you consider yourself an
12    expert in epidemiology?
13        A.    No.
14        Q.    Do you agree -- well, do you
15    agree that hospital-based case-control
16    studies are less susceptible to selection
17    bias than population-based case-control
18    studies?
19        A.    It depends on the methodology
20    that's used to recruit the study subjects.
21        Q.    With hospital-based
22    case-controlled studies, you're more likely
23    to be comparing hospitalized patients to
24    hospitalized patients rather than comparing

Page 240

1    ill patients in the community to healthy
2    people in the community, correct?
3        A.    In some cases that might be
4    correct, but I'm not sure that's any -- in
5    any sort of world an advantage.
6        Q.    Well, shouldn't there be
7    consistency if the Bradford Hill criteria is
8    to be -- well, strike that.
9        In applying the Bradford Hill
10    criteria of consistency, there should be
11    consistency across different types of
12    studies, cohort studies, hospital-based
13    case-control studies, and population-based
14    case-control studies, correct?
15        MS. O'DELL:  Object to the
16    form.
17        A.    That's correct.
18    BY MR. ZELLERS:
19        Q.    Isn't the absence of an
20    association in the cohort studies especially
21    significant in that the study design for the
22    cohort studies reduces the likelihood of
23    recall bias?
24        A.    There are many forms of bias

Page 241

1    that study designers need to consider in the
2    process of designing a study, and there are
3    even more types of bias that are discovered
4    after a study has begun.
5        You can fault case-control
6    studies for being particularly sensitive to
7    recall bias, but many of these authors who
8    perform these studies indicated that they
9    were well aware of that bias potential and
10    took measures to avoid it.
11        The same thing can be said
12    about cohort studies.  They suffer from other
13    forms of bias, misclassification in
14    particular.  They may also suffer from the
15    fact that they are extremely expensive, have
16    long duration, and require very large numbers
17    of subjects in order to carry them out and
18    are frequently underpowered and unable to
19    arrive at the conclusions that they seek for
20    that reason.
21        MR. ZELLERS:  Move to strike as
22    nonresponsive.
23    BY MR. ZELLERS:
24        Q.    Is it possible that recall bias

61 (Pages 238 to 241)

Arch I. "Chip" Carson, M.D., Ph.D.

Page 242

1  explains the difference between the cohort
2  studies and the retrospective case-control
3  studies?
4      MS. O'DELL: Object to form,
5  asked and answered.
6      A.   I don't believe that that is
7  the case.
8  BY MR. ZELLERS:
9      Q.   Is it possible?
10     MS. O'DELL: Objection.
11     A.   Theoretically it would be
12 possible.
13 BY MR. ZELLERS:
14     Q.   Are you familiar with the
15 Berge -- Berge 2017 study?
16     A.   Yes.
17     Q.   Is that a study that you cite
18 and reviewed and rely on?
19     A.   It was a meta-analysis.
20     Q.   Is that a meta-analysis that
21 you cite, review and have relied upon?
22     A.   Yes.
23     Q.   Take a look, if you will, at
24 Exhibit 22.

Page 243

1      (Carson Deposition Exhibit 22
2  marked.)
3      THE WITNESS: Thank you.
4      MS. O'DELL: Thank you.
5  BY MR. ZELLERS:
6      Q.   You're familiar with this
7  meta-analysis; is that right?
8      A.   Yes.
9      Q.   The authors conclude that
10 information bias from retrospective
11 self-report of talc use is a possible
12 explanation for the association detected in
13 case-control studies; is that right?
14     MS. O'DELL: I'm sorry, are you
15 reading from a certain page?
16     MR. ZELLERS: I am.
17     MS. O'DELL: Can you direct it
18 to us, please?
19     THE WITNESS: Could you tell us
20 where that is?
21     MR. ZELLERS: Sure.
22 BY MR. ZELLERS:
23     Q.   Take a look if you will on
24 page 6, the right-hand column, third

Page 244

1  paragraph. Reading from the second full
2  paragraph, the authors discuss the fact that
3  the association between genital talc use and
4  risk of ovarian cancer is present in
5  case-control but not in cohort studies, can
6  be attributed to bias in the former type of
7  studies; is that right?
8      MS. O'DELL: Object to the
9  form.
10     A.   That's what it says.
11 BY MR. ZELLERS:
12     Q.   Then continuing down:
13 Information bias from retrospective
14 self-report of talc use is a possible
15 explanation for the association detected in
16 case-control studies.
17     Is that right?
18     A.   That's what it says.
19     Q.   What was your methodology for
20 discounting the effect of recall bias in the
21 population-based case-control studies?
22     A.   The fact that several authors
23 discussed the possibility of recall bias and
24 incorporated methodology for avoiding recall

Page 245

1  bias, for example, placing parallel questions
2  that should be affected in the same way, and
3  still showed a positive result for talc and
4  ovarian cancer is one reason.
5      The other has to do with
6  consistency of the results, and although
7  you've stated that from these various
8  documents, including this quotation, that the
9  case-control studies showed positive
10 associations but the cohort studies did not,
11 I would -- I would refute that by saying that
12 all of the -- the vast majority of all of the
13 studies show a positive odds ratio or
14 relative risk, even if they don't rise to the
15 level of significance.
16     If these results were obtained
17 simply by chance, you would expect an equal
18 number of positive results and negative
19 results, but we don't have that here. We
20 have practically all positive results with
21 three or four outliers.
22     And so --
23     Q.   We looked at the Taher paper
24 early on in this deposition where Taher

62 (Pages 242 to 245)

Arch I. "Chip"  Carson, M.D., Ph.D.

Page 246

1  concluded that 15 out of the 30 case-control
2  studies reported a statistically significant
3  association between genital talc use and
4  ovarian cancer, correct?
5      A.    That's correct, but you're
6  not -- you're not talking about the other 15.
7      Q.    The hospital-based case-control
8  studies collectively do not show a
9  statistically significant association between
10  talc use and ovarian cancer, correct?
11          MS. O'DELL:  Object to the
12  form.
13      A.    I don't know that that is the
14  case.
15  BY MR. ZELLERS:
16      Q.    You don't know that it's not
17  the case; you'd have to go back and relook at
18  the studies, fair?
19      A.    I'd have to look through here,
20  which I'm happy to do if you want me to, but
21  I don't believe that that's the case.
22      Q.    In fact, the author, you cite
23  the Langseth paper, a 2008 paper, as
24  supportive of your position; is that right?

Page 247

1      A.    Yes.
2      Q.    I'll mark that
3  Deposition Exhibit 23.
4      A.    I think it was 2004, was it
5  not?
6      Q.    Well, I'm going to hand it to
7  you and we can look at it together.
8          (Carson Deposition Exhibit 23
9  marked.)
10      A.    Okay.
11  BY MR. ZELLERS:
12      Q.    You're familiar with the
13  Langseth paper; is that right?
14      A.    Yes.
15          (Comments off the stenographic
16  record.)
17  BY MR. ZELLERS:
18      Q.    Langseth and the authors
19  concluded that the current body of
20  experimental and epidemiological evidence is
21  insufficient to establish a causal
22  association between perineal use of talc and
23  ovarian cancer risk; is that right?
24          And I'm looking at the second

Page 248

1  page.
2          MS. O'DELL:  Object to the
3  form.
4  BY MR. ZELLERS:
5      Q.    Is that the conclusion of the
6  authors?
7      A.    What I'm reading here is on
8  balance, the epidemiological evidence
9  suggests that the use of cosmetic talc in the
10  perineal area may be associated with ovarian
11  cancer risk.  The mechanism of
12  carcinogenicity may be related to
13  inflammation.
14      Q.    Take a look at the paragraph on
15  the right-hand side under Proposal to
16  Research Community.  I'm looking at the
17  second page of the Langseth article.
18          Are you there?
19      A.    Yes, I am.
20      Q.    The authors state:  The current
21  body of experimental and epidemiological
22  evidence is insufficient to establish a
23  causal association between perineal use of
24  talc and ovarian cancer risk.

Page 249

1          Is that right?
2          MS. O'DELL:  Object to the
3  form.
4      A.    That's what it says.
5  BY MR. ZELLERS:
6      Q.    Experimental research is needed
7  to better characterize deposition, retention
8  and clearance of talc to evaluate the ovarian
9  carcinogenicity of talc.
10          Is that what the authors state?
11      A.    Well, that's what it says, but
12  it says much more.  In fact, the editors of
13  the journal, in the section on the next page
14  that is titled What This Study Adds, say:
15  Epidemiological evidence suggests that the
16  use of cosmetic talc in the perineal area may
17  be associated with ovarian cancer risk.  The
18  IARC has classified this use of talc as
19  possibly carcinogenic to human beings,
20  Group 2B.  The mechanism of carcinogenicity
21  may be related to inflammation.  This paper
22  focused on the high degree of consistency in
23  the studies accomplished so far and what
24  should be the focus in future studies.

63 (Pages 246 to 249)

Arch I. "Chip"  Carson, M.D., Ph.D.

Page 250

1          So I --
2     Q.    And then the conclusion is what
3   I read, that:  The current body of
4   experimental and epidemiological evidence is
5   insufficient to establish a causal
6   association between perineal use of talc and
7   ovarian cancer risk.
8          Correct?
9          MS. O'DELL:  Object to the
10   form.
11     A.    That is what it says, but this
12   was accepted in 2007, which was now 12 years
13   ago.
14   BY MR. ZELLERS:
15     Q.    Let me ask you about the cohort
16   studies.  They involved a much greater number
17   of women than the case-controlled studies; is
18   that right?
19          MS. O'DELL:  Object to the
20   form.
21     A.    Well, they did not involve more
22   cases, but they involved more women because
23   in order to do a cohort study, you have to
24   start with a huge group of people and wait

Page 251

1   for them to develop cancers, and then count
2   those cancers.
3   BY MR. ZELLERS:
4     Q.    What was your methodology for
5   weighing the power of the cohort studies
6   versus the case-control studies?
7     A.    The cohort studies, it wasn't
8   apparent in every research report exactly how
9   they had done their sample size calculations
10   and power determinations, but in many cases
11   the lack of arriving at conclusions was
12   simply due to an inability to detect an
13   effect in the cohort studies, not that they
14   detected that there was not an effect.  And
15   that's unfortunately a disadvantage of an
16   underpowered study.
17     Q.    Is it your testimony that the
18   cohort studies are underpowered?
19     A.    I think by and large most
20   cohort studies are underpowered and --
21   because power calculations are based on
22   chance.  Investigators are sort of spinning
23   the roulette wheel and hoping that the number
24   that they want comes up.  In some cases that

Page 252

1   doesn't happen.
2     Q.    Is it your testimony that the
3   cohort studies relating to genital talc use
4   and ovarian cancer are spinning the roulette
5   wheel?
6          MS. O'DELL:  Object to the
7   form.
8     A.    In terms of the power of the
9   studies to detect a meaningful difference
10   among the subjects, yes.
11   BY MR. ZELLERS:
12     Q.    That's your testimony as an
13   expert in this case; is that right?
14     A.    It is my testimony that cohort
15   studies, including these, are chronic -- or
16   quite often underpowered simply because of
17   the expense associated with performing these
18   studies.
19     Q.    What analysis did you do to
20   conclude that the cohort studies in this
21   area, the four cohort studies, are
22   underpowered?
23     A.    Like I just mentioned to you, I
24   read the studies and looked at their

Page 253

1   conclusions, and their conclusions were not
2   that the effect didn't exist, but they
3   couldn't detect it.
4          MR. ZELLERS:  Let's go off the
5   record because we need to change our
6   tape.
7          THE VIDEOGRAPHER:  We're off
8   the record at 3:06, end of Tape 3.
9          (Recess taken, 3:06 p.m. to
10   3:19 p.m.)
11          THE VIDEOGRAPHER:  We're on the
12   record at 3:19, beginning of Tape 4.
13   BY MR. ZELLERS:
14     Q.    Dr. Carson, you are not a
15   statistician, correct?
16     A.    That's correct.
17     Q.    You are not a biostatistician;
18   is that right?
19     A.    That's right.
20     Q.    Do you agree that some of the
21   case-control studies have shown statistically
22   significant findings and others have not?
23     A.    I do agree that.
24     Q.    If a study does not show a

64 (Pages 250 to 253)

Arch I. "Chip"  Carson, M.D., Ph.D.

Page 254

1  statistically significant association, it
2  could mean that no risk exists, as we've
3  discussed; is that right?
4      A.    That's correct.
5      Q.    What methodology did you use to
6  weigh the lack of statistical significance
7  across studies?
8          MS. O'DELL:  Object to the
9      form.
10     A.    Across all of the case-control
11 studies?
12 BY MR. ZELLERS:
13     Q.    Yes.
14     A.    I simply treated them as
15 isolated research designs that were done on
16 different populations in different places
17 with different considerations.  They were not
18 necessarily comparable, like apples to apples
19 or oranges to oranges; they were very
20 different studies in most cases, and so I
21 felt it was important to allow their findings
22 to stand on their own.
23     Q.    I want to talk to you about
24 dose-response.  That's another of the

Page 255

1  Bradford Hill criteria; is that right?
2      A.    That's correct.
3      Q.    Which studies show a
4  dose-response, talc exposure and ovarian
5  cancer?
6      A.    Let me see here.  I'm looking
7  at my notes.  The Harlow study from 1992
8  showed a dose-response, and the Cramer 2016
9  study showed a dose trend with strong odds
10 ratios for premenopausal women and hormone
11 therapy-treated women with greater than
12 24 years of exposure.
13         The Schildkraut study, also a
14 case-controlled study of 2016, showed a
15 dose-response.
16     Q.    There are a number of studies
17 that did not show a dose-response; is that
18 right?
19     A.    It's correct.  They did not
20 necessarily show there was not a
21 dose-response.  They just, as I was
22 mentioning before, were unable to detect a
23 dose-response.
24     Q.    Do you have your report in

Page 256

1  front of you?
2      A.    I do.
3          I would also add that the
4  Penninkilampi meta-analysis also found a
5  dose-response.
6      Q.    Do you mention Penninkilampi at
7  all in your report?
8      A.    It's cited.
9      Q.    In the body of your report?
10     A.    I think it's in there
11 somewhere.
12     Q.    You believe it is; is that
13 right?
14     A.    I do.
15     Q.    Well, I'll ask you a couple of
16 questions about it then.
17         Before I do, let's talk a
18 little bit more about your report.  So go to
19 page 7.  You state at the very top of that
20 page that it has been difficult to estimate
21 dose in order to evaluate the dose-response
22 relationship for ovarian cancer; is that
23 right?
24     A.    That's correct.

Page 257

1      Q.    You state that it also has been
2  difficult to exactly estimate the quantity of
3  talcum powder administration during personal
4  hygiene activities; is that right?
5      A.    That's correct.
6      Q.    Let's look at a couple of the
7  studies that you believe do, in fact, show a
8  dose-response.  The Penninkilampi, that's a
9  meta-analysis, 2018; is that right?
10     A.    That's correct.
11     Q.    That study does not consider or
12 include the Gertic 2010 cohort study; is that
13 right?
14     A.    I -- I'd have to look at the
15 table, but yes, that one may be left out.
16     Q.    Well, that's a significant
17 study to leave out of an analysis, isn't it?
18         MS. O'DELL:  Object to the
19     form.
20         THE WITNESS:  I'm getting
21     there.
22         (Document review.)
23         THE WITNESS:  Apologies, I have
24     binder block here.

65 (Pages 254 to 257)

Arch I. "Chip"  Carson, M.D., Ph.D.

|  | Page 258 |
|---|---|
| 1 | MS. O'DELL:  You need help? |
| 2 | THE WITNESS:  Okay. |
| 3 | BY MR. ZELLERS: |
| 4 | Q.    And I misspoke.  I meant to |
| 5 | refer to Gates, the updated Nurses' study. |
| 6 | So Gates 2010. |
| 7 | A.    Yes, it appears that Gates is |
| 8 | not included in the -- in the spectrum of |
| 9 | studies considering; the Gertic study does |
| 10 | appear. |
| 11 | Q.    Gates 2010 is an important |
| 12 | cohort study in this area, would you agree? |
| 13 | MS. O'DELL:  Object to the |
| 14 | form. |
| 15 | A.    It's important, but I think it |
| 16 | may be considered one of the ones that |
| 17 | suffered from power issues.  It wasn't able |
| 18 | to determine a relative risk in the |
| 19 | population that it assessed. |
| 20 | BY MR. ZELLERS: |
| 21 | Q.    There are a number of the |
| 22 | case-control studies that did not determine a |
| 23 | relative risk, at least of statistical |
| 24 | significance, correct? |

|  | Page 259 |
|---|---|
| 1 | A.    Well, they determined odds |
| 2 | ratios, which is the equivalent of relative |
| 3 | risk for a case-control study. |
| 4 | Q.    And in a number of those |
| 5 | case-control studies, at least 15 out of the |
| 6 | 30 relative risk was not -- or strike that -- |
| 7 | statistical significance was not achieved in |
| 8 | the study; is that right? |
| 9 | MS. O'DELL:  Object to the |
| 10 | form. |
| 11 | A.    That's correct. |
| 12 | BY MR. ZELLERS: |
| 13 | Q.    Let's look at the Cramer paper. |
| 14 | We've talked about this earlier. |
| 15 | A.    Which one, the 2016? |
| 16 | Q.    Exhibit 20, yes, 2016. |
| 17 | A.    Okay. |
| 18 | Q.    This is another study that you |
| 19 | cite as being supportive of your |
| 20 | dose-response opinion; is that right? |
| 21 | A.    Yes. |
| 22 | Q.    Tell me when you have it. |
| 23 | A.    I think you may have picked up |
| 24 | my copy or the copy that I was looking at. |

|  | Page 260 |
|---|---|
| 1 | Q.    This is my highlighted copy, so |
| 2 | I'm sure it wasn't yours. |
| 3 | A.    I'm sorry. |
| 4 | Q.    That's all right.  We'll -- |
| 5 | take your time. |
| 6 | A.    Here we are. |
| 7 | Q.    Got it, Exhibit 20? |
| 8 | A.    I think so. |
| 9 | Q.    Do you have the Cramer study in |
| 10 | front of you? |
| 11 | A.    I do. |
| 12 | Q.    It's a retrospective |
| 13 | case-control study published in 2016; is that |
| 14 | right? |
| 15 | A.    That's correct. |
| 16 | Q.    If we look at the table of |
| 17 | results on page 337, Table 1. |
| 18 | Do you see that? |
| 19 | A.    Yes. |
| 20 | Q.    This table shows the risk of |
| 21 | ovarian cancer for women who use talc, talcum |
| 22 | powder, daily; is that right? |
| 23 | MS. O'DELL:  Object to the |
| 24 | form. |

|  | Page 261 |
|---|---|
| 1 | A.    It does. |
| 2 | BY MR. ZELLERS: |
| 3 | Q.    And it's four different periods |
| 4 | of time; one year, one to five years, five to |
| 5 | 20 years and more than 20 years; is that |
| 6 | right? |
| 7 | A.    That's correct. |
| 8 | Q.    There was only statistical |
| 9 | significance found for the time period of one |
| 10 | to five years of use and more than 20 years |
| 11 | of use; is that right? |
| 12 | A.    For the first group, the -- for |
| 13 | those who reported months year of use -- |
| 14 | months per year of use. |
| 15 | Q.    Well, for the first group, |
| 16 | which was equivalent to one year of daily |
| 17 | use, there was no statistical significance; |
| 18 | is that right? |
| 19 | MS. O'DELL:  Object to the |
| 20 | form. |
| 21 | A.    That -- well, the -- there was |
| 22 | a positive odds ratio with a nonsignificant |
| 23 | 95% confidence interval. |
| 24 | /// |

66 (Pages 258 to 261)

Arch I. "Chip"  Carson, M.D., Ph.D.

Page 262

1  BY MR. ZELLERS:
2      Q.    Meaning that if you look at
3  this study, that it is certainly possible
4  that because there is not statistical
5  significance, there could be a finding of no
6  risk, correct, no increased risk?
7      A.    That's a possibility.
8      Q.    Then if we go to the next
9  period, we do show a dose-response for talcum
10  powder use in the year -- years one to five;
11  is that right?
12      A.    Well, one to five years of
13  daily use, yes.
14      Q.    But then when we look at five
15  to 20 years of daily use, there is not a
16  statistically significant association; is
17  that right?
18      A.    That's correct.
19      Q.    But then when we go to greater
20  than 20 years, we do find a statistical
21  association; is that right?
22      A.    That's correct.
23      Q.    If, in fact, there was a true
24  dose-response relationship, you would expect

Page 263

1  to see that dose-response relationship in
2  each of these groups; is that right?
3          MS. O'DELL:  Object to the
4      form.
5      A.    It's more like we see in the
6  group directly below that, where you start
7  out with an odds ratio which is not
8  significant but positive, and then reach a
9  significant odds ratio at one to five years
10  of daily use and a higher amount of
11  significance with five to 20 years of daily
12  use, and still a significant odds ratio,
13  which is about the same level, at greater
14  than 20 years of daily use.
15  BY MR. ZELLERS:
16      Q.    Is that a yes to my question,
17  that if you do have a true dose-response
18  relationship, you would expect to see that
19  dose-response continue throughout each of the
20  periods?
21          MS. O'DELL:  Object to the
22      form.
23      A.    Well, it would be nice if you
24  did that, but epidemiologic data is very

Page 264

1  dirty, and it doesn't always work out quite
2  that cleanly.
3  BY MR. ZELLERS:
4      Q.    All right.  Do you -- well, let
5  me withdraw that.
6          Confounding.  You considered
7  and talk about confounding as another one of
8  the Bradford Hill criteria; is that right?
9          MS. O'DELL:  Object to the
10      form.
11      A.    Confounding, by that you mean
12  specificity?
13  BY MR. ZELLERS:
14      Q.    Well, I thought your -- I
15  thought you said in your methodology that you
16  applied the Bradford Hill criteria.
17      A.    That's correct.
18      Q.    Is confound -- strike that.
19          Is confounding an issue in
20  interpreting epidemiologic studies?
21      A.    Yes.
22      Q.    Do you agree that there is
23  confounding in these studies?
24      A.    I'm sure there's confounding in

Page 265

1  these studies.
2      Q.    You're familiar with that term,
3  right?
4      A.    Yes.
5      Q.    That's where the presence of
6  another association confuses the relationship
7  between the exposure and the disease being
8  studied; is that right?
9      A.    That's correct.
10      Q.    For example, if you're studying
11  the association between coffee and pancreatic
12  cancer, you need to be mindful of whether
13  cigarette smoking is more common in coffee
14  drinkers than the rest of the population,
15  fair?
16      A.    Yes.
17      Q.    Coffee -- or strike that.
18          Cigarette smoking could be a
19  confounder in that situation?
20      A.    Possible.
21      Q.    Because if more coffee drinkers
22  are smokers than non-coffee drinkers, an
23  association between coffee drinking and
24  pancreatic cancer might be due to the

67 (Pages 262 to 265)

Arch I. "Chip"  Carson, M.D., Ph.D.

Page 266

1  smoking, not the coffee drinking; fair?
2      A.    That would be a good
3  description of confounding.
4      Q.    Confounding can distort results
5  in epidemiological studies; is that right?
6      A.    It can.
7      Q.    Do you agree that residual
8  confounding is possible in every
9  observational study?
10     A.    Yes, I think there's some form
11 of confounding that's present in every
12 observational study.
13     Q.    It's possible that unmeasured
14 confounders may be present in every
15 observational study; is that right?
16     A.    That's correct.  Not just
17 unmeasured confounders, but unrecognized
18 confounders.
19     Q.    It's impossible to say that all
20 known and unknown confounding factors have
21 been controlled for in any given study; is
22 that right?
23     A.    I also agree with that.
24     Q.    Many new factors possibly

Page 267

1  involved in ovarian cancer risk are just
2  being published in the literature, correct?
3          MS. O'DELL:  Object to the
4      form.
5      A.    I believe that is true.
6  BY MR. ZELLERS:
7      Q.    For example, history of
8  chlamydia infection, have you read about that
9  possibly being involved in ovarian cancer
10 risk?
11     A.    I haven't read that
12 specifically.  I was thinking more about the
13 new information regarding genetic
14 susceptibilities.
15     Q.    Also, weight gain during
16 adolescence, is that another relatively new
17 possible ovarian cancer risk factor?
18         MS. O'DELL:  Object to the
19     form.
20     A.    It is, but obesity has been
21 recognized as a cofactor for many years.
22 BY MR. ZELLERS:
23     Q.    History of chlamydia infection,
24 weight gain during adolescence, those were

Page 268

1  not controlled for in any of the talc/ovarian
2  cancer studies, were they?
3      A.    Not that I'm aware of.
4      Q.    Are you aware that studies that
5  show a relationship between talc and ovarian
6  cancer did not account for confounders?
7      A.    I think it's possible that many
8  of those studies did not account for all
9  potential confounders, but they made attempts
10 to.
11     Q.    For example, Terry 2013, we
12 talked about that earlier; is that right?
13     A.    Yes.
14     Q.    Terry 2013, that meta-analysis
15 did not adjust for hormone replacement
16 therapy usage, correct?
17     A.    Yes.
18     Q.    If hormone replacement therapy
19 is a risk factor for ovarian cancer, then the
20 Terry 2013 meta-analysis did not account for
21 that potential confounding factor, correct?
22         MS. O'DELL:  Object to the
23     form.
24     A.    Correct.

Page 269

1  BY MR. ZELLERS:
2      Q.    You cannot say whether the odds
3  ratio of the Terry 2013 study would have been
4  lower if the authors had adjusted for hormone
5  replacement therapy usage, correct?
6      A.    I cannot say that.  Yes.
7      Q.    Recall bias.  You're familiar
8  with recall bias?
9      A.    I am.
10     Q.    That is also a concern in every
11 retrospective study, correct?
12     A.    Yes.
13     Q.    Recall bias can distort a
14 scientific evaluation of whether an exposure
15 is actually related to a disease; is that
16 right?
17     A.    Yes, it can.
18     Q.    For example, recall bias could
19 distort results if women with ovarian cancer
20 were more likely to remember their exposure
21 to talc than women without ovarian cancer; is
22 that right?
23         MS. O'DELL:  Object to the
24     form.

68 (Pages 266 to 269)

Arch I. "Chip"  Carson, M.D., Ph.D.

Page 270

1      A.   That's correct.
2   BY MR. ZELLERS:
3      Q.   The effects of recall bias can
4   be very real; is that right?
5      MS. O'DELL:  Object to the
6   form.
7      A.   I'm not sure what you mean by
8   very real.
9   BY MR. ZELLERS:
10     Q.   Well, let's look at one of the
11  studies that you cite.  You cited the
12  Schildkraut study in your report and you
13  referred to it a bit earlier as supporting
14  dose-response; is that right?
15     A.   Yes.
16     Q.   That's a study by Schildkraut
17  and others titled Association Between Body
18  Powder Use and Ovarian Cancer, the
19  African-American Cancer Epidemiologic -- or
20  Epidemiology Study.
21     Is that right?
22     A.   Yes.
23     Q.   I've got it here for you.
24     A.   Okay.

Page 271

1      (Carson Deposition Exhibit 24
2   marked.)
3   BY MR. ZELLERS:
4      Q.   Deposition Exhibit 24 is the
5   Schildkraut study, 2016, correct?
6      (Pause.)
7   BY MR. ZELLERS:
8      Q.   Did you say correct?
9      A.   I think I did.  I'm sorry.
10     Q.   That's all right.  I may have
11  missed it.
12     Exhibit 24 is the Schildkraut
13  2016 study; is that right?
14     A.   Yes.
15     Q.   This is one of the studies that
16  you cite to and that you relied on in forming
17  your opinions; is that right?
18     A.   Yes.
19     Q.   The study looked at, among
20  other things, what impact, if any, lawsuit
21  filings in 2014 had on whether women recalled
22  using talc in the past, correct?
23     A.   I believe so.
24     Q.   The authors thought that the

Page 272

1   publicity from lawsuits might influence the
2   participants' recall of prior body powder
3   use; is that right?
4      A.   This was a recent study, so
5   that was more likely.
6      Q.   If you look on page 2,
7   right-hand side, last paragraph that starts
8   "Covariates include."
9      Do you see that?
10     A.   Yes.
11     Q.   And I'm reading about
12  two-thirds of the way down:  Two class action
13  lawsuits were filed in 2014 concerning
14  possible carcinogenic effects of body powder
15  which may have influenced recall of use;
16  therefore, year of interview 2014 or later,
17  yes/no, was concluded as a covariate in the
18  logistic regression models.
19     Is that correct?
20     A.   That's correct.
21     Q.   So go to page 4, Table 2.  This
22  is the adjusted odds ratio for the
23  associations between mode, frequency and
24  duration of body powder use in ovarian

Page 273

1   cancer; is that right?
2      A.   Yes.
3      Q.   The second column shows the
4   number of cases, and that would be women with
5   ovarian cancer; is that right?
6      A.   That's correct.
7      Q.   The third column shows the
8   controls; that's the women who do not have
9   ovarian cancer, correct?
10     A.   Yes.
11     Q.   Looking at this data before
12  2014, before the lawsuits, the percentage of
13  controls, meaning women without ovarian
14  cancer, said they used talc on their genitals
15  was 34%; is that right?
16     So those are women who were
17  interviewed before 2014.
18     A.   Yes.  Any genital use controls,
19  34%.
20     Q.   And the controls, again, are
21  women without ovarian cancer.
22     A.   That's correct.
23     Q.   The percentage of cases,
24  meaning women with ovarian cancer, that were

69 (Pages 270 to 273)

Arch I. "Chip"  Carson, M.D., Ph.D.

Page 274

1  interviewed before 2014 that said they used
2  talc on their genitals was 36.5%; is that
3  right?
4      A.    That's correct.
5      Q.    So roughly the same reporting
6  of genital talc use between women with and
7  without ovarian cancer occurred for those
8  women interviewed before the lawsuits were
9  filed; is that right?
10     A.    That's correct.
11     Q.    Then look at what happened
12  after the lawsuits were filed in 2014.  For
13  women interviewed after 2014, the percent of
14  women without ovarian cancer that said they
15  used talc on their genitals was 34.4%; is
16  that right?
17     A.    That's correct.
18     Q.    So based on this data, the
19  lawsuits had essentially no effect on how
20  many of the women without ovarian cancer, the
21  controls, remembered or recalled using baby
22  powder; is that right?
23     A.    Well, the percentage is the
24  same in both cases.

Page 275

1      Q.    It went from 34% to 34.4%; is
2  that right?
3      A.    That's correct.
4      Q.    For women with ovarian cancer,
5  before the lawsuits were filed, 36.5% of them
6  said they recalled using baby powder; is that
7  right?
8      A.    That's right.
9      Q.    But after the lawsuits were
10  filed, the percent of women with ovarian
11  cancer who said they used baby powder went up
12  to 51.5%; is that right?
13     A.    That is also correct.
14     Q.    Is that a significant increase
15  from 36.5%?
16     A.    I don't know, but it seems like
17  it might be.
18     Q.    So after the lawsuits were
19  filed, the percent of women with ovarian
20  cancer who said they used baby powder jumped
21  significantly; is that right?
22          MS. O'DELL:  Object to the
23     form.
24     A.    Well, that's -- that is true.

Page 276

1  BY MR. ZELLERS:
2      Q.    In this study, lawsuit filings
3  appears to have affected how many women with
4  ovarian cancer remembered using talc on their
5  genitals but basically had no effect on the
6  memory of women without ovarian cancer; is
7  that right?
8          MS. O'DELL:  Object to the
9     form.
10     A.    You can't say that this is --
11  this demonstrates recall bias.  It could.
12  BY MR. ZELLERS:
13     Q.    These findings could be an
14  example of the potential effect of recall
15  bias; is that right?
16          MS. O'DELL:  Object to the
17     form.
18     A.    That is correct.
19  BY MR. ZELLERS:
20     Q.    So pre-2014 there was an odds
21  ratio of 1.19 with the confidence interval
22  ranging from .87 to -- strike that --
23  from .87 to 1.63, so there is not statistical
24  significance pre-2014; is that right?

Page 277

1      A.    Probably not.
2      Q.    If the study had been
3  terminated as of 2014, prior to the lawsuits
4  being filed, then the results of the study
5  would have been that genital talc use was not
6  statistically significantly associated with
7  an increased risk of ovarian cancer; is that
8  right?
9          MS. O'DELL:  Object to the
10     form.
11     A.    Yes.
12  BY MR. ZELLERS:
13     Q.    Did you make an attempt to
14  account for this potential recall bias in
15  weighing the Schildkraut study?
16     A.    The authors did that for me by
17  including the period of the interview as a
18  cofactor in the logistic regression models.
19  It accounts for this difference that you see
20  on the table.
21     Q.    You do agree there was no
22  statistically significant finding of an odds
23  ratio prior to 2014, the data collected
24  through that time; is that right?

Arch I. "Chip"  Carson, M.D., Ph.D.

Page 278

1    A.    In the -- in the data collected
2  on those -- let me see here.  In the data
3  collected on those 351 cases and
4  corresponding controls, there was not a
5  significant odds ratio.
6    Q.    I want to go back and ask you a
7  few questions about some of the things I had
8  talked to you before about.
9         In terms of this chatter about
10 IARC, who has told you this?
11   A.    There are a number of
12 environmental websites and -- that also
13 operate on social media that discuss this
14 kind of thing.
15   Q.    So there's social media
16 websites that have talked about at least the
17 possibility of IARC revisiting the issue?
18   A.    Yes, among many other things.
19   Q.    I asked you earlier about
20 cornstarch, and you believe that cornstarch
21 is rapidly cleared from the body, including
22 the ovaries; is that right?
23        MS. O'DELL:  Object to the
24   form.

Page 279

1    A.    Yes.
2  BY MR. ZELLERS:
3    Q.    What is the mechanism by which
4  you believe that cornstarch is rapidly
5  cleared from the body, including the ovaries?
6    A.    It's primarily composed of
7  carbohydrate with a small amount of
8  structural material, probably cellulose, and
9  those materials are broken down in body
10 fluids fairly rapidly and dissolved and
11 become part of the general milieu of the
12 body.
13   Q.    Does cornstarch create
14 inflammation in the body?
15   A.    Yes.
16   Q.    You testified that the latency
17 period for ovarian cancer is between 20 and
18 40 years; is that right?
19   A.    Roughly, yes.
20   Q.    What is the basis for you
21 saying that?
22   A.    There are a number of factors
23 that influence that, but there are
24 organizations that have determined latency

Page 280

1  factors -- or latency periods for a number of
2  different types of cancers and tumors based
3  on the incidence data and what is known about
4  the natural progression of those tumors over
5  time.
6         I can't recall at the moment
7  exactly where I determined the latency period
8  for ovarian cancer to be between 20 and
9  40 years.
10        We do have a paper that's
11 referenced here that discusses the
12 determination of latency periods and includes
13 ovarian cancer as one of the tumors that it
14 determines a latency period for, and it uses
15 a mathematical formula with various factors
16 plugged into it to calculate that.
17        In that particular article, the
18 latency factor -- period was very long.  I
19 think it was 44 years on the average.
20   Q.    You do not have personal
21 expertise in terms of the latency period for
22 ovarian cancer, correct?
23   A.    I have -- I've calculated
24 latency periods as an exercise when I was in

Page 281

1  graduate school, but that's not something I
2  normally do.  I usually defer to the -- those
3  who have published latency periods for that
4  information.
5    Q.    You are recalling that at least
6  in some of the study or studies that you've
7  reviewed that the latency period for ovarian
8  cancer is 20 to 40 years, correct?
9    A.    Yes.
10   Q.    Are you able to tell us which
11 study or studies you're relying on for that
12 information?
13   A.    I'd have to go through my list
14 to find it.  Do you mind if I take a moment
15 to do that?
16   Q.    Define "a moment."
17   A.    Well, however long it takes me
18 to find it in that list, but --
19   Q.    Let me see if I can shortcut
20 it.
21        Do you believe that the latency
22 period for ovarian cancer is something you've
23 written out in one of your handwritten notes?
24   A.    I don't believe so.

71 (Pages 278 to 281)

Arch I. "Chip"  Carson, M.D., Ph.D.

Page 282

1    Q.   It would be -- where would it
2    be?
3         MS. O'DELL:  If you need a
4    moment to review either your report or
5    your materials list, you know --
6         THE WITNESS:  I don't believe
7    that particular piece of information
8    is in my report, but it's -- I think I
9    could come up with it fairly quickly
10   if I --
11   BY MR. ZELLERS:
12   Q.   All right.  Go ahead.  Find for
13   us the study or studies you're relying on for
14   the latency period of ovarian cancer.
15   A.   Okay.  If I'm lucky, I may hit
16   on it here.
17        (Document review.)
18   A.   It's the Diana Nadler and Igor
19   Zurbenko paper Estimating Cancer Latency
20   Times Using the Weibull Model.
21   BY MR. ZELLERS:
22   Q.   You're looking at Exhibit 4,
23   your literature list; is that right?
24   A.   Yes.

Page 283

1    Q.   What page of Exhibit 4 are you
2    looking at?
3    A.   Page 17 in the Ns.
4    Q.   Are you finished?
5    A.   There may be others in the
6    list, but you asked me to cite one.  You want
7    me to continue looking?
8    Q.   No, I -- that is sufficient for
9    my purposes.  Thank you.
10        Dr. Carson, there have been
11   some studies where talc particles had been
12   observed or reported in the ovaries of women
13   who have had perineal talc use; is that
14   right?
15   A.   Yes.
16   Q.   Heller was one of the studies
17   that we talked about, correct?
18   A.   Correct.
19   Q.   In those studies, there has not
20   been inflammation noted; is that right?
21   A.   No, there -- that's not been an
22   important finding.
23        MR. ZELLERS:  I have no further
24   questions for you.

Page 284

1         MS. BOCKUS:  If you want to
2    pass me your microphone, I think I can
3    stay here.  I'm not going to pass him
4    that many exhibits.
5         MR. ZELLERS:  I'm happy to help
6    you.
7         MS. BOCKUS:  Thank you.
8              EXAMINATION
9    BY MS. BOCKUS:
10   Q.   Dr. Carson, my name is Jane
11   Bockus.  I'm not certain I actually
12   introduced myself to you this morning, but I
13   represent Imerys in this litigation.
14        Do you understand that?
15   A.   I do.
16   Q.   Before Mr. Abney contacted you
17   about preparing a report that would explain
18   the relationship between regular perineal use
19   of talc based on personal hygiene products
20   and subsequent development of ovarian cancer,
21   is that anything that you had researched
22   before that date?
23        MS. O'DELL:  Object to the
24   form.

Page 285

1    A.   I don't think Mr. Abney --
2    well, he may have been that detailed in our
3    discussion.  But in response to your
4    question, that's not a specific question I
5    had researched in the past, although I had
6    researched related kinds of issues.
7    BY MS. BOCKUS:
8    Q.   So would it be fair to say that
9    the opinions contained in your report are all
10   opinions that you have come to as a result of
11   doing the research at the request of
12   Mr. Abney and others in the plaintiffs'
13   lawyer group?
14        MS. O'DELL:  Object to the
15   form.
16   A.   Yes.
17   BY MS. BOCKUS:
18   Q.   Okay.  And I'm going to
19   apologize right now.  I'll be jumping around
20   because most of my outline has already been
21   covered, so let me just get you to look at
22   your report, if I could, and I'm going to ask
23   you some questions about it.
24        Turn to page 4, and

72 (Pages 282 to 285)

Arch I. "Chip"  Carson, M.D., Ph.D.

Page 286

1  paragraph (b), the first sentence reads:
2  Numerous studies have examined the
3  cancer-causing characteristics of talc.
4        Do you see that?
5     A.   Yes.
6     Q.   And you identified Wilde as
7  your source for that statement, correct?
8     A.   That is correct.
9     Q.   Isn't it correct that the Wild
10  study actually exonerated talc as having
11  cancer-causing characteristics?
12     A.   That was a conclusion of the
13  author, but the reason it's cited there is
14  because that's an example of the
15  investigation of the relationship.
16     Q.   Okay.  But in that study,
17  they -- he concluded that talc alone did not
18  cause cancer, correct?
19     A.   As I recall, that was the
20  general conclusion, yes.
21     Q.   Okay.  Then in the next couple
22  of sentences, you say that talc has caused
23  cancer when implanted in various tissues and
24  under the skin in laboratory animals.  It

Page 287

1  causes inflammation and fibrotic reaction,
2  including the chemotaxis of inflammatory
3  immune cells and accelerated growth and
4  division of cells in the involved tissue.
5        And you cite Okada 2007 for
6  that proposition; is that correct?
7     A.   That's correct.
8     Q.   But Okada wasn't even looking
9  at talc, was it?
10     A.   Let me see here.  Okada was
11  looking at inflammation as -- as the endpoint
12  in the various components of inflammation
13  which I talked about here, the chemotaxis of
14  inflammatory immune cells, accelerated growth
15  division in the involved tissues.
16     Q.   But what you say is that talc
17  causes.  When you say "it," you're referring
18  to talc, correct?  It causes inflammation and
19  fibrotic reaction; isn't that what you're
20  saying in this sentence?
21     A.   It is talc, yes.
22     Q.   Okay.  And yet, Okada, the
23  study that you cite for that proposition,
24  doesn't look at talc at all, does it?

Page 288

1     A.   No.
2     Q.   And then going on, you talk
3  about the fact that there in that same
4  paragraph, if you go down, you talk about
5  IARC and the fact that IARC concluded that
6  talcum powder use by women for feminine
7  hygiene is a possible human carcinogen;
8  that's not a classification of talc as a
9  carcinogen, correct?
10        MS. O'DELL:  Object to the
11  form.
12     A.   It is within the spectrum of
13  carcinogens.
14  BY MS. BOCKUS:
15     Q.   It's possible.
16     A.   That's correct.
17     Q.   And then you say that --
18  meaning that there is insufficient evidence
19  of carcinogenesis in humans, but strong
20  evidence in other mammalian species.
21        Can you tell me where in IARC
22  it says that there is strong evidence that
23  talc causes ovarian cancer in other mammalian
24  species?

Page 289

1     A.   I think the issue is not
2  specifically ovarian cancer; the issue is
3  cancer.  And that's the point of view of
4  IARC, and that's what's alluded to here.
5     Q.   So this is the one exhibit I'm
6  going to hand you, if I can get that one
7  marked by my assistant.
8        MR. ZELLERS:  Exhibit 25.
9        (Carson Deposition Exhibit 25
10  marked.)
11        MS. O'DELL:  This is a page out
12  of the monograph?
13        MS. BOCKUS:  Yes.
14        MS. O'DELL:  Are you going to
15  identify it?
16        MS. BOCKUS:  And he can look it
17  up in his whole monograph.  I just
18  pulled the page for simplicity.
19        MS. O'DELL:  So feel free to do
20  that, Doctor.
21        MS. BOCKUS:  Yes, page 412.
22  BY MS. BOCKUS:
23     Q.   So looking at Exhibit 25, this
24  is a page from the IARC monograph where it

73 (Pages 286 to 289)

Arch I. "Chip"  Carson, M.D., Ph.D.

1  talks about the data -- the evidence that
2  they have and the evidence that they
3  reviewed.
4        Do you see that?
5     A.   That's correct.
6     Q.   And what they actually state
7  with regard to experimental evidence is that
8  there is limited evidence in experimental
9  animals for the carcinogenicity of talc not
10  containing asbestos or asbestiform fibers.
11        Correct?
12        MS. O'DELL:  Object to the
13     form.
14  BY MS. BOCKUS:
15     Q.   Did I read it incorrectly?
16     A.   No, I just lost you for a
17  moment.
18     Q.   It's one sentence.  Go ahead
19  and take your time and read it.
20     A.   Yes, I agree with that.  They
21  found that inhaled talc, which does not
22  contain asbestos or asbestiform fibers, is
23  Group 3.
24     Q.   That wasn't my question.  I'm

1  talking about experimental animals because
2  that's what -- you state in your report that
3  IARC found strong evidence in animals, and
4  yet the part of IARC that I know of where
5  they're addressing the animal data with
6  regard to talc is what I handed you in
7  Section 6.2, and it states there's limited
8  evidence, correct?
9        MS. O'DELL:  Objection.
10     A.   It states that there's limited
11  evidence -- I need to find this section in
12  the monograph.  Just bear with me for a
13  moment.  It's page 412?
14        (Document review.)
15     A.   Okay.  I seem to be missing
16  that part of the monograph.
17        MS. O'DELL:  Do you have the 93
18     monograph?
19        THE WITNESS:  Where's the --
20  this is 100C, and this is 93.  Okay.
21  Here it is.  All right.  Okay.
22     A.   Okay.  The entire monograph is
23  designed to evaluate carcinogenic risk, and
24  it looks at three different species, carbon

1  black, titanium dioxide and talc.
2        So regarding talc, the overall
3  point of view here is whether or not it
4  produces cancer, not just ovarian cancer, not
5  just lung cancer, but any cancer.
6        And so I'm not sure that that
7  responds to your question.
8  BY MS. BOCKUS:
9     Q.   No.  My question was:  You
10  state in your report that IARC found strong
11  evidence in animals, and I want to know where
12  you believe that statement occurs in the IARC
13  monograph, or do you know?
14        MS. O'DELL:  And if you need a
15     minute to look, feel free to do that.
16     A.   Well, I can say that it might
17  take me a while to look for it, but I can say
18  that that's the basic definition of Group 2B,
19  is limited evidence in humans and compelling
20  evidence in animals or other --
21  BY MS. BOCKUS:
22     Q.   Tell me where you're looking at
23  that definition of 2B.
24     A.   Let me see here.

1     Q.   We earlier marked the...
2        Exhibit 21, I think.
3     A.   Well, I have this other
4  exhibit, which is the preamble from another
5  situation; it's Exhibit P-346, and...
6     Q.   Well, let me just ask a
7  different question, rather than looking at
8  the preamble.
9     A.   All right.
10     Q.   Because that's kind of
11  overarching.
12     A.   It is.
13     Q.   To know what IARC found with
14  regard to talc and the evidence in animal
15  models, wouldn't it be more appropriate to
16  look at what they actually said about talc in
17  the animal studies?
18     A.   Yes.
19        MS. O'DELL:  Objection, form.
20     A.   I would agree that that's the
21  case.
22  BY MS. BOCKUS:
23     Q.   And to your knowledge, nowhere
24  did they find strong evidence of

74 (Pages 290 to 293)

Arch I. "Chip"  Carson, M.D., Ph.D.

Page 294

1  cancer-causing potential of talc in animal
2  studies, correct?
3         MS. O'DELL: Objection to form.
4     A.    Well -- well, it says on that
5  page there's limited evidence in experimental
6  animals, so I'll agree that at least in this
7  location it does not say strong evidence.
8  BY MS. BOCKUS:
9     Q.    And without going through the
10 entire monograph, you don't know where that
11 language came from, is that fair, that you
12 used in your report?
13        MS. O'DELL: Object. Excuse
14        me. Object to the form. I think he
15        was pointing -- directing you to the
16        preamble and you withdrew your
17        question, but --
18        MS. BOCKUS:  Well, let me just
19        ask a qualifying question.
20 BY MS. BOCKUS:
21    Q.    Does the preamble in any way
22 address their findings with regards to talc?
23    A.    No, the preamble addresses the
24 methodology that's used by the IARC agency in

Page 295

1  addressing all the substances that they
2  evaluate.
3     Q.    Okay.
4     A.    And that's usually where I pull
5  things like that.
6         MS. O'DELL:  Are you finished,
7         Doctor?
8         THE WITNESS:  Unless I'm going
9         to continue to search for this.
10 BY MS. BOCKUS:
11    Q.    I don't need for you to look in
12 the preamble, because I'm really only
13 interested in their findings as to talc, not
14 their overarching methodology, that sort of
15 thing.
16    A.    Okay.  But it's important to
17 point out that this particular monograph is
18 an evaluation of the carcinogenicity of talc
19 that does not contain asbestos or asbestiform
20 fibers, so --
21    Q.    Correct.  Which was, from their
22 view, the talc that was included in all of
23 the studies that they reviewed, correct?
24        MS. O'DELL:  Objection,

Page 296

1  misstates the evidence.
2     A.    I believe that was their
3  assumption.
4  BY MS. BOCKUS:
5     Q.    Okay.  The studies that you
6  reference in support of the notion that
7  asbestos in -- that may or may not exist in
8  body powder contributes to cause ovarian
9  cancer, none of the studies that you cite to
10 have referenced an application of a product
11 to the perineum of the women and girls study,
12 correct?
13        MS. O'DELL:  Object to the
14        form.
15        THE WITNESS:  I have a -- I
16        apologize greatly, but I lost the
17        track.  Could you repeat that
18        question.
19        MS. BOCKUS:  That's totally
20        understandable because it was a little
21        bit convoluted.
22        MS. O'DELL:  Do you mind if we
23        get the realtime running again?  We're
24        just off track here.

Page 297

1         MS. BOCKUS:  That's okay.
2  BY MS. BOCKUS:
3     Q.    I'm looking on page 5.  Do you
4  see on page 5 of your report, sir,
5  paragraph (c)?
6     A.    Yes.
7     Q.    And there you cite one, two,
8  three, four, five, six, seven, eight, nine,
9  10, 11, 12 studies, correct?
10    A.    Yes.
11    Q.    Do you speak Italian?
12    A.    I can read it pretty well.
13    Q.    Is that what you did for the
14 Bertolotti study?
15    A.    The Bertolotti study.  Yes, I
16 read most of it.  I may have kibitzed with
17 some of my colleagues about the meaning of a
18 few words.
19    Q.    At any rate, all of these
20 studies have to do with heavy occupational
21 exposure to asbestos, correct?
22        MS. O'DELL:  Object to the
23        form.
24    A.    Yes.

75 (Pages 294 to 297)

Arch I. "Chip" Carson, M.D., Ph.D.

Page 298

BY MS. BOCKUS:
2      Q.    And you don't have any
3  information how the dose of asbestos to which
4  these women were exposed during their heavy
5  occupational exposure compares to any
6  exposure to asbestos from the use of body
7  powder, correct?
8      A.    Well, I think these were not
9  all occupational exposures, but I do not have
10  information regarding things like the route
11  of exposure, no.
12      Q.    Do you have any information
13  regarding the dose?
14      A.    No, I don't.
15      Q.    Do you have any information
16  that would compare the dose of asbestos to
17  which the women in these studies were
18  exposed --
19      A.    Well, in some of the studies --
20      Q.    Wait, I haven't finished my
21  question.
22      A.    Sorry.
23      Q.    -- to any alleged dose of
24  asbestos in body powder?

Page 299

1      Can you make any comparison
2  whatsoever to the amount of asbestos to which
3  these women were exposed to any exposure by
4  any woman who has used a Johnson & Johnson
5  body powder?
6      MS. O'DELL:  Object to the
7  form.
8      A.    I don't think I'm able to make
9  that kind of comparison.
10  BY MS. BOCKUS:
11      Q.    Okay.  There are ways to study
12  whether two toxins combined increase a risk
13  more than exposure to a single toxin, whether
14  it -- whether one offsets the risk of one of
15  the toxins or whether you add them together,
16  even multiply them together, right?
17      A.    Yes.
18      Q.    Has any such study ever been
19  done with regard to talc and the heavy metals
20  that you identify in your report?
21      A.    Not specifically a study to
22  look at the combined contribution, but we
23  know a lot about the mechanism of action of
24  the metals in particular in the

Page 300

1  microenvironment, and based on what we know
2  about the mechanism of action of talc as well
3  and even asbestos, they're all similar, and
4  for that reason would be expected to be
5  additive.
6      Q.    But the study hasn't been done
7  even in a petri dish, has it?
8      MS. O'DELL:  Object to the
9  form.
10      A.    I don't know if there's
11  something in progress or not, but that's the
12  kind of study that is currently being looked
13  at.  Combined exposures is the -- sort of the
14  hallmark of research these days in
15  toxicology.
16  BY MS. BOCKUS:
17      Q.    Do you know of anyone who's
18  looking at that question?
19      A.    I don't.
20      Q.    Okay.  Have any of the heavy
21  metals that you have identified been
22  identified as carcinogenic to the ovary by
23  IARC?
24      A.    No.

Page 301

1      Q.    I want you to turn to page 7
2  now, if you would, please, on other evidence.
3  And you've talked about this paragraph a fair
4  amount already, and I don't want to repeat
5  any of the prior questions.
6      But I want to ask you about the
7  statement in that first sentence, where you
8  say that transport of talc-containing
9  materials from the perineum to the upper
10  reproductive tract and body cavities has been
11  shown to occur with startling regularity.
12  And I want to stop right there.
13      If I recall your testimony
14  correctly, none of these studies even look at
15  the transport of talc-containing materials
16  from the perineum to the upper reproductive
17  tract; isn't that correct?
18      MS. O'DELL:  Object to the
19  form.
20      A.    Well, it is true that most of
21  the research that's been done in this area
22  has been done on materials that have been
23  instilled into the vagina or the posterior
24  fornix, but I think and it's my opinion that

76 (Pages 298 to 301)

Arch I. "Chip" Carson, M.D., Ph.D.

Page 302

1    application to the perineum is equivalent to
2    that.
3        Q.    Do you have an opinion as to
4    what percentage of the talcum powder applied
5    in a daily dusting to the perineum makes its
6    way to the vagina?
7        A.    No, I don't know.
8        Q.    Do you have an opinion as to
9    what percentage of the talc that, in your
10   opinion, would make its way to the vagina
11   would actually make its way to the cervix?
12       A.    I don't know that either.
13       Q.    And out of the talc that makes
14   its way to the cervix, what percentage makes
15   it past the cervix into the uterus?
16       A.    That, I don't know either.
17       Q.    Do you have any reason to
18   believe that talc would migrate with more
19   frequency or rapidity than sperm?
20           MS. O'DELL:  Objection to form.
21       A.    No, I don't have reason to
22   believe that would be the case.
23   BY MS. BOCKUS:
24       Q.    Would you agree, in fact, that

Page 303

1    it is unlikely that talc, an inert particle,
2    would travel as quickly or in the same
3    percentages as sperm through the reproductive
4    tract?
5           MS. O'DELL:  Object to the
6       form.
7       A.    I think the transport time is
8    roughly the same for any particulate matter,
9    including sperm.
10   BY MS. BOCKUS:
11       Q.    Do you have any studies to
12   support that opinion?
13       A.    Well, we know -- we know the --
14   we know the velocity of motile sperm; it's
15   very slow.  And we have studies that have
16   shown the progression of particles through
17   the fallopian tubes at least that fast a
18   rate, possibly faster.
19           And so the motility of sperm is
20   slower than the rate at which it passes
21   through the female reproductive system, so
22   there are obviously other mechanisms at play
23   other than sperm motility.
24       Q.    To your knowledge, were any of

Page 304

1    those studies that you list here done in
2    women who were standing up?
3        A.    The studies that I list in
4    other evidence?
5        Q.    Yes.
6        A.    I think not.
7        Q.    In fact, were any of them done
8    in women who were inclined with their head
9    elevated over their hips?
10       A.    No.
11       Q.    So my question is:  Where do
12   you get the term "startling regularity" with
13   regard to the transport of talc from outside
14   a woman's body to the upper reproductive
15   tract?
16           MS. O'DELL:  Object to the
17       form.
18       A.    The propensity of evidence of
19   rapid transport of particulate material
20   regarding -- regardless of its composition.
21   BY MS. BOCKUS:
22       Q.    Particulate material inserted
23   well into a woman's vagina whose hips are
24   above her head, correct?

Page 305

1           MS. O'DELL:  Objection to form.
2        A.    Well, we have other studies
3    too.  We have the powdered glove examination
4    studies, things of that nature, that are a
5    little bit different.
6    BY MS. BOCKUS:
7        Q.    And you believe they support
8    your conclusion that talc is transported from
9    the perineum to the upper reproductive tract
10   with startling regularity?
11       A.    I think that's a valid
12   conclusion supported by the evidence, yes.
13       Q.    I'm turning to page 8 now, and
14   the number that you have here -- and you've
15   repeated it a couple of times today -- about
16   your opinion that the elimination of talc as
17   a risk could result in over 3,000 lives saved
18   in the U.S. each year.
19           How did you come to that
20   conclusion?
21       A.    Well, I'm referring to talcum
22   powder here --
23       Q.    Okay.  Sure.
24       A.    -- which is the complete

77 (Pages 302 to 305)

Arch I. "Chip"  Carson, M.D., Ph.D.

Page 306

1  product.
2        I came to that conclusion based
3  on the number of new cases of ovarian cancer
4  that are diagnosed in the United States each
5  year and the number of ovarian cancer deaths
6  that occur each year.
7        And essentially, of 21,000 or
8  so cases of -- new cases of ovarian cancer,
9  there are corresponding 14,000 or more deaths
10  each year, so that's a two-thirds fatality
11  rate if you look over time.
12        The -- at 30% increase in the
13  risk of -- or a 30% increase in the risk of
14  cancer applied in reverse, that is reducing
15  those -- that 30% increased risk from the use
16  of perineal application of talcum powder
17  could result in the prevention of as many as
18  3,000 lives, depending on the prevalence of
19  use.
20        Q.    Would that calculation require
21  that 100% of the women in the U.S. be using
22  talcum powder on a daily basis?
23        A.    It would require a hundred
24  percent of the women in the U.S. to stop

Page 307

1  using talcum powder on a daily basis.
2        Q.    That wasn't my question.
3        In order to attribute --
4        A.    Well, my answer to your
5  question then is no.
6        Q.    In order to attribute 30% of
7  all ovarian cancer deaths to the use of
8  talcum powder -- let me back up.
9        The data that you have that
10  you've cited is talking about the percentage
11  of women -- the percentage of women who use
12  talcum powder who are diagnosed with ovarian
13  cancer, correct?
14        MS. O'DELL:  Object to the
15  form.
16        A.    It is the total number of new
17  diagnoses per year.
18  BY MS. BOCKUS:
19        Q.    Okay.
20        A.    I think last year was
21  22,000-something.
22        Q.    But that number, 22,000, 100%
23  of those women did not use talcum powder,
24  correct?

Page 308

1        A.    There may not have been use of
2  talcum powder in all those women, that's
3  correct.
4        Q.    Do you have any notion as to
5  what percent of those women may have used
6  talcum powder?
7        A.    Based on these various studies,
8  it seems to vary between 30 and 60%.  It's
9  more so in the U.S., Australia and the U.K.
10        Q.    Do you have an opinion as to
11  how regularly a women needs to use talcum
12  powder before her risk of ovarian cancer is
13  increased by 30%?
14        A.    Well, based on the epidemiology
15  studies, that risk occurs in the population
16  in general from ever use as opposed to never
17  use, and so it would depend on the individual
18  woman.
19        Each person has an individual
20  susceptibility and individual characteristics
21  and would probably have an individual use
22  pattern.  So I couldn't say for any
23  individual woman.
24        Q.    And that's not what I'm asking

Page 309

1  for.  I'm really asking for in general,
2  because that's what epidemiology is, correct?
3  It's not talking about an individual woman,
4  right?
5        A.    That's correct, it's describing
6  it in the population.
7        Q.    So in the population, in the
8  studies that you've reviewed, what is the
9  minimum number of days per month, or however
10  you want to describe it, that a woman would
11  need to use talcum powder before she would be
12  included in the group that you believe have a
13  30% increased risk of ovarian cancer?
14        MS. O'DELL:  Object to the
15  form.
16        A.    The only qualifier that I've
17  been able to come up with and that I've used
18  in this report is the regular use of talcum
19  powder.
20  BY MS. BOCKUS:
21        Q.    Okay.
22        A.    And that is going to vary over
23  a broad range.  It would be periodically
24  daily to several times a week would be

Arch I. "Chip"  Carson, M.D., Ph.D.

Page 310

1    regular use.
2        Q.    And over how many years must a
3    woman use talcum powder on a regular basis
4    before her risk of ovarian cancer is
5    increased to 30% --
6            MS. O'DELL:  Object to the
7        form.
8    BY MS. BOCKUS:
9        Q.    -- in your opinion?
10           MS. BOCKUS:  Sorry.
11       A.    Some of the studies have
12   focused on usage periods as short as one
13   year, but most have studied longer periods of
14   use and separated use into things like
15   decades or accumulated total person-years
16   based on reports of the women, multiplying
17   frequency by time.
18           So again, it would depend on
19   the individual, but the research reports
20   hover around five to ten years of regular
21   use, resulting in significant odds ratios.
22   BY MS. BOCKUS:
23       Q.    As I understand it in
24   toxicology, one of the basic tenets is that

Page 311

1    it's the dose that makes the poison, correct?
2        A.    That's correct.
3        Q.    That water can kill you if you
4    drink too much of it, right?
5        A.    Theoretically.
6        Q.    In a short period of time.
7            And so I'm trying to find out
8    what you have determined is the threshold of
9    risk is -- for talcum powder use by women.
10   Do you have an opinion as to at what point a
11   threshold has been reached where the use of
12   talcum powder by women in their perineal
13   region increases their risk?
14       A.    I think any use of carcinogenic
15   materials or any exposure to carcinogenic
16   materials increases the risk somewhat.  A
17   greater exposure, based on the
18   "dose makes the poison" principle, would
19   result in a greater risk.
20           And we know from toxicologic
21   studies that intense exposures can sometimes
22   accelerate the process and even shorten the
23   latency period of a carcinogenic event.
24           So my opinion is that there is

Page 312

1    no threshold of exposure for risk; that we
2    are -- we are right to use a zero threshold
3    approach until we know more about the
4    possibility of a threshold below which
5    exposure would be safe.  At the current time
6    we don't have that information.
7        Q.    Do you believe that there
8    probably is a threshold below which use is
9    safe?
10       A.    In the carcinogenic process,
11   which we haven't talked about in this
12   session today, there is an insult to a cell
13   which affects the genetic material, the DNA.
14   And there are built-in repair mechanisms that
15   the cell has for fixing that problem that
16   occurred, a mutation, for example.
17           These kinds of insults are
18   happening to cells all the time, not just
19   from carcinogens in our environment, but just
20   from natural occurrences, even endogenous
21   biochemical reactions cause these problems.
22           The question is:  Is the repair
23   process sufficient to undo what's been done?
24   And an exposure to environmental carcinogens,

Page 313

1    that repair process is often overwhelmed so
2    that it cannot catch up with the damage
3    that's being created, and a tumor is born,
4    basically.
5            That is where the concept of
6    threshold comes from.  Have we overwhelmed
7    the repair or not, and we don't have enough
8    research evidence or scientific evidence to
9    be able to define that line at this point.
10       Q.    Has there ever been a study
11   that showed that talcum powder caused DNA
12   damage in normal ovarian epithelial tissue?
13       A.    Well, we do have the studies
14   that have recently been produced by Fletcher
15   and Saed that show the inflammatory process
16   is influenced by talc, and this is nonfibrous
17   talc, that result in mutagenic events that
18   are available for promotion, and there are
19   biomarkers that have also been established
20   for that.
21       Q.    The studies by Saed did not
22   demonstrate DNA mutation, did they?
23           MS. O'DELL:  Object to the
24       form.

79 (Pages 310 to 313)

Arch I. "Chip" Carson, M.D., Ph.D.

Page 314

1     A.   I think they actually did.
2  BY MS. BOCKUS:
3     Q.   That's your reading of them?
4     A.   Yes.
5     Q.   What Saed did is he placed talc
6  on cultured ovarian cancer cells, correct?
7     A.   Yes.
8     Q.   And that actually -- what he
9  recorded was an elevation in the CA-125?
10    A.   That's one of the things he
11  did. He also measured -- he did a number of
12  genetic studies. He did transcribed RNA. He
13  located individual SNPs, which are single
14  nucleotide polymorphisms, in the genetic
15  material.
16       And he found that as a result
17  of that treatment, those mutations altered
18  the effectiveness of antioxidant enzymes that
19  are part of the protection mechanism and
20  shield the repair process of the cell from
21  further damage.
22    Q.   Let's go back to the CA-125.
23       MS. O'DELL: If you need to
24  pull the paper out, Doctor, just, if

Page 315

1     you want to take a moment and do that.
2  I know you were searching for it while
3  you were talking.
4       THE WITNESS: Yes, I think I
5  have it right here.
6       MS. BOCKUS: These are just
7  general questions that I'm going to
8  ask you.
9       MS. O'DELL: You still may get
10  the paper out.
11       MS. BOCKUS: Do whatever you
12  want to do.
13       THE WITNESS: You can go ahead.
14  I'm...
15  BY MS. BOCKUS:
16    Q.   What controls did Saed use?
17  Did he use any controls? In other words, did
18  he place a known foreign object that was
19  not -- that was known not to be a carcinogen
20  on the cultured ovarian cells to see if there
21  was a difference?
22       MS. O'DELL: Can you just pause
23  just for a minute, let the doctor pull
24  out the exhibit?

Page 316

1       THE WITNESS: I'm sorry, it
2  appears that I do need to get the
3  original paper here. There it is.
4  Okay. Thank you.
5       (Document review.)
6  BY MS. BOCKUS:
7     Q.   Can you answer the question:
8  Did Saed have any either positive or negative
9  controls that he used in his experiments?
10       MS. O'DELL: Object to the
11  form.
12    A.   I think he did, but I'd like to
13  actually find it in here so I can give you
14  the specifics.
15       Well, he used normal cells and
16  epithelial ovarian cancer cells, and one was
17  the control for the other. He treated them
18  in the same way.
19  BY MS. BOCKUS:
20    Q.   Let me ask a different
21  question.
22       What I'm asking is: Did he
23  use, say, glass beads to see if -- as a
24  control to the talc? Did he have anything

Page 317

1     that he was controlling the cells' reaction
2  to against the talc?
3     A.   I don't believe so.
4     Q.   That would be important in an
5  experiment of this nature, would you not
6  agree with that?
7       MS. O'DELL: Object to the
8  form.
9     A.   Well, he did utilize normal and
10  cancerous cells, which would theoretically
11  act as a control in that experiment.
12  BY MS. BOCKUS:
13    Q.   That's not my question. I'm
14  really asking about another element that he
15  is exposing the cells to, both the normal and
16  the cancerous cells.
17       MS. O'DELL: Objection to form.
18  BY MS. BOCKUS:
19    Q.   To see if the reaction was just
20  a reaction to a foreign body versus talc
21  specifically.
22       Did he do that?
23       MS. O'DELL: Object to the
24  form.

80  (Pages 314 to 317)

Arch I. "Chip"  Carson, M.D., Ph.D.

1         A.    I don't believe that he
2    provided a control exposure as part of this
3    experiment.
4    BY MS. BOCKUS:
5         Q.    And you would agree that there
6    are many things that will increase a CA-125,
7    correct?
8             MS. O'DELL:  Object to the
9    form.
10        A.    Yes, it's an acute-phase
11   reactant.
12   BY MS. BOCKUS:
13        Q.    Pregnancy can increase
14   somebody's CA-125?
15        A.    That's correct.
16        Q.    And with regard to the SNPs,
17   that is not the same thing as a test showing
18   mutation, correct?
19            MS. O'DELL:  Object to the
20   form.
21   BY MS. BOCKUS:
22        Q.    It's a surrogate.
23        A.    Well, it's because there was
24   transcribed RNA that was used to determine

1         A.    I don't specifically know.
2    BY MS. BOCKUS:
3         Q.    There's no way to know that, is
4    there?
5         A.    No, there's not.
6         Q.    Let me find my -- there we go.
7             The Saed paper that you were
8    looking at just a minute ago, it has
9    something printed across it.  What does that
10   say?
11        A.    In blue here?
12        Q.    Uh-huh.
13        A.    "For Peer Review."
14        Q.    Okay.  So it hasn't yet been
15   peer reviewed; is that correct?
16            MS. O'DELL:  Object to the
17   form.
18        A.    It's been submitted.
19   BY MS. BOCKUS:
20        Q.    So does that mean it has not
21   yet been peer reviewed?
22            MS. O'DELL:  Object to the
23   form.
24        A.    I think it's been accepted for

1    their presence, and the -- it's just part of
2    their procedure, but it identifies genetic
3    alterations.  And those genetic alterations
4    transformed into differential enzyme
5    activities.
6         Q.    Do you know whether there are
7    standard tests for genotoxicity and
8    mutagenicity?
9         A.    There are lots of standard
10   tests, yes.
11        Q.    And Saed didn't use any of
12   those, did he?
13            MS. O'DELL:  Object to the
14   form.
15        A.    Well, he went directly to cells
16   in culture to see what happened when they
17   were treated with talc.
18   BY MS. BOCKUS:
19        Q.    Does the amount of talc that
20   Saed used compare in any way to the amount of
21   talc that may reach a woman's ovary from
22   perineal application?
23            MS. O'DELL:  Object to the
24   form.

1    publication.
2    BY MS. BOCKUS:
3         Q.    But the copy you have says on
4    it "For Peer Review," correct?
5         A.    That's correct.
6         Q.    In the paragraph that we were
7    looking at earlier, where you were talking
8    about the startling regularity, later on in
9    the paragraph you state that there
10   is clearly -- sufficient particulate
11   materials applied routinely to the perineum
12   have ready access and in sufficient
13   quantities to produce biologic responses in
14   internal tissues.
15            What internal tissues have you
16   seen any study recording a biologic response
17   to talc from?
18            That was such a bad question,
19   I'm going to ask it again.
20            What internal tissues are you
21   referring to there?
22        A.    Well, it says including --
23   including ovaries and surrounding structures.
24   By surrounding structures, I'm referring to

81 (Pages 318 to 321)

Arch I. "Chip"  Carson, M.D., Ph.D.

Page 322

1  the fallopian fimbriae and the epithelium of
2  the cavity.
3      Q.   So -- and I know we've been
4  through this already, but to your knowledge,
5  there are no studies reporting biologic
6  responses to talc in the vagina, correct?
7      A.   Not that I'm aware.
8      Q.   You're not aware of any studies
9  reporting biologic responses to talc in the
10  cervix, correct?
11      A.   Correct.
12      Q.   Are you aware of any studies
13  reporting biologic response to the uterus?
14      A.   No.
15      Q.   Are you aware of any studies
16  reporting a biologic response in the
17  fallopian tubes?
18          MS. O'DELL:  Object to the
19  form.
20      A.   Well, I don't -- I'm not aware
21  of studies that draws a direct correlation
22  between exposure to talc and reaction in the
23  fallopian tubes.
24              ///

Page 323

1  BY MS. BOCKUS:
2      Q.   Okay.  Is the ovary attached to
3  the fallopian tube?
4      A.   It is -- it's in proximity.
5  It's not directly attached.
6      Q.   And what surrounds the ovary?
7      A.   There's a structure that -- the
8  ovary itself?
9      Q.   Yes.
10      A.   There's an epithelial membrane
11  around the ovary, and --
12      Q.   And then what touches the
13  epithelial membrane?
14      A.   Well, the fimbriae of the
15  fallopian tubes surround that and the rest of
16  it is just sort of space.
17      Q.   Space.  Is the space filled
18  with fluid?
19      A.   It is.
20      Q.   And is that fluid kind of
21  moving around?
22      A.   All the time.
23      Q.   All the time.
24          So things that come through the

Page 324

1  fallopian tube goes into that fluid and just
2  gets moved around all the time; is that
3  correct?
4          MS. O'DELL:  Objection.  Excuse
5  me.  Objection, form.
6      A.   Well, there's a fairly direct
7  presentation of the ovary, so there's not a
8  large space there, but there is a space.  And
9  whatever goes into that space remains there.
10  Some of it may come back out.
11  BY MS. BOCKUS:
12      Q.   Does the fallopian tube move
13  around during the month?
14          MS. O'DELL:  Object to the
15  form.
16      A.   I don't know.
17          MS. BOCKUS:  I'm almost
18  finished.  I'm going through all the
19  things that I've crossed off.
20  BY MS. BOCKUS:
21      Q.   So I understand you correctly,
22  you have not identified a nonthreshold dose
23  of talc; is that correct?
24          MS. O'DELL:  Object to the

Page 325

1  form.
2      A.   You mean a dose that is below a
3  safe threshold?
4  BY MS. BOCKUS:
5      Q.   Correct.
6      A.   No, I have not.
7      Q.   Did you make any attempt to
8  extrapolate a de minimis risk level?
9          MS. O'DELL:  Object to the
10  form.
11      A.   I did not.  It would be nice to
12  be able to do that, considering that most of
13  us have had talcum powder exposures of one
14  sort or another during our lives.  And it's
15  something that seems to have been felt to be
16  very useful.
17          So it would be nice to be able
18  to do that exercise, but I haven't -- I have
19  not been prevented -- presented with the
20  information to approach that, nor am I aware
21  of anyone else who's been able to do it.
22  BY MS. BOCKUS:
23      Q.   What information would you need
24  that you don't have?

82 (Pages 322 to 325)

Arch I. "Chip"  Carson, M.D., Ph.D.

Page 326

1    A.    Well, we'd need -- we'd need
2  dose information, first of all, which we
3  don't have, to combine with the epidemiologic
4  results.
5          We need to define the
6  mechanistic issues better than they are
7  currently, and at that point I think we would
8  be able to make some strong conclusions
9  regarding potential thresholds of hazardous
10  doses.
11    Q.    You would agree that the great
12  majority of women who use talcum powder on a
13  regular basis are never diagnosed with
14  ovarian cancer, correct?
15    A.    I think that's true.
16    Q.    And it's also true that the
17  majority of women diagnosed with ovarian
18  cancer have never used talcum powder on a
19  regular basis, correct?
20          MS. O'DELL:  Object to the
21      form.
22    A.    I think it's a majority, but
23  there's a significant number who have.
24          ///

Page 327

1  BY MS. BOCKUS:
2    Q.    But the majority have not,
3  correct?
4    A.    I would say more than 50% have
5  not.
6    Q.    And would you agree that -- let
7  me back up.
8          When is the last time you
9  conducted a pelvic exam?
10    A.    I haven't done one in a couple
11  of years.
12    Q.    Under what circumstances did
13  you do it two years ago?
14    A.    I see patients regularly, and
15  in some cases, pelvic exams are either
16  requested or indicated by the issue.
17    Q.    It's not something you do on a
18  regular basis, correct?
19    A.    It's not.
20    Q.    And you do not -- what
21  percentage of your patients are women?
22    A.    Probably half, maybe a little
23  less than half.
24    Q.    How do patients come to see

Page 328

1  you?  In other words, are they referred by
2  other people?
3    A.    I have primarily a referral
4  practice in toxicology.
5    Q.    In toxicology?  And so what
6  types of patients are referred to you?
7    A.    I have patients who are either
8  workplace-related patients who have had
9  chemical or other substance exposures.  I
10  also have a number of environmental exposure
11  patients that I see.
12          And I also have a number of --
13  I also see a number of patients for general
14  routine surveillance activities or required
15  exams by regulation, either for licensure or
16  certification.
17    Q.    Are you sent patients where the
18  patient is trying to figure out why they got
19  some disease?
20    A.    Sometimes.  Usually the patient
21  comes and tells me why they got the disease,
22  and I go -- I talk to them about the
23  possibilities, and we look at ways of
24  confirming that or refuting it, or in many

Page 329

1  cases, altering to a correct path of
2  diagnostic investigation.
3    Q.    So sometimes a patient comes to
4  you and says:  I was exposed to this chemical
5  and that's why I can't breathe?
6    A.    Yes.
7    Q.    And you do an investigation,
8  and sometimes you say:  You know what, that
9  chemical has nothing to do with why you can't
10  breathe?
11    A.    Sometimes that's the case.
12          MS. O'DELL:  Are you finished,
13      sir?  Are you finished?
14    A.    Well, I just wanted to add --
15  BY MS. BOCKUS:
16    Q.    Sure.
17    A.    -- that although many times it
18  is the case, and often the patient does
19  understand that connection quite well,
20  usually from a very closely connected cause
21  and effect kind of relationship.  It's when
22  things are stretched out much more in time,
23  and there is a likely suspect that may be an
24  innocent bystander, that they may get

83 (Pages 326 to 329)

Arch I. "Chip"  Carson, M.D., Ph.D.

Page 330

1  confused.
2      Q.    Have you ever been referred a
3  patient to determine why they have ovarian
4  cancer?
5      A.    No.
6      Q.    Do you know of any methodology
7  accepted in the medical community for
8  determining why an individual woman has
9  developed ovarian cancer?
10         MS. O'DELL:  Object to the
11     form.
12     A.    Other than genetic testing that
13 identifies specific risks and history taking
14 that might identify other known risk factors
15 for that woman, there is -- I don't believe
16 that there is any good or prescribed
17 procedure for making that determination, and
18 there is no reasonable screening test that
19 can find that cancer when it is at an early
20 stage.
21 BY MS. BOCKUS:
22     Q.    Do you believe that obesity
23 causes ovarian cancer?
24     A.    It certainly seems to be

Page 331

1  related to the occurrence of ovarian cancer
2  from a statistical point of view.
3      Q.    What is the increase in a
4  woman's risk of ovarian cancer if she's obese
5  compared to a nonobese woman?
6      A.    In terms of numbers?
7      Q.    Yes, sir.
8      A.    I don't know the -- I don't
9  know the numbers.
10     Q.    What other risk factors are you
11 familiar with for ovarian cancer?
12     A.    Well, certainly work with
13 asbestos is a risk factor, and we have a
14 number of studies that have shown women
15 working in the asbestos industry or women who
16 are married to asbestos workers and have
17 secondary exposure presumably from that are
18 at risk for ovarian cancer.
19         There are --
20     Q.    Let me stop you just one
21 second.
22     A.    Yes.
23     Q.    What percentage -- what is
24 their relative risk or what is the odds ratio

Page 332

1  for that population of women?
2      A.    Well, it varies depending on
3  the research study that has been done, but
4  I've seen odds ratios or relative risks all
5  the way from 1 or even below to very high
6  numbers, like 20 to 50.
7      Q.    20.0, is that what you're
8  saying?
9      A.    Yes, 20.0.
10     Q.    Not 1.2, but 20.0?
11     A.    Correct.
12     Q.    Okay.
13     A.    Which is a -- which would be 20
14 times the normal risk without the exposure.
15     Q.    Okay.  So we've got obesity and
16 heavy exposure to asbestos.  Any other risk
17 factors that you're familiar with?
18         MS. O'DELL:  Objection --
19     excuse me.  Objection, misstates the
20     doctor's testimony.
21         You may answer.
22         THE WITNESS:  Okay.
23     A.    Other risk factors for ovarian
24 cancer would include things like early

Page 333

1  menarche, late menopause, never being
2  pregnant.  These are some of the more common
3  risk factors that are identified.
4          There are genetic risk factors
5  that are known, like the BRCA mutations,
6  which confer an increased risk.  Family
7  history.
8  BY MS. BOCKUS:
9      Q.    Do you know the odds ratios of
10 any of the risk factors that you just
11 identified of never having children, having
12 early menarche or late menopause?
13     A.    Right offhand, I don't know
14 what those odds ratios -- the range of those
15 are.
16     Q.    Do you know if any of those
17 odds ratios exceed 1.3?
18     A.    I think they do.
19     Q.    Does that lead you to conclude
20 that those things cause ovarian cancer?
21     A.    It certainly argues for that.
22 The -- there's a risk factor that derives
23 from something.  You need a mechanism to fill
24 in the blank.

84 (Pages 330 to 333)

Arch I. "Chip"  Carson, M.D., Ph.D.

Page 334

 1          But also, some of these risk
 2 factors are so common in the population that
 3 we can concoct large cohort studies that will
 4 have -- can have very low relative risks,
 5 like on the order of 1.3 or even lower, and
 6 still a significant result.
 7          So the more common a factor is,
 8 the easier it is to do the research and the
 9 more likely you'll get a finding that's
10 relevant to interpretation.
11     Q.    What pushes a talc particle
12 from the perineum into the vagina?
13     A.    Probably mostly the law of mass
14 action. It simply goes of its own volition.
15 These small particles are always in motion
16 through molecular forces, and they simply
17 move in all directions, and some of them move
18 in that direction.
19     Q.    Would that be true for any
20 small particles applied to a woman's
21 perineum?
22     A.    Yes.
23     Q.    Are you board certified in
24 medical toxicology?

Page 335

 1     A.    I'm not. I started practicing
 2 medical toxicology before there was a board
 3 in the specialty, and I've been grandfathered
 4 into the profession as a member of the
 5 American College of Medical Toxicology.
 6     Q.    How long did you talk to
 7 Dr. Ness about her paper?
 8     A.    About her paper, probably a
 9 minute and a half. About all kinds of other
10 things, for a while.
11     Q.    What other kinds of things?
12     A.    Mostly personal things that had
13 nothing to do with talc or this case.
14     Q.    How long do you think that
15 conversation was?
16     A.    Well, with Dr. Ness, nothing
17 lasts very long, so I would say ten minutes
18 at the most.
19     Q.    Okay. Did you call her?
20     A.    No. She's -- she comes and
21 goes in the same building where I office, and
22 my office is just on the opposite side of the
23 floor of hers, and I see her sometimes in
24 passing or in the elevator.

Page 336

 1     Q.    So you think you just ran into
 2 her?
 3     A.    Yeah.
 4     Q.    The other people that you
 5 identified that you discussed your report
 6 with, did you ask them to read your report?
 7     A.    I asked them to look at parts
 8 of it, early drafts of it to let me know if
 9 they thought I was making sense.
10     Q.    And did they offer you comments
11 and suggestions for changes in your paper?
12     A.    Not really. Mostly they gave
13 me a pat on the back and said: I think
14 you're doing a good job, just sort of beef
15 this part up, and what do you mean by this,
16 maybe I could rephrase that. That sort of
17 thing.
18     Q.    Did they give you written
19 suggestions?
20     A.    No, these were all verbal
21 comments.
22     Q.    Had you given them a hard copy
23 of the portions of your report that you
24 wanted them to comment on?

Page 337

 1     A.    Yes.
 2     Q.    And they didn't redline it or
 3 make -- draw arrows or anything like that for
 4 you?
 5     A.    I think actually George Delclos
 6 did draw some -- or make some notes on there
 7 and hand it back to me, and I incorporated
 8 those into my electronic version.
 9     Q.    Do you still have George's
10 notes to you?
11     A.    No, I don't.
12     Q.    Is he the only one out of the
13 people that you asked to look at it who gave
14 you handwritten notes?
15     A.    Yes, I think so.
16     Q.    Have you seen the term
17 "intrinsic elimination system" regarding the
18 ovary in any of the publications that you've
19 read?
20     A.    I don't know, I may have.
21     Q.    Can you think of one in
22 particular that discusses that characteristic
23 of -- that you believe relates to the ovary?
24     A.    Well, the migration papers

85 (Pages 334 to 337)

Arch I. "Chip"  Carson, M.D., Ph.D.

Page 338

1 discuss migration to the ovary. It would
2 probably be a talc paper, though. I don't
3 recall seeing it anywhere.
4     Q.    Did you consult any gynecologic
5 textbooks?
6     A.    No, I didn't. I may have
7 looked at some diagrams on the Internet.
8     Q.    Okay. Did you consult any
9 gynecologic oncology textbooks?
10     A.    Not textbooks, no.
11     Q.    Do you know the position of the
12 Society of Gynecologic Oncologists on the
13 question of whether does talc increase a
14 woman's risk for ovarian cancer?
15     A.    No, I don't.
16     Q.    Would that be important to you
17 to know their position?
18     A.    No, I don't think so.
19     Q.    Do you know the position of
20 ACOG on whether the use of -- perineal use of
21 talc increases a woman's risk of ovarian
22 cancer?
23     A.    I don't know that either.
24 That's not something I've looked at.

Page 339

1     Q.    Would that be important to you?
2     A.    No.
3     Q.    Do you have any scientific text
4 that suggests that an inert particle resides
5 on the ovary longer than it does in the
6 cervix?
7     A.    Well, I have -- I have a paper
8 that relates to the time for dissolution of a
9 particle in biological fluids, which would go
10 to the length of time a particle of talc
11 remains in the ovary once it gets there.
12         But I don't have -- I don't
13 know that I have a scientific paper that
14 specifically says that it stays in the ovary
15 longer than it stays in the cervix.
16     Q.    You testified that you
17 understand there have been some attempts to
18 quantify the amount of talc, I guess from a
19 single use, that ends up on the perineum.
20         Did I understand that
21 correctly?
22     A.    Yes.
23     Q.    Can you tell me what those
24 attempts are, who did them, where did you see

Page 340

1 that?
2     A.    Well, I saw this actually when
3 I first started this process, and I think
4 Dr. Longo was involved in that activity,
5 where they modeled the -- the application of
6 talcum powder and did some calculations based
7 on the amount of substance that was used, and
8 they measured it in things like shakes and --
9 and then quantified the amount that was lost
10 from the container to determine what an
11 application amount was.
12         I don't think they were able to
13 go beyond that point in the modeling process.
14     Q.    You didn't see anything that
15 Dr. Longo did that attempted to quantify the
16 amount of talcum powder from a single shake
17 that ended up on a woman's perineum, did you?
18         MS. O'DELL: Object to the
19     form.
20     A.    I -- you know, I don't know the
21 answer to that, simply because I don't
22 recall, but I wouldn't be surprised that
23 there was an attempt made to do that. But
24 beyond that, I don't think anything would be

Page 341

1 successful.
2         These were clothed subjects, so
3 that adds another factor to the calculation.
4 BY MS. BOCKUS:
5     Q.    Is that the only experiment
6 that you're familiar with that you've seen
7 anywhere that attempts to quantify the amount
8 of talcum powder from a single use that ends
9 up actually on a woman's perineum?
10     A.    There was another part of that
11 study where they applied it to underwear with
12 the same sort of calculation process. It was
13 all part of the same modeling process.
14     Q.    And do you recall what
15 percentage of the talc applied to the
16 underwear ended up adhered to the woman's
17 perineum?
18         MS. O'DELL: Object to the
19     form.
20     A.    I don't think -- I don't think
21 they measured the amount that adhered to the
22 perineum. I think what they were interested
23 in was proximity.
24         ///

Arch I. "Chip"  Carson, M.D., Ph.D.

Page 342

1  BY MS. BOCKUS:
2      Q.    Okay.  Can you tell me the
3  names of the environmental websites that have
4  been talking about IARC revisiting their
5  classification of talc?
6      A.    There are -- there are a number
7  of Twitter feeds and websites that carry on
8  this kind of discussion.  Science Interest is
9  one of them.  I think IARC Watch is another
10  one.  I have -- I get e-mails about some of
11  these and end up going into them for a period
12  of time and seeing if they have anything
13  interesting going on.  Some of them are
14  searchable.
15          And then I get e-mails from the
16  ones that I visit about other ones.  So I
17  spend as much of my time deleting these
18  e-mails without reading them as I do actually
19  viewing the material.
20      Q.    So fair to say this is just
21  chatter you've seen on the Internet in these
22  different chat rooms or Twitter accounts that
23  you visit from time to time?
24      A.    It's all Internet based, yes.

Page 343

1          MS. BOCKUS:  Okay.  I think
2  that's all I have.  Thank you.
3          MS. O'DELL:  Why don't we take
4  a short break.  We've been going about
5  two hours.
6          MR. ZELLERS:  Do you have
7  questions?
8          MS. APPEL:  I do, but --
9          MS. O'DELL:  Yeah, do you
10  have --
11          MS. APPEL:  I don't have a lot.
12          MS. O'DELL:  Okay.  Sure.  Why
13  don't you go ahead, and then we'll
14  take a break.  We have been going
15  about two hours, but, Renée, please.
16          If you're okay, Doctor.
17          THE WITNESS:  I'm fine.
18              EXAMINATION
19  BY MS. APPEL:
20      Q.    It's been a while since we did
21  introductions, so just as a reminder, my name
22  is Renée Appel and I'm here on behalf of
23  Seyfarth Shaw and I represent Personal Care
24  Products, counsel.

Page 344

1      A.    Uh-huh.
2      Q.    And echoing what my colleagues
3  have said today, if there's at any point I
4  ask a question that you do not understand,
5  just stop me and ask me to rephrase it or let
6  me know otherwise, okay?
7      A.    I will.
8      Q.    Thanks.
9          So going back shortly to your
10  scope of work, do you teach any coursework on
11  talc or ovarian cancer?
12      A.    I teach some general courses.
13  Up until last spring I taught a general
14  environmental health course for graduate
15  students in the Master of Public Health
16  program at the School of Public Health, and
17  in that course we did touch on things like
18  environmental exposures that would include
19  minerals of various varieties, but it was
20  very cursory.
21      Q.    And was that curriculum
22  specific to environmental and industrial
23  products or minerals as opposed to consumer
24  products?

Page 345

1      A.    We actually did touch on other
2  consumer products as well in terms of the
3  significant environmental problem that we
4  have currently, but -- regarding the huge
5  volume of personal care products that goes
6  into our aqueous waste stream and how that's
7  affecting the aquatic environment as well as
8  groundwater and so forth.
9          As a matter of fact, in that
10  course, as part of the culmination of the
11  course, there are student workgroups that
12  develop presentations on a particular topic,
13  and the topic of personal care products has
14  been a favorite choice for the last several
15  years.
16      Q.    But your curriculum did not
17  include talc among those products?
18          MS. O'DELL:  Object to the
19  form.
20      A.    I think talc may have been
21  represented as an individual mineral on a
22  slide that listed many minerals.
23  BY MS. APPEL:
24      Q.    Earlier today you had mentioned

87 (Pages 342 to 345)

Arch I. "Chip"  Carson, M.D., Ph.D.

Page 346

1   a shared file.  Is that shared file something
2   that you created or plaintiffs' counsel
3   created?
4        A.   It's something that I think
5   plaintiffs' counsel created for me to be able
6   to send them documents and receive documents,
7   and it's a Dropbox share file.  It's -- at
8   this point I think it might be mine.  I'm not
9   sure just exactly who's in charge of that or
10  runs it, but it comes directly into my
11  Dropbox file.
12          I know I had to boost my
13  subscription to Dropbox in order to hold the
14  2 gigabytes of data from -- that we were
15  putting into there.
16       Q.   Is there anything from that
17  Dropbox file that you relied upon in forming
18  your opinion in your report that you have not
19  already provided to defense counsel?
20       A.   No, everything that was in that
21  Dropbox that I've relied upon has been
22  identified here.
23       Q.   Who prepared Exhibit B to your
24  report?

Page 347

1        A.   Exhibit B was a list of
2   articles from the research literature
3   included in the Dropbox that -- that I think
4   does not -- I don't know whether it includes
5   the referenced articles from my report or
6   not, but they were all part of the same
7   collection of research articles and
8   supplemental documents.
9        Q.   And my question, Dr. Carson,
10  was:  Who prepared that exhibit?
11       A.   The exhibit was prepared by the
12  plaintiffs' attorneys.
13       Q.   You testified earlier that you
14  have spent approximately 150 to 180 hours in
15  your expert retention work; is that correct?
16       A.   Correct.
17       Q.   Can you estimate what portion
18  of that time was spent researching versus
19  what portion of time was spent actually
20  drafting your expert report?
21       A.   Those two things are in some
22  ways difficult to separate because I would --
23  I was writing my report the entire time that
24  I was reviewing the research materials and

Page 348

1   accumulating information in the draft as a
2   result of my review of the literature.
3          So if I had to separate things
4   out, I would say that, by far, the -- most of
5   the time has been spent in reading articles
6   and reviewing them and comparing them with
7   other articles, and a comparatively small
8   amount of time has been spent in drafting the
9   report.
10          Although there were some
11  strings of activity which was all report
12  drafting basically, I would say probably 85
13  to 90% was research, seeking articles,
14  reading them, reviewing them, and comparing
15  them.
16       Q.   And you also testified earlier
17  today that you discarded information not
18  relevant or interesting to you.
19          How did you make that
20  determination?
21       MS. O'DELL:  Objection to the
22       form.
23       A.   The things that I discarded did
24  not seem to fit into my gestalt of the

Page 349

1   understanding of this question and the
2   opinions that I wanted to express.  They may
3   have been interesting information and useful
4   for some purposes, but not for this
5   particular report.
6   BY MS. APPEL:
7        Q.   Was some of that information
8   that you discarded based on relevancy or that
9   you determined was not of interest
10  information that may have been different than
11  your opinions?
12       A.   No.  I didn't discard any
13  research because the opinions provided
14  differed from my own.  These were things that
15  really were irrelevant to the question.
16          I remember finding an awful lot
17  of geological research stuff that just didn't
18  have any relevance to the question.
19          Because I used such broad
20  search terms, I ended up pulling in a whole
21  lot of things that were not necessary or
22  useful, and those just went in the trash.
23       Q.   You testified earlier that you
24  have not treated any patients with ovarian

88 (Pages 346 to 349)

Arch I. "Chip"  Carson, M.D., Ph.D.

Page 350

1  cancer; is that correct?
2      A.   Not knowingly, not because of
3  ovarian cancer.
4      Q.   Have you ever diagnosed any
5  patients with ovarian cancer?
6      A.   I think when I was in medical
7  school or residency, I probably participated
8  in that on several patients.
9      Q.   Have you ever instructed a
10  patient not to use talcum powder products?
11      A.   I hadn't up until a month or
12  two ago, but I've been asking people about --
13  about their talcum powder use just as sort of
14  a curiosity in mentioning that there might be
15  a risk.
16      Q.   Do you ask that of all your
17  patients?
18      A.   I would say no, I don't usually
19  ask the men that, but I probably should.
20      Q.   And have the responses to those
21  inquiries of your female patients and their
22  talcum product use, has that been used at all
23  to inform your opinions in this case?
24      A.   I don't think so.  There have

Page 351

1  been very few that I have asked that question
2  in the last month or so.  I've had a limited
3  clinic schedule during this period of time.
4  We had the holidays and other things, so I
5  haven't seen that many patients.
6          And of those I've asked about
7  it, it seems about half of the women have had
8  a history of using talcum powder.
9      Q.   And of those women that are
10  using -- have told you that they have used
11  talcum powder, are those women diagnosed with
12  ovarian cancer?
13      A.   No.
14      Q.   So suffice to say the inquiry
15  that you've asked of your female patients
16  concerning their talcum use has nothing to do
17  with the question that you've been posed in
18  this particular litigation?
19          MS. O'DELL:  Object to the
20      form.
21      A.   Actually, that's the only
22  reason I've been asking them.  It's not
23  something that came to mind earlier.  I have
24  an environmental exposure survey that I

Page 352

1  usually administer to my patients, and I have
2  plans to add that as a question in my
3  environmental exposure survey.  Which I
4  haven't done already, but will as soon as I
5  get the opportunity.
6  BY MS. APPEL:
7      Q.   You testified earlier today
8  that you do not believe there was ever a
9  point where talcum powder did not contain
10  asbestos, correct?
11      A.   Yes.
12      Q.   So in forming your opinion in
13  your report, you've assumed that the talcum
14  powder does contain asbestos, correct?
15          MS. O'DELL:  Object to the
16      form.
17      A.   Well, I think the asbestos
18  contribution to this whole issue is important
19  and significant.  I think there's good
20  evidence that whatever we call talcum powder
21  is carcinogenic and responsible for ovarian
22  cancer -- as a cause of ovarian cancer, but I
23  can't say -- I can't say based on looking at
24  a can of talcum powder whether or not it has

Page 353

1  asbestos in it or how much.
2  BY MS. APPEL:
3      Q.   Have you formed an opinion,
4  Dr. Carson, on whether there's a relationship
5  between pure talc and ovarian cancer?
6          MS. O'DELL:  Objection to form.
7      A.   My opinion is there is, but
8  that's based on the research reports that
9  have been done using so-called pure talc,
10  talcum powder, and I am -- I -- my opinion is
11  that it's unlikely that those test substances
12  actually are pure talc.
13  BY MS. APPEL:
14      Q.   So again, Dr. Carson, in
15  forming your opinions, you have done so on
16  the belief that all the talc powder products
17  or just pure talc do, in fact, contain
18  asbestos?
19          MS. O'DELL:  Objection to form.
20      A.   It is my opinion that all
21  talcum powder products do contain a certain
22  amount of asbestos, even if it's extremely
23  small.
24          My opinions have been formed

89 (Pages 350 to 353)

Arch I. "Chip"  Carson, M.D., Ph.D.

Page 354

1  based on research that has been done on
2  available talcum powder products, so I guess
3  the research would have been done using some
4  small quantity of asbestos in all of those
5  studies.
6  BY MS. APPEL:
7      Q.    You also testified today,
8  Dr. Carson, that you have found in your
9  research that there is a dose-response
10  relationship between talcum powder products
11  and ovarian cancer, correct?
12      A.    Well, a number of the research
13  studies, the epidemiology studies have shown
14  positive and statistically significant
15  trends.
16      Q.    And those trends that you're
17  relying on, Dr. Carson, actually only relate
18  to duration and frequency, correct?
19          MS. O'DELL:  Objection to form.
20      A.    Yes, they do relate to duration
21  and frequency, which is the only surrogate we
22  have for dose.
23  BY MS. APPEL:
24      Q.    So in forming your opinion,

Page 355

1  Dr. Carson, you have not determined a level
2  of harmful exposure to talcum powder products
3  that causes ovarian cancer?
4      A.    That's correct.
5      Q.    And you did not conduct a dose
6  assessment between talcum powder products and
7  ovarian cancer, correct?
8          MS. O'DELL:  Objection to form.
9      A.    Well, I did not conduct a
10  dose-response, but I am of the opinion that
11  there's no safe threshold for exposure to a
12  carcinogen until such a threshold is
13  identified.
14  BY MS. APPEL:
15      Q.    And does that include
16  Category 2B particles as well --
17          MS. O'DELL:  Objection.
18  BY MS. APPEL:
19      Q.    -- that it's a possible
20  carcinogen?
21          MS. O'DELL:  Objection to form.
22      A.    It includes the talc that was
23  discussed in the IARC report.  Those
24  conclusions have nothing to do with how it's

Page 356

1  classified by IARC.
2  BY MS. APPEL:
3      Q.    But it's your opinion that a
4  possible carcinogen -- strike that.
5          It's your opinion that any dose
6  of a possible carcinogen can cause cancer?
7          MS. O'DELL:  Objection to form.
8      A.    I think there is a
9  potential for any dose of a carcinogen to
10  cause a cancer.  There's also the principle
11  that the lower the dose, the less likely it
12  is, the lower the risk is for developing a
13  cancer.
14  BY MS. APPEL:
15      Q.    And your opinion extends to
16  those particles that have not been identified
17  as carcinogens, but may just be possible
18  carcinogens?
19      A.    I think talc has been
20  identified as a carcinogen.
21      Q.    So you disagree with the IARC
22  classification?
23      A.    The IARC 2B classification is a
24  carcinogenic classification.

Page 357

1      Q.    But you recognize and -- that
2  there are different types of categories that
3  IARC has?
4      A.    Yes.
5      Q.    And that -- it's that talc that
6  does not contain asbestos was not, in fact,
7  categorized as a Group 1, correct?
8      A.    That's correct.
9      Q.    So is it your opinion, then,
10  looking at other 2B-classified particles by
11  IARC, that any exposure to pickled vegetables
12  would cause cancer?
13      A.    We know that there are a number
14  of carcinogens that are regularly present in
15  things like the food that we eat.  We have a
16  rule that says that those things should not
17  be included in food items unless they have
18  passed a particular exemption process.
19          Pickled vegetables are
20  something that people have been familiar with
21  and have been using for hundreds of years,
22  and things like talcum powder are things that
23  have been used for -- well, at least a
24  hundred years, but probably considerably

90 (Pages 354 to 357)

Arch I. "Chip"  Carson, M.D., Ph.D.

Page 358

1  longer.
2       And whether or not those things
3  are carcinogens, there are people who still
4  find enough value to offset that factor in
5  their own lives and they can make their own
6  decisions regarding their exposure.
7       It's a similar concept to
8  people who choose to smoke.  Although smoking
9  is an addictive behavior, people are aware
10 that it causes disease, including cancer, and
11 yet they continue to smoke.
12      We continue to eat grilled
13 meats, even -- most of us know now that
14 grilled meats contain polycyclic aromatic
15 hydrocarbons that are known carcinogens, some
16 of them Group 1 carcinogens, and yet, we
17 continue that practice and revel in it even.
18 That's just part of what we do as human
19 beings.
20      The issue with talc is a
21 complicated question in my mind.  I think I'm
22 straying a bit from your -- from your
23 question, but baby powder, for example, is
24 something that has a very -- very dear sort

Page 359

1  of relationship to many people.
2       The experience with that from
3  the time you were a baby until you grow up
4  and have your own children involves a lot of
5  the use of baby powder in many, many
6  households.  That's a difficult relationship
7  to break.  It's psychological as much as it
8  is knowledge based.
9       So as we go through the
10 decades, we get a little safer and safer as
11 we begin to peel these habits, these
12 dangerous habits away from our lives and
13 accept better lifestyles.
14      MR. ZELLERS:  Move to strike as
15 nonresponsive.
16      MS. APPEL:  Respectfully --
17      MS. BOCKUS:  Is he finished?
18      MR. ZELLERS:  I don't think so.
19      THE WITNESS:  I can go on.
20 BY MS. APPEL:
21      Q.   Yeah.  My question was more
22 narrow, and I was analogizing your opinion as
23 to talcum powder and was asking about other
24 2B classifications, and my example --

Page 360

1       A.   Pickled vegetables.
2       Q.   -- I had was pickled
3  vegetables, and the question was whether or
4  not is your opinion that any consumption of
5  pickled vegetables causes cancer?
6       MS. O'DELL:  Objection to form.
7       A.   I believe the primary form of
8  cancer that's potentially related with
9  pickled vegetables is stomach cancer, and
10 there is a slight increase in risk with
11 consumption of pickled vegetables for
12 everybody who does it.
13 BY MS. APPEL:
14      Q.   Okay.  And what about gasoline
15 or exhaust?
16      A.   Gasoline meaning the fuel?
17      Q.   Yes.
18      A.   Well, gasoline used to contain
19 a significant amount of benzene, which was
20 a -- determined to be a carcinogenic
21 substance.  In recent years, most of the
22 benzene has been removed from gasoline, so
23 now there's very little benzene in vapors
24 that are expressed.

Page 361

1       But there's a small amount.  So
2  when you inhale gasoline vapors, you are also
3  exposing yourself to a very small amount of a
4  carcinogenic substance.
5       As far as exhaust is concerned,
6  diesel exhaust in particular has -- contains
7  particles that have been identified through
8  various bioassays to be carcinogenic.  So
9  diesel exhaust is regulated as a carcinogenic
10 material, even though we continue to be
11 exposed.
12      Q.   And it's your opinion that any
13 exposure that we all incur related to exhaust
14 will cause us cancer?
15      MS. O'DELL:  Objection to form.
16      A.   It will cause an increase in
17 risk of cancer.  Doesn't necessarily cause
18 cancer in everybody.
19 BY MS. APPEL:
20      Q.   Okay.  Are you aware that Saed
21 has been hired by plaintiffs' counsel in this
22 litigation?
23      A.   I am.  And when I misspoke
24 earlier today regarding the Taher paper, I

91 (Pages 358 to 361)

Arch I. "Chip" Carson, M.D., Ph.D.

Page 362

1   was thinking of the Saed paper.
2       Q.   Okay.  Last question:  Counsel
3   was asking you about the migration process,
4   and you mentioned that in the course of
5   particles moving up the track, that some of
6   it may come back out even after it reaches
7   the fluid surrounding the ovaries, correct?
8       A.   Yes.
9       Q.   So if particles have the
10  ability to come back out, that means that
11  there is, in fact, some form of an intrinsic
12  elimination system.
13      A.   Well, if this is all based on
14  mass action, it would not necessarily be an
15  intrinsic elimination system, and I believe
16  that talc particles, once they produce an
17  inflammatory response, they become
18  sequestered within that inflammatory milieu
19  and no longer are available for movement back
20  out into the fluid.
21          I'm sure there's some small
22  percentage of them that are an exception to
23  that, but for the majority, that would be the
24  case.

Page 363

1           MS. APPEL:  Okay.  That's all I
2   have.  Thank you, Dr. Carson.
3           MS. TINSLEY:  I don't have any
4   questions.
5           MS. O'DELL:  Okay.  Why don't
6   we take a short break.
7           THE VIDEOGRAPHER:  Off the
8   record at 5:37, end of Tape 4.
9           (Recess taken, 5:37 p.m. to
10  5:44 p.m.)
11          THE VIDEOGRAPHER:  We're on the
12  record at 5:44, beginning of Tape 5.
13          MS. O'DELL:  Dr. Carson, I
14  don't have any questions, so this will
15  conclude your deposition.
16          MR. ZELLERS:  Thank you,
17  Doctor.
18          THE VIDEOGRAPHER:  Going off
19  the record, 5:44.  End of deposition,
20  end of Tape 5.
21          (Proceedings recessed at
22  5:45 p.m.)
23              --o0o--
24

Page 364

1                   CERTIFICATE
2           I, MICHAEL E. MILLER, Fellow of
    the Academy of Professional Reporters,
3   Registered Diplomate Reporter, Certified
    Realtime Reporter, Certified Court Reporter
4   and Notary Public, do hereby certify that
    prior to the commencement of the examination,
5   ARCH I. "CHIP" CARSON, M.D., Ph.D. was duly
    sworn by me to testify to the truth, the
6   whole truth and nothing but the truth.
7           I DO FURTHER CERTIFY that the
    foregoing is a verbatim transcript of the
8   testimony as taken stenographically by and
    before me at the time, place and on the date
9   hereinbefore set forth, to the best of my
    ability.
10
        I DO FURTHER CERTIFY that pursuant
11  to FRCP Rule 30, signature of the witness was
    not requested by the witness or other party
12  before the conclusion of the deposition.
13      I DO FURTHER CERTIFY that I am
    neither a relative nor employee nor attorney
14  nor counsel of any of the parties to this
    action, and that I am neither a relative nor
15  employee of such attorney or counsel, and
    that I am not financially interested in the
16  action.
17
18  _____
    MICHAEL E. MILLER, FAPR, RDR, CRR
19  Fellow of the Academy of Professional Reporters
    NCRA Registered Diplomate Reporter
20  NCRA Certified Realtime Reporter
    Certified Court Reporter
21
    Notary Public in and for the
22  State of Texas
    My Commission Expires:  7/9/2020
23
    Dated: January 22, 2019
24

Page 365

1           INSTRUCTIONS TO WITNESS
2
3           Please read your deposition over
4   carefully and make any necessary corrections.
5   You should state the reason in the
6   appropriate space on the errata sheet for any
7   corrections that are made.
8           After doing so, please sign the
9   errata sheet and date it.
10          You are signing same subject to
11  the changes you have noted on the errata
12  sheet, which will be attached to your
13  deposition.
14          It is imperative that you return
15  the original errata sheet to the deposing
16  attorney within thirty (30) days of receipt
17  of the deposition transcript by you.  If you
18  fail to do so, the deposition transcript may
19  be deemed to be accurate and may be used in
20  court.
21
22
23
24

Arch I. "Chip" Carson, M.D., Ph.D.

| Page 366 | | Page 368 |
|---|---|---|

**Page 366**

```
 1              ERRATA
 2    PAGE LINE CHANGE
 3    ____ ____ _____
 4         REASON: _____
 5    ____ ____ _____
 6         REASON: _____
 7    ____ ____ _____
 8         REASON: _____
 9    ____ ____ _____
10         REASON: _____
11    ____ ____ _____
12         REASON: _____
13    ____ ____ _____
14         REASON: _____
15    ____ ____ _____
16         REASON: _____
17    ____ ____ _____
18         REASON: _____
19    ____ ____ _____
20         REASON: _____
21    ____ ____ _____
22         REASON: _____
23    ____ ____ _____
24         REASON: _____
```

**Page 368**

```
 1            LAWYER'S NOTES
 2
 3    PAGE  LINE
 4    ____  ____  _____
 5    ____  ____  _____
 6    ____  ____  _____
 7    ____  ____  _____
 8    ____  ____  _____
 9    ____  ____  _____
10    ____  ____  _____
11    ____  ____  _____
12    ____  ____  _____
13    ____  ____  _____
14    ____  ____  _____
15    ____  ____  _____
16    ____  ____  _____
17    ____  ____  _____
18    ____  ____  _____
19    ____  ____  _____
20    ____  ____  _____
21    ____  ____  _____
22    ____  ____  _____
23    ____  ____  _____
24    ____  ____  _____
```

**Page 367**

```
 1        ACKNOWLEDGMENT OF DEPONENT
 2
 3
 4        I, ARCH I. "CHIP" CARSON, M.D.,
      Ph.D., do hereby certify that I have read the
 5    foregoing pages and that the same is a
      correct transcription of the answers given by
 6    me to the questions therein propounded,
      except for the corrections or changes in form
 7    or substance, if any, noted in the attached
      Errata Sheet.
 8
 9
10
11
12    _____
      ARCH I. "CHIP" CARSON, M.D., Ph.D.  DATE
13
14
15    Subscribed and sworn to before me this
16    _____ day of _____, 20 _____.
17    My commission expires: _____
18
19    _____
20    Notary Public
21
22
23
24
```

Arch I. "Chip"  Carson, M.D., Ph.D.

Page 369

**A**

**a.m**
1:16 8:2,8 31:10
  89:5,6
**ability**
211:18 362:10
  364:9
**able**
34:22 36:1 38:12
  42:22 64:3 71:15
  115:13 141:9
  154:11,14 175:20
  190:1 191:16
  216:2 220:1
  258:17 281:10
  299:8 309:17
  313:9 325:12,17
  325:21 326:8
  340:12 346:5
**Abney**
36:22,23,24 37:8
  37:14 38:1,17
  45:23,23,24 55:2
  65:15 284:16
  285:1,12
**absence**
72:16 99:23 240:19
**academic**
70:12 76:5
**Academy**
1:18 364:2,19
**accelerate**
311:22
**accelerated**
287:3,14
**accept**
359:13
**acceptance**
213:11
**accepted**
102:18 103:18,23
  250:12 320:24
  330:7
**access**
13:23 102:1,9,10
  162:5 321:12

**accessed**
42:3
**accomplished**
249:23
**account**
162:11 163:13
  166:18 224:14
  268:6,8,20 277:14
**accounts**
277:19 342:22
**accumulated**
310:15
**accumulating**
348:1
**accurate**
14:21 22:11 365:19
**Acheson**
145:12 154:19
**achieved**
259:7
**acidolite**
144:21
**acknowledge**
221:18
**ACKNOWLED...**
4:12 367:1
**ACOG**
338:20
**act**
317:11
**action**
96:6,6 98:2 99:22
  272:12 299:23
  300:2 334:14
  362:14 364:14,16
**activities**
27:18 31:17 58:16
  60:9 232:6 257:4
  319:5 328:14
**activity**
340:4 348:11
**acute**
198:16,20
**acute-phase**
318:10
**add**
83:16 119:17 256:3

**accessed** (col3)
299:15 329:14
  352:2
**added**
115:22 175:24
**addictive**
358:9
**adding**
119:15
**addition**
14:1 24:9 68:8
  215:23
**additional**
14:2 17:12 24:10
  24:20 25:18 28:3
  51:15 60:8 68:11
  72:6 217:18
**additions**
57:24
**additive**
300:5
**address**
32:4 38:2 93:13
  165:6 214:16
  294:22
**addressed**
215:2 216:3
**addresses**
294:23
**addressing**
291:5 295:1
**adds**
169:7 249:14 341:3
**adhered**
341:16,21
**adhesions**
116:17 119:3,12
  120:6,19 132:24
  133:4,14 185:6
**adjust**
268:15
**adjusted**
269:4 272:22
**administer**
352:1
**administered**
188:23
**administration**

**257:3**
**adolescence**
267:16,24
**adopt**
100:13
**adopted**
98:16
**advantage**
240:5
**advice**
164:14
**African-American**
196:23 198:3
  270:19
**age**
162:12 163:15
**agencies**
93:24 97:7
**agency**
178:23 179:1 219:9
  219:11 225:23
  294:24
**agent**
179:13,18,20
  226:24 227:9
  228:21 235:12
**agents**
178:15 179:10
  225:22 226:3,16
  226:21 227:7
**ago**
30:8 37:2 235:12
  250:13 320:8
  327:13 350:12
**agree**
75:6,14 77:20 78:3
  92:22 96:4 106:10
  120:14 121:2
  134:14 159:2
  160:23 167:18
  168:13,18 172:14
  180:2 218:3
  239:14,15 253:20
  253:23 258:12
  264:22 266:7,23
  277:21 290:20
  293:20 294:6

**302:24 317:6**
  318:5 326:11
  327:6
**agreed**
235:23 236:12
  239:4
**agreeing**
133:10
**ahead**
21:22 25:4 39:21
  67:10 282:12
  290:18 315:13
  343:13
**aid**
186:10
**air**
186:3 187:3
**aklevorn@burns...**
2:9
**al**
5:9,10,12,13,18,19
  6:4,6,7,8,10,13,14
  6:16 26:5
**Alabama**
2:5
**albumin**
183:18 189:6
**allege**
138:23
**alleged**
143:22 153:9 175:7
  298:23
**allegedly**
152:22
**Allen**
2:2 8:18,20
**allow**
12:4 254:21
**allows**
42:19 87:18
**allude**
86:17 128:9
**alluded**
289:4
**alterations**
319:3,3
**altered**

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 96 of 1035
PageID: 241275
Arch I. "Chip"  Carson, M.D., Ph.D.

Page 370

314:17
**altering**
329:1
**alternative**
132:16 150:16,20
**Amanda**
2:8 8:22
**America**
3:5,10
**American**
32:14 77:13 335:5
**amosite**
146:7
**amount**
55:16 73:5 143:22
152:11,21 153:9
170:21 171:2,2,2
171:7,16 177:21
202:21 231:12
232:3 263:10
279:7 299:2 301:4
319:19,20 339:18
340:7,9,11,16
341:7,21 348:8
353:22 360:19
361:1,3
**amounts**
73:5,16 167:5
169:11,16 176:5
211:4
**amphibole**
31:10 146:5,17
**analogizing**
359:22
**analyses**
113:24 114:4
**analysis**
80:23 86:4 163:13
191:18 192:18,21
193:22 219:2
220:4 252:19
257:17
**analyzes**
219:22
**analyzing**
215:12
**anatomical**

84:3
**anatomy**
207:22 209:9
**and/or**
139:4 171:7 221:22
**Angeles**
2:15
**animal**
291:5 293:14,17
294:1
**animals**
286:24 290:9 291:1
291:3 292:11,20
294:6
**Annie**
69:5,10
**answer**
11:18 12:4,5 23:7
39:17 40:9 53:18
64:4 81:15 92:14
92:14,20 105:14
110:10 112:9
115:13 135:16,24
141:9 148:4
156:12 161:9
162:23 172:4
188:5 189:4
206:15 208:18
220:1 307:4 316:7
332:21 340:21
**answered**
88:23 106:17
110:15 116:20
128:7 137:22
152:6 157:2
228:15 242:5
**answering**
150:2
**answers**
159:12 180:14
367:5
**anthophyllite**
144:11,23 145:3,4
145:5 146:6
**antiinflammatory**
131:8,20
**antioxidant**

314:18
**Antonio**
3:4
**apart**
28:5 207:18
**apologies**
74:4 257:23
**apologize**
285:19 296:16
**apparent**
211:2 251:8
**apparently**
208:22
**appear**
10:17 222:4 258:10
**appearances**
4:2 56:19
**appeared**
77:13,17
**appears**
258:7 276:3 316:2
**Appel**
3:17 4:8 9:9,9
343:8,11,19,22
345:23 349:6
352:6 353:2,13
354:6,23 355:14
355:18 356:2,14
359:16,20 360:13
361:19 363:1
**appendices**
102:2,11
**Appendix**
19:13 21:21
**apples**
254:18,18
**application**
86:13 87:11,16
88:4,9,12,13,21
109:3 110:24
111:14 117:6
119:24 147:2
152:18 167:10
183:13 185:9
210:8 230:11
231:6,10 232:4
296:10 302:1

306:16 319:22
340:5,11
**applications**
194:7
**applied**
109:3 116:15
119:14 201:5,7,16
201:24 264:16
302:4 306:14
321:11 334:20
341:11,15
**applies**
218:7 228:20
236:15
**apply**
186:19 231:4
235:17,19
**applying**
240:9
**appointment**
61:7
**appreciable**
202:21
**appreciate**
195:20
**approach**
42:15,18 95:16
98:11,16 99:15,19
99:20 100:4 312:3
325:20
**approaches**
93:12
**approaching**
28:11
**appropriate**
98:10 99:22 164:18
293:15 365:6
**approximately**
347:14
**April**
30:21,24 33:19
218:21
**aquatic**
345:7
**aqueous**
345:6
**Arch**

1:13 4:5 5:1 9:18
10:1 364:5 367:4
367:12
**area**
37:1 91:3 160:24
162:10 163:22
186:19 198:13
199:13 248:10
249:16 252:21
258:12 301:21
**areas**
43:3 70:19 198:22
199:2 201:19
**argues**
110:7 333:21
**argument**
213:10
**argumentative**
88:17
**aromatic**
358:14
**arrive**
215:1 241:19
**arriving**
251:11
**arrows**
337:3
**art**
41:18 208:12,17
**arthritis**
121:18
**article**
26:5,9,11,16,24
28:9,23 29:3,4,8
31:9,20 32:6,14
32:22 33:10,11
51:3,19 86:10
88:1,18 102:24
103:7,11 117:3
248:17 280:17
**articles**
25:6 28:3 51:14,17
86:17 87:8 104:23
105:1 125:1
183:11 185:5
192:8 347:2,5,7
348:5,7,13

Arch I. "Chip"  Carson, M.D., Ph.D.

**asbestiform**
290:10,22 295:19
**asbestos**
41:9,11,11 49:17
55:12,17,20 64:19
72:10,17,17 106:2
106:10 107:2
114:23 115:4,9
125:1 138:17,23
139:4,8,13,16,21
140:8,22 141:7
142:19 143:1
144:7,19,19 145:8
145:18,24 146:2,5
146:15,17 147:10
147:16,22 148:8
148:14 151:1
152:11,15,17,21
153:9,13,22 154:1
154:6,12,17 157:6
157:15 158:19
159:3 160:4,17
163:8 166:15
167:5,14 168:14
169:1 170:19
290:10,22 295:19
296:7 297:21
298:3,6,16,24
299:2 300:3
331:13,15,16
332:16 352:10,14
352:17 353:1,18
353:22 354:4
357:6
**asked**
32:3 38:1 39:15
53:15,17 57:4
80:19 88:22
106:16 110:15
116:20,22 117:13
118:10,12 123:4
124:11 128:7
137:21 144:24
152:6 156:11
157:1 165:7
168:24 172:5
199:11 214:1,16

216:3 228:14
242:5 278:19
283:6 336:7
337:13 351:1,6,15
**asking**
92:1,12 112:7,10
112:24 119:24
136:3 174:17
308:24 309:1
316:22 317:14
350:12 351:22
359:23 362:3
**aspect**
137:8 173:19
**aspects**
22:17,19,20 216:20
**aspirin**
131:9,13,20
**assemble**
24:8 40:18
**assess**
111:20 231:19
**assessed**
258:19
**assessing**
99:2 113:23
**assessment**
5:15 30:13 53:6
89:15 94:23 95:22
96:10,17 172:11
172:15 173:1,8,13
173:14,20,21
174:5,13,18,20,21
174:23 175:2,7,14
175:20 205:22,24
214:6,12 232:9
355:6
**assessments**
97:6 175:4 205:18
205:21
**assigning**
225:7
**assist**
43:21
**assistant**
58:8 289:7
**assisted**

43:23
**associate**
61:8
**associated**
63:16 121:24 122:1
122:7 131:10
145:9,11,16
152:12,15,19
153:10,13,16
154:13 179:9
248:10 249:17
252:17 277:6
**association**
17:7,17 27:3 38:19
53:21 54:10 55:8
64:19,20 85:2
91:20 107:3 110:2
110:7,12 111:3
129:18 130:9
138:7,12 166:12
196:11,21 198:1
223:5 229:24
230:9,20,21 233:2
233:12 235:3,4,17
235:24 237:8,23
238:8,16 240:20
243:12 244:3,15
246:3,9 247:22
248:23 250:6
254:1 262:16,21
265:6,11,23
270:17
**associations**
109:9,20,21 121:13
193:18 221:24
223:7 233:8
245:10 272:23
**assume**
11:20 181:2
**assumed**
352:13
**Assuming**
116:4
**assumption**
139:14,19 296:3
**attached**
21:7,21 323:2,5

365:12 367:7
**attachments**
15:24 16:2 21:1
**attempt**
188:3 231:18
277:13 325:7
340:23
**attempted**
340:15
**attempts**
231:23 232:1,2
268:9 339:17,24
341:7
**attention**
105:2
**attenuated**
193:18
**attorney**
36:21 364:13,15
365:16
**attorneys**
13:2 20:3 24:6
51:11 72:15 75:18
96:11,13 101:7
103:22 104:14
141:22 347:12
**attorneys'**
46:8
**attribute**
307:3,6
**attributed**
244:6
**Australia**
308:9
**author**
27:5,24 29:2 77:6,7
101:13 129:14,16
246:22 286:13
**author's**
186:14
**authored**
31:9 32:16 62:21
**authoring**
89:11
**authorities**
89:21
**authority**

90:24
**authorized**
39:24
**authors**
101:17 104:2,16,19
105:5,11 106:23
107:11 108:8
111:11 128:1,3
163:6,17,21
187:10 193:4,5,8
194:11 196:18
210:22 241:7
243:9 244:2,22
247:18 248:6,20
249:10 269:4
271:24 277:16
**availability**
37:6
**available**
13:24 16:18 25:6
34:2 40:19 50:15
54:13 69:1 78:5
94:16 174:1,9
214:18 215:14,23
216:9 228:9,10
313:18 354:2
362:19
**Avenue**
3:8
**average**
231:2 280:19
**avoid**
241:10
**avoiding**
244:24
**aware**
14:23 25:15 27:15
31:21 37:4 41:8
46:22 49:19,20
50:22 51:20 52:1
52:3 67:1,4 68:16
88:1 116:23 122:9
127:24 131:7
148:21 153:23
161:16 185:5
200:9 203:3,6
204:5 212:24

Arch I. "Chip"  Carson, M.D., Ph.D.

Page 372

213:21 229:4
241:9 268:3,4
322:7,8,12,15,20
325:20 358:9
361:20
**awareness**
55:17
**awful**
349:16

---

**B**
**b**
3:17 19:4,5,13
21:21 25:1 286:1
346:23 347:1
**baby**
22:2,3 85:6 144:16
152:23 177:22
232:9 274:21
275:6,11,20
358:23 359:3,5
**back**
31:21 37:9 77:6
125:16 136:20
142:15 145:10
158:1 163:19
168:11 207:19
227:6 228:24
246:17 278:6
307:8 314:22
324:10 327:7
336:13 337:7
344:9 362:6,10,19
**background**
155:23 156:1
236:24
**bacteria**
202:14
**bad**
321:18
**balance**
248:8
**Balkwill**
127:5
**banned**
133:19,24 134:9,15
134:18

**based**
19:21 71:17,19
75:24 85:17 93:22
94:5,15,20,23
105:8 113:1
143:13,17 148:1
153:22 157:17
180:4 192:24
193:8 214:15,22
220:3 223:13
224:20 227:21
228:8 235:13
251:21 274:18
280:2 284:19
300:1 306:2 308:7
308:14 310:16
311:17 340:6
342:24 349:8
352:23 353:8
354:1 359:8
362:13
**baseline**
176:1 195:8
**basic**
83:9 93:17 211:1
238:10 292:18
310:24
**basically**
276:5 313:4 348:12
**basis**
27:17 31:15 40:20
120:18 141:19
157:5,11 158:9,14
199:2,13 279:20
306:22 307:1
310:3 326:13,19
327:18
**Bates**
71:17,20
**bathe**
199:18,20
**bathing**
199:22
**beads**
316:23
**bear**
182:18 291:12

**Beasley**
2:2 8:18,20
**beef**
336:14
**began**
40:18 43:15 65:13
**beginning**
67:20 81:8 89:8
96:1 177:5 197:5
199:10 253:12
363:12
**begins**
24:22
**begun**
241:4
**behalf**
57:11 343:22
**behave**
213:3
**behavior**
74:7 358:9
**beings**
249:19 358:19
**belief**
200:15 206:22
353:16
**believe**
22:12,13,19 25:8
27:22 34:6,9 35:5
37:17 39:4 53:5
54:20 61:22 67:12
69:18 70:3,4
72:24 84:16 85:1
89:12 95:7 96:11
103:1 106:18
111:9 114:17
115:11 127:11
128:3 139:7,10
140:20 144:7,18
145:2 147:14
148:2,6 149:9
153:24 185:3,12
186:14 189:1
190:23 202:20
203:24 206:19
210:20 217:14,17
218:5 219:4

**Beasley** (column 4)
228:20 231:8
234:11 236:15
238:3 242:6
246:21 256:12
257:7 267:5
271:23 278:20
279:4 281:21,24
282:6 292:12
296:2 302:18,22
305:7 309:12
312:7 317:3 318:1
330:15,22 337:23
352:8 360:7
362:15
**believing**
17:5
**Beneath**
125:12
**benzene**
360:19,22,23
**Berge**
6:13 242:15,15
**Berry**
129:20 145:22
**Bertolotti**
146:8 297:14,15
**best**
12:2 74:7 364:9
**better**
109:14 249:7 326:6
359:13
**beyond**
202:11 340:13,24
**bias**
210:19 213:6,8,9
221:22 227:23
228:11 239:17
240:23,24 241:3,7
241:9,13,24
243:10 244:6,13
244:20,23 245:1
269:7,8,13,18
270:3 276:11,15
277:14
**biases**
221:18
**Biddle**

**2:19 9:3**
**billable**
40:4
**billing**
45:9
**biloba**
229:3
**binder**
13:13 15:8 24:1,3,8
28:5 30:1 192:5
257:24
**bioassays**
361:8
**biochemical**
312:21
**biologic**
59:18 229:24
321:13,16 322:5,9
322:13,16
**biological**
87:17 111:23 112:1
132:18 224:12
229:8 230:10
339:9
**biologist**
60:21
**biomarkers**
313:19
**biostatistician**
61:24 253:17
**bit**
56:5 83:12 256:18
270:13 296:21
305:5 358:22
**black**
183:16 292:1
**bladder**
202:18,22
**blank**
333:24
**blanks**
187:14
**block**
257:24
**blood**
170:11
**Blount**

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 99 of 1035
PageID: 241278
Arch I. "Chip"  Carson, M.D., Ph.D.

Page 373

5:18 31:10 32:7
33:10
**blue**
320:11
**Blumenkrantz**
183:18,21,22
**board**
61:20,23 204:9
334:23 335:2
**Bockus**
3:2 4:7 9:5,5 234:1
236:7 284:1,7,9
284:11 285:7,17
288:14 289:13,16
289:21,22 290:14
292:8,21 293:22
294:8,18,20
295:10 296:4,19
297:1,2 298:1
299:10 300:16
302:23 303:10
304:21 305:6
307:18 309:20
310:8,10,22 314:2
315:6,11,15 316:6
316:19 317:12,18
318:4,12,21
319:18 320:2,19
321:2 323:1
324:11,17,20
325:4,22 327:1
329:15 330:21
333:8 341:4 342:1
343:1 359:17
**bodies**
170:4 199:2,4
**body**
110:20 122:11
132:19 135:10
154:9 181:24
183:8 200:7 201:4
209:1 219:13
247:19 248:21
250:3 256:9
270:17 272:2,14
272:24 278:21
279:5,9,12,14

296:8 298:6,24
299:5 301:10
304:14 317:20
**bolts**
68:1
**book**
77:16,18
**boost**
346:12
**borderline**
237:2
**born**
313:3
**bottled**
170:7
**bottom**
69:10 196:19
**bound**
189:6
**Bradford**
107:20,24 110:18
215:7,12 219:22
225:4 229:21
230:18 240:7,9
255:1 264:8,16
**Branch**
58:5
**BRCA**
333:5
**break**
86:24 87:4 89:2
176:20 343:4,14
359:7 363:6
**breast**
196:24
**breathe**
329:5,10
**Brett**
79:21
**brief**
118:22
**briefly**
190:22 225:12
**bring**
23:24 28:8 29:3,17
33:4,7 58:2
**British**

129:17
**broad**
309:23 349:19
**broken**
279:9
**brought**
12:12,20 13:10,14
13:20 14:2,8,20
15:2,7 24:9,21
28:4,21 29:24
33:15,20 34:1,8,9
36:6 50:18 51:16
51:20 100:21
123:20,22 124:6
124:11 176:13
178:9 218:13
**building**
234:12 335:21
**built-in**
312:14
**burden**
182:19
**Burns**
2:8 8:23
**business**
76:1 149:7,12,20
**bystander**
329:24

_____
            **C**
_____
**c**
2:1,13 3:1 297:5
**CA-125**
314:9,22 318:6,14
**calculate**
280:16
**calculated**
212:11,12,14
280:23
**calculation**
306:20 341:3,12
**calculations**
251:9,21 340:6
**calendar**
45:17
**California**
2:15

**call**
37:23 335:19
352:20
**called**
38:17 77:16 189:24
**calls**
46:7 203:7 235:8
**Camargo**
6:7 162:20,21
165:18
**Canada**
5:15,22 30:14 65:8
89:15,22 93:5,19
94:3,18,20,22
95:22 96:4,10,17
96:21,24 97:3
98:13,15 99:1,13
99:18 100:9 205:9
205:24
**Canadian**
30:3
**Canal**
2:9
**cancer**
17:8 23:5 27:5 30:5
32:1 36:17 38:4
38:20 41:3,12,14
41:16,24 53:8,23
55:9 60:12,21
62:10,19 63:1
66:13 84:17 85:3
85:7 86:8 89:23
90:8,14,18,21,23
91:4,6,10,12,14
91:18,22 93:7,14
95:10,13,18 106:3
106:12,14,15,19
107:5 108:5 109:4
111:1,15 112:3
113:23 116:8
119:22 120:6,14
120:19,23 121:3,8
121:22,24 122:8
122:18,22 123:9
123:14 125:1,5
126:1,5,16,24
127:7,13 128:2,13

129:8 130:10
131:3,14,18,22
132:7,12,14 135:1
135:15,21 136:6
136:17,19 137:1
138:7,8,13 139:9
139:11 140:4
145:9,12 152:12
152:16,20 153:10
153:13,21 154:2
154:13,17,23
155:1,6 158:19
159:4,10 160:5
161:19 162:12
163:8,15 167:22
168:8 178:23
179:15,16 185:14
191:2,7,16 192:23
194:18 196:11,24
197:17 202:18,24
210:9 211:4,5
212:20,21 216:10
220:7,8 221:21
222:1 223:8
224:13,15,17
225:24 230:13,23
231:3 234:7,21
235:4,18,20 237:9
237:24 238:9,17
244:4 245:4 246:4
246:10 247:23
248:11,24 249:17
250:7 252:4 255:5
256:22 260:21
265:12,24 267:1,9
267:17 268:2,6,19
269:19,21 270:18
270:19 273:1,5,9
273:14,21,24
274:7,14,20 275:4
275:11,20 276:4,6
277:7 279:17
280:8,13,22 281:8
281:22 282:14,19
284:20 286:18,23
288:23 289:2,3
292:4,4,5,5 296:9

Arch I. "Chip" Carson, M.D., Ph.D.

Page 374

306:3,5,8,14
307:7,13 308:12
309:13 310:4
314:6 316:16
326:14,18 330:4,9
330:19,23 331:1,4
331:11,18 332:24
333:20 338:14,22
344:11 350:1,3,5
351:12 352:22,22
353:5 354:11
355:3,7 356:6,10
356:13 357:12
358:10 360:5,8,9
361:14,17,18
**cancer-causing**
286:3,11 294:1
**cancerous**
317:10,16
**cancers**
17:4 91:8 93:16
121:11,14 122:2
123:14 153:17
166:14 167:3,8
168:6,10 179:2,8
213:2 236:16,23
237:2,3,5 238:12
251:1,2 280:2
**capable**
78:4 164:13 202:6
220:21
**capacity**
42:4 56:20
**caption**
19:4
**carbohydrate**
279:7
**carbon**
183:16 185:21
291:24
**carcinogen**
178:22 179:14,15
179:19 226:22
235:9,13 288:7,9
315:19 355:12,20
356:4,6,9,20
**carcinogenesis**

41:14,17 116:13
226:14 288:19
**carcinogenic**
28:12 81:20 91:5
114:23 138:18
139:4 154:6 169:6
171:20 178:16,17
179:21 225:7,9
226:4,17 227:1,10
227:13 229:3
249:19 272:14
291:23 300:22
311:14,15,23
312:10 352:21
356:24 360:20
361:4,8,9
**carcinogenicity**
83:18 169:8 180:4
248:12 249:9,20
290:9 295:18
**carcinogens**
288:13 312:19,24
356:17,18 357:14
358:3,15,16
**care**
3:20 9:10 343:23
345:5,13
**careers**
213:24
**carefully**
365:4
**Caroline**
3:12 9:12
**caroline.tinsley...**
3:13
**carpentry**
229:12
**carried**
193:17 196:20
211:18
**carries**
196:17
**carry**
241:17 342:7
**Carson**
1:14 4:5 5:1,5,6 6:3
8:14 9:18 10:1,18

13:4,9 14:9,19
15:18 20:10 21:3
21:10 26:2,6,19
29:14 30:16 31:5
32:8,19 36:7,10
67:18 74:10,16
89:10 98:21 99:10
124:17 130:3
149:23 150:13
159:21 163:3
164:9,18 165:5,17
171:11 173:6
177:7 192:11
195:23 225:15
243:1 247:8
253:14 271:1
283:10 284:10
289:9 347:9 353:4
353:14 354:8,17
355:1 363:2,13
364:5 367:4,12
**Casale**
146:11
**case**
21:24 38:9 40:4
50:4 51:7,9 57:16
64:15 66:12 68:2
78:4,15,17 80:12
80:20 81:4 95:8
96:8 105:19 108:4
110:17 120:2
123:5 141:6,13,20
144:4,8,20 147:12
147:15 148:7
156:5 167:11
171:6 173:17
174:13 176:8
185:12 187:17
191:23 196:6
211:8 215:18,20
217:15 219:2
228:16 236:19
242:7 246:14,17
246:21 252:13
293:21 302:22
329:11,18 335:13
350:23 362:24

**case-control**
125:18 126:8 223:4
232:17 233:1
238:14 239:15,17
240:13,14 241:5
242:2 243:13
244:5,16,21 245:9
246:1,7 251:6
253:21 254:10
258:22 259:3,5
260:13
**case-controlled**
239:22 250:17
255:14
**case-specific**
171:13
**cases**
1:8 37:11,12 57:6
76:10,11 78:15
131:4 140:9,10
159:5,9 160:16
162:4 175:3
185:14,17 224:15
224:17 240:3
250:22 251:10,24
254:20 273:4,23
274:24 278:3
306:3,8,8 327:15
329:1
**catch**
313:2
**categories**
225:12 357:2
**categorized**
357:7
**category**
113:24 146:7 226:3
226:6,11 227:9
229:5 355:16
**causal**
53:21 54:11 85:2
132:6 247:21
248:23 250:5
**causation**
17:2 100:10 109:3
218:6 220:5 233:9
233:13 234:6

**cause**
23:5 38:4 53:8 98:9
99:24 120:6,19,22
122:17 127:12
128:16 129:7
135:7,14,15
136:24 154:12
160:5 179:2 188:4
199:5 211:2
286:18 296:8
312:21 329:20
333:20 352:22
356:6,10 357:12
361:14,16,17
**caused**
166:14 198:21
224:17 286:22
313:11
**causes**
53:8 85:6 86:8
93:16 122:21
123:8 126:16
128:2,13 131:18
132:14,23 135:5
139:8,10 287:1,17
287:18 288:23
330:23 355:3
358:10 360:5
**cavities**
301:10
**cavity**
83:12 183:8 207:1
322:2
**CDC**
90:6,11,12 234:24
**cell**
115:1 139:1 312:12
312:15 314:20
**cells**
287:3,4,14 312:18
314:6 315:20
316:15,16 317:10
317:15,16 319:15
**cells'**
317:1
**cellulose**
279:8

Arch I. "Chip"  Carson, M.D., Ph.D.

Page 375

cement
146:1,13
Center
1:15 90:3 93:6
centers
90:17
Century
136:20
certain
12:12 13:15 75:5
80:20 135:5
206:18 213:10
216:17 243:15
284:11 353:21
certainly
117:1 141:18 158:7
159:9 226:20
262:3 330:24
331:12 333:21
CERTIFICATE
4:10 364:1
certification
61:23 328:16
certified
1:19,20 61:20
334:23 364:3,3,20
364:20
certify
364:4,7,10,13
367:4
cervical
198:12 199:14,24
200:12
cervix
189:10,13 200:20
201:6,7,16 206:23
209:15,22 302:11
302:14,15 322:10
339:6,15
chairperson
95:17
chairs
95:20
chance
110:4,5,8 227:23
228:11 245:17
251:22

change
59:7 205:5 253:5
366:2
changed
17:9 75:2,4 81:1
204:13,19
changes
77:11 97:18 336:11
365:11 367:6
channel
206:23
Chappell
6:4 129:19
chapter
77:16
characteristic
337:22
characteristics
199:5 286:3,11
308:20
characterization
239:4
characterize
85:18 140:7 249:7
Charest
2:8 8:23
charge
93:20 144:3 346:9
Charles
129:19
chat
342:22
chatter
204:2,5,6,24 205:3
278:9 342:21
check
193:12
chemical
179:19,20 328:9
329:4,9
chemicals
63:7,13,15 72:23
73:6,17 75:1
114:24 115:16,18
172:6 174:6
175:15,19 176:7
177:9,13,22

178:15 179:10
chemotaxis
199:6 287:2,13
children
333:11 359:4
Chip
1:13 4:5 5:1 8:13
9:18 364:5 367:4
367:12
chlamydia
267:8,23
choice
345:14
choose
164:17 358:8
chose
33:4
chromium
169:7,11,24 171:7
172:1 173:22
180:8,18 181:6
chronic
114:18 115:24
116:6,10 121:7
131:14 199:2,9,13
252:15
chrysotile
145:18 147:9
154:21,23
cigarette
265:13,18
circumstances
186:18 206:20
327:12
cite
19:11,12 20:5
29:11 33:11 71:2
71:4 123:6 130:12
148:10,17 181:23
183:5,12 184:2
189:8 191:22
195:3,11 196:5
208:24 211:12
216:8 217:6,13,19
217:21,23 242:17
242:21 246:22
259:19 270:11

271:16 283:6
287:5,23 296:9
297:7
cited
13:11 15:8,11,13
24:15 29:9 32:23
54:18 66:17,20
142:22 184:7
185:18 217:9
218:1 256:8
270:11 286:13
307:10
citing
20:19 70:24
citizens
219:9
citizens'
221:16
claim
115:23 133:2
138:16 169:5
208:5
claimed
214:22
class
229:2 272:12
classification
6:11 178:20 225:6
225:8 288:8 342:5
356:22,23,24
classifications
225:14,22 359:24
classified
162:7 233:18
249:18 356:1
classifies
178:14
classify
63:17
clause
107:8
cleanly
264:2
clear
11:15
clearance
84:6 132:19 249:8

cleared
278:21 279:5
clearly
321:10
cleavage
168:21 169:1
clinic
58:7 90:16 351:3
clinical
27:17 31:16 38:24
58:8 60:4,8 70:12
76:5
close
202:1 223:9
closely
329:20
closer
198:13
closes
191:4
clothed
341:2
co-workers
134:12
coach
164:23
coaching
165:2
coauthors
101:6,9
cobalt
169:7,12,24 171:7
172:1 173:22
180:8,19
cofactor
267:21 277:18
coffee
265:11,13,17,21,23
266:1
cogent
224:12
cohort
125:8,9 232:21
237:7,8 238:7,10
240:12,20,22
241:12 242:1
244:5 245:10

250:15,23 251:5,7
251:13,18,20
252:3,14,20,21
257:12 258:12
334:3
**coin**
109:14
**colleague**
117:8
**colleagues**
44:12,14 46:8
51:15 79:9,10,15
79:17 80:13
297:17 344:2
**collected**
277:23 278:1,3
**collection**
12:14 153:17 347:7
**collectively**
238:15 246:8
**College**
59:5 335:5
**column**
160:10 165:24
196:21 243:24
273:3,7
**combination**
104:12
**combine**
326:3
**combined**
299:12,22 300:13
**come**
44:8,9 96:9 106:4
149:4,5,12 282:9
285:10 305:19
309:17 323:24
324:10 327:24
362:6,10
**comes**
56:3 232:16 251:24
313:6 328:21
329:3 335:20
346:10
**comfortable**
39:11,24
**coming**

18:16 25:16 198:4
**commencement**
364:4
**commencing**
1:16
**comment**
96:1 221:10 336:24
**comments**
44:2,4,8 96:20,24
97:2 117:13
216:23 247:15
336:10,21
**Commerce**
2:4
**commission**
364:22 367:17
**committee**
2:6 95:16,17,20
129:17
**committees**
95:15
**common**
144:24 145:2
161:24 265:13
333:2 334:2,7
**commonly**
144:17
**communicated**
65:4,7 104:15
**communications**
45:20 47:1,12 77:1
**community**
204:8 240:1,2
248:16 330:7
**community-based**
238:20
**companies**
72:5 75:9,22
143:15
**companies'**
150:23
**company**
58:17 60:15 69:19
70:14 71:1,4 73:8
76:6,8,13,17,18
77:22 149:13
150:23 151:13

**comparable**
187:4 201:15
254:18
**comparatively**
348:7
**compare**
298:16 319:20
**compared**
170:13 201:6 331:5
**compares**
298:5
**comparing**
239:23,24 348:6,14
**comparison**
132:20 161:14
166:17 214:23
299:1,9
**compelling**
220:10 230:13
292:19
**complete**
15:11 18:13 22:13
22:19 98:8 172:14
305:24
**completely**
106:13,19 112:9
120:14
**complicated**
358:21
**component**
74:22 137:2 176:2
177:17,20
**components**
63:21 64:13 114:21
140:15 147:21
287:12
**composed**
279:6
**composition**
304:20
**concentration**
59:18 198:11
**concentrations**
76:20
**concept**
313:5 358:7
**concern**

269:10
**concerned**
236:1 361:5
**concerning**
272:13 351:16
**concerns**
166:15
**conclude**
111:12 128:1
210:18 243:9
252:20 333:19
363:15
**concluded**
91:19 122:24
166:11 220:4
246:1 247:19
272:17 286:17
288:5
**concludes**
106:2
**conclusion**
86:19 106:5,6
107:7 108:9
141:11,19 163:12
193:3,5,7 215:14
223:1,12 224:11
224:19 248:5
250:2 286:12,20
305:8,12,20 306:2
364:12
**conclusions**
18:16 76:22 85:16
87:19,22,23 89:13
117:17 171:4
173:10 215:2,9
216:22 218:2,4
222:5 241:19
251:11 253:1,1
326:8 355:24
**concoct**
334:3
**condition**
116:24 119:16
121:19 122:5
**conditions**
121:3,7 186:5,18
**conduct**

215:13,17 355:5,9
**conducted**
61:14,15 85:11
114:3 206:8 209:5
209:12 327:9
**confer**
333:6
**conference**
46:7
**confidence**
126:9 223:8 227:24
228:12 261:23
276:21
**confirm**
85:12 185:4
**confirmed**
152:9
**confirming**
328:24
**conflicts**
105:4
**conformed**
137:7
**confound**
264:18
**confounder**
265:19
**confounders**
266:14,17,18 268:6
268:9
**confounding**
210:19 221:23
227:23 228:12
264:6,7,11,19,23
264:24 266:3,4,8
266:11,20 268:21
**confused**
330:1
**confuses**
265:6
**conjunction**
76:16
**connected**
120:11 329:20
**connection**
110:23 119:21
329:19

Arch I. "Chip"   Carson, M.D., Ph.D.

consensus
224:16 234:5,11
consequence
152:23 153:3
consider
51:4 54:9,12 55:20
80:20 90:20 123:4
137:11,14,19
156:23 215:7
232:24 238:22
239:9,11 241:1
257:11
considerably
357:24
consideration
221:14
considerations
91:9 225:4 254:17
considered
13:16,18,22 61:6
94:6 124:3 130:19
159:4,8 174:24
175:3,5 206:2
210:20 214:6
219:1 221:20
225:3 258:16
264:6
considering
110:18 215:1 222:6
258:9 325:12
considers
205:12
consistency
107:12 108:1,4
109:7 110:19
210:24 222:20
229:24 230:9
237:22 240:7,10
240:11 245:6
249:22
consistent
110:12,13 111:6,9
111:13 112:19
114:4 132:6 223:5
232:20 237:23
238:4
consistently

131:21 191:11
constituent
63:20 64:13
constituents
64:2
constructed
149:15
consult
338:4,8
consultant
55:23 56:4
consultants
105:11
consulting
56:16
consumer
22:5,7 73:8 143:23
151:13 152:4
155:9 344:23
345:2
consumers
214:8
consumption
360:4,11
contact
37:24 39:19 202:2
contacted
36:20,21 37:5,14
284:16
contain
16:4 19:10 139:13
140:22 141:6,13
141:17 148:14
290:22 295:19
352:9,14 353:17
353:21 357:6
358:14 360:18
contained
16:16 54:21 72:24
73:1,6 150:17
152:22,22 175:8
175:15 181:1
285:9
container
340:10
containing
5:21 139:4 290:10

contains
16:7 71:23 139:16
139:20 141:21
157:6,15 158:10
361:6
contaminant
143:23
contaminated
77:12 147:16 148:8
contamination
106:2,11 107:2
187:13
contemporaneous
94:4
Content
31:10
context
56:15 78:11
continue
58:7 74:18 263:19
283:7 295:9
358:11,12,17
361:10
continued
43:16
continues
206:24
continuing
244:12
continuous
43:17
contract
59:3
contractions
188:15
contractor
59:7
contradicted
205:10
contribute
18:11 20:22 74:22
80:22 221:21
contributed
20:5 73:20
contributes
296:8
contributing

171:20
contribution
78:24 299:22
352:18
contributor
167:10
control
90:3 93:7 157:24
316:17,24 317:11
318:2
controlled
266:21 268:1
controlling
317:1
controls
187:14 273:8,13,18
273:20 274:21
278:4 315:16,17
316:9
conversation
118:23 335:15
convoluted
296:21
copies
13:11,14 14:9
36:14
copy
10:20 13:17,21
14:11 21:13 28:6
30:2,20 149:24
150:7 159:19
162:22 195:19
259:24,24 260:1
321:3 336:22
cornstarch
29:6 132:10,15,17
132:22 133:19,24
134:8,14 278:20
278:20 279:4,13
Corporation
58:12 59:11,11,13
correct
20:20,21 22:22,23
39:1 45:3,4 49:6
53:23 55:12 57:19
60:16,17,19,20,24
61:4,18,19 62:2,5

62:7,19 63:2,10
63:13 64:10,11,14
81:6 82:4 83:9,21
84:19 85:4 90:14
90:18 96:2 98:5
101:12 105:15
106:3 108:23
110:13 114:5
116:18 120:7
121:8,9 122:14,16
125:14,18,23,24
127:13 128:13
131:1,5,17,23
132:8,24 134:4
138:7,13,14,15
146:24 147:11
148:15,20 152:24
154:2 155:7 157:7
158:11 166:9,9
168:2 170:5 172:3
172:6 176:8,9
177:10,14,23,24
178:3,13,19
179:16,17,22
181:7 182:2,5,6
183:10 184:22
185:2,9,19 186:1
186:3,4,11,20
187:15,20,23
188:12,18 190:11
190:16 194:16,23
195:7 196:7,8,14
197:16,19,22
198:6,22 200:23
201:20 202:16
205:7,21 206:6
207:3 208:2,4,10
209:3,4 210:10
216:7,11 217:8
220:8 221:9,11,12
222:21 223:17
224:2,6 225:9,10
226:1,4,5,8,19,23
227:2,11,14,20,24
228:13 230:2,14
232:15,17 233:5,9
234:15,22,24

Arch I. "Chip"  Carson, M.D., Ph.D.

Page 378

235:1,15 236:1,19
237:9,17,20,24
238:9,17 240:2,4
240:14,17 246:4,5
246:10 250:8
253:15,16 254:4
255:2,19 256:24
257:5,10 258:24
259:11 260:15
261:7 262:6,18,22
264:17 265:9
266:16 267:2
268:16,21,24
269:5,11 270:1
271:5,8,22 272:19
272:20 273:6,9,22
274:4,10,17 275:3
275:13 276:18
280:22 281:8
283:17,18 286:7,8
286:9,18 287:6,7
287:18 288:9,16
290:5,11 291:8
294:2 295:21,23
296:12 297:9,21
298:7 301:17
304:24 307:13,24
308:3 309:2,5
311:1,2 314:6
318:7,15,18
320:15 321:4,5
322:6,10,11 324:3
324:23 325:5
326:14,19 327:3
327:18 329:1
332:11 347:15,16
350:1 352:10,14
354:11,18 355:4,7
357:7,8 362:7
367:5
**corrected**
134:3
**corrections**
58:1,19 365:4,7
367:6
**correctly**
100:1 107:6,9

166:20 222:2,3
301:14 324:21
339:21
**correlation**
322:21
**correspondence**
87:17
**corresponding**
27:24 278:4 306:9
**corrugated**
146:13
**cosmetic**
31:11 57:16 60:15
157:6 158:10
168:14 180:9,20
181:7 248:9
249:16
**cosmetics**
219:15
**Cottreau**
127:2
**Coughlin**
3:7 9:8
**counsel**
2:6,11,16,22 3:5,10
3:15,20 8:15
11:19 15:5 23:1
25:11,15,17,20
26:17 27:10 30:10
32:3 33:5 34:16
34:19,24 35:19,24
36:5 38:15 39:3
45:20 47:6 53:17
65:20 71:13 72:5
101:10,15 102:13
104:24 105:12,18
105:23 108:23
118:12,20 142:23
148:22 343:24
346:2,5,19 361:21
362:2 364:14,15
**count**
251:1
**country**
97:23,24 100:11
233:20
**couple**

25:5 30:8 40:21
87:2 176:15
181:21 218:18
231:22 256:15
257:6 286:21
305:15 327:10
**course**
56:5 73:3 74:13
344:14,17 345:10
345:11 362:4
**courses**
344:12
**coursework**
344:10
**court**
1:1,19 9:15 12:6
364:3,20 365:20
**Coussens**
117:10 126:21
**covariate**
272:17
**Covariates**
272:8
**covered**
43:5 185:3 285:21
**covers**
22:17,20
**Cramer**
6:10 195:12,15,17
195:22 196:5,9
197:24 255:8
259:13 260:9
**create**
199:12 279:13
**created**
25:8 148:22 313:3
346:2,3,5
**credentials**
104:18
**criteria**
109:2 215:8,13
229:21 237:22
240:7,10 255:1
264:8,16
**criterion**
110:19
**crocidolite**

144:13,15 145:11
145:16 146:6
147:9 154:21,22
**crossed**
324:19
**Crowley**
48:16,17,18,19,24
49:2,21,22
**Crowley's**
50:8 73:3
**CRR**
364:18
**crystal**
180:13
**cull**
42:22
**culmination**
345:10
**culture**
319:16
**cultured**
314:6 315:20
**cure**
100:8
**curiosity**
350:14
**curious**
40:17
**current**
41:17 94:13 120:3
148:1 205:11
247:19 248:20
250:3 312:5
**currently**
60:5 204:4 300:12
326:7 345:4
**curriculum**
5:6 21:6 57:18
58:20 70:23
344:21 345:16
**cursory**
344:20
**cut**
74:9
**CV**
58:1 64:23 77:4

---

**D**

**D.C**
3:19
**daily**
231:9 232:10
260:22 261:16
262:13,15 263:10
263:11,14 302:5
306:22 307:1
309:24
**damage**
135:11 313:2,12
314:21
**dangerous**
359:12
**data**
76:24 149:3 150:17
211:19 215:14
220:11 263:24
273:11 274:18
277:23 278:1,2
280:3 290:1 291:5
307:9 346:14
**date**
1:17 57:20,21 58:2
227:4 284:22
364:8 365:9
367:12
**dated**
25:24 26:9 30:14
218:21 364:23
**day**
60:6 189:19 228:24
367:16
**days**
39:20 40:7 189:21
300:14 309:9
365:16
**de**
325:8
**deal**
164:16 239:5
**dealing**
168:10 199:9
**dealings**
37:2

Case 3:16-md-02738-MAS-RLS   Document 33123-4   Filed 08/22/24   Page 105 of 1035
PageID: 241284
Arch I. "Chip"  Carson, M.D., Ph.D.

Page 379

**dealt**
137:16
**dear**
358:24
**deaths**
306:5,9 307:7
**decades**
310:15 359:10
**December**
30:14
**decide**
29:17
**decided**
33:7 40:11 59:6
**decision-making**
5:23 99:1,14,20
**decisions**
14:14 358:6
**declare**
226:21
**deemed**
365:19
**defendants**
2:17,22 9:1,4 52:4
**defense**
52:12 57:14 346:19
**defer**
82:23 95:19 144:3
169:2 281:2
**define**
135:22 137:5
281:16 313:9
326:5
**defines**
99:18
**definition**
23:20 136:2 228:18
292:18,23
**definitions**
228:23
**definitively**
162:6
**degree**
59:17,24 249:22
**Delclos**
79:20 337:5
**deleting**

342:17
**demonstrate**
119:11 223:4
313:22
**demonstrates**
126:14 276:11
**demonstration**
98:9 99:23
**dendritic**
42:6
**department**
61:8 79:18 80:1,2
239:6
**depend**
308:17 310:18
**dependent**
139:3 180:24
**depending**
181:3 306:18 332:2
**depends**
78:14 156:6 236:5
239:19
**depo**
33:8
**deponent**
4:12 8:13 367:1
**deposed**
66:5,12
**deposing**
365:15
**deposition**
1:13 5:1,4 6:1 8:9
10:8,16,18 11:4
12:11,19 13:6
14:6,8 15:1,18,21
16:4,9 21:3,10
23:24 25:24 26:2
26:6,19,23 29:14
29:22 30:16 31:5
32:8,19 36:4,7
52:14 66:4,7,19
71:1,3 98:20,21
98:24 108:17,20
124:12,16,17
130:2,3 148:18,19
149:10,11,16,18
149:21 150:9,10

151:17 159:21
163:3 192:11,14
195:23 225:15
243:1 245:24
247:3,8 249:7
271:1,4 289:9
363:15,19 364:12
365:3,13,17,18
**depositions**
53:2 56:13 66:11
66:15 67:21 68:8
68:11,20,24 70:14
148:11 164:12
**deposits**
41:9 169:15
**deps@golkow.com**
1:24
**derived**
205:24
**derives**
333:22
**describe**
14:20 208:15,23
309:10
**described**
199:10
**describing**
309:5
**description**
5:3 84:14 237:15
266:3
**design**
190:1 211:18
221:19 240:21
**designated**
227:18
**designation**
227:16 228:10
**designed**
291:23
**designers**
241:1
**designing**
241:2
**designs**
254:15
**desired**

231:14
**despite**
166:11
**detail**
220:1
**detailed**
285:2
**detect**
211:19,23 251:12
252:9 253:3
255:22
**detected**
180:8,19 188:2
211:24 243:12
244:15 251:14
**determination**
78:6 280:12 330:17
348:20
**determinations**
194:14 251:10
**determine**
85:23 157:14 190:4
258:18,22 318:24
330:3 340:10
**determined**
59:14 91:12 143:18
259:1 279:24
280:7 311:8 349:9
355:1 360:20
**determines**
280:14
**determining**
330:8
**develop**
53:21 135:2 199:1
251:1 345:12
**developed**
330:9
**developing**
356:12
**development**
135:20 136:5
284:20
**diagnosed**
306:4 307:12
326:13,17 350:4
351:11

**diagnoses**
307:17
**diagnostic**
329:2
**diagrams**
338:7
**Diana**
282:18
**diaphragm**
201:17
**die**
233:20
**diesel**
361:6,9
**differ**
180:3 201:21
**differed**
193:23 349:14
**difference**
19:2 21:19 194:9
194:12 201:12
212:18 242:1
252:9 277:19
315:21
**different**
43:3 68:7 93:11,12
94:2 97:22 106:6
137:9 138:21
139:2 143:15
155:5 168:15
172:6 179:8,9,11
179:21 181:2
186:17 213:2
225:22 237:21
240:11 254:16,16
254:17,20 261:3
280:2 291:24
293:7 305:5
316:20 342:22
349:10 357:2
**differential**
319:4
**differentiate**
168:24
**differentiated**
212:22
**differently**

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 106 of 1035
PageID: 241285
Arch I. "Chip"  Carson, M.D., Ph.D.

Page 380

201:5 213:3
238:22
**difficult**
162:2 256:20 257:2
347:22 359:6
**difficulties**
161:17,21
**dioxide**
292:1
**Diplomate**
1:20 364:3,19
**direct**
82:2,11 83:4
181:14 243:17
322:21 324:6
**directed**
221:11
**directing**
294:15
**direction**
334:18
**directions**
334:17
**directly**
101:5 138:22 201:7
201:16 216:21
263:6 319:15
323:5 346:10
**director**
58:6,13,24 59:10
**dirty**
264:1
**disadvantage**
251:15
**disagree**
108:9,12 223:22
225:1 356:21
**discard**
42:23 349:12
**discarded**
348:17,23 349:8
**discount**
238:18
**discounting**
244:20
**discounts**
91:17

**discovered**
241:3
**discuss**
80:11 114:12
133:13 183:2
244:2 278:13
338:1
**discussed**
13:5 21:14 38:10
80:12,14 107:12
127:3 170:18
225:11 235:11
238:9,23 244:23
254:3 336:5
355:23
**discusses**
28:10 29:5 127:6,7
280:11 337:22
**discussing**
13:5 93:14
**discussion**
79:9 81:1 163:20
164:4 165:20
166:1 204:7 285:3
342:8
**discussions**
47:23 48:1
**disease**
77:14 90:3 93:7
122:17,21 123:8
126:15 127:12,19
128:2,13 196:14
233:21 265:7
269:15 328:19,21
358:10
**diseases**
121:12
**dish**
300:7
**dispute**
151:2,6
**disseminate**
93:22
**dissolution**
339:8
**dissolved**
279:10

**distillation**
214:21
**distinction**
238:19
**distinctions**
154:15
**distinguish**
34:22 35:5 154:11
162:2,7
**distinguishing**
161:18
**distort**
266:4 269:13,19
**DISTRICT**
1:1,1
**division**
287:4,15
**DNA**
312:13 313:11,22
**doctor**
73:24 92:2,10,13
92:21 113:1,4
127:23 164:11
207:6 289:20
295:7 314:24
315:23 343:16
363:17
**doctor's**
332:20
**document**
1:7 6:12 10:21
28:17 30:7,9,12
33:3 68:15 71:22
91:24 92:16 93:2
99:9 100:13 102:6
113:10,17 120:3
134:7 193:13
218:13,24 225:13
257:22 282:17
291:14 316:5
**documentation**
72:16
**documents**
12:12,15,17 13:15
14:7,24 19:6 24:5
25:19 29:23 30:19
33:24 34:1,5,7,13

34:15,18,23 36:14
71:5,9,12,16 72:3
72:3,4,6,22 75:7
75:10,14,21 76:6
76:9,13,19 77:22
77:23 78:10,10,11
78:18,19 136:4
158:5 245:8 346:6
346:6 347:8
**doing**
39:21 40:1 45:13
46:4 48:8 147:24
148:3 232:5
285:11 336:14
365:8
**Donath**
3:7 9:7,7
**dose**
153:4,5 206:16
230:14 255:9
256:21 298:3,13
298:16,23 311:1
311:18 324:22
325:2 326:2
354:22 355:5
356:5,9,11
**dose-response**
111:13 112:20
173:1,9,13,19,21
174:1,4,9 222:14
222:16,18 223:9
254:24 255:4,8,15
255:17,21,23
256:5,21 257:8
259:20 262:9,24
263:1,17,19
270:14 354:9
355:10
**doses**
326:10
**Doug**
3:23 8:4
**Downey**
69:17,18
**Downey's**
69:20
**Dr**

6:3 8:13,19 13:4,9
14:9,19 20:10
27:24 31:2 33:19
36:10 46:11,16,18
47:9,24 48:2,5,11
48:12,16,18,19,24
49:2,16,21,22,22
49:23 50:1,8,11
51:5,9,21 67:18
73:3 74:10,16
79:20,21 80:8
89:10 99:10 117:3
117:9,12 149:23
150:13 164:9,18
165:5,17 171:11
173:6 177:7
218:22 236:12
253:14 283:10
284:10 335:7,16
340:4,15 347:9
353:4,14 354:8,17
355:1 363:2,13
**draft**
5:15 30:13 44:1
89:14 95:22 97:6
205:18,21,22,24
348:1
**drafting**
347:20 348:8,12
**drafts**
336:8
**dramatically**
75:4
**draw**
76:22 86:18 87:19
171:4 337:3,6
**drawing**
204:9
**drawn**
85:17 87:21
**draws**
322:21
**drink**
311:4
**Drinker**
2:19 9:3
**drinkers**

Arch I. "Chip"  Carson, M.D., Ph.D.

265:14,21,22
**drinking**
170:7 265:23 266:1
**drive**
5:21 13:20 36:5,11
**Dropbox**
346:7,11,13,17,21
347:3
**drug**
219:14
**drugs**
131:8,20
**due**
29:6 110:3,5
171:19 187:12
251:12 265:24
**Duffy**
3:7 9:8
**duly**
9:19 364:5
**duplicated**
125:19
**duration**
212:15 241:16
272:24 354:18,20
**dust**
229:15,18
**dusting**
140:3 201:17 302:5
**Dydek**
47:16,19,24 48:2,5
48:12 49:23 50:1
**DYKEMA**
3:2

_____
E
_____

**E**
1:17 2:1,1 3:1,1,2
364:2,18
**e-mail**
37:22 47:11
**e-mails**
342:10,15,18
**earlier**
51:5 68:19 79:7
116:22 136:15
167:12,22 214:5

216:4 238:23
259:14 268:12
270:13 278:19
293:1 321:7
345:24 347:13
348:16 349:23
351:23 352:7
361:24
**early**
65:21 214:1 222:7
245:24 330:19
332:24 333:12
336:8
**easier**
334:8
**east**
3:3 145:21
**EASTERN**
1:1
**easy**
150:4,6
**eat**
357:15 358:12
**echoing**
344:2
**Edelman**
163:23 165:22
166:8
**editing**
43:17
**editors**
249:12
**edits**
103:6
**education**
61:12
**effect**
98:9 99:24 100:14
138:18 154:23
211:2,23,23
244:20 251:13,14
253:2 274:19
276:5,14 329:21
**effectiveness**
314:18
**effects**
63:15 129:13

137:17 170:20
213:23 270:3
272:14
**effort**
143:21 150:15
**efforts**
140:6 147:21
**Egli**
183:16 185:18
187:10 188:20
**eight**
24:10 192:19,22
193:9 194:5 297:8
**either**
24:15,21 29:9
31:15 32:23 37:17
52:17 73:7 75:8
82:2 92:13 94:6
96:5 101:21
139:21 140:8
176:6 177:21
181:14 194:12
226:21 282:4
302:12,16 316:8
327:15 328:7,15
338:23
**electronic**
337:8
**element**
317:14
**elements**
169:13 170:1
172:16
**elevated**
146:14 304:9
**elevation**
314:9
**elevator**
335:24
**eliminate**
200:5
**eliminated**
134:3
**eliminates**
199:23
**elimination**
83:20,23 84:10

208:8,11,16 209:3
305:16 337:17
362:12,15
**Ellis**
2:13 3:12 9:13
**elongated**
137:7
**emphasizes**
99:21
**employee**
58:7,24 364:13,15
**Enbridge**
58:12,18 59:11,13
**endeavors**
213:18
**ended**
194:12 340:17
341:16 349:20
**endogenous**
115:7 312:20
**endpoint**
287:11
**ends**
339:19 341:8
**Energy**
58:14 59:10,12
**engineering**
59:19
**England**
145:14
**English**
211:21
**entire**
52:20 69:13 83:11
291:22 294:10
347:23
**entirety**
68:21
**entry**
58:14
**environment**
181:3 312:19 345:7
**environmental**
31:12 55:19 57:7
57:11 179:1
278:12 312:24
328:10 342:3

344:14,18,22
345:3 351:24
352:3
**enzyme**
319:4
**enzymes**
314:18
**epidemic**
182:22
**epidemiologic**
191:15 211:11
224:21 231:1
236:24 239:5
263:24 264:20
270:19 326:3
**epidemiological**
84:16 104:21
111:19 210:6
212:7 213:1
247:20 248:8,21
249:15 250:4
266:5
**epidemiologist**
61:5,7 79:23
238:24 239:9
**epidemiologists**
211:14 232:24
233:18 236:1
**epidemiology**
61:9,18,21,23
87:14 140:1
213:14,17 220:17
239:7,12 270:20
308:14 309:2
354:13
**epithelial**
116:11,12 133:12
153:17 235:20
236:16 237:1
313:12 316:16
323:10,13
**epithelium**
322:1
**Epstein**
5:17 31:2 33:19
218:22
**equal**

Arch I. "Chip"   Carson, M.D., Ph.D.

Page 382

equal
245:17
equally
235:18
equipment
162:6
equivalent
72:20 259:2 261:16
302:1
errata
4:11 365:6,9,11,15
366:1 367:7
especially
112:2 240:20
ESQUIRE
2:2,3,8,13,19 3:2,7
3:12,17
essentially
16:24 134:18
136:18 194:4
220:3 274:19
306:7
establish
39:22 111:22
247:21 248:22
250:5
established
85:19 86:1 220:5
313:19
estimate
45:12 166:7 174:1
174:9 232:2
256:20 257:2
347:17
estimates
39:8 193:22
Estimating
282:19
et
5:9,10,12,13,18,19
6:4,6,7,8,10,13,14
6:16 26:5
Eternit
146:10
etiology
220:17
EU

97:21
evaluate
170:19 249:8
256:21 291:23
295:2
evaluated
105:8
evaluating
210:24 230:24
evaluation
228:21 269:14
295:18
event
311:23
events
313:17
eventually
42:17 43:18 214:24
233:12
everybody
360:12 361:18
evidence
87:14 91:20 93:22
98:1 109:2 111:2
112:15 143:19
170:10 203:7
204:15 206:4
210:24 211:1
220:11 222:16
223:10 226:7,13
227:22 228:3,8
230:9 233:14
235:13 247:20
248:8,22 249:15
250:4 288:18,20
288:22 290:1,2,7
290:8 291:3,8,11
292:11,19,20
293:14,24 294:5,7
296:1 301:2 304:4
304:18 305:12
313:8,8 352:20
evidencing
181:24
exactly
62:13 142:11
174:16 251:8

257:2 280:7 346:9
exam
62:9 189:9,11,12
327:9
examination
4:5 9:21 284:8
305:3 343:18
364:4
examined
102:9 160:10 190:8
207:7 286:2
example
64:17 76:14 84:6
93:13 97:21 117:3
140:13 154:19
205:8 245:1
265:10 267:7
268:11 269:18
276:14 286:14
312:16 358:23
359:24
examples
199:4
exams
327:15 328:15
exceed
333:17
exception
15:12 362:22
Excerpt
6:17
exchanged
47:11
excluding
216:17
exclusion
193:19
excuse
19:19 20:9 54:3
73:22 81:22 86:20
105:14 128:22
149:22 164:7
171:11 173:4
189:11 207:10
234:1 294:13
324:4 332:19
exemption

357:18
exercise
280:24 325:18
exhaust
360:15 361:5,6,9
361:13
exhaustive
214:16
exhaustively
210:19
exhibit
5:4,5,6,7,9,10,12
5:13,15,16,18,19
5:21,22 6:2,4,6,7
6:8,10,11,13,14
6:16,17 7:3,5,6
10:16,18 12:11,19
15:17,18,21 16:4
16:16 17:10,15
19:4,5 21:3,6,10
21:13,20,23 22:10
24:24 25:1,24
26:2,6,10,19,23
27:7,13,23 28:14
28:18 29:14 30:15
30:16 31:4,5 32:7
32:8,18,19,22
33:10,18 34:15,24
36:4,7,12 43:14
50:19 54:22 57:19
58:2,21 65:1,12
66:18,21 68:10
69:4,8 70:24 71:6
89:16,17 94:24
98:20,21,24 99:7
100:21 101:14
102:4,15,24
103:17 104:3,10
106:1,21 124:16
124:17 130:2,3
146:23 148:17,18
149:10,11,18,24
150:1,2,8,9,18,19
151:10,10 152:2,2
158:2,3,6,7
159:20,21 160:3
163:2,3 192:11,14

195:22,23 196:5
218:20 219:5,5
225:14,15,20
242:24 243:1
247:3,8 259:16
260:7 271:1,4,12
282:22 283:1
289:5,8,9,23
293:2,4,5 315:24
346:23 347:1,10
347:11
exhibits
5:1 6:1 7:1 21:2
53:1 68:24 69:2
148:11,22 149:4
150:18 152:1
284:4
exist
97:20 253:2 296:7
existed
161:17
existing
212:13
exists
27:15 59:13 86:19
209:21 213:18
254:2
exonerated
286:10
expand
16:8
expanded
41:5,9
expect
16:8 17:13 131:19
167:2 191:7
194:16 197:16
198:19 201:14
245:17 262:24
263:18
expected
300:4
expense
252:17
expensive
241:15
experience

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 109 of 1035
PageID: 241288
Arch I. "Chip"  Carson, M.D., Ph.D.

Page 383

19:23 118:19
121:6 359:2
**experienced**
159:10
**experiment**
317:5,11 318:3
341:5
**experimental**
116:23 120:2
185:21 188:4
189:17 247:20
248:21 249:6
250:4 290:7,8
291:1 294:5
**experimentation**
87:18
**experiments**
85:12 86:3,7 206:9
316:9
**expert**
5:5 10:11 15:16
37:5 47:14 48:7
48:14 49:19 50:2
55:11,20 56:17,21
57:3,9 66:11,15
67:23 80:5,9
117:24 118:20
137:12,15,20,23
156:13,15,24
168:20 171:13
187:8 207:16
224:4 239:12
252:13 347:15,20
**expertise**
151:1,6 280:21
**experts**
49:8,14 50:21 51:1
51:24 52:4,8,12
66:4,8,9 70:14
82:23 122:23
144:4 169:3
213:20
**expires**
364:22 367:17
**explain**
106:3,11,13,15
107:3 190:22

212:18 284:17
**explained**
111:8
**explains**
106:19 242:1
**explanation**
182:13 243:12
244:15
**explanations**
150:16,20
**exposed**
145:24 146:15
160:17,18 167:5
213:22 298:4,18
299:3 329:4
361:11
**exposes**
83:11
**exposing**
317:15 361:3
**exposure**
77:11 82:2,11,15
82:20 83:4,7
91:21 111:21
113:23,24 117:5
135:4,6 152:12,15
152:17 153:9
154:22 160:4
161:1 163:7
166:15 168:13,16
170:20,21 171:24
174:12,17,20
175:2,4,6,13,20
178:1 179:3,12,20
179:22 181:14,19
181:22 182:16,17
191:1,6 193:20
194:6 198:10,10
198:14,16,20
199:9,12,23 200:5
200:6 209:6,8
212:13,15 224:14
224:18 229:15
255:4,12 265:7
269:14,20 297:21
298:5,6,11 299:3
299:13 311:15,17

312:1,5,24 318:2
322:22 328:10
331:17 332:14,16
351:24 352:3
355:2,11 357:11
358:6 361:13
**exposures**
55:18,19 57:8,11
84:7 298:9 300:13
311:21 325:13
328:9 344:18
**express**
349:2
**expressed**
16:14 360:24
**expressing**
18:21 81:4 181:5
**extend**
41:14
**extended**
23:15,17 209:23
**extending**
43:2
**extends**
356:15
**extensive**
42:7 83:13
**extent**
35:3 75:6 155:18
170:9
**external**
86:13 87:10,15
88:3,12,20 119:24
185:8
**externally**
116:15 119:13
188:9
**extra**
228:24
**extrapolate**
325:8
**extremely**
76:3 241:15 353:22

---
**F**
---
**F**
3:7,18

**face**
97:19
**face-to-face**
45:24
**fact**
84:3 85:19 86:1
91:18 108:3 132:5
132:22 133:18
191:9 192:1 199:8
238:3 241:15
244:2,22 246:22
249:12 257:7
262:23 288:3,5
302:24 304:7
345:9 353:17
357:6 362:11
**factor**
90:13,18 91:14
110:9 128:14
129:1 147:6 171:1
191:14,18 230:18
267:17 268:19,21
280:18 331:13
333:22 334:7
341:3 358:4
**factoring**
170:21
**factors**
19:24 95:12 107:21
108:1 162:11
163:14 166:18
215:8 219:23
221:20 230:4
266:20,24 279:22
280:1,15 330:14
331:10 332:17,23
333:3,4,10 334:2
**factory**
145:20 146:11
**facts**
214:21
**faculty**
239:6
**fail**
365:18
**failed**
187:13 220:10

232:1
**failure**
166:17
**fair**
11:21,23 31:23
74:15 211:24
246:18 265:15
266:1 285:8
294:11 301:3
342:20
**fairly**
84:13 86:18 145:17
214:16 235:9
279:10 282:9
324:6
**fallopian**
183:14 184:4 190:3
191:4 200:24
303:17 322:1,17
322:23 323:3,15
324:1,12
**false**
187:12
**familiar**
11:9 27:14 41:4
90:2,21 97:12
99:10 129:4,11,21
129:23 131:12,15
144:12 155:8,13
155:16 158:17,23
159:15 162:20
203:4 212:5
242:14 243:6
247:12 265:2
269:7 331:11
332:17 341:6
357:20
**family**
58:9 333:6
**Fannin**
1:15
**FAPR**
364:18
**far**
10:10 198:11
249:23 348:4
361:5

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 110 of 1035
PageID: 241289
Arch I. "Chip"  Carson, M.D., Ph.D.

Page 384

fast
303:17
faster
303:18
fatal
233:21
fatality
306:10
fault
241:5
favorable
217:7,10
favorite
345:14
fax
1:23
FDA
5:16 30:21 31:2
  33:19 65:4 133:18
  134:15 143:6,11
  143:13 218:14,20
  219:13,21 220:4
  220:16,20 221:13
  221:16 222:5,11
  222:13,15,19
  224:7,20 230:14
  234:14
FDA's
143:4,8 223:12
  234:14
FDI
222:10
Federal
134:7
feedback
79:14
feeds
342:7
feel
74:9 99:8 113:3
  164:5,9 289:19
  292:15
Fellow
1:18 364:2,19
fellowship
61:18
felt

19:10 20:4 40:2
41:13 216:1,22
254:21 325:15
female
82:3 83:5 145:13
  181:15,18 207:24
  209:8 303:21
  350:21 351:15
feminine
288:6
fewer
160:16
fibers
72:11,17 114:22
  115:5,8,10,10
  138:23 140:9
  169:2 290:10,22
  295:20
fibrosis
116:16 119:3,12
  120:5,19 132:24
  133:4,15 185:6
fibrotic
287:1,19
fibrous
77:12 114:23 115:7
  115:9 137:5,6,12
  138:17 139:5,21
  140:15 141:4,17
  141:21 158:11
field
61:12 213:14,17
figure
328:18
file
24:6 35:23 346:1,1
  346:7,11,17
filed
272:13 274:9,12
  275:5,10,19 277:4
files
42:2
filings
271:21 276:2
fill
333:23
filled

323:17
filter
187:14
fimbriae
322:1 323:14
final
103:7 107:8
finalized
16:19
financially
364:15
find
34:20 42:18,19,20
  91:15 111:12
  132:6 142:18
  143:1 167:2 194:6
  194:11 218:17
  262:20 281:14,18
  282:12 291:11
  293:24 311:7
  316:13 320:6
  330:19 358:4
finding
100:10 193:18
  222:11,11 223:21
  223:23 262:5
  277:22 283:22
  334:9 349:16
findings
106:24 114:3
  220:17 223:19
  253:22 254:21
  276:13 294:22
  295:13
finds
123:7 197:24 226:7
fine
39:14 173:7 343:17
finish
12:2,5 74:1 103:13
finished
20:10 74:17 103:14
  173:5,6,7 207:11
  207:13 283:4
  295:6 298:20
  324:18 329:12,13
  359:17

first
29:2 30:24 36:16
  40:8 65:10 77:6,7
  81:18 83:15
  114:16 124:24
  140:1 160:9 166:3
  215:20 230:18
  237:15 261:12,15
  286:1 301:7 326:2
  340:3
fit
348:24
five
261:4,4,10 262:10
  262:12,14 263:9
  263:11 297:8
  310:20
fixing
312:15
Fletcher
5:10 26:5,9 313:14
floor
2:15 335:23
Flower
2:14
fluid
323:18,20 324:1
  362:7,20
fluids
279:10 339:9
FLW
1:5
focus
22:14,16 38:20
  93:15 94:2 249:24
focused
230:14,19 249:22
  310:12
focusing
216:17
follow
11:10
following
193:19
follows
9:20 98:13,15
food

170:6 219:14
  357:15,17
footnote
148:16
force
189:10,13
forces
334:16
foregoing
364:7 367:5
foreign
199:2,4 209:16
  315:18 317:20
form
11:22 17:21 18:22
  19:20 25:3 37:16
  38:7 53:10 54:2
  55:14 59:2 60:23
  62:12 63:9,24
  65:24 70:16 73:11
  75:13 78:2,13,23
  80:16 81:13 82:18
  84:2,21 85:15
  86:15 87:12 88:6
  92:18 94:12 95:4
  97:9 98:4 107:15
  108:11 109:17
  110:14 111:17
  114:7 116:20
  119:6 120:9,21
  123:11 127:15
  128:6,19,24 132:1
  133:7 136:8 137:6
  137:10 139:23
  140:24 141:24
  144:2 147:5,17
  148:23 151:4,14
  152:6 153:2,15
  154:4 155:12,20
  157:9 158:13,22
  159:7 161:6
  162:15 164:24
  167:16 168:4,17
  170:15,24 171:10
  172:8,18 174:7,15
  175:10,17,24
  179:5,23 180:5

Case 3:16-md-02738-MAS-RLS     Document 33123-4     Filed 08/22/24     Page 111 of 1035
PageID: 241290
Arch I. "Chip"  Carson, M.D., Ph.D.

Page 385

181:9 182:4,15
184:21 185:11
186:13 188:11
189:15 193:11
194:22 195:6
197:4,21 198:15
199:17 200:3
201:10 202:9
203:10,20 204:18
207:5 209:11,19
210:15 212:3
214:10 216:13
218:10 219:17
221:1 222:9
223:16 224:1,23
226:10 228:2
229:7,14 231:10
231:21 232:19
233:4,11 234:10
234:17 235:7
236:3,7,21 237:11
238:2 239:2
240:16 242:4
244:9 246:12
248:3 249:3
250:10,20 252:7
254:9 257:19
258:14 259:10
260:24 261:20
263:4,22 264:10
266:10 267:4,19
268:23 269:24
270:6 275:23
276:9,17 277:10
278:24 284:24
285:15 288:11
290:13 293:19
294:3,14 296:14
297:23 299:7
300:9 301:19
302:20 303:6
304:17 305:1
307:15 309:15
310:7 313:24
316:11 317:8,17
317:24 318:9,20
319:14,24 320:17

320:23 322:19
324:5,15 325:1,10
326:21 330:11
340:19 341:19
345:19 348:22
351:20 352:16
353:6,19 354:19
355:8,21 356:9
360:6,7 361:15
362:11 367:6
**formation**
19:9 120:12 176:2
**formed**
353:3,24
**former**
244:6
**formerly**
22:6
**forming**
18:9 271:16 346:17
352:12 353:15
354:24
**forms**
154:5 175:3 180:7
180:17 235:18
240:24 241:13
**formula**
280:15
**formulate**
20:23 43:12 44:20
70:19
**formulated**
97:4 101:24 106:7
**formulating**
45:14 46:4 71:10
107:21 139:15
205:18
**formulation**
73:19
**fornix**
301:24
**forth**
16:14 19:7,17
54:15,16 76:21
81:7,18 155:22
200:7 220:16
345:8 364:9

**found**
25:13 35:7,20
109:20 112:20
131:2 144:15,17
144:24 147:10
181:7 184:13,24
185:13 190:5,7,10
195:2,8 205:10
221:16 223:3,6
256:4 261:9
290:21 291:3
292:10 293:13
314:16 354:8
**foundation**
165:1
**four**
124:21 125:9
143:16 172:15
189:20 245:21
252:21 261:3
297:8
**fourth**
3:13 84:15 210:3,5
**fragments**
168:21 169:1
**fragrance**
63:7,13,15 72:23
73:6,16 74:22
75:1 115:17 172:6
174:5 175:14,18
176:6 177:9,13,22
**fragrances**
174:10 175:23
177:19
**frame**
39:12
**framework**
5:23 99:1,14
**frankly**
37:10
**FRCP**
364:11
**free**
99:8 113:3 164:6,9
289:19 292:15
**frequency**
272:23 302:19

310:17 354:18,21
**frequently**
241:18
**front**
24:12 192:3 256:1
260:10
**fuel**
360:16
**full**
98:8 99:23 244:1
**functional**
206:21
**funded**
104:13,23
**funder**
93:17
**funding**
104:6,8,11 105:3
105:17,22
**further**
138:17 163:12
283:23 314:21
364:7,10,13
**future**
16:10 249:24
_____
**G**
_____
**gain**
267:15,24
**Galveston**
58:5
**gas**
145:13,14
**gasoline**
360:14,16,18,22
361:2
**Gates**
258:5,6,7,11
**gauging**
76:20
**general**
16:7 28:10 40:12
40:24 41:15,16
42:15 55:19 75:24
79:8 82:6 92:23
97:20 100:5,14
103:9 106:4

126:22 127:20
147:12 156:16
161:7,8 180:3
279:11 286:20
308:16 309:1
315:7 328:13
344:12,13
**generally**
38:8 44:20 97:6
122:6,16 147:10
178:14 236:15
**generate**
45:7
**generated**
49:11
**generic**
84:13
**genetic**
267:13 312:13
314:12,14 319:2,3
330:12 333:4
**genital**
86:13 87:11 88:3
88:20 119:1
170:12 185:8
186:19 192:22
194:6 200:11
201:19 220:6
227:15,17 234:7
244:3 246:3 252:3
273:18 274:6
277:5
**genitals**
273:14 274:2,15
276:5
**genotoxicity**
319:7
**gentlemen**
54:4 74:11
**geological**
349:17
**geologist**
61:2 115:15
**George**
79:20 337:5
**George's**
337:9

Arch I. "Chip"  Carson, M.D., Ph.D.

Page 386

**Gertic**
257:12 258:9
**gestalt**
348:24
**getting**
63:21 64:6 110:6
142:14 257:20
**gigabytes**
346:14
**Ginkgo**
229:3
**girls**
296:11
**give**
12:3 54:4 64:4
135:23 156:3,8
188:5 230:3
316:13 336:18
**given**
11:4 18:10 20:3
23:1,6 56:14
164:12 188:14
266:21 336:22
367:5
**glass**
316:23
**gleaned**
18:8
**glove**
305:3
**gloves**
133:20 134:9,16,17
189:22,23 190:9
**go**
12:21 25:4 59:7
67:9 69:16 85:22
99:6,17 145:10
163:19 164:14
205:12 213:24
224:9 228:23,24
246:17 253:4
256:18 262:8,19
272:21 278:6
281:13 282:12
288:4 290:18
314:22 315:13
320:6 328:22

339:9 340:13
343:13 359:9,19
**goes**
68:1 136:19 219:21
225:21 324:1,9
334:14 335:21
345:5
**going**
11:10,20 39:21
73:24 74:19 85:21
86:22 87:22 112:5
117:24 136:11
156:3 162:23
164:16,19 176:17
176:18 192:4
233:16 247:6
284:3 285:18,22
288:2 289:6,14
294:9 295:8
309:22 315:7
321:19 324:18
342:11,13 343:4
343:14 344:9
363:18
**Golkow**
1:23 3:23 8:6
**good**
105:1 120:17 221:3
266:2 330:16
336:14 352:19
**GOSSETT**
3:2
**government**
221:8
**gradient**
111:23 112:1
**graduate**
281:1 344:14
**Graham**
5:13 29:2
**grandfathered**
335:3
**granuloma**
120:11
**granulomas**
116:16 119:3,12
120:5,18 132:24

133:4,13 185:6,13
**great**
74:17 326:11
**greater**
137:8 153:4 154:22
166:22 168:8
196:10,22 198:2
198:11,17,20
212:22 250:16
255:11 262:19
263:13 311:17,19
**greatly**
296:16
**grilled**
358:12,14
**gross**
214:11
**groundwater**
345:8
**group**
39:3 80:19 178:15
178:16 189:20
226:3,16 227:1,6
227:9,12,16,18
229:11,18,19
235:8,12 237:4
249:20 250:24
261:1,12,15 263:6
285:13 290:23
292:18 309:12
357:7 358:16
**groups**
6:11 190:10 263:2
**grow**
359:3
**growth**
115:2 139:1 287:3
287:14
**guess**
65:16 205:23
339:18 354:2
**guiding**
91:7
**gynecologic**
60:12 338:4,9,12
**gynecologist**
60:18

**gynecologists**
208:13
**gynecology**
32:15 208:6

**H**

**habits**
161:24 359:11,12
**habitual**
23:4,10,21 38:3
53:7,22 199:11
**half**
86:22 111:19
176:22 184:19,20
327:22,23 335:9
351:7
**hallmark**
300:14
**Halme**
183:23 184:3
**hand**
159:19 192:8
195:18 247:6
289:6 337:7
**hand-selected**
75:10
**handed**
160:2 291:6
**handled**
95:17
**handling**
164:13
**handwritten**
6:2 281:23 337:14
**happen**
252:1
**happened**
274:11 319:16
**happening**
312:18
**happy**
164:21 165:6,15
246:20 284:5
**hard**
336:22
**Harlow**
255:7

**harm**
188:5
**harmful**
355:2
**hazard**
97:19,19 143:19
153:4,6 172:22
**hazardous**
326:9
**Hazards**
77:17
**he'll**
164:21
**head**
188:22 304:8,24
**healing**
122:13
**health**
5:15,22 30:14
31:12 58:7,24
61:9 63:15 65:8
77:18 79:18 89:15
89:21,22 90:24
93:5,6,10,19 94:3
94:7,18,20,22
95:21 96:4,10,16
96:21,24 97:3
98:13,15 99:1,2
99:13,17 100:9,15
137:17 205:9,23
207:3 237:18
239:8 344:14,15
344:16
**health-related**
93:21
**healthcare**
93:24 204:8
**healthy**
240:1
**hear**
142:13
**heard**
14:19 204:23
**hearing**
16:6,15 17:14
**heavily**
160:18

heavy
168:15 170:11
172:2 173:23
175:7,19 176:6
297:20 298:4
299:19 300:20
332:16
held
1:14 8:10
Heller
184:1,8,15,24
283:16
help
258:1 284:5
helpful
79:14
helps
70:19 113:8
hereinbefore
364:9
high
145:17 249:22
332:5
high-grade
212:19,21
higher
160:19 167:3,21
168:5 170:12
263:10
highlighted
260:1
Hill
107:20,24 109:2
110:18 215:8,12
219:23 225:4
229:21 230:18
240:7,9 255:1
264:8,16
hips
304:9,23
hired
40:2 361:21
historical
191:17
history
184:13,19 196:23
267:7,23 330:13

333:7 351:8
hit
282:15
hold
346:13
holidays
351:4
hope
68:7
hoping
251:23
Hopkins
70:1,2 148:12,17
149:10,24 150:8
158:2
Hopkins-28
7:4 148:17 149:10
150:1,8,18 151:10
152:2 158:3
hormone
255:10 268:15,18
269:4
hospital-based
238:14,19 239:15
239:21 240:12
246:7
hospitalized
239:23,24
hospitals
134:18
hour
45:11 86:22 176:22
hours
40:4 45:13,18 60:9
343:5,15 347:14
households
359:6
Houston
1:15,16 8:10 37:1
59:4 61:10
hover
310:20
huge
250:24 345:4
human
112:15 226:13
236:5 249:19

288:7 358:18
humans
178:16,17 179:3
225:9 226:4,8,17
227:1,22 235:14
288:19 292:19
hundred
306:23 357:24
hundreds
357:21
hydrocarbons
358:15
hygiene
76:21 257:4 284:19
288:7
hypothesis
132:2 193:21
hysterectomies
189:18
hysterectomy
189:20,21 190:2
193:2,20 194:8,19
196:13 197:1,18
198:5

---

## I

IARC
6:11,17 28:6,11
176:13 178:9,14
178:22,22 203:3,4
203:6,11 204:10
204:12,13 205:11
205:13,17,20
206:2 225:3,6,12
225:13,20 226:7
226:20 227:8,15
227:18,22 228:10
228:11,23 235:2
249:18 278:10,17
288:5,5,21 289:4
289:24 291:3,4
292:10,12 293:13
294:24 300:23
342:4,9 355:23
356:1,21,23 357:3
357:11
IARC's

205:6 206:3
idea
73:4 169:17
identified
34:8 52:22 70:23
127:11 128:4,9
151:9 163:16
286:6 300:21,22
324:22 333:3,11
336:5 346:22
355:13 356:16,20
361:7
identifies
86:11 88:1,18
319:2 330:13
identify
8:15 71:15 86:10
87:7,8 172:21
220:10 289:15
299:20 330:14
Identifying
99:2
Igor
282:18
ill
240:1
illness
134:2
illustrative
216:22
Imerys
3:5,10 9:6,8 69:19
70:10 72:3 75:8
75:16,23 147:19
149:13 157:23
158:5 284:13
Imerys'
150:23
immediately
40:17 65:14
immune
287:3,14
immunogenic
81:19 114:17
impact
209:16 271:20
imperative

365:14
implanted
286:23
important
18:9,15 94:1
159:13 209:20
254:21 258:11,15
283:22 295:16
317:4 338:16
339:1 352:18
impossible
266:19
improvements
167:18
impurities
169:14
in-person
46:9
inability
162:10 163:13
251:12
inappropriate
166:16
inasmuch
184:11
incidence
131:3,14,22 191:7
191:16 194:17
196:14 197:17
280:3
inclined
304:8
include
45:19 67:2,22
82:24 101:20
146:5 191:17
237:1 257:12
272:8 332:24
344:18 345:17
355:15
included
24:17 66:24 67:6
67:13 152:3 158:8
169:14 195:9
214:19 217:4
226:2 258:8
295:22 309:12

347:3 357:17
**includes**
87:14 280:12 347:4
355:22
**including**
19:6 41:2,2 83:12
93:6 114:22 121:7
163:23 165:21
169:6 193:23
221:21 237:2
245:8 252:15
277:17 278:21
279:5 287:2 303:9
321:22,23 358:10
**inclusion**
41:8
**income**
56:2
**incorporated**
151:20 180:11
214:17 244:24
337:7
**incorrect**
105:14
**incorrectly**
290:15
**increase**
121:21 202:18,23
231:3 233:17
275:14 299:12
306:12,13 318:6
318:13 331:3
338:13 360:10
361:16
**increased**
84:18 91:21 121:14
122:8 131:3
152:19 211:5
220:7 232:13
236:4 262:6 277:7
306:15 308:13
309:13 310:5
333:6
**increases**
132:23 133:3
236:24 237:3
311:13,16 338:21

**incur**
361:13
**independent**
53:6 79:4 157:5,10
158:9,14
**INDEX**
4:1
**indicate**
135:1,19 154:18
220:12
**indicated**
241:8 327:16
**individual**
71:22 110:17
126:20 171:24
178:4,5 193:5
214:22 229:21
308:17,19,20,21
308:23 309:3
310:19 314:13
330:8 345:21
**industrial**
76:20 156:15
344:22
**industries**
76:2
**industry**
331:15
**inert**
303:1 339:4
**infection**
122:12 267:8,23
**infections**
202:14
**infer**
166:13
**inflammation**
86:8,11 87:9 88:2
88:11,19 114:18
116:1,7,10,16
117:4 119:2,11,20
122:11,15,16
123:13 125:4
126:23 127:9
131:18,21 132:14
132:23 133:3,11
134:21 136:18,23

137:3 138:12
198:21,23 200:10
248:13 249:21
279:14 283:20
287:1,11,12,18
**inflammatory**
115:1,6,11 119:20
120:10 121:3,6,10
121:12,19 122:4
122:17,21 123:8
126:15 127:12,19
127:20 128:1,12
138:24 171:18
287:2,14 313:15
362:17,18
**influence**
213:11 272:1
279:23
**influenced**
216:21 272:15
313:16
**inform**
350:23
**information**
16:17,21 18:8
19:10 20:22 42:2
42:4,23 70:18
78:5 149:17
155:23 156:1
166:13 173:24
174:3,8 205:12
232:21 243:10
244:13 267:13
281:4,12 282:7
298:3,10,12,15
312:6 325:20,23
326:2 348:1,17
349:3,7,10
**ingredients**
140:8
**inhalation**
82:3,15,23 83:6
134:12 181:15,19
181:22 182:2,17
**inhale**
361:2
**inhaled**

84:7 182:9 290:21
**initial**
37:23 198:14
237:14
**initially**
40:11
**initiation**
116:13
**injected**
186:7
**injury**
57:6 134:2
**innocent**
329:24
**inquiries**
350:21
**inquiry**
351:14
**inserted**
304:22
**insofar**
235:24
**instance**
74:2
**instances**
76:12
**instilled**
301:23
**Institute**
90:21,23 91:7,12
91:19 93:8,14
95:11,18 234:21
**institution**
58:10
**instructed**
350:9
**INSTRUCTIONS**
365:1
**insufficient**
166:13 247:21
248:22 250:5
288:18
**insult**
312:12
**insults**
312:17
**intend**

16:5 22:21 96:23
97:2 156:8
**intended**
15:10
**intense**
311:21
**intensifies**
138:17
**intensify**
114:24 115:5,8,11
138:24
**intention**
156:10
**intentionally**
115:21
**interaction**
196:21 197:12
198:1
**interest**
37:6 105:5 342:8
349:9
**interested**
39:21 295:13
341:22 364:15
**interesting**
43:1 80:24 342:13
348:18 349:3
**interests**
93:12
**internal**
75:7,15 76:6,8,12
76:19 77:1 88:9
88:13 321:14,15
321:20
**International**
178:22 225:23
**Internet**
338:7 342:21,24
**interpretation**
223:18 334:10
**interpreting**
264:20
**interrupt**
74:11 86:21 191:5
**interval**
261:23 276:21
**intervals**

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 115 of 1035
PageID: 241294
Arch I. "Chip"   Carson, M.D., Ph.D.

Page 389

126:10
**interview**
272:16 277:17
**interviewed**
273:17 274:1,8,13
**intimately**
120:11
**intrinsic**
83:19,23 84:9
  208:8,11,16 209:3
  337:17 362:11,15
**introduced**
188:8 284:12
**introductions**
343:21
**invasion**
212:23
**inverted**
188:21
**investigate**
150:16
**investigated**
104:20
**investigation**
79:5 286:15 329:2
  329:7
**investigations**
193:6 214:23
**Investigators**
251:22
**invoice**
14:10
**invoices**
14:9 45:3,7
**involve**
147:2 187:22 189:8
  250:21
**involved**
37:3 47:10 50:3
  54:24 56:23 57:3
  57:6 62:8,17
  63:21 64:7 73:9
  76:15 96:16
  135:20 136:5
  138:4,10 141:6,13
  142:14 147:15
  148:7 156:20,21

184:8 185:18
  187:19 189:12
  232:10 250:16,22
  267:1,9 287:4,15
  340:4
**involves**
172:15 359:4
**involving**
57:16
**ions**
180:10
**irrefutable**
226:13
**irrelevant**
349:15
**isolated**
254:15
**issue**
66:14 80:12 90:11
  118:5 141:20
  144:8,20 160:4,11
  163:7 176:7
  199:19 213:13
  264:19 278:17
  289:1,2 327:16
  352:18 358:20
**issues**
29:7 41:8,20 55:7
  64:18 77:18 80:20
  137:16 207:3
  258:17 285:6
  326:6
**Italian**
297:11
**Italy**
146:12
**item**
14:5 35:4,5 126:18
**items**
13:21 20:6,14 35:1
  357:17

_____
**J**

**J&J**
152:3 155:8
**J.D.P**
29:2

**Jane**
3:2 9:5 284:10
**January**
1:11 5:2 8:2,7 26:1
  26:10 94:9,14
  364:23
**jbockus@dykem...**
3:3
**jdonath@coughl...**
3:8
**Jersey**
1:1 3:9
**Jim**
77:7
**jive**
116:24
**job**
53:6 164:22,23
  336:14
**John**
70:1,2 148:12
**Johnson**
1:3,3 2:16,16,22,22
  9:1,1,4,4 22:4,5,7
  22:7 41:22,23
  43:9,9 70:3,4 72:4
  72:4 73:7,8 75:8,8
  75:16,16,22,22
  129:19 143:23,23
  147:20,20 149:13
  149:13 150:22,22
  151:12,12 299:4,4
**join**
234:3 236:10
**joinery**
229:13
**Jonathan**
3:7 9:7
**journal**
27:14,16,21 31:14
  32:14 249:13
**journals**
63:4 103:11
**Julie**
70:8,9 148:12
**jumped**
275:20

**jumping**
285:19

_____
**K**

**kaolin**
129:13 130:24
**Katherine**
2:19 9:2
**katherine.mcbet...**
2:20
**keep**
110:6
**Kemble**
3:8
**key**
20:5
**kibitzed**
297:16
**kill**
311:3
**kind**
24:7 38:11 42:6
  84:5 278:14
  293:10 299:9
  300:12 323:20
  329:21 342:8
**kinds**
285:6 312:17 335:9
  335:11
**Klevorn**
2:8 8:22,22
**know**
10:10 28:16 29:12
  36:23 42:20 44:6
  44:19 46:18 47:16
  48:10,13,16,18,19
  49:7,10 51:6
  66:11 68:2 69:20
  72:11 73:15 74:3
  74:7,24 75:20
  80:7 94:14 96:7
  96:12 101:15
  103:8,12,15,20
  104:2,5,18 105:4
  105:6,10,13,13,19
  105:21 134:5
  141:1 142:9 146:3

148:24 149:3,17
  151:8,23 153:8,12
  155:2 161:9 171:6
  171:12,16,23
  176:5,11 177:12
  177:15,16,17,18
  177:20 178:1
  180:7,17,23
  184:17 189:4
  204:11 208:21
  213:5 218:11
  221:2 246:13,16
  275:16 282:5
  291:4 292:11,13
  293:13 294:10
  299:23 300:1,10
  300:17 302:7,12
  302:16 303:13,13
  303:14 311:20
  312:3 315:2 319:6
  320:1,3 322:3
  324:16 329:8
  330:6 331:8,9
  333:9,13,16 336:8
  337:20 338:11,17
  338:19,23 339:13
  340:20,20 344:6
  346:12 347:4
  357:13 358:13
**knowingly**
350:2
**knowledge**
104:11 120:1 156:2
  169:11 224:7
  293:23 303:24
  322:4 359:8
**knowledgeable**
168:21
**known**
129:9 135:17
  166:18 171:2,3
  178:21 226:21
  266:20 280:3
  315:18,19 330:14
  333:5 358:15

_____
**L**

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 116 of 1035
PageID: 241295
Arch I. "Chip"  Carson, M.D., Ph.D.

Page 390

labeled
183:17
labeling
30:22 134:4 219:10
labia
200:19
laboratory
286:24
lack
107:12 110:11
  208:8 222:20
  251:11 254:6
lacking
222:16 223:10
  224:13
laggers
145:21
Lancet
28:24
Langseth
6:14 246:23 247:13
  247:18 248:17
language
92:6,7 134:6
  294:11
languages
214:19
large
241:16 251:19
  324:8 334:3
largely
232:16
larger
19:6 22:18 39:3
  153:4
lasts
335:17
late
40:6 65:21 333:1
  333:12
latency
168:7 279:16,24
  280:1,7,12,14,18
  280:21,24 281:3,7
  281:21 282:14,19
  311:23
Latin

190:1
lattice
180:11
law
334:13
lawsuit
142:14 271:20
  276:2
lawsuits
68:2 272:1,13
  273:12 274:8,12
  274:19 275:5,9,18
  277:3
lawyer
36:24 80:4 285:13
LAWYER'S
4:13 368:1
lawyers
39:16 44:7,9,11
  46:2,21,24 75:11
lays
117:4
leach
189:3
lead
27:5 121:3,8
  224:13 333:19
leading
90:24 116:15
leads
70:18 116:8,12
  122:12
learn
96:9
leave
129:2 257:17
lecture
42:2
left
13:13 177:7 257:15
legally
68:1
legs
186:3 187:3 188:22
Leigh
2:2 8:17
leigh.odell@beas...

2:3
length
137:8 339:10
lesser
190:20
let's
26:22 31:4 89:1
  225:12 237:21
  253:4 256:17
  257:6 259:13
  270:10 314:22
letter
5:16 30:20,23
  33:18 218:14,21
  219:20,21
level
20:19 109:22
  111:20 171:24
  217:2 238:13
  245:15 263:13
  325:8 355:1
levels
170:11
LHG
1:5
LIABILITY
1:5
licensure
328:15
lifestyles
359:13
ligation
190:13,14,19,23
  191:4,17 193:1,20
  194:8,19 196:13
  196:24 197:18
  198:4
light
162:1
likelihood
211:22 240:22
limb
224:9
limit
135:11
limitation
162:9 163:12,17

limitations
158:18,24 160:9
limited
87:15 160:11
  227:21 228:3
  235:13 290:8
  291:7,10 292:19
  294:5 351:2
limiting
236:18
limits
223:8
line
46:8 313:9 366:2
  368:3
lines
106:22 113:9
link
158:19
liquid
187:14
list
6:2 13:16,19,22
  17:23 18:5,7,18
  19:17 21:14,20,23
  24:22,24 25:8
  29:10,13,19 32:24
  34:14,18,23 35:1
  35:11,15,18 36:15
  51:19 58:15 67:20
  68:10 71:6 90:12
  90:17 101:21,22
  123:12,18,22,23
  124:1,6,12,13,15
  126:13 130:13
  133:9,16 143:13
  145:10 146:22
  154:18 178:11
  217:20 281:13,18
  282:5,23 283:6
  304:1,3 347:1
listed
13:15 20:15 35:10
  51:18 52:16 68:9
  125:9,13 143:2
  155:4 222:10
  227:17 345:22

listing
5:7 125:17 126:8
lists
24:18 73:2 226:16
literature
5:7 19:4,7,12,22
  20:17 21:14,20,23
  24:16,23 25:8,13
  29:10,13,19 31:24
  31:24 32:24 33:12
  33:13 34:14,20,23
  35:1,10 36:2,14
  40:12,19,24 41:5
  41:10,19 42:12
  43:7,8,16 45:14
  46:5 51:5,19
  52:17 54:9,13
  62:22 65:13 66:18
  67:3,6,14 68:10
  71:6 79:6 85:17
  85:23 87:18 94:16
  94:21 95:11
  101:22 110:20
  116:15 130:13
  157:22 158:6
  175:1 178:11
  213:1 214:3,14
  215:24 217:4,20
  218:7 220:11,14
  221:15 222:6
  223:14 224:21
  230:22 237:22
  267:2 282:2
  347:2 348:2
lithotomy
185:23 187:2
litigation
1:5,23 3:23 8:6,11
  10:8,12 23:2,8
  36:18 37:4 39:17
  46:22 48:5,15,21
  49:8 52:5,9,13
  55:1 56:15 63:22
  64:7 66:5 73:9
  75:22 80:6 97:5
  100:11 104:22,24
  105:12 118:1,13

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 117 of 1035
PageID: 241296
Arch I. "Chip"   Carson, M.D., Ph.D.

Page 391

142:15 178:3
181:5 218:8 224:5
284:13 351:18
361:22
**litigations**
56:24 57:2
**little**
68:6 256:18 296:20
305:5 327:22
359:10 360:23
**lives**
233:22 236:5
305:17 306:18
325:14 358:5
359:12
**LLC**
3:15,15 9:13,14
**LLP**
2:8,13,19 3:7,12,17
**locate**
199:3
**located**
314:13
**location**
294:7
**Lockey**
77:7
**Logan**
2:20
**logistic**
272:18 277:18
**London**
145:21
**long**
39:10 168:8,9
169:22 241:16
280:18 281:17
335:6,14,17
**long-term**
129:12
**longer**
58:23 59:9,12,15
209:7 310:13
339:5,15 358:1
362:19
**Longo**
5:9 25:22,24 49:16

49:22 142:4 143:1
157:20 340:4,15
**Longo's**
50:11 142:1,18
**look**
31:18 42:20,21
71:22 72:13 78:18
93:1 94:2 106:22
110:19 111:14
113:6,8 118:10,12
130:1 155:3
161:24 162:23
175:6,13 184:11
191:19 193:16
199:11 204:24
219:24 220:15
229:1 233:19
237:21 238:11
242:23 243:23
246:19 247:7
248:14 257:6,14
259:13 260:16
262:2,14 270:10
272:6 274:11
285:21 287:24
289:16 292:15,17
293:16 295:11
299:22 301:14
306:11 328:23
336:7 337:13
**looked**
41:20,22,24 42:1
69:2 72:2 88:8
89:20 107:20
129:24 130:8,22
131:8 142:10
143:12 155:24
159:18 163:6
165:17 183:12
184:10,11,15
191:15 196:9
214:2,3 245:23
252:24 271:19
300:12 338:7,24
**looking**
28:18 53:21 67:8
77:6,8 78:9 99:19

118:4 125:23
126:12,17 139:24
140:1 148:16
152:1 158:1
162:19 164:3
166:1 194:4
197:11 222:24
247:24 248:16
255:6 259:24
273:11 282:22
283:2,7 287:8,11
289:23 292:22
293:7 297:3
300:18 320:8
321:7 352:23
357:10
**looks**
134:6 160:3 291:24
**Los**
2:15
**lost**
290:16 296:16
340:9
**lot**
40:22 117:1 137:16
141:18 146:21
207:7 239:5
299:23 343:11
349:16,21 359:4
**lots**
93:10 319:9
**Louis**
3:14
**Louisiana**
2:10
**low**
153:5 334:4
**low-grade**
212:19
**lower**
197:16 223:8 269:4
334:5 356:11,12
**lubricant**
134:9
**lubricating**
133:20
**lucky**

282:15
**lung**
130:9 131:3 292:5
**lungs**
84:6 182:18

_____

### M

**M**
2:3 3:12
**M.D**
1:14 4:5 5:1 9:18
59:24 364:5 367:4
367:12
**magnesium**
180:12
**magnitude**
166:6 211:20
**main**
134:8
**major**
160:11
**majority**
57:9 109:19 137:10
245:12 326:12,17
326:22 327:2
362:23
**making**
54:17 216:23
330:17 336:9
**mammalian**
288:20,23
**Managing**
99:2
**Mantovani**
127:5
**manufactured**
22:4,6 146:12
**manufacturers**
145:14
**manufactures**
60:15
**manuscript**
101:1,4 102:18
103:4
**Margaret**
2:3 8:19
**margaret.thomp...**

2:4
**mark**
10:16 15:17 20:24
25:23 26:10,22
30:13 31:4 32:6
32:18 36:5 124:15
130:2 159:20
163:2 192:2
195:21 218:16
225:12 247:2
**marked**
10:19 12:11 15:19
21:4,11 24:24
26:3,7,20 27:6
28:13 29:15 30:17
31:6 32:9,20
34:14 36:8,12
43:14 50:18 54:21
57:19 58:21 65:1
65:11 89:16,17
94:24 98:22
100:20 102:4,15
124:18 130:4
146:23 159:22
160:3 163:4
192:12 195:24
218:15 225:16
243:2 247:9 271:2
289:7,10 293:1
**market**
140:21
**MARKETING**
1:4
**married**
331:16
**Marriott**
1:14
**Marysville**
76:17
**mask**
145:13
**masks**
145:14
**mass**
334:13 362:14
**Master**
344:15

Case 3:16-md-02738-MAS-RLS     Document 33123-4     Filed 08/22/24     Page 118 of 1035
PageID: 241297
Arch I. "Chip"   Carson, M.D., Ph.D.

Page 392

**material**
28:12 62:3 78:7
151:19 229:8
279:8 304:19,22
312:13 314:15
342:19 361:10
**materials**
5:21 6:3 13:11,16
13:18,22 14:2,24
15:8 18:19 19:13
19:14,16 20:17
24:1,3,14,20
25:10,12 28:5
29:6,24 30:1
35:10,15,17 42:8
42:24 43:10 77:4
91:4 123:20
157:24 175:22
279:9 282:5 301:9
301:15,22 311:15
311:16 321:11
347:24
**mathematical**
280:15
**matter**
8:10 15:22 16:6,12
16:15 17:15 34:11
44:21 45:6 46:19
47:1 49:5 51:22
55:2 80:10 86:4
89:13,14 96:14
106:7 141:3 149:1
172:12 187:20
209:7 215:9
217:24 219:6
303:8 345:9
**matters**
37:7 86:1 100:11
**Mayo**
90:16
**McBETH**
2:19 9:2,2
**MDL**
1:4 8:11 10:8 55:2
**mean**
18:4 22:15 39:23
40:1 62:14 88:16

135:6 150:21
153:5 157:10
179:1 180:18
236:8 254:2
264:11 270:7
320:20 325:2
336:15
**meaning**
262:2 273:13,24
288:18 297:17
360:16
**meaningful**
252:9
**means**
23:12 111:6 186:2
227:22 228:10
231:7,8,24 362:10
**meant**
258:4
**measured**
314:11 340:8
341:21
**measurements**
232:6
**measures**
241:10
**meats**
358:13,14
**mechanism**
224:12 248:11
249:20 279:3
299:23 300:2
314:19 333:23
**mechanisms**
126:22 135:11
303:22 312:14
**mechanistic**
326:6
**media**
278:13,15
**medical**
1:15 10:5 58:5,6,13
58:24 59:10 90:17
175:1 207:19
220:22 330:7
334:24 335:2,5
350:6

**medicine**
55:15 58:9,10 60:4
60:7 79:22 80:18
**meet**
39:2 45:24
**meeting**
38:13 39:5,18 40:8
45:22 48:4
**meetings**
45:19 46:9,12,15
47:9
**member**
239:6 335:4
**members**
38:14 129:18
**membrane**
323:10,13
**memory**
71:23 126:19
183:15 276:6
**men**
160:16 350:19
**menarche**
333:1,12
**menopause**
333:1,12
**menstruation**
183:23 184:3
**mention**
109:19 256:6
**mentioned**
49:23 51:5 104:8,9
105:16 252:23
345:24 362:4
**mentioning**
255:22 350:14
**merged**
58:17
**mesothelioma**
32:16 131:4 161:19
166:23 167:4
182:22
**mesotheliomas**
167:7,9
**met**
46:3 47:13 48:2,23
142:7

**meta-analyses**
61:15 125:13
215:22
**meta-analysis**
27:1,3 61:14 94:23
191:20 192:15
193:8 194:5 195:3
195:9 215:13,18
215:20 216:5
242:19,20 243:7
256:4 257:9
268:14,20
**metal**
77:18 169:13 172:2
173:23 180:10
**metals**
114:23 169:6,18
170:12 174:2
175:8,19 176:1,6
177:8,13,18,21
180:3 181:1,1
299:19,24 300:21
**metastasis**
212:23
**method**
143:17
**methodology**
40:10 214:2 215:4
215:6,10 239:19
244:19,24 251:4
254:5 264:15
294:24 295:14
330:6
**Michael**
1:17 2:13 8:24
10:22 48:17
164:15 364:2,18
**michael.zellers@...**
2:14
**microenvironment**
171:18 300:1
**microphone**
284:2
**microscopist**
61:3
**microscopy**
162:1

**mid**
39:13
**middle**
38:18 165:24
**midst**
221:7
**migrate**
182:10 183:13
302:18
**migrates**
85:13 198:9 206:10
**migrating**
206:5
**migration**
82:3 83:5 88:10
125:22 181:15
186:23 187:5
190:15,24 194:15
197:15 203:7
204:14,15 205:6
206:5,21 337:24
338:1 362:3
**Mike**
9:16 86:20
**milieu**
279:11 362:18
**Miller**
1:17 9:16 364:2,18
**milling**
155:9 156:4,9,14
156:18,20,24
**mind**
81:11 165:9 192:6
281:14 296:22
351:23 358:21
**mindful**
265:12
**mine**
218:3 346:8
**mineral**
114:22 115:5,10
132:21 138:23
180:11 345:21
**mineralogist**
61:3
**minerals**
64:16,20 344:19,23

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 119 of 1035
PageID: 241298
Arch I. "Chip"  Carson, M.D., Ph.D.

Page 393

345:22
**mines**
155:17 156:4,9
**minimis**
325:8
**minimum**
309:9
**mining**
41:21 77:19 155:10
156:4,8,14,17,20
156:24
**minor**
103:6
**minute**
164:1 292:15
315:23 320:8
335:9
**minutes**
235:12 335:17
**misclassification**
161:23 166:16
241:13
**misclassified**
167:8
**misleading**
77:24
**missed**
271:11
**missing**
291:15
**misspoke**
258:4 361:23
**misstates**
19:20 65:24 128:23
239:2 296:1
332:19
**MO**
3:14
**mode**
272:23
**Model**
282:20
**modeled**
340:5
**modeling**
232:8 340:13
341:13

**models**
232:5 272:18
277:18 293:15
**modest**
233:2,19
**modified**
16:20,22 28:24
**Mohamed**
27:5
**molecular**
334:16
**moment**
16:2 56:6,6 68:13
113:15 116:4
155:3 183:16
234:18 280:6
281:14,16 282:4
290:17 291:13
315:1
**Monferrato**
146:11
**monograph**
6:18 176:14 178:10
203:13,21 204:21
205:11 289:12,17
289:24 291:12,16
291:18,22 292:13
294:10 295:17
**monographs**
28:7 178:11
**Montgomery**
2:5
**month**
309:9 324:13
350:11 351:2
**months**
23:19 45:6 261:13
261:14
**morning**
284:12
**Morristown**
3:9
**motile**
303:14
**motility**
303:19,23
**motion**

334:15
**Mount**
3:8
**mounts**
111:2 233:14
**move**
121:15 140:17
162:8 176:18
192:5 205:14
236:8 241:21
324:12 334:17,17
359:14
**moved**
227:5 324:2
**movement**
362:19
**moving**
323:21 362:5
**multiple**
68:2 119:19 214:19
**multiply**
299:16
**multiplying**
212:14 310:16
**mutagenic**
313:17
**mutagenicity**
319:8
**mutation**
120:13 312:16
313:22 318:18
**mutations**
314:17 333:5

---

### N

**N**
2:1 3:1
**N.W**
3:18
**Nadler**
282:18
**name**
8:4 9:23 88:18
123:16 284:10
343:21
**named**
36:22

**names**
342:3
**narrow**
359:22
**national**
90:21,23 91:6,7,12
91:18 93:7,14
95:10,18 178:24
234:21
**natural**
170:1 280:4 312:20
**naturally**
170:3
**nature**
140:16 305:4 317:5
**NCI**
92:23 94:6,21
**NCI's**
94:8
**NCRA**
364:19,20
**necessarily**
93:16 135:9 171:3
172:19 173:2,9
213:16 218:3
239:3 254:18
255:20 361:17
362:14
**necessary**
19:11 20:4 78:18
79:2 173:12,16,17
231:13 349:21
365:4
**need**
29:21 41:14 45:17
54:5 57:24 58:1
93:1 99:21 113:4
163:24 164:8,14
173:5 192:9
213:21 234:1
241:1 253:5 258:1
265:12 282:3
291:11 292:14
295:11 309:11
314:23 316:2
325:23 326:1,1,5
333:23

**needed**
249:6
**needs**
98:1 164:19 308:11
**negative**
72:20 187:14
245:18 316:8
**neither**
364:13,14
**Ness**
79:23,24 80:8
117:9,10,12 127:1
136:14 335:7,16
**Ness'**
117:3
**never**
60:14 62:8,17,21
63:6,12 64:9,12
64:20 80:8 111:21
118:15,18 138:4
182:8 216:5
308:16 326:13,18
333:1,11
**new**
1:1 2:10 3:9 17:12
25:5,10 119:15
220:10,11 266:24
267:13,16 306:3,8
307:16
**nice**
263:23 325:11,17
**Nicholson**
70:6 129:20
**nickel**
169:7,12,24 171:8
172:1 173:23
180:8,19
**night**
29:20 33:7
**nine**
143:15 297:5
**NIOSH**
76:16
**non-coffee**
265:22
**nonfibrous**
313:16

Arch I. "Chip"  Carson, M.D., Ph.D.

Page 394

**Nonmetallic**
77:19
**nonobese**
331:5
**nonoccupational**
161:13 162:11
  163:14
**nonresponsive**
121:16 140:18
  205:15 234:2
  236:8 241:22
  359:15
**nonsignificant**
261:22
**nonthreshold**
324:22
**nonusers**
170:13
**normal**
122:11 313:12
  316:15 317:9,15
  332:14
**normally**
281:2
**Notary**
1:21 364:4,21
  367:20
**noted**
222:13,15 283:20
  365:11 367:7
**notes**
4:13 42:1 43:17
  92:16 124:20,21
  124:22 125:14
  126:18,19 183:19
  222:19 255:7
  281:23 337:6,10
  337:14 368:1
**notice**
5:4 10:15 11:1
  12:10,19 13:10
  14:6 15:1 23:24
**notion**
296:6 308:4
**November**
65:22 89:12 227:5
**Ns**

283:3
**NSAID**
131:12 132:5
**NSAIDs**
131:19
**nucleotide**
314:14
**number**
5:3 7:2 45:6,13
  46:6 49:10 57:5
  71:18 86:16 90:16
  93:9 95:14 111:24
  114:13 124:20
  125:5,17 146:14
  147:23 155:5
  159:5,9 160:15,15
  183:5 191:14
  208:22 212:16
  215:21 217:9
  220:20 221:17
  223:13 224:11
  227:3 228:4
  233:19 245:18
  250:16 251:23
  255:16 258:21
  259:4 273:4
  278:11 279:22
  280:1 305:14
  306:3,5 307:16,22
  309:9 314:11
  326:23 328:10,12
  328:13 331:14
  342:6 354:12
  357:13
**numbered**
21:22,22
**numbers**
71:20 194:13
  241:16 331:6,9
  332:6
**Numerous**
286:2
**Nurses'**
237:15,18 258:5
**Nursing**
59:5
**nuts**

67:24

**O**

**O'Dell**
2:2 8:17,17 10:22
  11:22 13:3,9
  14:20 15:5 17:20
  18:22 19:19 20:9
  20:12 21:17 25:2
  37:15 38:6 46:10
  46:13 53:9 54:1,7
  55:13 59:2 60:22
  62:11 63:8,23
  65:23 67:9,17
  70:15 71:17 73:10
  73:22,23 74:2,6
  74:14 75:12 78:1
  78:12,22 80:15
  81:12,22 82:17
  84:1,20 85:14
  86:14,20 87:5,12
  88:5,22 91:23
  92:3,5,11,17
  94:11 95:3 97:8
  98:3 99:8 106:16
  107:14 108:10
  109:16 110:14
  111:16 112:22
  113:2,3 114:6
  116:19 119:5
  120:8,20 123:10
  127:14 128:6,18
  128:22 130:6
  131:24 133:6
  136:7 137:21
  139:22 140:23
  141:23 143:10
  144:1,22 147:4,17
  148:23 149:22
  150:6 151:3,14
  152:5 153:1,14
  154:3 155:11,19
  157:1,8 158:12,21
  159:6,23 161:5
  162:14 163:24
  164:5,15 165:4,9
  167:16,24 168:3

168:17 170:14,23
  171:9 172:7,17
  173:4 174:7,14
  175:9,16 176:17
  176:21 178:4
  179:4,23 181:8
  182:3 184:21
  185:10 186:12
  188:10 189:14
  193:10 194:21
  195:5 196:2 197:3
  197:20 198:15
  199:16 200:2
  201:9 202:8 203:9
  203:19 204:17
  207:4,10,14
  209:10,18 210:14
  212:2 214:9
  216:12 218:9
  219:16 220:24
  222:8,22 223:15
  223:24 224:22
  226:9 228:1,14
  229:6,14 231:20
  232:18 233:3,10
  234:9,16 235:6
  236:2,11,20
  237:10 238:1
  239:1 240:15
  242:4,10 243:4,14
  243:17 244:8
  246:11 248:2
  249:2 250:9,19
  252:6 254:8
  257:18 258:1,13
  259:9 260:23
  261:19 263:3,21
  264:9 267:3,18
  268:22 269:23
  270:5 275:22
  276:8,16 277:9
  278:23 282:3
  284:23 285:14
  288:10 289:11,14
  289:19 290:12
  291:9,17 292:14
  293:19 294:3,13

295:6,24 296:13
  296:22 297:22
  299:6 300:8
  301:18 302:20
  303:5 304:16
  305:1 307:14
  309:14 310:6
  313:23 314:23
  315:9,22 316:10
  317:7,17,23 318:8
  318:19 319:13,23
  320:16,22 322:18
  324:4,14,24 325:9
  326:20 329:12
  330:10 332:18
  340:18 341:18
  343:3,9,12 345:18
  348:21 351:19
  352:15 353:6,19
  354:19 355:8,17
  355:21 356:7
  360:6 361:15
  363:5,13
**O.M**
76:16
**o0o--**
7:9 363:23
**oath**
24:19 122:20
  152:14 173:15
**OB/GYN**
207:20
**obese**
331:4
**obesity**
267:20 330:22
  332:15
**object**
11:22 17:20 19:19
  37:15 38:6 53:9
  54:1,5 55:13
  60:22 62:11 63:8
  63:23 65:23 70:15
  73:10 75:12 78:1
  78:12,22 80:15
  81:12 82:17 84:1
  84:20 85:14 86:14

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 121 of 1035
PageID: 241300
Arch I. "Chip"   Carson, M.D., Ph.D.

Page 395

88:5 92:17 94:11
95:3 97:8 98:3
107:14 108:10
109:16 111:16
114:6 116:19
119:5 120:8,20
123:10 127:14
128:6,18,23
131:24 133:6
136:7 139:22
140:23 141:23
144:1 147:4 151:3
153:1,14 154:3
155:11,19 157:8
158:12,21 159:6
161:5 162:14
167:24 168:3
170:14,23 172:7
172:17 174:14
175:9,16 179:4
181:8 182:3
184:21 185:10
186:12 188:10
189:14 193:10
194:21 195:5
197:3,20 199:16
200:2 201:9 202:8
203:9,19 204:17
207:4 209:10,18
210:14 212:2
214:9 216:12
218:9 219:16
220:24 222:8
223:15,24 224:22
226:9 228:1 229:6
231:20 232:18
233:3,10 234:2,16
235:6 236:2,3,7
236:20 237:10
238:1 239:1
240:15 242:4
244:8 246:11
248:2 249:2 250:9
250:19 252:6
254:8 257:18
258:13 259:9
260:23 261:19

263:3,21 264:9
267:3,18 268:22
269:23 270:5
275:22 276:8,16
277:9 278:23
284:23 285:14
288:10 290:12
294:13,14 296:13
297:22 299:6
300:8 301:18
303:5 304:16
307:14 309:14
310:6 313:23
315:18 316:10
317:7,23 318:8,19
319:13,23 320:16
320:22 322:18
324:14,24 325:9
326:20 330:10
340:18 341:18
345:18 351:19
352:15
**objection**
18:22 25:2 59:2
87:12 88:22
106:16 110:14
137:21 143:10
144:22 147:17
148:23 151:14
152:5 157:1
167:16 168:17
171:9,15 174:7
179:23 198:15
228:14 229:14
234:9 242:10
291:9 293:19
294:3 295:24
302:20 305:1
317:17 324:4,5
332:18,19 348:21
353:6,19 354:19
355:8,17,21 356:7
360:6 361:15
**objections**
10:24 164:24 165:2
**observational**
266:9,12,15

**observed**
156:22 187:12
213:15 283:12
**Obstetrics**
32:15
**obtain**
101:3
**obtained**
101:5 245:16
**obvious**
110:22
**obviously**
303:22
**occasions**
11:7 55:5 56:11
**occupation**
229:19
**occupational**
55:15,18 57:7,10
60:7 79:22 80:18
146:19 160:18
161:1,15 163:7
166:14 168:15
229:12 297:20
298:5,9
**occur**
103:6 162:4 301:11
306:6
**occurred**
149:21 194:7 274:7
312:16
**occurrence**
17:3 111:1 119:21
121:11 126:23
136:16 230:12
331:1
**occurrences**
312:20
**occurring**
171:19
**occurs**
199:1 292:12
308:15
**October**
36:19 37:13,18
38:18 39:5,13
40:6,6,8 59:14

64:7 65:21 66:1
142:15
**odds**
126:9 232:14 233:1
245:13 255:9
259:1 261:22
263:7,9,12 269:2
272:22 276:20
277:22 278:5
310:21 331:24
332:4 333:9,14,17
**offer**
16:5 22:21 336:10
**offered**
171:12
**offhand**
333:13
**office**
335:21,22
**official**
70:2
**offset**
358:4
**offsets**
299:14
**Oh**
66:9 180:21 192:7
197:12
**Ohio**
76:17
**Okada**
127:3 287:5,8,10
287:22
**okay**
17:23 20:12 25:22
39:9 44:5 63:4
65:3 74:5 92:3
100:23 113:3
123:18 124:15
130:15 138:15
149:9 150:11
165:14 192:4,21
197:10 207:14
247:10 258:2
259:17 270:24
282:15 285:18
286:16,21 287:22

291:15,20,21,22
295:3,16 296:5
297:1 299:11
300:20 305:23
307:19 309:21
316:4 320:14
323:2 332:12,15
332:22 335:19
338:8 342:2 343:1
343:12,16 344:6
360:14 361:20
362:2 363:1,5
**old**
42:1
**older**
29:4
**once**
72:2 339:11 362:16
**oncologist**
60:19
**oncologists**
208:17 338:12
**oncology**
338:9
**one-half**
60:6
**ones**
68:3 75:17 102:5
109:21 206:1
258:16 342:16,16
**ongoing**
198:24
**open**
206:23,24
**operate**
278:13
**operates**
97:22
**operating**
134:19
**operative**
69:19
**opine**
23:7 120:18 137:24
**opined**
150:24
**opining**

Case 3:16-md-02738-MAS-RLS   Document 33123-4   Filed 08/22/24   Page 122 of 1035
PageID: 241301
Arch I. "Chip"  Carson, M.D., Ph.D.

Page 396

82:14 108:3
122:20
**opinion**
43:4 74:20 81:18
81:24 82:5,7,9,10
83:1,10,14,15,16
84:15 86:7 88:12
92:23 107:21
114:12 115:15
116:6,9 123:2
141:3 144:6
148:13 156:4
169:10 171:17
181:5,12 206:14
208:7 210:5,12
211:7,10 259:20
301:24 302:3,8,10
303:12 305:16
308:10 310:9
311:10,24 346:18
352:12 353:3,7,10
353:20 354:24
355:10 356:3,5,15
357:9 359:22
360:4 361:12
**opinions**
16:5,8,9,12,13,20
16:23,24 17:6,9
17:13,17 18:9,20
19:9,21 20:23
22:21 34:10 38:12
39:22 41:13 43:13
44:17,17,21 45:15
46:4 54:15,19
57:5 63:19 64:1
70:19 71:10 79:1
79:5,12 80:14,23
81:2,3,4,7,16
82:22 84:24 85:22
89:14 95:8 117:18
123:3 139:3,15
156:8 196:6 215:9
217:8,11,15,18,21
217:24 218:2
219:6 235:16,21
236:19,22 271:17
285:9,10 349:2,11

349:13 350:23
353:15,24
**opportunity**
16:11 352:5
**Oppose**
236:11
**opposed**
308:16 344:23
**opposite**
335:22
**oranges**
254:19,19
**order**
76:21 92:24 98:2
100:13 173:10
213:11 241:17
250:23 256:21
307:3,6 334:5
346:13
**organization**
93:20
**organizations**
93:6,11,24 94:7
279:24
**organs**
198:21
**original**
193:6 316:3 365:15
**Orleans**
2:10
**ounce**
100:7
**outliers**
245:21
**outline**
285:20
**outlined**
105:7 215:11
**outset**
84:23
**outside**
48:14 97:5 104:22
304:13
**ovarian**
17:3,8 23:5 27:4
30:4 32:1,16 38:4
38:20 41:2,12,15

41:24 53:8,23
55:9 62:10,18
63:1 66:13 84:17
85:3,6 89:23 90:8
90:13,18 91:14,22
95:12 106:3,11,14
106:15,19 107:5
108:5 109:4 111:1
111:15 112:3
113:23 116:8
119:22 120:6,13
120:19,23 121:22
121:24 122:8,18
122:22 123:8,14
125:1 126:1,16,24
127:7,13 128:2,13
131:14,18,22
132:7,12 133:12
135:21 136:5,16
136:24 138:7,8,13
139:8,11 140:3
145:9,12 152:12
152:16,19 153:10
153:12,17,21
154:1,13,17,23
155:1,6 158:19
159:4,10 160:5
161:19 162:12
163:8,14 166:14
167:8,22 168:6,8
191:2,16 192:23
194:18 196:11
197:17 210:8
211:4,5 216:10
220:6,7 221:21,24
223:8 224:13,15
224:17 230:12,23
231:3 234:7 235:4
235:18,20 237:1,9
237:24 238:8,16
244:4 245:4 246:4
246:10 247:23
248:10,24 249:8
249:17 250:7
252:4 255:4
256:22 260:21
267:1,9,17 268:5

268:19 269:19,21
270:18 272:24
273:5,9,13,21,24
274:7,14,20 275:4
275:10,19 276:4,6
277:7 279:17
280:8,13,22 281:7
281:22 282:14
284:20 288:23
289:2 292:4 296:8
306:3,5,8 307:7
307:12 308:12
309:13 310:4
313:12 314:6
315:20 316:16
326:14,17 330:3,9
330:23 331:1,4,11
331:18 332:23
333:20 338:14,21
344:11 349:24
350:3,5 351:12
352:21,22 353:5
354:11 355:3,7
**ovaries**
82:2,16 83:4,8,17
84:5 85:13 116:5
116:7,11 154:8
169:19,23 177:14
181:14 182:1,10
182:14 183:14
184:12 191:2
198:10 200:17
201:1 206:6,10,14
206:17 208:8
209:2,6,17,23
278:22 279:5
283:12 321:23
362:7
**ovary**
300:22 319:21
323:2,6,8,11
324:7 337:18,23
338:1 339:5,11,14
**overall**
110:20 217:11
230:24 292:2
**overarching**

293:11 295:14
**oversees**
219:14
**oversight**
70:4 95:19
**oversimplification**
214:12
**Overstreet**
3:23 8:5
**overwhelmed**
313:1,6
**oxidative**
134:21,24 135:5,7
135:12,15,19,23
136:2,4,15,19,22
137:15,17,20,24
138:6 198:24
199:7 200:10
**oxygen**
199:6
**oxytocin**
186:8 188:17

---

**P**

**P**
2:1,1,2 3:1,1
**P-346**
7:7 28:14 293:5
**p.m**
177:2,3 253:9,10
363:9,10,22
**page**
5:3 7:2 17:24 18:18
18:19 21:24 24:23
30:24 67:8,20
69:4,6,8,16 77:8,9
81:8,16,19 99:6
99:17 106:21
108:15 112:16
113:9 114:13,16
115:23 124:24
125:8,16,17,20,21
126:7,8 130:13
148:11,16 160:9
163:10,19 164:2
183:2 196:16
197:5 220:16

Arch I. "Chip"  Carson, M.D., Ph.D.

243:15,24 248:1
248:17 249:13
256:19,20 260:17
272:6,21 283:1,3
285:24 289:11,18
289:21,24 291:13
294:5 297:3,4
301:1 305:13
366:2 368:3
**pages**
21:23 68:9 71:5
124:21 193:16
210:12 367:5
**paid**
224:4,8
**pancreatic**
265:11,24
**paper**
27:6 84:12 89:17
95:6 100:16,17,19
101:15,21 104:3,6
104:10,16,19
105:22,23 106:1
106:22 108:8
111:11 112:7,11
112:13 113:2,21
114:11 117:20,21
126:21 127:2,4,4
127:18 129:22,24
136:11,14 155:3
159:16 160:2
161:6 162:17,20
162:21 163:1
164:8,19,20
165:18 245:23
246:23,23 247:13
249:21 259:13
280:10 282:19
314:24 315:10
316:3 320:7 335:7
335:8 336:11
338:2 339:7,13
361:24 362:1
**papers**
70:22 71:3 76:9
111:13 127:10,24
128:17 136:15

337:24
**paragraph**
163:11,21 166:4,5
244:1,2 248:14
272:7 286:1 288:4
297:5 301:3 321:6
321:9
**parallel**
245:1
**Pardon**
68:13
**Parmley**
5:19 32:17
**parsing**
133:9
**part**
12:15 27:17 31:15
38:23 41:10 46:3
49:4 52:23 82:22
86:3 90:9 103:5
104:13,23 105:16
105:22 123:3
126:11 144:10
149:14 157:19
173:13 174:21
180:12 195:9,16
215:10 219:1
223:22 228:18
231:24 279:11
291:4,16 314:19
318:2 319:1
336:15 341:10,13
345:10 347:6
358:18
**parted**
39:19
**participants'**
272:2
**participated**
207:21 350:7
**particle**
303:1 334:11 339:4
339:9,10
**particles**
182:14 184:5,12
185:22 186:11,23
187:22 188:2,7,23

189:3 190:4,9,10
209:16 283:11
303:16 334:15,20
355:16 356:16
357:10 361:7
362:5,9,16
**particular**
44:2 77:23 151:17
211:19 241:14
280:17 282:7
295:17 299:24
337:22 345:12
349:5 351:18
357:18 361:6
**particularly**
83:17 91:3 141:5
160:17 241:6
**particulate**
187:19 209:7 303:8
304:19,22 321:10
**parties**
364:14
**parts**
209:8 336:7
**party**
364:11
**pass**
284:2,3
**passed**
101:7 357:18
**passes**
303:20
**passing**
335:24
**pat**
69:17,18 336:13
**path**
182:18 329:1
**pathological**
62:9
**pathologist**
62:6 162:3
**pathway**
191:1,5 206:21,22
**patient**
171:14 328:18,20
329:3,18 330:3

350:10
**patients**
60:5 130:22 134:13
184:15 185:1
190:19 239:23,24
240:1 327:14,21
327:24 328:6,7,8
328:11,13,17
349:24 350:5,8,17
350:21 351:5,15
352:1
**pattern**
238:5 308:22
**pause**
271:6 315:22
**pay**
105:2
**PC**
2:2
**Pecan**
3:3
**peel**
359:11
**peer**
102:15,19,21
320:13,15,21
321:4
**peer-review**
103:5,16 105:9
**peer-reviewed**
27:21 95:11 103:10
**pelvic**
83:12 122:17,21
123:8 126:15
127:12,18 128:1
128:12 207:1,21
327:9,15
**Penninkilampi**
256:4,6 257:8
**Pennsylvania**
2:21
**people**
44:10,15 49:11
199:20 212:16
221:3 240:2
250:24 328:2
336:4 337:13

350:12 357:20
358:3,8,9 359:1
**perceived**
29:7
**percent**
56:2 274:13 275:10
275:19 306:24
308:5
**percentage**
55:22 60:3 75:20
76:3 273:12,23
274:23 302:4,9,14
307:10,11 327:21
331:23 341:15
362:22
**percentages**
303:3
**perfectly**
164:12,18
**perform**
42:13 241:8
**performed**
40:13 76:18 140:12
173:19 182:8
214:5,13 215:22
228:5
**performing**
252:17
**perineal**
17:2,7 27:4 82:1,12
83:3,10 91:21
107:4 109:3
110:24 111:14
117:6 140:2 147:2
152:18 168:14
181:13 183:1,13
187:6 189:9 198:9
200:16 201:5,24
210:7 211:3 214:6
230:10 235:3
247:22 248:10,23
249:16 250:6
283:13 284:18
306:16 311:12
319:22 338:20
**perineally**
166:22

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 124 of 1035
PageID: 241303
Arch I. "Chip"  Carson, M.D., Ph.D.

Page 398

**perineum**
183:7 206:22 231:5
232:4 296:11
301:9,16 302:1,5
305:9 321:11
334:12,21 339:19
340:17 341:9,17
341:22
**period**
23:14,15,17 40:21
44:24 96:1 145:15
168:7 261:9 262:9
277:17 279:17
280:7,14,18,21
281:7,22 282:14
311:6,23 342:11
351:3
**periodic**
23:12
**periodically**
309:23
**periods**
261:3 263:20 280:1
280:12,24 281:3
310:12,13
**peritoneal**
161:18
**Perkison**
79:21
**person**
308:19
**person-years**
212:6,10,17 310:15
**personal**
3:20 9:10 57:6
151:5 156:2,17
196:23 257:3
280:20 284:19
335:12 343:23
345:5,13
**personally**
156:19
**persons**
146:15 149:6
182:15
**Perspectives**
31:13

**pertaining**
182:9
**pertinence**
78:7
**pertinent**
42:5,16 43:4 68:4
70:17 76:22
167:10 186:22
214:18
**petition**
219:12
**petitions**
30:22 221:16
**petri**
300:7
**Ph.D**
1:14 4:5 5:1 9:18
28:1 59:21 364:5
367:4,12
**Pharmaceutical**
31:11
**pharmacologists**
220:22
**Philadelphia**
2:21
**phone**
37:23
**phrase**
82:5,8
**phrasing**
83:13
**physical**
13:17
**physician**
10:2 55:16 79:22
**physicians**
207:23 208:4
213:20 220:21
**physiology**
84:4
**picked**
259:23
**pickled**
229:10 357:11,19
360:1,2,5,9,11
**piece**
51:4 87:15 119:23

149:17 282:7
**piecemeal**
40:20
**pieces**
18:11 42:23
**Pier**
70:8,9 148:12,18
149:11 150:1,10
151:17 158:2
**Pier-47**
7:5 148:18 149:11
150:2,9,19 151:10
152:2 158:2,7
**pipe**
145:21
**Pitocin**
188:14
**Pittsburgh**
117:11
**place**
97:18 315:18 364:8
**placed**
227:8 314:5
**places**
162:5 254:16
**placing**
245:1
**plain**
211:21
**plaintiff**
28:14 46:2,21,24
50:21 51:24 57:14
72:14 75:11
171:24
**plaintiffs**
2:11 8:18,21,23
10:12 15:5 23:1
35:7 44:9 47:14
49:9 53:15 57:12
78:20 80:6,9
96:13 117:24
118:13,21 142:24
178:2 224:5
**plaintiffs'**
2:6 13:1 20:3 24:6
25:11,15,17,20
26:17 27:10 30:10

32:3 33:5 34:16
34:19,24 35:19,24
36:5 38:14 39:3
39:16 45:20 47:5
49:14 51:1 53:17
65:20 71:13 72:5
75:18 101:7,10,15
102:13 103:22
104:14,24 105:12
105:18,23 108:22
141:22 148:22
285:12 346:2,5
347:12 361:21
**plans**
85:9 352:2
**plant**
146:12
**plasters**
146:1
**platy**
137:10
**plausibility**
230:1,10
**play**
303:22
**players**
233:15
**please**
8:15 9:24 30:12
53:12 73:24 87:7
98:19 105:15
113:15 119:10
164:5,9 165:10
243:18 301:2
343:15 365:3,8
**pleurodesis**
129:5,7,13 130:9
130:23
**PLLC**
3:2
**plugged**
280:16
**pocket**
123:24
**point**
38:1 40:3 42:11
49:19 86:23 107:1

136:12,13 142:11
147:13 148:5
187:24 190:2
194:10 202:11
209:21 223:2
233:14 236:6
289:3 292:3
295:17 311:10
313:9 326:7 331:2
340:13 344:3
346:8 352:9
**pointing**
112:23 294:15
**poison**
311:1,18
**policies**
91:8
**polite**
74:10
**polycyclic**
358:14
**polymorphisms**
314:14
**pooled**
166:6 192:18,21
**population**
258:19 265:14
308:15 309:6,7
332:1 334:2
**population-based**
239:17 240:13
244:21
**populations**
166:17 254:16
**portion**
347:17,19
**portions**
221:8 336:23
**pos-**
187:1
**posed**
351:17
**poses**
214:7
**position**
30:3 69:21,22 90:7
94:21 185:24

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 125 of 1035
PageID: 241304
Arch I. "Chip"  Carson, M.D., Ph.D.

Page 399

186:22 187:3
188:22 204:14,20
205:6 206:4,10
234:15,20,23
246:24 338:11,17
338:19
**positions**
30:22 93:21 191:23
205:19
**positive**
72:9,13 107:3
109:8,20,21 110:7
110:23 145:18
154:20,24 166:11
191:14 210:6
221:23 223:5,7
245:3,9,13,18,20
261:22 263:8
316:8 354:14
**positives**
187:12
**possession**
12:18
**possibilities**
328:23
**possibility**
244:23 262:7
278:17 312:4
**possible**
90:15 111:22
178:21 179:14
187:11 189:2
241:24 242:9,12
243:11 244:14
262:3 265:20
266:8,13 267:17
268:7 272:14
288:7,15 355:19
356:4,6,17
**possibly**
16:9 225:8 229:3
249:19 266:24
267:9 303:18
**posterior**
301:23
**potential**
37:5 97:19 134:10

136:24 158:18
159:3 161:22
170:20 171:21
172:22 180:4
241:9 268:9,21
276:14 277:14
294:1 326:9 356:9
**potentially**
77:24 221:20
233:22 360:8
**pound**
100:7
**powder**
1:4 8:11 17:3,8
22:2,4 23:4,11
30:4 32:1 38:4,18
48:20 52:4,8,13
53:8,23 55:1,8,9
62:23 63:20 64:2
64:10,13 65:5,8
66:13 72:18 73:1
73:7,8,17 81:19
82:1,13,15 83:3,7
83:10,18 84:17
85:2,6 87:16 90:8
90:13 91:13 107:4
107:13 108:5
110:24 114:17,22
115:24 132:11
133:3,19 139:8,10
139:12,16,20
140:21 141:4,5,12
141:16,20 143:5,7
143:9,24 144:8,16
144:16,20 147:3
147:11,14 148:6
148:13 151:11
152:3,18,23
157:14 158:10
175:8,15 176:7
177:9,22 178:3
181:13 182:1,23
184:14 192:22
193:19 194:6
198:8 199:4,12
200:1,16,18,23
201:4,16,18 202:1

202:6,18,21,24
206:5 210:8 211:3
211:6 216:9
219:11 220:6
230:11 231:4,7,11
231:19 232:2,9
257:3 260:22
262:10 270:18
272:2,14,24
274:22 275:6,11
275:20 288:6
296:8 298:7,24
299:5 302:4
305:22 306:16,22
307:1,8,12,23
308:2,6,12 309:11
309:19 310:3
311:9,12 313:11
325:13 326:12,18
340:6,16 341:8
350:10,13 351:8
351:11 352:9,14
352:20,24 353:10
353:16,21 354:2
354:10 355:2,6
357:22 358:23
359:5,23
**powdered**
134:17 189:22,23
305:3
**powders**
140:3,3,15 167:14
**power**
211:15,17,22 251:5
251:10,21 252:8
258:17
**practically**
245:20
**practice**
31:16 38:24 47:21
60:4 70:13 76:4
328:4 358:17
**practices**
1:5 41:21 76:1
100:15
**practicing**
335:1

**pre-2014**
276:20,24
**preamble**
28:7 293:4,8
294:16,21,23
295:12
**precautionary**
97:13,15,17 98:7
98:10,16 99:15,18
99:20 100:4,6
**precept**
97:21
**precision**
37:21
**predecessors**
147:20
**Pregnancy**
318:13
**pregnant**
333:2
**premenopausal**
255:10
**preparation**
19:8 43:22,24
108:17,20
**prepare**
24:4 42:10 43:19
**prepared**
17:9 24:4 50:6,9,12
126:13 346:23
347:10,11
**preparing**
18:14 65:11 284:17
**prescribed**
330:16
**presence**
49:17 72:10 134:24
138:16 169:6
184:12 265:5
319:1
**present**
142:21 169:16
170:6 175:21,24
244:4 266:11,14
357:14
**presentation**
324:7

**presentations**
345:12
**presented**
134:1 209:22
325:19
**presently**
85:10
**presumably**
331:17
**pretty**
31:18 43:5 68:7
85:19 168:8
206:23,24 217:3
297:12
**prevalence**
306:18
**preventative**
99:22
**prevented**
325:19
**prevention**
100:7 233:23
306:17
**preventive**
58:9
**prevents**
202:11
**previous**
48:4
**previously**
10:24 28:13 29:9
32:23 42:3 48:2
51:14 56:14
**primarily**
134:11 145:24
146:4 153:20
160:24 161:2
168:16 181:17
279:6 328:3
**primary**
93:15 182:24
205:20 206:1
210:23 360:7
**principle**
97:13,16,17,24
98:7 100:6 311:18
356:10

Arch I. "Chip"  Carson, M.D., Ph.D.

Page 400

principles
99:13
print
24:7
printed
320:9
prior
65:24 96:17 107:1
189:19,21 272:2
277:3,23 301:5
364:4
privileged
13:7
probable
178:21 179:14
226:21
probably
11:8 56:1,12 60:9
66:23 151:20
178:17 201:21
205:12 226:17
227:1,9 277:1
279:8 308:21
312:8 327:22
334:13 335:8
338:2 348:12
350:7,19 357:24
problem
312:15 345:3
problems
93:13 134:11
312:21
procedure
319:2 330:17
procedures
11:10 155:9,14
proceeded
214:20
proceeding
28:15 38:9
proceedings
4:3 8:1 10:9 363:21
process
28:11 43:18 95:19
102:17 103:5,9,16
105:9 120:10,12
122:11 171:18

173:20 198:24
214:13 241:2
311:22 312:10,23
313:1,15 314:20
340:3,13 341:12
341:13 357:18
362:3
processes
121:11 127:20
156:16
produce
154:1 216:2 321:13
362:16
produced
14:14 20:1 72:4
75:21 149:6
313:14
produces
82:13 114:18
115:24 116:6,10
292:4
product
22:4,6 69:24 72:11
77:23 132:18
151:9 152:3
296:10 306:1
350:22
production
133:12
products
1:4,5 3:20 9:11
22:2,2,5,7 23:4
49:17 57:16 60:15
73:20 75:16
140:13,21 141:5,6
141:13 143:5,7,9
144:8 146:1 147:3
147:11,15,22
148:7,13 151:11
151:13,21 152:4
184:20 214:7
219:11 284:19
343:24 344:23,24
345:2,5,13,17
350:10 353:16,21
354:2,10 355:2,6
Products'

155:9
profession
335:4
professional
1:18 19:23 42:4
55:24 58:16 61:11
138:1 364:2,19
professionals
220:23
professor
58:9 61:8
program
178:24 344:16
progress
147:23 300:11
progression
280:4 303:16
proliferation
115:2 139:1
promotion
116:13 120:13
313:18
propensity
212:23 304:18
proper
172:15
proportion
140:7 224:16
proposal
136:21 219:9
248:15
proposition
125:23 126:15
128:5 183:6 287:6
287:23
propositions
54:17
propounded
367:6
prospective
237:7
protection
179:1 314:19
protective
135:10
proved
97:20

proven
111:3
provide
57:5 59:16 72:15
79:11 84:5 219:10
provided
25:11,14,17,19
26:16 27:10 30:10
33:4 34:16,19
35:6,18,24 50:3
51:10 53:3 59:5
75:17 77:21 78:11
78:20 101:14
102:12 142:23
318:2 346:19
349:13
providing
56:15
proving
218:6
proximity
323:4 341:23
psoriasis
122:4
psychological
359:7
PTI
3:15,15 9:13,14
public
1:21 61:9 79:18
89:21 93:5,10,21
93:23,23 94:7
96:1 100:15 239:8
344:15,16 364:4
364:21 367:20
publication
5:9,11,12,14,18,20
6:5,6,7,9,10,13,15
6:16 51:3 63:18
77:3,15 91:16
94:9,14 96:18
101:14 102:3,14
102:19 103:19
106:23 123:7,17
136:3 138:5,11
213:5,8,9 214:18
321:1

publications
62:22 64:17,22
70:22 76:13,23
77:10 103:10
108:6 135:19
142:1 213:12
337:18
publicity
272:1
publish
76:9
published
31:12 51:14 61:13
61:16 63:6 64:9
64:12 71:3 85:5
85:17 86:17 92:24
100:18 103:1
107:1 117:2
119:10 146:8
185:5 204:20
206:4 208:19
214:3 216:1,5
260:13 267:2
281:3
pull
192:9 295:4 314:24
315:23
pulled
289:18
pulling
123:24 349:20
Pulmonary
77:11,16
pulmonologist
62:1 79:21
pure
353:5,9,12,17
purport
190:14
purpose
28:8 33:14,20
95:15
purposes
283:9 349:4
pursuant
364:10
purview

Arch I. "Chip"  Carson, M.D., Ph.D.

13:6
**pushes**
334:11
**put**
78:10 124:1 207:18
230:6
**putative**
28:12
**putting**
346:15

**Q**

**qualifications**
142:9,10
**qualified**
17:16 156:11
**qualifier**
309:16
**qualifying**
294:19
**qualitative**
173:8
**quality**
40:14 69:23 70:5
70:11 157:24
228:5
**quantified**
206:16 340:9
**quantify**
143:22 231:23
339:18 340:15
341:7
**quantities**
73:19 74:21 75:1
169:15 321:13
**quantity**
201:21 232:2,9
257:2 354:4
**question**
11:13,18 12:3,6
17:2 18:10 20:2
22:18,21,24 23:3
32:4 38:2 39:16
40:10,12 53:11,18
62:14 65:16 68:6
81:15 86:2 87:24
92:2,12,13,14,15

92:18,21 107:17
110:10 112:9
113:14,19 115:14
116:22 124:10
127:23 128:9
135:17,24 148:4
153:8 156:11
158:24 165:5,8,10
165:13 171:13
172:4 180:15
206:15 214:15
215:2 216:3
263:16 285:4,4
290:24 292:7,9
293:7 294:17,19
296:18 298:21
300:18 304:11
307:2,5 312:22
316:7,21 317:13
321:18 338:13
344:4 347:9 349:1
349:15,18 351:1
351:17 352:2
358:21,23 359:21
360:3 362:2
**questioning**
33:23
**questions**
15:6 23:7 33:9,17
34:3 85:24 87:3
112:6 113:1 150:3
156:6 159:13
162:24 164:21
168:24 181:22
195:14 218:18
245:1 256:16
278:7 283:24
285:23 301:5
315:7 343:7 363:4
363:14 367:6
**quickly**
282:9 303:2
**quite**
56:5 90:15 213:3
252:16 264:1
329:19
**quotation**

245:8
**quote**
91:24

**R**

**R**
2:1 3:1
**radar**
204:3
**radioactive**
183:17 187:19
189:5
**radionuclides**
189:3
**ran**
29:20 33:6 36:2
336:1
**randomly**
193:23
**range**
309:23 333:14
**ranging**
276:22
**rapid**
122:12 132:19
304:19
**rapidity**
302:19
**rapidly**
278:21 279:4,10
**rappel@seyfarth...**
3:18
**rate**
45:10 297:19
303:18,20 306:11
**rates**
121:14 167:3,22
168:6
**ratio**
137:8 232:14 233:1
245:13 261:22
263:7,9,12 269:3
272:22 276:21
277:23 278:5
331:24
**rationale**
136:21

**ratios**
126:9 255:10 259:2
310:21 332:4
333:9,14,17
**RDR**
364:18
**reach**
79:5 116:5 173:10
177:14,19 182:1
201:1 206:17
215:14 263:8
319:21
**reached**
141:11 182:14
311:11
**reaches**
169:18,23 177:16
177:18 206:13
362:6
**reaching**
215:8
**reactant**
318:11
**reaction**
287:1,19 317:1,19
317:20 322:22
**reactions**
119:21 121:6
312:21
**reactive**
199:6
**read**
44:15 100:1,24
107:9 112:13
127:17 130:16
154:16 166:19,20
222:2,3 250:3
252:24 267:8,11
290:15,19 297:12
297:16 336:6
337:19 365:3
367:4
**reading**
91:23 92:7,15,16
134:6 162:16
193:17 196:19
222:23 243:15

244:1 248:7
272:11 314:3
342:18 348:5,14
**reads**
286:1
**ready**
113:13,19 321:12
**real**
270:4,8
**really**
105:2 115:13 143:6
186:22 295:12
309:1 312:11
317:14 336:12
349:15
**realtime**
1:21 296:23 364:3
364:20
**reason**
94:1 132:17 133:22
133:23 134:8
241:20 245:4
286:13 300:4
302:17,21 351:22
365:5 366:4,6,8
366:10,12,14,16
366:18,20,22,24
**reasonable**
227:24 228:12
330:18
**reasonably**
39:11
**reasoning**
216:16
**reasons**
93:10 160:12
238:21
**reassert**
10:23
**Reath**
2:19 9:3
**recall**
14:6 29:12 31:22
37:10 47:22 48:3
69:12,14 70:7,24
79:13 90:10
101:16 105:7

Arch I. "Chip"  Carson, M.D., Ph.D.

142:11 187:16
240:23 241:7,24
244:20,23,24
269:7,8,13,18
270:3 272:2,15
276:11,14 277:14
280:6 286:19
301:13 338:3
340:22 341:14
**recalled**
271:21 274:21
275:6
**recalling**
281:5
**receipt**
365:16
**receive**
10:15 43:24 346:6
**received**
10:20 59:21 143:16
**Recess**
89:5 177:2 253:9
363:9
**recessed**
363:21
**recited**
146:18
**recognize**
225:18 357:1
**recognized**
208:12 213:13,17
233:15 267:21
**recommendation**
143:14
**reconsider**
203:14 204:1
**record**
8:4,16 10:23 14:16
89:4,8 177:1,5
247:16 253:5,8,12
363:8,12,19
**recorded**
314:9
**recording**
232:6 321:16
**records**
76:21 149:8,12,20

**recruit**
239:20
**rectal**
198:12 199:13,23
200:11 202:24
**redline**
337:2
**redo**
43:2
**redox**
181:3
**reduce**
131:21,22 147:21
**reduced**
191:6,7 194:13
196:13
**reduces**
132:11 240:22
**reducing**
306:14
**reduction**
132:6 193:24
194:17
**refer**
21:24 22:1 23:11
29:21 33:16,22
81:10 115:17
187:18 190:13
192:8 211:14
235:2 258:5
**reference**
20:19 24:22 35:15
35:17 51:18
210:11 296:6
**referenced**
7:1 143:12 158:5
216:19,24 217:3
280:11 296:10
347:5
**references**
15:11,14 17:24
18:3,7,17 19:3,17
20:5,15 24:11,15
29:9 32:24 33:11
35:22 52:17
**referral**
328:3

**referred**
24:21 102:3 151:24
184:8 192:15
210:12 270:13
328:1,6 330:2
**referring**
22:3 110:16 121:13
158:4 205:23
211:16 287:17
305:21 321:21,24
**refers**
211:17 228:4
**refine**
43:1
**refresh**
71:22 126:19 164:1
183:15
**refute**
54:19 245:11
**refuted**
54:10,16 217:22,24
218:4
**refuting**
328:24
**regard**
290:7 291:6 293:14
299:19 304:13
318:16
**regarding**
18:9 22:18 36:17
37:6 41:18,23
55:17 63:19 64:21
65:4,8 69:23,23
72:10,19 75:15
78:24 93:16 138:1
154:16 188:5
267:13 292:2
298:10,13 304:20
326:9 337:17
345:4 358:6
361:24
**regardless**
78:7 304:20
**regards**
294:22
**region**
187:6 198:9 200:17

201:6 202:1
311:13
**Register**
134:7
**Registered**
1:20 364:3,19
**regression**
272:18 277:18
**regular**
27:17 31:15 210:7
231:6,19 284:18
309:18 310:1,3,20
326:13,19 327:18
**regularity**
301:11 304:12
305:10 321:8
**regularly**
199:20,22 231:4
308:11 327:14
357:14
**regulated**
361:9
**regulation**
328:15
**regulatory**
97:7 219:13
**Reid**
6:6 159:15 160:2
**rejected**
219:11 225:6
**rejects**
203:6
**relate**
17:1 18:4 48:5,7
123:13 124:3
162:10 236:15,22
354:17,20
**related**
41:8 48:15 49:18
77:18 91:10
136:15 161:1
248:12 249:21
269:15 285:6
331:1 360:8
361:13
**relates**
1:7 37:22 41:11

55:18 66:13 82:11
91:8 95:12 117:5
212:6 337:23
339:8
**relating**
31:24 55:7 62:9,18
62:22 63:1 72:23
77:22 86:7 120:1
131:13 136:24
138:11 167:9
192:22 234:7
252:3
**relation**
112:2 126:23
209:24 212:13
**relationship**
30:4 38:19 41:3
47:5,8 48:11,14
51:6,8 53:22
54:11 58:4,12
86:18 90:7 91:17
121:10 127:6,8,19
133:11,14 136:17
140:2 154:16,20
159:3 210:7 211:3
256:22 262:24
263:1,18 265:6
268:5 284:18
286:15 329:21
353:4 354:10
359:1,6
**relative**
145:17,19,23
146:15 160:19
215:15 236:14
245:14 258:18,23
259:2,6 331:24
332:4 334:4
364:13,14
**relatively**
267:16
**relevance**
349:18
**relevancy**
349:8
**relevant**
42:24 334:10

Arch I. "Chip"  Carson, M.D., Ph.D.

Page 403

| | | | |
|---|---|---|---|
| 348:18 | repair | 216:2,21,23 217:6 | reproductive |
| reliable | 312:14,22 313:1,7 | 229:22 230:22 | 26:11 27:13,20 |
| 78:6 | 314:20 | 251:8 255:24 | 82:4,12 83:6,11 |
| reliance | repeat | 256:7,9,18 270:12 | 84:4 86:12 87:10 |
| 101:21 | 11:14 53:11 107:16 | 282:4,8 284:17 | 88:2,14,19 116:18 |
| relied | 165:15 296:17 | 285:9,22 291:2 | 119:4,13 181:16 |
| 76:12,19 77:1,4 | 301:4 | 292:10 294:12 | 181:18 183:1,8 |
| 88:8 232:12 | repeated | 297:4 299:20 | 185:7 186:24 |
| 242:21 271:16 | 305:15 | 309:18 336:5,6,23 | 188:6,8 191:3 |
| 346:17,21 | repeating | 346:18,24 347:5 | 200:18 206:11 |
| relies | 165:10 | 347:20,23 348:9 | 207:17,24 301:10 |
| 205:20 | rephrase | 348:11 349:5 | 301:16 303:3,21 |
| relook | 11:15 336:16 344:5 | 352:13 355:23 | 304:14 305:9 |
| 246:17 | replacement | reported | request |
| rely | 268:15,18 269:5 | 84:11 109:8 113:22 | 14:7 51:11 72:21 |
| 70:13 71:9 76:6,8 | replete | 157:22 166:7 | 108:22 285:11 |
| 93:4 97:6 104:22 | 140:14 | 174:24 175:2,5 | requested |
| 174:3 205:17 | report | 185:14 191:10,11 | 143:14 327:16 |
| 242:18 | 5:5 13:12 14:4 15:9 | 246:2 261:13 | 364:11 |
| relying | 15:15,16,22 16:3 | 283:12 | requests |
| 18:20 19:15,16 | 16:16,19 17:10,15 | reporter | 12:16 |
| 123:1 201:3 | 17:16,23 18:11,14 | 1:19,20,21 9:16 | require |
| 281:11 282:13 | 18:18,21 19:3,8 | 12:6 364:3,3,3,19 | 100:9 173:9 241:16 |
| 354:17 | 19:11,13 20:1,4,6 | 364:20,20 | 306:20,23 |
| remains | 20:20 21:1,7,15 | Reporters | required |
| 169:22 324:9 | 21:21 22:10 24:15 | 1:19 364:2,19 | 100:10 171:3 |
| 339:11 | 24:16,23 25:1,7 | reporting | 328:14 |
| remember | 25:22,24 29:11 | 274:5 322:5,9,13 | requiring |
| 37:20 165:12 | 42:10 43:13,18,19 | 322:16 | 217:2 |
| 183:20 269:20 | 43:22,24 44:1,13 | reports | research |
| 349:16 | 45:15 49:4 50:3,5 | 19:7 40:14 49:11 | 27:18 31:16 38:21 |
| remembered | 50:6,9,9,12,12,14 | 49:13,16,24 50:24 | 40:13,15 62:9,18 |
| 274:21 276:4 | 50:17 54:14,21 | 52:7 67:21 68:9 | 63:12,17 64:8 |
| reminder | 57:22 65:11,17,19 | 72:8,9 116:14,23 | 76:5,15,18 87:13 |
| 343:21 | 73:3 80:14 81:8 | 117:2 120:2,3 | 91:8 93:15,17 |
| remove | 81:10,16 89:12 | 132:3 140:1,14 | 105:17,20 126:20 |
| 200:5 | 92:8,9 94:3,4 | 141:21 142:2,5,21 | 129:17 132:3 |
| removed | 100:18 105:20 | 142:24 143:3 | 138:5,11 139:11 |
| 360:22 | 114:13 117:13,15 | 146:10 310:16,19 | 139:24 140:11 |
| render | 122:10 126:20 | 353:8 | 158:18,23 159:2 |
| 38:12 | 132:9 145:12,22 | represent | 159:12 165:21,21 |
| rendering | 146:9 148:10 | 18:13 105:1 284:13 | 178:23 225:24 |
| 34:11 | 155:22 158:7 | 343:23 | 231:1,1 238:4 |
| RENEE | 181:24 183:3 | represented | 248:16 249:6 |
| 3:17 | 192:16 205:9 | 345:21 | 251:8 254:15 |
| Renée | 209:1 210:13 | represents | 285:11 300:14 |
| 9:9 343:15,22 | 211:12 215:11 | 19:5 226:12 233:21 | 301:21 310:19 |

| | |
|---|---|
| 313:8 332:3 334:8 | |
| 347:2,7,24 348:13 | |
| 349:13,17 353:8 | |
| 354:1,3,9,12 | |
| researched | |
| 168:16 284:21 | |
| 285:5,6 | |
| researching | |
| 118:4 347:18 | |
| reside | |
| 199:3 | |
| residence | |
| 209:21 | |
| residency | |
| 350:7 | |
| residents | |
| 60:7 80:19 | |
| resides | |
| 339:4 | |
| residual | |
| 200:6 266:7 | |
| respect | |
| 17:6 33:9 91:13 | |
| 103:16 114:10 | |
| 131:9 173:22 | |
| 174:5 175:14,18 | |
| 187:4 205:6 206:9 | |
| 234:6 237:15 | |
| Respectfully | |
| 359:16 | |
| respiratory | |
| 77:14 134:11 | |
| respond | |
| 12:15 34:3 164:21 | |
| responding | |
| 30:21 | |
| responds | |
| 292:7 | |
| response | |
| 12:10 13:10 23:23 | |
| 33:17,23 113:24 | |
| 115:1,6,8,12 | |
| 138:24 219:8 | |
| 285:3 321:16 | |
| 322:13,16 362:17 | |
| responses | |
| 321:13 322:6,9 | |

Arch I. "Chip"  Carson, M.D., Ph.D.

350:20
**responsible**
70:10 91:7 230:12
352:21
**responsive**
12:18 15:1 20:2
**rest**
265:14 323:15
**restated**
100:6
**restates**
92:23
**restating**
210:22
**result**
16:21 88:9,11
185:8 191:6
200:11 201:15
212:17 221:23
245:3 285:10
305:17 306:17
311:19 313:17
314:16 334:6
348:2
**resulted**
64:17 146:10
203:13
**resulting**
87:10 88:3,20
137:18 310:21
**results**
72:10,13,19 82:1
83:4,7 86:12
111:6,10 120:13
151:16,18 157:23
181:13 191:2
194:9 196:18
215:23 222:21
223:18 232:4
245:6,16,18,19,20
260:17 266:4
269:19 277:4
326:4
**retained**
32:3 36:16 46:19
48:20 57:15 65:19
96:14

**retention**
249:7 347:15
**retrograde**
183:22 184:3
**retrospective**
242:2 243:10
244:13 260:12
269:11
**return**
365:14
**revel**
358:17
**reverse**
306:14
**review**
18:14 19:22 27:2
27:16 30:6 31:15
31:23 39:22 40:1
40:19 42:12,13,15
42:17 43:7,8 44:1
45:14 46:5 49:5
50:5,8 52:20 53:1
65:14 66:23 68:14
68:15 72:22 73:2
75:11 77:14 79:6
80:23 86:3 90:6
90:10 95:11 98:19
99:9 102:20,22
108:19 113:1,4,10
113:17 164:8,19
164:20 193:13
203:12,22 205:13
205:17 214:14
220:10,13 223:13
224:20 242:21
257:22 282:4,17
291:14 316:5
320:13 321:4
348:2
**reviewed**
5:8,21 6:3 14:3
19:8,14 20:18
35:9,12,14 40:21
42:8 43:9,16 49:4
49:12,13,15,24
50:2,11,14 51:1
51:12 52:7,11,14

66:3,8,10,10,11
66:16,20,23 67:13
67:22 68:12,20,23
69:13 75:7,9,15
75:23 76:2 87:8
89:11 91:11 95:6
100:17 102:16
108:16,21 142:4
142:17,21 143:4,8
217:5 219:1 221:6
227:8 242:18
281:7 290:3
295:23 309:8
320:15,21
**reviewing**
67:1 211:11 347:24
348:6,14
**reviews**
215:24
**revisiting**
278:17 342:4
**Rheumatoid**
121:18
**right**
10:3,9,13 11:5 13:8
15:9 19:18 20:15
21:8,15 24:1,12
25:1,18 26:12,15
27:7,11 28:1,15
28:19 31:2 32:12
34:11 38:5,21,22
38:24 39:7 44:24
45:2 49:5 50:13
50:19 52:18 53:18
54:22 56:16 59:19
59:22 60:1 61:21
62:10 63:7,22
67:5 68:21,24
71:7 81:5,9,20
83:8,20 84:18
85:3 89:18 91:1,5
91:22 94:10,19
95:1,8,22 96:6
98:2,11,12,17
99:15,16 100:12
100:18 101:1,11
101:18 103:2,24

106:8,12 107:13
107:22 108:1,6,9
108:18 109:9,12
109:15 110:4
111:15 112:6,16
112:21 113:18
114:1,10,14,19
115:2 116:2 117:9
117:14,18 118:16
121:19 122:13
123:23 125:2,6,10
126:2,5,10,12
128:17 129:4
130:10,14,17,20
130:24 131:4
132:7,12 133:5,20
134:16,22 138:14
138:19 139:17
142:5 145:6
146:20,23 147:1,3
148:14,19 155:6
155:10 156:5
157:15,20 158:3
158:20 159:5
160:6,13,19
162:13 163:1,8,23
165:18,22 166:8
166:21 167:15
169:8,9 170:1,4,8
170:22 171:8
172:2,12,22 173:1
174:22 176:14,16
178:12,18 179:10
181:16 182:11
183:3,9 184:9,16
184:18 185:1,24
186:8 188:9,16,24
189:10 191:12,23
192:16,19 193:2,9
194:2,9,20 195:4
195:12,16 197:2
197:24 198:8
199:5,15 200:21
201:1,19 202:3,7
202:15,19 203:4
203:17 204:16,23
205:1 206:3 208:1

208:9 209:9 210:3
210:9,13 214:8
215:5 216:6
218:22 219:2,15
219:23 220:18,23
221:8 222:17
223:14,23 224:5
225:4,24 226:18
226:22 227:10,13
227:19 229:17
230:1,16,17
232:11,14 233:2
234:21 235:14,16
236:16 238:24
243:7,13 244:7,17
246:24 247:13,23
249:1 250:18
252:13 253:18,19
254:3 255:1,18
256:13,23 257:4,9
257:13 259:8,20
260:4,14,22 261:6
261:11,18 262:11
262:17,21 263:2
264:4,8 265:3,8
266:5,15,22
268:12 269:16,22
270:4,14,21
271:10,13,17
272:3 273:1,5,15
274:3,9,16,22
275:2,7,8,12,21
276:7,15,24 277:8
277:24 278:22
279:18 282:12,23
283:14,20 285:19
291:21 293:9
299:16 301:12
309:4 311:4 312:2
315:5 333:13
**right-hand**
160:9 243:24
248:15 272:7
**rise**
20:18 238:12
245:14
**risen**

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 131 of 1035
PageID: 241310
Arch I. "Chip"   Carson, M.D., Ph.D.

Page 405

217:2
**risk**
27:4 84:18 90:13
90:17 91:14,22
95:12 96:10,17
99:3 107:4 110:13
113:23 121:21
122:8 126:2 132:7
132:11,23 133:3
134:2,2 145:17,19
145:23 152:19
162:11 163:14
166:18,22 172:11
172:15 173:8,13
173:20 174:21,23
190:20 192:23,24
193:22 211:5
214:5,7,12 215:15
220:7 222:1 231:3
232:14 236:4,14
244:4 245:14
247:23 248:11,24
249:17 250:7
254:2 258:18,23
259:3,6 260:20
262:6,6 267:1,10
267:17 268:19
277:7 291:23
299:12,14 305:17
306:13,13,15
308:12,15 309:13
310:4 311:9,13,16
311:19 312:1
325:8 330:14
331:4,10,13,18,24
332:14,16,23
333:3,4,6,10,22
334:1 338:14,21
350:15 356:12
360:10 361:17
**risks**
146:15 160:19
330:13 332:4
334:4
**RNA**
314:12 318:24
**Roberta**

79:23,24
**rooms**
134:19 342:22
**rose**
109:22
**rotations**
207:20
**roughly**
274:5 279:19 303:8
**roulette**
251:23 252:4
**route**
82:19 179:3,19,21
181:20 182:24
298:10
**routes**
179:11
**routine**
23:12 328:14
**routinely**
321:11
**Royston**
3:15 9:14
**rule**
227:23 228:11
357:16 364:11
**ruled**
140:10
**running**
296:23
**runs**
346:10
**Russ**
36:22

_____
**S**

**S**
2:1 3:1
**S-A-E-D**
27:24
**Saed**
27:24 51:5,9,19,21
313:15,21 314:5
315:16 316:8
319:11,20 320:7
361:20 362:1
**safe**

312:5,9 325:3
355:11
**safer**
359:10,10
**safety**
30:3 214:7
**SALES**
1:4
**sample**
187:12 193:24
251:9
**samples**
143:14 190:3
**San**
3:4
**satisfy**
43:4
**Saturday**
1:11
**saved**
233:22 305:17
**saw**
35:22 340:2
**saying**
127:21 245:11
279:21 287:20
332:8
**says**
98:8 244:10,18
249:4,11,12
250:11 288:22
294:4 321:3,22
329:4 339:14
357:16
**schedule**
351:3
**scheduled**
189:18
**Schildkraut**
6:16 255:13 270:12
270:16 271:5,12
277:15
**school**
61:9 79:18 207:19
239:8 281:1
344:16 350:7
**science**

94:5 105:2 342:8
**sciences**
26:12 27:14,20
59:18
**scientific**
19:6 51:4 98:1,9
99:23 120:17
175:1 204:8
213:18 218:6
220:11 221:14
222:6 223:14
224:16 269:14
313:8 339:3,13
**scientist**
62:4 70:9
**scientists**
150:23,24 213:20
220:21
**scope**
344:10
**Scott**
76:16
**screen**
204:4
**screening**
5:15 30:13 89:15
330:18
**Seal**
129:20
**search**
25:13 34:20 36:3
40:12,23,24 41:1
41:5,10,15 42:7
42:24 43:2 79:6
214:17 295:9
349:20
**searchable**
342:14
**searched**
41:1
**searching**
315:2
**second**
50:17 54:4 81:24
82:9,10 99:19
125:8,16 145:15
163:20 166:3,5

181:12 244:1
247:24 248:17
273:3 331:21
**second-to-last**
163:11
**secondary**
82:19 181:19
331:17
**Secondly**
215:21
**secretions**
200:7
**section**
24:16 112:14,18
113:6 115:17
124:24 125:22
157:23 249:13
291:7,11
**see**
18:1 30:12 40:13
41:17 60:5,11
67:15 69:9 77:5
99:4 109:5 149:23
155:3 183:18
218:17 255:6
260:18 263:1,5,18
272:9 277:19
278:2 281:19
286:4 287:10
290:4 292:24
297:4 315:20
316:23 317:19
319:16 327:14,24
328:11,13 335:23
339:24 340:14
**seeing**
167:7,9 338:3
342:12
**seek**
241:19
**seeking**
348:13
**seen**
16:17 84:11 139:11
167:21 208:19
321:16 332:4
337:16 341:6

Arch I. "Chip"   Carson, M.D., Ph.D.

342:21 351:5
**selected**
71:12
**selection**
221:22 239:16
**self-report**
243:11 244:14
**send**
346:6
**sense**
336:9
**sensitive**
209:16 210:1 241:6
**sent**
14:10 328:17
**sentence**
99:19 107:9 112:22
   286:1 287:20
   290:18 301:7
**sentences**
113:13 286:22
**separate**
21:1 28:4 149:19
   347:22 348:3
**separated**
310:14
**sequestered**
132:20 362:18
**sequesters**
116:2
**sequestration**
171:19
**series**
168:23
**serous**
153:20 212:19,20
   212:21 237:2
**serve**
58:8
**served**
10:24
**service**
14:3 59:16
**services**
1:23 3:23 8:6 56:16
   58:7,24 59:6
**serving**

58:23 59:9 105:11
**session**
312:12
**set**
15:11 16:14 19:6
   19:17 38:13 43:13
   54:15 81:7,18
   95:15 155:22
   364:9
**sets**
220:16
**setting**
54:15 57:7,10
**settings**
160:18 207:20
**seven**
297:8
**seventh**
58:15
**Seyfarth**
3:17 9:10 343:23
**shake**
340:16
**shakes**
340:8
**share**
24:6 35:23 44:13
   117:23 346:7
**shared**
80:17 346:1,1
**Shaw**
3:17 9:10 343:23
**sheet**
146:13 365:6,9,12
   365:15 367:7
**shield**
314:20
**shipped**
151:20
**short**
86:24 310:12 311:6
   343:4 363:6
**short-circuit**
14:12
**shortcut**
281:19
**shorten**

311:22
**shortly**
344:9
**show**
25:20 72:15 84:17
   88:9 92:9 117:15
   119:8,20 124:13
   132:10 151:1
   185:6 200:10
   202:17,23 209:6
   210:6 237:23
   238:4,7,15 245:13
   246:8 253:24
   255:3,17,20 257:7
   262:9 268:5
   313:15
**showed**
72:16 109:21
   117:12,17 145:23
   146:14 245:3,9
   255:8,9,14 313:11
**Shower**
22:3,3,5,6
**showing**
237:3 318:17
**shown**
72:12 88:11 112:1
   119:2 139:12
   144:10 236:23
   237:8 253:21
   301:11 303:16
   331:14 354:13
**shows**
192:23 213:1 231:2
   238:4 260:20
   273:3,7
**shutdown**
221:7
**sic**
26:1 144:21
**side**
248:15 272:7
   335:22
**sign**
365:8
**signal**
211:19

**signature**
364:11
**significance**
109:23 238:13
   245:15 254:6
   258:24 259:7
   261:9,17 262:5
   263:11 276:24
**significant**
55:16 87:16 100:14
   109:9 110:3,11
   143:19 147:21
   159:11 166:12
   235:9 240:21
   246:2,9 253:22
   254:1 257:16
   262:16 263:8,9,12
   275:14 277:22
   278:5 310:21
   326:23 334:6
   345:3 352:19
   354:14 360:19
**significantly**
196:22 198:2
   201:22 275:21
   277:6
**signing**
365:10
**silicate**
180:13
**similar**
83:15 116:21 162:1
   166:7 201:15
   300:3 358:7
**similarity**
106:24
**simple**
68:7
**simplicity**
289:18
**simply**
61:7 136:3 245:17
   251:12 252:16
   254:14 334:14,16
   340:21
**single**
221:19 299:13

314:13 339:19
   340:16 341:8
**sir**
20:9 150:14 164:7
   180:22 207:11
   297:4 329:13
   331:7
**sit**
123:6 156:7
**sitting**
67:5
**situation**
208:15 265:19
   293:5
**six**
230:4 297:8
**size**
194:1 251:9
**Sjösten**
183:21 184:4 189:7
**skin**
286:24
**skipping**
198:3
**slide**
345:22
**slight**
360:10
**slightly**
16:20 193:18
**slow**
303:15
**slower**
303:20
**small**
74:20 76:3 77:21
   159:4,11 160:15
   169:15,16 208:22
   223:7 279:7
   334:15,20 348:7
   353:23 354:4
   361:1,3 362:21
**smoke**
358:8,11
**smokers**
265:22
**smoking**

Arch I. "Chip"  Carson, M.D., Ph.D.

Page 407

265:13,18 266:1
358:8
**SNPs**
314:13 318:16
**so-called**
353:9
**social**
47:4 278:13,15
**Society**
338:12
**sold**
151:12 152:3
**somebody's**
318:14
**somewhat**
311:16
**soon**
352:4
**sorry**
20:12 54:3 67:9
69:7 86:21 100:19
103:12 107:16
119:17 163:11
173:7 184:1 197:8
222:23 236:8
243:14 260:3
271:9 298:22
310:10 316:1
**sort**
42:15 67:24 121:6
149:16 238:18
240:5 251:22
295:14 300:13
323:16 325:14
336:14,16 341:12
350:13 358:24
**sounds**
171:14 184:17
**source**
104:5 105:3 136:18
155:17 286:7
**sources**
54:10,16,18 104:7
104:11,13 127:8
143:16 157:17,18
**South**
2:14 3:13

**space**
323:16,17,17 324:8
324:8,9 365:6
**speak**
43:6 297:11
**speaking**
165:1
**special**
136:2 162:3,6
**specialist**
207:2 208:6
**specialists**
207:24
**specialty**
335:3
**species**
199:6 288:20,24
291:24
**specific**
20:5 21:24 22:17
22:18 64:3,4
73:18 78:14,19
92:5,6 93:1
115:14 134:5
137:23 171:14
175:7 216:20
285:4 330:13
344:22
**specifically**
19:15,16 23:9
41:16 62:20 64:21
88:24 90:10 105:6
116:24 126:18
177:15 180:23
220:2 267:12
289:2 299:21
317:21 320:1
339:14
**specificity**
264:12
**specifics**
316:14
**Spectra**
58:14 59:10,12
**spectrum**
235:20 258:8
288:12

**spend**
55:23 342:17
**spent**
45:13 60:4 347:14
347:18,19 348:5,8
**sperm**
302:19 303:3,9,14
303:19,23
**sphincter**
202:10
**spin**
213:10
**spinning**
251:22 252:4
**split**
57:13
**spoke**
79:11,15
**spring**
344:13
**spurious**
221:23
**square**
2:20 190:1
**St**
3:14
**stack**
24:10
**staff**
221:3
**stage**
142:12 330:20
**stages**
42:12
**stamp**
30:24
**stand**
128:5 254:22
**standard**
218:5 220:13 319:7
319:9
**standing**
186:20 187:5 304:2
**starch**
29:1 183:22 184:4
189:22,23 190:9
190:10

**start**
12:3 40:16 65:10
65:17 232:3
250:24 263:6
**started**
65:18 168:11 335:1
340:3
**starting**
39:22
**startling**
301:11 304:12
305:10 321:8
**starts**
272:7
**state**
9:23 41:17 106:23
107:6 109:7
114:16,21 122:10
127:11,16 128:17
132:9 166:10
180:18,21 181:2,6
229:22 248:20
249:10 256:19
257:1 290:6 291:2
292:10 321:9
364:22 365:5
**stated**
187:11 203:16
245:7
**statement**
67:3,7,14 120:15
123:2 138:21,22
167:19 203:12
286:7 292:12
301:7
**states**
1:1 90:4 91:1 93:18
97:18 100:12
113:21 219:14
221:13 291:7,10
306:4
**stating**
17:16
**statistical**
109:22 110:22
211:15,17,21
223:18 233:8

254:6 258:23
259:7 261:8,17
262:4,20 276:23
331:2
**statistically**
110:3,11 246:2,9
253:21 254:1
262:16 277:6,22
354:14
**statistician**
253:15
**status**
103:15 199:7
**stay**
284:3
**stays**
339:14,15
**Steering**
2:6
**stenographic**
247:15
**stenographically**
364:8
**step-wise**
147:23 167:18
**sticker**
28:18
**stimulate**
115:1 139:1 188:15
**stomach**
360:9
**stop**
13:3 301:12 306:24
331:20 344:5
**straying**
358:22
**stream**
345:6
**Street**
1:15 2:4,9,14 3:3
3:13,18
**strength**
229:23 230:8,19
235:17
**strengthened**
17:1,6
**strengthens**

Arch I. "Chip"  Carson, M.D., Ph.D.

95:7
**stress**
134:21 135:1,5,7
135:12,15,20,23
136:2,4,16,19,22
137:15,17,20,24
138:6 198:24
200:10
**stretched**
329:22
**strike**
31:1 33:2 34:6
46:23 53:16 61:12
63:5 64:8 69:7
80:4 90:1 98:14
118:20 121:15
122:3 131:6
140:17 141:10
152:9 160:22
176:11 186:6
204:12 205:4,14
210:4 212:9
217:22 219:20
222:14 227:16
236:9 240:8
241:21 259:6
264:18 265:17
276:22 356:4
359:14
**stringent**
219:10
**strings**
348:11
**strong**
86:18 121:10 235:4
235:24 255:9
288:19,22 291:3
292:10 293:24
294:7 326:8
**stronger**
17:18 85:1
**strongly**
110:8 111:2
**structural**
279:8
**structure**
180:24 323:7

**structures**
137:7 154:8 321:23
321:24
**student**
345:11
**students**
344:15
**studied**
161:4,13 212:16
226:2 265:8
310:13
**studies**
84:16 88:7,10
106:24 107:13
108:5 109:8,19
111:7,10,20,22
112:1,15,20
113:22 114:1
119:2,7,11,19
123:13 124:2
125:5,10,18,22
126:9,13 128:3,4
128:8 131:7,13,19
132:5,10 135:18
140:6,12 146:11
146:14,18,19
147:1 154:15
160:10,21,24
161:13,15 162:10
163:22 167:23
174:24 181:23
183:5 185:17
188:1 191:12,15
192:19,22 193:6,9
194:5 195:8 200:9
201:3 202:17,23
205:20 206:1
208:19,24 210:6
210:11,23 211:11
214:23 216:9,11
216:17,18,19
217:1,3,7,10,13
217:18,23 218:1
221:18 223:4,6,6
228:4,6,9 232:17
232:22 237:1,4,7
237:8 238:7,10,15

238:20,20 239:16
239:18,22 240:12
240:12,13,14,20
240:22 241:6,8,12
242:2,3 243:13
244:5,7,16,21
245:9,10,13 246:2
246:8,18 249:23
249:24 250:16,17
251:5,6,7,13,18
251:20 252:3,9,15
252:18,20,21,24
253:21 254:7,11
254:20 255:3,16
257:7 258:9,22
259:5 264:20,23
265:1 266:5 268:2
268:4,8 270:11
271:15 281:6,11
282:13 283:11,16
283:19 286:2
293:17 294:2
295:23 296:5,9
297:9,20 298:17
298:19 301:14
303:11,15 304:1,3
305:2,4 308:7,15
309:8 310:11
311:21 313:13,21
314:12 322:5,8,12
322:15,21 331:14
334:3 354:5,13,13
**study**
38:21 84:12 101:6
101:10 110:17
123:1,7,16 126:14
129:12 130:8,12
136:4 145:20
147:7 154:19
161:6 182:9
183:24 184:2,3,6
185:21 187:11,18
187:24 188:4,7,20
189:7,17 194:13
195:12,15,17,22
196:4 211:15,18
211:22 212:7

221:19,19 222:20
233:1 237:16,17
237:18 239:20
240:21 241:1,2,4
242:15,17 249:14
250:23 251:16
253:24 255:7,9,13
255:14 257:11,12
257:17 258:5,9,12
259:3,8,18 260:9
260:13 262:3
266:9,12,15,21
269:3,11 270:12
270:16,20 271:5
271:13,19 272:4
276:2 277:2,4,15
281:6,11 282:13
286:10,16 287:23
296:11 297:14,15
299:11,18,21
300:6,12 313:10
321:16 332:3
341:11
**studying**
265:10
**stuff**
349:17
**subcommittee**
129:19
**subgroup**
193:22
**subject**
51:13 138:6,12
365:10
**subjects**
238:11 239:20
241:17 252:10
341:2
**submission**
57:22
**submit**
96:23 97:3
**submitted**
25:7 51:3 96:20
221:15 320:18
**submitting**
103:10

**Subscribed**
367:15
**subscription**
346:13
**subsequent**
40:20 284:20
**subset**
77:21 78:5
**substance**
132:21 135:4,7
170:20 178:21
179:2 183:21
227:18 328:9
340:7 360:21
361:4 367:7
**substances**
73:19 74:21 91:10
135:14 202:5
226:12 295:1
353:11
**substantial**
134:1 167:5
**substantially**
103:7
**substantive**
79:12 194:8
**Substitute**
29:1
**substituting**
29:5
**substitutions**
75:5
**subtypes**
112:3 237:12
**successful**
148:3 341:1
**suffer**
241:12,14
**suffered**
258:17
**suffice**
351:14
**sufficient**
59:15 216:2 226:7
226:13 230:5
283:8 312:23
321:10,12

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 135 of 1035
PageID: 241314
Arch I. "Chip"  Carson, M.D., Ph.D.

Page 409

suggest
107:2
suggested
38:13
suggestions
336:11,19
suggests
248:9 249:15 339:4
suitability
29:5
Suite
2:10,20 3:4,13
summary
109:1 149:17
superior
132:15
supervisor
60:6
supervisory
69:22
supplemental
102:2,11 347:8
support
79:12 89:13 91:20
148:12 191:22
209:1 217:15,18
221:15 296:6
303:12 305:7
supported
237:16 305:12
supporting
270:13
supportive
34:10 193:21 196:6
217:7 219:5,8
246:24 259:19
supports
95:7 126:14 190:15
190:23
sure
14:13 36:1,2 39:6
53:14 54:6 62:13
62:16 68:3 70:3
87:1,5 105:15
107:19 113:16
129:16 135:16
136:9 150:21

165:5,11 174:16
176:23 180:14
186:22 195:21
197:9 238:21
240:4 243:21
260:2 264:24
270:7 292:6
305:23 329:16
343:12 346:9
362:21
surface
54:19 217:12
surgeries
207:21
surgical
133:20 134:16
surprised
340:22
surrogate
318:22 354:21
surround
323:15
surrounding
116:12 180:24
321:23,24 362:7
surrounds
323:6
surveillance
328:14
survey
129:12 351:24
352:3
Susan
70:6
susceptibilities
267:14
susceptibility
308:20
susceptible
83:17 239:16
suspect
154:5 199:18
208:21 329:23
swear
9:17
sweating
200:6

sworn
9:19 364:5 367:15
synthesize
93:21
system
83:20,24 84:4,6,10
208:8,12,17 209:3
303:21 337:17
362:12,15
Systematic
27:2

T
table
24:11 108:15 109:1
149:15 257:15
260:16,17,20
272:21 277:20
tables
102:2,11
Taher
5:12 27:5,6 89:16
94:24 100:16,24
102:3,14 105:23
106:1,23 107:11
108:8 111:11
112:7,10,13
113:21 245:23,24
361:24
take
10:7 12:6 43:16
86:23 87:3 89:1
96:5,5 97:18 98:2
98:10 99:9,21
124:12 130:1
164:1 166:18
176:19 220:15
228:22 229:1
242:23 243:23
248:14 260:5
281:14 290:19
292:17 315:1
343:3,14 363:6
taken
89:5 92:8 177:2
207:18 253:9
363:9 364:8

takes
281:17
talc
3:5,10 10:8 22:2
27:4 29:1,6,7 37:3
41:2,9,11,24
49:17 55:2 64:19
64:21 69:23 70:5
85:12 86:8,13
87:11 88:3,11,20
89:22 90:12,17
91:21 107:4 109:4
111:14,20 114:23
115:5,8,10,10
116:5,6,9,15
117:5 118:13
119:1,14 120:1
126:4 127:6
129:13 130:23
132:16,21 133:11
133:14 136:16
137:5,6,6,10,12
138:17,18 139:4,5
139:21 141:14,17
141:21 142:14
143:16 147:22
151:9,24 156:8,13
156:17,20,24
157:6 158:11
166:22 167:4,9
168:14 169:7,12
169:19,22 170:12
171:19 176:2
177:17,17 180:9
180:20 181:7
182:10,13,18
183:6,12,23,24
184:2,8,12,14,20
184:24 185:8,15
186:19 187:5,22
189:9 190:20
192:24 196:11
198:11 199:3
200:11 206:10,13
209:24 214:7
221:24 223:7
224:12,14,18

225:7 227:15,17
230:11,22 234:7
235:3 237:9,24
238:8,16 243:11
244:3,14 245:3
246:3,10 247:22
248:9,24 249:8,9
249:16,18 250:6
252:3 255:4
260:21 268:5
269:21 271:22
273:14 274:2,6,15
276:4 277:5
283:11,13 284:19
286:3,10,17,22
287:9,16,18,21,24
288:8,23 290:9,21
291:6 292:1,2
293:14,16 294:1
294:22 295:13,18
295:22 299:19
300:2 302:9,13,18
303:1 304:13
305:8,16 313:16
313:17 314:5
316:24 317:2,20
319:17,19,21
321:17 322:6,9,22
324:23 334:11
335:13 338:2,13
338:21 339:10,18
341:15 342:5
344:11 345:17,20
353:5,9,12,16,17
355:22 356:19
357:5 358:20
362:16
talc-containing
301:8,15
talc/ovarian
36:17 268:1
Talcs
31:11
talcum
1:4 8:11 17:2,7
23:4,11 30:4 32:1
38:3,18 48:20

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 136 of 1035
PageID: 241315
Arch I. "Chip"    Carson, M.D., Ph.D.

Page 410

52:4,8,12 53:7,23
55:1,7,8 62:22
63:20 64:2,10,13
65:4,8 66:13
72:17 73:1,7,8,17
81:19 82:1,13,15
83:3,7,10,18
84:17 85:2 87:16
90:7,13 91:13
107:13 108:5
110:24 114:17,22
115:24 132:11
133:2 139:7,10,12
139:16,20 140:3
140:20 141:4,5,12
141:16,20 143:5,7
143:9,24 144:7,15
144:20 147:3,11
147:14 148:6,13
151:11 152:3,18
157:14 158:10
167:14 175:8,15
176:7 177:9 178:3
181:13 182:1,23
198:8 199:3,12
200:1,16,18 201:4
201:15,18 202:1,6
202:18,20,24
206:5 210:8 211:3
211:5 216:9
219:10 220:6
230:11 231:4,6,11
231:19 257:3
260:21 262:9
288:6 302:4
305:21 306:16,22
307:1,8,12,23
308:2,6,11 309:11
309:18 310:3
311:9,12 313:11
325:13 326:12,18
340:6,16 341:8
350:10,13,22
351:8,11,16 352:9
352:13,20,24
353:10,21 354:2
354:10 355:2,6

357:22 359:23
**talk**
134:20 160:8
163:21 165:20
254:23 256:17
264:7 288:2,4
328:22 335:6
**talked**
38:8 44:16 46:3
47:13 49:2 55:2
117:16,19 118:18
170:18 259:14
268:12 278:8,16
283:17 287:13
301:3 312:11
**talking**
45:23 55:24 65:14
161:7 164:7 177:8
196:17 205:9
233:7 246:6 291:1
307:10 309:3
315:3 321:7 342:4
**talks**
112:14,18 126:22
290:1
**tallying**
45:16
**tape**
89:4,8 177:1,5
253:6,8,12 363:8
363:12,20
**taught**
344:13
**teach**
344:10,12
**technetium**
183:17 189:5
**technical**
19:7
**technically**
65:18
**telephone**
39:4
**tell**
11:13 26:23 36:1
44:3 67:4 76:11
118:8,11 119:10

124:5 129:14
169:20,21 225:18
243:19 259:22
281:10 288:21
292:22 339:23
342:2
**telling**
124:8
**tells**
110:21 328:21
**ten**
56:12 310:20
335:17
**tendency**
213:10
**tenets**
310:24
**term**
135:22 136:23
208:12,15,17,20
212:5 265:2
304:12 337:16
**terminated**
58:3,11,16 277:3
**terms**
18:15,20 20:23
22:14,15 41:2
43:6 46:9 56:17
62:18 76:20 94:13
133:9 136:20
138:5,8 159:9
160:8 201:21
235:21 252:8
278:9 280:21
331:6 345:2
349:20
**Terry**
6:8 191:19 192:1
192:15 194:5
195:3 268:11,14
268:20 269:3
**test**
72:19 143:17
157:23 162:6
196:20 198:1
318:17 330:18
353:11

**tested**
143:17
**testified**
9:20 55:6 56:8
279:16 339:16
347:13 348:16
349:23 352:7
354:7
**testify**
17:14 57:5 124:4
364:5
**testifying**
83:2 149:6
**testimonies**
71:3
**testimony**
11:5 19:20 24:19
56:17 65:24 68:19
71:1 78:21 118:21
128:21,23 152:14
173:14 187:2
190:18 239:2
251:17 252:2,12
252:14 301:13
332:20 364:8
**testing**
70:11 72:8,16
140:13 141:21
142:18,24 143:5,7
143:9,11 151:18
155:17 157:13,19
157:21 330:12
**tests**
85:11 86:3,6
150:24 162:3
197:12 206:8
209:6,13 319:7,10
**Texas**
1:16 3:4 8:10 58:4
59:1,4 239:7
364:22
**text**
339:3
**textbooks**
338:5,9,10
**Thank**
11:2 21:17 54:7

130:5,6 159:23
192:10 196:1,2
243:3,4 283:9
284:7 316:4 343:2
363:2,16
**Thanks**
344:8
**theoretical**
117:1
**theoretically**
242:11 311:5
317:10
**theory**
85:6,12,18 117:4
122:15 131:17
168:2 186:15
190:15,24 194:16
197:15 200:15
203:7 204:14,15
206:5,9 209:2
210:4
**therapy**
268:16,18 269:5
**therapy-treated**
255:11
**thereabouts**
231:9
**thing**
133:15 142:20
241:11 278:14
295:15 318:17
336:17
**things**
12:22 38:11 42:19
49:18 89:10 119:8
124:3 133:9
175:21 204:9
209:22,24 222:19
271:20 278:7,18
295:5 298:10
305:4 310:14
314:10 318:6
323:24 324:19
329:22 332:24
333:20 335:10,11
335:12 340:8
344:17 347:21

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 137 of 1035
PageID: 241316
Arch I. "Chip"  Carson, M.D., Ph.D.

Page 411

348:3,23 349:14
349:21 351:4
357:15,16,22,22
358:2
**think**
11:11 24:17 30:8
35:21 37:9 44:22
49:18 50:23 52:23
64:1 66:22 67:17
74:14 77:5 80:17
81:1 82:10 84:13
85:19,24 86:16
87:13,13 92:18
94:1 104:7 108:12
111:8 118:6
120:22 121:23
122:1,23 123:18
124:14 126:21
127:16 128:8
132:2,8 133:8
141:15 143:15
144:10 148:5
154:14 156:11
167:17 173:18
178:10 193:3
201:8,20 203:12
203:14 206:19
208:14 209:20
213:22 214:4
217:16 218:4,15
219:7 220:12
228:3 231:24
239:3 247:4
251:19 256:10
258:15 259:23
260:8 266:10
268:7 271:9
280:19 282:8
284:2 285:1 289:1
293:2 294:14
298:8 299:8
301:24 303:7
304:6 305:11
307:20 311:14
314:1 315:4
316:12 320:24
326:7,15,22

333:18 335:14
336:1,13 337:5,15
337:21 338:18
340:3,12,24
341:20,20,22
342:9 343:1
345:20 346:4,8
347:3 350:6,24
352:17,19 356:8
356:19 358:21
359:18
**thinking**
80:18 105:19
267:12 362:1
**third**
26:14,15 83:14
125:21 208:7
243:24 273:7
**thirty**
365:16
**Thomas**
47:16,19
**Thompson**
2:3 8:19,20 46:10
46:11,16,18 47:9
48:11 236:12
**Thoracic**
129:18
**thoroughly**
102:8
**thought**
20:2 29:21 33:16
33:22 167:13
227:3 264:14,15
271:24 336:9
**thousands**
159:8
**three**
46:14,17 47:9
106:22 185:18
221:6 245:21
291:24 297:8
**threshold**
311:8,11 312:1,2,4
312:8 313:6 325:3
355:11,12
**thresholds**

326:9
**thumb**
13:20 36:5,11
**thwarting**
122:12
**time**
8:7 11:12 16:19
23:14,16,18 25:7
37:3 39:12 40:20
45:9 55:22,24
57:21 59:15 60:3
60:8 75:5 101:23
120:4 147:13,18
148:6 161:17
169:19 192:5
199:1 209:21,23
215:19 228:22,24
234:6 260:5 261:4
261:9 277:24
280:5 290:19
303:7 306:11
310:17 311:6
312:5,18 323:22
323:23 324:2
327:8 329:22
339:8,10 342:12
342:17,23,23
347:18,19,23
348:5,8 351:3
359:3 364:8
**timely**
99:21
**times**
206:18 282:20
305:15 309:24
329:17 332:14
**Tinsley**
3:12 9:12,12 363:3
**tissue**
133:12 135:1,2,5
135:11 170:11
287:4 313:12
**tissues**
114:18 116:1,11,12
135:6,8 185:1
198:13 199:14,15
199:24 200:13

286:23 287:15
321:14,15,20
**titanium**
292:1
**title**
27:2
**titled**
28:24 31:10 32:15
77:18 249:14
270:17
**today**
8:6 9:16 10:7,17
11:10 12:13,20,24
13:20 14:21 15:2
15:7 16:13 17:13
17:18 22:1 23:23
24:21 28:4,22
29:18 33:4,15,21
34:1,9 36:6 45:21
50:18 51:16,20
74:7 83:2 100:22
120:18 124:4,6,12
156:7 181:5 206:3
218:14 305:15
312:12 344:3
345:24 348:17
352:7 354:7
361:24
**Today's**
16:11
**told**
38:2 39:20 42:9
43:10 44:7,19
47:2 79:7 80:8
84:23 103:21
118:9,19 167:12
214:4 216:4
278:10 351:10
**top**
165:23 256:19
**topic**
216:6 345:12,13
**topics**
41:6
**toss**
109:15
**total**

19:22 161:3 307:16
310:15
**totally**
148:3 296:19
**touch**
344:17 345:1
**touched**
64:18
**touches**
323:12
**toxicity**
180:4
**toxicologic**
311:20
**toxicologist**
10:5 47:20 137:4
**toxicologists**
220:22
**toxicology**
59:22 178:24
300:15 310:24
328:4,5 334:24
335:2,5
**toxin**
299:13
**toxins**
299:12,15
**trace**
170:11 177:8,13,21
**track**
296:17,24 362:5
**tract**
82:4,12 83:6,11
86:12 87:10 88:2
88:14,19 116:18
119:4,13 181:16
181:18 183:1,8
185:7 186:24
188:6,8 191:3
200:18 202:13
206:11 207:17,24
301:10,17 303:4
304:15 305:9
**training**
19:23 55:17 138:2
**transcribed**
314:12 318:24

Arch I. "Chip"  Carson, M.D., Ph.D.

transcript
69:14 221:6 364:7
  365:17,18
transcription
367:5
transcripts
50:1 52:12,15,21
  66:4,7,20,22 67:2
  67:21 68:8,12
transformed
319:4
translates
236:5
transmission
134:10
transport
184:11 185:21
  186:11 188:6
  202:11 301:8,15
  303:7 304:13,19
transported
183:7 305:8
transports
202:21
trash
349:22
travel
200:18 303:2
traveling
202:6
travels
200:16,23 201:6
  202:14
treat
60:11
treated
254:14 316:17
  319:17 349:24
treatment
212:14,15 314:17
treatments
93:15
tremolite
77:13 144:11,21
  145:3 146:6
trend
110:23 114:4 255:9

Trendelenburg
188:21
trends
354:15,16
trial
16:6,15 17:14 56:9
  56:19
tried
54:12
true
90:19 121:5 154:7
  172:5,9 190:12
  216:14 262:23
  263:17 267:5
  275:24 301:20
  326:15,16 334:19
truth
364:5,6,6
try
11:15 14:12 34:2
  39:17 156:12
  231:23
trying
15:4 18:5 112:8
  311:7 328:18
tubal
190:13,14,19,23
  191:3,17 193:1,20
  194:7,19 196:12
  196:24 197:18
  198:4
tube
323:3 324:1,12
tubes
183:14 184:4 190:3
  190:5 191:5 201:1
  303:17 322:17,23
  323:15
tubing
146:13
Tucker
2:13 3:12 9:13
tumor
166:16 313:3
tumors
280:2,4,13
turn

106:21 108:15
  163:10 196:16
  285:24 301:1
turning
305:13
Twitter
342:7,22
two
25:16,18 35:21
  37:12 41:3 77:10
  89:10 96:5 113:13
  145:5 148:11
  149:5 150:17
  151:24 160:11
  201:21 221:5
  222:19 272:12
  297:7 299:12
  327:13 343:5,15
  347:21 350:12
two-thirds
272:12 306:10
type
25:12 61:17 144:7
  146:2 153:12,21
  153:22 155:1
  172:24 174:12
  179:15,16 244:6
types
76:2 144:10,19
  145:8 146:5,17
  153:24 154:1,12
  154:13 155:6
  179:2 240:11
  241:3 280:2 328:6
  357:2
typical
45:5
typically
42:13 70:13 71:2
  238:12

---
U
---
U.K
308:9
U.S
118:24 178:24
  305:18 306:21,24

308:9
Uh-huh
320:12 344:1
unable
241:18 255:22
unaware
67:24 205:4,5
uncontrolled
221:22
Undated
5:12
undergraduate
59:17
underlying
99:12
Underneath
126:1,4
underpowered
241:18 251:16,18
  251:20 252:16,22
understand
11:13,14 15:4 18:5
  22:8 23:10 80:3,5
  87:21 95:21,24
  112:11 127:18
  168:7 180:15
  207:22 284:14
  310:23 324:21
  329:19 339:17,20
  344:4
understandable
296:20
understanding
36:11,13 38:10
  72:7 73:5,16 75:3
  76:1 78:4 100:3
  102:23 138:1
  147:19 148:2
  151:15 156:17
  157:16 349:1
understood
11:20 53:20
undertook
32:2
underwear
341:11,16
underwent

130:23
undo
312:23
unfair
92:19
unfortunately
251:15
Union
3:15 9:13
United
1:1 90:3,24 93:18
  100:12 219:14
  306:4
universe
231:1
University
58:4 59:1,4 239:7
unknown
266:20
unmeasured
266:13,17
unreasonable
134:1
unrecognized
266:17
update
94:8 237:16
updated
220:9 258:5
updates
58:20
uploaded
24:5
upper
183:7 301:9,16
  304:14 305:9
urethra
202:2,7,10,15,22
urinary
202:13
usage
268:16 269:5
  310:12
USB
5:21
use
17:3,8 23:4,11,12

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 139 of 1035
PageID: 241318
Arch I. "Chip"  Carson, M.D., Ph.D.

Page 413

23:13,21 27:4
38:3 53:7,22 82:1
82:12 83:3,10
99:14,18 107:4
131:9,13,20
132:10 133:19,24
134:15 140:2
166:21 168:15
169:19 174:4
181:13 182:22
184:14 187:13
189:8,9 190:14
192:22 196:11
199:11 200:11
201:17,18 202:19
202:24 208:20
211:4 214:7 216:9
220:6 221:24
230:22 231:19
232:10 235:3
237:24 238:8,16
243:11 244:3,14
246:3,10 247:22
248:9,23 249:16
249:18 250:6
252:3 254:5
260:21 261:10,11
261:13,14,17
262:10,13,15
263:10,12,14
270:18 272:3,15
272:24 273:18
274:6 277:5
283:13 284:18
288:6 298:6
306:15,19 307:7
307:11,23 308:1
308:11,16,17,21
309:11,18 310:1,3
310:14,14,21
311:9,11,14 312:2
312:8 315:16,17
316:23 319:11
326:12 338:20,20
339:19 341:8
350:10,13,22
351:16 359:5

**useful**
171:1 325:16 349:3
  349:22
**user**
231:14
**users**
131:14 170:12
  192:24 211:6
**uses**
28:11 280:14
**usually**
169:14 180:11
  281:2 295:4
  328:20 329:20
  350:18 352:1
**uterine**
188:15 198:12
  199:15,24 200:12
**uterus**
200:20,24 302:15
  322:13
**utilize**
20:22 317:9
**UTMB**
59:6,6

---

**V**

**vagina**
200:19 301:23
  302:6,10 304:23
  322:6 334:12
**vaginal**
198:12 199:14,24
  200:12
**vague**
143:10 147:18
  174:15
**valence**
180:18,21 181:2,6
**valid**
173:10 175:4
  223:17 238:21
  305:11
**valuable**
42:18
**value**
28:24 358:4

**vapors**
360:23 361:2
**variation**
136:22 192:24
**varies**
56:5 332:2
**varieties**
344:19
**various**
18:11 41:1 52:15
  71:4 79:17 93:23
  107:13 143:15
  144:9 175:3 188:2
  215:24 245:7
  280:15 286:23
  287:12 308:7
  344:19 361:8
**vary**
153:22 231:15
  308:8 309:22
**vast**
245:12
**vegetables**
229:10 357:11,19
  360:1,3,5,9,11
**velocity**
303:14
**Venter**
183:17 187:18
**verbal**
336:20
**verbatim**
364:7
**verify**
92:24 175:21
**vermiculite**
64:18 77:12,17
**version**
337:8
**versions**
44:1
**versus**
111:21 251:6
  317:20 347:18
**video**
8:9
**videographer**

3:22 8:3,5 9:15
  89:3,7 176:24
  177:4 253:7,11
  363:7,11,18
**Videotaped**
1:13
**view**
202:5 236:6 289:3
  292:3 295:22
  331:2
**viewed**
91:17
**viewing**
342:19
**visit**
342:16,23
**vitae**
5:6 21:7 57:18
  58:20 70:24
**vitamins**
170:7
**volition**
334:14
**volume**
345:5
**voluntary**
219:9
**vulvar**
198:12 199:14,24
  200:12

---

**W**

**Wagner**
129:20
**wait**
250:24 298:20
**want**
21:24 33:16,22
  39:7 44:6 74:8
  88:17 113:12
  246:20 251:24
  254:23 278:6
  283:6 284:1
  292:11 301:1,4,6
  301:12 309:10
  315:1,12
**wanted**

34:2 39:16 329:14
  336:24 349:2
**War**
145:15
**warned**
213:23
**washing**
190:3
**Washington**
3:19
**wasn't**
144:3 156:10 251:7
  258:17 260:2
  287:8 290:24
  307:2
**waste**
345:6
**Watch**
342:9
**water**
170:7,7 311:3
**waterfront**
43:6
**way**
18:15 37:4 81:2
  82:6 93:12 136:20
  141:8 164:17
  207:1 217:14
  245:2 272:12
  294:21 302:6,10
  302:11,14 316:18
  319:20 320:3
  332:5
**ways**
18:12 39:19 208:23
  299:11 328:23
  347:22
**we'll**
10:16 26:10 30:13
  32:18 85:22 87:3
  124:15 130:1,1
  159:20 163:2
  195:21 228:24
  229:1 260:4
  343:13
**we're**
11:10,19 28:17

Arch I. "Chip"  Carson, M.D., Ph.D.

89:3,7 168:10
176:24 177:4
195:16 199:9
213:22 233:7
253:7,11 296:23
363:11
**we've**
12:11 13:5 24:24
36:12 46:6 47:11
58:20 65:11 86:21
94:24 100:20
102:4,15 160:3
225:11 235:23
238:23 254:2
259:14 322:3
332:15 343:4
**weak**
203:8 204:15 206:6
233:2,18
**webpage**
41:23
**website**
41:23 43:9 225:13
225:21
**websites**
79:7 214:4 278:12
278:16 342:3,7
**week**
60:6,8,10 309:24
**weeks**
30:8 40:21
**Weibull**
282:20
**weigh**
254:6
**weighing**
251:5 277:15
**weight**
91:19 229:23 230:3
230:6 267:15,24
**welcome**
14:17
**went**
35:4 168:23 275:1
275:11 319:15
349:22
**Werb**

126:21
**whatsoever**
299:2
**wheel**
251:23 252:5
**width**
137:9
**Wild**
286:9
**Wilde**
286:6
**willing**
226:20
**withdraw**
62:16 73:12 131:11
176:12 190:21
224:8 235:22
264:5
**withdrew**
294:16
**witness**
9:17 10:11 13:8
20:11 37:5 40:3
47:14 48:7,15
54:6 56:21 67:19
71:1 74:8 80:9
113:5,18 150:4,11
164:16,23 165:3
165:12 192:4,10
196:1 207:12
223:2 243:3,19
257:20,23 258:2
282:6 291:19
295:8 296:15
315:4,13 316:1
332:22 343:17
359:19 364:11,11
365:1
**witnesses**
52:15,16,21 67:23
70:14
**woman**
185:7 186:18 187:2
187:5 231:15,16
299:4 308:18,23
309:3,10 310:3
330:8,15 331:5

**woman's**
86:12 87:9 88:2,19
116:17 119:4,13
169:18 200:17
202:2 304:14,23
319:21 331:4
334:20 338:14,21
340:17 341:9,16
**women**
60:11 118:24
159:10 160:16
161:3,12 166:21
167:3 178:2,4,6
182:22 185:19,23
188:14,21 189:17
189:19,20 190:8
191:8 193:19,24
194:18 196:12,22
197:17 198:2
202:13 207:7
233:20 250:17,22
255:10,11 260:21
269:19,21 271:21
273:4,8,13,16,21
273:24 274:6,8,13
274:14,20 275:4
275:10,19 276:3,6
283:12 288:6
296:11 298:4,17
299:3 304:2,8
306:21,24 307:11
307:11,23 308:2,5
308:11 310:16
311:9,12 326:12
326:17 327:21
331:14,15 332:1
351:7,9,11
**women's**
82:16 207:3,17
**wonder**
118:3
**wood**
229:15,18
**Woodruff**
32:17
**wording**
93:1

**words**
83:19 84:9,10,11
84:14 127:17
133:10 208:23
297:18 315:17
328:1
**work**
37:1 45:5 48:8,14
49:16 51:10,12,21
56:3 57:10 60:6
63:14 64:16 76:5
76:5,15 104:13,21
118:19 146:16
239:5 264:1
331:12 344:10
347:15
**worked**
37:7,11 60:14
**workers**
145:21,24 331:16
**workgroups**
345:11
**working**
55:23 103:3 221:3
331:15
**workplace-related**
328:8
**works**
70:10
**world**
145:15 240:5
**worry**
105:3
**worth**
100:7
**wouldn't**
36:1 42:20 85:18
141:8 167:2 224:9
293:15 340:22
**writing**
43:15 45:15 65:17
65:19 347:23
**written**
40:14 281:23
336:18
**wrote**
54:14

**X**

**Y**

**yeah**
118:7 176:21
183:20,22 197:14
218:15 336:3
343:9 359:21
**year**
221:5 233:20 261:4
261:13,14,16
262:10 272:16
305:18 306:5,6,10
307:17,20 310:13
**years**
23:19 37:2 75:2
96:5 130:24
147:23 168:9,9
212:16 250:12
255:12 261:4,5,5
261:10,10 262:10
262:12,15,20
263:9,11,14
267:21 279:18
280:9,19 281:8
310:2,20 327:11
327:13 345:15
357:21,24 360:21
**yes/no**
272:17
**Yessaian**
69:5,11

**Z**

**Zellers**
2:13 4:6 8:24,24
9:22 11:2,3 12:1
14:18 15:20 17:22
19:1 20:7,13 21:5
21:12,18 25:9
26:8,21 29:16
30:18 31:7 32:10
32:21 36:9 37:19
38:16 53:13 54:8
55:21 59:8 61:1
62:15 63:11 64:5
66:2 67:11 68:5

Arch I. "Chip"  Carson, M.D., Ph.D.

Page 415

| | | | | |
|---|---|---|---|---|
| 68:18 70:21 71:19 | 195:1,10,21 196:3 | **1** | 5:5 | 1:5 |
| 72:1 73:12,14,23 | 197:6,23 198:18 | 5:4 10:16,18 12:11 | **112** | **163** |
| 74:5,13,23 75:19 | 199:21 200:8 | 12:19 89:4 114:13 | 3:3 | 6:7 |
| 78:8,16 79:3 | 201:13 202:12 | 130:13 148:16 | **1170** | **16th** |
| 80:21 81:17,23 | 203:15,23 204:22 | 178:15 223:9 | 2:10 | 39:5 |
| 82:21 84:8,22 | 205:14,16 207:8 | 226:3 229:18 | **12** | **17** |
| 85:20 87:1,6,20 | 207:15 209:14 | 260:17 332:5 | 5:19 32:18,19,22 | 6:6 159:20,21 |
| 88:15 89:1,9 92:1 | 210:2,17 212:4 | 357:7 358:16 | 60:9 250:12 297:9 | 160:3 283:3 |
| 92:4,11,20 93:3 | 215:3 216:15 | **1,000** | **12/18** | **174** |
| 94:17 95:5 97:11 | 218:12 219:19 | 227:7 | 5:15 | 113:9 |
| 98:6,23 99:11 | 221:4 222:12,24 | **1.19** | **12:32** | **177** |
| 106:20 107:18 | 223:11,20 224:3 | 276:21 | 177:1,2 | 113:9 |
| 108:14 110:1 | 225:2,17 226:15 | **1.2** | **120** | **18** |
| 111:4 112:4,24 | 228:7,17 229:9,16 | 332:10 | 226:2 | 6:7 163:2,3 |
| 113:7,11,20 114:9 | 232:7,23 233:6 | **1.3** | **1215** | **180** |
| 117:7 119:9 | 234:3,4,13,19 | 232:14,24 235:23 | 163:20 | 45:18 347:14 |
| 120:16 121:1,15 | 235:10 236:10,13 | 236:14 333:17 | **1216** | **1800** |
| 121:17 123:15 | 237:6,13 238:6 | 334:5 | 163:11 | 3:4 |
| 124:19 127:22 | 239:10 240:18 | **1.63** | **124** | **18th** |
| 128:11,20 129:3 | 241:21,23 242:8 | 276:23 | 6:2 | 30:14 |
| 130:7 132:4 | 242:13 243:5,16 | **1.74** | **13** | **19** |
| 133:17 136:10 | 243:21,22 244:11 | 145:19 | 5:21 36:4,7,12 | 1:11 5:2 6:8 8:2 |
| 138:3 140:17,19 | 246:15 247:11,17 | **1/1/14** | **130** | 94:15 192:11,14 |
| 141:2 142:3 | 248:4 249:5 | 5:16 | 6:4 | **19103** |
| 143:20 144:5 | 250:14 251:3 | **1:38** | **14** | 2:21 |
| 145:1 147:8 148:9 | 252:11 253:4,13 | 177:3,5 | 5:22 98:20,21,24 | **192** |
| 149:2 150:12 | 254:12 258:3,20 | **10** | 99:7 130:24 | 6:8 |
| 151:7,22 152:8 | 259:12 261:2 | 5:4,16 31:4,5 33:18 | **14,000** | **195** |
| 153:7,18 154:10 | 262:1 263:15 | 218:20 219:5 | 306:9 | 6:10 |
| 155:15,21 157:4 | 264:3,13 267:6,22 | 229:22 297:9 | **148** | **1952** |
| 157:12 158:16 | 269:1 270:2,9 | **10%** | 7:3,5 | 5:13 28:24 |
| 159:1,14 160:1 | 271:3,7 276:1,12 | 56:7 | **14th** | **1970s** |
| 161:8,11 162:18 | 276:19 277:12 | **10:37** | 37:18 | 167:14 |
| 163:5 164:3,11,22 | 279:2 282:11,21 | 89:4,5 | **15** | **1974** |
| 165:7,11,14,16 | 283:23 284:5 | **10:55** | 5:5 6:2 109:8,11 | 5:19 32:15 |
| 167:20 168:1,12 | 289:8 343:6 | 89:6,8 | 111:5 124:16,17 | **1979** |
| 168:19 170:17 | 359:14,18 363:16 | **100** | 146:23 246:1,6 | 6:4 129:12 |
| 171:5,22 172:10 | **zero** | 3:13 | 259:5 | **1982** |
| 172:20 173:11 | 312:2 | **100%** | **150** | 145:13 |
| 174:11,19 175:12 | **Zurbenko** | 306:21 307:22 | 45:18 347:14 | **1984** |
| 176:4,19,23 177:6 | 282:19 | **100C** | **159** | 77:14 |
| 178:5,8 179:7 | | 291:20 | 6:6 | **1990s** |
| 180:1 181:11 | **0** | **11** | **15th** | 37:10 |
| 182:7 184:23 | **07962** | 5:18 17:24 18:18 | 26:1 37:18 | **1991** |
| 185:16 186:16 | 3:9 | 24:23 32:7,8 | **16** | 5:18 31:13,21 |
| 188:13 190:6 | | 33:10 297:9 | 6:4 18:19 130:2,3 | **1992** |
| 192:7,13 193:15 | **1** | **11/16/18** | **16-2738** | 255:7 |

Arch I. "Chip"  Carson, M.D., Ph.D.

**19th**
8:7 136:20
**1st**
30:21,24 218:21

---
**2**
---

**2**
4:2 5:5 15:17,18,21
16:4,16 17:10,15
22:10 43:14 54:22
65:12 89:8 108:15
109:1 177:1
221:17 272:6,21
346:14
**2.53**
145:23
**2.96**
145:17
**20**
6:10 112:16 168:9
195:22,23 196:5
259:16 260:7
261:5,5,10 262:15
262:20 263:11,14
279:17 280:8
281:8 332:6,13
367:16
**20.0**
332:7,9,10
**2000**
2:20 145:22
**20004-1454**
3:19
**2001**
127:4
**2004**
247:4
**2006**
203:12,22
**2007**
6:14 127:4 250:12
287:5
**2008**
146:8 246:23
**2009**
26:1
**2010**

**126:21** 203:17
204:20 257:12
258:6,11
**2011**
6:6,7 159:16 163:2
**2013**
6:8 191:19 192:15
268:11,14,20
269:3
**2014**
30:21 31:1 33:19
218:21 220:4
222:7 271:21
272:13,16 273:12
273:17 274:1,12
274:13 277:3,23
**2016**
6:10,16 195:12
196:5 255:8,14
259:15,16 260:13
271:5,13
**2017**
6:13 242:15
**2018**
30:15 36:19 37:13
38:18 40:6 57:23
59:14 64:8 65:22
66:1 89:12 100:24
102:3 142:15
227:5 257:9
**2019**
1:11 5:2,9,10 8:2,7
26:10 94:9 364:23
**202**
3:19
**21**
5:6,7 6:11 113:9
225:14,15,20
293:2
**21,000**
306:7
**210**
3:5 130:22
**213**
2:16
**215**
2:21

**216**
3:14 163:10
**22**
6:13 242:24 243:1
364:23
**22,000**
307:22
**22,000-something**
307:21
**225**
6:11
**23**
6:14 247:3,8
**234**
2:4
**24**
6:16 69:6 184:15
185:1 255:12
271:1,4,12
**243**
6:13
**247**
6:14
**25**
6:17 108:15 289:8
289:9,23
**26**
5:9,10,12
**267-0058**
3:9
**269-2343**
2:5
**27**
67:20 68:9 69:4,8
**271**
6:16
**2738**
8:12
**28**
7:6 68:10
**284**
4:7
**289**
6:17
**29**
5:13 71:5
**2A**

**226:16**
**2B**
227:16,18 228:10
229:2,11,17,19
235:8,12 249:20
292:18,23 355:16
356:23 359:24
**2B-classified**
357:10

---
**3**
---

**3**
5:6 21:3,6 57:19
58:2,21 65:1
70:24 177:5
196:21 223:1,2,13
227:6 253:8
290:23
**3,000**
233:22 305:17
306:18
**3.3.1**
112:14
**3:06**
253:8,9
**3:19**
253:10,12
**30**
5:15 11:8 55:5
56:13 71:5 109:8
109:11,19 111:5
246:1 259:6 308:8
364:11 365:16
**30-day**
44:24
**30%**
84:18 211:4 231:3
232:13 233:17
306:12,13,15
307:6 308:13
309:13 310:5
**31**
5:16
**32**
5:18,19
**334**
2:5

**337**
196:16,20 197:5,9
260:17
**339**
196:17,20
**34%**
273:15,19 275:1
**34.4**
274:15 275:1
**343**
4:8
**35**
11:8 55:5 56:13
164:12
**350**
3:8
**351**
278:3
**36**
5:21
**36.5**
274:2 275:5,15
**36103-4160**
2:5
**364**
4:10
**365**
2:9
**366**
4:11
**367**
4:12
**368**
4:13
**3rd**
26:10

---
**4**
---

**4**
5:7 21:10,13,20,23
24:24 34:15,24
66:21 68:10 69:4
69:8 71:6 126:8
178:16 220:16
221:13 224:11,11
227:1,9 253:12
272:21 282:22

Arch I. "Chip"   Carson, M.D., Ph.D.

283:1 285:24
363:8
**40**
130:24 168:9
279:18 280:9
281:8
**41**
106:21
**412**
289:21 291:13
**42nd**
2:15
**430-3400**
2:16
**44**
280:19
**450**
45:11
**463-2400**
3:19

---

**5**

**5**
5:9 25:24 26:2
50:19 99:6 148:11
148:16 227:12
297:3,4 363:12,20
**5%**
56:1
**5:37**
363:8,9
**5:44**
363:10,12,19
**5:45**
363:22
**50**
332:6
**50%**
109:11,14 118:24
327:4
**50/50**
57:14
**504**
2:11
**51.5**
275:12
**515**

2:14
**554-5500**
3:5

---

**6**

**6**
5:10 26:6,10 27:13
27:23 77:8,9
210:12 243:24
**6.2**
291:7
**60%**
308:8
**600**
3:13
**63102**
3:14
**6580**
1:15
**696-3675**
3:14

---

**7**

**7**
5:12 26:19,23 27:7
81:8,16,19 89:17
94:24 100:21
101:14 102:4,15
102:24 103:17
104:3,10 106:1,21
114:13,16 115:23
183:2 210:13
256:19 301:1
**7/9/2020**
364:22
**70130**
2:10
**70s**
168:11
**78205**
3:4
**799-2845**
2:11

---

**8**

**8**
4:3 5:13 29:14

99:17 305:13
**8/1/00**
5:22
**819**
193:16
**82**
226:16
**820**
193:17
**85**
348:12
**87**
276:22,23
**877.370.DEPS**
1:23

---

**9**

**9**
4:6 5:15 30:15,16
89:16
**9:02**
1:16 8:2,8
**90%**
348:13
**90071**
2:15
**917.591.5672**
1:23
**93**
6:18 291:17,20
**95%**
261:23
**973**
3:9
**975**
3:18
**98**
5:22
**988-2706**
2:21
**99**
117:4 127:2

Exhibit 27

Judith K. Wolf, M.D.

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| IN RE: JOHNSON & | : | |
| JOHNSON TALCUM POWDER | : | |
| PRODUCTS MARKETING, | : | |
| SALES PRACTICES, AND | : | |
| PRODUCTS LIABILITY | : | CASE NO. 16-2738 |
| LITIGATION | : | (FLW) (LHG) |
| | : | |
| THIS DOCUMENT RELATES | : | |
| TO ALL CASES | : | |
| | : | |
| MDL Docket No. 2738 | : | |

-   -   -

Monday, January 7, 2019

-   -   -


        Videotaped Oral Deposition of

JUDITH K. WOLF, M.D. taken pursuant to

notice, was held at the Hilton Austin, 500

East 4th Street, Austin, Texas, beginning at

9:08 a.m., on the above date, before Micheal

A. Johnson, Registered Diplomate Reporter,

Certified Realtime Reporter, and Notary

Public for the State of Texas.

-   -   -

Judith K. Wolf, M.D.

Page 2

APPEARANCES:
1
2  BEASLEY ALLEN, PC
   BY: P. LEIGH O'DELL, ESQUIRE
3  leigh.odell@beasleyallen.com
   Margaret M. Thompson, ESQUIRE
4  margaret.thompson@beasleyallen.com
   218 Commerce Street
5  Montgomery, Alabama 36104
   (334) 269-2343
6  Counsel for Plaintiffs' Steering
   Committee
7
8  ROBINSON CALCAGNIE, INC.
   BY: CYNTHIA L. GARBER, ESQUIRE
9  cgarber@robinsonfirm.com
   19 Corporate Plaza Drive
10 Newport Beach, California 92660
   (949) 720-1288
11 Counsel for Plaintiffs' Steering
   Committee
12
13 BLOOD HURST & O'REARDON LLP
   BY: PAULA R. BROWN, ESQUIRE
14 pbrown@hbolaw.com
   501 West Broadway, Suite 1490
15 San Diego, California 92101
   (619) 338-1100
16 Counsel for Plaintiffs' Steering
   Committee
17
18 WEIL, GOTSHAL & MANGES LLP
   BY: ALLISON M. BROWN, ESQUIRE
19 allison.brown@weil.com
   17 Hulfish Street, Suite 201
20 Princeton, New Jersey 08542-3792
   (609) 986-1104
21 Counsel for Johnson & Johnson entities
22
23
24

Page 3

APPEARANCES:
1
2  WEIL, GOTSHAL & MANGES LLP
   BY: ALEXIS KELLERT, ESQUIRE
3  alexis.kellert@weil.com
   767 Fifth Avenue
4  New York, New York 10153-0119
   (212) 310-8468
5  Counsel for Johnson & Johnson entities
6
7  DRINKER BIDDLE & REATH, LLP
   BY: KATHERINE MCBETH, ESQUIRE
   katherine.mcbeth@dbr.com
8  One Logan Square, Suite 2000
   Philadelphia, Pennsylvania 19103-6996
9  (215) 988-2706
   Counsel for Johnson & Johnson entities
10
11 GORDON REES SCULLY MANSUKHANI LLP
   BY: MICHAEL R. KLATT, ESQUIRE
12 mklatt@gordonrees.com
   816 Congress Avenue, Suite 1510
13 Austin, Texas 78701
   (512) 391-0197
14 Counsel for Imerys Talc America
15
16 COUGHLIN DUFFY LLP
   BY: MARK K. SILVER, ESQUIRE
   msilver@coughlinduffy.com
17 350 Mount Kemble Avenue
   Morristown, New Jersey 07962
18 (973) 267-0058
   Counsel for Imerys Talc America
19
20 TUCKER ELLIS LLP
   BY: TARIQ M. NAEEM, ESQUIRE
21 tariq.naeem@tuckerellis.com
   950 Main Avenue, Suite 1100
22 Cleveland, Ohio 44113-7213
   (216) 696-3675
23 Counsel for Pharmatech ("PTI")
24

Page 4

APPEARANCES:
1
2  SEYFARTH SHAW, LLP
   BY: RENEE B. APPEL, ESQUIRE
3  rappel@seyfarth.com
   975 F Street, N.W.
4  Washington, D.C. 20004-1454
   (202) 463-2400
5  Counsel for Personal Care Products
6
VIDEOGRAPHER:
7
   Shane Ramirez,
8  Golkow Litigation Services
9
         - - -
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 5

           INDEX
1       JUDITH K. WOLF, M.D.
2        January 7, 2019
3
4  APPEARANCES                      2
5
6  PROCEEDINGS                      9
7  EXAMINATION OF JUDITH K. WOLF, M.D.:
8     BY MS. BROWN          9
9
10    BY MR. KLATT          388
11    BY MS. O'DELL         446
12    BY MS. BROWN          461
13    BY MR. KLATT          470
14    BY MS. O'DELL         482
15    BY MS. BROWN          482
16
17 CERTIFICATE                      485
18 ACKNOWLEDGMENT OF DEPONENT          486
19 ERRATA                           487
20 LAWYER'S NOTES                   488
21
22
23
24

Judith K. Wolf, M.D.

Page 6

DEPOSITION EXHIBITS
JUDITH K. WOLF, M.D.
January 7, 2019

NUMBER          DESCRIPTION          MARKED

Exhibit 1   Notice of Oral and          11
            Videotaped Deposition of
            Judith Wolf and Duces
            Tecum

Exhibit 2   Reprint from UpToDate,      12
            Evidence-based medicine

Exhibit 3   IARC Monographs on the      31
            Evaluation of
            Carcinogenic Risks to
            Humans, Preamble

Exhibit 4   Reproductive Sciences,      35
            Original Manuscripts

Exhibit 5   Invoices for TALC MDL       36

Exhibit 6   Curriculum Vitae            52

Exhibit 7   Rule 26 Expert Report of    66
            Judith Wolf, MD

Exhibit 8   Rule 26 Expert Report of    100
            Ellen Blair Smith, MD

Exhibit 9   FDA.gov, Ingredients,       128
            Talc

Exhibit 10  Excerpt from Arsenic,       157
            Metals, Fibres, and
            Dusts, IARC Monographs
            on the Evaluation of
            Carcinogenic Risks to
            Humans

Page 7

DEPOSITION EXHIBITS
JUDITH K. WOLF, M.D.
January 7, 2019

NUMBER          DESCRIPTION          MARKED

Exhibit 11  The Association Between     198
            Talc Use and Ovarian
            Cancer, A Retrospective
            Case-Control Study in
            Two US States

Exhibit 12  The relationship between    213
            perineal cosmetic talc
            usage and ovarian talc
            particle burden, by
            Debra S. Heller, MD, et
            al.

Exhibit 13  IARC Monographs on the      224
            Evaluation of
            Carcinogenic Risks to
            Humans, Volume 93,
            Carbon Black, Titanium
            Dioxide, and Talc

Exhibit 14  April 1, 2014, Letter,      233
            Steven Musser to Samuel
            Epstein

Exhibit 15  American Association for     238
            Cancer Research,
            Research Article,
            Association between Body
            Powder Use and Ovarian
            Cancer: The African
            American Cancer
            Epidemiology Study
            (AACES)

Exhibit 16  Perineal Talc Use and       245
            Ovarian Cancer, A
            Systematic Review and
            Meta-Analysis

Page 8

DEPOSITION EXHIBITS
JUDITH K. WOLF, M.D.
January 7, 2019

NUMBER          DESCRIPTION          MARKED

Exhibit 17  Genital use of talc and     247
            risk of ovarian cancer:
            A meta-analysis, by Wera
            Berge, et al.

Exhibit 18  Ovarian, Fallopian Tube,    272
            and Primary Peritoneal
            Cancer Prevention (PDQ)
            - Health Professional
            Version

Exhibit 19  African-Americans and       294
            Hispanics Remain at
            Lower Risk of Ovarian
            Cancer Than Non-Hispanic
            Whites after Considering
            Nongenetic Risk Factors
            and Oophorectomy Rates,
            by Anna Wu, et al.

Exhibit 20  The Future of Ovarian       350
            Cancer Diagnosis Is Now
            - Through These 4
            Strategies

Exhibit 21  How to find the best        353
            doctor for ovarian
            cancer, by Judy Wolf

Exhibit 22  Arsenic, Metals, Fibres,    427
            and Dusts, IARC
            Monographs on the
            Evaluation of
            Carcinogenic Risks to
            Humans

Page 9

1          PROCEEDINGS
2          THE VIDEOGRAPHER:  Here begins
3     the deposition of Dr. Judy Wolf.
4     Today's date is January 7th, 2019.
5     The time is 9:08 a.m.
6          Will the court reporter please
7     swear in the witness.
8          JUDITH K. WOLF, M.D.,
9     called as a witness, having been duly sworn
10    by a Notary Public, was examined and
11    testified as follows:
12          EXAMINATION
13    BY MS. BROWN:
14    Q.    Good morning, Dr. Wolf.
15    A.    Good morning.
16    Q.    My name is Ally Brown and I
17    represent Johnson & Johnson, and I'll start
18    with some questions for you here today.
19    Okay?
20    A.    Okay.
21    Q.    Have you ever been deposed
22    before?
23    A.    One time.
24    Q.    And when was that?

3 (Pages 6 to 9)

Judith K. Wolf, M.D.

Page 10

1      A.    That was -- I want to say, was
2  nearly three years ago.  It was a wrongful
3  termination case at a hospital I used to
4  work.
5      Q.    And were you the plaintiff in
6  that case?
7      A.    No.
8      Q.    Okay.  Were you a witness in
9  that case?
10     A.    A witness.
11     Q.    Okay.  And you're probably
12 familiar with some of the rules of a
13 deposition, having done this not too long
14 ago, but I'll just remind you a little bit.
15     A.    Okay.
16     Q.    We'll try and talk one at a
17 time, so that the court reporter can get down
18 all of my questions and all of your answers.
19 Do you understand that you are under oath
20 here today same as if you were in a court of
21 law?
22     A.    Yes.
23     Q.    Okay.  If you don't understand
24 one of my questions, will you let me know?

Page 11

1      A.    Yes.
2      Q.    And if you go ahead and answer
3  them, is it fair to assume you understood
4  what I was asking?
5      A.    Yes.
6      Q.    Okay.  We'll take breaks
7  throughout the day.  It's not a marathon, so
8  just let me know if you need a break and
9  we'll be happy to accommodate you.  Okay?
10     A.    Okay.
11     Q.    I'm handing you, Dr. Wolf, what
12 we have marked as Exhibit 1 to your
13 deposition, which is the notice of your
14 deposition.
15         (Deposition Exhibit 1 marked
16         for identification.)
17 BY MS. BROWN:
18     Q.    Have you seen this document
19 before?
20     A.    Yes.
21     Q.    Okay.  And when was that?
22     A.    I saw it several days ago.  I
23 can't remember exactly when.
24     Q.    Okay.  And prior to starting

Page 12

1  today, you were -- the attorney representing
2  plaintiffs provided me with a number of
3  documents in request to this notice that I'd
4  like to mark and ask you about.
5      A.    Okay.
6      Q.    And so the first one we'll mark
7  as Exhibit 2 to your deposition.
8         (Deposition Exhibit 2 marked
9         for identification.)
10 BY MS. BROWN:
11     Q.    Which is an UpToDate printout
12 from January 5th, 2019.
13     A.    Yes.
14     Q.    We only have one copy, so let
15 me hand it to you and ask you to describe
16 what Exhibit 2 is.
17     A.    This is an article from
18 UpToDate that describes what evidence-based
19 medicine is, which is -- I provided because
20 this is how I reviewed the subject and how I
21 review any subject when I'm looking to treat
22 a patient or taking care of a patient or
23 working on a research project, and I thought
24 that this was a good outline and description

Page 13

1  of what I do.
2      Q.    Do you consider UpToDate to be
3  a reliable source in your field?
4      A.    I think it's a --
5         MS. O'DELL:  Object to form.
6      A.    I believe it's a good starting
7  place.  If I read something on UpToDate and I
8  want something more in depth, the first thing
9  I usually do is go to the references and look
10 at those.  If -- and if I want more
11 information and there's an UpToDate, I'll do
12 a general PubMed literature search to find
13 other articles.
14 BY MS. BROWN:
15     Q.    As part of your methodology in
16 your report when we're here to talk about
17 today in the MDL, did you employ the
18 evidence-based medicine approach described in
19 Exhibit 2?
20     A.    Yes.
21     Q.    And describe that for us
22 briefly, if you would.
23     A.    So first is formulating a
24 question and the question is, does talcum

4 (Pages 10 to 13)

Judith K. Wolf, M.D.

Page 14

1  powder product cause ovarian cancer?  And
2  then the next part is finding the available
3  evidence, which is, for me, looking at the
4  literature that I had at my house to start,
5  going on PubMed and searching literature,
6  looking at references from those, going --
7  finding more literature from the references
8  that I pulled.  Some references were provided
9  by the attorneys, some other information that
10 I asked for, they provided.  And so trying to
11 go through as many sources as I could find,
12 to find as much information about the topic
13 that I could find, both in human studies and
14 in vitro studies and in animal studies.
15     Q.    And so if I understand your
16 methodology, it was first formulating a
17 question?
18     A.    Yes.
19     Q.    Is that right?  And the
20 question at issue as it relates to this MDL
21 report was, does genital application of
22 talcum powder product cause cancer; is that right?
23     A.    Does genital -- does talcum
24 powder product cause ovarian cancer.

Page 15

1     Q.    That's the question that you
2  endeavored to answer in your report?
3     A.    Yes.
4     Q.    Is that right?
5     A.    Yes.
6     Q.    And when you say talcum -- does
7  talcum powder cause ovarian cancer, do you
8  have a particular product in mind?
9     A.    I'm thinking about talcum
10 powder product in general.
11     Q.    And how do you define a "talcum
12 powder product"?
13     A.    Anything that comes in a powder
14 form that people might apply to their body or
15 someone else's body.
16     Q.    What about deodorizing sprays
17 that contain talcum powder?  Do you include
18 that in your definition?
19     A.    I would include that in my
20 definition.
21     Q.    Okay.  What about soaps that
22 contain talcum powder?  Would you include
23 that in your definition as well?
24     A.    I hadn't thought about that,

Page 16

1  but if there's talcum powder in them, yes.
2     Q.    Okay.  What about tampons or
3  other feminine products that contain talcum
4  powder?  Are you including that in your
5  definition of a "talcum powder product"?
6     A.    Again, I haven't really thought
7  about tampons as containing talcum powder as
8  a possibility, so I would say I hadn't
9  considered that.
10     Q.    Okay.  What about talc-dusted
11 condoms?  Are you including that in your
12 definition of a "talcum powder product"?
13     A.    I am, but my understanding is,
14 that since the '90s, that practice has
15 stopped because of concerns.
16     Q.    And tell me what you're relying
17 on for that understanding.
18     A.    I have a reference in my
19 report.  I have to look up the name of the
20 author.
21     Q.    Okay.  And the reference in
22 your report is actually to an internal PCP
23 document.  Is that what you're relying on for
24 your understanding that condoms no longer

Page 17

1  contain talcum powder?
2     A.    No.  Well, can I look at my
3  report for a second?
4     Q.    Absolutely.
5           (Witness reviews document.)
6     A.    There are actually references
7  above the PCP report, talking about concerns
8  of ovarian cancer and talc on condoms, Kang,
9  Griffin and Ellis, Casper and Chandler.
10 BY MS. BROWN:
11     Q.    And for the record, Doctor,
12 what page are you on?
13     A.    I'm on page 5.
14     Q.    Okay.  And your understanding
15 that condoms no longer are dusted with talc
16 comes from Kang, Griffin and Ellis 1992, and
17 Casper and Chandler 1995, as well as an
18 internal PCPC document and McCullough in
19 1996; is that right?
20     A.    My understanding that there was
21 concern about talcum powder on condoms is
22 from the Kang, the Griffin and the Casper
23 articles, and then my understanding about
24 stopping dust in condoms was from the PCP

Judith K. Wolf, M.D.

Page 18

1    document and the McCullough document.
2        Q.    Have you reviewed the
3    epidemiology as it relates to whether or not
4    there is an increased risk for ovarian cancer
5    as a result of talc-dusted condoms?
6        MS. O'DELL:  Object to the
7    form.
8        A.    The papers, the Kang, the
9    Griffin and the Casper paper, that's part of
10   what they were looking at.
11   BY MS. BROWN:
12       Q.    And are you familiar with what
13   the conclusion of the body of studies looking
14   at talc-dusted condoms in ovarian cancer
15   conclude?
16       MS. O'DELL:  Dr. Wolf, if
17   you -- you have your records here.  If
18   you'd like to look at them, you're
19   certainly welcome to do that.
20       THE WITNESS:  Let me get that.
21   BY MS. BROWN:
22       Q.    Doctor, if you would, just
23   identify the document you're looking at for
24   us on the record.

Page 19

1        A.    So I'm looking at the Kang,
2    Griffin and Ellis paper right now.
3        Q.    Okay.  Great.
4        (Witness reviews document.)
5        A.    Now I'm looking at the Casper
6    paper.
7    BY MS. BROWN:
8        Q.    And before we move the -- move
9    from the Kang paper, Doctor, is there
10   anything in the Kang paper that informs your
11   view about whether or not there's an
12   increased risk of ovarian cancer with
13   talc-dusted condoms?
14       A.    This paper is just looking at
15   the pathologic changes from talc powder on
16   gloves or condoms and is looking at
17   pathologic changes in the intraabdominal
18   cavity.  It doesn't specifically look at the
19   risk of ovarian cancer.
20       Multiple other papers, both
21   prior and subsequent to this, though,
22   indicate that inflammation is an important
23   part in the development of ovarian cancer,
24   and so it does -- this paper does not

Page 20

1    directly talk about ovarian cancer, but the
2    fact that the powder causes inflammation
3    would lead me to be concerned about that.
4        Q.    Okay.  And we're going to talk
5    about inflammation.  But you cited this Kang
6    paper for the proposition that concerns were
7    raised in the medical literature regarding
8    ovarian cancer for talc being used on
9    condoms.  Does this paper speak to that in
10   your mind, Doctor?
11       MS. O'DELL:  Object to the
12   form, asked and answered.
13       A.    It specifically talks about
14   inflammation from this, which inflammation is
15   related to ovarian cancer.
16   BY MS. BROWN:
17       Q.    Is it your understanding,
18   Doctor, that all inflammation leads to
19   ovarian cancer?
20       A.    It's my understanding, from
21   reviewing the literature and my own knowledge
22   from practicing GYN oncology and doing the
23   research in it over the years, is that it's
24   more the concern of chronic inflammation

Page 21

1    versus acute inflammation.
2        When I look at the pathology of
3    ovarian tumors, sometimes we see a lot of
4    chronic, sometimes we see a mix of chronic
5    and acute inflammation, sometimes you don't
6    see inflammation.  That doesn't mean it's not
7    there; it just means it's not there in the
8    slide that you're looking at.  But in
9    general, more concern about chronic
10   inflammation.
11       Q.    Because, Doctor, you would
12   agree, that you can certainly have
13   inflammation that does not cause cancer,
14   right?
15       MS. O'DELL:  Object to the
16   form.
17       A.    Inflammation itself doesn't
18   always cause cancer.  However, inflammation
19   has been correlated with the development of
20   ovarian cancer in multiple studies, and since
21   the '30s, it's been suggested in the
22   implication of all cancers -- or many cancers
23   anyway.  I'll stop there.
24

6 (Pages 18 to 21)

Judith K. Wolf, M.D.

Page 22

BY MS. BROWN:

Q.    Would you agree, Doctor, that the inflammation that was being caused by powders on surgical gloves was not inflammation that was -- was suspected of leading to cancer?

MS. O'DELL:  Object to the form.

A.    I can't -- I don't know that I can say that, because if there's deposits of talc from the surgical gloves into the abdominal cavity and it stays there because it's not dissolved, that can lead to chronic inflammation.

BY MS. BROWN:

Q.    Do you have any -- can you cite any evidence in the medical literature of talc from surgical gloves causing a procancerous inflammatory response?

MS. O'DELL:  Object to the form.

A.    Can you define for me what you mean by a "procancer inflammatory response"?

BY MS. BROWN:

Page 23

Q.    Sure.  Can you cite us any evidence in the medical literature that talc from surgical gloves led to chronic inflammation that caused cancer?

MS. O'DELL:  Object to the form.

A.    I can cite literature that talc from surgical gloves causes inflammation and there is the concern that it leads to cancer.

BY MS. BROWN:

Q.    Okay.  And for the proposition, the second part of what you're testifying about, the concern that surgical gloves were causing, not just granulomas or adhesions or foreign body reactions, but cancer, but what literature are you relying on for that proposition?

MS. O'DELL:  Object to the form.  Excuse me just for a minute. Micheal, would you make the screen -- I don't know how that --

THE WITNESS:  So I can see it.

MS. O'DELL:  Yes.

Page 24

BY MS. BROWN:

Q.    Just for the record, Doctor, the lawyer for the plaintiffs has asked that you be able to look at the transcript of my questions and your answers, to assist you with your testimony under oath here today; is that right?

MS. O'DELL:  No, actually, she's -- she's had it there, not to assist her, but just to make sure she's read the -- understood the question correctly.  I'll put it that way.  You can answer.

BY MS. BROWN:

Q.    Just for the record, you'll be looking at the realtime questions and answers and testifying here today; is that right?

A.    That's my understanding, yes.

So now I'm going to have to ask you to repeat the question.

Q.    Fair enough, Doctor.  We were talking a little bit about talcum powder on surgical gloves.  Do you remember that?

A.    Yes.

Page 25

Q.    And is it your opinion that talcum powder that was used on surgical gloves could lead to cancer?

A.    It's my opinion that talcum powder generally has a concern for carcinogenesis, and because it was known to cause inflammation in adhesions, it has been removed from surgical gloves and from condoms.

Q.    And what are you relying on for your understanding that dusting powders were removed from surgical gloves because of a concern for cancer?

A.    I believe that we've already talked about that, the PCPC report that's referenced on page 5 in my report.

Q.    Okay.  So that's an internal company document that you cite in connection with condoms, right?

A.    Yes.

Q.    Okay.  And so my question was a little bit different, which is, what scientific literature are you relying on to support your opinion that dusting powder on

7 (Pages 22 to 25)

Judith K. Wolf, M.D.

Page 26

1    surgical gloves can lead to cancer?
2         MS. O'DELL:  Object to the
3    form.
4         A.    I'm going to give you the same
5    answer that I think I've given before is
6    that, the concern is that dusting powder on
7    surgical gloves has been shown to cause
8    inflammation and then that inflammation can
9    lead to cancer.
10   BY MS. BROWN:
11        Q.    And my question's just a little
12   bit different, which is, I'm asking you to
13   identify the scientific literature on which
14   you rely for that opinion, and "that opinion"
15   being that powders on surgical gloves can
16   cause cancer?
17        MS. O'DELL:  Object to the
18        form, asked and answered.  That's
19        probably the third time the question's
20        been repeated.
21        Dr. Wolf, you're welcome to
22        respond to the question.
23        A.    I have the same answer that I
24   gave before.  And powder has been removed

Page 27

1    from surgical gloves because of the concern
2    of adhesions and inflammation.
3    BY MS. BROWN:
4         Q.    I understand that testimony
5    perfectly.  And maybe we're just not
6    connecting, Dr. Wolf.  I understand your
7    opinion, and what I'm asking is, for the
8    scientific support for that opinion.  And so
9    what information are you relying on that
10   dusting powders on surgical gloves can cause
11   cancer?
12        MS. O'DELL:  Object to the
13        form, asked and answered the sixth
14        time.
15        A.    My understanding is what you're
16   asking me is, can I cite you a paper that
17   says that dusting powder on surgical gloves
18   causes cancer?
19   BY MS. BROWN:
20        Q.    My question to you is, what is
21   the scientific support, what articles in the
22   scientific literature, what studies have you
23   looked at that brings you to that conclusion?
24   If it's a paper, then we'll take the paper.

Page 28

1         A.    So the studies suggest -- or
2    show inflammation after talcum powder on --
3    or talc, talcum powder product on surgical
4    gloves, dusting powder, and therefore it was
5    taken off the market.  I am not aware of a
6    study where talcum-dusted, dusting powdered
7    gloves was used to see if it caused cancer.
8    I believe that would be unethical.  And so
9    the concern that there is inflammation was
10   enough that that was pulled off the market.
11        Q.    Okay.  And when you talk about
12   "unethical," you're talking about running a
13   randomized, controlled clinical trial, right?
14        A.    A prospective study of any
15   kind.
16        Q.    Sure.  And certainly it would
17   not be unethical to look at people who have
18   had operations with surgical gloves to study
19   this issue, correct?
20        MS. O'DELL:  Object to the
21        form.
22        A.    So you're -- could you
23   retrospectively look and see if people who
24   had surgery with powdered gloves got cancer

Page 29

1    more than those that did not?  Is that what
2    you're asking me?
3    BY MS. BROWN:
4         Q.    Sure.  What I'm trying to clear
5    up is, you didn't mean to suggest this is an
6    area of science that cannot be studied.
7    Fair?
8         MS. O'DELL:  Object to the
9         form.
10        A.    My suggestion would be that it
11   would be an area of study that would be
12   challenging to study.  I'm not saying it
13   couldn't be.  I'm saying it could be
14   challenging.
15   BY MS. BROWN:
16        Q.    Have you reviewed, in
17   connection with your opinions in this case,
18   the reasoning of the FDA when they banned
19   powders on surgical gloves?
20        A.    I don't recall that I have.
21        Q.    Are you aware of whether or not
22   the FDA made a determination about whether or
23   not the science supported your opinion here,
24   that use of powders on gloves can lead to

8 (Pages 26 to 29)

Judith K. Wolf, M.D.

Page 30

1    cancer?
2        A.    I don't recall.
3        Q.    Do you consider the FDA to be a
4    reliable public health authority?
5            MS. O'DELL:  Object to the
6        form.
7        A.    I consider that the FDA does
8    its best to be a reliable health authority.
9    The FDA, or any agency, is not without the
10   ability to make a wrong decision or a
11   decision that they later change.
12   BY MS. BROWN:
13       Q.    Do you consider the work that
14   scientists at the FDA do in connection with
15   public health issues, to be important to
16   consider in forming your opinions regarding
17   scientific theories?
18           MS. O'DELL:  Object to the
19       form.
20       A.    I think it's a piece of
21   information to consider.
22   BY MS. BROWN:
23       Q.    And as it relates to your
24   opinion about dusting powders on surgical

Page 31

1    gloves, you have not had the opportunity to
2    review the FDA's research on that score; is
3    that fair?
4        A.    That's correct.
5        Q.    Another item, Doctor, that
6    counsel for plaintiffs handed me before we
7    began the deposition, I will mark as
8    Exhibit 3, and it is the preamble to the IARC
9    monograph -- IARC monographs from the
10   evaluation of carcinogenic risk to humans.
11   This is an amendment of January 2006.
12           (Deposition Exhibit 3 marked
13       for identification.)
14   BY MS. BROWN:
15       Q.    I can hand you the copy we've
16   marked.  Let me know -- first of all, when
17   did you review the preamble, Doctor?
18       A.    When I looked at the IARC
19   monographs more than a year ago, I read the
20   whole thing, but this preamble specifically I
21   re-reviewed a few days ago when I pulled the
22   UpToDate article about evidence-based
23   medicine, to see how they review -- what
24   methods they used to review a subject to try

Page 32

1    to answer a question and pulled it today
2    or -- or gave it today because they actually
3    use very similar methods.
4        Q.    Do you consider the
5    International Agency on the Research of
6    Cancer to be a respected public health
7    authority?
8        A.    I do.
9        Q.    Do you look to the research
10   that the scientists at IARC do, when
11   considering your own evaluation of scientific
12   theories?
13       A.    I do.
14       Q.    Do you think that IARC is
15   generally an impartial body that endeavors to
16   do the best research it can on cancer?
17       A.    I do.
18       Q.    And have you considered IARC's
19   conclusions as it relates to the opinions
20   that you've provided in your report, your MDL
21   report?
22       A.    Yes.  I considered them amongst
23   many things.
24       Q.    Sure.  Is there anything

Page 33

1    different between the UpToDate source that
2    you provided as Exhibit 2 and the preamble
3    that you've directed us to on Exhibit 3?
4            MS. O'DELL:  Object to the
5        form.
6    BY MS. BROWN:
7        Q.    That wasn't a great question.
8    Do you find that Exhibit 2, the UpToDate
9    summary of evidence-based medicine, is
10   generally in concert with the preamble to the
11   IARC monographs?
12       A.    I think in general, it is.  I
13   think that the UpToDate evidence-based
14   medicine article is something that I as a MD,
15   a clinician, a practicing doctor, this is how
16   I think about questions.  How IARC thinks
17   about it may not be exactly the same, but the
18   general principles are the same.
19       Q.    Is UpToDate a peer-reviewed
20   publication, do you know, Doctor?
21       A.    It is a peer-reviewed
22   publication.  I would say it's -- it is.
23       Q.    And what knowledge do you have
24   about the peer-reviewed process for the

9 (Pages 30 to 33)

Judith K. Wolf, M.D.

Page 34

1  UpToDate articles?
2      A.   I don't know their peer review
3  process.  I've never put any article into
4  UpToDate.  So I don't understand -- I don't
5  know the details of it.
6      Q.   Okay.  What basis do you have
7  for saying that the UpToDate information
8  you've provided as Exhibit 2 is peer
9  reviewed?
10     A.   Well, it's my understanding
11 that it is.  Like any article that's
12 published in the medical literature, there's
13 usually some kind of reviewed process, where
14 the editor receives it and asks a panel of
15 experts to comment on it.
16     Q.   Okay.  But this UpToDate
17 information, that's not published in a
18 medical journal, right?
19     A.   It's published online.
20     Q.   Right.
21     A.   As many medical literature now
22 is published online, not in a hard journal.
23     Q.   Okay.  But to be fair, you're
24 not aware of whether or not the information

Page 35

1  you've provided as Exhibit 2 has gone through
2  the formal peer-reviewed process, as we know
3  it, as it relates to medical journals?
4          MS. O'DELL:  Object to the
5          form, misstates her testimony.
6      A.   I don't understand -- I don't
7  know the details of their peer review
8  process.
9  BY MS. BROWN:
10     Q.   Fair enough.  Counsel for the
11 plaintiff also provided us with a manuscript,
12 which we'll mark as Exhibit 4.
13         (Deposition Exhibit 4 marked
14         for identification.)
15 BY MS. BROWN:
16     Q.   And this is a manuscript, one
17 of the coauthors is Dr. Saed.  Can you tell
18 me, Doctor, when you reviewed the manuscript
19 that we've marked as Exhibit 4?
20     A.   I received this manuscript and
21 reviewed it on Friday, whatever date that
22 was.  I think the 4th of January.
23     Q.   And so this is something you
24 have recently taken a look at; is that right?

Page 36

1      A.   That's correct.
2      Q.   So as it relates to the
3  opinions in your report, dated November 16,
4  2018, the Saed manuscript that we've marked
5  as Exhibit 4, did not inform those opinions;
6  is that fair?
7      A.   That's correct.
8          MS. O'DELL:  Object to the
9          form.
10     A.   I had an abstract that has some
11 of this data that has been accepted to the
12 SGO meeting for this year, but I did not have
13 the entire report.
14 BY MS. BROWN:
15     Q.   The next piece of information
16 that counsel for plaintiffs provided, is a
17 list of your invoices.
18         (Deposition Exhibit 5 marked
19         for identification.)
20 BY MS. BROWN:
21     Q.   Did you type these invoices,
22 Dr. Wolf?
23     A.   Yes.
24     Q.   Okay.  And so it looks like

Page 37

1  there's actually a little different format
2  between the first invoice, which appears to
3  be January 2017, and later invoices; is that
4  right?
5      A.   Can I see those, please?
6      Q.   Yeah, absolutely.  I only have
7  one copy, so we'll have to share.
8      A.   This is me.  I typed this.
9      Q.   Okay.
10         MS. O'DELL:  We'll just say,
11         for the record, the invoice in the
12         form was done for purposes of my
13         office paying it.  So that's the
14         format we use.
15         But Dr. Wolf, you can explain
16         how you conveyed your hours.
17     A.   Yes.  I mean, this is how I
18 sent them every time.
19 BY MS. BROWN:
20     Q.   Okay.
21     A.   In an e-mail like this.  I --
22 this might be attached to my payment, but I
23 hadn't really seen this form.
24     Q.   Okay.  That's helpful.  So a

10 (Pages 34 to 37)

Judith K. Wolf, M.D.

Page 38

1  few follow-up questions, if I can grab that
2  back from you. As I understand it, Dr. Wolf,
3  the very first page of Exhibit 5, which is
4  entitled "Judith Wolf, Medical Expert Hours,"
5  January 2017, at $600 an hour, that's a
6  document you typed. Fair?
7      A.  That's correct.
8      Q.  Okay. And for each subsequent
9  invoice, you typed a document similar to the
10  first page of Exhibit 5. True?
11      A.  Yes.
12      Q.  Okay. And the remaining pages
13  of Exhibit 5 have sort of a -- a different
14  format. Would you agree?
15      A.  The hours look the same, but --
16  I mean the format of the hours look the same,
17  but the invoice at the top, no -- yes, that
18  looks different.
19      Q.  Right. And I'm not trying to
20  be tricky, but you didn't type everything
21  after page 1 of Exhibit 5; is that fair?
22          MS. O'DELL: What I'm
23  conveying -- what I said.
24          MS. BROWN: Let's get an answer

Page 39

1  and then I'm happy to have you make
2  the statement for the record. I just
3  want an answer to that question.
4          MS. O'DELL: That's fair. You
5  can answer the question.
6      A.  I didn't type the other ones.
7          MS. O'DELL: So the invoice was
8  prepared after the hours were
9  submitted to my office for purposes of
10  facilitating payment. So the data --
11  to be clear, the data that was
12  provided was from Dr. Wolf.
13          MS. BROWN: Understood.
14  BY MS. BROWN:
15      Q.  When you invoice the lawyers at
16  Beasley Allen, do you send a document that
17  looks like page 1 of Exhibit 5?
18      A.  Yes.
19      Q.  Okay. And have you done that
20  for every invoice that you've submitted
21  through your work on this matter?
22      A.  Yes.
23          MS. BROWN: Okay. So I'm going
24  to request production of the original

Page 40

1  invoices that Dr. Wolf sent to Beasley
2  Allen. For the record, what we have
3  are four additional pages of
4  Exhibit 5, which appear to be have
5  been generated by Beasley Allen. So
6  we'll request the underlying invoices
7  that came from the doctor.
8          MS. O'DELL: Fair enough.
9          MS. BROWN: Thank you.
10          MS. O'DELL: I would just note
11  for the record, just so there's no
12  suggestion otherwise, those are
13  contemporaneously provided. There's
14  no generation of that in conjunction
15  with this deposition. So I'm happy to
16  provide --
17          MS. BROWN: And to be fair, I
18  don't mean to suggest anything
19  untoward.
20          MS. O'DELL: I want the record
21  to be clear.
22          MS. BROWN: As do we.
23          MS. O'DELL: So I will -- happy
24  to ask my office for the other

Page 41

1  documents.
2          MS. BROWN: Terrific. And so
3  we'll request the original invoices
4  that came from Dr. Wolf.
5  BY MS. BROWN:
6      Q.  A couple of questions,
7  Doctor --
8          MS. O'DELL: There weren't
9  invoices. Fair enough. You've made
10  your statement, but that's not what
11  they were.
12          MS. BROWN: We're on the same
13  page.
14          MS. O'DELL: Not maybe -- maybe
15  we're not. But anyway, we will -- I
16  will ask for whatever the list was
17  that was originally received.
18  BY MS. BROWN:
19      Q.  Now, Dr. Wolf, the first
20  document we have in Exhibit 5, includes the
21  hours that you billed to Beasley Allen for
22  your work in January 2017. True?
23      A.  Yes.
24      Q.  And the very first entry that

11 (Pages 38 to 41)

Judith K. Wolf, M.D.

Page 42

1   you have here is for a one and a half hour
2   meeting with Margaret Thompson. True?
3        A.   Yes.
4        Q.   Who is Margaret Thompson?
5        A.   Margaret Thompson is one of the
6   attorneys for Beasley Allen.
7        Q.   Okay. And how is it -- and
8   Ms. Thompson's here today; is that right?
9        A.   Yes. She's sitting right
10  there.
11       Q.   And how is it that you came to
12  meet Ms. Thompson?
13       A.   So one of my neighbors, her
14  name is Ali Gallagher, lives in the same
15  building as I do. She is an attorney and
16  also a nurse practitioner by training. And I
17  met her at a social setting in the lobby of
18  my building. We have happy hours on Fridays.
19  And we sort of became friendly and talked and
20  then we became friends after that. She knows
21  what I do for a living. I'm a gynecologic
22  oncologist and take care of women with
23  ovarian cancer.
24       And one day we were talking

Page 43

1   about work, because she has a medical
2   background and lots of people ask me about
3   work, even if they don't. And we came about
4   talk -- she may have asked me, do I know
5   anything about talc and ovarian cancer, and I
6   said I was aware of articles about the risk
7   of talcum powder and ovarian cancer, and she
8   mentioned that she had a friend, a colleague,
9   who was working on a case. And I said I
10  would be interested in becoming more
11  involved, in learning more about it, so she
12  introduced us.
13       Q.   To your knowledge, is
14  Ms. Gallagher an attorney at Beasley Allen?
15       A.   To my knowledge, she is not.
16       Q.   To your knowledge, is she a
17  plaintiffs' attorney?
18       A.   To my knowledge, I don't really
19  know what kind of law she practices.
20       Q.   Okay. And what is your
21  understanding of how Ms. Gallagher knows
22  Ms. Thompson?
23       MS. O'DELL: If you know.
24       A.   You know what? I don't really

Page 44

1   know. I know that they both have lived in
2   Austin for a long time.
3   BY MS. BROWN:
4        Q.   When did this conversation take
5   place?
6        A.   I don't remember. Sometime
7   before January of 2017, but I don't remember
8   the date. And it had to happen after 2015,
9   because I didn't meet her until then, so
10  sometime in that two-year period.
11       Q.   Okay. And what did she tell
12  you about the question of talc and ovarian
13  cancer?
14       A.   She was --
15       MS. O'DELL: Are you referring
16  to Ms. Gallagher?
17       MS. BROWN: Yeah. Thank you.
18  BY MS. BROWN:
19       Q.   I want to talk a little bit
20  about the conversation with Ms. Gallagher.
21       A.   Yeah.
22       Q.   As I understand it, this was
23  the first conversation you had regarding this
24  potential expert witness work; is that right?

Page 45

1        A.   Yes.
2        Q.   Okay.
3        A.   So the conversation -- again,
4   the conversation happened more than two years
5   ago. My recollection was she asked me did I
6   know anything about the risk of ovarian
7   cancer in talcum powder use, and then we
8   started talking about it and I told her I
9   knew a little, I was aware of some
10  epidemiologic data suggesting it. And she
11  said she was asking because she had -- she
12  knew that there was some litigation about it.
13  And I said, one of my concerns with ovarian
14  cancer is there's very little we can do to
15  cure women. They present late, there's no
16  screening tests, the symptoms are nonspecific
17  and that if there's something that we can do
18  to prevent it, it would be helpful. And the
19  conversation went on and she asked me would I
20  be interested in talking to the people she
21  knew who were involved in the case, and I
22  said yes.
23       Q.   And in 2015, where were you
24  working, Dr. Wolf?

12 (Pages 42 to 45)

Judith K. Wolf, M.D.

Page 46

1    A.    In 2015, I was working for a
2  diagnostic company called Vermillion, and I
3  was doing some clinical medicine as locum
4  tenens covering practices here and there,
5  just so I could keep my clinical skills up.
6    Q.    And where were you doing your
7  clinical medicine during your time at
8  Vermillion?
9    A.    At -- in Atlanta and in
10 Indianapolis.
11   Q.    What facility in Atlanta?
12   A.    Northwest Memorial, I believe
13 is the name of the hospital.
14   Q.    And what was the other location
15 where you performed --
16   A.    Community Health in
17 Indianapolis.
18   Q.    And so were you a physician on
19 staff at both of those locations?
20   A.    On staff at the hospital, yes.
21   Q.    And Vermillion, of course, was
22 aware of your clinical practice as well?
23   A.    Yes.
24   Q.    Okay.  And how many patients

Page 47

1  would you say you were treating at that time?
2    A.    You know, I was only
3  intermittently treating, so I can't really
4  give you a number.  I don't know.
5    Q.    Did you have set office hours
6  or hospital hours during that time period?
7    A.    In Atlanta, I covered probably
8  three or four weeks a year when the doctors
9  were on vacation.  In Indianapolis, when I
10 started, that's what I was doing.  There was
11 one doctor and when he was gone, there was no
12 one to cover.
13   Q.    Fair to say clinical medicine
14 was a small part of your practice during the
15 time period you were at Vermillion?
16   A.    Yes.
17   Q.    Did you treat any ovarian
18 cancer patients during the time period you
19 worked for Vermillion?
20   A.    Yes.
21   Q.    About how many patients would
22 you estimate you treated during that time
23 period?
24   A.    I don't remember how many

Page 48

1  patients I treated.  I would say that, in
2  general, my practice in the last five years
3  has been about a third ovarian cancer and
4  about 50 percent endometrial cancer.
5          Prior to 2014, when I was
6  practicing full time GYN oncology, more than
7  50 percent of my practice was ovarian cancer
8  because patients came from around the country
9  to see me, specifically with that issue.
10   Q.    And that was during the time
11 period you were practicing at MD Anderson?
12   A.    In Houston at MD Anderson and
13 at Banner health -- Banner MD Anderson in
14 Arizona.
15   Q.    And as I understand, you left
16 MD Anderson to go to Vermillion, correct?
17   A.    I left MD Anderson in Houston
18 to go to MD Anderson in Arizona.  I left
19 Arizona to go to Vermillion.
20   Q.    Okay.  And then from Vermillion
21 you went to another start-up?
22   A.    Provista Diagnostics, yes.
23   Q.    Did you continue to treat
24 patients while you were at Provista?

Page 49

1    A.    I did.
2    Q.    At the same two locations?
3    A.    I don't believe I covered any
4  more in Atlanta, because the need was greater
5  in Indianapolis and, in fact, the last year
6  that I was working at Provista, I was
7  covering one week a month in Indiana.
8    Q.    In what states are you licensed
9  to practice medicine?
10   A.    My active licenses are in
11 Indiana, Georgia and Arizona.
12   Q.    And you no longer have an
13 active license in Texas; is that right?
14   A.    That's correct.
15   Q.    Any other states that are no
16 longer active for you?
17   A.    Minnesota.
18   Q.    And then as I understand it,
19 you left Provista in about January of 2017?
20   A.    No, I left Provista just -- my
21 official last day was October 1st of 2018.
22   Q.    And so during part of the time
23 when you began your expert work for the
24 plaintiffs' lawyers in the talc litigation,

13  (Pages 46 to 49)

Judith K. Wolf, M.D.

Page 50

1    you were working at Provista; is that right?
2        A.    That's correct.
3        Q.    Okay.  Did you do any of
4    work -- any expert work for plaintiffs'
5    lawyers in the talc litigation while you were
6    working at Vermillion?
7        A.    Let me think about that.  Yes,
8    I believe I did.
9        Q.    Did you disclose to Vermillion
10   your work for plaintiffs' lawyers in the talc
11   litigation?
12           MS. O'DELL:  If you did -- if
13       you did any work during that time
14       period.
15       A.    Yeah, I don't recall.  I don't
16   recall.
17   BY MS. BROWN:
18       Q.    Do you recall if Vermillion had
19   a policy about its officials doing expert
20   witness work?
21       A.    My recollection was that they
22   did not have a policy.
23       Q.    And what were the circumstances
24   that led to you leaving Provista in October

Page 51

1    of 2018?
2        A.    Provista?  I could see that the
3    company was having trouble getting funding,
4    and, in fact, on October 1st, 2018, the
5    company shut down.  And so I had already been
6    looking and I knew that Indiana wanted me to
7    come there, so...
8        Q.    So when you say "the company
9    shut down," what do you mean by that?
10       A.    They dissolved.
11       Q.    Was there any investigation
12   into the company that led to the dissolution?
13       A.    No, it was just -- ran out of
14   money, couldn't find new investors.
15       Q.    And since October of 2018,
16   you've been working at the Indiana --
17   Indianapolis location?
18       A.    Yes.
19       Q.    Okay.  What's the name of that?
20       A.    Community Health Network.
21       Q.    And you're a physician there
22   part-time; is that right?
23       A.    That's correct.
24       Q.    And how many -- what percentage

Page 52

1    of your time would you say is devoted to
2    treating patients at the Community Health
3    Network?
4        A.    60.
5           MS. O'DELL:  Just for
6       clarification, are you asking for her
7       time she's working at Community Health
8       in Indianapolis, what percentage of
9       her time is devoted to treating
10      patients, or are you asking overall?
11      It was just confusing.
12           MS. BROWN:  So the question --
13      I'm looking at the real time.  The
14      question said, "devoted to treating
15      patients at Community Health Network."
16           MS. O'DELL:  Okay.  Thank you.
17   BY MS. BROWN:
18       Q.    Doctor, the final document that
19   the lawyer for the plaintiffs, Ms. O'Dell
20   gave me this morning, is -- we will mark as
21   Exhibit 6, which appears to be an updated CV
22   for you, dated January 4th, 2017.
23           (Deposition Exhibit 6 marked
24       for identification.)

Page 53

1    BY MS. BROWN:
2        Q.    Do you have a copy in front of
3    you?
4        A.    Yes, I do.
5        Q.    So the copy that was attached
6    to your report, I believe was dated 2016.
7        A.    Yes.
8        Q.    Now, why would that be?
9        A.    Because from the time I started
10   working with a company actually, I haven't
11   had an assistant to help me update it and I'm
12   not -- I haven't been good at keeping it
13   updated.
14       Q.    Well, here's what I'm trying to
15   understand.  We got Exhibit 6, which is dated
16   January of 2017, correct?
17       A.    Oh, it should be 2018.  That's
18   my -- see, I'm not a good typist.
19       Q.    Okay.  So the correct date of
20   Exhibit 6 is really January 4th, 2018?
21       A.    That's correct.
22           MS. O'DELL:  Should it be 2019?
23       A.    '19.  '19.
24

14 (Pages 50 to 53)

Judith K. Wolf, M.D.

Page 54

BY MS. BROWN:

Q.    Okay.  I think we're all on the same page now.  All right.  And you've updated this with additional employment that you've had --

A.    Yes.

Q.    -- since the time of your last --

A.    And a few publications that weren't on there.

Q.    Have you ever -- just to speak generally about your resumé, Doctor, have you ever published any peer-reviewed article regarding talcum powder and ovarian cancer?

A.    No.

Q.    Have you ever given any presentation regarding talcum powder and ovarian cancer?

A.    No.

Q.    Have you ever been invited to speak at any conference that dealt with issues regarding talcum powder and ovarian cancer?

A.    No.

Page 55

Q.    I've seen over the years, Doctor, you've done some popular press and news segments; is that right?

A.    Yes.

Q.    Have you ever given any news interviews regarding talcum powder and ovarian cancer?

A.    No.

Q.    You have, however, been an advocate for women's health issues over the years, correct?

A.    Yes.

MS. O'DELL:  Object to the form.

BY MS. BROWN:

Q.    And you've given a number of issues -- a number of interviews regarding ovarian cancer; is that fair?

A.    Yes.

Q.    Including the causes of ovarian cancer.  True?

A.    In the popular -- are you asking me about in the popular press?

Q.    Uh-huh.

Page 56

A.    In the popular press, I have talked about the use of birth control pills to reduce the risk of ovarian cancer, I've talked about the symptoms of ovarian cancer, I've talked about some of my research and treatment of ovarian cancer.  I don't recall that I specifically talked about the risk of ovarian cancer.

Q.    Do you recall -- have you ever spoken -- have you ever gone on any -- strike that.

Have you ever done any news interviews in which you have indicated your opinion in this case, which is that you believe that talc -- talcum powder causes ovarian cancer?

A.    I have not.  But until I started reviewing all the literature for this case, I was generally aware of some epidemiologic studies, but I wasn't as convinced after reviewing the entire body of literature that I was able to review, that talcum powder causes ovarian cancer in some women and puts all women who use it at risk

Page 57

for ovarian cancer.

Q.    Prior to being hired as an expert witness for plaintiff lawyers in the talcum powder litigation, you, Dr. Wolf, were not as convinced that talcum powder causes ovarian cancer.  True?

MS. O'DELL:  Object to the form, misstates her testimony.

A.    Prior to being hired, I hadn't reviewed all the literature to be able to formulate my opinion.

BY MS. BROWN:

Q.    Prior to being hired by plaintiffs' lawyers in the talcum powder litigation, you did not hold the opinion that talcum powder causes ovarian cancer, correct?

MS. O'DELL:  Object to the form.

A.    Prior to reviewing all the literature for this case, I wasn't aware of all the literature.  I would say that I was aware that there was some indication that talcum powder increased the risk of ovarian cancer.  What I was always told when I

Judith K. Wolf, M.D.

Page 58

1    brought that up was that, not to worry,
2    talcum powder doesn't contain asbestos
3    anymore and so that data is old and it
4    doesn't matter.
5             After reviewing all the
6    literature and the information that I have
7    seen, I don't believe that's true anymore.
8    BY MS. BROWN:
9        Q.   You have formed the opinion
10   that talcum powder causes ovarian cancer
11   since being hired by the plaintiffs' lawyers
12   in the talcum powder litigation?
13            MS. O'DELL:  Object to the
14       form.
15       A.   I want to think about how I
16   want to answer that, because the question is
17   a little confusing to me because I believe
18   what I said was, until I was aware of all of
19   the literature and looked at it as a whole,
20   all of the evidence, I hadn't formed the
21   opinion that talcum powder causes ovarian
22   cancer.  I knew there was data that suggests
23   that talcum powder product increases the risk
24   of ovarian cancer and once I had all the

Page 59

1    information, I fully believe it.  And now I
2    tell all my patients, whether they have
3    ovarian cancer or not, not to use it or to
4    stop using it if they are.  I tell all my
5    friends and family the same thing.
6    BY MS. BROWN:
7        Q.   Prior to reviewing all of the
8    literature regarding talcum powder and
9    ovarian cancer, it was not your practice, as
10   a gynecologic oncologist, to tell your
11   patients not to use talcum powder.  True?
12       A.   Prior to reviewing all the
13   literature, it was not my practice to tell
14   patients, but I believe that I was naive, and
15   that when I take care of patients that come
16   to me that have cancer they think they
17   have cancer, this was not something that I
18   focused on because I wasn't spending my time
19   reviewing all the literature.
20       Q.   You practiced, Doctor, as a
21   gynecologic oncologist in a number of
22   different institutions for nearly 30 years
23   before being hired by plaintiffs' lawyers; is
24   that true?

Page 60

1        A.   Twenty-four years.
2        Q.   And for the 24 years that you
3    practiced as a gynecologic oncologist prior
4    to being hired by the plaintiffs' lawyers, it
5    was not your regular practice to ask your
6    patients if they used talcum powder.  True?
7             MS. O'DELL:  Object to the
8        form.
9        A.   Prior to reviewing all the
10   literature and becoming convinced that it was
11   a concern, it was not my regular practice.
12   BY MS. BROWN:
13       Q.   And you keep answering the
14   question by saying "prior to reviewing all
15   the literature."  You reviewed all of the
16   literature at the request of the plaintiffs'
17   lawyers, correct?
18            MS. O'DELL:  Object to the
19       form, asked and answered.
20       A.   I reviewed all the literature
21   when I got -- when I wanted to learn more
22   about it, to become involved with deciding on
23   my own, whether this was something that I
24   should be concerned about.  And if I reviewed

Page 61

1    the literature and felt there was no concern,
2    I would have a different opinion.
3    BY MS. BROWN:
4        Q.   You reviewed all of the
5    literature regarding talcum powder and
6    ovarian cancer at the request of the
7    plaintiffs' lawyers, correct?
8        A.   You're asking me at the
9    "request," and I -- that's the word that I'm
10   not -- I don't recall that being asked, but
11   the question at hand was, does talcum powder
12   cause ovarian cancer?
13       Q.   I think I understand the
14   disconnect.  You reviewed all of the
15   literature regarding talcum powder and
16   ovarian cancer in connection with your work
17   to answer a question that the plaintiffs'
18   lawyers asked you; is that fair?
19       A.   In connection with this work, I
20   reviewed all of the literature.
21       Q.   Okay.  So if we wanted to date
22   the time at which you formed the opinion that
23   talcum powder causes ovarian cancer, it would
24   be after the time that you were hired by the

16  (Pages 58 to 61)

Judith K. Wolf, M.D.

Page 62

1 plaintiffs' lawyers, correct?
2      A.   I would say the date that I was
3 convinced that talcum powder products cause
4 ovarian cancer was after I reviewed all the
5 literature.  Prior to that, I knew that there
6 was some papers that suggested there was a
7 risk, but I didn't review all the literature
8 to formulate an opinion about it.
9      Q.   And the reason that you
10 formulated an opinion by reviewing all of the
11 literature, was because you had been hired as
12 an expert witness by plaintiffs' lawyers.
13 True?
14           MS. O'DELL:  Object to the
15 form.
16      A.   I'm confused with the question.
17 Because --
18 BY MS. BROWN:
19      Q.   Well, let me see if I can
20 orient you, Dr. Wolf.  Here's what we're
21 trying to understand.  I understand your
22 testimony was that for about 24 years as a
23 practicing gynecologic oncologist, the
24 potential association between talcum powder

Page 63

1 and ovarian cancer was not something you
2 were, quote, focused on; is that right?
3           MS. O'DELL:  Object to the
4 form.
5      A.   It's not something that I was
6 researching.
7 BY MS. BROWN:
8      Q.   Okay.  Nonetheless, you worked
9 as an advocate for women's health during
10 those 24 years.  True?
11      A.   Most of those years.
12      Q.   You published a number of
13 papers in the area of women's health,
14 correct?
15      A.   Yes.
16      Q.   You were invited to a number of
17 conferences and seminars and symposia on
18 issues regarding ovarian cancer and women's
19 health.  True?
20      A.   Yes.
21      Q.   You published chapters in
22 textbooks regarding ovarian cancer.  True?
23      A.   Yes.
24      Q.   You gave interviews to women's

Page 64

1 health publications and went on TV shows,
2 like Dr. Oz.  True?
3      A.   Yes.
4           MS. O'DELL:  Object to the
5 form.
6 BY MS. BROWN:
7      Q.   And during those 24 years, you
8 did not publish, write or speak about the
9 opinion that talcum powder causes ovarian
10 cancer, correct?
11      A.   What I published was my
12 research, which was not on talcum powder
13 products and ovarian cancer.  What I spoke
14 about was what I was asked to speak about,
15 which was not talcum powder and ovarian
16 cancer.  When I was on the public -- when I
17 was on the television or in the news, there
18 was specific questions that I was being asked
19 to speak about.  They were not talcum powder
20 and ovarian cancer.
21      Q.   But to be fair, some of the
22 questions you were asked about is, what
23 increases a woman's risk for ovarian cancer,
24 right?

Page 65

1           MS. O'DELL:  Object to the
2 form.
3      A.   I don't remember the questions
4 that I was asked about on Dr. Oz.  I know
5 that the purpose for me to go on that was to
6 talk about the reduction in the risk of
7 ovarian cancer by using birth control pills
8 and I don't remember all of the questions.
9 As far as I can recall, the other times I was
10 on the news, that was not a question that was
11 raised.
12 BY MS. BROWN:
13      Q.   When is the first date you can
14 recall forming the opinion that you've
15 provided in your expert report in the MDL?
16           MS. O'DELL:  Object to the
17 form.  Are you moving off going
18 through the -- sort of the notice and
19 the documents requested?  I'm not --
20           MS. BROWN:  Shortly.  You
21 almost ready for a break?
22           MS. O'DELL:  Well, probably in
23 the next five minutes or so, but what
24 I was going to say and I neglected to

17 (Pages 62 to 65)

Judith K. Wolf, M.D.

Page 66

1    say earlier is, there were certain
2    documents that were requested through
3    the notice. And just for the record,
4    I wanted to state that plaintiffs
5    served objections to certain of those
6    requests and we produced documents
7    here consistent with those objections.
8        MS. BROWN: Right. We're in
9    receipt of your objections.
10   BY MS. BROWN:
11       Q.   So Doctor, what -- let's mark
12   your report as Exhibit 7.
13       (Deposition Exhibit 7 marked
14   for identification.)
15   BY MS. BROWN:
16       Q.   And my question for you is
17   that -- when's the first date by which you
18   formed the opinions that are contained in
19   this report that we've marked as Exhibit 7?
20       MS. O'DELL: Object to the
21   form.
22       A.   I cannot recall the first date.
23   BY MS. BROWN:
24       Q.   Okay. At the time that you

Page 67

1    were approached by Ms. Gallagher in 2005, you
2    did not hold the opinion that talcum powder
3    causes ovarian cancer, correct?
4        MS. O'DELL: Object to the
5    form.
6        A.   I didn't meet Ms. Gallagher
7    till 2015.
8    BY MS. BROWN:
9        Q.   Correct. I misspoke. I'm
10   sorry.
11       A.   And the question was, I did not
12   hold the opinion that -- I had concerns about
13   talcum powder uses in ovarian cancer and I
14   had enough concerns that I was interested
15   enough to become involved in learning more
16   about it.
17       Q.   To close the loop, then,
18   Doctor, on the requests we made in the
19   deposition notice that we've marked as
20   Exhibit 1, we've marked a number of documents
21   that lawyers for the plaintiffs produced
22   early this morning. We're aware of the
23   objections that lawyers for the plaintiffs
24   have made.

Page 68

1        Is there anything else that
2    you've brought with you today in response to
3    our requests contained in Exhibit 1?
4        MS. O'DELL: Other than the
5    notebooks she's brought for her
6    reference materials?
7        A.   No, I haven't -- I brought
8    this -- it has my report and my reference
9    list and my CV. These are all my references
10   and all of that is contributing material.
11   BY MS. BROWN:
12       Q.   Okay. So for the record, let's
13   identify what you've just pointed out to us.
14   You have a small binder in front of you --
15       A.   Yeah.
16       Q.   -- which appears to be tabbed.
17   Did you do that tabbing?
18       A.   I did. And it just sort of
19   says which section is which in my report.
20       Q.   Do you have any notes in your
21   report, other than the tabs?
22       A.   No.
23       Q.   Okay. And what else is
24   contained in that binder?

Page 69

1        A.   My CV and then this is a list
2    of all of the contributing material.
3        Q.   And then you have next to you
4    three larger binders, which I think you said
5    contain the references in the report; is that
6    right?
7        A.   The references and also the
8    other articles that you were provided, the
9    new are in these and then that's all the
10   contributing material.
11       Q.   Okay. And so for the record,
12   behind you there's probably another ten or 12
13   binders that you're suggesting contain the
14   documents contained in -- listed in Exhibit B
15   to your report?
16       A.   That's correct.
17       Q.   Okay. You didn't type Exhibit
18   B to your report, did you, Doctor?
19       A.   I did not type it.
20       Q.   Do you know where Exhibit B to
21   your report came from?
22       A.   The attorneys typed it up for
23   me from all of my reference -- contributing
24   material.

18 (Pages 66 to 69)

Judith K. Wolf, M.D.

Page 70

1    Q.    Okay. Did the attorneys
2 provide you with all of the materials that
3 are listed on Exhibit B?
4    A.    No.
5    Q.    Which of the materials on
6 Exhibit B were provided by the attorneys?
7    A.    I can't tell you. It's a mix
8 of what I provided them, what they provided
9 me, what I asked them to provide to me.
10    Q.    Well, let's start by
11 understanding the difference between your
12 reference list on page 18 of your report and
13 then Exhibit B to your report. Can you
14 explain to me the difference there?
15    A.    The reference lists are
16 articles that I actually reference in my
17 report. And this is all the articles that
18 I -- or pieces of information that I
19 considered when drafting my report.
20    Q.    Did you consider every piece of
21 information that's listed on the 28-page
22 Exhibit B?
23    A.    Yes.
24    Q.    Did you read every entry on the

Page 71

1 28-page Exhibit B?
2    A.    I did not read every word of
3 every entry. Some of them I looked at a
4 piece of it, if it was a reference from
5 something else that I wanted to confirm.
6 Some of it I looked at and set aside, didn't
7 feel like it was added -- additive or
8 pertinent to what I was reviewing. And --
9 but these are all of the things that I looked
10 at in some way.
11    Q.    How did you maintain all of the
12 documents contained at Exhibit B? And by
13 that I mean, do you have all of these
14 documents electronically or do you have a
15 hard copy at your house or office?
16    A.    Both.
17    Q.    Okay. You have a -- hard
18 copies of every document contained on Exhibit
19 B?
20    A.    Yes.
21    Q.    Okay. So you have 12 binders
22 in hard copy?
23    A.    Yes.
24    Q.    Do they have notes on them?

Page 72

1    A.    No.
2    Q.    Did you take any notes when you
3 were reviewing any of the materials cited in
4 your report?
5    A.    I didn't take separate notes.
6 What I did was, I started writing things down
7 and used that as the draft of my report and
8 then just updated it every time I read more,
9 changed more, added, subtracted to it.
10    Q.    Take a look, if you would, at
11 page 13 of Exhibit B. There are a number of
12 entries that begin with the letters J&J. Do
13 you see that?
14    A.    I do.
15    Q.    What are those?
16    A.    Those are internal documents
17 from J&J that were provided to me from the
18 plaintiffs' attorneys.
19    Q.    And did you request internal
20 documents be provided to you from the
21 plaintiffs' lawyers?
22    A.    Some of them I might have
23 requested and some of them were provided to
24 me. But I can't tell you which is which by

Page 73

1 looking at that list.
2    Q.    In the normal course of your
3 practice as a gynecologic oncologist, do you
4 review internal company documents in making
5 medical decisions?
6    A.    I don't have access to them.
7        MS. O'DELL: Object to the
8    form.
9 BY MS. BROWN:
10    Q.    So as part of your work as a
11 treating physician, you don't rely on
12 internal company documents. Fair?
13        MS. O'DELL: Object to the
14    form.
15    A.    I don't have access to internal
16 company documents.
17 BY MS. BROWN:
18    Q.    So you don't rely on them,
19 right?
20        MS. O'DELL: Object to the
21    form.
22    A.    Well, I don't have access to
23 them.
24

19 (Pages 70 to 73)

Judith K. Wolf, M.D.

Page 74

```
 1   BY MS. BROWN:
 2       Q.   Do you have any -- so that
 3   means you haven't used them in your practice
 4   as a gynecologic oncologist, right?
 5           MS. O'DELL:  Object to the
 6       form.
 7       A.   Not that I recall.
 8   BY MS. BROWN:
 9       Q.   And the 20-some-odd J&J
10   documents you have listed here at Exhibit 13,
11   do you have any idea what percentage of the
12   entire document production from J&J these 20
13   documents comprise?
14       A.   Of all of J&J's internal
15   documents?  I don't.
16       Q.   Was it important to you, to
17   consider the context of all of the internal
18   documents you have cited at Exhibit 13?
19           MS. O'DELL:  Object to the
20       form.
21       A.   Say that again.
22   BY MS. BROWN:
23       Q.   Was it important to you --
24   first of all, did you request that the
```

Page 75

```
 1   lawyers give you some of these internal
 2   documents?
 3       A.   I don't recall specifically if
 4   I requested these or they gave them to me.  I
 5   just don't recall.
 6       Q.   Do internal J&J documents form
 7   the basis of your opinions in this
 8   litigation?
 9           MS. O'DELL:  Object to the
10       form.
11       A.   The basis of my opinion is the
12   review of everything that I looked at in
13   total, not -- there isn't any one thing that
14   forms the basis of my opinion.  It's the
15   whole of the evidence.
16   BY MS. BROWN:
17       Q.   Okay.  So identify for me what
18   information in the internal Johnson & Johnson
19   documents you're relying on to form your
20   opinion.
21       A.   Well, these are in my
22   contributing data lists, not in my reference
23   lists.  So I'd have to look at all of them
24   to --
```

Page 76

```
 1       Q.   I want to know -- sitting here
 2   today, it's my opportunity to understand what
 3   forms the basis of your opinions and I want
 4   know if there's information in an internal
 5   Johnson & Johnson document that forms the
 6   basis of your opinion that talc causes
 7   ovarian cancer.
 8           MS. O'DELL:  Objection, asked
 9       and answered.
10       A.   My opinion is not based on any
11   one single document or any one single source
12   of documents.  It's the whole of the
13   documents that I reviewed.
14   BY MS. BROWN:
15       Q.   So what information do you rely
16   on from the whole of the 20 J&J documents you
17   looked at?
18           MS. O'DELL:  Objection,
19       mischaracterizes the witness's
20       testimony.
21       A.   So I'm going to say that this
22   is my contributing materials list.  It's not
23   even -- none of the -- those internal
24   documents are referenced in my -- in my
```

Page 77

```
 1   opinion.  So I don't know how else to answer
 2   to you, other than to say I looked at all of
 3   the evidence.  The things that I felt were
 4   important, I referenced in my opinion.  I
 5   don't recall what's in all of those.
 6   BY MS. BROWN:
 7       Q.   So there are internal company
 8   documents listed on page 13 of Exhibit B, the
 9   contents of which, sitting here today, you're
10   unaware of; is that fair?
11           MS. O'DELL:  Object.  That
12       misstates her testimony.
13       A.   What I --
14           MS. O'DELL:  Excuse me.  Object
15       to the form of the question.
16       You may answer.
17       A.   What I said is, I can't recall
18   what those individually are, sitting here
19   today.  I could look at them if you'd like me
20   to.
21   BY MS. BROWN:
22       Q.   Well, I want you to do that if
23   it forms the basis of your opinion.  If it
24   doesn't and it's just something that was
```

Judith K. Wolf, M.D.

Page 78

1    given to you by the plaintiffs' lawyers, we
2    can move on.  But if there's something in the
3    20 documents that the plaintiffs' lawyers
4    have listed on page 13 of Exhibit B to your
5    report that forms the basis of your opinion,
6    I want to know what that is.
7         MS. O'DELL:  Objection to the
8         form, asked and answered three times
9         now.
10        A.    The basis of my opinion is not
11   formed by any one document.
12   BY MS. BROWN:
13        Q.    Is the basis of your opinion
14   formed, in part, by internal Johnson
15   & Johnson documents?
16        MS. O'DELL:  Object to the
17        form.
18        A.    I would have to look at all of
19   those documents again to tell you if there
20   was something specifically in there and what
21   the -- I just -- they're numbers to me.
22   Looking at them here, I don't recall that --
23   what's in each one of those to tell you if
24   there's something specifically that formed my

Page 79

1    opinion.
2         MS. O'DELL:  And you're
3         referring to page 13.
4         THE WITNESS:  Of Exhibit B.
5         MS. O'DELL:  Of Exhibit B.
6         We've been going about an hour and ten
7         minutes.
8    BY MS. BROWN:
9         Q.    Sure.  I'll just finish real
10   quick on the company documents.  If you just
11   look at page 12 of your report, you list a
12   number -- sorry, Exhibit B to your report,
13   you list a number of Imerys entries.  Do you
14   see that there?
15        A.    I do.
16        Q.    Who is Imerys?
17        A.    Imerys is a mining company.
18        Q.    Did you select these internal
19   Imerys documents to review?
20        A.    These were provided to me.
21        Q.    And same with the J&J document,
22   did you select those to review or were they
23   provided to you?
24        MS. O'DELL:  Objection to the

Page 80

1    form.  I think Dr. Wolf stated
2    previously they were provided to her
3    because they weren't available
4    elsewhere.
5         MS. BROWN:  Well, I need her to
6         say that, though.  I need that
7         testimony from her.
8    BY MS. BROWN:
9         Q.    Dr. Wolf, did you -- were the
10   J&J documents on page 13 provided to you by
11   plaintiffs' lawyers?
12        MS. O'DELL:  Object to the
13        form.
14        A.    The documents were provided to
15   me by plaintiffs' lawyers.
16   BY MS. BROWN:
17        Q.    And are you -- can you provide
18   us with an understanding of the methodology
19   the plaintiffs' lawyers employed in terms of
20   which documents to select for your review?
21        MS. O'DELL:  Object to the
22        form, asked and answered.
23        A.    I'm not sure what you're
24   asking.

Page 81

1    BY MS. BROWN:
2         Q.    Do you have an understanding of
3    how the plaintiffs' lawyers went about
4    picking the 20 J&J documents and the 15
5    Imerys documents that appear on Exhibit B to
6    your report?
7         MS. O'DELL:  Object to the
8         form.
9         A.    I didn't specifically ask them
10   how they came about finding them, looking for
11   them, if that's what you're asking me.
12   BY MS. BROWN:
13        Q.    Do you have any understanding,
14   sitting here today, of how the internal
15   documents listed on page B of your report,
16   were compiled for your review?
17        MS. O'DELL:  Object to the
18        form, asked and answered.
19        A.    I'm not aware of how the
20   plaintiffs' attorneys compiled the report.  I
21   didn't ask them their methodology.
22   BY MS. BROWN:
23        Q.    Having reviewed the internal
24   documents that the plaintiffs' lawyers gave

21 (Pages 78 to 81)

Judith K. Wolf, M.D.

Page 82

1    you, did you ask them for additional internal
2    documents?
3        A.    I don't recall.
4        Q.    Did you ask the plaintiffs'
5    lawyers any questions about any of the
6    internal documents they provided you?
7            MS. O'DELL:  Excuse me, I'm
8        going to object to that question.
9            MS. BROWN:  I'll rephrase.
10           MS. O'DELL:  You're not
11       entitled to understand --
12           MS. BROWN:  I'll rephrase --
13           (Simultaneous discussion
14       interrupted by reporter.)
15           MS. O'DELL:  Let me finish my
16       objection before you interrupt me.
17           MS. BROWN:  Sure.
18           MS. O'DELL:  So she's not
19       entitled to ask you questions about
20       your conversations with counsel.
21           MS. BROWN:  That's not entirely
22       true.
23    BY MS. BROWN:
24       Q.    I'm certainly entitled to know

Page 83

1    about information that counsel provided to
2    you that you're relying on to form your
3    opinions.  So I will rephrase the question to
4    ask just for whether you asked for any -- you
5    have any questions about these internal
6    documents that you asked of plaintiffs that
7    you are relying on for your opinions here?
8            MS. O'DELL:  Dr. Wolf, I'm
9        going to instruct you not to discuss
10       conversations you had with counsel.
11           You're certainly entitled,
12       under the rules, to know what
13       materials were provided for Dr. Wolf,
14       which we are doing that, but you're
15       not entitled to understand any
16       conversations that occurred between
17       Dr. Wolf and counsel.  I'm going to
18       instruct the witness not to answer.
19           MS. BROWN:  But that's not the
20       law.  So the law is --
21           MS. O'DELL:  The law is --
22           MS. BROWN:  Let me finish.  I
23       let you put your statement on the
24       record.  Let me just finish.

Page 84

1            MS. O'DELL:  Fair enough.
2            MS. BROWN:  If she asked you,
3    as lawyers for the plaintiffs, for any
4    information on which she is relying
5    for her opinion, then that's
6    discoverable.  And so my question -- I
7    appreciate your work-product concern.
8    My question is meant to stay within
9    the bounds of the Federal Rules, which
10   is that -- was there any information
11   that you provided her about these
12   documents on which she is relying to
13   form her opinion.  That's
14   discoverable.
15           MS. O'DELL:  That's not the
16       question you asked her.
17           MS. BROWN:  Yes, absolutely.
18           MS. O'DELL:  You asked if she
19   asked any questions, which goes to
20   communication.  And what the rule
21   allows discovery on are the materials
22   provided to Dr. Wolf, which are
23   available here for your review.
24   They're available from the list that

Page 85

1    you've been provided.  You're not
2    entitled to any discussions, and that
3    was what the question focused on.  So
4    why don't we --
5            MS. BROWN:  We are entitled --
6    I just want to finish this question
7    and we'll absolutely take a break.  We
8    are entitled to any information,
9    verbal or otherwise that you may have
10   given her, if she's relying on it.
11   And so I will rephrase the question to
12   make clear, that all I want to know is
13   if she asked the lawyers a question
14   about the documents, the answer to
15   which she relies on for her opinion.
16   That is 100 percent discoverable.
17           MS. O'DELL:  It is not.  That's
18       a communication between counsel and
19       she's not going to testify.  Now, all
20       the materials that she's relying on
21       are present in the -- excuse me.
22       They're present before Dr. Wolf and on
23       the table beside Dr. Wolf.  Those are
24       the materials she's relying on and

Judith K. Wolf, M.D.

Page 86

1    you're welcome to ask all of the
2    questions you'd like.  But in terms of
3    communications between counsel and
4    Dr. Wolf, you're not entitled to
5    discover that and I'm going to
6    instruct the witness not to answer.
7        MS. BROWN:  Here's what we need
8    to do so we can take it to the judge.
9    I need an answer to the question, is
10   she relying on information from the
11   lawyers regarding the documents.  I
12   need -- that's a yes or no.  That's
13   not even questionable.  If she says
14   yes and you instruct her not to
15   answer, we'll take it to the judge.
16   We need an answer to that straight up.
17       MS. O'DELL:  So I want to make
18   sure I understand.  Are you asking her
19   if she relies on these materials?
20       MS. BROWN:  No.  Here's where
21   we are.  I want to know if she asked
22   the lawyers a question about the
23   documents, she got an answer and she's
24   relying on that answer to form the

Page 87

1    basis of her opinion, and that is
2    discoverable under the Federal Rules.
3    So we're going to start with that
4    question, did you rely on something
5    the lawyers told you about the
6    documents, and then if you want to
7    instruct from there, we'll tee it up
8    and talk to the judge about it because
9    that's discoverable.
10       MS. O'DELL:  I think the issue
11   is the discussion about "rely."  And
12   what -- but you're asking her about
13   discussions with counsel.  And that's
14   different.  And so she's not going to
15   testify about discussions with
16   counsel.  The materials that she
17   considered and she relied on are
18   present in front of her and to her
19   side.
20       MS. BROWN:  Let me --
21       MS. O'DELL:  That's what's
22   discoverable and that's where we're
23   going to stay.
24       MS. BROWN:  Okay.  We're

Page 88

1    missing each other, so let me ask my
2    question and you instruct.
3        MS. O'DELL:  I don't think we
4    are.
5        MS. BROWN:  We'll have it on
6    the record and be able to take it up.
7    For the record, my position is, any
8    information from counsel or otherwise,
9    on which the witness relies for her
10   opinion is plainly discoverable under
11   the Federal Rules.
12       MS. O'DELL:  Disagree with that
13   position.
14   BY MS. BROWN:
15       Q.  Dr. Wolf, one quick question
16   here, and then we'll certainly take a break.
17   I know we've been going a while.
18       Did counsel for the plaintiffs
19   provide you with any information regarding
20   internal company documents on which you are
21   relying to form the basis of your opinions in
22   this lawsuit?
23       MS. O'DELL:  Object to the
24   question.  And answer the question to

Page 89

1    the degree you understand it.  If you
2    don't understand the question, you
3    don't have to answer it, Dr. Wolf.
4        A.   My understanding of the
5    question, what I hear you asking me, is did I
6    ask counsel questions about this, information
7    I got from them, not from the documents but
8    from the answer to my question, did I use
9    that information to form my opinion?  The
10   answer to that is no.
11   BY MS. BROWN:
12       Q.   Thank you, Dr. Wolf.
13       MS. BROWN:  Why don't we go
14   ahead and take a break.
15       MS. O'DELL:  Okay.
16       MS. BROWN:  Thank you.
17       THE VIDEOGRAPHER:  Going off
18   the record.  The time is 10:21 a.m.
19       (Recess taken from 10:21 a.m.
20   to 10:33 a.m.)
21       THE VIDEOGRAPHER:  Back on the
22   record.  The time is 10:33 a.m.
23   BY MS. BROWN:
24       Q.   Welcome back, Dr. Wolf.

23 (Pages 86 to 89)

Judith K. Wolf, M.D.

Page 90

1      A.   Thank you.
2      Q.   Dr. Wolf, counsel for the
3   plaintiffs indicated to me earlier this
4   morning, that there are some additional
5   documents that you have reviewed since the
6   time of your report.  That would include the
7   pending health Canada risk assessment; is
8   that correct?
9      A.   Yes.
10     Q.   Okay.  When did you review
11  that?
12     A.   Sometime within the last few
13  weeks.  I don't remember the exact date.
14     Q.   Counsel indicated that you've
15  reviewed an article with the lead author
16  Taher, T-a-h-e-r; is that correct?
17     A.   That's correct.
18     Q.   When did you review that?
19     A.   Around the same time as the
20  Canadian health assessment.
21     Q.   Were both the health Canada
22  proposed report and the Taher article
23  provided to you by counsel for the
24  plaintiffs?

Page 91

1      A.   Yes.
2      Q.   Do you know if the Taher
3   article is publicly available yet?
4      A.   I don't know.  The copy that I
5   have says that it's submitted for publication
6   or is going to be submitted for publication.
7   I haven't done a search to see if it's
8   publicly available yet.
9      Q.   Have -- did you note in your
10  review of the Taher article, that it
11  references, in numerous places, supplemental
12  materials?
13     A.   Yes.
14     Q.   Have you reviewed the
15  supplemental materials on which Taher relies?
16     A.   I haven't reviewed them all.
17  Some of them I had reviewed otherwise, but
18  I -- I haven't reviewed them all, no.
19     Q.   Did plaintiffs' lawyers give
20  you access to the supplemental materials
21  relied on in Taher?
22     A.   I don't know.
23     Q.   Do you have those materials
24  with you here today?

Page 92

1      A.   I don't have the supplemental
2   materials.  I just have the Taher somewhere.
3          MS. BROWN:  Counsel, has that
4   material been provided to the doctor?
5          MS. O'DELL:  Yes.
6          MS. BROWN:  Okay.  We'll
7   request production of the supplemental
8   materials as referenced in the Taher
9   report.
10         MS. O'DELL:  Let me make sure.
11  What do you mean "supplemental"?  Let
12  me make sure I understand what you're
13  saying.  She's provided the Taher and
14  the -- she's provided the Taher paper
15  and the causal assessment.
16         MS. BROWN:  Okay.  The Taher
17  paper makes references in numerous
18  places to supplemental materials, and
19  my question was whether you've
20  provided those supplemental materials
21  to the witness and if so, I'll request
22  production of it.
23         MS. O'DELL:  Okay.  Let me
24  check that.

Page 93

1          MS. BROWN:  Okay.  Thank you.
2   BY MS. BROWN:
3      Q.   For your purposes, though,
4   Dr. Wolf, it's not something you have on hand
5   sitting here today?
6      A.   It's not.
7      Q.   And because these materials
8   were recently provided to you by counsel for
9   the plaintiffs, they did not form the basis
10  of the report that you authored, dated
11  November 16th, 2018; is that fair?
12     A.   That's fair.
13     Q.   Okay.  Counsel indicated you
14  have seen some of the other expert reports
15  from witnesses for plaintiffs' lawyers in
16  this litigation; is that right?
17     A.   That's correct.
18     Q.   Okay.  Can you tell me which
19  ones you've reviewed?
20     A.   Can I see the list of all of
21  them?  I don't --
22         MS. O'DELL:  I don't have a
23  list.
24     A.   I reviewed some of the

24 (Pages 90 to 93)

Judith K. Wolf, M.D.

Page 94

1  epidemiology ones, but I don't remember the
2  names.  I reviewed part of one of the other
3  GYN oncology ones.  It seemed to be similar
4  to mine.  I don't read it all.  I didn't read
5  the third.  I can't remember.
6  BY MS. BROWN:
7      Q.    Okay.  So let's back up.  How
8  many -- I assume the reports of these other
9  experts were provided to you from the
10 plaintiffs' lawyers; is that right?
11     A.    That's correct.
12     Q.    Okay.  When did you -- did you
13 receive them all at once?
14     A.    I did.
15     Q.    And do you recall approximately
16 when you received them?
17     A.    I don't know.  Sometime after
18 the reports were all submitted.  I don't
19 remember the date.
20     Q.    Okay.  Prior to issuing your
21 report, dated November 16th, 2018, did you
22 see any other expert reports?
23          MS. O'DELL:  Object to the
24     form.

Page 95

1      A.    I didn't see any of the expert
2  reports for this case.
3  BY MS. BROWN:
4      Q.    Okay.  In -- fair to say, then,
5  the opinions that you have contained in your
6  report, dated November 16, 2018, you're not
7  relying on any other plaintiff expert in
8  forming these opinions; is that right?
9          MS. O'DELL:  Object to the
10     form.  Other than cited in her actual
11     report.
12          MS. BROWN:  Counsel, it's
13     objection to form.  Don't testify for
14     her.
15     A.    Well, the Plunkett deposition,
16 I believe, is a reference in my report.
17 BY MS. BROWN:
18     Q.    Well, it couldn't be a
19 reference in your report because it didn't
20 happen till after your report, right?
21     A.    Sorry.  Yes.
22     Q.    Okay.  So we're going to get to
23 Plunkett.  Let's keep that to the side.  What
24 I'm interested -- you understand that lawyers

Page 96

1  for the plaintiffs submitted reports like
2  yours from a number of different people,
3  right?
4      A.    Yes.
5      Q.    And there came a point in time
6  when the plaintiffs' lawyers sent you some of
7  those reports, correct?
8      A.    Yes.
9      Q.    Did they send you completed
10 reports or did they sent you draft reports?
11     A.    They sent me the completed
12 reports that had already been submitted and
13 turned in.  I didn't see any drafts of
14 anybody else's reports.
15     Q.    Got it.  So in writing your
16 report in this case, which we have marked as
17 Exhibit 7 and which is dated November 16th,
18 2018, you did not rely on the opinions of
19 another expert.  Fair?
20          MS. O'DELL:  Object to the
21     form.
22     A.    My understanding what you're
23 asking me is, did I rely on the opinions of
24 the expert reports in this case?  No, I had

Page 97

1  not seen them.
2  BY MS. BROWN:
3      Q.    That was exactly what I was
4  asking.  Did you type the report that we've
5  marked as Exhibit 7 yourself, Doctor?
6      A.    You mean my fingers on?
7      Q.    Correct.
8      A.    I typed some of the drafts.
9  The final report, I dictated most of it.
10     Q.    So to whom did you dictate the
11 report?
12     A.    I don't remember her name.
13 Someone who works with the plaintiffs'
14 attorneys.  I'm not a typist.
15     Q.    Fair enough.  How many hours
16 did you spend preparing the report that we've
17 marked as Exhibit 7?
18          MS. O'DELL:  Object to the
19     form.
20     A.    An estimate of how much time, I
21 would say 20 to 30 hours, total.  I mean,
22 there were several drafts and then even when
23 I thought it was a final draft, a few tweaks
24 and revisions here and there.  And I still

25  (Pages 94 to 97)

Judith K. Wolf, M.D.

Page 98

1  see some typos and errors that if I had it
2  back, I would fix and change.
3  BY MS. BROWN:
4      Q.    Did someone other than you
5  write some of the information contained in
6  Exhibit 7?
7      A.    Exhibit 7 is my report?
8      Q.    Correct.
9      A.    Other than things that I have
10  in quotes that I've pulled from articles, no
11  one else wrote it.
12      Q.    Other than information that you
13  have in quotes, it's your testimony that all
14  of the language that we see in Exhibit 7 is
15  your own; is that right?
16          MS. O'DELL:  Object to the
17  form.
18      A.    I wrote the report, the entire
19  report.
20  BY MS. BROWN:
21      Q.    Do you know who Dr. Blair Smith
22  is?
23      A.    Dr. Blair Smith?
24      Q.    Correct.

Page 99

1      A.    Is that -- is that Ellen Blair
2  Smith?
3      Q.    Correct.
4      A.    I do know her, yes.
5      Q.    Okay.  Did you work with
6  Dr. Blair Smith on your report?
7      A.    I did not.
8      Q.    Okay.  Do you know why a
9  paragraph in your report would be exactly the
10  same as that contained in Dr. Smith -- Blair
11  Smith's report?
12      A.    I don't.
13      Q.    Okay.  Let's take a look at
14  that.  If you look at page 8 of your report,
15  Doctor.  Right above the bold text that says
16  "Meta-Analysis," do you see that sentence?
17      A.    Uh-huh.
18      Q.    It says, "All of the cohort
19  studies are limited by lack of power, failure
20  to make the appropriate queries, selection
21  bias and short follow-up."
22          Do you see that?
23      A.    I do.
24      Q.    Are those your words?

Page 100

1      A.    Yes.
2      Q.    You wrote that sentence?
3      A.    Yes.
4      Q.    Okay.  Skipping down to the
5  paragraph below "Summary of Epidemiological
6  Evidence," the paragraph that begins, "When
7  looking at epidemiological studies in their
8  totality" -- are you with me?
9      A.    Yes.
10      Q.    Did you write this entire
11  paragraph here?
12      A.    Yes.
13      Q.    Did you give Dr. Ellen Blair
14  Smith the authority to copy that into her
15  report?
16      A.    I didn't speak with Dr. Ellen
17  Blair Smith.
18      Q.    Are you surprised to learn that
19  the information that you wrote on page 8 also
20  appears in Dr. Blair Smith's report, which
21  I'm handing you as Exhibit 8.
22          (Deposition Exhibit 8 marked
23  for identification.)
24          MS. O'DELL:  Object to the

Page 101

1  form.
2      A.    Is it marked somewhere here
3  what it is?
4  BY MS. BROWN:
5      Q.    It is.  If you look at page 16,
6  Doctor.  And I'll direct you to the -- one,
7  two, three -- the end of the first -- go to
8  the third complete paragraph that begins "In
9  my opinion."  You with me?
10      A.    Uh-huh.
11      Q.    Okay.  And the end of that
12  paragraph contains the very first sentence I
13  asked you to read, right?  "All of the cohort
14  studies are limited by lack of power."
15  Correct?
16          MS. O'DELL:  Object to the
17  form.
18      A.    What I can say when I look at
19  these, she cited the same limitations as I
20  did, and that's not that surprising to me.
21  BY MS. BROWN:
22      Q.    Okay.  And if you look at --
23  when looking at the epidemiology studies, do
24  you see that that paragraph is the same,

26 (Pages 98 to 101)

Judith K. Wolf, M.D.

Page 102

1    Doctor?
2           MS. O'DELL:  Object to the
3    form.  Are you referring to when --
4    the fourth -- the last paragraph above
5    "Mechanism"?
6           MS. BROWN:  "When looking at
7    epidemiological studies."
8    BY MS. BROWN:
9       Q.    Do you see that, Doctor?
10      A.    Is that the last -- you're
11   talking about the last paragraph?
12      Q.    Sorry, of your report.  Page 8.
13   Is that your language, Doctor?
14      A.    This is my language; this is
15   her language.  I see some words that are the
16   same.  The conclusions are similar, but --
17   BY MS. BROWN:
18      Q.    And you see some sentences --
19          MS. O'DELL:  Excuse me.  She's
20   not finished.
21          Would you like to finish,
22   Dr. Wolf?
23      A.    But I mean, I'm just mostly
24   looking at the length of it and it's not even

Page 103

1    the same length, so I don't see how it's the
2    exact same thing.
3    BY MS. BROWN:
4       Q.    You see some sentences that are
5    identical, right, Doctor?
6           MS. O'DELL:  Object to the
7    form.
8       A.    I don't see -- give me a chance
9    to look at the entire thing.
10   BY MS. BROWN:
11      Q.    Sure.
12      A.    Because I don't see -- I see
13   one sentence is the same.  "There appears to
14   be no significant publication bias."
15      Q.    And also, Doctor, the sentence
16   that we just talked about, "All of the cohort
17   studies are limited by failure," that's the
18   same, right?
19          MS. O'DELL:  Object to the
20   form.
21      A.    No, it's not the same.  It
22   raises the same points, but it's not the
23   same.
24

Page 104

1    BY MS. BROWN:
2       Q.    In writing your report, Doctor,
3    did you take any language from other
4    articles?
5           MS. O'DELL:  Sorry, do you mean
6    quote language?
7    BY MS. BROWN:
8       Q.    Did you -- is any of the
9    language contained in your report not your
10   own; meaning did it come from publicly
11   available sources or articles?
12          MS. O'DELL:  Object to the
13   form.
14      A.    Quotes in my report came from
15   articles.
16   BY MS. BROWN:
17      Q.    In writing your report, did you
18   consult Wikipedia?
19      A.    Did I do what?
20      Q.    Did you consult Wikipedia?
21      A.    No.
22      Q.    Do you know what that is?
23      A.    I do, but I don't consult for
24   any medical literature or scientific

Page 105

1    literature.
2       Q.    You don't consider Wikipedia to
3    be a scientifically reliable source; is that
4    right?
5       A.    I don't.
6       Q.    Okay.  And in coming up with
7    your report, that's not something that you
8    cut and pasted from; is that right?
9       A.    I didn't look at Wikipedia to
10   prepare my report.
11      Q.    And there aren't parts of your
12   report that someone else did for you; is that
13   right?
14          MS. O'DELL:  Object to form.
15      A.    That's right.
16   BY MS. BROWN:
17      Q.    On page 2 of your report,
18   Doctor, you indicate the method -- you talk
19   about the methodology you employed here.  Do
20   you see that?
21      A.    Yes.
22      Q.    Describe for us -- I understand
23   you have it discussed in your report, but
24   describe for us what methodology you employed

27 (Pages 102 to 105)

Judith K. Wolf, M.D.

Page 106

1   to answer the question in this case.
2        A.   So that's -- this is why I
3   provided the UpToDate evidence-based
4   medicine. So I started with the question.
5   The question is, does general use of talcum
6   powder cause ovarian cancer. And then
7   researched the literature, looking for human
8   studies, animal studies, in vitro studies.
9   And then evaluated the validity of the
10  studies as a whole, by looking at their
11  materials and methods, the results and
12  conclusions that they drew, what journal
13  the -- if it was published in a peer-reviewed
14  journal, what journal it was in, what year it
15  was published, were there similar studies
16  showing similar findings, were there
17  outliers, and then from that formed my
18  opinion.
19       Q.   And your conclusion is that
20  genital talc use causes ovarian cancer,
21  correct?
22       A.   That is -- genital talcum
23  powder use, yes.
24       Q.   And is your opinion limited to

Page 107

1   a certain quantity of genital powder use?
2        MS. O'DELL: Object to the
3   form.
4        A.   It's not. And I had a hard
5   time with that issue just because I don't
6   know what a dose is, because how much do you
7   shake, how much do you apply, it's hard to
8   know a certain amount.
9   BY MS. BROWN:
10       Q.   In forming your opinions in
11  this case, have you attempted to quantify how
12  much talcum powder an individual woman would
13  be exposed to when using it in the genital
14  area?
15       MS. O'DELL: Objection to the
16  form. Dr. Wolf's being offered for
17  general causation, not for a specific
18  plaintiff.
19       A.   Repeat the question again.
20  BY MS. BROWN:
21       Q.   Sure. We were talking about
22  how much powder use, in your opinion, causes
23  ovarian cancer. And my question is, have you
24  attempted to quantify how much talcum powder

Page 108

1   a woman is exposed to when she uses it
2   perineally?
3        MS. O'DELL: Object to the
4   form.
5        A.   Are you asking me if I've done
6   a study? I'm not sure what you're asking.
7   BY MS. BROWN:
8        Q.   In forming your opinion in this
9   case, that talcum powder causes ovarian
10  cancer, have you attempted to quantify how
11  much talcum powder causes ovarian cancer?
12       MS. O'DELL: Object to the
13  form.
14       A.   In reviewing the articles, some
15  of the studies have tried to look at length
16  of time, frequency of use, years of use,
17  total applications. It's hard for me to know
18  what that amount is, because I don't know in
19  each individual woman, like, how much she put
20  in. And I also don't know in each individual
21  woman, what her risk might be from the talc,
22  based on her own genetic makeup and other
23  things in her immune system and how she
24  responds to it.

Page 109

1   BY MS. BROWN:
2        Q.   Have you calculated how much
3   genital talc powder is needed to cause
4   ovarian cancer?
5        MS. O'DELL: Object to the
6   form.
7        A.   Again, I think that my -- it's
8   difficult, even from reviewing the literature
9   and from all the questions that were asked,
10  queried, to know how much any woman is
11  exposed to when she uses it.
12  BY MS. BROWN:
13       Q.   So what you're identifying is
14  one of the limitations of the talc
15  epidemiology, correct?
16       MS. O'DELL: Object to the
17  form.
18       A.   What I'm identifying is one of
19  the limitations of knowing what dose is safe.
20  BY MS. BROWN:
21       Q.   In your mind, is there a dose
22  of genital talcum powder that does not cause
23  ovarian cancer?
24       A.   I don't know.

28 (Pages 106 to 109)

Judith K. Wolf, M.D.

Page 110

1     Q.    Have you investigated whether
2  or not there is an amount of talcum powder
3  that can be used perineally without
4  increasing the risk for ovarian cancer?
5         MS. O'DELL:  Objection, asked
6     and answered.
7     A.    I don't know if there is an
8  amount that's safe.  I don't know how I could
9  ethically test that.  I'm not aware of
10  anything in the literature that says, "This
11  dose is safe, this dose is not."  Because
12  even in all of the studies, what is a dose?
13  One shake?  Two shakes?  A hard shake?  A
14  light shake?
15  BY MS. BROWN:
16     Q.    Is your opinion, Dr. Wolf, that
17  some amount of perineal talcum powder use
18  causes ovarian cancer, is that opinion
19  dependent on an assumption that talcum powder
20  is contaminated with asbestos?
21     A.    No, because --
22         MS. O'DELL:  Object to the
23     form.
24     A.    -- talcum powder is a mix of

Page 111

1  things, right?  It's a mix of platy talc,
2  fibrous talc, asbestos, heavy metals have
3  been found in it, nickel and chromium and
4  cobalt, and then all of the fragrances.  And
5  I have seen the expert report of Michael
6  Crowley, where he assessed the irritant
7  quality of some of the fragrances.  And so
8  when I look at the talcum powder product, I
9  look at it as a whole.
10  BY MS. BROWN:
11     Q.    Do you believe there is
12  asbestos in talcum powder?
13     A.    I've seen evidence that there
14  is asbestos found in at least 60 percent of
15  talcum powder that's been evaluated that I've
16  seen.
17     Q.    Is it your opinion in this
18  case, that 60 percent of talcum powder is
19  contaminated with asbestos?
20         MS. O'DELL:  Object to the
21     form, asked and answered.
22     A.    In the reports that I've seen,
23  60 percent of the time there was evidence of
24  asbestos.

Page 112

1  BY MS. BROWN:
2     Q.    Are you referring to
3  plaintiffs' expert witness reports?
4     A.    Let me look in my report here
5  for just one second.  I'm sorry, I just need
6  to look in here to find it.  Because there is
7  plaintiffs' expert witness, but --
8         MS. O'DELL:  Take your time,
9     Doctor.
10         THE WITNESS:  All right.
11  BY MS. BROWN:
12     Q.    And, Doctor, maybe I can help.
13  On page 9 of your report, you reference in
14  the third paragraph --
15     A.    Yes.
16     Q.    -- that you believe Dr. Longo
17  and Rigler have demonstrated talc to be --
18  may be contaminated with asbestos.  Do you
19  see that?
20     A.    That's correct.  And then also
21  there's the deposition of John Hopkins.
22     Q.    What information are you
23  relying on from the deposition of John
24  Hopkins?

Page 113

1     A.    A report that I saw.
2     Q.    Okay.  What -- you just pulled
3  out a document from your binder.  What is
4  that, Doctor?
5     A.    That is the -- this is part of
6  the deposition, right?  Yeah.  It's in my
7  references.
8  BY MS. BROWN:
9     Q.    Okay.  Can I see it?
10     A.    Yeah.  It was just printed
11  separately so it can be bigger.
12     Q.    And what you have just handed
13  me, Dr. Wolf, is -- it bears an exhibit
14  sticker Hopkins 28, and do you know -- it
15  appears to be a large printout of some kind
16  of Excel chart.  Do you know what this is?
17     A.    This was from his deposition of
18  testing of talcum powder products.
19     Q.    Did you read the deposition of
20  Dr. John Hopkins?
21     A.    I did not see the entire
22  deposition.
23     Q.    Were you provided with the
24  deposition?

29 (Pages 110 to 113)

Judith K. Wolf, M.D.

Page 114

1    A.    If I was, I don't recall.
2    Q.    Did you ask to see Exhibit 28
3  to John Hopkins' deposition?
4    A.    Specifically ask for that?  I
5  did not.  I was provided it.
6    Q.    So the lawyers decided to give
7  you John Hopkins' Exhibit 28; is that right?
8    A.    I received it from the lawyers.
9    Q.    Okay.  And do you know what's
10  contained within Exhibit 28?
11    A.    Do I know what's contained
12  within it?  It's a chart of testing of talcum
13  powder from various sources and various time
14  periods, how the test was done and what the
15  results showed, as well as a few other things
16  on there.
17    Q.    Did you -- do you know who
18  created this chart, Dr. Wolf?
19    A.    I don't.
20    Q.    Do you have any idea if the
21  four pages of testing contained in Exhibit 28
22  to John Hopkins' deposition is representative
23  of all the testing that was done on Johnson
24  & Johnson's product?

Page 115

1        MS. O'DELL:  Object to the
2    form.
3    A.    I don't know if it is or it
4  isn't, but what I know is what I see there,
5  is that the results show evidence of asbestos
6  contamination over a period of time.
7  BY MS. BROWN:
8    Q.    Do you know -- are you familiar
9  with the test method "XRD"?
10    A.    I'm not a geologist and I don't
11  understand the test methods.  So I'm going to
12  have to say I would defer to the geologist to
13  answer a question about that.
14    Q.    So in terms of whether or not a
15  test method known as "XRD" is even capable of
16  distinguishing between asbestiform and
17  nonasbestiform minerals, you would defer to
18  somebody else on that question; is that
19  right?
20        MS. O'DELL:  Object to the
21    form.
22    A.    What I'm going to say is that
23  the details of how that's performed, I am not
24  aware of.

Page 116

1  BY MS. BROWN:
2    Q.    So in terms of interpreting the
3  findings of the chart, which list a number of
4  different test methods, you'd agree you're
5  not a microscopist.  True?
6        MS. O'DELL:  Object to the
7    form.
8    A.    Can you define what a
9  "microscopist" is in your -- from what you're
10  asking me?
11  BY MS. BROWN:
12    Q.    Sure.  Are you -- do you hold
13  yourself out to the medical community as an
14  expert in light microscopy in looking --
15  using various different types of microscopy
16  to study minerals?
17    A.    No, I'm not.
18    Q.    And you understand that the
19  chart you just handed me includes a number of
20  different test methods, correct?
21    A.    Yes.
22    Q.    And you're not aware whether
23  those test methods are even capable of
24  distinguishing or finding asbestos, correct?

Page 117

1        MS. O'DELL:  Object to the
2    form.
3    A.    I'm assuming since they found
4  asbestos, that they are.  I'm assuming that
5  since they were used to try to identify
6  asbestos, that they are.
7  BY MS. BROWN:
8    Q.    Show me on this chart what
9  asbestos finding you're referring to, Doctor.
10    A.    The second page, tremolite --
11  here, tremolite, tremolite, actinolite
12  fibrous talc, tremolite, tremolite,
13  actinolite, tremolite, actinolite -- sorry.
14  I'm sorry.  I didn't mean to go so fast.  I'm
15  looking at what tests revealed.
16    Q.    And are you familiar, Doctor,
17  with the fact that tremolite exists both as
18  tremolite asbestos and as the nonasbestiform
19  version of that mineral?  Are you aware of
20  that?
21    A.    Yes.
22    Q.    Okay.  And do you -- what
23  information are you relying on that the
24  tremolite that's indicated in that chart is

30 (Pages 114 to 117)

Judith K. Wolf, M.D.

Page 118

```
1    tremolite asbestos and not the nonasbestiform
2    version?
3            MS. O'DELL: Object to the
4    form.
5        A.   I wasn't given that
6    information.  All I can say is that there
7    is -- some of them say "tremolite," others
8    say "fibrous crocidolite, fibrous tremolite,
9    actinolite."
10   BY MS. BROWN:
11       Q.   And whether the information
12   that's contained on the exhibit from
13   Dr. Hopkins' deposition that was given to you
14   by the plaintiffs' lawyers, whether that, in
15   fact, indicates a finding of asbestos, you're
16   not the expert in that.  Fair?
17           MS. O'DELL: Object to the
18   form.
19       A.   I'm looking at the results, and
20   even if I take out ones that just say
21   "tremolite," and don't tell me if it's the
22   asbestos form or not, I see -- I see others
23   that do say "asbestos, asbestos fibers,
24   fibrous talc" --
```

Page 119

```
1    BY MS. BROWN:
2        Q.   Show me where it says
3    "asbestos."
4        A.   This one says "confirmed
5    asbestos."
6        Q.   And did you ask -- did you look
7    at the product that was being tested here,
8    Doctor?  Meaning, do you even know if this
9    was cosmetic talcum powder?
10           MS. O'DELL: Object to the
11   form.  If you want her to look at the
12   exhibit in full, you can ask a
13   question.
14   BY MS. BROWN:
15       Q.   Sure.  You just pointed me to a
16   line on the chart that says they're testing
17   ore mud.  Do you have any source of
18   information that would lead you to believe
19   that that was ore that was used to make
20   cosmetic talc?
21           MS. O'DELL: Object to the
22   form.
23       A.   Are you talking about the one
24   below it that says --
```

Page 120

```
1    BY MS. BROWN:
2        Q.   And have you reviewed -- what
3    you just pointed me to, Dr. Wolf, is a
4    testing from the 1970s by Dr. Langer,
5    correct?
6        A.   Can I see the whole thing?
7        Q.   Sure.  You pointed me to
8    Dr. Langer, Mount Sinai, 1975, right?
9        A.   Yes.
10       Q.   Okay.  Are you familiar with
11   Dr. Langer's testing of talcum powder
12   products in the 1970s?
13           MS. O'DELL: Object to the
14   form.  And if you're going to ask
15   questions about the exhibit, if you'll
16   put it back in front of the witness.
17           MS. BROWN:  Absolutely.
18           MS. O'DELL:  You've asked a
19   question, she's going to respond, so
20   hand her back Exhibit 28.
21           MS. BROWN:  I'm not sure she
22   needs it to answer it.
23           MS. O'DELL:  I'm sure counsel
24   has a copy of Exhibit 28 if you -- if
```

Page 121

```
1    you need it.  I'm sure you have it
2    committed to memory.
3        A.   Can you ask the question again?
4    BY MS. BROWN:
5        Q.   Sure.  In supporting your view
6    that 60 percent of talcum powder products are
7    contaminated with asbestos, you've handed me
8    a chart that the lawyers gave you from
9    Dr. Hopkins' deposition and pointed me to an
10   entry of a test that Dr. Langer performed in
11   the 1970s, right?
12           MS. O'DELL: Object to the
13   form, misstates her testimony as to
14   the percentage.  It's not what she
15   referred to.
16       A.   That's the line I pointed at.
17   BY MS. BROWN:
18       Q.   Okay.  But to be fair,
19   Dr. Wolf, you are not familiar with the
20   testing that Dr. Langer did on talcum powder
21   products in the 1970s, right?
22       A.   I am not.
23       Q.   Okay.  And you are certainly
24   not aware of the work that the Food and Drug
```

31 (Pages 118 to 121)

Judith K. Wolf, M.D.

Page 122

1    Administration did to check all of the work
2    that Dr. Langer did, correct?
3         MS. O'DELL: Object to the
4    form.
5         A.    I am not aware of all of the
6    testing or checking that the FDA did to test
7    Dr. Langer's work.
8    BY MS. BROWN:
9         Q.    And so in giving that
10   testimony, you were not aware that the FDA
11   tested that Dr. Langer sample and determined
12   there was no asbestos?
13        A.    That specific --
14        MS. O'DELL: Excuse me.
15   BY MS. BROWN:
16        Q.    Let me just --
17        MS. O'DELL: No.  I get to --
18   BY MS. BROWN:
19        Q.    I need to ask my question.
20        MS. O'DELL: I need to have the
21   opportunity to object.  If you'd give
22   me just a moment.  Object to the form
23   of the question.  Misstates the
24   record.

Page 123

1         MS. BROWN: But here's what
2    happened.  I didn't get the question
3    out.
4         MS. O'DELL: Yes, you did.
5         MS. BROWN: So let me get the
6    question on the record --
7         MS. O'DELL: Yes, you did.
8         MS. BROWN: -- and then we'll
9    leave time for Ms. O'Dell to object
10   and then, Doctor, you can answer.
11        So my question was, you're not
12   aware that the FDA tested all of the
13   Langer samples that were conducted in
14   the 1970s and determined that J&J's
15   product was free from asbestos, right?
16        MS. O'DELL: Object to the
17   form, misstates the record.
18        A.    I'm not aware that the FDA
19   tested all of Dr. Langer's testing, no.
20   BY MS. BROWN:
21        Q.    Were you aware that the FDA
22   tested Johnson & Johnson's baby powder in the
23   1970s at all?
24        A.    Yes.

Page 124

1         Q.    Did you review the testing that
2    the FDA did of Johnson's Baby Powder in the
3    1970s?
4         MS. O'DELL: Object to the
5    form.
6         A.    I don't recall reviewing in
7    detail the testing that they did.
8    BY MS. BROWN:
9         Q.    Were you aware that the FDA
10   determined, based on its own testing of
11   Johnson's baby powder product in the 1970s,
12   that it was asbestos free?
13        MS. O'DELL: Object to the
14   form.
15        A.    I was aware that they reported
16   that.
17   BY MS. BROWN:
18        Q.    Did you consider the finding of
19   the United States Food and Drug
20   Administration's own testing of baby powder's
21   product, before coming to your opinion that
22   60 percent of baby powder is contaminated
23   with asbestos?
24        MS. O'DELL: Object to the

Page 125

1    form.
2         A.    What I said, I believe, was
3    that what I saw of the samples that I saw
4    tested, 60 percent showed evidence.  I'm not
5    saying that -- I didn't say that -- what I
6    said was, of what I saw, 60 percent showed
7    evidence of asbestos.
8    BY MS. BROWN:
9         Q.    And you're getting that 60
10   percent figure from an expert report for a
11   plaintiffs' lawyer in litigation, correct?
12        MS. O'DELL: Object to the
13   form.
14        A.    Are you referring to the Longo
15   and Rigler report?
16   BY MS. BROWN:
17        Q.    I am.
18        A.    Yes.
19        Q.    Okay.  So the basis for your
20   opinion that 60 percent of baby powder
21   products are contaminated with asbestos is a
22   plaintiffs' expert report in litigation.
23   True?
24        MS. O'DELL: Object to the

32 (Pages 122 to 125)

Judith K. Wolf, M.D.

Page 126

1       form.
2           A.    My -- 60 percent of what I saw
3   tested had evidence.
4   BY MS. BROWN:
5           Q.    So the entire basis of your
6   opinion that 60 percent of what was tested
7   had asbestos comes from this Longo report,
8   right?
9               MS. O'DELL:  Object to the
10              form.
11          A.    60 percent of what I saw.
12  BY MS. BROWN:
13          Q.    What methodology did you employ
14  in terms of weighting the evidence from
15  Dr. Longo, a plaintiffs' expert witness, or
16  the Food and Drug Administration?
17              MS. O'DELL:  Object to the
18              form.
19          A.    I will have to say I took them
20  both into consideration.  Given that there's
21  been a continued concern since the 1970s and
22  beyond, that there is a relationship with
23  general talcum powder use and ovarian cancer,
24  I had to look at all of the information.  And

Page 127

1   if there is any asbestos in baby powder, it's
2   one of the components that could be
3   carcinogenic.
4   BY MS. BROWN:
5           Q.    Okay.  We're talking about the
6   basis for your opinion to believe there is
7   asbestos in baby powder.  Are you with me?
8               MS. O'DELL:  Object to the
9               form.
10          A.    Yes.
11  BY MS. BROWN:
12          Q.    Okay.  And I understand one of
13  the things you relied on was Dr. Longo's
14  report, right?
15          A.    Yes.
16          Q.    And you are testifying that you
17  also took into consideration the FDA's
18  testing in the 1970s, correct?
19          A.    Yes.
20          Q.    Did you consider the FDA's
21  testing in 2009 and 2010?
22          A.    I'd have to look at that
23  information.
24          Q.    Did you know that the FDA

Page 128

1   tested baby powder in 2009 and 2010?
2           A.    I don't recall.
3           Q.    Is it important to you, to have
4   considered that information before offering
5   an expert opinion that baby powder's
6   contaminated with asbestos?
7               MS. O'DELL:  Object to the
8               form.
9           A.    Can you show me that
10  information?
11  BY MS. BROWN:
12          Q.    Sure.
13              THE WITNESS:  Can you pull up
14          the Longo report for me?
15              (Deposition Exhibit 9 marked
16          for identification.)
17  BY MS. BROWN:
18          Q.    I'm marking, Dr. Wolf, as
19  Exhibit 9 to your deposition, a printout from
20  the FDA's website regarding talc, and this,
21  I'll represent to you, is a report from the
22  FDA's testing of baby powder products for
23  asbestos in 2009-2010.  Certainly take as
24  long as you need to review it, but I'd refer

Page 129

1   you to the very last page, which tests the
2   Johnson's baby powder product and reports, by
3   both PLM and TEM, no asbestos.
4               MS. O'DELL:  Would you -- would
5           you mind -- is it 9?  Exhibit 9?
6               MS. BROWN:  Yes.  Sorry.
7           Exhibit 9.  Sorry.
8               MS. O'DELL:  And feel free to
9           take an opportunity to review
10          Exhibit 9, Dr. Wolf.
11  BY MS. BROWN:
12          Q.    Dr. Wolf, I see you're looking
13  at the Longo report, which I'm going to give
14  you plenty of time to look at, but I just
15  want to ask you a question about Exhibit 9,
16  the FDA's testing.
17          A.    And what is your question?
18          Q.    Were you aware of the FDA's
19  testing of Johnson's baby powder products in
20  2009 and 2010?
21          A.    I can't recall specifically
22  that I was aware of that.  Am I surprised
23  that they tested?  I'm not.
24          Q.    Right.  So what -- did you

33 (Pages 126 to 129)

Judith K. Wolf, M.D.

Page 130

1  consider third-party testing of Johnson's
2  baby powder, like Princeton, MIT, Colorado
3  School of Mines?  Did you consider any of
4  those testings?
5          MS. O'DELL:  Object to the
6      form.
7      A.    Well, some of those were on
8  this report.
9  BY MS. BROWN:
10     Q.    Did you consider the testing
11 that they did in connection with the 1970s
12 Langer findings that determined there was no
13 asbestos in Johnson's baby powder?
14         MS. O'DELL:  Object to the
15     form, misstates the record.
16     A.    I'm getting a little confused
17 about what you're asking, about "the
18 consider."  I mean, I considered everything
19 that I saw.
20 BY MS. BROWN:
21     Q.    And that's what I'm trying to
22 find out.  So I understand you are here today
23 giving us an opinion that baby powder
24 contains asbestos.  True?

Page 131

1      A.    Some baby powder, I believe,
2  contains asbestos, yes.
3      Q.    What percentage of baby powder
4  contains asbestos?
5      A.    It doesn't matter what
6  percentage to me, if any of it does.  I'm
7  telling you the reports that I've seen, 60
8  percent in the testing that I've seen.  I
9  don't care if that's -- if you took all baby
10 powder and it's 60 percent or not.  If
11 there's any in there, it's a concern to me.
12     Q.    Okay.  So I understand you to
13 have an opinion there is asbestos in some
14 amount of baby powder, correct?
15         MS. O'DELL:  Object to the
16     form.
17     A.    In the testing that I've seen,
18 yes, I believe there's asbestos in some baby
19 powder.
20 BY MS. BROWN:
21     Q.    Okay.  And you're talking about
22 Dr. Longo's litigation testing, right?
23         MS. O'DELL:  Object to the
24     form.

Page 132

1      A.    Yes.  As well as the Hopkins
2  data.
3  BY MS. BROWN:
4      Q.    But we talked about --
5          MS. O'DELL:  Excuse me.
6      Dr. Wolf, when you say the "Hopkins
7      data," are you referring to the
8      Exhibit 28?
9          THE WITNESS:  Yes.
10 BY MS. BROWN:
11     Q.    We talked about Exhibit 28,
12 Doctor, and admittedly you're not able to
13 interpret the testing methods that were used
14 there, correct?
15         MS. O'DELL:  Object to the
16     commentary.  It's not what she said.
17     It misrepresents her testimony.
18     A.    You asked me about --
19         MS. BROWN:  Hold on.
20 BY MS. BROWN:
21     Q.    Your counsel thinks I'm
22 misrepresenting your testimony and I
23 certainly don't mean to do that.  We agreed,
24 Doctor, did we not, that you're not a

Page 133

1  microscopist?
2          MS. O'DELL:  Object to the
3      form.
4      A.    See, when you say
5  "microscopist," I say that that -- that's a
6  term to me that means more than I think
7  you're meaning to say.  I routinely look at
8  light microscopy, a pathology of gynecologic
9  cancers.  So in that area, would you say I'm
10 a microscopist?  I don't know.  Do I
11 routinely look for asbestos?  I do not.
12 BY MS. BROWN:
13     Q.    Right.  You don't hold yourself
14 out to the medical community as someone who
15 is qualified to look at bulk samples of baby
16 powder for the presence of asbestos.  True?
17     A.    I do not.
18     Q.    You have never used a
19 transmission electron microscope.  True?
20     A.    I might have used one when I
21 was in medical school or a fellowship.
22     Q.    It's not a regular part of your
23 practice to use TEM or SEM electron
24 microscopes.  True?

34 (Pages 130 to 133)

Judith K. Wolf, M.D.

Page 134

1    A.    It's not.
2    Q.    Okay.  We're going to have to
3  change the tape in a few minutes, but you
4  hold the opinion, do you not, Doctor, that
5  baby powder is contaminated with asbestos?
6        MS. O'DELL:  Object to the
7    form, asked and answered.
8    A.    I believe that some baby powder
9  contains asbestos.
10 BY MS. BROWN:
11   Q.    Do you believe that to be true
12 in terms of current baby powder on the shelf?
13   A.    The testing that I've seen goes
14 up through the 1990s.  So that's all I can
15 speak to.
16   Q.    Okay.  You're not offering an
17 opinion that any baby powder after the 1990s
18 contains asbestos; is that right?
19       MS. O'DELL:  Object to the
20   form.
21   A.    I'm not offering any opinion
22 about what's in baby powder tests beyond
23 where I've seen testing of it.
24

Page 135

1  BY MS. BROWN:
2    Q.    And the testing that you've
3  seen is in the form of Dr. Longo's report.
4  True?
5    A.    Yes.
6    Q.    Okay.  Where did Dr. Longo get
7  the samples that he tested; do you know?
8    A.    I thought that some of them --
9  I'll have to look here again.  From J&J.
10   Q.    Did you review, Doctor -- and
11 when you say "J&J," do you mean the samples
12 that came through warehouses and were
13 archived in the J&J "museum"?
14       MS. O'DELL:  Object to the
15   form, misstates the record.
16 BY MS. BROWN:
17   Q.    Well, that's a good point.
18       MS. O'DELL:  Testify to what
19   you've seen, Doctor.
20   A.    What I see is the source of the
21 talcum powder for these J&J historical
22 samples came from Italian Vermont talc mines.
23 So they were J&J historical powder samples.
24 Where they were stored at J&J -- is that what

Page 136

1  you're asking me?  I don't know -- I don't
2  have that information.
3  BY MS. BROWN:
4    Q.    Have you reviewed Dr. Longo's
5  report on the samples he acquired, in part,
6  from eBay?
7    A.    I'm laughing at eBay.
8    Q.    I know.  It sounds funny,
9  doesn't it?
10       MS. O'DELL:  Object to the
11   form.
12   A.    I believe there was some
13 commercial -- commercial products.  I didn't
14 know it was eBay.  But commercial product
15 that was off the shelf.
16 BY MS. BROWN:
17   Q.    Did you review and are you
18 relying on Dr. Longo's report of vintage baby
19 powder bottles that he purchased on eBay?
20       MS. O'DELL:  Object to the
21   form.
22   A.    I'm just looking for his
23 sources.
24       (Witness reviews document.)

Page 137

1    A.    When I looked in this report
2  for where -- the materials and methods, I
3  don't see anything about eBay on here.
4  BY MS. BROWN:
5    Q.    Did the lawyers for plaintiffs
6  give you Dr. Longo's prior reports?
7    A.    Yes, they're here somewhere.
8  BY MS. BROWN:
9    Q.    And I don't mean to have you
10 have to do homework here, Dr. Wolf.  I just
11 want to know if you're relying on Dr. Longo's
12 testing of the eBay samples.
13       MS. O'DELL:  Object to the
14   form.
15   A.    I'm relying on whole -- the
16 whole of Dr. Longo's testing.
17 BY MS. BROWN:
18   Q.    Okay.  And explain to us how
19 you employed your methodology of the weight
20 of the evidence to evaluate Dr. Longo's
21 findings, the FDA's findings, third-party
22 institution findings?
23       MS. O'DELL:  Objection to the
24   question, vague and unclear.

35 (Pages 134 to 137)

Judith K. Wolf, M.D.

1    THE WITNESS: Am I to answer or
2  not answer?
3    MS. O'DELL: If you understand
4  the question. If you don't understand
5  the question, you may ask that it be
6  rephrased.
7    A.    Can you rephrase the question?
8  BY MS. BROWN:
9    Q.    How did you weight the evidence
10  contained in Hopkins Exhibit 28 in connection
11  with the findings of the FDA?
12    MS. O'DELL: Object to the
13  form.
14    A.    I considered the weight of all
15  of the evidence in the whole of the risk of
16  talcum powder in ovarian cancer. This is a
17  small piece of it.
18  BY MS. BROWN:
19    Q.    I want to concentrate just on
20  your opinion that there's asbestos in talc.
21  And I want to know, did you weight
22  Dr. Longo's litigation reports the same as
23  the testing by the FDA?
24    MS. O'DELL: Object to the form

1  of the question, misstates her
2  testimony.
3    MS. BROWN: It's a question.
4  There's no testimony. We've got to go
5  off anyway. Let's take a break.
6    THE VIDEOGRAPHER: Going off
7  the record. The time is 11:18 a.m.
8    (Recess taken from 11:18 a.m.
9  to 11:27 a.m.)
10    THE VIDEOGRAPHER: This marks
11  the beginning of disk 2. Back on the
12  record. The time is 11:27 a.m.
13  BY MS. BROWN:
14    Q.    Dr. Wolf, before we took a
15  break, we were discussing your opinion that
16  talcum powder contains asbestos. I
17  understand you are relying in part on
18  Dr. Longo's reports for that opinion; is that
19  true?
20    A.    Yes.
21    Q.    You are also relying on the
22  Exhibit 28 to Dr. Hopkins' deposition. True?
23    A.    Yes.
24    Q.    And were you provided with any

1  of the documents that are cited in Hopkins'
2  Exhibit 28?
3    A.    No.
4    Q.    Do you know who created
5  Hopkins' Exhibit 28?
6    A.    Specifically, no.
7    Q.    Okay. Do you know whether
8  these represent final or preliminary test
9  results?
10    MS. O'DELL: Object to the
11  form.
12    A.    I don't know.
13  BY MS. BROWN:
14    Q.    Do you know whether the entries
15  that indicate testing of ore is industrial or
16  cosmetic talc ore?
17    A.    I don't.
18    MS. O'DELL: Object to the
19  form.
20  BY MS. BROWN:
21    Q.    Other than Hopkins' Exhibit 28,
22  Dr. Longo and the two FDA reports we've
23  discussed, are you relying on anything else
24  to inform your opinion that talcum powder is

1  contaminated with asbestos?
2    A.    I also have the deposition of
3  Dr. Blount.
4    Q.    And what in the deposition of
5  Dr. Blount informs your opinion that talc is
6  contaminated with asbestos?
7    A.    Let me get it out.
8    THE WITNESS: It's probably
9  over there. This is not the right
10  reference. There it is. Sorry. I
11  even had it marked.
12    (Witness reviews document.)
13  BY MS. BROWN:
14    Q.    Are you relying in part on
15  Dr. Blount's testimony, Dr. Wolf?
16    A.    Yes.
17    Q.    Have you reviewed Dr. Blount's
18  published articles?
19    A.    I have one here from 1991.
20    Q.    Did you review that in forming
21  your opinion that talc is contaminated?
22    A.    I did review it, but I'm going
23  to have to look at it here one second.
24    (Witness reviews document.)

Judith K. Wolf, M.D.

Page 142

1        A.    And the question is, did I use
2    this -- this -- this article that I have is
3    from 1991. I'm looking at my references.
4    Yes, I did -- did use this.
5    BY MS. BROWN:
6        Q.    And when you say "this," is it
7    your testimony that you are relying on the
8    information contained in Blount's 1991
9    article to inform your opinion that talc is
10   contaminated with asbestos?
11       A.    I'm relying on all of the --
12   all of the references that I have in my list.
13   That's one of them.
14       Q.    Well, some of these references
15   have nothing to do with Johnson's baby
16   powder, right?
17       A.    Yes. The references that
18   specifically are the testing for Johnson's
19   baby powder that I'm relying on for my
20   statement that some baby -- some talcum
21   powder product contains asbestos, are the
22   Hopkins data that I showed you, the Longo
23   testing and the deposition of Dr. Blount.
24       Q.    So did you write the paragraph

Page 143

1    that cites, for example, Paoletti and Rohl
2    1976?
3        A.    Yes.
4        Q.    Okay. Why would you include
5    Rohl 1976 as evidence that talcum powder --
6    Johnson's baby powder is contaminated?
7        A.    I'd have to read it again to
8    tell you what specifically I pulled out of
9    there. Would you like me to do that?
10       Q.    Let me see if I can ask you
11   some questions and save us some time. The
12   article --
13           MS. O'DELL: Excuse me. Feel
14   free to turn to it, if you'd like.
15           THE WITNESS: All right.
16           MS. O'DELL: I believe it's in
17   this one.
18   BY MS. BROWN:
19       Q.    The article reports on some
20   products tested being contaminated and others
21   not. Do you remember that?
22       A.    Yeah.
23       Q.    And what information are you
24   relying on to support your opinion that the

Page 144

1    products that are contaminated with asbestos
2    are Johnson & Johnson baby powder products?
3        A.    Let me look at one thing and
4    then I'll answer your question.
5           (Witness reviews document.)
6        A.    Given that the market of
7    Johnson -- of talcum powder products is --
8    the majority is Johnson's baby powder and
9    Johnson & Johnson products. I'm assuming
10   that in this, where they've got consumer
11   products, that some of those were Johnson &
12   Johnson.
13   BY MS. BROWN:
14       Q.    And you understand that some of
15   the consumer products they tested did not
16   have asbestos?
17       A.    Yes.
18       Q.    Did you understand that?
19       A.    I understand that.
20       Q.    Okay. What informs your
21   opinion that the products that were all
22   tested in 1976, in which he found asbestos,
23   were Johnson & Johnson products?
24           MS. O'DELL: Object to the

Page 145

1    form.
2        A.    That each one specifically that
3    was tested is a Johnson & Johnson product?
4    Is that what you're asking me?
5    BY MS. BROWN:
6        Q.    Are you relying on Rohl 1976 to
7    support your opinion that Johnson's baby
8    powder is contaminated with asbestos?
9        A.    This was a consumer talcum
10   powder product. The majority of consumer
11   talcum powder product is Johnson & Johnson.
12   I'm assuming that some of this is Johnson &
13   Johnson. Some of it tested positive. That,
14   along with all of the other evidence, leads
15   many to have the opinion that some Johnson &
16   Johnson talcum powder products contain
17   asbestos.
18       Q.    You have assumed that some of
19   the positive test results from Rohl 1976 were
20   Johnson & Johnson products; is that right?
21           MS. O'DELL: Object to the
22   form.
23       A.    I'm assuming that some of them
24   were.

37 (Pages 142 to 145)

Judith K. Wolf, M.D.

Page 146

BY MS. BROWN:
2    Q.    And other than your assumption,
3  are you relying on any other information for
4  your -- to support your opinion that Rohl
5  1976 tested Johnson baby powder products and
6  found asbestos?
7    A.    The fact that the majority of
8  consumer products are made by Johnson &
9  Johnson.
10    Q.    So Dr. Wolf, as I understand
11  your methodology, you've made an assumption,
12  that because the majority of talcum powder
13  products are made by J&J, the positive
14  results in the Rohl study must have included
15  J&J products?
16    A.    I used -- I -- what I'm saying
17  is that this supports all the other evidence
18  that there's been asbestos found in some
19  Johnson & Johnson products.
20    Q.    Right.  But my question was a
21  little different.  You've made an assumption,
22  that because J&J sells a lot of talcum powder
23  products, they must be one of the positive
24  test results in the Rohl 1976 article.  True?

Page 147

1          MS. O'DELL:  Object to the
2    form, it misstates Dr. Wolf's
3    testimony.
4    A.    I don't believe that's what I
5  said.  I believe that -- my assumption is
6  that some of the powder tested in this is
7  Johnson & Johnson product.  Some of the
8  powder tested in this tested positive for
9  asbestos.
10          In the other studies some of
11  the powder tested, some of which was Johnson
12  & Johnson, some of which might be from some
13  other company, tested positive, and therefore
14  the whole of the evidence, in my belief,
15  shows that some Johnson & Johnson product --
16  talcum powder products contain asbestos.
17  BY MS. BROWN:
18    Q.    You've made an assumption that
19  Johnson & Johnson's baby powder products that
20  were tested by Rohl in 1976 contained
21  asbestos, correct?
22          MS. O'DELL:  Object to the
23    form.
24    A.    My answer remains the same

Page 148

1  that -- that the majority of the products are
2  Johnson -- sold products -- consumer products
3  are Johnson & Johnson, that I -- I do assume
4  that some of the ones that were tested in
5  this are Johnson & Johnson.  I took that
6  information and put it with the other
7  information to make my conclusion.
8  BY MS. BROWN:
9    Q.    And if you were wrong about
10  your assumption regarding Rohl 1976, how
11  would that affect your opinion here?
12    A.    I don't believe it would affect
13  my opinion that talcum powder products
14  include asbestos.  So I don't think it would
15  change my opinion.
16    Q.    So whether Rohl found a
17  positive test result for a Johnson & Johnson
18  product or not doesn't affect your opinion;
19  is that right?
20          MS. O'DELL:  Objection to the
21    form.
22    A.    My concern is that overall
23  multiple testing, over multiple years from
24  multiple sites, suggests that some talcum

Page 149

1  powder product contains asbestos.
2  BY MS. BROWN:
3    Q.    Have you formed an opinion
4  about what percentage of Johnson & Johnson
5  talcum powder product contains asbestos?
6    A.    I don't care what percentage
7  does.  If there's any in it, it's too much.
8    Q.    Okay.  But we're going to get
9  through this so much faster if you just
10  listen to my question.  Which was, have you
11  formed an opinion about how much of Johnson &
12  Johnson's talcum powder products are
13  contaminated with asbestos?
14          MS. O'DELL:  Excuse me,
15    Dr. Wolf.  Move to strike the
16    commentary.  You may answer the
17    questions in any way you feel
18    appropriate, Dr. Wolf.  So object to
19    the form of the question.
20    A.    Sorry, you're going to -- what
21  your question was again.
22  BY MS. BROWN:
23    Q.    I'll re-ask it, rather than
24  have you read the realtime, Doctor.  Have you

38 (Pages 146 to 149)

Judith K. Wolf, M.D.

Page 150

1    attempted to quantify or estimate what
2    percentage of Johnson & Johnson powder --
3    Johnson & Johnson baby powder products are
4    contaminated with asbestos?
5         MS. O'DELL: Object to the
6         form.
7         A.    I haven't attempted to quantify
8    what percentage of Johnson & Johnson baby
9    powder products contain asbestos. I hold the
10   opinion that if any of it contains asbestos,
11   it's too much.
12   BY MS. BROWN:
13        Q.    Have you formed an opinion
14   about what type of asbestos is contaminating
15   Johnson & Johnson baby powder products?
16        A.    It doesn't matter to me. All
17   types of asbestos are carcinogenic.
18        Q.    And that wasn't my question.
19   My question was, have you formed an opinion
20   about what type of asbestos is contaminating
21   Johnson & Johnson's baby powder products?
22        MS. O'DELL: Excuse me. Object
23        to the form of the question, asked and
24        answered.

Page 151

1         A.    I'll restate that. Because it
2    doesn't matter to me what -- which type of
3    asbestos might be contained in a sample of
4    Johnson & Johnson's talcum powder product, I
5    don't have any opinion as to what type.
6    BY MS. BROWN:
7         Q.    Do you have an opinion as to
8    how much contamination is in each individual
9    bottle of Johnson & Johnson's baby powder?
10        MS. O'DELL: Object to the
11        form.
12        A.    Because it doesn't matter to me
13   how much there is, whether it's a small
14   amount, a large amount, a medium amount, my
15   concern is that if there's any in it, it's
16   dangerous; I haven't formed an opinion about
17   how much there is.
18   BY MS. BROWN:
19        Q.    Do you believe that there's no
20   amount of asbestos that's safe?
21        MS. O'DELL: Object to the
22        form.
23        A.    I believe that any amount of
24   asbestos in talcum powder product is

Page 152

1    dangerous.
2    BY MS. BROWN:
3         Q.    And in terms of your
4    methodology for analyzing the epidemiology in
5    this case, have you done that with an
6    assumption that the talcum powder evaluated
7    in the epi contained asbestos?
8         A.    That question is not clear to
9    me. Are you --
10        Q.    Let me rephrase. I understand
11   you looked at a number of epi studies in
12   forming your opinion here, correct?
13        A.    Yes.
14        Q.    Have you made the assumption
15   that the talcum powder that was studied in
16   those epi studies contained asbestos?
17        MS. O'DELL: Object to the
18        form.
19        A.    So I'm going to say that when
20   I -- when reviewing all of the studies, I
21   wasn't really thinking specifically about the
22   components of talcum powder product. I was
23   looking at the epidemiology of the findings
24   of talcum powder product and its risk for

Page 153

1    ovarian cancer, and then separately, in
2    investigating and looking at all the
3    components of talcum powder as a way to
4    explain the results of the epidemiology
5    studies.
6         So I'm not -- in the end, as a
7    whole -- it's part of the whole, but
8    specifically looking at the epidemiology
9    studies, that wasn't my biggest concern. My
10   concern was, did the use of genital talcum
11   powder increase the risk of ovarian cancer?
12   BY MS. BROWN:
13        Q.    Do you believe that talc that's
14   not contaminated with asbestos can cause
15   ovarian cancer?
16        A.    I think of the product as a
17   whole versus separate, and my concern is that
18   in the talcum powder product, whether or not
19   a particular sample has asbestos, yes, there
20   are other things in there that can be
21   carcinogenic and inflammatory and cause
22   ovarian cancer.
23        Q.    Do you believe that talcum
24   powder without asbestos causes ovarian

Judith K. Wolf, M.D.

Page 154

1    cancer?
2         MS. O'DELL:  Objection to the
3    form.
4         A.   I believe that asbestos is one
5    of the products -- one of the components of
6    talcum powder that causes carcinogenesis of
7    the ovary or cancer of the ovary, but I think
8    that in a specific sample, whether or not
9    there's asbestos, there's enough other
10   products that can be carcinogenic that, yes,
11   I think it's still at risk.
12   BY MS. BROWN:
13        Q.   Okay.  Have you reviewed, in
14   connection with your opinions, Doctor, IARC's
15   review of asbestos?
16        A.   Yes.
17        Q.   Do you believe that asbestos is
18   a recognized cause of ovarian cancer?
19        A.   Yes.
20        Q.   Have you ever diagnosed a
21   patient with ovarian cancer caused by
22   asbestos?
23        A.   I have, that I can recall, at
24   least one patient.

Page 155

1         Q.   And what was the asbestos
2    exposure of this patient encounter?
3         A.   I don't recall.  It was a long
4    time ago.
5         Q.   And you documented in a
6    patient's chart that you believed her ovarian
7    cancer was caused by asbestos?
8         A.   I'd have to go back and review
9    the chart.  I don't think I, personally, put
10   that in the chart.  I'd have to review the
11   chart.  It may be in her chart, in the
12   pathology report that they saw evidence of
13   fibers in the cancer.  It might be it was her
14   exposure.  I just remember one patient where
15   I went and reviewed the literature on
16   asbestos in ovarian cancer because that was
17   the concern.
18        Q.   Did this patient have
19   occupational exposure to asbestos?
20        A.   I don't recall.
21        Q.   You --
22        A.   And I don't have access to her
23   medical records.
24        Q.   Where were you the treating

Page 156

1    physician when you treated this patient?
2         A.   At MD Anderson.
3         Q.   You'd agree that the literature
4    that IARC relies upon in finding that
5    asbestos can cause ovarian cancer is in the
6    occupational context?
7         MS. O'DELL:  Object to the
8    form.
9         A.   Yes, I would say that they
10   looked at inhalation generally and dermal
11   contact, yes.
12   BY MS. BROWN:
13        Q.   And they looked at that in the
14   heavy occupational exposure context, correct?
15        MS. O'DELL:  Objection to the
16   form.
17        A.   You know, I'd have to look at
18   the wording in that IARC again to answer that
19   question.
20   BY MS. BROWN:
21        Q.   Dr. Wolf, I'll hand -- we'll
22   mark as Exhibit 10, IARC's monograph on
23   asbestos and ovarian cancer.
24

Page 157

1         (Deposition Exhibit 10 marked
2    for identification.)
3    BY MS. BROWN:
4         Q.   I'll direct your attention to
5    page 256.  Did you review all of the studies
6    in this monograph before forming your
7    opinions in this case?
8         MS. O'DELL:  Do you have a copy
9    for me, Counsel?
10        A.   Are you asking did I separately
11   read all of the articles in this monograph?
12   BY MS. BROWN:
13        Q.   Yes.
14        A.   The references?
15        MS. O'DELL:  Counsel, excuse
16   me.  Can I just ask, is this going to
17   be Exhibit 10?
18        MS. BROWN:  No, I marked
19   Exhibit 10.
20        MS. O'DELL:  Okay.  This is --
21        A.   I don't think I reviewed all of
22   these articles.
23   BY MS. BROWN:
24        Q.   Do the asbestos studies that

40 (Pages 154 to 157)

Judith K. Wolf, M.D.

Page 158

1    IARC relies on in what we've marked as
2    Exhibit 10, inform your opinion in this case?
3         A.    My opinion that asbestos causes
4    cancer?
5         Q.    Yes.
6         A.    It's part of the opinion, yes.
7         Q.    What do you rely on to support
8    your opinion that asbestos causes ovarian
9    cancer?
10        A.    I would say that this and all
11   of the literature.  And some of this
12   literature, I believe, is in my
13   contributing -- contributing materials that I
14   reviewed.  The Reid paper, the Langseth
15   paper, the Magnani paper.  Just didn't read
16   them all, but all of their references.
17        Q.    And you would agree that the
18   studies that IARC reviewed were in the heavy
19   occupational exposure context, correct?
20             MS. O'DELL: Object to the
21   form.
22        A.    Occupationally exposed.
23   BY MS. BROWN:
24        Q.    Let's look at page 256, the

Page 159

1    second column, the first full paragraph.
2    "The Working Group noted that a causal
3    association between exposure to asbestos and
4    cancer of the ovary was clearly established
5    based on five strongly positive cohort
6    mortality studies of women with heavy
7    occupational exposure to asbestos."
8             Right?
9             MS. O'DELL: Object to the
10   form.
11   BY MS. BROWN:
12        Q.    That's what IARC concluded,
13   right?
14             MS. O'DELL: Object to the
15   form.
16        A.    Well, that's part of the
17   conclusion.  The next study shows that women
18   and girls with environmental but not exposure
19   to -- occupational exposure had positive but
20   not a significant increase in ovarian cancer
21   also.
22   BY MS. BROWN:
23        Q.    Right.  The environmental
24   studies that IARC considered did not show a

Page 160

1    statistically significant increase of ovarian
2    cancer, correct?
3             MS. O'DELL: Object to the
4    form.
5         A.    There's an increase, but not a
6    statistically significant increase.
7    BY MS. BROWN:
8         Q.    Well, that's an important
9    distinction, isn't it, Doctor?
10        A.    So it would be -- it would be
11   stronger evidence if it was statistically
12   significant.  I'm not writing it off as not
13   important, because the overall conclusion is
14   that asbestos increases the risk of ovarian
15   cancer.  And I certainly wouldn't suggest
16   that anyone expose themselves to asbestos,
17   whether it's an occupational hazard or not,
18   not just for its risk of ovarian cancer, but
19   for the risk of other cancers, lung cancers,
20   pleural cancers, renal cancers.
21        Q.    The only studies on which IARC
22   relies to support its conclusion that
23   asbestos causes ovarian cancer that have a
24   statistically significant finding are in the

Page 161

1    heavy occupational context, correct?
2             MS. O'DELL: Object to the
3    form.
4         A.    In that paragraph, that's what
5    it says.
6    BY MS. BROWN:
7         Q.    Do you believe that studies
8    looking at women who are experiencing heavy
9    occupational exposure to asbestos, can be
10   relied on in the cosmetic exposure context?
11        A.    Can be relied on --
12        Q.    Do you think that women
13   experiencing heavy occupational exposure to
14   asbestos are exposed to the same amount of
15   asbestos as women using talcum powder
16   perineally?
17        A.    I don't know the answer to
18   that.
19        Q.    Have you attempted to quantify
20   the difference between heavy occupational
21   asbestos exposure and perineal talc asbestos
22   exposure?
23             MS. O'DELL: Objection to the
24   form.

41 (Pages 158 to 161)

Judith K. Wolf, M.D.

Page 162

1      A.    I haven't attempted to
2  quantify.  But if we go back to what I'm
3  talking about here is the talcum powder
4  product, which I believe some of which
5  contains asbestos but also contains fibrous
6  talc, heavy metals and fragrances that are
7  irritating.  So it's hard -- it's apples and
8  oranges.  It's asbestos occupationally that
9  we're saying here.  It's a talcum powder
10  product of which one of the concerning
11  components is asbestos and so it's more than
12  just asbestos.
13  BY MS. BROWN:
14      Q.    Are you aware of any scientific
15  literature that has attempted to quantify the
16  difference in exposure between heavy
17  occupational asbestos exposure and cosmetic
18  talcum powder use?
19      A.    Of asbestos specifically, is
20  that what you're asking me?  What are you
21  asking?
22      Q.    Are you aware of any scientific
23  literature that attempts to quantify the
24  difference between how much a woman is

Page 163

1  exposed -- how much asbestos a woman is
2  exposed to in the occupational context versus
3  if she uses a cosmetic talcum powder product
4  that you believe is contaminated with
5  asbestos?
6          MS. O'DELL:  Object to the
7      form.
8      A.    I'm not aware of any literature
9  that specifically would answer that question
10  because how much, how often the talcum powder
11  is used would have -- would differentiate
12  there.
13  BY MS. BROWN:
14      Q.    Are you aware of any scientific
15  support that exposure -- nonoccupational
16  exposure to asbestos causes ovarian cancer?
17          MS. O'DELL:  Object to the
18      form, asked and answered.
19      A.    So these papers referred here,
20  in fact the Reid paper, suggests that in
21  nonoccupational exposure, there's an
22  increase, although not a statistically
23  significant risk of ovarian cancer in women
24  exposed to what would be presumed to be

Page 164

1  environmental asbestos.  I don't know if
2  those women used talcum powder in their
3  perineum.  But again, talcum powder product
4  is more than asbestos.
5  BY MS. BROWN:
6      Q.    Are you relying on the
7  nonstatistically significant findings in the
8  environmental studies of women exposed to
9  asbestos to support your view that cosmetic
10  talcum powder exposure causes ovarian cancer?
11          MS. O'DELL:  Object to the
12      form.
13      A.    I'm relying on the fact that
14  asbestos is carcinogenic, fibrous talc is
15  carcinogenic, platy talc via IARC is a
16  possible carcinogenic, heavy metals, chromium
17  and nickel are carcinogenic, cobalt is
18  possibly carcinogenic and many of the
19  fragrances in talcum powder product are
20  irritating, that that combination of product
21  causes ovarian cancer in some women and puts
22  any woman who uses it on her perineum at
23  risk -- increased risk for ovarian cancer.
24

Page 165

1  BY MS. BROWN:
2      Q.    Other than the nonstatistically
3  significant studies discussed in IARC's
4  monograph on asbestos, are you aware of any
5  scientific support linking asbestos to
6  ovarian cancer outside of the heavy
7  occupational context?
8          MS. O'DELL:  Object to the
9      form, asked and answered.
10      A.    I'm going to say I'm not aware
11  of that, but it doesn't form my opinion.  I'm
12  going to go back to -- and I know I keep
13  repeating the same thing over again -- it's
14  not the asbestos alone.  Asbestos is one of
15  the -- one of the issues that's a component
16  of talcum powder product that I'm concerned
17  about, that I believe the combination of all
18  of those things can increase the risk of
19  ovarian cancer.
20  BY MS. BROWN:
21      Q.    Isn't it important for you to
22  know or have established how much asbestos
23  you believe is contaminating baby powder
24  products before you can make that opinion?

42 (Pages 162 to 165)

Judith K. Wolf, M.D.

Page 166

1          MS. O'DELL: Object to the
2     form.
3          A.    To me it is not and that's
4     because if -- if things work in an additive
5     or synergistic way, the amount of asbestos
6     that on its own might increase or not
7     increase the risk of ovarian cancer is
8     separate from the amount of asbestos that in
9     combination with all of the other components
10    might increase the risk of ovarian cancer.
11    BY MS. BROWN:
12         Q.    What scientific support do you
13    have for your opinion that asbestos works in
14    an additive way with the other constituents
15    of talcum powder to increase a woman's risk
16    for ovarian cancer?
17         A.    I don't know that specifically
18    for asbestos, but I know that in general,
19    cancer doesn't occur because of one thing; it
20    occurs because of multiple things. And that
21    toxins can work in combination and that
22    causes of cancer can work in combination.
23    For instance, the human papilloma virus
24    causes cervical cancer, but if you smoke on

Page 167

1     top of that, your risk of cervical cancer is
2     greater than if you don't smoke.
3          So things can be additive and
4     are synergistic. I don't know if these are
5     additive and/or synergistic. My concern is
6     that they're all toxic and more than likely,
7     I suspect, there are some additivity plus or
8     minus synergism.
9          Q.    So if I understand you,
10    Dr. Wolf, you have an understanding generally
11    that multiple factors can work together to
12    cause cancer; is that fair?
13         A.    That's correct.
14         MS. O'DELL: Object to form.
15    BY MS. BROWN:
16         Q.    As it relates to whether or not
17    multiple elements of a talcum powder product
18    work together to form -- to increase a
19    woman's risk of cancer, you're not aware of
20    any scientific support for that opinion.
21    True?
22         MS. O'DELL: Object to the
23    form.
24         A.    I'm not aware of -- as far as I

Page 168

1     know, as far as my understanding, there isn't
2     a study that's taken one out and looked at
3     the difference in carcinogenicity, whether
4     one or the other is not there, but it doesn't
5     matter to me because they're there. Asbestos
6     is carcinogenic. Heavy metals are
7     carcinogenic. Nickel and chromium. Platy
8     talc is possibly carcinogenic. Fibrous talc
9     is asbestos. It's carcinogenic.
10    BY MS. BROWN:
11         Q.    Is there a threshold exposure
12    to asbestos in your mind that is needed to
13    cause ovarian cancer?
14         A.    Are you asking about asbestos
15    on its own?
16         Q.    Asbestos on its own.
17         A.    I'm not aware what that
18    threshold is.
19         Q.    Have you attempted to survey
20    the literature to see if there is any
21    scientific studies examining whether there is
22    a threshold level of asbestos exposure that
23    causes ovarian cancer?
24         MS. O'DELL: Object to the

Page 169

1     form.
2          A.    Hold on one second. Because
3     I'm looking on my papers about an asbestos
4     exposure, but those are not human studies.
5     So my -- my brain says how I would test that,
6     would be to give humans varying amounts of
7     asbestos knowing what you're giving them and
8     seeing who got cancer or not, and that study
9     hasn't been done and can't be done.
10    BY MS. BROWN:
11         Q.    And other than kind of your gut
12    or your understanding about how cancer works,
13    is there anything else you're relying on in
14    the scientific literature to support this
15    idea that asbestos is working in combination
16    with something else in talcum powder to
17    increase a woman's risk for ovarian cancer?
18         MS. O'DELL: Object to the
19    form.
20         A.    So I'm going to step back and
21    say that my point is that all of those
22    components are toxic in talcum powder. How
23    much asbestos is in there on its own doesn't
24    matter to me because if it's in there and

43 (Pages 166 to 169)

Judith K. Wolf, M.D.

Page 170

1  this is in there and this is in there and
2  this is in there, and what I mean is fibrous
3  talc, platy talc, heavy metal, irritating
4  fragrances, it doesn't matter to me how much
5  asbestos is in there. If there's a sample of
6  baby powder that doesn't have asbestos in
7  there, it doesn't matter, because all of
8  those other things also are carcinogenic or
9  possibly carcinogenic or irritating and
10 inflammatory.
11 BY MS. BROWN:
12     Q.   So in forming your opinions in
13 this case, Dr. Wolf, it is not important to
14 you to know the chemical composition of an
15 individual bottle of talcum powder; is that
16 right?
17        MS. O'DELL: Object to the
18     form.
19     A.   In women who use talcum powder
20 on their perineum, if they're using it
21 regularly, whatever -- however that is
22 defined as once a day, once a week, twice a
23 day, over a period of years they're going to
24 be exposed to more than one bottle of baby --

Page 171

1  of talcum powder product. And so whether one
2  of those bottles did or did not have asbestos
3  in it doesn't matter to me.
4  BY MS. BROWN:
5      Q.   Because in your view, there are
6  other things in talcum powder that cause
7  cancer?
8      A.   Because there are other things
9  in talcum powder that are carcinogenic or
10 possibly carcinogenic, and if a woman has
11 used more than one bottle over her lifetime,
12 the chances are pretty high that one of those
13 bottles did contain asbestos in addition to
14 the others.
15     Q.   Is it your opinion that the
16 fragrances in Johnson & Johnson's baby powder
17 cause ovarian cancer?
18     A.   No, I never stated that. It's
19 my opinion that some of them are known
20 irritants or can be inflammatory, and that
21 was from Dr. Crowley's report, which I did
22 see before I wrote my report, his expert
23 report.
24     Q.   Time-out. Time-out. Are we --

Page 172

1  you're going to change your testimony from
2  earlier this morning?
3        MS. O'DELL: Object to the
4     commentary. She's not changing her
5     testimony. She's referred to
6     Dr. Crowley numerous times in her
7     deposition thus far.
8  BY MS. BROWN:
9      Q.   Dr. Wolf, you remember telling
10 me this morning you didn't look at anybody's
11 expert report before you wrote yours, right?
12     A.   Yes. But I was incorrect, and
13 I'm clarifying it now, because I did see
14 Dr. Crowley's report and I did see
15 Dr. Longo's report.
16     Q.   Did you rely on Dr. Crowley's
17 report in forming the opinions in your
18 report?
19     A.   About the fragrances, yes.
20     Q.   When did you see Dr. Crowley's
21 report?
22     A.   Sometime before I turned my
23 report in so that I had time to review it.
24     Q.   Did you see a draft version of

Page 173

1  Dr. Crowley's report?
2      A.   I think I saw his final report.
3      Q.   How many days did you spend
4  reviewing Dr. Crowley's report?
5        MS. O'DELL: Object to the
6     form.
7      A.   I don't recall.
8  BY MS. BROWN:
9      Q.   What information did you use or
10 rely on from Dr. Crowley's report?
11     A.   I can pull it up, but I believe
12 you have a list of all of the things that
13 were in there and looking at them, what they
14 were -- what was known about all of the
15 different components.
16     Q.   Did you do anything to verify
17 the accuracy of Dr. Crowley's list of
18 components of talcum powder?
19        MS. O'DELL: Object to the
20     form.
21     A.   Such as? What are you
22 suggesting?
23 BY MS. BROWN:
24     Q.   Did you do anything, as an

44 (Pages 170 to 173)

Judith K. Wolf, M.D.

Page 174

1    independent expert witness, to check the list
2    that you received from Dr. Crowley?
3            MS. O'DELL:  Object to the
4    form.
5        A.    I don't know how I could have
6    done that because I didn't have the list of
7    what was in there myself.  And I don't --
8    so -- and I don't do the testing myself.  I
9    relied on the expert, that he tested and
10   found those things in the report, in the
11   fragrance -- or in the product, sorry.
12   BY MS. BROWN:
13       Q.    And is it your opinion that
14   some of the elements on Dr. Crowley's list
15   increase a woman's risk of ovarian cancer?
16       A.    No.  It's my opinion that some
17   of the ingredients on the list are
18   inflammatory.  And I know that inflammation
19   plays a role in the development and
20   progression of ovarian cancer.
21       Q.    Are you relying on any
22   scientific literature to support your
23   opinion, that some of the chemicals in
24   Johnson & Johnson's baby powder cause an

Page 175

1    inflammatory reaction that can lead to
2    cancer?
3            MS. O'DELL:  Object to the
4    form.
5        A.    I'm relying on the literature
6    that says ovarian cancer is related to
7    inflammation, both development and
8    progression, and knowing that those are
9    inflammatory, I have a concern about them.
10   BY MS. BROWN:
11       Q.    Do you have any scientific
12   support that the chemicals in Johnson &
13   Johnson's baby powder are inflammatory in
14   human beings?
15           MS. O'DELL:  Object to the
16   form.
17       A.    I'd have to look at the report
18   of how they were all tested.  I know that --
19   I'm assuming most of it was in animals, not
20   in humans.  So I'd have to look at the
21   report.
22   BY MS. BROWN:
23       Q.    Are you relying on the presence
24   of certain of the chemicals listed on

Page 176

1    Dr. Crowley's list, are you relying on the
2    presence of those in the baby powder product
3    to support your opinion that it increases a
4    woman's risk of ovarian cancer?
5        A.    I believe it's one of the
6    things that could.
7        Q.    So what I want to know is what
8    ingredients do you believe could increase a
9    woman's risk of ovarian cancer, and then,
10   two, what scientific support you have for
11   that?
12           MS. O'DELL:  Excuse me.  Object
13   to the form.
14       A.    I never said that those
15   ingredients themselves could increase the
16   risk of ovarian cancer.  What I'm saying is
17   that some of the ingredients can be
18   inflammatory.  Inflammation is associated
19   with development and progression of ovarian
20   cancer.  Those fragrances on their own --
21   excuse me, in conjunction with all of the
22   other components of talcum powder are
23   concerning to me.
24

Page 177

1    BY MS. BROWN:
2        Q.    And what support do you have in
3    the scientific literature that would lead you
4    to be concerned about the inflammatory
5    process you just described?
6        A.    Oh, in ovarian cancer?
7        Q.    No, with these chemicals, what
8    support do you have -- the list of
9    fragrances, what support do you have that
10   those elements cause inflammation that could
11   lead to cancer in humans?
12           MS. O'DELL:  Object to the
13   form.
14       A.    I never said I had that
15   evidence.  What I'm saying, is that the
16   expert report says that many of them are
17   inflammatory and that I know that
18   inflammation has -- plays a large role in
19   ovarian cancer and there's more and more
20   papers suggesting that, and that this is one
21   of the components of talcum powder product
22   that I'm concerned about.
23   BY MS. BROWN:
24       Q.    And do you have any evidence

45 (Pages 174 to 177)

Judith K. Wolf, M.D.

Page 178

1   that those elements have been tested in human
2   beings, have caused inflammation in human
3   beings?
4           MS. O'DELL:  Object to the
5       form.
6       A.    I would have to review his
7   report again.  My -- so I can't answer that
8   question offhand.  I would suspect that most
9   of these were tested in animals, not in human
10  beings.
11  BY MS. BROWN:
12      Q.    For purposes of your opinion,
13  Dr. Wolf, are you relying on a finding in
14  animals of inflammation, to support your
15  opinion that talcum powder causes ovarian
16  cancer?
17          MS. O'DELL:  Object to the
18      form.
19      A.    No.  What I'm relying on is --
20  let me clarify it.  What I'm relying on is
21  that these cause inflammation, even if it's
22  in animals.  They are part of the talcum
23  powder product and concerning to me, in
24  addition with all of the other parts of

Page 179

1   talcum powder that are concerning, asbestos,
2   fibrous talc, platy talc, heavy metals.
3   BY MS. BROWN:
4       Q.    What support do you have that
5   the inflammation you're referring to leads to
6   cancer?
7           MS. O'DELL:  Object to the
8       form.
9   BY MS. BROWN:
10      Q.    What I'm after is, where are
11  the scientific studies that say this
12  inflammation in an animal caused cancer, of
13  the list of fragrances Dr. Crowley opines on?
14          MS. O'DELL:  Object to the
15      form, asked and answered.
16      A.    Yeah, I believe I've already
17  answered that question.  I don't have a study
18  that I can point to that says, using this
19  agent it produced cancer, in this agent that
20  it produced cancer.  But if they're
21  inflammatory, that's concerning enough to me,
22  especially with ovarian cancer, that they
23  could play a role in the toxicity of talcum
24  powder on the perineum to increase the risk

Page 180

1   of ovarian cancer.
2   BY MS. BROWN:
3       Q.    Other than your understanding
4   that some of the fragrances have been
5   inflammatory in animals, is there anything
6   else you're relying on to support your
7   opinion, that the presence of the fragrances
8   in Johnson & Johnson's baby powder increase a
9   woman's risk of ovarian cancer?
10          MS. O'DELL:  Object to the
11      form.
12      A.    I'm just reading the question
13  again.  The fact that I know that
14  inflammation in a proinflammatory state is
15  related to the development of ovarian cancer
16  and the progression of ovarian cancer, I'm
17  concerned about anything in talcum powder
18  product that would increase -- potentially
19  increase inflammation.
20  BY MS. BROWN:
21      Q.    How -- have you made a
22  determination of how much of the fragrances
23  are present in the talcum powder product?
24      A.    I do not know that.

Page 181

1       Q.    Isn't it important for you in
2   forming your opinion, to know the amount of
3   exposure that a woman would get from
4   fragrances in talcum powder?
5           MS. O'DELL:  Object to form.
6       A.    I'm going to go back to what I
7   said about asbestos and the amount.  First of
8   all, I don't know how you would quantify the
9   amount when I don't know what a dose is, how
10  often someone uses it, how much they use, how
11  long they used talcum powder product.  And
12  then in addition, each individual woman, her
13  makeup, her response is going to be
14  different.
15          And so given that there isn't
16  testing of dosing to see if each of these
17  individual things increases the risk of
18  ovarian cancer and there's some concern that
19  they increase inflammation, my concern is
20  that any amount is worrisome.
21  BY MS. BROWN:
22      Q.    And the basis for your opinion
23  that it's worrisome is your understanding
24  that in some dose, these chemicals can cause

46 (Pages 178 to 181)

Judith K. Wolf, M.D.

Page 182

1  inflammation in animal models. True?
2      MS. O'DELL: Object to the
3  form.
4      A.  And more than that, that
5  inflammation can cause -- be one of the
6  causes of ovarian cancer and this is
7  something that's in a product that has
8  multiple things that have been associated
9  with increased inflammation and/or
10  carcinogenicity of the ovaries.
11  BY MS. BROWN:
12      Q.  And tell me, Doctor, I
13  understand you believe that there is asbestos
14  in baby powder, right, we talked about that?
15      A.  I have seen data to support
16  that there is asbestos in some baby powder
17  product.
18      Q.  And you have not made a
19  determination as to how much may be in baby
20  powder, correct? How much asbestos?
21      MS. O'DELL: Objection to the
22  form --
23      A.  My concern is that I don't -- I
24  don't know specifically how much, and I don't

Page 183

1  really have a threshold of how much is safe.
2  I'm concerned with any.
3  BY MS. BROWN:
4      Q.  And you've not made a
5  determination as to how much fragrance is in
6  any individual bottle of baby powder,
7  correct?
8      A.  Well, an individual fragrance,
9  no, I don't know.
10      Q.  Is it your testimony that any
11  amount, including trace levels of fragrances,
12  can cause inflammation that lead to cancer?
13      MS. O'DELL: Objection to the
14  form.
15      A.  I don't know how much of the
16  fragrances are required to cause
17  inflammation. Given that I don't know how
18  much is safe, I'm concerned about any amount.
19  BY MS. BROWN:
20      Q.  But do you have scientific
21  support for the fact that any amount of
22  fragrance can cause inflammation that leads
23  to cancer?
24      MS. O'DELL: Object to the

Page 184

1  form.
2      A.  I believe I've answered this
3  question multiple times, that these fragrance
4  ingredients, some of them cause inflammation,
5  at least in animals, that ovarian cancer, one
6  of the causes, is a proinflammatory state and
7  inflammation can also enhance the progression
8  of ovarian cancer. And so if there's a
9  product that I know contains -- one of the
10  components can cause inflammation, and I
11  don't know what level is safe, I don't know
12  that I can answer that there's a safe level.
13  BY MS. BROWN:
14      Q.  Are you familiar with talc
15  pleurodesis?
16      A.  Yes.
17      Q.  You understand that that is a
18  procedure in which talc is placed inside a
19  person's lung for its inflammatory response,
20  correct?
21      A.  So it's not placed in the lung.
22  It's placed in the pleura.
23      Q.  Pleura. Right?
24      A.  Yes.

Page 185

1      Q.  And the purpose of placing it
2  in the pleura is to initiate an inflammatory
3  response, correct?
4      A.  That's correct.
5      Q.  And that's, in fact, one of the
6  reasons that talc is what's used in
7  pleurodesis because it produces in large
8  quantities, an inflammatory response, right?
9      A.  So that is one of the reasons
10  that talc has been used. It's not used very
11  much anymore because a lot of ovarian cancer
12  patients get malignant pleural effusions.
13  And so I've had a lot of personal experience
14  in -- I'm not doing the pleurodesis myself,
15  but referring, and most places for malignant
16  pleural effusions these days, they don't use
17  any kind of chemical pleurodesis. They put
18  in a drain, that the patient can drain as
19  needed when they're short of breath.
20      Q.  You, Doctor, have never
21  performed talc pleurodesis; is that right?
22      A.  I have referred patients to my
23  colleagues to do it, but I haven't personally
24  done it.

47 (Pages 182 to 185)

Judith K. Wolf, M.D.

Page 186

1    Q.    Part of your care as a
2  gynecological oncologist includes from time
3  to time referring patients for talc
4  pleurodesis; is that right?
5        MS. O'DELL: Object to the
6      form.
7      A.    Referring patients for
8  management of malignant pleural effusion.
9  And I would say that in the last 15, at
10 least, years, none of my patients have had
11 talc pleurodesis or any kind of chemical
12 pleurodesis. They've all had drains placed.
13 BY MS. BROWN:
14     Q.    And you're not a pulmonologist,
15 right, Doctor?
16     A.    I'm not a pulmonologist.
17     Q.    You are not the primary person
18 that patients go to when they're suffering
19 from diseases of the pleura like
20 mesothelioma, correct?
21        MS. O'DELL: Object to the
22     form.
23     A.    No.
24

Page 187

1  BY MS. BROWN:
2      Q.    And so whether or not talc
3  pleurodesis is and remains the standard of
4  care at a number of institutions treating
5  patients with mesothelioma is not something
6  that you necessarily know; is that fair?
7        MS. O'DELL: Object to the
8      form.
9      A.    I would say it's my
10 understanding that in general, talc
11 pleurodesis is not as common as it used to
12 be.
13 BY MS. BROWN:
14     Q.    And you would agree with me,
15 Doctor, that talc pleurodesis is something
16 that IARC considered in reviewing the
17 literature on talc, right?
18        MS. O'DELL: Object to the
19     form. Which monograph are you
20     referring to?
21 BY MS. BROWN:
22     Q.    On talc.
23     A.    Oh, the 2010? Yes.
24     Q.    Right. And one of the things

Page 188

1  that IARC noted is that in -- certainly, talc
2  pleurodesis causes an inflammatory response,
3  right?
4      A.    Yes.
5      Q.    And that those patients have
6  been followed for decades, to see if that
7  inflammatory response leads to cancer, right?
8      A.    Some of those patients.
9      Q.    And by and large -- have you
10 reviewed the epidemiology as it relates to
11 patients who have undergone talc pleurodesis?
12     A.    Yes.
13     Q.    And you would agree with IARC,
14 that the conclusions are that talc
15 pleurodesis does not cause cancer. True?
16        MS. O'DELL: Object to the
17     form.
18     A.    So my interpretation of the
19 literature on that, is that it's a -- most of
20 the time it's a one-time application of talc.
21 Many of those patients have a terminal
22 disease and don't live long enough to know
23 what happens down the road. Some of them
24 have been followed a long time, but the talc

Page 189

1  pleurodesis, it happens once, maybe twice,
2  but it's not a repeated application of talc.
3  BY MS. BROWN:
4      Q.    Have you attempted to quantify
5  the difference between how much talc is
6  applied to the mesothelial cells of the
7  pleura versus how much talc could enter a
8  woman's body from perineal use?
9        MS. O'DELL: Object to the
10     form.
11     A.    I haven't done that. I'm not
12 sure how you could do that, unless you
13 measured how much a woman used over time.
14 BY MS. BROWN:
15     Q.    You would agree with me that in
16 the pleurodesis context, talc causes an
17 inflammatory response that does not cause
18 cancer, right?
19        MS. O'DELL: Object to the
20     form.
21     A.    I would agree that it causes an
22 acute inflammatory response, that's why it's
23 used. And I would say that many of the --
24 much of -- it's given once, and much of the

48 (Pages 186 to 189)

Judith K. Wolf, M.D.

Page 190

 1    time we don't know -- the patients don't live
 2    long enough to know if there's any effect.
 3    In the patients that have lived long and have
 4    been followed, there hasn't seen an increase
 5    risk of cancer, but again, it's a one-time
 6    application.
 7    BY MS. BROWN:
 8         Q.    And in terms of how much -- of
 9    the one-time application, how much talc gets
10    into a person's body, that's not something
11    you know, right?
12         A.    No, because I think that if a
13    woman's using it, I don't know how much she's
14    using over time.  And although maybe one time
15    using it in the perineum is less than the
16    amount used for talc pleurodesis, if somebody
17    uses talcum powder product in their peroneum
18    daily, monthly, weekly for years, I don't
19    know how that relates to what's used in a
20    one-time talc pleurodesis.
21         Q.    Right.  You don't have any
22    information or any basis to compare the
23    amount of talc that's injected into a person
24    who's getting talc pleurodesis with the

Page 191

 1    amount of talc that may or may not migrate up
 2    the genital track to the ovaries.  True?
 3              MS. O'DELL:  Object to the
 4    form.
 5         A.    What I'm saying is that I can't
 6    compare the two.  It's certainly not bottles
 7    of talcum powder that -- multiple bottles
 8    that are used in pleurodesis.
 9    BY MS. BROWN:
10         Q.    Do you know how many grams of
11    talcum powder are used in talc pleurodesis?
12         A.    I don't remember offhand.
13         Q.    Have you attempted to quantify
14    how much talcum powder could ascend the
15    genital tract through perineal dusting?
16              MS. O'DELL:  Object to the
17    form.
18         A.    Are you asking me have I
19    personally done that?
20    BY MS. BROWN:
21         Q.    Well, in connection with your
22    opinion -- I assume your opinions in this
23    case are based on a belief that talc can
24    migrate to the ovaries.  True?

Page 192

 1         A.    I believe that talc, as well as
 2    many inert materials can migrate to the
 3    ovaries.
 4         Q.    What other inert materials can
 5    migrate to the ovaries?
 6         A.    Dead sperm, carbon particles,
 7    radioactive material that's been studied.
 8         Q.    Are you aware --
 9         A.    Menstrual blood that flows
10    retrograde.
11         Q.    What about particles from the
12    exterior of the vagina?  Are you aware of any
13    evidence that those particles can migrate to
14    the ovaries?
15         A.    So -- I want to say it's in one
16    of the animal studies.  There is definitely
17    inflammation of the genital tract with
18    perineal application of rats from talc.  It's
19    not necessarily a migration study.
20         Q.    So my question is, do you have
21    any scientific support that particles on the
22    exterior of the vagina can migrate up the
23    genital tract to the ovaries?
24              MS. O'DELL:  Object to the

Page 193

 1    form.
 2         A.    So I don't know how to say
 3    this.  Because of the position of the
 4    perineum, because of the opening of the
 5    vagina, because of the opening of the cervix,
 6    unless a woman has cervical stenosis, and the
 7    opening of the fallopian tubes, unless she
 8    has her tubes tied or removed, it's an open
 9    tract from the outside up through the vagina
10    and to the ovaries in humans.  Some animals
11    not, but in humans.  And it's generally
12    accepted in the gynecologic community and by
13    the FDA that migration occurs.
14    BY MS. BROWN:
15         Q.    And I understand in connection
16    with your report on page 10, you cite to a
17    number of studies that support your opinion;
18    is that right?
19         A.    That's correct.
20         Q.    And none of these studies
21    involve studying whether talcum powder
22    applied outside of the vagina can travel up
23    to the ovaries; is that right?
24         A.    That's correct, in these

49 (Pages 190 to 193)

Judith K. Wolf, M.D.

Page 194

1    studies.
2        Q.    And in fact, none of these
3    studies investigate whether any particle
4    applied outside of the vagina can travel up
5    to the ovaries.  True?
6        A.    Not -- no, that's correct.
7        Q.    And, in fact, there is no
8    evidence in the scientific community at all,
9    that would show a talcum powder particle
10   outside of the vagina traveling up to the
11   ovaries; that investigation has not been
12   done, correct?
13           MS. O'DELL:  Objection to the
14       form.
15       A.    So the studies that I have
16   quoted for -- referenced for migration are
17   not talcum powder.  There are other inert
18   substances.  The studies on talcum powder
19   were not on the perineum in the vagina, but
20   there's -- there's no reason to think or
21   believe, and from my perspective and from the
22   perspective of the gynecologic community,
23   that any inert substance couldn't travel from
24   the outside up into the ovaries.  In fact,

Page 195

1    it's been known for decades, that if a woman
2    has that system blocked in some way, if her
3    tubes are tied or her tubes are removed or
4    she's had a hysterectomy, that reduces her
5    risk of ovarian cancer.  And before there was
6    any hint of what might be coming from the
7    outside, the hypothesis in the medical
8    community, at least in the gynecologic
9    community, is that it's an external substance
10   that gets to the ovaries.
11           And the fact that that could
12   happen is based on the fact that all of these
13   other things that are known to travel back
14   from the outside.  And if something's on the
15   outside, it can be pushed up into the inside
16   through the vagina by intercourse, by going
17   to the bathroom, by wiping, by having --
18   riding a bike, by exercising, by walking.
19   And I think that's -- that's where I'm going
20   to stop.
21   BY MS. BROWN:
22       Q.    And you know that none of the
23   talc-dusted condom studies show an increased
24   risk of ovarian cancer, right?

Page 196

1           MS. O'DELL:  Object to the
2       form.
3       A.    So there was a concern for
4    that.  I think we talked about that earlier.
5    BY MS. BROWN:
6        Q.    I'm talking about the epi that
7    looked at women who had used, with their
8    partners, talc-dusted condoms and you know
9    that epi shows no increased risk of ovarian
10   cancer, right?
11           MS. O'DELL:  Object to the
12       form.
13       A.    So just because those
14   studies -- okay.  I'm going to say okay, yes.
15   BY MS. BROWN:
16       Q.    How did that body of
17   epidemiology, how did you take that into
18   account in forming your opinion in this case?
19           MS. O'DELL:  Object to the
20       form.
21       A.    So I mean, I'm going to say
22   that it's a piece of the information, but
23   when I look at all of the information as a
24   whole, as in epidemiology as far as talcum

Page 197

1    powder product exposure, the weight of the
2    evidence suggests that there is an increased
3    risk of ovarian cancer with genital talcum
4    powder application.
5    BY MS. BROWN:
6        Q.    Did you -- in considering the
7    epidemiology that looked at women whose
8    partners had used talc-dusted condoms, did
9    you weight that epidemiology differently than
10   some of the other studies you considered?
11           MS. O'DELL:  Object to the
12       form.
13       A.    So I'm going to say that the
14   studies I gave the most weight to in the epi
15   review, were those that were larger, newer
16   meta-analysis or a prospective of the cohort
17   studies.
18   BY MS. BROWN:
19       Q.    I think one of the ones you
20   pointed us to was Cramer 2016, right?
21       A.    Yes.
22       Q.    And you know that -- and how
23   did you consider Cramer's findings as it
24   related to women who had had tubal ligation?

50 (Pages 194 to 197)

Judith K. Wolf, M.D.

Page 198

1    A.   So I believe he didn't see a
2    difference.  I have to look at the paper
3    again.  Some of them they saw a difference if
4    the tubes were tied and some of them they
5    didn't and I can't remember.
6         MS. O'DELL:  If you need to
7         take a look at the paper.
8    BY MS. BROWN:
9         Q.   Let's take a look at the paper
10   and refresh you on what Dr. Cramer found, and
11   I'll ask you some questions about that.
12        A.   2016.  This one.
13        Q.   That's going to be this one.
14   Doctor, I want to direct you to page 339, and
15   we'll mark it as an exhibit.  This will be
16   Wolf 11, Dr. Cramer's 2016 article.  And I
17   think you stated in your report that this was
18   an article that you found to be of
19   particularly high quality; is that right?
20        A.   Yes.
21        (Deposition Exhibit 11 marked
22        for identification.)
23   BY MS. BROWN:
24        Q.   And what -- what's your

Page 199

1    definition of a "high-quality case-control
2    study"?
3         A.   So I looked at the size of the
4    study, the -- I was trying to focus on the
5    newer studies just because this would be more
6    related to talcum powder products in the last
7    20 or 30 years.  Dr. Cramer has expertise in
8    this area.  This is something that he studied
9    before.  And he also looked at multiple --
10   multiple -- how often the talc was used and
11   multiple factors that might influence whether
12   there was an impact.
13        Q.   So as I understand you,
14   Dr. Wolf, the factors you considered in
15   deeming that a study was, quote/unquote, high
16   quality, include the number of
17   people studied; is that right?
18        A.   Uh-huh.
19        Q.   The author of the study,
20   correct?
21        A.   Uh-huh.
22        Q.   The --
23        A.   The expertise of the author.
24        Q.   The expertise of the author.

Page 200

1         A.   If I know it.  I don't always
2    know.
3         Q.   The date of the publication
4    with a preference for more recent studies?
5         A.   Yes.
6         Q.   Okay.  And anything else that
7    went into your determination that
8    Dr. Cramer's 2016 study was high quality?
9         MS. O'DELL:  Other than what
10        she said previously.
11        A.   And also all of the different
12   potential cofactors that are evaluated.
13   BY MS. BROWN:
14        Q.   By "cofactors that are
15   evaluated," do you mean that the author
16   controlled for confounders?
17        A.   Or at least looked at other
18   things that might have an impact.
19        Q.   And one of the things you know
20   that Dr. Cramer found on page 339, is that
21   there was a statistically significant
22   increased risk in women who had had their
23   tubes tied who had used talcum powder, right?
24        A.   (Nods head.)

Page 201

1         Q.   Do you see that?
2         A.   Yes, I see that.
3         Q.   Okay.  And that's the opposite
4    of what you would expect, based on your
5    opinion and theory.  True?
6         MS. O'DELL:  Object to the
7         form.
8         A.   If we knew when they had their
9    tubes tied.  Did they have their tubes tied
10   before they started using talcum powder, or
11   after, or when?
12   BY MS. BROWN:
13        Q.   Well, in any event, what you
14   would expect, Doctor, is that the finding in
15   a woman who had her tubes tied should show
16   less of a relative risk than in those who did
17   not have their tubes tied, based on your
18   theory of migration.  True?
19        MS. O'DELL:  Object to the
20        form.
21        A.   Only if those tubes were tied
22   before she was ever exposed to talcum powder
23   product.
24

Judith K. Wolf, M.D.

1    BY MS. BROWN:
2        Q.    And you know Dr. Cramer did an
3    analysis of that as well, right?
4        A.    I don't know that he was able
5    to.
6        Q.    What he said, as you recall, is
7    that the number of women who only used talcum
8    powder after their tubes were tied were too
9    small to even analyze, right?
10        A.    That's the answer --
11            (Simultaneous discussion
12    interrupted by reporter.)
13            MS. O'DELL:  Give me a chance.
14    If you need to look at the paper,
15    don't -- don't assume based on what
16    the question is.
17            (Witness reviews document.)
18    BY MS. BROWN:
19        Q.    Doctor, you would agree that,
20    based on your theory of migration, you would
21    expect to see a significantly decreased risk
22    in women who had a tubal ligation.  True?
23            MS. O'DELL:  Doctor, feel free
24    to continue to refresh yourself before

1    you answer any questions.
2        A.    I just want to read the -- I
3    want to look at one more thing and then I'll
4    answer your question.
5            (Witness reviews document.)
6        A.    I can't find it in the written
7    part of the article.
8    BY MS. BROWN:
9        Q.    Doctor, I'm going to withdraw
10    the question because I really do want to move
11    on.  I understand you want to spend some time
12    with the study and we can do that on a break.
13            MS. O'DELL:  She's about to
14    answer your question.
15        A.    I mean, it basically says that
16    he didn't have enough women to be able to
17    explain why that was the case.
18    BY MS. BROWN:
19        Q.    Okay.  So as a concept, though,
20    Doctor, you would expect, based on your
21    theory, that the epidemiology would show a
22    decreased risk of ovarian cancer with powder
23    use in women who have their tubes tied before
24    they use the powder use, correct?

1            MS. O'DELL:  Object to the
2    form.
3        A.    I'm not sure.  I would -- if
4    the only way that they might get cancer from
5    an ovary is from migration, yes.  Unless
6    their tubes weren't adequately tied.
7    However, if the talc got to their ovaries
8    from another source through inhalation, then
9    there may still be some confounding and some
10    increased risk.
11    BY MS. BROWN:
12        Q.    Is it your opinion, Doctor,
13    that talc can get to a woman's ovaries
14    through inhalation?
15        A.    Yes.
16        Q.    Have you considered the
17    findings of the epidemiology as it relates to
18    body-only powder use?
19            MS. O'DELL:  Object to the
20    form.
21        A.    Yes.
22    BY MS. BROWN:
23        Q.    And what have those studies, by
24    and large, shown?

1        A.    That it's -- that there's no
2    carcinogenicity.
3        Q.    The epidemiology shows, by and
4    large, no increased risk of ovarian cancer
5    with body-only use of talcum powder, correct?
6        A.    Yes.
7            MS. O'DELL:  Object to the
8    form.
9    BY MS. BROWN:
10        Q.    How did you consider that
11    epidemiology in forming your opinion that a
12    woman might be exposed to talcum powder
13    through inhalation?
14            MS. O'DELL:  Object to the
15    form.
16        A.    I'm not sure how those two
17    things relate.
18    BY MS. BROWN:
19        Q.    If a woman uses talcum powder
20    on her body, how is she exposed to the talcum
21    powder?
22        A.    On her skin.  I don't know what
23    you're asking me.
24        Q.    Do you think there's

52 (Pages 202 to 205)

Judith K. Wolf, M.D.

Page 206

1  potential -- more of a potential for a woman
2  to be exposed from inhaling talcum powder
3  when she puts it in her underwear than if
4  she's using it on her chest?
5      A.   I don't know.
6      Q.   Have you evaluated how much
7  talcum powder a woman using body-use-only
8  would be exposed to?
9          MS. O'DELL:  Object to the
10         form.
11     A.   I know that body-use-only does
12 not increase carcinogenicity --
13 carcinogenesis, I'm sorry.  But I'm not
14 ruling out that someone who routinely daily
15 uses it on the perineum couldn't also have
16 inhalation exposure.
17 BY MS. BROWN:
18     Q.   And what support do you have in
19 the scientific literature for that opinion?
20     A.   I would say the finding of talc
21 in lymph nodes is one potential -- pelvic
22 lymph nodes near the ovary, although the
23 pelvic lymph nodes could also come from the
24 ovary in the other direction.  I mean,

Page 207

1  migration could lead to talc in pelvic lymph
2  nodes.
3      Q.   What you're referring to is a
4  case report from 2007 that -- by Dr. Cramer?
5      A.   Yes.
6      Q.   Okay.  Did you know that
7  Dr. Cramer was an expert witness for the
8  plaintiffs?
9      A.   I did.
10     Q.   Did you consider Dr. Cramer's
11 work as an expert witness in evaluating and
12 reaching the determination that his 2016
13 paper was high quality?
14     A.   No.
15     Q.   The fact that Dr. Kramer is
16 being paid by plaintiffs' lawyers in talcum
17 powder litigation did not affect your
18 evaluation of his 2016 article; is that
19 right?
20     A.   No.
21         MS. O'DELL:  Object to the
22         form.
23 BY MS. BROWN:
24     Q.   Other than Dr. Cramer's 2007

Page 208

1  case report, do you have any other support in
2  the scientific literature that a woman using
3  talcum powder perineally would be exposed via
4  inhalation?
5      A.   Hang on one second.
6          (Witness reviews document.)
7      A.   I'm looking at my report and my
8  references, but they don't specifically talk
9  about perineal application and inhalation.
10 All I'm saying, to answer your first
11 question, to go back a few, is that -- your
12 question was, if somebody had their tubes
13 tied before they ever used talcum powder,
14 would that negate any increased risk of
15 ovarian cancer?  And my answer was, if the
16 tubes were tied, it couldn't migrate up, but
17 there's still the possibility that she could
18 have it from inhalation.  That's all I'm
19 saying.
20 BY MS. BROWN:
21     Q.   And I want to know what support
22 you rely on in forming the opinion that a
23 woman could inhale talcum powder that could
24 reach her ovaries and cause ovarian cancer?

Page 209

1      A.   I'm going to talk -- say that
2  talcum powder has been found not only in the
3  lymph nodes but in the ovaries of women, both
4  who report using and not using perineal
5  talcum powder.
6      Q.   So you're talking about the
7  Heller study, right?
8      A.   Yes.
9      Q.   Okay.  How does the fact that
10 talcum powder has been potentially found in
11 the ovaries of women who did not report using
12 talcum powder, support your view that a woman
13 could inhale talcum powder from perineal use
14 and have that powder reach her ovaries and
15 cause cancer?
16     A.   To me it just supports the idea
17 that talcum powder can get to the ovaries
18 through inhalation.
19     Q.   And did you read the findings
20 of that study as it related to whether or not
21 the talcum powder that was allegedly found in
22 the ovary induced an inflammatory response?
23         MS. O'DELL:  Object to the
24         form.

53 (Pages 206 to 209)

Judith K. Wolf, M.D.

Page 210

1      A.    So sometimes there was an
2  inflammatory response and sometimes not, is
3  my recollection.
4  BY MS. BROWN:
5      Q.    Okay.  Let's take a look at the
6  paper.
7      A.    Okay.
8          MS. O'DELL:  We've been going
9  about an hour and a half.  It's 12:45.
10         MS. BROWN:  If we could finish
11 Heller, then we can take a break.
12         MS. O'DELL:  What do you
13 anticipate on Heller?
14         MS. BROWN:  Ten minutes.
15         MS. O'DELL:  Okay.  Is ten
16 minutes okay with you, Doctor?
17         THE WITNESS:  Uh-huh.
18 BY MS. BROWN:
19     Q.    Thanks, Doctor.
20     A.    So it doesn't look like they
21 looked at inflammation.
22     Q.    Hold on one second.  And one of
23 the things you know that this --
24         MS. O'DELL:  Are you going to

Page 211

1  mark an exhibit?
2          MS. BROWN:  Uh-huh.
3  BY MS. BROWN:
4      Q.    I'm trying to find it.  We'll
5  take a break and I can find it for you,
6  Doctor.  But you know that they reported that
7  the talc that was found did not show evidence
8  of a foreign body reaction.  Do you remember
9  that?
10         MS. O'DELL:  Object to the
11 form.
12     A.    That's not anywhere in the
13 results.
14 BY MS. BROWN:
15     Q.    I'll show it to you.  We'll
16 take a break and I'll show it to you.  Would
17 that be important for you to consider?
18         MS. O'DELL:  Object to the
19 form.
20     A.    I'm going to say not
21 necessarily, because it depends on did they
22 look at the entire ovary, depends on the
23 timing of when they looked at it, whether
24 there's a response -- an inflammatory

Page 212

1  response or not.  But what I'm going to tell
2  you, I'm reading their entire results.
3  BY MS. BROWN:
4      Q.    I promise you I will point it
5  out to you.  I don't want to waste time.
6  This is going to be the first thing we do
7  when we come back.
8          Is it your testimony, based on
9  talc causing an inflammatory response, that
10 leads to cancer?
11     A.    Yes.
12     Q.    And so how -- when talc -- a
13 talc particle is found, would you expect it
14 to show an inflammatory response?
15     A.    What I'm trying to say is, that
16 I don't know the timing of the talc being
17 placed and looking at the specimen, was the
18 entire specimen looked at.  When you look at
19 pathology slides, you look at a little piece
20 of the tissue.  You don't generally look at
21 the entire tissue.  And so it could be that
22 the area that was looked at did not show
23 inflammation and in an area that wasn't in
24 the slide did show inflammation.

Page 213

1      Q.    In your opinion, can talc be in
2  the ovaries and not cause inflammation?
3      A.    No, that's not what I'm saying.
4  I'm saying you might not see it if you don't
5  look at the entire specimen, the entire
6  ovary.
7          MS. BROWN:  Let's take a break
8  and have lunch and we'll come back and
9  finish Heller, which I will mark.
10         MS. O'DELL:  Okay.
11         THE VIDEOGRAPHER:  Going off
12 the record.  The time is 12:44 p.m.
13         (Recess taken from 12:44 p.m.
14 to 1:41 p.m.)
15         THE VIDEOGRAPHER:  Back on the
16 record.  The time is 1:41 p.m.
17         (Deposition Exhibit 12 marked
18 for identification.)
19 BY MS. BROWN:
20     Q.    Dr. Wolf, I'm handing you what
21 I've marked as Exhibit 12 to your deposition,
22 and which is the article by Heller from 1996
23 that we were discussing before lunch.
24     A.    Yes.

54 (Pages 210 to 213)

Judith K. Wolf, M.D.

Page 214

1    Q.    And this is --
2         MS. O'DELL:  Excuse me, do you
3    have a copy for me?
4         MS. BROWN:  Sorry.
5    BY MS. BROWN:
6    Q.    This is one of the articles
7    that you pointed me to in support of your
8    opinion that talc particles can migrate to
9    the ovaries, correct?
10   A.    Yes.
11   Q.    Okay.  And you would agree with
12   me, though, that this study looked at whether
13   or not the talc particles that they allegedly
14   found were causing an inflammatory response,
15   right?
16        MS. O'DELL:  Object to the
17   form.
18   A.    Well, in -- in reading that
19   full paragraph, they looked at one of the
20   specimens for an inflammatory response, out
21   of 24.
22   BY MS. BROWN:
23   Q.    And the conclusion was that
24   there was no evidence of a response to talc,

Page 215

1    such as foreign body giant cell reactions or
2    fibrosis in the tissue, right?
3    A.    In one out of 24.
4    Q.    That wasn't my question.  That
5    was their finding, right?
6         MS. O'DELL:  Object to the
7    form.
8    A.    Their finding in one out of 24.
9    BY MS. BROWN:
10   Q.    Do you have evidence that in
11   the other 23 they saw evidence of an
12   inflammatory reaction to talc?
13   A.    I don't have any evidence that
14   they looked at the other 23.
15   Q.    Do you have any evidence at all
16   that talc found in the ovary produces an
17   inflammatory response?
18   A.    Yes.
19   Q.    And what's that?
20   A.    So I'm going to look at --
21        THE WITNESS:  Can I get
22   Henderson?  Two thousand -- 1971.
23   BY MS. BROWN:
24   Q.    I have it here.  Let's just

Page 216

1    keep moving.
2         (Witness reviews document.)
3    A.    Okay.  Sorry, this one does not
4    talk -- they don't mention any -- whether
5    they even looked for inflammation.
6         MS. O'DELL:  Dr. Wolf, for the
7    record, you were referring to
8    Henderson '71?
9         THE WITNESS:  Yes.
10   BY MS. BROWN:
11   Q.    So to be clear for the record,
12   then, Dr. Wolf, in Heller '96 the case that
13   they reported on found no evidence of a
14   response to talc, correct?
15        MS. O'DELL:  Object to the
16   form.
17   A.    They looked at one out of 24
18   cases and in that one case, they did not see
19   a response to talc.
20   BY MS. BROWN:
21   Q.    And you have no evidence that
22   there was anything different in the other 23
23   cases.  True?
24        MS. O'DELL:  Object to the

Page 217

1    form.
2    A.    I don't have any evidence on
3    the other 23 cases.
4    BY MS. BROWN:
5    Q.    And in the Henderson article
6    that you just pointed us to, there's
7    similarly no evidence about whether or not
8    there was an inflammatory reaction.  True?
9    A.    It doesn't look like they
10   looked.
11   Q.    And the way we got started
12   talking about -- and you would agree, based
13   on the pleurodesis studies, that it is
14   possible for talc to cause an inflammatory
15   reaction that does not lead to cancer.  True?
16   A.    In the talc -- in pleurodesis
17   studies, that's an acute reaction.  The
18   inflammation that is concerning to lead to
19   cancer is a chronic reaction, not an acute
20   reaction.
21   Q.    And how -- what do you rely on
22   for how much exposure to talc takes someone
23   from a chronic in -- an acute inflammatory
24   response to a chronic inflammatory response?

55 (Pages 214 to 217)

Judith K. Wolf, M.D.

Page 218

1    MS. O'DELL: Object to the
2    form.
3    A.    What do I rely on for how much
4    exposure of talc?  Exposure to talc over
5    time, can lead to a chronic response, chronic
6    inflammatory response.  If you're looking
7    under the microscope at an ovary or something
8    that has talc in it, in that slide you may or
9    may not see an inflammatory response, either
10   acute or chronic, for several reasons.  One,
11   that if the talc has been there a long time,
12   you might be -- not be looking when you see
13   obvious inflammatory response either acute or
14   chronic.  The second is that you might not be
15   looking at every part of the specimen, to
16   determine if it's just the section that
17   you're looking at.
18   BY MS. BROWN:
19   Q.    Have you attempted to quantify
20   how much exposure over time leads to the
21   chronic inflammation you were just
22   describing?
23   MS. O'DELL: Object to the
24   form.

Page 219

1    A.    When I look at the literature
2    as a whole, again, going back to the
3    epidemiology literature that attempted to
4    look at dose response, it seems like the --
5    that several of the studies suggests that
6    more doses, and I'm putting that in quotes
7    because it's not measured, it's not a
8    specific amount, but more exposure increases
9    the risk of ovarian cancer.  And so my
10   inference from that, from putting the whole
11   of the literature together, is that the
12   longer -- the more the dose, the more likely
13   the more inflammation and more cell damage,
14   inflammation causing an oxidative response
15   that then can lead down to DNA damage and, in
16   fact, in Saed's most recent abstract genetic
17   changes from talc.
18   BY MS. BROWN:
19   Q.    You billed time to the
20   plaintiff's lawyers for speaking to Dr. Saed;
21   is that right?
22   A.    Yes.
23   Q.    What was the purpose of that
24   conversation?

Page 220

1    A.    I know he was doing some
2    research and I wanted to hear from him about
3    what exactly he was looking at, how he was
4    studying it and what his plans were to try to
5    investigate in an in vitro way, the mechanism
6    by which talc can cause ovarian cancer.
7    Q.    Would you agree that the
8    mechanism or the proposed mechanism by which
9    talc can cause ovarian cancer, is not well
10   understood today?
11   MS. O'DELL: Object to the
12   form.
13   A.    I would agree that there are
14   several lines of evidence, including all of
15   the body of Dr. Saed's work, as well as
16   Dr. Shukla's paper and Dr. Buz'Zard's paper,
17   that suggest that inflammation plays a role
18   in the carcinogenesis of talcum powder
19   product to cause ovarian cancer.  And that
20   the most recent work from Dr. Saed's lab,
21   which he's not the first author but the
22   senior author, shows that there's a dose
23   response for the amount of talc and that it's
24   not just inflammation that secondarily causes

Page 221

1    genetic changes, but there's actual genetic
2    changes in the cells that can be
3    carcinogenic.
4    BY MS. BROWN:
5    Q.    You testified earlier, I
6    believe, that the opinion that talc particles
7    can migrate to the ovaries is well accepted
8    in the medical community.  Do you remember
9    that?
10   A.    That migration of inert
11   substances is well accepted in the medical
12   community and, in fact, by the FDA.
13   Q.    And would you consider that to
14   include talcum powder?
15   A.    I would.
16   Q.    And, in fact, you state in your
17   report on page 17, that, "The evidence
18   supporting migration is robust and
19   universally accepted by the gynecologic
20   community."
21   Right?
22   A.    Yes.
23   Q.    Now, IARC doesn't agree with
24   that, right?

56 (Pages 218 to 221)

Judith K. Wolf, M.D.

Page 222

```
 1          MS. O'DELL:  Object to the
 2     form.
 3     A.    So my sentence here says
 4  "within the gynecologic community."
 5  BY MS. BROWN:
 6     Q.    Did you mean to exclude the
 7  international research on cancer?
 8          MS. O'DELL:  Object to the
 9     form.
10     A.    No.  I'm saying that my
11  sentence here says it's universally accepted
12  within the gynecologic community.
13  BY MS. BROWN:
14     Q.    Were you aware that it's
15  rejected by IARC?
16          MS. O'DELL:  Object to the
17     form.
18     A.    My understanding is that it's
19  not rejected, that in that report that you're
20  referring to, which I think is the 2010
21  report, that they -- that the evidence that
22  they looked at, they said that it was weak,
23  not rejected.
24
```

Page 223

```
 1  BY MS. BROWN:
 2     Q.    And have you looked at any
 3  additional evidence, other than that which
 4  IARC considered, which leads you to believe
 5  that it's universally accepted?
 6     A.    I'd have to look at everything
 7  that IARC looked at and compare it to what I
 8  looked at to say if it's different.
 9     Q.    Well, what was your methodology
10  in terms of considering the International
11  Agency for Research on Cancer's conclusion
12  that the evidence for migration is weak?
13          MS. O'DELL:  Object to the
14     form.
15     A.    You know, I -- as I've stated
16  before, I used all of the information as a
17  whole, to determine my opinion and my -- and
18  when I look at the bulk of the evidence and
19  with my experience and with what I know about
20  gynecology, there's multiple lines of
21  evidence that show that migration of inert
22  particles occurs, and that retrograde
23  migration occurs.
24
```

Page 224

```
 1  BY MS. BROWN:
 2     Q.    And you would agree with me,
 3  Doctor, that all of the information you cite
 4  on pages 10 and 11 was available to the
 5  International Agency for Research on Cancer
 6  in 2010.  True?
 7          MS. O'DELL:  Object to the
 8     form.
 9     A.    I'd have to look at everything
10  that they reviewed to see if they reviewed
11  all of that.
12  BY MS. BROWN:
13     Q.    I'm handing you what we've
14  marked as Exhibit 15.
15          (Deposition Exhibit 13 marked
16     for identification.)
17  BY MS. BROWN:
18     Q.    And I want to start by
19  directing your attention to page --
20          MS. BROWN:  I'm sorry, we have
21     a copy for you, Counsel.
22  BY MS. BROWN:
23     Q.    This is IARC monograph on talc,
24  2010, and I want to start by directing your
```

Page 225

```
 1  attention to page 33, under the section
 2  entitled "Mechanistic and other relevant
 3  data."
 4          MS. O'DELL:  What page?
 5          THE WITNESS:  Thirty-three.
 6          MS. BROWN:  Sorry, is that 13?
 7     I may have mismarked it.
 8          MS. O'DELL:  That says that's
 9     15.
10     A.    15.
11          MS. BROWN:  Should be 13.
12     We'll correct it.
13     A.    Do you want it back?
14  BY MS. BROWN:
15     Q.    Yeah, sorry.  Thank you,
16  Doctor.  Handing back to you what is
17  Exhibit 13.
18          MS. BROWN:  Thank you, Alexis.
19  BY MS. BROWN:
20     Q.    And I want to direct your
21  attention to page 33.  And this IARC
22  monograph on talc, nonasbestiform talc, of
23  course, you reviewed in connection with your
24  opinions in this case.  True?
```

57 (Pages 222 to 225)

Judith K. Wolf, M.D.

Page 226

1     A.   Yes.
2     Q.   Okay.  And you are aware that
3  IARC considers the strength of the evidence
4  as it relates to a proposed mechanism for
5  cancer, correct?
6     A.   Yes.
7     Q.   Okay.  And you see here on
8  page 33 that IARC evaluates those, using
9  terms such as "weak," "moderate" or "strong,"
10  correct?
11     A.   Yes.
12     Q.   Okay.  And IARC, if you would
13  turn to page 411, evaluated the data as it
14  relates to migration, right?
15        MS. O'DELL:  Object to the
16     form.
17  BY MS. BROWN:
18     Q.   And I'll direct you, excuse me,
19  Doctor --
20     A.   Are you directing me to
21  something specific on this page?
22     Q.   I am.
23     A.   Okay.
24     Q.   I'll direct you to the -- one,

Page 227

1  two, three -- fourth paragraph that begins
2  with "Perineal exposure."
3     A.   Okay.
4     Q.   And you see that IARC reports
5  on its review of the studies on potential
6  migration.  True?
7     A.   Yes.
8     Q.   And on balance, what the IARC
9  working group concluded was that the evidence
10  for retrograde transport of talc to the
11  ovaries in normal women is weak, right?
12     A.   Yes.
13     Q.   And that is their lowest
14  classification of mechanistic evidence,
15  correct?
16     A.   Yes.
17     Q.   And you believe IARC is a
18  reputable international health agency, right?
19     A.   Yes.
20     Q.   And so you considered its
21  conclusion, that the evidence for retrograde
22  migration is weak, right?
23     A.   I did.
24     Q.   And so tell me what methodology

Page 228

1  you employed to arrive at a conclusion that
2  is diametrically opposed to the one IARC
3  wrote about in 2010?
4        MS. O'DELL:  Object to the
5     form.
6     A.   I don't -- I don't believe it's
7  diametrically opposed and I believe that when
8  I reviewed all of the evidence and from my
9  own knowledge of gynecology and practicing
10  and my expertise in the last 30 years and
11  seeing multiple patients with endometriosis
12  and evidence of retrograde menstruation, that
13  my opinion is that migration occurs.  And
14  that I believe that it's the opinion of the
15  general gynecology community that migration
16  does occur.  And another reputable
17  institution is the FDA, who says that the
18  ability for particulates to migrate is
19  indisputable.
20  BY MS. BROWN:
21     Q.   And what you're referring to is
22  the 2014 citizen's petition, right?
23     A.   Yes.
24     Q.   And do you find that to be a

Page 229

1  reliable authority on the review of the
2  literature regarding talc and ovarian cancer?
3     A.   This is not regarding --
4  necessarily regarding talc and ovarian
5  cancer.  It's the idea that things can
6  migrate from the perineum through the genital
7  tract.  That's what I based my opinion on
8  that.
9     Q.   We're talking about two
10  different things.  You just referenced the
11  2014 response to a citizen's petition, right?
12     A.   Yes.
13     Q.   And do you -- and in that
14  response, the FDA went through its review of
15  the literature on talc and ovarian cancer,
16  correct?
17     A.   Yes.
18     Q.   And do you regard that as
19  authoritative and reputable?
20        MS. O'DELL:  Object to the
21     form.
22     A.   Yes.
23  BY MS. BROWN:
24     Q.   Okay.  And one of the things

58 (Pages 226 to 229)

Judith K. Wolf, M.D.

Page 230

```
 1   you're pointing to, is the FDA's statement
 2   that particles can migrate from the perineum
 3   in the vagina to the peritoneal cavity,
 4   correct?
 5       A.   That's correct.
 6       Q.   And the FDA, of course, doesn't
 7   cite to any evidence that talc can migrate
 8   from the exterior of the vagina to the
 9   ovaries, correct?
10           MS. O'DELL:  Object to the
11       form.  If you're pointing -- going to
12       point Dr. Wolf to a particular part of
13       the letter, then I would ask you to
14       show it to her.
15           MS. BROWN:  Absolutely.
16           MS. O'DELL:  So if you need to
17       see the letter --
18       A.   Yeah, let me see the letter.
19           MS. O'DELL:  -- to respond to
20       the question, please ask for it.
21   BY MS. BROWN:
22       Q.   I'm going to show you the
23   letter and I want to talk about it, but you
24   raised the statement about the particles,
```

Page 231

```
 1   right?
 2           MS. O'DELL:  She did.  But she
 3       doesn't have to answer questions about
 4       the letter aside from what she said.
 5           MS. BROWN:  I'm not talking --
 6           MS. O'DELL:  If you want to ask
 7       specific questions about the letter --
 8           MS. BROWN:  I'm going to show
 9       her the letter.
10           MS. O'DELL:  Then show her the
11       letter.
12           MS. BROWN:  Okay.  But I can
13       ask lead-up questions about the
14       letter.
15           MS. O'DELL:  Right.
16           MS. BROWN:  It doesn't have
17       to --
18           MS. O'DELL:  Let me finish.  In
19       order to answer any of the questions,
20       counsel asked if you need the letter,
21       please ask for it and I'm sure she'll
22       provide it to you.
23   BY MS. BROWN:
24       Q.   Dr. Wolf, did you review the
```

Page 232

```
 1   response to the citizen's petition by the FDA
 2   in 2014?
 3       A.   I'm sure I did.
 4       Q.   And, in fact, as support for
 5   your opinion that talc applied on the
 6   exterior of the vagina can migrate to the
 7   ovaries, you referenced a sentence from that
 8   letter, right?
 9       A.   That's correct.
10       Q.   Okay.  But we agree that the
11   FDA was talking about particles generally,
12   correct?
13           MS. O'DELL:  Object to the
14       form.
15       A.   The FDA was talking about
16   particulates in general.
17   BY MS. BROWN:
18       Q.   Okay.  And did you review, and
19   I'll hand you what we've marked as
20   Exhibit 14, the entirety of what the FDA had
21   to say about the epidemiology and the
22   evidence as it relates to talc and ovarian
23   cancer?
24
```

Page 233

```
 1           (Deposition Exhibit 14 marked
 2       for identification.)
 3           MS. O'DELL:  Object to the
 4       form.
 5           (Witness reviews document.)
 6       A.   You asked me if I reviewed the
 7   entire thing as to their opinion.  And the
 8   answer is yes.  And what did you --
 9   BY MS. BROWN:
10       Q.   That was the only question.
11       A.   That was the only question.
12       Q.   All right.  And you'll agree on
13   the first page, third paragraph, the FDA
14   concludes that it did not find that the data
15   submitted presented conclusive evidence of a
16   causal association between talc used in the
17   perineal area and ovarian cancer, right?
18           MS. O'DELL:  Object to the
19       form.
20   BY MS. BROWN:
21       Q.   That's what the FDA said?
22       A.   That's what the letter says.
23       Q.   And was the FDA's sentence in
24   a letter to the Cancer Prevention Coalition
```

59 (Pages 230 to 233)

Judith K. Wolf, M.D.

Page 234

1  in April of 2014, correct?
2      A.    Yes.
3      Q.    And you, Dr. Wolf, disagree
4  with that.  True?
5      A.    I do.
6      Q.    Okay.  And so what methodology
7  did you employ to distinguish your review of
8  the literature from the Food and Drug
9  Administration's review?
10      A.    The first thing is, is that I
11  have more literature to support my opinion
12  that was not yet available for the FDA.
13      Q.    And so tell me what that is,
14  Doctor.
15      A.    So all of the -- there are
16  three of the case report studies that I have
17  referenced in my article:  Wu and Cramer and
18  Schildkraut.  And, in fact, Schildkraut was
19  an NCI-sponsored study of African-American
20  women and use of talcum powder and risk of
21  ovarian cancer.  And after it's been
22  published, the NCI did update their talcum
23  powder on ovarian cancer, to say that this
24  study has shown that it increases risk of

Page 235

1  ovarian cancer in African-American women.
2  And then the meta-analysis Penninkilampi 2018
3  was not available.  The recent abstracts and
4  now paper from Dr. Saed on causation was not
5  available.
6      Q.    So the three case-control
7  studies that you believe distinguish your
8  review of the literature from the FDA's are
9  Wu 2015, Cramer 2016, and Schildkraut 2016,
10  correct?
11      A.    Yes.
12      Q.    In addition to a -- is it a
13  published paper by Dr. Saed?
14      A.    It's accepted for publication
15  and there's four abstracts.
16      Q.    Okay.  Has it been published
17  yet, to your knowledge?
18      A.    It hasn't yet been published.
19      Q.    Okay.  So in addition to the
20  three case-control studies, there is an
21  unpublished paper by a plaintiffs' expert in
22  the talc litigation, that you say you're
23  using to distinguish your review from the
24  FDA's review?

Page 236

1          MS. O'DELL:  Excuse me.  Object
2  to the form.  Give me just a minute to
3  object.  Fair enough.  Sorry.
4      A.    Additionally, the
5  meta-analysis, the Penninkilampi study that
6  was published in 2017.
7  BY MS. BROWN:
8      Q.    And that didn't include any new
9  information, though, right?  It's a
10  meta-analysis of old data.  True?
11      A.    Of all of the data, some of
12  which wasn't available when the FDA wrote
13  this letter.
14      Q.    Sure.  But if we're trying to
15  identify new data that you, Dr. Wolf, are
16  relying on that the FDA didn't have, we have
17  three case-control studies and an unpublished
18  manuscript by a plaintiffs' expert?
19          MS. O'DELL:  Object to the --
20  excuse me, object to the form,
21  misstates her testimony.
22      A.    There's also two of the three
23  cohort studies, the Nurses Health and Women's
24  Health Initiative, the Sister Study.  The

Page 237

1  Women's Health Initiative was published in
2  2014, so they wouldn't have had it, likely
3  wouldn't have, and the Sister Study.
4  BY MS. BROWN:
5      Q.    And what was the finding as it
6  relates to an increased talc use in ovarian
7  cancer in the Sister Study?
8      A.    The Sister Study did not find a
9  statistically significant increase, one of
10  the issues with all of the three cohort
11  studies is none of them are large enough to
12  detect a difference and none of them looked
13  at use over time.
14      Q.    Well, we're going to talk about
15  that.  But you'd agree that the Sister Study
16  and the follow-up to the Nurses Health Study
17  would not have changed the opinion of the
18  FDA, that there's not a causative link twine
19  talcum powder and ovarian cancer --
20          MS. O'DELL:  Object to the
21  form.
22  BY MS. BROWN:
23      Q.    -- right?
24      A.    I'm going to say that

Judith K. Wolf, M.D.

Page 238

```
 1    indirectly they might have if they had had
 2    the meta-analysis by Penninkilampi, because
 3    in that meta-analysis of the cohort studies
 4    there was a statistical significantly
 5    increase in serous carcinoma, which is the
 6    most common type of epithelial ovarian
 7    cancer, that if you were going to find
 8    something in those number of women, serous
 9    would be the most likely that you would find
10    a significant increase when they looked at
11    all of the cohort studies together.
12        Q.   Now, of course Wu, the other
13    study that you pointed us to, found a greater
14    increase in the nonserous cancers, right?
15        THE WITNESS:  Do you have Wu
16    for me to review?
17        MS. O'DELL:  Yeah.
18        A.   Yeah, it's not here.
19    BY MS. BROWN:
20        Q.   I'll give you a copy, Doctor.
21    So we'll mark Wu as Exhibit 14.
22        (Deposition Exhibit 15 marked
23        for identification.)
24
```

Page 239

```
 1    BY MS. BROWN:
 2        Q.   I'll direct you to page 1414,
 3    which is the "Subgroup Analysis by Histologic
 4    Type."
 5        MS. BROWN:  Counsel, I have a
 6    copy for you.  Page 1414.  I have two,
 7    actually.
 8        A.   This must not be the right
 9    paper either.  There's no page 1414.
10        MS. BROWN:  Wrong --
11        A.   Because there's a couple of
12    Wu's.
13    BY MS. BROWN:
14        Q.   Yeah, there's two.  We'll
15    remark it.  This is it.  No, this is another
16    Wu.  I misspoke, Doctor.  I meant to point
17    you to Schildkraut 2016, which is another
18    study that you identified as high quality,
19    right?
20        A.   Yes.
21        Q.   We'll mark that, as was my
22    intention, as 14.  And you know one of the
23    findings of Schildkraut was a greater
24    association with the nonserous histologic
```

Page 240

```
 1    subtype, right?  And I'll direct you to Table
 2    3 for that.
 3        MS. O'DELL:  Just for you to
 4    orient yourself, Doctor.
 5        THE WITNESS:  Got it.
 6        A.   Which Schildkraut?
 7    BY MS. BROWN:
 8        Q.   2016.
 9        A.   2016.
10        MS. BROWN:  I'll give you a
11    copy right now.
12        A.   So it does show a --
13    significant in nonserous.
14    BY MS. BROWN:
15        Q.   Right.  And that's not
16    consistent with some of the other studies,
17    like Penninkilampi that you were talking
18    about earlier, correct?
19        A.   Well, what I was specifically
20    talking about Penninkilampi was the cohort
21    studies, finding a statistical significantly
22    increase in serous cancers.  If you look at
23    all of the studies, varying -- often it's
24    serous.  It doesn't have to be serous.  Some
```

Page 241

```
 1    of the other studies found an increase in
 2    endometrioid borderline tumors, other cell
 3    types of ovarian tumors.
 4        Q.   Is it your opinion, Doctor,
 5    that talcum powder use perineally increases a
 6    woman's risk of all different histologic
 7    types of ovarian cancer?
 8        A.   Well, I'm going to say that
 9    we're looking at epithelial ovarian cancer,
10    and I don't have any evidence that has any
11    effect on stromal tumors or dermal cell
12    tumors.  I think of all of the epithelial
13    subtypes, that it's been shown to have -- in
14    some studies, in various studies, an increase
15    in serous or endometrioid.  And the other
16    subtypes are usually so small that there's
17    probably enough to know statistical
18    significance, such as clear cell or mucinous.
19    In this study by Schildkraut, it's just
20    serous or nonserous.  They don't break up the
21    other subtypes, at least in this table.
22        Q.   And the finding of the
23    nonserous increased risk is not consistent
24    with Penninkilampi's finding on that score,
```

61 (Pages 238 to 241)

Judith K. Wolf, M.D.

Page 242

1    correct?
2         MS. O'DELL:  Object to the
3    form.
4         A.    In the cohort studies, it was
5    serous.  That was statistically significant.
6    The two are not -- one does not negate the
7    other.  What I'm saying is that any of the
8    epithelial varying tumors could possibly be
9    increased, any cell type.  This one shows
10   nonserous.  The meta-analysis of the cohorts
11   showed serous, even though, except for the
12   first report of the Nurses Health Study there
13   wasn't any statistical increase in cohort
14   studies, one does not negate the other.
15   BY MS. BROWN:
16        Q.    Gates was a follow-up to
17   Gertig's --
18        A.    Gertig -- yeah.
19             (Simultaneous discussion
20        interrupted by reporter.)
21   BY MS. BROWN:
22        Q.    Gates was a follow-up to --
23        A.    Gertig --
24             MS. O'DELL:  If you would let

Page 243

1         her finish and vice versa, I'll do my
2         best not to interrupt you.
3    BY MS. BROWN:
4         Q.    Dr. Wolf, Gates was a follow-up
5    of the cohort that was followed in the Gertig
6    Nurses Health Study, correct?
7         A.    That's correct.
8         Q.    And when that cohort was
9    followed longer in Gates, there was no
10   association with serous cancer, correct?
11        A.    That's correct.
12        Q.    And do you agree that it's
13   important, when evaluating a body of
14   literature, to evaluate all available
15   information?
16        A.    Yes.
17        Q.    And particularly as it relates
18   to the follow-up of individuals who were
19   initially studied for perhaps a shorter
20   period of time.  Fair?
21             MS. O'DELL:  Object to the
22        form.
23        A.    So long-term follow-up is
24   always helpful, yes.

Page 244

1    BY MS. BROWN:
2         Q.    Sure.  As a scientist
3    evaluating data on cancer, the longer folks
4    are studied, the more available information
5    there is.  True?
6             MS. O'DELL:  Object to the
7        form.
8         A.    That's true.
9    BY MS. BROWN:
10        Q.    And in evaluating the body of
11   literature on talc and ovarian cancer, you
12   wouldn't want to close your eyes to some of
13   the studies that include additional
14   follow-up.  True?
15             MS. O'DELL:  Object to the
16        form.
17        A.    I don't.
18   BY MS. BROWN:
19        Q.    Did you know that Penninkilampi
20   does not include the Gates study?
21        A.    So I'm going to look at that
22   paper again to see why he might have left --
23   he or she left the Gates study out.
24        Q.    And for the record, we'll mark

Page 245

1    Penninkilampi as Exhibit 16 your deposition.
2             (Deposition Exhibit 16 marked
3        for identification.)
4    BY MS. BROWN:
5         Q.    And to help with your review,
6    Doctor, if you want to, take as much as you
7    need, but page 46 lists the name of the
8    studies that are included and Table A was the
9    meta-analysis for ever use in ovarian cancer.
10   And you agree with me that Gates 2010 is not
11   included?
12             MS. O'DELL:  Feel free to take
13        a look at the paper before you answer
14        the questions, Doctor.
15        A.    I see that it was not included.
16   BY MS. BROWN:
17        Q.    And in writing your report and
18   identifying Gates as one of the higher
19   quality studies, were you aware at the time
20   that Gates had omitted the follow-up to the
21   Nurses Health Study as published in Gates
22   2010?
23             MS. O'DELL:  Object to the form
24        of the question.  I don't think that

Judith K. Wolf, M.D.

Page 246

1    she referred to Gates as a
2    high-quality study in her report.
3        MS. BROWN:  Let me rephrase.
4    That's my fault.
5    BY MS. BROWN:
6      Q.    In writing your report and
7    identifying Penninkilampi as one of the
8    higher quality studies, were you aware that
9    Penninkilampi excluded the Gates 2010
10   follow-up to the Nurses Health Study?
11     A.    Given that they left it out or
12   they didn't include it, to me it doesn't
13   negate that I think the Penninkilampi study
14   is a good study.  I was trying to see if
15   there was a reason why they didn't look at it
16   and I don't see anything mentioned in their
17   methods or in their discussion or their
18   results as to why they did not include it.  I
19   still think the Penninkilampi is a good
20   study.
21     Q.    Okay.  And you are not at all
22   concerned -- would you weigh Penninkilampi
23   less, given the fact that it did not include
24   the most complete data from the Nurses

Page 247

1    Health?
2        MS. O'DELL:  Object to form.
3     A.    I'm -- I can't answer that
4   question because I don't know what the data
5   would look like if they included the study.
6   BY MS. BROWN:
7     Q.    Well, did you review the Berge
8   analysis, the meta-analysis that was done
9   close to the same time?
10     A.    Yes.
11     Q.    Okay.  And were you aware that
12   Berge actually did include Gates as the most
13   recent representation of the Nurses Health
14   cohort?  We'll mark the Berge meta-analysis
15   as Exhibit 17.
16       (Deposition Exhibit 17 marked
17      for identification.)
18       (Witness reviews document.)
19     A.    So what I don't see in the
20   Berge paper is if they separated out serous
21   for the cohort studies.  They looked at
22   serous separately in the study.  What I don't
23   see, that they looked at serous histology in
24   the case-control versus the cohorts.

Page 248

1    BY MS. BROWN:
2     Q.    So your critique of the Berge
3   paper is that there's not a subgroup analysis
4   by histologic type?
5       MS. O'DELL:  Object to the
6      form.
7     A.    That's -- that wasn't a
8   critique, it's a piece of information.  That
9   differently from the Penninkilampi study,
10   which was looking specifically at serous
11   histology of the cohorts, the Berge study
12   didn't look at serous from the cohort
13   separately, they looked at serous overall
14   separately.  It's just a difference.  It's
15   not a critique.
16   BY MS. BROWN:
17     Q.    So one of the things that
18   Penninkilampi looked at was whether ever use
19   of talc increases the risk for ovarian
20   cancer.
21     A.    Yes.
22     Q.    Do you understand that?
23     A.    Yes.
24     Q.    And that is the same question

Page 249

1    that was investigated by Berge, correct?
2     A.    Yes.
3     Q.    And Penninkilampi excluded the
4   most recent data on the Nurses Health cohort
5   and Berge included it, correct?
6     A.    Yes.
7       MS. O'DELL:  Object to the
8      form.
9     A.    And in ever use of talc in the
10   cohort studies, both of them found no --
11   nothing, no significant increase.
12       In the Penninkilampi study,
13   which I understand does not include the Gates
14   data, when they looked specifically at the
15   cohort studies, there was a significant
16   increase in serous.
17       In the Berge study when they
18   looked at everything, case-control and
19   cohorts together, there was a significant
20   increase in the risk for serous histology.
21   BY MS. BROWN:
22     Q.    I'm sorry, say that last part
23   again, in the --
24     A.    In the Berge study --

63 (Pages 246 to 249)

Judith K. Wolf, M.D.

Page 250

```
 1        Q.    Uh-huh.
 2        A.    -- what I'm reading here is,
 3   there is a significant increase in serous
 4   histology.
 5        Q.    In the case-control studies,
 6   correct?
 7        A.    I don't see that they separated
 8   out the case-control studies.
 9        Q.    In reviewing the Berge and
10   Penninkilampi meta-analyses, did you pay
11   attention to the tests for heterogeneity that
12   the authors did in terms of which studies
13   could and could not be combined?
14        A.    In which study are you asking
15   me about?  I'm sorry.  I'm still distracted
16   by the Berge one here.
17        Q.    Do you understand the concept
18   of heterogeneity in meta-analysis?
19        A.    Yes.
20        Q.    Okay.  And so you understand
21   that there are certain studies that can --
22   because of their study design cannot be
23   combined, correct?
24        A.    Yes.
```

Page 251

```
 1        Q.    And in evaluating the
 2   Penninkilampi meta-analysis and the Berge
 3   meta-analysis, did you undertake an effort to
 4   evaluate the heterogeneity of the studies
 5   that were combined in those two
 6   meta-analyses?
 7        A.    And compare the two, is that
 8   what you're asking me?
 9        Q.    Sure.  Here's what I'm after,
10   Doctor.  I understand that you made a
11   determination Penninkilampi is one of the
12   more high-quality studies?
13        A.    Yes.
14        Q.    And I want to understand your
15   methodology in selecting Penninkilampi as a
16   higher quality study than Berge.
17        MS. O'DELL:  Object to the
18   form.
19        A.    So when I look at all of the
20   meta-analyses, they all show a significant
21   increase in the risk of ovarian cancer with
22   minimal use of talcum powder use.  I
23   specifically chose the Penninkilampi one
24   because it was the most recent one.
```

Page 252

```
 1   BY MS. BROWN:
 2        Q.    Even though it excludes the
 3   most recent data from the Nurses Health
 4   Study.  True?
 5        MS. O'DELL:  Object to the
 6   form.
 7        A.    I specifically chose it because
 8   it's the most recent one.
 9   BY MS. BROWN:
10        Q.    Okay.  And you understand that
11   the Berge meta-analysis was published at
12   right about the same time, right?
13        MS. O'DELL:  Object to the
14   form.
15        A.    I have to look at the exact
16   date.
17        MS. BROWN:  We need to change
18   the tape, so let's go off for a
19   second.
20        THE VIDEOGRAPHER:  Going off
21   the record.  The time is 2:21 p.m.
22        (Recess taken from 2:21 p.m. to
23   2:26 p.m.)
24        THE VIDEOGRAPHER:  This marks
```

Page 253

```
 1   the beginning of disk 3.  Back on the
 2   record.  The time is 2:26 p.m.
 3   BY MS. BROWN:
 4        Q.    Dr. Wolf, before we took a
 5   break, we were discussing the difference
 6   between Penninkilampi and the Berge
 7   meta-analyses.  I want to direct your
 8   attention to page 42 of the Penninkilampi
 9   article.
10        A.    That's in this one.  Page 42.
11        Q.    And in the first paragraph on
12   the left-hand column, one of the things the
13   authors of Penninkilampi note, is that the
14   majority of the evidence as it relates to
15   perineal talc use in ovarian cancer has come
16   from case-control studies, correct?
17        MS. O'DELL:  Where are you
18   reading?
19        A.    Where are you reading?
20   BY MS. BROWN:
21        Q.    "The evidence for the
22   association between perineal talc use and
23   ovarian cancer is based on the body of
24   knowledge from observational studies and most
```

Judith K. Wolf, M.D.

Page 254

1  of these have been retrospective case-control
2  studies prone to recall bias."
3       Do you see that?
4       A.  I see that.
5       Q.  And do you agree with that,
6  Doctor, that most of the case-control studies
7  that you evaluated and that form the body of
8  epidemiology on talc and ovarian cancer are
9  prone to recall bias?
10      MS. O'DELL:  Object to the
11      form.
12      A.  I don't agree with that
13  statement.  I do agree that one concern of
14  case-control studies is recall bias.  I
15  believe that was acknowledged in most, if not
16  all, of the case-control studies and felt not
17  to be an issue.  And I looked at that, but
18  the weight of the evidence suggests that most
19  of the studies showed a relationship.
20      Also in a rare disease like
21  ovarian cancer, although a prospective study
22  would be -- might be -- give us more
23  information, the number of women and the
24  amount of time that it would take to do a

Page 255

1  prospective study makes it challenging, and
2  that's one of the challenges with all of the
3  cohort studies.  None of them are big enough
4  and most of them are not followed long
5  enough.
6       And so case-control studies are
7  what -- the best way to study a rare disease
8  like this.  And given the consistency in the
9  findings, although recall bias can occur, I
10  don't believe it -- after my review of the
11  entire literature, I'm not concerned that
12  recall bias had an effect on the results.
13  BY MS. BROWN:
14      Q.  You state in your report on
15  page 8, that all of the cohort studies are
16  limited by lack of power.
17      A.  Yes.
18      Q.  Is that your opinion?
19      A.  Lack of power to ask the
20  specific question, yes.
21      Q.  Lack of power to ask?
22      A.  To answer the specific
23  question.
24      Q.  Okay.  And you are not a

Page 256

1  biostatistician, correct?
2       A.  No.
3       Q.  Okay.  Did you perform a power
4  calculation on any of the studies that you
5  reviewed?
6       A.  I did not, but Dr. Narod
7  published a paper where he actually looked at
8  that question and estimated that it would
9  take about 200,000 women to answer the
10  question, and none of these studies have
11  that.
12      Q.  And have you calculated how
13  many women were studied in all of the
14  prospective studies and whether or not that
15  was more or less than 200,000?
16      A.  Well, if you look at all of
17  them together, putting them together, there
18  are more than 200,000.
19      Q.  And did that inform your
20  opinion that the prospective studies -- how
21  did you consider that fact in making the
22  statement that the cohort studies are limited
23  by a lack of power?
24      A.  Because each individual study

Page 257

1  is limited by lack of power.  And two of the
2  three studies are limited by the amount of
3  follow-up and all of the studies are limited
4  by the documentation of how much -- how often
5  and how frequent powder was used.  The --
6  short of the Sister Study, the primary
7  endpoints of the Nurses Health Study and the
8  Women's Health Study were not to look at the
9  relationship of talc and ovarian cancer.  It
10  was a secondary add-on study that was done
11  while the studies were ongoing.  So they
12  weren't designed to answer that question.
13      Q.  Did you consider the published
14  power calculation done by Berge?
15      A.  Let me look at Berge's
16  published power calculation.
17      Q.  Do you know that -- do you
18  know -- do you recall reviewing that in
19  connection with your --
20      A.  I recall --
21      Q.  -- testimony?
22      A.  -- reviewing the paper.  I
23  don't recall specifically what his -- his
24  person -- I don't know this person.

65 (Pages 254 to 257)

Judith K. Wolf, M.D.

Page 258

1    Q.    I'll direct your attention,
2    then, Doctor, to page 6 of the Berge paper.
3    It looks like you might have a different
4    version than I do, but page 6 of the
5    publication, second column, first paragraph
6    on the --
7        A.    What part of the paper is it
8    in?
9        Q.    The discussion section.
10       A.    Okay.
11       Q.    It's my third paragraph of the
12   discussion section.
13       A.    Gotcha.
14       Q.    And let me just read this into
15   the record to expedite us here.  "An
16   important feature of the present
17   meta-analysis is the inclusion of several
18   cohort studies, which enabled an analysis
19   stratified by study design.  This analysis
20   provided evidence of a heterogeneity of
21   results between the two groups of studies
22   with an association generally detected in
23   case-control studies but not in cohort
24   studies.  It should be noted that the cohort

Page 259

1    studies included in the meta-analysis
2    comprised of a total of 429 cases of ovarian
3    cancer exposed to genital talc and 943
4    unexposed:  The statistical power of the
5    meta-analysis of these cohort studies to
6    detect a relative risk of 1.25, similar to
7    the result of the meta-analysis of
8    case-control studies, was .99.  Thus, low
9    power of cohort studies cannot be invoked as
10   an explanation of the heterogeneity of the
11   results."
12       Did you consider Berge's power
13   calculation when you made the statement in
14   your report, that all of the cohort studies
15   are limited by lack of power?
16       A.    My statement is in relationship
17   into each study on their own, not all of them
18   together.  And my statement about the lack of
19   power for all over, my opinion about that was
20   based on Narod's paper of needing 200,000
21   women.  But this is about -- this is -- this
22   statement here is about each study on their
23   own.  None of those studies had 200,000
24   women.

Page 260

1        MS. O'DELL:  Excuse me, when
2    you say "here," are you referring to
3    your report?
4        A.    In my report, under "Summary of
5    Epidemiological Evidence" on page 8.
6    BY MS. BROWN:
7        Q.    And one of the things, Doctor,
8    you provided a site that meta-analyses can be
9    some of the highest form of epidemiological
10   evidence, correct?
11       A.    Yes.
12       Q.    And the Penninkilampi study
13   that you pointed to was one of the highest --
14       MS. O'DELL:  Why don't we go
15   off the record.
16       MS. BROWN:  Let's try to keep
17   going.
18   BY MS. BROWN:
19       Q.    The Penninkilampi study that
20   you pointed to as one of the higher quality
21   studies is, in fact, a meta-analysis,
22   correct?
23       A.    That's correct.
24       Q.    And you are certainly not

Page 261

1    meaning to suggest that there's something
2    improper about pooling or combining data in a
3    meta-analysis, correct?
4        MS. O'DELL:  Object to the
5    form.
6        A.    I don't believe I ever said
7    anything about -- negative about a
8    meta-analysis.
9    BY MS. BROWN:
10       Q.    Do you -- did you consider
11   Berge's power calculation of the pooled
12   prospective cohorts when you opined as you
13   did in your report on page 8, that all of the
14   cohort studies are limited by lack of power?
15       MS. O'DELL:  Object to the
16   form.
17       A.    The two are not comparing the
18   same thing.  His power analysis is looking at
19   the pooled analysis.  My statement was
20   regarding each individual cohort study on its
21   own.
22   BY MS. BROWN:
23       Q.    Do you think there is enough
24   power in the pooled prospective cohorts to

66 (Pages 258 to 261)

Page 262

1    detect a relative risk of 1.25?
2        A.    I see that Berge says that in
3    his discussion. I'm not a statistician. I'd
4    have to -- I'm not sure I could answer that
5    and I guess I'm going to ask you to -- do you
6    think there's enough power in the pooled
7    prospective cohorts to detect a relative risk
8    of 1.25? I'm going to say possibly. I don't
9    know.
10        Q.    In identifying Penninkilampi as
11    one of the higher quality studies, did you do
12    an independent verification that the data
13    Penninkilampi reports in his article is
14    indeed accurate?
15        A.    Are you -- my understanding of
16    what you're asking me is, did I recalculate
17    the results? Is that what you're asking me?
18        Q.    No. I'm asking you, for
19    example, on page 46 of Penninkilampi -- we
20    have them as exhibits, if that makes it
21    easier.
22        A.    No, I -- okay. Page 46.
23        Q.    Penninkilampi reports studies,
24    a purported odds ratio, a lower limit and an

Page 263

1    upper limit. Do you see that?
2        A.    Yeah.
3        Q.    Did you go back to the
4    individual studies to verify that
5    Penninkilampi was correct in that reporting?
6        A.    Oh, that -- in these charts?
7        Q.    Correct.
8        A.    That every -- I did not.
9        Q.    Would it be important to you in
10    determining that a study is of high quality,
11    that the authors accurately report the odds
12    ratios and the confidence intervals?
13        A.    It would, but it's not my
14    routine or standard for me to go back and
15    re-review the odds ratios of every paper to
16    confirm that. I would assume that is part of
17    the peer-review process that has happened.
18        Q.    And if there were, in fact,
19    errors in the reporting of the odds ratios or
20    the confidence intervals, would that call
21    into question your reliance on the study?
22        A.    I would want to see it
23    recalculated, if there were -- if there were
24    errors.

Page 264

1        Q.    In evaluating the Penninkilampi
2    meta-analysis and the Berge analysis, explain
3    to me how you weighted both of them.
4        MS. O'DELL: Object to the
5    form.
6        A.    When I was looking at all of
7    the meta-analysis, including the Berge and
8    the Penninkilampi, to me it -- all of them
9    showed a positive correlation between genital
10    talcum powder use and ovarian cancer. I
11    chose the most recent one to include in my
12    report.
13    BY MS. BROWN:
14        Q.    Other than the fact that
15    Penninkilampi was the most recent, is there
16    any reason -- any other reason you didn't
17    include Berge in your report?
18        MS. O'DELL: Object to the
19    form.
20        A.    Was there any other reason I
21    didn't include Berge?
22    BY MS. BROWN:
23        Q.    Correct.
24        A.    The reason I chose

Page 265

1    Penninkilampi was because it was the most
2    recent. And in my interpretation of the
3    meta-analysis, they all show a positive
4    correlation, so I just wanted to show the
5    most recent.
6        Q.    And you'll agree with me that
7    both meta-analyses -- or the Berge
8    meta-analysis shows no increased risk in the
9    cohorts, correct?
10        A.    No increased risk in the
11    cohort -- pooled cohorts in the Berge paper.
12        Q.    And if you consider the Gates
13    study as the most recent data available on
14    the Nurses Health cohort, you'll agree with
15    me there is no evidence at all in the
16    prospective cohorts of any increased risk of
17    ovarian cancer with talc use. True?
18        MS. O'DELL: Object to the
19    form.
20        A.    With the -- the other issues
21    with the cohort studies is they ask ever use,
22    not current use, length of use, time of use.
23    Both the Gates and Gertig and the Houghton,
24    the Women's Health Initiative, those studies

Judith K. Wolf, M.D.

Page 266

1    were not designed to be able to ask those
2    questions and so we can't have that
3    information.  And so the limitations of the
4    cohort studies, as -- as I said before,
5    individually, lack of power, not making the
6    correct queries and short follow-up, except
7    the second follow-up of Gates, but that's
8    only one study and it's still not large
9    enough.
10    BY MS. BROWN:
11        Q.    That wasn't my question.  My
12    question was, if you consider Gates as the
13    most recent data on the Nurses Health cohort,
14    you would agree with me that there is no
15    evidence in any of the prospective studies
16    that shows a statistically significant
17    increased risk of ovarian cancer with
18    perineal task use.  True?
19        MS. O'DELL:  Object to the
20    form.
21        A.    I would say that all the
22    cohorts or cohort studies have the same
23    limitations, not large enough, not asking the
24    right questions, and the only one that

Page 267

1    doesn't have the shortest -- short follow-up,
2    which it still may not be long enough, is the
3    Nurses Health Study.  And with those caveats,
4    there was no statistically significant
5    increase in ovarian cancer in perineal talcum
6    powder use.  But given that ovarian cancer's
7    a rare disease and with those caveats, I'm
8    not sure that they're designed to answer the
9    question.  So it doesn't say to me there
10    isn't a risk.
11    BY MS. BROWN:
12        Q.    But that wasn't my question.
13    My question was just, there is not a single
14    prospective study that shows an increased
15    risk of ovarian cancer with talcum powder
16    use.  That's it.  It's yes or no.
17        MS. O'DELL:  Excuse me.  No,
18    it's not.  Objection to form.  You may
19    answer it in any way you choose,
20    Dr. Wolf.
21        A.    The studies are all limited by
22    lack of power, by short follow-up in two of
23    the three and maybe short follow-up in all
24    three, by not asking the correct questions

Page 268

1    that might get at the answer, two of the
2    three by not being designed to answer that
3    question.  And so with those caveats, they
4    saw no statistically significant increase in
5    ovarian cancer with talcum powder use
6    reported as ever use.
7    BY MS. BROWN:
8        Q.    What's your methodology for --
9    do you weight the cohorts and the case
10    controls equally in your analysis?
11        MS. O'DELL:  Objection to the
12    form.
13        A.    I consider all of the evidence,
14    not only the epidemiologic evidence but the
15    causation evidence, the animal in the in
16    vitro data as a whole and formed my opinion.
17    BY MS. BROWN:
18        Q.    My question was, do you weight
19    the case controls equally to the cohorts?
20        MS. O'DELL:  Objection, asked
21    and answered.
22        You may answer it.
23        A.    I look at the entire evidence,
24    all the epidemiologic evidence, as well as

Page 269

1    the in vitro and in vivo evidence and made my
2    decision.
3    BY MS. BROWN:
4        Q.    Are you not understanding that
5    question?
6        MS. O'DELL:  Counselor, you can
7    ask the questions, but she's given you
8    an answer.  Just because you don't
9    like the answer doesn't mean she
10    didn't answer the question.
11        MS. BROWN:  I've heard the same
12    answer nine times.  The question is --
13        MS. O'DELL:  You're asking the
14    question over and over again.
15        MS. BROWN:  You're wasting so
16    much time.
17    BY MS. BROWN:
18        Q.    My question really just goes to
19    weight.  Okay.  I understand you marked at
20    the beginning of the deposition weight of the
21    evidence from UpToDate.  Do you remember
22    that?
23        A.    Yeah.
24        Q.    And my question is just, when

68 (Pages 266 to 269)

Judith K. Wolf, M.D.

Page 270

1    you did this analysis, did you give equal
2    weight to the cohorts and the case controls?
3         MS. O'DELL: Objection to the
4    preamble, which was incorrect, but you
5    may answer.
6    A.   So I weighted every piece of
7    evidence not separating by the type of study,
8    but looking at the strengths and the
9    weaknesses of the study and then together put
10   the evidence to make my opinion.
11   BY MS. BROWN:
12   Q.   On page 3 of your report,
13   Doctor, you reference the National Cancer
14   Institute and that's the public health
15   authority's definition of a risk factor.  Do
16   you remember that?
17   A.   Yes.
18   Q.   Fair to say one of the reasons
19   you reference the National Cancer Institute
20   is that you consider it to be a leading
21   public health authority, particularly when it
22   comes to cancer?
23        MS. O'DELL: Object to the
24   form.

Page 271

1    A.   Specifically here, I reference
2    the National Cancer Institute because of
3    their definition of "associations" versus
4    "causative" risk factors.
5    BY MS. BROWN:
6    Q.   And you consider the National
7    Cancer Institute to be a leading public
8    health authority.  True?
9         MS. O'DELL: Objection to the
10   form, asked and answered.
11   A.   So if you're asking me -- what
12   I think I hear you asking me is why did I
13   reference the National Cancer Institute here,
14   and I referenced it because of this
15   definition.
16   BY MS. BROWN:
17   Q.   The National Cancer Institute
18   has reviewed the epidemiology on talc and
19   ovarian cancer, correct?
20   A.   That's correct.
21   Q.   Did you consider the National
22   Cancer Institute's review of the epidemiology
23   in forming your opinions in this case?
24   A.   I read it and I did consider

Page 272

1    it.
2         (Deposition Exhibit 18 marked
3    for identification.)
4    BY MS. BROWN:
5    Q.   I'm handing you what we've
6    marked as Exhibit 18 to your deposition,
7    which is a printout from the NCI's website,
8    entitled "Ovarian, Fallopian Tube and Primary
9    Peritoneal Cancer Prevention, Health
10   Professional Version."  Do you see that,
11   Doctor?
12   A.   Yes.
13   Q.   And during your work as a
14   gynecologic oncologist, did you look to the
15   NCI for information on how to treat your
16   patients?
17   A.   Occasionally, but not
18   routinely.
19   Q.   Do you consider the National
20   Cancer Institute to be a reliable source of
21   information on cancer epidemiology?
22        MS. O'DELL: Object to the
23   form.
24   A.   I consider it a reliable source

Page 273

1    on cancer as a whole.  And again, to me
2    it's -- it's one of the pieces of evidence
3    that I might look to to find some
4    information.
5    BY MS. BROWN:
6    Q.   And what the National Cancer
7    Institute has done here is evaluate risk
8    factors for ovarian cancer, correct?
9    A.   Yes.
10   Q.   And, for example, if you look
11   at page 3 of 21, the National Cancer
12   Institute's information begins with factors
13   with adequate evidence of an increased risk
14   of ovarian cancer, correct?
15   A.   Yes.
16   Q.   Okay.  And they list things
17   like endometriosis, correct?
18   A.   Yeah.
19   Q.   They list hormone replacement
20   therapy.  True?
21   A.   Yes.
22   Q.   And the National Cancer
23   Institute goes on -- and one of the things
24   they do not list as a factor with adequate

69 (Pages 270 to 273)

Judith K. Wolf, M.D.

Page 274

1  evidence of an increased risk is talcum
2  powder use, correct?
3      A.   That's correct.
4      Q.   And what the National Cancer
5  Institute does, is it identifies some area
6  where there's uncertainty in terms of a risk
7  factor, right?
8      A.   Yes.
9      Q.   And so on page 7 of 21, for
10  example, they identify infertility treatment
11  as an area of uncertainty, correct?
12      A.   Yes.
13      Q.   And when it comes to perineal
14  talc use, however, the National Cancer
15  Institute has determined that that is a
16  factor with inadequate evidence of an
17  association of the risk of ovarian cancer,
18  correct?
19          MS. O'DELL:  Object to the
20      form.
21      A.   That's where they placed it in
22  this, yes.
23  BY MS. BROWN:
24      Q.   And directing your attention to

Page 275

1  page 14 of 21, what the National Cancer
2  Institute has concluded is that, "The weight
3  of the evidence does not support an
4  association between perineal talc exposure
5  and an increased risk of ovarian cancer.
6  Results from case-control and cohort studies
7  are inconsistent."
8          Do you see that?
9          MS. O'DELL:  Object to the
10      form.  Can I just ask where you're
11      reading from?  You said page 21.
12      A.   Yeah, I don't see that.
13  BY MS. BROWN:
14      Q.   Page 14 of 21.
15          MS. O'DELL:  We don't have 21.
16      We have 18 pages.
17      A.   And page 14 is references.
18  BY MS. BROWN:
19      Q.   You have a different version
20  than I do.  I'll get you there.  Right here,
21  perineal talc exposure.
22          MS. O'DELL:  So repeat the
23      question, please.
24          MS. BROWN:  Sure.

Page 276

1  BY MS. BROWN:
2      Q.   Let's reorient ourselves now
3  that we're all on the same page.  The
4  National Cancer Institute has classified
5  perineal talc exposure as a factor with
6  inadequate evidence of an association with
7  ovarian cancer, correct?
8          MS. O'DELL:  Object to the
9      form.
10      A.   It's listed under factors with
11  inadequate evidence, that's correct.
12  BY MS. BROWN:
13      Q.   All right.  And the National
14  Cancer Institute has factors with adequate
15  evidence, right?
16      A.   Yes.
17      Q.   We just looked at some.
18      A.   Yes.
19      Q.   It has factors with uncertain
20  evidence, right?
21      A.   Yes.
22      Q.   And then it has factors with
23  inadequate evidence, and that includes
24  perineal talc exposure, correct?

Page 277

1      A.   That's correct.
2          MS. O'DELL:  Object to the
3      form.
4  BY MS. BROWN:
5      Q.   And what the National Cancer
6  Institute has determined here is that the
7  weight of the evidence does not support an
8  association between perineal talc exposure
9  and an increased risk of ovarian cancer.
10      A.   That's the part I don't --
11      Q.   Results --
12      A.   That's where I'm trying to find
13  --
14      Q.   Let me read it and then I'm
15  going to help you.
16          "Results from case-control and
17  cohort studies are inconsistent."  And what
18  I'm reading are the first two lines of the
19  perineal talc exposure section.
20      A.   Okay.  Okay.  What's your
21  question?
22      Q.   You, Dr. Wolf, disagree with
23  the National Cancer Institute, correct?
24      A.   In this instance, I do.

70 (Pages 274 to 277)

Judith K. Wolf, M.D.

Page 278

1      Q.    And tell me what methodology
2  you have employed that is different from the
3  weight of the evidence approach, referenced
4  here by the National Cancer Institute.
5      A.    So I see that the National
6  Cancer Institute has referenced five
7  articles.  So one of the things is that I
8  believe that my review of the entire body of
9  literature is much broader than five
10  articles.  And when I look at the most recent
11  article, they do have one article from 2016,
12  which is the Schildkraut data, which is --
13  they just now at the end of 2018, added that
14  data into theirs.  So I would say there's
15  other data that they either didn't have when
16  they did the review or didn't include when
17  they did the review.
18      Q.    And in offering that opinion,
19  have you considered, Doctor, that according
20  to this document from the NCI, board members
21  meet monthly to review recently published
22  articles?  I'll point you to the section
23  entitled "About This PDQ Summary," at the
24  very end, under the section "Reviewers and

Page 279

1  Updates," do you see the National Cancer
2  Institute's --
3      A.    I see that.
4      Q.    -- board members meeting
5  monthly to review recently published
6  articles, right?
7      A.    Yes.
8          MS. O'DELL:  Object to the
9      form.
10  BY MS. BROWN:
11      Q.    And we see at the very last
12  page, that this particular document was
13  updated a few weeks ago in December 21st of
14  2018?
15      A.    Yes.
16      Q.    Okay.  Do you have any other
17  scientific evidence or methodology that would
18  distinguish your review of the literature
19  from the folks at the National Cancer
20  Institute?
21      A.    I'm going to go back to the
22  review of the entire body of the literature.
23  I don't know which articles they look at once
24  a month to make a determination with their

Page 280

1  opinion.  It's my experience that in order to
2  get someone like the National Cancer
3  Institute or some other guideline to suggest
4  something, there's generally a lag of several
5  years between publication of all the
6  literature and when the committee changes
7  something.  An example of that is that the
8  Schildkraut paper was published in 2016.  It
9  wasn't until the -- end of 2018 that they
10  included it.
11      Q.    Dr. Wolf, are you aware of any
12  public health authority that has concluded
13  talcum powder causes ovarian cancer?
14          MS. O'DELL:  Object to the
15      form.
16      A.    I'm aware that IARC has
17  considered that talc is possibly
18  carcinogenic, that asbestos is carcinogenic.
19  BY MS. BROWN:
20      Q.    IARC has not concluded that
21  talc causes ovarian cancer, correct?
22          MS. O'DELL:  Object to the
23      form.
24      A.    One of the reasons for the

Page 281

1  review of talc was the concern of ovarian
2  cancer.  The fact that they have considered
3  it possibly carcinogenic, to me is an
4  indication that they think it's possibly
5  carcinogenic.
6  BY MS. BROWN:
7      Q.    Okay.  Let's break that up.
8  Are you aware of any public health authority
9  that agrees with your opinion that talcum
10  powder causes ovarian cancer?
11          MS. O'DELL:  Object to the
12      form.
13      A.    When I formed my opinion, I
14  looked at all of the data that was available
15  to me, including the data as recent as
16  December.  The Canada health assessment, the
17  Taher paper.  And I believe that my opinion
18  is based on a greater weight of the evidence
19  than the review of the National Cancer
20  Institute or anything that was available
21  prior to this for a body to review.  And if I
22  go back to the talc and IARC study, even with
23  papers only till 2007 and 2008, there was
24  enough evidence that they thought that talc

Judith K. Wolf, M.D.

Page 282

1  was possibly carcinogenic.
2  BY MS. BROWN:
3      Q.   IARC did not consider three of
4  the four prospective cohort studies that
5  showed no increased risk of with talcum
6  powder, true?
7      A.   They also did not show --
8  include any paper that was published after
9  2007.
10     Q.   And that would include three of
11 the four prospective cohort studies that
12 showed no risk, right?
13     A.   That would include anything
14 published after 2007.
15     Q.   And as I understand your
16 testimony as it relates to the National
17 Cancer Institute, you believe that despite
18 the fact that the NCI updated its position as
19 recently as a few weeks ago, they have not
20 reviewed the most latest literature.  Is that
21 your testimony?
22         MS. O'DELL:  Object to the
23 form.
24     A.   I'm saying that I don't know if

Page 283

1  they have.  The most recent literature that
2  they cited is two years old.
3  BY MS. BROWN:
4      Q.   And what literature do you
5  think has come out in the next -- in the last
6  two years that IARC -- excuse me, that NCI,
7  despite a publication last month, did not
8  cite?
9      A.   Well, I'm going to say both the
10 Berge meta-analysis and the Penninkilampi
11 meta-analysis.
12     Q.   IARC has a classification for
13 agents that it believes to be carcinogenic,
14 correct?
15     A.   Yes.
16     Q.   And that is a group 1, correct?
17     A.   That's correct.
18     Q.   And IARC has and does make a
19 determination that with some substances,
20 there is sufficient evidence of
21 carcinogenicity.  True?
22     A.   That's correct.
23     Q.   And IARC does have a category
24 that an agent may be probably carcinogenic,

Page 284

1  correct?
2      A.   Yes.
3      Q.   And IARC has and done -- has
4  and does make that determination as it
5  relates to certain substances, correct?
6      A.   Yes.
7      Q.   Okay.  IARC has not determined
8  that nonasbestiform talc is -- strike that.
9          IARC has not determined that
10 there is sufficient evidence that
11 nonasbestiform talc causes ovarian cancer,
12 correct?
13         MS. O'DELL:  Object to the
14 form.
15     A.   In the IARC opinion on talc,
16 platy talc, what was assumed to be platy talc
17 without any fibrous contamination, the score
18 was 2B, which is possibly carcinogenic.
19 BY MS. BROWN:
20     Q.   And in explaining what IARC
21 means by "possibly carcinogenic," IARC
22 explains that chance, bias or confounding
23 can't be ruled out with reasonable
24 confidence, correct?

Page 285

1      A.   That's correct.
2      Q.   And you think as it relates to
3  IARC's interpretation of epidemiology,
4  they're wrong, right?
5          MS. O'DELL:  Object to the
6  form.
7      A.   I think that they made the
8  decision that they thought was correct with
9  the information that they had at the time
10 that they made it.
11 BY MS. BROWN:
12     Q.   At the time that IARC
13 determined that talc -- nonasbestiform talc
14 had limited evidence of carcinogenic, you
15 believe that was correct?
16         MS. O'DELL:  Object to the
17 form.
18     A.   I'm going to say again what I
19 said the last time.  That I believe that they
20 came to that conclusion based on their review
21 of the literature that they had at the time.
22 BY MS. BROWN:
23     Q.   And you understand when IARC
24 does a literature review, it employs the

72 (Pages 282 to 285)

Judith K. Wolf, M.D.

Page 286

1    Bradford Hill criteria?
2        A.    Yes.
3        Q.    And is that the criteria you
4    evaluated the literature with here too?
5        A.    I actually -- I didn't know
6    that's what I was doing until I read the
7    Bradford Hill criteria paper myself and
8    realized that that's what I do when I review
9    the literature and it fit very nicely into
10   that criteria.  So in my report, yes.
11       Q.    As a practicing gynecologic
12   oncologist, you don't use the epidemiologic
13   tool of Bradford Hill criteria; is that fair?
14       MS. O'DELL:  Object to the
15       form.
16       A.    In my general practice, I don't
17   use the Bradford Hill criteria, specifically
18   calling it that, but all of those criteria
19   are what I use when I evaluate something.
20   BY MS. BROWN:
21       Q.    And you understand that when
22   the scientists at IARC evaluate whether or
23   not a substance is carcinogenic, they too
24   employ the Bradford Hill criteria, correct?

Page 287

1        A.    Yes.
2        Q.    Okay.  Is there something
3    different in your mind, about how you
4    employed Bradford Hill and how IARC employed
5    Bradford Hill?
6        A.    We had different information.
7        Q.    And the different information
8    you're referring to are some additional
9    case-control studies and additional
10   meta-analysis?
11       A.    And cohort studies and in
12   inflammatory papers, causation papers that
13   weren't published before 2007.
14       Q.    And you would agree with me
15   that --
16       MS. O'DELL:  Excuse me,
17       published before 2007?
18       THE WITNESS:  Were not.  Were
19       not.
20   BY MS. BROWN:
21       Q.    You would agree with me that
22   the general relative risks seen in the
23   additional case-control studies that you're
24   referring to, range from about 1.2 to 1.6,

Page 288

1    right?
2        A.    Yes.
3        Q.    Okay.  There had been prior
4    case-control studies in that same relative
5    risk range, correct?
6        A.    Yes.
7        Q.    Okay.  There was nothing new or
8    different about the relative risks shown in
9    the most recent case-control studies,
10   correct?
11       MS. O'DELL:  Object to the
12       form.
13       A.    There was additional -- it's
14   just confirmation and -- of the same
15   information, showing consistency, which is
16   one of the tenets of the Bradford Hill
17   criteria.
18   BY MS. BROWN:
19       Q.    And, in fact, there's no
20   consistency with the findings of the
21   prospective studies, right?
22       MS. O'DELL:  Object to the
23       form.
24       A.    The three cohort studies, I'll

Page 289

1    say once again, had limitations which I don't
2    think allowed us to answer the question about
3    talc and ovarian cancer, the size, the
4    information about use and the follow-up.
5    BY MS. BROWN:
6        Q.    In your review of the
7    literature, did you make the determination
8    that the case-control studies asked different
9    questions about use than the prospective
10   studies?
11       A.    The case-control studies, many
12   of them, asked more specific questions and
13   were able to obtain more information.
14       Q.    Is it -- you state in your
15   report that the case-control studies are
16   consistent, right?
17       A.    Yes.
18       Q.    And they are not -- when you
19   look at the case-control studies and the
20   cohort studies, though, there is not
21   consistency, correct?
22       MS. O'DELL:  Object to the
23       form.
24       A.    When I look at the

73 (Pages 286 to 289)

Judith K. Wolf, M.D.

Page 290

1  epidemiologic data as a whole, as well as all
2  of the rest of the data about causation and
3  the makeup and the chemicals -- the
4  components of talcum powder product, it's
5  all -- it's consistent to me, the weight of
6  the evidence is consistent.
7  BY MS. BROWN:
8      Q.   Prospective studies have not
9  found an increased risk, correct?
10         MS. O'DELL:  Object to the
11     form.
12     A.   Prospective studies have
13  limitations, which I have described multiple
14  times, size, follow-up, length of follow-up,
15  information about talc use.  And given those
16  caveats, they have not shown a statistical
17  increase -- significant increase in ovarian
18  cancer.
19  BY MS. BROWN:
20     Q.   And you state that -- in your
21  report at page 6, "Overall, the case-control
22  studies are consistent showing a 30-50
23  percent increase in risk of ovarian cancer
24  with talcum powder use."

Page 291

1         Do you see that?
2      A.   Yes.
3      Q.   Okay.  And are you referring to
4  ever use and ovarian cancer?
5      A.   I'm referring to however it was
6  reported in the case-control studies.
7      Q.   Have you done an analysis of
8  the case-control studies to see what the
9  finding is when the same question is asked?
10     A.   So I, personally, haven't.
11  That's where I point to the meta-analysis, to
12  look at specific questions about how -- which
13  questions were asked.
14     Q.   And are you aware that when you
15  look at the ever used question in the
16  case-control studies, the majority of those
17  studies do not show an increased risk?
18         MS. O'DELL:  Object to the
19     form.
20     A.   Which is one of the limitations
21  of prospective studies because they only
22  asked ever used without details about how
23  often, how frequent, how long.
24

Page 292

1  BY MS. BROWN:
2      Q.   One of the studies you pointed
3  us to as a high quality study was the Wu
4  study, right?
5      A.   Yes.
6      Q.   And one of the things that's
7  reported in the Wu study and that you know as
8  a practicing gynecological oncologist, is
9  that the incident rate of ovarian cancer is
10  much lower in African-American women than it
11  is in Whites, correct?
12     A.   That's correct.
13     Q.   And one of the things that Wu
14  reports is that talcum powder use is much
15  higher in African-American women than in
16  Whites, correct?
17     A.   That's correct.
18     Q.   And how do you reconcile those
19  two facts, Doctor, that the population that
20  has the highest use of talcum powder has the
21  lowest incidence of ovarian cancer?
22     A.   Well, if we could pull up the
23  Wu study, I don't recall how many
24  African-American women were in that study,

Page 293

1  but the number was, I believe, small.
2      Q.   Welt, wasn't this one of the
3  studies you identified as being particularly
4  high quality?
5      A.   Yes.
6      Q.   Okay.
7      A.   Just because it didn't have a
8  lot of African-American patients doesn't make
9  it -- doesn't make it not a good study; it's
10  just a fact.
11     Q.   But your critique of the cohort
12  studies is that they didn't have enough
13  people, right?
14     A.   For a primary analysis.  This
15  is a secondary point of African-Americans.
16  When you look at the Schildkraut study, which
17  was specifically for African-Americans, there
18  was a significant increase.
19     Q.   The primary focus of the Wu
20  paper was whether African-American women had
21  an increased risk of talcum powder use.
22     A.   This is not the right Wu paper.
23         MS. O'DELL:  Let me get it for
24     you.

74 (Pages 290 to 293)

Judith K. Wolf, M.D.

---

Page 294

1        THE WITNESS: I don't have the
2   right Wu paper.
3        MS. O'DELL: Just a second
4   here.
5   BY MS. BROWN:
6        Q.   Is that what you're looking
7   for, Doctor? We can mark it.
8        A.   Yes, this is the one.
9        MS. O'DELL: Thank you.
10  BY MS. BROWN:
11       Q.   Let me just stick 19 on that
12  for you.
13       (Deposition Exhibit 19 marked
14       for identification.)
15  BY MS. BROWN:
16       Q.   Doctor, I have marked for the
17  record as Exhibit 19, the Wu article we've
18  been discussing. And my question for you
19  here is how -- what methodology you employed
20  to reconcile some of the facts that are
21  reported in Wu; namely, that African-American
22  women had the lowest incidence of ovarian
23  cancer and the highest incidence of talcum
24  powder use?

---

Page 295

1        A.   So the title of the Wu paper
2   says, "African-Americans and Hispanics Remain
3   at Lower Risk of Ovarian Cancer," but when
4   you read the purpose of this study, it was to
5   elucidate risk factors for disease and to
6   evaluate differences across -- across
7   Hispanics.
8        Q.   Sure.
9        A.   But not specifically
10  African-Americans.
11       Q.   No, Doctor, I'm using the
12  information reported in this study that you
13  identified as high quality to pose a
14  commonsense question for you. Which is that,
15  how do you reconcile the idea that the
16  population that has the lowest amount of
17  ovarian cancer has the highest amount of
18  powder use?
19       MS. O'DELL: Object to the
20  form. She's answered your question
21  previously.
22       But you may respond.
23       A.   So the reason I wanted to look
24  at this paper was to see, of the 1700 women,

---

Page 296

1   how many were African-American. There were
2   128.
3   BY MS. BROWN:
4        Q.   1700? Are you looking at Wu?
5        A.   Yes.
6        MS. O'DELL: Her testimony was
7   not -- was 128.
8        A.   128 African-Americans.
9   BY MS. BROWN:
10       Q.   I misheard you.
11       A.   1700 women total. Of those,
12  128 were African-American, most of them were
13  non-Hispanic/White. So that study isn't
14  powered to answer the question about
15  African-Americans and the relationship of
16  talcum powder and ovarian cancer. It's not
17  enough.
18       Q.   We're missing each other. I
19  want you to put this study aside. I'm asking
20  you a question about facts that are reported
21  here that you know as a gynecologic
22  oncologist. One of those facts, you'll
23  agree with me, is that African-American women
24  have a lower incidence of ovarian cancer than

---

Page 297

1   white women, right?
2        MS. O'DELL: Object to the
3   form.
4        A.   Yes.
5   BY MS. BROWN:
6        Q.   Okay. And one of the things
7   you know from reading Wu, because they report
8   it, is that African-American women are
9   traditionally higher talcum powder users than
10  white women, right?
11       A.   Yes.
12       Q.   And so what methodology have
13  you employed in opining that talcum powder
14  causes ovarian cancer to explain this
15  difference?
16       A.   Because when I look at the
17  Schildkraut study, which was a larger study
18  of African-American women, I believe, I have
19  to look at the numbers, there was a
20  statistical significant difference increase
21  in ovarian cancer in women --
22  African-American women.
23       Q.   Right. But you know the annual
24  incidence of ovarian cancer in

---

75 (Pages 294 to 297)

Judith K. Wolf, M.D.

Page 298

1    African-American women is historically and
2    remains much lower?
3        A.    Yes.
4            MS. O'DELL:  Objection, form,
5        asked and answered.
6    BY MS. BROWN:
7        Q.    I mean, do you understand what
8    I'm saying here?  How do you reconcile that?
9    If talcum powder use really did cause ovarian
10   cancer, why is the population that uses
11   talcum powder the most, the population that
12   gets ovarian cancer the least?
13           MS. O'DELL:  Objection to the
14       form, asked and answered.
15       You may answer.
16       A.    Okay.  So there are multiple
17   risk factors for ovarian cancer.  If
18   African-American women have some protection
19   from getting ovarian cancer, for whatever
20   reason they don't get it as often, it doesn't
21   matter what the risk factor is.  If you look
22   at an individual risk factor in that
23   population alone and it increases their risk
24   over their baseline, it's a risk factor.

Page 299

1    BY MS. BROWN:
2        Q.    What methodology have you
3    employed to explain the fact that a
4    population that uses this product the most
5    gets ovarian cancer the least?  How do you
6    reconcile that?
7            MS. O'DELL:  Objection, asked
8        and answered.  You've asked the same
9        question ten times.  The doctor --
10           MS. BROWN:  When I get an
11       answer, I'll be happy to move on.
12           MS. O'DELL:  Excuse me, I'm
13       not -- you want an answer you want.
14       She's given you an answer to the
15       question.
16           MS. BROWN:  Counsel, form.
17           MS. O'DELL:  Let me finish.
18           MS. BROWN:  But it's form.
19       Federal Rules.
20           MS. O'DELL:  I can say what I'm
21       going to say.
22           MS. BROWN:  Well, we can get
23       the judge.
24           MS. O'DELL:  Fine.

Page 300

1            MS. BROWN:  Your objection is
2        to form.
3            MS. O'DELL:  Fine.  I think
4        Judge Pisano would understand my
5        objection.  And what I've objected to
6        is the fact that you've asked the same
7        question ten times, often with facial
8        expressions, with gestures toward the
9        witness, which is inappropriate under
10       the protocol.  But I'm not being
11       critical of that.  I'm pointing it out
12       for the record.  So if you've got a
13       question, ask it, the doctor will
14       answer it to the best of her ability
15       as she's been doing.  But to keep
16       berating the witness with the same
17       question is really not appropriate.
18           MS. BROWN:  Counsel, your
19       objection under the Federal Rules is
20       to form.  If there's something you'd
21       like to discuss off the record, I'd be
22       happy to do that.  We need to move on
23       here.  We're wasting a lot of time.
24       If Dr. Wolf would answer the question,

Page 301

1    I would be happy to move on.
2            MS. O'DELL:  She's answered
3        your question.
4            You may answer it again --
5    BY MS. BROWN:
6        Q.    Please answer it again,
7    Dr. Wolf.
8            MS. O'DELL:  -- Dr. Wolf, and
9        feel free to give the same answer if
10       it's the same answer.
11       A.    My understanding of your
12   question is, how do -- how do I -- given that
13   African-American women are less likely to get
14   ovarian cancer and given that they use more
15   talcum powder, why don't we see more ovarian
16   cancer from talcum powder in African-American
17   women?  Is that what you're asking?
18   BY MS. BROWN:
19       Q.    No, Doctor.  Have you
20   considered that as a factor that your opinion
21   might not be right?
22           MS. O'DELL:  Object to the
23       form.
24       A.    My opinion is based on a study

76 (Pages 298 to 301)

Judith K. Wolf, M.D.

Page 302

1   of African-American women who use or did not
2   use talcum powder and ovarian cancer in the
3   case-control study of Schildkraut, which was
4   the most recent paper mentioned in the NCI
5   update on talc and ovarian cancer.
6   BY MS. BROWN:
7        Q.   And do you have Schildkraut in
8   front of you?  We marked it as Exhibit 19.
9        A.   I have it.
10       Q.   15, I'm sorry.  One of the
11  things that Schildkraut attempted to address
12  was recall bias as a result of talcum powder
13  lawsuits, correct?
14            MS. O'DELL:  Object to the
15       form.
16  BY MS. BROWN:
17       Q.   And I'll direct you, Doctor,
18  to --
19       A.   Because I'm looking at the
20  primary endpoint of the study and the primary
21  endpoint of the study was to analyze the
22  relationship of genital powder and nongenital
23  powder exposure in African-American women in
24  a case-control study of invasive ovarian

Page 303

1   cancer -- epithelial ovarian cancer in
2   African-American women.
3        Q.   In forming your opinions in
4   this case, did you consider the subgroup
5   analysis that Schildkraut conducted on women
6   who were interviewed before and after the
7   class action lawsuits began in 2014?
8            MS. O'DELL:  Objection to form.
9        A.   I'm looking for those results
10  in the paper.
11  BY MS. BROWN:
12       Q.   In forming your opinion in the
13  case, did you consider those?
14            MS. O'DELL:  Object to the
15       form.
16       A.   I need to remind myself what
17  those results were.
18  BY MS. BROWN:
19       Q.   Okay.  I'll direct you to Table
20  2 of the paper, which in my copy is 1414.
21       A.   I see that.  And what was your
22  question?
23       Q.   Do you recall, based on your
24  review of this paper, that one of the things

Page 304

1   Schildkraut endeavored to do was to determine
2   whether the class action lawsuits in 2014
3   created recall bias in the women who were
4   diagnosed with ovarian cancer?
5        A.   Okay.
6            MS. O'DELL:  Object to the
7       form.
8   BY MS. BROWN:
9        Q.   Do you recall that?
10       A.   I do.
11       Q.   And do you think that that is
12  an important thing for an author of a
13  case-control study to analyze?
14       A.   I do.
15       Q.   And you recall that when
16  Schildkraut analyzed folks who had been
17  interviewed prior to the lawsuits in 2014 and
18  after the lawsuits in 2014, there was a
19  significant difference in the number of
20  people diagnosed with ovarian cancer who
21  reported talcum powder use.  Do you remember
22  that?
23       A.   Well, I'm looking for that -- I
24  see in the query in the table, but I don't

Page 305

1   see a statistical significant difference, and
2   that's what I'm looking for in the results,
3   and I don't see it.  If you know where it is,
4   you can point it out to me.
5        Q.   Here's what I want to ask you
6   about.  In two thousand -- you looked at this
7   table, right, you considered this subgroup
8   analysis?
9        A.   Yes.
10       Q.   Because you would agree with
11  Schildkraut, that recall bias, particularly
12  where there's been a lot of lawsuit
13  attention, is important to investigate,
14  correct?
15            MS. O'DELL:  Object to the
16       form.
17       A.   Recall bias is always something
18  to investigate.
19  BY MS. BROWN:
20       Q.   But it's -- it could be
21  particularly acute in the context of a lot of
22  media attention due to lawsuits, right?
23            MS. O'DELL:  Object to the
24       form.

Page 306

1         A.    Something to look at.
2    BY MS. BROWN:
3         Q.    And one of the things
4    Schildkraut actually did in its analysis, was
5    it controlled for the recall bias -- it tried
6    to control for that recall bias, right?
7         A.    Well, it looked at it, yes.
8         Q.    And the reason it felt it had
9    to control -- he felt -- she felt she had to
10   control for it was because she found a
11   statistically significant effect modification
12   by year of interview, right?
13              MS. O'DELL:  Object to the
14        form.
15   BY MS. BROWN:
16        Q.    And that conclusion is at the
17   end of the results -- second paragraph of the
18   results on page 1413.  Do you recall
19   reviewing that?
20        A.    I don't see anything that says
21   about the year of -- year of review.
22        Q.    The second paragraph in the
23   results section of the paper concludes, "A
24   test for effect modification by year of

Page 307

1    interview was statistically significant with
2    P equaling 0.005."
3              Do you see that?
4              MS. O'DELL:  Object to the
5         form.
6         A.    Okay.  "Although increased,
7    exposure prevalences were not significantly
8    different from those interviewed before
9    2014."
10             So the exposure was no
11   different.
12   BY MS. BROWN:
13        Q.    Well, it was and the authors
14   concluded that they couldn't rule it out as
15   inflating the odds ratios, didn't they?
16             MS. O'DELL:  Objection, form.
17        A.    It was not statistically
18   different.
19   BY MS. BROWN:
20        Q.    They found a statistically
21   significant effect modification.  Do you see
22   that conclusion?
23             MS. O'DELL:  Object to the
24        form.

Page 308

1         A.    What I'm reading, it says, "In
2    2014 and later, we observed an increase in
3    any powder use.  Although increased, these
4    exposure prevalences were not statistically
5    significant for those interviewed before
6    2014."
7    BY MS. BROWN:
8         Q.    Did you consider the author's
9    conclusion that there was a statistically
10   significant effect modification by year of
11   interview when you reviewed this paper?
12             MS. O'DELL:  Object to the
13        form.
14        A.    Yes.  But -- yes, but this does
15   not clarify why that would be, because there
16   was no statistical difference in reported
17   use.
18   BY MS. BROWN:
19        Q.    And what happened, Doctor, if
20   you look at Table 2, is that prior to --
21   those folks who were interviewed about
22   whether or not they had used powder before
23   2014, 34 percent of the controls reported it
24   and about 36 and a half percent of the cases

Page 309

1    reported it, right?
2              MS. O'DELL:  Object to the
3         form.
4    BY MS. BROWN:
5         Q.    Do you see me --
6         A.    I see that.
7         Q.    And then they stratified
8    by interview date and they asked people after
9    the lawsuits if they had used powder, the
10   folks who did not get ovarian cancer reported
11   it at about the same percentage, right, 34.4
12   percent?
13             MS. O'DELL:  Object to the
14        form.
15        A.    Yes, 30 and 42 percent.
16   BY MS. BROWN:
17        Q.    Well, 34 and 34.4.
18        A.    Oh, I'm sorry.  After --
19        Q.    You see that?  Any genital use.
20        A.    Yes.
21        Q.    Okay.  So 34 percent of people
22   who did not have ovarian cancer reported talc
23   use before 2014, right?  And 34.4 percent of
24   people who did not have ovarian cancer

78 (Pages 306 to 309)

Judith K. Wolf, M.D.

Page 310

1  reported talc use after 2014, right?
2      A.   Yes.
3      Q.   That's about exactly the same,
4  correct?
5      A.   Yes.  Yes.
6      Q.   But as it relates to folks who
7  unfortunately were diagnosed with ovarian
8  cancer, those who were asked that question
9  before 2014, 36.5 percent of them reported
10 talc use, right?
11     A.   (Nods head.)
12     Q.   And then that number shot up to
13 51.5 percent after 2014, right?
14         MS. O'DELL:  Object to the
15     form.
16     A.   I see that.
17 BY MS. BROWN:
18     Q.   And what did the authors conclude
19 on page 1416, is that although -- because
20 of -- this is -- I'm reading from 1416, the
21 first full sentence of the second column.
22 "Because of publicity, we adjusted for date
23 of interview.  However, there is still a
24 possibility that recall bias may have caused

Page 311

1  some inflation of the OR" -- or the odds
2  ratios, correct?
3      A.   But if you read the rest of
4  that study, "Our data do not support that
5  recall bias alone before or after 2014 would
6  account for the associations with body powder
7  and epithelial ovarian cancer.  It was not
8  statistically significantly different."
9      Q.   Did you consider the author's
10 finding as it related to recall bias in
11 evaluating the Schildkraut paper?
12     A.   I did.
13     Q.   And would you agree that
14 particularly given the media attention to
15 lawsuits beginning in 2014, that recall bias
16 is a concern of the case-control studies?
17     A.   If there was a statistically
18 significant change and difference in change
19 in reporting, it might -- it might be
20 something to consider, but there was not.
21     Q.   All of the studies that you
22 identified -- or the three studies you
23 identified as being "high quality," were all
24 published after the lawsuits began in 2014,

Page 312

1  correct?
2      A.   Yes.
3      Q.   And what method did you employ
4  to assure yourself that those results were
5  not confounded by recall bias?
6      A.   By reviewing the methods and
7  analyzing the methods, just like we did with
8  this paper.
9      Q.   And what did you find in the Wu
10 article, for example, that leads you to
11 believe that the findings were not the
12 subject of recall bias?
13     A.   I would have to read the Wu
14 materials and methods again.  If you'd like
15 me to, I will.
16     Q.   Well, did you undertake an
17 analysis of the post-2014 papers with an
18 effort to investigate whether the findings
19 were subject to recall bias?  That's my
20 question.
21         MS. O'DELL:  Object to the
22     form.  She's answered your question.
23     A.   When I reviewed all of the
24 papers, that was one of the things -- bias is

Page 313

1  one of the things you wanted to -- I wanted
2  to look at and I looked at.  And if you're
3  asking me specifically about this one, you
4  know, I can read through it and tell you what
5  it was specifically.
6  BY MS. BROWN:
7      Q.   No, I don't need specifics of
8  the study.  I was asking for your
9  methodology.  How do you -- how -- when you
10 evaluate a paper post-2014, how do you --
11 what methodology do you employ to make sure
12 that the results are not inflated by the
13 lawsuit media attention?
14         MS. O'DELL:  Objection to form,
15     asked and answered.
16     A.   In all of the studies, I review
17 the methodology, I look for any evidence of
18 bias, recall bias or anything else.  Not
19 every study compared before 2014 and after
20 2014.  This one did.  They found no
21 significant difference in recall of use.
22 BY MS. BROWN:
23     Q.   They concluded that an
24 inflation of the odds ratio due to recall

79 (Pages 310 to 313)

Judith K. Wolf, M.D.

Page 314

1    bias could not be ruled out. Did you
2    consider that?
3        A.    When you -- when I look at
4    their methods -- that was their -- that was
5    their interpretation of the data as a
6    possible explanation. When I look at the
7    results, the results showed that there was no
8    statistically significant difference between
9    before and after 2014.
10       Q.    And so as it relates to their
11   conclusion, do you discount that?
12           MS. O'DELL: Object to the
13   form.
14       A.    When I read conclusions of this
15   paper or any paper, these are -- these are
16   possible explanations. It's not facts. The
17   facts are the results.
18   BY MS. BROWN:
19       Q.    And did you discount the
20   statistically significant effect modification
21   by interview year and date?
22       A.    No.
23           MS. O'DELL: Object to form.
24       A.    That was statistically

Page 315

1    significant.
2    BY MS. BROWN:
3        Q.    You considered that?
4        A.    Yes.
5            MS. BROWN: Let's take a break.
6            THE VIDEOGRAPHER: Going off
7    the record. The time is 3:24 p.m.
8            (Recess taken from 3:24 p.m. to
9    3:40 p.m.)
10           THE VIDEOGRAPHER: Back on the
11   record. The time is 3:40 p.m.
12   BY MS. BROWN:
13       Q.    Dr. Wolf, in evaluating the
14   talc epidemiology, do you agree with IARC
15   that the use of talcum powder for feminine
16   hygiene is acquired in young adulthood?
17   Approximately 80 percent of the women who use
18   powder start before the age of 25? Do you
19   agree with that?
20       A.    I'm going to agree with you on
21   adulthood.
22       Q.    And so in evaluating the
23   epidemiology here, you assumed that most
24   folks in these studies started using powder

Page 316

1    in young adulthood; is that right?
2            MS. O'DELL: Object to the
3    form.
4        A.    I assumed they started using
5    powder sometime after menarche.
6    BY MS. BROWN:
7        Q.    Okay. And the average age of
8    menarche is 12; is that right?
9        A.    I think it's ten in the US now.
10   I know.
11       Q.    My gosh. Good thing I have
12   boys. You say in your report that the
13   latency period for ovarian cancer is at least
14   20 years, correct?
15       A.    Yes.
16       Q.    Okay. And you would agree with
17   me that most of the prospective studies
18   enrolled women in their sort of mid --
19   middle-age women to postmenopause women, so
20   women in their 40s and 50s, correct?
21       A.    Yes.
22       Q.    And so if those women began
23   using powder, as IARC concludes, in young
24   adulthood, they would have been approximately

Page 317

1    anywhere from, you know, ten- to 20- to
2    30-year users at the time they enrolled in
3    the study, correct?
4            MS. O'DELL: Object to the
5    form.
6        A.    I don't think we know that for
7    sure because they weren't asked when they
8    started or how long they used it.
9    BY MS. BROWN:
10       Q.    Did you consider that WHI did
11   do a subgroup analysis on women who used
12   powder for more than 20 years?
13       A.    Yes.
14       Q.    And what was the finding of
15   that, Doctor?
16       A.    There was not a statistically
17   significant increased risk in those women.
18       Q.    How did -- how does your
19   understanding of when powder use generally
20   begins in women and the latency period for
21   ovarian cancer, how does that inform your
22   critique that the prospective studies are not
23   long enough to detect ovarian cancer?
24           MS. O'DELL: Object to the

80 (Pages 314 to 317)

Judith K. Wolf, M.D.

Page 318

1    form.
2        A.    The only thing that prospective
3    studies looked at was one point in time, so
4    we don't know how long.  You can't -- you
5    can't make a determination of a study based
6    on thinking that's how long they used it.
7    BY MS. BROWN:
8        Q.    Well, if the prospective study
9    asked a 55-year-old if she was a talcum
10   powder user, you would agree with me, based
11   on your understanding of when people began
12   using talcum powder, that she likely started
13   in young adulthood, right?
14       MS. O'DELL:  Objection to form.
15       A.    I think the question was often
16   ever use, and so I don't know if she started
17   in young adulthood and did it for 20 or 30
18   years, or she started at middle age and did
19   it later, or she lived in the North and
20   didn't use it and then moved to the South and
21   started using it because she was hotter,
22   because sweating is often a reason that
23   people -- women give for using powder, and
24   men.  I don't know that I can infer that from

Page 319

1    the data in the study.
2    BY MS. BROWN:
3        Q.    Well, IARC has stated that 80
4    percent of women who use body powder start
5    before the age of 25.  Do you agree with
6    that?
7        MS. O'DELL:  If you need to
8        look at that study --
9        A.    Yeah, I need to look at the
10   IARC paper.
11   BY MS. BROWN:
12       Q.    We have marked that as
13   Exhibit 13.  And it's page 305.
14       A.    I don't see that one, because
15   it's a thick one.  It's not here.
16       Q.    Did we mark IARC --
17       MS. O'DELL:  Here we go.
18       A.    Here we go.
19       MS. O'DELL:  What page?
20       MS. BROWN:  305.
21       MS. O'DELL:  Actually, this is
22   the wrong one.  I'm assuming you're
23   looking at 2010?
24       MS. BROWN:  Yeah.  She had --

Page 320

1    the witness has it.
2        MS. O'DELL:  Do you have the
3    right one?
4        THE WITNESS:  I don't have
5    page 305.
6        MS. O'DELL:  She has 100 C, not
7    2010.
8        THE WITNESS:  I have 100 C.
9    BY MS. BROWN:
10       Q.    Didn't we mark this?
11       A.    It's hiding.  Here it is.  Here
12   it is.
13       MS. O'DELL:  Yeah, sorry,
14   excuse me.
15   BY MS. BROWN:
16       Q.    And so my question was, to
17   orient you, Doctor, I'll direct you to
18   Section B, third paragraph, the conclusion
19   there, that, "The use of talcum powder for
20   feminine hygiene is acquired in young
21   adulthood, since 80 percent of women who use
22   body powder start before the age of 25.  IARC
23   cites Harlow and Weiss from 1989."
24       Do you agree with that?

Page 321

1        A.    Yes.
2        Q.    Okay.  And you know that the
3    Nurses Health Study enrolled women -- middle
4    age women, correct?
5        A.    Postmenopausal women.
6        Q.    Ages 30 to 55 in 1976, and that
7    would have been ages 36 to 61 in 1982, right?
8        A.    I thought we were talking about
9    the Women's Health Initiative.  We're talking
10   about the Nurses Health Study?
11       Q.    Well, one question is Nurses
12   Health.  We'll go to Women's Health next.
13       A.    All right.
14       Q.    And so if most women, majority
15   80 percent, start at age 25, many of the
16   women enrolled in Nurses Health, for example,
17   would have already been using talcum powder
18   for decades prior to enrollment in that
19   study, correct?
20       A.    I'm just adding up.  So they
21   would have been aged 36 to 61.
22       Q.    Correct.
23       A.    So some of them might have,
24   yes.

81 (Pages 318 to 321)

Judith K. Wolf, M.D.

Page 322

1    Q.    Well, at least everyone who was
2  enrolled would have been using it for at
3  least ten years, right?
4         MS. O'DELL:  Object to the
5    form.
6    A.    We don't know that.  We're
7  inferring from another paper where it was
8  reported that 80 percent of women use it
9  before age 25, that women who were asked did
10  they ever use it had been using it their
11  whole -- since age 25.
12  BY MS. BROWN:
13    Q.    And in evaluating the
14  epidemiology, did you make that conclusion?
15         MS. O'DELL:  Object to the
16    form.
17    A.    I didn't make that inference
18  because it wasn't clear in the paper, that
19  that was something that was considered or
20  asked about how long they used it.
21  BY MS. BROWN:
22    Q.    When you evaluated the Nurses
23  Health Study, did you believe that the women
24  ages 36 to 61, who were asked about talcum

Page 323

1  powder use in 1982, had just begun using
2  talcum powder?
3    A.    I don't know have any
4  information --
5         MS. O'DELL:  Object to form.
6    A.    -- to confirm or dispute that.
7  BY MS. BROWN:
8    Q.    Did you consider the
9  information from IARC, that most women who
10  use talcum powder start at age 25?
11         MS. O'DELL:  Object to the
12    form.
13    A.    But in the Nurses Health Study,
14  I don't have that information about when they
15  started.
16  BY MS. BROWN:
17    Q.    My question was, did you
18  consider the information from IARC, that most
19  women who use talcum powder start at age 25?
20         MS. O'DELL:  Object to the
21    form.
22    A.    And my answer is the two are
23  not -- I can't draw a conclusion from one to
24  the other.

Page 324

1  BY MS. BROWN:
2    Q.    In evaluating the Women's
3  Health Initiative data, you did consider the
4  data that they had on folks who reported
5  using powder for more than 20 years, right?
6    A.    Yes.
7    Q.    And you know that that resulted
8  in a nonstatistically significant finding,
9  correct?
10    A.    That's correct.
11    Q.    And so your critique, as it
12  relates to the fact that the cohorts were not
13  long enough, does not relate to the Women's
14  Health Initiative; is that right?
15         MS. O'DELL:  Object to the
16    form.
17    A.    My critique does relate to the
18  Women's Health Initiative, because even if
19  they were using it for 20 -- more than 20
20  years -- let me step back and say this, so
21  that it's clear in my mind.
22         I don't know at what point in
23  their use that 20 years till cancer occurs
24  starts.  I don't know if it's after one dose,

Page 325

1  if it's after a year, if it's after five
2  years, if it's after ten years.  When does
3  that zero point go to 20 years, and I don't
4  think there's any way we can know that.
5  BY MS. BROWN:
6    Q.    Is what you're saying, Doctor,
7  you don't know how much talcum powder
8  exposure is needed to cause ovarian cancer?
9         MS. O'DELL:  Object to the
10    form.
11    A.    I'm saying that in an
12  individual patient, it might take a different
13  amount and different time for ovarian cancer
14  to develop as a result of talcum powder use.
15  And so even guessing when the women started
16  doesn't give me enough information to know
17  when that lag period started or if that lag
18  period is 20 years or if it might be up to 40
19  years, which is reported in some studies as
20  how long it takes to develop cancer from a
21  toxin.
22  BY MS. BROWN:
23    Q.    In your opinion as a
24  gynecologic oncology, what's the latency

Judith K. Wolf, M.D.

Page 326

1  period for ovarian cancer?
2      A.    I'm going to answer you the way
3  I answer all of my patients.  And I don't
4  think we know for sure.  The only data that
5  we actually have that I'm aware of is the
6  Hiroshima data, that 15 to 20 years after the
7  atomic bomb was dropped, but when patients
8  come to me and they say, "How long had I had
9  this cancer?  When did this cancer develop?"
10  Well, we never sit and watch somebody from
11  the time they have the first hint of cancer,
12  to know how long it takes to develop, or
13  somebody who has a precancerous lesion,
14  although there isn't a good one for ovarian
15  cancer, so we don't know the answer to that.
16      Q.    So in fact, Doctor, the latency
17  period for ovarian cancer could be even
18  shorter than 15 or 20 years?
19          MS. O'DELL:  Objection to form.
20      A.    I don't know the latency period
21  for sure.  The only data that I -- you know,
22  that is clear is the data after the bombs,
23  and I think, could it be shorter, could it be
24  longer...

Page 327

1  BY MS. BROWN:
2      Q.    We don't know.  Fair?
3          MS. O'DELL:  Objection to form.
4      A.    I think it's variable.
5  BY MS. BROWN:
6      Q.    Have you evaluated the
7  case-control data and come to an opinion on
8  the amount of time between exposure and
9  development of ovarian cancer based on the
10  case-control data?
11          MS. O'DELL:  Object to the
12      form.
13      A.    So I'm going to answer the same
14  way, in that, I'm not sure that I can, based
15  on an individual person's response to the
16  powder and -- the talcum powder product and
17  dosage, to be able to say what the latency
18  period is.
19          If I have someone who has some
20  other intrinsic sensitivity risk for
21  developing ovarian cancer or risk for
22  developing ovarian cancer if they're exposed
23  to talcum powder product, it might not take
24  as long; it might not take the same amount of

Page 328

1  dose versus somebody else.
2          For instance, the
3  African-Americans who have, genetically, a
4  low -- it appears a low risk of ovarian
5  cancer, there are individual differences in
6  patients' intrinsic risk as well as any
7  external risks.
8  BY MS. BROWN:
9      Q.    Ware you aware of any
10  scientific article that has attempted to
11  quantify the latency period between first
12  exposure to perineal use of talc and the
13  development of ovarian cancer?
14          MS. O'DELL:  Object to the
15      form.
16      A.    As far as my understanding, we
17  don't have that information.  And I think
18  from my interpretation of reading the papers,
19  it might be hard to confirm or deny that.
20  BY MS. BROWN:
21      Q.    Would you agree that one of the
22  limitations of the talc epidemiology is the
23  self-reported nature of talcum powder use and
24  exposure?

Page 329

1          MS. O'DELL:  Objection to form.
2      A.    Anytime there's self-reporting
3  of anything, it's one thing to consider as a
4  potential bias in the study.
5  BY MS. BROWN:
6      Q.    In your review of the talc
7  epidemiology, did you find evidence of a dose
8  response?
9      A.    Some of the papers do show
10  evidence of a dose response and some do not.
11      Q.    Do you agree with the FDA in
12  its 2014 denial of the citizen's petition
13  that dose response evidence is lacking?
14          MS. O'DELL:  Object to the
15      form.
16      A.    I would say that if we look at
17  the -- many of the studies published after
18  2014, there does appear to be a dose
19  response, and so that information wouldn't
20  have been available.  The Wu -- the original
21  Wu study did show a response.  The Cramer
22  study 2016, the Schildkraut study, the
23  Penninkilampi meta-analysis all showed some
24  hint of a dose response.  They wouldn't have

83 (Pages 326 to 329)

Judith K. Wolf, M.D.

Page 330

1    had any of those, except the Wu.
2    BY MS. BROWN:
3        Q.    And those studies did not --
4    for example, Cramer did not show a dose
5    response with duration of use, right?
6        A.    I thought they showed an
7    increase with frequency and duration of use.
8        Q.    And so if you look, for
9    example, at Table 1 of Cramer, we actually
10   see a decrease in the risk after 35 years,
11   right?
12       A.    Can I --
13       Q.    Absolutely.
14       A.    Is that one of the exhibits?
15   Because it's not in there.
16       Q.    Right.
17       A.    Or I can't find it.
18       Q.    We marked it as 11.
19       A.    Yeah.
20           MS. O'DELL:  Here we go.
21       A.    Years used.  So I'm looking at
22   Table 1.  Is that what you're looking at?
23   BY MS. BROWN:
24       Q.    Right.  If you look at the

Page 331

1    years used, you'd agree with me that there's
2    actually a slight decreased risk after 35
3    years of use?
4        A.    But there's an increased risk
5    between 8 and 20, up to 35, and all of those
6    are fairly similar.
7        Q.    And what Cramer himself
8    includes -- concludes, is that the trend for
9    years used was flat, right?
10       A.    Yes.
11       Q.    So what he did not find was
12   that the longer you used talcum powder, a
13   significant increase in your risk of ovarian
14   cancer, correct?
15           MS. O'DELL:  Object to the
16   form.
17       A.    The more frequently you used
18   it, an increase.
19   BY MS. BROWN:
20       Q.    Right.  But as to the number of
21   years, he did not find any dose response,
22   correct?
23       A.    That's correct.
24       Q.    And even to be fair as to the

Page 332

1    frequency, if you look at Table 1 continued
2    on the very next page, there was -- while
3    there was an increase of use up to 7200
4    applications, after 7200 applications, the
5    use decreased, right?
6           MS. O'DELL:  Object to the
7    form.
8        A.    No, the top part of that, it
9    goes up, it goes down, it goes back up.  The
10   bottom part of that -- the last part of that
11   table is assuming 12 months per year
12   missing -- these are people with missing
13   months.
14   BY MS. BROWN:
15       Q.    And so you agree there's not a
16   linear increase in frequency of application,
17   correct?
18       A.    In this paper, there's not a
19   linear increase, but there is an increase
20   with more frequent application.  And I want
21   to say, again, and I think I've said this
22   earlier, is that what's a dose?  Frequency of
23   use, in my head, I can't get my head around,
24   is it the same amount every time?  There

Page 333

1    isn't -- it's not like it's a 5-milligram
2    pill.  It's powder in your panties.  And to
3    look at any of this data and try to
4    equivilate dose, I think it's challenging.
5        Q.    One of the things you say in
6    your report is, given those challenges, the
7    evaluation of a dose response was not as
8    important to your analysis; is that right?
9        A.    Yes.
10           MS. O'DELL:  Object to form.
11   BY MS. BROWN:
12       Q.    And what -- and that's
13   different than the Bradford Hill criteria,
14   right?
15           MS. O'DELL:  Object to the
16   form.
17       A.    That's one of the tenets of the
18   Bradford Hill.  It's not the only one.
19   BY MS. BROWN:
20       Q.    Right.  But in your analysis,
21   you determined that that factor of the
22   Bradford Hill was less important, correct?
23       A.    Because it's hard to
24   quantitate, as I just stated, what's a dose.

84 (Pages 330 to 333)

Judith K. Wolf, M.D.

Page 334

1  Even if you know for sure how many times
2  someone used talcum powder, you don't know
3  what dose they used and where it went. Did
4  it go all in their panties? Did it go on the
5  floor? Did it got in their groins? Did go
6  it up their backside? How much did they use?
7      None of these papers attempted
8  to and understandably it's hard to quantitate
9  how much is a dose. And so given that it's
10  challenging to answer the question about dose
11  response, it's hard to put a lot of weight on
12  that.
13      Q.   And what you say in your report
14  at page 15, is that given the limitations of
15  the data, and those would be the limitations
16  you just described, right?
17      A.   Yes.
18      MS. O'DELL: Objection to form.
19  BY MS. BROWN:
20      Q.   And what that means is that
21  this product, the use of this product is
22  difficult to quantify, correct?
23      MS. O'DELL: Object to the
24      form.

Page 335

1      A.   The dose of using this product
2  is difficult to quantify.
3  BY MS. BROWN:
4      Q.   Right. And when you say "the
5  dose is difficult to quantify," that just --
6  you're referring to just the dose that
7  somebody puts on their perineum or on their
8  underwear, right?
9      MS. O'DELL: Object to form.
10      A.   Their exposure dose, I'm
11  referring to now -- wherever they put it on
12  their perineum.
13  BY MS. BROWN:
14      Q.   So are you -- would you agree
15  that both the amount that they used is
16  difficult to quantify? Fair?
17      A.   Yes.
18      Q.   As well as the amount that
19  actually reaches the ovary, right?
20      MS. O'DELL: Object to the
21      form.
22      A.   The amount they used, the
23  amount that reaches the ovary, their own body
24  sensitivity to whatever amount reaches

Page 336

1  their -- all of those things are hard to
2  quantify.
3  BY MS. BROWN:
4      Q.   Is there any scientific data
5  that you are aware of that shows a particular
6  percentage of perineal powder reaching the
7  ovary?
8      A.   I'm not aware that there's any
9  data that's ever looked at that.
10      Q.   For purposes of your opinion,
11  however, you have assumed that some amount of
12  the powder that's applied perineally reaches
13  the ovary; is that right?
14      MS. O'DELL: Object to the
15      form.
16      A.   I assume that there's migration
17  of talc particles through the open genital
18  tract to get to the ovary.
19  BY MS. BROWN:
20      Q.   And for your opinion to hold
21  true, that talcum powder that reaches the
22  ovary causes ovarian cancer, is there a
23  particular amount of talcum powder in your
24  mind that needs to reach the ovary?

Page 337

1      MS. O'DELL: Objection to form.
2      A.   I think -- I have no idea what
3  that amount would be and I don't know that
4  that amount is the same for everyone.
5  BY MS. BROWN:
6      Q.   Is there any scientific
7  literature on which you rely that establishes
8  that individuals are susceptible to talcum
9  powder in a different way?
10      A.   Individuals are susceptible to
11  all cancer risk factors in a different way.
12  Everyone who has a BRC1 mutation doesn't get
13  ovarian cancer. Everyone who has a lynch
14  syndrome mutation doesn't get colon cancer.
15  There are individual differences in risk
16  factors. And everyone who uses
17  postmenopausal hormones doesn't get ovarian
18  cancer or breast cancer. So there are
19  individual differences. Everybody's made up
20  differently, has a different immune response.
21  So it only makes sense to me that if it's
22  different in every other circumstance, it's
23  going to be different in talcum powder use
24  exposure.

85 (Pages 334 to 337)

Judith K. Wolf, M.D.

Page 338

1      Q.    Based on your review of the
2  epidemiology, is it your opinion that
3  individuals are put at risk for ovarian
4  cancer through perineal exposure more likely
5  than through inhalation of genital talcum
6  powder?
7          MS. O'DELL:  Object to the
8      form.
8      A.    In my review of the
10  epidemiology, all of the studies are
11  particularly looking at perineal exposure.
12  So through -- through that lens, I believe
13  that most of the information in those studies
14  is looking at that particular question,
15  perineal exposure, not necessarily
16  inhalation.
17  BY MS. BROWN:
18      Q.    When you're evaluating a
19  patient for a suspected ovarian cancer, do
20  you inquire about any markers of asbestos
21  exposure, like pleural plaques or
22  mesothelioma or anything like that,
23  interstitial fibrosus?
24      A.    Do I inquire about them?  Do

Page 339

1  you mean do I investigate --
2      Q.    Yes.
3      A.    -- if they have any of those,
4  yes.
5      Q.    Do you believe that if talcum
6  powder was contaminated with asbestos, that
7  it would be causing asbestos-related
8  diseases, like mesothelioma?
9          MS. O'DELL:  Object to the
10      form.
11      A.    Do I believe that if talcum
12  powder is contaminated with asbestos, would
13  it cause mesothelioma?
14  BY MS. BROWN:
15      Q.    Uh-huh.
16      A.    That's your question?  I do
17  believe that talcum powder is contaminated
18  with asbestos and I believe that it causes --
19  it can increase the risk of both mesothelioma
20  of the ovary and epithelial ovarian cancer.
21  And I'm investigating for any signs of
22  abnormality in the chest, I'm looking for any
23  abnormalities, evidence of mesothelioma or
24  any other abnormalities in the chest that may

Page 340

1  or may not be related to the patient's
2  cancer.
3      Q.    Have you -- in connection with
4  that opinion, Dr. Wolf, have you evaluated
5  the epidemiology on the miners and millers of
6  cosmetic talcum powder?
7      A.    I believe that's in the IARC
8  paper or study.
9      Q.    You recall that IARC points to
10  that as some of the best evidence, that
11  inhalation of nonasbestiform talc is not
12  carcinogenic?
13          MS. O'DELL:  Object to the
14      form.
15      A.    I don't recall that specific
16  conclusion.  I'd have to look at it again.
17  So are we talking about IARC 10?  Which one
18  are you --
19  BY MS. BROWN:
20      Q.    I'm just asking if you recall
21  and if you considered that conclusion?
22          MS. O'DELL:  Could you repeat
23      the question, please?
24

Page 341

1  BY MS. BROWN:
2      Q.    Do you recall and did you
3  consider IARC's conclusion, that some of the
4  best epidemiology as it relates to inhalation
5  of a nonasbestiform talc, is the miners and
6  the millers of cosmetic talc?
7      A.    I do recall that.
8      Q.    Does that make sense to you as
9  a gynecologic oncologist, that one of the
10  best places to look in the epi world would be
11  the folks who are exposed to inhalation the
12  most?
13          MS. O'DELL:  Object to the
14      form.
15      A.    It makes sense to look at a
16  group of people who are going to be exposed.
17  BY MS. BROWN:
18      Q.    And in concluding, as you have
19  done here today, Doctor, that cosmetic talcum
20  powder is contaminated with asbestos, how, if
21  at all, did you consider the results of the
22  miners and miller studies that IARC points to
23  as some of the best evidence?
24          MS. O'DELL:  Object to the

86 (Pages 338 to 341)

Judith K. Wolf, M.D.

Page 342

1    form, asked and answered.
2        A.    So I'm not sure what you're
3    asking.  What I believe I'm hearing is,
4    you're asking if there's asbestos in talcum
5    powder, why don't miners and millers get
6    ovarian cancer?
7    BY MS. BROWN:
8        Q.    Exactly.  Have you considered
9    the fact that that epidemiology shows no
10   mesothelioma?
11           MS. O'DELL:  Object to the
12       form.
13       A.    That's a different question,
14   because I'm not talking about mesothelioma.
15   I'm talking about epithelial ovarian cancer.
16   BY MS. BROWN:
17       Q.    And a second ago I asked you if
18   you thought that talc was contaminated with
19   asbestos and people were really breathing it
20   in, shouldn't it be causing mesothelioma in
21   women?  And I thought your testimony was yes.
22           MS. O'DELL:  Object to the
23       form.
24       A.    No, you asked me do I

Page 343

1    investigate if women who I think might have
2    ovarian cancer might have abnormalities in
3    the chest, including abnormalities associated
4    with mesothelioma, and I said, yes, I do,
5    because women with ovarian cancer often have
6    abnormalities in the chest.  Usually if they
7    do, it's from their ovarian cancer, but
8    certainly I'm looking at any other potential
9    cause.
10   BY MS. BROWN:
11       Q.    Understood.  Bad question on my
12   part.  We're missing each other.  If -- you
13   hold the opinion that talcum powder is
14   contaminated with asbestos.  And my question
15   is, if that were true, shouldn't we be seeing
16   mesothelioma in the miners and the millers of
17   cosmetic talcum powder?
18           MS. O'DELL:  Object to the
19       form.
20       A.    I'm not sure how to answer
21   that, because I think that talcum powder has
22   multiple components that could cause cancer.
23   Is it only the asbestos that could be --
24   certainly, in people who work in mines,

Page 344

1    there's a lot of abnormalities in the lung
2    from breathing in talcum powder.  And I'm
3    losing myself because I'm not sure of the
4    question again.  Should -- can you -- let me
5    tell you what I think you're asking me.
6    BY MS. BROWN:
7        Q.    Why don't I just rephrase the
8    question and try to do this bit by bit.
9        A.    Okay.
10       Q.    You would agree that
11   mesothelioma is a disease that is often
12   caused by asbestos exposure?
13       A.    Yes.
14       Q.    Some people refer to it as a
15   signature asbestos-related disease, correct?
16           MS. O'DELL:  If you know.
17       A.    I don't know that term
18   "signature."  That's not something that --
19   BY MS. BROWN:
20       Q.    And you have offered the
21   opinion here today that talcum powder is
22   contaminated with asbestos, right?
23       A.    Yes.
24       Q.    And you have offered the

Page 345

1    opinion that perineal use of talcum powder
2    could reach the ovaries via inhalation,
3    correct?
4        A.    Yes.
5        Q.    And so my question to you is,
6    if talcum powder is really contaminated with
7    asbestos and if women who use it perineally
8    really do inhale it, shouldn't they be
9    getting asbestos-related diseases like
10   mesothelioma?
11           MS. O'DELL:  Object to the
12       form.
13       A.    I'm going to say that they
14   might.
15   BY MS. BROWN:
16       Q.    And in forming that opinion,
17   have you considered the epidemiology on the
18   miners and millers of cosmetic talcum powder?
19       A.    Yes.  That we just talked
20   about.
21       Q.    Okay.  And those studies show
22   that the folks with the highest, highest
23   exposure to cosmetic talcum powder via
24   inhalation, don't get mesothelioma, right?

87 (Pages 342 to 345)

Judith K. Wolf, M.D.

---

Page 346

1    MS. O'DELL: Object to the
2  form.
3    THE WITNESS: Are you just
4  objecting?
5    MS. O'DELL: Yes.
6    THE WITNESS: I wasn't sure if
7  I was supposed to answer or not.
8    A.    In that study, those patients
9  did not get mesothelioma.  So again, the
10  question is, might talcum powder applied
11  perineally cause ovarian cancer by -- via an
12  inhalation route?  Yes, I think that could
13  happen.  Do I think those people should be
14  getting mesothelioma, because I have evidence
15  that that talcum powder is contaminated with
16  mesothelioma?  I don't know.  Maybe.
17  BY MS. BROWN:
18    Q.    Did you look, in evaluating the
19  occupational studies that IARC relies on in
20  concluding that heavy occupational exposure
21  to asbestos causes ovarian cancer, did you
22  look at how the relative risks for ovarian
23  cancer in those studies compared to the
24  relative risks for mesothelioma?

---

Page 347

1    A.    Yes.
2    Q.    And what was the conclusion
3  there, Doctor?
4    A.    The relative risks of
5  mesothelioma is higher.
6    Q.    By how much?
7    A.    I can't remember.  A lot.
8    Q.    Okay.  So do you recall seeing
9  relative risks for ovarian cancers in the 1.5
10  to 2.5 range?
11    A.    Yeah.
12    Q.    And for mesothelioma in the 40
13  range?
14    A.    Yes.
15    Q.    And so if someone is truly
16  exposed to heavy amounts of asbestos through
17  inhalation, they -- based on that data that
18  IARC considered, they're far more likely to
19  get mesothelioma than ovarian cancer, right?
20    MS. O'DELL: Object to the
21  form.
22    A.    If people are exposed to heavy
23  doses of asbestos, they're more likely to get
24  mesothelioma than ovarian cancer, yes.

---

Page 348

1  BY MS. BROWN:
2    Q.    Does your current institution,
3  the Community Health Practice, does it advise
4  women that perineal use of talcum powder
5  causes ovarian cancer?
6    A.    So in my practice, it's me, a
7  physician's assistant and a nurse
8  practitioner and one other GYN oncologist.  I
9  do, my physician's assistant does, my nurse
10  practitioner does.  I don't know about my
11  partner.
12    Q.    And we talked a little bit
13  earlier about when you started that practice.
14  Do you recall when you started telling
15  patients your belief that talcum powder use
16  causes ovarian cancer?
17    A.    I started asking my patients
18  about their use and telling them to stop or
19  not use it once I started reviewing all of
20  the literature and formed my opinion.
21    Q.    You made a motion, all the
22  literature that's in front of you, right?
23    A.    Yes.
24    Q.    So you --

---

Page 349

1    MS. O'DELL: Which is not just
2  in front of you, but we're talking
3  about what's on the side table as
4  well.
5    THE WITNESS: Yes.
6    MS. BROWN: Fair.
7  BY MS. BROWN:
8    Q.    So to be clear, you started the
9  practice of asking patients if they used
10  talcum powder after you had undertaken review
11  of the literature in connection with your
12  expert work, correct?
13    MS. O'DELL: Object to the
14  form.
15    A.    After I undertook review of the
16  literature.
17  BY MS. BROWN:
18    Q.    And I understand that you
19  undertook a review of the literature in
20  connection with your expert work, right?
21    A.    That's when I read all of the
22  literature -- began reading all of the
23  literature.  I was aware of some of the data,
24  but when I began reviewing all of the

---

88 (Pages 346 to 349)

Judith K. Wolf, M.D.

Page 350

```
 1   literature, yes.
 2       Q.   Okay.  And so prior to that
 3   time, it was not your practice to ask
 4   patients whether or not they used talcum
 5   powder, correct?
 6       A.   Not as a routine.  However, if
 7   I saw somebody who, when I examined them,
 8   obviously was using talcum powder, I
 9   recommended they not use it.  They stop.
10       Q.   Do you agree, Doctor, that much
11   about ovarian cancer is shrouded in mystery,
12   from causes to early detection to effective
13   treatments?
14           MS. O'DELL:  Object to the
15   form.
16       A.   I would not agree with that
17   statement.
18   BY MS. BROWN:
19       Q.   Let's mark this as Exhibit 20.
20           (Deposition Exhibit 20 marked
21   for identification.)
22   BY MS. BROWN:
23       Q.   Handing you, Doctor, an article
24   entitled "The Future of Ovarian Cancer
```

Page 351

```
 1   Diagnosis is Now - Through These 4
 2   strategies," by Judy Wolf, November 11th,
 3   2015.  Is this an article that you wrote,
 4   Doctor?  First of all, is that your picture
 5   next to Judy Wolf on the first page?
 6       A.   It is.
 7       Q.   Okay.  And this article, dated
 8   November 11th, 2015, has your byline and
 9   picture, right?
10       A.   It does.
11       Q.   Okay.  And do you recall,
12   during the time period that you were in the
13   private sector, authoring a number of
14   articles that were posted on a website called
15   nopelvicmass.com?
16       A.   Yes.
17       Q.   And was this one of those
18   articles potentially?
19       A.   Yes.  Yes.
20       Q.   Okay.  And as we just -- as I
21   just read, the article that has your picture
22   and name on it says, "So much about ovarian
23   cancer is shrouded in mystery, from causes to
24   early detection to effective treatments."
```

Page 352

```
 1           Right?
 2       A.   Yes.
 3       Q.   And as of November 2015, that
 4   was information that you signed off on,
 5   correct?
 6       A.   Yes.
 7       Q.   Okay.  And so as of
 8   November 2015, you do not believe that one of
 9   the well-known causes of ovarian cancer is
10   talcum powder use.  True?
11       A.   I can't remember the time.  I
12   can tell you that this was used as part of
13   patient information in relationship to the
14   company that I was working, and the point of
15   this was not to talk about risk factors.  It
16   was to talk about the importance of diagnosis
17   and informing women, the general lay
18   population, about getting to a gynecologic
19   oncologist if they had a pelvic mass.
20       Q.   The information contained in
21   Exhibit 20 was meant for patients who --
22       A.   For women.
23       Q.   For women.
24       A.   For women.
```

Page 353

```
 1       Q.   Okay.  And certainly as a
 2   doctor, as a gynecologic oncologist, you
 3   think it's important to be truthful with
 4   women when you write about issues concerning
 5   women's health, right?
 6           MS. O'DELL:  Object to the
 7   form.
 8       A.   I don't see anything on here
 9   that was -- is untruthful.
10   BY MS. BROWN:
11       Q.   I'm not suggesting that.  I was
12   just asking you, that when you write, as you
13   do often, information about women's health,
14   you'd agree it's important to be truthful?
15       A.   Yes.
16       Q.   Because the intended recipient
17   of your writing are women who have or may
18   have ovarian cancer, right?
19       A.   Yes.
20           (Deposition Exhibit 21 marked
21   for identification.)
22   BY MS. BROWN:
23       Q.   I'm handing you, Doctor, what
24   we have marked as Exhibit 21 to your
```

Judith K. Wolf, M.D.

Page 354

1  deposition. This is another article with
2  your name and picture, entitled "How to find
3  the best doctor for ovarian cancer." Do you
4  recall writing this article?
5      A.    Not specifically, but I know I
6  did a lot of these while I was working at
7  Vermillion.
8      Q.    Okay. And just to close the
9  loop, Exhibit 20, even though you don't
10 necessarily recall writing it, you don't
11 dispute this is something that you did write,
12 correct?
13     A.    I'm not disputing that.
14     Q.    Okay. And the same for
15 Exhibit 21, you don't dispute that this
16 article is something you wrote in December of
17 2015?
18     A.    That's correct.
19     Q.    Okay. And this, again, was an
20 article aimed at folks who -- women who may
21 be concerned about ovarian cancer, correct?
22     A.    Yes.
23     Q.    And one of the things you did
24 in this article was to identify risk factors

Page 355

1  for ovarian cancer. True?
2      A.    All listed here are familiar
3  risk factors.
4      Q.    And the title of the section
5  you have in this -- well, first, you say,
6  "What are the odds," right? The odds of
7  getting ovarian cancer, right? And you say
8  one place to start is by considering your
9  risk factors. True?
10     A.    Yes.
11     Q.    All right. And then you state,
12 "You're more likely to be at risk of ovarian
13 cancer if" -- and then you have a number of
14 bullets, correct?
15     A.    Yes. And all of those bullets
16 relate to genetic risk.
17     Q.    Exactly. And so the first
18 deals with a first-degree relative, right?
19     A.    Yes.
20     Q.    The second is a prior history
21 of breast cancer, correct?
22     A.    Yes.
23     Q.    The third is a prior history of
24 breast cancer and a relative with breast or

Page 356

1  ovarian cancer, right?
2      A.    Yes.
3      Q.    And then the fourth is close
4  relatives with a history of breast cancer or
5  ovarian cancer at any age, right?
6      A.    Yes.
7      Q.    And then the fourth and fifth
8  have to do with the Ashkenazi Jewish
9  heritage, correct?
10     A.    Yes.
11     Q.    And one of the things you did
12 not list in December of 2015 as a risk factor
13 for ovarian cancer, was genital use of talcum
14 powder, correct?
15     A.    I did not use -- list any
16 nonhereditary risk.
17     Q.    And that would include talcum
18 powder, correct?
19     A.    Including talcum powder,
20 endometriosis, obesity, any hormonal
21 replacement.
22     Q.    Sorry. Are you done?
23     A.    I'm done.
24     Q.    And that's in part, Doctor,

Page 357

1  because in December of 2015, you had not
2  formed the opinion that genital use of talcum
3  powder causes ovarian cancer. True?
4          MS. O'DELL: Object to the
5  form.
6      A.    That was prior to my doing any
7  of the review of all the literature.
8  BY MS. BROWN:
9      Q.    Right. And so at the time of
10 these articles, that Exhibit 20 and 21, you
11 did not hold the opinion that talcum powder
12 use perineally causes ovarian cancer,
13 correct?
14     A.    I wasn't convinced, as I am
15 today.
16     Q.    Have you done any prior expert
17 work, Dr. Wolf?
18     A.    No.
19     Q.    Have you reviewed any
20 individual plaintiff cases who are suing in
21 the talcum powder litigation?
22     A.    No.
23     Q.    Okay. Has the extent of your
24 involvement in the talcum powder litigation

90 (Pages 354 to 357)

Judith K. Wolf, M.D.

Page 358

1  related to the report that we've been
2  discussing today?
3      A.  Yes.
4      Q.  Okay.  And in total, does it
5  sound about right to you, you've charged the
6  plaintiffs' lawyers for about 83 hours in
7  connection with your work?
8      A.  That seems about right.
9      Q.  And your rate is $600 an
10 hour --
11     A.  Yes.
12     Q.  -- is that correct?  And how
13 did you come up with that rate?
14     A.  I asked -- I asked my friend
15 Ali, what do people usually charge for this
16 kind of thing, and then I kind of picked a
17 rate in -- what I felt like was in the
18 middle.
19     Q.  And so if I wanted to know how
20 much money the plaintiffs' lawyers have paid
21 you in total for your work in the talc
22 litigation, I could multiply 600 by 83 and
23 that should be about right?
24     A.  That should be about right.

Page 359

1      Q.  Do you have any additional
2  plans to do additional expert work for the
3  plaintiffs in the talc litigation?
4      A.  I mean, completing out whatever
5  happens with this case.
6      Q.  Other than what we're here
7  about today, right?
8      A.  That's -- that's all I have
9  planned.
10     Q.  Do you have a website in
11 connection with your current practice?
12     A.  I do.
13     Q.  And do you indicate on your
14 website that talcum powder causes ovarian
15 cancer?
16     A.  I don't believe I talk about
17 any risk -- specific risk factors for ovarian
18 cancer.  That website is to introduce
19 patients to who I am and how I like to
20 practice.
21     Q.  Do you have any plans to
22 publicize your belief that talcum powder
23 causes ovarian cancer?
24     A.  I actually do plan to take my

Page 360

1  report and the references and write a review
2  paper and submit it for publication.
3      Q.  Have you done any work to that
4  end yet, Doctor?
5      A.  I haven't.
6      Q.  Do have you have any journals
7  in mind where you intend to submit that
8  review?
9      A.  I haven't decided for sure yet.
10 The journals that I read the most and most
11 GYN oncologists read, are the GYN Oncology,
12 the Journal of Clinical Oncology, The Gray
13 Journal, the ACOG journal, which is called
14 The Green Journal.  So I would probably
15 choose one of those because clinicians read
16 them.
17     Q.  Are you a member of ACOG?
18     A.  I am.
19     Q.  And are you a member of SGO?
20     A.  I am.
21     Q.  And in forming your opinions in
22 this case, did you consider the risk factors
23 that ACOG and SGO recognize for ovarian
24 cancer?

Page 361

1      A.  Yes.
2      Q.  And are you aware that in their
3  patient-facing websites, as well as any of
4  their publicly related information about
5  ovarian cancer, neither SGO nor ACOG
6  identifies perineal use of talcum powder as a
7  risk factor for ovarian cancer?
8      A.  I am aware of that.
9      Q.  And do you believe that the
10 doctors and the scientists at SGO and ACOG
11 simply have not reviewed all of the data
12 regarding perineal use of talcum powder and
13 ovarian cancer?
14     A.  It's my understanding that most
15 of the GYN oncologists probably have not
16 reviewed the literature to the extent of
17 which I have reviewed it.  And given that the
18 volume of literature has increased recently,
19 it takes time for societies like SGO and ACOG
20 to come up with an opinion.  It has to go
21 through a committee and various steps to come
22 out.  I don't think this is something that's
23 risen to their attention enough.  That's part
24 of the reason that I want to write a paper

91 (Pages 358 to 361)

Judith K. Wolf, M.D.

Page 362

1  about it, to help inform my colleagues.
2      Q.    Have you contacted anyone at
3  ACOG or SGO and told them that you think they
4  need to update their website and list that
5  talcum powder causes ovarian cancer?
6      A.    I haven't yet.
7      Q.    Do you intend to do that?
8      A.    I intend to write a letter to
9  SGO with my concerns, asking them to review
10  it. I think that's the first step, is they
11  have to review the literature on their own.
12      Q.    And you have been doing this
13  talcum powder work for the plaintiffs'
14  lawyers for a little over a year now; is that
15  right?
16      A.    Yes.
17      Q.    And during that time period,
18  you haven't contacted any of your
19  professional organizations to inform them of
20  your view that talc causes ovarian cancer?
21          MS. O'DELL:  Object to the
22  form.
23      A.    I have talked to individual
24  colleagues who practice GYN oncology, and I

Page 363

1  have talked to the National Ovarian Cancer
2  Coalition Medical Advisory Board, of which
3  I'm on the board.  I used to be on the
4  advisory board.  And at the time that I
5  raised it, there wasn't a lot of interest in
6  pursuing it.
7  BY MS. BROWN:
8      Q.    And so one of the organizations
9  you referenced and to your credit have done a
10  lot of work with, is the National Ovarian
11  Cancer Coalition, right?
12      A.    Yes.
13      Q.    And as you well know, as
14  someone who's been very active in that
15  organization, they too have a statement on
16  talcum powder, right?
17      A.    Yes.
18      Q.    And the National Ovarian Cancer
19  Coalition does not believe that the evidence
20  supports that talcum powder causes ovarian
21  cancer, right?
22          MS. O'DELL:  Object to form.
23      A.    That's what their statement
24  says.

Page 364

1  BY MS. BROWN:
2      Q.    Okay.  And it sounds like you
3  nonetheless, have raised the issue with some
4  folks at the coalition, correct?
5      A.    Yes.
6      Q.    And it sounds like they don't
7  agree with your assessment, correct?
8          MS. O'DELL:  Object to the
9  form.
10      A.    The last time I raised it,
11  which was in the spring, at the meeting that
12  is in conjunction with the Society of GYN
13  Oncology, they didn't want to address it,
14  they didn't want to take it on as something
15  to review.
16  BY MS. BROWN:
17      Q.    But do you think, generally,
18  the doctors and the scientists at
19  organizations like ACOG and SGO and the
20  National Ovarian Cancer Coalition are working
21  very hard to protect women's health issues?
22          MS. O'DELL:  Object to the
23  form.
24      A.    I think that all of those

Page 365

1  societies and many other advocacy groups are
2  doing what they think is best to protect
3  women's health.
4  BY MS. BROWN:
5      Q.    Have you considered the
6  possibility that these folks at ACOG, at SGO,
7  at NCI, at FDA, at IARC have reviewed the
8  same data that you have and come to a
9  different conclusion?
10          MS. O'DELL:  Object to the
11  form.
12      A.    I don't have all of the
13  information about what they've reviewed or
14  not reviewed.  And some of those, I know that
15  they didn't have all of the data and some of
16  them, like the National Ovarian Cancer
17  Coalition, I know they haven't reviewed the
18  data.  I don't know that SGO has done that at
19  any time recently.  If you go to their
20  website, they refer you to ACOG.  So I can't
21  make that statement.
22  BY MS. BROWN:
23      Q.    You don't have those -- sitting
24  here as someone who's been active in the

Judith K. Wolf, M.D.

Page 366

1  women's health field for almost 30 years, you
2  don't have any reason to believe that the
3  folks at ACOG, SGO, FDA, NCI, CDC have not
4  kept up-to-date with the talc and ovarian
5  cancer epidemiology?
6        MS. O'DELL: Object to the
7     form, misstates her testimony, assumes
8     things not in the record.
9        A.    My assumption is that some
10  people in all of those have probably read
11  some of the data. I'm not sure who, if
12  anyone, in any of those has looked at all of
13  the evidence in the way that I have done.
14  BY MS. BROWN:
15        Q.    And the way that you've looked
16  at the evidence is by using sort of your
17  interpretation of Bradford Hill; is that
18  right?
19        MS. O'DELL: Object to the
20     form.
21        A.    I would say evidence-based
22  medicine and then using the tenets of
23  Bradford Hill to explain how I interpreted
24  the data that I reviewed.

Page 367

1  BY MS. BROWN:
2        Q.    I'm sorry to interrupt. And
3  your methodology, though, as it relates to
4  Bradford Hill, employs a methodology that has
5  less reliance on dose response, right?
6        MS. O'DELL: Object to the
7     form.
8        A.    Not less reliance on dose
9  response, just that in this particular case,
10  determining what the dosage is makes it hard
11  to determine the dose response.
12  BY MS. BROWN:
13        Q.    And you say in your report that
14  you consider that a less important factor,
15  right?
16        MS. O'DELL: Object to the
17     form.
18  BY MS. BROWN:
19        Q.    And so that's your report on
20  page 15, I think we talked about this
21  earlier, "Given the limitations of the data,
22  I consider this to be a less important factor
23  compared to strength of association,
24  consistency and biologic mechanism"?

Page 368

1        A.    Because there's limitations in
2  the data that we'll never know the answer to.
3        Q.    And as it relates to strength
4  of the association, in your review of the
5  data, what is the relative risk associated
6  with talcum powder use and ovarian cancer?
7        MS. O'DELL: Object to the
8     form.
9        A.    The overall -- looking at the
10  studies as a whole, 1.3 to 1.4 odds ratio.
11  BY MS. BROWN:
12        Q.    And do you consider that to be
13  a strong association?
14        A.    I consider it to be a
15  consistent, reliable association. It doesn't
16  have to be a high number, and Bradford Hill
17  explains that in FedEx paper, that it's the
18  consistent association and finding that
19  association. It doesn't have -- it's not
20  number dependent.
21        Q.    You'd agree that 1.3 and 1.4 is
22  not a high relative risk?
23        MS. O'DELL: Object to the
24     form.

Page 369

1        A.    1.3 and 1.4 is not 10, but 1.2
2  was the risk of hormone -- postmenopausal
3  hormone replacement therapy, and I believe
4  that's a real risk also.
5  BY MS. BROWN:
6        Q.    Have you considered in your
7  review of the epi, the FDA's concern that the
8  studies that have found small positive
9  associations have lower confidence limits
10  that are pretty close to 1? Have you looked
11  into that?
12        MS. O'DELL: Object to the
13     form.
14        A.    So when the odds ratio's 1.3,
15  your confident intervals might be close to 1
16  sometimes. However, if it doesn't cross 1,
17  it's statistically significant.
18  BY MS. BROWN:
19        Q.    And one of the reasons -- do
20  you understand why the FDA is concerned if
21  the confidence interval is getting close to
22  1?
23        A.    That it might be by random
24  chance, yes.

Judith K. Wolf, M.D.

Page 370

1    Q.    And do you share that concern
2  as you evaluate the confidence intervals
3  here?
4    A.    If I didn't see such a
5  consistent average of 1.3 to 1.4, I would be
6  more concerned about it.  As a whole, I'm not
7  concerned about it when I look at all of the
8  evidence.
9    Q.    And when you say "consistent,"
10  you're referring within the population
11  case-control studies, right?
12    MS. O'DELL:  Object to the
13    form.
14    A.    Yes.
15  BY MS. BROWN:
16    Q.    Because if you look at the
17  prospective cohorts, there's not consistency
18  in the case controls, right?
19    A.    When you look at the
20  meta-analyses, everything as a whole, yes,
21  1.3 to 1.4.
22    Q.    Okay.  If you bear with me for
23  just one minute, Dr. Wolf, I want to just
24  make sure I'm not forgetting anything and

Page 371

1  then I'm going to turn the questioning over
2  to some of my colleagues.
3    When you say on page 8, "The
4  risk elevation is 20-60 percent," do you
5  think it's more like 30 to 40?
6    A.    I think if you look at all the
7  papers, some of them are 20 and some of them
8  are as high as 60.
9    Q.    And, of course, if the actual
10  risk is as high as 60, Narod's critique is
11  not accurate.  Fair?
12    A.    That's the range of what's been
13  reported.  The average is 1.3 to 1.4, and I
14  believe that's what he estimated the 200,000
15  on.
16    Q.    Did you understand him to be
17  estimating how many he needed to study if the
18  true relative risk was 1.2?
19    A.    I don't remember if it was 1.2
20  or 1.3.
21    Q.    Okay.  Real quick, Doctor, I
22  want to just make sure I understand your
23  opinion as it relates to the composition of
24  talcum powder.  Do you believe that -- list

Page 372

1  for me everything, other than talc, that you
2  believe is in Johnson & Johnson baby powder
3  and causes ovarian cancer.
4    MS. O'DELL:  Object to the
5    form.
6    A.    What I believe is in talcum
7  powder product and that can be -- cause
8  inflammation and/or be carcinogenic is platy
9  talc, fibrous talc, asbestos, heavy metals,
10  including nickel, chromium and cobalt, and
11  fragrance products that can be irritating and
12  inflammatory.
13  BY MS. BROWN:
14    Q.    And you have not formed an
15  opinion in connection with your analysis, as
16  to how much each of the items that you just
17  listed make up baby powder, right?
18    MS. O'DELL:  Of a particular
19    bottle, over time or --
20    MS. BROWN:  Any --
21    MS. O'DELL:  -- what's the
22    context of the question?
23    MS. BROWN:  At all.
24

Page 373

1  BY MS. BROWN:
2    Q.    I mean, have you attempted to
3  quantify how much heavy metal is in baby
4  powder?
5    A.    I haven't attempted to quantify
6  it.  The fact that there's any heavy metal in
7  there that's carcinogenic is of concern.
8    Q.    And what are you relying on for
9  your opinion that there's heavy metals in
10  baby powder?
11    A.    So that I believe is in Julie
12  Pier's -- let me find it -- deposition.
13  Julie Pier -- Exhibit 47.
14    Q.    Other than Exhibit 47 to Julie
15  Pier's deposition, are you relying on
16  anything else to support your opinion that
17  baby powder products are contaminated with
18  heavy metals?
19    A.    And also the testing by Longo
20  and Rigler.
21    Q.    Other than Julie Pier, Longo
22  and Rigler, are you relying on anything else
23  to support your opinion that heavy metals
24  contaminate Johnson & Johnson baby powder

94 (Pages 370 to 373)

Judith K. Wolf, M.D.

Page 374

1  products?
2      A.   No.
3      Q.   And as to asbestos, we reviewed
4  your reliance materials before.  You're
5  relying on the articles you pointed me to,
6  Hopkins Exhibit 28, Blount's testimony and
7  her '91 article and Longo's reports, to
8  support your opinion that talcum powder
9  contains asbestos, correct?
10     A.   And also the deposition of
11 Julie Pier.
12     Q.   And again, as it relates to
13 asbestos, you haven't made a determination as
14 to how much asbestos is contaminating talcum
15 powder, right?
16         MS. O'DELL:  Object to the
17     form.
18     A.   I've made a determination that
19 these testings show evidence of asbestos in a
20 significant amount of talcum powder that was
21 tested.
22 BY MS. BROWN:
23     Q.   Okay.  But in terms of how much
24 asbestos is in an individual bottle, you

Page 375

1  haven't attempted to quantify that, right?
2      A.   I haven't and it wouldn't
3  change my opinion.
4      Q.   Okay.  As it relates to fibrous
5  talc, what are you relying on for your
6  opinion that fibrous talc is contained in
7  Johnson & Johnson baby powder products?
8      A.   I don't have it referenced
9  here, but my understanding is that it's hard
10 to get pure platy talc and it's always
11 contaminated with some fibrous talc and I
12 can't tell you where I've seen it, but I've
13 seen it -- reports as small as 2 percent, as
14 high as 20 percent.
15     Q.   And sitting here today, you're
16 not sure of the site for that 2 to 20 percent
17 fibrous talc?
18     A.   I'm not.  No.
19     Q.   Other than platy talc, 2 to 20
20 percent fibrous talc, some amount of heavy
21 metals and some amount of asbestos, is there
22 anything else you believe is in Johnson &
23 Johnson baby powder products that causes
24 ovarian cancer?

Page 376

1          MS. O'DELL:  Object to the
2      form.
3      A.   I didn't say these cause
4  ovarian cancer.  I say that they're known to
5  be carcinogenic and could be the cause of why
6  talcum powder products causes ovarian cancer.
7  And the other thing in there that I know can
8  be inflammatory, from reading Dr. Crowley's
9  report, are some of the fragrances that are
10 used.  And since inflammation is a risk
11 factor and an initiator in -- leads -- is
12 related to the progression of ovarian cancer,
13 I have concerns about those.
14 BY MS. BROWN:
15     Q.   And your opinion, then, Doctor,
16 as I understand it, is that you're not sure
17 which or what combination of all the items
18 you just listed to me are working to cause
19 cancer; is that right?
20         MS. O'DELL:  Object do the
21     form.
22     A.   My opinion is that it's the
23 talcum powder product as a whole that
24 increases the risk of ovarian cancer, and

Page 377

1  I've listed things that I know are in there
2  that can be carcinogenic or inflammatory.
3  BY MS. BROWN:
4      Q.   And to be clear, though, you
5  don't have an opinion as to the amounts of
6  any of the items you just listed for me as
7  they appear in baby powder, right?
8          MS. O'DELL:  Object to the --
9      object to the form.
10 BY MS. BROWN:
11     Q.   That was a bad question.
12 Here's what I want to know.  I understand
13 your opinion is based on your assumption that
14 fragrance, platy talc, fibrous talc, heavy
15 metals and asbestos are in Johnson &
16 Johnson's products, correct?
17         MS. O'DELL:  Object to the
18     form.
19     A.   It's in talcum powder product.
20 BY MS. BROWN:
21     Q.   And that would include Johnson
22 & Johnson's products, correct?
23     A.   Would include any talcum powder
24 product.

95 (Pages 374 to 377)

Judith K. Wolf, M.D.

Page 378

```
 1        Q.   Are you of the opinion that --
 2   we need to change the tape.  Sorry.
 3           THE VIDEOGRAPHER:  Going off
 4      the record.  The time is 4:40 p.m.
 5           (Recess taken from 4:40 p.m. to
 6      4:52 p.m.)
 7           THE VIDEOGRAPHER:  This marks
 8      the beginning of disk 4.  Back on the
 9      record.  The time is 4:52 p.m.
10   BY MS. BROWN:
11        Q.   Dr. Wolf, before we took a
12   break, we were discussing your opinion that
13   J&J's talcum powder products contain
14   fragrances, platy talc, fibrous talc, heavy
15   metals and asbestos.  Do you recall that?
16        A.   I do.
17        Q.   And my question for you,
18   Doctor, is it your opinion that J&J's talcum
19   powder products contained all of those things
20   at all periods of time?
21        A.   Well, what I know for sure and
22   what testing that I've seen shows, that
23   evidence of asbestos, heavy metals from the
24   '70s through the '90s and testing looking for
```

Page 379

```
 1   fibrous talc at that same time -- actually
 2   Longo tested for fibrous talc too and found
 3   it in 41 of 42 specimens.  I don't know about
 4   the fragrance because I don't know how long
 5   this particular fragrance formulation has
 6   been used, if it's been -- how long it's been
 7   there.  And platy talc and fibrous talc I
 8   would assume have always been there.
 9        Q.   Have you done any investigation
10   into the different source mines J&J has used
11   over the years for its talcum powder
12   products?
13        A.   They have used talcum powder
14   from Vermont, from Italy -- I think Italy
15   first and then Vermont and then China.
16        Q.   And do you believe that the
17   components of talcum powder have changed over
18   time?
19        A.   I believe that there's probably
20   slight differences coming from different
21   areas in the world.  But as far as I can
22   tell, the testing that I have seen throughout
23   the Italian and Vermont and into early Asian,
24   which I assume meant China, testing, that
```

Page 380

```
 1   there's evidence of asbestos at least.
 2        Q.   And that's the Longo testing
 3   you referred to earlier?
 4        A.   Yes.
 5        Q.   Okay.  Final question -- final
 6   area of questioning, Dr. Wolf, would be
 7   page 20 of your report.  To be clear, you
 8   believe that the mechanism by which talcum
 9   powder causes cancer is chronic inflammation;
10   is that right?
11        A.   This is a reference page.  Are
12   you looking at a different page?
13        Q.   Page 12 of your report?
14           MS. O'DELL:  You said 20.
15        A.   You said 20.
16   BY MS. BROWN:
17        Q.   Sorry.  Tired.
18        A.   I know.  I understand.  I
19   believe it's inflammation that leads to
20   oxidative stress that then causes DNA damage,
21   and I believe with Saed's most recent papers,
22   that it actually induces gene mutations that
23   change ovarian epithelial cells and culture.
24        Q.   Do you rely on anyone else,
```

Page 381

```
 1   other than Dr. Saed, for your opinion that
 2   talcum powder is -- do you believe that talc
 3   is genotoxic?
 4        A.   I believe that Dr. Saed's paper
 5   that he found gene -- point gene mutations
 6   after application of talc -- talcum powder.
 7        Q.   Do you believe that talcum
 8   powder is genotoxic to ovarian cells?
 9        A.   I believe that his paper shows
10   that there's genetic mutations that occur
11   with exposure to talcum powder.
12        Q.   Independent of inflammation?
13        A.   Independent of inflammation.
14        Q.   So in fact, you think there are
15   two ways by which talcum powder can cause
16   ovarian cancer:  Chronic inflammation and
17   genetic mutations, correct?
18           MS. O'DELL:  Object to the
19      form.
20        A.   So chronic inflammation that
21   leads to changes within the cell and changes
22   the oxidative state that then causes,
23   secondarily, cytokine stimulation and changes
24   in the cell, and then Saed's paper also shows
```

96 (Pages 378 to 381)

Judith K. Wolf, M.D.

Page 382

1  evidence of gene -- point gene mutations that
2  change the oxidative state of the cell to a
3  prone inflammatory state.
4  BY MS. BROWN:
5      Q.    And other than Dr. Saed's work,
6  are you relying on any other published
7  literature to support your belief that talc
8  is genotoxic?
9          MS. O'DELL:  Object to the
10     form.
11     A.    Dr. Saed's work, as per my
12  review, is the most convincing data that I've
13  seen of genetic changes, separate from
14  inflammatory changes, when talc was exposed
15  to both ovarian epithelial cells, ovarian
16  cancer cell lines and fallopian tube
17  epithelial cell lines.
18  BY MS. BROWN:
19     Q.    And one of the papers you cited
20  for us in your early footnotes, lists sort of
21  a weight of the hierarchy of evidence.  Do
22  you recall that paper?
23         MS. O'DELL:  Object to the
24     form.

Page 383

1  BY MS. BROWN:
2      Q.    You had a footnote 4 and 5,
3  some cites that dealt with sort of he weight
4  of the evidence, generally.  Do you remember
5  those?
6      A.    I just want to see what they
7  are, 4 and 5.
8      Q.    Footnote 4 and 5.
9      A.    These are talking about the
10  difference between cohort studies and
11  meta-analysis?
12     Q.    Right.  And they contained a
13  chart with a hierarchy of evidence.  Do you
14  recall reviewing that?
15     A.    Yes.
16     Q.    And you would agree that expert
17  witness opinions are the very lowest rung of
18  that chart?
19         MS. O'DELL:  Object to the
20     form.
21     A.    I've referenced those charts in
22  relationship to evaluating cohort studies and
23  meta-analysis studies.
24

Page 384

1  BY MS. BROWN:
2      Q.    And finally, Doctor, you
3  reference on page 12, in support of your
4  opinion -- page 12 of your report in support
5  of your opinion, that talcum powder causes
6  inflammation and oxidative stress in vitro
7  and in vivo.  You reference the NTP study; is
8  that right?
9      A.    Yes.
10     Q.    Have you reviewed the FDA's
11  analysis of that NTP study?
12     A.    I'm aware that they had some
13  concerns about the analysis.
14     Q.    Do you share the concerns and
15  the -- first of all, you understand the FDA
16  concluded that the paper had serious flaws,
17  right?
18         MS. O'DELL:  Object to the
19     form.
20     A.    I understand that the FDA had
21  concerns about the paper.
22  BY MS. BROWN:
23     Q.    Do you share those concerns?
24     A.    I think that the NTP toxicology

Page 385

1  studies of talc is one of the pieces of
2  evidence that I believe supports that
3  inflammation occurs after talcum powder
4  application and can cause -- be a
5  carcinogenic -- mechanism of carcinogenesis.
6      Q.    Do you agree with the
7  conclusion of the 1994 FDA workshop, that the
8  NTP study has no relevance to human risk?
9          MS. O'DELL:  Object to the
10     form.
11     A.    I believe that the NTP study
12  helps as an informative, along with all of
13  the other studies listed there, that talcum
14  powder causes inflammation and oxidative
15  stress in ovarian cells and in cells in
16  general and that this can be carcinogenic.
17  It's a piece of the evidence, not the whole
18  evidence.
19  BY MS. BROWN:
20     Q.    Finally, Doctor, before I turn
21  the questioning over to my colleague, you
22  testified a little earlier that you plan to
23  write a review article based on the
24  information contained in your report?

97 (Pages 382 to 385)

Judith K. Wolf, M.D.

Page 386

1    A.    Yes.
2    Q.    Do you have plans to disclose
3  your work as an expert witness when you
4  author that publication?
5    A.    Of course I would.
6    Q.    Would you plan to disclose the
7  amount of money that you've made working for
8  plaintiffs' lawyers in connection with that
9  litigation -- paper?
10    MS. O'DELL:  Object to the
11  form.
12    A.    As I've never written a
13  paper -- as I've never been an expert witness
14  before, I don't know what you need to
15  disclose as far as that.  I know that if you
16  have grant or funding for anything, you
17  disclose the amount and who it's from.  I'm
18  assuming it would be the same for this, but I
19  don't know.  I would check with the journal
20  and see what was required and do whatever was
21  appropriate.
22  BY MS. BROWN:
23    Q.    And finally, Doctor, do you
24  know of any scientific support for the

Page 387

1  opinions that women who have had children
2  have a stretched-out vaginal tract such that
3  migration is more likely?
4    MS. O'DELL:  Object to the
5  form.
6    A.    I wouldn't put -- I would never
7  say that women who have had children have a
8  stretched-out vaginal tract.  All women have
9  an open vaginal tract.  Women who have had
10  multiple vaginal deliveries may or may not
11  have a larger opening to their vagina than
12  women who do not.
13  BY MS. BROWN:
14    Q.    You haven't seen any data to
15  suggest that having more kids increases your
16  risk of ovarian cancer because more
17  carcinogens can migrate to your ovaries,
18  right?
19    MS. O'DELL:  Object to the
20  form.
21    A.    So that seems like a multistep
22  question.  I do believe that at least one of
23  the case-control studies looked at parity as
24  a possible risk factor.  Personally, I don't

Page 388

1  think you can make the step to say that it's
2  because their vagina was stretched out more.
3    MS. BROWN:  Thanks for your
4  time today, Dr. Wolf.  I'm going to
5  hand it over to my colleague.
6    Can we go off for a second?
7    MR. KLATT:  Yeah, let's do
8  that.
9    THE VIDEOGRAPHER:  Going off
10  the record.  The time is 5:02 p.m.
11    (Recess taken from 5:02 p.m. to
12  5:06 p.m.)
13    THE VIDEOGRAPHER:  Back on the
14  record.  The time is 5:06 p.m.
15    EXAMINATION
16  BY MR. KLATT:
17    Q.    Good afternoon, Dr. Wolf.
18    A.    Good afternoon.
19    Q.    My name is Mike Klatt and I
20  represent Imerys Talc America in this case.
21  You said earlier that you were aware that
22  Imerys is a mining company, correct?
23    A.    That's correct.
24    Q.    I'm going to skip around,

Page 389

1  because I've just been following what's been
2  going on today and I just have a lot of
3  questions in different areas.  So there's
4  probably not going to be necessarily a
5  logical progression.  So if you'll just bear
6  with me, I'd appreciate it.
7    A.    Okay.
8    Q.    A minute ago, I believe that
9  Ms. Brown asked you, that if you end up
10  writing a letter or a review article to any
11  organization about talc and ovarian cancer,
12  you think it's important to disclose that
13  you've been an expert in litigation regarding
14  talc and ovarian cancer, correct?
15    A.    Yes.
16    Q.    Do you think it's important
17  that you specifically disclose that you've
18  been a retained, paid witness for plaintiffs
19  in talc ovarian cancer in making that
20  disclosure?
21    A.    Again, I've never been an
22  expert witness before.  I don't know what the
23  rules of what I have to disclose, so that
24  anyone who reads my article can read it with

98 (Pages 386 to 389)

Judith K. Wolf, M.D.

Page 390

1    all of the information.  Whatever the journal
2    said I needed to disclose, I would disclose.
3        Q.    But don't you think it's
4    important for your readers to know which side
5    you're involved in in this litigation?
6        MS. O'DELL:  Object to the
7        form.
8        A.    I don't know if that's
9    something that is routinely done.  If it is,
10   I definitely would do that.
11   BY MR. KLATT:
12       Q.    But I'm asking if you,
13   personally, think that's an important fact to
14   disclose.  Wouldn't you want to know that if
15   you were a doctor not involved in this in
16   reading an article, which side the person who
17   authored the article was testifying for?
18       MS. O'DELL:  Object to the
19       form.
20   BY MR. KLATT:
21       Q.    Would that be important to you
22   to know?
23       A.    I would want to know all the
24   information that I could know.  I'm assuming

Page 391

1    that that's information that would be
2    required to be disclosed and I would disclose
3    it.
4        Q.    Okay.  Can you look at Exhibit
5    No. 4, which is Dr. Saed's manuscript.
6        A.    Yes.
7        Q.    That's not a published article,
8    correct?
9        A.    It's an accepted article.
10       Q.    Well, it hasn't even been peer
11   reviewed yet, correct?
12       A.    No, it has been peer reviewed.
13       Q.    Can you hand me the article?
14   Do you see how on multiple pages, virtually
15   every page in blueprint, it says "for peer
16   review"?
17       A.    Yes.
18       Q.    So that's being submitted for
19   peer review, correct?
20       MS. O'DELL:  Object to the
21       form.
22       A.    It has been submitted.  It has
23   been reviewed.
24       THE WITNESS:  Do we have the

Page 392

1    letter somewhere?
2        MS. O'DELL:  Uh-huh.
3        A.    And it has been accepted with
4    some reviewer comments, which Dr. Saed
5    addressed.  I gave counsel one that was not
6    marked.
7        THE WITNESS:  Is it on the
8        back?
9        A.    Oh, yes, here.
10   BY MR. KLATT:
11       Q.    And are there any peer review
12   or comments compared -- put forth in what
13   you're looking at?
14       A.    The reviewer's -- yeah.  Say
15   that question again.
16       Q.    When people peer review an
17   article --
18       A.    Yes.
19       Q.    -- they submit comments,
20   correct?
21       A.    Yes.
22       Q.    Suggestions for revising the
23   article or adding data or adding explanation
24   or whatever, correct?

Page 393

1        A.    Yes.
2        Q.    Where are those comments
3    regarding Saed's article in what you're
4    looking at?
5        A.    There's nothing here.  There's
6    also a letter from Dr. Saed when he sent the
7    paper back in with the comments from the
8    reviewers and his addressing of those
9    comments.  This article has the changes that
10   the reviewer has recommended.
11       Q.    Have you seen this other
12   document that has the peer reviewer comments?
13       A.    I have.
14       Q.    I'm sorry?
15       A.    I have seen his letter.  I
16   don't recall that it has all the specific
17   comments.  It has what he's viewing as him
18   addressing the comments, but I don't know if
19   there are comments or --
20       Q.    Do you have that letter with
21   you?
22       A.    I thought I had it.
23       MS. O'DELL:  No.  I mean, I
24       think there may be some confusion on

Judith K. Wolf, M.D.

Page 394

1     that point.
2     BY MR. KLATT:
3         Q.    Well, if there's anything else
4     regarding Dr. Saed that you've reviewed that
5     you haven't brought here and marked as an
6     exhibit, we'd request that, please.
7         A.    Okay.
8         Q.    Is that fine with you?
9         A.    Yes.
10        Q.    Now, looking at Dr. Saed's
11    manuscript that's been marked as Exhibit 4,
12    I'm going to turn you to --
13            THE WITNESS:  Do I have my own
14        copy of that?  Yes, here it is.
15    BY MR. KLATT:
16        Q.    I'm going to turn you to
17    page 12 of Exhibit 4.
18        A.    Yeah.
19        Q.    And do you see down at the
20    bottom of the page, it says "Conflict of
21    Interest"?
22        A.    Yes.
23        Q.    It says, "The corresponding
24    author, Dr. Ghassam Saed, acted as a

Page 395

1     consultant regarding this topic for a fee,
2     otherwise, the authors declared that there
3     are no conflicts of interest."
4             There's no disclosure there
5     that Dr. Saed's involved in litigation on
6     behalf of plaintiffs in talc ovarian cancer
7     cases, is there?
8             MS. O'DELL:  Object to the
9         form.
10        A.    My assumption is that what
11    Reproductive Scientists [sic] requested be
12    disclosed is what is stated here.  And so
13    this is what it says.
14    BY MR. KLATT:
15        Q.    Who paid the fee to Dr. Saed
16    for doing this work?
17        A.    This particularly doesn't say.
18    I'm assuming that attorneys paid the fee.
19        Q.    Do you know who paid?
20        A.    I believe that in support of
21    some of this data -- of this research that he
22    received money from Beasley Allen.
23        Q.    Okay.  Other than Beasley
24    Allen, what contributors to this work are

Page 396

1     listed here?
2         A.    Beasley Allen isn't listed here
3     either.
4             MS. O'DELL:  Object to form.
5         A.    It just says he received a
6     consulting fee.  So I don't know where else
7     the money -- what other money he used.
8     BY MR. KLATT:
9         Q.    But Beasley Allen isn't even
10    listed here, as you said, as a source of the
11    money for his work, correct?
12            MS. O'DELL:  Object to the
13        form.
14        A.    That's correct.
15    BY MR. KLATT:
16        Q.    Okay.  This isn't an adequate
17    conflict of interest disclosure, is it?
18            MS. O'DELL:  Object to the
19        form.  If you know.  Don't guess.
20        A.    I'm assuming that this is the
21    conflict of interest that they requested from
22    Reproductive Scientists [sic], and if they
23    accept it, then I consider it adequate.
24

Page 397

1     BY MR. KLATT:
2         Q.    So whatever the journal says is
3     adequate is adequate in your mind?
4             MS. O'DELL:  Object to the
5         form.
6     BY MR. KLATT:
7         Q.    Is that what you're saying?
8         A.    I'm saying that as far as --
9     this is what's disclosed.  The journal
10    accepted the article.  I'm assuming they
11    considered it was adequate disclosure.
12        Q.    But if you're a physician, a
13    gynecologic oncologist out there in the
14    field, not involved in the talc ovarian
15    cancer litigation and you ultimately read
16    Dr. Saed's paper in Reproductive Scientists
17    [sic], aren't you going to want to know that
18    he was a paid witness for the plaintiffs in
19    that litigation?
20            MS. O'DELL:  Object to the
21        form.
22    BY MR. KLATT:
23        Q.    That's something you'd want to
24    know, isn't it?

100  (Pages 394 to 397)

Judith K. Wolf, M.D.

Page 398

1    MS. O'DELL: Object to the
2 form.
3    A.    If I had questions about
4 exactly where the money came from, I would
5 call Dr. Saed and ask him.
6 BY MR. KLATT:
7    Q.    Have you ever done that for any
8 article you've read in a journal?
9    A.    I haven't.
10    Q.    What do you know about the
11 Journal of Reproductive Sciences?
12    A.    I don't know that much about
13 it. It's not a journal that I routinely
14 read.
15    Q.    And as a gynecologic
16 oncologist, there's a certain set of journals
17 that you routinely review, correct?
18    A.    Yes.
19    MS. O'DELL: Object to the
20 form.
21 BY MR. KLATT:
22    Q.    And Reproductive Sciences is
23 not one of those, right?
24    A.    It is not one of those.

Page 399

1    Q.    Had you ever heard of it
2 before?
3    A.    I can't tell you if I've ever
4 heard of it. I've heard of lots of journals
5 over the years and I don't remember all of
6 them.
7    Q.    You don't remember of ever
8 hearing of Reproductive Sciences before you
9 saw Exhibit 4, correct?
10    A.    I can't recall.
11    Q.    Now, earlier, you said in
12 response to Ms. Brown's questions, that
13 things that you feel like may be playing a
14 role in talc-based body powder products and
15 ovarian cancer, if I got it right, were platy
16 talc; is that right?
17    MS. O'DELL: Object to the
18 form. If you're going to go -- I'll
19 object each time, but I object to the
20 preparatory language.
21 BY MR. KLATT:
22    Q.    What things in talc-based body
23 powder products do you think cause ovarian
24 cancer?

Page 400

1    A.    In talcum-based body products,
2 my concerns for carcinogenesis are platy
3 talc, fibrous talc, asbestos, heavy metal,
4 specifically the ones that have been found,
5 nickel, chromium and cobalt and inflammation
6 from the fragrances, which I know that
7 inflammation is associated with ovarian
8 cancer and so I have concerns about all of
9 those.
10    Q.    Well, having concerns is one
11 thing, but testifying based on a reasonable
12 degree of medical certainty that these things
13 are, in fact, a cause of ovarian cancer is a
14 different thing. So is it your opinion that
15 all of these items, platy talc, fibrous talc,
16 asbestos, nickel, chromium, cobalt and
17 fragrance are contributing causes of ovarian
18 cancer in women who use talc-based body
19 powder products?
20    MS. O'DELL: Object to the
21 form.
22    A.    It's my opinion that
23 talcum-based -- perineum use of talcum-based
24 body products causes ovarian cancer in some

Page 401

1 women and increases the risk in all. When I
2 look to see what is in it that could be
3 dangerous, potentially dangerous to women, I
4 see some things that are known to be
5 carcinogenic, such as fibrous talc and
6 asbestos and heavy metals. I see some things
7 that are possibly carcinogenic, such as platy
8 talc, and I see fragrances that are known to
9 be irritating and causing inflammation.
10 BY MR. KLATT:
11    Q.    Do you think any one of those
12 things by itself is capable of causing
13 ovarian cancer in women who use talc-based
14 body powder products?
15    A.    I didn't evaluate the data that
16 way and I don't look at the product that way.
17 I'm looking at it as a whole.
18    Q.    So if you testify in the
19 hearing of Judge Wolfson this year and she
20 asks you, because judges can ask witnesses
21 questions, which one of these items that
22 you've mentioned are capable by themselves of
23 causing ovarian cancer in women using
24 talc-based body powder products, you're going

101 (Pages 398 to 401)

Judith K. Wolf, M.D.

Page 402

```
 1   to tell her you can't tell her which one of
 2   these is capable by itself?
 3          MS. O'DELL:  Object to the
 4   form, misstates her testimony.
 5       A.   I'm going to tell her just what
 6   I said, that I evaluated the product as a
 7   whole and I found evidence of multiple
 8   carcinogenic, possibly carcinogenic and
 9   inflammatory substances that could account
10   for that.  Because they're all in the
11   product, I can't separate them out and say
12   which one is causing it.
13   BY MR. KLATT:
14       Q.   And you can just say that they
15   possibly cause it, correct, not that they
16   probably cause it?
17          MS. O'DELL:  Object to the
18   form, misstates her testimony.
19   BY MR. KLATT:
20       Q.   You just said "possibly."
21   Didn't I understand that?
22          MS. O'DELL:  Object to the
23   form.  That's not what she said.
24
```

Page 403

```
 1   BY MR. KLATT:
 2       Q.   Let's read it back.  I think
 3   you just said "possibly cause," correct?
 4          MS. O'DELL:  Object to the
 5   form.
 6       A.   No, that's not what I said.  I
 7   said there are multiple that are
 8   carcinogenic, possibly carcinogenic and
 9   inflammatory.
10   BY MR. KLATT:
11       Q.   So you're saying they're
12   possibly carcinogenic --
13       A.   No, I'm saying some of the
14   agents --
15       Q.   Let me finish -- not probably
16   carcinogenic, correct?
17          MS. O'DELL:  Excuse me.
18       A.   No.
19          MS. O'DELL:  Excuse me, let me
20   object.  Object to the testimony --
21   excuse me, object to the question
22   because it misrepresents her
23   testimony.
24          You may answer if you
```

Page 404

```
 1   understand.
 2       A.   So let me list them again.
 3   Platy talc has been determined to be possibly
 4   carcinogenic, asbestos has been determined to
 5   be carcinogenic, fibrous talc has been
 6   determined to be carcinogenic, nickel and
 7   chromium are -- have been determined to be
 8   carcinogenic, cobalt has been determined to
 9   be possibly carcinogenic, and the
10   fragrances -- some of the substances in the
11   fragrance are known to be inflammatory or
12   cause -- inflammatory or irritating.
13          And therefore, when I look at
14   the product of the whole, with all of that
15   spectrum of stuff in it, things in it, that
16   at the very least some are, the fragrances
17   are inflammatory and/or irritating and at the
18   very most, several are known to be
19   carcinogenic, that it's the combination of
20   that that increases the risk of ovarian
21   cancer in women who use perineal talcum
22   powder product.
23   BY MR. KLATT:
24       Q.   Are any of these things that
```

Page 405

```
 1   you've listed by themselves capable of
 2   causing ovarian cancer in women who use
 3   talc-based body powder products?
 4       A.   I'm not aware that anybody has
 5   looked at using any of those things by
 6   themselves to cause -- to assess the risk of
 7   ovarian cancer.  And since the product
 8   contains all of them, I don't know how that
 9   can be evaluated.
10       Q.   So if you evaluated the
11   talc-based body powder product as a whole
12   with all these things in them, you weren't
13   just evaluating Imerys raw talc by itself,
14   correct?
15          MS. O'DELL:  Object to the
16   form.
17       A.   I was evaluating the product.
18   BY MR. KLATT:
19       Q.   The product as used by women?
20       A.   The product as used by women --
21   the product as used by women.
22       Q.   Which is the product that sold
23   off the shelf, correct?
24          MS. O'DELL:  Object to the
```

Judith K. Wolf, M.D.

Page 406

1    form.
2        A.    The product that women could
3    obtain to use on their perineum.
4    BY MR. KLATT:
5        Q.    From retail stores, correct?
6            MS. O'DELL:  Object to the
7    form.
8        A.    From wherever they get it.
9    BY MR. KLATT:
10       Q.    And you understand Imerys
11   doesn't sell any talc directly to women?
12       A.    I understand that.
13       Q.    And you understand fragrance is
14   added after the talc leaves Imerys'
15   possession?
16       A.    I understand that.
17       Q.    Do any and all forms of
18   inflammation cause or contribute to ovarian
19   cancer?
20       A.    In the studies on inflammation
21   in ovarian cancer, it's -- and most cancers
22   and inflammation, it's the concern of chronic
23   inflammation.  T cells, lymphocytes, macro
24   fascias causing changes in the oxidation

Page 407

1    making free -- oxygen free radicals that can
2    cause changes in the DNA.  Not so much
3    concerned about acute inflammation, but
4    chronic inflammation.
5        Q.    Do all forms of chronic
6    inflammation cause ovarian cancer?
7        A.    I'm not sure what forms of
8    chronic inflammation you're asking about.
9        Q.    Well, are you saying that
10   chronic inflammation inevitably can cause
11   ovarian cancer?
12       A.    Chronic inflammation is a cause
13   of ovarian cancer.  You could have chronic
14   inflammation and not get ovarian cancer.
15       Q.    Are you aware that corn
16   starch-based body powder can cause
17   granulomas, adhesions, fibrous tissue
18   reactions and it's been banned by the FDA
19   from surgical gloves and from patient
20   examination gloves?
21       A.    I am aware of that.
22       Q.    Does the granulomas and
23   adhesions and fibrosus that corn starch
24   causes in patients cause ovarian cancer?

Page 408

1        A.    There's never been any evidence
2    of that, that I'm aware of.
3        Q.    When you -- you've done
4    abdominal surgeries on hundreds, if not maybe
5    even thousands of women in your career,
6    correct?
7        A.    Yes.
8        Q.    Now, that surgery itself can
9    cause fibrosis, inflammation and adhesions,
10   correct?
11       A.    That's correct.
12       Q.    And those adhesions can be
13   long-term complications for women, correct?
14       A.    Yes.
15       Q.    And that's a form of
16   inflammation, correct?
17       A.    It's a form of acute
18   inflammation that leads to a scar or
19   fibrosis.
20       Q.    And that's exactly what talc
21   leads to, correct?
22            MS. O'DELL:  Object to the
23   form.
24       A.    There's not evidence of chronic

Page 409

1    inflammation in adhesions secondary to
2    surgery.  There's an acute reaction and
3    change and then fibrosis can occur, and
4    that's what adhesions are, are fibrosis.
5    BY MR. KLATT:
6        Q.    And that's what happens when
7    talc in sufficient amounts is placed inside
8    the body, the exact same thing, correct,
9    Dr. Wolf?
10           MS. O'DELL:  Object to the
11   form.
12       A.    It's one of the things that can
13   happen when talc is placed inside the body.
14   BY MR. KLATT:
15       Q.    Well, is there anything else
16   other than that type of tissue reaction that
17   talc can cause?
18           MS. O'DELL:  Object to the
19   form.
20       A.    Yes.  When talcum powder --
21   when talc was placed, in an animal study, in
22   the bursa of rat's ovaries, there was
23   proliferation and precancerous changes in the
24   ovaries.

103 (Pages 406 to 409)

Judith K. Wolf, M.D.

Page 410

1  BY MR. KLATT:
2      Q.   Did those animals develop
3  ovarian cancer?
4      A.   They did not.  But they were
5  sacrificed in a short period of time.
6      Q.   Can you name for me a single
7  animal study that you've ever seen, where
8  talc caused ovarian cancer in the animals?
9      A.   I cannot.
10      Q.   Can you name -- in fact, can
11  you name for me any animal study you've ever
12  seen, where asbestos put in animals caused
13  ovarian cancer?
14          MS. O'DELL:  Object to the
15  form.
16      A.   So ovarian cancer is quite rare
17  in most animals and so it's very difficult to
18  have an animal model of something that causes
19  ovarian cancer.
20  BY MR. KLATT:
21      Q.   You know there's animal models
22  of peritoneal mesothelioma due to asbestos,
23  correct?
24      A.   I do.

Page 411

1      Q.   Are there animal models that
2  show that asbestos instilled in animals'
3  abdominal cavities can cause ovarian cancer?
4      A.   Not that I'm aware of.
5      Q.   Do you warn women before you do
6  surgery on them, that your surgery can cause
7  inflammation and adhesion -- long-term
8  adhesion formation that could cause ovarian
9  cancer?
10          MS. O'DELL:  Object to the
11  form.
12      A.   I inform my patients that
13  surgery can cause inflammation and adhesions.
14  BY MR. KLATT:
15      Q.   Can that cause ovarian cancer?
16      A.   Not the adhesions that are
17  formed from the acute inflammation from
18  surgery.  I would also say that 90-plus
19  percent of my patients, their ovaries come
20  out when I operate on them.
21      Q.   How do you know that these
22  long-term adhesions that result from
23  abdominal surgery that you've done on
24  hundreds of patients doesn't result in

Page 412

1  ovarian cancer?
2          MS. O'DELL:  Object to the
3  form.
4      A.   Are you asking about my
5  anecdotal experience?
6  BY MR. KLATT:
7      Q.   No, I'm asking you for the
8  medical evidence that you know, that these
9  types of long-term adhesions resulting from
10  surgery itself don't cause ovarian cancer in
11  your patients?
12      A.   I'm not aware of any literature
13  that suggests or supports that.
14      Q.   Has it ever been studied?
15      A.   I'm not aware of any studies
16  that have been published about that.
17      Q.   Well, if it hasn't been
18  studied, you can't say it doesn't cause
19  ovarian cancer, can you?
20          MS. O'DELL:  Object to the
21  form.
22  BY MR. KLATT:
23      Q.   You just don't know?
24          MS. O'DELL:  Object to the

Page 413

1  form.
2      A.   I haven't seen any studies
3  about it.
4  BY MR. KLATT:
5      Q.   So if something is not studied,
6  that means it doesn't occur?
7          MS. O'DELL:  Object to the
8  form.
9      A.   That's not what I said.
10  BY MR. KLATT:
11      Q.   Right.  Simply because there's
12  no studies doesn't prove that adhesions after
13  surgery don't cause ovarian cancer, correct?
14          MS. O'DELL:  Object to the
15  form.
16  BY MR. KLATT:
17      Q.   You'd have to do studies to
18  know that.
19          MS. O'DELL:  Excuse me.  Object
20  to the form.
21      A.   I don't believe those are
22  studies that could be done.
23  BY MR. KLATT:
24      Q.   So there are no such studies

104 (Pages 410 to 413)

Judith K. Wolf, M.D.

Page 414

1    that you're aware of, correct?
2        A.    Not that I'm aware of.
3        Q.    You cited about 20 Imerys
4    documents in -- as something that
5    materials that you considered.
6        A.    Yes.
7        Q.    Is that correct?
8        A.    Uh-huh.
9        Q.    Were you give a much larger set
10   of Imerys documents and you picked those 20
11   or were those 20 handpicked for you by the
12   lawyers?
13           MS. O'DELL:  Object to the
14       form.
15       A.    Those documents were provided
16   to me by the lawyers.
17   BY MR. KLATT:
18       Q.    So you didn't look at a much
19   larger set of Imerys documents yourself and
20   select those 20 yourself, correct?
21       A.    The one that -- ones that are
22   listed on my contributing data list are the
23   ones that I saw.
24       Q.    The only ones you saw, correct?

Page 415

1        A.    Yes.
2        Q.    And those were picked by the
3    lawyers and not by you?
4           MS. O'DELL:  Object to form.
5        A.    Those were given to me by the
6    lawyers.
7    BY MR. KLATT:
8        Q.    You said earlier -- you
9    referred to Julie Pier, an Imerys scientist,
10   her Exhibit 47 in her MDL deposition.  Do you
11   recall that?
12       A.    Yes.
13       Q.    You can't point to me to a
14   single talc sample that she tested in
15   Exhibit 47 that you can show me ended up in
16   talc-based body powders, can you?
17           MS. O'DELL:  Object to the
18       form.
19       A.    Can I look at it?
20   BY MR. KLATT:
21       Q.    Sure.
22       A.    What I see on here is the date,
23   what the material was, who did the testing,
24   what the sample was, what the test revealed,

Page 416

1    who the company -- what the company it came
2    from, and the mine, if it's -- if it's noted,
3    and any comments.
4        Q.    But my point is, you don't know
5    that any of these talc samples ended up in
6    any body powder products, correct?
7        A.    I don't have that information
8    on these.
9           MS. O'DELL:  Object to form.
10   BY MR. KLATT:
11       Q.    I'm sorry?
12       A.    I don't have that information
13   on these charts.
14       Q.    Are you aware the Imerys
15   supplies talc to many industries that have
16   nothing to do with body powder?
17       A.    I am aware of that.
18       Q.    Do you understand that there's
19   types of talc that are caused -- called
20   industrial talc that are not used for
21   personal use or cosmetic products?
22       A.    Yes.
23       Q.    Do you have any idea which one
24   of these on Exhibit 47 might fall into the

Page 417

1    industrial talc category rather than the
2    cosmetic talc category?
3           MS. O'DELL:  Object to the
4       form.
5        A.    It doesn't say on this list
6    where the talc falls in.
7    BY MR. KLATT:
8        Q.    And on many of these tests,
9    there's not even any asbestos identified at
10   all, correct?
11       A.    On some of them.
12       Q.    Are you aware that certain
13   types of asbestos are ubiquitous in the
14   environment?
15           MS. O'DELL:  Object to the
16       form.
17       A.    I am aware of that.
18   BY MR. KLATT:
19       Q.    And you're aware that when talc
20   is tested for asbestos, that there can be
21   occasional asbestos particles on the test
22   equipment itself, correct?
23           MS. O'DELL:  Object to the
24       form.  Don't guess.  If you know --

105 (Pages 414 to 417)

Judith K. Wolf, M.D.

Page 418

1      A.   I don't -- I mean, I don't know
2  that.  I don't have evidence to support that.
3  BY MR. KLATT:
4      Q.   Well, are you aware that in
5  various test methodologies testing talc to
6  see whether it has asbestos, that those
7  methods take into account that there may be
8  occasional contamination of the test
9  equipment by asbestos that has nothing to do
10 with the sample being tested?
11         MS. O'DELL:  Object to the
12     form.
13 BY MR. KLATT:
14     Q.   Are you aware of that?
15         MS. O'DELL:  Object to the
16     form.
17         Don't speculate, Dr. Wolf.  If
18     you know, please say so.  If you
19     don't --
20     A.   I don't know.
21 BY MR. KLATT:
22     Q.   If you turn over on the back of
23 page -- or second page of Exhibit 47 to
24 Ms. Pier's deposition.

Page 419

1      A.   Yes.
2      Q.   Do you see, for example, the
3  very last sample says, "finding
4  indistinguishable from background levels
5  determined using ASTM method D6620-00"?  Do
6  you see that?
7      A.   I see that.
8      Q.   Do you have any idea what that
9  method is?
10         MS. O'DELL:  Object to the
11     form.
12     A.   Well, it's -- on the left side,
13 this says "Transmission Electron Microscope
14 Analysis."  I don't know if that that's the
15 same as ASTM or not.
16 BY MR. KLATT:
17     Q.   But do you understand what it
18 means when it says, "Finding
19 indistinguishable from background levels
20 determined using ASTM method D6620-00"?  Do
21 you know what --
22         MS. O'DELL:  Excuse me.  Object
23     to the form.
24

Page 420

1  BY MR. KLATT:
2      Q.   Do you know what that means?
3         MS. O'DELL:  Object to the
4     form.
5      A.   I understand that using
6  whatever the ASTM method, that this finding
7  would be considered background levels.  I
8  don't know if that's the same method that was
9  used to test this.
10 BY MR. KLATT:
11     Q.   So just in summary, when you
12 cited Julie Pier's Exhibit 47 in your report,
13 you can't tell Judge Wilson that any of these
14 samples on Exhibit 47 ended up in Johnson &
15 Johnson baby powder or Shower to Shower,
16 correct?
17         MS. O'DELL:  Object to the
18     form, assumes facts not in evidence.
19     A.   I don't have that information.
20 BY MR. KLATT:
21     Q.   Let me ask you about fragrance.
22 Can you rule out fragrance as the sole cause
23 of ovarian cancer in women who use talc-based
24 body powder products?

Page 421

1         MS. O'DELL:  Object to the
2     form.
3      A.   I believe that fragrance that's
4  in the product is inflammatory and
5  irritating.  I don't know of any evidence
6  that has studied that fragrance on its own,
7  as to whether on its own it causes ovarian
8  cancer or not, or if it were out of the
9  product it would cause ovarian cancer or not.
10 All I have is the information on the whole
11 product.
12 BY MR. KLATT:
13     Q.   Do you know whether asbestos --
14 high levels of asbestos in drinking water
15 causes ovarian cancer?
16     A.   I don't believe that oral
17 ingestion has been shown to cause ovarian
18 cancer.
19     Q.   So not any -- just any
20 exposures to asbestos cause ovarian cancer,
21 correct?
22         MS. O'DELL:  Object to the
23     form.
24     A.   So what I said was, that I

106 (Pages 418 to 421)

Judith K. Wolf, M.D.

Page 422

1  don't think oral ingestion has been shown to
2  cause ovarian cancer.
3  BY MR. KLATT:
4      Q.   You're aware that there's been
5  studies of drinking -- of ovarian cancer in
6  women who consumed high levels of drinking
7  water for long periods of time that had high
8  levels of asbestos in it, correct?
9          MS. O'DELL:  Object to the
10  form.
11     A.   Restate that question.
12  BY MR. KLATT:
13     Q.   Yeah, I'm sorry, that was a bad
14  question.  You're aware there's been studies
15  done of women who consumed, over long periods
16  of time, drinking water with high levels of
17  asbestos in it and had no increased risk of
18  ovarian cancer, correct?
19         MS. O'DELL:  Object to the
20  form.
21     A.   I believe that oral intake of
22  asbestos has not been shown to increase the
23  risk of ovarian cancer.
24

Page 423

1  BY MR. KLATT:
2      Q.   Are you aware of any
3  nonoccupational studies of women living in
4  the vicinity of asbestos mines that show that
5  they had an increased risk of ovarian cancer?
6      A.   I'm not aware of any data
7  that -- studies that show that women living
8  near mines, that mine asbestos or talcum
9  powder have an increased risk of ovarian
10  cancer.
11     Q.   And, in fact, IARC said it
12  based its determination that there was a
13  potential link between asbestos and ovarian
14  cancer based only on cohort studies of high
15  occupational exposure in women, correct?
16         MS. O'DELL:  Object to the
17  form.
18         If you need to look at the IARC
19  monograph, Dr. Wolf, we'll pull it
20  out.
21     A.   So the IARC monograph, I know
22  that they looked at -- I can't remember what
23  -- if this is the right one or the other one.
24  Anyway.

Page 424

1  BY MR. KLATT:
2      Q.   Is that Exhibit 10?
3      A.   It's Exhibit 13.  It's here.  I
4  thought it was here.
5          MS. O'DELL:  This is my copy.
6  What do you have right here?
7          THE WITNESS:  That's
8  Exhibit 13.
9  BY MR. KLATT:
10     Q.   And is 13 the IARC talc
11  monograph or the IARC asbestos monograph?
12     A.   It's the IARC talc one.
13     Q.   Didn't we mark the -- we did?
14         MS. O'DELL:  I don't see it.
15         MR. SILVER:  Let's go off the
16  record while we look at the exhibit.
17         MS. O'DELL:  Well, he's asking
18  the questions.  We're looking here.
19  There's no need to go off the record,
20  I don't think.
21         MR. SILVER:  Mike, let's do it.
22         MR. KLATT:  Yeah, until we find
23  it, let's go off the record, because I
24  don't want to waste time looking for

Page 425

1  it.  I thought all the exhibits were
2  here.
3          MS. O'DELL:  Are you going to
4  mark it?
5          MR. KLATT:  No, I thought it's
6  already marked.
7          MS. BROWN:  It's already
8  marked.
9          MS. O'DELL:  Look right there.
10         THE WITNESS:  That's Dr. Saed's
11  paper.  This is my CV.  This is my
12  report.  What's this one?  There it
13  is.
14         MS. O'DELL:  There it is.
15     A.   I knew it was there.
16  BY MR. KLATT:
17     Q.   Would you look at page 256, and
18  let's identify for the record that you're
19  looking at Exhibit 10, which is the portion
20  of the IARC 2012 monograph dealing with
21  asbestos; is that correct?
22     A.   Yes.
23     Q.   And you see over in the
24  right-hand column of page 256, it says, "The

107 (Pages 422 to 425)

Judith K. Wolf, M.D.

Page 426

1    IARC Working Group noted a causal association
2    between exposure to asbestos and cancer of
3    the ovary was clearly established, based on
4    five strongly positive cohort mortality
5    studies of women with heavy occupational
6    exposure to asbestos."
7        Correct?
8        A.   I see that.
9        Q.   And do you -- can you flip over
10   to page 280 of that asbestos IARC monograph.
11       A.   I don't have 280.  I only go to
12   274.
13           MS. BROWN:  I think your
14       counsel has the -- did we give you the
15       larger copy?
16           MS. O'DELL:  You gave me this
17       copy.  But it -- and it's definitely a
18       larger one, but let's see what --
19           THE WITNESS:  I got it.  I got
20       page 280.
21           MS. BROWN:  Here's another one
22       if you need another one.
23   BY MR. KLATT:
24       Q.   Actually, that's my highlighted

Page 427

1    one.  Can I give you this one?  I just want
2    you to verify that you're looking at the same
3    thing that's been marked as Exhibit 10.
4           MS. O'DELL:  Well, it's
5       actually not the same as Exhibit 10,
6       because what you provided to her is a
7       more comprehensive copy of the
8       monograph.
9           MR. KLATT:  What I provided her
10       was the complete asbestos monograph
11       that Exhibit 10 is a part of.
12           MS. O'DELL:  Well, that's my
13       point.
14           MR. KLATT:  Okay.
15           MS. O'DELL:  It's not the same
16       thing.  And so just mark it.
17           MS. BROWN:  Let's just mark it.
18           MR. KLATT:  Yeah, let's mark
19       this as whatever our next exhibit is.
20           Do you know what that number
21       is?
22           (Deposition Exhibit 22 marked
23       for identification.)
24

Page 428

1    BY MR. KLATT:
2        Q.   I hand you what's marked as
3    Exhibit 22.
4        A.   Page 280.
5        Q.   And that is the full 2012 IARC
6    asbestos monograph that previously Exhibit 10
7    was an excerpt from --
8        A.   Yes.
9        Q.   -- is that correct?
10       A.   That's correct.
11       Q.   And we established that on
12   page 256, they said that the link between
13   ovarian cancer and asbestos was based on
14   heavy occupational exposure to asbestos in
15   women, correct?
16           MS. O'DELL:  Object to the
17       form.
18   BY MR. KLATT:
19       Q.   Is that correct?
20       A.   "The Working Group noted that a
21   causal association between exposure and
22   cancer in the" -- "to asbestos and cancer of
23   the ovary was clearly established, based on
24   five strongly positive cohort studies of

Page 429

1    women with heavy occupational exposure to
2    asbestos."
3        Yes.
4        Q.   Now, flip over, if you would,
5    to page 280.
6        A.   Okay.  I'm there.
7        Q.   I believe in the right-hand
8    column, this same exact working group, what
9    did they say about the relationship between
10   talc and ovarian cancer?
11           MS. O'DELL:  I'm sorry, where
12       are you reading, Mike?  On 280?
13   BY MR. KLATT:
14       Q.   Do you see --
15           MS. O'DELL:  Are you reading --
16   BY MR. KLATT:
17       Q.   On page 280, it makes a comment
18   about --
19       A.   They're referencing the IARC
20   10.
21       Q.   Yeah.  And what does --
22       A.   "The association between
23   exposure to talc," that one?
24       Q.   Yes.  Can you read that into

108 (Pages 426 to 429)

Judith K. Wolf, M.D.

Page 430

1    the record?
2        A.    "Potential retrograde
3    translocation to the ovarian epithelium and
4    the development of ovarian cancer" --
5            THE REPORTER:  Hold on.  You're
6        going to have to back up --
7            THE WITNESS:  Okay.
8        A.    "The association between
9    exposure to talc, potential retrograde
10   translocation to the ovarian epithelium and
11   the development of ovarian cancer is
12   controversial."
13           And this is referencing IARC
14   2010 and this volume.
15       Q.    So while the IARC working group
16   in 2012 said that asbestos exposure is
17   related to ovarian cancer based on heavy
18   occupational exposure, this same working
19   group said the association between exposure
20   to talc, retrograde translocation to the
21   ovary and development of ovarian cancer is
22   controversial, correct?
23           MS. O'DELL:  Object to the
24       form.

Page 431

1        A.    So that was the conclusion of
2    the IARC 10 talc --
3    BY MR. KLATT:
4        Q.    And it also refers to the IARC
5    2012 asbestos monograph, correct?
6            MS. O'DELL:  Object to the
7        form.
8    BY MR. KLATT:
9        Q.    Correct?
10           MS. O'DELL:  Object to the
11       form.
12       A.    It says "and this volume."
13   BY MR. KLATT:
14       Q.    And this volume is what?
15       A.    2012.
16           MS. O'DELL:  Object to the
17       form.
18   BY MR. KLATT:
19       Q.    The -- this volume that you
20   just referred to is the 2012 IARC asbestos
21   monograph, correct?
22       A.    That's correct.
23       Q.    IARC's never said that
24   chromium, cobalt or nickel are carcinogenic

Page 432

1    to the ovary, have they?
2        A.    No.  That they're carcinogenic,
3    not specifically to the ovary.
4        Q.    The type of carcinogenicity
5    they're referring to with those metals are
6    when they're breathed in fumes, correct?
7        A.    I can't recall.
8        Q.    Are you aware that chromium is
9    an essential trace heavy metal for nutrition?
10           MS. O'DELL:  Object to the
11       form.
12       A.    I haven't studied nutrition in
13   a long time.  If I saw a list and saw it on
14   there, I can't -- I don't know -- I'm not
15   aware of that.
16   BY MR. KLATT:
17       Q.    Chromium's contained in
18   multivitamins, isn't it, Dr. Wolf?
19       A.    I don't know.  I don't take
20   multivitamins and I don't recommend them to
21   my patients.
22       Q.    Chromium can help control your
23   blood sugar, right?
24       A.    Are you telling me that

Page 433

1    chromium is released from the pancreas to
2    help control blood sugar?
3        Q.    Do you know what chromium does
4    as an essential trace nutrient in the body?
5        A.    I don't.
6        Q.    Are you aware of any evidence
7    that the chromium levels in the blood or
8    tissue of women who use talc-based body
9    powder exceeds that in women who never have
10   used such products?
11       A.    I'm not aware that that study
12   has been done.
13       Q.    So you're not aware of any
14   evidence of that, correct?
15           MS. O'DELL:  Objection to the
16       form.
17       A.    I'm not aware that any study
18   like that has been performed.
19   BY MR. KLATT:
20       Q.    Are you aware that cobalt is an
21   essential part of vitamin B12?
22       A.    Yes.
23       Q.    You understand -- you know what
24   the Krebs cycle is?

109 (Pages 430 to 433)

Judith K. Wolf, M.D.

---

Page 434

1    A.    I do.
2    Q.    Do you know that cobalt plays a
3  vital role in the Krebs cycle in the human
4  body?
5    A.    It's also been shown to be
6  carcinogenic, possibly carcinogenic.
7    Q.    Has IARC ever said that cobalt
8  is possibly carcinogenic to the ovaries?
9    A.    Not specifically to the
10  ovaries.
11    Q.    Are you aware of any evidence
12  that the cobalt levels in the blood or tissue
13  of women who use talc-based body powder
14  exceeds that in the blood or tissues of women
15  who have never used such body powders?
16    A.    I'm not aware of any studies
17  that have been done to show that.
18    Q.    So you're not aware of any such
19  evidence, correct?
20        MS. O'DELL:  Object to the
21    form.
22    A.    I'm not aware of any studies
23  that have looked at that.
24

---

Page 435

1  BY MR. KLATT:
2    Q.    Are you aware that nickel is
3  found in nuts, dried beans, peas, soybeans,
4  grains and chocolate?
5    A.    I'm not aware of that.
6    Q.    Are you aware that nickel is
7  found in some multivitamins?
8        MS. O'DELL:  Object to the
9    form.
10    A.    I don't look at the list of
11  multivitamins, so I'm going to say I don't
12  know.
13  BY MR. KLATT:
14    Q.    Can you tell Judge Wolfson of
15  any evidence you know of, that the levels of
16  nickel in the blood or tissues of women who
17  use talc-based body powders exceeds that in
18  the blood or tissues of women who have never
19  used such products?
20    A.    I'm not --
21        MS. O'DELL:  Excuse me.  Object
22    to the form.
23    A.    I'm not aware that any study of
24  that nature has been performed.

---

Page 436

1  BY MR. KLATT:
2    Q.    So you know of no such
3  evidence, correct?
4        MS. O'DELL:  Object to the
5    form.
6    A.    I'm not aware of any
7  evidence -- any study that's looked at that
8  question.
9  BY MR. KLATT:
10    Q.    Would you agree with me that
11  foreign particles, other than talc that had
12  nothing to do with talc or talc-based body
13  powders, can be introduced into the female
14  reproductive tract by the activities you
15  listed earlier, intercourse, going to the
16  bathroom, toilet paper, riding a bike,
17  exercising, use of tampons, walking, all
18  those activities can introduce non-talc
19  foreign particles into the reproductive
20  tract?
21    A.    If they're exposed to the
22  perineal tissue, they could.
23    Q.    Are you aware that pathologists
24  hired by these plaintiffs' lawyers have found

---

Page 437

1  hundreds of foreign particles that have
2  nothing to do with talc-based body powders in
3  the tissues of women who have ovarian cancer?
4        MS. O'DELL:  Object to the
5    form.
6    A.    I'm not aware of that
7  information.
8  BY MR. KLATT:
9    Q.    Would that surprise you?
10    A.    It would not surprise me.
11    Q.    Why?
12    A.    Because I have multiple levels
13  of evidence that inert particles can go from
14  the vagina and reach the upper
15  reproductive -- female reproductive tract.
16    Q.    Do you have any curiosity
17  whether any of these inert particles that
18  have nothing to do with talc-based body
19  powders, might be responsible for
20  inflammation that causes ovarian cancer?
21        MS. O'DELL:  Object to the
22    form.
23    A.    If I had any evidence in an
24  epidemiologic study or concerns that there's

---

110  (Pages 434 to 437)

Judith K. Wolf, M.D.

Page 438

1  anything else, I would definitely want it
2  studied. I've never seen an epidemiologic
3  study that suggested that toilet paper or any
4  of those other things you mentioned are
5  potentially associated with an increased risk
6  of ovarian cancer.
7  BY MR. KLATT:
8      Q.   Are you aware in the '60s and
9  '70s, that tampons contained asbestos?
10     A.   I wasn't aware of that.
11         MS. O'DELL: You were not or
12  you were? I'm sorry.
13         THE WITNESS: Was not.
14  BY MR. KLATT:
15     Q.   Have you investigated -- had
16  any curiosity about investigating the
17  non-talc-based body powder particles that
18  women's reproductive tracts may be exposed to
19  that can result in ovarian cancer?
20         MS. O'DELL: Object to the
21  form.
22     A.   I don't have any evidence that
23  there's anything else that's been suggested
24  that something else could cause ovarian

Page 439

1  cancer, that's introduced through the
2  perineum.
3  BY MR. KLATT:
4      Q.   People just haven't looked at
5  it, correct?
6          MS. O'DELL: Object to the
7  form.
8      A.   Generally, people look at a
9  question when they see something that happens
10  that suggests that there may be a
11  correlation.
12  BY MR. KLATT:
13     Q.   But there's lots of things that
14  can cause cancer that haven't been studied
15  yet, correct?
16         MS. O'DELL: Object to the
17  form.
18     A.   I don't know the answer to
19  that.
20  BY MR. KLATT:
21     Q.   You would agree with me, that
22  during a woman's reproductive years, every
23  month she sheds the lining of her uterus and
24  it's eliminated out of the body, correct?

Page 440

1      A.   Most of it's eliminated out of
2  the body. In the vast majority of women,
3  some of it goes retrograde.
4      Q.   And you talked about
5  endometriosis earlier, correct?
6      A.   Yes.
7      Q.   That's endometrial tissue
8  that's already in the uterus that may get
9  into the peritoneum, correct?
10         MS. O'DELL: Objection.
11     A.   It's endometrial tissue that
12  during the time of menstruation goes back out
13  through the fallopian tubes and goes -- it
14  can go in the ovaries, in the pelvis,
15  anywhere in the abdomen. I've seen it in the
16  chest.
17  BY MR. KLATT:
18     Q.   But that endometrial tissue
19  starts in the uterus, correct?
20     A.   That's correct.
21     Q.   That's halfway up the
22  reproductive tract to the ovaries, correct?
23     A.   That's in the uterus.
24     Q.   You're not aware of any sort of

Page 441

1  endometrial tissue coming from the external
2  genital area, moving up the vagina, across
3  the cervix into the uterus, correct?
4      A.   Well, there isn't any
5  endometrial tissue in the vagina or the
6  cervix.
7      Q.   That's my point. The tissue in
8  endometriosis starts in the uterus, correct?
9      A.   Yes.
10     Q.   The talc particles that women
11  apply when they apply talc, are applied
12  externally, correct?
13     A.   That's correct.
14     Q.   Okay. And so they're nowhere
15  near the uterus when they're applied,
16  correct?
17         MS. O'DELL: Object to the
18  form.
19     A.   Define "near."
20  BY MR. KLATT:
21     Q.   They're on the external genital
22  area, correct?
23     A.   They're on the external genital
24  area.

111 (Pages 438 to 441)

Judith K. Wolf, M.D.

Page 442

1      Q.    And they have the entire
2    vaginal canal between the external genital
3    area and then the cervix, correct?
4      A.    Correct.
5      Q.    And then they have to cross the
6    cervix, correct?
7      A.    Yeah.
8      Q.    Before they even get to the
9    uterus, correct?
10     A.    That's correct.
11     Q.    And they're still not to the
12   fallopian tubes or ovaries, right?
13     A.    That's correct.
14     Q.    And I understand that you
15   testified earlier today, that you don't know
16   of a single study that traced talc particles
17   placed externally and traced them up the
18   vaginal canal, across the cervix, through the
19   uterus, up the fallopian tubes to the
20   ovaries, correct?
21         MS. O'DELL:  Object to the
22   form.
23     A.    I'm aware of multiple studies
24   of other inert products that cross from the

Page 443

1    genital area -- or the vagina, into the
2    ovaries and the pelvis.  As -- since other
3    inert substances do cross that way, it makes
4    sense to me that talc or something else,
5    other things that we talked about, certainly
6    could also.
7    BY MR. KLATT:
8      Q.    But none of those particles
9    that you just referred to were applied
10   externally.
11     A.    They were not applied
12   externally.
13     Q.    And talc is, correct?
14     A.    And talc is.  But the vagina is
15   open to the outside.
16     Q.    Any foreign particle, not just
17   talc?
18     A.    Excuse me.  Yes.  Yes.
19         MR. KLATT:  Can we go off the
20   record for just a second.  I think I
21   have little, if anything, left.
22         MS. O'DELL:  Okay.
23         MR. KLATT:  I just want to look
24   through my notes real quick.

Page 444

1          THE VIDEOGRAPHER:  Going off
2    the record.  The time is 5:51 p.m.
3          (Recess taken from 5:51 p.m. to
4    5:52 p.m.)
5          THE VIDEOGRAPHER:  Back on the
6    record.  The time is 5:52 p.m.
7    BY MR. KLATT:
8      Q.    Dr. Wolf, just a quick question
9    about your CV.  I just want to make sure I'm
10   clear.  Have you ever held the position of
11   full professor at an institution?
12     A.    Yes.
13     Q.    Okay.  I just wasn't sure.  And
14   that's listed on your CV; is that correct?
15     A.    Yes.
16     Q.    And are you still holding a
17   full professorship, or did you give that up
18   at some point?
19     A.    I gave that up.
20     Q.    When was that?
21     A.    When I left Banner MD Anderson
22   in 2014.  I haven't had an academic position
23   since then.
24     Q.    And earlier, you said that you

Page 445

1    had seen inflammation when you operated on
2    women with ovarian cancer, I think?
3          MS. O'DELL:  Object to form.
4      A.    I have seen pathologic slides.
5    I look at all the slides of my patients with
6    ovarian cancer.  And sometimes you see
7    inflammation in relationship with the cancer.
8    BY MR. KLATT:
9      Q.    And cancer itself is capable of
10   causing inflammation, correct?
11     A.    Cancer itself can cause
12   inflammation.
13         MR. KLATT:  I think that's all
14   the questions I have.
15         MS. O'DELL:  Let's go off the
16   record.
17         THE VIDEOGRAPHER:  Going off
18   the record.  The time is 5:54 p.m.
19         (Recess taken from 5:54 p.m. to
20   6:16 p.m.)
21         THE VIDEOGRAPHER:  Back on the
22   record.  The time is 6:16 p.m.
23
24

112 (Pages 442 to 445)

Judith K. Wolf, M.D.

Page 446

1                    EXAMINATION
2    BY MS. O'DELL:
3        Q.   Dr. Wolf, just a few questions
4    for you.  You were shown two exhibits today,
5    Exhibit 20 and Exhibit 21, from a website
6    from a company that you were formerly
7    employed by.  Do you recall those questions
8    and exhibits?
9        A.   Yes.
10       Q.   And have you had an opportunity
11   to review these documents?
12       A.   Yes.
13       Q.   And is there anything that's
14   contained in the materials that you -- that
15   are in these documents that's inaccurate?
16       A.   No.
17       Q.   Is there anything about what
18   was written here that's inconsistent with any
19   of the opinions that you've given in this
20   litigation?
21       A.   No.
22       Q.   And in terms of the risk
23   factors that you touched on in either of
24   these two articles, are there any risk

Page 447

1    factors other than family history or
2    familial-related risk factors?
3        A.   In the "How to find the best
4    doctor for ovarian cancer" article, I talk
5    about familial risk factors, but don't list
6    any of the other ones.
7        Q.   I'm sorry.  So you don't
8    address lifestyle risk factors such as --
9        A.   I don't.
10       Q.   -- as talc or any others?
11       A.   Or other hormonal risk factors
12   or anything else.
13       Q.   You've talked today about
14   talcum powder products.  When you've referred
15   to talcum powder products, what did you mean
16   in your testimony?
17       A.   Johnson & Johnson baby powder
18   and Shower to Shower.
19       Q.   You also were given a document
20   by counsel for J&J.  It was Exhibit No. 9.
21   It's got a title and it says "Talc."  It's
22   from the FDA website.  Do you have that in
23   front of you?
24       A.   I do.

Page 448

1        Q.   And J&J counsel purported to --
2    or suggested that FDA's testing of talcum
3    powder products, including J&J's talc, had
4    resulted in a finding that there was no
5    asbestos in baby powder.  Do you recall that?
6            MS. BROWN:  Objection to the
7        form.
8        A.   I recall that.
9    BY MS. O'DELL:
10       Q.   All right.  If you'll turn over
11   to page 2 of Exhibit 9, did the FDA state
12   that the testing that they performed was
13   evidence that there was no asbestos in
14   cosmetic talc?
15       A.   Under the results of the FDA
16   survey and what they mean, it says they found
17   no asbestos fibers or structures in any of
18   the samples that they tested, to shorten it
19   out.  But the results were limited, because
20   only four talc suppliers submitted samples,
21   and by the number of products tested.  The
22   next sentence says, "While the FDA finds
23   these results informative, they do not prove
24   that most or all talc or talc-containing

Page 449

1    cosmetic products currently marketed in the
2    United States are likely to be free of
3    asbestos contamination."
4        Q.   J&J's counsel didn't read that
5    sentence to you, did she?
6            MS. BROWN:  Objection to the
7        form.
8        A.   No.
9    BY MS. O'DELL:
10       Q.   You were also shown a -- what's
11   called a PDQ from the National Cancer
12   Institute website, Exhibit 18.  Do you have
13   that in front of you?
14       A.   I have it.
15       Q.   And you were asked questions
16   about the section that dealt with talc.  Do
17   you recall that?
18       A.   Yes.
19       Q.   And if you'll turn to page 12
20   and 13 of 18, there's a section on perineal
21   talc exposure.
22       A.   Yes.
23       Q.   And what are the references
24   that are cited in that section?  What numbers

113 (Pages 446 to 449)

Judith K. Wolf, M.D.

Page 450

1    are they?
2        A.    The reference are numbers 41,
3    42, 43, 44 and 45.
4        Q.    Do you need some water?
5        A.    Yeah, I need some more.
6        Q.    And if you'll turn to page 16
7    of 18 of Exhibit 18, you'll see it lists
8    there references 41 through 45.
9        A.    Yes.
10        Q.    And do those appear to be the
11    references that the authors at NCI relied on
12    in reaching their opinions regarding perineal
13    talc use?
14        A.    Yes.
15        Q.    And do those include -- excuse
16    me.  Do those references include the broad
17    cross section of evidence that you reviewed
18    and considered in reaching your opinions in
19    this case?
20            MS. BROWN:  Objection to the
21        form.
22        A.    No.
23    BY MS. O'DELL:
24        Q.    Are at least two of the five

Page 451

1    references in early 2000s, I think 2000 and
2    2003?
3        A.    2003, 2013.  Schildkraut, which
4    is the newest one that they just added, 2016,
5    2000, 2014.
6        Q.    Yes.  And the references
7    included here certainly do not cover all the
8    material that you reviewed, considered,
9    relied on in reaching your opinion, including
10    other meta-analyses, the mechanistic data, et
11    cetera?
12        A.    They do not include all of the
13    data that I considered, and the most recent
14    data that's even mentioned, as I said, is the
15    2016 Schildkraut study.
16        Q.    Put that aside.
17            You were asked a number of
18    questions about asbestos testing, the type of
19    testing, the methodology, whether it was
20    transmission electron microscope or XRD, I
21    think was asked of you.  Do you recall those
22    series of questions?
23        A.    I do.
24        Q.    And would you defer to other

Page 452

1    experts regarding the appropriate methodology
2    for testing asbestos in talc?
3            MS. BROWN:  Objection to the
4        form.
5        A.    I would refer to other experts
6    in that area.
7    BY MS. O'DELL:
8        Q.    Would you -- would you defer
9    to -- back up just a second.
10            You were asked questions about
11    Dr. Longo and Rigler's report in the MDL.
12        A.    Yes.
13        Q.    And you recall in Dr. Longo and
14    Rigler's report, that they do perform a
15    quantification or an estimate of the number
16    of fibers in a particular bottle if there's a
17    positive test.  Do you recall those?
18        A.    Yes.
19            MS. BROWN:  Objection to the
20        form.
21    BY MS. O'DELL:
22        Q.    Would you defer to Dr. Longo
23    and Dr. Rigler on calculations like that, in
24    terms of the specific composition of a

Page 453

1    specific bottle?
2            MS. BROWN:  Objection to the
3        form.
4        A.    Yes.
5    BY MS. O'DELL:
6        Q.    As a GYN oncologist,
7    gynecologic oncologist, that's not something
8    that you're offering opinions on or that
9    would be within your expertise, correct?
10            MS. BROWN:  Form.
11        A.    That's not something I'm
12    offering opinions on or is within my area of
13    expertise.
14    BY MS. O'DELL:
15        Q.    Okay.  And you would not --
16    would defer to Dr. Longo and Dr. Rigler on
17    that point?
18        A.    I would refer to Dr. Longo and
19    Dr. Rigler.
20        Q.    And in regard to questions you
21    received about geology or deposits, talc
22    deposits, would you defer to experts in
23    geology on those particular matters?
24        A.    Yes.

114 (Pages 450 to 453)

Judith K. Wolf, M.D.

Page 454

1    MS. BROWN: Form.
2    MS. O'DELL: I don't know what
3  the form objection is, but let me see
4  if I can address it.
5  BY MS. O'DELL:
6    Q.   Dr. Wolf, would you defer to
7  geology experts in terms of the composition
8  of the particular talc ore deposit?
9    A.   A talc deposit?
10    Q.   Yes.
11    A.   Yes.
12    Q.   You were also asked by
13  Mr. Klatt about adhesions and inflammation,
14  acute inflammation following a surgical
15  procedure. Is there any evidence -- any
16  suggestion that acute inflammation following
17  a surgical procedure causes ovarian cancer?
18    A.   No.
19    Q.   Let me -- you were asked some
20  questions about the IARC monograph, Volume
21  93, the 2010 monograph. It was marked as
22  Exhibit 13.
23    A.   This one. Yes.
24    Q.   And, Dr. Wolf, was IARC's

Page 455

1  examination of talc at the time they looked
2  at it in 2006, I believe it was, were they
3  considering talc containing asbestiform
4  fibers?
5    MR. KLATT: Objection, form.
6  BY MS. O'DELL:
7    Q.   Let me just ask -- let me ask
8  you a different way, see if I can address the
9  objection.
10    Why don't you turn to page 277,
11  please. And, Dr. Wolf, what is the substance
12  that the IARC working group is considering in
13  the 2010 monograph?
14    A.   Talc not containing asbestos
15  foreign fibers.
16    Q.   In other words, the 2010
17  monograph purported not to address talc with
18  asbestos?
19    MS. BROWN: Objection, form.
20    MR. KLATT: Objection, form.
21    A.   To investigate what they
22  thought or assumed was pure platy talc.
23  BY MS. O'DELL:
24    Q.   Is -- based on your review of

Page 456

1  the literature, the totality of the evidence,
2  can platy talc cause inflammation?
3    A.   Yes.
4    Q.   Does inflammation in the ovary
5  cause ovarian cancer?
6    A.   Chronic inflammation in the
7  ovary can cause changes that are associated
8  with ovarian cancer, yes. Chronic
9  inflammation can -- in the ovary can cause
10  ovarian cancer.
11    Q.   You asked a number of questions
12  about asbestos and -- in terms of studies
13  involving millers and miners. Would you
14  explain to what ultimately would be a jury,
15  but initially will be Judge Wolfson, what the
16  possible routes of exposure are for, you
17  know, asbestos and fibrous talc reaching the
18  ovary in the context of talcum powder
19  products?
20    MS. BROWN: Objection to the
21  form.
22    A.   So the possible routes are from
23  the perineum, through the open vagina and
24  open cervix and open fallopian tubes to the

Page 457

1  ovaries. From inhalation, smaller particles
2  can be -- cross the membrane, be absorbed by
3  the stroma, get into the lymphatic or blood
4  system and get it that way. Fibrous
5  particles can pierce the lung in the diagram
6  and get into the perineal cavity that way.
7  BY MS. O'DELL:
8    Q.   And is -- are those opinions
9  you've just expressed supported by the data
10  in the IARC monograph, the 2012 monograph?
11    A.   Yes.
12    MR. KLATT: Objection, form.
13  BY MS. O'DELL:
14    Q.   And did IARC conclude that when
15  asbestos and fibrous talc reached the
16  ovaries, they can cause ovarian cancer?
17    A.   Yes.
18    Q.   And IARC concluded that
19  asbestos and fibrous talc were known human
20  carcinogens?
21    A.   Yes.
22    Q.   You were asked a number of
23  questions about whether asbestos was
24  necessary in order to reach your opinions

115 (Pages 454 to 457)

Judith K. Wolf, M.D.

Page 458

1    about talcum powder products causing ovarian
2    cancer.  You recall those questions?
3        A.    Yes.
4        Q.    And is asbestos, as a component
5    of talcum powder products, essential in order
6    for talcum powder, baby powder and Shower to
7    Shower causing ovarian cancer?
8            MS. BROWN:  Objection to the
9        form of the question.
10       A.    So a talcum powder product has
11   all of these substance and I assessed it as a
12   whole.  Multiple of the substances are either
13   known to be carcinogenic or other substances
14   possibly carcinogenic or fragrances
15   irritating and inflammatory.  I looked at the
16   product as a whole.
17   BY MS. O'DELL:
18       Q.    If -- and you -- and in doing
19   that, looking at the product as a whole, was
20   it important to you to consider whether there
21   was a potent carcinogen such as asbestos in
22   the product?
23           MS. BROWN:  Form.
24       A.    It was information that added

Page 459

1    to my concerns about the product.  But
2    knowing that platy talc can cause
3    inflammation and is possibly carcinogenic, as
4    per IARC, and that platy talc appears to be
5    almost universally, as per Longo's testing,
6    part of talcum powder product, 41 out of 42
7    samples that she tested, and that fibrous
8    talc is asbestos, a form of asbestos, the
9    other asbestos fibers, one way or the other,
10   just add to my concern.
11   BY MS. O'DELL:
12       Q.    Yeah.  You -- and just when you
13   were relying, I think you misspoke.  You were
14   saying the 41 out of 42 samples in
15   Dr. Longo's testing and you referred to platy
16   talc.  Did you mean to say that?
17           MS. BROWN:  Objection to the
18       form.
19       A.    No, I meant fibrous talc.
20   BY MS. O'DELL:
21       Q.    And Dr. Longo tested Johnson &
22   Johnson historical samples for the presence
23   of fibrous talc?
24       A.    That's correct.

Page 460

1            MS. BROWN:  Objection to the
2        form of the question.
3    BY MS. O'DELL:
4        Q.    And did Dr. Longo find that
5    there was fibrous talc present in 41 out of
6    42 samples?
7            MS. BROWN:  Objection.
8        A.    She found fibrous talc in 41 of
9    42 samples.
10           THE REPORTER:  Hold on a
11       second.  I'm not hearing --
12           THE WITNESS:  I'm sorry.
13       A.    She --
14           MS. BROWN:  I -- sorry.  Go
15       ahead.
16       A.    She found fibrous talc in 41
17   of --
18           MS. BROWN:  He.
19       A.    He.  I keep picturing a woman.
20   Fibrous talc in 41 of 42 samples.
21           MS. BROWN:  And, Doctor, if you
22       wouldn't mind just giving me second to
23       object before you start answering --
24           THE WITNESS:  I'm sorry.

Page 461

1            MS. BROWN:  -- it will make the
2        court reporter's job easier.
3            THE WITNESS:  Sorry.
4    BY MS. O'DELL:
5        Q.    And if you pulled any one
6    component that you've talked about today out
7    of the talcum powder products, would that
8    change your opinions?
9        A.    No.
10           MS. O'DELL:  That's all I have,
11       Dr. Wolf.  Thank you.
12           MS. BROWN:  Go off?
13           MR. KLATT:  Yeah.
14           MS. BROWN:  Can we go off for
15       one second?
16           THE VIDEOGRAPHER:  Going off
17       the record.  The time is 6:36 p.m.
18           (Recess taken from 6:36 p.m. to
19       6:44 p.m.)
20           THE VIDEOGRAPHER:  Back on the
21       record.  The time is 6:44 p.m.
22           FURTHER EXAMINATION
23   BY MS. BROWN:
24       Q.    Dr. Wolf, you were just asked

116 (Pages 458 to 461)

Judith K. Wolf, M.D.

Page 462

1  some questions by counsel for plaintiffs
2  regarding Exhibits 20 and 21, articles that
3  you authored regarding ovarian cancer. Do
4  you recall those questions?
5      A.  Yes.
6      Q.  Okay. And you'd agree with me
7  that over the course of your career, you have
8  authored a number of articles, both in the
9  medical press and in the popular press,
10 regarding ovarian cancer, correct?
11     A.  Yes.
12     Q.  And you have never, over the
13 course of your entire career, published the
14 opinion that talc causes ovarian cancer,
15 correct?
16     A.  I have not.
17     Q.  And you have never, over the
18 course of your career, blogged or tweeted or
19 posted anything on any of the social media
20 accounts where you have a presence, that talc
21 causes ovarian cancer, correct?
22     A.  I have not.
23     Q.  And you have never spoken at
24 any symposia or conference and offered the

Page 463

1  opinion that talc causes ovarian cancer,
2  correct?
3          MS. O'DELL: Object to the
4  form. It's already been covered
5  previously today.
6          MS. BROWN: Form is the
7  objection.
8      A.  Not that I recall.
9  BY MS. BROWN:
10     Q.  You were asked some questions
11 regarding the work of Dr. Longo and
12 Dr. Rigler. Do you recall those?
13     A.  Yes.
14     Q.  And I assume you have not met
15 Dr. Longo; is that correct?
16     A.  No, I have not.
17     Q.  Okay. And you told counsel for
18 plaintiffs, that you are relying on
19 Dr. Longo's quantification of asbestos. Was
20 that your testimony?
21          MS. O'DELL: Object to the
22 form.
23     A.  Quantification of -- to
24 understand how much of the -- what she found

Page 464

1  was in her testing. I don't remember the
2  word "quantification of asbestos."
3  BY MS. BROWN:
4      Q.  So you are relying on
5  Dr. Longo's testing for how much asbestos is
6  in baby powder?
7      A.  To interpret her findings.
8          MS. O'DELL: His findings.
9      A.  His findings. I'm trying to
10 make Dr. Longo a woman. It's not working.
11 BY MS. BROWN:
12     Q.  You -- in sitting here -- and
13 when you offered your opinion in this case,
14 though, you didn't have in mind a certain
15 amount of asbestos that was needed or found
16 in the baby powder to cause ovarian cancer,
17 right?
18          MS. O'DELL: Object to the
19 form.
20     A.  Any amount of asbestos in baby
21 talcum powder product, I'm concerned about
22 causing ovarian cancer.
23 BY MS. BROWN:
24     Q.  And if I understood your

Page 465

1  testimony to plaintiffs' lawyer earlier, if
2  you took asbestos -- the asbestos that you
3  think is in baby powder, if you took it out,
4  you would still hold the opinion that baby
5  powder causes ovarian cancer; is that right?
6      A.  Yes.
7      Q.  And, in fact, that's your
8  opinion as it relates to any of the
9  components of baby powder that you believe
10 exists, such as platy talc, fibrous talc,
11 asbestos, heavy metals and fragrances,
12 correct?
13          MS. O'DELL: Object to the
14 form.
15     A.  If I took any one of those out,
16 I think that talcum powder products would
17 still cause ovarian cancer.
18 BY MS. BROWN:
19     Q.  And what if you took two out of
20 the five out, would you still hold the
21 opinion that powder products cause ovarian
22 cancer?
23          MS. O'DELL: Object to the
24 form, incomplete hypothetical.

117 (Pages 462 to 465)

Judith K. Wolf, M.D.

1    A.    If you took any one of them
2  out, I would still have the opinion that
3  talcum powder product causes ovarian cancer.
4  I don't know how you can take all of them out
5  and still have a talcum powder product.
6  BY MS. BROWN:
7    Q.    Well, you understand that there
8  is -- talcum powder exists that does not
9  include fragrances, heavy metals, asbestos
10  and fibrous talc.  Do you have that
11  understanding?
12          MS. O'DELL:  Object to the
13      form.
14    A.    I'm not sure that there's
15  talcum powder that doesn't have at least
16  fibrous talc.
17  BY MS. BROWN:
18    Q.    And so are you of the opinion
19  that platy talc and fibrous talc alone cause
20  ovarian cancer?
21          MS. O'DELL:  Object to the
22      form.
23    A.    I'm of the opinion that talcum
24  powder product contains all of those

1  ingredients that we list and that it causes
2  ovarian cancer.
3  BY MS. BROWN:
4    Q.    I'm with you on that.  What I
5  want to know is, are you of the opinion that
6  platy talc and fibrous talc alone cause
7  ovarian cancer?
8    A.    I'm of the opinion that platy
9  talc can cause cancer and fibrous talc is
10  considered a form of asbestos and can cause
11  cancer.  And that those are two of the
12  products in talcum powder product, two of the
13  substances in talcum powder product.
14          I don't know of any evidence
15  that the product doesn't have all of the
16  substances that I've described, and I don't
17  know that I can make an opinion that says if
18  it just had this and this, it would or would
19  not cause cancer.
20    Q.    And for your opinion, that if
21  you pulled out any one component of the
22  powder products, the product would still
23  cause ovarian cancer, do you rely on the same
24  epidemiology?

1    A.    There isn't epidemiology
2  because -- because I don't know that the
3  talcum powder product in the epidemiology
4  left any of those out.
5    Q.    So you issued a multipage
6  report in this case, right, Dr. Wolf?
7    A.    Yes.
8    Q.    And that report contains
9  numerous cites to epidemiology that looked at
10  people using cosmetic talcum powder, correct?
11    A.    That's correct.
12    Q.    Is it your testimony here today
13  that none of that epidemiology informs your
14  opinion about Johnson & Johnson baby powder
15  products?
16    A.    That is not --
17          MS. O'DELL:  Excuse me.
18    A.    -- my opinion.
19          MS. O'DELL:  Object to the
20      form, misstates her testimony.
21    A.    What my understanding of your
22  question was is, do I have epidemiologic
23  studies that show that if one -- any one of
24  those substances is left out of the product,

1  that it causes ovarian cancer.  And what my
2  answer is, is that my understanding is that
3  all of the epidemiologic studies are looking
4  at the product as I understand it and so I
5  can't give -- I cannot refer to a study that
6  has the product without one of those.
7  BY MS. BROWN:
8    Q.    And you were asked some
9  questions about the IARC monograph on
10  nonasbestiform talc.  Do you remember that?
11    A.    Yes.
12    Q.    And many, if not most, of the
13  epidemiology studies that you cite in your
14  report are contained and considered within
15  the IARC monograph on nonasbestiform talc.
16  True?
17          MS. O'DELL:  Object to the
18      form.
19    A.    I believe that's not true
20  because the -- again, this was 2010 and many
21  of the references that I report are after
22  this was published and they were only
23  reviewing up to 2006 or 2007 when they wrote
24  this.

Judith K. Wolf, M.D.

Page 470

BY MS. BROWN:
2      Q.    Sure.  And for studies that
3  looked at talcum powder products prior to
4  2010, you have considered and relied on those
5  in your report as well?
6      A.    Yes.
7      Q.    And, in fact, the Penninkilampi
8  meta-analysis that you regard as high
9  quality, includes a majority of studies that
10  were considered by the IARC group in 2006,
11  correct?
12          MS. O'DELL:  Object to the
13      form.
14      A.    It definitely includes some of
15  those older studies.
16          MS. BROWN:  I have no further
17      questions at this time.
18          MR. KLATT:  I have a couple
19      more.
20          FURTHER EXAMINATION
21  BY MR. KLATT:
22      Q.    Can you pull out Exhibit 9,
23  Dr. Wolf.
24      A.    Exhibit 9, yes.

Page 471

1      Q.    And Exhibit 9 is the document
2  that Ms. O'Dell discussed with you a few
3  minutes ago, where the FDA around 2009-2010,
4  tested both raw talc and off-the-shelf
5  talc-based body powder products, correct?
6      A.    Yes.
7      Q.    And I think you read a portion
8  where it said only four talc suppliers had
9  submitted their products to the FDA for
10  testing.  Do you recall that?
11      A.    Yes.
12      Q.    Are you aware that my client,
13  Imerys, was one of the four that did submit
14  their talc for testing?  And I'll just tell
15  you, in case you don't know, that Imerys is
16  the successor to Rio Tinto and Luzenac.  And
17  are those talcs tested by the FDA in Exhibit
18  9?
19      A.    Yes.
20      Q.    And what did the FDA find about
21  whether there was asbestos in those talcs?
22      A.    No evidence of asbestos.
23      Q.    In either the Rio Tinto
24  Minerals/Luzenac America talc, correct?

Page 472

1      A.    That's correct.
2      Q.    Have you ever recommended to a
3  patient of yours who does not have ovarian
4  cancer yet, that she have her ovaries removed
5  because of long-term talc use?
6      A.    No.
7      Q.    Would you make that
8  recommendation in the future?
9      A.    It would be a discussion that I
10  would have with the patient.  Looking at all
11  of her risk factors, if her only risk factor
12  was talcum powder usage, I would just want
13  her to know that she's at an increased risk
14  and let her make the decision about that.
15      Q.    Are you aware of any
16  professional --
17          MS. O'DELL:  Excuse me, Mike.
18          MR. KLATT:  I'm sorry.
19          MS. O'DELL:  I'm sorry.  Were
20      you done, Dr. Wolf?
21      A.    I mean, that's a tough
22  question.  The challenge is there's no
23  screening for ovarian cancer, right?  So if
24  you have someone who's at an increased risk,

Page 473

1  you can't say, well, we'll look at you more
2  often, we'll test you more often.  There's no
3  test to find ovarian cancer early.
4          On the other hand, the
5  generally accepted lifetime risk for ovarian
6  cancer to push a doctor to recommend
7  prophylactic surgery removal of the tubes and
8  ovaries, is a 10 percent or greater lifetime
9  risk.
10  BY MR. KLATT:
11      Q.    And talc use doesn't confer
12  that level of use, correct?
13      A.    It does not.
14      Q.    Okay.  And you're not aware of
15  any medical professional organization or
16  agency that has ever made the recommendation
17  that women who have used genital talc for a
18  certain period of time should consider having
19  their ovaries and fallopian tubes removed,
20  correct?
21      A.    I am not aware of any.
22      Q.    Can you show me one single
23  study, case report, case series, any type of
24  study at all, showing that a woman who used

119 (Pages 470 to 473)

Judith K. Wolf, M.D.

Page 474

1  Johnson & Johnson baby powder or Shower to
2  Shower product, had inflammation of her
3  reproductive tract as a result of that
4  powder?
5       MS. O'DELL: Objection to the
6  form.
7       A.   I can't -- I can't show you a
8  paper that shows that.
9  BY MR. KLATT:
10      Q.   You believe that talc can get
11 to the ovaries via inhalation, correct?
12      A.   Yes.
13      Q.   Are you aware that talc's
14 ubiquitous in the environment?
15      A.   Yes.
16      Q.   Are you aware that women just
17 walking around on city streets can breathe
18 talc particles in during the course of their
19 life?
20      MS. O'DELL: Objection to form.
21      A.   I'm aware that talc is
22 ubiquitous to the environment.
23 BY MR. KLATT:
24      Q.   Which means you can breathe it

Page 475

1  in every single breath you take, correct?
2       MS. O'DELL: Object to the
3  form.
4       A.   I'm aware that talc is
5  ubiquitous to the environment.
6  BY MR. KLATT:
7       Q.   And so since it's ubiquitous in
8  the environment and since you take a breath,
9  you know, many times a minute, you're
10 probably inhaling talc particles every time
11 you breath, or at least every minute you
12 breath, correct?
13      MS. O'DELL: Objection to the
14 form.
15      A.   I don't have evidence to
16 support that.
17 BY MR. KLATT:
18      Q.   Well, you -- and you know, for
19 example, that there's asbestos fibers in this
20 room as we sit here right now, don't you, Dr.
21 Wolf?
22      MS. O'DELL: Objection to form.
23      A.   Do I know that for a fact?
24 BY MR. KLATT:

Page 476

1       Q.   Sure.  You've seen -- you've
2  read the IARC monograph, you know in indoor
3  air and outdoor air in urban areas, there's
4  concentrations of asbestos fibers just in the
5  air we breath.
6       MS. O'DELL: Objection to form.
7       A.   I would have to test the air to
8  know for sure that there's asbestos fibers in
9  the air here.
10 BY MR. KLATT:
11      Q.   You haven't seen that data in
12 the IARC monograph that you reviewed?
13      A.   In this -- about the air in
14 this room, no.
15      Q.   I'm talking about indoor air
16 and outdoor area in urban areas.  You've seen
17 in the IARC monograph, that there's a certain
18 quantity of asbestos fibers in that air,
19 correct?
20      A.   There is a certain amount of
21 asbestos fibers in the air.
22      Q.   And so when you breathe that
23 air, you can inhale those asbestos fibers
24 and, according to you, they can end up in the

Page 477

1  ovary, correct?
2       A.   Yes.
3       Q.   And the same with talc
4  particles, correct?
5       A.   Yes.
6       Q.   Didn't even necessarily come
7  from body powder, correct --
8       MS. O'DELL: Objection, form.
9  BY MR. KLATT:
10      Q.   -- just from the environment?
11      MS. O'DELL: Objection to the
12 form.
13      A.   You can inhale it from the air
14 and it can get to the ovaries.
15 BY MR. KLATT:
16      Q.   How long have you known
17 Margaret Thompson, who is sitting here today?
18      A.   I met her about two -- a little
19 over two years ago.
20      Q.   Okay.  You've never seen or
21 been referred any patients by her; is that
22 correct?
23      A.   No.
24      Q.   Have you communicated with any

120 (Pages 474 to 477)

Judith K. Wolf, M.D.

Page 478

1    of the other plaintiffs' consultants by -- in
2    person, by phone, by e-mail, in any form or
3    fashion at all?
4        A.    The only one I spoke with was
5    Dr. Saed.  I spoke on the phone with him once
6    about, I'm going to say, a year or so ago.
7        Q.    And what was the substance of
8    that conversation?
9        A.    It was about his research.  I
10   had questions about what he was doing.
11       Q.    And what did you ask him?
12       A.    I don't recall exactly.
13       Q.    Did you keep notes?
14       A.    I did not.
15       Q.    How long was the phone call?
16       A.    I think it was about a half an
17   hour.
18       Q.    And when was that phone call?
19           MS. O'DELL:  I think she just
20   said.
21       A.    I think it was about a year
22   ago.  I can see I was standing in Arizona,
23   which meant I was still working for Provista,
24   so it was sometime before I left there.

Page 479

1    BY MR. KLATT:
2        Q.    Which month would that have
3    been?
4        A.    I don't know.
5        Q.    When did you leave there?
6        A.    My last working day there was
7    October 1st, but I hadn't been to Arizona for
8    months by then.
9        Q.    October 1st of?
10       A.    2018.
11       Q.    Okay.  But you think it was
12   about a year ago that you spoke to him?
13       A.    I do.
14       Q.    Approximately January of 2018?
15           MS. O'DELL:  Objection to form.
16   She's given her best estimate.
17       A.    Approximately.
18   BY MR. KLATT:
19       Q.    Can you tell me anything else
20   about the substance of what you talked about
21   with Dr. Saed on that phone call?
22       A.    I asked him what research he
23   was doing, what he was looking at, what type
24   of cell lines, what was he looking for.  We

Page 480

1    talked a little bit about the fact that he
2    worked in Detroit at Wayne State, where I
3    know the GYN oncologist, and we were friendly
4    about that.  I told him I thought his
5    research was interesting and important.  That
6    was it.
7        Q.    Are any of the Wayne State
8    gynecologic oncologists you know coauthors of
9    Dr. Saed's paper?
10       A.    Yes.  Dr. Robert Morris.
11       Q.    Have you talked to Dr. Morris
12   about this research?
13       A.    I haven't spoken with
14   Dr. Morris about anything in a couple of
15   years.
16       Q.    Have you communicated in any
17   form or fashion with any governmental
18   agencies about talc and ovarian cancer?
19       A.    I have not.
20       Q.    Did you keep any notes of your
21   discussion with Dr. Saed?  Maybe I asked
22   that.
23           MS. O'DELL:  Asked and
24   answered.

Page 481

1        A.    I did not.
2    BY MR. KLATT:
3        Q.    Did you ask Dr. Saed during
4    that phone call, who was funding his
5    experiments or work that he was doing?
6        A.    I don't remember.
7        Q.    What prompted that phone call?
8        A.    Margaret and I spoke about that
9    he was doing some research and she asked him
10   would it be okay if I talked to him, and so I
11   called him.
12       Q.    How long have you been a
13   gynecologic oncologist?
14       A.    I finished my fellowship in
15   1995.
16       Q.    Had you ever heard of Dr. Saed
17   before your discussion with Margaret
18   Thompson?
19       A.    I had not.  He's a Ph.D., so
20   it's not necessarily that I would know who he
21   was.
22       Q.    Well, you've been an academic
23   gynecologic oncologist for decades, right?
24       A.    Yes.

121 (Pages 478 to 481)

Judith K. Wolf, M.D.

Page 482

1    Q.    You have never once heard of
2  Dr. Saed, correct?
3    A.    I had not.
4        MR. KLATT:  That's all the
5  questions I have.
6        MS. O'DELL:  I just have one
7  question.
8        FURTHER EXAMINATION
9  BY MS. O'DELL:
10   Q.    Dr. Wolf, are your opinions in
11 this case contained in your report and in the
12 deposition you've given here today?
13   A.    Yes.
14       MS. O'DELL:  That's all I have.
15       MS. BROWN:  Just one final
16 question to that.
17       FURTHER EXAMINATION
18 BY MS. BROWN:
19   Q.    One final question, Doctor.
20 You're not relying on any materials to form
21 your opinion that are not contained in your
22 report or were discussed or marked as
23 exhibits here today, correct?
24   A.    My report, no, and my

Page 483

1  references, everything that's here today.
2  Nothing else.
3    Q.    And for a housekeeping item,
4  are all of the binders on that table to your
5  left, are those documents on Exhibit B of
6  your report?
7    A.    Yes.
8    Q.    Nothing additional, right?
9    A.    Nothing additional.
10   Q.    And all of the binders on the
11 table are the references in your report?
12   A.    The references and the
13 additional information that we provided
14 today.
15   Q.    Okay.  So with that, I don't
16 think it's necessary, unless anyone
17 disagrees, to mark all of the binders.
18       MS. BROWN:  And I have no
19 further questions.  Thanks.
20       MR. KLATT:  As long as the
21 binders don't contain any highlighting
22 or notations.
23       THE WITNESS:  Nothing.
24       MS. BROWN:  We're off the

Page 484

1  record.
2        THE VIDEOGRAPHER:  This
3  concludes the deposition of Dr. Judy
4  Wolf.  Going off the record.  The time
5  is 7:03 p.m.
6        (Deposition concluded at
7  7:03 p.m.)
8        – – – – – – –
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 485

1
2
3        CERTIFICATE
3        I, MICHEAL A. JOHNSON, Registered
4  Diplomate Reporter and Certified Realtime
   Reporter, do hereby certify that prior to the
4  commencement of the examination, JUDITH K.
5  WOLF, M.D. was duly sworn by me to testify to
   the truth, the whole truth and nothing but
6  the truth.
6        I DO FURTHER CERTIFY that the
7  foregoing is a verbatim transcript of the
   testimony as taken stenographically by and
8  before me at the time, place and on the date
9  hereinbefore set forth, to the best of my
   ability.
10
       I DO FURTHER CERTIFY that I am
11 neither a relative nor employee nor attorney
   nor counsel of any of the parties to this
12 action, and that I am neither a relative nor
   employee of such attorney or counsel, and
13 that I am not financially interested in the
   action.
14
15
16
_____
17 MICHEAL A. JOHNSON,
   NCRA Registered Diplomate Reporter
18 NCRA Certified Realtime Reporter
   Certified LiveNote Reporter
19
   Dated:  January 8, 2019
20
21
22
23
24

122 (Pages 482 to 485)

Judith K. Wolf, M.D.

Page 486

1   ACKNOWLEDGMENT OF DEPONENT
2
3
4      I,_____, do
hereby certify that I have read the foregoing
5   pages and that the same is a correct
transcription of the answers given by me to
6   the questions therein propounded, except for
the corrections or changes in form or
7   substance, if any, noted in the attached
Errata Sheet.
8
9
10
11
12   _____
JUDITH K. WOLF, M.D.        DATE
13
14
15   Subscribed and sworn to before me this
16   _____ day of _____, 20 _____.
17   My commission expires: _____
18
19   Notary Public
20
21
22
23
24

Page 487

1          _ _ _ _ _ _ _
ERRATA
2          _ _ _ _ _ _ _
3   PAGE  LINE  CHANGE/REASON
4   ____  ____  _____
5   ____  ____  _____
6   ____  ____  _____
7   ____  ____  _____
8   ____  ____  _____
9   ____  ____  _____
10  ____  ____  _____
11  ____  ____  _____
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16  ____  ____  _____
17  ____  ____  _____
18  ____  ____  _____
19  ____  ____  _____
20  ____  ____  _____
21  ____  ____  _____
22  ____  ____  _____
23  ____  ____  _____
24  ____  ____  _____

Page 488

1          _ _ _ _ _ _ _
LAWYER'S NOTES
2          _ _ _ _ _ _ _
3   PAGE  LINE
4   ____  ____  _____
5   ____  ____  _____
6   ____  ____  _____
7   ____  ____  _____
8   ____  ____  _____
9   ____  ____  _____
10  ____  ____  _____
11  ____  ____  _____
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16  ____  ____  _____
17  ____  ____  _____
18  ____  ____  _____
19  ____  ____  _____
20  ____  ____  _____
21  ____  ____  _____
22  ____  ____  _____
23  ____  ____  _____
24  ____  ____  _____

Judith K. Wolf, M.D.

Page 489

**A**

**a.m** 1:16 9:5
89:18,19,20,22
139:7,8,9,12
**AACES** 7:20
**abdomen** 440:15
**abdominal** 22:12 408:4
411:3,23
**ability** 30:10
228:18 300:14
485:9
**able** 24:4 56:22
57:10 88:6
132:12 202:4
203:16 266:1
289:13 327:17
**abnormalities** 339:23,24
343:2,3,6
344:1
**abnormality** 339:22
**absolutely** 17:4
37:6 84:17
85:7 120:17
230:15 330:13
**absorbed** 457:2
**abstract** 36:10
219:16
**abstracts** 235:3
235:15
**academic** 444:22 481:22
**accept** 396:23
**accepted** 36:11
193:12 221:7
221:11,19
222:11 223:5
235:14 391:9
392:3 397:10
473:5
**access** 73:6,15
73:22 91:20
155:22

**accommodate** 11:9
**account** 196:18
311:6 402:9
418:7
**accounts** 462:20
**accuracy** 173:17
**accurate** 262:14
371:11
**accurately** 263:11
**acknowledged** 254:15
**ACKNOWLE...** 5:16 486:1
**ACOG** 360:13
360:17,23
361:5,10,19
362:3 364:19
365:6,20 366:3
**acquired** 136:5
315:16 320:20
**acted** 394:24
**actinolite** 117:11,13,13
118:9
**action** 303:7
304:2 485:12
485:13
**active** 49:10,13
49:16 363:14
365:24
**activities** 436:14
436:18
**actual** 95:10
221:1 371:9
**acute** 21:1,5
189:22 217:17
217:19,23
218:10,13
305:21 407:3
408:17 409:2
411:17 454:14
454:16
**add** 459:10
**add-on** 257:10
**added** 71:7 72:9

278:13 406:14
451:4 458:24
**adding** 321:20
392:23,23
**addition** 171:13
178:24 181:12
235:12,19
**additional** 40:3
54:4 82:1 90:4
223:3 244:13
287:8,9,23
288:13 359:1,2
483:8,9,13
**Additionally** 236:4
**additive** 71:7
166:4,14 167:3
167:5
**additivity** 167:7
**address** 302:11
364:13 447:8
454:4 455:8,17
**addressed** 392:5
**addressing** 393:8,18
**adequate** 273:13
273:24 276:14
396:16,23
397:3,3,11
**adequately** 204:6
**adhesion** 411:7
411:8
**adhesions** 23:14
25:7 27:2
407:17,23
408:9,12 409:1
409:4 411:13
411:16,22
412:9 413:12
454:13
**adjusted** 310:22
**Administration** 122:1 126:16
**Administratio...** 124:20 234:9
**admittedly**

132:12
**adulthood** 315:16,21
316:1,24
318:13,17
320:21
**advise** 348:3
**advisory** 363:2,4
**advocacy** 365:1
**advocate** 55:10
63:9
**affect** 148:11,12
148:18 207:17
**African** 7:19
**African-Amer...** 234:19 235:1
292:10,15,24
293:8,20
294:21 296:1
296:12,23
297:8,18,22
298:1,18
301:13,16
302:1,23 303:2
**African-Amer...** 8:10 293:15,17
295:2,10 296:8
296:15 328:3
**afternoon** 388:17,18
**age** 315:18
316:7 318:18
319:5 320:22
321:4,15 322:9
322:11 323:10
323:19 356:5
**aged** 321:21
**agencies** 480:18
**agency** 30:9
32:5 223:11
224:5 227:18
473:16
**agent** 179:19,19
283:24
**agents** 283:13
403:14
**ages** 321:6,7

322:24
**ago** 10:2,14
11:22 31:19,21
45:5 155:4
279:13 282:19
342:17 389:8
471:3 477:19
478:6,22
479:12
**agree** 21:12 22:2
38:14 116:4
156:3 158:17
187:14 188:13
189:15,21
202:19 214:11
217:12 220:7
220:13 221:23
224:2 232:10
233:12 237:15
243:12 245:10
254:5,12,13
265:6,14
266:14 287:14
287:21 296:23
305:10 311:13
315:14,19,20
316:16 318:10
319:5 320:24
328:21 329:11
331:1 332:15
335:14 344:10
350:10,16
353:14 364:7
368:21 383:16
385:6 436:10
439:21 462:6
**agreed** 132:23
**agrees** 281:9
**ahead** 11:2
89:14 460:15
**aimed** 354:20
**air** 476:3,3,5,7,9
476:13,15,18
476:21,23
477:13
**al** 7:10 8:6,13
**Alabama** 2:5

Judith K. Wolf, M.D.

Alexis 3:2
  225:18
alexis.kellert...
  3:3
Ali 42:14 358:15
allegedly 209:21
  214:13
Allen 2:2 39:16
  40:2,5 41:21
  42:6 43:14
  395:22,24
  396:2,9
ALLISON 2:18
allison.brown...
  2:19
allowed 289:2
allows 84:21
Ally 9:16
amendment
  31:11
America 3:14,18
  388:20 471:24
American 7:16
  7:19
amount 107:8
  108:18 110:2,8
  110:17 131:14
  151:14,14,14
  151:20,23
  161:14 166:5,8
  181:2,7,9,20
  183:11,18,21
  190:16,23
  191:1 219:8
  220:23 254:24
  257:2 295:16
  295:17 325:13
  327:8,24
  332:24 335:15
  335:18,22,23
  335:24 336:11
  336:23 337:3,4
  374:20 375:20
  375:21 386:7
  386:17 464:15
  464:20 476:20
amounts 169:6

347:16 377:5
  409:7
analysis 202:3
  239:3 247:8
  248:3 258:18
  258:19 261:18
  261:19 264:2
  268:10 270:1
  291:7 293:14
  303:5 305:8
  306:4 312:17
  317:11 333:8
  333:20 372:15
  384:11,13
  419:14
analyze 202:9
  302:21 304:13
analyzed 304:16
analyzing 152:4
  312:7
and/or 167:5
  182:9 372:8
  404:17
Anderson 48:11
  48:12,13,16,17
  48:18 156:2
  444:21
anecdotal 412:5
animal 14:14
  106:8 179:12
  182:1 192:16
  268:15 409:21
  410:7,11,18,21
  411:1
animals 175:19
  178:9,14,22
  180:5 184:5
  193:10 410:2,8
  410:12,17
animals' 411:2
Anna 8:13
annual 297:23
answer 11:2
  15:2 24:13
  26:5,23 32:1
  38:24 39:3,5
  58:16 61:17

77:1,16 83:18
  85:14 86:6,9
  86:15,16,23,24
  88:24 89:3,8
  89:10 106:1
  115:13 120:22
  123:10 138:1,2
  144:4 147:24
  149:16 156:18
  161:17 163:9
  178:7 184:12
  202:10 203:1,4
  203:14 208:10
  208:15 231:3
  231:19 233:8
  245:13 247:3
  255:22 256:9
  257:12 262:4
  267:8,19 268:1
  268:2,22 269:8
  269:9,10,12
  270:5 289:2
  296:14 298:15
  299:11,13,14
  300:14,24
  301:4,6,9,10
  323:22 326:2,3
  326:15 327:13
  334:10 343:20
  346:7 368:2
  403:24 439:18
  469:2
answered 20:12
  26:18 27:13
  60:19 76:9
  78:8 80:22
  81:18 110:6
  111:21 134:7
  150:24 163:18
  165:9 179:15
  179:17 184:2
  268:21 271:10
  295:20 298:5
  298:14 299:8
  301:2 312:22
  313:15 342:1
  480:24

answering 60:13
  460:23
answers 10:18
  24:5,16 486:5
anticipate
  210:13
anybody 96:14
  405:4
anybody's
  172:10
anymore 58:3,7
  185:11
Anytime 329:2
anyway 21:23
  41:15 139:5
  423:24
appear 40:4
  81:5 329:18
  377:7 450:10
APPEARAN...
  5:3
appears 37:2
  52:21 68:16
  100:20 103:13
  113:15 328:4
  459:4
APPEL 4:2
apples 162:7
application
  14:21 188:20
  189:2 190:6,9
  192:18 197:4
  208:9 332:16
  332:20 381:6
  385:4
applications
  108:17 332:4,4
applied 189:6
  193:22 194:4
  232:5 336:12
  346:10 441:11
  441:15 443:9
  443:11
apply 15:14
  107:7 441:11
  441:11
appreciate 84:7

389:6
approach 13:18
  278:3
approached
  67:1
appropriate
  99:20 149:18
  300:17 386:21
  452:1
approximately
  94:15 315:17
  316:24 479:14
  479:17
April 7:14 234:1
archived 135:13
area 29:6,11
  63:13 107:14
  133:9 199:8
  212:22,23
  233:17 274:5
  274:11 380:6
  441:2,22,24
  442:3 443:1
  452:6 453:12
  476:16
areas 379:21
  389:3 476:3,16
Arizona 48:14
  48:18,19 49:11
  478:22 479:7
arrive 228:1
Arsenic 6:19
  8:19
article 7:17
  12:17 31:22
  33:14 34:3,11
  54:13 90:15,22
  91:3,10 142:2
  142:9 143:12
  143:19 146:24
  198:16,18
  203:7 207:18
  213:22 217:5
  234:17 253:9
  262:13 278:11
  278:11 294:17
  312:10 328:10

Judith K. Wolf, M.D.

| | | | | |
|---|---|---|---|---|
| 350:23 351:3,7 | 145:8,17 146:6 | 411:2 417:9,13 | 110:5 111:21 | 349:9 353:12 |
| 351:21 354:1,4 | 146:18 147:9 | 417:20,21 | 120:18 132:18 | 362:9 390:12 |
| 354:16,20,24 | 147:16,21 | 418:6,9 421:13 | 134:7 150:23 | 407:8 412:4,7 |
| 374:7 385:23 | 148:14 149:1,5 | 421:14,20 | 163:18 165:9 | 424:17 |
| 389:10,24 | 149:13 150:4,9 | 422:8,17,22 | 179:15 231:20 | **asks** 34:14 |
| 390:16,17 | 150:10,14,17 | 423:4,8,13 | 233:6 268:20 | 401:20 |
| 391:7,9,13 | 150:20 151:3 | 424:11 425:21 | 271:10 289:8 | **assess** 405:6 |
| 392:17,23 | 151:20,24 | 426:2,6,10 | 289:12 291:9 | **assessed** 111:6 |
| 393:3,9 397:10 | 152:7,16 | 427:10 428:6 | 291:13,22 | 458:11 |
| 398:8 447:4 | 153:14,19,24 | 428:13,14,22 | 298:5,14 299:7 | **assessment** 90:7 |
| **articles** 13:13 | 154:4,9,15,17 | 429:2 430:16 | 299:8 300:6 | 90:20 92:15 |
| 17:23 27:21 | 154:22 155:1,7 | 431:5,20 438:9 | 309:8 310:8 | 281:16 364:7 |
| 34:1 43:6 69:8 | 155:16,19 | 448:5,13,17 | 313:15 317:7 | **assist** 24:5,10 |
| 70:16,17 98:10 | 156:5,23 | 449:3 451:18 | 318:9 322:9,20 | **assistant** 53:11 |
| 104:4,11,15 | 157:24 158:3,8 | 452:2 455:14 | 322:24 342:1 | 348:7,9 |
| 108:14 141:18 | 159:3,7 160:14 | 455:18 456:12 | 342:17,24 | **associated** |
| 157:11,22 | 160:16,23 | 456:17 457:15 | 358:14,14 | 176:18 182:8 |
| 214:6 278:7,10 | 161:9,14,15,21 | 457:19,23 | 389:9 449:15 | 343:3 368:5 |
| 278:22 279:6 | 161:21 162:5,8 | 458:4,21 459:8 | 451:17,21 | 400:7 438:5 |
| 279:23 351:14 | 162:11,12,17 | 459:8,9 463:19 | 452:10 454:12 | 456:7 |
| 351:18 357:10 | 162:19 163:1,5 | 464:2,5,15,20 | 454:19 456:11 | **association** 7:4 |
| 374:5 446:24 | 163:16 164:1,4 | 465:2,2,11 | 457:22 461:24 | 7:16,18 62:24 |
| 462:2,8 | 164:9,14 165:4 | 466:9 467:10 | 463:10 469:8 | 159:3 233:16 |
| **asbestiform** | 165:5,14,14,22 | 471:21,22 | 479:22 480:21 | 239:24 243:10 |
| 115:16 455:3 | 166:5,8,13,18 | 475:19 476:4,8 | 480:23 481:9 | 253:22 258:22 |
| **asbestos** 58:2 | 168:5,9,12,14 | 476:18,21,23 | **asking** 11:4 | 274:17 275:4 |
| 110:20 111:2 | 168:16,22 | **asbestos-related** | 26:12 27:7,16 | 276:6 277:8 |
| 111:12,14,19 | 169:3,7,15,23 | 339:7 344:15 | 29:2 45:11 | 367:23 368:4 |
| 111:24 112:18 | 170:5,6 171:2 | 345:9 | 52:6,10 55:23 | 368:13,15,18 |
| 115:5 116:24 | 171:13 179:1 | **ascend** 191:14 | 61:8 80:24 | 368:19 426:1 |
| 117:4,6,9,18 | 181:7 182:13 | **Ashkenazi** | 81:11 86:18 | 428:21 429:22 |
| 118:1,15,22,23 | 182:16,20 | 356:8 | 87:12 89:5 | 430:8,19 |
| 118:23 119:3,5 | 280:18 338:20 | **Asian** 379:23 | 96:23 97:4 | **associations** |
| 121:7 122:12 | 339:6,12,18 | **aside** 71:6 231:4 | 108:5,6 116:10 | 271:3 311:6 |
| 123:15 124:12 | 341:20 342:4 | 296:19 451:16 | 130:17 136:1 | 369:9 |
| 124:23 125:7 | 342:19 343:14 | **asked** 14:10 | 145:4 157:10 | **assume** 11:3 |
| 125:21 126:7 | 343:23 344:12 | 20:12 24:3 | 162:20,21 | 94:8 148:3 |
| 127:1,7 128:6 | 344:22 345:7 | 26:18 27:13 | 168:14 191:18 | 191:22 202:15 |
| 128:23 129:3 | 346:21 347:16 | 43:4 45:5,19 | 205:23 250:14 | 263:16 336:16 |
| 130:13,24 | 347:23 372:9 | 60:19 61:10,18 | 251:8 262:16 | 379:8,24 |
| 131:2,4,13,18 | 374:3,9,13,14 | 64:14,18,22 | 262:17,18 | 463:14 |
| 133:11,16 | 374:19,24 | 65:4 70:9 76:8 | 266:23 267:24 | **assumed** 145:18 |
| 134:5,9,18 | 375:21 377:15 | 78:8 80:22 | 269:13 271:11 | 284:16 315:23 |
| 138:20 139:16 | 378:15,23 | 81:18 83:4,6 | 271:12 296:19 | 316:4 336:11 |
| 141:1,6 142:10 | 380:1 400:3,16 | 84:2,16,18,19 | 301:17 313:3,8 | 455:22 |
| 142:21 144:1 | 401:6 404:4 | 85:13 86:21 | 340:20 342:3,4 | **assumes** 366:7 |
| 144:16,22 | 410:12,22 | 101:13 109:9 | 344:5 348:17 | 420:18 |

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 271 of 1035
PageID: 241450
Judith K. Wolf, M.D.

Page 492

assuming 117:3
117:4 144:9
145:12,23
175:19 319:22
332:11 386:18
390:24 395:18
396:20 397:10
assumption
110:19 146:2
146:11,21
147:5,18
148:10 152:6
152:14 366:9
377:13 395:10
assure 312:4
ASTM 419:5,15
419:20 420:6
Atlanta 46:9,11
47:7 49:4
atomic 326:7
attached 37:22
53:5 486:7
attempted
107:11,24
108:10 150:1,7
161:19 162:1
162:15 168:19
189:4 191:13
218:19 219:3
302:11 328:10
334:7 373:2,5
375:1
attempts 162:23
attention 157:4
224:19 225:1
225:21 250:11
253:8 258:1
274:24 305:13
305:22 311:14
313:13 361:23
attorney 12:1
42:15 43:14,17
485:11,12
attorneys 14:9
42:6 69:22
70:1,6 72:18
81:20 97:14

395:18
**Austin** 1:14,15
3:13 44:2
**author** 16:20
90:15 199:19
199:23,24
200:15 220:21
220:22 304:12
386:4 394:24
**author's** 308:8
311:9
**authored** 93:10
390:17 462:3,8
**authoring**
351:13
**authoritative**
229:19
**authority** 30:4,8
32:7 100:14
229:1 270:21
271:8 280:12
281:8
**authority's**
270:15
**authors** 250:12
253:13 263:11
307:13 310:18
395:2 450:11
**available** 14:2
80:3 84:23,24
91:3,8 104:11
224:4 234:12
235:3,5 236:12
243:14 244:4
265:13 281:14
281:20 329:20
**Avenue** 3:3,12
3:17,21
**average** 316:7
370:5 371:13
**aware** 28:5
29:21 34:24
43:6 45:9
46:22 56:19
57:20,22 58:18
67:22 81:19
110:9 115:24

116:22 117:19
121:24 122:5
122:10 123:12
123:18,21
124:9,15
129:18,22
162:14,22
163:8,14 165:4
165:10 167:19
167:24 168:17
192:8,12
222:14 226:2
245:19 246:8
247:11 280:11
280:16 281:8
291:14 326:5
328:9 336:5,8
349:23 361:2,8
384:12 388:21
405:4 407:15
407:21 408:2
411:4 412:12
412:15 414:1,2
416:14,17
417:12,17,19
418:4,14 422:4
422:14 423:2,6
432:8,15 433:6
433:11,13,17
433:20 434:11
434:16,18,22
435:2,5,6,23
436:6,23 437:6
438:8,10
440:24 442:23
471:12 472:15
473:14,21
474:13,16,21
475:4

---

**B**

**B** 4:2 69:14,18
69:20 70:3,6
70:13,22 71:1
71:12,19 72:11
77:8 78:4 79:4
79:5,12 81:5

81:15 320:18
483:5
**B12** 433:21
**baby** 123:22
124:2,11,20,22
125:20 127:1,7
128:1,5,22
129:2,19 130:2
130:13,23
131:1,3,9,14
131:18 133:15
134:5,8,12,17
134:22 136:18
142:15,19,20
143:6 144:2,8
145:7 146:5
147:19 150:3,8
150:15,21
151:9 165:23
170:6,24
171:16 174:24
175:13 176:2
180:8 182:14
182:16,19
183:6 372:2,17
373:3,10,17,24
375:7,23 377:7
420:15 447:17
448:5 458:6
464:6,16,20
465:3,4,9
468:14 474:1
**back** 38:2 89:21
89:24 94:7
98:2 120:16,20
139:11 155:8
162:2 165:12
169:20 181:6
195:13 208:11
212:7 213:8,15
219:2 225:13
225:16 253:1
263:3,14
279:21 281:22
315:10 324:20
332:9 378:8
388:13 392:8

393:7 403:2
418:22 430:6
440:12 444:5
445:21 452:9
461:20
**background**
43:2 419:4,19
420:7
**backside** 334:6
**bad** 343:11
377:11 422:13
**balance** 227:8
**banned** 29:18
407:18
**Banner** 48:13,13
444:21
**based** 76:10
108:22 124:10
159:5 191:23
195:12 201:4
201:17 202:15
202:20 203:20
212:8 217:12
229:7 253:23
259:20 281:18
285:20 301:24
303:23 318:5
318:10 327:9
327:14 338:1
347:17 377:13
385:23 400:11
423:12,14
426:3 428:13
428:23 430:17
455:24
**baseline** 298:24
**basically** 203:15
**basis** 34:6 75:7
75:11,14 76:3
76:6 77:23
78:5,10,13
87:1 88:21
93:9 125:19
126:5 127:6
181:22 190:22
**bathroom**
195:17 436:16

Judith K. Wolf, M.D.

Page 493

Beach 2:10
beans 435:3
bear 370:22
  389:5
bears 113:13
Beasley 2:2
  39:16 40:1,5
  41:21 42:6
  43:14 395:22
  395:23 396:2,9
becoming 43:10
  60:10
began 31:7
  49:23 303:7
  311:24 316:22
  318:11 349:22
  349:24
beginning 1:15
  139:11 253:1
  269:20 311:15
  378:8
begins 9:2 100:6
  101:8 227:1
  273:12 317:20
begun 323:1
behalf 395:6
beings 175:14
  178:2,3,10
belief 147:14
  191:23 348:15
  359:22 382:7
believe 13:6
  25:14 28:8
  46:12 49:3
  50:8 53:6
  56:15 58:7,17
  59:1,14 95:16
  111:11 112:16
  119:18 125:2
  127:6 131:1,18
  134:8,11
  136:12 143:16
  147:4,5 148:12
  151:19,23
  153:13,23
  154:4,17
  158:12 161:7

162:4 163:4
165:17,23
173:11 176:5,8
179:16 182:13
184:2 192:1
194:21 198:1
221:6 223:4
227:17 228:6,7
228:14 235:7
254:15 255:10
261:6 278:8
281:17 282:17
285:15,19
293:1 297:18
312:11 322:23
338:12 339:5
339:11,17,18
340:7 342:3
352:8 359:16
361:9 363:19
366:2 369:3
371:14,24
372:2,6 373:11
375:22 379:16
379:19 380:8
380:19,21
381:2,4,7,9
385:2,11
387:22 389:8
395:20 413:21
421:3,16
422:21 429:7
455:2 465:9
469:19 474:10
believed 155:6
believes 283:13
berating 300:16
Berge 8:6 247:7
247:12,14,20
248:2,11 249:1
249:5,17,24
250:9,16 251:2
251:16 252:11
253:6 257:14
258:2 262:2
264:2,7,17,21
265:7,11

283:10
Berge's 257:15
  259:12 261:11
best 8:17 30:8
  32:16 243:2
  255:7 300:14
  340:10 341:4
  341:10,23
  354:3 365:2
  447:3 479:16
  485:9
beyond 126:22
  134:22
bias 99:21
  103:14 254:2,9
  254:14 255:9
  255:12 284:22
  302:12 304:3
  305:11,17
  306:5,6 310:24
  311:5,10,15
  312:5,12,19,24
  313:18,18
  314:1 329:4
BIDDLE 3:6
big 255:3
bigger 113:11
biggest 153:9
bike 195:18
  436:16
billed 41:21
  219:19
binder 68:14,24
  113:3
binders 69:4,13
  71:21 483:4,10
  483:17,21
biologic 367:24
biostatistician
  256:1
birth 56:2 65:7
bit 10:14 24:22
  25:22 26:12
  44:19 344:8,8
  348:12 480:1
Black 7:13
Blair 6:16 98:21

98:23 99:1,6
99:10 100:13
100:17,20
blocked 195:2
blogged 462:18
blood 2:13 192:9
  432:23 433:2,7
  434:12,14
  435:16,18
  457:3
Blount 141:3,5
  142:23
Blount's 141:15
  141:17 142:8
  374:6
blueprint
  391:15
board 278:20
  279:4 363:2,3
  363:4
body 7:18 15:14
  15:15 18:13
  23:15 32:15
  56:21 189:8
  190:10 196:16
  205:20 211:8
  215:1 220:15
  243:13 244:10
  253:23 254:7
  278:8 279:22
  281:21 311:6
  319:4 320:22
  335:23 399:14
  399:22 400:1
  400:18,24
  401:14,24
  405:3,11
  407:16 409:8
  409:13 415:16
  416:6,16
  420:24 433:4,8
  434:4,13,15
  435:17 436:12
  437:2,18
  438:17 439:24
  440:2 471:5
  477:7

body-only
  204:18 205:5
body-use-only
  206:7,11
bold 99:15
bomb 326:7
bombs 326:22
borderline
  241:2
bottle 151:9
  170:15,24
  171:11 183:6
  372:19 374:24
  452:16 453:1
bottles 136:19
  171:2,13 191:6
  191:7
bottom 332:10
  394:20
bounds 84:9
boys 316:12
Bradford 286:1
  286:7,13,17,24
  287:4,5 288:16
  333:13,18,22
  366:17,23
  367:4 368:16
brain 169:5
BRC1 337:12
break 11:8
  65:21 85:7
  88:16 89:14
  139:5,15
  203:12 210:11
  211:5,16 213:7
  241:20 253:5
  281:7 315:5
  378:12
breaks 11:6
breast 337:18
  355:21,24,24
  356:4
breath 185:19
  475:1,8,11,12
  476:5
breathe 474:17
  474:24 476:22

Judith K. Wolf, M.D.

| | | | | |
|---|---|---|---|---|
| **breathed** 432:6 | 87:24 88:5,14 | 161:6 162:13 | 238:19 239:1,5 | 320:9,15 |
| **breathing** | 89:11,13,16,23 | 163:13 164:5 | 239:10,13 | 322:12,21 |
| 342:19 344:2 | 92:3,6,16 93:1 | 165:1,20 | 240:7,10,14 | 323:7,16 324:1 |
| **briefly** 13:22 | 93:2 94:6 95:3 | 166:11 167:15 | 242:15,21 | 325:5,22 327:1 |
| **brings** 27:23 | 95:12,17 97:2 | 168:10 169:10 | 243:3 244:1,9 | 327:5 328:8,20 |
| **broad** 450:16 | 98:3,20 101:4 | 170:11 171:4 | 244:18 245:4 | 329:5 330:2,23 |
| **broader** 278:9 | 101:21 102:6,8 | 172:8 173:8,23 | 245:16 246:3,5 | 331:19 332:14 |
| **Broadway** 2:14 | 102:17 103:3 | 174:12 175:10 | 247:6 248:1,16 | 333:11,19 |
| **brought** 58:1 | 103:10 104:1,7 | 175:22 177:1 | 249:21 252:1,9 | 334:19 335:3 |
| 68:2,5,7 394:5 | 104:16 105:16 | 177:23 178:11 | 252:17 253:3 | 335:13 336:3 |
| **Brown** 2:13,18 | 107:9,20 108:7 | 179:3,9 180:2 | 253:20 255:13 | 336:19 337:5 |
| 5:7,10,13 9:13 | 109:1,12,20 | 180:20 181:21 | 260:6,16,18 | 338:17 339:14 |
| 9:16 11:17 | 110:15 111:10 | 182:11 183:3 | 261:9,22 | 340:19 341:1 |
| 12:10 13:14 | 112:1,11 113:8 | 183:19 184:13 | 264:13,22 | 341:17 342:7 |
| 17:10 18:11,21 | 115:7 116:1,11 | 186:13 187:1 | 266:10 267:11 | 342:16 343:10 |
| 19:7 20:16 | 117:7 118:10 | 187:13,21 | 268:7,17 269:3 | 344:6,19 |
| 22:1,15,24 | 119:1,14 120:1 | 189:3,14 190:7 | 269:11,15,17 | 345:15 346:17 |
| 23:10 24:1,14 | 120:17,21 | 191:9,20 | 270:11 271:5 | 348:1 349:6,7 |
| 26:10 27:3,19 | 121:4,17 122:8 | 193:14 195:21 | 271:16 272:4 | 349:17 350:18 |
| 29:3,15 30:12 | 122:15,18 | 196:5,15 197:5 | 273:5 274:23 | 350:22 353:10 |
| 30:22 31:14 | 123:1,5,8,20 | 197:18 198:8 | 275:13,18,24 | 353:22 357:8 |
| 33:6 35:9,15 | 124:8,17 125:8 | 198:23 200:13 | 276:1,12 277:4 | 363:7 364:1,16 |
| 36:14,20 37:19 | 125:16 126:4 | 201:12 202:1 | 279:10 280:19 | 365:4,22 |
| 38:24 39:13,14 | 126:12 127:4 | 202:18 203:8 | 281:6 282:2 | 366:14 367:1 |
| 39:23 40:9,17 | 127:11 128:11 | 203:18 204:11 | 283:3 284:19 | 367:12,18 |
| 40:22 41:2,5 | 128:17 129:6 | 204:22 205:9 | 285:11,22 | 368:11 369:5 |
| 41:12,18 44:3 | 129:11 130:9 | 205:18 206:17 | 286:20 287:20 | 369:18 370:15 |
| 44:17,18 50:17 | 130:20 131:20 | 207:23 208:20 | 288:18 289:5 | 372:13,20,23 |
| 52:12,17 53:1 | 132:3,10,19,20 | 210:4,10,14,18 | 290:7,19 292:1 | 373:1 374:22 |
| 54:1 55:15 | 133:12 134:10 | 211:2,3,14 | 294:5,10,15 | 376:14 377:3 |
| 57:12 58:8 | 135:1,16 136:3 | 212:3 213:7,19 | 296:3,9 297:5 | 377:10,20 |
| 59:6 60:12 | 136:16 137:4,8 | 214:4,5,22 | 298:6 299:1,10 | 378:10 380:16 |
| 61:3 62:18 | 137:17 138:8 | 215:9,23 | 299:16,18,22 | 382:4,18 383:1 |
| 63:7 64:6 | 138:18 139:3 | 216:10,20 | 300:1,18 301:5 | 384:1,22 |
| 65:12,20 66:8 | 139:13 140:13 | 217:4 218:18 | 301:18 302:6 | 385:19 386:22 |
| 66:10,15,23 | 140:20 141:13 | 219:18 221:4 | 302:16 303:11 | 387:13 388:3 |
| 67:8 68:11 | 142:5 143:18 | 222:5,13 223:1 | 303:18 304:8 | 389:9 425:7 |
| 73:9,17 74:1,8 | 144:13 145:5 | 224:1,12,17,20 | 305:19 306:2 | 426:13,21 |
| 74:22 75:16 | 146:1 147:17 | 224:22 225:6 | 306:15 307:12 | 427:17 448:6 |
| 76:14 77:6,21 | 148:8 149:2,22 | 225:11,14,18 | 307:19 308:7 | 449:6 450:20 |
| 78:12 79:8 | 150:12 151:6 | 225:19 226:17 | 308:18 309:4 | 452:3,19 453:2 |
| 80:5,8,16 81:1 | 151:18 152:2 | 228:20 229:23 | 309:16 310:17 | 453:10 454:1 |
| 81:12,22 82:9 | 153:12 154:12 | 230:15,21 | 313:6,22 | 455:19 456:20 |
| 82:12,17,21,23 | 156:12,20 | 231:5,8,12,16 | 314:18 315:2,5 | 458:8,23 |
| 83:19,22 84:2 | 157:3,12,18,23 | 231:23 232:17 | 315:12 316:6 | 459:17 460:1,7 |
| 84:17 85:5 | 158:23 159:11 | 233:9,20 236:7 | 317:9 318:7 | 460:14,18,21 |
| 86:7,20 87:20 | 159:22 160:7 | 237:4,22 | 319:2,11,20,24 | 461:1,12,14,23 |

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 274 of 1035
PageID: 241453
Judith K. Wolf, M.D.

Page 495

463:6,9 464:3
464:11,23
465:18 466:6
466:17 467:3
469:7 470:1,16
482:15,18
483:18,24
**Brown's** 399:12
**building** 42:15
42:18
**bulk** 133:15
223:18
**bullets** 355:14
355:15
**burden** 7:9
**bursa** 409:22
**Buz'Zard's**
220:16
**byline** 351:8

———————
**C**
**C** 2:1 3:1 4:1
320:6,8
**CALCAGNIE**
2:8
**calculated** 109:2
256:12
**calculation**
256:4 257:14
257:16 259:13
261:11
**calculations**
452:23
**California** 2:10
2:15
**call** 263:20
398:5 478:15
478:18 479:21
481:4,7
**called** 9:9 46:2
351:14 360:13
416:19 449:11
481:11
**calling** 286:18
**Canada** 90:7,21
281:16
**Canadian** 90:20

**canal** 442:2,18
**cancer** 7:5,17,19
7:19,22 8:5,8
8:11,15,18
14:1,22,24
15:7 17:8 18:4
18:14 19:12,19
19:23 20:1,8
20:15,19 21:13
21:18,20 22:6
23:4,9,15 25:3
25:13 26:1,9
26:16 27:11,18
28:7,24 30:1
32:6,16 42:23
43:5,7 44:13
45:7,14 47:18
48:3,4,7 54:14
54:18,23 55:7
55:18,21 56:3
56:4,6,8,16,23
57:1,6,16,24
58:10,22,24
59:3,9,16,17
61:6,12,16,23
62:4 63:1,18
63:22 64:10,13
64:16,20,23
65:7 67:3,13
76:7 106:6,20
107:23 108:10
108:11 109:4
109:23 110:4
110:18 126:23
138:16 153:1
153:11,15,22
154:1,7,18,21
155:7,13,16
156:5,23 158:4
158:9 159:4,20
160:2,15,18,23
163:16,23
164:10,21,23
165:6,19 166:7
166:10,16,19
166:22,24
167:1,12,19

168:13,23
169:8,12,17
171:7,17
174:15,20
175:2,6 176:4
176:9,16,20
177:6,11,19
178:16 179:6
179:12,19,20
179:22 180:1,9
180:15,16
181:18 182:6
183:12,23
184:5,8 185:11
188:7,15
189:18 190:5
195:5,24
196:10 197:3
203:22 204:4
205:4 208:15
208:24 209:15
212:10 217:15
217:19 219:9
220:6,9,19
222:7 224:5
226:5 229:2,5
229:15 232:23
233:17,24
234:21,23
235:1 237:7,19
238:7 241:7,9
243:10 244:3
244:11 245:9
248:20 251:21
253:15,23
254:8,21 257:9
259:3 264:10
265:17 266:17
267:5,15 268:5
270:13,19,22
271:2,7,13,17
271:19,22
272:9,20,21
273:1,6,8,11
273:14,22
274:4,14,17
275:1,5 276:4

276:7,14 277:5
277:9,23 278:4
278:6 279:1,19
280:2,13,21
281:2,10,19
282:17 284:11
289:3 290:18
290:23 291:4
292:9,21
294:23 295:3
295:17 296:16
296:24 297:14
297:21,24
298:10,12,17
298:19 299:5
301:14,16
302:2,5 303:1
303:1 304:4,20
309:10,22,24
310:8 311:7
316:13 317:21
317:23 324:23
325:8,13,20
326:1,9,9,11
326:15,17
327:9,21,22
328:5,13
331:14 336:22
337:11,13,14
337:18,18
338:4,19
339:20 340:2
342:6,15 343:2
343:5,7,22
346:11,21,23
347:19,24
348:5,16
350:11,24
351:23 352:9
353:18 354:3
354:21 355:1,7
355:13,21,24
356:1,4,5,13
357:3,12
359:15,18,23
360:24 361:5,7
361:13 362:5

362:20 363:1
363:11,18,21
364:20 365:16
366:5 368:6
372:3 375:24
376:4,6,12,19
376:24 380:9
381:16 382:16
387:16 389:11
389:14,19
395:6 397:15
399:15,24
400:8,13,18,24
401:13,23
404:21 405:2,7
406:19,21
407:6,11,13,14
407:24 410:3,8
410:13,16,19
411:3,9,15
412:1,10,19
413:13 420:23
421:8,9,15,18
421:20 422:2,5
422:18,23
423:5,10,14
426:2 428:13
428:22,22
429:10 430:4
430:11,17,21
437:3,20 438:6
438:19 439:1
439:14 445:2,6
445:7,9,11
447:4 449:11
454:17 456:5,8
456:10 457:16
458:2,7 462:3
462:10,14,21
463:1 464:16
464:22 465:5
465:17,22
466:3,20 467:2
467:7,9,11,19
467:23 469:1
472:4,23 473:3
473:6 480:18

Judith K. Wolf, M.D.

**cancer's** 223:11
267:6
**cancers** 21:22
21:22 133:9
160:19,19,20
160:20 238:14
240:22 347:9
406:21
**capable** 115:15
116:23 401:12
401:22 402:2
405:1 445:9
**carbon** 7:13
192:6
**carcinogen**
458:21
**carcinogenesis**
25:6 154:6
206:13 220:18
385:5 400:2
**carcinogenic** 6:9
6:21 7:12 8:21
31:10 127:3
150:17 153:21
154:10 164:14
164:15,16,17
164:18 168:6,7
168:8,9 170:8
170:9 171:9,10
221:3 280:18
280:18 281:3,5
282:1 283:13
283:24 284:18
284:21 285:14
286:23 340:12
372:8 373:7
376:5 377:2
385:5,16 401:5
401:7 402:8,8
403:8,8,12,16
404:4,5,6,8,9
404:19 431:24
432:2 434:6,6
434:8 458:13
458:14 459:3
**carcinogenicity**
168:3 182:10

205:2 206:12
283:21 432:4
**carcinogens**
387:17 457:20
**carcinoma**
238:5
**care** 4:5 12:22
42:22 59:15
131:9 149:6
186:1 187:4
**career** 408:5
462:7,13,18
**case** 1:4 10:3,6,9
29:17 43:9
45:21 56:14,19
57:20 95:2
96:16,24 106:1
107:11 108:9
111:18 152:5
157:7 158:2
170:13 191:23
196:18 203:17
207:4 208:1
216:12,18
225:24 234:16
268:9,19 270:2
271:23 303:4
303:13 359:5
360:22 367:9
370:18 388:20
450:19 464:13
468:6 471:15
473:23,23
482:11
**case-control** 7:6
199:1 235:6,20
236:17 247:24
249:18 250:5,8
253:16 254:1,6
254:14,16
255:6 258:23
259:8 275:6
277:16 287:9
287:23 288:4,9
289:8,11,15,19
290:21 291:6,8
291:16 302:3

302:24 304:13
311:16 327:7
327:10 370:11
387:23
**cases** 1:6 216:18
216:23 217:3
259:2 308:24
357:20 395:7
**Casper** 17:9,17
17:22 18:9
19:5
**category** 283:23
417:1,2
**causal** 92:15
159:2 233:16
426:1 428:21
**causation**
107:17 235:4
268:15 287:12
290:2
**causative**
237:18 271:4
**cause** 14:1,22,24
15:7 21:13,18
25:7 26:7,16
27:10 61:12
62:3 106:6
109:3,22
153:14,21
154:18 156:5
167:12 168:13
171:6,17
174:24 177:10
178:21 181:24
182:5 183:12
183:16,22
184:4,10
188:15 189:17
208:24 209:15
213:2 217:14
220:6,9,19
298:9 325:8
339:13 343:9
343:22 346:11
372:7 376:3,5
376:18 381:15
385:4 399:23

400:13 402:15
402:16 403:3
404:12 405:6
406:18 407:2,6
407:10,12,16
407:24 408:9
409:17 411:3,6
411:8,13,15
412:10,18
413:13 420:22
421:9,17,20
422:2 438:24
439:14 445:11
456:2,5,7,9
457:16 459:2
464:16 465:17
465:21 466:19
467:6,9,10,19
467:23
**caused** 22:3 23:4
28:7 154:21
155:7 178:2
179:12 310:24
344:12 410:8
410:12 416:19
**causes** 20:2 23:8
27:18 55:20
56:15,23 57:5
57:16 58:10,21
61:23 64:9
67:3 76:6
106:20 107:22
108:9,11
110:18 153:24
154:6 158:3,8
160:23 163:16
164:10,21
166:22,24
168:23 178:15
182:6 184:6
188:2 189:16
189:21 220:24
280:13,21
281:10 284:11
297:14 336:22
339:18 346:21
348:5,16

350:12 351:23
352:9 357:3,12
359:14,23
362:5,20
363:20 372:3
375:23 376:6
380:9,20
381:22 384:5
385:14 400:17
400:24 407:24
410:18 421:7
421:15 437:20
454:17 462:14
462:21 463:1
465:5 466:3
467:1 469:1
**causing** 22:18
23:14 212:12
214:14 219:14
339:7 342:20
401:9,12,23
402:12 405:2
406:24 445:10
458:1,7 464:22
**caveats** 267:3,7
268:3 290:16
**cavities** 411:3
**cavity** 19:18
22:12 230:3
457:6
**CDC** 366:3
**cell** 215:1
219:13 241:2
241:11,18
242:9 381:21
381:24 382:2
382:16,17
479:24
**cells** 189:6 221:2
380:23 381:8
382:15 385:15
385:15 406:23
**certain** 66:1,5
107:1,8 175:24
250:21 284:5
398:16 417:12
464:14 473:18

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 276 of 1035
PageID: 241455
Judith K. Wolf, M.D.

Page 497

476:17,20
**certainly** 18:19
21:12 28:16
82:24 83:11
88:16 121:23
128:23 132:23
160:15 188:1
191:6 260:24
343:8,24 353:1
443:5 451:7
**certainty** 400:12
**CERTIFICA...**
5:15 485:1
**Certified** 1:18
485:3,18,18
**certify** 485:4,7
485:10 486:4
**cervical** 166:24
167:1 193:6
**cervix** 193:5
441:3,6 442:3
442:6,18
456:24
**cetera** 451:11
**cgarber@robi...**
2:9
**challenge**
472:22
**challenges** 255:2
333:6
**challenging**
29:12,14 255:1
333:4 334:10
**chance** 103:8
202:13 284:22
369:24
**chances** 171:12
**Chandler** 17:9
17:17
**change** 30:11
98:2 134:3
148:15 172:1
252:17 311:18
311:18 375:3
378:2 380:23
382:2 409:3
461:8

**CHANGE/RE...**
487:3
**changed** 72:9
237:17 379:17
**changes** 19:15
19:17 219:17
221:1,2 280:6
381:21,21,23
382:13,14
393:9 406:24
407:2 409:23
456:7 486:6
**changing** 172:4
**chapters** 63:21
**charge** 358:15
**charged** 358:5
**chart** 113:16
114:12,18
116:3,19 117:8
117:24 119:16
121:8 155:6,9
155:10,11,11
383:13,18
**charts** 263:6
383:21 416:13
**check** 92:24
122:1 174:1
386:19
**checking** 122:6
**chemical** 170:14
185:17 186:11
**chemicals**
174:23 175:12
175:24 177:7
181:24 290:3
**chest** 206:4
339:22,24
343:3,6 440:16
**children** 387:1,7
**China** 379:15,24
**chocolate** 435:4
**choose** 267:19
360:15
**chose** 251:23
252:7 264:11
264:24
**chromium**

111:3 164:16
168:7 372:10
400:5,16 404:7
431:24 432:8
432:22 433:1,3
433:7
**Chromium's**
432:17
**chronic** 20:24
21:4,4,9 22:13
23:3 217:19,23
217:24 218:5,5
218:10,14,21
380:9 381:16
381:20 406:22
407:4,5,8,10
407:12,13
408:24 456:6,8
**circumstance**
337:22
**circumstances**
50:23
**cite** 22:16 23:1,7
25:18 27:16
193:16 224:3
230:7 283:8
469:13
**cited** 20:5 72:3
74:18 95:10
101:19 140:1
283:2 382:19
414:3 420:12
449:24
**cites** 143:1
320:23 383:3
468:9
**citizen's** 228:22
229:11 232:1
329:12
**city** 474:17
**clarification**
52:6
**clarify** 178:20
308:15
**clarifying**
172:13
**class** 303:7

304:2
**classification**
227:14 283:12
**classified** 276:4
**clear** 29:4 39:11
40:21 85:12
152:8 216:11
241:18 322:18
324:21 326:22
349:8 377:4
380:7 444:10
**clearly** 159:4
426:3 428:23
**Cleveland** 3:22
**client** 471:12
**clinical** 28:13
46:3,5,7,22
47:13 360:12
**clinician** 33:15
**clinicians**
360:15
**close** 67:17
244:12 247:9
354:8 356:3
369:10,15,21
**coalition** 233:24
363:2,11,19
364:4,20
365:17
**coauthors** 35:17
480:8
**cobalt** 111:4
164:17 372:10
400:5,16 404:8
431:24 433:20
434:2,7,12
**cofactors** 200:12
200:14
**cohort** 99:18
101:13 103:16
159:5 197:16
236:23 237:10
238:3,11
240:20 242:4
242:13 243:5,8
247:14,21
248:12 249:4

249:10,15
255:3,15
256:22 258:18
258:23,24
259:5,9,14
261:14,20
265:11,14,21
266:4,13,22
275:6 277:17
282:4,11
287:11 288:24
289:20 293:11
383:10,22
423:14 426:4
428:24
**cohorts** 242:10
247:24 248:11
249:19 261:12
261:24 262:7
265:9,11,16
266:22 268:9
268:19 270:2
324:12 370:17
**colleague** 43:8
385:21 388:5
**colleagues**
185:23 362:1
362:24 371:2
**colon** 337:14
**Colorado** 130:2
**column** 159:1
253:12 258:5
310:21 425:24
429:8
**combination**
164:20 165:17
166:9,21,22
169:15 376:17
404:19
**combined**
250:13,23
251:5
**combining**
261:2
**come** 51:7 59:15
104:10 206:23
212:7 213:8

Judith K. Wolf, M.D.

Page 498

253:15 283:5
326:8 327:7
358:13 361:20
361:21 365:8
411:19 477:6
**comes** 15:13
17:16 126:7
270:22 274:13
**coming** 105:6
124:21 195:6
379:20 441:1
**commencement**
485:4
**comment** 34:15
429:17
**commentary**
132:16 149:16
172:4
**comments** 392:4
392:12,19
393:2,7,9,12
393:17,18,19
416:3
**Commerce** 2:4
**commercial**
136:13,13,14
**commission**
486:17
**committed**
121:2
**committee** 2:6
2:11,16 280:6
361:21
**common** 187:11
238:6
**commonsense**
295:14
**communicated**
477:24 480:16
**communication**
84:20 85:18
**communicatio...**
86:3
**community**
46:16 51:20
52:2,7,15
116:13 133:14

193:12 194:8
194:22 195:8,9
221:8,12,20
222:4,12
228:15 348:3
**company** 25:18
46:2 51:3,5,8
51:12 53:10
73:4,12,16
77:7 79:10,17
88:20 147:13
352:14 388:22
416:1,1 446:6
**compare** 190:22
191:6 223:7
251:7
**compared**
313:19 346:23
367:23 392:12
**comparing**
261:17
**compiled** 81:16
81:20
**complete** 101:8
246:24 427:10
**completed** 96:9
96:11
**completing**
359:4
**complications**
408:13
**component**
165:15 458:4
461:6 467:21
**components**
127:2 152:22
153:3 154:5
162:11 166:9
169:22 173:15
173:18 176:22
177:21 184:10
290:4 343:22
379:17 465:9
**composition**
170:14 371:23
452:24 454:7
**comprehensive**

427:7
**comprise** 74:13
**comprised**
259:2
**concentrate**
138:19
**concentrations**
476:4
**concept** 203:19
250:17
**concern** 17:21
20:24 21:9
23:9,13 25:5
25:13 26:6
27:1 28:9
60:11 61:1
84:7 126:21
131:11 148:22
151:15 153:9
153:10,17
155:17 167:5
175:9 181:18
181:19 182:23
196:3 254:13
281:1 311:16
369:7 370:1
373:7 406:22
459:10
**concerned** 20:3
60:24 165:16
177:4,22
180:17 183:2
183:18 246:22
255:11 354:21
369:20 370:6,7
407:3 464:21
**concerning**
162:10 176:23
178:23 179:1
179:21 217:18
353:4
**concerns** 16:15
17:7 20:6
45:13 67:12,14
362:9 376:13
384:13,14,21
384:23 400:2,8

400:10 437:24
459:1
**concert** 33:10
**conclude** 18:15
310:18 457:14
**concluded**
159:12 227:9
275:2 280:12
280:20 307:14
313:23 384:16
457:18 484:6
**concludes**
233:14 306:23
316:23 331:8
484:3
**concluding**
341:18 346:20
**conclusion**
18:13 27:23
106:19 148:7
159:17 160:13
160:22 214:23
223:11 227:21
228:1 285:20
306:16 307:22
308:9 314:11
320:18 322:14
323:23 340:16
340:21 341:3
347:2 365:9
385:7 431:1
**conclusions**
32:19 102:16
106:12 188:14
314:14
**conclusive**
233:15
**condom** 195:23
**condoms** 16:11
16:24 17:8,15
17:21,24 18:5
18:14 19:13,16
20:9 25:9,19
196:8 197:8
**conducted**
123:13 303:5
**confer** 473:11

**conference**
54:21 462:24
**conferences**
63:17
**confidence**
263:12,20
284:24 369:9
369:21 370:2
**confident**
369:15
**confirm** 71:5
263:16 323:6
328:19
**confirmation**
288:14
**confirmed** 119:4
**conflict** 394:20
396:17,21
**conflicts** 395:3
**confounded**
312:5
**confounders**
200:16
**confounding**
204:9 284:22
**confused** 62:16
130:16
**confusing** 52:11
58:17
**confusion**
393:24
**Congress** 3:12
**conjunction**
40:14 176:21
364:12
**connecting** 27:6
**connection**
25:18 29:17
30:14 61:16,19
130:11 138:10
154:14 191:21
193:15 225:23
257:19 340:3
349:11,20
358:7 359:11
372:15 386:8
**consider** 13:2

Case 3:16-md-02738-MAS-RLS   Document 33123-4   Filed 08/22/24   Page 278 of 1035
PageID: 241457
Judith K. Wolf, M.D.

Page 499

30:3,7,13,16
30:21 32:4
70:20 74:17
105:2 124:18
127:20 130:1,3
130:10,18
197:23 205:10
207:10 211:17
221:13 256:21
257:13 259:12
261:10 265:12
266:12 268:13
270:20 271:6
271:21,24
272:19,24
282:3 303:4,13
308:8 311:9,20
314:2 317:10
323:8,18 324:3
329:3 341:3,21
360:22 367:14
367:22 368:12
368:14 396:23
458:20 473:18
**consideration**
126:20 127:17
**considered** 16:9
32:18,22 70:19
87:17 128:4
130:18 138:14
159:24 187:16
197:10 199:14
204:16 223:4
227:20 278:19
280:17 281:2
301:20 305:7
315:3 322:19
340:21 342:8
345:17 347:18
365:5 369:6
397:11 414:5
420:7 450:18
451:8,13
467:10 469:14
470:4,10
**considering**
8:12 32:11

197:6 223:10
355:8 455:3,12
**considers** 226:3
**consistency**
255:8 288:15
288:20 289:21
367:24 370:17
**consistent** 66:7
240:16 241:23
289:16 290:5,6
290:22 368:15
368:18 370:5,9
**constituents**
166:14
**consult** 104:18
104:20,23
**consultant**
395:1
**consultants**
478:1
**consulting** 396:6
**consumed** 422:6
422:15
**consumer**
144:10,15
145:9,10 146:8
148:2
**contact** 156:11
**contacted** 362:2
362:18
**contain** 15:17,22
16:3 17:1 58:2
69:5,13 145:16
147:16 150:9
171:13 378:13
483:21
**contained** 66:18
68:3,24 69:14
71:12,18 95:5
98:5 99:10
104:9 114:10
114:11,21
118:12 138:10
142:8 147:20
151:3 152:7,16
352:20 375:6
378:19 383:12

385:24 432:17
438:9 446:14
469:14 482:11
482:21
**containing** 16:7
455:3,14
**contains** 101:12
130:24 131:2,4
134:9,18
139:16 142:21
149:1,5 150:10
162:5,5 184:9
374:9 405:8
466:24 468:8
**contaminate**
373:24
**contaminated**
110:20 111:19
112:18 121:7
124:22 125:21
128:6 134:5
141:1,6,21
142:10 143:6
143:20 144:1
145:8 149:13
150:4 153:14
163:4 339:6,12
339:17 341:20
342:18 343:14
344:22 345:6
346:15 373:17
375:11
**contaminating**
150:14,20
165:23 374:14
**contamination**
115:6 151:8
284:17 418:8
449:3
**contemporane...**
40:13
**contents** 77:9
**context** 74:17
156:6,14
158:19 161:1
161:10 163:2
165:7 189:16

305:21 372:22
456:18
**continue** 48:23
202:24
**continued**
126:21 332:1
**contribute**
406:18
**contributing**
68:10 69:2,10
69:23 75:22
76:22 158:13
158:13 400:17
414:22
**contributors**
395:24
**control** 56:2
65:7 306:6,9
306:10 432:22
433:2
**controlled** 28:13
200:16 306:5
**controls** 268:10
268:19 270:2
308:23 370:18
**controversial**
430:12,22
**conversation**
44:4,20,23
45:3,4,19
219:24 478:8
**conversations**
82:20 83:10,16
**conveyed** 37:16
**conveying** 38:23
**convinced** 56:21
57:5 60:10
62:3 357:14
**convincing**
382:12
**copies** 71:18
**copy** 12:14
31:15 37:7
53:2,5 71:15
71:22 91:4
100:14 120:24
157:8 214:3

224:21 238:20
239:6 240:11
303:20 394:14
424:5 426:15
426:17 427:7
**corn** 407:15,23
**Corporate** 2:9
**correct** 28:19
31:4 36:1,7
38:7 48:16
49:14 50:2
51:23 53:16,19
53:21 55:11
57:16 58:12
60:17 61:7
62:1 63:14
64:10 67:3,9
69:16 90:8,16
90:17 93:17
94:11 96:7
97:7 98:8,24
99:3 101:15
106:21 109:15
112:20 116:20
116:24 120:5
122:2 125:11
127:18 131:14
132:14 147:21
152:12 156:14
158:19 160:2
161:1 167:13
182:20 183:7
184:20 185:3,4
186:20 193:19
193:24 194:6
194:12 199:20
203:24 205:5
214:9 216:14
225:12 226:5
226:10 227:15
229:16 230:4,5
230:9 232:9,12
234:1 235:10
240:18 242:1
243:6,7,10,11
249:1,5 250:6
250:23 253:16

Judith K. Wolf, M.D.

256:1 260:10
260:22,23
261:3 263:5,7
264:23 265:9
266:6 267:24
271:19,20
273:8,14,17
274:2,3,11,18
276:7,11,24
277:1,23
280:21 283:14
283:16,17,22
284:1,5,12,24
285:1,8,15
286:24 288:5
288:10 289:21
290:9 292:11
292:12,16,17
302:13 305:14
310:4 311:2
312:1 316:14
316:20 317:3
321:4,19,22
324:9,10
331:14,22,23
332:17 333:22
334:22 344:15
345:3 349:12
350:5 352:5
354:12,18,21
355:14,21
356:9,14,18
357:13 358:12
364:4,7 374:9
377:16,22
381:17 388:22
388:23 389:14
391:8,11,19
392:20,24
396:11,14
398:17 399:9
402:15 403:3
403:16 405:14
405:23 406:5
408:6,10,11,13
408:16,21
409:8 410:23

413:13 414:1,7
414:20,24
416:6 417:10
417:22 420:16
421:21 422:8
422:18 423:15
425:21 426:7
428:9,10,15,19
430:22 431:5,9
431:21,22
432:6 433:14
434:19 436:3
439:5,15,24
440:5,9,19,20
440:22 441:3,8
441:12,13,16
441:22 442:3,4
442:6,9,10,13
442:20 443:10
443:13 444:14
445:10 453:9
459:24 462:10
462:15,21
463:2,15
465:12 468:10
468:11 470:11
471:5,24 472:1
473:12,20
474:11 475:1
475:12 476:19
477:1,4,7,22
482:2,23 486:5
**corrections**
486:6
**correctly** 24:12
**correlated** 21:19
**correlation**
264:9 265:4
439:11
**corresponding**
394:23
**cosmetic** 7:8
119:9,20
140:16 161:10
162:17 163:3
164:9 340:6
341:6,19

343:17 345:18
345:23 416:21
417:2 448:14
449:1 468:10
**COUGHLIN**
3:15
**counsel** 2:6,11
2:16,21 3:5,9
3:14,18,23 4:5
31:6 35:10
36:16 82:20
83:1,10,17
85:18 86:3
87:13,16 88:8
88:18 89:6
90:2,14,23
92:3 93:8,13
95:12 120:23
132:21 157:9
157:15 224:21
231:20 239:5
299:16 300:18
392:5 426:14
447:20 448:1
449:4 462:1
463:17 485:11
485:12
**Counselor** 269:6
**country** 48:8
**couple** 41:6
239:11 470:18
480:14
**course** 46:21
73:2 225:23
230:6 238:12
371:9 386:5
462:7,13,18
474:18
**court** 1:1 9:6
10:17,20 461:2
**cover** 47:12
451:7
**covered** 47:7
49:3 463:4
**covering** 46:4
49:7
**Cramer** 197:20

198:10 199:7
200:20 202:2
207:4,7 234:17
235:9 329:21
330:4,9 331:7
**Cramer's**
197:23 198:16
200:8 207:10
207:24
**created** 114:18
140:4 304:3
**credit** 363:9
**criteria** 286:1,3
286:7,10,13,17
286:18,24
288:17 333:13
**critical** 300:11
**critique** 248:2,8
248:15 293:11
317:22 324:11
324:17 371:10
**crocidolite**
118:8
**cross** 369:16
442:5,24 443:3
450:17 457:2
**Crowley** 111:6
172:6 174:2
179:13
**Crowley's**
171:21 172:14
172:16,20
173:1,4,10,17
174:14 176:1
376:8
**culture** 380:23
**cure** 45:15
**curiosity** 437:16
438:16
**current** 134:12
265:22 348:2
359:11
**currently** 449:1
**Curriculum**
6:13
**cut** 105:8
**CV** 52:21 68:9

69:1 425:11
444:9,14
**cycle** 433:24
434:3
**CYNTHIA** 2:8
**cytokine** 381:23

---

**D**

**D** 4:6
**D.C** 4:4
**D6620-00** 419:5
419:20
**daily** 190:18
206:14
**damage** 219:13
219:15 380:20
**dangerous**
151:16 152:1
401:3,3
**data** 36:11 39:10
39:11 45:10
58:3,22 75:22
132:2,7 142:22
182:15 225:3
226:13 233:14
236:10,11,15
244:3 246:24
247:4 249:4,14
252:3 261:2
262:12 265:13
266:13 268:16
278:12,14,15
281:14,15
290:1,2 311:4
314:5 319:1
324:3,4 326:4
326:6,21,22
327:7,10 333:3
334:15 336:4,9
347:17 349:23
361:11 365:8
365:15,18
366:11,24
367:21 368:2,5
382:12 387:14
392:23 395:21
401:15 414:22

Judith K. Wolf, M.D.

423:6 451:10
451:13,14
457:9 476:11
**date** 1:16 9:4
35:21 44:8
53:19 61:21
62:2 65:13
66:17,22 90:13
94:19 200:3
252:16 309:8
310:22 314:21
415:22 485:8
486:12
**dated** 36:3 52:22
53:6,15 93:10
94:21 95:6
96:17 351:7
485:19
**day** 11:7 42:24
49:21 170:22
170:23 479:6
486:16
**days** 11:22
31:21 173:3
185:16
**Dead** 192:6
**dealing** 425:20
**deals** 355:18
**dealt** 54:21
383:3 449:16
**Debra** 7:9
**decades** 188:6
195:1 321:18
481:23
**December**
279:13 281:16
354:16 356:12
357:1
**decided** 114:6
360:9
**deciding** 60:22
**decision** 30:10
30:11 269:2
285:8 472:14
**decisions** 73:5
**declared** 395:2
**decrease** 330:10

**decreased**
202:21 203:22
331:2 332:5
**deeming** 199:15
**defer** 115:12,17
451:24 452:8
452:22 453:16
453:22 454:6
**define** 15:11
22:22 116:8
441:19
**defined** 170:22
**definitely**
192:16 390:10
426:17 438:1
470:14
**definition** 15:18
15:20,23 16:5
16:12 199:1
270:15 271:3
271:15
**degree** 89:1
400:12
**deliveries**
387:10
**demonstrated**
112:17
**denial** 329:12
**deny** 328:19
**deodorizing**
15:16
**dependent**
110:19 368:20
**depends** 211:21
211:22
**DEPONENT**
5:16 486:1
**deposed** 9:21
**deposit** 454:8,9
**deposition** 1:12
6:1,5 7:1 8:1
9:3 10:13
11:13,14,15
12:7,8 31:7,12
35:13 36:18
40:15 52:23
66:13 67:19

95:15 100:22
112:21,23
113:6,17,19,22
113:24 114:3
114:22 118:13
121:9 128:15
128:19 139:22
141:2,4 142:23
157:1 172:7
198:21 213:17
213:21 224:15
233:1 238:22
245:1,2 247:16
269:20 272:2,6
294:13 350:20
353:20 354:1
373:12,15
374:10 415:10
418:24 427:22
482:12 484:3,6
**deposits** 22:10
453:21,22
**depth** 13:8
**dermal** 156:10
241:11
**describe** 12:15
13:21 105:22
105:24
**described** 13:18
177:5 290:13
334:16 467:16
**describes** 12:18
**describing**
218:22
**description** 6:3
7:3 8:3 12:24
**design** 250:22
258:19
**designed** 257:12
266:1 267:8
268:2
**despite** 282:17
283:7
**detail** 124:7
**details** 34:5 35:7
115:23 291:22
**detect** 237:12

259:6 262:1,7
317:23
**detected** 258:22
**detection** 350:12
351:24
**determination**
29:22 180:22
182:19 183:5
200:7 207:12
251:11 279:24
283:19 284:4
289:7 318:5
374:13,18
423:12
**determine**
218:16 223:17
304:1 367:11
**determined**
122:11 123:14
124:10 130:12
274:15 277:6
284:7,9 285:13
333:21 404:3,4
404:6,7,8
419:5,20
**determining**
263:10 367:10
**Detroit** 480:2
**develop** 325:14
325:20 326:9
326:12 410:2
**developing**
327:21,22
**development**
19:23 21:19
174:19 175:7
176:19 180:15
327:9 328:13
430:4,11,21
**devoted** 52:1,9
52:14
**diagnosed**
154:20 304:4
304:20 310:7
**diagnosis** 8:15
351:1 352:16
**diagnostic** 46:2

**Diagnostics**
48:22
**diagram** 457:5
**diametrically**
228:2,7
**dictate** 97:10
**dictated** 97:9
**Diego** 2:15
**difference** 70:11
70:14 161:20
162:16,24
168:3 189:5
198:2,3 237:12
248:14 253:5
297:15,20
304:19 305:1
308:16 311:18
313:21 314:8
383:10
**differences**
295:6 328:5
337:15,19
379:20
**different** 25:22
26:12 33:1
37:1 38:13,18
59:22 61:2
87:14 96:2
116:4,15,20
146:21 173:15
181:14 200:11
216:22 223:8
229:10 241:6
258:3 275:19
278:2 287:3,6
287:7 288:8
289:8 307:8,11
307:18 311:8
325:12,13
333:13 337:9
337:11,20,22
337:23 342:13
365:9 379:10
379:20 380:12
389:3 400:14
455:8
**differentiate**

Judith K. Wolf, M.D.

163:11
**differently**
197:9 248:9
337:20
**difficult** 109:8
334:22 335:2,5
335:16 410:17
**Dioxide** 7:13
**Diplomate** 1:17
485:3,17
**direct** 101:6
157:4 198:14
225:20 226:18
226:24 239:2
240:1 253:7
258:1 302:17
303:19 320:17
**directed** 33:3
**directing** 224:19
224:24 226:20
274:24
**direction** 206:24
**directly** 20:1
406:11
**disagree** 88:12
234:3 277:22
**disagrees**
483:17
**disclose** 50:9
386:2,6,15,17
389:12,17,23
390:2,2,14
391:2
**disclosed** 391:2
395:12 397:9
**disclosure**
389:20 395:4
396:17 397:11
**disconnect**
61:14
**discount** 314:11
314:19
**discover** 86:5
**discoverable**
84:6,14 85:16
87:2,9,22
88:10

**discovery** 84:21
**discuss** 83:9
300:21
**discussed**
105:23 140:23
165:3 471:2
482:22
**discussing**
139:15 213:23
253:5 294:18
358:2 378:12
**discussion** 82:13
87:11 202:11
242:19 246:17
258:9,12 262:3
472:9 480:21
481:17
**discussions** 85:2
87:13,15
**disease** 188:22
254:20 255:7
267:7 295:5
344:11,15
**diseases** 186:19
339:8 345:9
**disk** 139:11
253:1 378:8
**dispute** 323:6
354:11,15
**disputing**
354:13
**dissolution**
51:12
**dissolved** 22:13
51:10
**distinction**
160:9
**distinguish**
234:7 235:7,23
279:18
**distinguishing**
115:16 116:24
**distracted**
250:15
**DISTRICT** 1:1
1:1
**DNA** 219:15

380:20 407:2
**Docket** 1:7
**doctor** 8:17
17:11 18:22
19:9 20:10,18
21:11 22:2
24:2,21 31:5
31:17 33:15,20
35:18 40:7
41:7 47:11
52:18 54:12
55:2 59:20
66:11 67:18
69:18 92:4
97:5 99:15
101:6 102:1,9
102:13 103:5
103:15 104:2
105:18 112:9
112:12 113:4
117:9,16 119:8
123:10 132:12
132:24 134:4
135:10,19
149:24 154:14
160:9 182:12
185:20 186:15
187:15 198:14
201:14 202:19
202:23 203:9
203:20 204:12
210:16,19
211:6 224:3
225:16 226:19
234:14 238:20
239:16 240:4
241:4 245:6,14
251:10 254:6
258:2 260:7
270:13 272:11
278:19 292:19
294:7,16
295:11 299:9
300:13 301:19
302:17 308:19
317:15 320:17
325:6 326:16

341:19 347:3
350:10,23
351:4 353:2,23
354:3 356:24
360:4 371:21
376:15 378:18
384:2 385:20
386:23 390:15
447:4 460:21
473:6 482:19
**doctors** 47:8
361:10 364:18
**document** 1:6
11:18 16:23
17:5,18 18:1,1
18:23 19:4
25:18 38:6,9
39:16 41:20
52:18 71:18
74:12 76:5,11
78:11 79:21
113:3 136:24
141:12,24
144:5 202:17
203:5 208:6
216:2 233:5
247:18 278:20
279:12 393:12
447:19 471:1
**documentation**
257:4
**documented**
155:5
**documents** 12:3
41:1 65:19
66:2,6 67:20
69:14 71:12,14
72:16,20 73:4
73:12,16 74:10
74:13,15,18
75:2,6,19
76:12,13,16,24
77:8 78:3,15
78:19 79:10,19
80:10,14,20
81:4,5,15,24
82:2,6 83:6

84:12 85:14
86:11,23 87:6
88:20 89:7
90:5 140:1
414:4,10,15,19
446:11,15
483:5
**doing** 20:22 46:3
46:6 47:10
50:19 83:14
185:14 220:1
286:6 300:15
357:6 362:12
365:2 395:16
458:18 478:10
479:23 481:5,9
**dosage** 327:17
367:10
**dose** 107:6
109:19,21
110:11,11,12
181:9,24 219:4
219:12 220:22
324:24 328:1
329:7,10,13,18
329:24 330:4
331:21 332:22
333:4,7,24
334:3,9,10
335:1,5,6,10
367:5,8,11
**doses** 219:6
347:23
**dosing** 181:16
**Dr** 9:3,14 11:11
18:16 26:21
27:6 35:17
36:22 37:15
38:2 39:12
40:1 41:4,19
45:24 57:4
62:20 64:2
65:4 80:1,9
83:8,13,17
84:22 85:22,23
86:4 88:15
89:3,12,24

Judith K. Wolf, M.D.

98:21,23 99:6
99:10 100:13
100:16,20
102:22 107:16
110:16 112:16
113:13,20
114:18 118:13
120:3,4,8,11
121:9,10,19,20
122:2,7,11
123:19 126:15
127:13 128:18
129:10,12
131:22 132:6
135:3,6 136:4
136:18 137:6
137:10,11,16
137:20 138:22
139:14,18,22
140:22 141:3,5
141:15,15,17
142:23 146:10
147:2 149:15
149:18 156:21
167:10 170:13
171:21 172:6,9
172:14,15,16
172:20 173:1,4
173:10,17
174:2,14 176:1
178:13 179:13
198:10,16
199:7,14 200:8
200:20 202:2
207:4,7,10,15
207:24 213:20
216:6,12
219:20 220:15
220:16,16,20
230:12 231:24
234:3 235:4,13
236:15 243:4
253:4 256:6
267:20 277:22
280:11 300:24
301:7,8 315:13
340:4 357:17

370:23 376:8
378:11 380:6
381:1,4 382:5
382:11 388:4
388:17 391:5
392:4 393:6
394:4,10,24
395:5,15
397:16 398:5
409:9 418:17
423:19 425:10
432:18 444:8
446:3 452:11
452:13,22,23
453:16,16,18
453:19 454:6
454:24 455:11
459:15,21
460:4 461:11
461:24 463:11
463:12,15,19
464:5,10 468:6
470:23 472:20
475:20 478:5
479:21 480:9
480:10,11,14
480:21 481:3
481:16 482:2
482:10 484:3
**draft** 72:7 96:10
  97:23 172:24
**drafting** 70:19
**drafts** 96:13
  97:8,22
**drain** 185:18,18
**drains** 186:12
**draw** 323:23
**drew** 106:12
**dried** 435:3
**DRINKER** 3:6
**drinking** 421:14
  422:5,6,16
**Drive** 2:9
**dropped** 326:7
**Drug** 121:24
  124:19 126:16
  234:8

**Duces** 6:5
**due** 305:22
  313:24 410:22
**DUFFY** 3:15
**duly** 9:9 485:5
**duration** 330:5
  330:7
**dust** 17:24
**dusted** 17:15
**dusting** 25:11,24
  26:6 27:10,17
  28:4,6 30:24
  191:15
**Dusts** 6:20 8:19

————————
**E**
**E** 2:1,1 3:1,1 4:1
  4:1,6,6
**e-mail** 37:21
  478:2
**earlier** 66:1 90:3
  172:2 196:4
  221:5 240:18
  332:22 348:13
  367:21 380:3
  385:22 388:21
  399:11 415:8
  436:15 440:5
  442:15 444:24
  465:1
**early** 67:22
  350:12 351:24
  379:23 382:20
  451:1 473:3
**easier** 262:21
  461:2
**East** 1:15
**EASTERN** 1:1
**eBay** 136:6,7,14
  136:19 137:3
  137:12
**editor** 34:14
**effect** 190:2
  241:11 255:12
  306:11,24
  307:21 308:10
  314:20

**effective** 350:12
  351:24
**effort** 251:3
  312:18
**effusion** 186:8
**effusions** 185:12
  185:16
**either** 218:9,13
  239:9 278:15
  396:3 446:23
  458:12 471:23
**electron** 133:19
  133:23 419:13
  451:20
**electronically**
  71:14
**elements** 167:17
  174:14 177:10
  178:1
**elevation** 371:4
**eliminated**
  439:24 440:1
**Ellen** 6:16 99:1
  100:13,16
**Ellis** 3:20 17:9
  17:16 19:2
**else's** 15:15
  96:14
**elucidate** 295:5
**employ** 13:17
  126:13 234:7
  286:24 312:3
  313:11
**employed** 80:19
  105:19,24
  137:19 228:1
  278:2 287:4,4
  294:19 297:13
  299:3 446:7
**employee**
  485:11,12
**employment**
  54:4
**employs** 285:24
  367:4
**enabled** 258:18
**encounter** 155:2

**endeavored**
  15:2 304:1
**endeavors** 32:15
**ended** 415:15
  416:5 420:14
**endometrial**
  48:4 440:7,11
  440:18 441:1,5
**endometrioid**
  241:2,15
**endometriosis**
  228:11 273:17
  356:20 440:5
  441:8
**endpoint** 302:20
  302:21
**endpoints** 257:7
**enhance** 184:7
**enrolled** 316:18
  317:2 321:3,16
  322:2
**enrollment**
  321:18
**enter** 189:7
**entire** 36:13
  56:21 74:12
  98:18 100:10
  103:9 113:21
  126:5 211:22
  212:2,18,21
  213:5,5 233:7
  255:11 268:23
  278:8 279:22
  442:1 462:13
**entirely** 82:21
**entirety** 232:20
**entities** 2:21 3:5
  3:9
**entitled** 38:4
  82:11,19,24
  83:11,15 85:2
  85:5,8 86:4
  225:2 272:8
  278:23 350:24
  354:2
**entries** 72:12
  79:13 140:14

Judith K. Wolf, M.D.

Page 504

entry 41:24
70:24 71:3
121:10
environment
417:14 474:14
474:22 475:5,8
477:10
environmental
159:18,23
164:1,8
epi 152:7,11,16
196:6,9 197:14
341:10 369:7
epidemiologic
45:10 56:20
268:14,24
286:12 290:1
437:24 438:2
468:22 469:3
epidemiological
100:5,7 102:7
260:5,9
epidemiology
7:20 18:3 94:1
101:23 109:15
152:4,23 153:4
153:8 188:10
196:17,24
197:7,9 203:21
204:17 205:3
205:11 219:3
232:21 254:8
271:18,22
272:21 285:3
315:14,23
322:14 328:22
329:7 338:2,10
340:5 341:4
342:9 345:17
366:5 467:24
468:1,3,9,13
469:13
epithelial 238:6
241:9,12 242:8
303:1 311:7
339:20 342:15
380:23 382:15

382:17
epithelium
430:3,10
Epstein 7:15
equal 270:1
equaling 307:2
equally 268:10
268:19
equipment
417:22 418:9
equivilate 333:4
Errata 5:17
486:7 487:1
errors 98:1
263:19,24
especially
179:22
ESQUIRE 2:2,3
2:8,13,18 3:2,7
3:11,16,20 4:2
essential 432:9
433:4,21 458:5
established
159:4 165:22
426:3 428:11
428:23
establishes
337:7
estimate 47:22
97:20 150:1
452:15 479:16
estimated 256:8
371:14
estimating
371:17
et 7:9 8:6,13
451:10
ethically 110:9
evaluate 137:20
243:14 251:4
273:7 286:19
286:22 295:6
313:10 370:2
401:15
evaluated 106:9
111:15 152:6
200:12,15

206:6 226:13
254:7 286:4
322:22 327:6
340:4 402:6
405:9,10
evaluates 226:8
evaluating
207:11 243:13
244:3,10 251:1
264:1 311:11
315:13,22
322:13 324:2
338:18 346:18
383:22 405:13
405:17
evaluation 6:9
6:20 7:11 8:20
31:10 32:11
207:18 333:7
event 201:13
Everybody's
337:19
evidence 14:3
22:17 23:2
58:20 75:15
77:3 100:6
111:13,23
115:5 125:4,7
126:3,14
137:20 138:9
138:15 143:5
145:14 146:17
147:14 155:12
160:11 177:15
177:24 192:13
194:8 197:2
211:7 214:24
215:10,11,13
215:15 216:13
216:21 217:2,7
220:14 221:17
222:21 223:3
223:12,18,21
226:3 227:9,14
227:21 228:8
228:12 230:7
232:22 233:15

241:10 253:14
253:21 254:18
258:20 260:5
260:10 265:15
266:15 268:13
268:14,15,23
268:24 269:1
269:21 270:7
270:10 273:2
273:13 274:1
274:16 275:3
276:6,11,15,20
276:23 277:7
278:3 279:17
281:18,24
283:20 284:10
285:14 290:6
313:17 329:7
329:10,13
339:23 340:10
341:23 346:14
363:19 366:13
366:16 370:8
374:19 378:23
380:1 382:1,21
383:4,13 385:2
385:17,18
402:7 408:1,24
412:8 418:2
420:18 421:5
433:6,14
434:11,19
435:15 436:3,7
437:13,23
438:22 448:13
450:17 454:15
456:1 467:14
471:22 475:15
evidence-based
6:7 12:18
13:18 31:22
33:9,13 106:3
366:21
exact 90:13
103:2 252:15
409:8 429:8
exactly 11:23

33:17 97:3
99:9 220:3
310:3 342:8
355:17 398:4
408:20 478:12
examination 5:6
9:12 388:15
407:20 446:1
455:1 461:22
470:20 482:8
482:17 485:4
examined 9:10
350:7
examining
168:21
example 143:1
262:19 273:10
274:10 280:7
312:10 321:16
330:4,9 419:2
475:19
exceeds 433:9
434:14 435:17
Excel 113:16
excerpt 6:19
428:7
exclude 222:6
excluded 246:9
249:3
excludes 252:2
excuse 23:19
77:14 82:7
85:21 102:19
122:14 132:5
143:13 149:14
150:22 157:15
176:12,21
214:2 226:18
236:1,20 260:1
267:17 283:6
287:16 299:12
320:14 403:17
403:19,21
413:19 419:22
435:21 443:18
450:15 468:17
472:17

Judith K. Wolf, M.D.

exercising
195:18 436:17
exhibit 6:4,7,8
6:11,12,13,14
6:16,17,19 7:4
7:7,11,14,16
7:21 8:4,7,10
8:14,17,19
11:12,15 12:7
12:8,16 13:19
31:8,12 33:2,3
33:8 34:8 35:1
35:12,13,19
36:5,18 38:3
38:10,13,21
39:17 40:4
41:20 52:21,23
53:15,20 66:12
66:13,19 67:20
68:3 69:14,17
69:20 70:3,6
70:13,22 71:1
71:12,18 72:11
74:10,18 77:8
78:4 79:4,5,12
81:5 96:17
97:5,17 98:6,7
98:14 100:21
100:22 113:13
114:2,7,10,21
118:12 119:12
120:15,20,24
128:15,19
129:5,7,10,15
132:8,11
138:10 139:22
140:2,5,21
156:22 157:1
157:17,19
158:2 198:15
198:21 211:1
213:17,21
224:14,15
225:17 232:20
233:1 238:21
238:22 245:1,2
247:15,16

272:2,6 294:13
294:17 302:8
319:13 350:19
350:20 352:21
353:20,24
354:9,15
357:10 373:13
373:14 374:6
391:4 394:6,11
394:17 399:9
415:10,15
416:24 418:23
420:12,14
424:2,3,8,16
425:19 427:3,5
427:11,19,22
428:3,6 446:5
446:5 447:20
448:11 449:12
450:7 454:22
470:22,24
471:1,17 483:5
exhibits 6:1 7:1
8:1 262:20
330:14 425:1
446:4,8 462:2
482:23
exists 117:17
465:10 466:8
expect 201:4,14
202:21 203:20
212:13
expedite 258:15
experience
185:13 223:19
280:1 412:5
experiencing
161:8,13
experiments
481:5
expert 6:14,16
38:4 44:24
49:23 50:4,19
57:3 62:12
65:15 93:14
94:22 95:1,7
96:19,24 111:5

112:3,7 116:14
118:16 125:10
125:22 126:15
128:5 171:22
172:11 174:1,9
177:16 207:7
207:11 235:21
236:18 349:12
349:20 357:16
359:2 383:16
386:3,13
389:13,22
expertise 199:7
199:23,24
228:10 453:9
453:13
experts 34:15
94:9 452:1,5
453:22 454:7
expires 486:17
explain 37:15
70:14 137:18
153:4 203:17
264:2 297:14
299:3 366:23
456:14
explaining
284:20
explains 284:22
368:17
explanation
259:10 314:6
392:23
explanations
314:16
expose 160:16
exposed 107:13
108:1 109:11
158:22 161:14
163:1,2,24
164:8 170:24
201:22 205:12
205:20 206:2,8
208:3 259:3
327:22 341:11
341:16 347:16
347:22 382:14

436:21 438:18
exposure 155:2
155:14,19
156:14 158:19
159:3,7,18,19
161:9,10,13,21
161:22 162:16
162:17 163:15
163:16,21
164:10 168:11
168:22 169:4
181:3 197:1
206:16 217:22
218:4,4,20
219:8 227:2
275:4,21 276:5
276:24 277:8
277:19 302:23
307:7,10 308:4
325:8 327:8
328:12,24
335:10 337:24
338:4,11,15,21
344:12 345:23
346:20 381:11
423:15 426:2,6
428:14,21
429:1,23 430:9
430:16,18,19
449:21 456:16
exposures
421:20
expressed 457:9
expressions
300:8
extent 357:23
361:16
exterior 192:12
192:22 230:8
232:6
external 195:9
328:7 441:1,21
441:23 442:2
externally
441:12 442:17
443:10,12
eyes 244:12

| F |
| --- |
F 4:3
facial 300:7
facilitating
39:10
facility 46:11
fact 20:2 49:5
51:4 117:17
118:15 146:7
163:20 164:13
180:13 183:21
185:5 194:2,7
194:24 195:11
195:12 207:15
209:9 219:16
221:12,16
232:4 234:18
246:23 256:21
260:21 263:18
264:14 281:2
282:18 288:19
293:10 299:3
300:6 324:12
326:16 342:9
373:6 381:14
390:13 400:13
410:10 423:11
465:7 470:7
475:23 480:1
factor 270:15
273:24 274:7
274:16 276:5
298:21,22,24
301:20 333:21
356:12 361:7
367:14,22
376:11 387:24
472:11
factors 8:12
167:11 199:11
199:14 271:4
273:8,12
276:10,14,19
276:22 295:5
298:17 337:11
337:16 352:15

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 285 of 1035
PageID: 241464
Judith K. Wolf, M.D.

Page 506

354:24 355:3,9
359:17 360:22
446:23 447:1,2
447:5,8,11
472:11
**facts** 292:19
294:20 296:20
296:22 314:16
314:17 420:18
**failure** 99:19
103:17
**fair** 11:3 24:21
29:7 31:3
34:23 35:10
36:6 38:6,21
39:4 40:8,17
41:9 47:13
55:18 61:18
64:21 73:12
77:10 84:1
93:11,12 95:4
96:19 97:15
118:16 121:18
167:12 187:6
236:3 243:20
270:18 286:13
327:2 331:24
335:16 349:6
371:11
**fairly** 331:6
**fall** 416:24
**fallopian** 8:7
193:7 272:8
382:16 440:13
442:12,19
456:24 473:19
**falls** 417:6
**familial** 355:2
447:5
**familial-related**
447:2
**familiar** 10:12
18:12 115:8
117:16 120:10
121:19 184:14
**family** 59:5
447:1

**far** 65:9 167:24
168:1 172:7
196:24 328:16
347:18 379:21
386:15 397:8
**fascias** 406:24
**fashion** 478:3
480:17
**fast** 117:14
**faster** 149:9
**fault** 246:4
**FDA** 29:18,22
30:3,7,9,14
122:6,10
123:12,18,21
124:2,9 127:24
138:11,23
140:22 193:13
221:12 228:17
229:14 230:6
232:1,11,15,20
233:13,21
234:12 236:12
236:16 237:18
329:11 365:7
366:3 369:20
384:15,20
385:7 407:18
447:22 448:11
448:15,22
471:3,9,17,20
**FDA's** 31:2
127:17,20
128:20,22
129:16,18
137:21 230:1
233:23 235:8
235:24 369:7
384:10 448:2
**FDA.gov** 6:17
**feature** 258:16
**Federal** 84:9
87:2 88:11
299:19 300:19
**FedEx** 368:17
**fee** 395:1,15,18
396:6

**feel** 71:7 129:8
143:13 149:17
202:23 245:12
301:9 399:13
**fellowship**
133:21 481:14
**felt** 61:1 77:3
254:16 306:8,9
306:9 358:17
**female** 436:13
437:15
**feminine** 16:3
315:15 320:20
**fibers** 118:23
155:13 448:17
452:16 455:4
455:15 459:9
475:19 476:4,8
476:18,21,23
**Fibres** 6:19 8:19
**fibrosis** 215:2
408:9,19 409:3
409:4
**fibrosus** 338:23
407:23
**fibrous** 111:2
117:12 118:8,8
118:24 162:5
164:14 168:8
170:2 179:2
284:17 372:9
375:4,6,11,17
375:20 377:14
378:14 379:1,2
379:7 400:3,15
401:5 404:5
407:17 456:17
457:4,15,19
459:7,19,23
460:5,8,16,20
465:10 466:10
466:16,19
467:6,9
**field** 13:3 366:1
397:14
**fifth** 3:3 356:7
**figure** 125:10

**final** 52:18 97:9
97:23 140:8
173:2 380:5,5
482:15,19
**finally** 384:2
385:20 386:23
**financially**
485:13
**find** 8:17 13:12
14:11,12,13
33:8 51:14
112:6 130:22
203:6 211:4,5
228:24 233:14
237:8 238:7,9
273:3 277:12
312:9 329:7
330:17 331:11
331:21 354:2
373:12 424:22
447:3 460:4
471:20 473:3
**finding** 14:2,7
81:10 116:24
117:9 118:15
124:18 156:4
160:24 178:13
201:14 206:20
215:5,8 237:5
240:21 241:22
241:24 291:9
311:10 317:14
324:8 368:18
419:3,18 420:6
448:4
**findings** 106:16
116:3 130:12
137:21,21,22
138:11 152:23
164:7 197:23
204:17 209:19
239:23 255:9
288:20 312:11
312:18 464:7,8
464:9
**finds** 448:22
**fine** 299:24

300:3 394:8
**fingers** 97:6
**finish** 79:9 82:15
83:22,24 85:6
102:21 210:10
213:9 231:18
243:1 299:17
403:15
**finished** 102:20
481:14
**first** 12:6 13:8
13:23 14:16
31:16 37:2
38:3,10 41:19
41:24 44:23
65:13 66:17,22
74:24 101:7,12
159:1 181:7
208:10 212:6
220:21 233:13
234:10 242:12
253:11 258:5
277:18 310:21
326:11 328:11
351:4,5 355:5
355:17 362:10
379:15 384:15
**first-degree**
355:18
**fit** 286:9
**five** 48:2 65:23
159:5 278:6,9
325:1 426:4
428:24 450:24
465:20
**fix** 98:2
**flat** 331:9
**flaws** 384:16
**flip** 426:9 429:4
**floor** 334:5
**flows** 192:9
**FLW** 1:5
**focus** 199:4
293:19
**focused** 59:18
63:2 85:3
**folks** 244:3

Judith K. Wolf, M.D.

279:19 304:16
308:21 309:10
310:6 315:24
324:4 341:11
345:22 354:20
364:4 365:6
366:3
**follow-up** 38:1
99:21 237:16
242:16,22
243:4,18,23
244:14 245:20
246:10 257:3
266:6,7 267:1
267:22,23
289:4 290:14
290:14
**followed** 188:6
188:24 190:4
243:5,9 255:4
**following** 389:1
454:14,16
**follows** 9:11
**Food** 121:24
124:19 126:16
234:8
**footnote** 383:2,8
**footnotes** 382:20
**foregoing** 485:7
486:4
**foreign** 23:15
211:8 215:1
436:11,19
437:1 443:16
455:15
**forgetting**
370:24
**form** 13:5 15:14
18:7 20:12
21:16 22:8,21
23:6,19 26:3
26:18 27:13
28:21 29:9
30:6,19 33:5
35:5 36:9
37:12,23 55:14
57:8,18 58:14

60:8,19 62:15
63:4 64:5 65:2
65:17 66:21
67:5 73:8,14
73:21 74:6,20
75:6,10,19
77:15 78:8,17
80:1,13,22
81:8,18 83:2
84:13 86:24
88:21 89:9
93:9 94:24
95:10,13 96:21
97:19 98:17
101:1,17 102:3
103:7,20
104:13 105:14
107:3,16 108:4
108:13 109:6
109:17 110:23
111:21 115:2
115:21 116:7
117:2 118:4,18
118:22 119:11
119:22 120:14
121:13 122:4
122:22 123:17
124:5,14 125:1
125:13 126:1
126:10,18
127:9 128:8
130:6,15
131:16,24
133:3 134:7,20
135:3,15
136:11,21
137:14 138:13
138:24 140:11
140:19 145:1
145:22 147:2
147:23 148:21
149:19 150:6
150:23 151:11
151:22 152:18
154:3 156:8,16
158:21 159:10
159:15 160:4

161:3,24 163:7
163:18 164:12
165:9,11 166:2
167:14,18,23
169:1,19
170:18 173:6
173:20 174:4
175:4,16
176:13 177:13
178:5,18 179:8
179:15 180:11
181:5 182:3,22
183:14 184:1
186:6,22 187:8
187:19 188:17
189:10,20
191:4,17 193:1
194:14 196:2
196:12,20
197:12 201:7
201:20 204:2
204:20 205:8
205:15 206:10
207:22 209:24
211:11,19
214:17 215:7
216:16 217:1
218:2,24
220:12 222:2,9
222:17 223:14
224:8 226:16
228:5 229:21
230:11 232:14
233:4,19 236:2
236:20 237:21
242:3 243:22
244:7,16
245:23 247:2
248:6 249:8
251:18 252:6
252:14 254:7
254:11 260:9
261:5,16 264:5
264:19 265:19
266:20 267:18
268:12 270:24
271:10 272:23

274:20 275:10
276:9 277:3
279:9 280:15
280:23 281:12
282:23 284:14
285:6,17
286:15 288:12
288:23 289:23
290:11 291:19
295:20 297:3
298:4,14
299:16,18
300:2,20
301:23 302:15
303:8,15 304:7
305:16,24
306:14 307:5
307:16,24
308:13 309:3
309:14 310:15
312:22 313:14
314:13,23
316:3 317:5
318:1,14 322:5
322:16 323:5
323:12,21
324:16 325:10
326:19 327:3
327:12 328:15
329:1,15
331:16 332:7
333:10,16
334:18,24
335:9,21
336:15 337:1
338:8 339:10
340:14 341:14
342:1,12,23
343:19 345:12
346:2 347:21
349:14 350:15
353:7 357:5
362:22 363:22
364:9,23
365:11 366:7
366:20 367:7
367:17 368:8

368:24 369:13
370:13 372:5
374:17 376:2
376:21 377:9
377:18 381:19
382:10,24
383:20 384:19
385:10 386:11
387:5,20 390:7
390:19 391:21
395:9 396:4,13
396:19 397:5
397:21 398:2
398:20 399:18
400:21 402:4
402:18,23
403:5 405:16
406:1,7 408:15
408:17,23
409:11,19
410:15 411:11
412:3,21 413:1
413:8,15,20
414:14 415:4
415:18 416:9
417:4,16,24
418:12,16
419:11,23
420:4,18 421:2
421:23 422:10
422:20 423:17
428:17 430:24
431:7,11,17
432:11 433:16
434:21 435:9
435:22 436:5
437:5,22
438:21 439:7
439:17 441:18
442:22 445:3
448:7 449:7
450:21 452:4
452:20 453:3
453:10 454:1,3
455:5,19,20
456:21 457:12
458:9,23 459:8

Judith K. Wolf, M.D.

459:18 460:2
463:4,6,22
464:19 465:14
465:24 466:13
466:22 467:10
468:20 469:18
470:13 474:6
474:20 475:3
475:14,22
476:6 477:8,12
478:2 479:15
480:17 482:20
486:6
**formal** 35:2
**format** 37:1,14
38:14,19
**formation** 411:8
**formed** 58:9,20
61:22 66:18
78:11,14,24
106:17 149:3
149:11 150:13
150:19 151:16
268:16 281:13
348:20 357:2
372:14 411:17
**formerly** 446:6
**forming** 30:16
65:14 95:8
107:10 108:8
141:20 152:12
157:6 170:12
172:17 181:2
196:18 205:11
208:22 271:23
303:3,12
345:16 360:21
**forms** 75:14
76:3,5 77:23
78:5 406:17
407:5,7
**formulate** 57:11
62:8
**formulated**
62:10
**formulating**
13:23 14:16

**formulation**
379:5
**forth** 392:12
485:9
**found** 111:3,14
117:3 144:22
146:6,18
148:16 174:10
198:10,18
200:20 209:2
209:10,21
211:7 212:13
214:14 215:16
216:13 238:13
241:1 249:10
290:9 306:10
307:20 313:20
369:8 379:2
381:5 400:4
402:7 435:3,7
436:24 448:16
460:8,16
463:24 464:15
**four** 40:3 47:8
114:21 235:15
282:4,11
448:20 471:8
471:13
**fourth** 102:4
227:1 356:3,7
**fragrance**
174:11 183:5,8
183:22 184:3
372:11 377:14
379:4,5 400:17
404:11 406:13
420:21,22
421:3,6
**fragrances**
111:4,7 162:6
164:19 170:4
171:16 172:19
176:20 177:9
179:13 180:4,7
180:22 181:4
183:11,16
376:9 378:14

400:6 401:8
404:10,16
458:14 465:11
466:9
**free** 123:15
124:12 129:8
143:14 202:23
245:12 301:9
407:1,1 449:2
**frequency**
108:16 330:7
332:1,16,22
**frequent** 257:5
291:23 332:20
**frequently**
331:17
**Friday** 35:21
**Fridays** 42:18
**friend** 43:8
358:14
**friendly** 42:19
480:3
**friends** 42:20
59:5
**front** 53:2 68:14
87:18 120:16
302:8 348:22
349:2 447:23
449:13
**full** 48:6 119:12
159:1 214:19
310:21 428:5
444:11,17
**fully** 59:1
**fumes** 432:6
**funding** 51:3
386:16 481:4
**funny** 136:8
**further** 461:22
470:16,20
482:8,17
483:19 485:7
485:10
**future** 8:14
350:24 472:8

————————
**G**
————————

**G** 4:6
**Gallagher** 42:14
43:14,21 44:16
44:20 67:1,6
**GARBER** 2:8
**Gates** 242:16,22
243:4,9 244:20
244:23 245:10
245:18,20,21
246:1,9 247:12
249:13 265:12
265:23 266:7
266:12
**gene** 380:22
381:5,5 382:1
382:1
**general** 13:12
15:10 21:9
33:12,18 48:2
106:5 107:17
126:23 166:18
187:10 228:15
232:16 286:16
287:22 352:17
385:16
**generally** 25:5
32:15 33:10
54:12 56:19
156:10 167:10
193:11 212:20
232:11 258:22
280:4 317:19
364:17 383:4
439:8 473:5
**generated** 40:5
**generation**
40:14
**genetic** 108:22
219:16 221:1,1
355:16 381:10
381:17 382:13
**genetically**
328:3
**genital** 8:4 14:21
14:23 106:20
106:22 107:1
107:13 109:3

109:22 153:10
191:2,15
192:17,23
197:3 229:6
259:3 264:9
302:22 309:19
336:17 338:5
356:13 357:2
441:2,21,23
442:2 443:1
473:17
**genotoxic** 381:3
381:8 382:8
**geologist** 115:10
115:12
**geology** 453:21
453:23 454:7
**Georgia** 49:11
**Gertig** 242:18
242:23 243:5
265:23
**Gertig's** 242:17
**gestures** 300:8
**getting** 51:3
125:19 130:16
190:24 298:19
345:9 346:14
352:18 355:7
369:21
**Ghassam**
394:24
**giant** 215:1
**girls** 159:18
**give** 26:4 47:4
75:1 91:19
100:13 103:8
114:6 122:21
129:13 137:6
169:6 202:13
236:2 238:20
240:10 254:22
270:1 301:9
318:23 325:16
414:9 426:14
427:1 444:17
469:5
**given** 26:5 54:16

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 288 of 1035
PageID: 241467
Judith K. Wolf, M.D.

Page 509

55:5,16 78:1
85:10 118:5,13
126:20 144:6
181:15 183:17
189:24 246:11
246:23 255:8
267:6 269:7
290:15 299:14
301:12,14
311:14 333:6
334:9,14
361:17 367:21
415:5 446:19
447:19 479:16
482:12 486:5
**giving** 122:9
130:23 169:7
460:22
**gloves** 19:16
22:4,11,18
23:3,8,13
24:23 25:3,8
25:12 26:1,7
26:15 27:1,10
27:17 28:4,7
28:18,24 29:19
29:24 31:1
407:19,20
**go** 11:2 13:9
14:11 48:16,18
48:19 65:5
89:13 101:7
117:14 139:4
155:8 162:2
165:12 181:6
186:18 208:11
252:18 260:14
263:3,14
279:21 281:22
319:17,18
321:12 325:3
330:20 334:4,4
334:5 361:20
365:19 388:6
399:18 424:15
424:19,23
426:11 437:13

440:14 443:19
445:15 460:14
461:12,14
**goes** 84:19
134:13 269:18
273:23 332:9,9
332:9 440:3,12
445:17 461:16
478:6 484:4
**Golkow** 4:8
**good** 9:14,15
12:24 13:6
53:12,18
135:17 246:14
246:19 293:9
316:11 326:14
388:17,18
**GORDON** 3:11
**gosh** 316:11
**Gotcha** 258:13
**GOTSHAL**
2:18 3:2
**governmental**
480:17
**grab** 38:1
**grains** 435:4
**grams** 191:10
**grant** 386:16
**granulomas**
23:14 407:17
407:22
**Gray** 360:12
**great** 19:3 33:7
**greater** 49:4
167:2 238:13
239:23 281:18
473:8
**Green** 360:14
**Griffin** 17:9,16
17:22 18:9
19:2
**groins** 334:5
**group** 159:2
227:9 283:16
341:16 426:1
428:20 429:8
430:15,19

388:4,9,24
389:2,4 394:12
394:16 397:17
399:18 401:24
402:5 425:3
430:6 435:11
436:15 444:1
445:17 461:16
478:6 484:4
**groups** 258:21
365:1
**guess** 262:5
396:19 417:24
**guessing** 325:15
**guideline** 280:3
**gut** 169:11
**GYN** 20:22 48:6
94:3 348:8
360:11,11
361:15 362:24
364:12 453:6
480:3
**gynecologic**
42:21 59:10,21
60:3 62:23
73:3 74:4
133:8 193:12
194:22 195:8
221:19 222:4
222:12 272:14
286:11 296:21
325:24 341:9
352:18 353:2
397:13 398:15
453:7 480:8
481:13,23
**gynecological**
186:2 292:8
**gynecology**
223:20 228:9
228:15

───────
**H**
───────
**H** 4:6
**half** 42:1 210:9
308:24 478:16
**halfway** 440:21
**hand** 12:15
31:15 61:11
93:4 120:20
156:21 232:19
388:5 391:13
428:2 473:4
**handed** 31:6
113:12 116:19

121:7
**handing** 11:11
100:21 213:20
224:13 225:16
272:5 350:23
353:23
**handpicked**
414:11
**Hang** 208:5
**happen** 44:8
95:20 195:12
346:13 409:13
**happened** 45:4
123:2 263:17
308:19
**happens** 188:23
189:1 359:5
409:6 439:9
**happy** 11:9 39:1
40:15,23 42:18
299:11 300:22
301:1
**hard** 34:22
71:15,17,22
107:4,7 108:17
110:13 162:7
328:19 333:23
334:8,11 336:1
364:21 367:10
375:9
**Harlow** 320:23
**hazard** 160:17
**head** 200:24
310:11 332:23
332:23
**health** 8:8 30:4
30:8,15 32:6
46:16 48:13
51:20 52:2,7
52:15 55:10
63:9,13,19
64:1 90:7,20
90:21 227:18
236:23,24
237:1,16
242:12 243:6
245:21 246:10

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 289 of 1035
PageID: 241468
Judith K. Wolf, M.D.

Page 510

247:1,13 249:4
252:3 257:7,8
265:14,24
266:13 267:3
270:14,21
271:8 272:9
280:12 281:8
281:16 321:3,9
321:10,12,12
321:16 322:23
323:13 324:3
324:14,18
348:3 353:5,13
364:21 365:3
366:1
**hear** 89:5 220:2
271:12
**heard** 269:11
399:1,4,4
481:16 482:1
**hearing** 342:3
399:8 401:19
460:11
**heavy** 111:2
156:14 158:18
159:6 161:1,8
161:13,20
162:6,16
164:16 165:6
168:6 170:3
179:2 346:20
347:16,22
372:9 373:3,6
373:9,18,23
375:20 377:14
378:14,23
400:3 401:6
426:5 428:14
429:1 430:17
432:9 465:11
466:9
**held** 1:14 444:10
**Heller** 7:9 209:7
210:11,13
213:9,22
216:12
**help** 53:11

112:12 245:5
277:15 362:1
432:22 433:2
**helpful** 37:24
45:18 243:24
**helps** 385:12
**Henderson**
215:22 216:8
217:5
**hereinbefore**
485:9
**heritage** 356:9
**heterogeneity**
250:11,18
251:4 258:20
259:10
**hiding** 320:11
**hierarchy**
382:21 383:13
**high** 171:12
198:19 199:15
200:8 207:13
239:18 263:10
292:3 293:4
295:13 311:23
368:16,22
371:8,10
375:14 421:14
422:6,7,16
423:14 470:8
**high-quality**
199:1 246:2
251:12
**higher** 245:18
246:8 251:16
260:20 262:11
292:15 297:9
347:5
**highest** 260:9,13
292:20 294:23
295:17 345:22
345:22
**highlighted**
426:24
**highlighting**
483:21
**Hill** 286:1,7,13

286:17,24
287:4,5 288:16
333:13,18,22
366:17,23
367:4 368:16
**Hilton** 1:14
**hint** 195:6
326:11 329:24
**hired** 57:2,9,13
58:11 59:23
60:4 61:24
62:11 436:24
**Hiroshima**
326:6
**Hispanics** 8:10
295:2,7
**histologic** 239:3
239:24 241:6
248:4
**histology** 247:23
248:11 249:20
250:4
**historical**
135:21,23
459:22
**historically**
298:1
**history** 355:20
355:23 356:4
447:1
**hold** 57:15 67:2
67:12 116:12
132:19 133:13
134:4 150:9
169:2 210:22
336:20 343:13
357:11 430:5
460:10 465:4
465:20
**holding** 444:16
**homework**
137:10
**Hopkins** 112:21
112:24 113:14
113:20 132:1,6
138:10 142:22
374:6

**Hopkins'** 114:3
114:7,22
118:13 121:9
139:22 140:1,5
140:21
**hormonal**
356:20 447:11
**hormone** 273:19
369:2,3
**hormones**
337:17
**hospital** 10:3
46:13,20 47:6
**hotter** 318:21
**Houghton**
265:23
**hour** 38:5 42:1
79:6 210:9
358:10 478:17
**hours** 37:16
38:4,15,16
39:8 41:21
42:18 47:5,6
97:15,21 358:6
**house** 14:4
71:15
**housekeeping**
483:3
**Houston** 48:12
48:17
**Hulfish** 2:19
**human** 14:13
106:7 166:23
169:4 175:14
178:1,2,9
385:8 434:3
457:19
**humans** 6:10,21
7:12 8:21
31:10 169:6
175:20 177:11
193:10,11
**hundreds** 408:4
411:24 437:1
**HURST** 2:13
**hygiene** 315:16
320:20

**hypothesis**
195:7
**hypothetical**
465:24
**hysterectomy**
195:4

---

**I**
**IARC** 6:8,20
7:11 8:19 31:8
31:9,18 32:10
32:14 33:11,16
156:4,18 158:1
158:18 159:12
159:24 160:21
164:15 187:16
188:1,13
221:23 222:15
223:4,7 224:23
225:21 226:3,8
226:12 227:4,8
227:17 228:2
280:16,20
281:22 282:3
283:6,12,18,23
284:3,7,9,15
284:20,21
285:12,23
286:22 287:4
315:14 316:23
319:3,10,16
320:22 323:9
323:18 340:7,9
340:17 341:22
346:19 347:18
365:7 423:11
423:18,21
424:10,11,12
425:20 426:1
429:19 430:13
430:15 431:2,4
431:20 434:7
454:20 455:12
457:10,14,18
459:4 469:9,15
470:10 476:2

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 290 of 1035
PageID: 241469
Judith K. Wolf, M.D.

Page 511

476:12,17
**IARC's** 32:18
154:14 156:22
165:3 285:3
341:3 431:23
454:24
**idea** 74:11
114:20 169:15
209:16 229:5
295:15 337:2
416:23 419:8
**identical** 103:5
**identification**
11:16 12:9
31:13 35:14
36:19 52:24
66:14 100:23
128:16 157:2
198:22 213:18
224:16 233:2
238:23 245:3
247:17 272:3
294:14 350:21
353:21 427:23
**identified**
239:18 293:3
295:13 311:22
311:23 417:9
**identifies** 274:5
361:6
**identify** 18:23
26:13 68:13
75:17 117:5
236:15 274:10
354:24 425:18
**identifying**
109:13,18
245:18 246:7
262:10
**Imerys** 3:14,18
79:13,16,17,19
81:5 388:20,22
405:13 406:10
414:3,10,19
415:9 416:14
471:13,15
**Imerys'** 406:14

**immune** 108:23
337:20
**impact** 199:12
200:18
**impartial** 32:15
**implication**
21:22
**importance**
352:16
**important** 19:22
30:15 74:16,23
77:4 128:3
160:8,13
165:21 170:13
181:1 211:17
243:13 258:16
263:9 304:12
305:13 333:8
333:22 353:3
353:14 367:14
367:22 389:12
389:16 390:4
390:13,21
458:20 480:5
**improper** 261:2
**in-** 217:23
**inaccurate**
446:15
**inadequate**
274:16 276:6
276:11,23
**inappropriate**
300:9
**incidence**
292:21 294:22
294:23 296:24
297:24
**incident** 292:9
**include** 15:17,19
15:22 90:6
143:4 148:14
199:16 221:14
236:8 244:13
244:20 246:12
246:18,23
247:12 249:13
264:11,17,21

278:16 282:8
282:10,13
356:17 377:21
377:23 450:15
450:16 451:12
466:9
**included** 146:14
245:8,11,15
247:5 249:5
259:1 280:10
451:7
**includes** 41:20
116:19 186:2
276:23 331:8
470:9,14
**including** 16:4
16:11 55:20
183:11 220:14
264:7 281:15
343:3 356:19
372:10 448:3
451:9
**inclusion** 258:17
**incomplete**
465:24
**inconsistent**
275:7 277:17
446:18
**incorrect** 172:12
270:4
**increase** 153:11
159:20 160:1,5
160:6 163:22
165:18 166:6,7
166:10,15
167:18 169:17
174:15 176:8
176:15 179:24
180:8,18,19
181:19 190:4
206:12 237:9
238:5,10,14
240:22 241:1
241:14 242:13
249:11,16,20
250:3 251:21
267:5 268:4

290:17,17,23
293:18 297:20
308:2 330:7
331:13,18
332:3,16,19,19
339:19 422:22
**increased** 18:4
19:12 57:23
164:23 182:9
195:23 196:9
197:2 200:22
204:10 205:4
208:14 237:6
241:23 242:9
265:8,10,16
266:17 267:14
273:13 274:1
275:5 277:9
282:5 290:9
291:17 293:21
307:6 308:3
317:17 331:4
361:18 422:17
423:5,9 438:5
472:13,24
**increases** 58:23
64:23 160:14
176:3 181:17
219:8 234:24
241:5 248:19
298:23 376:24
387:15 401:1
404:20
**increasing** 110:4
**independent**
174:1 262:12
381:12,13
**INDEX** 5:1
**Indiana** 49:7,11
51:6,16
**Indianapolis**
46:10,17 47:9
49:5 51:17
52:8
**indicate** 19:22
105:18 140:15
359:13

**indicated** 56:13
90:3,14 93:13
117:24
**indicates** 118:15
**indication** 57:22
281:4
**indirectly** 238:1
**indisputable**
228:19
**indistinguisha...**
419:4,19
**individual**
107:12 108:19
108:20 151:8
170:15 181:12
181:17 183:6,8
256:24 261:20
263:4 298:22
325:12 327:15
328:5 337:15
337:19 357:20
362:23 374:24
**individually**
77:18 266:5
**individuals**
243:18 337:8
337:10 338:3
**indoor** 476:2,15
**induced** 209:22
**induces** 380:22
**industrial**
140:15 416:20
417:1
**industries**
416:15
**inert** 192:2,4
194:17,23
221:10 223:21
437:13,17
442:24 443:3
**inevitably**
407:10
**infer** 318:24
**inference**
219:10 322:17
**inferring** 322:7
**infertility**

Judith K. Wolf, M.D.

274:10
**inflammation**
19:22 20:2,5
20:14,14,18,24
21:1,5,6,10,13
21:17,18 22:3
22:5,14 23:4,8
25:7 26:8,8
27:2 28:2,9
174:18 175:7
176:18 177:10
177:18 178:2
178:14,21
179:5,12
180:14,19
181:19 182:1,5
182:9 183:12
183:17,22
184:4,7,10
192:17 210:21
212:23,24
213:2 216:5
217:18 218:21
219:13,14
220:17,24
372:8 376:10
380:9,19
381:12,13,16
381:20 384:6
385:3,14 400:5
400:7 401:9
406:18,20,22
406:23 407:3,4
407:6,8,10,12
407:14 408:9
408:16,18
409:1 411:7,13
411:17 437:20
445:1,7,10,12
454:13,14,16
456:2,4,6,9
459:3 474:2
**inflammatory**
22:19,23
153:21 170:10
171:20 174:18
175:1,9,13

176:18 177:4
177:17 179:21
180:5 184:19
185:2,8 188:2
188:7 189:17
189:22 209:22
210:2 211:24
212:9,14
214:14,20
215:12,17
217:8,14,23,24
218:6,9,13
287:12 372:12
376:8 377:2
382:3,14 402:9
403:9 404:11
404:12,17
421:4 458:15
**inflated** 313:12
**inflating** 307:15
**inflation** 311:1
313:24
**influence** 199:11
**inform** 36:5
140:24 142:9
158:2 256:19
317:21 362:1
362:19 411:12
**information**
13:11 14:9,12
27:9 30:21
34:7,17,24
36:15 58:6
59:1 70:18,21
75:18 76:4,15
83:1 84:4,10
85:8 86:10
88:8,19 89:6,9
98:5,12 100:19
112:22 117:23
118:6,11
119:18 126:24
127:23 128:4
128:10 136:2
142:8 143:23
146:3 148:6,7
173:9 190:22

196:22,23
223:16 224:3
236:9 243:15
244:4 248:8
254:23 266:3
272:15,21
273:4,12 285:9
287:6,7 288:15
289:4,13
290:15 295:12
323:4,9,14,18
325:16 328:17
329:19 338:13
352:4,13,20
353:13 361:4
365:13 385:24
390:1,24 391:1
416:7,12
420:19 421:10
437:7 458:24
483:13
**informative**
385:12 448:23
**informing**
352:17
**informs** 19:10
141:5 144:20
468:13
**ingestion** 421:17
422:1
**ingredients** 6:17
174:17 176:8
176:15,17
184:4 467:1
**inhalation**
156:10 204:8
204:14 205:13
206:16 208:4,9
208:18 209:18
338:5,16
340:11 341:4
341:11 345:2
345:24 346:12
347:17 457:1
474:11
**inhale** 208:23
209:13 345:8

476:23 477:13
**inhaling** 206:2
475:10
**initially** 243:19
456:15
**initiate** 185:2
**Initiative** 236:24
237:1 265:24
321:9 324:3,14
324:18
**initiator** 376:11
**injected** 190:23
**inquire** 338:20
338:24
**inside** 184:18
195:15 409:7
409:13
**instance** 166:23
277:24 328:2
**instilled** 411:2
**Institute** 270:14
270:19 271:2,7
271:13,17
272:20 273:7
273:23 274:5
274:15 275:2
276:4,14 277:6
277:23 278:4,6
279:20 280:3
281:20 282:17
449:12
**Institute's**
271:22 273:12
279:2
**institution**
137:22 228:17
348:2 444:11
**institutions**
59:22 187:4
**instruct** 83:9,18
86:6,14 87:7
88:2
**intake** 422:21
**intend** 360:7
362:7,8
**intended** 353:16
**intention** 239:22

**intercourse**
195:16 436:15
**interest** 363:5
394:21 395:3
396:17,21
**interested** 43:10
45:20 67:14
95:24 485:13
**interesting**
480:5
**intermittently**
47:3
**internal** 16:22
17:18 25:17
72:16,19 73:4
73:12,15 74:14
74:17 75:1,6
75:18 76:4,23
77:7 78:14
79:18 81:14,23
82:1,6 83:5
88:20
**international**
32:5 222:7
223:10 224:5
227:18
**interpret** 132:13
464:7
**interpretation**
188:18 265:2
285:3 314:5
328:18 366:17
**interpreted**
366:23
**interpreting**
116:2
**interrupt** 82:16
243:2 367:2
**interrupted**
82:14 202:12
242:20
**interstitial**
338:23
**interval** 369:21
**intervals** 263:12
263:20 369:15
370:2

Judith K. Wolf, M.D.

306:12 307:1
308:11 309:8
310:23 314:21
**interviewed**
303:6 304:17
307:8 308:5,21
**interviews** 55:6
55:17 56:13
63:24
**intraabdominal**
19:17
**intrinsic** 327:20
328:6
**introduce**
359:18 436:18
**introduced**
43:12 436:13
439:1
**invasive** 302:24
**investigate**
194:3 220:5
305:13,18
312:18 339:1
343:1 455:21
**investigated**
110:1 249:1
438:15
**investigating**
153:2 339:21
438:16
**investigation**
51:11 194:11
379:9
**investors** 51:14
**invited** 54:20
63:16
**invoice** 37:2,11
38:9,17 39:7
39:15,20
**invoices** 6:12
36:17,21 37:3
40:1,6 41:3,9
**invoked** 259:9
**involve** 193:21
**involved** 43:11
45:21 60:22
67:15 390:5,15

395:5 397:14
**involvement**
357:24
**involving**
456:13
**irritant** 111:6
**irritants** 171:20
**irritating** 162:7
164:20 170:3,9
372:11 401:9
404:12,17
421:5 458:15
**issue** 14:20
28:19 48:9
87:10 107:5
254:17 364:3
**issued** 468:5
**issues** 30:15
54:22 55:10,17
63:18 165:15
237:10 265:20
353:4 364:21
**issuing** 94:20
**Italian** 135:22
379:23
**Italy** 379:14,14
**item** 31:5 483:3
**items** 372:16
376:17 377:6
400:15 401:21

_____

**J**

**J&J** 72:12,17
74:9,12 75:6
76:16 79:21
80:10 81:4
135:9,11,13,21
135:23,24
146:13,15,22
379:10 447:20
448:1
**J&J's** 74:14
123:14 378:13
378:18 448:3
449:4
**January** 1:9 5:2
6:2 7:2 8:2 9:4

12:12 31:11
35:22 37:3
38:5 41:22
44:7 49:19
52:22 53:16,20
479:14 485:19
**Jersey** 1:1 2:20
3:17
**Jewish** 356:8
**job** 461:2
**John** 112:21,23
113:20 114:3,7
114:22
**Johnson** 1:2,3
1:17 2:21,21
3:5,5,9,9 9:17
9:17 75:18,18
76:5,5 78:14
78:15 114:23
123:22 144:2,2
144:7,9,9,11
144:12,23,23
145:3,3,11,11
145:12,13,15
145:16,20,20
146:5,8,9,19
146:19 147:7,7
147:11,12,15
147:15,19
148:2,3,3,5,5
148:17,17
149:4,4,11
150:2,2,3,3,8,8
150:15,15,21
151:4,9 171:16
174:24 175:12
180:8 372:2,2
373:24,24
375:7,7,22,23
377:15,21
420:14,15
447:17,17
459:21,22
468:14,14
474:1,1 485:3
485:17
**Johnson's**

114:24 123:22
124:2,11 129:2
129:19 130:1
130:13 142:15
142:18 143:6
144:8 145:7
147:19 149:12
150:21 151:4,9
171:16 174:24
175:13 180:8
377:16,22
**journal** 34:18,22
106:12,14,14
360:12,13,13
360:14 386:19
390:1 397:2,9
398:8,11,13
**journals** 35:3
360:6,10
398:16 399:4
**judge** 86:8,15
87:8 299:23
300:4 401:19
420:13 435:14
456:15
**judges** 401:20
**Judith** 1:13 5:1
5:6 6:1,5,15
7:1 8:1 9:8
38:4 485:4
486:12
**Judy** 8:18 9:3
351:2,5 484:3
**Julie** 373:11,13
373:14,21
374:11 415:9
420:12
**jury** 456:14

_____

**K**

**K** 1:13 3:16 5:1
5:6 6:1 7:1 8:1
9:8 485:4
486:12
**Kang** 17:8,16,22
18:8 19:1,9,10
20:5

**KATHERINE**
3:7
**katherine.mc...**
3:7
**keep** 46:5 60:13
95:23 165:12
216:1 260:16
300:15 460:19
478:13 480:20
**keeping** 53:12
**KELLERT** 3:2
**Kemble** 3:17
**kept** 366:4
**kids** 387:15
**kind** 28:15
34:13 43:19
113:15 169:11
185:17 186:11
358:16,16
**Klatt** 3:11 5:8
5:11 388:7,16
388:19 390:11
390:20 392:10
394:2,15
395:14 396:8
396:15 397:1,6
397:22 398:6
398:21 399:21
401:10 402:13
402:19 403:1
403:10 404:23
405:18 406:4,9
409:5,14 410:1
410:20 411:14
412:6,22 413:4
413:10,16,23
414:17 415:7
415:20 416:10
417:7,18 418:3
418:13,21
419:16 420:1
420:10,20
421:12 422:3
422:12 423:1
424:1,9,22
425:5,16
426:23 427:9

428:1,18
429:13,16
431:3,8,13,18
432:16 433:19
435:1,13 436:1
436:9 437:8
438:7,14 439:3
439:12,20
440:17 441:20
443:7,19,23
444:7 445:8,13
454:13 455:5
455:20 457:12
461:13 470:18
470:21 472:18
473:10 474:9
474:23 475:6
475:17,24
476:10 477:9
477:15 479:1
479:18 481:2
482:4 483:20
**knew** 45:9,12,21
51:6 58:22
62:5 201:8
425:15
**know** 10:24 11:8
22:9 23:21
31:16 33:20
34:2,5 35:2,7
43:4,19,23,24
44:1,1 45:6
47:2,4 65:4
69:20 76:1,4
77:1 78:6
82:24 83:12
85:12 86:21
88:17 91:2,4
91:22 94:17
98:21 99:4,8
104:22 107:6,8
108:17,18,20
109:10,24
110:7,8 113:14
113:16 114:9
114:11,17
115:3,4,8

119:8 127:24
133:10 135:7
136:1,8,14
137:11 138:21
140:4,7,12,14
156:17 161:17
164:1 165:12
165:22 166:17
166:18 167:4
168:1 170:14
174:5,18
175:18 176:7
177:17 180:13
180:24 181:2,8
181:9 182:24
183:9,15,17
184:9,11,11
187:6 188:22
190:1,2,11,13
190:19 191:10
193:2 195:22
196:8 197:22
200:1,2,19
202:2,4 205:22
206:5,11 207:6
208:21 210:23
211:6 212:16
220:1 223:15
223:19 239:22
241:17 244:19
247:4 257:17
257:18,24
262:9 279:23
282:24 286:5
292:7 296:21
297:7,23 305:3
313:4 316:10
317:1,6 318:4
318:16,24
321:2 322:6
323:3 324:7,22
324:24 325:4,7
325:16 326:4
326:12,15,20
326:21 327:2
334:1,2 337:3
344:16,17

346:16 348:10
354:5 358:19
363:13 365:14
365:17,18
368:2 376:7
377:1,12
378:21 379:3,4
380:18 386:14
386:15,19,24
389:22 390:4,8
390:14,22,23
390:24 393:18
395:19 396:6
396:19 397:17
397:24 398:10
398:12 400:6
405:8 410:21
411:21 412:8
412:23 413:18
416:4 417:24
418:1,18,20
419:14,21
420:2,8 421:5
421:13 423:21
427:20 432:14
432:19 433:3
433:23 434:2
435:12,15
436:2 439:18
442:15 454:2
456:17 466:4
467:5,14,17
468:2 471:15
472:13 475:9
475:18,23
476:2,8 479:4
480:3,8 481:20
**knowing** 109:19
169:7 175:8
459:2
**knowledge**
20:21 33:23
43:13,15,16,18
228:9 235:17
253:24
**known** 25:6
115:15 171:19

173:14 195:1
195:13 376:4
401:4,8 404:11
404:18 457:19
458:13 477:16
**knows** 42:20
43:21
**Kramer** 207:15
**Krebs** 433:24
434:3

---

### L

**L** 2:8
**lab** 220:20
**lack** 99:19
101:14 255:16
255:19,21
256:23 257:1
259:15,18
261:14 266:5
267:22
**lacking** 329:13
**lag** 280:4 325:17
325:17
**Langer** 120:4,8
121:10,20
122:2,11
123:13 130:12
**Langer's** 120:11
122:7 123:19
**Langseth**
158:14
**language** 98:14
102:13,14,15
104:3,6,9
399:20
**large** 113:15
151:14 177:18
185:7 188:9
204:24 205:4
237:11 266:8
266:23
**larger** 69:4
197:15 297:17
387:11 414:9
414:19 426:15
426:18

**late** 45:15
**latency** 316:13
317:20 325:24
326:16,20
327:17 328:11
**latest** 282:20
**laughing** 136:7
**law** 10:21 43:19
83:20,20,21
**lawsuit** 88:22
305:12 313:13
**lawsuits** 302:13
303:7 304:2,17
304:18 305:22
309:9 311:15
311:24
**lawyer** 24:3
52:19 125:11
465:1
**LAWYER'S**
5:18 488:1
**lawyers** 39:15
49:24 50:5,10
57:3,14 58:11
59:23 60:4,17
61:7,18 62:1
62:12 67:21,23
72:21 75:1
78:1,3 80:11
80:15,19 81:3
81:24 82:5
84:3 85:13
86:11,22 87:5
91:19 93:15
94:10 95:24
96:6 114:6,8
118:14 121:8
137:5 207:16
219:20 358:6
358:20 362:14
386:8 414:12
414:16 415:3,6
436:24
**lay** 352:17
**lead** 20:3 22:13
25:3 26:1,9
29:24 90:15

Case 3:16-md-02738-MAS-RLS   Document 33123-4   Filed 08/22/24   Page 294 of 1035
PageID: 241473
Judith K. Wolf, M.D.

Page 515

119:18 175:1
177:3,11
183:12 207:1
217:15,18
218:5 219:15
**lead-up** 231:13
**leading** 22:6
270:20 271:7
**leads** 20:18 23:9
145:14 179:5
183:22 188:7
212:10 218:20
223:4 312:10
376:11 380:19
381:21 408:18
408:21
**learn** 60:21
100:18
**learning** 43:11
67:15
**leave** 123:9
479:5
**leaves** 406:14
**leaving** 50:24
**led** 23:3 50:24
51:12
**left** 48:15,17,18
49:19,20
244:22,23
246:11 419:12
443:21 444:21
468:4,24
478:24 483:5
**left-hand** 253:12
**LEIGH** 2:2
**leigh.odell@b...**
2:3
**length** 102:24
103:1 108:15
265:22 290:14
**lens** 338:12
**lesion** 326:13
**let's** 38:24 66:11
68:12 70:10
94:7 95:23
99:13 139:5
158:24 198:9

210:5 213:7
215:24 252:18
260:16 276:2
281:7 315:5
350:19 388:7
403:2 424:15
424:21,23
425:18 426:18
427:17,18
445:15
**letter** 7:14
230:13,17,18
230:23 231:4,7
231:9,11,14,20
232:8 233:22
233:24 236:13
362:8 389:10
392:1 393:6,15
393:20
**letters** 72:12
**level** 168:22
184:11,12
473:12
**levels** 183:11
419:4,19 420:7
421:14 422:6,8
422:16 433:7
434:12 435:15
437:12
**LHG** 1:5
**LIABILITY** 1:4
**license** 49:13
**licensed** 49:8
**licenses** 49:10
**life** 474:19
**lifestyle** 447:8
**lifetime** 171:11
473:5,8
**ligation** 197:24
202:22
**light** 110:14
116:14 133:8
**limit** 262:24
263:1
**limitations**
101:19 109:14
109:19 266:3

266:23 289:1
290:13 291:20
328:22 334:14
334:15 367:21
368:1
**limited** 99:19
101:14 103:17
106:24 255:16
256:22 257:1,2
257:3 259:15
261:14 267:21
285:14 448:19
**limits** 369:9
**line** 119:16
121:16 487:3
488:3
**linear** 332:16,19
**lines** 220:14
223:20 277:18
382:16,17
479:24
**lining** 439:23
**link** 237:18
423:13 428:12
**linking** 165:5
**list** 36:17 41:16
68:9 69:1
70:12 73:1
76:22 79:11,13
84:24 93:20,23
116:3 142:12
173:12,17
174:1,6,14,17
176:1 177:8
179:13 273:16
273:19,24
356:12,15
362:4 371:24
404:2 414:22
417:5 432:13
435:10 447:5
467:1
**listed** 69:14 70:3
70:21 74:10
77:8 78:4
81:15 175:24
276:10 355:2

372:17 376:18
377:1,6 385:13
396:1,2,10
405:1 414:22
436:15 444:14
**listen** 149:10
**lists** 70:15 75:22
75:23 245:7
382:20 450:7
**literature** 13:12
14:4,5,7 20:7
20:21 22:17
23:2,7,16
25:23 26:13
27:22 34:12,21
56:18,22 57:10
57:20,21 58:6
58:19 59:8,13
59:19 60:10,15
60:16,20 61:1
61:5,15,20
62:5,7,11
104:24 105:1
106:7 109:8
110:10 155:15
156:3 158:11
158:12 162:15
162:23 163:8
168:20 169:14
174:22 175:5
177:3 187:17
188:19 206:19
208:2 219:1,3
219:11 229:2
229:15 234:8
234:11 235:8
243:14 244:11
255:11 278:9
279:18,22
280:6 282:20
283:1,4 285:21
285:24 286:4,9
289:7 337:7
348:20,22
349:11,16,19
349:22,23
350:1 357:7

361:16,18
362:11 382:7
412:12 456:1
**litigation** 1:5 4:8
45:12 49:24
50:5,11 57:4
57:15 58:12
75:8 93:16
125:11,22
131:22 138:22
207:17 235:22
357:21,24
358:22 359:3
386:9 389:13
390:5 395:5
397:15,19
446:20
**little** 10:14
24:22 25:22
26:11 37:1
44:19 45:9,14
58:17 130:16
146:21 212:19
348:12 362:14
385:22 443:21
477:18 480:1
**live** 188:22
190:1
**lived** 44:1 190:3
318:19
**LiveNote** 485:18
**lives** 42:14
**living** 42:21
423:3,7
**LLP** 2:13,18 3:2
4:6,11,15,20
4:2
**lobby** 42:17
**location** 46:14
51:17
**locations** 46:19
49:2
**locum** 46:3
**Logan** 3:8
**logical** 389:5
**long** 10:13 44:2
128:24 155:3

Judith K. Wolf, M.D.

Page 516

| | | | | |
|---|---|---|---|---|
| 181:11 188:22 | 38:15,16 72:10 | 404:13 414:18 | 117:15 118:19 | 292:21 294:22 |
| 188:24 190:2,3 | 75:23 77:19 | 415:19 423:18 | 129:12 136:22 | 295:16 383:17 |
| 218:11 255:4 | 78:18 79:11 | 424:16 425:9 | 142:3 152:23 | **lunch** 213:8,23 |
| 267:2 291:23 | 99:13,14 101:5 | 425:17 435:10 | 153:2,8 161:8 | **lung** 160:19 |
| 317:8,23 318:4 | 101:18,22 | 439:8 443:23 | 169:3 173:13 | 184:19,21 |
| 318:6 322:20 | 103:9 105:9 | 445:5 473:1 | 199:16 208:7 | 344:1 457:5 |
| 324:13 325:20 | 108:15 111:8,9 | **looked** 27:23 | 212:17 218:6 | **Luzenac** 471:16 |
| 326:8,12 | 112:4,6 119:6 | 31:18 58:19 | 218:12,15,17 | **lymph** 206:21 |
| 327:24 379:4,6 | 119:11 126:24 | 71:3,6,9 75:12 | 220:3 241:9 | 206:22,23 |
| 422:7,15 | 127:22 129:14 | 76:17 77:2 | 248:10 261:18 | 207:1 209:3 |
| 432:13 477:16 | 133:7,11,15 | 137:1 152:11 | 264:6 270:8 | **lymphatic** 457:3 |
| 478:15 481:12 | 135:9 141:23 | 156:10,13 | 294:6 296:4 | **lymphocytes** |
| 483:20 | 144:3 156:17 | 168:2 196:7 | 302:19 303:9 | 406:23 |
| **long-term** | 158:24 172:10 | 197:7 199:3,9 | 304:23 305:2 | **lynch** 337:13 |
| 243:23 408:13 | 175:17,20 | 200:17 210:21 | 319:23 330:21 | |
| 411:7,22 412:9 | 196:23 198:2,7 | 211:23 212:18 | 330:22 338:11 | **M** |
| 472:5 | 198:9 202:14 | 212:22 214:12 | 338:14 339:22 | **M** 2:3,18 3:20 |
| **longer** 16:24 | 203:3 210:5,20 | 214:19 215:14 | 343:8 368:9 | **M.D** 1:13 5:1,6 |
| 17:15 49:12,16 | 211:22 212:18 | 216:5,17 | 378:24 380:12 | 6:1 7:1 8:1 9:8 |
| 219:12 243:9 | 212:19,20 | 217:10 222:22 | 392:13 393:4 | 485:5 486:12 |
| 244:3 326:24 | 213:5 215:20 | 223:2,7,8 | 394:10 401:17 | **macro** 406:23 |
| 331:12 | 217:9 219:1,4 | 237:12 238:10 | 424:18,24 | **Magnani** 158:15 |
| **Longo** 112:16 | 223:6,18 224:9 | 247:21,23 | 425:19 427:2 | **Main** 3:21 |
| 125:14 126:7 | 240:22 244:21 | 248:13,18 | 458:19 469:3 | **maintain** 71:11 |
| 126:15 128:14 | 245:13 246:15 | 249:14,18 | 472:10 479:23 | **majority** 144:8 |
| 129:13 135:6 | 247:5 248:12 | 254:17 256:7 | 479:24 | 145:10 146:7 |
| 140:22 142:22 | 251:19 252:15 | 276:17 281:14 | **looks** 36:24 | 146:12 148:1 |
| 373:19,21 | 256:16 257:8 | 305:6 306:7 | 38:18 39:17 | 253:14 291:16 |
| 379:2 380:2 | 257:15 268:23 | 313:2 318:3 | 258:3 | 321:14 440:2 |
| 452:11,13,22 | 272:14 273:3 | 336:9 366:12 | **loop** 67:17 354:9 | 470:9 |
| 453:16,18 | 273:10 278:10 | 366:15 369:10 | **losing** 344:3 | **makeup** 108:22 |
| 459:21 460:4 | 279:23 289:19 | 387:23 405:5 | **lot** 21:3 146:22 | 181:13 290:3 |
| 463:11,15 | 289:24 291:12 | 423:22 434:23 | 185:11,13 | **making** 73:4 |
| 464:10 | 291:15 293:16 | 436:7 439:4 | 293:8 300:23 | 256:21 266:5 |
| **Longo's** 127:13 | 295:23 297:16 | 455:1 458:15 | 305:12,21 | 389:19 407:1 |
| 131:22 135:3 | 297:19 298:21 | 468:9 470:3 | 334:11 344:1 | **malignant** |
| 136:4,18 137:6 | 306:1 308:20 | **looking** 12:21 | 347:7 354:6 | 185:12,15 |
| 137:11,16,20 | 313:2,17 314:3 | 14:3,6 18:10 | 363:5,10 389:2 | 186:8 |
| 138:22 139:18 | 314:6 319:8,9 | 18:13,23 19:1 | **lots** 43:2 399:4 | **management** |
| 172:15 374:7 | 329:16 330:8 | 19:5,14,16 | 439:13 | 186:8 |
| 459:5,15 | 330:24 332:1 | 21:8 24:16 | **low** 259:8 328:4 | **MANGES** 2:18 |
| 463:19 464:5 | 333:3 340:16 | 51:6 52:13 | 328:4 | 3:2 |
| **look** 13:9 16:19 | 341:10,15 | 73:1 78:22 | **lower** 8:11 | **MANSUKHA...** |
| 17:2 18:18 | 346:18,22 | 81:10 100:7 | 262:24 292:10 | 3:11 |
| 19:18 21:2 | 370:7,16,19 | 101:23 102:6 | 295:3 296:24 | **manuscript** |
| 24:4 28:17,23 | 371:6 391:4 | 102:24 106:7 | 298:2 369:9 | 35:11,16,18,20 |
| 32:9 35:24 | 401:2,16 | 106:10 116:14 | **lowest** 227:13 | 36:4 236:18 |

Judith K. Wolf, M.D.

391:5 394:11
**Manuscripts**
6:11
**marathon** 11:7
**Margaret** 2:3
42:2,4,5
477:17 481:8
481:17
**margaret.tho...**
2:4
**mark** 3:16 12:4
12:6 31:7
35:12 52:20
66:11 156:22
198:15 211:1
213:9 238:21
239:21 244:24
247:14 294:7
319:16 320:10
350:19 424:13
425:4 427:16
427:17,18
483:17
**marked** 6:3 7:3
8:3 11:12,15
12:8 31:12,16
35:13,19 36:4
36:18 52:23
66:13,19 67:19
67:20 96:16
97:5,17 100:22
101:2 128:15
141:11 157:1
157:18 158:1
198:21 213:17
213:21 224:14
224:15 232:19
233:1 238:22
245:2 247:16
269:19 272:2,6
294:13,16
302:8 319:12
330:18 350:20
353:20,24
392:6 394:5,11
425:6,8 427:3
427:22 428:2

454:21 482:22
**markers** 338:20
**market** 28:5,10
144:6
**marketed** 449:1
**MARKETING**
1:3
**marking** 128:18
**marks** 139:10
252:24 378:7
**mass** 352:19
**material** 68:10
69:2,10,24
92:4 192:7
415:23 451:8
**materials** 68:6
70:2,5 72:3
76:22 83:13
84:21 85:20,24
86:19 87:16
91:12,15,20,23
92:2,8,18,20
93:7 106:11
137:2 158:13
192:2,4 312:14
374:4 414:5
446:14 482:20
**matter** 39:21
58:4 131:5
150:16 151:2
151:12 168:5
169:24 170:4,7
171:3 298:21
**matters** 453:23
**MCBETH** 3:7
**McCullough**
17:18 18:1
**MD** 6:15,16 7:9
33:14 48:11,12
48:13,16,17,18
156:2 444:21
**MDL** 1:7 6:12
13:17 14:20
32:20 65:15
415:10 452:11
**mean** 21:6 22:23
29:5 37:17

38:16 40:18
51:9 71:13
92:11 97:6,21
102:23 104:5
117:14 130:18
132:23 135:11
137:9 170:2
196:21 200:15
203:15 206:24
222:6 269:9
298:7 339:1
359:4 373:2
393:23 418:1
447:15 448:16
459:16 472:21
**meaning** 104:10
119:8 133:7
261:1
**means** 21:7 74:3
133:6 284:21
334:20 413:6
419:18 420:2
474:24
**meant** 84:8
239:16 352:21
379:24 459:19
478:23
**measured**
189:13 219:7
**mechanism**
102:5 220:5,8
220:8 226:4
367:24 380:8
385:5
**mechanistic**
225:2 227:14
451:10
**media** 305:22
311:14 313:13
462:19
**medical** 20:7
22:17 23:2
34:12,18,21
35:3 38:4 43:1
73:5 104:24
116:13 133:14
133:21 155:23

195:7 221:8,11
363:2 400:12
412:8 462:9
473:15
**medicine** 6:7
12:19 13:18
31:23 33:9,14
46:3,7 47:13
49:9 106:4
366:22
**medium** 151:14
**meet** 42:12 44:9
67:6 278:21
**meeting** 36:12
42:2 279:4
364:11
**member** 360:17
360:19
**members**
278:20 279:4
**membrane**
457:2
**Memorial** 46:12
**memory** 121:2
**men** 318:24
**menarche** 316:5
316:8
**Menstrual**
192:9
**menstruation**
228:12 440:12
**mention** 216:4
**mentioned** 43:8
246:16 302:2
401:22 438:4
451:14
**mesothelial**
189:6
**mesothelioma**
186:20 187:5
338:22 339:8
339:13,19,23
342:10,14,20
343:4,16
344:11 345:10
345:24 346:9
346:14,16,24

347:5,12,19,24
410:22
**met** 42:17
463:14 477:18
**meta-analyses**
250:10 251:6
251:20 253:7
260:8 265:7
370:20 451:10
**meta-analysis**
7:23 8:5 99:16
197:16 235:2
236:5,10 238:2
238:3 242:10
245:9 247:8,14
250:18 251:2,3
252:11 258:17
259:1,5,7
260:21 261:3,8
264:2,7 265:3
265:8 283:10
283:11 287:10
291:11 329:23
383:11,23
470:8
**metal** 170:3
373:3,6 400:3
432:9
**metals** 6:19 8:19
111:2 162:6
164:16 168:6
179:2 372:9
373:9,18,23
375:21 377:15
378:15,23
401:6 432:5
465:11 466:9
**method** 105:18
115:9,15 312:3
419:5,9,20
420:6,8
**methodologies**
418:5
**methodology**
13:15 14:16
80:18 81:21
105:19,24

Judith K. Wolf, M.D.

126:13 137:19
146:11 152:4
223:9 227:24
234:6 251:15
268:8 278:1
279:17 294:19
297:12 299:2
313:9,11,17
367:3,4 451:19
452:1
**methods** 31:24
32:3 106:11
115:11 116:4
116:20,23
132:13 137:2
246:17 312:6,7
312:14 314:4
418:7
**Michael** 3:11
111:5
**Micheal** 1:16
23:20 485:3,17
**microscope**
133:19 218:7
419:13 451:20
**microscopes**
133:24
**microscopist**
116:5,9 133:1
133:5,10
**microscopy**
116:14,15
133:8
**mid** 316:18
**middle** 318:18
321:3 358:18
**middle-age**
316:19
**migrate** 191:1
191:24 192:2,5
192:13,22
208:16 214:8
221:7 228:18
229:6 230:2,7
232:6 387:17
**migration**
192:19 193:13

194:16 201:18
202:20 204:5
207:1 221:10
221:18 223:12
223:21,23
226:14 227:6
227:22 228:13
228:15 336:16
387:3
**Mike** 388:19
424:21 429:12
472:17
**miller** 341:22
**millers** 340:5
341:6 342:5
343:16 345:18
456:13
**mind** 15:8 20:10
109:21 129:5
168:12 287:3
324:21 336:24
360:7 397:3
460:22 464:14
**mine** 94:4 416:2
423:8
**mineral** 117:19
**minerals** 115:17
116:16
**Minerals/Luz...**
471:24
**miners** 340:5
341:5,22 342:5
343:16 345:18
456:13
**mines** 130:3
135:22 343:24
379:10 423:4,8
**minimal** 251:22
**mining** 79:17
388:22
**Minnesota**
49:17
**minus** 167:8
**minute** 23:19
236:2 370:23
389:8 475:9,11
**minutes** 65:23

79:7 134:3
210:14,16
471:3
**mischaracteri...**
76:19
**misheard**
296:10
**mismarked**
225:7
**misrepresenting**
132:22
**misrepresents**
132:17 403:22
**missing** 88:1
296:18 332:12
332:12 343:12
**misspoke** 67:9
239:16 459:13
**misstates** 35:5
57:8 77:12
121:13 122:23
123:17 130:15
135:15 139:1
147:2 236:21
366:7 402:4,18
468:20
**MIT** 130:2
**mix** 21:4 70:7
110:24 111:1
**mklatt@gord...**
3:12
**model** 410:18
**models** 182:1
410:21 411:1
**moderate** 226:9
**modification**
306:11,24
307:21 308:10
314:20
**moment** 122:22
**Monday** 1:9
**money** 51:14
358:20 386:7
395:22 396:7,7
396:11 398:4
**monograph**
31:9 156:22

157:6,11 165:4
187:19 224:23
225:22 423:19
423:21 424:11
424:11 425:20
426:10 427:8
427:10 428:6
431:5,21
454:20,21
455:13,17
457:10,10
469:9,15 476:2
476:12,17
**monographs** 6:8
6:20 7:11 8:20
31:9,19 33:11
**Montgomery**
2:5
**month** 49:7
279:24 283:7
439:23 479:2
**monthly** 190:18
278:21 279:5
**months** 332:11
332:13 479:8
**morning** 9:14,15
52:20 67:22
90:4 172:2,10
**Morris** 480:10
480:11,14
**Morristown**
3:17
**mortality** 159:6
426:4
**motion** 348:21
**Mount** 3:17
120:8
**move** 19:8,8
78:2 149:15
203:10 299:11
300:22 301:1
**moved** 318:20
**moving** 65:17
216:1 441:2
**msilver@coug...**
3:16
**mucinous**

241:18
**mud** 119:17
**multipage** 468:5
**multiple** 19:20
21:20 106:15
148:23,23,24
166:20 167:11
167:17 182:8
184:3 191:7
199:9,10,11
223:20 228:11
290:13 298:16
343:22 387:10
391:14 402:7
403:7 437:12
442:23 458:12
**multiply** 358:22
**multistep**
387:21
**multivitamins**
432:18,20
435:7,11
**museum** 135:13
**Musser** 7:15
**mutation** 337:12
337:14
**mutations**
380:22 381:5
381:10,17
382:1
**mystery** 350:11
351:23

---

**N**

**N** 2:1 3:1 4:1
**N.W** 4:3
**NAEEM** 3:20
**naive** 59:14
**name** 9:16 16:19
42:14 46:13
51:19 97:12
245:7 351:22
354:2 388:19
410:6,10,11
**names** 94:2
**Narod** 256:6
**Narod's** 259:20

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 298 of 1035
PageID: 241477
Judith K. Wolf, M.D.

Page 519

371:10
**National** 270:13
270:19 271:2,6
271:13,17,21
272:19 273:6
273:11,22
274:4,14 275:1
276:4,13 277:5
277:23 278:4,5
279:1,19 280:2
281:19 282:16
363:1,10,18
364:20 365:16
449:11
**nature** 328:23
435:24
**NCI** 234:22
272:15 278:20
282:18 283:6
302:4 365:7
366:3 450:11
**NCI's** 272:7
**NCI-sponsored**
234:19
**NCRA** 485:17
485:18
**near** 206:22
423:8 441:15
441:19
**nearly** 10:2
59:22
**necessarily**
187:6 192:19
211:21 229:4
338:15 354:10
389:4 477:6
481:20
**necessary**
457:24 483:16
**need** 11:8 49:4
80:5,6 86:7,9
86:12,16 112:5
121:1 122:19
122:20 128:24
198:6 202:14
230:16 231:20
245:7 252:17

300:22 303:16
313:7 319:7,9
362:4 378:2
386:14 423:18
424:19 426:22
450:4,5
**needed** 109:3
168:12 185:19
325:8 371:17
390:2 464:15
**needing** 259:20
**needs** 120:22
336:24
**negate** 208:14
242:6,14
246:13
**negative** 261:7
**neglected** 65:24
**neighbors** 42:13
**neither** 361:5
485:11,12
**Network** 51:20
52:3,15
**never** 34:3
133:18 171:18
176:14 177:14
185:20 326:10
368:2 386:12
386:13 387:6
389:21 408:1
431:23 433:9
434:15 435:18
438:2 462:12
462:17,23
477:20 482:1
**new** 1:1 2:20 3:4
3:4,17 51:14
69:9 236:8,15
288:7
**newer** 197:15
199:5
**newest** 451:4
**Newport** 2:10
**news** 55:3,5
56:12 64:17
65:10
**nicely** 286:9

**nickel** 111:3
164:17 168:7
372:10 400:5
400:16 404:6
431:24 435:2,6
435:16
**nine** 269:12
**nodes** 206:21,22
206:23 207:2
209:3
**Nods** 200:24
310:11
**Non-Hispanic**
8:11
**non-Hispanic/...**
296:13
**non-talc** 436:18
**non-talc-based**
438:17
**nonasbestiform**
115:17 117:18
118:1 225:22
284:8,11
285:13 340:11
341:5 469:10
469:15
**Nongenetic** 8:12
**nongenital**
302:22
**nonhereditary**
356:16
**nonoccupatio...**
163:15,21
423:3
**nonserous**
238:14 239:24
240:13 241:20
241:23 242:10
**nonspecific**
45:16
**nonstatistically**
164:7 165:2
324:8
**nopelvicmass....**
351:15
**normal** 73:2
227:11

**North** 318:19
**Northwest**
46:12
**Notary** 1:18
9:10 486:19
**notations**
483:22
**note** 40:10 91:9
253:13
**notebooks** 68:5
**noted** 159:2
188:1 258:24
416:2 426:1
428:20 486:7
**notes** 5:18 68:20
71:24 72:2,5
443:24 478:13
480:20 488:1
**notice** 1:14 6:4
11:13 12:3
65:18 66:3
67:19
**November** 36:3
93:11 94:21
95:6 96:17
351:2,8 352:3
352:8
**NTP** 384:7,11
384:24 385:8
385:11
**number** 6:3 7:3
8:3 12:2 47:4
55:16,17 59:21
63:12,16 67:20
72:11 79:12,13
96:2 116:3,19
152:11 187:4
193:17 199:16
202:7 238:8
254:23 293:1
304:19 310:12
331:20 351:13
355:13 368:16
368:20 427:20
448:21 451:17
452:15 456:11
457:22 462:8

**numbers** 78:21
297:19 449:24
450:2
**numerous** 91:11
92:17 172:6
468:9
**nurse** 42:16
348:7,9
**Nurses** 236:23
237:16 242:12
243:6 245:21
246:10,24
247:13 249:4
252:3 257:7
265:14 266:13
267:3 321:3,10
321:11,16
322:22 323:13
**nutrient** 433:4
**nutrition** 432:9
432:12
**nuts** 435:3

---
**O**
---

**O** 4:6
**O'Dell** 2:2 5:9
5:12 13:5 18:6
18:16 20:11
21:15 22:7,20
23:5,18,23
24:8 26:2,17
27:12 28:20
29:8 30:5,18
33:4 35:4 36:8
37:10 38:22
39:4,7 40:8,10
40:20,23 41:8
41:14 43:23
44:15 50:12
52:5,16,19
53:22 55:13
57:7,17 58:13
60:7,18 62:14
63:3 64:4 65:1
65:16,22 66:20
67:4 68:4 73:7
73:13,20 74:5

Judith K. Wolf, M.D.

Page 520

| | | | |
|---|---|---|---|
| 74:19 75:9 | 147:1,22 | 231:2,6,10,15 | 318:14 319:7 | 403:4,17,19 |
| 76:8,18 77:11 | 148:20 149:14 | 231:18 232:13 | 319:17,19,21 | 405:15,24 |
| 77:14 78:7,16 | 150:5,22 | 233:3,18 236:1 | 320:2,6,13 | 406:6 408:22 |
| 79:2,5,24 | 151:10,21 | 236:19 237:20 | 322:4,15 323:5 | 409:10,18 |
| 80:12,21 81:7 | 152:17 154:2 | 238:17 240:3 | 323:11,20 | 410:14 411:10 |
| 81:17 82:7,10 | 156:7,15 157:8 | 242:2,24 | 324:15 325:9 | 412:2,20,24 |
| 82:15,18 83:8 | 157:15,20 | 243:21 244:6 | 326:19 327:3 | 413:7,14,19 |
| 83:21 84:1,15 | 158:20 159:9 | 244:15 245:12 | 327:11 328:14 | 414:13 415:4 |
| 84:18 85:17 | 159:14 160:3 | 245:23 247:2 | 329:1,14 | 415:17 416:9 |
| 86:17 87:10,21 | 161:2,23 163:6 | 248:5 249:7 | 330:20 331:15 | 417:3,15,23 |
| 88:3,12,23 | 163:17 164:11 | 251:17 252:5 | 332:6 333:10 | 418:11,15 |
| 89:15 92:5,10 | 165:8 166:1 | 252:13 253:17 | 333:15 334:18 | 419:10,22 |
| 92:23 93:22 | 167:14,22 | 254:10 260:1 | 334:23 335:9 | 420:3,17 421:1 |
| 94:23 95:9 | 168:24 169:18 | 260:14 261:4 | 335:20 336:14 | 421:22 422:9 |
| 96:20 97:18 | 170:17 172:3 | 261:15 264:4 | 337:1 338:7 | 422:19 423:16 |
| 98:16 100:24 | 173:5,19 174:3 | 264:18 265:18 | 339:9 340:13 | 424:5,14,17 |
| 101:16 102:2 | 175:3,15 | 266:19 267:17 | 340:22 341:13 | 425:3,9,14 |
| 102:19 103:6 | 176:12 177:12 | 268:11,20 | 341:24 342:11 | 426:16 427:4 |
| 103:19 104:5 | 178:4,17 179:7 | 269:6,13 270:3 | 342:22 343:18 | 427:12,15 |
| 104:12 105:14 | 179:14 180:10 | 270:23 271:9 | 344:16 345:11 | 428:16 429:11 |
| 107:2,15 108:3 | 181:5 182:2,21 | 272:22 274:19 | 346:1,5 347:20 | 429:15 430:23 |
| 108:12 109:5 | 183:13,24 | 275:9,15,22 | 349:1,13 | 431:6,10,16 |
| 109:16 110:5 | 186:5,21 187:7 | 276:8 277:2 | 350:14 353:6 | 432:10 433:15 |
| 110:22 111:20 | 187:18 188:16 | 279:8 280:14 | 357:4 362:21 | 434:20 435:8 |
| 112:8 115:1,20 | 189:9,19 191:3 | 280:22 281:11 | 363:22 364:8 | 435:21 436:4 |
| 116:6 117:1 | 191:16 192:24 | 282:22 284:13 | 364:22 365:10 | 437:4,21 |
| 118:3,17 | 194:13 196:1 | 285:5,16 | 366:6,19 367:6 | 438:11,20 |
| 119:10,21 | 196:11,19 | 286:14 287:16 | 367:16 368:7 | 439:6,16 |
| 120:13,18,23 | 197:11 198:6 | 288:11,22 | 368:23 369:12 | 440:10 441:17 |
| 121:12 122:3 | 200:9 201:6,19 | 289:22 290:10 | 370:12 372:4 | 442:21 443:22 |
| 122:14,17,20 | 202:13,23 | 291:18 293:23 | 372:18,21 | 445:3,15 446:2 |
| 123:4,7,9,16 | 203:13 204:1 | 294:3,9 295:19 | 374:16 376:1 | 448:9 449:9 |
| 124:4,13,24 | 204:19 205:7 | 296:6 297:2 | 376:20 377:8 | 450:23 452:7 |
| 125:12,24 | 205:14 206:9 | 298:4,13 299:7 | 377:17 380:14 | 452:21 453:5 |
| 126:9,17 127:8 | 207:21 209:23 | 299:12,17,20 | 381:18 382:9 | 453:14 454:2,5 |
| 128:7 129:4,8 | 210:8,12,15,24 | 299:24 300:3 | 382:23 383:19 | 455:6,23 457:7 |
| 130:5,14 | 211:10,18 | 301:2,8,22 | 384:18 385:9 | 457:13 458:17 |
| 131:15,23 | 213:10 214:2 | 302:14 303:8 | 386:10 387:4 | 459:11,20 |
| 132:5,15 133:2 | 214:16 215:6 | 303:14 304:6 | 387:19 390:6 | 460:3 461:4,10 |
| 134:6,19 | 216:6,15,24 | 305:15,23 | 390:18 391:20 | 463:3,21 464:8 |
| 135:14,18 | 218:1,23 | 306:13 307:4 | 392:2 393:23 | 464:18 465:13 |
| 136:10,20 | 220:11 222:1,8 | 307:16,23 | 395:8 396:4,12 | 465:23 466:12 |
| 137:13,23 | 222:16 223:13 | 308:12 309:2 | 396:18 397:4 | 466:21 468:17 |
| 138:3,12,24 | 224:7 225:4,8 | 309:13 310:14 | 397:20 398:1 | 468:19 469:17 |
| 140:10,18 | 226:15 228:4 | 312:21 313:14 | 398:19 399:17 | 470:12 471:2 |
| 143:13,16 | 229:20 230:10 | 314:12,23 | 400:20 402:3 | 472:17,19 |
| 144:24 145:21 | 230:16,19 | 316:2 317:4,24 | 402:17,22 | 474:5,20 475:2 |

Judith K. Wolf, M.D.

| | | | |
|---|---|---|---|
| 475:13,22 | 134:6,19 | 244:15 245:23 | 366:19 367:6 |
| 476:6 477:8,11 | 135:14 136:10 | 247:2 248:5 | 367:16 368:7 |
| 478:19 479:15 | 136:20 137:13 | 249:7 251:17 | 368:23 369:12 |
| 480:23 482:6,9 | 138:12,24 | 252:5,13 | 370:12 372:4 |
| 482:14 | 140:10,18 | 254:10 261:4 | 374:16 376:1 |
| **O'REARDON** | 144:24 145:21 | 261:15 264:4 | 376:20 377:8,9 |
| 2:13 | 147:1,22 | 264:18 265:18 | 377:17 381:18 |
| **oath** 10:19 24:6 | 149:18 150:5 | 266:19 270:23 | 382:9,23 |
| **obesity** 356:20 | 150:22 151:10 | 272:22 274:19 | 383:19 384:18 |
| **object** 13:5 18:6 | 151:21 152:17 | 275:9 276:8 | 385:9 386:10 |
| 20:11 21:15 | 156:7 158:20 | 277:2 279:8 | 387:4,19 390:6 |
| 22:7,20 23:5 | 159:9,14 160:3 | 280:14,22 | 390:18 391:20 |
| 23:18 26:2,17 | 161:2 163:6,17 | 281:11 282:22 | 395:8 396:4,12 |
| 27:12 28:20 | 164:11 165:8 | 284:13 285:5 | 396:18 397:4 |
| 29:8 30:5,18 | 166:1 167:14 | 285:16 286:14 | 397:20 398:1 |
| 33:4 35:4 36:8 | 167:22 168:24 | 288:11,22 | 398:19 399:17 |
| 55:13 57:7,17 | 169:18 170:17 | 289:22 290:10 | 399:19,19 |
| 58:13 60:7,18 | 172:3 173:5,19 | 291:18 295:19 | 400:20 402:3 |
| 62:14 63:3 | 174:3 175:3,15 | 297:2 301:22 | 402:17,22 |
| 64:4 65:1,16 | 176:12 177:12 | 302:14 303:14 | 403:4,20,20,21 |
| 66:20 67:4 | 178:4,17 179:7 | 304:6 305:15 | 405:15,24 |
| 73:7,13,20 | 179:14 180:10 | 305:23 306:13 | 406:6 408:22 |
| 74:5,19 75:9 | 181:5 182:2 | 307:4,23 | 409:10,18 |
| 77:11,14 78:16 | 183:24 186:5 | 308:12 309:2 | 410:14 411:10 |
| 80:12,21 81:7 | 186:21 187:7 | 309:13 310:14 | 412:2,20,24 |
| 81:17 82:8 | 187:18 188:16 | 312:21 314:12 | 413:7,14,19 |
| 88:23 94:23 | 189:9,19 191:3 | 314:23 316:2 | 414:13 415:4 |
| 95:9 96:20 | 191:16 192:24 | 317:4,24 322:4 | 415:17 416:9 |
| 97:18 98:16 | 196:1,11,19 | 322:15 323:5 | 417:3,15,23 |
| 100:24 101:16 | 197:11 201:6 | 323:11,20 | 418:11,15 |
| 102:2 103:6,19 | 201:19 204:1 | 324:15 325:9 | 419:10,22 |
| 104:12 105:14 | 204:19 205:7 | 327:11 328:14 | 420:3,17 421:1 |
| 107:2 108:3,12 | 205:14 206:9 | 329:14 331:15 | 421:22 422:9 |
| 109:5,16 | 207:21 209:23 | 332:6 333:10 | 422:19 423:16 |
| 110:22 111:20 | 211:10,18 | 333:15 334:23 | 428:16 430:23 |
| 115:1,20 116:6 | 214:16 215:6 | 335:9,20 | 431:6,10,16 |
| 117:1 118:3,17 | 216:15,24 | 336:14 338:7 | 432:10 434:20 |
| 119:10,21 | 218:1,23 | 339:9 340:13 | 435:8,21 436:4 |
| 120:13 121:12 | 220:11 222:1,8 | 341:13,24 | 437:4,21 |
| 122:3,21,22 | 222:16 223:13 | 342:11,22 | 438:20 439:6 |
| 123:9,16 124:4 | 224:7 226:15 | 343:18 345:11 | 439:16 441:17 |
| 124:13,24 | 228:4 229:20 | 346:1 347:20 | 442:21 445:3 |
| 125:12,24 | 230:10 232:13 | 349:13 350:14 | 460:23 463:3 |
| 126:9,17 127:8 | 233:3,18 236:1 | 353:6 357:4 | 463:21 464:18 |
| 128:7 130:5,14 | 236:3,19,20 | 362:21 363:22 | 465:13,23 |
| 131:15,23 | 237:20 242:2 | 364:8,22 | 466:12,21 |
| 132:15 133:2 | 243:21 244:6 | 365:10 366:6 | 468:19 469:17 |

470:12 475:2
**objected** 300:5
**objecting** 346:4
**objection** 76:8
76:18 78:7
79:24 82:16
95:13 107:15
110:5 137:23
148:20 154:2
156:15 161:23
182:21 183:13
194:13 267:18
268:11,20
270:3 271:9
298:4,13 299:7
300:1,5,19
303:8 307:16
313:14 318:14
326:19 327:3
329:1 334:18
337:1 433:15
440:10 448:6
449:6 450:20
452:3,19 453:2
454:3 455:5,9
455:19,20
456:20 457:12
458:8 459:17
460:1,7 463:7
474:5,20
475:13,22
476:6 477:8,11
479:15
**objections** 66:5
66:7,9 67:23
**observational**
253:24
**observed** 308:2
**obtain** 289:13
406:3
**obvious** 218:13
**obviously** 350:8
**occasional**
417:21 418:8
**Occasionally**
272:17
**occupational**

Judith K. Wolf, M.D.

Page 522

155:19 156:6
156:14 158:19
159:7,19
160:17 161:1,9
161:13,20
162:17 163:2
165:7 346:19
346:20 423:15
426:5 428:14
429:1 430:18
**occupationally**
158:22 162:8
**occur** 166:19
228:16 255:9
381:10 409:3
413:6
**occurred** 83:16
**occurs** 166:20
193:13 223:22
223:22 228:13
324:23 385:3
**October** 49:21
50:24 51:4,15
479:7,9
**odds** 262:24
263:11,15,19
307:15 311:1
313:24 355:6,6
368:10 369:14
**off-the-shelf**
471:4
**offered** 107:16
344:20,24
462:24 464:13
**offering** 128:4
134:16,21
278:18 453:8
453:12
**offhand** 178:8
191:12
**office** 37:13 39:9
40:24 47:5
71:15
**official** 49:21
**officials** 50:19
**Oh** 53:17 177:6
187:23 263:6

309:18 392:9
**Ohio** 3:22
**okay** 9:19,20
10:8,11,15,23
11:6,9,10,21
11:24 12:5
15:21 16:2,10
16:21 17:14
19:3 20:4
23:11 25:17,21
28:11 34:6,16
34:23 36:24
37:9,20,24
38:8,12 39:19
39:23 42:7
43:20 44:11
45:2 46:24
48:20 50:3
51:19 52:16
53:19 54:2
61:21 63:8
66:24 68:12,23
69:11,17 70:1
71:17,21 75:17
87:24 89:15
90:10 92:6,16
92:23 93:1,13
93:18 94:7,12
94:20 95:4,22
99:5,8,13
100:4 101:11
101:22 105:6
113:2,9 114:9
117:22 120:10
121:18,23
125:19 127:5
127:12 131:12
131:21 134:2
134:16 135:6
137:18 140:7
143:4 144:20
149:8 154:13
157:20 196:14
196:14 200:6
201:3 203:19
207:6 209:9
210:5,7,15,16

213:10 214:11
216:3 226:2,7
226:12,23
227:3 229:24
231:12 232:10
232:18 234:6
235:16,19
246:21 247:11
250:20 252:10
255:24 256:3
258:10 262:22
269:19 273:16
277:20,20
279:16 281:7
284:7 287:2
288:3,7 291:3
293:6 297:6
298:16 303:19
304:5 307:6
309:21 316:7
316:16 321:2
344:9 345:21
347:8 350:2
351:7,11,20
352:7 353:1
354:8,14,19
357:23 358:4
364:2 370:22
371:21 374:23
375:4 380:5
389:7 391:4
394:7 395:23
396:16 427:14
429:6 430:7
441:14 443:22
444:13 453:15
462:6 463:17
473:14 477:20
479:11 481:10
483:15
**old** 58:3 236:10
283:2
**older** 470:15
**omitted** 245:20
**once** 58:24
94:13 170:22
170:22 189:1

189:24 279:23
289:1 348:19
478:5 482:1
**oncologist** 42:22
59:10,21 60:3
62:23 73:3
74:4 186:2
272:14 286:12
292:8 296:22
341:9 348:8
352:19 353:2
397:13 398:16
453:6,7 480:3
481:13,23
**oncologists**
360:11 361:15
480:8
**oncology** 20:22
48:6 94:3
325:24 360:11
360:12 362:24
364:13
**one-time** 188:20
190:5,9,20
**ones** 39:6 93:19
94:1,3 118:20
148:4 197:19
400:4 414:21
414:23,24
447:6
**ongoing** 257:11
**online** 34:19,22
**Oophorectomy**
8:13
**open** 193:8
336:17 387:9
443:15 456:23
456:24,24
**opening** 193:4,5
193:7 387:11
**operate** 411:20
**operated** 445:1
**operations**
28:18
**opined** 261:12
**opines** 179:13
**opining** 297:13

**opinion** 25:1,4
25:24 26:14,14
27:7,8 29:23
30:24 56:14
57:11,15 58:9
58:21 61:2,22
62:8,10 64:9
65:14 67:2,12
75:11,14,20
76:6,10 77:1,4
77:23 78:5,10
78:13 79:11
84:5,13 85:15
87:1 88:10
89:9 101:9
106:18,24
107:22 108:8
110:16,18
111:17 124:21
125:20 126:6
127:6 128:5
130:23 131:13
134:4,17,21
138:20 139:15
139:18 140:24
141:5,21 142:9
143:24 144:21
145:7,15 146:4
148:11,13,15
148:18 149:3
149:11 150:10
150:13,19
151:5,7,16
152:12 158:2,3
158:6,8 165:11
165:24 166:13
167:20 171:15
171:19 174:13
174:16,23
176:3 178:12
178:15 180:7
181:2,22
191:22 193:17
196:18 201:5
204:12 205:11
206:19 208:22
213:1 214:8

Judith K. Wolf, M.D.

Page 523

228:13,14
229:7 232:5
233:7 234:11
237:17 241:4
255:18 256:20
259:19 268:16
270:10 278:18
280:1 281:9,13
281:17 284:15
301:20,24
303:12 325:23
327:7 336:10
336:20 338:2
340:4 343:13
344:21 345:1
345:16 348:20
357:2,11
361:20 371:23
372:15 373:9
373:16,23
374:8 375:3,6
376:15,22
377:5,13 378:1
378:12,18
381:1 384:4,5
400:14,22
451:9 462:14
463:1 464:13
465:4,8,21
466:2,18,23
467:5,8,17,20
468:14,18
482:21
**opinions** 29:17
30:16 32:19
36:3,5 66:18
75:7 76:3 83:3
83:7 88:21
95:5,8 96:18
96:23 107:10
154:14 157:7
170:12 172:17
191:22 225:24
271:23 303:3
360:21 383:17
387:1 446:19
450:12,18

453:8,12 457:8
457:24 461:8
482:10
**opportunity**
31:1 76:2
122:21 129:9
446:10
**opposed** 228:2,7
**opposite** 201:3
**oral** 1:12 6:4
421:16 422:1
422:21
**oranges** 162:8
**order** 231:19
280:1 457:24
468:5
**ore** 119:17,19
140:15,16
454:8
**organization**
363:15 389:11
473:15
**organizations**
362:19 363:8
364:19
**orient** 62:20
240:4 320:17
**original** 6:11
39:24 41:3
329:20
**originally** 41:17
**outdoor** 476:3
476:16
**outliers** 106:17
**outline** 12:24
**outside** 165:6
193:9,22 194:4
194:10,24
195:7,14,15
443:15
**ovarian** 7:5,8,18
7:22 8:5,7,11
8:14,17 14:1
14:24 15:7
17:8 18:4,14
19:12,19,23
20:1,8,15,19

21:3,20 42:23
43:5,7 44:12
45:6,13 47:17
48:3,7 54:14
54:18,22 55:7
55:18,20 56:3
56:4,6,8,16,23
57:1,6,16,23
58:10,21,24
59:3,9 61:6,12
61:16,23 62:4
63:1,18,22
64:9,13,15,20
64:23 65:7
67:3,13 76:7
106:6,20
107:23 108:9
108:11 109:4
109:23 110:4
110:18 126:23
138:16 153:1
153:11,15,22
153:24 154:18
154:21 155:6
155:16 156:5
156:23 158:8
159:20 160:1
160:14,18,23
163:16,23
164:10,21,23
165:6,19 166:7
166:10,16
168:13,23
169:17 171:17
174:15,20
175:6 176:4,9
176:16,19
177:6,19
178:15 179:22
180:1,9,15,16
181:18 182:6
184:5,8 185:11
195:5,24 196:9
197:3 203:22
205:4 208:15
208:24 219:9
220:6,9,19

229:2,4,15
232:22 233:17
234:21,23
235:1 237:6,19
238:6 241:3,7
241:9 244:11
245:9 248:19
251:21 253:15
253:23 254:8
254:21 257:9
259:2 264:10
265:17 266:17
267:5,6,15
268:5 271:19
272:8 273:8,14
274:17 275:5
276:7 277:9
280:13,21
281:1,10
284:11 289:3
290:17,23
291:4 292:9,21
294:22 295:3
295:17 296:16
296:24 297:14
297:21,24
298:9,12,17,19
299:5 301:14
301:15 302:2,5
302:24 303:1
304:4,20
309:10,22,24
310:7 311:7
316:13 317:21
317:23 325:8
325:13 326:1
326:14,17
327:9,21,22
328:4,13
331:13 336:22
337:13,17
338:3,19
339:20 342:6
342:15 343:2,5
343:7 346:11
346:21,22
347:9,19,24

348:5,16
350:11,24
351:22 352:9
353:18 354:3
354:21 355:1,7
355:12 356:1,5
356:13 357:3
357:12 359:14
359:17,23
360:23 361:5,7
361:13 362:5
362:20 363:1
363:10,18,20
364:20 365:16
366:4 368:6
372:3 375:24
376:4,6,12,24
380:23 381:8
381:16 382:15
382:15 385:15
387:16 389:11
389:14,19
395:6 397:14
399:15,23
400:7,13,17,24
401:13,23
404:20 405:2,7
406:18,21
407:6,11,13,14
407:24 410:3,8
410:13,16,19
411:3,8,15
412:1,10,19
413:13 420:23
421:7,9,15,17
421:20 422:2,5
422:18,23
423:5,9,13
428:13 429:10
430:3,4,10,11
430:17,21
437:3,20 438:6
438:19,24
445:2,6 447:4
454:17 456:5,8
456:10 457:16
458:1,7 462:3

Judith K. Wolf, M.D.

Page 524

462:10,14,21
463:1 464:16
464:22 465:5
465:17,21
466:3,20 467:2
467:7,23 469:1
472:3,23 473:3
473:5 480:18
**ovaries** 182:10
191:2,24 192:3
192:5,14,23
193:10,23
194:5,11,24
195:10 204:7
204:13 208:24
209:3,11,14,17
213:2 214:9
221:7 227:11
230:9 232:7
345:2 387:17
409:22,24
411:19 434:8
434:10 440:14
440:22 442:12
442:20 443:2
457:1,16 472:4
473:8,19
474:11 477:14
**ovary** 154:7,7
159:4 204:5
206:22,24
209:22 211:22
213:6 215:16
218:7 335:19
335:23 336:7
336:13,18,22
336:24 339:20
426:3 428:23
430:21 432:1,3
456:4,7,9,18
477:1
**overall** 52:10
148:22 160:13
248:13 290:21
368:9
**oxidation**
406:24

**oxidative** 219:14
380:20 381:22
382:2 384:6
385:14
**oxygen** 407:1
**Oz** 64:2 65:4

**P**

**P** 2:1,1,2 3:1,1
4:1,1,6 307:2
**p.m** 213:12,13
213:14,16
252:21,22,23
253:2 315:7,8
315:9,11 378:4
378:5,6,9
388:10,11,12
388:14 444:2,3
444:4,6 445:18
445:19,20,22
461:17,18,19
461:21 484:5,7
**page** 17:12,13
25:16 38:3,10
38:21 39:17
41:13 54:3
70:12 72:11
77:8 78:4 79:3
79:11 80:10
81:15 99:14
100:19 101:5
102:12 105:17
112:13 117:10
129:1 157:5
158:24 193:16
198:14 200:20
221:17 224:19
225:1,4,21
226:8,13,21
233:13 239:2,6
239:9 245:7
253:8,10
255:15 258:2,4
260:5 261:13
262:19,22
270:12 273:11
274:9 275:1,11

275:14,17
276:3 279:12
290:21 306:18
310:19 319:13
319:19 320:5
332:2 334:14
351:5 367:20
371:3 380:7,11
380:12,13
384:3,4 391:15
394:17,20
418:23,23
425:17,24
426:10,20
428:4,12 429:5
429:17 448:11
449:19 450:6
455:10 487:3
488:3
**pages** 38:12 40:3
114:21 224:4
275:16 391:14
486:5
**paid** 207:16
358:20 389:18
395:15,18,19
397:18
**pancreas** 433:1
**panel** 34:14
**panties** 333:2
334:4
**Paoletti** 143:1
**paper** 18:9 19:2
19:6,9,10,14
19:24 20:6,9
27:16,24,24
92:14,17
158:14,15,15
163:20 198:2,7
198:9 202:14
207:13 210:6
220:16,16
235:4,13,21
239:9 244:22
245:13 247:20
248:3 256:7
257:22 258:2,7

259:20 263:15
265:11 280:8
281:17 282:8
286:7 293:20
293:22 294:2
295:1,24 302:4
303:10,20,24
306:23 308:11
311:11 312:8
313:10 314:15
314:15 319:10
322:7,18
332:18 340:8
360:2 361:24
368:17 381:4,9
381:24 382:22
384:16,21
386:9,13 393:7
397:16 425:11
436:16 438:3
474:8 480:9
**papers** 18:8
19:20 62:6
63:13 163:19
169:3 177:20
281:23 287:12
287:12 312:17
312:24 328:18
329:9 334:7
371:7 380:21
382:19
**papilloma**
166:23
**paragraph** 99:9
100:5,6,11
101:8,12,24
102:4,11
112:14 142:24
159:1 161:4
214:19 227:1
233:13 253:11
258:5,11
306:17,22
320:18
**parity** 387:23
**part** 13:15 14:2
18:9 19:23

23:12 47:14
49:22 73:10
78:14 94:2
113:5 133:22
136:5 139:17
141:14 153:7
158:6 159:16
178:22 186:1
203:7 218:15
230:12 249:22
258:7 263:16
277:10 332:8
332:10,10
343:12 352:12
356:24 361:23
427:11 433:21
459:6
**part-time** 51:22
**particle** 7:9
194:3,9 212:13
443:16
**particles** 192:6
192:11,13,21
214:8,13 221:6
223:22 230:2
230:24 232:11
336:17 417:21
436:11,19
437:1,13,17
438:17 441:10
442:16 443:8
457:1,5 474:18
475:10 477:4
**particular** 15:8
153:19 230:12
279:12 336:5
336:23 338:14
367:9 372:18
379:5 452:16
453:23 454:8
**particularly**
198:19 243:17
270:21 293:3
305:11,21
311:14 338:11
395:17
**particulates**

Judith K. Wolf, M.D.

228:18 232:16
**parties** 485:11
**partner** 348:11
**partners** 196:8
197:8
**parts** 105:11
178:24
**pasted** 105:8
**pathologic**
19:15,17 445:4
**pathologists**
436:23
**pathology** 21:2
133:8 155:12
212:19
**patient** 12:22,22
154:21,24
155:2,14,18
156:1 185:18
325:12 338:19
352:13 407:19
472:3,10
**patient's** 155:6
340:1
**patient-facing**
361:3
**patients** 46:24
47:18,21 48:1
48:8,24 52:2
52:10,15 59:2
59:11,14,15
60:6 185:12,22
186:3,7,10,18
187:5 188:5,8
188:11,21
190:1,3 228:11
272:16 293:8
326:3,7 346:8
348:15,17
349:9 350:4
352:21 359:19
407:24 411:12
411:19,24
412:11 432:21
445:5 477:21
**patients'** 328:6
**PAULA** 2:13

**pay** 250:10
**paying** 37:13
**payment** 37:22
39:10
**pbrown@hbol...**
2:14
**PC** 2:2
**PCP** 16:22 17:7
17:24
**PCPC** 17:18
25:15
**PDQ** 8:8 278:23
449:11
**peas** 435:3
**peer** 34:2,8 35:7
391:10,12,15
391:19 392:11
392:16 393:12
**peer-review**
263:17
**peer-reviewed**
33:19,21,24
35:2 54:13
106:13
**pelvic** 206:21,23
207:1 352:19
**pelvis** 440:14
443:2
**pending** 90:7
**Penninkilampi**
235:2 236:5
238:2 240:17
240:20 244:19
245:1 246:7,9
246:13,19,22
248:9,18 249:3
249:12 250:10
251:2,11,15,23
253:6,8,13
260:12,19
262:10,13,19
262:23 263:5
264:1,8,15
265:1 283:10
329:23 470:7
**Penninkilamp...**
241:24

**Pennsylvania**
3:8
**people** 15:14
28:17,23 43:2
45:20 96:2
199:17 293:13
304:20 309:8
309:21,24
318:11,23
332:12 341:16
342:19 343:24
344:14 346:13
347:22 358:15
366:10 392:16
439:4,8 468:10
**percent** 48:4,7
85:16 111:14
111:18,23
121:6 124:22
125:4,6,10,20
126:2,6,11
131:8,10
290:23 308:23
308:24 309:12
309:15,21,23
310:9,13
315:17 319:4
320:21 321:15
322:8 371:4
375:13,14,16
375:20 411:19
473:8
**percentage**
51:24 52:8
74:11 121:14
131:3,6 149:4
149:6 150:2,8
309:11 336:6
**perfectly** 27:5
**perform** 256:3
452:14
**performed**
46:15 115:23
121:10 185:21
433:18 435:24
448:12
**perineal** 7:8,21

110:17 161:21
189:8 191:15
192:18 208:9
209:4,13 227:2
233:17 253:15
253:22 266:18
267:5 274:13
275:4,21 276:5
276:24 277:8
277:19 328:12
336:6 338:4,11
338:15 345:1
348:4 361:6,12
404:21 436:22
449:20 450:12
457:6
**perineally** 108:2
110:3 161:16
208:3 241:5
336:12 345:7
346:11 357:12
**perineum** 164:3
164:22 170:20
179:24 190:15
193:4 194:19
206:15 229:6
230:2 335:7,12
400:23 406:3
439:2 456:23
**period** 44:10
47:6,15,18,23
48:11 50:14
115:6 170:23
243:20 316:13
317:20 325:17
325:18 326:1
326:17,20
327:18 328:11
351:12 362:17
410:5 473:18
**periods** 114:14
378:20 422:7
422:15
**peritoneal** 8:7
230:3 272:9
410:22
**peritoneum**

440:9
**peroneum**
190:17
**person** 186:17
190:23 257:24
257:24 390:16
478:2
**person's** 184:19
190:10 327:15
**personal** 4:5
185:13 416:21
**personally**
155:9 185:23
191:19 291:10
387:24 390:13
**perspective**
194:21,22
**pertinent** 71:8
**petition** 228:22
229:11 232:1
329:12
**Ph.D** 481:19
**Pharmatech**
3:23
**Philadelphia** 3:8
**phone** 478:2,5
478:15,18
479:21 481:4,7
**physician** 46:18
51:21 73:11
156:1 397:12
**physician's**
348:7,9
**picked** 358:16
414:10 415:2
**picking** 81:4
**picture** 351:4,9
351:21 354:2
**picturing**
460:19
**piece** 30:20
36:15 70:20
71:4 138:17
196:22 212:19
248:8 270:6
385:17
**pieces** 70:18

Judith K. Wolf, M.D.

Page 526

| | | | |
|---|---|---|---|
| 273:2 385:1 | 80:15,19 81:3 | 185:12,16 | 462:9 | postmenopause |
| **Pier** 373:13,21 | 81:20,24 82:4 | 186:8 338:21 | **population** | 316:19 |
| 374:11 415:9 | 91:19 93:15 | **pleurodesis** | 292:19 295:16 | **potent** 458:21 |
| **Pier's** 373:12,15 | 94:10 96:6 | 184:15 185:7 | 298:10,11,23 | **potential** 44:24 |
| 418:24 420:12 | 97:13 112:3,7 | 185:14,17,21 | 299:4 352:18 | 62:24 200:12 |
| **pierce** 457:5 | 118:14 125:11 | 186:4,11,12 | 370:10 | 206:1,1,21 |
| **pill** 333:2 | 125:22 126:15 | 187:3,11,15 | **portion** 425:19 | 227:5 329:4 |
| **pills** 56:2 65:7 | 207:16 235:21 | 188:2,11,15 | 471:7 | 343:8 423:13 |
| **Pisano** 300:4 | 236:18 358:6 | 189:1,16 | **pose** 295:13 | 430:2,9 |
| **place** 13:7 44:5 | 358:20 362:13 | 190:16,20,24 | **position** 88:7,13 | **potentially** |
| 355:8 485:8 | 386:8 436:24 | 191:8,11 | 193:3 282:18 | 180:18 209:10 |
| **placed** 184:18 | 465:1 478:1 | 217:13,16 | 444:10,22 | 351:18 401:3 |
| 184:21,22 | **plan** 359:24 | **PLM** 129:3 | **positive** 145:13 | 438:5 |
| 186:12 212:17 | 385:22 386:6 | **Plunkett** 95:15 | 145:19 146:13 | **powder** 1:3 7:18 |
| 274:21 409:7 | **planned** 359:9 | 95:23 | 146:23 147:8 | 14:1,22,24 |
| 409:13,21 | **plans** 220:4 | **plus** 167:7 | 147:13 148:17 | 15:7,10,12,13 |
| 442:17 | 359:2,21 386:2 | **point** 96:5 | 159:5,19 264:9 | 15:17,22 16:1 |
| **places** 91:11 | **plaques** 338:21 | 135:17 169:21 | 265:3 369:8 | 16:4,5,7,12 |
| 92:18 185:15 | **platy** 111:1 | 179:18 212:4 | 426:4 428:24 | 17:1,21 19:15 |
| 341:10 | 164:15 168:7 | 230:12 239:16 | 452:17 | 20:2 24:22 |
| **placing** 185:1 | 170:3 179:2 | 278:22 291:11 | **possession** | 25:2,5,24 26:6 |
| **plainly** 88:10 | 284:16,16 | 293:15 305:4 | 406:15 | 26:24 27:17 |
| **plaintiff** 10:5 | 372:8 375:10 | 318:3 324:22 | **possibility** 16:8 | 28:2,3,4 43:7 |
| 35:11 57:3 | 375:19 377:14 | 325:3 352:14 | 208:17 310:24 | 45:7 54:14,17 |
| 95:7 107:18 | 378:14 379:7 | 381:5 382:1 | 365:6 | 54:22 55:6 |
| 357:20 | 399:15 400:2 | 394:1 415:13 | **possible** 164:16 | 56:15,23 57:4 |
| **plaintiff's** | 400:15 401:7 | 416:4 427:13 | 217:14 314:6 | 57:5,14,16,23 |
| 219:20 | 404:3 455:22 | 441:7 444:18 | 314:16 387:24 | 58:2,10,12,23 |
| **plaintiffs** 12:2 | 456:2 459:2,4 | 453:17 | 456:16,22 | 58:23 59:8,11 |
| 24:3 31:6 | 459:15 465:10 | **pointed** 68:13 | **possibly** 164:18 | 60:6 61:5,11 |
| 36:16 52:19 | 466:19 467:6,8 | 119:15 120:3,7 | 168:8 170:9 | 61:15,23 62:3 |
| 66:4 67:21,23 | **play** 179:23 | 121:9,16 | 171:10 242:8 | 62:24 64:9,12 |
| 83:6 84:3 | **playing** 399:13 | 197:20 214:7 | 262:8 280:17 | 64:15,19 67:2 |
| 88:18 90:3,24 | **plays** 174:19 | 217:6 238:13 | 281:3,4 282:1 | 67:13 106:6,23 |
| 93:9 96:1 | 177:18 220:17 | 260:13,20 | 284:18,21 | 107:1,12,22,24 |
| 137:5 207:8 | 434:2 | 292:2 374:5 | 401:7 402:8,15 | 108:9,11 109:3 |
| 359:3 389:18 | **Plaza** 2:9 | **pointing** 230:1 | 402:20 403:3,8 | 109:22 110:2 |
| 395:6 397:18 | **please** 9:6 37:5 | 230:11 300:11 | 403:12 404:3,9 | 110:17,19,24 |
| 462:1 463:18 | 230:20 231:21 | **points** 103:22 | 434:6,8 458:14 | 111:8,12,15,18 |
| **plaintiffs'** 2:6,11 | 275:23 301:6 | 340:9 341:22 | 459:3 | 113:18 114:13 |
| 2:16 43:17 | 340:23 394:6 | **policy** 50:19,22 | **post-2014** | 119:9 120:11 |
| 49:24 50:4,10 | 418:18 455:11 | **pooled** 261:11 | 312:17 313:10 | 121:6,20 |
| 57:14 58:11 | **plenty** 129:14 | 261:19,24 | **posted** 351:14 | 123:22 124:2 |
| 59:23 60:4,16 | **pleura** 184:22 | 262:6 265:11 | 462:19 | 124:11,22 |
| 61:7,17 62:1 | 184:23 185:2 | **pooling** 261:2 | **postmenopausal** | 125:20 126:23 |
| 62:12 72:18,21 | 186:19 189:7 | **popular** 55:2,22 | 321:5 337:17 | 127:1,7 128:1 |
| 78:1,3 80:11 | **pleural** 160:20 | 55:23 56:1 | 369:2 | 128:22 129:2 |

Judith K. Wolf, M.D.

129:19 130:2
130:13,23
131:1,3,10,14
131:19 133:16
134:5,8,12,17
134:22 135:21
135:23 136:19
138:16 139:16
140:24 142:16
142:19,21
143:5,6 144:2
144:7,8 145:8
145:10,11,16
146:5,12,22
147:6,8,11,16
147:19 148:13
149:1,5,12
150:2,3,9,15
150:21 151:4,9
151:24 152:6
152:15,22,24
153:3,11,18,24
154:6 161:15
162:3,9,18
163:3,10 164:2
164:3,10,19
165:16,23
166:15 167:17
169:16,22
170:6,15,19
171:1,6,9,16
173:18 174:24
175:13 176:2
176:22 177:21
178:15,23
179:1,24 180:8
180:17,23
181:4,11
182:14,16,20
183:6 190:17
191:7,11,14
193:21 194:9
194:17,18
197:1,4 199:6
200:23 201:10
201:22 202:8
203:22,24

204:18 205:5
205:12,19,21
206:2,7 207:17
208:3,13,23
209:2,5,10,12
209:13,14,17
209:21 220:18
221:14 234:20
234:23 237:19
241:5 251:22
257:5 264:10
267:6,15 268:5
274:2 280:13
281:10 282:6
290:4,24
292:14,20
293:21 294:24
295:18 296:16
297:9,13 298:9
298:11 301:15
301:16 302:2
302:12,22,23
304:21 308:3
308:22 309:9
311:6 315:15
315:18,24
316:5,23
317:12,19
318:10,12,23
319:4 320:19
320:22 321:17
323:1,2,10,19
324:5 325:7,14
327:16,16,23
328:23 331:12
333:2 334:2
336:6,12,21,23
337:9,23 338:6
339:6,12,17
340:6 341:20
342:5 343:13
343:17,21
344:2,21 345:1
345:6,18,23
346:10,15
348:4,15
349:10 350:5,8

352:10 356:14
356:18,19
357:3,11,21,24
359:14,22
361:6,12 362:5
362:13 363:16
363:20 368:6
371:24 372:2,7
372:17 373:4
373:10,17,24
374:8,15,20
375:7,23 376:6
376:23 377:7
377:19,23
378:13,19
379:11,13,17
380:9 381:2,6
381:8,11,15
384:5 385:3,14
399:14,23
400:19 401:14
401:24 404:22
405:3,11
407:16 409:20
416:6,16
420:15,24
423:9 433:9
434:13 438:17
447:14,15,17
448:3,5 456:18
458:1,5,6,6,10
459:6 461:7
464:6,16,21
465:3,5,9,16
465:21 466:3,5
466:8,15,24
467:12,13,22
468:3,10,14
470:3 471:5
472:12 474:1,4
477:7
**powder's** 124:20
128:5
**powdered** 28:6
28:24
**powders** 22:4
25:11 26:15

27:10 29:19,24
30:24 415:16
434:15 435:17
436:13 437:2
437:19
**power** 99:19
101:14 255:16
255:19,21
256:3,23 257:1
257:14,16
259:4,9,12,15
259:19 261:11
261:14,18,24
262:6 266:5
267:22
**powered** 296:14
**practice** 16:14
46:22 47:14
48:2,7 49:9
59:9,13 60:5
60:11 73:3
74:3 133:23
286:16 348:3,6
348:13 349:9
350:3 359:11
359:20 362:24
**practiced** 59:20
60:3
**practices** 1:4
43:19 46:4
**practicing** 20:22
33:15 48:6,11
62:23 228:9
286:11 292:8
**practitioner**
42:16 348:8,10
**preamble** 6:10
31:8,17,20
33:2,10 270:4
**precancerous**
326:13 409:23
**preference**
200:4
**preliminary**
140:8
**preparatory**
399:20

**prepare** 105:10
**prepared** 39:8
**preparing** 97:16
**presence** 133:16
175:23 176:2
180:7 459:22
462:20
**present** 45:15
85:21,22 87:18
180:23 258:16
460:5
**presentation**
54:17
**presented**
233:15
**press** 55:2,23
56:1 462:9,9
**presumed**
163:24
**pretty** 171:12
369:10
**prevalences**
307:7 308:4
**prevent** 45:18
**Prevention** 8:8
233:24 272:9
**previously** 80:2
200:10 295:21
428:6 463:5
**primary** 8:7
186:17 257:6
272:8 293:14
293:19 302:20
302:20
**Princeton** 2:20
130:2
**principles** 33:18
**printed** 113:10
**printout** 12:11
113:15 128:19
272:7
**prior** 11:24
19:21 48:5
57:2,9,13,19
59:7,12 60:3,9
60:14 62:5
94:20 137:6

Judith K. Wolf, M.D.

281:21 288:3
304:17 308:20
321:18 350:2
355:20,23
357:6,16 470:3
485:4
**private** 351:13
**probably** 10:11
26:19 47:7
65:22 69:12
141:8 241:17
283:24 360:14
361:15 366:10
379:19 389:4
402:16 403:15
475:10
**procancer** 22:23
**procancerous**
22:19
**procedure**
184:18 454:15
454:17
**PROCEEDIN...**
5:4 9:1
**process** 33:24
34:3,13 35:2,8
177:5 263:17
**produced** 66:6
67:21 179:19
179:20
**produces** 185:7
215:16
**product** 14:1,24
15:8,10,12
16:5,12 28:3
58:23 111:8
114:24 119:7
123:15 124:11
124:21 129:2
136:14 142:21
145:3,10,11
147:7,15
148:18 149:1,5
151:4,24
152:22,24
153:16,18
162:4,10 163:3

164:3,19,20
165:16 167:17
171:1 174:11
176:2 177:21
178:23 180:18
180:23 181:11
182:7,17 184:9
190:17 197:1
201:23 220:19
290:4 299:4
327:16,23
334:21,21
335:1 372:7
376:23 377:19
377:24 401:16
402:6,11
404:14,22
405:7,11,17,19
405:20,21,22
406:2 421:4,9
421:11 458:10
458:16,19,22
459:1,6 464:21
466:3,5,24
467:12,13,15
467:22 468:3
468:24 469:4,6
474:2
**production**
39:24 74:12
92:7,22
**products** 1:3,4
4:5 16:3 62:3
64:13 113:18
120:12 121:6
121:21 125:21
128:22 129:19
136:13 143:20
144:1,2,7,9,11
144:15,21,23
145:16,20
146:5,8,13,15
146:19,23
147:16,19
148:1,2,2,13
149:12 150:3,9
150:15,21

154:5,10
165:24 199:6
372:11 373:17
374:1 375:7,23
376:6 377:16
377:22 378:13
378:19 379:12
399:14,23
400:1,19,24
401:14,24
405:3 416:6,21
420:24 433:10
435:19 442:24
447:14,15
448:3,21 449:1
456:19 458:1,5
461:7 465:16
465:21 467:12
467:22 468:15
470:3 471:5,9
**professional** 8:8
272:10 362:19
472:16 473:15
**professor**
444:11
**professorship**
444:17
**progression**
174:20 175:8
176:19 180:16
184:7 376:12
389:5
**proinflammat...**
180:14 184:6
**project** 12:23
**proliferation**
409:23
**promise** 212:4
**prompted** 481:7
**prone** 254:2,9
382:3
**prophylactic**
473:7
**proposed** 90:22
220:8 226:4
**proposition** 20:6
23:11,17

**propounded**
486:6
**prospective**
28:14 197:16
254:21 255:1
256:14,20
261:12,24
262:7 265:16
266:15 267:14
282:4,11
288:21 289:9
290:8,12
291:21 316:17
317:22 318:2,8
370:17
**protect** 364:21
365:2
**protection**
298:18
**protocol** 300:10
**prove** 413:12
448:23
**provide** 40:16
70:2,9 80:17
88:19 231:22
**provided** 12:2
12:19 14:8,10
32:20 33:2
34:8 35:1,11
36:16 39:12
40:13 65:15
69:8 70:6,8,8
72:17,20,23
79:20,23 80:2
80:10,14 82:6
83:1,13 84:11
84:22 85:1
90:23 92:4,13
92:14,20 93:8
94:9 106:3
113:23 114:5
139:24 258:20
260:8 414:15
427:6,9 483:13
**Provista** 48:22
48:24 49:6,19
49:20 50:1,24

51:2 478:23
**PTI** 3:23
**public** 1:19 9:10
30:4,15 32:6
64:16 270:14
270:21 271:7
280:12 281:8
486:19
**publication**
33:20,22 91:5
91:6 103:14
200:3 235:14
258:5 280:5
283:7 360:2
386:4
**publications**
54:9 64:1
**publicity** 310:22
**publicize** 359:22
**publicly** 91:3,8
104:10 361:4
**publish** 64:8
**published** 34:12
34:17,19,22
54:13 63:12,21
64:11 106:13
106:15 141:18
234:22 235:13
235:16,18
236:6 237:1
245:21 252:11
256:7 257:13
257:16 278:21
279:5 280:8
282:8,14
287:13,17
311:24 329:17
382:6 391:7
412:16 462:13
469:22
**PubMed** 13:12
14:5
**pull** 128:13
173:17 292:22
423:19 470:22
**pulled** 14:8
28:10 31:21

Case 3:16-md-02738-MAS-RLS   Document 33123-4   Filed 08/22/24   Page 308 of 1035
PageID: 241487
Judith K. Wolf, M.D.

Page 529

32:1 98:10
113:2 143:8
461:5 467:21
**pulmonologist**
186:14,16
**purchased**
136:19
**pure** 375:10
455:22
**purported**
262:24 448:1
455:17
**purpose** 65:5
185:1 219:23
295:4
**purposes** 37:12
39:9 93:3
178:12 336:10
**pursuant** 1:13
**pursuing** 363:6
**push** 473:6
**pushed** 195:15
**put** 24:12 34:3
83:23 108:19
120:16 148:6
155:9 185:17
270:9 296:19
334:11 335:11
338:3 387:6
392:12 410:12
451:16
**puts** 56:24
164:21 206:3
335:7
**putting** 219:6,10
256:17

**Q**
**qualified** 133:15
**quality** 111:7
198:19 199:16
200:8 207:13
239:18 245:19
246:8 251:16
260:20 262:11
263:10 292:3
293:4 295:13

311:23 470:9
**quantification**
452:15 463:19
463:23 464:2
**quantify** 107:11
107:24 108:10
150:1,7 161:19
162:2,15,23
181:8 189:4
191:13 218:19
328:11 334:22
335:2,5,16
336:2 373:3,5
375:1
**quantitate**
333:24 334:8
**quantities** 185:8
**quantity** 107:1
476:18
**queried** 109:10
**queries** 99:20
266:6
**query** 304:24
**question** 13:24
13:24 14:17,20
15:1 24:12,20
25:21 26:22
27:20 32:1
33:7 39:3,5
44:12 52:12,14
58:16 60:14
61:11,17 62:16
65:10 66:16
67:11 77:15
82:8 83:3 84:6
84:8,16 85:3,6
85:11,13 86:9
86:22 87:4
88:2,15,24,24
89:2,5,8 92:19
106:1,4,5
107:19,23
115:13,18
119:13 120:19
121:3 122:19
122:23 123:2,6
123:11 129:15

129:17 137:24
138:4,5,7
139:1,3 142:1
144:4 146:20
149:10,19,21
150:18,19,23
152:8 156:19
163:9 178:8
179:17 180:12
184:3 192:20
202:16 203:4
203:10,14
208:11,12
215:4 230:20
233:10,11
245:24 247:4
248:24 255:20
255:23 256:8
256:10 257:12
263:21 266:11
266:12 267:9
267:12,13
268:3,18 269:5
269:10,12,14
269:18,24
275:23 277:21
289:2 291:9,15
294:18 295:14
295:20 296:14
296:20 299:9
299:15 300:7
300:13,17,24
301:3,12
303:22 310:8
312:20,22
318:15 320:16
321:11 323:17
334:10 338:14
339:16 340:23
342:13 343:11
343:14 344:4,8
345:5 346:10
372:22 377:11
378:17 380:5
387:22 392:15
403:21 422:11
422:14 436:8

439:9 444:8
458:9 460:2
468:22 472:22
482:7,16,19
**question's** 26:11
26:19
**questionable**
86:13
**questioning**
371:1 380:6
385:21
**questions** 9:18
10:18,24 24:5
24:16 33:16
38:1 41:6
64:18,22 65:3
65:8 82:5,19
83:5 84:19
86:2 89:6
109:9 120:15
143:11 149:17
198:11 203:1
231:3,7,13,19
245:14 266:2
266:24 267:24
269:7 289:9,12
291:12,13
389:3 398:3
399:12 401:21
424:18 445:14
446:3,7 449:15
451:18,22
452:10 453:20
454:20 456:11
457:23 458:2
462:1,4 463:10
469:9 470:17
478:10 482:5
483:19 486:6
**quick** 79:10
88:15 371:21
443:24 444:8
**quite** 410:16
**quote** 63:2 104:6
**quote/unquote**
199:15
**quoted** 194:16

**quotes** 98:10,13
104:14 219:6

**R**
**R** 2:1,13 3:1,11
4:1,6,6
**radicals** 407:1
**radioactive**
192:7
**raised** 20:7
65:11 230:24
363:5 364:3,10
**raises** 103:22
**Ramirez** 4:7
**ran** 51:13
**random** 369:23
**randomized**
28:13
**range** 287:24
288:5 347:10
347:13 371:12
**rappel@seyfa...**
4:3
**rare** 254:20
255:7 267:7
410:16
**rat's** 409:22
**rate** 292:9 358:9
358:13,17
**Rates** 8:13
**ratio** 262:24
313:24 368:10
**ratio's** 369:14
**ratios** 263:12,15
263:19 307:15
311:2
**rats** 192:18
**raw** 405:13
471:4
**re-ask** 149:23
**re-review**
263:15
**re-reviewed**
31:21
**reach** 208:24
209:14 336:24
345:2 437:14

Case 3:16-md-02738-MAS-RLS     Document 33123-4     Filed 08/22/24     Page 309 of 1035
PageID: 241488
Judith K. Wolf, M.D.

Page 530

457:24
**reached** 457:15
**reaches** 335:19
335:23,24
336:12,21
**reaching** 207:12
336:6 450:12
450:18 451:9
456:17
**reaction** 175:1
211:8 215:12
217:8,15,17,19
217:20 409:2
409:16
**reactions** 23:15
215:1 407:18
**read** 13:7 24:11
31:19 70:24
71:2 72:8 94:4
94:4 101:13
113:19 143:7
149:24 157:11
158:15 203:2
209:19 258:14
271:24 277:14
286:6 295:4
311:3 312:13
313:4 314:14
349:21 351:21
360:10,11,15
366:10 389:24
397:15 398:8
398:14 403:2
429:24 449:4
471:7 476:2
486:4
**readers** 390:4
**reading** 180:12
212:2 214:18
250:2 253:18
253:19 275:11
277:18 297:7
308:1 310:20
328:18 349:22
376:8 390:16
429:12,15
**reads** 389:24

**ready** 65:21
**real** 52:13 79:9
369:4 371:21
443:24
**realized** 286:8
**really** 16:6
37:23 43:18,24
47:3 53:20
152:21 183:1
203:10 269:18
298:9 300:17
342:19 345:6,8
**realtime** 1:18
24:16 149:24
485:3,18
**reason** 62:9
194:20 246:15
264:16,16,20
264:24 295:23
298:20 306:8
318:22 361:24
366:2
**reasonable**
284:23 400:11
**reasoning** 29:18
**reasons** 185:6,9
218:10 270:18
280:24 369:19
**REATH** 3:6
**recalculate**
262:16
**recalculated**
263:23
**recall** 29:20 30:2
50:15,16,18
56:6,9 61:10
65:9,14 66:22
74:7 75:3,5
77:5,17 78:22
82:3 94:15
114:1 124:6
128:2 129:21
154:23 155:3
155:20 173:7
202:6 254:2,9
254:14 255:9
255:12 257:18

257:20,23
292:23 302:12
303:23 304:3,9
304:15 305:11
305:17 306:5,6
306:18 310:24
311:5,10,15
312:5,12,19
313:18,21,24
340:9,15,20
341:2,7 347:8
348:14 351:11
354:4,10
378:15 382:22
383:14 393:16
399:10 415:11
432:7 446:7
448:5,8 449:17
451:21 452:13
452:17 458:2
462:4 463:8,12
471:10 478:12
**receipt** 66:9
**receive** 94:13
**received** 35:20
41:17 94:16
114:8 174:2
395:22 396:5
453:21
**receives** 34:14
**Recess** 89:19
139:8 213:13
252:22 315:8
378:5 388:11
444:3 445:19
461:18
**recipient** 353:16
**recognize**
360:23
**recognized**
154:18
**recollection**
45:5 50:21
210:3
**recommend**
432:20 473:6
**recommendat...**

472:8 473:16
**recommended**
350:9 393:10
472:2
**reconcile** 292:18
294:20 295:15
298:8 299:6
**record** 17:11
18:24 24:2,15
37:11 39:2
40:2,11,20
66:3 68:12
69:11 83:24
88:6,7 89:18
89:22 122:24
123:6,17
130:15 135:15
139:7,12
213:12,16
216:7,11
244:24 252:21
253:2 258:15
260:15 294:17
300:12,21
315:7,11 366:8
378:4,9 388:10
388:14 424:16
424:19,23
425:18 430:1
443:20 444:2,6
445:16,18,22
461:17,21
484:1,4
**records** 18:17
155:23
**reduce** 56:3
**reduces** 195:4
**reduction** 65:6
**REES** 3:11
**refer** 128:24
344:14 365:20
452:5 453:18
469:5
**reference** 16:18
16:21 68:6,8
69:23 70:12,15
70:16 71:4

75:22 95:16,19
112:13 141:10
270:13,19
271:1,13
380:11 384:3,7
450:2
**referenced**
25:16 76:24
77:4 92:8
194:16 229:10
232:7 234:17
271:14 278:3,6
363:9 375:8
383:21
**references** 13:9
14:6,7,8 17:6
68:9 69:5,7
91:11 92:17
113:7 142:3,12
142:14,17
157:14 158:16
208:8 275:17
360:1 449:23
450:8,11,16
451:1,6 469:21
483:1,11,12
**referencing**
429:19 430:13
**referred** 121:15
163:19 172:5
185:22 246:1
380:3 415:9
431:20 443:9
447:14 459:15
477:21
**referring** 44:15
79:3 102:3
112:2 117:9
125:14 132:7
179:5 185:15
186:3,7 187:20
207:3 216:7
222:20 228:21
260:2 287:8,24
291:3,5 335:6
335:11 370:10
432:5

Judith K. Wolf, M.D.

Page 531

refers 431:4
refresh 198:10
202:24
regard 229:18
453:20 470:8
regarding 20:7
30:16 44:23
54:14,17,22
55:6,17 59:8
61:5,15 63:18
63:22 86:11
88:19 128:20
148:10 229:2,3
229:4 261:20
361:12 389:13
393:3 394:4
395:1 450:12
452:1 462:2,3
462:10 463:11
Registered 1:17
485:3,17
regular 60:5,11
133:22
regularly
170:21
Reid 158:14
163:20
rejected 222:15
222:19,23
relate 205:17
324:13,17
355:16
related 20:15
175:6 180:15
197:24 199:6
209:20 311:10
340:1 358:1
361:4 376:12
430:17
relates 1:6 14:20
18:3 30:23
32:19 35:3
36:2 167:16
188:10 190:19
204:17 226:4
226:14 232:22
237:6 243:17

253:14 282:16
284:5 285:2
310:6 314:10
324:12 341:4
367:3 368:3
371:23 374:12
375:4 465:8
relationship 7:7
126:22 254:19
257:9 259:16
296:15 302:22
352:13 383:22
429:9 445:7
relative 201:16
259:6 262:1,7
287:22 288:4,8
346:22,24
347:4,9 355:18
355:24 368:5
368:22 371:18
485:11,12
relatives 356:4
released 433:1
relevance 385:8
relevant 225:2
reliable 13:3
30:4,8 105:3
229:1 272:20
272:24 368:15
reliance 263:21
367:5,8 374:4
relied 87:17
91:21 127:13
161:10,11
174:9 450:11
451:9 470:4
relies 85:15
86:19 88:9
91:15 156:4
158:1 160:22
346:19
rely 26:14 73:11
73:18 76:15
87:4,11 96:18
96:23 158:7
172:16 173:10
208:22 217:21

218:3 337:7
380:24 467:23
relying 16:16,23
23:16 25:10,23
27:9 75:19
83:2,7 84:4,12
85:10,20,24
86:10,24 88:21
95:7 112:23
117:23 136:18
137:11,15
139:17,21
140:23 141:14
142:7,11,19
143:24 145:6
146:3 164:6,13
169:13 174:21
175:5,23 176:1
178:13,19,20
180:6 236:16
373:8,15,22
374:5 375:5
382:6 459:13
463:18 464:4
482:20
Remain 8:10
295:2
remaining 38:12
remains 147:24
187:3 298:2
remark 239:15
remember
11:23 24:23
44:6,7 47:24
65:3,8 90:13
94:1,5,19
97:12 143:21
155:14 172:9
191:12 198:5
211:8 221:8
269:21 270:16
304:21 347:7
352:11 371:19
383:4 399:5,7
423:22 464:1
469:10 481:6
remind 10:14

303:16
removal 473:7
removed 25:8
25:12 26:24
193:8 195:3
472:4 473:19
renal 160:20
RENEE 4:2
reorient 276:2
repeat 24:20
107:19 275:22
340:22
repeated 26:20
189:2
repeating
165:13
rephrase 82:9
82:12 83:3
85:11 138:7
152:10 246:3
344:7
rephrased 138:6
replacement
273:19 356:21
369:3
report 6:14,16
13:16 14:21
15:2 16:19,22
17:3,7 25:15
25:16 32:20,21
36:3,13 53:6
65:15 66:12,19
68:8,19,21
69:5,15,18,21
70:12,13,17,19
72:4,7 78:5
79:11,12 81:6
81:15,20 90:6
90:22 92:9
93:10 94:21
95:6,11,16,19
95:20 96:16
97:4,9,11,16
98:7,18,19
99:6,9,11,14
100:15,20
102:12 104:2,9

104:14,17
105:7,10,12,17
105:23 111:5
112:4,13 113:1
125:10,15,22
126:7 127:14
128:14,21
129:13 130:8
135:3 136:5,18
137:1 155:12
171:21,22,23
172:11,14,15
172:17,18,21
172:23 173:1,2
173:4,10
174:10 175:17
175:21 177:16
178:7 193:16
198:17 207:4
208:1,7 209:4
209:11 221:17
222:19,21
234:16 242:12
245:17 246:2,6
255:14 259:14
260:3,4 261:13
263:11 264:12
264:17 270:12
286:10 289:15
290:21 297:7
316:12 333:6
334:13 358:1
360:1 367:13
367:19 376:9
380:7,13 384:4
385:24 420:12
425:12 452:11
452:14 468:6,8
469:14,21
470:5 473:23
482:11,22,24
483:6,11
reported 124:15
211:6 216:13
268:6 291:6
292:7 294:21
295:12 296:20

Judith K. Wolf, M.D.

304:21 308:16
308:23 309:1
309:10,22
310:1,9 322:8
324:4 325:19
371:13
**reporter** 1:17,18
9:6 10:17
82:14 202:12
242:20 430:5
460:10 485:3,4
485:17,18,18
**reporter's** 461:2
**reporting** 263:5
263:19 311:19
**reports** 93:14
94:8,18,22
95:2 96:1,7,10
96:10,12,14,24
111:22 112:3
129:2 131:7
137:6 138:22
139:18 140:22
143:19 227:4
262:13,23
292:14 374:7
375:13
**represent** 9:17
128:21 140:8
388:20
**representation**
247:13
**representative**
114:22
**representing**
12:1
**Reprint** 6:7
**reproductive**
6:11 395:11
396:22 397:16
398:11,22
399:8 436:14
436:19 437:15
437:15 438:18
439:22 440:22
474:3
**reputable**

227:18 228:16
229:19
**request** 12:3
39:24 40:6
41:3 60:16
61:6,9 72:19
74:24 92:7,21
394:6
**requested** 65:19
66:2 72:23
75:4 395:11
396:21
**requests** 66:6
67:18 68:3
**required** 183:16
386:20 391:2
**research** 7:17,17
12:23 20:23
31:2 32:5,9,16
56:5 64:12
220:2 222:7
223:11 224:5
395:21 478:9
479:22 480:5
480:12 481:9
**researched**
106:7
**researching**
63:6
**respected** 32:6
**respond** 26:22
120:19 230:19
295:22
**responds** 108:24
**response** 22:19
22:23 68:2
181:13 184:19
185:3,8 188:2
188:7 189:17
189:22 209:22
210:2 211:24
212:1,9,14
214:14,20,24
215:17 216:14
216:19 217:24
217:24 218:5,6
218:9,13 219:4

219:14 220:23
229:11,14
232:1 327:15
329:8,10,13,19
329:21,24
330:5 331:21
333:7 334:11
337:20 367:5,9
367:11 399:12
**responsible**
437:19
**rest** 290:2 311:3
**restate** 151:1
422:11
**result** 18:5
148:17 259:7
302:12 325:14
411:22,24
438:19 474:3
**resulted** 324:7
448:4
**resulting** 412:9
**results** 106:11
114:15 115:5
118:19 140:9
145:19 146:14
146:24 153:4
211:13 212:2
246:18 255:12
258:21 259:11
262:17 275:6
277:11,16
303:9,17 305:2
306:17,18,23
312:4 313:12
314:7,7,17
341:21 448:15
448:19,23
**resumé** 54:12
**retail** 406:5
**retained** 389:18
**retrograde**
192:10 223:22
227:10,21
228:12 430:2,9
430:20 440:3
**retrospective**

7:5 254:1
**retrospectively**
28:23
**revealed** 117:15
415:24
**review** 7:22
12:21 31:2,17
31:23,24 34:2
35:7 56:22
62:7 73:4
75:12 79:19,22
80:20 81:16
84:23 90:10,18
91:10 124:1
128:24 129:9
135:10 136:17
141:20,22
154:15 155:8
155:10 157:5
172:23 178:6
197:15 227:5
229:1,14
231:24 232:18
234:7,9 235:8
235:23,24
238:16 245:5
247:7 255:10
271:22 278:8
278:16,17,21
279:5,18,22
281:1,19,21
285:20,24
286:8 289:6
303:24 306:21
313:16 329:6
338:1,9 349:10
349:15,19
357:7 360:1,8
362:9,11
364:15 368:4
369:7 382:12
385:23 389:10
391:16,19
392:11,16
398:17 446:11
455:24
**reviewed** 12:20

18:2 29:16
34:9,13 35:18
35:21 57:10
60:15,20,24
61:4,14,20
62:4 76:13
81:23 90:5,15
91:14,16,17,18
93:19,24 94:2
120:2 136:4
141:17 154:13
155:15 157:21
158:14,18
188:10 224:10
224:10 225:23
228:8 233:6
256:5 271:18
282:20 308:11
312:23 357:19
361:11,16,17
365:7,13,14,17
366:24 374:3
384:10 391:11
391:12,23
394:4 450:17
451:8 476:12
**reviewer** 392:4
393:10,12
**reviewer's**
392:14
**reviewers**
278:24 393:8
**reviewing** 20:21
56:18,21 57:19
58:5 59:7,12
59:19 60:9,14
62:10 71:8
72:3 108:14
109:8 124:6
152:20 173:4
187:16 250:9
257:18,22
306:19 312:6
348:19 349:24
383:14 469:23
**reviews** 17:5
19:4 136:24

Judith K. Wolf, M.D.

Page 533

| | | | |
|---|---|---|---|
| 141:12,24 | 196:10 197:20 | 367:15 370:11 | 201:16 202:21 |
| 144:5 202:17 | 198:19 199:17 | 370:18 372:17 | 203:22 204:10 |
| 203:5 208:6 | 200:23 202:3,9 | 374:15 375:1 | 205:4 208:14 |
| 216:2 233:5 | 207:19 209:7 | 376:19 377:7 | 219:9 234:20 |
| 247:18 | 214:15 215:2,5 | 380:10 383:12 | 234:24 241:6 |
| **revising** 392:22 | 219:21 221:21 | 384:8,17 | 241:23 248:19 |
| **revisions** 97:24 | 221:24 226:14 | 387:18 398:23 | 249:20 251:21 |
| **riding** 195:18 | 227:11,18,22 | 399:15,16 | 259:6 262:1,7 |
| 436:16 | 228:22 229:11 | 413:11 423:23 | 265:8,10,16 |
| **right** 14:19,22 | 231:1,15 232:8 | 424:6 425:9 | 266:17 267:10 |
| 15:4 17:19 | 233:12,17 | 432:23 442:12 | 267:15 270:15 |
| 19:2 21:14 | 236:9 237:23 | 448:10 464:17 | 271:4 273:7,13 |
| 24:7,17 25:19 | 238:14 239:8 | 465:5 468:6 | 274:1,6,17 |
| 28:13 34:18,20 | 239:19 240:1 | 472:23 475:20 | 275:5 277:9 |
| 35:24 37:4 | 240:11,15 | 481:23 483:8 | 282:5,12 288:5 |
| 38:19 42:8,9 | 252:12,12 | **right-hand** | 290:9,23 |
| 44:24 49:13 | 266:24 274:7 | 425:24 429:7 | 291:17 293:21 |
| 50:1 51:22 | 275:20 276:13 | **Rigler** 112:17 | 295:3,5 298:17 |
| 54:3 55:3 63:2 | 276:15,20 | 125:15 373:20 | 298:21,22,23 |
| 64:24 66:8 | 279:6 282:12 | 373:22 452:23 | 298:24 317:17 |
| 69:6 73:19 | 285:4 288:1,21 | 453:16,19 | 327:20,21 |
| 74:4 93:16 | 289:16 292:4 | 463:12 | 328:4,6 330:10 |
| 94:10 95:8,20 | 293:13,22 | **Rigler's** 452:11 | 331:2,4,13 |
| 96:3 98:15 | 294:2 297:1,10 | 452:14 | 337:11,15 |
| 99:15 101:13 | 297:23 301:21 | **Rio** 471:16,23 | 338:3 339:19 |
| 103:5,18 105:4 | 305:7,22 306:6 | **risen** 361:23 | 352:15 354:24 |
| 105:8,13,15 | 306:12 309:1 | **risk** 8:5,11,12 | 355:3,9,12,16 |
| 111:1 112:10 | 309:11,23 | 18:4 19:12,19 | 356:12,16 |
| 113:6 114:7 | 310:1,10,13 | 31:10 43:6 | 359:17,17 |
| 115:19 120:8 | 316:1,8 318:13 | 45:6 56:3,7,24 | 360:22 361:7 |
| 121:11,21 | 320:3 321:7,13 | 57:23 58:23 | 368:5,22 369:2 |
| 123:15 126:8 | 322:3 324:5,14 | 62:7 64:23 | 369:4 371:4,10 |
| 127:14 129:24 | 330:5,11,16,24 | 65:6 90:7 | 371:18 376:10 |
| 131:22 133:13 | 331:9,20 332:5 | 108:21 110:4 | 376:24 385:8 |
| 134:18 141:9 | 333:8,14,20 | 138:15 152:24 | 387:16,24 |
| 142:16 143:15 | 334:16 335:4,8 | 153:11 154:11 | 401:1 404:20 |
| 145:20 146:20 | 335:19 336:13 | 160:14,18,19 | 405:6 422:17 |
| 148:19 159:8 | 344:22 345:24 | 163:23 164:23 | 422:23 423:5,9 |
| 159:13,23 | 347:19 348:22 | 164:23 165:18 | 438:5 446:22 |
| 170:16 172:11 | 349:20 351:9 | 166:7,10,15 | 446:24 447:2,5 |
| 182:14 184:23 | 352:1 353:5,18 | 167:1,19 | 447:8,11 |
| 185:8,21 186:4 | 355:6,7,11,18 | 169:17 174:15 | 472:11,11,13 |
| 186:15 187:17 | 356:1,5 357:9 | 176:4,9,16 | 472:24 473:5,9 |
| 187:24 188:3,7 | 358:5,8,23,24 | 179:24 180:9 | **risks** 6:9,21 7:12 |
| 189:18 190:11 | 359:7 362:15 | 181:17 190:5 | 8:21 287:22 |
| 190:21 193:18 | 363:11,16,21 | 195:5,24 196:9 | 288:8 328:7 |
| 193:23 195:24 | 366:18 367:5 | 197:3 200:22 | 346:22,24 |

| |
|---|
| 347:4,9 |
| **road** 188:23 |
| **Robert** 480:10 |
| **ROBINSON** 2:8 |
| **robust** 221:18 |
| **Rohl** 143:1,5 |
| 145:6,19 146:4 |
| 146:14,24 |
| 147:20 148:10 |
| 148:16 |
| **role** 174:19 |
| 177:18 179:23 |
| 220:17 399:14 |
| 434:3 |
| **room** 475:20 |
| 476:14 |
| **route** 346:12 |
| **routes** 456:16,22 |
| **routine** 263:14 |
| 350:6 |
| **routinely** 133:7 |
| 133:11 206:14 |
| 272:18 390:9 |
| 398:13,17 |
| **rule** 6:14,16 |
| 84:20 307:14 |
| 420:22 |
| **ruled** 284:23 |
| 314:1 |
| **rules** 10:12 |
| 83:12 84:9 |
| 87:2 88:11 |
| 299:19 300:19 |
| 389:23 |
| **ruling** 206:14 |
| **rung** 383:17 |
| **running** 28:12 |
| **S** |
| **S** 2:1 3:1 4:1 7:9 |
| **sacrificed** 410:5 |
| **Saed** 35:17 36:4 |
| 219:20 235:4 |
| 235:13 381:1 |
| 392:4 393:6 |
| 394:4,24 |
| 395:15 398:5 |

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 313 of 1035
PageID: 241492
Judith K. Wolf, M.D.

Page 534

478:5 479:21
480:21 481:3
481:16 482:2
**Saed's** 219:16
220:15,20
380:21 381:4
381:24 382:5
382:11 391:5
393:3 394:10
395:5 397:16
425:10 480:9
**safe** 109:19
110:8,11
151:20 183:1
183:18 184:11
184:12
**SALES** 1:4
**sample** 122:11
151:3 153:19
154:8 170:5
415:14,24
418:10 419:3
**samples** 123:13
125:3 133:15
135:7,11,22,23
136:5 137:12
416:5 420:14
448:18,20
459:7,14,22
460:6,9,20
**Samuel** 7:15
**San** 2:15
**save** 143:11
**saw** 11:22 113:1
125:3,3,6
126:2,11
130:19 155:12
173:2 198:3
215:11 268:4
350:7 399:9
414:23,24
432:13,13
**saying** 29:12,13
34:7 60:14
92:13 125:5
146:16 162:9
176:16 177:15

191:5 208:10
208:19 213:3,4
222:10 242:7
282:24 298:8
325:6,11 397:7
397:8 403:11
403:13 407:9
459:14
**says** 27:17 68:19
86:13 91:5
99:15,18
110:10 119:2,4
119:16,24
161:5 169:5
175:6 177:16
179:18 203:15
222:3,11 225:8
228:17 233:22
262:2 295:2
306:20 308:1
351:22 363:24
391:15 394:20
394:23 395:13
396:5 397:2
419:3,13,18
425:24 431:12
447:21 448:16
448:22 467:17
**scar** 408:18
**Schildkraut**
234:18,18
235:9 239:17
239:23 240:6
241:19 278:12
280:8 293:16
297:17 302:3,7
302:11 303:5
304:1,16
305:11 306:4
311:11 329:22
451:3,15
**school** 130:3
133:21
**science** 29:6,23
**Sciences** 6:11
398:11,22
399:8

**scientific** 25:23
26:13 27:8,21
27:22 30:17
32:11 104:24
162:14,22
163:14 165:5
166:12 167:20
168:21 169:14
174:22 175:11
176:10 177:3
179:11 183:20
192:21 194:8
206:19 208:2
279:17 328:10
336:4 337:6
386:24
**scientifically**
105:3
**scientist** 244:2
415:9
**scientists** 30:14
32:10 286:22
361:10 364:18
395:11 396:22
397:16
**score** 31:2
241:24 284:17
**screen** 23:20
**screening** 45:16
472:23
**SCULLY** 3:11
**search** 13:12
91:7
**searching** 14:5
**second** 17:3
23:12 112:5
117:10 141:23
159:1 169:2
208:5 210:22
218:14 252:19
258:5 266:7
294:3 306:17
306:22 310:21
342:17 355:20
388:6 418:23
443:20 452:9
460:11,22

461:15
**secondarily**
220:24 381:23
**secondary**
257:10 293:15
409:1
**section** 68:19
218:16 225:1
258:9,12
277:19 278:22
278:24 306:23
320:18 355:4
449:16,20,24
450:17
**sector** 351:13
**see** 21:3,4,6
23:22 28:7,23
31:23 37:5
48:9 51:2
53:18 62:19
72:13 79:14
91:7 93:20
94:22 95:1
96:13 98:1,14
99:16,22
101:24 102:9
102:15,18
103:1,4,8,12
103:12 105:20
112:19 113:9
113:21 114:2
115:4 118:22
118:22 120:6
129:12 133:4
135:20 137:3
143:10 168:20
171:22 172:13
172:14,20,24
181:16 188:6
198:1 201:1,2
202:21 213:4
216:18 218:9
218:12 224:10
226:7 227:4
230:17,18
244:22 245:15
246:14,16

247:19,23
250:7 254:3,4
262:2 263:1,22
272:10 275:8
275:12 278:5
279:1,3,11
291:1,8 295:24
301:15 303:21
304:24 305:1,3
306:20 307:3
307:21 309:5,6
309:19 310:16
319:14 330:10
353:8 370:4
383:6 386:20
391:14 394:19
401:2,4,6,8
415:22 418:6
419:2,6,7
424:14 425:23
426:8,18
429:14 439:9
445:6 450:7
454:3 455:8
478:22
**seeing** 169:8
228:11 343:15
347:8
**seen** 11:18 37:23
55:1 58:7
93:14 97:1
111:5,13,16,22
131:7,8,17
134:13,23
135:3,19
182:15 190:4
287:22 375:12
375:13 378:22
379:22 382:13
387:14 393:11
393:15 410:7
410:12 413:2
438:2 440:15
445:1,4 476:1
476:11,16
477:20
**segments** 55:3

Judith K. Wolf, M.D.

Page 535

select 79:18,22
80:20 414:20
selecting 251:15
selection 99:20
self-reported
328:23
self-reporting
329:2
sell 406:11
sells 146:22
SEM 133:23
seminars 63:17
send 39:16 96:9
senior 220:22
sense 337:21
341:8,15 443:4
sensitivity
327:20 335:24
sent 37:18 40:1
96:6,10,11
393:6
sentence 99:16
100:2 101:12
103:13,15
222:3,11 232:7
233:23 310:21
448:22 449:5
sentences
102:18 103:4
separate 72:5
153:17 166:8
382:13 402:11
separated
247:20 250:7
separately
113:11 153:1
157:10 247:22
248:13,14
separating
270:7
series 451:22
473:23
serious 384:16
serous 238:5,8
240:22,24,24
241:15,20
242:5,11

243:10 247:20
247:22,23
248:10,12,13
249:16,20
250:3
served 66:5
Services 4:8
set 47:5 71:6
398:16 414:9
414:19 485:9
setting 42:17
SEYFARTH 4:2
SGO 36:12
360:19,23
361:5,10,19
362:3,9 364:19
365:6,18 366:3
shake 107:7
110:13,13,14
shakes 110:13
Shane 4:7
share 37:7 370:1
384:14,23
SHAW 4:2
she'll 231:21
sheds 439:23
Sheet 486:7
shelf 134:12
136:15 405:23
short 99:21
185:19 257:6
266:6 267:1,22
267:23 410:5
shorten 448:18
shorter 243:19
326:18,23
shortest 267:1
Shortly 65:20
shot 310:12
show 28:2 115:5
117:8 119:2
128:9 159:24
194:9 195:23
201:15 203:21
211:7,15,16
212:14,22,24
223:21 230:14

230:22 231:8
231:10 240:12
251:20 265:3,4
282:7 291:17
329:9,21 330:4
345:21 374:19
411:2 415:15
423:4,7 434:17
468:23 473:22
474:7
showed 114:15
125:4,6 142:22
242:11 254:19
264:9 282:5,12
314:7 329:23
330:6
Shower 420:15
420:15 447:18
447:18 458:6,7
474:1,2
showing 106:16
288:15 290:22
473:24
shown 26:7
204:24 234:24
241:13 288:8
290:16 421:17
422:1,22 434:5
446:4 449:10
shows 64:1
147:15 159:17
196:9 205:3
220:22 242:9
265:8 266:16
267:14 336:5
342:9 378:22
381:9,24 474:8
shrouded
350:11 351:23
Shukla's 220:16
shut 51:5,9
sic 395:11
396:22 397:17
side 87:19 95:23
349:3 390:4,16
419:12
signature

344:15,18
signed 352:4
significance
241:18
significant
103:14 159:20
160:1,6,12,24
163:23 164:7
165:3 200:21
237:9 238:10
240:13 242:5
249:11,15,19
250:3 251:20
266:16 267:4
268:4 290:17
293:18 297:20
304:19 305:1
306:11 307:1
307:21 308:5
308:10 311:18
313:21 314:8
314:20 315:1
317:17 324:8
331:13 369:17
374:20
significantly
202:21 238:4
240:21 307:7
311:8
signs 339:21
SILVER 3:16
424:15,21
similar 32:3
38:9 94:3
102:16 106:16
259:6 331:6
similarly 217:7
simply 361:11
413:11
Simultaneous
82:13 202:11
242:19
Sinai 120:8
single 76:11,11
267:13 410:6
415:14 442:16
473:22 475:1

Sister 236:24
237:3,7,8,15
257:6
sit 326:10
475:20
site 260:8
375:16
sites 148:24
sitting 42:9 76:1
77:9,18 81:14
93:5 365:23
375:15 464:12
477:17
sixth 27:13
size 199:3 289:3
290:14
skills 46:5
skin 205:22
skip 388:24
Skipping 100:4
slide 21:8
212:24 218:8
slides 212:19
445:4,5
slight 331:2
379:20
small 47:14
68:14 138:17
151:13 202:9
241:16 293:1
369:8 375:13
smaller 457:1
Smith 6:16
98:21,23 99:2
99:6,10 100:14
100:17
Smith's 99:11
100:20
smoke 166:24
167:2
soaps 15:21
social 42:17
462:19
societies 361:19
365:1
Society 364:12
sold 148:2

Judith K. Wolf, M.D.

405:22
sole 420:22
somebody
  115:18 190:16
  208:12 326:10
  326:13 328:1
  335:7 350:7
something's
  195:14
sorry 67:10
  79:12 95:21
  102:12 104:5
  112:5 117:13
  117:14 129:6,7
  141:10 149:20
  174:11 206:13
  214:4 216:3
  224:20 225:6
  225:15 236:3
  249:22 250:15
  302:10 309:18
  320:13 356:22
  367:2 378:2
  380:17 393:14
  416:11 422:13
  429:11 438:12
  447:7 460:12
  460:14,24
  461:3 472:18
  472:19
sort 38:13 42:19
  65:18 68:18
  316:18 366:16
  382:20 383:3
  440:24
sound 358:5
sounds 136:8
  364:2,6
source 13:3 33:1
  76:11 105:3
  119:17 135:20
  204:8 272:20
  272:24 379:10
  396:10
sources 14:11
  104:11 114:13
  136:23

South 318:20
soybeans 435:3
speak 20:9
  54:11,21 64:8
  64:14,19
  100:16 134:15
speaking 219:20
specific 64:18
  107:17 122:13
  154:8 219:8
  226:21 231:7
  255:20,22
  289:12 291:12
  340:15 359:17
  393:16 452:24
  453:1
specifically
  19:18 20:13
  31:20 48:9
  56:7 75:3
  78:20,24 81:9
  114:4 129:21
  140:6 142:18
  143:8 145:2
  152:21 153:8
  162:19 163:9
  166:17 182:24
  208:8 240:19
  248:10 249:14
  251:23 252:7
  257:23 271:1
  286:17 293:17
  295:9 313:3,5
  354:5 389:17
  400:4 432:3
  434:9
specifics 313:7
specimen
  212:17,18
  213:5 218:15
specimens
  214:20 379:3
spectrum
  404:15
speculate
  418:17
spend 97:16

173:3 203:11
spending 59:18
sperm 192:6
spoke 64:13
  478:4,5 479:12
  481:8
spoken 56:10
  462:23 480:13
sprays 15:16
spring 364:11
Square 3:8
staff 46:19,20
standard 187:3
  263:14
standing 478:22
starch 407:23
starch-based
  407:16
start 9:17 14:4
  70:10 87:3
  224:18,24
  315:18 319:4
  320:22 321:15
  323:10,19
  355:8 460:23
start-up 48:21
started 45:8
  47:10 53:9
  56:18 72:6
  106:4 201:10
  217:11 315:24
  316:4 317:8
  318:12,16,18
  318:21 323:15
  325:15,17
  348:13,14,17
  348:19 349:8
starting 11:24
  13:6
starts 324:24
  440:19 441:8
state 1:19 66:4
  180:14 184:6
  221:16 255:14
  289:14 290:20
  355:11 381:22
  382:2,3 448:11

480:2,7
stated 80:1
  171:18 198:17
  223:15 319:3
  333:24 395:12
statement 39:2
  41:10 83:23
  142:20 230:1
  230:24 254:13
  256:22 259:13
  259:16,18,22
  261:19 350:17
  363:15,23
  365:21
states 1:1 7:6
  49:8,15 124:19
  449:2
statistical 238:4
  240:21 241:17
  242:13 259:4
  290:16 297:20
  305:1 308:16
statistically
  160:1,6,11,24
  163:22 200:21
  237:9 242:5
  266:16 267:4
  268:4 306:11
  307:1,17,20
  308:4,9 311:8
  311:17 314:8
  314:20,24
  317:16 369:17
statistician
  262:3
stay 84:8 87:23
stays 22:12
Steering 2:6,11
  2:16
stenographica...
  485:8
stenosis 193:6
step 169:20
  324:20 362:10
  388:1
steps 361:21
Steven 7:15

stick 294:11
sticker 113:14
stimulation
  381:23
stop 21:23 59:4
  195:20 348:18
  350:9
stopped 16:15
stopping 17:24
stored 135:24
stores 406:5
straight 86:16
strategies 8:16
  351:2
stratified 258:19
  309:7
Street 1:15 2:4
  2:19 4:3
streets 474:17
strength 226:3
  367:23 368:3
strengths 270:8
stress 380:20
  384:6 385:15
stretched 388:2
stretched-out
  387:2,8
strike 56:10
  149:15 284:8
stroma 457:3
stromal 241:11
strong 226:9
  368:13
stronger 160:11
strongly 159:5
  426:4 428:24
structures
  448:17
studied 29:6
  152:15 192:7
  199:8,17
  243:19 244:4
  256:13 412:14
  412:18 413:5
  421:6 432:12
  438:2 439:14
studies 14:13,14

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 316 of 1035
PageID: 241495
Judith K. Wolf, M.D.

Page 537

| | | | | |
|---|---|---|---|---|
| 14:14 18:13 | 259:23 260:21 | 200:8 203:12 | 435:23 436:7 | 409:7 |
| 21:20 27:22 | 261:14 262:11 | 209:7,20 | 437:24 438:3 | **sugar** 432:23 |
| 28:1 56:20 | 262:23 263:4 | 214:12 234:19 | 442:16 451:15 | 433:2 |
| 99:19 100:7 | 265:21,24 | 234:24 236:5 | 469:5 473:23 | **suggest** 28:1 |
| 101:14,23 | 266:4,15,22 | 236:24 237:3,7 | 473:24 | 29:5 40:18 |
| 102:7 103:17 | 267:21 275:6 | 237:8,15,16 | **studying** 193:21 | 160:15 220:17 |
| 106:8,8,8,10 | 277:17 282:4 | 238:13 239:18 | 220:4 | 261:1 280:3 |
| 106:15 108:15 | 282:11 287:9 | 241:19 242:12 | **stuff** 404:15 | 387:15 |
| 110:12 147:10 | 287:11,23 | 243:6 244:20 | **subgroup** 239:3 | **suggested** 21:21 |
| 152:11,16,20 | 288:4,9,21,24 | 244:23 245:21 | 248:3 303:4 | 62:6 438:3,23 |
| 153:5,9 157:5 | 289:8,10,11,15 | 246:2,10,13,14 | 305:7 317:11 | 448:2 |
| 157:24 158:18 | 289:19,20 | 246:20 247:5 | **subject** 12:20,21 | **suggesting** |
| 159:6,24 | 290:8,12,22 | 247:22 248:9 | 31:24 312:12 | 45:10 69:13 |
| 160:21 161:7 | 291:6,8,16,17 | 248:11 249:12 | 312:19 | 173:22 177:20 |
| 164:8 165:3 | 291:21 292:2 | 249:17,24 | **submit** 360:2,7 | 353:11 |
| 168:21 169:4 | 293:3,12 | 250:14,22 | 392:19 471:13 | **suggestion** |
| 179:11 192:16 | 311:16,21,22 | 251:16 252:4 | **submitted** 39:9 | 29:10 40:12 |
| 193:17,20 | 313:16 315:24 | 254:21 255:1,7 | 39:20 91:5,6 | 454:16 |
| 194:1,3,15,18 | 316:17 317:22 | 256:24 257:6,7 | 94:18 96:1,12 | **Suggestions** |
| 195:23 196:14 | 318:3 325:19 | 257:8,10 | 233:15 391:18 | 392:22 |
| 197:10,14,17 | 329:17 330:3 | 258:19 259:17 | 391:22 448:20 | **suggests** 58:22 |
| 199:5 200:4 | 338:10,13 | 259:22 260:12 | 471:9 | 148:24 163:20 |
| 204:23 217:13 | 341:22 345:21 | 260:19 261:20 | **Subscribed** | 197:2 219:5 |
| 217:17 219:5 | 346:19,23 | 263:10,21 | 486:15 | 254:18 412:13 |
| 227:5 234:16 | 368:10 369:8 | 265:13 266:8 | **subsequent** | 439:10 |
| 235:7,20 | 370:11 383:10 | 267:3,14 270:7 | 19:21 38:8 | **suing** 357:20 |
| 236:17,23 | 383:22,23 | 270:9 281:22 | **substance** | **Suite** 2:14,19 |
| 237:11 238:3 | 385:1,13 | 292:3,4,7,23 | 194:23 195:9 | 3:8,12,21 |
| 238:11 240:16 | 387:23 406:20 | 292:24 293:9 | 286:23 455:11 | **summary** 33:9 |
| 240:21,23 | 412:15 413:2 | 293:16 295:4 | 458:11 478:7 | 100:5 260:4 |
| 241:1,14,14 | 413:12,17,22 | 295:12 296:13 | 479:20 486:7 | 278:23 420:11 |
| 242:4,14 | 413:24 422:5 | 296:19 297:17 | **substances** | **supplemental** |
| 244:13 245:8 | 422:14 423:3,7 | 297:17 301:24 | 194:18 221:11 | 91:11,15,20 |
| 245:19 246:8 | 423:14 426:5 | 302:3,20,21,24 | 283:19 284:5 | 92:1,7,11,18 |
| 247:21 249:10 | 428:24 434:16 | 304:13 311:4 | 402:9 404:10 | 92:20 |
| 249:15 250:5,8 | 434:22 442:23 | 313:8,19 317:3 | 443:3 458:12 | **suppliers** 448:20 |
| 250:12,21 | 456:12 468:23 | 318:5,8 319:1 | 458:13 467:13 | 471:8 |
| 251:4,12 | 469:3,13 470:2 | 319:8 321:3,10 | 467:16 468:24 | **supplies** 416:15 |
| 253:16,24 | 470:9,15 | 321:19 322:23 | **subtracted** 72:9 | **support** 25:24 |
| 254:2,6,14,16 | **study** 7:6,20 | 323:13 329:4 | **subtype** 240:1 | 27:8,21 143:24 |
| 254:19 255:3,6 | 28:6,14,18 | 329:21,22,22 | **subtypes** 241:13 | 145:7 146:4 |
| 255:15 256:4 | 29:11,12 108:6 | 340:8 346:8 | 241:16,21 | 158:7 160:22 |
| 256:10,14,20 | 116:16 146:14 | 371:17 384:7 | **successor** | 163:15 164:9 |
| 256:22 257:2,3 | 159:17 168:2 | 384:11 385:8 | 471:16 | 165:5 166:12 |
| 257:11 258:18 | 169:8 179:17 | 385:11 409:21 | **suffering** 186:18 | 167:20 169:14 |
| 258:21,23,24 | 192:19 199:2,4 | 410:7,11 | **sufficient** | 174:22 175:12 |
| 259:1,5,8,9,14 | 199:15,19 | 433:11,17 | 283:20 284:10 | 176:3,10 177:2 |

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 317 of 1035
PageID: 241496
Judith K. Wolf, M.D.

Page 538

177:8,9 178:14
179:4 180:6
182:15 183:21
192:21 193:17
206:18 208:1
208:21 209:12
214:7 232:4
234:11 275:3
277:7 311:4
373:16,23
374:8 382:7
384:3,4 386:24
395:20 418:2
475:16
**supported** 29:23
457:9
**supporting**
121:5 221:18
**supports** 146:17
209:16 363:20
385:2 412:13
**supposed** 346:7
**sure** 23:1 24:10
28:16 29:4
32:24 79:9
80:23 82:17
86:18 92:10,12
103:11 107:21
108:6 116:12
119:15 120:7
120:21,23
121:1,5 128:12
189:12 204:3
205:16 231:21
232:3 236:14
244:2 251:9
262:4 267:8
275:24 295:8
313:11 317:7
326:4,21
327:14 334:1
342:2 343:20
344:3 346:6
360:9 366:11
370:24 371:22
375:16 376:16
378:21 407:7

415:21 444:9
444:13 466:14
470:2 476:1,8
**surgeries** 408:4
**surgery** 28:24
408:8 409:2
411:6,6,13,18
411:23 412:10
413:13 473:7
**surgical** 22:4,11
22:18 23:3,8
23:13 24:23
25:2,8,12 26:1
26:7,15 27:1
27:10,17 28:3
28:18 29:19
30:24 407:19
454:14,17
**surprise** 437:9
437:10
**surprised**
100:18 129:22
**surprising**
101:20
**survey** 168:19
448:16
**susceptible**
337:8,10
**suspect** 167:7
178:8
**suspected** 22:5
338:19
**swear** 9:7
**sweating** 318:22
**sworn** 9:9 485:5
486:15
**symposia** 63:17
462:24
**symptoms** 45:16
56:4
**syndrome**
337:14
**synergism** 167:8
**synergistic**
166:5 167:4,5
**system** 108:23
195:2 457:4

**Systematic** 7:22

**T**

**T** 406:23
**T-a-h-e-r** 90:16
**tabbed** 68:16
**tabbing** 68:17
**table** 85:23
240:1 241:21
245:8 303:19
304:24 305:7
308:20 330:9
330:22 332:1
332:11 349:3
483:4,11
**tabs** 68:21
**Taher** 90:16,22
91:2,10,15,21
92:2,8,13,14
92:16 281:17
**take** 11:6 27:24
42:22 44:4
59:15 72:2,5
72:10 85:7
86:8,15 88:6
88:16 89:14
99:13 104:3
112:8 118:20
128:23 129:9
139:5 196:17
198:7,9 210:5
210:11 211:5
211:16 213:7
245:6,12
254:24 256:9
315:5 325:12
327:23,24
359:24 364:14
418:7 432:19
466:4 475:1,8
**taken** 1:13 28:5
35:24 89:19
139:8 168:2
213:13 252:22
315:8 378:5
388:11 444:3
445:19 461:18

485:8
**takes** 217:22
325:20 326:12
361:19
**talc** 3:14,18 6:12
6:18 7:5,8,8,13
7:21 8:4 17:8
17:15 19:15
20:8 22:11,18
23:2,7 28:3
43:5 44:12
49:24 50:5,10
56:15 76:6
106:20 108:21
109:3,14 111:1
111:2 112:17
117:12 118:24
119:20 128:20
135:22 138:20
140:16 141:5
141:21 142:9
153:13 161:21
162:6 164:14
164:15 168:8,8
170:3,3 179:2
179:2 184:14
184:18 185:6
185:10,21
186:3,11 187:2
187:10,15,17
187:22 188:1
188:11,14,20
188:24 189:2,5
189:7,16 190:9
190:16,20,23
190:24 191:1
191:11,23
192:1,18
199:10 204:7
204:13 206:20
207:1 211:7
212:9,12,13,16
213:1 214:8,13
214:24 215:12
215:16 216:14
216:19 217:14
217:16,22

218:4,4,8,11
219:17 220:6,9
220:23 221:6
224:23 225:22
225:22 227:10
229:2,4,15
230:7 232:5,22
233:16 235:22
237:6 244:11
248:19 249:9
253:15,22
254:8 257:9
259:3 265:17
271:18 274:14
275:4,21 276:5
276:24 277:8
277:19 280:17
280:21 281:1
281:22,24
284:8,11,15,16
284:16 285:13
285:13 289:3
290:15 302:5
309:22 310:1
310:10 315:14
328:12,22
329:6 336:17
340:11 341:5,6
342:18 358:21
359:3 362:20
366:4 372:1,9
372:9 375:5,6
375:10,11,17
375:19,20
377:14,14
378:14,14
379:1,2,7,7
381:2,6 382:7
382:14 385:1
388:20 389:11
389:14,19
395:6 397:14
399:16 400:3,3
400:15,15
401:5,8 404:3
404:5 405:13
406:11,14

Judith K. Wolf, M.D.

Page 539

408:20 409:7
409:13,17,21
410:8 415:14
416:5,15,19,20
417:1,2,6,19
418:5 424:10
424:12 429:10
429:23 430:9
430:20 431:2
436:11,12
441:10,11
442:16 443:4
443:13,14,17
447:10,21
448:3,14,20,24
449:16,21
450:13 452:2
453:21 454:8,9
455:1,3,14,17
455:22 456:2
456:17 457:15
457:19 459:2,4
459:8,16,19,23
460:5,8,16,20
462:14,20
463:1 465:10
465:10 466:10
466:16,19,19
467:6,6,9,9
469:10,15
471:4,8,14,24
472:5 473:11
473:17 474:10
474:18,21
475:4,10 477:3
480:18
**talc's** 474:13
**talc-based**
399:14,22
400:18 401:13
401:24 405:3
405:11 415:16
420:23 433:8
434:13 435:17
436:12 437:2
437:18 471:5
**talc-containing**

448:24
**talc-dusted**
16:10 18:5,14
19:13 195:23
196:8 197:8
**talcs** 471:17,21
**talcum** 1:3
13:24 14:22,23
15:6,7,9,11,17
15:22 16:1,3,5
16:7,12 17:1
17:21 24:22
25:2,4 28:2,3
43:7 45:7
54:14,17,22
55:6 56:15,23
57:4,5,14,16
57:23 58:2,10
58:12,21,23
59:8,11 60:6
61:5,11,15,23
62:3,24 64:9
64:12,15,19
67:2,13 106:5
106:22 107:12
107:24 108:9
108:11 109:22
110:2,17,19,24
111:8,12,15,18
113:18 114:12
119:9 120:11
121:6,20
126:23 135:21
138:16 139:16
140:24 142:20
143:5 144:7
145:9,11,16
146:12,22
147:16 148:13
148:24 149:5
149:12 151:4
151:24 152:6
152:15,22,24
153:3,10,18,23
154:6 161:15
162:3,9,18
163:3,10 164:2

164:3,10,19
165:16 166:15
167:17 169:16
169:22 170:15
170:19 171:1,6
171:9 173:18
176:22 177:21
178:15,22
179:1,23
180:17,23
181:4,11
190:17 191:7
191:11,14
193:21 194:9
194:17,18
196:24 197:3
199:6 200:23
201:10,22
202:7 205:5,12
205:19,20
206:2,7 207:16
208:3,13,23
209:2,5,10,12
209:13,17,21
220:18 221:14
234:20,22
237:19 241:5
251:22 264:10
267:5,15 268:5
274:1 280:13
281:9 282:5
290:4,24
292:14,20
293:21 294:23
296:16 297:9
297:13 298:9
298:11 301:15
301:16 302:2
302:12 304:21
315:15 318:9
318:12 320:19
321:17 322:24
323:2,10,19
325:7,14
327:16,23
328:23 331:12
334:2 336:21

336:23 337:8
337:23 338:5
339:5,11,17
340:6 341:19
342:4 343:13
343:17,21
344:2,21 345:1
345:6,18,23
346:10,15
348:4,15
349:10 350:4,8
352:10 356:13
356:17,19
357:2,11,21,24
359:14,22
361:6,12 362:5
362:13 363:16
363:20 368:6
371:24 372:6
374:8,14,20
376:6,23
377:19,23
378:13,18
379:11,13,17
380:8 381:2,6
381:7,11,15
384:5 385:3,13
404:21 409:20
423:8 447:14
447:15 448:2
456:18 458:1,5
458:6,10 459:6
461:7 464:21
465:16 466:3,5
466:8,15,23
467:12,13
468:3,10 470:3
472:12
**talcum-based**
400:1,23,23
**talcum-dusted**
28:6
**talk** 10:16 13:16
20:1,4 28:11
43:4 44:19
65:6 87:8
105:18 208:8

209:1 216:4
230:23 237:14
352:15,16
359:16 447:4
**talked** 25:15
42:19 56:2,4,5
56:7 103:16
132:4,11
182:14 196:4
345:19 348:12
362:23 363:1
367:20 440:4
443:5 447:13
461:6 479:20
480:1,11
481:10
**talking** 17:7
24:22 28:12
42:24 45:8,20
102:11 107:21
119:23 127:5
131:21 162:3
196:6 209:6
217:12 229:9
231:5 232:11
232:15 240:17
240:20 321:8,9
340:17 342:14
342:15 349:2
383:9 476:15
**talks** 20:13
**tampons** 16:2,7
436:17 438:9
**tape** 134:3
252:18 378:2
**TARIQ** 3:20
**tariq.naeem@...**
3:21
**task** 266:18
**Tecum** 6:6
**tee** 87:7
**television** 64:17
**tell** 16:16 35:17
44:11 59:2,4
59:10,13 70:7
72:24 78:19,23
93:18 118:21

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 319 of 1035
PageID: 241498
Judith K. Wolf, M.D.

Page 540

143:8 182:12
212:1 227:24
234:13 278:1
313:4 344:5
352:12 375:12
379:22 399:3
402:1,1,5
420:13 435:14
471:14 479:19
**telling** 131:7
172:9 348:14
348:18 432:24
**TEM** 129:3
133:23
**ten** 69:12 79:6
210:14,15
299:9 300:7
316:9 322:3
325:2
**ten-** 317:1
**tenens** 46:4
**tenets** 288:16
333:17 366:22
**term** 133:6
344:17
**terminal** 188:21
**termination**
10:3
**terms** 80:19
86:2 115:14
116:2 126:14
134:12 152:3
190:8 223:10
226:9 250:12
274:6 374:23
446:22 452:24
454:7 456:12
**Terrific** 41:2
**test** 110:9
114:14 115:9
115:11,15
116:4,20,23
121:10 122:6
140:8 145:19
146:24 148:17
169:5 306:24
415:24 417:21

418:5,8 420:9
452:17 473:2,3
476:7
**tested** 119:7
122:11 123:12
123:19,22
125:4 126:3,6
128:1 129:23
135:7 143:20
144:15,22
145:3,13 146:5
147:6,8,8,11
147:13,20
148:4 174:9
175:18 178:1,9
374:21 379:2
415:14 417:20
418:10 448:18
448:21 459:7
459:21 471:4
471:17
**testified** 9:11
221:5 385:22
442:15
**testify** 85:19
87:15 95:13
135:18 401:18
485:5
**testifying** 23:12
24:17 127:16
390:17 400:11
**testimony** 24:6
27:4 35:5 57:8
62:22 76:20
77:12 80:7
98:13 121:13
122:10 132:17
132:22 139:2,4
141:15 142:7
147:3 172:1,5
183:10 212:8
236:21 257:21
282:16,21
296:6 342:21
366:7 374:6
402:4,18
403:20,23

447:16 463:20
465:1 468:12
468:20 485:8
**testing** 113:18
114:12,21,23
119:16 120:4
120:11 121:20
122:6 123:19
124:1,7,10,20
127:18,21
128:22 129:16
129:19 130:1
130:10 131:8
131:17,22
132:13 134:13
134:23 135:2
137:12,16
138:23 140:15
142:18,23
148:23 174:8
181:16 373:19
378:22,24
379:22,24
380:2 415:23
418:5 448:2,12
451:18,19
452:2 459:5,15
464:1,5 471:10
471:14
**testings** 130:4
374:19
**tests** 45:16
117:15 129:1
134:22 250:11
417:8
**Texas** 1:15,19
3:13 49:13
**text** 99:15
**textbooks** 63:22
**Thank** 40:9
44:17 52:16
89:12,16 90:1
93:1 225:15,18
294:9 461:11
**Thanks** 210:19
388:3 483:19
**theirs** 278:14

**theories** 30:17
32:12
**theory** 201:5,18
202:20 203:21
**therapy** 273:20
369:3
**thick** 319:15
**thing** 13:8 31:20
59:5 75:13
103:2,9 120:6
144:3 165:13
166:19 203:3
212:6 233:7
234:10 261:18
304:12 316:11
318:2 329:3
358:16 376:7
400:11,14
409:8 427:3,16
**things** 32:23
71:9 72:6 77:3
98:9 108:23
111:1 114:15
127:13 153:20
165:18 166:4
166:20 167:3
170:8 171:6,8
173:12 174:10
176:6 181:17
182:8 187:24
195:13 200:18
200:19 205:17
210:23 229:5
229:10,24
248:17 253:12
260:7 273:16
273:23 278:7
292:6,13 297:6
302:11 303:24
306:3 312:24
313:1 333:5
336:1 354:23
356:11 366:8
377:1 378:19
399:13,22
400:12 401:4,6
401:12 404:15

404:24 405:5
405:12 409:12
438:4 439:13
443:5
**think** 13:4 26:5
30:20 32:14
33:12,13,16
35:22 50:7
54:2 58:15
59:16 61:13
69:4 80:1
87:10 88:3
109:7 133:6
148:14 153:16
154:7,11 155:9
157:21 161:12
173:2 190:12
194:20 195:19
196:4 197:19
198:17 205:24
222:20 241:12
245:24 246:13
246:19 261:23
262:6 271:12
281:4 283:5
285:2,7 289:2
300:3 304:11
316:9 317:6
318:15 325:4
326:4,23 327:4
328:17 332:21
333:4 337:2
343:1,21 344:5
346:12,13
353:3 361:22
362:3,10
364:17,24
365:2 367:20
371:5,6 379:14
381:14 384:24
388:1 389:12
389:16 390:3
390:13 393:24
399:23 401:11
403:2 422:1
424:20 426:13
443:20 445:2

Judith K. Wolf, M.D.

Page 541

445:13 451:1
451:21 459:13
465:3,16 471:7
478:16,19,21
479:11 483:16
**thinking** 15:9
152:21 318:6
**thinks** 33:16
132:21
**third** 26:19 48:3
94:5 101:8
112:14 233:13
258:11 320:18
355:23
**third-party**
130:1 137:21
**Thirty-three**
225:5
**Thompson** 2:3
42:2,4,5,12
43:22 477:17
481:18
**Thompson's**
42:8
**thought** 12:23
15:24 16:6
97:23 135:8
281:24 285:8
321:8 330:6
342:18,21
393:22 424:4
425:1,5 455:22
480:4
**thousand**
215:22 305:6
**thousands** 408:5
**three** 10:2 47:8
69:4 78:8
101:7 227:1
234:16 235:6
235:20 236:17
236:22 237:10
257:2 267:23
267:24 268:2
282:3,10
288:24 311:22
**threshold**

168:11,18,22
183:1
**tied** 193:8 195:3
198:4 200:23
201:9,9,15,17
201:21 202:8
203:23 204:6
208:13,16
**till** 67:7 95:20
281:23 324:23
**time** 9:5,23
10:17 26:19
27:14 37:18
44:2 46:7 47:1
47:6,15,18,22
48:6,10 49:22
50:13 52:1,7,9
52:13 53:9
54:7 59:18
61:22,24 66:24
72:8 89:18,22
90:6,19 96:5
97:20 107:5
108:16 111:23
112:8 114:13
115:6 123:9
129:14 139:7
139:12 143:11
155:4 172:23
186:2,3 188:20
188:24 189:13
190:1,14,14
203:11 212:5
213:12,16
218:5,11,20
219:19 237:13
243:20 245:19
247:9 252:12
252:21 253:2
254:24 265:22
269:16 285:9
285:12,19,21
300:23 315:7
315:11 317:2
318:3 325:13
326:11 327:8
332:24 350:3

351:12 352:11
357:9 361:19
362:17 363:4
364:10 365:19
372:19 378:4,9
378:20 379:1
379:18 388:4
388:10,14
399:19 410:5
422:7,16
424:24 432:13
440:12 444:2,6
445:18,22
455:1 461:17
461:21 470:17
473:18 475:10
484:4 485:8
**Time-out**
171:24,24
**times** 65:9 78:8
172:6 184:3
269:12 290:14
299:9 300:7
334:1 475:9
**timing** 211:23
212:16
**Tinto** 471:16,23
**Tired** 380:17
**tissue** 212:20,21
215:2 407:17
409:16 433:8
434:12 436:22
440:7,11,18
441:1,5,7
**tissues** 434:14
435:16,18
437:3
**Titanium** 7:13
**title** 295:1 355:4
447:21
**today** 9:18 10:20
12:1 13:17
24:6,17 32:1,2
42:8 68:2 76:2
77:9,19 81:14
91:24 93:5
130:22 220:10

341:19 344:21
357:15 358:2
359:7 375:15
388:4 389:2
442:15 446:4
447:13 461:6
463:5 468:12
477:17 482:12
482:23 483:1
483:14
**Today's** 9:4
**toilet** 436:16
438:3
**told** 45:8 57:24
87:5 362:3
463:17 480:4
**tool** 286:13
**top** 38:17 167:1
332:8
**topic** 14:12
395:1
**total** 75:13
97:21 108:17
259:2 296:11
358:4,21
**totality** 100:8
456:1
**touched** 446:23
**tough** 472:21
**toxic** 167:6
169:22
**toxicity** 179:23
**toxicology**
384:24
**toxin** 325:21
**toxins** 166:21
**trace** 183:11
432:9 433:4
**traced** 442:16
442:17
**track** 191:2
**tract** 191:15
192:17,23
193:9 229:7
336:18 387:2,8
387:9 436:14
436:20 437:15

440:22 474:3
**tracts** 438:18
**traditionally**
297:9
**training** 42:16
**transcript** 24:4
485:7
**transcription**
486:5
**translocation**
430:3,10,20
**transmission**
133:19 419:13
451:20
**transport**
227:10
**travel** 193:22
194:4,23
195:13
**traveling** 194:10
**treat** 12:21
47:17 48:23
272:15
**treated** 47:22
48:1 156:1
**treating** 47:1,3
52:2,9,14
73:11 155:24
187:4
**treatment** 56:6
274:10
**treatments**
350:13 351:24
**tremolite** 117:10
117:11,11,12
117:12,13,17
117:18,24
118:1,7,8,21
**trend** 331:8
**trial** 28:13
**tricky** 38:20
**tried** 108:15
306:5
**trouble** 51:3
**true** 38:10 41:22
42:2 55:21
57:6 58:7

Judith K. Wolf, M.D.

Page 542

59:11,24 60:6
62:13 63:10,19
63:22 64:2
82:22 116:5
125:23 130:24
133:16,19,24
134:11 135:4
139:19,22
146:24 167:21
182:1 188:15
191:2,24 194:5
201:5,18
202:22 216:23
217:8,15 224:6
225:24 227:6
234:4 236:10
244:5,8,14
252:4 265:17
266:18 271:8
273:20 282:6
283:21 336:21
343:15 352:10
355:1,9 357:3
371:18 469:16
469:19
**truly** 347:15
**truth** 485:5,5,6
**truthful** 353:3
353:14
**try** 10:16 31:24
117:5 220:4
260:16 333:3
344:8
**trying** 14:10
29:4 38:19
53:14 62:21
130:21 199:4
211:4 212:15
236:14 246:14
277:12 464:9
**tubal** 197:24
202:22
**tube** 8:7 272:8
382:16
**tubes** 193:7,8
195:3,3 198:4
200:23 201:9,9

201:15,17,21
202:8 203:23
204:6 208:12
208:16 440:13
442:12,19
456:24 473:7
473:19
**TUCKER** 3:20
**tumors** 21:3
241:2,3,11,12
242:8
**turn** 143:14
226:13 371:1
385:20 394:12
394:16 418:22
448:10 449:19
450:6 455:10
**turned** 96:13
172:22
**TV** 64:1
**tweaks** 97:23
**tweeted** 462:18
**Twenty-four**
60:1
**twice** 170:22
189:1
**twine** 237:18
**two** 7:6 45:4
49:2 101:7
110:13 140:22
176:10 191:6
205:16 215:22
227:1 229:9
236:22 239:6
239:14 242:6
251:5,7 257:1
258:21 261:17
267:22 268:1
277:18 283:2,6
292:19 305:6
323:22 381:15
446:4,24
450:24 465:19
467:11,12
477:18,19
**two-year** 44:10
**type** 36:21 38:20

39:6 69:17,19
97:4 150:14,20
151:2,5 238:6
239:4 242:9
248:4 270:7
409:16 432:4
451:18 473:23
479:23
**typed** 37:8 38:6
38:9 69:22
97:8
**types** 116:15
150:17 241:3,7
412:9 416:19
417:13
**typist** 53:18
97:14
**typos** 98:1

─────────────
**U**
**ubiquitous**
417:13 474:14
474:22 475:5,7
**Uh-huh** 55:24
99:17 101:10
199:18,21
210:17 211:2
250:1 339:15
392:2 414:8
**ultimately**
397:15 456:14
**unaware** 77:10
**uncertain**
276:19
**uncertainty**
274:6,11
**unclear** 137:24
**undergone**
188:11
**underlying** 40:6
**understand**
10:19,23 14:15
27:4,6 34:4
35:6 38:2
44:22 48:15
49:18 53:15
61:13 62:21,21

76:2 82:11
83:15 86:18
89:1,2 92:12
95:24 105:22
115:11 116:18
127:12 130:22
131:12 138:3,4
139:17 144:14
144:18,19
146:10 152:10
167:9 182:13
184:17 193:15
199:13 203:11
248:22 249:13
250:17,20
251:10,14
252:10 269:19
282:15 285:23
286:21 298:7
300:4 349:18
369:20 371:16
371:22 376:16
377:12 380:18
384:15,20
402:21 404:1
406:10,12,13
406:16 416:18
419:17 420:5
433:23 442:14
463:24 466:7
469:4
**understandably**
334:8
**understanding**
16:13,17,24
17:14,20,23
20:17,20 24:18
25:11 27:15
34:10 43:21
70:11 80:18
81:2,13 89:4
96:22 167:10
168:1 169:12
180:3 181:23
187:10 222:18
262:15 269:4
301:11 317:19

318:11 328:16
361:14 375:9
466:11 468:21
469:2
**understood** 11:3
24:11 39:13
220:10 343:11
464:24
**undertake** 251:3
312:16
**undertaken**
349:10
**undertook**
349:15,19
**underwear**
206:3 335:8
**unethical** 28:8
28:12,17
**unexposed**
259:4
**unfortunately**
310:7
**United** 1:1
124:19 449:2
**universally**
221:19 222:11
223:5 459:5
**unpublished**
235:21 236:17
**untoward** 40:19
**untruthful**
353:9
**up-to-date**
366:4
**update** 53:11
234:22 302:5
362:4
**updated** 52:21
53:13 54:4
72:8 279:13
282:18
**Updates** 279:1
**upper** 263:1
437:14
**UpToDate** 6:7
12:11,18 13:2
13:7,11 31:22

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 322 of 1035
PageID: 241501
Judith K. Wolf, M.D.

Page 543

33:1,8,13,19
34:1,4,7,16
106:3 269:21
**urban** 476:3,16
**usage** 7:8 472:12
**use** 7:5,18,21 8:4
29:24 32:3
37:14 45:7
56:2,24 59:3
59:11 89:8
106:5,20,23
107:1,22
108:16,16
110:17 126:23
133:23 142:1,4
153:10 162:18
170:19 173:9
181:10 185:16
189:8 203:23
203:24,24
204:18 205:5
209:13 234:20
237:6,13 241:5
245:9 248:18
249:9 251:22
251:22 253:15
253:22 264:10
265:17,21,22
265:22,22
266:18 267:6
267:16 268:5,6
274:2,14
286:12,17,19
289:4,9 290:15
290:24 291:4
292:14,20
293:21 294:24
295:18 298:9
301:14 302:1,2
304:21 308:3
308:17 309:19
309:23 310:1
310:10 313:21
315:15,17
317:19 318:16
318:20 319:4
320:19,21

322:8,10 323:1
323:10,19
324:23 325:14
328:12,23
330:5,7 331:3
332:3,5,23
334:6,21
337:23 345:1,7
348:4,15,18,19
350:9 352:10
356:13,15
357:2,12 361:6
361:12 368:6
400:18,23
401:13 404:21
405:2 406:3
416:21 420:23
433:8 434:13
435:17 436:17
450:13 472:5
473:11,12
**user** 318:10
**users** 297:9
317:2
**uses** 67:13 108:1
109:11 163:3
164:22 181:10
190:17 205:19
206:15 298:10
299:4 337:16
**usually** 13:9
34:13 241:16
343:6 358:15
**uterus** 439:23
440:8,19,23
441:3,8,15
442:9,19

─────────────
**V**

**V** 4:6
**vacation** 47:9
**vagina** 192:12
192:22 193:5,9
193:22 194:4
194:10,19
195:16 230:3,8
232:6 387:11

388:2 437:14
441:2,5 443:1
443:14 456:23
**vaginal** 387:2,8
387:9,10 442:2
442:18
**vague** 137:24
**validity** 106:9
**variable** 327:4
**various** 114:13
114:13 116:15
241:14 361:21
418:5
**varying** 169:6
240:23 242:8
**vast** 440:2
**verbal** 85:9
**verbatim** 485:7
**verification**
262:12
**verify** 173:16
263:4 427:2
**Vermillion** 46:2
46:8,21 47:15
47:19 48:16,19
48:20 50:6,9
50:18 354:7
**Vermont** 135:22
379:14,15,23
**versa** 243:1
**version** 8:9
117:19 118:2
172:24 258:4
272:10 275:19
**versus** 21:1
153:17 163:2
189:7 247:24
271:3 328:1
**vice** 243:1
**vicinity** 423:4
**VIDEOGRAP...**
9:2 89:17,21
139:6,10
213:11,15
252:20,24
315:6,10 378:3
378:7 388:9,13

444:1,5 445:17
445:21 461:16
461:20 484:2
**Videotaped** 1:12
6:5
**view** 19:11
121:5 164:9
171:5 209:12
362:20
**viewing** 393:17
**vintage** 136:18
**virtually** 391:14
**virus** 166:23
**Vitae** 6:13
**vital** 434:3
**vitamin** 433:21
**vitro** 14:14
106:8 220:5
268:16 269:1
384:6
**vivo** 269:1 384:7
**volume** 7:12
361:18 430:14
431:12,14,19
454:20

─────────────
**W**

**walking** 195:18
436:17 474:17
**want** 10:1 13:8
13:10 39:3
40:20 44:19
58:15,16 76:1
76:3 77:22
78:6 85:6,12
86:17,21 87:6
119:11 129:15
137:11 138:19
138:21 176:7
192:15 198:14
203:2,3,10,11
208:21 212:5
224:18,24
225:13,20
230:23 231:6
244:12 245:6
251:14 253:7

263:22 296:19
299:13,13
305:5 332:20
361:24 364:13
364:14 370:23
371:22 377:12
383:6 390:14
390:23 397:17
397:23 424:24
427:1 438:1
443:23 444:9
467:5 472:12
**wanted** 51:6
60:21 61:21
66:4 71:5
220:2 265:4
295:23 313:1,1
358:19
**Ware** 328:9
**warehouses**
135:12
**warn** 411:5
**Washington** 4:4
**wasn't** 33:7
56:20 57:20
59:18 118:5
150:18 152:21
153:9 212:23
215:4 236:12
242:13 248:7
266:11 267:12
280:9 293:2
322:18 346:6
357:14 363:5
438:10 444:13
**waste** 212:5
424:24
**wasting** 269:15
300:23
**watch** 326:10
**water** 421:14
422:7,16 450:4
**way** 24:13 71:10
149:17 153:3
166:5,14 195:2
204:4 217:11
220:5 255:7

Judith K. Wolf, M.D.

Page 544

267:19 325:4
326:2 327:14
337:9,11
366:13,15
401:16,16
443:3 455:8
457:4,6 459:9
**Wayne** 480:2,7
**ways** 381:15
**we'll** 10:16 11:6
11:9 12:6
27:24 35:12
37:7,10 40:6
41:3 85:7
86:15 87:7
88:5,16 92:6
123:8 156:21
198:15 211:4
211:15 213:8
225:12 238:21
239:14,21
244:24 247:14
321:12 368:2
423:19 473:1,2
**we're** 13:16 20:4
27:5 41:12,15
54:2 62:20
66:8 67:22
87:3,22,24
95:22 127:5
134:2 149:8
162:9 229:9
236:14 237:14
241:9 276:3
296:18 300:23
321:9 322:6
343:12 349:2
359:6 424:18
483:24
**we've** 25:14
31:15 35:19
36:4 66:19
67:19,20 79:6
88:17 97:4,16
139:4 140:22
158:1 210:8
224:13 232:19

272:5 294:17
358:1
**weak** 222:22
223:12 226:9
227:11,22
**weaknesses**
270:9
**website** 128:20
272:7 351:14
359:10,14,18
362:4 365:20
446:5 447:22
449:12
**websites** 361:3
**week** 49:7
170:22
**weekly** 190:18
**weeks** 47:8
90:13 279:13
282:19
**weigh** 246:22
**weight** 137:19
138:9,14,21
197:1,9,14
254:18 268:9
268:18 269:19
269:20 270:2
275:2 277:7
278:3 281:18
290:5 334:11
382:21 383:3
**weighted** 264:3
270:6
**weighting**
126:14
**WEIL** 2:18 3:2
**Weiss** 320:23
**welcome** 18:19
26:21 86:1
89:24
**well-known**
352:9
**Welt** 293:2
**went** 45:19
48:21 64:1
81:3 155:15
200:7 229:14

334:3
**Wera** 8:5
**weren't** 41:8
54:10 80:3
204:6 257:12
287:13 317:7
405:12
**West** 2:14
**when's** 66:17
**WHI** 317:10
**white** 297:1,10
**Whites** 8:12
292:11,16
**Wikipedia**
104:18,20
105:2,9
**Wilson** 420:13
**wiping** 195:17
**withdraw** 203:9
**witness** 9:7,9
10:8,10 17:5
18:20 19:4
23:22 44:24
50:20 57:3
62:12 79:4
83:18 86:6
88:9 92:21
120:16 126:15
128:13 132:9
136:24 138:1
141:8,12,24
143:15 144:5
174:1 202:17
203:5 207:7,11
208:6 210:17
215:21 216:2,9
225:5 233:5
238:15 240:5
247:18 287:18
294:1 300:9,16
320:1,4,8
346:3,6 349:5
383:17 386:3
386:13 389:18
389:22 391:24
392:7 394:13

397:18 424:7
425:10 426:19
430:7 438:13
460:12,24
461:3 483:23
**witness's** 76:19
**witnesses** 93:15
401:20
**Wolf** 1:13 5:1,6
6:1,5,15 7:1
8:1,18 9:3,8,14
11:11 18:16
26:21 27:6
36:22 37:15
38:2,4 39:12
40:1 41:4,19
45:24 57:4
62:20 80:1,9
83:8,13,17
84:22 85:22,23
86:4 88:15
89:3,12,24
90:2 93:4
102:22 110:16
113:13 114:18
120:3 121:19
128:18 129:10
129:12 132:6
137:10 139:14
141:15 146:10
149:15,18
156:21 167:10
170:13 172:9
178:13 198:16
199:14 213:20
216:6,12
230:12 231:24
234:3 236:15
243:4 253:4
267:20 277:22
280:11 300:24
301:7,8 315:13
340:4 351:2,5
357:17 370:23
378:11 380:6
388:4,17 409:9
418:17 423:19

432:18 444:8
446:3 454:6,24
455:11 461:11
461:24 468:6
470:23 472:20
475:21 482:10
484:4 485:5
486:12
**Wolf's** 107:16
147:2
**Wolfson** 401:19
435:14 456:15
**woman** 107:12
108:1,19,21
109:10 162:24
163:1 164:22
171:10 181:3
181:12 189:13
193:6 195:1
201:15 205:12
205:19 206:1,7
208:2,23
209:12 460:19
464:10 473:24
**woman's** 64:23
166:15 167:19
169:17 174:15
176:4,9 180:9
189:8 190:13
204:13 241:6
439:22
**women** 42:22
45:15 56:24,24
159:6,17 161:8
161:12,15
163:23 164:2,8
164:21 170:19
196:7 197:7,24
200:22 202:7
202:22 203:16
203:23 209:3
209:11 227:11
234:20 235:1
238:8 254:23
256:9,13
259:21,24
292:10,15,24

Judith K. Wolf, M.D.

| | | | | |
|---|---|---|---|---|
| 293:20 294:22 | 364:21 365:3 | 166:13 169:12 | **Wu's** 239:12 | 326:6,18 |
| 295:24 296:11 | 366:1 438:18 | **workshop** 385:7 | ——————— | 330:10,21 |
| 296:23 297:1,8 | **word** 61:9 71:2 | **world** 341:10 | **X** | 331:1,3,9,21 |
| 297:10,18,21 | 464:2 | 379:21 | **XRD** 115:9,15 | 366:1 379:11 |
| 297:22 298:1 | **wording** 156:18 | **worrisome** | 451:20 | 399:5 439:22 |
| 298:18 301:13 | **words** 99:24 | 181:20,23 | ——————— | 477:19 480:15 |
| 301:17 302:1 | 102:15 455:16 | **worry** 58:1 | **Y** | **York** 3:4,4 |
| 302:23 303:2,5 | **work** 10:4 30:13 | **wouldn't** 160:15 | **yeah** 37:6 44:17 | **young** 315:16 |
| 304:3 315:17 | 39:21 41:22 | 237:2,3 244:12 | 44:21 50:15 | 316:1,23 |
| 316:18,19,19 | 43:1,3 44:24 | 329:19,24 | 68:15 113:6,10 | 318:13,17 |
| 316:20,22 | 49:23 50:4,4 | 375:2 387:6 | 143:22 179:16 | 320:20 |
| 317:11,17,20 | 50:10,13,20 | 390:14 460:22 | 225:15 230:18 | |
| 318:23 319:4 | 61:16,19 73:10 | **write** 64:8 98:5 | 238:17,18 | ——————— |
| 320:21 321:3,4 | 99:5 121:24 | 100:10 142:24 | 239:14 242:18 | **Z** |
| 321:5,14,16 | 122:1,7 166:4 | 353:4,12 | 263:2 269:23 | **zero** 325:3 |
| 322:8,9,23 | 166:21,22 | 354:11 360:1 | 273:18 275:12 | ——————— |
| 323:9,19 | 167:11,18 | 361:24 362:8 | 319:9,24 | **0** |
| 325:15 342:21 | 207:11 220:15 | 385:23 | 320:13 330:19 | **0.005** 307:2 |
| 343:1,5 345:7 | 220:20 272:13 | **writing** 72:6 | 347:11 388:7 | **07962** 3:17 |
| 348:4 352:17 | 343:24 349:12 | 96:15 104:2,17 | 392:14 394:18 | **08542-3792** 2:20 |
| 352:22,23,24 | 349:20 357:17 | 160:12 245:17 | 422:13 424:22 | ——————— |
| 353:4,17 | 358:7,21 359:2 | 246:6 353:17 | 427:18 429:21 | **1** |
| 354:20 387:1,7 | 360:3 362:13 | 354:4,10 | 442:7 450:5 | **1** 6:4 7:14 11:12 |
| 387:8,9,12 | 363:10 382:5 | 389:10 | 459:12 461:13 | 11:15 38:21 |
| 400:18 401:1,3 | 382:11 386:3 | **written** 203:6 | **year** 31:19 36:12 | 39:17 67:20 |
| 401:13,23 | 395:16,24 | 386:12 446:18 | 47:8 49:5 | 68:3 283:16 |
| 404:21 405:2 | 396:11 463:11 | **wrong** 30:10 | 106:14 306:12 | 330:9,22 332:1 |
| 405:19,20,21 | 481:5 | 148:9 239:10 | 306:21,21,24 | 369:10,15,16 |
| 406:2,11 408:5 | **work-product** | 285:4 319:22 | 308:10 314:21 | 369:22 |
| 408:13 411:5 | 84:7 | **wrongful** 10:2 | 325:1 332:11 | **1.2** 287:24 369:1 |
| 420:23 422:6 | **worked** 47:19 | **wrote** 98:11,18 | 362:14 401:19 | 371:18,19 |
| 422:15 423:3,7 | 63:8 480:2 | 100:2,19 | 478:6,21 | **1.25** 259:6 262:1 |
| 423:15 426:5 | **working** 12:23 | 171:22 172:11 | 479:12 | 262:8 |
| 428:15 429:1 | 43:9 45:24 | 228:3 236:12 | **years** 10:2 20:23 | **1.3** 368:10,21 |
| 433:8,9 434:13 | 46:1 49:6 50:1 | 351:3 354:16 | 45:4 48:2 55:1 | 369:1,14 370:5 |
| 434:14 435:16 | 50:6 51:16 | 469:23 | 55:11 59:22 | 370:21 371:13 |
| 435:18 437:3 | 52:7 53:10 | **Wu** 8:13 234:17 | 60:1,2 62:22 | 371:20 |
| 440:2 441:10 | 159:2 169:15 | 235:9 238:12 | 63:10,11 64:7 | **1.4** 368:10,21 |
| 445:2 473:17 | 227:9 352:14 | 238:15,21 | 108:16 148:23 | 369:1 370:5,21 |
| 474:16 | 354:6 364:20 | 239:16 292:3,7 | 170:23 186:10 | 371:13 |
| **women's** 55:10 | 376:18 386:7 | 292:13,23 | 190:18 199:7 | **1.5** 347:9 |
| 63:9,13,18,24 | 426:1 428:20 | 293:19,22 | 228:10 280:5 | **1.6** 287:24 |
| 236:23 237:1 | 429:8 430:15 | 294:2,17,21 | 283:2,6 316:14 | **1:41** 213:14,16 |
| 257:8 265:24 | 430:18 455:12 | 295:1 296:4 | 317:12 318:18 | **10** 6:19 156:22 |
| 321:9,12 324:2 | 464:10 478:23 | 297:7 312:9,13 | 322:3 324:5,20 | 157:1,17,19 |
| 324:13,18 | 479:6 | 329:20,21 | 324:23 325:2,2 | 158:2 193:16 |
| 353:5,13 | **works** 97:13 | 330:1 | 325:3,18,19 | 224:4 340:17 |
| | | | | 369:1 424:2 |

Judith K. Wolf, M.D.

Page 546

425:19 427:3,5
427:11 428:6
429:20 431:2
473:8
**10:21** 89:18,19
**10:33** 89:20,22
**100** 6:16 85:16
320:6,8
**10153-0119** 3:4
**11** 6:4 7:4
198:16,21
224:4 330:18
**11:18** 139:7,8
**11:27** 139:9,12
**1100** 3:21
**11th** 351:2,8
**12** 6:7 7:7 69:12
71:21 79:11
213:17,21
316:8 332:11
380:13 384:3,4
394:17 449:19
**12:44** 213:12,13
**12:45** 210:9
**128** 6:17 296:2,7
296:8,12
**13** 7:11 72:11
74:10,18 77:8
78:4 79:3
80:10 224:15
225:6,11,17
319:13 424:3,8
424:10 449:20
454:22
**14** 7:14 232:20
233:1 238:21
239:22 275:1
275:14,17
**1413** 306:18
**1414** 239:2,6,9
303:20
**1416** 310:19,20
**1490** 2:14
**15** 7:16 81:4
186:9 224:14
225:9,10
238:22 302:10

326:6,18
334:14 367:20
**1510** 3:12
**157** 6:19
**16** 7:21 36:3
95:6 101:5
245:1,2 450:6
**16-2738** 1:4
**16th** 93:11 94:21
96:17
**17** 2:19 8:4
221:17 247:15
247:16
**1700** 295:24
296:4,11
**188:** 7 70:12
272:2,6 275:16
449:12,20
450:7,7
**19** 2:9 8:10
53:23,23
294:11,13,17
302:8
**19103-6996** 3:8
**1970s** 120:4,12
121:11,21
123:14,23
124:3,11
126:21 127:18
130:11
**1971** 215:22
**1975** 120:8
**1976** 143:2,5
144:22 145:6
145:19 146:5
146:24 147:20
148:10 321:6
**198** 7:4
**1982** 321:7
323:1
**1989** 320:23
**1990s** 134:14,17
**1991** 141:19
142:3,8
**1992** 17:16
**1994** 385:7
**1995** 17:17

481:15
**1996** 17:19
213:22
**1st** 49:21 51:4
479:7,9

—————

**2**

**2** 5:3 6:7 12:7,8
12:16 13:19
33:2,8 34:8
35:1 105:17
139:11 303:20
308:20 375:13
375:16,19
448:11
**2.5** 347:10
**2:21** 252:21,22
**2:26** 252:23
253:2
**20** 8:14 74:12
76:16 78:3
81:4 97:21
199:7 316:14
317:12 318:17
324:5,19,19,23
325:3,18 326:6
326:18 331:5
350:19,20
352:21 354:9
357:10 371:7
375:14,16,19
380:7,14,15
414:3,10,11,20
446:5 462:2
486:16
**20-** 317:1
**20-60** 371:4
**20-some-odd**
74:9
**200,000** 256:9
256:15,18
259:20,23
371:14
**2000** 3:8 451:1,5
**20004-1454** 4:4
**2000s** 451:1
**2003** 451:2,3

**2005** 67:1
**2006** 31:11
455:2 469:23
470:10
**2007** 207:4,24
281:23 282:9
282:14 287:13
287:17 469:23
**2008** 281:23
**2009** 127:21
128:1 129:20
**2009-2010**
128:23 471:3
**201** 2:19
**2010** 127:21
128:1 129:20
187:23 222:20
224:6,24 228:3
245:10,22
246:9 319:23
320:7 430:14
454:21 455:13
455:16 469:20
470:4
**2012** 425:20
428:5 430:16
431:5,15,20
457:10
**2013** 451:3
**2014** 7:14 48:5
228:22 229:11
232:2 234:1
237:2 303:7
304:2,17,18
307:9 308:2,6
308:23 309:23
310:1,9,13
311:5,15,24
313:19,20
314:9 329:12
329:18 444:22
451:5
**2015** 44:8 45:23
46:1 67:7
235:9 351:3,8
352:3,8 354:17
356:12 357:1

**2016** 53:6
197:20 198:12
198:16 200:8
207:12,18
235:9,9 239:17
240:8,9 278:11
280:8 329:22
451:4,15
**2017** 37:3 38:5
41:22 44:7
49:19 52:22
53:16 236:6
**2018** 36:4 49:21
51:1,4,15
53:17,20 93:11
94:21 95:6
96:18 235:2
278:13 279:14
280:9 479:10
479:14
**2019** 1:9 5:2 6:2
7:2 8:2 9:4
12:12 53:22
485:19
**202** 4:4
**21** 8:17 273:11
274:9 275:1,11
275:14,15
353:20,24
354:15 357:10
446:5 462:2
**212** 3:4
**213** 7:7
**215** 3:9
**216** 3:22
**218** 2:4
**21st** 279:13
**22** 8:19 427:22
428:3
**224** 7:11
**23** 215:11,14
216:22 217:3
**233** 7:14
**238** 7:16
**24** 60:2 62:22
63:10 64:7
214:21 215:3,8

Judith K. Wolf, M.D.

216:17
**245** 7:21
**247** 8:4
**25** 315:18 319:5
 320:22 321:15
 322:9,11
 323:10,19
**256** 157:5
 158:24 425:17
 425:24 428:12
**26** 6:14,16
**267-0058** 3:18
**269-2343** 2:5
**272** 8:7
**2738** 1:7
**274** 426:12
**277** 455:10
**28** 113:14 114:2
 114:7,10,21
 120:20,24
 132:8,11
 138:10 139:22
 140:2,5,21
 374:6
**28-page** 70:21
 71:1
**280** 426:10,11
 426:20 428:4
 429:5,12,17
**294** 8:10
**2B** 284:18

**3**

**3** 6:8 31:8,12
 33:3 240:2
 253:1 270:12
 273:11
**3:24** 315:7,8
**3:40** 315:9,11
**30** 59:22 97:21
 199:7 228:10
 309:15 318:17
 321:6 366:1
 371:5
**30-50** 290:22
**30-year** 317:2
**305** 319:13,20

320:5
**30s** 21:21
**31** 6:8
**310-8468** 3:4
**33** 225:1,21
 226:8
**334** 2:5
**338-1100** 2:15
**339** 198:14
 200:20
**34** 308:23
 309:17,21
**34.4** 309:11,17
 309:23
**35** 6:11 330:10
 331:2,5
**350** 3:17 8:14
**353** 8:17
**36** 6:12 308:24
 321:7,21
 322:24
**36.5** 310:9
**36104** 2:5
**388** 5:8
**391-0197** 3:13

**4**

**4** 6:11 8:15
 35:12,13,19
 36:5 351:1
 378:8 383:2,7
 383:8 391:5
 394:11,17
 399:9
**4:40** 378:4,5
**4:52** 378:6,9
**40** 325:18
 347:12 371:5
**40s** 316:20
**41** 379:3 450:2,8
 459:6,14 460:5
 460:8,16,20
**411** 226:13
**42** 253:8,10
 309:15 379:3
 450:3 459:6,14
 460:6,9,20

**427** 8:19
**429** 259:2
**43** 450:3
**44** 450:3
**44113-7213** 3:22
**446** 5:9
**45** 450:3,8
**46** 245:7 262:19
 262:22
**461** 5:10
**463-2400** 4:4
**47** 373:13,14
 415:10,15
 416:24 418:23
 420:12,14
**470** 5:11
**482** 5:12,13
**485** 5:15
**486** 5:16
**487** 5:17
**488** 5:18
**4th** 1:15 35:22
 52:22 53:20

**5**

**5** 6:12 17:13
 25:16 36:18
 38:3,10,13,21
 39:17 40:4
 41:20 383:2,7
 383:8
**5-milligram**
 333:1
**5:02** 388:10,11
**5:06** 388:12,14
**5:51** 444:2,3
**5:52** 444:4,6
**5:54** 445:18,19
**50** 48:4,7
**500** 1:14
**501** 2:14
**50s** 316:20
**51.5** 310:13
**512** 3:13
**52** 6:13
**55** 321:6
**55-year-old**

318:9
**5th** 12:12

**6**

**6** 6:13 52:21,23
 53:15,20 258:2
 258:4 290:21
**6:16** 445:20,22
**6:36** 461:17,18
**6:44** 461:19,21
**60** 52:4 111:14
 111:18,23
 121:6 124:22
 125:4,6,9,20
 126:2,6,11
 131:7,10 371:8
 371:10
**600** 38:5 358:9
 358:22
**609** 2:20
**60s** 438:8
**61** 321:7,21
 322:24
**619** 2:15
**66** 6:14
**696-3675** 3:22

**7**

**7** 1:9 5:2 6:2,14
 7:2 8:2 66:12
 66:13,19 96:17
 97:5,17 98:6,7
 98:14 274:9
**7:03** 484:5,7
**70s** 378:24 438:9
**71** 216:8
**720-1288** 2:10
**7200** 332:3,4
**767** 3:3
**78701** 3:13
**7th** 9:4

**8**

**8** 6:16 99:14
 100:19,21,22
 102:12 255:15
 260:5 261:13

331:5 371:3
 485:19
**80** 315:17 319:3
 320:21 321:15
 322:8
**816** 3:12
**83** 358:6,22

**9**

**9** 5:4,7 6:17
 112:13 128:15
 128:19 129:5,5
 129:7,10,15
 447:20 448:11
 470:22,24
 471:1,18
**9:08** 1:16 9:5
**90-plus** 411:18
**90s** 16:14 378:24
**91** 374:7
**92101** 2:15
**92660** 2:10
**93** 7:12 454:21
**943** 259:3
**949** 2:10
**950** 3:21
**96** 216:12
**973** 3:18
**975** 4:3
**986-1104** 2:20
**988-2706** 3:9
**99** 259:8

Exhibit 28

# Use of cosmetic talc on contraceptive diaphragms and risk of ovarian cancer: a meta-analysis of nine observational studies

Michael Huncharek[a,b], Joshua Muscat[c], Adedayo Onitilo[b] and Bruce Kupelnick[a]

Prior work suggests an association between perineal use of cosmetic talc and increased ovarian cancer risk. A meta-analysis was performed to examine this hypothesis by evaluating ovarian cancer risk associated with direct exposure of the female genital tract to talc via dusting of contraceptive diaphragms. Data were pooled from epidemiological studies using a general variance-based meta-analytic method that employs confidence intervals. The outcome of interest was a summary relative risk reflecting the risk of ovarian cancer development associated with the use of cosmetic talc on contraceptive diaphragms. Sensitivity analyses were performed to explain any observed statistical heterogeneity and to explore the influence of specific study characteristics on the summary estimate of effect. Initially, combining homogeneous data from nine case–control studies yielded a non-statistically significant summary relative risk of 1.03 (0.80–1.37), suggesting no association between talc-dusted diaphragms and ovarian cancer development. Sensitivity analyses were performed to evaluate the robustness of this finding. All resultant summary relative risks were not statistically significant. The available epidemiological data do not support a causal association between the use of cosmetic talc-dusted diaphragms and ovarian cancer development. European Journal of Cancer Prevention 16:422–429 © 2007 Lippincott Williams & Wilkins.

European Journal of Cancer Prevention 2007, 16:422–429

Keywords: diaphragms, ovarian neoplasms, systematic review, talcum powder

[a]Meta-Analysis Research Group, Stevens Point, [b]Department of Clinical Oncology, Marshfield Clinic, Marshfield, Wisconsin and [c]Department of Health Evaluation Sciences, Pennsylvania State College of Medicine, Hershey, Pennsylvania, USA

Correspondence to Dr Michael Huncharek, MD, MPH, Meta-Analysis Research Group, 2740 Sunset Blvd, Stevens Point, WI 54481, USA
Tel: +1 715 343 3035; fax: +1 715 343 3080;
e-mail: info@metaresearchgroup.org

Received 20 April 2006 Accepted 18 May 2006

## Introduction

Ovarian cancer represents a major cause of cancer-related morbidity and mortality in the United States with an estimated 22 000 new cases diagnosed in 2005 (Boger-Meigiddo and Weiss, 2005). It is the seventh most common cancer in women and ranks fourth as a cause of cancer deaths among female individuals from the United States, with some 16 000 succumbing to the disease this year. The lethality of ovarian tumors is in large part due to the fact that clinical symptoms tend to occur late in the natural history of the disease and the lack of screening tests allowing for early diagnosis. In fact, approximately 60% of patients are diagnosed with late-stage disease (stage III and IV) vastly diminishing the chance of long-term survival (approximately 10% at 5 years from diagnosis) (Richardson et al., 1985).

Primary prevention of ovarian cancer remains elusive as a clear etiology for the vast majority of cases is unknown. Nonetheless, prior epidemiological research suggests a number of risk factors, including age (older versus younger), nulliparity, first pregnancy after the age of 35 years, diet high in saturated fats, positive family history of ovarian/breast cancer and race (white versus African American) (Baker and Piver, 1994; Tortolero-Luna and Mitchell, 1995; Daly and Obrams, 1998). Clear geographic differences in incidence exist. The highest rates are found in industrialized countries versus under-developed nations (Ioka et al., 2003), implicating environmental factors in ovarian cancer etiology. The one exception is highly industrialized Japan (Ioka et al., 2003) with a low annual incidence of approximately 3/100 000. Interestingly, Japanese woman who migrate to the United States experience an increased occurrence of this disease, further suggesting environmental factors in its cause.

In 1982, Cramer et al. (1982) published the first study suggesting a link between use of cosmetic talc and the risk of developing ovarian cancer. Subsequently, a number of additional reports have shown a small but increased risk among women using cosmetic talc products, although this finding is not universal (Chang and Risch, 1997). These statistical associations raise concerns that a cause–effect relationship may exist between talc exposure (particularly perineal use) and ovarian carcinogenesis.

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 329 of 1035
PageID: 241508
Talc and ovarian cancer Huncharek *et al.*    423

Further fueling concerns about this association is the mistaken, but often repeated, assertion that asbestos and talc are biologically similar; that is, they may exhibit similar disease-causing potential (Wong *et al.*, 1999). While talc and asbestos are both silicates, they bear little resemblance structurally or in their biological properties. Asbestos fibers are well recognized human and animal carcinogens with substantial supporting epidemiological and in-vivo evidence available in the published literature (Huncharek, 1986; Mossman and Gee, 1989). Asbestos is known to induce peritoneal (and pleural) mesotheliomas among occupationally and environmentally exposed cohorts and some evidence exists suggesting that asbestos can also cause ovarian neoplasms in humans (Acheson *et al.*, 1982).

Although in the experimental setting translocation of talc particles to the human ovary can occur with deliberate or inadvertent manipulations of patients in the supine position (Wehner, 1998), it is unknown whether cosmetic use of talc in the perineal area can routinely penetrate the female reproductive tract and reach the ovary against physiological forces working in the opposite direction. The existing epidemiological literature focuses primarily on external perineal exposure. It appears, however, that the talc–ovarian cancer hypothesis could be tested with better precision and validity if the exposure to the suspected carcinogen was directly to the reproductive tract. A common route for such an exposure is via talc dusting of contraceptive diaphragms, a well documented practice in the relevant epidemiological literature. Intuitively, the possible association of ovarian cancer with talc-dusted diaphragms appears to provide a more rational test of this cause–effect hypothesis. Therefore, the present report describes the results of a meta-analysis pooling data from nine epidemiological studies examining the risk of ovarian cancer associated with the use of cosmetic talc on diaphragms.

## Methods

The methods employed in the design and execution of this analysis have been previously described (Greenland, 1986; Cooper and Hedges, 1994). A study protocol was prospectively developed outlining the purpose and methods; that is, a meta-analysis examining the risk of developing ovarian cancer associated with use of talc-dusted contraceptive diaphragms. Eligibility criteria for study inclusion were determined prospectively as were the specific data elements to be extracted from each published report. The study protocol included details of the planned statistical analysis.

We used a data extraction form designed for recording relevant information from each selected report. Two researchers performed data extraction with differences in extraction forms resolved by consensus. Other data collected but not included in the eligibility criteria were the number of patients in each study, study odds ratios or relative risks, 95% confidence intervals and type of statistical adjustments made, if any, by individual study authors.

### Literature search

Information retrieval was performed by previously described methods (Cooper and Hedges, 1994). We conducted a MEDLARS search of the literature published between January 1966 and March 2005, as well as a review of Cancer Lit and the CD-ROM version of Current Contents. The search criteria included all languages. The search terms used were talc exposure and ovarian neoplasms. If a series of articles was published, all data were retrieved from the most recent article. The literature search also included hand searches of bibliographies of published reports, review articles and textbooks.

The initial citations (in the form of abstracts) from this literature search were screened by a physician investigator to exclude those that did not meet inclusion criteria. Reasons for rejection included study designs other than case–control, cohort or randomized controlled trials; animal or in-vivo studies; abstracts; review articles and non-peer reviewed articles. Eligibility criteria included, observational studies or clinical trials enrolling patients with histologically proven ovarian tumors of all histologies, studies enrolling only adult patients (i.e. 18 years or older), availability of data documenting type of talc exposure, in this instance, dusting of diaphragms, and availability of odds ratios or relative risks with 95% confidence intervals for each report or availability of raw data to calculate these parameters.

### Statistical analysis

We performed data analysis according to meta-analytic procedures described by Greenland (1986). This method of meta-analysis is a general variance-based method employing confidence intervals. As the variance estimates are based on the adjusted measures of effect, the confidence interval methods do not ignore confounding and are the preferred methodology for pooling observational studies.

For each included study, we derived odds ratios reflecting the risk of developing ovarian cancer associated with the practice of dusting contraceptive diaphragms with cosmetic talc and determined the natural logarithm of the estimated relative risk for each data set followed by calculation of an estimate of the variance. We used the estimate of the 95% confidence interval from each study to calculate the variance of each study's measure of effect.

We calculated a weight for each included analysis as 1/variance followed by a summation of the weights. We then determined the product of the study weight and the natural logarithm of the estimated relative risk and performed a summation of these products. Finally, a summary relative risk and 95% confidence interval were determined.

Before the estimation of a summary relative risk, a statistical test for homogeneity was performed ($Q$). This procedure tests the hypothesis that the effect sizes are equal in all of the included studies (Greenland, 1986). If $Q$ exceeds the upper tail critical value of $\chi^2$ ($P < 0.10$) at $k-1$ d.f. (where $k$ equals the number of studies analyzed or the number of comparisons made), the observed variance in study effect sizes is significantly greater than what would be expected by chance if all studies shared a common population effect size. If the hypothesis that the studies are homogeneous is rejected, the studies do not measure an effect of the same size. In this instance, calculation of a pooled estimate of effect (i.e. relative risks) may be of questionable validity. Possible explanations for the observed heterogeneity must be sought to provide the most rational interpretation of the summary relative risk. Sensitivity analyses and or further stratified analyses are then performed based on the magnitude of $Q$.

## Results

The literature search yielded 17 studies that appeared to meet protocol specifications and full papers were obtained for review (Hartge *et al.*, 1983; Richardson *et al.*, 1985; Whittemore *et al.*, 1988; Booth *et al.*, 1989; Harlow and Weiss, 1989; Chen *et al.*, 1992; Harlow *et al.*, 1992; Rosenblatt *et al.*, 1992; Tzonou *et al.*, 1993; Purdie *et al.*, 1995; Cook *et al.*, 1997; Goddard *et al.*, 1998; Cramer *et al.*, 1999; Gertig *et al.*, 2000; Ness *et al.*, 2000). Upon further review, nine of these met the specified inclusion criteria. Table 1 provides an overview of the nine reports included in the meta-analysis (Hartge *et al.*, 1983; Richardson *et al.*, 1985; Whittemore *et al.*, 1988; Booth *et al.*, 1989; Harlow and Weiss, 1989; Harlow *et al.*, 1992; Rosenblatt *et al.*, 1992; Cook *et al.*, 1997; Ness *et al.*, 2000). A total of 2281 ovarian cancer cases and 3608 controls were enrolled in nine case–control studies. Table 1 also specifies which reports were hospital based versus those that were population based. Only Cook *et al.* (1997) and Harlow and Weiss (1989) used both population-derived cases and controls. All of the other studies listed as 'population based' used hospital-derived cases. The individual study odds ratios listed in Table 1 reflect the odds of exposure in cases versus controls, with an odds ratio greater than one suggesting a positive association, that is, an increased risk of ovarian cancer among women using talc-dusted diaphragms.

Before combining all studies to derive a summary estimate of effect (i.e. a summary relative risk) a statistical test for heterogeneity was performed ($Q$). This gave a value of $Q$ equal to 10.75. With eight degrees of freedom, the $P$ value associated with a $Q$ of this size is 0.22. This indicates that the studies are homogeneous; that is, the studies are measuring an effect of similar

**Table 1  Overview of included studies**

| Study (year) | Number of cases/controls | Percentage eligible cases included | Adjusted OR | 95% CI | Adjustments to OR | Epithelial tumors only | Borderline tumors incl. | Stratification by histology | H/P |
|---|---|---|---|---|---|---|---|---|---|
| Booth *et al.* (1989) | 235/451 | 84 | 0.75 | 0.85–2.02 | Age, SES | Y | Y | N | H |
| Cook *et al.* (1997) | 313/422 | 64 | 0.80 | 0.40–1.40 | Age | Y | N+ | Y | P |
| Cramer *et al.* (1982) | 215/215 | 72 | 1.56 | 0.62–3.88 | Parity, menstrual status | Y | Y | Y | P |
| Harlow *et al.* (1992) | 235/239 | 59 | 1.20 | 0.60–2.40 | Parity, education, marital status, religion, use of sanitary napkins, douching, age, weight | Y | Y | Y | P |
| Harlow and Weiss, 1989 | 116/158 | 68 | 0.50 | 0.20–1.30 | Age, parity, use of oral contraceptives | N/A | All | N/A | P |
| Hartge *et al.* (1983) | 135/171 | 69 | 0.80 | 0.40–1.40 | Age, race, hospital | Y | Unknown | N | H |
| Ness *et al.* (2000) | 767/1367 | 61 | 0.60 | 0.30–1.20 | Age, gravity, race family HX ovarian cancer, oral contraceptive use, tubal ligation, hysterectomy, breast feeding | Y | Y | N | P |
| Rosenblatt *et al.* (1992) | 77/46 | 55 | 3.0 | 0.80–10.8 | Obesity, SES, religion, number of live births, OC use | Y | Unknown | N | H |
| Whittemore *et al.* (1988) | 188/539 | NG | 1.5 | 0.63–3.58 | Parity, use of oral contra-ceptives | Y | Unknown | N | H |

SES, socio-economic status; OR, odds ratio; CI, confidence interval; H/P, hospital based/population based; N+, separate analyses done for borderline versus invasive tumors.

magnitudes. Given the lack of statistical heterogeneity, the data were pooled for calculation of a summary relative risk.

Table 1 shows that adjusted odds ratios ranged from 0.60 (Booth *et al.*, 1989) to 3.0 (Rosenblatt *et al.*, 1992), with adjustment parameters specified along with 95% confidence intervals. Of note, none of the reports showed a statistically significant odds ratio. Initial pooling of data from all nine reports yielded a summary relative risk of 1.03 with a 95% confidence interval of 0.80–1.33, a non-statistically significant result suggesting no association between talc/diaphragm use and ovarian cancer risk (see Fig. 1).

Upon closer scrutiny of the available data, further sensitivity analyses were performed as described below. The data provided by Booth *et al.* (1989) did not explicitly provide data on talc use via contraceptive diaphragms and such use could only be assumed. As the data were questionable in this respect they were dropped from the analysis and a summary relative risk was recalculated. The resultant relative risks was 1.12 with a 95% confidence interval of 0.84–1.48. Therefore, the results remained statistically non-significant despite removal of these data from the summary estimate of effect.

The report by Harlow *et al.* (1992) also represents a potential problem for statistical pooling as the cases in this instance were all patients with 'borderline ovarian tumors'. The exact nature of borderline ovarian tumors in terms of a relationship with their invasive counterparts remains unclear, with some data suggesting differences in epidemiology and etiology (Riman *et al.*, 2001). Whether borderline tumors are precursors of invasive cancers or a separate disease entity is a matter of debate. We therefore recalculated a summary relative risk without inclusion of data from the study by Ness *et al.* (2000). This gave a

relative risk of 1.09 with a 95% confidence interval of (0.84–1.41), a non-statistically significant result.

All studies except that of Hartge *et al.* (1983) are full research reports with the study by Ness *et al.* (2000) published as a 'Letter to the editor'. Publication in this format is potentially problematic owing to issues related to the 'quality' of the presented data. Letters to the editor normally do not undergo the same type of editorial scrutiny as full research papers. In addition, by their nature, letters are brief notes with limited details presented, precluding rigorous evaluation of methods, results and associated conclusions. In order to address these issues, we dropped the study by Hartge *et al.* from the pooled analysis and, again, recalculated a summary relative risk. This gave a relative risk of 1.07 with a 95% confidence interval of 0.82–1.40. Again, this represents a non-significant finding.

In a prior meta-analysis (Huncharek *et al.*, 2003), we demonstrated a possible bias among studies examining the perineal talc use/ovarian cancer association based on the source of cases. That is, our study suggested that population-based studies may spuriously show a causal association secondary to exposure misclassification to a 'treatment effect' among population-derived cases. Some patients with ovarian cancer will undergo treatment with radiation, chemotherapy and/or surgery. Side effects from treatment may prompt talc use among some of these individuals. Patients may not always make the distinction between pre-diagnosis and post-treatment use. Exposure misclassification among 'prevalent' cases may cause a spurious finding of an association when none, in fact, exists. We therefore recalculated the summary relative risk excluding the studies by Cook *et al.* (1997) and Harlow and Weiss (1989) as these were the only two reports that utilized population-derived cases and controls. The resultant relative risk was 1.15 with a non-statistically significant odds ratio of 0.87–1.53.

Furthermore, this suggests no association between talc use and increased ovarian cancer risk. In fact, if data from the studies by Cook *et al.* (1997) and Harlow and Weiss (1989) are statistically pooled, the summary relative risk is 0.67 with a non-significant confidence interval (i.e. 0.34–1.35). The fact that the population-based relative risk is in the opposite direction (i.e. favoring a protective effect for talc) to that shown in the other case–control studies, further supports the existence of bias in these analyses.

Another methodological consideration is the fact that the definitions of the control groups used across all nine studies are not completely comparable. Some reports defined controls as 'never having used talc' (e.g. Ness *et al.*, 2000), while others used controls defined as not

**Fig. 1**



Booth *et al.* (1989)
Cook *et al.* (1997)
Cramer *et al.* (1982)
Harlow *et al.* (1992)
Harlow and Weiss (1989)
Hartge *et al.* (1983)
Ness *et al.* (2000)
Rosenblatt *et al.* (1992)
Whittemore *et al.* (1988)

Combined

0.196 116                                      11.0227
OR

Forest plot of summary relative risk derived by pooling all available studies using adjusted odds ratios (OR).

426   European Journal of Cancer Prevention   2007, Vol 16 No 5

having used talc on diaphragms (e.g. Cook *et al.*, 1997). We therefore calculated crude odds ratios and 95% confidence intervals using data supplied in the available studies and recalculated a summary relative risk to ensure that the analysis using adjusted odds ratio was not spurious (Table 2). The resultant relative risk was 0.86 (0.59–1.40) (see Fig. 2), a non-statistically significant result suggesting no association between talc use on diaphragms and increased ovarian cancer risk (see Fig. 2). Of note, the test for heterogeneity for this latter analysis gave a value for $Q$ of 7.20 with a $P$ value of 0.52.

## Discussion

Talc is an important industrial mineral for a number of reasons including its resistance to heat, electricity and acids and its relatively low price. It is used in many commercial applications because of its lamellar platy nature, softness, whiteness, chemical inertness, high melting point and hydrophobic features, among others. For instance, talc is used in the plastic industry owing to its inertness, superior electrical and thermal resistance and its ability to improve the quality of plastic surfaces. It also finds application in the paint industry to increase the

smoothness of paint products and in paper manufacturing to reduce the usage of expensive whitening agents because of its high brightness.

Mineral talc is a magnesium silicate hydroxide belonging to the mineral class, silicate and subclass phyllosilicate. It belongs to the clay mineral group, an important subgroup within the phyllosilicates that contain large percentages of water trapped between the silicate sheets. Clay minerals are divided into four major groups: the kaolinite group, the montmorillonite/smectite group, the illite group and the chlorite group. Talc is a member of the montmorillon/smectite group along with pyrophyllite, vermiculite, sauconite, saponite and nontronite.

Talc also forms pseudomorphs, that is false shapes, of other minerals, replacing them on an atom by atom basis. For instance, talc forms pseudomorphs of quartz, pyroxene, olivine and amphiboles. In nature, it can also be found in association with a number of other minerals, such as serpentine, quartz, olivine and biotite.

In 1982, Cramer *et al.* (1982) published a case–control study suggesting an association between cosmetic talc use on the perineum and increased ovarian cancer risk. Women dusting the perineum with talc or dusting sanitary napkins showed a near doubling of ovarian cancer risk. Unfortunately, in addition to a number of methodological limitations plaguing this report (e.g. only 45% of eligible controls participating), it is important to point out the flawed premise on which it is based. Cramer *et al.* (1982) cite the 'chemical relationship between talc and asbestos' as a major reason for assuming that talc may also be a human carcinogen and that '…the mineral talc is a specific hydrous magnesium silicate chemically related to several asbestos group minerals and occurring in nature with them'.

The above-cited justification for the Cramer *et al.* (1982) study and subsequent work examining a possible cosmetic talc/ovarian cancer link is misguided for a number of reasons. Despite the fact that talc and various forms of asbestos are silicates, they are structurally distinct and belong to different mineral groups and subgroups. That is, amphibole minerals (e.g. tremolite) are inosilicates while talc is a member of the silicate subclass phyllosilicate and the group, clay or montmorillonite/smectite. While serpentines, including serpentine asbestos, are also phyllosilicates, serpentine minerals belong to the kalolinite–serpentine group. The asbestos varieties of serpentine are structurally different from other members of the serpentines in that their brucite layers and silicate layers bend into tubes that produce fibers. Non-fibrous serpentine does not have carcinogenic properties and it is clear that the physical structure of serpentine asbestos is responsible for its disease-causing

**Table 2   Crude odds ratios and 95% confidence intervals for included studies**

| Study (year) | Crude OR | 95% CI | Variance | Weight |
|---|---|---|---|---|
| Booth *et al.* (1989) | 0.75 | 0.33–2.02 | 0.175 | 5.70 |
| Cook *et al.* (1997) | 0.96 | 0.52–1.76 | 0.097 | 10.2 |
| Cramer *et al.* (1982) | 1.18 | 0.59–2.35 | 0.125 | 7.99 |
| Harlow *et al.* (1992) | 0.97 | 0.49–1.92 | 0.121 | 8.24 |
| Harlow and Weiss, 1989 | 0.51 | 0.22–1.13 | 0.184 | 5.43 |
| Hartge *et al.* (1983) | 0.72 | 0.40–1.30 | 0.090 | 11.1 |
| Ness *et al.* (2000) | 0.53 | 0.25–1.13 | 0.147 | 6.80 |
| Rosenblatt *et al.* (1992) | 1.82 | 0.55–6.34 | 0.373 | 2.68 |
| Whittemore *et al.* (1988) | 1.38 | 0.57–3.28 | 0.204 | 4.91 |

OR, odds ratio; CI, confidence interval.

**Fig. 2**



Forest plot of summary relative risk derived by pooling all available studies using crude odds ratios (OR).

potential, not its atomic constituents. It simply does not follow, therefore, that one should assume that talc is carcinogenic simply because it is a silicate and a member of the phyllosilicate subgroup. Structure dictates toxicity/carcinogenicity, not chemical composition.

It is true that in nature, mineral talc can be found in association with both serpentine and amphibole minerals, including the asbestos varieties. It is crucial to understand that the carcinogenic potential of asbestos is well known and abundantly documented in the medical and epidemiological literature (Huncharek, 1986; Mossman and Gee, 1989). Cramer *et al.*'s argument suggesting that pure talc is carcinogenic is based solely on 'guilt by association' rather than on scientific fact. If one is exposed to a mixture of talc and asbestos, it is reasonable to expect a carcinogenic effect as it contains a known carcinogen. To then suggest that talc is also carcinogenic simply owing to the fact that it is sometimes found in association with various asbestos minerals in nature is not logical. This reasoning ignores a large body of data regarding the mineralogy of silicates and fails to acknowledge the lack of supporting biological or in-vitro data documenting any carcinogenic potential of pure talc (i.e. uncontaminated by asbestos). A commercial product containing asbestos-contaminated talc could certainly pose a health risk and although prior to the mid-1970s some consumer talc products did, in fact, contain such contamination, the carcinogenic entity is asbestos, not talc (Rohl *et al.*, 1976). It is important to note that since that time, talc product manufacturers voluntarily ensured that such products are asbestos free. Despite this fact, even some recent studies looking at the perineal talc dusting/ovarian cancer risk connection show a weak association (e.g. Mills *et al.*, 2004), further suggesting a spurious finding.

Other evidence that indicates that talc and asbestos have dissimilar biological properties is the fact that talc has been used for decades as a sclerosing agent for both benign and malignant pleural effusions (Viskum *et al.*, 1989). Long-term follow-up studies of these patients have not shown even a single case of lung cancer or mesothelioma resulting from introduction of talc to the pleural cavity (Viskum *et al.*, 1989; Shaw and Agarwal, 2004). Epidemiological studies of talc miners and millers also fail to demonstrate an increased cancer risk (Rubino *et al.*, 1976; Gamble, 1993). In-vivo implantation and injection using asbestos of various types, in contrast, unequivocally induce tumors in experimental animals (Huncharek, 1986).

Despite the above-noted problems, the idea that cosmetic talc poses a possible ovarian cancer risk persists. As reviewed in the present paper and elsewhere (Richardson *et al.*, 1985; Tortolero-Luna and Mitchell,

1995) numerous investigators have examined this possible relationship in a variety of case–control studies and at least one cohort study (e.g. Gertig *et al.*, 2000). Most of these categorized talc use as 'ever versus never' used while others further stratified by particular types of use, for example, perineal dusting, sanitary napkin dusting, condoms, etc. Results differ across studies, with some showing no association (Rosenblatt *et al.*, 1992) while others suggests a 'weak effect' (Purdie *et al.*, 1995), that is odds ratios below 1.5.

In addition to the obvious problems with the premise put forth by Cramer *et al.* (1982) and others, validity of the weak effect shown in a number of other epidemiological studies also remains questionable. The major weaknesses of the existing database include (Boger-Meigiddo and Weiss, 2005) the relatively small sample size of most reports, which limits the statistical power to detect an effect (Richardson *et al.*, 1985), the lack of consistent positive association across studies (Baker and Piver, 1994), the absence of a demonstrable dose–response relationship (Daly and Obrams, 1998), the lack of supporting evidence of talc carcinogenicity from animal or in-vitro analyses (Tortolero-Luna and Mitchell, 1995) and the possible presence of uncontrolled confounding producing a spurious positive association. In fact, some of the available observational studies show an inverse dose–response (Ness *et al.*, 2000) that weighs against a causal association. In addition, no plausible biological mechanism capable of explaining how talc could induce ovarian malignancies exists.

In a study, Heller *et al.* (1996) examined talc particle counts in ovarian specimens from 24 women undergoing incidental oophorectomy and compared these counts with reported frequency and duration of talc use. The study sought to examine the hypothesis of a dose-related risk of epithelial ovarian cancer with perineal talc exposure. Women were considered 'exposed' if they reported talc application to undergarments or directly to the perineum. Talc was detected in all ovaries by either polarized light or electron microscopy. No relationship was found between cosmetic talc burden in healthy ovarian tissue and lifelong perineal talc dusting determined by either microscopic methods. This study raises further questions regarding whether reported associations between perineal talc exposure and ovarian tumors in observational studies reflects a carcinogenic action of talc. The validity of these epidemiologic associations has also been questioned because it is unknown whether talc dust in the perineal area can actually penetrate the female reproductive tract and then translocate to the ovaries against physiological forces working in the opposite direction. The work of Heller *et al.* clearly brings this into question.

Although the epidemiological literature focuses primarily on external perineal exposure to talc, a more valid

assessment of the 'talc hypothesis' would appear to be provided by examining the ovarian cancer risk associated with talc dusting of diaphragms. This particular use of talc results in direct female reproductive tract exposure. Although data on the use of talc-dusted diaphragms have been reported in some epidemiological studies, this literature fails to garner the attention devoted to perineal dusting and no systematic evaluation of this particular literature is available. This probably reflects the fact that perineal dusting is a more common practice than dusting contraceptive diaphragms. Nonetheless, exposure via this latter route is, intuitively, a better 'model' for testing whether talc represents a risk factor for ovarian cancer as the exposure is directly to the female genital tract. Consequently, we performed the above-detailed meta-analysis pooling all available published data on this topic.

Using accepted meta-analytic techniques our analysis was unable to demonstrate any increased risk of ovarian cancer associated with use of talc-dusted diaphragms. Despite performing a number of sensitivity analyses to test the robustness of our findings, the pooled data from over 5000 cases and controls failed to show a positive association. In some studies, the odds ratio was calculated based on an inappropriate control group; for example, individuals who reported no exposure to any talc. For these studies, the crude odds ratio was recalculated based on women who never used talc-dusted diaphragms as the reference group. This summary relative risk was also statistically non-significant.

In summary, our present report, along with our prior meta-analysis pooling data from studies examining the possible ovarian cancer risk associated with perineal talc dusting (Huncharek et al., 2003), does not provide evidence of a causal relationship. In the context of 'weak associations', many sources of bias and uncontrolled confounding can contribute to the finding of a spurious association. Recall bias in case–control studies, lack of a demonstrated dose–response in many published analyses, lack of a coherent biological mechanism for possible talc carcinogenicity and lack of supporting animal or in-vitro data demonstrating the carcinogenic potential of talc all argue against a causal relationship. These limitations and inconsistencies have also been discussed in detail elsewhere (Wehner, 1994; Muscat and Barish, 1998). As ovarian cancer remains a major cause of cancer-related morbidity and mortality in the United States, further work is needed to clearly define modifiable risk factors in an attempt to improve disease prevention.

## Acknowledgements

Funding for this work was provided by a grant from Luzenac American Inc., and Johnson and Johnson Consumer and Personal Products Worldwide.

## References

Acheson ED, Gardner MJ, Pippard EC, Grime LP (1982). Mortality of two groups of women who manufactured gas masks from chrysotile and crocidolite asbestos: a 40 year follow-up. Br J Ind Med 39:344–348.
Baker TR, Piver MS (1994). Etiology, biology and epidemiology of ovarian cancer. Semin Surg Oncol 10:242–248.
Boger-Meigiddo I, Weiss NS (2005). Histologic subtypes and laterality of primary epithelial ovarian tumors. Gynecol Oncol 97:80–83.
Booth M, Beral V, Smith P (1989). Risk factors for ovarian cancer: a case–control study. Br J Cancer 60:592–598.
Chang S, Risch HA (1997). Perineal talc exposure and risk of ovarian carcinoma. Cancer 79:2396–2401.
Chen Y, Wu PC, Lang JH, Ge WJ, Hartge P, Brinton LA (1992). Risk factors for epithelial ovarian cancer in Beijing, China. Int J Epidemiol 21:23–29.
Cook LS, Kamb ML, Weiss NS (1997). Perineal powder exposure and the risk of ovarian cancer. Am J Epidemiol 145:459–465.
Cooper H, Hedges LV (1994). The handbook of research synthesis. New York: Russell Sage Foundation. pp. 286–298.
Cramer DW, Welch WR, Scully RE, Wojciechowski CA (1982). Ovarian cancer and talc: a case–control study. Cancer 50:372–376.
Cramer DW, Liberman RF, Titus-Ernstoff L, Welch WR, Greenberg ER, Baron JA, Harlow BL (1999). Genital talc exposure and risk of ovarian cancer. Int J Cancer 81:351–356.
Daly M, Obrams GI (1998). Epidemiology and risk assessment for ovarian cancer. Semin Oncol 25:255–264.
Gamble JF (1993). A nested case–control study of lung cancer among New York talc workers. Int Arch Occup Environ Health 64:449–456.
Gertig DM, Hunter DJ, Cramer DW, Colditz GA, Speizer FE, Willett WC, Hankinson SE (2000). Prospective study of talc use and ovarian cancer. J Natl Cancer Inst 92:249–252.
Goddard B, Foulkes WD, Provencher D, Brunet JS, Tonin PN, Mes-Masson AM, et al. (1998). Risk factors for familial and sporadic ovarian cancer among French Canadians: a case–control study. Am J Obstet Gynecol 179:403–410.
Greenland S (1986). Quantitative methods in the review of epidemiological literature. Epidemiol Rev 9:1–30.
Harlow BL, Weiss NL (1989). A case–control study of borderline ovarian tumors: the influence of perineal exposure to talc. Am J Epid 130:390–394.
Harlow BL, Cramer DW, Bell DA, Welch WR (1992). Perineal exposure to talc and ovarian cancer risk. Obstet Gynecol 80:19–26.
Hartge P, Hoover R, Lesher LP, McGowan L (1983). Talc and ovarian cancer (letter). JAMA 250:1844.
Heller DS, Westhoff C, Gordon RE, Norman K (1996). The relationship between perineal cosmetic talc usage and ovarian talc particle burden. Am J Obstet Gynecol 174:1507–1510.
Huncharek M (1986). The biomedical and epidemiological characteristics of asbestos related diseases: a review. Yale J Biol Med 59:435–451.
Huncharek M, Geschwind JF, Kupelnick B (2003). Perineal application of cosmetic talc and risk of invasive epithelial ovarian cancer: a meta-analysis of 11,933 subjects from sixteen observational studies. Anticancer Res 23:1955–1960.
Ioka A, Tsukuma H, Ajiki W, Oshima A (2003). Ovarian cancer incidence and survival by histologic type in Osaka, Japan. Cancer Sci 94:292–296.
Mills PK, Riordan DG, Cress RD, Young HA (2004). Perineal talc exposure and epithelial ovarian cancer risk in the Central Valley of California. Int J Cancer 112:458–464.
Mossman BT, Gee JBL (1989). Asbestos related diseases. N Engl J Med 320:1721–1730.
Muscat J, Barish M (1998). Epidemiology of talc exposure and ovarian cancer: a critical assessment. Comments Toxicol 6:327–335.
Ness RB, Grisso JA, Cottreau C, Klapper J, Vergona R, Wheeler JE, et al. (2000). Factors related to inflammation of the ovarian epithelium and risk of ovarian cancer. Epidemiology 11:111–117.
Purdie P, Green A, Bain C, Siskind V, Ward B, Hacker N, et al. (1995). Reproductive and other factors and risk of epithelial ovarian cancer: an Australian case–control study. Int J Cancer 62:678–684.
Richardson GS, Scully RE, Nirui N, Nelson JH (1985). Common epithelial cancer of the ovary. N Engl J Med 312:415–424.
Riman T, Dickman PW, Nilsson S, Correia N, Nordlinder H, Magnusson CM, Persson IR (2001). Risk factors for epithelial borderline ovarian tumors: results of a Swedish case–control study. Gynecol Oncol 83:575–585.
Rohl AN, Langer AM, Selikoff IJ (1976). Consumer talcums and powders: mineral and chemical characteristics. J Toxicol Environ Health 2:255–284.
Rosenblatt KA, Szklo M, Rosenshein NB (1992). Mineral fiber exposure and the development of ovarian cancer. Gynecol Oncol 45:20–25.
Rubino GF, Scansetti G, Piolatto G, Romano CA (1976). Mortality study of talc miners and millers. J Occup Med 18:187–193.

Shaw P, Agarwal R (2004). Pleurodesis for malignant pleural effusions. *Cochrane Database Syst Rev* CD002916.

Tortolero-Luna G, Mitchell MF (1995). The epidemiology of ovarian cancer. *J Cell Biochem (Suppl)* **23**:200–207.

Tzonou A, Polychronopoulou A, Hsieh CC, Rebalakos A, Karakatsani A, Trichopoulos D (1993). Hair dyes, analgesics, tranquilizers and perineal talc application as risk factors for ovarian cancer. *Int J Cancer* **55**:408–410.

Viskum K, Lange P, Mortensen J (1989). Long term sequelae after talc pleurodesis for spontaneous pneumothorax. *Pneumologie* **43**:105–106.

Wehner AP (1994). Biological effects of cosmetic talc. *Food Chem Toxicol* **32**:1173–1184.

Wehner A (1998). Is cosmetic talc safe? *Comments Toxicol* **6**:337–366.

Whittemore AS, Wu ML, Paffenbarger RS, Sarles DL, Kampert JB, Grosser S, *et al.* (1988). Personal and environmental characteristics related to epithelial ovarian cancer. II. Exposures to talcum powder, tobacco, alcohol and coffee. *Am J Epidemiol* **128**:1228–1240.

Wong C, Hempling RE, Piver MS, Natarajan N, Mettlin CJ (1999). Perineal talc exposure and subsequent epithelial ovarian cancer: a case–control study. *Obstet Gynecol* **93**:372–376.

Exhibit 29

AMERICAN JOURNAL OF INDUSTRIAL MEDICINE 29:435–439 (1996)

# Asbestos Exposure and Ovarian Fiber Burden

**Debra S. Heller, MD, Ronald E. Gordon, PhD, Carolyn Westhoff, MD, and Susan Gerber, MD**

*Epidemiologic studies suggest increased risk of epithelial ovarian cancer in female asbestos workers and increased risk of malignancy in general in household contacts of asbestos workers. Ovaries were studied from 13 women with household contact with men with documented asbestos exposure and from 17 women undergoing incidental oophorectomy. Ovarian tissue was examined by analytic electron microscopy.*

*Significant asbestos fiber burdens were detected in 9 out of 13 women with household asbestos exposure (69.2%), and in 6 out of 17 women who gave no exposure history (35%). Three exposed women had asbestos counts over 1 million fibers per gram wet weight (23%), but only 1/17 women without an exposure history had a count that high (6%). Although asbestos has been documented as a contaminant of some older cosmetic talc preparations, the chrysotile and crocidolite types of asbestos we detected are more indicative of background and/or occupational exposure.*

*This study demonstrates that asbestos can reach the ovary. Although the number of subjects is small, asbestos appears to be present in ovarian tissue more frequently and in higher amounts in women with a documentable exposure history.*  © 1996 Wiley-Liss, Inc.

**KEY WORDS: asbestos, ovary, talc, environmental exposure**

## INTRODUCTION

Epidemiologic evidence suggests that there is an increased risk of ovarian carcinoma in female asbestos workers [Acheson et al., 1982; Graham and Graham, 1967; Keal, 1960; Newhouse et al., 1972, 1985; Wignall and Fox, 1982], and animal data show changes resembling early ovarian carcinoma after intraperitoneal injection of asbestos [Graham and Graham, 1967]. In addition, household contacts of asbestos workers have been shown to be at increased risk of developing asbestos-related disease [Joubert et al., 1991; Roggli and Longo, 1991], so female household contacts of asbestos workers may also be at risk of ovarian

exposure to asbestos. There is literature that supports that perineal talc exposure increases the risk of ovarian carcinoma. However, some of these data have been clouded by the fact that cosmetic talc was often contaminated with asbestos in the past, particularly before 1976 [Cramer et al., 1982]. Particulate matter can reach the female peritoneal cavity via the transvaginal route [Egli and Newton, 1961; Henderson et al., 1986; Joubert et al., 1991]. A woman exposed to her husband's occupationally contaminated laundry may have asbestos enter the peritoneal cavity by passive transfer, or even by sexual relations. The purpose of this study was to determine whether women exposed to asbestos have a high asbestos fiber burden in their ovaries.

## MATERIALS AND METHODS

Eligible women were contacted by postcard with the assistance of a law firm specializing in asbestos-related claims. Women with household contact to asbestos, as documented by interview, and who had themselves previously undergone ovarian surgery, were invited to participate. No women with direct occupational exposure responded.

College of Physicians and Surgeons, Columbia University, New York, New York (D.S.H., C.W., S.G.).

Mount Sinai School of Medicine, New York, New York (R.E.G.).

Address reprint requests to Debra S. Heller, M.D., Ob/Gyn Pathology-P&S 16-404, College of Physicians & Surgeons, 630 West 168th Street, New York, NY 10032.

Accepted for publication July 5, 1995.

© 1996 Wiley-Liss, Inc.

436　　Heller et al.

**TABLE I.** Demographics and Pathologic Findings Among 8 Patients With Household Contacts Evaluated for Asbestos-Related Disease Oophorectomized Between 1973–1994, and 5 Oophorectomized Patients With a History of Asbestos Exposure From the Columbia Presbyterian Medical Center Benign Neoplasm Study, 1992–1993

| Subject | Reason for surgery | Asbestos-fibers per gram wet weight | Limits of detection | Asbestos exposure |
|---|---|---|---|---|
| 1 | Papillary serous cystadenocarcinoma of ovary | 490,813 chrysotile: crocidolite 1:2 | 40,901 | Husband—pipefitter with asbestos |
| 2 | Mucinous cystadeno-carcinoma of ovary | below detectible limits | 26,267 | Father—died of mesothelioma; husband—asbestosis (both insulators) |
| 3 | Endometrial adenocarcinoma | 1,227,031 chrysotile: crocidolite 1:1 | 15,338 | Husband—asbestosis, carpenter in a factory |
| 4 | Atypical hyperplasia of endometrium | 74,167 chrysotile | 18,542 | Husband—insulator, died of lung cancer |
| 5 | Endometriosis of ovary | 328,913 chrysotile | 41,114 | Father and aunt—worked in asbestos plant; father—died of lung cancer, aunt of asbestosis |
| 6 | Leiomyoma uteri | 3,438,636 chrysotile | 42,983 | Father—asbestosis, asbestos and insulation worker |
| 7 | Serous cystadenoma of ovary, fibroma of ovary | below detectible limits | 42,983 | Husband—insulation worker |
| 8 | Endometrial adenocarcinoma | 1,513,00 chrysotile: tremolite 4:1 | 37,825 | Husband—died of asbestosis;[a] worked as carpenter and with concrete |
| 9[a] | Cystadenofibroma of ovary | 49,081 chrysotile: crocidolite 1:1 | 24,541 | 2 brothers—construction workers |
| 10[a] | Benign epithelial cyst of ovary | below detectible limits | 37,825 | Father—shipyard worker and school engineer |
| 11[a] | Serous cystadenoma of ovary | 298,618 chrysotile | 24,885 | Household member—shipyard worker × 4 years |
| 12[a] | Cystadenofibroma of ovary | 788,020 crocidolite | 157,604 | Father—shipyard worker |
| 13[a] | Cystadenofibroma of ovary | below detectible limits | 42,983 | Household contact —construction/insulation × 3 years |

[a]Subjects from Columbia Presbyterian Medical Center Benign Neoplasm Study.

Women with both benign and malignant disease responded. Women undergoing oophorectomy for benign ovarian neoplasms at Columbia Presbyterian Medical Center who were interviewed in depth for another study were available as controls and were included after ascertaining asbestos exposure history and availability of nonneoplastic ovarian tissue for analysis. These women were chosen for the availability of interviews as well as tissue. Five of these women were found to have sustained asbestos exposure. There were 13 exposed subjects and 17 women who gave no history of exposure. Tissue from two stillborn ovaries was also analyzed. Tissue blocks of benign adjacent or contralateral ovarian tissue as available were obtained, and analytic electron microscopy was performed according to the subsequent protocol. Hematoxylin and eosin stained sections of ana-

lyzed tissue were examined. There was no evidence of response to asbestos such as foreign body giant cell reactions or fibrosis in the tissue. Ovarian tissue does not undergo fibrosis as does lung.

## Analytic Electron Microscopy Protocol

Ovarian tissue in blocks was deparaffinized, rehydrated, blotted dry, and weighed. Digestion with 5% KOH was performed at 70°C for 2–4 hr. After complete digestion, the tissue was centrifuged at 12,000 rpm for 20 min. The KOH was removed, leaving a pellet to which approximately 20 ml of distilled water was added. The pellet was resuspended by using a microultrasonic cell disrupter at 50 watts for 5 sec. Centrifugation, distilled water wash, and

**TABLE II.** Demographics and Pathologic Findings Among 17 Oophorectomized Patients With No History of Asbestos Exposure—Columbia Presbyterian Medical Center Benign Neoplasm Study, 1992–1993

| Control | Reason for surgery | Asbestos fibers per gram wet weight | Limits of detection | Exposure history |
|---|---|---|---|---|
| 11 subjects | 4 serous cystadenomas/simple cyst 3 benign cystic teratoma/struma ovarii 2 endometrioma/endometriosis 1 fibrothecoma 1 mucinous cystadenoma | Below detectable limits | None greater than 27,267 | None |
| 1 | Endometriosis, benign cystic teratoma | 525,871 chrysotile: crocidolite 1:2 | 17,529 | None |
| 2 | Endometrioma of ovary | 109,069 chrysotile: crocidolite 1:1 | 6,817 | None |
| 3 | Benign cystic teratoma of ovary | 33,849 chrysotile | 8,462 | None |
| 4 | Endometrioma of ovary | 147,244 chrysotile: crocidolite 1:2 | 12,270 | None |
| 5 | Serous cystadenoma of ovary | 98,163 crocidolite | 12,270 | None |
| 6 | Benign cystic teratoma of ovary | 2,181,388 chrysotile | 27,267 | None |

microultrasonic cell disrupter were repeated 3 times. The distilled water was removed and the pellet was resuspended in 5–10 ml of distilled water. Ten-μl drops of the final suspension were placed on nickel Formvar and carbon-coated locator grids and air dried. Transmission electron microscopy to identify fibers, and their size was performed. The identity of the fibers was determined by energy-dispersive spectroscopy and confirmed by electron diffraction (SAED). Grids were viewed at both 10,000 and 19,000 diameters. All fibers observed were counted.

Routinely, as they are opened or distilled water at each filtering, all solutions are checked for detectable limits of asbestos fibers. All places where asbestos could have contaminated the specimen, such as paraffin, are also controlled for paraffin blocks from each different source. All solutions are checked by passing the fluids through a 0.1-μm Nucleopore filter to maximize the efficiency of detecting and counting fibers present in these solutions and materials. The solutions that are routinely tested are distilled water, KOH, and xylene. If detectable levels of asbestos fibers exist in the solutions used to initially fix and process the tissue because they came from different hospitals, at which it was not possible to test these solutions directly, they would be detected in the paraffin controls. We have yet to identify detectable levels in any of the solutions or paraffin.

# RESULTS

A summary of the results can be seen in Tables I and II. Nine of the 13 women exposed to asbestos had asbestos in their ovarian tissue (69.23%), with 3 (23%) of them having counts over 1 million fibers per gram of wet weight. Among the controls, 6/17 women had detectable asbestos in their ovaries (35%), with only 1 (6%) patient with a count over 1 million fibers per gram wet weight. In addition, talc was detected in 11/13 exposed women (85%) and in all 17 controls (100%). No asbestos or talc was detected in the stillborn material.

All fibers were counted and analyzed for type and size. The results of that analysis are summarized in Table III. In general, the fibers were relatively small with regard to length and narrow in diameter. However, the great majority of fibers were greater than 3 μm with a minimum aspect ratio of 10. Except for one case, in which tremolite was observed, the fibers were either chrysotile or crocidolite, or both.

# DISCUSSION

Epithelial ovarian carcinoma is a major cause of female mortality [Greene et al., 1984]. Epithelial ovarian cancer

438    Heller et al.

TABLE III. Asbestos Fibers in Ovarian Tissues: Type, Number, and Dimensions

| Subject | No. of fibers | Fiber type | <3 μm long | 3–10 μm long | >10 μm long | <0.1-μm diameter | 0.1–0.2-μm diameter | >0.2-μm diameter |
|---|---|---|---|---|---|---|---|---|
| 1[a] | 4 | Chrysotile | 1 | 2 | 1 | 4 | — | — |
|  | 8 | Crocidolite | 1 | 7 | — | 4 | 4 | — |
| 3[a] | 40 | Chrysotile | 2 | 28 | 10 | 35 | 5 | — |
|  | 40 | Crocidolite | 3 | 31 | 6 | 30 | 10 | — |
| 4[a] | 4 | Chrysotile | — | 3 | 1 | 4 | — | — |
| 5[a] | 8 | Chrysotile | 1 | 6 | 1 | 7 | 1 | — |
| 6[a] | 80 | Chrysotile | 5 | 62 | 13 | 71 | 9 | — |
| 8[a] | 32 | Chrysotile | 2 | 22 | 8 | 22 | 10 | — |
|  | 8 | Tremolite | 1 | 7 | — | — | 6 | 2 |
| 9[a] | 1 | Chrysotile | — | 1 | — | 1 | — | — |
|  | 1 | Crocidolite | — | 1 | — | 1 | — | — |
| 11[a] | 12 | Chrysotile | 1 | 9 | 2 | 8 | 4 | — |
| 12[a] | 20 | Crocidolite | 2 | 14 | 4 | 12 | 8 | — |
| 1[b] | 10 | Chrysotile | 1 | 8 | 1 | 4 | 6 | — |
|  | 20 | Crocidolite | 2 | 18 | — | 17 | 3 | — |
| 2[b] | 8 | Chrysotile | — | 7 | 1 | 5 | 3 | — |
|  | 8 | Crocidolite | 1 | 7 | — | 6 | 2 | — |
| 3[b] | 4 | Chrysotile | — | 4 | — | 3 | 1 | — |
| 4[b] | 4 | Chrysotile | — | 4 | — | 3 | 1 | — |
|  | 8 | Crocidolite | 1 | 7 | — | 7 | 1 | — |
| 5[b] | 8 | Crocidolite | — | 8 | — | 6 | 2 | — |
| 6[b] | 80 | Chrysotile | 7 | 58 | 15 | 68 | 12 | — |

[a]From Table I.
[b]From Table II.

develops from the surface epithelium of the ovary, which is embryologically derived from the same tissue as the mesothelium of the abdominal cavity, the celomic epithelium [Falkson, 1985]. Thus, ovarian carcinoma and malignant mesothelioma of the peritoneal cavity are believed by some to be related neoplasms [Parmely and Woodruff, 1974]. Asbestos causes malignant mesothelioma, and there is evidence to support it as an etiology in ovarian carcinoma as well [Acheson et al., 1982; Falkson, 1985; Graham and Graham, 1967; Keal, 1960; Newhouse, 1979; Newhouse et al., 1972, 1985; Whittemore et al., 1988; Wignall and Fox, 1982].

Intraperitoneal injection of tremolite asbestos into guinea pigs and rabbits was shown to cause epithelial changes in their ovaries similar to those seen in early ovarian cancer [Graham and Graham, 1967]. These investigators also found birefringent crystalline material near these epithelial changes, but no further attempt was made to identify the material. No such material was found in controls. Asbestos fibers have been shown to be cytotoxic to Chinese hamster ovary (CHO) cells, an epithelioid cell culture line [Neugut et al., 1978].

Several investigators have cited an increased mortality from ovarian cancer in female asbestos workers exposed as gas mask assemblers or other factory workers [Acheson et al., 1982; Newhouse, 1979; Newhouse et al., 1972, 1985; Wignall and Fox, 1982]. In addition, it is known that household contacts of asbestos exposed workers are also at increased risk of developing malignant disease in general [Joubert et al., 1991; Roggli and Longo, 1991]. In a study of 52 histologically confirmed malignant mesotheliomas in women, most with no occupational exposure of their own, a significant number were found to have husbands or fathers who worked in an asbestos-related industry [Vianna and Polan, 1978], and the findings suggested indirect exposure to a husband as the most important factor.

The fact that exposure to a husband is more significant than exposure to a father suggests a possible role for sexual contact as a transporting vector for asbestos fibers. Household exposure has been related to the asbestos dust on the workers' clothing, with risk to those who launder the clothing [Joubert et al., 1991]. While this may be the exposure source in wives as well as in daughters, it is possible that sexual contact with a male contaminated with asbestos fibers introduces those fibers into the vagina of his partner, where they can reach the peritoneal cavity. There is evi-

dence of transport of particulate matter into the female peritoneum by the transvaginal route, in both human and animal studies [Egli and Newton, 1961; Henderson et al., 1986; Venter and Iturralde, 1979]. Whittemore et al. [1988] suggested that vaginal exposure to particulate matter such as asbestos and talc was a potential risk factor for intraperitoneal ovarian exposure. Her conclusion was based on finding that in talc-exposed women, a previous history of hysterectomy or tubal ligation, which blocks peritoneal access, was protective against ovarian cancer.

Talc has also been implicated as a possible etiologic agent in ovarian cancer [Harlow et al., 1989, 1992], and this is related to the asbestos problem in several ways. Aside from the chemical similarities between the two, many cosmetic talcs contained significant amounts of asbestos, particularly prior to 1976 [Cramer et al., 1982]. The significance of the detection of talc in the majority of the exposed women and in all women giving no exposure history is unclear, and further studies are under way to further elucidate this association.

## CONCLUSIONS

In our study, the women with a positive exposure history had asbestos detected in their ovaries more frequently, and in higher counts. None of the exposed subjects in this study was directly occupationally exposed, but all were passively exposed to a household contact. It is unclear why so many of the women giving no exposure history did have detectable asbestos in their ovaries, although it is known that there is a background level of asbestos in the lung tissue of nonexposed individuals. All our available control patients were selected from a group of extensively interviewed women with benign ovarian neoplasms. Further studies are aimed at women with no ovarian pathology. The significance of the finding of asbestos in ovaries requires further investigation.

## ACKNOWLEDGMENTS

This work was supported by a grant from the Columbia Presbyterian Cancer Center. The authors wish to thank Norman Katz for technical assistance.

## REFERENCES

Acheson ED, Gardner MJ, Pippard EC, Grime LP (1982): Mortality of two groups of women who manufactured gas masks from chrysotile and crocidolite asbestos: A 40 year follow-up. Br J Ind Med 39:344–348.

Cramer DW, Welch WR, Scully RE, Wojciechowski CA (1982): Ovarian cancer and talc—A case-control study. Cancer 50:372–376.

Egli GE, Newton M (1961): The transport of carbon particles in the human female reproductive tract. Fertil Steril 2:151–155.

Falkson CI (1985): Mesothelioma or ovarian carcinoma: A case report. S Afr Med J 68:676–677.

Graham J, Graham R (1967): Ovarian cancer and asbestos. Environ Res 1:115–128.

Greene MH, Clark JW, Blayney DW (1984): The epidemiology of ovarian cancer. Semin Oncol 11:209–226.

Harlow BL, Cramer DW, Bell DA, Welch WR (1992): Perineal exposure to talc and ovarian cancer risk. Obstet Gynecol 80:19–26.

Harlow BL, Weiss NS (1989): A case-control study of borderline ovarian tumors: The influence of perineal exposure to talc. Am J Epidemiol 130: 390–394.

Henderson WJ, Joslin CA, Turnbull AC, Griffiths K (1971): Talc and carcinoma of the ovary and cervix. J Obstet Gynaecol Br Commonw 78: 266–272.

Henderson WJ, Hamilton TC, Griffiths K (1979): Talc in normal and malignant ovarian tissue. Lancet 5:499.

Henderson WJ, Hamilton TC, Baylis MS, Pierrepoint LG, Griffiths K (1986): The demonstration of the migration of talc from the vagina and posterior uterus to the ovary in the rat. Environ Res 40:247–50.

Joubert L, Seidman H, Selikoff IJ (1991): Mortality experience of family contacts of asbestos factory workers. Ann NY Acad Sci 643:416–418.

Keal EE (1960): Asbestosis and abdominal neoplasms. Lancet 2:1211–1216.

Longo DL, Young RC (1979): Cosmetic talc and ovarian cancer. Lancet 2:349–351.

Neugut AI, Eisenberg D, Silverstein M, Pulkrabek P, Weinstein IB (1978): Effects of asbestos on epithelioid cell lines. Environ Res 17:256–265.

Newhouse M (1979): Cosmetic talc and ovarian cancer. Lancet 6:528.

Newhouse ML, Berry G, Wagner JC, Turok ME (1972): A study of mortality of female asbestos workers. Br J Ind Med 29:134–141.

Newhouse ML, Berry G, Wagner JC (1985): Mortality of factory workers in East London 1933–80. Br J Ind Med 42:4–11.

Parmely TH, Woodruff JD (1974): The ovarian mesothelioma. Am J Obstet Gynecol 120:234–41.

Roggli VL, Longo WE (1991): Mineral fiber content of lung tissue in patients with environmental exposures: Household contacts vs building occupants. Ann NY Acad Sci 643:511–518.

Scully RE (1979): "Atlas of Tumor Pathology." 2nd Series, Fascicle 16: "Tumors of the Ovaries and Maldeveloped Gonads." Washington, DC: Armed Forces Institute of Pathology.

Venter PF, Iturralde M (1979): Migration of a particulate radioactive tracer from the vagina to the peritoneal cavity and ovaries. S Afr Med J 55:917–919.

Vianna NJ, Polan AK (1978): Non-occupational exposure to asbestos and malignant mesothelioma in females. Lancet 1:1061–1063.

Whittemore AS, Wu ML, Paffenbarger RS, Sarles DL, Kampert JB, Grosser S, Jung DL, Ballon S, Hendrickson M (1988): Personal and environmental characteristics related to epithelial ovarian cancer. II. Exposures to talcum powder, tobacco, alcohol, and coffee. Am J Epidemiol 128:1228–1240.

Wignall BK, Fox AJ (1982): Mortality of female gas mask assemblers. Br J Ind Med 39:34–38.

Exhibit 30

Page 1

1                UNITED STATES DISTRICT COURT

2                  DISTRICT OF NEW JERSEY

3

4

5    ------------------------x

                              )

6    IN RE JOHNSON & JOHNSON    )    MDL No. 16-2738

     TALCUM POWDER PRODUCTS     )    (MAS) (RLS)

7    MARKETING, SALES PRACTICES )

     AND PRODUCT LIABILITY      )

8    LITIGATION                 )

                              )

9    ------------------------x

10

11               V O L U M E   I

12

13        DEPOSITION OF CHERYL C. SAENZ, M.D.

14              LA JOLLA, CALIFORNIA

15            WEDNESDAY, JUNE 19, 2024

16                  9:13 A.M.

17

18

19

20

21

22

23    Job No.: 6753335

24    Pages: 1 - 307

25    Reported by: Leslie A. Todd, CSR No. 5129 and RPR

Page 2

1    Deposition of CHERYL C. SAENZ, M.D., held in
2  the conference room at the:
3
4
5        GRANDE COLONIAL HOTEL
6        910 Prospect Street
7        La Jolla, California 92037
8
9
10
11
12    Pursuant to notice, before Leslie Anne Todd,
13  California Certified Shorthand Reporter in and for
14  the State of California, who officiated in
15  administering the oath to the witness.
16
17
18
19
20
21
22
23
24
25

Page 4

1            C O N T E N T S
2  EXAMINATION OF CHERYL C. SAENZ, M.D.      PAGE
3    By Ms. O'Dell              9
4
5
6            E X H I B I T S
7        (Attached to transcript)
8  SAENZ DEPOSITION EXHIBITS            PAGE
9  No. 1    Notice of Oral Deposition of
10        Cheryl Saenz, M.D. and Duces
11        Tecum            9
12  No. 2    Amended Expert Report of Cheryl C.
13        Saenz, M.D., May 21, 2024        19
14  No. 3    Expert Report of Cheryl Christine
15        Saenz, MD, for General Causation
16        Daubert Hearing, February 25, 2019   19
17  No. 4    Saenz CV, June 2024         23
18  No. 5    Invoices sent to Dawn Curry from
19        Cheryl Saenz, March 6, 2019      35
20  No. 6    Cheryl Saenz, MD - Prior
21        Testimony         41
22  No. 7    ACOG Practice Bulletin - Hereditary
23        Breast and Ovarian Cancer Syndrome
24        Number 182, September 2017      49
25

Page 3

1        A P P E A R A N C E S
2  PLAINTIFFS CO-LEAD COUNSEL:
3    P. LEIGH O'DELL, ESQUIRE (via Zoom)
4    MARGARET THOMPSON, ESQUIRE (via Zoom)
5    LEANNA PITTARD, ESQUIRE (via Zoom)
6    BEASLEY, ALLEN, CROW, METHVIN,
7      PORTIS & MILES, P.C.
8    218 Commerce Street
9    Montgomery, Alabama 36104
10    (334) 269-2343
11
12    PAULA R. BROWN, ESQUIRE
13    Blood Hurst & O'Reardon LLP
14    501 West Broadway, Suite 1490
15    San Diego, California 92101
16    (619) 338-1100
17
18  ON BEHALF OF DEFENDANTS:
19    DAWN CURRY, ESQUIRE
20    NUTTER, McCLENNEN & FISH, LLP
21    155 Seaport Boulevard
22    Boston, Massachusetts 02210
23    (617) 439-2000
24  ALSO PRESENT:
25    SUZANNE TURPIN, ESQUIRE (via Zoom)

Page 5

1      E X H I B I T S   C O N T I N U E D
2        (Attached to transcript)
3  SAENZ DEPOSITION EXHIBITS            PAGE
4  No. 8    American Journal of Epidemiology
5        article:  Estimated Number of
6        Lifetime Ovulatory Years and Its
7        Determinants in Relation to
8        Levels of Circulating Inflammatory
9        Biomarkers          69
10  No. 9    Expert Report of Cheryl C. Saenz,
11        M.D. Case-Specific opinions
12        regarding Mr. Hilary Converse,
13        May 28, 2024        80
14  No. 10   ACOG article:  FAQs Ovarian
15        Cancer         98
16  No. 11   Ovarian Cancer Risk Factors      101
17  No. 12   Crawford - multi-panel gene testing
18        for hereditary cancer predisposition
19        Saenz 2017            112
20  No. 13   YNH CEMR, Patient Name: Converse,
21        Hilary          128
22  No. 14   Article in Fertility and Sterility:
23        Effects of risk factors for
24        ovarian cancer in women with and
25        without endometriosis    136

2 (Pages 2 - 5)

Page 6

1        E X H I B I T S   C O N T I N U E D
2           (Attached to transcript)
3  SAENZ DEPOSITION EXHIBITS            PAGE
4  No. 15   CDC article: Ovarian Cancer Risk
5        Factors              160
6  No. 16   HHS Public Access article:
7        Estrogen plus progestin hormone
8        therapy and ovarian cancer: A
9        complicated relationship explored   161
10 No. 17   Obstetrics & Gynecology article:
11       Executive Summary of the Ovarian
12       Cancer Evidence Review Conference
13       July 2023              168
14 No. 18   Appendix 1. Ovarian Cancer Evidence
15       Review Conference Attendees, 2023  168
16 No. 19   National Comprehensive Cancer
17       Network: Ovarian Cancer Including
18       Fallopian tube Cancer and Primary
19       Peritoneal Cancer, May 13, 2024   178
20 No. 20   NCBI Bookshelf article: Epithelial
21       Ovarian Cancer        184
22 No. 21   Oxford University Press article:
23       Analgesic Use and Ovarian Cancer
24       Risk: An Analysis in the Ovarian
25       Cancer Cohort Consortium      192

Page 8

1        E X H I B I T S   C O N T I N U E D
2           (Attached to transcript)
3  SAENZ DEPOSITION EXHIBITS            PAGE
4  No. 27   Article from Epidemiology: Douching
5        and Genital Talc Use: Patterns of
6        Use and Reliability of Self-
7        Reported Exposure         238
8  No. 28   O'Brien (2024) Intimate Care Products
9        and Hormone-Related Cancers (Sisters'
10       Study)              243
11 No. 29   Epigenetics research paper:
12       Transcriptomic and epigenomic
13       effects of insoluble particles
14       on J774 macrophages       273
15 No. 30   Slomovitz article: Asbestos and
16       ovarian cancer: Examining the
17       historical evidence        282
18 No. 31   Environmental International article:
19       Use of personal care product
20       mixtures and incident hormone-
21       sensitive cancers in the Sister
22       Study: A U.S.-wide prospective
23       cohort              288
24 No. 32   Chang (2024)_Supplemental Tables S4  288
25

Page 7

1        E X H I B I T S   C O N T I N U E D
2           (Attached to transcript)
3  SAENZ DEPOSITION EXHIBITS            PAGE
4  No. 22   ASCO article: Modification of the
5        Association Between Frequent
6        Aspirin Use and Ovarian Cancer
7        Risk: A Meta-Analysis Using
8        Individual-Level Data From Two
9        Ovarian Cancer Consortia      195
10 No. 23   Cancer Epidemiology, Biomarkers
11       & Prevention research article:
12       Genital Powder Use and Risk of
13       Epithelial Ovarian Cancer in the
14       Ovarian Cancer in Women of
15       African Ancestry Consortium    202
16 No. 24   JAMA Article: Association of
17       Powder Use in the Genital Area
18       With Risk of Ovarian Cancer     208
19 No.25    JAMA Article: Genital Powder Use
20       and Ovarian Cancer, May 26, 2020   217
21 No. 26   Article: Association Between the
22       Frequent Use of Perineal Talcum
23       Powder Products and Ovarian
24       Cancer: A Systematic Review
25       and Meta-Analysis, February 2, 2022  223

Page 9

1        P R O C E E D I N G S
2        ------------------
3        CHERYL C. SAENZ, M.D.
4        and having been first duly sworn,
5        was examined and testified as follows:
6             EXAMINATION
7  BY MS. O'DELL:
8        Q.   Good morning, Dr. Saenz.
9        A.   Good morning, Leigh.
10       Q.   I am going to endeavor to try to be
11 organized this morning.  We'll see if we're able
12 to achieve that.  But as you know, I talk slow
13 and I fumble around, so if you'll just let me
14 finish my question, that will help, I know,
15 Leslie, and it will be easier on Zoom.  I know
16 that's one of the challenges of Zoom to not talk
17 over each other, so if we can endeavor to do
18 that, that would be great.
19       MS. O'DELL:  As we begin this
20 morning, I want to mark as the first
21 exhibit the notice of deposition as
22 Exhibit No. 1.
23       (Exhibit No. 1 was marked for
24 identification.)

Page 10

1  BY MS. O'DELL:
2      Q.    And when you have that in front of
3  you, Doctor, I want to ask you a few questions
4  about it.
5      A.    Thank you.  I have it.
6      Q.    Oh, thank you.
7            First, have you seen this document
8  before?
9      A.    Yes.
10     Q.    And have you brought with you any
11  materials in response to the document request at
12  the end of the notice?
13           MS. CURRY:  I just want to put
14       on the record that there were objections
15       filed in response to the notice of
16       deposition as well as some documents
17       that have been produced on behalf of
18       Dr. Saenz.
19  BY MS. O'DELL:
20     Q.    Okay.  Are there any additional
21  documents in addition to the ones that were
22  produced to us I think two or three days ago that
23  you brought to the deposition that you've not yet
24  made available to plaintiffs?

Page 11

1      A.    No.  I have copies of my reports,
2  but I do believe that those were all made
3  available to you previously.
4      Q.    Yes, they were.
5            Is there anything else that you
6  have in front of you this morning in paper copy
7  other than your reports?
8      A.    No.
9            MS. CURRY:  And --
10  BY MS. O'DELL:
11     Q.    So no --
12           MS. CURRY:  Oh, I'm so sorry to
13       interrupt you.  I just wanted to make a
14       note.  I noticed this morning that on
15       the materials reviewed and considered
16       list, inadvertently I did not put the
17       newest amended reports of Dr. Daniel
18       Clarke-Pearson and Dr. Wolf that were
19       produced May 28th, 2024.  However,
20       Dr. Saenz has in fact reviewed those, so
21       we can update that and provide it to
22       you, but everything else you should have
23       in your possession.  That was just an
24       inadvertent disclosure on my part, so I

Page 12

1  apologize.
2            MS. O'DELL:  No, no problem.
3  BY MS. O'DELL:
4      Q.    So, Dr. Saenz, in front of you, you
5  have your reports, hard copies of your reports.
6  Do you have any copies of scientific articles or
7  scientific literature?
8      A.    No.
9      Q.    Okay.  I want to just, for
10  efficiency sake, go through the notice and just
11  ask you a few questions, and in particular, if I
12  could ask you to turn to page 8.
13     A.    Okay.
14     Q.    To Request No. 14.
15     A.    Okay.
16     Q.    And we asked you for documents that
17  related to communications with certain
18  organizations, and I want to ask you if you have
19  any documents related to communications you've
20  had with these organizations:  The Food and Drug
21  Administration?
22     A.    No.
23     Q.    Have you had any communications
24  with them where they were documented in an e-mail

Page 13

1  or any other writing?
2      A.    No.
3      Q.    Have you ever had any
4  communications of any type with Health Canada?
5      A.    No.
6      Q.    Have you ever had any
7  communications regarding talc with leadership of
8  the Society of Gynecologic Oncology?
9            MS. CURRY:  Object to the form.
10           THE WITNESS:  No.
11  BY MS. O'DELL:
12     Q.    And I want to try to address the
13  objection.  In regard to the Society of
14  Gynecologic Oncology, have you discussed talc
15  with any officer of the Society of Gynecologic
16  Oncology at any point during the time you've been
17  an expert in this litigation?
18     A.    No.
19     Q.    Have you had any conversations or
20  communications with an officer or employee of the
21  American College of Obstetrics and Gynecology
22  regarding talc and ovarian cancer?
23           MS. CURRY:  Object to the form.
24           THE WITNESS:  No.

4 (Pages 10 - 13)

Page 14

1  BY MS. O'DELL:
2      Q.    Have you had any discussions with
3  an employee or a representative of the American
4  Society of Clinical Oncology about talc and
5  ovarian cancer?
6      A.    No.
7      Q.    Have you had any communications,
8  conversations, oral or in writing, to the
9  International Agency for Research on Cancer
10 regarding talc and ovarian cancer?
11     A.    No.
12     Q.    I have the same question about the
13 American Cancer Society.  Have you had any
14 communications, orally or in writing, with the
15 American Cancer Society or a representative of
16 the American Cancer Society regarding talc and
17 ovarian cancer?
18     A.    No.
19     Q.    Are you involved with the American
20 Cancer Society as a volunteer or in any other
21 capacity?
22     A.    Presently?
23     Q.    Yes.
24     A.    No.

Page 15

1      Q.    Have you been in the past?
2      A.    Yes.
3      Q.    In what capacity?
4      A.    When I was chair of the cancer
5  committee at the Moores UCSD Cancer Center, there
6  was a representative of the local branch of the
7  American Cancer Society that participated in our
8  meetings.  And if there were events sponsored by
9  the American Cancer Society here in San Diego, we
10 would often participate in those events.
11     Q.    During what time period did you
12 have -- engage with local members of the American
13 Cancer Society there in San Diego?
14     A.    I remember I became chair of that
15 committee when I was pregnant with my oldest
16 child, who's now 22, so that would have been
17 starting in 2002.  And I believe I was chair of
18 that committee for 12 or 13 years.  So that would
19 take us up somewhere between 2014 to 2015.
20         My CV, Ms. O'Dell, would have the
21 actual dates that I was chair of that committee.
22 I'm sorry, I'm trying to give you my best
23 recollection, but...
24     Q.    That's -- that's fair, and that's

Page 16

1  what I'm asking for.  Thank you.
2         Have you ever had any discussions
3  with the -- sort of the national office of the
4  American Cancer Society, any of their employees
5  or representatives?
6      A.    No.
7      Q.    Have you ever interacted or
8  communicated, either in writing or orally, with
9  the Centers for Disease Control regarding talc
10 and ovarian cancer?
11     A.    No.
12     Q.    In regard to the National
13 Comprehensive Cancer Network, my first question
14 is, have you ever been a part or affiliated with
15 the National Comprehensive Cancer Network?
16     A.    Not on a committee level that I
17 would be responsible for a publication.  However,
18 certain other people that are attending at the
19 Moores Cancer Center are on those committees, and
20 at various times when there's new guidelines
21 coming out, in particular for endometrial and
22 cervical cancer treatment, and just the breadth
23 and depth of what they publish, I've been asked
24 to review those new changes prior to them being

Page 17

1  made public.
2      Q.    Okay.  Have you ever reviewed any
3  information regarding ovarian cancer for the
4  National Comprehensive Cancer Network?
5      A.    No.
6      Q.    Have you ever had any
7  communication -- and if you don't mind, I'll just
8  abbreviate it because it's a long name -- NCCN,
9  have you had any communications with NCCN
10 regarding ovarian cancer and talcum powder?
11     A.    No.
12     Q.    And lastly, I want to ask you about
13 the Ovarian Cancer Research Alliance, often
14 referred to as OCRA, have you had any involvement
15 with OCRA as a volunteer or a member of a
16 committee?
17     A.    No.
18     Q.    Have you had any communications in
19 writing or orally with either a member or an
20 affiliate of OCRA regarding ovarian cancer and
21 talcum powder?
22     A.    No.
23     Q.    Do you have colleagues there at
24 University of San Diego that are involved in OCRA

5 (Pages 14 - 17)

Page 18

1  and are -- let me just stop there, are involved
2  with OCRA?
3        MS. CURRY:  Object to the form.
4        THE WITNESS:  I don't know.
5  BY MS. O'DELL:
6    Q.    Have you discussed with any of your
7  colleagues ovarian cancer and research related to
8  the work of OCRA?
9        MS. CURRY:  Object to the form.
10       THE WITNESS:  In -- with respect
11    to talc and ovarian cancer or just in
12    general?
13  BY MS. O'DELL:
14    Q.    I will limit it to talc and ovarian
15  cancer.
16    A.    No, I have not had any such
17  conversations.
18    Q.    Okay.  Thank you.
19       Dr. Saenz, you can put that away if
20  you'd like.
21       Next I'd like to mark, and we'll be
22  referring to this throughout the day, as
23  Exhibit 2, and that's your expert report, your
24  general expert report.

Page 19

1        (Exhibit No. 2 was marked for
2        identification.)
3  BY MS. O'DELL:
4    Q.    And so we will get that in front of
5  you.
6        MS. O'DELL:  Thank you, Paula.
7        THE WITNESS:  Thank you.
8  BY MS. O'DELL:
9    Q.    And then also while Paula is giving
10  you the actual report, I'll ask if we can also
11  mark as Exhibit 3 a comparator document.
12        (Exhibit No. 3 was marked for
13        identification.)
14  BY MS. O'DELL:
15    Q.    And let me get that in front of
16  you, and I'll explain to you what it is,
17  Dr. Saenz.  It's the comparison of the report
18  from 2019 to her general report in 2024.
19        MS. O'DELL:  And let's see,
20    Paula, I think it's identified as
21    comparison -- the Saenz expert report
22    comparison.  It should be at the front.
23    It looks very pink if that helps.
24        MS. BROWN:  Yep.

Page 20

1        THE WITNESS:  Oh, it is pink.
2  BY MS. O'DELL:
3    Q.    I wasn't overstating it.  It's very
4  pink.
5    A.    Nope.
6    Q.    So, first, let me step back for a
7  moment.
8        Dr. Saenz --
9        MS. O'DELL:  And thank you,
10    Paula, for that.
11  BY MS. O'DELL:
12    Q.    Dr. Saenz, Exhibit 2, is that an
13  accurate and -- copy of your expert report in the
14  MDL dated May 21st, 2024?
15    A.    I mean, I haven't had a chance to
16  look through it, but the number of pages looks
17  about correct.  So -- I mean, I have no reason to
18  doubt you, but I'm not going to sit here and read
19  it to verify that, but it looks approximately
20  like -- I mean it --
21    Q.    Your answer was better than my
22  question.  I just wanted to get it identified for
23  the record.
24    A.    Yes.

Page 21

1    Q.    And then -- and so we'll be
2  referring to that throughout the day.
3        And then what's been marked as
4  Exhibit 3, I'll represent to you, Dr. Saenz, is
5  an electronic comparison of your report that was
6  disclosed in the MDL in February of 2019 to the
7  general report that you disclosed to the MDL on
8  May 21st, 2024.  And we may have an opportunity
9  to refer to that during the day, but this is
10  just -- will help us know what you disclosed in
11  2019 versus the report that you disclosed in
12  2024.
13        Is that fair?
14    A.    Yes.
15    Q.    Okay.  Going back to your report
16  itself, your current 2024 report that's been
17  marked as Exhibit No. 2, I'd like for you to
18  turn, if you will, please, to Exhibit A, which is
19  on page 60, and it's your curriculum vitae.
20    A.    Okay.
21    Q.    And we've had opportunity to talk
22  before, so I'm not going to ask you a lot of
23  questions about it, but I do want to know, is
24  this an up-to-date curriculum vitae?

6 (Pages 18 - 21)

Page 22

1          MS. CURRY: And just for the
2    record, we did produce in response to
3    the notice of deposition a more updated
4    version of the CV, which should be
5    swapped out with this Exhibit A.
6          MS. O'DELL: Okay. Okay. I
7    will pull that up and we will mark that
8    later in the deposition. But it will
9    take me a minute to pull it up, so I
10   won't -- I'll do that at the break.
11   BY MS. O'DELL:
12        Q.   Dr. Saenz, what are the
13   differences, if you know, between this CV that's
14   dated November 2023 and the updated CV that was
15   produced within the last few days?
16        A.    There are some updated publications
17   I believe I have detailed in there -- and I don't
18   know if it's in this one, but I believe I have
19   detailed in there an administrative position that
20   I now hold at the hospital.
21          I believe that I also have in there
22   a description of an engagement that I have with
23   CMS to be a reviewer of appeals for healthcare,
24   that patients get denied, and then they're

Page 23

1    appealing that denial with their insurer. It's
2    through the State of California.
3          And then I think there's also a
4    detail of part of a research grant that I am on
5    now that has been updated.
6        Q.    So let me just put in the chat
7    quickly because I was able to find it pretty
8    easily. So I have put in the chat, if you need
9    it, a copy of the June 2024 CV that you
10   mentioned. And I'm going to put it on the
11   screen.
12          MS. CURRY: Leigh, I actually
13      have a hard copy. Is there any
14      objection to me providing that to
15      Dr. Saenz just for ease of reference?
16          MS. O'DELL: Not at all.
17          THE WITNESS: Thank you.
18          MS. O'DELL: That's fine.
19      So for the new CV, Leslie, I
20      would like to mark that as -- I believe
21      we're at Exhibit 4.
22          (Exhibit No. 4 was marked for
23          identification.)
24   BY MS. O'DELL:

Page 24

1        Q.    And, Dr. Saenz, this CV is dated
2    June of 2024, correct?
3        A.    That's correct.
4        Q.    Okay. And let me ask you to go
5    back just for a moment. You mentioned that you
6    have a new administrative role there at the
7    University of San Diego. What is that role?
8        A.    So on page 3 under "Administrative
9    Appointments," it lists that I am the medical
10   director of Referral Management.
11        Q.    Okay. Give me just a moment to get
12   there.
13        A.    Of course.
14        Q.    What is Referral Management?
15        A.    One of the initiatives that the
16   medical group has put forth as a primary area of
17   focus is improving patient access to subspecialty
18   care and care at UCSD Medical Group in general.
19          So in particular, my responsibility
20   is to focus on getting new patient referrals in
21   to see the subspecialists in a timely manner with
22   the appropriate prior workup and documents. The
23   initiative is actually called RP2, which stands
24   for right patient, right provider. And I am the

Page 25

1    medical doctor -- medical director for that
2    project, and my team consists of various people
3    from IT, information services, patient advocacy,
4    things such as that.
5        Q.    So what percentage of your
6    professional time does this new position
7    encompass?
8        A.    Ten percent. I'm sorry, 20
9    percent. It's one day a week, theoretically.
10   Eight hours a week, so that's 20 percent. But no
11   doctor works a 40-hour workweek, so...
12        Q.    What percentage of your time
13   currently is devoted -- your professional time is
14   devoted to serving as medical director of the
15   family center for early detection of ovarian
16   cancer?
17        A.    That's actually more of an honorary
18   title than it is actually a time allotment of
19   work that needs to be done.
20        Q.    Okay.
21        A.    I do not receive any compensation
22   for that position.
23        Q.    And what percentage of your time
24   presently is devoted to the clinical care of

7 (Pages 22 - 25)

Page 26

1  patients?
2      A.    I am still clinically active five
3  days a week unless I'm on call, in which case I'm
4  on for seven days in a row.  So I'm in the
5  clinics three days a week, I have OR five days a
6  month, and so I'm still clinically active five
7  days a week.
8          We are actually recruiting for a
9  new partner because we're overly busy and trying
10  to offload some of the clinical work, as some of
11  us take on more administrative positions.
12     Q.    You mentioned that you have some
13  new publications that have been added to your
14  updated CV.  Are any of those publications -- do
15  any of those publications involve ovarian cancer?
16     A.    Yes.
17     Q.    Okay.  Would you tell me what page?
18     A.    Page 12, which is the page with
19  abstracts.  And the abstracts are listed with the
20  most recent first.
21         So the second abstract involves all
22  gynecologic cancers.  The third abstract and the
23  fourth abstract are bench work abstracts
24  involving ovarian cancer.  And the -- I think

Page 27

1  that's it for the abstracts that aren't new and
2  involve ovarian cancer.  And --
3      Q.    Before you turn --
4      A.    Yes.
5      Q.    -- let me just ask a question about
6  this bench work.  Were you actively involved in
7  the bench work that's reported in these
8  abstracts?
9      A.    I was --
10         MS. CURRY:  Object to the form.
11         THE WITNESS:  I was more of a
12      content reviewer, an advisor for the
13      writing up of the publication.  I did
14      not actually stand at the benchtop
15      myself and conduct the science.
16  BY MS. O'DELL:
17     Q.    Okay.  Thank you.
18     A.    Of course.
19         May I turn now?
20     Q.    Yes, please.
21     A.    On page 17, the first paper is a
22  publication that involved patients that had
23  concurrent endometrial and ovarian cancers, and I
24  was a content contributor to that publication.

Page 28

1  So I was responsible for the write-up of that
2  paper -- part of the write-up of that paper.
3          And then --
4      Q.    Are you talking about, Dr. Saenz,
5  the -- the May 2024 publication at the bottom of
6  page 17?
7      A.    Yes.  Yes.
8      Q.    Okay.
9      A.    And I think that's all that's new
10  for publications.
11     Q.    Okay.  Since 2019, have you written
12  any scientific publications, be they full
13  manuscripts, abstracts, posters, that involve
14  talc and ovarian cancer?
15     A.    No.
16     Q.    Are you currently working on any
17  research regarding talc and ovarian cancer?
18     A.    Can you better define "research"
19  for me?
20     Q.    Yes.  Any -- any activities that
21  evaluate the scientific data relating to the
22  genital use of talc and ovarian cancer that you
23  plan to publish in the literature.
24     A.    No.

Page 29

1      Q.    Any -- same question really, but in
2  regard to abstracts or a poster that would be
3  presented at a professional meeting.
4      A.    No.
5      Q.    And we may have touched on this,
6  Dr. Saenz, so if we did, I apologize, but I just
7  want to make sure I'm not missing something.
8          Since 2019 have you served as a
9  primary investigator on any research or studies
10  that relate to ovarian cancer?
11     A.    As a PI specifically, no.
12     Q.    Since 2019 have you published any
13  research regarding the -- let me just expand
14  that -- any research, whether you're an author on
15  the abstract or publication, have you published
16  any research regarding modifiable risk factors
17  for ovarian cancer?
18     A.    No.
19     Q.    Same question but for risk factors
20  in general, not just limited to modifiable risk
21  factors.
22     A.    No.
23     Q.    You also mentioned in regard to
24  your CV that there was a new grant that you

8 (Pages 26 - 29)

Page 30

1  recently received, and that was one of the
2  updates.  Would you please direct me to the grant
3  you're referring to.
4      A.    Yes.  On page 9, at the bottom
5  under Research Support is Current Research
6  Support, and the PI on that grant is Rebecca
7  Rakow-Penner.
8      Q.    And what's the purpose or the
9  objective of the study?
10     A.    The objective of the study is to
11 utilize MRIs to evaluate patients with cervical
12 cancer that are being treated appeals with radiation to
13 try and determine if they're responding
14 appropriately or not with the MRI.
15     Q.    All right.  Thank you.
16         Dr. Saenz, any other changes or
17 updates in your curriculum vitae that we haven't
18 touched on?
19     A.    I think I mentioned that I'm
20 involved with reviewing appeals of patients when
21 their healthcare has denied coverage for certain
22 interventions or certain medical care.  I don't
23 honestly know where that is.  I'm not seeing it
24 in here.  I thought it was in here.

Page 31

1      Q.    And who employs you to do that
2  work?
3      A.    It's contracted by CMS through an
4  independent organization called Maximus, which is
5  the group that CMS contracts to objectively
6  review those appeals.
7          Ah, I'm sorry, it's on page 6,
8  Leigh.
9      Q.    All right.  Thank you.
10     A.    Under Honors and Activities.  And
11 it's the first one.
12     Q.    I see that.  Okay.  Thank you.
13         And how much -- I see you started
14 that position in April of 2022.
15     A.    I did the training in April of
16 2022, but I did not actually review a case until,
17 I believe, late 2023.
18     Q.    Okay.  And how often are you
19 involved in that work?
20     A.    Maybe three times a year.
21     Q.    Okay.  Thank you.
22         Dr. Saenz, I want to talk with you
23 about your revised and amended report that we've
24 marked as Exhibit 2.

Page 32

1          What methodology did you use to
2  update your expert report?
3      A.    So from the 2019 report, which I
4  had, I went ahead and searched the literature for
5  any new publications on the topic of -- on the
6  topics of talc and ovarian cancer development,
7  risk factors for ovarian cancer.  I searched for
8  original publications.  I searched for society
9  statements.  I did pretty broad web searches for
10 keywords such as ovarian cancer, inflammation,
11 talc, risk factors, and then read the documents
12 that I found, incorporated them into my report.
13         I read through the updated reports
14 of Dr. Clarke-Pearson and Dr. Judith Wolf, and
15 also read their depositions.  Yeah, I think that
16 was the methodology that I used.
17     Q.    Did you typically use the same
18 methodology for your 2024 report that you used
19 for your 2019 report?
20     A.    Essentially.
21     Q.    And if I recall, in your 2019
22 report you did not include a Bradford Hill
23 analysis, and that's true also of your 2024
24 report, correct?

Page 33

1          MS. CURRY:  Object to the form,
2     misstates the facts.
3          THE WITNESS:  I -- I don't think
4     that's accurate.  I do believe that the
5     analysis that I did back in 2019 as well
6     as in 2024 follows the same conceptual
7     formatting of a Bradford Hill analysis,
8     looking at the literature and the data
9     that's available, and evaluating those
10    things by certain criteria, such as
11    strength of association, biologic
12    gradients, such as consistency in the
13    literature, such as biologic
14    plausibility.  And I did actually put
15    all of that forth in the 2019 report and
16    again in the 2024 report.
17 BY MS. O'DELL:
18     Q.    Okay.  Is there -- can you turn me
19 to in your report where you have a Bradford Hill
20 analysis?
21     A.    So I do actually talk about the
22 elements of a Bradford Hill analysis in my report
23 and talk about how I examined the literature
24 using those criteria that we just covered.  I

9 (Pages 30 - 33)

Page 34

1  don't have a word search function here, but I
2  also do specifically mention Bradford Hill in the
3  2024 report.
4      Q.    Can you point me to --
5      A.    On page 18 -- I'm sorry, page 18.
6      Q.    Okay.  All right.
7      A.    The second paragraph.  The second
8  sentence.
9          Would you like me to read it or are
10 you reading it?
11     Q.    I'm reading it here.  Are you
12 talking about the sentence that begins that
13 "Based upon my expertise"?
14     A.    Yes.
15     Q.    And that paragraph, is that your
16 discussion of Bradford Hill's tenets?
17         MS. CURRY:  Object to the form.
18         THE WITNESS:  No, that's my
19     discussion of the methodology that I
20     used to evaluate the literature, and
21     that I actually followed the criteria of
22     Bradford Hill.
23 BY MS. O'DELL:
24     Q.    Well, I -- okay.  So I don't forget

Page 35

1  it, Dr. Saenz, we had -- I'm going to come back
2  to Bradford Hill later, but -- that will be a
3  longer discussion.
4          So I don't forget this part, let
5      me ask Paula, if she will, to hand you a
6      group of exhibits -- excuse me, invoices
7      that we're going to mark as Exhibit 5.
8          (Exhibit No. 5 was marked for
9          identification.)
10 BY MS. O'DELL:
11     Q.    And it's all the invoices that
12 we've been provided to date for your work in the
13 MDL.
14         MS. CURRY:  Leigh, is it just
15     for the -- does it also include the
16     individual invoices for the
17     case-specific work on the four cases
18     that she's here about today?
19     MS. O'DELL:  Yes.
20     MS. CURRY:  Okay.
21     MS. O'DELL:  Yes, it does.
22 BY MS. O'DELL:
23     Q.    It includes -- and I'll ask you,
24 Dr. Saenz, but it appears to include what would

Page 36

1  be your work from 2019 and work that you've done
2  since 2019 on either the MDL generally or the
3  four other cases that you provided an opinion.
4          MS. CURRY:  And, Leigh, just so
5      the record is clear, we actually wound
6      up producing all of the invoices that
7      relate to the MDL, and including work
8      that was performed prior to 2019, just
9      so that you had them all in one subset.
10         MS. O'DELL:  Okay.  Thank you
11     for that.
12 BY MS. O'DELL:
13     Q.    So we've marked these as Exhibit
14 No. 5.  It's just a composite exhibit, Dr. Saenz.
15 Do you recognize these documents?
16     A.    Yes.
17     Q.    And I want to try to go through and
18 essentially understand the work that you were
19 doing and also get a sense of what work you've
20 done that you've not yet invoiced for.
21         So, first, you should have at
22 the -- on the top an invoice from March 6, 2019.
23 Is that how you have them there?
24     A.    Yes.

Page 37

1      Q.    And an invoice that totals
2  $100,500?
3      A.    Correct.
4      Q.    And this was for work in the MDL
5  prior to the Dalbert hearing in 2019, correct?
6      A.    Correct.
7      Q.    And then there is a April 16th,
8  2019 invoice totaling 43,215; is that correct?
9      A.    No, it's actually April 6th.
10     Q.    What did I say?
11     A.    April 16.
12     Q.    Oh, sorry.  I apologize.  April 6,
13 2019.
14     A.    Correct.
15     Q.    And it's for $43,215; is that
16 correct?
17     A.    Correct.
18     Q.    And then there's a September 30th,
19 2019 invoice totaling $78,502.60?
20     A.    Correct.
21     Q.    And then there are a series of four
22 invoices, all dated on April 25th, 2022, and they
23 are first for the Converse case in the amount of
24 $36,187.50; is that correct?

Page 38

1    A.    No, you said April 25th, and it's
2 actually February 25th.
3    Q.    Well, that's a problem.  In my
4 mind, I thought February and out of my mouth came
5 April.  So I don't know if you ever had that
6 experience before, but I did actually believe I
7 was saying February.
8         So February 25th, 2022.  Do I have
9 that correct?
10    A.    Yes, ma'am.
11    Q.    Okay.  And so -- and that amount
12 was for 36,000 -- excuse me, $36,187.50, and that
13 was for the Converse case.
14    A.    Yes, ma'am.
15    Q.    Correct?
16    A.    Correct.
17    Q.    Is that year on the invoice
18 correct?
19    A.    Is that what?
20    Q.    Is the year correct, 2022?
21    A.    Yes.
22    Q.    And so you did this work during the
23 pendency of the LTL bankruptcy, correct?
24         MS. CURRY:  Object to the form.

Page 39

1         THE WITNESS:  I did this work at
2    the end of 2021 and completed it by
3    February 25th, 2022.  I don't know
4    exactly how that correlates to what
5    you're referencing, but that is the time
6    frame that I did that work.
7 BY MS. O'DELL:
8    Q.    Okay.  And there's an invoice for
9 the Rausa case, same date, for $22,800, correct?
10    A.    Correct.
11    Q.    And another invoice, a third
12 invoice dated February 25th, 2022, for $35,812.50
13 for the Judkins case, correct?
14    A.    Correct.
15    Q.    And a fourth invoice for the
16 Newsome case, same date, $26,812.50.  Is that
17 correct?
18    A.    Correct.
19    Q.    And, Dr. Saenz, have you issued any
20 invoices since February of 2022?
21    A.    In this matter?
22    Q.    Correct, or any of the underlying
23 bellwether cases.
24    A.    No, I have not.

Page 40

1    Q.    Approximately how many hours have
2 you devoted to work for the MDL or for an MDL
3 individual bellwether case since February of
4 2022?
5         MS. CURRY:  Object to the form.
6         THE WITNESS:  It's a pure
7    estimate.  I have not produced any
8    invoices or tallied any hours.  I think
9    I probably spent somewhere between 60 to
10    70 hours in total.
11 BY MS. O'DELL:
12    Q.    And that 60 to 70 hours would be
13 for purposes of updating your general expert
14 report and the work you described previously.
15 True?
16    A.    Yes.
17    Q.    Reviewing medical records or other
18 materials for the individual plaintiffs and
19 writing your expert reports in those individual
20 cases, correct?
21    A.    Well, there were -- I had reports
22 written when I invoiced back in 2022 for each of
23 these cases.  So the reports were updated by me
24 recently, not written de novo.

Page 41

1    Q.    And was your rate for the work
2 you've done since 2022, the 60 to 70 hours, is at
3 a rate of $750 an hour?
4    A.    Yes.
5    Q.    And does that 60 to 70 hours
6 include preparation for your deposition today?
7    A.    Yes.
8    Q.    How many hours approximately did
9 you spend either on your own preparing or with
10 counsel to prepare for today's deposition?
11    A.    For today specifically?
12    Q.    Yes.
13    A.    Maybe five or six total.
14    Q.    Dr. Saenz, I want to ask you to set
15 that aside for a moment.
16         I want to mark one more exhibit
17 along these lines, and that is exhibit -- it's
18 going to be Exhibit 6, and it's your testimony
19 list that you provided -- or your counsel
20 provided in conjunction with your expert report
21 that was provided to us in May of 2024.
22         (Exhibit No. 6 was marked for
23         identification.)
24 BY MS. O'DELL:

11 (Pages 38 - 41)

Page 42

1      Q.      And is this an accurate listing of
2  your prior testimony in the talc litigation?
3            MS. CURRY:  Object to the form.
4            THE WITNESS:  Well, since 2021,
5      yes.
6  BY MS. O'DELL:
7      Q.      And let me ask you, and maybe I'm
8  mistaken, I was under the impression you
9  testified in the Giese case in St. Louis in 2021.
10     A.      Was that the year it was?  I'm
11 sorry, I guess -- is that not the same as the
12 Forrest, et al.?  Oh, those -- I apologize, I do
13 this every time you question me, Leigh.  I get
14 mixed up, because Forrest was initially a large
15 conglomerate of cases and then they get pulled
16 out.
17            And so you are correct, Giese, I
18 testified in, and that ended up being separate
19 from the individual Forrest case, you are
20 correct.  I do that every time.  I'm sorry.
21     Q.      And you also testified -- I
22 apologize, I didn't mean to talk over you.
23            So in addition to these cases -- I
24 just want to make sure that I have a good

Page 43

1  listing.  In addition to what you've listed
2  here -- let me strike that and start again.
3            On the current exhibit, would it be
4  fair to strike out Forrest and put in Giese,
5  et al., underneath that 2021 reference?
6      A.      Giese, et al., yes.
7            But then there was also a case
8  of -- I believe her first name was Vicki, I
9  think.  It was Vicki Forrest, and that was an
10 individual plaintiff.  And I think --
11     Q.      Correct.
12     A.      -- that was also venued in St.
13 Louis, if I'm not mistaken.
14     Q.      You are correct, and that case was
15 in, you know, 2019.
16     A.      Oh, okay.  Sorry.  Okay.
17     Q.      And you also -- I was going to ask
18 you about that.  You also testified in the Brower
19 case in 2019, correct, in Atlanta?
20     A.      Yes.
21     Q.      And you testified -- I think those
22 are the -- let me ask, are there any other talc
23 cases in addition to the ones you've listed here
24 on Exhibit 6 plus Brower, plus Forrest, that

Page 44

1  you've testified in?
2      A.      Regardless of the time --
3  regardless of the date, I should say?
4      Q.      Yes.  Yes.
5      A.      So I testified in the Echeverria
6  case.  And I testified in the Ingham case.  And
7  Forrest, I get confused because it was -- I think
8  it was originally like a 12 plaintiff case and
9  then certain things got pulled out.  So I think
10 that's it, though.
11     Q.      Okay.  You list here for 2024 a
12 deposition you gave in the Archer case in the
13 state court of Clayton County, Georgia.  When did
14 you give that deposition?
15     A.      Earlier this year, I believe.  It
16 was -- yeah, earlier this year.  I don't recall
17 the month.
18     Q.      Are you -- have you been asked to
19 testify at trial?
20     A.      Yes.
21     Q.      And when is that trial?
22     A.      I believe trial starts at the -- in
23 August.
24     Q.      Okay.  Are there any other cases

Page 45

1  that you've been disclosed as an expert but you
2  have not yet provided either deposition testimony
3  or trial testimony?
4            MS. CURRY:  Object to the form.
5            Only disclose cases in which
6      you've actually been disclosed to the
7      other side already as an expert witness.
8            MS. O'DELL:  And, Dawn, that was
9      my question, just to be -- I want to
10     make sure my question was clear.
11 BY MS. O'DELL:
12     Q.      I just -- I'm not asking for
13 anything other than cases where you've been
14 disclosed.
15     A.      On behalf of Johnson & Johnson?
16     Q.      Correct.
17     A.      I've been disclosed in a case, I
18 believe the plaintiff's name is Baker.
19     Q.      And where is that case pending?
20     A.      In Canada.  And Archer we already
21 covered, so...
22     Q.      Thank you, Dr. Saenz.  You can put
23 that aside.
24            All right.  Let's turn again to

12 (Pages 42 - 45)

Page 46

1  Exhibit 2, your expert report.
2        And if you'll forgive me just a
3  moment while I shuffle some things around.
4        So I'd like for you to turn,
5  please, Dr. Saenz, to the portion of your report
6  reviewing risk factors, really starting at
7  page 5. And I will ask you some questions,
8  general questions, and then I'm going to ask you
9  some questions also about the Converse case, and
10 so they will be hopefully clear but somewhat
11 intermingled in order to have some efficiency.
12       And specifically, I want to start
13 with genetics and your opinions starting on
14 page 5 regarding genetics. Is it your view,
15 Dr. Saenz, that all ovarian cancer cases are
16 caused by genetic mutations?
17       MS. CURRY: Object to the form.
18       THE WITNESS: Germline or
19 somatic?
20 BY MS. O'DELL:
21    Q.    I'll start with germline.
22    A.    No.
23    Q.    And so you agree that some ovarian
24 cancers are a result of somatic or acquired

Page 47

1  mutations?
2     A.    I think that the majority of
3  ovarian cancers are -- have somatic or acquired
4  mutations. Even ovarian cancers that have germline
5  mutations with them can have additional acquired
6  or somatic mutations.
7     Q.    In other words, a patient, to use
8  language that you have used, a patient could have
9  an acquired -- excuse me, a germline mutation,
10 like a BRCA mutation, for example, and not
11 develop ovarian cancer. True?
12    A.    True.
13    Q.    And that individual having a
14 germline mutation such as BRCA could have
15 acquired mutations, multiple acquired mutations
16 over the course of their life that result in
17 ovarian cancer. True?
18       MS. CURRY: Object to the form.
19       THE WITNESS: I -- I don't know
20 that it -- "results" is a word that you
21 said. I mean, I do know that when we do
22 molecular profiling of ovarian cancers
23 on patients, it's not uncommon to find
24 somatic mutations within those tumors,

Page 48

1  and those somatic mutations are not in
2  every cell in her body. They're just in
3  the tumors.
4  BY MS. O'DELL:
5     Q.    Yes, and this is sometimes referred
6  to as the -- the two hit or multiple hit process
7  that have a germline mutation that's in every
8  cell of the patient that have acquired mutations,
9  and they result in -- or let me change that since
10 that's -- you didn't like that language.
11       But it culminates -- that
12 accumulation of mutations mutations culminates in ovarian
13 cancer. That would be sort of an accurate
14 description of what occurs, correct?
15       MS. CURRY: Object to the form.
16       THE WITNESS: I don't agree with
17 that. Knudson's two-hit hypothesis
18 really didn't pertain to having a
19 germline mutation and then accumulating
20 additional somatic mutations. Knudson's
21 two-hit hypothesis came out of the fact
22 that we have two alleles for every gene
23 in our body.
24       And so knocking out just one of

Page 49

1  the alleles with a mutation isn't enough
2  for that mutation to effectually allow a
3  cancer to develop. Both alleles need to
4  either be mutated and defective or
5  functionally defective for that allele
6  to become nonfunctional. I mean, we
7  know that it doesn't take just two
8  mutations to develop a cancer, but
9  that's where that hypothesis came from.
10 BY MS. O'DELL:
11    Q.    It could take multiple mutations to
12 develop a cancer.
13    A.    For a cancer to develop?
14    Q.    True?
15    A.    Yes, I agree with that.
16       MS. O'DELL: And I want to mark
17 now what I believe is Exhibit 7.
18       And if, Paula, you would help me
19 make sure I number correctly, that would
20 be great. But it's -- it's an ACOG
21 document entitled "Hereditary Breast and
22 Ovarian Cancer Syndrome."
23       (Exhibit No. 7 was marked for
24       identification.)

13 (Pages 46 - 49)

Page 50

1  BY MS. O'DELL:
2      Q.    Dr. Saenz, do you have that in
3  front of you now?
4      A.    I do.
5      Q.    Okay.  And we've marked it as
6  Exhibit 7.  Are you familiar with this document?
7      A.    I'm sure I've seen it before or a
8  version of it, but I haven't reviewed it
9  recently.
10     Q.    Okay.  And this is a document
11 published by -- jointly by the American College
12 of Obstetricians and Gynecologists and the
13 Society of Gynecologic Oncology.  True?
14     A.    Yes, that's what it says at the
15 top.
16     Q.    And it is an ACOG Practice
17 Bulletin, and it's dated in this copy September
18 of 2017.  Do you see that?
19     A.    Yes.
20     Q.    And let me ask you just from your
21 perspective, Dr. Saenz, how do you define
22 "hereditary breast and ovarian cancer syndrome"?
23     A.    So hereditary breast and ovarian
24 cancer syndrome is a designation of patients

Page 51

1  being at risk for the development of breast and
2  ovarian cancer, which includes fallopian tube,
3  primary peritoneal, and often other malignancies
4  as well, such as melanoma or pancreatic cancer,
5  because they have been identified as carrying a
6  certain genetic mutation which predisposes them
7  to those malignancies and places them at an
8  increased risk of developing those malignancies
9  over the course of their lifetime.  It's not
10 actually just limited to women.  Men can also be
11 affected by these syndromes.
12     Q.    But are men affected by hereditary
13 breast and ovarian cancer syndrome?
14     A.    Yes.
15     Q.    And -- and -- well, I'm curious to
16 ask you the question, but I'm not going to do it
17 because it's not necessarily pertinent for today,
18 so maybe another time.
19        Let me direct you to the left-hand
20 column on page 1, and under Background, BRCA1
21 and 2.  Do you see that?
22     A.    Yes.
23     Q.    And at about the lower half of that
24 paragraph, it says:  "Both BRCA genes are tumor

Page 52

1  suppresser genes that encode proteins that
2  function in the DNA repair process.  Individuals
3  with hereditary breast and ovarian cancer
4  syndrome inherit one defective allele in BRCA1 or
5  BRCA2 from their father or mother, but they have
6  a second functional allele.  If the second allele
7  becomes nonfunctional as a result of a somatic
8  mutation, cancer can develop.  This is called the
9  two-hit hypothesis."
10        Do you agree with those statements,
11 Dr. Saenz?
12     A.    I mean, I think as a summary and
13 what they're referring to is what I quoted
14 before, which was Knudson's original two-hit
15 hypothesis, which dates back to 1971.  But what
16 we know --
17     Q.    Right.
18     A.    -- about cancer biology now is a
19 lot more than what Knudson proposed in 1971
20 because BRCA1 and 2 weren't even characterized in
21 1971.
22     Q.    But you agree with the concept that
23 it takes -- it's a combination often between an
24 inherited mutation and a series of acquired

Page 53

1  mutations that lead to the development of ovarian
2  cancer?
3        MS. CURRY:  Object to the form.
4  BY MS. O'DELL:
5      Q.    We agree with that -- I think
6  that's what you said before, and I'm just trying
7  to repeat it.
8      A.    I said not in the majority of
9  ovarian cancers, because even here they say -- or
10 they're saying that 9 to 24 percent of ovarian
11 cancers have a germline mutation within them.  So
12 that would mean that 76 percent of the ovarian
13 cancers that develop, there's no identified
14 germline mutation.
15     Q.    And then in those patients that
16 don't have an identified germline mutation, then
17 there are somatic mutations that accumulate --
18 that result in the development of ovarian cancer.
19 Would you agree with that?
20        MS. CURRY:  Object to the form.
21        THE WITNESS:  I believe that it
22 is -- yes, it is an accumulation of
23 somatic mutations that we find in
24 ovarian cancers.

14 (Pages 50 - 53)

Page 54

1  BY MS. O'DELL:
2      Q.    And if you'll turn to page 2,
3  please.  And I want to direct you, please, to
4  Table 1.
5      A.    Yes.
6      Q.    And it has a listing of genetic
7  mutations associated with hereditary breast and
8  ovarian cancer syndrome.  Correct?
9      A.    Yes.
10     Q.    And if you'll look, it lists the
11 gene on the leftmost column, and then it has a
12 column toward the right that describes the
13 ovarian cancer risk associated with that gene.
14         Do you see that?
15     A.    Yes.
16     Q.    And in the case of the ATM gene,
17 there's no increased risk of ovarian cancer if an
18 individual has that inherited mutation, correct?
19         MS. CURRY:  Object to the form.
20         THE WITNESS:  That's what this
21     table lists, but this table is actually
22     out of date.
23 BY MS. O'DELL:
24     Q.    Okay.  And what's your basis for

Page 55

1  saying the table is out of date, Dr. Saenz?
2      A.    The most current NCCN guidelines
3  actually now classify PALB2 as carrying an
4  increased ovarian cancer risk.  In here it says
5  no increased risk.
6          And the most recent NCCN guidelines
7  also say that women with PALB2 mutations should
8  now be offered risk reducing surgery.
9          Also, CHEK2 has been associated
10 with a risk of developing granulosis cell tumors,
11 not epithelial tumors as we have been primarily
12 talking about here today.  They don't recommend
13 prophylactic surgery, but there is an association
14 in the literature with granulosis cell tumors.
15     Q.    But not just -- so the record is
16 clear, so I'm tracking what you're saying, not
17 epithelial ovarian cancer.
18     A.    That's correct.
19     Q.    Okay.
20     A.    And ATM is actually now being
21 looked at critically as potentially increasing
22 the risk of epithelial ovarian cancers by 2 to 3
23 percent, and is actually being discussed as
24 potentially being one of the next genes that risk

Page 56

1  reducing surgery is being recommended for.  It
2  hasn't yet.  PALB2 has in the most recent NCCN,
3  but ATM is actually being reconsidered for its
4  risk.
5      Q.    So that's preliminary at this
6  point, there's been no final determination
7  regarding ATM, correct?
8      A.    There's not --
9          MS. CURRY:  Object to the form.
10         THE WITNESS:  Sorry.  There's
11     not a final national recommendation at
12     this juncture, but it is being
13     investigated.
14 BY MS. O'DELL:
15     Q.    Okay.  Looking at this table,
16 putting it in the context of epithelial ovarian
17 cancer, are there any other disagreements you
18 have with this particular table?
19     A.    Well, I'm --
20         MS. CURRY:  Object to the form.
21         THE WITNESS:  I'm not
22     disagreeing, Ms. O'Dell.  I'm just
23     telling you that this was published in
24     2017, and the most recent national

Page 57

1      guidelines that we have from 2024 are
2      different than what this table shows.
3      That's --
4  BY MS. O'DELL:
5      Q.    Okay.  Any others that you want to
6  point out that you think the present -- present
7  data --
8      A.    Has been updated?
9      Q.    Yeah, or different.
10     A.    No.
11     Q.    Okay.  And if you will turn,
12 Dr. Saenz, to page 17, you will see on page 17 a
13 box with some information regarding the review of
14 literature that was done in the preparation for
15 this bulletin.
16         Do you see that?
17     A.    Yes.
18     Q.    And it describes at the top the
19 Medline database, the Cochrane Library, and
20 ACOG's own internal resources -- resources and
21 documents were used to conduct a literature
22 search to locate relevant articles published
23 between January 2000 and January -- excuse me,
24 May 2017.

15 (Pages 54 - 57)

Page 58

1        Do you see that?
2    A.    Yes.
3    Q.    And it goes on to describe some of
4  what was reviewed, and then in the second
5  paragraph, it says:  "Studies were reviewed and
6  evaluated for quality according to the method
7  outlined by the U.S. Preventive Services Task
8  Force."
9        Do you see that?
10    A.    Yes.
11    Q.    And it gives levels of evidence
12  there in the -- in this box, correct?
13    A.    Yes.
14    Q.    And if you'll look at level Roman
15  numeral II-2, it states:  "Evidence obtained from
16  well-designed cohort or case-control studies,
17  preferably from more than one center research
18  group."
19        Did I read that correctly?
20    A.    You left out the word "analytic,"
21  but otherwise, yes.
22    Q.    Yes, I'm sorry.  I will read it
23  again.
24    A.    No worries.

Page 59

1    Q.    I didn't mean to skip a word.
2        "Evidence obtained from
3  well-designed cohort or case-control analytic
4  studies, preferably from more than one center or
5  research group."
6        Did I get it right that time?
7    A.    Yes.
8    Q.    Okay, good.
9        And you would agree then in
10  relation to talc and ovarian cancer that there
11  have been cohort and case-control analytic
12  studies from more than one center or research
13  group published over the last 40 years.  True?
14    A.    Yes.
15    Q.    And in this chart from ACOG, the
16  well- designed cohort and case-control analytic
17  studies are placed on the same level of evidence,
18  correct?
19    A.    They're both classified as evidence
20  II-2, yes.
21    Q.    I want to put that aside,
22  Dr. Saenz.
23        Let me ask you to turn back to your
24  report on page 6.  You state in the paragraph

Page 60

1  beginning at the top, there's a sentence about
2  midway or a third down that starts "To date."  Do
3  you see that sentence?
4    A.    Yes.
5    Q.    "To date, roughly 16 different
6  genes have been identified in this cluster, but
7  new genes are being identified and added to
8  testing panels every year."
9        And you go on to say:  "In the
10  mid-1990s we only tested for two genes, BRCA1 and
11  2.  By contrast, expanded panel testing currently
12  available through many commercial labs examine
13  more than 25 genes."
14        My question to you is, in your
15  opinion, what is the most reliable source in
16  listing of genes that you believe to be
17  pathogenic to ovarian cancer?
18        MS. CURRY:  Object to the form.
19        THE WITNESS:  I would say the
20    most reliable and up-to-date source are
21    the NCCN guidelines.
22  BY MS. O'DELL:
23    Q.    Are there any others that you
24  believe are authoritative and reliable that you

Page 61

1  rely on in reaching your opinions about the genes
2  that are pathetic for ovarian cancer?
3        MS. CURRY:  Object to the form.
4        THE WITNESS:  I mean, there are
5    other organizations such as
6    organizations for genetic research and
7    genetic counselors, but I don't utilize
8    those the way that I utilize the NCCN
9    guidelines.
10        MS. CURRY:  I just want to note
11    for the record that, Leigh, I'm giving a
12    little bit of leeway here, but -- no pun
13    intended, but the sections that you're
14    reading from on the report were actually
15    already in the 2019 general causation
16    report.
17        And so it was my understanding
18    that we're here to talk about anything
19    new, just going forward, and obviously
20    any of the case-specific information.
21        MS. O'DELL:  That's fair enough.
22    She -- Dr. Saenz changed some of the
23    material above that, and -- but I'm
24    happy to couch my questions in terms of

16 (Pages 58 - 61)

Page 62

1    2019.
2    BY MS. O'DELL:
3        Q.    Since 2019 and today, Dr. Saenz, is
4    it your testimony that what you refer to as the
5    authoritative sort of source for pathogenic genes
6    is the NCCN guidelines?  Is that an accurate
7    restatement of your testimony?
8        MS. CURRY:  Object to the form.
9        THE WITNESS:  The NCCN
10    guidelines are what I use as my resource
11    for the identification of genes that are
12    placing women at an increased risk of
13    developing ovarian cancer.
14        I mean, it's not the only thing
15    I've ever looked at, Leigh.  I don't
16    want to say that's the only reference
17    that I use, right.  I read other papers
18    and things.  That's how I know that ATM
19    is being investigated because that
20    hasn't changed in NCCN yet.  But I at,
21    for example, this juncture of my career
22    would not prophylactically take the
23    ovaries out of a woman with an ATM
24    mutation because I don't believe I have

Page 63

1    support from a national agency to
2    endorse that yet.  But in the course of
3    the last year or two, I've probably
4    operated on five women with PALB2
5    mutations because the guidelines have
6    changed.
7    BY MS. O'DELL:
8        Q.    All right.  I'm going to ask you to
9    turn, Dr. Saenz, to your -- to page 8 of your
10    report.
11        And you added here in your report a
12    reference 25 to the Huang and colleagues study
13    that was published in 2020.
14        Do you see that?
15    A.    Yes.
16        Q.    And for what purpose did you add
17    that -- that study to your discussion of early
18    menarche, late menopause risk factor description?
19    A.    I think there are a couple of
20    reasons.  One is the fact that the incessant
21    ovulation hypothesis, which, you know, has been
22    discussed numerous times before, but it goes back
23    to demonstrating that there is an increased risk
24    of developing ovarian cancer in women that seem

Page 64

1    to have more lifetime ovulatory cycles than women
2    that have fewer, but that the risk reduction from
3    either birth control pills or breastfeeding or
4    pregnancy is magnitudes greater than would simply
5    be accounted for by the number of suppressed
6    ovulatory cycles.
7        So it doesn't make sense
8    biologically that it's simply a matter of
9    ovulating.  There has to be -- there's another
10    biologic mechanism that we just haven't
11    elucidated yet that is related to an increased
12    number of ovulatory cycles leading to an
13    increased risk of ovarian cancer.
14        And so I came across the Huang
15    paper because I was looking up how lifetime
16    ovulatory cycles related to ovarian cancer risk
17    development, and what Huang did was also measure
18    women's CRP levels, which CRP being C-reactive
19    protein is a marker of chronic systemic
20    inflammation.  And paradoxically, what Huang
21    found was the more lifetime ovulatory cycles a
22    woman had, and they measured them in five-year
23    increments, the lower their level of C-reactive
24    protein.  And so they did not correlate.

Page 65

1        If ovulatory cycles number were
2    increasing systemic inflammation risk, then the
3    authors hypothesized that the C-reactive protein
4    levels should have been higher and correlating
5    directly with the number of ovulatory cycles.
6    But what they found actually was the more
7    ovulatory cycles, the lower levels of C-reactive
8    protein.  And so the authors concluded that
9    lifetime ovulatory cycles are not contributing to
10    the risk of ovarian cancer through the
11    development of chronic systemic inflammation
12    because they found lower C-reactive protein
13    levels in those women.
14    Q.    In the Huang paper, the premise of
15    the paper was that inflammation as a result of
16    lifetime ovulatory cycles increases inflammation,
17    and inflammation is associated with ovarian
18    cancer.  That was the premise of the study.
19    Fair?
20        MS. CURRY:  Object to the form.
21        THE WITNESS:  That was their
22    hypothesis, that the ovulatory events
23    were increasing systemic inflammation,
24    and so as a marker of that, they

17 (Pages 62 - 65)

Page 66

1    investigated CRP levels, and they found
2    the exact opposite of what the
3    hypothesis was.
4  BY MS. O'DELL:
5    Q.    You would agree, Dr. Saenz, that
6  reproductive events such as ovulation and
7  menstruation trigger an acute inflammatory
8  cascade of the repeated damage and repair
9  to the ovarian surface.
10    MS. CURRY:  Object to the form.
11    THE WITNESS:  I -- I don't -- if
12    you're talking about one event in
13    isolation, then it's an acute event, but
14    the chronicity is because these events
15    are happening monthly over many, many
16    years.
17  BY MS. O'DELL:
18    Q.    Yes.  So it's an acute event
19  happening on a monthly basis that results in a
20  chronic inflammatory process.  Fair?
21    MS. CURRY:  Object to the form.
22    THE WITNESS:  That's what the
23    authors hypothesized, but they didn't
24    find evidence of that.

Page 67

1  BY MS. O'DELL:
2    Q.    And would you agree -- I mean, you
3  say that was their hypothesis.  Would you agree
4  that ovulation and menstruation trigger an
5  inflammatory process due to the damage and repair
6  to the ovarian surface epithelium?
7    MS. CURRY:  Object to the form.
8    THE WITNESS:  I don't
9    necessarily know that.  I don't think
10    menstruation means the sloughing of the
11    endometrium has nothing to do with
12    what's going on with the ovulatory
13    events which occur during a different
14    phase of the cycle.  I do think that
15    ovulation causes damage to the surface
16    of the ovary and that gets repaired.
17    But we in looking at the ovaries of
18    women and sites of ovulation, we don't
19    see evidence of chronic damage or even
20    acute -- not acute, but chronic damage.
21  BY MS. O'DELL:
22    Q.    But there would be evidence of
23  acute damage to the -- an acute inflammation at
24  the time of ovulation.  True?

Page 68

1    MS. CURRY:  Object to the form.
2    THE WITNESS:  I think most
3    likely, but I've not actually looked for
4    that.
5  BY MS. O'DELL:
6    Q.    That's been reported in literature,
7  right?
8    A.    Yes, that's true.
9    Q.    And that would be a generally
10  accepted understanding of what happens at the
11  time of ovulation, that there is damage to the
12  surface of the ovary, and resulting repair that
13  is -- involves an inflammatory process.  True,
14  that's generally accepted?
15    MS. CURRY:  Object to the form.
16    THE WITNESS:  I agree that
17    there's damage to the ovary and then
18    there is a repair process.  There is a
19    cascade there, yes.
20  BY MS. O'DELL:
21    Q.    An inflammatory cascade, right?
22    MS. CURRY:  Object to the form.
23    THE WITNESS:  An acute
24    inflammatory cascade?

Page 69

1  BY MS. O'DELL:
2    Q.    Yes.
3    A.    Okay.  Yes.
4    Q.    Let me ask you to take a look at
5  the Huang paper, Dr. Saenz.
6    MS. O'DELL:  And I will mark
7    that as Exhibit 8.
8    (Exhibit No. 8 was marked for
9    identification.)
10  BY MS. O'DELL:
11    Q.    Do you have that in front of you,
12  Dr. Saenz?
13    A.    Yes, ma'am.
14    Q.    And this is the study that we've
15  been talking about and that you referred to
16  your -- you refer to your report on page -- page
17  8 and -- excuse me, on page 8 of your report.
18  And then I'd like for you to turn, please, to
19  what's identified as page 667 in the upper right
20  corner.
21    And if you'll look on the left-hand
22  side, Dr. Saenz, in the Discussion section.  Do
23  you see where I'm looking?
24    A.    Yes.

18 (Pages 66 - 69)

Page 70

1    Q.    And I think it's three sentences
2 down, it says: "The strength of the association
3 between LOY and CRP," meaning lifetime ovulations
4 and C-reactive protein, "was comparable to that
5 for other well-established inflammatory
6 exposures, including physical activity and an
7 inflammatory diet, the weaker than the
8 association for BMI, suggesting that LOY may be a
9 potential marker for systemic inflammation in
10 women."
11        Did I read that correctly?
12    A.    Yes.
13    Q.    And it goes on to say on the next
14 page, page 668, that -- in the Summary paragraph
15 at the end, second sentence: "Our results
16 suggest that reproductive history may be an
17 important source of inflammation in women that is
18 comparable to diet and physical activity."
19        Did I read that correctly?
20    A.    Yes.
21    Q.    And throughout this study,
22 Dr. Saenz, the researchers were focused on
23 inflammation as a contributor to ovarian cancer,
24 correct?

Page 71

1        MS. CURRY: Object to the form.
2        THE WITNESS: No, that was their
3    hypothesis. Throughout this study they
4    were focused on the number of ovulatory
5    years and how that -- those acute events
6    could have led to the development of
7    systemic chronic inflammation, and
8    looking at the markers for that, and
9    whether or not they were there. They
10    were not actually looking at ovarian
11    cancer. They were essentially trying to
12    identify a mechanism by which Fathalla's
13    original hypothesis would be related.
14    Q.    And at any -- and they say in this
15 paper that lifetime ovulatory years has been
16 consistently associated with a higher risk of
17 ovarian cancer. That's one of the underlying
18 premises of the study. True?
19        MS. CURRY: Where are you
20    reading from? Sorry, Leigh.
21        MS. O'DELL: I'm reading from
22    page 660.
23 BY MS. O'DELL:
24    Q.    But what I'm asking, Dr. Saenz, is

Page 72

1 that part of the reason they studied lifetime
2 ovulations is because of the understanding that
3 inflammation is associated with an increased risk
4 of ovarian cancer. True?
5        MS. CURRY: Object to the form.
6        THE WITNESS: No, I -- I don't
7    actually agree with that. The --
8 BY MS. O'DELL:
9    Q.    Now, please, if I could just --
10 forgive me, I'll try not to do that. But let me
11 just ask to make sure my question was clear.
12        I'm not asking -- I know you may
13 have a different opinion, but I'm asking about
14 what the authors in the premise of the paper as
15 they describe it, one of the premises -- one of
16 the main premises of the paper is that lifetime
17 ovulatory years and an increase in inflammation
18 results in a higher risk of ovarian cancer.
19 True?
20        MS. CURRY: Object to the form.
21        THE WITNESS: No, that's not
22    their hypothesis. The hypothesis has to
23    do with trying to link why an increased
24    number of ovulatory years and the acute

Page 73

1    inflammation that occurs as a result of
2    those individual ovulatory events, does
3    that result in systemic inflammation,
4    chronic, and trying to identify markers
5    that would show that there is some link
6    between the acute inflammatory events
7    with each ovulatory event and the
8    development of chronic systemic
9    ovulation that may be related to ovarian
10    cancer risk.
11        But it's not -- they weren't
12    investigating the inflammation, per se.
13    They were investigating whether or not
14    there's evidence that ovulation and the
15    number of ovulatory events leads to the
16    development of systemic chronic
17    inflammation, and they found the
18    opposite.
19 BY MS. O'DELL:
20    Q.    And as noted by the authors,
21 inflammation has a role in the development of
22 ovarian cancer. True?
23        MS. CURRY: Object to the form.
24        THE WITNESS: Where are you

19 (Pages 70 - 73)

Page 74

1    reading from?
2    BY MS. O'DELL:
3        Q.    I'm asking just -- that's my own
4    question.
5        A.    No, that's not their hypothesis.
6        Q.    You don't believe that they
7    believed -- these authors, these researchers on
8    Exhibit 8, are you saying that they as a part of
9    their research did not consider inflammation as a
10   mediator of ovarian cancer?
11       MS. CURRY:  Object to the form,
12   calls for speculation.
13       THE WITNESS:  The hypothesis of
14   these authors was that the development
15   of acute inflammation that occurs with
16   each ovulatory event could potentially
17   result in evidence of chronic systemic
18   inflammation, and they were trying to
19   see if they could identify that and
20   thereby link it to the increased risk of
21   ovarian cancer that we see in women with
22   more ovulatory events, and what they
23   found with their data was actually the
24   opposite.

Page 75

1        So they ended up not being able
2    to identify that the individual acute
3    inflammatory events associated with each
4    individual ovulatory event leads to
5    evidence of increased systemic
6    inflammation.
7    BY MS. O'DELL:
8        Q.    Okay.  Would you agree with me,
9    Dr. Saenz, that C-reactive protein is a
10   nonspecific systemic marker of chronic
11   inflammation?
12       A.    Yes.
13       Q.    And that it is not a measure of the
14   localized inflammation that may occur during
15   ovulation at the site of the ovary?
16       A.    I don't know that because I don't
17   know that anybody has assayed CRP levels at the
18   time of ovulation.  So I don't know that.
19       Q.    Certainly -- but the authors for
20   the Huang study were not assaying inflammation --
21   localized inflammation at the site of the ovary,
22   correct?
23       A.    That's absolutely correct, because
24   they also included postmenopausal women in their

Page 76

1    study who weren't ovulating either.  This was a
2    systemic assay.  It wasn't a localized assay at
3    the level of the ovary.
4        Q.    Did you consider the commentary by
5    Dr. Joellen Schildkraut about the Huang paper?
6        A.    I don't believe I've seen that.
7        Q.    Have you seen other studies
8    regarding -- have you seen and considered other
9    studies regarding lifetime ovulations that
10   conclude exactly the opposite of what Huang and
11   her colleagues concluded?
12       MS. CURRY:  Object to the form.
13       THE WITNESS:  I think you would
14   have to refer me to a specific study,
15   because I don't -- I don't recall off
16   the top of my head any specific study in
17   that level of detail.
18   BY MS. O'DELL:
19       Q.    Dr. Saenz, I want to turn your
20   attention back to Exhibit 3, the comparison.
21       A.    Are we done with this study, ma'am?
22   May I set it aside?
23       Q.    You can, yeah.  Thank you.
24       So I want to turn back -- I skipped

Page 77

1    something in my notes and I don't want to forget
2    it, so I just want to go back to it before we get
3    too far away.
4        Under your Genetics section, which
5    is page 5 in your May 2024 report, and in the
6    comparison which we marked as Exhibit 3, turn to
7    page 6, and you'll see in Exhibit 3 the
8    comparison, Dr. Saenz, under Genetics.
9        Are you there with me?
10       A.    Yes.
11       Q.    You struck a sentence that says:
12   "Approximately 10 percent of women diagnosed with
13   ovarian cancer are found to have inherited such a
14   deleterious mutation, but when that analysis is
15   restricted to women whose ovarian cancer is of
16   serous histology, the rate increases to
17   approximately 30 percent."
18       Why did you strike that?
19       A.    I thought it was confusing.
20   Because there was a point in time when we were
21   only sending women with serous histologies for
22   germline testing and not all women with
23   epithelial ovarian cancers, because the yield of
24   finding a germline mutation in a woman with

20 (Pages 74 - 77)

Page 78

1  ovarian cancer is higher if you restrict the
2  screening to serous histologies. But the current
3  NCCN guidelines are actually that all women with
4  epithelial ovarian cancer should be screened, and
5  so it didn't -- it seemed to me to be a sentence
6  that was not needed.
7      Q.    And no longer in keeping with
8  current practice. Fair?
9          MS. CURRY: Object to the form.
10         THE WITNESS: Correct, not
11     consistent with current guidelines.
12     It doesn't mean it's not
13     factual. It's factual, but not
14     consistent with current guidelines.
15 BY MS. O'DELL:
16     Q.    What's your -- if it's still
17 factual, what's your basis for that opinion? I
18 don't see a citation there.
19     A.    I don't recall what it was, but
20 there were papers that looked at screening women
21 with high grade serous histologies as opposed to
22 all histologies and what percentage of patients
23 would have mutations, and the high grade serous
24 histologies have a higher rate of having an HRD

Page 79

1  germline mutation.
2      Q.    And you believe that to be 30
3  percent?
4      A.    Yes.
5          MS. CURRY: Leigh, I don't know
6      if now is a good time, but we've been
7      going for over an hour and a half, for a
8      very brief break, if that's okay.
9          MS. O'DELL: That will be fine.
10     Any time, Dr. Saenz, you or
11     others need a break, just let me know.
12         THE WITNESS: Thank you so much.
13         MS. O'DELL: And I'm happy to
14     take a break. Thank you.
15     What do you say, five minutes?
16         MS. CURRY: Five minutes is
17     plenty. That's fine.
18     (Recess.)
19         MS. O'DELL: Let's go back on
20     the record.
21 BY MS. O'DELL:
22     Q.    Dr. Saenz, I want to ask you to
23 turn to the Converse case-specific report.
24         MS. O'DELL: And we're going to

Page 80

1      mark that as, I believe, Exhibit 9.
2          And Paula should have that.
3      Thank you.
4          (Exhibit No. 9 was marked for
5          identification.)
6  BY MS. O'DELL:
7      Q.    Just let me know when you are
8  ready.
9      A.    Oh, I'm sorry. Sorry. I'm ready.
10     Q.    Okay. Dr. Saenz, what was your
11 methodology in reaching your case-specific
12 opinions for Ms. Converse?
13     A.    For Ms. Converse, I read through
14 all of the medical records that I was provided.
15 I reviewed the reports of Dr. Clarke-Pearson,
16 Dr. Godleski. I reviewed a plaintiff's expert
17 report of, I believe, Dr. Felix. And I might be
18 confusing Newsome. I'm sorry.
19         MS. CURRY: You said plaintiff
20     expert report.
21         THE WITNESS: Oh, sorry.
22     Defense expert pathologist Dr. Felix.
23     I read all the depositions that
24     I was provided in this case, and as more

Page 81

1      medical records came in, I kept looking
2      at all of those.
3  BY MS. O'DELL:
4      Q.    Okay. And you did not consider the
5  expert report of plaintiff's expert John Levy,
6  correct?
7      A.    I did not.
8      Q.    And you did not consider the expert
9  report of -- exposure report of Dr. Bill Longo or
10 William Longo for Ms. Converse, correct?
11     A.    I did not.
12     Q.    And looking at this case-specific
13 expert report for Ms. Converse, based on your
14 review of her medical records and other
15 information that you mentioned, you did an
16 evaluation of the risk factors that she had for
17 ovarian cancer, correct?
18     A.    That's correct.
19     Q.    You ruled in certain risk factors
20 for ovarian cancer you felt that she had, and
21 then you ruled out certain risk factors you felt
22 that there was no evidence for. True?
23         MS. CURRY: Object to the form.
24         THE WITNESS: Well, I

21 (Pages 78 - 81)

Page 82

1    identified, based on her plaintiff
2    profile forms, deposition testimony, her
3    treaters, and medical records, certain
4    risk factors that are well established
5    for ovarian cancer that she seemed to
6    have.
7 BY MS. O'DELL:
8    Q.    And based on your review of
9 Ms. Converse's medical history and other
10 information, you concluded that her age, her
11 Ashkenazi Jewish heritage, her family history of
12 breast cancer and her use of hormone replacement
13 therapy were risk factors that she had for
14 ovarian cancer, correct?
15       MS. CURRY: Object to the form.
16       THE WITNESS: As well as the
17    endometriosis that was found within her
18    surgical specimens, as well as the
19    suggestion of a family history, and in
20    particular, the family history of her
21    mother having at a young age breast
22    cancer. That was also another risk
23    factor that she had, yes.
24 BY MS. O'DELL:

Page 83

1    Q.    And those risk factors, from your
2 point of view, contributed to her developing
3 ovarian cancer. True?
4       MS. CURRY: Object to the form.
5       THE WITNESS: So I am not
6    assigning causation to any of those risk
7    factors in her development of ovarian
8    cancer. I am simply saying that she had
9    various risk factors that certainly
10    increased her risk of developing ovarian
11    cancer.
12 BY MS. O'DELL:
13    Q.    And for those particular factors or
14 risk factors, would you say they contributed to
15 her development of ovarian cancer?
16    A.    I think they contributed to her
17 being at risk for the development of ovarian
18 cancer. I cannot point to any one of those
19 single risk factors and saying, Aha, there, it's
20 that one.
21    Q.    And I'm definitely not asking you
22 that, but would you agree with me that they all
23 can work together and contribute to the
24 development of her ovarian cancer? Is that your

Page 84

1 opinion or not your opinion?
2    A.    My opinion is that --
3       MS. CURRY: Object to the form.
4       THE WITNESS: My opinion is that
5    they all increased her risk of
6    developing ovarian cancer. I don't have
7    any opinion that they worked together,
8    but I do believe that they all increased
9    her risk of developing ovarian cancer.
10 BY MS. O'DELL:
11    Q.    Ovarian cancer, though, is a
12 multifactorial disease, correct?
13    A.    It can be.
14    Q.    And it's described in the
15 literature many times as a multifactorial
16 disease. Fair?
17    A.    I think that's in the literature.
18 Yes, I think that's fair.
19    Q.    But you've testified in the past,
20 and to some degree I think over the last few
21 minutes, that you don't know what causes ovarian
22 cancer in a particular woman. Correct?
23    A.    That's correct.
24    Q.    And in fact, you testified in the

Page 85

1 past that you have no idea what causes ovarian
2 cancer. True?
3       MS. CURRY: Object to the form.
4       THE WITNESS: In any one
5    particular woman, I have no idea what
6    causes ovarian cancer.
7 BY MS. O'DELL:
8    Q.    And is it your opinion that there's
9 no credible scientific data to support the
10 conclusion that talc contributed to
11 Ms. Converse's development of ovarian cancer?
12    A.    Yes, that is my opinion.
13    Q.    And if -- is there any circumstance
14 under which you could conclude that the genital
15 application of talc contributes to cause ovarian
16 cancer?
17       MS. CURRY: Object to the form.
18       THE WITNESS: Based on the
19    current state of the science, no.
20 BY MS. O'DELL:
21    Q.    If that's the case, Dr. Saenz, that
22 based on the science as you evaluate it, that
23 talc could never be a contributing cause of a
24 woman's ovarian cancer, why did you review all

22 (Pages 82 - 85)

Page 86

1  the medical records? Why was it necessary to
2  your opinion if your opinion is you already have
3  reached the conclusion that talc cannot
4  contribute to the development of ovarian cancer?
5      A.    I was asked to review her medical
6  records, her medical history, and her care, and I
7  thought it was important for me to identify
8  whether or not there were risk factors that she
9  had that increased her risk of developing ovarian
10 cancer.
11     Q.    And you listed age as a
12 well-established factor for increasing her risk
13 of ovarian cancer. True?
14     A.    Yes.
15     Q.    And you also listed Ashkenazi
16 Jewish heritage, correct?
17     A.    Yes.
18     Q.    Endometriosis, correct?
19     A.    Yes.
20     Q.    And the use of hormone replacement
21 therapy as a well-established risk factor for
22 developing ovarian cancer.
23     A.    Yes.
24     Q.    True?

Page 87

1      A.    Yes.
2      Q.    Okay.
3      A.    As well as her family history with
4  her mother in particular with breast cancer at a
5  young age, and the fact that she had genetic
6  testing, and even though the genetic testing
7  showed variants of uncertain significance, those
8  same two mutations were also found in her mother,
9  who had had breast cancer.
10     Q.    And is it your understanding that
11 Ms. Converse used Johnson's baby powder daily,
12 and sometimes more often than daily, during her
13 menstrual cycle for over 50 years?
14     A.    I -- I don't recall her specifying
15 it during her menstrual cycle, but if that's -- I
16 will take you at face value for saying that, if
17 that's what her testimony was.
18     Q.    You would agree with -- you would
19 agree with me she used Johnson's baby powder
20 daily or near daily for over 50 years, correct?
21     A.    I don't have that in front of me,
22 but I will agree that if that's what she
23 reported, then that is what she used.
24     Q.    And Ms. Converse testified that she

Page 88

1  began to use Johnson's baby powder in 1962 at the
2  age of 14, and then continued thereafter to
3  approximately 2017.
4          Do you recall that?
5      A.    I'm looking for that, ma'am. I'm
6  sorry.
7          Do I have that in my report? I
8  don't recall that specific testimony, but again,
9  I don't have a reason to doubt you.
10     Q.    And if -- you know, I'm -- I know
11 you reviewed her deposition and other materials
12 related to Ms. Converse. I'll represent to you
13 that's correct.
14     A.    Okay.
15     Q.    And would you agree that she used
16 Johnson's baby powder in her 20s and 30s?
17     A.    Yes.
18     Q.    And we're going to talk about that
19 just a little bit later, but that's a time period
20 that Dr. O'Brien and her colleagues in her 2024
21 study found to be of particular concern for the
22 development of ovarian cancer. True?
23         MS. CURRY: Object to the form.
24         THE WITNESS: That's what they

Page 89

1  reported.
2  BY MS. O'DELL:
3      Q.    And for Ms. Converse, taking my
4  representation that it's 55 years, that's what
5  the math is from 1962 to 2017, on a daily basis
6  if -- 365 days a year, that would be over 20,000
7  applications of Johnson's baby powder. True?
8      A.    I will trust you on your math.
9      Q.    Okay. I used a calculator. I
10 don't trust myself, but I trust a calculator.
11         And that would be, based on your
12 review of the epidemiological literature, over
13 20,000 applications would really be at the
14 highest level of exposures for what's been seen
15 in the epidemiological studies. True?
16         MS. CURRY: Object to the form.
17         THE WITNESS: Well, it's -- I
18 think most of the studies have looked at
19 20 years or more of application. They
20 haven't, you know, quantified the number
21 of years more than that. So, yes, that
22 would be at the upper limits of when
23 they're saying more than 20 years of
24 applications.

23 (Pages 86 - 89)

Page 90

1  BY MS. O'DELL:
2      Q.    Yeah, one of the highest usage
3  categories.  I mean, you can recall, for example,
4  in, I believe it was, the Penninkilampi study,
5  you will remember they talked about greater than
6  3600 applications.
7      A.    Correct.
8      Q.    And I believe it was Dr. Cramer's
9  study in 2016, colleagues talked about greater
10  than 7500 applications for lifetime applications.
11  Do you recall that?
12      A.    Yes.
13      Q.    And so this would be --
14  Ms. Converse's usage at 20,000 times over her
15  lifetime would be really at the upper end of
16  exposures for what's been seen in the
17  epidemiologic studies.  True?
18          MS. CURRY:  Object to the form,
19      asked and answered.
20          THE WITNESS:  Correct.
21  BY MS. O'DELL:
22      Q.    And that amount of usage or that
23  level of usage was not something that you found
24  relevant in your conclusion that talc does not

Page 91

1  increase her risk of ovarian cancer.  True?
2      A.    It's not that it's not relevant.
3  It's that even that number of applications is not
4  supported by the literature as increasing her
5  risk of developing ovarian cancer.
6      Q.    And because from your perspective
7  the epidemiologic literature doesn't support an
8  association; therefore, her amount of usage was
9  not important to your causation conclusion,
10  correct?
11          MS. CURRY:  Object to the form.
12          THE WITNESS:  So the amount of
13      usage that she had is not supported by
14      the literature as contributing to her
15      developing ovarian cancer.
16  BY MS. O'DELL:
17      Q.    And therefore, not relevant to your
18  causation opinion.  True?
19      A.    And therefore, I do not believe
20  that talc contributed to her developing ovarian
21  cancer.
22      Q.    And therefore, because you don't
23  believe that talc contributed to her development
24  of ovarian cancer, the level of usage was not

Page 92

1  important to your analysis for your causation
2  opinion, correct?
3          MS. CURRY:  Object to the form.
4          THE WITNESS:  It's not that it
5      wasn't important.  I mean, I
6      documented it --
7  BY MS. O'DELL:
8      Q.    Relevant --
9      A.    Relevant.
10      Q.    -- or important.
11      A.    Well --
12      Q.    Please --
13      A.    -- it's not both.
14          MS. CURRY:  Same objection.
15          THE WITNESS:  It was not
16      relevant to my opinion that talc did not
17      contribute to her developing ovarian
18      cancer.
19  BY MS. O'DELL:
20      Q.    When you were going through
21  Ms. Converse's medical history and her records,
22  did you rule out other risk factors that you felt
23  were not pertinent to her case -- excuse me --
24  were not pertinent to her case?  In other words,

Page 93

1  did you rule out early menarche and late
2  menopause as relevant to her case?
3          MS. CURRY:  Object to the form.
4          THE WITNESS:  So she had
5      menarche at age 14, so that wouldn't
6      really be considered early.  So I did
7      not believe that that contributed to her
8      risk of developing ovarian cancer.
9          And she had menopause in her
10      mid-50s, which is actually a little bit
11      on the later side.  So it's almost --
12      she had a later menarche but also a
13      later menopause, so -- but I did not
14      feel that the interval between those two
15      was all that significant for her -- to
16      place her at an increased risk of
17      developing ovarian cancer.
18  BY MS. O'DELL:
19      Q.    And in the same way, you didn't
20  feel her BMI was such that that was something
21  that contributed or was a risk factor for her
22  development of ovarian cancer.  True?
23      A.    Correct.
24      Q.    You ruled that out essentially as a

24 (Pages 90 - 93)

Page 94

1 risk factor for ovarian cancer in her case.
2 Fair?
3          MS. CURRY:  Object to the form.
4          THE WITNESS:  I did not believe
5      that that contributed to her risk.
6 BY MS. O'DELL:
7      Q.    How many hours did you spend --
8 have you spent on Ms. Converse's case since your
9 February 2022 invoice?
10     A.    Oh.  So the backbone, if you will,
11 or the majority of the report was already
12 written, because I don't actually think there
13 were that many more medical records that came in
14 on her per se after the fact, so I would say
15 maybe five more hours on her case.
16     Q.    I'm looking back at what we -- was
17 part of Exhibit 5 was the invoice for
18 Ms. Converse, and it indicated that you spent
19 48.25 hours in your review of her case.
20         And forgive me, would you mind
21 repeating how many hours you believe that you
22 spent on Ms. Converse's case since your February
23 2022 invoice?
24     A.    Yes.  I think somewhere between

Page 95

1 five to six hours more.
2      Q.    Okay.  In your report for
3 Ms. Converse, Exhibit 9, you -- and page 2 is
4 where I'm looking if you want to look there.
5          I want to first focus on age.  She
6 was diagnosed at age 58.
7      A.    Okay.
8      Q.    And, as I understand it, it's your
9 opinion that age was one of her risk factors for
10 her development of ovarian cancer, correct?
11     A.    That's correct.
12     Q.    And, Dr. Saenz, isn't it true that
13 the average age of the diagnosis of ovarian
14 cancer is 63?
15     A.    Yes, that's correct.
16     Q.    And so -- but it's your view, even
17 though the average age is 63, that her age, which
18 is five years younger than the average, would
19 still be a contributing factor to her development
20 of ovarian cancer.  Is that true?
21     A.    Yes, that's correct.
22     Q.    And what's your -- what's your
23 basis for stating that?
24     A.    So it's not actually the average.

Page 96

1 It's -- the mean age of ovarian cancer is 63, and
2 so from that mean age, there is a bell curve out.
3 And the majority of ovarian cancers are actually
4 diagnosed, I believe, from ages 55 to like 65 or
5 66.  So she's well within one standard deviation
6 of the bell curve.
7      Q.    I want to look at -- well, before I
8 turn to something else, let me just ask this
9 question just to make sure I understand.
10         What are you relying on for your
11 conclusion that age is a well-established risk
12 factor that would increase Ms. Converse's risk of
13 developing clear cell ovarian cancer?
14     A.    So as we just discussed, she's well
15 within one standard deviation of the mean age of
16 ovarian cancer with the majority of
17 cancers actually starting at about age 55.
18         In addition, most of societies,
19 such as ACS, SGO, OCRA, all identify age as a
20 risk factor for developing ovarian cancer.
21         In addition, you know, when you
22 look at articles that identify genetic mutations
23 and how they accumulate over the course of our
24 lifetime just from simple defects that happen as

Page 97

1 a result of replication errors, the longer you're
2 alive, the more of those accumulations -- those
3 defects you accumulate.  And she is well within
4 the age range of the majority of women that get
5 ovarian cancer.
6      Q.    Yes, and thank you for that.  I'm
7 just looking for a scientific study or reference
8 that you feel is supportive of your conclusion.
9 And I appreciate what you said about the
10 studies -- excuse me, the societies and what
11 they've said about it, but I'm really looking for
12 a reference that's published in the literature
13 that supports that conclusion.
14     A.    I think you could go to --
15         MS. CURRY:  Object to the form.
16         THE WITNESS:  Sorry.  I think
17     you could go to the Gates paper that
18     looked at age and looked specifically at
19     risk in women over 50 years old and the
20     increased risk with each year that
21     passes.  I think that's actually a paper
22     that you and I have looked at together
23     before.
24 BY MS. O'DELL:

25 (Pages 94 - 97)

Page 98

1     Q.    We disagreed about that paper
2   before --
3     A.    No.
4     Q.    -- Gates 2010?
5     A.    We had a discussion -- we had a
6   discussion.
7     Q.    Yeah, we did.
8     A.    Maybe you remember it differently
9   than I do, but I think we had a discussion.
10     Q.    We did have a discussion.  That is
11   true, we did.
12          Let me -- you mentioned the
13   societies and some of the things that the
14   societies have said about different risk factors
15   and symptoms of ovarian cancer.
16          I'd like to mark the ACOG risk
17   factors.
18          MS. O'DELL:  And if you have
19     those, that would be great, Paula.  And
20     you may have it in the form of ACOG's
21     FAQs.
22          And we'll mark this as
23     exhibit -- I believe this is Exhibit 10.
24          (Exhibit No. 10 was marked for

Page 99

1     identification.)
2   BY MS. O'DELL:
3     Q.    So, Dr. Saenz, we marked as
4   Exhibit 10 what is an ACOG document "FAQs for
5   Ovarian Cancer," something which you're very
6   familiar with, correct?
7     A.    Yes.
8     Q.    And you cite this in your report
9   and you've testified to this a number of times at
10   trial.  True?
11     A.    I'm sure.
12     Q.    Okay.  And a couple of the things
13   that I want to point out.  In terms of these risk
14   factors and symptoms, this list that's been put
15   forward by ACOG, it does not list talc as a risk
16   factor.  True?
17     A.    Correct.
18     Q.    And it doesn't say anything about
19   talc.  True?
20          MS. CURRY:  Object to the form.
21     Are you talking about this document or
22     ACOG in general?
23          MS. O'DELL:  I think -- yeah,
24     I'm talking about this document?

Page 100

1          MS. CURRY:  Okay.  Thank you.
2          THE WITNESS:  I don't see talc
3     listed here in this document.
4   BY MS. O'DELL:
5     Q.    And in terms of age, it says age
6   older than 55.  True?
7     A.    Yes.
8     Q.    And then in terms of inherited
9   mutations, it lists mutations in BRCA1 and BRCA2
10   genes, correct?
11     A.    Let me get there.
12          I'm sorry, what page are you on?
13     Q.    Page 2.
14     A.    Oh, we're just looking at the list.
15   I'm sorry.  I thought we were looking at --
16     Q.    Yeah, I'm just looking at the list.
17     A.    There is -- yes, it just lists
18   those two genes.
19     Q.    It does not list Ashkenazi Jewish
20   heritage as a risk factor for ovarian cancer.
21   True?
22     A.    It does not.
23     Q.    And I want to -- and I want to now
24   mark as Exhibit 11 the SGO risk factors that you

Page 101

1   reference in your report.
2          (Exhibit No. 11 was marked for
3     identification.)
4          MS. O'DELL:  And, Paula, if you
5     don't have it, I can put it on the
6     screen.
7          MS. BROWN:  I have it, I think.
8     Is this it?
9          MS. O'DELL:  Yes, that's it.
10     Exhibit 11.
11   BY MS. O'DELL:
12     Q.    And you recognize this as the SGO
13   list of risk factors for ovarian cancer.  True?
14     A.    Yes.
15     Q.    And if you look on page 1 of the
16   document, it lists women with BRCA1 or 2
17   mutation.
18     A.    True.
19     Q.    True?
20     A.    Correct.
21     Q.    And it does not list women with
22   Ashkenazi Jewish heritage.  True?
23     A.    It does not.
24     Q.    And we can agree, can't we,

26 (Pages 98 - 101)

Page 102

1 Dr. Saenz, that Ms. Converse tested negative for
2 BRCA1 and 2?
3     A.    Yes, she did.
4     Q.    And in the broader testing that
5 Ms. Converse had, she tested negative for all the
6 known pathogenic genes for ovarian cancer,
7 correct?
8         MS. CURRY:  Object to the form.
9         THE WITNESS:  So she tested
10     positive for two VUSes.  One was in ATM,
11     and those were the same two mutations
12     that her mom had as well.  The VUS that
13     she had in ATM is thought to be
14     pathogenic but perhaps not deleterious.
15 BY MS. O'DELL:
16     Q.    In terms of no pathogenic
17 deleterious gene mutations, inherited mutations,
18 Ms. Converse tested negative to all of those
19 genes.  True?
20         MS. CURRY:  Object to the form.
21         THE WITNESS:  No, that's not
22     true, because pathogenic and deleterious
23     don't necessarily mean the same thing.
24 BY MS. O'DELL:

Page 103

1     Q.    I understand.
2     A.    So the variant that she has in ATM
3 has not -- as we sit here, has not been directly
4 linked to ovarian cancer, in that you are
5 correct, but she does have that mutation.
6     Q.    I understand.
7         But in terms of known genes -- not
8 anticipated, not suspicious, not could be proven
9 in the future -- in terms of known genes that
10 are -- have been established to increase the risk
11 of ovarian cancer, Ms. Converse's testing was
12 negative.  True?
13         MS. CURRY:  Object to the form.
14         THE WITNESS:  That is true.  But
15     the genetics counselors that counseled
16     her were still extremely worried about
17     her and her risk of breast cancer, and
18     her daughter's risk, based on her family
19     history and based on the fact that
20     genetic testing was not entirely normal,
21     and that is the reason that they put her
22     in a high risk breast cancer screening
23     clinic.
24 BY MS. O'DELL:

Page 104

1     Q.    Looking at Exhibit 11, the SGO
2 ovarian cancer risk factors, this document does
3 not list or refer to talc, correct?
4     A.    It does not.
5     Q.    In relation to -- if you wouldn't
6 mind, I want to ask you some more questions about
7 your report, but if you'll keep the list of risk
8 factors handy, I want to ask you some -- I want
9 to go back to them at various points.
10         Looking at your discussion of
11 Ms. Converse, regarding her Ashkenazi Jewish
12 heritage on page 5 of your case-specific
13 report -- do you see that, page 5, about midway
14 through the middle paragraph?
15     A.    Yes.
16     Q.    And you write:  "Being of Ashkenazi
17 Jewish" -- excuse me, "Being of Ashkenazi
18 heritage also increased Ms. Converse's risk of
19 developing ovarian cancer, regardless of her past
20 genetic testing."
21         And then you go on to cite
22 Crawford, et al., 2017, and state:  "Crawford,
23 et al., 2017, reported on women previously found
24 to be negative for mutations in BRCA1 and 2."

Page 105

1         Do you see where I'm reading?
2     A.    Yes, ma'am.
3     Q.    And did I represent that correctly?
4     A.    Yes.
5     Q.    And do you agree, Dr. Saenz, that
6 women who have a personal or family history of
7 breast cancer or ovarian cancer but who do not
8 have a documented BRCA1, 2, or other hereditary
9 breast or ovarian cancers associated gene should
10 be managed based on their family history?  Do you
11 agree with that?
12     A.    In certain circumstances, yes.
13     Q.    And do you agree or disagree with
14 the statement that preliminary data have
15 suggested that women from families with a history
16 of breast cancer -- excuse me -- of only breast
17 cancer but not ovarian cancer, in which no BRCA
18 mutation is identified, remained at a
19 significantly increased risk of breast cancer but
20 not ovarian cancer?
21     A.    I'm sorry, I got lost in there.
22         MS. CURRY:  Where are you
23     reading from?
24         MS. O'DELL:  I'm reading from my

27 (Pages 102 - 105)

Page 106

1     notes, so -- but --
2   BY MS. O'DELL:
3       Q.    So --
4       A.    I'm sorry, because I think we
5   tripped over breast and ovary a couple of times,
6   and so I lost -- I got lost in there.
7       Q.    Okay.  Let me try again.
8             Do you agree or disagree with this
9   statement:  Preliminary data have suggested that
10  women from families with a history of only breast
11  cancer --
12            Are you with me, only breast
13  cancer?
14      A.    Yes, I'm with you.
15      Q.    -- but not ovarian cancer, in which
16  no BRCA mutation is identified, remain at a
17  significantly increased risk of breast cancer but
18  not ovarian cancer?  Do you agree or disagree
19  with that statement?
20      A.    I disagree with that statement.
21      Q.    Why?
22      A.    Because we know that women who have
23  a family history of breast cancer, particularly
24  in a first-degree relative who had their breast

Page 107

1   cancer at less than 50 years old, are at a 3 to 5
2   times -- sorry, 3 to 5 percent risk of developing
3   ovarian cancer.  So it's about 3 to -- a
4   threefold increased risk of developing ovarian
5   cancer just with one first-degree relative, and
6   in particular if that breast cancer occurred at
7   less than 50 years old.
8       Q.    What are you basing that on?  Is
9   there a reference or study that you're relying on
10  in making that statement?
11      A.    Can I go to my general report?
12      Q.    Yeah, sure.
13      A.    Okay.  So in my general report, it
14  would be the Hall 2001 study.  Sorry, that's the
15  primary one.  Sorry, that's if they themselves
16  had cancer before.
17            But there's also NCCN guidelines
18  2024.
19      Q.    And if the NCCN guidelines disagree
20  with statements by ACOG and SGO, it's your view
21  that they would be incorrect?
22      A.    I don't know what you're
23  referencing, and I wouldn't say that.  I mean,
24  it's my view that every organization that we've

Page 108

1   looked at so far has put together their own
2   listing of risk factors, and although there's
3   significant overlap between the two, there are
4   variances within them.
5       Q.    And if -- assume for me that ACOG
6   and SGO have said that women with a history of
7   only breast cancer, BRCA negative, that they are
8   at a significantly increased risk of breast
9   cancer but not ovarian cancer, assume for me that
10  that's correct -- and I'll represent that that is
11  correct that ACOG and SGO have made those
12  statements -- if that's true, you would disagree
13  with ACOG and SGO, and follow the NCCN
14  guidelines.  Is that your testimony?
15            MS. CURRY:  Object to the form.
16            THE WITNESS:  Your assumption is
17        incorrect, though, because I'm actually
18        looking at the SGO risk factors, and it
19        says women who have a strong family
20        history of breast or ovarian.  So SGO
21        has not said not breast.
22  BY MS. O'DELL:
23      Q.    I mean, I'm talking about in terms
24  of a woman who has a family member with breast

Page 109

1   cancer, negative for BRCA testing, that person is
2   at increased risk for breast cancer but not
3   ovarian cancer.  That's the statement that we're
4   discussing.
5       A.    And that statement is incorrect.
6   That's not listed on the SGO risk factors in the
7   way that you're stating that.
8       Q.    Do you disagree that most cases of
9   inherited predisposition to ovarian cancer are
10  caused by pathogenic variance in BRCA1, BRCA2 or
11  other hereditary breast and ovarian cancer
12  associated genes?
13            MS. CURRY:  Object to the form.
14            THE WITNESS:  So I wouldn't say
15        cause for anything.  Again, I don't know
16        what causes cancer in any individual
17        woman because, as we've discussed
18        before, you can have one of those
19        pathogenic variants and never actually
20        get cancer.
21  BY MS. O'DELL:
22      Q.    Okay.  Do you -- and I believe we
23  established this before, so -- we did, we talked
24  about this a minute ago, so I'm not going to

28 (Pages 106 - 109)

Page 110

1 rehash that.
2        Let's me just -- let's focus in on
3 Ashkenazi Jewish heritage.  Do you agree that
4 most of the increased risk of ovarian cancer
5 among women who are of Ashkenazi Jewish descent
6 is accounted for by inherited mutations in BRCA1
7 or 2?
8        MS. CURRY:  Object to the form.
9        THE WITNESS:  I think that's
10 true.  I think the majority are, but
11 there's still a certain percentage of
12 women that are Ashkenazi that don't have
13 identified mutations in those genes that
14 still seem to be at an increased risk of
15 developing ovarian cancer, and we
16 don't --
17 BY MS. O'DELL:
18 Q.    And -- I'm sorry.
19 A.    No, it's okay.
20    -- we don't necessarily know why
21 that is.  We've just seen that.
22 Q.    But even for women who are
23 Ashkenazi Jewish descent and maybe even BRCA1 and
24 2 positive, they're also susceptible to other

Page 111

1 somatic mutations that can contribute to their
2 development of ovarian cancer.  True?
3 A.    We all are.  If you have ovaries,
4 you're at risk.
5 Q.    And so they would be susceptible
6 just like anyone else to reproductive risk
7 factors, for example?
8 A.    They would be at risk for those
9 risk factors contributing to their development of
10 the disease, correct.
11 Q.    And they would be susceptible to
12 environmental risk factors for ovarian cancer as
13 well.  True?
14        MS. CURRY:  Object to the form.
15        THE WITNESS:  So I don't
16 necessarily know what you mean by
17 "environmental," and in fact, I'm
18 unaware of any environmental risk
19 factors increasing the risk of ovarian
20 cancer.
21 BY MS. O'DELL:
22 Q.    And how about your understanding,
23 what's your framework when you're thinking about
24 an environmental risk factor?

Page 112

1        MS. CURRY:  Object to the form.
2        THE WITNESS:  So, in particular,
3 I think about things such as dietary
4 interventions, essentially -- like a
5 lifestyle intervention, if you will.
6        But I'm unaware of any -- at
7 least for the serous histologies, I'm
8 unaware of any environmental factor
9 increasing the risk of developing
10 ovarian cancer.  I mean, I would modify
11 my answer a little bit to say that there
12 is some literature that smoking
13 increases the risk of the development of
14 mucinous ovarian cancer, but I think
15 that's the only environmental risk
16 factor for which there's been somewhat
17 consistent literature in increasing the
18 risk of developing a form of ovarian
19 cancer.
20 BY MS. O'DELL:
21 Q.    So I want to turn now to the
22 article you cite, the Crawford article, and mark
23 that as Exhibit 12.
24        (Exhibit No. 12 was marked for

Page 113

1        identification.)
2 BY MS. O'DELL:
3 Q.    It's Crawford 2017.
4    And let me know when you have it.
5 A.    I will.
6 Q.    Okay.  Thank you.
7        MS. O'DELL:  Is it in there,
8 Paula?
9        MS. BROWN:  I don't see it in
10 here, Leigh.
11        MS. O'DELL:  I'm sorry?
12        THE WITNESS:  She doesn't have
13 it.
14        MS. BROWN:  Yeah, I don't have
15 it in here.
16        MS. O'DELL:  All right.  No
17 problem.
18 BY MS. O'DELL:
19 Q.    Let me just pull that up.
20    I'll share my screen, and I'm also
21 going to put it in the chat so you can have
22 access to it, Dr. Saenz.
23 A.    Thank you.
24 Q.    It should be in the chat now.

29 (Pages 110 - 113)

Page 114

1        THE WITNESS:  Do you have it?
2        MS. CURRY:  I don't see it in
3    the chat.
4        Do you know how to pull that up
5    on here?  I'm not seeing it on -- like a
6    function on her.
7        MS. BROWN:  Yeah, she can't look
8    at you and look at the document, so
9    she's just looking at the document, but
10   she's still with us.
11       MS. O'DELL:  Okay.
12       THE WITNESS:  I'm still here.
13   BY MS. O'DELL:
14   Q.    All right.  Good.  Well, thanks for
15   doing that.
16       So this is the Crawford 2017
17   article you cite in your report.  True?
18   A.    Let me just take a quick look at
19   it. (Peruses document.)
20       I believe so, yep.
21   Q.    And if you'll look -- and I'll just
22   for ease just point you to the abstract and the
23   methods.  They tested 300 women in this study
24   with a multigene panel.  True?

Page 115

1    A.    Yes.
2    Q.    And part of the criteria for their
3    participation in this study was that they tested
4    negative for BRCA1 and 2, correct?
5    A.    In the past.
6    Q.    Yes.  They've been tested for BRCA1
7    and 2, and it was negative.
8    A.    Correct.
9    Q.    And they also met one of the other
10   following criteria, and so they either -- they
11   met, one, personal history of bilateral breast
12   cancer.  True?
13   A.    Yes.
14   Q.    That was one of the criteria.
15   A.    Mm-hmm.
16   Q.    And Ms. Converse does not have a
17   personal history of breast cancer, correct?
18   A.    Correct.
19   Q.    The second -- and a personal
20   history of breast cancer or a -- and, excuse me,
21   a first- or second-degree relative with ovarian
22   cancer.  That was the second criteria, right?
23   A.    Yes.
24   Q.    And Ms. Converse neither has a

Page 116

1    personal history of breast cancer or a first- or
2    second-degree relative with ovarian cancer.
3    True?
4    A.    Correct.
5    Q.    And she did have ovarian cancer.
6    A.    Correct.
7    Q.    And in addition to BRCA1 and 2
8    testing for Ms. Converse, she also had full
9    sequencing testing of BRCA1 and 2.  True?
10   A.    Yes.
11   Q.    And the patients in the Crawford
12   study did not have full sequencing testing of
13   BRCA1 and 2.  Correct?
14   A.    They -- they tested negative --
15   they had comprehensive sequencing, they could
16   have.  Some of them had limited, but some of them
17   had comprehensive sequencing.
18   Q.    It wasn't a criteria of the study,
19   was it, so that everyone had to have
20   comprehensive testing, correct?
21   A.    The patients in the study had
22   either limited or comprehensive, so both were
23   allowed in.
24   Q.    And in Ms. Converse's case, and --

Page 117

1    she had additional testing beyond BRCA1 and 2 in
2    2014, correct?
3    A.    She had additional testing of 20
4    other genes, and that's when those two VUSes were
5    discovered, correct.
6    Q.    And in that testing where she had,
7    you know, the additional testing in 2014, she
8    had, I think you mentioned, 20 additional genes
9    tested.  True?
10   A.    That's what -- that's what the
11   genetics report said, yes.
12   Q.    And in the genetics report, she
13   had -- no mutations were noted.  True?
14       MS. CURRY:  Object to the form.
15       THE WITNESS:  No, that's not
16   true, because those two VUSes were
17   identified.
18   BY MS. O'DELL:
19   Q.    And did the women in the Crawford
20   study have a multigene panel as a part of the
21   testing process?
22       MS. CURRY:  Object to the form,
23   asked and answered.
24       THE WITNESS:  Yes.

30 (Pages 114 - 117)

Page 118

1  BY MS. O'DELL:
2      Q.    Can you show me where it says that
3  in your paper?
4      A.    That the women in the study had
5  testing?
6      Q.    Yeah -- no, no, no.  A multigene
7  panel -- not just BRCA1 and 2 testing but a
8  multigene panel of all the genes associated with
9  ovarian cancer.
10     A.    That's what this study is.  It's on
11 page 3 of 8, multigene panel validation, and --
12     Q.    Yes.
13     A.    -- they looked at --
14     Q.    I'm asking an inartful question.  I
15 apologize.
16          They did not have the range of
17 testing that covered as many genes as
18 Ms. Converse, did they?
19          MS. CURRY:  Object to the form.
20          THE WITNESS:  I don't actually
21     understand what you're asking me.  What
22     this study looked at was comprehensive
23     screening of other genes.
24 BY MS. O'DELL:

Page 119

1      Q.    Right.  But I guess -- I'm sorry,
2  I'm asking it poorly and I apologize, but she --
3  Ms. Converse had a broader panel of testing than
4  the women in the Crawford study, correct?
5          MS. CURRY:  Object to the form.
6          THE WITNESS:  I don't think
7      that's the case, because that was the
8      point of what these authors were doing.
9  BY MS. O'DELL:
10     Q.    Let me -- I mean, I don't want to
11 belabor it, so let me just -- in -- in your
12 report, you say -- I'm back on page 9 of your
13 Converse case-specific report, Exhibit 9, and it
14 says: "Ashkenazi Jewish women have elevated
15 pathogenic mutation" --
16     A.    I'm sorry, Ms. O'Dell, at page 9?
17     Q.    I'm sorry.  Page 5 of Exhibit 9.
18 That's what I was trying to say, page 5 of
19 Exhibit 9, your case-specific report.
20     A.    Okay.  I am now on page 5.  And you
21 are --
22          MS. CURRY:  Can you repeat what
23     you were reading?
24          MS. O'DELL:  Yeah.

Page 120

1  BY MS. O'DELL:
2      Q.    If you're there.
3      A.    I'm there.
4      Q.    It says: "Ashkenazi Jewish women
5  had elevated pathogenic mutation rates of 12
6  percent over -- 12 percent over other
7  ethnicities."
8          Do you see where I'm reading?
9      A.    Yes.
10     Q.    Do you take that from Crawford as
11 well, that 12 percent?
12     A.    That is from Crawford.
13     Q.    And this 12 percent that you're
14 talking about is for women other than those who
15 test negative for pathogenic mutations, correct?
16     A.    I'm not --
17     Q.    Twelve percent does not refer to
18 women like Ms. Converse who tested negative for
19 a -- not only for BRCA1 and 2 but an expanded
20 panel of pathogenic genes.  Correct?
21          MS. CURRY:  Object to the form.
22          THE WITNESS:  I'm not following
23     you.  I'm sorry.  I'm --
24 BY MS. O'DELL:

Page 121

1      Q.    Okay.  I think -- you know, I guess
2  in terms of --
3      A.    I mean, I can -- okay.  Sorry, go
4  right ahead.  I'm sorry.  I'll wait for your
5  question.  I apologize.
6      Q.    What were you going to say?
7      A.    That the 12 percent comes from
8  Table 5.
9      Q.    Okay.  I'm there.
10     A.    Okay.  So the total of Ashkenazi
11 women, the percent that tested positive for
12 mutation that previously tested negative was 12
13 percent.  Line 2 in the table, Ashkenazi women.
14 So that was --
15     Q.    But she -- I guess this is -- we're
16 getting at it now.  This is the confusion.
17          So you're saying this paper is
18 saying that 12 percent that previously tested for
19 BRCA1 and 2 is negative, had a broader panel, and
20 they then tested positive for a gene on the
21 broader panel.  That's the finding of Crawford,
22 correct?
23     A.    Or a mutation that was previously
24 missed in BRCA1 and 2, that's correct.

31 (Pages 118 - 121)

Page 122

1    Q.    Okay.  That's correct.  And in
2  Ms. Converse's case, she tested negative for
3  BRCA1 and 2.  She -- she then tested a broader
4  gene panel, and she was negative for all the
5  genes on that broader panel, correct?
6         MS. CURRY:  Object to the form.
7         THE WITNESS:  No, that's not
8    correct, because she had mutations in
9    ATM and I think it was TGF beta-2.  And
10   they were VUSes, but they were still
11   mutations.
12 BY MS. O'DELL:
13   Q.    Okay.  She -- okay.  Fair enough.
14 Let's -- but let's -- the VUSes are variants of
15 unknown significance, correct?
16   A.    Or uncertain significance.  Both
17 terminologies are used, correct.
18   Q.    And so for those genes that are of
19 known significance, known to -- and accepted they
20 increase the risk of ovarian cancer, she tested
21 negative.  True?
22   A.    I don't -- I would never phrase it
23 that way, because those genes that she did have
24 mutations in were VUSes, which means they have

Page 123

1  yet to be identified as deleterious, but we don't
2  actually -- you can't say they are not cancer
3  causing.
4    Q.    Let me ask it differently.
5    A.    Okay.
6    Q.    She tested negative to every known
7  gene that is established to increase the risk of
8  ovarian cancer.  True?
9         MS. CURRY:  Object to the form.
10        THE WITNESS:  In the panel that
11   she was tested on at the time in 2014.
12 BY MS. O'DELL:
13   Q.    That's true?
14   A.    I will agree with that, with the
15 addition of what I just said.
16   Q.    Okay.  Let's turn to endometriosis.
17   A.    Should we come out of the chat
18 of this paper?
19   Q.    Yes, please.  Thank you.  You can
20 take that off the screen.
21   A.    Okay.
22   Q.    So it's your opinion that
23 endometriosis is a likely substantial
24 contributing factor to Ms. Converse's clear cell

Page 124

1  cancer.  True?
2    A.    It's my opinion that she had
3  endometriosis, and we know that endometriosis can
4  increase your risk of developing ovarian cancer.
5    Q.    But in your opinion, it's not
6  causal.  It just increased her risk, correct?
7    A.    I do not know what causes ovarian
8  cancer in any one particular woman.
9         I'm sorry, Ms. O'Dell, can I
10 interrupt you for one second?  I apologize.  In
11 my review last evening of this report, I saw that
12 I had somehow glitched a portion of a sentence
13 out, and so it doesn't even make sense as a
14 sentence.  And I want to bring that to your
15 attention because it's incorrect.
16        So at the very top --
17   Q.    Where is it?
18   A.    Page 8, the very top, since we're
19 on the endometriosis section.
20        It says:  "Dr. Schwartz," comma,
21 "Ms. Converse's background."  That's not a full
22 sentence.  That's not good English and it doesn't
23 make sense.  That -- I don't know how I cut that
24 out, but what that did and should say, and we can

Page 125

1  supply to you later, is:  "Dr. Schwartz,
2  Ms. Converse's gynecologic oncologist, stated in
3  deposition that he believes that Ms. Converse's
4  cancer arose in an endometriosis background."
5         And the reference there from his
6  deposition testimony is correct, but somehow I
7  butchered that sentence.  I apologize.
8         It's not dissimilar from on page 6,
9  where I actually say:  "As stated above,
10 Dr. Schwartz, Ms. Converse's gynecologic
11 oncologist, believes that her cancer likely arose
12 in a background of endometriosis."
13        I think I may have moved that
14 sentence at one point to another place, and
15 that's what happened.
16        MS. CURRY:  We can supply a new
17   report with the language put back in
18   there.  I think it was just like a half
19   a sentence that somehow got cut out, but
20   the -- it references still that what
21   she's referring to still is there in
22   footnote 34.
23        THE WITNESS:  It didn't -- I
24   don't think it belonged on page 6.  I

32 (Pages 122 - 125)

Page 126

1     think I accidentally cut and pasted it
2     there and spliced it out.  So, sorry.
3  BY MS. O'DELL:
4     Q.    Okay.  And you planned to say that
5  Dr. Schwartz, Ms. Converse's GYN oncologist
6  stated that her clear cell ovarian cancer arose
7  in an endometriosis background.  That's the
8  addition?
9     A.    Yes, ma'am.
10    Q.    Would you agree with me, Dr. Saenz,
11  that there's no mention of endometriosis in
12  Ms. Converse's medical records?
13    A.    I actually don't think that's true,
14  because Dr. Schwartz's op note discusses that the
15  mass was adherent to some degree, and there was
16  extrusion of green fluid from intraoperative
17  rupture of the mass, and that's consistent with
18  endometriosis, and actually the green fluid most
19  likely is old blood and hemosiderin products
20  that -- from the old blood in an endometrioma.
21    Q.    Let me be more clear.
22       In the pathology report,
23  Ms. Converse's surgical procedure, and the date
24  of the report is September 10th, 2007 --

Page 127

1     A.    The pathology.
2     Q.    Correct.
3     A.    Okay.
4     Q.    The pathology report does not
5  contain a finding of endometriosis.  True?
6     A.    They do not specify that, but as
7  Dr. Schwartz said, the initial frozen section was
8  that the cancer was an endometrioid cancer, but
9  the final path was clear cell.  And even
10  Dr. Schwartz interpreted that, because they
11  initially looked at it and thought they were
12  looking at an endometrioid cancer, but it
13  ultimately was clear cell.  That's why he said
14  that this tumor arose in an endometrioid
15  background.  So that the changing --
16    Q.    Let me -- I'm sorry.
17    A.    -- the changing of the histology on
18  the path report from the frozen to the permanent
19  is consistent with endometriosis.
20    Q.    And I just -- and I'm happy to mark
21  this pathology report.  It's -- and I will go
22  ahead and mark it just so there's clarity.
23       MS. O'DELL:  And I was on
24    Exhibit 13?

Page 128

1       MS. BROWN:  Yes.
2       MS. O'DELL:  So Exhibit 13,
3  it's -- Paula, it's the key medical
4  records pathology.  And if you don't
5  have it, I can pull it up for Dr. Saenz.
6       It's Converse HYCCMR00223
7  through 226.
8       MS. BROWN:  The ones I have are
9  not Bates stamped.
10       MS. O'DELL:  Okay.  It's -- I
11  don't know if you can -- if this helps
12  you, but it looks like that
13  (indicating).
14       I don't know if that helps or
15  not.
16       MS. BROWN:  Yes.  This looks
17  like it.  Is that it?
18       THE WITNESS:  It should be
19  September 5th.
20       MS. CURRY:  Yeah.  Do you want
21  to mark it?
22       MS. BROWN:  We got it.
23       (Exhibit No. 13 was marked for
24       identification.)

Page 129

1       MS. O'DELL:  Okay, thank you.
2  BY MS. O'DELL:
3     Q.    Exhibit 13.  And this is the
4  pathology report from Ms. Converse's surgical
5  procedure after her diagnosis or at the time of
6  her diagnosis, and does this pathology report
7  contain a diagnosis or an identification of
8  endometriosis?
9     A.    It doesn't mention it one way or
10  another, but the frozen section was initially
11  interpreted as --
12       I don't know where you went, Leigh.
13  I lost you.  I don't know who I'm looking at.
14    Q.    I'm right here.
15    A.    Oh, okay, you're back.
16       We were looking at something else.
17  I don't know what.
18       MS. CURRY:  Yeah, that was
19  weird.
20       THE WITNESS:  The frozen
21  section --
22       MS. O'DELL:  I've not moved.  I
23  represent that for the record.  I'm
24  sitting right here, so I don't know what

33 (Pages 126 - 129)

Page 130

1    that was.
2  BY MS. O'DELL:
3        Q.    But just so I understand, the
4  pathology report itself that I have marked as
5  Exhibit 13 does not contain a diagnosis of -- or
6  identification of endometriosis, correct?
7        A.    It does not identify -- it doesn't
8  mention its absence or its presence.
9        Q.    And you talked about this reference
10 to intraoperative leakage of green fluid in the
11 operative report.  You mentioned that a few
12 minutes ago.  And you -- you suggest that that
13 means that there was the presence of
14 endometriosis.
15             Is it also true that it could not
16 be endometriosis?
17       A.    I don't think that's the case.  I
18 don't know what else would be green fluid other
19 than hemosiderin.
20       Q.    Masses can be injured during
21 surgery and the contents of the mass extruded
22 without there being any presence of
23 endometriosis.  True?
24             MS. CURRY:  Object to the form.

Page 131

1             THE WITNESS:  Right, but here
2       there was extrusion of green fluid,
3       which is hemosiderin.
4  BY MS. O'DELL:
5        Q.    Is there any medical record in Dr.
6  -- in the hospitalization of Ms. Converse or even
7  Dr. Schwartz's own records from his clinic, is
8  there any medical record that describes her tumor
9  as arising from endometriosis?
10       A.    There's Dr. Schwartz's testimony.
11       Q.    No, no, please, I'm asking about a
12 medical record.
13       A.    I did not see a medical record.
14       Q.    You marked it --
15             THE WITNESS:  So, Margaret --
16       I'm sorry, Leigh, Margaret keeps coming
17       in and out of our screens.  I don't know
18       why.  I think that's where I'm losing
19       you.
20             MS. O'DELL:  Hey, Margaret, do
21       you mind just either --
22             MS. THOMPSON:  Yeah, sorry.  I
23       will turn off my camera.
24             MS. O'DELL:  Okay.

Page 132

1  BY MS. O'DELL:
2        Q.    If you -- did you look at
3  Dr. Godleski's plaintiffs' experts -- expert
4  pathologist's review of Ms. Converse's pathology
5  materials?
6        A.    I did.
7        Q.    And is it your opinion that
8  Dr. Godleski did not examine the pathology
9  materials for the presence of endometriosis?
10       A.    I do not believe that Dr. Godleski
11 indicated one way or another whether or not
12 endometriosis was present.
13       Q.    Pathologists by sort of methodology
14 only identify things -- they only note, I should
15 say, in their reports things they see on
16 pathology.  True?  I mean, that's the general
17 practice of a pathologist.  Would you agree with
18 me on that?
19             MS. CURRY:  Object to the form.
20             THE WITNESS:  No.
21 BY MS. O'DELL:
22       Q.    So, for example, a pathologist
23 doesn't look at a specimen and say all the things
24 they don't see.  They identify what they do see.

Page 133

1  They're not going to look at in an ovarian cancer
2  case pathology materials from the cervix and note
3  there was no cervical cancer.  True?  They
4  just --
5        A.    I don't agree -- I don't agree with
6  you there, because there are times, even in this
7  pathology report, and I call your attention back
8  to specimen 13, where they're looking at the
9  other biopsies that were taken, and they say
10 negative for carcinoma.
11            So I think it depends upon the
12 charge that they are given what they identify and
13 don't identify.  So even in this pathology report
14 on Ms. Converse from Yale, they say negative for
15 carcinoma.  So I can't agree with you.
16            I don't know why Dr. Godleski did
17 not mention the endometriosis that was there, and
18 Dr. Felix identified it, and so did Dr. Schwartz
19 in his deposition testimony.
20       Q.    Dr. Godleski testified to a
21 reasonable degree of scientific and medical
22 certainty that endometriosis was not present.
23            Are you aware of that?
24       A.    I have not seen that testimony.

34 (Pages 130 - 133)

Page 134

1    Q.    Let's talk about your discussion in
2  relation to the studies and endometriosis.  We'll
3  move on from the medical records to the studies
4  themselves.
5            And I'll ask you to turn to page 10
6  of your case-specific report.
7    A.    Okay.
8    Q.    And you list studies that -- you
9  list Terry as showing a statistically significant
10  increased risk with genital talc and clear cell
11  carcinoma on page 10, and you list some other
12  studies as well that you view as not supporting a
13  relationship between clear cell and ovarian
14  cancer in the table.  Correct?
15            MS. CURRY:  Object to the form.
16            THE WITNESS:  So I'm not viewing
17        anything here.  I'm simply listing the
18        nine studies that have examined whether
19        or not there is a specific histologic
20        analysis in breaking down cases in
21        particular with respect to clear cell
22        carcinoma and the perineal application
23        of talc.
24  BY MS. O'DELL:

Page 135

1    Q.    And you're aware of other studies,
2  are you not, Dr. Saenz, that address the
3  connection between talc and nonserous ovarian
4  cancers, which would include clear cell
5  carcinoma.  True?
6            MS. CURRY:  Object to the form.
7            THE WITNESS:  That was not the
8        intent of this table.  I'm not reporting
9        on all other nonserous histologies.  I'm
10        reporting specifically on studies that
11        said they broke out the clear cell
12        histology.  So this is not a report on
13        the collective grouping of the other
14        nonserous histologies.
15  BY MS. O'DELL:
16    Q.    So if Schildkraut 2016 and Wu 2009
17  show an increased risk of genital talc use and --
18  in the cases of nonserous cancers, that wasn't
19  something you intended to put in your table?
20    A.    Correct, because it did not break
21  out specifically the clear cell histologies.  It
22  looked at the collective grouping.
23            And I only focused here, because
24  this is Ms. Converse's case and she had clear

Page 136

1  cell histology, on the studies that looked
2  specifically at clear cell.
3    Q.    And we agree, I believe, that clear
4  cell carcinoma would be in that category of
5  nonserous ovarian cancers.  True?
6    A.    That's -- correct, it is not a
7  serous carcinoma.
8            MS. O'DELL:  May we go off the
9        record just for a moment, please?
10            (Recess.)
11  BY MS. O'DELL:
12    Q.    Dr. Saenz, before we leave the
13  issue of endometriosis, there are -- there's a
14  recent study that's been published that reports
15  on the effect of ovarian cancer risk factors with
16  and without endometriosis.
17            Are you familiar with that?
18    A.    Can you tell me who the authors
19  are?
20    Q.    Sure, absolutely.
21            MS. O'DELL:  We'll go ahead and
22        mark it as Exhibit 14.
23            (Exhibit No. 14 was marked for
24            identification.)

Page 137

1  BY MS. O'DELL:
2    Q.    It's the Phung study, P-H-U-N-G.
3    A.    Yes, I've seen that study.
4    Q.    So, Dr. Saenz, you have in front of
5  you what's been marked as Exhibit 14, a study by
6  Phung that you cited in your report.
7            Do you recall that?
8    A.    Yes.
9    Q.    And it's entitled "Effects of risk
10  factors for ovarian cancer in women with and
11  without endometriosis."  And this is a
12  publication of the Ovarian Cancer coalition --
13  Consortium, the OCAC.
14    A.    Right.
15    Q.    I'm sorry, ma'am, I couldn't hear
16  you very well.
17    A.    Right.
18    Q.    Thank you.  And it is the work of a
19  number of authors from, you know, leading
20  institutions, cancer institutions in the United
21  States and around the world.  Wouldn't you agree
22  with me?
23            MS. CURRY:  Object to the form.
24            THE WITNESS:  I mean, it's

35 (Pages 134 - 137)

Page 138

1    various authors from various
2    institutions around the world.
3  BY MS. O'DELL:
4    Q.    Yes.  And, for example, Dr. Britton
5  Trabert is one of the authors of this study.
6        Do you see that?
7    A.    Yes.
8    Q.    And Dr. Trabert has written
9  extensively in the area of ovarian cancer
10 research.  True?
11       MS. CURRY:  Object to the form.
12       THE WITNESS:  Dr. Trabert has
13       published a number of papers on ovarian
14       cancer, that's correct.
15 BY MS. O'DELL:
16   Q.    And if you will look further, you
17 will see Kathryn Terry, who published the study
18 we were referencing a few minutes ago, who pooled
19 analysis in 2013 and has published extensively on
20 ovarian cancer research, correct?
21       MS. CURRY:  Object to the form.
22       THE WITNESS:  Correct.
23 BY MS. O'DELL:
24   Q.    And Dr. Terry is from Harvard

Page 139

1  University, is she not?
2    A.    I don't actually know.
3    Q.    And then there is Dr. Cramer, who
4  you agree has published largely in this area, and
5  really published the first epidemiological study
6  in ovarian cancer and genital talc use.  True?
7    A.    I believe that Dr. Cramer's first
8  article on this was back in 1982.
9    Q.    That's right.  And he's published
10 extensively since then.  You would agree with
11 that?
12   A.    Yes.
13   Q.    Would you agree with that?
14   A.    Yes.
15   Q.    And that's also true of Dr. Holly
16 Harris, Dr. Andrew Berchuck, those are authors
17 that have written extensively and done extensive
18 research on ovarian cancer in a variety of
19 contexts but also on talc use and ovarian cancer.
20 True?
21       MS. CURRY:  Object to the form.
22       THE WITNESS:  I don't actually
23       know all of their CVs.  I am familiar
24       with their names.

Page 140

1  BY MS. O'DELL:
2    Q.    And Dr. Berchuck is at -- the head
3  of GYN oncology at Duke.  You're aware of that?
4    A.    I know he's at Duke.  I don't know
5  what his title is.
6    Q.    And he's the past president of the
7  Society of Gynecologic Oncology.  True?
8    A.    Yes.
9    Q.    And would be a leader in the
10 profession of GYN oncology, correct?
11       MS. CURRY:  Object to the form.
12       THE WITNESS:  I -- I think you
13       would have to tell me what criteria
14       you're making that evaluation.
15 BY MS. O'DELL:
16   Q.    If you'll look at -- at the
17 study -- if you'll turn to page 2 of the exhibit,
18 and the purpose of this study, the objective was
19 to evaluate the associations between the ten
20 well- established ovarian cancer risk factors and
21 the risk of ovarian cancer among women with and
22 without endometriosis.  Correct?
23   A.    Well, they identify ten factors
24 that they wanted to evaluate the risk of ovarian

Page 141

1  cancer in women with and without endometriosis,
2  but I don't agree that those are all ten well-
3  established risk factors.
4    Q.    I understand you don't agree, but
5  they state they're well-established ovarian
6  cancer risk factors, correct?
7    A.    That word is there, but I don't
8  actually think the literature supports that.
9    Q.    I understand you don't agree, but
10 that's what they -- that's what they write.
11   A.    They put that forth.
12   Q.    And they did -- they performed a
13 pooled analysis of nine case-control studies in
14 the Ovarian Cancer Association Consortium,
15 correct?
16   A.    Yes.
17   Q.    And it involved 8,500 women with
18 ovarian cancer, and 13,592 women who were in the
19 control group.  True?
20   A.    So -- so the nine studies included
21 that many women, but then when they got down to
22 actually looking at the data, and some of the
23 different studies were completely missing data,
24 the numbers were not that robust, and they

36 (Pages 138 - 141)

Page 142

1 described that in their methodology section.
2          So the results are not based on the
3 numbers you just quoted me. Those numbers
4 reflect the numbers that were enrolled in the
5 studies, but as they examined each of the
6 studies -- in fact, I think -- I think
7 somewhere -- if I'm recollecting correctly,
8 somewhere between three to four of the different
9 studies actually had no data at all on some of
10 those risk factors. So the numbers of the final
11 calculations are much less robust.
12      Q.    And you said some of the risk
13 factors, but they in fact -- every study had data
14 on at least some portion of the risk factors in
15 women with and without endometriosis. True?
16      A.    Every study had data on
17 endometriosis, but they didn't on the various
18 risk factors.
19      Q.    I'm not saying every study and data
20 on every risk factor. But what I am saying is
21 this -- that every -- it wasn't included -- let
22 me strike that and start again.
23          Not all of the nine case-control
24 studies had data on every one of the ten ovarian

Page 143

1 cancer risk factors, but they did have data on
2 some of them. True?
3      A.    Not all of the -- I'm sorry, can
4 you -- there was a double negative in there, and
5 it threw me.
6      Q.    I didn't intend to put a double
7 negative. And let me just step back.
8          On page 2 of the exhibit, page 961
9 of the publication --
10          Do you see in the gray box?
11      A.    Yes.
12      Q.    -- they describe the patients, and
13 they say -- they just state there, I'm just
14 reading it: "We included 8,500 women with
15 ovarian cancer and 13,592 control women."
16          That's what it states, correct?
17      A.    That's the total enrollment from
18 the original studies, but not all of those
19 studies contributed to the data on each of the
20 risk factors because they never collected that
21 data.
22      Q.    On each risk factor.
23      A.    Some of them had no data on some of
24 the risk factors at all.

Page 144

1      Q.    I understand.
2      A.    Okay.
3      Q.    But they had some data on at least
4 some of the risk factors.
5      A.    Correct.
6      Q.    And if you'll look on the
7 right-hand side, Dr. Saenz, in the text of the
8 paper, still on the same page, just above the
9 Materials and Methods section --
10          Are you with me, Materials and
11 Methods?
12      A.    Okay.
13      Q.    And it says: "Our analysis
14 considers ten well-established ovarian cancer
15 risk factors, including body mass index (BMI);
16 talc, i.e., talc use; family history of ovarian
17 cancer; nonsteroidal anti-inflammatory drug
18 (NSAID) use; breastfeeding; hormonal oral
19 contraceptive use; parody; tubal ligation;
20 menopausal hormone therapy use; estrogen-only and
21 estrogen/progestin therapy; and age at menarche."
22          Did I read that correctly?
23      A.    Yes.
24      Q.    And for talc and the data that they

Page 145

1 gleaned from their talc analysis, they found that
2 for women who used talc and had endometriosis,
3 the odds ratio was 1.38, with a confidence
4 interval of 1.04 to 1.84. Correct?
5      A.    Where are we now? Oh, I got it. I
6 found where we are.
7          Yes, that's correct.
8      Q.    And for women who used talc --
9 genital talc powder and did not have
10 endometriosis, their odds ratio was 1.12 and the
11 confidence interval was 1.01 to 1.25. Correct?
12      A.    And those are not statistically
13 different. Those are --
14      Q.    I didn't ask you that, ma'am. I'm
15 really -- we can get to where you want to go, but
16 let me just get my question first.
17          For women who used genital talc
18 powder and did not have endometriosis, the odds
19 ratio that they report was 1.12 with a confidence
20 interval of 1.01 to 1.25. Correct?
21      A.    No, that's not correct.
22      Q.    It says 1.12 -- why is that not
23 correct, ma'am? I mean, I'm not talking about
24 the statistical interaction --

37 (Pages 142 - 145)

Page 146

1    A.    That's without endometriosis.
2    Q.    I'm talking --
3         MS. CURRY:  Don't speak
4    over each other.
5    BY MS. O'DELL:
6    Q.    That's what I said, without
7    endometriosis.  It's 1.12, confidence interval
8    1.01 to 1.25.
9    A.    So for women without endometriosis.
10    Q.    Correct.
11    A.    Okay.
12    Q.    And so both women who -- if a woman
13    uses genital talcum powder, she's at increased
14    risk based on this data for ovarian cancer
15    whether she has endometriosis or does not have
16    endometriosis.  True?
17    A.    The odds ratios for talcum powder
18    increasing the risk of ovarian cancer are
19    positive and statistically significant as
20    reported by these authors regardless of
21    endometriosis status.
22    Q.    If you will turn, please, to
23    page 964.
24    A.    My pages are listed as 1, 2, 3,

Page 147

1    4, 5.
2    Q.    Okay.  If that's the case, then if
3    you will turn over to page 5.
4    A.    Okay.
5    Q.    It's the Discussion section.
6    A.    Yes, ma'am.
7    Q.    Do you see that?
8    A.    Yes.
9    Q.    The Discussion section?
10    A.    Yes.
11    Q.    And it begins by saying:
12    "Endometriosis is a common gynecologic condition
13    and a well- established risk factor for ovarian
14    cancer."
15         Do you see that?
16    A.    Yes.
17    Q.    And if you go to the next
18    paragraph, it says -- first, just in brief,
19    "Endometriosis is considered an inflammatory
20    disease."  Four lines down.
21         Do you see that statement,
22    "Endometriosis is considered an inflammatory
23    disease," reference 23?
24    A.    Yes.

Page 148

1    Q.    Do you agree with that statement?
2    A.    I mean, I see the statement.  Yes.
3    Q.    And then it goes on to say:
4    "Because inflammation plays a role in the
5    development of many cancers, including ovarian
6    cancer, the increased risk observed specifically
7    among women with endometriosis is plausible
8    because overweight women with endometriosis may
9    have higher levels of endometriosis" -- I mean,
10    excuse me, "inflammation" -- "higher levels of
11    inflammation."
12         Do you see where I'm reading?
13    A.    I see where you're reading.
14    Q.    And that's what these authors
15    state, correct?
16    A.    They stated that, but their
17    statistical analysis does not show a difference
18    between women with or without endometriosis.
19    Q.    It goes on to say:  "Both
20    endometriotic foci and adipose tissue produce
21    proinflammatory cytokines, including TNF-alpha,
22    IL-1 and IL-6.  These proinflammatory cytokines
23    have been shown to increase the risk of ovarian
24    cancer as they promote the synthesis of

Page 149

1    prostaglandins, which in turn inhibits cell
2    differentiation and apoptosis and enhances
3    invasion and angiogenesis."
4         Did I read that correctly?
5    A.    You read that correctly, but the
6    articles that they're citing to are review
7    articles and not actually original science with
8    any proof of that.
9    Q.    And -- and you disagree with that
10    statement?
11    A.    I do.  There's no original science
12    that shows that.  Reference 3 is Ness, it's all
13    hypotheses.  Earlier you cited to reference 25,
14    that's the Savant review.  None of these are
15    original science papers actually showing that.
16    They're hypotheses.
17    Q.    And you would agree with me, ma'am,
18    that the Savant paper, the review article, cited
19    over 200 references supporting the statements
20    contained in the review, correct?
21    A.    No, most of the articles that
22    Savant cites to are other review articles, not
23    original science.  So there's not --
24    Q.    That's not really my question, but

Page 150

1  --
2      A.    Ma'am --
3          MS. CURRY:  Were you finished
4   with your answer?
5   BY MS. O'DELL:
6      Q.    Can you please -- I apologize, but
7   go ahead, and I'll follow up.
8      A.    Savant's review article does not
9   cite to the original science that demonstrates
10  any benchtop or animal-based research that
11  actually supports these hypotheses.  It mainly
12  cites to other review articles.  And that's what
13  the authors are doing here.
14     Q.    And you disagree with what the
15  authors state?
16     A.    I do not believe that there is
17  actually any science that has shown this.
18     Q.    Okay.
19     A.    In -- I'm sorry, in ovarian cancer.
20     Q.    And so you believe, I guess it's
21  over 25 authors from respected institutions
22  around the country and the world who published
23  extensively in the area of ovarian cancer, just
24  don't know what they're talking about when they

Page 151

1   make these statements in their manuscript?  Is
2   that really what you're saying?
3          MS. CURRY:  Object to the form,
4   argumentative.
5          THE WITNESS:  No, what I'm --
6      what I'm saying is they are proposing
7      hypotheses, and they even use words in
8      their Discussion sections such as
9      "plausible."  They don't actually --
10     it's a Discussion section.  It's not
11     actually science showing this.  And
12     they're putting forth some of the
13     science that has been found, such as
14     there can be proinflammatory cytokines,
15     like TNF-alpha, IL-1 and Il-6.  But how
16     those actually then go on to lead to
17     malignant transformation, they don't
18     cite to anything that shows that.
19  BY MS. O'DELL:
20     Q.    All right.  When they say:
21  "Because inflammation plays a role in the
22  development of many cancers, including ovarian
23  cancer," they don't include the word "plausible,"
24  do they?

Page 152

1      A.    They used the word "plausible"
2   earlier, and what they cite to is Ness, which is
3   not --
4      Q.    Please.  I'm just asking -- when
5   they -- they're not saying that's plausible.
6   They say "because."  "Because inflammation plays
7   a role in the development of many cancers,
8   including ovarian cancer," that's what their --
9   their words -- those are the words they included
10  in their paper.  True?
11     A.    That's what they said, but they
12  also say they've been shown to increase the risk
13  of ovarian cancer, but they don't actually show
14  the mechanism.
15     Q.    Well, and in their data in this
16  study, there's an increased risk of ovarian
17  cancer for genital talc use with and without
18  endometriosis.  True?
19     A.    They report a positive odds ratio,
20  yes.
21     Q.    And they report that not only for
22  genital talc as a risk factor, but they report it
23  for other risk factors as well.  True?
24     A.    Actually, the authors say that

Page 153

1   there's no statistically significant findings in
2   their analysis.  They actually say that in their
3   Discussion section.
4      Q.    I think you're talking about the
5   interaction.
6      A.    Correct.
7      Q.    And I wasn't talking about that.  I
8   was talking about other risk factors.
9      A.    Oh, I'm sorry.  Can you direct me
10  to where you are?
11     Q.    Let's don't get sidetracked.  Let's
12  -- so going back to where we were on this page,
13  they go on to say:  "This would also be in line
14  with our observation of a higher risk associated
15  with genital talc use for women with
16  endometriosis since inflammation has been
17  proposed as a possible biologic mechanism for
18  talc's association with ovarian cancer."
19         That's what the authors state,
20  correct?
21     A.    They have, but they also say that
22  there's no difference between the endometriosis
23  group and the non-endometriosis group.
24     Q.    You can put that away.

39 (Pages 150 - 153)

Page 154

1      Let's go back to Ms. Converse. On
2  page 13 of your case-specific report, you talk
3  about hormone replacement therapy.
4      Let's just set the table, page 12
5  of your -- page 13, excuse me, of your --
6      A.    I don't have a 13.
7      MS. CURRY: Of your general
8  report.
9      THE WITNESS: Oh, of my general
10  report.
11  BY MS. O'DELL:
12      Q.    No, no, no. Forgive me -- let
13  me give you the right page. Sorry, I think I was
14  looking at -- I gave you the page on my outline.
15  I don't know if that is encouraging or not, but
16  that's what I did.
17      Let's set the table with
18  Ms. Converse to make sure we have the facts.
19  Ms. Converse used hormone replacement therapy,
20  estrogen plus progesterone, from 1997 to 2007,
21  for ten years.
22      A.    Correct.
23      Q.    And it's your view that when
24  Dr. Clarke-Pearson stated that combination

Page 155

1  hormone therapy, progesterone plus estrogen, does
2  not increase the risk of ovarian cancer, that he
3  was incorrect?
4      A.    That's correct.
5      Q.    And you go on to state that:
6  "Ms. Converse's use of HRT, combination estrogen
7  plus progesterone therapy, for greater than ten
8  years, the risk of developing ovarian cancer was
9  increased by 20 to 40 percent."
10      You state that on page 6 of your
11  Converse case-specific report.
12      A.    Yep.
13      Q.    And is it your opinion that her
14  increased -- her use of combination HRT increased
15  her risk by 20 to 40 percent?
16      A.    Yes.
17      Q.    And what's the basis for that
18  statement?
19      A.    The various studies that have shown
20  an increased risk of developing ovarian cancer
21  with increasing years of use of HRT.
22      Q.    So do you have a specific citation
23  other than just various -- do you have a specific
24  citation?

Page 156

1      A.    Yes. They're footnoted in the
2  report right there, 21 through 24.
3      Q.    So Urban --
4      A.    Urban.
5      Q.    -- Ovarian Cancer Research Alliance
6  risk factors --
7      A.    Yeah.
8      Q.    -- the Collaborative Group, and
9  American Cancer Society, those are the things
10  that you're relying on?
11      A.    Correct.
12      Q.    I would like you to turn back to
13  what we marked as Exhibit 11, the Society of
14  Gynecologic Oncology's ovarian cancer risk
15  factors.
16      Do you have that?
17      A.    Yes, ma'am.
18      Q.    And if you will go two-thirds down
19  the page, the -- they say: Women who are on
20  estrogen replacement therapy only, without
21  progesterone, for more than five years, they list
22  that as a risk factor. Women who are on estrogen
23  replacement with progesterone are at a lower
24  risk, meaning a lower risk of ovarian cancer.

Page 157

1  That's what they state, correct?
2      A.    No.
3      MS. CURRY: Object to the form.
4      THE WITNESS: That's -- they're
5      saying women that are on combination
6      therapy are at a lower risk than women
7      that are on the risk of estrogen alone,
8      but they're not at a lower risk of
9      developing ovarian cancer.
10  BY MS. O'DELL:
11      Q.    That's your -- that's your
12  understanding?
13      A.    Well, yes, because -- in fact, on
14  page 2 of the same document is where they list
15  things that reduce your risks, and they don't say
16  estrogen alone therapy reduces your risk there.
17  These are risk factors that --
18      Q.    I'm on Exhibit 11 for SGO.
19      A.    So am I.
20      Q.    Okay.
21      A.    If you flip over, some things
22  reduce a woman's risk of developing ovarian
23  cancer. Taking birth control pills reduces a
24  woman's risk, et cetera, et cetera. They do not

40 (Pages 154 - 157)

Page 158

1 say that taking estrogen alone reduces your risk.
2 Estrogen alone --
3     Q.    Well, ma'am, why would they say it
4 there if they've already said women who are on
5 estrogen replacement therapy with progesterone
6 are at a lower risk? They've already said it in
7 this very short document.
8     A.    That's not --
9         MS. CURRY: Object to the form.
10        THE WITNESS: That's not risk
11    reducing overall. They're at a lower
12    risk than women that are on
13    estrogen-only therapy, but they're not
14    at a reduced risk over the background
15    population risk.
16 BY MS. O'DELL:
17    Q.    Let me ask you to look at ACOG's
18 list of risk factors for ovarian cancer. Exhibit
19 10.
20    A.    I have it.
21    Q.    And they don't include hormone
22 replacement therapy as a risk factor for ovarian
23 cancer. True?
24    A.    They don't list it at all, that's

Page 159

1 correct.
2     Q.    And there are published studies
3 that establish that estrogen plus progesterone
4 hormone therapy does in fact reduce the risk of
5 ovarian cancer, correct?
6         MS. CURRY: Object to the form.
7         THE WITNESS: That is not the
8    current thinking in the management of
9    patients with ovarian cancer. Hormone
10    replacement therapy is thought, whether
11    in combination with estrogen and
12    progesterone or estrogen alone, to
13    increase your risk.
14        MS. O'DELL: Let me mark as
15    exhibit -- are we on 16 or 15?
16        MS. CURRY: 15.
17        MS. O'DELL: Okay. Thank you.
18    Exhibit 15, the CDC ovarian
19 cancer risk factors.
20        MS. O'DELL: Do you have
21    those -- do you have that, Paula?
22        MS. BROWN: Sorry, what was
23    that?
24        MS. O'DELL: CDC ovarian cancer

Page 160

1 risk factors.
2         (Exhibit No. 15 was marked for
3         identification.)
4 BY MS. O'DELL:
5     Q.    Do you have it in front of you,
6 ma'am?
7     A.    Yes. Thank you.
8     Q.    Thank you. So, Dr. Saenz, what has
9 been marked as Exhibit 15 is a document published
10 by the CDC, "Ovarian Cancer Risk Factors,"
11 correct?
12    A.    Yes.
13    Q.    And the CDC does not list hormone
14 replacement therapy use as a risk factor -- let
15 me strike that.
16        If you'll go down to the bottom of
17 the page, it says: "Some studies suggest that
18 women who take estrogen by itself without
19 progesterone for ten or more years may have an
20 increased risk of ovarian cancer."
21        They do not include there estrogen
22 plus progesterone, correct?
23    A.    They do not, but other places do.
24 And they also do list an Ashkenazi Jewish

Page 161

1 background.
2     Q.    If you will look -- I want to turn
3 your attention to what I'm going to mark as
4 Exhibit 16, Dr. Saenz.
5         MS. O'DELL: It's a paper by --
6    the first author is Alice Lee. And it
7    should be marked as Lee, L-E-E, and
8    it's -- if you have it there, Paula, I
9    just want to make sure. If not, I can
10    put it up.
11        MS. BROWN: I have it.
12        MS. O'DELL: Okay.
13        (Exhibit No. 16 was marked for
14        identification.)
15 BY MS. O'DELL:
16    Q.    All right, ma'am, do you have it?
17    A.    I do.
18    Q.    Okay. And this is a 2020 study
19 entitled "Estrogen Plus Progestin Therapy --
20 Hormone Therapy and Ovarian Cancer: A
21 Complicated Relationship Explored" published in
22 May of 2020 in the Journal of Epidemiology. Is
23 that correct?
24    A.    Yes.

41 (Pages 158 - 161)

Page 162

1    Q.    And this is also a publication of
2  the Ovarian Cancer Association Consortium.  True?
3    A.    Correct.
4    Q.    And it evaluates -- if you'll turn
5  over to what is my page 3 of the publication, it
6  evaluates primary data from five population based
7  case-control studies in the Ovarian Cancer
8  Association Consortium, including 1,509
9  postmenopausal ovarian cancer cases and 2,295
10  postmenopausal controls.  Correct?
11    A.    Correct.
12    Q.    And they looked at ever
13  postmenopausal use of continuous
14  estrogen-progestin combined therapy was not
15  associated with the increased risk of ovarian
16  cancer overall.
17          Do you see that?
18    A.    I do.
19    Q.    And they conclude that:  "Given
20  that estrogen alone therapy has been shown to be
21  associated with increased risk of ovarian cancer,
22  these findings are consistent with the hypothesis
23  that adding progesterone each day ameliorates the
24  carcinogenic effects of estrogen on cells of

Page 163

1  origin for all histotypes of ovarian cancer."
2          Did I read that correctly?
3    A.    That was their conclusion.  But
4  you -- I mean, you do -- the numbers you were
5  just showing me -- obviously, I have not read
6  this whole paper.  The finding was actually it
7  didn't achieve statistical significance in the
8  combination therapy because the confidence
9  interval overlapped 1.  And there are other
10  papers that show that the risk is increased with
11  both combination and estrogen alone HRT.
12    Q.    Clearly, this study and these
13  authors, the data states that estrogen plus
14  progestin combined therapy was not associated
15  with increased risk of ovarian cancer overall.
16  That was their conclusion.
17    A.    That's not a statistically
18  significant finding, though.
19    Q.    Let me turn back to your Converse
20  report and ask, did you consider any factors that
21  increased -- excuse me.  Strike that.
22          Did you consider any factors that
23  decreased Ms. Converse's risk of ovarian cancer?
24    A.    I believe --

Page 164

1    Q.    And if so, which ones?
2    A.    So she -- she breastfed one of her
3  children for 13 months, so that should have led
4  to a decreased risk of developing ovarian cancer.
5          She had used oral contraceptives
6  for more than ten years, so that should have
7  decreased her risk of developing ovarian cancer.
8  And she had her first child at age 25.
9    Q.    And she had two children, correct?
10    A.    I believe so.
11    Q.    And that would -- having two
12  children would also decrease her risk of ovarian
13  cancer.  True?
14    A.    That's correct.
15    Q.    And what weight did you give for
16  protective factors in reaching your opinions?
17          MS. CURRY:  Object to the form.
18          THE WITNESS:  So you can't take
19    data on risks of either increased or
20    decreased and do an attributable risk
21    analysis for any one individual person.
22          At the end of the day, she got
23    ovarian cancer, and I think hers is a
24    case that illustrates that even if you

Page 165

1    have protective -- quote/unquote,
2    protective factors, things that I term
3    as factors that reduce your risk, you
4    can still get ovarian cancer.
5  BY MS. O'DELL:
6    Q.    What is your methodology for -- or
7  let me strike that and reask it.
8          Do you balance -- do you consider
9  risk factors in conjunction with protective
10  factors to evaluate an individual's overall risk
11  of developing ovarian cancer?
12          MS. CURRY:  Object to the form.
13          THE WITNESS:  In a patient
14    that's already developed the disease or
15    in just a random woman?
16  BY MS. O'DELL:
17    Q.    Let's start out with in general.
18    A.    In general, I mean, we know that
19  there are risk factors that reduce your risk of
20  developing cancer, and so in terms of women, I
21  guess, you know, counseling them whether or not
22  they should use birth control pills to reduce
23  their risk of developing ovarian cancer, I
24  certainly advise women to do that that are

42 (Pages 162 - 165)

Page 166

1  premenopausal, and I advise women that are high
2  risk to do that.
3        But you -- I think I would advise
4  anybody, and if they were saying, What can I do
5  to reduce my risk? I would advise them of the
6  things that we know can reduce their risk. But I
7  can't quantify those things for an individual
8  patient.
9    Q.   Okay.
10       MS. O'DELL: We've been going
11    probably about 45 more minutes since
12    last break. I would like to go off the
13    record.
14       THE REPORTER: We're off the
15    record.
16       (Lunch recess.)
17  BY MS. O'DELL:
18    Q.   Dr. Saenz, let me ask you to turn
19  back to your general report, Exhibit 2. And I
20  want to ask you some questions about your general
21  opinions.
22       And as I launch into that, I want
23  to ask you specifically about the book paper that
24  you cite. If you'll turn to page 15 of your

Page 167

1  general report, you cite, footnote 71, Burke,
2  "Executive Summary of Ovarian Cancer Evidence
3  Review Conference" with appendices.
4        Do you see that?
5    A.   Yes, ma'am.
6    Q.   And I want to understand the
7  emphasis you're placing on Burke.
8        First, you say in your report: "As
9  recently as May 2023, at ACOG's annual clinical
10  and scientific meeting, the executive summary of
11  the ovarian cancer evidence review conference was
12  presented, and the authors concluded that,"
13  quote, "the studies regarding the use of talcum
14  powder and the risk of ovarian cancer are
15  heterogeneous."
16        Did I read that correctly?
17    A.   Yes.
18    Q.   And what is your understanding of
19  what they're saying about heterogeneity in that
20  state?
21    A.   That because of the heterogeneity
22  of the scientific articles that have been
23  published to date, there is no clear evidence
24  that the perineal application of talc increases

Page 168

1  the risk of ovarian cancer development.
2    Q.   They don't say in there --
3        MS. O'DELL: And I will mark it
4    for the record, and I believe we're on
5    Exhibit -- is it 16 or 17?
6        MS. CURRY: It's 17.
7        MS. O'DELL: Okay. Thank you.
8        -- the Burke paper.
9        (Exhibit No. 17 was marked for
10       identification.)
11       MS. O'DELL: And they -- I would
12    also mark at the same time the
13    appendix -- appendices as Exhibit 18 of
14    the Burke paper.
15       (Exhibit No. 18 was marked for
16       identification.)
17       THE WITNESS: I have it.
18  BY MS. O'DELL:
19    Q.   Okay. Great.
20        And Exhibit 17 is the Burke paper
21  you mention, right, at footnote 71, just for the
22  record.
23    A.   Yes.
24    Q.   And I'll ask you to turn to

Page 169

1  page 183.
2    A.   Okay.
3    Q.   The left-hand column, and in the
4  upper -- the first paragraph -- do you see that?
5    A.   Yes.
6    Q.   And this is in a section entitled
7  "Lifestyle," and the last sentence states: "Our
8  review found heterogeneity in the studies on the
9  use of talcum powder and ovarian cancer risk,
10  Appendices 3," and it gives a link, "provides a
11  complete evidence summary."
12       That is the complete statement in
13  this document regarding talcum powder, correct?
14    A.   Well, along with --
15       MS. CURRY: Object -- sorry.
16       THE WITNESS: Along with the
17    appendix they refer you to.
18  BY MS. O'DELL:
19    Q.   I understand, but there's no other
20  reference, discussion, explanation regarding talc
21  in this document besides that one sentence.
22  True?
23    A.   In 17, no, but 18 is part of 17,
24  because --

43 (Pages 166 - 169)

Page 170

1    Q.    Yes.
2    A.    Yeah.
3    Q.    I understand.
4         So let's turn to 18.  And I'll ask
5    you if you'll turn to page 27 of 71 in
6    Exhibit 18.
7    A.    I'm there.
8    Q.    Are you there?
9    A.    Yes.
10   Q.    Okay.  Thank you.
11        And this is the entirety of the
12   discussion on talcum powder, correct?
13   A.    Correct.
14   Q.    And they list certain studies
15   under -- in this section.  And if you'll notice,
16   the first reference is 18, and it -- in the third
17   paragraph, it cites to 21.  So, really, it's 18
18   through 21 of the references are those that refer
19   to genital talc and ovarian cancer.
20        Do you see what I'm saying here?
21        MS. CURRY:  Object to the form.
22        THE WITNESS:  Actually, it's 17
23   through 21, because in the next
24   paragraph they reference the NCCN

Page 171

1    guidelines, and that's 17.
2    BY MS. O'DELL:
3    Q.    Okay.  In terms of the scientific
4    studies, if you'll turn to the references on
5    page 40 of 71, you'll see -- and tell me when
6    you're there.
7    A.    I'm there.
8    Q.    So 40 of 71 lists reference 17
9    through 21, and 17 is the NCCN guidelines that
10   you referred to, and 18 through 21 are the talc
11   ovarian cancer studies that they reference in
12   this appendices, correct?
13   A.    Yes.
14   Q.    Huncharek, Berge, Taher, and
15   Penninkilampi.
16   A.    Yes.
17   Q.    And those are only four
18   of essentially more than 40 studies that are
19   referenced in this summary.  True?
20   A.    Those are the four they reference,
21   but some of those studies that they referenced
22   are meta-analyses, and so they do include data
23   from those other studies that you are saying are
24   the 40 studies.

Page 172

1    Q.    Right.  But they don't include some
2    of the meta-analyses.  True?
3    A.    Some of these -- oh, you mean some
4    of the other meta-analyses that have been
5    published?
6    Q.    Correct.
7    A.    No, they don't.
8    Q.    That's right.  And they don't
9    include the other pooled studies that have been
10   published, correct?
11   A.    That's correct.
12   Q.    And -- and so they cite these four,
13   but there's obviously a whole body of literature
14   that is not referenced in this short summary.
15   True?
16        MS. CURRY:  Object to the form.
17        THE WITNESS:  That's correct.
18   BY MS. O'DELL:
19   Q.    And they go through the studies,
20   and at the fourth paragraph, last paragraph, they
21   conclude:  "The studies regarding the use of
22   talcum powder and the risk of ovarian cancer are
23   heterogeneous."
24        That's the same statements included

Page 173

1    in the publication, correct?
2    A.    Yes.
3    Q.    There's no statement from ACOG
4    regarding cause, whether talc is causal or
5    noncausal, correct?  They never use the word
6    "cause."
7    A.    They do not use the word "cause,"
8    but they say that talc has not been conclusively
9    associated with the development of ovarian
10   cancer.
11   Q.    Well, actually what they say,
12   ma'am, is on the basis of seven studies, the NCCN
13   guidelines state that environmental factors have
14   not been conclusively associated with the
15   development of ovarian cancer.  They are quoting
16   and referencing the NCCN guidelines there,
17   correct?
18   A.    Correct.
19   Q.    It's not a statement of what ACOG
20   is concluding.
21        MS. CURRY:  Object to the form.
22        THE WITNESS:  I disagree with
23   that.  They're putting that statement in
24   there, and this is an ACOG document.  So

44 (Pages 170 - 173)

Page 174

1    I disagree with that. I think that they
2    are allowed to quote from another
3    document and then put it in their
4    document. They're agreeing with that
5    statement.
6  BY MS. O'DELL:
7    Q.    I'm not saying they're not allowed
8  to quote. That's not my point.
9          And the NCCN guidelines talk about
10 environmental factors, correct?
11   A.    And whether or not they increase
12 the risk of developing ovarian cancer, correct.
13   Q.    That's not what they say actually,
14 is it, Dr. Saenz?
15         Because what they state is not
16 increased risk. What they state is that:
17 "Environmental factors have not been conclusively
18 associated with the development of ovarian
19 cancer." That's the statement that's quoted,
20 correct?
21   A.    That's the statement, but that's
22 whether or not they increase risk. The
23 development of ovarian cancer is whether or not
24 it increases the risk of development.

Page 175

1    Q.    In your mind, and based on --
2  increased risk is the same thing as something
3  being conclusively associated with the
4  development of a disease. Is that your
5  testimony?
6    A.    The statement here says that:
7  "Environmental factors have not been conclusively
8  associated with the development of ovarian
9  cancer."
10         So there is no data that
11 environmental factors alter the risk of the
12 development of ovarian cancer.
13   Q.    It doesn't say there's no data in
14 the statement, does there, ma'am?
15   A.    That's what it does in terms of the
16 analysis. It says that there is -- these factors
17 have not been conclusively associated with the
18 development.
19   Q.    And that is not the equivalent of
20 no data.
21   A.    No, it's the summary of the data.
22   Q.    I know, ma'am. I know.
23         Huncharek, the study cited by this
24 summary, reports a 33 percent statistically

Page 176

1  significant increased risk of ovarian cancer with
2  genital talc. True?
3    A.    That's what they reported. But
4  they --
5    Q.    And if you -- just -- just if you
6  could bear with me -- Berge, in the second
7  paragraph, reports a 22 percent increased risk as
8  statistically significant.
9          MS. CURRY: Object to the form.
10 BY MS. O'DELL:
11   Q.    Do you see that?
12   A.    That's what the study reported
13 based --
14   Q.    And so --
15         Sorry.
16   A.    No, go ahead.
17   Q.    And so this document includes data
18 that shows an increased risk of ovarian cancer
19 with genital talc use, correct?
20         MS. CURRY: Object to the form.
21         THE WITNESS: And it also
22     includes data that shows that there's
23     not an increased risk. That's what they
24     mean by the data are heterogeneous, the

Page 177

1    studies are heterogeneous.
2  BY MS. O'DELL:
3    Q.    Is there any study that they've
4  cited and they've included the data that doesn't
5  show a statistically significant increased risk?
6    A.    So when they are pointing out in
7  the Berge analysis, they say -- and for the
8  cohort studies, the HR is 1.02 with the
9  confidence intervals of 0.85 to 1.2. That's --
10   Q.    All right.
11   A.    That's a finding that does not show
12 an increased risk. That's what they mean by the
13 studies are heterogeneous.
14   Q.    And you think that it is the
15 comparison of the cohort and the -- the cohort
16 data to the other studies is what they're
17 referring to when they say heterogeneous?
18         MS. CURRY: Object to the form.
19         THE WITNESS: That's part of it.
20 BY MS. O'DELL:
21   Q.    What else are they referring to?
22   A.    The studies that they analyzed, and
23 here we're referring to the statement from the
24 NCCN that looked at seven studies, and they say

45 (Pages 174 - 177)

Page 178

1 the studies regarding the use of talcum powder
2 and the risk of ovarian cancer are heterogeneous.
3 That means that they are --
4    Q.    Let me just ask --
5    A.    That means that they're not
6 consistent.
7    Q.    In the NCCN guidelines --
8        MS. O'DELL: And I'm going to
9 mark those as Exhibit 19.
10        (Exhibit No. 19 was marked for
11        identification.)
12 BY MS. O'DELL:
13    Q.    And if you will turn, Dr. Saenz, to
14 MS-3.
15    A.    Yes, I'm there.
16    Q.    And the extent of the NCCN
17 guidelines version February 2024 for ovarian
18 cancer, they extended their comment that would be
19 relevant to talc is: "Environmental factors have
20 been investigated, such as talc, but so far they
21 have not been conclusively associated with the
22 development of this neoplasm."
23        Did I read that correctly?
24    A.    Yes.

Page 179

1    Q.    And they cite 56 through 63, I
2 believe it is.
3        MS. CURRY: 66. 56 through 66
4 is what they cite.
5        MS. O'DELL: Thank you.
6 BY MS. O'DELL:
7    Q.    And if you look at 56 is -- is
8 Taher. Do you see that?
9    A.    Yes.
10    Q.    And you are aware that Taher showed
11 an increase risk of ovarian cancer with talc use,
12 correct?
13    A.    I believe that they did, yes.
14    Q.    And you're aware also that in 58
15 that Penninkilampi reported a statistically
16 significant increased risk with the use of
17 genital talc, correct?
18        MS. CURRY: Object to the form.
19        THE WITNESS: For the
20        case-control studies but not the cohort.
21 BY MS. O'DELL:
22    Q.    The overall data point is
23 statistically significant, correct?
24    A.    Correct.

Page 180

1    Q.    And for Berge, for all studies,
2 it's a statistically significant increased risk,
3 correct?
4    A.    But the Berge study actually showed
5 that the weight of that statistically significant
6 finding was from the case-control studies
7 because, as we just pointed out, when they pulled
8 out the cohort studies, that finding was not
9 significant.
10    Q.    Oh, they say that they, and
11 assuming environmental factors means talc in this
12 context, have not been conclusively associated
13 with the development of neoplasm -- of this
14 neoplasm.
15        And you agree with that statement?
16    A.    Yes.
17    Q.    And what would it take, Dr. Saenz,
18 for an association with genital use of talc to,
19 quote, conclusively be associated with ovarian
20 cancer?
21    A.    It would require that the
22 literature be consistent to not have positive and
23 negative findings within the various studies. It
24 would take a consistent strength of association.

Page 181

1 It would take evidence of a biologic gradient.
2 And it would take evidence of biologic
3 plausibility for the mechanism of migration as
4 well as the mechanism of mutagenesis.
5    Q.    Do you view conclusively as being a
6 hundred percent certain?
7        MS. CURRY: Object to the form.
8        THE WITNESS: No.
9 BY MS. O'DELL:
10    Q.    How much less than a hundred
11 percent do you have to be for it to be
12 conclusive?
13        MS. CURRY: Object to the form.
14        THE WITNESS: I can't quantify
15        that for you because it is a subjective
16        evaluation of the totality of the data.
17 BY MS. O'DELL:
18    Q.    Is it necessary for cause to be
19 established that it be done -- that it be
20 accomplished conclusively?
21        MS. CURRY: Object to the form.
22        THE WITNESS: I think that for
23        cause to be established, there has to
24        be, as I said, consistency in the data,

46 (Pages 178 - 181)

Page 182

1    and more than just a hypothesis.  There
2    has to be some level of either in vivo
3    or in vitro studies that can explain the
4    mechanism of malignant transformation as
5    is put forth and hypothesized about, as
6    well as consistency in the epidemiologic
7    data and in the migration data in terms
8    of the actual ability of talc to move
9    from a perineal application to something
10   that is now inciting an inflammatory
11   response in the ovaries.  I don't think
12   we have any data for that.
13   BY MS. O'DELL:
14       Q.    You and I have talked about that at
15   length.  We'll leave that for another day just to
16   conserve time.
17            Would it be fair to say that
18   neither Burke nor the NCCN guidelines cite to the
19   in vitro data regarding talc?
20       A.    They do not cite to that, that is
21   correct.
22       Q.    And neither Burke nor the NCCN
23   guidelines cite to the International Agency for
24   Research on Cancer 2012 monograph regarding

Page 183

1    asbestos, correct?
2        A.    In this section -- well, in this
3    section that we're looking at, they do not cite
4    to that, that is correct.  I'm not looking at the
5    entire document, so I don't know if that's
6    anywhere else.
7        Q.    I'm talking about only their
8    ovarian cancer talcum powder discussion.
9        A.    Correct, in this section of the
10   paper, they do not cite to that.
11       Q.    And they do not cite to the O'Brien
12   2020 publication, correct?
13       A.    That's correct.
14       Q.    They do not cite to the O'Brien
15   2024 publication, correct?
16       A.    Well, Burke was published before
17   that anyway, so they're not going to cite to
18   that.  And I think the NCCN guidelines came out
19   before O'Brien was published as well.
20       Q.    And they do not cite to the Woolen
21   2022 meta-analysis.  True?
22       A.    That's correct.
23       Q.    I would like to ask you to turn
24   your attention to Exhibit No. 20.

Page 184

1            MS. CURRY:  What is Exhibit 20?
2            MS. O'DELL:  I was just about
3    to announce it.  Sorry.  I had a little
4    pause there.
5            It's entitled "Epithelial
6    Ovarian Cancer."  It's by Arora.
7            (Exhibit No. 20 was marked for
8            identification.)
9    BY MS. O'DELL:
10       Q.    Let me know when you have it,
11   please.
12       A.    Okay, I have it.
13       Q.    And I'll represent to you,
14   Dr. Saenz, that this is a book chapter that was
15   obtained from the NCBI Bookshelf from the series
16   of National Library of Medicine, National
17   Institutes of Health, published in -- it was last
18   updated May 6, 2024.
19            Do you see that?
20       A.    Oh, yes.  Okay.
21       Q.    And this is an article that was
22   published by -- or written by four authors,
23   including Elsa Vadakekut.
24            Do you see that?

Page 185

1        A.    Yes.
2        Q.    And she's from the American College
3    of Osteopathic Obstetricians and Gynecologists.
4    Do you see that?
5        A.    No.  Where am I supposed to see
6    that?
7        Q.    Number 3.
8        A.    I see her name, but I don't know
9    what her training is.
10       Q.    It's actually just right below, her
11   affiliation --
12       A.    It's not there.  Yeah, it's not
13   there.
14       Q.    Okay.
15       A.    And it's really blurry -- okay.
16   No.
17       Q.    I'm sorry if it's blurry.  I'll
18   just try to -- it's not a big point.
19       A.    Okay.
20       Q.    Let me ask you to turn to page 2.
21   And I want to make sure you have what I'm looking
22   at, and that is there's a section entitled
23   "Etiology.  Ovarian Cancer Risk Factors."
24       A.    Yes.

47 (Pages 182 - 185)

Page 186

1    Q.    And it lists "perineal talc use,"
2    correct?
3    A.    Yes, it does.
4    Q.    Thank you, ma'am.  I want to put
5    that aside.
6        I want to turn to your report --
7    A.    I'm sorry, which -- so -- may I
8    ask?  So was the point of this just for me to
9    read into the record that this one paper cites
10    perineal talc use without any data or evidence or
11    opportunity to analyze this?
12    Q.    I guess, Dr. Saenz, the point is
13    I've got seven hours to get through this, and I'm
14    just doing it as quickly and as efficiently as I
15    can, and so --
16    A.    Right, but I -- I appreciate that,
17    but I don't understand the relevance of this
18    exhibit.
19    Q.    I understand.  I understand.
20    Sometimes our difference in point of views will
21    make it difficult for us to agree on the
22    relevance of something.  I understand.
23        Let me ask you to go back to your
24    report on page 13, please.  And actually page 16.

Page 187

1    A.    Okay, I'm there.
2    Q.    Thank you.
3        In your Talc and the Risk of
4    Ovarian Cancer - Overview section, you added in
5    your new report a reference to eating processed
6    meat and chronic physical inactivity or watching
7    TV for greater than five hours a day, and you
8    added references footnotes 73 through 75.
9        Do you see that?
10    A.    Yes.
11    Q.    And the question I have is,
12    Dr. Saenz, would you agree with me that in regard
13    to eating processed meat, that there are not more
14    than 40 studies that examined that issue
15    regarding ovarian cancer?
16        MS. CURRY:  Object to the form.
17        THE WITNESS:  I -- I don't know
18    how many studies there are on eating
19    processed meat.
20    BY MS. O'DELL:
21    Q.    Have you done a systematic review
22    for either processed meats or physical
23    inactivities and ovarian cancer?
24    A.    To the same degree that I've done

Page 188

1    it for talc?
2    Q.    Yes.
3    A.    No, I have not.
4    Q.    Turn over to page 13.  Please
5    excuse me, 18.  I'm sorry, I keep saying 13.
6    A.    You know that's Taylor Swift's
7    lucky number.
8    Q.    I heard that.  I'm always looking
9    for a lucky number.
10        You say in the middle of the top
11    paragraph, and beginning with "Additionally":
12    "Additionally, the literature on the use of
13    anti-inflammatory agents aspirin and NSAIDs has
14    not consistently been shown to decrease the risk
15    of developing ovarian cancer as it has in
16    malignancies that are known to arise from
17    induction of chronic inflammatory state, e.g.,
18    colon cancer."
19        Did I read that correctly?
20    A.    Yes, ma'am.
21    Q.    And you would agree with me that
22    there have been studies that have shown that the
23    consistent use of aspirin decreases the risk of
24    ovarian cancer.  True?

Page 189

1        MS. CURRY:  Object to the form.
2        THE WITNESS:  So there have been
3    some studies that show that low dose
4    aspirin is associated with a decreased
5    risk of ovarian cancer, but that regular
6    dose aspirin or aspirin use actually
7    for -- I think it was longer than --
8    more than six times a week and more than
9    six years has perhaps either no effect
10    or maybe even increases the risk.  So
11    the literature that has been published
12    on aspirin and the use of NSAIDs and the
13    risk of developing ovarian cancer has
14    been inconsistent.
15    BY MS. O'DELL:
16    Q.    You were referring to -- or
17    remembering a specific study regarding aspirin
18    use, and I'd ask you which one you were thinking
19    of.
20    A.    I think there was a study by Barnes
21    at one point on aspirin use.
22        I think there was also -- let me
23    find -- there was another study -- 233, 234.  So,
24    oh, sorry, there was the Wu study.  There was

48 (Pages 186 - 189)

Page 190

1 also the Barnard study. It wasn't Barnes, it was
2 Barnard. And those are both referenced on page
3 46 of my report. And then there was also the --
4 Hurwitz study. Correct.
5    Q.    So Wu was in 2009, correct?
6    A.    Yes.
7    Q.    Barnard was in 2018. Correct?
8    A.    Correct.
9    Q.    And you go on to talk about Trabert
10 and Hurwitz.
11    A.    Correct. And then there's also --
12    Q.    And --
13    A.    I'm sorry, there's also the Merritt
14 study from 2008.
15    Q.    And in regard to aspirin in
16 particular, both Trabert and Hurwitz report that
17 the use of aspirin decreases the risk of ovarian
18 cancer. True?
19        MS. CURRY: Object to the form.
20        THE WITNESS: Actually, only for
21    the first ten years of use, and then the
22    risk-benefit falls off or was actually
23    slightly elevated.
24 BY MS. O'DELL:

Page 191

1    Q.    But Trabert, for example, reports a
2 10 percent reduction in ovarian cancer for daily
3 use of aspirin.
4        You actually write that in your
5 report. True?
6        MS. CURRY: Object to the form.
7        THE WITNESS: Right, and that's
8    exactly what I wrote, and then I
9    finished that sentence. But that was
10    only for the first ten years of use,
11    after which the benefit was no longer
12    there or the actual ratio flips and the
13    risk becomes increased. That's --
14    that's from Trabert.
15 BY MS. O'DELL:
16    Q.    And then Hurwitz reports a 13
17 percent reduction of ovarian cancer with the
18 frequent use of aspirin. True?
19        MS. CURRY: Object to the form.
20        THE WITNESS: Yes.
21        MS. O'DELL: And I will just
22    mark for the record as Exhibit -- am I
23    at 22?
24        MS. CURRY: 21.

Page 192

1        MS. O'DELL: -- 21, the Trabert
2 article from 2019.
3        (Exhibit No. 21 was marked for
4        identification.)
5 BY MS. O'DELL:
6    Q.    And this is an OCAC -- excuse me,
7 this is an Ovarian Cancer Cohort Consortium
8 study, correct?
9    A.    Yes.
10    Q.    And so in other words, this is a
11 study that includes data from multiple cohort
12 studies that had been -- all the patients had
13 been considered together. True?
14    A.    Correct.
15    Q.    And it includes as authors on the
16 study Dr. Trabert, Dale Sandler, Katie O'Brien,
17 Nicholas Wentzensen, and Shelly Tworoger, all of
18 whom have published extensively in this area.
19        MS. CURRY: Object to the form.
20 BY MS. O'DELL:
21    Q.    Agree?
22    A.    I am not familiar with the
23 public -- with the CVs or publication lists of
24 all of those authors.

Page 193

1    Q.    Well, having read the literature in
2 this area for purposes of this case, you would --
3 you recognize these authors, many of the authors
4 I just named, true?
5    A.    Some of them. Not all of them.
6    Q.    Katie O'Brien is somebody you
7 recognize her name, I'm sure.
8    A.    For sure.
9    Q.    And if you'll look on page 1 in the
10 Introduction on the right-hand side, these
11 authors state: "Chronic inflammation likely
12 plays a key role in ovarian cancer
13 carcinogenesis."
14        Did I read that correctly?
15        MS. CURRY: I'm sorry, where are
16    you?
17        THE WITNESS: Oh, right here.
18        Yes, you read that correctly.
19 BY MS. O'DELL:
20    Q.    And you disagree with that
21 statement. True?
22    A.    Well, again, they are referencing
23 to Ness, which is a hypothesis paper, not
24 science. And the authors here actually say

49 (Pages 190 - 193)

Page 194

1  "likely," so they qualify it.  So I don't think
2  that's a conclusive statement.
3      Q.    And if you'll look in the results,
4  Dr. Saenz, and we can look at either results in
5  the abstract or I'm happy to point you to
6  Table 2, but in the results of the abstract, it
7  says:  "Women who used aspirin almost daily,
8  greater than six days a week, versus infrequent
9  nonuse, experienced a 10 percent reduction in
10  ovarian cancer risk."  Correct?
11      A.    Correct, and that's what I cited to
12  in my report.
13      Q.    Okay.  And despite the fact that
14  both in Trabert and Hurwitz, the use of aspirin,
15  which is a nonsteroidal that reduces
16  inflammation, it's your view that inflammation is
17  not associated with the development of ovarian
18  cancer; is that correct?
19      A.    So the studies show that the
20  benefit of aspirin use is not consistent, and in
21  fact, even in this paper, the authors say that
22  they don't understand why more than ten-plus
23  years of use potentially elevates the risk for
24  the development of ovarian cancer.

Page 195

1      So the inconsistency in this
2  literature is why I say that there is not
3  consistent evidence that inflammation is
4  developed -- sorry, is associated with the
5  development of ovarian cancer.
6      MS. O'DELL:  Okay.  And I'm
7      going to mark for the record exhibit --
8      as Exhibit 22 the Hurwitz paper.
9      Please, Paula.  Thank you.
10      (Exhibit No. 22 was marked for
11      identification.)
12  BY MS. O'DELL:
13      Q.    And Exhibit 22 is the Hurwitz paper
14  you cite in your report, correct?
15      A.    Yes.
16      Q.    And this actually is from the
17  Ovarian Cancer Association Consortium or OCAC.
18  True?
19      A.    Yes.
20      Q.    And it also includes non- -- well,
21  let me just back up.
22      It includes non-cohort studies from
23  the Ovarian Cancer Cohort Consortium of 2,600
24  cases, correct?

Page 196

1      A.    Did you say nine or non?  Oh, nine.
2  Sorry.  Yes, nine.
3      Q.    Nine, correct.
4      And eight case-control studies from
5  the Ovarian Cancer Association Consortium with
6  5,726 cases of ovarian cancer, correct?
7      A.    Correct.
8      Q.    And they go on to say in the
9  conclusion that:  "This study is the largest to
10  date on aspirin use and ovarian cancer.  It
11  provides evidence that frequent aspirin use is
12  associated with lower ovarian cancer risk
13  regardless of the presence of most other ovarian
14  cancer risk factors."
15      Did I read that correctly?
16      A.    Correct.
17      Q.    And this was published in 2022.
18      A.    Correct.
19      Q.    Correct?
20      And this is the most recent
21  publication of aspirin and ovarian cancer,
22  correct?
23      A.    I believe so.  It's the most recent
24  one I cited to.

Page 197

1      Q.    And in this case, it's the largest,
2  it's the most recent, and it shows a 13 percent
3  reduction of ovarian cancer risk with the use of
4  aspirin.  Correct?
5      A.    With greater than or equal to six
6  days of use for more than, I think it was, six
7  months.
8      Q.    And there's no limitation or any
9  increased risk associated with greater than ten
10  years reported in this -- in the Hurwitz study,
11  correct?
12      A.    I don't know how long they followed
13  the women for in this study.  I would have to
14  look at that.
15      Q.    And if you will turn to page 5 of
16  the paper, the lower right-hand column under
17  Discussion, the last sentence says:  "The
18  consistency of frequent aspirin use and ovarian
19  cancer association across the individual
20  case-control and cohort study populations was
21  notable and provides strong support for the
22  beneficial effect of frequent aspirin use on
23  ovarian cancer risk."
24      That was the conclusion of the

50 (Pages 194 - 197)

Page 198

1 authors, correct?
2     A.     Correct. But, I mean, within this
3 study they actually found no benefit to reduction
4 in risk of endometrioid or clear cell carcinomas,
5 which are thought to be associated with
6 endometriosis, an inflammatory process.
7             And in fact, in the sentence you
8 just read, although the authors are summarizing
9 what their data -- their results showed, they
10 don't have a hypothesis as to why that benefit
11 is. So the mechanism is still lacking.
12     Q.     That's not what they're saying that
13 the mechanism -- they don't state in this paper
14 that the mechanism is still lacking, do they,
15 ma'am?
16     A.     They don't state that they have
17 one.
18     Q.     No, that's not my question. Do
19 they make a statement in this paper that the
20 mechanism is lacking in regard to aspirin and
21 ovarian cancer?
22     A.     They don't have a mechanism.
23     Q.     No, no, no. You just said they
24 state the mechanism is lacking.

Page 199

1     A.     No, I said that --
2     Q.     That's not included in this paper,
3 and that's what I'm trying to establish.
4     A.     I said they don't describe the
5 mechanism and they don't have a hypothesis for
6 the mechanism. I said that, they don't list
7 that.
8     Q.     In fact, they do have --
9     A.     And that's --
10     Q.     I'm sorry. Please go ahead.
11     A.     And that's true. Their statement
12 just said that with frequent use greater than six
13 days per week, more than six months, there is a
14 reduction in risk of 13 percent in ovarian
15 cancer. But it is perplexing to them because
16 they discuss it as to why that benefit was not
17 seen with the cancers typically associated with
18 endometriosis. So they say there's a reduction
19 of risk, but they don't say why.
20     Q.     And they say at the beginning, the
21 whole premise -- and I don't want to rehash this
22 because we talked about it before -- on page 1,
23 that chronic inflammation likely plays a key role
24 in carcinogenesis, and that's the reason they're

Page 200

1 looking at aspirin, which is a nonsteroidal which
2 inhibits inflammation. That's the premise of the
3 paper.
4     A.     They say likely, and they cite to
5 Ness, which again has no data in it.
6     Q.     Okay. Let's turn back to page --
7 sorry, just a second here -- page 19 of your
8 report.
9             You begin your section on
10 epidemiology, and I want to talk about a couple
11 of things. First, page 19, at the bottom of the
12 paragraph, you include a statement: "None of the
13 studies found an odds ratio of greater than 2
14 when looking at never versus ever perineal use of
15 talc in ovarian cancer."
16             Why did you reference greater than
17 2 as a threshold odds ratio?
18     A.     It's just a fact.
19     Q.     No, I'm saying why was that
20 relevant? Is it your opinion that an odds ratio
21 would have to be greater than 2 in order for an
22 agent to be causal?
23     A.     No.
24     Q.     Is it your opinion that an

Page 201

1 increased risk of less than 2 can still be
2 causal?
3     A.     Yes.
4     Q.     What is an example of that?
5     A.     I believe hormone replacement
6 therapy and the risk of developing breast cancer.
7     Q.     Any others?
8             MS. CURRY: Object to the form.
9             THE WITNESS: I believe -- I
10     don't know across the board, but I
11     believe some of the smoking studies had
12     an overall risk of less than 2, but the
13     literature was consistent.
14 BY MS. O'DELL:
15     Q.     And that was with lung cancer?
16     A.     Yes, ma'am.
17     Q.     At page 21, if you will turn there,
18 please. You include in your table of
19 case-control studies Davis 2021.
20             MS. O'DELL: And I'm going to
21     mark for the record Davis. I don't have
22     a lot of questions on it, but I do want
23     to ask you one in particular. And I
24     think it's Exhibit 23.

51 (Pages 198 - 201)

Page 202

1          (Exhibit No. 23 was marked for
2      identification.)
3          THE WITNESS:  Thank you.
4  BY MS. O'DELL:
5      Q.    Do you have it?
6      A.    Yes, ma'am.
7      Q.    And you list Davis as a
8  case-control study.
9      A.    Yes.
10      Q.    And if you will look on page 23 --
11  excuse me, Exhibit 23, the first page -- this is
12  -- I guess I'll just ask the question:  This is a
13  pooled analysis, not a case-control analysis, is
14  it not, Dr. Saenz?
15      A.    It's set up as a case-control
16  study.
17      Q.    But it's a combination of data from
18  a series of studies -- of studies that are listed
19  in Table 1.  True?
20      A.    Right.  But, I mean, much like
21  Terry was a pooled analysis of case-control
22  studies, this is the same sort of thing.
23      Q.    This is a pooled analysis.  This is
24  not a single case-control study.

Page 203

1          MS. CURRY:  Object to the form.
2          THE WITNESS:  Multiple studies
3      contributed patients to this data,
4      correct.
5  BY MS. O'DELL:
6      Q.    Okay.  And so it's not a pooled
7  analysis -- I mean, it's a pooled analysis like
8  Terry.  It's not a case-control study like, you
9  know, Wu 2015.
10      A.    Well, it's not one individual study
11  database, but it is a case-control analysis with
12  the data coming from several different sources.
13      Q.    It's a pooled analysis from several
14  different case-control studies.
15      A.    Okay, I'll agree with that.
16      Q.    And it shows -- it reports for
17  women, both white women and women of -- African
18  American women, a point estimate that shows an
19  increased risk.  True?
20      A.    Where are we now?
21      Q.    Look in Results.
22      A.    Oh, we're in the abstract?
23      Q.    Yes.  That's just an easy place to
24  get the data.

Page 204

1      A.    Oh, sorry.
2      Q.    See that?  "For ever use of genital
3  talc was associated with a higher odds ratio of
4  ovarian cancer among African American women, OR
5  of 1.22" -- do you see that?
6      A.    Yes.
7      Q.    -- "confidence interval of 0.97 to
8  1.53, and white women of 1.36 with a confidence
9  interval of 1.19 to 1.57."
10          Did I read that correctly?
11      A.    Yes.
12      Q.    And that's for all -- that data was
13  for all epithelial ovarian cancer.  True?
14      A.    I believe so.
15      Q.    And then when they focused on high
16  grade serous tumors, then for African American
17  women there was a slightly increased risk of 1.31
18  that was -- had a confidence interval of 1.01 to
19  1.71, and then for white women -- sorry, I'm not
20  sure I read that right.  Yeah, let me just stop
21  there.
22          In African American women, there
23  was -- positive association with risk was more
24  pronounced among high grade serous tumors of

Page 205

1  1.31, confidence interval of 1.01 to 1.47,
2  correct?
3      A.    Correct.  Wait, one -- no, that's
4  --
5          MS. CURRY:  Object to the form.
6          THE WITNESS:  No, that's not
7      right.  No.
8  BY MS. O'DELL:
9      Q.    I didn't intend to read that
10  incorrectly, so tell me what I said that was
11  misstated.
12      A.    You flipped to the confidence
13  interval for other histotypes.
14      Q.    Okay.  Let me try again.  "More
15  pronounced among high grade serous tumors, OR of
16  1.31, with a confidence interval of 1.01 to
17  1.71."
18      A.    That's correct.
19      Q.    You note in your report in several
20  places in regard to the data study, they fail to
21  demonstrate a clear dose-response.  Do you recall
22  those statements?
23      A.    Yes.
24      Q.    And I ask you to turn to the next

52 (Pages 202 - 205)

Page 206

1  to the last page of the study.
2      Let me know when you're there.
3      A.    I'm there.
4      Q.    And this is the Discussion section.
5  And on the left-hand side, midway down there's a
6  sentence that begins "We did not conduct."  Do
7  you see that?
8      A.    Not yet.
9      Q.    Left-hand side, midway down, end of
10  the first full paragraph.  "We did not conduct an
11  analysis."
12      A.    Okay.
13      Q.    Do you see that?
14      A.    Yes.
15      Q.    "We did not conduct an analysis
16  that addressed both duration and frequency of
17  application.  Some women may use body powder
18  products on a daily -- non-daily basis.
19  Therefore, the best measure of dose may be number
20  of applications based on frequency of application
21  times years of use.  However, this measure was
22  not available for most OCWAA studies."
23      Did I read that correctly?
24      A.    Yes.

Page 207

1      Q.    And that can be one reason that a
2  clear dose-response was not seen in the study.
3  True?
4      MS. CURRY:  Object to the form.
5      THE WITNESS:  Well --
6  BY MS. O'DELL:
7      Q.    That's true?
8      A.    Well, that could be.  But my
9  comments as pertains to a lack of dose-response
10  being demonstrated by the Davis article really
11  have to do with the fact that African American
12  women used far more perineal talc than Caucasian
13  women, and yet they did not show the same
14  statistically significant increased risk as the
15  women that used less.
16      Q.    And isn't it true in African
17  American women, you're likely to see a greater
18  number of pregnancies in African American women
19  than you are with white women in these studies?
20      MS. CURRY:  Object to the form.
21      THE WITNESS:  I have no idea to
22      substantiate that statement.
23  BY MS. O'DELL:
24      Q.    Turn if you would, please, to page

Page 208

1  30 of your report.
2      And at the bottom of page 30, it
3  begins your discussion of the O'Brien pooled
4  analysis of the cohort studies.  Correct?
5      A.    I'm there.
6      MS. O'DELL:  And I want to go
7      ahead and mark for the record O'Brien as
8      Exhibit No. -- the O'Brien 2020 study as
9      Exhibit 23.
10      MS. CURRY:  24.
11      MS. O'DELL:  Thank you.
12      (Exhibit No. 24 was marked for
13      identification.)
14  BY MS. O'DELL:
15      Q.    Do you have it?
16      A.    Yes.
17      Q.    Okay.  This was published in
18  January of 2020 in JAMA, and it was a pooled
19  analysis of the data from the cohort studies,
20  correct?
21      A.    Yes, with the addition of the
22  NHS-II study, yes.
23      Q.    And if you will turn to Table 1,
24  the number of ovarian cancers included was 2,213,

Page 209

1  correct?
2      A.    Yes.
3      Q.    And they reported -- looking at
4  Table 2, for ever use used talc in the genital
5  area, all women, a pooled estimate -- this is all
6  women -- of 1.08 and confidence interval .99 to
7  1.17.
8      Did I read that correctly?
9      A.    Yes.
10      Q.    And is it your opinion, Dr. Saenz,
11  that the fact that the confidence interval
12  crosses 1 means there's no association?
13      A.    It means that that finding is not
14  statistically significant.
15      Q.    And would you agree with me that
16  they demonstrated an increased risk?
17      MS. CURRY:  Object to the form.
18      THE WITNESS:  No, I don't agree
19      with you -- with that.  You have a
20      hazard ratio that is 1.08, but that is
21      not statistically significant, which
22      means that those findings could be due
23      to chance, confounding, biases.  It's
24      not statistically significant.

53 (Pages 206 - 209)

Page 210

1  BY MS. O'DELL:
2      Q.    And therefore, in your view, it
3  means there's no association?
4      A.    In my view, they have not
5  demonstrated an increased risk with the use of
6  talc.
7      Q.    And for the data for women with
8  patent reproductive tracts, the pooled estimate
9  for ever versus never is 1.13 with a confidence
10  interval of 1.01 to 1.26, correct?
11      A.    That's what they reported.
12      Q.    And so they have in that instance
13  demonstrated an increased risk of ovarian cancer
14  with genital talc use, correct?
15          MS. CURRY:  Object to the form.
16          THE WITNESS:  They reported that
17      hazard ratio, but when you compare that
18      group to the women with non-patent
19      reproductive tract, they're not
20      different study populations.  So I don't
21      think that particular statistic has any
22      meaning.
23  BY MS. O'DELL:
24      Q.    And so despite the fact that it

Page 211

1  shows a 1.13 odds ratio, you feel that that has
2  no meaning and no relevance to the question of
3  whether talc can cause ovarian cancer?
4          MS. CURRY:  Object to the form.
5  BY MS. O'DELL:
6      Q.    That's what you just said, it has
7  no meaning.
8      A.    I think -- I think what has no
9  meaning to the -- and no relevance to the
10  development of ovarian cancer is to pull out
11  women that have patent reproductive tracts from
12  women that do not, because they are not different
13  study populations.  Women start --
14      Q.    Well -- I'm sorry, ma'am.  What's
15  your basis for saying that, just so I can
16  understand better what you're --
17      A.    Women start using talc in their 20s
18  -- in their teens or in their 20s, and they use
19  it on average, according to Cramer, for 20-plus
20  years.
21          Women do not have tubal ligations
22  until they are done having their children, which
23  is usually in their 30s or 40s.
24          So the exposure per se to perineal

Page 212

1  application of talc during those 20 years from
2  their teens to 35 or 40 years old is the exact
3  same in those two study populations.  The
4  intervention, if you will, of a tubal ligation
5  does not happen until women have already been
6  exposed for 20-plus years.
7  BY MS. O'DELL:
8      Q.    And that assumes that talc enters
9  the vagina and can reach the ovaries, correct?
10          MS. CURRY:  Object to the form.
11          THE WITNESS:  Well, that's the
12      hypothesis of why there would be a
13      difference between -- in exposure
14      between women with tubal ligations
15      versus women without tubal ligations,
16      but the actual data as to when women are
17      using the talc does not at all correlate
18      with when women get tubal ligations.
19  BY MS. O'DELL:
20      Q.    We can go through it all, but you
21  would agree with me that when they looked at
22  greater than or equal to one time a week for both
23  all women and for women with patent reproductive
24  tracts, the study demonstrated an increased risk.

Page 213

1          MS. CURRY:  Object to the form.
2          THE WITNESS:  The authors
3      reported an increased risk in women that
4      they pulled out that had patent
5      reproductive tracts, but it's not a
6      meaningful piece of data.
7  BY MS. O'DELL:
8      Q.    And they report a 9 percent or 1.09
9  adjusted hazard ratio for all women who used talc
10  at least once a week.  True?
11          MS. CURRY:  Where are you
12      reading from, Leigh?  Which table is
13      that?
14          MS. O'DELL:  Table 3.
15  BY MS. O'DELL:
16      Q.    Look at Table 3, Dr. Saenz, in the
17  top half.
18      A.    I'm getting there.  Table 3, top
19  half.
20      Q.    I'm looking at "used powder greater
21  or equal to one time a week."
22      A.    Right.
23      Q.    And --
24      A.    With the adjusted HR of 1.09?

54 (Pages 210 - 213)

Page 214

1  Q.  Correct.
2  A.  Right.  So that was not
3  statistically significant.
4  Q.  And therefore, you believe that is
5  not demonstrating an increased risk.  True?
6  A.  Correct.
7  Q.  You state in your report on page 31
8  that -- in the second paragraph on page 31:  "It
9  is notable that plaintiff's experts seek to
10  assign essentially zero weight to the O'Brien
11  study based on perceived weaknesses of the
12  study."
13  A.  I'm sorry, I'm not -- I -- are
14  we -- where are we?
15  MS. CURRY:  Your report here --
16  THE WITNESS:  Oh, down here.
17  Okay, sorry.
18  I'm there now.  Okay, go ahead.
19  BY MS. O'DELL:
20  Q.  You say:  "It is notable that
21  plaintiff's experts seek to assign essentially
22  zero weight to the O'Brien study based on
23  perceived weaknesses of the study."
24  What's your basis for saying that?

Page 215

1  A.  When I read Dr. Clarke-Pearson and
2  Dr. Wolf's analysis of the O'Brien study in their
3  reports.
4  Q.  They don't refer to weight in
5  either of their reports, correct?
6  A.  You mean weight as a measure -- I
7  mean, that's my colloquial term for them
8  discussing whether or not this study is relevant.
9  It's not a weighted analysis.
10  Q.  Well, exactly.  You don't have any
11  insight as to what weight they put on the study
12  or didn't put on the study, do you?
13  MS. CURRY:  Object to the form.
14  THE WITNESS:  Actually, I do,
15  because they quoted in their reports the
16  published criticisms of the O'Brien
17  paper saying that it was not a good
18  study for the reasons outlined by --
19  just above where you're reading from,
20  the commentary from Drs. Cramer, Harlow,
21  Murray and Rothman.  So that was cited
22  to by Drs. Clarke- Pearson and Wolf.
23  BY MS. O'DELL:
24  Q.  And you -- you -- it's your opinion

Page 216

1  that because they cite the letters to the editor
2  that were submitted by Drs. Cramer, Rothman,
3  Harlow and others, that they discounted the
4  relevance of the O'Brien study.  Is that what
5  you're saying?
6  A.  That and they wrote that they
7  agreed with those criticisms.
8  Q.  Did they misstate the data from
9  O'Brien in any way in their reports?
10  A.  Not that I'm aware of.
11  Q.  Did they state in any respect that
12  they did not consider O'Brien fully and fairly in
13  reaching their expert opinions?
14  MS. CURRY:  Object to the form.
15  THE WITNESS:  They did comment
16  on the fact that they thought that
17  O'Brien didn't -- wasn't sufficiently
18  powered in order to have a positive
19  finding, and I believe that that's
20  incorrect.
21  MS. O'DELL:  Let's mark as
22  Exhibit 25 the letters to the editor.
23  It should just be letters to the
24  editor, Paula, in the box as Exhibit 25.

Page 217

1  (Exhibit No. 25 was marked for
2  identification.)
3  BY MS. O'DELL:
4  Q.  You've seen this before, haven't
5  you, Dr. Saenz?
6  A.  Yes, ma'am.
7  Q.  And these were letters to the
8  editors that were submitted to JAMA in relation
9  to the O'Brien paper, O'Brien 2020 paper, and
10  Dr. O'Brien and Dr. Sandler and Dr. Wentzensen
11  replied to the comments that were made by the
12  researchers who wrote in, correct?  They -- they
13  replied.
14  A.  Yes.
15  Q.  If you will turn to page 2097.
16  A.  Yes.
17  Q.  Dr. O'Brien and others replies to
18  Dr. Rothman and Harlow's concern about the way
19  Dr. O'Brien and others had addressed statistical
20  significance in the study, correct?
21  MS. CURRY:  Object to the form.
22  THE WITNESS:  Can you direct me
23  to where you are exactly?
24  BY MS. O'DELL:

55 (Pages 214 - 217)

Page 218

1    Q.    I would be happy to do that.
2         And let me just go back a page.
3    Maybe it will make this easier for you and for
4    all of us.
5         Go back to page 2096, Dr. Harlow,
6    Murray and Rothman in their last paragraph
7    states: "To conclude that there is," quote, "no
8    statistical significant association based on an
9    HR of 1.08, 95 percent confidence interval 0.99
10   to 1.17, is now recognized as poor practice in
11   population in clinical research. If the 99
12   percent CI had instead been 1.01 to 1.19, would
13   the authors have had a completely different
14   interpretation? Given that the authors
15   produced -- reported a 13 percent increased risk
16   of ovarian cancer among women with intact genital
17   tracts who used powder despite these
18   methodological issues, this study should have
19   been taken as evidence of an effect."
20        Did I read that correctly?
21   A.    Yes, except that you read 99
22   percent CI when it's 95, but you don't have to
23   reread it.
24   Q.    Thank you. You disagree with that

Page 219

1    statement from -- those statements from Rothman,
2    Harlow and Murray, correct?
3    A.    I do. We, by convention, do not
4    throw out the concept of statistical significance
5    in analyzing data.
6    Q.    And you talk in your report about
7    statistically unsophisticated readers, and you
8    refer to statistically unsophisticated readers on
9    page 32 of your report.
10   A.    Well, I quote --
11        MS. CURRY: Object to the form.
12        THE WITNESS: Sorry. I quote
13   another editorial on this article.
14   BY MS. O'DELL:
15   Q.    And she -- but you quote
16   "statistically unsophisticated readers." True?
17   A.    Yes, that's the quote.
18   Q.    And is it your view that
19   Dr. Rothman, Harlow and Murray are statistically
20   unsophisticated readers?
21        MS. CURRY: Object to the form.
22        THE WITNESS: I'm just quoting
23   what that other editorial said. I'm not
24   commenting on the sophistication or not

Page 220

1    of those authors, but I do disagree with
2    their contention that statistical
3    significance should be thrown out the
4    window.
5    BY MS. O'DELL:
6    Q.    That's not what they say, to be
7    fair.
8    A.    Yes, they say that we should not be
9    paying attention to confidence intervals, and I
10   disagree with that.
11   Q.    Well, you disagree with Dr. O'Brien
12   as well. True?
13        MS. CURRY: Object to the form.
14        THE WITNESS: I disagree with
15   Dr. O'Brien that the women with patent
16   reproductive tracts have had a different
17   exposure history with respect to the
18   perineal application of talc than the
19   women with non-patent reproductive
20   tracts.
21   BY MS. O'DELL:
22   Q.    And you disagree with her regarding
23   statistical significance. True?
24        MS. CURRY: Object to the form.

Page 221

1         THE WITNESS: Can you direct me
2    to what you're talking about?
3    BY MS. O'DELL:
4    Q.    Yes. Next page, left-hand column,
5    the paragraph beginning "We completely agree."
6    Do you see that?
7         Dr. O'Brien and others write: "We
8    completely agree with Dr. Harlow and colleagues
9    that our results, particularly the analyses
10   limited to women with intact reproductive tracts,
11   should not be discounted because of lack of
12   statistical significance."
13        So you disagree with Dr. O'Brien.
14   A.    Yes.
15   Q.    True?
16   A.    With respect to that, yes.
17   Q.    "For all estimates, we reported 95
18   percent CIs so readers could consider the effect,
19   size and precision. The qualifier that there was
20   no statistically significant association between
21   ever genital powder use and ovarian cancer is a
22   factual report of the test of the null
23   hypothesis. We never equated the lack of
24   statistical significance to evidence -- to

56 (Pages 218 - 221)

Page 222

1  evidence of no association."
2      Did I read that correctly?
3      A.   Yes, you did.
4      Q.   In the O'Brien paper as well, the
5  authors also -- in addition to reporting the data
6  on the study, also talk about talc by irritating
7  epithelial ovarian tissue and fallopian tubes
8  directly, the powder could induce an inflammatory
9  response even in the absence of asbestos."
10     MS. CURRY:  Where are you
11     reading?
12 BY MS. O'DELL:
13     Q.   Do you recall that?
14     MS. CURRY:  What page is that?
15     MS. O'DELL:  It's on page 56.
16     THE WITNESS:  There's no data
17     for that.
18 BY MS. O'DELL:
19     Q.   Do you see where I'm reading,
20 ma'am?
21     A.   Yes, I do.
22     Q.   And that's what they state,
23 correct?
24     A.   They do state that, but there's no

Page 223

1  data for that.
2      Q.   They go on to say:  "This could set
3  off a cascade of increased oxidative stress
4  levels, DNA damage, a cell division, all of which
5  could contribute to carcinogenesis."
6      Do you see that?
7      A.   Again -- yes, that's a hypothesis,
8  and again, they're citing to Ness once again,
9  which is a summary article with hypotheses and no
10 data.
11     MS. O'DELL:  All right.  Let's
12     go off the record, please.
13     (Recess.)
14     MS. O'DELL:  Okay.  Let's go
15     back on the record.
16 BY MS. O'DELL:
17     Q.   Let me direct your attention back
18 to page 32, and you discuss Woolen 2023.
19     A.   2022.
20     Q.   Excuse me, yes, the 2022 paper.
21     MS. O'DELL:  And I'm going to
22     mark that as Exhibit 26.
23     (Exhibit No. 26 was marked for
24     identification.)

Page 224

1  BY MS. O'DELL:
2      Q.   And I want to talk about Woolen,
3  and specifically the purpose of Woolen to
4  evaluate frequent use of talc.
5      Ms. Converse, Dr. Saenz, would have
6  been a frequent user of talc, correct?
7      A.   Yes.
8      Q.   And in the Woolen paper, "frequent
9  use" was defined as two or more times a week,
10 correct?
11     MS. CURRY:  Object to the form.
12     THE WITNESS:  I think the
13     authors defined it as at least two times
14     per week.
15 BY MS. O'DELL:
16     Q.   Yeah.  And if you'll look on page 2
17 of the study, and they say multiple --
18     A.   I'm sorry, what -- what section are
19 you on?
20     Q.   Page 2 of the study, "Eligibility
21 Criteria and Study Selection."
22     A.   Got it.
23     Q.   Second sentence.
24     A.   Okay.

Page 225

1      Q.   They reported primary data on
2  "frequent" defined as multiple, two or more times
3  per week, perineal exposure to talc.
4      Did I read that correctly?
5      A.   Yes.
6      Q.   And Ms. Converse used daily, so she
7  would be in that frequent user group, correct?
8      A.   Yes.
9      Q.   And for this Woolen study, it was a
10 meta-analysis of ten case-control studies and
11 data from one cohort study.  Correct?
12     A.   With -- right, data from one cohort
13 study with additional data that was requested
14 from the authors.
15     Q.   In fact, that's -- you're going to
16 where I wanted to ask.  You state in your report:
17 "One cohort study which they claim is O'Brien
18 2020, but in fact, it's actually only data from
19 Nurses' Health Study I with inclusion of
20 previously unpublished data."
21     Do you see that in your report?
22     A.   Yes.
23     Q.   And if you will look at Table 2 of
24 the study, it lists the publications included in

57 (Pages 222 - 225)

Page 226

1  the systematic review.
2      A.    Correct.
3      Q.    And they extract data from these
4  studies that is the most frequent perineal talcum
5  powder use reported for each study. Correct?
6      A.    Well, what they actually did was if
7  the data was reported in more than one study,
8  they used the study that reported the higher use.
9      Q.    I don't think we're communicating.
10 Because from the each individual study, they
11 extracted data that was the most -- that reported
12 the most frequent perineal talc use.
13         MS. CURRY: Object to the form,
14     asked and answered.
15 BY MS. O'DELL:
16     Q.    Correct?
17     A.    So the authors say that in area --
18 or in some -- in the sections where duplicate
19 reports of the same study subjects were
20 published, they did not use the subject report or
21 that data if it was a lower usage. So -- because
22 in some of these studies, the subjects
23 overlapped.
24     Q.    I understand.

Page 227

1         And so their design was that they
2  would extract the data from the most exposed
3  group. In other words, the most frequent use
4  data is what they extracted from each study.
5  Correct?
6      A.    Right. If they had a choice for
7  similar study subjects of a lower exposure versus
8  a higher exposure, they did not use the data from
9  the lower exposure.
10     Q.    They used the data from the higher
11 exposure.
12     A.    Even though it was the same study
13 subjects, correct.
14     Q.    Correct, because she
15 double-counted. So they used the higher
16 exposure, correct?
17     A.    Correct.
18     Q.    And in fact, that's what they say
19 at the title of Table 2, that they would use the
20 most frequent perineal talcum powder use for each
21 study. That's what they describe, correct?
22     A.    Correct.
23     Q.    And if you look at O'Brien, number
24 11 in Table 2, it doesn't say O'Brien 2020, does

Page 228

1  it? It says "O'Brien," paren, "NHS-I." Correct?
2      A.    No, it says 2020 right there. If
3  you go over to year, the column year, it says
4  2020.
5      Q.    Look at the first author, just so
6  you'll --
7      A.    What?
8      Q.    It says O'Brien "NHS-I" in the
9  first column under first author.
10     A.    Right.
11     Q.    All right, bear with me. Look
12 at -- there's a -- there's a notation of a
13 reference at the bottom, a footnote. Do you see
14 that? It's actually number 5. Do you see
15 number 5 after the paren?
16     A.    Yes.
17     Q.    Go to the bottom of the table, and
18 it says: "O'Brien did not publish on daily
19 exposure for the National Health Study
20 participants. However, these data were
21 available, and O'Brien provided these data for
22 inclusion. The entirety of the data were
23 provided and are shared in the supplemental
24 table. We include data on women with intact

Page 229

1  fallopian tubes to harmonize with other
2  publications."
3         Did I read that correctly?
4      A.    Yes.
5      Q.    Okay. And the data from O'Brien
6  that they obtained from O'Brien was from Nurses'
7  Health Study I, correct?
8      A.    Well, not -- they didn't obtain all
9  of that from O'Brien, right. They already had
10 data on Nurses' Health Study I, and they
11 augmented it with O'Brien's additional data.
12     Q.    No, ma'am, if you will look on page
13 2 of the study, that's incorrect. If you look on
14 page 2 of the study, right-hand column, the
15 second -- third sentence down at the first
16 paragraph, do you see where it says, "As is
17 standard in systematic reviews" --
18     A.    Yes.
19     Q.    Do you see that sentence?
20     A.    Yes.
21     Q.    -- "to include relevant but
22 unpublished results, we contacted O'Brien and
23 requested primary data from the Nurses' Health
24 Study I (NHS-I) and the Sister Study (SIS) for

58 (Pages 226 - 229)

Page 230

1 the highest frequency talc exposure group.  The
2 data from NHS-I were provided and described in
3 the Supplemental Table 1 and are included in a
4 systematic review.  The data from the SIS study
5 were not provided to us due to the small sample
6 size of exposed individuals in the highest
7 exposure category (n=2 women)."
8        Did I read that correctly?
9     A.     You read that, but these are the
10 study subjects from NHS-I.  They are the women
11 that were originally published in that study.
12 And then they went back to O'Brien and asked her
13 for the primary data.  So it is --
14     Q.     Well, they asked -- they did not
15 include in their meta-analysis data from the
16 publication of pooled study O'Brien 2020.
17        You're aware of that, aren't you?
18     A.     That's correct.  This is data from
19 the NHS-I study that was published before but
20 then augmented by the data they got from O'Brien.
21     Q.     And I just want to make clear, the
22 JAMA publication of O'Brien of the pooled
23 analysis of cohort study data is not data that's
24 included in the Woolen meta-analysis.

Page 231

1     A.     For the NHS-I part of that pooled
2 analysis, it is the same study population.
3     Q.     That's not my question.  Because,
4 as you -- you know so well, the O'Brien 2020
5 publication did not include data from daily use.
6 Correct?
7     A.     It was ever/ever for most patients.
8 So it wasn't data on individual days of use, that
9 is correct.
10     Q.     And the data that's actually
11 included in Woolen is the daily exposure data
12 from Nurses' Health Study II participants, which as
13 she -- as described in the footnote, had not been
14 previously published.
15        Do you see that?
16     A.     The data on the frequency of use
17 was not published, but it is the same study
18 subjects as was previously published on.  It's
19 not new women.
20     Q.     I'm not saying they're new women.
21 I'm saying the data is new because this data had
22 never before been published on daily exposure.
23     A.     It was -- I mean, it was supplied
24 to Woolen by O'Brien.  So yes.

Page 232

1     Q.     Correct.
2     A.     Yes.
3     Q.     And -- and you -- strike that.
4        This meta-analysis, the actual
5 combined pooled estimate from this
6 meta-analysis -- and I'll just invite you, if you
7 want to, to turn over to page -- the next page,
8 Figure 2, to make it efficient -- the combined
9 pooled summary odds ratio for this meta-analysis
10 is 1.47, 95 percent confidence interval, 1.31,
11 1.65.  Correct?
12     A.     Correct.
13     Q.     And that is demonstrating a 47
14 percent increased risk, correct?
15        MS. CURRY:  Object to the form.
16        THE WITNESS:  Over background
17     population risk, correct.
18 BY MS. O'DELL:
19     Q.     And on page 33 of your report, you
20 state:  "The authors report a summary pooled OR
21 of 1.47," which we just discussed, "for all ten
22 studies and an OR of 1.49, 1.29 to 1.72, when the
23 analysis is restricted to case-control studies.
24 This means the positive OR reported in the study

Page 233

1 is entirely due to the case-control studies, and
2 not at all a reflection of the data contributed
3 by Nurses' Health Study I cohort study."
4        Did I read that correctly?
5     A.     Yes.
6     Q.     What is the increased risk of women
7 who daily used talc in Nurses' Health Study I?
8     A.     In the data from the study?
9     Q.     In the data as supplied by O'Brien,
10 yes.
11     A.     I would have to look through the
12 paper to find that.
13     Q.     Okay.
14     A.     But when the Nurses' Health Study I
15 is pulled out, the -- the pooled odds ratio
16 actually goes up, which means that the Nurses
17 Health Study I data was moving it down to 1.47.
18     Q.     Well, let's be clear, you don't say
19 it moved it down.  You say:  "This means that the
20 positive OR reported in this study is entirely
21 due to the case-control studies and not at all a
22 reflection of the data contributed by the Nurses'
23 Health Study I cohort study."
24     A.     Right.

59 (Pages 230 - 233)

Page 234

1    Q.    That's what you state.
2    A.    That's correct.
3    Q.    But look at supplemental Table 1,
4  Dr. Saenz.  It should be included in your copy.
5    A.    It's not.
6    Q.    Okay.
7         MS. BROWN:  It should be there.
8  Is it --
9         MS. CURRY:  It's right here.
10  BY MS. O'DELL:
11    Q.    Yep, Table 1 at the end,
12  supplemental Table 1.
13         MS. CURRY:  Oh, that's odd.
14    She -- in the marked copy -- the marked
15    copy is different than the copy that I
16    have, so we should swap the sticker out.
17         MS. O'DELL:  I'm sorry.  I don't
18    know the issue there, but --
19         MS. CURRY:  So Dr. Saenz's copy
20    ends after the references, and none of
21    the supplemental material are attached
22    on the version that was marked as an
23    exhibit.
24         MS. O'DELL:  Okay.

Page 235

1         MS. CURRY:  So we need to switch
2    the sticker.
3         MS. BROWN:  Yeah, you can switch
4    it.
5         MS. O'DELL:  Yeah, let's just
6    switch that out, shall we?
7  BY MS. O'DELL:
8    Q.    So, Dr. Saenz, do you have table --
9  supplemental Table 1?
10         THE WITNESS:  That's figure.
11    She said table.
12         No, I have supplemental
13    figure -- oh, table.  Sorry.  Here we
14    go.
15         Do you want to put that on
16    there?
17         MS. O'DELL:  All right.  Are we
18    together?
19         MS. BROWN:  Yes.
20  BY MS. O'DELL:
21    Q.    Supplemental Table 1 is data from
22  the Nurses' Health Study, correct?
23    A.    Yes.
24    Q.    Have you seen this before?

Page 236

1    A.    Yes.
2    Q.    And the table reports a -- for all
3  women daily users.  Do you see that --
4    A.    Yes.
5    Q.    -- the adjusted hazard ratio --
6    A.    Yes.
7    Q.    -- of 1.27, and it's statistically
8  significant, correct?
9    A.    Yes.
10    Q.    And for women with patent fallopian
11  tubes for daily users, it's 1.40.  Statistically
12  significant, correct?
13    A.    That's what they report.
14    Q.    Which is very close to the overall
15  pooled estimate of 1.40 -- I mean 1.47, correct?
16         MS. CURRY:  Object to the form.
17         THE WITNESS:  Those numbers are
18    close.  But as we've discussed before, I
19    think it's artifactual to look at women
20    with patent fallopian tubes.
21  BY MS. O'DELL:
22    Q.    Mrs. Converse would -- based on the
23  data from Nurses' Health Study 1, looking at just
24  all women, would have an increased risk of 27

Page 237

1  percent.  True?
2         MS. CURRY:  Object to the form.
3         THE WITNESS:  The hazard ratio
4    here was 1.27, that's correct.
5  BY MS. O'DELL:
6    Q.    And for women with patent fallopian
7  tubes, which would include Ms. Converse, daily
8  users had a 40 percent increased risk, which was
9  statistically significant, correct?
10    A.    Again, that's not -- it's an
11  artifactual manipulation of the data set that is
12  not relevant to exposure.
13    Q.    That's -- I understand that's your
14  view, ma'am, but that's what the data says,
15  correct?
16         MS. CURRY:  Object to the form.
17         THE WITNESS:  That's what the
18    reported hazard ratio is.
19         MS. O'DELL:  Okay.  Let's turn
20    now to the O'Brien "Douching and Genital
21    Talc Use:  Patterns of Use and
22    Reliability of Self-Reported Exposure."
23         And I would like to mark that as
24    our next exhibit, which is Exhibit 27.

60 (Pages 234 - 237)

Page 238

```
 1          (Exhibit No. 27 was marked for
 2          identification.)
 3   BY MS. O'DELL:
 4       Q.    Do you have it in front of you,
 5   ma'am?
 6       A.    Yes.  Thank you.
 7       Q.    And this publication is a report of
 8   the updated usage in the Sister Study based on a
 9   follow-up questionnaire that was sent from 2017
10   to 2019.  True?
11       A.    Correct.
12       Q.    And they looked at the -- they
13   compared the report of the women initially at
14   enrollment from 2003 to 2009, and the data that
15   was provided on the talc use and douching, and
16   they compared it to the data they obtained in
17   2017 to 2019.  True?
18       A.    Correct.
19       Q.    And if you look at the results
20   in the abstract, and you go down midway, it says
21   87 percent providing the same responses about
22   genital talc use.
23          Do you see that?
24       A.    Yes.
```

Page 239

```
 1       Q.    And the authors go on to say that:
 2   "Reliability did not vary by cancer status, race
 3   and ethnicity, attained education or age, though
 4   there was some evidence of recall bias for
 5   genital talc use among ovarian cancer survivors."
 6          Did I read that correctly?
 7       A.    Yes.
 8       Q.    And they also say, if you go down
 9   in Conclusions:  "Classification of ever use of
10   feminine hygiene products may be recalled with
11   good consistency."
12          Do you see that?
13       A.    Yes.
14       Q.    And it was the conclusion of the
15   authors that the data provided in the first round
16   at enrollment and from 2017 to 2019 that there
17   was -- good consistency really confirmed the
18   reliability of exposure information provided by
19   study participants.  True?
20          MS. CURRY: Object to the form.
21          THE WITNESS:  As a whole group,
22       but when they did essentially a subset
23       analysis looking at women that had been
24       diagnosed with ovarian cancer in the
```

Page 240

```
 1   intervening years, before they were
 2   queried again about talc use in 2017 to
 3   2019, that was the only group that
 4   actually increased their reports of use.
 5   The other groups actually, if anything,
 6   reported less use.  But the ovarian
 7   cancer patients themselves reported more
 8   use, which is why the authors talk about
 9   the potential for that recall bias.
10   BY MS. O'DELL:
11       Q.    So turn to page 379 of the study,
12   ma'am.  379, right-hand side.
13          Do you see recall bias talc use was
14   slightly less consistent with 87 percent of women
15   providing the same response at follow-up as they
16   did enrollment, and specificity was 94 percent,
17   and it goes on to list some others.
18          And it says here:  "The largest
19   source of inconsistency was 3,049 women,
20   10 percent of the sample, who initially reported
21   using genital talc in the 12 months before
22   enrollment but later responded that they did not
23   use it during that period."
24          So in fact, the difference, that
```

Page 241

```
 1   was because more people said they used talc was
 2   more people said they didn't use talc, correct?
 3       A.    That's correct, but that's not what
 4   I said.  What I said is that the only group that
 5   reported using more talc was the women that were
 6   diagnosed with ovarian cancer in the intervening
 7   years.  And that's actually on page 383.
 8       Q.    But you're not disagreeing with
 9   what I just read to you as being incorrect, are
10   you?
11       A.    I'm not disagreeing with that, but
12   I think what's relevant here is that it's the
13   cases, the women that had ovarian cancer in the
14   intervening years that increased their reported
15   use.  That's an example of recall bias.
16       Q.    You can put that aside.
17          I want to look at one other --
18   actually two others, but let me just -- is there
19   any evidence that genital use of talc increases
20   the risk of uterine cancer?
21       A.    No, I do not believe that there is.
22       Q.    Is there any evidence that genital
23   use of talc increases the risk of cervical
24   cancer?
```

61 (Pages 238 - 241)

Page 242

1    A.    No, I do not believe there is.
2    Q.    Is there any evidence that the
3  genital use of talc increases the risk of vaginal
4  cancer?
5    A.    No, I do not believe there is.
6    Q.    Vulvar cancer?
7    A.    No, I do not believe there is.
8    Q.    Breast cancer?
9    A.    No. In fact, I think there's some
10  literature that would say that breast cancer is
11  not associated with the use of talc.
12    Q.    And that would be true essentially
13  of uterine cancer, true, as well?
14    A.    I have reviewed, I want to say, I
15  think five, but please don't hold me accountable
16  because I don't have it here -- I think I've
17  reviewed five studies on the risk of uterine
18  cancer and the genital application of talc, and
19  there's only one study that showed a positive
20  association, and I think that may have been out
21  of Australia, but when that data or that study
22  was replicated, the positive finding did not hold
23  up.
24    Q.    And in fact, in the recent study by

Page 243

1  O'Brien in May of 2024, which I'll mark as
2  Exhibit 28, there was no association seen between
3  genital talc use and uterine cancer, correct?
4    A.    In that study as well as in the
5  Chang study that was also published in 2024. I
6  believe that study also looked at what are
7  classified as hormone sensitive cancers.
8        (Exhibit No. 28 was marked for
9        identification.)
10  BY MS. O'DELL:
11    Q.    You should have O'Brien 2024 in the
12  chat.
13        MS. BROWN: It's in the chat.
14  BY MS. O'DELL:
15    Q.    And if you will, please open that.
16        MS. CURRY: So, Leigh, what you
17  wanted to mark as 28 was O'Brien 2024
18  that's in the chat?
19        MS. O'DELL: That's correct.
20        MS. CURRY: Okay.
21  BY MS. O'DELL:
22    Q.    Do you have it, Doctor?
23    A.    Yes. I'm sorry, yes.
24    Q.    Okay. I can't tell when you have

Page 244

1  it open, because I just see your picture. But
2  you have it on the screen there and you're able
3  to see it?
4    A.    Yes.
5    Q.    Okay. Do you need me to share my
6  screen at all, or are you good with what you're
7  looking at?
8    A.    I think I'm good.
9    Q.    Okay. This study was a study that
10  looked at data from the Sister's cohort study,
11  correct?
12    A.    Yes. That's the study population,
13  yes.
14    Q.    And these authors considered data
15  from the Sister Study based on the fourth
16  questionnaire that was obtained from 2017 to
17  2019. True?
18    A.    I don't know that it was a fourth
19  questionnaire. I don't have any data for that.
20  But I do believe that the follow-up data that's
21  presented in the study is from the query that was
22  made between 2017 and 2019.
23    Q.    That's fair. If you'll turn to
24  page 3, on the left-hand side under the figure,

Page 245

1  do you see the paragraph beginning "More detailed
2  information"?
3    A.    Yes.
4    Q.    It was obtained in the fourth
5  follow-up questionnaire from 2017 to 2019. Do
6  you see that?
7    A.    Fair enough.
8    Q.    And the difference in the fourth
9  follow-up questionnaire as compared to the
10  initial questions dealt with lifetime exposure,
11  correct?
12        MS. CURRY: Object to the form.
13        THE WITNESS: I mean, they say:
14  "We primarily focused on ever use versus
15  never use for each product, but also
16  examined frequency, duration and timing
17  of use."
18        So I don't see the word
19  "lifetime."
20  BY MS. O'DELL:
21    Q.    Yes. In -- let me just compare it
22  for you. In the Sister's enrollment they asked
23  for usage in the 12 months prior to enrollment
24  and from the ages 10 to 13, correct?

62 (Pages 242 - 245)

Page 246

1    A.    That's my recollection.
2    Q.    And in the follow-up questionnaire
3  that we're talking about, they ask, How old were
4  you when you first started using talc?  They
5  asked questions about the decades that you used
6  talc.  20s and 30s, for example.  True?
7    A.    Yes.
8    Q.    And in addition to asking how old
9  you were when you first used talc, are you aware
10  that they also asked how old you were when you
11  last used talcum powder on or near your vaginal
12  area.  And are you aware of that?
13    A.    Yes.
14    Q.    And so that would allow the
15  researchers to understand the range of use from
16  beginning to end or the lifetime exposure.  Is
17  that fair?
18    A.    The range of use for those women,
19  correct, or the duration, yes.
20    Q.    And so there could be women in the
21  enrollment when asked the two finite questions,
22  did I use it in the last 12 months or did I use
23  from ages 10 to 13, they might say no, because
24  they're 55 and they stopped at 45.  And they

Page 247

1  started at age 20, so that's 25 years of use.
2        But they would have said no in the
3  initial study, and yet for the follow-up data,
4  they would have reported that as having been
5  exposed to talcum powder for basically decades.
6  True?
7    A.    I think that's probably true.
8    Q.    And there were more women with
9  ovarian cancer reported in -- in this study
10  because of a longer period of follow-up than had
11  been reported in prior studies.  True?
12    A.    In prior publications of the Sister
13  Study?
14    Q.    Correct.
15    A.    Well, not compared to Chang, but
16  compared to the Gonzales study, yes.
17    Q.    And also compared to the O'Brien
18  2020 study, there were more women --
19    A.    That's fair.
20    Q.    -- that had manifested ovarian
21  cancer.  True?
22        MS. CURRY:  Object to the form.
23        THE WITNESS:  I actually don't
24    know that to be true, because these

Page 248

1  women were queried in 2017 to 2019.  And
2  so the questionnaires, you know, if you
3  didn't have ovarian cancer by 2017 and
4  you submitted your questionnaire, you --
5  and you got it after, I'm not sure that
6  this paper would have picked that up,
7  right, because the queries were before
8  that study came out.
9        So I don't know that that's true
10  because I don't know when the women --
11  if you had turned your survey back in in
12  2017, and you hadn't yet had ovarian
13  cancer, you might not have reported it
14  in this study, but maybe you were
15  recorded in the O'Brien study.
16        I don't know the answer to that.
17  BY MS. O'DELL:
18    Q.    Are you sure about that?
19    A.    I'm not.
20        MS. CURRY:  Object to the form.
21        THE WITNESS:  What I'm saying is
22  I don't know where the queries and the
23  case documentation overlap between these
24  two studies.  I don't know the answer to

Page 249

1    that.
2  BY MS. O'DELL:
3    Q.    So this will help, I think, if you
4  look at Figure 1.
5    A.    Okay.
6    Q.    Are you there?
7    A.    Yes, ma'am.
8    Q.    And if you look at -- there's a
9  blue box at the bottom of the figure.
10    A.    Yes.
11    Q.    "Cancers diagnosed after
12  follow-up."  DFU4, which was after the
13  information was obtained about usage, the
14  follow-up questionnaire.
15        Do you see that?
16    A.    Yes.
17    Q.    And in fact, there were 30
18  additional cases.  True?
19    A.    Right.  But I don't know that those
20  weren't also collected for O'Brien 2020, and
21  that's what you asked me before was did --
22    Q.    Well, they were after -- excuse me,
23  they were after -- as I understand it, they were
24  after 2019 and before September 2021.

63 (Pages 246 - 249)

Page 250

1    A.    Not for all of those women because
2  some of them turned in their questionnaires in
3  like 2017.
4    Q.    But these were women after the
5  fourth questionnaire.  The 30 were after that.
6  They were not before the fourth -- the fourth
7  questionnaire was completed.
8        So I'm saying that --
9    A.    What?  No.
10   Q.    Yeah, I'm --
11   A.    I don't -- I don't think that's
12 actually -- if you -- so these cancers were
13 diagnosed after this questionnaire was completed.
14 But if you completed this questionnaire in 2017,
15 how do we know that cancer wasn't picked up by
16 the O'Brien 2020 study?
17   Q.    Let me just -- I don't believe
18 that's the case, but I don't think -- let's don't
19 get hung up on that.
20   A.    Okay.  Fair enough.
21   Q.    There's something that I think we
22 can agree on, that this is the maximum number of
23 ovarian cancer patients that have ever been
24 reported on from the Sister Study.  True?

Page 251

1    A.    True.
2    Q.    And the authors conducted a
3  statistical analysis to evaluate the use of
4  genital talc across the entire population of
5  women in the study.  True?
6    A.    I mean this paper is a statistical
7  analysis, that's correct.
8    Q.    That's right.
9        And if you'll turn to page 4, they
10 conducted quantitative bias analyses.  Do you see
11 that?
12   A.    Yes.
13   Q.    Where they first looked at a
14 scenario where there was no correction of data.
15 The second scenario was contradictory data was
16 corrected.  The third scenario was contradictory
17 data correction plus categorizing missing or
18 undefined as exposed.  And fourth, the scenario
19 was contradictory data correction with multiple
20 amputation of missing or undefined data.
21       Did I read that correctly?
22   A.    Yes.
23   Q.    And the authors go on to say on the
24 right-hand side at the top:  "Together,

Page 252

1  scenarios 2 and 3 demonstrate the range of
2  results" --
3    A.    I'm sorry -- I'm sorry -- Leigh,
4  I'm sorry.  Hold on one second.  The right-hand
5  side on the top?
6    Q.    Yes.  So page 4, right-hand side,
7  top of the page.  Top of the page --
8    A.    Oh, okay.  Sorry, the last sentence
9  of that paragraph.  Yes.
10   Q.    "We did this for each of 10 copies"
11 --
12   A.    I'm with you.  I'm with you.  Okay.
13   Q.    All right.  And then at the bottom
14 of that paragraph, they say:  "Together,
15 scenarios 2 and 3 demonstrate the range of
16 results defined by how women in the undefined
17 category are classified with the true exposure
18 distribution falling somewhere between the two
19 extremes."
20       Did I read that correctly?
21   A.    You read that correctly.
22   Q.    And they also, looking at the
23 bottom of that column, addressed the potential
24 for recall bias.  Correct?

Page 253

1    A.    That's what they said they did.
2    Q.    It says:  "We also generated a
3  single recall bias corrected estimate that
4  simultaneously corrected cases and non-cases.  We
5  assumed 25 percent of ovarian cancer initially
6  categorizes infrequent and short-term users were
7  reassigned to non-users."  Right?
8    A.    To be non-users, yes.
9    Q.    And they reported short-term use or
10 infrequent use, they made those people non-users,
11 correct?
12   A.    In 10 percent of the women without
13 ovarian cancer initially categorized as never
14 users were reassigned to infrequent short-term
15 users.
16   Q.    Yes.  And that was the assumption
17 that they make.  They said:  "HRs based on this
18 correction are included in the results as
19 examples of possible yet cautious estimates of
20 the association between genital talc use and
21 ovarian cancer after correcting for case
22 differential recall."
23       Did I read that correctly?
24   A.    Yes, you read that correctly.

64 (Pages 250 - 253)

Page 254

1    Q.    And you're critical of their
2  methodology.
3          MS. CURRY:  Object to the form.
4          THE WITNESS:  I am --
5  BY MS. O'DELL:
6    Q.    True?
7    A.    I am critical of this paper for
8  several different reasons.
9    Q.    Okay.  I want to hear them, but I
10  want to set the table a little bit more first,
11  okay?
12          If you'll turn over to page 7 of
13  this study, Table 2, this is a report of the four
14  scenarios we talked about a few minutes ago.
15  Correct?
16    A.    Yes.
17    Q.    And if you'll look at -- there's
18  scenario 2 and 3.  And we just read that the
19  authors feel that the true exposure distribution
20  is between scenario 2 and scenario 3.
21          Do you recall reading that?
22    A.    Yes.
23    Q.    And scenario 2 shows an increased
24  risk for ever use of talc with ovarian cancer of

Page 255

1  1.17.
2          Do you see that at the bottom?
3    A.    No.  I don't know what --
4    Q.    Scenario 2 at the bottom.
5    A.    Oh, okay.  So -- got it.  Okay.
6  Yep, I'm with you.
7    Q.    Scenario 2 is 1.17, and scenario 3
8  is 3.34.  Do you see that?
9    A.    Yes.
10    Q.    And the authors have stated that
11  they believe the true exposure distribution and
12  ostensibly the increased risk is between those
13  two data points.  Do you see that?
14          MS. CURRY:  Object to the form.
15          THE WITNESS:  So they're
16      proposing hypothetically that this is
17      where they believe the true exposure
18      data is.  One of these outcomes is a
19      nonstatistically significant finding,
20      and the other is a statistically
21      significant increased risk.  One of
22      these --
23  BY MS. O'DELL:
24    Q.    Yeah, so --

Page 256

1    A.    One of these outcomes is assuming
2  that the unexposed patients are actually
3  unexposed.  The other is assuming they're exposed
4  if they reported unexposed at enrollment and they
5  were missing data at follow-up.
6          And what the authors actually say
7  is that that category is actually overrepresented
8  by patients that were diagnosed with ovarian
9  cancer.  And that's back to where you and I were
10  before --
11    Q.    I want to see where you say that.
12  You say the authors state that?
13    A.    Yes, ma'am.
14    Q.    And I would like to understand what
15  you're talking about.
16    A.    Okay.  So I am on page 3, left-hand
17  column, and the authors -- it's the very last two
18  sentences of the left-hand column.
19          "We also used quantitative bias
20  analyses to implement different approaches for
21  imputing exposure in women who initially reported
22  never use but did not complete the follow-up
23  questionnaire.  These comparisons were crucial
24  for understanding potential biases as women with

Page 257

1  incident cancer were overrepresented in this
2  undefined group."
3    Q.    And so you read that correctly.
4  But they're not referring there specifically to
5  scenario 2 and 3, but they have said that women
6  with incident cancer were unrepresented in this
7  undefined group.  I agree with you.
8    A.    But that --
9          MS. CURRY:  Object to the form.
10          THE WITNESS:  But that is
11      scenario 3.  That is scenario 3.
12  BY MS. O'DELL:
13    Q.    So you view that to be scenario 3?
14          MS. CURRY:  Object to the form.
15          THE WITNESS:  Yes.
16  BY MS. O'DELL:
17    Q.    They go on to report in Table 3 --
18    A.    Let me get back there.  Sorry.
19    Q.    Table 3.
20    A.    Not there yet.  Okay, I'm there.
21    Q.    Page 10.  They -- if you look at
22  the ovarian cancer column with recall bias
23  correction.
24          Do you see that?

65 (Pages 254 - 257)

Page 258

1    A.    Yes.
2    Q.    And so this is their estimate, and
3    they're saying we assume there's some recall
4    bias, and we're going to correct for that.  In
5    other words, we're going to reduce the risk
6    adjusted to account for recall bias.  True?
7    A.    That's what they say.  What I don't
8    understand is how do you decide what that
9    percentage should be.
10    Q.    And their analysis for ever versus
11    never use of genital talc, they reported a hazard
12    ratio of 1.40, and it was statistically
13    significant, correct?
14    A.    That number was there, but that's
15    drawn from them using a certain percentage of
16    patients that they say were at risk for recall
17    bias, and the designation of what that percentage
18    should be is arbitrary.
19    Q.    Okay.  And -- and you view it as
20    arbitrary, but that's what the data shows on this
21    table, ever versus never is 1.40, if I stated the
22    data correctly.
23    A.    With the correction of --
24    Q.    Yes or no?

Page 259

1    A.    With the correction of 25 percent.
2    That's not what the data is if you used a
3    different number for the correction.
4    Q.    Well, it was 25 percent of women --
5    25 percent of women they're putting into
6    non-users that would -- that would decrease the
7    hazard ratio toward the null, correct?
8    A.    That's not the -- no, this is the
9    correction of the recall bias, and when you look
10    at --
11    Q.    I understand.
12    A.    When you look at the -- I'm trying
13    to find the table that I had before.
14    Q.    I want you -- so --
15    A.    Go ahead.  I'm sorry.  Yes, ma'am.
16    Q.    So just focus on this aspect,
17    because this is -- you know, if they took 25
18    percent of the women and put them out of -- took
19    them out of the group of users into -- and put
20    them into the group of non-users, that would
21    decrease the hazard ratio toward the null,
22    correct?
23    A.    That's not what the correction --
24    when I'm referring to the 25 percent, that's not

Page 260

1    what I'm referring to.  What they did in this
2    statistical analysis was they looked at
3    reclassification at various percentages, and when
4    they reclassified 25 percent of the patients,
5    their results were statistically significant, but
6    when they reclassified 50 percent of the
7    patients, they weren't.
8    And so what I'm saying is arbitrary
9    is how do you decide that that's the percentage
10    that you should correct for?  That in itself is
11    arbitrary.
12    Q.    Would you agree with me that -- and
13    you said this before -- most women begin to use
14    talc in their 20s, they used during their 20s and
15    30s, and they used it consistently or frequently.
16    You agree with that, right?
17    A.    What --
18    Q.    Based on the data that's in Cramer
19    and many other studies, true?
20    MS. CURRY:  Object to the form.
21    THE WITNESS:  What I said before
22    is that most women that use talc start
23    in either their teens or 20s, and the
24    average duration is about 20 years.

Page 261

1    That is what I have said before, and
2    that is based on Cramer and Wu.
3    BY MS. O'DELL:
4    Q.    And isn't it also true that women
5    who use talc and begin in that time period, they
6    used talc habitually?
7    MS. CURRY:  Object to the form.
8    THE WITNESS:  I don't -- I mean,
9    I don't know what the word "habitual"
10    really means.  What I'm saying is that I
11    think they do have a duration of about
12    20 years.
13    BY MS. O'DELL:
14    Q.    And it's your opinion that more
15    than 25 percent of women who said that they were
16    a talc user, because we're talking about ever
17    versus never talc user, would have misrepresented
18    that data in a study questionnaire.  Is that your
19    testimony --
20    MS. CURRY:  Object to the form.
21    BY MS. O'DELL:
22    Q.    -- more than 25 percent would have
23    done it?
24    A.    I don't know.  Because these

66 (Pages 258 - 261)

Page 262

1 calculations are arbitrary, so I don't actually
2 have any data on that.
3         What I do know -- the only thing
4 that I do know from Dr. O'Brien's prior
5 publication is that the women that are more
6 likely to say that they now use more talc or are
7 talc users are women that have been diagnosed
8 with ovarian cancer. That is the only population
9 out of her study in 2023 that increased their --
10 that had an increase in stating that they had
11 used talc when they had not before.
12    Q.    Okay. I think that misrepresents
13 what is being done here.
14         But if you'll turn to Table A1,
15 Dr. Saenz. Supplemental Table A1.
16    A.    Okay, I'm there.
17    Q.    And you look at women, and just
18 take it from the top, cases who ever used genital
19 talc reassigned to non-users. Do you see that?
20 It's the first group of data.
21    A.    Oh, yes. I'm sorry, yes.
22    Q.    Table A1.
23    A.    Yes. Go right ahead.
24    Q.    Zero reassigned -- zero percent

Page 263

1 reassigned. Do you see that?
2    A.    Yes.
3    Q.    There's been no adjustment
4 whatsoever.
5    A.    Correct.
6    Q.    Zero reassigned. What is the odds
7 ratio for that group of women?
8    A.    Well, it's a hazard ratio, and
9 it's --
10    Q.    Fair enough.
11    A.    -- 1.82.
12    Q.    And it's statistically significant,
13 correct?
14    A.    The confidence interval, yes, it's
15 statistically significant.
16    Q.    And if you look at the bottom of
17 the table when there's been a reassignment of
18 infrequent short-term users with ovarian cancer
19 to non-users, and 10 percent of non-case,
20 non-users to be short-term infrequent users is
21 1.40, correct?
22    A.    Correct.
23    Q.    And so when I said it was -- that
24 adjustment would bias it or reduce it towards the

Page 264

1 null, that was accurate, true?
2         MS. CURRY: Object to the form.
3         THE WITNESS: Assigning users to
4    non-users?
5 BY MS. O'DELL:
6    Q.    Yes.
7    A.    Yes. But again, it's a statistical
8 manipulation. It's not the actual data. So I
9 don't -- I don't know what that means. It could
10 just as easily look at some of the other
11 reassignments that are not statistically
12 significant.
13    Q.    Okay. So -- but the zero percent
14 reassignment is 1.82, and that's statistically
15 significant, correct?
16    A.    Correct. But what's most
17 interesting to me here is that that data is not
18 substantiated by Chang's publication on the exact
19 same women. The only difference being that these
20 women were requeried in 2017 to 2019 about their
21 talc use.
22         And so Chang looked at different
23 categories of hygiene products, et cetera, et
24 cetera, and talc was in that group. And even so

Page 265

1 looking at the Sister Study, Chang did not find
2 an increased risk in these same women for use of
3 the perineal application of talc and the
4 development of ovarian cancer, and that study was
5 published in 2024 as well.
6    Q.    Well, actually, in fact, what Chang
7 found was a 1.04 increased risk for one
8 frequency.
9    A.    No, Chang --
10         MS. CURRY: Object to the form.
11         THE WITNESS: When Chang pulled
12    out talc from the hygiene product
13    collective, the talc data was not
14    statistically significant. The hygiene
15    data had a statistical significance, and
16    that was contributed to by use of
17    douching products, but the actual talc
18    was not statistically significant.
19 BY MS. O'DELL:
20    Q.    Let's go back to Table 3, and look
21 at the column for recall bias correction.
22         Do you see that?
23    A.    Where -- am I missing this?
24    Q.    Table 3, ma'am.

67 (Pages 262 - 265)

Page 266

1      A.    I don't see recall bias correction.
2  Do you?  Oh, for ovarian cancer.  I'm sorry.
3  Okay, yes.
4      Q.    You're not running the clock on me,
5  are you, Dr. Saenz?
6      A.    Ma'am, come on now, you know me.
7      Q.    I'm teasing.  I'm teasing.
8      A.    I don't play games.
9      Q.    All right.
10     A.    I'm with you.  I'm with you.
11     Q.    Long-term use showed --
12 demonstrated a hazard ratio of 2.01, correct?
13 Statistically significant.
14     A.    Long-term use greater than two
15 decades --
16     MS. CURRY:  This is douching.
17     THE WITNESS:  Oh, down here.
18 Yes, ma'am, 2.01.
19 BY MS. O'DELL:
20     Q.    For ever versus never use in the
21 20s, it was 1.88 statistically significant,
22 correct?
23     A.    Ever versus never use in the 20s,
24 yes, that is correct.

Page 267

1      Q.    And then -- and then 2.08 was the
2  ever versus never hazard ratio for use in the
3  30s, correct?
4      A.    Correct.  And all of these were
5  recall bias corrections, so the manipulated
6  dataset.
7      MS. O'DELL:  Move to strike
8  "manipulated."
9  BY MS. O'DELL:
10     Q.    Let me ask you to turn to page 13.
11     A.    13?
12     Q.    Correct.
13     A.    I'm there.
14     Q.    Look at the right side of the page,
15 midway down, it says "Our findings."  Do you see
16 that?
17     A.    Yes, ma'am.
18     Q.    The authors concluded that the
19 positive association between genital talc use and
20 ovarian cancer in this study was consistent with
21 previous studies.  True?
22     A.    You're not asking me if you read it
23 correctly, right?  Because you editorialized
24 there, but --

Page 268

1      Q.    Yeah, but that's what their
2  conclusion was.
3      A.    That's their conclusion, yes.
4      MS. O'DELL:  Okay.  Let's go off
5  the record just for a moment, please.
6      THE WITNESS:  Yes, ma'am.
7      (Recess.)
8  BY MS. O'DELL:
9      Q.    So, Dr. Saenz, I want to move
10 forward in your report several pages, out of
11 epidemiology into a section that you entitled
12 "Inflammation as the mechanism by which talc
13 induces ovarian cancer."
14     And specifically, I want to -- oh,
15 forgive me, there's another title.  Sorry.  49 is
16 where I wanted to go, "Lack of data that talc
17 induces carcinogenesis in ovarian epithelial
18 cells."
19     Let me know when you turn there.
20     A.    I'm there.
21     Q.    And you have a discussion of -- of
22 the in vitro studies that have been done on talc.
23 You mentioned studies like the Shukla study,
24 Buz'Zard.  You also mention Emi, and then the

Page 269

1  work of Dr. Saed.
2      And I want to ask first is to have
3  you look at page 49, and the first sentence in
4  this section where you say:  "Plaintiff's experts
5  in this litigation have offered the opinion that
6  there is in vitro data and in vivo animal data
7  that talc can induce malignant transformation in
8  normal ovarian epithelial."
9      And you say:  "This is pure
10 speculation.  Often cited are in vitro studies
11 that report that talc can alter cell viability,
12 proliferation and gene expression, but none of
13 these endpoints are actual" -- excuse me -- "are
14 an actual demonstration of malignant
15 transformation and can in fact be manifestations
16 of normal cellular responses to any change in the
17 environment."
18     Did I read that correctly?
19     A.    Yes.
20     Q.    And this whole section in your
21 report is new.  Correct?
22     MS. CURRY:  Object to the form.
23     THE WITNESS:  I believe that I
24 had some discussion regarding Dr. Saed

68 (Pages 266 - 269)

Page 270

1    before, but I think that may be
2    augmented. I don't know where the pink
3    copy is, but I think I had some
4    discussion of Dr. Saed before.
5  BY MS. O'DELL:
6        Q.    Is it your view that in order for a
7  study to demonstrate that talc induces
8  carcinogenesis that there must be malignant
9  transformation?
10       A.    Yes.
11       Q.    Is there any demonstration that
12  talc causes reactive oxygen species, gene
13  expression, cell proliferation, or anything else
14  that would persuade you that talc can induce
15  inflammation?
16        MS. CURRY: Object to the form.
17        THE WITNESS: So if what we see
18    is limited to those things that you just
19    characterized, then because those can
20    also be normal cellular functions, I do
21    not believe that an experiment can claim
22    that with the production of reactive
23    oxygen species, changes in gene
24    expression or increased proliferation,

Page 271

1    that that equates to malignant
2    transformation. Those are things that
3    can be associated with a cancer
4    phenotype, but they can also be
5    associated with normal cellular
6    function.
7  BY MS. O'DELL:
8        Q.    And you understand that plaintiff's
9  experts are not arguing that some of those things
10  can also be associated with normal cell function.
11  You -- you understand that, correct?
12        MS. CURRY: Object to the form.
13        THE WITNESS: What I have seen
14    in their reports is that they have said
15    that seeing those things means that
16    malignant transformation has happened.
17    So -- I mean, we're sort of doing a
18    double negative. By extraction, I'm not
19    saying that they're not saying that
20    those things can't be normal cellular
21    function, but they're saying basically
22    that those are hallmarks of malignant
23    transformation, and I'm saying it's not
24    mutually exclusive.

Page 272

1  BY MS. O'DELL:
2        Q.    And is it your understanding that
3  the plaintiff's experts are arguing that Shukla,
4  Buz'Zard, and Emi are demonstrating malignant
5  transformation? Do you understand that to be
6  their conclusion?
7        MS. CURRY: Object to the form.
8        THE WITNESS: So originally
9    Dr. Clarke-Pearson actually did say that
10    about the Emi paper, but then in
11    deposition he retracted that statement
12    when he looked at the paper and saw that
13    it was a paper on macrophages and that
14    it was reflective of alterations in the
15    immune environment.
16  BY MS. O'DELL:
17       Q.    And is it your -- before I go on,
18  is it your evaluation and analysis that Dr. Wolf
19  in her report is opining that all in vitro
20  studies demonstrate malignant transformation?
21        MS. CURRY: Object to the form.
22        THE WITNESS: No, and I don't
23    think I said that she said that all in
24    vitro studies demonstrate malignant

Page 273

1    transformation.
2  BY MS. O'DELL:
3        Q.    I think you may have misspoke a few
4  minutes ago, and I just want to make sure that we
5  had an understanding.
6        So let me ask you about your review
7  of the in vitro studies regarding talc. In your
8  discussion, did you endeavor to analyze all
9  published in vitro studies that evaluated talc?
10       A.    I don't know that I've looked at
11  all in vitro studies that involve talc, but I
12  believe that I've looked at multiple studies that
13  involve talc and the risk of developing ovarian
14  cancer or the purported risk of inducing
15  malignant transformation.
16       Q.    You note the Emi study --
17        MS. O'DELL: And I want to mark
18    that quickly, and I guess that will be
19    Exhibit 29.
20        (Exhibit No. 29 was marked for
21        identification.)
22  BY MS. O'DELL:
23       Q.    The authors in Emi acknowledge that
24  talc is not inert. Are you aware of that?

69 (Pages 270 - 273)

Page 274

1      A.     Can you direct me to where you are
2  saying they state that?  Oh, right there.  So
3  sorry.
4             So they put "inert" in quotes.  So
5  in other words, they're characterizing they don't
6  think they are inert.
7      Q.     They don't think that talc is
8  inert --
9      A.     Correct.
10     Q.     -- is that what you're saying?
11     A.     Yes.
12     Q.     And Emi was published in
13  Epigenetics, correct?
14     A.     Yes.
15     Q.     And with researchers from Brown
16  University, correct?
17     A.     And some other places, I think,
18  yeah.
19     Q.     That's fair.  University of Puerto
20  Rico, Brown University, and maybe Rhode Island
21  Hospital.
22             Do you have any criticism of the
23  methodology that the researchers in Emi used?
24             MS. CURRY:  Object to the form.

Page 275

1             THE WITNESS:  Well, so the
2        only -- I mean, the -- the problem --
3        one of the -- one of the problems that I
4        have with the Emi study is that they
5        used titanium dioxide beads as their
6        control, and they found that the cells
7        treated with their so-called control
8        actually had the same changes in
9        cellular metabolism and the changes they
10       observed with the titanium dioxide as
11       they did with the talc.
12             So that's not really a good
13       control because there were changes, and
14       they were the same types of changes that
15       the authors saw with the application of
16       talc.  So I think that's a problem that
17       you don't -- that there wasn't actually
18       a control that didn't induce those same
19       effects.
20  BY MS. O'DELL:
21     Q.     If you will turn to page 1068.
22  Left-hand column at the top.
23     A.     Yes.
24     Q.     They actually state that: "Pathway

Page 276

1  analysis has identified that pathways affected by
2  talc included cell proliferation, immune response
3  in signaling, immunosurveillance, apoptosis.
4  These results help explain our prior finding of
5  reduced tumoricidal activity of J774 cells after
6  talc exposure."
7             I have -- the first question is --
8  the first sentence in talking about cell
9  proliferation, immune response in signaling and
10  immunosurveillance and apoptosis, those are all
11  part of the inflammation cascade, true?
12             MS. CURRY:  Object to the form.
13             THE WITNESS:  They certainly can
14       be.
15  BY MS. O'DELL:
16     Q.     And -- okay.  There's many more
17  questions I would like to ask you about that, but
18  I do not have time.
19     A.     We're done with that one?
20     Q.     We are.
21     A.     Okay.
22     Q.     So moving right along.  You did
23  not -- there's a study about "The effect of talc
24  particles on phagocytes in co-culture with

Page 277

1  ovarian cells" by Mandarino.
2             You did not review that paper, did
3  you?
4      A.     I did not.
5      Q.     I want to now turn your attention
6  to page 54 of your report.
7             MS. CURRY:  I'm sorry.  I just
8        have an objection to the last question.
9        Mandarino 2020 is actually cited in
10       her --
11             THE WITNESS:  Oh, so I guess I
12       did.  I didn't recall it.
13             MS. O'DELL:  Dawn, objection to
14       form I think is proper.
15             MS. CURRY:  I was just trying to
16       clarify for the record --
17             THE WITNESS:  I'm sorry.  I
18       guess I did.  I mean, it wouldn't be on
19       my list if I hadn't read it.  So I
20       apologize.  I'm not trying to keep
21       anything from you.  I just forgot.
22  BY MS. O'DELL:
23     Q.     You did not describe the Mandarino
24  paper in your report, did you?

70 (Pages 274 - 277)

Page 278

1    A.    No, but I believe that I read it
2 because I think Dr. Clarke-Pearson cited to it in
3 his report. And so sometimes when another expert
4 cites to a report, I'll go and look at it to see
5 if it's anything that I need to include.
6    Q.    And what was your basis for not
7 including it?
8    A.    I don't think it added anything to
9 the science.
10    Q.    You don't.  Okay.
11         Turning to page 54.  Your
12 discussion of asbestos begins on page 54, and in
13 your discussion -- and I'll just turn you to page
14 56, you focus on the Slomovitz publication from
15 2021, correct?
16    A.    You're in the middle of the page,
17 correct?
18    Q.    Yes, I am.
19    A.    Yes.  I see that.
20    Q.    And Dr. Slomovich's paper does not
21 include any new research, correct?
22         MS. CURRY:  Object to the form.
23         THE WITNESS:  It's a summary
24    paper, correct.  It's a review.

Page 279

1 BY MS. O'DELL:
2    Q.    It's a review?
3    A.    That's correct.  It's an analysis
4 and a review, yes.
5    Q.    Well, it's a review paper, as you
6 pointed out, and as a criticism of other review
7 articles, it has no new primary data, correct?
8    A.    That is correct.
9    Q.    And focusing on Slomovitz -- and
10 just to make sure we're clear, it's your opinion
11 that it doesn't matter if there's asbestos in
12 Johnson's baby powder or Shower to Shower, your
13 opinion is that those products do not cause
14 ovarian cancer.  Fair?
15    A.    Fair.
16    Q.    And since we talked last, you've
17 not seen any of the testing results or data about
18 the presence of asbestos in Johnson's baby powder
19 or Shower to Shower, true?
20         MS. CURRY:  Object to the form.
21         THE WITNESS:  Correct.
22 BY MS. O'DELL:
23    Q.    And Dr. Slomovitz and others -- by
24 the way, do you know these other authors,

Page 280

1 Dr. Slomovitz, Monk, Haydu, Taub and Coleman?
2    A.    I know several of them
3 professionally through --
4    Q.    That's what I'm asking.
5    A.    -- yeah, through the SGO, mm-hmm.
6 And through --
7    Q.    How do you know them?
8    A.    I know Dr. Slomovitz through the
9 SGO.  I know Dr. Coleman because I believe he and
10 I both served on the board of directors for the
11 Foundation for Women's Cancer at the same time,
12 or at least we overlapped.
13         And I know Dr. Monk, I've had --
14 gosh, it goes way back -- I think when I was
15 interviewing for fellowship, he was a fellow, and
16 then I've run into him at various meetings.
17    Q.    Okay.  Have you talked to him about
18 talc and ovarian cancer?
19    A.    No.  Not any of them.
20    Q.    Does this Slomovitz review paper
21 state that talc is safe for use in the genital
22 area?  Does it reach that conclusion?
23         MS. CURRY:  Object to the form.
24         THE WITNESS:  I don't believe

Page 281

1    that they draw that conclusion.  I
2    believe that they conclude that there's
3    a problem with misclassification of the
4    cases potentially, and that without
5    actual review of the pathologic data to
6    separate peritoneal mesothelioma from
7    ovarian cancer cases, those
8    classifications are potentially
9    confounded.
10 BY MS. O'DELL:
11    Q.    And they actually say that the
12 cases may be misdiagnosed as from ovarian
13 cancer -- ovarian cancer cases may be
14 misdiagnosed, and they're really primarily
15 peritoneal or peritoneal mesothelioma --
16    A.    Uh --
17    Q.    Let me strike that and start again.
18 I misspoke.
19    A.    Yeah.
20    Q.    They say some ovarian cancers may
21 be misdiagnosed and they're really mesothelioma.
22 They also acknowledge that some mesothelioma
23 cases may be misdiagnosed and are really ovarian
24 cancers.  True?

71 (Pages 278 - 281)

Page 282

1    A.    I think that based on when those
2  cases were analyzed that were reviewed, the ones
3  they're commenting on for IARC to make their
4  conclusions, since we didn't have the
5  immunohistochemistry techniques that we do now,
6  that's certainly a problem potentially.  Also
7  because a lot of the classifications were done
8  off of death certificates and not actually
9  medical records, that's also a problem.
10   Q.    So if you will turn to page 127,
11 Dr. Saenz, of the Slomovitz paper.
12   A.    I don't have it.  We didn't mark it
13 yet.
14   Q.    I thought we marked it as exhibit
15 --
16   A.    No, ma'am.  Paula is working on it.
17       MS. O'DELL:  Sorry, Paula, if I
18 got ahead of you.  Exhibit 29, I guess.
19       MS. BROWN:  30.
20       MS. O'DELL:  30.
21       (Exhibit No. 30 was marked for
22       identification.)
23       MS. CURRY:  You have about two
24 minutes left on general, Leigh.

Page 283

1        THE WITNESS:  Page 120 what?
2   I'm sorry, Ms. O'Dell.
3  BY MS. O'DELL:
4    Q.    127.
5    A.    Thank you.
6    Q.    They say that:  "Given the quality
7  of the evidence, the counterargument could be
8  made, namely that the incident rates of ovarian
9  cancer actually is much higher, and that the
10 peritoneal malignant mesothelioma cases are
11 actually misdiagnosed ovarian cancers."
12       Did I read that correctly?
13   A.    Yes.
14   Q.    And looking at your report,
15 Dr. Saenz, on page 50 -- 57 and 58, does that
16 encompass your review of the most recent studies
17 published on ovarian cancer and asbestos
18 exposure?
19   A.    I think that the Dalsgaard study
20 from 2022 is the most comprehensive and certainly
21 the largest study that I have ever seen, and
22 certainly followed study subjects for a much
23 longer time than any of the other prior
24 publications.

Page 284

1    Q.    Have you endeavored to identify all
2  of the recent publications regarding ovarian
3  cancer and exposure to asbestos and described
4  them in your report?
5    A.    No, not in the same way that I did
6  for talc.  Primarily because, again, if asbestos
7  was in the talc, then the baby powder literature
8  should reflect an increased risk of developing
9  ovarian cancer.  And so what the actual
10 constituents are in the baby powder do not matter
11 to me because the baby powder literature doesn't
12 reflect the increased risk of developing ovarian
13 cancer with the perineal application of talc.
14   Q.    Well, in fact, there is literature
15 that does reflect an increased risk, Dr. Saenz.
16 It's your opinion that it's not causal, correct?
17       MS. CURRY:  Object to the form.
18       THE WITNESS:  For talc or
19 asbestos?
20 BY MS. O'DELL:
21   Q.    Talc.
22   A.    No, I disagree with that.  I do not
23 believe --
24   Q.    That --

Page 285

1        MS. CURRY:  Go ahead, finish.
2        THE WITNESS:  I do not believe
3   there is an increased risk of developing
4   ovarian cancer with the perineal
5   application of talc.
6  BY MS. O'DELL:
7    Q.    And it's your opinion that there's
8  no data published in the literature regarding
9  genital use of talc and ovarian cancer that
10 demonstrates an increased risk.  Is that your
11 testimony?
12       MS. CURRY:  Object to the form.
13       THE WITNESS:  My opinion is that
14   the literature that has been published
15   is inconsistent.  The studies that have
16   found a positive association are
17   inconsistent with the studies that have
18   not found a positive association.  The
19   strength of association is weak.  There
20   is no biologic plausibility for either
21   the migration or the actual mechanism by
22   which the talc would induce malignant
23   transformation.  And there's also no
24   data for migration from the perineum,

72 (Pages 282 - 285)

Page 286

1    and there's no biologic gradient data.
2    There is no evidence of a dose-response
3    curve in any of the published
4    literature.
5    BY MS. O'DELL:
6        Q.    Based on your -- in your opinion.
7        A.    That's what I'm here for is my
8    expert opinion, and that is my expert opinion.
9        Q.    Thank you.
10           All right.  I think that's my time
11    for general, and I have what I believe to be 15
12    minutes left or so for a few more Converse
13    questions.
14           So, Dr. Saenz, if I could ask you
15    to dig out the Converse report, if you don't
16    mind.
17       A.    Yes, ma'am.
18           MS. O'DELL:  And, Leslie, would
19    you mind -- or someone tell me exactly
20    how many minutes you think I have.
21           And I'll try to be considerate
22    of your time, Dr. Saenz.
23    BY MS. O'DELL:
24       Q.    Dr. Saenz, I hope you can find your

Page 287

1    report.
2        A.    I have it.  It's Exhibit 9,
3    Ms. O'Dell.
4        Q.    Thank you.
5        A.    You're welcome.
6        Q.    I had a genius system that doesn't
7    appear to have worked, but I will get there.
8        A.    Always the downfall.
9        Q.    I know.  I know.  I was trying.
10           MS. CURRY:  You have 16 minutes
11    left in total.
12           MS. O'DELL:  We can do it.  All
13    right.  I did have a system.  I just
14    didn't know what it was.
15    BY MS. O'DELL:
16       Q.    So I'm back at Ms. Converse.  And
17    Ms. Converse we talked about several times, but
18    just to reset the table, Ms. Converse was a daily
19    user of talc, right?
20       A.    Correct.
21       Q.    And I want to calculate how
22    Ms. Converse would have been treated to evaluate
23    her risk under the Chang study.
24           MS. O'DELL:  You know, so I'll

Page 288

1    mark that Chang 2024 as Exhibit 31.
2           (Exhibit No. 31 was marked for
3           identification.)
4           MS. O'DELL:  And I think we have
5    not only the Chang study, but also the
6    tables.
7           MS. BROWN:  Yes.
8           MS. O'DELL:  And the tables may
9    be separate, and I will mark -- it's S4,
10    Table S4, and I'll go ahead and just
11    mark that as Exhibit 32.
12           (Exhibit No. 32 was marked for
13           identification.)
14           MS. BROWN:  So I have Chang S5.
15           MS. O'DELL:  Oh, do you?  I will
16    put up Chang S4 because that's the table
17    that we need.
18           MS. BROWN:  Okay.
19    BY MS. O'DELL:
20       Q.    So first, Dr. Saenz, just setting
21    the table for Chang 2024, it was an analysis from
22    the Sister Study.  True?
23       A.    Correct.
24       Q.    And it looked at a myriad of

Page 289

1    personal care products, everything from not only
2    talc to douching to baby oil, blemish products.
3    It looks at eyeshadow, mascara, hair spray.
4        A.    It looked at categories, if you
5    will.  So there was a beauty category, a hygiene
6    category, a skin care category, and within each
7    of those categories were various and sundry
8    products.
9        Q.    Right.  And so talc was included in
10    the hygiene category.  Fair?
11       A.    Correct.
12       Q.    And I would like to take you to
13    Figure 4, which is page 10 of the Chang study.
14           And just let me know when you get
15    there.
16       A.    I'm there.
17       Q.    And in the middle of the page, it
18    looks at hygiene, and in the single product
19    category looks at everything from bath gel,
20    deodorant, douching, mouthwash, and then talc
21    under arm, talc vaginal, and talc other.
22           And you would agree with me that
23    Ms. Converse's primary use of talc is talc in the
24    vaginal area, correct?

73 (Pages 286 - 289)

Page 290

1    A.    No, I think it was talc in the
2  perineal area.
3    Q.    And you would view that as
4  different as this category that they've
5  identified as talc in the vaginal area?
6    A.    I -- I don't ever say that the
7  vagina is the perineum.  I don't exactly know why
8  these authors used the word "vagina."  I don't
9  think these women were putting talc up into their
10  vagina.  I think they were applying it to their
11  perineum, at least that's what the data from the
12  original Sister Study said.  So I don't know why
13  these authors call it "vaginal," but it's not the
14  vaginal application of talc.
15    Q.    Well, you're not disagreeing with
16  me that these authors when they describe talc,
17  paren, "vaginal," close paren, that they are
18  intending to describe perineal application of
19  talc?
20    A.    I think you and I --
21    MS. CURRY:  Object to the form.
22    THE WITNESS:  I think you and I
23  are on the same page with that.  I don't
24  think that this paper, especially since

Page 291

1  it's not new study subjects, correct,
2  it's women from the Sister Study, these
3  were women that were studied placing
4  talc on their genitals, not up into
5  their vagina.
6  BY MS. O'DELL:
7    Q.    Well, we were doing great until we
8  got to that.  I mean, we don't know that.  We
9  know that they are placing it on the perineum,
10  but we don't know if it could have been moved
11  into the vagina through intercourse, moved into
12  the vagina through tampons or any other source,
13  correct?
14    We just know in general this is the
15  category that covers perineal use.  We're in
16  agreement, right?
17    A.    I think that's fair.
18    Q.    And if you look at Table 4, it is
19  an adjusted association between one frequency
20  category increase and the use of personal care
21  products and ovarian cancer.  Correct?
22    A.    Yes.
23    Q.    And in this instance, talc in this
24  single product, one frequency, its dot, or its

Page 292

1  estimate is just to the right of 1, correct?
2    A.    Correct.
3    MS. CURRY:  Object to the form.
4  BY MS. O'DELL:
5    Q.    And if you -- and of course, they
6  looked at uterine cancer in this study, and we're
7  not talking about uterine cancer.  We're only
8  talking about ovarian cancer.  Can we agree on
9  that?
10    A.    Well, we talked about uterine
11  before, but yes, we're just talking about ovary
12  right now.
13    Q.    For this moment --
14    A.    For this moment.
15    Q.    -- -- for Chang, that's what we're
16  talking about is ovarian cancer.
17    A.    Fair enough.
18    Q.    And if you'll turn to page 14, on
19  the left-hand side --
20    A.    I'm there.
21    Q.    -- last full paragraph.  Do you see
22  that, this study?
23    A.    Yes.
24    Q.    Go down midway of the paragraph, it

Page 293

1  says: "All of the observed effects of one
2  frequency level increase were modest in
3  magnitude.  The impact would be more substantial
4  when comparing the most frequent users with never
5  users.  For example, an 8 percent higher hazard
6  of postmenopausal breast cancer for a one
7  frequency level increase in the beauty mixture
8  use could translate into" -- excuse me, "could
9  translate to approximately a 36 percent higher
10  hazard for the most frequent users compared with
11  never users."
12    Did I read that correctly?
13    A.    You read that correctly.
14    Q.    And what they're saying is that
15  when you look at the increased risk for one
16  frequency, that's only one part of the picture,
17  right?
18    If you have a person that's using
19  multiple times a week, then you actually have to
20  multiply the increased risk in order to know the
21  true rate.  True?
22    MS. CURRY:  Object to the form.
23    THE WITNESS:  They don't show
24  that data.  I mean, the frequency that

74 (Pages 290 - 293)

Page 294

1    they're looking at is this is a
2    basically an ever/never, and they're not
3    being -- they're not able to drill down
4    to more increased frequency of
5    application, and they don't actually
6    show that data. I think that that's a
7    hypothesis that they're putting forth,
8    but they don't actually show that data.
9  BY MS. O'DELL:
10    Q.    Well, do they say it's a
11  hypothesis?
12    A.    They don't have to. It's in their
13  Discussion section. It's not in their Results
14  section.
15    Q.    Well, not every statement in a
16  Discussion section is an hypothesis, Dr. Saenz.
17  They're saying this categorically that the impact
18  would be substantially -- would be more
19  substantial when comparing the most frequent
20  users with never users, and then they give an
21  example. Correct?
22        MS. CURRY: Object to the form.
23        THE WITNESS: They're just
24    putting that data forth without actual

Page 295

1    data from the Results section being able
2    to draw that conclusion. So this is
3    them putting forth a proposal. It is
4    not something that is supported by the
5    Results section of their paper.
6  BY MS. O'DELL:
7    Q.    And you are saying that to a
8  reasonable degree of scientific certainty?
9    A.    Yes.
10    Q.    So, Dr. Saenz, if you took -- and
11  I'm going to share my screen, and you should see
12  in this a calculator. So I want to --
13        MS. CURRY: No, she's not --
14    she's sharing her screen.
15  BY MS. O'DELL:
16    Q.    Do you see my -- the calculator I
17  have on the screen?
18    A.    Sure.
19    Q.    And if the increased risk is
20  8 percent, so in other words, based on the data
21  we've seen previously, 1 -- excuse me -- 1.08.
22  Do you see that?
23    A.    Yes.
24    Q.    And you multiply 1.08 times 4 times

Page 296

1    or four times a week -- do you see what I'm doing
2    here?
3        MS. CURRY: I'm -- I object.
4    I'm not -- I have no idea what you're
5    doing here.
6        MS. O'DELL: Well, I'm just --
7    follow the calculation, if you don't
8    mind.
9        MS. CURRY: Well, we've been
10    going for 12 minutes since you said you
11    were turning to Converse, and we haven't
12    said the word "Converse" or looked at
13    anything about her case --
14        MS. O'DELL: I actually have,
15    Dawn. I will -- I will -- I've actually
16    asked about Converse, but --
17  BY MS. O'DELL:
18    Q.    And so let me be clear, you know,
19  the -- let me pull up the Converse tables, and I
20  will -- let's do the calculation. I wanted to
21  try to explain the calculation as they put it in
22  the discussion for this example, and then show
23  you what it would be for Converse.
24        Do you understand what I'm doing?

Page 297

1    A.    No.
2    Q.    Okay. Fair enough.
3    A.    Because I think you're making an
4  assumption here that when they say there is a one
5  frequency level increase with 8 percent, that
6  that somehow correlates to an application once a
7  week. And those two don't -- that's not what it
8  is. It's not -- you multiply it times four
9  because you use it four days a week. That's not
10  what it is.
11    Q.    That's not what I'm doing, by the
12  way.
13    A.    Okay. Well, that's why I'm
14  confused.
15    Q.    Yeah, fair enough. Let's just make
16  it Converse because I want to meet Dawn's
17  objection.
18        This is Table S5. I'm sure -- S4,
19  excuse me, association between one frequency
20  category increase in use of a single personal
21  care product in breast and ovarian and uterine
22  cancer.
23        Do you see that clearly?
24    A.    Yes.

75 (Pages 294 - 297)

Page 298

1    MS. O'DELL:  And I will put this
2    in the chat, Leslie, so we can mark the
3    table.
4  BY MS. O'DELL:
5    Q.    But it's Table S4.  And this is --
6  I'm in the ovarian cancer column.  Do you see
7  that?
8    A.    Yes.
9    Q.    And I tried to highlight it so it
10  would be clear to see.  And so I will scroll down
11  to the hygiene category, and you see I've
12  highlighted "talc vaginal," and it's the -- fully
13  adjusted as a ratio is 1.04.
14    Do you see that?
15    A.    Yes.
16    Q.    And so going back to my example --
17  and I'll just stop using the one that's in the
18  study, and just clear this out so it's
19  essentially zero -- and let's calculate
20  Ms. Converse and what it would be -- forgive me,
21  I just need to open this again -- what it would
22  be under the scenario 1.04.
23    Do you see that?  1.04 is what the
24  hazard ratio or the adjusted ratio was -- fully

Page 299

1  adjusted hazard ratio was for talc in the vaginal
2  area.  Correct?
3    MS. CURRY:  Object to the form.
4  Are you ignoring the statistical
5  significance?
6    MS. O'DELL:  I'm not.
7  BY MS. O'DELL:
8    Q.    I'm saying that's the hazard ratio
9  that they reported in this table.  True?
10    MS. CURRY:  Object to the form.
11  BY MS. O'DELL:
12    Q.    This 1.04.
13    A.    For talc, correct.
14    Q.    And so if you took -- if she's a
15  seven-day-a-week user, which is what she is,
16  right?  Ms. Converse is a seven-day-a-week user,
17  daily user?
18    A.    Correct.
19    Q.    And she's not a one-time frequent
20  user.  She's a seven-day user, true?
21    A.    This isn't a one-time frequent
22  user.  That's where you're losing me.  So I'm not
23  quite sure how you're taking that phrase and
24  translating it into the number of days.  It

Page 300

1  doesn't say that.
2    Q.    Well, what they say in their study,
3  and you have it there in front of you, they said:
4  "The impact" -- they're talking -- "although the
5  observed effects of one frequency level increase
6  were modest in magnitude," that would be true of
7  talc, "the impact would be more substantial when
8  comparing the most frequent users with never
9  users."
10    That's what we read earlier,
11  correct?
12    A.    That's a sentence that they put
13  forth, but they don't show the data for that.
14    Q.    They go forward and they do show
15  data.
16    A.    No --
17    Q.    They say, for example -- let me
18  just finish -- "An 8 percent higher hazard of
19  postmenopausal breast cancer for one frequency
20  level increase in the beauty mixture use could
21  translate to approximately 36 percent higher
22  hazard for the most frequent users compared with
23  never users."
24    Did I read that correctly?

Page 301

1    A.    You read it correctly, but that's a
2  proposition.  They say "could."  That's not
3  actual data.
4    MS. CURRY:  And we're actually
5    at -- we're over the time allotted for
6    seven hours at this point.
7    MS. O'DELL:  Okay.  So I have no
8    more time, that's seven hours?
9    MS. CURRY:  It's seven hours.
10    MS. BROWN:  Leigh, can you put
11    the last exhibit in the chat so we can
12    have it --
13    MS. O'DELL:  I would be happy
14    to.  It's Table S4, but it's all in one
15    Excel spreadsheet.
16    All right.
17    MS. CURRY:  I think -- hold on,
18    I have one question just so that the
19    exhibit is clear.  On my tables for
20    Chang, Table S4 that's at the top that
21    you're using, on the bottom it's
22    actually labeled as Table S5.  So I just
23    want to make sure that when you mark it,
24    if you went to the tab, it would be

76 (Pages 298 - 301)

Page 302

1    Table S5, but in reality at the top,
2    it's Table S4 is the one that we've been
3    using, just so the right one is marked
4    as an exhibit.
5        THE WITNESS:  Maybe you do have
6    it, Paula.  So Paula might have it.
7        MS. CURRY:  Let me see it and
8    you might not have to put it in there.
9        MS. O'DELL:  I think -- well,
10   let's see what you have, Paula.
11       MS. CURRY:  No, this is the
12   wrong one.
13       MS. O'DELL:  It's mislabeled.
14   Actually --
15       MS. CURRY:  Yeah.
16       MS. O'DELL:  -- what I had
17   pulled down from the paper itself is the
18   actual spreadsheet I showed.  So I think
19   they actually mislabeled it in the
20   published version or the online version
21   the tables at the bottom.
22       So with your agreement, Dawn, I
23   will make a PDF of Table S4 so it's
24   clear, and I will e-mail it to -- to --

Page 303

1    maybe, Leslie, you can send me your
2    e-mail, and I will e-mail everybody so
3    you have it, and that will be what is
4    marked as Exhibit 32.
5        Do we have agreement that that
6    works?
7        MS. CURRY:  That works.  Thank
8    you.
9        MS. O'DELL:  Okay.  Great.
10       Dr. Saenz, thank you for today.
11       THE WITNESS:  Thank you.
12       MS. O'DELL:  And hope everybody
13   has a good evening.  We will see you all
14   tomorrow.
15       THE WITNESS:  Nine o'clock
16   tomorrow, Leigh?  I'm just confirming.
17       MS. CURRY:  Yes, that's right.
18   (Whereupon, the deposition of
19       CHERYL C. SAENZ, M.D. was
20       adjourned at 5:30 p.m.)
21
22
23
24

Page 304

1    CERTIFICATE OF CERTIFIED SHORTHAND REPORTER
2        The undersigned Certified Shorthand
3    Reporter does hereby certify:
4        That the foregoing proceeding was
5    taken before me at the place and time therein
6    set forth, at which time the witness was duly
7    sworn; That the testimony of the witness and
8    all objections made at the time of the
9    examination were recorded stenographically by
10   me and were thereafter transcribed, said
11   transcript being a true and correct copy of my
12   shorthand notes thereof; That the dismantling
13   of the original transcript will void the
14   reporter's certificate.
15       In witness thereof, I have
16   subscribed my name this date:  July 2, 2024.
17
18   _____
19   LESLIE A. TODD, CSR, RPR
20   Certificate No. 5129
21
22
     (The foregoing certification of
23   this transcript does not apply to any
     reproduction of the same by any means,
24   unless under the direct control and/or
     supervision of the certifying reporter.)

Page 305

1        INSTRUCTIONS TO WITNESS
2        Please read your deposition over
3    carefully and make any necessary corrections.
4    You should state the reason in the appropriate
5    space on the errata sheet for any corrections
6    that are made.
7        After doing so, please sign the
8    errata sheet and date it.
9        You are signing same subject to the
10   changes you have noted on the errata sheet,
11   which will be attached to your deposition.  It
12   is imperative that you return the original
13   errata sheet to the deposing attorney within
14   thirty (30) days of receipt of the deposition
15   transcript by you.  If you fail to do so, the
16   deposition transcript may be deemed to be
17   accurate and may be used in court.
18
19
20
21
22
23
24

77 (Pages 302 - 305)

Page 306

```
 1           - - - - -
 2         E R R A T A
 3           - - - - - -
 4  PAGE LINE CHANGE
 5  ____ ____ _____
 6  REASON: _____
 7  ____ ____ _____
 8  REASON: _____
 9  ____ ____ _____
10  REASON: _____
11  ____ ____ _____
12  REASON: _____
13  ____ ____ _____
14  REASON: _____
15  ____ ____ _____
16  REASON: _____
17  ____ ____ _____
18  REASON: _____
19  ____ ____ _____
20  REASON: _____
21  ____ ____ _____
22  REASON: _____
23  ____ ____ _____
24  REASON: _____
```

Page 307

```
 1        ACKNOWLEDGMENT OF DEPONENT
 2      I,_____, do hereby
 3  certify that I have read the foregoing pages,
 4  and that the same is a correct transcription
 5  of the answers given by me to the questions
 6  therein propounded, except for the corrections
 7  or changes in form or substance, if any, noted
 8  in the attached Errata Sheet.
 9
10  Dated: _____
11
12  _____
13  CHERYL C. SAENZ, M.D.
14
15  Subscribed and sworn to
16  before me this
17  _____day of_____,20___.
18  My commission expires:_____
19  _____
20  Notary Public
21
22
23
24
```

Golkow Technologies,
A Veritext Division

877-370-3377                                                    www.veritext.com

**[& - 161]**

| & | | | |
|---|---|---|---|
| **&** 1:6 3:7,13,20 6:10 7:11 45:15 | **1.08.** 295:21 | **1.57.** 204:9 | **120** 283:1 |
| | **1.09** 213:8,24 | **1.65.** 232:11 | **127** 282:10 |
| | **1.12** 145:10,19 | **1.71** 204:19 | 283:4 |
| **0** | 145:22 146:7 | **1.71.** 205:17 | **128** 5:21 |
| **0.85** 177:9 | **1.13** 210:9 | **1.72** 232:22 | **13** 5:20 6:19 |
| **0.97** 204:7 | 211:1 | **1.82** 264:14 | 15:18 127:24 |
| **0.99** 218:9 | **1.17** 218:10 | **1.82.** 263:11 | 128:2,23 129:3 |
| **02210** 3:22 | 255:7 | **1.84.** 145:4 | 130:5 133:8 |
| | **1.17.** 209:7 | **1.88** 266:21 | 154:2,5,6 164:3 |
| **1** | 255:1 | **10** 5:14 77:12 | 186:24 188:4,5 |
| **1** 1:24 4:9 6:14 | **1.19** 204:9 | 98:23,24 99:4 | 191:16 197:2 |
| 9:22,23 51:20 | 218:12 | 134:5,11 | 199:14 218:15 |
| 54:4 101:15 | **1.2.** 177:9 | 158:19 191:2 | 245:24 246:23 |
| 146:24 148:22 | **1.22** 204:5 | 194:9 240:20 | 267:10,11 |
| 151:15 163:9 | **1.25.** 145:11,20 | 245:24 246:23 | **13,592** 141:18 |
| 193:9 199:22 | 146:8 | 252:10 253:12 | 143:15 |
| 202:19 208:23 | **1.26** 210:10 | 257:21 263:19 | **136** 5:25 |
| 209:12 230:3 | **1.27** 236:7 | 289:13 | **14** 5:22 12:14 |
| 234:3,11,12 | 237:4 | **100,500** 37:2 | 88:2 93:5 |
| 235:9,21 | **1.29** 232:22 | **101** 5:16 | 136:22,23 |
| 236:23 249:4 | **1.31** 204:17 | **1068** 275:21 | 137:5 292:18 |
| 292:1 295:21 | 205:1,16 | **10th** 126:24 | **14542** 304:17 |
| **1,509** 162:8 | 232:10 | **11** 5:16 100:24 | **1490** 3:14 |
| **1.01** 145:11,20 | **1.36** 204:8 | 101:2,10 104:1 | **15** 6:4 159:15 |
| 146:8 204:18 | **1.38** 145:3 | 156:13 157:18 | 159:16,18 |
| 205:1,16 | **1.40** 236:15 | 227:24 | 160:2,9 166:24 |
| 210:10 218:12 | 258:12,21 | **112** 5:19 | 286:11 |
| **1.02** 177:8 | 263:21 | **12** 5:17 15:18 | **155** 3:21 |
| **1.04** 145:4 | **1.40.** 236:11 | 26:18 44:8 | **16** 6:6 37:11 |
| 265:7 298:23 | **1.47** 205:1 | 112:23,24 | 60:5 159:15 |
| **1.04.** 298:13,22 | 232:10,21 | 120:5,6,11,13 | 161:4,13 168:5 |
| 299:12 | 236:15 | 121:7,12,18 | 186:24 287:10 |
| **1.08** 209:6,20 | **1.47.** 233:17 | 154:4 240:21 | **16-2738** 1:6 |
| 218:9 295:24 | **1.49** 232:22 | 245:23 246:22 | **160** 6:5 |
| | **1.53** 204:8 | 296:10 | **161** 6:9 |

**[168 - 2023]**                                                          Page 2

**168**  6:13,15
**16th**  37:7
**17**  6:10 27:21
  28:6 57:12,12
  168:5,6,9,20
  169:23,23
  170:22 171:1,8
  171:9
**178**  6:19
**18**  6:14 34:5,5
  168:13,15
  169:23 170:4,6
  170:16,17
  171:10 188:5
**182**  4:24
**183**  169:1
**184**  6:21
**19**  1:15 4:13,16
  6:16 178:9,10
  200:7,11
**192**  6:25
**195**  7:9
**1962**  88:1 89:5
**1971**  52:15,19
  52:21
**1982**  139:8
**1990s**  60:10
**1997**  154:20

**2**

**2**  4:12 7:25
  18:23 19:1
  20:12 21:17
  31:24 46:1
  51:21 52:20
  54:2 55:22

58:15 59:20
60:11 95:3
100:13 101:16
102:2 104:24
105:8 110:7,24
115:4,7 116:7,9
116:13 117:1
118:7 120:19
121:13,19,24
122:3,9 140:17
143:8 146:24
157:14 166:19
185:20 194:6
200:13,17,21
201:1,12 209:4
224:16,20
225:23 227:19
227:24 229:13
229:14 230:7
232:8 252:1,15
254:13,18,20
254:23 255:4,7
257:5 304:16
**2,213**  208:24
**2,295**  162:9
**2,600**  195:23
**2.01**  266:12
**2.01.**  266:18
**2.08**  267:1
**20**  6:20 25:8,10
  89:19,23 117:3
  117:8 155:9,15
  183:24 184:1,7
  211:19 212:1,6
  247:1 260:24
  261:12 307:17

**20,000**  89:6,13
  90:14
**200**  149:19
**2000**  57:23
**2001**  107:14
**2002**  15:17
**2003**  238:14
**2007**  126:24
  154:20
**2008**  190:14
**2009**  135:16
  190:5 238:14
**2010**  98:4
**2012**  182:24
**2013**  138:19
**2014**  15:19
  117:2,7 123:11
**2015**  15:19
  203:9
**2016**  90:9
  135:16
**2017**  4:24 5:19
  50:18 56:24
  57:24 88:3 89:5
  104:22,23
  113:3 114:16
  238:9,17
  239:16 240:2
  244:16,22
  245:5 248:1,3
  248:12 250:3
  250:14 264:20
**2018**  190:7
**2019**  4:16,19
  19:18 21:6,11
  28:11 29:8,12

32:3,19,21 33:5
33:15 36:1,2,8
36:22 37:5,8,13
37:19 43:15,19
61:15 62:1,3
192:2 238:10
238:17 239:16
240:3 244:17
244:22 245:5
248:1 249:24
264:20
**202**  7:15
**2020**  7:20 63:13
  161:18,22
  183:12 208:8
  208:18 217:9
  225:18 227:24
  228:2,4 230:16
  231:4 247:18
  249:20 250:16
  277:9
**2021**  39:2 42:4
  42:9 43:5
  201:19 249:24
  278:15
**2022**  7:25 31:14
  31:16 37:22
  38:8,20 39:3,12
  39:20 40:4,22
  41:2 94:9,23
  183:21 196:17
  223:19,20
  283:20
**2023**  6:13,15
  22:14 31:17
  167:9 223:18

**[2023 - 41]**                                                      Page 3

262:9

**2024**   1:15 4:13
4:17 5:13 6:19
8:8,24 11:19
19:18 20:14
21:8,12,16 23:9
24:2 28:5 32:18
32:23 33:6,16
34:3 41:21
44:11 57:1 77:5
88:20 107:18
178:17 183:15
184:18 243:1,5
243:11,17
265:5 288:1,21
304:16

**208**   7:18

**2096**   218:5

**2097**   217:15

**20s**   88:16
211:17,18
246:6 260:14
260:14,23
266:21,23

**21**   4:13 6:22
156:2 170:17
170:18,23
171:9,10
191:24 192:1,3
201:17

**217**   7:20

**218**   3:8

**21st**   20:14 21:8

**22**   7:4 15:16
176:7 191:23
195:8,10,13

**22,800**   39:9

**223**   7:25

**226**   128:7

**23**   4:17 7:10
147:23 201:24
202:1,10,11
208:9

**233**   189:23

**234**   189:23

**238**   8:7

**24**   7:16 53:10
156:2 208:10
208:12

**243**   8:10

**25**   4:16 60:13
63:12 149:13
150:21 164:8
216:22,24
217:1 247:1
253:5 259:1,4,5
259:17,24
260:4 261:15
261:22

**25th**   37:22 38:1
38:2,8 39:3,12

**26**   7:20,21
223:22,23

**26,812.50.**
39:16

**269-2343**   3:10

**27**   8:4 170:5
236:24 237:24
238:1

**273**   8:14

**28**   5:13 8:8
243:2,8,17

**282**   8:17

**288**   8:23,24

**28th**   11:19

**29**   8:11 273:19
273:20 282:18

---

**3**

**3**   4:14 19:11,12
21:4 24:8 55:22
76:20 77:6,7
107:1,2,3
118:11 146:24
149:12 162:5
169:10 178:14
185:7 213:14
213:16,18
244:24 252:1
252:15 254:18
254:20 255:7
256:16 257:5
257:11,11,13
257:17,19
265:20,24

**3,049**   240:19

**3.34.**   255:8

**30**   8:15 77:17
79:2 208:1,2
249:17 250:5
282:19,20,21
305:14

**300**   114:23

**307**   1:24

**30s**   88:16
211:23 246:6
260:15 267:3

**30th**   37:18

**31**   8:18 214:7,8
288:1,2

**32**   8:24 219:9
223:18 288:11
288:12 303:4

**33**   175:24
232:19

**334**   3:10

**338-1100**   3:16

**34**   125:22

**35**   4:19 212:2

**35,812.50**   39:12

**36**   293:9 300:21

**36,000**   38:12

**36,187.50**   37:24
38:12

**3600**   90:6

**36104**   3:9

**365**   89:6

**379**   240:11,12

**383**   241:7

---

**4**

**4**   4:17 23:21,22
147:1 251:9
252:6 289:13
291:18 295:24

**40**   25:11 59:13
155:9,15 171:5
171:8,18,24
187:14 212:2
237:8

**40s**   211:23

**41**   4:21

[43,215 - accountable]                                        Page 4

**43,215**  37:8,15
**439-2000**  3:23
**45**  166:11
   246:24
**46**  190:3
**47**  232:13
**48.25**  94:19
**49**  4:24 268:15
   269:3

**5**

**5**  4:18 35:7,8
   36:14 46:7,14
   77:5 94:17
   104:12,13
   107:1,2 119:17
   119:18,20
   121:8 147:1,3
   197:15 228:14
   228:15
**5,726**  196:6
**50**  87:13,20
   97:19 107:1,7
   260:6 283:15
**501**  3:14
**50s**  93:10
**5129**  1:25
   304:20
**54**  277:6 278:11
   278:12
**55**  89:4 96:4,17
   100:6 246:24
**56**  179:1,3,7
   222:15 278:14
**57**  283:15

**58**  95:6 179:14
   283:15
**5:30**  303:20
**5th**  128:19

**6**

**6**  4:19,20 31:7
   36:22 37:12
   41:18,22 43:24
   59:24 77:7
   125:8,24
   148:22 151:15
   155:10 184:18
**60**  21:19 40:9
   40:12 41:2,5
**617**  3:23
**619**  3:16
**63**  95:14,17
   96:1 179:1
**65**  96:4
**66**  96:5 179:3,3
**660**  71:22
**667**  69:19
**668**  70:14
**6753335**  1:23
**69**  5:9
**6th**  37:9

**7**

**7**  4:22 49:17,23
   50:6 254:12
**70**  40:10,12
   41:2,5
**71**  167:1 168:21
   170:5 171:5,8
**73**  187:8

**75**  187:8
**750**  41:3
**7500**  90:10
**76**  53:12
**78,502.60**  37:19

**8**

**8**  5:4 12:12 63:9
   69:7,8,17,17
   74:8 118:11
   124:18 293:5
   295:20 297:5
   300:18
**8,500**  141:17
   143:14
**80**  5:13
**87**  238:21
   240:14

**9**

**9**  4:3,11 5:10
   30:4 53:10 80:1
   80:4 95:3
   119:12,13,16
   119:17,19
   213:8 287:2
**910**  2:6
**92037**  2:7
**92101**  3:15
**94**  240:16
**95**  218:9,22
   221:17 232:10
**961**  143:8
**964**  146:23
**98**  5:15
**99**  209:6 218:11
   218:21

**9:13**  1:16

**a**

**a.m.**  1:16
**a1**  262:14,15,22
**abbreviate**  17:8
**ability**  182:8
**able**  9:11 23:7
   75:1 244:2
   294:3 295:1
**above**  61:23
   125:9 144:8
   215:19
**absence**  130:8
   222:9
**absolutely**
   75:23 136:20
**abstract**  26:21
   26:22,23 29:15
   114:22 194:5,6
   203:22 238:20
**abstracts**  26:19
   26:19,23 27:1,8
   28:13 29:2
**accepted**  68:10
   68:14 122:19
**access**  6:6
   24:17 113:22
**accidentally**
   126:1
**accomplished**
   181:20
**account**  258:6
**accountable**
   242:15

**accounted** 64:5
110:6
**accumulate**
53:17 96:23
97:3
**accumulating**
48:19
**accumulation**
48:12 53:22
**accumulations**
97:2
**accurate** 20:13
33:4 42:1 48:13
62:6 264:1
305:17
**achieve** 9:12
163:7
**acknowledge**
273:23 281:22
**acknowledg...**
307:1
**acog** 4:22 5:14
49:20 50:16
59:15 98:16
99:4,15,22
107:20 108:5
108:11,13
173:3,19,24
**acog's** 57:20
98:20 158:17
167:9
**acquired** 46:24
47:3,5,9,15,15
48:8 52:24
**acs** 96:19

**active** 26:2,6
**actively** 27:6
**activities** 28:20
31:10
**activity** 70:6,18
276:5
**actual** 15:21
19:10 182:8
191:12 212:16
232:4 264:8
265:17 269:13
269:14 281:5
284:9 285:21
294:24 301:3
302:18
**actually** 23:12
24:23 25:17,18
26:8 27:14
31:16 33:14,21
34:21 36:5 37:9
38:2,6 45:6
51:10 54:21
55:3,20,23 56:3
61:14 65:6 68:3
71:10 72:7
74:23 78:3
93:10 94:12
95:24 96:3,17
97:21 108:17
109:19 118:20
123:2 125:9
126:13,18
139:2,22 141:8
141:22 142:9
149:7,15
150:11,17

151:9,11,16
152:13,24
153:2 163:6
170:22 173:11
174:13 180:4
185:10 186:24
189:6 190:20
190:22 191:4
193:24 195:16
198:3 215:14
225:18 226:6
228:14 231:10
233:16 240:4,5
241:7,18
247:23 250:12
256:2,6,7 262:1
265:6 272:9
275:8,17,24
277:9 281:11
282:8 283:9,11
293:19 294:5,8
296:14,15
301:4,22
302:14,19
**acute** 66:7,13
66:18 67:20,20
67:23,23 68:23
71:5 72:24 73:6
74:15 75:2
**add** 63:16
**added** 26:13
60:7 63:11
187:4,8 278:8
**adding** 162:23
**addition** 10:21
42:23 43:1,23

96:18,21 116:7
123:15 126:8
208:21 222:5
246:8
**additional**
10:20 47:5
48:20 117:1,3,7
117:8 225:13
229:11 249:18
**additionally**
188:11,12
**address** 13:12
135:2
**addressed**
206:16 217:19
252:23
**adherent**
126:15
**adipose** 148:20
**adjourned**
303:20
**adjusted** 213:9
213:24 236:5
258:6 291:19
298:13,24
299:1
**adjustment**
263:3,24
**administering**
2:15
**administration**
12:21
**administrative**
22:19 24:6,8
26:11

**advise**  165:24
  166:1,3,5
**advisor**  27:12
**advocacy**  25:3
**affected**  51:11
  51:12 276:1
**affiliate**  17:20
**affiliated**  16:14
**affiliation**
  185:11
**african**  7:15
  203:17 204:4
  204:16,22
  207:11,16,18
**age**  82:10,21
  86:11 87:5 88:2
  93:5 95:5,6,9
  95:13,17,17
  96:1,2,11,15,17
  96:19 97:4,18
  100:5,5 144:21
  164:8 239:3
  247:1
**agency**  14:9
  63:1 182:23
**agent**  200:22
**agents**  188:13
**ages**  96:4
  245:24 246:23
**ago**  10:22
  109:24 130:12
  138:18 254:14
  273:4
**agree**  46:23
  48:16 49:15
  52:10,22 53:5

53:19 59:9 66:5
67:2,3 68:16
72:7 75:8 83:22
87:18,19,22
88:15 101:24
105:5,11,13
106:8,18 110:3
123:14 126:10
132:17 133:5,5
133:15 136:3
137:21 139:4
139:10,13
141:2,4,9 148:1
149:17 180:15
186:21 187:12
188:21 192:21
203:15 209:15
209:18 212:21
221:5,8 250:22
257:7 260:12
260:16 289:22
292:8
**agreed**  216:7
**agreeing**  174:4
**agreement**
  291:16 302:22
  303:5
**ah**  31:7
**aha**  83:19
**ahead**  32:4
  121:4 127:22
  136:21 150:7
  176:16 199:10
  208:7 214:18
  259:15 262:23
  282:18 285:1

288:10
**al**  42:12 43:5,6
  104:22,23
**alabama**  3:9
**alice**  161:6
**alive**  97:2
**allele**  49:5 52:4
  52:6,6
**alleles**  48:22
  49:1,3
**allen**  3:6
**alliance**  17:13
  156:5
**allotment**  25:18
**allotted**  301:5
**allow**  49:2
  246:14
**allowed**  116:23
  174:2,7
**alpha**  148:21
  151:15
**alter**  175:11
  269:11
**alterations**
  272:14
**ameliorates**
  162:23
**amended**  4:12
  11:17 31:23
**american**  5:4
  13:21 14:3,13
  14:15,16,19
  15:7,9,12 16:4
  50:11 156:9
  185:2 203:18
  204:4,16,22

207:11,17,18
**amount**  37:23
  38:11 90:22
  91:8,12
**amputation**
  251:20
**analgesic**  6:23
**analyses**  171:22
  172:2,4 221:9
  251:10 256:20
**analysis**  6:24
  7:7,25 32:23
  33:5,7,20,22
  77:14 92:1
  134:20 138:19
  141:13 144:13
  145:1 148:17
  153:2 164:21
  175:16 177:7
  183:21 202:13
  202:13,21,23
  203:7,7,11,13
  206:11,15
  208:4,19 215:2
  215:9 225:10
  230:15,23,24
  231:2 232:4,6,9
  232:23 239:23
  251:3,7 258:10
  260:2 272:18
  276:1 279:3
  288:21
**analytic**  58:20
  59:3,11,16
**analyze**  186:11
  273:8

**analyzed**
177:22 282:2
**analyzing**
219:5
**ancestry** 7:15
**andrew** 139:16
**angiogenesis**
149:3
**animal** 150:10
269:6
**anne** 2:12
**announce**
184:3
**annual** 167:9
**answer** 20:21
112:11 150:4
248:16,24
**answered** 90:19
117:23 226:14
**answers** 307:5
**anti** 144:17
188:13
**anticipated**
103:8
**anybody** 75:17
166:4
**anyway** 183:17
**apologize** 12:1
29:6 37:12
42:12,22
118:15 119:2
121:5 124:10
125:7 150:6
277:20
**apoptosis** 149:2
276:3,10

**appealing** 23:1
**appeals** 22:23
30:20 31:6
**appear** 287:7
**appears** 35:24
**appendices**
167:3 168:13
169:10 171:12
**appendix** 6:14
168:13 169:17
**application**
85:15 89:19
134:22 167:24
182:9 206:17
206:20 212:1
220:18 242:18
265:3 275:15
284:13 285:5
290:14,18
294:5 297:6
**applications**
89:7,13,24 90:6
90:10,10 91:3
206:20
**apply** 304:23
**applying**
290:10
**appointments**
24:9
**appreciate** 97:9
186:16
**approaches**
256:20
**appropriate**
24:22 305:4

**appropriately**
30:14
**approximately**
20:19 40:1 41:8
77:12,17 88:3
293:9 300:21
**april** 31:14,15
37:7,9,11,12,22
38:1,5
**arbitrary**
258:18,20
260:8,11 262:1
**archer** 44:12
45:20
**area** 7:17 24:16
138:9 139:4
150:23 192:18
193:2 209:5
226:17 246:12
280:22 289:24
290:2,5 299:2
**arguing** 271:9
272:3
**argumentative**
151:4
**arising** 131:9
**arm** 289:21
**arora** 184:6
**arose** 125:4,11
126:6 127:14
**article** 5:5,14
5:22 6:4,6,10
6:20,22 7:4,11
7:16,19,21 8:4
8:15,18 112:22
112:22 114:17

139:8 149:18
150:8 184:21
192:2 207:10
219:13 223:9
**articles** 12:6
57:22 96:22
149:6,7,21,22
150:12 167:22
279:7
**artifactual**
236:19 237:11
**asbestos** 8:15
183:1 222:9
278:12 279:11
279:18 283:17
284:3,6,19
**asco** 7:4
**ashkenazi**
82:11 86:15
100:19 101:22
104:11,16,17
110:3,5,12,23
119:14 120:4
121:10,13
160:24
**aside** 41:15
45:23 59:21
76:22 186:5
241:16
**asked** 12:16
16:23 44:18
86:5 90:19
117:23 226:14
230:12,14
245:22 246:5
246:10,21

[asked - aware]                                                    Page 8

249:21 296:16
**asking**   16:1
  45:12 71:24
  72:12,13 74:3
  83:21 118:14
  118:21 119:2
  131:11 152:4
  246:8 267:22
  280:4
**aspect**   259:16
**aspirin**   7:6
  188:13,23
  189:4,6,6,12,17
  189:21 190:15
  190:17 191:3
  191:18 194:7
  194:14,20
  196:10,11,21
  197:4,18,22
  198:20 200:1
**assay**   76:2,2
**assayed**   75:17
**assaying**   75:20
**assign**   214:10
  214:21
**assigning**   83:6
  264:3
**associated**   54:7
  54:13 55:9
  65:17 71:16
  72:3 75:3 105:9
  109:12 118:8
  153:14 162:15
  162:21 163:14
  173:9,14
  174:18 175:3,8

175:17 178:21
180:12,19
189:4 194:17
195:4 196:12
197:9 198:5
199:17 204:3
242:11 271:3,5
271:10
**association**   7:5
  7:16,21 33:11
  55:13 70:2,8
  91:8 141:14
  153:18 162:2,8
  180:18,24
  195:17 196:5
  197:19 204:23
  209:12 210:3
  218:8 221:20
  222:1 242:20
  243:2 253:20
  267:19 285:16
  285:18,19
  291:19 297:19
**associations**
  140:19
**assume**   108:5,9
  258:3
**assumed**   253:5
**assumes**   212:8
**assuming**
  180:11 256:1,3
**assumption**
  108:16 253:16
  297:4
**atlanta**   43:19

**atm**   54:16
  55:20 56:3,7
  62:18,23
  102:10,13
  103:2 122:9
**attached**   4:7
  5:2 6:2 7:2 8:2
  234:21 305:11
  307:8
**attained**   239:3
**attendees**   6:15
**attending**   16:18
**attention**   76:20
  124:15 133:7
  161:3 183:24
  220:9 223:17
  277:5
**attorney**
  305:13
**attributable**
  164:20
**augmented**
  229:11 230:20
  270:2
**august**   44:23
**australia**
  242:21
**author**   29:14
  161:6 228:5,9
**authoritative**
  60:24 62:5
**authors**   65:3,8
  66:23 72:14
  73:20 74:7,14
  75:19 119:8
  136:18 137:19

138:1,5 139:16
146:20 148:14
150:13,15,21
152:24 153:19
163:13 167:12
184:22 192:15
192:24 193:3,3
193:11,24
194:21 198:1,8
213:2 218:13
218:14 220:1
222:5 224:13
225:14 226:17
232:20 239:1
239:15 240:8
244:14 251:2
251:23 254:19
255:10 256:6
256:12,17
267:18 273:23
275:15 279:24
290:8,13,16
**available**   10:24
  11:3 33:9 60:12
  206:22 228:21
**average**   95:13
  95:17,18,24
  211:19 260:24
**aware**   133:23
  135:1 140:3
  179:10,14
  216:10 230:17
  246:9,12
  273:24

**[b - better]** Page 9

| **b** | **balance** 165:8 | **beasley** 3:6 | 242:7 243:6 |
|---|---|---|---|

**b** 4:6 5:1 6:1
 7:1 8:1
**baby** 87:11,19
 88:1,16 89:7
 279:12,18
 284:7,10,11
 289:2
**back** 20:6 21:15
 24:5 33:5 35:1
 40:22 52:15
 59:23 63:22
 76:20,24 77:2
 79:19 94:16
 104:9 119:12
 125:17 129:15
 133:7 139:8
 143:7 153:12
 154:1 156:12
 163:19 166:19
 186:23 195:21
 200:6 218:2,5
 223:15,17
 230:12 248:11
 256:9 257:18
 265:20 280:14
 287:16 298:16
**backbone** 94:10
**background**
 51:20 124:21
 125:4,12 126:7
 127:15 158:14
 161:1 232:16
**baker** 45:18

**balance** 165:8
**bankruptcy**
 38:23
**barnard** 190:1
 190:2,7
**barnes** 189:20
 190:1
**based** 34:13
 81:13 82:1,8
 85:18,22 89:11
 103:18,19
 105:10 142:2
 146:14 150:10
 162:6 175:1
 176:13 206:20
 214:11,22
 218:8 236:22
 238:8 244:15
 253:17 260:18
 261:2 282:1
 286:6 295:20
**basically** 247:5
 271:21 294:2
**basing** 107:8
**basis** 54:24
 66:19 78:17
 89:5 95:23
 155:17 173:12
 206:18 211:15
 214:24 278:6
**bates** 128:9
**bath** 289:19
**beads** 275:5
**bear** 176:6
 228:11

**beasley** 3:6
**beauty** 289:5
 293:7 300:20
**began** 88:1
**beginning** 60:1
 188:11 199:20
 221:5 245:1
 246:16
**begins** 34:12
 147:11 206:6
 208:3 278:12
**behalf** 3:18
 10:17 45:15
**belabor** 119:11
**believe** 11:2
 15:17 22:17,18
 22:21 23:20
 31:17 33:4 38:6
 43:8 44:15,22
 45:18 49:17
 53:21 60:16,24
 62:24 74:6 76:6
 79:2 80:1,17
 84:8 90:4,8
 91:19,23 93:7
 94:4,21 96:4
 98:23 109:22
 114:20 132:10
 136:3 139:7
 150:16,20
 163:24 164:10
 168:4 179:2,13
 196:23 201:5,9
 201:11 204:14
 214:4 216:19
 241:21 242:1,5

242:7 243:6
 244:20 250:17
 255:11,17
 269:23 270:21
 273:12 278:1
 280:9,24 281:2
 284:23 285:2
 286:11
**believed** 74:7
**believes** 125:3
 125:11
**bell** 96:2,6
**bellwether**
 39:23 40:3
**belonged**
 125:24
**bench** 26:23
 27:6,7
**benchtop** 27:14
 150:10
**beneficial**
 197:22
**benefit** 190:22
 191:11 194:20
 198:3,10
 199:16
**berchuck**
 139:16 140:2
**berge** 171:14
 176:6 177:7
 180:1,4
**best** 15:22
 206:19
**beta** 122:9
**better** 20:21
 28:18 211:16

**beyond** 117:1
**bias** 239:4
  240:9,13
  241:15 251:10
  252:24 253:3
  256:19 257:22
  258:4,6,17
  259:9 263:24
  265:21 266:1
  267:5
**biases** 209:23
  256:24
**big** 185:18
**bilateral** 115:11
**bill** 81:9
**biologic** 33:11
  33:13 64:10
  153:17 181:1,2
  285:20 286:1
**biologically**
  64:8
**biology** 52:18
**biomarkers** 5:9
  7:10
**biopsies** 133:9
**birth** 64:3
  157:23 165:22
**bit** 61:12 88:19
  93:10 112:11
  254:10
**blemish** 289:2
**blood** 3:13
  126:19,20
**blue** 249:9
**blurry** 185:15
  185:17

**bmi** 70:8 93:20
  144:15
**board** 201:10
  280:10
**body** 48:2,23
  144:15 172:13
  206:17
**book** 166:23
  184:14
**bookshelf** 6:20
  184:15
**boston** 3:22
**bottom** 28:5
  30:4 160:16
  200:11 208:2
  228:13,17
  249:9 252:13
  252:23 255:2,4
  263:16 301:21
  302:21
**boulevard** 3:21
**box** 57:13 58:12
  143:10 216:24
  249:9
**bradford** 32:22
  33:7,19,22 34:2
  34:16,22 35:2
**branch** 15:6
**brca** 47:10,14
  51:24 105:17
  106:16 108:7
  109:1
**brca1** 51:20
  52:4,20 60:10
  100:9 101:16
  102:2 104:24

  105:8 109:10
  110:6,23 115:4
  115:6 116:7,9
  116:13 117:1
  118:7 120:19
  121:19,24
  122:3
**brca2** 52:5
  100:9 109:10
**breadth** 16:22
**break** 22:10
  79:8,11,14
  135:20 166:12
**breaking**
  134:20
**breast** 4:23
  49:21 50:22,23
  51:1,13 52:3
  54:7 82:12,21
  87:4,9 103:17
  103:22 105:7,9
  105:16,16,19
  106:5,10,12,17
  106:23,24
  107:6 108:7,8
  108:20,21,24
  109:2,11
  115:11,17,20
  116:1 201:6
  242:8,10 293:6
  297:21 300:19
**breastfed** 164:2
**breastfeeding**
  64:3 144:18
**brief** 79:8
  147:18

**bring** 124:14
**britton** 138:4
**broad** 32:9
**broader** 102:4
  119:3 121:19
  121:21 122:3,5
**broadway** 3:14
**broke** 135:11
**brought** 10:10
  10:23
**brower** 43:18
  43:24
**brown** 3:12
  19:24 101:7
  113:9,14 114:7
  128:1,8,16,22
  159:22 161:11
  234:7 235:3,19
  243:13 274:15
  274:20 282:19
  288:7,14,18
  301:10
**bulletin** 4:22
  50:17 57:15
**burke** 167:1,7
  168:8,14,20
  182:18,22
  183:16
**busy** 26:9
**butchered**
  125:7
**buz'zard**
  268:24 272:4

| c | | | |
|---|---|---|---|
| **c**  1:13 2:1 3:1<br>4:1,2,12 5:1,10<br>6:1 7:1 8:1 9:1<br>9:3 64:18,23<br>65:3,7,12 70:4<br>75:9 303:19<br>307:13<br>**calculate**<br>287:21 298:19<br>**calculation**<br>296:7,20,21<br>**calculations**<br>142:11 262:1<br>**calculator**  89:9<br>89:10 295:12<br>295:16<br>**california**  1:14<br>2:7,13,14 3:15<br>23:2<br>**call**  26:3 133:7<br>290:13<br>**called**  24:23<br>31:4 52:8 275:7<br>**calls**  74:12<br>**camera**  131:23<br>**canada**  13:4<br>45:20<br>**cancer**  4:23<br>5:15,16,18,24<br>6:4,8,12,14,16<br>6:17,18,19,21<br>6:23,25 7:6,9<br>7:10,13,14,18<br>7:20,24 8:16 | 13:22 14:5,9,10<br>14:13,15,16,17<br>14:20 15:4,5,7<br>15:9,13 16:4,10<br>16:13,15,19,22<br>17:3,4,10,13,20<br>18:7,11,15<br>25:16 26:15,24<br>27:2 28:14,17<br>28:22 29:10,17<br>30:12 32:6,7,10<br>46:15 47:11,17<br>48:13 49:3,8,12<br>49:13,22 50:22<br>50:24 51:2,4,13<br>52:3,8,18 53:2<br>53:18 54:8,13<br>54:17 55:4,17<br>56:17 59:10<br>60:17 61:2<br>62:13 63:24<br>64:13,16 65:10<br>65:18 70:23<br>71:11,17 72:4<br>72:18 73:10,22<br>74:10,21 77:13<br>77:15 78:1,4<br>81:17,20 82:5<br>82:12,14,22<br>83:3,8,11,15,18<br>83:24 84:6,9,11<br>84:22 85:2,6,11<br>85:16,24 86:4<br>86:10,13,22<br>87:4,9 88:22<br>91:1,5,15,21,24 | 92:18 93:8,17<br>93:22 94:1<br>95:10,14,20<br>96:1,13,16,20<br>97:5 98:15 99:5<br>100:20 101:13<br>102:6 103:4,11<br>103:17,22<br>104:2,19 105:7<br>105:7,16,17,17<br>105:19,20<br>106:11,13,15<br>106:17,18,23<br>107:1,3,5,6,16<br>108:7,9,9 109:1<br>109:2,3,9,11,16<br>109:20 110:4<br>110:15 111:2<br>111:12,20<br>112:10,14,19<br>115:12,17,20<br>115:22 116:1,2<br>116:5 118:9<br>122:20 123:2,8<br>124:1,4,8 125:4<br>125:11 126:6<br>127:8,8,12<br>133:1,3 134:14<br>136:15 137:10<br>137:12,20<br>138:9,14,20<br>139:6,18,19<br>140:20,21<br>141:1,6,14,18<br>143:1,15<br>144:14,17 | 146:14,18<br>147:14 148:6<br>148:24 150:19<br>150:23 151:23<br>152:8,13,17<br>153:18 155:2,8<br>155:20 156:5,9<br>156:14,24<br>157:9,23<br>158:18,23<br>159:5,9,19,24<br>160:10,20<br>161:20 162:2,7<br>162:9,16,21<br>163:1,15,23<br>164:4,7,13,23<br>165:4,11,20,23<br>167:2,11,14<br>168:1 169:9<br>170:19 171:11<br>172:22 173:10<br>173:15 174:12<br>174:19,23<br>175:9,12 176:1<br>176:18 178:2<br>178:18 179:11<br>180:20 182:24<br>183:8 184:6<br>185:23 187:4<br>187:15,23<br>188:15,18,24<br>189:5,13<br>190:18 191:2<br>191:17 192:7<br>193:12 194:10<br>194:18,24 |

195:5,17,23
196:5,6,10,12
196:14,21
197:3,19,23
198:21 199:15
200:15 201:6
201:15 204:4
204:13 210:13
211:3,10
218:16 221:21
239:2,5,24
240:7 241:6,13
241:20,24
242:4,6,8,10,13
242:18 243:3
247:9,21 248:3
248:13 250:15
250:23 253:5
253:13,21
254:24 256:9
257:1,6,22
262:8 263:18
265:4 266:2
267:20 268:13
271:3 273:14
279:14 280:11
280:18 281:7
281:13,13
283:9,17 284:3
284:9,13 285:4
285:9 291:21
292:6,7,8,16
293:6 297:22
298:6 300:19
**cancers** 8:9,21
26:22 27:23

46:24 47:3,4,22
53:9,11,13,24
55:22 77:23
96:3,17 105:9
135:4,18 136:5
148:5 151:22
152:7 199:17
208:24 243:7
249:11 250:12
281:20,24
283:11
**capacity** 14:21
15:3
**carcinogenesis**
193:13 199:24
223:5 268:17
270:8
**carcinogenic**
162:24
**carcinoma**
133:10,15
134:11,22
135:5 136:4,7
**carcinomas**
198:4
**care** 8:8,19
24:18,18 25:24
30:22 86:6
289:1,6 291:20
297:21
**career** 62:21
**carefully** 305:3
**carrying** 51:5
55:3
**cascade** 66:8
68:19,21,24

223:3 276:11
**case** 5:11 26:3
31:16 35:17
37:23 38:13
39:9,13,16 40:3
42:9,19 43:7,14
43:19 44:6,6,8
44:12 45:17,19
46:9 54:16
58:16 59:3,11
59:16 61:20
79:23 80:11,24
81:12 85:21
92:23,24 93:2
94:1,8,15,19,22
104:12 116:24
119:7,13,19
122:2 130:17
133:2 134:6
135:24 141:13
142:23 147:2
154:2 155:11
162:7 164:24
179:20 180:6
193:2 196:4
197:1,20
201:19 202:8
202:13,15,21
202:24 203:8
203:11,14
225:10 232:23
233:1,21
248:23 250:18
253:21 263:19
296:13

**cases** 35:17
36:3 39:23
40:20,23 42:15
42:23 43:23
44:24 45:5,13
46:15 109:8
134:20 135:18
162:9 195:24
196:6 241:13
249:18 253:4,4
262:18 281:4,7
281:12,13,23
282:2 283:10
**categorically**
294:17
**categories** 90:3
264:23 289:4,7
**categorized**
253:13
**categorizes**
253:6
**categorizing**
251:17
**category** 136:4
230:7 252:17
256:7 289:5,6,6
289:10,19
290:4 291:15
291:20 297:20
298:11
**caucasian**
207:12
**causal** 124:6
173:4 200:22
201:2 284:16

**causation** 4:15
61:15 83:6 91:9
91:18 92:1
**cause** 85:15,23
109:15 173:4,6
173:7 181:18
181:23 211:3
279:13
**caused** 46:16
109:10
**causes** 67:15
84:21 85:1,6
109:16 124:7
270:12
**causing** 123:3
**cautious** 253:19
**cdc** 6:4 159:18
159:24 160:10
160:13
**cell** 48:2,8
55:10,14 96:13
123:24 126:6
127:9,13
134:10,13,21
135:4,11,21
136:1,2,4 149:1
198:4 223:4
269:11 270:13
271:10 276:2,8
**cells** 162:24
268:18 275:6
276:5 277:1
**cellular** 269:16
270:20 271:5
271:20 275:9

**cemr** 5:20
**center** 15:5
16:19 25:15
58:17 59:4,12
**centers** 16:9
**certain** 12:17
16:18 30:21,22
33:10 44:9 51:6
81:19,21 82:3
105:12 110:11
170:14 181:6
258:15
**certainly** 75:19
83:9 165:24
276:13 282:6
283:20,22
**certainty**
133:22 295:8
**certificate**
304:1,14,20
**certificates**
282:8
**certification**
304:22
**certified** 2:13
304:1,2
**certify** 304:3
307:3
**certifying**
304:24
**cervical** 16:22
30:11 133:3
241:23
**cervix** 133:2
**cetera** 157:24
157:24 264:23

264:24
**chair** 15:4,14
15:17,21
**challenges** 9:16
**chance** 20:15
209:23
**chang** 8:24
243:5 247:15
264:22 265:1,6
265:9,11
287:23 288:1,5
288:14,16,21
289:13 292:15
301:20
**chang's** 264:18
**change** 48:9
269:16 306:4
**changed** 61:22
62:20 63:6
**changes** 16:24
30:16 270:23
275:8,9,13,14
305:10 307:7
**changing**
127:15,17
**chapter** 184:14
**characterized**
52:20 270:19
**characterizing**
274:5
**charge** 133:12
**chart** 59:15
**chat** 23:6,8
113:21,24
114:3 123:17
243:12,13,18

298:2 301:11
**chek2** 55:9
**cheryl** 1:13 2:1
4:2,10,12,14,19
4:20 5:10 9:3
303:19 307:13
**child** 15:16
164:8
**children** 164:3
164:9,12
211:22
**choice** 227:6
**christine** 4:14
**chronic** 64:19
65:11 66:20
67:19,20 71:7
73:4,8,16 74:17
75:10 187:6
188:17 193:11
199:23
**chronicity**
66:14
**ci** 218:12,22
**circulating** 5:8
**circumstance**
85:13
**circumstances**
105:12
**cis** 221:18
**citation** 78:18
155:22,24
**cite** 99:8 104:21
112:22 114:17
150:9 151:18
152:2 166:24
167:1 172:12

179:1,4 182:18
182:20,23
183:3,10,11,14
183:17,20
195:14 200:4
216:1
**cited** 137:6
149:13,18
175:23 177:4
194:11 196:24
215:21 269:10
277:9 278:2
**cites** 149:22
150:12 170:17
186:9 278:4
**citing** 149:6
223:8
**claim** 225:17
270:21
**clarify** 277:16
**clarity** 127:22
**clarke** 11:18
32:14 80:15
154:24 215:1
215:22 272:9
278:2
**classification**
239:9
**classifications**
281:8 282:7
**classified** 59:19
243:7 252:17
**classify** 55:3
**clayton** 44:13
**clear** 36:5
45:10 46:10

55:16 72:11
96:13 123:24
126:6,21 127:9
127:13 134:10
134:13,21
135:4,11,21,24
136:2,3 167:23
198:4 205:21
207:2 230:21
233:18 279:10
296:18 298:10
298:18 301:19
302:24
**clearly** 163:12
297:23
**clinic** 103:23
131:7
**clinical** 14:4
25:24 26:10
167:9 218:11
**clinically** 26:2,6
**clinics** 26:5
**clock** 266:4
**close** 236:14,18
290:17
**cluster** 60:6
**cms** 22:23 31:3
31:5
**coalition**
137:12
**cochrane** 57:19
**cohort** 6:25
8:23 58:16 59:3
59:11,16 177:8
177:15,15
179:20 180:8

192:7,11
195:22,23
197:20 208:4
208:19 225:11
225:12,17
230:23 233:3
233:23 244:10
**coleman** 280:1
280:9
**collaborative**
156:8
**colleagues**
17:23 18:7
63:12 76:11
88:20 90:9
221:8
**collected**
143:20 249:20
**collective**
135:13,22
265:13
**college** 13:21
50:11 185:2
**colloquial**
215:7
**colon** 188:18
**colonial** 2:5
**column** 51:20
54:11,12 169:3
197:16 221:4
228:3,9 229:14
252:23 256:17
256:18 257:22
265:21 275:22
298:6

**combination**
52:23 154:24
155:6,14 157:5
159:11 163:8
163:11 202:17
**combined**
162:14 163:14
232:5,8
**come** 35:1
123:17 266:6
**comes** 121:7
**coming** 16:21
131:16 203:12
**comma** 124:20
**comment**
178:18 216:15
**commentary**
76:4 215:20
**commenting**
219:24 282:3
**comments**
207:9 217:11
**commerce** 3:8
**commercial**
60:12
**commission**
307:18
**committee** 15:5
15:15,18,21
16:16 17:16
**committees**
16:19
**common**
147:12
**communicated**
16:8

**communicating**
  226:9
**communication**
  17:7
**communicati...**
  12:17,19,23
  13:4,7,20 14:7
  14:14 17:9,18
**comparable**
  70:4,18
**comparator**
  19:11
**compare**
  210:17 245:21
**compared**
  238:13,16
  245:9 247:15
  247:16,17
  293:10 300:22
**comparing**
  293:4 294:19
  300:8
**comparison**
  19:17,21,22
  21:5 76:20 77:6
  77:8 177:15
**comparisons**
  256:23
**compensation**
  25:21
**complete**
  169:11,12
  256:22
**completed**  39:2
  250:7,13,14

**completely**
  141:23 218:13
  221:5,8
**complicated**
  6:9 161:21
**composite**
  36:14
**comprehensive**
  6:16 16:13,15
  17:4 116:15,17
  116:20,22
  118:22 283:20
**concept**  52:22
  219:4
**conceptual**
  33:6
**concern**  88:21
  217:18
**conclude**  76:10
  85:14 162:19
  172:21 218:7
  281:2
**concluded**  65:8
  76:11 82:10
  167:12 267:18
**concluding**
  173:20
**conclusion**
  85:10 86:3
  90:24 91:9
  96:11 97:8,13
  163:3,16 196:9
  197:24 239:14
  268:2,3 272:6
  280:22 281:1
  295:2

**conclusions**
  239:9 282:4
**conclusive**
  181:12 194:2
**conclusively**
  173:8,14
  174:17 175:3,7
  175:17 178:21
  180:12,19
  181:5,20
**concurrent**
  27:23
**condition**
  147:12
**conduct**  27:15
  57:21 206:6,10
  206:15
**conducted**
  251:2,10
**conference**  2:2
  6:12,15 167:3
  167:11
**confidence**
  145:3,11,19
  146:7 163:8
  177:9 204:7,8
  204:18 205:1
  205:12,16
  209:6,11 210:9
  218:9 220:9
  232:10 263:14
**confirmed**
  239:17
**confirming**
  303:16

**confounded**
  281:9
**confounding**
  209:23
**confused**  44:7
  297:14
**confusing**
  77:19 80:18
**confusion**
  121:16
**conglomerate**
  42:15
**conjunction**
  41:20 165:9
**connection**
  135:3
**conserve**
  182:16
**consider**  74:9
  76:4 81:4,8
  163:20,22
  165:8 216:12
  221:18
**considerate**
  286:21
**considered**
  11:15 76:8 93:6
  147:19,22
  192:13 244:14
**considers**
  144:14
**consistency**
  33:12 181:24
  182:6 197:18
  239:11,17

**consistent**
78:11,14
112:17 126:17
127:19 162:22
178:6 180:22
180:24 188:23
194:20 195:3
201:13 240:14
267:20
**consistently**
71:16 188:14
260:15
**consists** 25:2
**consortia** 7:9
**consortium**
6:25 7:15
137:13 141:14
162:2,8 192:7
195:17,23
196:5
**constituents**
284:10
**contacted**
229:22
**contain** 127:5
129:7 130:5
**contained**
149:20
**content** 27:12
27:24
**contention**
220:2
**contents** 130:21
**context** 56:16
180:12

**contexts** 139:19
**continued** 88:2
**continuous**
162:13
**contraceptive**
144:19
**contraceptives**
164:5
**contracted** 31:3
**contracts** 31:5
**contradictory**
251:15,16,19
**contrast** 60:11
**contribute**
83:23 86:4
92:17 111:1
223:5
**contributed**
83:2,14,16
85:10 91:20,23
93:7,21 94:5
143:19 203:3
233:2,22
265:16
**contributes**
85:15
**contributing**
65:9 85:23
91:14 95:19
111:9 123:24
**contributor**
27:24 70:23
**control** 16:9
58:16 59:3,11
59:16 64:3
141:13,19

142:23 143:15
157:23 162:7
165:22 179:20
180:6 196:4
197:20 201:19
202:8,13,15,21
202:24 203:8
203:11,14
225:10 232:23
233:1,21 275:6
275:7,13,18
304:24
**controls** 162:10
**convention**
219:3
**conversations**
13:19 14:8
18:17
**converse** 5:12
5:20 37:23
38:13 46:9
79:23 80:12,13
81:10,13 87:11
87:24 88:12
89:3 94:18 95:3
102:1,5,18
104:11 115:16
115:24 116:8
118:18 119:3
119:13 120:18
128:6 131:6
133:14 154:1
154:18,19
155:11 163:19
224:5 225:6
236:22 237:7

286:12,15
287:16,17,18
287:22 296:11
296:12,16,19
296:23 297:16
298:20 299:16
**converse's** 82:9
85:11 90:14
92:21 94:8,22
96:12 103:11
104:18 116:24
122:2 123:24
124:21 125:2,3
125:10 126:5
126:12,23
129:4 132:4
135:24 155:6
163:23 289:23
**copies** 11:1
12:5,6 252:10
**copy** 11:6 20:13
23:9,13 50:17
234:4,14,15,15
234:19 270:3
304:11
**corner** 69:20
**correct** 20:17
24:2,3 32:24
37:3,5,6,8,14
37:16,17,20,24
38:9,15,16,18
38:20,23 39:9
39:10,13,14,17
39:18,22 40:20
42:17,20 43:11
43:14,19 45:16

**[correct - correlates]**                                                       Page 17

| | | | |
|---|---|---|---|
| 48:14 54:8,18 | 155:4 156:11 | 227:17,21,22 | **correcting** |
| 55:18 56:7 | 157:1 159:1,5 | 228:1 229:7 | 253:21 |
| 58:12 59:18 | 160:11,22 | 230:18 231:6,9 | **correction** |
| 70:24 75:22,23 | 161:23 162:3 | 232:1,11,12,14 | 251:14,17,19 |
| 78:10 81:6,10 | 162:10,11 | 232:17 234:2 | 253:18 257:23 |
| 81:17,18 82:14 | 164:9,14 | 235:22 236:8 | 258:23 259:1,3 |
| 84:12,22,23 | 169:13 170:12 | 236:12,15 | 259:9,23 |
| 86:16,18 87:20 | 170:13 171:12 | 237:4,9,15 | 265:21 266:1 |
| 88:13 90:7,20 | 172:6,10,11,17 | 238:11,18 | **corrections** |
| 91:10 92:2 | 173:1,5,17,18 | 241:2,3 243:3 | 267:5 305:3,5 |
| 93:23 95:10,11 | 174:10,12,20 | 243:19 244:11 | 307:6 |
| 95:15,21 99:6 | 176:19 179:12 | 245:11,24 | **correctly**   49:19 |
| 99:17 100:10 | 179:17,23,24 | 246:19 247:14 | 58:19 70:11,19 |
| 101:20 102:7 | 180:3 182:21 | 251:7 252:24 | 105:3 142:7 |
| 103:5 104:3 | 183:1,4,9,12,13 | 253:11 254:15 | 144:22 149:4,5 |
| 108:10,11 | 183:15,22 | 258:4,13 259:7 | 163:2 167:16 |
| 111:10 115:4,8 | 186:2 190:4,5,7 | 259:22 260:10 | 178:23 188:19 |
| 115:17,18 | 190:8,11 192:8 | 263:5,13,21,22 | 193:14,18 |
| 116:4,6,13,20 | 192:14 194:10 | 264:15,16 | 196:15 204:10 |
| 117:2,5 119:4 | 194:11,18 | 266:12,22,24 | 206:23 209:8 |
| 120:15,20 | 195:14,24 | 267:3,4,12 | 218:20 222:2 |
| 121:22,24 | 196:3,6,7,16,18 | 269:21 271:11 | 225:4 229:3 |
| 122:1,5,8,15,17 | 196:19,22 | 274:9,13,16 | 230:8 233:4 |
| 124:6 125:6 | 197:4,11 198:1 | 278:15,17,21 | 239:6 251:21 |
| 127:2 130:6 | 198:2 203:4 | 278:24 279:3,7 | 252:20,21 |
| 134:14 135:20 | 205:2,3,18 | 279:8,21 | 253:23,24 |
| 136:6 138:14 | 208:4,20 209:1 | 284:16 287:20 | 257:3 258:22 |
| 138:20,22 | 210:10,14 | 288:23 289:11 | 267:23 269:18 |
| 140:10,22 | 212:9 214:1,6 | 289:24 291:1 | 283:12 293:12 |
| 141:6,15 | 215:5 217:12 | 291:13,21 | 293:13 300:24 |
| 143:16 144:5 | 217:20 219:2 | 292:1,2 294:21 | 301:1 |
| 145:4,7,11,20 | 222:23 224:6 | 299:2,13,18 | **correlate**   64:24 |
| 145:21,23 | 224:10 225:7 | 300:11 304:11 | 212:17 |
| 146:10 148:15 | 225:11 226:2,5 | 307:4 | **correlates**   39:4 |
| 149:20 153:6 | 226:16 227:5 | **corrected** | 297:6 |
| 153:20 154:22 | 227:13,14,16 | 251:16 253:3,4 | |

| | | | |
|---|---|---|---|
| **correlating** | **crawford** 5:17 | **curriculum** | 125:16 128:20 |
| 65:4 | 104:22,22 | 21:19,24 30:17 | 129:18 130:24 |
| **couch** 61:24 | 112:22 113:3 | **curry** 3:19 4:18 | 132:19 134:15 |
| **counsel** 3:2 | 114:16 116:11 | 10:13 11:9,12 | 135:6 137:23 |
| 41:10,19 | 117:19 119:4 | 13:9,23 18:3,9 | 138:11,21 |
| **counseled** | 120:10,12 | 22:1 23:12 | 139:21 140:11 |
| 103:15 | 121:21 | 27:10 33:1 | 146:3 150:3 |
| **counseling** | **credible** 85:9 | 34:17 35:14,20 | 151:3 154:7 |
| 165:21 | **criteria** 33:10 | 36:4 38:24 40:5 | 157:3 158:9 |
| **counselors** 61:7 | 33:24 34:21 | 42:3 45:4 46:17 | 159:6,16 |
| 103:15 | 115:2,10,14,22 | 47:18 48:15 | 164:17 165:12 |
| **counted** 227:15 | 116:18 140:13 | 53:3,20 54:19 | 168:6 169:15 |
| **counterargu...** | 224:21 | 56:9,20 60:18 | 170:21 172:16 |
| 283:7 | **critical** 254:1,7 | 61:3,10 62:8 | 173:21 176:9 |
| **country** 150:22 | **critically** 55:21 | 65:20 66:10,21 | 176:20 177:18 |
| **county** 44:13 | **criticism** | 67:7 68:1,15,22 | 179:3,18 181:7 |
| **couple** 63:19 | 274:22 279:6 | 71:1,19 72:5,20 | 181:13,21 |
| 99:12 106:5 | **criticisms** | 73:23 74:11 | 184:1 187:16 |
| 200:10 | 215:16 216:7 | 76:12 78:9 79:5 | 189:1 190:19 |
| **course** 24:13 | **crosses** 209:12 | 79:16 80:19 | 191:6,19,24 |
| 27:18 47:16 | **crow** 3:6 | 81:23 82:15 | 192:19 193:15 |
| 51:9 63:2 96:23 | **crp** 64:18,18 | 83:4 84:3 85:3 | 201:8 203:1 |
| 292:5 | 66:1 70:3 75:17 | 85:17 88:23 | 205:5 207:4,20 |
| **court** 1:1 44:13 | **crucial** 256:23 | 89:16 90:18 | 208:10 209:17 |
| 305:17 | **csr** 1:25 304:19 | 91:11 92:3,14 | 210:15 211:4 |
| **coverage** 30:21 | **culminates** | 93:3 94:3 97:15 | 212:10 213:1 |
| **covered** 33:24 | 48:11,12 | 99:20 100:1 | 213:11 214:15 |
| 45:21 118:17 | **culture** 276:24 | 102:8,20 | 215:13 216:14 |
| **covers** 291:15 | **curious** 51:15 | 103:13 105:22 | 217:21 219:11 |
| **cramer** 139:3 | **current** 21:16 | 108:15 109:13 | 219:21 220:13 |
| 211:19 215:20 | 30:5 43:3 55:2 | 110:8 111:14 | 220:24 222:10 |
| 216:2 260:18 | 78:2,8,11,14 | 112:1 114:2 | 222:14 224:11 |
| 261:2 | 85:19 159:8 | 117:14,22 | 226:13 232:15 |
| **cramer's** 90:8 | **currently** 25:13 | 118:19 119:5 | 234:9,13,19 |
| 139:7 | 28:16 60:11 | 119:22 120:21 | 235:1 236:16 |
| | | 122:6 123:9 | 237:2,16 |

**[curry - dated]**                                                    Page 19

239:20 243:16
243:20 245:12
247:22 248:20
254:3 255:14
257:9,14
260:20 261:7
261:20 264:2
265:10 266:16
269:22 270:16
271:12 272:7
272:21 274:24
276:12 277:7
277:15 278:22
279:20 280:23
282:23 284:17
285:1,12
287:10 290:21
292:3 293:22
294:22 295:13
296:3,9 299:3
299:10 301:4,9
301:17 302:7
302:11,15
303:7,17
**curve** 96:2,6
286:3
**cut** 124:23
125:19 126:1
**cv** 4:17 15:20
22:4,13,14 23:9
23:19 24:1
26:14 29:24
**cvs** 139:23
192:23
**cycle** 67:14
87:13,15

**cycles** 64:1,6,12
64:16,21 65:1,5
65:7,9,16
**cytokines**
148:21,22
151:14

**d**

**d** 5:1 6:1 7:1
8:1 9:1
**daily** 87:11,12
87:20,20 89:5
191:2 194:7
206:18,18
225:6 228:18
231:5,11,22
233:7 236:3,11
237:7 287:18
299:17
**dalbert** 37:5
**dale** 192:16
**dalsgaard**
283:19
**damage** 66:8
67:5,15,19,20
67:23 68:11,17
223:4
**daniel** 11:17
**data** 7:8 28:21
33:8 57:7 74:23
85:9 105:14
106:9 141:22
141:23 142:9
142:13,16,19
142:24 143:1
143:19,21,23

144:3,24
146:14 152:15
162:6 163:13
164:19 171:22
175:10,13,20
175:21 176:17
176:22,24
177:4,16
179:22 181:16
181:24 182:7,7
182:12,19
186:10 192:11
198:9 200:5
202:17 203:3
203:12,24
204:12 205:20
208:19 210:7
212:16 213:6
216:8 219:5
222:5,16 223:1
223:10 225:1
225:11,12,13
225:18,20
226:3,7,11,21
227:2,4,8,10
228:20,21,22
228:24 229:5
229:10,11,23
230:2,4,13,15
230:18,20,23
230:23 231:5,8
231:10,11,16
231:21,21
233:2,8,9,17,22
235:21 236:23
237:11,14

238:14,16
239:15 242:21
244:10,14,19
244:20 247:3
251:14,15,17
251:19,20
255:13,18
256:5 258:20
258:22 259:2
260:18 261:18
262:2,20 264:8
264:17 265:13
265:15 268:16
269:6,6 279:7
279:17 281:5
285:8,24 286:1
290:11 293:24
294:6,8,24
295:1,20
300:13,15
301:3
**database** 57:19
203:11
**dataset** 267:6
**date** 21:24
35:12 39:9,16
44:3 54:22 55:1
60:2,5,20
126:23 167:23
196:10 304:16
305:8
**dated** 20:14
22:14 24:1
37:22 39:12
50:17 307:10

**[dates - developing]**                                                    Page 20

**dates**  15:21
  52:15
**daubert**  4:16
**daughter's**
  103:18
**davis**  201:19,21
  202:7 207:10
**dawn**  3:19 4:18
  45:8 277:13
  296:15 302:22
**dawn's**  297:16
**day**  18:22 21:2
  21:9 25:9
  162:23 164:22
  182:15 187:7
  299:15,16,20
  307:17
**days**  10:22
  22:15 26:3,4,5
  26:5,7 89:6
  194:8 197:6
  199:13 231:8
  297:9 299:24
  305:14
**de**  40:24
**dealt**  245:10
**death**  282:8
**decades**  246:5
  247:5 266:15
**decide**  258:8
  260:9
**decrease**
  164:12 188:14
  259:6,21
**decreased**
  163:23 164:4,7

164:20 189:4
**decreases**
  188:23 190:17
**deemed**  305:16
**defective**  49:4,5
  52:4
**defects**  96:24
  97:3
**defendants**
  3:18
**defense**  80:22
**define**  28:18
  50:21
**defined**  224:9
  224:13 225:2
  252:16
**definitely**  83:21
**degree**  84:20
  106:24 107:5
  115:21 116:2
  126:15 133:21
  187:24 295:8
**deleterious**
  77:14 102:14
  102:17,22
  123:1
**demonstrate**
  205:21 252:1
  252:15 270:7
  272:20,24
**demonstrated**
  207:10 209:16
  210:5,13
  212:24 266:12
**demonstrates**
  150:9 285:10

**demonstrating**
  63:23 214:5
  232:13 272:4
**demonstration**
  269:14 270:11
**denial**  23:1
**denied**  22:24
  30:21
**deodorant**
  289:20
**depends**  133:11
**deponent**  307:1
**deposing**
  305:13
**deposition**  1:13
  2:1 4:8,9 5:3
  6:3 7:3 8:3 9:21
  10:16,23 22:3,8
  41:6,10 44:12
  44:14 45:2 82:2
  88:11 125:3,6
  133:19 272:11
  303:18 305:2
  305:11,14,16
**depositions**
  32:15 80:23
**depth**  16:23
**descent**  110:5
  110:23
**describe**  58:3
  72:15 143:12
  199:4 227:21
  277:23 290:16
  290:18
**described**  40:14
  84:14 142:1

230:2 231:13
  284:3
**describes**  54:12
  57:18 131:8
**description**
  22:22 48:14
  63:18
**design**  227:1
**designation**
  50:24 258:17
**designed**  58:16
  59:3,16
**despite**  194:13
  210:24 218:17
**detail**  23:4
  76:17
**detailed**  22:17
  22:19 245:1
**detection**  25:15
**determinants**
  5:7
**determination**
  56:6
**determine**
  30:13
**develop**  47:11
  49:3,8,12,13
  52:8 53:13
**developed**
  165:14 195:4
**developing**  51:8
  55:10 62:13
  63:24 83:2,10
  84:6,9 86:9,22
  91:5,15,20
  92:17 93:8,17

**[developing - disease]**                                                                Page 21

96:13,20
104:19 107:2,4
110:15 112:9
112:18 124:4
155:8,20 157:9
157:22 164:4,7
165:11,20,23
174:12 188:15
189:13 201:6
273:13 284:8
284:12 285:3
**development**
32:6 51:1 53:1
53:18 64:17
65:11 71:6 73:8
73:16,21 74:14
83:7,15,17,24
85:11 86:4
88:22 91:23
93:22 95:10,19
111:2,9 112:13
148:5 151:22
152:7 168:1
173:9,15
174:18,23,24
175:4,8,12,18
178:22 180:13
194:17,24
195:5 211:10
265:4
**deviation**   96:5
96:15
**devoted**   25:13
25:14,24 40:2
**dfu4**   249:12

**diagnosed**
77:12 95:6 96:4
239:24 241:6
249:11 250:13
256:8 262:7
**diagnosis**   95:13
129:5,6,7 130:5
**diego**   3:15 15:9
15:13 17:24
24:7
**diet**   70:7,18
**dietary**   112:3
**difference**
148:17 153:22
186:20 212:13
240:24 245:8
264:19
**differences**
22:13
**different**   57:2,9
60:5 67:13
72:13 98:14
141:23 142:8
145:13 203:12
203:14 210:20
211:12 218:13
220:16 234:15
254:8 256:20
259:3 264:22
290:4
**differential**
253:22
**differentiation**
149:2
**differently**   98:8
123:4

**difficult**   186:21
**dig**   286:15
**dioxide**   275:5
275:10
**direct**   30:2
51:19 54:3
153:9 217:22
221:1 223:17
274:1 304:24
**directly**   65:5
103:3 222:8
**director**   24:10
25:1,14
**directors**
280:10
**disagree**   105:13
106:8,18,20
107:19 108:12
109:8 149:9
150:14 173:22
174:1 193:20
218:24 220:1
220:10,11,14
220:22 221:13
284:22
**disagreed**   98:1
**disagreeing**
56:22 241:8,11
290:15
**disagreements**
56:17
**disclose**   45:5
**disclosed**   21:6,7
21:10,11 45:1,6
45:14,17

**disclosure**
11:24
**discounted**
216:3 221:11
**discovered**
117:5
**discuss**   199:16
223:18
**discussed**   13:14
18:6 55:23
63:22 96:14
109:17 232:21
236:18
**discusses**
126:14
**discussing**
109:4 215:8
**discussion**
34:16,19 35:3
63:17 69:22
98:5,6,9,10
104:10 134:1
147:5,9 151:8
151:10 153:3
169:20 170:12
183:8 197:17
206:4 208:3
268:21 269:24
270:4 273:8
278:12,13
294:13,16
296:22
**discussions**
14:2 16:2
**disease**   16:9
84:12,16

111:10 147:20
147:23 165:14
175:4
**dismantling**
304:12
**dissimilar**
125:8
**distribution**
252:18 254:19
255:11
**district** 1:1,2
**division** 223:4
**dna** 52:2 223:4
**doctor** 10:3
25:1,11 243:22
**document** 10:7
10:11 19:11
49:21 50:6,10
99:4,21,24
100:3 101:16
104:2 114:8,9
114:19 157:14
158:7 160:9
169:13,21
173:24 174:3,4
176:17 183:5
**documentation**
248:23
**documented**
12:24 92:6
105:8
**documents**
10:16,21 12:16
12:19 24:22
32:11 36:15
57:21

**doing** 36:19
114:15 119:8
150:13 186:14
271:17 291:7
296:1,5,24
297:11 305:7
**dose** 189:3,6
205:21 206:19
207:2,9 286:2
**dot** 291:24
**double** 143:4,6
227:15 271:18
**doubt** 20:18
88:9
**douching** 8:4
237:20 238:15
265:17 266:16
289:2,20
**downfall** 287:8
**dr** 9:8 10:18
11:17,18,20
12:4 18:19
19:17 20:8,12
21:4 22:12
23:15 24:1 28:4
29:6 30:16
31:22 32:14,14
35:1,24 36:14
39:19 41:14
45:22 46:5,15
50:2,21 52:11
55:1 57:12
59:22 61:22
62:3 63:9 66:5
69:5,12,22
70:22 71:24

75:9 76:5,19
77:8 79:10,22
80:10,15,16,17
80:22 81:9
85:21 88:20
90:8 95:12 99:3
102:1 105:5
113:22 124:20
125:1,10 126:5
126:10,14
127:7,10 128:5
131:5,7,10
132:3,8,10
133:16,18,18
133:20 135:2
136:12 137:4
138:4,8,12,24
139:3,7,15,16
140:2 144:7
154:24 160:8
161:4 166:18
174:14 178:13
180:17 184:14
186:12 187:12
192:16 194:4
202:14 209:10
213:16 215:1,2
217:5,10,10,10
217:17,18,19
218:5 219:19
220:11,15
221:7,8,13
224:5 234:4,19
235:8 262:4,15
266:5 268:9
269:1,24 270:4

272:9,18 278:2
278:20 279:23
280:1,8,9,13
282:11 283:15
284:15 286:14
286:22,24
288:20 294:16
295:10 303:10
**draw** 281:1
295:2
**drawn** 258:15
**drill** 294:3
**drs** 215:20,22
216:2
**drug** 12:20
144:17
**duces** 4:10
**due** 67:5 209:22
230:5 233:1,21
**duke** 140:3,4
**duly** 9:4 304:6
**duplicate**
226:18
**duration**
206:16 245:16
246:19 260:24
261:11

**e**

**e** 1:11 3:1,1 4:1
4:6 5:1,1 6:1,1
7:1,1 8:1,1 9:1
9:1 12:24 161:7
161:7 302:24
303:2,2 306:2

| | | | |
|---|---|---|---|
| **e.g.** 188:17 | **efficient** 232:8 | **encompass** | 148:7,8,9,18 |
| **earlier** 44:15,16 | **efficiently** | 25:7 283:16 | 152:18 153:16 |
| 149:13 152:2 | 186:14 | **encouraging** | 153:22,23 |
| 300:10 | **eight** 25:10 | 154:15 | 198:6 199:18 |
| **early** 25:15 | 196:4 | **endeavor** 9:10 | **endometriotic** |
| 63:17 93:1,6 | **either** 16:8 | 9:17 273:8 | 148:20 |
| **ease** 23:15 | 17:19 36:2 41:9 | **endeavored** | **endometrium** |
| 114:22 | 45:2 49:4 64:3 | 284:1 | 67:11 |
| **easier** 9:15 | 76:1 115:10 | **ended** 42:18 | **endorse** 63:2 |
| 218:3 | 116:22 131:21 | 75:1 | **endpoints** |
| **easily** 23:8 | 164:19 182:2 | **endometrial** | 269:13 |
| 264:10 | 187:22 189:9 | 16:21 27:23 | **ends** 234:20 |
| **easy** 203:23 | 194:4 215:5 | **endometrioid** | **engage** 15:12 |
| **eating** 187:5,13 | 260:23 285:20 | 127:8,12,14 | **engagement** |
| 187:18 | **electronic** 21:5 | 198:4 | 22:22 |
| **echeverria** 44:5 | **elements** 33:22 | **endometrioma** | **english** 124:22 |
| **editor** 216:1,22 | **elevated** 119:14 | 126:20 | **enhances** 149:2 |
| 216:24 | 120:5 190:23 | **endometriosis** | **enrolled** 142:4 |
| **editorial** 219:13 | **elevates** 194:23 | 5:25 82:17 | **enrollment** |
| 219:23 | **eligibility** | 86:18 123:16 | 143:17 238:14 |
| **editorialized** | 224:20 | 123:23 124:3,3 | 239:16 240:16 |
| 267:23 | **elsa** 184:23 | 124:19 125:4 | 240:22 245:22 |
| **editors** 217:8 | **elucidated** | 125:12 126:7 | 245:23 246:21 |
| **education** | 64:11 | 126:11,18 | 256:4 |
| 239:3 | **emi** 268:24 | 127:5,19 129:8 | **enters** 212:8 |
| **effect** 136:15 | 272:4,10 | 130:6,14,16,23 | **entire** 183:5 |
| 189:9 197:22 | 273:16,23 | 131:9 132:9,12 | 251:4 |
| 218:19 221:18 | 274:12,23 | 133:17,22 | **entirely** 103:20 |
| 276:23 | 275:4 | 134:2 136:13 | 233:1,20 |
| **effects** 5:23 | **emphasis** 167:7 | 136:16 137:11 | **entirety** 170:11 |
| 8:13 137:9 | **employee** 13:20 | 140:22 141:1 | 228:22 |
| 162:24 275:19 | 14:3 | 142:15,17 | **entitled** 49:21 |
| 293:1 300:5 | **employees** 16:4 | 145:2,10,18 | 137:9 161:19 |
| **effectually** 49:2 | **employs** 31:1 | 146:1,7,9,15,16 | 169:6 184:5 |
| **efficiency** | **encode** 52:1 | 146:21 147:12 | 185:22 268:11 |
| 12:10 46:11 | | 147:19,22 | |

**environment**
269:17 272:15
**environmental**
8:18 111:12,17
111:18,24
112:8,15
173:13 174:10
174:17 175:7
175:11 178:19
180:11
**epidemiologic**
89:15 90:17
91:7 182:6
**epidemiologi...**
89:12 139:5
**epidemiology**
5:4 7:10 8:4
161:22 200:10
268:11
**epigenetics**
8:11 274:13
**epigenomic**
8:12
**epithelial**   6:20
7:13 55:11,17
55:22 56:16
77:23 78:4
184:5 204:13
222:7 268:17
269:8
**epithelium**   67:6
**equal**   197:5
212:22 213:21
**equated**   221:23
**equates**   271:1

**equivalent**
175:19
**errata**   305:5,8
305:10,13
307:8
**errors**   97:1
**especially**
290:24
**esquire**   3:3,4,5
3:12,19,25
**essentially**
32:20 36:18
71:11 93:24
112:4 171:18
214:10,21
239:22 242:12
298:19
**establish**   159:3
199:3
**established**
70:5 82:4 86:12
86:21 96:11
103:10 109:23
123:7 140:20
141:3,5 144:14
147:13 181:19
181:23
**estimate**   40:7
203:18 209:5
210:8 232:5
236:15 253:3
258:2 292:1
**estimated**   5:5
**estimates**
221:17 253:19

**estrogen**   6:7
144:20,21
154:20 155:1,6
156:20,22
157:7,16 158:1
158:2,5,13
159:3,11,12
160:18,21
161:19 162:14
162:20,24
163:11,13
**et**   42:12 43:5,6
104:22,23
157:24,24
264:23,23
**ethnicities**
120:7
**ethnicity**   239:3
**etiology**   185:23
**evaluate**   28:21
30:11 34:20
85:22 140:19
140:24 165:10
224:4 251:3
287:22
**evaluated**   58:6
273:9
**evaluates**   162:4
162:6
**evaluating**   33:9
**evaluation**
81:16 140:14
181:16 272:18
**evening**   124:11
303:13

**event**   66:12,13
66:18 73:7
74:16 75:4
**events**   15:8,10
65:22 66:6,14
67:13 71:5 73:2
73:6,15 74:22
75:3
**everybody**
303:2,12
**evidence**   6:12
6:14 8:17 58:11
58:15 59:2,17
59:19 66:24
67:19,22 73:14
74:17 75:5
81:22 167:2,11
167:23 169:11
181:1,2 186:10
195:3 196:11
218:19 221:24
222:1 239:4
241:19,22
242:2 283:7
286:2
**exact**   66:2
212:2 264:18
**exactly**   39:4
76:10 191:8
215:10 217:23
286:19 290:7
**examination**
4:2 9:6 304:9
**examine**   60:12
132:8

**examined** 9:5
33:23 134:18
142:5 187:14
245:16
**examining** 8:16
**example** 47:10
62:21 90:3
111:7 132:22
138:4 191:1
201:4 241:15
246:6 293:5
294:21 296:22
298:16 300:17
**examples**
253:19
**excel** 301:15
**except** 218:21
307:6
**exclusive**
271:24
**excuse** 35:6
38:12 47:9
57:23 69:17
92:23 97:10
104:17 105:16
115:20 148:10
154:5 163:21
188:5 192:6
202:11 223:20
249:22 269:13
293:8 295:21
297:19
**executive** 6:11
167:2,10
**exhibit** 9:21,22
9:23 18:23 19:1

19:11,12 20:12
21:4,17,18 22:5
23:21,22 31:24
35:7,8 36:13,14
41:16,17,18,22
43:3,24 46:1
49:17,23 50:6
69:7,8 74:8
76:20 77:6,7
80:1,4 94:17
95:3 98:23,23
98:24 99:4
100:24 101:2
101:10 104:1
112:23,24
119:13,17,19
127:24 128:2
128:23 129:3
130:5 136:22
136:23 137:5
140:17 143:8
156:13 157:18
158:18 159:15
159:18 160:2,9
161:4,13
166:19 168:5,9
168:13,15,20
170:6 178:9,10
183:24 184:1,7
186:18 191:22
192:3 195:7,8
195:10,13
201:24 202:1
202:11 208:8,9
208:12 216:22
216:24 217:1

223:22,23
234:23 237:24
237:24 238:1
243:2,8 273:19
273:20 282:14
282:18,21
287:2 288:1,2
288:11,12
301:11,19
302:4 303:4
**exhibits** 4:8 5:3
6:3 7:3 8:3 35:6
**expand** 29:13
**expanded** 60:11
120:19
**experience** 38:6
**experienced**
194:9
**experiment**
270:21
**expert** 4:12,14
5:10 13:17
18:23,24 19:21
20:13 32:2
40:13,19 41:20
45:1,7 46:1
80:16,20,22
81:5,5,8,13
132:3 216:13
278:3 286:8,8
**expertise** 34:13
**experts** 132:3
214:9,21 269:4
271:9 272:3
**expires** 307:18

**explain** 19:16
182:3 276:4
296:21
**explanation**
169:20
**explored** 6:9
161:21
**exposed** 212:6
227:2 230:6
247:5 251:18
256:3
**exposure** 8:7
81:9 211:24
212:13 220:17
225:3 227:7,8,9
227:11,16
228:19 230:1,7
231:11,22
237:12,22
239:18 245:10
246:16 252:17
254:19 255:11
255:17 256:21
276:6 283:18
284:3
**exposures** 70:6
89:14 90:16
**expression**
269:12 270:13
270:24
**extended**
178:18
**extensive**
139:17
**extensively**
138:9,19

139:10,17
150:23 192:18
**extent**  178:16
**extract**  226:3
227:2
**extracted**
226:11 227:4
**extraction**
271:18
**extremely**
103:16
**extremes**
252:19
**extruded**
130:21
**extrusion**
126:16 131:2
**eyeshadow**
289:3

**f**

**face**  87:16
**fact**  11:20
48:21 63:20
84:24 87:5
94:14 103:19
111:17 142:6
142:13 157:13
159:4 194:13
194:21 198:7
199:8 200:18
207:11 209:11
210:24 216:16
225:15,18
227:18 240:24
242:9,24

249:17 265:6
269:15 284:14
**factor**  63:18
82:23 86:12,21
93:21 94:1
95:19 96:12,20
99:16 100:20
111:24 112:8
112:16 123:24
142:20 143:22
147:13 152:22
156:22 158:22
160:14
**factors**  5:16,23
6:5 29:16,19,21
32:7,11 46:6
81:16,19,21
82:4,13 83:1,7
83:9,13,14,19
86:8 92:22 95:9
98:14,17 99:14
100:24 101:13
104:2,8 108:2
108:18 109:6
111:7,9,12,19
136:15 137:10
140:20,23
141:3,6 142:10
142:13,14,18
143:1,20,24
144:4,15
152:23 153:8
156:6,15
157:17 158:18
159:19 160:1
160:10 163:20

163:22 164:16
165:2,3,9,10,19
173:13 174:10
174:17 175:7
175:11,16
178:19 180:11
185:23 196:14
**facts**  33:2
154:18
**factual**  78:13
78:13,17
221:22
**fail**  205:20
305:15
**fair**  15:24 21:13
43:4 61:21
65:19 66:20
78:8 84:16,18
94:2 122:13
182:17 220:7
244:23 245:7
246:17 247:19
250:20 263:10
274:19 279:14
279:15 289:10
291:17 292:17
297:2,15
**fairly**  216:12
**falling**  252:18
**fallopian**  6:18
51:2 222:7
229:1 236:10
236:20 237:6
**falls**  190:22
**familiar**  50:6
99:6 136:17

139:23 192:22
**families**  105:15
106:10
**family**  25:15
82:11,19,20
87:3 103:18
105:6,10
106:23 108:19
108:24 144:16
**faqs**  5:14 98:21
99:4
**far**  77:3 108:1
178:20 207:12
**fathalla's**  71:12
**father**  52:5
**february**  4:16
7:25 21:6 38:2
38:4,7,8 39:3
39:12,20 40:3
94:9,22 178:17
**feel**  93:14,20
97:8 211:1
254:19
**felix**  80:17,22
133:18
**fellow**  280:15
**fellowship**
280:15
**felt**  81:20,21
92:22
**feminine**
239:10
**fertility**  5:22
**fewer**  64:2
**figure**  232:8
235:10,13

**[figure - form]**                                                          Page 27

| | | | |
|---|---|---|---|
| 244:24 249:4,9 | 164:8 167:8 | 247:3,10 | 74:11 76:12 |
| 289:13 | 169:4 170:16 | 249:12,14 | 78:9 81:23 |
| **filed**   10:15 | 190:21 191:10 | 256:5,22 296:7 | 82:15 83:4 84:3 |
| **final**   56:6,11 | 200:11 202:11 | **followed**   34:21 | 85:3,17 88:23 |
| 127:9 142:10 | 206:10 228:5,9 | 197:12 283:22 | 89:16 90:18 |
| **find**   23:7 47:23 | 228:9 229:15 | **following** | 91:11 92:3 93:3 |
| 53:23 66:24 | 239:15 246:4,9 | 115:10 120:22 | 94:3 97:15 |
| 189:23 233:12 | 251:13 254:10 | **follows**   9:5 33:6 | 98:20 99:20 |
| 259:13 265:1 | 262:20 269:2,3 | **food**   12:20 | 102:8,20 |
| 286:24 | 276:7,8 288:20 | **footnote**   125:22 | 103:13 108:15 |
| **finding**   77:24 | **fish**   3:20 | 167:1 168:21 | 109:13 110:8 |
| 121:21 127:5 | **five**   26:2,5,6 | 228:13 231:13 | 111:14 112:1 |
| 163:6,18 | 41:13 63:4 | **footnoted**   156:1 | 112:18 117:14 |
| 177:11 180:6,8 | 64:22 79:15,16 | **footnotes**   187:8 | 117:22 118:19 |
| 209:13 216:19 | 94:15 95:1,18 | **force**   58:8 | 119:5 120:21 |
| 242:22 255:19 | 156:21 162:6 | **foregoing**   304:4 | 122:6 123:9 |
| 276:4 | 187:7 242:15 | 304:22 307:3 | 130:24 132:19 |
| **findings**   153:1 | 242:17 | **forget**   34:24 | 134:15 135:6 |
| 162:22 180:23 | **flip**   157:21 | 35:4 77:1 | 137:23 138:11 |
| 209:22 267:15 | **flipped**   205:12 | **forgive**   46:2 | 138:21 139:21 |
| **fine**   23:18 79:9 | **flips**   191:12 | 72:10 94:20 | 140:11 151:3 |
| 79:17 | **fluid**   126:16,18 | 154:12 268:15 | 157:3 158:9 |
| **finish**   9:14 | 130:10,18 | 298:20 | 159:6 164:17 |
| 285:1 300:18 | 131:2 | **forgot**   277:21 | 165:12 170:21 |
| **finished**   150:3 | **foci**   148:20 | **form**   13:9,23 | 172:16 173:21 |
| 191:9 | **focus**   24:17,20 | 18:3,9 27:10 | 176:9,20 |
| **finite**   246:21 | 95:5 110:2 | 33:1 34:17 | 177:18 179:18 |
| **first**   9:4,20 10:7 | 259:16 278:14 | 38:24 40:5 42:3 | 181:7,13,21 |
| 16:13 20:6 | **focused**   70:22 | 45:4 46:17 | 187:16 189:1 |
| 26:20 27:21 | 71:4 135:23 | 47:18 48:15 | 190:19 191:6 |
| 31:11 36:21 | 204:15 245:14 | 53:3,20 54:19 | 191:19 192:19 |
| 37:23 43:8 95:5 | **focusing**   279:9 | 56:9,20 60:18 | 201:8 203:1 |
| 106:24 107:5 | **follow**   108:13 | 61:3 62:8 65:20 | 205:5 207:4,20 |
| 115:21 116:1 | 150:7 238:9 | 66:10,21 67:7 | 209:17 210:15 |
| 139:5,7 145:16 | 240:15 244:20 | 68:1,15,22 71:1 | 211:4 212:10 |
| 147:18 161:6 | 245:5,9 246:2 | 72:5,20 73:23 | 213:1 215:13 |

**[form - genes]**                                                    Page 28

216:14 217:21
219:11,21
220:13,24
224:11 226:13
232:15 236:16
237:2,16
239:20 245:12
247:22 248:20
254:3 255:14
257:9,14
260:20 261:7
261:20 264:2
265:10 269:22
270:16 271:12
272:7,21
274:24 276:12
277:14 278:22
279:20 280:23
284:17 285:12
290:21 292:3
293:22 294:22
299:3,10 307:7
**formatting**
  33:7
**forms**  82:2
**forrest**  42:12
  42:14,19 43:4,9
  43:24 44:7
**forth**  24:16
  33:15 141:11
  151:12 182:5
  294:7,24 295:3
  300:13 304:6
**forward**  61:19
  99:15 268:10
  300:14

**found**  32:12
  64:21 65:6,12
  66:1 73:17
  74:23 77:13
  82:17 87:8
  88:21 90:23
  104:23 145:1,6
  151:13 169:8
  198:3 200:13
  265:7 275:6
  285:16,18
**foundation**
  280:11
**four**  35:17 36:3
  37:21 142:8
  147:20 171:17
  171:20 172:12
  184:22 254:13
  296:1 297:8,9
**fourth**  26:23
  39:15 172:20
  244:15,18
  245:4,8 250:5,6
  250:6 251:18
**frame**  39:6
**framework**
  111:23
**frequency**
  206:16,20
  230:1 231:16
  245:16 265:8
  291:19,24
  293:2,7,16,24
  294:4 297:5,19
  300:5,19

**frequent**  7:5,22
  191:18 196:11
  197:18,22
  199:12 224:4,6
  224:8 225:2,7
  226:4,12 227:3
  227:20 293:4
  293:10 294:19
  299:19,21
  300:8,22
**frequently**
  260:15
**front**  10:2 11:6
  12:4 19:4,15,22
  50:3 69:11
  87:21 137:4
  160:5 238:4
  300:3
**frozen**  127:7,18
  129:10,20
**full**  28:12 116:8
  116:12 124:21
  206:10 292:21
**fully**  216:12
  298:12,24
**fumble**  9:13
**function**  34:1
  52:2 114:6
  271:6,10,21
**functional**  52:6
**functionally**
  49:5
**functions**
  270:20
**further**  138:16

**future**  103:9

**g**

**g**  9:1 137:2
**games**  266:8
**gates**  97:17
  98:4
**gel**  289:19
**gene**  5:17 48:22
  54:11,13,16
  102:17 105:9
  121:20 122:4
  123:7 269:12
  270:12,23
**general**  4:15
  18:12,24 19:18
  21:7 24:18
  29:20 40:13
  46:8 61:15
  99:22 107:11
  107:13 132:16
  154:7,9 165:17
  165:18 166:19
  166:20 167:1
  282:24 286:11
  291:14
**generally**  36:2
  68:9,14
**generated**
  253:2
**genes**  51:24
  52:1 55:24 60:6
  60:7,10,13,16
  61:1 62:5,11
  100:10,18
  102:6,19 103:7

103:9 109:12
110:13 117:4,8
118:8,17,23
120:20 122:5
122:18,23
**genetic** 46:16
51:6 54:6 61:6
61:7 87:5,6
96:22 103:20
104:20
**genetics** 46:13
46:14 77:4,8
103:15 117:11
117:12
**genital** 7:12,17
7:19 8:5 28:22
85:14 134:10
135:17 139:6
145:9,17
146:13 152:17
152:22 153:15
170:19 176:2
176:19 179:17
180:18 204:2
209:4 210:14
218:16 221:21
237:20 238:22
239:5 240:21
241:19,22
242:3,18 243:3
251:4 253:20
258:11 262:18
267:19 280:21
285:9
**genitals** 291:4

**genius** 287:6
**georgia** 44:13
**germline** 46:18
46:21 47:4,9,14
48:7,19 53:11
53:14,16 77:22
77:24 79:1
**getting** 24:20
121:16 213:18
**giese** 42:9,17
43:4,6
**give** 15:22
24:11 44:14
154:13 164:15
294:20
**given** 133:12
162:19 218:14
283:6 307:5
**gives** 58:11
169:10
**giving** 19:9
61:11
**gleaned** 145:1
**glitched** 124:12
**go** 12:10 24:4
36:17 60:9 77:2
79:19 97:14,17
104:9,21
107:11 121:3
127:21 136:8
136:21 145:15
147:17 150:7
151:16 153:13
154:1 155:5
156:18 160:16
166:12 172:19

176:16 186:23
190:9 196:8
199:10 208:6
212:20 214:18
218:2,5 223:2
223:12,14
228:3,17
235:14 238:20
239:1,8 251:23
257:17 259:15
262:23 265:20
268:4,16
272:17 278:4
285:1 288:10
292:24 300:14
**godleski** 80:16
132:8,10
133:16,20
**godleski's**
132:3
**goes** 58:3 63:22
70:13 148:3,19
233:16 240:17
280:14
**going** 9:10
20:18 21:15,22
23:10 35:1,7
41:18 43:17
46:8 51:16
61:19 63:8
67:12 79:7,24
88:18 92:20
109:24 113:21
121:6 133:1
153:12 161:3
166:10 178:8

183:17 195:7
201:20 223:21
225:15 258:4,5
295:11 296:10
298:16
**gonzales**
247:16
**good** 9:8,9
42:24 59:8 79:6
114:14 124:22
215:17 239:11
239:17 244:6,8
275:12 303:13
**gosh** 280:14
**grade** 78:21,23
204:16,24
205:15
**gradient** 181:1
286:1
**gradients** 33:12
**grande** 2:5
**grant** 23:4
29:24 30:2,6
**granulosis**
55:10,14
**gray** 143:10
**great** 9:18
49:20 98:19
168:19 291:7
303:9
**greater** 64:4
90:5,9 155:7
187:7 194:8
197:5,9 199:12
200:13,16,21
207:17 212:22

[greater - heterogeneous]                                          Page 30

213:20 266:14
**green** 126:16
126:18 130:10
130:18 131:2
**group** 24:16,18
31:5 35:6 58:18
59:5,13 141:19
153:23,23
156:8 210:18
225:7 227:3
230:1 239:21
240:3 241:4
257:2,7 259:19
259:20 262:20
263:7 264:24
**grouping**
135:13,22
**groups** 240:5
**guess** 42:11
119:1 121:1,15
150:20 165:21
186:12 202:12
273:18 277:11
277:18 282:18
**guidelines**
16:20 55:2,6
57:1 60:21 61:9
62:6,10 63:5
78:3,11,14
107:17,19
108:14 171:1,9
173:13,16
174:9 178:7,17
182:18,23
183:18

**gyn** 126:5 140:3
140:10
**gynecologic**
13:8,14,15
26:22 50:13
125:2,10 140:7
147:12 156:14
**gynecologists**
50:12 185:3
**gynecology**
6:10 13:21

**h**

**h** 4:6 5:1 6:1
7:1 8:1 137:2
**habitual** 261:9
**habitually**
261:6
**hair** 289:3
**half** 51:23 79:7
125:18 213:17
213:19
**hall** 107:14
**hallmarks**
271:22
**hand** 35:5
51:19 69:21
144:7 169:3
193:10 197:16
206:5,9 221:4
229:14 240:12
244:24 251:24
252:4,6 256:16
256:18 275:22
292:19

**handy** 104:8
**happen** 96:24
212:5
**happened**
125:15 271:16
**happening**
66:15,19
**happens** 68:10
**happy** 61:24
79:13 127:20
194:5 218:1
301:13
**hard** 12:5 23:13
**harlow** 215:20
216:3 218:5
219:2,19 221:8
**harlow's**
217:18
**harmonize**
229:1
**harris** 139:16
**harvard** 138:24
**haydu** 280:1
**hazard** 209:20
210:17 213:9
236:5 237:3,18
258:11 259:7
259:21 263:8
266:12 267:2
293:5,10
298:24 299:1,8
300:18,22
**head** 76:16
140:2
**health** 13:4
184:17 225:19

228:19 229:7
229:10,23
231:12 233:3,7
233:14,17,23
235:22 236:23
**healthcare**
22:23 30:21
**hear** 137:15
254:9
**heard** 188:8
**hearing** 4:16
37:5
**held** 2:1
**help** 9:14 21:10
49:18 249:3
276:4
**helps** 19:23
128:11,14
**hemosiderin**
126:19 130:19
131:3
**hereditary** 4:22
5:18 49:21
50:22,23 51:12
52:3 54:7 105:8
109:11
**heritage** 82:11
86:16 100:20
101:22 104:12
104:18 110:3
**heterogeneity**
167:19,21
169:8
**heterogeneous**
167:15 172:23
176:24 177:1

**[heterogeneous - identification]**                                    Page 31

177:13,17
178:2
**hey**   131:20
**hhs**   6:6
**high**   78:21,23
   103:22 166:1
   204:15,24
   205:15
**higher**   65:4
   71:16 72:18
   78:1,24 148:9
   148:10 153:14
   204:3 226:8
   227:8,10,15
   283:9 293:5,9
   300:18,21
**highest**   89:14
   90:2 230:1,6
**highlight**   298:9
**highlighted**
   298:12
**hilary**   5:12,21
**hill**   32:22 33:7
   33:19,22 34:2
   34:22 35:2
**hill's**   34:16
**histologic**
   134:19
**histologies**
   77:21 78:2,21
   78:22,24 112:7
   135:9,14,21
**histology**   77:16
   127:17 135:12
   136:1

**historical**   8:17
**history**   70:16
   82:9,11,19,20
   86:6 87:3 92:21
   103:19 105:6
   105:10,15
   106:10,23
   108:6,20
   115:11,17,20
   116:1 144:16
   220:17
**histotypes**
   163:1 205:13
**hit**   48:6,6,17,21
   52:9,14
**hmm**   115:15
   280:5
**hold**   22:20
   242:15,22
   252:4 301:17
**holly**   139:15
**honestly**   30:23
**honorary**   25:17
**honors**   31:10
**hope**   286:24
   303:12
**hopefully**   46:10
**hormonal**
   144:18
**hormone**   6:7
   8:9,20 82:12
   86:20 144:20
   154:3,19 155:1
   158:21 159:4,9
   160:13 161:20
   201:5 243:7

**hospital**   22:20
   274:21
**hospitalization**
   131:6
**hotel**   2:5
**hour**   25:11 41:3
   79:7
**hours**   25:10
   40:1,8,10,12
   41:2,5,8 94:7
   94:15,19,21
   95:1 186:13
   187:7 301:6,8,9
**hr**   177:8 213:24
   218:9
**hrd**   78:24
**hrs**   253:17
**hrt**   155:6,14,21
   163:11
**huang**   63:12
   64:14,17,20
   65:14 69:5
   75:20 76:5,10
**huncharek**
   171:14 175:23
**hundred**   181:6
   181:10
**hung**   250:19
**hurst**   3:13
**hurwitz**   190:4
   190:10,16
   191:16 194:14
   195:8,13
   197:10
**hyccmr00223**
   128:6

**hygiene**   239:10
   264:23 265:12
   265:14 289:5
   289:10,18
   298:11
**hypotheses**
   149:13,16
   150:11 151:7
   223:9
**hypothesis**
   48:17,21 49:9
   52:9,15 63:21
   65:22 66:3 67:3
   71:3,13 72:22
   72:22 74:5,13
   162:22 182:1
   193:23 198:10
   199:5 212:12
   221:23 223:7
   294:7,11,16
**hypothesized**
   65:3 66:23
   182:5
**hypothetically**
   255:16

|           **i**           |

**i.e.**   144:16
**iarc**   282:3
**idea**   85:1,5
   207:21 296:4
**identification**
   9:24 19:2,13
   23:23 35:9
   41:23 49:24
   62:11 69:9 80:5

**[identification - increased]**　　　　　　　　　　　　Page 32

| | | | |
|---|---|---|---|
| 99:1 101:3 | **immune** 272:15 | 158:21 160:21 | 109:5 124:15 |
| 113:1 128:24 | 276:2,9 | 171:22 172:1,9 | 155:3 216:20 |
| 129:7 130:6 | **immunohisto...** | 200:12 201:18 | 229:13 241:9 |
| 136:24 160:3 | 282:5 | 228:24 229:21 | **incorrectly** |
| 161:14 168:10 | **immunosurve...** | 230:15 231:5 | 205:10 |
| 168:16 178:11 | 276:3,10 | 237:7 278:5,21 | **increase** 72:17 |
| 184:8 192:4 | **impact** 293:3 | **included** 75:24 | 91:1 96:12 |
| 195:11 202:2 | 294:17 300:4,7 | 141:20 142:21 | 103:10 122:20 |
| 208:13 217:2 | **imperative** | 143:14 152:9 | 123:7 124:4 |
| 223:24 238:2 | 305:12 | 172:24 177:4 | 148:23 152:12 |
| 243:9 273:21 | **implement** | 199:2 208:24 | 155:2 159:13 |
| 282:22 288:3 | 256:20 | 225:24 230:3 | 174:11,22 |
| 288:13 | **important** | 230:24 231:11 | 179:11 262:10 |
| **identified** 19:20 | 70:17 86:7 91:9 | 234:4 253:18 | 291:20 293:2,7 |
| 20:22 51:5 | 92:1,5,10 | 276:2 289:9 | 297:5,20 300:5 |
| 53:13,16 60:6,7 | **impression** | **includes** 35:23 | 300:20 |
| 69:19 82:1 | 42:8 | 51:2 176:17,22 | **increased** 51:8 |
| 105:18 106:16 | **improving** | 192:11,15 | 54:17 55:4,5 |
| 110:13 117:17 | 24:17 | 195:20,22 | 62:12 63:23 |
| 123:1 133:18 | **imputing** | **including** 6:17 | 64:11,13 72:3 |
| 276:1 290:5 | 256:21 | 36:7 70:6 | 72:23 74:20 |
| **identify** 71:12 | **inactivities** | 144:15 148:5 | 75:5 83:10 84:5 |
| 73:4 74:19 75:2 | 187:23 | 148:21 151:22 | 84:8 86:9 93:16 |
| 86:7 96:19,22 | **inactivity** 187:6 | 152:8 162:8 | 97:20 104:18 |
| 130:7 132:14 | **inadvertent** | 184:23 278:7 | 105:19 106:17 |
| 132:24 133:12 | 11:24 | **inclusion** | 107:4 108:8 |
| 133:13 140:23 | **inadvertently** | 225:19 228:22 | 109:2 110:4,14 |
| 284:1 | 11:16 | **inconsistency** | 124:6 134:10 |
| **ignoring** 299:4 | **inartful** 118:14 | 195:1 240:19 | 135:17 146:13 |
| **ii** 58:15 59:20 | **incessant** 63:20 | **inconsistent** | 148:6 152:16 |
| 208:22 | **incident** 8:20 | 189:14 285:15 | 155:9,14,14,20 |
| **il** 148:22,22 | 257:1,6 283:8 | 285:17 | 160:20 162:15 |
| 151:15,15 | **inciting** 182:10 | **incorporated** | 162:21 163:10 |
| **illustrates** | **include** 32:22 | 32:12 | 163:15,21 |
| 164:24 | 35:15,24 41:6 | **incorrect** | 164:19 174:16 |
| | 135:4 151:23 | 107:21 108:17 | 175:2 176:1,7 |

176:18,23
177:5,12
179:16 180:2
191:13 197:9
201:1 203:19
204:17 207:14
209:16 210:5
210:13 212:24
213:3 214:5
218:15 223:3
232:14 233:6
236:24 237:8
240:4 241:14
254:23 255:12
255:21 262:9
265:2,7 270:24
284:8,12,15
285:3,10
293:15,20
294:4 295:19
**increases** 65:16
77:16 112:13
167:24 174:24
189:10 241:19
241:23 242:3
**increasing**
55:21 65:2,23
86:12 91:4
111:19 112:9
112:17 146:18
155:21
**increments**
64:23
**independent**
31:4

**index** 144:15
**indicated** 94:18
132:11
**indicating**
128:13
**individual** 7:8
35:16 40:3,18
40:19 42:19
43:10 47:13
54:18 73:2 75:2
75:4 109:16
164:21 166:7
197:19 203:10
226:10 231:8
**individual's**
165:10
**individuals**
52:2 230:6
**induce** 222:8
269:7 270:14
275:18 285:22
**induces** 268:13
268:17 270:7
**inducing**
273:14
**induction**
188:17
**inert** 273:24
274:4,6,8
**inflammation**
32:10 64:20
65:2,11,15,16
65:17,23 67:23
70:9,17,23 71:7
72:3,17 73:1,3
73:12,17,21

74:9,15,18 75:6
75:11,14,20,21
148:4,10,11
151:21 152:6
153:16 193:11
194:16,16
195:3 199:23
200:2 268:12
270:15 276:11
**inflammatory**
5:8 66:7,20
67:5 68:13,21
68:24 70:5,7
73:6 75:3
144:17 147:19
147:22 182:10
188:13,17
198:6 222:8
**information**
17:3 25:3 57:13
61:20 81:15
82:10 239:18
245:2 249:13
**infrequent**
194:8 253:6,10
253:14 263:18
263:20
**ingham** 44:6
**inherit** 52:4
**inherited** 52:24
54:18 77:13
100:8 102:17
109:9 110:6
**inhibits** 149:1
200:2

**initial** 127:7
245:10 247:3
**initially** 42:14
127:11 129:10
238:13 240:20
253:5,13
256:21
**initiative** 24:23
**initiatives**
24:15
**injured** 130:20
**insight** 215:11
**insoluble** 8:13
**instance** 210:12
291:23
**institutes**
184:17
**institutions**
137:20,20
138:2 150:21
**instructions**
305:1
**insurer** 23:1
**intact** 218:16
221:10 228:24
**intend** 143:6
205:9
**intended** 61:13
135:19
**intending**
290:18
**intent** 135:8
**interacted** 16:7
**interaction**
145:24 153:5

**intercourse**
291:11
**interesting**
264:17
**intermingled**
46:11
**internal** 57:20
**international**
8:18 14:9
182:23
**interpretation**
218:14
**interpreted**
127:10 129:11
**interrupt** 11:13
124:10
**interval** 93:14
145:4,11,20
146:7 163:9
204:7,9,18
205:1,13,16
209:6,11
210:10 218:9
232:10 263:14
**intervals** 177:9
220:9
**intervening**
240:1 241:6,14
**intervention**
112:5 212:4
**interventions**
30:22 112:4
**interviewing**
280:15
**intimate** 8:8

**intraoperative**
126:16 130:10
**introduction**
193:10
**invasion** 149:3
**investigated**
56:13 62:19
66:1 178:20
**investigating**
73:12,13
**investigator**
29:9
**invite** 232:6
**invoice** 36:22
37:1,8,19 38:17
39:8,11,12,15
94:9,17,23
**invoiced** 36:20
40:22
**invoices** 4:18
35:6,11,16 36:6
37:22 39:20
40:8
**involve** 26:15
27:2 28:13
273:11,13
**involved** 14:19
17:24 18:1 27:6
27:22 30:20
31:19 141:17
**involvement**
17:14
**involves** 26:21
68:13
**involving** 26:24

**irritating** 222:6
**island** 274:20
**isolation** 66:13
**issue** 136:13
187:14 234:18
**issued** 39:19
**issues** 218:18

| j |
|---|

**j774** 8:14 276:5
**jama** 7:16,19
208:18 217:8
230:22
**january** 57:23
57:23 208:18
**jersey** 1:2
**jewish** 82:11
86:16 100:19
101:22 104:11
104:17 110:3,5
110:23 119:14
120:4 160:24
**job** 1:23
**joellen** 76:5
**john** 81:5
**johnson** 1:6,6
45:15,15
**johnson's** 87:11
87:19 88:1,16
89:7 279:12,18
**jointly** 50:11
**jolla** 1:14 2:7
**journal** 5:4
161:22
**judith** 32:14

**judkins** 39:13
**july** 6:13
304:16
**juncture** 56:12
62:21
**june** 1:15 4:17
23:9 24:2

| k |
|---|

**kathryn** 138:17
**katie** 192:16
193:6
**keep** 104:7
188:5 277:20
**keeping** 78:7
**keeps** 131:16
**kept** 81:1
**key** 128:3
193:12 199:23
**keywords**
32:10
**knocking** 48:24
**know** 9:12,14
9:15 18:4 21:10
21:23 22:13,18
30:23 38:5 39:3
43:15 47:19,21
49:7 52:16
62:18 63:21
67:9 72:12
75:16,17,18
79:5,11 80:7
84:21 88:10,10
89:20 96:21
106:22 107:22
109:15 110:20

111:16 113:4
114:4 117:7
121:1 124:3,7
124:23 128:11
128:14 129:12
129:13,17,24
130:18 131:17
133:16 137:19
139:2,23 140:4
140:4 150:24
154:15 165:18
165:21 166:6
175:22,22
183:5 184:10
185:8 187:17
188:6 197:12
201:10 203:9
206:2 231:4
234:18 244:18
247:24 248:2,9
248:10,16,22
248:24 249:19
250:15 255:3
259:17 261:9
261:24 262:3,4
264:9 266:6
268:19 270:2
273:10 279:24
280:2,7,8,9,13
287:9,9,14,24
289:14 290:7
290:12 291:8,9
291:10,14
293:20 296:18
**known** 102:6
103:7,9 122:19

122:19 123:6
188:16
**knudson** 52:19
**knudson's**
48:17,20 52:14

**l**

**l** 1:11 161:7
**la** 1:14 2:7
**labeled** 301:22
**labs** 60:12
**lack** 207:9
221:11,23
268:16
**lacking** 198:11
198:14,20,24
**language** 47:8
48:10 125:17
**large** 42:14
**largely** 139:4
**largest** 196:9
197:1 240:18
283:21
**lastly** 17:12
**late** 31:17 63:18
93:1
**launch** 166:22
**lead** 3:2 53:1
151:16
**leader** 140:9
**leadership** 13:7
**leading** 64:12
137:19
**leads** 73:15
75:4

**leakage** 130:10
**leanna** 3:5
**leave** 136:12
182:15
**led** 71:6 164:3
**lee** 161:6,7
**leeway** 61:12
**left** 51:19 58:20
69:21 169:3
206:5,9 221:4
244:24 256:16
256:18 275:22
282:24 286:12
287:11 292:19
**leftmost** 54:11
**leigh** 3:3 9:9
23:12 31:8
35:14 36:4
42:13 61:11
62:15 71:20
79:5 113:10
129:12 131:16
213:12 243:16
252:3 282:24
301:10 303:16
**length** 182:15
**leslie** 1:25 2:12
9:15 23:19
286:18 298:2
303:1 304:19
**letters** 216:1,22
216:23 217:7
**level** 7:8 16:16
58:14 59:17
64:23 76:3,17
89:14 90:23

91:24 182:2
293:2,7 297:5
300:5,20
**levels** 5:8 58:11
64:18 65:4,7,13
66:1 75:17
148:9,10 223:4
**levy** 81:5
**liability** 1:7
**library** 57:19
184:16
**life** 47:16
**lifestyle** 112:5
169:7
**lifetime** 5:6
51:9 64:1,15,21
65:9,16 70:3
71:15 72:1,16
76:9 90:10,15
96:24 245:10
245:19 246:16
**ligation** 144:19
212:4
**ligations** 211:21
212:14,15,18
**likely** 68:3
123:23 125:11
126:19 193:11
194:1 199:23
200:4 207:17
262:6
**limit** 18:14
**limitation**
197:8
**limited** 29:20
51:10 116:16

**[limited - lower]**                                          Page 36

| | | | |
|---|---|---|---|
| 116:22 221:10 | 33:13,23 34:20 | 114:7,8,18,21 | **looking** 33:8 |
| 270:18 | 55:14 57:14,21 | 132:2,23 133:1 | 56:15 64:15 |
| **limits** 89:22 | 68:6 84:15,17 | 138:16 140:16 | 67:17 69:23 |
| **line** 121:13 | 89:12 91:4,7,14 | 144:6 158:17 | 71:8,10 81:1,12 |
| 153:13 306:4 | 97:12 112:12 | 161:2 179:7 | 88:5 94:16 95:4 |
| **lines** 41:17 | 112:17 141:8 | 193:9 194:3,4 | 97:7,11 100:14 |
| 147:20 | 172:13 180:22 | 197:14 202:10 | 100:15,16 |
| **link** 72:23 73:5 | 188:12 189:11 | 203:21 213:16 | 104:1,10 |
| 74:20 169:10 | 193:1 195:2 | 224:16 225:23 | 108:18 114:9 |
| **linked** 103:4 | 201:13 242:10 | 227:23 228:5 | 127:12 129:13 |
| **list** 11:16 41:19 | 284:7,11,14 | 228:11 229:12 | 129:16 133:8 |
| 44:11 99:14,15 | 285:8,14 286:4 | 229:13 233:11 | 141:22 154:14 |
| 100:14,16,19 | **litigation** 1:8 | 234:3 236:19 | 183:3,4 185:21 |
| 101:13,21 | 13:17 42:2 | 238:19 241:17 | 188:8 200:1,14 |
| 104:3,7 134:8,9 | 269:5 | 249:4,8 254:17 | 209:3 213:20 |
| 134:11 156:21 | **little** 61:12 | 257:21 259:9 | 236:23 239:23 |
| 157:14 158:18 | 88:19 93:10 | 259:12 262:17 | 244:7 252:22 |
| 158:24 160:13 | 112:11 184:3 | 263:16 264:10 | 265:1 283:14 |
| 160:24 170:14 | 254:10 | 265:20 267:14 | 294:1 |
| 199:6 202:7 | **llp** 3:13,20 | 269:3 278:4 | **looks** 19:23 |
| 240:17 277:19 | **local** 15:6,12 | 291:18 293:15 | 20:16,19 |
| **listed** 26:19 | **localized** 75:14 | **looked** 55:21 | 128:12,16 |
| 43:1,23 86:11 | 75:21 76:2 | 62:15 68:3 | 289:3,18,19 |
| 86:15 100:3 | **locate** 57:22 | 78:20 89:18 | **losing** 131:18 |
| 109:6 146:24 | **long** 17:8 | 97:18,18,22 | 299:22 |
| 202:18 | 197:12 266:11 | 108:1 118:13 | **lost** 105:21 |
| **listing** 42:1 | 266:14 | 118:22 127:11 | 106:6,6 129:13 |
| 43:1 54:6 60:16 | **longer** 35:3 | 135:22 136:1 | **lot** 21:22 52:19 |
| 108:2 134:17 | 78:7 97:1 189:7 | 162:12 177:24 | 201:22 282:7 |
| **lists** 24:9 54:10 | 191:11 247:10 | 212:21 238:12 | **louis** 42:9 43:13 |
| 54:21 100:9,17 | 283:23 | 243:6 244:10 | **low** 189:3 |
| 101:16 171:8 | **longo** 81:9,10 | 251:13 260:2 | **lower** 51:23 |
| 186:1 192:23 | **look** 20:16 | 264:22 272:12 | 64:23 65:7,12 |
| 225:24 | 54:10 58:14 | 273:10,12 | 156:23,24 |
| **literature** 12:7 | 69:4,21 95:4 | 288:24 289:4 | 157:6,8 158:6 |
| 28:23 32:4 33:8 | 96:7,22 101:15 | 292:6 296:12 | 158:11 196:12 |

[lower - marked]                                                Page 37

197:16 226:21
227:7,9
**loy**  70:3,8
**ltl**  38:23
**lucky**  188:7,9
**lunch**  166:16
**lung**  201:15

**m**

**m**  1:11
**m.d.**  1:13 2:1
4:2,10,13 5:11
9:3 303:19
307:13
**ma'am**  38:10
38:14 69:13
76:21 88:5
105:2 126:9
137:15 145:14
145:23 147:6
149:17 150:2
156:17 158:3
160:6 161:16
167:5 173:12
175:14,22
186:4 188:20
198:15 201:16
202:6 211:14
217:6 222:20
229:12 237:14
238:5 240:12
249:7 256:13
259:15 265:24
266:6,18
267:17 268:6
282:16 286:17

**macrophages**
8:14 272:13
**made**  10:24
11:2 17:1
108:11 217:11
244:22 253:10
283:8 304:8
305:6
**magnitude**
293:3 300:6
**magnitudes**
64:4
**mail**  12:24
302:24 303:2,2
**main**  72:16
**majority**  47:2
53:8 94:11 96:3
96:16 97:4
110:10
**make**  11:13
29:7 42:24
45:10 49:19
64:7 72:11 96:9
124:13,23
151:1 154:18
161:9 185:21
186:21 198:19
218:3 230:21
232:8 253:17
273:4 279:10
282:3 297:15
301:23 302:23
305:3
**making**  107:10
140:14 297:3

**malignancies**
51:3,7,8 188:16
**malignant**
151:17 182:4
269:7,14 270:8
271:1,16,22
272:4,20,24
273:15 283:10
285:22
**managed**
105:10
**management**
24:10,14 159:8
**mandarino**
277:1,9,23
**manifestations**
269:15
**manifested**
247:20
**manipulated**
267:5,8
**manipulation**
237:11 264:8
**manner**  24:21
**manuscript**
151:1
**manuscripts**
28:13
**march**  4:19
36:22
**margaret**  3:4
131:15,16,20
**mark**  9:20
18:21 19:11
22:7 23:20 35:7
41:16 49:16

69:6 80:1 98:16
98:22 100:24
112:22 127:20
127:22 128:21
136:22 159:14
161:3 168:3,12
178:9 191:22
195:7 201:21
208:7 216:21
223:22 237:23
243:1,17
273:17 282:12
288:1,9,11
298:2 301:23
**marked**  9:23
19:1,12 21:3,17
23:22 31:24
35:8 36:13
41:22 49:23
50:5 69:8 77:6
80:4 98:24 99:3
101:2 112:24
128:23 130:4
131:14 136:23
137:5 156:13
160:2,9 161:7
161:13 168:9
168:15 178:10
184:7 192:3
195:10 202:1
208:12 217:1
223:23 234:14
234:14,22
238:1 243:8
273:20 282:14
282:21 288:2

[marked - meta]                                                    Page 38

288:12 302:3
303:4
**marker** 64:19
65:24 70:9
75:10
**markers** 71:8
73:4
**marketing** 1:7
**mas** 1:6
**mascara** 289:3
**mass** 126:15,17
130:21 144:15
**massachusetts**
3:22
**masses** 130:20
**material** 61:23
234:21
**materials** 10:11
11:15 40:18
88:11 132:5,9
133:2 144:9,10
**math** 89:5,8
**matter** 39:21
64:8 279:11
284:10
**maximum**
250:22
**maximus** 31:4
**mcclennen**
3:20
**md** 4:15,20
**mdl** 1:6 20:14
21:6,7 35:13
36:2,7 37:4
40:2,2

**mean** 20:15,17
20:20 42:22
47:21 49:6
52:12 53:12
59:1 61:4 62:14
67:2 78:12 90:3
92:5 96:1,2,15
102:23 107:23
108:23 111:16
112:10 119:10
121:3 132:16
137:24 145:23
148:2,9 163:4
165:18 172:3
176:24 177:12
198:2 202:20
203:7 215:6,7
231:23 236:15
245:13 251:6
261:8 271:17
275:2 277:18
291:8 293:24
**meaning** 70:3
156:24 210:22
211:2,7,9
**meaningful**
213:6
**means** 67:10
122:24 130:13
178:3,5 180:11
209:12,13,22
210:3 232:24
233:16,19
261:10 264:9
271:15 304:23

**measure** 64:17
75:13 206:19
206:21 215:6
**measured**
64:22
**meat** 187:6,13
187:19
**meats** 187:22
**mechanism**
64:10 71:12
152:14 153:17
181:3,4 182:4
198:11,13,14
198:20,22,24
199:5,6 268:12
285:21
**mediator** 74:10
**medical** 24:9,16
24:18 25:1,1,14
30:22 40:17
80:14 81:1,14
82:3,9 86:1,5,6
92:21 94:13
126:12 128:3
131:5,8,12,13
133:21 134:3
282:9
**medicine**
184:16
**medline** 57:19
**meet** 297:16
**meeting** 29:3
167:10
**meetings** 15:8
280:16

**melanoma** 51:4
**member** 17:15
17:19 108:24
**members** 15:12
**men** 51:10,12
**menarche**
63:18 93:1,5,12
144:21
**menopausal**
144:20
**menopause**
63:18 93:2,9,13
**menstrual**
87:13,15
**menstruation**
66:7 67:4,10
**mention** 34:2
126:11 129:9
130:8 133:17
168:21 268:24
**mentioned**
23:10 24:5
26:12 29:23
30:19 81:15
98:12 117:8
130:11 268:23
**merritt** 190:13
**mesothelioma**
281:6,15,21,22
283:10
**met** 115:9,11
**meta** 7:7,25
171:22 172:2,4
183:21 225:10
230:15,24
232:4,6,9

**metabolism**
  275:9
**method** 58:6
**methodological**
  218:18
**methodology**
  32:1,16,18
  34:19 80:11
  132:13 142:1
  165:6 254:2
  274:23
**methods**
  114:23 144:9
  144:11
**methvin** 3:6
**mid** 60:10
  93:10
**middle** 104:14
  188:10 278:16
  289:17
**midway** 60:2
  104:13 206:5,9
  238:20 267:15
  292:24
**migration**
  181:3 182:7
  285:21,24
**miles** 3:7
**mind** 17:7 38:4
  94:20 104:6
  131:21 175:1
  286:16,19
  296:8
**minute** 22:9
  109:24

**minutes** 79:15
  79:16 84:21
  130:12 138:18
  166:11 254:14
  273:4 282:24
  286:12,20
  287:10 296:10
**misclassificat...**
  281:3
**misdiagnosed**
  281:12,14,21
  281:23 283:11
**mislabeled**
  302:13,19
**misrepresented**
  261:17
**misrepresents**
  262:12
**missed** 121:24
**missing** 29:7
  141:23 251:17
  251:20 256:5
  265:23
**misspoke** 273:3
  281:18
**misstate** 216:8
**misstated**
  205:11
**misstates** 33:2
**mistaken** 42:8
  43:13
**mixed** 42:14
**mixture** 293:7
  300:20
**mixtures** 8:20

**mm** 115:15
  280:5
**modest** 293:2
  300:6
**modifiable**
  29:16,20
**modification**
  7:4
**modify** 112:10
**molecular**
  47:22
**mom** 102:12
**moment** 20:7
  24:5,11 41:15
  46:3 136:9
  268:5 292:13
  292:14
**monk** 280:1,13
**monograph**
  182:24
**montgomery**
  3:9
**month** 26:6
  44:17
**monthly** 66:15
  66:19
**months** 164:3
  197:7 199:13
  240:21 245:23
  246:22
**moores** 15:5
  16:19
**morning** 9:8,9
  9:11,20 11:6,14
**mother** 52:5
  82:21 87:4,8

**mouth** 38:4
**mouthwash**
  289:20
**move** 134:3
  182:8 267:7
  268:9
**moved** 125:13
  129:22 233:19
  291:10,11
**moving** 233:17
  276:22
**mri** 30:14
**mris** 30:11
**mucinous**
  112:14
**multi** 5:17
**multifactorial**
  84:12,15
**multigene**
  114:24 117:20
  118:6,8,11
**multiple** 47:15
  48:6 49:11
  192:11 203:2
  224:17 225:2
  251:19 273:12
  293:19
**multiply**
  293:20 295:24
  297:8
**murray** 215:21
  218:6 219:2,19
**mutagenesis**
  181:4
**mutated** 49:4

**mutation** 47:9
47:10,14 48:7
48:19 49:1,2
51:6 52:8,24
53:11,14,16
54:18 62:24
77:14,24 79:1
101:17 103:5
105:18 106:16
119:15 120:5
121:12,23
**mutations**
46:16 47:1,4,5
47:6,15,15,24
48:1,8,12,20
49:8,11 53:1,17
53:23 54:7 55:7
63:5 78:23 87:8
96:22 100:9,9
102:11,17,17
104:24 110:6
110:13 111:1
117:13 120:15
122:8,11,24
**mutually**
271:24
**myriad** 288:24

**n**

**n** 3:1 4:1,1 5:1
5:1 6:1,1 7:1,1
8:1,1 9:1 137:2
230:7
**name** 5:20 17:8
43:8 45:18
185:8 193:7

304:16
**named** 193:4
**names** 139:24
**national** 6:16
16:3,12,15 17:4
56:11,24 63:1
184:16,16
228:19
**ncbi** 6:20
184:15
**nccn** 17:8,9
55:2,6 56:2
60:21 61:8 62:6
62:9,20 78:3
107:17,19
108:13 170:24
171:9 173:12
173:16 174:9
177:24 178:7
178:16 182:18
182:22 183:18
**near** 87:20
246:11
**necessarily**
51:17 67:9
102:23 110:20
111:16
**necessary** 86:1
181:18 305:3
**need** 23:8 49:3
79:11 235:1
244:5 278:5
288:17 298:21
**needed** 78:6
**needs** 25:19

**negative** 102:1
102:5,18
103:12 104:24
108:7 109:1
115:4,7 116:14
120:15,18
121:12,19
122:2,4,21
123:6 133:10
133:14 143:4,7
180:23 271:18
**neither** 115:24
182:18,22
**neoplasm**
178:22 180:13
180:14
**ness** 149:12
152:2 193:23
200:5 223:8
**network** 6:17
16:13,15 17:4
**never** 85:23
109:19 122:22
143:20 173:5
200:14 210:9
221:23 231:22
245:15 253:13
256:22 258:11
258:21 261:17
266:20,23
267:2 293:4,11
294:2,20 300:8
300:23
**new** 1:2 16:20
16:24 23:19
24:6,20 25:6

26:9,13 27:1
28:9 29:24 32:5
60:7 61:19
125:16 187:5
231:19,20,21
269:21 278:21
279:7 291:1
**newest** 11:17
**newsome** 39:16
80:18
**nhs** 208:22
228:1,8 229:24
230:2,10,19
231:1
**nicholas** 192:17
**nine** 134:18
141:13,20
142:23 196:1,1
196:2,3 303:15
**no.25** 7:19
**non** 153:23
195:20,22
196:1 206:18
210:18 220:19
253:4,7,8,10
259:6,20
262:19 263:19
263:19,20
264:4
**noncausal**
173:5
**nonfunctional**
49:6 52:7
**nonserous**
135:3,9,14,18
136:5

**[nonspecific - o'dell]**                                                    Page 41

| | | | |
|---|---|---|---|
| **nonspecific** | **nsaids** 188:13 | 183:14,19 | 40:11 41:24 |
| 75:10 | 189:12 | 192:16 193:6 | 42:6 45:8,11 |
| **nonstatistically** | **null** 221:22 | 208:3,7,8 | 46:20 48:4 |
| 255:19 | 259:7,21 264:1 | 214:10,22 | 49:10,16 50:1 |
| **nonsteroidal** | **number** 4:24 | 215:2,16 216:4 | 53:4 54:1,23 |
| 144:17 194:15 | 5:5 20:16 49:19 | 216:9,12,17 | 56:14,22 57:4 |
| 200:1 | 64:5,12 65:1,5 | 217:9,9,10,17 | 60:22 61:21 |
| **nonuse** 194:9 | 71:4 72:24 | 217:19 220:11 | 62:2 63:7 66:4 |
| **nope** 20:5 | 73:15 89:20 | 220:15 221:7 | 66:17 67:1,21 |
| **normal** 103:20 | 91:3 99:9 | 221:13 222:4 | 68:5,20 69:1,6 |
| 269:8,16 | 137:19 138:13 | 225:17 227:23 | 69:10 71:21,23 |
| 270:20 271:5 | 185:7 188:7,9 | 227:24 228:1,8 | 72:8 73:19 74:2 |
| 271:10,20 | 206:19 207:18 | 228:18,21 | 75:7 76:18 |
| **notable** 197:21 | 208:24 227:23 | 229:5,6,9,22 | 78:15 79:9,13 |
| 214:9,20 | 228:14,15 | 230:12,16,20 | 79:19,21,24 |
| **notary** 307:20 | 250:22 258:14 | 230:22 231:4 | 80:6 81:3 82:7 |
| **notation** 228:12 | 259:3 299:24 | 231:24 233:9 | 82:24 83:12 |
| **note** 11:14 | **numbers** | 237:20 243:1 | 84:10 85:7,20 |
| 61:10 126:14 | 141:24 142:3,3 | 243:11,17 | 89:2 90:1,21 |
| 132:14 133:2 | 142:4,10 163:4 | 247:17 248:15 | 91:16 92:7,19 |
| 205:19 273:16 | 236:17 | 249:20 250:16 | 93:18 94:6 |
| **noted** 73:20 | **numeral** 58:15 | **o'brien's** | 97:24 98:18 |
| 117:13 305:10 | **numerous** | 229:11 262:4 | 99:2,23 100:4 |
| 307:7 | 63:22 | **o'clock** 303:15 | 101:4,9,11 |
| **notes** 77:1 | **nurses** 225:19 | **o'dell** 3:3 4:3 | 102:15,24 |
| 106:1 304:12 | 229:6,10,23 | 9:7,19 10:1,19 | 103:24 105:24 |
| **notice** 2:12 4:9 | 231:12 233:3,7 | 11:10 12:2,3 | 106:2 108:22 |
| 9:21 10:12,15 | 233:14,16,22 | 13:11 14:1 | 109:21 110:17 |
| 12:10 22:3 | 235:22 236:23 | 15:20 18:5,13 | 111:21 112:20 |
| 170:15 | **nutter** 3:20 | 19:3,6,8,14,19 | 113:2,7,11,16 |
| **noticed** 11:14 | **o** | 20:2,9,11 22:6 | 113:18 114:11 |
| **november** | | 22:11 23:16,18 | 114:13 117:18 |
| 22:14 | **o** 1:11 4:1 5:1 | 23:24 27:16 | 118:1,24 119:9 |
| **novo** 40:24 | 6:1 7:1 8:1 9:1 | 33:17 34:23 | 119:16,24 |
| **nsaid** 144:18 | **o'brien** 8:8 | 35:10,19,21,22 | 120:1,24 |
| | 88:20 183:11 | 36:10,12 39:7 | 122:12 123:12 |

**[o'dell - object]**                                                          Page 42

| | | | |
|---|---|---|---|
| 124:9 126:3 | 208:11,14 | 287:3,12,15,24 | 120:21 122:6 |
| 127:23 128:2 | 210:1,23 211:5 | 288:4,8,15,19 | 123:9 130:24 |
| 128:10 129:1,2 | 212:7,19 213:7 | 291:6 292:4 | 132:19 134:15 |
| 129:22 130:2 | 213:14,15 | 294:9 295:6,15 | 135:6 137:23 |
| 131:4,20,24 | 214:19 215:23 | 296:6,14,17 | 138:11,21 |
| 132:1,21 | 216:21 217:3 | 298:1,4 299:6,7 | 139:21 140:11 |
| 134:24 135:15 | 217:24 219:14 | 299:11 301:7 | 151:3 157:3 |
| 136:8,11,21 | 220:5,21 221:3 | 301:13 302:9 | 158:9 159:6 |
| 137:1 138:3,15 | 222:12,15,18 | 302:13,16 | 164:17 165:12 |
| 138:23 140:1 | 223:11,14,16 | 303:9,12 | 169:15 170:21 |
| 140:15 146:5 | 223:21 224:1 | **oath** 2:15 | 172:16 173:21 |
| 150:5 151:19 | 224:15 226:15 | **object** 13:9,23 | 176:9,20 |
| 154:11 157:10 | 232:18 234:10 | 18:3,9 27:10 | 177:18 179:18 |
| 158:16 159:14 | 234:17,24 | 33:1 34:17 | 181:7,13,21 |
| 159:17,20,24 | 235:5,7,17,20 | 38:24 40:5 42:3 | 187:16 189:1 |
| 160:4 161:5,12 | 236:21 237:5 | 45:4 46:17 | 190:19 191:6 |
| 161:15 165:5 | 237:19 238:3 | 47:18 48:15 | 191:19 192:19 |
| 165:16 166:10 | 240:10 243:10 | 53:3,20 54:19 | 201:8 203:1 |
| 166:17 168:3,7 | 243:14,19,21 | 56:9,20 60:18 | 205:5 207:4,20 |
| 168:11,18 | 245:20 248:17 | 61:3 62:8 65:20 | 209:17 210:15 |
| 169:18 171:2 | 249:2 254:5 | 66:10,21 67:7 | 211:4 212:10 |
| 172:18 174:6 | 255:23 257:12 | 68:1,15,22 71:1 | 213:1 215:13 |
| 176:10 177:2 | 257:16 261:3 | 72:5,20 73:23 | 216:14 217:21 |
| 177:20 178:8 | 261:13,21 | 74:11 76:12 | 219:11,21 |
| 178:12 179:5,6 | 264:5 265:19 | 78:9 81:23 | 220:13,24 |
| 179:21 181:9 | 266:19 267:7,9 | 82:15 83:4 84:3 | 224:11 226:13 |
| 181:17 182:13 | 268:4,8 270:5 | 85:3,17 88:23 | 232:15 236:16 |
| 184:2,9 187:20 | 271:7 272:1,16 | 89:16 90:18 | 237:2,16 |
| 189:15 190:24 | 273:2,17,22 | 91:11 92:3 93:3 | 239:20 245:12 |
| 191:15,21 | 275:20 276:15 | 94:3 97:15 | 247:22 248:20 |
| 192:1,5,20 | 277:13,22 | 99:20 102:8,20 | 254:3 255:14 |
| 193:19 195:6 | 279:1,22 | 103:13 108:15 | 257:9,14 |
| 195:12 201:14 | 281:10 282:17 | 109:13 110:8 | 260:20 261:7 |
| 201:20 202:4 | 282:20 283:2,3 | 111:14 112:1 | 261:20 264:2 |
| 203:5 205:8 | 284:20 285:6 | 117:14,22 | 265:10 269:22 |
| 207:6,23 208:6 | 286:5,18,23 | 118:19 119:5 | 270:16 271:12 |

**[object - old]**                                                    Page 43

272:7,21
274:24 276:12
278:22 279:20
280:23 284:17
285:12 290:21
292:3 293:22
294:22 296:3
299:3,10
**objection**  13:13
23:14 92:14
277:8,13
297:17
**objections**
10:14 304:8
**objective**  30:9
30:10 140:18
**objectively**
31:5
**observation**
153:14
**observed**  148:6
275:10 293:1
300:5
**obstetricians**
50:12 185:3
**obstetrics**  6:10
13:21
**obtain**  229:8
**obtained**  58:15
59:2 184:15
229:6 238:16
244:16 245:4
249:13
**obviously**  61:19
163:5 172:13

**ocac**  137:13
192:6 195:17
**occur**  67:13
75:14
**occurred**  107:6
**occurs**  48:14
73:1 74:15
**ocra**  17:14,15
17:20,24 18:2,8
96:19
**ocwaa**  206:22
**odd**  234:13
**odds**  145:3,10
145:18 146:17
152:19 200:13
200:17,20
204:3 211:1
232:9 233:15
263:6
**offered**  55:8
269:5
**office**  16:3
**officer**  13:15,20
**officiated**  2:14
**offload**  26:10
**oh**  10:6 11:12
20:1 37:12
42:12 43:16
80:9,21 94:10
100:14 129:15
145:5 153:9
154:9 172:3
180:10 184:20
189:24 193:17
196:1 203:22
204:1 214:16

234:13 235:13
252:8 255:5
262:21 266:2
266:17 268:14
274:2 277:11
288:15
**oil**  289:2
**okay**  10:20 12:9
12:13,15 17:2
18:18 21:15,20
22:6,6 24:4,11
25:20 26:17
27:17 28:8,11
31:12,18,21
33:18 34:6,24
35:20 36:10
38:11 39:8
43:16,16 44:11
44:24 50:5,10
54:24 55:19
56:15 57:5,11
59:8 69:3 75:8
79:8 80:10 81:4
87:2 88:14 89:9
95:2,7 99:12
100:1 106:7
107:13 109:22
110:19 113:6
114:11 119:20
121:1,3,9,10
122:1,13,13
123:5,16,21
126:4 127:3
128:10 129:1
129:15 131:24
134:7 144:2,12

146:11 147:2,4
150:18 157:20
159:17 161:12
161:18 166:9
168:7,19 169:2
170:10 171:3
184:12,20
185:14,15,19
187:1 194:13
195:6 200:6
203:6,15
205:14 206:12
208:17 214:17
214:18 223:14
224:24 229:5
233:13 234:6
234:24 237:19
243:20,24
244:5,9 249:5
250:20 252:8
252:12 254:9
254:11 255:5,5
256:16 257:20
258:19 262:12
262:16 264:13
266:3 268:4
276:16,21
278:10 280:17
288:18 297:2
297:13 301:7
303:9
**old**  97:19 107:1
107:7 126:19
126:20 212:2
246:3,8,10

**[older - ovarian]**

Page 44

| | | | |
|---|---|---|---|
| **older** 100:6 | 285:13 286:6,8 | **osteopathic** | 74:10,21 77:13 |
| **oldest** 15:15 | 286:8 | 185:3 | 77:15,23 78:1,4 |
| **once** 213:10 | **opinions** 5:11 | **outcomes** | 81:17,20 82:5 |
| 223:8 297:6 | 46:13 61:1 | 255:18 256:1 | 82:14 83:3,7,10 |
| **oncologist** | 80:12 164:16 | **outline** 154:14 | 83:15,17,24 |
| 125:2,11 126:5 | 166:21 216:13 | **outlined** 58:7 | 84:6,9,11,21 |
| **oncology** 13:8 | **opportunity** | 215:18 | 85:1,6,11,15,24 |
| 13:14,16 14:4 | 21:8,21 186:11 | **ovarian** 4:23 | 86:4,9,13,22 |
| 50:13 140:3,7 | **opposed** 78:21 | 5:14,16,24 6:4 | 88:22 91:1,5,15 |
| 140:10 | **opposite** 66:2 | 6:8,11,14,17,21 | 91:20,24 92:17 |
| **oncology's** | 73:18 74:24 | 6:23,24 7:6,9 | 93:8,17,22 94:1 |
| 156:14 | 76:10 | 7:13,14,18,20 | 95:10,13,20 |
| **ones** 10:21 | **oral** 4:9 14:8 | 7:23 8:16 13:22 | 96:1,3,13,16,16 |
| 43:23 128:8 | 144:18 164:5 | 14:5,10,17 | 96:20 97:5 |
| 164:1 282:2 | **orally** 14:14 | 16:10 17:3,10 | 98:15 99:5 |
| **online** 302:20 | 16:8 17:19 | 17:13,20 18:7 | 100:20 101:13 |
| **op** 126:14 | **order** 46:11 | 18:11,14 25:15 | 102:6 103:4,11 |
| **open** 243:15 | 200:21 216:18 | 26:15,24 27:2 | 104:2,19 105:7 |
| 244:1 298:21 | 270:6 293:20 | 27:23 28:14,17 | 105:9,17,20 |
| **operated** 63:4 | **organization** | 28:22 29:10,17 | 106:15,18 |
| **operative** | 31:4 107:24 | 32:6,7,10 46:15 | 107:3,4 108:9 |
| 130:11 | **organizations** | 46:23 47:3,11 | 108:20 109:3,9 |
| **opining** 272:19 | 12:18,20 61:5,6 | 47:17,22 48:12 | 109:11 110:4 |
| **opinion** 36:3 | **organized** 9:11 | 49:22 50:22,23 | 110:15 111:2 |
| 60:15 72:13 | **origin** 163:1 | 51:2,13 52:3 | 111:12,19 |
| 78:17 84:1,1,2 | **original** 32:8 | 53:1,9,10,12,18 | 112:10,14,18 |
| 84:4,7 85:8,12 | 52:14 71:13 | 53:24 54:8,13 | 115:21 116:2,5 |
| 86:2,2 91:18 | 143:18 149:7 | 54:17 55:4,17 | 118:9 122:20 |
| 92:2,16 95:9 | 149:11,15,23 | 55:22 56:16 | 123:8 124:4,7 |
| 123:22 124:2,5 | 150:9 290:12 | 59:10 60:17 | 126:6 133:1 |
| 132:7 155:13 | 304:13 305:12 | 61:2 62:13 | 134:13 135:3 |
| 200:20,24 | **originally** 44:8 | 63:24 64:13,16 | 136:5,15 |
| 209:10 215:24 | 230:11 272:8 | 65:10,17 66:9 | 137:10,12 |
| 261:14 269:5 | **ostensibly** | 67:6 70:23 | 138:9,13,20 |
| 279:10,13 | 255:12 | 71:10,17 72:4 | 139:6,18,19 |
| 284:16 285:7 | | 72:18 73:9,22 | 140:20,21,24 |

**[ovarian - page]**                                                                 Page 45

141:5,14,18
142:24 143:15
144:14,16
146:14,18
147:13 148:5
148:23 150:19
150:23 151:22
152:8,13,16
153:18 155:2,8
155:20 156:5
156:14,24
157:9,22
158:18,22
159:5,9,18,24
160:10,20
161:20 162:2,7
162:9,15,21
163:1,15,23
164:4,7,12,23
165:4,11,23
167:2,11,14
168:1 169:9
170:19 171:11
172:22 173:9
173:15 174:12
174:18,23
175:8,12 176:1
176:18 178:2
178:17 179:11
180:19 183:8
184:6 185:23
187:4,15,23
188:15,24
189:5,13
190:17 191:2
191:17 192:7

193:12 194:10
194:17,24
195:5,17,23
196:5,6,10,12
196:13,21
197:3,18,23
198:21 199:14
200:15 204:4
204:13 208:24
210:13 211:3
211:10 218:16
221:21 222:7
239:5,24 240:6
241:6,13 247:9
247:20 248:3
248:12 250:23
253:5,13,21
254:24 256:8
257:22 262:8
263:18 265:4
266:2 267:20
268:13,17
269:8 273:13
277:1 279:14
280:18 281:7
281:12,13,20
281:23 283:8
283:11,17
284:2,9,12
285:4,9 291:21
292:8,16
297:21 298:6
**ovaries**   62:23
67:17 111:3
182:11 212:9

**ovary**   67:16
68:12,17 75:15
75:21 76:3
106:5 292:11
**overall**   158:11
162:16 163:15
165:10 179:22
201:12 236:14
**overlap**   108:3
248:23
**overlapped**
163:9 226:23
280:12
**overly**   26:9
**overrepresent...**
256:7 257:1
**overstating**
20:3
**overview**   187:4
**overweight**
148:8
**ovulating**   64:9
76:1
**ovulation**   63:21
66:6 67:4,15,18
67:24 68:11
73:9,14 75:15
75:18
**ovulations**   70:3
72:2 76:9
**ovulatory**   5:6
64:1,6,12,16,21
65:1,5,7,9,16
65:22 67:12
71:4,15 72:17
72:24 73:2,7,15

74:16,22 75:4
**own**   41:9 57:20
74:3 108:1
131:7
**oxford**   6:22
**oxidative**   223:3
**oxygen**   270:12
270:23
**o'reardon**   3:13

**p**

**p**   3:1,1,3 9:1
137:2
**p.c.**   3:7
**p.m.**   303:20
**page**   4:2,8 5:3
6:3 7:3 8:3
12:12 21:19
24:8 26:17,18
26:18 27:21
28:6 30:4 31:7
34:5,5 46:7,14
51:20 54:2
57:12,12 59:24
63:9 69:16,16
69:17,19 70:14
70:14 71:22
77:5,7 95:3
100:12,13
101:15 104:12
104:13 118:11
119:12,16,17
119:18,20
124:18 125:8
125:24 134:5
134:11 140:17

| | | | |
|---|---|---|---|
| 143:8,8 144:8 | **pages** 1:24 | 272:10,12,13 | 239:19 |
| 146:23 147:3 | 20:16 146:24 | 277:2,24 | **participate** |
| 153:12 154:2,4 | 268:10 307:3 | 278:20,24 | 15:10 |
| 154:5,13,14 | **palb2** 55:3,7 | 279:5 280:20 | **participated** |
| 155:10 156:19 | 56:2 63:4 | 282:11 290:24 | 15:7 |
| 157:14 160:17 | **pancreatic** 51:4 | 295:5 302:17 | **participation** |
| 162:5 166:24 | **panel** 5:17 | **papers** 62:17 | 115:3 |
| 169:1 170:5 | 60:11 114:24 | 78:20 138:13 | **particles** 8:13 |
| 171:5 185:20 | 117:20 118:7,8 | 149:15 163:10 | 276:24 |
| 186:24,24 | 118:11 119:3 | **paradoxically** | **particular** |
| 188:4 190:2 | 120:20 121:19 | 64:20 | 12:11 16:21 |
| 193:9 197:15 | 121:21 122:4,5 | **paragraph** 34:7 | 24:19 56:18 |
| 199:22 200:6,7 | 123:10 | 34:15 51:24 | 82:20 83:13 |
| 200:11 201:17 | **panels** 60:8 | 58:5 59:24 | 84:22 85:5 87:4 |
| 202:10,11 | **paper** 8:11 11:6 | 70:14 104:14 | 88:21 107:6 |
| 206:1 207:24 | 27:21 28:2,2 | 147:18 169:4 | 112:2 124:8 |
| 208:2 214:7,8 | 64:15 65:14,15 | 170:17,24 | 134:21 190:16 |
| 217:15 218:2,5 | 69:5 71:15 | 172:20,20 | 201:23 210:21 |
| 219:9 221:4 | 72:14,16 76:5 | 176:7 188:11 | **particularly** |
| 222:14,15 | 97:17,21 98:1 | 200:12 206:10 | 106:23 221:9 |
| 223:18 224:16 | 118:3 121:17 | 214:8 218:6 | **partner** 26:9 |
| 224:20 229:12 | 123:18 144:8 | 221:5 229:16 | **passes** 97:21 |
| 229:14 232:7,7 | 149:18 152:10 | 245:1 252:9,14 | **past** 15:1 84:19 |
| 232:19 240:11 | 161:5 163:6 | 292:21,24 | 85:1 104:19 |
| 241:7 244:24 | 166:23 168:8 | **paren** 228:1,15 | 115:5 140:6 |
| 251:9 252:6,7,7 | 168:14,20 | 290:17,17 | **pasted** 126:1 |
| 254:12 256:16 | 183:10 186:9 | **parody** 144:19 | **patent** 210:8,18 |
| 257:21 267:10 | 193:23 194:21 | **part** 11:24 | 211:11 212:23 |
| 267:14 269:3 | 195:8,13 | 16:14 23:4 28:2 | 213:4 220:15 |
| 275:21 277:6 | 197:16 198:13 | 35:4 72:1 74:8 | 220:19 236:10 |
| 278:11,12,13 | 198:19 199:2 | 94:17 115:2 | 236:20 237:6 |
| 278:16 282:10 | 200:3 215:17 | 117:20 169:23 | **path** 127:9,18 |
| 283:1,15 | 217:9,9 222:4 | 177:19 231:1 | **pathetic** 61:2 |
| 289:13,17 | 223:20 224:8 | 276:11 293:16 | **pathogenic** |
| 290:23 292:18 | 233:12 248:6 | **participants** | 60:17 62:5 |
| 306:4 | 251:6 254:7 | 228:20 231:12 | 102:6,14,16,22 |

109:10,19
119:15 120:5
120:15,20
**pathologic**
281:5
**pathologist**
80:22 132:17
132:22
**pathologist's**
132:4
**pathologists**
132:13
**pathology**
126:22 127:1,4
127:21 128:4
129:4,6 130:4
132:4,8,16
133:2,7,13
**pathway**
275:24
**pathways** 276:1
**patient** 5:20
24:17,20,24
25:3 47:7,8
48:8 165:13
166:8
**patients** 22:24
26:1 27:22
30:11,20 47:23
50:24 53:15
78:22 116:11
116:21 143:12
159:9 192:12
203:3 231:7
240:7 250:23
256:2,8 258:16

260:4,7
**patterns** 8:5
237:21
**paula** 3:12 19:6
19:9,20 20:10
35:5 49:18 80:2
98:19 101:4
113:8 128:3
159:21 161:8
195:9 216:24
282:16,17
302:6,6,10
**pause** 184:4
**paying** 220:9
**pdf** 302:23
**pearson** 11:18
32:14 80:15
154:24 215:1
215:22 272:9
278:2
**pendency** 38:23
**pending** 45:19
**penner** 30:7
**penninkilampi**
90:4 171:15
179:15
**people** 16:18
25:2 241:1,2
253:10
**perceived**
214:11,23
**percent** 25:8,9
25:10 53:10,12
55:23 77:12,17
79:3 107:2
120:6,6,11,13

120:17 121:7
121:11,13,18
155:9,15
175:24 176:7
181:6,11 191:2
191:17 194:9
197:2 199:14
213:8 218:9,12
218:15,22
221:18 232:10
232:14 237:1,8
238:21 240:14
240:16,20
253:5,12 259:1
259:4,5,18,24
260:4,6 261:15
261:22 262:24
263:19 264:13
293:5,9 295:20
297:5 300:18
300:21
**percentage**
25:5,12,23
78:22 110:11
258:9,15,17
260:9
**percentages**
260:3
**performed** 36:8
141:12
**perineal** 7:22
134:22 167:24
182:9 186:1,10
200:14 207:12
211:24 220:18
225:3 226:4,12

227:20 265:3
284:13 285:4
290:2,18
291:15
**perineum**
285:24 290:7
290:11 291:9
**period** 15:11
88:19 240:23
247:10 261:5
**peritoneal** 6:19
51:3 281:6,15
281:15 283:10
**permanent**
127:18
**perplexing**
199:15
**person** 109:1
164:21 293:18
**personal** 8:19
105:6 115:11
115:17,19
116:1 289:1
291:20 297:20
**perspective**
50:21 91:6
**persuade**
270:14
**pertain** 48:18
**pertains** 207:9
**pertinent** 51:17
92:23,24
**peruses** 114:19
**phagocytes**
276:24

**[phase - powder]**                                                                                           Page 48

**phase** 67:14
**phenotype** 271:4
**phrase** 122:22 299:23
**phung** 137:2,6
**physical** 70:6 70:18 187:6,22
**pi** 29:11 30:6
**picked** 248:6 250:15
**picture** 244:1 293:16
**piece** 213:6
**pills** 64:3 157:23 165:22
**pink** 19:23 20:1 20:4 270:2
**pittard** 3:5
**place** 93:16 125:14 203:23 304:5
**placed** 59:17
**places** 51:7 160:23 205:20 274:17
**placing** 62:12 167:7 291:3,9
**plaintiff** 43:10 44:8 80:19 82:1
**plaintiff's** 45:18 80:16 81:5 214:9,21 269:4 271:8 272:3

**plaintiffs** 3:2 10:24 40:18 132:3
**plan** 28:23
**planned** 126:4
**plausibility** 33:14 181:3 285:20
**plausible** 148:7 151:9,23 152:1 152:5
**play** 266:8
**plays** 148:4 151:21 152:6 193:12 199:23
**please** 21:18 27:20 30:2 46:5 54:3,3 69:18 72:9 92:12 123:19 131:11 136:9 146:22 150:6 152:4 184:11 186:24 188:4 195:9 199:10 201:18 207:24 223:12 242:15 243:15 268:5 305:2,7
**plenty** 79:17
**plus** 6:7 43:24 43:24 154:20 155:1,7 159:3 160:22 161:19 163:13 194:22 211:19 212:6 251:17

**point** 13:16 34:4 56:6 57:6 77:20 83:2,18 99:13 114:22 119:8 125:14 174:8 179:22 185:18 186:8 186:12,20 189:21 194:5 203:18 301:6
**pointed** 180:7 279:6
**pointing** 177:6
**points** 104:9 255:13
**pooled** 138:18 141:13 172:9 202:13,21,23 203:6,7,13 208:3,18 209:5 210:8 230:16 230:22 231:1 232:5,9,20 233:15 236:15
**poor** 218:10
**poorly** 119:2
**population** 158:15 162:6 218:11 231:2 232:17 244:12 251:4 262:8
**populations** 197:20 210:20 211:13 212:3
**portion** 46:5 124:12 142:14

**portis** 3:7
**position** 22:19 25:6,22 31:14
**positions** 26:11
**positive** 102:10 110:24 121:11 121:20 146:19 152:19 180:22 204:23 216:18 232:24 233:20 242:19,22 267:19 285:16 285:18
**possession** 11:23
**possible** 153:17 253:19
**poster** 29:2
**posters** 28:13
**postmenopau...** 75:24 162:9,10 162:13 293:6 300:19
**potential** 70:9 240:9 252:23 256:24
**potentially** 55:21,24 74:16 194:23 281:4,8 282:6
**powder** 1:6 7:12,17,19,23 17:10,21 87:11 87:19 88:1,16 89:7 145:9,18 146:13,17

**[powder - proliferation]**                                    Page 49

167:14 169:9
169:13 170:12
172:22 178:1
183:8 206:17
213:20 218:17
221:21 222:8
226:5 227:20
246:11 247:5
279:12,18
284:7,10,11
**powered**
216:18
**practice**  4:22
50:16 78:8
132:17 218:10
**practices**  1:7
**precision**
221:19
**predisposes**
51:6
**predisposition**
5:18 109:9
**preferably**
58:17 59:4
**pregnancies**
207:18
**pregnancy**  64:4
**pregnant**  15:15
**preliminary**
56:5 105:14
106:9
**premenopausal**
166:1
**premise**  65:14
65:18 72:14
199:21 200:2

**premises**  71:18
72:15,16
**preparation**
41:6 57:14
**prepare**  41:10
**preparing**  41:9
**presence**  130:8
130:13,22
132:9 196:13
279:18
**present**  3:24
57:6,6 132:12
133:22
**presented**  29:3
167:12 244:21
**presently**  14:22
25:24
**president**  140:6
**press**  6:22
**pretty**  23:7
32:9
**prevention**
7:11
**preventive**  58:7
**previous**
267:21
**previously**  11:3
40:14 104:23
121:12,18,23
225:20 231:14
231:18 295:21
**primarily**
55:11 245:14
281:14 284:6
**primary**  6:18
24:16 29:9 51:3

107:15 162:6
225:1 229:23
230:13 279:7
289:23
**prior**  4:20
16:24 24:22
36:8 37:5 42:2
245:23 247:11
247:12 262:4
276:4 283:23
**probably**  40:9
63:3 166:11
247:7
**problem**  12:2
38:3 113:17
275:2,16 281:3
282:6,9
**problems**  275:3
**procedure**
126:23 129:5
**proceeding**
304:4
**process**  48:6
52:2 66:20 67:5
68:13,18
117:21 198:6
**processed**
187:5,13,19,22
**produce**  22:2
148:20
**produced**  10:17
10:22 11:19
22:15 40:7
218:15
**producing**  36:6

**product**  1:7
8:19 245:15
265:12 289:18
291:24 297:21
**production**
270:22
**products**  1:6
7:23 8:8 126:19
206:18 239:10
264:23 265:17
279:13 289:1,2
289:8 291:21
**profession**
140:10
**professional**
25:6,13 29:3
**professionally**
280:3
**profile**  82:2
**profiling**  47:22
**progesterone**
154:20 155:1,7
156:21,23
158:5 159:3,12
160:19,22
162:23
**progestin**  6:7
144:21 161:19
162:14 163:14
**proinflammat...**
148:21,22
151:14
**project**  25:2
**proliferation**
269:12 270:13
270:24 276:2,9

[promote - quantify]                                                      Page 50

**promote**
148:24
**pronounced**
204:24 205:15
**proof** 149:8
**proper** 277:14
**prophylactic**
55:13
**prophylactica...**
62:22
**proposal** 295:3
**proposed** 52:19
153:17
**proposing**
151:6 255:16
**proposition**
301:2
**propounded**
307:6
**prospect** 2:6
**prospective**
8:22
**prostaglandins**
149:1
**protective**
164:16 165:1,2
165:9
**protein** 64:19
64:24 65:3,8,12
70:4 75:9
**proteins** 52:1
**proven** 103:8
**provide** 11:21
**provided** 35:12
36:3 41:19,20
41:21 45:2

80:14,24
228:21,23
230:2,5 238:15
239:15,18
**provider** 24:24
**provides**
169:10 196:11
197:21
**providing**
23:14 238:21
240:15
**public** 6:6 17:1
192:23 307:20
**publication**
16:17 27:13,22
27:24 28:5
29:15 137:12
143:9 162:1,5
173:1 183:12
183:15 192:23
196:21 230:16
230:22 231:5
238:7 262:5
264:18 278:14
**publications**
22:16 26:13,14
26:15 28:10,12
32:5,8 225:24
229:2 247:12
283:24 284:2
**publish** 16:23
28:23 228:18
**published**
29:12,15 50:11
56:23 57:22
59:13 63:13

97:12 136:14
138:13,17,19
139:4,5,9
150:22 159:2
160:9 161:21
167:23 172:5
172:10 183:16
183:19 184:17
184:22 189:11
192:18 196:17
208:17 215:16
226:20 230:11
230:19 231:14
231:17,18,22
243:5 265:5
273:9 274:12
283:17 285:8
285:14 286:3
302:20
**puerto** 274:19
**pull** 22:7,9
113:19 114:4
128:5 211:10
296:19
**pulled** 42:15
44:9 180:7
213:4 233:15
265:11 302:17
**pun** 61:12
**pure** 40:6 269:9
**purported**
273:14
**purpose** 30:8
63:16 140:18
224:3

**purposes** 40:13
193:2
**pursuant** 2:12
**put** 10:13 11:16
18:19 23:6,8,10
24:16 33:14
43:4 45:22
59:21 99:14
101:5 103:21
108:1 113:21
125:17 135:19
141:11 143:6
153:24 161:10
174:3 182:5
186:4 215:11
215:12 235:15
241:16 259:18
259:19 274:4
288:16 296:21
298:1 300:12
301:10 302:8
**putting** 56:16
151:12 173:23
259:5 290:9
294:7,24 295:3

## q

**qualifier**
221:19
**qualify** 194:1
**quality** 58:6
283:6
**quantified**
89:20
**quantify** 166:7
181:14

**[quantitative - really]**                                                    Page 51

**quantitative**
  251:10 256:19
**queried** 240:2
  248:1
**queries** 248:7
  248:22
**query** 244:21
**question** 9:14
  14:12 16:13
  20:22 27:5 29:1
  29:19 42:13
  45:9,10 51:16
  60:14 72:11
  74:4 96:9
  118:14 121:5
  145:16 149:24
  187:11 198:18
  202:12 211:2
  231:3 276:7
  277:8 301:18
**questionnaire**
  238:9 244:16
  244:19 245:5,9
  246:2 248:4
  249:14 250:5,7
  250:13,14
  256:23 261:18
**questionnaires**
  248:2 250:2
**questions** 10:3
  12:11 21:23
  46:7,8,9 61:24
  104:6 166:20
  201:22 245:10
  246:5,21
  276:17 286:13

307:5
**quick** 114:18
**quickly** 23:7
  186:14 273:18
**quite** 299:23
**quote** 165:1
  167:13 174:2,8
  180:19 218:7
  219:10,12,15
  219:17
**quoted** 52:13
  142:3 174:19
  215:15
**quotes** 274:4
**quoting** 173:15
  219:22

**r**

**r** 3:1,12 9:1
  306:2,2
**race** 239:2
**radiation** 30:12
**rakow** 30:7
**random** 165:15
**range** 97:4
  118:16 246:15
  246:18 252:1
  252:15
**rate** 41:1,3
  77:16 78:24
  293:21
**rates** 120:5
  283:8
**ratio** 145:3,10
  145:19 152:19
  191:12 200:13

200:17,20
204:3 209:20
210:17 211:1
213:9 232:9
233:15 236:5
237:3,18
258:12 259:7
259:21 263:7,8
266:12 267:2
298:13,24,24
299:1,8
**ratios** 146:17
**rausa** 39:9
**reach** 212:9
  280:22
**reached** 86:3
**reaching** 61:1
  80:11 164:16
  216:13
**reactive** 64:18
  64:23 65:3,7,12
  70:4 75:9
  270:12,22
**read** 20:18
  32:11,13,15
  34:9 58:19,22
  62:17 70:11,19
  80:13,23
  144:22 149:4,5
  163:2,5 167:16
  178:23 186:9
  188:19 193:1
  193:14,18
  196:15 198:8
  204:10,20
  205:9 206:23

209:8 215:1
218:20,21
222:2 225:4
229:3 230:8,9
233:4 239:6
241:9 251:21
252:20,21
253:23,24
254:18 257:3
267:22 269:18
277:19 278:1
283:12 293:12
293:13 300:10
300:24 301:1
305:2 307:3
**readers** 219:7,8
  219:16,20
  221:18
**reading** 34:10
  34:11 61:14
  71:20,21 74:1
  105:1,23,24
  119:23 120:8
  143:14 148:12
  148:13 213:12
  215:19 222:11
  222:19 254:21
**ready** 80:8,9
**reality** 302:1
**really** 29:1 46:6
  48:18 89:13
  90:15 93:6
  97:11 139:5
  145:15 149:24
  151:2 170:17
  185:15 207:10

[really - referred]                                                Page 52

239:17 261:10
275:12 281:14
281:21,23
**reask**  165:7
**reason**  20:17
72:1 88:9
103:21 199:24
207:1 305:4
306:6,8,10,12
306:14,16,18
306:20,22,24
**reasonable**
133:21 295:8
**reasons**  63:20
215:18 254:8
**reassigned**
253:7,14
262:19,24
263:1,6
**reassignment**
263:17 264:14
**reassignments**
264:11
**rebecca**  30:6
**recall**  32:21
44:16 76:15
78:19 87:14
88:4,8 90:3,11
137:7 205:21
222:13 239:4
240:9,13
241:15 252:24
253:3,22
254:21 257:22
258:3,6,16
259:9 265:21

266:1 267:5
277:12
**recalled**  239:10
**receipt**  305:14
**receive**  25:21
**received**  30:1
**recent**  26:20
55:6 56:2,24
136:14 196:20
196:23 197:2
242:24 283:16
284:2
**recently**  30:1
40:24 50:9
167:9
**recess**  79:18
136:10 166:16
223:13 268:7
**reclassification**
260:3
**reclassified**
260:4,6
**recognize**  36:15
101:12 193:3,7
**recognized**
218:10
**recollecting**
142:7
**recollection**
15:23 246:1
**recommend**
55:12
**recommendat...**
56:11
**recommended**
56:1

**reconsidered**
56:3
**record**  10:14
20:23 22:2 36:5
55:15 61:11
79:20 129:23
131:5,8,12,13
136:9 166:13
166:15 168:4
168:22 186:9
191:22 195:7
201:21 208:7
223:12,15
268:5 277:16
**recorded**
248:15 304:9
**records**  40:17
80:14 81:1,14
82:3 86:1,6
92:21 94:13
126:12 128:4
131:7 134:3
282:9
**recruiting**  26:8
**reduce**  157:15
157:22 159:4
165:3,19,22
166:5,6 258:5
263:24
**reduced**  158:14
276:5
**reduces**  157:16
157:23 158:1
194:15
**reducing**  55:8
56:1 158:11

**reduction**  64:2
191:2,17 194:9
197:3 198:3
199:14,18
**refer**  21:9 62:4
69:16 76:14
104:3 120:17
169:17 170:18
215:4 219:8
**reference**  23:15
43:5 62:16
63:12 97:7,12
101:1 107:9
125:5 130:9
147:23 149:12
149:13 169:20
170:16,24
171:8,11,20
187:5 200:16
228:13
**referenced**
171:19,21
172:14 190:2
**references**
125:20 149:19
170:18 171:4
187:8 234:20
**referencing**
39:5 107:23
138:18 173:16
193:22
**referral**  24:10
24:14
**referrals**  24:20
**referred**  17:14
48:5 69:15

[referred - report]                                                          Page 53

171:10
**referring**   18:22
   21:2 30:3 52:13
   125:21 177:17
   177:21,23
   189:16 257:4
   259:24 260:1
**reflect**   142:4
   284:8,12,15
**reflection**   233:2
   233:22
**reflective**
   272:14
**regard**   13:13
   16:12 29:2,23
   187:12 190:15
   198:20 205:20
**regarding**   5:12
   13:7,22 14:10
   14:16 16:9 17:3
   17:10,20 28:17
   29:13,16 46:14
   56:7 57:13 76:8
   76:9 104:11
   167:13 169:13
   169:20 172:21
   173:4 178:1
   182:19,24
   187:15 189:17
   220:22 269:24
   273:7 284:2
   285:8
**regardless**   44:2
   44:3 104:19
   146:20 196:13

**regular**   189:5
**rehash**   110:1
   199:21
**relate**   29:10
   36:7
**related**   8:9
   12:17,19 18:7
   64:11,16 71:13
   73:9 88:12
**relating**   28:21
**relation**   5:7
   59:10 104:5
   134:2 217:8
**relationship**
   6:9 134:13
   161:21
**relative**   106:24
   107:5 115:21
   116:2
**relevance**
   186:17,22
   211:2,9 216:4
**relevant**   57:22
   90:24 91:2,17
   92:8,9,16 93:2
   178:19 200:20
   215:8 229:21
   237:12 241:12
**reliability**   8:6
   237:22 239:2
   239:18
**reliable**   60:15
   60:20,24
**rely**   61:1
**relying**   96:10
   107:9 156:10

**remain**   106:16
**remained**
   105:18
**remember**
   15:14 90:5 98:8
**remembering**
   189:17
**repair**   52:2
   66:8 67:5 68:12
   68:18
**repaired**   67:16
**repeat**   53:7
   119:22
**repeated**   66:8
**repeating**   94:21
**replacement**
   82:12 86:20
   154:3,19
   156:20,23
   158:5,22
   159:10 160:14
   201:5
**replicated**
   242:22
**replication**
   97:1
**replied**   217:11
   217:13
**replies**   217:17
**report**   4:12,14
   5:10 18:23,24
   19:10,17,18,21
   20:13 21:5,7,11
   21:15,16 31:23
   32:2,3,12,18,19
   32:22,24 33:15

33:16,19,22
34:3 40:14
41:20 46:1,5
59:24 61:14,16
63:10,11 69:16
69:17 77:5
79:23 80:17,20
81:5,9,9,13
88:7 94:11 95:2
99:8 101:1
104:7,13
107:11,13
114:17 117:11
117:12 119:12
119:13,19
124:11 125:17
126:22,24
127:4,18,21
129:4,6 130:4
130:11 133:7
133:13 134:6
135:12 137:6
145:19 152:19
152:21,22
154:2,8,10
155:11 156:2
163:20 166:19
167:1,8 186:6
186:24 187:5
190:3,16 191:5
194:12 195:14
200:8 205:19
208:1 213:8
214:7,15 219:6
219:9 221:22
225:16,21

226:20 232:19
232:20 236:13
238:7,13
254:13 257:17
268:10 269:11
269:21 272:19
277:6,24 278:3
278:4 283:14
284:4 286:15
287:1
**reported** 1:25
8:7 27:7 68:6
87:23 89:1
104:23 146:20
176:3,12
179:15 197:10
209:3 210:11
210:16 213:3
218:15 221:17
225:1 226:5,7,8
226:11 232:24
233:20 237:18
237:22 240:6,7
240:20 241:5
241:14 247:4,9
247:11 248:13
250:24 253:9
256:4,21
258:11 299:9
**reporter** 2:13
166:14 304:1,3
304:24
**reporter's**
304:14
**reporting** 135:8
135:10 222:5

**reports** 11:1,7
11:17 12:5,5
32:13 40:19,21
40:23 80:15
132:15 136:14
175:24 176:7
191:1,16
203:16 215:3,5
215:15 216:9
226:19 236:2
240:4 271:14
**represent** 21:4
88:12 105:3
108:10 129:23
184:13
**representation**
89:4
**representative**
14:3,15 15:6
**representatives**
16:5
**reproduction**
304:23
**reproductive**
66:6 70:16
111:6 210:8,19
211:11 212:23
213:5 220:16
220:19 221:10
**requeried**
264:20
**request** 10:11
12:14
**requested**
225:13 229:23

**require** 180:21
**reread** 218:23
**research** 7:11
8:11 14:9 17:13
18:7 23:4 28:17
28:18 29:9,13
29:14,16 30:5,5
58:17 59:5,12
61:6 74:9
138:10,20
139:18 150:10
156:5 182:24
218:11 278:21
**researchers**
70:22 74:7
217:12 246:15
274:15,23
**reset** 287:18
**resource** 62:10
**resources** 57:20
57:20
**respect** 18:10
134:21 216:11
220:17 221:16
**respected**
150:21
**responded**
240:22
**responding**
30:13
**response** 10:11
10:15 22:2
182:11 205:21
207:2,9 222:9
240:15 276:2,9
286:2

**responses**
238:21 269:16
**responsibility**
24:19
**responsible**
16:17 28:1
**restatement**
62:7
**restrict** 78:1
**restricted**
77:15 232:23
**result** 46:24
47:16 48:9 52:7
53:18 65:15
73:1,3 74:17
97:1
**resulting** 68:12
**results** 47:20
66:19 70:15
72:18 142:2
194:3,4,6 198:9
203:21 221:9
229:22 238:19
252:2,16
253:18 260:5
276:4 279:17
294:13 295:1,5
**retracted**
272:11
**return** 305:12
**review** 6:12,15
7:24 16:24 31:6
31:16 57:13
81:14 82:8
85:24 86:5
89:12 94:19

**[review - risk]**                                                    Page 55

| | | | |
|---|---|---|---|
| 124:11 132:4 | 139:9 144:7 | 62:12 63:18,23 | 144:4,15 |
| 149:6,14,18,20 | 151:20 154:13 | 64:2,13,16 65:2 | 146:14,18 |
| 149:22 150:8 | 156:2 161:16 | 65:10 71:16 | 147:13 148:6 |
| 150:12 167:3 | 168:21 172:1,8 | 72:3,18 73:10 | 148:23 152:12 |
| 167:11 169:8 | 177:10 185:10 | 74:20 81:16,19 | 152:16,22,23 |
| 187:21 226:1 | 186:16 191:7 | 81:21 82:4,13 | 153:8,14 155:2 |
| 230:4 273:6 | 193:10,17 | 82:22 83:1,6,9 | 155:8,15,20 |
| 277:2 278:24 | 197:16 202:20 | 83:10,14,17,19 | 156:6,14,22,24 |
| 279:2,4,5,6 | 204:20 205:7 | 84:5,9 86:8,9 | 156:24 157:6,7 |
| 280:20 281:5 | 213:22 214:2 | 86:12,21 91:1,5 | 157:8,16,17,22 |
| 283:16 | 223:11 225:12 | 92:22 93:8,16 | 157:24 158:1,6 |
| **reviewed** 11:15 | 227:6 228:2,10 | 93:21 94:1,5 | 158:10,12,14 |
| 11:20 17:2 50:8 | 228:11 229:9 | 95:9 96:11,12 | 158:15,18,22 |
| 58:4,5 80:15,16 | 229:14 233:24 | 96:20 97:19,20 | 159:4,13,19 |
| 88:11 242:14 | 234:9 235:17 | 98:14,16 99:13 | 160:1,10,14,20 |
| 242:17 282:2 | 240:12 248:7 | 99:15 100:20 | 162:15,21 |
| **reviewer** 22:23 | 249:19 251:8 | 100:24 101:13 | 163:10,15,23 |
| 27:12 | 251:24 252:4,6 | 103:10,17,18 | 164:4,7,12,20 |
| **reviewing** | 252:13 253:7 | 103:22 104:2,7 | 165:3,9,10,19 |
| 30:20 40:17 | 260:16 262:23 | 104:18 105:19 | 165:19,23 |
| 46:6 | 266:9 267:14 | 106:17 107:2,4 | 166:2,5,6 |
| **reviews** 229:17 | 267:23 274:2 | 108:2,8,18 | 167:14 168:1 |
| **revised** 31:23 | 276:22 286:10 | 109:2,6 110:4 | 169:9 172:22 |
| **rhode** 274:20 | 287:13,19 | 110:14 111:4,6 | 174:12,16,22 |
| **rico** 274:20 | 289:9 291:16 | 111:8,9,12,18 | 174:24 175:2 |
| **right** 24:24,24 | 292:1,12 | 111:19,24 | 175:11 176:1,7 |
| 30:15 31:9 34:6 | 293:17 299:16 | 112:9,13,15,18 | 176:18,23 |
| 45:24 52:17 | 301:16 302:3 | 122:20 123:7 | 177:5,12 178:2 |
| 54:12 59:6 | 303:17 | 124:4,6 134:10 | 179:11,16 |
| 62:17 63:8 68:7 | **risk** 5:16,23 6:4 | 135:17 136:15 | 180:2 185:23 |
| 68:21 69:19 | 6:24 7:7,12,18 | 137:9 140:20 | 187:3 188:14 |
| 113:16 114:14 | 29:16,19,20 | 140:21,24 | 188:23 189:5 |
| 115:22 119:1 | 32:7,11 46:6 | 141:3,6 142:10 | 189:10,13 |
| 121:4 129:14 | 51:1,8 54:13,17 | 142:12,14,18 | 190:17,22 |
| 129:24 131:1 | 55:4,5,8,10,22 | 142:20 143:1 | 191:13 194:10 |
| 137:14,17 | 55:24 56:4 | 143:20,22,24 | 194:23 196:12 |

196:14 197:3,9
197:23 198:4
199:14,19
201:1,6,12
203:19 204:17
204:23 207:14
209:16 210:5
210:13 212:24
213:3 214:5
218:15 232:14
232:17 233:6
236:24 237:8
241:20,23
242:3,17
254:24 255:12
255:21 258:5
258:16 265:2,7
273:13,14
284:8,12,15
285:3,10
287:23 293:15
293:20 295:19
**risks** 157:15
   164:19
**rls** 1:6
**robust** 141:24
   142:11
**role** 24:6,7
   73:21 148:4
   151:21 152:7
   193:12 199:23
**roman** 58:14
**room** 2:2
**rothman**
   215:21 216:2
   217:18 218:6

219:1,19
**roughly** 60:5
**round** 239:15
**row** 26:4
**rp2** 24:23
**rpr** 1:25 304:19
**rule** 92:22 93:1
**ruled** 81:19,21
   93:24
**run** 280:16
**running** 266:4
**rupture** 126:17

**s**

**s** 3:1 4:1,6 5:1
   6:1 7:1 8:1 9:1
**s4** 8:24 288:9
   288:10,16
   297:18 298:5
   301:14,20
   302:2,23
**s5** 288:14
   297:18 301:22
   302:1
**saed** 269:1,24
   270:4
**saenz** 1:13 2:1
   4:2,8,10,13,15
   4:17,19,20 5:3
   5:10,19 6:3 7:3
   8:3 9:3,8 10:18
   11:20 12:4
   18:19 19:17,21
   20:8,12 21:4
   22:12 23:15
   24:1 28:4 29:6

30:16 31:22
35:1,24 36:14
39:19 41:14
45:22 46:5,15
50:2,21 52:11
55:1 57:12
59:22 61:22
62:3 63:9 66:5
69:5,12,22
70:22 71:24
75:9 76:19 77:8
79:10,22 80:10
85:21 95:12
99:3 102:1
105:5 113:22
126:10 128:5
135:2 136:12
137:4 144:7
160:8 161:4
166:18 174:14
178:13 180:17
184:14 186:12
187:12 194:4
202:14 209:10
213:16 217:5
224:5 234:4
235:8 262:15
266:5 268:9
282:11 283:15
284:15 286:14
286:22,24
288:20 294:16
295:10 303:10
303:19 307:13
**saenz's** 234:19

**safe** 280:21
**sake** 12:10
**sales** 1:7
**sample** 230:5
   240:20
**san** 3:15 15:9
   15:13 17:24
   24:7
**sandler** 192:16
   217:10
**savant** 149:14
   149:18,22
**savant's** 150:8
**saw** 124:11
   272:12 275:15
**saying** 38:7
   53:10 55:1,16
   74:8 83:8,19
   87:16 89:23
   121:17,18
   142:19,20
   147:11 151:2,6
   152:5 157:5
   166:4 167:19
   170:20 171:23
   174:7 188:5
   198:12 200:19
   211:15 214:24
   215:17 216:5
   231:20,21
   248:21 250:8
   258:3 260:8
   261:10 271:19
   271:19,21,23
   274:2,10
   293:14 294:17

**[saying - seemed]**                                                    Page 57

295:7 299:8
**says**  50:14
   51:24 55:4 58:5
   70:2 77:11
   100:5 108:19
   118:2 119:14
   120:4 124:20
   144:13 145:22
   147:18 160:17
   175:6,16 194:7
   197:17 228:1,2
   228:3,8,18
   229:16 237:14
   238:20 240:18
   253:2 267:15
   293:1
**scenario**  251:14
   251:15,16,18
   254:18,20,20
   254:23 255:4,7
   255:7 257:5,11
   257:11,13
   298:22
**scenarios**  252:1
   252:15 254:14
**schildkraut**
   76:5 135:16
**schwartz**
   124:20 125:1
   125:10 126:5
   127:7,10
   133:18
**schwartz's**
   126:14 131:7
   131:10

**science**  27:15
   85:19,22 149:7
   149:11,15,23
   150:9,17
   151:11,13
   193:24 278:9
**scientific**  12:6,7
   28:12,21 85:9
   97:7 133:21
   167:10,22
   171:3 295:8
**screen**  23:11
   101:6 113:20
   123:20 244:2,6
   295:11,14,17
**screened**  78:4
**screening**  78:2
   78:20 103:22
   118:23
**screens**  131:17
**scroll**  298:10
**se**  73:12 94:14
   211:24
**seaport**  3:21
**search**  34:1
   57:22
**searched**  32:4,7
   32:8
**searches**  32:9
**second**  26:21
   34:7,7 52:6,6
   58:4 70:15
   115:19,21,22
   116:2 124:10
   176:6 200:7
   214:8 224:23

229:15 251:15
   252:4
**section**  69:22
   77:4 124:19
   127:7 129:10
   129:21 142:1
   144:9 147:5,9
   151:10 153:3
   169:6 170:15
   183:2,3,9
   185:22 187:4
   200:9 206:4
   224:18 268:11
   269:4,20
   294:13,14,16
   295:1,5
**sections**  61:13
   151:8 226:18
**see**  9:11 19:19
   24:21 31:12,13
   50:18 51:21
   54:14 57:12,16
   58:1,9 60:3
   63:14 67:19
   69:23 74:19,21
   77:7 78:18
   100:2 104:13
   105:1 113:9
   114:2 120:8
   131:13 132:15
   132:24,24
   138:6,17
   143:10 147:7
   147:15,21
   148:2,12,13
   162:17 167:4

169:4 170:20
   171:5 176:11
   179:8 184:19
   184:24 185:4,5
   185:8 187:9
   204:2,5 206:7
   206:13 207:17
   221:6 222:19
   223:6 225:21
   228:13,14
   229:16,19
   231:15 236:3
   238:23 239:12
   240:13 244:1,3
   245:1,6,18
   249:15 251:10
   255:2,8,13
   256:11 257:24
   262:19 263:1
   265:22 266:1
   267:15 270:17
   278:4,19
   292:21 295:11
   295:16,22
   296:1 297:23
   298:6,10,11,14
   298:23 302:7
   302:10 303:13
**seeing**  30:23
   114:5 271:15
**seek**  214:9,21
**seem**  63:24
   110:14
**seemed**  78:5
   82:5

seen 10:7 50:7 76:6,7,8 89:14 90:16 110:21 133:24 137:3 199:17 207:2 217:4 235:24 243:2 271:13 279:17 283:21 295:21

selection 224:21

self 8:6 237:22

send 303:1

sending 77:21

sense 36:19 64:7 124:13,23

sensitive 8:21 243:7

sent 4:18 238:9

sentence 34:8 34:12 60:1,3 70:15 77:11 78:5 124:12,14 124:22 125:7 125:14,19 169:7,21 191:9 197:17 198:7 206:6 224:23 229:15,19 252:8 269:3 276:8 300:12

sentences 70:1 256:18

separate 42:18 281:6 288:9

september 4:24 37:18 50:17 126:24 128:19 249:24

sequencing 116:9,12,15,17

series 37:21 52:24 184:15 202:18

serous 77:16,21 78:2,21,23 112:7 136:7 204:16,24 205:15

served 29:8 280:10

services 25:3 58:7

serving 25:14

set 41:14 76:22 154:4,17 202:15 223:2 237:11 254:10 304:6

setting 288:20

seven 26:4 173:12 177:24 186:13 299:15 299:16,20 301:6,8,9

several 203:12 203:13 205:19 254:8 268:10 280:2 287:17

sgo 96:19 100:24 101:12

104:1 107:20 108:6,11,13,18 108:20 109:6 157:18 280:5,9

share 113:20 244:5 295:11

shared 228:23

sharing 295:14

sheet 305:5,8 305:10,13 307:8

shelly 192:17

short 158:7 172:14 253:6,9 253:14 263:18 263:20

shorthand 2:13 304:1,2,12

show 73:5 118:2 135:17 148:17 152:13 163:10 177:5 177:11 189:3 194:19 207:13 293:23 294:6,8 296:22 300:13 300:14

showed 87:7 179:10 180:4 198:9 242:19 266:11 302:18

shower 279:12 279:12,19,19

showing 134:9 149:15 151:11 163:5

shown 148:23 150:17 152:12 155:19 162:20 188:14,22

shows 57:2 149:12 151:18 176:18,22 197:2 203:16 203:18 211:1 254:23 258:20

shuffle 46:3

shukla 268:23 272:3

side 45:7 69:22 93:11 144:7 193:10 206:5,9 240:12 244:24 251:24 252:5,6 267:14 292:19

sidetracked 153:11

sign 305:7

signaling 276:3 276:9

signature 304:17

significance 87:7 122:15,16 122:19 163:7 217:20 219:4 220:3,23 221:12,24 265:15 299:5

significant 93:15 108:3 134:9 146:19

153:1 163:18
176:1,8 177:5
179:16,23
180:2,5,9
207:14 209:14
209:21,24
214:3 218:8
221:20 236:8
236:12 237:9
255:19,21
258:13 260:5
263:12,15
264:12,15
265:14,18
266:13,21
**significantly**
105:19 106:17
108:8
**signing** 305:9
**similar** 227:7
**simple** 96:24
**simply** 64:4,8
83:8 134:17
**simultaneously**
253:4
**single** 83:19
202:24 253:3
289:18 291:24
297:20
**sis** 229:24 230:4
**sister** 8:21
229:24 238:8
244:15 247:12
250:24 265:1
288:22 290:12
291:2

**sister's** 244:10
245:22
**sisters** 8:9
**sit** 20:18 103:3
**site** 75:15,21
**sites** 67:18
**sitting** 129:24
**six** 41:13 95:1
189:8,9 194:8
197:5,6 199:12
199:13
**size** 221:19
230:6
**skin** 289:6
**skip** 59:1
**skipped** 76:24
**slightly** 190:23
204:17 240:14
**slomovich's**
278:20
**slomovitz** 8:15
278:14 279:9
279:23 280:1,8
280:20 282:11
**sloughing**
67:10
**slow** 9:12
**small** 230:5
**smoking** 112:12
201:11
**societies** 96:18
97:10 98:13,14
**society** 13:8,13
13:15 14:4,13
14:15,16,20
15:7,9,13 16:4

32:8 50:13
140:7 156:9,13
**somatic** 46:19
46:24 47:3,6,24
48:1,20 52:7
53:17,23 111:1
**somebody**
193:6
**somewhat**
46:10 112:16
**sophistication**
219:24
**sorry** 11:12
15:22 25:8 31:7
34:5 37:12
42:11,20 43:16
56:10 58:22
71:20 80:9,9,18
80:21 88:6
97:16 100:12
100:15 105:21
106:4 107:2,14
107:15 110:18
113:11 119:1
119:16,17
120:23 121:3,4
124:9 126:2
127:16 131:16
131:22 137:15
143:3 150:19
153:9 154:13
159:22 169:15
176:15 184:3
185:17 186:7
188:5 189:24
190:13 193:15

195:4 196:2
199:10 200:7
204:1,19
211:14 214:13
214:17 219:12
224:18 234:17
235:13 243:23
252:3,3,4,8
257:18 259:15
262:21 266:2
268:15 274:3
277:7,17
282:17 283:2
**sort** 16:3 48:13
62:5 132:13
202:22 271:17
**source** 60:15,20
62:5 70:17
240:19 291:12
**sources** 203:12
**space** 305:5
**speak** 146:3
**species** 270:12
270:23
**specific** 5:11
35:17 61:20
76:14,16 79:23
80:11 81:12
88:8 104:12
119:13,19
134:6,19 154:2
155:11,22,23
189:17
**specifically**
29:11 34:2
41:11 46:12

**[specifically - studied]**    Page 60

| | | | |
|---|---|---|---|
| 97:18 135:10 | **started** 31:13 | 175:6,14 | 214:3 219:7,8 |
| 135:21 136:2 | 246:4 247:1 | 177:23 180:15 | 219:16,19 |
| 148:6 166:23 | **starting** 15:17 | 193:21 194:2 | 221:20 236:7 |
| 224:3 257:4 | 46:6,13 96:17 | 198:19 199:11 | 236:11 237:9 |
| 268:14 | **starts** 44:22 | 200:12 207:22 | 255:20 258:12 |
| **specificity** | 60:2 | 219:1 272:11 | 260:5 263:12 |
| 240:16 | **state** 2:14 23:2 | 294:15 | 263:15 264:11 |
| **specify** 127:6 | 44:13 59:24 | **statements** 32:9 | 264:14 265:14 |
| **specifying** | 85:19 104:22 | 52:10 107:20 | 265:18 266:13 |
| 87:14 | 141:5 143:13 | 108:12 149:19 | 266:21 |
| **specimen** | 148:15 150:15 | 151:1 172:24 | **status** 146:21 |
| 132:23 133:8 | 153:19 155:5 | 205:22 219:1 | 239:2 |
| **specimens** | 155:10 157:1 | **states** 1:1 58:15 | **stenographic...** |
| 82:18 | 167:20 173:13 | 137:21 143:16 | 304:9 |
| **speculation** | 174:15,16 | 163:13 169:7 | **step** 20:6 143:7 |
| 74:12 269:10 | 188:17 193:11 | 218:7 | **sterility** 5:22 |
| **spend** 41:9 94:7 | 198:13,16,24 | **stating** 95:23 | **sticker** 234:16 |
| **spent** 40:9 94:8 | 214:7 216:11 | 109:7 262:10 | 235:2 |
| 94:18,22 | 222:22,24 | **statistic** 210:21 | **stop** 18:1 |
| **spliced** 126:2 | 225:16 232:20 | **statistical** | 204:20 298:17 |
| **sponsored** 15:8 | 234:1 256:12 | 145:24 148:17 | **stopped** 246:24 |
| **spray** 289:3 | 274:2 275:24 | 163:7 217:19 | **street** 2:6 3:8 |
| **spreadsheet** | 280:21 305:4 | 218:8 219:4 | **strength** 33:11 |
| 301:15 302:18 | **stated** 125:2,9 | 220:2,23 | 70:2 180:24 |
| **st** 42:9 43:12 | 126:6 148:16 | 221:12,24 | 285:19 |
| **stamped** 128:9 | 154:24 255:10 | 251:3,6 260:2 | **stress** 223:3 |
| **stand** 27:14 | 258:21 | 264:7 265:15 | **strike** 43:2,4 |
| **standard** 96:5 | **statement** | 299:4 | 77:18 142:22 |
| 96:15 229:17 | 105:14 106:9 | **statistically** | 160:15 163:21 |
| **stands** 24:23 | 106:19,20 | 134:9 145:12 | 165:7 232:3 |
| **start** 43:2 46:12 | 107:10 109:3,5 | 146:19 153:1 | 267:7 281:17 |
| 46:21 142:22 | 147:21 148:1,2 | 163:17 175:24 | **strong** 108:19 |
| 165:17 211:13 | 149:10 155:18 | 176:8 177:5 | 197:21 |
| 211:17 260:22 | 169:12 173:3 | 179:15,23 | **struck** 77:11 |
| 281:17 | 173:19,23 | 180:2,5 207:14 | **studied** 72:1 |
| | 174:5,19,21 | 209:14,21,24 | 291:3 |

**[studies - substantial]**                                        Page 61

| | | | |
|---|---|---|---|
| **studies**   29:9 | 247:11 248:24 | 203:10 205:20 | 265:1,4 267:20 |
| 58:5,16 59:4,12 | 260:19 267:21 | 206:1 207:2 | 268:23 270:7 |
| 59:17 76:7,9 | 268:22,23 | 208:8,22 | 273:16 275:4 |
| 89:15,18 90:17 | 269:10 272:20 | 210:20 211:13 | 276:23 283:19 |
| 97:10 134:2,3,8 | 272:24 273:7,9 | 212:3,24 | 283:21,22 |
| 134:12,18 | 273:11,12 | 214:11,12,22 | 287:23 288:5 |
| 135:1,10 136:1 | 283:16 285:15 | 214:23 215:2,8 | 288:22 289:13 |
| 141:13,20,23 | 285:17 | 215:11,12,18 | 290:12 291:1,2 |
| 142:5,6,9,24 | **study**   8:10,22 | 216:4 217:20 | 292:6,22 |
| 143:18,19 | 30:9,10 63:12 | 218:18 222:6 | 298:18 300:2 |
| 155:19 159:2 | 63:17 65:18 | 224:17,20,21 | **subject**   226:20 |
| 160:17 162:7 | 69:14 70:21 | 225:9,11,13,17 | 305:9 |
| 167:13 169:8 | 71:3,18 75:20 | 225:19,24 | **subjective** |
| 170:14 171:4 | 76:1,14,16,21 | 226:5,7,8,10,19 | 181:15 |
| 171:11,18,21 | 88:21 90:4,9 | 227:4,7,12,21 | **subjects**   226:19 |
| 171:23,24 | 97:7 107:9,14 | 228:19 229:7 | 226:22 227:7 |
| 172:9,19,21 | 114:23 115:3 | 229:10,13,14 | 227:13 230:10 |
| 173:12 177:1,8 | 116:12,18,21 | 229:24,24 | 231:18 283:22 |
| 177:13,16,22 | 117:20 118:4 | 230:4,10,11,16 | 291:1 |
| 177:24 178:1 | 118:10,22 | 230:19,23 | **submitted** |
| 179:20 180:1,6 | 119:4 136:14 | 231:2,12,17 | 216:2 217:8 |
| 180:8,23 182:3 | 137:2,3,5 138:5 | 232:24 233:3,3 | 248:4 |
| 187:14,18 | 138:17 139:5 | 233:7,8,14,17 | **subscribed** |
| 188:22 189:3 | 140:17,18 | 233:20,23,23 | 304:16 307:15 |
| 192:12 194:19 | 142:13,16,19 | 235:22 236:23 | **subset**   36:9 |
| 195:22 196:4 | 152:16 161:18 | 238:8 239:19 | 239:22 |
| 200:13 201:11 | 163:12 175:23 | 240:11 242:19 | **subspecialists** |
| 201:19 202:18 | 176:12 177:3 | 242:21,24 | 24:21 |
| 202:18,22 | 180:4 189:17 | 243:4,5,6 244:9 | **subspecialty** |
| 203:2,14 | 189:20,23,24 | 244:9,10,12,15 | 24:17 |
| 206:22 207:19 | 190:1,4,14 | 244:21 247:3,9 | **substance** |
| 208:4,19 | 192:8,11,16 | 247:13,16,18 | 307:7 |
| 225:10 226:4 | 196:9 197:10 | 248:8,14,15 | **substantial** |
| 226:22 232:22 | 197:13,20 | 250:16,24 | 123:23 293:3 |
| 232:23 233:1 | 198:3 202:8,16 | 251:5 254:13 | 294:19 300:7 |
| 233:21 242:17 | 202:24 203:8 | 261:18 262:9 | |

**[substantially - tables]**                                                           Page 62

| | | | t |
|---|---|---|---|

**substantially**
294:18
**substantiate**
207:22
**substantiated**
264:18
**sufficiently**
216:17
**suggest** 70:16
130:12 160:17
**suggested**
105:15 106:9
**suggesting** 70:8
**suggestion**
82:19
**suite** 3:14
**summarizing**
198:8
**summary** 6:11
52:12 70:14
167:2,10
169:11 171:19
172:14 175:21
175:24 223:9
232:9,20
278:23
**sundry** 289:7
**supervision**
304:24
**supplemental**
8:24 228:23
230:3 234:3,12
234:21 235:9
235:12,21
262:15

**supplied** 231:23
233:9
**supply** 125:1,16
**support** 30:5,6
63:1 85:9 91:7
197:21
**supported** 91:4
91:13 295:4
**supporting**
134:12 149:19
**supportive** 97:8
**supports** 97:13
141:8 150:11
**supposed** 185:5
**suppressed**
64:5
**suppresser**
52:1
**sure** 29:7 42:24
45:10 49:19
50:7 72:11 96:9
99:11 107:12
136:20 154:18
161:9 185:21
193:7,8 204:20
248:5,18 273:4
279:10 295:18
297:18 299:23
301:23
**surface** 66:9
67:6,15 68:12
**surgery** 55:8,13
56:1 130:21
**surgical** 82:18
126:23 129:4

**survey** 248:11
**survivors** 239:5
**susceptible**
110:24 111:5
111:11
**suspicious**
103:8
**suzanne** 3:25
**swap** 234:16
**swapped** 22:5
**swift's** 188:6
**switch** 235:1,3
235:6
**sworn** 9:4
304:7 307:15
**symptoms**
98:15 99:14
**syndrome** 4:23
49:22 50:22,24
51:13 52:4 54:8
**syndromes**
51:11
**synthesis**
148:24
**system** 287:6
287:13
**systematic** 7:24
187:21 226:1
229:17 230:4
**systemic** 64:19
65:2,11,23 70:9
71:7 73:3,8,16
74:17 75:5,10
76:2

**t** 4:1,1,6 5:1,1
6:1,1 7:1,1 8:1
8:1 306:2
**tab** 301:24
**table** 54:4,21
54:21 55:1
56:15,18 57:2
121:8,13
134:14 135:8
135:19 154:4
154:17 194:6
201:18 202:19
208:23 209:4
213:12,14,16
213:18 225:23
227:19,24
228:17,24
230:3 234:3,11
234:12 235:8,9
235:11,13,21
236:2 254:10
254:13 257:17
257:19 258:21
259:13 262:14
262:15,22
263:17 265:20
265:24 287:18
288:10,16,21
291:18 297:18
298:3,5 299:9
301:14,20,22
302:1,2,23
**tables** 8:24
288:6,8 296:19

301:19 302:21
**taher** 171:14
179:8,10
**take** 15:19 22:9
26:11 49:7,11
62:22 69:4
79:14 87:16
114:18 120:10
123:20 160:18
164:18 180:17
180:24 181:1,2
262:18 289:12
**taken** 133:9
218:19 304:5
**takes** 52:23
**talc** 8:5 13:7,14
13:22 14:4,10
14:16 16:9
18:11,14 28:14
28:17,22 32:6
32:11 42:2
43:22 59:10
85:10,15,23
86:3 90:24
91:20,23 92:16
99:15,19 100:2
104:3 134:10
134:23 135:3
135:17 139:6
139:19 144:16
144:16,24
145:1,2,8,9,17
152:17,22
153:15 167:24
169:20 170:19
171:10 173:4,8

176:2,19
178:19,20
179:11,17
180:11,18
182:8,19 186:1
186:10 187:3
188:1 200:15
204:3 207:12
209:4 210:6,14
211:3,17 212:1
212:8,17 213:9
220:18 222:6
224:4,6 225:3
226:12 230:1
233:7 237:21
238:15,22
239:5 240:2,13
240:21 241:1,2
241:5,19,23
242:3,11,18
243:3 246:4,6,9
251:4 253:20
254:24 258:11
260:14,22
261:5,6,16,17
262:6,7,11,19
264:21,24
265:3,12,13,17
267:19 268:12
268:16,22
269:7,11 270:7
270:12,14
273:7,9,11,13
273:24 274:7
275:11,16
276:2,6,23

280:18,21
284:6,7,13,18
284:21 285:5,9
285:22 287:19
289:2,9,20,21
289:21,23,23
290:1,5,9,14,16
290:19 291:4
291:23 298:12
299:1,13 300:7
**talc's** 153:18
**talcum** 1:6 7:22
17:10,21
146:13,17
167:13 169:9
169:13 170:12
172:22 178:1
183:8 226:4
227:20 246:11
247:5
**talk** 9:12,16
21:21 31:22
33:21,23 42:22
61:18 88:18
134:1 154:2
174:9 190:9
200:10 219:6
222:6 224:2
240:8
**talked** 90:5,9
109:23 130:9
182:14 199:22
254:14 279:16
280:17 287:17
292:10

**talking** 28:4
34:12 55:12
66:12 69:15
99:21,24
108:23 120:14
145:23 146:2
150:24 153:4,7
153:8 183:7
221:2 246:3
256:15 261:16
276:8 292:7,8
292:11,16
300:4
**tallied** 40:8
**tampons**
291:12
**task** 58:7
**taub** 280:1
**taylor** 188:6
**team** 25:2
**teasing** 266:7,7
**techniques**
282:5
**tecum** 4:11
**teens** 211:18
212:2 260:23
**tell** 26:17
136:18 140:13
171:5 205:10
243:24 286:19
**telling** 56:23
**ten** 25:8 140:19
140:23 141:2
142:24 144:14
154:21 155:7
160:19 164:6

**[ten - think]**                                                              Page 64

| | | | |
|---|---|---|---|
| 190:21 191:10 | **testify**  44:19 | 208:11 218:24 | 26:24 28:9 |
| 194:22 197:9 | **testimony**  4:21 | 238:6 283:5 | 30:19 32:15 |
| 225:10 232:21 | 41:18 42:2 45:2 | 286:9 287:4 | 33:3 40:8 43:9 |
| **tenets**  34:16 | 45:3 62:4,7 | 303:7,10,11 | 43:10,21 44:7,9 |
| **term**  165:2 | 82:2 87:17 88:8 | **thanks**  114:14 | 47:2 52:12 53:5 |
| 215:7 253:6,9 | 108:14 125:6 | **theoretically** | 57:6 63:19 67:9 |
| 253:14 263:18 | 131:10 133:19 | 25:9 | 67:14 68:2 70:1 |
| 263:20 266:11 | 133:24 175:5 | **therapy**  6:8 | 76:13 83:16 |
| 266:14 | 261:19 285:11 | 82:13 86:21 | 84:17,18,20 |
| **terminologies** | 304:7 | 144:20,21 | 89:18 94:12,24 |
| 122:17 | **testing**  5:17 | 154:3,19 155:1 | 97:14,16,21 |
| **terms**  61:24 | 60:8,11 77:22 | 155:7 156:20 | 98:9 99:23 |
| 99:13 100:5,8 | 87:6,6 102:4 | 157:6,16 158:5 | 101:7 106:4 |
| 102:16 103:7,9 | 103:11,20 | 158:13,22 | 110:9,10 112:3 |
| 108:23 121:2 | 104:20 109:1 | 159:4,10 | 112:14 117:8 |
| 165:20 171:3 | 116:8,9,12,20 | 160:14 161:19 | 119:6 121:1 |
| 175:15 182:7 | 117:1,3,6,7,21 | 161:20 162:14 | 122:9 125:13 |
| **terry**  134:9 | 118:5,7,17 | 162:20 163:8 | 125:18,24 |
| 138:17,24 | 119:3 279:17 | 163:14 201:6 | 126:1,13 |
| 202:21 203:8 | **text**  144:7 | **thereof**  304:12 | 130:17 131:18 |
| **test**  120:15 | **tgf**  122:9 | 304:15 | 133:11 140:12 |
| 221:22 | **thank**  10:5,6 | **thing**  62:14 | 141:8 142:6,6 |
| **tested**  60:10 | 16:1 18:18 19:6 | 102:23 175:2 | 153:4 154:13 |
| 102:1,5,9,18 | 19:7 20:9 23:17 | 202:22 262:3 | 164:23 166:3 |
| 114:23 115:3,6 | 27:17 30:15 | **things**  25:4 | 174:1 177:14 |
| 116:14 117:9 | 31:9,12,21 | 33:10 44:9 46:3 | 181:22 182:11 |
| 120:18 121:11 | 36:10 45:22 | 62:18 98:13 | 183:18 189:7 |
| 121:12,18,20 | 76:23 79:12,14 | 99:12 112:3 | 189:20,22 |
| 122:2,3,20 | 80:3 97:6 100:1 | 132:14,15,23 | 194:1 197:6 |
| 123:6,11 | 113:6,23 | 156:9 157:15 | 201:24 210:21 |
| **testified**  9:5 | 123:19 129:1 | 157:21 165:2 | 211:8,8 224:12 |
| 42:9,18,21 | 137:18 159:17 | 166:6,7 200:11 | 226:9 236:19 |
| 43:18,21 44:1,5 | 160:7,8 168:7 | 270:18 271:2,9 | 241:12 242:9 |
| 44:6 84:19,24 | 170:10 179:5 | 271:15,20 | 242:15,16,20 |
| 87:24 99:9 | 186:4 187:2 | **think**  10:22 | 244:8 247:7 |
| 133:20 | 195:9 202:3 | 19:20 23:3 | 249:3 250:11 |

[think - transformation]                                                   Page 65

250:18,21
261:11 262:12
270:1,3 272:23
273:3 274:6,7
274:17 275:16
277:14 278:2,8
280:14 282:1
283:19 286:10
286:20 288:4
290:1,9,10,20
290:22,24
291:17 294:6
297:3 301:17
302:9,18
**thinking** 111:23
159:8 189:18
**third** 26:22
39:11 60:2
170:16 229:15
251:16
**thirds** 156:18
**thirty** 305:14
**thompson** 3:4
131:22
**thought** 30:24
38:4 77:19 86:7
100:15 102:13
127:11 159:10
198:5 216:16
282:14
**three** 10:22
26:5 31:20 70:1
142:8
**threefold** 107:4
**threshold**
200:17

**threw** 143:5
**throw** 219:4
**thrown** 220:3
**time** 13:16
15:11 25:6,12
25:13,18,23
39:5 42:13,20
44:2 51:18 59:6
67:24 68:11
75:18 77:20
79:6,10 88:19
123:11 129:5
168:12 182:16
212:22 213:21
261:5 276:18
280:11 283:23
286:10,22
299:19,21
301:5,8 304:5,6
304:8
**timely** 24:21
**times** 16:20
31:20 63:22
84:15 90:14
99:9 106:5
107:2 133:6
189:8 206:21
224:9,13 225:2
287:17 293:19
295:24,24
296:1 297:8
**timing** 245:16
**tissue** 148:20
222:7
**titanium** 275:5
275:10

**title** 25:18
140:5 227:19
268:15
**tnf** 148:21
151:15
**today** 35:18
41:6,11 51:17
55:12 62:3
303:10
**today's** 41:10
**todd** 1:25 2:12
304:19
**together** 83:23
84:7 97:22
108:1 192:13
235:18 251:24
252:14
**tomorrow**
303:14,16
**took** 259:17,18
295:10 299:14
**top** 36:22 50:15
57:18 60:1
76:16 124:16
124:18 188:10
213:17,18
251:24 252:5,7
252:7 262:18
275:22 301:20
302:1
**topic** 32:5
**topics** 32:6
**total** 40:10
41:13 121:10
143:17 287:11

**totaling** 37:8,19
**totality** 181:16
**totals** 37:1
**touched** 29:5
30:18
**toward** 54:12
259:7,21
**towards** 263:24
**trabert** 138:5,8
138:12 190:9
190:16 191:1
191:14 192:1
192:16 194:14
**tracking** 55:16
**tract** 210:19
**tracts** 210:8
211:11 212:24
213:5 218:17
220:16,20
221:10
**training** 31:15
185:9
**transcribed**
304:10
**transcript** 4:7
5:2 6:2 7:2 8:2
304:11,13,23
305:15,16
**transcription**
307:4
**transcriptomic**
8:12
**transformation**
151:17 182:4
269:7,15 270:9
271:2,16,23

**[transformation - turn]**                                        Page 66

272:5,20 273:1
273:15 285:23
**translate** 293:8
293:9 300:21
**translating**
299:24
**treated** 30:12
275:7 287:22
**treaters** 82:3
**treatment**
16:22
**trial** 44:19,21
44:22 45:3
99:10
**tried** 298:9
**trigger** 66:7
67:4
**tripped** 106:5
**true** 32:23
40:15 47:11,12
47:17 49:14
50:13 59:13
67:24 68:8,13
71:18 72:4,19
73:22 81:22
83:3 85:2 86:13
86:24 88:22
89:7,15 90:17
91:1,18 93:22
95:12,20 98:11
99:10,16,19
100:6,21
101:13,18,19
101:22 102:19
102:22 103:12
103:14 108:12

110:10 111:2
111:13 114:17
114:24 115:12
116:3,9 117:9
117:13,16
122:21 123:8
123:13 124:1
126:13 127:5
130:15,23
132:16 133:3
135:5 136:5
138:10 139:6
139:15,20
140:7 141:19
142:15 143:2
146:16 152:10
152:18,23
158:23 162:2
164:13 169:22
171:19 172:2
172:15 176:2
183:21 188:24
190:18 191:5
191:18 192:13
193:4,21
195:18 199:11
202:19 203:19
204:13 207:3,7
207:16 213:10
214:5 219:16
220:12,23
221:15 237:1
238:10,17
239:19 242:12
242:13 244:17
246:6 247:6,7

247:11,21,24
248:9 249:18
250:24 251:1,5
252:17 254:6
254:19 255:11
255:17 258:6
260:19 261:4
264:1 267:21
276:11 279:19
281:24 288:22
293:21,21
299:9,20 300:6
304:11
**trust** 89:8,10,10
**try** 9:10 13:12
30:13 36:17
72:10 106:7
185:18 205:14
286:21 296:21
**trying** 15:22
26:9 53:6 71:11
72:23 73:4
74:18 119:18
199:3 259:12
277:15,20
287:9
**tubal** 144:19
211:21 212:4
212:14,15,18
**tube** 6:18 51:2
**tubes** 222:7
229:1 236:11
236:20 237:7
**tumor** 51:24
127:14 131:8

**tumoricidal**
276:5
**tumors** 47:24
48:3 55:10,11
55:14 204:16
204:24 205:15
**turn** 12:12
21:18 27:3,19
33:18 45:24
46:4 54:2 57:11
59:23 63:9
69:18 76:19,24
77:6 79:23 96:8
112:21 123:16
131:23 134:5
140:17 146:22
147:3 149:1
156:12 161:2
162:4 163:19
166:18,24
168:24 170:4,5
171:4 178:13
183:23 185:20
186:6 188:4
197:15 200:6
201:17 205:24
207:24 208:23
217:15 232:7
237:19 240:11
244:23 251:9
254:12 262:14
267:10 268:19
275:21 277:5
278:13 282:10
292:18

**[turned - use]**

Page 67

**turned**  248:11
250:2
**turning**  278:11
296:11
**turpin**  3:25
**tv**  187:7
**twelve**  120:17
**two**  7:8 10:22
48:6,17,21,22
49:7 52:9,14
60:10 63:3 87:8
93:14 100:18
102:10,11
108:3 117:4,16
156:18 164:9
164:11 212:3
224:9,13 225:2
241:18 246:21
248:24 252:18
255:13 256:17
266:14 282:23
297:7
**tworoger**
192:17
**type**  13:4
**types**  275:14
**typically**  32:17
199:17

**u**

**u**  1:11 5:1 6:1
7:1 8:1 137:2
**u.s.**  8:22 58:7
**ucsd**  15:5 24:18
**uh**  281:16

**ultimately**
127:13
**unaware**
111:18 112:6,8
**uncertain**  87:7
122:16
**uncommon**
47:23
**undefined**
251:18,20
252:16 257:2,7
**under**  24:8 30:5
31:10 42:8
51:20 77:4,8
85:14 170:15
197:16 228:9
244:24 287:23
289:21 298:22
304:24
**underlying**
39:22 71:17
**underneath**
43:5
**undersigned**
304:2
**understand**
36:18 95:8 96:9
103:1,6 118:21
130:3 141:4,9
144:1 167:6
169:19 170:3
186:17,19,19
186:22 194:22
211:16 226:24
237:13 246:15
249:23 256:14

258:8 259:11
271:8,11 272:5
296:24
**understanding**
61:17 68:10
72:2 87:10
111:22 157:12
167:18 256:24
272:2 273:5
**unexposed**
256:2,3,4
**united**  1:1
137:20
**university**  6:22
17:24 24:7
139:1 274:16
274:19,20
**unknown**
122:15
**unpublished**
225:20 229:22
**unquote**  165:1
**unrepresented**
257:6
**unsophisticated**
219:7,8,16,20
**update**  11:21
32:2
**updated**  22:3
22:14,16 23:5
26:14 32:13
40:23 57:8
184:18 238:8
**updates**  30:2,17
**updating**  40:13

**upper**  69:19
89:22 90:15
169:4
**urban**  156:3,4
**usage**  90:2,14
90:22,23 91:8
91:13,24
226:21 238:8
245:23 249:13
**use**  6:23 7:6,12
7:17,19,22 8:5
8:6,19 28:22
32:1,17 47:7
62:10,17 82:12
86:20 88:1
135:17 139:6
139:19 144:16
144:18,19,20
151:7 152:17
153:15 155:6
155:14,21
160:14 162:13
165:22 167:13
169:9 172:21
173:5,7 176:19
178:1 179:11
179:16 180:18
186:1,10
188:12,23
189:6,12,18,21
190:17,21
191:3,10,18
194:14,20,23
196:10,11
197:3,6,18,22
199:12 200:14

204:2 206:17
206:21 209:4
210:5,14
211:18 221:21
224:4,9 226:5,8
226:12,20
227:3,8,19,20
231:5,8,16
237:21,21
238:15,22
239:5,9 240:2,4
240:6,8,13,23
241:2,15,19,23
242:3,11 243:3
245:14,15,17
246:15,18,22
246:22 247:1
251:3 253:9,10
253:20 254:24
256:22 258:11
260:13,22
261:5 262:6
264:21 265:2
265:16 266:11
266:14,20,23
267:2,19
280:21 285:9
289:23 291:15
291:20 293:8
297:9,20
300:20
**used** 32:16,18
34:20 47:8
57:21 87:11,19
87:23 88:15
89:9 122:17

145:2,8,17
152:1 154:19
164:5 194:7
207:12,15
209:4 213:9,20
218:17 225:6
226:8 227:10
227:15 233:7
241:1 246:5,9
246:11 256:19
259:2 260:14
260:15 261:6
262:11,18
274:23 275:5
290:8 305:17
**user** 224:6
225:7 261:16
261:17 287:19
299:15,16,17
299:20,20,22
**users** 236:3,11
237:8 253:6,7,8
253:10,14,15
259:6,19,20
262:7,19
263:18,19,20
263:20 264:3,4
293:4,5,10,11
294:20,20
300:8,9,22,23
**uses** 146:13
**using** 7:7 33:24
211:17 212:17
240:21 241:5
246:4 258:15
293:18 298:17

301:21 302:3
**usually** 211:23
**uterine** 241:20
242:13,17
243:3 292:6,7
292:10 297:21
**utilize** 30:11
61:7,8

**v**

**v** 1:11
**vadakekut**
184:23
**vagina** 212:9
290:7,8,10
291:5,11,12
**vaginal** 242:3
246:11 289:21
289:24 290:5
290:13,14,17
298:12 299:1
**validation**
118:11
**value** 87:16
**variance**
109:10
**variances** 108:4
**variant** 103:2
**variants** 87:7
109:19 122:14
**variety** 139:18
**various** 16:20
25:2 83:9 104:9
138:1,1 142:17
155:19,23
180:23 260:3

280:16 289:7
**vary** 239:2
**venued** 43:12
**verify** 20:19
**version** 22:4
50:8 178:17
234:22 302:20
302:20
**versus** 21:11
194:8 200:14
210:9 212:15
227:7 245:14
258:10,21
261:17 266:20
266:23 267:2
**viability** 269:11
**vicki** 43:8,9
**view** 46:14 83:2
95:16 107:20
107:24 134:12
154:23 181:5
194:16 210:2,4
219:18 237:14
257:13 258:19
270:6 290:3
**viewing** 134:16
**views** 186:20
**vitae** 21:19,24
30:17
**vitro** 182:3,19
268:22 269:6
269:10 272:19
272:24 273:7,9
273:11
**vivo** 182:2
269:6

**[void - witness]**

Page 69

| | | | |
|---|---|---|---|
| **void** 304:13 | 241:17 242:14 | 212:22 213:10 | 60:19 61:4 62:9 |
| **volunteer** 14:20 | 254:9,10 | 213:21 224:9 | 65:21 66:11,22 |
| 17:15 | 256:11 259:14 | 224:14 225:3 | 67:8 68:2,16,23 |
| **vulvar** 242:6 | 268:9,14 269:2 | 293:19 296:1 | 71:2 72:6,21 |
| **vus** 102:12 | 273:4,17 277:5 | 297:7,9 299:15 | 73:24 74:13 |
| **vuses** 102:10 | 287:21 295:12 | 299:16 | 76:13 78:10 |
| 117:4,16 | 297:16 301:23 | **weight** 164:15 | 79:12 80:21 |
| 122:10,14,24 | **wanted** 11:13 | 180:5 214:10 | 81:24 82:16 |
| **w** | 20:22 140:24 | 214:22 215:4,6 | 83:5 84:4 85:4 |
| | 225:16 243:17 | 215:11 | 85:18 88:24 |
| **wait** 121:4 | 268:16 296:20 | **weighted** 215:9 | 89:17 90:20 |
| 205:3 | **watching** 187:6 | **weird** 129:19 | 91:12 92:4,15 |
| **want** 9:20 10:3 | **way** 61:8 93:19 | **welcome** 287:5 | 93:4 94:4 97:16 |
| 10:13 12:9,18 | 109:7 122:23 | **went** 32:4 | 100:2 102:9,21 |
| 13:12 17:12 | 129:9 132:11 | 129:12 230:12 | 103:14 108:16 |
| 21:23 29:7 | 216:9 217:18 | 301:24 | 109:14 110:9 |
| 31:22 36:17 | 279:24 280:14 | **wentzensen** | 111:15 112:2 |
| 41:14,16 42:24 | 284:5 297:12 | 192:17 217:10 | 113:12 114:1 |
| 45:9 46:12 | **we've** 21:21 | **west** 3:14 | 114:12 117:15 |
| 49:16 54:3 57:5 | 31:23 35:12 | **whatsoever** | 117:24 118:20 |
| 59:21 61:10 | 36:13 50:5 | 263:4 | 119:6 120:22 |
| 62:16 76:19,24 | 69:14 79:6 | **white** 203:17 | 122:7 123:10 |
| 77:1,2 79:22 | 107:24 109:17 | 204:8,19 | 125:23 128:18 |
| 95:4,5 96:7 | 110:21 166:10 | 207:19 | 129:20 131:1 |
| 99:13 100:23 | 236:18 295:21 | **wide** 8:22 | 131:15 132:20 |
| 100:23 104:6,8 | 296:9 302:2 | **william** 81:10 | 134:16 135:7 |
| 104:8 112:21 | **weak** 285:19 | **window** 220:4 | 137:24 138:12 |
| 119:10 124:14 | **weaker** 70:7 | **witness** 2:15 | 138:22 139:22 |
| 128:20 145:15 | **weaknesses** | 13:10,24 18:4 | 140:12 151:5 |
| 161:2,9 166:20 | 214:11,23 | 18:10 19:7 20:1 | 154:9 157:4 |
| 166:22 167:6 | **web** 32:9 | 23:17 27:11 | 158:10 159:7 |
| 185:21 186:4,6 | **wednesday** | 33:3 34:18 39:1 | 164:18 165:13 |
| 199:21 200:10 | 1:15 | 40:6 42:4 45:7 | 168:17 169:16 |
| 201:22 208:6 | **week** 25:9,10 | 46:18 47:19 | 170:22 172:17 |
| 224:2 230:21 | 26:3,5,7 189:8 | 48:16 53:21 | 173:22 176:21 |
| 232:7 235:15 | 194:8 199:13 | 54:20 56:10,21 | 177:19 179:19 |

| | | | |
|---|---|---|---|
| 181:8,14,22 | **wolf** 11:18 | 148:18 153:15 | 260:13,22 |
| 187:17 189:2 | 32:14 215:22 | 156:19,22 | 261:4,15 262:5 |
| 190:20 191:7 | 272:18 | 157:5,6 158:4 | 262:7,17 263:7 |
| 191:20 193:17 | **wolf's** 215:2 | 158:12 160:18 | 264:19,20 |
| 201:9 202:3 | **woman** 62:23 | 165:20,24 | 265:2 290:9 |
| 203:2 205:6 | 64:22 77:24 | 166:1 194:7 | 291:2,3 |
| 207:5,21 | 84:22 85:5 | 197:13 203:17 | **women's** 64:18 |
| 209:18 210:16 | 108:24 109:17 | 203:17,17,18 | 280:11 |
| 212:11 213:2 | 124:8 146:12 | 204:4,8,17,19 | **woolen** 183:20 |
| 214:16 215:14 | 165:15 | 204:22 206:17 | 223:18 224:2,3 |
| 216:15 217:22 | **woman's** 85:24 | 207:12,13,15 | 224:8 225:9 |
| 219:12,22 | 157:22,24 | 207:17,18,19 | 230:24 231:11 |
| 220:14 221:1 | **women** 5:24 | 209:5,6 210:7 | 231:24 |
| 222:16 224:12 | 7:14 51:10 55:7 | 210:18 211:11 | **word** 34:1 |
| 232:16 235:10 | 62:12 63:4,24 | 211:12,13,17 | 47:20 58:20 |
| 236:17 237:3 | 64:1 65:13 | 211:21 212:5 | 59:1 141:7 |
| 237:17 239:21 | 67:18 70:10,17 | 212:14,15,16 | 151:23 152:1 |
| 245:13 247:23 | 74:21 75:24 | 212:18,23,23 | 173:5,7 245:18 |
| 248:21 254:4 | 77:12,15,21,22 | 213:3,9 218:16 | 261:9 290:8 |
| 255:15 257:10 | 78:3,20 97:4,19 | 220:15,19 | 296:12 |
| 257:15 260:21 | 101:16,21 | 221:10 228:24 | **words** 47:7 |
| 261:8 264:3 | 104:23 105:6 | 230:7,10 | 92:24 151:7 |
| 265:11 266:17 | 105:15 106:10 | 231:19,20 | 152:9,9 192:10 |
| 268:6 269:23 | 106:22 108:6 | 233:6 236:3,10 | 227:3 258:5 |
| 270:17 271:13 | 108:19 110:5 | 236:19,24 | 274:5 295:20 |
| 272:8,22 275:1 | 110:12,22 | 237:6 238:13 | **work** 18:8 |
| 276:13 277:11 | 114:23 117:19 | 239:23 240:14 | 25:19 26:10,23 |
| 277:17 278:23 | 118:4 119:4,14 | 240:19 241:5 | 27:6,7 31:2,19 |
| 279:21 280:24 | 120:4,14,18 | 241:13 246:18 | 35:12,17 36:1,1 |
| 283:1 284:18 | 121:11,13 | 246:20 247:8 | 36:7,18,19 37:4 |
| 285:2,13 | 137:10 140:21 | 247:18 248:1 | 38:22 39:1,6 |
| 290:22 293:23 | 141:1,17,18,21 | 248:10 250:1,4 | 40:2,14 41:1 |
| 294:23 302:5 | 142:15 143:14 | 251:5 252:16 | 83:23 137:18 |
| 303:11,15 | 143:15 145:2,8 | 253:12 256:21 | 269:1 |
| 304:6,7,15 | 145:17 146:9 | 256:24 257:5 | **worked** 84:7 |
| 305:1 | 146:12 148:7,8 | 259:4,5,18 | 287:7 |

**[working - zoom]**                                    Page 71

**working**  28:16
  282:16
**works**  25:11
  303:6,7
**workup**  24:22
**workweek**
  25:11
**world**  137:21
  138:2 150:22
**worried**  103:16
**worries**  58:24
**wound**  36:5
**write**  28:1,2
  104:16 141:10
  191:4 221:7
**writing**  13:1
  14:8,14 16:8
  17:19 27:13
  40:19
**written**  28:11
  40:22,24 94:12
  138:8 139:17
  184:22
**wrong**  302:12
**wrote**  191:8
  216:6 217:12
**wu**  135:16
  189:24 190:5
  203:9 261:2

**x**

**x**  1:5,9 4:6 5:1
  6:1 7:1 8:1

**y**

**yale**  133:14
**yeah**  32:15
  44:16 57:9
  76:23 90:2 98:7
  99:23 100:16
  107:12 113:14
  114:7 118:6
  119:24 128:20
  129:18 131:22
  156:7 170:2
  185:12 204:20
  224:16 235:3,5
  250:10 255:24
  268:1 274:18
  280:5 281:19
  297:15 302:15
**year**  31:20
  38:17,20 42:10
  44:15,16 60:8
  63:3 64:22 89:6
  97:20 228:3,3
**years**  5:6 15:18
  59:13 66:16
  71:5,15 72:17
  72:24 87:13,20
  89:4,19,21,23
  95:18 97:19
  107:1,7 154:21
  155:8,21
  156:21 160:19
  164:6 189:9
  190:21 191:10
  194:23 197:10
  206:21 211:20

  212:1,2,6 240:1
  241:7,14 247:1
  260:24 261:12
**yep**  19:24
  114:20 155:12
  234:11 255:6
**yield**  77:23
**ynh**  5:20
**young**  82:21
  87:5
**younger**  95:18

**z**

**zero**  214:10,22
  262:24,24
  263:6 264:13
  298:19
**zoom**  3:3,4,5,25
  9:15,16

Federal Rules of Civil Procedure

Rule 30


(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

Exhibit 31

Kevin Holcomb, M.D.

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF NEW JERSEY

- - -

IN RE: JOHNSON &          :
JOHNSON TALCUM POWDER      :
PRODUCTS MARKETING,        :
SALES PRACTICES, AND       :   NO. 16-2738
PRODUCTS LIABILITY         :   (FLW) (LHG)
LITIGATION                 :
                           :
THIS DOCUMENT RELATES      :
TO ALL CASES               :

- - -

March 27, 2019

- - -

Videotaped deposition of
KEVIN HOLCOMB, M.D., taken pursuant to
notice, was held at Weil Gotshal &
Manges, LLP, 767 Fifth Avenue, New York,
New York, beginning at 9:53 a.m., on the
above date, before Michelle L. Gray, a
Registered Professional Reporter,
Certified Shorthand Reporter, Certified
Realtime Reporter, and Notary Public.

- - -

GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Kevin Holcomb, M.D.

---

Page 2

APPEARANCES:

ROBINSON CALCAGNIE, INC.
BY:  CYNTHIA L. GARBER, ESQ.
19 Corporate Plaza Drive
Newport Beach, California 92660
(949) 720-1288
cgarber@robinsonfirm.com

  - and -

BLOOD HURST & O'REARDON, LLP
BY:  PAULA R. BROWN, ESQ.
501 West Broadway
Suite 1490
San Diego, California 92101
(619) 338-1100
Pbrown@bholaw.com

  - and -

BEASLEY ALLEN, P.C.
BY:  MARGARET M. THOMPSON, M.D., ESQ.
BY:  P. LEIGH O'DELL, ESQ.
218 Commerce Street
Montgomery, Alabama 36104
(334) 269-2343
Margaret.thompson@beasleyallen.com
leigh.odell@beasleyallen.com
Representing the Plaintiffs

---

Page 3

APPEARANCES:  (Cont'd.)

NUTTER McCLENNEN & FISH, LLP
BY:  DAWN M. CURRY, ESQ.
155 Seaport Boulevard
Boston, Massachusetts 02210
(617) 439-2286
Dcurry@nutter.com

  - and -

DRINKER, BIDDLE & REATH, LLP
BY:  SUSAN M. SHARKO, ESQ.
600 Campus Drive
Florham Park, New Jersey 07932
(973) 549-7000
susan.sharko@dbr.com
  - and -
WEIL GOTSHAL & MANGES, LLP
BY:  RICHARD M. HEASLIP, ESQ.
17 Hulfish Street, Suite 201
Princeton, New Jersey 08542
(609) 986-1118
richard.heaslip@weil.com
Representing the Defendants, Johnson
& Johnson entities

SEYFARTH SHAW, LLP
BY:  RENÉE B. APPEL, ESQ.
975 F Street, NW
Washington, D.C. 20004
(202) 463-2400
rappel@seyfarth.com
Representing the Defendant, PCPC

---

Page 4

APPEARANCES:  (Cont'd.)

TUCKER ELLIS, LLP
BY:  JAMES W. MIZGALA, ESQ.
233 South Wacker Drive
Suite 6950
Chicago, Illinois 60606
(312) 624-6307
james.mizgala@tuckerellis.com
Representing the Defendant, PTI
Royston LLC and PTI Union LLC

ALSO PRESENT:

VIDEOTAPE TECHNICIAN:
  Henry Marte

---

Page 5

        - - -
      I N D E X
        - - -

Testimony of:    KEVIN HOLCOMB, M.D.

  By Ms. Garber         12

        - - -
    E X H I B I T S
      - - -

NO.       DESCRIPTION       PAGE
Holcomb-1   Excerpt from the      40
         Transcript of Kevin
         Holcomb, MD, 5/7/18
         Page 56

Holcomb-2   Excerpt from the      45
         Transcript of Kevin
         Holcomb, MD, 5/7/18
         Page 57
Holcomb-3   Excerpt from the      64
         Transcript of Kevin
         Holcomb, MD, 5/7/18
         Page 103

Holcomb-4   IARC Monographs     71
         Arsenic, Metals, Fibres
         And Dusts
         (Volume 100 C)

---

2 (Pages 2 to 5)

Kevin Holcomb, M.D.

Page 6

```
1            - - -
2      E X H I B I T S  (Cont'd.)
3            - - -
4
5    NO.      DESCRIPTION      PAGE
6    Holcomb-5   Notice of Oral and   102
            Videotaped Deposition
7
     Holcomb-6   Supplemental      110
8            Materials Received
             And Reviewed
9            & Invoice
10   Holcomb-7   Expert Report of   114
             Kevin Holcomb, M.D.
11           For General Causation
             Daubert Hearing
12           2/25/19
13   Holcomb-8   Talc & Ovarian   180
             Cancer
14           (Narod)
15   Holcomb-9   Table 1         186
             Study Type, Year
16           Author Journal
17   Holcomb-10  Retire Statistical   199
             Significance
18           (Amrhein)
19   Holcomb-11  Draft Screening   220
             Assessment
20           December 2018
21   Holcomb-12  Systemic Review   224
             and Meta-Analysis
22           Of the Association
             Between Perineal
23           Use of Talc and Risk
             Of Ovarian Cancer
24           (Taher)
```

Page 7

```
1            - - -
2      E X H I B I T S  (Cont'd.)
3            - - -
4
5    NO.      DESCRIPTION      PAGE
6    Holcomb-13  Perineal Talc   255
             Exposure and Epithelial
7            Ovarian Cancer Risk in
             the Central Valley of
8            California
             (Mills)
9
     Holcomb-14  Perineal Use of   271
10           Talc and Risk of
             Ovarian Cancer
11           (Langseth)
12   Holcomb-15  Association Between   273
             Body Powder Use and
13           Ovarian Cancer:
             The African American
14           Cancer Epidemiology Study
             (AACES)
15           (Schildkraut)
16   Holcomb-16  Six Persistent   281
             Research
17           Misconceptions
             (Rothman)
18
     Holcomb-17  Weill Cornell   292
19           Medicine, Evidence-
             Based Medicine, EBM
20           Defined
             (Straus)
21
     Holcomb-18  Ovulation and Risk   302
22           Of Epithelial Ovarian
             Cancer
23           (Purdie)
24
```

Page 8

```
1            - - -
2      E X H I B I T S  (Cont'd.)
3            - - -
4
5    NO.      DESCRIPTION      PAGE
6    Holcomb-19  Reports,        344
             Prospective Study of
7            Talc Use and Ovarian
             Cancer
8            (Gertig)
9    Holcomb-20  Risk Factors for   363
             Epithelial Ovarian
10           Cancer by
             Histologic Subtype
11           (Gates)
12   Holcomb-21  Perineal Powder Use   377
             And Risk of Ovarian
13           Cancer
             (Houghton)
14
     Holcomb-22  Douching, Talc Use   403
15           And Risk of Ovarian
             Cancer
16           (Gonzalez)
17   Holcomb-23  Perineal Talc Use   406
             and Ovarian Cancer
18           A Systematic Review
             And Metal-Analysis
19           (Penninkilampi)
20   Holcomb-24  Demonstrative   407
             TPP and Ovarian
21           And TPP Serous Cancer
             Meta-Analyses
22
23
24
```

Page 9

```
1            - - -
2      E X H I B I T S  (Cont'd.)
3            - - -
4
5    NO.      DESCRIPTION      PAGE
6    Holcomb-25  FDA Letter, 4/1/14   424
             To Epstein from Musser
7            RE, Docket Numbers
             JNJ 000489048-54
8
     Holcomb-26  American Journal of   468
9            Respiratory and
             Critical Care Medicine
10           Talc Should Not Be Used
             For Pleurodeses in
11           Patients with Nonmalignant
             Pleural Effusions
12           (Ghio)
13   Holcomb-27  Genital Use of Talc   471
             And Risk of Ovarian
14           Cancer:  A Meta-Analysis
             (Berge)
15
     Holcomb-28  Epithelial Ovarian   486
16           Cancer
             (Lheureux)
17
     Holcomb-29  What is New in   488
18           Ovarian Cancer?
             (Wright)
19
     Holcomb-30  FDA Advises Consumers 496
20           To Stop Using Certain
             Claire's Cosmetic
21           Products
22   Holcomb-31  Ingredients Talc   503
             (FDA Website)
23
24
```

Kevin Holcomb, M.D.

Page 10

1           - - -
2        DEPOSITION SUPPORT INDEX
3           - - -
4
5    Direction to Witness Not to Answer
6    PAGE  LINE
     None.
7
8    Request for Production of Documents
9    PAGE  LINE
     None.
10
11   Stipulations
12   PAGE  LINE
     None.
13
14   Questions Marked
15   PAGE  LINE
     None.
16
17
18
19
20
21
22
23
24

Page 11

1           - - -
2        THE VIDEOGRAPHER:  We are
3    now on the record.  My name is
4    Henry Marte.  I am a videographer
5    with Golkow Litigation Services.
6        Today's date is March 27,
7    2019, and the time is 9:53 a.m.
8        This videotaped deposition
9    is being held at 767 Fifth Avenue,
10   New York, New York in the matter
11   of Talcum Powder Litigation.
12       The deponent today is
13   Dr. Kevin Holcomb.
14       All appearances are noted on
15   the stenographic record.
16       Will the court reporter
17   please administer the oath.
18          - - -
19   ... KEVIN HOLCOMB, M.D.,
20   having been first duly sworn, was
21   examined and testified as follows:
22          - - -
23       EXAMINATION
24          - - -

Page 12

1    BY MS. GARBER:
2        Q.   Good morning, Doctor.
3        A.   Good morning.
4        Q.   Would you please state your
5    name for the record?
6        A.   Yes.  My name is Kevin
7    Holcomb.
8        Q.   And you're a medical doctor?
9        A.   Yes, I am.
10       Q.   Are you a gynecologic
11   oncologist?
12       A.   I am.
13       Q.   And are you a practicing
14   gynecologic oncologist?
15       A.   I am.
16       Q.   Where do you practice?
17       A.   I practice at Weill Cornell
18   Medical Center.
19       Q.   Thank you.  Are you here
20   today as a litigation expert for the
21   defendant, Johnson & Johnson?
22       A.   I am.
23       Q.   And this is not the first
24   time you've testified for the defendant

Page 13

1    Johnson & Johnson regarding their talcum
2    powder products and risk of ovarian
3    cancer; is that true?
4        A.   That's true.
5        Q.   You testified in deposition
6    and at trial in the Ingham matter; is
7    that correct?
8        A.   That's correct.
9        Q.   Have you ever testified in
10   deposition or trial in any other talcum
11   powder ovarian cancer cases?
12       A.   No, I haven't.
13       Q.   Doctor, have you been sued
14   in connection with your own medical care
15   and treatment?
16       A.   Yes, I have.
17       Q.   How many times?
18       A.   Probably about three.
19       Q.   Doctor, if you testified in
20   a prior matter that it was four times,
21   does that refresh your recollection?
22       A.   It's possible.
23       Q.   Are all of the matters
24   wherein you were sued as a medical

4 (Pages 10 to 13)

Kevin Holcomb, M.D.

Page 14

```
 1    defendant resolved in one way or another?
 2        A.   I believe there's still one
 3    outstanding.
 4        Q.   What is the name of that
 5    matter?
 6        A.   I'm trying to remember the
 7    patient's last name. I'm sorry. I don't
 8    remember the last name of the patient,
 9    sorry.
10        Q.   Where was that case venued?
11        A.   In New York.
12        Q.   And is it accurate, Doctor,
13    that none of those matters concern
14    diagnosis and/or treatment of ovarian
15    cancer?
16        A.   That's true.
17        Q.   Is the nature of the matter
18    that's still open in connection with
19    performance of robotic surgery?
20        A.   Yes.
21        Q.   Thank you. So I don't know
22    the last time that you've been deposed.
23    Has it been since the Ingham matter?
24        A.   That was the last time.
```

Page 15

```
 1        Q.   All right. I'll go through
 2    the admonitions that typically accompany
 3    the deposition process so we've reviewed
 4    the most important ones. Okay?
 5        A.   Okay.
 6        Q.   All right. You've taken an
 7    oath to tell the truth under penalty of
 8    perjury. And, Doctor, you understand
 9    that that oath carries the same force and
10    effect as if you were testifying in a
11    court of law even though you are in an
12    informal setting of this conference room.
13    Do you understand that?
14        A.   I do.
15        Q.   And you've given depositions
16    so you know that the court reporter is
17    going to be taking down what's said, and
18    we want to avoid talking over one
19    another.
20             You're doing a good job of
21    waiting for my question. And I'll try to
22    do the same, wait for your answer, so we
23    get a clear record. Okay?
24        A.   Okay.
```

Page 16

```
 1        Q.   If you don't understand one
 2    of my questions, I'm bound to be unartful
 3    at times, and I don't want you to guess
 4    at what you think I'm asking you. Just
 5    please ask me to clarify. Because if you
 6    don't I'm going to assume that you
 7    understood my question. Is that fair?
 8        A.   That's fair.
 9        Q.   All right. I just want to
10    kind of clear up a few definitions so
11    we're on the same page. Okay?
12             When I refer to talcum
13    powder products today, will you
14    understand that that includes Johnson &
15    Johnson's Baby Powder and Shower to
16    Shower products?
17        A.   Yes.
18        Q.   And in your report you use
19    the word talc. Is that fair to assume
20    that you are including Johnson &
21    Johnson's Baby Powder and Shower to
22    Shower products?
23             MS. CURRY: Objection to
24    form.
```

Page 17

```
 1             THE WITNESS: That's true.
 2    BY MS. GARBER:
 3        Q.   What is a carcinogen?
 4        A.   A carcinogen is something
 5    that causes cancer.
 6        Q.   What does it mean to be
 7    carcinogenic?
 8        A.   To have the ability to cause
 9    cancer.
10        Q.   What is a risk factor in the
11    context of ovarian cancer?
12             MS. CURRY: Objection to
13    form.
14             THE WITNESS: A risk factor
15    is something that's associated
16    with a higher likelihood of
17    developing a cancer.
18    BY MS. GARBER:
19        Q.   How do you define higher
20    likelihood?
21        A.   More likely than if you
22    hadn't been exposed.
23        Q.   To a medical degree of
24    certainty?
```

5 (Pages 14 to 17)

Kevin Holcomb, M.D.

Page 18

1          MS. CURRY:  Objection to
2     form.
3          THE WITNESS:  Typically that
4     is something that I would relate
5     to statistical analysis from
6     studies.  So there would be
7     statistical definitions.
8     BY MS. GARBER:
9          Q.   Rather than a medical degree
10    of certainty, correct?
11         MS. CURRY:  Objection to
12    form.
13         THE WITNESS:  My medical
14    degree of certainty is often based
15    on the statistical results of
16    tests.
17    BY MS. GARBER:
18         Q.   How do you define a causal
19    factor in the context of ovarian cancer?
20         A.   A causal factor would be
21    something that you know caused the
22    cancer.
23         Q.   How do you know if it caused
24    cancer?

Page 19

1          MS. CURRY:  Objection to
2     form.
3          THE WITNESS:  Well, in the
4     context of any individual patient,
5     I can't say what caused their
6     cancer.  So I think it's
7     impossible to say on an individual
8     level that you've seen that.
9     Outside of the individual, if you
10    have a substance that can
11    transform cells into a malignant
12    phenotype in a cell culture for
13    example, that would be evidence of
14    a carcinogen.
15    BY MS. GARBER:
16         Q.   What is your definition of
17    the phrase latency period in the context
18    of ovarian cancer?
19         MS. CURRY:  Objection to
20    form.
21         THE WITNESS:  In the context
22    of ovarian cancer -- well, the
23    latency period in any cancer is
24    the time between the initial

Page 20

1     exposure to a known carcinogen and
2     the development of the cancer that
3     it's associated with, that it
4     causes.
5     BY MS. GARBER:
6          Q.   You used the phrase "known
7     carcinogen."  How do you know if it's a
8     known carcinogen?
9          A.   Well, if it's not a
10    carcinogen, you can't really have a
11    latency period.
12         Q.   In the performance of a
13    study assessing whether or not it's a
14    carcinogen, you can nevertheless still
15    have a latency period for purposes of
16    determining follow-up and things of that
17    nature, correct?
18         A.   No, I don't think --
19         MS. CURRY:  Objection to
20    form.
21         THE WITNESS:  I don't agree
22    with that.
23    BY MS. GARBER:
24         Q.   You don't?

Page 21

1          A.   No.
2          Q.   All right.  Do you have an
3     opinion as to the latency period for
4     ovarian cancer?
5          A.   In general, I think to
6     define the latency period, you have to,
7     one, start with a carcinogen, and then
8     have data showing that you have an idea
9     from the time of first exposure to that
10    carcinogen to the development of the
11    disease in question.
12         So latency periods are going
13    to be specific to whichever carcinogen
14    you're speaking about.
15         Q.   Okay.  Fair enough.  Is
16    serous ovarian cancer included under the
17    umbrella of epithelial ovarian cancer?
18         A.   It is.
19         Q.   So in other words, serous
20    ovarian cancer is ovarian cancer, right?
21         A.   It's a type of ovarian
22    cancer, yes.
23         Q.   Let's talk about some of
24    your qualifications, okay.  Is it

6 (Pages 18 to 21)

Kevin Holcomb, M.D.

---

Page 22

1 accurate, Doctor, that you've never
2 conducted research experiments regarding
3 the effects of talcum powder products and
4 its carcinogenicity?
5     A.   That's true.
6     Q.   And in your CV it shows that
7 you've never published regarding talcum
8 powder products and ovarian cancer,
9 right?
10     A.   That's true.
11     Q.   Is it also true that you've
12 never published regarding talcum powder
13 products, asbestos, and ovarian cancer?
14     A.   That's true.
15     Q.   You don't have any
16 publications about asbestos at all,
17 correct?
18     A.   That's true.
19     Q.   And you don't have any
20 publications with regard to talcum powder
21 products at all, correct?
22     A.   That's true.
23     Q.   Have you ever created or
24 written any presentations regarding

---

Page 23

1 talcum powder products and ovarian
2 cancer?
3     A.   No.  I've created materials
4 on ovarian cancer and its risk factors
5 and general educational information for
6 the students -- medical students,
7 residents and fellows.  But not
8 particularly with regard to talc.
9     Q.   Did any of -- were those in
10 regard to risk factors and ovarian cancer
11 risk?
12     A.   Yes.
13     Q.   And did any of those
14 materials address the issue of talc one
15 way or another?
16     A.   No.
17     Q.   So let me clarify my
18 question.  Is it accurate, Doctor, that
19 in those presentations that you've
20 created with regard to risk factors for
21 ovarian cancer, you've never made an
22 affirmative statement in any of those
23 that talc is not a risk factor; is that
24 true?

---

Page 24

1     MS. CURRY:  Object to the
2 form.
3     THE WITNESS:  I'm a little
4 confused by the question.  Because
5 if you are giving a lecture and
6 you're listing what you consider
7 risk factors, anything that's not
8 on that list you are not
9 mentioning as a risk factor, so
10 you're -- you're asking me have I
11 formed a negative?
12 BY MS. GARBER:
13     Q.   Yeah, well, and I appreciate
14 you asking for clarification, because I
15 don't think my question was a good one,
16 so thank you.
17     I just want to be sure I
18 understand the -- the nature of your
19 presentation.
20     In your presentation you've
21 never actually used the word talc in any
22 of your presentations with regard to risk
23 factors and ovarian cancer; is that true?
24     A.   No.

---

Page 25

1     Q.   What percentage of your
2 current patients have been diagnosed with
3 female reproductive cancer including
4 ovarian cancer?
5     A.   I'd say about 70 percent of
6 my patients have malignant.
7     Q.   Can you break that down by
8 way of ovarian cancer?
9     A.   Out of that 70 percent,
10 probably 30 percent are ovarian.
11     Q.   For the 30 or so percent
12 that have not been diagnosed with a
13 malignancy, do you counsel them with
14 regard to risk factors?
15     MS. CURRY:  Objection to
16 form.
17     MS. GARBER:  I wasn't done
18 yet.  I'll start again.
19 BY MS. GARBER:
20     Q.   With regard to the
21 30 percent of your patients that have not
22 been diagnosed with malignancy, is it
23 your custom and practice to counsel them
24 with regard to risk factors for cancer in

---

7 (Pages 22 to 25)

Kevin Holcomb, M.D.

Page 26

1    general?
2         MS. CURRY: Objection to
3    form.
4         THE WITNESS: I take a
5    formal history and a complete
6    history, and I will address any
7    issues that I may bring up. But
8    giving a general lecture to each
9    patient on the risk factors for
10   cancers, it would only come up in
11   questions.
12   BY MS. GARBER:
13        Q.   When you take a history,
14   Doctor, do you ask for a patient's
15   exposure to asbestos?
16        A.   When I'm taking a history I
17   do question patients about their
18   occupations. And that would be the only
19   thing I can think of where an asbestos
20   exposure would likely be revealed.
21        Q.   Do you know how long it
22   takes to conduct an asbestos history?
23        MS. CURRY: Object to form.
24   BY MS. GARBER:

Page 27

1         Q.   A thorough asbestos history
2    of a patient?
3         MS. CURRY: Same objection.
4         THE WITNESS: No, I don't.
5    BY MS. GARBER:
6         Q.   When you take a history, do
7    you ask patients about their exposure to
8    talcum powder products?
9         A.   No.
10        Q.   Why do you ask them about
11   their occupation and put that in the
12   context of asbestos?
13        MS. CURRY: Object to the
14   form.
15        THE WITNESS: That's not why
16   I'm asking them about the
17   occupational history. I was
18   thinking, was there any chance of
19   asbestos exposure coming up in my
20   routine questioning, and I thought
21   that would be the only area that I
22   could think of it coming up.
23   BY MS. GARBER:
24        Q.   And do you relate that to

Page 28

1    any certain risk of any certain type of
2    cancer?
3         MS. CURRY: Object to the
4    form.
5         THE WITNESS: Well, I'm
6    aware that heavy occupational
7    exposure to asbestos has been
8    determined by at least some to be
9    a cause of ovarian cancer. So I
10   guess if -- if it came out through
11   a history that a patient had
12   engaged in any of those type of
13   practices, it would -- it would
14   catch my attention.
15   BY MS. GARBER:
16        Q.   Thank you.
17        How many publications do you
18   have to your credit about the causes of
19   ovarian cancer over your career?
20        A.   I don't believe any of my
21   publications are addressing the causes of
22   ovarian cancer.
23        Q.   Women place talcum powder
24   products on their genitals to stay fresh

Page 29

1    and clean, right?
2         MS. CURRY: Object to the
3    form.
4         THE WITNESS: I'm not sure
5    why every individual uses talcum
6    powder.
7    BY MS. GARBER:
8         Q.   Do you understand that women
9    place talcum powder products on their
10   genitals?
11        A.   Yes, I do.
12        Q.   And do you understand that
13   women place talcum powder products on
14   their body?
15        A.   Yes, I do.
16        Q.   And of course, you
17   understand that women in the United
18   States were likely diapered with talcum
19   powder products, correct?
20        MS. CURRY: Object to the
21   form.
22        THE WITNESS: I'm not sure
23   of the frequency of using it for
24   diaper.

8 (Pages 26 to 29)

Kevin Holcomb, M.D.

Page 30

BY MS. GARBER:
Q. But you understand that at least some portion of the population in the United States was diapered with talcum powder products, right?
A. I do understand that.
Q. Are you aware of data that indicates that there are women now with ovarian cancer who use talc on their genitals in the 1950s, '60s, and early 1970s?
A. Could you repeat the question.
Q. Sure. Are you aware of data that indicates that there are women now with ovarian cancer who used talc on their genitals in the 1950s, '60s, and early 1970s?
MR. MIZGALA: Object to form.
MS. GARBER: Are we -- sorry. Are we going to have one person objecting for the group? I thought that was CMO 11.

Page 31

MS. SHARKO: No that's not the in the CMO. He doesn't represent J&J.
MS. GARBER: I thought I read one objection was for all.
MS. SHARKO: Sometimes we do that.
BY MS. GARBER:
Q. Go ahead, Doctor. I forgot my question. Do you remember it?
A. If you would repeat it, I'd appreciate it.
Q. Sure. Let me see if you answered it. So my question is, are you aware of data that indicates women now with ovarian cancer who used talcum powder products on their genitals in the early 1950s, '60s, and 1970s?
A. I think your question was am I aware of any studies that suggest this. And I'd have to say, I'd have to look through each specific study to see do they mention that in particular.
Q. Sure. That wasn't my

Page 32

question. So I'll ask it again.
Doctor, are you aware of data that indicates that there are women now with ovarian cancer who used talc on their genitals in the 1950s, '60s, and '70s, any data?
MR. MIZGALA: Objection.
THE WITNESS: I'm not aware of any specific data, no.
BY MS. GARBER:
Q. Do you agree generally, Doctor, that there are women now in the United States with ovarian cancer who were diapered with Johnson & Johnson Baby Powder in the 1950s, '60s, and early 1970s?
MS. CURRY: Object to the form.
THE WITNESS: I don't have any specific data on people being diapered in the '50s and '60s. So no, I'd have to say no.
BY MS. GARBER:
Q. Okay. Johnson & Johnson

Page 33

talcum powder products are cosmetic products, not medications, right?
A. That's true.
Q. There's no medical benefits for women to use defendant's talcum powder products on their genitals, right?
MS. CURRY: Objection to form.
THE WITNESS: No, I would disagree with that.
BY MS. GARBER:
Q. There's medical benefits?
MS. CURRY: Object to the form.
THE WITNESS: I think you're using a term "medical benefit." I'm not sure if you can first clarify what you mean by medical benefit.
BY MS. GARBER:
Q. Sure. You've done a risk/benefit assessment of, say, a drug or a medication, right? You know what that means, don't you?

9 (Pages 30 to 33)

Kevin Holcomb, M.D.

Page 34

1     A.   I do.
2     Q.   All right.  And what do you
3  think that means, when I say a
4  risk/benefit in the context of a
5  medication?
6     A.   A risk/benefit would be an
7  analysis of the reason why the person is
8  using the drug versus the risk of using
9  the drug.
10     Q.   Right.  And so the benefit
11  is the reason they are using the drug,
12  right?
13     A.   Right.
14     Q.   It has to have some sort of
15  efficacy or benefit, right?
16     A.   Right.
17          MS. CURRY:  Object to the
18  form.
19  BY MS. GARBER:
20     Q.   So my question is now take
21  that to talc and talcum powder products.
22          There's no medical benefit
23  in that context, is there?
24          MS. CURRY:  Object to the

Page 35

1  form.
2          THE WITNESS:  I'm assuming a
3      practice that has endured for this
4      long of time, there must be a
5      perception on the people who are
6      using it that they are benefiting
7      from it in some form or fashion.
8  BY MS. GARBER:
9     Q.   Sure.  My question is a
10  little different.
11          Is -- is there a medical
12  benefit to using talcum powder products
13  in the same context as, say, a
14  medication, drug, something like that?
15          MS. CURRY:  Object to the
16  form.
17          THE WITNESS:  Yeah, I would
18      say there is.
19  BY MS. GARBER:
20     Q.   There isn't or --
21     A.   There is, I would say.
22     Q.   There is?  So you would tell
23  a patient to use talcum powder products
24  for a medical benefit?

Page 36

1          MS. CURRY:  Object to the
2      form.
3          THE WITNESS:  That wasn't --
4      no, I wouldn't.  But I believe
5      your question was, is there a
6      medical benefit.  And that's in
7      the eye of the patient who's using
8      it.  And I would have to ask her
9      why she's using it.
10          For example, if someone says
11      I'm diabetic, I get yeast
12      infections when I'm moist, and I
13      find that talcum keeps me dry and
14      I have less yeast infections, I
15      would say that's probably a
16      medical benefit to that
17      individual.
18  BY MS. GARBER:
19     Q.   But talcum powder products
20  do not fall under the rubric of a
21  medication for purposes of regulatory;
22  isn't that true?
23     A.   That's true.  But things
24  that fall under the rubric of medications

Page 37

1  that we prescribe pretty regularly that
2  are just quality of life issues are
3  considered medications.  I mean there are
4  medications that prevent hot flashes.  I
5  don't believe anybody can point to a
6  specific medical benefit of stopping hot
7  flashes, but there's still medications
8  for that use.
9     Q.   Doctor, you've been
10  designated as an expert by Johnson &
11  Johnson in the talcum powder litigation
12  in the multi-district litigation; is that
13  right?
14     A.   That's true.
15     Q.   And you understand that
16  we're here today to take your deposition
17  to get all your opinions and the bases of
18  those opinions so we can prepare for
19  briefings, hearings, and trial.
20          Do you understand that?
21     A.   Yes.
22     Q.   When were you first retained
23  in the talcum powder ovarian cancer
24  litigation generally, not in the MDL,

10  (Pages 34 to 37)

Kevin Holcomb, M.D.

Page 38

1    just in general?
2         A.   The Ingham case was my only
3    other involvement.  And I believe that.
4    That interaction began late.  Probably
5    November -- let me think.  I guess that
6    would be November of 2017 then.
7         No, I'm sorry, more like
8    January.  I think it was more like
9    January of 2018 then.
10        Q.   Were there any documents
11   that would refresh your recollection in
12   that regard?
13        A.   Not that I can think of.
14        Q.   You are not not an asbestos
15   expert, are you?
16        A.   No.
17        Q.   Before you were hired by
18   Johnson & Johnson regarding talcum powder
19   products, is it fair to say that your
20   understanding of asbestos was pretty
21   limited?
22        MS. CURRY:  Object to the
23   form.
24        THE WITNESS:  I'm not sure

Page 39

1         what you mean by limited.
2    BY MS. GARBER:
3         Q.   Did you testify that it was
4    pretty limited in a prior case?
5         MS. CURRY:  Object to the
6         form.
7         THE WITNESS:  When I -- if I
8         had used the term limited, I guess
9         I was referring to its role in
10        gynecologic oncology.
11        I'm not an expert in
12        asbestos in any way.  But I
13        probably have the same amount of
14        knowledge as anyone else.
15   BY MS. GARBER:
16        Q.   Doctor, let's look at your
17   prior testimony, if we can.
18        I'm going to mark as
19   Exhibit 1 -- no, I'm not going to mark it
20   for now.
21        Doctor, let me pass you
22   over --
23        MS. CURRY:  Do you have a
24        copy of the full transcript?

Page 40

1         MS. GARBER:  I do.
2    BY MS. GARBER:
3         Q.   Doctor, if I could call your
4    attention to --
5         MS. GARBER:  You know what,
6    I am going to mark this as
7    Exhibit 1.
8         Can I have that back,
9    Doctor?
10        THE WITNESS:  Sure.
11        MS. GARBER:  Sorry.
12        (Document marked for
13        identification as Exhibit
14        Holcomb-1.)
15   BY MS. GARBER:
16        Q.   I don't mean to throw these
17   at you.
18        A.   I didn't take offense.
19        Q.   I apologize.
20        So the front page of
21   Exhibit 1 indicates that this is a
22   deposition transcript on May 7th, 2018,
23   in the Ingham case; is that correct?
24        A.   That's correct.

Page 41

1         Q.   And on the front page it
2    indicates that you are the deponent,
3    correct?
4         A.   That I am the?
5         Q.   Person who was being
6    deposed.
7         Does your name --
8         A.   Yes.
9         Q.   Yes, it is.
10        And then, Doctor, if you
11   turn to Page 56 of the transcript, lines
12   2 through 8, I will read it.
13        "Question:  In fact, is it
14   fair to say that, B, until you began
15   consulting for Johnson & Johnson, your
16   understanding of the different fibers of
17   asbestos that exist was -- was pretty
18   limited?
19        And then question:  "Is that
20   fair to say?"
21        And the answer was:  "That's
22   fair to say."
23        So, Doctor, you agree that
24   your understanding of asbestos was pretty

Kevin Holcomb, M.D.

Page 42

```
 1    limited before you were hired by J&J,
 2    correct?
 3            MS. CURRY:  Object to the
 4    form.
 5            THE WITNESS:  Your prior
 6    question just asked me about my
 7    understanding of -- of asbestos
 8    and was proceeded by my admitting
 9    that I'm not an asbestos
10    specialist.
11            This testimony has to do
12    with my understanding of the
13    different fiber types of asbestos.
14    So I think there's a little bit of
15    a difference in what I was
16    testifying about here and your
17    question.  But I don't see the
18    inconsistency.
19    BY MS. GARBER:
20        Q.   Okay.  Fair enough.
21            As to the fibers, before you
22    were hired by J&J and consulting for
23    them, you weren't even aware what an
24    amphibole was, right?
```

Page 43

```
 1        A.   No.
 2        Q.   All right.  When were you
 3    first retained in the MDL talc
 4    litigation?
 5        A.   That, I believe, was around
 6    November of 2018.
 7        Q.   And what was your
 8    understanding of your assignment when you
 9    were hired in the MDL?
10        A.   My understanding with that,
11    that I was -- I was being asked for
12    my opinion based on my assessment of the
13    existing body of literature in the area
14    of whether talc causes ovarian cancers.
15        Q.   We're going to get to the
16    body of literature in a moment.  But were
17    you asked to do anything else?  Or
18    what -- strike that.
19            What was your understanding
20    of your assignment?  Did it -- did it
21    entail anything else?
22            MS. CURRY:  Object to the
23    form.
24            THE WITNESS:  I believe it
```

Page 44

```
 1    entailed what I thought was
 2    necessary to offer an opinion on
 3    the question of whether talc use
 4    causes ovarian cancer.
 5    BY MS. GARBER:
 6        Q.   At the time that you were
 7    hired by Johnson & Johnson to do work in
 8    the MDL, you already harbored -- harbored
 9    causation opinions based on the work that
10    you did attendant to the Ingham cases,
11    correct?
12        A.   That's correct.
13        Q.   Isn't it true that in the
14    Ingham case you formed your opinion that
15    talcum powder products do not cause
16    ovarian cancer based on review of 61
17    published studies provided to you by
18    counsel for Johnson & Johnson?
19            MS. CURRY:  Object to the
20    form.
21            THE WITNESS:  That's --
22    that's not true.  My opinion that
23    talc did not cause ovarian cancer
24    preceded my involvement with
```

Page 45

```
 1    Ingham.
 2            But, yes, that reliance list
 3    helped further confirm that
 4    feeling.
 5            (Document marked for
 6    identification as Exhibit
 7    Holcomb-2.)
 8    BY MS. GARBER:
 9        Q.   Doctor, I'm going to mark as
10    Exhibit 2 another deposition transcript.
11            Doctor, this is -- Exhibit 2
12    is the same front transcript, the Ingham
13    matter, and on your deposition taken on
14    May 7, 2018, right?
15        A.   Yes.
16        Q.   And at Page 57, Lines 10
17    through 14, question reads:
18            "Are the 61 reliance
19    materials cited in Exhibit 4 the complete
20    universe of the materials that you relied
21    upon in order to form your opinions in
22    that case?
23            "Answer:  Yes."
24            Is your testimony different
```

12 (Pages 42 to 45)

Kevin Holcomb, M.D.

Page 46

1  today, Doctor?
2      MS. CURRY:  Object to the
3  form.
4      THE WITNESS:  No, it's not
5  any different.  The -- I can't
6  think of anything that was outside
7  of this data that I reviewed for
8  this case that I had not seen
9  prior.
10     My testimony today is that
11  my opinion about the causal
12  relationship of talc and ovarian
13  cancer preceded my involvement in
14  Ingham.  And your question asked
15  me, or you stated in your question
16  that my opinion was developed
17  during Ingham, or that was my
18  understanding of your question.
19  And that's all I was trying to
20  clarify.
21  BY MS. GARBER:
22     Q.   Your universe of the data
23  that you relied on in the Ingham matter
24  consisted of 61 published studies

Page 47

1  provided to you by counsel for J&J.
2      MS. CURRY:  Object to the
3  form.
4  BY MS. GARBER:
5     Q.   Right?
6     A.   To be honest, some of the
7  materials I found on my own.  Some of it
8  was provided by J&J.
9      And again, I -- I don't know
10  if you mean to be doing this, but I just
11  want to clarify.  If I read some of this
12  material years ago and had come to an
13  independent opinion about this, and then
14  I read it again, I don't -- I just want
15  to clarify, that my opinion is not being
16  made during that case.
17     Q.   The 61 studies that were
18  reflected on a reference list were the
19  universe of studies that formed your
20  opinion in the Ingham case, correct?
21     A.   Yes.
22     Q.   Thank you.
23      You testified that the key
24  literature that formed the basis of your

Page 48

1  opinion in the Ingham case were the
2  cohort studies which included gate --
3  Gertig, Gates 2010, Houghton, and
4  Gonzalez, Heller 1996, and IARC 2010 and
5  IARC 2012.
6      Is that correct?
7      MS. CURRY:  Object to form.
8      THE WITNESS:  No.  You're --
9  you're piquing my memory of
10  this -- of this -- because I
11  realize I only have two pages of
12  it.
13      But repeatedly the counsel
14  who was taking my deposition
15  attempted to limit, as you are
16  defining them, as key pieces of
17  information.  My -- my opinion was
18  based on the totality of all the
19  data.
20      That -- that answer just did
21  not seem acceptable at the time,
22  and there was this attempt to
23  constantly drill down to me
24  identifying a few studies that I

Page 49

1  could say were important, but I
2  repeatedly said then and I imagine
3  I'll maybe have to do that again
4  today, that it is the totality of
5  the data that led me to my
6  opinion.
7      The universe, I believe, as
8  you like to call it.
9  BY MS. GARBER:
10     Q.   The totality of the evidence
11  that formulated the opinions in this
12  matter are listed in the reference list
13  of -- lists of your expert report, which
14  is dated February 25, 2019, and the
15  supplemental reference list.
16      Is that a true statement?
17      MS. CURRY:  Object to the
18  form.
19      THE WITNESS:  That's a true
20  statement, but there -- I -- I did
21  also read the expert reports of
22  others involved in the case.  And
23  they referenced other papers that
24  are not in my reference list.

13 (Pages 46 to 49)

Kevin Holcomb, M.D.

Page 50

1        So I -- I'd have to say I
2    came across more than -- than just
3    what was in my reference list in
4    my preparation.
5    BY MS. GARBER:
6        Q.   And in regard to what you
7    just said, reading other experts' reports
8    that were involved in the case, is it
9    true that you read the experts' report,
10   but did not read the underlying studies
11   that were referenced in that given expert
12   report?
13       A.   No.
14           MS. CURRY:  Object to the
15   form.
16           THE WITNESS:  That's exactly
17   the opposite of what I'm saying.
18   I'm saying at times I would read
19   something in an expert report that
20   piqued my interest, and I would go
21   back and pull that paper and read
22   the paper.
23   BY MS. GARBER:
24       Q.   And then you didn't list it

Page 51

1    on your reference list?
2           MS. CURRY:  Object to the
3    form.
4           THE WITNESS:  It was not
5    part of my expert report.  My
6    expert report had already been
7    completed.
8    BY MS. GARBER:
9        Q.   Did you know that a
10   supplemental reference list was just
11   produced in this matter?
12       A.   Yes.
13       Q.   Are you telling me that you
14   have reviewed other materials that do not
15   appear on any of the reference lists that
16   are attached to your expert report or the
17   supplemental materials that were just
18   produced on the 25th?
19           MS. CURRY:  Object to the
20   form.
21           THE WITNESS:  I believe that
22   it -- I don't know exactly the
23   list that you have of everything I
24   reviewed.  But if it's not clear

Page 52

1    that I reviewed the other experts'
2    reports and the literature that
3    they were basing their opinions
4    on, I did in some cases.
5    BY MS. GARBER:
6        Q.   Doctor, you understand that
7    I am entitled to know the materials that
8    you read, reviewed and relied upon in
9    formulating your opinions.  You
10   understand that, right?
11       A.   Yes.
12           MS. CURRY:  I can possibly
13   clarify --
14           MS. GARBER:  I don't --
15           MS. CURRY:  -- the issue if
16   it's helpful.
17           MS. GARBER:  Let me -- let
18   me just finish this line of
19   questioning, Ms. Curry.  Thank you
20   very much.
21   BY MS. GARBER:
22       Q.   And, Doctor, is it your
23   testimony that aside from the reference
24   lists that are attached to your expert

Page 53

1    report and the supplemental materials,
2    that there are papers that you have
3    reviewed that are not listed there?
4           MS. CURRY:  Object to the
5    form.
6           THE WITNESS:  I would have
7    to review my reference list and
8    see what's on there.  Or all the
9    information that was handed over
10   to you as far as what I reviewed.
11           But, again, I did look
12   through other experts' reports.
13   If they referenced a study, in
14   most cases, I did not go back and
15   review the study.  I just read
16   what they were saying.
17   BY MS. GARBER:
18       Q.   Can you think of a given
19   study that you were reading an expert
20   report and it piqued your interest, to
21   use your words, and you went and pulled
22   it and read it?
23       A.   No, I can't think of any
24   specific papers.

14 (Pages 50 to 53)

Kevin Holcomb, M.D.

Page 54

1     MS. GARBER: Go ahead,
2 Ms. Curry. Maybe you can clarify.
3     MS. CURRY: Just to clarify,
4 we have on the supplemental list,
5 in addition to the expert reports,
6 the deposition transcripts and
7 exhibits to the depositions, and
8 so I believe that the additional
9 articles that would have been
10 reviewed by Dr. Holcomb are
11 included in those exhibits.
12     MS. GARBER: I see. So what
13 I'm supposed to do is I'm supposed
14 to go pull the deposition, and
15 pull the exhibits and then move
16 those forward to the reference
17 list to understand his library?
18     MS. CURRY: It's the
19 deposition that you actually took
20 of Dr. Saenz, the exhibits that
21 you presented to her in its
22 totality were provided to
23 Dr. Holcomb after that deposition.
24

Page 55

1 BY MS. GARBER:
2     Q.   And which of those papers,
3 after reading Dr. Saenz's deposition,
4 which of those -- strike that.
5         Which of those exhibits
6 after reading Dr. Saenz's deposition did
7 you pull and read, if any?
8     A.   I didn't have to pull any of
9 them of them. The paper was in the -- in
10 the exhibit. And I don't remember which
11 one. I believe there were about 30
12 exhibits. So if you show me the list I
13 can show you which ones I read.
14     Q.   Did you read every single
15 one of them?
16     A.   No.
17     Q.   Do any come to mind?
18     A.   I just said no.
19     Q.   Are some of them included in
20 the supplemental reference list that was
21 just produced a couple days ago?
22         MS. CURRY: Object to the
23 form.
24         THE WITNESS: I don't know.

Page 56

1 BY MS. GARBER:
2     Q.   Did you prepare the
3 supplemental reference list?
4     A.   Yes. I don't remember if
5 there's any overlap I'm saying.
6     Q.   Did you type it up yourself?
7     A.   No.
8     Q.   How was it that that was
9 prepared?
10     A.   How was what?
11         MS. CURRY: Object to the
12 form.
13 BY MS. GARBER:
14     Q.   The supplemental reference
15 list.
16     A.   The lawyers asked me, was
17 there anything else that I had reviewed,
18 and I just gave them a list of which
19 papers I had reviewed.
20     Q.   Thank you. What did you do
21 to prepare for today's deposition?
22     A.   I reviewed the epidemiologic
23 papers on talc, and in some cases just
24 powder use and ovarian cancer.

Page 57

1         I looked at the basic
2 science papers, some that addressed
3 mechanistic questions.
4         I looked at some of the
5 basic science papers on theories of
6 carcinogenesis.
7         I reviewed -- that's pretty
8 much it. I pretty much went through that
9 body of literature, so...
10     Q.   The epidemiological
11 literature that you looked at appear on
12 the reference lists that are attached to
13 your expert report and the supplemental
14 reference list that was just produced?
15     A.   Yes.
16     Q.   And when you say the basic
17 science on mechanism of carcinogenicity,
18 what data are those?
19         MS. CURRY: Object to the
20 form.
21         MS. SHARKO: Can you keep
22 your voice a little louder,
23 please?
24         MS. GARBER: Sure.

15 (Pages 54 to 57)

Page 58

1    MS. SHARKO:  Thank you.
2        THE WITNESS:  Could you
3    repeat the question as well.
4    BY MS. GARBER:
5        Q.   The basic science with
6    regard to mechanism of carcinogenicity,
7    what specific studies are those?
8        MS. CURRY:  Object to the
9    form.
10       THE WITNESS:  I don't
11   remember the specific studies
12   because most of that came from
13   reviewing other experts' expert
14   reports.
15   BY MS. GARBER:
16       Q.   Do those studies that you
17   reviewed in connection with preparation
18   for your deposition appear on the
19   reference lists that you have produced?
20       A.   Again, in those cases I
21   wasn't pulling the whole paper.  I was
22   just reading expert reports.  So no, it's
23   not.
24       Q.   When you say science with

Page 59

1    regard to basic science with regard to
2    carcinogens, the theories of carcinogens,
3    that would be your same answer as the
4    prior one; it was in the context of
5    reading expert reports?
6        A.   That's true.
7        Q.   How many hours did you
8    prepare for today's deposition?
9        A.   Do you mean from the
10   beginning of my engagement in the MDL or?
11       Q.   Specifically in connection
12   with just getting ready for today.  I'm
13   going to get to that, Doctor.  And thanks
14   for the clarification.
15       But just with regard to
16   preparing for today's deposition.
17       A.   I'm not sure -- I asked you
18   if there was a difference.  But I guess
19   in essence there really isn't.  I've been
20   preparing for this deposition from the
21   beginning of my engagement.
22       So I would say probably
23   about 90 hours.
24       Q.   So is it your testimony that

Page 60

1    from the time that you were retained by
2    Johnson & Johnson in the MDL through
3    today's deposition, you prepared about
4    90 hours?
5        MS. CURRY:  Object to the
6    form.
7        THE WITNESS:  That's true.
8    BY MS. GARBER:
9        Q.   And your pay rate is $850 an
10   hour?
11       A.   That's true.
12       Q.   Doctor, in the Ingham case,
13   it was your opinion that occupational
14   exposure to asbestos couldn't cause
15   ovarian cancer; is that correct?
16       MS. CURRY:  Object to the
17   form.
18       THE WITNESS:  Yes.
19   BY MS. GARBER:
20       Q.   And is that still your
21   opinion today?
22       A.   As with my deposition at the
23   time of Ingham, I was quoting IARC's
24   monograph on the topic.  And also offered

Page 61

1    some critiques of that finding, which
2    included concerns about
3    misclassification, concerns about whether
4    environmental exposures really supported
5    the findings or not.  And so, you know, I
6    spent quite a bit of time in the Ingham
7    deposition going through this.  But I
8    accepted IARC's findings.
9        Q.   So my question is a little
10   narrower.
11       A.   Mm-hmm.
12       Q.   Is it your opinion today
13   that occupational exposure to asbestos
14   can cause ovarian cancer?
15       A.   In my -- it's my opinion
16   that based on the five heavy occupational
17   exposure papers cited in that IARC
18   monograph, that in those specific
19   situations, yes, those exposures did
20   contribute to ovarian cancer.
21       Q.   Doctor, did you testify in
22   Ingham that occupational exposure to
23   asbestos can cause ovarian cancer?
24       MS. CURRY:  Object to the

16 (Pages 58 to 61)

Kevin Holcomb, M.D.

Page 62

1    form.
2        THE WITNESS: Again, if I
3    did, it's to the degree of -- I --
4    I don't have any opinion outside
5    of the literature that I read on
6    the topic. And the only
7    literature I've read on the topic
8    are those five papers cited in the
9    monograph. So if I said it during
10   Ingham, it's based on the same
11   data that I'd be saying it based
12   on today.
13   BY MS. GARBER:
14       Q.   Was it your testimony that
15   occupational exposure to asbestos can
16   cause ovarian cancer?
17       MS. CURRY: Object to the
18   form.
19       THE WITNESS: I believe so.
20   BY MS. GARBER:
21       Q.   And is it your opinion today
22   that occupational exposure to asbestos
23   can cause ovarian cancer?
24       MS. CURRY: Object to the

Page 63

1    form.
2        THE WITNESS: Once again,
3    it's my opinion that occupational
4    exposure in those settings as
5    described in the IARC monograph,
6    which would be, you know, the --
7    the women who participated in gas
8    mask productions, or cement
9    factories in pre-World War II
10   Italy, and in those specific
11   situations, yes, I think that
12   there's enough evidence to deduce
13   that -- that exposure increased
14   the risk of ovarian cancer.
15   BY MS. GARBER:
16       Q.   So if I asked you in any
17   hearing, Doctor, can occupational
18   exposure to asbestos cause ovarian
19   cancer, and I asked you for a yes or no
20   question, would the answer be yes?
21       MS. CURRY: Object to the
22   form.
23       THE WITNESS: I don't think
24   you can ask a yes or no question

Page 64

1    in that situation, because the
2    question is so broad to say in an
3    occupational setting. And I only
4    have data on a few different
5    settings where it was shown. And
6    so I'm going to restrict my
7    opinion to the data I've read, and
8    the data I've read on those
9    specific occupational settings.
10   BY MS. GARBER:
11       Q.   So, Doctor, I'm going to
12   mark as Exhibit 3 --
13       (Document marked for
14   identification as Exhibit
15   Holcomb-3.)
16   BY MS. GARBER:
17       Q.   -- prior deposition
18   testimony in the Ingham matter.
19       Doctor, this was deposition
20   testimony from May 7, 2018, right?
21       A.   Yes.
22       Q.   And if you turn to Page 103,
23   Lines 7 through 19, it reads:
24       "Question: Do you believe

Page 65

1    that asbestos exposure can cause ovarian
2    cancer?"
3        And your answer is: "Yes.
4    We did go over this before and I do
5    believe that occupational exposure to
6    asbestos can cause ovarian cancer."
7        And it goes on to say: "Is
8    that because you believe that asbestos
9    fibers in the ovaries increases the risk
10   of developing ovarian cancer?"
11       And your answer was: "I
12   have no idea of the mechanism by which it
13   could occur."
14       Is that still your testimony
15   today?
16       MS. CURRY: Object to the
17   form. And to showing one page of
18   the deposition transcript.
19       MS. GARBER: I don't think
20   we're going to have any speaking
21   objections here today, Ms. Curry.
22   I --
23       MS. CURRY: It's just --
24   you're -- he's referring back to

17 (Pages 62 to 65)

Kevin Holcomb, M.D.

Page 66

1    testimony and you're not showing
2    him the prior testimony.
3        MS. GARBER: As you well
4    know, Ms. Curry, the proper
5    objection is, "Objection to form."
6        MS. SHARKO: I think she's
7    doing fine.
8        MS. GARBER: I'm sure you
9    do.
10   BY MS. GARBER:
11       Q.   Go ahead, Doctor.
12       A.   So, in my answer I said yes,
13   we did go over this before, which sort of
14   supports the conversation I was saying
15   without all the things I said before, you
16   don't know how to interpret that.
17           But I know what -- how to
18   interpret that. It's what I'm just
19   saying, we had gone over this multiple
20   times being asked the same question,
21   similar to what's happening now. And I
22   kept restricting it to not stepping
23   outside of -- and -- and this is a common
24   theme that I think we're going to revisit

Page 67

1    over and over today.
2           This idea of making comments
3    and conclusions that go outside of the
4    specific findings of your studies, and
5    purists and careful clinicians and
6    scientists don't do that. And so if you
7    ask me does any occupational exposure
8    increase your risk of asbestos, how would
9    I know? I only have a body of literature
10   that looks at specific situations. And
11   that's the only situation that I'm going
12   to speak to -- speak about.
13           So when I said yes, we did
14   go over this before, that's because this
15   was about who knows how many times I had
16   been asked the same question with the
17   same answer.
18           MS. GARBER: Objection.
19   Motion to strike as nonresponsive.
20   BY MS. GARBER:
21       Q.   Doctor, you answered to the
22   question, do you believe that asbestos
23   exposure can cause ovarian cancer, yes.
24   We did go over this. And I do believe

Page 68

1    that occupational exposure to asbestos
2    can cause cancer.
3        A.   Are you --
4        Q.   That's your --
5            MS. CURRY: Same objections.
6    BY MS. GARBER:
7        Q.   That's your answer, right?
8        A.   My answer has a piece of it
9    that you can't, or don't, or you're not
10   interested in. And I think it's just as
11   important as the part that you're
12   focusing on that says yes, we did go over
13   this before.
14           I'd be happy to go through
15   the entire transcript of this area. I
16   think you'll find what I'm referring to
17   as being consistent, that I was trying to
18   say that my opinions about exposure in
19   the occupational setting was restricted
20   to the few occupational settings that
21   were defined in the IARC monograph. And
22   that is what I'm trying to tell you now.
23           Because I said we've gone
24   through this before, I'm referring to

Page 69

1    those qualifications.
2        Q.   I'm just trying to get your
3    opinions here today. You understand
4    that, right?
5        A.   I don't. I don't. I don't
6    think so. Because my opinion on this is
7    so clear that I believe that if you're
8    making gas masks in a World War II, or
9    pre-World War II or during World War II
10   factory, or if you're mixing cement in
11   Italy around the same time, that I'd be
12   concerned about your risk of ovarian
13   cancer.
14           Outside of those specific
15   situations, I don't have an opinion.
16       Q.   You've read the IARC
17   monograph from 2012 with regard to
18   asbestos, right?
19       A.   Yes.
20       Q.   And, in fact, it's on your
21   reference list in this matter?
22       A.   Yes.
23       Q.   And, Doctor, do you think
24   that the IARC 2002 monograph limits risk

18 (Pages 66 to 69)

Kevin Holcomb, M.D.

Page 70

1    of ovarian cancer to occupational
2    exposure?
3         MS. CURRY: I believe you
4    mean IARC 2012. And objection to
5    form.
6         MS. GARBER: Thank you.
7    BY MS. GARBER:
8         Q.   So I'll redo that question.
9         Doctor, do you think the
10   IARC monograph of 2012 limits risk of
11   ovarian cancer to occupational exposure?
12        MS. CURRY: Object to the
13   form.
14        THE WITNESS: I'm telling
15   you my -- my opinion, which is
16   what I think you're trying to get
17   at, is that the only data on
18   occupational exposure that showed
19   an increased risk of ovarian
20   cancer were those same specific
21   settings that I am mentioning to
22   you. And so my personal opinion
23   is that I can only speak towards
24   the relationship of asbestos

Page 71

1    exposure in an occupational
2    setting and ovarian cancer with
3    regard to those specific settings.
4         (Document marked for
5    identification as Exhibit
6    Holcomb-4.)
7    BY MS. GARBER:
8         Q.   I'm going to mark as
9    Exhibit 4 the IARC monograph of 2012
10   Volume 100-C, titled "Arsenic, Metals,
11   Fibres, and Dust: A Review of Human
12   Carcinogens."
13        And I apologize. I don't
14   have a full copy of this with me.
15        A.   Sure. Thank you.
16        MS. SHARKO: Do you have a
17   copy for us?
18        MS. GARBER: That's what I
19   just said, Ms. Sharko. I
20   apologize. I don't have a full
21   copy. I have a page that I'm
22   going to question him from, but
23   not all the pages.
24        It's based on testimony that

Page 72

1    I just got. So I apologize.
2    BY MS. GARBER:
3         Q.   Doctor, if you could turn to
4    Page 219 of the monograph. And, Doctor,
5    you can look up here. It will go quicker
6    this way if you just --
7         A.   I'd rather look at it, if
8    that's okay.
9         You said 219. Oh.
10        Q.   Yeah. Why don't you just
11   look up here. I'm just going to read
12   something.
13        219, it says, exposure data,
14   identification of the agent.
15        A.   219 -- but what I saw at the
16   back.
17        Q.   Doctor, if you can just look
18   up here.
19        MS. CURRY: I'm sorry. The
20   exhibit that you just handed him
21   does not have a Page 219, is the
22   problem.
23        THE WITNESS: So I just -- I
24   just want to make sure that what

Page 73

1    you've given me is what you're
2    reading.
3         MS. GARBER: Yeah, that's
4    fine.
5    BY MS. GARBER:
6         Q.   Why don't you just look up
7    here at the Elmo.
8         A.   Are we looking at the same
9    thing?
10        Q.   Yes. Yes. I will cure it
11   on the break.
12        MS. SHARKO: If the doctor
13   wants a paper copy, number one
14   he's allowed to have it, and
15   number two --
16        MS. GARBER: Well, you --
17   you have one.
18        MS. SHARKO: -- I'm three
19   seats closer to the screen, and I
20   can't even read that.
21        MS. GARBER: You have one,
22   right?
23        MS. SHARKO: So I don't know
24   how he can.

19 (Pages 70 to 73)

Page 74

1    MS. CURRY: This is the one
2    page. I have the full.
3        THE WITNESS: Okay. So --
4    BY MS. GARBER:
5        Q.   So at Page 219, Doctor, do
6    you see that it says asbestos, and then
7    it lists the different fibers, correct?
8    The different types of asbestos?
9        A.   I don't know -- can you
10   please --
11       Q.   The title. The title.
12       A.   Yes.
13       Q.   The top.
14       A.   The -- correct.
15       Q.   All right. And then under
16   exposure data, Number 1, it says,
17   "Identification of the agent."
18       Do you see that?
19       A.   Yes.
20       Q.   And then about halfway
21   through the paragraph, it says, "The
22   conclusions reached in this monograph
23   about asbestos and its carcinogenic
24   risk" --

Page 75

1        A.   I'm sorry. I'm still just
2    getting up to where you are.
3        Q.   Just look -- just look up at
4    here, Doctor.
5        A.   Ma'am, if it's okay with
6    you, we went through the trouble to get
7    this because it's easier for me to see.
8    I'm going to use this if you just bear
9    with me.
10       Q.   Okay. Well, then you can
11   look up here to see where I'm reading.
12       A.   I've got you.
13       Q.   Okay. "The conclusions
14   reached in this monograph about asbestos
15   and its carcinogenic risks apply to these
16   six types of fibers wherever they are
17   found, and that includes talc containing
18   asbestiform fibers."
19       Correct? Is that what it
20   says?
21       A.   That's what it says.
22       Q.   Doctor, that's my only
23   question. Is that what it says?
24       A.   "The conclusions reached in

Page 76

1    this monograph about asbestos and its
2    carcinogenic risks apply to these six
3    types of fibers wherever they are found."
4    And I'm going to assume that the
5    conclusions are going to be based on the
6    studies that they cite.
7        Q.   Doctor, we don't want to
8    make conclusions. My question is, does
9    that what the monograph say?
10       A.   That's what the monograph --
11       Q.   Did I read that correctly?
12       A.   You read the monograph
13   correctly.
14       Q.   And I have no further
15   question for you.
16       MS. GARBER: Motion to
17   strike everything besides saying
18   yes, that's what it says.
19       MS. SHARKO: Does that mean
20   that we're done for today?
21   BY MS. GARBER:
22       Q.   Doctor, is that what the
23   monograph says on Page 219?
24       A.   That's what the monograph

Page 77

1    says. I disagree with that. Yes.
2        Q.   Okay. What part do you
3    disagree with?
4        MS. CURRY: Object to the
5    form.
6        THE WITNESS: I think -- I
7    was getting at this before, and I
8    think that a lot of what we're
9    going to get into today makes that
10   same mistake. You can't make
11   conclusions about things that you
12   haven't studied. And if you only
13   study a certain setting, and
14   you're able to show that in this
15   setting it causes ovarian cancer,
16   how can you reliably expand that
17   finding to situations that you've
18   never even looked at?
19       And I don't care if IARC
20   puts it in writing and says they
21   are going to do that. The
22   question is, do I accept it? Do
23   I accept that if you show me that
24   it causes cancer if you're making

Kevin Holcomb, M.D.

Page 78

1    gas masks, that means it causes
2    cancer in any other situation.
3         I think that's -- clearly is
4    what IARC said they did.  I think
5    that's a problem.  And I already
6    explained to you some of the other
7    issues that I have with IARC.  I
8    mean, we all can make mistakes.
9    There's other issues with IARC.  I
10   mean, the studies, even in the
11   ones that I accept, there's
12   misclassification issues.
13        In fact, if you look at the
14   studies where they do pathologic
15   confirmation, the increased risk
16   is attenuated to the baseline.
17        And so, you know, part of my
18   being able to give my opinion here
19   is my years of practice.  And I've
20   had the experience of debulking
21   somebody who I thought had ovarian
22   cancer who ended up having
23   mesothelioma.
24        So I know the difficulties

Page 79

1    in being able to tell the
2    difference between the two.
3    BY MS. GARBER:
4         Q.   Doctor, I'm going to get to
5    your report.
6         MS. CURRY:  Were you
7    finished with your response?
8         THE WITNESS:  No.
9         And I'm also aware that, you
10   know, there was not even a
11   diagnosis code for malignant
12   mesothelioma at a time that -- an
13   international diagnosis code, an
14   ICD-9 code for mesothelioma during
15   this time.
16        And I'm sure that the
17   immunohistochemical test that
18   helped to distinguish between
19   ovarian cancer and primary
20   peritoneal cancer and malignant
21   mesothelioma were not developed at
22   that time.
23        So, yes, I take IARC at what
24   they're saying.  But even in the

Page 80

1    settings where they found that
2    it's associated with, there are
3    weaknesses in their findings.  To
4    extend that definition outside to
5    any occupational exposure that
6    they haven't examined, I think is
7    problematic.
8    BY MS. GARBER:
9         Q.   Doctor, what was my
10   question?
11        A.   Did IARC make that
12   statement, and I said yes.
13        Q.   Thank you.
14        MS. GARBER:  Motion to
15   strike everything besides that.
16        MS. SHARKO:  Well, that
17   wasn't the question you asked.
18   BY MS. GARBER:
19        Q.   Doctor, you disagree --
20        MS. CURRY:  He answered your
21   question.
22        MS. O'DELL:  All right,
23   Susan.  We went over this
24   earlier -- I think -- not earlier

Page 81

1    this week, last week.  I think
2    Dawn is doing the objections.
3    There's no need for you to add the
4    commentary.
5         MS. SHARKO:  Well, why --
6    why are you talking if it's one
7    lawyer per side?  You should have
8    been there yesterday when you had
9    three people on your side talking
10   at us.
11        MS. O'DELL:  Well, I
12   can't -- can't speak to yesterday.
13   But we've had this discussion, you
14   and I, and --
15        MS. CURRY:  As the person
16   making objections, I do want to
17   put on the record that the
18   question that was asked was what
19   part of -- of IARC do you disagree
20   with, and so Dr. Holcomb's
21   response was directly responsive
22   to that question.
23        Thank you.
24

21 (Pages 78 to 81)

Page 82

1    BY MS. GARBER:
2        Q.   Doctor, we will get to your
3    report and what you say about asbestos.
4            My question was simply,
5    Number 1, at Page 219 where I read: "Is
6    that what the monograph says?"
7            And I think your testimony
8    was, yes, that's what the monograph says,
9    correct?
10       A.   That's what the monograph
11   says.
12       Q.   All right.  And then I
13   wanted to show you next at Page 232 with
14   regard to your testimony about the
15   populations?
16       A.   I'm sorry.
17       Q.   232 --
18       A.   232, right.
19       Q.   -- under human exposure.
20       A.   This is the --
21       Q.   Are you there?
22       A.   I'm just a little confused,
23   because this is talking about talc.  And
24   we were talking about asbestos.

Page 83

1            Are we in the same --
2        Q.   Are you --
3        A.   I think I'm in a
4    different --
5        Q.   -- are you on Page 232?
6        A.   Yes, but I don't know if I'm
7    reading the same thing you are.  You are
8    talking about the monograph on --
9        Q.   On asbestos.
10       A.   Right.  I think I'm in the
11   wrong --
12       Q.   No, that is -- that is --
13       A.   This is the right one?  Oh,
14   2012.  So this is the one.
15       Q.   Okay.  Doctor, under 1.6.5,
16   it says, "Human Exposure"?
17       A.   Yeah.
18       Q.   And then it indicates
19   "Exposure of the General Population."
20           Is that the heading?
21       A.   Exposure of the general
22   population.  And it's -- yeah, exposure
23   to talc for the general population.
24       Q.   Okay.  Well, let's read what

Page 84

1    it says.
2            It says, "Consumer products,
3    e.g., cosmetic, pharmaceuticals, are the
4    primary sources of exposure to talc for
5    the general population.  Inhalation and
6    dermal contact through" -- "i.e., through
7    perineal application of talcum powders,
8    are the primary routes of exposure."
9            Did I read that correctly?
10       A.   Yes.
11       Q.   So that is indicating that
12   talcum powder products and exposure in
13   the general population, correct?
14           MS. CURRY:  Object to form.
15   BY MS. GARBER:
16       Q.   That's on Page 232?
17       A.   I -- I just want to -- I
18   know we're only picking out this one page
19   to read, but it's a little confusing to
20   me since we had started reading a
21   monograph on asbestos and this seems to
22   be dealing with talc.
23           So I turn one page back.
24   This is a section on talc containing

Page 85

1    asbestiform fibers.
2            So this area that we are
3    talking about -- I -- I don't know if
4    they are talking about -- what -- I'm a
5    little unclear of what they are talking
6    about here, with the general -- are they
7    talking about asbestiform fibers?  Are
8    they talking about -- I'm not sure.
9        Q.   Let me see if I can help
10   you.
11       A.   Thank you.
12       Q.   So turning back to 219.
13       A.   Yes.
14       Q.   Where the monograph says,
15   "The conclusions reached by the monograph
16   about asbestos and its carcinogenic risks
17   apply to these six types of fibers
18   wherever they are found -- thereby
19   meaning asbestos -- and that includes
20   talc containing asbestiform fibers."
21           So this monograph applies to
22   both talc containing asbestiform fibers,
23   and asbestos.
24           You understand that,

22 (Pages 82 to 85)

Page 86

1    correct?
2        A.    This goes to the question of
3    what I disagree with, because what you're
4    saying is that if they study asbestos in
5    these heavy occupational exposures, that
6    means you should then extend these
7    findings to other clinical settings
8    outside of that.  And -- so yes, I get
9    what you're saying and that's exactly
10   what I was saying I disagreed with.
11       Q.    Do you -- I guess I don't
12   know what your -- what your opinion is,
13   so I'll ask it.
14            You understand that this
15   monograph from 2012 applies to asbestos
16   and asbestiform talc, you understand
17   that, right?
18       A.    Yes.
19       Q.    Thank you.
20            Doctor, in your expert
21   report and just a minute ago, you were
22   talking about the misdiagnosis of ovarian
23   cancer and peritoneal mesothelioma.  Do
24   you recall that?

Page 87

1        A.    I said misclassification.
2        Q.    Okay.  And, we'll turn to
3    that part of your expert report in a bit.
4    But since you brought it up, if you could
5    turn to Page 356 of the monograph.
6        A.    Sand and gravel?
7        Q.    It's -- did I say three?
8        A.    You said 356, sand and
9    gravel.
10       Q.    256.  I apologize.
11       A.    Okay.
12       Q.    Okay.  If you look at the
13   right-hand column.  We'll -- we'll start
14   with the first full paragraph which reads
15   the working group -- are we together?
16       A.    Yes.
17       Q.    Okay.  "The working group
18   noted that a causal association between
19   exposure to asbestos and cancer of the
20   ovary was clearly established based on
21   five strongly positive cohort mortality
22   studies of women with heavy occupational
23   exposure."
24            That's what you were

Page 88

1    testifying a bit ago, right?
2        A.    That's true.
3        Q.    All right.  But it goes on,
4    doesn't it, Doctor?  It says, "The
5    conclusion received" -- "the conclusion
6    received additional support from studies
7    showing that women and girls with
8    environmental, but not occupational
9    exposure to asbestos," right?
10       A.    This is what I was --
11   maybe -- maybe it wasn't clear what I was
12   referring to when you asked me earlier
13   what I disagreed with.
14            And I talked about the
15   limitations of the IARC monograph.  I
16   mentioned this issue, that they'll make
17   these statements and then they give you a
18   couple of papers to go look at; Ferante,
19   et al., and Reid, et al.
20            When you go back and you
21   look at those studies, they actually come
22   to the exact opposite conclusion, that
23   women in those settings did not have an
24   increased risk of ovarian cancer.  And

Page 89

1    yet the IARC authors say that their
2    findings were supported.  So they have
3    five strong studies showing an increased
4    risk of ovarian cancer.  Two studies
5    in -- in environmental settings that show
6    no increases of ovarian cancer come to
7    the conclusion that that is not a
8    discrepancy, it's actually in support of.
9            And I am supposed to read
10   this and agree with that.
11       Q.    You disagree with IARC and
12   their findings with regard --
13       A.    No, and if they regard --
14       Q.    Hold on, Doctor.
15       A.    Yes.  Okay.
16       Q.    You disagree with IARC and
17   their findings with regard to asbestos
18   and asbestiform talc and its
19   carcinogenicity as it relates to the
20   ovary, correct?
21            MS. CURRY:  Object to the
22   form.
23            THE WITNESS:  My opinion
24   about this is that I restrict my

23  (Pages 86 to 89)

Kevin Holcomb, M.D.

Page 90

1  opinions about the carcinogenicity
2  of asbestos with ovarian cancer to
3  the settings where it was shown to
4  increase ovarian cancer.
5      If you ask me about settings
6  where the studies explicitly show
7  it did not increase ovarian
8  cancer, I don't accept that it
9  increases ovarian cancer in those
10  situations.
11      I don't understand how a
12  reasonable person could. If you
13  read a study that says it did not
14  increase risk of ovarian cancer in
15  a situation, why would you then
16  conclude that it does?
17  BY MS. GARBER:
18      Q.  Have you done a thorough and
19  comprehensive assessment of the
20  literature as it pertains to asbestos and
21  ovarian cancer?
22      MS. CURRY:  Object to the
23  form.
24      THE WITNESS:  To be honest,

Page 91

1  I'm hoping that IARC would have
2  done an extensive study of the
3  literature. So my only -- as I've
4  already admitted, I'm not an
5  asbestos specialist, so my
6  understanding of asbestos and
7  ovarian cancer is limited to IARC.
8      And if they've done an
9  extensive review to reach their
10  conclusions, then I would have to
11  say that I have as well, because I
12  reviewed the papers they've
13  reviewed. And I've already
14  repeatedly told you the problems
15  that I have with saying you're
16  supported by studies that find the
17  exact opposite findings of the
18  studies that hold your original
19  opinion."
20  BY MS. GARBER:
21      Q.  Is the answer to my question
22  no, I have not conducted a full
23  comprehensive review of the literature?
24      MS. CURRY:  Object to the

Page 92

1  form.
2      THE WITNESS:  I believe I
3  have. I'm disagreeing with you.
4  BY MS. GARBER:
5      Q.  Because --
6      A.  I'm saying --
7      Q.  Because you --
8      A.  -- because I reviewed
9  IARC --
10      MS. CURRY:  Sorry. You
11  can't talk over one another.
12      Do you want to finish your
13  response?
14      THE WITNESS:  My
15  understanding is that IARC,
16  because so many other groups rely
17  on their findings to inform their
18  opinions, that they are tasked
19  with doing a comprehensive review
20  of the literature on the topic.
21  And so yes, I feel like if I
22  reviewed what they reviewed, I've
23  done a comprehensive review as
24  well.

Page 93

1  BY MS. GARBER:
2      Q.  With regard to the
3  misclassification issue that you
4  testified about, Doctor, if you could
5  look back at Page 256.
6      A.  Yes.
7      Q.  It indicates, "The working
8  group carefully considered the
9  possibility that cases of peritoneal
10  mesothelioma may have been misdiagnosed
11  as ovarian cancer and that these
12  contributed to the observed excesses.
13  Contravening that possibility is the
14  finding that three of the studies cited
15  here specifically examined the
16  possibility, and there were misdiagnosed
17  cases of peritoneal mesothelioma, and all
18  failed to find sufficient numbers of
19  misclassified cases."
20      Doctor, do you agree with
21  that statement?
22      A.  I agree with the statement
23  that they did not find what they
24  considered enough cases of misclassified

24 (Pages 90 to 93)

Kevin Holcomb, M.D.

Page 94

1    cases. But I'm aware that they actually
2    did not go back and do a histologic
3    evaluation of every case.
4         What I'm also aware of is
5    that specific cases that do
6    systematically go back and have
7    pathologic confirmation somehow come to a
8    different conclusion than the studies
9    that don't do that. And so I'm still
10   left wondering, if you do a systematic
11   pathology review and classify them, you
12   don't find an increased risk. If you
13   don't do a systematic pathology
14   confirmation, you find an increased risk.
15        I'm like IARC, I'm not
16   convinced that misclassification has been
17   totally ruled out because I can't
18   understand why these two different types
19   of studies are coming -- you see, you're
20   losing consistency then.
21        Q.   IARC found otherwise.
22        A.   I just admitted that I have
23   a different opinion.
24        Q.   So your review as to the

Page 95

1    issue of asbestos and asbestiform talc
2    and carcinogenicity is limited to IARC
3    2012, correct?
4         MS. CURRY: Object to the
5         form.
6         THE WITNESS: Again, I'm
7    trying to -- trying to state this
8    as clearly as possible so we can
9    move on.
10        My opinion of asbestos and
11   its ability to cause cancer of the
12   ovary are restricted to the
13   studies of heavy occupational
14   exposure in which they actually
15   found an increased risk of ovarian
16   cancer.
17   BY MS. GARBER:
18        Q.   And your review to come to
19   your opinions is limited to IARC 2012?
20        MS. CURRY: Object to form.
21        THE WITNESS: As far as
22   asbestos?
23   BY MS. GARBER:
24        Q.   Yes.

Page 96

1         A.   Yes.
2         Q.   And asbestiform talc?
3         A.   Yes.
4         Q.   Thank you.
5         Do you agree, Doctor, that
6    asbestos and asbestiform talc are Group 1
7    carcinogens under IARC 2012?
8         A.   I agree.
9         Q.   Doctor, if talcum powder
10   products contain asbestos, talcum powder
11   products contain a Group 1 carcinogen?
12        MS. CURRY: Object to the
13        form.
14        THE WITNESS: Excuse me?
15   BY MS. GARBER:
16        Q.   You just testified that
17   asbestos is a Group 1 carcinogen, right?
18        A.   Yes.
19        Q.   And --
20        A.   According to IARC, yes.
21        Q.   Okay. And if, it's a
22   hypothetical, talcum powder products
23   contain asbestos, then those talcum
24   powder products contain a Group 1

Page 97

1    carcinogen, right?
2         A.   That would be IARC's
3    opinion, yes.
4         Q.   Is it your opinion? It's a
5    Group 1 carcinogen.
6         A.   You asked, you asked what --
7    in the beginning whether -- what's my
8    definition of a carcinogen. And I said
9    it's a substance that can cause cancer.
10        So on one hand you're asking
11   if it contains this substance that IARC
12   has deemed a Level 1 carcinogen, would it
13   contain that carcinogen? By definition,
14   yes. You said if I take that
15   supposition.
16        I would just say I'm looking
17   at, and I was asked to review the
18   literature on talc. And you asked me
19   what do I consider talc, and I said
20   Johnson & Johnson and Shower to Shower.
21   Is that a carcinogen?
22        And now that goes back to my
23   definition of carcinogen. Can that
24   powder cause cancer? And my review, as

25  (Pages 94 to 97)

Kevin Holcomb, M.D.

Page 98

1  you know you've already asked, would be
2  no.
3      Q.  Well, so I'll go back to my
4  question.
5          Assume that talcum powder
6  products contain asbestos, then they
7  contain a Group 1 carcinogen, right?
8          MS. CURRY:  Object to form.
9          THE WITNESS:  You know,
10  we're sort of tying all these
11  things together.  I already
12  explained that I disagreed with
13  IARC's definition of at least its
14  role of -- outside of those heavy
15  occupational exposures, which are
16  the only studies that they cite
17  which shows an increased risk of
18  ovarian cancer.
19          So you're saying would IARC
20  consider that in talc as a
21  carcinogen, the asbestos, and I'm
22  saying yes, they considered -- in
23  your supposition, would
24  asbestiform talc be considered a

Page 99

1  Group 1.  I would say according to
2  IARC, yes.
3          I'm just clarifying to say
4  that the whole point of me being
5  here is to give an opinion whether
6  that supposition that you just
7  said, if there is asbestos in Baby
8  Powder, Johnson & Johnson's
9  product, is that a carcinogen?
10          And my answer would be no,
11  because I don't see convincing --
12  and we're going to go through I'm
13  sure all the reasons that I don't
14  believe that.  But I don't believe
15  that it proves that it's a
16  carcinogen.
17  BY MS. GARBER:
18      Q.  So then, you disagree with
19  IARC that asbestos is not a Group 1
20  carcinogen?
21          MS. CURRY:  Object to form.
22          THE WITNESS:  No.  You're
23  oversimplifying my statement.  And
24  I can't believe it's to really

Page 100

1  clarify my opinion, because my
2  opinion is really, I think,
3  clearly what I'm stating.
4          I'm saying that asbestos and
5  its relationship to ovarian cancer
6  has been clearly shown in a few
7  very unlikely situations ever to
8  happen again.  And those are those
9  prospective cohort studies.
10          I'm saying that IARC,
11  extending that outside of those
12  situations that they have not
13  studied, that's when I'm going to
14  go to what are people actually
15  using in that bottle.
16          And if that's asbestos in
17  that bottle, I'm closing this
18  book, and I'm opening the talc
19  monograph, because that -- all the
20  studies that they discuss in that
21  talc monograph are these products,
22  the Johnson & Johnson products.
23          I would be going to the
24  case-control studies in my report.

Page 101

1  I'd be going to the prospective
2  trials in my report.
3          I don't understand why we
4  would use such an indirect
5  comparison, finding something in
6  this book to help us figure out
7  does that product cause cancer
8  when there's been so much research
9  using what's in that bottle that
10  have results.
11  BY MS. GARBER:
12      Q.  Doctor, my question was just
13  way more broad than what -- what you're
14  answering.
15          Do you agree with IARC that
16  asbestos is a Group I carcinogen?  I
17  didn't mention ovarian cancer.  I said do
18  you agree with IARC that asbestos is a
19  Group I carcinogen?
20          MS. CURRY:  Object to the
21  form.
22          THE WITNESS:  Yes.  In
23  certain settings.
24  BY MS. GARBER:

26 (Pages 98 to 101)

Kevin Holcomb, M.D.

Page 102

```
 1         Q.   And so now if we put a
 2   Group I carcinogen in a bottle of talc,
 3   then the corollary is that the bottle of
 4   talc contains a Group I carcinogen,
 5   right?
 6         A.   That would be true.
 7              MS. CURRY:  Object to the
 8         form.
 9   BY MS. GARBER:
10         Q.   Thank you.
11              So let's mark your notice of
12   deposition as Exhibit 5.
13              (Document marked for
14         identification as Exhibit
15         Holcomb-5.)
16   BY MS. GARBER:
17         Q.   Doctor, we've marked as
18   Exhibit 5 your notice of deposition for
19   today's proceeding.  Did you review this
20   before today?
21         A.   At some point I did.
22         Q.   When did you review it?
23         A.   When?
24         Q.   Mm-hmm.
```

Page 103

```
 1         A.   When it was first produced.
 2         Q.   And did you review the
 3   documents --
 4              MS. GARBER:  And I
 5   understand you've made objections,
 6   Ms. Curry.
 7   BY MS. GARBER:
 8         Q.   But did you review the
 9   documents that we asked you to produce?
10         A.   Yes.
11         Q.   And did you endeavor to
12   comply with that and provide those
13   documents?
14         A.   Yes.
15         Q.   And have you brought with
16   you Item 3, a copy of your complete files
17   as they relate to the work done
18   concerning talcum powder litigation?
19              MS. CURRY:  Object to the
20         form.
21              THE WITNESS:  Yes.
22   BY MS. GARBER:
23         Q.   And where is that file?
24         A.   In my report.
```

Page 104

```
 1         Q.   Your file for this matter is
 2   your report?
 3         A.   Yes.
 4         Q.   Does it consist of anything
 5   else?
 6         A.   Does my report consist of
 7   anything else?
 8         Q.   No.
 9              Is it your testimony,
10   Doctor, that your file in this matter in
11   the MDL consists of your expert report,
12   which is dated February 25, 2019?
13              MS. CURRY:  Object to the
14         form.
15              THE WITNESS:  Yes.
16   BY MS. GARBER:
17         Q.   You don't have any other
18   documents?
19         A.   No.
20         Q.   And do you have any
21   document -- any scientific literature
22   that consists of your file?
23              MS. CURRY:  Object to the
24         form.
```

Page 105

```
 1              THE WITNESS:  I don't
 2         understand your question.
 3   BY MS. GARBER:
 4         Q.   You've reviewed a number of
 5   studies that appear on the reference
 6   lists attached to your expert report,
 7   correct?
 8         A.   Correct.
 9         Q.   Where physically are those
10   literature?
11         A.   When you say where
12   physically?
13         Q.   Mm-hmm.
14         A.   The -- I -- I did most of
15   my -- almost all of it electronically.
16         Q.   You didn't receive hard
17   copies of any documents?
18         A.   The expert reports I
19   received as a hardcopy.
20         Q.   What about with regard to
21   published literature.  Did you review
22   any -- did you receive any hard copies of
23   those?
24         A.   Not for the MDL.
```

27 (Pages 102 to 105)

Kevin Holcomb, M.D.

Page 106

1      Q.   You did receive hard copies
2  from the Ingham matter, correct?
3      A.   I did.  And I quickly asked
4  for electronic copies.
5      Q.   And did you make any notes
6  on those 61 studies that you received in
7  connection with Ingham?
8          MS. CURRY:  Object to the
9  form.
10         THE WITNESS:  No.
11 BY MS. GARBER:
12     Q.   With regard to the
13 literature that you reviewed in
14 connection with this matter, did you make
15 any notes electronically on the data?
16     A.   No.
17     Q.   Do you have the data saved
18 in a certain file in your computer?
19     A.   Yes.  I imagine it's
20 probably somewhere in my download list,
21 in my download area.
22     Q.   Like a DropBox?
23     A.   No.  I'm saying like if it
24 was sent electronically, when I

Page 107

1  downloaded it, I would imagine it must be
2  in the download part of my computer.
3      Q.   Have you -- I don't
4  understand when you say download of a
5  computer, where that would be?
6      A.   If you get a ZIP file, and
7  you open it, it's actually downloading
8  stuff to your computer.
9      Q.   I understand.  Okay.
10         Have you produced all
11 documents that relate to your
12 compensation for expert work in this
13 matter?
14     A.   Yes.
15         MS. CURRY:  Subject to the
16 objections.
17 BY MS. GARBER:
18     Q.   And have you produced all
19 references that identify facts, or data
20 that Johnson & Johnson lawyers provided
21 you and you considered in formulating
22 your opinions?
23     A.   Yes.
24     Q.   Are there any assumptions

Page 108

1  that Johnson & Johnson provided you that
2  you relied upon in forming your opinions?
3      A.   No.
4      Q.   Relating to your opinions as
5  set forth in your February 25, 2019,
6  litigation report, have you made any
7  assumptions?
8      A.   Please repeat that?
9      Q.   Sure.  Relating to your
10 opinions in your expert report in this
11 matter, have you made any assumptions?
12         MS. CURRY:  Object to the
13 form.
14         THE WITNESS:  No.
15 BY MS. GARBER:
16     Q.   Do you assume, in coming to
17 your causation opinions regarding talcum
18 powder products, that they are free of
19 asbestos?
20     A.   I don't have an opinion on
21 it.
22     Q.   Do you have an opinion as to
23 whether Johnson & Johnson products,
24 talcum powder products, are free of

Page 109

1  fibrous talc?
2      A.   No, I don't have an opinion.
3      Q.   Do you have an opinion if
4  Johnson & Johnson talcum powder products
5  contain heavy metals like nickel,
6  chromium, cobalt and the like?
7          MS. CURRY:  Object to the
8  form.
9          THE WITNESS:  I don't have
10 an opinion.
11 BY MS. GARBER:
12     Q.   Do you have an opinion
13 whether Johnson & Johnson talcum powder
14 products contain carcinogenic fragrances?
15         MS. CURRY:  Object to the
16 form.
17         THE WITNESS:  No, I don't
18 have an opinion.
19 BY MS. GARBER:
20     Q.   In the Ingham matter, you
21 had no opinion whether Johnson &
22 Johnson's talcum powder products
23 contained asbestos at any point, right?
24     A.   I didn't have an opinion,

28 (Pages 106 to 109)

Kevin Holcomb, M.D.

Page 110

1    no.
2         Q.   Is that still the case?
3         A.   Still the case.
4              (Document marked for
5         identification as Exhibit
6         Holcomb-6.)
7    BY MS. GARBER:
8         Q.   I'll mark as Exhibit 6 the
9    production that was made, I think, the
10   25th.
11             Doctor, this is a single
12   document that is printed on both sides,
13   and we'll start with the side that is
14   titled "Expert Report of Kevin Holcomb
15   For General Or Causation Daubert Hearing,
16   Supplemental Materials Received and
17   Reviewed By Dr. Kevin Holcomb."
18             Doctor, is this the
19   supplemental materials that you reviewed
20   after you issued your expert report?
21        A.   Yes.
22        Q.   Do you need to add any
23   further documents to this list to make it
24   accurate?

Page 111

1         A.   No.
2         Q.   And when did you review the
3    scientific studies that are listed there?
4         A.   When you say scientific?
5         Q.   Aside from the depositions
6    and expert reports, when did you review
7    each of those papers that are listed
8    there, specifically Items 1, 2, 8, 9 and
9    10?
10        A.   That came after reading
11   Dr. Saenz's deposition.  So I don't know.
12   Maybe about a week, week and a half ago.
13        Q.   Okay.  And then if we turn
14   the document over, does this reflect an
15   invoice issued by you on March 25th,
16   2019, to Johnson & Johnson for expert
17   services?
18        A.   Yes, it does.
19        Q.   And it indicates as to the
20   description for literature review,
21   drafting of expert report, and
22   preparation for deposition; is that
23   correct?
24        A.   That's true.

Page 112

1         Q.   And it lists 95 hours of
2    expert work?
3         A.   Yes, it does.
4         Q.   And at a rate of $850?
5         A.   Yes.
6         Q.   And so you've invoiced
7    Johnson & Johnson for $80,750, right?
8         A.   That's correct.
9         Q.   Have you been paid?
10        A.   No.
11        Q.   And are there any other
12   hours that you intend to invoice Johnson
13   & Johnson for?
14        A.   Yes.
15             MS. CURRY:  Object to the
16        form.
17   BY MS. GARBER:
18        Q.   And how many hours would
19   that entail?
20        A.   Depends on how long we go
21   today and the few hours yesterday.
22        Q.   How many hours yesterday?
23        A.   Maybe about four.
24        Q.   And do you intend to bill

Page 113

1    Johnson & Johnson for any work in
2    preparation of today's deposition before
3    the deposition started today?
4         A.   No.
5         Q.   Do you have a different rate
6    for your deposition --
7         A.   No.
8         Q.   -- as opposed to other work
9    that you do?
10        A.   No.
11        Q.   How much money were you paid
12   with regard to your work in the Ingham
13   case?
14        A.   In total, it was $100,300.
15        Q.   And so in connection with
16   your work today for Johnson & Johnson in
17   connection with talcum powder products,
18   ovarian cancer litigation, you have thus
19   at least invoiced and/or been paid for
20   roughly 183 -- almost $184,000; is that
21   fair?
22             MS. CURRY:  Object to the
23        form.
24             THE WITNESS:  No.

29 (Pages 110 to 113)

Page 114

BY MS. GARBER:
Q. How much?
A. You said invoiced and been paid?
Q. Yeah, so, so you have to date earned $103,000, correct?
A. Correct.
Q. And then you've invoiced Johnson & Johnson for $80,750, correct?
A. Correct.
Q. Plus the hours that you just mentioned?
A. Correct.
Q. Is that the totality of the compensation that you have received, or will receive up through today's deposition?
A. That is.
Q. Thank you.
(Document marked for identification as Exhibit Holcomb-7.)
BY MS. GARBER:
Q. I'm going to mark your

Page 115

expert report in the MDL as Exhibit 7.
You signed this document on February 25, 2019, correct?
A. Correct.
Q. And this is your litigation report attendant to the MDL talcum powder products litigation, correct?
A. Correct.
Q. Have you endeavored to have this litigation report published in any scientific journal?
A. No.
Q. Can you describe the process you used in developing the opinions contained in this report?
A. Yes. I started, again, by reviewing epidemiologic data. I reviewed both case-control and cohort studies. I looked at -- well, I guess my methodology would really be following Bradford Hill's methodology, because in reviewing that data I looked at the strengths of associations.
I tried to rate the studies

Page 116

with some degree of how strong I thought the studies were, how subject they might be to spurious results.
I looked to see if there was consistency. I looked to see if there was a biologic plausibility that involved mainly looking at migration issues. And then in a totality came up with my opinion about the ability of talc to cause ovarian cancer.
Q. If we turn to your references which appear beginning at Page 25 through 33. And in addition the supplemental references, there are more than the 61 references that you had in connection with the Ingham trial, correct?
A. Yes.
Q. Did you request any other documents or literature from counsel?
MS. CURRY: Object to the form.
THE WITNESS: No.
BY MS. GARBER:

Page 117

Q. And is it accurate that all of the documents that are listed on your reference lists, which include what's attached to your report and the supplemental, were all provided to you by counsel?
MS. CURRY: Object to the form.
THE WITNESS: No. Some of these I came up with on my own. I don't remember exactly which ones. But it's not all provided by counsel.
BY MS. GARBER:
Q. Is there anything you reviewed but did not rely upon in forming your opinions?
A. No.
Q. Are there any materials that you relied upon in forming your opinions that are not listed in your reference lists that we've reviewed?
MS. CURRY: Object to the form.

Kevin Holcomb, M.D.

Page 118

1    THE WITNESS: Other than
2    what I've already told you that I
3    came across in expert reports.
4    BY MS. GARBER:
5    Q.   And in drafting your expert
6    report, you have not made any notes; is
7    that correct?
8    A.   If you mean written, no.  I
9    would -- as the manuscript was being
10   produced, I would make points.  But it
11   all became incorporated in the end into a
12   final product.
13   Q.   What was the process by
14   which you developed your report?  Did you
15   read a study and then make some notes or
16   mental notes, or write?  Tell me the
17   process by which you --
18   MS. CURRY:  Object to the
19   form.
20   THE WITNESS:  I typically
21   worked with two monitors.  And one
22   I'm writing the manuscript.  The
23   other one, I'm bringing up papers.
24   BY MS. GARBER:

Page 119

1    Q.   Okay.  So there's no notes
2    that you made before you started to sit
3    down and write your expert report; is
4    that correct?
5    MS. CURRY:  Object to the
6    form.
7    THE WITNESS:  No.
8    BY MS. GARBER:
9    Q.   It's not correct?
10   A.   There are no notes.
11   Q.   There are -- thank you.
12   Did you read every word of
13   the documents listed in your reference
14   list?
15   A.   Yes.
16   Q.   Did you -- when you said you
17   obtained some of the references, is that
18   limited to reviewing exhibits from expert
19   reports or depositions?
20   A.   No.
21   Q.   Did you conduct any
22   searches, say, Medline searches or PubMed
23   searches?
24   A.   I did.

Page 120

1    Q.   What were your -- what was
2    your search engine?
3    A.   PubMed as you mentioned.
4    Sometimes Google.
5    Q.   And what were your search
6    terms?
7    A.   Ovarian cancer, talc,
8    perineal talc and ovarian cancer, body
9    powder and ovarian cancer.  It depended
10   what I was looking for.
11   There was some points I'm
12   making in my expert report where I'm
13   using analogies.  And so I was looking at
14   HPV and cervical cancer or herpes simplex
15   virus and cervical cancer.  And so it --
16   it depended on what I was -- what I was
17   looking at at the moment.
18   Q.   What did you do, Google
19   searches?
20   A.   I'm guilty of using Google
21   from now and then to start a search.
22   It's sometimes faster.  It will bring up
23   PubMed articles.
24   Q.   Did -- have you read, since

Page 121

1    the production of your supplemental
2    reference list, have you read any other
3    expert reports or depositions or other
4    studies?
5    A.   Since?
6    Q.   Since the production of your
7    supplemental expert report which was
8    marked as Exhibit 6.
9    MS. CURRY:  Object to the
10   form.  You mean supplemental
11   materials received list?
12   MS. GARBER:  Yes.
13   THE WITNESS:  Only -- let's
14   see.  Yes, there's one other --
15   one other paper, and that was a
16   migration paper.  But I believe it
17   just came out.  It was --
18   BY MS. GARBER:
19   Q.   What's the title?
20   A.   I don't remember.
21   Q.   Or the author?
22   A.   It was -- I don't know who
23   is the first author.  I know --
24   Q.   Can you give me any authors?

31 (Pages 118 to 121)

Kevin Holcomb, M.D.

Page 122

```
 1        A.   Cramer was -- was involved.
 2    I don't remember the first author though.
 3        Q.   What was the nature of that
 4    paper?
 5        A.   It was --
 6             MS. CURRY:  Object to the
 7    form.
 8             THE WITNESS:  It was a paper
 9        looking at an attempt to try to
10        differentiate contamination from
11        actual migration of talc
12        particles.
13    BY MS. GARBER:
14        Q.   What did you glean from that
15    paper, Doctor?
16             MS. CURRY:  Object to the
17    form.
18             THE WITNESS:  The biggest
19        thing that I gleaned was that
20        contamination is -- it's probably
21        even more widespread than I
22        realized.  And I appreciated the
23        effort to try to distinguish
24        between the two, but I wasn't
```

Page 123

```
 1        convinced that you can
 2        necessarily.
 3    BY MS. GARBER:
 4        Q.   Did the authors there
 5    attempt to distinguish surface
 6    contamination from talc that was deeply
 7    embedded in the tissue?
 8        A.   Well, they were only looking
 9    at lymph nodes from my memory.  So they
10    were trying to distinguish between
11    particles on the surface and particles
12    that are in, deeper inside the lymph node
13    itself, yes.
14        Q.   Does that paper provide a
15    basis for any of your expert opinions
16    today?
17        A.   No.
18        Q.   You did not rely upon -- you
19    do not rely upon the Cramer -- we'll call
20    it Cramer contamination paper -- for
21    purposes of your expert opinions; is that
22    fair?
23        A.   That's fair.
24        Q.   Did you read any other
```

Page 124

```
 1    expert reports or depositions after the
 2    supplemental reference list?
 3        A.   No.
 4        Q.   And it is accurate that
 5    prior to signing your expert report on
 6    February 25, 2019, you had not read the
 7    recent Saed 2019 paper with regard to a
 8    molecular basis supporting the
 9    association of talcum powder use with
10    increased risk of ovarian cancer, right?
11             MS. CURRY:  Object to the
12    form.
13             THE WITNESS:  I'm sorry, can
14        you repeat the question again?
15        Prior to --
16    BY MS. GARBER:
17        Q.   Sure.
18        Prior to signing your expert
19    report on February 25, 2019, you had not
20    read Dr. Saed's 2019 publication,
21    correct?
22        A.   That's true.
23             MS. CURRY:  Same objection.
24    Sorry.
```

Page 125

```
 1    BY MS. GARBER:
 2        Q.   Prior to signing your expert
 3    report on February 25, 2019, likewise you
 4    had not read Dr. Saed's abstract with
 5    regard to talc and ROS induction,
 6    correct?
 7        A.   That's true.
 8        Q.   You indicate at Page 20 --
 9             MS. CURRY:  Do you need a
10    break?
11             THE WITNESS:  Well, I wasn't
12    sure if I -- it looks like we're
13    going to be close to lunch so...
14        We'll be planning on
15    breaking around 12 or --
16             MS. CURRY:  Sorry.  I
17    thought he had a message from the
18    hospital, so I wanted to make sure
19    if he needs to take a break.
20    We've been going over an hour,
21    Susan, so whenever is a good time
22    for you.
23             MS. GARBER:  You want to
24    take a break?  Whenever you
```

32 (Pages 122 to 125)

Kevin Holcomb, M.D.

Page 126

1    guys --
2         THE WITNESS:  I'm fine for a
3    break.
4         MS. GARBER:  You want to
5    take a break?
6         THE WITNESS:  Yeah, I'd
7    appreciate it.
8         MS. GARBER:  Okay.
9         THE VIDEOGRAPHER:  Please
10   remove your microphones.  The time
11   is 11:28 a.m.  Going off the
12   record.
13        (Short break.)
14        THE VIDEOGRAPHER:  Okay.  We
15   are back on the record.  The time
16   is 11:42 a.m.
17   BY MS. GARBER:
18   Q.   Doctor, you state at Page 22
19   of your report that plaintiffs' expert
20   gynecologic oncologist conducted a
21   selective review of the study on biologic
22   mechanism.
23        What studies do you
24   contend --

Page 127

1         A.   Could you -- could you
2    point -- I'm not sure where you're
3    reading from.
4    Q.   From Page 22 of your expert
5    report.
6    A.   Right, where -- I'm just
7    looking where on the page it says this.
8    Q.   At the first full paragraph.
9         MS. CURRY:  I'm not seeing
10   it there either.
11        THE WITNESS:  I see where
12   you're saying.
13        You're saying, "Such
14   selective review of studies is
15   clearly conclusion driven."
16   Q.   Yeah, okay.  So what -- what
17   studies do you believe were omitted from
18   the expert -- from the plaintiffs'
19   experts?
20        MS. CURRY:  Object to the
21   form.
22        THE WITNESS:  There's animal
23   studies showing no ascension of --
24   of particles and -- and they --

Page 128

1    they do acknowledge that, but they
2    don't -- they don't describe it.
3    They just say considered limited
4    evidence to the contrary and find
5    it non-persuasive.
6         My review of the literature
7    on this topic, I was looking for
8    some studies showing that you
9    could dust the human vulva with
10   talc and show that those particles
11   can make it to the ovary, and I
12   couldn't find a single study in
13   that situation.
14        You could place particles in
15   the vagina.  You can give a
16   patient oxytocin.  You can do
17   some -- you know, different --
18   different than the majority of the
19   use of these products.
20        And so I -- I came to the
21   conclusion that their -- their
22   approach was conclusion driven,
23   just because it seemed to me, if
24   you've never seen a study that

Page 129

1    shows it's possible, and then you
2    just say well, the -- the studies
3    that I did say that it doesn't
4    happen in an animal model, I
5    don't -- I'm not persuaded by
6    that.
7    BY MS. GARBER:
8    Q.   What animal studies did you
9    review with regard to migration?
10   A.   Yeah, I'd have to look back
11   and see was -- whether it was the -- the
12   rat model or the pig model.  But there
13   were definitely animal model studies.
14        Let me just show you.  It's
15   in the -- in the talc monograph, if you
16   want me to, I can go back through and --
17   and find the citations of --
18   Q.   That's okay, Doctor.
19        I want to know what animal
20   studies you think plaintiffs' experts
21   should have looked at in connection with
22   migration.
23   A.   Well, it's exactly my point.
24   What I'm saying is the study they should

33 (Pages 126 to 129)

Kevin Holcomb, M.D.

Page 130

1  look at would be the study where someone
2  dusted the human perineum with talc and
3  showed that it was able to reach the
4  ovary, and that doesn't exist. So that
5  would be the best thing to look at.
6        The studies that I mentioned
7  to you, which I can go back to the talc
8  monograph and find, I don't remember if
9  it was Sprague rats or if it was actually
10 pigs or guinea pigs. There was a couple
11 of animal models where they were not able
12 to show migration from the vagina, not --
13 much less the perineum.
14 Q.   It's your testimony that
15 plaintiffs' experts didn't look at a
16 human study that dusted the perineum with
17 talc and it was shown to migrate to the
18 ovaries, and you're critical of that even
19 though such a study does not exist?
20       MS. CURRY: Object to the
21       form.
22       THE WITNESS: You know, I
23       guess what you can be critical of,
24       and I'd have to admit to that is,

Page 131

1  I'm saying such selective
2  review -- and I guess that's not
3  what's being selective here.
4  What's being selective is what you
5  consider persuasive or not.
6        It's not the review. It's
7  the absence of such a study. And
8  then not finding the studies on
9  animal models that don't show
10 ascension as not being persuasive.
11 BY MS. GARBER:
12 Q.   Doctor, I reviewed your
13 reference list, and I can find about
14 three studies with regard to the issue of
15 migration. And my question to you is,
16 did you do a comprehensive review of the
17 literature with regard to the ability of
18 talc to migrate from the genitals to the
19 perineum --
20       MS. CURRY: Objection.
21 BY MS. GARBER:
22 Q.   -- or to the ovaries?
23       MS. CURRY: Object to the
24       form.

Page 132

1        THE WITNESS: I'm not sure
2  what you mean by comprehensive. I
3  will tell you that the studies
4  that I do cite, for example a
5  study like Heller, where there's
6  no correlation between the
7  presence of talc in someone's
8  ovaries and the reported use of
9  talc, which I'm sure the
10 plaintiffs' experts have seen,
11 should give them reason to pause
12 if they've never been able to show
13 it in a human model that it can
14 happen.
15       And then you see studies
16 like that that say there's no
17 correlation between reported
18 history and the presence of talc
19 in the ovaries, that it should
20 make you -- it should make you
21 wonder.
22       And I wouldn't be so
23 dismissive of the studies that are
24 to the contrary. I mean, they're

Page 133

1  mentioning, "Reviewed the small
2  body of literature suggesting
3  migration of particles does not
4  occur." So they're admitting that
5  there is a body of literature that
6  shows that it doesn't occur.
7  BY MS. GARBER:
8  Q.   Doctor --
9  A.   You can go --
10 Q.   Doctor, if you can --
11       MS. CURRY: Are you finished
12 with your response?
13       THE WITNESS: Yeah.
14 BY MS. GARBER:
15 Q.   Can you turn to Page --
16 A.   Can I finish my answer?
17 So --
18 Q.   You can finish.
19 A.   Thank you.
20       So the statement that says,
21 "I've reviewed the small body of
22 literature suggesting that migration of
23 particles does not occur," they're
24 describing that body of literature as

34 (Pages 130 to 133)

Kevin Holcomb, M.D.

Page 134

1  small. And I'm saying that there is no
2  body of literature showing that perineal
3  dusting of talc gets to the ovaries.
4          So you're comparing small to
5  none, but you find the small
6  non-persuasive.
7      Q. Doctor, if you can turn to
8  Page 16 of your expert report. There is
9  a section on Page 16 titled "Migration of
10 Talc Particles," correct?
11     A. Yes.
12     Q. And you mention the Wehner
13 paper, correct?
14     A. Yes.
15     Q. And do you know what -- was
16 that an animal study or human study?
17     A. That was animals.
18     Q. All right. And then you
19 mentioned the Heller study. Was that a
20 talc migration study? In other words,
21 was talc placed at the genitals and
22 looked to see if it travels?
23     A. No.
24     Q. Okay. And then you also

Page 135

1  mentioned the Cramer study, right, the
2  2007 study?
3      A. Yes.
4          2007, you said?
5      Q. Yes.
6      A. Oh, yes, yes.
7      Q. And then if we turn the page
8  over, you also mention the Gertig study;
9  is that right?
10     A. Yes.
11     Q. And then you mention the
12 Terry study?
13     A. Right.
14     Q. Doctor, did you look at any
15 of the human studies where particulate
16 was placed at the genitals or in the
17 genitals and the ability to migrate?
18     A. What particular particulate
19 are you talking about?
20     Q. Any particulate.
21     A. Yes. And I saw in expert --
22 for example, in Dr. Birrer's report, I
23 believe he discusses a study of carbon.
24 But I think it's really important if

Page 136

1  you're going to develop a model to say --
2      Q. Doctor, sorry, I'm just
3  going to cut you off.
4      A. Sure.
5      Q. My question was did you --
6  it was just a really simple question.
7  Did you look at any other human studies.
8  And the answer was yes?
9      A. Yes.
10     Q. And then you mentioned one
11 study; is that right? Were there any
12 other studies?
13         MS. CURRY: Object to the
14 form.
15         THE WITNESS: I would have
16 to go back and remind myself of
17 how many, but it was more than
18 one.
19 BY MS. GARBER:
20     Q. Do you have any other
21 criticisms of plaintiffs' gynecologic
22 oncologists and the claim that they
23 selectively reviewed studies? Any other
24 criticisms as to the body of literature?

Page 137

1      A. I do.
2          MS. CURRY: Object to the
3  form.
4          THE WITNESS: I do. I
5  looked at the literature in
6  totality. So if you just restrict
7  to the epidemiologic data, I
8  looked at the case-control
9  studies. I spent a fair amount of
10 time going through those, looking
11 for consistency and things like
12 that.
13         And then I looked at the
14 cohort studies, which as you see
15 in my report I explain why they
16 may -- they are generally
17 considered to be less prone to
18 bias.
19         And then I read
20 Dr. Clarke-Pearson's report where
21 he almost -- I don't even think he
22 mentioned the cohort studies,
23 which to me was an important thing
24 that you'd have to explain away if

35 (Pages 134 to 137)

Kevin Holcomb, M.D.

Page 138

1    you really believe that talc
2    causes ovarian cancer.
3         I did -- as I mention, I
4    think they take as a given that
5    talc can migrate. And they're not
6    alone in this. I don't -- I don't
7    think that they're alone in doing
8    that. I read a number of papers
9    that in the introduction will make
10   statements like, "We all know talc
11   can get to the ovaries," and then
12   offer no citation for it.
13        And so I take issue with
14   that as well.
15   BY MS. GARBER:
16        Q.   Doctor, I didn't ask you for
17   a full list of your opinions.
18        A.   I thought you did.
19        Q.   I asked you --
20        A.   You asked me what areas do I
21   disagree with them.
22        Q.   Okay. And you mentioned --
23        MS. CURRY: Please let him
24   finish his response. You've cut

Page 139

1    him off twice now.
2         MS. GARBER: That's because
3    he's talking in very large
4    paragraphs, and we're never going
5    to get anywhere if I don't.
6         MS. CURRY: If you ask these
7    broad, open-ended questions, he's
8    entitled to respond to it.
9         MS. GARBER: All right.
10   I'll ask a different question.
11   BY MS. GARBER:
12        Q.   Doctor, did you review the
13   Buz'Zard 2007, Shukla 2009 papers?
14        A.   Only with regard to the
15   expert reports.
16        Q.   They're not on your
17   reference list, are they?
18        A.   No.
19        Q.   And you did not review the
20   Saed 2019 prior to signing your expert
21   report. We've already established that,
22   right?
23        MS. CURRY: Object to the
24   form.

Page 140

1         THE WITNESS: That's
2    correct.
3    BY MS. GARBER:
4         Q.   And those papers relied on
5    plaintiffs' experts in support of their
6    biologically plausible mechanism of
7    carcinogenicity, true?
8         A.   Yes, that's true.
9         Q.   And in Page 23 of your
10   report you state, "I understand that
11   there are a number of irregularities in
12   Dr. Saed's work and his lab notes."
13        What is your source of that
14   statement?
15        A.   Dr. Birrer's expert report.
16        Q.   When did you read
17   Dr. Birrer's expert report?
18        A.   I'm trying to think.
19   Probably about maybe two weeks ago.
20        Can you tell me what you're
21   referring to though?
22        Your -- your statement. You
23   said you -- I made a -- a referral to
24   something about Dr. Saed, but you didn't

Page 141

1    tell me where to find it.
2         Q.   I just asked you generally,
3    Doctor.
4         You -- you made mention
5    that -- that his work and lab notes --
6         A.   I'm just asking where you're
7    reading from, if you can --
8         Q.   At Page 23, Doctor.
9         A.   23. Thank you.
10        Q.   So what's your source of
11   that statement?
12        A.   Hold on one second.
13        Q.   If you don't know, we'll
14   move on.
15        MS. CURRY: Just give him a
16   second to look at where you're
17   reading from.
18        THE WITNESS: I just want to
19   get to -- yeah.
20   BY MS. GARBER:
21        Q.   It's at the top of 23.
22        A.   I don't remember exactly.
23        Q.   All right. Did you -- I --
24   I noted that his lab notebooks were not

36 (Pages 138 to 141)

Kevin Holcomb, M.D.

Page 142

1  on his reference list.  You didn't look
2  at those, did you?
3        MS. CURRY:  Object to the
4     form.
5        THE WITNESS:  No.
6  BY MS. GARBER:
7     Q.  You haven't looked at all of
8  his work relating to talc and mechanism
9  of carcinogenicity, right?
10    A.  No.
11    Q.  And with regard to your
12 reference list, you haven't reviewed
13 Health Canada's draft screening
14 assessment with regard to talc dated
15 December of 2018, correct?
16       MS. CURRY:  Object to the
17    form.
18       THE WITNESS:  I did.
19 BY MS. GARBER:
20    Q.  Sorry?
21    A.  I did.
22    Q.  You did review it?
23    A.  It's one of Dr. Saenz's
24 exhibits.

Page 143

1     Q.  Okay.  And it's not listed
2  on your reference list, correct?
3        MS. CURRY:  Object to the
4     form.
5        THE WITNESS:  I'd have to
6     look through the reference list --
7     no, it was something that I
8     reviewed as part of Dr. Saenz's
9     exhibits.
10 BY MS. GARBER:
11    Q.  So you have reviewed Health
12 Canada's December 2018 draft report?
13    A.  It's part of Dr. -- it's
14 part of Dr. Saenz's exhibits and I have
15 reviewed it.
16    Q.  When did you review that?
17    A.  Maybe about a week ago.
18    Q.  Okay.  Have you read any
19 comment letters or reports issued in
20 response to the Health Canada DSAR?
21    A.  No.
22    Q.  Have you been asked to
23 provide any comment to Health Canada?
24    A.  No.

Page 144

1     Q.  Are you planning to provide
2  any comment?
3     A.  What I reviewed was a draft.
4  So I'm not sure what Health Canada is
5  going to finally decide to publish.  So
6  no, I didn't -- I didn't --
7     Q.  Do --
8        MS. GARBER:  Motion to
9     strike as nonresponsive.
10 BY MS. GARBER:
11    Q.  Doctor, I asked you, are you
12 planning to provide any comment to Health
13 Canada?
14    A.  I'm saying perhaps I would
15 if I saw a final product that I thought
16 was really egregious, but I've only
17 reviewed a draft and so I -- I can't say
18 whether I would or not.
19    Q.  Doctor, do you understand
20 that Health Canada has asked for public
21 comment?
22    A.  I didn't -- no, I wasn't
23 aware of the process.
24    Q.  Okay.  Have you ever been

Page 145

1  asked to testify at any United States or
2  state government proceedings with regard
3  to talcum powder products?
4     A.  No.
5     Q.  And you are not conducting
6  any research, experimental research in
7  any capacity concerning talcum powder
8  products and ovarian cancer, right?
9     A.  No.
10    Q.  Are you planning to?
11    A.  No.
12    Q.  Have you ever applied for a
13 grant or monies to conduct a research on
14 talcum powder products and ovarian
15 cancer?
16    A.  No.
17    Q.  Have you read the Taher 2018
18 meta-analysis?
19    A.  I have.
20    Q.  Yes?
21    A.  Yes.
22    Q.  When did you read that?
23    A.  Same day I read the Health
24 Canada assessment.

37 (Pages 142 to 145)

Kevin Holcomb, M.D.

Page 146

1    Q.   And that was not on any of
2  your -- the Taher 2018 meta-analysis was
3  not listed on any of your reference
4  lists, correct?
5      A.   It is --
6      MS. CURRY:  Object to the
7  form.
8      THE WITNESS:  It's also part
9  of the exhibits for Dr. Saenz.
10 BY MS. GARBER:
11     Q.   Could you go back to
12 Exhibit 6, please.
13     Doctor, you understand that
14 your reference lists provide me an
15 opportunity to know what literature you
16 have reviewed and relied on attendant to
17 your expert opinions, correct?
18     A.   That's correct.
19     Q.   And if you look at Item 5 of
20 Exhibit 6 which is your supplemental
21 materials?
22     A.   Yes.
23     Q.   Could you read Number 5 for
24 me, please?

Page 147

1      A.   It says, "Expert report of
2  Cheryl Saenz, M.D., February 25, 2019."
3      Q.   It doesn't say exhibits,
4  does it?
5      MS. CURRY:  Object to the
6  form.  Number 3 discusses the
7  deposition.
8  BY MS. GARBER:
9      Q.   Is that what it says,
10 Doctor?  Does it say exhibits there, sir?
11     MS. CURRY:  Object to the
12 form.
13     THE WITNESS:  It clearly
14 doesn't say exhibits.  Number 3 is
15 where it says exhibits, so I'm not
16 sure why you're having me read all
17 of 5, when it clearly says on
18 Number 3, "Deposition of Cheryl
19 Saenz, M.D., and exhibits,
20 March 13, 2019."
21 BY MS. GARBER:
22     Q.   Okay.  Doctor, have you
23 spoken with any of the Taher study
24 authors?

Page 148

1      A.   No, I have not.
2      Q.   And your expert report
3  contains Table 1, correct?
4      A.   Yes.
5      Q.   And what is the nature of
6  Table 1?
7      A.   Table 1 --
8      MS. CURRY:  Table 1 in the
9  copy that you marked is actually
10 cut off.
11     Do you have a full version
12 of it?
13     MS. GARBER:  I do.  It's --
14 it's buried.  But I'm going to
15 mark it, so...
16 BY MS. GARBER:
17     Q.   Are you able to tell me what
18 Table 1 contains?
19     A.   Yes.
20     Q.   And what it is?
21     A.   Table 1 is a list of
22 case-control studies that I reviewed in
23 regard to this matter.
24     Q.   Why did you create this

Page 149

1  list?
2      A.   One, I wanted to show that I
3  performed a comprehensive review.  But I
4  guess largely what I saw mentions over
5  and over again by plaintiffs' experts and
6  sometimes in other papers, the statement
7  that the epidemiology data consistently
8  shows an increased risk of -- of ovarian
9  cancer with talc exposure.  And I think
10 most people already know that that's only
11 with case-control studies and none of the
12 cohort studies if you include Gates and
13 then update to Gertig.
14     So then I wanted to look at
15 the case-control studies.  And to see
16 could somebody use that term
17 consistently, maybe loosely, and what I
18 consider consistent and they consider
19 consistent different.
20     And so I looked through this
21 list of case-control studies.  I looked
22 at those that showed a positive
23 association and had a 95 percent
24 confidence interval that would suggest it

38 (Pages 146 to 149)

Kevin Holcomb, M.D.

Page 150

1  was statistically significant. And I
2  wanted to see what percentage of them,
3  that were not duplicates of the same
4  dataset actually showed this association.
5        And so my -- my review of
6  this list of case-control studies was
7  that -- I don't -- it came out to be
8  about 50/50 with a positive association.
9  Because I wanted to find out, would --
10 would anybody call, you know, a 50/50
11 chance consistent.
12     Q.   So you created Table 1 to
13 show or to support your claim that the
14 case-control studies were inconsistent
15 based on statistical significance.
16       Is that fair, Doctor?
17       MS. CURRY: Object to the
18 form.
19       THE WITNESS: That's fair.
20 BY MS. GARBER:
21     Q.   Okay. Exhibit A at the back
22 of your expert report is your CV, right?
23     A.   Yes.
24     Q.   When did you last update it?

Page 151

1      A.   I believe this is the most
2  recent copy. Let's see.
3        Let's see. This last paper
4  is from January 2019, probably like
5  February or maybe early March.
6      Q.   Do you need to make any
7  amendments to make it accurate today?
8      A.   I have a few more accepted
9  publications, but they are not up on
10 PubMed, so I don't think so.
11     Q.   Do they concern ovarian
12 cancer?
13     A.   No. Oh, hold on. I'm
14 sorry.
15       Yes.
16     Q.   In what capacity?
17     A.   There's one study, which
18 deals with early detection of ovarian
19 cancer where we looked at vaginal fluid
20 as a potential biomarker for women who
21 have an adnexa mass to pick up whether
22 they have ovarian cancer. And we looked
23 at a chemical called LPA,
24 lysophosphatidic acid, and showed that

Page 152

1  its levels were higher in women who
2  specifically had clear cell carcinoma.
3      Q.   Do any of the publications
4  that do not appear on your reference list
5  concern any of the issues that you deem
6  relevant in this case?
7        MS. CURRY: Object to the
8  form.
9        THE WITNESS: Please repeat
10 that.
11 BY MS. GARBER:
12     Q.   Do any of the publications
13 that do not appear on your CV,
14 bibliography, do any -- are any of those
15 relevant as you deem them to the issues
16 in this case?
17     A.   I just wanted to clarify.
18 You're asking if any of the papers that
19 I'm a co-author or author on relevant to
20 this topic?
21     Q.   That do not appear on your
22 CV?
23     A.   That do not appear on my CV?
24     Q.   Yes. The ones that you say

Page 153

1  that are not published yet.
2      A.   Oh, no.
3      Q.   No, they do not concern --
4      A.   No, they do not concern talc
5  and ovarian cancer.
6      Q.   Do you consider yourself a
7  research cancer biologist?
8        MS. CURRY: Object to the
9  form.
10       THE WITNESS: No, I would
11 consider someone who does mainly
12 basic science research a
13 biologist.
14 BY MS. GARBER:
15     Q.   You don't conduct in vitro
16 studies as part of your practice, right?
17     A.   If you see my CV, you'll see
18 some studies that involve in vitro
19 studies. So I collaborate with Ph.Ds.
20 So I'm part of a research team that does
21 perform --
22     Q.   But you don't do the bench
23 work, do you?
24     A.   I'm not doing the bench

39 (Pages 150 to 153)

Kevin Holcomb, M.D.

Page 154

1     work, no.
2          Q.   All right.  And you don't
3     have any degrees in epidemiology, right?
4          A.   No.
5          Q.   Did you review any internal
6     documents of defendants in this case that
7     were produced attendant to this
8     litigation?
9          A.   No, I have not.
10          Q.   And do you understand that
11     United States Senate seeking internal
12     company documents relevant to their
13     investigation as to whether Johnson &
14     Johnson has misrepresented the truth
15     about asbestos content in their talcum
16     powder products?
17          A.   I am aware.
18          Q.   You understand that the
19     public, which includes scientists, are
20     not normally allowed to review internal
21     company documents because manufacturers
22     like Johnson & Johnson mark them
23     confidential and disclosure can result in
24     violation of a protective order?  Do you

Page 155

1     understand that?
2          MS. CURRY:  Object to the
3     form.
4          THE WITNESS:  No, I --
5     BY MS. GARBER:
6          Q.   Do you understand how that
7     works?
8          A.   No, I didn't know that.
9          Q.   You do?
10          A.   I don't know that.
11          Q.   Okay.  Do I now have a full
12     list of the documents that you considered
13     in formulating your opinions as
14     referenced in your expert report and
15     supplemental materials?
16          A.   Yes.
17          Q.   Do you understand, Doctor,
18     that I'm entitled to know the literature
19     that you considered and the foundation
20     for your opinions?
21          A.   Yes.
22          Q.   And while you don't agree
23     with plaintiffs' causation opinions that
24     you reviewed, you do acknowledge that

Page 156

1     their opinions were based on informed
2     scientific medical judgment?
3          MS. CURRY:  Object to the
4     form.
5          THE WITNESS:  No.
6     BY MS. GARBER:
7          Q.   You disagree with that?
8          A.   No.
9          Q.   Pardon?
10          A.   I disagree with it.
11          Q.   Which experts -- and I don't
12     need to know why.  Which experts do you
13     think of uninformed scientific opinions?
14          MS. CURRY:  Object to the
15     form.
16          THE WITNESS:  I would say
17     Dr. Clarke-Pearson, Dr. Judith
18     Wolf, Ellen Blair Smith.
19     BY MS. GARBER:
20          Q.   Any others?
21          A.   No, I would restrict it to
22     that.
23          Q.   Okay.  And your criticisms
24     of those particular doctors as referenced

Page 157

1     in your expert report, does that consist
2     of -- strike that.
3          The opinions with regard to
4     plaintiffs' experts, Dr. Clarke-Pearson,
5     Wolf, and Blair Smith, your criticisms of
6     those experts are contained within your
7     expert report; is that fair?
8          A.   That's fair.
9          Q.   Do you agree that experts
10     must use scientific judgment when
11     assessing the literature for causality?
12          A.   Yes, I do.
13          Q.   And in assessing the
14     literature, one person's scientific
15     judgment may be different than another
16     person's scientific judgment?
17          MS. CURRY:  Object to the
18     form.
19          THE WITNESS:  I believe
20     scientific judgment has a role,
21     but I believe that there are
22     things that are right and wrong as
23     well.  And I gave you an example
24     of one of them, which was it's

40 (Pages 154 to 157)

Kevin Holcomb, M.D.

Page 158

1    wrong to say that something is
2    consistently shown to be
3    associated with something if it's
4    not consistently shown.
5        And -- and I think for
6    statements like that, you can rely
7    on what the general population
8    would consider consistency, or
9    just any reasonable person.  So if
10   someone says something is a
11   hallmark of a disease, and there's
12   no good evidence that it is even a
13   part of the disease, then, you
14   know, that's not a judgment call
15   at that point.  That's the
16   difference between a misstatement
17   and a -- it's just a misstatement.
18   BY MS. GARBER:
19       Q.  We will get to the issue of
20   consistency, Doctor.
21       In addressing -- or in
22   assessing -- strike that.
23       Do you agree that experts
24   can reasonably weigh factors differently?

Page 159

1        MS. CURRY:  Object to the
2    form.
3        THE WITNESS:  What I was
4    trying to get at, and I was hoping
5    that we would be able to cover
6    this quickly, but probably not.
7    That --
8    BY MS. GARBER:
9        Q.  Doctor, just yes or no.  And
10   you're --
11       A.  I need -- no --
12       Q.  -- going to have an
13   opportunity for your lawyer to ask you
14   questions.
15       A.  But ma'am, if you ask a
16   question --
17       MS. GARBER:  Object to form.
18   BY MS. GARBER:
19       Q.  I will withdraw the
20   question.
21       A.  Okay.
22       Q.  Doctor, with regard to
23   methodology, will you please point me to
24   the methodology section in your report

Page 160

1    that informs the reader of the
2    methodology that you employed to render
3    your opinions.
4        A.  I would have to point to my
5    description of the Bradford Hill
6    criteria.
7        Q.  Where does that appear?
8        A.  I'll find it for you.
9    Page 19.
10       Q.  Doctor, is that a
11   methodology section?  I asked you
12   specifically if you could point me to the
13   methodology section.
14       A.  No.  That does -- that is
15   not a methodology section.
16       Q.  And, in fact, you don't have
17   a methodology section in your report, do
18   you?
19       A.  I don't have a --
20       MS. CURRY:  Object to the
21   form.
22       THE WITNESS:  I don't have a
23   specific section labeled
24   methodology, no.

Page 161

1    BY MS. GARBER:
2        Q.  And, in fact, in the four
3    corners of your report you do not state
4    anywhere the methodology that you
5    employed in coming to your opinions.  Is
6    that also a true statement?
7        MS. CURRY:  Object to the
8    form.
9        THE WITNESS:  Throughout my
10   report, within the four corners
11   one could see the methodology I'm
12   using.  And then I go onto explain
13   where I got that methodology with
14   Bradford Hill.
15   BY MS. GARBER:
16       Q.  Doctor, you understand the
17   methodology is important so that opinions
18   can be replicated, right?
19       When you're reviewing a
20   study, there's a methods section, so that
21   the evaluation can be replicated.  You
22   understand that, right?
23       A.  Yes.
24       MS. CURRY:  Object to the

41 (Pages 158 to 161)

Kevin Holcomb, M.D.

Page 162

1    form.
2    BY MS. GARBER:
3        Q.   You don't have a methodology
4    section in your report where --
5        A.   I do not.
6        Q.   Thank you.
7            Doctor, if we could move
8    onto your statements about plaintiffs'
9    criticism of not reviewing the totality
10   of the literature.
11           I want to ask some questions
12   of you.
13           You did not review the
14   totality of the literature relating to
15   biologic plausibility, because you did
16   not review the Shukla, Buz'Zard, Saed
17   references before rendering your expert
18   opinion in the case?
19           MS. CURRY:  Object to the
20   form.
21   BY MS. GARBER:
22       Q.   In -- in this case.  Do you
23   agree with that?
24           MS. CURRY:  Object to the

Page 163

1    form.
2            THE WITNESS:  I believe that
3    even though it's -- I didn't have
4    a methodology section, I did
5    approach this in a method --
6    methodical way --
7    BY MS. GARBER:
8        Q.   Doctor, I didn't ask you
9    about your methodology.
10       A.   If I -- if I can finish my
11   answer, please.
12           MS. CURRY:  Please stop
13   cutting him off.
14           THE WITNESS:  So --
15           MS. GARBER:  Motion to
16   strike.
17   BY MS. GARBER:
18       Q.   My question was about
19   Shukla, Buz'Zard and Saez --
20           MS. SHARKO:  You have to let
21   him finish his answer.  You are
22   not allowed to interrupt.  Now be
23   polite please.
24           THE WITNESS:  With regard to

Page 164

1    the studies that you're referring
2    to, I did not specifically mention
3    those studies at the time that I
4    presented my opinion, because my
5    view of the Bradford Hill criteria
6    was that there's a reason why the
7    first one is strength of
8    association and the second is
9    consistency.  And that I felt that
10   my reasoning showing the
11   inconsistencies there, that
12   it's -- it's an interesting
13   question to look at biological
14   plausibility and -- and -- but
15   when you have such weakness in the
16   epidemiologic data, I did not
17   spend as much time going through
18   the biologic plausibility other
19   than to the degree that I did,
20   because I think -- and it's full
21   of weaknesses there as well.
22           But no, my opinion, just
23   even based on the epidemiology
24   is -- is that there isn't a

Page 165

1    consistent finding of an
2    association with talc use and
3    ovarian cancer.
4    BY MS. GARBER:
5        Q.   Doctor, is it your testimony
6    that if you look at the epidemiological
7    literature and you find it weak, you
8    don't then need to go on and review the
9    biologic plausibility to render a
10   causation opinion?
11           MS. CURRY:  Object to the
12   form.
13   BY MS. GARBER:
14       Q.   Is that your -- is that your
15   opinion?
16       A.   That is not my opinion.
17       Q.   Okay.
18       A.   And that's not what I'm
19   saying.
20       Q.   So -- and, Doctor, you did
21   not review studies that looked at the
22   biologic plausibility for talc and
23   ovarian cancer which included Shukla,
24   Buz'Zard, and Saed before signing your

42 (Pages 162 to 165)

Kevin Holcomb, M.D.

Page 166

1    report, correct?
2            MS. CURRY:  Object to the
3    form.
4            THE WITNESS:  I would argue
5    that Buz'Zard is not --
6    BY MS. GARBER:
7        Q.   Doctor, yes or no, did you
8    review those or not?
9            MS. CURRY:  Object to the
10   form.
11           THE WITNESS:  I don't --
12           MS. CURRY:  Please let him
13   finish his response.
14           THE WITNESS:  You're --
15   you're looking for yes or no
16   simple answers and you keep --
17   BY MS. GARBER:
18       Q.   I'm not looking for
19   paragraphs, Doctor.
20       A.   -- but -- but you keep
21   telling me that you're here to clarify my
22   answers.  But whenever I get started with
23   an answer you cut me off, which makes me
24   wonder are you really here to clarify my

Page 167

1    answers.  Because I can explain to you.
2            Buz'Zard --
3        Q.   I didn't ask you for an
4    explanation.  I asked you, were they
5    listed, yes or no.  And your answer was
6    no --
7        A.   Can you go back to your last
8    question?  Can you go back to the
9    question?
10       Q.   Doctor, you understand I'm
11   here to ask questions and you're here to
12   answer them.
13       A.   I'm asking you to repeat
14   your question.
15           MS. CURRY:  Ms. Garber,
16   you're not letting him answer the
17   question.  And please, you can't
18   keep talking over each other.
19           MS. O'DELL:  That's really
20   not fair.  If she's -- if she's
21   asking whether the doctor has
22   reviewed a study, that's a yes or
23   no question.
24           She's not cutting you off.

Page 168

1    She's asking him to respond to the
2    question.
3            And if Dr. Holcomb continues
4    not to answer a question, it's an
5    appropriate issue to take to
6    Judge Pisano and that's what we're
7    going to do.  So -- so --
8            MR. MIZGALA:  I want to
9    insert here.  Because you're
10   not -- she's not just asking him
11   yes or no about the studies.
12   She's characterizing the studies
13   in a specific manner and he
14   disagrees with that.  I think he
15   should be able to explain that.
16           THE WITNESS:  That's exactly
17   my feeling about it.  It's, the
18   question is did I review the
19   study --
20   BY MS. GARBER:
21       Q.   Doctor, there's no question
22   pending.
23           Did you --
24           MS. SHARKO:  All right.  So

Page 169

1    all prior questions are withdrawn.
2            MS. GARBER:  No --
3            MS. SHARKO:  She will now
4    ask a question and hopefully
5    she'll be polite and let you
6    answer it.  If we have to go to
7    the judge about the constant
8    interrupting that we've had over
9    the last few days, then we will.
10           MS. O'DELL:  We're here for
11   the day.  Not for the last few
12   days.  And the questions aren't
13   withdrawn.  You're welcome to pose
14   a new question.
15           And -- and I wanted to say
16   for the record the suggestion that
17   Ms. Garber is not being polite is
18   incorrect, Ms. Sharko.
19           MS. SHARKO:  I disagree.
20   But let's go on.
21           There's a lot of silence.
22   Are you going to ask a question,
23   or are you waiting for the doctor
24   to answer the --

43 (Pages 166 to 169)

Kevin Holcomb, M.D.

Page 170

1          MS. GARBER: I'm going to --
2     I'm going to ask a question.
3          MS. SHARKO: Great. Thank
4     you.
5     BY MS. GARBER:
6          Q.   Doctor, you did not review
7     Dr. Longo's testing of talcum powder
8     products for the presence of asbestos,
9     fibrous talc, heavy metals and the like,
10    correct?
11         A.   That's correct.
12         Q.   And you did not present or
13    discuss the study design limitations with
14    the cohort studies. Do you agree with
15    that, yes or no?
16         MS. CURRY: Object to the
17    form.
18         THE WITNESS: Please repeat.
19    BY MS. GARBER:
20         Q.   Did you -- you did not
21    present and discuss the study design
22    limitations of the cohort studies, yes or
23    no?
24         A.   I'd have to read through the

Page 171

1     report again. I don't remember.
2          Q.   You can't answer that
3     question?
4          A.   I can't.
5          Q.   Okay. Is it true, Doctor
6     that you did not provide a word of
7     analysis in your report regarding the
8     contrary data to your causation opinion
9     specifically with regard to
10    Penninkilampi, Health Canada or the Taher
11    paper?
12         MS. CURRY: Object to the
13    form.
14    BY MS. GARBER:
15         Q.   Is that true?
16         A.   Please repeat one more time.
17         Q.   Your report does not provide
18    a word of analysis regarding the contrary
19    data to your causation opinion,
20    specifically the Penninkilampi, Health
21    Canada or Taher analysis of causation,
22    correct?
23         A.   No, I -- I mentioned
24    Penninkilampi.

Page 172

1          MS. CURRY: Object to the
2     form.
3     BY MS. GARBER:
4          Q.   Do you mention her
5     reference -- his references with regard
6     to causation?
7          MS. CURRY: Object to the
8     form.
9          THE WITNESS: No. I
10    reference his study, not his
11    discussion section.
12    BY MS. GARBER:
13         Q.   Okay. In your critique of
14    plaintiffs' experts' opinions, you do not
15    state the methodology used in coming to
16    those opinions, correct?
17         MS. CURRY: Object to the
18    form.
19         THE WITNESS: I do discuss
20    the methodology that I used. I
21    don't have a methodology section
22    that you discussed.
23    BY MS. GARBER:
24         Q.   You don't discuss the

Page 173

1     methodology that you employed in
2     rendering critiques of plaintiffs'
3     experts' opinions, correct?
4          MS. CURRY: Object to the
5     form.
6          THE WITNESS: I just discuss
7     and describe my critiques, yes.
8     BY MS. GARBER:
9          Q.   Wouldn't you agree, Doctor,
10    that there's medical consensus that the
11    female genital tract is an open system to
12    facilitate the passage of menses and
13    promote retrograde movement of sperm?
14         MS. CURRY: Object to the
15    form.
16         THE WITNESS: Yes.
17    BY MS. GARBER:
18         Q.   Let's talk about your
19    opinions and be sure that I understand
20    what they are.
21         These should be yes or no
22    questions, not why.
23         Okay. Is it your opinion
24    that the literature does not provide a

44 (Pages 170 to 173)

Page 174

```
 1   biologically plausible mechanism whereby
 2   talcum powder products can migrate from a
 3   woman's genitals to her ovaries?
 4          MS. CURRY:  Object to the
 5      form.
 6          THE WITNESS:  Is it my
 7      opinion that it does not provide?
 8   BY MS. GARBER:
 9      Q.   Correct.
10      A.   The answer would be yes.
11      Q.   Is it your opinion that the
12   literature does not provide a
13   biologically plausible mechanism whereby
14   talcum powder products can induce chronic
15   inflammation, resulting in ovarian
16   cancer?
17      A.   I believe that it proves
18   that it can cause chronic inflammation.
19   I don't believe that it's been proven
20   that that causes ovarian cancer.
21      Q.   Is it your opinion that
22   talcum powder products do not increase
23   the risk of developing ovarian cancer?
24      A.   Yes.
```

Page 175

```
 1      Q.   And if talcum powder
 2   products contain asbestos, does that
 3   opinion change?
 4      A.   No.
 5      Q.   Is it your opinion that
 6   talcum powder products do not cause
 7   ovarian cancer?
 8      A.   I don't have an opinion.
 9   I'm sorry.  Talcum powder is -- did you
10   ask the same question twice?
11      Q.   No.  One was risk, one was
12   cause.
13      A.   Oh.
14      Q.   Is it your opinion that
15   talcum powder products do not cause
16   ovarian cancer?
17      A.   That's my opinion.
18      Q.   Is it your opinion that
19   there is no evidence that talc is
20   associated with ovarian cancer?
21          MS. CURRY:  Object to the
22      form.
23          THE WITNESS:  No, that's not
24      my opinion.
```

Page 176

```
 1   BY MS. GARBER:
 2      Q.   Is your opinion limited to
 3   there's no credible evidence --
 4          MS. CURRY:  Object to the
 5      form.
 6   BY MS. GARBER:
 7      Q.   -- that talc is associated
 8   with ovarian cancer?
 9          MS. CURRY:  Object to the
10      form.
11          THE WITNESS:  This is going
12      to be tough for yes or no.  I
13      can't answer that with a yes or
14      no.
15   BY MS. GARBER:
16      Q.   Okay.  As a gynecologic
17   oncologist, you're a member of the
18   Society For Gynecologic Oncology, right?
19      A.   Correct.
20      Q.   And you've served as a
21   reviewer for the publications submitted
22   to the Journal of Gynecologic Oncology,
23   right?
24      A.   Correct.
```

Page 177

```
 1      Q.   And I assume that you
 2   believe the journal -- the journal is a
 3   reliable source for study data generally?
 4          MS. CURRY:  Object to the
 5      form.
 6          THE WITNESS:  What's your
 7      definition of reliable?
 8   BY MS. GARBER:
 9      Q.   What do you think it means?
10      A.   I don't use that term
11   reliable.  So I wouldn't use that term.
12      Q.   Do you read the journal?
13      A.   Yes, I do.
14      Q.   And the data that's
15   contained therein generally, do you deem
16   it reliable for what it provides or do
17   you think it's not credible?
18          MS. CURRY:  Object to the
19      form.
20          THE WITNESS:  Again, if
21      you're saying I believe it's
22      reliable, do I assume that
23      everybody is honestly reporting
24      what they found, that is a general
```

45 (Pages 174 to 177)

Kevin Holcomb, M.D.

| Page 178 | Page 180 |
|---|---|

**Page 178**

1　assumption that we hold in
2　academic medicine.  And, yes, I
3　make that assumption for
4　gynecologic oncology.
5　　　There's no way for a
6　reviewer or someone else to know
7　if someone is giving you false
8　information.  We assume it's all
9　valid and that they've not lied
10　about anything.  So is that what
11　you mean by reliable?
12　BY MS. GARBER:
13　　Q.　Have you had an experience
14　as a reviewer for Gynecologic Oncology
15　where authors submitted false data?
16　　A.　What I'm saying is we don't
17　ask for raw data.  I've never -- let me
18　say I.  I have never asked a submitting
19　scientist for their raw data so that I
20　could look for irregularities.  There is
21　a general understanding that you are
22　trusting the person is giving you their
23　findings, and you're reviewing them with
24　that understanding.

**Page 179**

1　　Q.　And based on the fact that
2　you're a reviewer for Gynecologic
3　Oncology, do you tend to trust the data
4　presented in that journal?
5　　　MS. CURRY:  Object to the
6　　　form.
7　　　THE WITNESS:  When you
8　　　say -- unfortunately, when you say
9　　　"trust" --
10　BY MS. GARBER:
11　　Q.　That was your word, Doctor.
12　　A.　You may disagree with the
13　findings, but the word -- when I use the
14　word "trust," that's why I keep on coming
15　back to believing that what the person is
16　giving you is valid, this is actually
17　what they did, that they're not
18　falsifying results.  To that degree, I
19　trust those results just as much as any
20　other journal.
21　　　Whether I find the findings
22　of every study valid, no.  Just because
23　it's in GYN Oncology does not mean that I
24　take it as a valid study.

**Page 180**

1　　Q.　Okay.  I'm going to show you
2　a paper, Doctor.  I don't believe it was
3　cited in your expert report.
4　　　(Document marked for
5　　　identification as Exhibit
6　　　Holcomb-8.)
7　BY MS. GARBER:
8　　Q.　I'm going to mark as
9　Exhibit 8 -- oh, sorry.
10　　　Doctor, this is a paper that
11　is published in Gynecologic Oncology
12　titled "Talc and Ovarian Cancer" by
13　Steven Narod, the date of this study is
14　2016.
15　　　Have you read this paper
16　before?
17　　A.　I've seen it before, yes.
18　　Q.　And when did you see it?
19　　A.　When it came out.
20　　Q.　Okay.  Did you review it as
21　a reviewer for --
22　　A.　No.
23　　Q.　Thank you.  Let me -- let me
24　get that clear.

**Page 181**

1　　　Did you review this paper
2　prior to its publication attendant to
3　your reviewer role from time to time with
4　Gynecologic Oncology?
5　　A.　I did not review this paper
6　before publication.
7　　Q.　Okay.  Let's look at some of
8　the statements that are therein.
9　　　If you look at, Doctor, the
10　bottom of Page 2.  The very last sentence
11　at the bottom of Page 2.
12　　　And, Doctor, it reads:  "In
13　any case, given the number of hazard
14　ratios reported in the literature" --
15　　A.　I'm -- I'm sorry, I'm
16　looking for you.  Bottom of 2.
17　　Q.　Doctor, you can look up here
18　at the Elmo.
19　　A.　Yes.
20　　Q.　And see where I am.  I'm at
21　the bottom of 2, Page 2.  Left-hand
22　column.
23　　A.　Okay.  Left-hand column.
24　That helps.  Okay.

46 (Pages 178 to 181)

Page 182

1      Q.   And -- and it says, "This
2    article about talc and ovarian cancer
3    indicates in any case given the number of
4    hazard ratios reported in the literature
5    between 1.1 and 1.4 in both case-control
6    and cohort studies, it would be
7    disingenuous to state that there is no
8    evidence that talc is associated with
9    ovarian cancer."
10          Did I read that correctly?
11      A.   Yes, you read it correctly.
12      Q.   Yes or no, do you agree with
13    that statement?
14      A.   It's actually a question you
15    already asked me and I agreed.
16      Q.   Let's look at some of the
17    other statements in this paper and see if
18    you agree with them.
19          If you go over to the first
20    page, Doctor, right-hand column.
21          As to the issue of
22    consistency, it indicates, "The
23    case-control studies to date are
24    consistent.  Given the small effect size

Page 183

1    it is not surprising that some are
2    positive, i.e., show a consistent" --
3    "show a significant increase in risk and
4    some are negative, i.e., show a
5    nonconsistent increased risk."
6          MS. CURRY:  You keep saying
7    consistent, but the word is
8    significant.
9          MS. GARBER:  Significant.
10    BY MS. GARBER:
11      Q.   Let me start again.
12          "The case-control studies to
13    date are consistent.  Given the small
14    effect size it is not surprising that
15    some are positive, i.e., show a
16    significant increased risk and some are
17    negative, i.e., show a nonsignificant
18    increase in risk or no risk difference."
19          Did I read that correctly?
20      A.   Yes.
21      Q.   Do you disagree with that?
22      A.   It's interesting.  He says
23    the case-control studies are consistent,
24    and then goes on to describe

Page 184

1    inconsistency.  Some are positive and
2    some are negative.
3          So you read it correctly.  I
4    think it's a contradictory statement.
5    He's saying they are consistent, and then
6    says some are positive, some are
7    negative.  That's not my definition of
8    consistency.
9      Q.   Doctor, this study author
10    is -- in a peer-reviewed paper said that
11    the data are consistent.  Do you agree
12    with that?
13      A.   And then himself says some
14    are positive and some are negative.  And
15    I'm asking, my definition of consistency
16    means that they say the same thing.
17      Q.   I didn't ask you for what --
18    why.  I said did this study author in a
19    peer-reviewed journal call the data
20    consistent, yes or no?
21      A.   Yes.  Yes.
22      Q.   Thank you.  You didn't
23    present that in your expert report that
24    there are peer-reviewed published authors

Page 185

1    who say the data are consistent, did you?
2          MS. CURRY:  Object to the
3    form.
4          THE WITNESS:  I would like
5    to say that this is a -- this --
6    there's a difference between a
7    paper and a news -- a story in a
8    newspaper that a reporter wrote
9    and an op Ed.
10          This is the medical version
11    of an op Ed.  I'm not going to be
12    citing op Eds.  I'm going to be
13    citing the literature that's based
14    on.
15          And -- and you find the
16    difficulty with what Dr. Narod is
17    saying here in his own statement.
18    It's contradictory.  He could --
19    it would have made more sense if
20    he said I can explain away the
21    inconsistency.  Because the effect
22    size is low you can expect to see
23    inconsistent data.  But you can't
24    say it's consistent, some are

Kevin Holcomb, M.D.

Page 186

1    positive, some are negative.
2    BY MS. GARBER:
3        Q.   Doctor, let's -- let's turn
4    to Table 1 of your expert report.  And
5    I'll mark that as Exhibit 9.
6        (Document marked for
7        identification as Exhibit
8        Holcomb-9.)
9    BY MS. GARBER:
10       Q.   And this appears in your
11   expert report, correct?
12       A.   Correct.
13       Q.   And it is separated by --
14   I -- I've produced a color copy, right?
15       A.   Yes.
16       Q.   Yeah.  And it is -- there
17   appears to be shaded studies that appear
18   to be in a -- in a blue color; is that
19   right?
20       A.   Correct.
21       Q.   And then those that are not
22   shaded, right?
23       A.   That's correct.
24       Q.   And then you have shaded

Page 187

1    the -- some of the studies in blue and
2    why are those studies shaded in blue?
3        A.   They are shaded in blue,
4    because they have 95 -- 95 percent
5    confidence intervals that cross one.  And
6    that is not a statistically significant
7    finding whether it's showing an increase
8    or a decrease.
9        Q.   Did you create this table?
10       A.   Yes, I did.
11       Q.   On your computer?
12       A.   Yes.
13       Q.   And you put all the data
14   into this table and -- and color-coded
15   it?
16       A.   Yes.
17       Q.   In your expert report at
18   Page 10, you indicate that the -- with
19   regard to the case-control studies, the
20   risk estimates range between 1.2 and 1.6,
21   suggesting a 20 to 60 percent increased
22   risk; is that right?
23       A.   Yes.
24       Q.   And so, you believe that the

Page 188

1    case-control data are unreliable because
2    they are inconsistent based on some
3    studies lack statistical significance?
4        MS. CURRY:  Object to the
5        form.
6    BY MS. GARBER:
7        Q.   Is that your opinion?
8        A.   I'm -- no.  Please repeat
9    that again.
10       Q.   Sure.
11       Is it your opinion that the
12   case-control data are unreliable because
13   they are inconsistent based on some
14   studies lack statistical significance?
15       A.   No.  It's my opinion that
16   it's not reliable because those studies
17   that lack statistical significance are
18   actually showing no increased risk, no --
19   no -- we -- we use statistical
20   significance to say that that increased
21   risk was more than just by chance.  So
22   the lack of statistical significance is
23   what leads to the inconsistency.
24       Q.   Okay.  So you believe that

Page 189

1    the case-control studies are inconsistent
2    because some of the studies don't show
3    statistical significance because the
4    confidence interval crosses one; is that
5    fair?
6        A.   In the materials and
7    methods, like you asked me to have a
8    methods section, they will say before
9    they look at the data, and this is what
10   you do, so you're not biased, you say
11   we're going to consider this significant
12   at this level.  We're going to consider
13   this a positive study at this level, and
14   then you go and you do your analysis.
15   And when it doesn't reach that level,
16   whether it's above or below, you don't
17   come out of that study saying there's
18   a -- there's a significant risk of
19   ovarian cancer associated with talc.
20       So everything that's shaded
21   in blue, those things are negative
22   studies.
23       Q.   Doctor, do you remember my
24   question?

48 (Pages 186 to 189)

Kevin Holcomb, M.D.

Page 190

1      A.  I felt the need to clarify
2  why I think this is inconsistent.  It's
3  not just -- it's because yes, they
4  don't -- they -- they --
5      Q.  Doctor, excuse me.
6      A.  Yes.
7      Q.  I'm going to interrupt you
8  there, because --
9          MS. SHARKO:  You can't do
10         that.
11 BY MS. GARBER:
12     Q.  I -- you -- you understood
13 my question, yet you felt the need to
14 clarify.
15         That isn't what I've asked
16 you to do.  I've asked you a very simple
17 question:  What's the nature of this
18 Table 1, and then you launched into what
19 the study authors do.
20     A.  I -- I think I might be
21 mistaken about the purpose of this --
22         MS. CURRY:  Ms. Garber --
23         hold on.  Can I just state an
24         objection on the record, please?

Page 191

1          THE WITNESS:  Okay.
2          MS. SHARKO:  The question,
3          if he can't answer it without
4          clarifying, then he's entitled to
5          clarify the question.
6              And the question was broader
7          than what you just stated.  It
8          was, because it asked specifically
9          whether or not the case-control
10         studies are inconsistent because
11         it doesn't show statistical
12         significance.
13 BY MS. GARBER:
14     Q.  Doctor, is it your opinion
15 that the studies that do not show
16 statistical significance are unreliable
17 and attributable to chance?
18     A.  Yes.
19     Q.  And is it your opinion that
20 the case-control studies that do not
21 show -- strike that.
22         Is it your opinion that the
23 studies do not -- that do not show
24 statistical significance are unreliable

Page 192

1  because they're inconsistent with those
2  that do show statistical significance?
3          MS. CURRY:  Object to the
4          form.
5          THE WITNESS:  Because they
6          are inconsistent with -- no.
7  BY MS. GARBER:
8      Q.  Okay.  Doctor, if we look at
9  Table 1, with the exception of, I think,
10 two studies, every one of those relative
11 risks are all to the right of one, are
12 they not?
13     A.  Yes.
14     Q.  And you have odds ratio,
15 relative risk.  Which is it for the
16 case-control studies?
17         MS. CURRY:  Object to the
18         form.
19 BY MS. GARBER:
20     Q.  Which would be proper?
21     A.  An odds ratio.
22     Q.  Okay.  And so --
23     A.  I'm sorry.  Hold on.  I'm
24 sorry.  One second.  I'm sorry.  It's the

Page 193

1  other way around.  Case-control would be
2  relative risk.
3      Q.  Are you sure?
4      A.  Yeah.
5      Q.  And all of those studies are
6  to the right of one except two, right?
7      A.  Right.
8      Q.  And so all of those are
9  positive because they're to the right of
10 one, correct?
11     A.  No, that's --
12         MS. CURRY:  Object to the
13         form.
14         THE WITNESS:  That's a
15 misunderstanding of statistics.
16 They are not positive because
17 they're to the right of one.  It's
18 defined in the study what they
19 were going to consider a positive
20 study.  It had to be above one and
21 have a 95 percent chance that the
22 true risk estimate was within the
23 range of the 95 percent confidence
24 interval.  So once it drops below

49 (Pages 190 to 193)

Kevin Holcomb, M.D.

Page 194

1    one, you're saying the author
2    themselves, by doing the
3    statistics, by putting that in the
4    materials and methods, they're
5    saying I don't consider this a
6    positive study unless I achieve a
7    positive direction above one and
8    the 95 percent confidence interval
9    does not cross one, otherwise why
10   bother doing that?
11   BY MS. GARBER:
12       Q.   Can you give me any article,
13   treatise, authority, that supports that
14   claim that for a study to be positive, it
15   needs to be greater than one and reach
16   statistical significance?
17       A.   Any treatise?
18       Q.   Any -- any authority to
19   support that claim?
20       A.   Again, I think for each
21   individual paper, I could go through the
22   materials and methods, and the author who
23   wrote that paper will describe, before
24   they started collecting data, their

Page 195

1    methodology.  And what they were going to
2    consider significant.
3        Q.   Do you understand that to be
4    authority?
5            MS. CURRY:  Object to the
6        form.
7            THE WITNESS:  I'm saying for
8        each individual person that's
9        doing the study, that is their
10       definition of what they considered
11       a positive study.
12   BY MS. GARBER:
13       Q.   I understand that.  I'm
14   asking you for an authoritative paper
15   that indicates your definition of a
16   positive study meaning greater than one
17   that reached statistical significance
18   constitutes a positive study.  Can you
19   please give me an authority for that
20   statement?
21       A.   I'm sure if you gave me the
22   time I could find it.  But I don't have
23   one that I can quote you now.
24       Q.   You can't come up with one

Page 196

1    off the top of your head?
2        A.   No.  It's such -- you're
3    asking something that is so widely
4    accepted, that it would be like finding
5    an authority that says water is H2O.  I
6    mean, it's -- I could find a nice review
7    article that explains, and this all comes
8    down to the quality of the study, and in
9    the study design how much risk is there
10   for a spurious value, for a confounder or
11   for a recall bias to play a role.
12           And that's why you have -- I
13   think of 95 confidence intervals as your
14   bumpers, your safety bumpers that keep
15   you from making a mistake.
16       Q.   Is the point estimate the
17   best estimate of risk?
18           MS. CURRY:  Object to the
19       form.
20           THE WITNESS:  The point
21       estimate has to be taken into
22       account with the 95 percent
23       confidence intervals.
24   BY MS. GARBER:

Page 197

1        Q.   That wasn't my question.  Is
2    the point estimate the best estimate of
3    risk?
4            MS. CURRY:  Object to the
5        form.
6            THE WITNESS:  I don't
7        understand your question.  As
8        opposed to what?
9    BY MS. GARBER:
10       Q.   In looking at the data, in
11   looking --
12       A.   As opposed to what though?
13   All you get is the point estimate and the
14   95 percent confidence interval.  So
15   you're saying it's better than what?
16       Q.   You've never seen that
17   statement that the point estimate is the
18   best estimate of risk?
19       A.   Have you heard the term
20   "compared to what"?
21       Q.   Okay.  Doctor, what is your
22   definition of a negative study?
23       A.   A negative study is a study
24   that doesn't reach your predefined

Kevin Holcomb, M.D.

Page 198

1  definition of a positive study. Anything
2  that doesn't reach your definition of a
3  positive study -- there's no in between.
4  It's either positive or negative.
5      Q.  So your definition of
6  negative is a study which can be to the
7  right of one or greater than one, but
8  doesn't reach statistical significance?
9  That's how --
10      A.  Say this once again.
11      Q.  That's how you define a
12  negative study?
13          MS. CURRY:  Object to the
14      form.
15          THE WITNESS:  I do.  And the
16      reason being is because when you
17      think about the problems with
18      case-control studies, and it's
19      every -- all the experts on both
20      sides talk about this risk of
21      recall bias.  Recall bias never
22      sends your numbers below zero.
23  BY MS. GARBER:
24      Q.  Doctor, did I ask you about

Page 199

1  recall bias?
2      A.  And I'm explaining why I
3  have this opinion.
4      Q.  I didn't ask you why you
5  have your opinion.
6      A.  Then I'll withdraw my
7  statement.
8      Q.  Your lawyer will be able to
9  ask you questions.  Thank you, Doctor.
10  Doctor, have you cited any
11  authority to support your claims that
12  studies that don't show statistical
13  significance are attributable to chance
14  and bias?
15      A.  No.  That's not -- that's
16  not my claim, first of all.
17      Q.  Okay.  Doctor, do you know
18  who Sander Greenland is?
19      A.  No.
20      Q.  Do you know who Kenneth
21  Rothman is?
22      A.  No.
23          (Document marked for
24      identification as Exhibit

Page 200

1      Holcomb-10.)
2  BY MS. GARBER:
3      Q.  I'm going to mark as
4  Exhibit 10 a paper that was just
5  published.  Doctor, in just looking at
6  this paper -- this paper was just
7  published on March 21st, here at the
8  bottom.  March 21, 2019, in Nature.
9          Do you -- do you know that
10  journal?
11      A.  Yes.
12      Q.  And what's your opinion of
13  that journal?
14      A.  Nature?
15      Q.  Mm-hmm.
16      A.  It's a highly respected
17  journal.
18      Q.  Thank you.
19          And do you see that the
20  title of this article is "Retire
21  Statistical Significance"?
22      A.  Yes.  And this is a comment
23  in the highly respected journal.  Again,
24  this is an op Ed piece, not -- this is

Page 201

1  not a study.
2      Q.  Doctor, do you see who the
3  study authors are?
4      A.  Yes.
5      Q.  And do you see that Sander
6  Greenland is one of the study authors?
7      A.  Yes.
8      Q.  And do you see that it goes
9  on to say, "And more than 800 signatories
10  call for an end to the hyped claim and
11  dismissal of possibly crucial effects."
12          Do you see that?  That's
13  the --
14      A.  Yes, I do see that.
15      Q.  All right.  And let's look
16  at this paper, if we could, together.
17          It begins by stating, "When
18  was the last time you heard a seminar
19  speaker claim that there was no
20  difference between two groups because the
21  difference was statistically
22  nonsignificant?"
23          Did I read that correctly?
24      A.  You read that correctly.

51 (Pages 198 to 201)

Kevin Holcomb, M.D.

Page 202

1    Q.  So this is a paper, just
2  from the introduction at least, looking
3  like it's going to talk about statistical
4  versus non-statistical data using the
5  95 percent confidence interval, right?
6    A.  Right.
7       MS. CURRY:  Object to the
8    form.
9  BY MS. GARBER:
10   Q.  Is that fair?
11      And then if you go to the
12 section which indicates the pervasive
13 problem.  It says, "Let's be clear about
14 what must stop.  We should never conclude
15 that there is no difference or no
16 association just because a P-value is
17 larger than a threshold such as 2
18 point" -- "such as 0.05."
19      And then we turn to the next
20 page, "or equivocally because a
21 confidence interval includes zero."
22      MS. CURRY:  Take the time to
23    look it through.
24 BY MS. GARBER:

Page 203

1    Q.  "Neither should we include
2  that two studies conflict because one has
3  a statistically significant result and
4  the other did not.  These errors waste
5  research efforts and misinform policy
6  decisions."
7       Did I read that correctly,
8  Doctor?
9    A.  Yes, you read that
10 correctly.
11   Q.  That's the opinion of these
12 authors and 800 signatories, correct?
13      MS. CURRY:  Object to the
14    form.
15      THE WITNESS:  I haven't read
16    the full paper, but that's what
17    the title says, yes.
18 BY MS. GARBER:
19   Q.  All right.  Let's go on to
20 read further down where it indicates, "It
21 is ludicrous to conclude that the
22 statistically nonsignificant results
23 showed no association when the interval
24 estimate included serious risk increases.

Page 204

1  It is equally absurd to claim that these
2  results were in contrast with earlier
3  results showing an identical observed
4  result, yet these common practices show
5  how reliance on thresholds of statistical
6  significance can" -- "can mislead us (See
7  'Beware false conclusions')."
8       Did I read that correctly?
9    A.  You did.
10   Q.  And -- and that's, in fact,
11 what you've done in Table 1, haven't you?
12      MS. CURRY:  Object to the
13    form.
14 BY MS. GARBER:
15   Q.  You've tried to separate
16 them by statistically significant and
17 nonstatistically significant, correct?
18   A.  As -- as much -- I did
19 divide them by significance and
20 nonsignificance.
21      Based on these doctors --
22 I'm not familiar with them.  But they are
23 clearly worried about missing significant
24 effects that are small, and I'm not

Page 205

1  saying I'm not interested in small effect
2  sizes.  But I'm saying that because of
3  the risk of -- of confounders and other
4  biases, that you need to find -- if
5  you're going to have a small effect size,
6  you're going to need to find consistency
7  along -- the -- the onus is going to be
8  even stronger to prove that you're not
9  making a spurious conclusion.  Because I
10 would imagine, being Nature contributors,
11 these are likely basic science
12 researchers.  And I can show you example
13 after example in clinical medicine where
14 nonsignificant findings led to wrong
15 results.  Whether -- and I give some
16 examples in my report with, you know,
17 what causes cervix cancer, the effect of
18 estrogen replacement therapy.  These
19 things that we did not use the safety
20 bumpers of 95 percent confidence
21 intervals.  It just -- it doesn't mean
22 that the studies should stop.  It just
23 means -- and that you have a definitive
24 answer.  It means that that should raise

52 (Pages 202 to 205)

Kevin Holcomb, M.D.

Page 206

1    questions for you and that should make
2    you think that there may be something
3    else going on.
4            MS. GARBER: Objection.
5        Motion to strike as nonresponsive.
6    BY MS. GARBER:
7        Q.   Doctor, what we're talking
8    about here is ovarian cancer, correct?
9        A.   Correct.
10       Q.   We're talking about a risk
11   of a deadly disease, correct?
12       A.   I treat ovarian cancer,
13   ma'am.  We don't have to go through the
14   fact it's deadly.
15       Q.   Right.  And -- and so here
16   there is a body of literature over
17   40 years that's looked at the topic,
18   right?
19       A.   Right.
20       Q.   And that body of literature
21   has consistent odds ratios throughout
22   case-control, cohort and -- and
23   meta-analyses?
24       A.   Cohort, no --

Page 207

1            MS. CURRY: Object to the
2        form.
3            THE WITNESS: I disagree
4        with that.
5    BY MS. GARBER:
6        Q.   You do?
7        A.   Yeah.
8        Q.   Okay.  The cohort studies
9    are showing, aside from the Gonzalez
10   study, they are all showing numbers that
11   are to the right of one, aren't they?
12           MS. CURRY: Object to the
13       form.
14   BY MS. GARBER:
15       Q.   For every use?
16       A.   For example, Gates is 1.06.
17       Q.   Mm-hmm.  That's to the right
18   of one, isn't it?
19       A.   Yes, ma'am.  Just right to
20   the right of one.
21       Q.   Okay.  Let's -- let's carry
22   on with this paper.
23           MS. SHARKO: Why doesn't --
24   why doesn't Dr. Greenland disclose

Page 208

1    that he is a plaintiffs' expert
2    here?  I'm just curious.
3            MS. GARBER: Let's -- let's
4    go on.
5    BY MS. GARBER:
6        Q.   Doctor --
7            MS. O'DELL: Susan, that's
8    totally inappropriate.  Stop
9    coaching the witness.
10           MS. SHARKO: I'm not.  I'm
11   not coaching him.  I'm asking you.
12           MS. O'DELL: He's not my
13   expert.  I don't know what you're
14   talking about.
15           MS. SHARKO: You identified
16   him as an plaintiffs' expert.
17           MS. O'DELL: I did not.
18           MS. SHARKO: Yeah, you did.
19   Look at your disclosures.
20       All right.  We'll send --
21   we'll send you a letter on this,
22   because I'm concerned about that.
23           MS. GARBER: So I -- I would
24   just like to say I would

Page 209

1    appreciate it, Ms. Sharko, if you
2    could stop coaching.  I understand
3    your need to, you know, speak up,
4    but Ms. Curry is completely
5    capable of defending the doctor.
6    And your coaching only frustrates
7    the process.
8            And -- and I will go to the
9    Court if we need to, because it's
10   not fair.  And you know it.
11           MS. SHARKO: Right.  There's
12   no coaching.  I asked you --
13           MS. GARBER: There is
14   coaching, Ms. Sharko.  You -- you
15   have just coached him about
16   Dr. Greenland, so --
17           MS. SHARKO: You are
18   interrupting me.  You are
19   interrupting me.
20           MS. GARBER: Because, you
21   know what, we're on the record.
22   So we'll have this topic off the
23   record later if we like.
24           MS. SHARKO: Are you going

53 (Pages 206 to 209)

Kevin Holcomb, M.D.

1    to interrupt me off the record?
2        There's no question pending.
3    It's a question for the plaintiffs
4    and we'll pursue it. We'll pursue
5    it off the record.
6    BY MS. GARBER:
7        Q. Doctor, could you look at
8    the bottom of this document. And it
9    indicates: "Beware of false conclusions.
10   Studies currently dubbed statistically
11   significant and statistically
12   nonsignificant need not be contradictory,
13   and as such, designations might cause
14   genuine effects to be dismissed."
15       Do you see that?
16       A. Yes.
17       Q. The study authors are very
18   concerned about risk of disease being
19   dismissed because a body of literature
20   shows statistical significance and
21   another one showing near statistical
22   significance, but experts like you,
23   dismissing that risk, they are concerned
24   about that, aren't they?

1        A. Because I'm -- I'm
2    concerned --
3        MR. MIZGALA: Object to the
4    form.
5        MS. CURRY: Object to the
6    form.
7        THE WITNESS: What I'm
8    concerned about is if you have a
9    group of studies that are all the
10   same design that are subject --
11   BY MS. GARBER:
12       Q. Doctor, I didn't ask you
13   that. I asked you yes or no, is that the
14   author's conclusions in your opinion?
15       MR. MIZGALA: Object to the
16   form.
17       THE WITNESS: The author is
18   not here speaking in front of the
19   camera. I'm here because you
20   asked me my opinions. And if you
21   want me to just read their
22   opinions, you don't need me here.
23   BY MS. GARBER:
24       Q. I don't want that. I --

1        A. So I'm here to give you my
2    opinions --
3        Q. I don't --
4        A. -- but you're not -- you're
5    not really interested in my opinions --
6        Q. What I --
7        A. -- because every time I try
8    to offer it to you, you cut me off and
9    you want me to tell you, are you reading
10   his opinions correctly.
11       Q. No, Doctor, I'm asking for
12   yours.
13       A. I believe you can read it.
14       Q. Do you agree with that?
15   That was my question. Do you agree with
16   these study authors?
17       A. Can you repeat the
18   statement?
19       Q. Okay. Do you agree with
20   these -- strike that.
21       These study authors are
22   concerned about dismissing genuine
23   effects.
24       A. Do I agree that they're

1    concerned?
2        Q. Yes.
3        MR. MIZGALA: Object to the
4    form.
5        MS. CURRY: Object to the
6    form.
7        THE WITNESS: They're
8    obviously concerned. They wrote
9    the paper.
10   BY MS. GARBER:
11       Q. Okay. That was my first
12   question --
13       A. Right.
14       Q. -- you didn't answer. Now
15   my second question is --
16       MS. SHARKO: Objection.
17       MS. GARBER: Strike my
18   second question. Let's move on.
19       MS. SHARKO: Thank you.
20       MS. GARBER: You know what?
21   I just -- I don't think I've ever
22   had another lawyer treat me as
23   disrespectfully as you,
24   Ms. Sharko. I just can't believe

54 (Pages 210 to 213)

Page 214

1 it. Okay.
2 MS. SHARKO: I have great
3 respect for you, Ms. Garber. It's
4 not my intention to make you feel
5 disrespected.
6 MS. GARBER: When you laugh
7 and you make snide comments, it's
8 hard to see that you have great
9 respect for me.
10 MS. SHARKO: I haven't
11 laughed or made snide comments,
12 but let's move on.
13 BY MS. GARBER:
14 Q. Okay. If we move on to the
15 middle of the column. The authors say,
16 "We agree on the call for the entire
17 concept of statistical significance to be
18 abandoned. We are far from alone." And
19 it goes onto describe, 250 people signed
20 on in the first 24 hours and another 800
21 experts.
22 Do you see that?
23 A. Yes.
24 Q. And so it's not just these

Page 215

1 study authors. It's -- it's other
2 experts in the field, right?
3 MS. CURRY: Object to the
4 form.
5 BY MS. GARBER:
6 Q. Do you understand that from
7 reading this or do you need to read the
8 whole paper?
9 MS. CURRY: Object to the
10 form.
11 THE WITNESS: I agree that
12 you read the segment correctly.
13 BY MS. GARBER:
14 Q. Okay. And then, Doctor,
15 finally, under -- at the right-hand side
16 under the heading "Quit Categorizing,"
17 the authors write, "The trouble is human
18 and cognitive more than statistical.
19 Bucketing results into statistical
20 significance and statistical
21 non-significance makes people think that
22 the items assigned in the way" -- "in
23 that way are categorically different."
24 Do you see that?

Page 216

1 A. I do.
2 Q. And you're drawing
3 categorical differences in the data
4 between statistically significant and
5 non-statistically significant, correct?
6 MS. CURRY: Object to the
7 form.
8 THE WITNESS: Will I be able
9 to explain for my reasons doing
10 so? Or are just going to see if I
11 agree with everything that they
12 say?
13 BY MS. GARBER:
14 Q. You know what? Your lawyer
15 can ask you questions --
16 A. Okay.
17 Q. -- that you want asked of
18 you --
19 A. Okay.
20 Q. -- Doctor. But this is my
21 opportunity to ask you questions that I
22 want to ask you.
23 A. Sure.
24 Q. And finally, turning over to

Page 217

1 the next page. The -- under the heading
2 of "Wrong Interpretations," it reads, "An
3 analysis of 791 articles across five
4 journals found that around half
5 mistakenly assume non-significance means
6 no effect."
7 Did I read that correctly?
8 A. Yes.
9 Q. And so, finally, turning
10 over to page -- to the right-hand column,
11 the authors conclude, "But eradicating
12 categorization will help to halt
13 overconfident claims, unwarranted
14 declarations of no difference, and absurd
15 statements about replication failure when
16 the results from the original and
17 replication studies are highly
18 compatible.
19 "The misuse of statistical
20 significance has done much harm to the
21 science community and those who rely on
22 scientific evidence. P-values, intervals
23 and other statistical measures all have
24 their place, but it's time for

Kevin Holcomb, M.D.

Page 218

1    statistical significance to go."
2         And I assume that you
3    disagree with these 800-some authors?
4         MS. CURRY:  Object to the
5    form.
6         THE WITNESS:  If you say
7    P-value has its place, what is its
8    place if not to determine
9    significance?  That's all a
10   P-values is.  So I would want to
11   know from the authors, if P-values
12   have their place and it's not in
13   determining significance, what
14   exactly is the place for a
15   P-value?  It's only used for one
16   thing, determining significance.
17   BY MS. GARBER:
18        Q.   What was my question,
19   Doctor?
20        A.   I'm sorry.
21        Q.   What was my question?
22        A.   I don't remember.
23        Q.   Okay.  My question was, I
24   assume you disagree with those authors;

Page 219

1    is that correct?
2         A.   Yes.
3         Q.   So in accord with the study
4    authors of the paper we just reviewed,
5    the case-control data as presented in
6    your Table 1 should not be deemed
7    different or inconsistent based on the
8    confidence interval under the authority
9    of the paper we just reviewed, correct?
10        MS. CURRY:  Object to the
11   form.
12        THE WITNESS:  Under my
13   authority, I would say they should
14   be considered different.
15   BY MS. GARBER:
16        Q.   Under the authority of the
17   paper that we just reviewed --
18        A.   Oh, these doctors want to
19   get rid of statistics altogether.  So we
20   wouldn't even -- yeah, they would say
21   don't bother doing them.
22        Q.   Where do you see that these
23   doctors want to get rid of statistics?
24        A.   Statistical significance,

Page 220

1    sorry.  They want to get rid of
2    statistical significance altogether.
3         Q.   You read Health Canada?
4         A.   Yes.
5         Q.   Let's look at what Health
6    Canada said about the consistency of the
7    study data.  Okay?
8         A.   Are you going to provide
9    something?
10        Q.   I'm going to mark the Health
11   Canada draft screening assessment dated
12   December 2010 as Exhibit 11.
13        A.   Thank you.
14        (Document marked for
15   identification as Exhibit
16   Holcomb-11.)
17   BY MS. GARBER:
18        Q.   There, Doctor, the study
19   authors indicated that, "The
20   meta-analyses of the available human
21   studies in the peer-reviewed literature
22   indicate a consistent and statistically
23   significant positive association between
24   perineal exposure to talc and ovarian

Page 221

1    cancer."
2         Do you agree with that, that
3    that's what the meta-analyses show?
4         A.   Yes.
5         Q.   You disagree?
6         MS. CURRY:  Object to the
7    form.
8    BY MS. GARBER:
9         Q.   You think --
10        A.   No.  They're talking about
11   the meta-analyses?
12        Q.   Yes.  Do you agree with
13   that?
14        A.   I believe they take a bunch
15   of studies, put them together.  Yes,
16   that's true.
17        Q.   So you believe that they are
18   consistent?
19        A.   The meta-analyses?
20        Q.   Yes.
21        MS. CURRY:  Object to the
22   form.
23        THE WITNESS:  The
24   meta-analyses -- if -- if I -- I

56 (Pages 218 to 221)

Kevin Holcomb, M.D.

Page 222

1    want to make sure it's okay for me
2    to expound on this.
3         The meta-analyses combine
4    both case-control and cohort
5    studies and come to the conclusion
6    that the case-control studies that
7    they are including, find a
8    difference, and usually typically
9    described as moderate -- a -- a
10   weak difference.  And cohort
11   studies which show no difference.
12   And they combine them together.
13        The few that have kept them
14   separate and look separately have
15   shown no difference in the cohort
16   studies they've put together and a
17   difference in the case-control
18   studies.
19   BY MS. GARBER:
20       Q.   Doctor, the authors here in
21   the Health Canada have concluded that the
22   meta-analyses are consistent.  Do you
23   agree with that?
24       A.   Yes.  That's what they are

Page 223

1    concluding.
2         Q.   Do you agree with the study
3    authors?
4              MS. CURRY:  Object to the
5         form.
6              THE WITNESS:  Again --
7    BY MS. GARBER:
8         Q.   Do you think they're -- do
9    you think they are consistent or
10   inconsistent?
11        A.   No.  Meta-analyses are
12   consistent.
13        Q.   Thank you.
14             You reviewed the Taher
15   paper?
16        A.   The what?
17        Q.   The Taher, T-A-H-E-R.
18        A.   Taher --
19        Q.   Yes.
20        A.   -- yes.  Mm-hmm.
21             MS. CURRY:  Ms. Garber,
22        whenever it's appropriate to take
23        a lunch break?
24             MS. GARBER:  Okay.  Let me

Page 224

1    just get into this.  I'm half into
2    it.
3         I'll mark the Taher 2018
4    meta-analyses as Exhibit 12.
5         (Document marked for
6         identification as Exhibit
7         Holcomb-12.)
8    BY MS. GARBER:
9         Q.   And turning -- as to the
10   topic of consistency, turning over to
11   Page 49, under the conclusion, it
12   reads --
13        A.   Page 49, I'm sorry.
14        Q.   -- "Consistent with previous
15   evaluations, the IARC in 2010 and
16   subsequent evaluations by individual
17   investigators, the present comprehensive
18   evaluation of all currently available
19   relevant data indicates that perineal
20   exposure to talcum powder is a possible
21   cause of ovarian cancer in humans."
22        First, did I read that
23   correctly?
24        A.   You did read it correctly.

Page 225

1         Q.   And this indicates that the
2    data are consistent --
3              MS. CURRY:  Object to the
4         form.
5    BY MS. GARBER:
6         Q.   -- correct?
7         A.   It's consistent with IARC,
8    yes.
9         Q.   Does it limit it to IARC,
10   that statement?
11        A.   IARC is basically using the
12   subsequent evaluations and so consistency
13   would not be surprising when you're
14   rechurning the same data over and over.
15        So when you say that the --
16   the individual investigators are
17   consistent with IARC, but IARC uses
18   individual investigators.  When you have
19   individual investigator's data then put
20   together into a pooled analysis, you
21   would expect consistency.  When you --
22   when you do meta-analysis that then take
23   those same individual studies and put all
24   the patients together, you would expect

Kevin Holcomb, M.D.

Page 226

1  consistency.
2         The consistency in that
3  sense, you know, really doesn't surprise
4  me.  If you take a bunch of studies that
5  have the same risk of bias -- and even if
6  the level of bias is the same, for
7  example, if you're doing a case-control
8  study in Boston, I wouldn't expect women
9  in Massachusetts to be more prone or less
10  prone to recall bias than a group of
11  women in California.
12         So I wouldn't be surprised
13  to see, especially since they are so
14  small, similar risk.  And that's why I
15  have a problem with the commenters in
16  Nature to say you don't need these, these
17  safe ways, because as long as they keep
18  going in the same direction, we should be
19  assuming it's real.
20         But what if all the studies
21  have the same problem, and that problem
22  takes your risk estimate in the same
23  direction?  And that's the problem I have
24  with just getting away with intervals,

Page 227

1  then, in any case.
2         So yes, IARC reviewed the
3  individual investigator's data and came
4  to this conclusion, and they are coming
5  to the same conclusion, largely looking
6  at the same data.
7         Taher's meta-analysis is
8  basically Berge's, it's basically
9  Penninkilampi.  There's no new data in
10  there.  It's rechurning the same data.
11         So to say that this is
12  consistent with this and this is
13  consistent with this, and you're all
14  looking at the same studies, to do the
15  same thing over and over and expect a
16  different outcome is insanity.
17         Q.  Are you done?
18         A.  Yes.
19         Q.  What was my question?
20         A.  Did I agree with this?
21         Q.  Okay.  That wasn't my
22  question.
23         The subsequent evaluations
24  by individual investigators, are -- are

Page 228

1  those contained within IARC's or are
2  those new studies?
3         A.  Well, interesting, IARC came
4  to the conclusion that it's a possible
5  carcinogen --
6         Q.  Doctor, what was my
7  question?
8         A.  I'm going to answer.  And
9  this time, you asked me a question, I'm
10  going to give you an answer.  And --
11         Q.  Are you going to give me an
12  answer that's --
13         A.  I'm going to give you a very
14  direct answer to the question you
15  asked --
16         Q.  That would be great.
17         A.  -- and if you would give me
18  a chance, you would have found out that
19  it would have been that case.
20         So IARC 2010 looks at talc.
21  They have one prospective trial included
22  in that.
23         In the coming years, you
24  asked, are there subsequent data that was

Page 229

1  added to it.  Well, IARC comes to this
2  conclusion, in the subsequent years
3  there's three more prospective studies
4  that are not included in IARC that come
5  to the conclusion that there is no
6  association.
7         And there are a number of
8  pooled analysis, and -- and meta-analysis
9  that keeps rechurning the same old data
10  that's in IARC.
11         So there's a number of
12  studies that have come out since IARC.  I
13  would say the balance of which have been
14  stronger design studies that have shown
15  no increased risk.  And I'll be curious
16  to see what IARC thinks the next time
17  they sit down and pool all this together.
18         Q.  Doctor, Endnote 3 and 5 and
19  69 do not cite to IARC.  Are you aware of
20  that?
21         A.  3, 5 and 69 in IARC?
22         Q.  Yeah.  I'll represent to you
23  they're Berge, Penninkilampi and --
24         A.  Right, so what are Berge and

58 (Pages 226 to 229)

Page 230

1    Penninkilampi, what are the studies in
2    those?
3        Q.    Those are just rechurning in
4    your opinion.  Those are just --
5        A.    I'm saying --
6        Q.    -- those studies are
7    invaluable because they are just
8    rechurning the prior meta-analyses.
9        Is that your opinion?
10        MS. CURRY:  Object to the
11    form.
12        THE WITNESS:  I'm saying
13    that there's very little
14    difference between Taher's
15    meta-analysis and Penninkilampi's
16    meta-analysis, and Berge's
17    meta-analysis.
18        The overlap in those studies
19    is great.  There's very -- that's
20    not much difference between those.
21    They have very similar number of
22    studies.  And so yes, it is a
23    rechurning of the same data.
24    BY MS. GARBER:

Page 231

1        Q.    That doesn't provide you
2    with support that those data are robust?
3        A.    If you --
4        MS. CURRY:  Object to the
5    form.
6        THE WITNESS:  No.  If you --
7    if you --
8    BY MS. GARBER:
9        Q.    Different authors doing --
10    picking basically different studies --
11        A.    Different studies?  That's
12    what I'm saying, they are not different
13    studies.
14        Q.    Okay.
15        A.    They're talking the same
16    studies.
17        Q.    I'm talking about the body
18    of meta-analyses.
19        A.    I'm telling you that
20    Penninkilampi, and Berge, and Taher, if
21    you look at the overlap in the studies
22    that they are putting together, if you
23    look at my case-control list, and it may
24    look like there's so many studies, but in

Page 232

1    fact, you'll see that Purdie and Green,
2    same dataset.  You'll see that Wu 2015
3    includes Wu 2009.  You'll see that Cramer
4    2016 includes Cramer 2009.
5        So is it surprising that
6    2009 Cramer and 2015 Cramer looks the
7    same when the -- half of 2016 is 2009?
8        Q.    Shall we throw out --
9        A.    It is rechurning --
10        Q.    Shall we throw out the
11    meta-analysis because they are
12    rechurning?
13        A.    I'm saying all -- no.  I'm
14    saying that meta --
15        MS. CURRY:  Object to the
16    form.
17        We have to do this in -- in
18    question and answer or you're
19    going to drive the court reporter
20    crazy.
21        THE WITNESS:  I apologize.
22        MS. CURRY:  Let her get her
23    full question out, give me a
24    second if I need to make an

Page 233

1    objection, and then please let him
2    finish his answer.
3    BY MS. GARBER:
4        Q.    Doctor, should we throw out
5    the meta-analyses because the subsequent
6    meta-analyses are just rechurning of
7    prior meta-analyses?
8        A.    No, what I'm saying is don't
9    say Penninkilampi, Berge, and the --
10    don't count three -- in the same way that
11    in my list of case-control studies, you
12    shouldn't consider Purdie and Green
13    different studies.  Even though I have a
14    list there just to show that I was being
15    comprehensive.  It's the same dataset.
16        So my point is, if you're
17    look -- if there's a lot of overlap, you
18    shouldn't then look and say, well, this
19    is consistent, because what Bradford Hill
20    meant by consistency was different
21    populations in different places at
22    different times.  That's not the spirit
23    of taking the same patients from the same
24    times in the same places and looking at

Kevin Holcomb, M.D.

Page 234

1    them over and over again.
2         Q.   There's not 100 percent
3    overlap in any of the studies, is there?
4         A.   Not 100 percent.  But the
5    majority of them.  The majority of Berge
6    is in Taher, and the majority of
7    Penninkilampi is in Taher.
8              You do the math and tell me
9    what percentage is not there.  It's the
10   same.  It's -- the majority, it's the
11   same studies.
12        Q.   In the case-control studies
13   is the majority -- are the majority of
14   those studies overlap of the prior
15   studies?
16             MS. CURRY:  Object to the
17        form.
18             THE WITNESS:  I don't
19        understand what you mean.
20   BY MS. GARBER:
21        Q.   Well, you seem to take issue
22   with -- that there's overlap?  So
23   let's --
24        A.   There's some.

Page 235

1         Q.   Let's talk about the
2    case-control studies.
3         A.   Sure.
4         Q.   Do the body of case-control
5    studies provide 100 percent overlap of
6    data?
7              MS. CURRY:  Object to the
8         form.
9              THE WITNESS:  No.
10   BY MS. GARBER:
11        Q.   And what's the percentage of
12   overlap in your opinion?
13             MS. CURRY:  Object to the
14        form.
15             THE WITNESS:  I just
16        mentioned the studies on my list
17        that were overlap.
18   BY MS. GARBER:
19        Q.   Okay.  And it's limited to
20   those studies, correct?
21        A.   And you have -- irrespective
22   of what the doctors say about throwing
23   away confidence intervals, which is not
24   the majority of people in medicine, I

Page 236

1    will say that, yes, when you don't have
2    overlap you get a 50/50.  You get a 50/50
3    significance, 50/50 non-significance.
4              If you keep churning the
5    same data over, you would be surprised to
6    see it drop out of significance.  And in
7    fact, when you look at Berge, which is
8    really the only meta-analysis I -- I
9    wouldn't say it's the only meta-analysis
10   that I respect.
11             But one of the rules of
12   meta-analysis is that you have to do a
13   test for heterogeneity before you just
14   decide to throw these studies together
15   and it's valid to do so.
16             And I look at Penninkilampi.
17   And Penninkilampi says, well, I did a
18   study for heterogeneity.  And I looked
19   at, make sure they use condoms and
20   diaphragms and perineal dusting.  And
21   that's what he's looking for
22   heterogeneity.
23             But the biggest form of
24   heterogeneity, the one thing that they

Page 237

1    don't mention, is the first thing Berge
2    did.  What if you looked at the
3    case-control studies and the cohort
4    studies?  Should these things even be
5    mixed together.
6              And Berge says, they
7    shouldn't.  There's too much
8    heterogeneity.  But they go ahead and do
9    it anyway.
10        Q.   The Penninkilampi authors
11   looked at the issue of heterogeneity and
12   found --
13        A.   Through case-control -- I'm
14   sorry.
15             MS. CURRY:  You have to let
16        her finish her question.
17             THE WITNESS:  I'm sorry.
18   BY MS. GARBER:
19        Q.   The Penninkilampi authors
20   looked at the issue of heterogeneity and
21   concluded that there was not
22   heterogeneity with regard to talc
23   exposure, true?
24             MS. CURRY:  Object to the

60 (Pages 234 to 237)

Kevin Holcomb, M.D.

Page 238

1    form.
2         THE WITNESS:  Looking at a
3    very similar group of studies as
4    Berge, and somehow Berge came up
5    with heterogeneity and mentions
6    the heterogeneity between study
7    design, and Penninkilampi, if you
8    look at what they looked at as far
9    as heterogeneity, they never say
10   that they saw a lack of
11   heterogeneity between cohort
12   studies and case-control studies.
13        And how could you not find
14   heterogeneity when you have none
15   of the cohort studies showing a
16   significant impact?
17   BY MS. GARBER:
18        Q.   Are you an advocate for the
19   defense?
20        MS. CURRY:  Object to the
21   form.
22        THE WITNESS:  I'm an
23   advocate for the truth.  But I'm
24   the biggest advocate for my

Page 239

1    patients.  But that's a whole
2    other story.
3    BY MS. GARBER:
4         Q.   You are an advocate for your
5    patients?
6         A.   I am.
7         Q.   Do you advise them that it's
8    safe to put asbestos on their genitals?
9         A.   No, I don't.
10        MS. CURRY:  Is it a good
11   time -- good breaking point for
12   you?
13        MS. GARBER:  Sure.
14        THE VIDEOGRAPHER:  Off the
15   record, right?  The time is
16   1:07 p.m.  Off the record.
17        (Lunch break.)
18        THE VIDEOGRAPHER:  We are
19   back on the record.  The time is
20   2:04 p.m.
21   BY MS. GARBER:
22        Q.   Good afternoon, Doctor.  Did
23   you have a good lunch?
24        A.   Yes, I did.  Thank you.

Page 240

1         Q.   Very well.
2              In the case-control studies
3    that are here published in Table 1, do
4    those studies involve study participants
5    of different ethnicities?
6         A.   Yes.
7         Q.   And do those studies involve
8    case-control studies that have occurred
9    over decades, in other words from 1982 to
10   recently?
11        A.   Yes.
12        Q.   Okay.  And while some of
13   them are in the United States, some are
14   in foreign countries?
15        A.   Majority in the United
16   States.
17        Q.   But some are in foreign
18   countries?
19        A.   A few.
20        Q.   Yeah.  And --
21        MR. MIZGALA:  Could you
22   raise your voice just a little
23   bit?
24        MS. GARBER:  Yeah.

Page 241

1              MR. MIZGALA:  Thank you.
2    BY MS. GARBER:
3         Q.   And with regard to the
4    case-control cohorts and meta-analyses,
5    the published literature with regard to
6    talc and ovarian cancer contained
7    different study designs, can we agree
8    with that?
9         A.   Yes.
10        Q.   And even within the
11   case-control studies, those involve
12   different study designs generally?
13        MS. CURRY:  Object to the
14   form.
15        THE WITNESS:  No.  The
16   case-control is a study design.
17   BY MS. GARBER:
18        Q.   Okay.  I'll just strike
19   that.
20             All right.  Is it your
21   opinion that unless a given study is
22   statistically significant and with an
23   odds ratio greater or equal to 2.0, that
24   the findings are attributable to random

61 (Pages 238 to 241)

Kevin Holcomb, M.D.

Page 242

1    chance?
2           MS. CURRY:  Object to the
3    form.
4           THE WITNESS:  No.
5    BY MS. GARBER:
6       Q.   That's not your opinion?
7       A.   No.
8       Q.    Who is Melissa Frey?
9       A.    She is one of my partners at
10   Cornell.  She is a GYN oncologist.
11      Q.    Do you respect her as a
12   clinician?
13          MS. CURRY:  Object to the
14   form.
15          THE WITNESS:  Yes, I do.
16   BY MS. GARBER:
17      Q.    Do you respect her
18   professional judgment?
19      A.    Yes.
20      Q.    You indicate in your expert
21   report that use of hormone replacement
22   therapy, or can we call that HRT?
23      A.    It depends what you're
24   talking about.  If you're talking about a

Page 243

1    combination single -- I -- I assume we're
2    going to specify what you're referring
3    to.
4       Q.    Okay.  For purposes of your
5    expert report with regard to risk factors
6    and HRT, what are you referencing?
7       A.    Most of the studies that
8    show a significant increased risk is with
9    estrogen replacement alone.
10      Q.    Okay.  And you believe that
11   HRT is a risk factor for ovarian cancer,
12   or do you limit that to estrogen alone?
13      A.    I would limit it to estrogen
14   alone.
15      Q.    Okay.  In caring for women
16   who use HRT in connection with menopause,
17   have you had the occasion to prescribe or
18   care for a woman using HRT Prempro?
19      A.    Yes.
20      Q.    Did you ever prescribe it?
21      A.    Yes, I have.
22      Q.    Are you aware that the --
23   what the odds ratio or the risks are
24   associated with that drug for cancer?

Page 244

1           MS. CURRY:  Object to the
2    form.
3           THE WITNESS:  Which type of
4    cancer are you referring to?
5    BY MS. GARBER:
6       Q.    We'll start with breast
7    cancer.
8       A.    I don't know the odds ratio
9    exactly, no.
10      Q.    Doctor, if I represent to
11   you that the odds ratio for Prempro and
12   breast cancer is a 1.24, you don't have
13   any reason to dispute that, do you?
14          MS. CURRY:  Object to the
15   form.
16          THE WITNESS:  I -- I don't
17   know the odds ratio.
18   BY MS. GARBER:
19      Q.    Do you know, Doctor, or are
20   you aware that Prempro carries a black
21   box warning for a risk of breast cancer
22   based on an odds ratio of 1.24?
23      A.    For all patients?
24      Q.    Yes.

Page 245

1       A.    No, I wasn't aware of that.
2       Q.    No -- for menopausal women.
3    Are you aware of that?
4       A.    No.
5       Q.    Do you believe that the risk
6    associated with talc and ovarian cancer
7    is generally 1.3 to 1.4?
8           MS. CURRY:  Object to the
9    form.
10          THE WITNESS:  I believe in
11   my report I say it's between 1.2
12   and 1.6.  So I'll stick with that.
13   BY MS. GARBER:
14      Q.    Okay.  And so that would be
15   a 20 to 60 percent increased risk of
16   ovarian cancer associated with talcum
17   powder products, right?
18      A.    In the studies that show a
19   risk increase at all, yes.
20      Q.    And you believe that that
21   odds ratio or relative risk is low?
22          MS. CURRY:  Object to the
23   form.
24          THE WITNESS:  Yes.

62 (Pages 242 to 245)

Kevin Holcomb, M.D.

Page 246

1    BY MS. GARBER:
2        Q.   And do you, therefore, feel
3    that it does not meet sufficiency of a
4    magnitude of a risk to be reliable under
5    the Bradford Hill factors?
6        A.   No --
7            MS. CURRY:  Object to the
8        form.
9            THE WITNESS:  -- that's not
10       my opinion.
11   BY MS. GARBER:
12       Q.   Okay.  Do you have any
13   opinion as to the magnitude of the risk
14   or strength of the association between
15   the talc literature and ovarian cancer?
16       A.   Please repeat the question.
17       Q.   Sure.  Do you have an
18   opinion as to the strength of the
19   association or magnitude of the risk as
20   it pertains to the talc ovarian cancer
21   literature?
22           MS. CURRY:  Object to the
23       form.
24           THE WITNESS:  It's generally

Page 247

1        referred to -- it's generally
2        referred to as modest.  In some
3        cases weak.  And I would -- I
4        would agree with that.
5    BY MS. GARBER:
6        Q.   You are aware of
7    peer-reviewed and published studies that
8    hold the opposite opinion to yours,
9    right, that -- that the magnitude of
10   risk -- magnitude of the risk is
11   sufficient to meet with the Bradford Hill
12   criteria as to that issue?
13       A.   I agree with the statement
14   that -- I don't agree with the statement
15   that I've seen literature that described
16   the association as anything but modest
17   even in the -- by the authors who hold a
18   different opinion.
19       Q.   Do you know what IARC says
20   as to the magnitude of the risk in the
21   2010 monograph?
22       A.   I'd have to review it again
23   to say specifically.
24       Q.   Do you know what the

Page 248

1    prevalence is in the United States for
2    use of talcum powder products?
3            MS. CURRY:  Object to the
4        form.
5            THE WITNESS:  The different
6        studies that I reviewed had
7        different -- different prevalence
8        of use.  And I think it's somewhat
9        related to the ethnic group.  For
10       example, the group that has
11       probably one of the lowest rates
12       of ovarian cancer is African
13       Americans, and historically they
14       have one of the highest uses of
15       talc.
16           But for example, in Gertig
17       at the -- at that time of that
18       study I believe it was about
19       42 percent of women reported using
20       it with about 14 percent using it
21       daily.
22   BY MS. GARBER:
23       Q.   You've seen literature that
24   cites it as high as 50 percent in the

Page 249

1    United States, right?
2        A.   Yes.
3        Q.   Do you agree with the Narod
4    author in 2016 that it's right to be
5    concerned over carcinogenicity of talc
6    even if a risk ratio is below 50 percent?
7            MS. CURRY:  Object to the
8        form.
9            THE WITNESS:  No.  I think
10       that statement taken in isolation,
11       I would not agree with that.
12   BY MS. GARBER:
13       Q.   You agree that his opinion
14   has been published in Gynecologic
15   Oncology, correct?
16       A.   I agree, yes.
17       Q.   Do you have an opinion as to
18   when subgroup analysis for epithelial
19   ovarian cancer histology type is
20   performed in the studies that serous has
21   the strongest association?
22           MS. CURRY:  Object to the
23       form.
24           THE WITNESS:  I do.  It's

63 (Pages 246 to 249)

Kevin Holcomb, M.D.

Page 250

1     not surprising, because it's the
2     most predominate cell type.
3   BY MS. GARBER:
4     Q.   Do you agree if women tend
5   to use talc daily, as you indicate in
6   your report, that the use becomes
7   habitual rather than memorable?
8     A.   Habitual rather than
9   memorable?
10    Q.   Mm-hmm.
11        MS. CURRY:  Object to the
12    form.
13  BY MS. GARBER:
14    Q.   Do you understand the nature
15  of my question?
16    A.   No, I guess I have to think
17  about that.
18    Q.   Let me see if I can help.
19  So if, let's say, I have grown up
20  brushing my teeth every single day twice
21  a day with Crest toothpaste, and somebody
22  wants to know what I've done over my
23  lifetime, I don't have to think about,
24  oh, did I use Crest every single day,

Page 251

1   twice a day?  It's habitual because I've
2   done it my whole life, rather than if I
3   used one product one day and another
4   product the other day and, you know, it
5   was not something that was part of my
6   ADLs.  You understand what ADLs are, of
7   course.
8     A.   I do.
9     Q.   Yeah.  Activities of daily
10  living.  So if it was not part of an
11  activity of daily living, it might be
12  more memorable.
13        Do you understand now?
14        MS. CURRY:  Object to the
15    form.
16        THE WITNESS:  I -- honestly,
17    I think my understanding of this
18    isn't that certain things are
19    memorable and certain things are
20    habitual.  It's that activities
21    can be impacted by alterations in
22    your recall of those things by a
23    number of factors, which I
24    outlined in my report, one

Page 252

1     including the desirability of the
2     exposure.
3        But -- so I think all
4     behaviors are subject to changes
5     in recall based on the specifics.
6   BY MS. GARBER:
7     Q.   Do you believe that the
8   case-control studies are unreliable for
9   assessment of risk for talcum powder
10  exposure in ovarian cancer based on
11  recall bias?
12        MS. CURRY:  Object to the
13    form.
14        THE WITNESS:  I think all
15    case-control studies have a risk
16    of recall bias, not just limited
17    to ovarian cancer studies.
18  BY MS. GARBER:
19    Q.   I understand they're at risk
20  for that.  Is it your opinion that the
21  case-control studies have had recall bias
22  at play to explain that increase in risk?
23    A.   I think that's one of the
24  possible explanations, yes.

Page 253

1     Q.   Possible, not probable?
2        MS. CURRY:  Object to the
3    form.
4        THE WITNESS:  I would argue
5    probable.
6   BY MS. GARBER:
7     Q.   Okay.  I got you to change
8   it to a probable?
9     A.   Yes.
10    Q.   Are you aware of literature
11  that says it's not likely at play to
12  explain the increased odds ratios or
13  relative risks?
14    A.   I have read opinions about
15  it, but literature, no.
16    Q.   Okay.  Are you aware of
17  authors that have studied the topic of
18  talcum powder products and risk of
19  ovarian cancer who have concluded that
20  recall bias is not at play?
21        MS. CURRY:  Object to the
22    form.
23        THE WITNESS:  Please repeat
24    the question again.

64 (Pages 250 to 253)

Page 254

BY MS. GARBER:
Q. Sure. Have you -- have you read peer-reviewed published studies where the authors were studying talcum powder products and the risk of ovarian cancer and have concluded that recall bias was not at play as increasing the risk for ovarian cancer?
MS. CURRY: Object to the form.
THE WITNESS: No. In fact, the only time I remember a study really getting into this where they had proof was Schildkraut 2016, where there was a pretty significant increase and people remembering being exposed to talc after 2014 compared to before 2014.
And I can't think of any other explanation for that difference other than recall bias.
BY MS. GARBER:
Q. Well, we'll get to that

Page 255

paper. And I appreciate that. But you just used a term, "proof." What do you mean by that?
A. I don't know exactly what I said. Can you repeat my statement?
Q. You said, "I remember a study really getting into this where they had proof, was Schildkraut 2016, where there were pretty significant" --
A. Let me change the word from "proof" to "evidence."
Q. Okay. Let's look at some studies.
(Document marked for identification as Exhibit Holcomb-13.)
BY MS. GARBER:
Q. I'm going to mark as Exhibit 13 a paper by Mills, et al. This is one that you reviewed, right?
A. Yes.
MS. GARBER: Sorry. I didn't -- I didn't make enough copies for you guys. I apologize.

Page 256

Here's a screen. The doctor has a screen.
BY MS. GARBER:
Q. Doctor, at Page 464 of this paper, if you can turn to that, the last page of the study. And on the left-hand column, about halfway down the paragraph, it begins "recall."
Do you see where I am? If you look -- if you look here, Doctor. See?
A. Yeah.
Q. Okay. It reads, "Recall bias has also been implicated as a limitation in studies of talc and ovarian cancer. However, findings in a prospective" -- "in a prospective study, the Nurses' Health Study, in which exposure data were collected prior to diagnosis and hence free of recall bias were similar to the present finding for our talc use and serous invasive ovarian cancer.
"It has also been suggested

Page 257

that use of talc is habitual versus memorable and not likely to be subject to recall bias."
So, Doctor, my question is, this is a peer-reviewed study author who is suggesting that the studies are similar between case-control and a cohort and suggesting that recall bias is not at play because the use is habitual versus memorable.
Do you agree?
MS. CURRY: Object to the form.
THE WITNESS: No. Can I explain why?
BY MS. GARBER:
Q. I don't -- I don't mean agree with the author. Do you agree with my assessment of what the authors are saying?
MS. CURRY: Object to the form.
THE WITNESS: That's true what the authors are saying.

65 (Pages 254 to 257)

Kevin Holcomb, M.D.

Page 258

BY MS. GARBER:
Q.   Okay.  And you disagree that recall bias is not at play because the use is habitual rather than memorable?
A.   No.
Q.   You don't agree with that?
A.   If I can explain my reasoning, or should I leave this at yes or no?
Q.   Just I don't need to know why.
A.   You don't need to know why.
Q.   No, I want to ask you a few more questions and then I'll circle back to that --
A.   Sure.
Q.   -- because there are a few other papers that I want to get to before we understand that.
     Doctor, if you can go back to the Health Canada, which we marked as Exhibit 11.  And if you could turn to Page 28.  Under -- do you see where I am?  Under the 6.4, third paragraph down.

Page 259

     Do you see where I am?  It says, "In studies?"
A.   28.  Yes.  Yes.  Okay.
Q.   It says, "In studies where the exposure is simple, e.g., never versus ever use, recall bias is unlikely to be an important source of bias."  And then it cites to Narod 2016.
     "The positive association is strongest for serous histologic type," and then it cites to Berge 2018 and Taher 2018.  "Findings that the association may vary by histologic type detracts from the hypothesis of report bias as this type of bias would likely operate for all histologic types."
     Did I read that correctly?
A.   You did.
Q.   And so what the authors there are saying is if recall bias was at play here, you would expect to see an increase in all of the histologic types, not just certain ones, correct?
     MS. CURRY:  Object to the

Page 260

form.
     THE WITNESS:  One, the first statement, "The recall bias is unlikely to be an important source of bias," is now referring to an opinion of Narod.  Narod's 2016, I told you was that not -- that wasn't based on data.  So there's an echo chamber thing.
     And then the positive association is strongest for serous histologic type, if you have a higher prevalence of a type, you would expect recall bias to be more commonly seen with that, because when you have rarer, smaller numbers, you may not reach an association high enough to show the increased risk there.
     So it's not surprising to me if there was going to be a consistent cell type that you saw this increased risk with, it would be with serous, because it is the

Page 261

predominate cell type.
BY MS. GARBER:
Q.   You disagree with the study authors of Health Canada wherein they are stating at Page 28, that recall bias is not likely at play --
A.   They are -- yeah, I'm sorry.
Q.   -- not likely at play for the increased risk amongst the studies, correct?
A.   I do because if they would cite a study where they can show it wasn't at play.  See, I can cite a study where I believe it was at play when I cite Schildkraut.
     When they cite a study that shows it's not at play, they cite an opinion piece by Narod.  There's a difference.
Q.   Well, and they also cite the Berge and Taher papers, don't they?
A.   For a different period -- for a different point.
Q.   Is there any metric,

66 (Pages 258 to 261)

Kevin Holcomb, M.D.

Page 262

1    objective metric to measure recall bias
2    in a given study?  In other words, for
3    those who don't typically read
4    epidemiological literature, there --
5    there is not an objective measurement
6    that can be --
7        A.  I can think of one.
8        MS. CURRY:  Object to the
9    form.
10       THE WITNESS:  If you have a
11   situation where there is a -- an
12   increase in familiarity with a
13   topic that happens after a certain
14   time point and you look at the
15   association before and after this
16   is widely known and show that
17   there's a difference, I think that
18   that's a fair metric -- it puts
19   the onus to figure out, well, why
20   all of a sudden after the time
21   that it's a well-known entity, why
22   do more people remember using it
23   who have cancer compared to the
24   controls.

Page 263

1        So if the controls have the
2    same memory of using it before
3    it's widely known as after it's
4    widely known, but the cases, all
5    of the sudden after it's widely
6    known the cases remember using,
7    this habitual practice, all of the
8    sudden goes up, after it's widely
9    known, I take that as a fair
10   metric of recall bias.
11       And I've tried to explain in
12   my mind what other thing could get
13   played to explain that finding,
14   and I can't.
15       So with all due respect to
16   Dr. Narod's opinion, which is not
17   citing a paper, I have seen data
18   where I think -- I can't think of
19   another plausible explanation for
20   what's at play other than recall
21   bias using the metric I just
22   described.
23   BY MS. GARBER:
24       Q.  Widely known is subjective,

Page 264

1    isn't it?  I mean, how does a study
2    author decide what is and what isn't
3    likely known?
4        A.  Well, if you -- I think it's
5    a fair thing to ask.  But if you have a
6    date where there's a big lawsuit, per
7    se -- per se.  And I bet you if you
8    counted how many commercials you see on a
9    topic, a liability topic, I bet you can
10   come up with a clear point where you can
11   say before this time frame there was this
12   amount of activity on TV, and after this
13   time frame, it was that much.  And -- and
14   yeah, that was a crude estimate to do it
15   with what date the -- the first cases are
16   becoming very well known.
17       But I disagree with the
18   point that you can't approximate recall
19   bias.  Because I -- I do think
20   Schildkraut's study was a good example of
21   it.
22       Q.  The Schildkraut separated
23   the -- what was known from what was not
24   known based on a time frame of 2014,

Page 265

1    correct?
2        A.  Right.
3        Q.  And what was known, what was
4    widely known in 2014 in your opinion?
5        MS. CURRY:  Object to the
6    form.
7        THE WITNESS:  Well, I don't
8    think it was as widely known
9    before 2014 of large payments and
10   lawsuits because of talc being
11   associated with -- with ovarian
12   cancer.
13       Because it's my assumption
14   that most lay people don't know of
15   the association because they've
16   been reading Cramer studies, or
17   Merritt or any of these other --
18   I'm -- I'm going to assume that
19   the majority of people out there
20   who are going to be on these
21   studies and answering these
22   questionnaires, how are they going
23   to find out about talc.  It's most
24   likely going to come through the

67 (Pages 262 to 265)

Page 266

1    lay media.
2        The lay media pipes up more
3    when there is product liability
4    associated with it.
5    BY MS. GARBER:
6        Q.    When --
7        A.    And so --
8        Q.    When was that first time
9    that there was lay media coverage of a
10   talc verdict or litigation?
11       A.    I don't think it's -- I
12   can't give you the exact date where it
13   starts.  I think you'd have to look, and
14   split your studies up into an earlier
15   period and a later period.
16       But, if people who don't
17   have ovarian cancer have the same
18   recollection of talc usage before and
19   after a certain point, but cases have a
20   very different memory of using it before
21   and after, I think that that's a very,
22   very powerful statement, and I would
23   argue that you'd be challenged to come up
24   with another reason why that would

Page 267

1    happen, other than recall bias.
2        Q.    Are you aware of
3    peer-reviewed study authors that state in
4    their papers with regard to talcum powder
5    product use and ovarian cancer, that say
6    reporting bias is not at play with regard
7    to the results?
8        MS. CURRY:  Object to the
9    form.
10       THE WITNESS:  I'm not
11   familiar with, and you -- you
12   posited that there's no good
13   metric.  So I'm not sure, other
14   than me describing examples where
15   I believe it's at play and
16   explaining why, I would be curious
17   to hear the opinion of somebody
18   like Narod who says I don't
19   believe it's at play.
20       And if your only
21   justification for the statement is
22   that I believe it's habitual
23   versus memorable, that is less
24   persuasive than what I'm

Page 268

1    describing.
2        I believe it was at play in
3    Schildkraut.  And I don't believe
4    there is anything special about
5    Schildkraut's study design that
6    would make it at play in that
7    study and not another one.
8    BY MS. GARBER:
9        Q.    Okay.  Your opinion that
10   there's recall bias at play in the
11   case-control studies is based on
12   Schildkraut's study?
13       MS. CURRY:  Object to the
14   form.
15       THE WITNESS:  Not only.
16   BY MS. GARBER:
17       Q.    What -- what other data do
18   you have to support that claim?
19       A.    A trend in the strength of
20   association also increasing over time.
21       Q.    Is that your opinion?
22       A.    Yes.
23       Q.    That there is a trend of
24   increasing --

Page 269

1        A.    To be fair the term
2    "trend" --
3        Q.    -- risk over time?
4        A.    I'm sorry.
5        Q.    Sorry.
6        A.    The term "trend" is a -- is
7    a statistical term.  So I -- I can't say
8    I've subjected this to a statistical
9    test.
10       But in earlier versus later
11   studies, you do see an increase.
12       Q.    And, Doctor, if we look at
13   your Table 1 and we look at the odds
14   ratios -- or sorry, the relative risk,
15   do --
16       A.    Let me go back.
17       Q.    -- does it show an increase
18   over time?
19       A.    Let me go back one second.
20       Q.    It's Exhibit 9.
21       A.    I'd have to take the time to
22   look through all the odds ratios, but one
23   of the reasons why I color-coded it was I
24   can just look at that and -- and see that

Kevin Holcomb, M.D.

Page 270

1  there's more blue which are
2  nonsignificant studies --
3      Q.   Well --
4      A.   -- in the beginning --
5      Q.   Well, Doctor --
6      A.   -- and these -- these are
7  in -- in chronological order.
8      Q.   Let's just look at the -- at
9  the white ones.
10         The odds ratios don't seem
11  to be increasing over time appreciably,
12  do they?
13     A.   Not to my naked eye, no.
14     Q.   Okay.
15     A.   Just the frequency of
16  positive studies.
17     Q.   And we're going to get to
18  the meta-analysis shortly.  But the
19  meta-analyses over time.  How many
20  meta-analyses are there, by the way?
21     A.   There's probably about
22  seven.  Maybe more.
23     Q.   And do you, off the top of
24  your head, do you have a general sense of

Page 271

1  what those odds ratios are?
2      A.   Yes.  I believe they're in
3  the same modest range as the studies that
4  are going into them.  1.24, 1.28, 1.31,
5  in that general region.
6      Q.   Let's look at another paper,
7  the Langseth paper.  You reviewed that as
8  part of your expert opinions, right?
9      A.   Yes.
10         (Document marked for
11         identification as Exhibit
12         Holcomb-14.)
13  BY MS. GARBER:
14     Q.   And if you turn to page --
15  well, it's 358.  It's the front page,
16  Doctor.
17         And if you look at -- if you
18  look at the right-hand column about
19  halfway down -- do you see where I am?
20  Where it says, "Methodological factors"?
21     A.   Yes, I do.
22     Q.   And the paper reads,
23  "Methodological factors such as recall
24  bias should always be considered in

Page 272

1  case-control studies.  It could have been
2  a problem had there been widespread
3  publicity about the possible association
4  between use of body powder and cancer.
5  The IARC" -- shortened that -- "working
6  group considers that there has not been
7  widespread public concern about the issue
8  and, therefore, considers it unlikely
9  that such a bias could explain the
10  consistent findings."
11         Did I read that correctly?
12     A.   You did.  And you're talking
13  about one type of recall bias.  The
14  authors go on to say that's not the only
15  type of recall bias that we have to
16  consider.  And in fact just recall bias
17  in cancer patients remembering exposures
18  at a higher rate cannot be ruled out.
19     Q.   Doctor, you can't say to a
20  medical degree of probability that there
21  is recall bias that explain the
22  statistically significant increased risk
23  in the case-control studies, can you?
24         MS. CURRY:  Object to the

Page 273

1  form.
2         THE WITNESS:  No.
3  BY MS. GARBER:
4      Q.   In your expert report, do
5  you address at all anywhere in the four
6  corners of your report where study
7  authors -- peer-reviewed study authors
8  have indicated that recall bias is not
9  likely at play to explain the increased
10  risk?  Do you address that issue at all?
11     A.   No.
12     Q.   And anywhere in the four
13  corners of your report, do you address
14  that study authors, peer-reviewed study
15  authors, have indicated that the
16  epidemiological data is consistent?
17     A.   Do I present the data in my
18  report showing a 50/50 split and then say
19  that other people called it consistent?
20  No, I didn't.
21     Q.   Let's turn to the
22  Schildkraut paper.
23         (Document marked for
24         identification as Exhibit

Page 274

1    Holcomb-15.)
2  BY MS. GARBER:
3    Q.  I'm going to mark it as 15.
4  Doctor, in your expert report at Page 9,
5  you indicate that, "Recall bias can lead
6  to spurious results in case-control
7  studies in a variety" --
8    A.  I'm sorry.  Which page were
9  you reading from?
10    Q.  Page 9.  You indicate that,
11  "Recall bias can lead to spurious results
12  in case-control studies in a variety
13  of" --
14    A.  I'm sorry.  I'm still trying
15  to find out where we are.  I don't
16  think --
17    Q.  I'm just --
18    A.  One second.
19    Q.  I'm just reading.
20    A.  I know.  I just want to read
21  along, if it's okay.
22        Yes, I'm ready for you.
23    Q.  I'll try it again.  You
24  indicate that, "Recall bias can lead to

Page 275

1  spurious results in case-control studies
2  in a variety of clinical scenarios."  And
3  then you cite to the Schildkraut 2016
4  paper, correct?
5    A.  Right.
6    Q.  All right.  And --
7    A.  Hold on.  Is that
8  Schildkraut that I'm -- let me see.  33,
9  yes.
10    Q.  What you didn't cite to is
11  that the -- is what the authors stated
12  about the class action publicity.  And so
13  if I can have you turn to Page 1416 of
14  the Schildkraut paper.
15        And so if you go to the
16  right-hand column, in the first paragraph
17  about halfway down with the sentence that
18  begins "although."
19        Do you see where I am?
20    A.  Yes.
21    Q.  It says, "Although our
22  findings" --
23    A.  No.  I'm sorry.  Wrong
24  although.  They say "although" more than

Page 276

1  once.
2        MS. CURRY:  Where are you?
3        MS. GARBER:  Right here.
4        THE WITNESS:  Yes, I found
5  it.
6  BY MS. GARBER:
7    Q.  "Although our findings
8  suggest that the publicity of class
9  action lawsuits may have resulted in
10  increased reporting of body powder use,
11  our data do not support that recall bias
12  alone before 2014 versus" -- "before 2014
13  versus 2014 or later would account for
14  the associations with body powder use and
15  epithelial ovarian cancer."
16        Did I read that correctly?
17    A.  Yes, you did.
18    Q.  So you didn't cite in
19  your expert report, did you?
20    A.  I -- maybe I'm
21  misunderstanding what they are saying
22  here.  But they're saying maybe it's not
23  just not that alone.  They're saying that
24  there could be other things that cause

Page 277

1  recall bias.  And they're saying --
2  they're not discounting that that played
3  a role.  They're saying there could be
4  other things, and they are pretty much
5  saying the same thing that I read before
6  where they said there's other causes of
7  recall bias other than just information
8  out in the media.
9        Possibly there were multiple
10  things at play that caused recall bias.
11  But that statement, they're not saying
12  there was no recall bias in the study.
13  They're just saying that it may be more
14  than just -- than just the lawsuits.
15    Q.  That's your interpretation
16  of what they are saying?
17    A.  Well, it says --
18        MS. CURRY:  Object to the
19  form.
20        THE WITNESS:  -- it says,
21  "The data do not support the
22  recall bias alone before 2014
23  versus" -- "or later would account
24  for the associations."  They

70 (Pages 274 to 277)

1    didn't say that it didn't.
2    They're just saying possibly
3    there's other things.
4        Yes, that's my
5    interpretation.
6  BY MS. GARBER:
7    Q.   You don't know what the
8  other things are, do you?
9    A.   They don't either.  They're
10  saying -- they're not discounting recall
11  bias.  They're just saying there may be
12  multiple sources.
13    Q.   There was no widespread
14  publicity about talc and ovarian cancer
15  in the lay media in 2014, was there?
16        MS. CURRY:  Object to the
17    form.
18        THE WITNESS:  Then why did
19    Schildkraut decide to make that
20    analysis?  They made that analysis
21    specifically because of the
22    lawsuits.
23  BY MS. GARBER:
24    Q.   You're making that

1  assumption, aren't you?
2        MS. CURRY:  Object to the
3    form.
4        THE WITNESS:  No.  They --
5    they say in the materials and
6    methods, why they split at 2014.
7  BY MS. GARBER:
8    Q.   Do you know --
9    A.   They didn't just routinely
10  pick that up.
11    Q.   I understand that, Doctor.
12    A.   Right.
13    Q.   But authors can make
14  mistakes, can't they?
15    A.   I've been pointing out a lot
16  of them.
17    Q.   Okay.  You didn't point out
18  this one, did you?
19    A.   Which mistake?
20    Q.   Well, do you know if there
21  was widespread publicity about lawsuits
22  in 2014?
23    A.   The authors consider that
24  maybe publicity would make a difference.

1    They then design an experiment to see if
2    they could show a difference, and guess
3    what?  The findings show exactly that.
4    That controls have the same level of
5    memory of exposure but the cases all of
6    the sudden jump up after 2014.
7        If you do an experiment
8    because you have a hypothesis, and your
9    experiment then proves the hypothesis,
10   you should reasonably say, this is why I
11   did it.  I found what I found.  I have
12   evidence of recall bias.  That's the
13   whole point why they did this experiment.
14     Q.   Did the Schildkraut authors
15   find a statistically significant finding
16   between genital powder use and epithelial
17   ovarian cancer?
18     A.   Yes.  What I found
19   interesting about --
20     Q.   Doctor, I didn't --
21     A.   I won't editorialize.  I
22   won't -- sorry.
23     Q.   I appreciate that.
24     A.   Sure.

1    Q.   At Page 8, Figure 1 of your
2  expert report, if we can turn there.
3        Are you there?
4    A.   I am.
5    Q.   Here you have a diagram
6  regarding the levels of evidence; is that
7  right?
8    A.   Yes.
9    Q.   I'll publish it on the Elmo.
10  This is your diagram for the levels of
11  evidence, correct?
12    A.   It's not my diagram.
13    Q.   In fact, it's the levels of
14  evidence for the Center For
15  Evidence-Based Medicine, or the CEBMA,
16  correct?
17    A.   Management, yes.
18    Q.   And what -- is that a
19  medical site or is that a business site?
20    A.   I'm not sure.
21    Q.   Why did you pick that
22  diagram?
23    A.   I was looking -- I was
24  looking for an example of the -- what I

Kevin Holcomb, M.D.

Page 282

1  believe is a widely held hierarchy on the
2  strengths of different study types based
3  on their ability to be altered by
4  inaccuracies.  And this was the diagram
5  that I found that I thought showed it the
6  best.
7        Q.   Did you just look to find a
8  diagram where cohorts were above
9  case-control studies, is that how you
10  searched?
11        MS. CURRY:  Object -- object
12    to the form.
13        THE WITNESS:  If you search
14    under levels of evidence, you will
15    never find -- well, I may not say
16    never.  Who knows.
17        I -- I don't think you
18    will -- you have to search hard to
19    find a -- a figure that has cohort
20    studies above case-control
21    studies.
22  BY MS. GARBER:
23        Q.   Okay.  So what you said is
24  if you search under levels of evidence,

Page 283

1  you will never find -- I mean -- I mean I
2  may not say never.  Who knows.  You have
3  to search hard to find a figure that has
4  cohorts above case-control studies.
5        Is that your testimony?
6        A.   I'm sorry.  It's below.
7  Sorry.  The other way around.  Thank you.
8        Q.   Thanks for that.
9        Did you attempt to find a
10  medical website or an evidence-based
11  medical website as to the levels of
12  evidence?
13        MS. CURRY:  Object to the
14    form.
15  BY MS. GARBER:
16        Q.   Or did you find this one and
17  stop?
18        A.   I -- I don't -- I don't
19  think that whether -- statistics don't
20  alter from one practice to the other.
21  Weaknesses in a study design are built in
22  and baked in.  And so I, I didn't look
23  for a specific medical website, because I
24  thought it would look differently than

Page 284

1  this.
2        This is how I was -- this is
3  how I was trained.  I mean, this -- I'm
4  looking for -- there are some things that
5  I learned in reviewing for the -- for
6  this deposition.  And there are certain
7  beliefs that I've long held because I was
8  trained that way.  I was forced -- well,
9  not forced.  I was happily taking a
10  graduate level statistics course as part
11  of my fellowship.  And I was taught this
12  then too.  And that was part of a medical
13  statistics course.
14        So this is just consistent
15  with what I already knew.
16        Q.   Where do meta-analyses fall
17  on your pyramid?
18        A.   You know, the reason why
19  meta-analyses aren't on these is because
20  meta-analysis is a somewhat controversial
21  practice.  They -- there are some
22  strengths to meta-analysis.  There are
23  some ways that meta-analyses can help.
24  But you have to really, really conduct

Page 285

1  them in a strict format and not break the
2  rules.  So you can have a meta-analysis
3  that's well -- you know, very well
4  controlled, and look for heterogeneity
5  and did all the things that you have to
6  do, that would be a strong study.  But
7  it's so fraught with the ability to make
8  it a poor study.  So it's hard to put it
9  on here.  Because there is no one
10  meta-analysis that's going to be
11  positive.  It's going to be a good study.
12        Q.   What -- what is your basis
13  to say that -- that meta-analyses are
14  controversial?
15        A.   Let me go through.  I -- I
16  thought I had actually given a citation
17  for it when I said -- because I believe I
18  made that statement in here as well.
19        You know, I didn't cite to
20  a -- to an exact paper.
21        Q.   So that's the opinion of
22  Dr. Holcomb --
23        A.   No, I wish I had cited it,
24  because I actually reviewed different

72 (Pages 282 to 285)

Kevin Holcomb, M.D.

Page 286

1    study designs. Not just for this. And
2    that is, if given the -- the time, I
3    could find a citation that makes the same
4    statement. It's not just my opinion.
5        Q.   But there's not one in your
6    report?
7        A.   There's not one in my
8    report, no.
9        Q.   You can't think of one
10   either, can you?
11       A.   No, I would have to do a
12   search.
13       Q.   So when you had your
14   statistics class, what was your text, do
15   you remember?
16           MS. CURRY: Object to the
17       form.
18           THE WITNESS: I don't.
19   BY MS. GARBER:
20       Q.   And I asked you this before,
21   if you knew who Kenneth Rothman was in
22   the context of epidemiology. And you did
23   not, correct?
24       A.   That's correct.

Page 287

1        Q.   So I'll represent to you
2    that he is a professor of epidemiology,
3    an author of textbooks and many published
4    articles regarding epidemiology. Okay?
5           I'll also show you that he
6    is the study author of this widely used
7    text with regard to epidemiology. You
8    see that Kenneth Rothman is the first
9    author, Sander Greenland is the second.
10   And that goes back to that paper on
11   statistical significance. That's the
12   author, right?
13          You are not familiar with
14   those authors or this text; is that
15   correct?
16       A.   Or the fact that it's widely
17   used, no.
18       Q.   Okay. You've never read a
19   book with regard to meta-analyses and the
20   utility of them -- strike that.
21          Can you name a text with
22   regard to meta-analyses and the utility
23   of them?
24          MS. CURRY: Object to the

Page 288

1    form.
2           THE WITNESS: No. As I
3       stated before, I would have to
4       search and find you one.
5    BY MS. GARBER:
6        Q.   Did you know that Kenneth
7    Rothman is known for his work on teaching
8    about epidemiologic research methodology?
9           MS. CURRY: Object to the
10      form.
11   BY MS. GARBER:
12       Q.   Were you aware of that?
13       A.   Given the fact that I --
14   I've already answered that I wasn't aware
15   who he is, I don't see how I would know
16   that.
17       Q.   Do you ever rely on
18   meta-analyses in your practice to make
19   clinical decisions, do you ever look at
20   epidemiological data and set your care
21   attendant to the results or are they just
22   worthwhile in your opinion?
23          MS. CURRY: Object to the
24      form.

Page 289

1           THE WITNESS: No, no,
2       they're worthwhile but they -- we
3       don't -- I've never made any
4       clinical decisions on care based
5       on one study. It's -- it's --
6       meta-analysis will become part of
7       the totality of what I'm looking
8       at.
9    BY MS. GARBER:
10       Q.   Meta-analysis is looking at
11   a systematic review of a body of
12   literature, correct?
13       A.   Meta-analysis is taking
14   subjects that were in different places
15   and different times and mixing them up as
16   if they were all in the same place at the
17   same time under the same conditions,
18   hence it's fraught with potential issues.
19       Q.   There's utility to them,
20   isn't there?
21          MS. CURRY: Object to the
22      form.
23          THE WITNESS: If done
24      correctly, yes.

73 (Pages 286 to 289)

Kevin Holcomb, M.D.

Page 290

1    BY MS. GARBER:
2        Q.   What are -- what is the
3    utility of them?
4        A.   For example, if you had --
5    this question of do you have enough
6    numbers in your cohort studies to
7    approximate an effect size that you see
8    in your case-control studies, well, you
9    might be able to do that in a
10   meta-analysis.  You might be able to put
11   all these things together.
12           And Berge says when we put
13   everything together, we felt we had
14   99 percent chance of finding the effect
15   size in the case-control size when we put
16   all the people together from the three
17   cohort studies that Berge put together.
18           So that's an example where
19   it might be helpful.  If you think you
20   can put together studies that are biased
21   for example, and that if you mix them
22   altogether the bias will be diluted,
23   that's where it's not helpful.
24       Q.   Do you have a source to cite

Page 291

1    that when you put cohort studies
2    together, that the bias will affect the
3    results of a meta-analysis?
4            MS. CURRY:  Object to the
5    form.
6            THE WITNESS:  I didn't --
7    that wasn't my statement.
8    BY MS. GARBER:
9        Q.   Do you have a source for
10   that?
11       A.   I didn't say that.  So why
12   would I have a source?
13       Q.   Do you have a source for
14   what you just said?
15       A.   Please repeat it.
16       Q.   You said, "If you think you
17   can put together studies that are biased,
18   for example, and that if you mix them
19   together, although the bias will be
20   diluted, that's where it's not helpful."
21           What is your source for that
22   statement?
23       A.   The source?  That adding
24   biased studies together doesn't dilute

Page 292

1    the bias?  I don't can't think of a
2    source.  I know it's not -- I know even
3    some of your experts don't -- don't
4    refute that.  Ellen Blair Smith says as
5    much in her -- in her expert report.  She
6    agrees that that's the case.
7        Q.   Does she say there's no
8    utility to the meta-analyses because of
9    bias?
10       A.   I didn't -- I didn't say
11   that.  If you're asking me about the
12   statement, I can tell you that I can find
13   support of that statement by some of the
14   plaintiff experts.
15       Q.   Let's look at a paper by Ken
16   Rothman.
17           (Document marked for
18           identification as Exhibit
19           Holcomb-16.)
20   BY MS. GARBER:
21       Q.   I'm going to mark as
22   Exhibit 16 a paper titled "Six Persistent
23   Research Misconceptions" by Kenneth
24   Rothman.  You've not seen that paper

Page 293

1    before?
2        A.   No.
3        Q.   Doctor, if you look at the
4    left-hand column, do you see here that's
5    illuminated or highlighted?
6            Do you see where I am?
7        A.   Yes, I do.
8        Q.   It reads, "Scientific
9    knowledge changes rapidly, but the
10   concepts and methods of conduct of
11   research change more slowly.  To
12   stimulate discussion of outmoded thinking
13   regarding the conduct of research, I list
14   six misconceptions about research that
15   persist long after their flaws become
16   apparent.
17           "These misconceptions are:
18           "Number one, the
19   hierarchy" -- I'm sorry.
20           "Number one, there is a
21   hierarchy of study designs.  Randomized
22   trials provide the greatest validity
23   followed by cohort studies, with
24   case-control studies being least

74 (Pages 290 to 293)

Page 294

1  reliable."
2         So Dr. Rothman is indicating
3  that there is a misconception that there
4  is a hierarchy which ranks cohort studies
5  above case-control studies.
6      A.  He's admitting --
7      Q.  Do you see that?
8      A.  Yes.  He's admitting that
9  this is the hierarchy.
10     Q.  No.  He's admitting that it
11 is a misconception to say that cohort
12 studies are above case-control studies.
13     A.  He's admitting that this is
14 a common thought, right?  He's saying
15 there's a hierarchy.  The misconceptions
16 are, there's a hierarchy.  So he's saying
17 there is this thought out there that
18 there's a hierarchy, because it's clear
19 that there is and it's a commonly taught
20 thing.
21        So this one doctor is
22 saying, similar to the doctors you
23 brought up earlier, let's throw away
24 convention.  And I would have to read the

Page 295

1  whole paper to understand why.  But I
2  take this as -- the first statement to
3  say that there is -- he doesn't say well
4  recognized.
5         But I believe he took the
6  time to write this paper to try to debunk
7  some of these things, because they are
8  out there and well accepted.
9      Q.  Right.  They're out there,
10 and he is concerned about that, that
11 clinicians like yourself are putting
12 cohort above case-control.  And he's
13 trying to debunk that because he doesn't
14 agree with that; is that fair?
15        MS. CURRY:  Object to the
16     form.
17        MR. MIZGALA:  Object to the
18     form.
19        THE WITNESS:  Can I tell you
20     that there's --
21 BY MS. GARBER:
22     Q.  Doctor --
23     A.  -- not as much difference in
24 what --

Page 296

1      Q.  Is that what he's saying?
2         MS. CURRY:  Object to the
3     form.
4         THE WITNESS:  Yes, yes.
5  BY MS. GARBER:
6      Q.  Okay.  Thank you.  That's
7  the only question that I had.
8         He's also saying, number
9  three, "If a term that denotes the
10 product of two factors is a regression
11 model" -- "is a regression model is not
12 statistically significant, then there is
13 no biologic interaction between those
14 factors."
15        So again, he is attempting
16 to debunk this notion of holding at
17 disparate statistically significant from
18 nonstatistically significant data,
19 correct?
20        MS. CURRY:  Object to the
21     form.
22 BY MS. GARBER:
23     Q.  That's a misconception?
24        THE WITNESS:  I'm just

Page 297

1  curious.  Are you here -- are you
2  more interested in me agreeing
3  that you're reading this correctly
4  or my response to it?  Because I'd
5  love to jump in and tell you about
6  what I think about these
7  statements.  But I feel like I'm
8  not being given an opportunity.
9  And I -- you know, I could have
10 come down and read all the papers
11 that you want to read and read
12 them out loud for you.
13        But I'm assuming that you
14 would like to know if I agree with
15 it, why not if I disagree.
16        But I feel like you keep on
17 asking me, is that -- did I read
18 that correctly, and I said yes,
19 you read very well.  And you say
20 do you agree with it?  And I say
21 no.
22        And then I go to try to
23 explain, and you move on.  And I'm
24 trying to understand what's the

Kevin Holcomb, M.D.

Page 298

1    purpose of that?
2    BY MS. GARBER:
3        Q.   Are you done?
4        A.   Yes, I am.
5        Q.   Okay.  You know that I am
6    here to ask you questions, and you're
7    here to answer questions.  You also know
8    that this is in the context of a
9    cross-examination and your counsel has
10   the opportunity to ask you questions too.
11   You understand that, right?
12       A.   I understand.
13       Q.   Thanks.
14           All right.  So Dr. Rothman
15   in his peer-reviewed and published paper
16   indicates that there is a misconception
17   about the hierarchy, which places cohorts
18   above case-control.  And this is a
19   misconception about statistical
20   significance and calling nonstatistically
21   results different from statistical
22   significant results.
23           Can we agree with that?
24           MS. CURRY:  Object to the

Page 299

1    form.
2           THE WITNESS:  No.
3    BY MS. GARBER:
4        Q.   You don't agree with that?
5        A.   Because you started off the
6    statement by saying this is a review article.
7    peer-reviewed.  This is a review article.
8    I don't know if it's peer-reviewed.
9        Q.   It's a published article?
10       A.   It's not peer-reviewed
11   necessarily.
12       Q.   But it's a published?
13       A.   You said peer-reviewed.
14       Q.   I know.
15       A.   I'm saying, do you know that
16   it was peer reviewed?
17       Q.   Now I'm saying, it's a
18   published article, right?
19       A.   Simple -- yeah, you can --
20   it's an open access journal that you
21   can -- I mean, just because something is
22   published, you're making it seem like --
23   there's something called vanity
24   publishing.  And I'm not suggesting

Page 300

1    that's what he's doing.  I don't know the
2    author.
3           But to suggest that
4    something's published and ergo it's
5    worthwhile, that's a big misconception.
6        Q.   All right.  And otherwise
7    you agree with what I just said, if we --
8    if we amend my question to say it is a
9    published article --
10       A.   Can you repeat it because I
11   got so stuck on your mentioning that it
12   was peer-reviewed that I didn't --
13       Q.   I'll just move on.
14       A.   -- I stopped listening.
15       Q.   Did you attempt to look at
16   what your institution said about study
17   hierarchies?
18           MS. CURRY:  Object to the
19   form.
20           THE WITNESS:  My
21   institution?  Which institution?
22   BY MS. GARBER:
23       Q.   Where do you work?  Where do
24   you work?

Page 301

1        A.   I work in two -- I'm
2    actually an employee of Weill Cornell
3    Medical Center.  But I --
4        Q.   Okay.  And that's your
5    institution, right?
6        A.   As is New York Presbyterian
7    Hospital, which is separate, so which
8    institution --
9        Q.   You have privileges at both?
10       A.   I don't have privileges in
11   the medical school because that's not our
12   medical school's work.  So, no, I don't
13   have privileges --
14       Q.   You don't have privileges
15   in -- in the hospital associated --
16       A.   The hospital is -- is owned
17   by New York Presbyterian Hospital.
18       Q.   Okay.
19       A.   So I have no privileges at
20   Weill Cornell.
21       Q.   Got it.  I didn't understand
22   the -- the nature of that.
23           So did you look at Weill
24   Cornell's study hierarchy?

76 (Pages 298 to 301)

Kevin Holcomb, M.D.

Page 302

1    MS. CURRY: Object to the
2  form.
3    THE WITNESS: I don't know
4  if -- well, no, I don't know that
5  Weill Cornell has a study
6  hierarchy.
7  BY MS. GARBER:
8    Q.   Okay.
9    (Document marked for
10  identification as Exhibit
11  Holcomb-17.)
12  BY MS. GARBER:
13    Q.   Let's mark as Exhibit 17 a
14  document.
15    And, Doctor, this is a
16  printout of a website from Weill Cornell.
17  And it is titled "Evidence-based
18  Medicine, or EBM, Defined."
19    Did I read that correctly?
20    A.   You did.
21    Q.   Under the definition it
22  reads, "Evidence-based medicine requires
23  the integration of the best research
24  evidence with our clinical expertise, and

Page 303

1  our patients' unique values and
2  circumstances."
3    And then there's a citation
4  to Straus, S-T-R-A-U-S, et al.,
5  Evidence-based Medicine 2015.
6    Did you see this before you
7  put in your expert report the hierarchy
8  that you put from the --
9    A.   No.
10    Q.   -- management website?
11    A.   No.
12    MS. CURRY: Object to the
13  form.
14  BY MS. GARBER:
15    Q.   Doctor, if we could look at
16  this together.
17    Evidence-based medicine.
18  That is what -- that's a -- that's a
19  medical term, right, evidence-based
20  medicine?
21    A.   Yes.
22    Q.   And it implies what to you?
23    A.   It implies practicing on
24  what's deemed to be accurate findings

Page 304

1  from studies, and then brought into
2  clinical practice.
3    Q.   Okay.  And under that
4  heading in the hierarchy at the top lists
5  Cochrane systematic reviews.  Do you know
6  what those are?
7    A.   Yes.
8    Q.   Have you ever considered
9  them for purposes of your practice?
10    A.   Yes.
11    Q.   You ever considered them for
12  purposes of your opinions?
13    A.   They are part of it --
14    MS. CURRY: Object to the
15  form.
16    THE WITNESS: -- yes.
17  BY MS. GARBER:
18    Q.   And next on the top of the
19  hierarchy is what?
20    A.   I'm not sure what SR is --
21  systematic reviews, must be, and
22  meta-analyses.
23    Q.   Mm-hmm.  So up above the
24  cohorts and the case-control are

Page 305

1  systematic reviews and meta-analyses,
2  right, on this evidence-based hierarchy,
3  right?
4    A.   Yes.
5    Q.   All right.  And then there's
6  evidence guidelines and the evidence
7  summaries.  And then one, two, three,
8  four -- fifth down, lists randomized
9  clinical trials, case cohorts, and
10  control studies.  All in the same line,
11  correct?
12    A.   Yes.
13    Q.   And so that's a little
14  different than your hierarchy, right?
15    A.   Yes.
16    MS. CURRY: Object to the
17  form.
18  BY MS. GARBER:
19    Q.   And this one relates to
20  medicine, not to management and business,
21  right?
22    MS. CURRY: Object to the
23  form.
24    THE WITNESS: Yes.  It

77 (Pages 302 to 305)

Kevin Holcomb, M.D.

Page 306

1    relates to medicine.
2    BY MS. GARBER:
3        Q.   And this is from the web --
4    this is from the -- off the website of
5    where you practice medicine?
6        A.   Yes.
7        Q.   And where you teach?
8        A.   And where I teach.  And I
9    don't necessarily disagree that a
10   well-designed --
11       Q.   Doctor, I didn't ask you if
12   you disagreed or not --
13       A.   Okay.
14       Q.   -- I just asked you --
15       A.   Just to read the website.
16       MS. CURRY:  Let him finish
17   his response, please.
18   BY MS. GARBER:
19       Q.   Are you aware that the link
20   between smoking and lung cancer was
21   initially discovered in the case-control
22   studies carried out in the 1950s, are you
23   aware of that?
24       A.   Yes.

Page 307

1        Q.   As a physician you do
2    consider meta-analyses in your practice?
3        A.   Yes.
4        Q.   And as to the cohort studies
5    in this case, do you rely primarily on
6    them in support of your opinions?
7        MS. CURRY:  Object to the
8    form.
9        THE WITNESS:  No.  As I
10   stated in the beginning, it's the
11   totality of their reviews.
12       So the cohort studies which,
13   you know, I will still say as a
14   design are less prone to bias than
15   case-control studies regardless of
16   how this is, I don't think any --
17   anybody questions that.
18       I will look at the whole
19   picture which is what I did with
20   the talc literature.  So it was
21   the inconsistency in case-control
22   results.  It was the low level of
23   strength of association that I
24   found plus the lack of findings in

Page 308

1    the cohort study.  And then the
2    weaknesses and biologic
3    plausibility that led me to the
4    opinion that I offered in the
5    beginning.
6    BY MS. GARBER:
7        Q.   Do you believe that the
8    case-control studies are less reliable
9    than the cohort studies?
10       A.   I believe that all study
11   designs can have weaknesses.  And a
12   poorly designed study can come in the
13   form of any type.
14       You can have a poorly
15   designed cohort study.  You can have a
16   poorly designed case-control study.  You
17   can have a poorly designed meta-analysis.
18       I'm sorry, I forgot your
19   question now.
20       Q.   That's okay.
21       And with regard to the
22   cohort studies, Doctor, I don't see in
23   your expert report where you talk about
24   the design limitations, specifically what

Page 309

1    even the authors talk about as the design
2    limitations.
3        You don't -- you don't talk
4    about those in your expert report, right?
5        A.   I'd have to read through it.
6    I'm not sure.
7        Q.   Okay.
8        A.   I'm not sure if I address
9    that.
10       Q.   I'll represent to you that I
11   couldn't find a single word about you
12   talking about the design limitations.  So
13   you can check me to see if I'm wrong.
14       You do talk about some of
15   the design limitations and the problems
16   with the case-control studies, correct?
17       A.   That is true.
18       Q.   And you do talk about some
19   of the design limitations and problems of
20   the meta-analyses, right?
21       A.   Yes.
22       Q.   And so in your opinion the
23   case-control studies do not support
24   statistically an increased risk of talcum

Kevin Holcomb, M.D.

Page 310

1    powder product exposure and risk of
2    ovarian cancer, right?
3        A.   My feeling is that the
4    case-control studies are not consistent
5    in their results.  That some studies show
6    an association and some studies don't.
7    And that it seems to be as consistent as
8    flipping a coin.
9        Q.   Do they support the opinion
10   that there is an increased risk, yes or
11   no?
12       A.   Some do, and some don't.
13       Q.   Okay.  What about the -- the
14   cohort studies, do they support an
15   increased risk for --
16       A.   No.
17       Q.   Let me finish my sentence.
18       A.   Sorry.
19       Q.   Do the cohort studies
20   support an increased risk for talcum
21   powder exposure and ovarian cancer?
22       A.   The initial Gertig study had
23   found that in a subset of just
24   histologically split out there was an

Page 311

1    increased risk of serous carcinoma.  The
2    reason why we're saying no about cohort
3    studies is because the same group of
4    women, when followed longer in Gates,
5    that significance dropped down.
6        So I would say overall in
7    those populations, the sister study, the
8    WHI, and the Nurses' Health Study, that
9    they did not support an increased risk.
10       Q.   Do the meta-analyses as a
11   whole support an increased risk of talcum
12   powder exposure and ovarian cancer?
13       A.   Not surprisingly, the
14   meta-analyses all say that the
15   case-control studies do and the cohort
16   studies don't, and when you mix the 27
17   case-control studies with the three
18   cohorts and weigh them fairly equally,
19   that you will find an increased risk when
20   you mix them altogether, which is not at
21   all surprising.
22       Q.   Do the odds ratios that are
23   reported for epithelial ovarian cancer
24   and genital talc exposure support an

Page 312

1    increased risk in ovarian cancer?
2        MS. CURRY:  Object to the
3    form.
4        THE WITNESS:  In which
5    study?
6    BY MS. GARBER:
7        Q.   In the meta-analysis as a
8    body?
9        A.   Again, yes.
10       Q.   Okay.  The only group of
11   studies that, in your opinion, don't
12   support an increased risk, you don't have
13   a single criticism of, yet the studies
14   that do, you criticize; is that fair?
15       MS. CURRY:  Object to the
16   form.
17       THE WITNESS:  If you -- that
18   is true.  I'm criticizing all the
19   case-control studies as a design.
20   But that means I'm criticizing the
21   ones that didn't find an
22   association just as much as I'm
23   criticizing the ones that do.
24       I'm saying at the design,

Page 313

1    there are flaws in case-control
2    studies.  And so I'm not just
3    trying to pick on the positive
4    case-control studies.  I'm talking
5    about case-control studies.
6        And that's -- from my look
7    at the literature, I'm saying that
8    about half of them saying there is
9    an association and half of them
10   saying that there's not, I'm
11   criticizing case-control study
12   design altogether.
13   BY MS. GARBER:
14       Q.   You said generally that
15   there can be design problems with
16   cohorts, yet I don't see a single
17   reference to the design limitations of
18   the cohorts that play in this case,
19   right?
20       A.   Well, one of the concerns
21   that you can have with a cohort study is
22   whether or not you follow patients long
23   enough, whether you have sufficient size.
24       And in my read, in my

79 (Pages 310 to 313)

Kevin Holcomb, M.D.

Page 314

1  understanding of the data, I was not
2  concerned -- size I already explained,
3  that I was concerned since it was such a
4  small level of effect in the case-control
5  studies.  It wasn't until I saw Berge,
6  when they put them together, that I
7  realized that you could overcome that
8  size problem.  And so I was not concerned
9  that you would pick up an effect size
10  that small.
11      Q.  Do you remember what my
12  question was?
13      A.  Yes.  You asked me did I
14  bring up criticisms.  And I'm saying my
15  criticisms about cohort studies in
16  general, I was able to put to rest with
17  my reading of those cohort studies,
18  whereas things like recall bias -- and we
19  already went through Schildkraut -- I was
20  able to find examples of why I was
21  concerned, and then find examples of
22  studies where I thought they were at
23  play.
24          So, I'm just explaining to

Page 315

1  you, you're saying, why is there an
2  absence of criticisms on these things.  I
3  didn't find any evidence of those things
4  at play in the cohort studies.
5      Q.  So you didn't find as the
6  expert for Johnson & Johnson in the
7  studies that didn't find an increased
8  risk in your opinion, and you didn't
9  bother to advise the court that there are
10  design limitations in that group of
11  studies, the cohorts, yet you did tell
12  the court about the study limitations of
13  the case-control and the study
14  limitations of the meta-analyses, true?
15      MS. CURRY:  Object to the
16  form.
17  BY MS. GARBER:
18      Q.  I didn't ask why.  I just
19  said true.
20      A.  True.
21      Q.  Thank you.
22          All right.  Let's look at a
23  couple of things.  So in looking at the
24  cohort studies and the limitations, is it

Page 316

1  true, Doctor, that none of the cohort
2  studies were specifically designed to
3  investigate the relationship of talcum
4  powder product use and the risk of
5  ovarian cancer?
6      MS. CURRY:  Object to the
7  form.
8      THE WITNESS:  Specifically
9  no.
10  BY MS. GARBER:
11      Q.  Rather, the cohorts were
12  designed to study a large number of
13  outcomes in a wide variety of exposures,
14  true?
15      A.  True.  When you do a cohort
16  study, because of the time and money
17  invested, you are very rarely going to
18  design a cohort study to answer one
19  question.
20      Q.  Right.  And that's a
21  limitation, right?
22      MS. CURRY:  Object to the
23  form.
24      THE WITNESS:  I'm not

Page 317

1  sure --
2  BY MS. GARBER:
3      Q.  It's okay.
4      A.  -- in what way that was a
5  limitation.
6      Q.  You're not sure?
7      A.  No.
8      Q.  Okay.  With a cohort study
9  looking at a rare cancer like ovarian
10  cancer, the study has to be large enough
11  to detect the true relative risk.
12          Do you agree with that?
13      A.  I agree.
14      Q.  So in fact, that a cohort
15  does not find a significant relative risk
16  can be due to the small study size,
17  correct?
18      MS. CURRY:  Object to the
19  form.
20      THE WITNESS:  Correct.
21  BY MS. GARBER:
22      Q.  The sample sizes and the
23  number of cases of most of the cohort
24  study publications were too small to be

Kevin Holcomb, M.D.

Page 318

1    able to accurately detect a relative risk
2    around 1.2 to 1.3.
3         Do you agree with that
4    statement?
5         MS. CURRY:  Object to the
6    form.
7         THE WITNESS:  I'm not sure.
8    I -- I've seen the opinion
9    expressed in the Narod paper that
10   you -- you had produced earlier.
11   And I keep on referring to Berge
12   only because it was the one
13   meta-analysis where they actually
14   addressed that.
15        Narod said you need like
16   200,000 women to see this effect
17   size, and then you look at three
18   studies with 78,000, 61,000,
19   41,000.  You're getting close to
20   that 200,000.  They say, we have
21   99 percent power to detect the
22   effect size in a meta-analysis
23   that is held so highly to see the
24   same effect size in the

Page 319

1    case-control studies.
2    BY MS. GARBER:
3         Q.   Well, you do go to Berge all
4    the time.  But you do that by ignoring
5    Penninkilampi which was a more recent
6    study, right?
7         A.   But the problem --
8         MS. CURRY:  Object to the
9    form.
10        THE WITNESS:  The problem --
11   the problem with Penninkilampi is
12   that Berge says the first thing
13   out the box is I'm going to look
14   at heterogeneity and see if these
15   should be mixed.  And one of the
16   problems with putting
17   meta-analyses on the top of your
18   thing is assuming it's well
19   designed.
20        And I think all these
21   studies can have design flaws.
22   But I think meta-analysis is
23   probably the most at risk for
24   making mistakes in the design of

Page 320

1    your study and then coming out
2    with spurious values.
3         And one of the first things
4    that is generally thought to be a
5    no-no, we don't do cross-trial
6    comparisons in general.  If you
7    had a group of women taking this
8    chemotherapy over here and a group
9    of women taking chemotherapy over
10   there, we don't compare those two
11   chemotherapies and say well, this
12   study showed a response rate of
13   this.  This showed this, this,
14   that.
15        So whenever you're going
16   against that rule and you're going
17   to mix these people together, you
18   want to make sure that there's not
19   heterogeneity.  And the reason why
20   I keep on going back to Berge, is
21   because Penninkilampi somehow
22   looked at pretty much the same
23   studies and did not find a problem
24   with heterogeneity, whereas Berge

Page 321

1    says yeah, I found this
2    difference, but I'll caution you,
3    don't take it too seriously
4    because there was too much
5    heterogeneity in these two study
6    designs.
7         And I'm just questioning,
8    how is it that Berge was able to
9    find this heterogeneity issue and
10   yet other -- Taher, Penninkilampi,
11   other people who looked at largely
12   overlap the same study group, with
13   very little difference, somehow
14   didn't come up with this problem.
15   BY MS. GARBER:
16        Q.   So --
17        A.   And so I keep on going back
18   to it because it's the only meta-analysis
19   that says okay, here is the group if we
20   put them altogether.  Maybe we shouldn't
21   be doing it in the first place.  But
22   we're going to do it.
23        We put them altogether, but
24   here is what it looks like if you leave

Kevin Holcomb, M.D.

Page 322

1    them separately.
2        Q.   So, Doctor, if you would
3    then look at the Penninkilampi
4    meta-analysis which is later than the
5    Berge meta-analysis, right?
6        A.   Yes.
7        Q.   And the Berge meta-analysis,
8    and you say that those are basically the
9    same studies that the two study groups --
10       A.   There's a lot of overlap.
11       Q.   -- studied, right?
12           And the Penninkilampi says
13   there's no heterogeneity.  And the Berge
14   that says there is.  What is your basis
15   to say Berge is right and Penninkilampi
16   is wrong?
17       A.   Because if you can share --
18       Q.   You don't like the results
19   of Penninkilampi?
20       A.   -- if you can share -- yes.
21   If you can share Penninkilampi, because
22   Berge the -- Berge, Berge, I don't know
23   if I'm pronouncing it correctly, sorry.
24       Q.   However you say it.

Page 323

1        A.   The first thing they do is
2    to talk about heterogeneity in study
3    design.  And I'd like to see in
4    Penninkilampi to say that they considered
5    study design heterogeneity and found
6    none.  Because I don't remember seeing
7    that.  I'd like to see the paper if you
8    have it.  But I don't remember them even
9    addressing it.
10           He goes into act -- other
11   lesser important areas of heterogeneity
12   like the percentage that looked at mode
13   of exposure and things like that.
14           So if one doesn't even
15   mention it, and one mentions it and says
16   we found heterogeneity, I don't assume
17   that the one who didn't even mention it,
18   looked at it, found heterogeneity and
19   just decided not to mention it.  I'm
20   assuming they didn't think about it.
21       Q.   What did the Taher paper say
22   about heterogeneity?  Was there a
23   significant overlap in the Taher paper?
24       A.   I don't remember -- I don't

Page 324

1    remember them splitting out the case
2    controls and the -- they -- they do say
3    all the impact -- the positive effect was
4    in case-control, not in cohort studies.
5    Taher does say that.
6            Although Taher, if you look
7    at the tables, there's a few things that
8    I don't understand.  Like they -- they
9    say, actually in the cohort studies that
10   there is some increased risk of -- of
11   ovarian cancer.
12           And they -- they are
13   actually including Gates in that.  And
14   they say there's possibly an increased
15   risk in -- in Gates.  And then go onto
16   say, "but not mucinous."
17           But in Gates there was no
18   increased risk of any of the types.  In
19   fact, the only one that came the closest
20   to it was mucinous.
21       Q.   We're going to get to that,
22   and we'll go through that data, okay?
23       A.   Sure.
24       Q.   Let's look at Health Canada

Page 325

1    as to the topic of case-control -- or
2    cohort studies.
3        A.   Yes.
4        Q.   Page 20.
5            All right.  On Page 20 in
6    this paragraph here.  Do you see where I
7    am in the -- in the Taher paper?
8        A.   Yes, I see it.
9        Q.   Or, sorry, Health Canada.
10           It indicates -- I'll -- I'll
11   start with the first given.
12           "Given the long latency
13   period of ovarian cancer, the follow-up
14   periods may not have been sufficient to
15   capture all cases for the individual
16   cohort studies.
17           "Also, given the rarity of
18   ovarian cancer, many of the available
19   human studies may not be sufficiently
20   powered to detect a low odds ratio."
21           Do you agree with both of
22   those statements?
23       A.   No.
24       Q.   Which ones do you --

82 (Pages 322 to 325)

Kevin Holcomb, M.D.

Page 326

1    A.   I'll start off.
2    Q.   Do you agree with either
3  one?
4    A.   I -- I'll start off.  The
5  long latency for ovarian cancer suggests
6  we know the latency for ovarian cancer.
7  To determine the latency for a cancer you
8  have to know the time from exposure to a
9  carcinogen to the time it develops.
10        So most people who make
11 statements about ovarian cancer latency
12 will look at things like women who
13 developed ovarian cancer after the
14 dropping of the atomic bomb at Hiroshima.
15 They'll look at the chance of developing
16 ovarian cancer after heavy occupational
17 exposure to asbestos.
18        You have to know the
19 carcinogen first before you can determine
20 the latency.  So they are assuming, well,
21 if there is long latency in these
22 situations it should be the same.  But
23 instead it's taken as a given.
24        Given the long latency of

Page 327

1  ovarian cancer.  Latency to what?
2  Latency from what incident?  There --
3  latency from --
4    Q.   Do you have an opinion of
5  the years?
6    A.   Excuse me?
7    Q.   Do you have an opinion of
8  the years of latency --
9    A.   I -- I'm just letting --
10   Q.   -- of ovarian cancer?
11   A.   I'm saying that you --
12        MS. CURRY:  Object to the
13 form.  And were you done with your
14 prior answer?
15        THE WITNESS:  No.  Because I
16 didn't go through the other part.
17        And then -- but going back
18 to the other one where they say --
19 BY MS. GARBER:
20   Q.   Sorry, Doctor, can I
21 interrupt you?
22        Do you have an opinion --
23   A.   I'd like to finish my first
24 answer.

Page 328

1        MS. CURRY:  I'm sorry.
2  You -- you've asked three
3  questions already that he's trying
4  to respond to.  So we'll still on
5  question Number 1 as to why he
6  disagrees with these two
7  statements.
8  BY MS. GARBER:
9    Q.   I just -- I just now asked
10 you if you have an opinion as to the
11 latency period.
12   A.   I was -- yeah, I'm -- I'm
13 trying to keep my train of thought
14 steady.  And I'm sure you want to keep
15 yours steady as well.
16        So I'm going to finish
17 answering the first thing you asked and
18 then we'll get to that.
19   Q.   Okay.
20   A.   So sample sizes were not
21 large enough to detect the 20 to
22 30 percent increased risk.  And as you
23 said, I keep going back to Berge, because
24 they say yes, there was enough.

Page 329

1        If you add those three
2  cohort studies, you had 99 percent chance
3  of picking up what was in the
4  case-control studies, but yet Taher
5  says -- or, sorry, Health Canada says
6  that there may not have been enough.  But
7  they -- and then they -- they quote Narod
8  as opposed to quoting -- there's no
9  mention of Berge saying that there was
10 enough.  There's just Narod's op Ed
11 opinion in 2016 which was not based on a
12 single study.  So I didn't -- so I didn't
13 agree with either one.
14   Q.   So the Narod paper is
15 talking in the abstract about the design
16 of cohort studies, and that you need a
17 sufficient number to detect a low odds
18 ratio.
19        The Berge study is talking
20 about their study, his study, right?
21   A.   Berge was a meta-analysis.
22   Q.   Yeah.  And -- and they're
23 talking about, for purposes of power,
24 that study.  Narod is talking about in

Kevin Holcomb, M.D.

Page 330

1    general when you look at cohort studies,
2    they have to have sufficient number of --
3    of study participants or you are not
4    going to detect a small risk.
5         A.    In the same way that I
6    wouldn't look at --
7              MS. CURRY:  Object to the
8    form.
9              THE WITNESS:  --
10    occupational exposure to asbestos
11    to answer the question of what
12    talc does when dusted on the
13    perineum, I wouldn't stick on a
14    hypothetical statement by Narod
15    when you actually have data from
16    women in the clinical scenario
17    that you're questioning, do you or
18    do you not have the power to
19    detect the level of -- the low
20    level of effect.
21         They are admitting it's a
22    low level.  They are saying that
23    maybe it wasn't enough.  But I'm
24    saying there's a study out there

Page 331

1    that says it was enough and gives
2    the explanation with the numbers.
3         It's not -- it's not cited
4    here.
5    BY MS. GARBER:
6         Q.    Doctor, you recognize that
7    Health Canada is recognizing that the
8    latency for development of ovarian cancer
9    is an important issue in the cohort
10    designs, right?
11              MS. CURRY:  Object to the
12    form.
13              THE WITNESS:  I'm -- I'm not
14    requesting that.  I'm questioning
15    what is the latency from.  If you
16    assume that talc causes ovarian
17    cancer, what is the latency for
18    talc causing ovarian cancer?
19         No one knows.  So any
20    extrapolation is an extrapolation
21    from another situation like an
22    atomic bomb, like in a heavy
23    occupational exposure.  So there
24    is an assumption, and these

Page 332

1    assumptions get made over and over
2    and over of what the latency
3    period is.  And you asked me then,
4    do I have an opinion on what the
5    latency period is.
6         And I can say that if you
7    had heavy occupational exposure
8    to -- I'll let you finish.
9    BY MS. GARBER:
10         Q.    No.  Carry on.  Carry on.
11         A.    No, I'll let you finish.
12         Q.    I can do two things at once.
13    I can multitask.  I'm listening.  I'm
14    listening.
15         A.    All right.  So if you -- if
16    you're asking me what is the latency
17    period for someone making gas masks in a
18    factory, I would say it's probably
19    somewhere around 20 years, maybe
20    30 years.  Hiroshima, you know, maybe 10
21    to 20 years.  That's the question.
22         Q.    So you have testified in a
23    prior case that ovarian cancer has a long
24    latency; is that true?

Page 333

1              MS. CURRY:  Object to the
2    form.
3              THE WITNESS:  In those
4    situations.
5    BY MS. GARBER:
6         Q.    Yeah.  All right.
7         And you have testified that
8    it can be as long as 20 to 40 years,
9    correct?
10         A.    It's possible, yes.  Based
11    on the extrapolations I just mentioned.
12         Q.    And you're aware of the
13    Purdie study from 2003 that indicated the
14    latency as likely 30 to 40 years,
15    correct?
16         A.    Can you show me Purdie study
17    and I can see what they're relying on --
18         Q.    Sure.
19         A.    -- and see what citation
20    they use, or if it's cited at all.
21              (Document marked for
22    identification as Exhibit
23    Holcomb-18.)
24    BY MS. GARBER:

84 (Pages 330 to 333)

Kevin Holcomb, M.D.

Page 334

1          Q.   Let's mark as Exhibit 18.
2    The Purdie 2003 study.
3          Doctor, if you turn to Page
4    231. Following Footnote 23, it reads,
5    "With regard to the latency" --
6          A.   I'm sorry. 231.
7    Following -- you said --
8          Q.   Here. Look up here, Doctor.
9          A.   Hold on one second.
10         Q.   The authors state, "It is
11   likely that ovarian cancer has a
12   reasonable" --
13         A.   I'm sorry. Can you -- I
14   really want to read along with you. I
15   just don't see where you are. You said
16   231 is the page we're on?
17         Q.   Yes.
18         A.   Okay. Left? Right?
19         Q.   Left-hand column.
20         A.   Okay. Top of the page,
21   middle of the page, bottom?
22         Q.   Right here. "It is likely
23   that ovarian cancer has a reasonably long
24   latency period between initiation and

Page 335

1    manifestation of established disease, and
2    this is exacerbated by unusually late
3    clinical detection of the disease."
4          A.   And that --
5          Q.   And you agree -- you
6    disagree with that?
7          MS. CURRY:  Object to the
8          form. I think you said unusually.
9          The word is usually.
10   BY MS. GARBER:
11         Q.   Do you disagree with that
12   statement?
13         A.   What I -- I was curious to
14   see what the citation was. I would say
15   that in other situations with a known
16   carcinogen, like the radiation from an
17   atomic bomb or heavy occupational
18   exposure, in those situations there is a
19   long latency.
20         Q.   And so, Doctor --
21         A.   Here there's no citations.
22   So I'm not sure what the statement is
23   based on.
24         Q.   So, Doctor, if you go down a

Page 336

1    bit it says -- couple lines, it says,
2    "Thus, the latency period of more
3    advanced malignant epithelial ovarian
4    cancer could be estimated to be
5    approximately 30 to 40 years."
6          A.   "This time frame is
7    consistent with data from the Hiroshima
8    cohort."
9          Yes. They're doing what I
10   said. They're extrapolating from an
11   atomic bomb victim to figure out what the
12   latency would be for somebody putting
13   talcum powder in their underwear.
14         Q.   And, Doctor, do you have any
15   reason or basis -- strike that.
16         Do you have any basis to
17   claim that the latency period would be
18   any different for talcum powder exposure
19   and development of ovarian cancer?
20         A.   In the totality of my review
21   of the literature, I don't see sufficient
22   evidence to consider that talcum powder
23   even causes ovarian cancer. So I don't
24   have a carcinogen to start off with to

Page 337

1    start estimating latency.
2          What they're saying is, if
3    you extrapolate from the few situations
4    that we know that cause ovarian cancer,
5    they have a long latency. So the
6    assumption is, well, this must have a
7    long latency period too.
8          They've given no citation
9    why that it is likely. It's just, well,
10   it happened here; it must be the same
11   here.
12         Q.   So let's talk about this.
13   You're a study designer. And you really
14   want to find out if talcum powder
15   exposure causes ovarian cancer. And you
16   know that there's all this data out here
17   that ovarian cancer has a long latency.
18         A.   It's all this data out here?
19         Q.   Yeah. I'm giving you a
20   hypothetical. There's data from
21   radiation and other exposures. Okay?
22         A.   Okay.
23         Q.   And the latency period is
24   about 20 to 40 years. Are you going to

85 (Pages 334 to 337)

Kevin Holcomb, M.D.

Page 338

1    design a study that is going to follow
2    women 10 or six or 15 years when you know
3    that potentially it could be 20,
4    40 years?  You're not going to detect all
5    the risk, are you?
6        MS. CURRY:  Object to the
7    form.
8        THE WITNESS:  I think
9    there's a misconception between
10    how long you follow a patient and
11    latency.
12        Latency doesn't start when
13    you designed a study and she
14    signed the consent form.  Latency
15    started from exposure to
16    development of a cancer.
17        So if somebody, let's say,
18    on the woman's health initiative,
19    is 55 at the time that she goes
20    on, and you're trying to convince
21    me earlier that this is this
22    habitual thing that she does, that
23    she doesn't even think about it.
24    Cramer 2016 says she likely

Page 339

1    started in her 20s.  She may be
2    decades in by the time that you're
3    following her.
4        So if somebody has been
5    using talc for 20 years and then
6    you follow them for another 12, or
7    in the case of Gates, they were
8    followed for 24 years, and they
9    showed even women who had greater
10    than 20 years' exposure didn't
11    have an increased risk.
12        The other problem with this
13    concept that you're having, like
14    you're missing the latency, you
15    would expect that even in the
16    studies that are showing an
17    effect, that you should be able to
18    show a dose-response curve with
19    duration of use.  And it's an
20    inconsistent thing.  And all the
21    data, it's inconsistent.
22        There's -- one of the
23    struggles of saying that this
24    is -- that talc is a cause of

Page 340

1    ovarian cancer is the biologic
2    plausibility and where it falls
3    apart on dose-response.
4        So I'm saying, just because
5    you followed somebody from
6    12 years, doesn't mean that they
7    started using talc the day before
8    she signed consent.
9        And so no, if you're talking
10    about a behavior that likely
11    starts in the 20s, and you're
12    trying to design a study that's
13    enrolling women who started at 50,
14    yeah, 12 years should be enough.
15    BY MS. GARBER:
16        Q.  Doctor, in the studies
17    themselves, do they indicate when the
18    women started using the talc, the age at
19    which they started using the talc?
20        MS. CURRY:  Object to the
21    form.
22        THE WITNESS:  Again, no.  I
23    am referring to what Dr. Cramer
24    believes.

Page 341

1    BY MS. GARBER:
2        Q.  You're making assumptions
3    based on one given study --
4        MS. CURRY:  Objection.
5    BY MS. GARBER:
6        Q.  -- as to when the women were
7    exposed to talc.  Isn't that true?
8        MS. CURRY:  Object to the
9    form.
10        THE WITNESS:  Honest -- no.
11    Honestly it's -- it's also
12    personal experience with just
13    people in my family who have used
14    talc.  It's been -- it hasn't been
15    my experience.  I -- I don't know
16    anybody --
17    BY MS. GARBER:
18        Q.  That's not scientific,
19    Doctor, is it?
20        A.  It's not.  No.  But you
21    asked me what it's based on.  I'm saying
22    I don't know anybody who starts using
23    talc and never did it before and they
24    started at 50.

86 (Pages 338 to 341)

Kevin Holcomb, M.D.

Page 342

1          Q.   Okay.  And if you were going
2   to take my history if I were one of your
3   patients and you wanted to find out about
4   my risk for developing lung cancer, you
5   wanted to find out about my smoking
6   history, ask me what questions you
7   would -- and tell me what questions you
8   would ask me.
9          A.   I would ask --
10             MS. CURRY:  Object to the
11   form.
12   BY MS. GARBER:
13         Q.   About my exposure?
14         A.   I would ask when you started
15   smoking cigarettes.  How many cigarettes
16   a day do you smoke.
17         Q.   What else?
18         A.   Have you been exposed to
19   asbestos.  I know that's a co-carcinogen.
20   Things like that.
21         Q.   So when I started.
22         A.   Mm-hmm.
23         Q.   And how --
24         A.   Do you still smoke today?

Page 343

1          Q.   -- how frequently I smoke?
2          A.   Mm-hmm.
3          Q.   And so that's a two-sided
4   metric, right, frequency and duration.
5          A.   Right.
6          Q.   Right?  And that's important
7   to determine the true risk?
8              MS. CURRY:  Object to the
9   form.
10   BY MS. GARBER:
11         Q.   Right?
12             MS. CURRY:  Object to the
13   form.
14             THE WITNESS:  That's true.
15             MS. GARBER:  Okay.  Let's
16   take a break.
17             THE VIDEOGRAPHER:  Okay.
18   Stand by, please.  The time is
19   3:28 p.m.  Off the record.
20             (Short break.)
21             THE VIDEOGRAPHER:  Okay.  We
22   are back on the record.  The time
23   is 3:55 p.m.
24   BY MS. GARBER:

Page 344

1          Q.   Doctor, I'm going to mark
2   the Gertig 2000 study --
3              (Document marked for
4   identification as Exhibit
5   Holcomb-19.)
6   BY MS. GARBER:
7          Q.   -- as -- I'm sorry -- as
8   Exhibit 19.
9              Doctor, a study limitation
10   of the Nurses' Health Study is that the
11   authors only captured talcum powder
12   exposure one time in 1982 via
13   questionnaire, right?
14         A.   It's true.
15         Q.   Another limitation is the
16   study's exposure metric only captured
17   frequency of use, and not cumulative use,
18   correct?
19             MS. CURRY:  Object to the
20   form.
21             THE WITNESS:  Yes.
22   BY MS. GARBER:
23         Q.   And Table 2 shows that the
24   talc use in the perineum is never less

Page 345

1   than one week, one to -- one to six --
2   sorry.
3              Less than one time per week,
4   one to six times per week, and daily,
5   correct, is that your understanding?
6          A.   Yes.
7          Q.   And an adequate
8   dose-response cannot be determined by
9   just measuring frequency without the
10   length of use, correct?
11             MS. CURRY:  Object to the
12   form.
13   BY MS. GARBER:
14         Q.   Do you agree with that?
15         A.   No, I don't agree.
16         Q.   Okay.  Because the
17   assessment was only made in 1982, many of
18   the women may have stopped using talcum
19   powder products over the study period.
20   Do you agree with that?
21         A.   Not likely.
22         Q.   Do you agree that there were
23   only 78,630 women who formed the cohort
24   analysis?

87 (Pages 342 to 345)

Kevin Holcomb, M.D.

Page 346

```
1       A.   Yes.
2       Q.   That's a far cry from the
3   requisite 200 of the Narod study,
4   correct?
5           MS. CURRY:  Object to the
6       form.
7           THE WITNESS:  I've already
8       addressed that in the past.
9   BY MS. GARBER:
10      Q.   All right.  You didn't --
11  and didn't you testify in the Ingham case
12  that we don't know if there was a proper
13  control group because we don't know if
14  the control group was exposed to talcum
15  powder products via diapering?
16          MS. CURRY:  Object to the
17      form.
18          THE WITNESS:  You'd have to
19      show me my --
20  BY MS. GARBER:
21      Q.   You don't recall testifying
22  about that?
23      A.   We talked -- I'd be happy to
24  read through it again.  I don't have an
```

Page 347

```
1   independent memory of that.
2       Q.   All right.  The Gertig paper
3   provided a result for ever use of talcum
4   powder products on the perineum for
5   ovarian cancer at Table 2.  Do you recall
6   that?
7       A.   Yes.
8       Q.   And I'll just show you
9   Table 2 here.  Table 2, ever perineal
10  talc use, yes, no.
11          Correct?
12      A.   Correct.
13      Q.   All right.  And the point
14  estimate for ever use of talc, talc
15  powder products and EOC was 1.9 with a
16  confidence interval of 0.86 to 1.37; is
17  that correct?
18      A.   No.  The reference is by
19  Definition 1.
20      Q.   The ever use.
21      A.   I'm sorry.
22      Q.   The ever use --
23      A.   Yes.
24      Q.   -- point estimate was 0.09
```

Page 348

```
1   under the multivariant relative risk,
2   right?
3       A.   Yes.  Earlier you had said
4   reference.  So yes.  It's 1.09.
5       Q.   That's an elevated risk,
6   right?
7           THE VIDEOGRAPHER:  Can you
8       give me one second.  Sorry.  Just
9       lost power in my camera for some
10      reason.
11          Stand by.  The time is
12      3:59 p.m.  Off the record.
13          (Brief pause.)
14          THE VIDEOGRAPHER:  Okay.  We
15      are back on the record.  The time
16      is 4:00 p.m.
17  BY MS. GARBER:
18      Q.   And, Doctor, before that
19  break, I was just asking you about ever
20  use of perineal talc -- ever perineal
21  talc use.  And I asked you, is a
22  multivariant relative risk 1.09 with a
23  confidence interval of 0.86 to 1.37.  And
24  you agreed that that's what it is,
```

Page 349

```
1   correct?
2       A.   Yes.
3       Q.   That's an elevated risk,
4   correct?
5           MS. CURRY:  Object to the
6       form.
7           THE WITNESS:  No.  That's --
8       you can't say for sure whether
9       that's an elevated risk.  Because
10      the true risk estimate is
11      somewhere between having a 14 --
12      yeah, 14 percent reduction in risk
13      to a 37 percent increase in risk.
14      And the true risk is somewhere in
15      there.  Where exactly the true
16      risk estimate I'm not sure.
17  BY MS. GARBER:
18      Q.   The point estimate, the
19  point estimate is elevated at 1.09, true?
20          MS. CURRY:  Object to the
21      form.
22          THE WITNESS:  The point
23      estimate is elevated, yes.
24  BY MS. GARBER:
```

88 (Pages 346 to 349)

Kevin Holcomb, M.D.

Page 350

1    Q.   And the follow-up study
2 period was just 14 years, correct, here
3 at Table 2, it sets forth a follow-up
4 period.
5         If you look here at the
6 table, you see the study period?
7    A.   Okay --
8    Q.   It's 14 years, right?
9    A.   One second.  I'm just doing
10 the math.  I went to public school.
11    Q.   Okay.  I went to a private
12 school.  But I'm not good at math either.
13    A.   Yes, 14 years.
14    Q.   Okay.  And with regard to
15 that follow-up period at Page 251,
16 Doctor, the authors note the limitation
17 in that they state, "In that regard, in
18 the peer-reviewed paper" --
19         MS. CURRY:  I'm sorry, where
20 are you --
21         THE WITNESS:  I'm sorry, I
22 don't know where you're reading.
23 BY MS. GARBER:
24    Q.   I'm reading at the top of

Page 351

1 251, right-hand column.  The authors
2 state, "Our relatively short follow-up
3 period may be inadequate to detect an
4 association if the latency for
5 development of ovarian cancer is more
6 than 15 years."
7         Did I read that correctly?
8    A.   You read that correctly.
9    Q.   So the authors are noting
10 that study limitation, correct?
11    A.   Yes, they did.
12    Q.   Also, at 251, the authors in
13 the middle column note that there are
14 several important study limitations,
15 correct?
16    A.   That's what it says, yes.
17    Q.   The authors also note that
18 they cannot determine the age at which
19 women began using talc or the duration of
20 their use.  That's what they say under
21 the heading of "Several Important
22 Limitations in Our Study," right?
23    A.   Yes.
24    Q.   Okay.  None of those study

Page 352

1 limitations that I just went through with
2 you are cited or addressed in your expert
3 report; is that true?
4    A.   That's true.  I did not
5 consider that a -- while a potential
6 study limitation, I sort of -- I looked
7 at the literature in totality, and other
8 papers suggested that while they could
9 not account for it, it's very likely that
10 this was a practice that began early in
11 the women's lives.
12         And so for completeness'
13 sake, they are mentioning this as a
14 limitation.  But the follow-up period, as
15 I mentioned earlier, of 14 years would be
16 too short to pick up a latency of
17 15 years if the woman just started using
18 talc the day she signed the consent.  But
19 if she had used talc for just three years
20 before signing the consent, it would not
21 have been a weakness.
22         So I respect them mentioning
23 this for completeness' sake.  But the
24 likelihood of them having not enough time

Page 353

1 for latency -- because latency again is
2 not follow-up time, it's exposure to
3 diagnosis -- I think it's unlikely that
4 they would not have the latency if you
5 extrapolated from an atomic bomb victim.
6    Q.   Did I ask you why those
7 aren't -- those study limitations aren't
8 contained within your expert report?
9    A.   No.  You asked me if it was
10 mentioned.  And I was just explaining why
11 it wasn't.
12    Q.   Try to just answer my
13 questions, if you can, Doctor.  I really
14 appreciate it.
15         The relative risk for ever
16 use of talcum powder products in serous
17 invasive ovarian cancer was elevated at
18 1.4 with a confidence interval of 1.02 to
19 1.91, correct?
20    A.   It depends on what type of
21 use you're talking about.  Because
22 strangely enough, in this study, for some
23 reason, if you use talcum powder on your
24 perineum, but you also used it on

89 (Pages 350 to 353)

Page 354

1     sanitary napkins, an increased exposure,
2     the point estimates are actually
3     protective, there's .89, of course
4     crossing one, and .90. So --
5       Q. Doctor, what was my
6     question?
7       A. You said ever use of what
8     type.
9         MS. CURRY: Did you complete
10     your thought?
11    BY MS. GARBER:
12       Q. So, Doctor, you'll get a
13     chance to answer questions that counsel
14     for Johnson & Johnson may want to ask
15     you.
16         My question was, is the odds
17     ratio for serous ovarian cancer 1.4 with
18     a confidence interval of 1.02 to 1.91?
19     Is that what's reported in the study?
20       A. I'm sorry. One second,
21     ma'am. For multivariate, it's 1.4, yes.
22       Q. Okay. And serous ovarian
23     cancer, as you testified several hours
24     ago, is a type of ovarian cancer,

Page 356

1       So if Gates has 24 years of
2     follow-up, I would look at Gates
3     as the answer to this.
4       So that's exactly what
5     happened in this situation. These
6     same group of women followed years
7     later, closer to covering the
8     latency that you were concerned
9     about, this risk went away.
10       And so I don't think I would
11     report twice on the same cohort of
12     patients.
13         MS. GARBER: Objection.
14     Motion to strike as nonresponsive.
15    BY MS. GARBER:
16       Q. Doctor, you didn't cite in
17     the four corners of your expert report
18     that the Gertig study showed an increased
19     risk in serous ovarian cancer, did you?
20         MS. CURRY: Object to the
21     form.
22         THE WITNESS: I just
23     explained why I made the general
24     statement --

Page 355

1     correct?
2       A. The most predominate type,
3     yes.
4       Q. Okay. And so when you say
5     in your expert report that none of the
6     cohort studies showed an increased risk
7     in ovarian cancer, that was an error,
8     right? Because --
9       A. No.
10       Q. -- serous ovarian cancer is
11     a form of ovarian cancer, true?
12         MS. CURRY: Object to the
13     form.
14         THE WITNESS: No. I don't
15     see that as an error, because if I
16     have two studies of the same
17     population, one with 14 years of
18     follow-up, which you seem to take
19     a lot of issue with, and one with
20     24 years follow-up, I was under
21     impression with your criticisms of
22     the study that the one with the
23     longer follow-up would be
24     considered more accurate.

Page 357

1    BY MS. GARBER:
2       Q. I didn't ask you why. My
3     question was very clear and precise.
4         MS. SHARKO: You can't
5     interrupt him.
6    BY MS. GARBER:
7       Q. Did you -- did you in the
8     four corners of your report state what
9     the results were for serous ovarian
10     cancer in Gertig, yes or no?
11       A. Let me take a look and see.
12     Yes, I did mention it.
13       Q. And, Doctor, do you state at
14     the top of Page 11 that the Gates 2010
15     reversed the finding of the only cohort
16     study reporting the association between
17     genital talc and epithelial ovarian
18     cancer?
19       A. Yes.
20       Q. What is your basis for that?
21       A. Pretty much as I stated in
22     the report, that you said I didn't
23     state, is that there was a modest
24     increased risk for invasive serous

Kevin Holcomb, M.D.

Page 358

1    ovarian cancer in the Gertig study, which
2    was stated on the bottom of Page 10
3    clearly. And that -- I can read it to
4    you, "In 2010 Gates, et al." --
5         Q. You don't have to read it,
6    Doctor. I can read it for myself. Let
7    me withdraw that.
8              Doctor, did the Gates
9    authors state that their study reversed
10   the findings of the Gertig 2000 study?
11             MS. CURRY: Object to the
12   form.
13             THE WITNESS: The results
14   did, yes.
15   BY MS. GARBER:
16        Q. Did the study authors say
17   our data reversed the findings, used that
18   phrase, "reversed the findings" of the
19   Gertig study?
20        A. I'd have to read through the
21   study to see if it was mentioned.
22        Q. Is it epidemiological
23   sound to say, "My study reversed the
24   findings of a prior study"?

Page 359

1              MS. CURRY: Object to the
2    form.
3    BY MS. GARBER:
4         Q. Have you ever heard that
5    done?
6         A. I use the term. So yes,
7    I've heard it done.
8         Q. It's your turn -- it's your
9    term?
10             MS. CURRY: Object to the
11   form.
12             THE WITNESS: I use it in my
13   report, yes.
14   BY MS. GARBER:
15        Q. Have you seen any other
16   study authors who say, in all of
17   epidemiological literature that you've
18   looked at, that says that the Gates 2010
19   study reversed the findings of the Gertig
20   2000 study?
21        A. I could not tell you that
22   out of all the epidemiologic studies that
23   I've read whether or not that term was
24   used.

Page 360

1         Q. In fact, there are
2    epidemiological studies as recent as
3    2018, that use the Gertig study in their
4    meta-analysis, right, the Penninkilampi
5    for one?
6         A. That is true. And a
7    weakness of the study.
8         Q. We're going to get to that.
9    I'm sure that's your opinion. But that
10   study relies on the Gertig study, in
11   other words, if they are including it in
12   their meta-analysis, surely those study
13   authors aren't thinking that the results
14   are reversed by Gates, correct?
15        A. And --
16             MS. CURRY: Object to the
17   form.
18             THE WITNESS: -- and by not
19   including Gates, they will come to
20   a spurious result. They will
21   think that maybe a prospective
22   study supports that there's an
23   increased risk. Where if they had
24   done -- and this is what I was

Page 361

1    saying about meta-analysis.
2              Not only do you have to
3    worry about heterogeneity. And we
4    spent enough time talking about
5    that. But selection of the
6    studies that go into your
7    meta-analysis are very, very
8    important. And one -- and
9    selection bias is -- is a very
10   important thing that you have to
11   watch out for as well.
12             So the fact that
13   Penninkilampi, as late as that
14   study just came out, was unable to
15   figure out that that same cohort
16   had been followed for ten years
17   longer, we -- strengthening the
18   study by increasing the follow-up
19   time, all the criticisms you just
20   gave me about Gertig is now
21   strengthened in Gates, and yet you
22   choose to use the number from
23   Gertig. I'd have to ask why would
24   somebody who's seeking the truth

91 (Pages 358 to 361)

Page 362

1    do that.
2    BY MS. GARBER:
3        Q.   I'm going to show you some
4    data and see if we can figure that out
5    together.
6        You don't have any basis to
7    conclude that the Penninkilampi authors
8    didn't know about the Gates 2010 data,
9    did you?
10       MS. CURRY:  Object to the
11       form.
12       THE WITNESS:  I'm saying
13       that I don't see in their
14       definitions, including the studies
15       that they included, the search
16       terms that they included, a reason
17       why they would negate Gates.
18   BY MS. GARBER:
19       Q.   Do you know whether or not
20   the Taher authors included the Gertig or
21   the Gates study?
22       A.   I believe they included
23   both.  But if I can look at it.  Because
24   earlier that was where I was telling you

Page 363

1    that they are saying Gates shows a
2    possible increased risk of cancer in
3    their table, where -- and I'm talking
4    about on the -- the -- can I pull out
5    Taher since you bring it up?
6        Q.   That's okay.  We're going
7    to -- we're going to get there in a
8    minute --
9        A.   Okay.
10       Q.   -- when I'm done with these
11   cohorts, so...
12       All right.  Let's -- let's
13   talk about Gates 2010.
14       (Document marked for
15       identification as Exhibit
16       Holcomb-20.)
17   BY MS. GARBER:
18       Q.   I'll mark as Exhibit 20, the
19   Gates 2010 publication:
20       Doctor, the Gates 2010
21   article was a publication of the
22   follow-up to the Nurses' Health Study I
23   that was published as Gertig in the year
24   2000, correct?

Page 364

1        A.   Correct.
2        Q.   And the age of the women in
3    the Gates 2010 were younger than the
4    study women in the Gertig?
5        MS. CURRY:  Objection to
6        form.
7    BY MS. GARBER:
8        Q.   Is that true?
9        A.   I'm sorry, say the --
10       Q.   Sorry.  The age of the women
11   in Gates 2010 were younger than the
12   Gertig women, correct?
13       MS. CURRY:  Object to form.
14       THE WITNESS:  You mean the
15       same women that were followed
16       in -- in Gertig, by the time they
17       saw them ten years later they were
18       younger?
19   BY MS. GARBER:
20       Q.   Is there a disparity in the
21   age of the two cohorts?
22       A.   Between Gertig and Gates.
23       MS. CURRY:  Not -- I
24   think --

Page 365

1        THE WITNESS:  I'm a -- I'm a
2    little confused by your question.
3    BY MS. GARBER:
4        Q.   Okay.  Do you understand
5    that the women who were included in the
6    Gates study were younger than the women
7    in the Gertig study?
8        MS. CURRY:  Object to the
9        form.
10   BY MS. GARBER:
11       Q.   Maybe I'll show you --
12       A.   Yes.
13       Q.   -- and then you can maybe
14   help me understand.
15       A.   Because I don't need to read
16   through.
17       Q.   Doctor, if you could look
18   right here?
19       A.   Sure.
20       Q.   On the first page.  Do you
21   see where it says, "The Nurses' Health
22   Study was established in 1976 and the
23   Nurses' Health Study II in 1989 amongst
24   121,700 U.S. women" -- "U.S. female

92 (Pages 362 to 365)

Kevin Holcomb, M.D.

Page 366

1  registered nurses aged 30 to 55 and
2  116,430 U.S. female registered nurses
3  aged 25 to 42 respectively."
4       So the two cohorts are
5  different ages, are they not?
6       MS. CURRY:  Object to the
7       form.
8       THE WITNESS:  I'm sorry, I'm
9       just taking my time to read
10      through this again.
11  BY MS. GARBER:
12      Q.   Mm-hmm.  Do you need time to
13  study?  We'll go off the record if you
14  do.
15      A.   No.  That seems to be the
16  case, yes.
17      Q.   Okay.  Okay.  In the Gates
18  study they were not asked questions about
19  it -- about their talc use.  Instead, the
20  data about their talc exposure was
21  carried over from the Gertig one-time
22  1982 questionnaire.  Do you agree with
23  that?
24      A.   It's my understanding that

Page 367

1  the NHSII population was not queried on
2  their use of talc because it was a
3  one-time questionnaire in 1982.
4       So yes, the NHSII
5  population is younger than the NHSI, but
6  the question of the effect of talc on
7  ovarian cancer was in -- only in patients
8  that have been asked about ovarian cancer
9  exposure.
10      Q.   Mm-hmm.  And that's a study
11  limitation, correct?
12      A.   No.
13      Q.   Okay.  In the Gates 2010 the
14  authors provide no results for ever use
15  of talcum powder product on the perineum
16  for ovarian cancer; is that true?
17      A.   No.
18      Q.   It's not true?
19      A.   No.  Hold on one second.
20  Sorry.  I have to go and find.
21      Q.   Doctor, if you turn to
22  Table 4 --
23      A.   Yes.
24      Q.   -- Page 50.  You see that

Page 368

1  the metric is talc use greater than once
2  a week versus less than once a week.
3  It's not ever never, correct?
4       A.   Correct.
5       Q.   That's a different metric
6  from Gertig, right?
7       A.   Different metric, yes.
8       Q.   Thank you.
9       A.   Valid -- valid change
10  though.
11      Q.   Okay.  But different
12  nonetheless, right?
13      A.   Different and valid.
14      Q.   While the Gates 2010 study
15  followed women for ten more years, the
16  follow-up is, in total, 26 years,
17  correct?
18      A.   Correct.
19      Q.   And we don't know when the
20  women were exposed, at what age they
21  began using talc, correct, the study
22  doesn't -- either study doesn't tell us
23  that, correct?
24      A.   No.

Page 369

1       Q.   And assuming the latency for
2  ovarian cancer is 30 to 40 years, that
3  study period would be inadequate to
4  accurately detect all of the women with
5  ovarian cancer.  Would you agree with
6  that?
7       MS. CURRY:  Object to the
8       form.
9       THE WITNESS:  No.  I think
10      if you -- if you can stretch to
11      the assumption that the latency
12      for something that's not even
13      proven carcinogenic is the same as
14      somebody working in a gas mask
15      factory, I think you can
16      equally -- in fact, it takes less
17      of a stretch to believe that the
18      women didn't start talc use four
19      years before they went on the
20      study, because that is not what
21      most people believe, even
22      Dr. Cramer doesn't believe most
23      women start that late in life.
24  BY MS. GARBER:

93 (Pages 366 to 369)

Kevin Holcomb, M.D.

Page 370

1      Q.   But you have no data as to
2  when the women in this study actually
3  started talc use, do you?
4      A.   No.
5      Q.   The Gates relative risk for
6  women who use talc greater than once a
7  week and serous ovarian cancer is 1.06
8  with a confidence interval of 0.84 to
9  1.35.  Do you agree with that?
10     A.   Sorry, one second.  Yes.
11     Q.   And again, under your
12 definition of positive, you do not think
13 that is a positive finding, correct?
14     A.   Positive and not
15 statistically significant, yes.
16     Q.   You do think it's positive,
17 but not statistically significant?
18         MS. CURRY:  Object to the
19     form.
20         THE WITNESS:  If you're
21     asking me about directionality,
22     it's obvious.  Because
23     directionality it's positive.
24         I do not consider it a

Page 371

1      significant or valid finding
2      because I can't say for 90
3      percent, 95 percent accuracy, that
4      the true risk estimate lies above
5      one.
6  BY MS. GARBER:
7      Q.   So, Doctor, earlier today
8  you told me that where relative risk was
9  greater than one, but not statistically
10 significant, that was a negative finding.
11         Are you now changing your
12 definition of positive versus negative?
13     A.   I think you just misstated
14 my statement, because that's not --
15 doesn't make sense what you just said.
16     Q.   Okay.  I thought you told me
17 earlier today when I asked you what a
18 negative study was, it included an odds
19 ratio that could be greater than one but
20 if it wasn't statistically significant,
21 it was a negative study in your opinion?
22     A.   In this term, the question
23 that you just asked me when you were
24 asked positive, I thought you were asking

Page 372

1  directionality.  And that's why I said
2  it's obviously directionality positive.
3         And if you're asking me is
4  it a valid study, one that I would rely
5  on with a degree of medical certainty, I
6  would say no, because I'm one of those
7  old school doctors who still believe that
8  95 percent confidence intervals are
9  important.
10     Q.   If the Court asked you if
11 the Gertig serous ovarian cancer in the
12 Gates study was positive or negative, how
13 would you reply?
14     A.   I would say it's a negative.
15     Q.   Okay.  And I think we
16 already covered this.  But you can't cite
17 me to any authority, can you, that the
18 Gates study reverses the Gertig finding,
19 correct?
20         MS. CURRY:  Object to the
21     form.
22         THE WITNESS:  Well, I'm here
23     giving my testimony.  So I'm going
24     to assume the mantle of an

Page 373

1      authority.  And I would say if
2      this group is followed for ten
3      years longer -- and I'll add the
4      caveat that women who used it for
5      less than one week had the same
6      risk in a study just two years
7      before this, as women who had
8      never used.
9         So if you go to Gates 2008,
10     you will see for this study cohort
11     there's no reason to believe that
12     it's not a valid thing to lump
13     somebody who used it in less than
14     one week with never used, based on
15     the Gates 2008 data.
16        So, yes, I would say this
17     1.4 that was found in Gertig is
18     not -- is no longer here.
19        And so in my estimation,
20     this reverses the findings.  This
21     says in the same population of
22     women followed longer, the
23     increased risk went away.
24 BY MS. GARBER:

94 (Pages 370 to 373)

Page 374

1      Q.   The study authors, again, do
2  not say that, correct?
3      A.   I'd have to --
4      Q.   They don't say it reverses?
5      A.   I don't remember.  I'd have
6  to read through the whole discussion
7  section for you.
8      Q.   Okay.  And, Doctor, as to
9  the Houghton study, the WHI study, you
10 read that one, right?
11     A.   Yes.
12     Q.   You say in your report, at
13 Page 11 in sort of the middle of the
14 page, that there was no statistically
15 significant association between use of
16 genital talc and the development of
17 ovarian cancer for ever users?
18     A.   I'm sorry.  The page again?
19     Q.   Page 11.
20     A.   Yes.
21     Q.   And to make that statement,
22 there is --
23     A.   I'm still looking for it.
24 One second.

Page 375

1      Q.   It's in the middle of the
2  page.
3      A.   Can you repeat the statement
4  that you said I'm looking for.
5      Q.   In your expert report at
6  Page 11 as to the Houghton study --
7      A.   Yes.
8      Q.   -- you indicate that there
9  was no statistically significant
10 association.
11     A.   I'm looking for the term
12 that you're saying.
13     Q.   That's okay, Doctor.
14          Do you know what the sample
15 size was in the WHI study?
16     A.   I think it was about 61,000.
17     Q.   And based on the relative
18 small size, that's a study limitation of
19 the Houghton study, correct?
20          MS. CURRY:  Object to the
21 form.
22          THE WITNESS:  As taken in a
23 vacuum as an individual study,
24 yes.

Page 376

1  BY MS. GARBER:
2      Q.   And what was the exposure
3  metric in the Houghton study?
4      A.   There was a question at
5  baseline with, "Have you ever used powder
6  on your private parts/genital areas?"
7  And then respondents responding yes, were
8  then asked to identify the duration of
9  use.  It was less than one year, one to
10 four years, five to nine years, and all
11 the way up to greater than 20 years.
12     Q.   And, Doctor, that's --
13 that's a duration of use --
14     A.   Right.
15     Q.   -- assessment, right?
16     A.   Yes.
17     Q.   And that doesn't take into
18 consideration frequency of use, right?
19     A.   No.
20     Q.   All right.  And then the
21 Houghton authors state that the Nurses'
22 Health Study found that there was a
23 40 percent increase in the risk with a
24 confidence interval of 1.02 to 1.91?

Page 377

1      A.   I'm not sure where you're
2  looking.
3      Q.   Okay.  Doctor, if you look
4  at the right-hand -- yeah.  If you look
5  at the first page, the right-hand column.
6          MS. CURRY:  Which study?
7  Sorry.
8          MS. GARBER:  Houghton.
9          THE WITNESS:  Yeah, but we
10 don't --
11          MS. CURRY:  You haven't
12 marked it as an exhibit.
13          MS. GARBER:  Oh, I'm sorry,
14 you guys.
15          (Document marked for
16 identification as Exhibit
17 Holcomb-21.)
18 BY MS. GARBER:
19     Q.   Okay.  Let's mark the
20 Houghton 2014 study.  Doctor, if you look
21 at the right-hand column, here.
22          MS. SHARKO:  What exhibit is
23 this?
24          MS. GARBER:  What?

95 (Pages 374 to 377)

Kevin Holcomb, M.D.

Page 378

1          MS. CURRY: 21.
2          MS. SHARKO: Oh, 21? Okay.
3    BY MS. GARBER:
4          Q.   Doctor, do you see where I'm
5    marking right here, on the right-hand
6    side?
7          A.   Yes.
8          Q.   The -- the sentence begins,
9    "In the Nurses' Health Study (NHS)
10   cohort, no overall association was found
11   between the use of perineal powder and
12   epithelial ovarian cancer" -- and it
13   cites the risk -- "or serous ovarian
14   cancer," and it cites the odds ratio.  It
15   goes on to say, "However, there was a
16   40 percent with a 95 percent confidence
17   interval of 1.02 to 1.91 increased risk
18   for serous invasive ovarian cancer with
19   ever perineal use, which comprises
20   86 percent of the serous ovarian cancers
21   in the cohort."
22          Did I read that correctly?
23          A.   You read it correctly.
24          Q.   And that cites to the Gertig

Page 379

1    study, right?
2          A.   Yes.  The beginning of that
3    paragraph says, "To date there has only
4    been one prospective study conducted."
5    This is 2013.  And we've already
6    established there was a follow-up to that
7    study in 2010 that wasn't included here.
8          Q.   And that's precisely my
9    point.  So here, the Houghton authors are
10   citing to the Gertig study, not the Gates
11   study, correct?
12         A.   That's correct.  And I would
13   consider it inappropriate not to mention
14   that follow-up information.
15         Q.   The authors don't say that
16   the Gates 2010 reversed the findings of
17   the Gertig study; rather, they cite those
18   data, don't they?
19         A.   They do.
20         MS. CURRY:  Object to the
21   form.
22         THE WITNESS:  I just think
23   it's a mistake to leave out what
24   clearly -- this statement, "To

Page 380

1    date, there has only been one
2    prospective study conducted the
3    powder use and risk of ovarian
4    cancer," and then only cite
5    Gertig, which in fact to that
6    date, there had been two studies.
7          If you don't want to say one
8    reversed it.  Then you have to at
9    least admit there was two
10   studies.  It was Gertig and Gates.
11   So the fact that they made that
12   mistake from the beginning of that
13   paragraph and follow it through
14   with only talking about Gertig,
15   yes, you're accurate -- you read
16   perfectly right what they said.
17   But my point is that that's not an
18   accurate statement.  There was
19   more than one.
20   BY MS. GARBER:
21         Q.   So Nurses' Health Study was
22   one study, right, with two publications?
23         A.   No, I think that if you are
24   talking about how many studies,

Page 381

1    there's -- there is two different
2    publications.  You're right, they are
3    only citing one of them.
4          Q.   So the Nurses' Health Study
5    was one study with two publications or it
6    was two studies with two publications?
7          MS. CURRY:  Object to the
8    form.
9          THE WITNESS:  As you can see
10   with my case-control lists for
11   example, I still counted those as
12   separate studies and you are
13   talking about what percentage are
14   positive, what percentage are
15   negative.  When, in fact, I had
16   studies that were reported on the
17   same populations at later time.  I
18   can -- I considered them two
19   studies.
20         So I'm -- the Nurses' Health
21   Study was one prospective study
22   with -- with two publications.
23   And the fact that they don't cite
24   Gates, I see as a weakness to

96 (Pages 378 to 381)

Kevin Holcomb, M.D.

Page 382

1    their -- their introduction.
2  BY MS. GARBER:
3        Q.   You think they should have
4   cited the Gates 2010 study?
5        A.   I think that's -- I think
6   that's -- it should make you pause when
7   the only prospective study that you're
8   quoting has this increased risk.  And
9   then the women followed longer, the risk
10  goes away.  It's worth mentioning I would
11  think.
12       Q.   Well, Doctor, the Gates
13  study is peer reviewed and published,
14  right?
15       A.   Yes.
16       Q.   And the Penninkilampi is
17  peer reviewed and published, correct?
18       A.   Yes.
19       Q.   And I know the Taher isn't
20  yet peer reviewed, but it -- it cites to
21  the Gertig study too, doesn't it?
22       A.   Repeated --
23            MS. CURRY:  Object to the
24       form.

Page 383

1            THE WITNESS:  -- mistakes
2       don't make it less of a mistake.
3  BY MS. GARBER:
4        Q.   Okay.  But -- but at least
5   the Gertig and the Penninkilampi are peer
6   reviewed and cite --
7        A.   Some of -- so --
8        Q.   -- to Gertig --
9        A.   Yes.
10       Q.   -- is that true?
11       A.   Yes, yes.
12       Q.   Okay.  Let's talk further
13  about the Houghton study --
14       A.   Yes.
15       Q.   -- the WHI study.  The study
16  enrolled 61,576 postmenopausal women,
17  right?
18       A.   I'm sorry --
19       Q.   It's in the abstract under
20  results?
21       A.   Yes.
22       Q.   Okay.  And you don't -- do
23  you know when the women started using
24  talc, at what age, in this study?

Page 384

1        A.   I have to go back to the
2   materials and methods to see if they
3   asked.  One second.
4            No.
5        Q.   Okay.  And while there is
6   duration of exposure, you don't know how
7   many women were exposed to long-term talc
8   defined by more than 20 years, do you,
9   this study doesn't report that data, does
10  it?
11       A.   How many women had used it
12  for 20 or more years?
13       Q.   Yes.
14       A.   I'd have to go to the
15  results to check for that.  Because it
16  was part of the questions.
17       Q.   All right.  That's all
18  right.  I'll withdraw the question.
19            And turning to Page 4,
20  Table 2.  It shows the number of women in
21  the study who reported using talcum
22  powder products on their genitals, right?
23       A.   Yes.
24       Q.   And how many women used

Page 385

1   it -- let me catch up to you.  How many
2   women were reporting using ten years or
3   more?
4        A.   68.
5        Q.   Not very many, is it?
6            MS. CURRY:  Object to the
7       form.
8            THE WITNESS:  No.
9            This -- you -- let me
10      clarify.  You're asking not how
11      many women used it for longer, but
12      how many women who developed
13      ovarian cancer that had used it.
14  BY MS. GARBER:
15       Q.   Yeah.
16       A.   That's 68.  Yes.
17       Q.   Yeah.  It's not very many
18  women in that study group, is it?
19            MS. CURRY:  Object to the
20      form.
21            THE WITNESS:  Relative to?
22  BY MS. GARBER:
23       Q.   Relative to 200,000?
24       A.   Narod didn't say you need

97 (Pages 382 to 385)

Kevin Holcomb, M.D.

Page 386

1    200,000 women with ovarian cancer. He
2    said you need 200,000 women total.
3        Q.   Okay. Is 68 who developed
4    ovarian cancer a good amount that gives
5    you confidence in these data?
6            MS. CURRY: Object to the
7        form.
8            THE WITNESS: You know, the
9        smaller the number, the wider the
10       confidence interval would be.
11   BY MS. GARBER:
12       Q.   Is this a wide confidence
13   interval? You testified in the Ingham
14   case it was, didn't you?
15       A.   That this is a wide
16   interval?
17       Q.   Mm-hmm.
18       A.   Well, it crosses -- it's
19   wide enough, and it's in the wrong -- you
20   know, it crosses one, so it's not
21   statistically significant.
22       So that apparent reduction
23   in the risk, that 2 percent reduction in
24   the risk, I wouldn't trust it.

Page 387

1        Q.   That's a limitation of the
2    study, right, the wide confidence
3    interval, in that few women -- few number
4    of women participants?
5            MS. CURRY: Object to the
6        form.
7    BY MS. GARBER:
8        Q.   Right?
9        A.   The few number of women
10   participants, it's -- it's actually what,
11   61,000 women participants.
12       Q.   The 68 women participants
13   calls into question the validity of this
14   subgroup analysis, doesn't it, Doctor?
15           MS. CURRY: Object to the
16       form.
17           THE WITNESS: If you're --
18       the only analysis that was broken
19       down, you're saying the number of
20       women with ten or more years is
21       68.
22       And when you say that's low,
23       I'm not sure it's relative to
24       what.

Page 388

1    BY MS. GARBER:
2        Q.   Okay. Another limitation of
3    the study was that one-sided metric of
4    only capturing duration. Do you agree
5    with that?
6            MS. CURRY: Object to the
7        form.
8            THE WITNESS: I think a
9        perfect study would collect --
10       collect both. So yes.
11   BY MS. GARBER:
12       Q.   It would be an optimal study
13   to collect both, wouldn't it?
14           MS. CURRY: Object to the
15       form.
16           THE WITNESS: Unfortunately
17       there is no such thing as an
18       optimal study. I could look at
19       all -- every study I reviewed and
20       pick up things that should have
21       been done differently and better.
22       And hopefully learn with the next
23       study design. But that's true for
24       everything in my reliance list.

Page 389

1    BY MS. GARBER:
2        Q.   Let's see if we can work out
3    how this would work.
4        If you only captured
5    duration of use and you said it was --
6    you used it ten years or more, a given
7    woman could have used it once a year on
8    her anniversary for all you know,
9    correct?
10       A.   Correct.
11       The -- the big problem with
12   this whole body of literature though, is
13   this concept that you have any idea of
14   the dose at the tissue level.
15       I -- if you told me you used
16   it everyday, and I'm a woman and I use it
17   everyday and you take three shakes and I
18   take one, we're really not getting to the
19   heart of dose-response.
20       And this -- this is a
21   difficulty of all this topic. It's --
22   it's -- they are all limited. They are
23   all limited. We have no idea of the dose
24   of talc, if it's even getting to the

98 (Pages 386 to 389)

Kevin Holcomb, M.D.

Page 390

1  ovaries, and if it's getting to the
2  ovaries from that dusting, what amount is
3  getting to the ovaries.  And so we're
4  playing a pseudoscience game with
5  dose-response.
6         This isn't really
7  dose-response.  Dose-response studies
8  have to do with the level of what you're
9  interested in at the tissue level.  So we
10 can go through the stuff and talk about
11 these as weaknesses, but this whole body
12 of literature is weakened by the
13 inability to know.
14        I don't even know for sure
15 that it gets to the ovary from this way.
16 How much each women put into her --
17 dusted with is -- is totally random.
18     Q.   And that's what I want to
19 really get at here because you're aware
20 of data where there is talc found in the
21 ovarian tissue, both tumor and
22 non-diseased, right?
23     A.   In women who report exposure
24 and women who don't report exposure.

Page 392

1         Because even in the cases of
2  the particles that you find, I
3  have no idea how they got there.
4         There is -- there is a lot
5  of weakness just overall in this
6  whole area.
7         So I would be less bothered
8  by that if you gave me the
9  epidemiology data that showed me a
10 20-fold increase.  Then I'm less
11 reliant or feel like you -- it's
12 less necessary.
13        But in this situation where
14 we've already gone through the
15 epidemiologic data earlier.  And I
16 pointed out all the
17 inconsistencies, as I describe.  I
18 call a 50/50 split inconsistent.
19        And now you get to this, and
20 you can point out all the
21 weaknesses.  But I'm saying
22 there's weaknesses in all these
23 studies going through.
24

Page 391

1     Q.   Okay.  And you're aware
2  of -- from your work in individual cases,
3  that there are women who report talcum
4  powder product exposure who have found
5  asbestos and talc in their ovaries,
6  correct?
7         MS. CURRY:  Object to the
8  form.
9         THE WITNESS:  There are
10 women who report neither of the
11 two who find particles that
12 diagnosed as talc or asbestos in
13 their ovaries.
14        So you're getting to my
15 point, is that the -- it falls
16 apart with the biologic
17 plausibility because of all these
18 weaknesses, because you can't
19 really assess dose at the tissue
20 level, because women who report
21 no -- because there isn't a good
22 correlation between reported
23 history of exposure and finding
24 the particles.

Page 393

1  BY MS. GARBER:
2     Q.   Doctor, do you think that
3  the data which shows that there is
4  asbestos and talc in ovarian tissue
5  provides a biologically plausible
6  mechanism of carcinogenicity?
7         MS. CURRY:  Object to the
8  form.
9         THE WITNESS:  Just the
10 presence of it in the --
11 BY MS. GARBER:
12    Q.   Yeah.
13    A.   This is part of the problem
14 with this whole area.  The presence --
15    Q.   Doctor, that wasn't my
16 question.
17    A.   No.  The presence --
18    Q.   Yes or no.
19    A.   No.  The presence of it does
20 not --
21    Q.   You don't think that --
22    A.   Just the mere presence of
23 the particle does not prove a causal
24 relationship.

99 (Pages 390 to 393)

Kevin Holcomb, M.D.

Page 394

1      Q.   And you've seen paper after
2   published paper wherein the study authors
3   who are actually studying talcum powder
4   exposure, talc product exposure and
5   ovarian cancer, are stating that there is
6   a biologically plausible mechanism,
7   correct?
8           MS. CURRY:  Object to the
9   form.
10          THE WITNESS:  The
11   statements of --
12   BY MS. GARBER:
13      Q.   You just disagree with them?
14          MS. CURRY:  Object to the
15   form.
16          THE WITNESS:  But the -- in
17   no situation, in medicine that I
18   can think of would a -- the mere
19   presence of a molecule or particle
20   or whatever in a certain organ be
21   evidence of its carcinogenicity.
22          That's not biologic
23   plausibility.
24          Just its mere presence

Page 395

1   isn't.
2           And the fact -- the fact
3   that so many people are saying
4   that is exactly what I'm talking
5   about when people overstate the
6   findings of their studies, just
7   the -- just the finding it there
8   in no way implies biologic
9   plausibility.
10   BY MS. GARBER:
11      Q.   That's your opinion, right?
12      A.   That's like saying --
13      Q.   There are study authors who
14   disagree with you, correct?
15          MS. CURRY:  Object to the
16   form.
17          THE WITNESS:  Just to give
18   you an example, it was -- it would
19   be like saying because I went to
20   the bank, there's a plausible
21   evidence that I robbed the bank
22   because I was there.  I mean, that
23   doesn't make any sense to me.
24   That's not the way I look at it,

Page 396

1   not just in talc.  I would look at
2   that as a ridiculous situation in
3   any statement.
4           We're here and studying this
5   because people say they -- they
6   describe finding talc there.  But
7   that's -- that's not the burden of
8   proof.
9   BY MS. GARBER:
10      Q.   Okay.  Do you think the
11   burden of proof is absolute proof that
12   the talc got there through perineal
13   dusting?
14      A.   Does it matter how it got
15   there if it's a carcinogen?
16      Q.   If it's a carcinogen, does
17   it matter?
18      A.   It matters maybe for you,
19   because of the nature of this litigation.
20          But if talc caused cancer of
21   the ovary, I could care less how it got
22   there.  I'd want to -- you know, the fact
23   that it's there is an issue.  You'd be
24   able to prove that it's a carcinogen.

Page 397

1           So even the cases, the
2   Heller study, you mentioned it earlier,
3   24 women, 12 reporting a history of
4   exposure, 12 not reporting a history of
5   exposure.  Not only is there not a
6   correlation, if I go back and I read the
7   paper, I think the fiber counts are even
8   higher in the women without a reported
9   history.
10      Q.   We're going to look at that
11   paper in a minute.  But, Doctor, don't
12   the authors suggest why that is, why the
13   unexposed group may have high fiber
14   counts?
15          MS. CURRY:  Object to the
16   form.
17          THE WITNESS:  Do they
18   what -- what it is?  Can you
19   repeat?
20   BY MS. GARBER:
21      Q.   Don't the study authors
22   suggest --
23      A.   See --
24      Q.   -- what may account for that

100  (Pages 394 to 397)

Kevin Holcomb, M.D.

Page 398

1    high fiber burden in the non-exposed
2    group?
3            MS. CURRY:  Object to the
4        form.
5            THE WITNESS:  If you
6        equal -- if you think and suggest
7        and hypothesize are the same, I
8        would agree with you.  You see
9        suggestion in science means
10       there's some evidence to make you
11       think this is the case.
12       Otherwise, you're just -- it's
13       conjecture and it's hypothesis.
14   BY MS. GARBER:
15       Q.   And you read the Cramer
16   paper.  Didn't the Cramer paper suggest
17   that -- address the issues, the
18   shortcomings of the Heller data, that
19   there may be surface contamination that
20   goes in and mixes with the talc or
21   asbestos in the tissue which accounts for
22   the unexposed group?
23           MS. CURRY:  Object to the
24       form.

Page 399

1    BY MS. GARBER:
2        Q.   Don't they suggest that?
3        A.   Yes.  You're saying that one
4    author says it's from one explanation and
5    Cramer says it's from another
6    explanation, so yeah, they're all
7    suggesting these different things.  One
8    person saying it is diapering as a child.
9    The next person is saying it's
10   contamination.  The truth is no one
11   knows.
12       Q.   Did Cramer say it's coming
13   from contamination, or did Cramer say
14   that you need to do polarized light to
15   make sure that you're adequately counting
16   what's really deeply embedded in the
17   tissue and not what's coming in the
18   surface?
19           MS. CURRY:  Object to the
20       form.
21           THE WITNESS:  Because he
22       thinks what's on the surface is
23       contamination.
24   BY MS. GARBER:

Page 400

1        Q.   No, from the paraffin
2    processing, right?
3            MS. CURRY:  Object to the
4        form.
5            THE WITNESS:  Contamination
6        at some point.  I mean, is it
7        contamination during processing?
8        Is it from surgical gloves from
9        past surgeries?  Is it from -- my
10       point is, this is all conjecture
11       because there's all these possible
12       explanations.  And people can
13       suggest what they want in their
14       introduction to their paper.
15           But I'm more interested in
16       the actual science that goes to
17       the heart of trying to figure
18       out -- you know.
19           But again, you're -- we
20       started this conversation by
21       talking about the mere presence of
22       talc particles in the ovary.
23   BY MS. GARBER:
24       Q.   Okay.  So we'll get back to

Page 401

1    the cohorts, and then we'll move onto the
2    biologic plausibility.
3            But you would agree with me,
4    wouldn't you, that there are study --
5    peer-reviewed study authors that set
6    forth that there is a biologically
7    plausible mechanism.  You just disagree
8    with that, correct?
9            MS. CURRY:  Object to the
10       form.
11           THE WITNESS:  The reason
12       that I have to disagree with it
13       is --
14   BY MS. GARBER:
15       Q.   Doctor, my question is yes
16   or no.
17       A.   I disagree with it that
18   there's -- it's conjecture.
19       Q.   That's fine.  I understand
20   your opinion.
21           I just want you to answer my
22   question, which is you agree that there
23   are study authors that say there's
24   biologically plausible mechanism, you

101 (Pages 398 to 401)

Page 402

1    just disagree with that?
2         MS. CURRY: Object to the
3    form.
4    BY MS. GARBER:
5         Q.   Correct?
6         A.   I disagree with it. Many
7    people disagree with it.
8         Q.   Okay. And there's many
9    people who agree with it, right?
10        MS. CURRY: Object to the
11   form.
12        THE WITNESS: Based on
13   pseudoscience.
14   BY MS. GARBER:
15        Q.   Is the Health Canada
16   pseudoscience?
17        A.   No, I wouldn't describe
18   Health Canada as pseudoscience in
19   totality. But if you -- if you want to
20   read through it and ask what things I
21   agree with and what things I don't, I
22   think I've already told you that when --
23   when authors make statements in their
24   preambles, in their introductions, that

Page 403

1    aren't based on data but they state it as
2    a fact, watch out for what's coming
3    later.
4         Q.   Okay. We'll go to --
5         A.   If somebody starts off like
6    that.
7         Q.   We'll go to Health Canada
8    and see what they said about biologic
9    plausibility.
10        A.   You spend a lot of time in
11   Canada.
12        Q.   You also reviewed the Gertig
13   study, correct?
14        A.   The same study that we were
15   just going through?
16        Q.   I'm sorry, I -- I misspoke.
17   The Gonzalez study?
18        A.   Yes, I did.
19        Q.   And I'll mark that as
20   Exhibit 22.
21        (Document marked for
22        identification as Exhibit
23        Holcomb-22.)
24   BY MS. GARBER:

Page 404

1         Q.   Doctor, this study involved
2    only 41,654 women, correct?
3         A.   41,000 women, and 600.
4         Q.   Yeah. And the talc exposure
5    metric was to ask women about the
6    frequency of their talcum powder exposure
7    within -- in their genitals within the
8    prior 12 months, correct?
9         A.   Let me just confirm that.
10        Q.   It's under the methods on
11   the abstract, Doctor.
12        A.   Can you repeat your
13   statement just now?
14        Q.   Doctor, was one of the
15   limitations that the -- the exposure was
16   talcum powder exposure to the genitals
17   within the prior 12 months. Do you agree
18   with that?
19        A.   Yes. Along -- along with
20   frequency. I -- I thought you were --
21   yes.
22        Q.   Okay. And the follow-up
23   there in the abstract was 6.6 years,
24   right?

Page 405

1         A.   Yes.
2         Q.   And you don't know when the
3    women started using talc, right?
4         A.   No.
5         Q.   Like the others?
6         A.   As I -- I would anticipate
7    that they were average users.
8         Q.   Doctor, does douching
9    increase the risk for ovarian cancer?
10        A.   This study suggests it does.
11        Q.   Is douching a risk factor
12   for ovarian cancer?
13        A.   This study suggests it is.
14        Q.   Do you tell your patients
15   that douching is a risk factor for
16   ovarian cancer?
17        A.   No. Because it's only one
18   study suggesting it.
19        Q.   And, Doctor, any of the
20   limitations that we've just gone through
21   with regard to the cohort studies, none
22   of them are listed within the four
23   corners of your expert report; is that
24   correct?

102 (Pages 402 to 405)

Kevin Holcomb, M.D.

Page 406

1          MS. CURRY: Object to the
2     form.
3          THE WITNESS: The
4     limitations of cohort studies in
5     general?
6     BY MS. GARBER:
7          Q.   That we've gone through
8     here, as we've gone through the cohorts.
9          A.   The --
10         Q.   You have not -- you have not
11    put forth in the four corners of your
12    report any of the study limitations of
13    the cohorts, correct?
14         A.   I'd have to read through
15    the -- through this again.  I -- I don't
16    remember exactly, you know, every word
17    that I said about them.
18         Q.   Doctor, let's talk about the
19    meta-analyses.
20         A.   Sure.
21         (Document marked for
22    identification as Exhibit
23    Holcomb-23.)
24    BY MS. GARBER:

Page 407

1          Q.   I'm going to mark the
2     Penninkilampi paper.  Exhibit 23.
3          Doctor, before we turn to
4     the Penninkilampi paper.  In your expert
5     report, you indicate that the
6     meta-analyses -- the results of the
7     meta-analyses --
8          A.   Can you tell me what page
9     you are reading from?
10         Q.   Page 13.
11         -- are discrepant.  Do you
12    recall using that phrase or that term?
13         It's the very last two words
14    of the first paragraph at Page 13.
15         Do you see that?
16         A.   Yes.
17         (Document marked for
18    identification as Exhibit
19    Holcomb-24.)
20    BY MS. GARBER:
21         Q.   And I'm going to mark as
22    Exhibit 24, a document which I will
23    represent to you I created.  It may have
24    errors on it.  I hope it doesn't.

Page 408

1          MS. CURRY: Do you have
2     copies of that?
3     BY MS. GARBER:
4          Q.   Doctor, what I've attempted
5     to do is to show the results for talcum
6     powder product and ovarian cancer results
7     of the meta-analyses.
8          A.   Mm-hmm.
9          Q.   And I've listed there the
10    meta-analyses and the pooled study.
11    The -- as you see study type, the Berge
12    study indicates it's a pooled study.
13         All of those odds ratios are
14    within the vicinity of 1.22 to 1.35.
15         Do you see that?
16         A.   Yes.
17         MS. CURRY:  Object to the
18    form.
19    BY MS. GARBER:
20         Q.   And those are discrepant
21    results?
22         A.   I wasn't speaking about the
23    strength of association.  I think you
24    assumed that.

Page 409

1          I was referring to, there's
2     discrepancies between what tumors were
3     increased and which ones weren't.  For
4     example, Penninkilampi, I believe, found
5     serous and endometrioid but not mucinous
6     or clear cell.  Berge found serous only.
7     Terry found -- I don't even think Terry
8     broke it down by...
9          So there's discrepancies in
10    results.  I wasn't referring to the
11    strength of association.
12         Q.   Okay.
13         A.   We spent a fair amount of
14    time earlier talking about the levels of
15    overlap in some of the meta-analyses.
16         Q.   We're going to give you a
17    chance to talk about those in a second,
18    Doctor.
19         A.   Sure.
20         Q.   With regard to talcum powder
21    products and serous ovarian cancer in the
22    meta-analyses, the Taher paper, the
23    Penninkilampi paper and the Berge paper
24    are all within 1.24 to 1.38.  Do you

103 (Pages 406 to 409)

Kevin Holcomb, M.D.

Page 410

1  agree with that?
2      A.  Can we talk -- we spoke
3  earlier about the overlap in the number,
4  the studies on these three studies --
5      Q.  Doctor, I --
6      A.  -- so it would be strange
7  for the same study design to come out
8  with discrepant results when they are
9  looking at largely the same studies.
10     So yes, the -- the point
11 that these are showing consistency is not
12 going towards proving causality.  Because
13 you would just expect that if you
14 subjected the same studies to this study
15 design, you really should come up with
16 very similar results.
17     Q.  So you agree then, Doctor,
18 that the meta-analyses both with
19 epithelial ovarian cancer and serous
20 ovarian cancer are consistent, correct?
21     MS. CURRY:  Object to the
22 form.
23     THE WITNESS:  I believe they
24 are very similar studies.

Page 411

1  BY MS. GARBER:
2      Q.  Is the answer to my question
3  yes?
4      A.  Yes.  I believe that when
5  you examine the same studies you will get
6  very similar answers.
7      Q.  With regard to your
8  criticisms of the Penninkilampi paper,
9  did you write the journal voicing your
10 concerns about this study?
11     A.  No.
12     Q.  Did you attempt to contact
13 the study authors?
14     A.  No.
15     Q.  And you indicate in your
16 expert report that the study authors in
17 Penninkilampi should have included the
18 Gates study instead of the Gertig 2000
19 study; is that correct?
20     A.  Yes.
21     Q.  And there are other study
22 authors that we've seen that have
23 included Gertig rather than Gates 2010,
24 correct?

Page 412

1      A.  It's a mistake then that's
2  not only made by Penninkilampi.
3      Q.  Right.  The -- you have not
4  performed a meta-analysis yourself, have
5  you?
6      A.  No, I have not.
7      Q.  And you certainly do not
8  have any evidence, do you, Dr. Holcomb,
9  that would support your contention that
10 if the study authors had used Gates 2010
11 instead of Gertig, it would have changed
12 the outcome?
13     MS. CURRY:  Object to the
14 form.
15     THE WITNESS:  I'm not so
16 sure about that.
17 BY MS. GARBER:
18     Q.  You would be speculating,
19 wouldn't you, because you haven't done
20 that study, right?
21     MS. CURRY:  Object to the
22 form.
23     THE WITNESS:  But that
24 wasn't your question.  Can you

Page 413

1  repeat your question?
2  BY MS. GARBER:
3      Q.  Sure.  I'll ask it this way.
4      A.  No, I wanted you to repeat,
5  because I -- you're saying speculation,
6  but I believe you asked me to speculate.
7      Q.  Sure.  I'll ask you a better
8  question.
9          You have not performed a
10 meta-analysis using the Gates rather than
11 the Gertig for the ever use with
12 epithelial ovarian cancer, true?
13     A.  As I stated earlier I have
14 not performed any meta-analysis, so that
15 would be true for that specific question
16 as well.
17     Q.  And there are no study
18 authors that have indicated it's a
19 mistake to include Gertig rather than
20 Gates 2010, correct?
21     MS. CURRY:  Object to the
22 form.
23 BY MS. GARBER:
24     Q.  In other words, Health

104 (Pages 410 to 413)

Kevin Holcomb, M.D.

Page 414

1    Canada didn't say that, did they?
2        A.   Health Canada included
3    Gates, so they didn't make the mistake.
4        Q.   But they didn't say it was a
5    mistake for other study authors to
6    include --
7        A.   The fact that they didn't
8    make the same mistake, I've got to
9    believe that they thought it was
10   worthwhile to include the study.  So yes,
11   they thought it was a mistake not to
12   include it.  They included it.
13       Q.   Well, they didn't say it was
14   a mistake, did they?
15       A.   Because they did it.  Why
16   would they --
17       Q.   Doctor, you are speculating,
18   aren't you?
19           MS. CURRY:  Object to the
20       form.
21   BY MS. GARBER:
22       Q.   As -- as we talked about
23   earlier --
24           MS. SHARKO:  Was that a

Page 415

1        question the doctor should answer?
2    BY MS. GARBER:
3        Q.   Did you answer my question?
4        A.   I'm a little confused if you
5    can repeat.
6        Q.   I'll just withdraw and move
7    on.
8            Doctor, the exposure for
9    Gertig was ever/never, right?
10       A.   Right.
11       Q.   And the exposure for Gates
12   was not ever/never, was it?
13       A.   No.
14       Q.   And so let's look at
15   Penninkilampi, if we could.  Page 46,
16   figure A.
17           Do you see where I am?
18   Figure 2-A.
19       A.   I'm sorry, 2-A?  I'm looking
20   at -- oh, I'm looking at Table 2.  46.
21   Sorry.
22       Q.   It's on Page 46.
23       A.   Yes.
24       Q.   And -- do you see where I

Page 416

1    am?
2        A.   I'm looking at A, yes.
3        Q.   Yeah, okay.  Very good.  And
4    with the legend below, it indicates that
5    2-A is any perineal talc use, right?
6    That's a ever/never metric, right?
7        A.   That's what they say down
8    here, yes.
9        Q.   Right.  And as we see, Gates
10   is not an ever/never, is it?
11       A.   Neither is Wu, et al., 2015
12   and they included that --
13       Q.   I thought you might say
14   that.  Let's look at Wu.  Or let's look
15   at what Penninkilampi says about Wu.
16       A.   Okay.
17       Q.   Let's go to Page 43 of the
18   Penninkilampi paper.  And here in the
19   middle of the paragraph.
20           Do you see where I am?
21       A.   Yes.
22       Q.   It says, "Note that the Wu,
23   et al., 2015 include results from Wu
24   2009.  However, only Wu, et al., 2009,

Page 417

1    reported on non-perineal talc use total
2    lifetime applications and long-term talc
3    use, hence data were extracted from Wu
4    2015 for any perineal use outcome from
5    the Wu, et al., 2009, for the" -- "for
6    the three other outcomes previously
7    mentioned."
8            So the authors in
9    Penninkilampi were trying to keep the
10   data consistent and keep with ever/never
11   exposure, not change the metric, right,
12   Doctor?
13       A.   Give me one -- give me one
14   second just read that.  Note that Wu, et
15   al...
16           MS. CURRY:  Object to the
17       form.  And do you have a copy of
18       Wu 2015?  Do you have a copy of
19       the Wu 2015 paper?
20           MS. GARBER:  I may.  I don't
21       know if I'm going to use it.  You
22       can if you'd like.
23   BY MS. GARBER:
24       Q.   Doctor, should we go off the

105  (Pages 414 to 417)

Kevin Holcomb, M.D.

Page 418

1    record while you read that?
2        A.   Well, I guess I don't -- I'm
3    trying to figure out, is he saying that
4    he only looked at the patients in Wu 2015
5    that were actually included in the Wu
6    2009 for that --
7        Q.   Doctor, if you don't
8    understand what the authors are saying --
9        A.   I don't.
10       Q.   -- we'll just move on.
11       A.   Yeah, I don't understand.
12       Q.   Okay.  All right.  Let's
13   move on.
14       A.   Because it seems to me that
15   he would only include Wu 2009.
16       Q.   Doctor, I don't have a
17   question pending.
18       A.   If Wu 2009 only had the ever
19   use, why have Wu 2015 cited if you only
20   used the patients on 2009?
21           MS. GARBER:  Objection to
22       strike as nonresponsive.
23   BY MS. GARBER:
24       Q.   Doctor, I did not have a

Page 419

1    question pending.
2           Are you aware, Doctor, that
3    the Health Canada considered the
4    collective meta-analyses in coming to
5    their causal opinion regarding genital
6    talc and risk of ovarian cancer?
7        A.   Yes.
8           MS. CURRY:  Object to the
9        form.
10   BY MS. GARBER:
11       Q.   And are you aware that the
12   IARC 2010 considered the meta-analyses
13   that were then available at the time in
14   coming to their findings regarding talc
15   and its carcinogenicity?
16       A.   Yes.
17       Q.   And what was Health Canada's
18   conclusion about talc and risk of ovarian
19   cancer?  Did they come to a causal
20   opinion?
21           MS. CURRY:  Object to the
22       form.
23           THE WITNESS:  My memory was
24       that they said it's possibly --

Page 420

1        they were similar to IARC,
2        possibly a carcinogen.
3    BY MS. GARBER:
4        Q.   Health Canada?
5        A.   Yes.
6        Q.   Okay.  Let's look at Health
7    Canada.
8        A.   Sure.  I have it open.
9        Q.   Doctor, if you can turn to
10   Page 21, and right above 6.2, exposure
11   assessment, it indicates, "The most
12   recent meta-analysis detailed above,
13   Taher 2018, and consistent with the Hill
14   criteria suggest a small but consistent
15   statistically significant positive
16   association between ovarian cancer and
17   perineal talc exposure.  Further
18   available data are indicative of a causal
19   effect."
20           Did I read that correctly?
21       A.   Yes.  Apparently they
22   disagree with IARC.
23       Q.   They looked at more data
24   than IARC looked at, didn't they?

Page 421

1        A.   I'll tell you, I'm not -- I
2    have to tell you that they do say causal
3    effect here.  And yet if I have time to
4    read through this, I can show you where
5    they say it's a possible carcinogen.
6           And I'm not sure how you can
7    say that something is a possible
8    carcinogen and that it is causative of
9    cancer in the same paper.
10          But if you can give -- if
11   you give me the time I can show you where
12   it says it's a possible carcinogen.
13          MS. GARBER:  Let's take a
14       break.
15          THE VIDEOGRAPHER:  Okay.
16       The time -- the time is 5:01 p.m.
17       Off the record.
18          (Short break.)
19          THE VIDEOGRAPHER:  We are
20       back on the record.  The time is
21       5:22 p.m.
22   BY MS. GARBER:
23       Q.   Just so I'm clear, Doctor,
24   it's your opinion that there is no

Kevin Holcomb, M.D.

Page 422

 1    biologically plausible mechanism by which
 2    talc powder products can translocate or
 3    migrate from the perineum to the
 4    fallopian tubes and ovaries in your
 5    opinion?
 6        A.   I want to make sure I'm
 7    understanding the question.  I -- there
 8    is no expelling evidence that I've seen
 9    that has the ability to do it.  So I'm
10    not ask -- I'm not sure if you're asking
11    is it just possible or is it -- is any
12    evidence to suggest that it can happen.
13        Because if -- if you're
14    saying is it possible, I'd have to say
15    yes.  If you're saying is there any
16    evidence suggesting it could happen, I
17    would have to say no.
18        Q.   Doctor, is there a
19    biologically plausible mechanism by which
20    talcum powder products can translocate
21    from the perineum to the fallopian tubes
22    and ovaries in your opinion?
23        A.   I would have to say it would
24    be unlikely that -- that the female

Page 423

 1    genital tract, while open, for obvious
 2    reasons has developed many mechanisms to
 3    keep particulate matter and foreign
 4    bodies from ascending into the peritoneal
 5    cavity.
 6        So I would say it's -- it's
 7    not plausible to me.
 8        Q.   You've seen study data that
 9    would indicate that -- strike that.
10        You have seen study authors
11    who have concluded the opposite, that
12    there is a biologically plausible
13    mechanism by which talc can -- talcum
14    powder products can translocate from the
15    perineum to the fallopian tubes and
16    ovaries, right?
17        MS. CURRY:  Object to the
18    form.
19        THE WITNESS:  I'm assuming
20    you -- I'm assuming you struck
21    your original question because
22    they are making the statements
23    with no data.  And so no, I've
24    never seen any data suggesting it

Page 424

 1    can happen.
 2        But people hypothesizing,
 3    yes, I've seen that.
 4    BY MS. GARBER:
 5        Q.   You've seen study authors
 6    who conclude that, right?
 7        A.   I have seen study authors
 8    who hypothesize it.  You can't conclude
 9    it without any studies showing it.
10        (Document marked for
11        identification as Exhibit
12        Holcomb-25.)
13    BY MS. GARBER:
14        Q.   I'm going to mark as
15    Exhibit 25 a document which I'll
16    represent to you is an FDA letter dated
17    April 1st, 2014.
18        And, Doctor, this document
19    appears on your reference list, doesn't
20    it?
21        A.   Yes.
22        Q.   And if we could turn to
23    Page 5 in the middle of the page where
24    the --

Page 425

 1        A.   I'm sorry, give me one
 2    second.  5 -- Page 4 -- 5.  Mm-hmm.
 3        Q.   Where -- in the middle of
 4    the document where the first word is
 5    while.
 6        Do you see where I am?
 7        A.   No.  I'm sorry.  Can -- can
 8    we use the --
 9        Q.   Right here in the middle,
10    where it says while.
11        A.   Give me one second, ma'am.
12    Give me one second.  Yes.
13        Q.   "While there exists no
14    direct proof of talc and ovarian
15    carcinogenesis, the potential for
16    particulates to migrate from the perineum
17    and vagina to the peritoneal cavity is
18    indisputable."
19        Do you agree with that?
20        A.   No.  This is an example of
21    what I was saying earlier.  Someone
22    making a very, very strong statement.
23    Indisputable, and yet there's no studies
24    showing that perineal talc can make it to

Kevin Holcomb, M.D.

Page 426

1    the ovaries. And yet Dr. Epstein is
2    saying it's indisputable.
3        So that's not a judgment
4    call. That's not reasonable doctors
5    having different opinions. That's just
6    wrong. It can't be indisputable without
7    a single study showing its ability.
8        Q.    You -- you disagree with FDA
9    on the issue of migration being
10   indisputable, correct?
11       A.    No, I -- I disagree with
12   Dr. Epstein.
13       Q.    And this letter comes from
14   FDA, right?
15       A.    Written by Dr. Epstein,
16   right?
17       Q.    Right. And --
18       A.    I'm sorry, no, it's written
19   by -- it seems to be written by Steven
20   Musser.
21       Q.    Right. It's written to
22   Dr. Epstein.
23       A.    It's written to Dr. -- so I
24   guess I'm disagreeing with Steven M.

Page 427

1    Musser, Ph.D., who I -- I don't even know
2    what area of practice he's -- he's the
3    director of operations for Center of Food
4    Safety and Applied Nutrition.
5        I -- I don't know if he
6    knows more about the female genital tract
7    than I do, but my -- my guess is probably
8    not. And if he's calling it indisputable
9    in the absence of any study showing that
10   it happens, that by definition is just
11   wrong.
12       Q.    Doctor, you would agree,
13   would you not, that in the Health Canada,
14   the study authors, as part of the
15   Bradford Hill have concluded that there
16   is a biologically plausible mechanism by
17   which talcum powder products can migrate
18   from the perineum to the ovaries?
19       MS. CURRY: Object to the
20   form.
21       THE WITNESS: I'd have --
22   I'd have to read through it again.
23   Can you point it to me?
24   BY MS. GARBER:

Page 428

1        Q.    You don't recall that?
2        A.    No. If you can just point
3    it out to me again.
4        Q.    Just so I'm clear, you
5    disagree with the position of the FDA as
6    indicated in the April 1st, 2014, paper
7    on migration, right?
8        A.    I'm -- I'm disagreeing again
9    with a Dr. Steven Musser, Ph.D., who is
10   the deputy director for Scientific
11   Operation Center For Food Safety and
12   Applied Nutrition. That's who I'm
13   disagreeing with.
14       Q.    So going back to the Health
15   Canada which we've previously marked as
16   Exhibit 11.
17       Do you see starting at
18   Pages 19 through 21, the study authors of
19   the Health Canada assessment are
20   analyzing the scientific evidence in the
21   context of the Bradford Hill criteria?
22       A.    Is there a specific area
23   you'd like me to read or?
24       Q.    No.

Page 429

1        Do you -- do you see that
2    that's what that portion of the document
3    is doing? It's an analysis of the
4    evidence in the context of the Bradford
5    Hill criteria.
6        Is that true?
7        A.    They are addressing
8    translocation in this section. I -- I
9    assume that's part of a larger...
10       Q.    Doctor, is -- is strength of
11   the association a criteria of Bradford
12   Hill?
13       A.    Yes.
14       Q.    And consistency is a
15   criteria of Bradford Hill?
16       A.    Yes. Which makes me think
17   I'm looking at a different page.
18       I'm sorry, which page are
19   you on?
20       Q.    19 through 20.
21       A.    19.
22       Q.    Specificity as an aspect
23   of --
24       A.    Oh, down at the bottom. I'm

108 (Pages 426 to 429)

Page 430

```
 1    sorry.  I was looking someplace else.
 2           If you can just give me some
 3    idea when we turn the page, if you're
 4    talking top or bottom, I can probably get
 5    there faster.
 6      Q.   Doctor, Pages 19 through 21,
 7    the authors of Health Canada are
 8    analyzing the scientific evidence in the
 9    context of the Bradford Hill aspects or
10    criteria, are they not?
11      A.   Yes.
12      Q.   Thank you.  And if you turn
13    to Page 20 -- sorry, Page 21, under the
14    heading of "Biologic Plausibility."  You
15    agree that that's one of the aspects of
16    Bradford Hill, right?
17      A.   Yes.  And the first line
18    they have is, "Particles of talc are
19    hypothesized to migrate into the pelvis."
20    And that's very different from the
21    statement of the other doctor who said
22    it's indisputable.
23           MS. GARBER:  Motion to
24      strike as nonresponsive.
```

Page 431

```
 1    BY MS. GARBER:
 2      Q.   Doctor, did I ask you a
 3    question?
 4      A.   No.
 5      Q.   Should I get my time back
 6    that you just wasted?
 7      A.   It's a small amount of time.
 8           MS. CURRY:  Object to the
 9      form.
10    BY MS. GARBER:
11      Q.   All day long it's not a
12    small amount of time, is it, Doctor?
13           So let me ask you this,
14    under the biologic plausibility section
15    of the Bradford Hill analysis as
16    conducted by Health Canada, the study
17    authors indicate that, "Particles of talc
18    are hypothesized to migrate into the
19    pelvis and ovarian tissue, causing
20    irritation and inflammation."
21           I read that correctly,
22    right?
23      A.   Yes.
24      Q.   The authors go on to say,
```

Page 432

```
 1    "The presence of talc in the ovaries has
 2    been documented," and they cite to the
 3    Heller 1996 paper, correct?
 4      A.   True.
 5      Q.   And they go on to say, "This
 6    evidence" -- "This evidence of retrograde
 7    transport supports the biologic
 8    plausibility of the association between
 9    perineal talc application and ovarian
10    exposure; however, the specific
11    mechanisms in the cascade of molecular
12    events by which talc cause ovarian cancer
13    have not been identified."  And then they
14    cite to Taher 2018.
15           Did I read that correctly?
16      A.   You read it correctly, yes.
17      Q.   And Doctor, the Saed 2019
18    paper does, in fact, provide the
19    molecular events by which talc can cause
20    ovarian cancer.  Can we agree with that?
21           MS. CURRY:  Object to the
22      form.
23           THE WITNESS:  No.
24    BY MS. GARBER:
```

Page 433

```
 1      Q.   Okay.  You have read the
 2    Saed 2019 paper now?
 3      A.   I have.
 4      Q.   Not at the time of your
 5    report, but you have?
 6           MS. CURRY:  Object to the
 7      form.
 8           THE WITNESS:  I have.
 9    BY MS. GARBER:
10      Q.   Did it provide a molecular
11    basis by which talc can cause ovarian
12    cancer?
13      A.   It proposed a theory without
14    proving it.  So when you say provide, I'm
15    assuming you mean that it proposed a
16    theory and then showed that that -- that
17    molecular change actually transformed
18    cells and causes cancer.
19      Q.   You used the word "prove."
20    So the study provided statistically
21    significant findings of an association in
22    support of the experiment hypothesis,
23    correct?
24      A.   I disagree.
```

109 (Pages 430 to 433)

Kevin Holcomb, M.D.

Page 434

1        MS. CURRY:  Object to the
2   form.
3        THE WITNESS:  I disagree.
4   If the hypothesis is to say that
5   inflammation was the cause of
6   ovarian cancer, and in your study
7   you prove something like CA-125
8   goes up, and you consider that
9   proof of your hypothesis, I'd have
10   to say that's not the case.
11   BY MS. GARBER:
12        Q.   Doctor, was that the only
13   finding of the Saed 2019 paper?
14        A.   I'd be happy to look at the
15   rest of it.
16        Q.   Well, you seem to remember
17   the CA-125 that was a corollary finding,
18   wasn't it?
19        MS. CURRY:  Object to the
20   form.
21        THE WITNESS:  If you have
22   the paper, again, I'd be happy to
23   look at the others.
24   BY MS. GARBER:

Page 435

1        Q.   Can you think of any other
2   molecular findings that were reported?
3        A.   I remember --
4        Q.   For instance ROS or NOS
5   increasing with talc application?
6        MS. CURRY:  Object to the
7   form.
8        THE WITNESS:  I remember --
9   and again, if you have the paper
10   I'd rather look at it again.  But
11   I remember him making a statement
12   that reactive oxygen species
13   actually went up in the presence
14   of talc when in fact they were
15   actually lower than the controls
16   except for one concentration.
17        And then with the next
18   concentration, it actually went
19   back down.  And yet, he concluded
20   that reactive oxygen species was
21   actually going up.
22   BY MS. GARBER:
23        Q.   What was the conclusion of
24   the study authors in that paper, by way

Page 436

1   of --
2        A.   I'd have to look at it
3   again.
4        Q.   Okay.  And we'll do that.
5        So you see at the end of the
6   Bradford Hill analysis and the Health
7   Canada assessment, the authors conclude
8   that the data are indicative of a causal
9   effect, right?
10        A.   That's what they state, yes.
11        Q.   And so the authors have
12   found that there is a biologically
13   plausible mechanism by which talc can
14   migrate and talc can induce inflammation,
15   correct?
16        MS. CURRY:  Object to the
17   form.
18        THE WITNESS:  The authors
19   believe that Heller's findings are
20   evidence of retrograde
21   translocation of talc.
22        And that is a big
23   assumption.  And so I can
24   understand how they would put

Page 437

1   those things together.  But
2   there's no proof in Heller's study
3   where the talc particles came
4   from.
5        And so they're saying this
6   evidence of retrograde transports
7   supports biologic plausibility.
8   They cite a study that doesn't
9   prove retrograde transport and
10   says that is what I'm using to
11   support what I believe is
12   biologically plausible.
13        So yes, these authors are
14   making a statement and then citing
15   to something that never examined
16   retrograde transport.
17   BY MS. GARBER:
18        Q.   Doctor, you have not
19   reviewed the Zervomanolakis or the Kunz
20   paper with regard to genital tract
21   peristalsis, have you?
22        A.   No.
23        Q.   Are you aware that there is
24   retrograde genital tract peristalsis

Kevin Holcomb, M.D.

Page 438

1  during the woman's cycle?
2       MS. CURRY:  Object to the
3  form.
4       THE WITNESS:  Yes.  Of
5  course I am.  Does that mean that
6  talc is able to retrograde
7  translocate?  I'm not sure.  This
8  is what often happens.  People
9  cite studies that don't prove what
10  the -- the point that they're
11  trying to make.
12  BY MS. GARBER:
13       Q.   Okay.  There's been data
14  that have shown that particulate in a
15  woman's genital tract can travel
16  retrograde from the vagina to the
17  fallopian tubes and the ovaries, correct?
18  You are aware of this data?
19       A.   If you put her -- if you put
20  her in the lithotomy position and give
21  her a little oxytocin and -- yes, under
22  those very unnatural conditions, there's
23  studies supporting that.
24       What I'm saying is I don't

Page 439

1  see a single study -- and maybe you can
2  quote one for me -- where they dusted the
3  perineum of women and shown that that
4  talc gets to the ovaries.
5       Q.   Based on what we know about
6  talc and its carcinogenicity that would
7  be an unethical study to conduct at this
8  point, wouldn't it?
9       MS. CURRY:  Object to the
10  form.
11       MR. MIZGALA:  Object to the
12  form.
13       THE WITNESS:  Not if -- I
14  would say not for a woman who's
15  currently using talc.
16  BY MS. GARBER:
17       Q.   Doctor, you would agree with
18  me, wouldn't you, that there are study
19  authors, peer-reviewed studies authors, and
20  in addition Health Canada, who have
21  concluded that there is a biologically
22  plausible mechanism by which talc can
23  migrate from the genitals to the ovaries,
24  true?

Page 440

1       A.   True.  And I've explained
2  exactly how they make that connection.
3       Q.   Thank you.
4       Let's talk about
5  inflammation.  You are aware that there
6  is study data and peer-reviewed studies
7  that indicate a biologically plausible
8  mechanism by which talc can induce
9  inflammation, correct?
10       A.   Is there a specific --
11       MS. CURRY:  Object to the
12  form.
13       THE WITNESS:  -- study you'd
14  like to review?
15  BY MS. GARBER:
16       Q.   No, I'm just asking you,
17  have you seen peer-reviewed studies that
18  indicate talc can induce inflammation?
19       A.   I have not seen studies that
20  I've read that I've been convinced.  If
21  you have a specific study that you'd like
22  to review, I'm happy to go over --
23       Q.   Have you seen the Ness data?
24  Either '99 or 2000?

Page 441

1       A.   I did -- it's on my reliance
2  list.  If we can pull it out I'd be glad
3  to go through it again with you.
4       Q.   Did the Ness authors
5  conclude that there was a biologically
6  plausible mechanism by which talc can
7  induce inflammation?
8       A.   Again, I'd be happy to read
9  the paper if you have it.
10       Q.   You're not sure?
11       MS. CURRY:  Object to the
12  form.
13       THE WITNESS:  Oh, I don't
14  remember everything off my
15  reliance list off the top of my
16  head, no.
17  BY MS. GARBER:
18       Q.   Doctor, is it your opinion
19  that -- is it your opinion that there is
20  not a biologically plausible mechanism to
21  support talc can migrate from the
22  genitals to the ovaries and tubes because
23  of the tubal ligation data?
24       MS. CURRY:  Object to the

111 (Pages 438 to 441)

Kevin Holcomb, M.D.

Page 442

1    form.
2        THE WITNESS:  Please repeat
3    that again.
4    BY MS. GARBER:
5        Q.  Sure.
6        Do you base your opinion
7    that talcum powder products don't migrate
8    to the ovaries based on tubal ligation
9    and hysterectomy data?
10        MS. CURRY:  Object to the
11    form.
12        THE WITNESS:  No.  I base
13    the fact that I don't have any
14    proof of talc being able to
15    migrate to the ovaries under
16    normal situations.  The tubal
17    ligation data and the
18    inconsistency of its protective
19    impact makes me question even
20    further.
21    BY MS. GARBER:
22        Q.  Doctor, if you could pull
23    out Taher 2018, Page 2.  Do you see under
24    the results there --

Page 443

1        A.  I'm sorry -- Page 2.
2        Q.  -- that the study authors
3    indicate that the most recent
4    meta-analysis found a negative
5    association with tubal ligation.  That's
6    what the authors say, right?
7        A.  This is an unpublished,
8    un-peer-reviewed paper.
9        Q.  That's what the authors say
10    in this paper, true?
11        A.  In this unpublished
12    un-peer-reviewed paper, yes.
13        Q.  That's what the authors say,
14    right?
15        A.  In this unpublished
16    peer-reviewed paper, correct.
17        Q.  Turn to Page 33 please,
18    Doctor.  That the first full -- second
19    full paragraph.  It indicates, "Women
20    with prior ligation of the fallopian
21    tubes showed a significant reduction in
22    risk," and then they cite a statistically
23    significant odds ratio, right, against
24    ovarian cancer?

Page 444

1        A.  I'm assuming this is the
2    results of the meta-analysis that hasn't
3    been published?
4        Q.  Yes.
5        A.  Yes, that's what they say.
6        Q.  All right.  And then a
7    couple lines down it says, "This might be
8    attributed to the fact that tubal
9    ligation is usually performed at an
10    earlier age, thus preventing entry of
11    talc into the reproductive tract earlier
12    and prolonged exposure to talc, compared
13    to hysterectomy that is performed later
14    in life where higher exposure has already
15    taken place."
16        It goes on to say, "In a
17    recent meta-analysis," and then it cites
18    70, "The authors reported a negative
19    association with tubal ligation and
20    hysterectomy with risk of ovarian
21    cancer."
22        Did I read that correctly?
23        A.  Yes, you've read everything
24    very well so far.

Page 445

1        Q.  All right.
2        A.  It's that private schooling.
3        Q.  And -- and the authors go on
4    to say as to the study that the authors
5    there stated a highly plausible mechanism
6    for the association --
7        A.  I'm sorry -- yes.  As
8    suggested by the author.  Suggested.
9        Q.  Right.  "Involving the
10    blocking of ascent of such agents such as
11    talc to the ovaries."
12        Again, you disagree with
13    these study -- with these two study
14    authors that indicate that talc can
15    ascend the female genital tract, right?
16        A.  It is a suggestion by the
17    authors.  It's not a proven point.  These
18    are conjecture and theory by those
19    authors.  And, yes, I would say
20    apparently my bar is a little bit higher.
21    I would like to see a study where you
22    actually put talc on the perineum the way
23    people put talc on the perineum and show
24    that it gets to the ovaries.  So, yes.

112 (Pages 442 to 445)

Kevin Holcomb, M.D.

Page 446

1       And -- and I find, outside
2   of this unpublished meta-analysis, when
3   you get to the individual studies it
4   becomes much less consistent on this
5   protective impact of tubal ligation with
6   regard to talc.
7           MS. GARBER:  Objection.
8       Motion to strike as nonresponsive.
9   BY MS. GARBER:
10      Q.   Doctor, if you could turn
11  back to Health Canada and Page 18.  And
12  I'll just point to where I'm reading,
13  Doctor.  Right here.
14          Do you see where I am?
15      Doctor, it reads:  "There is
16  support for an association of
17  inflammation and increased risk of
18  ovarian cancer."  And it cites to the
19  National Academy of Sciences, Engineering
20  and Medicine in 2016 in the Rasmussen
21  paper.
22          Doctor, that's what these
23  study authors who did an analysis --
24      A.   Can -- can -- I'm sorry,

Page 447

1   I'll let you finish.
2       Q.   -- concluded about the mode
3   of action, correct?
4           MS. CURRY:  Object to the
5       form.
6           THE WITNESS:  Yes, and
7       interestingly, I -- I would be
8       glad to look at the Rasmussen
9       paper.  I believe it was actually
10      a paper that was negative, that
11      there was a paper that didn't show
12      a reduce in the risk of ovarian
13      cancer with -- with
14      antiinflammatories.
15  BY MS. GARBER:
16      Q.   And, Doctor, I'm glad you
17  mentioned antiinflammatories.  Because is
18  the other basis for your opinion that
19  talc, while it increases inflammation,
20  doesn't cause ovarian -- talcum powder --
21  strike that.
22          Another basis for your
23  opinion that talcum powder products do
24  not cause ovarian cancer based on the

Page 448

1   fact that the NSAID data do not support
2   reduction of risk of ovarian cancer?
3           MS. CURRY:  Object to the
4       form.
5           THE WITNESS:  The main
6       reason why I hold that opinion is
7       because I have seen no evidence of
8       chronic inflammation in the
9       genital tract from perineal use of
10      talc.
11          In the Heller study, in the
12      case that they looked for evidence
13      of clinical information, and --
14      and we know what it looks like
15      with talc, because there's years
16      of using it in pleurodesis, it
17      causes granulomas.
18          I -- we -- we present every
19      STIC lesion, a serous tubular
20      intraepithelial carcinoma at
21      Cornell.  We present it as part of
22      our tumor board.  And so I've seen
23      a lot of STIC lesions.  I've seen
24      a lot of p53 signatures.

Page 449

1           I've not ever seen a case
2   with a granuloma or any evidence
3   of granulomatous inflammation or
4   any other sort of inflammation,
5   and so that's the real -- the --
6   the other thing that you're
7   mentioning, the inconsistency of
8   whether antiinflammatories reduce
9   the risk of ovarian cancer just
10  further confirms my -- my belief.
11          But it's really the fact
12  that I've seen the precursor
13  lesion for high grade serous
14  carcinoma, and I've never seen it
15  in conjunction with any evidence
16  of granulomatous inflammation.
17  BY MS. GARBER:
18      Q.   Okay.  Let's take both of
19  those, because I think you mentioned two
20  different things there.
21          As to what you see when you
22  look at the tissue pathology, -- that's
23  what you're referencing, right, what
24  you're seeing microscopically in the path

113 (Pages 446 to 449)

Kevin Holcomb, M.D.

Page 450

1    slides?
2        A.   Yes.
3        Q.   And --
4        A.   I would argue in -- in
5    ovarian cancer cases as well, I don't see
6    granulomas.
7        Q.   You mean macroscopically
8    when you're doing surgery?
9        A.   No, I mean microscopically.
10   I also scrub out and look at all my
11   frozen sections.  And we present every
12   new patient in a multi-disciplinary tumor
13   board where we look at the slides.  So
14   there's not an ovarian cancer patient
15   that I take care of that I haven't seen
16   her histologic slides.
17       Q.   Have you seen testimony
18   where there is -- strike that.
19            Have you seen data that
20   would suggest that you're not seeing
21   evidence of acute inflammation because
22   the talc and its effects have been
23   subsumed by tumor?  In other words,
24   that's a snapshot in time when there's

Page 451

1    carcinogenic transformation, and what
2    you're seeing over here years later
3    you're not going to see the evidence of
4    the chronic inflammation, correct?
5            MS. CURRY:  Object to the
6    form.
7            THE WITNESS:  Maybe you
8    misunderstood my description of
9    what we do.  I said look at every
10   invasive cancer and we present
11   every STIC.
12            And so that's precancer.
13   That is a precursor to high grade
14   serous ovarian cancer.  And now we
15   believe there's a p53 signature
16   that's even earlier.  And I will
17   tell you that I've never seen any
18   evidence of inflammation in any of
19   those lesions, nor have I read of
20   anybody showing granulomatous
21   inflammation in any of those
22   lesions.
23            So you may believe it
24   disappears later.  I'm saying even

Page 452

1    at the time of precancer, I've not
2    seen it.  And if it's not there in
3    the precancerous phase, when was
4    it there?
5    BY MS. GARBER:
6        Q.   Is it your opinion that all
7    epithelial ovarian cancers begin in the
8    fallopian tube?
9        A.   No.
10       Q.   Okay.  Let's talk about the
11   NSAIDs, the NSAID data.
12            You've looked at some
13   studies about NSAIDs and their effect
14   upon the risk of --
15       A.   Yes.
16       Q.   -- ovarian cancer right?
17       A.   Yes, I have.
18       Q.   Would you agree with me that
19   the aspirin data seem to indicate a
20   decreased risk in ovarian cancer?
21            MS. CURRY:  Object to the
22   form.
23            THE WITNESS:  I'm not sure
24   if that's consistent in every --

Page 453

1    in every study.  I just want to
2    get to my report in that area, if
3    that's okay.
4    BY MS. GARBER:
5        Q.   Okay.  Doctor, shall we go
6    off the record?
7        A.   You can.  It's not going to
8    take me long.
9            THE VIDEOGRAPHER:  The time
10   is 5:49.  Going off the record.
11       (Brief pause.)
12            THE VIDEOGRAPHER:  The time
13   is 5:49 p.m.  Back on the record.
14            THE WITNESS:  So Bonovas, et
15   al., is a meta-analysis that
16   showed antiinflammatory drug use
17   did not reduce ovarian cancer.
18            Ni, et al., did a pooled
19   analysis of 13 case-control
20   studies, one clinical trial, three
21   cohort studies.  Also found no
22   efforts of an association between
23   aspirin use and ovarian cancer and
24   did not find strong evidence of an

114 (Pages 450 to 453)

Page 454

1    association between non-aspirin
2    NSAID use and ovarian cancer.
3  BY MS. GARBER:
4        Q.   Doctor, did I have a
5  question pending?
6        A.   You had asked me -- yeah.
7  You did.  That's why we went off.
8  Remember I was looking for the --
9        Q.   Okay.  Have you seen the
10 I don't know how to pronounce it --
11 Q-I-A-O, 2018, study with regard to --
12 with regard to aspirin and its effects on
13 ovarian cancer?
14       A.   I have not.
15       Q.   Have you seen Trabert 2013
16 study wherein the study authors found
17 that use of antiinflammatory aspirin was
18 associated with a reduction of risk of
19 ovarian cancer?
20       A.   I believe that --
21       MS. CURRY:  Object to the
22       form.
23       THE WITNESS:  I believe
24       that's in my -- my report that's

Page 455

1    saying -- to show the
2    inconsistencies.  I gave you two
3    examples of studies, one including
4    meta-analysis, and showing no
5    reduced ovarian cancer, and the
6    studies that you mentioned that
7    show that there was a reduction.
8  BY MS. GARBER:
9        Q.   Do you agree, Doctor, that
10 there are data on both sides for both
11 aspirin and nonsteroidal
12 antiinflammatories that go both ways?  In
13 other words, there's some data that show
14 a decreased risk of ovarian cancer and
15 some data that do not for both aspirin
16 and NSAIDs?
17       A.   I do believe that if there
18 was powerful enough data to support the
19 use of antiinflammatories to prevent the
20 deadliest GYN malignancy, this would be a
21 common recommendation for patients to
22 use.  We don't tell BRCA mutation
23 patients to take NSAIDs.  We don't tell
24 the women at the highest risk of ovarian

Page 456

1    cancer to take an NSAID, Tylenol -- well,
2    Tylenol really hasn't shown much
3    difference.  But even aspirin.
4        That's different from a
5    woman who has -- or a man who has
6    familial adenomatous polyposis.  There's
7    certain situations where the data is so
8    strong that you can prevent cancer, it's
9    actually recommended to use aspirin to
10 prevent it.  And we don't do that in GYN
11 oncology.
12       And so I'd have to ask you,
13 not only do I not believe this, but why
14 is the GYN oncology not recommending
15 NSAID and aspirin use if it is so proven
16 that it decreases ovarian cancer risk?
17 It would be --
18       MS. GARBER:  Objection.
19       Objection.  Motion to strike as
20       nonresponsive.
21 BY MS. GARBER:
22       Q.   Doctor, you're talking in
23 paragraphs, and you're not answering my
24 question.  I'm going to just ask you to

Page 457

1    indulge me, please.
2        MS. CURRY:  I disagree.
3  BY MS. GARBER:
4        Q.   My question --
5        MS. CURRY:  That was
6        directly responsive to the
7        question.
8  BY MS. GARBER:
9        Q.   My question was, do you
10 agree that there are data for aspirin and
11 NSAIDs that go both ways, they decrease
12 the risk, and other studies do not show
13 that?
14       A.   The reason why for speaking
15 in paragraphs --
16       Q.   I didn't ask you why.
17       A.   -- is because it's still
18 clearly stated in my report --
19       Q.   Doctor, I didn't ask you why
20 you're speaking in paragraphs.
21       A.   But it says so in my report.
22 And I gave you the examples.  And we just
23 went through them one by one.  I gave you
24 two examples where it did, and two

Page 458

1  examples it didn't. And then you follow
2  up a question --
3      Q.  If you're not -- if you're
4  not going to answer my question --
5      A.  Because --
6      Q.  -- I think we're going to
7  have to call the Court because we're
8  nearly done, and you're talking in
9  paragraphs and you're not responding to
10  my question.
11      A.  But you're asking --
12      MS. SHARKO:  The order
13      doesn't allow you to criticize his
14      answer.  So please stop.
15      THE WITNESS:  You're asking
16      questions that --
17      MS. O'DELL:  That's not
18      true, Susan.  Completely not true.
19      THE WITNESS:  -- have clear
20      evidence.  You're saying have I --
21      I cited in my report data that
22      went both ways.  And then you turn
23      around and ask me, do you believe
24      that data goes both ways?  And I

Page 459

1      cited.
2  BY MS. GARBER:
3      Q.  I never said in your report.
4      Do you agree that there are
5  peer-reviewed published studies on the
6  topic of anti-inflammatories, aspirin and
7  NSAIDs -- NSAIDs, that go both ways, some
8  data show a decreased risk and other data
9  do not?
10      MS. CURRY:  Object to the
11      form.
12  BY MS. GARBER:
13      Q.  Do you agree?
14      A.  I do agree.  And that's the
15  reason -- the fact that it's gone both
16  ways is the reason why we do not
17  recommend nonsteroidal use or aspirin use
18  to prevent it.
19      Q.  And Doctor, you don't
20  know -- strike that.
21      You cited on your
22  supplemental report some data that were
23  cited in the Penninkilampi paper about
24  the COX expression in epithelial ovarian

Page 460

1  cancer.
2      Do you recall that data?
3      MS. CURRY:  Object to the
4      form.
5      THE WITNESS:  Yes.
6  BY MS. GARBER:
7      Q.  Why did you cite those data?
8      A.  Couple reasons.
9  Penninkilampi, in trying to explain the
10  way exactly what were you trying to
11  explain, he's saying that I know it's
12  inconsistent, the data on nonsteroidals.
13  He's saying, I know it doesn't look in
14  support of my argument for my biologic
15  plausibility.
16      But maybe -- maybe NSAIDs
17  don't work because they don't -- they
18  only -- they prevent -- they work on COX.
19  And COX expression is low in these cells
20  anyway.  And that's why you don't see a
21  more impressive -- so he's explaining why
22  this data that you're saying is -- is as
23  unimpressive as it is.
24      And so I read in

Page 461

1  Dr. Saenz -- her deposition, she
2  mentioned some basic science research by
3  Dr. Dineo Khabele, who I happened to have
4  been a resident with back at Cornell
5  years ago.
6      And so that piqued my
7  interest.  And I was curious to see what
8  is she doing in her lab, and so I
9  actually went back and I looked at the
10  studies that she was showing to see that
11  Penninkilampi actually had misstated the
12  fact that Type 2 tumors, high grade
13  serous carcinomas, actually expressed
14  COX-1.  And Type 1 expressed COX-2.
15      So this idea that inhibitors
16  of COX, that NSAIDs, that they don't
17  work, or aspirin doesn't work because
18  there's low expression of this thing in
19  the first place, that doesn't make sense.
20  If -- if -- you'd have to explain
21  something else.
22      Maybe it doesn't make a
23  difference because ovarian cancer is not
24  caused by inflammation.

116 (Pages 458 to 461)

Kevin Holcomb, M.D.

Page 462

```
 1          Q.   You didn't read the Wilson
 2   2015 paper with regard to COX -- COX
 3   expression in epithelial ovarian tissue,
 4   did you?
 5          MS. CURRY:  Object to the
 6   form.
 7          THE WITNESS:  Whose -- whose
 8   paper?  I'm sorry.
 9   BY MS. GARBER:
10          Q.   Wilson, et al.?
11          A.   If you can show it to me I'd
12   let you know.  I don't think so.
13          MS. O'DELL:  Counsel, please
14   don't show something to the
15   witness.
16          MS. CURRY:  I'm just --
17   you're referring to -- you just
18   said Wilson 2000 --
19          MS. O'DELL:  Let me finish.
20   That's the third time --
21          MS. CURRY:  Hang on a minute
22   and let me explain.  It's not the
23   third time.
24          MS. O'DELL:  It's the third
```

Page 463

```
 1   time I've seen you do it and I
 2   haven't said anything.  But that's
 3   not appropriate --
 4          MS. GARBER:  I've seen you
 5   do it as well.
 6          MS. CURRY:  Excuse me.
 7   Excuse me.  I've pointed out where
 8   you were trying to show something
 9   on the Elmo, and he's trying to
10   find it, where it is on the
11   document to help speed things
12   along.
13          MS. O'DELL:  Those --
14          MS. CURRY:  What I just
15   referred to him -- excuse me.  Let
16   me finish speaking, please.
17          What I just pointed out was,
18   when you say Wilson 2015, it's --
19   you're not giving any further
20   information about the article.
21          So I'm pointing out that
22   it's the one on his supplemental
23   list of items considered that
24   we've produced to you today.
```

Page 464

```
 1          That's the only thing I was
 2   doing.  That is not inappropriate.
 3          MS. O'DELL:  It is
 4   inappropriate --
 5          MS. CURRY:  I disagree.
 6          MS. O'DELL:  -- and the
 7   three instances that I've referred
 8   to are not occasions when the Elmo
 9   was in use, so --
10          MS. CURRY:  Well, I think
11   you are mischaracterizing what has
12   happened today.
13          MS. O'DELL:  That is not
14   true.
15   BY MS. GARBER:
16          Q.   Doctor, is the basis for
17   your opinion that talc does not induce
18   inflammation which leads to ovarian
19   cancer based on pleurodesis data?
20          MS. CURRY:  Object to the
21   form.
22          THE WITNESS:  No.
23   BY MS. GARBER:
24          Q.   Pleurodesis does -- talc
```

Page 465

```
 1   pleurodesis has been shown to increase
 2   inflammation in pleural tissue, correct?
 3          A.   But not cancer.  Yes, it
 4   increases --
 5          Q.   That wasn't my question.
 6          A.   It increases inflammation.
 7   Does not cause cancer.
 8          So the reason why I don't
 9   think inflammation --
10          Q.   Doctor, I didn't ask you the
11   reason.  Did I?
12          A.   Oh, I'm sorry.  I thought I
13   was here to clarify my positions.  I'll
14   wait for the questions.
15          Q.   Thank you.  I really
16   appreciate that.  You've got to let me
17   get there.
18          A.   You don't get there.
19          Q.   I will if you don't stop
20   talking in paragraphs.
21          Doctor, did you read the
22   Ghio 2007 study with regard to
23   pleurodesis, talc pleurodesis?
24          A.   Can you produce it for me so
```

117 (Pages 462 to 465)

Kevin Holcomb, M.D.

Page 466

```
 1    I can let you know?
 2         Q.   I will.
 3              While she's pulling that,
 4    I'll ask you this.  You indicate that
 5    talc pleurodesis does not induce cancer,
 6    is that fair, what you said?
 7         A.   Yes.
 8         Q.   And the number one
 9    indication for talc pleurodesis is
10    malignant pleural effusions, right?
11         A.   Yes.
12         Q.   And so those patients
13    already have cancer and are likely end
14    stage, right?
15         A.   It had been used for years
16    on patients without malignancy.  The
17    reason why it's used on patients --
18         Q.   Did you say yes?
19         A.   Say this again?
20         Q.   Did you say yes to my -- to
21    my question?
22              MS. CURRY:  Objection.
23         Please don't interrupt him --
24    BY MS. GARBER:
```

Page 467

```
 1         Q.   Did you say yes to my
 2    question?  I didn't ask you for the
 3    reason.
 4         A.   Your -- your question is?
 5         Q.   Did you say yes?
 6         A.   Can you ask the question
 7    again?  I want to -- just repeat it.
 8         Q.   I said:  "And those patients
 9    have cancer and are likely end stage,
10    right?"
11              And you said:  "It has been
12    used for years on patients without
13    malignancy.  The reason --"
14              And then I said:  "Did you
15    say yes?"
16              You said?
17         A.   Yes.  In those patients that
18    have malignancy, they are likely end
19    stage.  As opposed to the patients who
20    don't have malignancy for years that has
21    been used.
22         Q.   Doctor, the title of this
23    study is "Talc Should Not Be Used For
24    Pleurodesis in Patients With Nonmalignant
```

Page 468

```
 1    Pleural Effusions."
 2              (Document marked for
 3         identification as Exhibit
 4         Holcomb-26.)
 5    BY MS. GARBER:
 6         Q.   Nonmalignant pleural
 7    effusions are what for the lay listener?
 8              MS. CURRY:  Object to the
 9         form.
10              MS. SHARKO:  What exhibit is
11    this now?
12              MS. BROWN:  26.
13              MS. SHARKO:  Pardon me?
14              MS. BROWN:  26.
15    BY MS. GARBER:
16         Q.   What's a nonmalignant
17    pleural effusion?
18         A.   A nonmalignant pleural
19    effusion is one where you have fluid
20    surrounding the lung but it's not from a
21    cancer.
22         Q.   All right.  And -- and this
23    paper is authored by Andrew Ghio and
24    Victor Roggli.
```

Page 469

```
 1              Do you see that?
 2              MS. CURRY:  Object to the
 3         form.
 4              THE WITNESS:  Yes.
 5    BY MS. GARBER:
 6         Q.   Okay.  In the first
 7    paragraph, it begins, however, it says,
 8    "However, there should continue to be
 9    concern regarding use of talc for
10    pleurodesis in individuals with
11    nonmalignant pleural effusions and
12    spontaneous pneumothorax.  This dilemma
13    results from a possible increased risk of
14    malignant mesothelioma in those patients
15    treated with talc.  Consequently, an
16    alternative agent should be employed in
17    any individual without malignancy
18    requiring pleurodesis."
19              Did I read that correctly?
20         A.   You read that correctly
21    again.
22              THE VIDEOGRAPHER:  Can
23         you -- your hair is on top of the
24         mic.
```

118 (Pages 466 to 469)

Page 470

```
 1          MS. GARBER:  Sorry.
 2          THE VIDEOGRAPHER:  Thanks.
 3    BY MS. GARBER:
 4      Q.   Doctor, do you think that --
 5    that peer-reviewed published data
 6    indicate that there is a dose-response
 7    with regard to talc and risk of ovarian
 8    cancer?
 9      A.   I believe that that's one of
10    the weaknesses is it's not consistently
11    shown.
12      Q.   But you do agree that there
13    are peer-reviewed studies which show a
14    dose-response, correct?
15          MS. CURRY:  Object to the
16    form.
17          THE WITNESS:  I've seen
18    studies that are peer reviewed and
19    published that have only two
20    levels of exposure, and one is
21    higher than the other and they
22    call that a dose-response.
23          So what I've seen in the
24    literature, people define
```

Page 472

```
 1      A.   Yeah.  I mean, I can't --
 2    I'm going to have to watch up here
 3    because it's too small.
 4      Q.   Are you there --
 5      A.   Yeah, I'm going to have to
 6    sit it here because --
 7      Q.   -- in your version?
 8          MS. CURRY:  Can I show him
 9    my version which is --
10          THE WITNESS:  I mean
11    literally, it's this.  That's
12    Table 3.  You want me to read that
13    and give you an opinion?
14          MS. GARBER:  Let me see
15    yours, Ms. Curry, if you could.
16          Yes, please show that to
17    him.  Thank you.
18    BY MS. GARBER:
19      Q.   Doctor, in the Berge study
20    it indicates that with the duration of
21    talc use greater than ten years, defined
22    as ten years, there is a statistically
23    significant relative risk, correct?
24      A.   I'm just trying to make sure
```

Page 471

```
 1    dose-response in a lot of
 2    different ways.  So I'd have to
 3    agree with you, yes.
 4          Penninkilampi does that.
 5    Two dose levels and says there's a
 6    dose-response.
 7          (Document marked for
 8    identification as Exhibit
 9    Holcomb-27.)
10    BY MS. GARBER:
11      Q.   I'm going to mark as
12    Exhibit 27 the Berge paper that you've
13    referenced many times today, Doctor.
14          And, Doctor, if you can turn
15    to -- if you can turn to -- well, in this
16    paper, unfortunately there isn't page
17    numbers.
18          And so this table is Table
19    3, and it appears about five, six pages
20    forward from the end of the document.
21    Table 3.
22      A.   Sure.
23      Q.   If you want, we can look at
24    it here.  Do you see Table 3, Doctor?
```

Page 473

```
 1    I understand what they're looking at
 2    here.
 3      Q.   That's what the table says,
 4    right?
 5      A.   Give me one second, ma'am.
 6    I'll be right with you.
 7          MS. GARBER:  Let's go off
 8    the record then.
 9          THE VIDEOGRAPHER:  All
10    right.  The time is 6:03 p.m.  Off
11    the record.
12          (Brief pause.)
13          MS. SHARKO:  For the record,
14    we object to this.  I don't think
15    it's appropriate.  I don't think
16    it's appropriate, but it's late in
17    the day, and I assume that the
18    plaintiffs are almost done in any
19    event.
20          MS. GARBER:  You're correct
21    in that regard.
22          THE VIDEOGRAPHER:  We are
23    back on the record.  The time is
24    6:04 p.m.
```

119 (Pages 470 to 473)

Kevin Holcomb, M.D.

Page 474

1    BY MS. GARBER:
2        Q.   Doctor, these data here that
3    are presented in Table 3, they show
4    duration and frequency of talc use,
5    right?
6        A.   Yes.
7        Q.   In the meta-analysis?
8        A.   Yes.
9        Q.   Correct?
10           And for the duration defined
11   as ten years, the relative risk is
12   statistically significant at 1.16, right?
13       A.   The only thing I'm not -- I
14   have to say I'm not sure what's going on
15   here, and I didn't want to hold up more
16   time.  Are they saying if you compare
17   studies in this 12-risk estimate and look
18   at someone who had less than ten years
19   use and more than ten years use, and then
20   say the relative risk between those two
21   is 1.16, and a confidence interval that
22   comes close but doesn't cross one, then
23   you're -- if it's a -- if it's just
24   splitting it in two, and say well ten is

Page 475

1    the split-off and I'm going to look at
2    less than ten and more than ten, that's
3    not a dose-response.  You can't make a
4    dose-response on just two observations.
5           And I think that may be what
6    they're doing on the second one as well.
7    But to be perfectly honest, I'm not sure.
8    I'd have to look at the methods to figure
9    out what they're doing here.  But it
10   seems like a -- like a -- basically
11   just -- what's the term I'm looking for?
12   Just two options, less than ten years,
13   more than ten years.
14       Q.   Doctor, let me ask you this.
15   Does Table 3 --
16       A.   I guess I don't understand
17   exactly what they did here.
18       Q.   Yeah.  Okay.  That's fair.
19   Does Table 3 present
20   duration and frequency of talc use that
21   present statistically significant
22   results?
23           MS. CURRY:  Object to the
24   form.

Page 476

1           THE WITNESS:  Yes.  But not
2    together.  They're saying duration
3    in one and frequency in the other.
4    So they're saying that -- but I
5    think they've just split this in
6    two.
7    BY MS. GARBER:
8        Q.   And, Doctor, if you go back
9    to the abstract, first page of this
10   study.
11       A.   Right.
12       Q.   Okay.  Second-to-last
13   sentence.  It says, "This meta-analysis
14   resulted in a weak but statistically
15   significant association between genital
16   use of talc and ovarian cancer, which
17   appears to be limited to serous carcinoma
18   with a suggestion of a dose-response."
19           Do you see that?
20       A.   Yeah.
21       Q.   Those were the authors'
22   words, right, suggestion of a
23   dose-response?
24       A.   Suggestion, yes.

Page 477

1        Q.   Okay.  And then --
2        A.   And I think they're using
3    suggestion because they just did a
4    dichotomous -- that's the word that I was
5    looking for, dichotomous -- a dichotomous
6    evaluation with just -- and you can't
7    prove a dose-response.  Because if they
8    were doing a test for dose-response, they
9    met statistical significance.  And you
10   know how much I like confidence
11   intervals.  They would say that they
12   found a dose-response.  But they're
13   saying it's a suggestion of a
14   dose-response because they didn't do that
15   sort of analysis.
16       Q.   Doctor, Health Canada
17   concluded there was a dose-response in
18   their Bradford Hill, right, under their
19   biologic gradient assessment?
20           MS. CURRY:  Object to the
21   form.
22           THE WITNESS:  I'd have to
23   look -- have to look back at that.
24   BY MS. GARBER:

120 (Pages 474 to 477)

Page 478

1    Q.   You don't remember?
2    A.   No, I don't.
3    Q.   All right.
4    A.   Can you tell me which page
5  you are talking about?
6    Q.   Can I ask you a few more
7  questions?
8         Were you provided by
9  Johnson & Johnson counsel any testing of
10 talcum powder products by Dr. Longo with
11 regard to historical samples of talcum
12 powder products?
13   A.   No.
14   Q.   Were you provided by Johnson
15 & Johnson with any internal Johnson &
16 Johnson company testing of their talcum
17 powder products for asbestos or fibrous
18 talc?
19   A.   No.
20   Q.   Were you provided with any
21 company witness testimony with regard to
22 testing of talcum powder products?
23   A.   I hadn't requested any of
24 these, and no, I wasn't provided.

Page 479

1    Q.   So, Doctor, let me ask you
2  this. I want you to assume that talcum
3  powder products contain asbestos, and a
4  patient of yours has asked you, is it
5  safe to use talcum powder products on my
6  genitals. What would be your response?
7    A.   Well, my first step would be
8  to disclose that I'm involved in this
9  litigation.
10        And then I would tell her,
11 pretty much what I would say without that
12 assumption, that there are some, in my
13 opinion, weaker designed studies showing
14 a weak, as other people agree, increased
15 risk of ovarian cancer. And other
16 weaker -- other weakly designed studies
17 that show no difference, and it seems to
18 be about a 50/50 thing, and then cohort
19 studies that show no increased risk.
20        And I would tell the patient
21 overall there's not sufficient evidence
22 to suggest that talcum powder causes
23 ovarian cancer.
24   Q.   And, Doctor, if after you

Page 480

1  said all that to her, she said, "I just
2  need to know, Doctor, should I use it?
3  Is it safe? Yes or no?" what would your
4  response be?
5         MS. CURRY: Object to the
6  form.
7         THE WITNESS: I'd want to
8  ask her why she uses it. I'm
9  going to make another assumption.
10 The fact that she's asking me
11 again after that explanation is
12 that she's concerned. And I would
13 say, if you're concerned maybe you
14 should find an alternative product
15 because you're concerned, not
16 because I think it causes ovarian
17 cancer. But I don't see why you
18 would stress yourself out over
19 this.
20 BY MS. GARBER:
21   Q.   And, Doctor, if your patient
22 said, "I just need to know, is using
23 Johnson & Johnson talcum powder products
24 that contain asbestos, is that safe for

Page 481

1  me to use? Yes or no?"
2         MS. CURRY: Object to the
3  form.
4         THE WITNESS: And this is
5  with my assumption that there's
6  asbestos in the product?
7  BY MS. GARBER:
8    Q.   Right.
9    A.   And I'm going to make
10 another assumption that there were
11 asbestos in the products that was studied
12 in this totality of the evidence that I
13 reviewed. And I would -- I'm not going
14 to repeat it for the sake of time, but I
15 would have the same exact discussion with
16 her.
17   Q.   You would say that it's safe
18 to use?
19   A.   I would say that, given your
20 assumption, there's asbestos in this
21 talcum powder. The totality of the data
22 using the same product that you say has
23 asbestos in it, does not convince me that
24 it causes ovarian cancer. So I would --

121 (Pages 478 to 481)

Kevin Holcomb, M.D.

Page 482

1    that's what I would say to her.
2        Q.   Would you say that it was
3    then safe to use?
4        A.   Again, I'm telling you that
5    there is no convincing evidence that this
6    powder causes ovarian cancer.  And that's
7    where I would leave it.
8        Q.   Okay.  Let me turn to
9    another hypothetical.
10            I want you to assume that
11   Johnson & Johnson's talcum powder
12   products are found to contain fibrous
13   talc and your patient asks you the same
14   question, is it safe for me to use
15   Johnson & Johnson's talcum powder
16   products that contain fibrous talc on my
17   genitals, what would your response be?
18            MS. CURRY:  Object to the
19       form.
20            THE WITNESS:  In this
21       hypothetical situation, can I
22       assume that that same Johnson &
23       Johnson that has fibrous talc was
24       the same stuff used in all the

Page 483

1            body of literature that I've or --
2       is that what you'd like me to
3       assume as well?
4    BY MS. GARBER:
5        Q.   What I want you to assume is
6    that one of your patients is asking you
7    is it safe or not.
8        A.   But this is your world.  And
9    this is your hypothetical situation, so I
10   want to make sure I'm doing it right.
11           The patient is asking me,
12   talcum powder products by Johnson &
13   Johnson has fibrous talc as you said.
14   And I'm just asking you, can I assume
15   that the body of literature in its
16   totality that I've reviewed is the same
17   product that you're describing, there is
18   no reason for me to have a different
19   conversation?
20       Q.   My hypothetical did not
21   include the body of literature.
22           My hypothetical was that
23   Johnson & Johnson's products contain
24   fibrous talc and your patient is asking

Page 484

1    you, is it safe to apply this product to
2    my genitals.
3        A.   Okay.  I'm going to assume
4    then that the product that you're
5    describing is the same product that was
6    used in the totality of the data that I
7    reviewed.  And I would tell her the exact
8    same story, that there's some weaker
9    studies suggesting a modest or weak
10   inconsistent positive association, and
11   stronger studies showing no association.
12   And in its totality, I would say there's
13   no compelling evidence that that product
14   that you're describing increases her risk
15   for ovarian cancer.
16       Q.   Do you go to those data
17   because you assume there's asbestos in
18   Johnson & Johnson's products always?
19            MS. CURRY:  Object to the
20       form.
21            THE WITNESS:  Do I go to
22       what data?
23   BY MS. GARBER:
24       Q.   Do you go to the talc data

Page 485

1    because you make an assumption that
2    Johnson & Johnson's products contain
3    asbestos?
4            MS. CURRY:  Object to the
5       form.
6            THE WITNESS:  I'm not sure
7       what would make you say that.
8            How else can I advise a
9       patient on the risk of a substance
10      without going to the epidemiologic
11      data on that substance?  She's
12      asking me about talc.  What other
13      data am I going to review to give
14      her an answer?
15   BY MS. GARBER:
16       Q.   Doctor, you didn't look at
17   the NTP data, did you?
18       A.   No.
19            MS. GARBER:  Okay.  Let's
20      just take a break and let me look
21      at my notes.  But I think I'm
22      finished.
23            MS. CURRY:  Let's go off the
24      record.

122 (Pages 482 to 485)

Page 486

1    THE VIDEOGRAPHER: Okay.
2  The time is 6:13 p.m. Off the
3  record.
4    (Short break.)
5    THE VIDEOGRAPHER: We are
6  back on the record. The time is
7  6:36 p.m.
8  BY MS. GARBER:
9    Q.  Doctor, I'm going to mark an
10  additional paper that appears in the
11  Lancet dated March 23, 2019.
12    (Document marked for
13    identification as Exhibit
14    Holcomb-28.)
15  BY MS. GARBER:
16    Q.  And, Doctor, you have not
17  seen this paper before, have you?
18    A.  No.
19    Q.  All right. If I could turn
20  your attention to the left-hand column
21  that appears at the bottom if you look up
22  here?
23    A.  Yes.
24    Q.  Okay. And, Doctor, it

Page 487

1  reads -- the title is "Epithelial Ovarian
2  Cancer" by Stephanie -- oh boy. Okay. I
3  have to start with French.
4    A.  Lheureux, I believe.
5    Q.  Lheureux. All right.
6    And it indicates: "Risk
7  factors for epithelial ovarian cancer
8  include the number of lifetime ovulations
9  (absence of pregnancy, early age of
10  menarche, and late age of menarche)
11  family history of EOC, smoking, benign
12  gynecologic conditions (including
13  endometriosis, polycystic ovarian system,
14  and pelvic inflammatory disease) and
15  potentially the use of talcum powder."
16    Did I read that correctly?
17    A.  Yes, you did.
18    Q.  So here the authors just
19  days ago are indicating the potential of
20  talc as a risk factor for epithelial
21  ovarian cancer, true?
22    MS. CURRY: Object to the
23    form.
24    THE WITNESS: Yes. They for

Page 488

1  some reason separated that one out
2  with a potentially.
3  BY MS. GARBER:
4    Q.  All right. And the footnote
5  that the authors are citing to is the
6  Penninkilampi data, correct?
7    A.  Yes.
8    Q.  And, Doctor, I'm going to
9  mark another document as Exhibit 29.
10    (Document marked for
11    identification as Exhibit
12    Holcomb-29.)
13  BY MS. GARBER:
14    Q.  And this is a study that
15  appeared in ACOG Obstetrics and
16  Gynecology, and it's titled "What's New
17  in Ovarian Cancer."
18    Do you see that?
19    A.  Yes, I do.
20    Q.  And it says, "Best articles
21  from the past year," correct?
22    A.  Yes.
23    Q.  It's written by Jason D.
24  Wright, M.D., correct?

Page 489

1    A.  Correct.
2    Q.  You respect him?
3    A.  Yes.
4    Q.  And the Penninkilampi
5  article is listed as four of the best
6  articles from the past year, correct?
7    A.  Yes.
8    Q.  Doctor, we --
9    MS. CURRY: Object to the
10    form of the last question.
11    THE WITNESS: I don't -- you
12  know, I'm sorry.
13  BY MS. GARBER:
14    Q.  Doctor, I didn't have a
15  question.
16    A.  No, no, I want to go back.
17  Because I said yes. But you made a few
18  misstatements there.
19    A, you said this was a
20  study. It's not. It's another op Ed
21  piece from Jason Wright saying what he
22  felt was the best papers of the year.
23    Two, you said it was an
24  ACOG. No, it's the journal of

123 (Pages 486 to 489)

Kevin Holcomb, M.D.

Page 490

1    obstetrics -- Obstetrics and Gynecology
2    is the name of the journal this is in.
3        And just to clarify, without
4    speaking to Dr. Wright, I'm not sure why
5    he's calling these specifically the best,
6    whether he's speaking towards the quality
7    of the studies or just what's the most
8    popular or sensational.
9        Q.   Doctor, what's the journal
10   name?
11       A.   Obstetrics and Gynecology.
12       Q.   Does that -- do people refer
13   to that as by a particular color?
14       A.   Green.
15       Q.   And that's a -- that's a
16   journal that you regularly read?
17       A.   Yes.
18       Q.   And you do some review work
19   for them, don't you?
20       A.   Yes.
21       Q.   That is a published document
22   that appears within the Green Journal,
23   right?
24       A.   Yes.  You're telling me this

Page 491

1    is from the Green Journal, so it's --
2        Q.   Doctor, were you aware that
3    IARC is currently evaluating talcum
4    powder products for its carcinogenicity?
5        MS. CURRY:  Object to the
6    form.
7        THE WITNESS:  No.  I was not
8    aware.
9    BY MS. GARBER:
10       Q.   You are not aware of that?
11       Doctor, if -- I want you to
12   assume that IARC reviews the data that
13   exists to date and concludes that talcum
14   powder products are a Group 1 carcinogen.
15   Would your opinions in this case differ
16   with regard to talcum powder products?
17       MS. CURRY:  Object to the
18   form.
19       THE WITNESS:  I'd have to
20   see what additional data happened
21   between 2010 and 2019 that that
22   bumped them from 2-B to 1.  So I'm
23   assuming that there would be some
24   data that I've -- after my

Page 492

1    exhaustive review haven't seen
2    before.
3        And so in that setting, if
4    there was some convincing data
5    that bumped them from 2-B to 1,
6    yes, I would feel differently
7    about it.
8    BY MS. GARBER:
9        Q.   I will state in my
10   hypothetical that the IARC authors or
11   working group look at the data that
12   exists today with regard to the
13   epidemiological data, the meta-analyses
14   that exist, the nine meta-analyses,
15   including Taher, and the other
16   epidemiological data, the Saed data and
17   the other biologically plausible data,
18   and the mechanistic data that was
19   previously contained in IARC 2010, and
20   they concluded that it -- that talcum
21   powder products were a Group 1
22   carcinogen, would your opinions in this
23   matter change?
24       MS. CURRY:  Object to the

Page 493

1    form.
2        THE WITNESS:  I have to be
3    honest.  It's hard for me to
4    imagine that Dr. Saed's paper
5    being quoted in IARC.  So this is
6    a tough one for me to get into
7    your hypothetical situation here.
8        But no, I'm not so sure,
9    because I'm thinking from the last
10   time they published a
11   classification to now, there's
12   going to be three prospective
13   studies, all coming to the
14   conclusion that there is no
15   increased risk.
16       And then there's going to be
17   a number of meta-analysis, as
18   you're saying, which a lot of the
19   data is rechurning what they've
20   already looked at.  So it would be
21   what incremental data have they
22   added to it.
23       So I guess I'm having a hard
24   time in your -- in your scenario,

124 (Pages 490 to 493)

Kevin Holcomb, M.D.

Page 494

1      how IARC is going to get from a
2      2-B to a 1, based on what's been
3      published from the last time that
4      they issued an opinion on this.
5   BY MS. GARBER:
6      Q.   I want you to assume that
7   they get to a 1.  Is your opinion going
8   to change out of your respect for the
9   institution of IARC, a branch of the
10  World Health Organization?
11         MS. CURRY:  Object to the
12     form.
13         THE WITNESS:  If IARC used
14     Penninkilampi, for example --
15     let's say that I was -- I'm going
16     to give you a hypothetical.
17  BY MS. GARBER:
18     Q.   Doctor, you don't give me a
19  hypothetical.
20     A.   If --
21     Q.   I give you one.  You
22  understand that, right?
23     A.   I'm giving you the
24  hypothetical of how I'm considering your

Page 495

1   situation.
2      Q.   I want you to answer my
3   hypothetical.
4      A.   It depends on what brought
5   them from 2-B to 1.  I have respect for
6   IARC because I looked at their
7   methodology.  We've gone through the
8   things that I didn't agree with IARC
9   methodology.  But if you told me IARC's
10  quality dropped to such a standard that
11  they had Dr. Saed's paper as highly
12  credible, and this is moving us from here
13  to here, I'm no longer so impressed with
14  IARC.
15         So, no, my respect level for
16  IARC would drop considerably, and I
17  probably wouldn't follow the
18  recommendations.
19     Q.   Doctor, you're aware, aren't
20  you, of FDA's recent statements with
21  regard to the businesses Justice and
22  Claire and their cosmetic products?
23     A.   That's -- I'm not -- can you
24  repeat that once again.

Page 496

1      Q.   Sure.  Are you aware that
2   the FDA -- are you aware of FDA's
3   statements with regard to certain
4   cosmetic makeup products that are sold at
5   Justice and Claire's with regard to talc
6   and asbestos?
7          MS. CURRY:  Object to the
8      form.
9          THE WITNESS:  No, I'm not
10     aware.
11  BY MS. GARBER:
12     Q.   Did you, before you came
13  here today and in preparation for your
14  deposition, endeavor to look at what FDA
15  is saying about talcum powder products?
16         MS. CURRY:  Object to the
17     form.
18         THE WITNESS:  No.
19         (Document marked for
20     identification as Exhibit
21     Holcomb-30.)
22  BY MS. GARBER:
23     Q.   Let's mark this as
24  Exhibit 30.

Page 497

1          Doctor, this is -- at the
2   bottom, you see this is the FDA's
3   website, right, FDA.gov/cosmetics?
4      A.   Yes.
5      Q.   Do you see that?
6      A.   Yes.
7      Q.   And do you see at the top it
8   indicates recalls and alerts?  "FDA
9   advises consumers to stop using certain
10  Claire's cosmetic products."
11         Do you see that?
12     A.   Yes.
13     Q.   And do you see there in the
14  middle of the document, it indicates,
15  "Product samples test positive for
16  asbestos," and then it lists a number of
17  Claire's products?
18     A.   Yes.
19     Q.   Doctor, if there was such a
20  finding by FDA with regard to J&J's
21  talcum powder products, would your
22  opinions change in this case?
23         MS. CURRY:  Object to the
24     form.

125 (Pages 494 to 497)

Page 498

1    THE WITNESS: I'd have to
2  say the testing of the products
3  that went into this body of
4  knowledge that I have, I'm not
5  sure. I would have to think about
6  it. The reason why I'm hesitating
7  is because I don't know, is that a
8  new problem? Like, for example,
9  this one store, Claire's stores, I
10  think it's easier to call these
11  folks out because you don't know
12  if this is a new contamination.
13    The question would be if all
14  this data is with the same
15  contaminated product, I'd have to
16  assume that a woman is at no more
17  increased risk than -- than --
18  than the stuff in this paper -- in
19  these papers.
20    But I can't see myself going
21  against FDA regulations. I mean,
22  if FDA says stop using something,
23  I'm not going to tell people to
24  use something against FDA's

Page 499

1  regulations.
2  BY MS. GARBER:
3    Q. And if FDA indicates that
4  the testing that they conducted of
5  Johnson & Johnson's talcum powder
6  products test positive for asbestos,
7  would your causation opinions change?
8    MS. CURRY: Object to the
9  form.
10    THE WITNESS: No. No.
11  BY MS. GARBER:
12    Q. Would your advice to
13  patients change?
14    A. Apparently the FDA would
15  likely put out a warning to say stop
16  using it, and, yeah, I would stop using
17  it. I've done that in the past where
18  there's things that -- if the FDA sends
19  out a warning about, and I stop doing it,
20  even though I may think in my hands it's
21  safe.
22    It has a lot to do with
23  medical/legal issues and things like
24  that. But --

Page 500

1    Q. You would heed the warning?
2    MS. CURRY: Object to the
3  form.
4    THE WITNESS: I would think
5  anyone with common sense would.
6  It doesn't make sense to not to.
7  BY MS. GARBER:
8    Q. Similarly, if FDA compelled
9  a warning to be placed on Johnson &
10  Johnson's products, would you heed that
11  warning if your patients were asking you
12  if it was safe to use?
13    MS. CURRY: Object to the
14  form.
15    THE WITNESS: Putting a
16  warning on it or pulling it off
17  the market?
18  BY MS. GARBER:
19    Q. Putting a warning on the
20  bottle.
21    MS. CURRY: Object to the
22  form.
23    THE WITNESS: Would I tell
24  patients to heed the warning.

Page 501

1  BY MS. GARBER:
2    Q. Sure. If the patient -- if
3  there was a warning about ovarian cancer
4  on the bottle, compelled by -- by FDA and
5  your patient came and said I've been
6  putting this on my genitals, should I
7  stop, what would your answer be?
8    MS. CURRY: Object to the
9  form.
10    THE WITNESS: I have to
11  believe that if the -- if the FDA
12  thought that that product was such
13  a carcinogen and so dangerous
14  there wouldn't be just a warning
15  label, they would pull it off the
16  market. If the FDA is just
17  putting a warning so that patients
18  are aware of it, I think my
19  conversation with her is going to
20  be very similar to the
21  conversation I just told you I
22  would have now.
23  BY MS. GARBER:
24    Q. But you wouldn't tell her

126 (Pages 498 to 501)

Kevin Holcomb, M.D.

Page 502

1  to -- to stop using it?
2      A.  My guess is the warning
3  would be very similar to the
4  conversations I'm having, there are some
5  weaker data suggesting -- so in your --
6  you know, your hypothetical situation,
7  it's -- I would think that they would
8  possibly recall it or -- not recall it.
9  They would -- they would put an advice to
10  stop using a certain product, like they
11  are doing in this situation.  And a
12  patient came to me and says the FDA has
13  this warning to stop using this product,
14  I would support the FDA.
15     Q.  And, Doctor, I know you are
16  not a regulatory expert, but you do know
17  that at times FDA does not have the power
18  to compel a warning, you understand that,
19  right?
20     A.  I -- I, really -- as you
21  started with your statement, I am not a
22  regulatory expert.  I know very little
23  about regulations and how the FDA works
24  in that regard.

Page 503

1      (Document marked for
2      identification as Exhibit
3      Holcomb-31.)
4  BY MS. GARBER:
5      Q.  I want to mark another
6  document.  And this is Exhibit 31, which
7  is from the FDA website.  And it's titled
8  "Talc."
9      Doctor, do you see -- do you
10  see that the date of the download of this
11  document is March 19, 2019?
12     A.  Yes.
13     Q.  And, Doctor, did you ever
14  endeavor to go to the FDA website and put
15  in "talc" to see what the FDA was saying
16  about talcum powder products?
17     A.  No.
18     Q.  Okay.  I will represent to
19  you what appears on this website is
20  what's under the heading of "Talc."
21      It says, "Here is a recent
22  FDA action related to talc.  Learn more
23  below."
24      It reads, "The FDA continues

Page 504

1  to investigate and monitor reports of
2  asbestos contamination in certain
3  cosmetic products and will provide
4  additional information as it becomes
5  available.  The agency is and will
6  continue to work with other" -- "other
7  federal partners to share our collective
8  expertise to advance scientific test
9  methods for the assessment of asbestos."
10     Did I read that correctly?
11     A.  So far you've been perfect.
12     Q.  Does it cause you concern
13  that the FDA is interested in looking
14  further into whether talcum powder
15  products contain asbestos?
16      MS. CURRY:  Object to the
17  form.
18      THE WITNESS:  No.  It
19  actually gives me reassurance that
20  the federal agencies that are
21  supposed to be protecting public
22  safety are at work and doing what
23  they are supposed to be doing.
24  BY MS. GARBER:

Page 505

1      Q.  But you are here in this
2  litigation saying talc is safe, even
3  though FDA is looking into whether or not
4  talcum powder products contain asbestos.
5      A.  Right.  So if --
6      MS. CURRY:  Object to the
7  form.
8  BY MS. GARBER:
9      Q.  It doesn't concern you?
10     A.  It would concern me if they
11  told me that they found levels of talc
12  and -- and -- you know, the -- the reason
13  why it would concern me is because I
14  don't know if that's a new contamination
15  or that product is the same as it's
16  always been.
17      If it's the same as it's
18  always been, then you are talking about a
19  level of contamination that doesn't have
20  compelling evidence that it causes
21  cancer.
22      But I don't know how I would
23  know the difference.  I think I would
24  have to assume that it's -- that it's

127 (Pages 502 to 505)

Kevin Holcomb, M.D.

Page 506

1    different than this.  I think you'd have
2    to either assume it's the same or it's
3    different.  And I think the safer thing
4    to do would be to assume that it's
5    different.
6         If I knew for sure that this
7    level of contamination they find has been
8    in this stuff all this time and all these
9    thousands of patients that we've
10   followed, you know, the large
11   case-control studies, the 70,000, 60,000,
12   40,000 patients on cohort studies, if
13   that's the product that they've been
14   using and it's contaminated all this
15   time, I would have to say no, that
16   wouldn't worry me.  But there's no way
17   that I would be able to tell the
18   difference.
19        Q.   Shouldn't you, as a patient
20   advocate, err on the side of safety?
21        MS. CURRY:  Object to the
22   form.
23        THE WITNESS:  That's what I
24   just said, I would.

Page 507

1    BY MS. GARBER:
2         Q.   You know, Doctor, if -- you
3    are a member of the SGO, right?
4         A.   Yes.
5         Q.   And that stands for Society
6    of Gynecologic Oncology, right?
7         A.   Yes.
8         Q.   That's a professional
9    organization?
10        A.   Yes.
11        Q.   And do you know what --
12   whether they list talc as a risk factor
13   at present?
14        A.   On which site, on the SGO
15   website?
16        Q.   Yeah.
17        A.   No, I'm not -- I'm not sure.
18        Q.   I want you to assume that --
19   that the SGO issues an advisory that talc
20   can cause cancer.  Would you continue to
21   recommend to patients that they use
22   talcum powder products on their genitals?
23        MS. CURRY:  Object to the
24   form.

Page 508

1         THE WITNESS:  You're saying
2    the advisory would just say that
3    there's some evidence suggesting
4    that talc -- what is the -- can
5    you word the -- can you give me
6    the hypothetical wording of what
7    is SGO is saying?
8    BY MS. GARBER:
9         Q.   Sure.  SGO has issued an
10   advisory that says there is evidence that
11   talc can cause cancer, ovarian cancer.
12        A.   Right.  And then --
13        Q.   Would you -- would you
14   continue to advise patients that talcum
15   powder products are safe?
16        MS. CURRY:  Object to the
17   form.
18        THE WITNESS:  Before I made
19   a decision on that I'd have to go
20   and see what is the data that they
21   are basing that on.
22        If they are basing it on the
23   data that I've just reviewed, I
24   would have the same discussion

Page 509

1    with my patients, because I -- I
2    would say them saying that there's
3    evidence to this effect is just
4    telling the truth.
5         If I then have to go and
6    read the body of literature that
7    they're using to make that
8    warning, to decide, well, yes,
9    the -- the studies that they are
10   referring to are the same ones I
11   know, and the ones that don't is
12   the same amount going both ways,
13   my feeling would be the same.
14        So is their advisory based
15   on new data or an assessment of
16   what I've assessed?
17   BY MS. GARBER:
18        Q.   You wouldn't heed the
19   advisory of the SGO, your professional
20   organization, is that your testimony?
21        A.   And stop using talc myself?
22   What -- what would --
23        MS. CURRY:  Object to the
24   form.

128 (Pages 506 to 509)

Kevin Holcomb, M.D.

Page 510

1    BY MS. GARBER:
2        Q.   And advise patients that
3    it's safe to use?
4        A.   You didn't say that SGO is
5    advising to stop using talc.  You said
6    what would I do if the SGO had an
7    advisory just saying that patients should
8    be aware that there's information out
9    there to this effect.
10       Q.   That wasn't my hypothetical,
11   was it, Doctor?
12       A.   Yeah.  Can you go back and
13   read it?
14       Q.   The SGO issues an advisory
15   that talc can cause cancer.  Would that
16   change what you told patients about the
17   safety of talcum powder products?
18           MS. CURRY:  Object to the
19   form.
20           THE WITNESS:  If the SGO
21   jumped up to the same
22   classification as IARC that says
23   there's insufficient evidence but
24   this is potentially a carcinogen,

Page 511

1    I don't see how SGO would be
2    saying anything different than
3    IARC.
4        So that -- that statement
5    that says it can, you'd have to go
6    in and see, well, what's the
7    evidence that you're basing it on.
8        And I'm saying that -- why
9    would I change my feeling about
10   this if somebody else looks at
11   this data, and it's the same data
12   that I've just reviewed, and says
13   we're going to make this
14   statement.
15       And the patient comes to me
16   and asks me, well, how do you feel
17   about that statement?  And if it's
18   based on this same data, I'm not
19   sure how it changes the fact that
20   it's from SGO.  I'm still going to
21   then explain, this is the truth as
22   I see it and the totality of the
23   evidence.
24   BY MS. GARBER:

Page 512

1        Q.   You're not going to heed the
2    advisory of the SGO?
3            MS. CURRY:  Object to the
4    form.
5            THE WITNESS:  You -- the
6    advice --
7    BY MS. GARBER:
8        Q.   Because you know the data
9    better?
10       A.   The advice -- there is no
11   advisory here.  You keep on saying that
12   the SGO is saying that there's evidence
13   that talc can cause cancer.  An advisory
14   is telling you to do something.  In this
15   case, are they saying stop using talc or
16   that patients should just be aware?
17       Q.   Let me give you another
18   hypothetical.  SGO issues an advisory to
19   stop using talcum powder products on your
20   genitals because it contains asbestos.
21   Would you heed that advisory?
22           MS. CURRY:  Object to the
23   form.
24           THE WITNESS:  If the SGO is

Page 513

1    telling patients to stop using
2    talc because of asbestos that's
3    been proven to be there, yes, to
4    be honest, I would probably drop
5    in line, just not to be out of --
6    I'd be fearing medical/legal
7    exposure by not doing it, no
8    matter how I felt about the data.
9    BY MS. GARBER:
10       Q.   More concerned about your
11   neck rather than the patients, Doctor?
12           MS. CURRY:  Object to the
13   form.
14           THE WITNESS:  I have my
15   opinion of this data.  The data --
16   if you're saying my hypothetical
17   that I just gave you is that the
18   data didn't change and SGO makes a
19   statement.  I'm worried about the
20   patients the same amount, because
21   the data is the data.
22       You're saying, well, what if
23   SGO gets behind it and says based
24   on what you read, we want to give

129 (Pages 510 to 513)

Kevin Holcomb, M.D.

|  | Page 514 |
|---|---|

1    an advisory?
2        The risk level hasn't
3    changed.  It's not based on any
4    new data.  So I don't care about
5    my patients any less.  The risk to
6    them hasn't increased.
7    BY MS. GARBER:
8        Q.   Doctor, is cornstarch a safe
9    alternative to talcum powder products?
10        MS. CURRY:  Object to the
11    form.
12        THE WITNESS:  It's an
13    alternative, yes.
14    BY MS. GARBER:
15        Q.   Is it a safe alternative?
16        MS. CURRY:  Object to the
17    form.
18        THE WITNESS:  I have no
19    reason to think that cornstarch is
20    not safe.
21    BY MS. GARBER:
22        Q.   You haven't done a
23    comprehensive literature review of the
24    cornstarch data, have you?

|  | Page 516 |
|---|---|

1    finished.
2        THE VIDEOGRAPHER:  Okay.
3    Stand by, please.  This marks the
4    end of today's deposition.  The
5    time is 6:59 p.m.
6        (Excused.)
7        (Deposition concluded at
8    approximately 6:59 p.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

|  | Page 515 |
|---|---|

1        A.   No.
2        Q.   Let me ask you about some of
3    the expert work that you've done, just so
4    that I'm clear on your prior testimony.
5        Since the Ingham case, and
6    that verdict, and before you were hired
7    in the MDL, did you continue to do any
8    expert work with regard to talcum powder
9    products and ovarian cancer?
10        A.   No.  You actually asked me
11    that earlier.  Same answer.  No.
12        Q.   Okay.  And are you currently
13    serving as an expert on the talcum powder
14    products in any other litigation aside
15    from the MDL?
16        A.   No.
17        MS. GARBER:  Okay.  Just
18    give me one moment.
19        Okay.  All right.  I have
20    nothing further at this point.
21    Thank you, Doctor.
22        THE WITNESS:  Sure.
23        MS. CURRY:  No questions.
24        MS. GARBER:  Okay.  We're

|  | Page 517 |
|---|---|

1
2        CERTIFICATE
3
4
5        I HEREBY CERTIFY that the
6    witness was duly sworn by me and that the
     deposition is a true record of the
     testimony given by the witness.
7
8        It was requested before
     completion of the deposition that the
9    witness, KEVIN HOLCOMB, M.D. have the
     opportunity to read and sign the
     deposition transcript.
10
11
12
     _____
13    MICHELLE L. GRAY,
     A Registered Professional
     Reporter, Certified Shorthand
14    Reporter, Certified Realtime
     Reporter and Notary Public
15    Dated:  March 28, 2019
16
17
18        (The foregoing certification
19    of this transcript does not apply to any
20    reproduction of the same by any means,
21    unless under the direct control and/or
22    supervision of the certifying reporter.)
23
24

130  (Pages 514 to 517)

Kevin Holcomb, M.D.

---

Page 518

INSTRUCTIONS TO WITNESS

1
2
3          Please read your deposition
4    over carefully and make any necessary
5    corrections.  You should state the reason
6    in the appropriate space on the errata
7    sheet for any corrections that are made.
8          After doing so, please sign
9    the errata sheet and date it.
10          You are signing same subject
11   to the changes you have noted on the
12   errata sheet, which will be attached to
13   your deposition.
14          It is imperative that you
15   return the original errata sheet to the
16   deposing attorney within thirty (30) days
17   of receipt of the deposition transcript
18   by you.  If you fail to do so, the
19   deposition transcript may be deemed to be
20   accurate and may be used in court.
21
22
23
24

---

Page 520

ACKNOWLEDGMENT OF DEPONENT

1
2
3
4          I,_____, do
5    hereby certify that I have read the
6    foregoing pages, 1 - 521, and that the
7    same is a correct transcription of the
8    answers given by me to the questions
9    therein propounded, except for the
10   corrections or changes in form or
11   substance, if any, noted in the attached
12   Errata Sheet.
13
14
15   _____
16   KEVIN HOLCOMB, M.D.              DATE
17
18
19   Subscribed and sworn
     to before me this
20   _____ day of _____, 20_____.
21   My commission expires:_____
22
     _____
23   Notary Public
24

---

Page 519

1          - - - - - -
              E R R A T A
2          - - - - - -
3
4    PAGE LINE CHANGE
5    ____ ____ _____
6          REASON: _____
7    ____ ____ _____
8          REASON: _____
9    ____ ____ _____
10         REASON: _____
11   ____ ____ _____
12         REASON: _____
13   ____ ____ _____
14         REASON: _____
15   ____ ____ _____
16         REASON: _____
17   ____ ____ _____
18         REASON: _____
19   ____ ____ _____
20         REASON: _____
21   ____ ____ _____
22         REASON: _____
23   ____ ____ _____
24         REASON: _____

---

Page 521

1          LAWYER'S NOTES
2    PAGE LINE
3    ____ ____ _____
4    ____ ____ _____
5    ____ ____ _____
6    ____ ____ _____
7    ____ ____ _____
8    ____ ____ _____
9    ____ ____ _____
10   ____ ____ _____
11   ____ ____ _____
12   ____ ____ _____
13   ____ ____ _____
14   ____ ____ _____
15   ____ ____ _____
16   ____ ____ _____
17   ____ ____ _____
18   ____ ____ _____
19   ____ ____ _____
20   ____ ____ _____
21   ____ ____ _____
22   ____ ____ _____
23   ____ ____ _____
24   ____ ____ _____

---

131 (Pages 518 to 521)

**A**

**a.m** 1:15 11:7
126:11,16
**AACES** 7:14
**abandoned**
214:18
**ability** 17:8
95:11 116:9
131:17 135:17
282:3 285:7
422:9 426:7
**able** 77:14 78:18
79:1 130:3,11
132:12 148:17
159:5 168:15
199:8 216:8
290:9,10
314:16,20
318:1 321:8
339:17 396:24
438:6 442:14
506:17
**absence** 131:7
315:2 427:9
487:9
**absolute** 396:11
**abstract** 125:4
329:15 383:19
404:11,23
476:9
**absurd** 204:1
217:14
**academic** 178:2
**Academy**
446:19
**accept** 77:22,23
78:11 90:8
**acceptable**
48:21
**accepted** 61:8
151:8 196:4
295:8
**access** 299:20
**accompany** 15:2
**accord** 219:3
**account** 196:22

276:13 277:23
352:9 397:24
**accounts** 398:21
**accuracy** 371:3
**accurate** 14:12
22:1 23:18
110:24 117:1
124:4 151:7
303:24 355:24
380:15,18
518:20
**accurately**
318:1 369:4
**achieve** 194:6
**acid** 151:24
**acknowledge**
128:1 155:24
**ACKNOWLE...**
520:2
**ACOG** 488:15
489:24
**act** 323:10
**action** 275:12
276:9 447:3
503:22
**activities** 251:9
251:20
**activity** 251:11
264:12
**actual** 122:11
400:16
**acute** 450:21
**add** 81:3 110:22
329:1 373:3
**added** 229:1
493:22
**adding** 291:23
**addition** 54:5
116:13 439:20
**additional** 54:8
88:6 486:10
491:20 504:4
**address** 23:14
26:6 273:5,10
273:13 309:8
398:17
**addressed** 57:2

318:14 346:8
352:2
**addressing**
28:21 158:21
323:9 429:7
**adenomatous**
456:6
**adequate** 345:7
**adequately**
399:15
**ADLs** 251:6,6
**administer**
11:17
**admit** 130:24
380:9
**admitted** 91:4
94:22
**admitting** 42:8
133:4 294:6,8
294:10,13
330:21
**admonitions**
15:2
**adnexa** 151:21
**advance** 504:8
**advanced** 336:3
**advice** 499:12
502:9 512:6,10
**advise** 239:7
315:9 485:8
508:14 510:2
**advises** 9:19
497:9
**advising** 510:5
**advisory** 507:19
508:2,10
509:14,19
510:7,14 512:2
512:11,13,18
512:21 514:1
**advocate** 238:18
238:23,24
239:4 506:20
**affect** 291:2
**affirmative**
23:22
**African** 7:13

248:12
**afternoon**
239:22
**age** 340:18
351:18 362:2
364:10,21
368:20 383:24
444:10 487:9
487:10
**aged** 366:1,3
**agencies** 504:20
**agency** 504:5
**agent** 72:14
74:17 469:16
**agents** 445:10
**ages** 366:5
**ago** 47:12 55:21
86:21 88:1
111:12 140:19
143:17 354:24
461:5 487:19
**agree** 20:21
32:11 41:23
89:10 93:20,22
96:5,8 101:15
101:18 155:22
157:9 158:23
162:23 170:14
173:9 182:12
182:18 184:11
212:14,15,19
212:24 214:16
215:11 216:11
221:2,12
222:23 223:2
227:20 241:7
247:4,13,14
249:3,11,13,16
250:4 257:11
257:18,18
258:6 295:14
297:14,20
298:23 299:4
300:7 317:12
317:13 318:3
325:21 326:2
329:13 335:5

345:14,15,20
345:22 366:22
369:5 370:9
388:4 398:8
401:3,22 402:9
402:21 404:17
410:1,17
425:19 427:12
430:15 432:20
439:17 452:18
455:9 457:10
459:4,13,14
470:12 471:3
479:14 495:8
**agreed** 182:15
348:24
**agreeing** 297:2
**agrees** 292:6
**ahead** 31:9 54:1
66:11 237:8
**al** 88:19,19
255:19 303:4
358:4 416:11
416:23,24
417:5,15
453:15,18
462:10
**Alabama** 2:14
**alerts** 497:8
**ALLEN** 2:12
**allow** 458:13
**allowed** 73:14
154:20 163:22
**alter** 283:20
**alterations**
251:2
**altered** 282:3
**alternative**
469:16 480:14
514:9,13,15
**altogether**
219:19 220:2
290:22 311:20
313:12 321:20
321:23
**amend** 300:8
**amendments**

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 628 of 1035
PageID: 241807
Kevin Holcomb, M.D.

Page 523

151:7
**American** 7:13
9:8
**Americans**
248:13
**amount** 39:13
137:9 264:12
386:4 390:2
409:13 431:7
431:12 509:12
513:20
**amphibole**
42:24
**Amrhein** 6:18
**analogies**
120:13
**analysis** 18:5
34:7 171:7,18
171:21 189:14
217:3 225:20
229:8 249:18
278:20,20
345:24 387:14
387:18 429:3
431:15 436:6
446:23 453:19
477:15
**analyzing**
428:20 430:8
**and/or** 14:14
113:19 517:21
**Andrew** 468:23
**animal** 127:22
129:4,8,13,19
130:11 131:9
134:16
**animals** 134:17
**anniversary**
389:8
**answer** 10:5
15:22 41:21
45:23 48:20
59:3 63:20
65:3,11 66:12
67:17 68:7,8
91:21 99:10
133:16 136:8

163:11,21
166:23 167:5
167:12,16
168:4 169:6,24
171:2 174:10
176:13 191:3
205:24 213:14
228:8,10,12,14
232:18 233:2
298:7 316:18
327:14,24
330:11 353:12
354:13 356:3
401:21 411:2
415:1,3 458:4
458:14 485:14
495:2 501:7
515:11
**answered** 31:14
67:21 80:20
288:14
**answering**
101:14 265:21
328:17 456:23
**answers** 166:16
166:22 167:1
411:6 520:8
**anti-inflamma...**
459:6
**anticipate** 405:6
**antiinflammat...**
447:14,17
449:8 455:12
455:19
**antiinflammat...**
453:16 454:17
**anybody** 37:5
150:10 307:17
341:16,22
451:20
**anyway** 237:9
460:20
**apart** 340:3
391:16
**apologize** 40:19
71:13,20 72:1
87:10 232:21

255:24
**apparent** 293:16
386:22
**apparently**
420:21 445:20
499:14
**appear** 51:15
57:11 58:18
105:5 116:12
152:4,13,21,23
160:7 186:17
**appearances** 2:1
3:1 4:1 11:14
**appeared**
488:15
**appears** 186:10
186:17 424:19
471:19 476:17
486:10,21
490:22 503:19
**APPEL** 3:17
**application** 84:7
432:9 435:5
**applications**
417:2
**applied** 145:12
427:4 428:12
**applies** 85:21
86:15
**apply** 75:15 76:2
85:17 484:1
517:19
**appreciably**
270:11
**appreciate**
24:13 31:12
126:7 209:1
255:1 280:23
353:14 465:16
**appreciated**
122:22
**approach**
128:22 163:5
**appropriate**
168:5 223:22
463:3 473:15
473:16 518:6

**approximate**
264:18 290:7
**approximately**
336:5 516:8
**April** 424:17
428:6
**area** 27:21 43:13
68:15 85:2
106:21 392:6
393:14 427:2
428:22 453:2
**areas** 138:20
323:11 376:6
**argue** 166:4
253:4 266:23
450:4
**argument**
460:14
**Arsenic** 5:22
71:10
**article** 182:2
194:12 196:7
200:20 299:7,9
299:18 300:9
363:21 463:20
489:5
**articles** 54:9
120:23 217:3
287:4 488:20
489:6
**asbestiform**
75:18 85:1,7
85:20,22 86:16
89:18 95:1
96:2,6 98:24
**asbestos** 22:13
22:16 26:15,19
26:22 27:1,12
27:19 28:7
38:14,20 39:12
41:17,24 42:7
42:9,13 60:14
61:13,23 62:15
62:22 63:18
65:1,6,8 67:8
67:22 68:1
69:18 70:24

74:6,8,23
75:14 76:1
82:3,24 83:9
84:21 85:16,19
85:23 86:4,15
87:19 88:9
89:17 90:2,20
91:5,6 95:1,10
95:22 96:6,10
96:17,23 98:6
98:21 99:7,19
100:4,16
101:16,18
108:19 109:23
154:15 170:8
175:2 239:8
326:17 330:10
342:19 391:5
391:12 393:4
398:21 478:17
479:3 480:24
481:6,11,20,23
484:17 485:3
496:6 497:16
499:6 504:2,9
504:15 505:4
512:20 513:2
**ascend** 445:15
**ascending** 423:4
**ascension**
127:23 131:10
**ascent** 445:10
**aside** 52:23
111:5 207:9
515:14
**asked** 42:6
43:11,17 46:14
56:16 59:17
63:16,19 66:20
67:16 80:17
81:18 88:12
97:6,6,17,18
98:1 103:9
106:3 138:19
138:20 141:2
143:22 144:11
144:20 145:1

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 629 of 1035
PageID: 241808
Kevin Holcomb, M.D.

Page 524

178:18 182:15
189:7 190:15
190:16 191:8
209:12 211:13
211:20 216:17
228:9,15,24
286:20 306:14
314:13 328:2,9
328:17 332:3
341:21 348:21
353:9 366:18
367:8 371:17
371:23,24
372:10 376:8
384:3 413:6
454:6 479:4
515:10
**asking** 16:4
24:10,14 27:16
97:10 141:6
152:18 167:13
167:21 168:1
168:10 184:15
195:14 196:3
208:11 212:11
292:11 297:17
332:16 348:19
370:21 371:24
372:3 385:10
422:10 440:16
458:11,15
480:10 483:6
483:11,14,24
485:12 500:11
**asks** 482:13
511:16
**aspect** 429:22
**aspects** 430:9,15
**aspirin** 452:19
453:23 454:12
454:17 455:11
455:15 456:3,9
456:15 457:10
459:6,17
461:17
**assess** 391:19
**assessed** 509:16

**assessing** 20:13
157:11,13
158:22
**assessment** 6:19
33:22 43:12
90:19 142:14
145:24 220:11
252:9 257:19
345:17 376:15
420:11 428:19
436:7 477:19
504:9 509:15
**assigned** 215:22
**assignment** 43:8
43:20
**associated** 17:15
20:3 80:2
158:3 175:20
176:7 182:8
189:19 243:24
245:6,16
265:11 266:4
301:15 454:18
**association** 6:22
7:12 87:18
124:9 149:23
150:4,8 164:8
165:2 202:16
203:23 220:23
229:6 246:14
246:19 247:16
249:21 259:9
259:12 260:11
260:18 262:15
265:15 268:20
272:3 307:23
310:6 312:22
313:9 351:4
357:16 374:15
375:10 378:10
408:23 409:11
420:16 429:11
432:8 433:21
443:5 444:19
445:6 446:16
453:22 454:1
476:15 484:10

484:11
**associations**
115:23 276:14
277:24
**assume** 16:6,19
76:4 98:5
108:16 177:1
177:22 178:8
217:5 218:2,24
243:1 265:18
323:16 331:16
372:24 429:9
473:17 479:2
482:10,22
483:3,5,14
484:3,17
491:12 494:6
498:16 505:24
506:2,4 507:18
**assumed** 408:24
**assuming** 35:2
226:19 297:13
319:18 323:20
326:20 369:1
423:19,20
433:15 444:1
491:23
**assumption**
178:1,3 265:13
279:1 331:24
337:6 369:11
436:23 479:12
480:9 481:5,10
481:20 485:1
**assumptions**
107:24 108:7
108:11 332:1
341:2
**atomic** 326:14
331:22 335:17
336:11 353:5
**attached** 51:16
52:24 57:12
105:6 117:4
518:12 520:11
**attempt** 48:22
122:9 123:5

283:9 300:15
411:12
**attempted** 48:15
408:4
**attempting**
296:15
**attendant** 44:10
115:6 146:16
154:7 181:2
288:21
**attention** 28:14
40:4 486:20
**attenuated**
78:16
**attorney** 518:16
**attributable**
191:17 199:13
241:24
**attributed** 444:8
**author** 6:16
121:21,23
122:2 152:19
184:9,18 194:1
194:22 211:17
249:4 257:5,18
264:2 287:3,6
287:9,12 300:2
399:4 445:8
**author's** 211:14
**authored** 468:23
**authoritative**
195:14
**authority**
194:13,18
195:4,19 196:5
199:11 219:8
219:13,16
372:17 373:1
**authors** 89:1
121:24 123:4
147:24 178:15
184:24 190:19
201:3,6 203:12
210:17 212:16
212:21 214:15
215:1,17
217:11 218:3

218:11,24
219:4 220:19
222:20 223:3
231:9 237:10
237:19 247:17
253:17 254:4
257:19,24
259:19 261:4
267:3 272:14
273:7,7,14,15
275:11 279:13
279:23 280:14
287:14 309:1
334:10 344:11
350:16 351:1,9
351:12,17
358:9,16
359:16 360:13
362:7,20
367:14 374:1
376:21 379:9
379:15 394:2
395:13 397:12
397:21 401:5
401:23 402:23
411:13,16,22
412:10 413:18
414:5 417:8
418:8 423:10
424:5,7 427:14
428:18 430:7
431:17,24
435:24 436:7
436:11,18
437:13 439:19
439:19 441:4
443:2,6,9,13
444:18 445:3,4
445:14,17,19
446:23 454:16
487:18 488:5
492:10
**authors'** 476:21
**available** 220:20
224:18 325:18
419:13 420:18
504:5

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 630 of 1035
PageID: 241809
Kevin Holcomb, M.D.

Page 525

**Avenue** 1:14
11:9
**average** 405:7
**avoid** 15:18
**aware** 28:6 30:7
30:14 31:15,20
32:2,8 42:23
79:9 94:1,4
144:23 154:17
229:19 243:22
244:20 245:1,3
247:6 253:10
253:16 267:2
288:12,14
306:19,23
333:12 390:19
391:1 419:2,11
437:23 438:18
440:5 491:2,8
491:10 495:19
496:1,2,10
501:18 510:8
512:16

**B**

**B** 3:17 5:10 6:2
7:2 8:2 9:2
41:14
**Baby** 16:15,21
32:14 99:7
**back** 40:8 50:21
53:14 65:24
72:16 84:23
85:12 88:20
93:5 94:2,6
97:22 98:3
126:15 129:10
129:16 130:7
136:16 146:11
150:21 167:7,8
179:15 239:19
258:14,20
269:16,19
287:10 320:20
321:17 327:17
328:23 343:22
348:15 384:1

397:6 400:24
421:20 428:14
431:5 435:19
446:11 453:13
461:4,9 473:23
476:8 477:23
486:6 489:16
510:12
**baked** 283:22
**balance** 229:13
**bank** 395:20,21
**bar** 445:20
**base** 442:6,12
**based** 7:19
18:14 43:12
44:9,16 48:18
61:16 62:10,11
71:24 76:5
87:20 150:15
156:1 164:23
179:1 185:13
188:2,13
204:21 219:7
244:22 252:5
252:10 260:8
264:24 268:11
282:2 289:4
329:11 333:10
335:23 341:3
341:21 373:14
375:17 402:12
403:1 439:5
442:8 447:24
464:19 494:2
509:14 511:18
513:23 514:3
**baseline** 78:16
376:5
**bases** 37:17
**basic** 57:1,5,16
58:5 59:1
153:12 205:11
461:2
**basically** 225:11
227:8,8 231:10
322:8 475:10
**basing** 52:3

508:21,22
511:7
**basis** 47:24
123:15 124:8
285:12 322:14
336:15,16
357:20 362:6
433:11 447:18
447:22 464:16
**Beach** 2:4
**bear** 75:8
**BEASLEY** 2:12
**becoming**
264:16
**began** 38:4
41:14 351:19
352:10 368:21
**beginning** 1:15
59:10,21 97:7
116:12 270:4
307:10 308:5
379:2 380:12
**begins** 201:17
256:8 275:18
378:8 469:7
**behavior** 340:10
**behaviors** 252:4
**belief** 449:10
**beliefs** 284:7
**believe** 14:2
28:20 36:4
37:5 38:3 43:5
43:24 49:7
51:21 54:8
55:11 62:19
64:24 65:5,8
67:22,24 69:7
70:3 92:2
99:14,14,24
121:16 127:17
135:23 138:1
151:1 157:19
157:21 163:2
174:17,19
177:2,21 180:2
187:24 188:24
212:13 213:24

221:14,17
243:10 245:5
245:10,20
248:18 252:7
261:14 267:15
267:19,22
268:2,3 271:2
282:1 285:17
295:5 308:7,10
362:22 369:17
369:21,22
372:7 373:11
409:4 410:23
411:4 413:6
414:9 436:19
437:11 447:9
451:15,23
454:20,23
455:17 456:13
458:23 470:9
487:4 501:11
**believes** 340:24
**believing** 179:15
**bench** 153:22,24
**benefit** 33:16,19
34:10,15,22
35:12,24 36:6
36:16 37:6
**benefiting** 35:6
**benefits** 33:4,12
**benign** 487:11
**Berge** 9:14
229:23,24
231:20 233:9
234:5 236:7
237:1,6 238:4
238:4 259:11
261:21 290:12
290:17 314:5
318:11 319:3
319:12 320:20
320:24 321:8
322:5,7,13,15
322:22,22,22
328:23 329:9
329:19,21
408:11 409:6

409:23 471:12
472:19
**Berge's** 227:8
230:16
**best** 130:5
196:17 197:2
197:18 282:6
302:23 488:20
489:5,22 490:5
**bet** 264:7,9
**better** 197:15
388:21 413:7
512:9
**Beware** 204:7
210:9
**bias** 137:18
196:11 198:21
198:21 199:1
199:14 226:5,6
226:10 252:11
252:16,21
253:20 254:7
254:22 256:14
256:20 257:3,8
258:3 259:6,7
259:14,15,20
260:3,5,14
261:5 262:1
263:10,21
264:19 267:1,6
268:10 271:24
272:9,13,15,16
272:21 273:8
274:5,11,24
276:11 277:1,7
277:10,12,22
278:11 280:12
290:22 291:2
291:19 292:1,9
307:14 314:18
361:9
**biased** 189:10
290:20 291:17
291:24
**biases** 205:4
**bibliography**
152:14

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 631 of 1035
PageID: 241810
Kevin Holcomb, M.D.

Page 526

**BIDDLE** 3:7
**big** 264:6 300:5
  389:11 436:22
**biggest** 122:18
  236:23 238:24
**bill** 112:24
**biologic** 116:6
  126:21 162:15
  164:18 165:9
  165:22 296:13
  308:2 340:1
  391:16 394:22
  395:8 401:2
  403:8 430:14
  431:14 432:7
  437:7 460:14
  477:19
**biological**
  164:13
**biologically**
  140:6 174:1,13
  393:5 394:6
  401:6,24 422:1
  422:19 423:12
  427:16 436:12
  437:12 439:21
  440:7 441:5,20
  492:17
**biologist** 153:7
  153:13
**biomarker**
  151:20
**Birrer's** 135:22
  140:15,17
**bit** 42:14 61:6
  87:3 88:1
  240:23 336:1
  445:20
**black** 244:20
**Blair** 156:18
  157:5 292:4
**blocking** 445:10
**BLOOD** 2:7
**blue** 186:18
  187:1,2,3
  189:21 270:1
**board** 448:22

450:13
**bodies** 423:4
**body** 7:12 29:14
  43:13,16 57:9
  67:9 120:8
  133:2,5,21,24
  134:2 136:24
  206:16,20
  210:19 231:17
  235:4 272:4
  276:10,14
  289:11 312:8
  389:12 390:11
  483:1,15,21
  498:3 509:6
**bomb** 326:14
  331:22 335:17
  336:11 353:5
**Bonovas** 453:14
**book** 100:18
  101:6 287:19
**Boston** 3:4
  226:8
**bother** 194:10
  219:21 315:9
**bothered** 392:7
**bottle** 100:15,17
  101:9 102:2,3
  500:20 501:4
**bottom** 181:10
  181:11,16,21
  200:8 210:8
  334:21 358:2
  429:24 430:4
  486:21 497:2
**Boulevard** 3:4
**bound** 16:2
**box** 244:21
  319:13
**boy** 487:2
**Bradford**
  115:20 160:5
  161:14 164:5
  233:19 246:5
  247:11 427:15
  428:21 429:4
  429:11,15

430:9,16
  431:15 436:6
  477:18
**branch** 494:9
**BRCA** 455:22
**break** 25:7
  73:11 125:10
  125:19,24
  126:3,5,13
  223:23 239:17
  285:1 343:16
  343:20 348:19
  421:14,18
  485:20 486:4
**breaking** 125:15
  239:11
**breast** 244:6,12
  244:21
**Brief** 348:13
  453:11 473:12
**briefings** 37:19
**bring** 26:7
  120:22 314:14
  363:5
**bringing** 118:23
**broad** 64:2
  101:13 139:7
**broader** 191:6
**Broadway** 2:8
**broke** 409:8
**broken** 387:18
**brought** 87:4
  103:15 294:23
  304:1 495:4
**BROWN** 2:8
  468:12,14
**brushing** 250:20
**Bucketing**
  215:19
**built** 283:21
**bumped** 491:22
  492:5
**bumpers** 196:14
  196:14 205:20
**bunch** 221:14
  226:4
**burden** 396:7,11

398:1
**buried** 148:14
**business** 281:19
  305:20
**businesses**
  495:21
**Buz'Zard**
  139:11 162:16
  163:19 165:24
  166:5 167:2

---
**C**

**C** 5:23
**CA-125** 434:7
  434:17
**CALCAGNIE**
  2:3
**California** 2:4,9
  7:8 226:11
**call** 40:3 49:8
  123:19 150:10
  158:14 184:19
  201:10 214:16
  242:22 392:18
  426:4 458:7
  470:22 498:10
**called** 151:23
  273:19 299:23
**calling** 298:20
  427:8 490:5
**calls** 387:13
**camera** 211:19
  348:9
**Campus** 3:8
**Canada** 143:20
  143:23 144:4
  144:13,20
  145:24 171:10
  171:21 220:3,6
  220:11 222:21
  258:21 261:4
  324:24 325:9
  329:5 331:7
  402:15,18
  403:7,11 414:1
  414:2 419:3
  420:4,7 427:13

428:15,19
  430:7 431:16
  436:7 439:20
  446:11 477:16
**Canada's**
  142:13 143:12
  419:17
**cancer** 6:13,23
  7:7,10,13,14
  7:22 8:7,10,13
  8:15,17,21
  9:14,16,18
  13:3,11 14:15
  17:5,9,11,17
  18:19,22,24
  19:6,18,22,23
  20:2 21:4,16
  21:17,20,20,22
  22:8,13 23:2,4
  23:10,21 24:23
  25:3,4,8,24
  28:2,9,19,22
  30:9,16 31:16
  32:4,13 37:23
  44:4,16,23
  46:13 56:24
  60:15 61:14,20
  61:23 62:16,23
  63:14,19 65:2
  65:6,10 67:23
  68:2 69:13
  70:1,11,20
  71:2 77:15,24
  78:2,22 79:19
  79:20 86:23
  87:19 88:24
  89:4,6 90:2,4,8
  90:9,14,21
  91:7 93:11
  95:11,16 97:9
  97:24 98:18
  100:5 101:7,17
  113:18 116:10
  120:7,8,9,14
  120:15 124:10
  138:2 145:8,15
  149:9 151:12

Case 3:16-md-02738-MAS-RLS   Document 33123-4   Filed 08/22/24   Page 632 of 1035
PageID: 241811
Kevin Holcomb, M.D.

Page 527

151:19,22
153:5,7 165:3
165:23 174:16
174:20,23
175:7,16,20
176:8 180:12
182:2,9 189:19
205:17 206:8
206:12 221:1
224:21 241:6
243:11,24
244:4,7,12,21
245:6,16
246:15,20
248:12 249:19
252:10,17
253:19 254:6,8
256:16,23
262:23 265:12
266:17 267:5
272:4,17
276:15 278:14
280:17 306:20
310:2,21
311:12,23
312:1 316:5
317:9,10
324:11 325:13
325:18 326:5,6
326:7,11,13,16
327:1,10 331:8
331:17,18
332:23 334:11
334:23 336:4
336:19,23
337:4,15,17
338:16 340:1
342:4 347:5
351:5 353:17
354:17,23,24
355:7,10,11
356:19 357:10
357:18 358:1
363:2 367:7,8
367:16 369:2,5
370:7 372:11
374:17 378:12

378:14,18
380:4 385:13
386:1,4 394:5
396:20 405:9
405:12,16
408:6 409:21
410:19,20
413:12 419:6
419:19 420:16
421:9 432:12
432:20 433:12
433:18 434:6
443:24 444:21
446:18 447:13
447:24 448:2
449:9 450:5,14
451:10,14
452:16,20
453:17,23
454:2,13,19
455:5,14 456:1
456:8,16 460:1
461:23 464:19
465:3,7 466:5
466:13 467:9
468:21 470:8
476:16 479:15
479:23 480:17
481:24 482:6
484:15 487:2,7
487:21 488:17
501:3 505:21
507:20 508:11
508:11 510:15
512:13 515:9
**cancers** 26:10
43:14 378:20
452:7
**capable** 209:5
**capacity** 145:7
151:16
**capture** 325:15
**captured** 344:11
344:16 389:4
**capturing** 388:4
**carbon** 135:23
**carcinogen** 17:3

17:4 19:14
20:1,7,8,10,14
21:7,10,13
96:11,17 97:1
97:5,8,12,13
97:21,23 98:7
98:21 99:9,16
99:20 101:16
101:19 102:2,4
228:5 326:9,19
335:16 336:24
396:15,16,24
420:2 421:5,8
421:12 491:14
492:22 501:13
510:24
**carcinogenesis**
57:6 425:15
**carcinogenic**
17:7 74:23
75:15 76:2
85:16 109:14
369:13 451:1
**carcinogenicity**
22:4 57:17
58:6 89:19
90:1 95:2
140:7 142:9
249:5 393:6
394:21 419:15
439:6 491:4
**carcinogens**
59:2,2 71:12
96:7
**carcinoma**
152:2 311:1
448:20 449:14
476:17
**carcinomas**
461:13
**care** 9:9 13:14
77:19 243:18
288:20 289:4
396:21 450:15
514:4
**career** 28:19
**careful** 67:5

**carefully** 93:8
518:4
**caring** 243:15
**carried** 306:22
366:21
**carries** 15:9
244:20
**carry** 207:21
332:10,10
**cascade** 432:11
**case** 14:10 38:2
39:4 40:23
44:14 45:22
46:8 47:16,20
48:1 49:22
50:8 60:12
94:3 110:2,3
113:13 152:6
152:16 154:6
162:18,22
181:13 182:3
227:1 228:19
292:6 305:9
307:5 313:18
324:1 332:23
339:7 346:11
366:16 386:14
398:11 434:10
448:12 449:1
491:15 497:22
512:15 515:5
**case-control**
100:24 115:18
137:8 148:22
149:11,15,21
150:6,14 182:5
182:23 183:12
183:23 187:19
188:1,12 189:1
191:9,20
192:16 193:1
198:18 206:22
219:5 222:4,6
222:17 226:7
231:23 233:11
234:12 235:2,4
237:3,13

238:12 240:2,8
241:4,11,16
252:8,15,21
257:7 268:11
272:1,23 274:6
274:12 275:1
282:9,20 283:4
290:8,15
293:24 294:5
294:12 295:12
298:18 304:24
306:21 307:15
307:21 308:8
308:16 309:16
309:23 310:4
311:15,17
312:19 313:1,4
313:5,11 314:4
315:13 319:1
324:4 325:1
329:4 381:10
453:19 506:11
**cases** 1:8 13:11
44:10 52:4
53:14 56:23
58:20 93:9,17
93:19,24 94:1
94:5 247:3
263:4,6 264:15
266:19 280:5
317:23 325:15
391:2 392:1
397:1 450:5
**catch** 28:14
385:1
**categorical**
216:3
**categorically**
215:23
**categorization**
217:12
**Categorizing**
215:16
**causal** 18:18,20
46:11 87:18
393:23 419:5
419:19 420:18

Kevin Holcomb, M.D.

Page 528

| | | | | |
|---|---|---|---|---|
| 421:2 436:8 | 425:17 | 242:1 290:14 | 335:14 337:8 | 23:17 33:18 |
| **causality** 157:11 | **CEBMA** 281:15 | 326:15 329:2 | **citations** 129:17 | 46:20 47:11,15 |
| 410:12 | **cell** 19:12 152:2 | 354:13 409:17 | 335:21 | 52:13 54:2,3 |
| **causation** 6:11 | 250:2 260:22 | **change** 175:3 | **cite** 76:6 98:16 | 100:1 152:17 |
| 44:9 108:17 | 261:1 409:6 | 253:7 255:10 | 132:4 229:19 | 166:21,24 |
| 110:15 155:23 | **cells** 19:11 | 293:11 368:9 | 261:12,13,15 | 190:1,14 191:5 |
| 165:10 171:8 | 433:18 460:19 | 417:11 433:17 | 261:16,17,20 | 385:10 465:13 |
| 171:19,21 | **cement** 63:8 | 492:23 494:8 | 275:3,10 | 490:3 |
| 172:6 499:7 | 69:10 | 497:22 499:7 | 276:18 285:19 | **clarifying** 99:3 |
| **causative** 421:8 | **Center** 12:18 | 499:13 510:16 | 290:24 356:16 | 191:4 |
| **cause** 17:8 28:9 | 281:14 301:3 | 511:9 513:18 | 372:16 379:17 | **Clarke-Pearson** |
| 44:15,23 60:14 | 427:3 428:11 | 519:4 | 380:4 381:23 | 156:17 157:4 |
| 61:14,23 62:16 | **Central** 7:7 | **changed** 412:11 | 383:6 432:2,14 | **Clarke-Pears...** |
| 62:23 63:18 | **certain** 9:20 | 514:3 | 437:8 438:9 | 137:20 |
| 65:1,6 67:23 | 28:1,1 77:13 | **changes** 252:4 | 443:22 460:7 | **class** 275:12 |
| 68:2 95:11 | 101:23 106:18 | 293:9 511:19 | **cited** 45:19 | 276:8 286:14 |
| 97:9,24 101:7 | 251:18,19 | 518:11 520:10 | 61:17 62:8 | **classification** |
| 116:10 174:18 | 259:23 262:13 | **changing** 371:11 | 93:14 180:3 | 493:11 510:22 |
| 175:6,12,15 | 266:19 284:6 | **characterizing** | 199:10 285:23 | **classify** 94:11 |
| 210:13 224:21 | 394:20 456:7 | 168:12 | 331:3 333:20 | **clean** 29:1 |
| 276:24 337:4 | 496:3 497:9 | **check** 309:13 | 352:2 382:4 | **clear** 15:23 |
| 339:24 432:12 | 502:10 504:2 | 384:15 | 418:19 458:21 | 16:10 51:24 |
| 432:19 433:11 | **certainly** 412:7 | **chemical** 151:23 | 459:1,21,23 | 69:7 88:11 |
| 434:5 447:20 | **certainty** 17:24 | **chemotherapies** | **cites** 248:24 | 152:2 180:24 |
| 447:24 465:7 | 18:10,14 372:5 | 320:11 | 259:8,11 | 202:13 264:10 |
| 504:12 507:20 | **CERTIFICA...** | **chemotherapy** | 378:13,14,24 | 294:18 357:3 |
| 508:11 510:15 | 517:2 | 320:8,9 | 382:20 444:17 | 409:6 421:23 |
| 512:13 | **certification** | **Cheryl** 147:2,18 | 446:18 | 428:4 458:19 |
| **caused** 18:21,23 | 517:18 | **Chicago** 4:4 | **citing** 185:12,13 | 515:4 |
| 19:5 277:10 | **Certified** 1:16 | **child** 399:8 | 263:17 379:10 | **clearly** 78:3 |
| 396:20 461:24 | 1:16 517:13,14 | **choose** 361:22 | 381:3 437:14 | 87:20 95:8 |
| **causes** 17:5 20:4 | **certify** 517:5 | **chromium** | 488:5 | 100:3,6 127:15 |
| 28:18,21 43:14 | 520:5 | 109:6 | **claim** 136:22 | 147:13,17 |
| 44:4 77:15,24 | **certifying** | **chronic** 174:14 | 150:13 194:14 | 204:23 358:3 |
| 78:1 138:2 | 517:22 | 174:18 448:8 | 194:19 199:16 | 379:24 457:18 |
| 174:20 205:17 | **cervical** 120:14 | 451:4 | 201:10,19 | **clinical** 86:7 |
| 277:6 331:16 | 120:15 | **chronological** | 204:1 268:18 | 205:13 275:2 |
| 336:23 337:15 | **cervix** 205:17 | 270:7 | 336:17 | 288:19 289:4 |
| 433:18 448:17 | **cgarber@robi...** | **churning** 236:4 | **claims** 199:11 | 302:24 304:2 |
| 479:22 480:16 | 2:5 | **cigarettes** | 217:13 | 305:9 330:16 |
| 481:24 482:6 | **challenged** | 342:15,15 | **Claire** 495:22 | 335:3 448:13 |
| 505:20 | 266:23 | **circle** 258:14 | **Claire's** 9:20 | 453:20 |
| **causing** 331:18 | **chamber** 260:9 | **circumstances** | 496:5 497:10 | **clinician** 242:12 |
| 431:19 | **chance** 27:18 | 303:2 | 497:17 498:9 | **clinicians** 67:5 |
| **caution** 321:2 | 150:11 188:21 | **citation** 138:12 | **clarification** | 295:11 |
| **caveat** 373:4 | 191:17 193:21 | 285:16 286:3 | 24:14 59:14 | **close** 125:13 |
| **cavity** 423:5 | 199:13 228:18 | 303:3 333:19 | **clarify** 16:5 | 318:19 474:22 |

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 634 of 1035
PageID: 241813
Kevin Holcomb, M.D.

Page 529

closer 73:19
  356:7
closest 324:19
closing 100:17
CMO 30:24
  31:2
co-author
  152:19
co-carcinogen
  342:19
coached 209:15
coaching 208:9
  208:11 209:2,6
  209:12,14
cobalt 109:6
Cochrane 304:5
code 79:11,13
  79:14
cognitive 215:18
cohort 48:2
  87:21 100:9
  115:18 137:14
  137:22 149:12
  170:14,22
  182:6 206:22
  206:24 207:8
  222:4,10,15
  237:3 238:11
  238:15 257:7
  282:19 290:6
  290:17 291:1
  293:23 294:4
  294:11 295:12
  307:4,12 308:1
  308:9,15,22
  310:14,19
  311:2,15
  313:21 314:15
  314:17 315:4
  315:24 316:1
  316:15,18
  317:8,14,23
  324:4,9 325:2
  325:16 329:2
  329:16 330:1
  331:9 336:8
  345:23 355:6

356:11 357:15
361:15 373:10
378:10,21
405:21 406:4
453:21 479:18
506:12
cohorts 241:4
  282:8 283:4
  298:17 304:24
  305:9 311:18
  313:16,18
  315:11 316:11
  363:11 364:21
  366:4 401:1
  406:8,13
coin 310:8
collaborate
  153:19
collect 388:9,10
  388:13
collected 256:19
collecting
  194:24
collective 419:4
  504:7
color 186:14,18
  490:13
color-coded
  187:14 269:23
column 87:13
  181:22,23
  182:20 214:15
  217:10 256:7
  271:18 275:16
  293:4 334:19
  351:1,13 377:5
  377:21 486:20
combination
  243:1
combine 222:3
  222:12
come 26:10
  47:12 55:17
  88:21 89:6
  94:7 95:18
  189:17 195:24
  222:5 229:4,12

264:10 265:24
266:23 297:10
308:12 321:14
360:19 410:7
410:15 419:19
comes 196:7
  229:1 426:13
  474:22 511:15
coming 27:19,22
  94:19 108:16
  161:5 172:15
  179:14 227:4
  228:23 320:1
  399:12,17
  403:2 419:4,14
  493:13
comment
  143:19,23
  144:2,12,21
  200:22
commentary
  81:4
commenters
  226:15
comments 67:2
  214:7,11
Commerce 2:14
commercials
  264:8
commission
  520:21
common 66:23
  204:4 294:14
  455:21 500:5
commonly
  260:15 294:19
community
  217:21
company 154:12
  154:21 478:16
  478:21
compare 320:10
  474:16
compared
  197:20 254:18
  262:23 444:12
comparing

134:4
comparison
  101:5
comparisons
  320:6
compatible
  217:18
compel 502:18
compelled 500:8
  501:4
compelling
  484:13 505:20
compensation
  107:12 114:15
complete 26:5
  45:19 103:16
  354:9
completed 51:7
completely
  209:4 458:18
completeness'
  352:12,23
completion
  517:8
comply 103:12
comprehensive
  90:19 91:23
  92:19,23
  131:16 132:2
  149:3 224:17
  233:15 514:23
comprises
  378:19
computer
  106:18 107:2,5
  107:8 187:11
concentration
  435:16,18
concept 214:17
  339:13 389:13
concepts 293:10
concern 14:13
  151:11 152:5
  153:3,4 272:7
  469:9 504:12
  505:9,10,13
concerned 69:12

208:22 210:18
210:23 211:2,8
212:22 213:1,8
249:5 295:10
314:2,3,8,21
356:8 480:12
480:13,15
513:10
concerning
  103:18 145:7
concerns 61:2,3
  313:20 411:10
conclude 90:16
  202:14 203:21
  217:11 362:7
  424:6,8 436:7
  441:5
concluded
  222:21 237:21
  253:19 254:6
  423:11 427:15
  435:19 439:21
  447:2 477:17
  492:20 516:7
concludes
  491:13
concluding
  223:1
conclusion 88:5
  88:5,22 89:7
  94:8 127:15
  128:21,22
  205:9 222:5
  224:11 227:4,5
  228:4 229:2,5
  419:18 435:23
  493:14
conclusions 67:3
  74:22 75:13,24
  76:5,8 77:11
  85:15 91:10
  210:9 211:14
conclusions'
  204:7
conditions
  289:17 438:22
  487:12

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 635 of 1035
PageID: 241814
Kevin Holcomb, M.D.

Page 530

condoms 236:19
conduct 26:22
  119:21 145:13
  153:15 284:24
  293:10,13
  439:7
conducted 22:2
  91:22 126:20
  379:4 380:2
  431:16 499:4
conducting
  145:5
conference
  15:12
confidence
  149:24 187:5
  189:4 193:23
  194:8 196:13
  196:23 197:14
  202:5,21
  205:20 219:8
  235:23 347:16
  348:23 353:18
  354:18 370:8
  372:8 376:24
  378:16 386:5
  386:10,12
  387:2 474:21
  477:10
confidential
  154:23
confirm 45:3
  404:9
confirmation
  78:15 94:7,14
confirms 449:10
conflict 203:2
confounder
  196:10
confounders
  205:3
confused 24:4
  82:22 365:2
  415:4
confusing 84:19
conjecture
  398:13 400:10

401:18 445:18
conjunction
  449:15
connection
  13:14 14:18
  58:17 59:11
  106:7,14
  113:15,17
  116:16 129:21
  243:16 440:2
consensus
  173:10
consent 338:14
  340:8 352:18
  352:20
Consequently
  469:15
consider 24:6
  97:19 98:20
  131:5 149:18
  149:18 153:6
  153:11 158:8
  189:11,12
  193:19 194:5
  195:2 233:12
  272:16 279:23
  307:2 336:22
  352:5 370:24
  379:13 434:8
considerably
  495:16
consideration
  376:18
considered 37:3
  93:8,24 98:22
  98:24 107:21
  128:3 137:17
  155:12,19
  195:10 219:14
  271:24 304:8
  304:11 323:4
  355:24 381:18
  419:3,12
  463:23
considering
  494:24
considers 272:6

272:8
consist 104:4,6
  157:1
consisted 46:24
consistency
  94:20 116:5
  137:11 158:8
  158:20 164:9
  182:22 184:8
  184:15 205:6
  220:6 224:10
  225:12,21
  226:1,2 233:20
  410:11 429:14
consistent 68:17
  149:18,19
  150:11 165:1
  182:24 183:2,7
  183:13,23
  184:5,11,20
  185:1,24
  206:21 220:22
  221:18 222:22
  223:9,12
  224:14 225:2,7
  225:17 227:12
  227:13 233:19
  260:22 272:10
  273:16,19
  284:14 310:4,7
  336:7 410:20
  417:10 420:13
  420:14 446:4
  452:24
consistently
  149:7,17 158:2
  158:4 470:10
consists 104:11
  104:22
constant 169:7
constantly 48:23
constitutes
  195:18
consulting 41:15
  42:22
Consumer 84:2
consumers 9:19

497:9
Cont'd 3:1 4:1
  6:2 7:2 8:2 9:2
contact 84:6
  411:12
contain 96:10,11
  96:23,24 97:13
  98:6,7 109:5
  109:14 175:2
  479:3 480:24
  482:12,16
  483:23 485:2
  504:15 505:4
contained
  109:23 115:15
  157:6 177:15
  228:1 241:6
  353:8 492:19
containing
  75:17 84:24
  85:20,22
contains 97:11
  102:4 148:3,18
  512:20
contaminated
  498:15 506:14
contamination
  122:10,20
  123:6,20
  398:19 399:10
  399:13,23
  400:5,7 498:12
  504:2 505:14
  505:19 506:7
contend 126:24
content 154:15
contention
  412:9
context 17:11
  18:19 19:4,17
  19:21 27:12
  34:4,23 35:13
  59:4 286:22
  298:8 428:21
  429:4 430:9
continue 469:8
  504:6 507:20

508:14 515:7
continues 168:3
  503:24
contradictory
  184:4 185:18
  210:12
contrary 128:4
  132:24 171:8
  171:18
contrast 204:2
Contravening
  93:10
contribute
  61:20
contributed
  93:12
contributors
  205:10
control 305:10
  346:13,14
  517:21
controlled 285:4
controls 262:24
  263:1 280:4
  324:2 435:15
controversial
  284:20 285:14
convention
  294:24
conversation
  66:14 400:20
  483:19 501:19
  501:21
conversations
  502:4
convince 338:20
  481:23
convinced 94:16
  123:1 440:20
convincing
  99:11 482:5
  492:4
copies 105:17,22
  106:1,4 255:24
  408:2
copy 39:24
  71:14,17,21

Case 3:16-md-02738-MAS-RLS   Document 33123-4   Filed 08/22/24   Page 636 of 1035
PageID: 241815
Kevin Holcomb, M.D.

Page 531

73:13 103:16
148:9 151:2
186:14 417:17
417:18
**Cornell** 7:18
12:17 242:10
301:2,20 302:5
302:16 448:21
461:4
**Cornell's** 301:24
**corners** 161:3
161:10 273:6
273:13 356:17
357:8 405:23
406:11
**cornstarch**
514:8,19,24
**corollary** 102:3
434:17
**Corporate** 2:4
**correct** 13:7,8
18:10 20:17
22:17,21 29:19
40:23,24 41:3
42:2 44:11,12
47:20 48:6
60:15 74:7,14
75:19 82:9
84:13 86:1
89:20 95:3
105:7,8 106:2
111:23 112:8
114:6,7,9,10
114:13 115:3,4
115:7,8 116:17
118:7 119:4,9
124:21 125:6
134:10,13
140:2 142:15
143:2 146:4,17
146:18 148:3
166:1 170:10
170:11 171:22
172:16 173:3
174:9 176:19
176:24 186:11
186:12,20,23

193:10 203:12
204:17 206:8,9
206:11 216:5
219:1,9 225:6
235:20 249:15
259:23 261:10
265:1 275:4
281:11,16
286:23,24
287:15 289:12
296:19 305:11
309:16 317:17
317:20 333:9
333:15 344:18
345:5,10 346:4
347:11,12,17
349:1,4 350:2
351:10,15
353:19 355:1
360:14 363:24
364:1,12
367:11 368:3,4
368:17,18,21
368:23 370:13
372:19 374:2
375:19 379:11
379:12 382:17
389:9,10 391:6
394:7 395:14
401:8 402:5
403:13 404:2,8
405:24 406:13
410:20 411:19
411:24 413:20
426:10 432:3
433:23 436:15
438:17 440:9
443:16 447:3
451:4 465:2
470:14 472:23
473:20 474:9
488:6,21,24
489:1,6 520:7
**corrections**
518:5,7 520:10
**correctly** 76:11
76:13 84:9

182:10,11
183:19 184:3
201:23,24
203:7,10 204:8
212:10 215:12
217:7 224:23
224:24 259:17
272:11 276:16
289:24 297:3
297:18 302:19
322:23 351:7,8
378:22,23
420:20 431:21
432:15,16
444:22 469:19
469:20 487:16
504:10
**correlation**
132:6,17
391:22 397:6
**cosmetic** 9:20
33:1 84:3
495:22 496:4
497:10 504:3
**counsel** 25:13,23
44:18 47:1
48:13 116:20
117:6,13 298:9
354:13 462:13
478:9
**count** 233:10
**counted** 264:8
381:11
**counting** 399:15
**countries**
240:14,18
**counts** 397:7,14
**couple** 55:21
88:18 130:10
315:23 336:1
444:7 460:8
**course** 29:16
251:7 284:10
284:13 354:3
438:5
**court** 1:1 11:16
15:11,16 209:9

232:19 315:9
315:12 372:10
458:7 518:20
**cover** 159:5
**coverage** 266:9
**covered** 372:16
**covering** 356:7
**COX** 459:24
460:18,19
461:16 462:2,2
**COX-1** 461:14
**COX-2** 461:14
**Cramer** 122:1
123:19,20
135:1 232:3,4
232:6,6 265:16
338:24 340:23
369:22 398:15
398:16 399:5
399:12,13
**crazy** 232:20
**create** 148:24
187:9
**created** 22:23
23:3,20 150:12
407:23
**credible** 176:3
177:17 495:12
**credit** 28:18
**Crest** 250:21,24
**criteria** 160:6
164:5 247:12
420:14 428:21
429:5,11,15
430:10
**critical** 9:9
130:18,23
**criticism** 162:9
312:13
**criticisms**
136:21,24
156:23 157:5
314:14,15
315:2 355:21
361:19 411:8
**criticize** 312:14
458:13

**criticizing**
312:18,20,23
313:11
**critique** 172:13
**critiques** 61:1
173:2,7
**cross** 187:5
194:9 474:22
**cross-examina...**
298:9
**cross-trial** 320:5
**crosses** 189:4
386:18,20
**crossing** 354:4
**crucial** 201:11
**crude** 264:14
**cry** 346:2
**culture** 19:12
**cumulative**
344:17
**cure** 73:10
**curious** 208:2
229:15 267:16
297:1 335:13
461:7
**current** 25:2
**currently**
210:10 224:18
439:15 491:3
515:12
**Curry** 3:3 16:23
17:12 18:1,11
19:1,19 20:19
24:1 25:15
26:2,23 27:3
27:13 28:3
29:2,20 32:17
33:7,13 34:17
34:24 35:15
36:1 38:22
39:5,23 42:3
43:22 44:19
46:2 47:2 48:7
49:17 50:14
51:2,19 52:12
52:15,19 53:4
54:2,3,18

Case 3:16-md-02738-MAS-RLS     Document 33123-4     Filed 08/22/24     Page 637 of 1035
PageID: 241816
Kevin Holcomb, M.D.

Page 532

55:22 56:11
57:19 58:8
60:5,16 61:24
62:17,24 63:21
65:16,21,23
66:4 68:5 70:3
70:12 72:19
74:1 77:4 79:6
80:20 81:15
84:14 89:21
90:22 91:24
92:10 95:4,20
96:12 98:8
99:21 101:20
102:7 103:6,19
104:13,23
106:8 107:15
108:12 109:7
109:15 112:15
113:22 116:21
117:7,23
118:18 119:5
121:9 122:6,16
124:11,23
125:9,16 127:9
127:20 130:20
131:20,23
133:11 136:13
137:2 138:23
139:6,23
141:15 142:3
142:16 143:3
146:6 147:5,11
148:8 150:17
152:7 153:8
155:2 156:3,14
157:17 159:1
160:20 161:7
161:24 162:19
162:24 163:12
165:11 166:2,9
166:12 167:15
170:16 171:12
172:1,7,17
173:4,14 174:4
175:21 176:4,9
177:4,18 179:5

183:6 185:2
188:4 190:22
192:3,17
193:12 195:5
196:18 197:4
198:13 202:7
202:22 203:13
204:12 207:1
207:12 209:4
211:5 213:5
215:3,9 216:6
218:4 219:10
221:6,21 223:4
223:21 225:3
230:10 231:4
232:15,22
234:16 235:7
235:13 237:15
237:24 238:20
239:10 241:13
242:2,13 244:1
244:14 245:8
245:22 246:7
246:22 248:3
249:7,22
250:11 251:14
252:12 253:2
253:21 254:9
257:12,21
259:24 262:8
265:5 267:8
268:13 272:24
276:2 277:18
278:16 279:2
282:11 283:13
286:16 287:24
288:9,23
289:21 291:4
295:15 296:2
296:20 298:24
300:18 302:1
303:12 304:14
305:16,22
306:16 307:7
312:2,15
315:15 316:6
316:22 317:18

318:5 319:8
327:12 328:1
330:7 331:11
333:1 335:7
338:6 340:20
341:4,8 342:10
343:8,12
344:19 345:11
346:5,16 349:5
349:20 350:19
354:9 355:12
356:20 358:11
359:1,10
360:16 362:10
364:5,13,23
365:8 366:6
369:7 370:18
372:20 375:20
377:6,11 378:1
379:20 381:7
382:23 385:6
385:19 386:6
387:5,15 388:6
388:14 391:7
393:7 394:8,14
395:15 397:15
398:3,23
399:19 400:3
401:9 402:2,10
406:1 408:1,17
410:21 412:13
412:21 413:21
414:19 417:16
419:8,21
423:17 427:19
431:8 432:21
433:6 434:1,19
435:6 436:16
438:2 439:9
440:11 441:11
441:24 442:10
447:4 448:3
451:5 452:21
454:21 457:2,5
459:10 460:3
462:5,16,21
463:6,14 464:5

464:10,20
466:22 468:8
469:2 470:15
472:8,15
475:23 477:20
480:5 481:2
482:18 484:19
485:4,23
487:22 489:9
491:5,17
492:24 494:11
496:7,16
497:23 499:8
500:2,13,21
501:8 504:16
505:6 506:21
507:23 508:16
509:23 510:18
512:3,22
513:12 514:10
514:16 515:23
**curve** 339:18
**custom** 25:23
**cut** 136:3 138:24
  148:10 166:23
  212:8
**cutting** 163:13
  167:24
**CV** 22:6 150:22
  152:13,22,23
  153:17
**cycle** 438:1
**CYNTHIA** 2:3

――――――――
          **D**
――――――――
**D** 5:2 488:23
**D.C** 3:18
**daily** 248:21
  250:5 251:9,11
  345:4
**dangerous**
  501:13
**data** 21:8 30:7
  30:14 31:15
  32:3,6,9,20
  46:7,22 48:19
  49:5 57:18

62:11 64:4,7,8
70:17 72:13
74:16 106:15
106:17 107:19
115:17,22
137:7 149:7
164:16 171:8
171:19 177:3
177:14 178:15
178:17,19
179:3 184:11
184:19 185:1
185:23 187:13
188:1,12 189:9
194:24 197:10
202:4 216:3
219:5 220:7
224:19 225:2
225:14,19
227:3,6,9,10
228:24 229:9
230:23 231:2
235:6 236:5
256:19 260:8
263:17 268:17
273:16,17
276:11 277:21
288:20 296:18
314:1 324:22
330:15 336:7
337:16,18,20
339:21 358:17
362:4,8 366:20
370:1 373:15
379:18 384:9
386:5 390:20
392:9,15 393:3
398:18 403:1
417:3,10
420:18,23
423:8,23,24
436:8 438:13
438:18 440:6
440:23 441:23
442:9,17 448:1
450:19 452:11
452:19 455:10

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 638 of 1035
PageID: 241817
Kevin Holcomb, M.D.

Page 533

455:13,15,18
456:7 457:10
458:21,24
459:8,8,22
460:2,7,12,22
464:19 470:5
474:2 481:21
484:6,16,22,24
485:11,13,17
488:6 491:12
491:20,24
492:4,11,13,16
492:16,17,18
493:19,21
498:14 502:5
508:20,23
509:15 511:11
511:11,18
512:8 513:8,15
513:15,18,21
513:21 514:4
514:24
**dataset** 150:4
  232:2 233:15
**date** 1:15 11:6
  114:6 180:13
  182:23 183:13
  264:6,15
  266:12 379:3
  380:1,6 491:13
  503:10 518:9
  520:16
**dated** 49:14
  104:12 142:14
  220:11 424:16
  486:11 517:15
**Daubert** 6:11
  110:15
**Dawn** 3:3 81:2
**day** 145:23
  169:11 250:20
  250:21,24
  251:1,3,4
  340:7 342:16
  352:18 431:11
  473:17 520:20
**days** 55:21

169:9,12
  487:19 518:16
**Dcurry@nutt...**
  3:5
**deadliest** 455:20
**deadly** 206:11
  206:14
**dealing** 84:22
**deals** 151:18
**debulking** 78:20
**debunk** 295:6
  295:13 296:16
**decades** 240:9
  339:2
**December** 6:20
  142:15 143:12
  220:12
**decide** 144:5
  236:14 264:2
  278:19 509:8
**decided** 323:19
**decision** 508:19
**decisions** 203:6
  288:19 289:4
**declarations**
  217:14
**decrease** 187:8
  457:11
**decreased**
  452:20 455:14
  459:8
**decreases**
  456:16
**deduce** 63:12
**deem** 152:5,15
  177:15
**deemed** 97:12
  219:6 303:24
  518:19
**deeper** 123:12
**deeply** 123:6
  399:16
**defendant** 3:20
  4:6 12:21,24
  14:1
**defendant's**
  33:5

**defendants** 3:15
  154:6
**defending** 209:5
**defense** 238:19
**define** 17:19
  18:18 21:6
  198:11 470:24
**defined** 7:20
  68:21 193:18
  302:18 384:8
  472:21 474:10
**defining** 48:16
**definitely**
  129:13
**definition** 19:16
  80:4 97:8,13
  97:23 98:13
  177:7 184:7,15
  195:10,15
  197:22 198:1,2
  198:5 302:21
  347:19 370:12
  371:12 427:10
**definitions**
  16:10 18:7
  362:14
**definitive**
  205:23
**degree** 17:23
  18:9,14 62:3
  116:1 164:19
  179:18 272:20
  372:5
**degrees** 154:3
**Demonstrative**
  8:20
**denotes** 296:9
**depended** 120:9
  120:16
**depends** 112:20
  242:23 353:20
  495:4
**deponent** 11:12
  41:2 520:2
**deposed** 14:22
  41:6
**deposing** 518:16

**deposition** 1:13
  6:6 10:2 11:8
  13:5,10 15:3
  37:16 40:22
  45:10,13 48:14
  54:6,14,19,23
  55:3,6 56:21
  58:18 59:8,16
  59:20 60:3,22
  61:7 64:17,19
  65:18 102:12
  102:18 111:11
  111:22 113:2,3
  113:6 114:17
  147:7,18 284:6
  461:1 496:14
  516:4,7 517:6
  517:8,9 518:3
  518:13,17,19
**depositions**
  15:15 54:7
  111:5 119:19
  121:3 124:1
**deps@golkow...**
  1:21
**deputy** 428:10
**dermal** 84:6
**describe** 115:13
  128:2 173:7
  183:24 194:23
  214:19 392:17
  396:6 402:17
**described** 63:5
  222:9 247:15
  263:22
**describing**
  133:24 267:14
  268:1 483:17
  484:5,14
**description** 5:13
  6:5 7:5 8:5 9:5
  111:20 160:5
  451:8
**design** 170:13
  170:21 196:9
  211:10 229:14
  238:7 241:16

268:5 280:1
  283:21 307:14
  308:24 309:1
  309:12,15,19
  312:19,24
  313:12,15,17
  315:10 316:18
  319:21,24
  323:3,5 329:15
  338:1 340:12
  388:23 410:7
  410:15
**designated**
  37:10
**designations**
  210:13
**designed** 308:12
  308:15,16,17
  316:2,12
  319:19 338:13
  479:13,16
**designer** 337:13
**designs** 241:7,12
  286:1 293:21
  308:11 321:6
  331:10
**desirability**
  252:1
**detailed** 420:12
**detect** 317:11
  318:1,21
  325:20 328:21
  329:17 330:4
  330:19 338:4
  351:3 369:4
**detection** 151:18
  335:3
**determine** 218:8
  326:7,19 343:7
  351:18
**determined** 28:8
  345:8
**determining**
  20:16 218:13
  218:16
**detracts** 259:13
**develop** 136:1

Kevin Holcomb, M.D.

developed 46:16
79:21 118:14
326:13 385:12
386:3 423:2
developing
17:17 65:10
115:14 174:23
326:15 342:4
development
20:2 21:10
331:8 336:19
338:16 351:5
374:16
develops 326:9
diabetic 36:11
diagnosed 25:2
25:12,22
391:12
diagnosis 14:14
79:11,13
256:20 353:3
diagram 281:5
281:10,12,22
282:4,8
diaper 29:24
diapered 29:18
30:4 32:14,21
diapering
346:15 399:8
diaphragms
236:20
dichotomous
477:4,5,5
Diego 2:9
differ 491:15
difference 42:15
59:18 79:2
158:16 183:18
185:6 201:20
201:21 202:15
217:14 222:8
222:10,11,15
222:17 230:14
230:20 254:22
261:19 262:17
279:24 280:2
295:23 321:2

321:13 456:3
461:23 479:17
505:23 506:18
differences
216:3
different 35:10
41:16 42:13
45:24 46:5
64:4 74:7,8
83:4 94:8,18
94:23 113:5
128:17,18
139:10 149:19
157:15 215:23
219:7,14
227:16 231:9
231:10,11,12
233:13,20,21
233:22 240:5
241:7,12
247:18 248:5,7
248:7 261:22
261:23 266:20
282:2 285:24
289:14,15
298:21 305:14
336:18 366:5
368:5,7,11,13
381:1 399:7
426:5 429:17
430:20 449:20
456:4 471:2
483:18 506:1,3
506:5 511:2
differentiate
122:10
differently
158:24 283:24
388:21 492:6
difficulties
78:24
difficulty 185:16
389:21
dilemma 469:12
dilute 291:24
diluted 290:22
291:20

Dineo 461:3
direct 228:14
425:14 517:21
direction 10:5
194:7 226:18
226:23
directionality
370:21,23
372:1,2
directly 81:21
457:6
director 427:3
428:10
disagree 33:10
77:1,3 80:19
81:19 86:3
89:11,16 99:18
138:21 156:7
156:10 169:19
179:12 183:21
207:3 218:3,24
221:5 258:2
261:3 264:17
297:15 306:9
335:6,11
394:13 395:14
401:7,12,17
402:1,6,7
420:22 426:8
426:11 428:5
433:24 434:3
445:12 457:2
464:5
disagreed 86:10
88:13 98:12
306:12
disagreeing 92:3
426:24 428:8
428:13
disagrees
168:14 328:6
disappears
451:24
disclose 207:24
479:8
disclosure
154:23

disclosures
208:19
discounting
277:2 278:10
discovered
306:21
discrepancies
409:2,9
discrepancy
89:8
discrepant
407:11 408:20
410:8
discuss 100:20
170:13,21
172:19,24
173:6
discussed
172:22
discusses 135:23
147:6
discussion 81:13
172:11 293:12
374:6 481:15
508:24
disease 21:11
158:11,13
206:11 210:18
335:1,3 487:14
disingenuous
182:7
dismissal 201:11
dismissed
210:14,19
dismissing
210:23 212:22
dismissive
132:23
disparate
296:17
disparity 364:20
dispute 244:13
disrespected
214:5
disrespectfully
213:23
distinguish

79:18 122:23
123:5,10
DISTRICT 1:1
1:2
divide 204:19
Docket 9:7
doctor 12:2,8
13:13,19 14:12
15:8 22:1
23:18 26:14
31:9 32:2,12
37:9 39:16,21
40:3,9 41:10
41:23 45:9,11
46:1 52:6,22
59:13 60:12
61:21 63:17
64:11,19 66:11
67:21 69:23
70:9 72:3,4,17
73:12 74:5
75:4,22 76:7
76:22 79:4
80:9,19 82:2
83:15 86:20
88:4 89:14
93:4,20 96:5,9
101:12 102:17
104:10 110:11
110:18 122:15
126:18 129:18
131:12 133:8
133:10 134:7
135:14 136:2
138:16 139:12
141:3,8 144:11
144:19 146:13
147:10,22
150:16 155:17
158:20 159:9
159:22 160:10
161:16 162:7
163:8 165:5,20
166:7,19
167:10,21
168:21 169:23
170:6 171:5

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 640 of 1035
PageID: 241819
Kevin Holcomb, M.D.

Page 535

173:9 179:11
180:2,10 181:9
181:12,17
182:20 184:9
186:3 189:23
190:5 191:14
192:8 197:21
198:24 199:9
199:10,17
200:5 201:2
203:8 206:7
208:6 209:5
210:7 211:12
212:11 215:14
216:20 218:19
220:18 222:20
228:6 229:18
233:4 239:22
244:10,19
256:1,4,10
257:4 258:20
269:12 270:5
271:16 272:19
274:4 279:11
280:20 293:3
294:21 295:22
302:15 303:15
306:11 308:22
316:1 322:2
327:20 331:6
334:3,8 335:20
335:24 336:14
340:16 341:19
344:1,9 348:18
350:16 353:13
354:5,12
356:16 357:13
358:6,8 363:20
365:17 367:21
371:7 374:8
375:13 376:12
377:3,20 378:4
382:12 387:14
393:2,15
397:11 401:15
404:1,11,14
405:8,19

406:18 407:3
408:4 409:18
410:5,17
414:17 415:1,8
417:12,24
418:7,16,24
419:2 420:9
421:23 422:18
424:18 427:12
429:10 430:6
430:21 431:2
431:12 432:17
434:12 437:18
439:17 441:18
442:22 443:18
446:10,13,15
446:22 447:16
453:5 454:4
455:9 456:22
457:19 459:19
464:16 465:10
465:21 467:22
470:4 471:13
471:14,24
472:19 474:2
475:14 476:8
477:16 479:1
479:24 480:2
480:21 485:16
486:9,16,24
488:8 489:8,14
490:9 491:2,11
494:18 495:19
497:1,19
502:15 503:9
503:13 507:2
510:11 513:11
514:8 515:21
**doctors** 156:24
204:21 219:18
219:23 235:22
294:22 372:7
426:4
**document** 1:8
40:12 45:5
64:13 71:4
102:13 104:21

110:4,12
111:14 114:20
115:2 180:4
186:6 199:23
210:8 220:14
224:5 255:14
271:10 273:23
292:17 302:9
302:14 333:21
344:3 363:14
377:15 403:21
406:21 407:17
407:22 424:10
424:15,18
425:4 429:2
463:11 468:2
471:7,20
486:12 488:9
488:10 490:21
496:19 497:14
503:1,6,11
**documented**
432:2
**documents** 10:8
38:10 103:3,9
103:13 104:18
105:17 107:11
110:23 116:20
117:2 119:13
154:6,12,21
155:12
**doing** 15:20
47:10 66:7
81:2 92:19
138:7 153:24
194:2,10 195:9
216:9 219:21
226:7 231:9
300:1 321:21
336:9 350:9
429:3 450:8
461:8 464:2
475:6,9 477:8
483:10 499:19
502:11 504:22
504:23 513:7
518:8

**dose** 389:14,23
391:19 471:5
**dose-response**
339:18 340:3
345:8 389:19
390:5,7,7
470:6,14,22
471:1,6 475:3
475:4 476:18
476:23 477:7,8
477:12,14,17
**douching** 8:14
405:8,11,15
**download**
106:20,21
107:2,4 503:10
**downloaded**
107:1
**downloading**
107:7
**Dr** 11:13 54:10
54:20,23 55:3
55:6 81:20
110:17 111:11
124:20 125:4
135:22 137:20
140:12,15,17
140:24 142:23
143:8,13,14
146:9 156:17
156:17 157:4
168:3 170:7
185:16 207:24
209:16 263:16
285:22 294:2
298:14 340:23
369:22 412:8
426:1,12,15,22
426:23 428:9
461:1,3 478:10
490:4 493:4
495:11
**draft** 6:19
142:13 143:12
144:3,17
220:11
**drafting** 111:21

118:5
**drawing** 216:2
**drill** 48:23
**DRINKER** 3:7
**drive** 2:4 3:8 4:3
232:19
**driven** 127:15
128:22
**drop** 236:6
495:16 513:4
**DropBox** 106:22
**dropped** 311:5
495:10
**dropping**
326:14
**drops** 193:24
**drug** 33:22 34:8
34:9,11 35:14
243:24 453:16
**dry** 36:13
**DSAR** 143:20
**dubbed** 210:10
**due** 263:15
317:16
**duly** 11:20 517:5
**duplicates** 150:3
**duration** 339:19
343:4 351:19
376:8,13 384:6
388:4 389:5
472:20 474:4
474:10 475:20
476:2
**dust** 71:11 128:9
**dusted** 130:2,16
330:12 390:17
439:2
**dusting** 134:3
236:20 390:2
396:13
**Dusts** 5:22

---

**E**

**E** 5:2,10 6:2 7:2
8:2 9:2 519:1
**e.g** 84:3 259:5
**earlier** 80:24,24

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 641 of 1035
PageID: 241820
Kevin Holcomb, M.D.

Page 536

88:12 204:2
266:14 269:10
294:23 318:10
338:21 348:3
352:15 362:24
371:7,17
392:15 397:2
409:14 410:3
413:13 414:23
425:21 444:10
444:11 451:16
515:11
**early** 30:10,18
31:18 32:15
151:5,18
352:10 487:9
**earned** 114:6
**easier** 75:7
498:10
**EASTERN** 1:2
**EBM** 7:19
302:18
**echo** 260:9
**Ed** 185:9,11
200:24 329:10
489:20
**editorialize**
280:21
**Eds** 185:12
**educational**
23:5
**effect** 15:10
182:24 183:14
185:21 205:1,5
205:17 217:6
290:7,14 314:4
314:9 318:16
318:22,24
324:3 330:20
339:17 367:6
420:19 421:3
436:9 452:13
509:3 510:9
**effects** 22:3
201:11 204:24
210:14 212:23
450:22 454:12

**efficacy** 34:15
**effort** 122:23
**efforts** 203:5
453:22
**effusion** 468:17
468:19
**effusions** 9:11
466:10 468:1,7
469:11
**egregious**
144:16
**either** 127:10
198:4 278:9
286:10 326:2
329:13 350:12
368:22 440:24
506:2
**electronic** 106:4
**electronically**
105:15 106:15
106:24
**elevated** 348:5
349:3,9,19,23
353:17
**Ellen** 156:18
292:4
**ELLIS** 4:2
**Elmo** 5:7
181:18 281:9
463:9 464:8
**embedded** 123:7
399:16
**employed** 160:2
161:5 173:1
469:16
**employee** 301:2
**endeavor**
103:11 496:14
503:14
**endeavored**
115:9
**ended** 78:22
**Endnote** 229:18
**endometrioid**
409:5
**endometriosis**
487:13

**endured** 35:3
**engaged** 28:12
**engagement**
59:10,21
**engine** 120:2
**Engineering**
446:19
**enrolled** 383:16
**enrolling** 340:13
**entail** 43:21
112:19
**entailed** 44:1
**entire** 68:15
214:16
**entities** 3:15
**entitled** 52:7
139:8 155:18
191:4
**entity** 262:21
**entry** 444:10
**environmental**
61:4 88:8 89:5
**EOC** 347:15
487:11
**epidemiologic**
56:22 115:17
137:7 149:7
164:16 288:8
359:22 392:15
485:10
**epidemiological**
57:10 165:6
262:4 273:16
288:20 359:17
360:2 492:13
492:16
**epidemiologic...**
358:22
**epidemiology**
7:14 154:3
164:23 286:22
287:2,4,7
392:9
**epithelial** 7:6,22
8:9 9:15 21:17
249:18 276:15
280:16 311:23

336:3 357:17
378:12 410:19
413:12 452:7
459:24 462:3
487:1,7,20
**Epstein** 9:6
426:1,12,15,22
**equal** 241:23
398:6
**equally** 204:1
311:18 369:16
**equivocally**
202:20
**eradicating**
217:11
**ergo** 300:4
**err** 506:20
**errata** 518:6,9
518:12,15
520:12
**error** 355:7,15
**errors** 203:4
407:24
**especially**
226:13
**ESQ** 2:3,8,13,13
3:3,8,12,17 4:3
**essence** 59:19
**established**
87:20 139:21
335:1 365:22
379:6
**estimate** 193:22
196:16,17,21
197:2,2,13,17
197:18 203:24
226:22 264:14
347:14,24
349:10,16,18
349:19,23
371:4 474:17
**estimated** 336:4
**estimates**
187:20 354:2
**estimating**
337:1
**estimation**

**373:19
estrogen** 205:18
243:9,12,13
**et** 88:19,19
255:19 303:4
358:4 416:11
416:23,24
417:5,14
453:14,18
462:10
**ethnic** 248:9
**ethnicities** 240:5
**evaluating**
491:3
**evaluation** 94:3
161:21 224:18
477:6
**evaluations**
224:15,16
225:12 227:23
**event** 473:19
**events** 432:12,19
**ever/never**
415:9,12 416:6
416:10 417:10
**everybody**
177:23
**everyday** 389:16
389:17
**evidence** 19:13
49:10 63:12
128:4 158:12
175:19 176:3
182:8 217:22
255:11 280:12
281:6,11,14
282:14,24
283:12 302:24
305:6,6 315:3
336:22 394:21
395:21 398:10
412:8 422:8,12
422:16 428:20
429:4 430:8
432:6,6 436:20
437:6 448:7,12
449:2,15

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 642 of 1035
PageID: 241821
Kevin Holcomb, M.D.

Page 537

| | | | | |
|---|---|---|---|---|
| 450:21 451:3 | 498:8 | 503:2,6 | 119:18 120:12 | 185:20 216:9 |
| 451:18 453:24 | **examples** | **exhibits** 54:7,11 | 121:3,7 123:15 | 252:22 253:12 |
| 458:20 479:21 | 205:16 267:14 | 54:15,20 55:5 | 123:21 124:1,5 | 257:15 258:7 |
| 481:12 482:5 | 314:20,21 | 55:12 119:18 | 124:18 125:2 | 263:11,13 |
| 484:13 505:20 | 455:3 457:22 | 142:24 143:9 | 126:19 127:4 | 272:9,21 273:9 |
| 508:3,10 509:3 | 457:24 458:1 | 143:14 146:9 | 127:18 134:8 | 297:23 460:9 |
| 510:23 511:7 | **exception** 192:9 | 147:3,10,14,15 | 135:21 139:15 | 460:11 461:20 |
| 511:23 512:12 | **Excerpt** 5:14,16 | 147:19 | 139:20 140:15 | 462:22 511:21 |
| **Evidence-** 7:19 | 5:19 | **exist** 41:17 | 140:17 146:17 | **explained** 78:6 |
| **evidence-based** | **excesses** 93:12 | 130:4,19 | 147:1 148:2 | 98:12 314:2 |
| 281:15 283:10 | **excuse** 96:14 | 492:14 | 150:22 155:14 | 356:23 440:1 |
| 302:17,22 | 190:5 327:6 | **existing** 43:13 | 157:1,7 162:17 | **explaining** |
| 303:5,17,19 | 463:6,7,15 | **exists** 425:13 | 180:3 184:23 | 199:2 267:16 |
| 305:2 | **Excused** 516:6 | 491:13 492:12 | 186:4,11 | 314:24 353:10 |
| **exacerbated** | **exhaustive** | **expand** 77:16 | 187:17 208:1 | 460:21 |
| 335:2 | 492:1 | **expect** 185:22 | 208:13,16 | **explains** 196:7 |
| **exact** 88:22 | **exhibit** 39:19 | 225:21,24 | 242:20 243:5 | **explanation** |
| 91:17 266:12 | 40:7,13,21 | 226:8 227:15 | 271:8 273:4 | 167:4 254:21 |
| 285:20 481:15 | 45:6,10,11,19 | 259:21 260:14 | 274:4 276:19 | 263:19 331:2 |
| 484:7 | 55:10 64:12,14 | 339:15 410:13 | 281:2 292:5 | 399:4,6 480:11 |
| **exactly** 50:16 | 71:5,9 72:20 | **expelling** 422:8 | 303:7 308:23 | **explanations** |
| 51:22 86:9 | 102:12,14,18 | **experience** | 309:4 315:6 | 252:24 400:12 |
| 117:11 129:23 | 110:5,8 114:21 | 78:20 178:13 | 352:2 353:8 | **explicitly** 90:6 |
| 141:22 168:16 | 115:1 121:8 | 341:12,15 | 355:5 356:17 | **exposed** 17:22 |
| 218:14 244:9 | 146:12,20 | **experiment** | 375:5 405:23 | 254:17 341:7 |
| 255:4 280:3 | 150:21 180:5,9 | 280:1,7,9,13 | 407:4 411:16 | 342:18 346:14 |
| 349:15 356:4 | 186:5,7 199:24 | 433:22 | 502:16,22 | 368:20 384:7 |
| 395:4 406:16 | 200:4 220:12 | **experimental** | 515:3,8,13 | **exposure** 7:6 |
| 440:2 460:10 | 220:15 224:4,6 | 145:6 | **expertise** 302:24 | 20:1 21:9 |
| 475:17 | 255:15,19 | **experiments** | 504:8 | 26:15,20 27:7 |
| **EXAMINATI...** | 258:22 269:20 | 22:2 | **experts** 127:19 | 27:19 28:7 |
| 11:23 | 271:11 273:24 | **expert** 6:10 | 129:20 130:15 | 60:14 61:13,17 |
| **examine** 411:5 | 292:18,22 | 12:20 37:10 | 132:10 140:5 | 61:22 62:15,22 |
| **examined** 11:21 | 302:10,13 | 38:15 39:11 | 149:5 156:11 | 63:4,13,18 |
| 80:6 93:15 | 333:22 334:1 | 49:13,21 50:11 | 156:12 157:4,6 | 65:1,5 67:7,23 |
| 437:15 | 344:4,8 363:15 | 50:19 51:5,6 | 157:9 158:23 | 68:1,18 70:2 |
| **example** 19:13 | 363:18 377:12 | 51:16 52:24 | 198:19 210:22 | 70:11,18 71:1 |
| 36:10 132:4 | 377:16,22 | 53:19 54:5 | 214:21 215:2 | 72:13 74:16 |
| 135:22 157:23 | 403:20,22 | 57:13 58:13,22 | 292:3,14 | 80:5 82:19 |
| 205:12,13 | 406:22 407:2 | 59:5 86:20 | **experts'** 50:7,9 | 83:16,19,21,22 |
| 207:16 226:7 | 407:18,22 | 87:3 104:11 | 52:1 53:12 | 84:4,8,12 |
| 248:10,16 | 424:11,15 | 105:6,18 | 58:13 172:14 | 87:19,23 88:9 |
| 264:20 281:24 | 428:16 468:3 | 107:12 108:10 | 173:3 | 95:14 149:9 |
| 290:4,18,21 | 468:10 471:8 | 110:14,20 | **expires** 520:21 | 220:24 224:20 |
| 291:18 381:11 | 471:12 486:13 | 111:6,16,21 | **explain** 137:15 | 237:23 252:2 |
| 395:18 409:4 | 488:9,11 | 112:2 115:1 | 137:24 161:12 | 252:10 256:19 |
| 425:20 494:14 | 496:20,24 | 118:3,5 119:3 | 167:1 168:15 | 259:5 280:5 |

310:1,21
311:12,24
323:13 326:8
326:17 330:10
331:23 332:7
335:18 336:18
337:15 338:15
339:10 342:13
344:12,16
353:2 354:1
366:20 367:9
376:2 384:6
390:23,24
391:4,23 394:4
394:4 397:4,5
404:4,6,15,16
415:8,11
417:11 420:10
420:17 432:10
444:12,14
470:20 513:7
**exposures** 61:4
61:19 86:5
98:15 272:17
316:13 337:21
**expound** 222:2
**expressed** 318:9
461:13,14
**expression**
459:24 460:19
461:18 462:3
**extend** 80:4 86:6
**extending**
100:11
**extensive** 91:2,9
**extracted** 417:3
**extrapolate**
337:3
**extrapolated**
353:5
**extrapolating**
336:10
**extrapolation**
331:20,20
**extrapolations**
333:11
**eye** 36:7 270:13

**F**

**F** 3:18
**facilitate** 173:12
**fact** 41:13 69:20
78:13 160:16
161:2 179:1
204:10 206:14
232:1 236:7
254:11 272:16
281:13 287:16
288:13 317:14
324:19 360:1
361:12 369:16
380:5,11
381:15,23
395:2,2 396:22
403:2 414:7
432:18 435:14
442:13 444:8
448:1 449:11
459:15 461:12
480:10 511:19
**factor** 17:10,14
18:19,20 23:23
24:9 243:11
405:11,15
487:20 507:12
**factories** 63:9
**factors** 8:9 23:4
23:10,20 24:7
24:23 25:14,24
26:9 158:24
243:5 246:5
251:23 271:20
271:23 296:10
296:14 487:7
**factory** 69:10
332:18 369:15
**facts** 107:19
**fail** 518:18
**failed** 93:18
**failure** 217:15
**fair** 16:7,8,19
21:15 38:19
41:14,20,22
42:20 113:21

123:22,23
137:9 150:16
150:19 157:7,8
167:20 189:5
202:10 209:10
262:18 263:9
264:5 269:1
295:14 312:14
409:13 466:6
475:18
**fairly** 311:18
**fall** 36:20,24
284:16
**fallopian** 422:4
422:21 423:15
438:17 443:20
452:8
**falls** 340:2
391:15
**false** 178:7,15
204:7 210:9
**falsifying**
179:18
**familial** 456:6
**familiar** 204:22
267:11 287:13
**familiarity**
262:12
**family** 341:13
487:11
**far** 53:10 95:21
214:18 238:8
346:2 444:24
504:11
**fashion** 35:7
**faster** 120:22
430:5
**fax** 1:20
**FDA** 9:6,19,22
424:16 426:8
426:14 428:5
496:2,14 497:8
497:20 498:21
498:22 499:3
499:14,18
500:8 501:4,11
501:16 502:12

502:14,17,23
503:7,14,15,22
503:24 504:13
505:3
**FDA's** 495:20
496:2 497:2
498:24
**FDA.gov/cos...**
497:3
**fearing** 513:6
**February** 49:14
104:12 108:5
115:3 124:6,19
125:3 147:2
151:5
**federal** 504:7,20
**feel** 92:21 214:4
246:2 297:7,16
392:11 492:6
511:16
**feeling** 45:4
168:17 310:3
509:13 511:9
**fellows** 23:7
**fellowship**
284:11
**felt** 164:9 190:1
190:13 290:13
489:22 513:8
**female** 25:3
173:11 365:24
366:2 422:24
427:6 445:15
**Ferante** 88:18
**fiber** 42:13
397:7,13 398:1
**fibers** 41:16
42:21 65:9
74:7 75:16,18
76:3 85:1,7,17
85:20,22
**Fibres** 5:22
71:11
**fibrous** 109:1
170:9 478:17
482:12,16,23
483:13,24

**field** 215:2
**fifth** 1:14 11:9
305:8
**figure** 101:6
262:19 281:1
282:19 283:3
336:11 361:15
362:4 400:17
415:16,18
418:3 475:8
**file** 103:23 104:1
104:10,22
106:18 107:6
**files** 103:16
**final** 118:12
144:15
**finally** 144:5
215:15 216:24
217:9
**find** 36:13 68:16
91:16 93:18,23
94:12,14 128:4
128:12 129:17
130:8 131:13
134:5 141:1
150:9 160:8
165:7 179:21
185:15 195:22
196:6 205:4,6
222:7 238:13
265:23 274:15
280:15 282:7
282:15,19
283:1,3,9,16
286:3 288:4
292:12 309:11
311:19 312:21
314:20,21
315:3,5,7
317:15 320:23
321:9 337:14
342:3,5 367:20
391:11 392:2
446:1 453:24
463:10 480:14
506:7
**finding** 61:1

Kevin Holcomb, M.D.

Page 539

| | | | |
|---|---|---|---|
| 77:17 93:14 | 127:8 164:7 | 361:16 364:15 | 104:24 106:9 |
| 101:5 131:8 | 182:19 199:16 | 368:15 373:2 | 108:13 109:8 |
| 165:1 187:7 | 213:11 214:20 | 373:22 382:9 | 109:16 112:16 |
| 196:4 256:21 | 224:22 237:1 | 506:10 | 113:23 116:22 |
| 263:13 280:15 | 260:2 264:15 | **following** | 117:8,24 |
| 290:14 357:15 | 266:8 275:16 | 115:20 334:4,7 | 118:19 119:6 |
| 370:13 371:1 | 287:8 295:2 | 339:3 | 121:10 122:7 |
| 371:10 372:18 | 319:12 320:3 | **follows** 11:21 | 122:17 124:12 |
| 391:23 395:7 | 321:21 323:1 | **Food** 427:3 | 127:21 130:21 |
| 396:6 434:13 | 325:11 326:19 | 428:11 | 131:24 136:14 |
| 434:17 497:20 | 327:23 328:17 | **footnote** 334:4 | 137:3 139:24 |
| **findings** 61:5,8 | 365:20 377:5 | 488:4 | 142:4,17 143:4 |
| 67:4 80:3 86:7 | 407:14 425:4 | **force** 15:9 | 146:7 147:6,12 |
| 89:2,12,17 | 430:17 443:18 | **forced** 284:8,9 | 150:18 152:8 |
| 91:17 92:17 | 461:19 469:6 | **foregoing** | 153:9 155:3 |
| 178:23 179:13 | 476:9 479:7 | 517:18 520:6 | 156:4,15 |
| 179:21 205:14 | **FISH** 3:3 | **foreign** 240:14 | 157:18 159:2 |
| 241:24 256:16 | **five** 61:16 62:8 | 240:17 423:3 | 159:17 160:21 |
| 259:12 272:10 | 87:21 89:3 | **forgot** 31:9 | 161:8 162:1,20 |
| 275:22 276:7 | 217:3 376:10 | 308:18 | 163:1 165:12 |
| 280:3 303:24 | 471:19 | **form** 16:24 | 166:3,10 |
| 307:24 358:10 | **flashes** 37:4,7 | 17:13 18:2,12 | 170:17 171:13 |
| 358:17,18,24 | **flaws** 293:15 | 19:2,20 20:20 | 172:2,8,18 |
| 359:19 373:20 | 313:1 319:21 | 24:2 25:16 | 173:5,15 174:5 |
| 379:16 395:6 | **flipping** 310:8 | 26:3,23 27:14 | 175:22 176:5 |
| 419:14 433:21 | **Florham** 3:9 | 28:4 29:3,21 | 176:10 177:5 |
| 435:2 436:19 | **fluid** 151:19 | 30:20 32:18 | 177:19 179:6 |
| **fine** 66:7 73:4 | 468:19 | 33:8,14 34:18 | 185:3 188:5 |
| 126:2 401:19 | **FLW** 1:6 | 35:1,7,16 36:2 | 192:4,18 |
| **finish** 52:18 | **focusing** 68:12 | 38:23 39:6 | 193:13 195:6 |
| 92:12 133:16 | **folks** 498:11 | 42:4 43:23 | 196:19 197:5 |
| 133:18 138:24 | **follow** 313:22 | 44:20 45:21 | 198:14 202:8 |
| 163:10,21 | 338:1,10 339:6 | 46:3 47:3 48:7 | 203:14 204:13 |
| 166:13 233:2 | 380:13 458:1 | 49:18 50:15 | 207:2,13 211:4 |
| 237:16 306:16 | 495:17 | 51:3,20 53:5 | 211:6,16 213:4 |
| 310:17 327:23 | **follow-up** 20:16 | 55:23 56:12 | 213:6 215:4,10 |
| 328:16 332:8 | 325:13 350:1,3 | 57:20 58:9 | 216:7 218:5 |
| 332:11 447:1 | 350:15 351:2 | 60:6,17 62:1 | 219:11 221:7 |
| 462:19 463:16 | 352:14 353:2 | 62:18 63:1,22 | 221:22 223:5 |
| **finished** 79:7 | 355:18,20,23 | 65:17 66:5 | 225:4 230:11 |
| 133:11 485:22 | 356:2 361:18 | 70:5,13 77:5 | 231:5 232:16 |
| 516:1 | 363:22 368:16 | 84:14 89:22 | 234:17 235:8 |
| **first** 11:20 12:23 | 379:6,14 | 90:23 92:1 | 235:14 236:23 |
| 21:9 33:17 | 404:22 | 95:5,20 96:13 | 238:1,21 |
| 37:22 43:3 | **followed** 293:23 | 98:8 99:21 | 241:14 242:3 |
| 87:14 103:1 | 311:4 339:8 | 101:21 102:8 | 242:14 244:2 |
| 121:23 122:2 | 340:5 356:6 | 103:20 104:14 | 244:15 245:9 |

| |
|---|
| 245:23 246:8 |
| 246:23 248:4 |
| 249:8,23 |
| 250:12 251:15 |
| 252:13 253:3 |
| 253:22 254:10 |
| 257:13,22 |
| 260:1 262:9 |
| 265:6 267:9 |
| 268:14 273:1 |
| 277:19 278:17 |
| 279:3 282:12 |
| 283:14 286:17 |
| 288:1,10,24 |
| 289:22 291:5 |
| 295:16,18 |
| 296:3,21 299:1 |
| 300:19 302:2 |
| 303:13 304:15 |
| 305:17,23 |
| 307:8 308:13 |
| 312:3,16 |
| 315:16 316:7 |
| 316:23 317:19 |
| 318:6 319:9 |
| 327:13 330:8 |
| 331:12 333:2 |
| 335:8 338:7,14 |
| 340:21 341:9 |
| 342:11 343:9 |
| 343:13 344:20 |
| 345:12 346:6 |
| 346:17 349:6 |
| 349:21 355:11 |
| 355:13 356:21 |
| 358:12 359:2 |
| 359:11 360:17 |
| 362:11 364:6 |
| 364:13 365:9 |
| 366:7 369:8 |
| 370:19 372:21 |
| 375:21 379:21 |
| 381:8 382:24 |
| 385:7,20 386:7 |
| 387:6,16 388:7 |
| 388:15 391:8 |
| 393:8 394:9,15 |

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 645 of 1035
PageID: 241824
Kevin Holcomb, M.D.

Page 540

395:16 397:16
398:4,24
399:20 400:4
401:10 402:3
402:11 406:2
408:18 410:22
412:14,22
413:22 414:20
417:17 419:9
419:22 423:18
427:20 431:9
432:22 433:7
434:2,20 435:7
436:17 438:3
439:10,12
440:12 441:12
442:1,11 447:5
448:4 451:6
452:22 454:22
459:11 460:4
462:6 464:21
468:9 469:3
470:16 475:24
477:21 480:6
481:3 482:19
484:20 485:5
487:23 489:10
491:6,18 493:1
494:12 496:8
496:17 497:24
499:9 500:3,14
500:22 501:9
504:17 505:7
506:22 507:24
508:17 509:24
510:19 512:4
512:23 513:13
514:11,17
520:10
**formal** 26:5
**format** 285:1
**formed** 24:11
44:14 47:19,24
345:23
**forming** 108:2
117:16,20
**formulated**

49:11
**formulating**
52:9 107:21
155:13
**forth** 108:5
350:3 401:6
406:11
**forward** 54:16
471:20
**found** 47:7
75:17 76:3
80:1 85:18
94:21 95:15
177:24 217:4
228:18 237:12
276:4 280:11
280:11,18
282:5 307:24
310:23 321:1
323:5,16,18
373:17 376:22
378:10 390:20
391:4 409:4,6
409:7 436:12
443:4 453:21
454:16 477:12
482:12 505:11
**foundation**
155:19
**four** 13:20
112:23 161:2
161:10 273:5
273:12 305:8
356:17 357:8
369:18 376:10
405:22 406:11
489:5
**fragrances**
109:14
**frame** 264:11,13
264:24 336:6
**fraught** 285:7
289:18
**free** 108:18,24
256:20
**French** 487:3
**frequency** 29:23

270:15 343:4
344:17 345:9
376:18 404:6
404:20 474:4
475:20 476:3
**frequently**
343:1
**fresh** 28:24
**Frey** 242:8
**front** 40:20 41:1
45:12 211:18
271:15
**frozen** 450:11
**frustrates** 209:6
**full** 39:24 71:14
71:20 74:2
87:14 91:22
127:8 138:17
148:11 155:11
164:20 203:16
232:23 443:18
443:19
**further** 45:3
76:14 110:23
203:20 383:12
420:17 442:20
449:10 463:19
504:14 515:20

---

## G

**game** 390:4
**Garber** 2:3 5:5
12:1 17:2,18
18:8,17 19:15
20:5,23 24:12
25:17,19 26:12
26:24 27:5,23
28:15 29:7
30:1,21 31:4,8
32:10,23 33:11
33:20 34:19
35:8,19 36:18
39:2,15 40:1,2
40:5,11,15
42:19 44:5
45:8 46:21
47:4 49:9 50:5

50:23 51:8
52:5,14,17,21
53:17 54:1,12
55:1 56:1,13
57:24 58:4,15
60:8,19 62:13
62:20 63:15
64:10,16 65:19
66:3,8,10
67:18,20 68:6
70:6,7 71:7,18
72:2 73:3,5,16
73:21 74:4
76:16,21 79:3
80:8,14,18
82:1 84:15
90:17 91:20
92:4 93:1
95:17,23 96:15
99:17 101:11
101:24 102:9
102:16 103:4,7
103:22 104:16
105:3 106:11
107:17 108:15
109:11,19
110:7 112:17
114:1,23
116:24 117:14
118:4,24 119:8
121:12,18
122:13 123:3
124:16 125:1
125:23 126:4,8
126:17 129:7
131:11,21
133:7,14
136:19 138:15
139:2,9,11
140:3 141:20
142:6,19
143:10 144:8
144:10 146:10
147:8,21
148:13,16
150:20 152:11
153:14 155:5

156:6,19
158:18 159:8
159:17,18
161:1,15 162:2
162:21 163:7
163:15,17
165:4,13 166:6
166:17 167:15
168:20 169:2
169:17 170:1,5
170:19 171:14
172:3,12,23
173:8,17 174:8
176:1,6,15
177:8 178:12
179:10 180:7
183:9,10 186:2
186:9 188:6
190:11,22
191:13 192:7
192:19 194:11
195:12 196:24
197:9 198:23
200:2 202:9,24
203:18 204:14
206:4,6 207:5
207:14 208:3,5
208:23 209:13
209:20 210:6
211:11,23
213:10,17,20
214:3,6,13
215:5,13
216:13 218:17
219:15 220:17
221:8 222:19
223:7,21,24
224:8 225:5
230:24 231:8
233:3 234:20
235:10,18
237:18 238:17
239:3,13,21
240:24 241:2
241:17 242:5
242:16 244:5
244:18 245:13

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 646 of 1035
PageID: 241825
Kevin Holcomb, M.D.

Page 541

| | | | | |
|---|---|---|---|---|
| 246:1,11 247:5 | 377:8,13,18,24 | 483:4 484:23 | 83:19,21,23 | 365:7 366:21 |
| 248:22 249:12 | 378:3 380:20 | 485:15,19 | 84:5,13 85:6 | 368:6 372:11 |
| 250:3,13 252:6 | 382:2 383:3 | 486:8,15 488:3 | 110:15 158:7 | 372:18 373:17 |
| 252:18 253:6 | 385:14,22 | 488:13 489:13 | 177:24 178:21 | 378:24 379:10 |
| 254:1,23 | 386:11 387:7 | 491:9 492:8 | 270:24 271:5 | 379:17 380:5 |
| 255:17,22 | 388:1,11 389:1 | 494:5,17 | 314:16 320:6 | 380:10,14 |
| 256:3 257:16 | 393:1,11 | 496:11,22 | 330:1 356:23 | 382:21 383:5,8 |
| 258:1 261:2 | 394:12 395:10 | 499:2,11 500:7 | 406:5 | 403:12 411:18 |
| 263:23 266:5 | 396:9 397:20 | 500:18 501:1 | **generally** 32:11 | 411:23 412:11 |
| 268:8,16 | 398:14 399:1 | 501:23 503:4 | 37:24 137:16 | 413:11,19 |
| 271:13 273:3 | 399:24 400:23 | 504:24 505:8 | 141:2 177:3,15 | 415:9 |
| 274:2 276:3,6 | 401:14 402:4 | 507:1 508:8 | 241:12 245:7 | **getting** 59:12 |
| 278:6,23 279:7 | 402:14 403:24 | 509:17 510:1 | 246:24 247:1 | 75:2 77:7 |
| 282:22 283:15 | 406:6,24 | 511:24 512:7 | 313:14 320:4 | 226:24 254:13 |
| 286:19 288:5 | 407:20 408:3 | 513:9 514:7,14 | **genital** 9:13 | 255:7 318:19 |
| 288:11 289:9 | 408:19 411:1 | 514:21 515:17 | 173:11 280:16 | 389:18,24 |
| 290:1 291:8 | 412:17 413:2 | 515:24 | 311:24 357:17 | 390:1,3 391:14 |
| 292:20 295:21 | 413:23 414:21 | **gas** 63:7 69:8 | 374:16 419:5 | **Ghio** 9:12 |
| 296:5,22 298:2 | 415:2 417:20 | 78:1 332:17 | 423:1 427:6 | 465:22 468:23 |
| 299:3 300:22 | 417:23 418:21 | 369:14 | 437:20,24 | **girls** 88:7 |
| 302:7,12 | 418:23 419:10 | **gate** 48:2 | 438:15 445:15 | **give** 78:18 88:17 |
| 303:14 304:17 | 420:3 421:13 | **Gates** 8:11 48:3 | 448:9 476:15 | 99:5 121:24 |
| 305:18 306:2 | 421:22 424:4 | 149:12 207:16 | **genitals** 28:24 | 128:15 132:11 |
| 306:18 308:6 | 424:13 427:24 | 311:4 324:13 | 29:10 30:10,17 | 141:15 194:12 |
| 312:6 313:13 | 430:23 431:1 | 324:15,17 | 31:17 32:5 | 195:19 205:15 |
| 315:17 316:10 | 431:10 432:24 | 339:7 356:1,2 | 33:6 131:18 | 212:1 228:10 |
| 317:2,21 319:2 | 433:9 434:11 | 357:14 358:4,8 | 134:21 135:16 | 228:11,13,17 |
| 321:15 327:19 | 434:24 435:22 | 359:18 360:14 | 135:17 174:3 | 232:23 266:12 |
| 328:8 331:5 | 437:17 438:12 | 360:19 361:21 | 239:8 384:22 | 348:8 395:17 |
| 332:9 333:5,24 | 439:16 440:15 | 362:8,17,21 | 404:7,16 | 409:16 417:13 |
| 335:10 340:15 | 441:17 442:4 | 363:1,13,19,20 | 439:23 441:22 | 417:13 421:10 |
| 341:1,5,17 | 442:21 446:7,9 | 364:3,11,22 | 479:6 482:17 | 421:11 425:1 |
| 342:12 343:10 | 447:15 449:17 | 365:6 366:17 | 484:2 501:6 | 425:11,12 |
| 343:15,24 | 452:5 453:4 | 367:13 368:14 | 507:22 512:20 | 430:2 438:20 |
| 344:6,22 | 454:3 455:8 | 370:5 372:12 | **genuine** 210:14 | 472:13 473:5 |
| 345:13 346:9 | 456:18,21 | 372:18 373:9 | 212:22 | 485:13 494:16 |
| 346:20 348:17 | 457:3,8 459:2 | 373:15 379:10 | **Gertig** 8:8 48:3 | 494:18,21 |
| 349:17,24 | 459:12 460:6 | 379:16 380:10 | 135:8 149:13 | 508:5 512:17 |
| 350:23 354:11 | 462:9 463:4 | 381:24 382:4 | 248:16 310:22 | 513:24 515:18 |
| 356:13,15 | 464:15,23 | 382:12 411:18 | 344:2 347:2 | **given** 15:15 |
| 357:1,6 358:15 | 466:24 468:5 | 411:23 412:10 | 356:18 357:10 | 50:11 53:18 |
| 359:3,14 362:2 | 468:15 469:5 | 413:10,20 | 358:1,10,19 | 73:1 138:4 |
| 362:18 363:17 | 470:1,3 471:10 | 414:3 415:11 | 359:19 360:3 | 181:13 182:3 |
| 364:7,19 365:3 | 472:14,18 | 416:9 | 360:10 361:20 | 182:24 183:13 |
| 365:10 366:11 | 473:7,20 474:1 | **general** 6:11 | 361:23 362:20 | 241:21 262:2 |
| 369:24 371:6 | 476:7 477:24 | 21:5 23:5 26:1 | 363:23 364:4 | 285:16 286:2 |
| 373:24 376:1 | 480:20 481:7 | 26:8 38:1 | 364:12,16,22 | 288:13 297:8 |

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 647 of 1035
PageID: 241826
Kevin Holcomb, M.D.

Page 542

325:11,12,17
326:23,24
337:8 341:3
389:6 481:19
517:6 520:8
**gives** 331:1
386:4 504:19
**giving** 24:5 26:8
178:7,22
179:16 337:19
372:23 463:19
494:23
**glad** 441:2 447:8
447:16
**glean** 122:14
**gleaned** 122:19
**gloves** 400:8
**go** 15:1 31:9
50:20 53:14
54:1,14 65:4
66:11,13 67:3
67:14,24 68:12
68:14 72:5
88:18,20 94:2
94:6 98:3
99:12 100:14
112:20 129:16
130:7 133:9
136:16 146:11
161:12 165:8
167:7,8 169:6
169:20 182:19
189:14 194:21
202:11 203:19
206:13 208:4
209:8 218:1
237:8 258:20
269:16,19
272:14 275:15
285:15 297:22
319:3 324:15
324:22 327:16
335:24 361:6
366:13 367:20
373:9 384:1,14
390:10 397:6
403:4,7 416:17

417:24 431:24
432:5 440:22
441:3 445:3
453:5 455:12
457:11 459:7
473:7 476:8
484:16,21,24
485:23 489:16
503:14 508:19
509:5 510:12
511:5
**goes** 65:7 86:2
88:3 97:22
183:24 201:8
214:19 263:8
287:10 323:10
338:19 378:15
382:10 398:20
400:16 434:8
444:16 458:24
**going** 15:17 16:6
21:12 30:22
39:18,19 40:6
43:15 45:9
59:13 61:7
64:6,11 65:20
66:24 67:11
71:8,22 72:11
75:8 76:4,5
77:9,21 79:4
99:12 100:13
100:23 101:1
114:24 125:13
125:20 126:11
136:1,3 137:10
139:4 144:5
148:14 159:12
164:17 168:7
169:22 170:1,2
176:11 180:1,8
185:11,12
189:11,12
190:7 193:19
195:1 200:3
202:3 205:5,6
205:7 206:3
209:24 216:10

220:8,10
226:18 228:8
228:10,11,13
232:19 243:2
255:18 260:21
265:18,20,22
265:24 270:17
271:4 274:3
285:10,11
292:21 316:17
319:13 320:15
320:16,20
321:17,22
324:21 327:17
328:16,23
330:4 337:24
338:1,4 342:1
344:1 360:8
362:3 363:6,7
372:23 392:23
397:10 403:15
407:1,21
409:16 410:12
417:21 424:14
428:14 435:21
451:3 453:7,10
456:24 458:4,6
471:11 472:2,5
474:14 475:1
480:9 481:9,13
484:3 485:10
485:13 486:9
488:8 493:12
493:16 494:1,7
494:15 498:20
498:23 501:19
509:12 511:13
511:20 512:1
**Golkow** 1:20
11:5
**Gonzalez** 8:16
48:4 207:9
403:17
**good** 12:2,3
15:20 24:15
125:21 158:12
239:10,11,22

239:23 264:20
267:12 285:11
350:12 386:4
391:21 416:3
**Google** 120:4,18
120:20
**Gotshal** 1:14
3:12
**government**
145:2
**grade** 449:13
451:13 461:12
**gradient** 477:19
**graduate** 284:10
**grant** 145:13
**granuloma**
449:2
**granulomas**
448:17 450:6
**granulomatous**
449:3,16
451:20
**gravel** 87:6,9
**Gray** 1:15
517:12
**great** 170:3
214:2,8 228:16
230:19
**greater** 194:15
195:16 198:7
241:23 339:9
368:1 370:6
371:9,19
376:11 472:21
**greatest** 293:22
**Green** 232:1
233:12 490:14
490:22 491:1
**Greenland**
199:18 201:6
207:24 209:16
287:9
**group** 30:23
87:15,17 93:8
96:6,11,17,24
97:5 98:7 99:1
99:19 101:16

101:19 102:2,4
211:9 226:10
238:3 248:9,10
272:6 311:3
312:10 315:10
320:7,8 321:12
321:19 346:13
346:14 356:6
373:2 385:18
397:13 398:2
398:22 491:14
492:11,21
**groups** 92:16
201:20 322:9
**grown** 250:19
**guess** 16:3 28:10
38:5 39:8
59:18 86:11
115:19 130:23
131:2 149:4
250:16 280:2
418:2 426:24
427:7 475:16
493:23 502:2
**guidelines** 305:6
**guilty** 120:20
**guinea** 130:10
**guys** 12:7
255:24 377:14
**GYN** 179:23
242:10 455:20
456:10,14
**gynecologic**
12:10,14 39:10
126:20 136:21
176:16,18,22
178:4,14 179:2
180:11 181:4
249:14 487:12
507:6
**Gynecology**
488:16 490:1
490:11

---

**H**

**H** 5:10 6:2 7:2
8:2 9:2

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 648 of 1035
PageID: 241827
Kevin Holcomb, M.D.

Page 543

**H2O** 196:5
**habitual** 250:7,8
  251:1,20 257:1
  257:9 258:4
  263:7 267:22
  338:22
**hair** 469:23
**half** 111:12
  217:4 224:1
  232:7 313:8,9
**halfway** 74:20
  256:7 271:19
  275:17
**hallmark**
  158:11
**halt** 217:12
**hand** 97:10
**handed** 53:9
  72:20
**hands** 499:20
**Hang** 462:21
**happen** 100:8
  129:4 132:14
  267:1 422:12
  422:16 424:1
**happened**
  337:10 356:5
  461:3 464:12
  491:20
**happening**
  66:21
**happens** 262:13
  427:10 438:8
**happily** 284:9
**happy** 68:14
  346:23 434:14
  434:22 440:22
  441:8
**harbored** 44:8,8
**hard** 105:16,22
  106:1 214:8
  282:18 283:3
  285:8 493:3,23
**hardcopy**
  105:19
**harm** 217:20
**hazard** 181:13

182:4
**head** 196:1
  270:24 441:16
**heading** 83:20
  215:16 217:1
  304:4 351:21
  430:14 503:20
**health** 142:13
  143:11,20,23
  144:4,12,20
  145:23 171:10
  171:20 220:3,5
  220:10 222:21
  256:18 258:21
  261:4 311:8
  324:24 325:9
  329:5 331:7
  338:18 344:10
  363:22 365:21
  365:23 376:22
  378:9 380:21
  381:4,20
  402:15,18
  403:7 413:24
  414:2 419:3,17
  420:4,6 427:13
  428:14,19
  430:7 431:16
  436:6 439:20
  446:11 477:16
  494:10
**hear** 267:17
**heard** 197:19
  201:18 359:4,7
**hearing** 6:11
  63:17 110:15
**hearings** 37:19
**heart** 389:19
  400:17
**HEASLIP** 3:12
**heavy** 28:6
  61:16 86:5
  87:22 95:13
  98:14 109:5
  170:9 326:16
  331:22 332:7
  335:17

**heed** 500:1,10
  500:24 509:18
  512:1,21
**held** 1:14 11:9
  282:1 284:7
  318:23
**Heller** 48:4
  132:5 134:19
  397:2 398:18
  432:3 448:11
**Heller's** 436:19
  437:2
**help** 85:9 101:6
  217:12 250:18
  284:23 365:14
  463:11
**helped** 45:3
  79:18
**helpful** 52:16
  290:19,23
  291:20
**helps** 181:24
**Henry** 4:10 11:4
**herpes** 120:14
**hesitating** 498:6
**heterogeneity**
  236:13,18,22
  236:24 237:8
  237:11,20,22
  238:5,6,9,11
  238:14 285:4
  319:14 320:19
  320:24 321:5,9
  322:13 323:2,5
  323:11,16,18
  323:22 361:3
**hierarchies**
  300:17
**hierarchy** 282:1
  293:19,21
  294:4,9,15,16
  294:18 298:17
  301:24 302:6
  303:7 304:4,19
  305:2,14
**high** 248:24
  260:18 397:13

398:1 449:13
  451:13 461:12
**higher** 17:16,19
  152:1 260:13
  272:18 397:8
  444:14 445:20
  470:21
**highest** 248:14
  455:24
**highlighted**
  293:5
**highly** 200:16,23
  217:17 318:23
  445:5 495:11
**Hill** 160:5
  161:14 164:5
  233:19 246:5
  247:11 420:13
  427:15 428:21
  429:5,12,15
  430:9,16
  431:15 436:6
  477:18
**Hill's** 115:20
**hired** 38:17 42:1
  42:22 43:9
  44:7 515:6
**Hiroshima**
  326:14 332:20
  336:7
**histologic** 8:10
  94:2 259:10,13
  259:16,22
  260:12 450:16
**histologically**
  310:24
**histology** 249:19
**historical**
  478:11
**historically**
  248:13
**history** 26:5,6
  26:13,16,22
  27:1,6,17
  28:11 132:18
  342:2,6 391:23
  397:3,4,9

487:11
**Holcomb** 1:13
  5:4,15,17,20
  6:10 11:13,19
  12:7 54:10,23
  110:14,17
  168:3 285:22
  412:8 517:8
  520:16
**Holcomb's**
  81:20
**Holcomb-1** 5:14
  40:14
**Holcomb-10**
  6:17 200:1
**Holcomb-11**
  6:19 220:16
**Holcomb-12**
  6:21 224:7
**Holcomb-13** 7:6
  255:16
**Holcomb-14** 7:9
  271:12
**Holcomb-15**
  7:12 274:1
**Holcomb-16**
  7:16 292:19
**Holcomb-17**
  7:18 302:11
**Holcomb-18**
  7:21 333:23
**Holcomb-19** 8:6
  344:5
**Holcomb-2** 5:16
  45:7
**Holcomb-20** 8:9
  363:16
**Holcomb-21**
  8:12 377:17
**Holcomb-22**
  8:14 403:23
**Holcomb-23**
  8:17 406:23
**Holcomb-24**
  8:20 407:19
**Holcomb-25** 9:6
  424:12

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 649 of 1035
PageID: 241828
Kevin Holcomb, M.D.

Page 544

Holcomb-26 9:8
468:4
Holcomb-27
9:13 471:9
Holcomb-28
9:15 486:14
Holcomb-29
9:17 488:12
Holcomb-3 5:19
64:15
Holcomb-30
9:19 496:21
Holcomb-31
9:22 503:3
Holcomb-4 5:21
71:6
Holcomb-5 6:6
102:15
Holcomb-6 6:7
110:6
Holcomb-7 6:10
114:22
Holcomb-8 6:13
180:6
Holcomb-9 6:15
186:8
hold 89:14 91:18
141:12 151:13
178:1 190:23
192:23 247:8
247:17 275:7
334:9 367:19
448:6 474:15
holding 296:16
honest 47:6
90:24 341:10
475:7 493:3
513:4
honestly 177:23
251:16 341:11
hope 407:24
hopefully 169:4
388:22
hoping 91:1
159:4
hormone 242:21
hospital 125:18

301:7,15,16,17
hot 37:4,6
Houghton 8:13
48:3 374:9
375:6,19 376:3
376:21 377:8
377:20 379:9
383:13
hour 60:10
125:20
hours 59:7,23
60:4 112:1,12
112:18,21,22
114:11 214:20
354:23
HPV 120:14
HRT 242:22
243:6,11,16,18
Hulfish 3:13
human 71:11
82:19 83:16
128:9 130:2,16
132:13 134:16
135:15 136:7
215:17 220:20
325:19
humans 224:21
HURST 2:7
hyped 201:10
hypothesis
259:14 280:8,9
398:13 433:22
434:4,9
hypothesize
398:7 424:8
hypothesized
430:19 431:18
hypothesizing
424:2
hypothetical
96:22 330:14
337:20 482:9
482:21 483:9
483:20,22
492:10 493:7
494:16,19,24
495:3 502:6

508:6 510:10
512:18 513:16
hysterectomy
442:9 444:13
444:20

---

**I**

i.e 84:6 183:2,4
183:15,17
IARC 5:21 48:4
48:5 61:17
63:5 68:21
69:16,24 70:4
70:10 71:9
77:19 78:4,7,9
79:23 80:11
81:19 88:15
89:1,11,16
91:1,7 92:9,15
94:15,21 95:2
95:19 96:7,20
97:11 98:19
99:2,19 100:10
101:15,18
224:15 225:7,9
225:11,17,17
227:2 228:3,20
229:1,4,10,12
229:16,19,21
247:19 272:5
419:12 420:1
420:22,24
491:3,12
492:10,19
493:5 494:1,9
494:13 495:6,8
495:14,16
510:22 511:3
IARC's 60:23
61:8 97:2
98:13 228:1
495:9
ICD-9 79:14
idea 21:8 65:12
67:2 389:13,23
392:3 430:3
461:15

identical 204:3
identification
40:13 45:6
64:14 71:5
72:14 74:17
102:14 110:5
114:21 180:5
186:7 199:24
220:15 224:6
255:15 271:11
273:24 292:18
302:10 333:22
344:4 363:15
377:16 403:22
406:22 407:18
424:11 468:3
471:8 486:13
488:11 496:20
503:2
identified
208:15 432:13
identify 107:19
376:8
identifying
48:24
ignoring 319:4
II 63:9 69:8,9,9
365:23
Illinois 4:4
illuminated
293:5
imagine 49:2
106:19 107:1
205:10 493:4
immunohistoc...
79:17
impact 238:16
324:3 442:19
446:5
impacted
251:21
imperative
518:14
implicated
256:14
implies 303:22
303:23 395:8

important 15:4
49:1 68:11
135:24 137:23
161:17 259:7
260:4 323:11
331:9 343:6
351:14,21
361:8,10 372:9
impossible 19:7
impressed
495:13
impression
355:21
impressive
460:21
inability 390:13
inaccuracies
282:4
inadequate
351:3 369:3
inappropriate
208:8 379:13
464:2,4
incident 327:2
include 117:3
149:12 203:1
413:19 414:6
414:10,12
416:23 418:15
483:21 487:8
included 21:16
48:2 54:11
55:19 61:2
165:23 203:24
228:21 229:4
362:15,16,20
362:22 365:5
371:18 379:7
411:17,23
414:2,12
416:12 418:5
includes 16:14
75:17 85:19
154:19 202:21
232:3,4
including 16:20
25:3 222:7

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 650 of 1035
PageID: 241829
Kevin Holcomb, M.D.

Page 545

| | | | | |
|---|---|---|---|---|
| 252:1 324:13 | 311:1,9,11,19 | 203:20 210:9 | **inflammatory** | 112:24 |
| 360:11,19 | 312:1,12 315:7 | 224:19 225:1 | 487:14 | **intention** 214:4 |
| 362:14 455:3 | 324:10,14,18 | 298:16 325:10 | **inform** 92:17 | **interaction** 38:4 |
| 487:12 492:15 | 328:22 339:11 | 408:12 416:4 | **informal** 15:12 | 296:13 |
| **inconsistencies** | 354:1 355:6 | 420:11 443:19 | **information** | **interest** 50:20 |
| 164:11 392:17 | 356:18 357:24 | 472:20 487:6 | 23:5 48:17 | 53:20 461:7 |
| 455:2 | 360:23 363:2 | 497:8,14 499:3 | 53:9 178:8 | **interested** 68:10 |
| **inconsistency** | 373:23 378:17 | **indicating** 84:11 | 277:7 379:14 | 205:1 212:5 |
| 42:18 184:1 | 382:8 409:3 | 294:2 487:19 | 448:13 463:20 | 297:2 390:9 |
| 185:21 188:23 | 446:17 469:13 | **indication** 466:9 | 504:4 510:8 | 400:15 504:13 |
| 307:21 442:18 | 479:14,19 | **indicative** | **informed** 156:1 | **interesting** |
| 449:7 | 493:15 498:17 | 420:18 436:8 | **informs** 160:1 | 164:12 183:22 |
| **inconsistent** | 514:6 | **indirect** 101:4 | **Ingham** 13:6 | 228:3 280:19 |
| 150:14 185:23 | **increases** 65:9 | **indisputable** | 14:23 38:2 | **interestingly** |
| 188:2,13 189:1 | 89:6 90:9 | 425:18,23 | 40:23 44:10,14 | 447:7 |
| 190:2 191:10 | 203:24 447:19 | 426:2,6,10 | 45:1,12 46:14 | **internal** 154:5 |
| 192:1,6 219:7 | 465:4,6 484:14 | 427:8 430:22 | 46:17,23 47:20 | 154:11,20 |
| 223:10 339:20 | **increasing** 254:7 | **individual** 19:4 | 48:1 60:12,23 | 478:15 |
| 339:21 392:18 | 268:20,24 | 19:7,9 29:5 | 61:6,22 62:10 | **international** |
| 460:12 484:10 | 270:11 361:18 | 36:17 194:21 | 64:18 106:2,7 | 79:13 |
| **incorporated** | 435:5 | 195:8 224:16 | 109:20 113:12 | **interpret** 66:16 |
| 118:11 | **incremental** | 225:16,18,19 | 116:16 346:11 | 66:18 |
| **incorrect** 169:18 | 493:21 | 225:23 227:3 | 386:13 515:5 | **interpretation** |
| **increase** 67:8 | **independent** | 227:24 325:15 | **Ingredients** 9:22 | 277:15 278:5 |
| 90:4,7,14 | 47:13 347:1 | 375:23 391:2 | **Inhalation** 84:5 | **Interpretations** |
| 174:22 183:3 | **INDEX** 10:2 | 446:3 469:17 | **inhibitors** | 217:2 |
| 183:18 187:7 | **indicate** 125:8 | **individuals** | 461:15 | **interrupt** |
| 245:19 252:22 | 187:18 220:22 | 469:10 | **initial** 19:24 | 163:22 190:7 |
| 254:16 259:22 | 242:20 250:5 | **induce** 174:14 | 310:22 | 210:1 327:21 |
| 262:12 269:11 | 274:5,10,24 | 436:14 440:8 | **initially** 306:21 | 357:5 466:23 |
| 269:17 349:13 | 340:17 375:8 | 440:18 441:7 | **initiation** 334:24 | **interrupting** |
| 376:23 392:10 | 407:5 411:15 | 464:17 466:5 | **initiative** 338:18 | 169:8 209:18 |
| 405:9 465:1 | 423:9 431:17 | **induction** 125:5 | **insanity** 227:16 | 209:19 |
| **increased** 63:13 | 440:7,18 443:3 | **indulge** 457:1 | **insert** 168:9 | **interval** 149:24 |
| 70:19 78:15 | 445:14 452:19 | **infections** 36:12 | **inside** 123:12 | 189:4 193:24 |
| 88:24 89:3 | 466:4 470:6 | 36:14 | **instance** 435:4 | 194:8 197:14 |
| 94:12,14 95:15 | **indicated** | **inflammation** | **instances** 464:7 | 202:5,21 |
| 98:17 124:10 | 220:19 273:8 | 174:15,18 | **institution** | 203:23 219:8 |
| 149:8 183:5,16 | 273:15 333:13 | 431:20 434:5 | 300:16,21,21 | 347:16 348:23 |
| 187:21 188:18 | 413:18 428:6 | 436:14 440:5,9 | 301:5,8 494:9 | 353:18 354:18 |
| 188:20 229:15 | **indicates** 30:8 | 440:18 441:7 | **INSTRUCTI...** | 370:8 376:24 |
| 243:8 245:15 | 30:15 31:15 | 446:17 447:19 | 518:1 | 378:17 386:10 |
| 253:12 260:19 | 32:3 40:21 | 448:8 449:3,4 | **insufficient** | 386:13,16 |
| 260:23 261:9 | 41:2 83:18 | 449:16 450:21 | 510:23 | 387:3 474:21 |
| 272:22 273:9 | 93:7 111:19 | 451:4,18,21 | **integration** | **intervals** 187:5 |
| 276:10 309:24 | 182:3,22 | 461:24 464:18 | 302:23 | 196:13,23 |
| 310:10,15,20 | 195:15 202:12 | 465:2,6,9 | **intend** 112:12 | 205:21 217:22 |

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 651 of 1035
PageID: 241830
Kevin Holcomb, M.D.

Page 546

226:24 235:23
372:8 477:11
**intraepithelial**
448:20
**introduction**
138:9 202:2
382:1 400:14
**introductions**
402:24
**invaluable**
230:7
**invasive** 256:22
353:17 357:24
378:18 451:10
**invested** 316:17
**investigate**
316:3 504:1
**investigation**
154:13
**investigator's**
225:19 227:3
**investigators**
224:17 225:16
225:18 227:24
**invoice** 6:9
111:15 112:12
**invoiced** 112:6
113:19 114:3,8
**involve** 153:18
240:4,7 241:11
**involved** 49:22
50:8 116:6
122:1 404:1
479:8
**involvement**
38:3 44:24
46:13
**Involving** 445:9
**irregularities**
140:11 178:20
**irrespective**
235:21
**irritation**
431:20
**isolation** 249:10
**issue** 23:14
52:15 88:16

93:3 95:1
131:14 138:13
158:19 168:5
182:21 234:21
237:11,20
247:12 272:7
273:10 321:9
331:9 355:19
396:23 426:9
**issued** 110:20
111:15 143:19
494:4 508:9
**issues** 26:7 37:2
78:7,9,12
116:7 152:5,15
289:18 398:17
499:23 507:19
510:14 512:18
**Italy** 63:10
69:11
**Item** 103:16
146:19
**items** 111:8
215:22 463:23

---

## J

**J&J** 31:3 42:1
42:22 47:1,8
**J&J's** 497:20
**JAMES** 4:3
**james.mizgala...**
4:5
**January** 38:8,9
151:4
**Jason** 488:23
489:21
**Jersey** 1:2 3:9
3:13
**JNJ** 9:7
**job** 15:20
**Johnson** 1:4,5
3:15,15 12:21
12:21 13:1,1
16:14,20 32:14
32:14,24,24
37:10,11 38:18
38:18 41:15,15

44:7,7,18,18
60:2,2 97:20
97:20 99:8
100:22,22
107:20,20
108:1,1,23,23
109:4,4,13,13
109:21 111:16
111:16 112:7,7
112:12,13
113:1,1,16,16
114:9,9 154:13
154:14,22,22
315:6,6 354:14
354:14 478:9,9
478:14,15,15
478:16 480:23
480:23 482:11
482:15,22,23
483:12,13,23
484:18 485:2
499:5 500:9
**Johnson's** 16:15
16:21 99:8
109:22 482:11
482:15 483:23
484:18 485:2
499:5 500:10
**journal** 6:16 9:8
115:11 176:22
177:2,2,12
179:4,20
184:19 200:10
200:13,17,23
299:20 411:9
489:24 490:2,9
490:16,22
491:1
**journals** 217:4
**judge** 168:6
169:7
**judgment** 156:2
157:10,15,16
157:20 158:14
242:18 426:3
**Judith** 156:17
**jump** 280:6

297:5
**jumped** 510:21
**Justice** 495:21
496:5
**justification**
267:21

---

## K

**keep** 57:21
166:16,20
167:18 179:14
183:6 196:14
226:17 236:4
297:16 318:11
320:20 321:17
328:13,14,23
417:9,10 423:3
512:11
**keeps** 36:13
229:9
**Ken** 292:15
**Kenneth** 199:20
286:21 287:8
288:6 292:23
**kept** 66:22
222:13
**Kevin** 1:13 5:4
5:14,17,19
6:10 11:13,19
12:6 110:14,17
517:8 520:16
**key** 47:23 48:16
**Khabele** 461:3
**kind** 16:10
**knew** 284:15
286:21 506:6
**know** 14:21
15:16 18:21,23
20:7 26:21
33:23 40:5
47:9 51:9,22
52:7 55:24
61:5 63:6 66:4
66:16,17 67:9
73:23 74:9
78:17,24 79:10
83:6 84:18

85:3 86:12
98:1,9 111:11
121:22,23
128:17 129:19
130:22 134:15
138:10 141:13
146:15 149:10
150:10 155:8
155:10,18
156:12 158:14
178:6 199:17
199:20 200:9
205:16 208:13
209:3,10,21
213:20 216:14
218:11 226:3
244:8,17,19
247:19,24
250:22 251:4
255:4 258:10
258:12 265:14
274:20 278:7
279:8,20
284:18 285:3
285:19 288:6
288:15 292:2,2
297:9,14 298:5
298:7 299:8,14
299:15 300:1
302:3,4 304:5
307:13 322:22
326:6,8,18
332:20 337:4
337:16 338:2
341:15,22
342:19 346:12
346:13 350:22
362:8,19
368:19 375:14
382:19 383:23
384:6 386:8,20
389:8 390:13
390:14 396:22
400:18 405:2
406:16 417:21
427:1,5 439:5
448:14 454:10

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 652 of 1035
PageID: 241831
Kevin Holcomb, M.D.

Page 547

459:20 460:11
460:13 462:12
466:1 477:10
480:2,22
489:12 498:7
498:11 502:6
502:15,16,22
505:12,14,22
505:23 506:10
507:2,11
509:11 512:8
**knowledge**
39:14 293:9
498:4
**known** 20:1,6,8
262:16 263:3,4
263:6,9,24
264:3,16,23,24
265:3,4,8
288:7 335:15
**knows** 67:15
282:16 283:2
331:19 399:11
427:6
**Kunz** 437:19

———————

**L**

**L** 1:15 2:3
517:12
**lab** 140:12 141:5
141:24 461:8
**label** 501:15
**labeled** 160:23
**lack** 188:3,14,17
188:22 238:10
307:24
**Lancet** 486:11
**Langseth** 7:11
271:7
**large** 139:3
265:9 316:12
317:10 328:21
506:10
**largely** 149:4
227:5 321:11
410:9
**larger** 202:17

429:9
**late** 38:4 335:2
361:13 369:23
473:16 487:10
**latency** 19:17,23
20:11,15 21:3
21:6,12 325:12
326:5,6,7,11
326:20,21,24
327:1,2,3,8
328:11 331:8
331:15,17
332:2,5,16,24
333:14 334:5
334:24 335:19
336:2,12,17
337:1,5,7,17
337:23 338:11
338:12,14
339:14 351:4
352:16 353:1,1
353:4 356:8
369:1,11
**laugh** 214:6
**laughed** 214:11
**launched** 190:18
**law** 15:11
**lawsuit** 264:6
**lawsuits** 265:10
276:9 277:14
278:22 279:21
**lawyer** 81:7
159:13 199:8
213:22 216:14
**LAWYER'S**
521:1
**lawyers** 56:16
107:20
**lay** 265:14 266:1
266:2,9 278:15
468:7
**lead** 274:5,11,24
**leads** 188:23
464:18
**learn** 388:22
503:22
**learned** 284:5

**leave** 258:8
321:24 379:23
482:7
**lecture** 24:5
26:8
**led** 49:5 205:14
308:3
**left** 94:10 334:18
**left-hand** 181:21
181:23 256:6
293:4 334:19
486:20
**legend** 416:4
**LEIGH** 2:13
**leigh.odell@b...**
2:16
**length** 345:10
**lesion** 448:19
449:13
**lesions** 448:23
451:19,22
**lesser** 323:11
**let's** 21:23 39:16
83:24 102:11
121:13 151:2,3
169:20 173:18
181:7 182:16
186:3,3 201:15
202:13 203:19
207:21,21
208:3,3 213:18
214:12 220:5
234:23 235:1
250:19 255:12
270:8 271:6
273:21 292:15
294:23 302:13
315:22 324:24
334:1 337:12
338:17 343:15
363:12,12
377:19 383:12
389:2 406:18
415:14 416:14
416:14,17
418:12 420:6
421:13 440:4

449:18 452:10
473:7 485:19
485:23 494:15
496:23
**letter** 9:6 208:21
424:16 426:13
**letters** 143:19
**letting** 167:16
327:9
**level** 19:8 97:12
189:12,13,15
226:6 280:4
284:10 307:22
314:4 330:19
330:20,22
389:14 390:8,9
391:20 495:15
505:19 506:7
514:2
**levels** 152:1
281:6,10,13
282:14,24
283:11 409:14
470:20 471:5
505:11
**Lheureux** 9:16
487:4,5
**LHG** 1:6
**liability** 1:6
264:9 266:3
**library** 54:17
**lied** 178:9
**lies** 371:4
**life** 37:2 251:2
369:23 444:14
**lifetime** 250:23
417:2 487:8
**ligation** 441:23
442:8,17 443:5
443:20 444:9
444:19 446:5
**light** 399:14
**likelihood** 17:16
17:20 352:24
**likewise** 125:3
**limit** 48:15
225:9 243:12

243:13
**limitation**
256:15 316:21
317:5 344:9,15
350:16 351:10
352:6,14
367:11 375:18
387:1 388:2
**limitations**
88:15 170:13
170:22 308:24
309:2,12,15,19
313:17 315:10
315:12,14,24
351:14,22
352:1 353:7
404:15 405:20
406:4,12
**limited** 38:21
39:1,4,8 41:18
42:1 91:7 95:2
95:19 119:18
128:3 176:2
235:19 252:16
389:22,23
476:17
**limits** 69:24
70:10
**line** 10:6,9,12,15
52:18 305:10
430:17 513:5
519:4 521:2
**lines** 41:11
45:16 64:23
336:1 444:7
**link** 306:19
**list** 24:8 45:2
47:18 49:12,15
49:24 50:3,24
51:1,10,23
53:7 54:4,17
55:12,20 56:3
56:15,18 57:14
69:21 106:20
110:23 119:14
121:2,11 124:2
131:13 138:17

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 653 of 1035
PageID: 241832
Kevin Holcomb, M.D.

Page 548

139:17 142:1
142:12 143:2,6
148:21 149:1
149:21 150:6
152:4 155:12
231:23 233:11
233:14 235:16
293:13 388:24
424:19 441:2
441:15 463:23
507:12
**listed** 49:12 53:3
111:3,7 117:2
117:21 119:13
143:1 146:3
167:5 405:22
408:9 489:5
**listener** 468:7
**listening** 300:14
332:13,14
**listing** 24:6
**lists** 49:13 51:15
52:24 57:12
58:19 74:7
105:6 112:1
117:3,22 146:4
146:14 304:4
305:8 381:10
497:16
**literally** 472:11
**literature** 43:13
43:16 47:24
52:2 57:9,11
62:5,7 67:9
90:20 91:3,23
92:20 97:18
104:21 105:10
105:21 106:13
111:20 116:20
128:6 131:17
133:2,5,22,24
134:2 136:24
137:5 146:15
155:18 157:11
157:14 162:10
162:14 165:7
173:24 174:12

181:14 182:4
185:13 206:16
206:20 210:19
220:21 241:5
246:15,21
247:15 248:23
253:10,15
262:4 289:12
307:20 313:7
336:21 352:7
359:17 389:12
390:12 470:24
483:1,15,21
509:6 514:23
**lithotomy**
438:20
**litigation** 1:7,20
11:5,11 12:20
37:11,12,24
43:4 103:18
108:6 113:18
115:5,7,10
154:8 266:10
396:19 479:9
505:2 515:14
**little** 24:3 35:10
42:14 57:22
61:9 82:22
84:19 85:5
230:13 240:22
305:13 321:13
365:2 415:4
438:21 445:20
502:22
**lives** 352:11
**living** 251:10,11
**LLC** 4:6,6
**LLP** 1:14 2:7
3:3,7,12,17 4:2
**long** 26:21 35:4
112:20 226:17
284:7 293:15
313:22 325:12
326:5,21,24
332:23 333:8
334:23 335:19
337:5,7,17

338:10 431:11
453:8
**long-term** 384:7
417:2
**longer** 311:4
355:23 361:17
373:3,18,22
382:9 385:11
495:13
**Longo** 478:10
**Longo's** 170:7
**look** 31:21 39:16
53:11 72:5,7
72:11,17 73:6
75:3,3,11
78:13 87:12
88:18,21 93:5
129:10 130:1,5
130:15 135:14
136:7 141:16
142:1 143:6
146:19 149:14
164:13 165:6
178:20 181:7,9
181:17 182:16
189:9 192:8
201:15 202:23
208:19 210:7
220:5 222:14
231:21,23,24
233:17,18
236:7,16 238:8
255:12 256:10
256:10 262:14
266:13 269:12
269:13,22,24
270:8 271:6,17
271:18 282:7
283:22,24
285:4 288:19
292:15 293:3
300:15 301:23
303:15 307:18
313:6 315:22
318:17 319:13
322:3 324:6,24
326:12,15

330:1,6 334:8
350:5 356:2
357:11 362:23
365:17 377:3,4
377:20 388:18
395:24 396:1
397:10 415:14
416:14,14
420:6 434:14
434:23 435:10
436:2 447:8
449:22 450:10
450:13 451:9
460:13 471:23
474:17 475:1,8
477:23,23
485:16,20
486:21 492:11
496:14
**looked** 57:1,4,11
77:18 115:19
115:22 116:4,5
129:21 134:22
137:5,8,13
142:7 149:20
149:21 151:19
151:22 165:21
206:17 236:18
237:2,11,20
238:8 320:22
321:11 323:12
323:18 352:6
359:18 418:4
420:23,24
448:12 452:12
461:9 493:20
495:6
**looking** 73:8
97:16 116:7
120:10,13,17
122:9 123:8
127:7 128:7
137:10 166:15
166:18 181:16
197:10,11
200:5 202:2
227:5,14

233:24 236:21
238:2 281:23
281:24 284:4
289:7,10
315:23 317:9
374:23 375:4
375:11 377:2
410:9 415:19
415:20 416:2
429:17 430:1
454:8 473:1
475:11 477:5
504:13 505:3
**looks** 67:10
125:12 228:20
232:6 321:24
448:14 511:10
**loosely** 149:17
**losing** 94:20
**lost** 348:9
**lot** 77:8 169:21
233:17 279:15
322:10 355:19
392:4 403:10
448:23,24
471:1 493:18
499:22
**loud** 297:12
**louder** 57:22
**love** 297:5
**low** 185:22
245:21 307:22
325:20 329:17
330:19,22
387:22 460:19
461:18
**lower** 435:15
**lowest** 248:11
**LPA** 151:23
**ludicrous**
203:21
**lump** 373:12
**lunch** 125:13
223:23 239:17
239:23
**lung** 306:20
342:4 468:20

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 654 of 1035
PageID: 241833
Kevin Holcomb, M.D.

Page 549

lymph 123:9,12
lysophosphati...
  151:24

## M

M 2:13 3:3,8,12
  426:24
M.D 1:13 2:13
  5:4 6:10 11:19
  147:2,19
  488:24 517:8
  520:16
ma'am 75:5
  159:15 206:13
  207:19 354:21
  425:11 473:5
macroscopically
  450:7
magnitude
  246:4,13,19
  247:9,10,20
main 448:5
majority 128:18
  234:5,5,6,10
  234:13,13
  235:24 240:15
  265:19
makeup 496:4
making 67:2
  69:8 77:24
  81:16 120:12
  196:15 205:9
  278:24 299:22
  319:24 332:17
  341:2 423:22
  425:22 435:11
  437:14
malignancy
  25:13,22
  455:20 466:16
  467:13,18,20
  469:17
malignant 19:11
  25:6 79:11,20
  336:3 466:10
  469:14
man 456:5

management
  281:17 303:10
  305:20
Manges 1:14
  3:12
manifestation
  335:1
manner 168:13
mantle 372:24
manufacturers
  154:21
manuscript
  118:9,22
March 1:10 11:6
  111:15 147:20
  151:5 200:7,8
  486:11 503:11
  517:15
MARGARET
  2:13
Margaret.tho...
  2:15
mark 39:18,19
  40:6 45:9
  64:12 71:8
  102:11 110:8
  114:24 148:15
  154:22 180:8
  186:5 200:3
  220:10 224:3
  255:18 274:3
  292:21 302:13
  334:1 344:1
  363:18 377:19
  403:19 407:1
  407:21 424:14
  471:11 486:9
  488:9 496:23
  503:5
marked 10:14
  40:12 45:5
  64:13 71:4
  102:13,17
  110:4 114:20
  121:8 148:9
  180:4 186:6
  199:23 220:14

224:5 255:14
  258:21 271:10
  273:23 292:17
  302:9 333:21
  344:3 363:14
  377:12,15
  403:21 406:21
  407:17 424:10
  428:15 468:2
  471:7 486:12
  488:10 496:19
  503:1
market 500:17
  501:16
MARKETING
  1:5
marking 378:5
marks 516:3
Marte 4:10 11:4
mask 63:8
  369:14
masks 69:8 78:1
  332:17
mass 151:21
Massachusetts
  3:4 226:9
material 47:12
materials 6:8
  23:3,14 45:19
  45:20 47:7
  51:14,17 52:7
  53:1 110:16,19
  117:19 121:11
  146:21 155:15
  189:6 194:4,22
  279:5 384:2
math 234:8
  350:10,12
matter 11:10
  13:6,20 14:5
  14:17,23 45:13
  46:23 49:12
  51:11 64:18
  69:21 104:1,10
  106:2,14
  107:13 108:11
  109:20 148:23

396:14,17
  423:3 492:23
  513:8
matters 13:23
  14:13 396:18
McCLENNEN
  3:3
MD 5:15,17,20
MDL 37:24 43:3
  43:9 44:8
  59:10 60:2
  104:11 105:24
  115:1,6 515:7
  515:15
mean 17:6 33:18
  37:3 39:1
  40:16 47:10
  59:9 70:4
  76:19 78:8,10
  118:8 121:10
  132:2,24
  178:11 179:23
  196:6 205:21
  234:19 255:3
  257:17 264:1
  283:1,1 284:3
  299:21 340:6
  364:14 395:22
  400:6 433:15
  438:5 450:7,9
  472:1,10
  498:21
meaning 85:19
  195:16
means 33:24
  34:3 78:1 86:6
  177:9 184:16
  205:23,24
  217:5 312:20
  398:9 517:20
meant 233:20
measure 262:1
measurement
  262:5
measures
  217:23
measuring

345:9
mechanism
  57:17 58:6
  65:12 126:22
  140:6 142:8
  174:1,13 393:6
  394:6 401:7,24
  422:1,19
  423:13 427:16
  436:13 439:22
  440:8 441:6,20
  445:5
mechanisms
  423:2 432:11
mechanistic
  57:3 492:18
media 266:1,2,9
  277:8 278:15
medical 12:8,18
  13:14,24 17:23
  18:9,13 23:6
  33:4,12,16,18
  34:22 35:11,24
  36:6,16 37:6
  156:2 173:10
  185:10 272:20
  281:19 283:10
  283:11,23
  284:12 301:3
  301:11,12
  303:19 372:5
medical/legal
  499:23 513:6
medication
  33:23 34:5
  35:14 36:21
medications
  33:2 36:24
  37:3,4,7
medicine 7:19
  7:19 9:9 178:2
  205:13 235:24
  281:15 302:18
  302:22 303:5
  303:17,20
  305:20 306:1,5
  394:17 446:20

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 655 of 1035
PageID: 241834
Kevin Holcomb, M.D.

Page 550

**Medline** 119:22
**meet** 246:3
  247:11
**Melissa** 242:8
**member** 176:17
  507:3
**memorable**
  250:7,9 251:12
  251:19 257:2
  257:10 258:4
  267:23
**memory** 48:9
  123:9 263:2
  266:20 280:5
  347:1 419:23
**menarche**
  487:10,10
**menopausal**
  245:2
**menopause**
  243:16
**menses** 173:12
**mental** 118:16
**mention** 31:23
  101:17 134:12
  135:8,11 138:3
  141:4 164:2
  172:4 237:1
  323:15,17,19
  329:9 357:12
  379:13
**mentioned**
  88:16 114:12
  120:3 130:6
  134:19 135:1
  136:10 137:22
  138:22 171:23
  235:16 333:11
  352:15 353:10
  358:21 397:2
  417:7 447:17
  449:19 455:6
  461:2
**mentioning** 24:9
  70:21 133:1
  300:11 352:13
  352:22 382:10

449:7
**mentions** 149:4
  238:5 323:15
**mere** 393:22
  394:18,24
  400:21
**Merritt** 265:17
**mesothelioma**
  78:23 79:12,14
  79:21 86:23
  93:10,17
  469:14
**message** 125:17
**met** 477:9
**meta** 232:14
**meta-analyses**
  8:21 206:23
  220:20 221:3
  221:11,19,24
  222:3,22
  223:11 224:4
  230:8 231:18
  233:5,6,7
  241:4 270:19
  270:20 284:16
  284:19,23
  285:13 287:19
  287:22 288:18
  292:8 304:22
  305:1 307:2
  309:20 311:10
  311:14 315:14
  319:17 406:19
  407:6,7 408:7
  408:10 409:15
  409:22 410:18
  419:4,12
  492:13,14
**meta-analysis**
  6:21 9:14
  145:18 146:2
  225:22 227:7
  229:8 230:15
  230:16,17
  232:11 236:8,9
  236:12 270:18
  284:20,22

285:2,10 289:6
  289:10,13
  290:10 291:3
  308:17 312:7
  318:13,22
  319:22 321:18
  322:4,5,7
  329:21 360:4
  360:12 361:1,7
  412:4 413:10
  413:14 420:12
  443:4 444:2,17
  446:2 453:15
  455:4 474:7
  476:13 493:17
**Metal-Analysis**
  8:18
**metals** 5:22
  71:10 109:5
  170:9
**method** 163:5
**methodical**
  163:6
**Methodological**
  271:20,23
**methodology**
  115:19,21
  159:23,24
  160:2,11,13,15
  160:17,24
  161:4,11,13,17
  162:3 163:4,9
  172:15,20,21
  173:1 195:1
  288:8 495:7,9
**methods** 161:20
  189:7,8 194:4
  194:22 279:6
  293:10 384:2
  404:10 475:8
  504:9
**metric** 261:24
  262:1,18
  263:10,21
  267:13 343:4
  344:16 368:1,5
  368:7 376:3

388:3 404:5
  416:6 417:11
**mic** 469:24
**Michelle** 1:15
  517:12
**microphones**
  126:10
**microscopically**
  449:24 450:9
**middle** 214:15
  334:21 351:13
  374:13 375:1
  416:19 424:23
  425:3,9 497:14
**migrate** 130:17
  131:18 135:17
  138:5 174:2
  422:3 425:16
  427:17 430:19
  431:18 436:14
  439:23 441:21
  442:7,15
**migration** 116:7
  121:16 122:11
  129:9,22
  130:12 131:15
  133:3,22 134:9
  134:20 426:9
  428:7
**Mills** 7:8 255:19
**mind** 55:17
  263:12
**minute** 86:21
  363:8 397:11
  462:21
**mischaracteri...**
  464:11
**misclassificati...**
  61:3 78:12
  87:1 93:3
  94:16
**misclassified**
  93:19,24
**misconception**
  294:3,11
  296:23 298:16
  298:19 300:5

338:9
**misconceptions**
  7:17 292:23
  293:14,17
  294:15
**misdiagnosed**
  93:10,16
**misdiagnosis**
  86:22
**misinform**
  203:5
**mislead** 204:6
**misrepresented**
  154:14
**missing** 204:23
  339:14
**misspoke**
  403:16
**misstated**
  371:13 461:11
**misstatement**
  158:16,17
**misstatements**
  489:18
**mistake** 77:10
  196:15 279:19
  379:23 380:12
  383:2 412:1
  413:19 414:3,5
  414:8,11,14
**mistaken** 190:21
**mistakenly**
  217:5
**mistakes** 78:8
  279:14 319:24
  383:1
**misunderstan...**
  193:15 276:21
**misunderstood**
  451:8
**misuse** 217:19
**mix** 290:21
  291:18 311:16
  311:20 320:17
**mixed** 237:5
  319:15
**mixes** 398:20

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 656 of 1035
PageID: 241835
Kevin Holcomb, M.D.

Page 551

**mixing** 69:10
289:15
**MIZGALA** 4:3
30:19 32:7
168:8 211:3,15
213:3 240:21
241:1 295:17
439:11
**Mm-hmm** 61:11
102:24 105:13
200:15 207:17
223:20 250:10
304:23 342:22
343:2 366:12
367:10 386:17
408:8 425:2
**mode** 323:12
447:2
**model** 129:4,12
129:12,13
132:13 136:1
296:11,11
**models** 130:11
131:9
**moderate** 222:9
**modest** 247:2,16
271:3 357:23
484:9
**moist** 36:12
**molecular** 124:8
432:11,19
433:10,17
435:2
**molecule** 394:19
**moment** 43:16
120:17 515:18
**money** 113:11
316:16
**monies** 145:13
**monitor** 504:1
**monitors** 118:21
**monograph**
60:24 61:18
62:9 63:5
68:21 69:17,24
70:10 71:9
72:4 74:22

75:14 76:1,9
76:10,12,23,24
82:6,8,10 83:8
84:21 85:14,15
85:21 86:15
87:5 88:15
100:19,21
129:15 130:8
247:21
**Monographs**
5:21
**Montgomery**
2:14
**months** 404:8,17
**morning** 12:2,3
**mortality** 87:21
**Motion** 67:19
76:16 80:14
144:8 163:15
206:5 356:14
430:23 446:8
456:19
**move** 54:15 95:9
141:14 162:7
213:18 214:12
214:14 297:23
300:13 401:1
415:6 418:10
418:13
**movement**
173:13
**moving** 495:12
**mucinous**
324:16,20
409:5
**multi-discipli...**
450:12
**multi-district**
37:12
**multiple** 66:19
277:9 278:12
**multitask**
332:13
**multivariant**
348:1,22
**multivariate**
354:21

**Musser** 9:6
426:20 427:1
428:9
**mutation** 455:22

## N

**N** 5:2
**naked** 270:13
**name** 11:3 12:5
12:6 14:4,7,8
41:7 287:21
490:2,10
**napkins** 354:1
**Narod** 6:14
180:13 185:16
249:3 259:8
260:6 261:18
267:18 318:9
318:15 329:7
329:14,24
330:14 346:3
385:24
**Narod's** 260:6
263:16 329:10
**narrower** 61:10
**National** 446:19
**nature** 14:17
20:17 24:18
122:3 148:5
190:17 200:8
200:14 205:10
226:16 250:14
301:22 396:19
**near** 210:21
**nearly** 458:8
**necessarily**
123:2 299:11
306:9
**necessary** 44:2
392:12 518:4
**neck** 513:11
**need** 81:3
110:22 125:9
151:6 156:12
159:11 165:8
190:1,13 205:4
205:6 209:3,9

210:12 211:22
215:7 226:16
232:24 258:10
258:12 318:15
329:16 365:15
366:12 385:24
386:2 399:14
480:2,22
**needs** 125:19
194:15
**negate** 362:17
**negative** 24:11
183:4,17 184:2
184:7,14 186:1
189:21 197:22
197:23 198:4,6
198:12 371:10
371:12,18,21
372:12,14
381:15 443:4
444:18 447:10
**neither** 203:1
391:10 416:11
**Ness** 440:23
441:4
**never** 22:1,7,12
23:21 24:21
77:18 128:24
132:12 139:4
178:17,18
197:16 198:21
202:14 238:9
259:5 282:15
282:16 283:1,2
287:18 289:3
341:23 344:24
368:3 373:8,14
423:24 437:15
449:14 451:17
459:3
**nevertheless**
20:14
**new** 1:2,14,15
3:9,13 9:17
11:10,10 14:11
169:14 227:9
228:2 301:6,17

450:12 488:16
498:8,12
503:19 505:14
509:15 514:4
**Newport** 2:4
**news** 185:7
**newspaper**
185:8
**NHS** 378:9
**NHSI** 367:5
**NHSII** 367:1,4
**Ni** 453:18
**nice** 196:6
**nickel** 109:5
**nine** 376:10
492:14
**no-no** 320:5
**node** 123:12
**nodes** 123:9
**non-aspirin**
454:1
**non-diseased**
390:22
**non-exposed**
398:1
**non-perineal**
417:1
**non-persuasive**
128:5 134:6
**non-significan...**
215:21 217:5
236:3
**non-statistical**
202:4
**non-statistically**
216:5
**nonconsistent**
183:5
**nonmalignant**
9:11 467:24
468:6,16,18
469:11
**nonresponsive**
67:19 144:9
206:5 356:14
418:22 430:24
446:8 456:20

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 657 of 1035
PageID: 241836
Kevin Holcomb, M.D.

Page 552

| | | | | |
|---|---|---|---|---|
| nonsignificance 204:20 | 73:15 74:16 82:5 105:4 | object 24:1 26:23 27:13 | 173:4,14 174:4 175:21 176:4,9 | 318:5 319:8 327:12 330:7 |
| nonsignificant 183:17 201:22 203:22 205:14 210:12 270:2 | 138:8 140:11 146:23 147:6 147:14,18 181:13 182:3 | 28:3 29:2,20 30:19 32:17 33:13 34:17,24 35:15 36:1 | 177:4,18 179:5 185:2 188:4 192:3,17 193:12 195:5 | 331:11 333:1 335:7 338:6 340:20 341:8 342:10 343:8 |
| nonstatistically 204:17 296:18 298:20 | 229:7,11 230:21 251:23 293:18,20 | 38:22 39:5 42:3 43:22 44:19 46:2 | 196:18 197:4 198:13 202:7 203:13 204:12 | 343:12 344:19 345:11 346:5 346:16 349:5 |
| nonsteroidal 455:11 459:17 | 296:8 316:12 317:23 328:5 | 47:2 48:7 49:17 50:14 | 207:1,12 211:3 211:5,15 213:3 | 349:20 355:12 356:20 358:11 |
| nonsteroidals 460:12 | 329:17 330:2 361:22 384:20 | 51:2,19 53:4 55:22 56:11 | 213:5 215:3,9 216:6 218:4 | 359:1,10 360:16 362:10 |
| normal 442:16 | 386:9 387:3,9 | 57:19 58:8 | 219:10 221:6 | 364:13 365:8 |
| normally 154:20 | 387:19 410:3 | 60:5,16 61:24 | 221:21 223:4 | 366:6 369:7 |
| NOS 435:4 | 466:8 487:8 | 62:17,24 63:21 | 225:3 230:10 | 370:18 372:20 |
| Notary 1:17 517:14 520:23 | 493:17 497:16 numbers 9:7 | 65:16 70:12 77:4 84:14 | 231:4 232:15 234:16 235:7 | 375:20 379:20 381:7 382:23 |
| note 350:16 351:13,17 416:22 417:14 | 93:18 198:22 207:10 260:17 290:6 331:2 | 89:21 90:22 91:24 95:4,20 96:12 98:8 | 235:13 237:24 238:20 241:13 242:2,13 244:1 | 385:6,19 386:6 387:5,15 388:6 388:14 391:7 |
| notebooks 141:24 | 471:17 nurses 366:1,2 | 99:21 101:20 102:7 103:19 | 244:14 245:8 245:22 246:7 | 393:7 394:8,14 395:15 397:15 |
| noted 11:14 87:18 141:24 518:11 520:11 | Nurses' 256:18 311:8 344:10 363:22 365:21 | 104:13,23 106:8 108:12 109:7,15 | 246:12 248:3 249:7,22 250:11 251:14 | 398:3,23 399:19 400:3 401:9 402:2,10 |
| notes 106:5,15 118:6,15,16 119:1,10 140:12 141:5 485:21 521:1 | 365:23 376:21 378:9 380:21 381:4,20 Nutrition 427:4 428:12 | 112:15 113:22 116:21 117:7 117:23 118:18 119:5 121:9 122:6,16 | 252:12 253:2 253:21 254:9 257:12,21 259:24 262:8 265:5 267:8 | 406:1 408:17 410:21 412:13 412:21 413:21 414:19 417:16 419:8,21 |
| notice 1:14 6:6 102:11,18 | NUTTER 3:3 NW 3:18 | 124:11 127:20 130:20 131:23 | 268:13 272:24 277:18 278:16 | 423:17 427:19 431:8 432:21 |
| noting 351:9 | | 136:13 137:2 | 279:2 282:11 | 433:6 434:1,19 |
| notion 296:16 | O | 139:23 142:3 | 282:11 283:13 | 435:6 436:16 |
| November 38:5 38:6 43:6 | O'DELL 2:13 80:22 81:11 | 142:16 143:3 146:6 147:5,11 | 286:16 287:24 288:9,23 | 438:2 439:9,11 440:11 441:11 |
| NSAID 448:1 452:11 454:2 456:1,15 | 167:19 169:10 208:7,12,17 458:17 462:13 | 150:17 152:7 153:8 155:2 156:3,14 | 289:21 291:4 295:15,17 296:2,20 | 441:24 442:10 447:4 448:3 451:5 452:21 |
| NSAIDs 452:11 452:13 455:16 455:23 457:11 459:7,7 460:16 461:16 | 462:19,24 463:13 464:3,6 464:13 O'REARDON 2:7 | 157:17 159:1 159:17 160:20 161:7,24 162:19,24 165:11 166:2,9 | 298:24 300:18 302:1 303:12 304:14 305:16 305:22 307:7 312:2,15 | 454:21 459:10 460:3 462:5 464:20 468:8 469:2 470:15 473:14 475:23 |
| NTP 485:17 number 73:13 | oath 11:17 15:7 15:9 | 170:16 171:12 172:1,7,17 | 315:15 316:6 316:22 317:18 | 477:20 480:5 481:2 482:18 |

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 658 of 1035
PageID: 241837
Kevin Holcomb, M.D.

Page 553

484:19 485:4
487:22 489:9
491:5,17
492:24 494:11
496:7,16
497:23 499:8
500:2,13,21
501:8 504:16
505:6 506:21
507:23 508:16
509:23 510:18
512:3,22
513:12 514:10
514:16
**objecting** 30:23
**objection** 16:23
17:12 18:1,11
19:1,19 20:19
25:15 26:2
27:3 31:5 32:7
33:7 66:5,5
67:18 70:4
124:23 131:20
190:24 206:4
213:16 233:1
341:4 356:13
364:5 418:21
446:7 456:18
456:19 466:22
**objections** 65:21
68:5 81:2,16
103:5 107:16
**objective** 262:1
262:5
**observations**
475:4
**observed** 93:12
204:3
**obstetrics**
488:15 490:1,1
490:11
**obtained** 119:17
**obvious** 370:22
423:1
**obviously** 213:8
372:2
**occasion** 243:17

**occasions** 464:8
**occupation**
27:11
**occupational**
27:17 28:6
60:13 61:13,16
61:22 62:15,22
63:3,17 64:3,9
65:5 67:7 68:1
68:19,20 70:1
70:11,18 71:1
80:5 86:5
87:22 88:8
95:13 98:15
326:16 330:10
331:23 332:7
335:17
**occupations**
26:18
**occur** 65:13
133:4,6,23
**occurred** 240:8
**odds** 192:14,21
206:21 241:23
243:23 244:8
244:11,17,22
245:21 253:12
269:13,22
270:10 271:1
311:22 325:20
329:17 354:16
371:18 378:14
408:13 443:23
**offense** 40:18
**offer** 44:2
138:12 212:8
**offered** 60:24
308:4
**oh** 72:9 83:13
135:6 151:13
153:2 175:13
180:9 219:18
250:24 377:13
378:2 415:20
429:24 441:13
465:12 487:2
**okay** 15:4,5,23

15:24 16:11
21:15,24 32:24
42:20 72:8
74:3 75:5,10
75:13 77:2
83:15,24 87:2
87:11,12,17
89:15 96:21
107:9 111:13
119:1 126:8,14
127:16 129:18
134:24 138:22
143:1,18
144:24 147:22
150:21 155:11
156:23 159:21
165:17 171:5
172:13 173:23
176:16 180:1
180:20 181:7
181:23,24
188:24 191:1
192:8,22
197:21 199:17
207:8,21
212:19 213:11
214:1,14
215:14 216:16
216:19 218:23
220:7 222:1
223:24 227:21
231:14 235:19
240:12 241:18
243:4,10,15
245:14 246:12
253:7,16
255:12 256:13
258:2 259:3
268:9 270:14
274:21 279:17
282:23 287:4
287:18 296:6
298:5 301:4,18
302:8 304:3
306:13 308:20
309:7 310:13
312:10 317:3,8

321:19 324:22
328:19 334:18
334:20 337:21
337:22 342:1
343:15,17,21
345:16 348:14
350:7,11,14
351:24 354:22
355:4 363:6,9
365:4 366:17
366:17 367:13
368:11 371:16
372:15 374:8
375:13 377:3
377:19 378:2
383:4,12,22
384:5 386:3
388:2 391:1
396:10 400:24
402:8 403:4
404:22 409:12
416:3,16
418:12 420:6
421:15 433:1
436:4 438:13
449:18 452:10
453:3,5 454:9
469:6 475:18
476:12 477:1
482:8 484:3
485:19 486:1
486:24 487:2
503:18 515:12
515:17,19,24
516:2
**old** 229:9 372:7
**omitted** 127:17
**once** 63:2
193:24 198:10
276:1 332:12
368:1,2 370:6
389:7 495:24
**oncologist** 12:11
12:14 126:20
176:17 242:10
**oncologists**
136:22

**oncology** 39:10
176:18,22
178:4,14 179:3
179:23 180:11
181:4 249:15
456:11,14
507:6
**one-sided** 388:3
**one-time** 366:21
367:3
**ones** 15:4 55:13
78:11 117:11
152:24 259:23
270:9 312:21
312:23 325:24
409:3 509:10
509:11
**onus** 205:7
262:19
**op** 185:9,11,12
200:24 329:10
489:20
**open** 14:18
107:7 173:11
299:20 420:8
423:1
**open-ended**
139:7
**opening** 100:18
**operate** 259:15
**Operation**
428:11
**operations**
427:3
**opinion** 21:3
43:12 44:2,14
44:22 46:11,16
47:13,15,20
48:1,17 49:6
60:13,21 61:12
61:15 62:4,21
63:3 64:7 69:6
69:15 70:15,22
78:18 86:12
89:23 91:19
94:23 95:10
97:3,4 99:5

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 659 of 1035
PageID: 241838
Kevin Holcomb, M.D.

Page 554

100:1,2 108:20
108:22 109:2,3
109:10,12,18
109:21,24
116:9 162:18
164:4,22
165:10,15,16
171:8,19
173:23 174:7
174:11,21
175:3,5,8,14
175:17,18,24
176:2 188:7,11
188:15 191:14
191:19,22
199:3,5 200:12
203:11 211:14
230:4,9 235:12
241:21 242:6
246:10,13,18
247:8,18
249:13,17
252:20 260:6
261:18 263:16
265:4 267:17
268:9,21
285:21 286:4
288:22 308:4
309:22 310:9
312:11 315:8
318:8 327:4,7
327:22 328:10
329:11 332:4
360:9 371:21
395:11 401:20
419:5,20
421:24 422:5
422:22 441:18
441:19 442:6
447:18,23
448:6 452:6
464:17 472:13
479:13 494:4,7
513:15
**opinions** 37:17
37:18 44:9
45:21 49:11

52:3,9 68:18
69:3 90:1
92:18 95:19
107:22 108:2,4
108:10,17
115:14 117:17
117:20 123:15
123:21 138:17
146:17 155:13
155:20,23
156:1,13 157:3
160:3 161:5,17
172:14,16
173:3,19
211:20,22
212:2,5,10
253:14 271:8
304:12 307:6
426:5 491:15
492:22 497:22
499:7
**opportunity**
146:15 159:13
216:21 297:8
298:10 517:9
**opposed** 113:8
197:8,12 329:8
467:19
**opposite** 50:17
88:22 91:17
247:8 423:11
**optimal** 388:12
388:18
**options** 475:12
**Oral** 6:6
**order** 45:21
154:24 270:7
458:12
**organ** 394:20
**organization**
494:10 507:9
509:20
**original** 91:18
217:16 423:21
518:15
**outcome** 227:16
412:12 417:4

**outcomes**
316:13 417:6
**outlined** 251:24
**outmoded**
293:12
**outside** 19:9
46:6 62:4
66:23 67:3
69:14 80:4
86:8 98:14
100:11 446:1
**outstanding**
14:3
**ovarian** 6:13,23
7:7,10,13,22
8:7,9,12,15,19
8:20 9:13,15
9:18 13:2,11
14:14 17:11
18:19 19:18,22
21:4,16,17,20
21:20,21 22:8
22:13 23:1,4
23:10,21 24:23
25:4,8,10 28:9
28:19,22 30:9
30:16 31:16
32:4,13 37:23
43:14 44:4,16
44:23 46:12
56:24 60:15
61:14,20,23
62:16,23 63:14
63:18 65:1,6
65:10 67:23
69:12 70:1,11
70:19 71:2
77:15 78:21
79:19 86:22
88:24 89:4,6
90:2,4,7,9,14
90:21 91:7
93:11 95:15
98:18 100:5
101:17 113:18
116:10 120:7,8
120:9 124:10

138:2 145:8,14
149:8 151:11
151:18,22
153:5 165:3,23
174:15,20,23
175:7,16,20
176:8 180:12
182:2,9 189:19
206:8,12
220:24 224:21
241:6 243:11
245:6,16
246:15,20
248:12 249:19
252:10,17
253:19 254:5,8
256:15,22
265:11 266:17
267:5 276:15
278:14 280:17
310:2,21
311:12,23
312:1 316:5
317:9 324:11
325:13,18
326:5,6,11,13
326:16 327:1
327:10 331:8
331:16,18
332:23 334:11
334:23 336:3
336:19,23
337:4,15,17
340:1 347:5
351:5 353:17
354:17,22,24
355:7,10,11
356:19 357:9
357:17 358:1
367:7,8,16
369:2,5 370:7
372:11 374:17
378:12,13,18
378:20 380:3
385:13 386:1,4
390:21 393:4
394:5 405:9,12

405:16 408:6
409:21 410:19
410:20 413:12
419:6,18
420:16 425:14
431:19 432:9
432:12,20
433:11 434:6
443:24 444:20
446:18 447:12
447:20,24
448:2 449:9
450:5,14
451:14 452:7
452:16,20
453:17,23
454:2,13,19
455:5,14,24
456:16 459:24
461:23 462:3
464:18 470:7
476:16 479:15
479:23 480:16
481:24 482:6
484:15 487:1,7
487:13,21
488:17 501:3
508:11 515:9
**ovaries** 65:9
130:18 131:22
132:8,19 134:3
138:11 174:3
390:1,2,3
391:5,13 422:4
422:22 423:16
426:1 427:18
432:1 438:17
439:4,23
441:22 442:8
442:15 445:11
445:24
**ovary** 87:20
89:20 95:12
128:11 130:4
390:15 396:21
400:22
**overall** 311:6

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 660 of 1035
PageID: 241839
Kevin Holcomb, M.D.

Page 555

378:10 392:5
479:21
**overcome** 314:7
**overconfident**
217:13
**overlap** 56:5
230:18 231:21
233:17 234:3
234:14,22
235:5,12,17
236:2 321:12
322:10 323:23
409:15 410:3
**oversimplifying**
99:23
**overstate** 395:5
**Ovulation** 7:21
**ovulations** 487:8
**owned** 301:16
**oxygen** 435:12
435:20
**oxytocin** 128:16
438:21

**P**
**P** 2:13
**P-value** 202:16
218:7,15
**P-values** 217:22
218:10,11
**P.C** 2:12
**p.m** 239:16,20
343:19,23
348:12,16
421:16,21
453:13 473:10
473:24 486:2,7
516:5,8
**p53** 448:24
451:15
**page** 5:13,15,18
5:20 6:5 7:5
8:5 9:5 10:6,9
10:12,15 16:11
40:20 41:1,11
45:16 64:22
65:17 71:21

72:4,21 74:2,5
76:23 82:5,13
83:5 84:16,18
84:23 87:5
93:5 116:12
125:8 126:18
127:4,7 133:15
134:8,9 135:7
140:9 141:8
160:9 181:10
181:11,21
182:20 187:18
202:20 217:1
217:10 224:11
224:13 256:4,6
258:23 261:5
271:14,15
274:4,8,10
275:13 281:1
325:4,5 334:3
334:16,20,21
350:15 357:14
358:2 365:20
367:24 374:13
374:14,18,19
375:2,6 377:5
384:19 407:8
407:10,14
415:15,22
416:17 420:10
424:23,23
425:2 429:17
429:18 430:3
430:13,13
442:23 443:1
443:17 446:11
471:16 476:9
478:4 519:4
521:2
**pages** 48:11
71:23 428:18
430:6 471:19
520:6
**paid** 112:9
113:11,19
114:4
**paper** 50:21,22

55:9 58:21
73:13 121:15
121:16 122:4,8
122:15 123:14
123:20 124:7
134:13 151:3
171:11 180:2
180:10,15
181:1,5 182:17
184:10 185:7
194:21,23
195:14 200:4,6
200:6 201:16
202:1 203:16
207:22 213:9
215:8 219:4,9
219:17 223:15
255:1,19 256:5
263:17 271:6,7
271:22 273:22
275:4,14
285:20 287:10
292:15,22,24
295:1,6 298:15
318:9 323:7,21
323:23 325:7
329:14 347:2
350:18 394:1,2
397:7,11
398:16,16
400:14 407:2,4
409:22,23,23
411:8 416:18
417:19 421:9
428:6 432:3,18
433:2 434:13
434:22 435:9
435:24 437:20
441:9 443:8,10
443:12,16
446:21 447:9
447:10,11
459:23 462:2,8
468:23 471:12
471:16 486:10
486:17 493:4
495:11 498:18

**papers** 49:23
53:2,24 55:2
56:19,23 57:2
57:5 61:17
62:8 88:18
91:12 111:7
118:23 138:8
139:13 140:4
149:6 152:18
258:18 261:21
267:4 297:10
352:8 489:22
498:19
**paraffin** 400:1
**paragraph**
74:21 87:14
127:8 256:7
258:24 275:16
325:6 379:3
380:13 407:14
416:19 443:19
469:7
**paragraphs**
139:4 166:19
456:23 457:15
457:20 458:9
465:20
**Pardon** 156:9
468:13
**Park** 3:9
**part** 51:5 68:11
77:2 78:17
81:19 87:3
107:2 143:8,13
143:14 146:8
153:16,20
158:13 251:5
251:10 271:8
284:10,12
289:6 304:13
327:16 384:16
393:13 427:14
429:9 448:21
**participants**
240:4 330:3
387:4,10,11,12
**participated**

63:7
**particle** 393:23
394:19
**particles** 122:12
123:11,11
127:24 128:10
128:14 133:3
133:23 134:10
391:11,24
392:2 400:22
430:18 431:17
437:3
**particular** 31:23
135:18 156:24
490:13
**particularly**
23:8
**particulate**
135:15,18,20
423:3 438:14
**particulates**
425:16
**partners** 242:9
504:7
**parts/genital**
376:6
**pass** 39:21
**passage** 173:12
**path** 449:24
**pathologic**
78:14 94:7
**pathology** 94:11
94:13 449:22
**patient** 14:8
19:4 26:9 27:2
28:11 35:23
36:7 128:16
338:10 450:12
450:14 479:4
479:20 480:21
482:13 483:11
483:24 485:9
501:2,5 502:12
506:19 511:15
**patient's** 14:7
26:14
**patients** 9:11

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 661 of 1035
PageID: 241840
Kevin Holcomb, M.D.

Page 556

25:2,6,21
26:17 27:7
225:24 233:23
239:1,5 244:23
272:17 313:22
342:3 356:12
367:7 405:14
418:4,20
455:21,23
466:12,16,17
467:8,12,17,19
467:24 469:14
483:6 499:13
500:11,24
501:17 506:9
506:12 507:21
508:14 509:1
510:2,7,16
512:16 513:1
513:11,20
514:5
**patients'** 303:1
**PAULA** 2:8
**pause** 132:11
348:13 382:6
453:11 473:12
**pay** 60:9
**payments** 265:9
**Pbrown@bho...**
2:10
**PCPC** 3:20
**peer** 299:16
382:13,17,20
383:5 470:18
**peer-reviewed**
184:10,19,24
220:21 247:7
254:3 257:5
267:3 273:7,14
298:15 299:7,8
299:10,13
300:12 350:18
401:5 439:19
440:6,17
443:16 459:5
470:5,13
**pelvic** 487:14

**pelvis** 430:19
431:19
**penalty** 15:7
**pending** 168:22
210:2 418:17
419:1 454:5
**Penninkilampi**
8:19 171:10,20
171:24 227:9
229:23 230:1
231:20 233:9
234:7 236:16
236:17 237:10
237:19 238:7
319:5,11
320:21 321:10
322:3,12,15,19
322:21 323:4
360:4 361:13
362:7 382:16
383:5 407:2,4
409:4,23 411:8
411:17 412:2
415:15 416:15
416:18 417:9
459:23 460:9
461:11 471:4
488:6 489:4
494:14
**Penninkilamp...**
230:15
**people** 32:20
35:5 81:9
100:14 149:10
214:19 215:21
235:24 254:16
262:22 265:14
265:19 266:16
273:19 290:16
320:17 321:11
326:10 341:13
369:21 395:3,5
396:5 400:12
402:7,9 424:2
438:8 445:23
470:24 479:14
490:12 498:23

**percent** 25:5,9
25:10,11,21
149:23 187:4
187:21 193:21
193:23 194:8
196:22 197:14
202:5 205:20
234:2,4 235:5
245:15 248:19
248:20,24
249:6 290:14
318:21 328:22
329:2 349:12
349:13 371:3,3
372:8 376:23
378:16,16,20
386:23
**percentage** 25:1
150:2 234:9
235:11 323:12
381:13,14
**perception** 35:5
**perfect** 388:9
504:11
**perfectly** 380:16
475:7
**perform** 153:21
**performance**
14:19 20:12
**performed**
149:3 249:20
412:4 413:9,14
444:9,13
**perineal** 6:22
7:6,9 8:12,17
84:7 120:8
134:2 220:24
224:19 236:20
347:9 348:20
348:20 378:11
378:19 396:12
416:5 417:4
420:17 425:24
432:9 448:9
**perineum** 130:2
130:13,16
131:19 330:13

344:24 347:4
353:24 367:15
422:3,21
423:15 425:16
427:18 439:3
445:22,23
**period** 19:17,23
20:11,15 21:3
21:6 261:22
266:15,15
325:13 328:11
332:3,5,17
334:24 336:2
336:17 337:7
337:23 345:19
350:2,4,6,15
351:3 352:14
369:3
**periods** 21:12
325:14
**peristalsis**
437:21,24
**peritoneal** 79:20
86:23 93:9,17
423:4 425:17
**perjury** 15:8
**persist** 293:15
**Persistent** 7:16
292:22
**person** 30:23
34:7 41:5
81:15 90:12
158:9 178:22
179:15 195:8
399:8,9
**person's** 157:14
157:16
**personal** 70:22
341:12
**persuaded**
129:5
**persuasive**
131:5,10
267:24
**pertains** 90:20
246:20
**pervasive**

202:12
**ph** 1:20
**Ph.D** 427:1
428:9
**Ph.Ds** 153:19
**pharmaceutic...**
84:3
**phase** 452:3
**phenotype**
19:12
**phrase** 19:17
20:6 358:18
407:12
**physically** 105:9
105:12
**physician** 307:1
**pick** 151:21
279:10 281:21
313:3 314:9
352:16 388:20
**picking** 84:18
231:10 329:3
**picture** 307:19
**piece** 68:8
200:24 261:18
489:21
**pieces** 48:16
**pig** 129:12
**pigs** 130:10,10
**pipes** 266:2
**piqued** 50:20
53:20 461:6
**piquing** 48:9
**Pisano** 168:6
**place** 28:23 29:9
29:13 128:14
217:24 218:7,8
218:12,14
289:16 321:21
444:15 461:19
**placed** 134:21
135:16 500:9
**places** 233:21,24
289:14 298:17
**plaintiff** 292:14
**plaintiffs** 2:16
210:3 473:18

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 662 of 1035
PageID: 241841
Kevin Holcomb, M.D.

Page 557

plaintiffs'
126:19 127:18
129:20 130:15
132:10 136:21
140:5 149:5
155:23 157:4
162:8 172:14
173:2 208:1,16
planning 125:14
144:1,12
145:10
plausibility
116:6 162:15
164:14,18
165:9,22 308:3
340:2 391:17
394:23 395:9
401:2 403:9
430:14 431:14
432:8 437:7
460:15
plausible 140:6
174:1,13
263:19 393:5
394:6 395:20
401:7,24 422:1
422:19 423:7
423:12 427:16
436:13 437:12
439:22 440:7
441:6,20 445:5
492:17
play 196:11
252:22 253:11
253:20 254:7
257:9 258:3
259:21 261:6,8
261:13,14,17
263:20 267:6
267:15,19
268:2,6,10
273:9 277:10
313:18 314:23
315:4
played 263:13
277:2
playing 390:4

Plaza 2:4
please 11:17
12:4 16:5
57:23 74:10
108:8 126:9
138:23 146:12
146:24 152:9
159:23 163:11
163:12,23
166:12 167:17
170:18 171:16
188:8 190:24
195:19 233:1
246:16 253:23
291:15 306:17
343:18 442:2
443:17 457:1
458:14 462:13
463:16 466:23
472:16 516:3
518:3,8
pleural 9:11
465:2 466:10
468:1,6,17,18
469:11
Pleurodeses
9:10
pleurodesis
448:16 464:19
464:24 465:1
465:23,23
466:5,9 467:24
469:10,18
plus 114:11
307:24
pneumothorax
469:12
point 37:5 99:4
102:21 109:23
127:2 129:23
158:15 159:23
160:4,12
196:16,20
197:2,13,17
202:18 233:16
239:11 261:23
262:14 264:10

264:18 266:19
279:17 280:13
347:13,24
349:18,19,22
354:2 379:9
380:17 391:15
392:20 400:6
400:10 410:10
427:23 428:2
438:10 439:8
445:17 446:12
515:20
pointed 392:16
463:7,17
pointing 279:15
463:21
points 118:10
120:11
polarized
399:14
policy 203:5
polite 163:23
169:5,17
polycystic
487:13
polyposis 456:6
pool 229:17
pooled 225:20
229:8 408:10
408:12 453:18
poor 285:8
poorly 308:12
308:14,16,17
popular 490:8
population 30:3
83:19,22,23
84:5,13 158:7
355:17 367:1,5
373:21
populations
82:15 233:21
311:7 381:17
portion 30:3
429:2
pose 169:13
posited 267:12
position 428:5

438:20
positions 465:13
positive 87:21
149:22 150:8
183:2,15 184:1
184:6,14 186:1
189:13 193:9
193:16,19
194:6,7,14
195:11,16,18
198:1,3,4
220:23 259:9
260:10 270:16
285:11 313:3
324:3 370:12
370:13,14,16
370:23 371:12
371:24 372:2
372:12 381:14
420:15 484:10
497:15 499:6
possibility 93:9
93:13,16
possible 13:22
95:8 129:1
224:20 228:4
252:24 253:1
272:3 333:10
363:2 400:11
421:5,7,12
422:11,14
469:13
possibly 52:12
201:11 277:9
278:2 324:14
419:24 420:2
502:8
postmenopausal
383:16
potential 151:20
289:18 352:5
425:15 487:19
potentially
338:3 487:15
488:2 510:24
powder 1:5 7:12
8:12 11:11

13:2,11 16:13
16:15,21 22:3
22:8,12,20
23:1 27:8
28:23 29:6,9
29:13,19 30:5
31:17 32:15
33:1,6 34:21
35:12,23 36:19
37:11,23 38:18
44:15 56:24
84:12 96:9,10
96:22,24 97:24
98:5 99:8
103:18 108:18
108:24 109:4
109:13,22
113:17 115:6
120:9 124:9
145:3,7,14
154:16 170:7
174:2,14,22
175:1,6,9,15
224:20 245:17
248:2 252:9
253:18 254:5
267:4 272:4
276:10,14
280:16 310:1
310:21 311:12
316:4 336:13
336:18,22
337:14 344:11
345:19 346:15
347:4,15
353:16,23
367:15 376:5
378:11 380:3
384:22 391:4
394:3 404:6,16
408:6 409:20
422:2,20
423:14 427:17
442:7 447:20
447:23 478:10
478:12,17,22
479:3,5,22

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 663 of 1035
PageID: 241842
Kevin Holcomb, M.D.

Page 558

480:23 481:21
482:6,11,15
483:12 487:15
491:4,14,16
492:21 496:15
497:21 499:5
503:16 504:14
505:4 507:22
508:15 510:17
512:19 514:9
515:8,13
**powders** 84:7
**power** 318:21
329:23 330:18
348:9 502:17
**powered** 325:20
**powerful** 266:22
455:18
**practice** 12:16
12:17 25:23
35:3 78:19
153:16 263:7
283:20 284:21
288:18 304:2,9
306:5 307:2
352:10 427:2
**practices** 1:6
28:13 204:4
**practicing** 12:13
303:23
**pre-World** 63:9
69:9
**preambles**
402:24
**precancer**
451:12 452:1
**precancerous**
452:3
**preceded** 44:24
46:13
**precise** 357:3
**precisely** 379:8
**precursor**
449:12 451:13
**predefined**
197:24
**predominate**

250:2 261:1
355:2
**pregnancy**
487:9
**Prempro** 243:18
244:11,20
**preparation**
50:4 58:17
111:22 113:2
496:13
**prepare** 37:18
56:2,21 59:8
**prepared** 56:9
60:3
**preparing** 59:16
59:20
**Presbyterian**
301:6,17
**prescribe** 37:1
243:17,20
**presence** 132:7
132:18 170:8
393:10,14,17
393:19,22
394:19,24
400:21 432:1
435:13
**present** 4:8
170:12,21
184:23 224:17
256:21 273:17
448:18,21
450:11 451:10
475:19,21
507:13
**presentation**
24:19,20
**presentations**
22:24 23:19
24:22
**presented** 54:21
164:4 179:4
219:5 474:3
**pretty** 37:1
38:20 39:4
41:17,24 57:7
57:8 254:15

255:9 277:4
320:22 357:21
479:11
**prevalence**
248:1,7 260:13
**prevent** 37:4
455:19 456:8
456:10 459:18
460:18
**preventing**
444:10
**previous** 224:14
**previously**
417:6 428:15
492:19
**primarily** 307:5
**primary** 79:19
84:4,8
**Princeton** 3:13
**printed** 110:12
**printout** 302:16
**prior** 13:20 39:4
39:17 42:5
46:9 59:4
64:17 66:2
124:5,15,18
125:2 139:20
169:1 181:2
230:8 233:7
234:14 256:19
327:14 332:23
358:24 404:8
404:17 443:20
515:4
**private** 350:11
376:6 445:2
**privileges** 301:9
301:10,13,14
301:19
**probability**
272:20
**probable** 253:1
253:5,8
**probably** 13:18
25:10 36:15
38:4 39:13
59:22 106:20

122:20 140:19
151:4 159:6
248:11 270:21
319:23 332:18
427:7 430:4
495:17 513:4
**problem** 72:22
78:5 202:13
226:15,21,21
226:23 272:2
314:8 319:7,10
319:11 320:23
321:14 339:12
389:11 393:13
498:8
**problematic**
80:7
**problems** 91:14
198:17 309:15
309:19 313:15
319:16
**proceeded** 42:8
**proceeding**
102:19
**proceedings**
145:2
**process** 15:3
115:13 118:13
118:17 144:23
209:7
**processing**
400:2,7
**produce** 103:9
465:24
**produced** 51:11
51:18 55:21
57:14 58:19
103:1 107:10
107:18 118:10
154:7 186:14
318:10 463:24
**product** 99:9
101:7 118:12
144:15 251:3,4
266:3 267:5
296:10 310:1
316:4 367:15

391:4 394:4
408:6 480:14
481:6,22
483:17 484:1,4
484:5,13
497:15 498:15
501:12 502:10
502:13 505:15
506:13
**production** 10:8
110:9 121:1,6
**productions**
63:8
**products** 1:5,6
9:21 13:2
16:13,16,22
22:3,8,13,21
23:1 27:8
28:24 29:9,13
29:19 30:5
31:17 33:1,2,6
34:21 35:12,23
36:19 38:19
44:15 84:2,12
96:10,11,22,24
98:6 100:21,22
108:18,23,24
109:4,14,22
113:17 115:7
128:19 145:3,8
145:14 154:16
170:8 174:2,14
174:22 175:2,6
175:15 245:17
248:2 253:18
254:5 345:19
346:15 347:4
347:15 353:16
384:22 409:21
422:2,20
423:14 427:17
442:7 447:23
478:10,12,17
478:22 479:3,5
480:23 481:11
482:12,16
483:12,23

484:18 485:2
491:4,14,16
492:21 495:22
496:4,15
497:10,17,21
498:2 499:6
500:10 503:16
504:3,15 505:4
507:22 508:15
510:17 512:19
514:9 515:9,14
**professional**
1:16 242:18
507:8 509:19
517:13
**professor** 287:2
**prolonged**
444:12
**promote** 173:13
**prone** 137:17
226:9,10
307:14
**pronounce**
454:10
**pronouncing**
322:23
**proof** 254:14
255:2,8,11
396:8,11,11
425:14 434:9
437:2 442:14
**proper** 66:4
192:20 346:12
**proposed**
433:13,15
**propounded**
520:9
**prospective** 8:6
100:9 101:1
228:21 229:3
256:17,17
360:21 379:4
380:2 381:21
382:7 493:12
**protecting**
504:21
**protective**

154:24 354:3
442:18 446:5
**prove** 205:8
393:23 396:24
433:19 434:7
437:9 438:9
477:7
**proven** 174:19
369:13 445:17
456:15 513:3
**proves** 99:15
174:17 280:9
**provide** 103:12
123:14 143:23
144:1,12
146:14 171:6
171:17 173:24
174:7,12 220:8
231:1 235:5
293:22 367:14
432:18 433:10
433:14 504:3
**provided** 44:17
47:1,8 54:22
107:20 108:1
117:5,12 347:3
433:20 478:8
478:14,20,24
**provides** 177:16
393:5
**proving** 410:12
433:14
**pseudoscience**
390:4 402:13
402:16,18
**PTI** 4:6,6
**public** 1:17
144:20 154:19
272:7 350:10
504:21 517:14
520:23
**publication**
124:20 181:2,6
363:19,21
**publications**
22:16,20 28:17
28:21 151:9

152:3,12
176:21 317:24
380:22 381:2,5
381:6,22
**publicity** 272:3
275:12 276:8
278:14 279:21
279:24
**publish** 144:5
281:9
**published** 22:7
22:12 44:17
46:24 105:21
115:10 153:1
180:11 184:24
200:5,7 240:3
241:5 247:7
249:14 254:3
287:3 298:15
299:9,12,18,22
300:4,9 363:23
382:13,17
394:2 444:3
459:5 470:5,19
490:21 493:10
494:3
**publishing**
299:24
**PubMed** 119:22
120:3,23
151:10
**pull** 50:21 54:14
54:15 55:7,8
363:4 441:2
442:22 501:15
**pulled** 53:21
**pulling** 58:21
466:3 500:16
**Purdie** 7:23
232:1 233:12
333:13,16
334:2
**purists** 67:5
**purpose** 190:21
298:1
**purposes** 20:15
36:21 123:21

243:4 304:9,12
329:23
**pursuant** 1:13
**pursue** 210:4,4
**put** 27:11 81:17
102:1 187:13
221:15 222:16
225:19,23
239:8 285:8
290:10,12,15
290:17,20
291:1,17 303:7
303:8 314:6,16
321:20,23
390:16 406:11
436:24 438:19
438:19 445:22
445:23 499:15
502:9 503:14
**puts** 77:20
262:18
**putting** 194:3
231:22 295:11
319:16 336:12
500:15,19
501:6,17
**pyramid** 284:17

—————————
**Q**
**Q-I-A-O** 454:11
**qualifications**
21:24 69:1
**quality** 37:2
196:8 490:6
495:10
**queried** 367:1
**question** 15:21
16:7 21:11
23:18 24:4,15
26:17 30:13
31:10,14,19
32:1 34:20
35:9 36:5
41:13,19 42:6
42:17 44:3
45:17 46:14,15
46:18 58:3

61:9 63:20,24
64:2,24 66:20
67:16,22 70:8
71:22 75:23
76:8,15 77:22
80:10,17,21
81:18,22 82:4
86:2 91:21
98:4 101:12
105:2 124:14
131:15 136:5,6
139:10 159:16
159:20 163:18
164:13 167:8,9
167:14,17,23
168:2,4,18,21
169:4,14,22
170:2 171:3
175:10 182:14
189:24 190:13
190:17 191:2,5
191:6 197:1,7
210:2,3 212:15
213:12,15,18
218:18,21,23
227:19,22
228:7,9,14
232:18,23
237:16 246:16
250:15 253:24
257:4 290:5
296:7 300:8
308:19 314:12
316:19 328:5
330:11 332:21
354:6,16 357:3
365:2 367:6
371:22 376:4
384:18 387:13
393:16 401:15
401:22 411:2
412:24 413:1,8
413:15 415:1,3
418:17 419:1
422:7 423:21
431:3 442:19
454:5 456:24

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 665 of 1035
PageID: 241844
Kevin Holcomb, M.D.

Page 560

457:4,7,9
458:2,4,10
465:5 466:21
467:2,4,6
482:14 489:10
489:15 498:13
**questioning**
27:20 52:19
321:7 330:17
331:14
**questionnaire**
344:13 366:22
367:3
**questionnaires**
265:22
**questions** 10:14
16:2 26:11
57:3 139:7
159:14 162:11
167:11 169:1
169:12 173:22
199:9 206:1
216:15,21
258:14 298:6,7
298:10 307:17
328:3 342:6,7
353:13 354:13
366:18 384:16
458:16 465:14
478:7 515:23
520:8
**quicker** 72:5
**quickly** 106:3
159:6
**Quit** 215:16
**quite** 61:6
**quote** 195:23
329:7 439:2
**quoted** 493:5
**quoting** 60:23
329:8 382:8

— R —
**R** 2:8 519:1,1
**radiation**
335:16 337:21
**raise** 205:24

240:22
**random** 241:24
390:17
**randomized**
293:21 305:8
**range** 187:20
193:23 271:3
**ranks** 294:4
**rapidly** 293:9
**rappel@seyfa...**
3:19
**rare** 317:9
**rarely** 316:17
**rarer** 260:16
**rarity** 325:17
**Rasmussen**
446:20 447:8
**rat** 129:12
**rate** 60:9 112:4
113:5 115:24
272:18 320:12
**rates** 248:11
**ratio** 192:14,21
241:23 243:23
244:8,11,17,22
245:21 249:6
325:20 329:18
354:17 371:19
378:14 443:23
**ratios** 181:14
182:4 206:21
253:12 269:14
269:22 270:10
271:1 311:22
408:13
**rats** 130:9
**raw** 178:17,19
**reach** 91:9 130:3
189:15 194:15
197:24 198:2,8
260:17
**reached** 74:22
75:14,24 85:15
195:17
**reactive** 435:12
435:20
**read** 31:5 41:12

47:11,14 49:21
50:9,10,18,21
52:8 53:15,22
55:7,13,14
62:5,7 64:7,8
69:16 72:11
73:20 76:11,12
82:5 83:24
84:9,19 89:9
90:13 118:15
119:12 120:24
121:2 123:24
124:6,20 125:4
137:19 138:8
140:16 143:18
145:17,22,23
146:23 147:16
170:24 177:12
180:15 182:10
182:11 183:19
184:3 201:23
201:24 203:7,9
203:15,20
204:8 211:21
212:13 215:7
215:12 217:7
220:3 224:22
224:24 253:14
254:3 259:17
262:3 272:11
274:20 276:16
277:5 287:18
294:24 297:10
297:11,11,17
297:19 302:19
306:15 309:5
313:24 334:14
346:24 351:7,8
358:3,5,6,20
359:23 365:15
366:9 374:6,10
378:22,23
380:15 397:6
398:15 402:20
406:14 417:14
418:1 420:20
421:4 427:22

428:23 431:21
432:15,16
433:1 440:20
441:8 444:22
444:23 451:19
460:24 462:1
465:21 469:19
469:20 472:12
487:16 490:16
504:10 509:6
510:13 513:24
517:9 518:3
520:5
**reader** 160:1
**reading** 50:7
53:19 55:3,6
58:22 59:5
73:2 75:11
83:7 84:20
111:10 127:3
141:7,17 212:9
215:7 265:16
274:9,19 297:3
314:17 350:22
350:24 407:9
446:12
**reads** 45:17
64:23 87:14
181:12 217:2
224:12 256:13
271:22 293:8
302:22 334:4
446:15 487:1
503:24
**ready** 59:12
274:22
**real** 226:19
449:5
**realize** 48:11
**realized** 122:22
314:7
**really** 20:10
59:19 61:4
99:24 100:2
115:20 135:24
136:6 138:1
144:16 166:24

167:19 212:5
226:3 236:8
254:13 255:7
284:24,24
334:14 337:13
353:13 389:18
390:6,19
391:19 399:16
410:15 449:11
456:2 465:15
502:20
**Realtime** 1:17
517:14
**reason** 34:7,11
132:11 164:6
198:16 244:13
266:24 284:18
311:2 320:19
336:15 348:10
353:23 362:16
373:11 401:11
448:6 457:14
459:15,16
465:8,11
466:17 467:3
467:13 483:18
488:1 498:6
505:12 514:19
518:5 519:6,8
519:10,12,14
519:16,18,20
519:22,24
**reasonable**
90:12 158:9
334:12 426:4
**reasonably**
158:24 280:10
334:23
**reasoning**
164:10 258:8
**reasons** 99:13
216:9 269:23
423:2 460:8
**reassurance**
504:19
**REATH** 3:7
**recall** 86:24

Case 3:16-md-02738-MAS-RLS   Document 33123-4   Filed 08/22/24   Page 666 of 1035
PageID: 241845
Kevin Holcomb, M.D.

Page 561

196:11 198:21
198:21 199:1
226:10 251:22
252:5,11,16,21
253:20 254:6
254:22 256:8
256:13,20
257:3,8 258:3
259:6,20 260:3
260:14 261:5
262:1 263:10
263:20 264:18
267:1 268:10
271:23 272:13
272:15,16,21
273:8 274:5,11
274:24 276:11
277:1,7,10,12
277:22 278:10
280:12 314:18
346:21 347:5
407:12 428:1
460:2 502:8,8
**recalls** 497:8
**receipt** 518:17
**receive** 105:16
105:22 106:1
114:16
**received** 6:8
88:5,6 105:19
106:6 110:16
114:15 121:11
**rechurning**
225:14 227:10
229:9 230:3,8
230:23 232:9
232:12 233:6
493:19
**recognize** 331:6
**recognized**
295:4
**recognizing**
331:7
**recollection**
13:21 38:11
266:18
**recommend**

459:17 507:21
**recommendat...**
455:21
**recommendat...**
495:18
**recommended**
456:9
**recommending**
456:14
**record** 11:3,15
12:5 15:23
81:17 126:12
126:15 169:16
190:24 209:21
209:23 210:1,5
239:15,16,19
343:19,22
348:12,15
366:13 418:1
421:17,20
453:6,10,13
473:8,11,13,23
485:24 486:3,6
517:6
**redo** 70:8
**reduce** 447:12
449:8 453:17
**reduced** 455:5
**reduction**
349:12 386:22
386:23 443:21
448:2 454:18
455:7
**refer** 16:12
490:12
**reference** 47:18
49:12,15,24
50:3 51:1,10
51:15 52:23
53:7 54:16
55:20 56:3,14
57:12,14 58:19
69:21 105:5
117:3,21
119:13 121:2
124:2 131:13
139:17 142:1

142:12 143:2,6
146:3,14 152:4
172:5,10
313:17 347:18
348:4 424:19
**referenced**
49:23 50:11
53:13 155:14
156:24 471:13
**references**
107:19 116:12
116:14,15
119:17 162:17
172:5
**referencing**
243:6 449:23
**referral** 140:23
**referred** 247:1,2
463:15 464:7
**referring** 39:9
65:24 68:16,24
88:12 140:21
164:1 243:2
244:4 260:5
318:11 340:23
409:1,10
462:17 509:10
**reflect** 111:14
**reflected** 47:18
**refresh** 13:21
38:11
**refute** 292:4
**regard** 22:20
23:8,10,20
24:22 25:14,20
25:24 38:12
50:6 58:6 59:1
59:1,15 69:17
71:3 82:14
89:12,13,17
93:2 105:20
106:12 113:12
124:7 125:5
129:9 131:14
131:17 139:14
142:11,14
145:2 148:23

157:3 159:22
163:24 171:9
172:5 187:19
237:22 241:3,5
243:5 267:4,6
287:7,19,22
308:21 334:5
350:14,17
405:21 409:20
411:7 437:20
446:6 454:11
454:12 462:2
465:22 470:7
473:21 478:11
478:21 491:16
492:12 495:21
496:3,5 497:20
502:24 515:8
**regarding** 13:1
22:2,7,12,24
38:18 108:17
171:7,18 281:6
287:4 293:13
419:5,14 469:9
**regardless**
307:15
**region** 271:5
**registered** 1:16
366:1,2 517:13
**regression**
296:10,11
**regularly** 37:1
490:16
**regulations**
498:21 499:1
502:23
**regulatory**
36:21 502:16
502:22
**Reid** 88:19
**relate** 18:4
27:24 103:17
107:11
**related** 248:9
503:22
**relates** 1:8 89:19
305:19 306:1

**relating** 108:4,9
142:8 162:14
**relationship**
46:12 70:24
100:5 316:3
393:24
**relative** 192:10
192:15 193:2
245:21 253:13
269:14 317:11
317:15 318:1
348:1,22
353:15 370:5
371:8 375:17
385:21,23
387:23 472:23
474:11,20
**relatively** 351:2
**relevant** 152:6
152:15,19
154:12 224:19
**reliable** 177:3,7
177:11,16,22
178:11 188:16
246:4 294:1
308:8
**reliably** 77:16
**reliance** 45:2,18
204:5 388:24
441:1,15
**reliant** 392:11
**relied** 45:20
46:23 52:8
108:2 117:20
140:4 146:16
**relies** 360:10
**rely** 92:16
117:16 123:18
123:19 158:6
217:21 288:17
307:5 372:4
**relying** 333:17
**remember** 14:6
14:8 31:10
55:10 56:4
58:11 117:11
121:20 122:2

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 667 of 1035
PageID: 241846
Kevin Holcomb, M.D.

Page 562

130:8 141:22
171:1 189:23
218:22 254:12
255:6 262:22
263:6 286:15
314:11 323:6,8
323:24 324:1
374:5 406:16
434:16 435:3,8
435:11 441:14
454:8 478:1
**remembering**
254:17 272:17
**remind** 136:16
**remove** 126:10
**render** 160:2
165:9
**rendering**
162:17 173:2
**RENÉE** 3:17
**repeat** 30:12
31:11 58:3
108:8 124:14
152:9 167:13
170:18 171:16
188:8 212:17
246:16 253:23
255:5 291:15
300:10 375:3
397:19 404:12
413:1,4 415:5
442:2 467:7
481:14 495:24
**Repeated**
382:22
**repeatedly**
48:13 49:2
91:14
**replacement**
205:18 242:21
243:9
**replicated**
161:18,21
**replication**
217:15,17
**reply** 372:13
**report** 6:10

16:18 49:13
50:9,12,19
51:5,6,16 53:1
53:20 57:13
79:5 82:3
86:21 87:3
100:24 101:2
103:24 104:2,6
104:11 105:6
108:6,10
110:14,20
111:21 115:1,6
115:10,15
117:4 118:6,14
119:3 120:12
121:7 124:5,19
125:3 126:19
127:5 134:8
135:22 137:15
137:20 139:21
140:10,15,17
143:12 147:1
148:2 150:22
155:14 157:1,7
159:24 160:17
161:3,10 162:4
166:1 171:1,7
171:17 180:3
184:23 186:4
186:11 187:17
205:16 242:21
243:5 245:11
250:6 251:24
259:14 273:4,6
273:13,18
274:4 276:19
281:2 286:6,8
292:5 303:7
308:23 309:4
352:3 353:8
355:5 356:11
356:17 357:8
357:22 359:13
374:12 375:5
384:9 390:23
390:24 391:3
391:10,20

405:23 406:12
407:5 411:16
433:5 453:2
454:24 457:18
457:21 458:21
459:3,22
**reported** 132:8
132:17 181:14
182:4 248:19
311:23 354:19
381:16 384:21
391:22 397:8
417:1 435:2
444:18
**reporter** 1:16,16
1:17 11:16
15:16 185:8
232:19 517:13
517:14,14,22
**reporting**
177:23 267:6
276:10 357:16
385:2 397:3,4
**reports** 8:6
49:21 50:7
52:2 53:12
54:5 58:14,22
59:5 105:18
111:6 118:3
119:19 121:3
124:1 139:15
143:19 504:1
**represent** 31:3
229:22 244:10
287:1 309:10
407:23 424:16
503:18
**Representing**
2:16 3:15,20
4:6
**reproduction**
517:20
**reproductive**
25:3 444:11
**request** 10:8
116:19
**requested**

478:23 517:7
**requesting**
331:14
**requires** 302:22
**requiring**
469:18
**requisite** 346:3
**research** 7:16
22:2 101:8
145:6,6,13
153:7,12,20
203:5 288:8
292:23 293:11
293:13,14
302:23 461:2
**researchers**
205:12
**resident** 461:4
**residents** 23:7
**resolved** 14:1
**respect** 214:3,9
236:10 242:11
242:17 263:15
352:22 489:2
494:8 495:5,15
**respected**
200:16,23
**respectively**
366:3
**Respiratory** 9:9
**respond** 139:8
168:1 328:4
**respondents**
376:7
**responding**
376:7 458:9
**response** 79:7
81:21 92:13
133:12 138:24
143:20 166:13
297:4 306:17
320:12 479:6
480:4 482:17
**responsive**
81:21 457:6
**rest** 314:16
434:15

**restrict** 64:6
89:24 137:6
156:21
**restricted** 68:19
95:12
**restricting**
66:22
**result** 154:23
203:3 204:4
347:3 360:20
**resulted** 276:9
476:14
**resulting** 174:15
**results** 18:15
101:10 116:3
179:18,19
203:22 204:2,3
205:15 215:19
217:16 267:7
274:6,11 275:1
288:21 291:3
298:21,22
307:22 310:5
322:18 357:9
358:13 360:13
367:14 383:20
384:15 407:6
408:5,6,21
409:10 410:8
410:16 416:23
442:24 444:2
469:13 475:22
**retained** 37:22
43:3 60:1
**Retire** 6:17
200:20
**retrograde**
173:13 432:6
436:20 437:6,9
437:16,24
438:6,16
**return** 518:15
**revealed** 26:20
**reversed** 357:15
358:9,17,18,23
359:19 360:14
379:16 380:8

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 668 of 1035
PageID: 241847
Kevin Holcomb, M.D.

Page 563

reverses 372:18
373:20 374:4
review 6:21 8:18
44:16 53:7,15
71:11 91:9,23
92:19,23 94:11
94:24 95:18
97:17,24
102:19,22
103:2,8 105:21
111:2,6,20
126:21 127:14
128:6 129:9
131:2,6,16
139:12,19
142:22 143:16
149:3 150:5
154:5,20
162:13,16
165:8,21 166:8
168:18 170:6
180:20 181:1,5
196:6 247:22
289:11 299:7
336:20 440:14
440:22 485:13
490:18 492:1
514:23
reviewed 6:8
15:3 46:7
51:14,24 52:1
52:8 53:3,10
54:10 56:17,19
56:22 57:7
58:17 91:12,13
92:8,22,22
105:4 106:13
110:17,19
115:17 117:16
117:22 131:12
133:1,21
136:23 142:12
143:8,11,15
144:3,17
146:16 148:22
155:24 167:22
219:4,9,17

223:14 227:2
248:6 255:20
271:7 285:24
299:16 382:13
382:17,20
383:6 388:19
403:12 437:19
470:18 481:13
483:16 484:7
508:23 511:12
reviewer 176:21
178:6,14 179:2
180:21 181:3
reviewing 58:13
115:17,21
119:18 161:19
162:9 178:23
284:5
reviews 304:5
304:21 305:1
307:11 491:12
revisit 66:24
RICHARD 3:12
richard.heasli...
3:14
rid 219:19,23
220:1
ridiculous 396:2
right 15:1,6 16:9
21:2,20 22:9
29:1 30:5 33:2
33:6,23 34:2
34:10,12,13,15
34:16 37:13
42:24 43:2
45:14 47:5
52:10 64:20
68:7 69:4,18
73:22 74:15
80:22 82:12,18
83:10,13 86:17
88:1,3,9 96:17
97:1 98:7
102:5 109:23
112:7 124:10
127:6 134:18
135:1,9,13

136:11 139:9
139:22 141:23
142:9 145:8
150:22 153:16
154:2,3 157:22
161:18,22
168:24 176:18
176:23 186:14
186:19,22
187:22 192:11
193:6,6,7,9,17
198:7 201:15
202:5,6 203:19
206:15,18,19
207:11,17,19
207:20 208:20
209:11 213:13
215:2 229:24
239:15 241:20
245:17 247:9
249:1,4 255:20
265:2 271:8
275:5,6 276:3
279:12 281:7
287:12 294:14
295:9 298:11
298:14 299:18
300:6 301:5
303:19 305:2,3
305:5,14,21
309:4,20 310:2
313:19 315:22
316:20,21
319:6 322:5,11
322:15 325:5
329:20 331:10
332:15 333:6
334:18,22
343:4,5,6,11
344:13 346:10
347:2,13 348:2
348:6 350:8
351:22 355:8
360:4 363:12
365:18 368:6
368:12 374:10
376:14,15,18

376:20 378:5
379:1 380:16
380:22 381:2
382:14 383:17
384:17,18,22
387:2,8 390:22
395:11 400:2
402:9 404:24
405:3 412:3,20
415:9,10 416:5
416:6,9 417:11
418:12 420:10
423:16 424:6
425:9 426:14
426:16,17,21
428:7 430:16
431:22 436:9
443:6,14,23
444:6 445:1,9
445:15 446:13
449:23 452:16
466:10,14
467:10 468:22
473:4,6,10
474:5,12
476:11,22
477:18 478:3
481:8 483:10
486:19 487:5
488:4 490:23
494:22 497:3
502:19 505:5
507:3,6 508:12
515:19
right-hand
87:13 182:20
215:15 217:10
271:18 275:16
351:1 377:4,5
377:21 378:5
risk 6:23 7:7,10
7:21 8:9,12,15
9:13 13:2
17:10,14 23:4
23:10,11,20,23
24:7,9,22
25:14,24 26:9

28:1 34:8
63:14 65:9
67:8 69:12,24
70:10,19 74:24
78:15 88:24
89:4 90:14
94:12,14 95:15
98:17 124:10
149:8 174:23
175:11 183:3,5
183:16,18,18
187:20,22
188:18,21
189:18 192:15
193:2,22 196:9
196:17 197:3
197:18 198:20
203:24 205:3
206:10 210:18
210:23 226:5
226:14,22
229:15 243:5,8
243:11 244:21
245:5,15,19,21
246:4,13,19
247:10,10,20
249:6 252:9,15
252:19,22
253:6 254:5,8
260:19,23
261:9 269:3,14
272:22 273:10
309:24 310:1
310:10,15,20
311:1,9,11,19
312:1,12 315:8
316:4 317:11
317:15 318:1
319:23 324:10
324:15,18
328:22 330:4
338:5 339:11
342:4 343:7
348:1,5,22
349:3,9,10,12
349:13,14,16
353:15 355:6

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 669 of 1035
PageID: 241848
Kevin Holcomb, M.D.

Page 564

356:9,19
357:24 360:23
363:2 370:5
371:4,8 373:6
373:23 376:23
378:13,17
380:3 382:8,9
386:23,24
405:9,11,15
419:6,18
443:22 444:20
446:17 447:12
448:2 449:9
452:14,20
454:18 455:14
455:24 456:16
457:12 459:8
469:13 470:7
472:23 474:11
474:20 479:15
479:19 484:14
485:9 487:6,20
493:15 498:17
507:12 514:2,5
**risk/benefit**
33:22 34:4,6
**risks** 75:15 76:2
85:16 192:11
243:23 253:13
**robbed** 395:21
**ROBINSON** 2:3
**robotic** 14:19
**robust** 231:2
**Roggli** 468:24
**role** 39:9 98:14
157:20 181:3
196:11 277:3
**room** 15:12
**ROS** 125:5
435:4
**Rothman** 7:17
199:21 286:21
287:8 288:7
292:16,24
294:2 298:14
**roughly** 113:20
**routes** 84:8

**routine** 27:20
**routinely** 279:9
**Royston** 4:6
**rubric** 36:20,24
**rule** 320:16
**ruled** 94:17
272:18
**rules** 236:11
285:2

--------

**S**

**S** 5:10 6:2 7:2
8:2 9:2
**S-T-R-A-U-S**
303:4
**Saed** 124:7
139:20 140:24
162:16 165:24
432:17 433:2
434:13 492:16
**Saed's** 124:20
125:4 140:12
493:4 495:11
**Saenz** 54:20
146:9 147:2,19
461:1
**Saenz's** 55:3,6
111:11 142:23
143:8,14
**Saez** 163:19
**safe** 226:17
239:8 479:5
480:3,24
481:17 482:3
482:14 483:7
484:1 499:21
500:12 505:2
508:15 510:3
514:8,15,20
**safer** 506:3
**safety** 196:14
205:19 427:4
428:11 504:22
506:20 510:17
**sake** 352:13,23
481:14
**SALES** 1:6

**sample** 317:22
328:20 375:14
**samples** 478:11
497:15
**San** 2:9
**sand** 87:6,8
**Sander** 199:18
201:5 287:9
**sanitary** 354:1
**saved** 106:17
**saw** 72:15
135:21 144:15
149:4 238:10
260:22 314:5
364:17
**saying** 50:17,18
53:16 56:5
62:11 66:14,19
76:17 79:24
86:4,9,10
91:15 92:6
98:19,22 100:4
100:10 106:23
127:12,13
129:24 131:1
134:1 144:14
165:19 177:21
178:16 183:6
184:5 185:17
189:17 194:1,5
195:7 197:15
205:1,2 230:5
230:12 231:12
232:13,14
233:8 257:20
257:24 259:20
276:21,22,23
277:1,3,5,11
277:13,16
278:2,10,11
294:14,16,22
296:1,8 299:6
299:15,17
311:2 312:24
313:7,8,10
314:14 315:1
327:11 329:9

330:22,24
337:2 339:23
340:4 341:21
361:1 362:12
363:1 375:12
387:19 392:21
395:3,12,19
399:3,8,9
413:5 418:3,8
422:14,15
425:21 426:2
437:5 438:24
451:24 455:1
458:20 460:11
460:13,22
474:16 476:2,4
477:13 489:21
493:18 496:15
503:15 505:2
508:1,7 509:2
510:7 511:2,8
512:11,12,15
513:16,22
**says** 36:10 68:12
72:13 74:6,16
74:21 75:20,21
75:23 76:18,23
77:1,20 82:6,8
82:11 83:16
84:1,2 85:14
88:4 90:13
127:7 133:20
147:1,9,15,17
158:10 182:1
183:22 184:6
184:13 196:5
202:13 203:17
236:17 237:6
247:19 253:11
259:2,4 267:18
271:20 275:21
277:17,20
290:12 292:4
319:12 321:1
321:19 322:12
322:14 323:15
329:5,5 331:1

336:1,1 338:24
351:16 359:18
365:21 373:21
379:3 399:4,5
416:15,22
421:12 425:10
437:10 444:7
457:21 469:7
471:5 473:3
476:13 488:20
498:22 502:12
503:21 508:10
510:2 511:5
511:12 513:23
**scenario** 330:16
493:24
**scenarios** 275:2
**Schildkraut**
7:15 254:14
255:8 261:15
264:22 268:3
273:22 275:3,8
275:14 278:19
280:14 314:19
**Schildkraut's**
264:20 268:5
268:12
**school** 301:11
350:10,12
372:7
**school's** 301:12
**schooling** 445:2
**science** 57:2,5
57:17 58:5,24
59:1 153:12
205:11 217:21
398:9 400:16
461:2
**Sciences** 446:19
**scientific** 104:21
111:3,4 115:11
156:2,13
157:10,14,16
157:20 217:22
293:8 341:18
428:10,20
430:8 504:8

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 670 of 1035
PageID: 241849
Kevin Holcomb, M.D.

Page 565

scientist 178:19
scientists 67:6
  154:19
screen 73:19
  256:1,2
screening 6:19
  142:13 220:11
scrub 450:10
se 264:7,7
Seaport 3:4
search 120:2,5
  120:21 282:13
  282:18,24
  283:3 286:12
  288:4 362:15
searched 282:10
searches 119:22
  119:22,23
  120:19
seats 73:19
second 141:12
  141:16 164:8
  192:24 213:15
  213:18 232:24
  269:19 274:18
  287:9 334:9
  354:20 367:19
  370:10 374:24
  384:3 409:17
  417:14 425:2
  425:11,12
  443:18 473:5
  475:6
Second-to-last
  476:12
section 84:24
  134:9 159:24
  160:11,13,15
  160:17,23
  161:20 162:4
  163:4 172:11
  172:21 189:8
  202:12 374:7
  429:8 431:14
sections 450:11
see 31:13,22

42:17 53:8
54:12 74:6,18
75:7,11 85:9
94:19 99:11
116:4,5 121:14
127:11 129:11
132:15 134:22
137:14 149:15
150:2 151:2,3
153:17,17
161:11 180:18
181:20 182:17
185:22 200:19
201:2,5,8,12
201:14 204:6
210:15 214:8
214:22 215:24
216:10 219:22
226:13 229:16
232:1,2,3
236:6 250:18
256:9,11
258:23 259:1
259:21 261:13
264:8 269:11
269:24 271:19
275:8,19 280:1
287:8 288:15
290:7 293:4,6
294:7 303:6
308:22 309:13
313:16 318:16
318:23 319:14
323:3,7 325:6
325:8 333:17
333:19 334:15
335:14 336:21
350:6 355:15
357:11 358:21
362:4,13
365:21 367:24
373:10 378:4
381:9,24 384:2
389:2 397:23
398:8 403:8
407:15 408:11
408:15 415:17

415:24 416:9
416:20 425:6
428:17 429:1
436:5 439:1
442:23 445:21
446:14 449:21
450:5 451:3
460:20 461:7
461:10 469:1
471:24 472:14
476:19 480:17
488:18 491:20
497:2,5,7,11
497:13 498:20
503:9,10,15
508:20 511:1,6
511:22
seeing 127:9
  323:6 449:24
  450:20 451:2
seeking 154:11
  361:24
seen 19:8 46:8
  128:24 132:10
  180:17 197:16
  247:15 248:23
  260:15 263:17
  292:24 318:8
  359:15 394:1
  411:22 422:8
  423:8,10,24
  424:3,5,7
  440:17,19,23
  448:7,22,23
  449:1,12,14
  450:15,17,19
  451:17 452:2
  454:9,15 463:1
  463:4 470:17
  470:23 486:17
  492:1
segment 215:12
selection 361:5,9
selective 126:21
  127:14 131:1,3
  131:4
selectively

136:23
seminar 201:18
Senate 154:11
send 208:20,21
sends 198:22
  499:18
sensational
  490:8
sense 185:19
  226:3 270:24
  371:15 395:23
  461:19 500:5,6
sent 106:24
sentence 181:10
  275:17 310:17
  378:8 476:13
separate 204:15
  222:14 301:7
  381:12
separated
  186:13 264:22
  488:1
separately
  222:14 322:1
serious 203:24
seriously 321:3
serous 8:21
  21:16,19
  249:20 256:22
  259:10 260:12
  260:24 311:1
  353:16 354:17
  354:22 355:10
  356:19 357:9
  357:24 370:7
  372:11 378:13
  378:18,20
  409:5,6,21
  410:19 448:19
  449:13 451:14
  461:13 476:17
served 176:20
services 1:20
  11:5 111:17
serving 515:13
set 108:5 288:20
  401:5

sets 350:3
setting 15:12
  64:3 68:19
  71:2 77:13,15
  492:3
settings 63:4
  64:5,9 68:20
  70:21 71:3
  80:1 86:7
  88:23 89:5
  90:3,5 101:23
seven 270:22
SEYFARTH
  3:17
SGO 507:3,14
  507:19 508:7,9
  509:19 510:4,6
  510:14,20
  511:1,20 512:2
  512:12,18,24
  513:18,23
shaded 186:17
  186:22,24
  187:2,3 189:20
shakes 389:17
share 322:17,20
  322:21 504:7
Sharko 3:8 31:1
  31:6 57:21
  58:1 66:6
  71:16,19 73:12
  73:18,23 76:19
  80:16 81:5
  163:20 168:24
  169:3,18,19
  170:3 190:9
  191:2 207:23
  208:10,15,18
  209:1,11,14,17
  209:24 213:16
  213:19,24
  214:2,10 357:4
  377:22 378:2
  414:24 458:12
  468:10,13
  473:13
SHAW 3:17

Kevin Holcomb, M.D.

Page 566

| | | | | |
|---|---|---|---|---|
| **she'll** 169:5 | 320:12,13 | **signatures** | 518:10 | 292:22 293:14 |
| **sheet** 518:7,9,12 | 339:9 355:6 | 448:24 | **silence** 169:21 | 338:2 345:1,4 |
| 518:15 520:12 | 356:18 392:9 | **signed** 115:2 | **similar** 66:21 | 471:19 |
| **short** 126:13 | 433:16 443:21 | 214:19 338:14 | 226:14 230:21 | **size** 182:24 |
| 343:20 351:2 | 453:16 | 340:8 352:18 | 238:3 256:21 | 183:14 185:22 |
| 352:16 421:18 | **Shower** 16:15 | **significance** | 257:7 294:22 | 205:5 290:7,15 |
| 486:4 | 16:16,21,22 | 6:17 150:15 | 410:16,24 | 290:15 313:23 |
| **shortcomings** | 97:20,20 | 188:3,14,17,20 | 411:6 420:1 | 314:2,8,9 |
| 398:18 | **showing** 21:8 | 188:22 189:3 | 501:20 502:3 | 317:16 318:17 |
| **shortened** 272:5 | 65:17 66:1 | 191:12,16,24 | **Similarly** 500:8 | 318:22,24 |
| **Shorthand** 1:16 | 88:7 89:3 | 192:2 194:16 | **simple** 136:6 | 375:15,18 |
| 517:13 | 127:23 128:8 | 195:17 198:8 | 166:16 190:16 | **sizes** 205:2 |
| **shortly** 270:18 | 134:2 164:10 | 199:13 200:21 | 259:5 299:19 | 317:22 328:20 |
| **show** 55:12,13 | 187:7 188:18 | 204:6,19 | **simplex** 120:14 | **slides** 450:1,13 |
| 77:14,23 82:13 | 204:3 207:9,10 | 210:20,22 | **simply** 82:4 | 450:16 |
| 89:5 90:6 | 210:21 238:15 | 214:17 215:20 | **single** 55:14 | **slowly** 293:11 |
| 128:10 129:14 | 273:18 339:16 | 217:20 218:1,9 | 110:11 128:12 | **small** 133:1,21 |
| 130:12 131:9 | 410:11 424:9 | 218:13,16 | 243:1 250:20 | 134:1,4,5 |
| 132:12 149:2 | 425:24 426:7 | 219:24 220:2 | 250:24 309:11 | 182:24 183:13 |
| 150:13 180:1 | 427:9 451:20 | 236:3,6 287:11 | 312:13 313:16 | 204:24 205:1,5 |
| 183:2,3,4,15 | 455:4 461:10 | 298:20 311:5 | 329:12 426:7 | 226:14 314:4 |
| 183:17 189:2 | 479:13 484:11 | 477:9 | 439:1 | 314:10 317:16 |
| 191:11,15,21 | **shown** 64:5 90:3 | **significant** | **sir** 147:10 | 317:24 330:4 |
| 191:23 192:2 | 100:6 130:17 | 150:1 183:3,8 | **sister** 311:7 | 375:18 420:14 |
| 199:12 204:4 | 158:2,4 222:15 | 183:9,16 187:6 | **sit** 119:2 229:17 | 431:7,12 472:3 |
| 205:12 221:3 | 229:14 438:14 | 189:11,18 | 472:6 | **smaller** 260:17 |
| 222:11 233:14 | 439:3 456:2 | 195:2 203:3 | **site** 281:19,19 | 386:9 |
| 243:8 245:18 | 465:1 470:11 | 204:16,17,23 | 507:14 | **Smith** 156:18 |
| 260:18 261:12 | **shows** 22:6 | 210:11 216:4,5 | **situation** 64:1 | 157:5 292:4 |
| 262:16 269:17 | 98:17 129:1 | 220:23 238:16 | 67:11 78:2 | **smoke** 342:16 |
| 280:2,3 287:5 | 133:6 149:8 | 241:22 243:8 | 90:15 128:13 | 342:24 343:1 |
| 310:5 333:16 | 210:20 261:17 | 254:16 255:9 | 262:11 331:21 | **smoking** 306:20 |
| 339:18 346:19 | 344:23 363:1 | 272:22 280:15 | 356:5 392:13 | 342:5,15 |
| 347:8 362:3 | 384:20 393:3 | 296:12,17,18 | 394:17 396:2 | 487:11 |
| 365:11 408:5 | **Shukla** 139:13 | 298:22 317:15 | 482:21 483:9 | **snapshot** 450:24 |
| 421:4,11 | 162:16 163:19 | 323:23 370:15 | 493:7 495:1 | **snide** 214:7,11 |
| 445:23 447:11 | 165:23 | 370:17 371:1 | 502:6,11 | **Society** 176:18 |
| 455:1,7,13 | **side** 81:7,9 | 371:10,20 | **situations** 61:19 | 507:5 |
| 457:12 459:8 | 110:13 215:15 | 374:15 375:9 | 63:11 67:10 | **sold** 496:4 |
| 462:11,14 | 378:6 506:20 | 386:21 420:15 | 69:15 77:17 | **somebody** 78:21 |
| 463:8 470:13 | **sides** 110:12 | 433:21 443:21 | 90:10 100:7,12 | 149:16 250:21 |
| 472:8,16 474:3 | 198:20 455:10 | 443:23 472:23 | 326:22 333:4 | 267:17 336:12 |
| 479:17,19 | **sign** 517:9 518:8 | 474:12 475:21 | 335:15,18 | 338:17 339:4 |
| **showed** 70:18 | **signatures** | 476:15 | 337:3 442:16 | 340:5 361:24 |
| 130:3 149:22 | 201:9 203:12 | **signing** 124:5,18 | 456:7 | 369:14 373:13 |
| 150:4 151:24 | **signature** | 125:2 139:20 | **six** 7:16 75:16 | 403:5 511:10 |
| 203:23 282:5 | 451:15 | 165:24 352:20 | 76:2 85:17 | **someone's** 132:7 |

someplace 430:1
something's
  300:4
somewhat 248:8
  284:20
sorry 14:7,9
  30:22 38:7
  40:11 72:19
  75:1 82:16
  92:10 124:13
  124:24 125:16
  136:2 142:20
  151:14 175:9
  180:9 181:15
  192:23,24,24
  218:20 220:1
  224:13 237:14
  237:17 255:22
  261:7 269:4,5
  269:14 274:8
  274:14 275:23
  280:22 283:6,7
  293:19 308:18
  310:18 322:23
  325:9 327:20
  328:1 329:5
  334:6,13 344:7
  345:2 347:21
  348:8 350:19
  350:21 354:20
  364:9,10 366:8
  367:20 370:10
  374:18 377:7
  377:13 383:18
  403:16 415:19
  415:21 425:1,7
  426:18 429:18
  430:1,13 443:1
  445:7 446:24
  462:8 465:12
  470:1 489:12
sort 34:14 66:13
  98:10 352:6
  374:13 449:4
  477:15
sound 358:23
source 140:13

141:10 177:3
259:7 260:4
290:24 291:9
291:12,13,21
291:23 292:2
sources 84:4
  278:12
South 4:3
space 518:6
speak 67:12,12
  70:23 81:12
  209:3
speaker 201:19
speaking 21:14
  65:20 211:18
  408:22 457:14
  457:20 463:16
  490:4,6
special 268:4
specialist 42:10
  91:5
species 435:12
  435:20
specific 21:13
  31:22 32:9,20
  37:6 53:24
  58:7,11 61:18
  63:10 64:9
  67:4,10 69:14
  70:20 71:3
  94:5 160:23
  168:13 283:23
  413:15 428:22
  432:10 440:10
  440:21
specifically
  59:11 93:15
  111:8 152:2
  160:12 164:2
  171:9,20 191:8
  247:23 278:21
  308:24 316:2,8
  490:5
Specificity
  429:22
specifics 252:5
specify 243:2

speculate 413:6
speculating
  412:18 414:17
speculation
  413:5
speed 463:11
spend 164:17
  403:10
spent 61:6 137:9
  361:4 409:13
sperm 173:13
spirit 233:22
split 266:14
  273:18 279:6
  310:24 392:18
  476:5
split-off 475:1
splitting 324:1
  474:24
spoke 410:2
spoken 147:23
spontaneous
  469:12
Sprague 130:9
spurious 116:3
  196:10 205:9
  274:6,11 275:1
  320:2 360:20
SR 304:20
stage 466:14
  467:9,19
Stand 343:18
  348:11 516:3
standard 495:10
stands 507:5
start 21:7 25:18
  87:13 110:13
  120:21 183:11
  244:6 325:11
  326:1,4 336:24
  337:1 338:12
  369:18,23
  487:3
started 84:20
  113:3 115:16
  119:2 166:22
  194:24 299:5

338:15 339:1
340:7,13,18,19
341:24 342:14
342:21 352:17
370:3 383:23
400:20 405:3
502:21
starting 428:17
starts 266:13
  340:11 341:22
  403:5
state 12:4 95:7
  126:18 140:10
  145:2 161:3
  172:15 182:7
  190:23 267:3
  334:10 350:17
  351:2 357:8,13
  357:23 358:9
  376:21 403:1
  436:10 492:9
  518:5
stated 46:15
  191:7 275:11
  288:3 307:10
  357:21 358:2
  413:13 445:5
  457:18
statement 23:22
  49:16,20 80:12
  93:21,22 99:23
  133:20 140:14
  140:22 141:11
  149:6 161:6
  182:13 184:4
  185:17 195:20
  197:17 199:7
  212:18 225:10
  247:13,14
  249:10 255:5
  260:3 266:22
  267:21 277:11
  285:18 286:4
  291:7,22
  292:12,13
  295:2 299:6
  318:4 330:14

335:12,22
356:24 371:14
374:21 375:3
379:24 380:18
396:3 404:13
425:22 430:21
435:11 437:14
502:21 511:4
511:14,17
513:19
statements
  88:17 138:10
  158:6 162:8
  181:8 182:17
  217:15 297:7
  325:22 326:11
  328:7 394:11
  402:23 423:22
  495:20 496:3
States 1:1 29:18
  30:4 32:13
  145:1 154:11
  240:13,16
  248:1 249:1
stating 100:3
  201:17 261:5
  394:5
statistical 6:17
  18:5,7,15
  150:15 188:3
  188:14,17,19
  188:22 189:3
  191:11,16,24
  192:2 194:16
  195:17 198:8
  199:12 200:21
  202:3 204:5
  210:20,21
  214:17 215:18
  215:19,20
  217:19,23
  218:1 219:24
  220:2 269:7,8
  287:11 298:19
  298:21 477:9
statistically
  150:1 187:6

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 673 of 1035
PageID: 241852
Kevin Holcomb, M.D.

Page 568

201:21 203:3
203:22 204:16
210:10,11
216:4 220:22
241:22 272:22
280:15 296:12
296:17 309:24
370:15,17
371:9,20
374:14 375:9
386:21 420:15
433:20 443:22
472:22 474:12
475:21 476:14
**statistics** 193:15
194:3 219:19
219:23 283:19
284:10,13
286:14
**stay** 28:24
**steady** 328:14
328:15
**stenographic**
11:15
**step** 479:7
**Stephanie** 487:2
**stepping** 66:22
**Steven** 180:13
426:19,24
428:9
**STIC** 448:19,23
451:11
**stick** 245:12
330:13
**stimulate**
293:12
**Stipulations**
10:11
**stop** 9:20 163:12
202:14 205:22
208:8 209:2
283:17 458:14
465:19 497:9
498:22 499:15
499:16,19
501:7 502:1,10
502:13 509:21

510:5 512:15
512:19 513:1
**stopped** 300:14
345:18
**stopping** 37:6
**store** 498:9
**stores** 498:9
**story** 185:7
239:2 484:8
**strange** 410:6
**strangely**
353:22
**Straus** 7:20
303:4
**Street** 2:14 3:13
3:18
**strength** 164:7
246:14,18
268:19 307:23
408:23 409:11
429:10
**strengthened**
361:21
**strengthening**
361:17
**strengths**
115:22 282:2
284:22
**stress** 480:18
**stretch** 369:10
369:17
**strict** 285:1
**strike** 43:18
55:4 67:19
76:17 80:15
144:9 157:2
158:22 163:16
191:21 206:5
212:20 213:17
241:18 287:20
336:15 356:14
418:22 423:9
430:24 446:8
447:21 450:18
456:19 459:20
**strong** 89:3
116:1 285:6

425:22 453:24
456:8
**stronger** 205:8
229:14 484:11
**strongest** 249:21
259:10 260:11
**strongly** 87:21
**struck** 423:20
**struggles** 339:23
**stuck** 300:11
**students** 23:6,6
**studied** 77:12
100:13 253:17
322:11 481:11
**studies** 18:6
31:20 44:17
46:24 47:17,19
48:2,24 50:10
58:7,11,16
67:4 76:6
78:10,14 87:22
88:6,21 89:3,4
90:6 91:16,18
93:14 94:8,19
95:13 98:16
100:9,20,24
105:5 106:6
111:3 115:18
115:24 116:2
121:4 126:23
127:14,17,23
128:8 129:2,8
129:13,20
130:6 131:8,14
132:3,15,23
135:15 136:7
136:12,23
137:9,14,22
148:22 149:11
149:12,15,21
150:6,14
153:16,18,19
164:1,3 165:21
168:11,12
170:14,22
182:6,23
183:12,23

186:17 187:1,2
187:19 188:3
188:14,16
189:1,2,22
191:10,15,20
191:23 192:10
192:16 193:5
198:18 199:12
203:2 205:22
207:8 210:10
211:9 217:17
220:21 221:15
222:5,6,11,16
222:18 225:23
226:4,20
227:14 228:2
229:3,12,14
230:1,6,18,22
231:10,11,13
231:16,21,24
233:11,13
234:3,11,12,14
234:15 235:2,5
235:16,20
236:14 237:3,4
238:3,12,12,15
240:2,4,7,8
241:11 243:7
245:18 247:7
248:6 249:20
252:8,15,17,21
254:3 255:13
256:15 257:6
259:2,4 261:9
265:16,21
266:14 268:11
269:11 270:2
270:16 271:3
272:1,23 274:7
274:12 275:1
282:9,20,21
283:4 290:6,8
290:17,20
291:1,17,24
293:23,24
294:4,5,12,12
304:1 305:10

306:22 307:4
307:12,15
308:8,9,22
309:16,23
310:4,5,6,14
310:19 311:3
311:15,16,17
312:11,13,19
313:2,4,5
314:5,15,17,22
315:4,7,11,24
316:2 318:18
319:1,21
320:23 322:9
324:4,9 325:2
325:16,19
329:2,4,16
330:1 339:16
340:16 355:6
355:16 359:22
360:2 361:6
362:14 380:6
380:10,24
381:6,12,16,19
390:7 392:23
395:6 405:21
406:4 410:4,4
410:9,14,24
411:5 424:9
425:23 438:9
438:23 440:6
440:17,19
446:3 452:13
453:20,21
455:3,6 457:12
459:5 461:10
470:13,18
474:17 479:13
479:16,19
484:9,11 490:7
493:13 506:11
506:12 509:9
**study** 6:15 7:14
8:6 20:13
31:22 53:13,15
53:19 77:13
86:4 90:13

Kevin Holcomb, M.D.

91:2 118:15
126:21 128:12
128:24 129:24
130:1,16,19
131:7 132:5
134:16,16,19
134:20 135:1,2
135:8,12,23
136:11 147:23
151:17 161:20
167:22 168:19
170:13,21
172:10 177:3
179:22,24
180:13 184:9
184:18 189:13
189:17 190:19
193:18,20
194:6,14 195:9
195:11,16,18
196:8,9 197:22
197:23,23
198:1,3,6,12
201:1,3,6
207:10 210:17
212:16,21
215:1 219:3
220:7,18 223:2
226:8 236:18
238:6 240:4
241:7,12,16,21
248:18 254:12
255:7 256:6,17
256:18 257:5
261:3,12,13,16
262:2 264:1,20
267:3 268:5,7
268:12 273:6,7
273:14,14
277:12 282:2
283:21 285:6,8
285:11 286:1
287:6 289:5
293:21 300:16
301:24 302:5
308:1,10,12,15
308:16 310:22

311:7,8 312:5
313:11,21
315:12,13
316:12,16,18
317:8,10,16,24
319:6 320:1,12
321:5,12 322:9
323:2,5 329:12
329:19,20,20
329:24 330:3
330:24 333:13
333:16 334:2
337:13 338:1
338:13 340:12
341:3 344:2,9
344:10 345:19
346:3 350:1,6
351:10,14,22
351:24 352:6
353:7,22
354:19 355:22
356:18 357:16
358:1,9,10,16
358:19,21,23
358:24 359:16
359:19,20
360:3,7,10,10
360:12,22
361:14,18
362:21 363:22
364:4 365:6,7
365:22,23
366:13,18
367:10 368:14
368:21,22
369:3,20 370:2
371:18,21
372:4,12,18
373:6,10 374:1
374:9,9 375:6
375:15,18,19
375:23 376:3
376:22 377:6
377:20 378:9
379:1,4,7,10
379:11,17
380:2,21,22

381:4,5,21,21
382:4,7,13,21
383:13,15,15
383:24 384:9
384:21 385:18
387:2 388:3,9
388:12,18,19
388:23 394:2
395:13 397:2
397:21 401:4,5
401:23 403:13
403:14,17
404:1 405:10
405:13,18
406:12 408:10
408:11,12,12
410:7,14
411:10,13,16
411:18,19,21
412:10,20
413:17 414:5
414:10 423:8
423:10 424:5,7
426:7 427:9,14
428:18 431:16
433:20 434:6
435:24 437:2,8
439:1,7,18,19
440:6,13,21
443:2 445:4,13
445:13,21
446:23 448:11
453:1 454:11
454:16,16
465:22 467:23
472:19 476:10
488:14 489:20
**study's** 344:16
**studying** 254:4
394:3 396:4
**stuff** 107:8
390:10 482:24
498:18 506:8
**subgroup**
249:18 387:14
**subject** 107:15
116:2 211:10

252:4 257:2
518:10
**subjected** 269:8
410:14
**subjective**
263:24
**subjects** 289:14
**submitted**
176:21 178:15
**submitting**
178:18
**Subscribed**
520:19
**subsequent**
224:16 225:12
227:23 228:24
229:2 233:5
**subset** 310:23
**substance** 19:10
97:9,11 485:9
485:11 520:11
**subsumed**
450:23
**Subtype** 8:10
**sudden** 262:20
263:5,8 280:6
**sued** 13:13,24
**sufficiency**
246:3
**sufficient** 93:18
247:11 313:23
325:14 329:17
330:2 336:21
479:21
**sufficiently**
325:19
**suggest** 31:20
149:24 276:8
300:3 397:12
397:22 398:6
398:16 399:2
400:13 420:14
422:12 450:20
479:22
**suggested**
256:24 352:8
445:8,8

**suggesting**
133:2,22
187:21 257:6,8
299:24 399:7
405:18 422:16
423:24 484:9
502:5 508:3
**suggestion**
169:16 398:9
445:16 476:18
476:22,24
477:3,13
**suggests** 326:5
405:10,13
**Suite** 2:9 3:13
4:4
**summaries**
305:7
**supervision**
517:22
**supplemental**
6:7 49:15
51:10,17 53:1
54:4 55:20
56:3,14 57:13
110:16,19
116:14 117:5
121:1,7,10
124:2 146:20
155:15 459:22
463:22
**support** 10:2
88:6 89:8
140:5 150:13
194:19 199:11
231:2 268:18
276:11 277:21
292:13 307:6
309:23 310:9
310:14,20
311:9,11,24
312:12 412:9
433:22 437:11
441:21 446:16
448:1 455:18
460:14 502:14
**supported** 61:4

Case 3:16-md-02738-MAS-RLS   Document 33123-4   Filed 08/22/24   Page 675 of 1035
PageID: 241854
Kevin Holcomb, M.D.

Page 570

```
89:2 91:16              471:22 472:24      T-A-H-E-R             342:2 343:16          249:5 250:5
supporting              474:14 475:7         223:17             355:18 357:11         254:17 256:15
  124:8 438:23          483:10 485:6       table 6:15 148:3     376:17 389:17         256:22 257:1
supports 66:14          490:4 493:8          148:6,7,8,18       389:18 421:13         265:10,23
  194:13 360:22         496:1 498:5          148:21 150:12      449:18 450:15         266:10,18
  432:7 437:7           501:2 506:6          186:4 187:9,14     453:8 455:23          278:14 307:20
supposed 54:13          507:17 508:9         190:18 192:9       456:1 485:20          311:24 330:12
  54:13 89:9            511:19 515:22        204:11 219:6     taken 1:13 15:6         331:16,18
  504:21,23           surely 360:12          240:3 269:13       45:13 196:21         339:5,24 340:7
supposition           surface 123:5,11       344:23 347:5,9     249:10 326:23         340:18,19
  97:15 98:23           398:19 399:18        347:9 350:3,6      375:22 444:15         341:7,14,23
  99:6                  399:22               363:3 367:22     takes 26:22             344:24 347:10
sure 24:17 29:4       surgeries 400:9        384:20 415:20      226:22 369:16         347:14,14
  29:22 30:14         surgery 14:19          471:18,18,21     talc 6:13,23 7:6        348:20,21
  31:13,24 33:17        450:8                471:24 472:12      7:10 8:7,14,17        351:19 352:18
  33:21 35:9          surgical 400:8         473:3 474:3        9:10,13,22           352:19 357:17
  38:24 40:10         surprise 226:3         475:15,19          16:19 23:8,14         366:19,20
  57:24 59:17         surprised            tables 324:7         23:23 24:21           367:2,6 368:1
  66:8 71:15            226:12 236:5       Taher 6:24           30:9,16 32:4          368:21 369:18
  72:24 79:16         surprising 183:1       145:17 146:2       34:21 43:3,14         370:3,6 374:16
  85:8 99:13            183:14 225:13        147:23 171:10      44:3,23 46:12         383:24 384:7
  108:9 124:17          232:5 250:1          171:21 223:14      56:23 75:17           389:24 390:20
  125:12,18             260:20 311:21        223:17,18         82:23 83:23            391:5,12 393:4
  127:2 132:1,9       surprisingly           224:3 231:20       84:4,22,24            394:4 396:1,6
  136:4 144:4           311:13               234:6,7 259:11     85:20,22 86:16        396:12,20
  147:16 173:19       surrounding            261:21 321:10      89:18 95:1            398:20 400:22
  188:10 193:3          468:20               323:21,23          96:2,6 97:18          404:4 405:3
  195:21 216:23       Susan 3:8 80:23        324:5,6 325:7      97:19 98:20,24        416:5 417:1,2
  222:1 235:3           125:21 208:7         329:4 362:20       100:18,21             419:6,14,18
  236:19 239:13         458:18               363:5 382:19       102:2,4 109:1         420:17 422:2
  246:17 254:2        susan.sharko...        409:22 420:13      116:9 120:7,8         423:13 425:14
  258:16 267:13         3:10                 432:14 442:23      122:11 123:6          425:24 430:18
  280:24 281:20       sworn 11:20            492:15             125:5 128:10          431:17 432:1,9
  304:20 309:6,8        517:5 520:19       Taher's 227:7        129:15 130:2,7        432:12,19
  317:1,6 318:7       system 173:11          230:14            130:17 131:18         433:11 435:5
  320:18 324:23         487:13             take 26:4,13         132:7,9,18           435:14 436:13
  328:14 333:18       systematic 8:18        27:6 34:20         134:3,10,20,21       436:14,21
  335:22 349:8          94:10,13             37:16 40:18        138:1,5,10           437:3 438:6
  349:16 360:9          289:11 304:5         79:23 97:14        142:8,14 149:9        439:4,6,15,22
  365:19 377:1          304:21 305:1         125:19,24          153:4 165:2,22        440:8,18 441:6
  387:23 390:14       systematically         126:5 138:4,13    170:9 175:19          441:21 442:14
  399:15 406:20         94:6                 168:5 179:24       176:7 180:12          444:11,12
  409:19 412:16       Systemic 6:21          202:22 221:14      182:2,8 189:19        445:11,14,22
  413:3,7 420:8       ─────────────          223:22 225:22      220:24 228:20         445:23 446:6
  421:6 422:6,10             T               226:4 234:21       237:22 241:6          447:19 448:10
  438:7 441:10        T 5:10 6:2 7:2         263:9 269:21       245:6 246:15          448:15 450:22
  442:5 452:23          8:2 9:2 519:1        295:2 321:3        246:20 248:15         464:17,24
```

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 676 of 1035
PageID: 241855
Kevin Holcomb, M.D.

Page 571

465:23 466:5,9
467:23 469:9
469:15 470:7
472:21 474:4
475:20 476:16
478:18 482:13
482:16,23
483:13,24
484:24 485:12
487:20 496:5
503:8,15,20,22
505:2,11
507:12,19
508:4,11
509:21 510:5
510:15 512:13
512:15 513:2
**talcum** 1:5
  11:11 13:1,10
  16:12 22:3,7
  22:12,20 23:1
  27:8 28:23
  29:5,9,13,18
  30:5 31:16
  33:1,5 34:21
  35:12,23 36:13
  36:19 37:11,23
  38:18 44:15
  84:7,12 96:9
  96:10,22,23
  98:5 103:18
  108:17,24
  109:4,13,22
  113:17 115:6
  124:9 145:3,7
  145:14 154:15
  170:7 174:2,14
  174:22 175:1,6
  175:9,15
  224:20 245:16
  248:2 252:9
  253:18 254:4
  267:4 309:24
  310:20 311:11
  316:3 336:13
  336:18,22
  337:14 344:11

345:18 346:14
347:3 353:16
353:23 367:15
384:21 391:3
394:3 404:6,16
408:5 409:20
422:20 423:13
427:17 442:7
447:20,23
478:10,11,16
478:22 479:2,5
479:22 480:23
481:21 482:11
482:15 483:12
487:15 491:3
491:13,16
492:20 496:15
497:21 499:5
503:16 504:14
505:4 507:22
508:14 510:17
512:19 514:9
515:8,13
**talk** 21:23 92:11
  173:18 198:20
  202:3 235:1
  308:23 309:1,3
  309:14,18
  323:2 337:12
  363:13 383:12
  390:10 406:18
  409:17 410:2
  440:4 452:10
**talked** 88:14
  346:23 414:22
**talking** 15:18
  81:6,9 82:23
  82:24 83:8
  85:3,4,5,7,8
  86:22 135:19
  139:3 167:18
  206:7,10
  208:14 221:10
  231:15,17
  242:24,24
  272:12 309:12
  313:4 329:15

329:19,23,24
340:9 353:21
361:4 363:3
380:14,24
381:13 395:4
400:21 409:14
430:4 456:22
458:8 465:20
478:5 505:18
**tasked** 92:18
**taught** 284:11
  294:19
**teach** 306:7,8
**teaching** 288:7
**team** 153:20
**TECHNICIAN**
  4:9
**teeth** 250:20
**tell** 15:7 35:22
  68:22 79:1
  118:16 132:3
  140:20 141:1
  148:17 212:9
  234:8 292:12
  295:19 297:5
  315:11 342:7
  359:21 368:22
  405:14 407:8
  421:1,2 451:17
  455:22,23
  478:4 479:10
  479:20 484:7
  498:23 500:23
  501:24 506:17
**telling** 51:13
  70:14 166:21
  231:19 362:24
  482:4 490:24
  509:4 512:14
  513:1
**ten** 361:16
  364:17 368:15
  373:2 385:2
  387:20 389:6
  472:21,22
  474:11,18,19
  474:24 475:2,2

475:12,13
**tend** 179:3 250:4
**term** 33:16 39:8
  149:16 177:10
  177:11 197:19
  255:2 269:1,6
  269:7 296:9
  303:19 359:6,9
  359:23 371:22
  375:11 407:12
  475:11
**terms** 120:6
  362:16
**Terry** 135:12
  409:7,7
**test** 79:17
  236:13 269:9
  477:8 497:15
  499:6 504:8
**testified** 11:21
  12:24 13:5,9
  13:19 47:23
  93:4 96:16
  332:22 333:7
  354:23 386:13
**testify** 39:3
  61:21 145:1
  346:11
**testifying** 15:10
  42:16 88:1
  346:21
**testimony** 5:4
  39:17 42:11
  45:24 46:10
  52:23 59:24
  62:14 64:18,20
  65:14 66:1,2
  71:24 82:7,14
  104:9 130:14
  165:5 283:5
  372:23 450:17
  478:21 509:20
  515:4 517:6
**testing** 170:7
  478:9,16,22
  498:2 499:4
**tests** 18:16

**text** 286:14
  287:7,14,21
**textbooks** 287:3
**thank** 12:19
  14:21 24:16
  28:16 47:22
  52:19 56:20
  58:1 70:6
  71:15 80:13
  81:23 85:11
  86:19 96:4
  102:10 114:19
  119:11 133:19
  141:9 162:6
  170:3 180:23
  184:22 199:9
  200:18 213:19
  220:13 223:13
  239:24 241:1
  283:7 296:6
  315:21 368:8
  430:12 440:3
  465:15 472:17
  515:21
**thanks** 59:13
  283:8 298:13
  470:2
**theme** 66:24
**theories** 57:5
  59:2
**theory** 433:13
  433:16 445:18
**therapy** 205:18
  242:22
**thing** 26:19 73:9
  83:7 122:19
  130:5 137:23
  184:16 218:16
  227:15 236:24
  237:1 260:9
  263:12 264:5
  277:5 294:20
  319:12,18
  323:1 328:17
  338:22 339:20
  361:10 373:12
  388:17 449:6

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 677 of 1035
PageID: 241856
Kevin Holcomb, M.D.

Page 572

461:18 464:1
474:13 479:18
506:3
**things** 20:16
36:23 66:15
77:11 98:11
137:11 157:22
189:21 205:19
237:4 251:18
251:19,22
276:24 277:4
277:10 278:3,8
284:4 285:5
290:11 295:7
314:18 315:2,3
315:23 320:3
323:13 324:7
326:12 332:12
342:20 388:20
399:7 402:20
402:21 437:1
449:20 463:11
495:8 499:18
499:23
**think** 16:4 19:6
20:18 21:5
24:15 26:19
27:22 31:19
33:15 34:3
38:5,8,13
42:14 46:6
53:18,23 63:11
63:23 65:19
66:6,24 68:10
68:16 69:6,23
70:9,16 77:6,8
78:3,4 80:6,24
81:1 82:7 83:3
83:10 100:2
110:9 129:20
135:24 137:21
138:4,7 140:18
149:9 151:10
156:13 158:5
164:20 168:14
177:9,17 184:4
190:2,20 192:9

194:20 196:13
198:17 206:2
213:21 215:21
221:9 223:8,9
248:8 249:9
250:16,23
251:17 252:3
252:14,23
254:20 262:7
262:17 263:18
263:18 264:4
264:19 265:8
266:11,13,21
274:16 282:17
283:19 286:9
290:19 291:16
292:1 297:6
307:16 319:20
319:22 323:20
335:8 338:8,23
353:3 356:10
360:21 364:24
369:9,15
370:12,16
371:13 372:15
375:16 379:22
380:23 382:3,5
382:5,11 388:8
393:2,21
394:18 396:10
397:7 398:6,11
402:22 408:23
409:7 429:16
435:1 449:19
458:6 462:12
464:10 465:9
470:4 473:14
473:15 475:5
476:5 477:2
480:16 485:21
498:5,10
499:20 500:4
501:18 502:7
505:23 506:1,3
514:19
**thinking** 27:18
293:12 360:13

493:9
**thinks** 229:16
399:22
**third** 258:24
462:20,23,24
**thirty** 518:16
**THOMPSON**
2:13
**thorough** 27:1
90:18
**thought** 27:20
30:24 31:4
44:1 78:21
116:1 125:17
138:18 144:15
282:5 283:24
285:16 294:14
294:17 314:22
320:4 328:13
354:10 371:16
371:24 404:20
414:9,11
416:13 465:12
501:12
**thousands** 506:9
**three** 13:18
73:18 81:9
87:7 93:14
131:14 229:3
233:10 290:16
296:9 305:7
311:17 318:17
328:2 329:1
352:19 389:17
410:4 417:6
453:20 464:7
493:12
**threshold**
202:17
**thresholds**
204:5
**throw** 40:16
232:8,10 233:4
236:14 294:23
**throwing** 235:22
**time** 11:7 12:24
14:22,24 19:24

21:9 35:4 44:6
48:21 60:1,23
61:6 69:11
79:12,15,22
125:21 126:10
126:15 137:10
164:3,17
171:16 181:3,3
195:22 201:18
202:22 212:7
217:24 228:9
229:16 239:11
239:15,19
248:17 254:12
262:14,20
264:11,13,24
266:8 268:20
269:3,18,21
270:11,19
286:2 289:17
295:6 316:16
319:4 326:8,9
336:6 338:19
339:2 343:18
343:22 344:12
345:3 348:11
348:15 352:24
353:2 361:4,19
364:16 366:9
366:12 381:17
403:10 409:14
419:13 421:3
421:11,16,16
421:20 431:5,7
431:12 433:4
450:24 452:1
453:9,12
462:20,23
463:1 473:10
473:23 474:16
481:14 486:2,6
493:10,24
494:3 506:8,15
516:5
**times** 13:17,20
16:3 50:18
66:20 67:15

233:22,24
289:15 345:4
471:13 502:17
**tissue** 123:7
389:14 390:9
390:21 391:19
393:4 398:21
399:17 431:19
449:22 462:3
465:2
**title** 74:11,11
121:19 200:20
203:17 467:22
487:1
**titled** 71:10
110:14 134:9
180:12 292:22
302:17 488:16
503:7
**today** 11:12
12:20 16:13
37:16 46:1,10
49:4 59:12
60:21 61:12
62:12,21 65:15
65:21 67:1
69:3 76:20
77:9 102:20
112:21 113:3
113:16 123:16
151:7 342:24
371:7,17
463:24 464:12
471:13 492:12
496:13
**today's** 11:6
56:21 59:8,16
60:3 102:19
113:2 114:16
516:4
**told** 91:14 118:2
260:7 371:8,16
389:15 402:22
495:9 501:21
505:11 510:16
**toothpaste**
250:21

Case 3:16-md-02738-MAS-RLS   Document 33123-4   Filed 08/22/24   Page 678 of 1035
PageID: 241857
Kevin Holcomb, M.D.

Page 573

top 74:13 141:21
  196:1 270:23
  304:4,18
  319:17 334:20
  350:24 357:14
  430:4 441:15
  469:23 497:7
topic 60:24 62:6
  62:7 92:20
  128:7 152:20
  206:17 209:22
  224:10 253:17
  262:13 264:9,9
  325:1 389:21
  459:6
total 113:14
  368:16 386:2
  417:1
totality 48:18
  49:4,10 54:22
  114:14 116:8
  137:6 162:9,14
  289:7 307:11
  336:20 352:7
  402:19 481:12
  481:21 483:16
  484:6,12
  511:22
totally 94:17
  208:8 390:17
tough 176:12
  493:6
TPP 8:20,21
Trabert 454:15
tract 173:11
  423:1 427:6
  437:20,24
  438:15 444:11
  445:15 448:9
train 328:13
trained 284:3,8
transcript 5:14
  5:17,19 39:24
  40:22 41:11
  45:10,12 65:18
  68:15 517:9,19
  518:17,19

transcription
  520:7
transcripts 54:6
transform 19:11
transformation
  451:1
transformed
  433:17
translocate
  422:2,20
  423:14 438:7
translocation
  429:8 436:21
transport 432:7
  437:9,16
transports
  437:6
travel 438:15
travels 134:22
treat 206:12
  213:22
treated 469:15
treatise 194:13
  194:17
treatment 13:15
  14:14
trend 268:19,23
  269:2,6
trial 13:6,10
  37:19 116:16
  228:21 453:20
trials 101:2
  293:22 305:9
tried 115:24
  204:15 263:11
trouble 75:6
  215:17
true 13:3,4
  14:16 17:1
  22:5,10,11,14
  22:18,22 23:24
  24:23 33:3
  36:22,23 37:14
  44:13,22 49:16
  49:19 50:9
  59:6 60:7,11
  88:2 102:6

  111:24 124:22
  125:7 140:7,8
  161:6 171:5,15
  193:22 221:16
  237:23 257:23
  309:17 312:18
  315:14,19,20
  316:1,14,15
  317:11 332:24
  341:7 343:7,14
  344:14 349:10
  349:14,15,19
  352:3,4 355:11
  360:6 364:8
  367:16,18
  371:4 383:10
  388:23 413:12
  413:15 429:6
  432:4 439:24
  440:1 443:10
  458:18,18
  464:14 487:21
  517:6
trust 179:3,9,14
  179:19 386:24
trusting 178:22
truth 15:7
  154:14 238:23
  361:24 399:10
  509:4 511:21
try 15:21 122:9
  122:23 212:7
  274:23 295:6
  297:22 353:12
trying 14:6
  46:19 68:17,22
  69:2 70:16
  95:7,7 123:10
  140:18 159:4
  274:14 295:13
  297:24 313:3
  328:3,13
  338:20 340:12
  400:17 417:9
  418:3 438:11
  460:9,10 463:8
  463:9 472:24

tubal 441:23
  442:8,16 443:5
  444:8,19 446:5
tube 452:8
tubes 422:4,21
  423:15 438:17
  441:22 443:21
tubular 448:19
TUCKER 4:2
tumor 390:21
  448:22 450:12
  450:23
tumors 409:2
  461:12
turn 41:11 64:22
  72:3 84:23
  87:2,5 111:13
  116:11 133:15
  134:7 135:7
  186:3 202:19
  256:5 258:22
  271:14 273:21
  275:13 281:2
  334:3 359:8
  367:21 407:3
  420:9 424:22
  430:3,12
  443:17 446:10
  458:22 471:14
  471:15 482:8
  486:19
turning 85:12
  216:24 217:9
  224:9,10
  384:19
TV 264:12
twice 139:1
  175:10 250:20
  251:1 356:11
two 48:11 73:15
  79:2 89:4
  94:18 118:21
  122:24 140:19
  192:10 193:6
  201:20 203:2
  296:10 301:1
  305:7 320:10

  321:5 322:9
  328:6 332:12
  355:16 364:21
  366:4 373:6
  380:6,9,22
  381:1,5,6,6,18
  381:22 391:11
  407:13 445:13
  449:19 455:2
  457:24,24
  470:19 471:5
  474:20,24
  475:4,12 476:6
  489:23
two-sided 343:3
tying 98:10
Tylenol 456:1,2
type 6:15 21:21
  28:1,12 56:6
  244:3 249:19
  250:2 259:10
  259:13,14
  260:12,14,23
  261:1 272:13
  272:15 308:13
  353:20 354:8
  354:24 355:2
  408:11 461:12
  461:14
types 42:13 74:8
  75:16 76:3
  85:17 94:18
  259:16,22
  282:2 324:18
typically 15:2
  18:3 118:20
  222:8 262:3

**U**

U.S 365:24,24
  366:2
umbrella 21:17
un-peer-revie...
  443:8,12
unable 361:14
unartful 16:2
unclear 85:5

underlying
  50:10
understand 15:8
  15:13 16:1,14
  24:18 29:8,12
  29:17 30:2,6
  37:15,20 52:6
  52:10 54:17
  69:3 85:24
  86:14,16 90:11
  94:18 101:3
  103:5 105:2
  107:4,9 140:10
  144:19 146:13
  154:10,18
  155:1,6,17
  161:16,22
  167:10 173:19
  195:3,13 197:7
  209:2 215:6
  234:19 250:14
  251:6,13
  252:19 258:19
  279:11 295:1
  297:24 298:11
  298:12 301:21
  324:8 365:4,14
  401:19 418:8
  418:11 436:24
  473:1 475:16
  494:22 502:18
understanding
  38:20 41:16,24
  42:7,12 43:8
  43:10,19 46:18
  91:6 92:15
  178:21,24
  251:17 314:1
  345:5 366:24
  422:7
understood 16:7
  190:12
underwear
  336:13
unethical 439:7
unexposed
  397:13 398:22

unfortunately
  179:8 388:16
  471:16
unimpressive
  460:23
uninformed
  156:13
Union 4:6
unique 303:1
United 1:1 29:17
  30:4 32:13
  145:1 154:11
  240:13,15
  248:1 249:1
universe 45:20
  46:22 47:19
  49:7
unnatural
  438:22
unpublished
  443:7,11,15
  446:2
unreliable 188:1
  188:12 191:16
  191:24 252:8
unusually 335:2
  335:8
unwarranted
  217:13
update 149:13
  150:24
usage 266:18
use 6:23 7:9,12
  8:7,12,14,17
  9:13 16:18
  30:9 33:5
  35:23 37:8
  44:3 53:21
  56:24 75:8
  101:4 124:9
  128:19 132:8
  149:16 157:10
  165:2 177:10
  177:11 179:13
  188:19 205:19
  207:15 236:19
  242:21 243:16

248:2,8 250:5
  250:6,24
  256:22 257:1,9
  258:4 259:6
  267:5 272:4
  276:10,14
  280:16 316:4
  333:20 339:19
  344:17,17,24
  345:10 347:3
  347:10,14,20
  347:22 348:20
  348:21 351:20
  353:16,21,23
  354:7 359:6,12
  360:3 361:22
  366:19 367:2
  367:14 368:1
  369:18 370:3,6
  374:15 376:9
  376:13,18
  378:11,19
  380:3 389:5,16
  413:11 416:5
  417:1,3,4,21
  418:19 425:8
  448:9 453:16
  453:23 454:2
  454:17 455:19
  455:22 456:9
  456:15 459:17
  459:17 464:9
  469:9 472:21
  474:4,19,19
  475:20 476:16
  479:5 480:2
  481:1,18 482:3
  482:14 487:15
  498:24 500:12
  507:21 510:3
users 374:17
  405:7
uses 29:5 225:17
  248:14 480:8
usually 222:8
  335:9 444:9
utility 287:20,22

289:19 290:3
  292:8

─────────
       V
─────────
vacuum 375:23
vagina 128:15
  130:12 425:17
  438:16
vaginal 151:19
valid 178:9
  179:16,22,24
  236:15 368:9,9
  368:13 371:1
  372:4 373:12
validity 293:22
  387:13
Valley 7:7
value 196:10
values 303:1
  320:2
vanity 299:23
variety 274:7,12
  275:2 316:13
vary 259:13
venued 14:10
verdict 266:10
  515:6
version 148:11
  185:10 472:7,9
versus 34:8
  202:4 257:1,9
  259:6 267:23
  269:10 276:12
  276:13 277:23
  368:2 371:12
vicinity 408:14
victim 336:11
  353:5
Victor 468:24
videographer
  11:2,4 126:9
  126:14 239:14
  239:18 343:17
  343:21 348:7
  348:14 421:15
  421:19 453:9
  453:12 469:22

470:2 473:9,22
  486:1,5 516:2
VIDEOTAPE
  4:9
videotaped 1:13
  6:6 11:8
view 164:5
violation 154:24
virus 120:15
vitro 153:15,18
voice 57:22
  240:22
voicing 411:9
Volume 5:23
  71:10
vulva 128:9

─────────
       W
─────────
W 4:3
Wacker 4:3
wait 15:22
  465:14
waiting 15:21
  169:23
want 15:18 16:3
  16:9 24:17
  47:11,14 72:24
  76:7 81:16
  84:17 92:12
  125:23 126:4
  129:16,19
  141:18 162:11
  168:8 211:21
  211:24 212:9
  216:17,22
  218:10 219:18
  219:23 220:1
  222:1 258:13
  258:18 274:20
  297:11 320:18
  328:14 334:14
  337:14 354:14
  380:7 390:18
  396:22 400:13
  401:21 402:19
  422:6 453:1
  467:7 471:23

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 680 of 1035
PageID: 241859
Kevin Holcomb, M.D.

Page 575

472:12 474:15
479:2 480:7
482:10 483:5
483:10 489:16
491:11 494:6
495:2 503:5
507:18 513:24
**wanted** 82:13
125:18 149:2
149:14 150:2,9
152:17 169:15
342:3,5 413:4
**wants** 73:13
250:22
**War** 63:9 69:8,9
69:9
**warning** 244:21
499:15,19
500:1,9,11,16
500:19,24
501:3,14,17
502:2,13,18
509:8
**Washington**
3:18
**wasn't** 25:17
31:24 36:3
58:21 80:17
88:11 122:24
125:11 144:22
197:1 227:21
245:1 260:8
261:13 288:14
291:7 314:5
330:23 353:11
371:20 379:7
393:15 408:22
409:10 412:24
434:18 465:5
478:24 510:10
**waste** 203:4
**wasted** 431:6
**watch** 361:11
403:2 472:2
**water** 196:5
**way** 14:1 23:15
25:8 39:12

72:6 101:13
163:6 178:5
193:1 215:22
215:23 233:10
270:20 283:7
284:8 317:4
330:5 376:11
390:15 395:8
395:24 413:3
435:24 445:22
460:10 506:16
**ways** 226:17
284:23 455:12
457:11 458:22
458:24 459:7
459:16 471:2
509:12
**we'll** 87:2,13,13
110:13 123:19
125:14 141:13
208:20,21
209:22 210:4,4
244:6 254:24
324:22 328:4
328:18 366:13
400:24 401:1
403:4,7 418:10
436:4
**we're** 16:11
37:16 43:15
65:20 66:24
76:20 77:8
84:18 98:10
99:12 125:12
139:4 168:6
169:10 189:11
189:12 206:7
206:10 209:21
243:1 270:17
311:2 321:22
324:21 334:16
360:8 363:6,7
389:18 390:3
396:4 397:10
409:16 458:6,7
511:13 515:24
**we've** 15:3 68:23

81:13 102:17
117:22 125:20
139:21 169:8
379:5 392:14
405:20 406:7,8
411:22 428:15
463:24 495:7
506:9
**weak** 165:7
222:10 247:3
476:14 479:14
484:9
**weakened**
390:12
**weaker** 479:13
479:16 484:8
502:5
**weakly** 479:16
**weakness**
164:15 352:21
360:7 381:24
392:5
**weaknesses** 80:3
164:21 283:21
308:2,11
390:11 391:18
392:21,22
470:10
**web** 306:3
**website** 9:22
283:10,11,23
302:16 303:10
306:4,15 497:3
503:7,14,19
507:15
**week** 81:1,1
111:12,12
143:17 345:1,3
345:4 368:2,2
370:7 373:5,14
**weeks** 140:19
**Wehner** 134:12
**weigh** 158:24
311:18
**Weil** 1:14 3:12
**Weill** 7:18 12:17
301:2,20,23

302:5,16
**welcome** 169:13
**well-designed**
306:10
**well-known**
262:21
**went** 53:21 57:8
75:6 80:23
314:19 350:10
350:11 352:1
356:9 369:19
373:23 395:19
435:13,18
454:7 457:23
458:22 461:9
498:3
**weren't** 42:23
409:3
**West** 2:8
**WHI** 311:8
374:9 375:15
383:15
**whichever** 21:13
**white** 270:9
**wide** 316:13
386:12,15,19
387:2
**widely** 196:3
262:16 263:3,4
263:5,8,24
265:4,8 282:1
287:6,16
**wider** 386:9
**widespread**
122:21 272:2,7
278:13 279:21
**Wilson** 462:1,10
462:18 463:18
**wish** 285:23
**withdraw**
159:19 199:6
358:7 384:18
415:6
**withdrawn**
169:1,13
**witness** 10:5
17:1,14 18:3

18:13 19:3,21
20:21 24:3
26:4 27:4,15
28:5 29:4,22
32:8,19 33:9
33:15 35:2,17
36:3 38:24
39:7 40:10
42:5 43:24
44:21 46:4
48:8 49:19
50:16 51:4,21
53:6 55:24
58:2,10 60:7
60:18 62:2,19
63:2,23 70:14
72:23 74:3
77:6 79:8
89:23 90:24
92:2,14 95:6
95:21 96:14
98:9 99:22
101:22 103:21
104:15 105:1
106:10 108:14
109:9,17
113:24 116:23
117:9 118:1,20
119:7 121:13
122:8,18
124:13 125:11
126:2,6 127:11
127:22 130:22
132:1 133:13
136:15 137:4
140:1 141:18
142:5,18 143:5
146:8 147:13
150:19 152:9
153:10 155:4
156:5,16
157:19 159:3
160:22 161:9
163:2,14,24
166:4,11,14
168:16 170:18
172:9,19 173:6

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 681 of 1035
PageID: 241860
Kevin Holcomb, M.D.

Page 576

173:16 174:6
175:23 176:11
177:6,20 179:7
185:4 191:1
192:5 193:14
195:7 196:20
197:6 198:15
203:15 207:3
208:9 211:7,17
213:7 215:11
216:8 218:6
219:12 221:23
223:6 230:12
231:6 232:21
234:18 235:9
235:15 237:17
238:2,22
241:15 242:4
242:15 244:3
244:16 245:10
245:24 246:9
246:24 248:5
249:9,24
251:16 252:14
253:4,23
254:11 257:14
257:23 260:2
262:10 265:7
267:10 268:15
273:2 276:4
277:20 278:18
279:4 282:13
286:18 288:2
289:1,23 291:6
295:19 296:4
296:24 299:2
300:20 302:3
304:16 305:24
307:9 312:4,17
316:8,24
317:20 318:7
319:10 327:15
330:9 331:13
333:3 338:8
340:22 341:10
343:14 344:21
346:7,18 349:7

349:22 350:21
355:14 356:22
358:13 359:12
360:18 362:12
364:14 365:1
366:8 369:9
370:20 372:22
375:22 377:9
379:22 381:9
383:1 385:8,21
386:8 387:17
388:8,16 391:9
393:9 394:10
394:16 395:17
397:17 398:5
399:21 400:5
401:11 402:12
406:3 410:23
412:15,23
419:23 423:19
427:21 432:23
433:8 434:3,21
435:8 436:18
438:4 439:13
440:13 441:13
442:2,12 447:6
448:5 451:7
452:23 453:14
454:23 458:15
458:19 460:5
462:7,15
464:22 469:4
470:17 472:10
476:1 477:22
478:21 480:7
481:4 482:20
484:21 485:6
487:24 489:11
491:7,19 493:2
494:13 496:9
496:18 498:1
499:10 500:4
500:15,23
501:10 504:18
506:23 508:1
508:18 510:20
512:5,24

513:14 514:12
514:18 515:22
517:5,6,8
518:1
**Wolf** 156:18
157:5
**woman** 243:18
352:17 389:7
389:16 439:14
456:5 498:16
**woman's** 174:3
338:18 438:1
438:15
**women** 28:23
29:8,13,17
30:8,15 31:15
32:3,12 33:5
63:7 87:22
88:7,23 151:20
152:1 226:8,11
243:15 245:2
248:19 250:4
311:4 318:16
320:7,9 326:12
330:16 338:2
339:9 340:13
340:18 341:6
345:18,23
351:19 356:6
364:2,4,10,12
364:15 365:5,6
365:24 368:15
368:20 369:4
369:18,23
370:2,6 373:4
373:7,22 382:9
383:16,23
384:7,11,20,24
385:2,11,12,18
386:1,2 387:3
387:4,9,11,12
387:20 390:16
390:23,24
391:3,10,20
397:3,8 404:2
404:3,5 405:3
439:3 443:19

455:24
**women's** 352:11
**wonder** 132:21
166:24
**wondering**
94:10
**word** 16:19
24:21 119:12
171:6,18
179:11,13,14
183:7 255:10
309:11 335:9
406:16 425:4
433:19 477:4
508:5
**wording** 508:6
**words** 21:19
53:21 134:20
240:9 262:2
360:11 407:13
413:24 450:23
455:13 476:22
**work** 44:7,9
103:17 107:12
112:2 113:1,8
113:12,16
140:12 141:5
142:8 153:23
154:1 288:7
300:23,24
301:1,12 389:2
389:3 391:2
460:17,18
461:17,17
490:18 504:6
504:22 515:3,8
**worked** 118:21
**working** 87:15
87:17 93:7
272:5 369:14
492:11
**works** 155:7
502:23
**world** 69:8,9
483:8 494:10
**worried** 204:23
513:19

**worry** 361:3
506:16
**worth** 382:10
**worthwhile**
288:22 289:2
300:5 414:10
**wouldn't** 36:4
132:22 173:9
177:11 219:20
226:8,12 236:9
330:6,13
386:24 388:13
401:4 402:17
412:19 439:8
439:18 495:17
501:14,24
506:16 509:18
**Wright** 9:18
488:24 489:21
490:4
**write** 118:16
119:3 215:17
295:6 411:9
**writing** 77:20
118:22
**written** 22:24
118:8 426:15
426:18,19,21
426:23 488:23
**wrong** 83:11
157:22 158:1
205:14 217:2
275:23 309:13
322:16 386:19
426:6 427:11
**wrote** 185:8
194:23 213:8
**Wu** 232:2,3
416:11,14,15
416:22,23,24
417:3,5,14,18
417:19 418:4,5
418:15,18,19

| X |
|---|
| **X** 5:2,10 6:2 7:2 |
| 8:2 9:2 |

Kevin Holcomb, M.D.

Page 577

| Y | | | |
|---|---|---|---|
| **yeah** 24:13 | 384:8,12 385:2 | 148:3,6,7,8,18 | 358:2 | 429:21 430:6 |
| 35:17 72:10 | 387:20 389:6 | 148:21 150:12 | **100** 5:23 234:2,4 | 503:11 |
| 73:3 83:17,22 | 404:23 448:15 | 186:4 190:18 | 235:5 | **1950s** 30:10,17 |
| 114:5 126:6 | 451:2 461:5 | 192:9 204:11 | **100-C** 71:10 | 31:18 32:5,15 |
| 127:16 129:10 | 466:15 467:12 | 219:6 240:3 | **100,300** 113:14 | 306:22 |
| 133:13 141:19 | 467:20 472:21 | 269:13 281:1 | **102** 6:6 | **1970s** 30:11,18 |
| 186:16 193:4 | 472:22 474:11 | 328:5 347:19 | **103** 5:20 64:22 | 31:18 32:16 |
| 207:7 208:18 | 474:18,19 | 461:14 491:14 | **103,000** 114:6 | **1976** 365:22 |
| 219:20 229:22 | 475:12,13 | 491:22 492:5 | **11** 30:24 220:12 | **1982** 240:9 |
| 240:20,24 | **years'** 339:10 | 492:21 494:2,7 | 258:22 357:14 | 344:12 345:17 |
| 251:9 256:12 | **yeast** 36:11,14 | 495:5 520:6 | 374:13,19 | 366:22 367:3 |
| 261:7 264:14 | **yesterday** 81:8 | **1.02** 353:18 | 375:6 428:16 | **1989** 365:23 |
| 299:19 321:1 | 81:12 112:21 | 354:18 376:24 | **11:28** 126:11 | **199** 6:17 |
| 328:12 329:22 | 112:22 | 378:17 | **11:42** 126:16 | **1996** 48:4 432:3 |
| 333:6 337:19 | **York** 1:14,15 | **1.06** 207:16 | **110** 6:7 | **1st** 424:17 428:6 |
| 340:14 349:12 | 11:10,10 14:11 | 370:7 | **114** 6:10 | |
| 377:4,9 385:15 | 301:6,17 | **1.09** 348:4,22 | **116,430** 366:2 | **2** |
| 385:17 393:12 | **younger** 364:3 | 349:19 | **12** 5:5 125:15 | **2** 41:12 45:10,11 |
| 399:6 404:4 | 364:11,18 | **1.1** 182:5 | 224:4 339:6 | 111:8 181:10 |
| 416:3 418:11 | 365:6 367:5 | **1.16** 474:12,21 | 340:6,14 397:3 | 181:11,16,21 |
| 454:6 472:1,5 | | **1.2** 187:20 | 397:4 404:8,17 | 181:21 202:17 |
| 475:18 476:20 | **Z** | 245:11 318:2 | **12-risk** 474:17 | 344:23 347:5,9 |
| 499:16 507:16 | **zero** 198:22 | **1.22** 408:14 | **121,700** 365:24 | 347:9 350:3 |
| 510:12 | 202:21 | **1.24** 244:12,22 | **13** 147:20 | 384:20 386:23 |
| **year** 6:15 363:23 | **Zervomanola...** | 271:4 409:24 | 255:19 407:10 | 415:20 442:23 |
| 376:9 389:7 | 437:19 | **1.28** 271:4 | 407:14 453:19 | 443:1 461:12 |
| 488:21 489:6 | **ZIP** 107:6 | **1.3** 245:7 318:2 | **14** 45:17 248:20 | **2-A** 415:18,19 |
| 489:22 | | **1.31** 271:4 | 349:11,12 | 416:5 |
| **years** 47:12 | **0** | **1.35** 370:9 | 350:2,8,13 | **2-B** 491:22 |
| 78:19 206:17 | **0.05** 202:18 | 408:14 | 352:15 355:17 | 492:5 494:2 |
| 228:23 229:2 | **0.09** 347:24 | **1.37** 347:16 | **1416** 275:13 | 495:5 |
| 327:5,8 332:19 | **0.84** 370:8 | 348:23 | **1490** 2:9 | **2.0** 241:23 |
| 332:20,21 | **0.86** 347:16 | **1.38** 409:24 | **15** 274:3 338:2 | **2/25/19** 6:12 |
| 333:8,14 336:5 | 348:23 | **1.4** 182:5 245:7 | 351:6 352:17 | **2:04** 239:20 |
| 337:24 338:2,4 | **000489048-54** | 353:18 354:17 | **155** 3:4 | **20** 125:8 187:21 |
| 339:5,8 340:6 | 9:7 | 354:21 373:17 | **16** 134:8,9 | 245:15 325:4,5 |
| 340:14 350:2,8 | **02210** 3:4 | **1.6** 187:20 | 292:22 | 328:21 332:19 |
| 350:13 351:6 | **07932** 3:9 | 245:12 | **16-2738** 1:6 | 332:21 333:8 |
| 352:15,17,19 | **08542** 3:13 | **1.6.5** 83:15 | **17** 3:13 302:13 | 337:24 338:3 |
| 355:17,20 | | **1.9** 347:15 | **18** 334:1 446:11 | 339:5,10 |
| 356:1,6 361:16 | **1** | **1.91** 353:19 | **180** 6:13 | 363:18 376:11 |
| 364:17 368:15 | **1** 6:15 39:19 | 354:18 376:24 | **183** 113:20 | 384:8,12 |
| 368:16 369:2 | 40:7,21 74:16 | 378:17 | **184,000** 113:20 | 429:20 430:13 |
| 369:19 373:3,6 | 82:5 96:6,11 | **1:07** 239:16 | **186** 6:15 | 520:20 |
| 376:10,10,11 | 96:17,24 97:5 | **10** 45:16 111:9 | **19** 2:4 64:23 | **20-fold** 392:10 |
| | 97:12 98:7 | 187:18 200:4 | 160:9 344:8 | **200** 346:3 |
| | 99:1,19 111:8 | 332:20 338:2 | 428:18 429:20 | **200,000** 318:16 |

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 683 of 1035
PageID: 241862
Kevin Holcomb, M.D.

Page 578

318:20 385:23
386:1,2
**2000** 344:2
358:10 359:20
363:24 411:18
440:24 462:18
**20004** 3:18
**2002** 69:24
**2003** 333:13
334:2
**2007** 135:2,4
139:13 465:22
**2008** 373:9,15
**2009** 139:13
232:3,4,6,7
416:24,24
417:5 418:6,15
418:18,20
**201** 3:13
**2010** 48:3,4
220:12 224:15
228:20 247:21
357:14 358:4
359:18 362:8
363:13,19,20
364:3,11
367:13 368:14
379:7,16 382:4
411:23 412:10
413:20 419:12
491:21 492:19
**2012** 48:5 69:17
70:4,10 71:9
83:14 86:15
95:3,19 96:7
**2013** 379:5
454:15
**2014** 254:18,19
264:24 265:4,9
276:12,12,13
277:22 278:15
279:6,22 280:6
377:20 424:17
428:6
**2015** 232:2,6
303:5 416:11
416:23 417:4

417:18,19
418:4,19 462:2
463:18
**2016** 180:14
232:4,7 249:4
254:15 255:8
259:8 260:6
275:3 329:11
338:24 446:20
**2017** 38:6
**2018** 6:20 38:9
40:22 43:6
45:14 64:20
142:15 143:12
145:17 146:2
224:3 259:11
259:12 360:3
420:13 432:14
442:23 454:11
**2019** 1:10 11:7
49:14 104:12
108:5 111:16
115:3 124:6,7
124:19,20
125:3 139:20
147:2,20 151:4
200:8 432:17
433:2 434:13
486:11 491:21
503:11 517:15
**202** 3:19
**20s** 339:1 340:11
**21** 200:8 378:1,2
420:10 428:18
430:6,13
**218** 2:14
**219** 72:4,9,13,15
72:21 74:5
76:23 82:5
85:12
**21st** 200:7
**22** 126:18 127:4
403:20
**220** 6:19
**224** 6:21
**23** 140:9 141:8,9
141:21 334:4

407:2 486:11
**231** 334:4,6,16
**232** 82:13,17,18
83:5 84:16
**233** 4:3
**24** 214:20 339:8
355:20 356:1
397:3 407:22
**25** 49:14 104:12
108:5 115:3
116:13 124:6
124:19 125:3
147:2 366:3
424:15
**250** 214:19
**251** 350:15
351:1,12
**255** 7:6
**256** 87:10 93:5
**25th** 51:18
110:10 111:15
**26** 368:16
468:12,14
**269-2343** 2:15
**27** 1:10 11:6
311:16 471:12
**271** 7:9
**273** 7:12
**28** 258:23 259:3
261:5 517:15
**281** 7:16
**29** 488:9
**292** 7:18

———————
**3**

**3** 64:12 103:16
147:6,14,18
229:18,21
471:19,21,24
472:12 474:3
475:15,19
**3:28** 343:19
**3:55** 343:23
**3:59** 348:12
**30** 25:10,11,21
55:11 328:22
332:20 333:14

336:5 366:1
369:2 496:24
518:16
**302** 7:21
**31** 503:6
**312** 4:5
**33** 116:13 275:8
443:17
**334** 2:15
**338-1100** 2:10
**344** 8:6
**356** 87:5,8
**358** 271:15
**36104** 2:14
**363** 8:9
**37** 349:13
**377** 8:12

———————
**4**

**4** 45:19 71:9
367:22 384:19
425:2
**4/1/14** 9:6
**4:00** 348:16
**40** 5:14 206:17
333:8,14 336:5
337:24 338:4
369:2 376:23
378:16
**40,000** 506:12
**403** 8:14
**406** 8:17
**407** 8:20
**41,000** 318:19
404:3
**41,654** 404:2
**42** 248:19 366:3
**424** 9:6
**43** 416:17
**439-2286** 3:5
**45** 5:16
**46** 415:15,20,22
**463-2400** 3:19
**464** 256:4
**468** 9:8
**471** 9:13
**486** 9:15

**488** 9:17
**49** 224:11,13
**496** 9:19

———————
**5**

**5** 102:12,18
146:19,23
147:17 229:18
229:21 424:23
425:2,2
**5/7/18** 5:15,17
5:20
**5:01** 421:16
**5:22** 421:21
**5:49** 453:10,13
**50** 248:24 249:6
340:13 341:24
367:24
**50/50** 150:8,10
236:2,2,3
273:18 392:18
479:18
**501** 2:8
**503** 9:22
**50s** 32:21
**521** 520:6
**549-7000** 3:9
**55** 338:19 366:1
**56** 5:15 41:11
**57** 5:18 45:16

———————
**6**

**6** 110:8 121:8
146:12,20
**6.2** 420:10
**6.4** 258:24
**6.6** 404:23
**6:03** 473:10
**6:04** 473:24
**6:13** 486:2
**6:36** 486:7
**6:59** 516:5,8
**60** 187:21
245:15
**60,000** 506:11
**600** 3:8 404:3
**60606** 4:4

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 684 of 1035
PageID: 241863
Kevin Holcomb, M.D.

Page 579

**609** 3:14
**60s** 30:10,17
   31:18 32:5,15
   32:21
**61** 44:16 45:18
   46:24 47:17
   106:6 116:15
**61,000** 318:18
   375:16 387:11
**61,576** 383:16
**617** 3:5
**619** 2:10
**624-6307** 4:5
**64** 5:19
**68** 385:4,16
   386:3 387:12
   387:21
**69** 229:19,21
**6950** 4:4

**7**

**7** 45:14 64:20,23
   115:1
**70** 25:5,9 444:18
**70,000** 506:11
**70s** 32:6
**71** 5:21
**720-1288** 2:5
**767** 1:14 11:9
**78,000** 318:18
**78,630** 345:23
**791** 217:3
**7th** 40:22

**8**

**8** 41:12 111:8
   180:9 281:1
**80,750** 112:7
   114:9
**800** 201:9
   203:12 214:20
**800-some** 218:3
**850** 60:9 112:4
**86** 378:20
**877.370.3377**
   1:20
**89** 354:3

**9**

**9** 111:8 186:5
   269:20 274:4
   274:10
**9:53** 1:15 11:7
**90** 59:23 60:4
   354:4 371:2
**917.591.5672**
   1:20
**92101** 2:9
**92660** 2:4
**949** 2:5
**95** 112:1 149:23
   187:4,4 193:21
   193:23 194:8
   196:13,22
   197:14 202:5
   205:20 371:3
   372:8 378:16
**973** 3:9
**975** 3:18
**986-1118** 3:14
**99** 290:14
   318:21 329:2
   440:24

# Exhibit 32

Cheryl Saenz, M.D.

```
 1              UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF NEW JERSEY

 3

 4   IN RE JOHNSON & JOHNSON TALCUM      )

     POWDER PRODUCTS MARKETING,          )

 5   SALES PRACTICES, AND PRODUCTS       )

     LIABILITY LITIGATION,               )

 6                                       )MDL NO.

                                         )16-2738(FLW)(LGH)

 7   THIS DOCUMENT RELATES TO ALL        )

     CASES,                              )

 8                                       )

 9

10

11

12

13

14        VIDEOTAPED DEPOSITION OF CHERYL SAENZ, M.D.

15              SAN DIEGO, CALIFORNIA

16             WEDNESDAY, MARCH 13, 2019

17

18

19

20

21

22

23   STENOGRAPHICALLY REPORTED BY:

24

     Valerie C. Rodriguez

25   CSR No. 12871 (orig 6980)
```

Cheryl Saenz, M.D.

---

**Page 2**

```
1          UNITED STATES DISTRICT COURT
2          FOR THE DISTRICT OF NEW JERSEY
3
4  IN RE JOHNSON & JOHNSON TALCUM  )
   POWDER PRODUCTS MARKETING,     )
5  SALES PRACTICES, AND PRODUCTS  )
   LIABILITY LITIGATION,          )
6                            )MDL NO.
                             )16-2738(FLW)(LGH)
7  THIS DOCUMENT RELATES TO ALL   )
   CASES,                         )
8                                 )
9
10
11    VIDEOTAPED DEPOSITION OF CHERYL SAENZ, M.D., TAKEN
12    ON BEHALF OF THE DEFENDANTS, AT 12255 EL CAMINO
13    REAL, STE. 100, SAN DIEGO, CALIFORNIA, COMMENCING AT
14    9:30 a.m. AND ENDING AT 6:19 p.m. ON WEDNESDAY,
15    MARCH 13, 2019, BEFORE VALERIE C. RODRIGUEZ,
16    CERTIFIED SHORTHAND REPORTER NO. 12871 (ORIGINALLY
17    6980).
18
19
20
21
22
23
24
25
```

---

**Page 4**

```
1
   APPEARANCES CONTINUED:
2
3
        FOR DEFENDANTS JOHNSON & JOHNSON
4
        DRINKER, BIDDLE & REATH, LLP
5        BY:  SUSAN M. SHARKO, ESQ.
         600 CAMPUS DRIVE
6        FLORHAM PARK, NEW JERSEY 07932
         973.549.7000
7        SUSAN.SHARKO@DBR.COM
8
9   FOR DEFENDANT PTI ROYSTON/PTI
10       TUCKER ELLIS LLP
         BY:  MICHAEL ANDERTON, ESQ.
11       950 MAIN AVENUE
         SUITE 1100
12       CLEVELAND, OHIO 44113
         216.696.4835
13       MICHAEL.ANDERTON@TUCKERELLIS.COM
14
    FOR DEFENDANTS PCPC:
15
        SEYFARTH SHAW LLP
16       BY: RENEE B. APPEL, ESQ.
         975 F STREET, NW
17       WASHINGTON, DC 20004-1454
         202.463.2400
18       RAPPEL@SEYFARTH.COM
19
    ALSO PRESENT:
20
        DARNELL BROWN, VIDEOGRAPHER
21
22
23
24
25
```

---

**Page 3**

```
1  APPEARANCES:
2
3      FOR PLAINTIFF:
4        ROBINSON CALCAGNIE, INC.
         BY:  CYNTHIA L. GARBER, ESQ.
5        19 CORPORATE PLAZA DRIVE
         NEWPORT BEACH, CALIFORNIA  92660
6        949.720.1288
         CGARBER@ROBINSONFIRM.COM
7
8      FOR PLAINTIFF:
9        BEASLEY ALLEN
         BY:  MARGARET M. THOMPSON
10       MD, JD, MPAFF
         218 COMMERCE STREET
11       PO BOX 4160
         MONTGOMERY, ALABAMA 36103
12       334.269.2343
         MARGARET.THOMPSON@BEASLEYALLEN.COM
13
14     FOR PLAINTIFF:
15       BLOOD HURST & O'REARDON LLP
         BY:  PAULA R. BROWN, ESQ.
16       501 WEST BROADWAY
         SUITE 1490
17       SAN DIEGO, CALIFORNIA 92101
         619.338.1100
18       pbrown@bholaw.com
19
    FOR DEFENDANTS JOHNSON & JOHNSON:
20
         NUTTER MCCLENNEN & FISH LLP
21       BY:  DAWN M. CURRY, ESQ.
         155 SEAPORT BOULEVARD
22       BOSTON, MASSACHUSETTS 02210
         617.439.2286
23       DCURRY@NUTTER.COM
24
25
```

---

**Page 5**

```
1       INDEX TO DEPOSITION OF CHERYL SAENZ, M.D.
2                 MARCH 13, 2019
3
4   EXAMINATION BY MS. GARBER            12
5   EXAMINATION BY MS. CURRY            363
6
7              EXHIBITS
8   MARKED       DESCRIPTION           PAGE
9   Exhibit 1  Payment Type Definitions     35
10  Exhibit 2  Industry Payments to
               Obstetrician Gynecologists
11             An Analysis of 2014 Open
               Payments Data            46
12
    Exhibit 3  Notice of Deposition of
13             Cheryl Saenz, MD         78
14  Exhibit 4  Defendants' Response to
               Plaintiffs' Document Requests
15             Contained in Notice of Oral
               and Videotaped Deposition of
16             Cheryl Saenz, M.D. and Duces
               Tecum                    82
17
    Exhibit 5  Expert Report of Cheryl
18             Christine Saenz, MD
               for General Causation Daubert
19             Hearing                  94
20  Exhibit 6  Rule 26 Expert Report of
               Rebecca Smith-Bindman, MD     115
21
    Exhibit 7  Schildkraut paper,
22             Association between Body
               Powder Use and
23             Ovarian Cancer: The African
               American Cancer
24             Epidemiology Study (AACES)   118
25
```

---

Page 6

INDEX OF EXHIBITS CONTINUED
MARKED    DESCRIPTION    PAGE

Exhibit 8  Videotaped Deposition
Transcript of Rebecca
Smith-Bindman, M.D. San
Francisco, California
Friday, February 8, 2019,
Volume II    121

Exhibit 9  LB-044 - Talcum Powder
Enhances Cancer
Antigen 125 Levels in Ovarian
Cancer Cells
and in Normal Ovarian
Epithelial Cells    142

Exhibit  214A Reproductive Sciences
10    Vol. 25. Supplement 1, March
2018 Scientific Abstracts    144

Exhibit  Biologic Plausibility:
11    Migration/Translocation    194

Exhibit  Perineal Use of Talc and Risk
12    of Ovarian Cancer
H Langseth, 1 S E Hankinson,
2 J Siemiatycki, 3 E
Weiderpass 1A,5    204

Exhibit  Factors Related to
13    Inflammation of the Ovarian
Epithelium and Risk of
Ovarian Cancer by Roberta B.
Ness, 1 Jeane Ann Grisso,2
Carrie Cottreau, 1 Jennifer
Klapper,1 Ron Vergona, 1
James E. Wheeler, 3 Mark
Morgan, 4 and James J.
Schlesselman5    207

Exhibit  12871-6980
14    ACOG COMMITTEE OPINION
Number 374, August 2007
Reaffirmed 2016 Committee on
Ethics "Expert Testimony"    222

Page 7

INDEX OF EXHIBITS CONTINUED
MARKED    DESCRIPTION    PAGE

Exhibit  Letter dated April 1st, 2014.
15    Sent from the FDA to Samuel
Epstein, MD    224

Exhibit  Fax from Richard Zazenski to
16    Bill Ashton dated September
30, 2004    226

Exhibit  REVIEW-Possible Role of
17    Ovarian Epithelial
Inflammation in Ovarian
Cancer by Roberta B. Ness,
Carrie Cottreau    232

Exhibit  Biologic Plausibility:
18    Chronic Inflammation    242

Exhibit  Draft Screening Assessment
19    Talc (Mg3H2(SiO3)4)
Chemical Abstracts Service
Registry Number 14807-96-6
Environment and Climate
Change Canada - Health Canada    246

Exhibit  NIH Public Access, Author
20    Manuscript Published in final
edited form as: Cancer
Epidemiol Biomarkers Prev.
2008 September; 17(9):
2436-2444. Doi:
10.1158/1055-9965.EPI-08-0399
Talc use, variants of the
GSTM1, GSTT1, and NAT2 Genes,
and Risk of Epithelial
Ovarian Cancer    252

Exhibit  © 2004 Wiley-Liss, Inc.
21    Publication of the
International Union Against
Cancer PERINEAL TALC EXPOSURE
AND EPITHELIAL OVARIAN CANCER
RISK IN THE CENTRAL VALLEY OF
CALIFORNIA    253

Page 8

INDEX OF EXHIBITS CONTINUED

MARKED    DESCRIPTION    PAGE

Exhibit  RESEARCH ARTICLE -
22    Associations Between Aspirin
Use and the Risk of Cancers:
A Meta-Analysis of
Observational Studies. By
Yan Qiao1t, Tingting Yang2)
Yong Gan 1, Wenzhen Li1, Chao
Wang 1, Yanhong Gong1 and
Zuxun Lu1    268

Exhibit  Aspirin, Nonaspirin
23    Nonsteroidal
Anti-Inflammatory Drug, and
Acetaminophen Use and Risk of
Invasive Epithelial Ovarian
Cancer: A Pooled Analysis in
the Ovarian Cancer
Association Consortium by
Britton Trabert    270

Exhibit  Expert report by Cheryl
24    Saenz, MD, in the Echeverria
matter    279

Exhibit  Genital Use of Talc and Risk
25    of Ovarian Cancer: A
Meta-Analysis, by Wera Berge,
Kenneth Mundt, Hung Luu and
Paolo Boffetta    282

Exhibit  [Review Article]
26    Gynecological Cancer]
Genital use of talc and risk
of ovarian cancer: A
meta-analysis by Berge, Wera;
Mundt, Kenneth; Luu, Hung;
Boffetta, Paolo    286

Page 9

INDEX OF EXHIBITS CONTINUED
MARKED    DESCRIPTION    PAGE

Exhibit  The Association Between Talc
27    Use and Ovarian Cancer
A Retrospective Case-Control
Study in Two US States
Daniel W Cramer, Allison F.
Vitonis, Kathryn L. Terry,
a,b William R. Welch, c and
Linda J. Titusd    290

Exhibit  Genital powder use and risk
28    of ovarian cancer: A pooled
analysis of 8,525 cases and
9,859 controls by Kathryn L.
Terry    297

Exhibit  Systematic Review and
29    Meta-Analysis of the
Association between Perineal
Use of Talc and Risk of
Ovarian Cancer by Mohamed
Kadry Taher    309

Exhibit  Clinical commentary Talc and
30    ovarian cancer by Steven A.
Narod    317

Exhibit  Perineal Talc Use and Ovarian
31    Cancer, A Systematic Review
and Meta-Analysis by
Ross Penninkilampi, and Guy
D. Eslick    319

Exhibit  Prospective Study of Talc Use
32    and Ovarian Cancer by
Dorota M Gertig    324

Exhibit  Risk Factors for Epithelial
33    Ovarian Cancer by Histologic
Subtype by Margaret A. Gates    325

Exhibit  What Is New in Ovarian
34    Cancer? Best Articles From
the Past Year by Jason D.
Wright, MD    342

Page 10

INDEX OF EXHIBITS CONTINUED

MARKED    DESCRIPTION          PAGE
Exhibit   Arsenig, Metals, Fibres, and
35        Dusts Volume 100 C, a Review
          of Human Carcinogens          346
Exhibit   Heller 1996 Asbestos Exposure
36        and Ovarian Fiber Burden      350

INFORMATION REQUESTED:  (None)

DIRECTIONS NOT TO ANSWER:  (None)

---

Page 11

1    SAN DIEGO, CALIFORNIA, WEDNESDAY, MARCH 13, 2019
2         ~~~9:30 A.M.~~~
3              -O0O-
4
5
6         THE VIDEOGRAPHER:  Good morning.  We are
7    now on the record.  My name is Darnell Brown and I'm
8    the videographer with Golkow Litigation Services.
9         Today's date is March 13th, 2019, and the
10   time is 9:29 a.m.  This video deposition being is
11   held in San Diego, California, in a matter of In Re:
12   Talc, the United States district court for the
13   district of New Jersey.
14        The deponent is Dr. Cheryl Saenz.
15   Counsel, please identify yourselves for the record.
16        MS. CURRY:  Dawn Curry on behalf of
17   Johnson & Johnson.
18        MS. SHARKO:  Susan Sharko for Johnson &
19   Johnson, the defendants.
20        MR. ANDERTON:  Michael Anderton for PTI
21   Royston and PTI Union.
22        MS. APPEL:  Renee Appel on behalf of
23   defendant Personal Care Products Council.
24        MS. GARBER:  Cynthia Garber on behalf of
25   the plaintiffs.

---

Page 12

1         MS. THOMPSON:  Margaret Thompson on
2    behalf of the plaintiffs.
3         MS. BROWN:  Paula Brown on behalf of the
4    plaintiffs.
5         VIDEOGRAPHER:  The court reporter is
6    Valerie Rodriguez who will now swear in the witness.
7              CHERYL SAENZ, M.D.,
8         having been first duly sworn,
9         was examined and testified as follows:
10
11             EXAMINATION
12              -o0o-
13   BY MS. GARBER:
14   Q    Good morning.
15   A    Good morning.
16   Q    Will you state your name for the record.
17   A    Cheryl Christine Saenz.
18   Q    You're a medical doctor?
19   A    Yes.
20   Q    Dr. Saenz, we've had the occasion to meet
21   before today, haven't we?
22   A    That's correct.
23   Q    And what is your memory of that meeting?
24        MS. CURRY:  Objection to form.
25        THE WITNESS:  I believe that you actually

---

Page 13

1    took my deposition in a matter in 2017.
2    BY MS. GARBER:
3    Q    That was in the Echeverria case; is that
4    correct?
5    A    That's my recollection.
6    Q    That was in the California JCCP?
7    A    I don't know what you mean by that.
8    Q    That was venued in California in
9    Los Angeles; is that correct?
10   A    Well, we took the deposition in
11   San Diego, but I believe the case was tried in
12   Los Angeles.
13   Q    Correct.  You testified at that trial;
14   did you not?
15   A    I did.
16   Q    You've testified at other talc product
17   litigation cases, have you not?
18   A    Can you define for me what you mean by
19   "testify"?
20   Q    Sure.  Did you testify in court in
21   connection with other talcum powder product cases
22   aside from California?
23        MS. CURRY:  Object to the form.
24        THE WITNESS:  Only one other case.
25   ///

---

Cheryl Saenz, M.D.

Page 14

BY MS. GARBER:
2    Q    What was the name of that case as you
3 recall it?
4    A    My recollection is that that case was
5 called Ingham, et al. versus Johnson & Johnson.
6    Q    Those are the only two occasions where
7 you testified in court in connection with a talcum
8 powder litigation?
9    A    That's correct.
10    Q    Do you hold yourself out as a gynecologic
11 oncologist?
12    A    Well, I don't just hold myself out.  I'm
13 board certified in the subspecialty of gynecologic
14 oncology, so I'm also recognized by the American
15 Board of OB-GYN.
16    Q    And you're a medical doctor?
17    A    Yes.
18    Q    And you're licensed in the State of
19 California to practice medicine?
20    A    Yes.
21    Q    You just mentioned you're board
22 certification.  So you're board certified by what's
23 known as ACOG?
24    A    No.
25        MS. CURRY:  Object to the form.

Page 15

BY MS. GARBER:
2    Q    I'm sorry.  By the American board of
3 obstetricians and gynecologists; correct?
4    A    Actually the board is called American
5 Board of Obstetrics and Gynecology.
6    Q    Thank you.  Are you a member of ACOG?
7    A    I am.
8    Q    You are also subspecialty board certified
9 in gynecologic oncology?
10        MS. CURRY:  Object to the form.
11        THE WITNESS:  Right.  So I actually hold
12 two boards.  I hold a board in obstetrics and
13 gynecology and a board in gynecologic oncology.
14 BY MS. GARBER:
15    Q    Are you a member of the Society of
16 Gynecologic Oncologists?
17    A    I am.
18    Q    You are here as an expert witness for
19 defendant Johnson & Johnson in connection with the
20 talcum powder product litigation; true?
21    A    I am.
22    Q    And you have given four prior depositions
23 regarding defendant Johnson & Johnson's talcum
24 powder products and the risk of ovarian cancer;
25 correct?

Page 16

MS. CURRY:  Object to the form.
2        THE WITNESS:  I don't think that's quite
3 accurate because that's not the way I look at it.
4 I've testified at deposition twice in one matter,
5 because initially, I was only offering testimony on
6 six of the plaintiffs but then I gave additional
7 testimony.
8        So I still look at that as really only
9 one deposition.
10 BY MS. GARBER:
11    Q    Let me see if I can clarify.  You've
12 offered a deposition in connection with the
13 Echeverria matter that you've already told us about;
14 correct?
15    A    Correct.
16    Q    You've also provided deposition testimony
17 in connection with the Ingham matter; correct?
18    A    Correct.
19    Q    You've also given deposition testimony in
20 the Brower matter?
21    A    Correct.
22    Q    You've also given deposition testimony in
23 the Forrest matter; correct?
24    A    Correct.  So I apologize, you're correct.
25 There are four.

Page 17

Q    Have you testified in deposition or trial
2 in any other talcum powder product cases?
3    A    No.
4    Q    You last gave a deposition in the
5 Flannigan matter in 2019?
6    A    I believe that deposition, yes, was in
7 2019, that's correct.
8    Q    Have you given any deposition since then?
9    A    No.
10    Q    Is it true that the Flannigan matter did
11 not concern talcum powder products or ovarian
12 cancer?
13    A    That's correct.
14    Q    Did the Flannigan matter concern any of
15 the issues as you deem them in this case?
16    A    No.
17    Q    The case was totally unrelated to any
18 issue in this case; is that true?
19    A    That's correct.
20        MS. CURRY:  Object to form.
21        THE WITNESS:  That's correct.
22 BY MS. GARBER:
23    Q    I know you've just recently given a
24 deposition, but I'll just basically re-cover some --
25    A    I'm sorry, ma'am.  May I stop -- I'm

Cheryl Saenz, M.D.

Page 18

1  sorry.
2      Q    Of course.
3      A    In the broadest sense that the Flannigan
4  matter did involve causation, then I would say there
5  is a similarity between these cases from the
6  Flannigan matter.  But it wasn't the same type of
7  cancer and it wasn't a talcum powder litigation.
8      Q    What was the nature of the allegations in
9  the Flannigan matter?
10     A    The nature of the allegations was that
11  the failure on the part of a practitioner, a medical
12  doctor to obtain a Pap smear on a patient led to a
13  delay in diagnosis.
14     Q    Who were you the expert witness for, the
15  defense or the plaintiff?
16     A    The defense.
17     Q    And it was your opinion that there was no
18  delay in diagnosis?
19     A    It was my opinion that the absence of a
20  Pap smear being obtained at the time that plaintiff
21  asserted it should have been did not lead to a
22  change in the patient's outcome.
23     Q    In that matter, did you testify about the
24  risk factors that may or may not be applicable for
25  endomet -- I'm sorry, uterine cancer?

Page 19

1      A    It wasn't a case of uterine cancer, so
2  no.
3      Q    Was it a case of cervical cancer?
4      A    Yes.
5      Q    Did you testify about the risk factors
6  for that disease?
7      A    Only in the most general sense.  It was
8  not really the focus of my testimony.
9      Q    Was the focus of your testimony relating
10  to causation in any way as concerning the risk
11  factors for cervical cancer?
12         MS. CURRY:  Object to form.
13         THE WITNESS:  Again, not other than in
14  the most general sense.  My testimony really was
15  more about whether or not a Pap smear should have
16  been performed at the time the plaintiff asserted it
17  should have been.
18         MS. GARBER:  Thank you.
19  BY MS. GARBER:
20     Q    Let's go over some of the ground rules
21  that govern the deposition process just as a review.
22  You're sufficiently familiar with ground rules that
23  cover the deposition process?
24     A    I believe I am.
25         MS. CURRY:  Object to the form.

Page 20

1  BY MS. GARBER:
2      Q    You understand that you've taken an oath
3  to tell the truth under penalty of perjury, which
4  carries the same force and effect as if we were
5  sitting in a court of law rather than in the
6  informal setting of this conference room.
7          You understand that, don't you?
8      A    Yes.
9      Q    You understand that if you don't
10  understand any of my questions, that it's perfectly
11  fine for you to ask for clarification; right?
12     A    Correct.
13     Q    And I'm going to hope that you will do
14  so.  If you don't understand the nature of my
15  question and you answer it, then I'll assume you
16  understood the nature of my question.
17         Is that fair?
18     A    Fair.
19     Q    You're doing a very good job of not
20  talking over the top of me and I'll try to do a good
21  job of not doing that.  So let's try to avoid that,
22  especially as it gets later in the day so we have a
23  clear record; okay?
24     A    Okay.
25     Q    It's important to be truthful in a

Page 21

1  deposition; right?
2      A    I would agree with that.
3      Q    Do you agree it's important to be candid
4  and fair because this testimony will be, could be
5  read and heard by a court and jury?
6          MS. CURRY:  Objection to the form.
7          THE WITNESS:  I don't really know what
8  will happen with this testimony today, but I agree
9  that it's important to be candid and fair.
10  BY MS. GARBER:
11     Q    Do you also agree it's important to tell
12  the truth, the whole truth, and not half truths?
13     A    Absolutely.
14     Q    We'll go through some of your sort of
15  background.  Can we agree that it is important for
16  you to avoid giving the impression that you are an
17  expert in a given area where you have no expertise?
18         MS. CURRY:  Object to form.
19         THE WITNESS:  I think I would have to
20  have you define what is expertise, because your
21  understanding of expertise may not be in agreement
22  with my understanding of expertise.
23  BY MS. GARBER:
24     Q    Certainly.  But if you understand the
25  nature of my question, you won't try to answer

Cheryl Saenz, M.D.

Page 22

1  questions out of your understood expertise.
2       Is that a fair statement?
3     A   I think that's fair.
4     Q   For example, you've never conducted
5  research regarding the effects of talcum powder
6  products including its carcinogenicity; right?
7       MS. CURRY:  Object to the form.
8       THE WITNESS:  What do you mean by
9  research?
10 BY MS. GARBER:
11    Q   Have you done any research with regard to
12 talcum powder products?  You yourself, have you done
13 any research studies?
14    A   I'm certainly researched the literature.
15    Q   But have you done any -- okay, that's
16 fair.  Have you done any experimentation with regard
17 to talcum powder products and ovarian cancer?
18    A   You mean benchtop research or clinical
19 trials research?
20    Q   Yes?
21    A   No, I've not done either of those.
22    Q   With regard to the literature, have
23 you -- you yourself, conducted any epidemiological
24 studies in connection with talcum powder products
25 and ovarian cancer risk?

Page 23

1     A   Do you mean have I published on that?
2     Q   Yeah.
3     A   I've not published on that, but I've
4  certainly conducted research with the literature in
5  the sense of reading it in order to understand it
6  and to express an opinion.
7     Q   And that is the extent of your research
8  experience with regard to talcum powder products and
9  risk of ovarian cancer; correct?
10      MS. CURRY:  Object to the form.
11      THE WITNESS:  So I'm not entirely
12 comfortable with what I think is your vague use of
13 the term research, because research really does
14 encompass many things and what I do on a daily
15 basis.
16      So if we're discussing benchtop research
17 or publishing specifically on the issue of talc and
18 ovarian cancer, I've not done either of those.  But
19 my research experience, I think, is a broader
20 definition than perhaps what you're using.
21 BY MS. GARBER:
22    Q   So in connection with the, as you say,
23 research that you've done regarding the talcum
24 powder products literature, you -- is it true that
25 you have not endeavored to publish that research?

Page 24

1     A   That's true.
2     Q   Have you been asked to publish your
3  research?
4     A   I'm sorry.  No, I have not.
5     Q   Have you endeavored to attempt to publish
6  your expert report which was issued in connection
7  with this litigation, which is dated February 25th,
8  2019?
9     A   No, I have not.
10    Q   Have you endeavored to publish any of
11 your expert reports that you have issued in
12 connection with talcum powder product litigation?
13    A   Well, there's only one other report that
14 I've actually ever generated and no, I've not
15 endeavored to publish that either.
16    Q   And that report was the Echeverria
17 report; correct?
18    A   That's correct.
19    Q   Are you an expert with regard to causes
20 of ovarian cancer?
21    A   So I believe I'm an expert with risk fact
22 to risk factors associated with the development of
23 ovarian cancer, but I don't believe that we know in
24 any one particular patient what causes ovarian
25 cancer.  I would not use that term.

Page 25

1     Q   Doctor, haven't you testified a little
2  broader than that in the past that you have no idea
3  what causes ovarian cancer, not limiting it down to
4  a specific patient?
5       MS. CURRY:  Object to the form.
6       THE WITNESS:  No, I don't actually think
7  that's what my testimony was.  I think my testimony
8  is that, in terms of what actually causes ovarian
9  cancer from a molecular biology standpoint, and with
10 respect to any one particular patient, we don't know
11 what causes ovarian cancer.
12      We certainly know of risk factors that
13 are associated with the disease, but in any one
14 particular patient, we can't say this is the cause.
15 BY MS. GARBER:
16    Q   Doctor, do you recall when I took your
17 deposition in the Echeverria matter on May 9th,
18 2017?
19    A   Yes, I do recall.
20    Q   And do you recall I was asking you about
21 causes of ovarian cancer?  Do you recall that?
22    A   In the general sense; yes.
23    Q   And, Doctor, I asked you, "So you can't
24 think of anything that you could say would cause a
25 woman's ovarian cancer?"  And Doctor, you answered,

Cheryl Saenz, M.D.

1  quote "I have no idea what causes ovarian cancer."
2       Do you dispute that testimony as you sit
3  here today?
4       MS. SHARKO:  Could you just show her the
5  transcript, please?
6       MS. GARBER:  I don't have a copy of it.
7       MS. CURRY:  May we see your copy that you
8  were just reading from?
9       MS. GARBER:  Sure.  It's 5 through 17.
10      MS. CURRY:  Thank you.
11      THE WITNESS:  Right.  So this is
12  referring to a woman's cancer, and as I just
13  testified, I don't believe that we have any idea
14  what causes a woman's cancer.  The question was in a
15  specific woman and that's how I responded to you.
16  BY MS. GARBER:
17      Q   Doctor, nowhere here does it say "in a
18  specific patient."  The question was not, in a
19  specific patient do we ever know what causes a
20  woman's ovarian cancer.  It was stated, in this most
21  broad sense, so you can't think of anything that you
22  could say would cause a woman's ovarian cancer.  And
23  your answer was:  I have no idea what causes ovarian
24  cancer?
25      MS. CURRY:  Object to form.

1       THE WITNESS:  No, ma'am, I disagree with
2  you.  The question is "a woman."  I'm answering your
3  question, which was "a woman."
4  BY MS. GARBER:
5       Q   I wasn't asking you about a specific
6  woman.  I was asking you about women in general, but
7  that's fine, I'll move on.
8       A   But, ma'am, I disagree with you.  You
9  actually said "a woman" in your question, so that is
10  an individual patient.  And so I was answering you
11  for an individual patient.
12      The question was not women in general.
13  The question was a woman.
14      Q   The record stands.
15      How many -- how many papers have you
16  published about the causes of ovarian cancer in the
17  last 19 years?
18      A   None.
19      Q   What percentage of your current patients
20  have not been diagnosed with female reproductive
21  cancer?
22      MS. CURRY:  Object to the form.
23      THE WITNESS:  Of any type of cancer?
24      MS. GARBER:  Yes.
25      THE WITNESS:  I would say maybe

1  20 percent.
2  BY MS. GARBER:
3       Q   So the majority of the patients that you
4  treat have not been diagnosed with ovarian cancer --
5  or sorry, with any form of female reproductive
6  cancer?
7       MS. CURRY:  Object to the form.
8       THE WITNESS:  No.
9       MS. CURRY:  Misstates the testimony.
10      THE WITNESS:  I think you're completely
11  misstating what I just said.  You asked me --
12      MS. GARBER:  I might have misspoke.
13  BY MS. GARBER:
14      Q   The majority of your patients have been
15  diagnosed with some form of female reproductive
16  cancer; is that true?
17      A   With either invasive cancer or
18  pre-cancer; yes, that's correct.
19      Q   How much money have you made to date from
20  defendant Johnson & Johnson testifying about their
21  talcum powder products?
22      MS. CURRY:  Object to the form.
23      THE WITNESS:  Prior to this MDL
24  litigation?
25      MS. GARBER:  Ever.

1       THE WITNESS:  Ever.  So I have not
2  received payment for my last invoice, so to date, I
3  believe I've made around $390,000.
4  BY MS. GARBER:
5       Q   The invoice that you submitted as part of
6  my request for documents, was for 100,000 -- roughly
7  100,500; correct?
8       MS. CURRY:  Object to the form.
9       THE WITNESS:  It's exactly 100,500.
10  BY MS. GARBER:
11      Q   That's for 134 hours of work?
12      A   That's correct.
13      Q   And that was spanning from December
14  of 2018 to February 2019?
15      A   That's correct.
16      Q   So if we add that to the previous amount
17  that you've made, that would total roughly -- well,
18  nearly half a million dollars?
19      A   Nearly, it would be about $490,000 over
20  about three and a half years that I've been working
21  in this matter, that's correct.
22      Q   And since February of 2019 to today, how
23  many hours have you worked on this case?
24      A   I would say maybe 15.
25      Q   Have you invoiced for that time yet?

Cheryl Saenz, M.D.

Page 30

1    A    No, I have not.
2    Q    So the -- we would know that the totality
3  of the money that you've generated in connection
4  with Johnson & Johnson talcum powder products
5  through today by taking roughly 490,000 and adding
6  an additional 15 hours of pay at $750 an hour;
7  correct?
8    A    Over the three years, that's correct.
9    Q    Have you made other money from
10 pharmaceutical companies?
11       MS. CURRY:  Object to the form.
12       THE WITNESS:  So I have given talks on
13 behalf of Merck and in the past Genentech, speaking
14 on behalf of Gardasil, the HPV vaccine.
15       Previously I spoke about Avastin, which
16 is a drug that we use to treat ovarian and cervical
17 cancer.
18 BY MS. GARBER:
19    Q    How much money were you paid from
20 pharmaceutical companies aside from Johnson &
21 Johnson in 2018?
22    A    In 2018, I think the number was somewhere
23 around maybe $30,000.
24    Q    I think you were asked this in a previous
25 deposition or testimony that I read, but you are

Page 31

1  familiar with the Physician Payments Sunshine Act
2  that was passed in 2010?
3    A    Yes.
4    Q    What is your understanding of that Act?
5       MS. CURRY:  Object to form.
6       THE WITNESS:  With what context?
7  BY MS. GARBER:
8    Q    What did the Act state or what's your
9  understanding of it?
10       MS. CURRY:  Object to the form.
11       THE WITNESS:  My understanding of it is
12 that when I go out and speak, as I do and as I
13 stated on behalf of products such as Gardasil or
14 Avastin, that the federal government is notified of
15 those payments and those are posted for public view
16 in the public domain.
17 BY MS. GARBER:
18    Q    What is the reason, as you understand it,
19 for the Physician Payments Sunshine Act?
20       MS. CURRY:  Object to the form.
21       THE WITNESS:  My understanding is that
22 the rationale is that patients have an opportunity
23 to go to that site to see if their physicians have
24 been collecting monies from those companies because
25 that may have undue influence on the physicians'

Page 32

1  choice of drugs for their patients.
2  BY MS. GARBER:
3    Q    Is it limited to drugs?
4    A    It is in -- in terms of payments?  No, I
5  think that even if you go and you have a meal or
6  something, then the company reports that as the cost
7  associated with you attending a meeting.
8    Q    So the purpose is to inform patients of
9  any undue influence between the physician by
10 industry that may affect your medical care and
11 treatment of that patient; correct?
12       MS. CURRY:  Object to the form.
13       THE WITNESS:  No, I don't believe that's
14 what I said.  It's the potential.  There have been
15 some studies that have shown that if physicians are
16 reimbursed for issuing certain drugs or certain
17 perhaps medications for patients and they're
18 collecting money from those companies, that it may
19 influence their choices.  But it's a potential; it's
20 not necessarily a given, as you just stated.
21 BY MS. GARBER:
22    Q    There is potential for undue influence on
23 patient care; correct?
24       MS. CURRY:  Object to the form.
25       THE WITNESS:  There's potential for undue

Page 33

1  influence on the choices of medications that
2  physicians may prescribe.
3  BY MS. GARBER:
4    Q    It's limited only to undue influence on
5  prescriptions that physicians may give, it's not
6  limited, it's not concerned for undue influence on
7  medical care in general, Dr. Saenz?
8       MS. CURRY:  Object to the form.
9       THE WITNESS:  So my understanding of the
10 published peer-reviewed literature on this topic is
11 that it's limited to physicians making choices about
12 prescription medications.
13 BY MS. GARBER:
14    Q    Okay.  Tell me about your understanding
15 of the reporting attendant to the physician's
16 payment under the act.  Who does the reporting, the
17 physician or the industry manufacturer?
18       MS. CURRY:  Object to the form.
19       THE WITNESS:  I don't really know the
20 nuances of that.  I do know that if I receive a
21 payment from a company, that that is reported on
22 that website.  But there are inaccuracies in that
23 reporting.  There are methods for physicians to
24 query into if they feel that the reporting has been
25 in error.

Cheryl Saenz, M.D.

Page 34

1    So I can't honestly tell you how the
2 reporting happens. I just know that I don't do the
3 reporting. I believe it's the pharmaceutical
4 company, but I don't really know. I have no
5 personal knowledge of how that happens.
6 BY MS. GARBER:
7    Q    Do you know if Johnson & Johnson
8 disclosed the money that they paid you attendant to
9 your expert work in this case?
10    MS. CURRY: Object to the form.
11    THE WITNESS: I don't know.
12 BY MS. GARBER:
13    Q    Did you go and look on the website to see
14 if that's disclosed?
15    A    No, I have not.
16    Q    You said that you know that you've made
17 about 30,000 in 2018. Did you see that that
18 included any payments from Johnson & Johnson?
19    MS. CURRY: Object to the form.
20    THE WITNESS: No.
21    MS. CURRY: Misstates the testimony.
22    THE WITNESS: I believe I told you that
23 was payments from Genentech and Merck specifically.
24 So I have not been on the website. I have no idea
25 what's reported for me on the website.

Page 35

1 BY MS. GARBER:
2    Q    You did work for Johnson & Johnson in
3 2017; correct?
4    A    Yes.
5    Q    Did you look at the website to see what
6 the disclosure was of your payments in 2017?
7    A    No.
8    MS. CURRY: Object to the form.
9    THE WITNESS: I've not been on the
10 website.
11 BY MS. GARBER:
12    Q    Okay.
13    (C. Saenz Exhibit 1 was marked for
14    identification.)
15 BY MS. GARBER:
16    Q    As Exhibit 1, Doctor, I will represent to
17 you that the -- this document I obtained from the
18 Openpaymentsdata.cms.gov website for the physician
19 profile of Cheryl Saenz.
20    Do you see that by turning to page two of
21 this document?
22    A    Okay.
23    Q    Doctor, on the first page, I printed out
24 the payment type definitions. Do you see that?
25    A    Yes.

Page 36

1    Q    Do you see under the term "general" that
2 it indicates payments that are not associated with
3 any research study?
4    A    Yes.
5    Q    So that is the type -- that is a type of
6 payment; correct?
7    MS. CURRY: Object to the form.
8    THE WITNESS: That's what it says on the
9 piece of paper.
10 BY MS. GARBER:
11    Q    If we turn to the second page in, it
12 indicates your name; correct?
13    A    Yes.
14    Q    Does that indicate your business address,
15 3855 Health Sciences Drive?
16    A    Yes.
17    Q    That's your work address; correct?
18    A    That's one of my work addresses.
19    Q    This is for -- what's your other work
20 address?
21    A    9300 Campus Point Drive, 200 West Arbor
22 Drive. There's -- UCSD has many facilities.
23    Q    Is this your primary office?
24    A    This is where my academic office is, yes.
25    Q    In connection with University of

Page 37

1 California San Diego; correct?
2    A    Correct.
3    Q    So it looks like this is a disclosure of
4 a payment from the year 2013; correct?
5    MS. CURRY: Objection to the form.
6    THE WITNESS: It's a listing of a general
7 payment in the year 2013, correct.
8 BY MS. GARBER:
9    Q    All right. If you go under about midway
10 through the page, it says "general payments";
11 correct?
12    A    (No audible response.)
13    Q    Right above the amount?
14    A    Yes.
15    Q    It indicates that you received general
16 payments in the amount of 3,151.88; correct?
17    A    Correct.
18    Q    That was listed above the national mean
19 by about $1,500; correct?
20    A    Correct.
21    Q    If we turn to what is listed at the
22 bottom, page one of three, it gives us the
23 manufacturer who made that payment here: Merck,
24 Sharp & Dohme; correct?
25    MS. CURRY: I'm sorry.

Cheryl Saenz, M.D.

Page 38

1    THE WITNESS: I don't have page numbers.
2  BY MS. GARBER:
3    Q   If you look at the right-hand corner?
4    A   There's no page numbers.
5    Q   Can you go one page in.
6    A   There's no page numbers.
7    Q   All right. If you turn four pages in, do
8  you see that the manufacturer was Merck, Sharp, &
9  Dohme who made that payment of 3,100?
10   A   Are you referring to this bar graph?
11   Q   Yes.
12   A   At the bottom?
13   Q   Yes.
14   A   Yes.
15   Q   Then if you go a couple pages further, we
16 come to the payments you received in 2014. Do you
17 see that?
18   A   Yes.
19   Q   There you received general payments in
20 the amount of $25,751.41; is that correct?
21   A   Correct.
22   Q   And there this is above the national mean
23 for physicians by amount of 22,000-some dollars;
24 correct?
25   A   Correct.

Page 39

1    Q   The bar, so we understand the nature of
2  this document, the bar graph at the bottom is
3  showing the national average for physicians, and
4  then the sliding scale there with the person showing
5  what you made, $25,000, which is off to the right
6  above the national average, is that a fair
7  understanding of what that means?
8    A   That's what the picture shows.
9    MS. CURRY: Object to the form.
10   THE WITNESS: I don't necessarily know
11 what the intent of that is, but that's what the
12 picture shows.
13 BY MS. GARBER:
14   Q   Okay. And going a couple of pages back,
15 we see for 2014 that you were paid by the industry
16 manufacturers Genentech and Merck, Sharp & Dohme;
17 correct?
18   A   Correct.
19   Q   If we go a couple more pages forward, we
20 come to the year 2015. Are we there?
21   A   Yes.
22   Q   In 2015, you made $47,095.28; correct?
23   A   According to this. But I want to qualify
24 something here.
25   Q   Doctor, I didn't have a question pending.

Page 40

1    A   But you asked me for my explanation --
2    MS. CURRY: I'm sorry.
3    THE WITNESS: -- of what these payments
4  are --
5  BY MS. GARBER:
6    Q   Do you understand that we're here, I'm
7  asking you questions and you're answering them,
8  Doctor?
9    A   I'm trying --
10   MS. CURRY: She tried to clarify.
11   MS. GARBER: You answered my question and
12 there was no question pending, but go ahead.
13   THE WITNESS: I want to clarify
14 completely, because you had me skip past several
15 pages that actually talk about what some of these
16 payments are for. And some of these payments are
17 for travel expenses to the venue. Some of these
18 payments are for food and beverage that was consumed
19 at these.
20   So they're not all just payments. I just
21 want to make sure we're clarifying exactly what
22 these monies are. They're not all just payments.
23 BY MS. GARBER:
24   Q   Okay, Doctor. The total that you were
25 paid by these medical manufacturers in the year of

Page 41

1  2015 was $47,095.28; true or false?
2    MS. CURRY: Object to the form.
3    THE WITNESS: So the total payments I
4  received include reimbursements as well as payments
5  for giving a talk. So I think it's important to be
6  complete in what we're looking at.
7    MS. GARBER: Fair enough.
8  BY MS. GARBER:
9    Q   And, Doctor, if you turn a few pages more
10 we come to 2016. Are you there?
11   A   No. Okay.
12   Q   There you were paid $15,606.79, which is
13 above -- again above the national mean by
14 physicians; correct?
15   A   That's what the picture shows; yes.
16   Q   We go a couple pages back, we see that
17 the medical manufacturers that paid you in 2016 were
18 again Genentech and Merck Sharp; is that true?
19   A   Couple pages back or a couple pages
20 forward?
21   Q   I'm sorry, forward.
22   A   Yes, that's correct.
23   Q   Now let's get to 2017. This document
24 reflects that in 2017, you were paid $31,060.06;
25 correct?

Cheryl Saenz, M.D.

Page 42

1    A    I received payments in that amount;
2  correct.
3    Q    If we go a couple pages forward, we see
4  the listing of the same medical manufacturers,
5  Genentech and Merck Sharp, who made that payment;
6  correct?
7    A    Correct.
8    Q    Doctor, does this reflect the money that
9  you made from Johnson & Johnson in 2017?
10    A    It doesn't appear to.
11       MS. CURRY:  Object to the form.
12  BY MS. GARBER:
13    Q    Does it reflect the roughly 300 and some
14  thousand dollars that you earned with regard to
15  talcum powder products from Johnson & Johnson?
16       MS. CURRY:  Object to the form.
17       THE WITNESS:  Well, in 2017, I didn't
18  make 300,000 and something, but in 2017 in this
19  particular document that you've handed me, there
20  doesn't seem to be any notation about the monies
21  that I did make from Johnson & Johnson.
22  BY MS. GARBER:
23    Q    How much money did you make from Johnson
24  & Johnson in 2017?
25    A    I don't actually know the breakdown.

Page 43

1    Q    What's your best estimate?
2       MS. CURRY:  Object to the form.
3       THE WITNESS:  I'd be guessing.
4  BY MS. GARBER:
5    Q    We don't want you to guess, but your best
6  estimate?
7    A    I'd be guessing.  I only know --
8    Q    Is it more than 100,000?
9       MS. CURRY:  Object to the form.
10       THE WITNESS:  I think it might be
11  slightly more than 100,000.
12  BY MS. GARBER:
13    Q    Thanks.  So as I went through this group
14  of documents, it looks like it adds up to over
15  $100,000 spanning from 2013 to 2017; correct?
16    A    Well, it's through 2017, so that's five
17  years, yes.
18    Q    Then you told me that you thought you had
19  looked at 2018 CMCS and had seen that you had made
20  another $30,000?
21       MS. CURRY:  Object to the form, misstates
22  the testimony.
23       THE WITNESS:  So that's not what I said
24  at all.  I specifically told you that I've not
25  looked at the website, but that my recollection is

Page 44

1  that I earned about $30,000 in income from Merck and
2  Genentech.  But I've actually never looked at this
3  website, never seen any of these documents until you
4  showed me this today.
5  BY MS. GARBER:
6    Q    Okay.  I'm not showing you documents from
7  2018 because they're not on the website.  Okay?
8    A    Good to know.
9    Q    All right.  Do physicians receiving
10  substantial sums of money from the medical industry
11  have an obligation to disclose those transactions --
12       MS. CURRY:  Object --
13       MS. GARBER: -- to their patients?
14       MS. CURRY:  Object to the form.
15       THE WITNESS:  With respect to what
16  exactly?
17  BY MS. GARBER:
18    Q    Do they have an obligation to disclose to
19  their patients that they have been paid by medical
20  manufacturers in general, we'll start there?
21       MS. CURRY:  Object to the form.
22       THE WITNESS:  So in general, I don't
23  think there is a general obligation to make such a
24  disclosure unless the particular product or
25  medication that you were discussing with a patient

Page 45

1  is from a company that you have received monies
2  from.
3       So for example, if I'm discussing with a
4  patient whether or not she should get the Gardasil
5  vaccine, I actually do tell patients that I speak on
6  behalf of the Gardasil vaccine and that I am paid
7  for such talks.
8  BY MS. GARBER:
9    Q    What is the reason that you should do
10  that?
11    A    So that there's transparency.  So that
12  patients know that you may actually have information
13  that could potentially bias you towards making such
14  a recommendation.  But I think that patients knowing
15  that are able to make an informed consent as to
16  whether or not they want to go ahead and pursue
17  whatever is your recommendation.
18    Q    Do you tell each and every patient that
19  you care for your work that you're doing for Johnson
20  & Johnson in connection with this litigation?
21    A    So I don't tell each and every patient
22  because I don't think it's influential in each and
23  every patient.  I only tell patients if specifically
24  they ask me questions about talc.
25    Q    Have you ever written a paper on this

Page 46

1  topic, Doctor?
2        MS. CURRY:  Object to the form.
3        THE WITNESS:  What topic are we
4  discussing now?
5  BY MS. GARBER:
6    Q   Disclosing payments from medical
7  manufacturers and the importance of that?
8    A   No, I have not.
9        (C. Saenz Exhibit 2 was marked for
10        identification.)
11  BY MS. GARBER:
12    Q   I'll mark as Exhibit 2 a paper.  It
13  indicates original research and it's titled
14  "Industry Payments to Obstetrician Gynecologists and
15  Analysis of 2014 Open Payments Data."
16        Did I read that title correctly?
17    A   Yes.
18    Q   Are you listed as an author?
19    A   As a coauthor; yes.
20    Q   So do you now believe that you have
21  published in this area?
22    A   I don't believe this is about disclosure.
23  This is about the payments that are being received.
24        So the actual disclosure to patients and
25  that as a topic is not actually what the topic of

Page 47

1  this paper is.
2    Q   What is the topic of this paper?
3    A   The topic of this paper is taking a look
4  at what kind of monies physicians are earning from
5  industry.
6    Q   Okay, well, let's go through some of
7  this.  On the first page, in the right-hand column
8  about three quarters of way down, do you see the
9  sentence that begins the Physician Payments Sunshine
10  Act?
11    A   Yes.
12    Q   And that's what we were talking about
13  earlier; correct?
14    A   Correct.
15    Q   And there it defines the physician
16  sunshine Act that was passed in 2014; correct?
17    A   Correct.
18    Q   It says --
19    A   Actually, it's 2010.
20    Q   I'm sorry, I misspoke.  In 2010.  It
21  indicates that the Physician Payments Sunshine Act
22  was passed in 2010 as part of the Affordable Care
23  Act and it mandates that medical manufacturers
24  report financial relationships in the form of
25  payments made to physicians and teaching hospitals,

Page 48

1  and to centers for Medicare and Medicaid service.
2        Did I read that correctly?
3    A   Yes.
4    Q   If you turn to page 377, in the left-hand
5  column, last -- near the top, the paragraph that
6  begins, "the primary objective."
7        Do you see that?  It's near the top on
8  the left-hand column?
9    A   Yes.
10    Q   It indicates as to your secondary
11  objective, it was to "promote awareness of published
12  payments to encourage OB-GYNs to participate in
13  disclosure of their fiscal relationship to patients
14  and to make an active role in maintaining accuracy
15  of their payment data."
16        Did I read that correctly?
17        MS. CURRY:  To take an active role.
18        THE WITNESS:  No, you transposed "take"
19  to "make."
20  BY MS. GARBER:
21    Q   Okay.  To take an active role in
22  maintaining accuracy of their payment date?
23    A   Correct.
24    Q   Have I read that correctly now?
25    A   Yes.

Page 49

1    Q   If you turn to page 381; okay?
2        Under the discussion section, do you see
3  is the sentence beginning "according to the
4  recommendations"?
5    A   No.
6    Q   It's about three quarters of the way
7  down?
8    A   Okay.
9    Q   It reads, "according to the
10  recommendations by the college's ethics committee,
11  physicians receiving substantial sums of money from
12  the medical industry have a particular obligation to
13  their patients to disclose these transactions, and
14  to discuss their effects on clinical decision
15  making."
16        Did I read that correctly?
17    A   Yes.
18    Q   That's the obligation under the ethics;
19  correct?
20    A   Right.
21    Q   If we go over to the right-hand side,
22  about halfway down on page 381, do you see the
23  sentence which begins "a large part"?
24    A   Yes.
25    Q   "A large part of this uncertainty is the

Page 50

1  result of the complexities involved in defining and
2  identifying when clinical integrity is compromised
3  by physical relationships with industry."
4        Did I read that correctly?
5    A   No, you did not.
6    Q   Fiscal.  Sorry.  I said physical, didn't
7  I. Fiscal relationships with industry.
8        Did I read that correctly?
9    A   Yes.
10   Q   Then it goes on to say, "perhaps the
11 final important conclusion to be made from this work
12 is that physicians have an opportunity to play
13 crucial roles in promoting transparency and managing
14 conflicts of interest.  By discussing industry
15 payments with patients and in maintaining accuracy
16 of posted information, doctors can help maximize the
17 beneficial effects of disclosure and avoid
18 inappropriate influence."
19       Did I read that correctly?
20   A   Yes.
21   Q   Do you agree with that?
22   A   Completely.
23   Q   You wrote that, didn't you?
24   A   Along with the other authors in this
25 paper.

Page 51

1    Q   Finally, at the end of this paper, it
2  reads, "ongoing involvement from both physicians and
3  medical industry will ensure reliable data are made
4  available to the public."
5        Did I read that correctly?
6    A   Yes.
7    Q   So both parties have an obligation, the
8  physician and the manufacturer, to be sure that
9  there is disclosure of the payments so that patients
10 are informed as to whether or not their physician
11 has a potential conflict of interest; true?
12       MS. CURRY:  Object to the form.
13       THE WITNESS:  Both parties don't have an
14 obligation to post information on the website.
15       MS. GARBER:  I didn't say that, Doctor.
16       THE WITNESS:  Ma'am, you said both
17 parties have an obligation, and the obligation of
18 the pharmaceutical company is to post the
19 information to the website.
20       My obligation is to disclose when I have
21 a potential conflict of interest to my patients, and
22 I do that.
23 BY MS. GARBER:
24   Q   And, Doctor, in this paper, you wrote,
25 that both parties have an obligation to be sure that

Page 52

1  those payments are posted.
2    A   Where are you reading from again?
3    Q   (No audible response.)
4    A   Ma'am, where are you reading from?
5    Q   I'm looking for it.  Hold on, please.
6        On the right-hand column on 381, it says,
7  "by discussing industry payments with patients and
8  in maintaining accuracy of the posted information,
9  doctors can help maximize the benefits"?
10   A   Right.  And I do discuss payments with my
11 patients for anything that comes up that actually
12 has to do with the agents involved in the reason
13 that I receive those payments.
14   Q   Doctor, are you making $1,200 here today
15 from Johnson & Johnson in connection with your
16 deposition?
17   A   No.
18   Q   How much are you making an hour?
19   A   1,200 an hour.
20   Q   Does UCSD know that you're doing expert
21 work on behalf of Johnson & Johnson?
22   A   Yes.
23   Q   In connection -- I'm sorry.  In
24 connection with the talcum powder product
25 litigation?

Page 53

1    A   Yes, they do.
2    Q   Are you aware that the United States
3  Senate is investigating whether or not Johnson &
4  Johnson lied about asbestos being in the products?
5        MS. CURRY:  Object to the form.
6        THE WITNESS:  So I'm aware that --
7  basically through the nightly news that there's an
8  investigation as to whether or not there actually
9  was some knowledge as to whether or not asbestos was
10 in the baby powder litigation, but other than that,
11 other than what's reported on the nightly news, I'm
12 not aware of what specific agency is investigating,
13 no.
14 BY MS. GARBER:
15   Q   Have you seen any written media coverage.
16 You said the nightly news.  Have you seen any
17 newspaper articles?
18   A   No.
19       MS. SHARKO:  Is this the one where your
20 expert testified?
21 BY MS. GARBER:
22   Q   Your report in this case indicates that
23 you served as chair of the Moores UCSD cancer
24 center; is that correct?
25   A   No.

Cheryl Saenz, M.D.

Page 54

1    Q    You --
2    A    That's not correct.
3    Q    I thought I read that -- what is your
4  connection with the Moores UCSD cancer center?  What
5  is your involvement?
6    A    I'm a faculty physician there.
7    Q    You haven't been chair of the department?
8    A    No, and I didn't put that in my report.
9  That's inaccurate.
10    Q    When were you first retained by Johnson &
11  Johnson in connection with this litigation?  What
12  was the very first date as you remember it?
13        MS. CURRY:  Object to the form.  Just to
14  clarify for the record, do you mean any talcum
15  powder product litigation or the MDL?
16        MS. GARBER:  No, any talc powder
17  litigation.
18        THE WITNESS:  Any talcum powder
19  litigation?  November of 2016.
20  BY MS. GARBER:
21    Q    How was it that you were retained in this
22  matter?
23        MS. CURRY:  Object to the form.
24        THE WITNESS:  I was -- I have a vague
25  recollection of receiving a phone call and asking if

Page 55

1  I knew of the purported risks of developing ovarian
2  cancer associated with the uses of perineal talc and
3  whether or not I would be interested in reviewing
4  more of the literature than I had already reviewed
5  and giving opinions on that particular topic.
6  BY MS. GARBER:
7    Q    Who approached you first?
8    A    I think I received a phone call from a
9  gentleman named Brian Lee.
10    Q    Did you know Mr. Lee prior to that phone
11  call?
12    A    No.
13    Q    Did he offer any opinions about perineal
14  talc and risk of ovarian cancer?
15        MS. CURRY:  I'm sorry, I'm going to
16  instruct you not to disclose any communications with
17  counsel.
18  BY MS. GARBER:
19    Q    Did you understand Mr. Lee to be a
20  lawyer?
21    A    I don't honestly recall that I knew that.
22  I knew that he was from a law firm, but I don't know
23  if he was a paralegal or a legal.  But I knew he was
24  in a law firm.
25        MS. CURRY:  I can stipulate that Brian

Page 56

1  Lee is a partner with my law firm.
2  BY MS. GARBER:
3    Q    So when you were first retained, you
4  indicated you had already reviewed some
5  literature -- you had already been aware of some
6  literature with regard to perineal talc and risk of
7  ovarian cancer; is that true?
8    A    Correct.
9    Q    What literature was that?
10    A    I don't recall specifically, but it
11  wasn't the first time that I had heard about the
12  issue of a possible association between the use of
13  perineal talc and the development of ovarian cancer.
14    Q    Were you consequently sent some
15  literature?
16        MS. CURRY:  Object to the form.
17        THE WITNESS:  I was sent a flash drive
18  with some articles on it.
19  BY MS. GARBER:
20    Q    Did you conduct your own research?
21    A    At what point?
22    Q    At that point.  When you were retained,
23  did you conduct your own research for medical
24  articles or did you rely on the lawyers to give you
25  that literature?

Page 57

1    A    Oh.  I mean, over the time course of
2  researching the issue, I conducted my own research
3  as well.
4    Q    Do you still have that flash drive?
5    A    I don't think so.
6    Q    By the way, do you have a file in this
7  case?
8        MS. CURRY:  Object to the form.
9        THE WITNESS:  What do you mean by a
10  "file"?
11  BY MS. GARBER:
12    Q    What's your understanding of the word
13  "file"?
14    A    Like a shadow file?
15    Q    Do you have any kind of file in
16  connection with your work in this case?
17    A    No.  I have my report and I have the
18  articles that I've used to read about the issues.
19    Q    Where are those articles?
20    A    On my computer.
21    Q    You don't have any printed articles?
22    A    No.
23    Q    Not one?
24    A    Not one.
25    Q    In connection with writing your expert

Cheryl Saenz, M.D.

| Page 58 |
| --- |

report in this case, did you make any notes?

2    A    So as I was reading plaintiffs' reports
and depositions, I would make notes on the computer
for statements of the experts that I would want to
make comments on in order to incorporate it into my
report. But it was basically my report outline of
things that I wanted to incorporate, but that is my
report.

9    Q    Did you produce those notes that you made
when you were reviewing expert reports and the like?

11        MS. CURRY: Object to the form.

12        THE WITNESS: No, it's the draft of my
report. So it is my report. So I mean, I have
produced it, but that's my report.

15 BY MS. GARBER:

16    Q    So when you were making notes about a
given deposition, you were making a note of that on
your computer and now it's your testimony that
became your expert report?

20    A    Right. I make a note, I'd say for
example, oh, there's something on page nine of this
person's thing, and put it in there. And then
when -- I'd skip some pages, write some more, come
back to that. So that it was there in the report as
I was drafting the report.

| Page 59 |
| --- |

1    Q    Did you write every word of your expert
report, and when I say "expert report," I'm meaning
the MDL report dated February 25th, 2019.

4    A    Did I write every word? Absolutely.

5    Q    Do you have any drafts or copies or
notes?

7        MS. CURRY: Object to the form.

8        THE WITNESS: Of?

9 BY MS. GARBER:

10    Q    Of your report.

11    A    No. I mean, it was an evolving process
that just kept getting morphed every time I would
add to it.

14    Q    You said you reviewed the literature
online. Did you make any highlights electronically
of that literature?

17    A    No.

18    Q    Or notes?

19    A    No.

20    Q    How was it that you tracked what you
wanted to recall or remember or note about a given
piece of literature?

23    A    So I'd go to the article itself, I'd
highlight it, and you can snapshot that paragraph or
whatever and then put it into my report so that I

| Page 60 |
| --- |

could make sure that I could read it and capture the
essence of what it was that I was trying to point
out.

4        Sometimes if it was just numbers, I'd
have the report open, and then I'd have the article
open at the same time and I'd be reading it as I
would type my report.

8    Q    Okay. You understand that Johnson &
Johnson is the manufacturer of baby powder products
and formerly Shower to Shower talcum powder product;
correct?

12    A    That's my understanding.

13    Q    You're aware that women use defendant's
talcum powder products for feminine hygiene?

15        MS. CURRY: Object to the form.

16        THE WITNESS: I mean, I don't know that I
would say feminine hygiene. I would say I know that
they do put on it their perineum or on their bodies,
on their groins, in different parts. So yes.

20 BY MS. GARBER:

21    Q    What's your understanding of why women
put talcum powder product on their genitals?

23        MS. CURRY: Object to the form.

24        THE WITNESS: I think it's variable.

25 ///

| Page 61 |
| --- |

1 BY MS. GARBER:

2    Q    What's your understanding of some of the
reasons?

4    A    I think some women do it because they
like the softness. I think some women do it because
they like the fragrance. I think some women do it
because they are sweaters and they want to try to
stay dry. I think there are various uses.

9    Q    Do you have any first-hand information
about the manner in which women use it, the manner
in which they apply it, the amount, the nature of
how it's applied?

13        MS. CURRY: Object to the form.

14        THE WITNESS: I don't really know what
you mean.

16        MS. GARBER: Sure.

17 BY MS. GARBER:

18    Q    You don't -- you don't have any firsthand
information about the way in which women applied it;
in other words, did they shake it on their hands,
did they shake it directly on their genitals, did
they apply it to toilet paper and then apply it.

23        In other words, you don't have any of
these details, do you?

25        MS. CURRY: Object to the form.

Cheryl Saenz, M.D.

Page 62

1    THE WITNESS: Firsthand?
2    MS. GARBER: Yes.
3    THE WITNESS: I disagree.
4  BY MS. GARBER:
5    Q    You do?
6    A    Uh-huh.
7    Q    What's your firsthand knowledge?
8    A    I've used it.
9    Q    Okay. Besides yourself.
10    A    But that is firsthand knowledge.
11    Q    All right. You don't have any firsthand
12  knowledge of how other women use it, do you?
13    MS. CURRY: Object to the form.
14    THE WITNESS: I have not personally
15  watched another woman apply baby powder to herself,
16  that is correct.
17  BY MS. GARBER:
18    Q    And the literature, the epidemiological
19  literature does not describe the way in which it was
20  applied, and in that regard, I mean was it applied
21  to the hand, was it applied to tissue, doesn't give
22  that kind of detail, how much was applied at any
23  given time?
24    MS. CURRY: Object to the form.
25    THE WITNESS: So I've not read anything

Page 63

1  that talks about how many shakes, but there are
2  certainly studies that talk about women applying it
3  to diaphragms or women applying it to their perineum
4  or women applying it to their sanitary napkins.
5    I do believe that many of the studies
6  have looked at and asked those questions. But in
7  terms of an in-depth analysis of what constitutes a
8  dose per se and how many shakes, no, I'm not aware
9  of that.
10  BY MS. GARBER:
11    Q    Are you aware of data that indicates
12  there are women -- there are women now with ovarian
13  cancer who used talc on their genitals in the 1950s,
14  60s, and early 70s?
15    MS. CURRY: Object to the form.
16    THE WITNESS: Can you say that again?
17  BY MS. GARBER:
18    Q    Sure. Are you aware of data that
19  indicates there are women now with ovarian cancer
20  that used genital talc in the 1950s, 60s, and early
21  70s?
22    MS. CURRY: Same objection.
23    THE WITNESS: So I'd have to kind of do
24  like a retrospective time point. I do believe that
25  if we look at some of the studies that were

Page 64

1  published in, say, 2000, 2010, knowing that on
2  average women used baby powder for at least 20 years
3  when they were users, that if somebody was diagnosed
4  with ovarian cancer in 2000, that most likely she
5  would have used it in the 70s or 80s.
6    So I do believe that that's the case.
7  BY MS. GARBER:
8    Q    So the point is women were exposed to
9  Johnson & Johnson baby powder products in the 50s,
10  60s, and 70s and have ovarian cancer; correct?
11    MS. CURRY: Object to the form.
12    THE WITNESS: I do believe that there
13  were some women that probably used it then and then
14  had ovarian cancer in later years; yes.
15  BY MS. GARBER:
16    Q    Let's talk about talcum powder product.
17  You understand that Johnson & Johnson's baby powder
18  and Shower to Shower are talcum powder products;
19  correct?
20    A    I believe that one of the constituents of
21  each of those products is talcum powder; correct.
22    Q    And in your report, when you use the word
23  "talc," what do you mean?
24    A    Baby powder products.
25    Q    And do you make an assumption that within

Page 65

1  Johnson & Johnson's talcum powder products there is
2  no asbestos?
3    A    I don't believe that what's the
4  constituents of the baby powder actually matters to
5  my opinion. My opinion is the same regardless,
6  because I do believe that if there is a risk of
7  developing ovarian cancer with the use of talc,
8  regardless of what's in that -- in that product,
9  there would be an increased risk of developing
10  ovarian cancer, borne out in the literature.
11    Q    Doctor, my question was a little
12  different. Do you make assumptions about the
13  constituents of Johnson & Johnson talcum powder
14  products when you render your opinions in your
15  expert report?
16    MS. CURRY: Object to the form.
17    THE WITNESS: No, I don't make any
18  assumptions.
19  BY MS. GARBER:
20    Q    Is it your opinion that Johnson & Johnson
21  baby powder products do not contain talc -- sorry,
22  do not contain asbestos?
23    A    So I'm going to defer to the experts that
24  are mineralogists or geologists to make that
25  analysis. My opinion is that baby powder products

Page 66

1  do not increase the risk of developing ovarian
2  cancer, regardless of what the constituent products
3  are in that product.
4        MS. CURRY:  We've been going for an hour.
5  So when it's a good time to break, we'd like to take
6  one.
7        MS. GARBER:  Sure.  Just want to follow
8  up.
9  BY MS. GARBER:
10   Q   So as to the constituents of the talcum
11  powder products, and what was or wasn't constituting
12  the constituents, you are going to defer to experts
13  in other areas; is that true?
14        MS. CURRY:  Object to the form.
15        THE WITNESS:  With respect to the
16  chemical composition of the product; yes.  But not
17  with respect to the opinion that baby powder is not
18  associated with an increased risk of developing
19  ovarian cancer.
20  BY MS. GARBER:
21   Q   I understand that.
22        And the same question with regard to the
23  presence of heavy metals, are you going to defer to
24  others as to whether or not Johnson & Johnson's
25  talcum powder products contained heavy metals?

Page 67

1    A   Yes.
2    Q   Same question with regard to fragrances,
3  are you going to defer to others with regard to
4  whether Johnson & Johnson's talcum powder products
5  contained fragrances that may have been toxic or
6  carcinogens?
7        MS. CURRY:  Object to the form.
8        THE WITNESS:  So I'm not going to defer
9  that the product itself is associated with an
10  increased risk of developing ovarian cancer, meaning
11  the baby powder.  But if there are constituent
12  fragrances in that product, I'm going to defer to
13  somebody whose analysis of the chemical composition
14  of that product is their field of expertise.
15  BY MS. GARBER:
16   Q   So you know in looking at the label,
17  there's fragrance in the bottle; right?
18    A   Well, it smells good, yeah.
19    Q   It says that.  And so what those
20  fragrances constitute and whether or not they are
21  toxic or carcinogenic, you're going to defer to
22  experts in that regard; is that true?
23    A   No, that's not true.  Because if those
24  fragrances were toxic or carcinogenic, then the
25  literature that is evaluating whether or not baby

Page 68

1  powder is associated with developing ovarian cancer
2  would be borne out as showing a risk between
3  developing ovarian cancer in the use of the product.
4        What those individual constituents are,
5  I'm going to defer that analysis.  But the opinion
6  that the baby powder as it stands with the
7  fragrances, with whatever else is in it, does not --
8  is not associated with an increased risk of
9  developing ovarian cancer.  I stand by that as my
10  opinion.
11   Q   And the last question and then we'll
12  break.  Same with regard to fibrous talc, are you
13  going to defer to experts as to whether or not
14  Johnson & Johnson's talcum powder products contained
15  fibrous talc?
16        MS. CURRY:  Object to the form.
17        THE WITNESS:  Yes.
18        MS. GARBER:  Thanks.  Let's take a break.
19        THE VIDEOGRAPHER:  The time is now 10:32.
20  Going off the record.
21     (Break in the deposition taken at 10:33 a.m.)
22              0o0
23     (The deposition resumed at 10:48 a.m.)
24              0o0
25        THE VIDEOGRAPHER:  Time is now 10:47.

Page 69

1  Back on the record.
2  BY MS. GARBER:
3    Q   Doctor, are you aware that Johnson &
4  Johnson enjoys about a 70 percent market share of
5  talcum powder products?
6        MS. CURRY:  Object to the form.
7        THE WITNESS:  I don't have any knowledge
8  of what their market share is.
9  BY MS. GARBER:
10   Q   Do you know -- you understand what a risk
11  benefit assessment is in the context of medicine;
12  right?
13    A   In the context of medicine?
14    Q   Uh-huh.
15    A   I've done risk benefit analyses, sure.
16    Q   You're aware that there's no health
17  benefits for women to use defendant's talcum powder
18  products on their genitals, aren't you?
19        MS. CURRY:  Object to the form.
20        THE WITNESS:  I don't agree with that.
21  BY MS. GARBER:
22    Q   You think there's medical benefits?
23    A   I do.
24    Q   Okay.  You've seen literature that --
25  peer-reviewed published literature that indicates

Cheryl Saenz, M.D.

|  | Page 70 |
| --- | --- |

1 there's no medical benefits, haven't you?
2 　　　MS. CURRY: Object to the form.
3 　　　THE WITNESS: No, I have not.
4 BY MS. GARBER:
5 　　Q　What were the medical benefits?
6 　　A　So there are some women that sweat a lot,
7 and because they sweat, they can get candidal
8 infections. And so some women like to apply baby
9 powder products to their genital area to decrease
10 the sweat so that they don't get candidal infection.
11 　　Q　If there's a medical benefit, then talcum
12 powder is a medicine; right?
13 　　A　No. Patients use talcum powder in order
14 to decrease the amount that they're sweating and
15 that can result in them getting fewer candidal
16 infections. It doesn't mean that it's a medicine.
17 　　Q　You understand that if there's medical
18 benefits and patients are using it for medical
19 purposes, then talcum powder isn't a cosmetic, but
20 rather a medicine by way of regulatory oversight?
21 　　Do you understand that?
22 　　　MS. CURRY: Object to the form.
23 　　　THE WITNESS: No. I don't agree with
24 that. What you asked me is if patients use it for
25 any sort of medical benefit. It's not dispensed as

|  | Page 71 |
| --- | --- |

1 a medicine. It's not prescribed as a medicine. But
2 women do use it in order to absorb whatever sweat
3 they may have so that they don't get candidal
4 infections or they don't have discomfort in the
5 genital area from their sweat.
6 BY MS. GARBER:
7 　　Q　Have you ever prescribed talcum powder
8 products to your patients for medical benefit?
9 　　A　I've prescribed Nystatin powder, which
10 does contain talc, to my patients, which does have a
11 medical benefit of treating candidal infections.
12 　　Q　That is a medication; correct?
13 　　A　That's a medication.
14 　　Q　Talcum powder products are not?
15 　　A　So Nystatin powder does contain talc, so
16 that is a talcum powder product.
17 　　Q　Nystatin powder is a medicine?
18 　　A　Nystatin powder is a medicine.
19 　　Q　Johnson & Johnson baby powder products
20 are not a medicine?
21 　　A　That's correct.
22 　　Q　What is your definition of the phrase
23 "latency period" in the context of ovarian cancer?
24 　　A　Latency period would be the time from --
25 when we're talking about perhaps exposures to any

|  | Page 72 |
| --- | --- |

1 particular agent, it would be the time from the
2 exposure to the development of the disease.
3 　　Q　So in the context of the talcum powder
4 product litigation, from the exposure to Johnson &
5 Johnson's talcum powder products to the diagnosis of
6 ovarian cancer?
7 　　　MS. CURRY: Object to the form.
8 　　　THE WITNESS: Well, I didn't say the
9 diagnosis. I said the development of the disease.
10 BY MS. GARBER:
11 　　Q　So when you say development, what do you
12 mean? How do you know when the disease developed in
13 the context of ovarian cancer?
14 　　A　So we don't necessarily know when it
15 starts. We do know that ovarian cancer goes through
16 various stages and you can diagnose it at various
17 stages. Sometimes we catch it at stage 1, sometimes
18 we catch it at stage 4.
19 　　But in the general context of what a
20 latency period is, it's from the time of exposure to
21 the development of the disease.
22 　　Q　In the context of cohort studies, it's
23 from -- the latency period is from the point of
24 exposure to the point of diagnosis of the disease,
25 isn't it?

|  | Page 73 |
| --- | --- |

1 　　　MS. CURRY: Object to the form.
2 　　　THE WITNESS: So in the cohort studies;
3 yes, I think that's probably accurate.
4 BY MS. GARBER:
5 　　Q　There are peer-reviewed published studies
6 showing that ovarian cancer has a long latency
7 period, reporting to be as long as 30 to 40 years,
8 aren't there?
9 　　　MS. CURRY: Object to the form.
10 　　　THE WITNESS: There are some that show
11 that. There are some that show other data.
12 BY MS. GARBER:
13 　　Q　What is your opinion as to the latency
14 period for ovarian cancer?
15 　　A　So I think the literature has shown some
16 periods of 20 to 40 years. Since I don't really
17 know what causes ovarian cancer and therefore I
18 don't really know what is the incipient underlying
19 events that have the cancer develop, I don't really
20 have a specific sense other than to say I think it
21 probably is reasonable that it's somewhere in
22 between 20 to 40 years.
23 　　Q　And that's a range; correct?
24 　　A　That's correct.
25 　　Q　Do you agree with the statement, if

Cheryl Saenz, M.D.

Page 74

1  talcum powder is a potential carcinogen for ovarian
2  cancer, it is likely that there is a long latency
3  period between exposure and development of the
4  disease?
5        MS. CURRY:  Object to the form.
6        THE WITNESS:  As a general statement, I
7  don't know what that word "long" necessarily means,
8  but I think as a general statement I would agree
9  with that statement.
10 BY MS. GARBER:
11    Q    Is it true that for asbestos the latency
12 period is at least 25 years, according to
13 peer-reviewed published studies?
14       MS. CURRY:  Object to the form.
15       THE WITNESS:  So I think in the IARC
16 monograph that looked at heavy occupational exposure
17 of patients to -- I should say subjects -- of
18 subjects to asbestos, there was one study that
19 tracked when the subjects were exposed to the
20 asbestos and then looked at how many years later
21 they were diagnosed with ovarian cancer, and I do
22 believe that range was somewhere between 20 to
23 25 years.
24       However, I think there are a lot of
25 problems with the asbestos studies in general.

Page 75

1  BY MS. GARBER:
2     Q    Did you do a comprehensive literature
3  review of asbestos and ovarian cancer?
4        MS. CURRY:  Object to the form.
5        THE WITNESS:  I read the studies that are
6  listed in the IARC Monograph.
7  BY MS. GARBER:
8     Q    You read each and every one of those
9  studies that's listed in the IARC Monograph?
10    A    Yes, as pertains to asbestos and ovarian
11 cancer.
12    Q    And which monograph are you speaking of?
13    A    The 2012.
14    Q    And how many studies was that, by your
15 recollection?
16    A    So IARC drew their conclusions on the
17 basis of five studies that looked at heavy
18 occupational exposure and the risk of developing
19 ovarian cancer.  There have been other studies after
20 that as well that I have read, including Reed,
21 including Camargo, that looked at the risk of
22 developing ovarian cancer and asbestos exposure in
23 the heavy occupational setting.
24       There also were other studies that looked
25 at environmental exposure and did not find any such

Page 76

1  association.
2     Q    We will turn to that shortly.  But
3  thank you for that.
4        Do you have an opinion, then, as to the
5  latency period for asbestos, and ovarian cancer?
6     A    So again, I don't necessarily agree with
7  IARC's conclusions about developing ovarian cancer
8  with asbestos exposure, but as documented in the
9  articles that IARC cites, the latency period
10 reported is 20 to 25 years.
11    Q    And you mentioned the Camargo paper, you
12 read that one?
13    A    Yes.
14    Q    It's on your reference list?
15    A    Yes.
16    Q    And didn't that study show a
17 statistically -- showed a statistically significant
18 association after 25 years of follow up?
19       MS. CURRY:  Object to the form.  If you
20 need to see the article, I have a copy.
21       THE WITNESS:  Sure.  I'd be happy to take
22 a look at it.
23       MS. GARBER:  Okay.  Well, so first thing
24 we're going to do is we're going to make sure we
25 don't have speaking objections, Ms. Curry.  And I'm

Page 77

1  not going to pull out that article right now.  We'll
2  get to that when I want to get to that.
3  BY MS. GARBER:
4     Q    You've been designated as an expert
5  witness by Johnson & Johnson in the talcum powder
6  product litigation in the MDL; right?
7     A    Yes.
8     Q    You understand that we are here to take
9  your deposition, to get all of your opinions and the
10 bases for those opinions so we can prepare for
11 briefing, hearing, and trial.
12       Do you understand that?
13    A    Yes.
14    Q    Did you see the Notice of Deposition that
15 was served with regard to your deposition?
16    A    Yes.
17    Q    When did you see that?
18    A    I believe last week sometime.
19    Q    Have you -- did you understand that in
20 the Notice of Deposition there was a request for
21 documents for you to bring to today's deposition, or
22 actually to provide five days before today's
23 deposition?  Did you notice that?
24    A    I read the deposition notice and I know
25 that there were a number of requests, and I believe

Cheryl Saenz, M.D.

Page 78

1  that -- I don't have any documents to provide you
2  with.  I think my CV was already provided.
3      MS. CURRY:  Just for the record, the
4  Notice of Deposition was actually received by
5  Johnson & Johnson just six business days ago and the
6  responses are subject to the objections that were
7  filed on behalf of Johnson & Johnson.
8      (C. Saenz Exhibit 3 was marked for
9  identification.)
10     MS. GARBER:  I'm going to mark as
11 Exhibit 3 the Notice of Deposition.
12     THE WITNESS:  Thank you.
13 BY MS. GARBER:
14     Q    Turning, Dr. Saenz, to page five of the
15 notice.  Those are the documents that we asked you
16 to produce that you have reviewed this list.
17     A    Okay.
18     Q    Have you?
19     A    Yes.
20     Q    In connection with the request number
21 two, item B, have you produced all of the invoices
22 for the expert work that you've done so far?
23     MS. CURRY:  Subject to the objections
24 that were produced on behalf --
25     MS. GARBER:  I'll give you an ongoing

Page 79

1  objection.
2      MS. CURRY:  Thank you.
3      THE WITNESS:  Yes.
4  BY MS. GARBER:
5      Q    Have you produced all invoices and
6  payments in connection with your talcum powder
7  products work in general?
8      A    We're --
9      MS. CURRY:  Object to the form.
10     THE WITNESS:  With my -- everything that
11 I've invoiced has been produced.
12 BY MS. GARBER:
13     Q    Including from other litigations?
14     MS. SHARKO:  You need to look at the
15 objections we served.  This isn't fair to just look
16 at the note.  We responded -- although it came very
17 late, we responded yesterday.
18     MS. GARBER:  Ms. Sharko, with all due
19 respect, I think we're having one attorney at a time
20 represent the witness.  I'm sure Ms. Curry is very
21 capable of objecting.
22     MS. SHARKO:  I wish you had been at all
23 the other depositions where three of you all were
24 talking, but I understand your point.
25     MS. CURRY:  This is why I was raising the

Page 80

1  issue of subject to the objections, because the
2  objections made clear that the documents that were
3  produced were with respect to the MDL talcum powder
4  litigation and not all talcum powder litigation.
5      So I was just making that clarification
6  so that you know which documents were actually
7  produced and why.
8  BY MS. GARBER:
9      Q    Dr. Saenz, do you have any communications
10 in connection with any of the study authors
11 concerning talc or talcum powder products in ovarian
12 cancer?
13     A    With what studies?
14     Q    Any of the published studies.  Have you
15 communicated with any of the study authors?
16     A    Oh.  So I don't know that I can answer
17 that specifically, because I don't know if over the
18 course of my career I've ever communicated with
19 anybody that's ever been listed.  I mean, I
20 certainly know some of them professionally, so at
21 some point, I would have communicated with them.
22     Q    Since you've been an expert in the MDL,
23 have you communicated with any study authors?
24     A    I'm sure I have.  Again, because the
25 world of OB-GYN oncology is a rather small world and

Page 81

1  so some of the people on some of the studies are in
2  the same professional organizations that I'm in.
3      So I'm sure I've had professional
4  communications.
5      Q    Have you had professional communications
6  with any of the study authors in connection with
7  talcum powder products?
8      A    Oh.  No.
9      Q    Thank you.  Have you had any
10 communications with the Society of Gynecologic
11 Oncology in connection with talcum powder products
12 since you've been retained as an expert witness in
13 any talcum powder product litigation?
14     A    Specifically with regard to this issue?
15     Q    Yes.
16     A    No.
17     Q    Same question as to have you had any
18 communications with regard to talcum powder
19 litigation with the American Congress of Obstetrics
20 and Gynecology?
21     A    With respect to this particular issue,
22 no.
23     Q    And when you say with respect to this
24 particular issue, what do you mean so I know?
25     A    With respect to talcum powder litigation,

Page 82

1  no.
2      Q    Talcum powder products and the risk of
3  ovarian cancer?
4      A    Correct.
5      Q    Thank you.  Turning to the objections
6  that were issued in this matter and the documents
7  that are attached, I want to review those briefly
8  with you; okay.  Do you have a copy?
9      A    No, I don't.
10     THE WITNESS:  Thank you so much.
11     MS. GARBER:  We'll mark that as
12  Exhibit 4.
13         (C. Saenz Exhibit 4 was marked for
14         identification.)
15  BY MS. GARBER:
16     Q    And the first document looks to be on the
17  UCSD Moores Cancer Center letterhead signed by you?
18     A    I'm sorry, ma'am, what page are we on?
19     Q    Third from the last.
20     A    Okay.
21     Q    Is that an invoice?
22     A    Yes.
23     Q    We already spoke about that earlier,
24  that's reflecting the work that was done by you from
25  December 18th to February 2019?

Page 83

1      A    Correct.
2      Q    And at a rate of $750 an hour?
3      A    That's correct.
4      Q    If we turn to the next document, it is
5  also on UCSD Medical Center Moores Cancer Center
6  letterhead; correct?
7      A    What's the title of the document?
8      Q    Legal consultation fee schedule.
9      A    Okay; yes, I'm there.
10     Q    Did you draft this document?
11     A    Yes.
12     Q    What is the nature of this document?
13     A    This is my fee schedule as of October
14  of 2016, I believe, is the last time I revised it.
15     Q    And what does out of town travel fees
16  mean?
17     A    It means I pick up, I leave San Diego
18  County, and I go someplace else.
19     Q    The third document that was produced is
20  a -- is titled "Supplement to Materials Reviewed By
21  Dr. Cheryl Saenz"; is that correct?
22     A    Yes.
23     Q    Did you draft this document?
24     A    I didn't do the actual typing, but I did
25  send an email to Ms. Curry about things that I had

Page 84

1  reviewed since I submitted my report.
2      Q    And so is it true that from the point
3  that you issued your report to today, the only
4  documents you reviewed in connection with your
5  opinions are those listed here at the supplement to
6  the materials reviewed by Dr. Cheryl Saenz?
7      MS. CURRY:  Object to the form.
8      THE WITNESS:  So no, because I actually
9  did a little bit more reading last evening.  So I
10  haven't informed anybody of that, other than what I
11  did myself.
12  BY MS. GARBER:
13     Q    Turning to that soon.  So you knew where
14  I was going.  But what did you read last night?
15     A    Last evening I reread the Penninkilampi
16  meta-analysis, and I pulled online the reference
17  where they talk about ovarian cancer -- sorry,
18  ovarian epithelial cells lacking COX-1 and COX-2,
19  and therefore, I went to see that article to see if
20  that was actually quoted properly in the
21  Penninkilampi study.
22         And then I was aware of some other
23  studies just from personal knowledge that actually
24  did document that COX-1 and COX-2 are in ovarian
25  cancer cells, so I re-reviewed those myself just to

Page 85

1  make sure that my recollection was accurate.
2      Q    What were those?  What were the titles of
3  those studies?
4      A    So I don't recall the Penninkilampi
5  title, the one that's referenced in Penninkilampi,
6  but I think it was reference 27.  I'm happy to show
7  you if you have the article, but I think it was
8  reference 27 in the Penninkilampi.
9         Then the other two articles that I read
10  were actually out of Dr. Khabele's lab, and they
11  look at the presence of COX-1 and COX-2 in ovarian
12  cancer cells.
13         And I had read that actually to -- like,
14  one was published last year and one was published a
15  few years ago.  I had read that before and I just
16  re-reread them.  But do I believe that Dr. Khabele
17  is the senior author, but -- I'm sorry, I don't
18  remember the title, but I think that Dr. Khabele was
19  the senior author on those papers.
20     Q    How do you spell Khabele?
21     A    K-H-A-B-E LE, and her first name is
22  Dineo, D-I-N-E-O.
23     Q    Do you know the second study author's
24  name?
25     A    Well, Dr. Khabele was senior author on

Cheryl Saenz, M.D.

Page 86

1  both of those, so she's actually the last author.
2     Q    Do you remember the first author?
3     A    I don't, I'm sorry.
4     Q    That's okay.  So there were two papers by
5  the Khabele lab?
6     A    Yes.
7     Q    What was the upshot of their findings?
8     A    That there is expression of COX-1 and
9  COX-2 in ovarian cancer cells, as well as production
10  of MRNA, particularly for COX-1.
11         The Penninkilampi study -- well, it
12  wasn't the Penninkilampi study, but it was the
13  reference in Penninkilampi, they actually did find
14  expression of COX-1 and COX-2 proteins in the
15  ovarian cancer cell lines that they looked at.  And
16  so Penninkilampi actually was incorrect in the way
17  that they were referencing that study.  That's why I
18  looked at it.
19     Q    So your take-away is that the
20  Penninkilampi paper miscited whether there's
21  expression of COX-1 and COX-2 in epithelial ovarian
22  cells?
23         MS. CURRY:  Object to the form.
24         THE WITNESS:  Well, the paper that they
25  cited, I think they cited it correctly, but I think

Page 87

1  they misstated the results of that study, yes.
2  BY MS. GARBER:
3     Q    So do you have opinion, Doctor, based on
4  your research as to whether epithelial ovarian cells
5  express COX-1 and COX-2?
6     A    So that gets to the point of where I
7  think Penninkilampi misrepresented the conclusions
8  of the study, because Penninkilampi stated that
9  ovarian epithelium doesn't have COX-1 or COX-2.  But
10  the study they cited wasn't on normal ovarian
11  epithelium, it was actually on cancer cells, and the
12  cancer cells actually did have expression of COX-1
13  and COX-2.
14     Q    Why did you go back and look at that in
15  particular?
16     A    Because I was reading the Penninkilampi
17  study again, and it's meta-analysis that's focused
18  on by many of your experts, and I felt it was
19  important to the whole theory of chronic
20  inflammation and why NSAIDS may or may not show a
21  decreased risk of ovarian cancer.  The literature on
22  that is very inconsistent.
23         I also am very familiar with the work in
24  Dr. Khabele's lab because -- well, she once
25  interviewed for a division director at our

Page 88

1  department, and so I knew her research and I knew
2  she had shown that COX was in ovarian cancer cells,
3  so it seemed that like strange to me that
4  Penninkilampi said that it wasn't there.
5         So that's why I went back in and wanted
6  to verify that.
7     Q    Did you do a comprehensive literature
8  review on the issue of whether epithelial ovarian
9  cancer express -- I'm sorry, epithelial ovarian
10  cells express COX-1 and COX-2?
11         MS. CURRY:  Object to the form.
12         THE WITNESS:  So I read those three
13  papers.  I had read Dr. Khabele's papers before, but
14  I read these papers last evening and read them
15  thoroughly.  So I wouldn't say I've read every
16  article ever published on it, but I certainly read
17  the paper that Penninkilampi referenced and I read
18  Dr. Khabele's work, which I think actually is some
19  of the largest volume of work given the tissue
20  microarray that she studies and how many different
21  specimens she actually looked at it.
22  BY MS. GARBER:
23     Q    And based on your review of the three
24  studies, are you going to give an opinion whether or
25  not you believe and it's your opinion whether

Page 89

1  epithelial ovarian cells express COX-1 and COX-2?
2     A    Yes.
3     Q    You're going to say they don't?
4     A    No, I'm going to say they do.
5     Q    They do --
6     A    They do express COX-1 and COX.
7     Q    So you have not produced all documents
8  that relate to your compensation for expert work in
9  this matter; correct?
10         MS. CURRY:  Object to the form.
11         THE WITNESS:  With respect to this MDL
12  work, this particular matter, I have.  I've only
13  invoiced the one invoice.
14  BY MS. GARBER:
15     Q    That was a bad question.
16         You have not produced all documents that
17  relate to your compensation for expert work done in
18  the talcum powder litigation; correct?
19         MS. CURRY:  Object to the form.  It's the
20  subject of our objections.
21         THE WITNESS:  I've only produced the
22  invoice for this particular matter.
23  BY MS. GARBER:
24     Q    With regard to the supplement to
25  materials reviewed by Dr. Cheryl Saenz, did you

Page 90

1  review any other expert reports?
2       MS. CURRY:  Object to the form.
3       THE WITNESS:  On the defense side or the
4  plaintiff side?
5       MS. GARBER:  Either side.
6       THE WITNESS:  So, yes, but I think that's
7  listed in the materials reviewed.  This is only the
8  listing of the defense expert reports that I
9  reviewed subsequent to submitting my report in the
10 original materials reviewed list.
11 BY MS. GARBER:
12      Q    What was the nature of reviewing those
13 particular expert reports?  Did you ask for them?
14 Were they provided?
15      MS. CURRY:  Object to the form.
16      THE WITNESS:  The ones on the supplement
17 lists?
18      MS. GARBER:  Yes.
19      THE WITNESS:  Okay.  The ones on the
20 supplement list, I've actually been provided with
21 these expert reports, and I picked these particular
22 ones because I wanted -- after my report was
23 submitted, I felt that it was important for me to
24 see what the other expert said with regards to
25 things that I had actually given opinions on as

Page 91

1  well.
2  BY MS. GARBER:
3       Q    Prior to finalizing and signing your
4  expert report, in the MDL, did you review any draft
5  reports of any of the defense experts?
6       A    No.
7       Q    Did you ever speak with any of the
8  experts?
9       A    About --
10      MS. CURRY:  Object to the form.
11      THE WITNESS:  About this matter?
12      MS. GARBER:  Yes.
13      THE WITNESS:  No.
14 BY MS. GARBER:
15      Q    After you issued your MDL report, have
16 you spoken with any of the defense experts about
17 this litigation?
18      A    No.
19      Q    Have you ever spoken with Dr. Swisher
20 about this litigation?
21      A    No.
22      Q    Have you ever spoken with Dr. Huh about
23 this litigation?
24      A    Warner?
25      Q    Yes?

Page 92

1       A    No.
2       Q    Have you ever spoken with Dr. Holcombe
3  about this litigation?
4       A    No.
5       Q    Did you conduct any research in
6  connection with your expert opinion?
7       MS. CURRY:  Object to the form.
8  BY MS. GARBER:
9       Q    In other words, did you do a literature
10 search on PubMed or Medline?
11      A    Oh.  Yes, I often -- particularly as I
12 was reading an article, if I felt that there was
13 something that was important in one of the reference
14 lists for an article that I was reading, then I
15 would go do a lit search to find that article and
16 read that as well.
17      But yes, I've done quite an extensive
18 literature search.
19      Q    Did you ever do any general searches, for
20 instance, talcum powder products and ovarian cancer,
21 or was it just to find other papers based on the
22 papers you had previously read?
23      MS. CURRY:  Object to the form.
24      THE WITNESS:  I've done all of that.
25 ///

Page 93

1  BY MS. GARBER:
2       Q    Did counsel in the MDL provide for you
3  any published literature for you to review?
4       A    Other than that flash drive that we
5  originally talked back in November of 2016, no.
6       Oh, ma'am, I'm sorry.  For the sake of
7  the completeness, I have received a copy of that
8  Health Canada assessment which was not available to
9  me online, and also the Taher article, which has not
10 been published.  And it's in my materials reviewed,
11 but I believe that I received one or two of the
12 abstracts from Dr. Saed's lab that have yet to be
13 presented.
14      So, sorry, that was provided for me.  But
15 I asked for those materials.  They weren't provided
16 to me without my reading about them I think in
17 plaintiff's experts' depositions or reports and then
18 I asked to see them.  Sorry about that.
19      Q    Between when you were first retained in
20 2016 and were given the flash drive and completing
21 your expert report in the MDL, you were not provided
22 any published literature by Johnson & Johnson
23 lawyers.  Is that a true statement?
24      A    Other than what we've just discussed?
25      Q    I'm trying to narrow down before your

Page 94

```
 1  expert report was issued.
 2       A   Oh, before it was issued?
 3       Q   Yes.
 4       A   But I just listed those things.  So I did
 5  receive those before it was issued.
 6       Q   Okay.  We're -- I'm going to mark your
 7  report in a minute.  But before your expert report
 8  was issued, you had received some Dr. Saed
 9  abstracts, the Taher meta-analysis and the Health
10  Canada review?
11       A   The Health Canada summary, yeah, the
12  assessment; right.  Yes, before my report was
13  issued.
14       Q   Which abstracts did you receive in
15  connection with Dr. Saed's work?
16       A   I'd have to look at my expert report to
17  see exactly because they're listed there in the
18  materials reviewed.
19           MS. GARBER:  Let's mark the expert
20  report.
21           (C. Saenz Exhibit 5 was marked for
22           identification.)
23           MS. GARBER:  We'll mark the expert report
24  of Cheryl Saenz dated February 25th, 2019, as
25  Exhibit 5.
```

Page 95

```
 1           Do you need one?
 2           MS. CURRY:  No, I have one.
 3  BY MS. GARBER:
 4       Q   Doctor, let's turn in Exhibit 5 of your
 5  expert report --
 6           MS. CURRY:  Actually, can I just ask you
 7  one thing.  The copy that Dr. Saenz has that's been
 8  marked as an official exhibit is not in color, but
 9  there is some color in the original report.
10           Do you want to mark the color version or
11  swap it out?
12           MS. GARBER:  If you want to -- do you
13  have a color copy?
14           MS. CURRY:  I do.
15           MS. GARBER:  Sure.
16           THE WITNESS:  I'm sorry, what page,
17  ma'am?
18  BY MS. GARBER:
19       Q   If we turn to page 32 of your report.
20       A   Yes.
21       Q   There is a document that spans from
22  page 32 to 39 that was titled "References"?
23       A   Yes.
24       Q   Can you tell me what the nature of that
25  document is?
```

Page 96

```
 1       A   These are all the references that I made
 2  reference to in my report.
 3       Q   So these are the references that were
 4  cited to in the body of your expert report?
 5       A   Right.  These are the -- right, exactly.
 6       Q   Then if we turn to 40 through 42, what is
 7  the nature of those documents titled "Additional
 8  Materials Reviewed By Dr. Cheryl Saenz"?
 9       A   So these are other articles that I have
10  read over the time period that I have been giving
11  opinions in the talc litigation matters, but that I
12  didn't necessarily reference in my report.
13       Q   I notice those are listed alphabetically,
14  are they not?
15       A   Yes.
16       Q   I don't see any reference to any of
17  Dr. Saenz' work; is that true?
18       A   I am Dr. Saenz.
19       Q   I'm sorry.  I don't see any reference to
20  Dr. Saed's work.  Do you?
21       A   So if you look on page 33, reference 21,
22  Nicole Fletcher is first author on one of his works.
23  That's actually his work.
24       Q   With regard -- I was referencing the
25  second grouping.  Do you cite any of Dr. Saed's
```

Page 97

```
 1  abstracts?
 2       A   No, because I do in the report.  That's
 3  why it's in the report.  That's why it's listed
 4  there.
 5       Q   I think you told me several abstracts.  I
 6  don't see -- or a couple of abstracts.  I don't see
 7  more than one.
 8       A   I can't remember the name of his other
 9  first author.  There's Fletcher and then there's --
10  I can't remember who else he published with.
11       Q   Did you read Dr. Saed's 2019 publication
12  with regard to talc and ovarian cancer molecular
13  mechanisms?
14       A   No, I don't believe that I did.  I
15  believe that I read his deposition testimony and his
16  expert report.  So I would have learned what I
17  learned about what he did from his expert report as
18  well as his deposition testimony.
19       Q   So I'm clear, you have not read his 2019
20  publication; is that true?
21       A   I don't believe that I have.
22       Q   It isn't your testimony, is it,
23  Dr. Saenz, that by reading his deposition and expert
24  report, you thereby know what is in his peer
25  reviewed and published publications?
```

Cheryl Saenz, M.D.

Page 98

1    MS. CURRY: Object to the form.
2    THE WITNESS: I've not read the
3  publication from 2019. I have read his expert
4  report wherein he describes the experiments he did,
5  I believe, for that publication. But no, I have not
6  read the 2019 publication.
7  BY MS. GARBER:
8    Q    You do make comments on this
9  publication in your expert report?
10   A    The one --
11   MS. CURRY: Object to the form.
12   THE WITNESS: -- that is cited in my
13  report; correct.
14  BY MS. GARBER:
15   Q    Did you ask Johnson & Johnson to provide
16  you with any documents?
17   MS. CURRY: Objection to the form.
18   THE WITNESS: What do you mean by
19  "documents"?
20  BY MS. GARBER:
21   Q    Any. Did you ask for any documents
22  whatsoever from Johnson & Johnson?
23   A    Well, yes, we've already covered I asked
24  for the Health Canada assessment and I asked for the
25  Taher report, and I believe I asked for one of the

Page 99

1  abstracts from Dr. Saed to take a look at that.
2    Q    Which abstract was that?
3    A    I think it's the one that's referenced
4  there as reference 21.
5    Q    How did you know to ask for that?
6    A    Because I read his report and saw where
7  he talked about that. But I also read the reports
8  of some of plaintiff's gynecological oncology
9  experts where they reference that he talked about
10  rising levels of CA 125 as a result of talc
11  treatment of ovarian cancer cells.
12   Q    How did you know to ask for the Taher
13  paper?
14   A    Because that was discussed in, I believe,
15  the depositions of some of plaintiff's experts.
16   Q    How did you know to ask for the Health
17  Canada assessment?
18   A    Again, the same thing. I believe that
19  was discussed in some of plaintiff's experts
20  depositions.
21   Q    Did you ask Johnson & Johnson for any
22  internal documents?
23   A    Internal to Johnson & Johnson?
24   Q    Yes.
25   A    No.

Page 100

1    Q    Why not?
2    A    I didn't believe that they were important
3  to my opinion. I don't know where they would come
4  from. They're not peer-reviewed literature and my
5  opinion is based on my experience, my treating
6  patients with ovarian cancer, as well as assessing
7  people, and the risk factors and a review of the
8  peer-reviewed literature.
9    Q    What Johnson & Johnson, the defendant,
10  was saying about the science was not important to
11  you, Dr. Saenz?
12   MS. CURRY: Object to the form.
13   THE WITNESS: So I wouldn't know the
14  context of that. What's important to me in
15  assessing whether or not application of talcum
16  powder products in the perineum is increasing the
17  risk of ovarian cancer is reading the peer-reviewed
18  literature to see if that's substantiated by that.
19  BY MS. GARBER:
20   Q    For the expert reports that are listed in
21  your reference materials, all of them, all three
22  lists, did you read every word of those reports?
23   A    Can you reference me which page we're
24  looking at now? Are we looking at the supplemental
25  list or --

Page 101

1    Q    All three.
2    A    -- the report?
3    Q    Well, actually, it would just be the --
4  let's see what you called it -- additional
5  materials. Have you -- which is at page 40,
6  attached to your expert report, have you read every
7  word of those expert reports?
8    A    Yes.
9    Q    Sorry. Okay. Have you read every word
10  of the deposition transcript of the witnesses listed
11  on page 40?
12   A    Yes.
13   Q    And similarly, have you read every word
14  of the expert reports that is listed on the
15  supplement to materials review by Dr. Cheryl Saenz?
16   A    Yes.
17   Q    You read Dr. Crowley's deposition
18  testimony; right?
19   A    Yes.
20   Q    What did you glean from his deposition
21  testimony?
22   MS. CURRY: Object to the form.
23   THE WITNESS: What did I glean?
24   MS. GARBER: Uh-huh.
25   THE WITNESS: I gleaned that I don't

Cheryl Saenz, M.D.

| Page 102 |
| --- |

1  think he necessarily understands that the vaginal
2  mucosa and the eye mucosa are the same.
3  BY MS. GARBER:
4      Q    And you've made reference to that in
5  your expert report, haven't you?
6      A    Yes.
7      Q    Did you glean anything else from reading
8  his testimony?
9          MS. CURRY:  Object to the form.
10         THE WITNESS:  Not that I wanted to remark
11  on.
12  BY MS. GARBER:
13     Q    Do you have any criticisms of his expert
14  report other than with regard to the vaginal mucosa?
15     A    Not that I know.
16         MS. CURRY:  Object to the form.
17         THE WITNESS:  Not that I intend to give.
18  BY MS. GARBER:
19     Q    What did you glean from the testimony of
20  Dr. Saed?
21         MS. CURRY:  Object to the form.
22         THE WITNESS:  I felt that based on his --
23  I believe that based on his deposition testimony,
24  that there were a lot of irregularities in the
25  research that he conducted.  I don't believe that

| Page 103 |
| --- |

1  the results as he stated them from his work
2  necessarily support the hypothesis that chronic
3  inflammation leads to the development of ovarian
4  cancer.
5  BY MS. GARBER:
6      Q    And with regard to your prior statement,
7  "I don't believe that the results as he stated them
8  from his work necessarily support the hypothesis
9  that chronic inflammation leads to the development
10  of ovarian cancer," is limited to the context of his
11  study that appears at reference 21?
12         MS. CURRY:  Object to the form.
13         THE WITNESS:  No.  I believe that what
14  you asked me about was his -- what I gleaned from
15  his deposition testimony and so I was commenting on
16  that.
17         I think that Dr. Saed is mentioned in
18  many different places, many different expert reports
19  and so to some extent, it gets confusing to me as to
20  what the source for each and every one of these
21  things is.
22         Sometimes I saw it in expert plaintiff's
23  reports or their deposition testimony.  But from
24  Dr. Saed's deposition testimony, I believe that he
25  talks about how his treatment of talc to the ovarian

| Page 104 |
| --- |

1  cancer cells causes changes in the molecular biology
2  of those cells that leads to ovarian cancer and I
3  don't believe that the reports that -- that the
4  reports of his data, the way that he puts them
5  forth, actually show that.
6  BY MS. GARBER:
7      Q    But you make that statement not having
8  read all his data, don't you?
9          MS. CURRY:  Object to the form.
10         THE WITNESS:  I read his report and I
11  read his deposition and I read at least one of the
12  papers from Fletcher and Saed, and I read definitely
13  references to him in other expert plaintiff's
14  reports.
15  BY MS. GARBER:
16     Q    Doctor, from reading his expert report
17  and from reading his two depositions; right?
18     A    There were two volumes to his deposition;
19  correct.
20     Q    You understood that he published a study
21  whereby he conducted an experiment with talc and the
22  cellular response, but yet you didn't ask for that
23  study?  You didn't ask to review that study itself?
24         MS. CURRY:  Object to the form.
25         THE WITNESS:  No, I read his testimony

| Page 105 |
| --- |

1  where he talked about those things and he had his
2  notebooks in front of him.  And I also read his
3  report, because he even discussed in his deposition
4  that the science that was in his report is the
5  experiments that he then went on to publish.
6  BY MS. GARBER:
7      Q    I see.  As a scientist, you just read a
8  deposition, you don't bother to consult the data.
9  Is that how it works?
10         MS. CURRY:  Objection.  Argumentative.
11         THE WITNESS:  No.
12  BY MS. GARBER:
13     Q    Don't you think the best source of
14  understanding Dr. Saed's work is to look at the data
15  itself, Dr. Saenz?
16         MS. CURRY:  Object to the form.
17         THE WITNESS:  I did look at the data from
18  the Fletcher and Saed paper and then --
19  BY MS. GARBER:
20     Q    But you didn't look at the 2019 data, did
21  you, Dr. Saenz?
22     A    Ma'am, I wasn't finished with my
23  response.
24     Q    I'm sorry.  Go ahead and finish.
25     A    I look at what Dr. Saed's report was and

Page 106

1  there was data in that report; that is his expert
2  report. He provided data in that expert report as
3  to the experiments that he had done and that's what
4  I looked at.
5      Q   For your critique, Doctor, don't you
6  think it would be fair for you to look at the source
7  data rather than rely on his deposition testimony
8  about those data?
9          Isn't the direct data more reliable than
10 his deposition about the data?
11         MS. CURRY:  Object to the form.
12         THE WITNESS:  I didn't say his
13 deposition. I said his report. His source data is
14 in his report. He testified to as much. The
15 written report that he submitted as an -- as an
16 expert are the experiments that he says he
17 published. So he is the source and I had that
18 report and I read that report.
19 BY MS. GARBER:
20     Q   So his expert report is the totality of
21 his data that was published in the 2019 publication,
22 is that your testimony?
23     A   That's his testimony.
24         MS. CURRY:  Object to the form.
25 ///

Page 107

1  BY MS. GARBER:
2      Q   And all one needs to do is to read his
3  deposition to fully understand the data that is
4  referenced and described in the 2019 publication, is
5  that your testimony?
6          MS. CURRY:  Object to the form.
7          THE WITNESS:  You're misstating my
8  testimony. What I said --
9  BY MS. GARBER:
10     Q   Why don't you clarify?
11     A   I'd be happy to. What I said is I read
12 his report and his report is the experiments that he
13 did, that he then says he published in his
14 deposition. But the report contains the
15 experiments. He said he did that report for the
16 purposes of evaluating talc and its potential to be
17 carcinogenic, but he states it himself, he is the
18 source.
19     Q   Can you tell me from reading his expert
20 report what his methodologies and materials were
21 with regard to his study that was published in 2019?
22         MS. CURRY:  Object to the form.
23         THE WITNESS:  Can I have his expert
24 report in front of me so that I can make sure I
25 don't misquote anything?

Page 108

1          MS. GARBER:  Sure. I can't give that you
2  to you right now, but you can ask your counsel to
3  look at his report.
4          THE WITNESS:  Okay. For the purposes of
5  accuracy, I'd rather not hypothesize about what he
6  had in his report, but if I have it in front of me,
7  I would be happy to comment on it.
8          MS. GARBER:  Okay.
9  BY MS. GARBER:
10     Q   Where do you list in your references
11 Dr. Saed's abstracts?
12     A   I don't recall the name of the first
13 author on anything other than the Fletcher abstract
14 so I don't know where to find it right now. I do
15 believe that I have seen them, but I don't know
16 where it is right now.
17     Q   Is it fair to say, Dr. Saenz, that
18 Dr. Saed's abstracts are not listed on any of your
19 reference materials?
20         MS. CURRY:  Object to the form.
21         THE WITNESS:  I don't think that would be
22 fair to say, because I just am saying that I can't
23 recall who else were first authors on his papers
24 right now. And so I can't be sure that they are
25 aren't actually here, other than the Fletcher paper,

Page 109

1  or the Fletcher abstract, I should say. But without
2  recalling who the first author was, I just can't
3  recall.
4  BY MS. GARBER:
5      Q   You did read Health Canada's draft
6  screening; correct?
7      A   Yes.
8      Q   Have you read any comment letters or
9  reports issued in response to the Health Canada's
10 December DSAR?
11         MS. CURRY:  Object to the form.
12         THE WITNESS:  No, I don't believe that I
13 have.
14 BY MS. GARBER:
15     Q   Have you or are you planning to comment
16 to Health Canada regarding their assessment?
17     A   No, I am not.
18     Q   Have you been asked to reply?
19     A   No, I have not.
20     Q   Have you been asked to testify at any
21 United States or state government proceedings
22 regarding talcum powder products?
23     A   No, I have not.
24     Q   Are you conducting any research in any
25 capacity concerning talcum powder products and risk

Cheryl Saenz, M.D.

1  of ovarian cancer, and by that I mean in your
2  laboratory or at your institution?
3      A    No, ma'am.
4      Q    Have you ever applied for a grant or any
5  monies to conduct a research project on talcum
6  powder products and ovarian cancer?
7      A    No.
8      Q    Do you sit on any editorial boards for
9  any scientific journals?
10     A    As a regular editorial board position,
11 no.  But I have been an ad hoc reviewer.
12     Q    I saw that in your CV.  As an ad hoc
13 reviewer, which journals have you served on?
14     A    Let me turn to my -- is that my CV?  Yes.
15 So I've an ad hoc reviewer for Gynecologic Oncology,
16 for the Gray Journal, which is the American Journal
17 of Obstetrics and Gynecology, for Cancer, and for
18 the Journal of Pediatric Surgery Case Reports.
19     Q    In that regard, have you ever reviewed
20 any articles in connection with talcum powder
21 products and risk of ovarian cancer?
22     A    No.
23     Q    Turning back to your expert report and
24 going through it, there is at the back of your
25 report, a document titled "Table one, analysis of

1  case control studies cited by Dr. Smith-Bindman,"
2  and table four of her expert report.
3          Do you see that?
4      A    Yes.
5      Q    What is the nature of that document?
6      A    The nature of this document was to
7  analyze and review the case control studies that are
8  cited by Dr. Smith-Bindman in her report as
9  influencing her opinion.  But in my review, in
10 reading her report, it became obvious to me that she
11 was mis-transcribing or misquoting the numbers and
12 the odds ratios and the confidence interval from the
13 original documents into her report.
14         So in my review, I wanted to make sure I
15 had accurate data and I found a number of
16 discrepancies.
17     Q    Is it your opinion that those
18 discrepancies, as you say, were made intentionally?
19         MS. CURRY:  Object to the form.
20         THE WITNESS:  I have no idea.
21 BY MS. GARBER:
22     Q    Is it your opinion that those
23 discrepancies made a difference in the outcome of
24 her opinions?
25         MS. CURRY:  Object to the form.

1          THE WITNESS:  I believe that these
2  discrepancies misrepresent the data, and so for the
3  sakeness [sic] of trying to be accurate with the
4  data, I wanted to make sure I had an accurate
5  representation.  I do believe that this was in part
6  part of her opinion, otherwise, I don't think she
7  would have put it in her report.
8  BY MS. GARBER:
9      Q    Do you have any basis to conclude that
10 she intentionally misrepresented the data?
11         MS. CURRY:  Object to the form.
12         THE WITNESS:  I don't know why she
13 misrepresented the data.  I only know that she did.
14 BY MS. GARBER:
15     Q    You read her deposition; did you not?
16     A    Yes, I did.
17     Q    Did you read both volumes?
18     A    Yes, I did.
19     Q    What was your understanding of her
20 testimony with regard to table four in her second
21 deposition?
22     A    I don't believe I recall specifically
23 getting asked questions about table four in her
24 deposition.  I --
25     Q    You didn't read her deposition, did you,

1  Doctor?
2      A    No, that's not true, ma'am.  I did read
3  her deposition, both volumes, cover to cover.  What
4  I recall the main focus of her deposition testimony
5  was on the individual analysis that she did, which
6  she called her own systematic review of the
7  literature that has been published and the different
8  conditions on which she made that analysis.
9      Q    I notice, Doctor, that your chart, which
10 is table one, of her table, table four, you have
11 indicated on the right-hand column mistakes in
12 reported -- mistakes in reported data in table four
13 of Smith-Bindman's report.
14         Is that correct?
15     A    Yes.
16     Q    Then you go down for the various studies
17 and you indicate a number.  So we'll just do for
18 instance, the Schildkraut paper?
19     A    Okay.
20     Q    You indicate, Schildkraut paper, and you
21 give an odds ratio or a relative risk and then you
22 give a confidence interval; correct?
23     A    Well --
24         MS. CURRY:  Object to the form.
25         THE WITNESS:  I don't give that.  That's

Page 114

1  what the Schildkraut paper found.
2  BY MS. GARBER:
3      Q    That's what I'm trying to understand.  So
4  you -- so I understand the nature of your table,
5  you're giving Schildkraut's odds ratio or relative
6  risk for every use of genital talc, and then if we
7  move to the right, you're indicating whether or not
8  it's statistically significant or not statistically
9  significant; correct?
10     A    Again, I don't give these.  This is the
11  data as reported in the table.
12     Q    Understood.
13     A    I am generating this table, extracting
14  the data from the report as published, and comparing
15  it to what Dr. Smith-Bindman listed in her table
16  four.
17          So for ever versus never genital-only use
18  of talcum powder products, that's what Schildkraut
19  reports, and Schildkraut reported that that was a
20  statistically significant finding.
21     Q    In the next column for the mistakes, what
22  you're indicating here is that Dr. Smith-Bindman
23  reported an incorrect odds ratio in her table four?
24     A    That's correct.
25     Q    Okay.  Now I understand the nature of

Page 115

1  your table.
2      A    Okay.
3          MS. GARBER:  Let's mark
4  Dr. Smith-Bindman's table four and a couple
5  documents that sort of explain it from her report.
6  We'll mark that as Exhibit 6.
7          (C. Saenz Exhibit 6 was marked for
8          identification.)
9  BY MS. GARBER:
10     Q    And I'll represent for the record, this
11  does not include every page of her expert report.
12  It's meant to demonstrate table four.  And so if you
13  see at the bottom of 18, it starts to describe what
14  is going to be referenced at her table four.
15          Do you see that?
16     A    Where are you, ma'am?
17     Q    If you go to the top of page 19, first
18  paragraph.  It ends -- the last sentence says, "the
19  number of individual women included in each study
20  and the reported or estimated effect size for any
21  exposure to talc adjusted for other risk factors
22  such as age are in table four."
23          Did I read that correctly?
24     A    Yes.
25     Q    And so there she's just describing the

Page 116

1  nature of the table four; correct?
2      A    Hold on one second, please.
3          MS. CURRY:  Object to the form.
4          THE WITNESS:  She's describing that in
5  table four and table four is labeled, "list of
6  included studies with number of cancers, controls
7  and reported odds ratios."  So that's the odds ratio
8  that she claims was reported in the study for ever
9  versus never use of perineal -- the perineal
10  application of talc.
11  BY MS. GARBER:
12     Q    Does it say that, Doctor?
13     A    It does in the title.
14     Q    Did she provide any testimony about why
15  those odds ratios are slightly off in her table
16  four?
17          MS. CURRY:  Object to the form.
18          THE WITNESS:  I don't recall, but I'd be
19  happy to look at the deposition.  But specifically
20  with respect to table four, I don't recall.
21          MS. GARBER:  Okay.
22          THE WITNESS:  I do recall that her own
23  analysis, she changed numbers and things, but this
24  is table four, which is titled "reported odds
25  ratio."

Page 117

1  BY MS. GARBER:
2      Q    Is the gist of this table that you're
3  trying to convey she's misrepresenting the data, or
4  rather, there's mistakes and she's sloppy, or both?
5          MS. CURRY:  Object to the form.
6          THE WITNESS:  Again, as I testified
7  earlier, I don't know what her intention was and why
8  the data that is listed as reported odds ratios,
9  which means the published odds ratios, I don't know
10  why in this table it's different than what actually
11  was in the study.  I just know that it is.
12  BY MS. GARBER:
13     Q    Is it important to get it right in your
14  opinion?
15          MS. CURRY:  Object to the form.
16          THE WITNESS:  It's important that she --
17  if she's going to label this as reported odds ratio,
18  it's important that she transcribe the data
19  accurately.
20  BY MS. GARBER:
21     Q    Let's look at your table one.  Let's look
22  at the Schildkraut study.  You stated here that the
23  accurate odds ratio is 1.44 with a confidence
24  interval of 1.11 to 1.86; correct?
25          MS. CURRY:  Object to the form.

| Page 118 |
|---|

1    THE WITNESS:  For ever versus never
2 genital use.
3 BY MS. GARBER:
4    Q    That's incorrect, isn't it?
5    A    No, it's correct.
6    MS. GARBER:  I'll mark the Schildkraut
7 paper, which is Exhibit 7.
8    (C. Saenz Exhibit 7 was marked for
9    identification.)
10 BY MS. GARBER:
11    Q    Doctor, in the Schildkraut paper, the
12 ever or any genital use, the odds ratio is reported
13 a 1.71 with a confidence interval of 1.26 to 2.33;
14 correct?
15    A    Where are you, ma'am?
16    Q    I'm at page 1413.
17    A    And where?
18    Q    Under the results, at the bottom of the
19 page.
20    Doctor, is that what it says?
21    A    That's --
22    MS. CURRY:  Object to the form.
23    THE WITNESS:  -- what you're reading,
24 however --
25 ///

| Page 119 |
|---|

1 BY MS. GARBER:
2    Q    Doctor, is that what it says?
3    A    Ma'am, ma'am, I said that's what you're
4 reading.  But I need you to turn to the next page,
5 which is table two, which shows any genital use has
6 an odds ratio of 1.44 with a confidence interval of
7 1.11 on to 1.86, which is the ever versus never use.
8 And that is where I draw my figure from.
9    Q    Doctor, you drew your figure from the
10 abstract, didn't you?
11    A    No.
12    MS. CURRY:  Object to the form.
13    THE WITNESS:  I drew my figure from this
14 table.
15 BY MS. GARBER:
16    Q    And though you didn't report under the
17 result section any genital powder use odds ratio
18 1.71?
19    A    Because that has to do with daily use.
20 That's not any use ever.  Any use ever is what's in
21 table two.  The table four, as in the Smith-Bindman
22 study, didn't qualify that it was for any daily use.
23    What you're reading from is any daily
24 use, whereas table two is an ever versus never,
25 which doesn't qualify the dosing to be daily.

| Page 120 |
|---|

1    Q    Doctor, doesn't the ever use under table
2 two give the odds ratio of 1.39 with a confidence
3 interval of 1.10 to 1.76?
4    MS. CURRY:  Object to the form.
5    THE WITNESS:  That's for body powder
6 uses, ma'am.  That's not restricted to genital use.
7 BY MS. GARBER:
8    Q    Okay, Doctor.  Let's turn to
9 Dr. Smith-Bindman's deposition testimony.
10    MS. CURRY:  We've gone an hour, so if you
11 need a break, just let us know.
12    THE WITNESS:  Okay.
13 BY MS. GARBER:
14    Q    Do you have any recollection of what she
15 said, why those numbers were slightly off on table
16 four in her deposition?
17    A    No, ma'am, I already testified I'd need
18 to look at her deposition to testify specifically.
19    Do you have a copy of her deposition
20 testimony?
21    Q    I do.
22    A    Thank you.
23    ///
24    ///
25    ///

| Page 121 |
|---|

1    MS. GARBER:  I'll represent for the
2 record that this is not her complete deposition, but
3 an excerpt where she testified about this topic.
4    (C. Saenz Exhibit 8 was marked for
5    identification.)
6 BY MS. GARBER:
7    Q    Doctor, this deposition was on Friday,
8 February 8th, on 2019; correct, Volume two?
9    A    That's what it says.
10    Q    And that is reflected that you read this
11 deposition on your reference list; correct?
12    A    Yes, ma'am.
13    Q    If we turn to page 254 of her deposition.
14    A    Okay.
15    Q    She was asked, was she not, what she did
16 to prepare for the deposition since yesterday, and
17 at lines 13 through 17, does she indicate that she
18 called the biostatistician who worked on the
19 meta-analysis for review for a few details, and that
20 her name was Dr. Hall?
21    A    That's what it says.
22    Q    Do you understand from reading her
23 deposition that it was Dr. Hall, the
24 biostatistician, who ran these numbers and not
25 Dr. Bindman?

Cheryl Saenz, M.D.

Page 122

1    A    That's what I understand from the
2  deposition testimony.
3    Q    And then if you turn to page 255, at
4  lines 16 through 25, it indicates what notes did you
5  make from your conversation with Dr. Hall.  And she
6  explains that she mostly asked her to clarify about
7  how she did the calculations and the numbers that
8  are shown in the figures.
9         She goes on to explain, she was
10 struggling to see why they were not exactly the same
11 as the ones shown in the published studies.
12        And then it --
13    A    Ma'am, I'm sorry, I believe you're
14 misquoting what it says here.
15    Q    Okay.  What do you think it says?
16    A    It says, "I was struggling to understand
17 why the numbers and the figures were not exactly the
18 same as the ones that you showed me in the published
19 manuscript."  So that's not the same as saying, in
20 published studies.
21        What Dr. Smith-Bindman is testifying to
22 here is what I was referencing before.  These are
23 questions about her own meta-analysis.  These are
24 not questions that are referring to table four.
25        Table four is separate and distinct from

Page 123

1  her own meta-analysis.  So all of this conversation
2  in her deposition is with regards to the
3  meta-analysis that she did separate and apart from
4  table four.
5    Q    That's your understanding of her
6  testimony?
7    A    That is --
8         MS. CURRY:  Object to the form.
9         THE WITNESS:  That is what is there.
10 BY MS. GARBER:
11    Q    Let's go on to page 257.  On page 257,
12 lines one through nine, does she explain what what
13 the discrepancies between the studies and what was
14 reported on table four was attributable to issues
15 with the software that the biostatistician used in
16 running those numbers?
17        MS. CURRY:  Object to the form.
18        THE WITNESS:  I'll need to read this,
19 ma'am.
20 BY MS. GARBER:
21    Q    Okay.
22    A    She makes absolutely no specific
23 reference to table four.  She talks about that there
24 are some numbers that she didn't understand, that
25 the statistician then says that there were -- it was

Page 124

1  not necessarily a problem with the software.  She
2  specified that the calculations were made by the
3  software in the program she used.  But there's
4  absolutely no reference here specifically to table
5  four.
6    Q    Do you harbor the opinion that
7  Dr. Smith-Bindman intentionally misrepresented her
8  numbers?
9         MS. CURRY:  Object to the form.
10        THE WITNESS:  I harbor the opinion that
11 table four in Dr. Smith-Bindman's report, which is
12 listed as the transcription of the reported odds
13 ratios from the published literature as ever versus
14 never use, are not actually the numbers that were in
15 that publication, or those publications.  That is
16 different than her own meta-analysis, which was her
17 own analysis that she did at the end of her report.
18        I don't know what her motivation was.  Do
19 I know that the numbers that she reported are wrong,
20 where I have highlighted that they're wrong.
21 BY MS. GARBER:
22    Q    And if in fact, it's her testimony that
23 those number are slightly off and she was not aware
24 they were slightly off, but it was attributable to
25 her biostatistician's application of a software

Page 125

1  program, do you have any criticisms of her table
2  four?
3         MS. CURRY:  Object to the form.
4         THE WITNESS:  Yes, I do.  This is not a
5  calculation.  This is a reporting of the data from
6  the studies that were published.  Whatever software
7  program her statistician used had nothing to do with
8  the production of the numbers that are in table
9  four.  The software program that she used was for
10 the purposes of her own meta-analysis.
11        Table four is supposed to be where she
12 looked at the published literature and transcribed
13 the number.  There were no computations that were
14 supposed to be getting done in table four as she
15 reported table four.
16 BY MS. GARBER:
17    Q    Do you have any basis to conclude that
18 those slight deviations from what was in the
19 published literature affected her opinions in any
20 way?
21        MS. CURRY:  Object to the form.
22        THE WITNESS:  Yes, I do.  Because she
23 reported odds ratios that were incorrect and were
24 inflated from what was actually published in the
25 literature.

Page 126

BY MS. GARBER:
2    Q    Were they all inflated?
3    A    No, and I didn't say they were all
4 inflated. I listed when there were no mistakes in
5 what she transcribed.
6    Q    And were there were mistakes, were those
7 always an inflation of the data or were they
8 sometimes a deflation of data?
9    A    I can't recall the exact nature of all of
10 them, ma'am. There's something like 30 studies
11 here.
12    Q    Wouldn't that make a difference,
13 Dr. Saenz? If she had deflated the value, that
14 wouldn't have affected her opinion, would it?
15        MS. CURRY: Object to the form.
16 BY MS. GARBER:
17    Q    Doesn't it show that this was not done
18 intentionally?
19    A    I don't think it -- we have any idea
20 whatsoever what her intent was. The data was wrong.
21 And when you're producing a report such as this and
22 you say that this is the data that's reported in
23 those studies, then you have a responsibility to
24 accurately report that data.
25        The directionality of it doesn't make it

Page 127

1 right or -- it's wrong to incorrectly report the
2 data.
3    Q    In reading her deposition, did you glean
4 from that that she realized that those data were
5 misreported and she tried to explain why they were
6 misreported?
7        MS. CURRY: Object to the form.
8        THE WITNESS: Again, the deposition
9 testimony that you're handing me here is an
10 explanation of what her meta-analysis was and the
11 software programming that was used in order to
12 conduct her meta-analysis, has nothing to do with
13 what's been produced in table four.
14        MS. GARBER: That's your opinion.
15        MS. CURRY: Object to the form.
16        THE WITNESS: That's documented in her
17 report and in the testimony she gave. She talks
18 about this being for her meta-analysis, not for
19 table four.
20        MS. GARBER: Let's turn back to your
21 expert report.
22        THE WITNESS: Can we take a break?
23        MS. GARBER: Yes. It's a good breaking
24 point.
25        THE VIDEOGRAPHER: The time is 11:59.

Page 128

1 We're going off the record.
2        (Lunch break taken at 12:00 p.m.)
3                0o0
4        (The deposition resumed at 12:59 p.m.)
5                0o0
6        THE VIDEOGRAPHER: The time is now 12:58.
7 Back on the record.
8 BY MS. GARBER:
9    Q    Good afternoon, Dr. Saenz.
10    A    Good afternoon.
11    Q    With regard to Exhibit 5, your expert
12 report, your CV is attached to the back of it; is
13 that right?
14    A    Yes.
15    Q    And it looks like it was last updated
16 February of 2019; is that right?
17    A    Correct.
18    Q    Are there any amendments that you need to
19 make to your CV to make it accurate?
20    A    No.
21    Q    Does it accurately reflect all your
22 publications?
23    A    Yes.
24    Q    You don't hold yourself out as a cancer
25 biologist, do you?

Page 129

1        MS. CURRY: Object to the form.
2        THE WITNESS: I'm not formally trained in
3 cancer biology, but I have certainly worked in
4 cancer biology labs and I read the cancer biology
5 literature as it pertains to gynecologic
6 malignancies.
7 BY MS. GARBER:
8    Q    You don't have any degrees in
9 epidemiology?
10    A    I do not have any degrees in
11 epidemiology.
12    Q    You don't hold yourself out as an
13 epidemiologist, do you?
14    A    I'm not formally trained in epidemiology,
15 but I've published epidemiologic literature and I
16 certainly review epidemiologic literature on a
17 regular basis as pertains to gynecologic oncology.
18        MS. GARBER: Motion to strike as
19 nonresponsive.
20 BY MS. GARBER:
21    Q    Doctor, my question was, do you hold
22 yourself out as an epidemiologist?
23    A    I do have expertise in epidemiology and
24 gynecologic oncology.
25    Q    Do you hold yourself out as an

Cheryl Saenz, M.D.

| Page 130 |
|---|

1  epidemiologist?  If I go to your website, does it
2  say you're an epidemiologist?
3      A    I don't have an website.
4      Q    If I went to a bio about you, does it say
5  you're an epidemiologist?
6      A    It says I'm an expert in gynecologic
7  oncology and in that includes literature on the
8  epidemiology of gynecologic oncology.
9      Q    How many times have you served as an
10  ad hoc reviewer?
11      A    Upwards of 20.
12      Q    When was the last time you served as an
13  ad hoc reviewer?
14      A    Approximately two months ago.
15      Q    What journal?
16      A    Gynecologic Oncology.
17      Q    Were any of the papers that you reviewed
18  regarding ovarian cancer?
19      A    Over the course of my career?
20      Q    I'm sorry, were any of the papers that
21  you reviewed as an ad hoc reviewer, did the topic
22  concern ovarian cancer?
23      A    Right.  So for clarification purposes,
24  you mean over the course of my career?
25      Q    Yes.

| Page 131 |
|---|

1      A    Yes.
2      Q    When was the last time?
3      A    Oh, I don't remember.  I review somewhere
4  around two to three articles a year.
5      Q    Do you know the -- based on you being an
6  ad hoc reviewer for gynecologic -- well, strike
7  that.
8          Have you reviewed abstracts for the
9  Society for Gynecologic Oncology?
10      A    Yes.
11      Q    When is the last time you did that?
12      A    You mean for the annual meeting itself?
13      Q    Yes.
14      A    I would say, two to three years ago.
15      Q    How many times have you done that kind of
16  work in general?
17      A    At least three.
18      Q    In that regard, did you ever review any
19  papers on the topic of ovarian cancer?
20      A    Yes.
21      Q    In that regard, did you review papers or
22  presentations on the topic of talc and ovarian
23  cancer?
24      A    No.
25      Q    Attendant to your work as an ad hoc

| Page 132 |
|---|

1  reviewer for SGO, do you know what their policies
2  and procedures are for review and acceptance?
3          MS. CURRY:  Object to the form.
4          THE WITNESS:  So I think you're kind of
5  mixing apples and oranges.  When you review for the
6  annual meeting for SGO, you're not an ad hoc
7  reviewer.  You're somebody that's either volunteered
8  to review the abstracts for presentation at the
9  meeting, or you're on the program committee and it's
10  your responsibility to review those abstracts.
11          Or you're on the marketing and
12  communications committee and you're asked to do it
13  in that role as well.
14  BY MS. GARBER:
15      Q    And in the three times that you have
16  served as a reviewer, what was your role for SGO?
17      A    So two of the times, I was invited to
18  review abstracts and to score them.  And one of the
19  times, I was actually a member of the program
20  committee that year.
21      Q    The two times that you were invited to
22  review and score, what were -- what was the nature
23  of the articles you were reviewing?
24      A    It was the breath and depth of
25  gynecologic oncology because I reviewed over 300

| Page 133 |
|---|

1  abstracts for the annual meeting on each of those
2  occasion.
3      Q    But none of those involved talcum ovarian
4  cancer?
5      A    Not that I recall.
6      Q    The one additional time, what was the
7  nature of that one?
8      A    I was on the program committee.
9      Q    What does that entail?
10      A    That entails reviewing all of abstracts,
11  scoring them, and then going to a venue, if you
12  will, almost a two to three-day retreat where the
13  people that are actually on the program committee
14  decide which abstracts are being accepted, which
15  will be posters, which will be oral presentations,
16  and which will be highlighted with reference to
17  invited speakers.
18      Q    Would you say based on your experience,
19  it's a rigorous review to be accepted to present at
20  SGO?
21          MS. CURRY:  Object to the form.
22          THE WITNESS:  In what capacity?
23  BY MS. GARBER:
24      Q    Scientific capacity.
25          MS. CURRY:  Object to the form.

Cheryl Saenz, M.D.

Page 134

1    THE WITNESS: So I think that's really
2  kind of a gross overgeneralization of the way that
3  the meeting occurs. There are different levels of a
4  claim, if you will, or scientific accord of the
5  abstracts, based on whether or not you're accepted
6  for a plenary session presentation versus a breakout
7  session versus a poster session.
8    And so the scientific acclaim with each
9  of those is really in descending order.
10 BY MS. GARBER:
11   Q    Are you familiar with, I'll use the
12 phrase, policies and procedures or sort of the
13 context in which you would review data for the SGO?
14   MS. CURRY: Object to the form.
15   THE WITNESS: What do you mean by "data"?
16 BY MS. GARBER:
17   Q    In other words, the review process, say
18 were you asked to review and you were invited to
19 review and to score data or a presentation. Are you
20 familiar with policies and procedures of how that's
21 done generally speaking?
22   A    Well --
23   Q    In other words, is it five people, is it
24 ten people? What level of review is it? Just give
25 me a feel for how that process happens.

Page 135

1    MS. CURRY: Object to the form.
2    THE WITNESS: So I'm only familiar with
3  respect to the three times that I did serve as a
4  review for the meeting. So to that extent, yes.
5  BY MS. GARBER:
6    Q    To that extent, yes, what?
7    A    During the three times that I did serve
8  as a reviewer for the annual meeting, I'm familiar
9  with the policies and procedures.
10   Q    Okay. And what are these?
11   MS. CURRY: Object to the form.
12   THE WITNESS: I don't know what the
13 current ones are, but because I'm not on the program
14 committee this year. But when I did serve, there
15 can be many dozen of people that review abstracts,
16 but then the ultimate decision amongst the program
17 committee as to what makes it to plenary sessions
18 versus breakout sessions versus a poster is decided
19 by a committee of -- I believe our program committee
20 was around 20 people.
21 BY MS. GARBER:
22   Q    Are you planning to go to SGO this year?
23   A    I was.
24   Q    What did you do to prepare for today's
25 deposition?

Page 136

1    A    Other than write the report? I, as we
2  discussed earlier, read the Penninkilampi article
3  again last evening. I looked up some other articles
4  on COX and ovarian cancer. I've read my own report.
5    I met with counsel in preparation for
6  today. And generally read all the expert reports
7  that we talked about, read the depositions that are
8  listed in my reference, and re-reviewed the
9  literature that is in my report over a long time
10 period.
11   Q    In preparation for today's deposition,
12 how many meetings did you have with counsel?
13   A    Since what time period?
14   Q    Just in preparation for today's
15 deposition as you would understand that question.
16   A    Do we mean back to when I was first
17 retained for this matter or do we mean since my
18 report was submitted?
19   Q    In connection with preparing for today's
20 deposition, did you meet with counsel?
21   A    Specifically for today's deposition, I've
22 had one meeting.
23   Q    How long was that meeting?
24   A    About two and a half hours.
25   Q    Who was present?

Page 137

1    A    Ms. Curry.
2    Q    Anybody else?
3    A    No.
4    Q    Were any lawyers on the phone?
5    A    No. I was there too obviously.
6    Q    Did you have any other meetings with
7  Ms. Curry or any other lawyers in connection with
8  today's deposition, preparing for it specifically?
9    A    No.
10   Q    With regard to the documents that you
11 reviewed that you've told us about, how many hours
12 would you say you've reviewed those?
13   A    Probably in sum total, somewhere around
14 75 to 80 hours.
15   Q    So between, I thought you said between
16 February of '19 and today, you had worked about
17 15 hours?
18   A    Correct.
19   Q    So how many hours did it take you to
20 review the documents that you reference? The
21 Penninkilampi and the COX-2 and to re-review your
22 report and those types of things, how many hours did
23 that take?
24   A    About two hours.
25   Q    Other than counsel, have you told me

Cheryl Saenz, M.D.

Page 138

1  about all conversations that you've had concerning
2  this matter? I think it's none, but there aren't
3  any other people other than counsel you've discussed
4  this case with; is that a true statement?
5      A    That's a true statement.
6      Q    I was asking you about internal documents
7  earlier, and I want to be sure I understand some of
8  your answers.
9          Do you harbor any opinions about whether
10 or not internal documents are reliable for forming
11 the basis of an expert opinion?
12         MS. CURRY: Object to the form.
13         THE WITNESS: I have no opinion on that.
14 I don't believe it's -- I don't believe it's
15 important to generating my opinion. I believe that
16 my opinion is based on what we discussed before. So
17 internal documents don't influence my opinion one
18 way or another.
19 BY MS. GARBER:
20     Q    So if you saw a document wherein Johnson
21 & Johnson employees were admitting -- I'll just
22 throw out a hypothetical -- talc can migrate,
23 there's compelling evidence that talc can migrate,
24 that wouldn't influence your opinion?
25         MS. CURRY: Object to the form.

Page 139

1          THE WITNESS: I base my opinions on the
2  peer-reviewed literature and there is no literature
3  that supports that preposition [sic].
4  BY MS. GARBER:
5      Q    There's no literature?
6      A    Not on the perineum to the ovaries, no.
7      Q    Do you limit it to that?
8      A    That's the case that we're discussing,
9  that's my review.
10     Q    So when you say there's no literature
11 that supports talc can migrate, you're limiting that
12 body of literature from the perineum to the vagina;
13 is that true?
14         MS. CURRY: Object to the form.
15         THE WITNESS: No, I'm qualifying my
16 statement that the application of talc from the
17 perineum and whether or not it can migrate to the
18 ovaries, there's no literature that supports that
19 hypothesis.
20 BY MS. GARBER:
21     Q    Okay. We'll get to that shortly.
22         Are you aware of circumstances where
23 scientists have gained access to internal company
24 documents and rely upon those in formulating their
25 opinions for scientific publications?

Page 140

1          MS. CURRY: Object to the form.
2          THE WITNESS: No.
3  BY MS. GARBER:
4      Q    Are you aware of that?
5      A    No.
6      Q    Do I now have the full list of the
7  documents that you considered in formulating your
8  opinions as referenced in your February 2019 report?
9          MS. CURRY: Object to the form.
10         THE WITNESS: So I think there may be
11 some confusion with respect to the Saed abstract
12 that's in my report versus what has been presented
13 in -- I should say in a published format as what was
14 the meeting that was accepted at -- I'm sorry, the
15 abstract that was accepted at a meeting, but then
16 later published in the Journal of Reproductive
17 Sciences as the abstract that had been presented at
18 the meeting.
19         During the break, I asked counsel to show
20 me the abstract and there seems to be two abstracts
21 from Fletcher and Saed that have different topics
22 but are from the same meeting.
23         So the confusion for me was that I didn't
24 realize that they were two. One is referencing the
25 CA 125, and I think that's the abstract that was

Page 141

1  listed as to be presented at the meeting in March
2  of 2018, but then the actual journal published a
3  different abstract.
4          So that's wherein the confusion lies.
5  BY MS. GARBER:
6      Q    So are you saying now after lunch break
7  and talking to counsel, you need to correct your
8  reference list?
9          MS. CURRY: Object to the form.
10         THE WITNESS: I need -- so the reference
11 is correct in the sense that that is what was
12 published in the Journal of Reproductive Sciences.
13 But the abstract that talks about CA 125 looks to me
14 as though it's from the program and it's not the
15 same abstract as what was then published in the
16 Journal of Reproductive Sciences.
17         So, yes, we likely should add that other
18 abstract that wasn't in the program.
19 BY MS. GARBER:
20     Q    So you're now saying we need to add
21 something to your reference list?
22     A    Correct. I've seen both of those. It
23 wasn't on my list, but I think that's because one
24 was in the program, the other was in the journal,
25 and they don't match, which means most likely

Cheryl Saenz, M.D.

Page 142

1 additional data was added to what was the program
2 aspect when it finally was published in the journal.
3     Q    What is the title of the abstract that
4 you say we now need to add to your reference list?
5         MS. CURRY: I actually have a copy of it
6 if that would be helpful, if you want to mark it as
7 an exhibit.
8         MS. GARBER: Sure.
9         MS. CURRY: I'll give you a copy of both
10 of the abstracts that Dr. Saenz just testified
11 about.
12         (C. Saenz Exhibit 9 was marked for
13         identification.)
14 BY MS. GARBER:
15     Q    Doctor, I'm going to mark as Exhibit 9,
16 an abstract that --
17     A    If you want to give me the marked one --
18     Q    Thank you. That counsel just handed me.
19 The first of two documents that counsel just handed
20 me.
21     A    Right.
22     Q    The first is dated March 10th, 2018, and
23 it's from SRI, 65th annual scientific meeting, and
24 it's titled "Talcum powder enhances cancer antigen
25 125 levels in ovarian cancer cells and in normal

Page 143

1 ovarian epithelial cells."
2         Doctor, this is the abstract that was
3 originally reflected on your reference as
4 reference 21; is that correct?
5         MS. CURRY: Object to the form.
6         THE WITNESS: I don't actually think
7 that's correct, ma'am. I think that the second one
8 is actually the one that's listed in my reference
9 list as number 21.
10         This one, Exhibit 9, is the abstract that
11 I believe comes from the program that was to be --
12 that was for the meeting, the 65th annual meeting of
13 SRI, which was on March 10th.
14         But then when the program abstracts were
15 published, the abstract was modified. And that's
16 what ends up in the journal and is my reference 21.
17         MS. GARBER: Okay.
18         THE WITNESS: But I've seen both of
19 these, and that's where my confusion lied, because
20 they're both from the same meeting. It's just that
21 the one that was published in the journal was
22 modified from the one that was published in the
23 meeting program.
24 BY MS. GARBER:
25     Q    Doctor, you didn't type yourself, did

Page 144

1 you, pages 32 through 42, of your expert report, did
2 you?
3     A    I supplied the reference to counsel, but
4 I did not format the list, that's correct.
5     Q    Do you have a folder on your computer
6 which reflects the body of literature that you have
7 reviewed in connection with your expert opinions
8 that formulate the reference that you have provided
9 us?
10     A    Yes.
11         MS. CURRY: Object to the form.
12 BY MS. GARBER:
13     Q    You have not brought with you that body
14 of literature with you today.
15     A    It's all on my computer, ma'am.
16     Q    It can be downloaded to a jump drive;
17 right?
18     A    Potentially, yes.
19         MS. GARBER: Let's mark as Exhibit 10 a
20 document.
21         (C. Saenz Exhibit 10 was marked for
22         identification.)
23 BY MS. GARBER:
24     Q    And, Doctor, this would reflect an
25 abstract titled "F-098, talcum powder enhances

Page 145

1 oxidative stress in ovarian cancer cells," Nicole
2 Fletcher, Ira Memaj, and Dr. Saed.
3         Is that correct?
4     A    That's correct.
5     Q    It's your testimony that in connection
6 with your expert report, you had reviewed this
7 abstract?
8     A    Yes, ma'am.
9     Q    Do you now need to add any other
10 documents to your reference list that we have
11 reviewed today to make it accurate to reflect what
12 you have reviewed in connection with your expert
13 report or expert opinions today?
14         MS. CURRY: Object to the form.
15         THE WITNESS: So with respect to what I
16 have cited in the report, no. Obviously, I've had a
17 very long career and there's literature that I've
18 read that is not in this report or in my reliance
19 list over the course of time, but nothing else that
20 I've referenced to or cited for the purposes of this
21 report, other than my general fount of knowledge.
22 BY MS. GARBER:
23     Q    I appreciate that. You understand that
24 I'm entitled to know the literature you considered
25 in formulating your opinions; correct?

Page 146

1    A    Absolutely. Which is why I tried to
2 figure out at lunchtime why there was a discrepancy.
3    Q    Do you have any documentation which
4 evidences -- strike that.
5        What was your assignment as you
6 understood it when you were first retained by the
7 MDL lawyers for Johnson & Johnson?
8        MS. CURRY: Object to the form.
9        THE WITNESS: For this particular matter?
10       MS. GARBER: Yes.
11       THE WITNESS: To review the literature on
12 the topic of perineal application of talc and the
13 risk of developing ovarian cancer, to write a report
14 on that, as well as on the same evaluation that
15 plaintiff's experts made, and to essentially get my
16 opinion down on paper.
17 BY MS. GARBER:
18    Q    Were you asked to render a causation
19 opinion?
20       MS. CURRY: Object to the form.
21       THE WITNESS: With respect to whether or
22 not talc causes ovarian cancer -- the perineal
23 application of talc causes ovarian cancer, I would
24 say in the broadest sense; yes.
25 ///

Page 147

1 BY MS. GARBER:
2    Q    Why do you say in the broadest sense?
3 What do you mean by that?
4    A    Well, because I don't believe in any one
5 individual woman that we know what causes ovarian
6 cancer, and the issue that was put forth to me that
7 I was asked to comment on was whether or not the
8 hypothesis that perineal application of talc
9 increased the risk of ovarian cancer made sense from
10 an epidemiologic standpoint, from a biologic
11 plausibility standpoint, from a mechanistic
12 standpoint. So that's what I mean by in the
13 broadest sense.
14 BY MS. GARBER:
15    Q    Are you saying that scientists can
16 determine what causes ovarian cancer in women
17 generally, but not what caused a given woman's
18 ovarian cancer?
19       MS. CURRY: Object to the form.
20       THE WITNESS: So I think science is
21 trying to determine in the broadest sense what
22 causes ovarian cancer, but I think the state of the
23 science as it exists right now has only been to
24 identify known associated risk factors.
25       I think that, as time goes on, it's

Page 148

1 certainly my hope that we can identify causes of
2 ovarian cancer, but I don't think the science is
3 there right now.
4 BY MS. GARBER:
5    Q    So you understood that one of the
6 questions that you were asked to determine is
7 whether talcum powder products can cause ovarian
8 cancer; in other words, a general causation opinion.
9 Generally speaking, can ovarian -- sorry, can talcum
10 powder products cause ovarian cancer?
11       MS. CURRY: Object to the form.
12       THE WITNESS: Right. So in the broad
13 sense of, does -- is hypothesis supported by the
14 epidemiology, the mechanistic studies that exist,
15 the bio -- the migration theory that's been put
16 forth, the patient data, the clinical data that we
17 know and that we see, is the hypothesis that
18 perineal application of talc can cause ovarian
19 cancer, is that substantiated or not.
20 BY MS. GARBER:
21    Q    That's a different question. I just want
22 to be sure I know your opinions because I don't
23 think it's clear from your report.
24       Are you going to give an opinion, and is
25 it your opinion, can talcum powder products cause

Page 149

1 ovarian cancer -- epithelial ovarian cancer, is that
2 your opinion?
3    A    My opinion --
4        MS. CURRY: Object to the form.
5        THE WITNESS: -- is that talcum powder
6 products cannot cause ovarian cancer.
7 BY MS. GARBER:
8    Q    Is it your opinion that talcum powder
9 products are a risk factor for epithelial ovarian
10 cancer?
11   A    It is my opinion that talcum powder
12 products are not a risk factor for the development
13 of ovarian cancer.
14   Q    Is it your opinion that asbestos can
15 cause ovarian cancer?
16   A    It --
17       MS. CURRY: Object to the form.
18       THE WITNESS: It is my opinion that IARC
19 has identified asbestos as causing ovarian cancer in
20 women with heavy occupational exposure, but in the
21 context of whether or not there is asbestos in the
22 talcum powder products, I do not believe that
23 asbestos, nor the talcum powder products themselves,
24 can cause ovarian cancer.
25 ///

Cheryl Saenz, M.D.

Page 150

BY MS. GARBER:
2    Q    Is it your opinion, Doctor -- I heard all
3    that.  Is it your opinion that asbestos can cause
4    epithelial ovarian cancer?
5        MS. CURRY:  Object to the form.
6        THE WITNESS:  Independent of IARC's
7    findings?
8    BY MS. GARBER:
9    Q    I didn't ask you that.  I just want to
10   know what your opinion is.  I don't want you to
11   qualify it.  Just it's a yes-or-no question.
12       Can asbestos cause epithelial ovarian
13   cancer?
14       MS. CURRY:  Object to the form, asked and
15   answered.
16       THE WITNESS:  So I don't think I can
17   answer it as a yes-or-no question, because I don't
18   think the literature is clear on that topic.
19   BY MS. GARBER:
20   Q    Is it your opinion that heavy
21   occupational use of asbestos can cause ovarian
22   cancer?
23   A    Same answer.  I don't think I can answer
24   that as a yes-or-no question because I think the
25   literature on that topic is not entirely clear.

Page 151

1    Q    That is inconsistent with your prior
2    testimony, isn't it?
3        MS. CURRY:  Object to the form.
4        THE WITNESS:  I don't believe that it is.
5        MS. GARBER:  Okay.  We'll get to that.
6    BY MS. GARBER:
7    Q    I think -- I think we already identified,
8    but just let me be sure.  You do not have any
9    opinions as to whether heavy metals can cause
10   epithelial ovarian cancer; is that true?
11   A    So I have not reviewed the literature on
12   heavy metals in ovarian cancer, so you are correct.
13   I'm not giving an opinion on that.
14   Q    You are not giving an opinion on whether
15   fragrance can cause epithelial ovarian cancer?
16   A    Likewise, I'm not giving an opinion on
17   that.
18   Q    Is asbestos a risk factor for epithelial
19   ovarian cancer?
20       MS. CURRY:  Object to the form.
21       THE WITNESS:  So again, based on my
22   review of the IARC 2012 document, and based on the
23   literature that I reviewed, including the Langseth
24   paper, I do not believe that the literature that's
25   been published to date supports a clear role for

Page 152

1    asbestos increasing the risk of ovarian cancer.
2    BY MS. GARBER:
3    Q    I didn't ask you for a clear role.  In
4    your opinion, is asbestos a risk factor for
5    epithelial ovarian cancer?
6    A    Again, I don't think that's a yes-or-no
7    answer, because I think the literature is somewhat
8    inconsistent on that particular topic.
9    Q    So you don't have that opinion?
10       MS. CURRY:  Object to the form.
11       THE WITNESS:  I don't have an opinion
12   that it does or that it does not; correct.
13   BY MS. GARBER:
14   Q    You reviewed some of the plaintiff's
15   expert purports; correct?
16   A    That's correct.
17   Q    Those are all indicated on your reference
18   list; correct?
19   A    Yes.
20   Q    Would you agree that there are multiple
21   epidemiological studies that are cited in those
22   reports that showed an association between genital
23   use of talcum powder products and ovarian cancer?
24       MS. CURRY:  Object to the form.
25       THE WITNESS:  I would agree that some of

Page 153

1    the experts' reports cite to different epidemiologic
2    literature.  Some of that is demonstrating a weak
3    association with the use of perineal talc in the
4    development of ovarian cancer, in particular, in the
5    case control studies, but there's also other
6    literature that does not demonstrate such an
7    association.
8    BY MS. GARBER:
9    Q    How do you define weak, as you used it?
10   A    Weak would be an odds ratio of less than
11   two.  For this literature in particular, the odds
12   ratio tends to be in the range of 1.2 to 1.4.
13   Q    Are you saying a weak odds ratio is
14   anything less than 2.0, the point estimate?
15       MS. CURRY:  Object to the form.
16       THE WITNESS:  I'm saying that the odds
17   ratios that have been shown in the literature on the
18   case control studies are in the range of 1.2 to 1.4.
19   It's not a strong association.
20   BY MS. GARBER:
21   Q    I'm trying to get your definition of what
22   you mean by weak association.  How do you define
23   that?
24   A    I define weak as something that is above
25   one, but lower than two, and that the strength of

Page 154

1 the association is such that the results of the
2 study could still be due to random chance, recall
3 bias, or confounds within the study.
4     Q    If you look at a body of literature and
5 it's greater than one, and statistically
6 significant, but does not approach a point estimate
7 of 2.0, you deem that weak literature?
8         MS. CURRY: Objection.
9         THE WITNESS: No, I would deem that weak
10 statistical association, a weak odds ratio. Not
11 weak literature, that's not what I said.
12 BY MS. GARBER:
13    Q    Okay. You deem that a weak association?
14    A    Correct.
15    Q    And what published peer review study,
16 article, text, or treatise do you have that supports
17 that statement?
18    A    So off the top of my head, I can't
19 necessarily recall one specific. This is something
20 that I've just been taught over the years in
21 reviewing epidemiologic literature that you don't
22 just look at one thing, i.e., the odds ratio, and
23 say, whether or not that proves causation.
24         There has to be other things that would
25 support the contention of the hypothesis that would

Page 155

1 allow you to evaluate whether or not that odds risk
2 is impactful, meaningful, but just simply looking at
3 the odds ratio is not enough.
4    Q    Dr. Saenz, point me to one source that
5 says that you need a 2.0 point estimate or the study
6 data is weak. Just point me to one, just one
7 source.
8         MS. CURRY: Object to the form.
9         MS. GARBER: That says that.
10         THE WITNESS: So I actually think that
11 within the context of one of the IARC monographs
12 they talk about this, the statistical calculations
13 for some of the different risk factors, especially
14 with talc and the development of ovarian cancer.
15 And it's weak, and I believe their term is weak. I
16 believe that IARC uses the term weak when we talk
17 about statistical associations and odd ratios of 1.2
18 and 1.3.
19 BY MS. GARBER:
20    Q    That's not way asked you, did I? What
21 did I ask you?
22    A    I believe that's what you asked you.
23    Q    Didn't I ask you for a source that says
24 that anything below a 2.0 is deemed to be weak?
25    A    So I don't off the top of my head have an

Page 156

1 epidemiologic textbook in my recollection right now.
2    Q    I didn't ask you for a textbook. I asked
3 you for any source, and you can't name one, can you?
4    A    As we sit here today, ma'am, I cannot
5 recall one for you.
6         MS. CURRY: Object to the form.
7 BY MS. GARBER:
8    Q    Do you believe that the plaintiff expert
9 reports that you reviewed discussed biologically
10 plausible mechanisms of carcinogenicity based on the
11 scientific data that they reviewed?
12         MS. CURRY: Object to the form.
13 BY MS. GARBER:
14    Q    Whether or not you agree with it, do you
15 agree that plaintiff's expert reports discuss
16 biologically plausible mechanisms of carcinogenicity
17 that were based on scientific data that they
18 reviewed?
19         MS. CURRY: Object to the form.
20         THE WITNESS: Which reports specifically
21 are we talking about?
22 BY MS. GARBER:
23    Q    Any of them that you reviewed.
24         MS. CURRY: Object to the form.
25         THE WITNESS: The various reports had

Page 157

1 different discussion of different things. So
2 without seeing a specific report in front of me, I
3 can't assign a name to that topic matter.
4 BY MS. GARBER:
5    Q    How about the gynecologic oncologist
6 experts of plaintiffs that you reviewed, did each of
7 them discuss biologically plausible mechanisms of
8 carcinogenicity based on scientific data that they
9 reviewed?
10         MS. CURRY: Object to the form.
11         THE WITNESS: I do know that one or two
12 or perhaps all three of them did. I just don't know
13 specifically which ones did. I do believe that they
14 had a discussion of biologic plausibility, which I
15 disagreed with.
16 BY MS. GARBER:
17    Q    While I know that you disagree with
18 plaintiff's experts' causation opinions, do you
19 acknowledge that their opinions were based on
20 informed scientific medical judgment?
21         MS. CURRY: Object to the form.
22         THE WITNESS: No.
23         MS. GARBER: Are you laughing,
24 Ms. Sharko? That seems very unprofessional to me.
25         MS. SHARKO: Well, I think your question

Cheryl Saenz, M.D.

Page 158

1  is totally misleading and very unprofessional, and
2  I'm trying to honor your request that only one
3  lawyer object.  But it's really unclear to me
4  whether you're asking her about the content or
5  whether she agrees with them.
6          MS. GARBER:  Well --
7          MS. SHARKO:  I think --
8          MS. GARBER:  -- all I heard was a laugh
9  of my question and I don't think in all my years of
10 taking depositions I've ever had defense counsel
11 laugh out loud at one of my questions.  So that's a
12 first for me, so I appreciate that.
13         MS. SHARKO:  Well, I think --
14         MS. GARBER:  Go ahead, Dr. Saenz --
15         MS. SHARKO:  -- the record will reflect
16 that you are totally exaggerating what I did.  But,
17 go ahead with what you're doing, if that's what you
18 want to do.
19 BY MS. GARBER:
20     Q    Dr. Saenz, while you do not agree with
21 plaintiff's experts' causation opinions, do you
22 acknowledge that their opinions were based on
23 informed scientific medical judgment?
24         MS. CURRY:  Object to the form.
25         THE WITNESS:  So, no, actually.  I think

Page 159

1  there's very little evidence for what they put forth
2  as biologic plausibility.  I think a lot of your
3  experts' reports were conjecture, hypothesis without
4  any scientific basis.
5  BY MS. GARBER:
6      Q    Do you think their opinions were
7  uninformed?
8          MS. CURRY:  Object to the form.
9          THE WITNESS:  I think their opinions were
10 wrong.
11 BY MS. GARBER:
12     Q    That's very different question.  You
13 disagree.  They're wrong.  But were they uninformed?
14         MS. CURRY:  Object to the form.
15         THE WITNESS:  I think that their opinions
16 were uninformed.  I don't think that they based on
17 their opinions on the literature as published,
18 because I think that had they actually read the
19 literature and analyzed it in the manner that I
20 have, they would come to the same conclusion that I
21 have.
22 BY MS. GARBER:
23     Q    Tell me which experts' you believe
24 opinions were uninformed and the reason they were
25 uninformed.

Page 160

1          MS. CURRY:  Object to the form.
2          THE WITNESS:  I believe all three of them
3  are uninformed.
4  BY MS. GARBER:
5      Q    All three who?
6      A    Drs. Wolf, Blair Smith, and
7  Clarke-Pearson.
8      Q    Why were all three of those plaintiff's
9  experts' opinions uninformed?
10     A    Because they all concluded that perineal
11 application of talc causes ovarian cancer.
12     Q    Did they base their opinions on a review
13 of published literature which included
14 epidemiological and mechanistic data?
15         MS. CURRY:  Object to the form.
16         THE WITNESS:  Not always.
17 BY MS. GARBER:
18     Q    Did Dr. Wolf, Blair Smith, and can I call
19 Dr. CP -- Dr. Clarke-Pearson, CP, Dr. CP for short?
20     A    No, you have to call him DCP.  That's
21 what we call him.
22     Q    So DCP.  Did they base their opinions on
23 medical judgment?
24         MS. CURRY:  Object to the form.
25         THE WITNESS:  Not always.

Page 161

1  BY MS. GARBER:
2      Q    What basis do you have to say they didn't
3  base their opinions on medical judgment?
4      A    I read their reports and I read their
5  depositions and there were times that what they
6  stated in their reports and their depositions was
7  unsupported by medical judgment.
8      Q    Which specifically are you thinking of
9  when you say that?
10     A    I would need to see the reports or
11 actually look at my reports and I could tell you
12 where I reference and critique what they said in
13 their reports.
14     Q    And so that's what I want to get to.
15 Your critique of those three plaintiff experts are
16 limited to what is referenced in your expert report;
17 is that fair?
18     A    No.  Also in their depositions as well.
19     Q    We'll get to that, but as you sit here,
20 what criticisms do you have of Dr. Wolf aside from
21 what you have referenced in your expert report?
22         MS. CURRY:  Object to the form.  Do you
23 have a copy of her deposition transcript and her
24 report?
25 ///

Cheryl Saez, M.D.

Page 162

BY MS. GARBER:
2  Q  Go ahead, Doctor, do you understand my
3  question?
4  A  I can't just give you something broadly.
5  I've done a lot of reading for my preparation to be
6  here and I don't want to misquote her.  So I would
7  need to look at the actual report or deposition in
8  order to make sure that I'm giving you a complete
9  reference of -- just basically comprehensive review
10  of what my critiques are.
11  Q  And, Doctor, does anything come to mind?
12  A  Other than what I've already referenced
13  in my report, additional findings, not off the top
14  of my head, ma'am.  I would need to see the
15  documents.
16  Q  What about Dr. Smith?
17  A  Same thing.
18  Q  What about doctor -- DCP?
19  A  Same thing.
20  Q  And you understand that this is my
21  opportunity to get all of your opinions and
22  criticisms and bases for those opinions; correct?
23  A  I understand that.
24  Q  And you know I have seven hours.  So for
25  me to sit and watch you read a deposition would be

Page 163

1  wholly unfair of each of those witnesses; right?
2      MS. CURRY:  Object to the form.
3      THE WITNESS:  So my position, ma'am, is
4  that you want me to give you a comprehensive honest
5  answer and in order to do that, I would need the
6  document in front of me.
7  BY MS. GARBER:
8  Q  But you can't think of any other
9  criticisms as you sit here today?
10      MS. CURRY:  Object to the form.
11      MS. GARBER:  Correct?
12      THE WITNESS:  Off the top of my head,
13  ma'am, no.
14  BY MS. GARBER:
15  Q  So before you read Dr. Wolf's expert
16  report and deposition, did you know her
17  professionally?
18  A  No.
19  Q  Had you ever heard of her?
20  A  No.
21  Q  And what about Dr. Smith?
22  A  No.
23  Q  And obviously you knew DCP?
24  A  Correct.
25  Q  And you know him professionally?

Page 164

1  A  Yes.
2  Q  What are the circumstances?
3  A  What are the circumstances?
4  Q  Uh-huh.  How do you know him personally?
5  A  We're both gynecologic oncologists.  I
6  believe that I have served -- I don't know exactly
7  when.  I think I actually might have been on the
8  program committee when he was president of SGO.  I
9  think that he and I have done some work together for
10  the Foundation for Women's Cancer as well.  I think
11  we might have served on the board at the same time.
12  I don't have an exact recollection, but I think
13  that's quite possible.
14  Q  Does he enjoy an excellent professional
15  reputation?
16      MS. CURRY:  Object to the form.
17      THE WITNESS:  I believe so.
18  BY MS. GARBER:
19  Q  Do you respect him?
20      MS. CURRY:  Object to the form.
21      THE WITNESS:  Not with respect to this
22  matter, ma'am.
23  BY MS. GARBER:
24  Q  You respected him before you got involved
25  in this talc case?

Page 165

1  A  I still respect him as an individual.  I
2  don't respect his opinion with respect to talc in
3  the development of ovarian cancer.
4  Q  Doctors can look at the same evidence and
5  come to different medical judgments, can't they?
6      MS. CURRY:  Object to the form.
7      THE WITNESS:  I don't believe that's
8  true, ma'am.  I believe that anybody that has gone
9  as thorough analysis of this literature and looked
10  at all of the considerations would not draw any
11  conclusion other than the conclusion that I have
12  drawn.
13  BY MS. GARBER:
14  Q  What is the purpose of a second medical
15  opinion then?
16  A  What is the purpose of a second medical
17  opinion?
18      MS. CURRY:  Object to the form.
19      THE WITNESS:  It varies.  Sometimes
20  patients want to know that what their doctor is
21  saying is accurate and true.  Other times, patients
22  maybe don't hit it off personality-wise with a
23  certain practitioner and so they want to establish
24  care with someone else.
25  ///

Page 166

BY MS. GARBER:

1  Q    And sometimes they seek a second medical
2  opinion because two doctors can look at the same set
3  of evidence and come to different conclusions;
4  correct?
5      MS. CURRY:  Object to the form.
6      THE WITNESS:  I don't actually think
7  that's why you see a second opinion.  I think you
8  see a second opinion to make sure that you're
9  exploring all possible alternatives.
10 BY MS. GARBER:
11 Q    Do you think expert witnesses can weigh
12 evidence differently?
13     MS. CURRY:  Object to the form.
14     THE WITNESS:  Can you define for me what
15 you mean by "weigh"?
16 BY MS. GARBER:
17 Q    Sure.  Did you weigh the evidence in your
18 expert report?  I didn't see where you had done
19 that.
20     MS. CURRY:  Object to the form.
21     THE WITNESS:  Again, can you --
22 BY MS. GARBER:
23 Q    Did you weigh it in your mind?
24     MS. CURRY:  Object to the form.
25

Page 167

1      THE WITNESS:  What do you mean by
2  "weigh"?
3  BY MS. GARBER:
4  Q    So if you looked at say the cohort
5  studies versus the case control studies, did you
6  weigh the case control less heavily than you weighed
7  the cohort studies?
8      Did you put any more emphasis on one type
9  of evidence as opposed to another?
10 A    So I wouldn't use the word weigh.  I do
11 believe that the cohort studies have more scientific
12 credibility than the case control studies because
13 the case control studies are subject to more biases
14 and potential confounds than the cohort studies.
15 Q    You didn't perform a weight of the
16 evidence analysis in your expert report, did you?
17 A    No, I did not.
18 Q    Coming to a different conclusion doesn't
19 mean the methodology is flawed or improper, does it?
20     MS. CURRY:  Object to the form.
21     THE WITNESS:  So in this particular
22 matter I believe that it is.  I believe that in this
23 particular matter, if you've reviewed all of the
24 literature, looked at the data that is actually
25 available from a biologic plausibility standpoint,

Page 168

1  from a mechanistic standpoint, and not hypothesized
2  about things that don't actually exist, there is
3  only one conclusion that can be drawn.
4  BY MS. GARBER:
5  Q    There are scientific bodies that have
6  concluded that talc can cause ovarian cancer; true?
7      MS. CURRY:  Object to the form.
8      THE WITNESS:  I don't believe that that's
9  true.
10 BY MS. GARBER:
11 Q    You don't?
12 A    No, I don't.
13 Q    You don't think Health Canada has come to
14 that conclusion?
15 A    No, I absolutely don't.  That's a draft
16 screening and I don't believe that they have come to
17 the conclusion that talc applied in the perineum can
18 cause ovarian cancer.
19 Q    Do you believe that IARC has concluded
20 that talc is a possible carcinogen?
21 A    IARC has classified talc in the perineal
22 application as Group 2B, which is possibly
23 carcinogenic.  That's not saying that talc causes
24 ovarian cancer.
25 Q    You disagree with that assessment?

Page 169

1  A    No, I disagree with your statement that
2  that says that talc is causing ovarian cancer.
3  Q    Well, you disagree with IARC's 2012
4  assessment of asbestos in fibrous talc.  Do you
5  disagree with IARC's 2010 and 2006 assessment of
6  non-asbestiform talc?
7      MS. CURRY:  Object to the form, misstates
8  prior testimony.
9      THE WITNESS:  I don't agree that talc
10 causes ovarian cancer.  So -- and I do believe that
11 there's more literature that has became available
12 since IARC did its analysis.  So yeah, I don't think
13 that ovarian cancer even is possibly caused by
14 perineal application of talc.
15 BY MS. GARBER:
16 Q    So you think IARC is wrong with regard to
17 non-asbestiform talc?
18 A    I think IARC is wrong.  Talc does not
19 possibly lead to ovarian cancer.  I think IARC is
20 wrong.
21 Q    Has talc been shown to be safe?
22     MS. CURRY:  Object to the form.
23     THE WITNESS:  Has talc been shown to be
24 safe in what context?
25 ///

Cheryl Saenz, M.D.

Page 170

BY MS. GARBER:
1  BY MS. GARBER:
2    Q    In not causing ovarian cancer.
3    A    I don't know how you would prove a
4  negative hypothesis, ma'am.
5    Q    Can you think of any data that has shown
6  that talc is safe?
7        MS. CURRY:  Object to the form.
8        THE WITNESS:  In terms of causing ovarian
9  cancer?
10       MS. GARBER:  We'll start there.
11       THE WITNESS:  I don't believe that any
12  such literature exists.
13  BY MS. GARBER:
14   Q    On page eight of your expert report --
15   A    I'm sorry, what page?
16   Q    Page eight.
17   A    Okay.
18   Q    Which is Exhibit 5.  It seems to indicate
19  that your opinion is the scientific evidence does
20  not support a causal role in the development of
21  ovarian cancer with the application of talcum powder
22  products applied to the genital region.
23       Is that a fair assessment of your report
24  on that page?
25       MS. CURRY:  You're reading -- I'm just

Page 171

1  trying to follow along with you.
2        MS. GARBER:  Under the genital
3  application of talc and risk factor of ovarian
4  cancer overview.
5  BY MS. GARBER:
6    Q    Is it your opinion that the scientific
7  evidence does not support a causal role in the
8  development of ovarian cancer with the application
9  of talc to the perineal region?
10       Does your report say that?
11   A    Are we referring something specific --
12   Q    Yeah, your report, your report, Doctor.
13   A    Can you refer me, ma'am, to exactly where
14  you're reading or are we doing a general statement?
15   Q    In the first paragraph under the heading
16  I just read.
17   A    Okay.
18   Q    Is that your opinion?
19   A    Which sentence are we starting with?
20   Q    The second sentence.
21   A    Okay.  So I write, "despite many years of
22  research on this topic, the scientific evidence does
23  not support a causal role in the development of
24  ovarian cancer, with application of talc to the
25  perineal region."  Right.

Page 172

1    Q    Is that still your opinion?
2    A    That is still my opinion.
3    Q    And in coming to that opinion as stated
4  in your report, you did not review the totality of
5  relevant literature, did you?
6        MS. CURRY:  Object to the form.
7        THE WITNESS:  I don't believe that's
8  correct.
9  BY MS. GARBER:
10   Q    Are the articles cited in the four
11  corners of your report given any more weight than
12  the articles that are not cited there?
13       MS. CURRY:  Object to the form.
14       THE WITNESS:  So everything that I've
15  read, everything that I've evaluated is in my
16  report.  If there's a particular article that you're
17  referencing to that you think I've left out, I'd be
18  happy to look at it right now.
19  BY MS. GARBER:
20   Q    Do you think in coming to a causation
21  opinion, it's important to review the totality of
22  the relevant evidence as to the topic?
23       MS. CURRY:  Object to the form.
24       THE WITNESS:  I believe that I have
25  reviewed a very comprehensive breadth and depth of

Page 173

1  the literature that is available on this topic.
2  BY MS. GARBER:
3    Q    And in looking at the topic of whether or
4  not an exposure can cause cancer, I like to call
5  them little -- different buckets of evidence.
6        So would you agree that in looking at
7  that assessment, it would be important to look at
8  the human epidemiological literature?
9    A    Yes, and I have.
10   Q    And the totality of that literature;
11  correct?
12   A    Yes, and I have.
13   Q    And it would be important to look at the
14  mechanistic data or the biologically plausible
15  mechanisms by which that agent or exposure could
16  cause cancer; correct?
17   A    Yes, and I have.  And the hypothesis here
18  is that chronic inflammation from the talc is
19  leading to the development of ovarian cancer, and
20  I've looked at that literature and I don't believe
21  that that is supported.
22   Q    You believe that you've looked at the
23  full body of the literature that speaks to the issue
24  of talc and inflammation in its role in causing
25  cancer, you believe you've looked at that full body

Cheryl Saenz, M.D.

Page 174

1 of the literature?
2          MS. CURRY:  Object to the form.
3          THE WITNESS:  In its role in causing
4 ovarian cancer; yes.
5 BY MS. GARBER:
6     Q    And do you believe that you've looked at
7 the full body of the literature that shows the
8 mechanistic ways in which inflammation can cause
9 ovarian cancer?
10         MS. CURRY:  Object to the form.
11 BY MS. GARBER:
12    Q    In other words, the pathways in which
13 inflammation can cause ovarian cancer?
14         MS. CURRY:  Object to the form.
15         THE WITNESS:  I believe that I've
16 thoroughly reviewed the hypothesis that chronic
17 inflammation can cause ovarian cancer or lead to the
18 development of ovarian cancer and I don't believe
19 that it is substantiated by the published
20 literature.
21 BY MS. GARBER:
22    Q    Let's talk about oxidative stress.
23    A    Okay.
24    Q    Is oxidative stress thought to be a
25 mechanism by which an agent or in general can result

Page 175

1 in cancer, just speaking broad picture?
2     A    Speaking --
3          MS. CURRY:  Object to the form.
4          THE WITNESS:  Speaking broad picture,
5 oxidative stress can be a response to any particular
6 stressful situation.  Inflammation is a generalized
7 process that's not necessarily carcinogenic.
8 BY MS. GARBER:
9     Q    But oxidative stress is a mechanism
10 that's understood in the medical community; correct?
11    A    Yes.
12         MS. CURRY:  Object to the form.
13         THE WITNESS:  But not in the sense of
14 oxidative stress leading to malignant transformation
15 in ovarian cancer.  There is no literature that
16 supports that.
17 BY MS. GARBER:
18    Q    There's no literature at all?
19    A    There's no literature that supports
20 mutagenicity as a result of the generation of
21 oxidative species in ovarian cancer.
22    Q    Have you reviewed the Buz'Zard paper?
23    A    No, I've not reviewed that paper.
24    Q    Have you -- and you haven't reviewed
25 Dr. Saed's 2019 paper, have you?

Page 176

1     A    Dr. Saed's 2019 paper is in his report
2 and I have reviewed his report.  Dr. Saed does not
3 ever demonstrate that generation of oxidative
4 species leads to malignant transformation.
5     Q    That's based on not reviewing his actual
6 published paper, but rather his expert report in
7 this case?
8          MS. CURRY:  Object to the form.
9          MS. GARBER:  Correct?
10         THE WITNESS:  Ma'am, his expert report is
11 what he's putting forth for his opinion to say that
12 this exists.  I've read his expert report.  There is
13 generation of oxidative stress responses.  There is
14 no data that that leads to malignant transformation.
15 BY MS. GARBER:
16    Q    Have you read the Shukla 2009 paper?
17    A    No, I have not.
18    Q    So you would have no basis to know
19 whether or not those papers provided mechanistic
20 data as to the connection between talc and ovarian
21 cancer or other forms of paper, because you've never
22 read them, right?
23         MS. CURRY:  Object to the form.
24         THE WITNESS:  There's no data, ma'am, in
25 the published literature that demonstrates that the

Page 177

1 generation of oxidative stress, reactive oxygen
2 species or nitrogen species leads to malignant
3 transformation.
4 BY MS. GARBER:
5     Q    That's not my question.  Have you read
6 the -- no, strike that.
7          You have not read the Shukla 2009 paper;
8 correct?
9     A    Correct.
10    Q    You have not read the Buz'Zard 2007
11 paper; correct?
12    A    Correct.
13    Q    And you have not read the Saed 2019
14 published paper; correct?
15    A    Ma'am, this Saed 2019 paper is in his
16 report.  So the content of that paper I have read.
17 There is no generation of malignant cells in that
18 report.
19         MS. GARBER:  Motion to strike as
20 nonresponsive.
21 BY MS. GARBER:
22    Q    I just need a yes-or-no question [sic.].
23    A    It's not a yes-or-no answer.
24    Q    Have you read the paper or not?
25         MS. CURRY:  Object to the form.

Page 178

```
1        THE WITNESS:  I've read his report.  His
2   report details his paper.
3        MS. GARBER:  We'll get to his paper.
4   BY MS. GARBER:
5    Q    Doctor, you have not considered the
6   Shukla, Saed 2019 paper, or the Buz'Zard 2007 paper
7   in connection with your opinions; is that a true
8   statement?
9        MS. CURRY:  Object to the form.
10       THE WITNESS:  No, that's incorrect.
11  BY MS. GARBER:
12   Q    Because the Saed paper was contained
13  within his expert report, that's your testimony?
14   A    That is my testimony.
15   Q    Do you know what the findings were of the
16  Buz'Zard paper?
17   A    No, ma'am.
18   Q    Do you know what the findings were of the
19  Shukla paper?
20   A    I have a vague sense, just based on
21  reading other expert reports, that both of those
22  papers involved inflammation, but I also have a
23  vague sense that neither of those papers involved
24  malignant transformation.  But I've not read either
25  of those reports.
```

Page 179

```
1    Q    What was your basis for your vague
2   recollection of those papers?
3    A    Reading other expert reports, including
4   Dr. Saed's report, including some of the other
5   expert reports for plaintiff's side that reference
6   those papers.
7    Q    So we're here in a case wherein experts
8   have said that talcum powder products can cause
9   ovarian cancer, a very lethal cancer, and you are
10  aware of literature, and you're telling me you did
11  not review that literature.
12       MS. CURRY:  Object to the form.
13       THE WITNESS:  What I'm telling you,
14  ma'am, is that there is no literature that
15  demonstrates malignant transformation.  So have I
16  read every single paper ever published on anything?
17  No.  But I do know that there is no published
18  literature that demonstrates that talc leads to
19  malignant transformation in ovarian cells.
20  BY MS. GARBER:
21   Q    In reading the other expert reports, did
22  you review or read about Dr. Longo's testing for
23  talcum powder products and asbestos content?
24   A    I did see other experts make mention of
25  that report.
```

Page 180

```
1    Q    Did you ask for that testing from defense
2   counsel?
3    A    I did not.
4    Q    Why not?
5    A    Because I don't believe that it is
6   germane to my opinion, which based on what we've
7   already talked about before.
8    Q    You don't need to know whether or not
9   asbestos is contained in Johnson & Johnson's baby
10  powder products?
11   A    I don't, because if baby powder contained
12  asbestos or not is irrelevant to the fact that the
13  literature does not support that perineal
14  application of talc leads to an increased risk of
15  developing ovarian cancer.
16   Q    Why do you think the United States
17  government is so interested to know if Johnson &
18  Johnson's baby powder products contain asbestos?  Do
19  you think they want to know that because it doesn't
20  matter?
21       MS. CURRY:  Object to the form.
22       THE WITNESS:  I don't think that has
23  anything to do with the scientific medical question
24  that we're dealing with right here right now, ma'am.
25  ///
```

Page 181

```
1   BY MS. GARBER:
2    Q    Doctor, in your report, you fail to
3   address or discuss the poor study designs and
4   limitations of the cohort studies, don't you?
5        MS. CURRY:  Object to the form.
6        THE WITNESS:  I don't think I failed to
7   evaluate any of the studies that are in my report.
8   BY MS. GARBER:
9    Q    Do you discuss the study of limitations
10  in the cohort studies?
11   A    I don't discuss the limitations that are
12  in the cohort studies because the authors do that
13  themselves in their discussion sections.
14   Q    Don't you think it's important to
15  consider what the author says is the limitations of
16  those data in formulating your opinion?
17       MS. CURRY:  Object to the form.
18       THE WITNESS:  I did consider it.  I
19  considered it when I read the paper and that's what
20  allowed me to formulate my opinions.
21  BY MS. GARBER:
22   Q    In formulating your opinions, are they
23  based on fact that you believe the cohort studies do
24  not show an association between genital talcum
25  powder use and epithelial ovarian cancer?
```

Cheryl Saenz, M.D.

Page 182

1        MS. CURRY:  Object to the form.
2        THE WITNESS:  That's part of the data
3   that I used to formulate my opinions.
4   BY MS. GARBER:
5        Q    In formulating your opinions, I didn't
6   see any analysis in your report addressing the
7   opinions of the Health Canada assessment; is that
8   true?
9        A    So I believe that the Health Canada
10  assessment is primarily based off of the Taher
11  publishing -- actually, I take that back.  The Taher
12  manuscript, because Taher has not been published.
13  And so I don't know whether or not that actually
14  will be published; it's not something that's peer
15  reviewed.
16       And the Health Canada assessment as I
17  understand it is a draft.  That's not necessarily
18  published peer-reviewed literature either.  So
19  although I read it and I read Taher, I did not put
20  it into my analysis, because I don't think it adds
21  anything to the discussion that is already
22  incorporated in my report.
23       Q    If both of those papers were peer
24  reviewed and published -- I know that the Health
25  Canada wouldn't be peer reviewed and published, but

Page 183

1   if it was a final draft and it made the exact same
2   conclusions and the Taher paper made the exact same
3   conclusions, would that change your expert opinion
4   in this case?
5        MS. CURRY:  Object to the form.
6        THE WITNESS:  No, because I actually
7   don't think Taher adds anything to the analysis.
8   It's much the same data that was in Berge and in
9   Penninkilampi.
10  BY MS. GARBER:
11       Q    In your critique of -- is it true,
12  Doctor, that in the four corners of your expert
13  report you do not state anywhere the methodology
14  that you employed in coming to your causation
15  opinion?
16       MS. CURRY:  Object to the form.
17       THE WITNESS:  So I don't think I
18  necessarily had a paragraph that says exactly what I
19  did, but I certainly think the breadth and depth of
20  the literature I reviewed and the detailed analysis
21  of all the literature I reviewed is contained within
22  the details of my report.
23  BY MS. GARBER:
24       Q    In the four corners of your expert
25  report, you don't have a methodology section, do

Page 184

1   you?
2        A    As a separate paragraph?  No, I don't
3   have a methodology section as a separate paragraph,
4   but the details of the analysis that I did are
5   certainly in the four corners of the report.
6        Q    Doctor, nowhere in your expert report do
7   you even utilize the word "methodology," do you?
8        A    I don't know that's necessarily true.
9        Q    Doctor, isn't the point of stating what
10  your causation methodology is, so that your opinions
11  can be reproduced?
12       MS. CURRY:  Object to the form.
13       THE WITNESS:  So every single paper that
14  I read, every single opinion that I had, why I came
15  to the conclusions that I came to, is all in the
16  body of the report.
17  BY MS. GARBER:
18       Q    It is?
19       A    Yes, it is.
20       Q    Okay.  Can you point to me with regard to
21  the literature about how particulates have been
22  shown to translocate to reach the ovary?
23       Can you show me where you are discussing
24  every one of those literature, your conclusions
25  about those literature, and why you concluded the

Page 185

1   way you did with regard to those literature?
2        MS. CURRY:  Object to the form.
3        THE WITNESS:  Page 28.  "The vagina is
4   not the perineum, and no studies have ever shown
5   that something placed onto the perineum can migrate
6   to the ovaries.  While plaintiffs' experts discuss
7   in their reports that the female reproductive tract
8   is open to the external environment, there is not a
9   single study that traces something from the vulva to
10  the ovaries.  Some of plaintiffs' experts rely on
11  the study by Drs. Egli and Newton published in 1961
12  to support the hypothesis that talc can migrate from
13  the perineum to the ovaries."
14       I then go on to describe in great detail
15  the context of that study and the conditions under
16  which it was held.  And then I say why I've
17  concluded what I concluded.
18  BY MS. GARBER:
19       Q    One study?
20       A    Ma'am --
21       MS. CURRY:  Object to the form.
22       THE WITNESS:  -- you asked me to point
23  out one place, so I did it.
24  BY MS. GARBER:
25       Q    Okay.  But I think what you told me,

Page 186

1  Doctor, is that you reviewed the full body of the
2  literature and then you analyzed it in your report.
3  And I don't see that being done.  I see you maybe
4  talking about one study or another.  I don't see you
5  analyzing the data in your report --
6     A    Okay.  So --
7     Q    -- or providing methodology for the way
8  you do it.
9         MS. CURRY:  Object to the form.
10         THE WITNESS:  Then I think you're missing
11  the context of the report because my report is quite
12  extensive.  I also reference in my reference list
13  the Ventor article which talks about migration of
14  particulate radioactive tracer from the vagina to
15  the peritoneal cavity and the ovaries.
16         So, ma'am, it's there.  It's throughout
17  the report.
18  BY MS. GARBER:
19     Q    Doctor, can you turn to me in your report
20  and tell me where I can read the methodology that
21  you employed in coming to your causation opinions?
22         MS. CURRY:  Object to the form.
23         THE WITNESS:  Ma'am, you already asked me
24  whether or not I have a section on methodology, and
25  I told you that I don't have a specific paragraph

Page 187

1  titled that.  But I do have a demonstration of the
2  extent of research that I went through in terms of
3  analyzing studies, comparing the known literature to
4  what we know based on medical and scientific fact,
5  and explaining how I came to the opinions that I
6  came to.
7         MS. GARBER:  Motion to strike as
8  nonresponsive.
9  BY MS. GARBER:
10     Q    Doctor, can you please point me to the
11  place in your report where you provide for me the
12  methodology that you employed in coming to your
13  expert opinions?
14         MS. CURRY:  Object to the form.
15         THE WITNESS:  Ma'am, I already answered
16  this for you.
17  BY MS. GARBER:
18     Q    That was your answer?
19     A    Yes, ma'am.
20     Q    In other words, you can't point me to an
21  area in your report where you provide the
22  methodology, can you?
23         MS. CURRY:  Object to the form.
24         THE WITNESS:  Ma'am, I already told you,
25  I don't have a specific section titled methodology.

Page 188

1  BY MS. GARBER:
2     Q    In your critique of plaintiffs' expert's
3  opinions, you don't provide your methodology in
4  coming to those opinions, do you?
5         MS. CURRY:  Object to the form.
6         THE WITNESS:  Ma'am, I just read you a
7  section that was from the critique of one of
8  plaintiff expert's opinions where I showed you.  I
9  read an article where it talks about migration of
10  particles.  I explained the context of that article,
11  the conditions under which that study was held, and
12  why I, therefore, dispute and disagree with your
13  expert.
14         That is a thorough explanation of how I
15  came to the conclusion that I came to and why I'm
16  critical of your expert.
17  BY MS. GARBER:
18     Q    Is that the extent of your methodology?
19         MS. CURRY:  Object to the form.
20         THE WITNESS:  Throughout my report,
21  ma'am, I'm very thorough in supporting the
22  conclusions that I have come to.
23  BY MS. GARBER:
24     Q    Dr. Saenz, can you -- strike that.
25         Can you name any causation methodologies

Page 189

1  that have been peer reviewed and published as a
2  scientifically accepted methodology for rendering a
3  causation opinion?
4         MS. CURRY:  Object to the form.
5         THE WITNESS:  I don't really understand
6  what you mean.
7  BY MS. GARBER:
8     Q    Can you think of any peer-reviewed
9  methodology that's used by scientists to render
10  causation opinions?
11         MS. CURRY:  Same objection.
12         THE WITNESS:  So throughout plaintiffs'
13  expert's reports, they talk about the Bradford Hill
14  criteria and looking at things such as the
15  literature, the epidemiologic literature, whether or
16  not it supports that, the mechanistic studies,
17  biologic plausibility, strength of association,
18  consistency in the literature.
19         So I do believe that that as a system, if
20  you will, is a methodology for trying to define
21  causation.
22  BY MS. GARBER:
23     Q    And your understanding is that's peer
24  reviewed; correct?
25     A    I don't necessarily know that Bradford

Page 190

1  Hill criteria per se was peer reviewed because I've
2  not actually seen the publication.  But I do think
3  that is well accepted in the medical and scientific
4  community as criteria by which causation can be
5  evaluated.
6      Q    You didn't apply the Bradford Hill in
7  your analysis in coming to your causation opinions
8  in this case, did you?
9          MS. CURRY:  Object to the form.
10         THE WITNESS:  Oh, I disagree with that
11  completely.  I didn't sit there and outline the
12  Bradford Hill criteria by the nine criteria that are
13  listed in the original proposition.  However, my
14  analysis itself is the way that I've always analyzed
15  certain questions in looking at it.  So the actual
16  concepts of strength of association, consistency in
17  the data, biologic plausibility, that's all there.
18  That's all in my report.
19         So I didn't title it perhaps the way that
20  you wanted me to title it, but the crux of it is all
21  there in my report.
22  BY MS. GARBER:
23     Q    Did you think I wanted you to do it in a
24  certain way?
25     A    Well, I think --

Page 191

1          MS. CURRY:  Object to the form.
2          THE WITNESS:  -- there's certain things
3  that you clearly have wanted me to do in a certain
4  way that has come up a couple times now when we've
5  talked about the methodology.  So in terms of how
6  I've gone about analyzing this problem, I've
7  analyzed it the same way people go about a Bradford
8  Hill analysis.  I just haven't titled it that way.
9  BY MS. GARBER:
10     Q    You think that you have shown the reader
11  in the four corners of your expert report a Bradford
12  Hill analysis of the data in coming to your
13  causation opinions?
14     A    Absolutely.
15     Q    And how am I to find that within the four
16  corners of your report?  Where can I find that
17  Bradford Hill analysis?
18         MS. CURRY:  Object to the form.
19         THE WITNESS:  Read the report.  It's
20  throughout the report.
21  BY MS. GARBER:
22     Q    So I just have to read the report and
23  figure out where you're talking about the
24  association and whether or not you think it's weak
25  or strong or adequate?  I just have to find that

Page 192

1  somewhere in your expert report?
2          MS. CURRY:  Object to the form.
3          THE WITNESS:  So my report is a total
4  report.  There are places in there that I absolutely
5  talk about the strength of the association.  I
6  absolutely talk about consistency.  I absolutely
7  talk about biologic plausibility.  I absolutely talk
8  about the mechanisms.
9          So the report is something that's to be
10  accepted in total.  It's not like there's one page
11  to pull out and say, oh, this is that.
12  BY MS. GARBER:
13     Q    You had me reference or you turned --
14  strike that.
15         With regard to migration of talc, you had
16  me turn to page 17.  Do you remember that?
17         MS. CURRY:  Object to the form.
18         THE WITNESS:  I don't actually think
19  that's the page I had you turn to.
20  BY MS. GARBER:
21     Q    Strike that.  Doctor, in your expert
22  report, you discuss migration of talc from the
23  perineum to the ovaries at pages 17 and 18; is that
24  correct?
25         MS. CURRY:  Object to the form.

Page 193

1          THE WITNESS:  The topic of this section
2  is titled "Migration of Talc from the Perineum to
3  the Ovaries"; correct.
4  BY MS. GARBER:
5      Q    That appears at page -- at half of the
6  page on 17 and a full page at 18; correct?
7      A    Yes.
8      Q    And, Doctor, in that part of your report,
9  you fail to acknowledge the data in the
10  peer-reviewed and published author statements
11  regarding biologically plausible mechanisms for
12  talcum powder products' migration and its
13  carcinogenicity, don't you?
14         MS. CURRY:  Object to the form.
15         THE WITNESS:  No, there is no date from
16  migration from the perineum to the ovaries.
17  BY MS. GARBER:
18     Q    Are you saying, and are you contending
19  that there is no published data in the peer-reviewed
20  literature which indicates that talc can migrate?
21     A    I'm saying there's no data in the
22  peer-reviewed literature that can show that talc can
23  migrate from the perineum to the ovaries.
24     Q    Doctor, you're aware that there are many
25  epidemiological studies that have indicated that

Cheryl Saenz, M.D.

| | |
|---|---|
| Page 194 | Page 196 |

1  talc can migrate from the genitals and reach the
2  ovaries, you're aware of those data; right?
3       MS. CURRY:  Object to the form.
4       THE WITNESS:  No, there are no data that
5  show that.
6       MS. GARBER:  I'm out of the stickers.
7       THE REPORTER:  Would you like to go off
8  the record while I print them up?
9       MS. GARBER:  Sure.
10      THE VIDEOGRAPHER:  The time is now 2:09.
11  Going off the record.
12      (Break in the deposition taken at 2:11 p.m.)
13          0o0
14      (The deposition resumed at 2:11 p.m.)
15          0o0
16      THE VIDEOGRAPHER:  The time is now 2:10.
17  Back on the record.
18      (C. Saenz Exhibit 11 was marked for
19      identification.)
20  BY MS. GARBER:
21      Q    Doctor, I'm handing to you what is a
22  document that we've marked as Exhibit 11, which is
23  titled "Biologic Plausibility Migration
24  Translocation."
25      Doctor, I will represent to you this is a

1  document that I created.  I will represent to you
2  these are quotes from the published literature with
3  regard to talc and ovarian cancer.
4      Doctor, just -- I don't expect you to
5  read every single one of these, but do you have a
6  single one of these citations in the four corners of
7  your report?
8       MS. CURRY:  I'm going to object to the
9  use of this document as it's literally pulled out
10  one sentences, sometimes not even full sentences of
11  a variety of different articles without the expert
12  witness having the opportunity to actually look at
13  the totality of the article, say, that --
14      MS. GARBER:  I appreciate all that
15  testimony, Ms. Curry.
16      THE WITNESS:  I'm sorry, what's your
17  question?
18  BY MS. GARBER:
19      Q    Do you have a single one of these quotes
20  from the published literature in your expert report?
21      MS. CURRY:  And I object to the form of
22  the question.
23      THE WITNESS:  The quotes that you
24  yourself pulled and put on this document?
25      MS. GARBER:  Yes.

1       THE WITNESS:  No, because none of these
2  quotes is actually scientific proof that talc can
3  migrate from the perineum to the ovaries.
4  BY MS. GARBER:
5      Q    Doctor, you understand that the authors
6  of these published -- these cited publications in
7  Exhibit 11 are statements that were pulled from the
8  peer-reviewed, published literature of these study
9  authors?
10      Do you understand that?
11      A    I understand --
12      MS. CURRY:  Object to the form.
13      THE WITNESS:  I understand that, and not
14  a single one of these is actually demonstrating
15  proof that talc applied to the perineum can migrate
16  to the ovaries.  Not a single one.
17      In fact, these are described as
18  plausibility.  These are described as particles up
19  here.  This is not scientific evidence, ma'am.  This
20  is your listing pulling one sentences out of
21  articles without documented scientific proof of the
22  migration path from the perineum to the ovaries.
23  BY MS. GARBER:
24      Q    So, Doctor, do you see the title of the
25  this document, as "Biologic Plausibility."  Do you

1  see that?
2      A    That's your title.
3      Q    Yes.  Do you know what that means?
4      A    Yes, I do.
5      Q    What?
6      A    That there is the hypothesis of how this
7  might actually happen from a biologic standpoint.
8  But there isn't a single scientific article that has
9  actually ever traced a migratory path of talc from
10  the perineum to the ovaries, not a single one, and
11  you putting a listing here of these different
12  sentences saying, well, this article says it could
13  happen doesn't make it so.
14      Q    Doctor, you've used the word "proof"
15  there a couple of times.  Is it your understanding
16  for biologic plausibility that you need proof?
17      MS. CURRY:  Object to the form.
18  BY MS. GARBER:
19      Q    Or that it's a plausible mechanism?
20      A    My understanding --
21      MS. CURRY:  Object to the form.
22      THE WITNESS:  My understanding in this
23  particular case is that there has to be some proof
24  that a particulate matter applied to the perineum
25  can actually make it to the ovaries for the

Cheryl Saenz, M.D.

Page 198

1  hypothesis that talc can cause ovarian cancer to be
2  so.
3  BY MS. GARBER:
4      Q    That's your understanding of biologic
5  plausibility?
6      A    In this particular circumstance; yes.
7      Q    What is your understanding of biologic
8  plausibility in the context of the Bradford Hill
9  guidelines?
10         MS. CURRY:  Object to the form.
11         THE WITNESS:  My understanding is that
12  there has to be biologic evidence that what you're
13  hypothesizing could actually happen.  It doesn't
14  have to be that you have to prove that talc itself
15  could migrate, but there's no studies of any
16  migration whatsoever in the human that any
17  particulate matter applied to the perineum can make
18  it all the way to the ovaries.
19         So it doesn't have to be talc, but it has
20  to show that something can actually make it from the
21  perineum to the ovaries.
22  BY MS. GARBER:
23      Q    Let's mark as Exhibit 12 -- Doctor, the
24  point I was trying to make with this Exhibit 11 is
25  this:  There are peer-reviewed, published papers

Page 199

1  where the authors concluded that talc can migrate,
2  that it's a biologically plausible mechanism that
3  talc with migrate.
4         Do you disagree with that?
5         MS. CURRY:  Object to the form.
6         THE WITNESS:  I disagree with the concept
7  that's saying that if it migrates from the vagina to
8  the ovaries, it's the same as migrating from the
9  perineum to the ovaries.
10  BY MS. GARBER:
11      Q    That wasn't my question.
12      A    But it is, ma'am, because you didn't
13  qualify.  You're just saying talc can migrate,
14  period.  That's not the same thing.  What we're
15  talking about here is whether or not we're including
16  the entire female anatomy, and we have to do that.
17         Having a study show that something can be
18  in the vagina and make it to the ovaries is not the
19  same thing as going from the perineum to the
20  ovaries.
21      Q    Let's talk about the epi.  The epi
22  studies show that talc applied to the genitals is
23  associated with epithelial ovarian cancer in some of
24  the studies.  You'll agree to that; right?
25         MS. CURRY:  Object to the form.

Page 200

1         THE WITNESS:  Some of the case control
2  studies have shown a weak increased odds ratio for
3  the development of ovarian cancer with the perineal
4  application of talc.
5  BY MS. GARBER:
6      Q    Some of the meta-analysis, or is it, in
7  fact, all of the meta-analysis, which shows an
8  association between genital talc and the development
9  of epithelial ovarian cancer?
10      A    So the meta --
11         MS. CURRY:  Object to the form.
12         THE WITNESS:  -- the meta-analyses that
13  have been done only show that when they look at the
14  case control studies.  They don't show that when
15  they look at the cohort studies.
16  BY MS. GARBER:
17      Q    Okay.  Some of the epidemiological data
18  that shows an association between genital
19  application of talc and the development of
20  epithelial ovarian cancer also report that it's
21  biologically plausible that talc can reach the
22  ovaries from the genitals, don't they?
23      A    No.
24         MS. CURRY:  Object to the form.
25         THE WITNESS:  It doesn't.  They suppose

Page 201

1  that.  They don't actually show that.
2  BY MS. GARBER:
3      Q    But that's the authors' conclusions, that
4  it can get there.  They think it's biologically
5  plausible?
6         MS. CURRY:  Object to the form.
7         THE WITNESS:  But there's no data for
8  that.  They can conclude that, but there's no data
9  for that.  There has to be data for which to support
10  that hypothesis.  And there's not.
11  BY MS. GARBER:
12      Q    Doctor, in the peer-review process, a
13  study author who is looking at the data of genital
14  application of talc and development of ovarian
15  cancer is saying it's biologically plausible that
16  talc can go from the genitals to the ovaries, and
17  that's been peer reviewed and published, do you
18  agree with that?
19         MS. CURRY:  Object to the form.
20         THE WITNESS:  I don't agree with that
21  statement.
22  BY MS GARBER:
23      Q    No, I know you don't agree with the --
24  with the conclusion.  But do you agree that a study
25  author who studied the topic has concluded it's

Page 202

1  biologically plausible.
2      A    There's always evidence, and in fact --
3      Q    Doctor, it's a yes-or-no question --
4      A    No, it's not, ma'am.
5          MS. CURRY:  Object to the form.
6          MS. SHARKO:  Please let her finish her --
7          THE WITNESS:  It's a very complicated
8  issue.
9  BY MS. GARBER:
10     Q    My question is --
11     A    It's not a yes-or-no answer.  And IARC
12 even says that it's not entirely clear that talc can
13 migrate from the perineum.  The data on that is
14 weak.
15         MS. GARBER:  Objection.  Motion to strike
16 as nonresponsive.
17 By MS. GARBER:
18     Q    Doctor --
19     A    Ma'am, I'm trying to answer you
20 comprehensively, and I'm not going to give you a
21 yes-or-no answer to something that's a complicated
22 issue.
23     Q    I just need to know if, in your review of
24 the epidemiological literature, the study authors
25 have concluded that it's biologically plausible that

Page 203

1  talc can migrate from the genitals to the ovaries.
2  Have they said that in the studies?  I know you
3  disagree with it.  But has that been peer reviewed
4  and published?
5          MS. CURRY:  Object to the form.
6          THE WITNESS:  No one has concluded that
7  because there's no data for that.  They have offered
8  it as a hypothesis, but nobody has come to that
9  conclusion, because there's no data.
10 BY MS. GARBER:
11     Q    The study authors have indicated that
12 it's biologically plausible that talc can migrate
13 from the genitals to the ovaries; true or false?
14         MS. CURRY:  Object to the form.
15         THE WITNESS:  Some of the study authors
16 have supposed that it's possible.  None of them have
17 shown that it actually happens.
18         MS. SHARKO:  Is this a good time for a
19 break?
20         MS. GARBER:  Do you want to take a break
21 now?
22         MS. CURRY:  Yes, that would be great.
23         THE VIDEOGRAPHER:  The time is now 2:19.
24 We're going off the record.
25     (Break in the deposition taken at 2:20 p.m.)

Page 204

1                      0o0
2      (The deposition resumed at 2:37 p.m.)
3                      0o0
4          THE VIDEOGRAPHER:  Time is now 2:36.
5  Back on the record.
6  BY MS. GARBER:
7      Q    Doctor, you cited to the Langseth paper
8  2008 in your expert report; correct?
9      A    Correct.
10     Q    But you didn't cite to or address the
11 statements that were made in that paper with regard
12 to the issue of the biologically plausible mechanism
13 by which talc can migrate to the ovaries, did you?
14         MS. CURRY:  Object to the form.
15         THE WITNESS:  Can you show me exactly
16 what you're talking about.
17 BY MS GARBER:
18     Q    I can.
19     (C. Saenz Exhibit 12 was marked for
20        identification.)
21 BY MS. GARBER:
22     Q    Doctor, I've marked as Exhibit 12 the
23 Langseth 2008 paper titled "Perineal Use of Talc and
24 Risk of Ovarian Cancer."
25         You have read that paper, have you not?

Page 205

1      A    Yes, I have.
2      Q    And, Doctor, on the front page of this
3  paper in the left-hand column about halfway down, do
4  you see where it starts from the pathological
5  studies?
6      A    "From pathological studies, it is known
7  that particles and fibers that enter the body can
8  migrate to distant organs."
9      Q    Can you keep reading?
10     A    "For instance, asbestos fibers have been
11 found in ovaries from women exposed to asbestos.
12 Analogously, following perineal application, talc
13 particles can migrate from the vagina to the
14 peritoneal cavity and ovaries."
15     Q    And you disagree with that?
16     A    I do.
17     Q    And you know that --
18     A    May I explain why, ma'am?
19     Q    No, no.  It's --
20     A    Well, but you asked me a question.
21     Q    Doctor, I asked you a question, and I'll
22 ask you another.  Doctor --
23     A    That cites the Ventor article which is
24 reference six which actually does not put talc on
25 the perineum.

Page 206

1    Q    Doctor --
2    A    It's in the vagina.
3    Q    Doctor --
4         MS. GARBER:  Motion to strike as
5  nonresponsive.
6  BY MS. GARBER:
7    Q    Doctor, this paper is peer reviewed,
8  correct?
9    A    Yes.
10   Q    And published?
11   A    Yes.
12   Q    Including those statements you just read.
13   A    Which are misstatements from the actual
14  original publication.
15   Q    So the authors from IARC, some of the
16  authors from IARC who published this paper got it
17  wrong in your opinion?
18   A    Got it --
19        MS. CURRY:  Object to the form.
20        THE WITNESS:  Got it wrong in that
21  statement because that's not what Ventor article
22  shows.
23  BY MS. GARBER:
24   Q    Okay.  You also read the Ness -- you also
25  read -- or you also reference the Ness 2000 paper in

Page 207

1  your expert report; did you not?
2    A    Yes, I do.
3    Q    When I say reference, I mean it's on your
4  reference list; correct?
5    A    And I cite it in my paper.
6         (C. Saenz Exhibit 13 was marked for
7         identification.)
8  BY MS. GARBER:
9    Q    I will hand you that paper.  I've marked
10  that as Exhibit 13.
11        MS. SHARKO:  What is Exhibit 13?
12        MS. GARBER:  The paper is titled "Factors
13  Related to Inflammation of Ovarian Epithelium and
14  Risk of Ovarian Cancer."
15  BY MS. GARBER:
16   Q    Did I read that correctly?
17   A    Yes.
18   Q    Doctor, if you turn over to page 116, in
19  the left-hand column, first full paragraph, could
20  you read, could you read for me the last sentence.
21   A    I'm sorry, where?
22   Q    Left-hand column, first full paragraph --
23   A    Yes.
24   Q    -- last sentence.
25   A    "Substances that may cause lower genital

Page 208

1  tract inflammation such as talc can travel up an
2  open genital tract, but with tubal ligation or
3  hysterectomy, that pathway is cut off, thereby
4  reducing the risk of environmentally mediated
5  inflammation."
6    Q    Do you also disagree with this
7  peer-review author?
8         MS. CURRY:  Object to the form.
9         THE WITNESS:  On what, on that sentence?
10        MS. GARBER:  Yes.
11        THE WITNESS:  That sentence says nothing
12  about the perineum.  So I don't disagree with that
13  sentence because it could be something that's in the
14  vagina.
15  BY MS. GARBER:
16   Q    Okay.  So is it your opinion that talc
17  can migrate from the vagina to the ovaries, but when
18  it's placed at the perineum, it cannot travel
19  through the perineum into the vagina up the female
20  tract to the ovaries?
21        MS. CURRY:  Object to the form.
22        THE WITNESS:  So my opinion is that
23  there's never been a study that's looked at the
24  travel of particulate matter from the perineum to
25  the ovaries.

Page 209

1         But when we're talking about biologic
2  plausibility, there have been studies that have
3  shown that some particulate matter placed into the
4  vagina under certain experimental conditions can
5  migrate to the ovaries.
6  BY MS. GARBER:
7    Q    So is it your opinion that talc can
8  migrate from the vagina up to the ovaries?
9    A    I don't know one way or another, but I do
10  think that in terms of biologic plausibility, there
11  is some data that there can be particulate matter
12  that can make it to the ovaries, but I don't
13  actually know one way or another if talc can do
14  that.
15   Q    Does the literature support a
16  biologically plausible mechanism that talc once in
17  the vagina can reach the fallopian tubes and
18  ovaries?
19        MS. CURRY:  Object to the form.
20        THE WITNESS:  I would say only under
21  certain controlled situations such as the literature
22  that I cited in my report where a slurry of
23  particles, be they carbon particles or albumin
24  microspheres were placed into the posterior vagina.
25  The women were placed into Trendelenburg.

Page 210

1    In the Egli study, they were given
2    oxytocin injections to incite uterine contractions,
3    so under those particular experimental
4    circumstances, there has been demonstration of
5    particulate matter in a slurry making it to the
6    ovaries.  But outside of that context, there is no
7    literature.
8    BY MS. GARBER:
9        Q    So those data don't have -- cannot be
10   properly extrapolated to the human experience in
11   your opinion?
12           MS. CURRY:  Object to the form.
13           THE WITNESS:  What human experience?
14   BY MS. GARBER:
15       Q    Well, if talc is going to migrate from
16   the vagina to the ovaries, does a woman need to be
17   in Trendelenburg position?
18           MS. CURRY:  Object to the form.
19           THE WITNESS:  So there's no data without
20   that, for any particulate matter, so I can only
21   speak to what has actually been published in the
22   peer-reviewed literature, and those are the
23   experimental conditions under which particulate
24   matter has been shown to be found in the ovaries
25   after placement in the vagina.

Page 211

1    BY MS. GARBER:
2        Q    Have you read the Sjosten paper?
3        A    The -- I'm sorry, which one?
4        Q    S-J-O-S-T-E-N, with regard to starch
5    particulate on gloves following a vaginal
6    examination?
7        A    No, I've seen that referenced in some of
8    the expert reports, but that's a different
9    circumstance where my understanding is that gloves
10   were used for a pelvic exam and then they looked
11   for, I believe it was, cornstarch.
12       Q    You understand that the FDA has banned
13   powdered gloves based on properties of inflammation
14   and toxicity to the female genital tract following
15   exam.  You're aware of those data, aren't you?
16           MS. CURRY:  Object to the form.
17           THE WITNESS:  So I've not seen the FDA
18   report.  I don't know that it was actually toxicity,
19   the word that you've chosen to use.  I do know that
20   we no longer have powder on surgical gloves.
21   BY MS. GARBER:
22       Q    I asked you about that in your deposition
23   before.  Do you remember that?  You hadn't seen
24   those?  Don't remember that?
25       A    Sounds like I'm still answering the same.

Page 212

1        Q    You didn't think you wanted to go look at
2    that study or the FDA's banned and figure out why?
3        A    No.
4           MS. CURRY:  Object to the form.
5    BY MS. GARBER:
6        Q    Weren't curious?
7        A    No, ma'am, because again it's not
8    perineal application.
9        Q    Okay.  So I think I understand your
10   opinions.  If talc were in the vagina and the woman
11   was under the circumstances of exogenous oxytocin in
12   a Trendelenburg position, it may be the case that
13   talc could get there.
14           Is that the limitations of your opinion?
15           MS. CURRY:  Object to the form.
16           THE WITNESS:  So when we're talking about
17   biologic plausibility --
18           MS. CURRY:  I'm sorry, it's highly
19   distracting, Ms. Thompson, when you're making
20   gestures and faces and speaking to other co-counsel
21   when a question is pending and the witness is trying
22   to focus and --
23           MS. THOMPSON:  Okay, I apologize.  I
24   didn't realize that was -- could be overheard.  At
25   least I wasn't laughing.

Page 213

1           MS. CURRY:  Smirking is very similar, but
2    in any event, it's very distracting.
3           THE WITNESS:  When we're talking about
4    biologic plausibility, I would apply the science
5    that is known in terms of trying to demonstrate
6    whether or not there is biologic plausibility.  And
7    the only studies that exist in humans are studies
8    where the particulate matter arises in the vagina
9    under those circumstances.
10          So in that circumstance, because of that,
11   I cannot say that talc does get to the ovaries that
12   way, but I would say that that it's biologically
13   plausible in those circumstances.
14   BY MS. GARBER:
15       Q    You haven't seen the Zervomanolakis paper
16   on -- with regard to mechanisms by which particulate
17   can travel, have you?
18           MS. CURRY:  Object to the form.
19           THE WITNESS:  From where to where?
20   BY MS. GARBER:
21       Q    Are you aware of that?  It's not a paper
22   that you've cited.  Are you aware of that paper by
23   study author?
24       A    No, ma'am.
25       Q    Okay.  We've already established, you

Cheryl Saenz, M.D.

Page 214

1  haven't seen the Sjosten paper; that's correct?
2      A    The paper --
3          MS. CURRY:  Object to the form.
4          THE WITNESS:  -- itself, no, but I've
5  seen where it's been referenced, and I believe I
6  understand the crux of that study.
7  BY MS. GARBER:
8      Q    Have you seen the Koontz paper?  Do you
9  know that paper?
10     A    No, ma'am.
11     Q    Have you looked at Ventor 1981, ma'am?
12     A    Yes, ma'am, it's on my reference list.
13     Q    Have you seen Whittemore, 1988, what that
14 author says about migration?
15     A    Yes, ma'am, it's on my reference list.
16     Q    Okay.  All right.  So Dr. Ness concludes
17 in her 2000 paper that the female genital tract is
18 open; correct?
19     A    What page are we on?
20     Q    On the last page that I just had you
21 read, 116.
22     A    Where are we, ma'am?
23     Q    At the top of the paragraph you just
24 read.  Beginning with the sentence, "Substances."
25     A    Right, I disagree with her, ma'am, and

Page 215

1  she also doesn't cite a single reference for that
2  supposition.
3      Q    Did you cite a single reference when you
4  said the female genital tract was closed?
5          MS. CURRY:  Object to the form.
6          THE WITNESS:  I talk about the female
7  anatomy, ma'am.
8  BY MS. GARBER:
9      Q    Did you cite a single reference when you
10 said the female genital tract is not an open
11 conduit?
12     A    It's the anatomy.  I'm a gynecologic
13 oncologist.  I understand the anatomy.
14     Q    So that's your opinion, that's Cheryl
15 Saenz's opinion?
16     A    No.
17         MS. CURRY:  Object to the form.
18         THE WITNESS:  It's the female anatomy.
19 BY MS. GARBER:
20     Q    Doctor, when I took your deposition, did
21 you tell me that there was an open pathway --
22         MS. CURRY:  Object to the form.
23         MS. GARBER:  -- in the female genital
24 tract?
25         THE WITNESS:  From where to where?

Page 216

1  BY MS. GARBER:
2      Q    Let's look at your testimony.  It's now
3  your opinion that it's not an open conduit --
4      A    No.
5      Q    -- the female genital tract; right?
6          MS. CURRY:  Object to the form.
7          THE WITNESS:  Not from the perineum to
8  the ovaries.
9  BY MS. GARBER:
10     Q    That's not what your report says, does
11 it?  Let's go to what your report says.
12         At the bottom of page 17, your report
13 indicates, "But the vagina is not the perineum and
14 the female genital tract is not an open conduit,
15 despite Drs. Clark, Pearson, and Smith-Bindman's
16 contrary contentions in their depositions?"
17     A    Exactly.
18     Q    So it's your opinion that the female
19 genital tract is not an open system or tract;
20 correct?
21     A    From the --
22         MS. CURRY:  Object to the form.
23         THE WITNESS:  -- outside, from the
24 perineum, which is very different than from the
25 vagina.

Page 217

1  BY MS. GARBER:
2      Q    Is it an open system once you get into
3  the vagina to the ovaries?
4      A    There is a way that you can pass up
5  through the cervix once something is in the vagina.
6  But as an external genitalia stands in a woman, it's
7  not an open pathway.
8          This is why we need to put a speculum in
9  somebody's vagina in order to see into the vagina.
10 You can't see into the vagina just from looking at
11 the perineum.  You have to separate the labia
12 majora, minora, you have to put in a speculum, and
13 you have to open it.  It's not wide open from the
14 external genitalia to the ovaries.
15     Q    Doctor, I'm going to hand you your
16 deposition testimony from the Echeverria case, and I
17 will show it to you.  But the question I asked you
18 is, is the female genital tract an open pathway from
19 the vagina to the peritoneal space.
20         And your answer was:  "In a woman that
21 has not had a hysterectomy or a tubal ligation,
22 there's a pathway of ascension."
23         Is that still your opinion, Doctor?
24     A    Yeah, that's no different than what I
25 just said to you.

Cheryl Saenz, M.D.

Page 218

1    Q    Okay.
2    A    May I see that back, please, ma'am?  I
3  just want to make sure --
4    Q    Of course.
5    A    -- you're reading it accurately.  Thank
6  you.  Yes, ma'am.  Thank you.
7    Q    Doctor, if it's an open pathway, then why
8  at the bottom of 18 in your expert report do you
9  spend a half a page talking about the barriers to
10  ascension of that open female tract?
11        MS. CURRY:  Object to the form.
12        THE WITNESS:  Because that's the female
13  anatomy.  That would be the challenges that any
14  particular matter would face in order to ascend
15  through retrograde migration.  And what we're
16  talking about in this particular matter is the
17  perineal application of talc which is not the
18  vagina.
19  BY MS. GARBER:
20    Q    So it's your opinion that particulate
21  that sits on the perineum has no opportunity to get
22  inside the vagina.
23    A    It's my opinion that there's never been
24  anything that has been published in the
25  peer-reviewed literature that shows that something

Page 219

1  can migrate from the perineum to the ovaries.
2    Q    That study would never be approved
3  because it's ridiculous; isn't that true?
4        MS. CURRY:  Object to the form.
5  Argumentative.
6        THE WITNESS:  Why would that be
7  ridiculous?
8  BY MS. GARBER:
9    Q    Because of course something on the
10  perineum is going to get inside the vagina.  What
11  about the issue of sexual intercourse?  Are you
12  saying that sexual intercourse doesn't drive what's
13  on the outside on the inside?
14        MS. CURRY:  Object to the form.
15  BY MS. GARBER:
16    Q    Is that not a possibility, Doctor?
17        MS. CURRY:  Object to the form.
18        THE WITNESS:  There's no data to support
19  your opinion, ma'am.
20  BY MS. GARBER:
21    Q    Is there -- is the fact that a woman who
22  applies genital talc to her perineum and then wipes,
23  using the bathroom, that would not be an opportunity
24  for talc to go inside the vaginal wall?  That would
25  be an impossibility?

Page 220

1        MS. CURRY:  Object to the form.
2        THE WITNESS:  I don't know how somebody
3  would wipe in order for your possibility to exist.
4  That would be mean that you're actually putting the
5  toilet paper into your vagina which would be a very
6  different scenario than perineal application of
7  talc.
8  BY MS. GARBER:
9    Q    Would it not be an opportunity for talc
10  to get inside the vagina by way of exercise and
11  movement?
12    A    I do not --
13    Q    Moving of the tissues?
14    A    No.
15        MS. CURRY:  Object to the form.
16        THE WITNESS:  That's not how the female
17  anatomy lays and opposes upon itself.  So no.
18  BY MS. GARBER:
19    Q    So it's your opinion and you're going to
20  tell this court that what gets put on the outside of
21  the female genital tract on the perineum has zero
22  opportunity to go into the vaginal vault, that can't
23  happen, because that study hasn't been done?
24        MS. CURRY:  Object to the form.
25        THE WITNESS:  I'm not aware of any study

Page 221

1  that has every documented the migration of any
2  particulate matter from the perineum into the vagina
3  and then to the ovaries, not a single one.
4  BY MS. GARBER:
5    Q    You know that your obligations under ACOG
6  are you're only able to testify as to what you know
7  could be peer reviewed.  Is it your testimony that
8  you would put up for peer review a statement like
9  that, that what is on the perineum can't possibly
10  get inside the vaginal vault?
11        Would you submit that for peer review,
12  Doctor?
13        MS. CURRY:  Object to the form.
14        THE WITNESS:  It's not a peer-reviewed
15  study, ma'am.  I'm making a statement very
16  consistent with what ACOG requires me to do, which
17  is to use peer-reviewed literature to render my
18  opinions.
19        And there is no peer-reviewed literature
20  to support what you're contending.  So very
21  consistent with ACOG guidelines, I'm not giving an
22  opinion to something that there is no data for.
23        ////
24        ////
25        ////

Page 222

1      MS. GARBER:  Let's actually look at what
2  ACOG says.  I'm going to mark as -- I'm so sorry,
3  Ms. Curry, I only have one copy of this.
4      (C. Saenz Exhibit 14 was marked for
5      identification.)
6  BY MS. GARBER:
7   Q    Doctor, this is an ACOG committee opinion
8  document, and if I could have you turn to -- it's
9  titled "Expert Testimony" and it talks about expert
10  testimony.  If I could have you turn to page two of
11  three of this document.
12      MS. SHARKO:  What exhibit number is this,
13  ma'am?
14      MS. GARBER:  I'm sorry.  14.
15  BY MS. GARBER:
16   Q    Doctor, can you turn, please, to page two
17  of three, under the numbered principles that are
18  offered as guidelines for the physician who assumes
19  the role as an expert witness.
20      Do you see where I am?
21   A    Yes.
22   Q    Number six says, "The physician must be
23  prepared to have the testimony given in any judicial
24  proceeding subjected to peer review by an
25  institution or professional organization to which he

Page 223

1  or she belongs."
2      Did I read that correctly?
3   A    Yes.
4   Q    Would you be willing to have that
5  statement, that particulate that is sitting on the
6  perineum can't possibly get into the vaginal vault?
7  Would you be willing to have that expert opinion
8  subjected to peer review?
9   A    So first of all, I think you're
10  misquoting what I said.  What I said, and I would be
11  more than happy to have subject to peer review, is
12  that I'm unaware of any literature that has
13  demonstrated the migration of something from outside
14  the perineum into the vagina and to the ovaries.  I
15  would be very, very proud and supportive of that
16  being subject to peer review.
17   Q    There's zero literature that has said
18  that talc can get from the perineum to the ovary,
19  zero literature, none.
20      MS. CURRY:  Object to the form.
21      THE WITNESS:  Zero scientific literature
22  to support that contention.  There is no experiment
23  that's ever been done that has showed that.
24  BY MS. GARBER:
25   Q    Are you aware that the FDA has said that

Page 224

1  talc from the perineum to the ovary, the migration
2  of talc from the perineum to the ovary, is
3  indisputable.  You cited that in your expert report,
4  didn't you?
5   A    I did.
6   Q    So let's look at that.
7      (C. Saenz Exhibit 15 was marked for
8      identification.)
9  BY MS. GARBER:
10   Q    I will mark as Exhibit 15 a letter which
11  you have referenced in your reference list in your
12  expert report; correct?
13   A    Yes.
14   Q    It's dated April 1st, 2014.  It's sent
15  from the FDA to a Samuel Epstein, MD; correct?
16   A    Yes.
17   Q    And, Doctor, you have read this letter,
18  haven't you?
19   A    Yes.
20   Q    You reference it under the migration
21  section of your expert report?
22   A    Yes.
23   Q    In fact, you say, at page 17, "And even
24  the USFDA administration have stated, quote, 'While
25  there exists no direct proof of talc in ovarian

Page 225

1  carcinogenesis, the potential for particulates to
2  migrate from the perineum to the vagina to the
3  peritoneal cavity is indisputable."
4      Then the cite to this Exhibit 15;
5  correct?  That's what your expert report says?
6   A    That is what my expert report says.
7   Q    In fact, let's turn to what that says and
8  where.  At page five, the middle of the page, the
9  letter actually indicates the same.  It's a direct
10  quote.  "While there exists no direct proof of talc
11  in ovarian carcinogenesis, the potential for
12  particulates to migrate from the perineum to the
13  vagina" --
14   A    "And the vagina" -- or "and vagina."
15   Q    -- "from the perineum and the vagina to
16  the peritoneal cavity is indisputable."
17      FDA says the fact that it can go from the
18  perineum to the peritoneal cavity is indisputable.
19  Correct?
20   A    That's what the FDA says.
21   Q    But you disagree with the FDA.
22   A    I completely disagree with the FDA, on
23  that statement.
24      MS. SHARKO:  I see you laughing,
25  Ms. Thompson.

Cheryl Saenz, M.D.

Page 226

1      MS. THOMPSON: I didn't laugh. I smiled
2   at Ms. Garber.
3      MS. SHARKO: I think that was a laugh.
4      MS. THOMPSON: We'll let the --
5      MS. SHARKO: Let the jury decide.
6      MS. THOMPSON: Did the tape-record --
7   recording say.
8      THE WITNESS: Ma'am, I heard you.
9      MS. THOMPSON: Okay. We'll let the
10  record speak for itself.
11      (C. Saenz Exhibit 16 was marked for
12  identification.)
13      MS. GARBER: Dr. Saenz, I'm going to mark
14  another Exhibit 16, and I'll represent to you, this
15  is an internal document that was produced attendant
16  to this litigation by Johnson & Johnson.
17      MS. CURRY: Do you have an extra copy?
18      MS. GARBER: I do. Sorry.
19  BY MS. GARBER:
20      Q   Doctor, so we can get oriented, I'll just
21  represent to you, Luzenac is one of the defendants
22  in this case. Their director of product safety,
23  Richard Zazenski is emailing Bill Ashton of J&J --
24  or not emailing, sorry. This is a fax. The date is
25  September 30th, 2004.

Page 227

1      It reads: "Bill, I came across this
2   paper this morning published in the April 2004
3   journal, Human Reproduction, an official journal of
4   the European Society for Human Reproduction and
5   Embryology. It offers some compelling evidence in
6   support of the migration hypothesis?"
7      You have not seen that before, have you?
8      A   No, ma'am.
9      Q   Do you remember being shown that in the
10  Echeverria trial?
11      A   No, I don't remember.
12      Q   Johnson & Johnson -- well, strike that.
13      It looks like defendants thought that was
14  compelling evidence that talc can migrate. Do you
15  disagree with that?
16      MS. CURRY: Object to the form.
17      THE WITNESS: So, one, I've not seen this
18  article that they're referencing to, so I don't know
19  what is being interpreted as compelling evidence and
20  not in a position to evaluate this facsimile on any
21  level.
22      MS. GARBER: Okay.
23  BY MS. GARBER:
24      Q   And the article that is being discussed
25  is the Sjosten paper, which I asked you about

Page 228

1   earlier, which you said you had not seen. And the
2   Sjosten paper that is included in this facsimile is
3   titled "Retrograde Migration of Glove Powder in the
4   Human Female" -- "in the Human Female Genital
5   Tract."
6      Did I read that correctly?
7      A   Yes.
8      Q   You've not seen that study?
9      MS. CURRY: Object to the form.
10      THE WITNESS: I've only seen references
11  to the study.
12  BY MS. GARBER:
13      Q   Here there is a fax from Luzenac to Bill
14  Ashton, saying that the study provides compelling
15  evidence of the migration hypothesis. Do you agree?
16      A   No.
17      Q   You don't?
18      A   No.
19      Q   You don't agree with the data or you
20  don't agree that that's what that fax says?
21      A   The fax --
22      MS. CURRY: Object to the form.
23      THE WITNESS: -- says that, but I don't
24  agree that the study supports that.
25  BY MS. GARBER:

Page 229

1      Q   But you've never read the street, Doctor?
2      MS. CURRY: Object to the form.
3      THE WITNESS: Ma'am, I've just read the
4   abstract because you've handed it to me, and I've
5   also seen it referenced in the expert reports
6   before. And this is a study that's looking at women
7   undergoing pelvic exams with powder on the gloves.
8   That's not powder being applied to the perineum.
9      And as I read this abstract, that's
10  exactly what they say happened. Women underwent
11  pelvic exams. That means the fingers went into the
12  vagina.
13  BY MS. GARBER:
14      Q   Do you make a habit of looking at an
15  abstract and rendering scientific opinions? I mean,
16  you looked at that abstract for about 30 seconds.
17  And then you rendered an opinion about the study.
18      Is that your custom and practice, Doctor?
19      MS. CURRY: Object to the form.
20      THE WITNESS: You asked me to comment on
21  that and whether or not I believe this facsimile
22  supported the contention of the people faxing each
23  other, ma'am. So I thought I needed to give you an
24  answer to your question so that's why I did that.
25  BY MS. GARBER:

Page 230

1    Q    The truth is, after Echeverria, you knew
2  full well about this internal document.  It was used
3  in that litigation and the study that was behind it,
4  but you never bothered to go back and read it, did
5  you?
6          MS. CURRY:  Object to the form.  Would
7  you like her to review the --
8          MS. GARBER:  I'll --
9          MS. CURRY:  -- what's attached now?
10          MS. GARBER:  I'll withdraw that question.
11  BY MS. GARBER:
12    Q    If we could go -- do you still have it in
13  front of you?
14    A    Which one, ma'am?
15    Q    Exhibit 16.
16    A    Yes.
17    Q    The fax goes on to say, "Combine this
18  evidence with the theory that talc deposition in the
19  ovarian epithelium initiates epithelial
20  inflammation, which leads to epithelial
21  carcinogenesis, and you have a potential formula for
22  NTP classifying talc as a causative agent in ovarian
23  cancer."
24          Did I read that correctly?
25    A    You read it correctly.

Page 231

1    Q    Do you understand what the author is
2  saying there?
3          MS. CURRY:  Object to the form.
4          THE WITNESS:  I understand the contents
5  of his message.  I don't agree with him
6  biologically.
7  BY MS. GARBER:
8    Q    What do you understand he's trying to
9  convey there?
10          MS. CURRY:  Object to the form.
11          THE WITNESS:  That there is a theory that
12  ovarian carcinogenesis is caused by inflammation.
13  BY MS. GARBER:
14    Q    In fact, they cut and paste a diagram or
15  a flow chart as to the mechanism by which that may
16  occur, don't they?
17          MS. CURRY:  Object to the form.
18          THE WITNESS:  I don't know.
19  BY MS. GARBER:
20    Q    You don't recognize this diagram?
21    A    No.
22    Q    You don't remember it from the Echeverria
23  trial?
24    A    No.
25    Q    Let's refresh your memory.  A source of

Page 232

1  that diagram comes from the Ness paper, the Ness
2  2099 paper --
3    A    We're not in 2099.
4    Q    I'm sorry.  Did I say that?
5    A    Uh-huh.
6    Q    I do that all the time.  Thank you.
7  1999.
8          MS. GARBER:  I'll mark that as
9  Exhibit 17.
10          (C. Saenz Exhibit 17 was marked for
11          identification.)
12  BY MS. GARBER:
13    Q    If you -- if you turn to page two of that
14  paper, do you see that the figure one diagram is the
15  same as appears on Exhibit 16, fax?
16    A    Yes, ma'am, it looks the same.
17    Q    All right.  And if we look at Exhibit 17,
18  figure one indicates inflammation as a common
19  mechanism underlying ovarian cancer.
20          Do you see that?
21    A    Yes, I see the wording saying that; yes.
22    Q    Right.  And this study was a
23  peer-reviewed, published scientific paper; correct?
24    A    Well --
25    Q    Exhibit 17?

Page 233

1    A    I wouldn't really classify it as that,
2  because it's a review article.  So it's --
3    Q    Don't peer review -- or don't review
4  papers undergo the peer review process before
5  publication?
6    A    Not necessarily --
7          MS. CURRY:  Object to the form.
8          THE WITNESS:  -- the same way.  Sometimes
9  authors are invited to write a review article.  So
10  it doesn't actually then go out to reviewers for
11  review.
12          So no.
13  BY MS. GARBER:
14    Q    Okay.  But the defendants in this case
15  thought enough of this article that they cut and
16  paste this diagram into their fax to talk about the
17  inflammation mechanism, didn't they?
18          MS. CURRY:  Object to the form.
19          THE WITNESS:  So I'm not in a position to
20  comment on what the actual purpose of this was back
21  in 2004.  Inflammation is a hypothesis as to the
22  potential for ovarian carcinogenesis, but there is
23  not actually any mechanistic data that shows that
24  that is true.
25          So this is a hypothesis.

Page 234

BY MS. GARBER:

2    Q    There's no mechanistic data that supports
3    inflammation as a mechanism that you've reviewed.
4        MS. CURRY:  Object to the form.
5        THE WITNESS:  Correct.
6    BY MS. GARBER:
7    Q    Let's look at this figure one.  At the
8    top left, it indicates "Epithelial Inflammation
9    Initiators."  What do you understand that to mean
10   scientifically?
11   A    I don't actually know what the author is
12   referring to here.
13   Q    Okay.
14   A    I would have to see within the article
15   what she's referring to here.
16   Q    Okay.  Then there's a downward arrow and
17   a positive sign there.  So what do you think that
18   means scientifically as a review of scientific
19   literature?
20       MS. CURRY:  Object to the form.
21       THE WITNESS:  That it has a positive
22   influence.
23   BY MS. GARBER:
24   Q    All right.  And then in that center box,
25   there is the word "inflammation"; correct?

Page 235

1    A    Yes, ma'am.
2    Q    Then below that, there's a number of
3    bullet points.  One is DNA damage and repair;
4    correct?
5    A    Correct.
6    Q    One is oxidative stress; correct?
7    A    Yes, ma'am.
8    Q    One is elevated cytokines and
9    prostaglandins; correct?
10   A    Yes, ma'am.
11   Q    Then a downward arrow ends in the words
12   "ovarian carcinogenesis"; correct?
13   A    Yes, ma'am.
14   Q    Are you aware that the Saed data
15   provide -- 2019 paper provided mechanistic data
16   supporting DNA damage?
17       MS. CURRY:  Object to the form.
18       THE WITNESS:  No, ma'am.
19   BY MS. GARBER:
20   Q    Okay.  Are you aware that the Saed data
21   provided mechanistic data between talc and inducing
22   oxidative stress?
23       MS. CURRY:  Object to the form.
24       THE WITNESS:  I do believe that he showed
25   that; yes.

Page 236

1    BY MS. GARBER:
2    Q    Are you aware that the Buz'Zard 2007 data
3    showed mechanistic data supporting talc and elevated
4    oxidative stress or reactive oxygen species?
5    A    No.
6        MS. CURRY:  Object to the form.
7        THE WITNESS:  I've not read that paper,
8    ma'am.
9    BY MS. GARBER:
10   Q    All right.  Are you aware that the
11   Shukla data supported an elevated cytokines after
12   talc exposure?
13       MS. CURRY:  Object to the form.
14       THE WITNESS:  I have not read that paper,
15   ma'am.
16       MS. GARBER:  All right.
17       MS. SHARKO:  Ms. Garber and Ms. Thompson,
18   going forward, can you please bring copies of
19   exhibits for all counsel.  I know there's two
20   defendants down here who aren't getting anything.
21   You've given one copy for us.  I think the case
22   management order addresses the number of copies.
23       MS. GARBER:  Ms. Sharko, I would be happy
24   to do that, but that was not provided to us when we
25   defended our experts and it's a significant cost and

Page 237

1    we tried to bring our own copies of things.
2        I'll do my best in the depositions I'm
3    taking to do that in the future.
4        MS. SHARKO:  Okay, well --
5        MS. GARBER:  Flying on an airplane is a
6    lot of money to take multiple copies.
7        MS. SHARKO:  All right, well, I disagree
8    with what you're saying about the other depositions,
9    and I'll take up the violation of the order with
10   your lead counsel.
11       MS. GARBER:  We did our best to provide
12   copies here today.  I understood that this witness
13   would be defended by one lawyer, and I have brought
14   copies for her.
15       MS. SHARKO:  I think my friends at the
16   end of the table would appreciate copies.
17   BY MS. GARBER:
18   Q    Doctor, we've now gone through a number
19   of studies where the tract -- where the published
20   peer-reviewed authors have stated that it's
21   biologically plausible that talc can migrate.
22       But is it a true statement that nowhere
23   in the four corners of your report do you discuss or
24   analyze those statements?
25       MS. CURRY:  Object to the form.

Cheryl Saenz, M.D.

---

Page 238

1    THE WITNESS: So I discuss and analyze
2 the data that's actually on studies of migration. I
3 don't discuss every proposal that any author may
4 ever have made that such a supposition is true.
5    What I discuss is the actual experiments
6 that evaluated migration.
7 BY MS. GARBER:
8    Q    And we've already established that you
9 have not considered the totality of the literature
10 in connection with the issue of whether talc can
11 migrate; correct?
12    MS. CURRY: Object to the form.
13    THE WITNESS: No, I disagree with you,
14 ma'am. Having an author put in their paper that
15 they propose migration can exist is not a scientific
16 evaluation of the migration theory. It's a
17 statement. And I'm not going to put in my report
18 statements that are not based on -- in an experiment
19 into my report.
20    My report contains references to Egli, it
21 contains references to Ventor, and those authors
22 actually published on migration. And those papers
23 are in my report.
24    Having Dr. Ness suggest a proposal that
25 migration exists is not something that belongs in my

---

Page 239

1 report as scientific evidence of migration.
2    MS. GARBER: Objection. Move to strike
3 as nonresponsive.
4 BY MS. GARBER:
5    Q    Doctor, are you aware that the female
6 genital tract has a mechanism by which retrograde
7 transport of particulate can move up the female
8 genital tract?
9    MS. CURRY: Object to the form.
10    THE WITNESS: From where to where?
11 BY MS. GARBER:
12    Q    Well, let's say from the vaginal vault up
13 to the fallopian tubes.
14    A    I'm aware of some studies that have been
15 conducted that have demonstrated the migration of
16 particulate matter from the posterior vaginal vault
17 in a slurry to the fallopian tubes under certain
18 scientific experimental conditions.
19    Q    And those are limited to the studies that
20 you've cited in your report; correct?
21    A    Correct.
22    Q    Have you heard of a peristaltic pump with
23 regard to the female genital tract?
24    A    I've heard that phrase used; yes.
25    Q    Do you know what that is?

---

Page 240

1    A    It's the actual contraction mechanism of
2 the uterus. That's, in fact, triggered by oxytocin.
3    Q    And do you have any knowledge that
4 oxytocin can stimulate both antegrade contractions
5 as well as retrograde contractions of the female
6 genital tract?
7    MS. CURRY: Object to the form.
8    THE WITNESS: The directionality of flow
9 can be either way.
10 BY MS. GARBER:
11    Q    That is a biologically plausible
12 mechanism by which particulate can move up the
13 female genital tract; right?
14    MS. CURRY: Object to the form.
15    THE WITNESS: From the posterior vagina
16 as a slurry.
17 BY MS. GARBER:
18    Q    What happens to talc when it mixed with
19 the vaginal fluids. Doesn't it act like a slurry?
20    MS. CURRY: Object to the form.
21    THE WITNESS: I don't know. I haven't
22 seen any studies on talc mixing with vaginal fluids.
23 BY MS. GARBER:
24    Q    Don't the authors indicate -- the study
25 authors indicate that those studies are applicable

---

Page 241

1 to talc?
2    A    Which study authors?
3    MS. CURRY: Object to the form.
4 BY MS. GARBER:
5    Q    The published studies that cite to that
6 there's a biologically plausible mechanism, that
7 cite Egli and Ventor and some of the studies that
8 you have cited, that it's biologically plausible
9 that talc can migrate from the genitals to the
10 ovaries.
11    A    So --
12    MS. CURRY: Object to the form.
13    THE WITNESS: -- the authors don't
14 actually make that leap. They do say those studies
15 support the migration, but they're misquoting Egli
16 and Ventor because Egli and Ventor actually have the
17 slurry start in the posterior vagina, not on the
18 peritoneum.
19 BY MS. GARBER:
20    Q    If I were to put any study in front of
21 you that said talc can migrate and it was a study
22 author that studied genital talc in ovarian cancer,
23 any study author who was peer reviewed and published
24 who said that is a biologically plausible mechanism,
25 you would say they're wrong?

---

Cheryl Saenz, M.D.

Page 242

1    MS. CURRY:  Object to the form.
2    THE WITNESS:  I would say to you, show me
3  the science, show me the experiment that they are
4  making this statement from.  That's what I would say
5  to you.
6  BY MS. GARBER:
7    Q    Have you acknowledged in your expert
8  report any of the published authors' statements with
9  regard to the biologically plausible mechanisms for
10  talcum powder products' carcinogenicity and chronic
11  inflammation?
12    MS. CURRY:  Object to the form.
13    THE WITNESS:  So I don't exactly know
14  what you're referencing to.  I have done an analysis
15  in my report as to whether or not there's evidence
16  of chronic inflammation with talc being found in the
17  ovaries.
18    I've also done an analysis in my report
19  as to whether or not we see evidence of foreign body
20  granulomas in ovarian cancer.
21    (C. Saenz Exhibit 18 was marked for
22    identification.)
23    MS. GARBER:  Doctor, I'm going to mark as
24  Exhibit 18, a document again, that I created.  It is
25  titled "Biologic Plausibility Chronic Inflammation."

Page 243

1    Doctor, I will represent to you that
2  these are a listing of peer-reviewed study
3  publications that address the issue of talc's
4  ability to induce chronic inflammation.  I'll
5  represent that to you.
6    MS. CURRY:  I have the same objection to
7  Exhibit 18 as I do to Exhibit 11.
8    MS. GARBER:  You may, Ms. Curry.
9  BY MS. GARBER:
10    Q    Doctor, nowhere in the four corners of
11  your report have you attempted to settle or respond
12  to these statements with regard to peer-reviewed,
13  published study authors' statements with regard to
14  talc's induction of chronic inflammation, have you?
15    MS. CURRY:  Object to the form.  If you
16  need to review this document in full, please do so
17  before responding, as well as other underlying
18  documents.
19    THE WITNESS:  Well, ma'am, first I'm
20  going to disagree with you, because not all of these
21  are peer reviewed or published.
22    Secondly, I'm going to disagree with you
23  because I believe that what you've done here is
24  cherry-picked comments that each of the authors have
25  made from these publications and may not necessarily

Page 244

1  even correspond to the methods, the data collection,
2  and what the results were of these studies.
3    I do believe that many of these comments
4  most likely came from the discussion sections of
5  these papers, and that's not scientific proof of
6  that hypothesis.
7  BY MS. GARBER:
8    Q    Doctor, it's your opinion that talc does
9  not induce chronic inflammation; correct?
10    MS. CURRY:  Object to the form.
11    THE WITNESS:  In what venue?
12  BY MS. GARBER:
13    Q    With regard to the initiation of ovarian
14  cancer as a possible mechanism.
15    A    That's correct.
16    Q    There are a number of peer-reviewed
17  publications that indicate otherwise; correct?
18    MS. CURRY:  Object to the form.
19    THE WITNESS:  No, ma'am.  All of these
20  are hypotheses.  They're not indicating that ovarian
21  cancer is caused by chronic inflammation or talc.
22  They all say, basically -- I mean, right here,
23  ma'am, your own reference that you cherry-picked,
24  one, two, three, four, five, six, seven down.  This
25  is the Wu paper, "with previous findings and are

Page 245

1  compatible with the hypothesis."
2    So these are not statements of fact.
3  They are hypotheses.
4  BY MS. GARBER:
5    Q    You understand the biologic plausibility
6  for the mechanism does not require proof.  It's only
7  a plausible mechanism; correct?
8    MS. CURRY:  Object to the form.
9  BY MS. GARBER:
10    Q    You understand that, don't you?
11    A    For which you need to have a scientific
12  basis and not a single one of these statements is
13  the scientific basis.
14    Q    Provide for me the support of that
15  statement.
16    A    Provide for you the support?
17    Q    Yeah.
18    A    You can't just say something is so and
19  have it be so.  A hypothesis has to actually be
20  based in scientific proof of some sort.  There's no
21  mechanistic study that shows that talc leads to
22  ovarian carcinogenesis via chronic inflammation.
23    Q    Doctor, you understand that in a
24  causation analysis, there is no necessity to prove
25  mechanism of carcinogenicity; right?  You understand

Page 246

1  that?
2      MS. CURRY:  Object to the form.
3      THE WITNESS:  Ma'am, I disagree with you.
4  Biologic plausibility means that you actually have
5  to have some scientific proof that that mechanism
6  exists or makes sense.  And there is no scientific
7  proof that talc leads to chronic inflammation in the
8  ovaries.
9      There's also no scientific proof that
10 chronic inflammation leads to ovarian
11 carcinogenesis.
12 BY MS. GARBER:
13     Q    Provide for me the citation that supports
14 that definition of biologically plausibility.
15     A    Ma'am, I can't provide for you something
16 that is saying, you can just say a hypothesis and it
17 is so.  That's not what an analysis is about.
18 Biologic plausibility can be an extension whereby
19 you say, if we have seen X, Y, or Z in A, B, C, then
20 by extension, it's biologically plausible that it
21 also exists in X, Y, and Z.  You can't just say we
22 have this hypothesis and so, therefore, it's so.
23     (C. Saenz Exhibit 19 was marked for
24     identification.)
25     MS. GARBER:  Let's mark as Exhibit 19 a

Page 247

1  draft screening assessment from Health Canada.
2      MS. CURRY:  Do you guys need to see
3  copies of these exhibits because I may have extra
4  copies of some of them if you need them.
5      MR. ANDERTON:  If you have them, that
6  would be great.  And I guess going forward, I would
7  tend to agree, that we're going to be at these depos
8  and in the interest of checking them --
9      MS. GARBER:  Well, then you guys are
10 going to need to let us know how many of you are
11 going to attend so that we know that --
12     MR. ANDERTON:  We're here as a party, so
13 at least one for each party would be appropriate in
14 my mind.
15     MS. GARBER:  Thank you.
16     MS. SHARKO:  You can assume fairly that
17 you need four copies of every exhibit.  That is what
18 we did.
19 BY MS. GARBER:
20     Q    Doctor, if you could turn to page 18 of
21 this paper.  With regard to -- or sorry, turning to
22 the middle of the document under the title, "Mode of
23 Action," it's right after the Keskin citation.
24     Do you see where I am?
25     A    Yes.

Page 248

1      Q    It indicates, "There is support for an
2  association of inflammation and increased risk of
3  ovarian cancer," and it cites to the National
4  Academy of Sciences and Engineering, 2016, and that
5  Rasmussen paper.
6      Do you disagree with that statement?
7      A    So I've not read the N-A-S [sic] paper,
8  so I don't actually know if the authors are quoting
9  it correctly or not.
10     And which of the Rasmussen -- oh, it's
11 only the published one.  I actually have read the
12 Rasmussen paper.  And the only positive finding in
13 that study for an inflammatory process which would
14 be pelvic inflammatory disease was found with an
15 association of borderline tumors, and that was only
16 after, I believe, the second episode of pelvic
17 inflammatory disease.
18     So I can't comment on the reference of
19 the N-A-S paper and I think that the statement that
20 there is support for an association of inflammation
21 and increased risk of ovarian cancer is really kind
22 of an overbroad generalization because it really
23 only did pertain to borderline tumors.
24     Q    That's a long way of saying no?
25     MS. CURRY:  Object to the form.

Page 249

1      THE WITNESS:  Ma'am, I'm sorry.  I'm just
2  trying to be complete for you so you understand why
3  I say what I'm saying.
4  BY MS. GARBER:
5      Q    Did you read the Trabert paper, 2014,
6  titled "Pre-diagnostic Serum Levels of Inflammation
7  Markers and the Risk of Ovarian Cancer in the
8  Prostate, Lung, Colorectal, and Ovarian Cancer,
9  P-L-C-O, Screening Trial"?
10     A    I don't think it's in my report, but I
11 might have read it somewhere around the course of my
12 career.
13     Q    I didn't see it in your citations.
14     A    But I do think that -- I know I've read
15 various publications from the P-L-C-O trial --
16 sorry, the P-L-C-O clinical trials.  So I don't know
17 if I've, off the top of my head, read that
18 particular one.  I'd be happy to take a look at it
19 for you.
20     But the --
21     Q    I --
22     A    -- P-L-C-O trials are something that the
23 GYN oncology community has paid attention to.
24     Q    So I just want to read for you a
25 statement.  It says "Research Highlights" at page

Page 250

1  13. It says, "Our study provides additional
2  evidence that" --
3        MS. CURRY:  I'm sorry, do you have a copy
4  of that?
5        MS. GARBER:  I don't.
6  BY MS. GARBER:
7     Q    "Our study provides additional evidence
8  that inflammation plays an important role in ovarian
9  carcinogenesis."  If that's what it says, do you
10 disagree with that?
11    A    Why don't we just --
12       MS. CURRY:  Object to the form.  Do you a
13 copy so we can look at it?
14       MS. GARBER:  You don't have a copy?
15       MS. CURRY:  No, can we take a look at
16 what you're quoting?
17 BY MS. GARBER:
18    Q    If that's what it says, do you disagree
19 with that?
20    A    I can't comment on that one way or
21 another because I don't know what they're referring
22 to as inflammation.  If it's something such as an
23 elevated CA 125 versus looking at the actually
24 ovaries.
25       So without looking at the study, I can't

Page 251

1  comment on that statement.
2     Q    What is Interleukin 8?
3     A    Interleukin 8, it's an inflammatory
4  marker.
5     Q    Is it -- so it's associated with
6  inflammation?
7        MS. CURRY:  Object to the form.
8        THE WITNESS:  It can be.
9  BY MS. GARBER:
10    Q    Has it been tied to risk of ovarian
11 cancer or a pathway of developing ovarian cancer?
12       MS. CURRY:  Object to the form.
13       THE WITNESS:  I'm sure there are some
14 publications that have shown Interleukin 8 levels
15 are elevated, but where along the pathway of
16 carcinogenesis, off the top of my head, I don't
17 really know how that would relate.
18 BY MS. GARBER:
19    Q    You reference the Gates 2018 study in
20 your reference list.
21    A    No, ma'am, there's no Gates 2018 study.
22    Q    I'm sorry, 2008; correct?
23    A    Yes, ma'am.
24       ///
25       ///

Page 252

1        MS. GARBER:  I'll mark that study as
2  Exhibit 20.
3        (C. Saenz Exhibit 20 was marked for
4        identification.)
5  BY MS. GARBER:
6     Q    Doctor, if I could call your attention to
7  page eight, the first full paragraph about halfway
8  down, the sentence begins, "Talc particles."
9        Do you see that?
10    A    I'm sorry, which paragraph?
11    Q    The first full paragraph.
12    A    Oh.  Halfway down.  Okay.
13    Q    Could you read what those two sentences
14 until you reach the note -- I'm sorry, the citation
15 11.
16    A    "Talc particles can induce an
17 inflammatory response in vivo, which may be
18 important in ovarian cancer."
19    Q    Keep going.  One more sentence.
20    A    Hold on one second.  "Normal ovarian
21 cells treated with talc are more likely to undergo
22 self-proliferation and neoplastic trans -- whoops,
23 neoplastic transformation and cellular generation of
24 reactive oxygen species increasing with increasing
25 exposure to talc."

Page 253

1     Q    Do you disagree with those sentences?
2     A    No.
3     Q    Okay.  You also cited to the Mills 2008,
4  study; correct?
5        MS. CURRY:  Object to the form.
6        I don't believe --
7        MS. GARBER:  I'm sorry, 2004.  That's
8  what I do when I get tired.  I get my numbers all
9  mixed up.  You also -- I'll start over.
10 BY MS. GARBER:
11    Q    You also reference the Mills 2004 study
12 in your expert report references; correct?
13    A    Yes.
14       (C. Saenz Exhibit 21 was marked for
15       identification.)
16 BY MS. GARBER:
17    Q    If you could turn to page 458 of this
18 paper.
19    A    That's the first page.
20    Q    Okay.  This is a peer-reviewed
21 publication; correct?
22    A    Yes.
23    Q    This concerned perineal talc exposure and
24 epithelial ovarian cancer risk; correct?
25    A    Yes.

Page 254

1    Q   And with regard to the issue of migration
2  in the first full paragraph, it reads: "In animal
3  studies, talc and other substances have been
4  demonstrated to migrate from the vagina through the
5  peritoneal cavity to the ovaries."
6        Did I read that correctly?
7    A   Yes.
8    Q   And this is in your -- another
9  peer-reviewed paper where the authors have stated
10 that; correct?
11   A   Ma'am, that's the --
12       MS. CURRY:  Object to the form.
13       THE WITNESS:  -- introduction.  That's
14 not anything that they're proving in this paper.
15 BY MS. GARBER:
16   Q   And with regard to the issue of
17 inflammation, the authors state, and it has been
18 peer reviewed, "Collectively, these studies point to
19 a possible etiologic role of talc in ovarian cancer,
20 via inflammation process at the site of the ovarian
21 epithelium."
22       Did I read that correctly?
23       MS. CURRY:  Inflammatory process.
24 BY MS. GARBER:
25   Q   I'm sorry.  "Collectively, these studies

Page 255

1  point to a possible etiologic role of talc in
2  ovarian cancer via an inflammatory process at the
3  site of the ovarian epithelium."
4        Did I now read that correctly?
5    A   You read it correctly, but the paper that
6  they're citing there and referencing is the Ness
7  2000 paper, which actually was about hypotheses of
8  ovarian cancer in mutagenesis and was not a
9  mechanistic paper.
10       So it's not describing actually the
11 inflammation.  It's theorizing.
12       And, again, this is the introduction.
13 It's not anything that's being proven in this paper.
14   Q   This has been peer reviewed and
15 published, so it's undergone a peer-review process
16 that your opinions have not; true?
17       MS. CURRY:  Object to the form.
18       THE WITNESS:  Ma'am, the introduction is
19 not the result of the study.  And a statement that
20 the author makes doesn't make it so, particularly if
21 it's in the introduction or the discussion section.
22       There's nothing in the results of this
23 paper that supports that, and in fact, the paper
24 that they cite for that statement is Ness 2000,
25 which actually doesn't look at inflammation per se.

Page 256

1  It's talking about hypotheses.
2  BY MS. GARBER:
3    Q   Doctor, at page 20 of your expert report,
4  you indicate that "There is no data to support that
5  inflammation is the underlying -- "There is no data
6  to support that inflammation is underlying the" --
7    A   I'm sorry, ma'am, where are we?
8    Q   Under the summary.
9    A   Okay.
10   Q   I'll start again.  In your expert report
11 at page 20, you indicate, "There is no data to
12 support inflammation is the underlying" -- "is
13 underlying the" --
14   A   Wait, I'm sorry.  I don't see where you
15 are.
16       MS. CURRY:  I don't either.
17 BY MS. GARBER:
18   Q   Doctor, under "Summary" --
19   A   Yes, ma'am.
20   Q   -- at the very end, do you see where I
21 am?
22       MS. CURRY:  You're reading the last half
23 of the sentence.
24       THE WITNESS:  You're starting in the
25 middle of a sentence.

Page 257

1  BY MS. GARBER:
2    Q   Okay.  All right.  I'll read the whole
3  sentence.  "The clinical and epidemiologic data" --
4  so we'll start there.
5        What does "clinical data" mean?
6    A   Patients, ovaries themselves, looking for
7  foreign body granulomas, associations of pelvic
8  inflammatory disease with the development of ovarian
9  cancer.
10   Q   What you've seen with your eyes?
11   A   What I've seen with my eyes, but also the
12 literature on PID that we discussed earlier, the
13 Rasmussen study.
14   Q   Okay.  So the clinical an epidemiological
15 data, and there you mean the data that we've been
16 going through, the published, peer-reviewed
17 epidemiological data with regard to genital talc and
18 risk of ovarian cancer, correct?
19   A   Yes, ma'am.
20   Q   You indicate, "do not support the
21 hypothesis that talc causes ovarian cancer through
22 induction of chronic inflammatory process, primarily
23 because there's no data to support that inflammation
24 is underlying the malignant transformation of the
25 ovarian epithelium at all."

Cheryl Saenz, M.D.

Page 258

1    Did I read that correctly?
2    A    Yes.
3    Q    And you have made that statement without
4    reviewing the totality of the literature with regard
5    to mechanisms of carcinogenicity; correct?
6        MS. CURRY:  Object to the form.
7        THE WITNESS:  No, ma'am.  I've reviewed
8    the date on mechanisms of carcinogenicity and
9    ovarian cancer and I've also reviewed the clinical
10   data, which we talked about, and I've also reviewed
11   the pathologic data and the epidemiologic data.
12   BY MS. GARBER:
13   Q    Which pathologic data did you review?
14   A    Whenever we operate on patients, we don't
15   see evidence of foreign body granulomas.  We don't
16   see evidence of chronic inflammation.  From a
17   pathologic standpoint, there's no evidence of
18   inflammation underlying the development of ovarian
19   cancer.
20   Q    Okay.  And I'm going to get to that.  I
21   just wondered if you had seen some patient-level
22   data in this case or something you were referencing.
23       MS. CURRY:  Object to the form.
24       THE WITNESS:  I don't know what you mean,
25   patient --

Page 259

1        MS. GARBER:  Never mind.  I'll withdraw.
2    BY MS. GARBER:
3    Q    But when you claim no epidemiologic or
4    biologic data, as we have established over and over,
5    you have not seen the Buz'Zard or Shukla paper;
6    correct?
7    A    Correct.  But those don't demonstrate
8    cancer.
9    Q    They demonstrate mechanism, don't they?
10       MS. CURRY:  Object to the form.
11       THE WITNESS:  No, they demonstrate
12   inflammatory processes.  They don't demonstrate
13   cancer.
14   BY MS. GARBER:
15   Q    Okay.  What is the purpose of a cellular
16   study with regard to, let's say, applying talc to a
17   given cell to assess what happens at the cellular
18   level?  What would be the purpose of doing such a
19   study?
20       MS. CURRY:  Object to the form.
21       THE WITNESS:  It all depends on what your
22   hypothesis is.
23   BY MS. GARBER:
24   Q    What if your hypothesis is that talc can
25   induce epithelium ovarian cancer and you're looking

Page 260

1    for a plausible mechanism of how that happens?  What
2    would such a study do?
3        MS. CURRY:  Object to the form.
4        THE WITNESS:  It would look for malignant
5    transformation from a normal cell.
6    BY MS. GARBER:
7    Q    Would it also look for inflammatory
8    factors and mechanistic data by which malignant
9    transformation could happen?
10       MS. CURRY:  Object to the form.
11       THE WITNESS:  Only if you believed that
12   chronic inflammation might be involved in the
13   process of malignant transformation.
14   BY MS. GARBER:
15   Q    Are you aware of data that chronic
16   inflammation is associated with malignant
17   transformation in any context?
18   A    In other tumors, yes, about not in
19   ovarian cancer.
20   Q    Okay.  Now, you also indicate in your
21   report -- and I think we were just talking about the
22   pathologic data.  And you talk about when you've
23   performed surgery on patients and what you've seen
24   macroscopically; right, with your naked eye.
25   A    Also microscopically.

Page 261

1    Q    I'm going to get there.  I'm breaking it
2    down.  So you're describing what you see with your
3    eyes, macroscopically, when you operate, and you
4    remove their, let's say, ovaries; correct?
5    A    Their cancer?
6    Q    Uh-huh.
7    A    Yes.
8    Q    You also review their pathological --
9    their pathology slides of the tissue that you've
10   removed; correct?
11   A    Yes.
12   Q    And you use that as support for your
13   opinion that talc can't induce chronic inflammation
14   that leads to cancer, because when you look with
15   your eyes and look under the microscope, you don't
16   see evidence of that in the tumor?
17   A    That's some of what --
18       MS. CURRY:  Object to the form.
19   BY MS. GARBER:
20   Q    Is that fair?
21   A    That's some of what I use to support it,
22   I've not seen evidence of foreign body granulomas,
23   other things that would suggest that foreign bodies
24   are actually causing it.  Yes.
25   Q    Isn't it true, though, Doctor, by the

Cheryl Saenz, M.D.

Page 262

1  time you see the cancer, the inflammatory process
2  has already been overtaken by the tumor?  You're not
3  going to see at time of diagnosis what happened
4  years earlier, way before the latency period as
5  there was transformation of those normal cells into
6  cancer cells, are you?
7       MS. CURRY:  Object to the form.
8       THE WITNESS:  I have no reason to believe
9  that that's accurate.  I think that if there was
10  evidence of foreign body granulomas, they would
11  still be there in the pathology that we're
12  reviewing.
13  BY MS. GARBER:
14     Q    Is it a true statement that today, when
15  you're looking at, let's say, ovarian tissue, you
16  have no way of seeing cancerous transformation when
17  it occurred years earlier?
18       MS. CURRY:  Object to the form.
19  BY MS. GARBER:
20     Q    You can't see cancer evolving in ovarian
21  cancer, can you?
22       MS. CURRY:  Object to the form.
23       THE WITNESS:  I don't actually think
24  that's true.  I think there's some new and emerging
25  literature that in particular, for high-grade serous

Page 263

1  carcinomas, is giving us a glimpse into the
2  evolution from a pre-neoplastic process to ovarian
3  cancer.
4       That's in particular with what we've been
5  able to glean from a lot of the BRCA one and two
6  patients who have prophylactic surgery and we've
7  been able to identify precursor lesions in those
8  patients.
9       So I think that might have been true five
10  years ago.  I don't think that's necessarily true
11  now.
12  BY MS. GARBER:
13     Q    Was it true on February 25th, 2019?
14       MS. CURRY:  Object to the form.
15       THE WITNESS:  That we didn't know what it
16  looks like?  I think we don't know what it looks
17  like for all cases of ovarian cancer.  I think with
18  respect to high-grade serous carcinomas, we're
19  starting to learn.
20  BY MS. GARBER:
21     Q    If you could turn to page three of your
22  expert report, Doctor.
23     A    Sure.
24     Q    As to what cancer looks like as it's
25  developing, don't you indicate at the bottom of

Page 264

1  page three, quote, "As we really don't know what
2  ovarian cancer looks like as it's developing, unlike
3  cancers of the colon, breast, and cervix."
4       Isn't that what you said on February
5  25th, 2019?
6     A    Yeah, I think it's an evolving process,
7  because I think the different histologic subtypes
8  are starting to provide us with clues, but we don't
9  really know what it looks like.  This is --
10     Q    So when you look at an ovarian tumor when
11  you remove it from a woman, it in no way indicates
12  what was happening years earlier during cancer
13  transformation, does it?
14       MS. CURRY:  Object to the form.
15       THE WITNESS:  I don't --
16  MS. GARBER:
17     Q    Because you can't see that.  You can't
18  see the transformation of those cells years earlier,
19  can you?
20       MS. CURRY:  Object to the form.
21       THE WITNESS:  I could still see hallmarks
22  of foreign bodies if they were actually there.  We
23  see in pathology in women that have had surgery
24  years before evidence of suture granulomas for
25  somebody that might have had surgery before.

Page 265

1       Somebody that might have had a unilateral
2  salpingo-oophorectomy and had staples in order to
3  operate on her, we see evidence of that even years
4  later when they have cancer.  So those markers of
5  inflammation and responses to foreign bodies don't
6  go away just because the patient has cancer.
7  BY MS. GARBER:
8     Q    You can't look at a cancerous tumor and
9  say what induced that cancer by looking at it today,
10  cellularly, can you?
11       MS. CURRY:  Object to the form.
12       THE WITNESS:  I agree with that.  I
13  don't -- I don't know what induced that particular
14  cancer.  I agree with that.
15       MS. GARBER:  Thank you.
16       THE WITNESS:  Can we take a break?
17       MS. GARBER:  Sure.
18       THE VIDEOGRAPHER:  The time is now 3:48.
19  Going off the record.
20     (Break in the deposition taken at 3:49 p.m.)
21            0o0
22     (The deposition resumed at 4:10 p.m.)
23            0o0
24       THE VIDEOGRAPHER:  Time is now 4:09.
25  Back on the record.

Cheryl Saenz, M.D.

Page 266

1  BY MS. GARBER:
2      Q    Doctor, at page 20 of your report, in the
3  first full paragraph near the top, you indicate that
4  "If talc induces ovarian cancer by causing chronic
5  inflammation, then studies examining the use of
6  anti-inflammatory agents such as NSAIDS and aspirin
7  should show a decreased risk of developing ovarian
8  cancer with regular use of these agents."
9          Did I read that correctly?
10     A    Yes.
11     Q    Did you cite in your expert report
12 references to any data looking at NSAIDS and aspirin
13 by way of risk of ovarian cancer?
14     A    Yes.
15     Q    Okay.  And which studies did you cite?
16 Are those 13, 15, and 91?
17     A    Yes, along with reference two.
18     Q    Doctor, in your references, I could not
19 find where you had cited a 2018 paper by the author
20 Qiao, Q-I-A-O; is that correct?  You did not cite
21 that paper?
22     A    I did not.
23     Q    Did you perform a comprehensive review of
24 the literature looking at NSAIDS and aspirin and the
25 potential reduction for risk of ovarian cancer?

Page 267

1          MS. CURRY:  Object to the form.
2          THE WITNESS:  Yes.
3  BY MS. GARBER:
4      Q    Tell me about that comprehensive review
5  of the literature.  What did you do?
6      A    I went to search engines and typed in
7  ovarian cancer and NSAIDS.
8      Q    Did you type in ovarian cancer and
9  aspirin?
10     A    Yes.  Aspirin is an NSAID.
11     Q    But they seem to break it out in the
12 literature.
13     A    Not always.
14     Q    Okay.  Did you do any other search terms
15 with regard to ovarian cancer and NSAIDS?
16     A    Well, I didn't just type NSAIDS because I
17 was concerned that if that acronym wasn't in there,
18 that it might not come up.  So I also typed in
19 Tylenol, acetaminophen, ibuprofen, and what else did
20 I type in.  I think I even looked to see if Celebrex
21 was in there, yeah.
22         ///
23         ///
24         ///
25         ///

Page 268

1      Q    So with regard to the Qiao paper, I
2  will -- I don't know how to pronounce it.  I'm
3  guessing it's Qiao.  I'm going to mark that as
4  Exhibit 22.
5          (C. Saenz Exhibit 22 was marked for
6          identification.)
7  BY MS. GARBER:
8      Q    Doctor, I know you haven't read this
9  paper.  But in the abstract in the conclusions, are
10 the conclusions that as cited by these study
11 authors, these findings suggest that aspirin use is
12 associated with a reduced risk of gastric,
13 esophageal, colorectal, pancreatic, ovarian,
14 endometrial, breast and prostate cancers and small
15 intestine, neuroendocrine tumors?
16     A    That's the conclusion that the authors
17 put there; yes.
18     Q    So this study, does this look like this
19 was a meta-analysis study?
20     A    That's what it says in the title.
21     Q    So this was published in 2018, and it is
22 a meta-analysis of the association between aspirin
23 use and risk of certain cancers when included
24 ovarian cancer; correct?
25     A    Yes, that's one of the things they

Page 269

1  examined.
2      Q    What was the finding by way of reduction
3  of risk with regard to ovarian cancer?
4      A    The authors report that the risk of
5  ovarian cancer decreased by 11 percent.
6      Q    It was statistically significant, wasn't
7  it?
8      A    They reported that that finding was
9  statistically significant; correct.
10         MS. GARBER:  Let's look at another paper.
11 This I'll mark as Exhibit 24.  And this paper, the
12 lead author is Trabert, T-R-A-B-E-R-T, et al.,
13 titled "Aspirin, Nonsteroidal, Nonaspirin,
14 Nonsteroidal Anti-Inflammatory Drug and
15 Acetaminophen Use and the Risk of Invasive
16 Epithelial Ovarian Cancer, a Pooled Analysis in the
17 Ovarian Cancer Association Consortium."
18 BY MS. GARBER:
19     Q    Did I read that correctly?
20     A    Yes.
21         MS. CURRY:  Did we skip Exhibit 23?
22         MS. GARBER:  Did I miss one?
23         THE WITNESS:  Yes.
24         MS. GARBER:  Oh, I did.  Let's replace.
25         MS. SHARKO:  So Trabert is now 23?

Cheryl Saenz, M.D.

Page 270

1    MS. GARBER:  Trabert 2013 is now Exhibit
2  23.
3    MS. CURRY:  I think this is a 2014 --
4    MS. GARBER:  You're right.  It's at the
5  top.  All right.  So Trabert 2014, part of the
6  title, "Aspirin, Nonaspirin, Nonsteroidal
7  Anti-Inflammatory Drug," is now Exhibit 23.
8    (C. Saenz Exhibit 23 was marked for
9    identification.)
10  BY MS. GARBER:
11    Q    Doctor, I don't see that this paper is on
12  your reference list either; is that correct?
13    A    Correct.
14    Q    And nonsteroidal anti-inflammatory drug
15  is the long name for the acronym, NSAIDS; correct?
16    A    Correct.
17    Q    So your literature search should have
18  turned up this paper because NSAID was in the title;
19  correct?
20    A    It depends.  It's not always that simple.
21  I understand that it's there in the title, but if
22  you type in NSAIDS, it doesn't always come up.
23  Sometimes different permutations of your search will
24  yield different results.
25    Q    In the authors' conclusions, in the

Page 271

1  manuscript, it indicates "Aspirin use was associated
2  with a reduced risk of ovarian cancer especially
3  among daily users of low-dose aspirin.  These
4  findings suggest that same aspirin regimen proven to
5  protect against cardiovascular events and several
6  cancers could reduce the risk of ovarian cancer, 20
7  to 34 percent, depending upon" -- "depending on
8  frequency and dose of use."
9    Did I read that correctly?
10    A    That's their conclusion.  The result
11  section is what actually has that data.  The
12  conclusion section doesn't comment on the NSAIDS.
13    Q    And, Doctor, on the first page of this
14  paper, in the second paragraph, does it indicate
15  multiple lines of evidence suggest that ovarian
16  cancer maybe related to chronic inflammation?
17    A    So again, that's a statement from the
18  introduction section and they're referencing to that
19  same Ness paper that actually didn't evaluate
20  chronic inflammation but just commented on different
21  hypotheses as to carcinogenesis of ovarian cancer.
22  This paper is actually very similar in findings, I
23  think, to the Barnard paper, which I did reference
24  to in my report.
25    Q    This paper, if you look at page two on

Page 272

1  the left-hand column, indicates that it included
2  more than 7500 ovarian cancer cases from 12
3  population based case control studies; correct?
4    A    I'm sorry, where are we?
5    Q    On page two.
6    A    Yeah.
7    Q    Left-hand column at the top.
8    A    Oh, left-hand column.
9    Q    "We concluded."
10    A    We conducted?
11    Q    Yeah.  It indicates that the study
12  included more than 7500 ovarian cancer cases from 12
13  population based case control studies; right?
14    A    Right.
15    Q    At the last page, nine of 11, it
16  indicates, "In summary, this pooled analysis
17  supports the hypothesis that regular aspirin use
18  reduces ovarian cancer risk.  Specifically we report
19  a statistically significant decreased risk of
20  ovarian cancer with daily use of aspirin.  Further
21  biological and pharmaceutical" -- sorry,
22  pharmacological research is necessary to understand
23  the mechanisms of ovarian cancer risk reduction by
24  aspirin."
25    Did I read that correctly?

Page 273

1    A    You read that statement correctly, but
2  that wasn't the only finding in this study, just
3  like it wasn't the only finding in the Barnard
4  study, which is why in my report, I talked about the
5  literature on NSAIDS being inconsistent.
6    Sometimes it looks like it reduces the
7  risk.  Sometimes it looks like there is no effect.
8  Sometimes it looks like there actually was an
9  increased risk of developing ovarian cancer.  So the
10  literature on NSAID use in development of ovarian
11  cancer is inconsistent.
12    Q    How many studies did you review that
13  indicated that NSAIDS increased the risk of ovarian
14  cancer?
15    A    Two.
16    Q    How many studies did you review that
17  indicated NSAIDS, including aspirin, reduced the
18  risk of ovarian cancer?
19    A    So the issue is a little bit more complex
20  than that because some of the studies don't
21  necessarily break out which ones they were talking
22  about.  I believe the Barnard study looked at
23  low-dose aspirin use, daily aspirin use, and then
24  NSAIDS, and the results for each of those agents was
25  different.

Cheryl Saenz, M.D.

Page 274

1    So in total, I reference, I believe -- is
2  it three or four studies -- four studies in my
3  review that looked at the use of NSAIDS and the
4  development of ovarian cancer.  And the literature
5  was inconsistent.
6    Q    Do you rely on the studies that show that
7  NSAIDS and aspirin do not reduce the risk to support
8  your opinions that talc does not induce chronic
9  inflammation that leads to ovarian cancer?
10    A    No, I rely on the fact that the
11  literature is inconsistent to formulate my opinion
12  that chronic inflammation is the mechanism by which
13  talc would increase the risk of developing ovarian
14  cancer is not true.
15    Q    You do admit, though, that is there is
16  peer reviewed, published literature that NSAIDS,
17  including aspirin, have been shown to reduce the
18  risk of ovarian cancer, because they're
19  anti-inflammatories; right?
20    MS. CURRY:  Object to the form.
21  BY MS. GARBER:
22    Q    It's the mechanism?
23    A    Well, but just within this paper that you
24  just produced as evidence, there's also within the
25  exact same paper showing evidence that NSAIDS don't

Page 275

1  review -- sorry, don't reduce the risk of ovarian
2  cancer.
3    So what's what I mean by inconsistent, is
4  that some components of a study, depending on the
5  agent, show a reduction in risk.  Others don't show
6  a reduction in risk, even within the same study, and
7  other studies have shown an increase in risk.
8    So that's actually what I mean by
9  inconsistent.
10  BY MS. GARBER:
11    Q    But you nevertheless conclude based on
12  the data with regard to NSAIDS and aspirin and risk
13  of ovarian cancer, that there is not a mechanism of
14  carcinogenicity by chronic inflammation, don't you?
15    MS. CURRY:  Object to the form.
16    THE WITNESS:  What I conclude is that the
17  literature on NSAIDS and ovarian cancer does not
18  support the hypothesis of chronic inflammation as
19  the mechanism.
20    If all the literature on NSAIDS
21  consistently showed a reduction in risk across the
22  board in the development of ovarian cancer with
23  regular NSAID use, then I think that would actually
24  go to potentially the biologic plausibility of
25  chronic inflammation as a mechanism.  But it does

Page 276

1  not.
2    The fact that the NSAID literature
3  doesn't consistently show a reduction in risk speaks
4  to it likely being some other reason that the
5  literature is showing that, that it's not simply the
6  prevention of chronic inflammation.
7  BY MS. GARBER:
8    Q    Could it be the design of the study?
9    MS. CURRY:  Object to the form.
10    THE WITNESS:  I think any time we're
11  talking about case control studies, which is what
12  this study, this meta-analysis looks like, this one
13  that you just handed me, Exhibit 23, is a
14  compilation of -- what did we say, 12
15  population-based case control studies.  I think
16  there's always the possibility that you've got a
17  confound in that study.  That is the reason that you
18  have the findings that you have.
19    But the Barnard study was actually a
20  cohort study.  It was prospective.  So I don't
21  necessarily think that you're subject to the same
22  compound and recall biases that you might be in a
23  case control study such as Exhibit 23.
24  BY MS. GARBER:
25    Q    So you put more weight on the Barnard

Page 277

1  cohort study than you did the meta-analyses of the
2  data; is that fair, with regard to NSAIDS?
3    A    Well, with respect to the studies you
4  just showed me?
5    Q    Okay.
6    A    I've not had a chance to read these two
7  studies through, so I can't really give you an
8  analysis on that.  If we're talking about in a
9  general principle, I do think that a cohort study is
10  more scientifically credible than a case controlled
11  study.
12    Q    You've rendered an opinion about what the
13  literature shows by way of consistency with regard
14  to NSAIDS and aspirin without reviewing all of the
15  literature, do you agree?
16    MS. CURRY:  Object to the form.
17    THE WITNESS:  I believe that I've
18  reviewed a sufficient amount of the literature to
19  render the opinion that I've rendered which is that
20  the literature is inconsistent and, in fact, the two
21  references that you just showed me are consistent
22  with my opinion that the literature on NSAIDS is
23  inconsistent.
24  BY MS. GARBER:
25    Q    Doctor, do you think it's possible to

Cheryl Saenz, M.D.

| Page 278 | Page 280 |
|---|---|

**Page 278**

1 render an accurate opinion without reviewing the
2 totality of the literature on a given topic?
3          MS. CURRY:  Object to the form.
4          THE WITNESS:  I think that you can review
5 a sufficient amount of literature to render an
6 opinion as long as the literature that you're
7 reviewing encompasses the breath and depth of the
8 science that is out there.
9 BY MS. GARBER:
10     Q    Do you remember in the Echeverria report
11 what your opinions were with regard to the risk of
12 obesity and serous ovarian cancer?
13     A    So I'm not entirely sure what I said in
14 that report.  I'd be happy to look at it.  I'm not
15 entirely sure I commented specifically on serous
16 ovarian cancer in the Echeverria report.
17     Q    In this report, do you have an opinion as
18 to the risk of obesity as it pertains to serous
19 ovarian cancer?
20     A    So I think the literature on obesity
21 actually does -- well, I think it's inconsistent.  I
22 think that it's somewhat weak.  I think that the
23 strength of the association is still in the range of
24 roughly 1.2 to 1.3.  And I believe the histologic
25 subtypes that are most often associated with obesity

**Page 279**

1 do not include serous.
2          MS. GARBER:  I'm going to mark as
3 Exhibit 24 your expert report from the Echeverria
4 matter.
5          (C. Saenz Exhibit 24 was marked for
6          identification.)
7 BY MS. GARBER:
8     Q    If you could turn to -- you didn't number
9 your pages, but it's about fourth page in.
10         MS. SHARKO:  Is that protected
11 information in it?
12         MS. GARBER:  Not in this section -- you
13 know, that's a good point.  Thank you very much,
14 Ms. Sharko.  You know what we'll do is, I will
15 take --
16         MS. SHARKO:  Maybe give the witness the
17 whole report, question her, and then only mark pages
18 of it.
19         MS. GARBER:  Thank you.  Well, I don't
20 have pages.  You know what, let's do, Dr. Saenz,
21 let's put just a number, just if you could do this,
22 put a number one on the first page at the bottom.
23         THE WITNESS:  On the first page?  I'm
24 sorry.  Okay.
25 ///

**Page 280**

1 BY MS. GARBER:
2     Q    Let's put a number two on the second
3 page.
4     A    Okay.
5     Q    Then let's put a page three.  And
6 page four.
7     A    Okay.
8     Q    That's all I'm going to mark as from the
9 report of Cheryl Saenz, MD, with regard to the
10 Echeverria report.  We will just mark the first four
11 pages; okay?
12     A    Ma'am, there's patient identifier
13 information on page two.
14     Q    Okay.  We will then just mark page four
15 of the Echeverria report.
16     A    Okay.  I just --
17     Q    Thank you for saying that.  Okay.
18         With regard to your obesity opinion, in
19 this expert report, do you indicate that the data
20 shows an increased risk for high-grade serous?
21     A    In this report?
22     Q    In the Echeverria report, which we've
23 marked as Exhibit 24.
24     A    No.  I don't comment on it increasing the
25 development of high-grade serous.  I comment on it

**Page 281**

1 portending a worse prognosis in terms of mortality
2 for high-grade serous.
3     Q    Was it your opinion that obesity
4 increases high-grade serous in that case?
5     A    In terms of that incidence or the
6 mortality from?
7     Q    The incidence.
8     A    Not the incidence.  The mortality from.
9     Q    Is it your opinion in the MDL report that
10 obesity increases the risk for high-grade serous, or
11 serous ovarian cancer?
12     A    The incidence?
13     Q    Yes.
14     A    No.
15     Q    Is it your opinion that obesity increases
16 the mortality for high-grade serous?
17     A    It's my opinion that obesity increases
18 the mortality for basically all of the ovarian
19 cancers.
20     Q    Do you say that in your expert report?
21     A    I do.
22     Q    Okay.
23     A    Ma'am, may I ask, what should I do with
24 this then?
25     Q    Thank you.  Moving on.  Okay.  Let's talk

Cheryl Saenz, M.D.

Page 282

1 about a different topic for awhile.
2        Is it your opinion that the data do not
3 support a dose response with regard to talcum
4 powder, genital talcum powder exposure and risk of
5 ovarian cancer?
6     A    Yes, that's correct.
7     Q    You reviewed the Berge study in
8 connection with your expert report; correct?
9     A    The meta-analysis?
10    Q    Yes.
11    A    Yes.
12        MS. GARBER:  I will mark the Berge paper
13 as Exhibit 25.
14        (C. Saenz Exhibit 25 was marked for
15        identification.)
16 BY MS. GARBER:
17    Q    Doctor, the title of this paper is
18 "Genital Use of Talc and Risk of Ovarian Cancer, a
19 Meta-Analysis"; correct?
20    A    Correct.
21    Q    If you turn to page -- let's just look at
22 the first page.  In the abstract, the study authors
23 indicate, "This meta-analysis resulted" --
24    A    I'm sorry, ma'am.  On the first page,
25 where are we?  In the second column?

Page 283

1    Q    At the top, in the abstract.
2    A    Okay.
3    Q    Right-hand column, it indicates, "This
4 meta-analysis."  Do you see that?
5    A    Yes, thank you.
6    Q    "This meta-analysis resulted in weak but
7 statistically significant association between
8 genital use of talc in ovarian cancer, which appears
9 to be limited to serous" -- sorry.
10    A    No worries.
11    Q    I gave you the wrong version.
12    A    Give you this back?
13    Q    No.  Let's just hang on.
14        Your references indicate the Berge paper
15 that was published in the European Journal of Cancer
16 Prevention in 2018; correct?  It's at page 32.
17    A    Yes.
18    Q    The citation there is Volume 27(3),
19 May 2018, pages 248 to 257; correct?
20    A    Correct.
21    Q    So you have read that publication of the
22 Berge study; correct?
23    A    Correct.
24    Q    So, Doctor, I will represent to you that
25 at the bottom of the abstract, the study says, "This

Page 284

1 meta-analysis resulted in a weak but statistically
2 significant association between genital talc use in
3 ovarian cancer, which appears to be limited to
4 serous carcinoma with suggestion of a dose
5 response."
6        If it says that, do you disagree with the
7 study authors?
8        MS. CURRY:  Do you have a copy of that
9 version?
10        MS. GARBER:  No, I just said that I
11 don't.
12        MS. CURRY:  You don't have it.
13        MS. GARBER:  She had it on her reference
14 list, and I don't.  I put it in hypothetical.
15 BY MS. GARBER:
16    Q    If the study authors say that, do you
17 disagree with that?
18    A    So I have to look at the paper to see
19 exactly what we're looking at and to see where
20 they're saying the suggestion.  Because the paper
21 you've just put in front of me, by the same group,
22 with the same title, actually says that the
23 heterogeneity of results by study design and the
24 lack of a trend for duration and frequency of use
25 detract from a causal interpretation of the

Page 285

1 association.
2        MS. GARBER:  Would you object if I give
3 her a highlighted version that she can look at for
4 purposes of this question?
5        MS. CURRY:  No objection.
6        MS. GARBER:  I can make a clean copy of
7 it so that doesn't show up.
8        MS. CURRY:  Okay.
9 BY MS. GARBER:
10    Q    Doctor, do you see in the abstract where
11 I read from, at the bottom, where it says "This
12 meta-analysis"?
13    A    "This meta-analysis resulted in a weak
14 but statistically significant association between
15 genital use of talc and ovarian cancer, which
16 appears to be limited to serous carcinoma with
17 suggestion of a dose response."
18    Q    Do you disagree with the study authors,
19 the study provided a suggestion of a dose response?
20        MS. CURRY:  Object to the form.
21        THE WITNESS:  So I don't disagree with
22 the suggestion.  I don't think that demonstrates a
23 dose response, because the authors also go on to
24 say, "The heterogeneity of results by study design,
25 however, detracts from a causal interpretation of

Page 286

1  this association."
2      MS. GARBER:  Motion to strike as
3  nonresponsive.
4  BY MS. GARBER:
5      Q    Doctor, if you could now turn to about
6  halfway through the paper.
7      A    Which paper, ma'am, the one that I just
8  got handed or the one before?
9      Q    The one that you just got handed --
10     A    Okay.
11     Q    -- which we will mark as Exhibit -- we
12  will change and we will make that Exhibit 25.
13     MS. CURRY:  I think there's been
14  testimony on Exhibit 25.  Do you want to change --
15  do you want to mark this 26?
16     MS. GARBER:  Let's make that -- let's
17  just make that, yeah, 26.
18     (C. Saenz Exhibit 26 was marked for
19      identification.)
20  BY MS. GARBER:
21     Q    So Doctor, Exhibit 26 is now the Berge
22  paper which is published in the European journal of
23  Cancer Prevention, Volume 273, May 2018; correct?
24     A    Yes, ma'am.
25     Q    That's the same one that's listed on your

Page 287

1  reference list in your expert report?
2      A    Yes, ma'am.
3      Q    All right.  Now, if I could have you turn
4  to table three of that study.
5      A    I don't see a table three.  Am I missing
6  something?
7      Q    Go back one page.
8      A    Sorry; yes.
9      Q    That table three is titled "Duration and
10  Frequency of Use of Genital Talc, Results of the
11  Meta-Analysis."  Do you see that?
12     A    No.  Oh, sorry, "Duration and Frequency
13  of Use of Genital Talc Results in Meta-Analysis."
14  Yes.
15     Q    For the duration of ten years, the
16  relative risk was 1.16 and statistically
17  significant; correct?
18     A    Yes.
19     Q    And the frequency of use defined as one
20  time per week, showed a relative risk of 1.05, also
21  statistically significant; correct?
22     A    Yes.
23     Q    So these data support a suggestion of
24  dose response, don't they?
25     MS. CURRY:  Object to the form.

Page 288

1      THE WITNESS:  I don't necessarily know
2  that, because I don't know what it's being compared
3  against.  If it's being compared against never use
4  versus another time period, my answer would be
5  different.
6  BY MS. GARBER:
7      Q    Okay.  Can you go back to the Schildkraut
8  paper that we marked as Exhibit 7, please.  If you
9  turn --
10     A    Give me a second, ma'am.
11     Q    Sure.
12     A    Okay.
13     Q    If you turn to page 1416 of that
14  publication --
15     A    Yes, ma'am.
16     Q    -- on the left-hand column, about just a
17  little ways halfway down, it begins with "The
18  results."  Do you see where I am?
19     A    No.
20     Q    It's about three-quarters of the way down
21  the results.
22     A    Oh.
23     Q    See that?
24     A    Oh, sorry, yes.  The beginning of the
25  paragraph -- yes.

Page 289

1      Q    Yes.  The study authors indicate here,
2  "The results of the current study show that genital
3  powder use was associated with ovarian cancer risk
4  in African-American women and are consistent with
5  localized chronic inflammation in the ovary due to
6  particulates that travel through a direct
7  transvaginal route."  Did I read that correctly?
8      A    You read that component of the discussion
9  section; yes.
10     Q    The authors also say, "The dose response
11  observed for duration of genital powder use provides
12  further evidence for the relationship between
13  genital powder and overall epithelial ovarian cancer
14  risk."
15     Did I read that correctly?
16     A    That is what the author said, but what
17  their data actually shows, their analysis for their
18  dose response curve was not done correctly.  And so
19  I don't agree that this paper actually shows a dose
20  response.
21     Q    Here again, you agree -- you disagree
22  with study authors who actually conducted the study?
23     A    I do, ma'am, because this study looked at
24  applications without pulling out the never-users.
25  So the weight of having a statistically significant

Page 290

1  finding with more use is influenced by the never-use
2  population remaining in the analysis.
3      Q   Let's look at Cramer 2016.  That was
4  another study you cited in your reference list;
5  correct?
6      A   Yes, ma'am.
7          (C. Saenz Exhibit 27 was marked for
8          identification.)
9  BY MS. GARBER:
10     Q   Dr. Cramer was one of the --
11     A   This is 27.
12     Q   Thank you.  Exhibit 27 is the Cramer 2016
13 paper titled "The Association Between Talc Use in
14 Ovarian Cancer Retrospective Case Control Study in
15 Two US States"; right?
16     A   Yes.
17     Q   Dr. Cramer was the first study author in
18 1982 to find a statistically significant associated
19 risk between genital talc use and ovarian cancer;
20 right?
21     A   I believe that he's the first person to
22 publish that, yes, ma'am.
23     Q   He has since published a number of
24 studies about the issues surrounding talc and
25 ovarian cancer, including this study in 2016;

Page 291

1  correct?
2          MS. CURRY:  Object to the form.
3          THE WITNESS:  He -- he has published a
4  number of studies, yes.  And -- yes, this study was
5  publish in yeah, 2016.
6  BY MS. GARBER:
7      Q   Do you have any reason to doubt the
8  reliability of this particular study?
9          MS. CURRY:  Object to the form.
10         THE WITNESS:  I think there are problems
11 with this study, particularly with respect to the
12 reporting of a dose-response curve as we were just
13 discussing.
14 BY MS. GARBER:
15     Q   Can you name any positive study that
16 supports an association between genital talc use and
17 ovarian cancer that you don't think has a problem?
18     A   So I actually think the Terry pooled
19 analysis --
20     Q   Is that in your eyes?
21     A   Yeah.  I can just sit back a little.
22         MS. CURRY:  Are you okay on the video?
23         THE VIDEOGRAPHER:  Yeah, they're all
24 down.  Tried to pull them down more.  They're not
25 blocking.

Page 292

1          THE WITNESS:  The Terry pooled analysis,
2  I think, from a standpoint of the way that that
3  study was conducted, I think it was scientifically
4  sound.
5  BY MS. GARBER:
6      Q   Any others?  There's about 30 of them;
7  right?
8          MS. CURRY:  Object to the form.
9          THE WITNESS:  The case control studies, I
10 don't have criticisms of all of them.  It's just
11 when I'm reviewing them, I review the data in its
12 entirety, particularly looking for consistencies
13 within the study, if it's reporting on things that
14 are claimed in the conclusions.
15 BY MS. GARBER:
16     Q   Do you have any criticisms of any of the
17 data that didn't find a statistically significant
18 increased risk between genital talc and epithelial
19 ovarian cancer?
20         MS. CURRY:  Object to the form.
21         THE WITNESS:  I'm sure I --
22         MS. GARBER:  Or are your criticisms just
23 limited to the positive data?
24         MS. CURRY:  Object to the form.
25         THE WITNESS:  No, my criticisms are not

Page 293

1  just limited to the positive data.
2  BY MS. GARBER:
3      Q   Let's look at the Terry 2016 study.
4          MS. CURRY:  Do you mean Cramer?
5          THE WITNESS:  We're looking at Terry 2013
6  or Cramer 2016?
7          MS. GARBER:  Let's look at the Cramer
8  2016 study.
9          THE WITNESS:  Okay.
10         MS. SHARKO:  Are you okay with the sun?
11         THE WITNESS:  I'm okay.  If I need to --
12 I can back up.  Right now, I'm okay.
13         THE VIDEOGRAPHER:  Doctor, try to move a
14 little way this way.  That's fine.
15         THE WITNESS:  Move this way?  Yeah,
16 that's -- I'm going to sit back here.
17         THE VIDEOGRAPHER:  That's better
18 actually.
19         THE WITNESS:  You got the right side?
20         MS. GARBER:  That's all off the record.
21         THE REPORTER:  Unfortunately, it is on.
22 BY MS. GARBER:
23     Q   Doctor, if you can turn to page 337 of
24 this study.
25     A   Yes, ma'am.

Cheryl Saenz, M.D.

Page 294

1    Q    Start with page 335 to get the full
2  sentence.  The very last sentence on 335 indicates,
3  "An odds ratio of 1.49 with a confidence interval of
4  1.06 to 2.10 was associated with more than 20 talc
5  years (greater than 7200 applications) and a dose
6  response."
7    A    That's what they wrote.
8    Q    Do you disagree with the study authors in
9  this case that the results supported a dose
10  response?
11    A    So I don't disagree with the finding,
12  that that's the odds ratio.  But I do disagree with
13  the statement that this analysis, which is in the
14  top part of the table one, looking at total genital
15  applications among only those who reported months
16  per year per use, that analysis, that grouping, does
17  not support a dose response with each of those
18  intervals of applications.
19         The only -- there are two, actually, that
20  report statistical significance.  The one of the 361
21  to 1800 applications, and the greater than 7200 that
22  you just reported.  But the interval in between
23  those two does not achieve statistical significance
24  and, in fact, has an odds ratio even lower than less
25  application.

Page 295

1         So I don't believe that this grouping,
2  the analysis of the total applications actually
3  supports a dose response.
4    Q    You make that assumption, because you
5  assume that the dose response needs to be linear,
6  don't you?
7         MS. CURRY:  Object to the form.
8         THE WITNESS:  No, that's actually not
9  true.  I'm drawing that opinion from the fact that a
10  lower number of applications was reported as a
11  statistically significant finding, and then the
12  intermediate number of applications actually wasn't
13  statistically significant and had a lower odds
14  ratio.  And then the higher number of applications
15  had statistical significance.
16         So it's not a matter of threshold
17  response per se.  It's a matter of the fact that the
18  statistically significant findings are interrupted
19  by nonstatistically significant findings of an
20  actually lower odds ratio.
21  BY MS. GARBER:
22    Q    Are you aware of any toxicology
23  principles that would support that you don't have to
24  have a linear increase.  It can be in the shape of
25  go up, go down, then go back up?

Page 296

1         MS. CURRY:  Object to the form.
2         THE WITNESS:  Not with respect to talc
3  and not with respect to having a lesser exposure
4  cause a cancer as we're looking at in this
5  circumstance, an intermediate exposure not causing
6  cancer and then the higher exposure causing the
7  cancer.  It -- I'm not aware of anything that would
8  say an intermediate exposure of a carcinogenic agent
9  is safe when a lower exposure is not.
10  BY MS. GARBER:
11    Q    You're not a toxicologist, though; right?
12    A    No, ma'am.
13    Q    If you turn to page 345, there is a
14  summary, that says, "In summary, the study on talc
15  in epithelial ovarian" --
16    A    I'm sorry, can you slow down and let me
17  get there.
18    Q    Sure.
19    A    Thank you.
20    Q    345, left-hand column.  It reads, "In
21  summary, this study on talc and epithelial ovarian
22  cancer has contributed to the following perspectives
23  with some new regarding this association."
24         And the first one reads, "Overall, there
25  is an association between genital talc use an EOC

Page 297

1  and a significant trend with increasing talc years
2  of use."
3         Did you disagree with that?
4    A    I don't believe this paper supports that
5  contention.
6    Q    So yet again here, you're disagreeing
7  with a study author that has actually conducted a
8  study with regard to genital talc use in ovarian
9  cancer?
10         MS. CURRY:  Object to the form.
11         THE WITNESS:  I disagree with the
12  statement in the conclusion section, because the
13  table that is presented actually as the data does
14  not support that statement.
15         MS. GARBER:  Let's mark the Terry paper
16  as 28.
17         (C. Saenz Exhibit 28 was marked for
18         identification.)
19  BY MS. GARBER:
20    Q    Doctor, you looked at this study;
21  correct?
22    A    I read this study, yes.
23    Q    The title is "Genital Powder Use in the
24  Risk of Ovarian Cancer, a Pooled Analysis, of
25  8525 Cases and 9859 Controls."

Cheryl Saenz, M.D.

Page 298

1    A    Correct.
2    Q    With regard to dose response at page six,
3  the authors address -- I'm sorry, under discussion.
4  Under discussion that begins "The biologic
5  plausibility."
6        Do you see where I am?
7    A    Yes.
8    Q    The authors here address some of the
9  issues that I was just raising with regard to it may
10 not be a linear dose response, don't they?
11       MS. CURRY:  Object to the form.
12       THE WITNESS:  You would need to point out
13 for me exactly what you're referring to.
14       MS. GARBER:  Okay.
15 BY MS. GARBER:
16   Q    The Terry authors indicate "The biologic
17 plausibility for the observed association between
18 genital talc use and ovarian cancer risk has been
19 challenged because evidence for a dose response has
20 been inconsistent."
21       Gives some citation.  It says "The lack
22 of significant dose response may reflect the
23 difficulty inherent in accurate recollection of
24 specific details of frequency and duration of
25 genital powder use."

Page 299

1        They go on to say "Also, because not all
2  powder products contain talc, various products may
3  differ in their potential cardiogenic effects."
4        MS. CURRY:  Carcinogenic effects.
5        MS. GARBER:  "Carcinogenic effects.
6  Alternatively, the association between genital
7  powder exposure and ovarian cancer risk may not be
8  linear, and modest exposure maybe sufficient to
9  increase cancer risk."
10 BY MS. GARBER:
11   Q    Did I read that correctly with counsel's
12 help?
13   A    That, and earlier I think you missed a
14 word.  It wasn't genital talc use.  It was genital
15 powder use in the first sentence, but otherwise;
16 yes.
17   Q    Okay.  Do you agree with the authors that
18 the dose response results that are seen in the
19 literature and the inconsistency of those may
20 reflect that there's not a linear response, but yet
21 there can still be carcinogenicity?
22       MS. CURRY:  Object to the form.
23       THE WITNESS:  So I believe that the lack
24 of a linear response may be true, and it may be that
25 a threshold dose is the mechanism by which something

Page 300

1  is carcinogenic.  But the literature on talc and
2  developing ovarian cancer, that's not my criticisms
3  of the studies that lack a dose response curve.
4        My criticisms of the studies that lack a
5  dose response curve are either one, they fail to
6  pool the never-users out of the analysis, so the
7  weight of seeing a dose response is actually
8  influenced by the fact that the never-users still
9  remain in the analysis.
10       And two, there are studies such as Cramer
11 2016 that we just talked about, that a lower dose
12 seems to have an association between ovarian cancer,
13 but an intermediate dose does not.  And then a
14 higher dose does have that statistical significant
15 finding so I believe what Terry is saying, is that
16 may be not linear.  It may be threshold.  But that
17 doesn't alter the findings in Cramer.  It doesn't
18 alter the way that Schildkraut did the analysis.
19       So those are my criticisms.  I don't
20 think it's entirely explained by what Terry is
21 offering here in the discussion section.
22 BY MS. GARBER:
23   Q    Do you agree that the literature -- there
24 are literature that support a dose response?
25   A    I do not believe that there's any

Page 301

1  literature that actually has shown a dose response
2  where the dose response calculations have been done
3  correctly.
4    Q    You believe the failure to pull the
5  never-users out of the equation operates to increase
6  the odds ratio?
7        MS. CURRY:  Object to the form.
8        THE WITNESS:  I believe that the failure
9  to pull the never-users out of the calculation of a
10 dose response analysis does influence that analysis
11 towards showing a higher odds ratio for increased
12 applications or longer duration or increased
13 frequency.
14 BY MS. GARBER:
15   Q    Why is that if they've never used talc?
16   A    Because the dose, if you're looking at
17 just two applications, let's say that you're looking
18 at less than 5,000 applications or more than 5,000
19 applications, the lower odds ratio that's calculated
20 with less than 5,000 applications is influenced by
21 the never-users still being in there.
22       The higher odds ratio that you see when
23 you calculate the odds ratio for more than 5,000
24 applications is being compared against that
25 population that still had no applications in it.

Cheryl Saenz, M.D.

Page 302

1     So that odds ratio for that first dosing
2  is influenced by the never-users still being
3  contained in that grouping.
4     Q    You're speculating, aren't you, that
5  those odds ratios are influenced by the never-users?
6         MS. CURRY:  Object to the form.
7         THE WITNESS:  No --
8  BY MS. GARBER:
9     Q    You have no data to suggest that that has
10 positively influenced the data, do you?
11        MS. CURRY:  Object to the form.
12        THE WITNESS:  I absolutely do.  That's
13 actually how Terry calculated their dose response.
14 They pulled the never-users out, and they commented
15 that this is the only way to actually go look for a
16 dose response.  Your never-users are not going to
17 have a statistically significant increased risk
18 because they have no applications.
19        So their referent number is one.  That's
20 a lower number by the fact that they're never-users.
21 Terry pulled those patients out, the never-users,
22 when Terry went about doing the dose calculations.
23 And Terry did not find a statistically significant
24 dose response curve.
25 ///

Page 303

1  BY MS. GARBER:
2     Q    Are there other data that support that
3  failure to pull out the never-users inflated the
4  odds ratio?
5         MS. CURRY:  Object to the form.
6         THE WITNESS:  No, every other study left
7  them in.  That's not the proper way to do that
8  analysis, because you're weighting your lower
9  applications by the never-users.  They don't belong
10 in the dose response calculations, because they
11 don't have applications.
12 BY MS. GARBER:
13    Q    But you don't know the way that you just
14 cited in Terry in the other studies that the
15 never-users affected the results, do you?
16        MS. CURRY:  Object to the form.
17        THE WITNESS:  No, I do, because they have
18 an odds ratio, a referent value of one.  So that is
19 the referent value because they have no exposures.
20 That's influencing the lower dose applications.
21 BY MS. GARBER:
22    Q    Do you have any data to indicate that the
23 study subjects that reported no use did, in fact,
24 have no use?
25    A    So I think what you're getting at is

Page 304

1  actually the entire issue of recall bias.  Any case
2  control studies is up and open to recall bias.  I
3  have no reason to believe that somebody would report
4  they never used talc if they never used it.  But I
5  don't have actual data on that.
6     Q    Do you have an opinion that recall bias
7  accounts for the positive association in the case
8  control studies?
9         MS. CURRY:  Object to the form.
10        THE WITNESS:  I think it has the
11 potential to contribute to it.
12 BY MS. GARBER:
13    Q    But that's not my question.  Do you think
14 that the positive results, the statistically
15 significant association in the case control studies
16 are attributable to recall bias?
17        MS. CURRY:  Object to the form.
18        THE WITNESS:  Not exclusively, but I
19 think there is the potential that recall bias is
20 influencing the odds ratios in the case control
21 studies along with other factors that case control
22 studies are subject to.
23 BY MS. GARBER:
24    Q    So I'm here to get your opinion.  So
25 there's potential, but it is not your opinion that

Page 305

1  those studies are, in fact, influenced by recall
2  bias; correct?
3     A    I do --
4         MS. CURRY:  Object to the form.
5         THE WITNESS:  I do believe that
6  Schildkraut demonstrated that recall bias
7  contributes to the odds ratio because when
8  Schildkraut analyzed the data pre-2014 and
9  post-2014, the odds ratio changed.  So I do believe
10 that as a piece of data, the Schildkraut study does
11 show the influence of recall bias in case control
12 studies -- sorry, in her study.
13 BY MS. GARBER:
14    Q    Do you know when there was the first
15 widespread coverage or media coverage of the talcum
16 powder litigation?
17        MS. CURRY:  Object to the form.
18        THE WITNESS:  No, I do not.
19 BY MS. GARBER:
20    Q    Did you read any studies that talked
21 about that?
22    A    About the recall bias?
23    Q    Uh-huh.
24    A    Or the litigation?
25    Q    Uh-huh.

Cheryl Saenz, M.D.

Page 306

1    A    Other than Schildkraut?
2    Q    Uh-huh.
3    A    Penninkilampi talks about it.
4    Q    We'll get to some of that in a minute.
5  Do you have an opinion about whether the
6  epidemiological data provides consistent increased
7  risk of ovarian cancer?
8        MS. CURRY:  Object to the form.
9        THE WITNESS:  I'm sorry, you're going to
10  have to rephrase that.  That's really broad.  The
11  epidemiologic literature shows increased risk of
12  ovarian cancer?
13        MS. GARBER:  Yes.
14        THE WITNESS:  That's very broad.  I
15  don't -- can you please rephrase that?
16  BY MS. GARBER:
17    Q    What are your opinions about whether or
18  not the epidemiological data is -- provides
19  consistency or inconsistency?  Don't you have
20  opinions about that in your report?
21        MS. CURRY:  Object to the form.
22        THE WITNESS:  With respect to what and
23  what?
24  BY MS. GARBER:
25    Q    With respect to genital talc use and risk

Page 307

1  of ovarian cancer.
2    A    I think the epidemiologic literature on
3  the risk of -- the possible risk of perineal
4  application of talc and the development of ovarian
5  cancer is inconsistent.
6    Q    You're aware of study data that
7  indicate -- strike that.
8        You're aware of study authors in
9  epidemiological studies that indicate that the
10  literature is consistent, not inconsistent; correct?
11        MS. CURRY:  Object to the form.
12        THE WITNESS:  No, you'd have to point me
13  to what exactly you're referencing.
14        MS. GARBER:  Let's go back to Health
15  Canada, which is Exhibit 20.
16        THE WITNESS:  Okay.
17        MS. CURRY:  Exhibit 19?
18        MS. GARBER:  Is it 19?
19        THE WITNESS:  Yes.
20        MS. GARBER:  Thank you.  I misspoke.  So
21  Exhibit 19, that draft screening assessment of
22  Health Canada.
23  BY MS. GARBER:
24    Q    Could you please turn to page -- it's not
25  three, but it's Roman three.  It's three pages in.

Page 308

1  Do you see where I am?
2    A    So the -- is this the synopsis section?
3    Q    Yes.  Do you see at the bottom of -- the
4  third page in, under the synopsis, the second to the
5  last paragraph?
6    A    Yes.
7    Q    It reads, "The meta-analyses of the
8  available human studies and peer-reviewed literature
9  indicate a consistent and statistically significant
10  positive association between perineal exposure to
11  talc in ovarian cancer."
12        Do you disagree with that statement of
13  these authors who drafted this for Health Canada?
14    A    Yes, the literature is not consistent.
15  In fact, Berge talks about that.  There's
16  heterogeneity between case control studies and the
17  cohort studies.
18    Q    So here, again, you're disagreeing with
19  authors who have actually performed an analysis of
20  the data.
21        MS. CURRY:  Object to the form.
22        THE WITNESS:  These authors didn't
23  perform an analysis.  This is a draft screening
24  assessment, and in fact, I'm very consistent with
25  what Berge puts forth, which is that there's

Page 309

1  heterogeneity, meaning inconsistency, between the
2  cohort studies and the case control studies.
3        MS. GARBER:  Let's mark the Taher study.
4        THE REPORTER:  Which study?
5        MS. GARBER:  T-A-H-E-R, 2018.  I'm going
6  to mark as Exhibit 29 the Taher 2018 meta-analysis.
7        (C. Saenz Exhibit 29 was marked for
8  identification.)
9        THE WITNESS:  Thank you.
10  BY MS. GARBER:
11    Q    Could you please turn to page 49 of the
12  study.  Under the conclusion section, beginning with
13  "consistent," the authors conclude "Consistent with
14  previous evaluations, the IARC and subsequent
15  evaluations by individual investigators, the present
16  comprehensive evaluation of all currently available
17  relevant data indicates that perineal exposure to
18  talcum powder is a possible cause of ovarian cancer
19  in humans."
20        I'm assuming that you disagree with that
21  conclusion.
22    A    I disagree with that.  I mean, they are
23  basically saying what IARC said, and I disagree with
24  that.
25    Q    You disagree that the literature is

Cheryl Saenz, M.D.

Page 310

1  consistent?
2      A   I disagree that the literature is
3  consistent, because again the cohort studies do not
4  show an increased risk.
5      Q   And you disagree that the perineal
6  exposure to talc is a possible cause of ovarian
7  cancer in humans?
8      A   Yes.
9      Q   Turning back to the Terry 2013 paper.  If
10 you turn to page six of that study where it
11 indicates "Based on the consistency," do you see
12 that?
13     A   I'm sorry, where are we?
14     Q   If you could hand that to me, because I
15 can't find mine.  Thanks.
16     A   No problem.
17     Q   Thank you.  Page six, under the
18 discussion.  Do you see where it begins, "Based on
19 the consistency"?
20     A   Yes.
21     Q   It reads, "Based on the consistency of
22 the epidemiologic literature on talc-based body
23 powder and ovarian cancer risk, the IARC classified
24 talc-based body powder as a 2(b) carcinogen,
25 possibly carcinogenic in human beings."

Page 311

1         So there the Terry papers are citing to
2  IARC, where IARC was saying the data are consistent;
3  correct?
4      A   So Terry is citing IARC, which is a 2010
5  publication, and that's before the cohort studies
6  such as when the talc initiative study was
7  published.  So IARC didn't actually analyze those
8  studies, and I do believe that here, Terry is simply
9  quoting what IARC has to say.
10     Q   Okay.  Did you consider the -- did you
11 consider the issue of recall bias in formulating
12 your opinions in this case?
13         MS. CURRY:  Object to the form.
14         THE WITNESS:  With respect to what?
15 BY MS. GARBER:
16     Q   With regard to the sufficiency of the
17 literature and what it showed.
18         MS. CURRY:  Object to the form.
19         THE WITNESS:  I think recall bias is
20 always an issue.  Whenever there's a case control
21 study, I don't think that that's something that you
22 can necessarily eliminate.  You can try and control
23 for it, but as we discussed earlier and as evidenced
24 by the Schildkraut study, there's certainly an
25 influence of, on the odds ratios, of recall bias.

Page 312

1  BY MS. GARBER:
2      Q   In your report at page eight, under the
3  heading, "Genital Application of Talc," you
4  indicate, "The majority of the published studies" --
5      A   I'm sorry.  Give me a second.  I see
6  where you are, yes.
7      Q   "The majority of the published studies
8  consist of small, retrospective case control studies
9  with inherent selection and recall bias."
10     A   Biases.
11     Q   Biases.
12     A   Yes.
13     Q   That's your opinion?
14     A   Yes.
15     Q   The majority of them?
16     A   Yes.
17     Q   Okay.  Are you aware of study author
18 statements that have indicated that those data are
19 not subject to recall bias?
20         MS. CURRY:  Object to the form.
21         THE WITNESS:  No, you would have to show
22 me that, and I don't believe that you can entirely
23 eliminate recall bias from a case control study.
24 And selection bias is always going to be a component
25 of a case control study because you will have people

Page 313

1  that don't participate in terms of who your cases
2  are.  And what is the reason for them to not
3  participate and the people that do participate, to
4  participate, you can't sort out.  You don't know
5  what those influences are.
6  BY MS. GARBER:
7      Q   At Exhibit 19, page 28.
8      A   What document are we on now, ma'am?
9      Q   Sorry, the Health Canada.
10     A   Health Canada.
11     Q   Health Canada, page 28.
12     A   Okay.
13     Q   Under the heading, "Uncertainties in the
14 Evaluation of Risk in Human Health," third paragraph
15 down, beginning with the sentence, "However."
16         Do you see where I am?
17     A   Yes.
18     Q   The next sentence down, it begins, "The
19 studies where the exposure is simple, e.g., never
20 versus ever use, recall bias is unlikely to be an
21 important source of bias."
22         Then it cites to Narod 2016.  "The
23 positive association is strongest for serous
24 histologic type."  Then he cites to Berge 2018.
25 Taher, 2018.  "The findings that the association may

Cheryl Saenz, M.D.

Page 314

1  vary by histologic type detracts from the hypothesis
2  of report bias, as this type of bias would likely
3  operate in all histologic types."
4          Then he cites to the Berge 2018 paper.
5          Correct?
6      A    That's what it says there, but that's
7  just not true.
8      Q    So let's talk about that for a minute.
9  If recall bias were at play, then it wouldn't
10  operate in some histologies and not others, would
11  it?
12     A    So the studies that have shown the
13  association with the serous subtype was the Gertig
14  2000 study, which in the follow-up study with Gates
15  in 2010, did not show the association with the
16  serous subtype.
17     Q    Were there other studies that you saw
18  where serous subtype was more highly associated with
19  risk of ovarian cancer than the other subtypes?
20     A    So across the different literature that
21  has been published at various times, there has been
22  association with the serous type, but there have
23  also been associations with the endometrial type.
24  So the literature has varied, according to what
25  subtypes were found.

Page 315

1          I also think, again, I would cite back to
2  Schildkraut, which demonstrated the influence of
3  recall bias, regardless.  And I just don't think
4  that you can completely eliminate recall bias.
5          You're talking about patients with
6  ovarian cancer that are searching for answers as to
7  why they got their disease.  They want to know why
8  they're in this unfortunately circumstance, and we
9  don't really know how the people that were doing the
10  questions were asking them the questions and how
11  that might influence them as well.
12     Q    Can you pull the Langseth paper from
13  2008.
14         MS. CURRY:  Which exhibit number was
15  that?
16         MS. GARBER:  I think it was seven.
17         MS. THOMPSON:  It's 12.
18         MS. GARBER:  It was not.  It was 12.
19         THE WITNESS:  Almost there.
20  BY MS. GARBER:
21     Q    If you turn to page 358.
22     A    Is that the first page?
23     Q    Yeah.  On the right-hand column, the
24  paragraph that begins with "Methodological factors,"
25  do you see that?

Page 316

1      A    Yes.
2      Q    It reads:  "Methodological factors such
3  as recall bias could always be considered in case
4  control studies."
5          MS. CURRY:  Should always be considered.
6          MS. GARBER:  "It could have been a
7  problem had there been widespread publicity about
8  the possible association between use of body powder
9  and cancer.  The International Agency For Research
10  on Cancer, IARC, working group, considers that there
11  has not been widespread public concern about this
12  issue, and therefore, considers it unlikely that
13  such bias could play -- could explain the consistent
14  findings."
15  BY MS. GARBER:
16     Q    Did I read that correctly?
17     A    Yes, and it goes on, "Another source of
18  recall bias could result from the fact that women
19  with cancer tend to remember or overreport their use
20  of body powder," which is exactly what I was saying
21  before.
22     Q    Isn't it true, Doctor, that habitual use
23  eliminates or reduces the risk of recall bias?
24         MS. CURRY:  Object to the form.
25         THE WITNESS:  It can reduce recall bias,

Page 317

1  but you can't eliminate it.  And even as the authors
2  say in this paper that you were just reading from,
3  the influence of this type of recall bias cannot be
4  ruled out.  So habitual use doesn't even rule out
5  the possibility that the women with cancer tend to
6  overreport or remember more so their use of body
7  powder.
8  BY MS. GARBER:
9      Q    Would you read the Narod 2016 publication
10  with regard to talc in ovarian cancer.  I didn't see
11  it cited on your reference list.
12     A    I think in the course of being a GYN
13  oncologist, I probably read it, but I don't know
14  that I read it specifically for the purposes of
15  generating my report.
16         MS. GARBER:  So I've marked that as
17  Exhibit 30.
18         (C. Saenz Exhibit 30 was marked for
19         identification.)
20  BY MS. GARBER:
21     Q    Doctor, this was published in Gynecologic
22  Oncology, so this is something that you probably
23  would have read?
24     A    Quite possibly; yes.
25     Q    Doctor, here, Dr. Narod discusses that

Cheryl Saenz, M.D.

Page 318

1   case control studies to date are consistent on the
2   right-hand column, doesn't he?
3       A   He writes, "The case control studies to
4   date are consistent," yes.
5       Q   If you turn --
6       A   He goes on to say, "Given the small
7   effect size, it is not surprising that some are
8   positive and some are negative."
9       Q   Does he also discuss the cohort studies,
10  if you turn the page over in the left-hand column,
11  about halfway down, beginning with the word
12  "neither"?
13      MS. CURRY: I don't see where you are.
14      THE WITNESS:  I don't either.
15      MS. GARBER:  Second page in.
16      THE WITNESS:  Yes, ma'am.
17      MS. GARBER:  Left-hand column.
18      THE WITNESS:  Yes, ma'am.
19      MS. GARBER:  About halfway down the
20  paragraph, right after the odds ratio that ends with
21  the competence interval of 1.15.
22      THE WITNESS:  I'm sorry, say that number
23  again.
24      MS. GARBER:  Let me show you, where it
25  says "neither."

Page 319

1       THE WITNESS:  Thank you; okay.
2   BY MS. GARBER:
3       Q   It indicates:  "Neither prospective study
4   confirmed the association of talc use in ovarian
5   cancer raised by the case control studies, but
6   neither study was powered to detect the risk of 1.2
7   and, therefore, we cannot exclude the possibility."
8       He goes on to say, "Only two women in a
9   thousand will develop ovarian cancer in ten-year
10  follow-up period.  If we study 10,000 women over ten
11  years, we can expect 20 cancers to occur.  If the
12  true odds ratio is 1.2, we will expect 20 cancers in
13  the unexposed group of 100,000."
14      MS. CURRY:  10,000.
15      THE WITNESS:  10,000.
16  BY MS. GARBER:
17      Q   And so on.  He goes on to say, "In order
18  to achieve statistical significance in the
19  prospective study, we would need a much larger
20  cohort, e.g., we would need a study upwards of
21  200,000 women for ten years?"
22      Did I read that correctly?
23      A   So, one, he does say that.  Two, I don't
24  know what his -- the bases for his calculations and,
25  three, we actually do have that data.  Berge in the

Page 320

1   meta-analysis, when Berge looked at the cohort
2   studies and put them together, Berge did a
3   mathematical calculation to look at the power of the
4   cohort studies to be able to detect a relative risk
5   of 1.25.
6       And what Berge found was that when you
7   put the cohort studies together, you actually do
8   achieve the statistical significance to detect a
9   relative risk of 1.25 to the 99th percentile.
10      So the power is actually there within the
11  cohort studies, particularly when you do a
12  meta-analysis with them.
13      So I disagree that that data is not
14  available.  I think that this is why Berge came to
15  the conclusion that you cannot say the heterogeneity
16  between the case control studies and the cohort
17  studies is due to the cohort studies lacking power.
18  BY MS. GARBER:
19      Q   None of the cohort studies have a study
20  population of 200,000 women, do they?
21      MS. GARBER:  Object to the form.
22      THE WITNESS:  No, they don't, but the
23  pool of them does.  And the pool of them did not
24  detect a statistically significant difference in the
25  risk of developing ovarian cancer with the use of

Page 321

1   perineal talc.
2   BY MS. GARBER:
3       Q   What did the Penninkilampi data find with
4   regard to the cohort studies?
5       MS. CURRY:  Object to the form.
6       THE WITNESS:  So the Penninkilampi study
7   only looked --
8       MS. GARBER:  Go ahead, I'm sorry.
9       THE WITNESS:  That's okay.
10  BY MS. GARBER:
11      Q   The Penninkilampi study only looked at
12  the Gertig data.  It didn't look at the Gates data.
13      Do you take issue with that?
14      A   I do.
15      Q   Why?
16      A   Because I would think that study authors
17  that are trying to conduct a meta-analysis would
18  always want to look at the most mature data,
19  particularly in cohort study.  So I understand that
20  the authors didn't --
21      Q   I'm listening.  I promise you, I'm
22  listening.  I'm sorry.  We're just short on time.  I
23  can do two things at once.  I'm a woman.
24      A   Understood.  I understand that
25  Penninkilampi didn't want to have duplicate data.

Cheryl Saenz, M.D.

Page 322

1    Q    Okay; yes.
2    A    I understand that Penninkilampi didn't
3  want to have duplicate data, so they said they
4  didn't want to reanalyze the same patient study
5  population.  But I still -- can you move that water
6  bottle?  Sorry.  This one.  The light is reflecting
7  off of it.  Thank you so much.
8         But that means that they should have
9  favored an analysis of the Gates data over the
10 Gertig data and they did not.
11   Q    Do you know what the metric of exposure
12 was for the Penninkilampi meta-analysis?
13        MS. CURRY:  Object to the form.
14        THE WITNESS:  You mean what did they
15 calculate their odds ratio off of?
16 BY MS. GARBER:
17   Q    How did they select the exposure for
18 purposes of their meta-analysis that was conducted?
19   A    I'd have to go look at the original study
20 again.  I can't recall off the top of my head.
21        MS. GARBER:  Let's mark Exhibit 31 the
22 Penninkilampi study.
23        (C. Saenz Exhibit 31 was marked for
24        identification.)
25 ///

Page 323

1  BY MS. GARBER:
2    Q    Doctor, if you look at table two, sorry.
3  If you look at figure two at page 46.  Do you see
4  for figure 2(a), the metric is ever-talc use or
5  any-talc use?
6    A    I'm sorry, where are you?
7    Q    Under figure two.
8    A    Are we reading the legend?
9    Q    Yes.
10   A    Thank you.
11   Q    Figure 2(a), it indicates, "Any perineal
12 talc use is associated with an increased risk";
13 right?
14   A    Yes.
15   Q    Figure 2(a), the metric, is ever-use of
16 talc; correct?
17   A    Well, it says "Any perineal talc use";
18 yes.
19   Q    Ever-use; right?
20   A    I don't see where it says "ever."
21   Q    Well, any, ever, those are used
22 interchangeably, aren't they?
23   A    Fair enough.
24   Q    So now if we go -- you take issue because
25 the Penninkilampi authors included the Gertig 2000

Page 324

1  data; correct?
2    A    Well, they didn't include the Gates data.
3  It's not that they included the Gertig data that I
4  take issue with.  It's that they didn't include the
5  Gates data.
6         MS. GARBER:  Now, if I mark Gertig, as
7  Exhibit 32.
8         (C. Saenz Exhibit 32 was marked for
9         identification.)
10 BY MS. GARBER:
11   Q    Doctor, if we turn to the Gertig data
12 that the Penninkilampi authors included, was an odds
13 ratio of 1.09, with a confidence interval of .86 to
14 1.38; is that correct?
15   A    I'm looking at the Penninkilampi table.
16 Do you want me to reference me where to look in the
17 Gertig paper?
18   Q    I do.  So let's do this together.  So in
19 the Penninkilampi publication, under --
20   A    Table A, yes.
21   Q    -- figure 2(a) --
22   A    Right.
23   Q    -- the Gertig data that's reported, is an
24 odds ratio of 1.09, .86 to 1.38; correct?
25   A    Yes.

Page 325

1    Q    We've already established that this is
2  for ever-use of talc; right?
3    A    That's what the legend says.
4    Q    Now, if we go over to table two in the
5  Gertig paper and we see ever-use of talc, we see
6  that that's where the Penninkilampi authors got
7  their data; correct?
8    A    So the adjusted odds ratio is 1.09 with
9  0.86 to 1.37; correct.
10   Q    Okay.  So --
11   A    So that's not exactly the same.
12   Q    Well, it's off by --
13   A    By .01.
14   Q    Close enough?
15   A    I guess for government work.  But it's
16 not exactly the same.
17   Q    For epidemiologic work.  Now, if we go to
18 the Gates paper, I'll mark that as Exhibit 33.
19        (C. Saenz Exhibit 33 was marked for
20        identification.)
21 BY MS. GARBER:
22   Q    And we turn to table one at the Gates
23 2010 paper, the authors reported that genital talc
24 use by way of frequency; correct, not ever-never?
25   A    Correct.

Page 326

1    Q    So it would have been incorrect of the
2 Penninkilampi authors to include the Gates data,
3 because between the Gertig data, looking at
4 ever-never, the Gates data presented only a
5 frequency of use, so that would be comparing apples
6 to oranges by way of exposure, wouldn't it, Doctor?
7         MS. CURRY:  Object to the form.
8         THE WITNESS:  By that analysis, then,
9 Penninkilampi also should not have included Wu 2015.
10 Because Wu 2015 included in its analysis as
11 never-users anybody that reported use of less than
12 one year.
13        So it wasn't pure, and yet, they included
14 Wu 2015 in the analysis for the same rationale that
15 you've just pointed out Gates.
16        So Wu 2015 is in figure 2(a).  So if the
17 authors are really trying to pull out and only
18 report on ever-never users, then Wu 2015 should not
19 have been included in the analysis either.
20 BY MS. GARBER:
21    Q    Well, Wu -- did Wu 2009 provide
22 ever-never?
23    A    That's --
24        MS. CURRY:  Object to the form.
25        THE WITNESS:  -- not the issue.  The

Page 327

1 issue is, you're trying to explain that Gertig was
2 included and Gates wasn't, because it was an
3 ever-never use reporting.  And what I'm saying is,
4 in figure 2(a), the fourth study down, Wu 2015 are
5 was not an ever-never use reporting.
6        So if the reason Gates was left out is
7 because frequency of use of, what was it, less than
8 one time per week was the report, then Wu 2015
9 should have been left out as well.  Because Wu 2015
10 grouped women that used talc, but reported less than
11 one year of use, in with the never-users.
12 BY MS. GARBER:
13    Q    Do you think in your experience, which
14 doesn't include a degree in epidemiology, that it
15 was improper for the Penninkilampi authors to
16 analyze the Gertig 2000 data rather than the Gates
17 2010 data?
18        MS. CURRY:  Object to the form.
19        THE WITNESS:  Yes, I do.  And if the
20 rash -- especially in the rationale that you're
21 trying to propose is because they're trying to be
22 pure in the reporting of ever-never data, then they
23 weren't.  Wu 2015 does not belong in that analysis
24 if the rationale that you're proposing is actually
25 what they did.

Page 328

1 BY MS. GARBER:
2    Q    Have you analyzed the Berge data to see
3 if the consistency of the exposures are consistent
4 throughout the meta-analysis study?
5        MS. CURRY:  Object to the form.
6        THE WITNESS:  Berge 2015 didn't make an
7 exclusion based on that.  What I'm saying is that I
8 think you would always want to report on a study
9 that has longer latency to -- especially when you're
10 looking at development of a cancer.  And Gates has a
11 longer latency than Gertig.
12        Within Wu 2015, there were patients that
13 had exposure that were grouped in never-users.  So I
14 don't think that that's a reason to eliminate the
15 Gates study.
16 BY MS. GARBER:
17    Q    Do you -- and I don't know why the
18 authors relied on the Gates -- on the Gertig versus
19 the Gates, because it's not in the paper.  Do you?
20    A    No, that's true.  I tried to figure that
21 out as well by thoroughly reading that paper.  What
22 I do know is that they said they -- within their
23 methodology section, that they didn't include
24 studies that had patients that were previously
25 reported on.

Page 329

1    Q    Let's talk about some of the cohorts
2 quickly, and then we'll move on to a final area --
3    A    Sure.
4    Q    -- before my time expires.  So in the
5 three cohort studies that you looked at, the Nurses
6 Health Study, the W-H-I and the sister study, did
7 those support your opinion that there's no credible
8 scientific evidence that talc increases risk for
9 developing ovarian cancer?
10        MS. CURRY:  Object to the form.
11        THE WITNESS:  They helped form my
12 opinion.
13 BY MS. GARBER:
14    Q    So where the other studies were not
15 credible, these studies were?
16        MS. CURRY:  Object to the form.
17        THE WITNESS:  No, that's not what I said.
18 I've read everything that's there and analyzed
19 everything that I've read and every single study
20 that I've read has helped to influence my opinion.
21        I've come to the conclusions that I've
22 come to, because I've read all of these studies.  So
23 just because they didn't have a statistically
24 significant finding or just because the data was
25 inconsistent doesn't mean I discounted that

Page 330

1  literature.  I actually evaluated that in terms of
2  generating my opinion.
3  BY MS. GARBER:
4      Q    Doctor, you make reference at page 30 of
5  your report to junk science.  Which of the
6  peer-reviewed public -- published data is junk
7  science that you're referencing?
8          MS. CURRY:  Object to the form.
9          THE WITNESS:  I'm not referencing any one
10 particular manuscript or article.  I'm just saying
11 the supposition that talc causes ovarian cancer is
12 junk science.
13 BY MS. GARBER:
14     Q    So the literature which supports that
15 talc is associated with a statistically significant
16 increased risk of epithelial ovarian cancer is junk
17 science?
18         MS. CURRY:  Object to the form.
19         THE WITNESS:  The hypothesis is.  It's
20 not supported by the science.
21 BY MS. GARBER:
22     Q    With regard to the cohort studies, let's
23 turn to the Gates 2010 study.  That was a follow-up
24 of the Gertig 2000 study; correct?
25         MS. CURRY:  Do you have another copy?

Page 331

1  This is the wrong publication.
2          THE WITNESS:  It's this one.
3          MS. CURRY:  I know, that's what I'm
4  looking for.
5          MS. GARBER:  It's just a different --
6  it's the same publication.
7          MS. CURRY:  No, no, it's not.  This is a
8  different article.
9          THE WITNESS:  This is the 2008.  This is
10 the 2010.
11         MS. GARBER:  They got merged again.
12 Sorry.  Maybe she can pull one out.
13 BY MS. GARBER:
14     Q    So does the Gates article, it's follow-up
15 to the Gertig 2000 paper; correct?
16     A    I mean, with respect to the NHS-1 study;
17 yes.
18     Q    And you indicate that the case control
19 studies were reliable based on a couple of factors,
20 one, that the women were the right study population;
21 correct?
22         MS. CURRY:  Object to the form.
23         THE WITNESS:  You just said "case control
24 studies."  No, that's actually not true.
25 ///

Page 332

1  BY MS. GARBER:
2      Q    The cohort studies were reliable based on
3  a couple of factors, one of the which is that the
4  women were the right age.
5          MS. CURRY:  Object to the form.
6  BY MS. GARBER:
7      Q    Is that correct?
8      A    Can you direct me to the page in my
9  report that we're discussing?
10     Q    Page 13.  Let's turn specifically to the
11 Gates study.  The age of the women in the Gates
12 study were 25 to 42; correct?
13     A    Not at enrollment.
14     Q    In the Gates study, the study did not ask
15 the question about talc.  Instead, it just carried
16 forward the data from the Gertig, one time, 1982
17 questionnaire; is that correct?
18     A    So at enrollment, so the Gates study had
19 two components.  The NHS-1 Group of patients that
20 were actually originally enrolled and asked about
21 talc in 1982.  And the women in that analysis
22 were -- I'm trying to find the information on age at
23 the time of enrollment.
24     Q    Doctor, in the Gertig study, the women at
25 the time of enrollment were age 30 to 55.

Page 333

1      A    Right.  So that's not the number that you
2  just quoted me.  So at the time of enrollment in the
3  Gertig study, they were 30 to 55; correct.
4      Q    They were followed for 14 years; correct?
5          MS. CURRY:  Object to the form.
6          THE WITNESS:  That's how old they were
7  when they enrolled in 1976.  They were asked the
8  question about talc in 1982.  So they actually would
9  be six years older when they were asked about talc
10 and then they were followed for 14 years.
11 BY MS. GARBER:
12     Q    When you say at page 14 that based on the
13 use of, that the average use is greater than
14 20 years, based on the Wu 2015 data, you're
15 speculating --
16     A    Where --
17     Q    -- as to when it stopped.  In your expert
18 report.
19     A    Page 14?
20     Q    You indicate a criticism is often made of
21 the two studies, that they were only -- that they
22 only ascertained information on talc usage at one
23 point.  But we know from Wu 2015, however, the women
24 who are ever users of talc in perineal area, the
25 mean duration of use is 20 years.

Cheryl Saenz, M.D.

Page 334

1    So you're speculating about the years of
2 talc use, based on the Wu data; correct?
3         MS. CURRY:  Object to the form.
4 BY MS. GARBER:
5    Q    You don't know that, you don't have any
6 firsthand knowledge, do you?
7         MS. CURRY:  Object to the form.
8         THE WITNESS:  Well, of course, I don't
9 have firsthand knowledge, but I'm building upon what
10 Wu published.  And what Wu published is that the
11 average of duration of use of women that are talc
12 users is more than 20 years.
13 BY MS. GARBER:
14    Q    But you're speculating --
15    A    I have no reason to believe that the
16 population in either Gertig or Gates is not typical
17 of the same population that Wu studied.
18    Q    But you don't have any reason to know
19 that it was.  This is an entire different study,
20 cohort, than the Wu data, wasn't it?
21         MS. CURRY:  Object to form.
22         THE WITNESS:  It's a different study, but
23 the women are talc users and there's every reason to
24 believe that a talc user is a talc user and the
25 duration of use is going to be more than 20 years.

Page 335

1 BY MS. GARBER:
2    Q    The study does not give that information,
3 does it?
4    A    The study doesn't include that
5 information.
6    Q    Also, the Houghton study does not give
7 that information, does it?
8         MS. CURRY:  Object to the form.
9         THE WITNESS:  That's actually not true.
10 The Houghton study actually did study women who
11 reported on more than 20 years of usage.  Houghton
12 looked at duration.
13 BY MS. GARBER:
14    Q    The Gonzalez sister study did not
15 indicate the years of use, did it?
16    A    That's correct.
17    Q    There again, like Gates, you relied on
18 extrapolation from the Cramer study to give you that
19 data; correct?
20    A    I relied on the data as reported by
21 Dr. Cramer as to the age at which women start using,
22 but I also relied on IARC, even though I don't quote
23 it there, because IARC talks about women that are
24 talc users usually starting by their mid 20s.
25    Q    These cohort studies were not long enough

Page 336

1 to capture a 30- or 40-year latency for ovarian
2 cancer, were they?
3         MS. CURRY:  Objection to form.
4         THE WITNESS:  I disagree with that.  I
5 think that in particular, with Gates and Gertig
6 study, the length of study time in that study was
7 24 years.  The length of study in that study for
8 follow-up was 24 years, and if we then look at as
9 reported by Wu and as reported by Dr. Cramer, these
10 women most likely started by their mid 20s and had
11 used talc for more than 30 years then -- I'm sorry, more
12 than 20 years, then we actually are in the range of
13 30 plus years of latency.
14 BY MS. GARBER:
15    Q    But, Doctor, to make that statement,
16 you're speculating.  You don't have any information
17 from the studies that support the length of use, do
18 you?
19    A    That's actually not true.  The women's
20 health initiative study reported on women that had
21 used talc for more than 20 years.  It then followed
22 women for 12.4 years.  That puts us at 32.4 years.
23         So if you ask me whether or not the
24 latency ever got to 30 years, absolutely it did.  At
25 a minimum for the women that reported more than

Page 337

1 20 years of use in the Houghton study.
2    Q    Doctor, what was the metric for exposure
3 in the Gertig and Gates study?
4         MS. CURRY:  Objection to form.
5         THE WITNESS:  Gertig and Gates looked at
6 frequency of use.  Gertig looked at it with a little
7 bit more specificity than Gates did.
8 BY MS. GARBER:
9    Q    And what was the metric in the Houghton
10 study?
11    A    Duration.
12         MS. CURRY:  Object to the form.
13         THE WITNESS:  Duration of use.
14 BY MS. GARBER:
15    Q    What was the metric in the sister study
16 or the Gonzalez study?
17         MS. CURRY:  Object to the form.
18         THE WITNESS:  Whether or not the subject
19 had used talc in the preceding 12 months.
20 BY MS. GARBER:
21    Q    Didn't you testify in the Echeverria case
22 that without looking at cumulative use, in other
23 words, if you just look at one side of the equation,
24 either frequency or duration, but not frequency
25 times duration, you only see half the story?

Cheryl Saenz, M.D.

| Page 338 | Page 340 |
|---|---|
| 1    MS. CURRY: Objection. | 1    MS. CURRY: Object to the form. |

Page 338

1    MS. CURRY: Objection.
2    THE WITNESS: I don't believe that that
3  is actually what my testimony was.
4    MS. CURRY: To form.
5  BY MS. GARBER:
6    Q    Your testimony was that it would be more
7  accurate, and it would give a better picture of the
8  true risk to see duration times frequency in a
9  cohort study.
10    Wasn't that your testimony, Doctor?
11    MS. CURRY: Objection to form.
12    THE WITNESS: Then I don't know that
13  you're --
14    MS. CURRY: Do you have a copy of the
15  testimony?
16    THE WITNESS: -- I don't know that you're
17  quoting me exactly. I would agree with you that had
18  there been information on frequency and duration, it
19  would be more informative. But I don't think that
20  any of the cohort studies, simply because they
21  looked at one metric, i.e., frequency or, i.e.,
22  duration, is not informative.
23    It would always be nice to have more
24  information, but it doesn't discount the fact that
25  there is information in these studies which

Page 339

1  demonstrates that there is not an increased risk of
2  developing ovarian cancer with perineal application
3  of talc.
4  BY MS. GARBER:
5    Q    Amongst the cohorts, the longest
6  follow-up was what period of time?
7    A    Follow-up of the study period itself?
8    Q    Yes.
9    A    24, almost 25 years.
10    Q    What about the other studies?
11    A    The follow-up itself, in Houghton, was
12  12.4 years. But again, that is -- needs to be
13  clarified by the fact that women were asked about
14  years of use and there were women in the study that
15  already had reported more than 20 years of use.
16    Q    And what about the Gonzales study, what
17  was the period of follow-up in those studies?
18    A    I believe that was 6.4 years. But I'd
19  have to look at the study to know that I have the
20  decimal right.
21    Q    In the meta-analyses that you looked at,
22  how many meta-analyses are there with regard to
23  talcum powder, genital talcum powder exposure and
24  risk of ovarian cancer?
25    A    Are we talking --

Page 340

1    MS. CURRY: Object to the form.
2    THE WITNESS: Are we talking about the
3  published ones, peer-reviewed, published?
4    MS. GARBER: We can start there.
5    THE WITNESS: I'm aware of at least
6  eight.
7  BY MS. GARBER:
8    Q    There's nine if we count the Taher paper;
9  correct?
10    A    Which has not been published.
11    Q    Can we agree that each of nine
12  meta-analyses, whether published or not, each showed
13  a statistically significant increased risk in
14  genital talc and risk of ovarian cancer?
15    MS. CURRY: Object to the form.
16    THE WITNESS: Each of them did report a
17  statistically significant odds ratio; yes, but the
18  meta-analyses all are different in that some of them
19  included the cohort data, but then pulled it out of
20  the analysis and this influenced the odds ratio.
21  And many of the meta-analyses have simply built upon
22  the earlier meta-analyses, so they're reanalyzing
23  the same data.
24  BY MS. GARBER:
25    Q    So you think they're just rehashing the

Page 341

1  same old data, so you discount them?
2    MS. CURRY: Object to the form.
3    THE WITNESS: I don't discount them. I
4  absolutely reviewed them and I considered them in my
5  opinion, but I don't think that their findings are
6  anything unique or different. I don't think that,
7  for example, to hear added anything to the
8  information in the field, I think Penninkilampi is
9  incomplete.
10    I think that the fact that they all
11  report similar odds ratio is not at all surprising,
12  because they're using the same data.
13  BY MS. GARBER:
14    Q    Do you know what was said about the
15  Penninkilampi article by ACOG --
16    MS. CURRY: Object to the form.
17    MS. GARBER: -- when it was published.
18    THE WITNESS: You'll have to show me what
19  you're referring to.
20    ///
21    ///
22    ///
23    ///
24    ///
25    ///

Cheryl Saenz, M.D.

Page 342

1      MS. GARBER:  I'm going to mark as
2  Exhibit 34 a document that the title indicates
3  "What's New in Ovarian Cancer, Best Articles From
4  the Past Year."  And there are four articles that
5  are included and the Penninkilampi article was
6  listed as number two.
7          (C. Saenz Exhibit 34 was marked for
8          identification.)
9  BY MS. GARBER:
10     Q    Did you consider that in your expert
11  opinions with regard to Penninkilampi?
12     A    So I've actually read the Penninkilampi
13  article, and I stand by my opinions on this.  This
14  is not the opinion of ACOG.  This is the opinion of
15  Jason Wright.
16     Q    Do you know who Jason Wright is?
17     A    I do.
18     Q    Do you respect him?
19        MS. CURRY:  Object to the form.
20        THE WITNESS:  On some issues.  I've
21  actually taken issue with some of his other
22  publications in the past.  This is not something
23  that is peer reviewed.  This is something that he
24  submitted.
25  ///

Page 343

1  BY MS. GARBER:
2     Q    The range of odds ratios for the
3  meta-analyses were from 1.22 to 1.4 across those
4  nine studies; correct?
5     A    I would have to see exactly, but I will
6  concede with you that I believe you are in the
7  correct range.
8     Q    The Health Canada considered the
9  collective meta-analyses in coming to their causal
10  opinion about genital talcum risk of ovarian cancer,
11  didn't they?
12        MS. CURRY:  Object to the form.
13        THE WITNESS:  They included them in their
14  reference list.
15  BY MS. GARBER:
16     Q    IARC considered 2010 -- considered the
17  meta-analyses that were then available at the time
18  of their analysis -- analysis in coming to their
19  opinions regarding genital talc and carcinogenicity.
20        MS. CURRY:  Object to the form.
21        THE WITNESS:  I don't know that IARC
22  considered the meta-analyses.  I think that IARC
23  considered published literature, but I don't
24  actually know that IARC considered the metas.
25  ///

Page 344

1  BY MS. GARBER:
2     Q    Do you have any opinions about
3  hospital-based versus population-based studies?
4        MS. CURRY:  Object to the form.
5        THE WITNESS:  With respect to what?
6  BY MS. GARBER:
7     Q    Do you think one group is more reliable
8  than another?
9     A    So I think --
10        MS. CURRY:  Object to the form.
11        THE WITNESS:  -- in general, with respect
12  to epidemiologic analysis, you want to match your
13  subjects as closely as you can to -- you want to
14  match your subjects in your controls, your cases in
15  your controls as closely as you can.
16        So when we're talking about ovarian
17  cancer patients, the hospital-based studies, I
18  think, in these circumstances are going to be a more
19  appropriate match for ovarian cancer patients
20  because they're sick patients.  So you're comparing
21  like to like.
22        With the population-based studies in
23  ovarian cancer, I don't really have a -- I don't
24  agree that a general population control person that
25  doesn't have an illness per se such as somebody with

Page 345

1  ovarian cancer is necessarily an appropriate match
2  control.
3        So I think that's why you see, for
4  example, something like in the Langseth paper, where
5  there's a difference in the studies that find
6  statistically significant odds ratios in the
7  population-based studies versus the hospital-based
8  studies.
9  BY MS. GARBER:
10     Q    Doctor, you reviewed the IARC 2012
11  analysis, didn't you?
12        MS. CURRY:  Object to the form.
13        THE WITNESS:  You mean the monograph?
14        MS. GARBER:  Yes, thank you.
15        THE WITNESS:  Yes.  On asbestos?
16        MS. GARBER:  Yes.
17  BY MS. GARBER:
18     Q    Did that formulate your opinions about
19  asbestos in this case?
20     A    No.
21        MS. CURRY:  Object to the form.
22        THE WITNESS:  No.
23        MS. SHARKO:  So we have about 20 minutes
24  left on the record.
25        MS. GARBER:  Let's mark as Exhibit 35.

Page 346

1  Was I supposed to bring a bunch of these?  I knew
2  you'd have one.
3          MS. CURRY:  According to the CMR, I
4  believe so.  I do have my own copy this time.
5          MS. GARBER:  All right, I'm glad to see
6  you have your own.
7          (C. Saenz Exhibit 35 was marked for
8          identification.)
9  BY MS. GARBER:
10   Q    Doctor, did you read the entirety of this
11  IARC Monograph Volume 100C?
12   A    No.
13   Q    Which portions did you read?
14   A    The portions that pertained to ovarian
15  cancer.
16   Q    And the topic of asbestos?
17   A    Yes, ma'am.
18   Q    You didn't read this IARC Monograph with
19  regard to heavy metals like chromium or nickel, did
20  you?
21   A    No, I did not.
22   Q    If I could have you turn to page 219.
23   A    I'm sorry, say that again.
24   Q    Page 219.
25   A    Sure.

Page 347

1   Q    You've testified in the past, haven't
2  you, that you're not an expert in asbestos; right?
3   A    That's correct.
4   Q    Under the heading, "Identification of the
5  Agent," the monograph indicates, midway through the
6  paragraph, "The conclusion reached by this monograph
7  about asbestos" --
8   A    In this monograph.
9   Q    I'll start again.  The monograph
10  indicates:  "The conclusions reached in this
11  monograph about asbestos and it's carcinogenic risk
12  applied to the six types of fibers, wherever they
13  are found, and that includes talc containing
14  asbestiform fibers."
15          Did I read that correctly?
16   A    Yes, ma'am.
17   Q    When it indicates the six types of
18  fibers, those are the six type of asbestos fibers
19  listed above; correct?
20   A    I believe it's --
21          MS. CURRY:  Object to the form.
22          THE WITNESS:  I believe it's the six
23  types of fibers that are listed in the title of this
24  section on page 219, yes.
25  ///

Page 348

1  BY MS. GARBER:
2   Q    This monograph pertains to asbestos and
3  talc containing asbestiform fibers; right?
4   A    That's what it says.
5   Q    Are you aware that the IARC Monograph
6  states that the general population can be exposed to
7  asbestos through perineal powder use?
8          MS. CURRY:  I'm sorry, where are you
9  reading?
10          THE WITNESS:  Where is this in the
11  monograph?
12          MS. GARBER:  Turn to 232.  Sorry, I was
13  on the wrong page.  If you turn to page 232, where
14  it says "Human Exposure."
15          THE WITNESS:  Yes.
16          MS. GARBER:  Subheading, "Exposure in the
17  General Population."  It indicates:  "Consumer
18  products, e.g. cosmetics, pharmaceuticals are the
19  primary sources of exposure to talc for the general
20  population.  Inhalation and dermal contact, i.e.,
21  through a perineal application of talcum powders are
22  the primary routes of exposure."
23  BY MS. GARBER:
24   Q    Did I read that correctly?
25   A    Yes.

Page 349

1   Q    You read the Heller 1996 paper, correct?
2          MS. CURRY:  Object to the form.  There
3  are multiple Heller 1996 papers.  I'm not sure which
4  one you're referring to.
5          MS. GARBER:  Heller 1996 that related to
6  asbestos.
7          THE WITNESS:  I don't know.  Let me see.
8  I believe that it's on my additional materials
9  reviewed by list, yes.  Number 11.
10  BY MS. GARBER:
11   Q    Do you --
12   A    Oh, I take that back.  That's malignant
13  mesotheliomas.  Are we talking about the correlation
14  of asbestos fiber burdens and fallopian tubes and
15  ovarian tissue?
16   Q    Yes.  Did you read that paper?
17   A    Yes.
18   Q    Do you believe that paper provides
19  support that asbestos can reach the ovarian tissue?
20          MS. CURRY:  Object to the form.
21          THE WITNESS:  So I don't know how the
22  asbestos that's reported in the Heller paper got
23  there.  I don't know if it's inhalation, ingestion.
24  I don't know if it's contamination.  I have no way
25  of knowing.

Cheryl Saenz, M.D.

Page 350

BY MS. GARBER:

2  Q   Okay.

3  A   And I'm sorry, I think we -- that you
4 misquoted.  I think that this is Heller 1999.  Not
5 1996.

6  Q   On your --

7  A   Unless I have a typo.

8  Q   On your reference list, you cite -- you
9 cite Heller 1996, asbestos exposure and ovarian
10 fiber burden.  Did I read that correctly?

11  A   Oh, I apologize, ma'am.  Yes.  I was
12 looking in the additional materials reviewed, so my
13 bad.

14      MS. GARBER:  I'm going to mark the
15 "Heller 1996 Asbestos Exposure and Ovarian Fiber
16 Burden" as Exhibit 36.

17      (C. Saenz Exhibit 36 was marked for
18      identification.)

19 BY MS. GARBER:

20  Q   Doctor, if you could turn to page 438,
21 left-hand column.

22      Doctor, if you're going to read it, we'll
23 go off the record.  We're short on time.  I didn't
24 ask you to read it.  I asked you to --

25  A   I understand that, but I want to --

Page 351

there's --

2      MS. GARBER:  Let's go off the record.

3      THE WITNESS:  -- four Heller papers.

4      MS. GARBER:  Let's go off the record.

5      THE VIDEOGRAPHER:  Time is now 6:05.
6 Going off the record.

7      (Break in the deposition taken at 6:06 p.m.)

8                0o0

9      (The deposition resumed at 6:07 p.m.)

10               0o0

11      THE VIDEOGRAPHER:  Time is now 6:06.
12 Back on the record.

13 BY MS. GARBER:

14  Q   At page 438, left-hand column.  Beginning
15 in the first paragraph, where it begins, "Asbestos,"
16 it indicates, "Asbestos causes" --

17  A   438, beginning in the left-hand column.
18 First paragraph or second paragraph?

19  Q   I said the first paragraph.

20  A   First paragraph.  Okay.  I'm right there
21 with you.

22  Q   "Asbestos causes malignant mesothelioma
23 and there is evidence to support it as an etiology
24 in ovarian carcinoma as well."  And some citations.

25      Did you consider that in formulating your

Page 352

opinions?

2  A   Right, so I believe that many of those
3 citations are the same ones that are reported in the
4 IARC Monograph that talks about heavy occupational
5 exposure.

6      So I did read those and consider those,
7 but again, I don't necessarily agree with IARC.  I
8 think there are problems in this.

9  Q   Is it your opinion that asbestos is
10 associated with ovarian cancer and heavy
11 occupational users?

12      MS. CURRY:  Object to the form.

13      THE WITNESS:  So I don't necessarily
14 agree with IARC's conclusions on that, because I
15 think as we've discussed earlier, I believe, that
16 there are problems with the five studies that IARC
17 looked at, including problems of misclassification,
18 problems of using death certificates, and not
19 necessarily -- I -- actually identifying whether or
20 not these women had peritoneal mesothelioma versus
21 ovarian cancer.

22 BY MS. GARBER:

23  Q   Doctor, have you testified that asbestos
24 can cause ovarian cancer with heavy occupation
25 allege exposure?

Page 353

MS. CURRY:  Object to the form.

2      THE WITNESS:  I'd have to look at my
3 testimony to know if that's exactly what I said.

4 BY MS. GARBER:

5  Q   Well, if it's the truth, wouldn't you
6 remember it, Doctor?

7      MS. CURRY:  Object to the form.

8 BY MS. GARBER:

9  Q   Do you have to see your old testimony to
10 see what your opinions are?

11      MS. CURRY:  Object to the form.

12      THE WITNESS:  Ma'am, I gave you my
13 opinion today.  I don't know that you're reading
14 accurately from what that transcript is and that
15 transcript was from, I believe, if that's the trial
16 transcript, July of 2017.  If it was the deposition,
17 it's almost three years ago now so -- or two years
18 ago.  So I would need to see it to know --

19 BY MS. GARBER:

20  Q   Has your opinion changed?

21  A   I don't know that you're reading my
22 testimony accurately.  And I would ask to be able to
23 see my testimony to see if that's actually true.  I
24 gave you my opinion today.  I'm simply asking to see
25 if I can look at what you're reading to see if

Cheryl Saenz, M.D.

Page 354

1  you're reading it accurately.
2      Q   It was formerly your opinion prior to the
3  MDL report and today's testimony that asbestos could
4  cause ovarian cancer in heavy occupational use, was
5  it not?
6          MS. CURRY:  Object to the form.
7          THE WITNESS:  Ma'am, I'm not going to
8  comment on that unless you actually let me see the
9  testimony and see what I said.
10         MS. GARBER:  I will read it to you first.
11         THE WITNESS:  Ma'am, that's not going to
12 be good enough.
13 BY MS. GARBER:
14     Q  "But my question is simple."
15         I'm going to read it, and then I'll show
16 it to you.
17         "But my question simple.  Answer it,
18         please.  So we'll know which side of the
19         equation you're on.  Does asbestos cause
20         ovarian cancer, Dr. Saenz?"
21         Your answer is:  "Answer:  Yes, with
22         heavy occupational exposure.  Yes, if
23         exposed enough, that's what I said."
24         "Well, ma'am, you're not an asbestos
25         specialist, are you?"

Page 355

1         "No, I am not."
2          MS. CURRY:  What transcript are you
3  reading from?
4          MS. GARBER:  I'm reading from the Ingham
5  testimony at trial.
6          MS. CURRY:  If you need to see additional
7  pages, please let Counsel know.
8  BY MS. GARBER:
9      Q   Is that your testimony?  Did I read it
10 correctly?
11     A   No, ma'am, you're not reading this
12 accurately, because earlier in this transcript, I'm
13 asked about what I think of the IARC monograph.  And
14 that's actually very consistent with what I'm saying
15 here today.
16         In this transcript, I said, I read the
17 IARC Monograph.  I've read the studies in the
18 monograph and I know the conclusion that IARC came
19 to.  And I think there are some problems with the
20 studies that they used to come to that conclusion,
21 but that is their conclusion.  I understand that,
22 but that was limited to heavy occupational exposure.
23         So in the context --
24 BY MS. GARBER:
25     Q   But you've said -- you've said in the

Page 356

1  trial, Doctor --
2      A   Ma'am, I'm not done.
3      Q   Okay.
4      A   In the context of being asked about what
5  I thought about IARC's report and whether or not
6  IARC showed that in the context, did IARC report
7  that asbestos causes ovarian cancer with heavy
8  occupational exposure.  I recorded that.  But it was
9  with the qualifications that I had problems with the
10 studies in the IARC Monograph.
11     Q   I understand that.
12     A   That's exactly what I've said here today.
13     Q   Is your --
14     A   I have not changed my opinion.
15     Q   I understand that.  Is your opinion --
16 no, I don't understand that.  Is your opinion today
17 that asbestos causes ovarian cancer?
18         MS. CURRY:  Object to the form.
19         THE WITNESS:  My opinion today is that I
20 don't think the IARC Monograph conclusions are
21 correct.  I believe that there are problems with
22 those studies.  And my opinion, as I stated then in
23 the Ingham trial, is that there are problems with
24 those studies.
25         And so IARC makes that conclusion,

Page 357

1  but I don't necessarily agree with that conclusion.
2  BY MS. GARBER:
3      Q   But Dr. Saenz, the record speaks for
4  itself.
5      A   Ma'am, you can't cherry-pick one line.
6  The context of which --
7      Q   No, now you're interrupting me.  I'm
8  trying to ask you a question, I'm short on time and
9  you know it.  The IARC -- you testified in the
10 Ingham trial, and you admitted to Mr. Lenear, that
11 heavy occupational use of asbestos was associated
12 with ovarian cancer.
13         Now you're here today saying something
14 differently, that it doesn't, correct?
15         MS. CURRY:  Object to the form, misstates
16 the testimony.
17         THE WITNESS:  I'm not saying anything any
18 different than I said in my testimony --
19         MS. GARBER:  I just need to know what
20 your opinion is --
21         MS. SHARKO:  Don't interrupt the witness,
22 come on.
23 BY MS. GARBER:
24     Q   When you show up at any hearing or trial,
25 are you going to tell the court and jury that

Page 358

1 asbestos does or doesn't cause ovarian cancer?
2 That's all I need to know, and we're pretty much
3 done.
4         MS. CURRY:  Object to the form.
5         THE WITNESS:  My testimony today is
6 consistent with what I said in testimony at trial at
7 the Ingham trial.  I take issue with the conclusions
8 that IARC has drawn.  But the conclusions that IARC
9 has drawn is that ovarian cancer can be caused by
10 asbestos, but it's limited to heavy occupational
11 exposure.  I don't agree with those conclusions.
12 BY MS. GARBER:
13     Q    You have stated at trial, haven't you,
14 asbestos can cause inflammation at the cellular
15 level?
16         MS. CURRY:  Object to the form.  May we
17 see the testimony?
18         THE WITNESS:  I don't know that I said
19 that.
20 BY MS. GARBER:
21     Q    Have you said asbestos generates R-O-S
22 and N-O-S?
23         MS. CURRY:  Object to the form.
24 BY MS. GARBER:
25     Q    Have you testified to that?

Page 359

1         MS. CURRY:  Object to the form.  Can we
2 see the testimony?
3         THE WITNESS:  I can't recall saying that
4 specifically.  I would be happy to review it for
5 you.
6 BY MS. GARBER:
7     Q    Have you testified that asbestos is
8 genotoxic?
9         MS. CURRY:  Object to the form.
10         THE WITNESS:  I cannot verify for you
11 that I have testified to that.  I'd be happy to
12 review the testimony for you.
13 BY MS. GARBER:
14     Q    Have you testified that asbestos can
15 cause epigenetic alterations?
16         MS. CURRY:  Object to the form.
17         THE WITNESS:  I don't know that I have
18 said that phrase exactly, ma'am.  I'd be happy to
19 look at the testimony.
20 BY MS. GARBER:
21     Q    Asbestos can alter signaling pathways
22 which is an established mechanistic event for some
23 cancers, including ovarian cancer.  You agreed to
24 that, didn't you?
25         MS. CURRY:  Object to the form.

Page 360

1         THE WITNESS:  Again, ma'am, I'd like to
2 see the testimony to know the exact context in which
3 you're pulling that from.
4         MS. SHARKO:  Aren't we now at seven
5 hours?
6         MS. GARBER:  You've testified that
7 asbestos can cause resistance to apoptosis, which is
8 an established mechanistic event for the development
9 of ovarian cancer, haven't you?
10         MS. CURRY:  Object to the form.
11         THE WITNESS:  You would have to show me
12 that testimony, ma'am.
13 BY MS. GARBER:
14     Q    Do you ever tell your patients that
15 asbestos is a risk factor for ovarian cancer?
16     A    No, I do not.
17     Q    Are you -- if a patient asks you, Doctor,
18 is there asbestos in the Johnson & Johnson products
19 that I'm using on my genitals, how would you reply?
20     A    I would reply to them that I do not know
21 what the actual makeup of the baby powder products
22 are, but that the literature that I have reviewed as
23 a paid expert for Johnson & Johnson does not show
24 any consistency that using baby powder products in
25 the perineal region increases the risk of developing

Page 361

1 ovarian cancer.
2     Q    And I want you -- I'm going to ask you a
3 final hypothetical.  I want you to assume that there
4 is asbestos in Johnson & Johnson baby powder
5 products or Johnson & Johnson talcum powder
6 products.  And if a patient asked you, Doctor, is it
7 safe for me to use that product on my genitals, what
8 would be your reply?
9         MS. CURRY:  Object to the form.
10         THE WITNESS:  My reply would be, to my
11 patient, ma'am, I've done a thorough review of the
12 literature, the case control studies, the biologic
13 plausibility, the cohort studies, it is my review
14 and my opinion that there is no increased risk of
15 you developing ovarian cancer from the use of
16 Johnson & Johnson baby powder products and I would
17 disclose that I am a paid expert in this litigation
18 testimony.
19 BY MS. GARBER:
20     Q    You would counsel your patient to put a
21 product that has asbestos in it on her genitals?
22         MS. CURRY:  Object to the form, misstates
23 the testimony.
24         THE WITNESS:  I don't believe that there
25 is any -- any increased risk of developing ovarian

Page 362

1  cancer with the use of Johnson & Johnson baby powder
2  products. And if asbestos is in the baby powder and
3  the baby powder is the vehicle by which the asbestos
4  is being delivered there, then the baby powder
5  literature should show an increased risk of
6  developing ovarian cancer. And it does not.
7  BY MS. GARBER:
8      Q    Doctor, based on the IARC assessment of
9  asbestos and risk of ovarian cancer, and I want you
10  now to assume that there is asbestos in Johnson &
11  Johnson talcum powder products. It is your
12  testimony that you would counsel your patient that
13  it is safe, based on your review of the literature,
14  to put that product containing asbestos on her
15  genitals, that's your testimony?
16      MS. CURRY: Object to the form.
17      THE WITNESS: Yes.
18      MS. GARBER: Okay. Thank you. I'm
19  finished for now.
20      THE VIDEOGRAPHER: The time is now 6:17.
21  Going off the record.
22      (Break in the deposition taken at 6:18 p.m.)
23              0o0
24      (The deposition resumed at 6:18 p.m.)
25              0o0

Page 363

1      THE VIDEOGRAPHER: The time is now 6:17.
2  Back on the record.
3          EXAMINATION
4          -o0o-
5  BY MS. CURRY:
6      Q    Dr. Saenz, I just have one final question
7  for you, and that is, having heard and seen
8  everything presented to you today by plaintiffs'
9  counsel, do you stand by all of your opinions in
10  your expert report in this case?
11      A    I stand by everything that is in my
12  expert report. I stand by everything that I have
13  expressed as an opinion today.
14      MS. CURRY: Thank you. No further
15  questions.
16      MS. GARBER: No further questions.
17      THE VIDEOGRAPHER: The time is now 6:18.
18  This concludes the deposition. Going off the
19  record.
20      (The deposition was concluded at 6:19 p.m.)
21              0o0
22
23
24
25

Page 364

1      I, CHERYL SAENZ, M.D., do hereby declare
2  under penalty of perjury that I have read the
3  foregoing transcript; that I have made any
4  corrections as noted in ink, initialed by me; that
5  my testimony as contained herein, as corrected, is
6  true and correct.
7
8      EXECUTED this _____ day of
9  _____, 20____, at _____,
                           (City)
10  _____.
       (State)
11
12
13
                _____
14                CHERYL SAENZ, M.D.
15
16
17
18
19
20
21
22
23
24
25

Page 365

1      REPORTER'S CERTIFICATE
2      I, Valerie C. Rodriguez, a Certified
3  Shorthand Reporter for the State of California, do
4  hereby certify:
5      That prior to being examined, CHERYL
6  SAENZ, M.D., the witness named in the foregoing
7  deposition, was by me duly sworn;
8      That said deposition was taken before me
9  at the time and place set forth herein and was
10  stenographically reported by me in shorthand and
11  thereafter transcribed into typewriting using
12  computer-aided transcription, and I hereby certify
13  that said deposition is a full, true, and correct
14  transcript; that the dismantling, unsealing, or
15  unbinding of the original transcript will render the
16  reporter's certificate null and void.
17      I further certify that I am neither
18  counsel for, nor related to any party to said
19  action, nor in any way interested in the outcome
20  thereof. IN WITNESS WHEREOF, I have subscribed my
21  name this 15th day of March, 2019.
22
23
24
                _____
                VALERIE C. RODRIGUEZ
25                CSR No. 12871 (orig. 6980)

Page 366

1  DEPOSITION ERRATA SHEET
2  Case Name: IN RE JOHNSON & JOHNSON
3  Name of Witness:  CHERYL SAENZ, M.D.
4  Date of Deposition: MARCH 13, 2019, 2019
5  Job No.: 210344
6  Reason Codes:  1. To clarify the record.
7              2. To conform to the facts.
8              3. To correct transcription errors.
9

10  Page _____ Line _____ Reason _____

    From _____ to
11  _____
12  Page _____ Line _____ Reason _____
13  From _____ to

14  _____

15  Page _____ Line _____ Reason _____

    From _____ to
16  _____
17  Page _____ Line _____ Reason _____
18  From _____ to

19  _____

    Page _____ Line _____ Reason _____
20

21  _____  Subject to the above changes, I certify
    that the transcript is true and correct.
22

    _____  No changes have been made. I certify that
23  the transcript is true and correct.
24          _____
25          CHERYL SAENZ, M.D.

Exhibit 33

# Assessing Pelvic Epithelial Cancer Risk and Intercepting Early Malignancy

Ann K. Folkins, Elke A. Jarboe, Jonathan L. Hecht, Michael G. Muto, and Christopher P. Crum

## Chapter Outline

**INTRODUCTION**

**RISK IDENTIFICATION**

Genetic Ovarian Cancer Syndromes

Breast Ovarian Cancer Syndrome and Site-Specific Ovarian Cancer Syndrome

Lynch Syndrome

Hereditary Predisposition to Ovarian Cancer: Beyond *BRCA* and Mismatch Repair Genes

Demographic Risk Factors for Ovarian Cancer

Endometriosis

**REDUCING RISK**

Oral Contraceptives

Tubal Ligation

Risk Reduction Surgery

**EARLY DETECTION**

Pelvic Examination

Biomarker Screening Alone

Combining Biomarkers With Ultrasound and Other Imaging Techniques

Molecular Screening for Ovarian Cancer

**PRESENTING SIGNS AND SYMPTOMS**

**THE ROLE OF THE PATHOLOGIST IN RISK REDUCTION AND EARLY DETECTION**

Prophylactic Surgery and Detection of Early Malignancy

The SEE-FIM Protocol

Histologic Criteria for Early Tubal Cancer (Serous Tubal Intraepithelial Carcinoma)

Differential Diagnosis of Serous Tubal Intraepithelial Carcinoma

Clinical Impact

Early Ovarian Cancer

## Introduction

This chapter addresses the risk factors for pelvic (ovarian and fallopian tube) epithelial cancer, detection, and the role of the pathologist in risk reduction. The 5-year survival for stages IA and IV ovarian cancer are 88% and 18%, respectively, indicating that early detection may improve survival.[1] However, the opportunity to detect the tumors when they are limited to the ovary or fallopian tube may be difficult, because the period of time when these tumors are so localized is brief. Thus, with the exception of discovering novel therapies, reducing the death rate from pelvic epithelial cancer will involve (1) identification of women at high risk for pelvic cancers, (2) risk reduction, and (3) early detection of patients with cancer at lower and more curable stages.

## Risk Identification

### Genetic Ovarian Cancer Syndromes

There are three well-recognized genetic syndromes that account for the vast majority of familial ovarian cancer and approximately 10% of all ovarian cancers. These are breast ovarian cancer syndrome (BOCS), site-specific ovarian cancer syndrome (SSOCS), and hereditary non-polyposis colorectal cancer (HNPCC) syndrome (or Lynch syndrome).[2] Both BOCS and SSOCS are caused by inherited mutations in the *BRCA-1* and *BRCA-2* genes. In fact, although often described as separate entities, these two syndromes are most likely phenotypic variants of the same genetic mutations. *BRCA-1* and *BRCA-2* function as classic tumor suppressor genes and are inherited in an autosomal dominant fashion. Lynch syndrome is caused by mutations in DNA mismatch repair genes responsible for repairing errors in DNA replication. Inactivation of these genes result in a high incidence of right-sided colon cancer, endometrial cancer, and ovarian cancer.[3] Hereditary ovarian cancers associated with *BRCA-1* and *BRCA-2* mutations will be discussed first, followed by Lynch syndrome–related ovarian cancer.

### Breast Ovarian Cancer Syndrome and Site-Specific Ovarian Cancer Syndrome

Germline mutations in the *BRCA-1* and *BRCA-2* tumor suppressor genes account for approximately 90% of cases of hereditary ovarian epithelial cancers and confer a risk of ovarian carcinoma by age 70 of 40% to 50% and 10% to 20%, respectively.[4-8] *BRCA-1* and *BRCA-2* are located on chromosomes 17q21 and 13q12-13, respectively, and are inherited in an autosomal dominant fashion. They encode nuclear proteins that are functionally similar. Both proteins participate in the repair of double-stranded DNA

## Abstract

This chapter addresses several important aspects of ovarian cancer prevention. One pertains to the risk factors and efforts at early detection, critically reviewing the data on screening tests for ovarian cancer. Another addresses the role of the fallopian tube, a topic that has been at the center of efforts to reduce the risk of high-grade serous cancer via both risk reduction salpingo-oophorectomy and opportunistic salpingectomy. The role of the pathologist is first and foremost by more careful scrutinizing of the fallopian tube using the Sectioning and Extensively Examining the FIMbraited End (SEE-FIM) protocol, which has allowed all pathologists to participate in this paradigm shift to the oviduct as a potential source and target of prevention. Both supporting data and caveats are presented on this compelling issue that continues to evolve and the various entities that deserve attention as either potential premalignant lesions or their mimics are illustrated.

## Keywords

*BRCA*
BOCS
hereditary ovarian cancer
serous tubal intraepithelial carcinoma (STIC)
risk-reducing salpingo-oophorectomy

damage, as well as the regulation of gene expression at a transcriptional level.[9-12] Loss of BRCA protein function leads to failure to repair DNA damage, resulting in the activation of p53, with subsequent initiation of cell cycle arrest or apoptosis. In the absence of functional p53, however, the cell continues to proliferate, DNA damage accumulates, and the likelihood of ensuing malignancy increases.

The lifetime risk of developing ovarian cancer in the United States is about 1.4%, but among women with BRCA-1 and BRCA-2 mutations, the risk has been estimated to be about 40% and 20%, respectively.[4,13,14] These genes also impart a significant lifetime risk of breast cancer in women and, in the case of BRCA-2, in men as well. Less than 0.3% of those in the general population are carriers of BRCA-1 or BRCA-2 mutations; however, the carrier rate is dependent on ethnic background.[7,15-17]

Founder mutations have been identified among multiple unrelated families in Iceland, the Netherlands, Sweden, and among Jews of Central or Eastern European (Ashkenazi) descent. The best-described founder mutations are the 185delAG and 5382insC mutations in BRCA-1 and the 6174delT mutation in BRCA-2, occurring in Ashkenazi Jews at a carrier rate of 2%.[16] Although women of Ashkenazi Jewish descent do not have an overall increased rate of ovarian cancer, if an Ashkenazi Jewish woman develops ovarian cancer, it is far more likely to be genetic rather than sporadic. Consequently, if a woman of Ashkenazi Jewish descent develops ovarian cancer, there is a 40% chance she carries a mutation in one of these two genes.[18] The implications for her first-degree relatives (mother, sisters, daughters) are that they have a 20% risk for being gene carriers (given autosomal dominant transmission). Therefore, a woman of Ashkenazi Jewish heritage needs only one first-degree relative with ovarian cancer to be considered for further genetic counseling.[19] Routine screening of Ashkenazi women has been proposed given the high likelihood missing carriers based on family history alone.[20]

In contrast to hereditary breast cancers, in which BRCA-1 and BRCA-2 mutations are found with equal frequency, BRCA-1 mutations are found more commonly than BRCA-2 mutations in patients with familial ovarian carcinoma.[21-23] The mean age of developing ovarian cancer in the setting of a BRCA-1 mutation is younger than in the women without a mutation (53 vs. 63 in the latter group).[24] Although BRCA-1 carriers have a 2% to 3% risk of ovarian carcinoma by age 40, for BRCA-2 carriers, this risk is not until age 50.[25] Mutations in BRCA genes are rare in the setting of sporadic ovarian tumors, but loss of function of their encoded proteins may play a role in tumor development.[26,27] Inactivation of BRCA-1 in sporadic ovarian tumors has been attributed to promoter hypermethylation.[28,29]

The Society of Gynecologic Oncologists (SGO) has issued recommended criteria for referral of women to genetic counselors and consideration for genetic testing for BRCA-1 and BRCA-2 genes. These risk variables are summarized in Box 24.1. Because women with high-grade serous carcinoma probably have a higher rate of underlying germline mutations in BRCA (16% to 20%) than other ovarian tumors, testing should be considered for all women with this type of tumor.[30] Some have argued for population-based testing, independent of history, given the feasibility

**BOX 24.1** Society of Gynecologic Oncologists Guidelines for Identifying Women at Increased Risk for Having an Inherited Genetic Predisposition to Breast and Ovarian/Tubal/Peritoneal Cancer Who Should Receive Genetic Counseling and Be Offered Genetic Testing

Women *affected* with:
- High grade epithelial ovarian/tubal/peritoneal cancer
- Breast cancer ≤45 years old
- Breast cancer with a close relative[a] with breast cancer ≤50 years old or close relative[a] with epithelial ovarian/tubal/peritoneal cancer
- Breast cancer ≤50 years old with a limited family history[b]
- Breast cancer with two or more close relatives[a] with breast cancer at any age, with pancreatic cancer, or with aggressive prostate cancer (Gleason score ≥7)
- Two breast primaries, with the first diagnosed prior to age 50
- Triple negative breast cancer ≤60 years old
- With breast cancer and Ashkenazi Jewish ancestry
- Pancreatic cancer with two or more close relatives[a] with breast, ovarian/tubal/peritoneal, pancreatic, or aggressive prostate cancer (Gleason score ≥7)

Women *unaffected* with cancer, but with:
- A first degree or several close relatives[a] that meet one of the above criteria
- A close relative[a] carrying a known BRCA-1 or BRCA-2 mutation
- A close relative[a] with male breast cancer

[a]Close relative is defined as first-degree relative (parent, sibling, offspring), second-degree relative (grandparent, grandchild, uncle, aunt, nephew, niece, half-sibling), or third-degree relative (first cousin, great-grandparent, or great-grandchild).
[b]Limited family history includes less than two first- or second-degree female relative of female relatives surviving beyond 45 years old.
From Lancaster JM, Powell CB, Chen LM, et al: Society of Gynecologic Oncology statement on risk assessment for inherited gynecologic cancer predispositions. *Gynecol Oncol* 136(1):3-7, 2015.

of such testing, risk associated with missing carriers, and variability in assessment of family history and referral to genetic counselors.[31] In addition, it is currently far more common to obtain expanded panel testing to include other lower penetrance genes.[32]

Most ovarian malignancies diagnosed in women with BRCA mutations are high-grade serous carcinomas of advanced stage.[33,34] These tumors tend to have morphologic features known as SET, referring to more than 50% solid, pseudoendometrioid, or transitional.[35] Other histologic types have less frequently been described in patients with BRCA-1 mutations, including endometrioid, clear cell, transitional, and undifferentiated carcinomas; carcinosarcoma; and dysgerminoma.[36,37] Borderline tumors and mucinous tumors do not appear to be associated with BRCA mutations.[38] The overwhelming majority of malignancies identified in the fallopian tube in women with BRCA mutations are also high-grade serous carcinomas.

## Lynch Syndrome

Mutations in mismatch repair genes (Lynch syndrome) account for only a small percentage of hereditary ovarian cancer; these women have a lifetime risk of up to 12% for ovarian cancer.[39] Mutations in DNA mismatch repair genes (MLH1, MSH2, MSH6, and PMS2) most frequently lead to loss of function and, therefore, to microsatellite instability (MSI). Mismatch repair proteins function to

DNA base-pair mismatches. Microsatellites are repetitive DNA sequences that are prone to replication errors, such as base-pair mismatches. Loss of mismatch repair protein function results in an inability to repair these mismatches with resultant MSI. MSI is characterized by these repetitive DNA areas retracting or expanding and causing frameshift mutations. Tumors presumably form when the frameshift mutations occur within the coding region of genes involved in tumor development. Not all mismatch repair gene mutations bear an equivalent risk for ovarian cancer; mutations in *PMS2* are associated with the lowest overall risk.[40]

Most ovarian cancers in Lynch syndrome are non-serous histology, specifically endometrioid, clear cell, or undifferentiated carcinomas. Up to 10% of ovarian carcinomas in patients less than or equal to 50 years old are associated with Lynch syndrome.[41] There is a strong association between Lynch syndrome and clear cell carcinoma of the ovary, with mismatch repair protein mutations in 14% or 17% of clear cell carcinomas.[41,42]

Guidelines for Lynch syndrome in ovarian cancer are not well defined. The Amsterdam and Bethesda criteria primarily focus on colorectal carcinoma, but the SGO has also outlined guidelines for gynecologic tumors.[43] In general, testing for Lynch syndrome should be considered in woman with non-serous ovarian epithelial carcinoma. Because most women with Lynch syndrome who present with ovarian cancer are younger than 50 years old, many age-based algorithms must take this into account.[39] Molecular analysis of the DNA mismatch repair genes is the gold standard for definitive diagnosis of Lynch syndrome, but it is not routinely employed as a screening method due to cost and is used mostly for confirmation. Various algorithms using mismatch repair protein immunohistochemistry, MSI analysis, and MLH1 methylation studies have been employed. In our institution, we screen all non-serous ovarian epithelial carcinomas by mismatch repair protein immunohistochemistry, with reflex to MLH1 methylation studies in cases where MLH1 expression is lost. This information is directly forwarded to our genetic counseling department to determine the need for further assessment and potential germline testing. Parenthetically, all women with ovarian cancers at the Dana Farber Cancer Institute/Brigham and Women's Hospital are referred for genetic counseling and undergo expanded panel testing if consenting. We no longer use family history to guide us.

## Hereditary Predisposition to Ovarian Cancer: Beyond *BRCA* and Mismatch Repair Genes

Given that there are still families with strong histories of ovarian cancer with no identifiable mutations in *BRCA-1*, *BRCA-2*, or mismatch repair genes, current efforts are focused on identification of other inherited genetic mutations, which might account for the increased risk. Analysis of the large genomic library of single nucleotide repeats in large populations of cases and controls has been performed with the intent to identify loci that segregate with malignancy. This has been successful to a degree, identifying potentially predictive genomic markers for ovarian cancer. The downside has been the relatively low overall risk imposed by individual changes (less than twofold), which

are too small to justify their use in a clinical setting, but combined risk models are emerging.[44-46] Multigene panel testing for cancer risk has become available to patients complicating management recommendations and further stressing the invaluable role of genetic counselors in the process. The risk associated with the genes is highly variable with about 20% of mutations considered to be variants of uncertain significance.[43,47,48]

Although *BRCA-1*, *BRCA-2*, and mismatch repair genes are certainly the most well-known and studied genes associated with a hereditary disposition to ovarian cancer, recent advances have identified other genes associated with potential increased risk.[43] Mutations in *BRIP1*, *RAD51C*, and *RAD51D* confer a lifetime risk of 10% to 15%.[49-51] A multi-gene profile (BROCA) is also in use.[52] *PALB2* gene mutations have been identified in some families with strong breast and ovarian cancer histories, but the actual risk of ovarian cancer with this gene is currently unknown.[49,53] Some recently identified mutations are associated with particular types of ovarian tumors. For example, *DICER1* mutations are associated with increased risk for the development of Sertoli-Leydig cell tumors, and *SMARCA4* gene mutations confer risk for ovarian small cell carcinoma.[54,55]

## Demographic Risk Factors for Ovarian Cancer

### Dietary Factors

Obesity has been reported to be associated with an increased risk of ovarian cancer mortality. There may also be an increased risk in women eating a diet high in saturated fat and low in vegetable fiber. In 1989, the observation that Swedes had both a high risk of ovarian cancer and the highest per capita dairy consumption in the world led some investigators to postulate a relationship between lactose consumption and ovarian cancer risk. Specifically, ovarian cancer cases were more likely to have high levels of galactose, a component sugar of the disaccharide lactose and a known oocyte toxin, than matched controls.[56] This observation, however, has been inconsistent. Overall, observational studies of diet and ovarian cancer risk have not shown a consistent pattern of association; therefore, no specific dietary strategy for ovarian cancer risk reduction can be recommended.[57-60]

### Talc Exposure

Talc placed on the perineum may enter the vagina and ascend to the upper genital tract. Structurally similar to asbestos, there is theoretic concern that talc may potentially increase ovarian cancer risk. In addition, women who undergo tubal sterilization procedures or hysterectomy have a lower risk of ovarian cancer, supporting the ascending carcinogen hypothesis. Multiple case-control studies have shown a small but consistent increased risk with talc exposure, and a recent pooled analysis demonstrates a 24% increase in epithelial ovarian cancer (odds ratio [OR] = 1.24, 95% confidence interval [CI] = 1.15–1.33).[61] However, two prospective cohort studies found no overall increased risk for ovarian cancer associated with talc use.[62,63] Of note, one of those studies did show that there was a modest risk of the development of invasive serous carcinoma (relative risk

[RR] = 1.4, 95% CI = 1.02–1.09).[62] Overall, the evidence is mixed and inconclusive, with a possible risk associated with talc usage. Given the widespread availability and quality of cornstarch-based dusting powders and potential risk of talc-based powders, the practice of applying genuine talc to the perineum should be discouraged.

### Infertility and Infertility Drugs

One of the most difficult issues to study is the association of infertility drugs and the risk of ovarian cancer. It is known, for example, that unexplained infertility is an independent risk factor for the development of ovarian cancer. One retrospective study claimed an association between prolonged clomiphene exposure and an increased risk of ovarian cancer. This study, however, was not restricted to invasive epithelial ovarian cancers but also included granulosa cell tumors.[64] These estrogen-secreting neoplasms of stromal origin may contribute to infertility directly by disrupting normal follicular maturation and the menstrual cycle. There are, however, a number of studies, including a large collaborative analysis of 12 case-control studies, that have reported an association between fertility drugs and invasive epithelial ovarian cancer.[65] In addition, many of the theoretic models of epithelial ovarian cancer pathogenesis implicate both incessant ovulation and high gonadotropin levels as important steps in malignant transformation of ovarian epithelium. Oral contraceptives that reduce ovulatory events and moderate gonadotropin levels are associated with a consistent and significant protective effect. It therefore seems prudent, in the absence of convincing data, to use fertility medication only when absolutely indicated, at the lowest effective dose, and for the shortest duration possible without compromising successful fertility treatment. Prior exposure to these agents should not be considered an indication for increased surveillance or prophylactic surgery.

### Hormone Replacement Therapy

There appears to be an increased risk of ovarian cancer among women on estrogen replacement therapy (ERT). When compared with nonusers, users of ERT had a RR of ovarian cancer of 2.2 (95% CI = 1.53–3.17).[66] This risk increased with the duration of use. Long-term users, defined as at least 20 years of ERT use, had a RR of 3.2 (95% CI = 1.7–5.7).[67] Although some studies suggest a protective effect of combination replacement regimens including both estrogen and progesterone, this observation has not been confirmed. Based on these observations, long-term users of ERT should consider an increased risk of developing ovarian cancer as a factor in whether or not to initiate or continue ERT. Two recent meta-analyses suggested that women who use hormone therapy for 5 years from around 50 years old have about one extra ovarian cancer per 1000 users and, if its prognosis if typical, about one extra ovarian cancer death per 1700 users.[68,69]

### Endometriosis

Endometriosis increased ovarian cancer risk with a RR of 1.3 to 1.8. Such cancers are more often low stage and of low-grade endometrioid and clear cell histology.[70] The risk is higher with increasing age and cyst complexity on ultrasound.[71]

## Reducing Risk

### Oral Contraceptives

Oral contraceptive pills (OCPs) significantly reduce the risk of developing ovarian cancer. A number of studies have demonstrated a 10% per year risk reduction up to 5 to 7 years of use.[72] This effect seems to persist for at least 10 years after OCPs are discontinued. This protective effect has also been observed in patients known to be carriers of the BRCA-1 and BRCA-2 genes and is the basis for recommending OCPs as a chemoprophylactic agent in known carriers who wish to retain their fertility.[73] There has recently been some controversy about the protective effects of OCPs in BRCA patients. An Israeli population-based study of OCPs and ovarian cancer demonstrated a protective effect of pregnancy but not of OCPs. It is unclear why the Israeli data are inconsistent with prior published reports.[74]

### Tubal Ligation

Tubal ligation reduces risk by more than half and may be effective in subsets of women with BRCA mutations and family history of ovarian cancer.[75-77] The mechanism by which this procedure reduces risk is unknown, but the popular theory is that the transfer of growth factors or carcinogens is interrupted.

### Risk Reduction Surgery

Women with inherited mutations in BRCA-1 or BRCA-2 genes carry a sizable risk of "pelvic" (ovarian/fallopian tube/peritoneal) cancer. This risk is attenuated as much as 80% to 90% in those who elect to undergo risk reduction surgery.[78,79] Following the increased attention to the fallopian tube as a source of high-grade serous cancer over the past 10 years, opportunistic salpingectomy has emerged as a recommended approach to reducing cancer risk in women undergoing sterilization or hysterectomy for benign disease.[80,81] This involves the removal of fallopian tubes for primary prevention of epithelial carcinoma of the fallopian tube, ovary, or peritoneum in a woman undergoing pelvic surgery for another indication. Based on retrospective population studies, the reduction in ovarian cancer risk is estimated at about 50% with a hazard ratio of 0.65.[82] Although not universal, this practice is being employed in many centers and more precise estimates as to the effectiveness of this technique should be forthcoming over the next one or two decades. Professional societies in several countries now recommend considering salpingectomy at the time of hysterectomy when convenient.[83] Opportunistic salpingectomy with temporary preservation of the ovaries is also being explored in women with BRCA mutations who refuse oophorectomy but there are no outcome data at present.[84,85] Table 24.1 provides a summary of the risk reduction for ovarian cancer provided by these potential preventative measures.

**Table 24.1** Potential Preventive Measures for Ovarian Cancer

| Method | Risk Reduction |
| --- | --- |
| Oral contraceptives | OR 0.11-0.80 |
| Tubal ligation | OR 0.33-0.72 |
| Prophylactic oophorectomy | HR 0.15 |
| Salpingectomy | HR 0.65 (estimated 50% reduction) |

*HR,* Hazard ratio; *OR,* odds ratio.

From Falconer H, Yin L, Grönberg H, et al: Ovarian cancer risk after salpingectomy: a nationwide population-based study. *J Natl Cancer Inst* 107(2), 2015; Yoon SH, Kim SN, Shim SH, et al: Bilateral salpingectomy can reduce the risk of ovarian cancer in the general population: a meta-analysis. *Eur J Cancer* 55:38-46, 2016.

## Early Detection

There are two obvious theoretical reasons for ovarian cancer screening. The first is that tumors *arising in the ovary* begin as true stage I (A or B) tumors and early detection will predate de-differentiation or extra-ovarian spread. The second is that (at least theoretically) small neoplasms originating within the tubal mucosa or the ovary that are detected when the tumor burden is low would be more likely to be cured. Here it is important to separate early detection from the incidental removal of early malignancies during risk reduction surgery, which is not technically "early detection." By far, the role of risk reduction surgery, as implied previously, is to remove the tissue at risk rather than interrupt an evolving neoplasm. In one study, 5-year cancer-free rates for *BRCA-1* and *BRCA-2* mutation carriers were 96% and 69%, respectively, for those with prophylactic oophorectomy versus intensive surveillance. Moreover, even some of these patients with "early" disease have positive peritoneal fluid cytology, indicating early dissemination of malignant cells presumably came from occult tubal or ovarian primary neoplasms.[86,87] Nonetheless, when the early malignancy in the fallopian tube is confined to the mucosa (serous tubal intraepithelial carcinoma [STIC]) the risk of a subsequent pelvic serous cancer is approximately 5%, supporting the concept that these early lesions can be intercepted and cured.[88,89] Favorable short-term outcomes in small studies raise the prospect that sufficiently sensitive detection schemes could identify early disease and possibly enhance survival.[90]

### Pelvic Examination

Pelvic examination is a central component of gynecologic care and permits the evaluation of potential abnormalities throughout the reproductive tract. However, the sensitivity of pelvic examination for the detection of ovarian cancer is only about 44%.[91] A 15-year study of pelvic examination alone uncovered six ovarian cancers in more than 18,000 examinations of 1319 women.[1,92]

### Biomarker Screening Alone

Since the discovery of CA-125 in the 1980s, there has been little progress in the development of a molecular screening tool that promised to make a measurable impact on the death rate for ovarian epithelial cancer. The reasons for this are several:

- CA-125 is a high molecular weight glycoprotein that is elevated above 35 IU/mL in 85% of all epithelial carcinomas but in only 50% of women with stage I disease.[1]
- CA-125 elevations are associated with a range of other intra-abdominal disorders, cutting into the specificity of this marker.
- A test with 99% specificity will still necessitate as many as 25 invasive procedures to identify a single malignancy.[1] This level of precision has not been attained, even when multiple biomarkers have been used, including osteopontin and HE4.[65,93-96] One study proposed six biomarkers: leptin, prolactin, osteopontin, insulin-like growth factor II, macrophage inhibitory factor, and CA-125, claiming both high sensitivity and specificity, but it was challenged as unduly optimistic.[97,98]

Another highly challenging variable in reducing the ovarian cancer death rate by conventional serologic screening lies in the nature of the disease itself.[99] One-fourth of ovarian cancers are associated with a pathogenesis that would favor screening—that is, tumors arising in the ovary that have a lag period prior to developing and metastasizing, specifically endometrioid, mucinous, and clear cell carcinomas. Clearly, these tumors would benefit from screening. Accordingly, when detected in stage I, they all have a good to excellent prognosis. Unfortunately, two-thirds or more ovarian cancers are high-grade serous (or high-grade endometrioid) and have spread to the pelvic organs by the time of diagnosis.[1] A recent report estimated the lead time that could be expected for serologic detection. Based on a longitudinal study with serologic biomarker analysis, the study concluded that levels of CA-125, HE4, and mesothelin began to rise as early as 3 years before the clinical presentation with malignancy; however, significant elevations were not seen until the last 12 months before presentation.[100] The efforts to develop diagnostic biomarkers the past two decades have come face to face with the stark implications of this reality if not the profound significance of understanding the origins and precursors of ovarian cancer. At present, the failure of biomarker detection to alter the disease has resulted in recommendations by every society and task force that routine screening for ovarian cancer not be performed.

## Combining Biomarkers With Ultrasound and Other Imaging Techniques

There is evidence that transvaginal sonography (TVS) improves early detection of ovarian cancer and possibly influences mortality in some instances, but at a significant trade-off in specificity (Fig. 24.1).[101-103] Van Nagell et al. scored ovaries as abnormal if they exceeded 10 and 20 cm³ from post- and premenopausal women, respectively. In a study of 8500 women who underwent TVS, 121 were abnormal and underwent surgery. A total of 57 had serous cystadenomas, and eight had ovarian cancers, six of which were stage IA. Only one each had an enlarged ovary by palpation or an elevated CA-125.[98] The implication from studies of this type is that TVS will downstage a proportion



**Fig. 24.1.** Ultrasound evaluation of benign and malignant ovarian cysts. **A,** Hemorrhagic smooth-walled cyst. **B,** Ovarian cancer with irregular wall thickness, lining surface, and septation. (Courtesy of Beryl Bennaceraf, Boston, MA.)

of tumors and permit improved survival.[104] Despite these results, this group found that TVS had a sensitivity of 98.7% but a positive predictive value (PPV) of only 6.8%. Partridge and Barnes summarized five studies of 11,283 women, noting a PPV of only 3.1% for ovarian cancer.[1] In a study of TVS encompassing 42,113 screening years, van Nagell et al. defined an ovarian volume exceeding 10 cm in postmenopausal women or 20 cm in premenopausal women, or papillary or complex architecture as abnormal. Some 17 of 180 patients with persisting TVS abnormalities who underwent exploratory laparoscopy or laparotomy had cancer, 11 of which were stage I. Eight of the 11 did not have a palpable mass. TVS screening in this setting had a PPV of 9.4% with a negative predictive value of 99.97%. When nonepithelial tumors were excluded, the survival of ovarian cancer patients in the annually screened population was 92.9% at 2 years and 83.6% at 5 years. The authors cautioned that although the improved detection and reduced mortality were associated with screening, this benefit did not apply to women whose cancers occurred in the setting of a normal ovarian volume.[99] Additional studies have echoed the low PPV (1% to 27%) and false positive/true positive ratios of over 30, while reporting a small number of tumors diagnosed at stage I.[105-110]

A recent report summarized *sequential screening* with a baseline and three follow-up CA-125 and TVS assessments.[109] The PPVs were 1.4% to 1.8%, respectively. The ratio of surgical procedures to cancers detected was 31 : 1 at the initial screening and 14 : 1 on the subsequent three testing events. Similar to the studies described, 67% to 83% were stage III or IV, respectively, when diagnosed. Most of the surgeries were prompted by a positive TVS event. An important caveat is that these studies targeted ovarian enlargement, a strategy that ignores the early phases of serous carcinogenesis in the distal fallopian tube, ovarian, and pelvic surfaces. The same limitations apply to the use of ultrasound and biomarkers in combination. The Prostate, Lung, Colorectal and Ovarian (PLCO) trial show that

screening with both CA-125 and transvaginal ultrasound compared with standard care did not reduce ovarian cancer mortality.[111]

A recent trial garnering considerable attention was the United Kingdom Collaborative Trial of Ovarian Cancer Screening (UKTOCS) that compared yearly CA-125 (using an algorithm) and transvaginal ultrasound (multimodality screening [MMS]) to ultrasound alone and no screening. Over 200,000 women were enrolled. Although the primary analysis did not appear to show a reduction in mortality for MMS, there was a 20% mortality reduction at 7 to 14 years.[112] The authors concluded that this was due to removal of prevalent cases (years 1 to 7). Caveats include the following:

- The notion that the differences in mortality between early and later years of the study are due to prevalent versus incident disease is unproven.
- Estimates of ovarian cancer mortality were based on death certificate data in the compared populations, and the precise reason for reduced mortality estimates is not known.
- There is no evidence that this screening algorithm will alter mortality in women with *BRCA-1* or *BRCA-2* mutations, where the ovarian cancer outcome estimation would be far less prone to error.

This management algorithm is currently not recommended by the U.S. Food and Drug Administration (FDA). Various other algorithms which combine imaging, biomarkers, and clinical signs have been proposed but have not yet been widely adopted.[113,114]

## Molecular Screening for Ovarian Cancer

With the emergence of highly sensitive molecular assays for gene mutations, a few studies have explored the possibility that ovarian or tubal cancers could be detected via analysis of lower genital tract fluids. In theory, these "molecular Papanicolaou (Pap) tests" would detect mutations by sequence analysis targeting common mutations

associated with gynecologic cancers. Kinde et al. successfully identified mutations in liquid-based Pap tests from 9 of 22 ovarian carcinomas.[115] It remains to be seen whether this approach will detect early ovarian or tubal carcinomas in their curable stages or will encounter problems with "background mutations" in the genital tract mucosa of healthy women.

## Presenting Signs and Symptoms

Clinical presentations with borderline early and advanced cancer vary. Webb et al. examined patients in these groups and noted 16%, 7%, and 4% of patients with borderline disease, early ovarian cancer, and advanced ovarian cancer, respectively, were symptom free. Abdominal pain (44%) and swelling (39%) were the most common symptoms as opposed to abdominal mass and gynecologic symptoms (12% each). Gastrointestinal problems and malaise were more common in advanced disease.[116]

Overall, ovarian volume is expected to decrease with age.[117] In patients with a suspected pelvic mass, TVS, with or without CA-125 assessments, is of considerable value in segregating low- versus high-risk patients and can be used as a guide to intervention (see Fig. 24.1).[1,118] The presence of a mass with conspicuous calcium supports the diagnosis of teratoma. In contrast, any solid tumor is of concern. Numerous investigators have proposed scoring systems, which depend on specific characteristics of tumors that predict risk. Certain groups can be identified with a strikingly low risk. Bailey et al. showed that none of unilocular cysts less than 10 cm in diameter proved to be malignant.[119] Half resolved spontaneously; many of the rest were cystadenomas. In contrast, complex cysts had a similar resolution rate, but seven of 114 proved to be malignant.[74] In a study of more than 3200 unilocular cysts, nearly 70% resolved spontaneously. Of the remainder, 16.5% (of the total) developed septation, 5.8% a solid area, and 6.8% persisted as a unilocular lesion. Of 27 cancers emerging in the persistent group, 10 were associated with the unilocular lesions, underscoring the need to follow all patients with a persistent ovarian lesion.[120]

## The Role of the Pathologist in Risk Reduction and Early Detection

There are two opportunities for the pathologist to participate in the early detection of ovarian cancer:
- Routine analysis of the distal fallopian tube in women undergoing procedure for benign disorders: The routine analysis of the distal fallopian tube in salpingectomies from benign disorders will occasionally uncover an early (intraepithelial) carcinoma in that site. Several studies of limited populations employing comprehensive examination of the fallopian tube similar to the Sectioning and Extensively Examining the FIMbriated End (SEE-FIM) protocol have estimated the frequency of occult serous carcinoma to be between 0.6% and 1.1% in women with no history of or risk factors for serous carcinomas of the uterus or other pelvic sites.[121,122] In a recent report from Brigham and Women's Hospital

covering 10 years, the frequency of tubal serous carcinoma was estimated to be between 0.1% and 0.2%.[123] Notably, many of the early carcinomas were associated with concurrent endometrioid carcinomas of the uterus; the significance of this association (which is still uncommon) is under study.

The detection of these rare, but early cancers will permit both a thorough workup of the patient for metastatic disease and, in the right setting, a rationale for genetic testing, which if positive could benefit others in the family.[124,125] It is our practice to submit the fimbriated end of the fallopian tube in addition to representative cross-sections in these cases.

- Systematic analysis of fallopian tubes from women who are deemed at risk for ovarian cancer (i.e., those with known inherited mutations in the BRCA-1 or BRCA-2 gene): The more conventional exercise is the evaluation of the prophylactic salpingo-oophorectomy from these women for evidence of occult malignancy. However, in recent years, a proportion of these tumors have been found in the fallopian tube mucosa, leading investigators to propose a tubal origin in many instances. Moreover, the frequent location of these early lesions in the fimbriated portion of the tube mandates thorough attention to this portion of the structure. This discussion will address the following points: (1) the beneficial role of prophylactic surgery, (2) the risk of malignancy in women with mutations in BRCA, (3) the procedure for evaluation of the fallopian tube, (4) the criteria for tubal intraepithelial carcinoma, (5) the pitfalls in the diagnosis of early tubal malignancies, and (6) the potential impact on clinical management and perceptions of serous carcinogenesis.

## Prophylactic Surgery and Detection of Early Malignancy

Bilateral salpingo-oophorectomy in women with BRCA mutations reduces the risk of developing pelvic serous cancers by greater than 90%.[78,126] Laparoscopy (whenever possible this is the preferred modality) and laparotomy (almost never) are the surgical modalities of choice to allow inspection of the peritoneal surfaces at the time of prophylactic salpingo-oophorectomy and collect fluid for cytologic evaluation. Performing a hysterectomy in addition to removing the adnexa does not appear to improve the efficacy of the procedure. Paradoxically, women with BRCA-associated cancers have a better clinical outcome following treatment than those without BRCA mutations, even though the former tend to present at a higher stage. Presumably, this is due in part to BRCA-associated tumors being more susceptible to chemotherapeutic agents, such as cisplatin, that induce double-stranded DNA damage.[127]

Prophylactic surgery may reduce, but not completely eliminate, the risk of ovarian cancer in high-risk individuals. Bilateral salpingo-oophorectomy in BRCA carriers reduces ovarian cancer risk by over 90% and breast cancer risk by over 50%.[29,124] The operation should be reserved for women with known mutations in BRCA-1 or BRCA-2 (or other lower penetrance genes with deleterious mutations) or those who have a family history consistent with one of the genetic syndromes associated with ovarian cancer, and

it should include an evaluation by a genetic counselor.[9] The addition of hysterectomy does not appear to increase the efficacy of the operation and should be performed only for concurrent gynecologic indications or if the patient has HNPCC. Patients should be informed that prophylactic surgery does not protect them against the subsequent development of high-grade serous carcinoma of the peritoneum. They should also be warned that about 7% of prophylactic operations detect occult ovarian or tubal carcinoma and that these lesions may not be appreciated until final pathology reports are available.[128] Pathologists should be instructed to submit the entire specimen for sectioning to reduce the risk of missing a microscopic occult malignancy. Finally, the patient should be prepared for the consequences of surgical menopause.

An additional risk that has been addressed recently is that of a subsequent uterine serous adenocarcinoma. One study computed an odds ratio of 22 for women with *BRCA-1* and 6.4 for those with *BRCA-2* germ line mutations. These estimates were based on a very small number of cancer cases across multiple institutions; however, three of three did show loss of wild type *BRCA-1* gene.[129] Thus this risk, albeit small, will enter into the discussion when counseling women with these mutations.

In studies of women undergoing prophylactic salpingo-oophorectomy for *BRCA-1* or *BRCA-2* mutations *(BRCA+)*, the risk of uncovering an early cancer has been estimated to be about 5% to 10%, a figure that may vary both as a function of the age of the population and the thoroughness with which the specimen is examined.[90,130-139] Many of these early cancers have been identified in the distal fallopian tube, the earliest malignancy being a tubal intraepithelial carcinoma. In a review of nearly 20 cases in our institution, the frequency of a tubal intraepithelial carcinoma was over 80%.[140] In the largest study to date (GOG-0199), clinically occult cancers were detected in 15 of 326 (4.6%) *BRCA-1* carriers and 8 of 231 (3.5%) *BRCA-2* carriers undergoing prophylactic salpingo-oophorectomy; about half of these tumors were more than stage II.[141] With these figures in mind, the following points must be stressed:

- Early malignancies can be both serous (STIC, 80%) and rarely, endometrioid (ETIC, 20%).[130,134]
- Twenty percent of these early serous cancers are not associated with an intraepithelial lesion in the fallopian tube; more extensive tubal sampling might uncover some, but most of the time it will not.[142]
- Advanced pelvic serous cancers in *BRCA+* women are virtually identical in tumor distribution to the general population with this disease (i.e., less than half will have evidence of a tubal origin).[130,143] Although it may be tempting to attribute this to obliteration of the tubal mucosal origin by expanding tumor or some other sampling artifact, *the reader is strongly cautioned that salpingectomy alone may not rid the patient of risk, and leaving the ovary might even place her at a substantial risk of an eventual pelvic serous cancer*.
- Prophylactic specimens from women with a family history of cancer but without a documented *BRCA* mutation are unlikely to contain an early malignancy.[144] Virtually all genetically related pelvic serous cancers are linked to *BRCA+*.

- As mentioned earlier, STICs are also rarely reported in fallopian tubes removed as part of surgery for indications other than serous carcinoma.[118,121-123,145]

## The SEE-FIM Protocol

Prophylactic salpingo-oophorectomies from women with mutations in *BRCA* or strong family histories of ovarian carcinoma should be submitted entirely and examined histologically. Most of the early cancers described in the preceding sections occur in grossly unremarkable specimen, so it is imperative that all the tissue be evaluated in order to properly treat the individual and to further understand the pathogenesis of this disease.

The fallopian tubes and ovaries should be submitted entirely and be evaluated in serial sections by a pathologist with expertise in gynecologic malignancies. At Brigham and Women's Hospital, the goal is to ensure sectioning and extensive examination of the fimbria (SEE-FIM protocol), because the majority of early serous tumors occur in this area, which is as follows (Fig. 24.2):

- The entire tube is initially fixed for at least 4 hours to minimize loss of epithelium during manipulation.
- The distal 2 cm of the fimbriated end is amputated.
- The fimbrial mucosa is sectioned longitudinally into four pieces. The remainder of the tube is sectioned transversely every 2 to 3 mm into cross sections.
- The tubal segments combined with the fully sectioned fimbriated end are submitted in toto.[146]

Recent studies show increased rates of detection (from less than 2.5% to 17%) with more thorough sectioning.[127] Thus, protocols for examining the fallopian tubes in genetically susceptible patients will continue to evolve. We have used a protocol whereby the laboratory makes several sections from each fimbrial block. However, a more economical and probably equally effective method is to section the fimbria as finely as possible, maximizing the surface area that is examined, and examine a single section. If an area of concern is encountered, it can be evaluated by further serial sections.



**Fig. 24.2.** Sectioning and Extensively Examining the FIMbriated End (SEE-FIM) protocol for tubal examination. One tube is shown here. The fimbria *(lower row)* is finely sectioned in sagittal orientation. The remainder of the tube *(upper row) is* sectioned at 1- to 2-mm intervals. (Photo courtesy of Dr. Eric Huang.)

## Histologic Criteria for Early Tubal Cancer (Serous Tubal Intraepithelial Carcinoma)

As a consequence of the increasing surgical practice of prophylactic salpingo-oophorectomy for women with *BRCA* mutations, more and more serous carcinomas are being discovered in the fallopian tube and at an early stage.[89] This will eventually alter the currently perceived ratio of fallopian tube/ovarian carcinomas (0.41 and 15 per 100,000/year).[147,148] In applying histologic criteria, the practitioner must be cognizant of the fact that terms used previously for early malignancies should be selected with caution, inasmuch as the literature is replete with terms such as dysplasia or atypical hyperplasia.[146,149] Such terms may appropriately identify epithelial changes of uncertain biologic significance, but they cannot be used without carefully qualifying their risk to the patient. We resort to a single term *serous tubal intraepithelial carcinoma (STIC)*, because most of the lesions are serous-type.

STICs can be found in both prophylactic salpingo-oophorectomies, in the tubes of women with pelvic serous carcinoma,[88,90,146] and, rarely, in routine salpingo-oophorectomy specimens.[118,142,150] The presence of STIC implies an origin in the distal fallopian tube, although this point remains controversial, inasmuch as an alternative explanation would be spread from an ovarian or peritoneal primary to the endosalpinx. We do not classify a lesion as an STIC unless there is clear association with normal mucosa without underlying malignancy, including vascular space invasion. Either could give rise to intramucosal tumor. Overall, intramucosal neoplasia manifesting as spread to the tube from another site is uncommon but is being recognized more in studies that pay close attention to the tubes in intra-abdominal malignancies.[151]

The following features characterize a tubal intraepithelial carcinoma (Table 24.2 and Figs. 24.3 and 24.4):

- *Most but not all exhibit epithelial stratification, but virtually all should exhibit some degree of depolarization,* often with exfoliation of cells into the lumen. The lesion at low power may assume a slightly thickened, almost velvety appearance, with a slightly irregular surface relative to the adjacent non-neoplastic mucosa. Intraepithelial fracture lines may appear as a function of disaggregation of the stratified epithelial cells.
- The neoplastic cells can be variable in size but are often noteworthy for their uniformity, owing to the lack of the usual heterogeneity seen with a mixed ciliated and secretory cell population. The high nuclear/cytoplasmic (N/C) ratio gives them a somewhat more basophilic appearance as well. A mildly stratified monomorphic population can often be easily appreciated at low magnification.
- Nuclear features vary, but rounded enlarged nuclei with prominent nucleoli are common. Marked nuclear

**Table 24.2** Assessment of Serous Tubal Epithelial Proliferations

| Parameter | Benign Serous Tubal Epithelial Proliferation (p53 Signature) | Serous Tubal Epithelial Proliferation of Uncertain Significance | Serous Tubal Intraepithelial Carcinoma |
|---|---|---|---|
| N/C ratio | Variable | Variable | High |
| Thickness | Variable | Variable | High |
| Nucleoli | Occasional | Common | Common |
| Molding | Occasional | Variable | Variable |
| Cell shape | Round/oblong | Round/oblong | Round |
| Unpolarized | No | No | Yes |
| Exfoliation | No | No | Common |
| Intraepithelial fractures | No | No | Common |
| p53 staining abnormality[a] | Yes | Yes | Yes |
| Cyclin E | Negative or patchy | Variable | Usually strong[c] |
| p16 | Negative or patchy | Variable | Usually strong[c] |
| MIB-1 (index in the most proliferative area)[b] | <20% | 20% to 50% | 40% to 90% |

*N/C,* Nuclear/cytoplasmic.
[a] A subset of serous tubal intraepithelial carcinomas (STICs) will stain completely negative because of a deletion mutation in the sequence encoding the antigenic target.
[b] Approximate proliferation index ranges are given. Proliferation index is not a primary factor in lesion classification.
[c] Expression of some genes (ALDH-1, PAX-2, Cyclin E, p16) can change abruptly. Thus no biomarker is completely reliable at this point in identifying STIC.
From Mehra K, Mehrad M, Ning G, et al: STICs, SCOUTs and p53 signatures; a new language for pelvic serous carcinogenesis. *Front Biosci (Elite Ed)* 3:625-634, 2011; Chen EY, Mehra K, Mehrad M, et al: Secretory cell outgrowth, PAX2 and serous carcinogenesis in the Fallopian tube. *J Pathol* 222:110-116, 2010; Roh MH, Yassin Y, Miron A, et al: High-grade fimbrial-ovarian carcinomas are unified by altered p53, PTEN and PAX2 expression. *Mod Pathol* 23:1316-1324, 2010; Ning G, Xian W, Crum CP: Unpublished data.



Fig. 24.3. **A**, Low-power image of a thickened neoplastic epithelium in the fimbria. **B**, At higher magnification, note the stratification and fracture lines, with exfoliation. **C**, Another serous tubal intraepithelial carcinoma (STIC) with marked loss of polarity, irregular thickness, and horizontal fracture lines. **D**, This STIC is slightly more deceptive, with a lower nuclear/cytoplasmic (N/C) ratio. However, note the loss of polarity and exfoliating neoplastic cells on the surface.

variation is the exception rather than the rule. Nuclear molding is another feature, but in our experience, is not reliable by itself. *Of note, foci containing nuclear enlargement, nucleoli, and molding can be observed in otherwise benign-appearing epithelium.*

- STICs, specifically those associated with serous carcinomas, are usually diffusely positive for p53 and p16 (see Fig. 24.4). A minority are completely p53-negative due to deletion mutation of the gene that prevents recognition of the protein by the antibody (Fig. 24.5). Thus a completely p53-negative stain in the area of interest does not exclude tubal intraepithelial carcinoma. p16 may be helpful, although we have seen p16 staining in some nonmalignant tubal epithelia. Cyclin E is also upregulated in tubal intraepithelial carcinomas but can be seen in nonmalignant epithelia. Novak et al. reported a strong correlation between concurrent staining for both Stathmin1 and p16ink4 and STIC.[152] This combination may be helpful, although like most biomarkers, staining is not invariably predictive of STIC.

- The proliferative (MIB-1) index is typically high, exceeding 70% in at least a portion of the lesion. However, it may vary considerably, particularly in endometrioid STICs.

- The diagnosis of STIC should be made morphologically, with stains used to enhance and refine the histologic findings. Corroboration of the diagnosis by another pathologist is prudent, particularly if there is any uncertainty. The reproducibility of diagnosing STICs has been only fair to good, but a recent algorithmic approach has improved this dramatically.[153-155]

### Endometrioid Tubal Intraepithelial Carcinoma

Although more unusual than STICs, endometrioid intraepithelial carcinomas are sometimes found in the fallopian tube epithelium. These lesions demonstrate stratified columnar or cuboidal epithelial cells with an endometrioid appearance (Fig. 24.6). The N/C ratio is lower than in STICs. They are typically negative or weakly positive for p53 and demonstrate a variable MIB-1 index.



Fig. 24.4. **A** and **B,** A serous tubal intraepithelial carcinoma (STIC) exhibits **(C)** strong positivity for p53 and **(D)** a high MIB-1 index.

**Mucinous Tubal Intraepithelial Carcinoma**

We have rarely encountered mucinous intraepithelial neoplasia in the distal fallopian tube. It is included in this section for completeness and because we have no evidence to refute it as a primary lesion. An interesting feature of these mucinous tubal intraepithelial carcinomas is the not infrequent strong staining for both p16 and p53, suggesting that etiologically they are closer to STICs than endometrioid lesions (Fig. 24.7). Presumably they signify some element of plasticity in tubal secretory cell differentiation, akin to an intestinal type.

**Early Invasive Serous Carcinoma**

The point at which an STIC transits to an invasive carcinoma may be difficult to ascertain and may be moot (Fig. 24.8). Papillary architecture with marked complexity in epithelial growth may not be accompanied by invasion but almost certainly conveys a high risk of peritoneal disease. Likewise, if solid growth is present in the stroma, a diagnosis of invasion is made and may very well be followed by

adjunctive chemotherapy. Because these lesions can be on the order of 1 or 2 mm in diameter, when an STIC is identified, it is important to perform serial sections in addition to immunohistochemical stains, because sectioning can sometimes reveal an underlying invasive lesion. The morphology of the cells is the same as that for the STIC, except that there is architectural evidence of invasion.

## Differential Diagnosis of Serous Tubal Intraepithelial Carcinoma

The differential diagnosis of STIC or early malignancy includes a limited number of possibilities and must always be approached in the context of the clinical picture (see Table 24.2). A number of potentially confusing alterations, including complex transitional metaplasia, fimbrial adenofibromas, papillary hyperplasia, Arias-Stella effect, inflammatory atypias, and others, are discussed in a previous chapter. This discussion is confined to a spectrum of intraepithelial changes that are most often encountered in the distal fallopian tube, in increasing degree of atypia.



**Fig. 24.5.** Early tubal malignancy in a woman who underwent salpingo-oophorectomy for a benign ovarian fibroma. **A,** Low magnification highlights an irregular epithelial surface. **B,** Higher magnification. Note the rounded cells and loss of polarity with true stratification *(arrows)*. **C,** Complete absence of p53 immunostaining is characteristic of a deletion mutation in the gene.

**Fig. 24.6.** Endometrioid carcinoma in a *BRCA*+ individual. **A,** A focus of endometrioid carcinoma on the ovarian surface *(arrows)*. **B,** The distal tube contains a microscopic endometrioid tubal intraepithelial carcinoma *(arrows); (inset)* at higher magnification *(arrowheads)*.



**Fig. 24.7. A,** Mucinous tubal intraepithelial carcinoma. **B,** At higher magnification with strong staining for p16 *(upper left inset)* and absence of p53 staining *(upper right inset)*. **C,** The adjacent ovary contained a mucinous carcinoma.

### Benign Tubal Epithelial Hyperplasias (Secretory/Stem Cell Outgrowths)

Secretory/stem cell outgrowths (SCOUTs) are common findings in the tube and consist of what appear to be small clonal expansions of epithelial cells with variable ciliated cell differentiation. They do not harbor mutations in p53 but are increased in frequency in older women and to some degree in patients with ovarian cancer. Moreover, they harbor alterations in expression of PAX-2, ALDH1 (overexpression or underexpression), beta-catenin, and other genes altered in neoplasia.[156-158] They have no clinical significance in practice but are occasionally seen adjacent to rare beta-catenin positive endometrioid neoplasms of the tube (Brouwer J & Schmechler C, personal communication). They consist of type 1 SCOUTs, manifesting with ciliated differentiation (PAX2−/ALDH1−) and type 2 SCOUTs, which closely resemble endometrioid epithelium (PAX2−/ALDH1+/beta-catenin+) (Fig. 24.9A).[159] However, there are minimal atypia, preservation of pseudostratification, and a low MIB-1 index.

### Serous Tubal Epithelial Proliferations/Lesions

Serous tubal epithelial proliferations, or serous tubal epithelial proliferations/lesions (STEPs) constitute clonally derived expansions or proliferations with p53 mutations.

### Benign Serous Tubal Epithelial Proliferations/Lesions (p53 Signatures)

These constitute small minimally proliferative arrays of benign appearing epithelium with altered p53 (see Fig. 24.9B to D).[160] These small foci were initially designated as "p53 signatures."[161] p53 signatures are defined as benign appearing areas of tubal epithelium that show strong staining for p53 by immunohistochemistry. They have a secretory cell phenotype, a low proliferative index, and evidence of DNA damage by staining with γ-H2AX. In the study by Lee et al., about half of cases with STICs also have p53 signatures, and p53 mutations were identified in about half of p53 signatures by laser capture microdissection and PCR mutation analysis. Unlike STICs, p53 signatures



Fig. 24.8. **A,** Low power of a small focus of invasive carcinoma in a fimbrial plica. **B,** Same image at higher magnification. Following, p53 **(C)** and MIB-1 **(D)** immunostaining, note the lower than expected MIB-1 index in the invasive focus *(arrows)*.

are common in fallopian tubes regardless of *BRCA* mutation status.[162] Moreover, examination of prophylactically removed ovaries and fallopian tubes from *BRCA+* women showed that although p53 signatures are common in fallopian tubes, they are rare in ovarian epithelium.[162] One study addressed the epidemiologic risk factors for the development of p53 signatures, as compared with the known risk factors for ovarian carcinoma in this group.[163] However, although this entity may signify an early phase of serous cancer evolution, like many early lesions, it is

common and clinically insignificant in the context of a salpingectomy, irrespective of its indications.

p53 signatures are morphologically indistinct or benign-appearing areas of tubal mucosa that are usually discovered incidentally when immunohistochemistry for p53 is performed. By definition, p53 signatures are at least 12 cells that are p53 positive by immunohistochemistry and have a low proliferative index (MIB-1 less than 10%) (see Fig. 24.9B).[109] Like their STIC counterparts, p53 signatures have a secretory cell phenotype. Signatures can be

Fig. 24.9. The following must be excluded when making a diagnosis of serous tubal intraepithelial carcinoma (STIC) (additional examples can be seen in Chapter 21). **A,** Benign tubal epithelial proliferation (secretory/stem cell outgrowth [SCOUT]) with endometrioid differentiation. **B,** Benign serous tubal epithelial proliferation (p53 signature). Note the appearance of benign mucosa and low proliferative (MIB-1) index despite the strong staining for p53. **C,** Another p53 signature *(upper)*. **D,** It expresses no p53 protein, in keeping with a deletion (null) mutations.

continuous (an uninterrupted strip of p53-positive secretory cells) or discontinuous (p53-positive cells with some intervening ciliated cells).

### Serous Tubal Epithelial Proliferations/Lesions of Uncertain Significance

The pathologist who scrutinizes prophylactic salpingo-oophorectomies will invariably encounter a process that cannot be readily classified. Jarboe et al. noted that, on rare occasion, atypical foci of p53-positive secretory cells can be identified, which exhibit features intermediate between p53 signatures and STICs.[164] These "atypical hyperplasias" demonstrate the following:

- Overall preservation of pseudostratification and epithelial polarity (Fig. 24.10)
- Inter-digitation with benign-appearing ciliated epithelium in some cases

- An increased MIB-1 index of 20% or more in at least a portion of the lesion
- Evidence of DNA damage manifested by immunopositivity for γ–H2AX

The authors originally designated these atypical p53-positive foci as tubal intraepithelial lesions in transition (TILT) for these. Vang et al. proposed the term *serous tubal intraepithelial lesion (STIL)*.[155] Lee et al. suggested the term *tubal epithelial atypia (TEA)*.[165] We would classify them as serous tubal epithelial proliferations or lesions of uncertain significance (STEP-US) for two reasons. First, distinguishing such proliferations of this type from STIC may not always be possible; interobserver reproducibility in separating the two is far from ideal, and in some instances one of these proliferations may be found in continuity with an invasive serous carcinoma. Second, despite the fact that they are presumably neoplastic, they confer minimal if any risk of subsequent pelvic serous carcinoma. In fact, the risk of a



**Fig. 24.10.** Serous tubal epithelial proliferations/lesions of uncertain significance (STEP-USs). **A,** A proliferation with some nuclear enlargement and hyperchromasia. **B,** Note the focal strong p53 positivity. **C,** The MIB-1 index is low. **D,** Higher magnification of **A** showing the nuclear atypias. **E,** Another STEP-US. There is a monomorphic non-ciliated population with some nuclear enlargement; however, the lining is uniform with a cohesive cell population. **F,** Another STEP-US, most conspicuous on the right, with nuclear enlargement. This was strongly p53 positive; however, note the preservation of ciliated differentiation.

**Table 24.3** Sample Terminology and Explanatory Notes for Incidentally Discovered Tubal Epithelial Abnormalities

| Terms or Abbreviations Used | Diagnostic Term | Comment |
|---|---|---|
| SCOUT | Benign epithelial proliferation | None |
| p53 signature | Benign serous epithelial proliferation/lesion | None |
| STIL/TILT/TEA | STEP-US | This proliferation exhibits cellular atypia and is p53 positive, but cell polarity is maintained with a low proliferative index. It is not sufficient for a diagnosis of STIC. |
| STIC | STIC | This proliferation exhibits cellular atypia, evidence of a p53 mutation, loss of cell polarity, and an elevated proliferative index. When found in isolation, STICs carry an approximately 5% risk of subsequent pelvic HGSC based on the current literature. |

*HGSC, High grade serous carcinoma; SCOUT, secretory/stem cell outgrowth; STEP-US, serous tubal epithelial proliferation/lesion of uncertain significance; STIC, serous tubal intraepithelial carcinoma; STIL, serous tubal intraepithelial lesion; TEA, tubal epithelial atypia; TILT, tubal intraepithelial lesion in transition.*

*From Visvanathan K, Vang R, Shaw P, et al: Diagnosis of serous tubal intraepithelial carcinoma based on morphologic and immunohistochemical features: a reproducibility study. Am J Surg Pathol 35:1766-1775, 2011; Vang R, Visvanathan K, Gross A, et al: Validation of an algorithm for the diagnosis of serous tubal intraepithelial carcinoma. Int J Gynecol Pathol 31:243-253, 2012; Mehra K, Mehrad M, Ning G, et al: STICs, SCOUTs and p53 signatures; a new language for pelvic serous carcinogenesis. Front Biosci (Elite Ed) 3:625-634, 2011; Chen EY, Mehra K, Mehrad M, et al: Secretory cell outgrowth, PAX2 and serous carcinogenesis in the fallopian tube. J Pathol 222:110-116, 2010; Roh MH, Yassin Y, Miron A, et al: High-grade fimbrial-ovarian carcinomas are unified by altered p53, PTEN and PAX2 expression. Mod Pathol 23:1316-1324, 2010.*

subsequent pelvic malignancy for isolated STIC is only 5%. *Uncertain significance* or a comparable term conveys this message.[166] Diagnostic terms and sample comments for these various tubal epithelial abnormalities are provided in Table 24.3.

**Other Benign Tubal Abnormalities**

On occasion, foci of benign tubal epithelium can be identified, which can raise suspicion for a neoplastic process. Tubal epithelium exhibiting architectural complexity with pseudostratification and occasional scattered atypical-appearing nuclei can be mistaken for neoplasia (see Chapter 21). In general, such a benign mimic will exhibit the presence of cilia diffusely, and overall polarity of the epithelium will be preserved. In especially challenging cases, immunostaining for p53 and MIB-1 can serve as a useful diagnostic adjunct. The reader should be cautioned, however, that positive staining for p53 and increased MIB-1 should never be used as a substitute for the appropriate morphologic features when assessing whether or not an STIC is present.

## Clinical Impact

The thorough examination of prophylactic salpingo-oophorectomy specimens from women with *BRCA* mutations is critical both for the treatment and risk assessment of the individual patient and to gain a better understanding of the pathogenesis of pelvic cancer. These specimens offer a unique opportunity to observe preclinical lesions of the fallopian tube and ovary, knowledge that is vital to the development of future early detection programs. Brown et al. published a mathematical model of the natural history of serous ovarian carcinoma in order to estimate the "window of opportunity" in which intervention might be life-saving and to define more clearly a target for early detection.[167] This study used the literature on prophylactic salpingo-oophorectomy specimens from *BRCA-1* carriers to calculate the prevalence of early occult tumors and estimated the incidence of symptomatic carcinomas in the same population based on prospective studies. The model estimated that the duration of the window of opportunity for detecting early occult tumors was 4.3 years (CI = 2.6 to 6.9 years) and that most of the tumors in this population progress to an advanced stage by a mean of 0.8 years (CI = 0.4 to 1.9 years) before detection. The stage-specific survival data show that a 50% reduction in 5-year mortality could be achieved with an annual screen that detects a 4-mm tumor. The development of early detection modalities is critically dependent on our understanding of the natural development of these tumors, both in terms of size and rate of growth; proper evaluation of prophylactic specimens is the key to furthering this understanding.

The rate of progression of STICs to invasive serous carcinoma remains unknown, because biopsy and follow-up are not viable options in evaluation of the fallopian tube. A recent analysis of the literature reported that 4.5% of *BRCA+* women with isolated STICs developed primary peritoneal carcinoma within 72 months.[168] Other recent studies have supported the idea that the risk is low but not zero.[138,169,170] The role of adjuvant chemotherapy after a diagnosis of an incidental STIC remains uncertain; a recent meta-analysis reported that 16.4% of patients with a diagnosis of STIC in the literature received chemotherapy.[168] Most centers do not recommend chemotherapy if STIC is not accompanied by invasion or spread.

## Early Ovarian Cancer

The frequency of early serous ovarian cancer is best put in perspective by the study by Bell and Scully, in which they identified 14 cases of early ovarian cancer, 10 of which were serous, from a large consultation file.[171] Precisely how many of these were bona fide serous carcinomas versus spread from an adjacent tubal primary is unknown, but the study underscores the rarity of early serous carcinomas.



**Fig. 24.11.** **A** and **B,** Early ovarian carcinoma in a cyst from a *BRCA+* woman. **C,** Small surface implant of serous carcinoma on the ovary.

Occasional cases have been identified of apparent early primary ovarian malignancies in the *BRCA+* population, manifesting neoplastic cysts in the ovarian cortex. The criteria for diagnosis are similar to those for the fallopian tube (Fig. 24.11A and B).

More frequently, the pathologist may stumble on small foci of malignancy in the ovarian surface. Some of these likely signify metastases from the tube, but cases have been seen in which no tubal origin was identified (see Fig. 24.11C). Thus, the concept of surface ovarian carcinoma remains in play and emphasizes further the importance of carefully inspecting the ovarian surface in all prophylactic specimens.

- Isolated STICs found in prophylactic salpingo-oophorectomies from *BRCA+* women have a low risk of a high-grade serous cancer outcome (≈5%). The role of chemotherapy in these patients is controversial, and most institutions do not treat women with STIC alone.
- Benign tubal mucosa can appear atypical, with variations in nuclear size and even nuclear molding. Critical features of STIC in hematoxylin and eosin (H&E)-stained sections are loss of polarity, rounded rather than elongated cell shape, intraepithelial fractures, and exfoliation. The latter two features will invariably be accompanied by irregular epithelial outlines with stratification and help in distinguishing STIC from serous tubal epithelial proliferations/lesions of uncertain significance (STEP-US).

Please see the Appendix for suggested ICD-10 codes.

## KEY POINTS

- Risk-reducing surgery will reduce the death rate from ovarian cancer by over 80% in women with *BRCA-1* or *BRCA-2* mutations.
- From 5% to 10% of prophylactic surgical specimens from *BRCA+* women will harbor an early serous tubal intraepithelial carcinoma (STIC).

## References

1. Partridge EE, Barnes MN: Epithelial ovarian cancer: prevention, diagnosis, and treatment. *CA Cancer J Clin* 49:297–320, 1999.
2. Trimble EL, Karlan BY, Lagasse LD, et al: Diagnosing the correct ovarian cancer syndrome. *Obstet Gynecol* 78:1023–1026, 1991.

3. Vasen HF, Watson P, Mecklin JP, et al: New clinical criteria for hereditary nonpolyposis colorectal cancer (HNPCC, Lynch syndrome) proposed by the International Collaborative group on HNPCC. *Gastroenterology* 116:1453–1456, 1999.

4. Boyd J: Specific keynote: hereditary ovarian cancer: what we know. *Gynecol Oncol* 88:S8–S10, discussion S11–S13, 2003.

5. ACOG Practice Bulletin No. 103: Hereditary breast and ovarian cancer syndrome. *Obstet Gynecol* 113:957–966, 2009.

6. Girolimetti G, Perrone AM, Santini D, et al: BRCA-associated ovarian cancer: from molecular genetics to risk management. *Biomed Res Int* 2014:787143, 2014.

7. Antoniou A, Pharoah PD, Narod S, et al: Average risks of breast and ovarian cancer associated with BRCA1 or BRCA2 mutations detected in case series unselected for family history: a combined analysis of 22 studies. *Am J Hum Genet* 72:1117–1130, 2003.

8. Chen S, Parmigiani G: Meta-analysis of BRCA1 and BRCA2 penetrance. *J Clin Oncol* 25:1329–1333, 2007.

9. Scully R, Livingston DM: In search of the tumour-suppressor functions of BRCA1 and BRCA2. *Nature* 408:429–432, 2000.

10. Tutt A, Ashworth A: The relationship between the roles of BRCA genes in DNA repair and cancer predisposition. *Trends Mol Med* 8:571–576, 2002.

11. Chapman MS, Verma IM: Transcriptional activation by BRCA1. *Nature* 382:678–679, 1996.

12. Milner J, Ponder B, Hughes-Davies L, et al: Transcriptional activation functions in BRCA2. *Nature* 386:772–773, 1997.

13. Easton DF, Ford D, Bishop DT: Breast and ovarian cancer incidence in BRCA1-mutation carriers. Breast Cancer Linkage Consortium. *Am J Hum Genet* 56:265–271, 1995.

14. Nakonechny QB, Gilks CB: Ovarian cancer in hereditary cancer susceptibility syndromes. *Surg Pathol Clin* 9:189–199, 2016.

15. Nelson HD, Huffman LH, Fu R, et al: Genetic risk assessment and BRCA mutation testing for breast and ovarian cancer susceptibility: systematic evidence review for the U.S. Preventive Services Task Force. *Ann Intern Med* 143:362–379, 2005.

16. Struewing JP, Hartge P, Wacholder S, et al: The risk of cancer associated with specific mutations of BRCA1 and BRCA2 among Ashkenazi Jews. *N Engl J Med* 336:1401–1408, 1997.

17. Moslehi R, Chu W, Karlan B, et al: BRCA1 and BRCA2 mutation analysis of 208 Ashkenazi Jewish women with ovarian cancer. *Am J Hum Genet* 66:1259–1272, 2000.

18. Lu KH, Cramer DW, Muto MG, et al: A population-based study of BRCA1 and BRCA2 mutations in Jewish women with epithelial ovarian cancer. *Obstet Gynecol* 93:34–37, 1999.

19. Parent ME, Ghadirian P, Lacroix A, et al: The reliability of recollections of family history: implications for the medical provider. *J Cancer Educ* 12:114–120, 1997.

20. Gabai-Kapara E, Lahad A, Kaufman B, et al: Population-based screening for breast and ovarian cancer risk due to BRCA1 and BRCA2. *Proc Natl Acad Sci U S A* 111:14205–14210, 2014.

21. Evans DG, Young K, Bulman M, et al: Probability of BRCA1/2 mutation varies with ovarian cancer histology: results from screening 442 ovarian cancer families. *Clin Genet* 73:338–345, 2008.

22. Ramus SJ, Harrington PA, Pye C, et al: Contribution of BRCA1 and BRCA2 mutations to inherited ovarian cancer. *Hum Mutat* 28:1207–1215, 2007.

23. Frank TS, Deffenbaugh AM, Reid JE, et al: Clinical characteristics of individuals with germline mutations in BRCA1 and BRCA2: analysis of 10,000 individuals. *J Clin Oncol* 20:1480–1490, 2002.

24. Boyd J, Sonoda Y, Federici MG, et al: Clinicopathologic features of BRCA-linked and sporadic ovarian cancer. *JAMA* 283:2260–2265, 2000.

25. Pruthi S, Gostout BS, Lindor NM: Identification and management of women with BRCA mutations or hereditary predisposition for breast and ovarian cancer. *Mayo Clin Proc* 85:1111–1120, 2010.

26. Merajver SD, Pham TM, Caduff RF, et al: Somatic mutations in the BRCA1 gene in sporadic ovarian tumours. *Nat Genet* 9:439–443, 1995.

27. Foster KA, Harrington P, Kerr J, et al: Somatic and germline mutations of the BRCA2 gene in sporadic ovarian cancer. *Cancer Res* 56:3622–3625, 1996.

28. Geisler JP, Hatterman-Zogg MA, Rathe JA, et al: Frequency of BRCA1 dysfunction in ovarian cancer. *J Natl Cancer Inst* 94:61–67, 2002.

29. Hilton JL, Geisler JP, Rathe JA, et al: Inactivation of BRCA1 and BRCA2 in ovarian cancer. *J Natl Cancer Inst* 94:1396–1406, 2002.

30. Schrader KA, Hurlburt J, Kalloger SE, et al: Germline BRCA1 and BRCA2 mutations in ovarian cancer: utility of a histology-based referral strategy. *Obstet Gynecol* 120:235–240, 2012.

31. King MC, Levy-Lahad E, Lahad A: Population-based screening for BRCA1 and BRCA2: 2014 Lasker Award. *JAMA* 312:1091–1092, 2014.

32. Toss A, Tomasello C, Razzaboni E, et al: Hereditary ovarian cancer: not only BRCA 1 and 2 genes. *Biomed Res Int* 2015:341723, 2015.

33. Shaw PA, McLaughlin JR, Zweemer RP, et al: Histopathologic features of genetically determined ovarian cancer. *Int J Gynecol Pathol* 21:407–411, 2002.

34. Rubin SC, Benjamin I, Behbakht K, et al: Clinical and pathological features of ovarian cancer in women with germ-line mutations in BRCA1. *N Engl J Med* 335:1413–1416, 1996.

35. Howitt BE, Hanamornroongruang S, Lin DI, et al: Evidence for a dualistic model of high-grade serous carcinoma: BRCA mutation status, histology, and tubal intraepithelial carcinoma. *Am J Surg Pathol* 39:287–293, 2015.

36. Werness BA, Ramus SJ, Whittemore AS, et al: Histopathology of familial ovarian tumors in women from families with and without germline BRCA1 mutations. *Hum Pathol* 31:1420–1424, 2000.

37. Werness BA, Ramus SJ, Whittemore AS, et al: Primary ovarian dysgerminoma in a patient with a germline BRCA1 mutation. *Int J Gynecol Pathol* 19:390–394, 2000.

38. Sowter HM, Ashworth A: BRCA1 and BRCA2 as ovarian cancer susceptibility genes. *Carcinogenesis* 26:1651–1656, 2005.

39. Mills AM, Longacre TA: Lynch syndrome: female genital tract cancer diagnosis and screening. *Surg Pathol Clin* 9:201–214, 2016.

40. Senter L, Clendenning M, Sotamaa K, et al: The clinical phenotype of Lynch syndrome due to germ-line PMS2 mutations. *Gastroenterology* 135:419–428, 2008.

41. Jensen KC, Mariappan MR, Putcha GV, et al: Microsatellite instability and mismatch repair protein defects in ovarian epithelial neoplasms in patients 50 years of age and younger. *Am J Surg Pathol* 32:1029–1037, 2008.

42. Ketabi Z, Bartuma K, Bernstein I, et al: Ovarian cancer linked to Lynch syndrome typically presents as early-onset, non-serous epithelial tumors. *Gynecol Oncol* 121:462–465, 2011.

43. Lancaster JM, Powell CB, Chen LM, et al: Society of Gynecologic Oncology statement on risk assessment for inherited gynecologic cancer predispositions. *Gynecol Oncol* 136:3–7, 2015.

44. Song H, Ramus SJ, Kjaer SK, et al: Association between invasive ovarian cancer susceptibility and 11 best candidate SNPs from breast cancer genome-wide association study. *Hum Mol Genet* 18:2297–2304, 2009.

45. Song H, Ramus SJ, Tyrer J, et al: A genome-wide association study identifies a new ovarian cancer susceptibility locus on 9p22.2. *Nat Genet* 41:996–1000, 2009.

46. Bahcall OG: iCOGS collection provides a collaborative model. Foreword. *Nat Genet* 45:343, 2013.

47. Domchek SM, Bradbury A, Garber JE, et al: Multiplex genetic testing for cancer susceptibility: out on the high wire without a net? *J Clin Oncol* 31:1267–1270, 2013.

48. Easton DF, Pharoah PD, Antoniou AC, et al: Gene-panel sequencing and the prediction of breast-cancer risk. *N Engl J Med* 372:2243–2257, 2015.

49. Walsh T, Casadei S, Lee MK, et al: Mutations in 12 genes for inherited ovarian, fallopian tube, and peritoneal carcinoma identified by massively parallel sequencing. *Proc Natl Acad Sci U S A* 108:18032–18037, 2011.

50. Loveday C, Turnbull C, Ramsay E, et al: Germline mutations in RAD51D confer susceptibility to ovarian cancer. *Nat Genet* 43:879–882, 2011.

51. Loveday C, Turnbull C, Ruark E, et al: Germline RAD51C mutations confer susceptibility to ovarian cancer. *Nat Genet* 44:475–476, 2012.

52. Bernards SS, Norquist BM, Harrell MI, et al: Genetic characterization of early onset ovarian carcinoma. *Gynecol Oncol* 140(2):221–225, 2016.

53. Casadei S, Norquist BM, Walsh T, et al: Contribution of inherited mutations in the BRCA2-interacting protein PALB2 to familial breast cancer. *Cancer Res* 71:2222–2229, 2011.

54. Sabbaghian N, Srivastava A, Hamel N, et al: Germ-line deletion in DICER1 revealed by a novel MLPA assay using synthetic oligonucleotides. *Eur J Hum Genet* 22:564–567, 2014.

55. Witkowski L, Carrot-Zhang J, Albrecht S, et al: Germline and somatic SMARCA4 mutations characterize small cell carcinoma of the ovary, hypercalcemic type. *Nat Genet* 46:438–443, 2014.

56. Cramer DW, Harlow BL, Willett WC, et al: Galactose consumption and metabolism in relation to the risk of ovarian cancer. *Lancet* 2:66–71, 1989.

57. Crane TE, Khulpateea BR, Alberts DS, et al: Dietary intake and ovarian cancer risk: a systematic review. *Cancer Epidemiol Biomarkers Prev* 23:255–273, 2014.

58. Chang ET, Lee VS, Canchola AJ, et al: Diet and risk of ovarian cancer in the California Teachers Study cohort. *Am J Epidemiol* 165:802–813, 2007.

59. Romaguera D, Vergnaud AC, Peeters PH, et al: Is concordance with World Cancer Research Fund/American Institute for Cancer Research guidelines for cancer prevention related to subsequent risk of cancer? Results from the EPIC study. *Am J Clin Nutr* 96:150–163, 2012.

60. Xie J, Poole EM, Terry KL, et al: A prospective cohort study of dietary indices and incidence of epithelial ovarian cancer. *J Ovarian Res* 7:112, 2014.

61. Terry KL, Karageorgi S, Shvetsov YB, et al: Genital powder use and risk of ovarian cancer: a pooled analysis of 8,525 cases and 9,859 controls. *Cancer Prev Res (Phila)* 6:811–821, 2013.

62. Gertig DM, Hunter DJ, Cramer DW, et al: Prospective study of talc use and ovarian cancer. *J Natl Cancer Inst* 92:249–252, 2000.

63. Houghton SC, Reeves KW, Hankinson SE, et al: Perineal powder use and risk of ovarian cancer. *J Natl Cancer Inst* 106(9):2014.

64. Rossing MA, Daling JR, Weiss NS, et al: Ovarian tumors in a cohort of infertile women. *N Engl J Med* 331:771–776, 1994.

65. Whittemore AS, Harris R, Itnyre J: Characteristics relating to ovarian cancer risk: collaborative analysis of 12 US case-control studies. II.

Invasive epithelial ovarian cancers in white women. Collaborative Ovarian Cancer Group. *Am J Epidemiol* 136:1184–1203, 1992.

66. Rodriguez C, Patel AV, Calle EE, et al: Estrogen replacement therapy and ovarian cancer mortality in a large prospective study of US women. *JAMA* 285:1460–1465, 2001.

67. Lacey JV, Jr, Mink PJ, Lubin JH, et al: Menopausal hormone replacement therapy and risk of ovarian cancer. *JAMA* 288:334–341, 2002.

68. Beral V, Gaitskell K, Hermon C, et al: Menopausal hormone use and ovarian cancer risk: individual participant meta-analysis of 52 epidemiological studies. *Lancet* 385:1835–1842, 2015.

69. Shi LF, Wu Y, Li CY: Hormone therapy and risk of ovarian cancer in postmenopausal women: a systematic review and meta-analysis. *Menopause* 23:417–424, 2016.

70. Kim HS, Kim TH, Chung HH, et al: Risk and prognosis of ovarian cancer in women with endometriosis: a meta-analysis. *Br J Cancer* 110:1878–1890, 2014.

71. Kadan Y, Fiascone S, McCourt C, et al: Predictive factors for the presence of malignant transformation of pelvic endometriosis. *Eur J Obstet Gynecol Reprod Biol* 185:23–27, 2015.

72. The Cancer and Steroid Hormone Study of the Centers for Disease Control and the National Institute of Child Health and Human Development: The reduction in risk of ovarian cancer associated with oral-contraceptive use. *N Engl J Med* 316:650–655, 1987.

73. Narod SA, Risch H, Moslehi R, et al: Oral contraceptives and the risk of hereditary ovarian cancer. Hereditary Ovarian Cancer Clinical Study Group. *N Engl J Med* 339:424–428, 1998.

74. Modan B, Hartge P, Hirsh-Yechezkel G, et al: Parity, oral contraceptives, and the risk of ovarian cancer among carriers and noncarriers of a BRCA1 or BRCA2 mutation. *N Engl J Med* 345:235–240, 2001.

75. Hankinson SE, Hunter DJ, Colditz GA, et al: Tubal ligation, hysterectomy, and risk of ovarian cancer. A prospective study. *JAMA* 270:2813–2818, 1993.

76. Narod SA, Sun P, Ghadirian P, et al: Tubal ligation and risk of ovarian cancer in carriers of BRCA1 or BRCA2 mutations: a case-control study. *Lancet* 357:1467–1470, 2001.

77. Madsen C, Baandrup L, Dehlendorff C, et al: Tubal ligation and salpingectomy and the risk of epithelial ovarian cancer and borderline ovarian tumors: a nationwide case-control study. *Acta Obstet Gynecol Scand* 94:86–94, 2015.

78. Kauff ND, Satagopan JM, Robson ME, et al: Risk-reducing salpingo-oophorectomy in women with a BRCA1 or BRCA2 mutation. *N Engl J Med* 346:1609–1615, 2002.

79. Barnes MN, Grizzle WE, Grubbs CJ, et al: Paradigms for primary prevention of ovarian carcinoma. *CA Cancer J Clin* 52:216–225, 2002.

80. McAlpine JN, Hanley GE, Woo MM, et al: Opportunistic salpingectomy: uptake, risks, and complications of a regional initiative for ovarian cancer prevention. *Am J Obstet Gynecol* 210:471.e1-471.e11, 2014.

81. Walker JL, Powell CB, Chen LM, et al: Society of Gynecologic Oncology recommendations for the prevention of ovarian cancer. *Cancer* 121:2108–2120, 2015.

82. Falconer H, Yin L, Grönberg H, et al: Ovarian cancer risk after salpingectomy: a nationwide population-based study. *J Natl Cancer Inst* 107(2):2015.

83. Ziętek A, Bogusiewicz M, Szumiło J, et al: Opportunistic salpingectomy for prevention of sporadic ovarian cancer—a jump from basic science to clinical practice? *Ginekol Pol* 87:467–472, 2016.

84. Oliver Perez MR, Magriñá J, García AT, et al: Prophylactic salpingectomy and prophylactic salpingoophorectomy for adnexal high-grade serous epithelial carcinoma: a reappraisal. *Surg Oncol* 24:335–344, 2015.

85. Harmsen MG, Arts-de Jong M, Hoogerbrugge N, et al: Early salpingectomy (TUBectomy) with delayed oophorectomy to improve quality of life as alternative for risk-reducing salpingo-oophorectomy in BRCA1/2 mutation carriers (TUBA study): a prospective non-randomised multicentre study. *BMC Cancer* 15:593, 2015.

86. Colgan TJ, Boerner SL, Murphy J, et al: Peritoneal lavage cytology: an assessment of its value during prophylactic oophorectomy. *Gynecol Oncol* 85:397–403, 2002.

87. Agoff SN, Mendelin JE, Grieco VS, et al: Unexpected gynecologic neoplasms in patients with proven or suspected BRCA-1 or -2 mutations: implications for gross examination, cytology, and clinical follow-up. *Am J Surg Pathol* 26:171–178, 2002.

88. Carlson JW, Miron A, Jarboe EA, et al: Serous tubal intraepithelial carcinoma: its potential role in primary peritoneal serous carcinoma and serous cancer prevention. *J Clin Oncol* 26:4160–4165, 2008.

89. Colgan TJ: Challenges in the early diagnosis and staging of fallopian-tube carcinomas associated with BRCA mutations. *Int J Gynecol Pathol* 22:109–120, 2003.

90. Colgan TJ, Murphy J, Cole DE, et al: Occult carcinoma in prophylactic oophorectomy specimens: prevalence and association with BRCA germline mutation status. *Am J Surg Pathol* 25:1283–1289, 2001.

91. Ebell MH, Culp M, Lastinger K, et al: A systematic review of the bimanual examination as a test for ovarian cancer. *Am J Prev Med* 48:350–356, 2015.

92. Macfarlane C, Sturgis MC, Fetterman FS: Results of an experiment in the control of cancer of the female pelvic organs and report of fifteen-year research. *Am J Obstet Gynecol* 69:294–298, 1955.

93. Zhang Z, Barnhill SD, Zhang H, et al: Combination of multiple serum markers using an artificial neural network to improve specificity in discriminating malignant from benign pelvic masses. *Gynecol Oncol* 73:56–61, 1999.

94. Mok SC, Chao J, Skates S, et al: Prostasin, a potential serum marker for ovarian cancer: identification through microarray technology. *J Natl Cancer Inst* 93:1458–1464, 2001.

95. Dikmen ZG, Colak A, Dogan P, et al: Diagnostic performances of CA125, HE4, and ROMA index in ovarian cancer. *Eur J Gynaecol Oncol* 36:457–462, 2015.

96. Palmer C, Duan X, Hawley S, et al: Systematic evaluation of candidate blood markers for detecting ovarian cancer. *PLoS ONE* 3:e2633, 2008.

97. Visintin I, Feng Z, Longton G, et al: Diagnostic markers for early detection of ovarian cancer. *Clin Cancer Res* 14:1065–1072, 2008.

98. McIntosh M, Anderson G, Drescher C, et al: Ovarian cancer early detection claims are biased. *Clin Cancer Res* 14:7574, author reply 7577–7579, 2008.

99. Tuma RS: Origin of ovarian cancer may have implications for screening. *J Natl Cancer Inst* 102:11–13, 2010.

100. Anderson GL, McIntosh M, Wu L, et al: Assessing lead time of selected ovarian cancer biomarkers: a nested case-control study. *J Natl Cancer Inst* 102:26–38, 2010.

101. Jacobs IJ, Skates SJ, MacDonald N, et al: Screening for ovarian cancer: a pilot randomised controlled trial. *Lancet* 353:1207–1210, 1999.

102. Karlan BY, Platt LD: Ovarian cancer screening. The role of ultrasound in early detection. *Cancer* 76:2011–2015, 1995.

103. van Nagell JR, Jr, DePriest PD, Reedy MB, et al: The efficacy of transvaginal sonographic screening in asymptomatic women at risk for ovarian cancer. *Gynecol Oncol* 77:350–356, 2000.

104. van Nagell JR, Jr, Gallion HH, Pavlik EJ, et al: Ovarian cancer screening. *Cancer* 76:2086–2091, 1995.

105. Sato S, Yokoyama Y, Sakamoto T, et al: Usefulness of mass screening for ovarian carcinoma using transvaginal ultrasonography. *Cancer* 89:582–588, 2000.

106. Bourne TH, Campbell S, Reynolds KM, et al: Screening for early familial ovarian cancer with transvaginal ultrasonography and colour blood flow imaging. *BMJ* 306:1025–1029, 1993.

107. van Nagell JR, Jr, DePriest PD, Ueland FR, et al: Ovarian cancer screening with annual transvaginal sonography: findings of 25,000 women screened. *Cancer* 109:1887–1896, 2007.

108. Fishman DA, Cohen L, Blank SV, et al: The role of ultrasound evaluation in the detection of early-stage epithelial ovarian carcinoma. *Am J Obstet Gynecol* 192:1214–1221, discussion 1221–1212, 2005.

109. Partridge E, Kreimer AR, Greenlee RT, et al: Results from four rounds of ovarian cancer screening in a randomized trial. *Obstet Gynecol* 113:775–782, 2009.

110. Clarke-Pearson DL: Clinical practice. Screening for ovarian cancer. *N Engl J Med* 361:170–177, 2009.

111. Buys SS, Partridge E, Black A, et al: Effect of screening on ovarian cancer mortality: the Prostate, Lung, Colorectal and Ovarian (PLCO) Cancer Screening Randomized Controlled Trial. *JAMA* 305:2295–2303, 2011.

112. Jacobs IJ, Menon U, Ryan A, et al: Ovarian cancer screening and mortality in the UK Collaborative Trial of Ovarian Cancer Screening (UKCTOCS): a randomised controlled trial. *Lancet* 387:945–956, 2016.

113. Menon U, Ryan A, Kalsi J, et al: Risk algorithm using serial biomarker measurements doubles the number of screen-detected cancers compared with a single-threshold rule in the United Kingdom collaborative trial of ovarian cancer screening. *J Clin Oncol* 33:2062–2071, 2015.

114. Li K, Husing A, Fortner RT, et al: An epidemiologic risk prediction model for ovarian cancer in Europe: the EPIC study. *Br J Cancer* 112:1257–1265, 2015.

115. Kinde I, Bettegowda C, Wang Y, et al: Evaluation of DNA from the Papanicolaou test to detect ovarian and endometrial cancers. *Sci Transl Med* 5:167ra164, 2013.

116. Webb PM, Purdie DM, Grover S, et al: Symptoms and diagnosis of borderline, early and advanced epithelial ovarian cancer. *Gynecol Oncol* 92:232–239, 2004.

117. Pavlik EJ, DePriest PD, Gallion HH, et al: Ovarian volume related to age. *Gynecol Oncol* 77:410–412, 2000.

118. Benjapibal M, Sunsaneevithayakul P, Phatihattakorn C, et al: Sonographic morphological pattern in the pre-operative prediction of ovarian masses. *J Med Assoc Thai* 86:332–337, 2003.

119. Bailey CL, Ueland FR, Land GL, et al: The malignant potential of small cystic ovarian tumors in women over 50 years of age. *Gynecol Oncol* 69:3–7, 1998.

120. Modesitt SC, Pavlik EJ, Ueland FR, et al: Risk of malignancy in unilocular ovarian cystic tumors less than 10 centimeters in diameter. *Obstet Gynecol* 102:594–599, 2003.

121. Seidman JD, Krishnan J, Yemelyanova A, et al: Incidental serous tubal intraepithelial carcinoma and non-neoplastic conditions of the fallopian tubes in grossly normal adnexa: a clinicopathologic study of 388 completely embedded cases. *Int J Gynecol Pathol* 35:423–429, 2016.

122. Rabban JT, Garg K, Crawford B, et al: Early detection of high-grade tubal serous carcinoma in women at low risk for hereditary breast and ovarian

cancer syndrome by systematic examination of fallopian tubes incidentally removed during benign surgery. *Am J Surg Pathol* 38:729–742, 2014.

123. Meserve EEK, Mirkovic J, Conner JR, et al: Frequency of "incidental" serous tubal intraepithelial carcinoma (STIC) in women without a history of or genetic risk factor for high-grade serous carcinoma: A six-year study. *Gynecol Oncol* 2017 (in press).

124. Semmel DR, Folkins AK, Hirsch MS, et al: Intercepting early pelvic serous carcinoma by routine pathological examination of the fimbria. *Mod Pathol* 22:985–988, 2009.

125. Kwon JS, Daniels MS, Sun CC, et al: Preventing future cancers by testing women with ovarian cancer for BRCA mutations. *J Clin Oncol* 28:675–682, 2010.

126. Rebbeck TR, Lynch HT, Neuhausen SL, et al: Prophylactic oophorectomy in carriers of BRCA1 or BRCA2 mutations. *N Engl J Med* 346:1616–1622, 2002.

127. Cass I, Baldwin RL, Varkey T, et al: Improved survival in women with BRCA-associated ovarian carcinoma. *Cancer* 97:2187–2195, 2003.

128. Lu KH, Garber JE, Cramer DW, et al: Occult ovarian tumors in women with BRCA1 or BRCA2 mutations undergoing prophylactic oophorectomy. *J Clin Oncol* 18:2728–2732, 2000.

129. Shu CA, Pike MC, Jotwani AR, et al: Uterine cancer after risk-reducing salpingo-oophorectomy without hysterectomy in women with BRCA mutations. *JAMA Oncol* 2:1434–1440, 2016.

130. Carcangiu ML, Peissel B, Pasini B, et al: Incidental carcinomas in prophylactic specimens in BRCA1 and BRCA2 germ-line mutation carriers, with emphasis on fallopian tube lesions: report of 6 cases and review of the literature. *Am J Surg Pathol* 30:1222–1230, 2006.

131. Powell CB, Kenley E, Chen LM, et al: Risk-reducing salpingo-oophorectomy in BRCA mutation carriers: role of serial sectioning in the detection of occult malignancy. *J Clin Oncol* 23:127–132, 2005.

132. Finch A, Shaw P, Rosen B, et al: Clinical and pathologic findings of prophylactic salpingo-oophorectomies in 159 BRCA1 and BRCA2 carriers. *Gynecol Oncol* 100:58–64, 2006.

133. Callahan MJ, Crum CP, Medeiros F, et al: Primary fallopian tube malignancies in BRCA-positive women undergoing surgery for ovarian cancer risk reduction. *J Clin Oncol* 25:3985–3990, 2007.

134. Hirst JE, Gard GB, McIllroy K, et al: High rates of occult fallopian tube cancer diagnosed at prophylactic bilateral salpingo-oophorectomy. *Int J Gynecol Cancer* 19:826–829, 2009.

135. Leeper K, Garcia R, Swisher E, et al: Pathologic findings in prophylactic oophorectomy specimens in high-risk women. *Gynecol Oncol* 87:52–56, 2002.

136. Powell CB, Chen LM, McLennan J, et al: Risk-reducing salpingo-oophorectomy (RRSO) in BRCA mutation carriers: experience with a consecutive series of 111 patients using a standardized surgical-pathological protocol. *Int J Gynecol Cancer* 21:846–851, 2011.

137. Rabban JT, Barnes M, Chen LM, et al: Ovarian pathology in risk-reducing salpingo-oophorectomies from women with BRCA mutations, emphasizing the differential diagnosis of occult primary and metastatic carcinoma. *Am J Surg Pathol* 33:1125–1136, 2009.

138. Conner JR, Meserve E, Pizer E, et al: Outcome of unexpected adnexal neoplasia discovered during risk reduction salpingo-oophorectomy in women with germ-line BRCA1 or BRCA2 mutations. *Gynecol Oncol* 132:280–286, 2014.

139. Manchanda R, Abdelraheim A, Johnson M, et al: Outcome of risk-reducing salpingo-oophorectomy in BRCA carriers and women of unknown mutation status. *BJOG* 118:814–824, 2011.

140. Schulte S, Roh M, Folkins A, et al: BRCA 1 or 2–associated (BRCA+) pelvic serous carcinomas arise from both the ovaries and fallopian tubes: the contrast between symptomatic and asymptomatic women. *Mod Pathol* 2010:262a, 2010.

141. Sherman ME, Piedmonte M, Mai PL, et al: Pathologic findings at risk-reducing salpingo-oophorectomy: primary results from Gynecologic Oncology Group Trial GOG-0199. *J Clin Oncol* 32:3275–3283, 2014.

142. Rabban JT, Krasik E, Chen LM, et al: Multistep level sections to detect occult fallopian tube carcinoma in risk-reducing salpingo-oophorectomies from women with BRCA mutations: implications for defining an optimal specimen dissection protocol. *Am J Surg Pathol* 33:1878–1885, 2009.

143. Kindelberger DW, Lee Y, Miron A, et al: Intraepithelial carcinoma of the fimbria and pelvic serous carcinoma: evidence for a causal relationship. *Am J Surg Pathol* 31:161–169, 2007.

144. Domchek SM, Gaudet MM, Stopfer JE, et al: Breast cancer risks in individuals testing negative for a known family mutation in BRCA1 or BRCA2. *Breast Cancer Res Treat* 119:409–414, 2010.

145. Shaw PA, Rouzbahman M, Pizer ES, et al: Candidate serous cancer precursors in fallopian tube epithelium of BRCA1/2 mutation carriers. *Mod Pathol* 22:1133–1138, 2009.

146. Carcangiu ML, Radice P, Manoukian S, et al: Atypical epithelial proliferation in fallopian tubes in prophylactic salpingo-oophorectomy specimens from BRCA1 and BRCA2 germline mutation carriers. *Int J Gynecol Pathol* 23:35–40, 2004.

147. Stewart SL, Wike JM, Foster SL, et al: The incidence of primary fallopian tube cancer in the United States. *Gynecol Oncol* 107:392–397, 2007.

148. Rosenblatt KA, Weiss NS, Schwartz SM: Incidence of malignant fallopian tube tumors. *Gynecol Oncol* 35:236–239, 1989.

149. Piek JM, van Diest PJ, Zweemer RP, et al: Dysplastic changes in prophylactically removed Fallopian tubes of women predisposed to developing ovarian cancer. *J Pathol* 195:451–456, 2001.

150. Morrison JC, Blanco LZ, Jr, Vang R, et al: Incidental serous tubal intraepithelial carcinoma and early invasive serous carcinoma in the nonprophylactic setting: analysis of a case series. *Am J Surg Pathol* 39:442–453, 2015.

151. Rabban JT, Vohra P, Zaloudek CJ: Nongynecologic metastases to fallopian tube mucosa: a potential mimic of tubal high-grade serous carcinoma and benign tubal mucinous metaplasia or nonmucinous hyperplasia. *Am J Surg Pathol* 39:35–51, 2015.

152. Novak M, Lester J, Karst AM, et al: Stathmin 1 and p16(INK4A) are sensitive adjunct biomarkers for serous tubal intraepithelial carcinoma. *Gynecol Oncol* 139:104–111, 2015.

153. Carlson JW, Jarboe EA, Kindelberger D, et al: Serous tubal intraepithelial carcinoma: diagnostic reproducibility and its implications. *Int J Gynecol Pathol* 29:310–314, 2010.

154. Visvanathan K, Vang R, Shaw P, et al: Diagnosis of serous tubal intraepithelial carcinoma based on morphologic and immunohistochemical features: a reproducibility study. *Am J Surg Pathol* 35:1766–1775, 2011.

155. Vang R, Visvanathan K, Gross A, et al: Validation of an algorithm for the diagnosis of serous tubal intraepithelial carcinoma. *Int J Gynecol Pathol* 31:243–253, 2012.

156. Mehra K, Mehrad M, Ning G, et al: STICs, SCOUTs and p53 signatures; a new language for pelvic serous carcinogenesis. *Front Biosci (Elite Ed)* 3:625–634, 2011.

157. Chen EY, Mehra K, Mehrad M, et al: Secretory cell outgrowth, PAX2 and serous carcinogenesis in the fallopian tube. *J Pathol* 222:110–116, 2010.

158. Roh MH, Yassin Y, Miron A, et al: High-grade fimbrial-ovarian carcinomas are unified by altered p53, PTEN and PAX2 expression. *Mod Pathol* 23:1316–1324, 2010.

159. Hecht JL, Mutter GL: Molecular and pathologic aspects of endometrial carcinogenesis. *J Clin Oncol* 24:4783–4791, 2006.

160. Medeiros F, Muto MG, Lee Y, et al: The tubal fimbria is a preferred site for early adenocarcinoma in women with familial ovarian cancer syndrome. *Am J Surg Pathol* 30:230–236, 2006.

161. Lee Y, Miron A, Drapkin R, et al: A candidate precursor to serous carcinoma that originates in the distal fallopian tube. *J Pathol* 211:26–35, 2007.

162. Folkins AK, Jarboe EA, Saleemuddin A, et al: A candidate precursor to pelvic serous cancer (p53 signature) and its prevalence in ovaries and fallopian tubes from women with BRCA mutations. *Gynecol Oncol* 109:168–173, 2008.

163. Saleemuddin A, Folkins AK, Garrett L, et al: Risk factors for a serous cancer precursor ("p53 signature") in women with inherited BRCA mutations. *Gynecol Oncol* 111:226–232, 2008.

164. Jarboe E, Folkins A, Nucci MR, et al: Serous carcinogenesis in the fallopian tube: a descriptive classification. *Int J Gynecol Pathol* 27:1–9, 2008.

165. Lee S, Nelson G, Duan Q, et al: Precursor lesions and prognostic factors in primary peritoneal serous carcinoma. *Int J Gynecol Pathol* 32:547–555, 2013.

166. Meserve EE, Brouwer J, Crum CP: Serous tubal intraepithelial neoplasia: the concept and its applications. *Mod Pathol* 2017. [Epub ahead of print].

167. Brown PO, Palmer C: The preclinical natural history of serous ovarian cancer: defining the target for early detection. *PLoS Med* 6:e1000114, 2009.

168. Patrono MG, Iniesta MD, Malpica A, et al: Clinical outcomes in patients with isolated serous tubal intraepithelial carcinoma (STIC): a comprehensive review. *Gynecol Oncol* 139:568–572, 2015.

169. Powell CB, Swisher EM, Cass I, et al: Long term follow up of BRCA1 and BRCA2 mutation carriers with unsuspected neoplasia identified at risk reducing salpingo-oophorectomy. *Gynecol Oncol* 129:364–371, 2013.

170. Wethington SL, Park KJ, Soslow RA, et al: Clinical outcome of isolated serous tubal intraepithelial carcinomas (STIC). *Int J Gynecol Cancer* 23:1603–1611, 2013.

171. Bell DA, Scully RE: Early de novo ovarian carcinoma. A study of fourteen cases. *Cancer* 73:1859–1864, 1994.

172. Yoon SH, Kim SN, Shim SH, et al: Bilateral salpingectomy can reduce the risk of ovarian cancer in the general population: a meta-analysis. *Eur J Cancer* 55:38–46, 2016.

173. Ning G, Xian W, Crum CP: Unpublished data.

Exhibit 34

DOI:10.1093/jnci/dju208
First published online September 11, 2014
© The Author 2014. Published by Oxford University Press. All rights reserved.
For Permissions, please e-mail: journals.permissions@oup.com.

ARTICLE

# Perineal Powder Use and Risk of Ovarian Cancer

Serena C. Houghton, Katherine W. Reeves, Susan E. Hankinson, Lori Crawford, Dorothy Lane,
Jean Wactawski-Wende, Cynthia A. Thomson, Judith K. Ockene, Susan R. Sturgeon

Manuscript received October 31, 2013; revised May 21, 2014; accepted June 5, 2014.

**Correspondence to:** Susan R. Sturgeon, DrPH, MPH, University of Massachusetts Amherst, 715 North Pleasant Street, Arnold House 407, Amherst, MA 01003 (e-mail: ssturgeon@schoolph.umass.edu).

| | |
|---|---|
| **Background** | Case-control studies have reported an increased risk of ovarian cancer among talc users; however, the only cohort study to date found no association except for an increase in serous invasive ovarian cancers. The purpose of this analysis was to assess perineal powder use and risk of ovarian cancer prospectively in the Women's Health Initiative Observational Study cohort. |
| **Methods** | Perineal powder use was assessed at baseline by self-report regarding application to genitals, sanitary napkins, or diaphragms and duration of use. The primary outcome was self-reported ovarian cancer centrally adjudicated by physicians. Cox proportional hazard regression was used to estimate risk, adjusting for covariates, including person-time until diagnosis of ovarian cancer (n = 429), death, loss to follow-up, or September 17, 2012. All statistical tests were two-sided. |
| **Results** | Among 61 576 postmenopausal women, followed for a mean of 12.4 years without a history of cancer or bilateral oophorectomy, 52.6% reported ever using perineal powder. Ever use of perineal powder (hazard ratio [HR]$_{adj}$ = 1.06, 95% confidence interval [CI] = 0.87 to 1.28) was not associated with risk of ovarian cancer compared with never use. Individually, ever use of powder on the genitals (HR$_{adj}$ = 1.12, 95% CI = 0.92 to 1.36), sanitary napkins (HR$_{adj}$ = 0.95, 95% CI = 0.76 to 1.20), or diaphragms (HR$_{adj}$ = 0.92, 95% CI = 0.68 to 1.23) was not associated with risk of ovarian cancer compared with never use, nor were there associations with increasing durations of use. Estimates did not differ when stratified by age or tubal ligation status. |
| **Conclusion** | Based on our results, perineal powder use does not appear to influence ovarian cancer risk. |

JNCI J Natl Cancer Inst (2014) 106(9): dju208 doi:10.1093/jnci/dju208

In 2013, it is estimated that there will be 22 240 new cases of ovarian cancer and 14 030 ovarian cancer deaths in the United States (US) alone (1). Since the 1960s, there has been speculation that the use of perineal powder is associated with ovarian cancer. In 2006, the International Agency for Research on Cancer (IARC) reviewed studies examining perineal powder use and ovarian cancer and classified talc as a possible carcinogen (2,3). The proportion of US women ever using talc powder on the perineum was estimated in 2001 to be approximately 40% (4), whereas 52% reported ever use of perineal powder in 1993–1998 within the Women's Health Initiative (WHI) (5).

The primary proposed mechanism linking perineal powder use to ovarian cancer is an inflammatory response (6). Talc particulates from perineal application have been shown to migrate to the ovaries (6), disrupting the surface ovarian epithelial tissue leading to entrapment of the talc particles within inclusion cysts (7). Furthermore, tubal ligation and/or hysterectomy, which would eliminate the pathway of talc particulates to the ovaries, are associated with reduced ovarian cancer risk (6).

A meta-analysis examining the risk of ovarian cancer among ever perineal powder users vs non-users showed odds ratios (ORs)

of 1.40 (95% confidence interval [CI] = 1.29 to 1.52) for population-based case-control, 1.12 (95% CI = 0.92 to 1.36) for hospital based case-control, and 1.35 (95% CI = 1.26 to 1.46) for all case-control studies (2). More recently, a large pooled analysis found that ever use of perineal powder increased epithelial ovarian cancer risk by 24% compared with non-use (OR = 1.24, 95% CI = 1.15 to 1.33) (8). Increased risk was associated with invasive serous, endometrioid, clear cell, and borderline serous subtypes of epithelial ovarian cancer (8). However, when looking at the lifetime number of applications of perineal powder, there was no statistically significant trend for increasing applications, attributed to difficulty in recalling details of frequency and duration of perineal powder use (8).

To date there has only been one prospective study conducted examining perineal powder use and risk of ovarian cancer (9). In the Nurses' Health Study (NHS) cohort, no overall association was found between ever use of perineal powder and epithelial ovarian cancer (relative risk [RR] = 1.09, 95% CI = 0.86 to 1.37) or serous ovarian cancers (RR = 1.26, 95% CI = 0.94 to 1.69) (9). However, there was a 40% (95% CI = 1.02 to 1.91) increase in risk for serous

Downloaded from http://jnci.oxfordjournals.org/ at Massachusetts General Hospital on November 13, 2014

invasive ovarian cancer with ever perineal powder use, which comprises 86% of serous ovarian cancers in this cohort (9).

Limitations of recall bias and misclassification make it difficult to determine the true relationship between perineal powder (10), a commonly used cosmetic product, and ovarian cancer, a disease with poor survival and few known modifiable risk factors. The prior prospective cohort study, which should not be affected by recall bias, had no information on duration of use limiting interpretation. Here we expand on the available evidence by assessing perineal powder use and risk of ovarian cancer in the Women's Health Initiative Observational Study (WHI-OS). The WHI-OS is a large cohort that collected information on several application areas of perineal powder use and their respective durations of use.

## Methods

### Study Population
The WHI-OS enrolled 93 676 women from 40 clinical centers across the United States from 1993 to 1998 (11). Women were eligible if they were aged 50 to 79 at enrollment, postmenopausal, and planned to reside in the area for at least three years (11). Women were excluded from the WHI-OS if they were participating in another clinical trial, unlikely to survive three years due to medical conditions, or had conditions that would interfere with study participation (11). Participants completed annual mailed questionnaires to update information on risk factors and outcomes, including ovarian cancer (11). Written informed consent was obtained from participants, and all clinical centers were approved by their respective institutional review boards (11). The current analysis was approved by the University of Massachusetts, Amherst Human Subjects Review Committee.

For this analysis, participants were additionally excluded if they reported a bilateral oophorectomy or an unknown number of ovaries at baseline (n = 20 960), a prior cancer at baseline except nonmelanoma skin cancer (n = 10 622), or were missing exposure or follow up information (n = 516). After applying the exclusion criteria, 61 576 participants with 429 adjudicated incident ovarian cancer cases remained.

### Exposure Ascertainment
Perineal powder use was assessed via self-report at baseline. Participants were asked, "Have you ever used powder on your private parts (genital areas)?" Those who responded yes further indicated the duration of use with the following possible responses: less than 1 year, 1–4 years, 5–9 years, 10–19 years, or 20 or more years. For persons that reported ever use of a diaphragm, participants were asked, "Did you ever use powder on your diaphragm?" and those who responded yes further indicated duration. The third category evaluated was "Did you ever use powder on a sanitary napkin or pad?" with those responding yes also reporting duration. Each area of application variable was assessed dichotomously and the duration of use, collapsed into fewer categories because of small numbers, was assessed categorically as never, 9 years or less, or 10 or more years. A combined ever perineal powder variable and duration variable for any powder use was created; where ever use was defined as report of ever use of any of the three application categories, never was report of never use for all three categories,

and duration was the maximum duration reported of any single area of application, because we could not exclude the possibility that applications were concurrent. Lastly, all possible combinations of the three application areas were assessed.

### Outcome Ascertainment
Ovarian cancer cases were initially self-reported by participants in the WHI-OS on annual questionnaires. Medical records, including hospital discharge summaries and pathology reports, were requested for each self-reported case and adjudicated by a physician at the local Clinical Center and then centrally by the WHI's Clinical Coordinating Center (11).

### Covariate Ascertainment
Potential covariates considered included age, race, education, alcohol servings per week, smoking status, metabolic equivalent (MET) hours per week of recreational physical activity, Body Mass Index (BMI), and self-reported family history of ovarian or breast cancer. Reproductive factors considered were age at menarche, age at menopause, age at first birth, age at last birth, parity, breastfeeding duration, history of tubal ligation, history of hysterectomy, history of irregular cycles, history of endometriosis, duration of oral contraceptive use, and duration of postmenopausal hormone use. All covariates were from baseline and were not updated.

### Statistical Analysis
To estimate the association between perineal powder use and ovarian cancer, proportional hazard regression models were used. Participants contributed person-time until diagnosis of ovarian cancer, death, loss to follow-up, or September 17, 2012, whichever came first. Participants with other cancers were still considered at risk for ovarian cancer and were not censored at the time of other cancer diagnoses. Information on incident oophorectomy during follow-up was not available and thus participants were not censored in this analysis. The proportional hazards assumption was tested using weighted Schoenfeld residuals.

Covariates were included in the adjusted model according to purposeful selection, where covariates with Wald $P$ values of .25 or less in age-adjusted models were entered into an initial multivariable model and then each covariate was subsequently tested individually via likelihood ratio tests in order of decreasing Wald $P$ values. Variables that had $P$ values of .10 or less during the backwards elimination were kept in the model until a parsimonious model was obtained. Additional variables shown in previous literature (8,9) but not statistically significant in our population were also included in the final multivariable model. Lastly, family history of breast cancer and personal history of endometriosis did not change estimates and were not included in the final multivariable model.

Models fitted included the following independent variables: 1) combined ever perineal powder use, 2) ever powder use by application area (ie, applied to genitals, applied to diaphragm, or applied to sanitary napkins), 3) duration of use by application area, and 4) application area combinations (ie, genital only, diaphragm only, sanitary napkin only, genital and sanitary napkin, genital and diaphragm, diaphragm and sanitary napkin, and all three areas of application). For duration models, test for trend was used to evaluate linear trends across duration categories by modeling the

Downloaded from http://jnci.oxfordjournals.org/ at Massachusetts General Hospital on November 13, 2014

categories as a continuous variable in the multivariable regression models.

Because powder particles may not reach the ovaries due to tubal ligation and because previous studies have shown a stronger association between powder use and ovarian cancer in women without tubal ligation (4), we separately examined women without tubal ligation. We also stratified by age at baseline, because older women may have had more potential for exposure to talc contaminated with asbestos. Additionally, associations by ovarian cancer histological subtype were evaluated. All analyses were performed using Stata v.12.1 (StataCorp, College Station, TX) and two-sided $P$ values of .05 or less were considered statistically significant.

## Results

The average age of the participants at baseline was 63.3 years. Participants were followed for a mean of 12.4 years; never powder users were followed for a mean of 12.2 years (range = 0.12 to 17.9 years) and ever powder users were followed for a mean of 12.6 years (range = 0.03 to 18.0). The majority of the participants were white (83.7%), had less than a college degree (56.1%), and were overweight/obese (57.2%). Approximately half (52.6%) of the population reported ever use of perineal powder. Ever powder users were heavier (27.5 kg/m² vs 26.5 kg/m², $P < .0001$) and were more likely to have used oral contraceptives (44% vs 36%, $P < .0001$) and/or diaphragms (50.8% vs 37.3 %, $P < .0001$) than never users (Table 1).

Use of powder on the genitals was associated with a 12% increase in the multivariable-adjusted hazard ratio of ovarian cancer ($HR_{adj} = 1.12$, 95% CI = 0.92 to 1.36), though this was not statistically significant (Table 2). Use of powder on sanitary napkins ($HR_{adj} = 0.95$, 95% CI = 0.76 to 1.20) or diaphragms ($HR_{adj} = 0.92$, 95% CI = 0.68 to 1.23) also was not associated with risk. Duration of powder use on the genitals, sanitary napkins, or on the diaphragm was not associated with ovarian cancer; $P_{trend}$ for years of use: .67, .69, and .67 respectively. Combined ever powder use from any of the three application areas did not show an association with ovarian cancer risk ($HR_{adj} = 1.06$, 95% CI = 0.87 to 1.28). For combined duration of use, which was the longest duration of use among the three areas of application, there was no evidence of an association with risk of ovarian cancer [$P_{trend}$ for years of use: .77]. Use of powder on genitals, the most common application area, for 20 or more years was not associated with increased risk of ovarian cancer compared with never users ($HR_{adj} = 1.10$, 95% CI = 0.82 to 1.48). In a sensitivity analysis, invasive serous ovarian cancer risk was not increased ($HR_{adj} = 0.96$, 95% CI = 0.65 to 1.41), even in women reporting durations of use greater than 10 years.

There was no evidence of an association between perineal powder use and ovarian cancer risk by category of application (Table 3). Combined ever powder use was not associated with individual subtypes of ovarian cancer (Table 4). The multivariable-adjusted hazard ratio for serous ovarian cancer was 1.16 (95% CI = 0.88 to 1.53). Additionally, duration of combined ever powder use was also not shown to be associated with any subtype of ovarian cancer (results not shown).

The associations of combined ever powder use and ovarian cancer did not statistically differ by tubal ligation status (results not shown). When stratified by age group at baseline, hazard estimates also did not statistically differ ($P_{interaction} = .37$); $HR_{adj}$ for younger than

50 to 59 years = 1.29, 95% CI = 0.91 to 1.82; $HR_{adj}$ for those 60 to 69 years = 0.94, 95% CI = 0.70 to 1.26; and $HR_{adj}$ for those 70 to 79 years = 1.01, 95% CI = 0.68 to 1.48. When restricted to only whites or to those who had never used oral contraceptives, results were again unchanged.

## Discussion

In this large prospective study, ever perineal powder use was not associated with ovarian cancer risk, nor was it associated with ovarian cancer when assessed by area of application, duration of use, or ovarian cancer subtype. While many case-control studies have shown an approximately 24–40% increase in risk of ovarian cancer (2,8) for powder users, we did not find evidence of this association in our large, prospective analysis.

The meta-analysis of 20 case-control studies by Langseth and colleagues found a 35% increase in the odds of epithelial ovarian

**Table 1.** Characteristics of postmenopausal women according to perineal powder use status (n = 61 285): Women's Health Initiative Observational Study, 1993–2012

| Characteristic, n (%) | Never perineal powder use<br>n = 29 066 | Ever perineal powder use<br>n = 32 219 |
|---|---|---|
| Race | | |
| White | 24 006 (82.6) | 27 336 (84.8) |
| Nonwhite | 4991 (17.2) | 4811 (14.9) |
| Body mass index category, kg/m² | | |
| <25.0 | 13 056 (44.9) | 12 461 (38.7) |
| 25.0–29.9 | 9734 (33.5) | 10 799 (33.5) |
| 30.0 + | 5935 (20.4) | 8577 (26.6) |
| Smoking status | | |
| Never | 15 347 (52.8) | 15 621 (48.5) |
| Past | 11 481 (39.5) | 14 339 (44.5) |
| Current | 1912 (6.6) | 1881 (5.8) |
| Duration of oral contraceptive use, y | | |
| Never | 17 877 (61.5) | 17 954 (55.7) |
| <5 | 6241 (21.5) | 7858 (24.4) |
| 5 to <10 | 2528 (8.7) | 3270 (10.2) |
| 10 to <15 | 1650 (5.7) | 2125 (6.6) |
| 15+ | 760 (2.6) | 1005 (3.1) |
| Diaphragm use | 10 826 (37.3) | 16 353 (50.8) |
| Tubal ligation | 4929 (17.0) | 5901 (18.3) |
| Hysterectomy | 6878 (23.7) | 8285 (25.7) |
| Family history of ovarian cancer | 606 (2.1) | 660 (2.1) |
| Parity | | |
| 0 | 3687 (12.7) | 3769 (11.7) |
| 1–2 | 9773 (33.6) | 11 585 (36.0) |
| 3–4 | 11 101 (38.2) | 12 609 (39.1) |
| 5+ | 4365 (15.0) | 4098 (12.7) |
| Age at last birth, y | | |
| Never had term pregnancy | 6219 (21.4) | 6260 (19.4) |
| < 20 | 210 (0.7) | 324 (1.0) |
| 20–29 | 9143 (31.5) | 11 480 (35.6) |
| 30+ | 13 011 (44.8) | 13 668 (42.4) |
| Duration of postmenopausal hormone use, y | | |
| Never | 13 381 (46.0) | 13 880 (43.1) |
| <5 | 6498 (22.4) | 7546 (23.4) |
| 5 to <10 | 3783 (13.0) | 4567 (14.2) |
| 10 to <15 | 2688 (9.3) | 3128 (9.7) |
| 15+ | 2716 (9.3) | 3097 (9.6) |

Downloaded from http://jnci.oxfordjournals.org/ at Massachusetts General Hospital on November 13, 2014

**Table 2.** Age and multivariable-adjusted hazard ratios of ovarian cancer by area of perineal powder application (n = 61 576): Women's Health Initiative Observational Study, 1993–2012

| Variable | No. of cases | Person-years | Age-adjusted HR | | Multivariable HR* | |
|---|---|---|---|---|---|---|
| | | | (95% CI) | $P_{trend}$ † | (95% CI) | $P_{trend}$ † |
| Powder use on genitals | | | | | | |
| Never | 247 | 457 855 | 1.0 (referent) | .63 | 1.0 (referent) | .67 |
| Ever‡ | 181 | 304 867 | 1.13 (0.93 to 1.37) | | 1.12 (0.92 to 1.36) | |
| Less than 9 years | 112 | 173 118 | 1.24 (0.99 to 1.55) | | 1.23 (0.98 to 1.54) | |
| 10 or more years | 68 | 129 647 | 0.98 (0.75 to 1.29) | | 0.98 (0.75 to 1.29) | |
| Powder use on sanitary napkins | | | | | | |
| Never | 336 | 590 351 | 1.0 (referent) | .70 | 1.0 (referent) | .69 |
| Ever‡ | 93 | 172 712 | 0.96 (0.76 to 1.21) | | 0.95 (0.76 to 1.20) | |
| Less than 9 years | 62 | 114 305 | 0.98 (0.75 to 1.28) | | 0.96 (0.73 to 1.26) | |
| 10 or more years | 30 | 56 174 | 0.93 (0.64 to 1.35) | | 0.95 (0.65 to 1.37) | |
| Powder use on diaphragm | | | | | | |
| Never | 373 | 661 239 | 1.0 (referent) | .78 | 1.0 (referent) | .67 |
| Ever‡ | 52 | 97 714 | 0.94 (0.70 to 1.25) | | 0.92 (0.68 to 1.23) | |
| Less than 9 years | 35 | 67 468 | 0.93 (0.66 to 1.32) | | 0.91 (0.64 to 1.30) | |
| 10 or more years | 17 | 29 202 | 0.99 (0.61 to 1.60) | | 0.95 (0.58 to 1.56) | |
| Combined ever powder use§ | | | | | | |
| Never | 197 | 361 583 | 1.0 (referent) | .67 | 1.0 (referent) | .77 |
| Ever‡ | 232 | 404 983 | 1.07 (0.89 to 1.30) | | 1.06 (0.87 to 1.28) | |
| Less than 9 years | 135 | 228 931 | 1.12 (0.90 to 1.39) | | 1.09 (0.88 to 1.36) | |
| 10 or more years | 97 | 173 307 | 1.03 (0.81 to 1.31) | | 1.02 (0.80 to 1.30) | |

* Adjusted for: Age (continuous), race (white, nonwhite, missing), oral contraceptive duration in years (never, <5, 5 to <10, 10 to <15, 15+, missing), hormone replacement therapy duration in years (never, <5, 5 to <10, 10 to <15, 15+, missing), family history (yes, no, missing), age (y) at last birth (never, <20, 20 to <30, 30+, missing), body mass index in kg/m² (<25.0, 25.0 to <30.0, 30.0+, missing), smoking (never, past, current, missing), tubal ligation (yes, no, missing), and parity (0, 1 to 2, 3 to 4, 5+, children, missing).

† Hazard ratios (HRs) and 95% confidence intervals (CIs) were estimated in cox proportional hazard regression models; $P_{trend}$ was estimated by modeling categories as continuous. All statistical tests were two-sided.

‡ Person-years may not add up; duration information was missing for some.

§ Combined ever powder use is the longest duration of use among the applications to genitals, sanitary napkins, and diaphragms.

**Table 3.** Age and multivariable-adjusted hazard ratios for ovarian cancer by combined categories of powder use (n = 61 576): Women's Health Initiative Observational Study, 1993–2012

| Variable | No. of cases | Person-years | Age-adjusted HR* (95% CI) | Multivariable HR* (95% CI) |
|---|---|---|---|---|
| Powder Type Used | | | | |
| No powder | 193 | 355 523 | 1.0 (referent) | 1.0 (referent) |
| Only genital powder | 96 | 158 130 | 1.14 (0.90 to 1.46) | 1.13 (0.88 to 1.45) |
| Only diaphragm powder | 19 | 42 367 | 0.82 (0.51 to 1.32) | 0.80 (0.50 to 1.29) |
| Only sanitary napkin powder | 28 | 50 051 | 1.04 (0.70 to 1.54) | 1.01 (0.68 to 1.50) |
| Genital and sanitary napkin powder | 55 | 96 173 | 1.09 (0.80 to 1.47) | 1.08 (0.80 to 1.46) |
| Genital and diaphragm powder | 24 | 29 858 | 1.49 (0.98 to 2.28) | 1.45 (0.95 to 2.23) |
| Diaphragm and sanitary napkin powder | 4 | 6858 | 1.06 (0.40 to 2.86) | 1.02 (0.38 to 2.74) |
| Genital, diaphragm, and sanitary napkin powder | 5 | 18 331 | 0.51 (0.21 to 1.24) | 0.50 (0.21 to 1.22) |

* Hazard ratios (HRs) and 95% confidence intervals (CIs) were estimated in cox proportional hazard regression models. All statistical tests were two-sided. Multivariable HR adjusted for: age (continuous), race (white, nonwhite, missing), oral contraceptive duration in years (never, <5, 5 to <10, 10 to <15, 15+, missing), hormone replacement therapy duration in years (never, <5, 5 to <10, 10 to <15, 15+, missing), family history (yes, no, missing), age (y) at last birth (never, <20, 20 to <30, 30+, missing), body mass index in kg/m² (<25.0, 25.0 to <30.0, 30.0+, missing), smoking (never, past, current, missing), tubal ligation (yes, no, missing), and parity (0, 1 to 2, 3 to 4, 5+, children missing).

cancer among ever perineal powder users compared to never-users (2), and the pooled analysis of eight case-control studies by Terry and colleagues found a 24% increase in the same group (8). Langseth and colleagues did not assess dose-response or risk among subtypes of ovarian cancer (2). Terry and colleagues assessed lifetime applications of perineal powder and found no statistically significant trend with increasing lifetime applications (8). This corroborates our results that there was no statistically significant risk with increasing duration

of perineal powder use, though they were able to capture both frequency and duration (8), whereas we only had duration. Terry and colleagues found elevated risks for invasive serous, borderline serous, endometrioid, and clear cell subtypes of ovarian cancer (8), which we did not observe. One potential reason that case-control studies have found slight increases in risk is the potential for an overestimation of the true association due to recall bias, because the participants are aware of their ovarian cancer status when reporting powder

Downloaded from http://jnci.oxfordjournals.org/ at Massachusetts General Hospital on November 13, 2014

**Table 4.** Age and multivariable-adjusted hazard ratios for combined ever powder use by subtype of ovarian cancer (n = 61 576): Women's Health Initiative Observational Study, 1993–2012

| Variable | No. of cases | Person-years | Age-adjusted HR* (95% CI) | Multivariable HR* (95% CI) |
|---|---|---|---|---|
| Serous† | | | | |
| Never | 87 | 355 523 | 1.0 (referent) | 1.0 (referent) |
| Ever | 117 | 404 983 | 1.18 (0.89 to 1.56) | 1.16 (0.88 to 1.53) |
| Serous Invasive | | | | |
| Never | 80 | 355 523 | 1.0 (referent) | 1.0 (referent) |
| Ever | 105 | 404 983 | 1.16 (0.87 to 1.55) | 1.13 (0.84 to 1.51) |
| Mucinous | | | | |
| Never | 12 | 355 523 | 1.0 (referent) | 1.0 (referent) |
| Ever | 13 | 404 983 | 0.98 (0.44 to 2.14) | 1.03 (0.47 to 2.27) |
| Endometrioid | | | | |
| Never | 13 | 355 523 | 1.0 (referent) | 1.0 (referent) |
| Ever | 20 | 404 983 | 1.39 (0.69 to 2.79) | 1.29 (0.64 to 2.61) |
| Other | | | | |
| Never | 47 | 355 523 | 1.0 (referent) | 1.0 (referent) |
| Ever | 54 | 404 983 | 1.04 (0.71 to 1.54) | 1.04 (0.70 to 1.54) |

\* Hazard ratios (HRs) and 95% confidence intervals (CIs) were estimated in cox proportional hazard regression models. All statistical tests were two-sided. Multivariable HR adjusted for: age (continuous), race (white, nonwhite, missing), oral contraceptive duration in years (never, <5, 5 to <10, 10 to <15, 15+, missing), hormone replacement therapy duration in years (never, <5, 5 to <10, 10 to <15, 15+, missing), family history (yes, no, missing), age (y) at last birth (never, <20, 20 to <30, 30+, missing), body mass index in kg/m² (<25.0, 25.0 to <30.0, 30.0+, missing), smoking (never, past, current, missing), tubal ligation (yes, no, missing), and parity (0, 1 to 2, 3 to 4, 5+, children missing).

† Includes borderline cancers.

Downloaded from http://jnci.oxfordjournals.org/ at Massachusetts General Hospital on November 13, 2014

exposure. The prospective nature of our study would eliminate the potential for recall bias. Additionally, the case-control studies tended to have a younger population than our study, which included both premenopausal and postmenopausal ovarian cancers (2,8), whereas the WHI cohort consisted only of postmenopausal ovarian cancers. Ovarian cancer that occurs prior to menopause may have a different etiology than ovarian cancer occurring afterwards.

We found similar results to that of the NHS, the only other prospective cohort, which had a similar sample size and number of ovarian cancer cases to our study. Ever use of perineal powder did not appear to be associated with ovarian cancer in the NHS (9), similar to our findings. The results of Gertig and colleagues were also null for use on the genitals and for use on sanitary napkins (9). Additionally, neither our study nor the NHS found associations with serous ovarian cancer, endometrioid, or mucinous ovarian cancers, although subgroup sample size may have reduced statistical power to test these associations. In contrast to our results, the study by Gertig and colleagues found a 40% increase in invasive serous ovarian cancer among ever powder users compared with never powder users (9).

Strengths of our study included large sample size with a substantial number of ovarian cancer cases, a prospective cohort design, good case ascertainment, and detailed information on most ovarian cancer risk factors. We also had information on duration of powder use, qualifiers not available in several earlier studies, including the previous cohort study (2,8,9).

One potential limitation of our analyses includes a lack of information regarding oophorectomy after baseline, which would result in the inclusion of some women not at risk for ovarian cancer in the analytical cohort. However, the impact was likely to be minor, as a previous study in the WHI-OS had reported the number of persons with incident bilateral oophorectomies to be less than 250 (out of more than 90 000 participants) during nearly eight years of follow-up (12). While the prospective nature of the study design

eliminates recall bias, it does not eliminate potential for nondifferential misclassification of the exposure. Women still needed to recall past perineal powder use and duration and thus may have trouble recollecting specifics regarding the use of perineal powder, leading to a bias toward the null. Information regarding powder use was not collected after baseline, and there is potential for never users to begin using powder; however, this is unlikely because the women are postmenopausal, reducing need to use perineal powder on diaphragms or sanitary napkins. We also had no specific data regarding the frequency of powder use in our sample. Frequency of use, as well as duration may influence ovarian cancer risk. We may have been comparing long-term infrequent users with short-term frequent users. If we had frequency of use in addition to the duration, we could have looked at intensity of use, which may be more accurate, and shown a dose response relationship. However, Terry and colleagues did not find a dose response relationship either when taking into account frequency and duration (8).

When restricted to women without tubal ligation status, the estimates for the association between combined ever perineal powder use and ovarian cancer were not increased. While some studies have found stronger associations between powder use and ovarian cancer in women that have not undergone a tubal ligation (4), the results from our study did not support this previous finding. The pooled analysis (8) and the NHS cohort (9) also did not find evidence of stronger associations in women without tubal ligations.

While we had information on duration of use, it is unknown during which years the perineal powder was used. Talc powder had potential for asbestos contamination (13) until 1976, when the Cosmetic, Toiletry, and Fragrance Association required all cosmetic talc products to be free of asbestos (14). Therefore, those using powder prior to 1976 may have been potentially exposed to asbestos, a known carcinogen. The pooled analysis and meta-analysis also included case-control studies not within the United States

Downloaded from http://jnci.oxfordjournals.org/ at Massachusetts General Hospital on November 13, 2014

(2,8), which potentially have different regulations regarding perineal powder and earlier studies that may have been more likely to include exposure to contaminated perineal powder (2). However, risk estimates in more recent studies are similar to earlier studies (2), reducing the likelihood that confounding by asbestos is driving the findings. Additionally, assuming older women in the cohort could have been exposed longer to perineal powder with potential contamination compared with younger women, we did not see statistically significant differences in risk when stratified by age group, further suggesting asbestos contamination is not a likely explanation.

The WHI-OS queried general perineal powder use rather than talc powder use, and we had no specific information regarding the content of talc in products used, which the previous literature reviewed by IARC suggested to be the possible carcinogen of concern (2). However, the NHS cohort and most studies included within the pooled analyses asked about general perineal powder use as well (2,8,9). In summary, perineal powder use did not appear to be associated with ovarian cancer risk in this large sample of postmenopausal women, even with use for long durations.

## References

1. American Cancer Society. *Cancer Facts & Figures 2013*. Atlanta: American Cancer Society; 2013.
2. Langseth H, Hankinson SE, Siemiatycki J, Weiderpass E. Perineal use of talc and risk of ovarian cancer. *J Epidemiol Community Health*. 2008;62(4):358–360.
3. Baan R, Straif K, Grosse Y, et al. Carcinogenicity of carbon black, titanium dioxide, and talc. *Lancet*. 2006;7(4):295–296.
4. Mills PK, Riordan DG, Cress RD, Young HA. Perineal talc exposure and epithelial ovarian cancer risk in the Central Valley of California. *Int J Cancer*. 2004;112(3):458–464.
5. Crawford L, Reeves KW, Luisi N, Balasubramanian R, Sturgeon SR. Perineal powder use and risk of endometrial cancer in postmenopausal women. *Cancer Causes Control*. 2012;23(10):1673–1680.
6. Muscat JE, Huncharek MS. Perineal talc use and ovarian cancer: a critical review. *Eur J Cancer Prev*. 2008;17(2):139–146.
7. Cramer DW, Liberman RF, Titus-Ernstoff L, et al. Genital talc exposure and risk of ovarian cancer. *Int J Cancer*. 1999;81(3):351–356.
8. Terry KL, Karageorgi S, Shvetsov YB, et al. Genital powder use and risk of ovarian cancer: a pooled analysis of 8,525 cases and 9,859 controls. *Cancer Prev Res (Phila)*. 2013;6(8):811–821.
9. Gertig DM, Hunter DJ, Cramer DW, et al. Prospective study of talc use and ovarian cancer. *J Natl Cancer Inst*. 2000;92(3):249–252.
10. Harlow BL, Hartge PA. A review of perineal talc exposure and risk of ovarian cancer. *Regul Toxicol Pharm*. 1995;21(2):254–260.
11. Langer RD, White E, Lewis CE, Kotchen JM, Hendrix SL, Trevisan M. The Women's Health Initiative Observational Study: Baseline characteristics of participants and reliability of baseline measures. *Ann Epidemiol*. 2003;13(9):S107–S121.
12. Jacoby VL, Grady D, Wactawski-Wende J, et al. Oophorectomy vs ovarian conservation with hysterectomy: cardiovascular disease, hip fracture, and cancer in the Women's Health Initiative Observational Study. *Archives of Internal Medicine*. 2011;171(8):760–768.
13. Rohl AN, Langer AM, Selikoff IJ, et al. Consumer talcums and powders: mineral and chemical characterization. *J Toxicol Environ Health*. 1976;2(2):255–284.
14. Cosmetic Ingredient Review. Safety Assessment of Talc as Used in Cosmetics [updated April 12, 2013]. Available at: http://www.cir-safety.org/sites/default/files/talc032013rep.pdf. Accessed September 5, 2013.

## Funding

The WHI programs is funded by the National Heart, Lung, and Blood Institute, National Institutes of Health, US Department of Health and Human Services through contracts HHSN268201100046C, HHSN268201100001C, HHSN268201100002C, HHSN268201100003C, HHSN268201100004C.

## Notes

WHI Investigators:

Program Office: (National Heart, Lung, and Blood Institute, Bethesda, MD) Jacques Rossouw, Shari Ludlam, Dale Burwen, Joan McGowan, Leslie Ford, and Nancy Geller.

Clinical Coordinating Center: (Fred Hutchinson Cancer Research Center, Seattle, WA) Garnet Anderson, Ross Prentice, Andrea LaCroix, and Charles Kooperberg.

Investigators and Academic Centers: (Brigham and Women's Hospital, Harvard Medical School, Boston, MA) JoAnn E. Manson; (MedStar Health Research Institute/Howard University, Washington, DC) Barbara V. Howard; (Stanford Prevention Research Center, Stanford, CA) Marcia L. Stefanick; (The Ohio State University, Columbus, OH) Rebecca Jackson; (University of Arizona, Tucson/Phoenix, AZ) Cynthia A. Thomson; (University at Buffalo, Buffalo, NY) Jean Wactawski-Wende; (University of Florida, Gainesville/Jacksonville, FL) Marian Limacher; (University of Iowa, Iowa City/Davenport, IA) Robert Wallace; (University of Pittsburgh, Pittsburgh, PA) Lewis Kuller; (Wake Forest University School of Medicine, Winston-Salem, NC) Sally Shumaker.

Women's Health Initiative Memory Study: (Wake Forest University School of Medicine, Winston-Salem, NC) Sally Shumaker.

**Affiliations of authors:** Division of Biostatistics and Epidemiology, University of Massachusetts Amherst, Amherst, MA (SCH, KWR, SEH, LC, SRS); Channing Division of Network Medicine, Department of Medicine, Brigham and Women's Hospital and Harvard Medical School, Boston, MA (SEH); Department of Preventive Medicine, Stony Brook University School of Medicine, New York, NY (DL); Department of Social and Preventive Medicine, University at Buffalo, SUNY, Buffalo, NY (JWW); Health Promotion Sciences Division, College of Public Health and University of Arizona Cancer Center, Tucson, AZ (CAT); Division of Preventive and Behavioral Medicine, University of Massachusetts Medical School, Worcester, MA (JKO).

Exhibit 35

Downloaded from http://jech.bmj.com/ on May 16, 2017 - Published by group.bmj.com

Research report

# Perineal use of talc and risk of ovarian cancer

H Langseth,[1] S E Hankinson,[2] J Siemiatycki,[3] E Weiderpass[1,4,5]

[1] The Cancer Registry of Norway, Institute of population-based Cancer Research, Oslo, Norway; [2] Channing Laboratory, Department of Medicine, Brigham and Women's Hospital and Harvard Medical School, Boston, MA, USA; [3] Department of Social and Preventive Medicine, University of Montreal, Montreal, Canada; [4] Department of Medical Epidemiology and Biostatistics, Karolinska Institutet, Stockholm, Sweden; [5] Samfundet Folkhälsan, Helsinki, Finland

Correspondence to:
E Weiderpass, The Cancer Registry of Norway, 0310 Oslo, Norway; eliwei@ki.se

Accepted 15 October 2007

## ABSTRACT

Ovarian cancer is one of the most common gynaecological neoplasms, especially in industrialised countries. The aetiology of the disease is not well understood, except that inherited mutations in the breast cancer genes BRCA-1 and BRCA-2 account for up to 10% of all cases,[1] and child-bearing, oral contraceptive use and breast-feeding reduce the risk.[2] Some environmental exposures, notably talc and asbestos, have been suspected as ovarian carcinogens.

Talc refers to both mineral talc and industrial products that contain mineral talc. Mineral talc occurs naturally in many regions of the world and is valued for its softness, platyness, and ability to absorb organic matter. Mineral talc occurs naturally in a platy (flat) form, but may also occur as asbestiform fibres, which describes its physical form and does not imply the presence of asbestos. The purer forms (approximately 90% mineral talc) are used for cosmetic and hygiene products including baby powders and feminine hygiene products. Perineal use of cosmetic talc is a common practice in the United Kingdom, North America, Australia and some other countries. To our knowledge accurate estimates of prevalence of use of cosmetic talc are not available. However, the use for female hygiene of body powders, baby powders, talcum powders and deodorising powder, most of which contain cosmetic talc in varying amounts, has been reported to be as high as 50% in some countries.[3]

From pathological studies it is known that particles and fibres that enter the body can migrate to distant organs. For instance, asbestos fibres have been found in ovaries from women exposed to asbestos.[4 5] Analogously, following perineal application, talc particles can migrate from the vagina to the peritoneal cavity and ovaries.[6] A majority of women experience retrograde menstruation[7]; this suggests a mechanism by which talc particles can travel through the female reproductive tract to the ovaries. Furthermore, epidemiological studies have shown decreased risks of ovarian cancer after tubal ligation and/or hysterectomy, suggesting that removing a pathway by which carcinogenic substances can reach the ovaries reduces the risk.[8 9]

The association between talc use in the perineal region and ovarian cancer was investigated in one cohort study,[10] and 20 case-control studies.[11–30] In the cohort study, arguably the strongest study because of its partly prospective ascertainment of exposure, there was no association between cosmetic talc use and risk of all subtypes of ovarian cancer combined. The various case-control studies provided indications of either a significant excess risk (10 studies) or non-significant excess risk or

null (10 studies), with odds ratios (ORs) ranging from 1.0 to 3.9. None of the studies reported relative risks below 1.0. The population-based case-control studies,[11 15–17 20–26 28–30] included studies with 112–824 ovarian cancer cases, and had odds ratios ranging from 1.1 to 3.9 (fig 1). The hospital-based case control studies[12–14 18 19 27] included studies with 77–462 cases, and reported odds ratios between 1.0 and 2.5. Pooled odds ratios were calculated by fixed effects model. As shown in figure 1 pooled ORs were 1.40, 1.12 and 1.35 for population-based, hospital-based and all case control studies combined, respectively. Some studies[13 14 22 23 26 28] tried to assess exposure-response associations, in terms of frequency of use or length of use in years but found no clear trend.

Methodological factors such as recall bias should always be considered in case-control studies. It could have been a problem had there been widespread publicity about the possible association between use of body powder and cancer. The International Agency for Research on Cancer (IARC) working group considers that there has not been widespread public concern about this issue and therefore considers it unlikely that such a bias could explain the consistent findings. Another source of recall bias could result from the fact that women with the cancer tend to remember or over-report their use of body powder. The influence of this type of recall bias cannot be ruled out.

Eight of the population-based case-control studies[11 16 22–24 26 28 29] were identified, by the IARC working group as being most informative in terms of size of the studies, whether the studies were population-based, participation rates and adjustments of confounding variables. The selected studies included at least 188 cases and had participation rates ranging from 60% to 75%. Among these eight studies, the prevalence of perineal use of talc-based body powder among controls ranged from 16% to 52%. The relative risks of ovarian cancer among body powder users were homogeneous across this set of eight studies, each of which indicated a 30–60% increase in risk. Among the other 12 case-control studies, most also reported relative risks of this magnitude or higher.

Information on talc use in infancy is generally insufficient in the case-control studies. However, in one study the exposure to baby powder was reported by 42.2% of the cases and 40.5% of the controls.[15] In several of the other studies patients were asked about age at first use of perineal talc, as an indicator for use in infancy or other periods of life.

Only four case-control studies[16 23 29 30] and one cohort study[10] provided results by histological type. In four of these studies, in particular the cohort study, there were hints of higher risks of serous tumours related to talc exposure.

J Epidemiol Community Health 2008;62:358–360. doi:10.1136/jech.2006.047894

Downloaded from http://jech.bmj.com/ on May 16, 2017 - Published by group.bmj.com

**Research report**



**Figure 1** Results from case-control studies contributing data on perineal talc use and ovarian cancer. Results are presented as odds ratios (ORs) and their corresponding confidence intervals (95% CIs) and represented by squares and lines, respectively. Results are separated in 14 population-based and six hospital-based case-control studies. Pooled ORs for all population-based studies combined and all hospital-based studies combined are given. OR pooling by fixed effect models (Mantel–Haenszel method).

Before 1976, talc was to some extent contaminated with asbestos, so that the early studies relating talc to ovarian cancer may have been confounded by the asbestos.[31] However, the association between talc exposure and ovarian cancer is as strong in recent studies,[28 29] as in earlier ones, diminishing the likelihood that all these results are influenced by contamination of talc by asbestos.

To summarise the evidence in favour of an association, a very large number of studies have found that women who used talc experienced excess risks of ovarian cancer; some results were statistically significant and some were not. There was some indication in the cohort study of an increase in serous tumours. The evidence of talc migrating to the ovaries lends credibility to such a possible association. The main epidemiological evidence against the association is the absence of clear exposure-response associations in most studies, as well as the absence of an overall excess risk in the cohort study.

On balance, the epidemiological evidence suggests that use of cosmetic talc in the perineal area may be associated with ovarian cancer risk. The mechanism of carcinogenicity may be related to inflammation.[32]

The carcinogenicity of non-asbestiform talc was assessed by a monograph working group at IARC in 2006.[33] After considering biases and possible confounding factors, the IARC working group concluded that the epidemiological studies provided limited evidence for the carcinogenicity of perineal use of talc-based body powder, and classified this use as possibly carcinogenic to human beings (that is, group 2B).[34]

## PROPOSAL: TO RESEARCH COMMUNITY

The current body of experimental and epidemiological evidence is insufficient to establish a causal association between perineal use of talc and ovarian cancer risk. Experimental research is needed to better characterise deposition, retention and clearance of talc to evaluate the ovarian carcinogenicity of talc.

The majority of the epidemiological studies carried out so far have been among American women. It would be instructive to seek evidence in other countries where perineal use of talc has been common.

While there has been some efforts to measure the degree of use, these have mainly been measured simply as the reported years of use. It is possible that the ostensible lack of exposure response trends is the result of crudeness of the exposure metric used. Therefore, it is important that future studies, irrespective of study design, devote some effort to better assessment of exposure. The use of body powders should be assessed both in terms of calendar time and age of the subject. Subjects should be asked about lifetime use, including age at initial use (infancy, childhood, teenager years, adulthood), age at which they stopped using such powders, gaps in the lifetime period of use

J Epidemiol Community Health 2008;**62**:358–360. doi:10.1136/jech.2006.047894

Downloaded from http://jech.bmj.com/ on May 16, 2017 - Published by group.bmj.com

**Research report**

## What this study adds

► Epidemiological evidence suggests that use of cosmetic talc in the perineal area may be associated with ovarian cancer risk. The IARC has classified this use of talc as possibly carcinogenic to human beings (group 2B).
► The mechanism of carcinogenicity may be related to inflammation. This paper focus on the high degree of consistency in the studies accomplished so far, and what should be the focus in future studies.

and frequency and nature of use (daily, during certain seasons of the year, only while menstruating). Another important question is whether the use of body powder was before or after tubal ligation or hysterectomy.

Individuals' answers to questions about use of brand names over time may be unreliable, and therefore, in future studies, investigators should try to ascertain, either from government or industry sources, the composition of the powders used in different time periods by different brand names and, in particular, to ascertain whether the exposure may have included some contamination by asbestos and also whether the exposure was to talc or a non-talc product. Statistical analyses should attempt to assess risk separately for the categories of powders: talc containing asbestos, talc not containing asbestos, non-talc product. Further, exposure metrics should take into account the age, duration and intensity of exposure. As well as analyses for all ovarian tumours combined, there should, if possible, be analyses by histological subtype and by invasiveness of the tumour.

While it would not be reasonable to envisage establishing a costly long-term prospective cohort study just to study this association, any long-term cohort study that is being set up to study cancer among women should collect information about talc use if the study is being conducted in a country where such use has been widespread.

In summary, future studies should focus on seeking evidence in talc-exposed female populations worldwide, collecting reliable information on age at initial use of body powder, exposure assessments and dose response associations.

**Acknowledgements:** The work reported in this paper was initiated while SH, JS and EW were part of an IARC Monographs Working Group of the International Agency for Research on Cancer, Lyon, France.

**Funding:** This study was financed by the Cancer Registry of Norway.

**Competing interests:** None.

## REFERENCES

1. **Lux MP,** Fasching PA, Beckmann MW. Hereditary breast and ovarian cancer: review and future perspectives. J Mol Med 2006;**84**:16–28.
2. **Persson I.** Estrogens in the causation of breast, endometrial and ovarian cancers—evidence and hypotheses from epidemiological findings. J Steroid Biochem Mol Biol 2000;**74**:357–64.
3. **International Agency for Research on Cancer.** IARC monographs on the evaluation of carcinogenic risks to human, Vol 93, Carbon black, titanium dioxide, and non-asbestiform talc. Geneva: WHO (in press).
4. **Heller DS,** Gordon RE, Westhoff C, et al. Asbestos exposure and ovarian fiber burden. Am J Ind Med 1996;**29**:435–9.
5. **Langseth H,** Johansen BV, Nesland JM, et al. Asbestos fibers in ovarian tissue from Norwegian pulp and paper workers. Int J Gynecol Cancer 2007;**17**:44–9.
6. **Venter PF.** Ovarian epithelial cancer and chemical carcinogenesis. Gynecol Oncol 1981;**12**:281–5.
7. **Olive DL,** Schwartz LB. Endometriosis. N Engl J Med 1993;**328**:1759–69.
8. **Rosenblatt KA,** Thomas DB. Reduced risk of ovarian cancer in women with a tubal ligation or hysterectomy. the World Health Organization Collaborative Study of Neoplasia and Steroid Contraceptives. Cancer Epidemiol Biomarkers Prev 1996;**5**:933–5.
9. **Tortolero-Luna G,** Mitchell MF. The epidemiology of ovarian cancer. J Cell Biochem Suppl 1995;**23**:200–7.
10. **Gertig DM,** Hunter DJ, Cramer DW, et al. Prospective study of talc use and ovarian cancer. J Natl Cancer Inst 2000;**92**:249–52.
11. **Cramer DW,** Welch WR, Scully RE, et al. Ovarian cancer and talc: a case-control study. Cancer 1982;**50**:372–6.
12. **Hartge P,** Hoover R, Lesher LP, et al. Talc and ovarian cancer. JAMA 1983;**250**:1844.
13. **Whittemore AS,** Wu ML, Paffenbarger RS Jr, et al. Personal and environmental characteristics related to epithelial ovarian cancer. II. Exposures to talcum powder, tobacco, alcohol, and coffee. Am J Epidemiol 1988;**128**:1228–40.
14. **Booth M,** Beral V, Smith P. Risk factors for ovarian cancer: a case-control study. Br J Cancer 1989;**60**:592–8.
15. **Harlow BL,** Weiss NS. A case-control study of borderline ovarian tumors: the influence of perineal exposure to talc. Am J Epidemiol 1989;**130**:390–4.
16. **Harlow BL,** Cramer DW, Bell DA, et al. Perineal exposure to talc and ovarian cancer risk. Obstet Gynecol 1992;**80**:19–26.
17. **Chen Y,** Wu PC, Lang JH, et al. Risk factors for epithelial ovarian cancer in Beijing, China. Int J Epidemiol 1992;**21**:23–9.
18. **Rosenblatt KA,** Szklo M, Rosenshein NB. Mineral fiber exposure and the development of ovarian cancer. Gynecol Oncol 1992;**45**:20–5.
19. **Tzonou A,** Polychronopoulou A, Hsieh CC, et al. Hair dyes, analgesics, tranquilizers and perineal talc application as risk factors for ovarian cancer. Int J Cancer 1993;**55**:408–10.
20. **Cramer DW,** Xu H. Epidemiologic evidence for uterine growth factors in the pathogenesis of ovarian cancer. Ann Epidemiol 1995;**5**:310–4.
21. **Purdie D,** Green A, Bain C, et al. Reproductive and other factors and risk of epithelial ovarian cancer: an Australian case-control study. Survey of Women's Health Study Group. Int J Cancer 1995;**62**:678–84.
22. **Chang S,** Risch HA. Perineal talc exposure and risk of ovarian carcinoma. Cancer 1997;**79**:2396–401.
23. **Cook LS,** Kamb ML, Weiss NS. Perineal powder exposure and the risk of ovarian cancer. Am J Epidemiol 1997;**145**:459–65.
24. **Green A,** Purdie D, Bain C, et al. Tubal sterilisation, hysterectomy and decreased risk of ovarian cancer. Survey of Women's Health Study Group. Int J Cancer 1997;**71**:948–51.
25. **Godard B,** Foulkes WD, Provencher D, et al. Risk factors for familial and sporadic ovarian cancer among French Canadians: a case-control study. Am J Obstet Gynecol 1998;**179**:403–10.
26. **Cramer DW.** Perineal talc exposure and subsequent epithelial ovarian cancer: a case-control study. Obstet Gynecol 1999;**94**:160–1.
27. **Wong C,** Hempling RE, Piver MS, et al. Perineal talc exposure and subsequent epithelial ovarian cancer: a case-control study. Obstet Gynecol 1999;**93**:372–6.
28. **Ness RB,** Grisso JA, Cottreau C, et al. Factors related to inflammation of the ovarian epithelium and risk of ovarian cancer. Epidemiology 2000;**11**:111–7.
29. **Mills PK,** Riordan DG, Cress RD, et al. Perineal talc exposure and epithelial ovarian cancer risk in the Central Valley of California. Int J Cancer 2004;**112**:458–64.
30. **Jordan SJ,** Green AC, Whiteman DC, et al. Risk factors for benign serous and mucinous epithelial ovarian tumors. Obstet Gynecol 2007;**109**:647–54.
31. **Harlow BL,** Hartge PA. A review of perineal talc exposure and risk of ovarian cancer. Regul Toxicol Pharmacol 1995;**21**:254–60.
32. **Ness RB,** Cottreau C. Possible role of ovarian epithelial inflammation in ovarian cancer. J Natl Cancer Inst 1999;**91**:1459–67.
33. **International Agency for Research on Cancer.** Preamble to the IARC monographs on the evaluation of carcinogenic risks to humans. 93. Lyon: IARC
34. **Baan R,** Straif K, Grosse Y, et al. Carcinogenicity of carbon black, titanium dioxide, and talc. Lancet Oncol 2006;**7**:295–6.

Downloaded from http://jech.bmj.com/ on May 16, 2017 - Published by group.bmj.com



# Perineal use of talc and risk of ovarian cancer

H Langseth, S E Hankinson, J Siemiatycki and E Weiderpass

*J Epidemiol Community Health* 2008 62: 358-360
doi: 10.1136/jech.2006.047894

---

Updated information and services can be found at:

**http://jech.bmj.com/content/62/4/358**

---

*These include:*

| | |
|---|---|
| **References** | This article cites 31 articles, 7 of which you can access for free at:<br>**http://jech.bmj.com/content/62/4/358#BIBL** |
| **Email alerting service** | Receive free email alerts when new articles cite this article. Sign up in the box at the top right corner of the online article. |

---

| | |
|---|---|
| **Topic Collections** | Articles on similar topics can be found in the following collections<br><br>Environmental issues (205)<br>Editor's choice (122) |

---

**Notes**

---

To request permissions go to:

**http://group.bmj.com/group/rights-licensing/permissions**

To order reprints go to:

**http://journals.bmj.com/cgi/reprintform**

To subscribe to BMJ go to:

**http://group.bmj.com/subscribe/**

Exhibit 36

ENVIRONMENTAL RESEARCH 40, 247–250 (1986)

# The Demonstration of the Migration of Talc from the Vagina and Posterior Uterus to the Ovary in the Rat



W. J. Henderson, T. C. Hamilton,[1] M. S. Baylis, C. G. Pierrepoint, and K. Griffiths

*Tenovus Institute for Cancer Research, University of Wales College of Medicine, The Heath, Cardiff CF4 4XX, Wales*

Received May 15, 1984

Talc particles placed in both the uterine cavity and the vagina of the rat were shown to migrate to the ovary and become localized within its substance.    © 1986 Academic Press, Inc.

## INTRODUCTION

The presence of talc particles deeply embedded in ovarian and cervical benign and malignant tissue was reported by this Institute (Henderson *et al.*, 1971). Positive identification of the particles was achieved (Griffiths *et al.*, 1973) by replicating the surface morphology of tissue sections (Henderson, 1969) and analyzing the X-ray emission spectra of extracted foreign material with an electron microscope microanalyzer (EMMA, A. E. I. Harlow, England).

Direct communication between the external environment and the peritoneal cavity exists in the female via her genital tract. It has been demonstrated that the injection of a suspension of talc beneath the bursa of the rat ovary was followed by the development of large ovarian bursal cysts, with associated epithelial changes not inconsistent with the histological picture of premalignancy (Hamilton *et al.*, 1984). It was, therefore, of interest to see whether talc placed in the lower part of the female genital tract of the rat would migrate anteriorly to the ovary.

## MATERIALS AND METHODS

In a pilot study eight female exbreeder Sprague–Dawley rats 7.5 months old were used. Under light ether anesthesia a speculum of an auroscope with the lens removed was introduced into the vagina and the cervical os illuminated. A Portex catheter (o.d. 0.75 mm) was passed a distance of approximately 2.5 cm into the cervical canal from the vagina introitus and a suspension of talc (100 mg/ml) in phosphate-buffered saline (PBS) introduced (vol 250 μl). The animals were divided into two groups of four. Group I was sacrificed 5 days following intrauterine instillation of the talc suspension and their ovaries were removed. The animals in Group II received further uterine instillations 6 and 15 days after the initial treatment. On Day 20, two rats from this group were killed and their ovaries removed. The remaining two rats received further treatments 22 and 30 days after their initial treatment and were sacrificed on Day 49.

[1] Present address: Medicine Branch, Division of Cancer Treatment, National Cancer Institute, Building 10, Room 12 N226, 9000 Rockville Pike, Bethesda, Md. 20205.

0013-9351/86 $3.00
Copyright © 1986 by Academic Press, Inc.
All rights of reproduction in any form reserved.

JNJ 000020965

248                           HENDERSON ET AL.

The ovaries from each animal were combined and subjected to an ashing procedure as described previously (Henderson *et al.*, 1978). Essentially this process removes organic matter by heating the organs to 550°C in the incineration chamber of a horizontal tubular muffle furnace in a stream of oxygen (250 ml/min/500 mg wet wt for 5 hr). The ashed material was then suspended in distilled water (50 μl). Aliquots (10 μl) were pipeted onto carbon-coated electron microscope grids and the water was evaporated. A further carbon coat was applied *in vacuo* to stabilize any particles and to dissipate heat and electrostatic charge generated by the concentrated electron beam prior to examination with the EMMA.

Twelve Sprague–Dawley exbreeder rats of a similar age to those used in the experiment described above were divided into two groups of six. Group I animals were firmly held and the louver of a 1-ml disposable microjet 501 TB syringe was introduced into the vaginal orifices and 250 μl of a suspension of talc (100 mg/ml) in PBS was deposited into the vaginas. The animals in Group II were treated similarly except that 250 μl of PBS was substituted for the talc suspension. Two animals from each group were sacrificed 24 hr, 48 hr, and 4 days, respectively, following initial treatment. Their ovaries were removed and treated similarly to those described in the first experiment.



## RESULTS

Particles of talc were identified in the ovaries of all the animals that received intrauterine talc and in the two animals that received intravaginal talc killed after 4 days (Fig. 1a). X-Ray analysis (Fig. 1b) confirmed the chemical constitution of talc. No talc could be demonstrated in the group of rats that had received PBS intravaginally or in those animals with intravaginal talc killed after 24 and 48 hr.

## DISCUSSION

Birefringent particles were first noted to be present in human ovarian carcinomas by Graham and Graham (1967) who postulated that these particles might be asbestos. Subsequent work at this Institute identified talc in ovarian cancer tissue but not asbestos (Henderson *et al.*, 1971; Griffiths *et al.*, 1973). The ease of migration of particulate material from the vagina to the peritoneal cavity (Venter and Iturralde, 1979; Iturralde and Venter, 1981) has been established.

The physiological mechanisms associated with translocation of particulate material within the genital tract are unknown but are probably operative in most mammalian species. The chemical nature of the particulate would not appear to alter its ability to be transported through the genital tract and does not elicit any selective mechanisms. Indeed it is accepted that retrograde flow of menstrual products into the peritoneal cavity via the Fallopian tubes is not an uncommon finding by laparoscopy at the time of menstruation. The rhythmic muscular contractions of the uterus that occur spontaneously and the illicit currents established by the epithelial cells of the genital tract may contribute to the translocation process.

Talc is widely used in the cosmetic and pharmaceutical industry and has been associated with the use of certain forms of barrier contraceptives. Many women apply talc to their perinea and some to their sanitary ware (Cramer *et al.*, 1982).

MIGRATION OF TALC IN RAT GENITAL TRACT                    249



FIG. 1. (a) Particles of talc recovered from the ovary by oxygen ashing following instillation of a suspension of talc into the posterior genital tract of a rat (10,000×). (b) Spectral analysis of the particles showing the 3:1 ratio of silicon to magnesium characteristic of talc.

The association of talc with formation of granulomata is well documented (Lichtman *et al.*, 1946) and it may be speculated that disruption of normal ovarian stromal structure may lead to disturbances in steroid hormone metabolism.

Carcinogenic activity of talc has not been established although its ubiquitous presence in the environment and its elemental similarity to asbestos has brought it under suspicion (Longo and Young, 1979). However, it has been found in both normal and malignant tissue and its precise role remains unclear, although Cramer *et al.* (1982) suggested that a relationship between increased incidence of ovarian cancer and the use of talc existed. A long latent period from the initial exposure to talc to the induction of malignant change has been postulated (Katsnelson and Mokronosova, 1979), but until a greater understanding of the biological properties of talc is achieved further speculation is unjustified at this time.

## REFERENCES

Cramer, D. W., Welch, W. R., Scully, R. E., and Wojciechowski, C. A. (1982). Ovarian cancer and talc. *Cancer* 50, 372–376.

Egli, G. E., and Newton, M. (1961). The transport of carbon particles in the human female reproductive tract. *Fertil. Steril.* 12, 151–155.

Graham, J., and Graham, R. (1967). Ovarian cancer and asbestos. *Environ. Res.* 1, 115–128.

Griffiths, K., Henderson, W. J., Chandler, J. A., and Joslin, C. A. F. (1973). Ovarian cancer: Some new analytical approaches. *Postgrad. Med. J.* 49, 69–72.

JNJ 000020967

250                          HENDERSON ET AL.

Hamilton, T. C., Fox, H., Buckley, C. H., Henderson, W. J., and Griffiths, K. (1984). Effects of talc on the rat ovary. *Brit. J. Exp. Pathol.* **65**, 101–106.

Henderson, W. J. (1969). A simple replication technique for the study of biological tissues by electron microscopy. *J. Microsc.* **89**, 369–372.

Henderson, W. J., Joslin, C. A. F., Turnbull, A. C., and Griffiths, K. (1971). Talc and carcinoma of the ovary and cervix. *J. Obstet. Gynaecol. Brit. Commonw.* **78**, 266–272.

Henderson, W. J., Melville-Jones, C., Wilson, D. W. and Griffiths, K. (1978). Oxygen incineration and electron microscope micro-analysis of mineral particles in biological tissues. *J. Histochem. Cytochem.* **26**, 1087–1093.

Iturralde, M., and Venter, P. F. (1981). Hysterosalpingo-radionuclide scintigraphy (HERS). *Semin. Nucl. Med.* **11**, 301–314.

Katsnelson, B. A., and Mokronosova, K. A. (1979). Non-fibrous mineral dusts and malignant tumours. *J. Occup. Med.* **21**, 15–20.

Lichtman, A. L., McDonald, R., Dixon, C. F., and Mann, F. C. (1946). Talc granulomas. *Surg. Gynecol. Obstet.* **83**, 531–558.

Longo, D. L., and Young, R. C. (1979). Cosmetic talc and ovarian cancer. *Lancet* **2**, 349–351.

Venter, P. F., and Iturralde, M. (1979). Migration of a particulate radioactive tracer from the vagina to the peritoneal cavity and ovaries. *S. Afr. Med. J.* **55**, 917–919.



JNJ 000020968

Exhibit 37

time of the female cycle, normal sperm are able to move through the cervix, but sperm with abnormal tails or impaired swimming ability are detained. These latter sperm then die and are reabsorbed or lost from the body. Other sperm enter *cervical crypts* (deep recesses in the cervical wall), where they die or are lost, or they may remain alive as a reservoir of sperm that later may enter the uterus. Fewer than 1 million of the original approximately 200 million sperm make it through the cervix.

### Uterine Sperm

Upon leaving the cervix, the sperm travel up the uterus to the uterotubal junction. The uterine fluid is watery but sparse in humans, and the sperm essentially "climb" up the uterine lumen by beating their tails. The swimming rate of sperm (about 3 mm/min), however, cannot account for their traveling a distance of about 15 cm in the 30 min after ejaculation. Also, dead sperm reach the oviduct at about the same time as do live sperm. Thus, sperm tail beating probably is not important during sperm transport through the uterus, so it must be the muscle contraction and movement of cilia in the female reproductive tract that facilitate sperm transport.

During the later follicular phase, a thin layer of myometrium just underneath the uterine endometrium contracts, directing fluid toward the fallopian tubes. If coitus has occurred, these contractions probably increase. Mechanical stimulation of the cervix by the penis during coitus causes release of the hormone oxytocin from a woman's posterior pituitary gland. This hormone quickly travels via the blood to the uterus and increases the force of rhythmic uterine muscle contractions. These contractions act as waves to help the sperm move to the uterotubal junction. Prostaglandins in the seminal fluid may also cause uterine muscles to contract, but this is unlikely as very little seminal fluid enters the uterus through the cervix. The main function of the prostaglandins in seminal fluid is probably to contract the muscles of the vasa deferentia, thus aiding sperm passage during ejaculation.

The vagina, cervix, and uterus respond to the presence of sperm with an immunological attack, and those sperm cells that do not move rapidly through these por-

Thus, the uterotubal junction allows the gradual entrance of sperm into the isthmus of the oviduct. About half of the sperm enter the wrong oviduct, and only a few hundred make it to the general proximity of the waiting egg.

## TRANSPORT OF THE SPERM AND OVUM IN THE OVIDUCT

Sperm that survive the journey into the fallopian tube find a less hostile environment than in other portions of the female tract. Attack by leukocytes is much reduced. The passage of sperm slows down as the cells encounter mucus in the lumen of the oviduct and have to navigate the increasingly complex folds of the inner lining of the tube. Evidence suggests that sperm heads make contact with and briefly bind to the epithelial cells of the mucosal lining. This contact somehow preserves and extends the viability of the sperm. By slowing down the progress of the sperm, the oviducts may serve as a reservoir from which sperm may gradually proceed, thus extending the time that sperm are available to fertilize an egg. After ovulation, sperm approach the ovum, and fertilization by a single sperm usually occurs at the point where the isthmus joins the wider oviductal ampulla (ampullary–isthmic junction). Other sperm swim up the ampulla, through the infundibulum, and are lost in the body cavity.

Once ovulation has occurred, the infundibulum (funnel-shaped free end) of the oviduct moves toward the ovary and envelops the ovulated ovum along with fluid derived from the ovulated follicle. Movement of the infundibulum is accomplished by the contraction of muscles in the membrane supporting the oviduct. Cilia are present in the wall of the fimbria (the edge of the infundibulum), and these beat toward the uterus. Thus, when the infundibulum envelops the ovary, the beating of the cilia moves the ovum into the ampulla of the oviduct. Cilia in the ampulla and isthmus of the oviduct also beat in a uterine direction, which sets up a flow of fluid toward the uterus.

The muscles of the oviduct also exhibit waves of muscular contraction after ovulation. These waves travel in the direction of the uterus and, along with the cilia, help

Exhibit 38

*Acta Obstet Gynecol Scand 2004: 83: 369–374*
*Printed in Denmark. All rights reserved*

*Copyright © Acta Obstet Gynecol Scand 2004*

**Acta Obstetricia et
Gynecologica Scandinavica**

———————————— ORIGINAL ARTICLE ————————————

# Uterine contractility and directed sperm transport assessed by hysterosalpingoscintigraphy (HSSG) and intrauterine pressure (IUP) measurement

Stefan Kissler[1], Ernst Siebzehnruebl[1], Joachim Kohl[1], Anja Mueller[1], Nadja Hamscho[3], Regine Gaetje[2], Andre Ahr[2], Achim Rody[2] and Manfred Kaufmann[2]

From the [1]Division of Gynecologic Endocrinology and Reproductive Medicine, the [2]Department of Gynecology and Obstetrics and the [3]Institute of Nuclear Medicine, Johann Wolfgang Goethe-University, Frankfurt am Main, Germany

*Acta Obstet Gynecol Scand* 2004; 83: 369–374. © Acta Obstet Gynecol Scand 83 2004

*Background.* Uterine peristalsis sustains sperm transport and can be detected by hysterosalpingoscintigraphy (HSSG). This study is the first to be designed to investigate uterotubal transport function by HSSG and uterine contractility by intrauterine pressure measurement (IUP) consecutively on the same day in the periovulatory phase.
*Methods.* Twenty-one female subjects (mean age 28.4 years) without a gynecologic history were examined sequentially by HSSG and IUP on the same day to evaluate uterine contractility in relation to the utero-tubal transport function. In HSSG, intact transport function was visualized by the rapid uptake of $99^m$-technetium-marked albumin aggregates through the female genital tract. In IUP, the frequency of uterine contractions (UC/min), amplitude of uterine contractions and basal pressure tone were detected via a intrauterine catheter. HSSG and IUP were embedded in cycle monitoring with measurement of LH and estradiol.
*Results.* In HSSG, a positive transport of inert particles was assessed in 20 of 21 subjects, in 76% to the side of the dominant follicle or on both sides of the oviduct, and in 19% a strict contralateral transport could be observed. In only one subject (5%), no transport was assessed. The mean value of uterine contractions was 3.4 UC/min (SD ± 0.7), the mean amplitude was 12.0 mmHg (SD ± 4.25 mmHg). Basal pressure tone was 70.7 mmHg. There was a statistically significant correlation with estradiol levels: none of the subjects with less than 3 UC/min showed an estradiol level higher than 100 pg/mL; nearly every patient (one exception) with more than 3 UC/min had an estradiol level higher than 100 pg/mL ($p < 0.0001$, Fisher's exact test).
*Conclusions.* Intact periovulatory utero-tubal transport function can be documented by HSSG and is caused by directed uterine contractility, measured consecutively by IUP. Uterine contractility is influenced by rising estradiol levels. Directed uterine contractility and intact utero-tubal transport function are considered necessary for intact sperm transport, mainly to the side bearing the dominant follicle to maximize fertility.

*Key words:* intrauterine pressure; intrauterine contractility; HSSG; utero-tubal transport function

*Submitted 23 June, 2003*
*Accepted 8 September, 2003*

Uterine peristalsis is of critical importance in the process of reproduction and has been investigated mainly by transvaginal ultrasound examination (1,2). Uterine peristalsis only involves the stratum subvasculare of the myometrium and reveals cyclic changes in direction, frequency and intensity (3,4). During menstruation, contraction waves with the lowest

frequency are directed towards the cervix, while during the other phases of the cycle, with the highest frequency and intensity during the peri-ovulatory phase, cervico-fundal peristalsis prevails (3,5). Uterine contractions are involved in the expulsion of menstrual debris as well as in rapid directed sperm transport (6–9) and in the high fundal implantation of the embryo in the luteal phase.

Two methods have generally been used to assess uterine contractions (UC): one involves a record of changes in intrauterine pressure (IUP) using invasive probes that detect intraluminal variation of pressure produced by the UC (10–12). A less invasive technique has been invented in various forms of direct visualization of UC with transvaginal ultrasound, some from digitized scans. Ultrasound measurements usually provide information on the direction of UC propagation, which is difficult to detect in IUP recordings. In contrast, IUP measurement allows a quantification of the UC amplitude, especially in the periovulatory period.

Hysterosalpingoscintigraphy (HSSG) (13,14) can be used to investigate the utero-tubal transport mechanism of the female genital tract *in vivo* by means of technetium-labeled albumin macrospheres of the size of sperm that are placed in the posterior vaginal fornix. The ascension of these particles within the female genital tract can be observed by scintigraphy.

In this study, to our knowledge, this is the first time that uterine contractions have been measured in frequency and amplitude by IUP in the late follicular phase, and consequently correlated with the utero-tubal transport mechanism assessed by HSSG on the same day.

## Material and methods

Twenty-one healthy patients (mean age 28.4 years) with a history of fertility or infertility due to severe andrologic factors were examined by HSSG and measurement of the IUP on the same day in the late follicular phase. All patients had ovulatory cycles and underwent a monitored cycle when HSSG and IUP were performed. Both examinations were undertaken successively on the same day. Ovulation was proven by an LH surge. All patients had proven patency of fallopian tubes by chromolaparoscopy or hysterosalpingosonography.

Exposure of the ovaries to radiation was calculated to be 0.8–1.4 cGy, with the mean exposure below a threshold of 1 cGy. By comparison, radiation exposure in the standard procedure of hysterosalpingography (HSG) is more than seven times higher, at 7.6 cGy.

The study was approved by the local ethics committee and patients gave their informed consent about HSSG and IUP and were strictly advised not to become pregnant during the diagnostic cycle in which HSSG was carried out.

### HSSG

HSSG is a well-established technique for evaluating the utero-tubal transport mechanism (7–9). The examination was performed as close as possible before ovulation in the late follicular phase. On the day of the examination, the size and the location of the dominant follicle were detected ultrasonographically. For HSSG, 10 MBq $99^m$-technetium-marked macroalbuminaggregates (Solco MAA; Solco Basel AG, Birsfelden, Switzerland) with a size of 5–20 µm, which imitates the size of sperms, were diluted with 2 mL saline solution 0.9% and then administered in the posterior vaginal fornix of the supine patient. Serial scintigrams were taken by a gamma-camera. For quantitative evaluation of HSSG, 'regions of interest' (ROI) were determined in the area of both fallopian tubes to visualize the concentration of radioactivity in the area of the oviduct. By using ROIs, radioactivity can easily be attached to the compartment's uterine cavity or fallopian tubes. Taking into account the size and location of the dominant follicle, the results of HSSG can be classified as follows:

Ipsilateral: concentration of radioactivity on the side of the dominant follicle.

Contralateral: concentration of radioactivity on the opposite side of the dominant follicle.

Both sides: equal concentration of radioactivity on both sides.

No tubal transport (uterine cavity): concentration of radioactivity in the area of the uterine cavity without any further transport to the fallopian tubes.

### IUP

Each of the 21 women underwent IUP measurement directly after HSSG. IUP was recorded as follows: a rubber balloon-catheter (Ruesch 5 Ch., Ruesch AG®, Kernen, Germany) for intrauterine use was gently inserted into the uterine cavity and blocked with 0.5 mL of distilled water. Its hollow cavity was filled with sterile distilled water so that uterine contractions could easily be transferred to a transducer calibrated to convert mechanical to electrical signals. In none of the patients was cervical dilatation necessary, nor was a tenaculum used. Storage of data followed on a PC with specifically designed software (ScopeView, Metex®). The exact position of the rubber balloon was estimated in the lower third of the uterine cavity and controlled by transvaginal ultrasound. Recordings lasted 15–20 min.

In every patient the frequency of uterine contractions could be calculated by the number of oscillations per minute and expressed as the number of uterine contractions per minute (UC/min). The amplitude of contractions was expressed in mmHg and defined as the difference from the baseline pressure tone. Basal pressure tone was also detected in mmHg and expresses the basal myometrial activity in the late follicular phase.

In every patient LH and estradiol were measured on the day of the examination.

Documentation of data and statistical analysis was performed with SPSS for windows (SPSS Inc., Chicago, Illinois, USA) on a PC. Statistical significances were calculated with Fisher's exact test. A $p$-value $<0.05$ was considered to be statistically significant.

## Results

### HSSG

In 16 of 21 (76%) patients an ipsilateral positive transport to the side of the dominant follicle or transport towards both oviducts could be



*Fig. 1.* Hysterosalpingoscintigraphy: demonstration of radioactivity on the left side with a dominant follicle of 15 mm in diameter (ipsilateral demonstration). Compartment I, vagina; compartment II, uterine cavity; compartment III, oviduct. Positive transport mechanism can easily be detected in an early scan after 20 s.

observed (Fig. 1). In four patients (19%) the positive transport could be documented strictly on the contralateral side, in one patient (5%) no tubal transport could be observed (negative transport function). In summary, 20 of the 21 evaluated subjects had a positive transport function of the utero-tubal unit, sustained by uterine contractions. One patient showed a dominant follicle of 17 mm in diameter, an estradiol level of 125 pg/mL, and a contraction of 4.07 UC/min, but failed to build up an intact transport mechanism.

### IUP

In all patients uterine contractions could be easily observed (Fig. 2). The IUP measurement took place in the periovulatory phase directly following HSSG on the same day. Contractions varied between 1.8 and 5 UC/min.

The mean value of contractions in the periovulatory phase was 3.4 UC/min (SD ± 0.7).

The amplitude of contractions varied in range from 8 to 36 mmHg. The mean amplitude was 12.0 mmHg (SD ± 4.25 mmHg).

The basal pressure tone of the uterus reflects the basal isotonic contraction of this strong muscle containing smooth muscle fibers. In our patients the basal muscle tone was 70.7 mmHg (SD ± 15.7 mmHg) in the periovulatory phase (Table I).

Depending on the estradiol levels, uterine contractility reveals a statistically significant increase: none of the patients showing less than 3 UC/min had an estradiol level higher than 100 pg/mL (mean 63 pg/mL). By comparison, nearly every patient (one exception) with more than 3 UC/min had an estradiol level higher than 100 pg/mL (mean 201 pg/mL) (Table II, $p < 0.0001$).

### Discussion

Rhythmic contractions of the nonpregnant uterus have been demonstrated by invasive techniques in



*Fig. 2.* Contractility pattern demonstrated by IUP in the same patient (see Fig. 1). The patient showed a dominant follicle of 15 mm on the left side, LH peaked on the day of the examination, and the estradiol level was 120 pg/mL. A mean contractility of 3.3 UC/min was detected, with a mean pressure amplitude of 14.1 mmHg and the basal tone was 73.3 mmHg.

372    *S. Kissler et al.*

Table I. Results from intrauterine pressure measurement ($n = 21$) in the periovulatory phase

|  | Mean | Range |
|---|---|---|
| Frequency (UC/min) | 3.4 ($\pm 4.25$) | 1.8-5.0 |
| Amplitude (mmHg) | 12.0 ($\pm 4.25$) | 8.0-36.0 |
| Basal tone (mmHg) | 70.7 ($\pm 15.7$) | 36.0-96.7 |

different species including humans (10–12). From the end of menstruation until the late proliferative phase most researchers found small and frequent contractions in a retrograde direction (cervico-fundal). The main interest in these first studies was to evaluate uterine contractility during menstruation, which revealed slower and stronger contractions in an antegrade (fundo-cervical) direction.

Before the noninvasive technique of transabdominal or transvaginal ultrasonography appeared, the reasons for propagated uterine contractions in the late follicular phase remained enigmatic. Transvaginal studies (3–5) demonstrated a tremendous cyclic increase in frequency and amplitude of uterine contractions towards the fundus uteri throughout the late follicular phase and the periovulatory phase. This contractility pattern was reversed in the luteal phase. The authors presumed that these subendometrial contractions could be of importance concerning sperm transport.

Kunz et al. (8) reported for the first time a direct relationship between the increase in the frequency of uterine contractions assessed by transvaginal ultrasound and the percentage of ipsilateral transport of sperm-like material by HSSG. The mean value for uterine contractions in the preovulatory phase was constantly considered to be in the range 2.8–3.0 UC/min. This process was positively correlated with increasing estradiol levels, but the intrauterine pressure has not been recorded because of its invasive character. Nowadays, HSSG has been established for evaluating the integrity of the utero-tubal transport function (7–9,13,14).

Based upon the encouraging results of these studies, Kadanali et al. (6) reported similar results concerning utero-tubal transport capacity when

radioactive-labeled sperm were used compared to $99^m$-technetium-marked albumin macrospheres in patients bearing an intrauterine device (IUD) *in vivo*.

Therefore, there is even *in vivo* substantial evidence that the utero-tubal transport unit is responsible for intact sperm transport.

Contradictory results have also been published (15), although no information was given about the size and location of the dominant follicle and the estradiol levels of the patients examined. The majority of authors working with HSSG support this method as an important diagnostic tool for infertility workup.

To our knowledge, our study is the first to provide proof of an intact sperm transport mechanism assessed by HSSG in healthy women directly followed by IUP measurement. IUP recordings reveal strong and high-frequency contractions that are responsible for the integrity of the utero-tubal transport system.

Although we were not able to investigate the direction of the contraction waves by using only one inserted catheter, the aim of this study was to examine the amplitude, frequency and basal pressure tone in the decisive reproductive phase of the menstrual cycle, results that cannot be obtained by ultrasonographic examination alone.

Uterine contractility at various phases of the menstrual cycle by transvaginal ultrasound and IUP recordings on the same day was first published by Bulletti et al. (16). There was no difference between the measurement of ultrasonographic contractions and contractions measured by IUP recordings, which were 2.9 UC/min in the late follicular phase and 3.9 UC/min in the periovulatory phase. However, IUP recordings were only taken in five subjects.

Our data concerning uterine contractility measured by IUP confirm, in a higher number of subjects, the findings of Bulletti et al., who found a mean value of 3.9 UC/min in the periovulatory phase. Our data revealed 3.4 UC/min at that phase of the cycle. The only difference between the findings is a lower amplitude of uterine contractions (12.0 vs. 25.6 mmHg) and a higher basal tone (70.7 vs. 56.2 mmHg) in our patients. The higher basal tone might be due to the influence of the rubber balloons on the calculated tone pressure.

Failure of an intact utero-tubal transport function as assessed by negative HSSG (no tubal transport) (17) is associated with poor pregnancy rates and might reflect a dissynchronization of uterine wall movements (18).

We found a statistically significant relationship between rising estradiol levels and an increase in UC/min. None of our patients showed less than

Table II. Dependence of uterine contractility on estradiol levels ($n = 21$)

| Frequency (UC/min) | Estradiol | |
|---|---|---|
|  | <100 pg/mL (mean 63 pg/mL) | >100 pg/mL (mean 201 pg/mL) |
| <3 | 8 | 0 |
| ≥3 | 1 | 12 |

3 UC/min if the estradiol level was higher than 100 pg/mL. This observation indicates that the integrity of utero-tubal transport function transport through the female genital tract is under the endocrine control of the dominant follicle.

As an outlook for further investigations, it would be interesting to perform IUP recordings in patients with endometriosis, as endometriosis and adenomyosis uteri can be regarded as a unique disease – the dislocation of the basal endometrium (19), which is linked with hyper- and dysperistalsis and impeded transport function in HSSG (20). There are data suggesting a higher basal tone of the uterus in patients with endometriosis (21). In patients with endometriosis, a high percentage of structural uterine wall abnormalities are described in transvaginal ultrasonography as well as in T2-weighed magnetic resonance imaging (MRI) (22).

Concerning uterine contractility, patients with endometriosis show a higher frequency, amplitude and basal pressure tone in IUP during menstruation than healthy controls (23). This confirms the results by transvaginal ultrasonography that patients with endometriosis predominantly show a retrograde contractility pattern (in the cervico-fundal direction) (24). These studies might indicate that an increase of cervico-fundal peristalsis might increase the amount of dislocated basal endometrium for intraperitoneal implantation.

Medical treatment studies to reduce uterine contractility are mainly performed in pregnant patients (25,26) but would certainly be of value in reducing dysregulated uterine contractility in patients with endometriosis.

To summarize, our data provide proof that uterine contractility with a mean value of 3.4 UC/min is under the control of the hormonal cycle and regulates the intact uterine transport function assessed by HSSG.

## References

1. Birnholz JC. Ultrasonic visualization of endometrial movement. Fertil Steril 1984; 41: 157–8.
2. de Vries K, Lyons EA, Ballard G, Levi CS, Lindsay DJ. Contractions of the inner third of the myometrium. Am J Obstet Gynecol 1990; 162: 679–82.
3. Lyons EA, Taylor PJ, Zheng XH, Ballard G, Levi CS, Kredenster JV. Characterization of subendometrial myometrial contractions throughout the menstrual cycle in normal fertile women. Fertil Steril 1991; 55: 771–4.
4. Abramowicz JS, Archer DF. Uterine endometrial peristalsis – a transvaginal ultrasound study. Fertil Steril 1990; 54: 451–4.
5. Fukuda M, Fukuda K. Uterine endometrial cavity movement and cervical mucus. Hum Reprod 1994; 9: 1013–16.
6. Kadanali S, Varoglu E, Komec D, Uslu H. Evaluation of active and passive transport mechanisms in genital tracts of IUD-bearing women with radionuclide hysterosalpingoscintigraphy. Contraception 2001; 63: 41–5.
7. Kissler S, Doeinghaus K, Becker W, Wildt L. Hysterosalpingoscintigraphic examination of the fallopian tube: a selective, unilateral transport mechanism. Contracept Fertil Steril 1995; 23: OC–286.
8. Kunz G, Beil D, Deininger H, Wildt L, Leyendecker G. The dynamics of rapid sperm transport through the female genital tract: evidence from vaginal sonography of uterine peristalsis and hysterosalpingoscintigraphy. Hum Reprod 1996; 11: 627–32.
9. Wildt L, Kissler S, Licht P, Becker W. Sperm transport in the human female genital tract and its modulation by oxytocin as assessed by hysterosalpingoscintigraphy, hysterotonography, electrohysterography and Doppler sonography. Hum Reprod Update 1998; 4: 655–66.
10. Hendricks CH. Inherent motility patterns and response characteristics of the nonpregnant human uterus. Am J Obst Gynecol 1966; 96: 824–43.
11. Cibils LA. Contractility of the nonpregnant human uterus. Obstet Gynecol 1967; 30: 441–61.
12. Matinez Gaudo M, Yoshiba T, Bentason LP. Propagated and non-propagated myometrial contractions in the normal menstrual cycle. Am J Obstet Gynecol 1973; 115: 107–11.
13. Iturralde M, Venter PF. Hysterosalpingo-radionuclide scintigraphy (HERS). Semin Nucl Med 1981; 11: 301–14.
14. Becker W, Steck T, Albert P. Hysterosalpingoscintigraphy: a simple and accurate method of evaluating fallopian tube patency. Nuklearmedizin 1988; 27: 252–7.
15. Lundberg S, Wramsby H, Bremmer S, Lundberg HJ, Asard PE. Radionuclide hysterosalpingography is not predictive in the diagnosis of infertility. Fertil Steril 1998; 69: 216–20.
16. Bulletti C, de Ziegler D, Polli V, Diotallevi L, Del Ferro E, Flamigni C. Uterine contractility during the menstrual cycle. Hum Reprod 2000; 15: 81–9.
17. Kissler S, Wildt L, Kohl J, Ahr A, Kaufmann M, Siebzehnruebl E. Gestörte utero-tubare Transportfunktion in der Hysterosalpingoszintigraphie als prädiktiver Funktionstest für die IVF-Therapie. [Disturbed utero-tubal transport in hysterosalpingoscintigraphy as a predictive functional test for IVF therapy.] (In German with English abstract.) Zentralbl Gynaekol 2002; 124: 418–22.
18. Eytan O, Halevi I, Har-Toov J, Wolman I, Elad D, Jaffa AJ. Characteristics of uterine peristalsis in spontaneous and induced cycles. Fertil Steril 2001; 76: 337–41.
19. Leyendecker G, Herbertz M, Kunz G, Mall G. Endometriosis results from the dislocation of basal endometrium. Hum Reprod 2002; 17: 2725–36.
20. Leyendecker G, Kunz G, Wildt L. Uterine hyperperistalsis and dysperistalsis as dysfunctions of the mechanism of rapid sperm transport in patients with endometriosis and infertility. Hum Reprod 1996; 11: 1542–51.
21. Mäkäräinen L. Uterine contractions in endometriosis: effects of operative and danazol treatment. J Obstet Gynecol 1988; 9: 134–8.
22. Kunz G, Beil D, Huppert P, Leyendecker G. Structural abnormalities of the uterine wall in women with endometriosis and infertility visualized by vaginal sonography and magnetic resonance imaging. Hum Reprod 2000; 15: 76–82.
23. Bulletti C, de Ziegler D, Polli V, del Ferro E, Palini S, Flamigni C. Characteristics of uterine contractility during menses in women with mild to moderate endometriosis. Fertil Steril 2002; 77: 1156–61.
24. Salamanca A, Beltran E. Subendometrial contractility in menstrual phase visualized by transvaginal sonography in patients with endometriosis. Fertil Steril 1995; 64: 193–5.

374    *S. Kissler et al.*

25. Kantas E, Cetin A, Kaya T, Cetin M. Effect of magnesium sulfate, isradipine and ritodrine on contractions of myometrium: pregnant human and rat. Acta Obstet Gynecol Scand 2002; 81: 825–30.

26. Husslein P. Development and clinical experience with the new evidence-based tocolytic atosiban. Acta Obstet Gynecol Scand 2002; 81: 633.

*Address for correspondence:*
Stefan Kissler
Department of Gynecology and Obstetrics
Division of Gynecologic Endocrinology and
Reproductive Medicine
Johann Wolfgang Goethe-University Frankfurt am Main
Theodor-Stern-Kai 7
60590 Frankfurt am Main
Germany
e-mail: stefan.kissler@kgu.de

Exhibit 39

# THE UTERINE PERISTALTIC PUMP

## Normal and Impeded Sperm Transport within the Female Genital Tract

G. Kunz,[1] D. Beil,[2] H. Deiniger,[2] A. Einspanier,[4] G. Mall,[3] and
G. Leyendecker[1]

[1]Department of Obstetrics and Gynecology
[2]Department of Radiology I
[3]Department of Pathology
Klinikum Darmstadt
Academic Teaching Hospital to the University of Frankfurt
Grafenstr. 9, 64283 Darmstadt, Germany
[4]Deutsches Primatenzentrum GmbH
Kellnerweg 4, 37077 Göttingen, Germany

## 1. SUMMARY

Rapid as well as sustained sperm transport from the cervical canal to the isthmical part of the fallopian tube is provided by cervico-fundal uterine peristaltic contractions that can be visualized by vaginal sonography. The peristaltic contractions increase in frequency and presumably also in intensity as the proliferative phase progresses. As shown by placement of labeled albumin macrospheres of sperm size at the external cervical os and serial hysterosalpingoscintigraphy (HSSG) sperm reach, following their vaginal deposition, the uterine cavity within minutes. In the early follicular phase a large proportion of the macrospheres remains at the site of application, while a smaller proportion enters the uterine cavity with even a smaller one reaching the isthmical part of the tubes. In the mid-follicular phase of the cycle with increased frequency and intensity of the uterine contractions the proportion of macrospheres entering the uterine cavity as well as the tubes has significantly increased. In the late follicular phase with maximum frequency and intensity of uterine peristalsis the proportion of macrospheres entering the tube increases further at the expense of those at the site of application as well as within the uterine cavity. The transport of the macrospheres into the tube is preferentially directed into the tube ipsilateral to the dominant follicle, which becomes apparent in the mid-follicular phase as soon as a dominant follicle can be identified by ultrasound. Since the macrosphere are inert particles the directed sperm transport into the tube ipsilateral to the dominant follicle is not

*The Fate of the Male Germ Cell*, edited by Ivell and Holstein
Plenum Press, New York, 1997

e 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 830 of
PageID: 242009
268                                                                          G. Kunz *et al.*

functionally related to a mechanism such as chemotaxis but is rather provided by uterine contraction of which the direction may be controlled by a specific myometrial architecture in combination with an asymmetric distribution of myometrial oestradiol receptors.

Women with infertility and mostly mild endometriosis display on VSUP a uterine hyperperistalsis with nearly double the frequency of contractions during the early and mid- as well as midluteal phase in comparison to the fertile and healthy controls. During midcycle these women display a considerable uterine dysperistalsis in that the normally long and regular cervico-fundal contractions during this phase of the cycle have become more or less undirected and convulsive in character. Hyperperistalsis results in the transport of inert particles from the cervix into the tubes within minutes already during the early follicular phase, and may therefore constitute the mechanical cause for the development of endometriosis in that it transports detached endometrial cells and tissue fragments via the tubes into the peritoneal cavity. Moreover, dysperistalsis may contribute to the infertility in these patients since it results in a break down of sperm transport within the female genital tract.

# 2. INTRODUCTION

There is no doubt that the ultimate fate of the successful male germ cell is to impregnate the female oocyte, where its genetic material will fuse with that of the oocyte to result in fertilization and embryo formation. This particular sperm is usually deposited five to zero days prior to ovulation (Wilcox et al., 1995) in the posterior vaginal fornix in close vicinity to the external os of the cervical canal from where it reaches its final site of destination, the place of sperm-oocyte encounter within the tube ipsilateral to the dominant follicle.

Usually, the uterus is considered to be specialized, first, for the reception of the blastocyst by the endometrium and the continuous nourishment of the developing fetus and, second, for the eventual expulsion of the fetus (Romanini, 1994). Considering the fact that the sperm has to cover a long distance within the female genital tract from the external os of the cervix to the site of fertilization within the tube it is surprising that the facilitation and the guidance of this journey has only recently been considered a genuine and active function of the uterus (Kunz et al., 1996a). Previously, the ascension of the sperm within the female genital tract to the site of fertilization was regarded more or less a functional capacity of the sperm itself with the uterus serving merely as a passive canal, although a functional importance had been ascribed to uterine contractions (Moghissi, 1977; Harper, 1994). With respect to sperm ascension, attention was mostly directed towards the cervical canal with its glands and cyclically changing secretion. These are assumed to provide optimal conditions for the penetration of the sperm into the female genital tract around ovulation and serve, with its crypts, as a sperm reservoir, from where constant release for sustained sperm transport could occur. In this communication, the mechanism of uterine peristalsis will be discussed, and its role in sperm transport within the female genital tract will be outlined. It will be demonstrated that this function of the uterus is of fundamental importance in the process of reproduction and that disturbances of the uterine mechanism of sperm transport may result in infertility.

# 3. UTERINE PERISTALSIS

Rapid sperm transport from the vagina to the Fallopian tubes within minutes has been described in many species including man (Hartman, 1962; Mortimer, 1983; Hunter,

1987; Drobnis and Overstreet, 1992; Harper, 1994). Since the velocity of sperm movement does not itself account for covering such a long distance through the female genital tract within a few minutes, rapid sperm transport is considered a passive phenomenon and has been ascribed to uterine contractions (Moghissi, 1977; Harper, 1994; Kunz et al., 1996a; Leyendecker et al., 1996).

## 3.1. Vaginal Sonography of Uterine Peristalsis (VSUP)

Contractile activity of the non-pregnant uterus has been known for many decades (Hendricks, 1966; Cibils, 1967; Martinez-Gaudio et al., 1973). High resolution sonography has made it possible to demonstrate these contractions without invasive techniques. These contractions involve mostly the subendometrial layer of the myometrium and may be detected only by endometrial movements (Birnholz, 1984). Following their first description they have been further characterized (Oike et al., 1988; De Vries et al., 1990; Lyons et al., 1991; Fukuda and Fukuda, 1994). The contractions increase in frequency and in intensity as the follicular phase progresses with an inverse pattern during the luteal phase. The peristaltic waves of the endometrium and the subendometrial layer of the myometrium are directed from the cervical canal to the fundal part of the uterus, while only during menstruation do they exhibit a fundo-cervical direction (Lyons et al., 1991).

In our own study (Kunz et al., 1996a; Leyendecker et al.,1996), with measurements of the uterine peristalsis during the menstrual period, the early, mid- and late follicular as well as mid-luteal phases of the cycle, respectively (Fig. 1) it was demonstrated that there was a steady increase in peristaltic activity ranging from roughly 1.2 contraction per minute during the menstrual period and early follicular phase to 2.8 contractions per minute in the late follicular phase. During the mid-follicular and mid-luteal phases, respectively, the frequency averaged 1.5 contractions per min. Over the same time period, the proportion of fundo-cervical contraction waves decreased significantly from 43% during the menstrual period to less than 1% in the periovulatory phase. Thus, almost all peristaltic



**Figure 1.** A graphical demonstration of the frequency of the subendometrial uterine peristaltic waves during menstruation, the early, mid- and late follicular and mid-luteal phases of the cycle, respectively, as determined by vaginal ultrasonography (contractions/min ± SEM). The graph shows also the relative distribution of fundo-cervical contractions versus cervico-fundal contractions during these different phases of the cycle (from Leyendecker et al., 1996).

3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 832 of
PageID: 242011
270                                                                    G. Kunz *et al.*

waves of the uterus during the late follicular phase had a cervico-fundal direction. They also appeared to be more intense than during the other parts of the follicular phase, which might, however, be related to the thickness of the endometrium rendering the movements more pronounced. In comparison to the early follicular phase, however, a thicker proportion of the myometrium appeared also to be involved in the contractions. Because the frequency, intensity and direction of the uterine peristalsis depend upon the phase of the cycle, an endocrine control of this phenomenon by the ovary may be assumed. In this regard oxytocin and prostaglandins may function as mediators (Eliasson and Posse, 1960; Hein et al., 1973; Karim et al., 1973; Fuchs et al., 1985; Lefebvre et al., 1994a, Lefebvre et al., 1994b). This view is supported by the finding that administration of oestradiol valerate to hypogonadal women yielding a pattern of serum oestradiol values similar to that of the normal cycle could completely mimic the cyclic changes of uterine peristalsis and that the frequency of the uterine peristaltic contractions could be significantly increased during the follicular phase of the cycle by the administration of an i.v. bolus of oxytocin. The increase in the frequency of the peristaltic contractions could be totally attributed to the peristaltic waves with cervico-fundal direction, which may be related to the high density of oxytocin receptors in the cervical tissue (unpublished).

Peristaltic contractions with the same frequency as described above were also observed with transvesical scanning (Birnholz, 1984). Thus, it is very unlikely that the uterine peristalsis was induced by the vaginal ultrasound examination. In contrast, it can be assumed that uterine peristalsis during the menstrual cycle is a continuous phenomenon with varying frequency, intensity and direction of the contraction waves depending on the phase of the cycle and does not require a specific stimulus for initiation. These studies, however, do not exclude a coital enhancement of uterine contractions.

## 3.2. Hysterosalpingoscintigraphy (HSSG)

It is reasonable to assume that the uterine peristaltic activity provides the forces that are required for the transport of spermatozoa from the external os of the cervix into the tubes within minutes. Using hysterosalpingoscintigraphy (Itturalde and Venter, 1981; Becker et al., 1988), rapid sperm transport was studied by placing technitium-labelled albumin macrospheres of sperm size at the external os of the uterine cervix and following their path through the female genital tract (Kunz et al., 1996a; Leyendecker et al., 1996).The albumin macrospheres used in our study resemble spermatozoa in their size. Thus, the demonstration of their ascension through the genital was considered to represent passive sperm transport.

According to these data (Fig. 2–4) the following concept of the dynamics of rapid sperm ascension within the female genital tract was proposed. Rapid sperm ascension occurs immediately following deposition of the ejaculate at the external os of the cervix. As early as one minute thereafter spermatozoa have reached the intramural and isthmical part of the tube. Quantitatively, however, the extent of ascension increases with the progression of the follicular phase. While only a few spermatozoa enter the uterine cavity and even fewer the tubes during the early follicular phase, the proportion of spermatozoa that enters the uterine cavity increases dramatically during the mid-follicular phase with still a limited entry into the tube. During the late follicular phase there is a considerable ascension of spermatozoa into the tubes.

Furthermore the HSSG revealed the preferential direction of rapid sperm transport into the tube ipsilateral to the dominant follicle. This corresponds with recent findings during surgery that the number of sperm around ovulation was higher in the tube ipsilat-



**Figure 2.** The distribution of the percentage of total counts, representing the labeled albumin macrospheres, within the female genital tract (compartment 1, 2 and 3 being the upper vagina, the uterine cavity and the isthmical part of the tubes respectively) following 1, 16 and 32 minutes after vaginal application during the early follicular phase. With respect to compartment 3, the right and left tubes were differentiated. The amount of radioactivity transported into the tubes was significantly higher in patients with endometriosis in comparison with healthy controls ( P< 0.01) (from Leyendecker et al., 1996).



**Figure 3.** The respective distribution pattern of radioactivity, as in Fig. 2, obtained during the mid-follicular phase of the cycle. While in patients without endometriosis the labeled macrospheres preferentially entered the tube ipsilateral to the dominant follicle, in patients with endometriosis the macrospheres preferentially entered the tube contralateral to the dominant follicle. The difference in ascension into the contralateral tube between the two groups of patients was significant (P<0.01) (from Leyendecker et al., 1996).



Percent of total
counts per minute
healthy patients
n= 10
comp.1
comp.2
comp.3 ipsilat.
comp.3 contralat.
patients with
endometriosis
n=14
1
16
32
minutes after application

by the dominant follicle in that the uterine myometrium with its specific architecture (Go-erttler, 1930) is activated and contracts in a manner providing this directed transport. In order to elucidate the mechanisms that govern directed sperm ascension, the estrogen receptor distribution within the myometrium was studied. It could be demonstrated in removed uteri that the percentage of estrogen receptor positive nuclei of smooth muscle cells in the myometrium was significantly higher on the side of the dominant ovarian structure in comparison with the contralateral side (Kunz et al., 1996b).

The strong correlation between receptor distribution and the site of the dominant ovarian structure suggested that the side-specific asymmetric estrogen receptor distribution is induced by the dominant follicle. This preferential induction of estrogen receptors in the myometrium on the side of the dominant ovarian structure is presumably not effected by the oestradiol concentration in the systemic circulation. Rather, it may involve a more direct endocrine influence mediated, for example, by the utero-ovarian vascular counter-current system (Einer-Jensen, 1988) that may provide higher oestradiol concentrations in the uterus on the side of the dominant follicle. This finding may also indicate that other hormone receptors in the uterus, pertinent to its contractile function, might be expressed asymmetrically with respect to the localization of the dominant ovarian structure. Preliminary data show that oxytocin receptors, exhibiting high concentrations in cervical tissue, like those for oestradiol, are asymmetrically distributed within the fundal part of the myometrium relative to the side of the dominant follicle (unpublished).

The asymmetric estrogen receptor distribution being presumably responsible for the directed sperm transport appears to be superimposed on a basal, more evenly distributed level of estrogen receptors under the influence of systemic oestradiol. This may be derived from the observation that the systemic administration of exogenous estrogen to hypogonadal women results in a uterine peristaltic activity which is, according to VSUP, indistinguishable from normal

## 5. UTERINE HYPERPERISTALSIS AND DYSPERISTALSIS

In studying infertile women suffering from mostly mild endometriosis, which is considered not to be a cause of infertility (Hull et al., 1986; Adamson and Pasta, 1994), a fundamental disturbance of uterine peristaltic activity was observed (Leyendecker et al., 1996) (Fig 1). In VSUP, these women displayed a considerable degree of hyperperistalsis in that, during the early and mid follicular as well as mid-luteal phase of the cycle, respectively, the frequency of peristaltic contraction was nearly doubled in comparison to normal. During the late follicular phase the frequency was increased further but less pronounced as compared to the early and mid-follicular phase of the cycle. The character of the peristaltic activity, however, had completely changed. While in the fertile controls long and regular cervico-fundal peristaltic waves prevailed, the contractions displayed a convulsive character in the infertile women. Some of the contraction waves started in the middle portion of the uterine cavity, while in other patients the contractions started at different sites at the same time, and some vanished before reaching the fundal part of the uterine cavity. Thus, in comparison with the regular and frequent cervico-fundal contractions of healthy women, the impression of a dysperistalsis prevailed in patients with infertility and endometriosis (Leyendecker and Kunz, 1996).

These abnormalities of the uterine peristaltic activity in women with endometriosis had a profound impact on the uterine transport function as demonstrated by HSSG, which, at least in part, may account for the infertility of these women. Already during the early

3:16-md-02738-MAS-RLS     Document 33123-4     Filed 08/22/24     Page 836 of
PageID: 242015
274                                                                    G. Kunz *et al.*

follicular phase of the cycle, there was a rapid transport of inert particles through the uterine cavity into the tubes. This was further increased during the mid follicular phase. However, there was no directed transport into the tube ipsilateral to the dominant follicle. During the late follicular phase, when the uterine contractions had become dysperistaltic, a breakdown of the uterine transport function occurred in that most of the particles remained at the site of application and only a few entered the tubes without a preference for the "dominant" one (Fig. 2–4).

## 6. IMPLICATIONS REGARDING THE FUNCTION OF THE CERVICAL MUCUS

These data are also pertinent in reconsidering some of the functions of the cervical mucus with regard to sperm ascension.. It is generally assumed that the sperm actively penetrate the cervical mucus and that the scant and viscous cervical mucus of the early follicular phase acts as a barrier in this respect (Moghissi, 1977). The HSSG demonstrates that already in the early follicular phase, in the presence of scant cervical mucus with little spinnbarkeit, a rapid transport of inert particles through the cervical canal occurs (Fig 2). Moreover, the distribution pattern of the labeled macrospheres within the genital tract of women with endometriosis and hyperperistalsis in the early follicular phase (Fig. 2; lower panel) resembles that of the healthy controls with normoperistalsis in the mid follicular phase of the cycle (Fig. 3; upper panel). Thus, it is not so much the quality of the cervical mucus but rather the power of the uterine peristalsis that determines the amount of sperm ascension through the cervical canal.

According to in vitro studies sperm penetrate the cervical mucus at a speed of 0.1 to 3 mm/min depending upon the phase of the cycle. There is no doubt on the basis of our studies that the sperm's own velocity is of little importance with respect to the ascension through the cervical canal. Irrespective of whether there is a function at all to the sperm's active movement at this stage of reproduction, the interaction of the sperm with the physico-chemical properties of the mucus enable viable sperm to enter the cervical crypts as a primary reservoir for later release. Of course, our model using inert albumin macrospheres cannot account for effects that have to be attributed to the functional capacity of healthy sperm.

## 7. AN INTEGRAL VIEW ON SPERM ASCENSION WITHIN THE FEMALE GENITAL TRACT AND ITS POSSIBLE DISTURBANCES

The clinician has been familiar for a long time with rhythmical contractions of the non-pregnant uterus. Upon cervical inspection during the preovulatory phase rhythmical protrusions of the abundant cervical mucus can be observed. Only due to high resolution ultrasound examination, it was possible to relate these cervical activities to uterine peristaltic waves that originate in the cervix and are propagated towards the cornual section of the uterus. With the placement of labeled inert particles of sperm size at the external cervical os and following their path through the female genital tract by HSSG it was possible to demonstrate the enormous power and transport capacity of this uterine peristaltic pump. Furthermore, the directed transport of the particles preferentially into the

tube ipsilateral to the dominant follicle demonstrated the surprising sophistication of this uterine system of sperm transport (Kunz et al., 1996a).

On the basis of the data obtained in our studies and available from literature, we hypothesize that rapid as well as sustained sperm is controlled by uterine peristaltic activity. Uterine contractions aspirate sperm into the cervical mucus and the uterine cavity, and provide further transport into the isthmical part of the tubes. In the mid- and late follicular phases of the cycle this transport is directed preferentially into the tube ipsilateral to the dominant follicle. This indicates that the mechanism of rapid and passive sperm transport is under the endocrine control of the dominant follicle. Some sperm, probably the most motile ones, follow, by their own movement, the filamentous structures of the cervical mucus and enter the cervical crypts as a primary reservoir. This results in a partial sequestration of the sperm increasing the proportion of less motile and immobile sperm that reach the tubes rapidly. This observation has probably lead to the notion that rapid sperm ascension might not be essential for fertilization (Mortimer, 1983; Hunter, 1987). With the progression of the follicular phase there is an increasing release of sperm from the primary reservoir as they are flushed and squeezed out of the crypts due to the cervical secretion which becomes more profuse and the rhythmical contractions that originate within the cervix, respectively. Entering the "main stream" of cervical secretion they are caught by the "uterine peristaltic system" and rapidly transported in an aliquot of mucus (Fukuda and Fukuda, 1994), which protects the sperm from leukocyte degradation within the uterine cavity (Harper, 1994), to the tube with its isthmic mucus as the secondary reservoir. Dilatation of the external cervical os, maximum cervical secretion and rhythmical protrusion of the mucus around ovulation enlarge the zone of contact between a fresh ejaculate and the uterine peristaltic pump. At the same time preovulatory mucorrhea, together with the rhythmical contractions of the cervix, prevents by large motile sperm from entering the cervical crypts and thus ensures, in combination with maximally increased uterine peristalsis, that no or only minor sequestration of sperm can occur and that motile sperm are directly transported into the isthmical mucus (Jansen, 1980) of the tube ipsilateral to the dominant follicle where they are available for fertilization.

There is, in our opinion, no principle difference between the mechanisms of rapid and sustained sperm transport, respectively. Both aim at the availability of viable sperm at the site of fertilization around ovulation and both rely, in this respect, on the continuous peristaltic activity of the uterus. Sustained sperm transport utilizes the cervical crypts as a primary reservoir, from where later release occurs. The reduced power of the peristaltic pump several days prior to ovulation in comparison to the preovulatory phase might, together with a more viscous cervical mucus at this time, facilitate the migration of motile sperm into the cervical crypts. No data are available, which of the two reservoirs, the cervical or the tubal mucus, have a preponderance in the function of sperm preservation. If there is any preponderance at all, one may assume that it may shift from the cervix to the tube with the progression of the preovulatory phase. In any event, the fundamental importance of sperm preservation within the genital tract and sustained sperm transport for the overall process of reproduction is documented by the observation that intercourse several days prior to ovulation may result in a pregnancy with a considerable probability ranging from about 10% with intercourse five to more than 30% with intercourse two days prior to ovulation, respectively (Wilcox et al., 1995).

These data and considerations show that the availability of sperm at the site of fertilization at the appropriate time depends to a large extent on coordinated uterine peristaltic contractions that cyclically change in quality and frequency. At a low frequency and power, they may favor sperm preservation within the cervical mucus, at a higher preovula-

tory frequency and power of contractions, the uterine peristaltic pump provides rapid and directed transport of sperm either from the reservoir or from a freshly deposited ejaculate into the tube ipsilateral to the dominant follicle.

Recently, it could be shown that this fine-tuned system is fundamentally disturbed in women with infertility and, mostly, mild endometriosis. Both, the hyper- and dysperistalsis of the uterine peristaltic pump observed in these women may contribute to their reduced fertility. Hyperperistalsis may prevent the development of an adequate pool of preserved sperm within the reservoir of the cervical crypts, and preovulatory dysperistalsis impedes, by a breakdown of sperm transport, the formation of an adequate sperm reservoir in the mucus of the isthmical part of the tube from where sperm migrate to the final site of fertilization.

Independent of its effects on sperm transport and fertility uterine hyperperistalsis may promote the detachment and exfoliation of endometrial cells and tissue fragments and their transtubal transport into the peritoneal cavity and may, therefore, propagate the development of endometriosis (Leyendecker et al., 1996).

# 8. CONCLUSIONS

Uterine peristalsis is of fundamental importance in the process of reproduction in that it serves sperm transport from the external os of the cervix to the mucus of the isthmical part of the tube ipsilateral to the dominant follicle. This mechanism is controlled by the dominant follicle. This newly disclosed and described uterine function is of clinical importance in that a dysfunction of this functional system may result in infertility and may propagate the development of endometriosis.

# 9. REFERENCES

Abramovicz JS & Archer DF 1990 Uterine endometrial peristalsis - a transvaginal ultrasound study. Fertility and Sterility 54:451–454

Adamson GD & Pasta DJ 1994 Surgical treatment of endometriosis-associated infertility: Meta analysis compared with survival analysis. American Journal of Obstetrics and Gynecology 171: 1488–1505

Amso NN, Crow J & Shaw RW 1994a Comparative immunohistochemical study of oestrogen and progesterone receptors in the fallopian tube and uterus at different stages of the menstrual cycle and the menopause. Human Reproduction 9: 1027 - 1037

Amso NN, Crow J, Lewin J & Shaw RW 1994b A comparative morphological and ultrastructural study of endometrial gland and fallopian tube epithelia at different stages of the menstrual cycle and the menopause. Human Reproduction 9: 2234 - 2241

Becker W, Steck T, Alber P & Borne W 1988 Hystero-salpingo-scinitraphy: A simple and accurate method of evulating fallopian tube patency. Nuklearmedizin 27: 252–257

Birnholz J. (1984) Ultrasonoc visualization of endometrial movements. Fertility and Sterility 41:157–158

Cibils L.A. (1967) Contractility of the non-pregnant human uterus. Obstetrics and Gynecology. 30: 441 - 461

Crow J, Amso NN, Lewin J & Shaw RW 1994 Morphology and ultrastructure of fallopian tube epithelium at different stages of the menstrual cycle and the menopause. Human Reproduction 9: 2224 - 2233

De Vries K, Lyons EA, Ballard G, Levi CS & Lindsay DJ 1990 Contractions of the inner third of the myometrium. Amercan Journal of Obstetrics and Gynecology 162:679–682

Drobnis EZ & Overstreet JW 1992 Natural history of mammalian spermatozoa in the female reproductive tract. Oxford Review of Reproductive Biology 14: 1–46

Einer-Jensen N 1988. Countercurrent transfer in the ovarian pedicle and it's physiological implications. Oxford Reviews of Reproductive Biology 10:348–381

Eliasson R & Posse N 1960 The effect of prostaglandins on the nonpregnant uterus in vivo. Acta Obstetrica et Gynecologica Scandinavica 39: 112–117

Fuchs A-R, Fuchs F & Soloff M.S 1985 Oxytocin receptors in nonpregnant human uterus. Journal of clinical Endocrinology and Metabolism 60: 37–41

Fukuda M & Fukuda K 1994 Uterine endometrial cavity movement and cervical mucus. Human Reproduction 9:1013–1016

Goerttler K 1930 Die Architektur der Muskelwand des menschlichen Uterus und ihre funktionelle Bedeutung. Gegenbaurs Morphologisches Jahrbuch 65:45–52

Harper MJK 1994 Gamete and zygote transport. p123–187 In The physiology of reproduction. Eds Knobil E. & Neill, JD Raven Press, New York,

Hartman CG 1962 Science and the safe period. A compendium of human reproduction. Williams and Wilkins, Baltimore

Hein PR, Eskes TKAB, Stolte LAM, Braaksma JF, Jansens J & Hoek JM 1973 The influence of steroids on uterine motility in the nonpregnant human uterus. p107–140 In Uterine contractions - side effects of steroidal contraceptives. Ed Josimovich, J.B. New York: Wiley and Sons

Hendricks CH 1966 Inherent motility patterns and response characteristics in the nonpregnant uterus. Amercan Journal of Obstetrics and Gynecology 96: 824–841

Hull ME, Moghissi KS, Magyar DF, & Hayes MF 1986 Comparison of different treatment modalities of endometriosis in infertile women. Fertility and Sterility 47: 40–44

Hunter RHF 1987 Human fertilization in vivo with special reference to progression, storage and release of competent spermatozoa. Human Reproduction 2: 329–332

Iturralde M & Venter PP 1981 Hysterosalpingo-radionuclide scintigraphy. Seminars in Nuclear Medicine 11: 301 - 314

Jansen RPS 1980 Cyclic changes in the human fallopian tube isthmus and their functional importance. American Journal of Obstetrics and Gynecology 136: 292–308

Karim SMM & Hillier K 1973 The role of prostaglandins in myometrial contraction. p141–169 In Uterine contraction - side effects of steroidal contraceptives. Ed Josimovich JB New York: Wiley and Sons

Kunz G & Leyendecker G 1996 Uterine peristalsis throughout the menstrual cycle. Physiological and pathophysiological aspects. Human Reproduction update (in press)

Kunz G, Beil D, Deininger H, Wildt L & Leyendecker G 1996a The dynamics of rapid sperm transport through the female genital tract. Evidence from vaginal sonography of uterine peristalsis and hysterosalpingoscintigraphy Human Reproduction 11: 627–632

Kunz G. Mall G & Leyendecker G 1996b Asymmetry of oestrogen receptor expression in the myometrium relative to the site of the dominant follicle and corpus luteum during the menstrual cycle in healthy women. Human Reproduction 11: Abstract book 1, p 158

Leyendecker G, Kunz G, Wildt L, Beil D & Deiniger H 1996 Uterine hyperperistalsis and dysperistalsis as dysfunctions of the mechanism of rapid sperm transport in patients with endometriosis and infertility. Human Reproduction, 11: 1542–1551

Lefebvre DL, Farookhi R, Larcher A, Neculcea J & Zingg HH 1994a Uterine oxytocin gene expression. I. Induction during pseudopregnancy and the estrous cycle. Endocrinology 134: 2556–2561

Lefebvre DL, Farookhi R, Giaid A, Neculcea J & Zingg HH 1994b Uterine oxytocin gene expression. II. Induction by exogenous steroid administration. Endocrinology 134: 2562–2566

Lyons EA, Taylor PJ, Zheng, XH, Ballard G, Levi CS & Kredentser JV 1991 Characterization of subendometrial myometrial contractions throughout the menstrual cycle in normal fertile women. Fertility and Sterility 55:771–775

Martinez-Gaudio M, Yoshida T & Bentsson LP 1973 Propagated and non propgated myometrial contractions in normal menstrual cycles. American Journal of Obstetrics and Gynecology 115: 107–111

Moghissi KS 1977 Sperm migration through the human cervix. In The uterine cervix in reproduction p146–165. Eds Insler V & Bettendorf G. Georg Thieme Publishers Stuttgart

Mortimer D 1983 Sperm transport in the human female reproductive tract. Oxford Reviews of Reproductive Biology 5: 40–61

Oike K, Obata S, Tagaki K, Matsuo K, Ishihara K & Kikuchi S 1988 Observation of endometrial movement with transvaginal sonography. Journal of Ultrasound in Medicine 7: 99

Romanini C 1994 Measurement of uterine contractions. P337–355 In The uterus. Eds Chard J & Grudzinskas JG Cambridge Reviews in Reproduction, Cambridge University Press

Williams M, Hill C.J, Scudamore I, Dunphy B, Cooke ID & Barratt CLR 1993 Sperm numbers and distribution within the human fallopian tube around ovulation. Human Reproduction 8: 2019–2026

Wilcox AJ, Weinberg CR & Baird DD 1995 Timing of sexual intercourse in relation to ovulation - effects on the probability of conception, survival of the pregnancy, and sex of the baby. New England Journal of Medicine 333: 1517–1521

# Exhibit 40

# Physiology of Upward Transport in the Human Female Genital Tract

I. ZERVOMANOLAKIS,[a] H.W. OTT,[a] D. HADZIOMEROVIC,[a] V. MATTLE,[a]
B. E. SEEBER,[a] I. VIRGOLINI,[b] D. HEUTE,[b] S. KISSLER,[c]
G. LEYENDECKER,[d] AND L. WILDT[a]

[a]*Division of Gynecological Endocrinology and Reproductive Medicine,
Department of Obstetrics and Gynecology, University of Innsbruck, Innsbruck,
Austria*

[b]*Department of Nuclear Medicine, University of Innsbruck, Innsbruck, Austria*

[c]*Department of Obstetrics and Gynecology, University of Frankfurt, Frankfurt,
Germany*

[d]*Department of Obstetrics and Gynecology, Klinikum Darmstadt, Academic
Teaching Hospital to the University of Frankfurt, Darmstadt, Germany*

**ABSTRACT: The uterus and fallopian tubes represent a functionally
united peristaltic pump under the endocrine control of ipsilateral ovary.
We have examined this function by using hysterosalpingoscintigraphy
(HSS), recording of intrauterine pressure, electrohysterography, and
Doppler sonography of the fallopian tubes. An uptake of labeled parti-
cles into the uterus was observed during the follicular and luteal phases
of the cycle after application into the vagina. Transport into the oviducts,
however, could only be demonstrated during the follicular phase. Fur-
thermore, the predominant transport was into the tube ipsilateral to
the ovary containing the dominant follicle. The pregnancy rate following
spontaneous intercourse or insemination was higher in those women in
whom ipsilateral transport could be demonstrated. The amount of ma-
terial transported to the ipsilateral tube was increased after oxytocin ad-
ministration, as demonstrated by radionuclide imaging and by Doppler
sonography following instillation of ultrasound contrast medium. An in-
crease in the basal tone and amplitude of contractions was observed after
oxytocin administration. These results support the idea that the uterus
and fallopian tubes act as a peristaltic pump, which increases transport
of sperm into the oviduct ipsilateral to the ovary bearing the dominant
follicle. Oxytocin appears to play a critical role in this peristaltic pump.
A failure of the peristaltic mechanism is possibly responsible for infertil-
ity. We propose the term tubal transport disorder (TTD) as a nosological
entity. Results from HSS could be a useful adjunct for choosing treat-
ment modalities in patients with patent fallopian tubes suffering from**

Address for correspondence: Prof. Dr. L. Wildt, Clinical Division of Gynaecological Endocrinology
and Reproductive Medicine, Medical University of Innsbruck, Anichstrasse 35, A 6020 Innsbruck,
Austria. Voice: 0043-512-504-23276; fax: 0043-512-504-23277.

ludwig.wildt@i-med.ac.at

**Ann. N.Y. Acad. Sci. 1101: 1–20 (2007). © 2007 New York Academy of Sciences.
doi: 10.1196/annals.1389.032**

**infertility. These patients may be better served with *in vitro* fertilization (IVF).**

**KEYWORDS: sperm transport; female genital tract; hysterosalpingoscintigraphy; intrauterine pressure; oxytocin; infertility**

## INTRODUCTION

One of the critical steps in the process of reproduction is the transport of spermatozoa from the vagina to the pars ampullaris of the fallopian tube. Its successful completion requires a mechanical patency as well as a functional integrity of the uterus and the oviducts.[1,2] The biological significance and pathophysiology of transport function, in contrast to simple mechanical patency of the female genital tract, have also not been completely understood. The procedures used for clinical evaluation of the uterus and oviduct, that is, hysterosalpingography (HSG), hysterosalpingocontrastultrasonography (HyCoSy), and laparoscopy with chromopertubation (LSCP) are based on the infusion of liquid media into the uterus, such as a radiological water-soluble contrast medium, a contrast medium developed for ultrasonography and a solution of methylene-blue during laparoscopy, using pressure to force their passage through the fallopian tubes into the abdominal cavity, and mainly assess mechanical patency.[3–5] Mechanical patency does not necessarily equate with functional integrity. Up to now, development and clinical application of methods for the assessment of functional aspects of the genital tract with regard to transport processes have not been available and thus not examined as possible diagnostic tools. By studying aspects of transport mechanisms in the uterus and the fallopian tubes through the use of hysterosalpingoscintigraphy (HSS), in conjunction with other biophysical and pharmacological interventions, we offer new insights into the pathophysiology of the female reproductive tract. Consequently, we suggest that tubal transport disorders (TTD), which can be diagnosed by HSS, may represent a thus far unrecognized factor in infertility.

## METHODS

### *Patients*

We reviewed the results of HSS in more than 1,000 women, ages 20–46, suffering from primary or secondary infertility of various etiologies, who underwent HSS followed by HyCoSy, to evaluate uterine and fallopian tube function. These women also underwent other diagnostic procedures, such as cycle monitoring combining determination of luteinizing hormone (LH), estradiol (E2), and progesterone in serum with sonographic determination of follicular development. Informed consent was obtained from all participants.

**ZERVOMANOLAKIS** *et al*.                                                    **3**

### *Materials*

Urinary silastic catheters 6 or 8 charriere for intrauterine application of con-
trast medium fitted with an inflatable balloon were used (Uromed Kurt Drews
GmbH, Oststeinbeck, Germany). We prepared the recording electrodes for
electrohysterography using cephalic electrodes from Hewlett Packard Med-
ical Products Group, Waltham MA, USA. Silastic, polyethylene, and teflon
tubing was obtained from Reichelt Chemietechnik, Heidelberg, Germany.

### *Cycle Monitoring*

We defined a dominant follicle as a follicle with a diameter of more than
10 mm and determined LH, E2, and progesterone in blood samples collected
once daily starting on day 10 of the cycle using commercially available im-
munoassays (Boehringer Mannheim, Germany). The luteal phase was assessed
by progesterone levels taken every 2–5 days during the 2 weeks after the be-
ginning of the LH surge until the onset of menstruation. Ultrasonography
was used to monitor follicular development using Siemens Sonoline AC and
Siemens Versa Pro ultrasound devices (Siemens AG, Erlangen, Germany),
both equipped with 5.0–7.5 MHz vaginal probes.

### *HSS*

HSS was performed in the follicular phase of the cycle in 1,000 patients.
Fifteen patients were examined inadvertently during the early- to midluteal
phase. The largest follicle was identified by ultrasonography on the day of
examination and its localization (left or right ovary) and diameter were deter-
mined. Using a catheter we applied $10 \pm 2$ MBq-TC-99 m labeled macroag-
gregates of human serum albumin (SolcoMAA, Solco Basel AG, Birsfelden
Switzerland) with a size of 5–20 Hm, corresponding roughly to the size of
spermatozoa, in a volume of 1–2 mL to the posterior vaginal fornix with the
patient in a supine position. Scans with a gamma camera were obtained imme-
diately after application and at various time intervals for up to 4 h, as already
described.[6,7] Color printouts of the scans were used for evaluation. A small
mark was set on the skin between symphysis pubis and the umbilicus for topo-
graphical identification. The results were rated as (a) radioactivity within the
cavum uteri, (b) radioactivity within the fallopian tubes, and (c) radioactivity
within the abdominal cavity. Combining the examination with the findings
obtained by ultrasonography, the results were further classified as ipsilateral
when radioactivity concentrated predominantly within the fallopian tube on
the side of the dominant follicle, as contralateral when radioactivity was de-
tected predominantly in the tube opposite to the side of the dominant follicle,

as bilateral when activity was found equally distributed within both tubes, and as unilateral when activity was found within one tube only, but no dominant follicle was identified by ultrasound.

### *Validation of HSS*

A bladder catheter was placed into the uterus in 4 patients after the examination was completed and flushed with 3 mL of saline to ascertain that the labeled material had remained in an intrauterine or intratubal position. The amount of radioactivity in the region of the uterus was determined and compared to that in the abdominal cavity by taking an additional scan after flushing. In addition, fluid was collected from the pouch of Douglas in 3 patients who underwent laparoscopy on the HSS day and the radioactivity of the fluid was counted in a well-type gamma counter. The fluid was divided into two aliquots. One aliquot (0.5 mL) was mixed with 3 mL 20% trichloracetic acid. The sample was centrifuged, the supernatant removed, and the radioactivity in the precipitate was counted. The second aliquot was centrifuged, the pellet washed once with saline and counted after recentrifugation for 10 min. Microscopic examination of the pellet was done.

### *Effects of Oxytocin*

The transport of radiolabeled microspheres was used to examine the effects of oxytocin in 50 patients, using serial HSS scans. The first scan was performed immediately after application of the microspheres to the vagina, followed 8–10 min later by a second scan. After intravenous (i.v.) administration of 3 international units (IU) oxytocin (Syntocinon, Sandoz AG, Nürnberg, Germany), two additional scans were taken, one immediately after oxytocin injection and the second scan 8–10 min later. Regions of interest (ROI) were placed for quantitative evaluation on both sides of the uterus in the area of the fallopian tubes and the radioactivity per unit time within these areas was recorded and plotted.

### *Measurement of Intrauterine Pressure (Hysterotonography)*

During the follicular phase of the cycle, the intrauterine pressure was recorded in 25 patients using either a catheter fitted with two Millar-microtip transducers positioned 6 cm apart or with two catheters filled with sterile water, each connected to a Gould–Statham element as pressure recorder. The catheters were made from teflon or polypropylene tubing with an outer diameter of 1 mm and fitted at the tip with a small, inflatable rubber balloon as pressure

sensor (Hugo Sachs Elektronik, March-Hugstetten, Germany). The catheters were placed under ultrasonographic guidance into the uterus with the tip of the first catheter at the fundus (position I), and the tip of the second catheter just behind the internal os (position II). The catheters were either connected with an 8-charriere bladder catheter that could be blocked by an inflatable balloon or held in place by a wire clip attached to the cervix, so that their expulsion could be avoided. Using this multichannel recorder, the differential between the pressure measured at positions I and II (intrauterine pressure) was recorded for 10 to 20 min. Oxytocin was administered either i.v. (3 IU) or as nasal spray (4 IU) and recording continued for another 10 to 20 min. Frequency and amplitude of contractions and the pressure gradients between fundus and cervix uteri were determined using calipers.

### *Electrohysterography*

Two silver electrodes made from a cephalic electrode were used for recording uterine electrical activity in 20 patients. The wires were immersed repeatedly into a solution prepared by mixing 1 mL medical grade silastic adhesive with 5 mL n-Hexane and allowed to dry at room temperature under a light stream of air for insulation. The insulating silastic layer was then removed carefully with a scalpel at a length of 2 mm from the tip of the wires. By placing one electrode into the fundus uteri and fixing the second one at the external os or within the cervix, we could measure electrical potentials continuously and record them with a Biofeedback system (SOM Biofeedback, Murrhardt, Germany) connected to a computer. A computer program adapted from a program for detection of pulses of hormones in plasma[8] identified the amplitude and frequency of spikes and calculated the variability from point to point.

### *Doppler Ultrasonography of the Fallopian Tubes*

Performing Doppler ultrasonography in 60 patients who underwent HyCoSy was used to determine flow through the fallopian tubes. We infused contrast medium (Echovist 300, Schering AG, Berlin, Germany) into the uterus via a catheter until the uterine cavity and the fallopian tubes could be visualized either by vaginal or by abdominal ultrasonography. After removal of the catheter, a pulsed Doppler beam was directed to the cavum uteri and the fallopian tubes. The ultrasound probe was held in place by a clamp fitted to a colposcope holder. Oxytocin was administered i.v. or intranasally at doses of 4 and 3 IU per application, respectively, after 2–5 min and the recording of Doppler signals was continued. A video printer was used during the recording periods. An increase to at least 10 cm/sec for a duration of at least 1 sec was defined as a signal. Frequency and intensity of the signals on the printout were determined using mechanical calipers.

### *Measurement of Ciliary Beat Frequency*

Using a photoelectric technique and fast Fourier transform analysis, we determined the baseline ciliary beat frequency (CBF) of fimbria under standardized temperature conditions. Fimbrial portions of fallopian tubes were collected from 21 patients undergoing post partum sterilization, after obtaining written informed consent and local ethical committee approval. All study subjects had regular menstrual cycles before gravidity and no subject had used hormonal medications during pregnancy. Normal appearing, representative sections of fimbrial tissues, 0.5–1 cm in length, of both fallopian tubes of each subject were rinsed several times to remove all visible evidence of blood. Changes in CBF were documented by ROI measures for temperatures ranging from 37–39°C.

### *Clinical Evaluation of Tubal Patency*

The mechanical tubal patency is defined as the observation of flow into the abdomen revealed by one of the following methods: HSG, HyCoSy, or LSCP. HSG was performed with a Schultze apparatus applied to the cervix for instillation of a radiological water-soluble contrast medium into the uterus (Isovist 300, Schering AG, Berlin, Germany). During HyCoSy a bladder catheter (Kinder- Ballon-Katheter 6 charriere, Uromed) was placed into the uterus and blocked; 2–4 mL of contrast medium developed for ultrasonography (Echovist 300, Schering AG, Berlin, Germany) was infused via the catheter into the uterus. The flow into the uterine cavity and the fallopian tubes was monitored by vaginal ultrasonography. Chromopertubation during laparoscopy was performed by placing a portio adapter into the uterus and infusing a solution of methylene-blue, with visualization of contrast escaping the fimbria as evidence of patency.

### *Statistical Analysis*

The SPSS software package versions 6.1.3–11.00 were used for statistical analysis. Multiple data sets were analyzed by analysis of variance (ANOVA) followed by the Newman–Keuls test for comparing means. The level of significance was set as $P \leq 0.05$. Chi-squared analysis was used for testing distributions. Paired *t*-test was used when the effects of treatment were compared.[9]

## **RESULTS**

Rapid transport of the microspheres from the vagina into the uterine cavity was confirmed by the detection of labeled particles in the uterus at the time of

the first HSS scan, as early as 2 min after intravaginal application. Uptake into
the uterus was observed during the follicular as well as during the luteal phases
of the cycle in every patient examined. Radioactivity entered the fallopian tubes
either on both sides (15%) or on only one side (64%) in 79% of the patients
studied during the follicular phase. In the remaining patients, radioactivity
was detected only in the uterine cavity and did not migrate into the fallopian
tubes. FIGURE 1 shows typical examples of the scans. Significant radioactivity
entering the pelvis was observed in only 6% of the patients.

The ascension of radioactive particles into the uterus in the 15 patients
examined during the luteal phase appeared to be indistinguishable from that
observed during the follicular phase. However, we did not observe transport
into the oviducts in any of the patients examined during the luteal phase. In
addition, in these 10 women, we observed a qualitatively different pattern
of distribution of radioactivity within the uterus compared to that observed
during the follicular phase of the cycle. A rather broad area of radioactivity
was observed during the luteal phase giving the impression of a large cavum
uteri, while during the follicular phase, the area of maximal activity had an
elongated shape.

Radioactivity from the uterine cavity and the oviducts was completely dis-
persed by flushing the uterus with a small volume of saline ($\sim$ 3 mL). In
addition, more than 90% of radioactivity in the fluid collected from the cul
de sac in 3 patients who underwent laparoscopy was found in the pellet after
centrifugation and could be precipitated by trichloracetic acid, indicating that
most of the radioactivity was still protein bound.

FIGURE 2 shows the relationship between ipsilateral and bilateral entry of
radioactivity into the fallopian tubes and the size of the dominant follicle.
The frequency of ipsilateral transport of activity into the oviduct was found
to increase from 10% to 75% with increasing diameter of the leading follicle,



**FIGURE 1.** Typical examples of scans taken 10–20 min after application of 10–12
MBq 99mTc labeled microspheres to the posterior vaginal fornix, demonstrating (from left
to right) uptake into the uterus and unilateral transport to the right fallopian tube (**A**), uptake
into the uterus only (**B**), and bilateral transport into the oviducts (**C**). A marker is placed
at half distance between the symphysis and umbilicus (reprinted from Wildt *et al*.[27] with
permission).



**FIGURE 2.** Lateralization of transport of labeled microspheres and size of the leading follicle. With increasing diameter of the dominant follicle, the proportion of patients exhibiting ipsilateral transport to the oviduct leading to the dominant follicle did increase progressively. The proportion of patients who had ipsilateral transport was higher in those who became pregnant after timed intercourse or intrauterine insemination than in those who did not conceive after this treatment (Treatment duration lasting up to 6 cycles). Up to a follicle size of 13 mm, ipsilateral transport could be diagnosed only in retrospect, at the time when a dominant follicle appeared on the side where radioactivity was concentrated.

when all patients were included in the analysis. The percentage of patients with ipsilateral transport was higher and increased from 25% to 95%, when only those patients were considered who later became pregnant either spontaneously or after intrauterine insemination.

TABLE 1 shows the relationship between the outcome of treatment of infertility and the asymmetrical distribution of radioactivity. The combined pregnancy rate for spontaneous pregnancies (Sp) or pregnancies following intrauterine insemination (IUI) in women exhibiting ipsilateral transport was 21.7%; when no entry of radioactivity into the tubes was found, the pregnancy rate was only 2% ($P < 0.05$). In contrast, no significant difference in pregnancy rate (22.7% vs. 24.5%, respectively) could be observed between both groups of patients who underwent *in vitro* fertilization (IVF) or intracytoplasmic sperm injection (ICSI).

The effects of oxytocin administration on transport of radioactivity are shown in FIGURES 3 AND 4. After oxytocin administration, radioactivity within

**TABLE 1. Relationship between the outcome of treatment for infertility and the symmetrical distribution of radioactivity**

|  | Ipsilateral Transport | No Transport |
| --- | --- | --- |
| Pregnant (Sp*+ IUI) | 78/360 (21.7 %) | 4/200 (2%) |
| Pregnant ** (IVF+ICSI) | 25/110 (22.7%) | 48/196 (24.5%) |

*includes pregnancies after normal and timed intercourse.
**includes pregnancies after transfer of cryopreserved pronucleus cells.

**ZERVOMANOLAKIS *et al*.**                                                                 **9**

the ROI on the ipsilateral side immediately increased, suggesting an increase in the amount of particles transported as a consequence of the administration of the peptide, as shown in FIGURE 3. Radioactivity on the contralateral side, in contrast, did not exhibit dramatic changes. FIGURE 4 summarizes the data for all 50 patients studied. During the luteal phase, oxytocin had no effect on the distribution of radioactivity within the uterus.

Doppler ultrasonography of the uterus and the oviduct filled with contrast medium resulted in eddy formations, indicative of turbulent rather than laminar flow within the tubes. Oxytocin administration resulted in an increase of turbulent flow, as shown in FIGURE 5, but only within the oviduct on the side of the dominant follicle. Only few signals could be detected on the contralateral side before and after the administration of oxytocin.

FIGURE 6 shows the results of the recording of the intrauterine pressure during the follicular phase of the cycle before and after oxytocin administration. Basal pressure increased significantly ($P < 0.05$) immediately following the administration of oxytocin.

FIGURE 7 shows the results of the recording of the CBF under a constant physiological temperature of 37°C. The mean ($\pm$ SD) baseline in tubal explants



**FIGURE 3.** Intravenous (i.v.) administration of oxytocin (3 IU) in a patient during HSS. The upper panel (**A** and **B**) shows two scans taken 10 min apart, with the regions of interest (ROI) depicted as boxes over the cavum and the left and right oviducts, respectively. The lower panel shows radioactivity measured within the ROIs over the left and right oviducts and expressed as counts per second. The dominant follicle in this patient was located in the left ovary. Activity on the left side is higher than on the right side. The arrow marks the time when oxytocin was administered; this was followed by an increase of radioactivity found within the ROI on the left side, indicating increased transport into the left oviduct (reprinted from Wildt *et al*.[27] with permission).



**FIGURE 4.** Relative increase of the radioactivity detected within the ROI placed over uterus and the fallopian tube leading to the dominant follicle. There is a significant ($P \leq$ 0.05) increase in radioactivity immediately after oxytocin administration on the dominant, but not at the contralateral side. Data represent mean $\pm$ SD of 50 observations (reprinted from Wildt et al.[27] with permission).

of the study population was $7.5 \pm 0.5$ Hz. A significant increase of CBF of 20% ($9.5 \pm 0.5$ Hz) ($P < 0.05$) was recorded after the temperature increased from $37°$C to $39°$C.

## DISCUSSION

Male germ cells have to migrate from the posterior vaginal fornix to the pars ampullaris of the fallopian tubes to fertilize an oocyte; the fertilized oocyte then has to be transported to the uterine cavity for implantation. The mechanisms and timing of this bidirectional travel are not completely understood. We studied the migration of radiolabeled immotile aggregates of serum albumin, used as surrogates for spermatozoa, from the vagina through the genital tract and explored some of the factors affecting this migration. We provide evidence that upstream transport in the genital tract may be composed of two components: a rapid uptake by the uterus from the vagina and a directed transport from the uterus to the oviduct toward the ovary bearing the dominant follicle. The former is observed during the follicular and luteal phase of the cycle, while



**FIGURE 5.** Doppler ultrasonography of the left and right fallopian tubes following instillation of echogenic contrast medium before and after oxytocin administration, demonstrating a significant increase ($P \leq 0.05$) in signal density and frequency after administration of the hormone. Data represent mean $\pm$ SD of 30 observations (reprinted from Wildt *et al*.[27] with permission).

the latter is restricted to the follicular and preovulatory phase, becoming more prominent when the size of the leading follicle increases. Therefore, we believe that the ovary bearing the dominant follicle controls this directed transport.

All examined patients exhibited an uptake of the radiolabeled aggregates by the uterus. This is an indication that this part of the transport mechanism is rather stable and that inhibition of sperm uptake does not represent a major factor in infertility. The observation of this uptake into the uterus during the luteal phase of the cycle was rather unexpected because of the hypothesis that the cervical mucus becomes impenetrable for spermatozoa under the influence of elevated progesterone serum levels. Spermatozoa have previously been shown to be immotile in luteal phase mucus *in vivo* and *in vitro*, resulting in a failure to penetrate cervical mucus *in vitro* experiments.[10–13] Our results may indicate that this does not necessarily affect that passive transport of spermatozoa, which may not be blocked during the luteal phase. Similar numbers of motile spermatozoa are found within the oviduct during the luteal as in the early- to midfollicular phase of the cycle, as previously reported by studies that examined the presence of spermatozoa in different compartments of the genital tract after intercourse. Nevertheless, the highest number of spermatozoa



**FIGURE 6.** Intrauterine pressure recorded during the follicular phase of the cycle before and after the i.v. administration of 3 IU oxytocin. Transducer I (TrI) was placed in the fundal part (**A**), transducer II (TrII) near the internal cervical os (**B**). The arithmetic difference between pressure recorded in position II and the pressure recorded in position I is plotted in the lowest panel (**C**). Note the increase in basal tonus and the increase of the pressure difference between the two recording sites after oxytocin administration. The effect of oxytocin lasted for 20–40 min (reprinted from Wildt et al., 1998[27] with permission).

can be detected in the fallopian tube during the preovulatory phase.[10–14] With regard to sperm transport, our interpretation of the results of HSS is based on the assumptions that the properties of the labeled material used for examination are similar to those of human spermatozoa and that there is no separation of label from the carrier in vivo. Various radiolabeled compounds have been used the past 30 years for radionuclide imaging of the female genital tract, including aggregates of human albumin, radioactive inert gases, and labeled spermatozoa.[6,15–22] In this study, human serum albumin macroaggregates with Tc-99m attached to the protein by noncovalent binding were used as surrogates for spermatozoa. We feel that we can adequately confirm that the radioactivity was protein-bound because: (1) we observed the disappearance of the radioactivity from the uterus after flushing with saline and (2) the radioactivity collected from the cul de sac at laparoscopy could be precipitated completely by acid and still could be centrifuged down at low speed 4–7 h after application excluding uptake by the lymphatic system.

Although HSS has not been widely used, it is a technically very simple procedure with little discomfort to the patient, in contrast to HSG. There is an apparent discrepancy between the results of HSS and those obtained with HSG



**FIGURE 7.** Ciliary beat frequency (CBF) is a local phenomenon in fimbrial cilia of human oviducts. Under physiological temperature conditions until 37°C, CBF is 7.5Hz ± 0.5Hz (**A**). As temperature increased to 39°C, CBF increased exponentially up to 20% (9.5 ± 0.5Hz, (**B**). A postovulatory increase of CBF in local areas of fimbrial cilia cells of the ipsilateral tube may guarantee the pickup of the oocyte–cumulus complex into the tube.

or laparoscopy; in the majority of patients with proven patency of both fallopian tubes only one oviduct could be visualized by HSS. The transport of the radiolabeled microspheres is physiologically restricted to the oviduct leading to the ovary bearing the dominant follicle while the contralateral fallopian tube appears to be functionally closed, as it is observed by a detailed analysis of the results of HSS and their correlation with the results of ultrasonography and determination of endocrine parameters for follicular growth.[23–26] Our present study demonstrates that ipsilateral transport, as first shown by our group in 1992,[23] is a reflection of the physiological function of the uterus and the oviduct and not the consequence of tubal pathology or an artifact of the method. This demonstration is supported by the observation that the pregnancy rate after normal intercourse or intrauterine insemination was significantly higher in patients exhibiting ipsilateral transport than in those who did not.

Our results also imply that failure of transport in patients with otherwise mechanically patent fallopian tubes, may be considered an etiology of infertility. Most of the patients examined in this study would have been diagnosed as suffering from idiopathic infertility. We proposed the concept of TTD as a more adequate description of the condition of these patients.[27] The results of HSS may provide criteria for the choice of the adequate therapy in such women, since pregnancy rates in patients with TTD, which are extremely low following insemination or timed intercourse, can be increased substantially by *in vitro* fertilization.

The ovary bearing the dominant follicle appears to control the transport from the uterus to the oviduct. The proportion of patients exhibiting ipsilateral transport increased with the size of the dominant follicle, reaching up to 90% of those patients who became pregnant when the follicle diameter was 19 mm or more. The forces that are driving transport and the mechanisms directing this process need to be defined. Since the particles used for HSS are protein aggregates devoid of motility, motility of the spermatozoa can be excluded. Movements of the ciliae within the oviduct do not seem to be a major factor in rapid transport, since the beat of ciliae is directed from the ampulla to the uterus (the opposite direction), and women with Kartagener Syndrome, that is, congenital absence of ciliae, have no difficulties in becoming pregnant.[1,28–31] It is also unlikely that capillary forces generated within the mucus and a difference in hydrostatic pressure between vagina and peritoneal cavity account for the immediate uptake from the vagina and the directed transport.[32] Peristaltic contractions of the uterus and of the muscular layers of the fallopian tubes therefore represent the most likely candidates responsible for the rapid transport phenomena. Using direct measurement of intrauterine pressure or vaginal ultrasonography combined with videocinematography during the follicular phase of the cycle, peristaltic contractions of the nonpregnant uterus have been described in women during the normal menstrual cycle as well as in women suffering from primary dysmenorrhea or in women with endometriosis.[33–37] The contractions seem to occur with a frequency of 2–5 per min and to exhibit a characteristic pattern of propagation in healthy women, depending on the phase of the menstrual cycle. While a cervicofundal propagation of peristaltic waves was found during the preovulatory phase of the cycle, a fundocervical direction predominated in the early follicular phase.

The strong positive correlation between the temperature and the oocyte pick-up rate in the animaloviductal infundibulum is demonstrated by a linear regression.[38] Preovulatory temperature differences between the ampullary and isthmic portions of a single tube have been previously reported and thought to primarily reflect the extent and activity of the vascular and lymphatic beds in the oviduct tissues.[39–41] We found periovulatory temperature differences of up to 1.5 °C between the two oviducts measured *in vivo* during tubal catheterization in a small group of patients, temperature being higher within the oviduct leading to the ovary bearing the dominant follicle (Wildt *et al*. unpublished) . Furthermore, we found an exponential increase in CBF in the range of physiological temperature. This is in accordance with the report of a significantly higher temperature in the ipsilateral tube corresponding to the dominant follicle compared to the contralateral side in human oviducts.[42] Our data suggest that this difference in periovulatory temperature between the two fimbriae may be responsible for the increased CBF on the side ipsilateral to the dominant follicle, underlining the concept of the uterus consisting of two functionally different components.

A number of hormones and paracrine mediators, such as prostaglandins, vasopressin, oxytocin, and various peptides can induce uterine contractions.[43–46] The administration of oxytocin during HSS was followed by a five- to sevenfold increase in the radioactivity detected in the oviduct ipsilateral to the dominant follicle; in addition, systemic administration of oxytocin increased the amplitude of contractions and reversed the pressure gradient from a fundocervical to a cervicofundal direction. Oxytocin is known to play an important role in eliciting contractions of the pregnant and nonpregnant uterus, while oxytocin receptors have been demonstrated in the nonpregnant uterus of human females and laboratory animals.[43,47–50] Following vaginal distension and cervical stimulation during intercourse, oxytocin is released from the posterior lobe of the pituitary in response to tactile as well as emotional stimuli.[32,51–55] Synthesis of oxytocin has also been demonstrated within the endometrium and the ovary, respectively.[50,56–59] Knaus demonstrated that injections of posterior pituitary extract containing oxytocin promptly induced contractions of the nonpregnant human uterus during the follicular phase, but not after ovulation.[60] Our results show a striking effect of oxytocin on uterine transport mechanisms and are in agreement with the early observations of Knaus, demonstrating the absence of directed transport during the luteal phase.

The electrical activity as a response to the oxytocin administration corresponded to the increase of intrauterine pressure. In most instances, no direct relationship between contractions and electrical activity was found. Further studies are necessary to explore the correlation between electrical activity and intrauterine pressure and to examine the validity of recording electrical potentials for the assessment of uterine contractions.[61,62] The Doppler ultrasonography after administration of ultrasound contrast medium supports the observation of ipsilateral transport into and within the oviduct during scintigraphy. An increase in turbulent flow within the fallopian tube is indicated by an increase in signal density that was consistently observed immediately after oxytocin administration, either i.v. or intranasally. The increase of flow could only be detected within the oviduct leading to the dominant follicle, which shows that transport occurred predominantly in this direction.[27,63]

Although the overall increase in transport may be explained by the stimulatory action of oxytocin on myometrial contractions, additional mechanisms acting at the levels of uterus and oviduct, such as asymmetric distribution of oxytocin receptors or changes in the resistance of the oviducts caused by the activation or relaxation of smooth muscle cells at the uterotubal junction, are required to account for the unilateral transport. This question cannot be answered by the present studies. Therefore, we propose the following hypothesis, schematically depicted in FIGURE 8: (1) The fallopian tubes are functionally closed in the absence of ovarian hormones. (2) Hormones that cause relaxation of smooth muscle cells are produced by the ovary bearing the dominant follicle. (3) Unilateral transport is to be regarded as the consequence of active relaxation of the myometrium at the side of the ovary that is bearing the



**FIGURE 8.** Schematic representation of the model of directed transport. During the early follicular phase (**A**) both fallopian tubes are functionally closed, transport occurs from the vagina to the uterine cavity. Contractions of the myometrium, indicated by the broken arrows, which are followed by relaxation, cause a negative pressure within the uterus when compared to the vagina. (**B**) The dominant follicle has been selected. Concentrations of progesterone, produced by the dominant follicle, are elevated at the uterotubal junction due to a countercurrent system indicated by the arrows, causing relaxation of the musculature. Since the contralateral side remains functionally closed, transport is directed into the fallopian tube at the side of the dominant follicle. (**C**) Demonstrates transport during the luteal phase of the cycle. Uptake into the uterus is not impaired, but transport into the fallopian tubes appears to be completely blocked. Transport of the fertilized oocyte is depicted by the arrows within the right fallopian tube, however, the mechanisms governing embryo transport remain to be delucidated.

dominant follicle rather than the induction of a contraction at the contralateral side.

Progesterone can also induce relaxation of the myometrium. The preovulatory follicle produces progesterone in increasing amounts. In addition, progesterone concentrations in the venous effluent from the ovary bearing the dominant follicle are higher than those from the contralateral ovary several days before ovulation.[64,65] Progesterone could be delivered to the area of the uterotubal junction through the arteriovenous countercurrent exchange system that has been identified between the ovary and the uterus.[66–70]

In conclusion, our data demonstrate that the uterus and fallopian tubes seem to act as a functional unit and peristaltic pump that provides the pressure gradients necessary to transport spermatozoa from the vagina to the fallopian tubes. Secretory products originating from the ovary bearing the dominant follicle allow further transport to the ampullary part of the tube on the side of the follicle destined to ovulate, inducing the active relaxation of a functional sphincter mechanism located in the area of the uterotubal junction, while the contralateral oviduct remains functionally closed. Consequently, the probability for fertilization is increased by the maximized number of spermatozoa at

the site where the oocyte is released. Oxytocin contributes to the control of this process by activating pump mechanisms via contraction of uterine smooth muscles. Disturbance of these mechanisms interferes with tubal transport, causing infertility, even in the presence of mechanically open fallopian tubes. HSS appears to be a suitable method to diagnose this TTD.

## REFERENCES

1. LYONS, R.A., E. SARIDOGAN & O. DJAHANBAKHCH. 2006. The reproductive significance of human Fallopian tube cilia. Hum. Reprod. Update **12:** 363–372.
2. PULKKINEN, M.O. 1995. Oviductal function is critical for very early human life. Ann. Med. **27:** 307–310.
3. ADELUSI, B., L. AL-NUAIM, D. MAKANJUOLA, *et al.* 1995. Accuracy of hysterosalpingography and laparoscopic hydrotubation in diagnosis of tubal patency. Fertil. Steril. **63:** 1016–1020.
4. KARANDE, V.C., D.E. PRATT., D.S. RABIN, *et al.* 1995. The limited value of hysterosalpingography in assessing tubal status and fertility potential. Fertil. Steril. **63:** 1167–1171.
5. SHAHID, N., A. AHLUWALIA, S. BRIGGS, *et al.* 2005. An audit of patients investigated by hysterosalpingo-contrast-ultrasonography (HyCoSy) for infertility. J. Obstet. Gynaecol. **25:** 275–278.
6. BECKER, W., T. STECK, P. ALBERT, *et al.* 1988. Hysterosalpingoscintigraphy: a simple and accurate method of evaluating fallopian tube patency. Nuklearmedizin. **27:** 252–257.
7. STECK, T., W. BECKER, P. ALBERT, *et al.* 1989. Initial experiences with hysterosalpingoscintigraphy in normal and pathologic fallopian tube passage. Geburtshilfe und Frauenheilkunde. **49:** 889–893.
8. MERRIAM, G.R. & K.W. WACHTER. 1982. Algorithms for the study of episodic hormone secretion. Am. J. Physiol. **243:** 310–318.
9. ZAR, J.H. 1984. Biostatistical Analysis. Second edition. Prentice-Hall. Englewood Cliffs, NJ.
10. BIANCHI, P.G., A. DE AGOSTINI, J. FOURNIER, *et al.* 2004. Human cervical mucus can act *in vitro* as a selective barrier against spermatozoa carrying fragmented DNA and chromatin structural abnormalities. J. Assist. Reprod. Genet. **21:** 97–102.
11. CHRETIEN, F.C., C. SUREAU & C. NEAU. 1980. Experimental study of cervical blockage induced by continuous low-dose oral progestogens. Contraception **22:** 445–456.
12. GADDUM-ROSSE, P., R.J. BLANDAU & W.I. LEE. 1980. Sperm penetration into cervical mucus *in vitro*. II. Human spermatozoa in bovine mucus. Fertil. Steril. **33:** 644–648.
13. MORALES, P., M. ROCO & P. VIGIL. 1993. Human cervical mucus: relationship between biochemical characteristics and ability to allow migration of spermatozoa. Hum. Reprod. **8:** 78–83.
14. VIGIL, P., R. RIQUELME & P. MORALES. 1995. Sperm binding to the human zona pellucida after migration through human cervical mucus. Int. J. Androl. **18:** 7–11.
15. ALIMOV, S.H.A., A.A. KOGAN, V.S. GINZBURG, *et al.* 1973. Radioisotope study of uterine tubal patency. Akush.Ginekol. Mosk. **49:** 64–67.

16. ARDRAN, G.M. & F.H. KEMP. 1972. Radiography of potentially pregnant females. Br. Med. J. **4:** 422–423.

17. BRUNDIN, J., M. DAHLBORN, E. AHLBERG AHRE, *et al.* 1989. Radionuclide hysterosalpingography for measurement of human oviductal function. Int. J. Gynaecol. Obstet. **28:** 53–59.

18. DE ROSSI, G., M. SALVATORI, A. GIORDANO, *et al.* 1981. Hysterosalpingoscintigraphy. About the possibility of fallopian tubes patency evaluations by means of 99mTc-pertechnetate and comparison of radiation loads due to radioisotopic and x-ray examinations. Radiol. Diagn. Berl. **46:** 692–695.

19. ITURRALDE, M. & P.F. VENTER. 1981. Hysterosalpingo-radionuclide scintigraphy. Semin. Nucl. Med. **11:** 301–314.

20. OZGUR, K., A. YILDIZ, M. UNER., et al. 1997. Radionuclide hysterosalpingography with radiolabeled spermatozoa. Fertil. Steril. **67:** 751–755.

21. PERTYNSKI, T., W. JAKUBOWSKI, J. STELMACHOW, *et al.* 1977. A scintigraphic method of examining the patency of oviducts using 133Xe. Eur. J. Nucl. Med. **2:** 159–164.

22. SCHMIEDEHAUSEN, K., S. KAT, N. ALBERT, *et al.* 2003. Determination of velocity of tubar transport with dynamic hysterosalpingoscintigraphy. Nucl. Med. Commun. **24:** 865–870.

23. BECKER, W., L. WILDT., E. SIEBZEHNRUEBL, *et al.* 1992. Tubal patency regulated by the endocrine system—new concept based on hysterosalpingoszintigraphy. Acta Endocrinologica **126:** 135.

24. KISSLER, S., K. DOINGHAUS, W. BECKER, *et al.* 1995. Hysterosalpingoscintigraphic examination of the fallopian tube: a selective, unilateral transport mechanism. Contracep. Fertil. Steril. **23:** 286.

25. KUNZ, G., D. BEIL, H. DEINIGER, *et al.* 1997. The dynamics of rapid sperm transport through the female genital tract: evidence from vaginal ultrasonography of uterine peristalsis and hysterosalpingoscintigraphy. Hum. Reprod. **11:** 627–632.

26. KUNZ, G., D. BEIL, P. HUPPERT, *et al.* 2006. Control and function of uterine peristalsis during the human luteal phase. Reprod. Biomed. Online **13:** 528–540.

27. WILDT, L., S. KISSLER, P. LICHT, *et al.* 1998. Sperm transport in the human female genital tract and its modulation by oxytocin as assessed by hysterosalpingoscintigraphy, hysterotonography, electrohysterography and Doppler ultrasonography. Hum. Reprod. Update **4:** 655–666.

28. AMSLER, P. & N. PAVIC. 1985. Pregnancy in a patient with immotile cilia syndrome (Kartagener syndrome). Geburtshilfe Frauenheilkd. **45:** 183–185.

29. ELIJAHU, S. & E. SHALEV. 1996. A fertile woman with Kartagener's syndrome and three consecutive pregnancies. Hum. Reprod. **11:** 683.

30. HALBERT, S.A., D.L. PATTON, P.W. ZARUTSKIE, *et al.* 1997. Function and structure of cilia in the fallopian tube of an infertile woman with Kartagener's syndrome. Hum. Reprod. **12:** 55–58.

31. MC COMB, P., L. LANGLEY, M. VILLALON, *et al.* 1986. The oviductal cilia and Kartagener's syndrome. Fertil. Steril. **46:** 412–416.

32. FOX, C.A., H.S. WOLFF & J.A. BAKER. 1970. Measurement of intra-vaginal and intra-uterine pressures during human coitus by radio-telemetry. J. Reprod. Fertil. **22:** 243–255.

33. CSAPO, A.I. & C.R. PINTO DANTAS. 1966. The cyclic activity of the nonpregnant human uterus. A new method for recording intrauterine pressure. Fertil. Steril. **17:** 34–38.

34. DAWOOD, M.Y. 1986. Current concepts in the aetiology and treatment of primary dysmenorrhea. Acta Obstet. Gynecol. Scand. Suppl. **138:** 7–10.

35. KISSLER, S., N. HAMSCHO, S. ZANGOS, *et al.* 2006. Uterotubal transport disorder in adenomyosis and endometriosis—a cause for infertility. BJOG **113:** 902–908.

36. KUNZ, G., D. BEIL, H. DEINIGER, *et al.* 1997. The uterine peristaltic pump. Normal and impeded sperm transport within the female genital tract. Adv. Exp. Med. Biol. **424:** 267–277.

37. LEYENDECKER, G., G. KUNZ, L. WILDT, *et al.* 1996. Uterine hyperperistalsis and dysperistalsis as dysfunctions of the mechanism of rapid sperm transport in patients with endometriosis and infertility. Hum. Reprod. **11:** 1542–1551.

38. HUANG, S., N. DRIESSEN, M. KNOLL, *et al.* 1997. *In vitro* analysis of oocyte cumulus complex pick up rate in the hamster *Mesocricetus auratus*. Mol. Reprod. Dev. **47:** 312–322.

39. HUNTER, R.H. & R. NICHOL. 1986. A preovulatory temperature gradient between the isthmus and ampulla of pig oviducts during the phase of sperm storage. J. Reprod. Fertil. **2:** 599–606.

40. HUNTER, R.H. 2005. The fallopian tubes in domestic mammals: how vital is their physiological activity? Reprod. Nutr. Dev. **45:** 281–290.

41. BAHAT, A., M. EISENBACH & I. TUR-KASPA. 2005. Periovulatory increase in temperature difference within the rabbit oviduct. Human Reprod. **20:** 2118–2121.

42. CICINELLI, E., N. EINER-JENSEN, R. ALFONSO, *et al.* 2005. A dominant ovarian follicle induces unilateral changes in the origin of the blood supply to the tubal corner of the uterus. Hum. Reprod. **20:** 3208–3211.

43. AKERLUND, M. 2006. Targeting the oxytocin receptor to relax the myometrium. Expert Opin. Ther. Targets **10:** 423–427.

44. AKERLUND, M. 2002. Involvement of oxytocin and vasopressin in the pathophysiology of preterm labor and primary dysmenorrhea. Prog. Brain Res. **139:** 359–365.

45. MAGGI, M., E. BALDI & T. SUSINI. 1994. Hormonal and local regulation of uterine activity during parturition: Part I–The oxytocin system. J. Endocrinol. Invest. **17:** 739–756.

46. MAGGI, M., E. BALDI & T. SUSINI. 1994. Hormonal and local regulation of uterine activity during parturition: Part II–The prostaglandin and adrenergic systems. J. Endocrinol. Invest. **17:** 757–770.

47. TERRILLON, S., L.L. CHENG, S. STOEV, *et al.* 2002. Synthesis and characterization of fluorescent antagonists and agonists for human oxytocin and vasopressin V(1)(a) receptors. J. Med. Chem. **45:** 2579–2588.

48. FUCHS, A.R., F. FUCHS & M.S. SOLOFF. 1985. Oxytocin receptors in nonpregnant human uterus. J. Clin. Endocrinol. Metab. **60:** 37–41.

49. MILLER, F.D., R. CHIBBAR & B.F. MITCHELL. 1993. Synthesis of oxytocin in amnion, chorion and decidua: a potential paracrine role for oxytocin in the onset of human parturition. Regul. Pept. **45:** 247–251.

50. IVELL, R., W. RUST, A. EINSPANIER, *et al.* 1995. Oxytocin and oxytocin receptor gene expression in the reproductive tract of the pregnant cow: rescue of luteal oxytocin production at term. Biol. Reprod. **53:** 553–560.

51. FOX, C.A. & B. FOX. 1971. A comparative study of coital physiology, with special reference to the sexual climax. J. Reprod. Fertil. **24:** 319–336.

52. FOX, C.A. 1973. Recent studies in human coital physiology. Clin. Endocrinol. Metab. **2:** 527–543.

53. FOX, C.A. 1976. Some aspects and implications of coital physiology. J. Sex. Marital. Ther. **2:** 205–213.

54. MURPHY, M.R., J.R. SECKL, S. BURTON, *et al.* 1987. Changes in oxytocin and vasopressin secretion during sexual activity in men. J. Clin. Endocrinol. Metab. **65:** 738–741.

55. GILBERT, C.L., K. JENKINS & D.C. WATHES. 1991. Pulsatile release of oxytocin into the circulation of the ewe during oestrus, mating and the early luteal phase. J. Reprod. Fertil. **91:** 337–346.

56. BURNS, P.D., J.O. MENDES, JR., R.S. YEMM, *et al.* 2001. Cellular mechanisms by which oxytocin mediates ovine endometrial prostaglandin F2alpha synthesis: role of G(i) proteins and mitogen-activated protein kinases. Biol. Reprod. **65:** 1150–1155.

57. GARCIA VILLAR, R., P.L. TOUTAIN, D. SCHAMS, *et al.* 1983. Are regular activity episodes of the genital tract controlled by pulsatile releases of oxytocin? Biol. Reprod. **29:** 1183–1188.

58. OKUDA, K., A. MIYAMOTO, H. SAUERWEIN, *et al.* 1992. Evidence for oxytocin receptors in cultured bovine luteal cells. Biol. Reprod. **46:** 1001–1006.

59. KHAN-DAWOOD, F.S., J. YANG & M.Y. DAWOOD. 1995. Potential role of oxytocin in cell to cell communication in the corpus luteum. Adv. Exp. Med. Biol. **395:** 507–516.

60. KNAUS, H. 1950. Die Physiologie der Zeugung des Menschen. Third edition. Wilhelm Maudlach Verlag. Wien. 34.

61. DARCONZA, G., S. PARADISO, R. TRENTADUE, *et al.* 1990. Electrical activity of the human uterus *in vivo* in the phases of the menstrual cycle. Clin. Exp. Obstet. Gynecol. **17:** 171–180.

62. VERDENIK, I., M. PAJNTAR & B. LESKOSEK. 2001. Uterine electrical activity as predictor of preterm birth in women with preterm contractions. Eur. J. Obstet. Gynecol. Reprod. Biol. **95:** 149–153.

63. KUNZ, G., M. HERBERZT, M. NOE, *et al.* 1998. Uterine peristalsis during the follicular phase of the menstrual cycle: effects of oestrogen, antioestrogen and oxytocin. Hum. Reprod. Update **4:** 647–654.

64. BAIRD, D.T. & I.S. FRASER. 1975. Concentration of oestrone and oestradiol in follicular fluid and ovarian venous blood of women. Clin. Endocrinol.. **4:** 259–264.

65. KHAN-DAWOOD, F.S., L.T. GOLDSMITH, G. WEISS, *et al.* 1989. Human corpus luteum secretion of relaxin, oxytocin, and progesterone. J. Clin. Endocrinol. Metab. **68:** 627–631.

66. GINTHER, O.J. 1974. Internal regulation of physiological processes through local venoarterial pathways. A review. J. Anim. Sci. **39:** 550–564.

67. CZERKWINSKI, J. 1985. Selected problems of morphology of the venous system of the female internal genital organs. II. Morphology of the veins of the mesosalpinx. The venous system in cases of uterine myoma. Atypical anastomoses between ovarian and uterine venous trunks. Ginekol. Pol. **56:** 293–299.

68. EINER JENSEN, N. 1990. Functional and therapeutic aspects of counter current transfer in the female adnexa. Med. Hypotheses **33:** 125–127.

69. KRZYMOWSKI, T., J. KOTWICA & S. STEFANCZYK KRZYMOWSKA. 1990. Uterine and ovarian countercurrent pathways in the control of ovarian function in the pig. J. Reprod. Fertil. Suppl. **40:** 179–191.

70. STEFANCZYK KRZYMOWSKA, S., J. CHLOPEK, W. GRZEGORZEWSKI, *et al.* 2005. Local transfer of prostaglandin E2 into the ovary and its retrograde transfer into the uterus in early pregnant sows. Exp. Physiol. **90:** 807–814.

Exhibit 41



*Journal of The American College of Obstetricians and Gynecologists*

Volume 64      *August 1984*      Number 2

# Retrograde Menstruation in Healthy Women and in Patients With Endometriosis

JOUKO HALME, MD, PhD, MARY G. HAMMOND, MD,

JAROSLAV F. HULKA, MD, SHAILAJA G. RAJ, MD,

AND LUTHER M. TALBERT, MD

**Blood was found in the peritoneal fluid in 90% of women with patent tubes at laparoscopy during perimenstrual time. If the fallopian tubes were occluded, then only 15% of patients had evidence of blood in the pelvis. Also, 90% of patients with endometriosis and eight of nine women on oral contraceptives had bloody fluid during the menstrual period. The present observations indicate that retrograde menstruation through the fallopian tubes into the peritoneal cavity is a very common physiologic event in all menstruating women with patent tubes. (Obstet Gynecol 64:151, 1984)**

In 1927 Sampson proposed that endometriosis was due to implantation of endometrial cells during retrograde menstruation.[1] During his lifetime, most of the opponents of this theory dismissed it mainly on the basis that retrograde menstruation, although occasionally noted to occur, was a relatively rare phenomenon.[2,3] Therefore, it would not explain the development of a common clinical entity such as endometriosis. Since that time, the frequency of retrograde menstruation has been debated.

No systematic studies documenting the incidence of retrograde menstruation have been published in spite of the fact that millions of women have undergone laparotomy or laparoscopy, making possible direct observations of pelvic structures. Recently, however, Blumenkrantz et al[4] reported that nine of 11 menstruating women undergoing peritoneal dialysis had blood present regularly in the dialysate during the time of their period and in this way documented retrograde menstruation. They also suggested that this event was a rather common phenomenon, and not limited to women with renal failure. In addition, a study from the authors' institution reported that of 80 peritoneal fluid samples, all four obtained during menses were bloody.[5]

Based on laparoscopy of 323 women, the current study presents further evidence suggesting that retrograde menstruation occurs in most menstruating women who have open fallopian tubes.

## Material and Methods

Between July 1980 and September 1983, 331 pelvic fluid samples were obtained from patients undergoing laparoscopy at The North Carolina Memorial Hospital. Of

*From the Division of Reproductive Endocrinology and Fertility, Department of Obstetrics and Gynecology, University of North Carolina School of Medicine, Chapel Hill, North Carolina.*

*Supported in part by the Kenneth D. Dickinson Fund.*

181 patients with patent tubes and normal pelves, 78 underwent laparoscopy for bilateral tubal ligation, and 103 were undergoing diagnostic laparoscopy for evaluation of infertility or chronic pelvic pain. Of 40 patients with occluded fallopian tubes, 16 had distal blockage, two had proximal blockage, and 22 had proximal occlusion as a result of previous tubal ligation. Eighty-one patients were noted to have mild to moderate endometriosis.

Peritoneal fluid was aspirated with an 18-gauge Silastic catheter through the operative channel of the laparoscope and collected into a heparin-containing test tube. The color of the fluid, when in the tube, was recorded either as straw, pink, or bloody. Upon reviewing the records of these patients, the date of the last normal menses in 302 patients, and observations on the fluid samples were available. In addition, 21 women who were on oral contraceptives were identified.

Because only visual documentation of the color of the fluid was available for all samples, an experiment was set up to test the accuracy of this technique in assessment of the presence of blood. A series of 30 tubes containing ten different concentrations of red blood cells (ranging from hematocrit of 0 to 10) in peritoneal fluid was constructed. The tubes were shown in a random order to each of the nine persons involved in classifying these fluids into one of the three color categories. The color was judged as straw when hematocrit was less than $0.5 \pm 0.2\%$ (SD) and bloody when hematocrit was higher than $3.2 \pm 2.0\%$. Between these values, the color was judged to be pink. The level of agreement between different individuals and by each individual between two testing occasions (the coefficient $\kappa$) was determined according to Cohen[6]



**Figure 1.** Appearance of all 302 peritoneal fluid samples obtained during laparoscopy. Solid bars = bloody; shaded bars = pink; open bars = straw.

**Table 1.** Appearance of Peritoneal Fluid Samples Obtained on Nonmenstrual Days 7 to 26

| | No endometriosis | | Endometriosis |
|---|---|---|---|
| | Open tubes | Closed tubes | |
| Straw | 54 | 11 | 14 |
| Pink or bloody | 85 | 16 | 57 |
| Total | 139 | 27 | 71 |

and Fleiss.[7] Values of $\kappa$ ranged from 0.39 to 1.0 between pairs of individuals and from 0.52 to 1.0 between the two testings.

Observations by Blumenkrantz et al[4] suggested that the presence of blood in the peritoneal dialysates usually preceded the beginning of menstrual flow by one to two days. Therefore, the patients in this series were divided in two groups: 1) perimenstrual, if they underwent laparoscopy on days one to six or 27 to 30 of their cycle, and 2) nonmenstrual, if laparoscopy was performed between days 7 to 26 of the cycle.

Statistical analysis of the data was performed by using the $\chi^2$ statistic for $2 \times 2$ contingency tables constructed for pairs of variables and normal approximation for the binomial distribution.[8]

## Results

Figure 1 presents the noted color of each of the 302 fluid samples in perimenstrual and nonmenstrual phases of the cycle. It is obvious from the graph that there is an increased amount of blood in the pelvic cavity around the time of menses and also immediately after ovulation with clearance of that blood over the next five to six days.

As indicated in Table 1, a total of 237 fluid samples were obtained in the nonmenstrual phase. Overall one-third of these fluids were straw, and the other two-thirds contained an appreciable amount of red blood cells (either pink or bloody). In normal women with open fallopian tubes, 61.1% of fluids were either pink or bloody as compared with 60% in women with occluded tubes, suggesting that tubal patency is not an important factor for the presence of blood in the peritoneal cavity during the nonmenstrual phase of the

**Table 2.** Appearance of Peritoneal Fluid Samples Obtained on Perimenstrual Days 1 to 6 and 27 to 30

| | No endometriosis | | Endometriosis |
|---|---|---|---|
| | Open tubes | Closed tubes | |
| Straw | 4 | 11 | 1 |
| Pink or bloody | 38 | 2 | 9 |
| Total | 42 | 13 | 10 |

normal cycle. In the 12 women on oral contraceptives who underwent laparoscopy during this phase of the cycle, six had pink fluid in the cul-de-sac. In patients with endometriosis, blood was detected significantly more often ($P \leq .005$) than in other women with patent tubes in the nonmenstrual phase.

Table 2 presents corresponding data for fluid samples obtained during the perimenstrual phase of the cycle. Of 52 samples from women with patent fallopian tubes, 47 (90.4%) had an appreciable amount of red blood cells; 70% of these were grossly bloody. This is significantly different ($P \leq .001$) than the corresponding percentage in nonmenstrual samples. In the nine women on oral contraceptives who underwent laparoscopy in the perimenstrual phase, eight had bloody fluid. Only two of 13 (15.4%) patients with occluded tubes had red blood cells (one pink and one bloody sample) in the peritoneal fluid. This frequency is significantly lower ($P \leq .005$) than in women with open tubes. These figures clearly indicate that during the perimenstrual phase, the peritoneal fluid in almost all women, including those taking oral contraceptives, contains blood and that the fallopian tubes play an important role as conduits for menstrual blood.

## Discussion

The important clinical observations by Blumenkrantz et al[4] in women undergoing peritoneal dialysis indicated that bleeding into the dialysate usually was detectable one to two days before the menstrual period and during the menses. The recognition of this phenomenon prompted the authors to include the patients undergoing laparoscopy on these premenstrual days in the perimenstrual group rather than in the nonmenstrual group. The results of this study clearly indicate that during this perimenstrual time of the cycle, over 90% of normal and infertile women have blood in their peritoneal fluid. If the tubes are occluded, there is no correlation between the perimenstrual phase and the presence of blood in the pelvis. This indicates that the fallopian tubes are the major conduit for blood entering the peritoneal compartment at the time of menses.

The use of oral contraceptives has been advocated as a possible means of protection from endometriosis,[5,9] but it may be inferred from the present data that if used noncontinuously, allowing menstruation to occur, retrograde menstruation will also occur, as these women consistently had blood in the pelvic fluid at this time. To prevent this, an uninterrupted mode of administration may be necessary.

Many studies have demonstrated that various volumes of peritoneal fluid are found in the female pelvis during laparoscopy.[5,10,11] This fluid in the pelvis often

seems to contain blood.[12,13] In 69% of all patients in this series, an appreciable amount of blood was detected. Sources of this blood include the abdominal wall stab wound(s) and severed vessels in omentum or adhesions in the pelvis. This contamination with fresh blood is always variably present in addition to blood derived from natural, physiologic phenomena like ovulation, and eventually, retrograde menstruation. It is not possible to accurately assess the impact of this contamination, but it may be safe to assume that this iatrogenic hemorrhage occurs at random and is not dependent on any particular time of the cycle. Furthermore, observation (not shown) that even grossly bloody peritoneal fluid samples obtained during menses did not contain appreciable numbers of granulocytes suggests that the blood did not result from an immediate hemorrhage to the pelvic compartment.

Sampson[1] originally suggested that retrograde menstruation provides a mechanism by which endometrial cells can implant on peritoneal surfaces in women with endometriosis. Because the great majority of the authors' patients either with or without endometriosis showed evidence of retrograde menstruation, it cannot explain why only some women have developed the disease. Other factors, either hormonal or immunologic, will apparently determine whether or not ectopic implantation can take place. Koninckx et al[14,15] demonstrated a high incidence of luteinized unruptured follicle syndrome in women with endometriosis, and also a low, late luteal phase progesterone/estrogen ratio of peritoneal fluid in this syndrome. They hypothesized that this local hormonal imbalance may be critical in allowing endometrial cells, if present in the peritoneal compartment, to implant on the peritoneum. The results of the present study provide direct evidence that cells originating from the uterine cavity indeed are present in the pelvis in the late luteal phase preceding menses, and this theory may hold if peritoneal fluid hormone levels are abnormal. However, a recent study[16] found no difference in progesterone and estrogen levels during this time in the fluid of women with or without endometriosis. However, several sources[17,18] suggest that abnormal immunologic defense mechanisms may be operative in women with endometriosis, and this can explain the occurrence of ectopic implantation of endometrium. More detailed comparative information on both hormonal and immunologic function in a sizeable population of both normal women and patients with endometriosis is clearly warranted.

Studies on peritoneal macrophages[5,19] have demonstrated that samples taken at menstruation usually have the highest concentrations of these cells, the majority of which are recent arrivals. It was suggested that this influx of phagocytic macrophages to the pelvis

is a response to retrograde menstruation. The present results clearly support this idea, and it remains to be seen whether or not the nucleated cellular components of menstrual detritus are also regularly transported through the fallopian tubes. Studies are in progress in The North Carolina Memorial Hospital to detect the presence of either epithelial or stromal cells of endometrial origin in peritoneal fluid.

## References

1. Sampson JA: Peritoneal endometriosis due to the menstrual dissemination of endometrial tissue into the peritoneal cavity. Am J Obstet Gynecol 14:422, 1927
2. Novak E: Pelvic endometriosis and its treatment. Am J Surg 33:422, 1936
3. Watkins RE: Uterine replacement, retrograde menstruation and endometriosis. West J Surg 46:480, 1938
4. Blumenkrantz MJ, Gallagher RN, Bashore RA, et al: Retrograde menstruation in women undergoing chronic peritoneal dialysis. Obstet Gynecol 57:667, 1981
5. Halme J, Becker S, Hammond MG, et al: Pelvic macrophages in normal and infertile women: The role of patent tubes. Am J Obstet Gynecol 142:890, 1982
6. Cohen J: A coefficient of agreement for nominal scales. Educat Psychol Measure 20:37, 1960
7. Fleiss JL: Measuring nominal scale agreement among many raters. Psychol Bull 76:379, 1971
8. Remington RD, Schork MA: Statistics with Applications to the Biological and Health Sciences. Englewood Cliffs, NJ, Prentice-Hall, 1970, pp 229–246
9. Kistner RW: Endometriosis and infertility. Clin Obstet Gynecol 22:101, 1979
10. Maathuis JB, Van Look PFA, Michie EA: Changes in volume, total protein and ovarian steroid concentration of peritoneal fluid throughout the human menstrual cycle. J Endocrinol 76:123, 1978
11. Koninckx PR, Renaer M, Brosens IA: Origin of peritoneal fluid in women: An ovarian exudation product. Br J Obstet Gynaecol 87:177, 1980
12. Polishuk WA, Sharf M: Culdoscopic findings in primary dysmenorrhea. Obstet Gynecol 26:746, 1965
13. Reti LL, Bryne GA, Davoren RAN: The acute clinical features of retrograde menstruation. Aust N Z J Obstet Gynaecol 23:51, 1983
14. Koninckx PR, DeMoor P, Brosens IA: Diagnosis of the luteinized unruptured follicle syndrome by steroid hormone assays of peritoneal fluid. Br J Obstet Gynaecol 87:929, 1980
15. Koninckx PR, Ide P, Vandenbroucke W, et al: New aspects of the pathophysiology of endometriosis and associated infertility. J Reprod Med 24:257, 1980
16. Crain JL, Luciano AA: Peritoneal fluid evaluation in infertility. Obstet Gynecol 161:159, 1983
17. Dmowski WP, Steele RW, Baker GF: Deficient cellular immunity in endometriosis. Am J Obstet Gynecol 141:377, 1981
18. Halme J, Becker S, Wing RD: Accentuated cyclic activation of peritoneal macrophages in patients with endometriosis. Am J Obstet Gynecol 148:85, 1984
19. Halme J, Becker S, Hammond M, et al: Increased activation of pelvic macrophages in infertile women with mild endometriosis. Am J Obstet Gynecol 145:333, 1983

Address reprint requests to:
*Jouko Halme, MD, PhD*
*Department of Obstetrics and Gynecology*
*University of North Carolina School of Medicine*
*Old Clinic Building 226H*
*Chapel Hill, NC 27514*

*Submitted for publication October 28, 1983.*
*Revised February 20, 1984.*
*Accepted for publication March 2, 1984.*

Copyright © 1984 by The American College of Obstetricians and Gynecologists.

# Exhibit 42

high. The few cases in which progestin therapy resulted in improvement of symptoms and relief of obstruction suggest that there may be a place for selective medical management. Patients who are young and wish to preserve their childbearing capacity may be considered initially for such treatment. Fertility potential is probably poor in this group of patients because of the extent of their pelvic endometriosis. Patients considered for medical management should be informed of the risks of permanent renal damage and treated with close surveillance of renal function.

## References

1. Cullen TS: Adenomyoma of the recto-vaginal septum. Bull Johns Hopkins Hosp 28:343, 1917
2. Moore JG, Hibbard LT, Growdon WA, et al: Urinary tract endometriosis: Enigmas in diagnosis and treatment. Obstet Gynecol 134:162, 1979
3. Stanley KE, Utz DC, Dockerty MB: Clinically significant endometriosis of the urinary tract. Surg Gynecol Obstet 120:491, 1965
4. Kerr SW: Endometriosis involving the urinary tract. Clin Obstet Gynecol 9:331, 1966
5. Klein RS, Cattolica EV: Ureteral endometriosis. Urology 13:477, 1979
6. Lavelle KJ, Melman AW, Cleary RE: Ureteral obstruction owing to endometriosis: Reversal with synthetic progesterone. Urology 116:965, 1976

Address reprint requests to:
*Paul G. McDonough, MD*
*Department of Obstetrics & Gynecology*
*Reproductive Endocrine Unit*
*Medical College of Georgia School of Medicine*
*Augusta, Georgia 30912*

*Accepted for publication April 18, 1980.*

Copyright © 1980 by The American College of Obstetricians and Gynecologists.

# Retrograde Menstruation in Women Undergoing Chronic Peritoneal Dialysis

*Michael J. Blumenkrantz, MD,*
*Nancy Gallagher, RN, Richard A. Bashore, MD,*
*and Henry Tenckhoff, MD*

**Blood in the peritoneal dialysis catheter just before menstruation was regularly observed in 9 of 11 premenopausal women maintained on peritoneal dialysis for end-stage renal failure. Peritoneal bleeding at other times during the menstrual cycle was not seen in any of these patients. Likewise, peritoneal bleeding in men or nonmenstruating women on chronic peritoneal dialysis was exceedingly rare, was not periodic, and usually was due to recognizable causes. These observations suggest that retrograde menstrual bleeding into the peritoneal cavity is the rule rather than the exception in women on peritoneal dialysis and possibly in all menstruating women. Implications of this observation for the pathogenesis of endometriosis and dysmenorrhea are discussed. (Obstet Gynecol 57:667, 1981)**

*From the Division of Kidney Diseases, University of Washington School of Medicine, and the Northwest Kidney Center, Seattle, Washington; the Department of Medical and Research Services, Veterans Administration—Wadsworth Medical Center, and the Departments of Obstetrics and Gynecology and of Medicine, UCLA School of Medicine, Los Angeles, California.*

*Submitted for publication May 8, 1980.*

The incidence of retrograde menstruation and its consequences have been the topic of extensive debate. Sampson[1] suggested that retrograde menstruation is the cause of external endometriosis, noting that blood was frequently observed escaping from the ostea of the fallopian tubes in menstruating women who were undergoing pelvic surgery. Novak questioned this theory on the grounds that retrograde menstruation was rare as compared to the observed frequency of endometriosis.[2,3] Watkins reported bloody fluid containing endometrial cells aspirating from the cul-de-sac during menstruation.[4] Other reports note the occasional appearance of blood in the pelvic cavity at the time of culdoscopy or pelvic surgery when performed during menstruation.[5-9]

This communication describes observations in menstruating women on maintenance peritoneal dialysis who were noted to have blood in the peritoneal catheters or in the effluent dialysate coincident with menstruation.

## Patients and Materials

The development of implantable Silastic catheters has made it possible to maintain selected patients with end-stage renal failure alive and well for extended periods by means of peritoneal dialysis.[10] A silicone rubber catheter is implanted through the abdominal wall with its intraabdominal section usually lying in the pelvic cavity. During intermittent peritoneal dialysis,

0029-7844/81/050667-04$02.50

sterile dialysate is pumped through the catheter into the peritoneal cavity, where it remains for a specified dwell period; then it is drained and replaced by fresh dialysate. This cycle is generally repeated every 30 minutes during a 12-hour overnight treatment period. Most patients require 3 treatments per week. The transparent external catheter segment is closed between treatments by a disposable rubber cap and represents a fluid-filled extension of the peritoneal cavity. The character of the peritoneal fluid in the catheter can be observed prior to dialysis or in the effluent of the initial dialysis cycle. Heparin was not routinely added to the dialysate in any of these patients. Bleeding into the peritoneal cavity is usually readily detectable by the presence of a red thread of sedimented red blood cells within the transparent external Silastic catheter segment. Occasionally blood is not apparent until the first exchange of dialysate is being drained.

The records of all women between the ages of 15 and 50 who were maintained on peritoneal dialysis were reviewed. A total of 11 women with a history of menstrual bleeding after initiation of maintenance peritoneal dialysis was identified (Table 1). All patients were interviewed to obtain a detailed menstrual history to supplement the official record. At the time of data collection 5 of the women were no longer on peritoneal dialysis; 3 had undergone successful renal transplantation and 2 had been switched to hemodialysis. At the time of the interview, patients 10 and 11 had only a vague recollection of their menstrual history.

The 11 patients had a mean age of 38.8 years (range, 15 to 44 years); all had been on maintenance home peritoneal dialysis and were followed at the University of Washington or the Northwest Kidney Center in Seattle. Uremic symptomatology was controlled in all these patients and they were as well as comparable patients undergoing hemodialysis. Eight of the 11 women had experienced cessation of menstruation prior to dialysis; 1 patient had primary amenorrhea, 4 were nulliparous, and 7 were multiparous.

Three of the 11 women who were on maintenance peritoneal dialysis at the time of the survey had peritoneal fluid collected on several occasions in the course of their menstrual cycles and when blood was in evidence. The fluid specimens were aspirated aseptically from the peritoneal catheter and placed into sterile glass flasks, which were sent immediately or after overnight refrigeration to the cytology laboratory for processing.

## Results

Eight of 11 women listed in Table 1 developed secondary amenorrhea coincident with the development of chronic renal failure. All 8 resumed menstruation after maintenance peritoneal dialysis was instituted. The mean time interval from the beginning of dialysis to resumption of menstruation was 7.7 months. Menstruation had not ceased in patients 6 and 11. Patient 7 had primary amenorrhea. Of the 9 patients who experienced resumption of menstruation or menarche after initiation of peritoneal dialysis, 5 were noted to have regular menses and 6 had irregular menses. With the exception of patients 10 and 11, both of whom had only 2 very scanty periods, all patients were noted to have small amounts of blood in their peritoneal catheter and/or in the effluent dialysate coincident with

**Table 1.** Menstrual History of Women Who Had Noted Blood in Catheter and/or Effluent Dialysate While Undergoing Maintenance Peritoneal Dialysis

| Patient | Age at onset of dialysis | Cessation of menstruation prior to dialysis | Months of dialysis until resumption of menstruation | Menstruation Regularity | Menstruation Flow | Blood in catheter and/or effluent dialysate |
|---|---|---|---|---|---|---|
| 1 | 17 | Yes | 3 | Regular | Moderate | Yes |
| 2 | 21 | Yes | 6 | Regular | Moderate | Yes |
| 3 | 40 | Yes* | 5 | Irregular | Heavy | Yes |
| 4 | 40 | Yes | 5 | Irregular | Scanty | Yes |
| 5 | 36 | Yes | 12 | Regular | Moderate | Yes |
| 6 | 34 | No | — | Irregular | Moderate | Yes |
| 7 | 15 | —† | 32 | Regular | Scanty | Yes |
| 8 | 44 | Yes | 2 | Regular | Moderate | Yes |
| 9 | 25 | Yes | 3 | Irregular | Heavy | Yes |
| 10 | 40 | Yes | — | Irregular | Scanty‡ | No |
| 11 | 27 | No | — | Irregular | Scanty‡ | No |

\* Contraceptive injection.
† Primary amenorrhea.
‡ Only 2 periods.

the time of menstruation. Blood always appeared in the dialysate or in the catheter a few days prior to the onset of vaginal bleeding, and it usually persisted during the first day of menstrual flow. Patient 6 consistently noted blood in the peritoneal catheter 4 days before the onset of menstruation. In several of the patients the appearance of blood in the dialysate was the first sign of the return of menses after secondary amenorrhea. In patient 7, menarche was noted at the age of 19 by the appearance of peritoneal blood. This patient had started dialysis at the age of 15, at which time she had no secondary sexual development.

Six of the 11 patients (patients 1 through 5 and 7) eventually underwent laparotomy for nephrectomy and/or splenectomy prior to renal transplantation. In none of these patients was endometriosis noted at the time of abdominal surgery. Menstrual blood loss did not have a significant effect on hematocrit levels in these women, none of whom required blood transfusions once stabilized on peritoneal dialysis. Although numerous attempts were made in 3 of the patients to identify endometrial or tubular epithelial cells in the peritoneal effluent or aspirate, unequivocal evidence for such cells in any of the specimens was not obtained.

## Discussion

With advancing renal failure, as with other debilitating diseases, secondary amenorrhea often develops. Hemodialysis therapy has been reported to be associated with resumption of menstrual periods in some patients, menorrhagia in others, and persistent amenorrhea in a third group.[11,12]

In this series 11 women under the age of 45 who were treated with chronic peritoneal dialysis and who continued or resumed menstrual periods are reported. The presence of an implanted intraabdominal catheter afforded an opportunity to observe the character of peritoneal fluid over months or years. When patient 1 first noted blood in the effluent dialysate she was alarmed, and her physician was at a loss to explain the phenomenon. This first episode was not associated with vaginal bleeding. In subsequent months, blood staining of her peritoneal fluid occurred at regular intervals in association with vaginal bleeding. In the course of subsequent years the same phenomenon was observed in all women who resumed menstrual cycles while undergoing peritoneal dialysis. The 2 exceptions were patients 10 and 11, each of whom had only 2 periods with very scanty flow after initiation of dialysis. As both had undergone dialysis at home and neither was a good observer, it is conceivable that small amounts of peritoneal blood may have escaped their

attention. Resumption of periods was often indicated by blood in the effluent dialysate before vaginal bleeding occurred.[13] None of the women had a history of dysmenorrhea or showed evidence suggestive of pelvic endometriosis; this was verified in 6 of the 11 women during pretransplant laparotomy. In men and nonmenstruating women, blood in the peritoneal catheter or effluent dialysis is exceedingly rare and usually can be explained by a detectable anomaly such as peritonitis, intraabdominal malignancy, recent abdominal surgery, or tissue herniation into the implanted catheter with subsequent hemorrhage.

The authors think it highly unlikely that hormonal alterations or anatomic abnormalities associated with chronic renal failure or dialysis explain the high frequency and regular occurrence of blood in the peritoneal cavity coincident with the time of menstruation. Likewise, it would appear most unusual for mechanical irritation by the peritoneal catheter to occur exclusively in menstruating women and in association with menstrual flow. These observations suggest strongly that retrograde bleeding regularly occurs with menstruation in most if not all women on peritoneal dialysis and quite possibly in most menstruating women in the general population.

The current emphasis on prostaglandin as a possible cause of dysmenorrhea notwithstanding,[14] it remains intriguing to speculate on the role that retrograde menstruation may play in the pathogenesis of dysmenorrhea. If retrograde menstrual bleeding is the rule rather than the exception, then bleeding must be asymptomatic in most women as it was in these patients, none of whom has a history of dysmenorrhea. As most women do not experience dysmenorrhea, this lack of pain may be a reflection of low peritoneal reactivity to irritation by blood or other irritants. Variability in the pain threshold to intraabdominal blood is well known to surgeons confronted with hemoperitoneum and to gynecologists treating endometrial disease. Similarly, the present authors and others with extensive peritoneal dialysis experience have observed remarkable individual differences in abdominal pain response to acid peritoneal dialysis solutions. Thus, both the amount of blood spill and individual reactivity may be important modulating factors in the causation of dysmenorrhea. In this context, it may also be of interest to recall that retrograde bleeding usually occurred 1 or several days prior to the onset of vaginal bleeding and ceased when vaginal flow commenced, a pattern analogous to that of the pain prevalent in dysmenorrhea, especially in nulliparous women.

Cervical or other obstruction to free flow during the initial phase of menstruation may contribute to or aggravate abdominal spillage of blood and may help ex-

plain premenstrual pelvic congestion and its relief by establishment of cervical blood flow, especially in nulliparous women. Obstruction to free flow also appears to be associated with early establishment of pelvic endometriosis in teenagers,[15,16] an age group not normally affected by this disease.

The observation of frequent, perhaps regular retrograde menstruation in most women tends to support Sampson's theory of retrograde menstrual bleeding as the most likely and most frequent cause of pelvic endometriosis. Watkins[4] had rejected this notion because he believed retrograde bleeding was too infrequent to account for the incidence of endometriosis. However, it was Watkins who reported endometrial cells in the cul-de-sac of menstruating women, a finding supported by other workers in this field, most recently by Gahl,[17] who observed tubal epithelial cells in the peritoneal effluent of women undergoing peritoneal dialysis. Although retrograde bleeding does not explain why only some women develop endometriosis, these findings rebuke Watkins' objections to the spill–implantation theory of endometriosis.

### Addendum

Since the compilation of the data for this report, the authors have treated additional patients who menstruated while being maintained on peritoneal dialysis. All showed evidence of retrograde bleeding in the catheters or in the initial peritoneal effluent, except 1 patient who had undergone tubal ligation.

### References

1. Sampson JA: The development of the implantation theory for the origin of peritoneal endometriosis. Am J Obstet Gynecol 40:549, 1940
2. Novak E: The significance of uterine mucosa in the fallopian tube with a discussion of the origin of aberrant endometrium. Am J Obstet Gynecol 12:484, 1922
3. Novak E: Pelvic endometriosis and its treatment. Am J Surg 33:422, 1936
4. Watkins RE: Uterine replacement, retrograde menstruation and endometriosis. West J Surg 46:480, 1938
5. Watkins RE: The presence of endometrial cells in peritoneal fluid. J Pac Coast Soc Obstet 7:120, 1937
6. Ridley JH: The histiogenesis of endometriosis. Obstet Gynecol Surv 23:1, 1968
7. Leventhal JM: The place of culdoscopy and laparoscopy in diagnosis, Controversy in Obstetrics and Gynecology. Edited by DE Reid and D Christian. Philadelphia, Saunders, 1974, p 617
8. Goodall JR: A Study of Endometriosis. Second edition. Philadelphia, Lippincott, 1944, p 114
9. Geist SH: The viability of fragments of menstrual epithelium. Am J Obstet Gynecol 25:753, 1933
10. Tenckhoff H: Peritoneal dialysis today: A new look. Nephron 12:420, 1974
11. Goodwin NJ, Valenti C, Hall JE, et al: Effects of uremia and chronic hemodialysis on the reproductive cycle. Am J Obstet Gynecol 100:528, 1968
12. Rice GG: Hypermenorrhea in the young hemodialysis patient. Am J Obstet Gynecol 116:539, 1973
13. Tenckhoff H: Home peritoneal dialysis, Clinical Aspects of Uremia and Dialysis. Edited by SG Massry and AL Sellers. Springfield, IL, Thomas, 1976, p 611
14. Kistner RW: Gynecology: Principles and Practice. Third edition. Chicago, Year Book, 1979, pp 630–634
15. Fallas RE: Endometriosis. Demonstration for the Sampson theory by a human anomaly. Am J Obstet Gynecol 72:557, 1956
16. Schifrin BS, Erez S, Moore JG: Teenage endometriosis. Am J Obstet Gynecol 116:973, 1973
17. Gahl G: Personal communication, 1979

Address reprint requests to:
Richard A. Bashore, MD
Department of Obstetrics & Gynecology
The University of California Center for the Health Sciences
Los Angeles, CA 90024

Accepted for publication June 18, 1980.

Copyright © 1980 by The American College of Obstetricians and Gynecologists.

# FATAL CASE OF CYTOMEGALOVIRUS PNEUMONITIS IN A POSTPARTUM WOMAN

Stewart D. Lipton, PhD, James Bryant, MD, Farhad Saed, MD, and Graciano Fontillas, MT

From the Departments of Pathology and of Obstetrics and Gynecology, Edgewater Hospital, Chicago, Illinois.
Submitted for publication May 8, 1980.

This is the first reported fatal case of cytomegalic inclusion disease in a pregnant woman. The 28-year-old woman died after cesarean section for cephalopelvic disproportion. The diagnosis of cytomegalic inclusion disease was made at autopsy by finding enlarged pneumocytes with typical intranuclear inclusions, positive direct immunofluorescence on the lung tissue with antibody specific for cytomegalovirus, and retrospective serologic titers of 1:64 for the virus. The time of the infection is unclear, but the absence of infection in the newborn may suggest an onset late in pregnancy; there was no evidence of disease before labor and cesarean section. (Obstet Gynecol 57:670, 1981)

Exhibit 43

Ellen Blair Smith, M.D.

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY


IN RE:  JOHNSON & JOHNSON      )
TALCUM POWDER PRODUCTS         )
MARKETING, SALES               )
PRACTICES, AND PRODUCTS        ) MDL NO:
LIABILITY LITIGATION           ) 16-2738 (FLW)(LHG)
                               )
THIS DOCUMENT RELATES TO       )
ALL CASES                      )




*******************************************

ORAL VIDEOTAPED/REALTIMED DEPOSITION OF

ELLEN BLAIR SMITH, M.D.

JANUARY 9, 2019

VOLUME 1 OF 1

*******************************************

Ellen Blair Smith, M.D.

## Page 2

1     ORAL AND VIDEOTAPED/REALTIMED DEPOSITION OF

2     ELLEN BLAIR SMITH, M.D., produced as a witness at

3     the instance of the Defendants Johnson & Johnson

4     entities, and duly sworn, was taken in the

5     above-styled and numbered cause on January 9, 2019,

6     from 9:24 a.m. to 9:23 p.m., before Karen L. D.

7     Schoeve, CSR, RDR, CRR, in and for the State of

8     Texas, reported by computerized machine shorthand,

9     at the Hilton Austin, 500 E 4th Street, Austin,

10    Texas, pursuant to the Federal Rules of Civil

11    Procedure and the provisions stated on the record or

12    attached hereto.

13        It is further agreed that Rule 30(b)(5) is

14    waived by agreement of the parties.

15

16

17

18

19

20

21

22

23

24

## Page 3

1        A P P E A R A N C E S

2

3     FOR PLAINTIFFS' STEERING COMMITTEE:

4       P. LEIGH O'DELL, ESQUIRE

        DR. MARGARET M. THOMPSON, ESQUIRE

5       BEASLEY ALLEN, P.C.

        218 Commerce Street

6       P.O. Box 4160

        Montgomery, Alabama 36104

7       T: 334.269.2343  (Ms. O'Dell)

        F: 334.954.7555  (Ms. O'Dell)

8       C: 512.695.1708  (Ms. Thompson)

        T: 800.898.2034  (Ms. Thompson)

9       F: 855.674.1818  (Ms. Thompson)

        leigh.odell@beasleyallen.com

10      margaret.thompson@beasleyallen.com

11        --AND--

12      CYNTHIA L. GARBER, ESQUIRE

        ROBINSON CALCAGNIE, INC.

13      19 Corporate Plaza Drive

        Newport Beach, California 92660

14      C:  949.456.0037

        T:  949.720.1288

15      F:  949.720.1292

        cgarber@robinsonfirm.com

16

17        --AND--

18      PAULA R. BROWN, ESQUIRE

        BLOOD HURST & O'REARDON, LLP

19      501 West Broadway, Suite 1490

        San Diego, California 92101

        T:  619.338.1100

20      F:  619.338.1101

        pbrown@bholaw.com

21

22

23

24

## Page 4

1        A P P E A R A N C E S (Continued)

2

3     FOR DEFENDANTS JOHNSON & JOHNSON ENTITIES:

4       SCOTT A. JAMES, ESQUIRE

        SHOOK, HARDY & BACON L.L.P.

5       JPMorgan Chase Tower

        600 Travis Street, Suite 2450

6       Houston, Texas 77002-2926

        D:  713.546.5644

7       T:  713.227.8008

        F:  713.227.9508

8       sjames@shb.com

9         --AND--

10      KATHERINE McBETH, ESQUIRE

        DRINKER BIDDLE & REATH LLP

11      One Logan Square, Suite 2000

        Philadelphia, Pennsylvania 19103-6996

12      D:  215.988.2706

        T:  215.988.2700

13      F:  215.988.2757

        katherine.mcbeth@dbr.com

14

15    FOR DEFENDANT IMERYS TALC AMERICA, INC.

16      MICHAEL R. KLATT, ESQUIRE

        GORDON REES SCULLY MANSUKHANI, LLP

17      816 Congress Avenue, Suite 1510

        Austin, Texas 78701

18      D:  512.582.6485

        T:  512.391.0197

19      F:  512.391.0183

        mklatt@grsm.com

20

21        --AND--

22

23

24

## Page 5

1        A P P E A R A N C E S (Continued)

2

3       MARK K. SILVER, ESQUIRE

        COUGHLIN DUFFY LLP

4       350 Mount Kemble Avenue

        P.O. Box 1917

5       Morristown, New Jersey 07962

        D:  973.631.6045

6       T:  973.267.0058

        F:  973.267.6442

7       msilver@coughlinduffy.com

8

9     FOR DEFENDANT PERSONAL CARE PRODUCTS COUNCIL:

10      RENEE B. APPEL, ESQUIRE

        SEYFARTH SHAW LLP

11      975 F Street, N.W.

        Washington, D.C. 20004

        D:  202.828.5731

12      T:  202.463.2400

        F:  202.828.5393

13      rappel@seyfarth.com

14

15    FOR DEFENDANTS PTI ROYSTON LLC AND PTI UNION LLC:

16      TARIQ M. NAEEM, ESQUIRE

        TUCKER ELLIS | LLP

17      950 Main Avenue, Suite 1100

        Cleveland, Ohio 44113-7213

18      D:  216.696.3675

        T:  216.592.5000

19      F:  216.592.5009

        tariq.naeem@tuckerellis.com

20

21    ALSO PRESENT:

22      Shane Ramirez, Videographer

23    THE COURT REPORTER:

24      Karen L. D. Schoeve, CRR, RDR, RSA

2 (Pages 2 to 5)

Ellen Blair Smith, M.D.

---

Page 6

INDEX

PAGE

1  INDEX
2                              PAGE
3  Appearances                                3
4  Stipulation:   Objection by one is good    15
       for all
5
6  ELLEN BLAIR SMITH, M.D.
7     Examination By Mr. James          11
8     Afternoon Session
9     Examination Continued By Mr. James      162
10    Examination By Mr. Klatt          297
11    Examination By Ms. O'Dell         308
12    Further Examination By Mr. James        343
13    Further Examination By Mr. Klatt        352
14    Further Examination By Ms. O'Dell       378
15    Further Examination By Mr. Klatt        379
16
17  Changes and Signature                381
18  Reporter's Certificate               383
19
20    REPORTER'S NOTE 1:  Please be advised that an
    UNCERTIFIED ROUGH DRAFT version of this transcript
21  exists.  If you are in possession of said rough
    draft, please replace it immediately with this
22  CERTIFIED FINAL TRANSCRIPT.
23    REPORTER'S NOTE 2:  Quotation marks are used for
    clarity and do not necessarily reflect a direct
24  quote.

---

Page 7

EXHIBIT INDEX
NO. DESCRIPTION                     PAGE
Exhibit 1              20
   Invoices dated 02/09/17 through 09/04/18
Exhibit 2              38
   Notice of Oral and Videotaped Deposition
   of Ellen Blair Smith and Duces Tecum
Exhibit 3              40
   Materials considered
   (2.5 reams)
Exhibit 4              41
   Rule 26 Expert Report of Ellen Blair
   Smith, M.D., dated 11/16/18
Exhibit 5              44
   Rule 26 Expert Report of Judith Wolf,
   M.D., dated 11/16/18
Exhibit 6              53
   Curriculum Vitae of Ellen Blair Smith, M.D.
Exhibit 7              99
   Article entitled "Talc" from
   www.fda.gov, dated 01/07/19
Exhibit 8              106
   Letter dated 04/01/14 to Samuel Epstein,
   M.D., from Steven M. Musser, Ph.D.
Exhibit 9              113
   AACR article entitled "Does Exposure to
   Asbestos Cause Ovarian Cancer?
   A Systematic Literature Review and
   Meta-analysis," dated 05/24/11
Exhibit 10             124
   IARC Monographs - 100C, "Fig 2.4.6
   Cancer of the ovary"

---

Page 8

EXHIBIT INDEX (Continued)
NO. DESCRIPTION                     PAGE
Exhibit 11             154
   ACOG, Women's Health Care Physicians
   article entitled "Talc Use and
   Ovarian Cancer"
Exhibit 12             157
   Ovarian Cancer:  Risk Factors, SGO,
   article entitled "Ovarian Cancer"
Exhibit 13             160
   ACOG, Women's Health Care Physicians,
   FAQ096, July 2017, FAQ entitled
   "Ovarian Cancer"
Exhibit 14             163
   NIH, National Cancer Institute article
   entitled "Ovarian, Fallopian Tube, and
   Primary Peritoneal Cancer Prevention
   (PDQ)-Health Professional Version"
Exhibit 15             169
   American College of Obstetricians
   and Gynecologists, article entitled
   "Assessing Ovarian Cancer Risk When
   Considering Elective Oophorectomy at
   the Time of Hysterectomy" by Allison
   F. Vitronis, Linda Titus-Ernstoff
   and Daniel Cramer, dated 05-2011
Exhibit 16             176
   Obstetrics & Gynecology, article
   entitled "Perineal Exposure to Talc
   and Ovarian Cancer Risk" by Bernard
   Harlow, Daniel Cramer, Debra Bell
   and William Welch, dated 07-1992
Exhibit 17             184
   International Union Against Cancer,
   article entitled "Genital Talc
   Exposure and Risk of Ovarian Cancer"
   by Daniel Cramer, et al., dated
   11/19/98

---

Page 9

EXHIBIT INDEX (Continued)
NO. DESCRIPTION                     PAGE
Exhibit 18             189
   Anticancer Research 23 (2003), article
   entitled "Perineal Application of osmetic
   Talc and Risk of Invasive Epithelial
   Ovarian Cancer:  A Meta-analysis of
   11,933 subjects from Sixteen Observational
   Studies" by Michael Huncharek,
   J. F. Gerschwind and Bruce Kupelnick
Exhibit 19             197
   Article entitled "Perineal use of
   talc and risk of ovarian cancer" by
   H. Langseth, S. E. Hankinson,
   J. Siemiatycki, E. Winderpass,
   dated 10/15/07
Exhibit 20             203
   AACR, article entitled "Genital Powder
   Use and Risk of Ovarian Cancer:  A
   Pooled Analysis of 8,525 Cass and
   9,859 Controls," by Kathryn Terry,
   et al., dated 06/12/13
Exhibit 21             207
   Epidemiology, article entitled
   "Perineal Talc Use and Ovarian
   Cancer, A Systematic Review and
   Meta-Analysis" by Ross Penninkilampi
   and Guy Eslick, dated 01/2018
Exhibit 22             216
   American Journal of Epidemiology,
   article entitled "Risk Factors for
   Epithelial Ovarian Cancer by Histologic
   Subtype" by Margaret Gates, et al.,
   dated 09/11/09
Exhibit 23             216
   Journal of the National Cancer
   Institute Report, "Prospective Study
   of Talc Use and Ovarian Cancer" by
   Dorota Gertig, et al.

---

Ellen Blair Smith, M.D.

Page 10

EXHIBIT INDEX (Continued)
NO. DESCRIPTION                              PAGE
Exhibit 24                226
    Wolters Kluwer Health, Inc., article
    entitled "Genital use of talc and risk
    of ovarian cancer: a meta-analysis"
    by Wera Berge, et al.
Exhibit 25                238
    Oxford University Press article entitled
    "Perineal Powder Use and Risk of
    Ovarian Cancer" by Serena Houghton,
    et al., dated 06/05/14
Exhibit 26                254
    Gynecologic Oncology, article
    entitled "Talc and ovarian cancer"
    by Steven A. Narod, dated 2016

Exhibit 27                300
    List of Tests from 08/22/1985 - 10/1/2002
Exhibit 28                300
    List of Tests (large blue chart)

Exhibit 29                309
    MAS, article entitled "The Analysis
    of Johnson & Johnson's Historical
    Baby Powder & Shower to Shower
    Products from the 1960's to the
    Early 1990's for Amphibole Asbestos"
    by William Longo and Mark Rigler,
    dated 11/14/18
Exhibit 30                333
    European Journal of Cancer Prevention,
    article entitled "Genital use of talc
    and risk of ovarian cancer: a meta-analysis"
    by Wera Berge, et al., dated 05/2018
Exhibit 31                352
    IARC Monographs, Arsenic, Metals,
    Fibres, and Dusts, Volume 100C,
    A Review of Human Carcinogens

Page 11

                PROCEEDINGS
        THE VIDEOGRAPHER: Here begins the
deposition of Ellen Blair Smith, Ph.D.
        THE WITNESS: No, M.D.
        THE VIDEOGRAPHER: M.D. Excuse me.
        Today's date is January 9th, 2019.
The time is 9:24 a.m.
        Will the court reporter please swear
in the witness.
        ELLEN BLAIR SMITH, M.D.,
having been first duly sworn to tell the truth, the
whole truth, and nothing but the truth, so help her
God, testified as follows:
                EXAMINATION
BY MR. JAMES:
    Q.  Good morning, Dr. Smith.
    A.  Good morning.
    Q.  Is Dr. Smith the appropriate way to refer
to you?
    A.  Sure.
    Q.  Okay.  My name is Scott James.  I'm
counsel for J&J, and we met briefly before the
deposition, correct?
    A.  Yes.

Page 12

    Q.  Where are you currently employed,
Dr. Smith?
    A.  I am a hospice medical director for
Halcyon Home, LLC.
    Q.  And do you have a separate consulting
business?
    A.  No.
    Q.  We're here to take your deposition today
in the talc MDL.
        Do you understand that?
    A.  I do.
    Q.  When were you first contacted about
serving as an expert witness in the talc MDL?
    A.  I was contacted to look at the scientific
data in January of 2017.
    Q.  When did you first agree to serve as an
expert in the litigation?
    A.  In about August or September in 2017.
    Q.  Who contacted you?
    A.  Margaret Thompson.
    Q.  How many contacts have you had with
Margaret Thompson between the first contact and
today?
    A.  Enumerable.

Page 13

    Q.  More than ten?
    A.  Yes.
    Q.  More than 20?
    A.  I would think so.
    Q.  All pertaining to this litigation?
    A.  No.
    Q.  Okay.  How do you know Ms. Thompson?
    A.  I've known Dr. Thompson for almost 40
years.
    Q.  And how did you first meet Ms. Thompson?
    A.  I was a fellow in gynecologic oncology at
Duke, and she was a senior resident at Duke.  She's
one year behind me in training.
    Q.  How many meetings have you had with
Mrs. Thompson pertaining to this litigation?
    A.  I don't know.  A lot.
    Q.  Same series of questions.  More than ten?
    A.  Yes.
    Q.  Okay.  More than 20?
    A.  Yes.
    Q.  And have those meetings occurred between
the first contact about the litigation, which was
January 2017, and today?
    A.  Yes.

4 (Pages 10 to 13)

Ellen Blair Smith, M.D.

Page 14

1    Q.  More than 30 meetings?
2    A.  Probably not that many.
3    Q.  Can you estimate the amount of time that
4  you have spent with Mrs. Thompson pertaining to the
5  issues in this litigation?
6    A.  No, I cannot.
7    Q.  Have you met with any other counsel for
8  plaintiffs in this litigation?
9    A.  Leigh O'Dell and Cynthia Garber.
10        THE WITNESS:  And Paula, I don't know
11  your last name.
12        MS. BROWN:  Brown.
13    Q.  (BY MR. JAMES)  Any other counsel besides
14  the ones you just mentioned?
15    A.  No.
16    Q.  How much time would you -- have all the
17  meetings with Mrs. O'Dell and Ms. Garber -- and I --
18  my apologies, Mrs. Brown, have any of those meetings
19  been without the presence of Mrs. Thompson?
20    A.  No.
21    Q.  Has Ms. Thompson been present at all of
22  your meetings pertaining to this litigation?
23    A.  Yes.
24    Q.  Dr. Smith, have you given a deposition

Page 15

1  before?
2    A.  Yes.
3    Q.  So you understand the ground rules, but
4  I'll repeat just a couple of them to help us along
5  the way today, okay?
6    A.  Okay.
7    Q.  So my questions will be verbal, and I ask
8  that your answers be verbal as well so they can be
9  recorded.
10    A.  Yes.
11    Q.  If you need a break at any time today,
12  please just let me know, and we'll be happy to
13  accommodate you.
14    A.  Thank you.
15    Q.  And if you don't understand one of my
16  questions, please ask me to rephrase, or oftentimes,
17  your counsel will ask that I rephrase as well.
18  Okay?
19    A.  Thank you.
20        MR. KLATT:  And can I add that we have
21  an agreement that an objection for one is good for
22  all?
23        MS. O'DELL:  Yes.
24        MR. KLATT:  Okay.  Fine.

Page 16

1        MR. JAMES:  Thank you, Mr. Klatt.
2    Q.  (BY MR. JAMES)  Have you ever worked as an
3  expert -- a paid expert in litigation before?
4    A.  Yes.
5    Q.  What -- what matters?
6    A.  It was expert testimony as an expert on
7  cervical cancer, in between 1996 and 1998, for a
8  local obstetrician gynecologist here in Houston, and
9  the case pertained to appropriate treatment of
10  carcinoma in situ of the cervix, and the patient's
11  informed consent for a hysterectomy.
12    Q.  Were you serving as an expert for the
13  physician?
14    A.  I was on the defense side, yes, sir.
15    Q.  Have you served as an expert in any other
16  litigation other than the one you just mentioned and
17  the talc MDL?
18    A.  No.
19    Q.  How many prior depositions have you given?
20    A.  Maybe five.  I was -- I've been treating
21  physician in several litigations, not an expert,
22  just fact.
23    Q.  Were you deposed in the -- as an expert in
24  the litigation that you just discussed with us?

Page 17

1    A.  The -- I was --
2        MS. O'DELL:  Object to the form.
3        MR. JAMES:  Sure.
4        MS. O'DELL:  Just make sure . . .
5    Q.  (BY MR. JAMES)  So you mentioned that you
6  served as an expert one time in one --
7    A.  Right.
8    Q.  -- prior case, correct?
9    A.  Correct.
10    Q.  Were you deposed in that case?
11    A.  Yes.
12    Q.  Were the other -- all of the other
13  depositions taken in your capacity as a treating
14  physician?
15    A.  Yes.
16    Q.  Have you been a defendant in any of those
17  cases?
18    A.  No.
19    Q.  Are there any other depositions, other
20  than the ones that we've just discussed, that you
21  have given during your lifetime?
22    A.  I gave a deposition -- oh, I gave a
23  testimony and a deposition once as -- I don't
24  exactly know what I was.  I'm -- fact, and as a

Ellen Blair Smith, M.D.

| Page 18 | Page 20 |
|---|---|

**Page 18**

1  patient at a hospital.
2    Q.  Were you a defendant in that case?
3    A.  No.
4    Q.  For this case, for the talc MDL, turning
5  back to the talc MDL, where do the fees that you
6  receive in this litigation, where do those fees go
7  to?
8    A.  You mean come from?
9    Q.  Do you take -- do you receive those fees
10  personally?
11    A.  Yes, I receive them personally.
12    Q.  You are currently employed, as we
13  discussed, correct?
14    A.  Yes.
15    Q.  Do you have any other sources of income
16  besides the expert work that you're engaged in now
17  and your current role for the hospice facility?
18    A.  I have several personal annuities.
19    Q.  Any other sources of income --
20    A.  No.
21    Q.  -- besides personal investments?
22    A.  No.
23    Q.  And you're charging $600 per hour in this
24  litigation, correct?

**Page 19**

1    A.  I am.
2    Q.  Is that a standard rate regardless of the
3  sort of work you're performing?
4    A.  In this MDL?
5    Q.  Yes.
6    A.  Yes.
7    Q.  Yes, Doctor.
8    A.  Yes.
9    Q.  Can you quantify for us the number of
10  hours you have spent working as an expert in this
11  litigation?
12    A.  I -- I don't have it off the top of my
13  head, but I know they have very clear time records.
14    Q.  Have you to date invoiced -- have you
15  invoiced for all of the time that you've spent in
16  the litigation to date?
17    A.  No.
18    Q.  Where do your invoices carry you through?
19    A.  December 31st.  I have -- there is an
20  invoice that I submitted December 31st that's not
21  been paid yet.  But I'm through the end of 2018.
22    Q.  And you'll be submitting an additional
23  invoice for the time that you've spent in January,
24  correct?

**Page 20**

1    A.  Correct.
2      MR. JAMES:  And counsel mentioned
3  before the deposition that they have brought with
4  them copies of the invoices in litigation.
5      Could I have those, please.
6      MS. O'DELL:  Sure.
7      MR. JAMES:  Thank you.
8      MS. O'DELL:  I'm missing a last
9  invoice.  I'll get it to you on the break.
10      MR. JAMES:  Okay.
11      And I'm gonna hand what counsel has --
12  I'm gonna mark what counsel has handed me, the set
13  of invoices, as Exhibit Number 1.
14      (Deposition Exhibit 1 marked for
15      identification.)
16    Q.  (BY MR. JAMES)  And, again, Dr. Smith,
17  these set of invoices that I was just handed will
18  reflect the time that you've spent in this
19  litigation through the end of December 2018,
20  correct?
21    A.  When you get the last one, yes, it will.
22    Q.  Understood.
23      And then we get an additional invoice
24  for January, correct?

**Page 21**

1    A.  Correct.
2    Q.  How much time have you spent in January on
3  this litigation?
4      MS. O'DELL:  Just give your best
5  estimate, if you don't . . .
6    A.  20.  15 to 20.
7    Q.  (BY MR. JAMES)  Can you break that time
8  down for me, as far as what you've been doing during
9  the month of January?
10      Has it been preparing for the
11  deposition, reviewing --
12    A.  Yes.
13    Q.  -- articles?
14      I'm sorry.  I --
15    A.  Sorry.
16    Q.  -- didn't finish the question --
17    A.  I'm sorry.
18    Q.  -- so let me rephrase it.
19      Has all the time that you've spent in
20  January been preparing for the deposition?
21    A.  Yes.
22    Q.  For the total time that you've spent as
23  work for -- strike that.
24      For the total time you've spent

6 (Pages 18 to 21)

Ellen Blair Smith, M.D.

Page 22

1  working in this litigation as an expert, can you
2  give me a rough breakdown about the amount of time
3  you've spent reviewing literature, reviewing company
4  documents, and meeting with plaintiffs' counsel?
5      A.   The vast majority of time has -- can I do
6  it in percentages?
7      Q.   That'd -- that would be fine.
8      A.   Okay.  I would say 75 percent is reviewing
9  medical literature, 20 percent is meeting with --
10 maybe less than that.  15 percent is -- no.
11 20 percent is meeting with plaintiffs' attorneys,
12 and the remainder is reviewing other documents.
13     Q.   When you say "other documents," are you
14 referring to company docket -- company documents and
15 litigation materials you've been provided?
16     A.   Yes.
17     Q.   Have you discussed your involvement in
18 this litigation with any of the other experts for
19 the plaintiffs in the talc MDL?
20     A.   No.
21     Q.   And let me ask specifically about a few of
22 the experts, if I may.
23          Have you discussed this litigation at
24 all with Alan Campion?

Page 23

1      A.   In terms of, "What are you doing?"
2           "I'm reading articles," that kind of
3  discussion.
4           In terms of when he was going to --
5  certainly in terms of when he was going out of town
6  to do experiments, that kind of discussion.
7           But I did give him an article once
8  that I didn't understand some of the technology in
9  it.  And I asked him if he understood it, to read it
10 and see if he could explain to me, and he couldn't.
11 So I guess that's talking about too.
12     Q.   Do you recall the article in question?
13     A.   It was a lab study.  I think it was Lee.
14     Q.   Did you discuss any other studies with
15 Alan Campion?
16     A.   I don't believe so.
17     Q.   Have you discussed the substance of
18 Campion's opinions with him?
19     A.   No.
20     Q.   What is your relationship with Alan
21 Campion?
22     A.   He's my husband.
23     Q.   I understand.
24          Did Ms. Thompson first contact you or

Page 24

1  Mr. Campion about the litigation?
2      A.   Me.
3      Q.   And before you were retained as a
4  litigation, did Ms. -- Ms. Thompson share with you
5  any information about the litigation?
6           MS. O'DELL:  Object to the form.
7      A.   I'm not sure I understand that question.
8      Q.   (BY MR. JAMES)  What were the nature of
9  the discussions before you were retained in this
10 litigation with Ms. Thompson?
11     A.   She informed me that she was involved
12 in --
13          MS. O'DELL:  Let's stop you right
14 there.  Dr. Smith, in terms of -- should have been
15 quicker on my objection.
16          In terms of discussions with kind of
17 like Dr. Thompson, those are -- those discussions
18 are protected by the work prod- -- product
19 privilege, so I'm gonna instruct you not to answer
20 about any discussions that you had with the lawyers
21 for the plaintiffs.
22          MR. JAMES:  And that's -- just so I'm
23 clear, that's regardless of whether the discussions
24 were before she was retained or after she was

Page 25

1  retained?
2           MS. O'DELL:  I think, in terms of the
3  litigation when she billed for the time regarding
4  those discussions, those are privileged.  And -- and
5  I believe if you'll look at the invoices, Dr. Smith
6  has billed for all the time during which she's
7  discussed the litigation.
8      Q.   (BY MR. JAMES)  Did -- did you recommend
9  to Mrs. Thompson that she also reach out to your
10 husband?
11     A.   Yes.
12     Q.   And why did you do that?
13     A.   Leigh O'Dell said that --
14          THE WITNESS:  Oh, is that work
15 product?
16          MS. O'DELL:  It is, but you can --
17 just to the degree I -- I made a suggestion to you,
18 but don't go any further than that.  Go ahead.
19     A.   Yeah.  Leigh O'Dell told me that the
20 defense had recommended evaluation of particles by
21 Raman spectroscopy.
22          And I said, "Too bad we don't know
23 anybody who does that."
24          And Leigh and Dr. Thompson both said,

7 (Pages 22 to 25)

Ellen Blair Smith, M.D.

---

Page 26

1  "Yeah, it's too bad."
2         And I said, "My husband does that." I
3  thought they knew.
4         MS. O'DELL:  That's the extent of any
5  disclosure, again, of communications with counsel.
6         THE WITNESS:  Okay.
7     Q.  (BY MR. JAMES)  Did you refer Ms. Thompson
8  to any of the other experts who were working on the
9  MDL?
10    A.  I did not.
11    Q.  Do you understand that there are a number
12 of experts that are working on the MDL for the
13 plaintiffs that are located in Austin?
14    A.  I know of one -- oh, I guess two.  My
15 husband is one of them.
16    Q.  Other than your husband --
17    A.  Yeah.
18    Q.  -- do you know of any other experts who
19 are located in Austin?
20    A.  One, yes.
21    Q.  And who is that?
22    A.  Judy Wolf.
23    Q.  And do you know Dr. Wolf?
24    A.  Yes, I do.

---

Page 27

1     Q.  Do you know here -- did you know her
2  before this litigation?
3     A.  Oh, yes.
4     Q.  Did you refer Ms. Thompson to her for this
5  litigation?
6     A.  I did not.
7     Q.  Do you know if Ms. Thompson contacted you
8  or -- or Dr. Wolf first?
9     A.  I believe I was contacted first.
10    Q.  Have you had any discussions with Dr. Wolf
11 about this litigation?
12    A.  No.
13    Q.  Have you had discussions with any of the
14 other plaintiffs' experts about this litigation
15 besides Alan Campion?
16    A.  No.
17    Q.  Are you familiar with a
18 Dr. Clarke-Pearson?
19    A.  Very well.
20    Q.  Have you had any discussions with
21 Dr. Clarke-Pearson about the litigation?
22    A.  No.
23    Q.  Have you exchanged any e-mails with any of
24 the experts, including your husband about this

---

Page 28

1  litigation?
2     A.  No.
3     Q.  Have you exchanged any other writings or
4  written materials about this litigation with any of
5  the other experts in this litigation?
6     A.  No.
7     Q.  How long have you known Dr. Wolf, did you
8  say?
9     A.  Maybe 20 years.
10    Q.  Did you reach out to her and encourage her
11 involvement in litigation?
12    A.  I did not.
13    Q.  Did she reach out to you to encourage your
14 involvement --
15    A.  She did not.
16    Q.  -- in litigation?
17        THE COURT REPORTER:  Doctor, let him
18 finish his whole question, please.
19        THE WITNESS:  Yes, ma'am.  I'm sorry.
20    Q.  (BY MR. JAMES)  Have you ever authored any
21 publications concerning talc?
22    A.  No, sir.
23    Q.  Have you ever authored any publications
24 concerning talc and ovarian cancer?

---

Page 29

1     A.  No, sir.
2     Q.  Have you ever authored any publications
3  concerning asbestos?
4     A.  No, sir.
5     Q.  Have you ever published a talc or asbestos
6  or risk factors for ovarian cancer?
7     A.  No.
8     Q.  Have you ever conducted any studies that
9  pertain to the issues addressed in your report?
10        MS. O'DELL:  Object to the form.
11    A.  I am --
12        THE WITNESS:  Can I answer it?
13        MS. O'DELL:  Yes.
14    A.  I am --
15    Q.  (BY MR. JAMES)  May I just rephrase?
16    A.  Sure.
17    Q.  Have you ever conducted any studies
18 pertaining to the allegation that talc causes
19 ovarian cancer?
20    A.  No.
21    Q.  Do you -- are you working on any articles
22 that pertain to the issues in this litigation that
23 you consider works in progress?
24    A.  No.

---

8 (Pages 26 to 29)

Ellen Blair Smith, M.D.

Page 30

1    Q.  Do you have any plans to author or
2  contribute to any articles that pertain to the
3  issues in this litigation?
4    A.  No.
5    Q.  Have you submitted the substance or any --
6  any substance in your report to a journal for peer
7  review?
8    A.  No.
9    Q.  Have you made any internet postings, blog
10  postings, or other social media postings about the
11  issues in this litigation?
12    A.  No.
13    Q.  Have you ever given any presentations,
14  speeches, or lectures concerning talc and ovarian
15  cancer?
16    A.  No.
17    Q.  The same question for asbestos and ovarian
18  cancer.
19    A.  No.
20    Q.  Have you ever given any interviews or made
21  any public statements concerning talc?
22    A.  No.
23    Q.  Concerning talc or ovarian cancer?
24    A.  No.

Page 31

1    Q.  And concerning asbestos and ovarian
2  cancer?
3    A.  No.
4    Q.  Have you ever counseled patients on risk
5  factors for ovarian cancer?
6    A.  Yes.
7    Q.  What risk factors have you counseled your
8  patients on?
9    A.  Predominantly BRCA, Fanconi anemia pathway
10  risk factors.
11    Q.  And when you say "predominantly," are
12  there any other risk factors for ovarian cancer that
13  you've counseled your patients on?
14    A.  No.
15    Q.  Have you ever told a patient that talcum
16  powder products was the cause or were the cause of
17  their ovarian cancers?
18    A.  No.
19    Q.  Have you ever told a patient that talcum
20  powder products was likely the cause of their
21  ovarian cancer?
22    A.  No.
23    Q.  Have you ever asked any of your patients
24  about their usage of talcum powder products?

Page 32

1    A.  Not to my recall.
2    Q.  Have you ever asked your patients about
3  their usage of talcum powder products in taking
4  their medical histories?
5    A.  No.
6    Q.  And same question:  Have you asked -- it's
7  not the same question.  Let me strike that.
8          Have you ever asked your patients
9  about their exposure to asbestos in the course of
10  taking their medical histories?
11    A.  No.
12    Q.  Have you discussed the opinions that
13  you've rendered in your report concerning talc and
14  ovarian cancer with any of your patients?
15    A.  No.
16    Q.  And have you discussed with any of your
17  patients the opinions that you've rendered in your
18  report concerning asbestos or other alleged
19  constituents of talcum powder products?
20    A.  No.
21    Q.  Have you ever told any of your patients to
22  stop using talcum powder products?
23    A.  No.
24    Q.  Have you ever cautioned any of your

Page 33

1  patients about using talcum powder products?
2    A.  No.
3    Q.  Have you ever evaluated the personal risk
4  of a patient for developing ovarian cancer based
5  upon their history of usage of talcum powder
6  products?
7    A.  No.
8    Q.  Have you ever recommended risk-reducing
9  surgery on the basis of any of your patients' prior
10  usage of talcum powder products?
11    A.  No.
12    Q.  Are you aware of any physicians who
13  recommend risk-reducing surgery for patients with a
14  history of usage of talcum powder products?
15    A.  There is a published paper using use of
16  talcum powder as one of the risk factors for doing
17  oophorectomy and benign disease, but I didn't write
18  that paper.
19    Q.  Let me ask the question again.  Just make
20  sure I said it correctly.
21    A.  Okay.
22    Q.  Are you aware of any physicians that you
23  know that recommend risk-reducing surgery to
24  patients who have prior -- a history of usage of

9 (Pages 30 to 33)

Ellen Blair Smith, M.D.

Page 34

1    talcum powder products?
2        A.  No.
3            MS. O'DELL:  Object to the form.  I
4    think the question, Mr. James, is just a little
5    unclear.  When you say "you know," are you talking
6    about know of, know personally --
7            MR. JAMES:  Sure.
8            MS. O'DELL:  -- in the community?  I
9    mean --
10           MR. JAMES:  Sure.  I'll rephrase.
11       Q.  (BY MR. JAMES)  Do you know any physicians
12   with whom you have a professional relationship who
13   recommend risk-reducing surgery for patients who
14   have a prior history of usage of talcum powder
15   products?
16       A.  No.
17       Q.  You mentioned a paper in the course of --
18   of this line of questioning.
19           Do you recall the name of the paper
20   that you're referring to?
21       A.  The first author, it starts with a V,
22   V-i-t.  And the third author is Cramer.  And it's
23   some --
24       Q.  Did you say V-i-d, Doctor?  I'm sorry.

Page 35

1        A.  V as in Valentine.  V- -- I can't spell
2    the name.  I can't remember the first name.
3            The third author is Daniel Cramer, and
4    it was published in 2011 or 2013, and it's -- it's a
5    paper about a risk scoring system to recommend
6    oophorectomy in women who are undergoing
7    hysterectomy, trying to establish their risk of
8    ovarian cancer.  One of such factors is talcum
9    powder use.
10       Q.  And do you recall if that paper recommends
11   that physicians recommend to their patients
12   risk-reducing surgery if they have prior history of
13   talcum powder product usage?
14       A.  That is not an exclusive factor in that
15   risk assessment system.
16       Q.  Are you aware of any medical or scientific
17   organization that has recommended risk-reducing
18   surgery for patients who report prior usage of
19   talcum powder products?
20           MS. O'DELL:  Object to the form.
21       A.  I am not.
22       Q.  (BY MR. JAMES)  Do you understand that
23   Dr. Cramer is a paid litigation expert for the
24   plaintiffs?

Page 36

1        A.  I understand that.
2        Q.  And Dr. Cramer is one of the authors that
3    you identified as an author on the paper that you
4    were just discussing, correct?
5        A.  Correct.
6        Q.  Have you ever recommended increased
7    screening or monitoring for your patients for
8    ovarian cancer based on their prior usage of talcum
9    powder products?
10       A.  No, I have not.
11       Q.  Are you aware of any physicians with whom
12   you have a professional relationship who do this?
13       A.  No.
14       Q.  Have you ever recommended to any doctors
15   that you know professionally to tell their patients
16   to stop using talcum powder products?
17       A.  Yes.
18       Q.  Okay.  Who is that?
19       A.  Which doctors I've recommended that to?
20       Q.  Yes, Doctor.
21       A.  Well, I didn't tell them to do it.  I told
22   them my concerns about talc, but I thought it was
23   implicit in expressing my concerns that they would
24   counsel their patients.  I didn't tell -- I didn't

Page 37

1    tell the doctors to do a lot of things.
2        Q.  Understood.
3        A.  Okay.
4        Q.  And can you identify any of the doctors
5    with whom you've had those conversations?
6        A.  Yes.
7        Q.  And please identify them.
8        A.  Karen Swenson, Michael Breen, Anna Lozano.
9        Q.  And are those physicians that you know
10   here in the Austin community?
11       A.  Yes.
12       Q.  Are there any other physicians with whom
13   you've discussed your concerns of talcum powder
14   products?
15       A.  Mark Crozier is a GYN, gynecologist, but
16   he's no longer practicing.  He's retired.
17       Q.  And do you know if the three physicians
18   that you've just identified do now indeed counsel
19   their patients about talcum powder products?
20       A.  I do not know.
21       Q.  Did you have those conversations with
22   those three physicians before your retention in the
23   litigation or after?
24       A.  After.

10  (Pages 34 to 37)

Ellen Blair Smith, M.D.

Page 38

1    Q.  Have you recommended to those three
2    physicians or any other physicians that they
3    recommend to their patients risk-reducing surgery if
4    they have prior usage of talcum powder products?
5    A.  No.
6    Q.  Have you suggested to those three
7    physicians or any other physicians that they follow
8    some sort of increased monitoring or screening of
9    patients based upon prior usage of talcum powder
10   products?
11   A.  No.
12   Q.  I'm going to hand you a copy of the
13   deposition notice, which is why we're all here
14   today.  And I'm gonna mark that as Exhibit Number 2.
15      (Deposition Exhibit 2 marked for
16      identification.)
17   MS. O'DELL:  Thanks, Scott.
18   MR. JAMES:  Yeah.
19   BY MS. O'DELL:  We previously served
20   objections, and I'll just -- to certain document
21   requests that are contained in the notice, and I
22   would just reassert those now for the record.
23   MR. JAMES:  Understood.
24   Q.  (BY MR. JAMES)  Dr. Smith, have you seen a

Page 39

1    copy of this deposition notice before?
2    A.  Yes.
3    Q.  And when were you pro- -- when were you
4    provided a copy?
5    A.  Saturday or Sunday -- this past Saturday
6    or Sunday.
7    Q.  And I understand that you and your counsel
8    have brought with you to today's deposition a number
9    of materials, correct?
10   A.  Correct.
11   Q.  And we've discussed and marked the
12   invoices already.  And so Ms. O'Dell is looking
13   toward a table with other materials that I'll
14   describe.
15      Are those the materials that you've
16   brought with you that respond to the deposition
17   notice?
18   A.  Yes, sir.
19   Q.  And Ms. O'Dell and I discussed prior to
20   the deposition, but the materials that you've
21   brought with your -- with you today to today's
22   deposition are your materials considered in your
23   references, correct?
24   A.  Correct.

Page 40

1    Q.  And you've also brought with you a
2    separate pile of -- a smaller set of studies or
3    literature that you have included some notes on,
4    correct?
5    A.  Correct.
6    Q.  And without getting up and moving around
7    right now, I would like to mark the subset pile as
8    Exhibit Number 3.
9    MR. JAMES:  Okay, Leigh?
10   MS. O'DELL:  Yeah.
11      (Deposition Exhibit 3 marked for
12      identification.)
13   Q.  (BY MR. JAMES)  And we'll apply the
14   sticker at the break.  Okay?
15   Dr. Smith, are there any other
16   materials that -- that you've brought with you today
17   that we have not discussed?
18   A.  No.
19   Q.  Are there any other materials that -- that
20   having looked back at this deposition notice today,
21   that you can think of that are responsive that you
22   have not brought with you?
23   A.  No.
24   MS. O'DELL:  I say that subject to the

Page 41

1    objections.
2    MR. JAMES:  Understood.
3    Q.  (BY MR. JAMES)  Okay.  I'm going to hand
4    you, Dr. Smith, what you have in front of you
5    already, and I'm going to mark as Exhibit Number 4 a
6    copy of the report that you authored in this
7    litigation.
8       (Deposition Exhibit 4 marked for
9       identification.)
10   Q.  (BY MR. JAMES)  And, Dr. Smith, I'm gonna
11   hand you the -- the stickered copy, but I understand
12   that you have an identical copy in front of you,
13   correct?
14   A.  Correct.
15   Q.  And if throughout the deposition today you
16   prefer to flip it in the loose-leaf binder, that's
17   fine as well.  Okay?
18   A.  Okay.  May I --
19   MS. O'DELL:  Just leave it there.
20   A.  May I point out a couple of corrections
21   for that, because I've only recently --
22   MS. O'DELL:  Dr. Smith, you certainly
23   may, but let him ask you the questions.
24   Q.  (BY MR. JAMES)  Yeah.  I'm actually going

11 (Pages 38 to 41)

Ellen Blair Smith, M.D.

Page 42

1  to ask you that question, so you'll have a chance
2  to.
3      A.  Okay.
4          MR. JAMES:  And if counsel, down the
5  line throughout the day, has any requests of copies
6  of anything I'm handing out, just let me know.  I
7  have some.
8      Q.  (BY MR. JAMES)  Okay.  Dr. Smith, you
9  would agree that the report that I've handed you and
10  marked as Exhibit Number 4 defines the scope of your
11  opinions in this litigation --
12     A.  Yes.
13     Q.  -- correct?
14         MS. O'DELL:  Object to the form.
15  Excuse me.  I was a little off the mark.
16         MR. JAMES:  Okay.
17     Q.  (BY MR. JAMES)  Dr. Smith, do you have any
18  changes to this report that you'd like to make
19  today?
20     A.  Yes.
21     Q.  And what are those changes?
22     A.  There is deficient of second parenthesis,
23  and I'm trying to figure out where it is in here.
24  Let me go to more substantive things.

Page 43

1          On page 7 where it says, "A Cancer
2  Genome," second paragraph.  Do you know where I am,
3  page 7, second paragraph?
4      Q.  Yes.  Yes, Doctor.
5      A.  It should be "The Cancer Genome Atlas,"
6  not "A Cancer Genome Atlas."
7          Do you want me to mark it on here?
8      Q.  It's fine.
9      A.  Okay.  And then on the chart labeled on
10  Exhibit B the single gene studies, on the second
11  page, the back page under Wu, 2015, the fourth
12  column, 1.56.
13         Are you with me?
14     Q.  Yes, Doctor.
15     A.  That 1.56 and 1.77 are inverted.  The 1.77
16  should go with Hispanics as is the confidence
17  intervals.  The 1.56 should go with
18  African-Americans, as does that conference
19  intervals, just a transposition.
20     Q.  Are there any other changes to the report
21  that you'd like to make today?
22     A.  Well, I haven't found the parentheses yet,
23  but you'll figure it out when you see it.
24     Q.  Okay.  Dr. Smith, did you write this

Page 44

1  report?
2      A.  I did.
3      Q.  Is all of the wording in this report your
4  wording?
5      A.  Yes.
6      Q.  Did you consult with Dr. Wolf in writing
7  your report?
8      A.  I did not.
9      Q.  Did you meet with Dr. Wolf in writing your
10  report?
11     A.  I did not.
12     Q.  I'm gonna mark as Exhibit Number 5 a copy
13  of Dr. Wolf's report in this litigation.
14         (Deposition Exhibit 5 marked for
15         identification.)
16     Q.  (BY MR. JAMES)  Dr. Smith, have you seen
17  this report before?
18     A.  No.
19         MR. JAMES:  I apologize to -- to
20  counsel and to you, Dr. Smith.  I have a bad back
21  which prevents me from leaning too --
22     A.  That's okay.
23     Q.  -- further -- too far forward.
24         Dr. Smith, at first I'd like you to

Page 45

1  pull out your report.
2      A.  Um-hum.
3      Q.  And I'd like you to turn to page 16 of
4  your report, please.
5      A.  (Complied.)  Um-hum.
6      Q.  And if you look down at the one, two,
7  three, fourth full paragraph.
8      A.  Um-hum.
9      Q.  Actually, it's the -- when I say "full,"
10  it's the third full paragraph.  It's the paragraph
11  that starts with "In my opinion."
12     A.  Um-hum.
13     Q.  Do you see that paragraph?
14     A.  Um-hum.
15     Q.  If you look at that last sentence of that
16  paragraph -- I'm gonna read and make sure I read it
17  correctly.
18         It says, quote, "All of the cohort
19  studies are limited by failure to obtain complete
20  information, lack of power, selection bias, and
21  short follow-up," close quotes.
22         Did I read that correctly?
23     A.  Yes.
24     Q.  And if you could turn, then, to Dr. Wolf's

12 (Pages 42 to 45)

Ellen Blair Smith, M.D.

Page 46

1  report, please.
2     A. What page?
3     Q. And I'm looking at page 8 of Dr. Wolf's
4  report. And it's second full paragraph, so it's the
5  second section on that page. I'm gonna quote a page
6  of Dr. Wolf's report here.
7     A. (Complied.) Um-hum.
8     Q. Okay. It's the sentence that starts with
9  the word "All."
10      Do you see where I am?
11     A. Um-hum.
12     Q. Okay. It says, quote, "All of the cohort
13  study are limited by lack of power, failure to make
14  the appropriate queries, selection bias, and short
15  follow-up," close quote.
16     A. Um-hum.
17     Q. Do you see that section that I read?
18     A. I do.
19     Q. And did I read that correctly?
20     A. You did.
21     Q. Do you agree that those two sentences are
22  remarkably similar?
23     A. They are similar.
24     Q. And is your testimony that the wording in

Page 47

1  your report is purely your wording?
2     A. It is.
3     Q. All right. If you could turn back to your
4  report, please, Dr. Smith, on page 16.
5     A. (Complied.) I'm on 16. Okay.
6     Q. Okay. And if we look down, it's the --
7  it's the paragraph below the paragraph that we just
8  read. It starts with the "When looking" phrase.
9     Do you see --
10     A. Um-hum.
11     Q. -- where I am?
12     A. Um-hum.
13     Q. Okay. And if you look at that paragraph,
14  Dr. Smith, on page 16, that full paragraph.
15     A. Um-hum.
16     Q. If you could read that to yourself right
17  now, please.
18     A. Okay. (Examined exhibit.)
19     Q. And it's the paragraph that starts with
20  the phrase "When looking at epidemiological
21  studies."
22     A. Um-hum.
23     Q. And have you had a chance to read that?
24     A. I have.

Page 48

1     Q. Okay. And if you look at page -- if you
2  can turn to Dr. Wolf's report, please.
3     A. Um-hum.
4     Q. Okay. If you turn to Dr. Wolf's report on
5  page 8 --
6     A. Um-hum.
7     Q. -- it's the bottom paragraph.
8     A. (Complied.)
9     Q. And Dr. Wolf starts a paragraph with the
10  same phraseology. She says, quote, "When looking at
11  epidemiological studies."
12     Do you see where I'm reading?
13     A. Um-hum.
14     Q. And have you had a chance to review her
15  paragraph there?
16     MS. O'DELL: Object to the form.
17     A. (Examined exhibit.) I do.
18     Q. (BY MR. JAMES) Okay. Would you agree
19  that those two paragraphs are remarkably similar?
20     A. I'm not --
21     MS. O'DELL: Object to the form.
22     A. -- quite through that.
23     Q. (BY MR. JAMES) Please take your time.
24  I'm sorry.

Page 49

1     A. (Examined exhibit.) They're similar. I
2  think it's because we looked at the same data.
3     Q. And, Dr. Smith, within that paragraph, I'm
4  gonna call your attention to two specific sentences.
5     So I'm looking back at your report,
6  Dr. Smith, and you say, quote -- in your report,
7  quote, "Recall and confounding bias in case-control
8  studies appear to have minimal impact."
9     A. Um-hum.
10     Q. "(Penninkilampi and Eslick 2018;" --
11     A. Um-hum.
12     Q. -- "Langseth 2008)."
13     A. Um-hum.
14     Q. "There appears to be no significant
15  publication bias."
16     A. Um-hum.
17     Q. "(Berge, 2017;" --
18     A. Um-hum.
19     Q. -- "Penninkilampi 2018)," close --
20     A. Um-hum.
21     Q. -- quote.
22     Did I read that correctly?
23     A. You did.
24     Q. And do you see that in Dr. Wolf's report

13 (Pages 46 to 49)

Ellen Blair Smith, M.D.

Page 50

1    she has those exact same sentences verbatim?
2        A.  Yes.
3        Q.  And, again, is your testimony that the
4    wording in this report is your wording?
5        A.  It is my wording.
6        Q.  Okay.  Dr. Smith, if you could look at
7    page 7 of your report.  If you look at the bottom
8    paragraph, about halfway down through that
9    paragraph, Dr. Smith, you state the following --
10       A.  Page 7?
11       Q.  Yes, Dr. Smith.
12       A.  Okay.
13       Q.  It's the last paragraph on that page,
14   right above the visuals.
15       A.  (Complied.)  Um-hum.
16       Q.  Do you see the sentence that starts with
17   the word "binding"?  "Binding of BCDX2 or CX3," it's
18   a Holliday Junction.
19           Do you see where I'm reading?
20       A.  Um-hum.
21       Q.  And if I kept rea- -- if I keep reading,
22   that sentence ends with a citation to the Compton
23   2010 study.
24           Do you see that?

Page 51

1        A.  Um-hum.
2        Q.  Is that wording in that sentence your
3    wording or is that quoted from the article?
4        A.  It's quoted from the article, I believe.
5    By -- that's why it's referenced.
6        Q.  Oh, understood.  Is that what you were
7    referring to earlier as something that was missing a
8    quote?
9        A.  No.  No, it's not a quo- -- I -- what I
10   was referring to is there's missing a back half of a
11   parenthesis in the text.
12       Q.  Do you agree that if you're quoting
13   verbatim from one of the sources that you cite that
14   you should include quotations in your report?
15           MS. O'DELL:  Object to the form.
16       A.  I'm not sure that's necessary in a
17   scientific paper.  I think the importance is it's
18   cited.
19       Q.  (BY MR. JAMES)  You submitted articles to
20   peer-reviewed journals before, correct?
21       A.  I have.
22       Q.  And your understanding is that if -- if
23   something is cited without quotes that's standard?
24           MS. O'DELL:  Object to the form.

Page 52

1        A.  I think it's allowable.
2        Q.  (BY MR. JAMES)  Are there any other
3    passages in your report that you can recall that you
4    would have written verbatim but not quoted?  Excuse
5    me, strike that.
6            Are there any other passages in your
7    report that you have cited to a source and included
8    text verbatim from that source --
9            MS. O'DELL:  Object to the form.
10       Q.  (BY MR. JAMES) -- that you did not put in
11   quotations?
12           MS. O'DELL:  Excuse me.  Object to the
13   form.
14       A.  I don't remember any.
15       Q.  (BY MR. JAMES)  Okay.  Dr. Smith, with
16   your expert report you produced a copy of your CV.
17       A.  Yes.
18       Q.  Correct?
19       A.  Yes.
20       Q.  Since providing your counsel with a copy
21   of the CV that was then provided to me, have there
22   been any changes to your CV?
23       A.  No.
24       Q.  I'm gonna mark the CV, then, that was

Page 53

1    produced to the defendants as Exhibit Number 6.
2            (Deposition Exhibit 6 marked for
3            identification.)
4        Q.  (BY MR. JAMES)  I'm gonna hand you a copy,
5    Dr. Smith.  Sorry again for the --
6        A.  That's okay.
7        Q.  -- throwing.
8            MS. O'DELL:  If you just hand them to
9    me, I'll be glad to hand them over.
10           MR. JAMES:  Thank you so much.
11       Q.  (BY MR. JAMES)  And, again, Dr. Smith,
12   this is your current CV that you're looking at, is
13   Exhibit Number 6?
14       A.  (Examined exhibit.)  Yes, it is.
15       Q.  Thank you.  Okay.
16           In your report, Dr. Smith, you
17   describe the methodology that you've conducted to
18   collect the materials that you reviewed, correct?
19       A.  Correct.
20       Q.  And I see you're still looking at your CV,
21   so I don't intend to rush you.
22       A.  That's okay.  It's fine.
23       Q.  And so I am -- I'm not gonna ask you any
24   further questions about the CV if you want to set

14  (Pages 50 to 53)

Ellen Blair Smith, M.D.

Page 54

1  that aside.
2    A.  Oh, okay.  (Complied.)  Okay.
3    Q.  I'm gonna turn to your report now.
4    A.  Okay.
5      MS. O'DELL:  Yeah, just -- we can
6  maybe stack -- thank you.
7    Q.  (BY MR. JAMES)  The searches that you ran
8  to capture the materials that you reviewed for
9  purposes of forming your litigation opinions, had
10  you run those searches before being retained as an
11  expert in this litigation?
12    A.  No.
13    Q.  Had you read any of the studies that you
14  cite in your report before being retained in the
15  litigation?
16    A.  Yes.
17    Q.  Is there a way for you to delineate which
18  studies that you reviewed before your retention and
19  which studies you reviewed after?
20    A.  I know I'd seen Cramer 82.
21      Do you want me to go through my
22  references list and try to identify which one I've
23  seen before?
24    Q.  Well, we understand that the reference

Page 55

1  list is -- is lengthy, correct?
2    A.  It is.
3    Q.  Do you think that you're looking for a
4  handful of articles or a larger set of articles that
5  you saw before your retention?
6    A.  I would say it's larger than that on these
7  references, yes.
8    Q.  Okay.  And so rather than us take the time
9  to do that now, Dr. Smith, sitting here today, is
10  there any way for you to delineate or define which
11  ones you reviewed before being retained?
12    A.  Do I --
13      MS. O'DELL:  Object to the -- excuse
14  me.  Object to the form.
15      I think she just -- she's willing to
16  do that, if you want her to go through the list,
17  but --
18    A.  Or I can put a check on them, if you want.
19    Q.  (BY MR. JAMES)  Let's not do that right
20  now.  How about that?
21    A.  Okay.
22    Q.  And then we'll think about how we approach
23  that.
24      Did plaintiffs' counsel provide you

Page 56

1  any of the studies that are listed in your
2  references or materials considered lists?
3    A.  Yes.
4    Q.  Is there any way for you to delineate
5  which studies were provided to you by plaintiffs'
6  counsel and which ones that you found on your own?
7    A.  Frequently I would provide them an
8  abstract asking for full text, so that happened a
9  lot.  There were some that they sent to me as these
10  studies were coming out in e-Pubs, e-publication,
11  prior to print publication.  I could go through,
12  and, again, try to mark those.
13    Q.  Would you have in your possession records
14  that would help you come up with a list of what was
15  provided to you versus what you found on your own?
16    A.  No, but, like, I know that things that
17  came out in '17 and '18 usually they got before I
18  did.
19    Q.  And those are the prepub versions you were
20  just mentioning?
21    A.  Right.  They usually weren't
22  prepublication.  They were usually peer --
23    Q.  You said e-Pub?
24    A.  Yeah.  e-Pub.

Page 57

1    Q.  My apologies.
2    A.  Yeah, that didn't have a citation, right.
3    Q.  In your report under the Methodology
4  section, Dr. Smith, you say that you, "Began with a
5  comprehensive review of the medical literature," and
6  then you use the phraseology, "ON many topics."
7      Is that -- do you recall using that
8  phraseology?  It's at page 2.
9      MS. O'DELL:  Object to the form.
10    A.  (Examined exhibit.)  I'm looking for -- it
11  says --
12    Q.  (BY MR. JAMES)  It's the first sentence,
13  Doctor -- it's the second sentence, Dr. Smith.
14    A.  Then I read many of the references of the
15  articles cited in those papers.  I didn't see many
16  topics.
17    Q.  Sure.  So in the second sentence -- and
18  I -- my questioning is probably unnecessarily
19  confusing.
20      But in the second sentence under
21  Methodology, you say that you relied on PubMed
22  searches on many topics.
23      Do you see that?
24    A.  Oh, that.  Okay.  Oh, that was the second

## Ellen Blair Smith, M.D.

Page 58

1 sentence. Sorry, I was off by one. Yes.
2    Q. And -- and then later on you just
3 mentioned, Dr. Smith, you note in this paragraph
4 that you also looked at the references of the
5 articles --
6    A. Right.
7    Q. -- and conducted some additional Google
8 searching, correct?
9    A. Correct.
10       MS. O'DELL: Object to the form.
11    Q. (BY MR. JAMES) When you refer to the
12 "many topics" there, can you define what many topics
13 you are referring to?
14    A. Sometimes you find different -- when
15 you're using a search engine, even in PubMed, if you
16 put in -- put it in one way and it looks like talc
17 and ovarian cancer, then you put it in ovarian
18 cancer, and talc you may get deferences on how you
19 go back. Inflammation in carcinogenesis. Then you
20 look at inflammation and ovarian cancer.
21       So just, if you word it differently,
22 you can pick up different references, and they come
23 out in different order sometimes. So it's -- when
24 you're looking for everything, you need to, kind of,

Page 59

1 mix it up and say it different ways to try to find
2 all the articles.
3    Q. For every topic that you looked at, did
4 you conduct a comprehensive review for the
5 underlying scientific and medical literature?
6    A. Yes.
7    Q. So every topic that you've addressed in
8 your paper was a critical component of your meth- --
9 methodology to conduct a comprehensive review and
10 capture all of the relevant and scientific -- the
11 relevant scientific and medical literature?
12    A. That --
13       MS. O'DELL: Object to the form. Give
14 me --
15    A. That was --
16       MS. O'DELL: Excuse me. Just give me
17 just a second, and I'll get my obj- -- object to
18 the form. Thank you.
19    A. That was my attempt.
20    Q. (BY MR. JAMES) Do you agree that prior to
21 offering expert opinions on particular topics an
22 expert should be expected to conduct a con- --
23 comprehensive review of the scientific and medical
24 literature on that topic?

Page 60

1       MS. O'DELL: Object to the form.
2    A. I would agree with that.
3    Q. (BY MR. JAMES) You agree that --
4       THE WITNESS: Am I supposed to wait,
5 Laurel [sic]?
6       MS. O'DELL: Just give me just a --
7 just a second.
8       THE WITNESS: Okay.
9       MS. O'DELL: I'll try to be quicker on
10 the draw.
11       THE WITNESS: Okay.
12    Q. (BY MR. JAMES) Do you agree that doing
13 that is a fundamental first step to your
14 methodology?
15    A. I do.
16    Q. Would you agree that any opinion formed on
17 an incomplete review of the relevant scientific and
18 medical literature on a particular topic would be
19 unreliable?
20       MS. O'DELL: Object to the form.
21    A. Not necessarily. Not necessarily.
22    Q. (BY MR. JAMES) And why do you say that?
23    A. I mean, if you miss -- if a person misses
24 one article but has a substantial amount of the

Page 61

1 information required, they can reach the right
2 conclusion and have not read one article.
3    Q. Then do you -- again, do you agree that
4 the methodology to opine on a particular topic
5 should start with the intent to capture the relevant
6 scientific and medical literature on that topic?
7       MS. O'DELL: Object to the form.
8    A. I agree.
9    Q. (BY MR. JAMES) Do you believe that you
10 conducted a comprehensive review in the manner that
11 we just described on the topic of heavy metals and
12 ovarian cancer?
13       MS. O'DELL: Object to the form.
14    A. No.
15    Q. (BY MR. JAMES) Do you believe that you
16 followed the methodology that we just described on
17 the topic of fragrances and ovarian cancer?
18       MS. O'DELL: Object to the form.
19    A. I read a limited amount of material on
20 fragrances.
21    Q. (BY MR. JAMES) And so my question
22 remains.
23       Do you agree -- or do you believe that
24 you followed the methodology that we just described

16 (Pages 58 to 61)

Ellen Blair Smith, M.D.

Page 62

1    in forming your opinions on fragrances and ovarian
2    cancer?
3        A.  No.
4            MS. O'DELL:  Object to the form.
5        Q.  (BY MR. JAMES)  Do you believe that you
6    followed the methodology that we just described in
7    forming your opinions on asbestos and ovarian
8    cancer?
9            MS. O'DELL:  Object to the form.
10       A.  Yes.
11       Q.  (BY MR. JAMES)  Do you believe that you
12   followed the methodology that we just described on
13   the issue of, quote, "fibrous talc," close quote,
14   and ovarian cancer?
15       A.  Yes.
16           MS. O'DELL:  Object to the form.
17           Give me just a second, Doctor.  Thank
18   you.
19       Q.  (BY MR. JAMES)  Dr. Smith, can you explain
20   to me the difference between the reference list
21   attached to your report and the -- what I refer to
22   as the materials considered list attached to your
23   report as part of Exhibit C?
24           Do you understand that there are two

Page 63

1    different lists?
2        A.  Yes, I do.
3        Q.  Okay.  Can you explain to me the
4    difference between those two lists, the significance
5    of why they're placed on one list versus the other?
6        A.  If I used a reference in my paper, it is
7    on my reference list.
8            The larger reference list, I believe,
9    is what's called a reliance list that aggregates all
10   the references that all the experts that are
11   involved in this litigation had as one master list
12   of reference for the whole litigation.
13           Does that make sense?
14       Q.  Was that a list that you created, the
15   materials considered list?
16       A.  The reliance list, the last one?
17       Q.  Yes, Doctor.
18       A.  I did not create that.
19       Q.  Did you review all of the sources listed
20   on that list?
21       A.  There are sources on there that I have not
22   reviewed.
23       Q.  Is there any way for you to delineate
24   which sources you reviewed on the -- what you're

Page 64

1    referring to as the reliance list and which sources
2    you did not review?
3        A.  I'd have to go through it one by one.  I'd
4    be glad to.
5        Q.  Yeah.  I think that we're time limited
6    today, so I ask that we not do that at this time.
7        A.  Okay.
8        Q.  Are there materials that you reviewed and
9    that you concluded were not relevant to your opinion
10   cited on the reliance list but not on the reference
11   list?
12           MS. O'DELL:  Objection to form.
13       A.  I think that -- so are we calling the
14   Exhibit C a reliance list --
15       Q.  (BY MR. JAMES)  I think, Doctor
16       A.  -- and my --
17       Q.  I was trying to use your terminology, but
18   it's -- I'll just --
19       A.  Okay.
20       Q.  -- to be clearer, I'll ask the question
21   with Exhibit C.
22       A.  Okay.
23       Q.  Are there materials contained on Exhibit C
24   that you reviewed but did not cite to or discuss in

Page 65

1    the text of your report?
2            MS. O'DELL:  If you understand the
3    question, Doctor.  If you're confused about the
4    question, then I'm sure counsel will be glad to
5    rephrase it.  Because with the terminology, this is
6    getting -- it is a little confusing.
7        A.  Could you clarify that --
8        Q.  (BY MR. JAMES)  Sure.  I'll try to.
9        A.  -- because I am a little confused.
10       Q.  I'll try.
11       A.  I'm sorry.
12       Q.  That's okay.
13           Did you review materials cited on the
14   Exhibit C that you concluded were not relevant to
15   your opinions?
16       A.  I can't recall anything.
17       Q.  In your report, you make reference to
18   looking at company documents, correct?
19       A.  Correct.
20       Q.  Did you affirmatively request those
21   company documents or were those provided to you by
22   counsel without you requesting those?
23       A.  Those were provided to me without request.
24       Q.  Did counsel -- sitting here today, do you

17 (Pages 62 to 65)

Ellen Blair Smith, M.D.

Page 66

1  recall the information or subject matter of the
2  company documents that you reviewed?
3        A.  Ummm . . .
4            MS. O'DELL:  Object to the form.
5            If there's any confusion in the
6  question, Doctor, just ask him to rephrase it.  But
7  if you understand the question, feel free to answer.
8        A.  I believe that the -- there was a
9  newspaper article about condoms and exclusion of
10 talc products with condoms, that was a company
11 document that I saw.
12       Q.  (BY MR. JAMES)  Did the company documents
13 that you were provided by counsel inform your
14 opinions in this case?
15       A.  No -- well . . .  No.
16       Q.  When counsel provided you the company
17 documents to review, did you ask for any additional
18 company documents?
19       A.  No.
20       Q.  Did you ask for context to those company
21 documents?
22           MS. O'DELL:  Object- -- objection to
23 form of the question.
24           You -- don't reveal any communications

Page 67

1  you've had with counsel about company documents, or
2  any other thing, for that matter --
3            THE WITNESS:  Okay.
4            MS. O'DELL:  -- but in regard to this
5  topic.
6            MR. JAMES:  Well, I'm just asking what
7  she's asked to see.  So --
8            THE WITNESS:  I haven't asked to --
9            MR. JAMES:  -- I'm asking --
10           THE WITNESS:  -- see anything.
11           MR. JAMES:  Well, I'm sorry,
12 Dr. Smith.
13           THE WITNESS:  Sorry.
14           MR. JAMES:  So if you feel like
15 there's a way to rephrase my question, that's what
16 I'm trying to get at.
17           MS. O'DELL:  I think you asked -- I
18 heard you ask a different question than asked --
19           MR. JAMES:  Okay.  Let me try again.
20           MS. O'DELL:  -- than that.  So just --
21 if you don't mind, rephrase it.
22           MR. JAMES:  Understood.
23       Q.  (BY MR. JAMES)  After you were provided
24 the company documents, did you ask if there were any

Page 68

1  additional documents that would provide context to
2  the documents that you were initially provided?
3        A.  I --
4            MS. O'DELL:  Object to the form.
5        A.  I don't believe so.
6        Q.  (BY MR. JAMES)  Did you ask if any defense
7  witness had ever authored any testimony about the
8  company documents you were provided?
9            MS. O'DELL:  Excuse me, Doctor.  Don't
10 testify to any communications with counsel.
11           So if you -- you can ask her, did she
12 ask a question.  She can say yes.  But in terms of
13 the subject matter of the question, the content of
14 that conversation, I'm gonna object and just
15 instruct the witness not to answer.
16           Is that -- is that a
17 fair distinction --
18           MR. JAMES:  But you're allowing the
19 witness to answer whether she asked for it, correct?
20           MS. O'DELL:  I think I -- you asked
21 that question and I allowed it.
22           MR. JAMES:  Got it.
23           MS. O'DELL:  But to the degree you've
24 asked for what her questions were, what the

Page 69

1  discussion was, I think that is protected.
2            MR. JAMES:  Got it.
3        Q.  (BY MR. JAMES)  So did you ask for any --
4  once you were provided the company documents that
5  you were provided by counsel, did you ask whether
6  the defense had ever offered any testimony or
7  witnesses about the contents of those documents?
8            MS. O'DELL:  Excuse me, Doctor.  Don't
9  answer that question.
10           That's the subject matter of the
11 communication, and I'm not gonna allow her to answer
12 those questions.
13           So don't answer the question.
14       Q.  (BY MR. JAMES)  Do you know if any defense
15 witness has ever addressed the content of the
16 company documents that you were provided by counsel?
17           MS. O'DELL:  Object to the form.
18       A.  I don't know that.
19       Q.  (BY MR. JAMES)  You would agree with me
20 that if you were attempting as a scientist to form
21 opinions on a particular topic you would want to be
22 sure that you were provided both sides of the story,
23 correct?
24           MS. O'DELL:  Object to the form.

18  (Pages 66 to 69)

Ellen Blair Smith, M.D.

Page 70

1       You may answer the question if you
2  understand it, Doctor.
3       A.  I think the scientific literature presents
4  both sides of the story.  That's how you factor it
5  in, right?  You usually don't call up individuals
6  and ask them their opinion.  Their published,
7  peer-reviewed opinions are available in the
8  literature.
9       Q.  (BY MR. JAMES)  Dr. Smith, in your report
10 in discussing asbestos, you mentioned litigation
11 reports authored by a Dr. Longo, correct?
12      A.  Yes.
13      Q.  Okay.  So we were just talking about
14 company documents --
15      A.  But now --
16      Q.  -- in the -- prior to the questioning, and
17 I want to just make sure you know where I'm going.
18      You testified that the company
19 documents did not inform your opinions, correct?
20      MS. O'DELL:  Object to the form.
21      A.  Yes.  Perhaps you and I are talking about
22 different things between company documents and
23 litigation documents.
24      Q.  (BY MR. JAMES)  Sure.  And I think -- fair

Page 71

1  enough.
2       Let's just move on to the Longo
3  requesting.
4       A.  Okay.
5       Q.  And with respect to asbestos, you looked
6  at Longo litigation reports, correct?
7       A.  I did.
8       Q.  You understand those to be litigation
9  materials, correct?
10      A.  Yes.
11      MS. O'DELL:  Object to the form.
12      Q.  (BY MR. JAMES)  Do you understand Longo --
13 Dr. Longo is a paid litigation expert, correct?
14      A.  Yes.
15      Q.  And you understand his reports are not
16 peer-reviewed, correct?
17      MS. O'DELL:  Object to the form.
18      A.  Yes.
19      Q.  (BY MR. JAMES)  You understand that
20 they're not published, correct?
21      A.  Yes.
22      Q.  Do you know if anyone on the defense side
23 has addressed or responded to Dr. Longo's litigation
24 reports?

Page 72

1       A.  I do not know that.
2       Q.  And wouldn't you want to know that as a
3  scientist before forming opinions upon Dr. Longo's
4  reports?
5       MS. O'DELL:  Object to the form.
6       A.  I would be interested in that.
7       Q.  (BY MR. JAMES)  And counsel didn't provide
8  that information to you, did they?
9       A.  They did not.
10      MS. O'DELL:  I would just object to
11 the statement that somehow that question assumes,
12 Counsel, that defense -- defendants in this case
13 have served expert reports, which they have not.
14 It's a little misleading, but . . .
15      Q.  (BY MR. JAMES)  You were looking at
16 Dr. Longo's litigation reports from other cases.
17      Did you know that?
18      MS. O'DELL:  Dr. Smith is not involved
19 in other cases, so I'm not sure she would have
20 information to know what's another case or what the
21 present case.  So to be fair --
22      MR. JAMES:  Leigh, I've asked a fair
23 question, and I think Dr. Smith is capable of
24 answering it.

Page 73

1       MS. O'DELL:  I'm not sure that that's
2  a fair question.
3       If you understand it --
4       MR. JAMES:  Well, why don't you please
5  state your objection and then let Dr. Smith answer,
6  if you can.
7       MS. O'DELL:  Object to the form.
8       MR. JAMES:  Thank you.
9       A.  Could you say it again?  I got lost.
10      Q.  (BY MR. JAMES)  Sure.  You've already
11 agreed with me that the Longo reports that you've
12 reviewed are litigation reports, correct?
13      A.  Right.
14      Q.  Okay.  And your counsel just stated that
15 the Longo litigation reports were not part of the
16 MDL litigation.
17      MS. O'DELL:  That's not what I said.
18      MR. JAMES:  Okay.
19      Q.  (BY MR. JAMES)  Nevertheless, you have
20 reviewed litigation reports from plaintiffs -- an
21 expert that's paid by plaintiffs in this litigation,
22 correct?
23      A.  I have.
24      Q.  You have also reviewed a litigation report

19 (Pages 70 to 73)

## Ellen Blair Smith, M.D.

Page 74

1  prepared by a Dr. Crowley, correct?
2       A.  Correct.
3       Q.  And that pertains to fragrances, correct?
4       A.  Correct.
5       Q.  You understand Dr. Crowley's report is not
6  peer-reviewed, correct?
7       A.  Correct.
8       Q.  You understand his report is not published
9  in the medical literature, correct?
10      A.  Correct.
11      Q.  Did you review any of the other expert
12 reports besides Dr. Crowley's report in this MDL?
13           MS. O'DELL:  In addition to Dr. Longo.
14           MR. JAMES:  Thank you.
15      Q.  (BY MR. JAMES)  In addition to Dr. Longo?
16      A.  I don't think so.
17           MS. O'DELL:  Hey, Scott, we've been
18 going about an hour and 15 minutes or something
19 close to that, hour and 10 minutes.  Whenever it's a
20 good place --
21           MR. JAMES:  Another 5 to finish this
22 line.
23           Is that good, Doctor?
24           THE WITNESS:  Sure.

Page 75

1           MR. JAMES:  Okay.
2       Q.  (BY MR. JAMES)  Dr. Smith, you also looked
3  at -- or at least you listed, in your lists, you
4  looked at the deposition of a Dr. Alice Blount,
5  correct?
6       A.  Oh, yes.
7       Q.  Okay.  Does that ring a bell?
8       A.  Yes.  But is she involved in this
9  litigation?
10      Q.  That was gonna be my question to you.
11           Did you know that Dr. Blount has
12 testified as an expert for plaintiffs in the talc
13 litigation?
14      A.  In --
15           MS. O'DELL:  Excuse me.  Object to the
16 form.
17      A.  In this MDL?
18      Q.  (BY MR. JAMES)  In the talc litigation --
19      A.  Oh, in the talc litigation, yes.
20           MS. O'DELL:  Object to the form.  I
21 think it's a mischaracterization to say she's an
22 expert, to my knowledge.
23           So you want to restate your question.
24      Q.  (BY MR. JAMES)  Do you know that

Page 76

1  Dr. Blount has been listed by plaintiffs in talc
2  litigation as an expert for plaintiffs?
3           MS. O'DELL:  Object to the form;
4  misstates the testimony, as I understand it.
5       A.  I know she's been deposed.
6       Q.  (BY MR. JAMES)  Did you review her
7  testimony in full?
8       A.  I -- I reviewed her paper, and I read her
9  testimony fairly superficially.
10      Q.  Do you know if the defense in the talc
11 litigation has responded to or addressed
12 Dr. Blount's testimony and article?
13      A.  I do not know that.
14      Q.  Wouldn't you like to know that?
15           MS. O'DELL:  Object to the form.
16      A.  Sure.
17      Q.  (BY MR. JAMES)  Is there a reason that you
18 didn't consider the defenses' response to
19 Dr. Blount's testimony and article?
20           MS. O'DELL:  Object to the form of the
21 question.
22           There have been no expert reports
23 in -- by -- served by defendants in the MDL.  That's
24 an unfair question.

Page 77

1       A.  I'm lost again.  I'm sorry.
2       Q.  (BY MR. JAMES)  Sure.  I understand.
3           You read Dr. Blount's testimony
4  superficially is what you just testified to,
5  correct?
6       A.  Yes.
7       Q.  You understand Dr. Blount testified in
8  another case in the talc litigation, correct?
9       A.  Yes.
10      Q.  Do you know if the defendants responded to
11 Dr. Blount's testimony and report in that case?
12      A.  I do not know that.
13      Q.  You've cited in your report a deposition
14 exhibit from a Dr. John Hopkins.
15           Does that ring a bell?
16      A.  It does.
17      Q.  Okay.  And you also cited a deposition
18 exhibit from a Julie Pier.
19           Does that ring a bell?
20      A.  It does.
21      Q.  And why did you look at those two
22 exhibits?
23      A.  I looked at the identification in Pier on
24 minerals and quantities, parts per million.

Page 78

1    I looked at the Hopkins', the
2  identification of asbestos and asbestiform species
3  in various ore and talcum powder products.
4    Q.  Did you consider both of those exhibits
5  relevant to the opinions that you formed concerning
6  asbestos and ovarian cancer?
7    A.  Yes.
8    Q.  Did you -- do you know if the defense has
9  addressed or responded to the information contained
10  in those two deposition exhibits?
11    A.  I --
12    MS. O'DELL:  Object to the form.
13    A.  I do not know.
14    Q.  (BY MR. JAMES)  Did you ask if the
15  defendants have responded to the information
16  contained in those exhibits?
17    MS. O'DELL:  Object to the form.
18    A.  I did --
19    MS. O'DELL:  And I -- excuse me.  And
20  I would instruct you just-- he's asking you about
21  what you talked about with your lawyers for the
22  plaintiffs, and I would just instruct you not to
23  answer that question, as I've instructed you on
24  every other line of inquiry to that extent.

Page 79

1    I instructed her not to answer that.
2    A.  I'm --
3    MR. JAMES:  Understood.
4    A.  -- not responding.
5    Q.  (BY MR. JAMES)  Yeah, understood.
6    Would you like to know if the
7  defendants have responded to the information
8  contained in the two deposition exhibits that you
9  cited?
10    A.  Yes, I would.
11    MR. JAMES:  Is now good for a break?
12    MS. O'DELL:  Sure.
13    MR. JAMES:  Okay.
14    Thank you, Doctor.
15    THE VIDEOGRAPHER:  Going off the
16  record.  The time is 10:34 a.m.
17    (A recess was taken from 10:34 a.m.
18    to 10:53 a.m.)
19    THE VIDEOGRAPHER:  Back on the record.
20  The time is 10:53 a.m.
21    Q.  (BY MR. JAMES)  Okay.  Dr. Smith, are we
22  ready to proceed?
23    A.  I am.
24    Q.  Great.

Page 80

1    Dr. Smith, did you do any independent
2  testing to support your opinions in this case?
3    A.  I did not.
4    Q.  Did you do any independent analysis or
5  reanalysis of raw data to support your opinions?
6    A.  I did not.
7    Q.  On page 2 of your report, Dr. Smith, you
8  conclude with a passage where you state that you
9  have applied in this litigation, quote, "The same
10  methodology and scientific rigor that I have used
11  regularly in my professional career and clinical
12  practice," closed quote.
13    Do you see that passage that I read?
14    A.  Oh, yes.  In the -- under Methodology?
15    Q.  Yes, Doctor.
16    A.  Yes.
17    Q.  Did you see where I read?
18    A.  Yes.
19    Q.  Okay.
20    A.  Yes.
21    Q.  In your professional practice and your
22  clinical practice, do you rely on litigation reports
23  by paid experts?
24    MS. O'DELL:  Object to the form.

Page 81

1    A.  No.
2    Q.  (BY MR. JAMES)  Do you rely on unpublished
3  data or unpublished testing as a clinician?
4    MS. O'DELL:  Object to the form.
5    A.  Occasionally, there is unpublished data
6  that you may cite information from an author for the
7  things that weren't in publication material.
8  That -- that happens commonly with a lot of
9  scientific reports.
10    Q.  (BY MR. JAMES)  As a clinician, have you
11  ever relied on the type of litigation materials that
12  you have reviewed in your capacity as an expert in
13  this case?
14    MS. O'DELL:  Object to the form;
15  vague.
16    A.  I don't think so.
17    Q.  (BY MR. JAMES)  As a clinician, in your
18  daily practice or your professional practice, have
19  you ever relied on deposition testimony of paid
20  experts to form your opinions?
21    MS. O'DELL:  Object to the form.
22    A.  No.
23    Q.  (BY MR. JAMES)  Before being contacted by
24  counsel in this case, had you formed an opinion as

21 (Pages 78 to 81)

Ellen Blair Smith, M.D.

Page 82

1    to any cause of ovarian cancer?
2        A.  (No response.)
3        Q.  And let me rephrase that --
4        A.  Yes.
5        Q.  -- because it's prob- -- it's phrased
6    poorly.
7            Before being contacted about work in
8    this litigation, had you reached the conclusion that
9    there were any causes of ovarian cancer?
10       A.  Yes.
11       Q.  And what had you concluded before being
12   contacted in the litigation about causes of ovarian
13   cancer?
14       A.  Well, I'm not sure that I
15   understand how -- what do you mean "cause"?
16       Q.  You understand that in the epidemiologic
17   literature, the word "association" is used, correct?
18       A.  Yes.
19       Q.  And the word "cause" is used, correct?
20       A.  Correct.
21       Q.  In your clinical practice, if someone
22   asked you what caused their ovarian cancer, would
23   you know what they were asking you?
24       A.  Yes.

Page 83

1        Q.  By the word "cause"?
2        A.  Yes.
3        Q.  And so I don't mean for my question to be
4    confusing.  I'm -- what I'm asking you is if --
5    certainly in this litigation, you have offered the
6    opinion in your report that in your opinion talc
7    causes ovarian cancer, correct?
8        A.  Correct.
9        Q.  Did you form that opinion, that causation
10   opinion, after being retained in this litigation?
11       A.  After reviewing the literature.
12       Q.  And after being retained; is that right?
13       A.  Correct.
14       Q.  And so my question to you, which I hope is
15   simple, is that before you were contacted about work
16   in this litigation, had you concluded that there was
17   anything else out there that could be categorized as
18   a cause of ovarian cancer?
19       A.  Are you -- causation such as genetic
20   predisposition?
21       Q.  That would be one of them.
22       A.  Okay.  Yeah.  Then we're on the same page.
23       Q.  Okay.  And so had -- had you concluded
24   before your work in this litigation that genetics,

Page 84

1    loosely, could -- could be categorized as a cause of
2    ovarian cancer?
3        A.  Yes.
4        Q.  Is there anything else that you had
5    concluded before your work in this litigation that
6    could be categorized as a cause of ovarian cancer?
7        A.  Yes.
8        Q.  What else?
9        A.  Endometriosis.
10          Do you want more?
11       Q.  Yes.  If you could list any others.
12       A.  Nulliparity, some data on obesity, mixed
13   data on pelvic inflammatory disease, mixed data on
14   smoking.  That's what has come to the top of my
15   head.
16       Q.  And just to make sure that we're on the
17   same page, my question at this point is still
18   confined to the issue of cause.
19          And so of the items that you just
20   mentioned before being retained in this litigation,
21   had you concluded that obesity is a cause of ovarian
22   cancer?
23          MS. O'DELL:  Object to the form.
24       A.  Mixed data on that.  More pertaining to

Page 85

1    endometrioid cancers.
2        Q.  (BY MR. JAMES) So you would -- did you
3    hold the opinion before your work in this litigation
4    that obesity was a cause of ovarian cancer?
5          MS. O'DELL:  Object to the form.
6        A.  Partially.
7        Q.  (BY MR. JAMES) And when you say
8    "partially," are you referring to the subtype?
9        A.  Yes.
10       Q.  And so of the i- -- the items that you did
11   just mention to me, then, you do consider those to
12   be -- you did consider those to be causes of ovarian
13   cancer before your work in this litigation; is that
14   correct?
15       A.  Correct.
16       Q.  When you reached those causation
17   conclusions, did you do so based upon the body of
18   scientific and medical literature?
19       A.  Yes.
20          MS. O'DELL:  Object to the form.
21       Q.  (BY MR. JAMES) Did you reach those
22   conclusions in the context of litigation?
23       A.  No.
24       Q.  Did you reach those causation conclusions

22 (Pages 82 to 85)

Ellen Blair Smith, M.D.

Page 86

1  after talking with plaintiffs' counsel?
2          MS. O'DELL:  Object to the form.
3      A.  No.
4      Q.  (BY MR. JAMES)  Did you reach those
5  causation conclusions after being provided materials
6  selected for your review by counsel?
7          MS. O'DELL:  Object to the form.
8      A.  (Examined realtime screen.)  No.
9      Q.  (BY MR. JAMES)  Did you reach those
10  causation conclusions by reviewing unpublished
11  litigation reports?
12          MS. O'DELL:  Object to the form.
13      A.  No.
14      Q.  (BY MR. JAMES)  Did you reach those
15  causation conclusions by reviewing company
16  documents?
17          MS. O'DELL:  Object to the form.
18      A.  No.
19      Q.  (BY MR. JAMES)  What conclusions did you
20  have, if any, before your work in this litigation on
21  the talc ovarian cancer hypothesis?
22          MS. O'DELL:  Object to the form.
23          Would you -- would you -- could you
24  just -- I was just reading your question, Scott.

Page 87

1          Is that right?
2          MR. JAMES:  What conclusions.
3          MS. O'DELL:  Okay.  Sorry.
4      A.  I was concerned about talc products being
5  transported through the female genital tract because
6  of findings in the '70s of talc deeply embedded in
7  ovarian tissue.
8          J. Don Woodruff was one of my mentors,
9  and he shared this information with me in 1979; and
10  I found it concerning.  He went on or was in the
11  position at that time of postulating talc -- talcum
12  powder as an etiologic factor in the development of
13  ovarian cancer.  This is well before the publication
14  of the epidemiologic studies, and I registered his
15  concerns in my brain.
16      Q.  (BY MR. JAMES)  And with that statement,
17  then, are you indicating that those concerns -- you
18  did not express those concerns to anyone else,
19  correct?
20          MS. O'DELL:  Object to the form.
21  Misstates her testimony, but go ahead.
22          MR. JAMES:  I don't want to do that,
23  so let me start over.
24      A.  Okay.

Page 88

1      Q.  (BY MR. JAMES)  When you said you
2  registered those concerns in your brain, what do you
3  mean by that?
4      A.  I never used talcum powder products on my
5  female children, and I don't have any male children,
6  so that's pretty much -- and I didn't use talcum
7  powder products on myself, and I felt strongly about
8  that.
9      Q.  And what time frame was that?
10      A.  Well, I heard from him in 1979 in my first
11  trial, and I didn't use talcum powder from 1979 to
12  1992 when my first daughter was born, nor did I use
13  it in 1994 for diapering my second daughter; and we
14  just didn't have powder in my home.
15      Q.  Did you express those concerns in writing
16  anywhere?
17      A.  No.
18      Q.  We discussed this already this morning,
19  but did you express those concerns to any of the
20  patients that you treated?
21      A.  No.
22      Q.  Same line of questions but with respect to
23  asbestos.  Okay?
24          Did you conclude before -- what --

Page 89

1  what conclusions had you come to, if any, before
2  your work in this litigation about a relationship
3  between asbestos and ovarian cancer?
4      A.  Prior to my work in this litigation, I did
5  not have an awareness of the relationship of
6  asbestos to ovarian cancer.
7      Q.  Is that an opinion, then, that you've
8  formed in the context of litigation?
9          MS. O'DELL:  Object to the form.
10      A.  After my review of the scientific data,
11  yes.
12      Q.  (BY MR. JAMES)  And to be clear and to
13  respond to the objection, the question I'm asking
14  is:  Did you reach the opinion about the
15  relationship between asbestos and ovarian cancer in
16  the context of this litigation?
17      A.  I think it's unfair to say "context of
18  litigation."  I would have -- had I reviewed all
19  that literature, I would have reached that
20  conclusion whether or not this litigation was
21  ongoing or not.
22      Q.  If you don't like the word "context," I
23  can rephrase.
24          Did you reach the asbestos conclusions

23  (Pages 86 to 89)

Ellen Blair Smith, M.D.

Page 90

1  that you've rendered in your report after being
2  retained in this litigation?
3      A.  Yes, correct.
4      Q.  On that note, Dr. Smith, let's look at
5  page 21 of your report, please.
6      A.  (Complied.)  Excuse me.
7      Q.  And you see at the bottom of page 21,
8  Dr. Smith, you have a section that's labeled
9  "Summary of my opinions."
10         Do you see where I am?
11     A.  Yes, sir.
12     Q.  And Item Number 1 is the opinion that you
13  hold today that talc causes ovarian cancer, correct?
14     A.  Correct.
15     Q.  And we've discussed this already, but that
16  is an opinion that you've formed after being
17  retained in the litigation, correct?
18     A.  Correct.
19     Q.  With respect to Item Number 2, you have
20  opined that "There is credible evidence that
21  Johnson and Johnson baby powder products contain
22  asbestos."
23         Do you see where I read?
24     A.  I do.

Page 91

1      Q.  Is that an opinion that you formed after
2  your retention in this litigation?
3      A.  Correct.
4      Q.  Then you have the opinion that asbestos
5  and fibrous talc cause ovarian cancer.
6          Again, those are opinions that you've
7  formed after being retained in the litigation,
8  correct?
9      A.  Correct.
10     Q.  And then continuing on to Number 2, the
11  opinion that you've formed concerning heavy metals,
12  is that an opinion that you formed after being
13  retained in the litigation?
14     A.  Correct.
15     Q.  With respect to -- and the same is true
16  with fragrances, is that an opinion that you formed
17  after being retained in the litigation?
18     A.  Correct.
19     Q.  And Item Number 3, you express opinions
20  concerning inflammation.
21          Is that a fair paraphrasing of
22  Number 3?
23         MS. O'DELL:  Objection to form.
24     A.  I don't think those are opinions.  I think

Page 92

1  those are facts.  Those are scientific facts.
2  They've been demonstrated in the laboratory.
3      Q.  (BY MR. JAMES)  You understand that you
4  have been retained to offer your scientific opinions
5  in this litigation, right?
6      A.  Yes.  Yes.
7      Q.  And so Number 3, do you hold the opinion
8  that you've expressed in Number 3?
9      A.  Yes.
10     Q.  Is that an opinion that you've formed
11  after being retained in the litigation?
12     A.  Yes.
13     Q.  And Number 4, do you see where I am still?
14     A.  I do.
15     Q.  Okay.  And Number 4 is an opinion
16  concerning migration and also an opinion concerning
17  inhalation, correct?
18     A.  Yes.
19     Q.  Are those opinions that you've formed
20  after being retained in this litigation?
21     A.  Correct.
22     Q.  Turning to the opinion that you have
23  expressed that there is, quote, "credible evidence,"
24  close quote, that Johnson's Baby Powder products

Page 93

1  contain asbestos, what is the credible evidence that
2  you rely upon?
3      A.  The paper of Blount in 1991 and the report
4  of Dr. Longo and the other doctor with him whose
5  name I forgot.  It starts with an R, I think.
6         MS. O'DELL:  I think you mean Rigler.
7         THE WITNESS:  That's it.  Starts with
8  an R.
9      Q.  (BY MR. JAMES)  Are those the litigation
10  reports in litigation testimony that we previously
11  discussed?
12     A.  Yes, sir.
13     Q.  Is there any other evidence that you
14  consider -- that you have considered that supports
15  your opinion that there's, quote, "credible
16  evidence" of asbestos in those products?
17         MS. O'DELL:  Object to the form.
18     A.  I can't remember any other evidence or
19  references.
20     Q.  (BY MR. JAMES)  You cite some articles on
21  page 18 of your report?
22     A.  Oh, yes.
23     Q.  Do you see where I am, Doctor?
24     A.  Yes.

Ellen Blair Smith, M.D.

Page 94

1    Q.  And you cite a number of articles there.
2         Do you see where I'm looking in the
3    first paragraph?
4    A.  (Examined exhibit.)  Yes.
5    Q.  Okay.  In that -- the first paragraph in
6    that section?
7    A.  Yes.
8         MS. O'DELL:  And we're -- just for
9    purposes, we're at page 18?
10        MR. JAMES:  Correct.
11        THE WITNESS:  Yeah.  We're talking
12   about the first sentence.
13        MS. O'DELL:  Okay.
14   Q.  (BY MR. JAMES)  How did you obtain those
15   articles?
16   A.  Those articles were provided for me as
17   reference materials by the plaintiffs' attorneys.
18   Q.  Do any of those articles pertain to
19   Johnson & Johnson products?
20   A.  Blount disclosed in her deposition that it
21   was Johnson & Johnson Baby Powder.
22   Q.  And I'm -- just to be clear, I'm asking
23   about the articles that you've cited in the first
24   paragraph in the asbestos section on page 18.

Page 95

1    A.  Blount's one of those articles -- well,
2    her article -- the deposition is not the paper.
3    You're right.  Sorry.
4    Q.  No, that's fine.
5    A.  I don't know that any of those were
6    Johnson & Johnson Baby Powder.
7         MS. O'DELL:  Just to be -- if you're
8    referring to -- when you say "those", it's not clear
9    on the record, so if there's something specific --
10   you don't have to go back, but just be -- be
11   cognizant of that.
12   Q.  (BY MR. JAMES)  What level of review did
13   you undertake to collect literature on the topic of
14   the alleged presence of asbestos in talcum powder
15   products?
16        MS. O'DELL:  Object to the form.
17   A.  (Examined exhibit.)
18        MS. O'DELL:  If you understand the
19   question.
20        THE WITNESS:  I understand the
21   question.
22   A.  I mean, I remember Googling that question
23   and getting into a lot of craziness on the internet
24   that I didn't want to be in.  I relied on the

Page 96

1    reports provided to review.
2    Q.  (BY MR. JAMES)  And those were the reports
3    provided to you by plaintiffs' counsel?
4    A.  Yes.
5    Q.  And you also cited a number of articles
6    that you just testified were provided to you by
7    plaintiffs' counsel?
8         MS. O'DELL:  Object to the form.
9    A.  Yes.
10   Q.  (BY MR. JAMES)  Did you find any articles
11   through your searches that contradicted the
12   information provided to you by plaintiffs' counsel?
13        MS. O'DELL:  Object to the form.
14   A.  Yes.
15   Q.  (BY MR. JAMES)  Where are those articles
16   cited in your report?
17   A.  I don't think I have cited them in my
18   report.
19   Q.  You found articles that contradict the
20   allegation that asbestos is a contaminant in talcum
21   powder products, correct?
22        MS. O'DELL:  Object to the form.
23   A.  It's not a contradiction.  The absence of
24   something does not contradict the presence of

Page 97

1    something.
2         Do you understand?
3         Like in Longo's report, he found
4    asbestos in 63 percent of his samples.  He did not
5    find asbestos in 34 percent of his samples.  The
6    fact that he didn't find it in 34 percent does not
7    mean he didn't find it in 66.
8         Asbestos is a carcinogen and its
9    significance in risk to life is when you find it.
10        In the FDA report that did not find
11   asbestos in Johnson's Baby Powder, Shower to Shower,
12   and in multiple samples from suppliers of ore -- I
13   mean, that's great that they didn't find it, but it
14   doesn't mean it's not detectable.  And I can't
15   explain in terms of being an expert in technique to
16   understand why some people found it and some people
17   didn't find it.
18        Does that make sense to you?
19   Q.  (BY MR. JAMES)  I think you answered a
20   question that I didn't ask, so let me rephrase.
21   A.  I'm sorry.
22   Q.  In searching for literature about the
23   alleged presence of asbestos in cosmetic talc, did
24   you find any articles -- published articles that

25  (Pages 94 to 97)

Ellen Blair Smith, M.D.

Page 98

1  reach the conclusion that there was no such
2  contamination?
3          MS. O'DELL:  Object to the form.
4      A.  I can't remember any.
5      Q.  (BY MR. JAMES)  If you had found those,
6  would you have discussed those in your report?
7      A.  Probably.  I mean, I want to be
8  comprehensive.
9      Q.  And so if there is a body of literature
10  out there that you didn't discuss in your report,
11  then you would agree that your analysis of the issue
12  was not comprehensive, correct?
13          MS. O'DELL:  Excuse me.  Object to the
14  form; misstates her testimony.
15      A.  If I missed it, I shouldn't have.
16      Q.  (BY MR. JAMES)  And, Dr. Smith, you did
17  just mention the FDA testing of talc for the
18  presence of asbestos, correct?
19      A.  Yes.
20      Q.  And have you reviewed that testing?
21      A.  I've reviewed that report.
22      Q.  The FDA's report?
23      A.  Yes.
24      Q.  Did you discuss it at all in your

Page 99

1  litigation report?
2      A.  No.
3      Q.  And why is that?
4      A.  I explained that.  Negative isn't as
5  significant as positive.
6      Q.  Is that because the positive testing
7  results supports your litigation opinion; the
8  negative testing results do not?
9          MS. O'DELL:  Object to the form.
10     A.  No.  It's because the positive testing is
11  a threat to human life.
12     Q.  (BY MR. JAMES)  So you have seen -- I'm
13  gonna mark as Exhibit Number 7 the 2007 -- excuse
14  me, the 2010 FDA testing on cosmetic talc.
15     A.  Yes.
16          (Deposition Exhibit 7 marked for
17          identification.)
18     Q.  (BY MR. JAMES)  Is that a printout of the
19  testing information you have reviewed, Dr. Smith?
20     A.  That is identical to what I have reviewed.
21     Q.  Okay.  Do you have any reason to disagree
22  with the FDA's findings here in this Exhibit 7?
23          MS. O'DELL:  Object to the form to the
24  degree -- what findings are you referring to in your

Page 100

1  question?
2          MR. JAMES:  The findings in Exhibit
3  Number 7.
4          MS. O'DELL:  Object to the form.
5      A.  Their -- I -- they said, "No asbestos
6  detected."
7          I can -- I don't know enough about
8  testing to disagree with them, but I don't know
9  what -- I mean, does "none" mean zero or does "none"
10  mean below some level?
11          I do know that their technique -- I
12  know enough to know that it's a good means of
13  finding asbestos by, you know, polarized light
14  microscopy followed by TEM, that that's a good
15  technique.
16          I don't understand why theirs are so
17  different from the other, and I don't have the
18  expertise to go any further than that.
19     Q.  (BY MR. JAMES)  With respect to whether
20  there is asbestos in the cosmetic talc products or
21  there isn't, is it fair to say that you would defer
22  to others?
23     A.  Yes.
24          MS. O'DELL:  Object to the form.

Page 101

1      Q.  (BY MR. JAMES)  And do you consider
2  yourself to be an expert in mineral classification?
3      A.  Absolutely not.
4      Q.  What about an expert in mineralogy?
5      A.  Absolutely not.
6      Q.  But you understand the FDA's testing was
7  performed by an independent lab?
8      A.  Yes, they said that.
9      Q.  And that's contrasted, which you
10  understand that Longo's testing is done by a paid
11  litigation expert, correct?
12          MS. O'DELL:  Object to the form.
13     A.  I'm kind of thinking they probably paid
14  the lab they sent it too.  I mean, shouldn't
15  they?
16     Q.  (BY MR. JAMES)  And who's -- who is
17  "they"?
18     A.  The FDA paid the AMA Analytical Services.
19     Q.  Okay.  Do you have any understanding of
20  how the lab results by the FDA were obtained or paid
21  for?
22     A.  No.
23     Q.  Do you have an understanding of -- did you
24  know that the FDA's testing was performed outside

Ellen Blair Smith, M.D.

| Page 102 | Page 104 |
|---|---|

**Page 102**

1  the context of litigation?

2      MS. O'DELL: Object to the form.

3    A. I hadn't thought of it, but I would not

4  think it's about litigation.

5    Q. (BY MR. JAMES) And if we looked at the

6  front page of Exhibit Number 7, which I've handed

7  you, have you reviewed the text of this exhibit

8  before today?

9    A. This whole -- yes.

10    Q. Okay.

11      MS. O'DELL: And if you need to

12  look --

13    Q. (BY MR. JAMES) And do you understand that

14  this exhibit --

15      MS. O'DELL: Excuse me. Excuse me.

16      If you -- and if you need to refresh

17  yourself on any part of the text, Doctor, feel free

18  to do that as he's asking you questions.

19      THE WITNESS: Okay.

20      MR. JAMES: Absolutely. Certainly.

21    Q. (BY MR. JAMES) If you turn to the second

22  page of the exhibit, do you see the section that's

23  titled "How FDA followed up on the latest reports"?

24    A. Yes.

**Page 103**

1    Q. Okay. And you see it says, quote,

2  "Because safety questions about the possible

3  presence of asbestos in talc are raised

4  periodically, the FDA decided to conduct an

5  exploratory survey of currently marketed

6  cosmetic-grade raw material talc," closed quote.

7    Do you see where I read?

8    A. Yes.

9    Q. And there's no discussion there that the

10  testing was done at the behest of litigation, is

11  there?

12    A. No.

13    Q. And did you know that the talcum products

14  tested by the FDA in this document were Johnson &

15  Johnson products?

16      MS. O'DELL: Object to the form.

17    A. I think it says Johnson's Baby Powder and

18  Shower to Shower on there, and I know those are J&J

19  products.

20    Q. (BY MR. JAMES) Do you have any personal

21  knowledge concerning the specifications that are

22  used by Johnson & Johnson with respect to its

23  cosmetic talcum powder products?

24    A. I do not know them.

**Page 104**

1    Q. Have you looked at those?

2    A. No, I have not.

3    Q. Are you aware that Johnson & Johnson

4  manufacturers its products in accordance with United

5  States Pharmacopeia Convention?

6      MS. O'DELL: Objection to form.

7    A. I did not know that specifically.

8    Q. (BY MR. JAMES) Have heard of that

9  organization before?

10    A. Yes, I have.

11    Q. Do you consider that to be a respected

12  organization?

13      MS. O'DELL: Object to the form.

14    A. Yes.

15    Q. (BY MR. JAMES) Did you know that there

16  have been thousands upon thousands of testing

17  documents produced in this litigation?

18      MS. O'DELL: Object to the form.

19    A. I --

20      MS. O'DELL: Don't speculate. If

21  you -- if you --

22      THE WITNESS: I --

23      MR. JAMES: I'm asking her if she

24  knew.

**Page 105**

1      THE WITNESS: -- was going to say I

2  didn't know.

3      MS. O'DELL: Okay. Good. I didn't

4  hear what your answer was. Sorry.

5      THE WITNESS: Okay.

6      MS. O'DELL: I didn't -- I talked over

7  you. I apologize.

8      THE WITNESS: That's okay.

9    Q. (BY MR. JAMES) So the -- just so that the

10  exchange is clear, Doctor, did you know that there

11  have been thousands upon thousands of testing

12  documents produced in this litigation?

13    A. I did not.

14    Q. Did you know that those testing documents

15  include testing documents performed by third-party

16  labs?

17      MS. O'DELL: Object to the form.

18    A. I did not.

19    Q. (BY MR. JAMES) Did you review a 2014

20  letter by the FDA in the course of forming your

21  opinions in this case?

22    A. Could you show me that letter?

23    Q. Absolutely.

24    A. See if I recognize it.

27 (Pages 102 to 105)

## Ellen Blair Smith, M.D.

Page 106

1          MR. JAMES:  I'm gonna mark as Exhibit
2    Number 8 -- it's the 2014 FDA letter denying the
3    Citizen Petitions.
4          (Deposition Exhibit 8 marked for
5           identification.)
6    A.  (Examined exhibit.)  Yes, sir, I have seen
7    this letter.
8    Q.  (BY MR. JAMES)  Did you consider this
9    letter informative -- to be informative of your
10   opinions?
11         MS. O'DELL:  Object to the form.
12   A.  I read this report, and it went into a
13   total database.
14   Q.  (BY MR. JAMES)  And does that mean your
15   total set of materials that you considered?
16   A.  Yes, it's my brain.
17   Q.  Do you understand that in this letter the
18   FDA also commented on the allegation that asbestos
19   contaminates cosmetic talc products?
20   A.  Yes.
21   Q.  And did you -- do you recall seeing the
22   FDA's conclusion in this letter about that
23   allegation?
24         MS. O'DELL:  Feel free to refresh

Page 107

1    yourself about the document, Dr. Smith.
2    A.  (Examined exhibit.)  My understanding was
3    their conclusions was that they were not going to
4    issue a warning on products, nor were they going to
5    allow a hearing for further discussion.
6    Q.  (BY MR. JAMES)  And you understand that in
7    this 2014 letter the FDA referred back to its 2010
8    testing for presence of asbestos, correct?
9    A.  Correct.
10   Q.  Do you have any reason to disagree with
11   the FDA's statements in this letter about the
12   allegation that asbestos contaminates talc products?
13         MS. O'DELL:  Objection to the form.
14         I think Dr. Smith misunderstood your
15   prior question.  Counsel, I think you sort of missed
16   each other.
17         But your context of this question is
18   asbestos, not the overall finding of the letter, but
19   asbestos itself?
20   Q.  (BY MR. JAMES)  Dr. Smith, can you answer
21   my question?
22   A.  I may have to read it again.
23         (Examined realtime screen.)  Yes, they
24   did refer back to the 2010 testing for presence of

Page 108

1    asbestos.
2    Q.  (BY MR. JAMES)  And my -- the question
3    that I posed before Ms. O'Dell made her speaking
4    objection was that do you have any reason to
5    disagree with the FDA's statements in this letter
6    about the allegation that asbestos contaminates talc
7    products?
8          MS. O'DELL:  Object to the form;
9    misstates the document.
10   A.  (Examined realtime screen.)
11         I share the FDA's concern that they
12   make a blanket statement with testing only some of
13   the suppliers and a limited number of products and a
14   limited number of samples of those products, so I --
15   I understand they -- how they base their conclusion.
16   I might have or would have suggested additional
17   studies.
18   Q.  (BY MR. JAMES)  And you understand --
19   again, we've discussed this already, but of the
20   products tested, those products included Johnson &
21   Johnson products.
22         Did you know that?
23   A.  Yes.  I -- they had a single sample of
24   Johnson & Johnson powder from the DC area.

Page 109

1    Q.  Do you understand that the supplier of the
2    talc that's used in Johnson & Johnson products also
3    submitted samples?
4    A.  Yes, I did.
5    Q.  Do you have any opinions about the amount
6    of exposure to asbestos that you believe would be
7    imparted upon a user of Johnson & Johnson talc
8    products?
9          MS. O'DELL:  Object to the form; vague
10   as to time and duration.
11   A.  No.
12   Q.  (BY MR. JAMES)  And do you have any
13   opinions about the alleged contamination on a
14   fiber-per-bottle basis?
15         MS. O'DELL:  Object to the form.
16   A.  No.
17   Q.  (BY MR. JAMES)  Do you have an opinion as
18   to when you believe J&J talc powder products were
19   contaminated with asbestos and on the market?
20         MS. O'DELL:  Object to the form.
21   A.  Yes.
22   Q.  (BY MR. JAMES)  What is that opinion?
23   A.  My opinion is that contamination occurs at
24   the mine and persists through the processing all the

Page 110

1  way to market.
2      Q.  Okay.  I think you misunderstood my
3  question or maybe I asked a bad question.
4          But do you have any opinion about
5  when, for what duration or period of years,
6  Johnson & Johnson talc products were on the market
7  and were allegedly contaminated with asbestos?
8          MS. O'DELL:  Object to the form.
9      A.  Dr. Longo has tested samples from the '70s
10  to 2000 with the presence of a -- presence of
11  asbestos.
12      Q.  (BY MR JAMES)  And, again, you're
13  referring back to the Longo litigation testing that
14  we've talked about at length --
15      A.  Yes.
16      Q.  -- this morning, correct?
17      A.  Yes.
18          MS. O'DELL:  Objection to form.
19  Excuse me.  Object to the form.
20      Q.  (BY MR. JAMES)  Do you have any opinion
21  about -- well, strike that.
22          With respect to your opinion that
23  asbestos is a cause of ovarian cancer, how did you
24  go about searching for the materials that you

Page 111

1  reviewed to inform that opinion?
2      A.  I reviewed articles that were listed in
3  IARC 100C and --
4      Q.  And the -- oh, I'm sorry, Doctor.
5      A.  -- then PubMed research as well.
6          THE COURT REPORTER:  What did you say?
7          THE WITNESS:  PubMed, P-u-b-M-e-d
8      Q.  And on page 18 through 19, Doctor, is,
9  again, your section on asbestos, correct?
10      A.  Um-hum.  Um-hum.
11      Q.  And in that section, Doctor, you refer to
12  the IARC, which you just mentioned, correct?
13      A.  Correct.
14      Q.  And then you cite five, what you refer to
15  as, quote, "heavy occupational exposure," close
16  quote, studies, correct?
17      A.  Correct.
18      Q.  And below that you also discuss the
19  Camargo study; is that right?
20      A.  Correct.
21      Q.  And then if you turn the page, you refer
22  in a single sentence to a Reid study, correct?
23      A.  Correct.
24      Q.  Did you review all of those studies?

Page 112

1      A.  Yes.
2      Q.  Okay.  Did you review any other studies
3  examining the purported relationship between
4  asbestos and ovarian cancer?
5      A.  Not that I remember.
6      Q.  Does this report reflect your complete
7  analysis of those studies?
8          MS. O'DELL:  Object to the form.
9      Q.  (BY MR. JAMES)  And how they relate to
10  your opinions in this case?
11          MS. O'DELL:  Objection to form.
12      A.  Yes.  I believe so.
13      Q.  (BY MR. JAMES)  Do you recall looking at
14  the Reid study?  Do you -- sitting here today, do
15  you recall the Reid study?
16      A.  That's my favorite one.  May I see it.
17      Q.  Sure.
18          MS. O'DELL:  Yes.  Please.
19      Q.  (BY MR. JAMES)  Did you say -- I'm sorry.
20          Did you say the Reid study was your
21  favorite study?
22      A.  Yes.
23          MS. O'DELL:  On this topic, Doctor.
24          THE WITNESS:  In my life, no.  It is

Page 113

1  not my favorite study in my life, but . . .
2          MR. JAMES:  Okay.  I'm gonna mark the
3  Reid study as Exhibit Number 9.
4          (Deposition Exhibit 9 marked for
5          identification.)
6      A.  (Examined exhibit.)
7          MR. JAMES:  Oh, thank you.
8      Q.  (BY MR. JAMES)  Have you had a chance to
9  refresh your recollection of the study, Doctor?
10      A.  Um-hum.  Um-hum.
11      Q.  And why is this your favorite study?
12      A.  As a pathology review discriminating
13  mesothelioma from epithelial ovarian cancer.
14      Q.  And you don't have any -- strike that.
15          The discussion that you've included in
16  your report as to Reid is that single sentence,
17  correct?
18      A.  Yes.
19      Q.  Do you --
20      A.  And it's a meta-analysis.
21      Q.  Do you agree with the statements in the
22  Reid study about misclassification?
23      A.  Exactly what statements, please?
24      Q.  Sure.

29 (Pages 110 to 113)

Ellen Blair Smith, M.D.

Page 114

1    So if you look towards the Conclusion
2 section that's on the second to last page of the
3 article.
4    A. (Complied.) Thank you.
5    Q. And if you look at the Conclusion section,
6 I'll just read the first couple sentences.
7    The article says, quote, "Taken
8 without further analysis, women thought to have
9 ovarian cancer had an increased rate in the
10 meta-analysis if reporting having been exposed to
11 asbestos, compared with reference populations."
12 (Paraphrasing.) However, this finding may result
13 from the methods used to identify the ovarian cancer
14 cases, close quote.
15    A. Yes.
16    Q. Do you agree with the concern expressed in
17 Reid about the disease misclassification?
18    A. I do.
19    Q. And then if you scan further down in that
20 paragraph of the article, Doctor, you see, you know,
21 about halfway to three-quarters of the way down,
22 there's a sentence that starts with the word
23 "However."
24    It says, quote, "However, the authors

Page 115

1 of this article suggest that the IARC decision to
2 determine asbestos exposure as a cause of ovarian
3 cancer was premature and not wholly supported by the
4 evidence" --
5    A. Are you on the back page?
6    Q. -- close quote.
7    Yes. On the same paragraph that I was
8 reading with you earlier. It's the Conclusion
9 paragraph.
10    A. Where it says "Discussions"? Oh, no.
11    Q. I'm on page --
12    A. Oh, I'm --
13    Q. -- 1294.
14    A. Okay. I've caught up with you now.
15 Sorry. (Examined exhibit.)
16    Q. And I was reading a sent- -- a sentence
17 that started with the word "However."
18    A. All right. Um-hum. (Examined exhibit.)
19    Q. Do you agree with the Reid authors that
20 the determination of IARC was premature?
21    A. No, I do not.
22    Q. Do you agree with the authors of the Reid
23 paper that the IARC conclusion was not wholly
24 supported by the evidence?

Page 116

1    A. I think the weight of the evidence falls
2 with the IARC even though they're meta-analysis
3 crossed -- their -- no, their meta-analysis didn't.
4    The overall -- I mean, their findings
5 have a risk of 1.75 with confidence intervals of
6 1.45 to 2.10.
7    So, again, she has a positive study
8 with pathology review, and then she says the IARC is
9 premature. I don't understand her conclusion.
10    Q. Do you understand that, again, her --
11 her -- the cautions expressed in this last
12 paragraph, some of those cautions arise from the
13 concerns about disease in this classification.
14    Do you understand that?
15    MS. O'DELL: Object to the form.
16    A. Yes.
17    Q. (BY MR. JAMES) And do you agree with
18 those concerns?
19    MS. O'DELL: Object to the form.
20    A. I think it is very difficult to
21 discriminate mesothelioma from epithelial ovarian
22 cancer sometimes.
23    Q. (BY MR. JAMES) And I received word that
24 the tape needs to be changed so --

Page 117

1    A. Okay.
2    Q. -- we'll take a short break.
3    A. Okay.
4    THE VIDEOGRAPHER: Going off the
5 record. The time is 11:39 a.m.
6    (A recess was taken from 11:39 a.m.
7    to 11:55 a.m.)
8    THE VIDEOGRAPHER: This marks the
9 beginning of Disk 2. Back on the record. The time
10 is 11:55 a.m.
11    Q. (BY MR. JAMES) Dr. Smith, we are
12 continuing our discussion of your opinion on
13 asbestos as causes of ovarian cancer. Okay?
14    A. Correct.
15    Q. Did you consider any weaknesses or
16 limitations in the body of the literature that you
17 reviewed concerning the link between asbestos and
18 ovarian cancer?
19    A. Could you be more specific?
20    Q. Certainly in evaluating medical literature
21 you would agree that one thing for you to consider
22 is whether the study has any limitations, correct?
23    A. Correct.
24    Q. And so my question, which is open-ended,

Ellen Blair Smith, M.D.

Page 118

1  is whether, in looking at the set of literature that
2  you looked at on asbestos and ovarian cancer, if you
3  found any limitations to that set of literature?
4          MS. O'DELL: Objection; vague.
5      A. I've considered whether they're single
6  site studies, occupational spousre -- exposure
7  versus people who wash the clothes of workers or
8  nonenvironmental exposure as opposed to
9  occupational, those things.
10     Q. (BY MR. JAMES) And --
11     A. And --
12     Q. -- so let's start --
13         MS. O'DELL: I'm sorry. Were you
14  finished, Dr. Smith? If you --
15         THE WITNESS: I have.
16         MS. O'DELL: Okay.
17     Q. (BY MR. JAMES) Let's -- so you just
18  identified one limitation as -- let me -- let me
19  rephrase this.
20         Would you agree that one limitation of
21  the set of literature that you reviewed was that --
22         (Phone interruption.)
23         THE WITNESS: What is that?
24         MR. JAMES: Just a second. Let's go

Page 119

1  off.
2          THE VIDEOGRAPHER: Going off the
3  record. The time is 11:57.
4          (A recess was taken from 11:57 a.m.
5          to 11:58 a.m.)
6          THE VIDEOGRAPHER: Back on the record.
7  The time is 11:58 a.m.
8      Q. (BY MR. JAMES) Dr. Smith, would you agree
9  that one limitation to this set of literature that
10  you reviewed is that the literature pertains to
11  occupational exposures?
12         MS. O'DELL: Object to the form.
13     A. It contains occupational exposure and, I
14  mean, the meta-analysis of Reid, for example. It
15  contains both.
16     Q. (BY MR. JAMES) Do you -- would you agree
17  that for the studies that pertain to occupational
18  exposure that you've reviewed that's one limitation
19  to those studies in applying them to the --
20     A. Nonoccupational people, yes.
21     Q. Thank you. And the doctor finished my
22  question.
23     A. Sorry.
24     Q. And I -- we understood each other, so

Page 120

1  that's okay. I'll try to talk quicker, and you can
2  try to anticipate my questions less.
3          MS. O'DELL: Well, and if you would --
4  yes, and give me a moment just to respond --
5          THE WITNESS: Sorry.
6          MS. O'DELL: -- respond with an
7  objection if I need to.
8          THE WITNESS: I'll get better.
9          MS. O'DELL: Thank you. You're doing
10  great.
11     Q. (BY MR. JAMES) You agree that long-term
12  exposure to asbestos in an indust- -- in an
13  industrial environment is different than the
14  allegation that a person's exposed to
15  asbestos-contaminated talc products --
16         MS. O'DELL: Object --
17     Q. (BY MR. JAMES) -- correct?
18         MS. O'DELL: Object to the form.
19     A. If you are talking about difference in
20  terms of dosage and -- and amount of exposure, then
21  I would say there's probably a difference.
22         If you would suggest that the
23  mechanism of carcinogenesis is different, then I
24  would say no, it's probably the same.

Page 121

1      Q. (BY MR. JAMES) And you agree that some of
2  the studies that the IARC looked at were in the
3  occupational context, correct?
4      A. Correct.
5      Q. And, in fact, the IARC's conclusion on
6  causation was heavily weighted on the occupational
7  studies, correct?
8          MS. O'DELL: Object to the form.
9      A. I'd have to look at the IARC study again
10  to see how they stated it. And I could do that, if
11  you want me to.
12     Q. (BY MR. JAMES) Do you recall that when
13  the IARC looked at the nonoccupational studies the
14  association that they found there was not
15  statistically significant?
16         MS. O'DELL: Objection to the form.
17     A. I don't recall that.
18     Q. (BY MR. JAMES) If that's the case, do you
19  believe that's important?
20         MS. O'DELL: Object to the form.
21     A. I'd like to look at the paper if you'd
22  let -- if you'd let me.
23     Q. (BY MR. JAMES) Sure.
24         THE WITNESS: Am I allowed to see it?

31 (Pages 118 to 121)

Page 122

```
 1        Q.  (BY MR. JAMES) That's fine.  That's fine.
 2            Let's talk about -- talk about --
 3   we'll talk about the paper more -- more specifically
 4   in just a second.
 5        A.  Okay.
 6        Q.  If I can continue the line of questions on
 7   the limitations.
 8        A.  Okay.
 9        Q.  So we've talked about occupational --
10            MS. O'DELL:  Excuse me.
11        Q.  (BY MR. JAMES)  -- being one limitation,
12   correct?
13            MS. O'DELL:  Excuse me.  Doctor --
14            MR. JAMES:  Leigh, there's not a
15   question pending.
16            MS. O'DELL:  She's asked to look at
17   IARC 100C, and if the witness has asked to look at
18   the document, I'm going to put it in front of her.
19   Give me just a second.
20            THE WITNESS:  It's the second IA.
21   It's the first thing in the second IA.
22            MS. O'DELL:  (Handed binder to
23   witness.)
24            THE WITNESS:  Thank you.
```

Page 123

```
 1        A.  (Examined binder.)
 2        Q.  (BY MR. JAMES) Okay.  Dr. Smith, your
 3   counsel has handed you a copy of the IARC talc
 4   monograph, correct?
 5        A.  Correct.
 6        Q.  Okay.  And I'm gonna mark as Exhibit
 7   Number 10 --
 8            MS. O'DELL:  I'm sorry.  You said the
 9   talc monograph.  I handed her 100C.  Not --
10            MR. JAMES:  Oh.  Thank you.
11            BY MS. O'DELL:  Not monograph.
12            MR. JAMES:  You're right.
13            BY MS. O'DELL:  193.
14            MR. JAMES:  You're right.  You're
15   right.  Thank you.
16        Q.  (BY MR. JAMES) So I am going to -- I'll
17   refer to it commonly as the asbestos monograph
18   for -- for a simple shorthand.
19            So your counsel has handed you a copy
20   of the asbestos monograph 100C and --
21            MS. O'DELL:  Which -- which discusses
22   talc, so I don't want to be misleading.
23            THE WITNESS:  No, 193 discusses talc.
24   100C discusses asbestos.
```

Page 124

```
 1        Q.  (BY MR. JAMES)  So I'm going to hand
 2   you -- I think we're all on the same page now.  I'm
 3   gonna hand you also a copy with some excerpts from
 4   100C.  Okay?
 5        A.  Okay.
 6        Q.  And I'm gonna mark it as Exhibit
 7   Number 10.
 8            (Deposition Exhibit 10 marked for
 9            identification.)
10            MS. O'DELL:  Thank you.  Feel free to
11   refer to the whole monograph if you'd like,
12   Doctor -- Dr. Smith.
13            THE WITNESS:  Okay.
14        A.  I turned right to it.
15        Q.  (BY MR. JAMES) Okay.  Doctor, if you can
16   look at page 256 --
17        A.  Yeah.
18        Q.  -- of either the exhibit that I handed you
19   with the excerpts or you're welcome to look at the
20   larger monograph as well.
21        A.  I'm there.
22        Q.  And if you look at the right-hand column,
23   it's the first full paragraph in that column.  It
24   starts with "The Working Group."
```

Page 125

```
 1            Do you see where I'm reading?
 2        A.  Um-hum.  Um-hum.  Yes.
 3        Q.  And if you look down at the bottom half of
 4   that paragraph, the IARC Monograph states, quote,
 5   "The conclusion received additional support from
 6   studies showing that women and girls with
 7   environmental, but not occupational exposure to
 8   asbestos had positive, though non-significant,
 9   increases in both ovarian cancer incidence and
10   mortality," close quote.
11            Do you see where I read that?
12        A.  Yes.
13        Q.  And did I read that correctly?
14        A.  Yes.
15        Q.  So here the IARC is commenting that in the
16   nonoccupational studies the association is not
17   statistically significant, correct?
18            MS. O'DELL:  Object to the form.
19        A.  In the articles, they cited, IARC -- this
20   started in 2009 and was published in 2012, and I do
21   not believe they had the 2011 meta-analysis by Reid
22   in this.  They cite Reid 2008 and 2009, but not the
23   meta-analysis.  So what they have, they're making
24   their conclusions there.
```

Ellen Blair Smith, M.D.

Page 126

1    Q.  (BY MR. JAMES)  Right.
2    A.  I think this adds to it.
3    Q.  The Reid paper?
4    A.  The 2011 Reid paper.
5    Q.  And the 2011 Reid paper, again, is the
6  paper where the authors conclude that the IARC's
7  finding with respect to asbestos and ovarian cancer
8  is -- may be premature, correct?
9    A.  I disa- --
10       MS. O'DELL:  Object to the form.
11    A.  Yes.  You are correct that that is their
12  conclusion.  I disagree with their conclusion.  It
13  is your Exhibit 9.
14    Q.  (BY MR. JAMES)  And so you disagree with
15  the conclusions of -- of the paper that you qual- --
16  that you categorized as one of your favorites,
17  correct?
18       MS. O'DELL:  Object to the form.
19    A.  Yes.
20    Q.  (BY MR. JAMES)  And if you look up on the
21  same paragraph, Dr. Smith --
22    A.  Um-hum.
23    Q.  -- the first sentence of that paragraph
24  reads, quote:  (Paraphrasing.)  The Working Group

Page 127

1  noted that a causal association between exposure to
2  asbestos and cancer of the ovary was clearly
3  established, based on five strongly positive
4  mort-- -- mortality studies of women with heavy
5  occupational exposure to asbestos, close quote.
6       Do you see that?
7    A.  Correct.
8    Q.  So, again, the IARC here is emphasizing
9  that the body of literature that supports the IARC's
10  finding is the occupational body of literature,
11  correct?
12       MS. O'DELL:  Objection to the form.
13    A.  Correct.
14    Q.  (BY MR. JAMES)  Are there any other
15  limitations that -- that you can think of with
16  respect to this set of literature?
17       And when I say "set," I refer to the
18  literature exploring the relationship between
19  asbestos and ovarian cancer.
20    A.  In IARC --
21       MS. O'DELL:  Object to the form;
22  vague.
23    A.  -- 100C.
24    Q.  (BY MR. JAMES)  The -- yes.  My question

Page 128

1  posed is about the body of literature that you
2  reviewed to inform your opinions about asbestos and
3  ovarian cancer.
4       Are there any other limitations that
5  you can identify for us today?
6       MS. O'DELL:  Objection to form; vague.
7    A.  I think the IARC -- I forgot how to speak
8  English.  Sorry.
9       The IARC conclusion that asbestos is
10  causative in ovarian cancer is expanded by two
11  meta-analyses as opposed to these single studies,
12  EPI studies, even though they're cohort studies of
13  Camargo and Reid.
14       Reid doesn't agree with her own
15  statistical findings.  I don't know why she did
16  that.
17    Q.  (BY MR. JAMES)  Well, the Reid authors
18  considered the limitations of the body of
19  literature, correct?
20       MS. O'DELL:  Object to the form.
21    A.  Everyone considers the limitations of the
22  body of literature when they write a paper.
23    Q.  (BY MR. JAMES)  Right.  So do you -- do
24  you think Reid did anything incorrectly in

Page 129

1  evaluating the limitations of the body of
2  literature?
3    A.  I think she made an incorrect conclusion.
4  I don't think that necessarily has to do with the
5  limitations of the body.
6       She has statistically significant
7  meta-analytic study even though the strength is low,
8  but she -- and then she says -- I disagree with it.
9  I don't think it's significant.
10       I mean, it's 1.75.  What -- I don't --
11  I don't understand how she reached her conclusion.
12    Q.  But you understand she -- the paper notes
13  the concern for misclassification, which we've
14  already discussed, correct?
15    A.  Right.  But she accounted for that in her
16  studies, so I --
17    Q.  What do you mean by that?
18    A.  She had a patholo- -- she had pathologic
19  review accounted for within here too.
20       MS. O'DELL:  When you say "here,"
21  you're referring to Exhibit 9, the Reid paper?
22       THE WITNESS:  Yes.
23       MS. O'DELL:  Okay.
24       THE WITNESS:  Sorry.  I wasn't clear,

Ellen Blair Smith, M.D.

Page 130

1  and the camera probably can't see it too.
2      Q.  (BY MR. JAMES)  So the authors of the Reid
3  paper conclude that disease misclassification may be
4  such a problem such that the IARC's conclusion may be
5  premature?
6          MS. O'DELL:  Objection to --
7      Q.  (BY MR. JAMES)  And you're saying that the
8  authors --
9          MS. O'DELL:  Excuse me.  Have you
10  finished your question?  Sorry.
11         MR. JAMES:  No.
12         MS. O'DELL:  Okay.
13     Q.  (BY MR. JAMES)  You're saying the author's
14  just got it -- got it wrong?
15         MS. O'DELL:  Object to the form.
16     A.  I disagree with their conclusion.
17     Q.  (BY MR. JAMES)  So with mis- -- with this
18  set of literature we've talked about two limitations
19  so far:  Misclassification and occupational versus
20  nonoccupational, correct?
21     A.  We've talked about those two things, yes.
22     Q.  Are there any other limitations to the
23  body of literature that you reviewed that you can
24  identify today?

Page 131

1          MS. O'DELL:  Object to the form;
2  vague.
3      A.  No.
4          MS. O'DELL:  Are you limiting that to
5  asbestos and ovarian cancer or are you limit -- I
6  mean --
7          MR. JAMES:  Yes.  We're talking about
8  the subset of literature, which I've said several
9  times, pertaining to the allegation that asbestos is
10  causative of ovarian cancer.  That's what we're
11  talking about right now.
12         MS. O'DELL:  That makes it clear.  I
13  don't want something taken out of the record later
14  and it's not -- it's not clear.
15         MR. JAMES:  Fair enough.
16     A.  We've talked about those things.  At this
17  time, I can think of nothing else.
18     Q.  (BY MR. JAMES)  Do you consider the small
19  number of cases to be a limitation to that body of
20  literature pertaining to the allegation that
21  asbestos is -- is a cause of ovarian cancer?
22         MS. O'DELL:  Object to the form.
23     A.  (Examined exhibit.)  I'm looking at the
24  numbers in the Reid study, and I'm sorry, it's

Page 132

1  taking me a minute here, Table 2.
2          Small number of cases.  When they are
3  talking about all cases combining, studying 5,240
4  cases, is that a small number?
5      Q.  (BY MR. JAMES)  Do you believe there's --
6  one of the limitations to this body of literature is
7  the small number of cases?
8      A.  No.  No.
9      Q.  Do you believe that there are any
10  limitations to this literature associated with the
11  type of asbestos involved in these studies?
12     A.  No.
13     Q.  Are you familiar with the type of asbestos
14  involved in these occupational studies?
15     A.  Each of the studies list types, at least
16  some of them do.
17     Q.  Does that matter to you at all?
18     A.  Big picture, probably not.
19     Q.  Okay.  So does the type of asbestos at
20  issue in the studies looked at by the IARC matter to
21  you at all in your opinion that asbestos
22  contamination in talc is causative of ovarian
23  cancer?
24         MS. O'DELL:  Objection to form.

Page 133

1      A.  I don't remember a breakdown by type in
2  the IARC by tremolite or actinolite or -- you know,
3  I don't remember that breakdown.
4      Q.  (BY MR. JAMES)  And it's not addressed in
5  your report, correct?
6      A.  It is not addressed in my report.
7      Q.  To reach your opinion that asbestos is a
8  cause of ovarian cancer, what methodology did you
9  apply?
10     A.  The same methodology I applied -- I apply
11  every time.  I read all the literature that I could
12  find.  I read it critically.  Went through the
13  tables, read the footnotes, and made a conclusion,
14  as did IARC 100C.
15     Q.  Is your causation opinion based on IARC?
16     A.  I think we reached the same conclusion.  I
17  certainly got a bunch of references from IARC.
18         But as I told you, I make my own
19  conclusions, even when they disagree with an author
20  of a paper.  So I'm certainly influenced by their
21  conclusion, but I made my conclusion, and I felt
22  freedom to disagree if I did.
23     Q.  Did you read all the studies that IARC
24  discussed?

34 (Pages 130 to 133)

Ellen Blair Smith, M.D.

Page 134

1    A.  Yes.
2    Q.  Did you read the nonoccupational studies?
3    A.  I read all of these studies.  They are --
4  I would have to look at them individually or go to
5  details of them.
6    Q.  Is there a reason why you didn't discuss
7  the nonoccupational studies but you did discuss the
8  occupational studies?
9        MS. O'DELL:  Object to the form.
10    A.  I discussed two meta-analyses that include
11  occupational and nonoccupational exposure because,
12  as I stated other places in my report, I give
13  strength to a meta-analysis above a single either
14  occupational or nonoccupational exposure.
15    Q.  (BY MR. JAMES)  And in that section, you
16  did cite to the five occupational studies, but you
17  actually don't cite to the nonoccupational studies
18  in the text of your report.
19        And so that's the genesis of my
20  question is:  Did you actually look at the
21  nonoccupational studies?
22        MS. O'DELL:  Objection to form; asked
23  and answered.
24    A.  If -- if there's a study that's -- that I

Page 135

1  didn't cite, I -- I don't believe I -- I don't
2  remember it.
3    Q.  (BY MR. JAMES)  Later on in your analysis
4  with respect to talc and ovarian cancer you talk
5  about the importance of strength, correct?
6    A.  Part of the Bradford Hill criteria, yes.
7    Q.  And did you consider strength with respect
8  to asbestos and ovarian cancer?
9    A.  I thought it was interesting that the
10  strength of the relative risk or overall risk was
11  similar between talc and asbestos.
12        For Reid, it was 1.75.
13        For Camargo, it was pretty close to
14  that.  I don't remember the exact number.  I don't
15  think -- I mean, do you want to know the exact
16  number?  Wait, wait.  I may have said it in my
17  report.
18        (Examined exhibit.)  Yeah, 1.77.
19  Yeah, that's almost exactly the same thing and
20  almost exactly the same confidence intervals, 1.45,
21  2.1, 1.37, 2.28.  So they're, you know, so those two
22  meta-analyses.  Now I forgot -- oh, yes.  Strength.
23        I thought -- I thought it was
24  interesting, yes.

Page 136

1    Q.  Is the odds ratio that you just cited, the
2  odds ratio, applicable to the occupational studies
3  or the nonoccupational studies?
4    A.  Well, there's an occupational one.
5  There's a little bit lower.  There tend to be in
6  the -- the statistically significant ones tend to be
7  a 2.27s, 2.53s, not like -- not like asbestos and
8  mesothelioma where the relative risk is 70, you
9  know.  I mean, we're talking about a much lower
10  thing.
11    Q.  And, again, we've talked already about the
12  fact of the IARC noted in its analysis that the
13  nonoccupational studies provide a not statistically
14  significant association.
15    A.  Yes.
16        MS. O'DELL:  Excuse me.
17    Q.  (BY MR. JAMES)  Correct?
18        MS. O'DELL:  Objection to form.
19        You may answer.
20    A.  I agree with you, but that's why we have
21  meta-analyses.
22    Q.  (BY MR. JAMES)  Do you consider a
23  limitation to the body of literature looking at
24  asbestos and ovarian cancer to include confounding?

Page 137

1    A.  Tell me what you mean by "confounding."
2    Q.  What does "confounding" mean to you?
3    A.  No, no.  You asked -- I asked first.
4    Q.  I know, but I get to ask the questions.
5  That's the way it works.
6        MS. O'DELL:  Object to the form to the
7  extent it's vague and there may be some confusion.
8    A.  For example, I would consider a
9  confounding factor that every one of your asbestos
10  workers are heavy cigarette smokers.
11    Q.  (BY MR. JAMES)  And I'll ask a more
12  precise question now.
13        Did you -- do you recall, in reviewing
14  the body of literature in asbestos and ovarian
15  cancer, that the literature notes an inability to
16  account for confounding factors?
17    A.  Yes.  In these studies, they -- they
18  don't -- they have not accounted for factors.
19  Certainly --
20    Q.  And --
21    A.  Yeah.
22    Q.  I'm sorry.
23        MS. O'DELL:  Finish your answer if
24  you'd like to, Dr. Smith.

35 (Pages 134 to 137)

## Ellen Blair Smith, M.D.

Page 138

1      A.  Like genetic.  Smoking, genetics, you
2  know, all those things, yes.
3      Q.  (BY MR. JAMES)  And you would agree that
4  is a limitation to the set of literature, correct?
5      A.  Yes.
6      Q.  Have you heard of a body of literature
7  referred to as the Miners and Millers studies.
8          Does that ring a bell to you?
9      A.  It rings a bell.
10     Q.  Do you know if you reviewed those studies
11 in the course of forming your opinions in this case?
12     A.  I'd have to hear an author, but I remember
13 reading about the Miners and Mills [sic] studies.
14     Q.  Did you know that there's a body of
15 literature out there studying cancer rates in miners
16 and millers of cosmetic talc?
17         MS. O'DELL:  Object to the form.  It's
18 vague, asked and answered.
19     A.  Without an author, I -- I remember studies
20 by author or perhaps by the first initial of the
21 author's last name, but I don't remember reading
22 something called Miners and Mills studies.
23     Q.  (BY MR. JAMES)  If there is a body of
24 literature out there that looks at the cancer rates

Page 139

1  of talc miners and millers and that body of
2  literature is not cited in your report, then that
3  means you didn't consider that body of literature,
4  correct?
5          MS. O'DELL:  Objection to form;
6  misstates the record.
7      A.  I don't remember reading that paper.  I
8  hope I did.
9      Q.  (BY MR. JAMES)  Okay.  Can you cite to
10 me -- I'm sorry, Doctor.
11     A.  I would hope I did read the paper, but I
12 didn't.  I don't remember it.
13     Q.  Can you point to me anywhere in your
14 report where you would address studies looking at
15 cancer rates in miners and millers of talc?
16     A.  There is not --
17         MS. O'DELL:  Objection to the form.
18     A.  There is not in my report.
19     Q.  (BY MR. JAMES)  Within your report, you
20 include some opinions on a phrase that I'll put into
21 quotes, "fibrous talc," close quote.
22     A.  Yes.
23     Q.  You state in your report that "Asbestos
24 and fibrous talc cause epithelial ovarian cancer,"

Page 140

1  correct?
2      A.  I do.
3      Q.  Do you equate fibrous talc to be -- to be
4  also talc-containing asbestiform fibers?
5      A.  Fibrous talc is an abest- -- asbestiform
6  habit of talcum powder.  So in that -- in that
7  equivalence, they're needlelike particles.
8      Q.  Do you know if the term "fibrous talc" is
9  used in the IARC Monograph?
10     A.  I believe it is.
11     Q.  Do you understand if there is a
12 distinction between fibrous talc and talc-containing
13 asbestiform fibers?
14         MS. O'DELL:  Objection to form.
15     A.  I believe -- wait.
16         (Examined realtime screen.)  I believe
17 there is a distinction.  I would really like to find
18 that part because I know it's in here.
19         (Examined exhibit.)  Talcum-containing
20 asbestiform fibers.  Talc may also form true mineral
21 fibers that are asbestiform in habit.  I used the
22 right word.
23         "Talc-containing asbestiform fibres is
24 a term that's been used inconsistently in the

Page 141

1  literature.  In some contexts, it applies to talc
2  containing asbestiform fibres of talc or talc
3  intergrown on a nanoscale with other minerals,
4  including [sic] anthophyllite."
5          So I think they make distinction
6  between whether it's asbestos or asbestiform habit
7  of talc.
8          Am I answering your question?
9      Q.  (BY MR. JAMES)  I think so.
10     A.  Okay.
11     Q.  Let me ask you this.
12     A.  Okay.
13     Q.  Would you defer to other experts on
14 distinctions or characterat- -- characterizations of
15 fibrous talc versus talc-containing asbestiform
16 fibers?
17         MS. O'DELL:  Objection; form.  She
18 just answered your question about that.
19     A.  I believe many mineralogists know more
20 about the forms of talc and minerals than I do.
21 I...
22     Q.  (BY MR. JAMES)  Have you cited any
23 epidemiologic or medical literature that supports
24 your opinion that fibrous talc is causative of

36 (Pages 138 to 141)

Ellen Blair Smith, M.D.

Page 142

1  ovarian cancer?
2      A.  I have never seen a study that looks
3  specifically with pure fibrous talc and ovarian
4  cancer.
5      Q.  What is the significance of your opinions
6  on asbestos to your opinions on talc and ovarian
7  cancer?
8          MS. O'DELL:  Objection to the form.
9      A.  (Examined realtime screen.)  I think the
10  presence of asbestos in talcum powder products
11  causes ovarian cancer.
12      Q.  (BY MR. JAMES)  Is the alleged presence of
13  asbestos in cosmetic talc powders critical to your
14  causation opinion that talc powders cause ovarian
15  cancer?
16      A.  No.
17          MS. O'DELL:  Objection to form.
18      Q.  (BY MR. JAMES)  Do you believe that talc
19  powders not contaminated with asbestos would also be
20  a cause of ovarian cancer?
21      A.  I'm not sure there is such a thing as a
22  pure, platy talc powder, but I believe such powder
23  use, did it exist, would cause ovarian cancer.
24      Q.  Would your answer hold true if I asked the

Page 143

1  same question about fibrous talc?
2          MS. O'DELL:  Just to be clear --
3          MR. JAMES:  And if you'd like -- I'll
4  just go through it again, which is no problem.
5      Q.  (BY MR. JAMES)  Is the alleged presence of
6  fibrous talc critical to your causation opinion that
7  talcum powders cause ovarian cancer?
8          MS. O'DELL:  Object to the word
9  "alleged."
10          You may answer.
11      A.  I believe that fibr- -- fibrous talc -- a
12  poor preparation of fibrous talc applied repeatedly
13  and consistently to the perineum would cause ovarian
14  cancer.
15      Q.  (BY MR. JAMES)  And let me ask a question,
16  maybe, that's more precise, similar to the question
17  I asked you about asbestos.
18          Do you believe that talc that does not
19  contain fibrous talc is a cause of ovarian cancer?
20      A.  I already answered that.
21          MS. O'DELL:  Object to the form.
22      A.  But I -- but --
23      Q.  (BY MR. JAMES)  I think maybe we missed
24  each other.

Page 144

1      A.  Okay.  You gave me a --
2          MS. O'DELL:  Let him -- excuse me.
3  Let him ask the question and then you respond.
4          THE WITNESS:  Okay.
5      Q.  (BY MR. JAMES)  (Examined realtime
6  screen.)  So the question that I asked was:  Do you
7  believe that talc that does not contain fibrous talc
8  is a cause of ovarian cancer?
9          MS. O'DELL:  Object to the form.
10      A.  Yes.
11      Q.  (BY MR. JAMES)  If talc powders did not
12  contain asbestos or fibrous talc, would your
13  opinions about mechanism change?
14      A.  This is kind of a double negative, doesn't
15  it?
16          MS. O'DELL:  Object to the form.
17      Q.  (BY MR. JAMES)  I don't think it's a
18  double negative.
19      A.  Okay.
20          (Examined realtime screen.)  My
21  opinion about mechanisms unchanged by concerns of
22  asbestos in fibrous talc.
23          MR. JAMES:  It's 12:32.  I can
24  continue a little longer if you'd like or -- it's up

Page 145

1  to you Leigh and Dr. Smith.
2          MS. O'DELL:  Dr. Smith, would you like
3  to take a break for lunch now or --
4          THE WITNESS:  Have you got a 10-minute
5  block?
6          MR. JAMES:  I can always go for 10
7  more minutes.
8          THE WITNESS:  Let's do it.
9          MR. JAMES:  Okay.
10          THE WITNESS:  Is that -- is everybody
11  else comfortable?  Yeah, I don't want to --
12          MS. O'DELL:  Yeah.  10 minutes and
13  let's --
14          THE WITNESS:  -- make somebody --
15          BY MS. O'DELL:  -- take a break.
16          THE WITNESS:  -- endure hunger pains.
17      Q.  (BY MR. JAMES)  All right.  Dr. Smith,
18  we're gonna wade back into your report --
19      A.  Oh, good.
20      Q.  -- and I'm looking at page 3.
21          And on page 3, Dr. Smith, you list
22  what you consider to be, quote, "generally
23  accepted," close quote, risk factors for ovarian
24  cancer, correct?

37 (Pages 142 to 145)

Ellen Blair Smith, M.D.

| Page 146 | Page 148 |
|---|---|

**Page 146**

1    A.  I see that.
2    Q.  What is your definition of a generally
3  accepted risk factor?
4    A.  Something that the vast majority of
5  trained physicians in that specialty would accept as
6  truth.
7    Q.  And how did you compile this list?
8    A.  Working in the field for 40 years, viewing
9  lots of risk articles and tabulating them, like
10  listing them and reviewing the literature regarding
11  specific things.
12      For example, a comprehensive view of
13  the literature regarding tubal sterilization and its
14  risk of ovarian cancer.
15      Throughout my career, numerous times,
16  I've done ovarian contraceptive use and ovarian
17  cancer of use as formulations of oral contraceptives
18  have changed and different progestins, different
19  levels of estrogen, do we still have a suppressive
20  effect on ovarian cancer?  So this is kind of my
21  life.
22    Q.  Do you believe all of the factors that
23  you've listed here in this first paragraph are
24  mentioned in the articles here that you've cited?

**Page 147**

1    A.  I'm not -- without going to each
2  individual article, I can't checklist which thing is
3  listed in each article.
4    Q.  Was it -- when you created this list, was
5  it your intention to cite to an authority that
6  supported each one of these things that you listed
7  at least once?
8    A.  I think -- I don't think everyone -- I
9  can't promise you, without looking at each of these
10  papers, that everybody listed every single one of
11  the things I said, but somebody in this group
12  mentioned these things, and I had other information
13  that maybe want to put on the list.
14    Q.  Is it possible that at least some of these
15  things that you've listed are not identified in the
16  sources that you've cited and instead come from the
17  information that you just referred to that -- that
18  you possessed through your practice?
19    A.  It's possible.
20      MS. O'DELL:  Object to form.
21    A.  It's possible.
22    Q.  (BY MR. JAMES)  For -- for example, IUDs
23  that you listed here, do you believe that's a
24  general accepted risk factor for ovarian cancer?

**Page 148**

1    A.  What's -- oh, intrauterine devices.  I
2  don't think that's generally -- it's been -- it's
3  been studied in some studies.  Pelvic inflammatory
4  disease, it's been plus or minus in some studies.
5    Q.  So --
6    A.  But --
7    Q.  I'm sorry.
8    A.  -- somebody mentioned it somewhere in
9  my -- in my life.
10    Q.  And so the way you've characterized this
11  paragraph is that you have attempted to list, quote,
12  "generally accepted," close quote, risk factors.
13      And what I'm asking you is whether all
14  these things that you've listed here are, in your
15  opinion, generally accepted by the medical
16  community?
17    A.  I will give you that intrauterine devices
18  may not be generally accepted by the majority of --
19  I lost my mike.  I'm sorry -- obstetrician
20  gynecologists.
21    Q.  And how about PID?  Do you believe that's
22  a generally accepted risk factor with the
23  terminology you've used?
24    A.  There -- there are a whole bunch of papers

**Page 149**

1  about pelvic inflammatory disease and its impact on
2  ovarian cancer and epidemiologic studies and they
3  vary in value.
4      I would -- it is not as strong a risk
5  factor as inherited gene mutations, family history,
6  nulliparity, and endometriosis.
7    Q.  When creating this list of generally
8  accepted risk factors, did you consult a list of
9  risk factors published by any medical or scientific
10  organization?
11      MS. O'DELL:  Object to the form.
12      But you . . .
13    A.  I didn't go on any websites to get my
14  references.
15    Q.  (BY MR. JAMES)  Would you have consulted
16  the list of risk factors published by ACOG?
17    A.  I didn't get the -- even the committee
18  opinion or the postgraduate, all those different
19  letters, I didn't use that as one of my resources.
20    Q.  And did you consider a list of risk
21  factors published by the SGL?
22    A.  I did not use that as one of my risk
23  factors.
24    Q.  Do you recognize both of those

**38 (Pages 146 to 149)**

## Ellen Blair Smith, M.D.

Page 150

1  organizations as respected scientific organizations?
2      A.  I do.
3      Q.  And you're members of both, correct?
4      A.  I am.
5      Q.  And you have been active in both, correct?
6      A.  Very.
7      Q.  In crafting a list of generally accepted
8  risk factors, why wouldn't you have been interested
9  in what those two organizations have to say about
10  what is, quote, "generally accepted"?
11      A.  I'm not disinterested.  I, again,
12  assembled my own sources out of medical databases
13  and read the articles and did my own work.
14          It's not that I disagree with them.
15  It's just I don't want a copy of their stuff, you
16  know.  I want to do my own work.
17      Q.  Earlier you defined "generally
18  accepted" -- and I'll see if I can find it on my
19  realtime.
20          While I'm looking for it, and you can
21  correct me if I've misstated it, Dr. Smith, but my
22  recall is that you defined "generally accepted" as
23  something that is believed by the majority of
24  practitioners in the field.

Page 151

1          Is that a fair summary?
2      A.  Yes.
3      Q.  Wouldn't it be logical that statements by
4  medic- -- respected medical and scientific
5  organizations with regard to risk factors would be
6  reflective of what the medical community believes --
7      A.  Yes.
8      Q.  -- as a whole?
9          MS. O'DELL:  Object to the form.
10      Q.  (BY MR. JAMES)  Among that list in the
11  same paragraph, you have listed all of the risk
12  factors.
13          You also list talc and asbestos,
14  correct?
15      A.  Yes.
16      Q.  And the way you phrase it, I want to be
17  sure that I understand your testimony, but are you
18  testifying here that talcum powder and asbestos are
19  generally accepted risk factors for ovarian cancer?
20          MS. O'DELL:  Object to the form.
21      A.  They are not on the SGO list.  They are
22  not -- I mean, on the ACOG list.  They are listed in
23  some review articles and the literature about them
24  in risk factors.  They are not listed in others.

Page 152

1          I can't give you a percentage, like
2  have a vote in ACOG of who calls it a risk factor
3  and who doesn't.  So I don't know what proportion of
4  OB/GYNs believe that's a risk factor or not, but
5  certainly some do, and I can't quantitate it
6  further.
7      Q.  (BY MR. JAMES)  And to say something is
8  generally accepted, you'd have to quantify it,
9  wouldn't you?
10          MS. O'DELL:  Object to the form.
11      A.  Yeah.  I think generally it would be at
12  51 percent, and I don't know where the count is.
13      Q.  (BY MR. JAMES)  And do you know that the
14  ACOG has actually issued a statement on the
15  talc/ovarian cancer hypothesis?
16          MS. O'DELL:  Object to the form.
17      A.  I have read a very brief statement on the
18  ACOG website about talc.
19      Q.  (BY MR. JAMES)  And, again, is -- so
20  because you consider it to be a well-respected
21  organization, you would be interested in what that
22  organization has to say about the hypothesis,
23  correct?
24      A.  That's why I looked it up.

Page 153

1      Q.  And do you -- did you -- do you recall, if
2  you've looked at that statement, that they say that
3  there is, quote, "No medical consensus that talcum
4  powder causes ovarian cancer," closed quote?
5      A.  That was the final line, I think, a first
6  line -- first part of what I read was "Don't use it"
7  because of the -- I can't -- I can't quote it out of
8  my brain.  But just the "Don't use talc."  We
9  haven't got medical consistent is the very short
10  statement I remember reading some time ago.
11      Q.  Okay.  I'm gonna mark that, ACOG
12  statement that I'm discussing --
13      A.  Oh.  Well, good.
14      Q.  -- with you, Dr. Smith, as Exhibit
15  Number 11.
16      A.  Don't make me dig so far back.
17          MS. O'DELL:  Exhibit 11?
18          MR. JAMES:  Yes.
19          BY MS. O'DELL:  Thank you.
20          MR. JAMES:  That's where we are.
21          BY MS. O'DELL:  Is this the . . .
22          MR. JAMES:  And I'm sorry for the
23  small print.
24          (Line intentionally left blank.)

## Ellen Blair Smith, M.D.

Page 154

1    (Deposition Exhibit 11 marked for
2    identification.)
3    A. (Examined exhibit.) Okay. "Obstetrician
4  gynecologists do not remend -- recommend use of
5  vaginal treatment such as douche, vaginal sprays or
6  talcum powder and the use of talcum powder has
7  declined over the years. There is no medical
8  consensus that talcum powder causes ovarian cancer."
9    Q. (BY MR. JAMES) Right. And so we've
10  talked about that last sentence already, correct,
11  where they -- ACOG has published a statement saying
12  there's not a medical consensus, correct?
13    A. Yes.
14    Q. Okay. And the first portion of the
15  statement that you've read into the record about the
16  gynecologists not recommending the use --
17    A. Um-hum.
18    Q. -- can you read the first part of that
19  sentence for me?
20    A. "Because of concerns regarding potential
21  discomfort or pain."
22    Q. And so the recommendation to not use the
23  talcum powder products there is predicated on
24  concern for discomfort or pain, correct?

Page 155

1    MS. O'DELL: Object to the form.
2    A. That's what it says, but -- so -- and the
3  number of references they cite here are puny
4  compared to a number of studies that I reviewed
5  in-depth. I --
6    Q. (BY MR. JAMES) Do you believe the ACOG --
7    MS. O'DELL: Excuse me, sir. Let her
8  finish the --
9    Q. (BY MR. JAMES) Oh, I'm sorry. I thought
10  you were.
11    MS. O'DELL: Yeah.
12    You may finish, Dr. Smith, if you'd
13  like.
14    A. Reading between the lines and knowing some
15  of the people involved, they don't want to incur
16  criticism for saying, "Because of our concerns about
17  a potential for the development of ovarian cancer,
18  obstetrician gynecologists do not recommend the use
19  of vaginal treatments," so they threw in "potential
20  discomfort or pain."
21    Now, women frequently use douches,
22  sprays, or powder because they're uncomfortable.
23  It's not because they cause discomfort.
24    So the people behind the statement

Page 156

1  don't want women to use talcum powder products and
2  aren't willing to call its relation to ovarian
3  cancer.
4    Q. (BY MR. JAMES) Do you know Dr. Hal
5  Lawrence?
6    A. I do. Blue-eyed boy.
7    Q. Have you reached out to him with any
8  concerns about the statement and how --
9    A. No, I have not.
10    Q. -- it's phrased?
11    MS. O'DELL: Dr. Smith, let him
12  finish, please, with his question --
13    THE WITNESS: Oh, I'm sorry.
14    MS. O'DELL: -- just so it's clear on
15  the record.
16    MR. JAMES: Okay. I'm about to the
17  breaking point, I believe. I'm gonna mark as the
18  next two exhibits, Exhibit 12.
19    THE WITNESS: I'm out of order.
20    MS. O'DELL: That's okay. We'll do it
21  a --
22    THE WITNESS: I don't want to lose
23  any. I don't.
24    MS. O'DELL: They're all there.

Page 157

1    THE WITNESS: Here. I got some over
2  here. Sorry.
3    (Deposition Exhibit 12 marked for
4    identification.)
5    Q. (BY MR. JAMES) All right. Dr. Smith,
6  what I've handed you is the publication of risk
7  factors for ovarian cancer published by the SGA --
8  SGO.
9    A. Yes.
10    Q. Just for the record, Dr. Smith, is this
11  the list that you consulted in forming your opinions
12  in this case?
13    MS. O'DELL: Object to the form;
14  misstates her testimony. I think she said she
15  didn't consult the list.
16    A. Yeah, I didn't read this for writing my
17  report.
18    Q. (BY MR. JAMES) Okay. I thought earlier
19  you testified --
20    A. I've looked them up.
21    Q. -- that you -- I'm sorry. Well, we're so
22  close.
23    A. I interrupted you. I'm sorry.
24    Q. No. We're both doing it now, but we're

40 (Pages 154 to 157)

Ellen Blair Smith, M.D.

Page 158

1  close.
2      I'm sorry.  I thought you acknowledged
3  earlier that you were aware that talc was not listed
4  as a risk factor on -- on the SGO's list.
5      MS. O'DELL:  That's a different
6  question, Counsel, but --
7      A.  Yes, sir, I was aware of that.
8      Q.  (BY MR. JAMES)  Okay.  So at some point
9  you've read the list, correct?
10     A.  Yes.
11     Q.  Did you -- have -- when is the last time
12 you've read the list?
13     A.  I -- the last time I read the list was
14 probably in the past two weeks.  I did not use this
15 list in the preparation of my report.  I didn't use
16 this as a source.
17     Q.  And you didn't cite to it?
18     A.  And I didn't cite it.
19     Q.  And you didn't discuss it at all?
20     A.  And I didn't discuss it at all.
21     Q.  You agree it's relevant when opining on
22 what risk factors are generally accepted, correct?
23     MS. O'DELL:  Object to the form.
24     A.  (Examined exhibit.)  I'm sorry.  I was

Page 159

1  reading it.
2      MS. O'DELL:  Take a moment if you need
3  to, Doctor, to read it.
4      A.  (Examined exhibit.)  I see something here
5  that I can say is not permanent -- is not -- I
6  disagree with.  Let's put it that way.  I disagree
7  with.
8      Yes, women who -- yes.  I mean, age
9  is -- you know, when -- when you read all these
10 papers on risk factors, aging is a risk factor for
11 the development of ovarian cancer, and this is one
12 of the few places that I say -- that I see actually
13 say, "Yeah, the older you get, the higher your
14 risk," because that's just the way it is.
15     They say women who have had
16 gynecologic surgery makes them at increased risk for
17 ovarian cancer, and I have never seen that before.
18 I -- I can't remember seeing that anywhere.
19     And I've certainly seen hysterectomy
20 decreases value and tubal ligation decreases value,
21 but having that in the increase, that is not
22 something I've ever seen.  I'd like to see the
23 studies that show that.
24     Okay.  So my comments are done.

Page 160

1      Q.  And before we break, Doctor, just for
2  purposes of the record, I also want to confirm:  At
3  some point, you have looked at a list of risk
4  factors for ovarian cancer published by ACOG,
5  correct?
6      A.  Yes.
7      Q.  And earlier you acknowledged that talc was
8  not listed on that --
9      A.  Yes.
10     Q.  -- list, correct?
11     A.  Yes.
12     Q.  And so I'm -- it's -- and, again, it's
13 something that you have not cited or discussed in
14 your report, correct?
15     A.  (Nodded head.)
16     Q.  So I'm going to hand you what I'm marking
17 as Exhibit Number 13 to confirm that this is, in
18 fact, what you've looked at.  Okay?
19     (Deposition Exhibit 13 marked for
20     identification.)
21     A.  (Examined exhibit.)  Okay.
22     Q.  (BY MR. JAMES)  Does that list -- does
23 that publication that I've handed you look familiar
24 to you?

Page 161

1      A.  Yes.
2      Q.  Is that what you reviewed before,
3  Dr. Smith --
4      A.  I've seen it before.
5      Q.  -- with respect to ACOG?
6      A.  I've seen it before.
7      Q.  Do you consider it relevant to the
8  opinions that you're offering in this case?
9      A.  It is relevant to the conversation.
10     Q.  Is it relevant to an opinion about whether
11 something is generally accepted or not?
12     MS. O'DELL:  Object to the form.
13     A.  It's accepted by the members of -- or at
14 least the steering committee of ACOG, and I -- this
15 is pretty bland.  It's -- I think most people would
16 agree with these risk -- risk factors.
17     MR. JAMES:  Is now time for a break
18 everyone?
19     THE WITNESS:  I'm up for it.
20     THE VIDEOGRAPHER:  Going off the
21 record.  The time is 12:54 p.m.
22
23     (A lunch recess taken from 12:54 p.m.
24     to 2:03 p.m.)

41 (Pages 158 to 161)

Ellen Blair Smith, M.D.

Page 162

1           AFTERNOON SESSION
2           THE VIDEOGRAPHER:  Back on the record.
3  The time is 2:03 p.m.
4           EXAMINATION (CONTINUED)
5  BY MR. JAMES:
6      Q.  Dr. Smith, are we ready to proceed?
7      A.  We are.
8      Q.  Great.
9           In compiling your list of generally
10  accepted risk factors, did you consult the NCI's
11  list of risk factors for ovarian cancer?
12     A.  I did not.
13     Q.  Okay.  Are you aware that the NCI has
14  listed risk factors in the publication referred to
15  as the PDQ?
16     A.  I know they have PDQs.  I have not read
17  that PDQ.
18     Q.  You recognize the NCI, the National Cancer
19  Institute, as a respected scientific organization?
20          MS. O'DELL:  Object to the form.
21     A.  Yes.
22     Q.  (BY MR. JAMES)  And I've seen references
23  to the NC-- -- NCI in your report, correct?
24     A.  Yes.

Page 163

1      Q.  And they're a frequent sponsor of studies
2  and --
3      A.  Yes.
4      Q.  -- cancer research, correct?
5      A.  Yes.
6      Q.  I'm gonna mark as Exhibit Number 14 the
7  NCI PDQ on Ovarian Cancer Prevention, Health
8  Professional Version.
9           (Deposition Exhibit 14 marked for
10          identification.)
11     Q.  (BY MR. JAMES)  And, Dr. Smith, is this
12  the first time that you've seen this document?
13     A.  I believe so.
14     Q.  Okay.  If you turn to -- unfortunately,
15  it's not paginated.  I'll do a manual count for you.
16  If you flip seven pages and look on
17  the backside of this double-sided copy.
18     A.  (Complied.)  Okay.
19     Q.  Okay.  At the top of that page there's a
20  section titled, "Factors With Inadequate Evidence of
21  an Association Risk of -- of Ovarian, Fallopian
22  Tube, and Primary Peritoneal Cancer."
23          Do you see where I'm reading?
24     A.  Yes.  And do you know what, I recognize

Page 164

1  this page.  I have seen it before.
2      Q.  So you've seen this PDQ document?
3      A.  Yes, I have.
4      Q.  And this document is not cited or
5  discussed in your report, correct?
6      A.  It is not.
7      Q.  Why is that?
8      A.  I prefer to use peer-reviewed references
9  rather than organizational websites or PDQs.
10     Q.  And you reference other organizations in
11  your report, correct?
12     A.  Give me an example.
13     Q.  For example, do you reference IARC in your
14  report?
15     A.  Oh, yes.
16     Q.  Okay.  But here you decided not to
17  recognize the NCI PDQ, correct?
18          MS. O'DELL:  Object to the form.
19     A.  I think they're a different level of -- of
20  standard between IARC and the PDQ.
21     Q.  (BY MR. JAMES)  Are you familiar with the
22  process employed to prepare the PDQ that's in front
23  of you right now?
24     A.  I do not know what method that is.

Page 165

1      Q.  We see here on this PDQ on the page that I
2  referred you to --
3      A.  Um-hum.
4      Q.  -- that below the category of "Factors
5  With Inadequate Evidence," you see there that
6  "Perineal talc exposure" is listed, correct?
7      A.  Yes.
8      Q.  Okay.  And can you read that first
9  sentence for me in the section right there?
10     A.  "The weight of evidence does not support
11  an association between perineal talc exposure and an
12  increased risk of ovarian cancer."
13     Q.  And your litigation opinion offered here
14  today is different than what the NCI states here,
15  correct?
16     A.  Yes, it is.
17     Q.  In determining whether something is
18  generally accepted, do you believe it would be
19  appropriate to consult what the National Cancer
20  Institute says with respect to the association
21  between ovarian cancer and talc?
22          MS. O'DELL:  Object to the form.
23     A.  I have told you that I have seen this and
24  I looked at the references they cited, which is a

42 (Pages 162 to 165)

Page 166

1    very limited portion of the medical literature.
2         This is not an exhausted list of
3    references. Certainly it lacks the most recent
4    meta-analyses, so I think they didn't look at enough
5    stuff.
6         Q.  (BY MR. JAMES)  Do you think the recent
7    meta-analyses are the -- are pieces of literature
8    that are critical to the causation opinion --
9    opinion you're reaching here today?
10        MS. O'DELL:  Object to the form.
11        A.  I believe they are more comprehensive and
12   highly supportive.
13        Q.  (BY MR. JAMES)  And the question that I
14   asked earlier, I think that maybe I didn't get an
15   answer to.
16        Do you believe when opining about
17   whether something is generally accepted it would be
18   appropriate to consult what the National Cancer
19   Institute has to say about the topic?
20        MS. O'DELL:  Object to the form.
21        A.  I've read it.  It's not worthy of
22   citation.
23        Q.  (BY MR. JAMES)  Do you believe the opinion
24   published by the NCI with respect to risk factors

Page 167

1    and ovarian cancer is informative to your opinion
2    about what is generally accepted as a risk factor
3    for ovarian cancer?
4         MS. O'DELL:  Object to the form.
5         A.  I sought other references in peer-reviewed
6    journals to compile my risk factor list.
7         Q.  (BY MR. JAMES)  Do you believe the NCI PDQ
8    paper is relevant to forming an opinion about what
9    is generally accepted by the medical community?
10        MS. O'DELL:  Objection --
11        A.  It is not relevant --
12        MS. O'DELL:  Excuse me.  Objection;
13   asked and answered.
14        A.  It is not relevant to my opinion because
15   it is not comprehensive.
16        Q.  (BY MR. JAMES)  And when you say it's not
17   relevant to your opinion, are you speaking about
18   your opinion on causation?
19        A.  Yes.
20        MS. O'DELL:  Object to the form.
21        Q.  (BY MR. JAMES)  And --
22        A.  Well, and risk factor.  Yes, all of it.
23        Q.  But in your report you've -- in addition
24   to opine -- opining that talc is causative of

Page 168

1    ovarian cancer, you have also opined that talc is a
2    generally accepted risk factor for ovarian cancer.
3         Do you understand the distinction
4    between those two opinions?
5         MS. O'DELL:  Objection to form.
6         A.  I understand the difference in -- of those
7    opinions.
8         Q.  (BY MR. JAMES)  And with respect to the
9    latter opinion, the opinion about what is generally
10   accepted by the medical community, would you agree
11   that the statement provided by the NCI in its PDQ is
12   relevant to determining what is generally accepted
13   as a risk factor?
14        MS. O'DELL:  Object to the form.
15        A.  I don't -- I don't think that physicians
16   go to the PDQ and say, "If that's what the NCI says,
17   that's what I believe."
18        To find out the number of, for
19   example, obstetricians/gynecologists who believe
20   talcum powder products are a significant contributor
21   to ovarian cancer, I believe to answer that
22   question, we'd have to survey those people.
23        Q.  (BY MR. JAMES)  I think I've asked my
24   question enough times there.

Page 169

1         What risk factors for ovarian cancer
2    do you believe have been scientifically demonstrated
3    to be synergistic or additive?
4         MS. O'DELL:  Object to the form.
5         You may answer.
6         A.  BRCA and -- BRCA 1 and 2 status in oral
7    contraceptive use has been demonstrated to be
8    additive.
9         Tubal ligation with nulliparity and
10   other higher risk factors.
11        The -- I'm looking up the name of the
12   author again.
13        MS. O'DELL:  What are you referring
14   to, Dr. Smith?
15        (Deposition Exhibit 15 referenced.)
16        A.  The multiple risk factor studies of
17   Vitonis, Titus-Ernstoff, and Cramer, 2011 and their
18   five risk factors, one of which was talc, were
19   cumulative in increasing your risk for -- as a
20   scoring system for increasing your risk of ovarian
21   cancer, so that's clearly an additive study.  It
22   doesn't look at synergy.
23        Q.  (BY MR. JAMES)  So the Vitonis study that
24   you mentioned you're saying looks at cumulativeness,

Ellen Blair Smith, M.D.

Page 170

1  but not synergy, correct?
2      A.  Synergy to me means you put two things
3  together and they're bigger than their sum.  And I
4  haven't seen that in ovarian cancer risk factors.
5      Q.  As a whole or with respect to talc?
6          MS. O'DELL:  Object to form.
7      A.  As a whole.
8      Q.  (BY MR. JAMES)  So you don't have an
9  opinion that -- let me start over.
10         Are there any ovarian cancer risk
11 factors that you believe have been scientifically
12 demonstrated to be synergistic?
13     A.  I can't think of any at this time.
14     Q.  Are there any risk factors for ovarian
15 cancer that you believe have been scientifically
16 demonstrated to be additive?
17     A.  Yes.
18     Q.  And what are those?
19         MS. O'DELL:  Objection; asked and
20 answered.
21     A.  I just answered that question.
22         THE WITNESS:  May I see the Vitonis
23 paper, please?
24         MS. O'DELL:  Sure.

Page 171

1          MR. JAMES:  I'm gonna mark the Vitonis
2  paper as Exhibit 15.
3          (Deposition Exhibit 15 marked for
4          identification.)
5          (Discussion off the record.)
6      Q.  (BY MR. JAMES)  Before we dig into the
7  paper, Dr. Smith, and this may help move us along,
8  in your report, you used the terminology
9  "cumulative," "additive," and "synergistic."
10     A.  I do.
11     Q.  So synergistic we have discussed already,
12 correct?
13     A.  Correct.
14     Q.  Do you believe "cumulative" and "additive"
15 mean the same thing?
16     A.  Not necessarily.
17     Q.  Do you believe that it has been
18 scientifically demonstrated that talc is cumulative
19 with other risk factors?
20     A.  I'm not aware of such a paper.
21     Q.  Do you believe it has been scientifically
22 demonstrated that talc is additive with other risk
23 factors?
24     A.  I believe this paper suggests it's

Page 172

1  additive.
2      Q.  And so this paper is discussing a
3  hypothesis, correct?
4          MS. O'DELL:  Object to the form.
5      A.  That this paper has attempted to develop a
6  risk factor score that may estimate patients who do
7  not have documented genetic predisposition to
8  ovarian cancer, so eliminating that possibility.
9          And now -- or they're trying to
10 develop a risk factor based score system to advise
11 physicians on when to include oophorectomy with
12 hysterectomy and salpingectomy.
13     Q.  (BY MR. JAMES)  If you look with me at the
14 first page in the Conclusion section of the
15 abstract, Dr. Smith --
16     A.  Um-hum.
17     Q.  -- do you see where it says that "We
18 developed a risk-assessment tool that can quantify
19 women's risk for ovarian cancer and should be
20 validated in other data sets."
21         Do you see that language?
22     A.  Yes.
23     Q.  Okay.  Do you acknowledge that this paper
24 represents a hypothesis?

Page 173

1          MS. O'DELL:  Object to the form.
2      A.  I -- it has not been validated by other
3  studies that I am aware of.
4      Q.  (BY MR. JAMES)  Okay.  Dr. Smith, on
5  page 9 you begin your review of the epidemiologic
6  literature, correct?
7      A.  Yes, sir.
8      Q.  Okay.  And I'm referring you there because
9  we'll spend a little bit of the time walking through
10 it together.  Okay?
11     A.  Okay.
12     Q.  You start your analysis with a discussion
13 of meta-analyses in the pooled study, correct?
14     A.  Correct.
15     Q.  What limitations do you believe there are
16 with meta-analyses in general?
17     A.  Meta-analyses are statistical studies of
18 single -- single site epidemiologic studies, but
19 they are still retrospective in the tiers of level
20 of evidence in medicine, case control, and cohort
21 studies.
22         All epidemiologic studies are all
23 listed at Level 4, which is obviously not the
24 highest level of evidence.  So that's a big

44 (Pages 170 to 173)

Ellen Blair Smith, M.D.

Page 174

1  limitation to start with.
2      Q.  Any other limitations that you can
3  identify, sitting here today, with respect to
4  meta-analyses?
5      A.  I am not an expert on statistical methods,
6  but I know there are multiple different statistical
7  tools to perform meta-analyses, and I'm sure a
8  biostatistician could give you a better discussion
9  of that.
10     Q.  So on page 9, you start with your
11  discussion of the 1992 Harlow meta-analysis,
12  correct?
13     A.  Correct.
14     Q.  How would you characterize the odds ratio
15  reported in that meta-analysis?
16         MS. O'DELL:  Object to the form.
17     A.  It's -- the authors conclude there's
18  associated, albeit modest, between ovarian cancer
19  and peritoneal talc use.
20         In their study, their meta-analysis
21  was 1.5, 0.9; but in all studies involved for 1100
22  patients, which is still a really small number,
23  it's 1.3, confidence intervals 1.1 to 1.6.
24     Q.  (BY MR. JAMES)  And just to be clear,

Page 175

1  Dr. Smith, the meta-analysis odds ratio for this
2  paper is -- the crude odds ratio is 1.3, correct?
3         MS. O'DELL:  Objection to form.
4      A.  Yes, but it says "all studies."
5         THE WITNESS:  Do you want to pull this
6  out --
7         MS. O'DELL:  Um-hum.
8         THE WITNESS:  -- so I can --
9         MS. O'DELL:  Sure.
10         THE WITNESS:  -- look at it?
11         MR. JAMES:  Leigh, I probably have it
12  as well.
13         Did you beat me to it?
14         THE WITNESS:  Yep.  Well, she did.  I
15  didn't.
16         MS. O'DELL:  I was trying to redeem
17  myself from not alphabetizing correctly before.
18         Do you want to mark it, and I'll --
19         MR. JAMES:  Sure.
20         BY MS. O'DELL:  -- have to hand it to
21  her.
22         MR. JAMES:  I'm gonna mark the
23  Harlow '92 study as Exhibit 16.
24      A.  Let me go to this one.  Easier for --

Page 176

1         (Deposition Exhibit 16 marked for
2             identification.)
3      Q.  (BY MR. JAMES)  And, Dr. Smith, just --
4  just to make sure we're framed correctly here, my
5  question to you is:  How you would -- how would you
6  characterize an odds ratio of 1.3?
7         MS. O'DELL:  Objection to form.
8      A.  Depends on what the confidence intervals
9  are, but it's -- it reflects a 30 percent increase
10  in whatever you're measuring.
11     Q.  (BY MR. JAMES)  Would you characterize the
12  association as weak?
13         MS. O'DELL:  Object to the form.
14     A.  30 percent.  It's relative.  30 percent
15  more ovarian cancer is not weak.  It's fatal.
16     Q.  (BY MR. JAMES)  That's not the question
17  that I asked.
18         The question I asked is --
19     A.  I wouldn't call it weak.
20         MS. O'DELL:  Excuse me.  Sorry.
21         THE WITNESS:  Sorry.
22         MS. O'DELL:  Let him finish and let me
23  object.  Go ahead.
24     Q.  (BY MR. JAMES)  How would you characterize

Page 177

1  the 1.3, please?
2      A.  30 percent.
3      Q.  Would you characterize it as a strong
4  association?
5      A.  I would characterize it as statistically
6  significant number.
7      Q.  Would you characterize it as a modest
8  association?
9      A.  Modest, weak suggests unimportant, and I
10  would not call it unimportant.
11     Q.  Do you understand that the authors of this
12  paper use the terminology "modest"?
13     A.  Yes, they did.
14     Q.  Okay.  Do you think that when they use
15  that terminology they were calling it unimportant?
16     A.  I think that they suggested that it was
17  small in size.  Small increase, modest increase,
18  that's what they were meaning.
19     Q.  And you understand one of the factors that
20  experts use in evaluating an epidemiological body of
21  literature is the strength of an association,
22  correct?
23     A.  Yes.
24     Q.  And you discuss that later in your report,

Page 178

1  correct?
2      A. I do.
3      Q. And so my question here is whether, in
4  your expert opinion, a 1.3 odds ratio can be
5  characterized as strong, modest, weak, or another
6  adjective?
7          MS. O'DELL: Object to the form.
8      A. I will use the authors term as modest.
9  I'll accept that word.
10     Q. (BY MR. JAMES) Would you also accept the
11  terminology "weak," if the authors use that term?
12     A. Did they use that term? Can you show me
13  where they use the word "weak"?
14     Q. You can turn to the last page. Usually
15  I'm asking questions, but I'm happy to try to point
16  you out to what I'm discussing. Page 26 of the
17  Harlow paper.
18     A. Um-hum.
19     Q. Okay. Do you see the last paragraph
20  there?
21     A. Yes.
22     Q. That first sentence?
23     A. Oh, they did use the word "weak." If the
24  authors use it, I will quote them.

Page 179

1      Q. Will you accept that terminology to
2  describe the 1.3?
3          MS. O'DELL: Object to the form.
4      A. I -- in light of the larger body that's
5  coming up, I will not accept that.
6      Q. (BY MR. JAMES) You --
7      A. That's my personal opinion.
8      Q. Is your personal opinion guided by
9  principles of epidemiology?
10         MS. O'DELL: Objection to form.
11     A. Yeah, I think so.
12     Q. (BY MR. JAMES) You disagree with the
13  characterization of the association by the authors
14  of the study that you cite, correct?
15         MS. O'DELL: Objection; asked and
16  answered.
17     A. Happens, yes.
18     Q. (BY MR. JAMES) Okay. Dr. Smith, looking
19  at your report, returning to the second study that
20  you cite, you cite the Gross and Berg study; is that
21  correct?
22     A. I do.
23     Q. That's from 1995, correct?
24     A. It is.

Page 180

1      Q. Okay. And here you note in the report, if
2  you turn the page, Dr. Smith, you have copied in a
3  table from the article, correct?
4      A. Correct.
5      Q. In here, we see that according to your
6  report the odds ratio is a 1.29, correct?
7      A. It is.
8      Q. And, again, how would you characterize a
9  1.29 odds ratio?
10     A. A 29 percent increase in ovarian cancer
11  after talc exposure.
12     Q. And would you characterize that
13  association as strong, modest, weak, or another
14  adjective?
15         MS. O'DELL: Object to the form.
16     A. Are those my only choices?
17     Q. (BY MR. JAMES) No, I gave you another
18  adjective choice at the end of my question.
19         MS. O'DELL: Objection.
20     A. You gave me strong, modest, weak.
21     Q. (BY MR. JAMES) I'm sorry if I -- maybe I
22  misspoke, but I'm just asking you if you'd
23  characterize a 1.29 as strong, modest, weak, or
24  choose another adjective if you'd like.

Page 181

1          MS. O'DELL: Object -- excuse me.
2  Object to form.
3      A. Statistically significant.
4      Q. (BY MR. JAMES) Would you acknowledge that
5  there are statistically significant associations
6  that in epidemiological community would be referred
7  to as weak?
8          MS. O'DELL: Object to the form.
9      A. The rate of dissolution of an aspirin
10  tablet in the stomach, coated or noncoated, in terms
11  of time to analgesia may be statistically
12  significantly different if there's a 30 second
13  difference between coated and noncoated.
14         But that is a statistical significant
15  difference that I find is not clinically
16  significant. Whether your headache goes away
17  30 seconds sooner or later isn't clinically
18  significant to me; whereas, a 29 percent increase
19  risk of ovarian cancer is very clinically
20  significant to me.
21     Q. (BY MR. JAMES) Do you understand that
22  epidemiologists judge odds ratios based upon their
23  strength?
24         MS. O'DELL: Object to the form.

Ellen Blair Smith, M.D.

Page 182

1    A. They may use adjectives to quantitate the
2 amount of difference in terms of size or strength
3 and they may use words "modest." I understand they
4 do that.
5    Q. Do you understand --
6        MS. O'DELL: Excuse me.
7        Are -- I'm sorry. Are you finished,
8 Dr. Smith?
9        THE WITNESS: Yes.
10    Q. (BY MR. JAMES) Do you understand that in
11 judging associations, epidemiologists -- do you have
12 expertise in epidemiology, Dr. Smith?
13    A. I do not.
14    Q. You do not?
15    A. Just reading them; not doing them.
16    Q. Do you understand that the weaker an odds
17 ratio for an epidemiologist, that that bears some
18 significance to an epidemiologist in making a causal
19 conclusion?
20        MS. O'DELL: Object to the form.
21    A. It is one of Bradford Hill's nine factors
22 or pos-- he did -- didn't want to call them
23 postulates.
24        One of Bradford Hill -- I forget the

Page 183

1 word he used -- nine factors in assessing causation
2 and significance of epidemiologic findings.
3    Q. (BY MR. JAMES) Do you agree that when an
4 association is lower, weaker, smaller, or more
5 modest, that the smaller, weaker, or more modest
6 that it gets, even if it's statistically
7 significant, the lower the odds ratio becomes the
8 more concerned you become as an epidemiologist or as
9 an expert with whether that association is due to
10 chance, bias, confounding?
11        MS. O'DELL: Obj- --
12    Q. (BY MR. JAMES) Do you accept that?
13        MS. O'DELL: Excuse me. Objection to
14 the form.
15    A. It depends. It depends on if this is a
16 single study, a small-numbered study, or whether
17 that small result is consistent, reproducible over a
18 wide number of studies.
19    Q. (BY MR. JAMES) Would you agree that the
20 smaller the association the more concern there is --
21 there -- there is with confounding, chance, or bias?
22        MS. O'DELL: Excuse me. Objection;
23 asked and answered.
24    A. Not necessarily.

Page 184

1    Q. (BY MR. JAMES) All right. The next study
2 you discuss. And we're still on page 10, Dr. Smith,
3 is the Cramer 1999 study.
4    A. Yes.
5    Q. And, I believe, just like with the prior,
6 you have copied in a table from that study, right?
7    A. Once you learn it on the computer, you
8 just keep doing it.
9    Q. Sure. And do you see there with the table
10 that you've inputted into your report the odds
11 ratio, a summary odds ratio of 1.4; is that right?
12    A. I do.
13    Q. Again, if the authors referred to that
14 association in the paper as a relatively weak odds
15 ratio, would you accept their terminology?
16        MS. O'DELL: Do you happen to have
17 that paper handy?
18        THE WITNESS: You seem to be getting
19 there faster than we are.
20        I'm missing 14. Where did 14 go?
21    Q. (BY MR. JAMES) I'll mark it as Exhibit --
22 I think we're at 17?
23        (Deposition Exhibit 17 marked for
24         identification.)

Page 185

1        THE WITNESS: Are you get -- are you
2 going -- I'm missing some of your exhibits.
3        MS. O'DELL: We'll -- we'll straighten
4 it out.
5        THE WITNESS: Okay. I'm not
6 responsible for that?
7        MS. O'DELL: You are not responsible.
8        THE WITNESS: Okay. I will quit
9 worrying about it.
10        And I dropped my mike. I'm sorry.
11 Can you still hear me, sir?
12        THE VIDEOGRAPHER: I can hear you.
13        THE WITNESS: Okay.
14    A. Yes, he does use "the relatively weak odds
15 ratio observed."
16    Q. (BY MR. JAMES) Would you agree with that
17 conclusion in the study that you cite?
18    A. As an epidemiologist, I think he's using
19 epidemiologist speak. It's not my word choice.
20    Q. You are here evaluating a body of
21 epidemiologic literature, correct?
22    A. I am. As a clinician and expert on
23 ovarian cancer.
24    Q. And do you see here where the authors of

47 (Pages 182 to 185)

Ellen Blair Smith, M.D.

Page 186

1  this article that you cited say in that same
2  paragraph, quote, "Despite the consistency noted
3  above, the relatively weak odds ratio observed could
4  reflect potential biases, especially recall and
5  confounding"?
6      A.  Yes.  And then they go on to say:
7  (Paraphrasing.)  Recall bias seems more likely to
8  affect exposures that occurred over a short period
9  of time than those occurred long ago.  The average
10  duration of talc exceeded 20 years in both cases,
11  genital talc exposure may be less likely to be
12  subject to recall bias.
13          And I cite that exact thing in
14  quotations in my report.  It is restated on
15  page 356, I believe.
16      Q.  So that you cite the portion of the
17  statement that you read, correct?
18      A.  Correct.
19      Q.  Okay.  But you didn't cite the statement
20  that I read into the record, correct?
21          MS. O'DELL:  Object to the form.
22      A.  Correct.
23      Q.  (BY MR. JAMES)  Did you cite the portion
24  of this -- of the article that supports your

Page 187

1  opinion?
2          MS. O'DELL:  Objection to the form.
3      A.  I sub- -- quoted the part of the paper
4  where the author specifically addressed concerns
5  about recall, bias, and found them unlikely.  I
6  think it's important that he thought of it.  I think
7  it's real important that he thought of it.
8          But I think he, and every author, in
9  every study should go through his or her study with
10  a fine-tune comb that says "What -- "Why should I
11  believe these results?"
12          "What could I -- how -- what could I
13  have made a mistake?
14          "What are confounding factors?
15          "Where is the bias that could've been
16  introduced?
17          "Did I draw my conclusion from the
18  data in my study?"
19          That's what every good author does,
20  and so he did that.  And then he answered his own
21  question, "No, I don't think that's a confounding
22  factor."
23      Q.  (BY MR. JAMES)  In discussing this study,
24  do you discuss Dr. Cramer's findings on dose

Page 188

1  response in your report?
2      A.  (Examined exhibit.)  He -- I do not
3  discuss it in my report.  He himself called
4  dose-response relationship, quote, "weak," unquote.
5      Q.  And you would agree that's an important
6  finding of the study, correct?
7      A.  I think you ought to look at every study
8  to see if it has a dose-response relationship.
9      Q.  Including this one, correct?
10      A.  Every study.  Yes, including this one.
11      Q.  All right.  Next, Dr. Smith, you discuss
12  the Huncharek study, correct?
13      A.  Correct.
14      Q.  And in the text --
15          THE WITNESS:  Are you just going to
16  supply that to us?
17          MR. JAMES:  I can or the --
18          THE WITNESS:  I'd like to have the
19  studies as we discuss them, if you wouldn't mind.
20          MR. JAMES:  Absolutely.  And --
21  absolutely.
22          And right now, I'm looking at your
23  report with you as well, so . . .
24          THE WITNESS:  Sure.  Sure.  But they

Page 189

1  have -- I -- mine is a summary.  You got the real
2  thing.
3          MR. JAMES:  Sure.  As do you.  But I'm
4  happy to give you my copy.
5          THE WITNESS:  Well, Ms. O'Dell does
6  not mind getting every study for us.  She's . . .
7          MR. JAMES:  All right.  So I'm going
8  to mark the Huncharek study as Exhibit Number 18.
9          (Deposition Exhibit 18 marked for
10          identification.)
11      A.  Thank you.  (Examined exhibit.)
12      Q.  (BY MR. JAMES)  And you note in your
13  report an odds ratio of 1.33, correct?
14      A.  Yes.  Ever versus never exposure,
15  "Relative risk of 1.33 with a 95% confidence
16  interval of 1.16 to 1.45, a statistically
17  significant result suggesting a 33% increased risk
18  of ovarian cancer."  That is a quote from the study.
19      Q.  Dr. Smith, would -- how would you
20  characterize a 1.33 odds ratio?
21      A.  33 percent --
22      Q.  Okay.  And would --
23      A.  -- clinically significant, statistically
24  significant.

48 (Pages 186 to 189)

Ellen Blair Smith, M.D.

Page 190

1    Q. You recognize that all statistically
2  significant associations cannot be described as
3  strong, correct?
4    A. No. We've been through this.
5      MS. O'DELL: Objection to form.
6    A. Not all statistical significant -- you
7  used the word "strong." I used the word "clinically
8  significant." Those are different things.
9    Q. (BY MR. JAMES) I agree with you. And I'm
10  asking you about strength.
11      MS. O'DELL: Could you repeat your
12  question, please?
13      MR. JAMES: I'd be happy to.
14    Q. (BY MR. JAMES) Would you characterize the
15  odds ratio in this paper as strong, modest, weak or
16  another adjective that you prefer?
17      MS. O'DELL: Object to the form; asked
18  and answered.
19      MR. JAMES: It hasn't been asked.
20    A. Clinically, statistically significant.
21  That's the word I'm gonna use.
22    Q. (BY MR. JAMES) Is there a reason why
23  you're uncomfortable characterizing the odds ratio
24  with one of the adjectives strong --

Page 191

1    A. That, yeah --
2    Q. -- modest or weak?
3    A. -- epidemiologists use because weak in --
4  I'm not an epidemiologist. Perhaps I don't have the
5  epidemiologic --
6      (Counsel conferring off the record.)
7    A. Do you want me to wait while y'all talk?
8    Q. (BY MR. JAMES) No, ma'am.
9    A. I don't know the connotations of what
10  "weak" means in epidemiologic circles. If it just
11  means a small number, less than 2.0, weak, in my
12  medical clinical brain implies unimportant, trivial.
13  And I think that kind of difference, when you talk
14  about ovarian cancer, is not trivial and it's not
15  unimportant.
16      So maybe that's my hang-up, and maybe
17  it's because I'm not an epidemiologist. I'm a -- I
18  am person who takes care -- or took care of patients
19  with ovarian -- continues to take care of people
20  with ovarian cancer.
21    Q. You include the statement in your report
22  that "The study" -- and I'm looking at your report
23  now -- "did not collect the necessary data to permit
24  this determination," in what you're referring to

Page 192

1  there as dose response in the above sentence.
2      Do you see where I've --
3    A. Yes.
4    Q. -- read that?
5    A. Yes.
6    Q. Okay. And what's your basis for that
7  statement?
8    A. This is -- I believe this is an ever/never
9  study. Now, have you -- so if it's ever/never, you
10  didn't use it or you ever used it. And so you --
11  implicitly, you can't get dose response if you don't
12  look at frequency and duration. And a lot of these
13  talc studies are ever/nevers.
14    Q. And this is not an attempt for a gotcha or
15  anything like that, but I want to make sure we're
16  looking at the same paper.
17      So can you turn with me to page 1958?
18    A. (Complied.)
19    Q. And you see Table 2. There's a table
20  there with dose response data.
21    A. (Examined exhibit.) Well . . .
22    Q. Do you see here that the --
23    A. Yeah, I see --
24    Q. I'm sorry.

Page 193

1    A. -- I see your table.
2    Q. Thank you.
3    A. I see your table. Here it's used. And I
4  see what I wrote, and I haven't reread this
5  immediately prior to my deposition.
6      MS. O'DELL: And if you need a few
7  minutes to refresh yourself, Dr. Smith, feel free to
8  do that.
9      THE WITNESS: I hate to waste your
10  time, but I'd like to do that.
11      MS. O'DELL: Yes, please.
12      MR. JAMES: Yeah. Can we go off the
13  record while the Doctor reviews the paper?
14      THE WITNESS: Sure.
15      MR. JAMES: Leigh, Margaret, is that
16  fine?
17      MS. O'DELL: You know, if it's gonna
18  take you a few minutes, I think --
19      THE WITNESS: Yeah.
20      MS. O'DELL: -- we'll go off. If it's
21  gonna take you a minute or so, let's just give the
22  Doctor a moment and we'll keep going.
23      THE VIDEOGRAPHER: Going off the
24  record. The time is 2:44 p.m.

49 (Pages 190 to 193)

Ellen Blair Smith, M.D.

Page 194

1    (A recess was taken from 2:44 p.m.
2    to 2:56 p.m.)
3    THE VIDEOGRAPHER:  This marks the
4    beginning of Disk 3.  Back on the record.  The time
5    is 2:56 p.m.
6    Q.  (BY MR. JAMES)  Dr. Smith, you've had a
7    chance to look at the Huncharek paper, correct?
8    A.  I have.
9    Q.  And does that paper include data to permit
10   a conclusion as to dose response?
11   A.  It does not.
12   Q.  And what's your basis for that statement?
13   A.  They only had dose response information
14   on 9 of the 16 studies, and the authors themselves
15   said only a small minority of studies contain dose
16   responses.
17          This is on page 1958, the left side
18   column, second paragraph that starts there about
19   halfway -- between one-third and one-half way down.
20          "Unfortunately, only limited data were
21   available and only a small minority of" -- oh, I
22   lost my place -- "only a small minority" --
23          UNIDENTIFIED SPEAKER:  (Inaudible.)
24          THE WITNESS:  Okay.

Page 195

1    A.  -- "only a small minority of studies
2    contain dose-response information of any type
3    and (2), substantial differences existed in dose
4    stratification levels among the studies reporting
5    such information.  It is therefore not possible to
6    perform more sophisticated modeling of dose response
7    data."
8          Final -- far- -- farther down on that,
9    "The lowest half exposure category in this Cramer
10   study was 'less than 30' applications, which is not
11   consistent with other 'low.'"
12          "Taken together, these" -- last
13   sentence, "Taken together, these data show a lack of
14   clear dose-response relationship."  Okay.
15   Q.  (BY MR. JAMES)  So you concluded your
16   answer to my question with a sentence in the paper
17   that says, quote, "Taken together, these data show a
18   lack of a clear dose-response relationship," close
19   quote, correct?
20   A.  Correct.
21          MS. O'DELL:  Object to the form.
22   Q.  (BY MR. JAMES)  So the authors have made
23   conclusions about dose response, correct?
24   A.  They can't.  They said they couldn't.  I

Page 196

1    must not be understanding you.
2    Q.  Are you misunderstanding the paper?
3          MS. O'DELL:  Objection to form.
4    A.  No.
5          MS. O'DELL:  She said she was
6    misunderstanding your question.
7          MR. JAMES:  I'm posing the questions,
8    Leigh.  Thank you.
9    Q.  (BY MR. JAMES)  Dr. Smith, you've stated
10   in your report that, quote, "The study did not
11   collect the necessary data to permit this
12   determination," close quote.
13          Do you see that?
14   A.  Yes.
15   Q.  And your position is that the
16   dose-response findings in this paper are a nullity?
17   Is that your position?
18          MS. O'DELL:  Object to the form.
19   A.  I don't know what you mean by "nullity,"
20   but they didn't have sufficient data to determine a
21   clear dose-response.
22   Q.  (BY MR. JAMES)  Okay.  And yet we do see
23   here that the authors have made a conclusion about
24   dose response, correct?

Page 197

1          MS. O'DELL:  Object to the form.
2    A.  "Despite the findings, the data showed a
3    lack of clear dose-response relationship, making the
4    relative risk of questionable validity."  That's in
5    their abstract.
6          So I don't see where they say they
7    have made a clear dose-response relationship.
8    Q.  (BY MR. JAMES)  Okay.  Let's just let the
9    language of the paper speak for itself and we can
10   move on.
11          MS. O'DELL:  Object to the form.
12   Q.  (BY MR. JAMES)  Next you discuss the
13   Langseth study, correct?
14   A.  Yes, sir.
15   Q.  And on page 12 of your report, you quote
16   the statement in the paper, and I'm gonna mark it as
17   Exhibit Number 19.
18          (Deposition Exhibit 19 marked for
19          identification.)
20   Q.  (BY MR. JAMES)  Okay.  I'm handing you a
21   clean copy of Exhibit Number 19 of Langseth.
22   A.  Thank you.
23   Q.  Okay.  In your report you quote the
24   article for the proposition --

Ellen Blair Smith, M.D.

Page 198

1    A.  You gave me two copies.
2         THE WITNESS:  Does somebody else need
3    another one?
4    Q.  (BY MR. JAMES)  -- for the proposition
5    that the epide- -- "epidemiological evidence
6    suggests that the use of cosmetic talc in the
7    perineal area may be associated with ovarian cancer
8    risk."
9         That's what you quote in your report,
10   correct?
11   A.  Correct.
12   Q.  If you look at the second page of the
13   article in the section titled "Proposal: To Research
14   Community," do you see where I am?
15   A.  I do.
16   Q.  Okay.  The authors there state, quote,
17   "The current body of experimental and
18   epidemiological evidence is insufficient to
19   establish a causal association between perineal use
20   of talc and ovarian cancer risk," close quote.
21        Do you see where I read that?
22   A.  I do.
23   Q.  And that conclusion of the author -- or
24   the authors is not included in your report, is it?

Page 199

1         MS. O'DELL:  Object to the form.
2    A.  It is not.  I don't agree with that
3    conclusion.
4    Q.  (BY MR. JAMES)  So this is another paper
5    that you've cited where you disagree with the
6    authors' conclusions, correct?
7    A.  Correct.  They have a statistically
8    significant overall risk of 1.35 -- between 1.26
9    to 1.46, so that is -- and then it says on research
10   report what this study shows, "Epidemiologic [sic]
11   evidence suggests the use of cosmetic talc in the
12   perineal area may be associated with ovarian cancer
13   risk."
14   Q.  That's the portion that you've cited in
15   your report, correct?
16   A.  Yes, that is exactly what I quoted.
17   Q.  But you didn't quote the sentence that I
18   read that specifically disclaims a causal
19   association, correct?
20        MS. O'DELL:  Object to the form.
21   Q.  (BY MR. JAMES)  Or --
22   A.  I --
23   Q.  Well, let me --
24   A.  I did not --

Page 200

1    Q.  Sorry.
2    A.  -- cite that.
3    Q.  And, again, you -- in your report, you
4    concluded that meta-analyses are -- I think you used
5    the terminology "most valid" way to look at this
6    issue; is that right?
7    A.  Okay.  I think they're the best we have,
8    and I think they are the best we are going to have.
9         The best studies to determine
10   causation are randomized, controlled, prospective
11   trials, and more than one of them.  That's what's
12   called Level 1 evidence.
13        There is no ethical way we can apply
14   any possible carcinogen, suspected carcinogen,
15   proven carcinogen to the perineum of any woman and
16   have that be ethically acceptable.  That study
17   cannot be done.
18        We are going to have to validate the
19   epidemiologic data in the laboratory, because that's
20   the only ethical place.
21   Q.  And you understand the length of study is
22   authored by the IARC Working Group, correct?
23   A.  Yes.
24   Q.  And do you understand that IARC has

Page 201

1    classifi- -- classified perineal talc application as
2    a 2B?
3         MS. O'DELL:  Objection to --
4    Q.  (BY MR. JAMES)  Do you understand that?
5         MS. O'DELL:  Excuse me.  Object to the
6    characteration -- characterization regarding the
7    working group.
8    A.  IARC 93 classified talc as a 2B possible
9    carcinogen.
10   Q.  (BY MR. JAMES)  Do you understand IARC has
11   not classified talc as a carcinogen, correct?
12        MS. O'DELL:  Object to the form.
13   A.  Correct.
14   Q.  (BY MR. JAMES)  And IARC has not
15   classified talc as a probable carcinogen, correct?
16   A.  Correct.
17   Q.  The conclusion that you're offering -- the
18   opinion that you're offering here today conflicts
19   with the IARC 2B finding, correct?
20        MS. O'DELL:  Objection to form.
21   A.  I told you that a study can't apply
22   anything that's a possible, and I didn't say talc in
23   any study.
24        I said the model for a randomized

51 (Pages 198 to 201)

Ellen Blair Smith, M.D.

Page 202

1 controlled trial would be apply whatever substance
2 you want to women and see if they result in this
3 disease.
4        But if you start with a possible,
5 probable, or absolutely carcinogen, you're never
6 gonna -- you can't -- you can't even write that down
7 on the paper. That's not going anywhere.
8        That study will -- multiple studies we
9 need -- we needed to have to have Level 1 evidence
10 will never be done.
11    Q. (BY MR. JAMES) And I think that your
12 answer maybe wasn't responsive to my question.
13        And so my question is whether the
14 causation opinion you're offering in this litigation
15 is different than the conclusion reached by IARC?
16    A. IARC in -- based on data up to 2006,
17 declared talc a 2B possible carcinogen.
18        I believe that since 2006, in the past
19 12 years, we have a plethora of data that leads me
20 to the conclusion that talc is a Class 1 carcinogen.
21    Q. You know IARC has not, to date, made that
22 classification, correct?
23    A. That's right.
24    Q. Okay. Next in your report you discuss a

Page 203

1 Terry pooled analysis, correct?
2    A. Yes.
3    Q. And, again, here in your report -- and we
4 can mark Terry if that -- I'll hand you a copy of
5 that.
6        In your report you note the overall
7 odds ratio in Terry is a 1.24, correct?
8    A. Yes.
9    Q. Okay. And I'm gonna mark Terry as Exhibit
10 Number 20.
11        (Deposition Exhibit 20 marked for
12        identification.)
13    Q. (BY MR. JAMES) You see here that the
14 Terry odds ratio of 1.24 is lower than some of the
15 odds ratios reported in the prior meta-analyses,
16 correct?
17        MS. O'DELL: Object to the form.
18    A. Slightly. Well, let's see.
19        (Examined exhibit.) 1.33. 1.24 is
20 smaller. Yes, I agree with -- that 1.24 is lower
21 than 1.33.
22    Q. (BY MR. JAMES) Would you agree with the
23 authors of this paper when they describe the odds
24 ratio as a modest odds ratio?

Page 204

1    A. We've had this discussion before.
2    Q. Okay. Fair enough.
3        And your answers prior hold here as
4 well?
5    A. They hold.
6    Q. Understood.
7        In your report, I didn't see any
8 discussion in the -- when you're mentioning the
9 Terry paper of the paper's findings on dose
10 response.
11        Are you familiar with the
12 dose-response findings in the Terry paper?
13    A. Once more, I'll need a moment to look.
14        (Examined exhibit.) They did -- there
15 is no significant trend for increasing number of
16 lifetime applications.
17    Q. And if you see on page -- I think you're
18 reading on page 817; is that right, Dr. Smith?
19    A. I was reading from the abstracts.
20    Q. Oh, yes, Doctor.
21        If we also look at the page 812.
22    A. (Complied.)
23    Q. Do you see there where they say "Evidence
24 for a dose-response relationship has been

Page 205

1 inconsistent" or are you on another page?
2    A. Did you say 812?
3    Q. Yes, Doctor.
4    A. The top?
5    Q. Yes, The top.
6    A. Yes. "Evidence of dose-response
7 relationship has been inconsistent."
8    Q. And is there a reason why you don't
9 discuss the dose-response findings of Terry in your
10 report?
11    A. Because they didn't use -- they didn't
12 observe the trend of increased risk applications. I
13 mean, I -- it wasn't a pointed omission.
14        MS. O'DELL: If you want to re- --
15 need to review the paper.
16    Q. (BY MR. JAMES) Dr. Smith, are you
17 reviewing or may I continue with another question?
18    A. Hold on one second. (Examined exhibit.)
19    Q. Sure.
20    A. (Paraphrasing.) No trend in cumulative
21 use was evident in analyses restricted to ever-users
22 of genital powder. Taken together, these
23 observations suggest that the significant trend test
24 largely reflects ever/never.

52 (Pages 202 to 205)

## Ellen Blair Smith, M.D.

---

Page 206

1      I would -- I would suggest that I
2 didn't mention a negative. I mean, it isn't there.
3      Q. So that if a paper finds that there's no
4 dose response, that's the basis for you not to
5 report that finding?
6      MS. O'DELL: Object to the form.
7      A. I think it didn't add anything to the body
8 of this report.
9      Q. (BY MR. JAMES) You acknowledge later in
10 your report that whether or not the literature
11 reports a dose response, one way or the other, is
12 important to the causative analysis, correct?
13      A. I accept that it -- I could have improved
14 my report by including that negative information.
15      Q. And if you look at the page 820 of the
16 Terry article -- it's at the very end of the
17 article. We see in the language at the top of the
18 right column that the authors conclude, quote, "More
19 work is needed to understand how genital powders may
20 exert a carcinogenic effect, and which constituents
21 (e.g., talc) may be involved."
22      MS. O'DELL: Object to form.
23      A. I would agree with that wholeheartedly.
24      Q. (BY MR. JAMES) So as of 2013, Dr. Smith,

---

Page 207

1 the Terry authors are concluding that the --
2 concluding that whether or not talc exerts a
3 carcinogenic effect is undetermined, correct?
4      MS. O'DELL: Object to the form;
5 misstates the record.
6      A. That's what they stated, exactly. And I
7 would agree more work needs to be done.
8      Q. (BY MR. JAMES) All right. Finally,
9 Dr. Smith, you discuss the Penninkilampi --
10      A. Yes.
11      Q. -- study, correct?
12      A. Yes.
13      Q. I'm gonna mark the Penninkilampi study as
14 Exhibit Number 21.
15      (Deposition Exhibit 21 marked for
16 identification.)
17      Q. (BY MR. JAMES) In your report, Dr. Smith,
18 you refer to the odds ratio with -- associated with
19 long-term powder use as a 1.25, correct?
20      A. Correct.
21      Q. And if we look at Figure 2 of the study --
22 or it's Table 2 --
23      A. (Complied.)
24      Q. -- you see that the long-term use odds

---

Page 208

1 ratio of the 1.25 is less than the overall odds
2 ratio reported of the 1.31, correct?
3      A. I --
4      Q. And another -- maybe an easier place to
5 reference, Dr. Smith, would be the abstract in the
6 results section.
7      A. No. I believe I used the serous invasion
8 rather than all. And that -- that's just -- I
9 should've put "serous carcinoma" there, not "all."
10 That's just a flat out mistake.
11      Q. And if we see in the Results section,
12 Dr. Smith, we see -- and this is in the abstract
13 portion of the paper, they report that the odds
14 ratio with any perineal talc use associated with
15 ovarian cancer --
16      MS. O'DELL: Where -- where are you
17 reading from?
18      MR. JAMES: I'm in the abstract in the
19 Results section.
20      MS. O'DELL: Okay.
21      MR. JAMES: This is 1.31.
22      A. Yeah. That's just a typo. Yeah, 1.31 --
23      Q. (BY MR. JAMES) And then --
24      MS. O'DELL: Excuse me.

---

Page 209

1      Q. (BY MR. JAMES) Let me finish.
2      MS. O'DELL: Let him finish, please.
3      A. I'm sorry.
4      Q. (BY MR. JAMES) So the abstract reports
5 that the overall odds ratio was a 1.31. But if you
6 continue on reading in the abstract, you see that
7 the long-term talc use odds ratio is a 1.25.
8      Do you see that?
9      MS. O'DELL: Object to the form.
10      A. Okay. How far down did you go? I see
11 "any," then "more than 3600 lifetime applications"
12 is 1.42.
13      And ever use is 1.35, 1.27, 1.43 in
14 case control, but not cohort studies.
15      Q. (BY MR. JAMES) Okay. And my apol- --
16      A. "However" --
17      Q. Oh, sorry, Doctor.
18      A. -- is that where -- is that where you are?
19 Is that right sentence now?
20      Q. If -- if I may. If I may refer you back
21 to Figure 2 and not Table 2, I think that will get
22 us there quicker.
23      MS. O'DELL: I'm sorry, Scott. I'm
24 sort of confused.

---

53 (Pages 206 to 209)

Ellen Blair Smith, M.D.

Page 210

1          MR. JAMES:  Sure.  And I'm gonna --
2  I'm straightening this up right now.
3          THE WITNESS:  Okay.  Okay.
4      Q.  (BY MR. JAMES)  So we're looking at
5  Figure 2, which is where I initially --
6      A.  Okay.
7      Q.  -- tried to get us.
8      A.  Okay.  So -- okay.  So the -- yes.
9          MS. O'DELL:  Okay.  Excuse me.  Let
10  him --
11          THE WITNESS:  I'm sorry.
12          MS. O'DELL:  -- ask a question.
13      Q.  (BY MR. JAMES)  So on page -- on
14  Figure 2 --
15          MS. O'DELL:  Excuse me.  Dr. Smith, if
16  you'll let him ask the question.
17          This is very -- gonna be very
18  confusing on the record, so if we could just start
19  over and make it clear.
20          MR. JAMES:  Sure.  Sure.
21          MS. O'DELL:  Thank you.
22      Q.  (BY MR. JAMES)  So we're looking at the
23  Penninkilampi study, Figure 2, page 46, correct?
24      A.  Correct.

Page 211

1      Q.  Okay.  And do we see here, which is where
2  I was trying to go, that the "Any perineal talc use"
3  odds ratio reported here is a 1.31, correct?
4      A.  Correct.
5      Q.  And then they go on in Figure 2 to state
6  that the "Long-Term perineal talc use" odds ratio is
7  a 1.25, correct?
8      A.  Correct.
9      Q.  And the authors also note that it's a
10  lower magnitude odds ratio, correct?
11      A.  Correct.
12      Q.  Does that lower magnitude odds ratio for
13  long-term perineal talc use comport with your
14  litigation opinions?
15          MS. O'DELL:  Object to the form.
16      A.  It's not inconsistent.
17      Q.  (BY MR. JAMES)  It's not inconsistent with
18  your opinions that a long-term talc user has a lower
19  odds ratio?
20          MS. O'DELL:  Object to the form.
21      A.  It is not unusual to have a -- a single
22  inconsistent finding within one study.  It doesn't
23  change the whole picture of -- I mean, I note it.  I
24  acknowledge it.

Page 212

1      Q.  (BY MR. JAMES)  Uh-huh.
2      A.  Cramer's got a paper.  I think it's Cramer
3  has a paper that tubal ligation increases ovarian
4  cancer risks in one of his forms.  I mean, it's --
5  you know, you have the outliers.  But the body of
6  literature doesn't support this single decrease from
7  1.31 to 1.25.  But, you know, okay, but I see it.  I
8  know it.
9      Q.  And in your report you discuss
10  Penninkilampi as politically -- excuse me,
11  particularly important to your analysis, correct?
12          MS. O'DELL:  Object to the form.
13      A.  I really like this study.  I -- I like the
14  scope of it.  I like inclusion of the cohorts.  It
15  has a huge number of cases.  Bigger is better.  When
16  you get away from small numbers and into the really
17  large numbers, you have a much higher chance of
18  finding truth if you -- so I like this study.
19      Q.  (BY MR. JAMES)  Do you see on page 42 of
20  the study, it's the left-hand column, top paragraph,
21  bottom sentence, the authors state, "Hence, while
22  perineal talc use has not been shown to be safe, in
23  a similar regard, a certain causal link between talc
24  use and ovarian cancer has not yet been

Page 213

1  established," close quote?
2      A.  They do say that.
3      Q.  Okay.  Do you agree with that finding or
4  statement?
5      A.  My conclusions are based on the totality
6  of all the evidence that I have reviewed, not just
7  the epidemiologic.  Certainly, they have not reached
8  that conclusion.
9          MR. KLATT:  Objection; nonresponsive.
10      Q.  (BY MR. JAMES)  And the Penninkilampi
11  authors did not reach a causation conclusion,
12  correct?
13          MS. O'DELL:  Object to form.
14      A.  Well, in their introduction, they said a
15  causal link has not been used.
16          And their discussion is that they said
17  that a (paraphrasing) talc use appears to be
18  associated with an increased risk of serous ovarian
19  cancer, both invasive and borderline, and not with
20  mucinous and with endometrial -- endometrioid
21  ovarian cancer with perineal use.
22      Q.  (BY MR. JAMES)  The question remains,
23  Dr. Smith:  The Penninkilampi study that you cite as
24  particularly important in your report, the authors

Ellen Blair Smith, M.D.

Page 214

1 there do not render the conclusion that talc is a
2 demonstrated cause of ovarian cancer, do they?
3        MS. O'DELL: Objection to form; asked
4 and answered.
5     A.  They ask for a sustained need for further
6 research on the potential mechanism by which ovarian
7 cancer may be caused by talc.
8        So they -- they do not allow a causal
9 relationship, nor do they allow rejecting that
10 causal relationship.
11    Q.  (BY MR. JAMES)  And here, we do know that
12 you have rendered the causation opinion, and so your
13 causation opinion is different than the opinion
14 reached by the authors of the Penninkilampi study,
15 isn't it?
16    A.  Yes.
17    Q.  When evaluating the Penninkilampi study,
18 did you note that the Penninkilampi authors omitted
19 certain cohort data?
20    A.  They use Gertig rather than Gates.
21    Q.  Okay.  And the Gates paper is the
22 follow-up paper, correct?
23    A.  The Gates paper is the -- do you want to
24 do the -- the prospective studies now or do you want

Page 215

1 to do it as part of this?
2    Q.  I -- right now, I'd just like to continue
3 with the questioning.
4    A.  Okay.  Okay.
5    Q.  And if there is a --
6    A.  Okay.
7    Q.  -- point where you'd like the papers,
8 we'll get them for you.
9    A.  Thank you.
10    Q.  Okay.
11    A.  I always love the papers.
12        The Gates study is the first half of
13 the Nurses' study.
14        MS. O'DELL: Scott, if you're gonna
15 mark the papers, why don't we go ahead and mark
16 Gates and --
17        THE WITNESS: Gertig?
18        MS. O'DELL: -- if you're going to --
19 Yes.
20        If you're going to -- I think we've
21 marked them --
22        MR. JAMES: Sure.  That sounds fine.
23        MS. O'DELL: That way the Doctor can
24 have it in front of her while she's answering the

Page 216

1 questions.
2        MR. JAMES: Okay.  So I'm marking the
3 Gates 2010 paper as Exhibit 22.
4        (Deposition Exhibit 22 marked for
5         identification.)
6    Q.  (BY MR. JAMES)  And so the question --
7 I'll rephrase.
8        MS. O'DELL: Oh.  I thought you were
9 gonna hand me something else.  Okay.
10    Q.  (BY MR. JAMES)  The Gates paper is the --
11 is a paper produced on the Nurses' Health cohort,
12 correct, Dr. Smith?
13    A.  Did you say the Gates' paper?
14    Q.  Yes.
15    A.  Yes.
16        MS. O'DELL:  Are you gonna mark
17 Gertig, if you're gonna compare the two?
18        MR. JAMES:  I'll mark Gertig as
19 Exhibit 23.
20        (Deposition Exhibit 23 marked for
21         identification.)
22    Q.  (BY MR. JAMES)  And Dr. Smith, Gertig is
23 also a Nurses' Health paper, correct?
24    A.  It's the first one.

Page 217

1    Q.  Thank you.
2    A.  Thank you.
3    Q.  All right.  And so to reframe the
4 question, Dr. Smith, the Penninkilampi study omits
5 the data from the Gates 2010 study, correct?
6        MS. O'DELL:  Object to the form.
7 Excuse me.  I'm sorry.
8    A.  It used Gertig and not Gates.
9    Q.  (BY MR. JAMES)  Okay.  Is there --
10    A.  I -- I don't think he -- I don't know why
11 he -- that is what it is.
12    Q.  And, again, you understand the Gates 2010
13 paper has data on additional years of follow-up,
14 correct?
15    A.  And additional patients.
16        MS. O'DELL:  Objection to form.
17    Q.  (BY MR. JAMES)  And you understand that
18 the Gates 2010 paper includes an analysis of the
19 odds ratios associated with talc and ovarian cancer,
20 correct?
21    A.  Correct.
22    Q.  Do you believe the Penninkilampi study
23 should have included the data from the Gates 2010
24 paper?

55 (Pages 214 to 217)

Ellen Blair Smith, M.D.

Page 218

1    A.  I --
2        MS. O'DELL:  Object to the form.
3    A.  I believe it doesn't matter.
4    Q.  (BY MR. JAMES)  Why doesn't it matter?
5    A.  Because we have the Berge study that did
6  include it, and that -- for some reason, it's not
7  included in my report, and if you don't call it a
8  flaw, I will.  I -- I think in multiple drafts and
9  cut and pasting it went to the great cyber void.
10    Q.  Okay.  And that's -- the discussion that
11  you just had was concerning the Berge paper,
12  correct?
13    A.  Right.
14    Q.  But returning back to the Penninkilampi
15  study, do you believe it was a flaw for the authors
16  not to include data from Gates 2010?
17        MS. O'DELL:  Objection to form.
18    A.  No, I don't.
19    Q.  (BY MR. JAMES)  Why is that?
20    A.  Because it doesn't make any difference.
21  Because Berge did, and it didn't make any difference
22  in the results.
23    Q.  Okay.  So I'm asking about the
24  Penninkilampi study.  And my question is whether

Page 219

1  Penninkilampi should have included the data from the
2  Gates 2010.
3        MS. O'DELL:  Object to the form.
4    A.  Well, if you use the most recent available
5  data, maybe he should have, yes, you're right.
6    Q.  (BY MR. JAMES)  And, in fact, that's one
7  of the points that you make in your report, correct?
8        You -- one of the things you note in
9  your report is follow-up is a good thing, right?
10    A.  Correct.
11    Q.  And the Penninkilampi authors make certain
12  conclusions about the cohort data, don't they?
13    A.  You're gonna have to tell me what those
14  conclusions are before I'll agree with or not agree
15  with that.
16    Q.  Okay.  Dr. Smith, if you -- do you have
17  the Penninkilampi paper in front of you?
18    A.  I do.
19    Q.  Okay.  And you see on page 47 in the
20  Conclusions section --
21    A.  Um-hum.
22    Q.  -- you see that, quote -- and this is the
23  second sentence down --
24    A.  Um-hum.

Page 220

1    Q.  -- "While the results of case-control
2  studies are prone to recall bias, especially with
3  intense media attention following the commencement
4  of litigation in 2014, the confirmation of an
5  association in cohort studies between perineal talc
6  use and serous invasive ovarian cancer is suggestive
7  of a causal association," closed quote.
8        Do you see that?
9    A.  Yes.
10    Q.  And so Penninkilampi is hinging its
11  conclusions on what it believes to be the results
12  of, quote, "cohort studies," closed quote, correct?
13        MS. O'DELL:  Object to the form.
14    A.  I don't believe that they hinge their
15  whole findings on cohort studies.  Their statistical
16  and significant include- -- significance included
17  those cohort studies, but it's only a component of
18  theirs.
19    Q.  (BY MR. JAMES)  And certainly in the
20  Conclusions section, the Penninkilampi authors
21  acknowledge the bias limitations associated with
22  case control studies, correct?
23    A.  They say case control studies are prone to
24  recall bias.  I think a better choice of words would

Page 221

1  be may be prone to recall bias.
2        But, yes, cohort studies obviate
3  recall bias.  They don't have it.
4    Q.  And we know again here that Penninkilampi
5  did not include the Nurses' Health cohort data from
6  2010 Gates, correct?
7        MS. O'DELL:  Object to the form.
8    A.  Correct.
9    Q.  (BY MR. JAMES)  Okay.  And are -- do you
10  know that in the Gates 2010 paper the reported
11  association with the serous ovarian cancer washed
12  out?
13    A.  I know that.
14        MS. O'DELL:  Object to the form.
15    Q.  (BY MR. JAMES)  And Penninkilampi
16  apparently doesn't know that, correct?
17        MS. O'DELL:  Object to the form.
18    A.  I haven't talked to him.
19    Q.  (BY MR. JAMES)  Okay.  Well, Penninkilampi
20  is referring to a confirmation of an association and
21  cohort studies.
22        Do you see that?
23    A.  Right.
24    Q.  So he must be referring to --

Ellen Blair Smith, M.D.

Page 222

1      A.  The Gertig study.
2      Q.  -- Gertig study, correct?
3          MS. O'DELL:  Excuse me.
4      A.  Right.
5          MS. O'DELL:  Object to the form.
6          Hey, Doctor, give me just a minute
7   to --
8          THE WITNESS:  Okay.  I'm sorry.
9          MS. O'DELL:  -- get my objection in.
10     Q.  (BY MR. JAMES)  And we know that's true
11  because we know none of the cohorts performed today
12  have found an association, correct?
13         MS. O'DELL:  Object to the form.
14     A.  That is true.
15     Q.  (BY MR. JAMES)  We know the Women's Health
16  Initiative study did not find an association between
17  perineal talc use and ovarian cancer, correct?
18         MS. O'DELL:  Object to the form.
19     A.  That is true.
20     Q.  (BY MR. JAMES)  We know the Gonzalez
21  Sister Study -- the prospective Gonzalez Sister
22  Study did not find an association between perineal
23  talc use and ovarian cancer, correct?
24     A.  That is true.

Page 223

1      Q.  So we can deduce here that the only study
2   that he can be referring to is the Gertig 2000
3   study, correct?
4      A.  He lists Gertig in his reference -- in
5   his -- see.  He lists Gertig --
6      Q.  So there's no dispute --
7      A.  -- right there.
8      Q.  I'm sorry, Doctor.
9      A.  In Gertig, there's no dispute.  He's
10  not trying to hide anything.  It's listed,
11  "Gertig 2000."
12     Q.  Right.  So there's no dispute in our
13  discussion here either that what he's referring to
14  there is the Gertig 2000 study, correct?
15         MS. O'DELL:  Object to the form.
16     A.  He is referring to the Gertig.
17     Q.  (BY MR. JAMES)  And he just forgot to look
18  at the Gates 2010 data, correct?
19     A.  I don't know why --
20         MS. O'DELL:  Object to the form.
21     A.  -- he didn't look at the Gates study.
22         MS. O'DELL:  Excuse me, Doctor.
23         Object to the form.
24         You may answer.

Page 224

1      Q.  (BY MR. JAMES)  If you had looked at
2   the Gates --
3          MS. O'DELL:  Hey, let -- finish -- if
4   you've got an answer --
5          Did you finish your answer?
6          THE WITNESS:  I did finish my answer.
7          MS. O'DELL:  Okay.  Give me a moment.
8   Thank you.
9          THE WITNESS:  I know.  I'm not
10  supposed to talk so fast.
11     Q.  (BY MR. JAMES)  If you had looked at the
12  Gates 2010 data, he wouldn't have been able to make
13  that statement, correct?
14         MS. O'DELL:  Object to the form.
15     A.  Do you mean the statement that the
16  confirmation of an association in cohort studies
17  between perineal talc use and serous invasive cancer
18  is suggested of a causal association?
19         Well, his -- the Gates study did not
20  have statistically significant increase incidence of
21  serous ovarian cancer.
22     Q.  (BY MR. JAMES)  Another reason that you'd
23  want to look at the most recent data available from
24  a cohort is because of concerns about latency, which

Page 225

1   you also cite in your report, correct?
2          MS. O'DELL:  Objection to form.
3      A.  That's not the only reason to just look at
4   most up-to-date studies.
5      Q.  (BY MR. JAMES)  Is it one of the reasons?
6          MS. O'DELL:  Object to the form.
7      A.  I have never con- -- thought about latency
8   in terms of looking at the most recent study and the
9   most up-to-date studies.
10     Q.  (BY MR. JAMES)  Okay.  In your report, do
11  you recall critiquing the cohort studies on the
12  basis that, in your opinion, they have short
13  follow-up and don't account for latency?
14         Do you recall that critique?
15     A.  Particularly -- particularly the Gonzalez
16  study, yes.
17     Q.  Okay.  But the -- the question that I'm
18  posing here is more general in nature.
19         Is that one of the reasons that you
20  would want to include the most recent data from a
21  cohort is to, in part, address the concern of
22  latency that you --
23     A.  The longest follow-up possible.
24     Q.  Okay.  We will turn to the Berge study,

57 (Pages 222 to 225)

Ellen Blair Smith, M.D.

Page 226

1    which you previewed for us, Dr. Smith, and I will
2    hand you a copy, if I haven't already.
3            MR. JAMES: I'm gonna mark Berge,
4    B-e-r-g-e, as Exhibit 24.
5            (Deposition Exhibit 24 marked for
6            identification.)
7    Q. (BY MR. JAMES) Dr. Smith, I've handed you
8    the Berge paper.
9        And this is a paper you have seen
10    before, correct?
11    A. It is.
12    Q. And as you just discussed, you acknowledge
13    it's not discussed in your report, correct?
14            MS. O'DELL: Objection to form.
15    Q. (BY MR. JAMES) Or I'll -- I'm going to
16    rephrase. I know -- I --
17    A. I have cited it --
18    Q. -- I can correct that.
19        You cited it for a publication bias
20    point, correct?
21    A. I don't -- I'd have to look where I cited
22    it.
23    Q. Okay.
24    A. I -- it's missing from here. Yeah.

Page 227

1    Q. Do you agree that you haven't discussed
2    the Berge study in-depth in your report?
3    A. Correct.
4    Q. And that was a -- what you were alluding
5    to earlier as a mistake and omission. Fair?
6            MS. O'DELL: Objection to form.
7    A. Correct.
8    Q. (BY MR. JAMES) What are your thoughts on
9    the Berge study?
10    A. Again, it -- it -- it uses Gates instead
11    of Gertig. It has very similar findings to
12    Penninkilampi. If you look at his forest plot, he
13    looks at the cohort studies: Gates, Houghton,
14    Gonzalez, nurses, women, sisters. Again, they are
15    not statistically significant on their relative risk
16    and confidence intervals.
17        And yet in inclusion with the entire
18    population, his numbers are very similar to
19    Penninkilampi with an overall relative risk slightly
20    lower of 1.22 versus Penninkilampi is 1.31;
21    confidence intervals 1.13 to 1.30 for Berg remains
22    statistically significant as Penninkilampi 1.24 to
23    1.39.
24    Q. Do you -- Doctor, are you finished?

Page 228

1    A. I was looking for something, but go ahead
2    and talk.
3            MS. O'DELL: Excuse me. I think --
4    let me get -- I think maybe -- do you have part of
5    the table missing from your version?
6            THE WITNESS: There's -- yeah, there's
7    a table that I'm used to around here.
8            MR. JAMES: Do you have a better copy,
9    Leigh?
10            THE WITNESS: Let me see.
11            MS. O'DELL: Is it an eTable?
12            THE WITNESS: No, I think it's just
13    the copy . . .
14            MR. JAMES: That's all I have.
15            THE WITNESS: Oh, yeah. No. I don't
16    know. Yeah, this is my copy.
17            MR. JAMES: Okay. Let me see.
18        And Mr. Klatt has handed me some
19    better copies as well, if anybody needs a better one
20    as well.
21            MS. O'DELL: Thank you.
22            MR. JAMES: And at the break, I will
23    resticker.
24            THE WITNESS: Yeah, it's Table 2 on --

Page 229

1    here it is.
2    A. Table 2 on page 6 where Penninkilampi -- I
3    am becoming buried -- found invasive serous.
4        So first, I'm gonna give you
5    Penninkilampi's statistically significant increase
6    rate invasive serous cancer with genital talc use.
7    Penninkilampi's numbers are overall risk 1.25,
8    confidence interval 1.01 to 1.55.
9            Berg -- Berge is 1.24, confident
10    intervals 1.15 to 1.34.
11        So this is why I told you from
12    comparing these two papers that Gertig versus Gates,
13    when you look at all the same body, it's six of one
14    half-a-dozen of the other, the inclusion of which of
15    those two post -- his studies in meta-analyses.
16    Q. (BY MR. JAMES) But you have already
17    agreed with me that it would have been better for
18    Penninkilampi to included the Gates 2010 data,
19    correct?
20            MS. O'DELL: Objection to form.
21    A. I like using the most recent study.
22    Q. (BY MR. JAMES) And that's EPI 101, isn't
23    it?
24            MS. O'DELL: Objection; form.

58 (Pages 226 to 229)

Ellen Blair Smith, M.D.

Page 230

1    A.  That's everything 101.
2    Q.  (BY MR. JAMES)  And we see here in the
3  Berge paper if we look at the conclusions in the
4  abstract, the very last sentence of the paper, the
5  authors conclude, quote -- and I'm at the very first
6  page of the paper in the abstract -- they conclude,
7  quote, "The heterogeneity of results by study
8  design . . . however, detracts from a causal
9  interpretation of the association."
10    A.  I think I'm in the wrong place.
11        MS. O'DELL:  What page are you on?
12        MR. JAMES:  The abstract.
13    A.  The heterogeneity.
14    Q.  (BY MR. JAMES)  Dr. Smith, I think your
15  scarf is covering your mike.
16    A.  I'm sorry.  Nope.  I broke it.
17        THE VIDEOGRAPHER:  Okay.  We need to
18  go off the record.
19        MR. JAMES:  Okay.  Off the record.
20        THE VIDEOGRAPHER:  Okay.  Off the
21  record.  The time is 3:41 p.m.
22        (A recess was taken from 3:41 p.m.
23        to 4:13 p.m.)
24        THE VIDEOGRAPHER:  Back on the record.

Page 231

1  The time is 4:13 p.m.
2    Q.  (BY MR. JAMES)  And, Dr. Smith, when we
3  broke, we were discussing the Berge study, correct?
4    A.  Yes.
5    Q.  And so I'm gonna -- I think that when we
6  broke I was pointing you toward the abstract portion
7  of the patient -- paper.
8    A.  Correct.
9    Q.  Okay.  And do you see there at the bottom
10  of the abstract the authors there conclude, quote,
11  "The heterogeneity of results by study design and
12  the lack of a trend for duration and frequency of
13  use, however, detract from a causal interpretation
14  of this association," close quotes?
15    A.  That --
16        MS. O'DELL:  Object to form.
17    A.  That was their assessment.
18    Q.  (BY MR. JAMES)  Okay.  And your litigation
19  opinion differs from the causal conclusions reached
20  by these authors, correct?
21        MS. O'DELL:  Object to the form.
22    A.  My causal interpretation is built on the
23  totality of all of these studies and the
24  biochemistry and all the literature I reviewed.  So

Page 232

1  it does differ from this individual one paper.
2    Q.  (BY MR. JAMES)  And, again, the individual
3  one paper you're here is a meta-analysis that -- it
4  is a meta-analysis, correct?
5    A.  Yes.  I have -- I have great respect for
6  this paper.
7    Q.  And we see the -- in the conclusion that
8  we just read, one of the points the authors here
9  make concerns the heterogeneity results by study
10  design, correct?
11    A.  Correct.
12    Q.  And there the authors are noting that the
13  association that appears in a subset of the case
14  control studies is not being replicated in the
15  cohorts prospective studies, correct?
16        MS. O'DELL:  Object to the form.
17    A.  Case control studies are entirely
18  different from cohort studies.
19    Q.  (BY MR. JAMES)  All right.  Let me ask my
20  question again.
21    A.  Okay.
22    Q.  Here when the authors are referring to the
23  difference in the results of the types of studies,
24  right, in this conclusion, that's what they're

Page 233

1  referring to, aren't they, when they say
2  "heterogeneity"?
3    A.  I can't -- I can't define their
4  heterogeneity.
5    Q.  Let me try again.  So here the authors
6  refer to the -- quote, "The heterogeneity of results
7  by study design," close quote.
8        Does that phrase -- do you understand
9  what they mean by that phrase?
10    A.  Do they define it further in the text?  I
11  don't remember that.
12    Q.  Let's look to page 253 of the article.
13    A.  Mine has single-digit page numbers.
14    Q.  Hum.
15    A.  Starts on page 1 and goes to page 9 --
16  oop.  Because mine's an e-Pub.  This is an e-Pub.
17        MS. O'DELL:  This is the copy I think
18  you gave.
19        MR. JAMES:  Can I see that real quick?
20        MS. O'DELL:  Yeah.
21        MR. JAMES:  Is that an e-Pub as well,
22  Leigh, on the front?
23        BY MS. O'DELL:  It --
24        THE WITNESS:  It says, "Cancer --

Ellen Blair Smith, M.D.

Page 234

1    General Cancer Position 00000."
2        MS. O'DELL: Is that the same one
3    you're looking at? It's just different page
4    numbers.
5        MR. JAMES: Um-hum.
6        MS. O'DELL: That may be the copy
7    that -- I think that's the copy that -- that Mike
8    gave us.
9        MR. JAMES: Um-hum.
10       THE WITNESS: Because on my copy, I
11   had to write down the final publication information
12   beside it.
13       MR. JAMES: Okay. I think on the next
14   break I'm gonna take a peek closer at these Berge
15   articles. I think we may still have a disconnect.
16       MS. O'DELL: Okay.
17       MR. JAMES: I'm not sure why we're
18   looking at two different versions on the same paper.
19   Here you go.
20       THE WITNESS: I have written here that
21   the final publication pages were 248 through 257 of
22   Volume 27.
23       Does that help you?
24       MR. JAMES: Sort of. So let's --

Page 235

1    let's just keep moving. Okay?
2        THE WITNESS: Okay.
3        MR. JAMES: Let's keep plowing.
4        Q. (BY MR. JAMES) The Berge authors made a
5    conclusion that the evidence was insufficient to
6    support causation, correct?
7        MS. O'DELL: Object to the form.
8        A. They say it detracts from causal
9    interpretation of this association.
10       Q. (BY MR. JAMES) And one of the items they
11   consider is the fact that the cohort data does not
12   report a statistically significant association
13   between ovarian cancer and talc use, correct?
14       A. Because they use Gates.
15       Q. Understood.
16       Would you agree that all of the
17   meta-analyses that we have looked at today and that
18   you addressed in your report are relying on a -- on
19   a similar set of data?
20       MS. O'DELL: Object to the form.
21       A. I will certainly tell you the past three
22   studies -- two to three studies we've looked at work
23   on a similar data. This is a growing body of
24   epidemiologic evidence, so each study grows in the

Page 236

1    number of studies they include.
2        Q. (BY MR. JAMES) So as time goes on and
3    more studies are performed testing the hypothesis of
4    ovarian cancer in talc, that body of literature can
5    be included in the next meta-analysis that's
6    completed, correct?
7        MS. O'DELL: Object to the form.
8        A. Correct.
9        Q. (BY MR. JAMES) You agree that the
10   meta-analyses of all of the underlying studies
11   cannot eliminate the recall bias in the underlying
12   studies?
13       MS. O'DELL: Object to the form.
14       A. In any case control study, there exists
15   the possibility of any recall bias.
16       Q. (BY MR. JAMES) And putting these studies
17   together in a meta doesn't eliminate that, correct?
18       MS. O'DELL: Object to the form.
19       A. No, it does not.
20       Q. (BY MR. JAMES) And you may recall this,
21   but the Penninkilampi study concedes that point,
22   correct?
23       MS. O'DELL: Object -- object to the
24   form.

Page 237

1        A. (No response.)
2        Q. (BY MR. JAMES) And Dr. Smith, referring
3    to page 47, the Conclusions section of the paper.
4        A. Yes.
5        Q. And we see here that the -- if you look
6    down to --
7        A. Yes.
8        Q. -- the last sentence in that column, they
9    say, "Additional epi evidence from prospective
10   studies with attention to effects of ovarian cancer
11   subtype is warranted."
12       Do you see that?
13       A. I see that.
14       Q. And so the authors here in the
15   Penninkilampi study are expressing a need for
16   additional prospective data, correct?
17       MS. O'DELL: Objection.
18       A. Correct.
19       Q. (BY MR. JAMES) We've talked already, in
20   some fashion, about the cohort studies.
21       You agree with me that the litigation
22   opinions you're offering in your report conflict
23   with the cohort studies, correct?
24       MS. O'DELL: Object to the form.

60 (Pages 234 to 237)

Ellen Blair Smith, M.D.

Page 238

1      A.  The cohort studies, with the exception of
2  Gertig and serous, showed no statistically
3  significant increase hazard ratio or relative risk
4  or standardized mortality ratio, depending on the
5  statistics they chose, hazard ratios for ovarian
6  cancer.  That is a fact.
7      Q.  (BY MR. JAMES)  You discuss the Houghton
8  study, the Women's Health Initiative study on
9  page 15 of your report.
10     A.  Yes.
11     Q.  And you include the note that -- on
12  page 15, that "No histologic information was
13  obtained."
14         Do you see that phrase in your report?
15     A.  I do.
16     Q.  Do you believe that to be correct?
17     A.  May I see the paper.
18     Q.  Yes, Doctor.
19         MR. JAMES:  I'm gonna mark the Women's
20  Health Initiative Houghton study as Exhibit
21  Number 25.
22         (Deposition Exhibit 25 marked for
23          identification.)
24         THE WITNESS:  Thank you.

Page 239

1      Q.  (BY MR. JAMES)  If we look at the study on
2  page 3, Dr. Smith.
3      A.  (Examined exhibit.)  Yes.  Table 1?
4      Q.  You're ahead of -- you're ahead of me.
5         MS. O'DELL:  Please wait for the
6  question, Dr. Smith.
7         THE WITNESS:  He said, "If we look at
8  the study on page 3."  That was a question.
9      Q.  (BY MR. JAMES)  Yes.  Yes.  Yes, page 3.
10  Page 3.  I'm getting there.
11         (Examined exhibit.)  And the study
12  states that "Associations by ovarian cancer
13  histological subtype were evaluated."
14     A.  I'm sorry.  Where are you on page 3?
15     Q.  Give me one second.  I lost it.  I'm on
16  the wrong page here.  Give me one second.
17         Dr. Smith, if we turn to page 5
18  of 6 --
19     A.  Um-hum.
20     Q.  -- we see here that there is information
21  in the Table 4 pertaining to Histology, correct?
22     A.  I see that.
23     Q.  Okay.  And do you know if this study found
24  any variation in risk by subtype?

Page 240

1      A.  They did not find any variation of risk by
2  subtype.
3      Q.  Okay.  So would you agree with me, then,
4  that that statement in your report is erroneous?
5      A.  I believe --
6         MS. O'DELL:  Object to the form.
7      A.  I believe I -- it would have been better
8  stated "No difference in risks by histologic
9  information was demonstrated."
10     Q.  (BY MR. JAMES)  Okay.
11     A.  What it stated here is wrong.
12     Q.  Are your opinions that you're offering
13  today on general causation between talc and ovarian
14  cancer histologic specific?
15     A.  With regards to mucinous ovarian cancer, I
16  have seen no -- strike that.
17         I learned how to say that.
18     Q.  That's fine.
19     A.  With a totality of the information I've
20  looked at, I do not believe talcum powder is a risk
21  factor for the development of mucinous ovarian
22  cancer.
23     Q.  Do you believe it is a risk factor for the
24  other subtypes of epithelial ovarian cancer?

Page 241

1      A.  I am certain that it's a risk factor for
2  the risk factor of serous invasive ovarian and
3  endometrioid invasive --
4         Did I say endometrial?
5      Q.  You did.
6      A.  Oh, I meant -- okay.  Let me start again.
7         I believe it is.  It -- talcum powder
8  products cause invasive serous ovarian cancer and
9  invasive endometrioid ovarian cancer.
10         I am less clear on its relation to
11  clear cell carcinoma, and I believe it is not a
12  causative agent in the development of mucinous
13  ovarian cancer.
14     Q.  And when you say you're less clear with
15  respect to clear cell, sitting here today, do you
16  offer the opinion that talc is causative of clear
17  cell ovarian cancer?
18     A.  It is -- yes, I will say that.  Because of
19  the inflammation, yes, I can say that.
20     Q.  So you're -- you say that you're less
21  clear about it, but you still feel --
22     A.  I think there's less dat- --
23         MS. O'DELL:  Let him finish his
24  question.

61 (Pages 238 to 241)

Ellen Blair Smith, M.D.

Page 242

1    Q. (BY MR. JAMES)  So you --
2         THE WITNESS:  Let him finish his
3    question.
4    Q. (BY MR. JAMES)  So you say that you're
5    less clear about clear cell, but you were still
6    comfortable stating that the evidence is sufficient
7    to conclude that talc causes clear cell carcinoma?
8         MS. O'DELL:  Objection; form.
9    A. I can say it better.  Clear cell carcinoma
10   is a less frequent histologic type, but inflammation
11   still contributes heavily to its development.  I
12   think we have fewer cases; therefore, fewer data,
13   but I think talc contributes to its development.
14   Q. (BY MR. JAMES)  And when you say
15   "contributes to its development" --
16   A. Causes.
17   Q. -- I think you --
18   A. In a legal term.
19   Q. -- are you asking -- are you saying that
20   it causes?
21   A. Causes.
22   Q. So your opinion here today is that talc is
23   causative of serous?
24   A. Serous.

Page 243

1    Q. Serous endometrioid --
2    A. Yes.
3    Q. -- and clear cell; is that correct?
4    A. Yes.
5    Q. Do you consider those three subtypes of
6    ovarian cancer to be separate diseases?
7         MS. O'DELL:  Object to the form.
8    A. If they're -- if they're poorly
9    differentiated, they are in the same type 2 ovarian
10   cancer that we talk about aggressive, metastasized
11   widely, fatal, yes.
12   Q. (BY MR. JAMES)  Do you believe that the
13   risk factor profiles for serous, endometrioid, and
14   clear cell are different or the same?
15        MS. O'DELL:  Object to the form.
16   A. They're certainly overlapping.
17   Endometriosis is generally associated more with
18   endometrioid and clear cell carcinomas, less so with
19   serous carcinomas.
20   Q. (BY MR. JAMES)  If other experts have
21   reached the conclusion that the association between
22   talc and ovarian cancer is causative -- proven
23   causative by the science only with serous and talc,
24   then you would disagree with those experts?

Page 244

1         MS. O'DELL:  Object to the form; lack
2    of foundation.
3    A. I'd love to discuss it with them.
4    Q. (BY MR. JAMES)  Do you have any quarrels
5    with the analysis on the Houghton paper?
6    A. Could you be more specific?
7    Q. Do you have any critiques, just sitting
8    here today, of the Houghton paper?
9         MS. O'DELL:  Object to the form;
10   vague.
11   A. Well, in evaluating it, I looked at
12   that it was small and -- well, it's 61,000
13   postmenopausal women.  It had a relatively short
14   follow-up of only 12.4 years.  The number of cases
15   is low, about 429, so -- I mean, it's a small, short
16   study.
17   Q. (BY MR. JAMES)  (Short pause.)
18        And do you understand that the Women's
19   Health Initiative included a question on duration?
20   A. Yes.
21   Q. Okay.  Did you factor that into
22   considering your comment on follow-up?
23        MS. O'DELL:  Object to the form.
24   A. The follow-up's still 12.4 years.  It

Page 245

1    doesn't change it.
2    Q. (BY MR. JAMES)  Does the fact that they
3    asked about duration factor into your analysis at
4    all?
5    A. It's better to ask about duration, but --
6    Q. And -- I'm sorry.
7    A. -- but it doesn't change how long the
8    study went on with the small numbers.
9    Q. And so the study, if -- by asking about
10   duration is increasing data on the -- on the time
11   period for which it's evaluating talc users,
12   correct?
13   A. Correct.
14        MS. O'DELL:  So off the mark.  I
15   object to that question.
16   Q. (BY MR. JAMES)  On page 16 of your report,
17   you state that, quote, "In my opinion, meta-analyses
18   is the most valid and reliable way to study an issue
19   like ovarian cancer," closed quote.
20        Did you see where I read that?
21   A. I see "In my opinion meta-analyses
22   provides most reliable evidence in this situation."
23        Is there another place?  That's the
24   third -- second full paragraph.

62 (Pages 242 to 245)

Ellen Blair Smith, M.D.

Page 246

1    I heard you say "valid," and I
2 don't -- I'm not seeing that word.
3    MS. O'DELL: I think you need to look
4 a bit further down the page.
5    THE WITNESS: Sorry.
6    MR. JAMES: Yeah.
7    Q. (BY MR. JAMES) It's the next paragraph.
8    Do you see that? It's the
9 lead sentence --
10    A. Yeah, okay. I'm -- okay. I'm with you
11 now.
12    Q. Okay. Is that statement confined to talc
13 or to ovarian cancer in general?
14    MS. O'DELL: Object to the form.
15    A. No. I mean, if we're looking at treatment
16 studies, we have the opportunity to do prospective
17 randomized controls trials, like the Armstrong trial
18 that's cited in here. Those are always the best
19 forms we have for treatment. We just can't do it
20 for exposure.
21    Q. (BY MR. JAMES) Here you say that you
22 consider meta-analyses to be the most valid and
23 reliable way to study an issue like ovarian cancer,
24 correct?

Page 247

1    MS. O'DELL: Object to the form; asked
2 and answered.
3    A. I think meta-analysis is most valid and
4 reliable way to study risk in ovarian cancer.
5 Perhaps the word "issue" was not the best word
6 choice.
7    Q. (BY MR. JAMES) So you believe that
8 meta-analysis is the best way to study risk factors
9 for ovarian cancer?
10    MS. O'DELL: Object to the form.
11    A. Yes.
12    Q. (BY MR. JAMES) Do you understand that the
13 literature that we have discussed today, prospective
14 cohort studies, meta-analyses, case control studies
15 commonly make the comment about the advantages
16 over -- excuse me -- the advantages of prospective
17 studies over retrospective studies?
18    A. Absolutely.
19    Q. And those studies that make those comments
20 are the studies that look at the issue of talc and
21 ovarian cancer.
22    MS. O'DELL: Excuse me. Make --
23    Q. (BY MR. JAMES) Correct?
24    A. Are you talking about --

Page 248

1    MS. O'DELL: Excuse me. Let me object
2 to form of that question and the question before.
3    MR. JAMES: A retrospective objection.
4    MS. O'DELL: Yes, that's right.
5    A. Prospective what type studies, please?
6    Q. (BY MR. JAMES) Okay.
7    A. Cohort versus randomized? Double-blind?
8    Q. So the meta-analyses, for example, that
9 you have described as the most valid and reliable
10 way to study the issue have commented in the studies
11 themselves that prospective data is a higher level
12 of evidence.
13    Did you know that?
14    A. Are you talking about cohort studies that
15 are prospective?
16    Q. Correct, prospective cohort studies.
17    A. Okay.
18    MS. O'DELL: Object to the form.
19    A. Which can be analyzed by meta-analysis as
20 well.
21    Q. (BY MR. JAMES) But the meta-analyses
22 themselves that you have cited have discussed --
23    A. Contain retrospective studies.
24    Q. Excuse me. Just one second.

Page 249

1    The meta-analyses that you have cited
2 and relied upon have discussed the fact that
3 prospective cohort studies are higher level
4 evidence.
5    Did you know that?
6    MS. O'DELL: Object to the form.
7    A. In general, I know that.
8    Q. (BY MR. JAMES) The cohorts themselves in
9 their methodology sections and discussion sections
10 talk about the fact that they are being studied
11 prospectively for the purpose of eliminating recall
12 bias.
13    Do you understand that?
14    MS. O'DELL: Object to the form.
15    A. That is one bias that can be eliminated in
16 a prospective cohort study, but they're both Level 4
17 evident epidemiologic studies which comes fourth
18 down the scale on the validity of scientific papers.
19    Q. (BY MR. JAMES) For example, the Houghton
20 study that we've looked at today says that "The
21 prospective nature of our study would eliminate the
22 potential for recall bias."
23    Would you agree with that statement?
24    A. Yes.

63 (Pages 246 to 249)

Ellen Blair Smith, M.D.

Page 250

1    Q.  The Gertig study that we've discussed
2    today says that they have prospectively examined the
3    relationship in a large cohort of U.S. women given
4    the concerns for recall and selection bias.
5         Do you understand that?
6         MS. O'DELL:  Objection to form.
7    A.  I understand that.
8    Q.  (BY MR. JAMES)  So these studies are
9    performed to address the flaws in the case control
10   studies, correct?
11        MS. O'DELL:  Object to the form.
12   A.  They are a different type of study and
13   they do account for recall bias, but they have their
14   own weakness and limitations.
15   Q.  (BY MR. JAMES)  And we've already talked
16   about today that, even in the Penninkilampi study
17   that you've discussed in your report, they conclude
18   with a note that prospective studies are warranted,
19   correct?
20        MS. O'DELL:  Object to the form;
21   misrepresents the document.
22   A.  They conclude with a note that prospective
23   studies are warranted.
24   Q.  (BY MR. JAMES)  If we look back at the

Page 251

1    Langseth study.
2         MS. O'DELL:  19.
3    Q.  (BY MR. JAMES)  Did you locate it before I
4    did?
5    A.  I got it.
6    Q.  Okay.  I'm coming behind you here.  You
7    see on page 3 --
8    A.  My -- it's not paginated, but I'm on the
9    third page.
10   Q.  Oh, thank you.  And it's actually -- it
11   should be on page 2 because there's only three
12   pages.
13   A.  Okay.
14        MS. O'DELL:  Is there a specific place
15   you want her to read?
16        MR. JAMES:  I'm still looking.
17   (Examined exhibit.)
18   Q.  (BY MR. JAMES)  Do you see in the bottom
19   paragraph where the authors there call for the --
20   A.  "Proposal; To Research Community?
21   Q.  Yes.  They call for the performance of
22   prospective studies.
23        MS. O'DELL:  Is there a specific place
24   you're pointing her to?

Page 252

1         MR. JAMES:  In that section.
2    A.  I have read this three times, and I'm not
3    seeing it.  Proposal:  To Research Community.
4    Q.  (BY MR. JAMES)  Huh.
5    A.  Are you looking at the next page, the next
6    to the last paragraph?
7    Q.  Oh.  Yes.  Thank you.
8    A.  Okay.
9    Q.  Page 3.
10   A.  Page --
11   Q.  It's the second to the last paragraph.
12   A.  I gotcha.  "While it would not be
13   reasonable"?
14   Q.  Yes, Doctor.
15   A.  Okay.  Yes, I see that.
16   Q.  Okay.  Again, they're calling there for
17   cohort studies, cohort prospective studies, correct?
18        MS. O'DELL:  Object to the
19   mischaracterization.
20   A.  Correct.
21   Q.  (BY MR. JAMES)  And we know that after the
22   Langseth 2008 paper, we did have additional cohort
23   data published, correct?
24   A.  The Gates follow-up, you mean?

Page 253

1    Q.  We had the Gates 2010 paper, correct?  The
2    Houghton WHI 2014 paper, correct?
3         Can you verbally answer, please?
4    A.  Yes.  I'm sorry.
5    Q.  And the Gonzalez 2016 prospective paper,
6    correct?
7    A.  Correct.
8    Q.  On page 16, you also remark that "The
9    cohort studies were not designed specifically to
10   look at talcum powder."
11        Do you remember making that remark?
12        MS. O'DELL:  Where are you?
13        MR. JAMES:  On page 16 of Dr. Smith's
14   report.
15        BY MS. O'DELL:  Oh, 16.
16   Q.  (BY MR. JAMES)  It's the third par- --
17   third full paragraph down.  "In my opinion"
18   paragraph.
19   A.  "In my opinion, meta-analysis is the most
20   valid and reliable way to study an issue like
21   ovarian cancer, which is relatively rare and
22   requires a long study period to detect.  The cohort
23   studies were not designed specifically to look at
24   talcum powder.  Instead, the use of talcum powder is

Golkow Litigation Services - 877.370.DEPS

Ellen Blair Smith, M.D.

Page 254

1    only one of many queries."
2        Q. And that's the question I'm asking you
3    right now.
4            So there you make the remark that
5    cohort studies were not designed specifically to
6    look at talc.
7            Is that a criticism you have of the
8    cohort studies?
9        MS. O'DELL: Objection to the --
10   object to the form; misstates what's in Dr. --
11           Go ahead, Doctor.
12       A. I don't find it particularly critical. I
13   mean, that -- they're studying lots of things.
14       Q. (BY MR. JAMES) So you do not include a
15   criticism against the cohort studies for the fact
16   that talcum powder is only one of many queries?
17       A. That is not a criticism.
18       Q. You also make the claim, and if you
19   continue on reading, Doctor, that there's a lack of
20   power in the cohort studies?
21       A. Yes.
22       Q. Okay. And what is that based on?
23           (Deposition Exhibit 26 referenced.)
24       A. The numbers. "Power" is the numbers.

Page 255

1            Steven Narod, who is a medical
2    oncologist and epidemiologist, suggests that in
3    cohort studies the critical threshold for finding --
4    because of the rarity of ovarian cancer, the
5    critical number base is 200,000.
6            Only did one cohort study, which is
7    Gates, reach 200,000.
8            Houghton -- Houghton had 61,576 women.
9            Gonzalez had only 41,654 sisters.
10           Kind of tiny and underpowered or lack
11   of power, and those are epidemiologic terms.
12       Q. Did you consider the statements in Berge
13   about the power of the cohorts?
14       A. I'd have to look at Berge again to see
15   what that was. I found it.
16           Where do you see that?
17       Q. If you look at the right column, the first
18   full paragraph.
19       A. What page, please?
20       Q. Oh, thank you.
21       A. Oh, do you have a prob- --
22       Q. It's page --
23       A. Is this your bad problem?
24       Q. Yes. We're gonna --

Page 256

1        A. Which table does it have on it? Does it
2    have Table 2 on it?
3        Q. Yeah. We're looking at page 6 --
4        A. Okay.
5        Q. -- of Table 2.
6        A. Table 2 page.
7        Q. Yes. Thanks, Doctor.
8        A. All right. Now, okay, so right-hand or
9    left-hand column?
10       Q. It's the right-hand column.
11       A. Okay. Paragraph number?
12       Q. It's the first full paragraph --
13       A. Okay, great.
14       Q. -- in the right-hand column.
15       A. Got it.
16       Q. And are you reading that paragraph?
17       A. Yes.
18       Q. Thank you.
19       A. (Examined exhibit.) He's talking about
20   heterogeneity. I don't think he's . . .
21       Q. So that -- Doctor, may I ask you a
22   question?
23       A. Certainly.
24       Q. All right.

Page 257

1            So that paragraph concludes with the
2    statement that, quote, "Low power of cohort studies
3    cannot be invoked as explanation of the
4    heterogeneity results," closed quote, correct?
5        A. I am -- I agree with you that that is what
6    it says.
7        Q. Okay.
8        A. I cannot agree to that interpretation.
9        Q. Have you performed your own power
10   calculations in this case?
11       A. I have not.
12       Q. Okay. Do you have any reason to disagree
13   with the power calculations set forth in the Berge
14   paper?
15       MS. O'DELL: Object to the form.
16       A. The data from the Narod paper.
17       Q. (BY MR. JAMES) Do you have any other
18   basis upon which you would disagree with the Berge
19   power calculations?
20       A. No.
21       Q. On page 16 of your report, you discuss a
22   range by which you believe the risk of ovarian
23   cancer is increased by way of talc use, and you
24   conclude that it is a 20 to 50 percent range.

65 (Pages 254 to 257)

## Ellen Blair Smith, M.D.

Page 258

```
1            Do you see where I am?
2     A.  I know I wrote that, but -- yes, I found
3   it.
4     Q.  Super.
5         It's in the paragraph --
6     A.  Right.
7     Q.  -- above Mechanisms?
8     A.  Right.
9     Q.  Where do you get that range from?
10    A.  Smith-Bindman.  I don't think I -- I --
11  okay.  So over all the studies, the meta-analyses,
12  they ran from a 1.2 to a serous subtype 1.5.
13        In that range, it -- that would be a
14  50 -- 20 to 50 percent increase in ovarian cancer.
15    Q.  In the course of answering that question,
16  did you reference Smith-Bindman?
17    A.  Yeah, at the time I wrote this report, I
18  hadn't seen her individual analysis, so I couldn't
19  have had that information when I wrote this.  I have
20  seen it subsequently.
21    Q.  When you did look at that report?
22    A.  Her deposition.  Probably, I don't know, a
23  week-and-a-half ago, week ago.  The days are running
24  together.  Maybe as much as two weeks ago.  I don't
```

Page 259

```
1   remember it in relation to Christmas.
2         MS. O'DELL:  Do you remember -- do --
3   are you referring to her report?
4     A.  Is that her report?  Oh, yes, it's not her
5   deposition.  It's her report.
6     Q.  (BY MR. JAMES)  Did you look at any other
7   expert reports in this litigation that we haven't
8   discussed today?
9     A.  I have seen Plunkett.
10    Q.  Okay.  Any others?
11        MS. O'DELL:  Other than the ones we've
12  talked about previously.
13    A.  Crowley, Longo.  None of the GYN
14  oncologists.  I can't think of any other.
15    Q.  (BY MR. JAMES)  Do you know why you were
16  provided the Smith-Bindman report?
17    A.  Can I tell you why I enjoyed it?
18    Q.  No.
19        Do you know why you were provided it?
20    A.  I suppose the lawyers wanted me to read
21  it.
22    Q.  Did you ask for it?
23    A.  No.
24    Q.  Did you ask for the report from
```

Page 260

```
1   Dr. Plunkett?
2     A.  No.
3     Q.  Those reports that you are provided in
4   this case were selected for you by plaintiffs'
5   counsel, correct?
6         MS. O'DELL:  Object to the form.
7     A.  Those two reports.
8     Q.  (BY MR. JAMES)  So to opine that there's a
9   20 to 50 percent increased risk for ovarian cancer
10  by way of talc use, you said that you -- how did you
11  get to the 50 percent again?
12    A.  That was a high limit in serous in
13  Gerrig --
14    Q.  In Gertig?
15    A.  -- Gertig.  In Gertig.
16        The low range was 1 point.  I think
17  it's 22 or 21.  So I put that range.
18    Q.  And do you have any opinion about where
19  the risk actually falls in that range?
20        MS. O'DELL:  Object to the form.
21    A.  Let's say it's 20 percent.  Let's look at
22  the lowest possible increase in risk.  And let's
23  look at the percentage of women who use talc.
24        We -- when you use various parameters
```

Page 261

```
1   such as Narod did, you're going to come up with
2   hundreds of lives interrupted by ovarian cancer.  So
3   even a 20 percent increase is amazingly clinically
4   significant and severe.
5     Q.  (BY MR. JAMES)  Dr. Smith, with due
6   respect, that wasn't the question that I asked you.
7     A.  Okay.
8     Q.  My question to you is:  You've cited in
9   your report a range of a 20 to 50 percent increased
10  risk of ovarian cancer, correct?
11    A.  Yes.
12    Q.  And my question is:  Do you have an
13  opinion about where -- a more precise opinion about
14  where the risk actually falls in that range?
15        MS. O'DELL:  Object -- object to
16  the --
17    A.  I --
18        MS. O'DELL:  -- form.  The report
19  speaks for itself.
20    A.  I think that range encompassed what the
21  truth is.  I don't know an exact number that I can
22  give you.
23    Q.  (BY MR. JAMES)  And when you answered my
24  question in discussion about the 20 percent
```

Page 262

```
1   increased risk . . .
2      A.  I was giving you the lowest number.
3      Q.  And you answered my question -- in the
4   manner that you answered my question, that's with
5   the assumption that it is a real increased risk,
6   correct?
7         MS. O'DELL:  Object to the form.
8      A.  Correct.
9      Q.  (BY MR. JAMES)  On page 16 and 17 of your
10  report, you include a discussion of migration?
11     A.  Yes.
12     Q.  And you include the phrase that it is,
13  quote, "universally accepted," close quote, by the
14  gynecological community --
15     A.  Correct.
16     Q.  -- that "the female genital tract
17  functions as a conduit for foreign material to enter
18  the peritoneal cavity."
19        Do you see where I was reading?
20     A.  I see exactly where it's reading.
21     Q.  On what basis do you support your claim
22  that it is universally accepted?
23     A.  It's what we teach medical students and
24  residents.  We have the data of Egli and Sjösten
```

Page 263

```
1   and -- starts with a K -- uterine peristalsis, and
2   the Alba tubal transport dysfunction literature
3   through infermil- -- infertility.  Looking at
4   nonflagellated particles that go through from the
5   outside world to the peritoneal cancer -- peritoneal
6   cavity via the vagina, cervix, uterus, fallopian
7   tube, peritoneal cavity.
8         We certainly have all the
9   bacteriologic information from chlamydia.  Looking
10  at the shot we have all the information --
11  consistent information on decreasing incidence of
12  ovarian cancer with tubal ligation, with
13  hysterectomy that blocks that open channel.
14        This is -- this is universally
15  accepted in my gynecologic/obstetric population.
16  I've seen it cited in the FDA without footnote.
17  It's kind of like the sun's gonna rise tomorrow and
18  things get from the outside world to the peritoneal
19  cavity through the patent genital tract of a woman.
20     Q.  Do you believe it's universally accepted
21  that talc is one of the foreign materials that can
22  migrate through the genital tract?
23     A.  I believe it is.  It's a particulate.
24  It's in the range of all the particles that -- that
```

Page 264

```
1   have gone from outside to inside.
2      Q.  We've talked about the IARC today,
3   correct?
4      A.  Yes.
5      Q.  Do you know that the IARC has called the
6   evidence concerning migration to be relatively weak?
7      A.  May I see that statement?
8      Q.  I'm asking you if you're familiar with it?
9      A.  I don't remember that statement.
10     Q.  You referenced the FDA statement on
11  migration.
12        What are you referring to there?
13     A.  I think they say it's something like
14  universally accepted or everybody acknowledges.  I
15  don't remember the exact words, but they -- they say
16  that it's what happens.
17     Q.  Do you know if the FDA statement you're
18  referring to pertains specifically to talc?
19     A.  No, it doesn't particularly -- it --
20  it . . .
21        MS. O'DELL:  If you need to see the
22  statement again, Doctor --
23        THE WITNESS:  Okay.  It should --
24        BY MS. O'DELL:  -- please take a look.
```

Page 265

```
1         THE WITNESS:  -- be on the bottom down
2   here.
3         You want to pull IARC while you're
4   there?
5         I know it's here.  It's one of the
6   early, early -- nope.  We're getting there.
7         BY MS. O'DELL:  Here you go.
8         THE WITNESS:  We're getting close to
9   it.
10        BY MS. O'DELL:  (Inaudible.)
11        THE WITNESS:  I got it.  And that's --
12  that's the petition.  Here's the FDA.
13        BY MS. O'DELL:  No, no.  That's --
14     Q.  (BY MR. JAMES)  Here, I'll see if I can
15  find somewhere.
16     A.  8?
17     Q.  Did we find the FDA letter?
18        MS. O'DELL:  Exhibit 8.
19        MR. JAMES:  Okay.  Super.
20     A.  (Examined exhibit.)  I am not finding what
21  I'm looking for.
22     Q.  (BY MR. JAMES)  You want to look on page 5
23  of the letter, Dr. Smith?  I think that's where
24  you're looking.
```

## Ellen Blair Smith, M.D.

Page 266

1    A. Oh, okay.
2    Q. And it's the third full paragraph down.
3    A. Here we go. Here we go.
4        (Examined exhibit.) Right. "The
5    potential for particulates to migrate from the
6    perineum and vagina to the peritoneal cavity is
7    indisputable."
8    Q. So that statement is not a direct
9    statement about talc, correct?
10   A. Correct.
11       MS. O'DELL: Object to the form.
12   Q. (BY MR. JAMES) You say in the section of
13   your report that you reviewed the small number of
14   articles that dispute talcum powder's ability to
15   reach the tubes and ovaries, but that you, quote,
16   "rejected those claims."
17       Do you see that passage of your
18   report?
19   A. Yes.
20   Q. What studies did you review and reject?
21   A. The one with the cynomolgus monkeys -- I
22   can't say that right, cynolugus monkeys. I know the
23   name of the author.
24   Q. Are there any other studies that --

Page 267

1    A. There's two of them.
2    Q. Sorry, Doctor.
3    A. I'm sorry. There's one with -- there's
4    one with two monkeys, and there's one with six
5    monkeys or five monkeys, about like that.
6        Anyhow, they didn't -- they put
7    particulate in the vagina. It did not transport
8    into the peritoneal cavity of these sacrifice
9    monkeys. And I apologize for spacing out on the
10   name of the author. Um --
11   Q. Are -- sorry, Doctor.
12       MS. O'DELL: Yes, go ahead. Sorry.
13   A. There's a rodent study by Wiener, Weiner
14   that did not get -- well, everything went through,
15   including the controls for black carbon and then
16   nothing went through. Let me think of the author of
17   those monkeys. Nothing went through in the next set
18   of experiments.
19       The absence of evidence is not
20   evidence of absence. The fact that it doesn't go
21   through in somebody's study is not as significant as
22   it does go through in somebody else's.
23   Q. (BY MR. JAMES) In somebody else's study?
24   A. Right. Like even the Sjösten person with

Page 268

1    talc -- I mean, not talc -- corn starch on gloves,
2    seeing those pelvic exam under anesthesia and then
3    looking for starch in the peritoneum when the ladies
4    get a subsequent hysterectomy, some of the patients
5    did not have starch particles go through, but the
6    majority did. So it doesn't have to go through
7    every time to prove a point.
8    Q. Do you believe you conducted a
9    comprehensive review of the literature relevant to
10   the issue of migration?
11   A. I do.
12   Q. Did you review all of the relevant animal
13   studies pertaining to the issue of migration?
14   A. I tried to. I know more about rat and
15   rabbit ovaries than I want to.
16       MS. O'DELL: There's no question
17   pending, Doctor. Thank you.
18   Q. (BY MR. JAMES) You discussed the tubal
19   ligation data earlier --
20   A. Yes.
21   Q. -- correct?
22   A. Yes.
23   Q. Okay. What is your view on the tubal
24   ligation data? Do you find the data there

Page 269

1    consistent or inconsistent?
2        MS. O'DELL: Object to the form.
3    A. I find it consistent.
4        MS. O'DELL: Excuse me. Sorry. Keep
5    going.
6    Q. (BY MR. JAMES) And earlier today, we
7    discussed the Terry 2013 study, correct?
8    A. Yes.
9    Q. Okay. Do you know what the Terry study
10   had to say about the tu- -- tubal ligation
11   hypothesis?
12   A. Not without looking at it. Uh-oh. I've
13   got that bad copy that's missing part of a page.
14   Q. That's a different copy, Doctor.
15   A. That's Katherine Terry.
16   Q. Oh, is it?
17   A. The first study. It's got a badly copied
18   page, so we had to go to the originals. I don't
19   know if it's on that page, but . . .
20       MS. O'DELL: I've got it here.
21   A. Oh, here. I found the -- the tubal
22   ligation paper -- chart is on a different page.
23   It's not the bad page.
24   Q. (BY MR. JAMES) And are you looking at

Ellen Blair Smith, M.D.

Page 270

1  page 819, Doctor?
2      A.  Yes.
3      Q.  Okay.
4      A.  This has in the cases with ovarian cancer
5  there was a lower incidence of tubal ligation than
6  in the controls in this study.
7      Q.  You'd agree the data of the Terry paper is
8  not supportive of the tubal ligation hypothesis,
9  correct?
10         MS. O'DELL:  Objection; form.
11     A.  In this study, the cases had a lower
12 instance of ligation than the patients with ovarian
13 cancer.  So this is not a data point in the whole
14 literature of tubal ligation and its protective
15 effects.
16     Q.  (BY MR. JAMES)  Did you discuss this
17 finding of the Terry paper in your report?
18     A.  I don't think I did.
19     Q.  Why not?
20     A.  Because I think I made a -- very broad
21 statement about tubal ligation.
22         Do you know exactly where that is?
23     Q.  Are we looking at the report or the paper,
24 Doctor?

Page 271

1      A.  I'm looking at the report on tubal
2  ligation.
3          MS. O'DELL:  I think you're looking
4  for page 3, Doctor.
5          THE WITNESS:  About what?
6          MS. O'DELL:  Page 3.
7          THE WITNESS:  Back to page 3?
8      A.  Oh, the risk?  There it is.  "Additionally
9  there are factors that are recognized as protective
10 that include tubal ligation, oral contraceptive use,
11 salpingectomy, salpingo-oophorectomy, hysterectomy,
12 and breastfeeding."
13         Yes, I did not cite the Terry study.
14     Q.  (BY MR. JAMES)  And then on page 14 of
15 your report is where you include a more detailed
16 discussion of Terry, correct?
17     A.  Yes.
18     Q.  Do you include any discussion there of the
19 tubal ligation data in that setting?
20     A.  I do not.
21     Q.  In fact, you do say here that -- just for
22 all candor here, Doctor, if we look on page 14 of
23 your paper, you say that "There was no association
24 with parity, OC use, tubal ligation status, or

Page 272

1  menopausal status."
2          Do you see where I'm reading?  I'm on
3  page 14 of your report.
4      A.  I don't think -- I think it came out to be
5  not statistically significant.
6      Q.  Correct.
7          So you do have this report in here,
8  correct?
9      A.  Yeah.
10     Q.  Okay.  So the data, according to your
11 report on tubal ligation, is inconsistent, isn't it?
12         MS. O'DELL:  Object to the form.
13     A.  This single study does not support my
14 earlier station.  But again, the totality of the
15 literature on tubal ligation supports it as
16 decreasing risk factor for ovarian carcinoma and
17 even your -- some of the other things cited tubal
18 ligation.
19         MS. O'DELL:  What are you looking for,
20 Doctor?
21         THE WITNESS:  SGO and the PDQ risk
22 factors.
23         MS. O'DELL:  Uh-huh.
24         THE WITNESS:  Yeah.

Page 273

1      A.  "If a patient has her tubes tied, a tubal
2  ligation, her risk is deeply reduced."
3          "Tubal ligation benefits based on
4  solid evidence, tubal ligation is associated with a
5  decreased risk of ovarian cancer."
6      Q.  (BY MR. JAMES)  Do you find those SGO and
7  ACOG statements that you just referred to to be
8  informative about risk factors for ovarian cancer?
9          MS. O'DELL:  Object to the form.
10     A.  No.  What I found to be informative of my
11 assessment of tubal ligation is a comprehensive view
12 of all the literature on tubal ligation through
13 numerous papers and a full report that ultimately
14 was cut out of this in one of my reports in the
15 early drafts.
16         MS. O'DELL:  Don't discuss drafts.
17         THE WITNESS:  I'm sorry.
18         MS. O'DELL:  Thank you.
19         THE WITNESS:  I'm sorry.  I dropped it
20 again.
21     A.  I have completely reviewed the literature.
22 I know all the literature on tubal ligation.  You
23 have -- I mentioned earlier the -- the Cramer study
24 that shows tubal ligation increased ovarian cancer;

Ellen Blair Smith, M.D.

Page 274

1　whereas, Terry's not statistically significant, but
2　that's beta error, finding difference where none
3　exist.
4　　　　The -- the totality of the literature,
5　not just a couple of funky websites, tell me that
6　tubal ligation decreases the incidence of ovarian
7　cancer, and that is because it interrupts the
8　conduit from the outer world to the peritoneal
9　cavity.
10　　Q.　(BY MR. JAMES) Do you have the Terry
11　paper in front of you still, Dr. Smith?
12　　A.　Yes.
13　　Q.　Okay.  If we look at page 819, in the
14　right-hand column, the bottom first --
15　　　　MS. O'DELL:  Excuse me, Scott.  Can
16　you give me just a minute to get there?  I can't
17　find it.
18　　　　MR. JAMES:  Sure.
19　　　　MS. O'DELL:  Yeah.  Thank you.
20　　　　What page?
21　　　　MR. JAMES:  819, the bottom first full
22　paragraph that leads with the words, "The biological
23　plausibility."
24　　A.　Um-hum.  I'm there.

Page 275

1　　Q.　(BY MR. JAMES) Do you see where I am?
2　　A.　Yes, I am.
3　　Q.　Okay.  If you drop down about halfway
4　through that paragraph --
5　　A.　Uh-huh.
6　　Q.　-- the article states, quote,
7　"Talc-containing powders are hypothesized to promote
8　cancer development by ascending the female genital
9　tract and interacting directly with the ovarian
10　surface epithelium leading to local inflammation."
11　　A.　Correct.
12　　Q.　Do you agree with the Terry
13　characterization of that?
14　　　　MS. O'DELL:  Would you mind reading
15　the full sentence, please?
16　　A.　"Talc" --
17　　　　MS. O'DELL:  Excuse me.  Not you.
18　　　　THE WITNESS:  Oh, sorry.
19　　　　MR. JAMES:  Sure.  Where did I leave
20　off, Leigh?
21　　　　MS. O'DELL:  You left off "leading to
22　local inflammation," and then you stopped.
23　　Q.　(BY MR. JAMES) Okay.  "Characterized by
24　increased rates of cell division, DNA repair,

Page 276

1　oxidative stress, and elevated and inflammatory
2　cytokines."
3　　　　Do you see that per- -- that sentence
4　that I read?
5　　A.　I do.
6　　Q.　Okay.
7　　A.　Yes.
8　　Q.　Do you agree with the Terry authors that
9　that is a hypothesis?
10　　　　MS. O'DELL:  Objection to form.
11　　A.　Yes.  I think at the time this was
12　written . . .
13　　　　Yes, I think that is a hypothesis that
14　many people have drawn and is drawn in this paper.
15　　Q.　(BY MR. JAMES) Dr. Smith, with respect to
16　your report section that discusses NSAIDs.  So I'm
17　moving on.
18　　A.　Yes.
19　　　　MS. O'DELL:  Hey, Scott, if you're
20　moving on to another topic, can we take a short
21　break?
22　　　　MR. JAMES:  Absolutely.
23　　　　MS. O'DELL:  Thank you.
24　　　　THE VIDEOGRAPHER:  Going off the

Page 277

1　record.  The time is 5:17 p.m.
2　　　　(A recess was taken from 5:17 p.m.
3　　　　to 5:37 p.m.)
4　　　　THE VIDEOGRAPHER:  This marks the
5　beginning of Disk 3 -- excuse me, Disk 4.  Back on
6　the record.  The time is 5:37 p.m.
7　　Q.　(BY MR. JAMES) Dr. Smith, are you aware
8　that the cohort studies that we've discussed today
9　have also considered the migration hypothesis by
10　considering the data on tubal ligation and ovarian
11　cancer?
12　　　　MS. O'DELL:  Object to the form.
13　　A.　I need to look at those studies for the
14　specific information.  May I retrieve them?
15　　Q.　(BY MR. JAMES) Sure.  If I --
16　　A.　Nope.
17　　Q.　If I can refer you first to the Houghton
18　WHI study.
19　　A.　Sure.  Okay, Gates.
20　　　　I need Gertig and I -- have you given
21　me Gonzalez?
22　　Q.　We have not marked Gonzalez.
23　　A.　Okay.  Then I will not look for it.
24　　　　(Examined exhibit.)  Yes.

## Ellen Blair Smith, M.D.

Page 278

1    Q.   Okay.  So are you aware that the cohorts
2    also included data on that hypothesis?
3              MS. O'DELL:  Object to the form.
4    A.   Now I am, yes.
5    Q.   (BY MR. JAMES)  Did you cite that data in
6    your report?
7    A.   I did not.
8    Q.   Earlier you discussed that in
9    acknowledging the Terry finding on tubal ligation
10   that you had considered the entire body of
11   literature, correct?
12             MS. O'DELL:  Object to the form.
13   A.   Yes.
14   Q.   (BY MR. JAMES)  And that's one of the
15   reasons that you discounted the Terry finding on the
16   tubal ligation migration issue, correct?
17             MS. O'DELL:  Object to the form.
18   A.   I didn't discount it.  I think the
19   preponderance of all the literature on tubal
20   ligation overpowers a single or two or three reports
21   that do not find tubal ligation important, either
22   not statistically significant or impair prognosis --
23   increase risk of ovarian cancer.
24   Q.   (BY MR. JAMES)  Would you weigh the cohort

Page 279

1    data on this issue more heavily than the case
2    controlled data on this issue?
3              MS. O'DELL:  Object to the form.
4    A.   No.
5    Q.   (BY MR. JAMES)  Would you consider the
6    data on equal footing?
7              MS. O'DELL:  Object to the form.
8    A.   I con- -- I can consider all of these
9    individual studies equally.
10             Yes.  I consider the case control
11   if -- just because it's a case control study about
12   effects of tubal ligation compared to a cohort
13   study, I don't think that weight is about pa- --
14   recall of tubal ligation.
15             There -- there are studies on women
16   recalling whether they've had a surgical procedure
17   to end their fertility and they're pretty accurate
18   because it's pretty important to every woman.
19   Q.   (BY MR. JAMES)  Are you aware of any
20   prospective cohort data that supports the tubal
21   ligation migration hypothesis?
22             MS. O'DELL:  Object to the form.
23   A.   I cannot give you one off the top of my
24   head.

Page 280

1    Q.   (BY MR. JAMES)  And you didn't discuss any
2    of that data in your report, correct?
3    A.   I did not.
4    Q.   Discussing now where we left off,
5    Dr. Smith, the data on NSAIDs.
6    A.   Yes.
7    Q.   In your report, you acknowledge the
8    literature on NSAIDs and ovarian cancer risk as
9    inconsistent, correct?
10   A.   Yes.  And in its totality.
11   Q.   And earlier in your report when you list
12   what you considered to be generally accepted
13   protective factors, you do not list NSAIDs, correct?
14   A.   Correct.
15   Q.   Is that because you believe that it's not
16   generally accepted that NSAIDs apply a protective
17   effect for ovarian cancer?
18             MS. O'DELL:  Object to form.
19   A.   I don't think we have found the right
20   anti-inflammatories because I don't think we, as a
21   scientific community, do not understand the critical
22   points in inflammation and carcinogenesis and
23   disease progression.
24             So I believe in the future -- and I

Page 281

1    think this is critical -- in the future in
2    laboratory studies when we discern the actual
3    mechanisms of carcinogenesis, enzyme changes,
4    reactive oxygen species, DNA damage, aneuploidy,
5    malignancy, that we will be able to affect
6    inflammation and interrupt it in a -- in a very
7    progressive, protective way.  I think that's coming,
8    and it's gonna come out of the lab.
9    Q.   (BY MR. JAMES)  Is it fair to say that
10   we're not there yet?
11   A.   We're not there yet.
12   Q.   Are you aware, as of today, with
13   doctors -- a doctor following a standard of care to
14   prescribe NSAIDs to decrease ovarian cancer risk?
15   A.   Not in ovarian cancer.
16   Q.   Would you agree that some types of
17   inflammation don't increase cancer risk?
18             MS. O'DELL:  Object to the form.
19   A.   I can think of examples of an acute single
20   inflammation episode that's been studied and not had
21   long-term cancer effects, but I think what we know
22   about cancer is that it is chronic inflammation,
23   repeated insult, the snowballing of the inflammatory
24   cascade inducing enzyme, changes reactive oxygen

Ellen Blair Smith, M.D.

Page 282

1  species, reactive nitrogen species and ultimately
2  DNA alteration, inducing driver mutations and
3  starting this thing going and then causing it to
4  progress.
5       Q.  (BY MR. JAMES)  Do you believe rheumatoid
6  arthritis is associated with cancer?
7       A.  I have not reviewed that literature, and I
8  cannot comment on that.
9       Q.  Can you think of any inflammatory
10 conditions, as you sit here today, that are not
11 associated with cancer?
12      A.  That are not associated with cancer?
13      Q.  Correct.  Correct.
14         MS. O'DELL:  Object to the form.
15      A.  I haven't studied all inflammatory
16 conditions.
17      Q.  (BY MR. JAMES)  Did you look for
18 genotoxicity studies in conducting your review in
19 this case?
20      A.  Yes.
21      Q.  Okay.  Did you review any?
22      A.  Yes.
23      Q.  Which ones?
24      A.  There is an article on nanoparticles and

Page 283

1  talc.  There is -- and I cannot remember the name of
2  the author for the life of me.  I can see the
3  heading and there is a growing body of evidence on
4  the role inflammation plays in the development of
5  ovarian cancer.
6         And their initial papers are more
7  about oxidative stress in the pathogenesis of
8  ovarian cancer.  A group at Wayne State University
9  have been looking at this for several years.
10      Q.  Do you know Dr. Saed?
11      A.  I have never met him.  I've just read his
12 stuff.
13      Q.  Had you read his papers before you were
14 retained as an expert in this litigation?
15      A.  Yes.
16      Q.  You had read his papers?
17      A.  Yes.
18      Q.  When did you read his papers?
19      A.  Just in the course of -- he's presented at
20 SGO before.
21      Q.  Do you know when?
22      A.  I know he -- oh, I know he had an abstract
23 in '17.  I think he's been there before that.  And
24 then I went deep diving into his paper after I was

Page 284

1  asked to review his literature.
2       Q.  Do you know anything about his connection
3  to this litigation?
4       A.  Yes, I do.
5       Q.  What do you know?
6       A.  I know that I suggested to Dr. Thompson
7  that she get in touch with him and start reading his
8  literature.
9       Q.  So were you the first point of contact
10 between plaintiffs' counsel and Dr. Saed?
11      A.  I was the name.  I was the person that
12 gave them his name.
13      Q.  And how did you know Dr. Saed again?
14      A.  I don't know him.  I just read his papers.
15      Q.  How did you become --
16      A.  I think they're good.
17      Q.  How did you become familiar with him or
18 aware of him, just through his papers?
19      A.  Through his papers and looking at
20 inflammation in ovarian cancer and reading GY --
21 he's published in GY Oncology before.  I just knew
22 his paper.  Maura Fletcher [sic, Nicole] who's in
23 his lab, I think I saw her papers first.
24      Q.  Do you know Fletcher?

Page 285

1       A.  I don't know any of them.  I don't know
2  anybody in -- I don't know where Wayne State is.
3  It's in Michigan somewhere.  I don't know anybody
4  there.
5       Q.  Do you know if plaintiffs' counsel had a
6  litigation relationship with Dr. Saed before you
7  identified Dr. Saed as someone they should contact?
8       A.  I don't know if they did, but they may
9  have.  I don't know that.
10      Q.  Do you know anything about the funding of
11 his studies?
12      A.  I do not.
13      Q.  And when were you retained in this
14 litigation, it was 2017?
15      A.  January of 2017 was the first time that
16 they asked me to look at the literature.
17      Q.  I looked at your references in your
18 materials considered list.  I didn't see reference
19 to an Endo-Capron study.
20         Does that title ring any bells with
21 you, Endo-Capron?
22      A.  I don't -- it does not ring any bells.
23      Q.  If that study and a body of other studies
24 on genotoxicity are not listed in your references

72 (Pages 282 to 285)

Ellen Blair Smith, M.D.

Page 286

1    list or your materials considered list, may I
2    assume, then, that you didn't review those studies?
3         MS. O'DELL:  Excuse me.  I object to
4    the question.  I think it's vague.  If there's a
5    specific study you want to ask her about, then you
6    know she's happy to review it and comment if you ask
7    her questions, but to the degree you've referenced,
8    quote, "a body of literature," that may not be the
9    way Dr. Smith is aware of it.
10        I object to the question.
11        MR. JAMES:  Speaking objection is
12   noted.  You can answer the question.
13        MS. O'DELL:  Objection is noted.
14        MR. JAMES:  Your speaking objection is
15   noted.  That you've been speaking all day.  So thank
16   you.
17        A.  Could you ask the question again?  I'm so
18   lost.
19        Q.  (BY MR. JAMES)  Okay.  Let's start with
20   the Endo-Capron study.
21        If the Endo-Capron study is not listed
22   in your materials considered or reference list, then
23   may I safely presume that you did not review that
24   study?

Page 287

1         MS. O'DELL:  Objection.  It goes to --
2         A.  Do you know who the author is?
3         MS. O'DELL:  Excuse me.  Excuse me.
4    Object to the form.
5         A.  I mean, do I know -- would I know it by an
6    authors' name or another name of Endo-Capron?
7         Does it stand for something?
8         Q.  (BY MR. JAMES)  If you have not listed the
9    study in your references or materials considered
10   list, then may I assume or presume that you did not
11   review that study?
12        MS. O'DELL:  Object to the form.
13        A.  I don't recognize that study.  I --
14   with -- I can't give you more information.
15        MS. O'DELL:  It's --
16        Q.  (BY MR. JAMES)  If you have reviewed --
17        MR. JAMES:  This is a very simple
18   question, Leigh.
19        Q.  (BY MR. JAMES)  If you have reviewed a
20   piece of literature, whether you've cited it,
21   considered it, or referred to it, it would be listed
22   somewhere in your references list or your materials
23   considered list, correct?
24        MS. O'DELL:  Objection to form.

Page 288

1         A.  I would presume so.
2         Q.  (BY MR. JAMES)  Are you aware of any
3    studies that have reported inflammation, granulomas,
4    or foreign body reactions in the ovarian tissue of a
5    woman following her usage of talcum powder products?
6         MS. O'DELL:  Object- --
7         A.  I --
8         THE WITNESS:  Sorry, were you saying
9    something?
10        MS. O'DELL:  Give me just a moment
11   here.
12        A.  I know of -- I do not know of a human
13   study with talc related granuloma.
14        Q.  (BY MR. JAMES)  With respect to your
15   Bradford Hill analysis, Dr. Smith, we have covered a
16   lot of that along the way today, and so I'm going to
17   jump around just a little bit in hopes of moving us
18   along.  Okay?
19        A.  Okay.
20        Q.  So with regard to specificity, which is
21   one of the factors you've analyzed in your report,
22   correct?
23        A.  Yes.
24        Q.  Do you believe that factor was met here on

Page 289

1    this body of literature?
2         A.  I . . . I think the --
3         Q.  And I believe -- sorry, Doctor.
4         A.  -- body of all the work cited here
5    supports that criteria.  I don't think that's as
6    important as the consistency and the strength.
7         Q.  We have discussed strength earlier today,
8    and I don't want to replow ground that we have
9    plowed, but, in your opinion, is the criteria of
10   strength met on this body of literature?
11        A.  I believe that.
12        Q.  Can you cite any study or scientific
13   literature that characterizes the association at
14   issue as an association that is strong?
15        MS. O'DELL:  Object to the form.
16        A.  The numbers are what they are and
17   statistically significant and clinically
18   significant.
19        Q.  (BY MR. JAMES)  Can you cite to a single
20   study that characterizes the odds ratio or
21   association as strong?
22        MS. O'DELL:  Object to the form.
23        Q.  (BY MR. JAMES)  That's a "yes" or "no"
24   question.

73 (Pages 286 to 289)

Ellen Blair Smith, M.D.

Page 290

1           MS. O'DELL:  Object to the form.
2       A.  I haven't read the word "strong" in those
3   studies.
4       Q.  (BY MR. JAMES)  Do you believe the
5   criteria consistency is met?
6       A.  Oh, yes.
7       Q.  Do you acknowledge that there is an
8   inconsistency with respect to the results based upon
9   the design study -- correct?
10          MS. O'DELL:  Objection to the form.
11      A.  You mean the cohort studies?
12      Q.  (BY MR. JAMES)  Yes.  Do you acknowledge
13  that there is an inconsistency between the results
14  produced by the cohort studies as compared to the
15  results produced by the case control studies?
16      A.  Individually, but not in the meta -- not
17  with their inclusion in the meta-analyses.
18          So you're looking at individual
19  studies, but when they go into the whole stew pot it
20  becomes statistically significant and consistent.
21      Q.  And that brings us back to the word of
22  heterogeneity that we discussed a bit earlier in the
23  Berge study.
24          But do you understand that in the

Page 291

1   Berge study one of the detractors from the causal
2   interpretation was the heterogeneity between study
3   and design?
4           Do you understand that?
5           MS. O'DELL:  Object to the form.
6       A.  They didn't quantitate heterogeneity like
7   they did in the Penninkilampi study which actually
8   quantitated heterogeneity on the Newhouse Ottawa
9   Scale [sic, Newcastle], so I think it's better to
10  look at that.  And none -- none of the studies in
11  Penninkilampi had an NOS score less than 5, which
12  meant they didn't have to get rid of anything for
13  lack of -- for -- because of heterogeneity, and the
14  cohort studies were in there.  So I think we have a
15  better idea of assessment of heterogeneity in
16  that -- in that study.
17      Q.  (BY MR. JAMES)  Okay.  And my question is:
18  Do you acknowledge that in the Berge study, one of
19  the reasons the authors of that study concluded that
20  the caus- -- causal interpretation was not
21  appropriate was because of the lack of consistency
22  between study design?
23          MS. O'DELL:  Object to form.
24      A.  I agree with you that is a quote from that

Page 292

1   study.
2       Q.  (BY MR. JAMES)  We discussed already that
3   in the Penninkilampi study the finding that they
4   included in that study based upon cohort studies
5   omitted the data from the Gates 2010 study, correct?
6           MS. O'DELL:  Object to the form.
7       A.  Correct.  We have discussed that.
8       Q.  (BY MR. JAMES)  Would you agree that a
9   lack of data on dose response, in a hypothetical
10  situation, would counter against a causal
11  interpretation?
12          MS. O'DELL:  Object to the form.
13      A.  That is one of the factors that one
14  considers in determining causality.
15      Q.  (BY MR. JAMES)  Do you believe dose
16  response is met on the body of literature here?
17      A.  On the epidemiologic da- -- data, it --
18  their dose response is equivocal.  Penninkilampi
19  found dose response in the -- in the meta-analysis,
20  whereas Berge didn't.
21      Q.  Let me finish, Doctor.  I'm sorry.
22      A.  I think it's -- as I said in my report, it
23  is very difficult, even if you look at -- so many
24  studies did not look at frequency and duration.

Page 293

1           For example, Gertig, one of the cohort
2   studies is ever/never in 1982.  But many of the
3   other studies didn't look at dose, duration,
4   frequency, and how do you -- how do you establish
5   dose in pouring powder on your bottom.
6           So I -- I am not surprised that it's
7   been in the epidemiologic literature very difficult
8   to establish clear dose response curves.
9       Q.  You mentioned the Gertig study in your
10  answer, Dr. Smith.
11          And do you understand that the Gertig
12  study did look at frequency?
13      A.  I thought the Gertig study was the Nurses'
14  study, and they asked in 1982 ever/never, single
15  time, and they never queried again.
16      Q.  So you're unaware of the fact that the
17  Nurses' Health study included information on
18  frequency?
19          MS. O'DELL:  Objection; form.
20  Misstates.
21      A.  Let me look at it.  It's right on top.
22          (Examined exhibit.)  They were given
23  one assessment, no daily, one to six times a week,
24  less than once a week, on sanitary napkins, yes, no,

## Ellen Blair Smith, M.D.

Page 294

1    one time.
2          That's not -- that's not a decent
3    frequency and duration. I'm sorry. You don't know
4    how long. You ask it one time. You don't account
5    for changes in practices. That's not valid.
6        Q. (BY MR. JAMES) Do you acknowledge that
7    frequency is a valid measure of dose response?
8          MS. O'DELL: Object to the form.
9        A. It's a measure of assessing dose response.
10       Q. (BY MR. JAMES) Do you acknowledge
11   duration is a measure of assessing dose response?
12         MS. O'DELL: Object to the form.
13       A. Yes.
14       Q. (BY MR. JAMES) Are you aware that there
15   are case control studies that have looked at
16   duration and frequency and found no dose response?
17         MS. O'DELL: Object to the form.
18       A. Yes.
19       Q. (BY MR. JAMES) And, in fact, the studies
20   that -- those studies are cited in your Exhibit B,
21   correct?
22       A. These are only single case control studies
23   in Exhibit B, and I looked at dose responses. I
24   read through the studies, and they attempted to do

Page 295

1    that.
2        Q. You acknowledged that some of the dose --
3    excuse me, some of the case control studies that you
4    cited do not show dose response, correct?
5        A. I would say the majority do not show dose
6    response with a single epi case control studies.
7        Q. Did you consider the findings in the
8    studies that you cited and in other literature
9    pertaining to the use of talcum powder on condoms,
10   diaphragms, or sanitary napkins?
11       A. No.
12       Q. Why not?
13       A. Well, the good people that make condoms
14   eliminated talc exposure on condoms in the 1990s.
15   That's a very smart move.
16         And then you start breaking down sales
17   of these populations into small enough groups that
18   you lose the ability to have statistical
19   significance.
20       Q. Do you understand the number of articles
21   that you've cited and discussed in your report do
22   include -- include finding on odds ratios associated
23   with sanitary napkins, diaphragms, and condoms?
24       A. Right. And I -- and I put some of those

Page 296

1    on my Exhibit B chart in the Comments section.
2        Q. And so my question that I think I
3    originally posed is: Do you consider those findings
4    relevant to your opinions today?
5        A. They are a component of my -- of genital
6    talc use, so, yes, they are a component of my
7    opinion.
8        Q. Do you understand the data in those
9    studies does not show an association between the use
10   of talcum powder on condoms, diaphragms, and
11   sanitary napkins in ovarian cancer?
12         MS. O'DELL: Object to the form.
13       A. Most -- most studies, when you broke them
14   down, they lost -- they did not have statistical
15   significance. Your statement is correct.
16         (Discussion off the record.)
17         MR. SILVER: Could we go off the
18   record?
19         THE VIDEOGRAPHER: Going off the
20   record. The time is 6:05 p.m.
21         (A recess was taken from 6:05 p.m.
22         to 6:16 p.m.)
23         THE VIDEOGRAPHER: Back on the record.
24   The time is 6:16 p.m.

Page 297

1          MR. JAMES: Dr. Smith, thank you for
2    your time. That's all the questions I have for now.
3          THE WITNESS: Thank you.
4              EXAMINATION
5    BY MR. KLATT:
6        Q. Dr. Smith, my name is Mike Klatt --
7        A. Hi.
8        Q. -- and I represent Imerys Talc America.
9          Do you know what Imerys Talc America
10   is?
11       A. Yes.
12       Q. What are they?
13       A. They are -- own the mines from which the
14   talc is mined.
15       Q. Do you know what years they owned the
16   mines from which the talc is mined and used in the
17   Johnson & Johnson talc-based body powder product?
18       A. I know it's more recent, but I don't know
19   the exact dates.
20       Q. Do you know who owned the mines before
21   Imerys owned them?
22       A. Lusignac, which I think was J&J.
23       Q. No, Lusignac is Imerys, my client.
24       A. Oh, is Imerys. Okay.

Ellen Blair Smith, M.D.

Page 298

1  Q.  So who owned it before Lusignac and
2  Imerys?  Do you know?
3  A.  J&J, I believe.
4  Q.  Okay.  I'm gonna skip around because a lot
5  of ground's been covered today --
6  A.  Okay.
7  Q.  -- and I just have follow-ups on a bunch
8  of different areas, so --
9  A.  Okay.
10  Q.  -- I'll be skipping from subject to
11  subject, and it's pretty random here.
12      You said earlier today that you knew
13  Dr. Hal Lawrence with ACOG?
14  A.  Yes.
15  Q.  If you communicate with Dr. Hal Lawrence,
16  or anybody else outside of this litigation, on the
17  subject of talc and ovarian cancer, are you gonna
18  disclose to them that you're a paid expert for
19  plaintiffs in the litigation?
20      BY MS. O'DELL:  Object to the --
21  A.  No.
22      MS. O'DELL:  Object to the form.
23  A.  No.  And I haven't talked to Dr. Lough- --
24  Lawrence in 40 years.

Page 299

1  Q.  (BY MR. KLATT)  Okay.  But I'm just asking
2  in the future.
3  Q.  (BY MR. KLATT)  You understand that Imerys
4  tests talc of competitors.  It tests talc from mines
5  that are never used for body powder.  It tests talc
6  from portions of mines that are never used for any
7  purpose.
8      You can't tell me that any of these
9  samples ended up in Johnson & Johnson Body Powder,
10  can you?
11      MS. O'DELL:  Objection to the form;
12  misstates the evidence, misleading, mischaracterizes
13  the document.
14  A.  (Examined document.)  9-9-1975, Johnson's
15  Baby Powder anthophyllite and tremolite on the 28.
16  Q.  (BY MR. KLATT)  And do you have any proof
17  that Imerys owned the mines that that sample came
18  from at the time it was tested?
19      MS. O'DELL:  Objection.
20  A.  I don't.
21  Q.  (BY MR. KLATT)  I'm sorry?
22      MS. O'DELL:  Objection.
23  A.  I don't know when Imerys bought the mine.
24  Q.  (BY MR. KLATT)  And let's mark what you're

Page 300

1  looking at as the next exhibit, 28.  If you can
2  please, Dr. Smith, put this sticker on there.
3      (Deposition Exhibit 27 and 28 marked
4      for identification.)
5  Q.  (BY MR. KLATT)  Have you read Dr. Hopkins
6  multiday deposition where he was questioned about
7  what you're looking at right now, Exhibit 28?
8  A.  I have not read it in detail.
9  Q.  Have you read Ms. Pier's deposition where
10  she was questioned about Exhibit 27?
11  A.  I have not read it in detail.
12  Q.  Do you know that Exhibit 27 and 28 that
13  you're looking at are attorney created charts?
14      MS. O'DELL:  Objection; misrepresents
15  the record.
16      MR. KLATT:  Not at all.  It's exactly
17  what happened.
18      MS. O'DELL:  Objection.
19  A.  I have another J&J sample here from
20  3-3-87.  You want to just --
21      MR. JAMES:  Objection; nonresponsive.
22  Q.  (BY MR. KLATT)  Have you read Dr. Hopkins
23  multiday deposition that resulted in the creation of
24  Exhibit 28 --

Page 301

1      (Speaking simultaneously.)
2  A.  No.
3  Q.  (BY MR. KLATT)  -- or Ms. --
4  A.  Not in detail --
5  Q.  -- or Ms. Pier's --
6  A.  -- no.
7  Q.  -- deposition --
8      MS. O'DELL:  Let him finish.
9  Q.  (BY MR. KLATT)  -- that resulted in the
10  creation of Exhibit 27 to your deposition?
11  A.  Not in detail.
12  Q.  Do you understand that they had
13  explanations why each of those items that you're
14  looking at had nothing to do with any asbestos in
15  Johnson & Johnson Baby Powder?
16      MS. O'DELL:  Objection.
17  A.  I did not know that.
18  Q.  (BY MR. KLATT)  And if you were being
19  objective, you would weigh their explanations in
20  contrast to Dr. Longo's testimony that you're just
21  accepting at face value, correct?
22      MS. O'DELL:  Objection; misstates the
23  record.
24  A.  I think there are three different

## Ellen Blair Smith, M.D.

Page 302

1 determinations.
2    Q.  (BY MR. KLATT)  Well, you're just assuming
3 what Dr. Longo found was valid, correct?
4        MS. O'DELL:  Objection.  An expert is
5 allowed to rely on another expert.
6        You may answer the question if you
7 understand.
8        THE WITNESS:  An expert is allowed to
9 what?
10       MS. O'DELL:  To rely on the findings
11 of another expert as counsel knows.
12   A.  I have no reason to doubt Dr. Longo's
13 technique.
14   Q.  (BY MR. KLATT)  Do you know anything about
15 his technique?
16   A.  I have read it in his report, but I don't
17 remember off the top of my head.
18   Q.  Have you -- do you have any expertise
19 yourself in how to test a product to see whether
20 there's asbestos in it?
21   A.  Only in the broadest general TEM, SEM, XRD
22 case.  I don't know how to perform any of those.
23   Q.  But let's -- you would agree with me
24 that you accept -- you don't know Dr. Longo

Page 303

1 personally, correct?
2   A.  Not at all.
3   Q.  And you know nothing about his background
4 or qualifications, correct?
5   A.  I have not --
6        MS. O'DELL:  Objection.
7   A.  -- studied his CV.
8   Q.  (BY MR. KLATT)  But you were willing to
9 accept his conclusions about asbestos being in body
10 powder at face value, but you didn't even bother to
11 look at the explanations that Dr. Hopkins from
12 Johnson & Johnson or Ms. Pier from Imerys gave that
13 asbestos isn't in body powder --
14       MS. O'DELL:  Objection --
15   Q.  (BY MR. KLATT)  -- correct?
16       MS. O'DELL:  Objection to the form.
17 Misstates the record.
18   A.  I have not read their depositions.
19   Q.  (BY MR. KLATT)  If this court were to
20 determine when it examines the evidence that
21 Dr. Longo's testing does not show asbestos in
22 Johnson & Johnson Body Powder, you would have no
23 basis -- other basis to say that there is asbestos
24 in Johnson & Johnson --

Page 304

1        MS. O'DELL:  Objection.  Incomplete --
2   Q.  (BY MR. KLATT)  -- body powders, correct?
3        MS. O'DELL:  Excuse me.  Objection;
4 incomplete hypothetical.  The Court will not make
5 findings of fact.  That's a jury's job and counsel
6 knows that.
7        MR. KLATT:  Absolutely not.  This
8 court can exclude that evidence under Daubert, and
9 you know it.
10       MS. O'DELL:  That's not a finding of
11 fact, and you know that.  End of story.
12       MR. KLATT:  But they can find that the
13 methodology used is inadequate to show that there's
14 asbestos in this product.
15       MS. O'DELL:  Which is not what you
16 just said, and you know that, so it misstates the
17 process.
18       (Speaking simultaneously.)
19       MR. JAMES:  Ms. O'Dell --
20   Q.  (BY MR. KLATT)  Well, let me ask you
21 this --
22       MR. JAMES:  -- make your objections
23 and let the record proceed.
24   Q.  (BY MR. KLATT)  If the judge in this

Page 305

1 case --
2        MS. O'DELL:  The record --
3        MR. JAMES:  That's the way it's
4 supposed to work.
5   Q.  (BY MR. KLATT)  If the judge in this case
6 concludes that Dr. Longo's methodology is inadequate
7 to show that asbestos is in Johnson & Johnson Body
8 Powder, then you have no basis to say that it is,
9 correct?
10       MS. O'DELL:  Objection to the form.
11 Misstates the record.
12   A.  I'd have to think about that.
13   Q.  (BY MR. KLATT)  Are Exhibit 27 and 28 and
14 Dr. Longo's testing the only documents you're
15 relying on regarding asbestos being in Johnson &
16 Johnson Body Powder products?
17       MS. O'DELL:  Objection to form.
18   A.  No.  There is the Blount deposition
19 that --
20   Q.  (BY MR. KLATT)  Do you know whether that
21 has anything to --
22       MS. O'DELL:  Let her finish, please,
23 sir.
24   Q.  (BY MR. KLATT)  I'm sorry.  Go ahead.

77 (Pages 302 to 305)

## Ellen Blair Smith, M.D.

Page 306

1          MS. O'DELL:  Let her finish.
2      Go ahead.
3      A.  -- that identified asbestos in Baby
4  Powder, Johnson's -- the -- that she identified as
5  Johnson's Baby Powder.
6      Q.  (BY MR. KLATT)  Do you know whether that
7  Baby Powder --
8          MS. O'DELL:  Let her -- I don't think
9  she's done.
10     Q.  (BY MR. KLATT)  -- was supplied by Imerys?
11         MS. O'DELL:  I don't think she --
12  she's done.
13     A.  I haven't finished thinking.  I cannot
14  think of another example at the top of -- off my
15  head at this hour.
16     Q.  (BY MR. KLATT)  Do you know whether
17  Dr. Blount's finding of asbestos that you just
18  referred to involved talc supplied by Imerys?
19     A.  As I answered previously, I do not know
20  when Imerys assumed ownership of those mines.
21     Q.  So you can't tell the Court whether
22  Dr. Blount's testing was testing talc from Imerys or
23  not, correct?
24         MS. O'DELL:  Objection to form.

Page 307

1      A.  I cannot.
2          MS. O'DELL:  Misstates the record.
3      Q.  (BY MR. KLATT)  You're charging $600 an
4  hour; is that correct?
5      A.  I am.
6      Q.  Is that for all work you're doing in the
7  case, including testimony, whether it's in a
8  deposition or in a court of law?
9      A.  I believe there's a flat daily rate.  I'm
10  not sure about this, but I believe that a flat daily
11  rate of 800 hours in one day is only $5,000.  That
12  was an exaggeration.  I'm trying to show that I've
13  retained my sense of humor.
14     Q.  I think what you were saying is that if
15  testimony lasted all day there would be a flat rate
16  of $5,000 --
17     A.  Correct.
18     Q.  -- is that correct?
19         But if it's broken down by an hourly
20  basis, whether you're doing reading or testifying,
21  it's all $600 an hour?
22     A.  That -- I agree with that.
23     Q.  Okay.
24         MR. KLATT:  Can we go off the record

Page 308

1  for a second.  I think I'm done.  I just need to
2  look back over my notes.
3          THE VIDEOGRAPHER:  Going off the
4  record.  The time is 7:06 p.m.
5          (Ms. Brown left the room.)
6          (A recess was taken from 7:06 p.m.
7          to 7:39 p.m.)
8          THE VIDEOGRAPHER:  Back on the record.
9  The time is 7:39 p.m.
10         MR. KLATT:  I'm done with my
11  questioning, subject to any follow-up, so . . .
12             EXAMINATION
13  BY MS. O'DELL:
14     Q.  Dr. Smith, I've got a few questions for
15  you.
16     A.  Okey-doke.
17     Q.  I know it's been a long day so I'll be
18  brief.
19         You were asked a series of questions
20  about the presence of asbestos in Johnson's Baby
21  Powder and Shower to Shower.
22         Do you remember those questions?
23     A.  I remember I was asked them.
24     Q.  Good answer to not a very specific

Page 309

1  question.
2          Don't remember the specific questions,
3  but you were asked about those topics?
4      A.  Yes.
5      Q.  And let me show you what I'm marking as
6  Exhibit 29, which is Dr. Longo's report.
7          (Deposition Exhibit 29 marked for
8          identification.)
9      Q.  (BY MS. O'DELL)  Are you, in part, relying
10  on Dr. Longo's testing and his findings of the
11  presence of asbestos in historical samples of
12  Johnson's Baby Powder and Shower to Shower?
13     A.  Yes.
14     Q.  And from your review of Dr. Longo's
15  report, he found -- did he find asbestos in a number
16  of samples?
17     A.  He found --
18         MR. JAMES:  Objection; leading.
19     A.  He found asbestos in 66 percent of the
20  samples he tested.
21     Q.  (BY MS. O'DELL)  And did he test samples
22  from a time period of the 1960s into the 1990s?
23         MR. JAMES:  Objection; leading.
24         MR. KLATT:  Object to form.

Ellen Blair Smith, M.D.

Page 310

1    A.  Yes.  And memory serves the last date on
2  his report was 2000, but there was a chart that I
3  saw.
4    Q.  (BY MS. O'DELL)  Is -- is -- what other --
5  and you would defer to Dr. Longo on the testing
6  methodology that's appropriate for identifying
7  asbestos in Johnson's Baby Powder and Shower to
8  Shower?
9    MR. JAMES:  Objection; form.
10    A.  Yes.
11    Q.  (BY MS. O'DELL)  Would you also -- well,
12  strike that.
13    Did Dr. Longo also test for the
14  presence of fibrous talc?
15    A.  He did.
16    MR. JAMES:  Objection; form.
17    Q.  (BY MS. O'DELL)  Did he -- were there --
18  what do you recall about Dr. Longo's findings
19  regarding fibrous talc?
20    A.  I believe the vast majority of his samples
21  had fibrous talc.  If memory serves, there's only
22  one sample in which he could not demonstrate fibrous
23  talc.
24    Q.  And -- and you -- would you defer to

Page 311

1  Dr. Longo on the methodology that's appropriate for
2  testing Johnson's Baby Powder and Shower to Shower
3  for the presence of fibrous talc?
4    MR. JAMES:  Object to the form.
5    A.  I would.
6    Q.  (BY MS. O'DELL)  Is there other evidence
7  that you relied on in considering the question of --
8  of whether there is asbestos present in Johnson's
9  Baby Powder and Shower to Shower?
10    A.  Yes.
11    Q.  And -- and what is that evidence?
12    A.  Blount found asbestos in Johnson &
13  Johnson's Baby Powder.  Her report is in 1991.  Her
14  deposition specified that it wasn't just any talcum
15  powder; it was Johnson & Johnson's.
16    Exhibits formerly known as 28, but now
17  known as -- no.  Are you kidding?  It's 28 again --
18  showed tremolite, actinolite, and chrysotile --
19  chryso-- in Shower to Shower.
20    Do you want me to go through every one
21  of them, or just --
22    Q.  Not every one, but --
23    A.  Okay.  But Johnson & Johnson sent -- some
24  Johnson & Johnson samples had identifiable asbestos

Page 312

1  fibers.
2    And the now labeled Exhibit 27 by Pier
3  from -- deposition of Pier had Johnson & Johnson
4  sample demonstrating chrysotile and tremolite.
5    Q.  And is there also published literature
6  that -- in addition to Dr. Blount that reports
7  finding asbestos in cosmetic powders?
8    A.  Yes.  Those references are listed in the
9  very first sentence of my section on asbestos in my
10  report on page 18.
11    Q.  And are you referring to --
12    A.  Cralley.
13    Q.  Is that -- would you spell that for the
14  record?
15    A.  C-r-a-l-l-e-y is the first author.  68.
16    Do you want me to pull all these
17  studies and go through here for you?
18    Q.  No.
19    Would it be fair to say that in
20  addition to Dr. Longo's testing and the evidence
21  that you've referenced in regard to the -- to the
22  Hopkins chart and the Pier chart that there's
23  evidence in the published literature regarding the
24  presence of asbestos in talcum powder?

Page 313

1    A.  Yes.
2    MR. JAMES:  Object to form.
3    Q.  (BY MS. O'DELL)  You were also asked
4  earlier today about your review of the literature
5  regarding the causal connection between exposure to
6  asbestos and ovarian cancer.
7    Do you recall those questions?
8    A.  I do recall those questions.
9    Q.  Was your review of the asbestos and
10  ovarian cancer literature comprehensive?
11    A.  To the best of my ability.
12    Q.  And you spoke earlier about the IARC
13  monogram regarding asbestos and fibrous talc or a
14  talcum asbestiform habit 100C -- you called that?
15    A.  Yes.
16    Q.  Do you --
17    MR. JAMES:  Objection; form.
18    Sorry, Leigh.
19    MS. O'DELL:  Excuse me.
20    Q.  (BY MS. O'DELL)  Did you review all of the
21  monograph?  Let me start there.
22    A.  Yes.
23    Q.  Did you review all of the articles that
24  are referenced in IARC's comprehensive review of

Ellen Blair Smith, M.D.

Page 314

1   asbestos?
2       A.  I read them.
3       Q.  Did --
4       A.  And other studies that have come out
5   subsequent to IARC.
6       Q.  Did you attempt to review all the relevant
7   literature regarding asbestos and ovarian cancer?
8       A.  I did.
9       Q.  Is that literature included on the
10  materials considered list that I think is Exhibit C
11  of your expert report?
12      A.  I believe all those references are in
13  there.
14      Q.  Has IARC concluded that fibrous talc or
15  talc in an asbestiform habit is a known human
16  carcinogen?
17          MR. JAMES:  Object to form.
18      A.  Yes.
19      Q.  (BY MS. O'DELL)  Now, I asked you just a
20  moment ago about Exhibit C, the materials considered
21  list, the, -- the bigger list of literature that's --
22      A.  This (indicating)?
23      Q.  Yes -- included in your report.
24          And did you review the materials that

Page 315

1   are listed on Exhibit C?
2       A.  I can't promise you that I've read every
3   single word on every single study, but I have read
4   the vast majority of them.
5       Q.  Let me --
6       A.  Greater than 90 percent.
7       Q.  Okay.  Let me switch gears for a moment.
8   You were asked a series of questions today about the
9   FDA's response to the civil service petition.  That
10  was one topic.
11          Do you recall that?
12      A.  Yes.
13      Q.  If you don't mind finding that and pulling
14  it out.  I think it's right here.  It was Exhibit 8.
15      A.  Yes.
16      Q.  Do you recall that?
17      A.  Yes.
18      Q.  And if you will turn to page 5 of
19  Exhibit 8.  Just let me know --
20      A.  This is the FEC letter.
21      Q.  Yes.
22      A.  Yes.
23      Q.  And so if you'll look about a little more
24  than halfway down the page, the paragraph beginning

Page 316

1   "While there exists."
2           Do you see that?
3       A.  Yes, I do.
4       Q.  And I think you and counsel for Johnson &
5   Johnson discussed this a little earlier.  It says,
6   "The potential for particulates to migrate from the
7   perineum and vagina through the peritoneal cavity is
8   indisputable."
9           Did I read that correctly?
10      A.  You did.
11      Q.  Is that your opinion?
12      A.  Absolutely.
13      Q.  And counsel for Johnson & Johnson
14  suggested that that statement in this letter that's
15  written by the FDA did not apply to talc and talc
16  migrating through the upper genital tract.
17          Do you recall that?
18          MR. JAMES:  Object to form and object
19  to the mischaracterization.
20      A.  I recall that.
21          MS. O'DELL:  It was not a
22  mischaracterization.
23      Q.  (BY MS. O'DELL)  What does the next
24  sentence say regarding the migration of perineal

Page 317

1   talc?
2       A.  I was just getting ready to say it's the
3   very next statement that they said:  (Paraphrasing.)
4   It is, therefore, plausible that perineal talc --
5   other -- any -- they say (other particulate) can
6   reach the endometrial cavity, fallopian tubes,
7   ovaries, and peritoneum and may elicit a foreign
8   body reaction, inflammatory response, but in some
9   exposed women may progress to epithelial cancers.
10      Q.  And in terms of -- of -- of migration, let
11  me also ask you -- just keep that in front of you,
12  but I'm gonna pull out what's marked as Exhibit 19,
13  the Langseth paper.  If you see it, maybe you can
14  help me.
15      A.  Yeah.  I told you they're all messed up.
16      Q.  They -- they are.
17      A.  Here it is.
18      Q.  Okay.  Great.
19          And the -- in reference to Exhibit 19,
20  earlier, counsel for J&J suggested that the -- the
21  IARC Working Group authored this paper.
22          Do you recall that?
23      A.  I remember he -- this is from the Cancer
24  Registry of Norway and Harvard and Montreal and

Ellen Blair Smith, M.D.

Page 318

1  Stockholm and Finland.
2      Q.  So this is not an official publication
3  of -- of IARC.  Fair?
4      A.  No, it is not.
5      Q.  And if you'll -- but the authors in this
6  study, if you'll . . .
7      A.  Yeah.  I see here where they mention the
8  working group.
9      Q.  Yes.  And, in fact, the authors of the --
10  of the study, to be fair, are part of the working
11  group.  Is that . . .
12      A.  Correct.
13      Q.  And if you'll look at page 1 of Exhibit 19
14  and if you'll -- the left-hand column, the -- it's
15  the next to the last paragraph toward the end of the
16  page, does the authors of the Langseth conclude that
17  talc particles can migrate to the vagina to the
18  peritoneal cavity and ovaries?
19      A.  They document asbestos fibers -- well,
20  first they say: (Paraphrasing.)  It's known that
21  particles and fibres that enter the body can migrate
22  to distant organs.  Asbestos fibres that are found
23  in the ovaries exposed to asbestos, analogously
24  following perineal application, talc part--

Page 319

1  particles can migrate from the vagina to the
2  peritoneal cavity and ovaries.  A majority of women
3  experience retrograde menstruation.  And this
4  also -- this suggests a mechanism by which talc
5  particles can travel through the female reproductive
6  tract to the ovaries.
7      Q.  Is this part of the evidence that you
8  relied on in supporting your opinion that talc
9  particles applied to the -- to the perineal area can
10  migrate to the upper genital tract, including the
11  ovaries?
12      A.  Yes, and the research that these
13  statements are based on.
14      Q.  Yes.  And what other evidence do you rely
15  on to support your opinion that talc can migrate to
16  the ovaries?
17      A.  I have a section called "Migration" in --
18  in my report.  While I'm finding it, I'll start with
19  the multiple human studies, which I weight more
20  heavily -- or influenced me more strongly than
21  studies in rodents that have shown particulate
22  matter passing from the perineum into the peritoneal
23  cavity.
24          And -- and as I'm looking through all

Page 320

1  the studies, I will cite S-j-ö-r-s-e-n, et al., Egli
2  and Newton, et al., Hunes, Zerm- -- a Greek study
3  with the e-r.
4      Q.  Why don't you spell it for us?
5      A.  Why don't I look at my bibliography.  It's
6  gotta be the last one --
7          THE VIDEOGRAPHER:  We need to
8  change --
9      A.  -- if they're in alphabetical order.
10          THE VIDEOGRAPHER:  -- the disk, like
11  now, so if we can go off the record.
12          MS. O'DELL:  I'm sorry.  I didn't hear
13  you.
14          THE VIDEOGRAPHER:  The disk, I need to
15  change it out.  It finished a little earlier, so let
16  me swap it out.
17          MS. O'DELL:  Can she finish her answer
18  or . . .
19          THE VIDEOGRAPHER:  No because I have
20  to switch it out.  Sorry.
21          (A recess was taken from 7:56 p.m.
22           to 8:00 p.m.)
23          THE VIDEOGRAPHER:  This marks the
24  beginning of disk 5.  Back on the record.  The time

Page 321

1  is 8:00 p.m.
2      Q.  (BY MS. O'DELL)  Dr. Smith, before we had
3  to change the videographic tape, I had asked you
4  what evidence you rely on to support your opinion
5  that talc migrates from the perineum to the ovaries,
6  and you were walking us through that.
7          So why don't you just take a step back
8  and --
9      A.  Did you get the reading from Langseth on
10  the tape?
11      Q.  I think we got that.  Assume we got that
12  and then go from there.
13      A.  Okay.  So there are a number of papers
14  that look at migration of particulates.
15          First, talc was identified deeply
16  embedded in the ovaries, 1971 by Henderson.
17          Egli and Newton had flushed carbon
18  particles from the vaginal vault and that came out
19  in the peritoneal cavity.  These patients generally
20  who were coming to abdominal surgery in some period
21  of time, same day, next day, up to four days in
22  these studies.
23          And so this -- particulates would be
24  placed in the vagina, not propelled, but placed in

Ellen Blair Smith, M.D.

---

Page 322

1  the vagina, and then the peritoneal cavity was
2  entered, washed to see if those particulates are
3  there.  So Egli and Newton did carbon particles.
4           Sjösten did glove powder.
5           There are studies from K-u-n-z, looks
6  at micronized albumin particles placed in the vagina
7  that are transported.
8           There's a recent study by Zermanitokis
9  [sic] -- you have the spelling -- that looks at
10  tubal transport.  And the great thing about that
11  study is that you can pass particles and demonstrate
12  them by ultrasonography and actually live-action
13  watch them go through the tube and study tubal
14  motal- -- motility as they go towards the dominant
15  ovarian part -- particle.
16           All these particles, a wide range of
17  studies from very small particles to larger
18  particles, the majority of them are approximating
19  sperm size, which is, in length, 5 microns.
20           So I looked at all these studies and
21  conclude that migration is real.  There's -- a
22  female genital tract is the path to the peritoneal
23  cavity.
24           Dr. Woodruff gave his presidential

---

Page 323

1  address in 1979 talking about ovarian cancer
2  resulting from unknown agents transversing the
3  vagina, cervix, endometrium, fallopian tube, into
4  the peritoneal cavity, surrounding the uterus and
5  inciting ovarian cancer.
6           I think we're seeing in in vitro
7  studies in the lab, as we study inflammation in
8  ovarian cancers, we are seeing -- able to generate
9  these studies at a molecular level without hurting
10  women, but seeing what the effect of exposure to
11  talc is on normal epithelial cells, fallopian
12  tubes . . .
13      Q.  Before you get so far into that -- I'm
14  gonna ask you about that in just a moment, but let
15  me just ask one question before we leave migration.
16  It is the ability of talc applied to the perineum to
17  migrate through the -- the genital tract to the
18  ovaries.
19           Is that a hypothesis?
20           MR. JAMES:  Object to form.
21      A.  I think it is something that happens.  It
22  is -- it has been -- while I have not seen a paper
23  that demonstrates talc, per se, has been transported
24  through the internal genitalia and to peritoneal

---

Page 324

1  cavity, particulates of similar size, larger and
2  smaller, have been demonstrated to do that.  These
3  are not motile; they're not flagellated.  A particle
4  can go from outside to inside.
5           There's no reason why talc shouldn't
6  do it, and certainly we've seen talc deeply embedded
7  in the ovary suggesting that that's how it got
8  there.
9      Q.  (BY MS. O'DELL)  In fact, the evidence is
10  so strong the FDA has concluded it's indisputable.
11           MR. KLATT:  Objection to form.
12      Q.  (BY MS. O'DELL)  Has the FDA concluded
13  that it's indisputable that talc can migrate from
14  the perineum to the upper genital tract?
15           MR. JAMES:  Object to form.
16  Mischaracterizes the letter.
17           MR. KLATT:  Misstates the testimony.
18      A.  I think indisputable is the word that --
19  that Dr. Musser, deputy director for scientific
20  operations, Center for Food Safety and Applied
21  Nutrition, used in his letter to Dr. Epstein.
22           "The potential for particulates to
23  migrate from the peritoneum [sic] and vagina to the
24  peritoneal cavity is indisputable."  That's the word

---

Page 325

1  he used.
2      Q.  (BY MS. O'DELL)  Okay.  Let me ask you to
3  go back to the topic you were -- had moved on to.  I
4  just wanted to finish migration, and you were
5  talking about inflammation.
6      A.  Yes.
7      Q.  What evidence is there that talcum powder
8  causes inflammation?
9      A.  Well, when you go into -- when you go into
10  the laboratory, you don't have to use the broad
11  brush of inflammation.  You can look at specific
12  biochemical production or responses of molecules
13  involved in that inflammatory cascade.
14           So Kahn showed that nanopart --
15  nanotalc particles stabilized TNF-alpha, which is a
16  tumor necrosis factor alpha in human macrophages,
17  which is one of the steps in the inflammatory
18  cascade.
19           In fact, he found that the smaller --
20  the smaller of the pol- -- particle, the more the
21  production of unstabilization of TNF-alpha as
22  opposed to larger pol- -- particles.
23           Saed has, through the 2000s, looked at
24  ovarian cancer cell lines upregulation of

---

82 (Pages 322 to 325)

## Ellen Blair Smith, M.D.

Page 326

1  anti-inflammatory and pro-inflammatory enzymes in
2  products. And then -- and he's written -- has a new
3  book chapter on it with Nicole Fletcher and all the
4  people in his lab.
5          And then has recently had a paper
6  accepted that looks at the response of controls,
7  normal ovarian epithelium, fallopian tube
8  epithelium, normal, and three different cell lines
9  of ovarian epithelial cancer cells in response to
10 three different levels of -- of talc.
11         And looked at the production of
12 pro-inflammatory enzymes, decrease in
13 anti-inflammatory enzymes, increase in cell
14 proliferation, decrease in apoptosis, and induction
15 of single-nucleotide polymorphisms that are
16 associated with carcinogenesis.
17         Before we had one paper where a
18 researcher named Buzard had taken a memorialized
19 normal ovarian cell line, exposed it to 5 milligrams
20 per -- micrograms, I'm sorry, per milliliter to --
21 of talc, talcum powder, and this is scientific grade
22 talc, this was not Johnson's Baby Powder -- and
23 induced malignancy, as measured by the criteria of
24 lack of adherence in semi-solid auger, which is a

Page 327

1  standard of maligat -- malignancy and; yet, she
2  didn't do anything with it. She didn't
3  cytologically evaluate it. She didn't -- she just
4  said, "I made it a malignant."
5          So we have an example of malignant
6  transformation that is documented by a pretty
7  reliable basis if you query -- I can't say that, but
8  she really didn't go far with it.
9          Saed is starting to really break it
10 down, and he had a really remarkable dose response
11 in vitro to 5, 50, or 100-microgram per mil talc in
12 his changes.
13         MR. KLATT: Object to the narrative
14 answer.
15         Q.  (BY MS. O'DELL) Has -- in addition to the
16 Buzard paper you mentioned and Dr. Saed's work over
17 the last decade, have there been others that looked
18 at talc and -- in cell cult -- culture and found
19 evidence that talc produced inflammation?
20         MR. KLATT: Objection;
21 mischaracterization.
22         MR. JAMES: Join.
23         A.  Oh, Shulka. I forgot that study. That's
24 a big one. Shulka -- Shulka, S-h-u-l-k-a, looked

Page 328

1  at -- at exposed normal mesothelial cells and then
2  normal ovarian epithelial ovarian cells to both
3  asbestos and nonfibrous talc and found induction of
4  pro-inflammatory genes have -- with exposure to
5  these 2 carcinogens.
6          Here's another Saed.
7          I think that covers it pretty much.
8          Q.  (BY MS. O'DELL) You asked earlier today
9  about I think the question was -- well, let me just
10 ask it this way: Is there a regulatory body that
11 shares your view that talcum powder can cause
12 ovarian cancer?
13         MR. JAMES: Object to form.
14         A.  The Canadian EPA, CEPA, came out with
15 Health Canada, which is publishing -- is in
16 it's discussion period where they cite the
17 literature and base -- and their conclusion is that
18 talcum powders -- I can paraphrase it.
19         Do you have a copy that I can read?
20         But they say that talcum powder is a
21 significant public health risk to women from
22 perineal exposure, but I -- off the top of my head,
23 I can't remember their conclusion to read to you.
24         Q.  (BY MS. O'DELL) You also asked some

Page 329

1  questions today about the -- about ACOG.
2          Do you remember those questions about
3  ACOG and the societies --
4          A.  Um-hum.
5          Q.  -- of which you're a member?
6          A.  Um-hum.
7          Q.  What's referred to as "The Green Journal,"
8  I believe?
9          A.  It's obstetrics and gynecology. It's the
10 journal of ACOG.
11         Q.  And has -- recently have papers been
12 published regarding ovarian cancer and its -- excuse
13 me, and talcum powder causing -- well, let me strike
14 that and start over.
15         Have recently, in The Green Journal,
16 there have been a publication dealing with talcum
17 powder products causing a significant increase in
18 ovarian cancer?
19         A.  I think what --
20         MR. JAMES: Object to form.
21         A.  I think what you're referring to is, you
22 know, the end of every year they -- they review a
23 lot of topics and it's, you know, top five articles
24 in preeclampsia and top five articles in

Ellen Blair Smith, M.D.

| Page 330 |
|---|

1  endometriosis and there's Jason Wright wrote the top
2  five articles in ovarian cancer.
3       And I think -- I don't remember
4  whether they were ranked, but I know Number 4 on the
5  list was the Penninkilampi study, but that's -- I
6  don't know who decides that. I don't remember
7  reading how that was decided, but I know Jason
8  Wright wrote it.
9       Q. (BY MS. O'DELL) And is that something
10  that suggests that the -- the causal connection
11  between the use of genital talc and ovarian cancer
12  is becoming more well-known in the medical
13  community?
14       MR. JAMES: Objection to form.
15       MR. KLATT: Objection; leading.
16  Speculation.
17       A. I think both Canada Health and the flurry
18  of two publications in '18. There are other studies
19  that are ongoing and in various stage of analysis,
20  preparation, proof, shows that we're getting a lot
21  more interest in talc and its relationship to
22  ovarian cancer. And there is increasing concern in
23  the -- all over the world, but the studies I know of
24  are largely in the United States and Canada.

| Page 331 |
|---|

1       Q. (BY MS. O'DELL) Let me change topics just
2  for a minute.
3       You were asked questions throughout
4  the day, different points about the fragrance
5  chemicals that comprise the fragrance for --
6  fragrances for Baby Powder and Shower to Shower.
7       Do you recall that?
8       A. I do recall that.
9       Q. Do you -- did you -- excuse me.
10       Do you defer to Dr. Crowley on his
11  examination of the specific characteristics of those
12  fragrance chemicals?
13       A. I was getting ready to say I defer --
14  before you could finish your sentence. I defer to
15  Dr. Crowley on everything about fragrances.
16       Q. And do you -- I mean, your -- do you rely
17  on his opinions regarding the inflammatory, toxic,
18  and potential carcinogenic effect of the chemicals
19  in the fragrances for Baby Powder and Shower to
20  Shower?
21       A. Yes. I don't know anything about those
22  substances.
23       Q. You were also asked questions about the
24  heavy metals that had been demonstrated to be

| Page 332 |
|---|

1  present in talcum powder in certain periods.
2       MR. JAMES: Object to form.
3       Q. (BY MS. O'DELL) Do you rely on IARC's
4  comprehensive review of the literature regarding the
5  carcinogenicity of chromium?
6       A. Yes.
7       Q. Did you review IARC's analysis of --
8       A. Yes. I read that. That is the way I made
9  my assessment of whether or not they are toxic.
10       Q. And did you -- in the same way, did you
11  review IARC's Monograph in relation to nickel?
12       A. Yes.
13       Q. And do you rely on IARC's comprehensive
14  review of both the epidemiological literature, the
15  animal studies, and other evidence regarding the
16  carcinogenicity of nickel?
17       A. Yes.
18       Q. And --
19       A. I didn't individually pull every one of
20  their papers. I just read IARC.
21       Q. And you relied on IARC's review of those
22  materials?
23       A. Yes. I have trusted them. If they say
24  nickel is a carcinogen at specific levels, then I

| Page 333 |
|---|

1  have no intention of pulling all those papers and
2  studying them myself.
3       Q. And would the same be true of Cobalt?
4       A. Yes.
5       Q. I want to show you what I'm going to mark
6  as Exhibit 30, and this is a copy of the Berge
7  paper. It's the most up-to-date copy.
8       (Deposition Exhibit 30 marked for
9         identification.)
10       Q. (BY MS. O'DELL) So I've handed you
11  Exhibit 30. It's a copy --
12       A. Um-hum.
13       Q. It's the most up-to-date copy of the Berge
14  paper. We had discussions today at different times.
15  I think that we had different Berge publications,
16  and so I want to mark the one that has been
17  published most recently.
18       A. Okay. This is -- we have previously
19  marked the e-Pub. This is the print.
20       Q. All right. And if you'll -- I have just
21  one question.
22       You were asked today or the suggestion
23  was made to you today that in Berge the study did
24  not demonstrate a dose response.

84 (Pages 330 to 333)

## Ellen Blair Smith, M.D.

Page 334

1          Do you recall those questions?
2     A.  Yes.
3     Q.  And if you'll take a look at the next to
4  last sentence of the abstract --
5     A.  Yes.
6     Q.  -- of Berge.
7          Do you see that?
8     A.  Yes.
9     Q.  And, in fact, did Berge demonstrate a -- a
10  dose response?
11     A.  He says it's a -- which appears to be
12  limited, that -- okay.
13          "Statistically significant association
14  between general use of talc in ovarian cancer, which
15  appears to be limited to serous carcinoma was
16  suggestion of dose-response."
17     Q.  The . . .
18     A.  And he has a table of the duration
19  frequency.
20     Q.  And is that table supportive of the fact
21  that the studies show the -- a dose response or at
22  least the trending of a dose response?
23     A.  Their -- the --
24          MR. KLATT:  Objection.

Page 335

1          MR. JAMES:  Object to form.
2     A.  His results -- his relative risks are 1.16
3  for a duration.  1.05 for frequency.  They are
4  statistically significant with 1.07 to 1.26 for a
5  duration.  1.04 to 1.07 confidence intervals.  But
6  his number of risk estimates are small, 12 and 7.
7     Q.  Okay.  You . . .
8          MR. JAMES:  Leigh, if you're done with
9  Exhibit 30, may I have a look at it, please.
10          MS. O'DELL:  Sure.
11     A.  I think -- from what I've seen, it looks
12  pretty much the same.
13          MR. JAMES:  Thank you.
14     Q.  (BY MS. O'DELL)  Let me ask you to --
15     A.  Except that chart is -- oh, yeah.  It's in
16  the other one.  Down here.  I think they're the same
17  thing.
18          Go ahead.
19     Q.  Doctor, you were asked a series of
20  questions about individual patients and whether
21  talcum powder can cause ovarian cancer in an
22  individual patient.
23          Do you remember those questions?
24     A.  Generally.

Page 336

1     Q.  Yeah.  Have you been asked to look at any
2  individual patients in order to render what's
3  ter- -- referred to as a case specific opinion?
4     A.  No.
5     Q.  And is it -- would you be willing to do
6  that if asked?
7     A.  No.  I haven't thought about it.
8     Q.  Okay.
9     A.  I'd like to think about it before I accept
10  any more responsibility.
11     Q.  Yeah.
12          Does that in any way --
13     A.  At this hour -- at this hour of the
14  deposition.
15     Q.  Does that in any way undermine or change
16  your opinion that talcum powder products, Baby
17  Powder and Shower to Shower cause ovarian cancer?
18     A.  No.
19          MR. KLATT:  Objection; leading.
20     A.  It doesn't change my mind.
21     Q.  (BY MS. O'DELL)  And is that opinion based
22  on your review of the totality of the literature as
23  you've described in your report and in the materials
24  that are cited not only within the report but also

Page 337

1  Exhibit C?
2          MR. JAMES:  Object to form.
3     A.  Yes.  I -- I find the epidemiologic data
4  and the consistency is so significant, and then the
5  biochemical stuff, the skin would be coming out like
6  gangbusters.  Speaks to plausibility,
7  experimentation, mechanism, and that's just very
8  compelling.
9     Q.  (BY MS. O'DELL)  And in terms of the
10  opinions that you've expressed in your report, are
11  those opinions based on the published literature and
12  other data that you have referenced and relied on in
13  your report?
14     A.  Yes.
15     Q.  Okay.
16     A.  All of that has been published and
17  peer-reviewed.
18     Q.  Right.
19          So the degree that there's new data
20  coming out, you're not relying on sort of the hope
21  of new data in the future to reach your opinions?
22     A.  No, I think I'm willing to commit and make
23  my opinion.  I -- I feel very excited that we
24  have -- we will have opportunities as we understand

85 (Pages 334 to 337)

Ellen Blair Smith, M.D.

Page 338

1    this process, the therapeutic interventions at some
2    time.
3        Q.  You were asked questions earlier today
4    about what you had done prior to litigation and what
5    you've done post litigation in terms of informing
6    your opinions in this case.
7            Did you know that talc and asbestos
8    are inflammatory prior to becoming involved in the
9    litigation?
10       A.  Yes.
11           MR. JAMES:  Object to form.
12       Q.  (BY MS. O'DELL)  Prior to the litigation,
13   did you know, based on your understanding of the
14   medical and scientific literature, that inflammation
15   creates a pro-carcinogenesis -- excuse me,
16   carcinogenic environment?
17           MR. JAMES:  Object to form.
18       A.  Yes.
19       Q.  (BY MS. O'DELL)  Prior to the litigation,
20   did you know, based on your review of the scientific
21   and medical literature, that inflammation was a
22   mechanism for epithelial ovarian cancer development
23   and progression?
24           MR. JAMES:  Object to form.

Page 339

1        A.  Certainly the recent data is more
2    compelling, that has been postulated, and various
3    little snippets of data like some of Saed's stuff
4    and enzyme induction, stuff like that, has been
5    leading there.  It's been growing.
6        Q.  (BY MS. O'DELL)  But you were aware of
7    that --
8        A.  Yeah, prior to --
9        Q.  -- in -- excuse me.  You were aware of --
10       A.  -- prior to January of 2017.
11       Q.  Okay.
12           MR. JAMES:  Object to the form.
13       Q.  (BY MS. O'DELL)  Prior to litigation, did
14   you know that particles such as talc and asbestos
15   could migrate or be transported to the fallopian
16   tube and ovary from the perineum?
17           MR. JAMES:  Object to the form.
18       A.  Oh, yes.
19       Q.  (BY MS. O'DELL)  Prior to the litigation,
20   were you aware of scientific data and medical
21   literature demonstrating that talc as well as
22   asbestos could be exposed to the body through
23   inhalation?
24       A.  Oh, yes.

Page 340

1        Q.  Are your opinions in this case outlined in
2    your deposition today as well as the report that
3    you've provided in this case?
4        A.  Yes.
5        Q.  And every time today when you have
6    referred to talcum powder products, have you been
7    referring to Johnson's Baby Powder and Shower to
8    Shower?
9            MR. JAMES:  Object to form.
10       A.  Except when specified otherwise.
11       Q.  (BY MS. O'DELL)  Okay.  And then last
12   question.  You were asked a series of -- or maybe
13   the last question.
14           You were asked a --
15       A.  I got so excited.
16       Q.  We've got a series of questions about what
17   you tell your patients, and you --
18       A.  Um-hum.
19       Q.  -- testified that you do not tell your
20   patients presently about the increased risk of
21   ovarian cancer with perineal talc use.
22           Do you recall that?
23       A.  I do.
24       Q.  Do you treat patients with ovarian cancer

Page 341

1    at this time?
2        A.  At the end of their life.
3        Q.  Why do you not tell them about talc as
4    a -- as a cause of ovarian cancer?
5        A.  It's too late.
6        Q.  Why?
7        A.  They're dying.
8        Q.  And --
9        A.  There's nothing -- they failed all
10   therapy.  If there was adequate therapy --
11       Q.  And it would be --
12       A.  -- to reverse it, then they wouldn't be my
13   patient.
14       Q.  And it would be insensitive and wrong to
15   counsel a patient at that junction in their life --
16       A.  Um-hum.
17       Q.  -- about a risk factor that they will have
18   no effect on their --
19       A.  They can't do anything about it.  I don't
20   want to induce guilt.  The horse is out of the barn.
21           They need pain control.
22           They need nausea control.
23           They need love, support.  They need
24   their family, you know, their priest or spiritual

86 (Pages 338 to 341)

Ellen Blair Smith, M.D.

Page 342

1    leader. They need a lot of care, but they don't
2    need to be told "This happened because you used
3    powder" or, "Boy, if you hadn't" -- I don't know.
4    That'd be just dumb.
5              MS. O'DELL: I don't have any further
6    questions, Dr. Smith. Thank you.
7              I'm sure these -- one of these
8    gentlemen will have some questions.
9              MR. JAMES: We will.
10             Are we taking five, Mike?
11             MR. KLATT: Five minutes.
12             MR. JAMES: Okay.
13             MR. KLATT: We'll just need a time
14   from the videographer.
15             MR. JAMES: Okay.
16             THE VIDEOGRAPHER: So let's -- are we
17   going off?
18             MR. KLATT: We don't need to go off.
19   Just what's the time?
20             THE VIDEOGRAPHER: 32 plus 16 prior,
21   so it should be 48.
22             MS. O'DELL: So I'm not sure what
23   the -- I'm not sure what the calculation's being
24   made.

Page 343

1              MR. SILVER: Let's go off the record
2    so we can figure out the calculation because I think
3    it's different that he . . .
4              THE VIDEOGRAPHER: Going off the
5    record. The time is 8:32 p.m.
6              (A recess was taken from 8:32 p.m.
7              to 8:43 p.m.)
8              THE VIDEOGRAPHER: Back on the record.
9    The time is 8:43 p.m.
10             FURTHER EXAMINATION
11   BY MR. JAMES:
12       Q. Dr. Smith, good evening.
13       A. Hi.
14       Q. I have a few more questions for you.
15   Okay?
16       A. Okey-doke.
17       Q. Are you aware of any studies or literature
18   showing that the presence of heavy metals in
19   cosmetic talc powders increases the risk of ovarian
20   cancer?
21             MS. O'DELL: Object to the form.
22       A. I know that IARC calls those Class 1 --
23   two of them Class 1 carcinogens. I don't know how
24   much they influence the carcinogenicity of talcum

Page 344

1    powder.
2        Q. (BY MR. JAMES) Are you aware of any
3    scientific literature or studies that address
4    whether the chemicals and the fragrances of talc
5    powder cause ovarian cancer?
6        A. I do not. I defer to Dr. Crowley.
7        Q. Did you consider the body of literature,
8    looking at whether talc is associated with other
9    types of gynecological cancers?
10       A. I did not --
11             MS. O'DELL: Object to the form.
12       A. I did not even search endometrial cancer,
13   cervical cancer, vulvar cancer.
14       Q. (BY MR. JAMES) Do you believe that body
15   of literature would be relevant to the opinions
16   you're offering today?
17       A. It would be confirmatory, were it to
18   exist.
19       Q. Confirm --
20       A. I don't know if it exists.
21       Q. Sorry.
22             Confirmatory to the extent that it
23   revealed an association, correct?
24             MS. O'DELL: Object to the form.

Page 345

1        A. To the extent that it revealed an
2    association if such literature exists.
3        Q. (BY MR. JAMES) If the literature, looking
4    at the association between talc and other
5    gynecological cancers, did not support an
6    association, would that impact the opinions you're
7    offering today?
8              MS. O'DELL: Object to the form.
9        A. Probably not.
10       Q. (BY MR. JAMES) Why is that?
11       A. Because -- because of the lethality of
12   ovarian cancer, we do much better curing endometrial
13   and cervix cancer. Ovarian cancer is a real killer.
14   Not that I want anybody to get cancer.
15       Q. And I'm not sure that I understood your
16   answer.
17       A. Okay.
18       Q. So -- and it may -- and it's probably on
19   my part.
20             But you said because of the?
21       A. Lethality. Lethal.
22       Q. Lethality? Lethality. Okay.
23       A. Yeah, of ovarian cancer. It is unusual
24   to -- it's unusual to find ovarian cancer at an

87 (Pages 342 to 345)

Ellen Blair Smith, M.D.

Page 346

1    early stage. It is unusual to cure ovarian cancer.
2    We have a pretty darn good -- well, it could be
3    better. We don't cure everybody. But we have a
4    pretty good track record with curing endometrial and
5    cervical cancer. Not that I want anybody to get
6    cancer, but we need to do everything to decrease the
7    incidence of ovarian cancer.
8        Q. If your opinion is that talc causes
9    ovarian cancer, would you believe that talc would
10   also cause cervical cancer?
11       A. I don't know that information.
12           MS. O'DELL: Objection; form.
13       A. Cervical cancer -- cervical cancer, in
14   all, except extremely rare incidents such as DES
15   exposure, which thank God we've gotten rid of, is --
16   a component of cervical cancer is human papilloma
17   virus, which is a necessary but insufficient
18   carcinogen. That is, this is your cumulative -- one
19   of your cumulative examples where you've got to have
20   the one of HPV, but then you need another punch.
21   You need another factor. You can't just have HPV to
22   cause cervical cancer.
23           I -- I can't think of any research
24   that -- in influence of talc usage in cervical

Page 347

1    cancer. I don't think I've ever seen that paper.
2        Q. (BY MR. JAMES) Would you expect talc to
3    be associated with uterine cancer?
4        A. I've never seen that paper either. Taking
5    us back to Mr. -- is it Klatt? Menstruation
6    association -- I'm just -- I'm thinking, and I
7    shouldn't be thinking. I should -- I've never seen
8    that paper.
9        Q. Or body of papers, if such a body exists,
10   correct?
11       A. Or if such a body --
12           MS. O'DELL: Object to the form.
13       A. -- exists.
14       Q. (BY MR. JAMES) You would agree that if
15   talc migrates to the genital tract, that talc would
16   be exposed to tissues and organs along the way,
17   correct?
18       A. Yes.
19       Q. Okay. You discussed with your counsel
20   Exhibit Number 30, which is the most recent version
21   of the Berge paper, correct?
22       A. Yes. I have the -- I have the 24, but I
23   think this is good enough.
24       Q. And I'm gonna hand you back Exhibit 30.

Page 348

1        A. Okay. I haven't found any differences
2    between the two, except the page numbers.
3        Q. And Dr. Smith, if you could just look at
4    that abstract for me on the first page, please.
5        A. Yes.
6        Q. And you see at the bottom of the abstract
7    that -- the sentence that I asked you about earlier,
8    and discussed with you at some length, about the
9    heterogeneity issue.
10           Do you see that?
11       A. Yes.
12       Q. Okay. And you see there that the authors
13   of the Berge paper still conclude on Exhibit
14   Number 30 that a causal interpretation is not
15   warranted, correct?
16           MS. O'DELL: Objection; form.
17       A. It says, "The heterogeneity" -- they
18   didn't say it's not casual. They say the
19   heterogeneity results detract from a causal
20   interpretation, so that lowers the chance that
21   they're willing to make in a causal association. It
22   doesn't strike it out entirely.
23       Q. (BY MR. JAMES) And that language is
24   consistent with the language that we discussed

Page 349

1    earlier today, correct?
2        A. It is.
3           MS. O'DELL: Objection; form.
4        Q. (BY MR. JAMES) During counsel's
5    questions, you made references to literature or
6    studies that I think you characterized as "would be
7    coming out."
8           Is that terminology that I heard
9    correctly?
10       A. Yes.
11       Q. Okay. Are you aware of studies on the
12   talc ovarian cancer hypothesis that are works in
13   progress?
14       A. Yes.
15       Q. Okay. What are those studies?
16       A. Well, there's another epidemiologic study
17   cited in Health Canada by Traher -- Taher,
18   T-a-h-e-r, Mohamed Taher, and a whole bunch of other
19   people. That is another epidemiologic
20   meta-analysis.
21       Q. Are there any other studies that you're
22   aware of that pertain to the issues in this
23   litigation that are works in progress?
24       A. I think people all over are still actively

88 (Pages 346 to 349)

Ellen Blair Smith, M.D.

Page 350

1  looking at inflammation in all cancers at various
2  molecular levels.  Gosh.  Their group's called the
3  Cancer Genome Analysis, that's working on --
4  continues to work on ovarian cancer.  Sambucetti
5  looks on ovarian cancer with BRCA mutations.
6  Looking -- there are new papers coming out all the
7  time on other risk factors.
8      Q.  And if I may ask a very precise question
9  in hopes of moving us along.
10     A.  Okay.  Sorry.
11     Q.  That's fine.
12     A.  No worries.
13     Q.  Are you aware of any other papers that are
14  works in progress that specifically look at the
15  issue of talc and ovarian cancer?
16     A.  I have not read --
17         MS. O'DELL:  Besides the one she
18  mentioned?
19     A.  Besides the one I mentioned, I have not
20  read any other data or prepublication drafts.
21         MR. JAMES:  Okay.  That's all the
22  questions I have for now.
23         MR. KLATT:  Oh.
24         THE WITNESS:  What are we on?  10s?

Page 351

1  14, 13.  It may be down here.  11, 10.
2         MR. KLATT:  Do you -- I don't -- I'm
3  looking for the IR Asbestos Monograph.
4         THE WITNESS:  This is not it?
5         MR. KLATT:  No, I don't believe so.
6         THE WITNESS:  I mean, it's like --
7         MS. O'DELL:  I don't believe we
8  entered that yet.
9         THE WITNESS:  It's got -- this is from
10  the IR Monograph, but it is not the --
11        MR. KLATT:  Do you have the entire
12  monograph --
13        THE WITNESS:  Yes, we do.
14        MR. KLATT:  -- in one of those books?
15        THE WITNESS:  Yes, we do.
16        MR. KLATT:  Can you pull it?
17        THE WITNESS:  Second IA.
18        MS. O'DELL:  Which monograph?
19        THE WITNESS:  The --
20        MR. KLATT:  The 2012 Asbestos
21  Monograph.
22        THE WITNESS:  MC.  It's the second
23  one.  It's not that one.  It's the second IA.  Yep,
24  that's it.

Page 352

1         MR. KLATT:  Let me do this.
2         Let's just mark this, the full
3  Asbestos Monograph --
4         THE WITNESS:  Okay.
5         MR. KLATT:  -- Doctor, instead of some
6  pages.  Let's mark it as the next exhibit.
7         THE COURT REPORTER:  It should be 31.
8         (Deposition Exhibit 31 marked for
9         identification.)
10        FURTHER EXAMINATION
11  BY MR. KLATT:
12     Q.  Doctor, I'm handing you, and just verify
13  it's what you're looking at.  But this -- I'm
14  representing to you this is a copy of the 2012 IARC
15  Asbestos Monograph that's referred to your
16  report and also --
17     A.  Exactly.
18     Q.  -- referred to in your testimony multiple
19  times today, correct?
20     A.  Correct.
21     Q.  And if you would, turn to page 256,
22  please.
23     A.  (Complied.)  Getting close.
24     Q.  Are you at page 256?

Page 353

1     A.  I am.
2     Q.  Of the IARC 2012 Asbestos Monograph?
3     A.  I am.
4     Q.  I'm looking in the right-hand column, and
5  I think you looked at this language earlier today.
6         The right-hand column, the middle
7  paragraph says, "The IARC Working Group noted that a
8  causal association between exposure to asbestos and
9  cancer of the ovary was clearly established based on
10  five strongly positive cohort mortality studies of
11  women with heavy occupational exposure to asbestos,"
12  correct?
13     A.  Correct.
14     Q.  And then it cites five studies that you've
15  reviewed, correct?
16     A.  Right.
17     Q.  None of those studies involve the type of
18  asbestos that's alleged to be in Johnson & Johnson's
19  body powder products, correct?
20        MS. O'DELL:  Object to the form.
21     A.  I'd have to look at them back to look at
22  the types.  I -- I'm sorry.  I don't remember the
23  details in these studies --
24     Q.  (BY MR. KLATT)  If, in fact --

Ellen Blair Smith, M.D.

Page 354

1    A. -- at the time.
2    Q. -- those five studies involve a type of
3  asbestos that hasn't been alleged to be in Johnson &
4  Johnson's Baby Powder, then you wouldn't be reliant
5  on those, correct?
6       MS. O'DELL: Object to the form.
7  Misstates the record.
8    A. These studies are not about Johnson's Baby
9  Powder.
10    Q. (BY MR. KLATT) Exactly.
11    A. These studies are about asbestos.
12    Q. Right. And they're not even done in the
13  U.S., are they?
14    A. Some of them for sure were in the UK. I
15  can look them all up if you want.
16    Q. And they were studies of women who had
17  heavy occupational exposure to asbestos, correct?
18  That's what the IARC Monograph says?
19    A. I can -- I can look at that in more detail
20  if I find Reid or --
21    Q. No, I'm just asking you what the IARC
22  Monograph says.
23       MS. O'DELL: You're welcome to refer
24  to Reid if you'd like.

Page 355

1    A. I'd like to refer to Reid if I can find
2  it, because it's up here as evidence. Early,
3  early --
4    Q. (BY MR. KLATT) But I'm not asking you
5  about Reid. I'm asking you about the IARC
6  Monograph.
7    A. The Reid includes those studies in a
8  meta-analysis and has details on those studies that
9  will allow me to refresh my memory --
10    Q. All right. I'll withdraw --
11    A. -- about them.
12    Q. -- the question.
13       I want to focus on what IARC's saying
14  because you said earlier today you relied on IARC.
15       IARC says in Exhibit 31, Doctor --
16  IARC says in Exhibit 31 that the link to ovarian
17  cancer and asbestos is based on the studies with
18  women with heavy occupational exposure, correct?
19  That's --
20    A. Predominance, it says that. And the
21  predominoc-- -- the predominant exposure in these
22  studies, to my memory, was occupational. But I
23  believe some -- some studies were spouses and --
24  of people who were nonoccupationally exposed, and I

Page 356

1  can't remember which studies are that.
2    Q. I'm talking about the studies IARC is
3  relying on for its conclusion that ovarian cancer --
4    A. I'd like to --
5    Q. -- is related to --
6       THE WITNESS: Get me Reid, will you?
7  What is that saying on there?
8    Q. (BY MR. KLATT) The studies are cited
9  right there, Doctor.
10    A. I know. I just --
11       MS. O'DELL: She's just reading.
12    A. -- was verifying the information before I
13  give this to you.
14       (Examined exhibit.) Okay. My -- the
15  next sentence takes us where we want to go.
16       (Paraphrasing.) The conclusion
17  received these initial support from studies showing
18  women and girls with environmental but not
19  occupational exposure. I will give you that now.
20    Q. Okay. But it says the link is clearly
21  established based on the heavy occupational
22  exposure, correct?
23       MS. O'DELL: Objection to the form.
24    A. That was their initial establishment of

Page 357

1  the link.
2    Q. (BY MR. KLATT) Now, that very same IARC
3  Monograph, turn over to page 280, if you would. It
4  says there in the right-hand column about three
5  paragraphs down -- do you see where I'm reading?
6    A. Yeah.
7    Q. This very same IARC Working Group that
8  looked at asbestos says, "The association between
9  exposure to talc, potential retrograde translocation
10  to the ovarian epithelium, and the development of
11  ovarian cancer is controversial," correct?
12       MS. O'DELL: Objection.
13    A. That was their assessment based on
14  IARC 2010, which --
15    Q. (BY MR. KLATT) And this --
16       MS. O'DELL: Excuse me.
17    Q. (BY MR. KLATT) I'm sorry. Go ahead.
18    A. -- and this volume.
19       MS. O'DELL: She was not finished.
20    Q. (BY MR. KLATT) And this volume is --
21       MS. O'DELL: Excuse me.
22    A. And this volume.
23       MS. O'DELL: Let her finish, please,
24  sir.

Golkow Litigation Services - 877.370.DEPS

Ellen Blair Smith, M.D.

Page 358

1      Q. (BY MR. KLATT) Are you finished?
2      A. I am now.
3          MS. O'DELL: She was not finished, and
4  it's not gonna be clear on the record.
5          Dr. Smith, if you need to finish your
6  answer, please go ahead and do that.
7      Q. (BY MR. KLATT) I apologize. I thought
8  you were finished, and so I didn't mean to interrupt
9  you.
10         So IARC, on the one hand --
11         THE WITNESS: I said it.
12     Q. (BY MR. KLATT) -- is saying --
13         THE WITNESS: She's got it down.
14         MS. O'DELL: Okay.
15     Q. (BY MR. KLATT) I'm sorry?
16     A. The transcriptionist has what I said.
17  This -- 20 -- 93 and 100C, 2010 and 2012.
18     Q. Are what IARC cites for stating that the
19  association between exposure to talc, potential
20  retrograde translocation to the ovarian epithelium,
21  and the development of ovarian cancer is
22  controversial, correct?
23         MS. O'DELL: Object to the form.
24     A. That's what they say in probably 2011.

Page 359

1      Q. (BY MR. KLATT) So on the one hand,
2  they're saying in this monograph that the link to
3  ovarian cancer they ascertain is based on every
4  occupational exposure, but when they describe the
5  association with talc, retrograde translocation to
6  the ovaries and ovarian cancer, they don't say it's
7  clearly established at all. They say it's
8  controversial, correct?
9          MS. O'DELL: Object to the form.
10     A. I know what they say. I can read their
11  words. I would, again, disagree that retrograde
12  translocation of particulates to the ovarian
13  epithelium is not controversial based on the data
14  that I've been talking about for about half the day.
15     Q. (BY MR. KLATT) Which IARC also summarizes
16  in its 2010 talc monograph and in this monograph?
17     A. In 2010 --
18         MS. O'DELL: Objection -- excuse me.
19  Excuse me.
20         Objection. That is -- misstates her
21  prior testimony, and you know that.
22         So to the degree you understand the --
23  the question, Dr. Smith, please go ahead.
24     A. I know what they say. I know what I have

Page 360

1  facts to substantiate. They are not the same thing,
2  so I disagree with their assessment that retrograde
3  translocation to the ovarian epithelium is at all
4  controversial for any particulate.
5          I have talked about the both
6  epidemiologic and biochemical by different
7  investigators of exposure to talc in vitro and a
8  strong epidemiologic history relating talc and
9  ovarian cancer.
10         So based on what I've been talking
11  about for the past 12 hours, I disagree with this.
12     Q. (BY MR. KLATT) Okay. Well, that's what I
13  wanted to establish.
14         On the one hand, when IARC in the
15  asbestos monograph in 2012 is talking about exposure
16  to talc, translocation to the ovaries, and the
17  development of ovarian cancer, they don't say it's
18  clearly established at all.
19         They -- they, IARC, says it's
20  controversial, correct?
21         MS. O'DELL: Objection; asked and
22  answered.
23     A. They're flat wrong.
24     Q. (BY MR. KLATT) I'm asking what IARC says.

Page 361

1      A. I -- okay. We have read this sentence 14
2  times.
3      Q. Do you agree with it?
4      A. I do not agree with the statement. I
5  agree those words are printed on the paper.
6      Q. Do you agree that's IARC's position?
7      A. IARC printed those things --
8          MS. O'DELL: Objection; asked and
9  answered.
10     A. -- and said that.
11     Q. (BY MR. KLATT) Okay. Thank you.
12         And they cite their own talc monograph
13  in 2010, and they cite their asbestos monograph --
14     A. Asked and answered.
15     Q. -- and they ask -- you're not the lawyer
16  here.
17     A. I know it, but I'm getting it.
18     Q. IARC, for the statement that the exposure
19  to talc translocation to the ovaries and development
20  of ovarian cancer is controversial, what IARC
21  cites -- listen to me, Doctor -- what IARC cites --
22     A. I'm listening. I have my eyes closed, but
23  I'm listening.
24     Q. -- is their own 2010 talc monograph and

91 (Pages 358 to 361)

Ellen Blair Smith, M.D.

Page 362

1  this very 2012 asbestos monograph, correct?
2      MS. O'DELL: Excuse me. Asked and
3  answered 10 times.
4      Q. (BY MR. KLATT) Is that correct?
5      MS. O'DELL: Excuse me. Asked and
6  answered.
7      A. The words are printed on the paper. That
8  is what they wrote.
9      Q. (BY MR. KLATT) So my statement's correct?
10      MS. O'DELL: Objection.
11      A. They wrote that, yes.
12      Q. (BY MR. KLATT) Not that hard.
13      I think we established earlier that
14  there's not a single study showing talc applied to
15  the external genital area has been shown to migrate
16  into the ovaries?
17      A. I know of no talc translocation migration
18  studies.
19      Q. And the Egli study and the Sjösten study
20  and the Zervomanoklakis study --
21      (Speaking simultaneously.)
22      A. I'm not (unintelligible).
23      Q. -- that you cited, none of those involve
24  talc?

Page 363

1      A. None of --
2      MS. O'DELL: Object to the form.
3      A. -- them did.
4      Q. (BY MR. KLATT) And they all involve those
5  particles being injected into the reproductive
6  tract?
7      MS. O'DELL: Object to the form.
8      A. Absolutely not.
9      Q. (BY MR. KLATT) They say poster- --
10      A. Sjösten did not inject anything. He had
11  corn starch on gloves.
12      Q. And was that applied externally or was the
13  corn starch --
14      A. It's a pelvic examination.
15      Q. Let me finish.
16      And a pelvic examination involves
17  introduction of corn starch on surgical gloves into
18  the reproductive tract. It's not specific --
19      A. I don't think you'll get any --
20      MS. O'DELL: Excuse me. Excuse me.
21      Q. (BY MR. KLATT) It's not external
22  application, correct?
23      MS. O'DELL: Object to the form.
24      A. You said "injected."

Page 364

1      Q. (BY MR. KLATT) Okay. Well, let's talk --
2  Egli and Zervomanoklaskis involved injections of
3  particles into something called the vaginal
4  posterior fornix, correct?
5      A. Um-hum.
6      Q. I'm sorry?
7      A. Yes.
8      Q. And that's not the external genital area,
9  is it?
10      A. Hum. That is part of the lower genital
11  tract.
12      Q. The posterior vaginal fornix is the area
13  of the vagina right next to the cervix, correct?
14      A. Uh-huh.
15      Q. So the very top of the vagina, correct?
16      A. It's sort of at the very back.
17      Q. And so it's not at the external genital
18  area, correct?
19      A. I didn't say it was external. I said it
20  was part of the lower genital tract.
21      Q. It's about halfway to the ovaries,
22  correct?
23      MS. O'DELL: Objection to form.
24      A. Yes.

Page 365

1      Q. (BY MR. KLATT) And those animals in those
2  studies --
3      A. They're humans.
4      Q. Well, no. You said -- Egli, I thought you
5  said was in animals.
6      MS. O'DELL: Object to form.
7      A. No, Egli's in humans.
8      Q. (BY MR. KLATT) Well --
9      A. Egli's --
10      Q. -- the humans were --
11      A. -- in humans.
12      Q. The hum- --
13      A. Zervomanoklaskis is in humans. Sjösten is
14  in humans. Hunts is in humans.
15      Q. And these humans, then, were given Pitocin
16  to stimulate uterine contractions, weren't they?
17      A. Some of them in some of the studies.
18      Q. Well, that doesn't have anything to do
19  with women applying talc externally, does it?
20      MS. O'DELL: Object to the form.
21      A. No, but it is part of the transport
22  mech- -- the contractions of the uterus and the
23  fallopian tube are part of the mechanisms of
24  transport.

92 (Pages 362 to 365)

Ellen Blair Smith, M.D.

Page 366

1    Q. (BY MR. KLATT) And, in fact, in Egli,
2    the -- the study subjects were tilted head down at a
3    15-degree angle, correct?
4         MS. O'DELL: Objection to form.
5    A. Yes.
6    Q. (BY MR. KLATT) And in Sjösten, it was
7    corn starch, not talc, correct?
8    A. Yes.
9    Q. And you said these were a part of
10   gynecologic examinations in which the physician was
11   introducing the corn starch into the reproductive
12   tract, correct?
13        MS. O'DELL: Objection to form.
14   A. On his or her gloves. Not injecting it.
15   Q. (BY MR. KLATT) Health Canada that you've
16   referred to, they just announced a preliminary
17   evaluation and opened it up to public comment,
18   right?
19   A. They are in the 90-day discussion window.
20   Q. And -- well, the discussion window means
21   the public comments can be submitted for the next 90
22   days, correct?
23   A. Correct.
24   Q. And then they have up to two years to make

Page 367

1    a decision whether they're gonna do anything at all
2    or nothing, correct?
3         MS. O'DELL: Object to the form.
4    A. Correct.
5    Q. (BY MR. KLATT) So they haven't made any
6    final conclusions at all, have they?
7    A. They've drawn their conclusions. They
8    will entertain comments. I think their conclusions
9    are compelling.
10   Q. Well, at the end of nine -- at the end of
11   two years, they may decide to do nothing at all
12   based on the evidence they receive, correct?
13   A. It might, but may still be here.
14   Q. The Shukla study that you talked about --
15   A. Yes.
16   Q. -- that didn't look at any sort of genetic
17   mutations, did it?
18   A. It looked at gene activation.
19        THE WITNESS: Can you get the Shukla?
20   Q. (BY MR. KLATT) Gene expression, correct?
21   A. Gene expression.
22        THE WITNESS: Sorry. Thank you.
23   Q. (BY MR. KLATT) Gene expression is a part
24   of daily living, isn't it?

Page 368

1         MS. O'DELL: Object to the form.
2    A. Gene expression is part of everything.
3    Q. (BY MR. KLATT) Exactly. It's how we
4    live.
5         If we didn't have gene expression,
6    we'd die, right?
7    A. Right.
8    Q. So the mere fact that they measured gene
9    expression doesn't say anything about causing
10   cancer, does it?
11   A. It's what genes --
12        MS. O'DELL: Object to the form.
13   A. -- they looked at.
14   Q. (BY MR. KLATT) And Shukla didn't conclude
15   that their findings showed that talc causes
16   ovarian --
17        MS. O'DELL: Give her a moment to --
18   Q. (BY MR. KLATT) -- cancer --
19        MS. O'DELL: -- and just --
20   Q. (BY MR. KLATT) -- correct?
21        MS. O'DELL: You may look at the study
22   before you answer the question.
23   Q. (BY MR. KLATT) Well, you testified to
24   Shukla study in response to Ms. O'Dell's question

Page 369

1    without looking at it.
2         MS. O'DELL: Let me rephrase my
3    objection.
4         If you need to look at a study, you
5    may. If you don't, please feel free to answer Mr.
6    Klatt's questions.
7    Q. (BY MR. KLATT) Doctor, when you were
8    answering Ms. O'Dell's questions about Shukla, you
9    didn't need to look at the study, did you?
10        MS. O'DELL: Objection.
11   A. I want to know -- I want to see the
12   descriptions of --
13   Q. (BY MR. KLATT) Did they conclude their
14   results of their study showed that talc caused
15   ovarian cancer?
16   A. (Examined exhibit.) So they looked at --
17   this is the mesothelioma, so we're not -- they
18   looked at subalteration, cell activation, cell
19   motility, immune response, protein metabolic
20   processes, signal transection, changes in
21   extracellular matrix.
22        All of these are pathways looking at
23   MRA levels that are activated in the carcinogenic
24   process in . . .

Ellen Blair Smith, M.D.

Page 370

1      Q.  Doctor, my question is:  Shukla nowhere
2  concludes that the results of their experiments
3  showed that talc or even asbestos caused ovarian
4  cancer, correct?
5      A.  No, they did not cause ovarian cancer,
6  yes.
7          They upregulated enzymes active in
8  some part of the carcinogenic process.  They didn't
9  induce any demonstrated genetic abnormalities.
10      Q.  Correct.
11          And if you would turn your attention
12  to page 2000 -- I'm sorry.  Page -- do you have a
13  page 121?
14      A.  No -- oh, wait.  I have a -- this is
15  crazy.  I have a 199 and then it goes to 2009 -- oh,
16  wait.  That may be the year.
17      Q.  I think that's the year.
18      A.  Yeah, I think that's the year.
19          Ah.  I have a 121, yes.
20      Q.  Okay.  Do you see a paragraph in the
21  Shukla study on page 121 beginning with, "Several
22  other genes"?
23      A.  Yes.
24      Q.  "Several other genes uprate -- upregulated

Page 371

1  by talc at 8 hours are affected by asbestos at both
2  8 and 24 hours may be important in repair from
3  mineral-induced responses," correct?
4      A.  Correct.
5          MS. O'DELL:  Object to the form.
6      Q.  (BY MR. KLATT)  For example, SOD2 is an
7  antioxidant protein, correct?
8      A.  Correct.
9      Q.  Antioxidant has anticancer properties,
10  right?
11          MS. O'DELL:  Object to the form.
12      A.  In general.
13      Q.  (BY MR. KLATT)  And you see that the next
14  thing they talk about, PTGS2?
15      A.  Yes.
16      Q.  It's a key enzyme in pros- -- prostanoid
17  bio- -- biosynthesis associated with modulation of
18  mitogenesis and inflammation, correct?
19          MS. O'DELL:  Object to the form.
20      A.  Correct.
21      Q.  (BY MR. KLATT)  That's an anticancer
22  property?
23      A.  Not necessarily.
24      Q.  Well --

Page 372

1      A.  You can modulate up and you can modulate
2  down.
3      Q.  And what they found is that it modulated
4  down, correct?
5          MS. O'DELL:  Object to the form.
6      A.  I don't see the figure.
7      Q.  (BY MR. KLATT)  Do you see the next thing
8  they talk about?  Upregulation of angiopoietin-4.
9      A.  Um-hum.
10      Q.  Do you see that?
11      A.  Uh-huh.
12      Q.  Is thought to play a key role -- or excuse
13  me, play a role in inhibition of tumor cell motility
14  and metastasis.
15          So if you're inhibiting tumor cell
16  motility and metastasis, that's an anticancer
17  property, correct?
18          MS. O'DELL:  Objection to the form.
19      A.  Yes.
20      Q.  (BY MR. KLATT)  And then KLF4,
21  Kruppel-like factor 4, is a negative regulator of
22  cell proliferation, correct?
23      A.  And can be a positive or negative
24  modulator of DNA transcription.

Page 373

1      Q.  Well, cancer is uncontrolled cell
2  proliferation, correct?
3      A.  You can't -- it can go either way.
4      Q.  Well, it says --
5          MS. O'DELL:  Excuse me.  She's
6  finished?
7      Q.  (BY MR. KLATT)  -- it's a negative
8  regulator of cell proliferation.
9          Does it say that?
10      A.  Which is different from transcription.  It
11  says "positive or negative transcription."
12      Q.  But if you're a negative regulator of cell
13  proliferation, that's an anticancer property,
14  correct?
15          MS. O'DELL:  Objection to form.
16      A.  I think --
17          MS. O'DELL:  She's answered the
18  question.
19      A.  -- that's oversimplified.
20      Q.  (BY MR. KLATT)  What a negative regulator
21  of cell proliferation means it down-regulates
22  self-proliferation, correct?
23      A.  Yes.
24      Q.  That's anticancer property?

Ellen Blair Smith, M.D.

Page 374

1    A.  I think when you make that big jump, there
2  are a whole lot of little steps in there to get to
3  that.
4           I can't make that conclusion, and I
5  don't think you can either.
6    Q.  I'm just reading what they're saying
7  there.
8           MS. O'DELL:  Object to the form.
9    A.  No, you're interpreting what they're
10  saying because they didn't say it's an anticancer
11  drug.
12    Q.  (BY MR. KLATT)  They say it's a negative
13  regulator of cell proliferation, correct?
14    A.  And nowhere in this sentence does it say
15  it's anticancer.
16    Q.  Well, do you want something that increases
17  cell proliferation or decreases cell proliferation?
18    A.  Certainly in repair --
19           MS. O'DELL:  Objection to form.
20    A.  -- process.  If it's normal epithelium, I
21  want -- you don't know enough about this and neither
22  do I.
23           Can we just keep going?
24    Q.  (BY MR. KLATT)  Sure.  That's fine.

Page 375

1           You're not aware of any evidence that
2  genital talc use increases vulvar cancer in women --
3    A.  No.
4    Q.  -- who use it, correct?  Correct?
5    A.  I said "no."  Correct.
6    Q.  You're not aware of any evidence that
7  women who use external genital talc have increased
8  risk of vaginal cancer, correct?
9    A.  I do not.
10    Q.  And I believe with Mr. --
11    A.  James.
12    Q.  -- Mr. Scott James you talked about no --
13  awareness of no increase in cervical cancer or
14  uterine cancer in talc users, correct?
15    A.  You are correct.
16    Q.  And also, talc applied to the external
17  genital area would come into contact with the rectal
18  area, correct?
19           MS. O'DELL:  Objection.
20    A.  It -- yes.
21    Q.  (BY MR. KLATT)  Are you aware of any
22  evidence that women who use talc in the genital area
23  have an increased risk of rectal cancer?
24    A.  I do not have any evidence to that effect.

Page 376

1    Q.  You're aware that Dr. Saed has just
2  started writing about talc in relation to ovarian
3  cancer since he's become a retained litigation
4  expert by the plaintiffs, right?
5           MS. O'DELL:  Objection to form.
6    A.  I can't tell you the exact first time he
7  did an experiment or published a result with that.
8  I can't -- I . . .
9    Q.  (BY MR. KLATT)  You're not aware of
10  Dr. Saed making any sort of connection between talc
11  and ovarian cancer before you got involved in this
12  litigation, correct?
13    A.  I -- I'm not aware of that.
14    Q.  IARC has not said that any of the heavy
15  metals you cite in your report increase the risk of
16  ovarian cancer, correct?
17    A.  They have called them Class 1 carcinogens,
18  and there's been no association with ovarian cancer
19  made in their report.
20    Q.  And you're not aware of any evidence that
21  women who use talc-based body powder products have
22  increased blood or tissue levels of cadmium, cobalt,
23  chromium, or nickel, compared to women who never use
24  those products --

Page 377

1    A.  I know no evidence --
2    Q.  -- correct --
3           MS. O'DELL:  Objection; form.
4    A.  -- to that effect.
5           MS. O'DELL:  Excuse me.  Objection to
6  form.
7    Q.  (BY MR. KLATT)  Is that correct?
8    A.  I know no evidence to that effect.
9    Q.  And finally, Doctor, and I think it's very
10  admirable what you're currently doing with the women
11  who are in hospice care for ovarian cancer.
12           When you interact with these women,
13  you interact not only with the women but with their
14  family and friends as well, correct?
15    A.  Absolutely.
16    Q.  Now, have you ever told any of their
17  family or friends that they shouldn't use talc --
18           MS. O'DELL:  Objection to form.
19    Q.  (BY MR. KLATT)  -- in the genital area?
20    A.  I think it would be quite inappropriate to
21  have that conversation at that time.
22    Q.  Well, these are women -- these are
23  mothers, sisters, daughters, and female friends of
24  these women who are dying with ovarian cancer,

95 (Pages 374 to 377)

Ellen Blair Smith, M.D.

Page 378

1  correct?
2      MS. O'DELL:  Objection to form.
3      A.  I have never told them -- counseled a
4  family member or a friend or a child of a dying
5  ovarian cancer patient about genital talc use.
6      Q.  (BY MR. KLATT)  You haven't said a word
7  about it right up until as we sit here today; is
8  that correct?
9      MS. O'DELL:  Objection to form.
10     A.  Correct.
11         MR. KLATT:  Thank you.  That's all I
12  have.
13         MR. JAMES:  I don't have any further
14  questions.
15     MS. O'DELL:  Okay.
16         FURTHER EXAMINATION
17  BY MS. O'DELL:
18     Q.  I have -- have -- let me just ask one
19  question.
20         In the situation when you're
21  counseling a family of a dying patient, would it be
22  inappropriate to have a discussion that Mr. Klatt
23  suggested?
24     A.  I feel it would be.

Page 380

1      MR. JAMES:  Thank you, Dr. Smith.
2      (Discussion off the record.)
3      THE COURT REPORTER:  Leigh, would you
4  like the witness to read and sign?
5      MS. O'DELL:  Yes, I would.
6      THE COURT REPORTER:  Would you like it
7  to go to you or directly to the witness?
8      MS. O'DELL:  To me.
9
10     (Deposition concluded at 9:23 p.m.,
11     January 9, 2019.)
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 379

1      MS. O'DELL:  Okay.  I have no further
2  questions.
3         FURTHER EXAMINATION
4  BY MR. KLATT:
5      Q.  Well, let me ask one more question about
6  that.
7         Do you ever care for women who are
8  dying from ovarian cancer due to BRCA1 or BRCA2
9  mutations?
10     MS. O'DELL:  Object to the form.
11     A.  I -- in my life?  Yes.
12     Q.  (BY MR. KLATT)  And you would certainly
13  counsel those women to have their female mothers,
14  sisters, daughters, and friends -- well, mothers,
15  sisters, and daughters tested for those mutations,
16  correct, because you'd want them to take steps to
17  potentially avoid the risk of ovarian cancer.
18     A.  Correct.
19     MS. O'DELL:  Objection.
20     MR. KLATT:  Thank you.
21     MS. O'DELL:  I have nothing further.
22     THE VIDEOGRAPHER:  This concludes the
23  deposition of Ellen Blair Smith, M.D.  Going off the
24  record.  The time is 9:22 p.m.

Page 381

1         CHANGES AND SIGNATURE
2  WITNESS NAME:  ELLEN BLAIR SMITH, M.D.
3  DATE:  JANUARY 9, 2019
4  PAGE/LINE   CHANGE          REASON
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____

96 (Pages 378 to 381)

Ellen Blair Smith, M.D.

---

**Page 382**

1    I, ELLEN BLAIR SMITH, M.D., have read the
2  foregoing deposition and hereby affix my signature
3  that same is true and correct, except as noted
4  above.
5    _____
6        ELLEN BLAIR SMITH, M.D.
7
   THE STATE OF _____)
8
   COUNTY OF _____)
9
10    Before me, _____, on
11  this day personally appeared ELLEN BLAIR SMITH,
12  M.D., known to me (or proved to me under oath or
13  through _____) (description of
14  identity card or other document) to be the person
15  whose name is subscribed to the foregoing instrument
16  and acknowledged to me that they executed the same
17  for the purposes and consideration therein
18  expressed.
19    Given under my hand and seal of office
20  this _____ day of _____,
21  2019.
22
   _____
23
        NOTARY PUBLIC IN AND FOR
24        THE STATE OF _____

---

**Page 383**

1      IN THE UNITED STATES DISTRICT COURT
       FOR THE DISTRICT OF NEW JERSEY
2
3  IN RE:  JOHNSON & JOHNSON    )
    TALCUM POWDER PRODUCTS      )
4  MARKETING, SALES            )
    PRACTICES, AND PRODUCTS     ) MDL NO:
5  LIABILITY LITIGATION        ) 16-2738 (FLW)(LHG)
                                )
6  THIS DOCUMENT RELATES TO    )
    ALL CASES                   )
7
8
9
10      REPORTER'S CERTIFICATE
11  ------------------------------------------
12    DEPOSITION OF ELLEN BLAIR SMITH, M.D.
13        TAKEN JANUARY 9, 2019
14  ------------------------------------------
15
16
17    I, Karen L. D. Schoeve, Registered
18  Diplomate Reporter, Certified Realtime Reporter, and
19  Realtime Systems Administrator, residing in the
20  State of Texas, do hereby certify that the foregoing
21  proceedings were reported by me and that the
22  foregoing transcript constitutes a full, true, and
23  correct transcription of my stenographic notes, to
24  the best of my ability and hereby certify to the

---

**Page 384**

1  following:
2    That the witness, ELLEN BLAIR SMITH, M.D.,
3  was duly sworn by the officer and that the
4  transcript of the oral deposition is a true record
5  of the testimony given by the witness;
6    That the original deposition was delivered
7  to SCOTT A. JAMES, custodial attorney;
8    That a copy of this certificate
9  was served on all parties and/or the witness shown
10  herein on _____.
11    I further certify that pursuant to FRCP
12  No. 30(f)(i) that the signature of the deponent was
13  requested by the deponent or a party before the
14  completion of the deposition and the signature is to
15  be returned within 30 days from date of receipt of
16  the transcript.
17    If returned, the attached Changes
18  and Signature Page contains any changes and the
19  reasons therefor.
20    That pursuant to information given to the
21  deposition officer at the time said testimony was
22  taken, the following includes counsel for all
23  parties of record:
24

---

**Page 385**

1  FOR PLAINTIFFS' STEERING COMMITTEE:
2    P. LEIGH O'DELL, ESQUIRE
     DR. MARGARET M. THOMPSON, ESQUIRE
3    BEASLEY ALLEN, P.C.
     218 Commerce Street
4    P.O. Box 4160
     Montgomery, Alabama 36104
5    T: 334.269.2343 (Ms. O'Dell)
     F: 334.954.7555 (Ms. O'Dell)
6    C: 512.695.1708 (Ms. Thompson)
     T: 800.898.2034 (Ms. Thompson)
7    F: 855.674.1818 (Ms. Thompson)
     leigh.odell@beasleyallen.com
8    margaret.thompson@beasleyallen.com
9      --AND--
10    CYNTHIA L. GARBER, ESQUIRE
     ROBINSON CALCAGNIE, INC.
11    19 Corporate Plaza Drive
     Newport Beach, California 92660
12    C:  949.456.0037
     T:  949.720.1288
13    F:  949.720.1292
     cgarber@robinsonfirm.com
14
       --AND--
15
     PAULA R. BROWN, ESQUIRE
16    BLOOD HURST & O'REARDON, LLP
     501 West Broadway, Suite 1490
17    San Diego, California 92101
     T: 619.338.1100
18    F: 619.338.1101
     pbrown@bholaw.com
19
20
21
       (Continued on following page)
22
23
24

---

97 (Pages 382 to 385)

Ellen Blair Smith, M.D.

---

Page 386

```
1   FOR DEFENDANTS JOHNSON & JOHNSON ENTITIES:
        SCOTT A. JAMES, ESQUIRE
2       SHOOK, HARDY & BACON L.L.P.
3       JPMorgan Chase Tower
        600 Travis Street, Suite 2450
4       Houston, Texas 77002-2926
        D:  713.546.5644
5       T:  713.227.8008
        F:  713.227.9508
6       sjames@shb.com
7           --AND--
        KATHERINE McBETH, ESQUIRE
8       DRINKER BIDDLE & REATH LLP
9       One Logan Square, Suite 2000
        Philadelphia, Pennsylvania 19103-6996
10      D:  215.988.2706
        T:  215.988.2700
11      F:  215.988.2757
        katherine.mcbeth@dbr.com
12
13  FOR DEFENDANT IMERYS TALC AMERICA, INC.
        MICHAEL R. KLATT, ESQUIRE
14      GORDON REES SCULLY MANSUKHANI, LLP
15      816 Congress Avenue, Suite 1510
        Austin, Texas 78701
16      D:  512.582.6485
        T:  512.391.0197
17      F:  512.391.0183
        mklatt@grsm.com
18
            --AND--
19
        MARK K. SILVER, ESQUIRE
20      COUGHLIN DUFFY LLP
        350 Mount Kemble Avenue
21      P.O. Box 1917
        Morristown, New Jersey 07962
22      D:  973.631.6045
        T:  973.267.0058
23      F:  973.267.6442
        msilver@coughlinduffy.com
24
```

---

Page 387

```
1   FOR DEFENDANT PERSONAL CARE PRODUCTS COUNCIL:
2       RENEE B. APPEL, ESQUIRE
        SEYFARTH SHAW LLP
3       975 F Street, N.W.
        Washington, D.C. 20004
4       D:  202.828.5371
        T:  202.463.2400
5       F:  202.828.5393
        rappel@seyfarth.com
6
7   FOR DEFENDANTS PTI ROYSTON LLC AND PTI UNION LLC:
8       TARIQ M. NAEEM, ESQUIRE
        TUCKER ELLIS | LLP
9       950 Main Avenue, Suite 1100
        Cleveland, Ohio 44113-7213
10      D:  216.696.3675
        T:  216.592.5000
11      F:  216.592.5009
        tariq.naeem@tuckerellis.com
12
13
14          I further certify that I am neither
15  counsel for, related to, nor employed by any of the
16  parties in the action in which this proceeding was
17  taken, and further that I am not financially or
18  otherwise interested in the outcome of the action.
19
20
21          (Continued on following page)
22
23
24
```

---

Page 388

```
1           Subscribed and sworn to on this the 11th
2   day of January, 2019.
3
4
5
6   _____
    Karen L.D. Schoeve, RDR, CRR
7   Realtime Systems Administrator
    NCRA Exp. Date:  09-30-21
8   Golkow Litigation Services
    Firm Registration No. 690
9   One Liberty Place
    1650 Market Street, Suite 5150
10  Philadelphia, Pennsylvania 19103
    T:  877.370.3377
11  F:  917.591.5672
    www.golkow.com
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 970 of 1035
PageID: 242149
Ellen Blair Smith, M.D.

Page 389

| | | | | |
|---|---|---|---|---|
| **A** | 150:7,10,18,22 | **activated** 369:23 | **advantages** | 240:3 249:23 |
| **a.m** 2:6 11:7 | 151:19 152:8 | **activation** | 247:15,16 | 257:5,8 270:7 |
| 79:16,17,18,20 | 158:22 161:11 | 367:18 369:18 | **advise** 172:10 | 275:12 276:8 |
| 117:5,6,7,10 | 161:13 162:10 | **active** 150:5 | **advised** 6:20 | 281:16 291:24 |
| 119:4,5,7 | 165:18 166:17 | 370:7 | **affect** 186:8 | 292:8 302:23 |
| **AACR** 7:18 9:12 | 167:2,9 168:2 | **actively** 349:24 | 281:5 | 307:22 347:14 |
| **abdominal** | 168:10,12 | **actual** 281:2 | **affirmatively** | 361:3,4,5,6 |
| 321:20 | 262:13,22 | **acute** 281:19 | 65:20 | **agreed** 2:13 |
| **abest-** 140:5 | 263:15,20 | **add** 15:20 206:7 | **affix** 382:2 | 73:11 229:17 |
| **ability** 266:14 | 264:14 280:12 | **addition** 74:13 | **African-Amer...** | **agreement** 2:14 |
| 295:18 313:11 | 280:16 326:6 | 74:15 167:23 | 43:18 | 15:21 |
| 323:16 383:24 | **accepting** | 312:6,20 | **Afternoon** 6:8 | **Ah** 370:19 |
| **able** 224:12 | 301:21 | 327:15 | 162:1 | **ahead** 25:18 |
| 281:5 323:8 | **accommodate** | **additional** 19:22 | **age** 159:8 | 87:21 176:23 |
| **abnormalities** | 15:13 | 20:23 58:7 | **agent** 241:12 | 215:15 228:1 |
| 370:9 | **account** 137:16 | 66:17 68:1 | **agents** 323:2 | 239:4,4 254:11 |
| **above-styled** 2:5 | 225:13 250:13 | 108:16 125:5 | **aggregates** 63:9 | 267:12 305:24 |
| **absence** 96:23 | 294:4 | 217:13,15 | **aggressive** | 306:2 335:18 |
| 267:19,20 | **accounted** | 237:9,16 | 243:10 | 357:17 358:6 |
| **absolutely** 101:3 | 129:15,19 | 252:22 | **aging** 159:10 | 359:23 |
| 101:5 102:20 | 137:18 | **Additionally** | **ago** 153:10 | **al** 8:23 9:14,20 |
| 105:23 188:20 | **accurate** 279:17 | 271:8 | 186:9 258:23 | 9:24 10:5,8,21 |
| 188:21 202:5 | **acknowledge** | **additive** 169:3,8 | 258:23,24 | 320:1,2 |
| 247:18 276:22 | 172:23 181:4 | 169:21 170:16 | 314:20 | **Alabama** 3:6 |
| 304:7 316:12 | 206:9 211:24 | 171:9,14,22 | **agree** 12:16 42:9 | 385:4 |
| 363:8 377:15 | 220:21 226:12 | 172:1 | 46:21 48:18 | **Alan** 22:24 |
| **abstract** 56:8 | 280:7 290:7,12 | **address** 139:14 | 51:12 59:20 | 23:15,20 27:15 |
| 172:15 197:5 | 291:18 294:6 | 225:21 250:9 | 60:2,3,12,16 | **Alba** 263:2 |
| 208:5,12,18 | 294:10 | 323:1 344:3 | 61:3,8,23 | **albeit** 174:18 |
| 209:4,6 230:4 | **acknowledged** | **addressed** 29:9 | 69:19 98:11 | **albumin** 322:6 |
| 230:6,12 231:6 | 158:2 160:7 | 59:7 69:15 | 113:21 114:16 | **Alice** 75:4 |
| 231:10 283:22 | 295:2 382:16 | 71:23 76:11 | 115:19,22 | **allegation** 29:18 |
| 334:4 348:4,6 | **acknowledges** | 78:9 133:4,6 | 116:17 117:21 | 96:20 106:18 |
| **abstracts** 204:19 | 264:14 | 187:4 235:18 | 118:20 119:8 | 106:23 107:12 |
| **accept** 146:5 | **acknowledging** | **adds** 126:2 | 119:16 120:11 | 108:6 120:14 |
| 178:9,10 179:1 | 278:9 | **adequate** 341:10 | 121:1 128:14 | 131:9,20 |
| 179:5 183:12 | **ACOG** 8:3,8 | **adherence** | 136:20 138:3 | **alleged** 32:18 |
| 184:15 206:13 | 149:16 151:22 | 326:24 | 158:21 161:16 | 95:14 97:23 |
| 302:24 303:9 | 152:2,14,18 | **adjective** 178:6 | 168:10 183:3 | 109:13 142:12 |
| 336:9 | 153:11 154:11 | 180:14,18,24 | 183:19 185:16 | 143:5,9 353:18 |
| **acceptable** | 155:6 160:4 | 190:16 | 188:5 190:9 | 354:3 |
| 200:16 | 161:5,14 273:7 | **adjectives** 182:1 | 199:2 203:20 | **allegedly** 110:7 |
| **accepted** 145:23 | 298:13 329:1,3 | 190:24 | 203:22 206:23 | **ALLEN** 3:5 |
| 146:3 147:24 | 329:10 | **Administrator** | 207:7 213:3 | 385:3 |
| 148:12,15,18 | **actinolite** 133:2 | 383:19 388:7 | 219:14,14 | **Allison** 8:15 |
| 148:22 149:8 | 311:18 | **admirable** | 227:1 235:16 | **allow** 69:11 |
| | **action** 387:16,18 | 377:10 | 236:9 237:21 | 107:5 214:8,9 |

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 971 of 1035
PageID: 242150
Ellen Blair Smith, M.D.

Page 390

355:9
**allowable** 52:1
**allowed** 68:21
  121:24 302:5,8
**allowing** 68:18
**alluding** 227:4
**alpha** 325:16
**alphabetical**
  320:9
**alphabetizing**
  175:17
**alteration** 282:2
**AMA** 101:18
**amazingly** 261:3
**America** 4:15
  297:8,9 386:13
**American** 8:13
  9:19
**amount** 14:3
  22:2 60:24
  61:19 109:5
  120:20 182:2
**Amphibole**
  10:17
**analgesia**
  181:11
**analogously**
  318:23
**analyses** 205:21
**analysis** 9:13
  10:15 80:4
  98:11 112:7
  114:8 135:3
  136:12 173:12
  203:1 206:12
  212:11 217:18
  244:5 245:3
  258:18 288:15
  330:19 332:7
  350:3
**Analytical**
  101:18
**analyzed** 248:19
  288:21
**AND--** 3:11,16
  4:9,20 385:9
  385:14 386:7

386:18
**and/or** 384:9
**anemia** 31:9
**anesthesia** 268:2
**aneuploidy**
  281:4
**angiopoietin-4**
  372:8
**angle** 366:3
**animal** 268:12
  332:15
**animals** 365:1,5
**Anna** 37:8
**announced**
  366:16
**annuities** 18:18
**answer** 24:19
  29:12 66:7
  68:15,19 69:9
  69:11,13 70:1
  73:5 78:23
  79:1 105:4
  107:20 136:19
  137:23 142:24
  143:10 166:15
  168:21 169:5
  195:16 202:12
  223:24 224:4,5
  224:6 253:3
  286:12 293:10
  302:6 308:24
  320:17 327:14
  345:16 358:6
  368:22 369:5
**answered** 97:19
  134:23 138:18
  141:18 143:20
  167:13 170:20
  170:21 179:16
  183:23 187:20
  190:18 214:4
  247:2 261:23
  262:3,4 306:19
  360:22 361:9
  361:14 362:3,6
  373:17
**answering** 72:24

141:8 215:24
  258:15 369:8
**answers** 15:8
  204:3
**anthophyllite**
  141:4 299:15
**anti-inflamma...**
  280:20
**anti-inflamma...**
  326:1,13
**anticancer** 9:3
  371:9,21
  372:16 373:13
  373:24 374:10
  374:15
**anticipate** 120:2
**antioxidant**
  371:7,9
**anybody** 25:23
  228:19 285:2,3
  298:16 345:14
  346:5
**apol-** 209:15
**apologies** 14:18
  57:1
**apologize** 44:19
  105:7 267:9
  358:7
**apoptosis**
  326:14
**apparently**
  221:16
**appear** 49:8
**Appearances**
  6:3
**appeared**
  382:11
**appears** 49:14
  213:17 232:13
  334:11,15
**APPEL** 5:9
  387:2
**applicable** 136:2
**application** 9:4
  201:1 318:24
  363:22
**applications**

195:10 204:16
  205:12 209:11
**applied** 80:9
  133:10 143:12
  319:9 323:16
  324:20 362:14
  363:12 375:16
**applies** 141:1
**apply** 40:13
  133:9,10
  200:13 201:21
  202:1 280:16
  316:15
**applying** 119:19
  365:19
**approach** 55:22
**appropriate**
  11:18 16:9
  46:14 165:19
  166:18 291:21
  310:6 311:1
**approximating**
  322:18
**area** 108:24
  198:7 199:12
  319:9 362:15
  364:8,12,18
  375:17,18,22
  377:19
**areas** 298:8
**Armstrong**
  246:17
**Arsenic** 10:22
**arthritis** 282:6
**article** 7:14,18
  8:4,6,10,14,18
  8:22 9:3,8,12
  9:15,19 10:3,6
  10:9,15,20
  23:7,12 51:3,4
  60:24 61:2
  66:9 76:12,19
  95:2 114:3,7
  114:20 115:1
  147:2,3 180:3
  186:1,24
  197:24 198:13

206:16,17
  233:12 275:6
  282:24
**articles** 21:13
  23:2 29:21
  30:2 51:19
  55:4,4 57:15
  58:5 59:2
  93:20 94:1,15
  94:16,18,23
  95:1 96:5,10
  96:15,19 97:24
  97:24 111:2
  125:19 146:9
  146:24 150:13
  151:23 234:15
  266:14 295:20
  313:23 329:23
  329:24 330:2
**asbestiform**
  78:2 140:4,5
  140:13,20,21
  140:23 141:2,6
  141:15 313:14
  314:15
**asbestos** 7:19
  10:17 29:3,5
  30:17 31:1
  32:9,18 62:7
  70:10 71:5
  78:2,6 88:23
  89:3,6,15,24
  90:22 91:4
  93:1,16 94:24
  95:14 96:20
  97:4,5,8,11,23
  98:18 100:5,13
  100:20 103:3
  106:18 107:8
  107:12,18,19
  108:1,6 109:6
  109:19 110:7
  110:11,23
  111:9 112:4
  114:11 115:2
  117:13,17
  118:2 120:12

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 972 of 1035
PageID: 242151
Ellen Blair Smith, M.D.

Page 391

123:17,20,24
125:8 126:7
127:2,5,19
128:2,9 131:5
131:9,21
132:11,13,19
132:21 133:7
135:8,11 136:7
136:24 137:9
137:14 139:23
141:6 142:6,10
142:13,19
143:17 144:12
144:22 151:13
151:18 301:14
302:20 303:9
303:13,21,23
304:14 305:7
305:15 306:3
306:17 308:20
309:11,15,19
310:7 311:8,12
311:24 312:7,9
312:24 313:6,9
313:13 314:1,7
318:19,22,23
328:3 338:7
339:14,22
351:3,20 352:3
352:15 353:2,8
353:11,18
354:3,11,17
355:17 357:8
360:15 361:13
362:1 370:3
371:1
**asbestos-cont...**
120:15
**ascending** 275:8
**ascertain** 359:3
**aside** 54:1
**asked** 23:9
31:23 32:2,6,8
67:7,8,17,18
68:19,20,24
72:22 82:22
110:3 122:16

122:17 134:22
137:3,3 138:18
142:24 143:17
144:6 166:14
167:13 168:23
170:19 176:17
176:18 179:15
183:23 190:17
190:19 214:3
245:3 247:1
261:6 284:1
285:16 293:14
308:19,23
309:3 313:3
314:19 315:8
321:3 328:8,24
331:3,23
333:22 335:19
336:1,6 338:3
340:12,14
348:7 360:21
361:8,14 362:2
362:5
**asking** 56:8 67:6
67:9 78:20
82:23 83:4
89:13 94:22
102:18 104:23
148:13 178:15
180:22 190:10
218:23 242:19
245:9 254:2
264:8 299:1
354:21 355:4,5
360:24
**aspirin** 181:9
**assembled**
150:12
**assessing** 8:14
183:1 294:9,11
**assessment**
35:15 231:17
273:11 291:15
293:23 332:9
357:13 360:2
**associated**
132:10 174:18

198:7 199:12
207:18 208:14
213:18 217:19
220:21 243:17
273:4 282:6,11
282:12 295:22
326:16 344:8
347:3 371:17
**association**
82:17 121:14
125:16 127:1
136:14 163:21
165:11,20
176:12 177:4,8
177:21 179:13
180:13 183:4,9
183:20 184:14
198:19 199:19
220:5,7 221:11
221:20 222:12
222:16,22
224:16,18
230:9 231:14
232:13 235:9
235:12 243:21
271:23 289:13
289:14,21
296:9 334:13
344:23 345:2,4
345:6 347:6
348:21 353:8
357:8 358:19
359:5 376:18
**associations**
181:5 182:11
190:2 239:12
**assume** 286:2
287:10 321:11
**assumed** 306:20
**assumes** 72:11
**assuming** 302:2
**assumption**
262:5
**Atlas** 43:5,6
**attached** 2:12
62:21,22
384:17

**attempt** 59:19
192:14 314:6
**attempted**
148:11 172:5
294:24
**attempting**
69:20
**attention** 49:4
220:3 237:10
370:11
**attorney** 300:13
384:7
**attorneys** 22:11
94:17
**auger** 326:24
**August** 12:18
**Austin** 2:9,9
4:17 26:13,19
37:10 386:15
**author** 30:1
34:21,22 35:3
36:3 81:6
133:19 138:12
138:19,20
169:12 187:4,8
187:19 198:23
266:23 267:10
267:16 283:2
287:2 312:15
**author's** 130:13
138:21
**authored** 28:20
28:23 29:2
41:6 68:7
70:11 200:22
317:21
**authority** 147:5
**authors** 36:2
114:24 115:19
115:22 126:6
128:17 130:2,8
174:17 177:11
178:8,11,24
179:13 184:13
185:24 194:14
195:22 196:23
198:16,24

203:23 206:18
207:1 211:9
212:21 213:11
213:24 214:14
214:18 218:15
219:11 220:20
230:5 231:10
231:20 232:8
232:12,22
233:5 235:4
237:14 251:19
278:6 291:19
318:5,9,16
348:12
**authors'** 199:6
287:6
**available** 70:7
194:21 219:4
224:23
**Avenue** 4:17 5:4
5:16 386:15,20
387:9
**average** 186:9
**avoid** 379:17
**aware** 33:12,22
35:16 36:11
104:3 158:3,7
162:13 171:20
173:3 277:7
278:1 279:19
281:12 284:18
286:9 288:2
294:14 339:6,9
339:20 343:17
344:2 349:11
349:22 350:13
375:1,6,21
376:1,9,13,20
**awareness** 89:5
375:13

---
**B**
---
**B** 5:9 43:10
294:20,23
296:1 387:2
**B-e-r-g-e** 226:4
**baby** 10:16

Ellen Blair Smith, M.D.

90:21 92:24
94:21 95:6
97:11 103:17
299:15 301:15
306:3,5,7
308:20 309:12
310:7 311:2,9
311:13 326:22
331:6,19
336:16 340:7
354:4,8
**back** 18:5 40:20
43:11 44:20
47:3 49:5
51:10 58:19
79:19 95:10
107:7,24
110:13 115:5
117:9 119:6
145:18 153:16
162:2 194:4
209:20 218:14
230:24 250:24
271:7 277:5
290:21 296:23
308:2,8 320:24
321:7 325:3
343:8 347:5,24
353:21 364:16
**background**
303:3
**backside** 163:17
**BACON** 4:4
386:2
**bacteriologic**
263:9
**bad** 25:22 26:1
44:20 110:3
255:23 269:13
269:23
**badly** 269:17
**barn** 341:20
**base** 108:15
255:5 328:17
**based** 33:4 36:8
38:9 85:17
127:3 133:15

172:10 181:22
202:16 213:5
254:22 273:3
290:8 292:4
319:13 336:21
337:11 338:13
338:20 353:9
355:17 356:21
357:13 359:3
359:13 360:10
367:12
**basis** 33:9
109:14 192:6
194:12 206:4
225:12 257:18
262:21 303:23
303:23 305:8
307:20 327:7
**BCDX2** 50:17
**Beach** 3:13
385:11
**bears** 182:17
**BEASLEY** 3:5
385:3
**beat** 175:13
**becoming** 229:3
330:12 338:8
**Began** 57:4
**beginning** 117:9
194:4 277:5
315:24 320:24
370:21
**begins** 11:2
**behest** 103:10
**believe** 23:16
25:5 27:9 51:4
61:9,15,23
62:5,11 63:8
66:8 68:5
109:6,18
112:12 121:19
125:21 132:5,9
135:1 140:10
140:15,16
141:19 142:18
142:22 143:11
143:18 144:7

146:22 147:23
148:21 152:4
155:6 156:17
163:13 165:18
166:11,16,23
167:7 168:17
168:19,21
169:2 170:11
170:15 171:14
171:17,21,24
173:15 184:5
186:15 187:11
192:8 202:18
208:7 217:22
218:3,15
220:14 238:16
240:5,7,20,23
241:7,11
243:12 247:7
257:22 263:20
263:23 268:8
280:15,24
282:5 288:24
289:3,11 290:4
292:15 298:3
307:9,10
310:20 314:12
329:8 344:14
346:9 351:5,7
355:23 375:10
**believed** 150:23
**believes** 151:6
220:11
**bell** 8:19 75:7
77:15,19 138:8
138:9
**bells** 285:20,22
**benefits** 273:3
**benign** 33:17
**Berg** 179:20
227:21 229:9
**Berge** 10:5,21
49:17 218:5,11
218:21 225:24
226:3,8 227:2
227:9 229:9
230:3 231:3

234:14 235:4
255:12,14
257:13,18
290:23 291:1
291:18 292:20
333:6,13,15,23
334:6,9 347:21
348:13
**Bernard** 8:19
**best** 21:4 200:7
200:8,9 246:18
247:5,8 313:11
383:24
**beta** 274:2
**better** 120:8
174:8 212:15
220:24 228:8
228:19,19
229:17 240:7
242:9 245:5
291:9,15
345:12 346:3
**bias** 45:20 46:14
49:7,15 183:10
183:21 186:7
186:12 187:5
187:15 220:2
220:21,24
221:1,3 226:19
236:11,15
249:12,15,22
250:4,13
**biases** 186:4
**bibliography**
320:5
**BIDDLE** 4:10
386:8
**big** 132:18
173:24 327:24
374:1
**bigger** 170:3
212:15 314:21
**billed** 25:3,6
**binder** 41:16
122:22 123:1
**binding** 50:17
50:17

**bio-** 371:17
**biochemical**
325:12 337:5
360:6
**biochemistry**
231:24
**biological**
274:22
**biostatistician**
174:8
**biosynthesis**
371:17
**bit** 136:5 173:9
246:4 288:17
290:22
**black** 267:15
**Blair** 1:12 2:2
6:6 7:5,9,13
11:3,10 379:23
381:2 382:1,6
382:11 383:12
384:2
**bland** 161:15
**blank** 153:24
**blanket** 108:12
**block** 145:5
**blocks** 263:13
**blog** 30:9
**blood** 3:18
376:22 385:16
**Blount** 75:4,11
76:1 77:7 93:3
94:20 305:18
311:12 312:6
**Blount's** 76:12
76:19 77:3,11
95:1 306:17,22
**blue** 10:13
**Blue-eyed** 156:6
**body** 85:17 98:9
117:16 127:9
127:10 128:1
128:18,22
129:1,5 130:23
131:19 132:6
136:23 137:14
138:6,14,23

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 974 of 1035
PageID: 242153
Ellen Blair Smith, M.D.

Page 393

| | | | | |
|---|---|---|---|---|
| 139:1,3 177:20 | 117:2 145:3,15 | **C-r-a-l-l-e-y** | 9:22,23 10:4,7 | 168:1,2,21 |
| 179:4 185:20 | 160:1 161:17 | 312:15 | 10:10,19,20 | 169:1,21 170:4 |
| 198:17 206:7 | 228:22 234:14 | **cadmium** | 16:7 28:24 | 170:10,15 |
| 212:5 229:13 | 276:21 327:9 | 376:22 | 29:6,19 30:15 | 172:8,19 |
| 235:23 236:4 | **breakdown** 22:2 | **CALCAGNIE** | 30:18,23 31:2 | 174:18 176:15 |
| 278:10 283:3 | 133:1,3 | 3:12 385:10 | 31:5,12,21 | 180:10 181:19 |
| 285:23 286:8 | **breaking** 156:17 | **calculation** | 32:14 33:4 | 185:23 189:18 |
| 288:4 289:1,4 | 295:16 | 343:2 | 35:8 36:8 43:1 | 191:14,20 |
| 289:10 292:16 | **breastfeeding** | **calculation's** | 43:5,6 58:17 | 198:7,20 |
| 297:17 299:5,9 | 271:12 | 342:23 | 58:18,20 61:12 | 199:12 208:15 |
| 303:9,13,22 | **Breen** 37:8 | **calculations** | 61:17 62:2,8 | 212:4,24 |
| 304:2 305:7,16 | **brief** 152:17 | 257:10,13,19 | 62:14 78:6 | 213:19,21 |
| 317:8 318:21 | 308:18 | **California** 3:13 | 82:1,9,13,22 | 214:2,7 217:19 |
| 328:10 339:22 | **briefly** 11:22 | 3:19 385:11,17 | 83:7,18 84:2,6 | 220:6 221:11 |
| 344:7,14 347:9 | **brings** 290:21 | **call** 49:4 70:5 | 84:22 85:4,13 | 222:17,23 |
| 347:9,11 | **broad** 270:20 | 156:2 176:19 | 86:21 87:13 | 224:17,21 |
| 353:19 376:21 | 325:10 | 177:10 182:22 | 89:3,6,15 | 229:6 233:24 |
| **book** 326:3 | **broadest** 302:21 | 218:7 251:19 | 90:13 91:5 | 234:1 235:13 |
| **books** 351:14 | **Broadway** 3:18 | 251:21 | 110:23 112:4 | 236:4 237:10 |
| **borderline** | 385:16 | **called** 63:9 | 113:13 114:9 | 238:6 239:12 |
| 213:19 | **broke** 230:16 | 138:22 188:3 | 114:13 115:3 | 240:14,15,22 |
| **born** 88:12 | 231:3,6 296:13 | 200:12 264:5 | 116:22 117:13 | 240:24 241:8,9 |
| **bother** 303:10 | **broken** 307:19 | 313:14 319:17 | 117:18 118:2 | 241:13,17 |
| **bottom** 48:7 | **brought** 20:3 | 350:2 364:3 | 125:9 126:7 | 243:6,10,22 |
| 50:7 90:7 | 39:8,16,21 | 376:17 | 127:2,19 128:3 | 245:19 246:13 |
| 125:3 212:21 | 40:1,16,22 | **calling** 64:13 | 128:10 131:5 | 246:23 247:4,9 |
| 231:9 251:18 | **Brown** 3:17 | 177:15 252:16 | 131:10,21 | 247:21 253:21 |
| 265:1 274:14 | 14:12,12,18 | **calls** 152:2 | 132:23 133:8 | 255:4 257:23 |
| 274:21 293:5 | 308:5 385:15 | 343:22 | 135:4,8 136:24 | 258:14 260:9 |
| 348:6 | **Bruce** 9:6 | **Camargo** | 137:15 138:15 | 261:2,10 263:5 |
| **bought** 299:23 | **brush** 325:11 | 111:19 128:13 | 138:24 139:15 | 263:12 270:4 |
| **Box** 3:6 5:4 | **built** 231:22 | 135:13 | 139:24 142:1,4 | 270:13 273:5,8 |
| 385:4 386:21 | **bunch** 133:17 | **camera** 130:1 | 142:7,11,15,20 | 273:24 274:7 |
| **boy** 156:6 342:3 | 148:24 298:7 | **Campion** 22:24 | 142:23 143:7 | 275:8 277:11 |
| **Bradford** 135:6 | 349:18 | 23:15,21 24:1 | 143:14,19 | 278:23 280:8 |
| 182:21,24 | **buried** 229:3 | 27:15 | 144:8 145:24 | 280:17 281:14 |
| 288:15 | **business** 12:6 | **Campion's** | 146:14,17,20 | 281:15,17,21 |
| **brain** 87:15 88:2 | **Buzard** 326:18 | 23:18 | 147:24 149:2 | 281:22 282:6 |
| 106:16 153:8 | 327:16 | **Canada** 328:15 | 151:19 152:15 | 282:11,12 |
| 191:12 | | 330:17,24 | 153:4 154:8 | 283:5,8 284:20 |
| **BRCA** 31:9 | **―――――――― C ――――――――** | 349:17 366:15 | 155:17 156:3 | 296:11 298:17 |
| 169:6,6 350:5 | **C** 3:1,8,14 4:1 | **Canadian** | 157:7 159:11 | 313:6,10 314:7 |
| **BRCA1** 379:8 | 5:1 11:1 62:23 | 328:14 | 159:17 160:4 | 317:23 323:1,5 |
| **BRCA2** 379:8 | 64:14,21,23 | **cancer** 7:19,22 | 162:11,18 | 325:24 326:9 |
| **break** 15:11 | 65:14 314:10 | 8:4,6,6,9,10,11 | 163:4,7,22 | 328:12 329:12 |
| 20:9 21:7 | 314:20 315:1 | 8:14,19,21,22 | 165:12,19,21 | 329:18 330:2 |
| 40:14 79:11 | 337:1 385:6,12 | 9:5,9,12,16,20 | 166:18 167:1,3 | 330:11,22 |

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 975 of 1035
PageID: 242154
Ellen Blair Smith, M.D.

Page 394

334:14 335:21
336:17 338:22
340:21,24
341:4 343:20
344:5,12,13,13
345:12,13,13
345:14,23,24
346:1,5,6,7,9
346:10,13,13
346:16,22
347:1,3 349:12
350:3,4,5,15
353:9 355:17
356:3 357:11
358:21 359:3,6
360:9,17
361:20 368:10
368:18 369:15
370:4,5 373:1
375:2,8,13,14
375:23 376:3
376:11,16,18
377:11,24
378:5 379:8,17
**cancers** 31:17
85:1 317:9
323:8 344:9
345:5 350:1
**candor** 271:22
**capable** 72:23
**capacity** 17:13
81:12
**capture** 54:8
59:10 61:5
**carbon** 267:15
321:17 322:3
**carcinogen** 97:8
200:14,14,15
201:9,11,15
202:5,17,20
314:16 332:24
346:18
**carcinogenesis**
58:19 120:23
280:22 281:3
326:16
**carcinogenic**

206:20 207:3
331:18 338:16
369:23 370:8
**carcinogenicity**
332:5,16
343:24
**carcinogens**
10:23 328:5
343:23 376:17
**carcinoma**
16:10 208:9
241:11 242:7,9
272:16 334:15
**carcinomas**
243:18,19
**card** 382:14
**care** 5:8 8:3,8
191:18,18,19
281:13 342:1
377:11 379:7
387:1
**career** 80:11
146:15
**carry** 19:18
**cascade** 281:24
325:13,18
**case** 16:9 17:8
17:10 18:2,4
66:14 72:12,20
72:21 77:8,11
80:2 81:13,24
105:21 112:10
121:18 138:11
157:12 161:8
173:20 209:14
220:22,23
232:13,17
236:14 247:14
250:9 257:10
260:4 279:1,10
279:11 282:19
290:15 294:15
294:22 295:3,6
302:22 305:1,5
307:7 336:3
338:6 340:1,3
**case-control**

49:7 220:1
**cases** 1:6 17:17
72:16,19
114:14 131:19
132:2,3,4,7
186:10 212:15
242:12 244:14
270:4,11 383:6
**Cass** 9:13
**categorized**
83:17 84:1,6
126:16
**category** 165:4
195:9
**caught** 115:14
**caus-** 291:20
**causal** 127:1
182:18 198:19
199:18 212:23
213:15 214:8
214:10 220:7
224:18 230:8
231:13,19,22
235:8 291:1,20
292:10 313:5
330:10 348:14
348:18,19,21
353:8
**causality** 292:14
**causation** 83:9
83:19 85:16,24
86:5,10,15
121:6 133:15
142:14 143:6
166:8 167:18
183:1 200:10
202:14 213:11
214:12,13
235:6 240:13
**causative**
128:10 131:10
132:22 141:24
167:24 206:12
241:12,16
242:23 243:22
243:23
**cause** 2:5 7:19

31:16,16,20
82:1,15,19
83:1,18 84:1,6
84:18,21 85:4
91:5 110:23
115:2 131:21
133:8 139:24
142:14,20,23
143:7,13,19
144:8 155:23
214:2 241:8
328:11 335:21
336:17 341:4
344:5 346:10
346:22 370:5
**caused** 82:22
214:7 369:14
370:3
**causes** 29:18
82:9,12 83:7
85:12 90:13
117:13 142:11
153:4 154:8
242:7,16,20,21
325:8 346:8
368:15
**causing** 282:3
329:13,17
368:9
**cautioned** 32:24
**cautions** 116:11
116:12
**cavity** 262:18
263:6,7,19
266:6 267:8
274:9 316:7
317:6 318:18
319:2,23
321:19 322:1
322:23 323:4
324:1,24
**cell** 241:11,15
241:17 242:5,7
242:9 243:3,14
243:18 275:24
325:24 326:8
326:13,19

327:18 369:18
369:18 372:13
372:15,22
373:1,8,12,21
374:13,17,17
**cells** 323:11
326:9 328:1,2
**Center** 324:20
**CEPA** 328:14
**certain** 38:20
212:23 214:19
219:11 241:1
332:1
**certainly** 23:5
41:22 83:5
102:20 117:20
133:17,20
137:19 152:5
159:19 166:3
213:7 220:19
235:21 243:16
256:23 263:8
324:6 339:1
374:18 379:12
**certificate** 6:18
383:10 384:8
**Certified** 6:22
383:18
**certify** 383:20
383:24 384:11
387:14
**cervical** 16:7
344:13 346:5
346:10,13,13
346:16,22,24
375:13
**cervix** 16:10
263:6 323:3
345:13 364:13
**cgarber@robi...**
3:15 385:13
**chance** 42:1
47:23 48:14
113:8 183:10
183:21 194:7
212:17 348:20
**change** 144:13

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 976 of 1035
PageID: 242155
Ellen Blair Smith, M.D.

Page 395

211:23 245:1,7
320:8,15 321:3
331:1 336:15
336:20 381:4
**changed** 116:24
146:18
**changes** 6:17
42:18,21 43:20
52:22 281:3,24
294:5 327:12
369:20 381:1
384:17,18
**channel** 263:13
**chapter** 326:3
**characterat-**
141:14
**characteration**
201:6
**characteristics**
331:11
**characterizati...**
179:13 201:6
275:13
**characterizati...**
141:14
**characterize**
174:14 176:6
176:11,24
177:3,5,7
180:8,12,23
189:20 190:14
**characterized**
148:10 178:5
275:23 349:6
**characterizes**
289:13,20
**characterizing**
190:23
**charging** 18:23
307:3
**chart** 10:13 43:9
269:22 296:1
310:2 312:22
312:22 335:15
**charts** 300:13
**Chase** 4:5 386:3
**check** 55:18

**checklist** 147:2
**chemicals** 331:5
331:12,18
344:4
**child** 378:4
**children** 88:5,5
**chlamydia**
263:9
**choice** 180:18
185:19 220:24
247:6
**choices** 180:16
**choose** 180:24
**chose** 238:5
**Christmas**
259:1
**chromium**
332:5 376:23
**chronic** 281:22
**chryso-** 311:19
**chrysotile**
311:18 312:4
**cigarette** 137:10
**circles** 191:10
**citation** 50:22
57:2 166:22
**cite** 51:13 54:14
64:24 81:6
93:20 94:1
111:14 125:22
134:16,17
135:1 139:9
147:5 155:3
158:17,18
179:14,20,20
185:17 186:13
186:16,19,23
200:2 213:23
225:1 271:13
278:5 289:12
289:19 320:1
328:16 361:12
361:13 376:15
**cited** 51:18,23
52:7 57:15
64:10 65:13
77:13,17 79:9

94:23 96:5,16
96:17 125:19
136:1 139:2
141:22 146:24
147:16 160:13
164:4 165:24
186:1 199:5,14
226:17,19,21
246:18 248:22
249:1 261:8
263:16 272:17
287:20 289:4
294:20 295:4,8
295:21 336:24
349:17 356:8
362:23
**cites** 353:14
358:18 361:21
361:21
**Citizen** 106:3
**civil** 2:10 315:9
**claim** 254:18
262:21
**claims** 266:16
**clarify** 65:7
**clarity** 6:23
**Clarke-Pearson**
27:18,21
**Class** 202:20
343:22,23
376:17
**classifi-** 201:1
**classification**
101:2 116:13
202:22
**classified** 201:1
201:8,11,15
**clean** 197:21
**clear** 19:13
24:23 89:12
94:22 95:8
105:10 129:24
131:12,14
143:2 156:14
174:24 195:14
195:18 196:21
197:3,7 210:19

241:10,11,14
241:15,16,21
242:5,5,7,9
243:3,14,18
293:8 358:4
**clearer** 64:20
**clearly** 127:2
169:21 353:9
356:20 359:7
360:18
**Cleveland** 5:17
387:9
**client** 297:23
**clinical** 80:11,22
82:21 191:12
**clinically** 181:15
181:17,19
189:23 190:7
190:20 261:3
289:17
**clinician** 81:3,10
81:17 185:22
**close** 45:21
46:15 49:19
62:13 74:19
92:24 111:15
114:14 115:6
125:10 127:5
135:13 139:21
145:23 148:12
157:22 158:1
195:18 196:12
198:20 213:1
231:14 233:7
262:13 265:8
352:23
**closed** 80:12
103:6 153:4
220:7,12
245:19 257:4
361:22
**closer** 234:14
**clothes** 118:7
**coated** 181:10
181:13
**cobalt** 333:3
376:22

**cognizant** 95:11
**cohort** 45:18
46:12 128:12
173:20 209:14
214:19 216:11
219:12 220:5
220:12,15,17
221:2,5,21
224:16,24
225:11,21
227:13 232:18
235:11 237:20
237:23 238:1
247:14 248:7
248:14,16
249:3,16 250:3
252:17,17,22
253:9,22 254:5
254:8,15,20
255:3,6 257:2
277:8 278:24
279:12,20
290:11,14
291:14 292:4
293:1 353:10
**cohorts** 212:14
222:11 232:15
249:8 255:13
278:1
**collect** 53:18
95:13 191:23
196:11
**College** 8:13
**column** 43:12
124:22,23
194:18 206:18
212:20 237:8
255:17 256:9
256:10,14
274:14 318:14
353:4,6 357:4
**comb** 187:10
**combining**
132:3
**come** 18:8 56:14
58:22 84:14
89:1 147:16

261:1 281:8
314:4 375:17
**comes** 249:17
**comfortable**
145:11 242:6
**coming** 56:10
179:5 251:6
281:7 321:20
337:5,20 349:7
350:6
**commencement**
220:3
**comment**
244:22 247:15
282:8 286:6
366:17
**commented**
106:18 248:10
**commenting**
125:15
**comments**
159:24 247:19
296:1 366:21
367:8
**Commerce** 3:5
385:3
**commit** 337:22
**committee** 3:3
149:17 161:14
385:1
**commonly** 81:8
123:17 247:15
**communicate**
298:15
**communication**
69:11
**communicatio...**
26:5 66:24
68:10
**community** 34:8
37:10 148:16
151:6 167:9
168:10 181:6
198:14 251:20
252:3 262:14
280:21 330:13
**company** 22:3

22:14,14 65:18
65:21 66:2,10
66:12,16,18,20
67:1,24 68:8
69:4,16 70:14
70:18,22 86:15
**compare** 216:17
**compared**
114:11 155:4
279:12 290:14
376:23
**comparing**
229:12
**compelling**
337:8 339:2
367:9
**competitors**
299:4
**compile** 146:7
167:6
**compiling** 162:9
**complete** 45:19
112:6
**completed** 236:6
**completely**
273:21
**completion**
384:14
**Complied** 45:5
46:7 47:5 48:8
50:15 54:2
90:6 114:4
163:18 192:18
204:22 207:23
352:23
**component** 59:8
220:17 296:5,6
346:16
**comport** 211:13
**comprehensive**
57:5 59:4,9,23
61:10 98:8,12
146:12 166:11
167:15 268:9
273:11 313:10
313:24 332:4
332:13

**comprise** 331:5
**Compton** 50:22
**computer** 184:7
**computerized**
2:8
**con-** 59:22 225:7
279:8
**concedes** 236:21
**concern** 108:11
114:16 129:13
154:24 183:20
225:21 330:22
**concerned** 87:4
183:8
**concerning**
28:21,24 29:3
30:14,21,23
31:1 32:13,18
78:5 87:10
91:11,20 92:16
92:16 103:21
117:17 218:11
264:6
**concerns** 36:22
36:23 37:13
87:15,17,18
88:2,15,19
116:13,18
144:21 154:20
155:16 156:8
187:4 224:24
232:9 250:4
**conclude** 80:8
88:24 126:6
130:3 174:17
206:18 230:5,6
231:10 242:7
250:17,22
257:24 318:16
322:21 348:13
368:14 369:13
**concluded** 64:9
65:14 82:11
83:16,23 84:5
84:21 195:15
200:4 291:19
314:14 324:10

324:12 380:10
**concludes** 257:1
305:6 370:2
379:22
**concluding**
207:1,2
**conclusion** 61:2
82:8 89:20
98:1 106:22
108:15 114:1,5
115:8,23 116:9
121:5 125:5
126:12,12
128:9 129:3,11
130:4,16
133:13,16,21
133:21 172:14
182:19 185:17
187:17 194:10
196:23 198:23
199:3 201:17
202:15,20
213:8,11 214:1
232:7,24 235:5
243:21 328:17
328:23 356:3
356:16 374:4
**conclusions**
85:17,22,24
86:5,10,15,19
87:2 89:1,24
107:3 125:24
126:15 133:19
195:23 199:6
213:5 219:12
219:14,20
220:11,20
230:3 231:19
237:3 303:9
367:6,7,8
**conditions**
282:10,16
**condoms** 66:9
66:10 295:9,13
295:14,23
296:10
**conduct** 59:4,9

59:22 103:4
**conducted** 29:8
29:17 53:17
58:7 61:10
268:8
**conducting**
282:18
**conduit** 262:17
274:8
**conference**
43:18
**conferring**
191:6
**confidence**
43:16 116:5
135:20 174:23
176:8 189:15
227:16,21
229:8 335:5
**confident** 229:9
**confined** 84:18
246:12
**confirm** 160:2
160:17 344:19
**confirmation**
220:4 221:20
224:16
**confirmatory**
344:17,22
**conflict** 237:22
**conflicts** 201:18
**confounding**
49:7 136:24
137:1,2,9,16
183:10,21
186:5 187:14
187:21
**confused** 65:3,9
209:24
**confusing** 57:19
65:6 83:4
210:18
**confusion** 66:5
137:7
**Congress** 4:17
386:15
**connection**

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 978 of 1035
PageID: 242157
Ellen Blair Smith, M.D.

Page 397

284:2 313:5
330:10 376:10
**connotations**
191:9
**consensus** 153:3
154:8,12
**consent** 16:11
**consider** 29:23
76:18 78:4
85:11,12 93:14
101:1 104:11
106:8 117:15
117:21 131:18
135:7 136:22
137:8 139:3
145:22 149:20
152:20 161:7
235:11 243:5
246:22 255:12
279:5,8,10
295:7 296:3
344:7
**consideration**
382:17
**considered** 7:7
39:22 56:2
62:22 63:15
93:14 106:15
118:5 128:18
277:9 278:10
280:12 285:18
286:1,22 287:9
287:21,23
314:10,20
**considering**
8:15 244:22
277:10 311:7
**considers**
128:21 292:14
**consistency**
186:2 289:6
290:5 291:21
337:4
**consistent** 153:9
183:17 195:11
263:11 269:1,3
290:20 348:24

**consistently**
143:13
**constituents**
32:19 206:20
**constitutes**
383:22
**consult** 44:6
149:8 157:15
162:10 165:19
166:18
**consulted**
149:15 157:11
**consulting** 12:5
**contact** 12:22
13:22 23:24
284:9 285:7
375:17
**contacted** 12:12
12:14,19 27:7
27:9 81:23
82:7,12 83:15
**contacts** 12:21
**contain** 90:21
93:1 143:19
144:7,12
194:15 195:2
248:23
**contained** 38:21
64:23 78:9,16
79:8
**containing**
141:2
**contains** 119:13
119:15 384:18
**contaminant**
96:20
**contaminated**
109:19 110:7
142:19
**contaminates**
106:19 107:12
108:6
**contamination**
98:2 109:13,23
132:22
**content** 68:13
69:15

**contents** 69:7
**context** 66:20
68:1 85:22
89:8,16,17,22
102:1 107:17
121:3
**contexts** 141:1
**continue** 122:6
144:24 205:17
209:6 215:2
254:19
**Continued** 4:1
5:1 6:9 8:1 9:1
10:1 162:4
385:21 387:21
**continues**
191:19 350:4
**continuing**
91:10 117:12
**contraceptive**
146:16 169:7
271:10
**contraceptives**
146:17
**contractions**
365:16,22
**contradict** 96:19
96:24
**contradicted**
96:11
**contradiction**
96:23
**contrast** 301:20
**contrasted**
101:9
**contribute** 30:2
**contributes**
242:11,13,15
**contributor**
168:20
**control** 173:20
209:14 220:22
220:23 232:14
232:17 236:14
247:14 250:9
279:10,11
290:15 294:15

294:22 295:3,6
341:21,22
**controlled**
200:10 202:1
279:2
**controls** 9:13
246:17 267:15
270:6 326:6
**controversial**
357:11 358:22
359:8,13 360:4
360:20 361:20
**Convention**
104:5
**conversation**
68:14 161:9
377:21
**conversations**
37:5,21
**copied** 180:2
184:6 269:17
**copies** 20:4 42:5
198:1 228:19
**copy** 38:12 39:1
39:4 41:6,11
41:12 44:12
52:16,20 53:4
123:3,19 124:3
150:15 163:17
189:4 197:21
203:4 226:2
228:8,13,16
233:17 234:6,7
234:10 269:13
269:14 328:19
333:6,7,11,13
352:14 384:8
**corn** 268:1
363:11,13,17
366:7,11
**Corporate** 3:13
385:11
**correct** 11:23
17:8,9 18:13
18:24 19:24
20:1,20,24
21:1 36:4,5

39:9,10,23,24
40:4,5 41:13
41:14 42:13
51:20 52:18
53:18,19 55:1
58:8,9 65:18
65:19 68:19
69:23 70:11,19
71:6,9,13,16
71:20 73:12,22
74:1,2,3,4,6,7
74:9,10 75:5
77:5,8 82:17
82:19,20 83:7
83:8,13 85:14
85:15 87:19
90:3,13,14,17
90:18 91:3,8,9
91:14,18 92:17
92:21 94:10
96:21 98:12,18
101:11 107:8,9
110:16 111:9
111:12,13,16
111:17,20,22
111:23 113:17
117:14,22,23
120:17 121:3,4
121:7 122:12
123:4,5 125:17
126:8,11,17
127:7,11,13
128:19 129:14
130:20 133:5
135:5 136:17
138:4 139:4
140:1 145:24
150:3,5,21
151:14 152:23
154:10,12,24
158:9,22 160:5
160:10,14
162:23 163:4
164:5,11,17
165:6,15 170:1
171:12,13
172:3 173:6,13

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 979 of 1035
PageID: 242158
Ellen Blair Smith, M.D.

Page 398

| | | | | |
|---|---|---|---|---|
| 174:13 175:2 | 253:1,2,6,7 | **corrections** | 378:21 | 142:13 143:6 |
| 177:22 178:1 | 257:4 260:5 | 41:20 | **count** 152:12 | 166:8 254:12 |
| 179:14,21,23 | 261:10 262:6,8 | **correctly** 33:20 | 163:15 | 255:3,5 280:21 |
| 180:3,4,6 | 262:15 264:3 | 45:17,22 46:19 | **counter** 292:10 | 281:1 |
| 185:21 186:17 | 266:9,10 | 49:22 125:13 | **COUNTY** 382:8 | **critically** 133:12 |
| 186:18,20,22 | 268:21 269:7 | 175:17 176:4 | **couple** 15:4 | **criticism** 155:16 |
| 188:6,9,12,13 | 270:9 271:16 | 316:9 349:9 | 41:20 114:6 | 254:7,15,17 |
| 189:13 190:3 | 272:6,8 275:11 | **cosmetic** 97:23 | 274:5 | **critique** 225:14 |
| 194:7 195:19 | 278:11,16 | 99:14 100:20 | **course** 32:9 | **critiques** 244:7 |
| 195:20,23 | 280:2,9,13,14 | 103:23 106:19 | 34:17 105:20 | **critiquing** |
| 196:24 197:13 | 282:13,13 | 138:16 142:13 | 138:11 258:15 | 225:11 |
| 198:10,11 | 287:23 288:22 | 198:6 199:11 | 283:19 | **crossed** 116:3 |
| 199:6,7,15,19 | 290:9 292:5,7 | 312:7 343:19 | **court** 1:1 5:23 | **Crowley** 74:1 |
| 200:22 201:11 | 294:21 295:4 | **cosmetic-grade** | 11:8 28:17 | 259:13 331:10 |
| 201:13,15,16 | 296:15 301:21 | 103:6 | 111:6 303:19 | 331:15 344:6 |
| 201:19 202:22 | 302:3 303:1,4 | **COUGHLIN** | 304:4,8 306:21 | **Crowley's** 74:5 |
| 203:1,7,16 | 303:15 304:2 | 5:3 386:20 | 307:8 352:7 | 74:12 |
| 206:12 207:3 | 305:9 306:23 | **could've** 187:15 | 380:3,6 383:1 | **Crozier** 37:15 |
| 207:11,19,20 | 307:4,17,18 | **COUNCIL** 5:8 | **covered** 288:15 | **CRR** 2:7 5:24 |
| 208:2 210:23 | 318:12 344:23 | 387:1 | 298:5 | 388:6 |
| 210:24 211:3,4 | 347:10,17,21 | **counsel** 11:22 | **covering** 230:15 | **crude** 175:2 |
| 211:7,8,10,11 | 348:15 349:1 | 14:7,13 15:17 | **covers** 328:7 | **CSR** 2:7 |
| 212:11 213:12 | 352:19,20 | 20:2,11,12 | **crafting** 150:7 | **cult** 327:18 |
| 214:22 216:12 | 353:12,13,15 | 22:4 26:5 | **Cralley** 312:12 | **culture** 327:18 |
| 216:23 217:5 | 353:19 354:5 | 36:24 37:18 | **Cramer** 8:16,19 | **cumulative** |
| 217:14,20,21 | 354:17 355:18 | 39:7 42:4 | 8:23 34:22 | 169:19 171:9 |
| 218:12 219:7 | 356:22 357:11 | 44:20 52:20 | 35:3,23 36:2 | 171:14,18 |
| 219:10 220:12 | 358:22 359:8 | 55:24 56:6 | 54:20 169:17 | 205:20 346:18 |
| 220:22 221:6,8 | 360:20 362:1,4 | 65:4,22,24 | 184:3 195:9 | 346:19 |
| 221:16 222:2 | 362:9 363:22 | 66:13,16 67:1 | 212:2 273:23 | **cumulativeness** |
| 222:12,17,23 | 364:4,13,15,18 | 68:10 69:5,16 | **Cramer's** | 169:24 |
| 223:3,14,18 | 364:22 366:3,7 | 72:7,12 73:14 | 187:24 212:2 | **cure** 346:1,3 |
| 224:13 225:1 | 366:12,22,23 | 81:24 86:1,6 | **craziness** 95:23 | **curing** 345:12 |
| 226:10,13,18 | 367:2,4,12,20 | 96:3,7,12 | **crazy** 370:15 | 346:4 |
| 226:20 227:3,7 | 368:20 370:4 | 107:15 123:3 | **create** 63:18 | **current** 18:17 |
| 229:19 231:3,8 | 370:10 371:3,4 | 123:19 158:6 | **created** 63:14 | 53:12 198:17 |
| 231:20 232:4 | 371:7,8,18,20 | 191:6 260:5 | 147:4 300:13 | **currently** 12:1 |
| 232:10,11,15 | 372:4,17,22 | 284:10 285:5 | **creates** 338:15 | 18:12 103:5 |
| 235:6,13 236:6 | 373:2,14,22 | 302:11 304:5 | **creating** 149:7 | 377:10 |
| 236:8,17,22 | 374:13 375:4,4 | 316:4,13 | **creation** 300:23 | **Curriculum** |
| 237:16,18,23 | 375:5,8,14,15 | 317:20 341:15 | 301:10 | 7:13 |
| 238:16 239:21 | 375:18 376:12 | 347:19 379:13 | **credible** 90:20 | **curves** 293:8 |
| 243:3 245:12 | 376:16 377:2,7 | 384:22 387:15 | 92:23 93:1,15 | **custodial** 384:7 |
| 245:13 246:24 | 377:14 378:1,8 | **counsel's** 349:4 | **criteria** 135:6 | **cut** 218:9 273:14 |
| 247:23 248:16 | 378:10 379:16 | **counseled** 31:4,7 | 289:5,9 290:5 | **CV** 52:16,21,22 |
| 250:10,19 | 379:18 382:3 | 31:13 378:3 | 326:23 | 52:24 53:12,20 |
| 252:17,20,23 | 383:23 | **counseling** | **critical** 59:8 | 53:24 303:7 |

Ellen Blair Smith, M.D.

Page 399

**CX3** 50:17
**cyber** 218:9
**cynologus**
  266:22
**cynomolgus**
  266:21
**Cynthia** 3:12
  14:9 385:10
**cytokines** 276:2
**cytologically**
  327:3

**D**

**D** 2:6 4:6,12,18
  5:5,11,17,24
  11:1 383:17
  386:4,10,16,22
  387:4,10
**D.C** 5:11 387:3
**da-** 292:17
**daily** 81:18
  293:23 307:9
  307:10 367:24
**damage** 281:4
**Daniel** 8:16,19
  8:23 35:3
**darn** 346:2
**dat-** 241:22
**data** 12:15 49:2
  80:5 81:3,5
  84:12,13,13,24
  89:10 172:20
  187:18 191:23
  192:20 194:9
  194:20 195:7
  195:13,17
  196:11,20
  197:2 200:19
  202:16,19
  214:19 217:5
  217:13,23
  218:16 219:1,5
  219:12 221:5
  223:18 224:12
  224:23 225:20
  229:18 235:11
  235:19,23

237:16 242:12
245:10 248:11
252:23 257:16
262:24 268:19
268:24,24
270:7,13
271:19 272:10
277:10 278:2,5
279:1,2,6,20
280:2,5 292:5
292:9,17 296:8
337:3,12,19,21
339:1,3,20
350:20 359:13
**database** 106:13
**databases**
  150:12
**date** 11:6 19:14
  19:16 202:21
  310:1 381:3
  384:15 388:7
**dated** 7:3,9,11
  7:15,16,20
  8:16,20,23
  9:10,14,17,21
  10:8,10,18,21
**dates** 297:19
**Daubert** 304:8
**daughter** 88:12
  88:13
**daughters**
  377:23 379:14
  379:15
**day** 42:5 286:15
  307:11,15
  308:17 321:21
  321:21 331:4
  359:14 382:11
  382:20 388:2
**days** 258:23
  321:21 366:22
  384:15
**DC** 108:24
**dealing** 329:16
**Debra** 8:19
**decade** 327:17
**December** 19:19

19:20 20:19
**decent** 294:2
**decide** 367:11
**decided** 103:4
  164:16 330:7
**decides** 330:6
**decision** 115:1
  367:1
**declared** 202:17
**declined** 154:7
**decrease** 212:6
  281:14 326:12
  326:14 346:6
**decreased** 273:5
**decreases**
  159:20,20
  274:6 374:17
**decreasing**
  263:11 272:16
**deduce** 223:1
**deep** 283:24
**deeply** 87:6
  273:2 321:15
  324:6
**defendant** 4:15
  5:8 17:16 18:2
  386:13 387:1
**defendants** 2:3
  4:3 5:14 53:1
  72:12 76:23
  77:10 78:15
  79:7 386:1
  387:7
**defense** 16:14
  25:20 68:6
  69:6,14 71:22
  72:12 76:10
  78:8
**defenses'** 76:18
**defer** 100:21
  141:13 310:5
  310:24 331:10
  331:13,14
  344:6
**deferences**
  58:18
**deficient** 42:22

**define** 55:10
  58:12 233:3,10
**defined** 150:17
  150:22
**defines** 42:10
**definition** 146:2
**degree** 25:17
  68:23 99:24
  286:7 337:19
  359:22
**delineate** 54:17
  55:10 56:4
  63:23
**delivered** 384:6
**demonstrate**
  310:22 322:11
  333:24 334:9
**demonstrated**
  92:2 169:2,7
  170:12,16
  171:18,22
  214:2 240:9
  324:2 331:24
  370:9
**demonstrates**
  323:23
**demonstrating**
  312:4 339:21
**denying** 106:2
**depending**
  238:4
**depends** 176:8
  183:15,15
**deponent**
  384:12,13
**deposed** 16:23
  17:10 76:5
**deposition** 1:11
  2:1 7:5 11:3,23
  12:8 14:24
  17:22,23 20:3
  20:14 21:11,20
  38:13,15 39:1
  39:8,16,20,22
  40:11,20 41:8
  41:15 44:14
  53:2 75:4

77:13,17 78:10
  79:8 81:19
  94:20 95:2
  99:16 106:4
  113:4 124:8
  154:1 157:3
  160:19 163:9
  169:15 171:3
  176:1 184:23
  189:9 193:5
  197:18 203:11
  207:15 216:4
  216:20 226:5
  238:22 254:23
  258:22 259:5
  300:3,6,9,23
  301:7,10
  305:18 307:8
  309:7 311:14
  312:3 333:8
  336:14 340:2
  352:8 379:23
  380:10 382:2
  383:12 384:4,6
  384:14,21
**depositions**
  16:19 17:13,19
  303:18
**deputy** 324:19
**DES** 346:14
**describe** 39:14
  53:17 179:2
  203:23 359:4
**described** 61:11
  61:16,24 62:6
  62:12 190:2
  248:9 336:23
**description** 7:2
  8:2 9:2 10:2
  382:13
**descriptions**
  369:12
**design** 230:8
  231:11 232:10
  233:7 290:9
  291:3,22
**designed** 253:9

Ellen Blair Smith, M.D.

Page 400

253:23 254:5
**Despite** 186:2
197:2
**detail** 300:8,11
301:4,11
354:19
**detailed** 271:15
**details** 134:5
353:23 355:8
**detect** 253:22
**detectable** 97:14
**detected** 100:6
**determination**
115:20 191:24
196:12
**determinations**
302:1
**determine** 115:2
196:20 200:9
303:20
**determining**
165:17 168:12
292:14
**detract** 231:13
348:19
**detractors** 291:1
**detracts** 230:8
235:8
**develop** 172:5
172:10
**developed**
172:18
**developing** 33:4
**development**
87:12 155:17
159:11 240:21
241:12 242:11
242:13,15
275:8 283:4
338:22 357:10
358:21 360:17
361:19
**devices** 148:1,17
**diapering** 88:13
**diaphragms**
295:10,23
296:10

**die** 368:6
**Diego** 3:19
385:17
**differ** 232:1
**difference** 62:20
63:4 120:19,21
168:6 181:13
181:15 182:2
191:13 218:20
218:21 232:23
240:8 274:2
**differences**
195:3 348:1
**different** 58:14
58:22,23 59:1
63:1 67:18
70:22 100:17
120:13,23
146:18,18
149:18 158:5
164:19 165:14
174:6 181:12
190:8 202:15
214:13 232:18
234:3,18
243:14 250:12
269:14,22
298:8 301:24
326:8,10 331:4
333:14,15
343:3 360:6
373:10
**differentiated**
243:9
**differently**
58:21
**differs** 231:19
**difficult** 116:20
292:23 293:7
**dig** 153:16 171:6
**Diplomate**
383:18
**direct** 6:23
266:8
**directly** 275:9
380:7
**director** 12:3

324:19
**disa-** 126:9
**disagree** 99:21
100:8 107:10
108:5 126:12
126:14 129:8
130:16 133:19
133:22 150:14
159:6,6 179:12
199:5 243:24
257:12,18
359:11 360:2
360:11
**discern** 281:2
**disclaims**
199:18
**disclose** 298:18
**disclosed** 94:20
**disclosure** 26:5
**discomfort**
154:21,24
155:20,23
**disconnect**
234:15
**discount** 278:18
**discounted**
278:15
**discriminate**
116:21
**discriminating**
113:12
**discuss** 23:14
64:24 98:10,24
111:18 134:6,7
158:19,20
177:24 184:2
187:24 188:3
188:11,19
197:12 202:24
205:9 207:9
212:9 238:7
244:3 257:21
270:16 273:16
280:1
**discussed** 16:24
17:20 18:13
22:17,23 23:17

25:7 32:12,16
37:13 39:11,19
40:17 88:18
90:15 93:11
98:6 108:19
129:14 133:24
134:10 160:13
164:5 171:11
226:12,13
227:1 247:13
248:22 249:2
250:1,17 259:8
268:18 269:7
277:8 278:8
289:7 290:22
292:2,7 295:21
316:5 347:19
348:8,24
**discusses** 123:21
123:23,24
276:16
**discussing** 36:4
70:10 153:12
172:2 178:16
187:23 231:3
280:4
**discussion** 23:3
23:6 69:1
103:9 107:5
113:15 117:12
171:5 173:12
174:8,11 204:1
204:8 213:16
218:10 223:13
249:9 261:24
262:10 271:16
271:18 296:16
328:16 366:19
366:20 378:22
380:2
**discussions** 24:9
24:16,17,20,23
25:4 27:10,13
27:20 115:10
333:14
**disease** 33:17
84:13 114:17

116:13 130:3
148:4 149:1
202:3 280:23
**diseases** 243:6
**disinterested**
150:11
**disk** 117:9 194:4
277:5,5 320:10
320:14,24
**dispute** 223:6,9
223:12 266:14
**dissolution**
181:9
**distant** 318:22
**distinction**
68:17 140:12
140:17 141:5
168:3
**distinctions**
141:14
**DISTRICT** 1:1
1:1 383:1,1
**diving** 283:24
**division** 275:24
**DNA** 275:24
281:4 282:2
372:24
**docket** 22:14
**doctor** 19:7
28:17 34:24
36:20 43:4,14
57:13 62:17
63:17 64:15
65:3 66:6 68:9
69:8 70:2
74:23 79:14
80:15 93:4,23
102:17 105:10
111:4,8,11
112:23 113:9
114:20 119:21
122:13 124:12
124:15 139:10
159:3 160:1
193:13,22
204:20 205:3
209:17 215:23

Ellen Blair Smith, M.D.

222:6 223:8,22
227:24 238:18
252:14 254:11
254:19 256:7
256:21 264:22
267:2,11
268:17 269:14
270:1,24 271:4
271:22 272:20
281:13 289:3
292:21 335:19
352:5,12
355:15 356:9
361:21 369:7
370:1 377:9
**doctors** 36:14,19
37:1,4 281:13
**document** 1:6
38:20 66:11
103:14 107:1
108:9 122:18
163:12 164:2,4
250:21 299:13
299:14 318:19
382:14 383:6
**documented**
172:7 327:6
**documents** 22:4
22:12,13,14
65:18,21 66:2
66:12,17,18,21
67:1,24 68:1,2
68:8 69:4,7,16
70:14,19,22,23
86:16 104:17
105:12,14,15
305:14
**doing** 21:8 23:1
33:16 60:12
120:9 157:24
182:15 184:8
307:6,20
377:10
**dominant**
322:14
**Don** 87:8
**Dorota** 9:24

**dosage** 120:20
**dose** 187:24
192:1,11,20
194:10,13,15
195:3,6,23
196:21,24
204:9 206:4,11
292:9,15,18,19
293:3,5,8
294:7,9,11,16
294:23 295:2,4
295:5 327:10
333:24 334:10
334:21,22
**dose-response**
188:4,8 195:2
195:14,18
196:16 197:3,7
204:12,24
205:6,9 334:16
**double** 144:14
144:18
**Double-blind**
248:7
**double-sided**
163:17
**doubt** 302:12
**douche** 154:5
**douches** 155:21
**down-regulates**
373:21
**Dr** 3:4 11:16,18
12:2 13:8
14:24 20:16
24:14,17 25:5
25:24 26:23
27:8,10,18,21
28:7 35:23
36:2 38:24
40:15 41:4,10
41:22 42:8,17
43:24 44:6,9
44:13,16,20,24
45:24 46:3,6
47:4,14 48:2,4
48:9 49:3,6,24
50:6,9,11

52:15 53:5,11
53:16 55:9
57:4,13 58:3
62:19 67:12
70:9,11 71:13
71:23 72:3,16
72:18,23 73:5
74:1,5,12,13
74:15 75:2,4
75:11 76:1,12
76:19 77:3,7
77:11,14 79:21
80:1,7 90:4,8
93:4 98:16
99:19 107:1,14
107:20 110:9
117:11 118:14
119:8 123:2
124:12 126:21
137:24 145:1,2
145:17,21
150:21 153:14
155:12 156:4
156:11 157:5
157:10 161:3
162:6 163:11
169:14 171:7
172:15 173:4
175:1 176:3
179:18 180:2
182:8,12 184:2
187:24 188:11
189:19 193:7
194:6 196:9
204:18 205:16
206:24 207:9
207:17 208:5
208:12 210:15
213:23 216:12
216:22 217:4
219:16 226:1,7
230:14 231:2
237:2 239:2,6
239:17 253:13
254:10 260:1
261:5 265:23
274:11 276:15

277:7 280:5
283:10 284:6
284:10,13
285:6,7 286:9
288:15 293:10
297:1,6 298:13
298:15,23
300:2,5,22
301:20 302:3
302:12,24
303:11,21
305:6,14
306:17,22
308:14 309:6
309:10,14
310:5,13,18
311:1 312:6,20
321:2 322:24
324:19,21
327:16 331:10
331:15 342:6
343:12 344:6
348:3 358:5
359:23 376:1
376:10 380:1
385:2
**draft** 6:20,21
**drafts** 218:8
273:15,16
350:20
**draw** 60:10
187:17
**drawn** 276:14
276:14 367:7
**DRINKER** 4:10
386:8
**Drive** 3:13
385:11
**driver** 282:2
**drop** 275:3
**dropped** 185:10
273:19
**drug** 374:11
**Duces** 7:5
**due** 183:9 261:5
379:8
**DUFFY** 5:3

386:20
**Duke** 13:12,12
**duly** 2:4 11:11
384:3
**dumb** 342:4
**duration** 109:10
110:5 186:10
192:12 231:12
244:19 245:3,5
245:10 292:24
293:3 294:3,11
294:16 334:18
335:3,5
**Dusts** 10:23
**dying** 341:7
377:24 378:4
378:21 379:8
**dysfunction**
263:2

**E**

**E** 2:9 3:1,1 4:1,1
5:1,1 9:9,10
11:1,1
**e-mails** 27:23
**e-Pub** 56:23,24
233:16,16,21
333:19
**e-publication**
56:10
**e-Pubs** 56:10
**e-r** 320:3
**e.g** 206:21
**e.g** 206:21
**earlier** 51:7
115:8 150:17
157:18 158:3
160:7 166:14
227:5 268:19
269:6 272:14
273:23 278:8
280:11 289:7
290:22 298:12
313:4,12 316:5
317:20 320:15
328:8 338:3
348:7 349:1
353:5 355:14

362:13
early 10:17
  265:6,6 273:15
  346:1 355:2,3
easier 175:24
  208:4
effect 146:20
  206:20 207:3
  280:17 323:10
  331:18 341:18
  375:24 377:4,8
effects 237:10
  270:15 279:12
  281:21
Egli 262:24
  320:1 321:17
  322:3 362:19
  364:2 365:4
  366:1
Egli's 365:7,9
either 124:18
  134:13 223:13
  278:21 347:4
  373:3 374:5
Elective 8:15
elevated 276:1
elicit 317:7
eliminate
  236:11,17
  249:21
eliminated
  249:15 295:14
eliminating
  172:8 249:11
Ellen 1:12 2:2
  6:6 7:5,9,13
  11:3,10 379:23
  381:2 382:1,6
  382:11 383:12
  384:2
ELLIS 5:16
  387:8
else's 267:22,23
embedded 87:6
  321:16 324:6
emphasizing
  127:8

employed 12:1
  18:12 164:22
  387:15
encompassed
  261:20
encourage 28:10
  28:13
ended 299:9
Endo-Capron
  285:19,21
  286:20,21
  287:6
endometrial
  213:20 241:4
  317:6 344:12
  345:12 346:4
endometrioid
  85:1 213:20
  241:3,9 243:1
  243:13,18
endometriosis
  84:9 149:6
  243:17 330:1
endometrium
  323:3
ends 50:22
endure 145:16
engaged 18:16
engine 58:15
English 128:8
enjoyed 259:17
enter 262:17
  318:21
entered 322:2
  351:8
entertain 367:8
entire 227:17
  278:10 351:11
entirely 232:17
  348:22
entities 2:4 4:3
  386:1
entitled 7:14,18
  8:4,6,8,11,14
  8:18,22 9:4,8
  9:12,15,19
  10:4,6,10,15

10:20
Enumerable
  12:24
environment
  120:13 338:16
environmental
  125:7 356:18
enzyme 281:3
  281:24 339:4
  371:16
enzymes 326:1
  326:12,13
  370:7
EPA 328:14
epi 128:12
  229:22 237:9
  295:6
epide- 198:5
epidemiologic
  82:16 87:14
  141:23 149:2
  173:5,18,22
  183:2 185:21
  191:5,10
  199:10 200:19
  213:7 235:24
  249:17 255:11
  292:17 293:7
  337:3 349:16
  349:19 360:6,8
epidemiological
  47:20 48:11
  177:20 181:6
  198:5,18
  332:14
epidemiologist
  182:17,18
  183:8 185:18
  185:19 191:4
  191:17 255:2
epidemiologists
  181:22 182:11
  191:3
epidemiology
  9:15,19 179:9
  182:12
episode 281:20

epithelial 9:4,20
  113:13 116:21
  139:24 240:24
  317:9 323:11
  326:9 328:2
  338:22
epithelium
  275:10 326:7,8
  357:10 358:20
  359:13 360:3
  374:20
Epstein 7:16
  324:21
equal 279:6
equally 279:9
equate 140:3
equivalence
  140:7
equivocal
  292:18
erroneous 240:4
error 274:2
Eslick 9:17
  49:10
especially 186:4
  220:2
ESQUIRE 3:4,4
  3:12,17 4:4,10
  4:16 5:3,9,15
  385:2,2,10,15
  386:2,8,14,19
  387:2,8
establish 35:7
  198:19 293:4,8
  360:13
established
  127:3 213:1
  353:9 356:21
  359:7 360:18
  362:13
establishment
  356:24
estimate 14:3
  21:5 172:6
estimates 335:6
estrogen 146:19
et 8:23 9:14,20

9:24 10:5,8,21
  320:1,2
eTable 228:11
ethical 200:13
  200:20
ethically 200:16
etiologic 87:12
European 10:19
evaluate 327:3
evaluated 33:3
  239:13
evaluating
  117:20 129:1
  177:20 185:20
  214:17 244:11
  245:11
evaluation
  25:20 366:17
evening 343:12
ever-users
  205:21
ever/never
  192:8,9 205:24
  293:2,14
ever/nevers
  192:13
everybody
  145:10 147:10
  264:14 346:3
evidence 90:20
  92:23 93:1,13
  93:16,18 115:4
  115:24 116:1
  163:20 165:5
  165:10 173:20
  173:24 198:5
  198:18 199:11
  200:12 202:9
  204:23 205:6
  213:6 235:5,24
  237:9 242:6
  245:22 248:12
  249:4 264:6
  267:19,20
  273:4 283:3
  299:12 303:20
  304:8 311:6,11

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 984 of 1035
PageID: 242163
Ellen Blair Smith, M.D.

Page 403

| | | | | |
|---|---|---|---|---|
| 312:20,23 | 158:24 159:4 | 144:2 155:7 | 106:1,4,6 | 79:8 156:18 |
| 319:7,14 321:4 | 160:21 188:2 | 167:12 176:20 | 107:2 113:3,4 | 185:2 311:16 |
| 324:9 325:7 | 189:11 192:21 | 181:1 182:6 | 113:6 115:15 | **exist** 142:23 |
| 327:19 332:15 | 203:19 204:14 | 183:13,22 | 115:18 123:6 | 274:3 344:18 |
| 355:2 367:12 | 205:18 239:3 | 201:5 208:24 | 124:6,8,18 | **existed** 195:3 |
| 375:1,6,22,24 | 239:11 250:2 | 210:9,15 | 126:13 129:21 | **exists** 6:21 |
| 376:20 377:1,8 | 251:17 256:19 | 212:10 217:7 | 131:23 135:18 | 236:14 316:1 |
| **evident** 205:21 | 265:20 266:4 | 222:3 223:22 | 140:19 153:14 | 344:20 345:2 |
| 249:17 | 277:24 293:22 | 228:3 247:16 | 153:17 154:1,3 | 347:9,13 |
| **exact** 50:1 | 299:14 356:14 | 247:22 248:1 | 156:18 157:3 | **Exp** 388:7 |
| 135:14,15 | 369:16 | 248:24 269:4 | 158:24 159:4 | **expanded** |
| 186:13 261:21 | **examines** | 274:15 275:17 | 160:17,19,21 | 128:10 |
| 264:15 297:19 | 303:20 | 277:5 286:3 | 163:6,9 169:15 | **expect** 347:2 |
| 376:6 | **examining** | 287:3,3 295:3 | 171:2,3 175:23 | **expected** 59:22 |
| **exactly** 17:24 | 112:3 | 304:3 313:19 | 176:1 184:21 | **experience** |
| 113:23 135:19 | **example** 119:14 | 329:12 331:9 | 184:23 188:2 | 319:3 |
| 135:20 199:16 | 137:8 146:12 | 338:15 339:9 | 189:8,9,11 | **experiment** |
| 207:6 262:20 | 147:22 164:12 | 357:16,21 | 192:21 197:17 | 376:7 |
| 270:22 300:16 | 164:13 168:19 | 359:18,19 | 197:18,21 | **experimental** |
| 352:17 354:10 | 248:8 249:19 | 362:2,5 363:20 | 203:9,11,19 | 198:17 |
| 368:3 | 293:1 306:14 | 363:20 372:12 | 204:14 205:18 | **experimentati...** |
| **exaggeration** | 327:5 371:6 | 373:5 377:5 | 207:14,15 | 337:7 |
| 307:12 | **examples** | **executed** 382:16 | 216:3,4,19,20 | **experiments** |
| **exam** 268:2 | 281:19 346:19 | **exert** 206:20 | 226:4,5 238:20 | 23:6 267:18 |
| **examination** 6:7 | **exceeded** 186:10 | **exerts** 207:2 | 238:22 239:3 | 370:2 |
| 6:9,10,11,12 | **exception** 238:1 | **exhausted** 166:2 | 239:11 251:17 | **expert** 7:9,11 |
| 6:13,14,15 | **excerpts** 124:3 | **exhibit** 7:1,3,4,6 | 254:23 256:19 | 12:13,17 16:3 |
| 11:14 162:4 | 124:19 | 7:8,10,12,14 | 265:18,20 | 16:3,6,6,12,15 |
| 297:4 308:12 | **exchange** | 7:16,18,21 8:1 | 266:4 277:24 | 16:21,23 17:6 |
| 331:11 343:10 | 105:10 | 8:3,5,7,10,13 | 293:22 294:20 | 18:16 19:10 |
| 352:10 363:14 | **exchanged** | 8:17,21 9:1,3,8 | 294:23 296:1 | 22:1 35:23 |
| 363:16 378:16 | 27:23 28:3 | 9:11,15,18,22 | 300:1,3,7,10 | 52:16 54:11 |
| 379:3 | **excited** 337:23 | 10:1,3,6,9,11 | 300:12,24 | 59:21,22 71:13 |
| **examinations** | 340:15 | 10:13,14,19,22 | 301:10 305:13 | 72:13 73:21 |
| 366:10 | **exclude** 304:8 | 20:13,14 38:14 | 309:6,7 312:2 | 74:11 75:12,22 |
| **examined** 47:18 | **exclusion** 66:9 | 38:15 40:8,11 | 314:10,20 | 76:2,22 81:12 |
| 48:17 49:1 | **exclusive** 35:14 | 41:5,8 42:10 | 315:1,14,19 | 97:15 101:2,4 |
| 53:14 57:10 | **excuse** 11:5 | 43:10 44:12,14 | 317:12,19 | 101:11 174:5 |
| 86:8 94:4 | 42:15 52:4,12 | 47:18 48:17 | 318:13 333:6,8 | 178:4 183:9 |
| 95:17 106:6 | 55:13 59:16 | 49:1 53:1,2,13 | 333:11 335:9 | 185:22 259:7 |
| 107:2,23 | 68:9 69:8 | 53:14 57:10 | 337:1 347:20 | 283:14 298:18 |
| 108:10 113:6 | 75:15 78:19 | 62:23 64:14,21 | 347:24 348:13 | 302:4,5,8,11 |
| 115:15,18 | 90:6 98:13 | 64:23 65:14 | 352:6,8 355:15 | 314:11 376:4 |
| 123:1 131:23 | 99:13 102:15 | 77:14,18 94:4 | 355:16 356:14 | **expertise** 100:18 |
| 135:18 140:16 | 102:15 110:19 | 95:17 99:13,16 | 369:16 | 182:12 302:18 |
| 140:19 142:9 | 122:10,13 | 99:22 100:2 | **exhibits** 77:22 | **experts** 22:18,22 |
| 144:5,20 154:3 | 130:9 136:16 | 102:6,7,14,22 | 78:4,10,16 | 26:8,12,18 |

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 985 of 1035
PageID: 242164
Ellen Blair Smith, M.D.

Page 404

27:14,24 28:5
63:10 80:23
81:20 141:13
177:20 243:20
243:24
**explain** 23:10
62:19 63:3
97:15
**explained** 99:4
**explanation**
257:3
**explanations**
301:13,19
303:11
**exploratory**
103:5
**exploring**
127:18
**exposed** 114:10
120:14 317:9
318:23 326:19
328:1 339:22
347:16 355:24
**exposure** 7:18
8:18,22 32:9
109:6 111:15
115:2 118:6,8
119:13,18
120:12,20
125:7 127:1,5
134:11,14
165:6,11
180:11 186:11
189:14 195:9
246:20 295:14
313:5 323:10
328:4,22
346:15 353:8
353:11 354:17
355:18,21
356:19,22
357:9 358:19
359:4 360:7,15
361:18
**exposures**
119:11 186:8
**express** 87:18

88:15,19 91:19
**expressed** 92:8
92:23 114:16
116:11 337:10
382:18
**expressing**
36:23 237:15
**expression**
367:20,21,23
368:2,5,9
**extent** 26:4
78:24 137:7
344:22 345:1
**external** 362:15
363:21 364:8
364:17,19
375:7,16
**externally**
363:12 365:19
**extracellular**
369:21
**extremely**
346:14
**eyes** 361:22

---

**F**

**F** 3:7,9,15,20 4:7
4:13,19 5:6,10
5:12,18 8:16
9:6 385:5,7,13
385:18 386:5
386:11,17,23
387:3,5,11
388:11
**face** 301:21
303:10
**facility** 18:17
**fact** 16:22 17:24
97:6 121:5
136:12 160:18
219:6 235:11
238:6 245:2
249:2,10
254:15 267:20
271:21 293:16
294:19 304:5
304:11 318:9

324:9 325:19
334:9,20
353:24 366:1
368:8
**factor** 35:14
70:4 87:12
137:9 146:3
147:24 148:22
149:5 152:2,4
158:4 159:10
167:2,6,22
168:2,13
169:16 172:6
172:10 187:22
240:21,23
241:1,2 243:13
244:21 245:3
272:16 288:24
325:16 341:17
346:21 372:21
**factors** 8:6 9:19
29:6 31:5,7,10
31:12 33:16
35:8 137:16,18
145:23 146:22
148:12 149:8,9
149:16,21,23
150:8 151:5,12
151:19,24
157:7 158:22
159:10 160:4
161:16 162:10
162:11,14
163:20 165:4
166:24 169:1
169:10,18
170:4,11,14
171:19,23
177:19 182:21
183:1 187:14
247:8 271:9
272:22 273:8
280:13 288:21
292:13 350:7
**facts** 92:1,1
360:1
**failed** 341:9

**failure** 45:19
46:13
**fair** 68:17 70:24
72:21,22 73:2
91:21 100:21
131:15 151:1
204:2 227:5
281:9 312:19
318:3,10
**fairly** 76:9
**fallopian** 8:11
163:21 263:6
317:6 323:3,11
326:7 339:15
365:23
**falls** 116:1
260:19 261:14
**familiar** 27:17
132:13 160:23
164:21 204:11
264:8 284:17
**family** 149:5
341:24 377:14
377:17 378:4
378:21
**Fanconi** 31:9
**FAQ** 8:8
**FAQ096** 8:8
**far** 21:8 44:23
130:19 153:16
209:10 323:13
327:8
**far-** 195:8
**farther** 195:8
**fashion** 237:20
**fast** 224:10
**faster** 184:19
**fatal** 176:15
243:11
**favorite** 112:16
112:21 113:1
113:11
**favorites** 126:16
**FDA** 97:10
98:17 99:14
101:18,20
102:23 103:4

103:14 105:20
106:2,18 107:7
263:16 264:10
264:17 265:12
265:17 316:15
324:10,12
**FDA's** 98:22
99:22 101:6,24
106:22 107:11
108:5,11 315:9
**FEC** 315:20
**Federal** 2:10
**feel** 66:7 67:14
102:17 106:24
124:10 193:7
124:21 337:23
369:5 378:24
**fees** 18:5,6,9
**fellow** 13:11
**felt** 88:7 133:21
**female** 87:5 88:5
262:16 275:8
319:5 322:22
377:23 379:13
**fertility** 279:17
**fewer** 242:12,12
**fiber-per-bottle**
109:14
**fibers** 140:4,13
140:20,21
141:16 312:1
318:19
**fibr-** 143:11
**fibres** 10:23
140:23 141:2
318:21,22
**fibrous** 62:13
91:5 139:21,24
140:3,5,8,12
141:15,24
142:3 143:1,6
143:11,12,19
144:7,12,22
310:14,19,21
310:22 311:3
313:13 314:14
**field** 146:8

150:24
**Fig** 7:21
**figure** 42:23
43:23 207:21
209:21 210:5
210:14,23
211:5 343:2
372:6
**final** 6:22 153:5
195:8 234:11
234:21 367:6
**finally** 207:8
377:9
**financially**
387:17
**find** 58:14 59:1
96:10 97:5,6,7
97:9,10,13,17
97:24 133:12
140:17 150:18
168:18 181:15
222:16,22
240:1 254:12
265:15,17
268:24 269:3
273:6 274:17
278:21 304:12
309:15 337:3
345:24 354:20
355:1
**finding** 100:13
107:18 114:12
126:7 127:10
188:6 201:19
206:5 211:22
212:18 213:3
255:3 265:20
270:17 274:2
278:9,15 292:3
295:22 304:10
306:17 312:7
315:13 319:18
**findings** 87:6
99:22,24 100:2
116:4 128:15
183:2 187:24
196:16 197:2

204:9,12 205:9
220:15 227:11
295:7 296:3
302:10 304:5
309:10 310:18
368:15
**finds** 206:3
**fine** 15:24 22:7
41:17 43:8
53:22 95:4
122:1,1 193:16
215:22 240:18
350:11 374:24
**fine-tune** 187:10
**finish** 21:16
28:18 74:21
137:23 155:8
155:12 156:12
176:22 209:1,2
224:3,5,6
241:23 242:2
292:21 301:8
305:22 306:1
320:17 325:4
331:14 357:23
358:5 363:15
**finished** 118:14
119:21 130:10
182:7 227:24
306:13 320:15
357:19 358:1,3
358:8 373:6
**Finland** 318:1
**Firm** 388:8
**first** 11:11 12:12
12:16,22 13:10
13:22 23:24
27:8,9 34:21
35:2 44:24
57:12 60:13
88:10,12 94:3
94:5,12,23
114:6 122:21
124:23 126:23
137:3 138:20
146:23 153:5,6
154:14,18

163:12 165:8
172:14 178:22
215:12 216:24
229:4 230:5
255:17 256:12
269:17 274:14
274:21 277:17
284:9,23
285:15 312:9
312:15 318:20
321:15 348:4
376:6
**five** 16:20
111:14 127:3
134:16 169:18
267:5 329:23
329:24 330:2
342:10,11
353:10,14
354:2
**flagellated**
324:3
**flat** 208:10
307:9,10,15
360:23
**flaw** 218:8,15
**flaws** 250:9
**Fletcher** 284:22
284:24 326:3
**flip** 41:16
163:16
**flurry** 330:17
**flushed** 321:17
**FLW** 1:5 383:5
**focus** 355:13
**follow** 38:7
**follow-up** 45:21
46:15 214:22
217:13 219:9
225:13,23
244:14,22
252:24 308:11
**follow-up's**
244:24
**follow-ups**
298:7
**followed** 61:16

61:24 62:6,12
100:14 102:23
**following** 50:9
220:3 281:13
288:5 318:24
384:1,22
385:21 387:21
**follows** 11:13
**Food** 324:20
**footing** 279:6
**footnote** 263:16
**footnotes** 133:13
**foregoing** 382:2
382:15 383:20
383:22
**foreign** 262:17
263:21 288:4
317:7
**forest** 227:12
**forget** 182:24
**forgot** 93:5
128:7 135:22
223:17 327:23
**form** 17:2 24:6
29:10 34:3
35:20 42:14
48:16,21 51:15
51:24 52:9,13
55:14 57:9
58:10 59:13,18
60:1,20 61:7
61:13,18 62:4
62:9,16 64:12
66:4,23 68:4
69:17,20,24
70:20 71:11,17
72:5 73:7
75:16,20 76:3
76:15,20 78:12
78:17 80:24
81:4,14,20,21
83:9 84:23
85:5,20 86:2,7
86:12,17,22
87:20 89:9
91:23 93:17
95:16 96:8,13

96:22 98:3,14
99:9,23 100:4
100:24 101:12
102:2 103:16
104:6,13,18
105:17 106:11
107:13 108:8
109:9,15,20
110:8,18,19
112:8,11
116:15,19
119:12 120:18
121:8,16,20
125:18 126:10
126:18 127:12
127:21 128:6
128:20 130:15
131:1,22
132:24 134:9
134:22 136:18
137:6 138:17
139:5,17
140:14,20
141:17 142:8
142:17 143:21
144:9,16
147:20 149:11
151:9,20
152:10,16
155:1 157:13
158:23 161:12
162:20 164:18
165:22 166:10
166:20 167:4
167:20 168:5
168:14 169:4
170:6 172:4
173:1 174:16
175:3 176:7,13
178:7 179:3,10
180:15 181:2,8
181:24 182:20
183:14 186:21
187:2 190:5,17
195:21 196:3
196:18 197:1
197:11 199:1

Case 3:16-md-02738-MAS-RLS   Document 33123-4   Filed 08/22/24   Page 987 of 1035
PageID: 242166
Ellen Blair Smith, M.D.

Page 406

199:20 201:12
201:20 203:17
206:6,22 207:4
209:9 211:15
211:20 212:12
213:13 214:3
217:6,16 218:2
218:17 219:3
220:13 221:7
221:14,17
222:5,13,18
223:15,20,23
224:14 225:2,6
226:14 227:6
229:20,24
231:16,21
232:16 235:7
235:20 236:7
236:13,18,24
237:24 240:6
242:8 243:7,15
244:1,9,23
246:14 247:1
247:10 248:2
248:18 249:6
249:14 250:6
250:11,20
254:10 257:15
260:6,20
261:18 262:7
266:11 269:2
270:10 272:12
273:9 276:10
277:12 278:3
278:12,17
279:3,7,22
280:18 281:18
282:14 287:4
287:12,24
289:15,22
290:1,10 291:5
291:23 292:6
292:12 293:19
294:8,12,17
296:12 298:22
299:11 303:16
305:10,17

306:24 309:24
310:9,16 311:4
313:2,17
314:17 316:18
323:20 324:11
324:15 328:13
329:20 330:14
332:2 335:1
337:2 338:11
338:17,24
339:12,17
340:9 343:21
344:11,24
345:8 346:12
347:12 348:16
349:3 353:20
354:6 356:23
358:23 359:9
363:2,7,23
364:23 365:6
365:20 366:4
366:13 367:3
368:1,12 371:5
371:11,19
372:5,18
373:15 374:8
374:19 376:5
377:3,6,18
378:2,9 379:10
**formed** 60:16
78:5 81:24
89:8 90:16
91:1,7,11,12
91:16 92:10,19
**formerly** 311:16
**forming** 54:9
62:1,7 72:3
105:20 138:11
157:11 167:8
**forms** 141:20
212:4 246:19
**formulations**
146:17
**fornix** 364:4,12
**forth** 257:13
**forward** 44:23
**found** 43:22

56:6,15 87:10
96:19 97:3,16
98:5 118:3
121:14 187:5
222:12 229:3
239:23 255:15
258:2 269:21
273:10 280:19
292:19 294:16
302:3 309:15
309:17,19
311:12 318:22
325:19 327:18
328:3 348:1
372:3
**foundation**
244:2
**four** 321:21
**fourth** 43:11
45:7 249:17
**fragrance** 331:4
331:5,12
**fragrances**
61:17,20 62:1
74:3 91:16
331:6,15,19
344:4
**frame** 88:9
**framed** 176:4
**FRCP** 384:11
**free** 66:7 102:17
106:24 124:10
193:7 369:5
**freedom** 133:22
**frequency**
192:12 231:12
292:24 293:4
293:12,18
294:3,7,16
334:19 335:3
**frequent** 163:1
242:10
**frequently** 56:7
155:21
**friend** 378:4
**friends** 377:14
377:17,23

379:14
**front** 41:4,12
102:6 122:18
164:22 215:24
219:17 233:22
274:11 317:11
**full** 45:7,9,10
46:4 47:14
56:8 76:7
124:23 245:24
253:17 255:18
256:12 266:2
273:13 274:21
275:15 352:2
383:22
**functions**
262:17
**fundamental**
60:13
**funding** 285:10
**funky** 274:5
**further** 2:13
6:12,13,14,15
25:18 44:23
53:24 100:18
107:5 114:8,19
152:6 214:5
233:10 246:4
342:5 343:10
352:10 378:13
378:16 379:1,3
379:21 384:11
387:14,17
**future** 280:24
281:1 299:2
337:21

_____
**G**
**G** 11:1
**gangbusters**
337:6
**Garber** 3:12
14:9,17 385:10
**Gates** 9:20
214:20,21,23
215:12,16
216:3,10 217:5

217:8,12,18,23
218:16 219:2
221:6,10
223:18,21
224:2,12,19
227:10,13
229:12,18
235:14 252:24
253:1 255:7
277:19 292:5
**Gates'** 216:13
**gears** 315:7
**gene** 43:10
149:5 367:18
367:20,21,23
368:2,5,8
**general** 147:24
173:16 225:18
234:1 240:13
246:13 249:7
302:21 334:14
371:12
**generally**
145:22 146:2
148:2,12,15,18
148:22 149:7
150:7,10,17,22
151:19 152:8
152:11 158:22
161:11 162:9
165:18 166:17
167:2,9 168:2
168:9,12
243:17 280:12
280:16 321:19
335:24
**generate** 323:8
**genes** 328:4
368:11 370:22
370:24
**genesis** 134:19
**genetic** 83:19
138:1 172:7
367:16 370:9
**genetics** 83:24
138:1
**genital** 8:22 9:12

Ellen Blair Smith, M.D.

Page 407

| | | | | |
|---|---|---|---|---|
| 10:4,20 87:5 | 174:8 189:4 | 325:3,9,9 | 193:21 197:16 | **Greater** 315:6 |
| 186:11 205:22 | 193:21 222:6 | 327:8 335:18 | 202:6 203:9 | **Greek** 320:2 |
| 206:19 229:6 | 224:7 229:4 | 342:18 343:1 | 207:13 210:1 | **Green** 329:7,15 |
| 262:16 263:19 | 239:15,16 | 356:15 357:17 | 210:17 215:14 | **Gross** 179:20 |
| 263:22 275:8 | 261:22 274:16 | 358:6 359:23 | 216:9,16,17 | **ground** 15:3 |
| 296:5 316:16 | 279:23 287:14 | 373:3 380:7 | 219:13 226:3 | 289:8 |
| 319:10 322:22 | 288:10 356:13 | **God** 11:13 | 229:4 231:5 | **ground's** 298:5 |
| 323:17 324:14 | 356:19 368:17 | 346:15 | 234:14 238:19 | **group** 124:24 |
| 330:11 347:15 | **given** 14:24 | **goes** 181:16 | 255:24 263:17 | 126:24 147:11 |
| 362:15 364:8 | 16:19 17:21 | 233:15 236:2 | 281:8 298:4,17 | 200:22 201:7 |
| 364:10,17,20 | 30:13,20 250:3 | 287:1 370:15 | 317:12 323:14 | 283:8 317:21 |
| 375:2,7,17,22 | 277:20 293:22 | **going** 23:4,5 | 347:24 358:4 | 318:8,11 353:7 |
| 377:19 378:5 | 365:15 382:19 | 38:12 41:3,5 | 367:1 | 357:7 |
| **genitalia** 323:24 | 384:5,20 | 41:24 70:17 | **Gonzalez** 222:20 | **group's** 350:2 |
| **Genome** 43:2,5 | **giving** 262:2 | 74:18 79:15 | 222:21 225:15 | **groups** 295:17 |
| 43:6 350:3 | **glad** 53:9 64:4 | 105:1 107:3,4 | 227:14 253:5 | **growing** 235:23 |
| **genotoxicity** | 65:4 | 117:4 119:2 | 255:9 277:21 | 283:3 339:5 |
| 282:18 285:24 | **glove** 322:4 | 122:18 123:16 | 277:22 | **grows** 235:24 |
| **gentlemen** 342:8 | **gloves** 268:1 | 124:1 147:1 | **good** 6:4 11:16 | **guess** 23:11 |
| **Gerrig** 260:13 | 363:11,17 | 160:16 161:20 | 11:17 15:21 | 26:14 |
| **Gerschwind** 9:6 | 366:14 | 185:2 188:15 | 74:20,23 79:11 | **guided** 179:8 |
| **Gertig** 9:24 | **go** 18:6 25:18,18 | 189:7 193:22 | 100:12,14 | **guilt** 341:20 |
| 214:20 215:17 | 42:24 43:16,17 | 193:23 200:8 | 105:3 145:19 | **Guy** 9:17 |
| 216:17,18,22 | 54:21 55:16 | 200:18 202:7 | 153:13 187:19 | **GY** 284:20,21 |
| 217:8 222:1,2 | 56:11 58:19 | 215:18,20 | 219:9 284:16 | **GYN** 37:15 |
| 223:2,4,5,9,11 | 64:3 87:21 | 226:15 261:1 | 295:13 308:24 | 259:13 |
| 223:14,16 | 95:10 100:18 | 269:5 276:24 | 343:12 346:2,4 | **gynecologic** |
| 227:11 229:12 | 110:24 118:24 | 282:3 288:16 | 347:23 | 10:9 13:11 |
| 238:2 250:1 | 134:4 143:4 | 296:19 308:3 | **Google** 58:7 | 159:16 366:10 |
| 260:14,15,15 | 145:6 149:13 | 333:5 342:17 | **Googling** 95:22 | **gynecologic/o...** |
| 277:20 293:1,9 | 168:16 175:24 | 343:4 374:23 | **GORDON** 4:16 | 263:15 |
| 293:11,13 | 176:23 184:20 | 379:23 | 386:14 | **gynecological** |
| **getting** 40:6 | 186:6 187:9 | **Golkow** 388:8 | **Gosh** 350:2 | 262:14 344:9 |
| 65:6 95:23 | 193:12,20 | **gonna** 20:11,12 | **gotcha** 192:14 | 345:5 |
| 184:18 189:6 | 209:10 211:2,5 | 24:19 38:14 | 252:12 | **gynecologist** |
| 239:10 265:6,8 | 215:15 228:1 | 41:10 44:12 | **gotta** 320:6 | 16:8 37:15 |
| 317:2 330:20 | 230:18 234:19 | 45:16 46:5 | **gotten** 346:15 | **gynecologists** |
| 331:13 352:23 | 254:11 263:4 | 49:4 52:24 | **grade** 326:21 | 8:14 148:20 |
| 361:17 | 265:7 266:3,3 | 53:4,23 54:3 | **granuloma** | 154:4,16 |
| **girls** 125:6 | 267:12,20,22 | 68:14 69:11 | 288:13 | 155:18 |
| 356:18 | 268:5,6 269:18 | 75:10 99:13 | **granulomas** | **gynecology** 8:18 |
| **give** 21:4 22:2 | 290:19 296:17 | 106:1 113:2 | 288:3 | 329:9 |
| 23:7 59:13,16 | 305:24 306:2 | 123:6 124:3,6 | **great** 79:24 | |
| 60:6 62:17 | 307:24 311:20 | 145:18 153:11 | 97:13 120:10 | **H** |
| 120:4 122:19 | 312:17 320:11 | 156:17 163:6 | 162:8 218:9 | **H** 9:9 |
| 134:12 148:17 | 321:12 322:13 | 171:1 175:22 | 232:5 256:13 | **habit** 140:6,21 |
| 152:1 164:12 | 322:14 324:4 | 190:21 193:17 | 317:18 322:10 | 141:6 313:14 |

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 989 of 1035
PageID: 242168
Ellen Blair Smith, M.D.

Page 408

314:15
**Hal** 156:4
298:13,15
**Halcyon** 12:4
**half** 51:10 125:3
195:9 215:12
359:14
**half-a-dozen**
229:14
**halfway** 50:8
114:21 194:19
275:3 315:24
364:21
**hand** 20:11
38:12 41:3,11
53:4,8,9 124:1
124:3 160:16
175:20 203:4
216:9 226:2
347:24 358:10
359:1 360:14
382:19
**handed** 20:12,17
42:9 102:6
122:22 123:3,9
123:19 124:18
157:6 160:23
226:7 228:18
333:10
**handful** 55:4
**handing** 42:6
197:20 352:12
**handy** 184:17
**hang-up** 191:16
**Hankinson** 9:9
**happen** 184:16
**happened** 56:8
300:17 342:2
**happens** 81:8
179:17 264:16
323:21
**happy** 15:12
178:15 189:4
190:13 286:6
**hard** 362:12
**HARDY** 4:4
386:2

**Harlow** 8:19
174:11 175:23
178:17
**Harvard** 317:24
**hate** 193:9
**hazard** 238:3,5
**head** 19:13
84:15 160:15
279:24 302:17
306:15 328:22
366:2
**headache**
181:16
**heading** 283:3
**health** 8:3,8
10:3 163:7
216:11,23
221:5 222:15
238:8,20
244:19 293:17
328:15,21
330:17 349:17
366:15
**hear** 105:4
138:12 185:11
185:12 320:12
**heard** 67:18
88:10 104:8
138:6 246:1
349:8
**hearing** 107:5
**heavily** 121:6
242:11 279:1
319:20
**heavy** 61:11
91:11 111:15
127:4 137:10
331:24 343:18
353:11 354:17
355:18 356:21
376:14
**help** 11:12 15:4
56:14 171:7
234:23 317:14
**Henderson**
321:16
**hereto** 2:12

**heterogeneity**
230:7,13
231:11 232:9
233:2,4,6
256:20 257:4
290:22 291:2,6
291:8,13,15
348:9,17,19
**Hey** 74:17 222:6
224:3 276:19
**Hi** 297:7 343:13
**hide** 223:10
**high** 260:12
**higher** 159:13
169:10 212:17
248:11 249:3
**highest** 173:24
**highly** 166:12
**Hill** 135:6
182:24 288:15
**Hill's** 182:21
**Hilton** 2:9
**hinge** 220:14
**hinging** 220:10
**Hispanics** 43:16
**histologic** 9:20
238:12 240:8
240:14 242:10
**histological**
239:13
**Histology**
239:21
**historical** 10:15
309:11
**histories** 32:4,10
**history** 33:5,14
33:24 34:14
35:12 149:5
360:8
**hold** 85:3 90:13
92:7 142:24
204:3,5 205:18
**Holliday** 50:18
**home** 12:4 88:14
**hope** 83:14
139:8,11
337:20

**hopes** 288:17
350:9
**Hopkins** 77:14
300:5,22
303:11 312:22
**Hopkins'** 78:1
**horse** 341:20
**hospice** 12:3
18:17 377:11
**hospital** 18:1
**Houghton** 10:7
227:13 238:7
238:20 244:5,8
249:19 253:2
255:8,8 277:17
**hour** 18:23
74:18,19
306:15 307:4
307:21 336:13
336:13
**hourly** 307:19
**hours** 19:10
307:11 360:11
371:1,2
**Houston** 4:6
16:8 386:4
**HPV** 346:20,21
**huge** 212:15
**Huh** 252:4
**hum-** 365:12
**Hum** 233:14
364:10
**human** 10:23
99:11 288:12
314:15 319:19
325:16 346:16
**humans** 365:3,7
365:10,11,13
365:14,14,15
**humor** 307:13
**Huncharek** 9:6
188:12 189:8
194:7
**hundreds** 261:2
**Hunes** 320:2
**hunger** 145:16
**Hunts** 365:14

**HURST** 3:18
385:16
**hurting** 323:9
**husband** 23:22
25:10 26:2,15
26:16 27:24
**hypothesis**
86:21 152:15
152:22 172:3
172:24 236:3
269:11 270:8
276:9,13 277:9
278:2 279:21
323:19 349:12
**hypothesized**
275:7
**hypothetical**
292:9 304:4
**hysterectomy**
8:15 16:11
35:7 159:19
172:12 263:13
268:4 271:11

---

**I**

**i-** 85:10
**IA** 122:20,21
351:17,23
**IARC** 7:21
10:22 111:3,12
115:1,20,23
116:2,8 121:2
121:9,13
122:17 123:3
125:4,15,19
127:8,20 128:7
128:9 132:20
133:2,14,15,17
133:23 136:12
140:9 164:13
164:20 200:22
200:24 201:8
201:10,14,19
202:15,16,21
264:2,5 265:3
313:12 314:5
314:14 317:21

Ellen Blair Smith, M.D.

318:3 332:20
343:22 352:14
353:2,7 354:18
354:21 355:5
355:14,15,16
356:2 357:2,7
357:14 358:10
358:18 359:15
360:14,19,24
361:7,18,20,21
376:14
**IARC's** 121:5
126:6 127:9
130:4 313:24
332:3,7,11,13
332:21 355:13
361:6
**idea** 291:15
**identical** 41:12
99:20
**identifiable**
311:24
**identification**
20:15 38:16
40:12 41:9
44:15 53:3
77:23 78:2
99:17 106:5
113:5 124:9
154:2 157:4
160:20 163:10
171:4 176:2
184:24 189:10
197:19 203:12
207:16 216:5
216:21 226:6
238:23 300:4
309:8 333:9
352:9
**identified** 36:3
37:18 118:18
147:15 285:7
306:3,4 321:15
**identify** 37:4,7
54:22 114:13
128:5 130:24
174:3

**identifying**
310:6
**identity** 382:14
**Imerys** 4:15
297:8,9,21,23
297:24 298:2
299:3,17,23
303:12 306:10
306:18,20,22
386:13
**immediately**
6:21 193:5
**immune** 369:19
**impact** 49:8
149:1 345:6
**impair** 278:22
**imparted** 109:7
**implicit** 36:23
**implicitly**
192:11
**implies** 191:12
**importance**
51:17 135:5
**important**
121:19 187:6,7
188:5 206:12
212:11 213:24
278:21 279:18
289:6 371:2
**improved**
206:13
**in-depth** 155:5
227:2
**inability** 137:15
**inadequate**
163:20 165:5
304:13 305:6
**inappropriate**
377:20 378:22
**Inaudible**
194:23 265:10
**incidence** 125:9
224:20 263:11
270:5 274:6
346:7
**incidents** 346:14
**inciting** 323:5

**include** 51:14
105:15 134:10
136:24 139:20
172:11 191:21
194:9 218:6,16
221:5 225:20
236:1 238:11
254:14 262:10
262:12 271:10
271:15,18
295:22,22
**include-** 220:16
**included** 40:3
52:7 108:20
113:15 198:24
217:23 218:7
219:1 220:16
229:18 236:5
244:19 278:2
292:4 293:17
314:9,23
**includes** 217:18
355:7 384:22
**including** 27:24
141:4 188:9,10
206:14 267:15
307:7 319:10
**inclusion** 212:14
227:17 229:14
290:17
**income** 18:15,19
**incomplete**
60:17 304:1,4
**inconsistency**
290:8,13
**inconsistent**
205:1,7 211:16
211:17,22
269:1 272:11
280:9
**inconsistently**
140:24
**incorrect** 129:3
**incorrectly**
128:24
**increase** 159:21
176:9 177:17

177:17 180:10
181:18 224:20
229:5 238:3
258:14 260:22
261:3 278:23
281:17 326:13
329:17 375:13
376:15
**increased** 36:6
38:8 114:9
159:16 165:12
189:17 205:12
213:18 257:23
260:9 261:9
262:1,5 273:24
275:24 340:20
375:7,23
376:22
**increases** 125:9
212:3 343:19
374:16 375:2
**increasing**
169:19,20
204:15 245:10
330:22
**incur** 155:15
**independent**
80:1,4 101:7
**INDEX** 6:1 7:1
8:1 9:1 10:1
**indicating** 87:17
314:22
**indisputable**
266:7 316:8
324:10,13,18
324:24
**individual** 147:2
232:1,2 258:18
279:9 290:18
335:20,22
336:2
**individually**
134:4 290:16
332:19
**individuals** 70:5
**induce** 341:20
370:9

**induced** 326:23
**inducing** 281:24
282:2
**induction**
326:14 328:3
339:4
**indust-** 120:12
**industrial**
120:13
**infermil-** 263:3
**infertility** 263:3
**inflammation**
58:19,20 91:20
241:19 242:10
275:10,22
280:22 281:6
281:17,20,22
283:4 284:20
288:3 323:7
325:5,8,11
327:19 338:14
338:21 350:1
371:18
**inflammatory**
84:13 148:3
149:1 276:1
281:23 282:9
282:15 317:8
325:13,17
331:17 338:8
**influence** 343:24
346:24
**influenced**
133:20 319:20
**inform** 66:13
70:19 111:1
128:2
**information**
24:5 45:20
61:1 66:1 72:8
72:20 78:9,15
79:7 81:6 87:9
96:12 99:19
147:12,17
194:13 195:2,5
206:14 234:11
238:12 239:20

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 991 of 1035
PageID: 242170
Ellen Blair Smith, M.D.

Page 410

240:9,19
258:19 263:9
263:10,11
277:14 287:14
293:17 346:11
356:12 384:20
**informative**
106:9,9 167:1
273:8,10
**informed** 16:11
24:11
**informing** 338:5
**inhalation** 92:17
339:23
**inherited** 149:5
**inhibiting**
372:15
**inhibition**
372:13
**initial** 138:20
283:6 356:17
356:24
**initially** 68:2
210:5
**Initiative** 222:16
238:8,20
244:19
**inject** 363:10
**injected** 363:5
363:24
**injecting** 366:14
**injections** 364:2
**inputted** 184:10
**inquiry** 78:24
**insensitive**
341:14
**inside** 264:1
324:4
**instance** 2:3
270:12
**Institute** 8:10
9:23 162:19
165:20 166:19
**instruct** 24:19
68:15 78:20,22
**instructed** 78:23
79:1

**instrument**
382:15
**insufficient**
198:18 235:5
346:17
**insult** 281:23
**intend** 53:21
**intense** 220:3
**intent** 61:5
**intention** 147:5
333:1
**intentionally**
153:24
**interact** 377:12
377:13
**interacting**
275:9
**interest** 330:21
**interested** 72:6
150:8 152:21
387:18
**interesting**
135:9,24
**intergrown**
141:3
**internal** 323:24
**International**
8:21
**internet** 30:9
95:23
**interpretation**
230:9 231:13
231:22 235:9
257:8 291:2,20
292:11 348:14
348:20
**interpreting**
374:9
**interrupt** 281:6
358:8
**interrupted**
157:23 261:2
**interruption**
118:22
**interrupts** 274:7
**interval** 189:16
229:8

**intervals** 43:17
43:19 116:5
135:20 174:23
176:8 227:16
227:21 229:10
335:5
**interventions**
338:1
**interviews** 30:20
**intrauterine**
148:1,17
**introduced**
187:16
**introducing**
366:11
**introduction**
213:14 363:17
**invasion** 208:7
**invasive** 9:4
213:19 220:6
224:17 229:3,6
241:2,3,8,9
**inverted** 43:15
**investigators**
360:7
**investments**
18:21
**invoice** 19:20,23
20:9,23
**invoiced** 19:14
19:15
**invoices** 7:3
19:18 20:4,13
20:17 25:5
39:12
**invoked** 257:3
**involve** 353:17
354:2 362:23
363:4
**involved** 24:11
63:11 72:18
75:8 132:11,14
155:15 174:21
206:21 306:18
325:13 338:8
364:2 376:11
**involvement**

22:17 28:11,14
**involves** 363:16
**IR** 351:3,10
**issue** 62:13
84:18 98:11
107:4 132:20
200:6 245:18
246:23 247:5
247:20 248:10
253:20 268:10
268:13 278:16
279:1,2 289:14
348:9 350:15
**issued** 152:14
**issues** 14:5 29:9
29:22 30:3,11
349:22
**Item** 90:12,19
91:19
**items** 84:19
85:10 235:10
301:13
**IUDs** 147:22

_____

**J**

**J** 9:6,10 87:8
**J&J** 11:22
103:18 109:18
297:22 298:3
300:19 317:20
**James** 4:4 6:7,9
6:12 11:15,21
14:13 16:1,2
17:3,5 20:2,7
20:10,16 21:7
24:8,22 25:8
26:7 28:20
29:15 34:4,7
34:10,11 35:22
38:18,23,24
40:9,13 41:2,3
41:10,24 42:4
42:8,16,17
44:16,19 48:18
48:23 51:19
52:2,10,15
53:4,10,11

54:7 55:19
57:12 58:11
59:20 60:3,12
60:22 61:9,15
61:21 62:5,11
62:19 64:15
65:8 66:12
67:6,9,11,14
67:19,22,23
68:6,18,22
69:2,3,14,19
70:9,24 71:12
71:19 72:7,15
72:22 73:4,8
73:10,18,19
74:14,15,21
75:1,2,18,24
76:6,17 77:2
78:14 79:3,5
79:11,13,21
81:2,10,17,23
85:2,7,21 86:4
86:9,14,19
87:2,16,22
88:1 89:12
92:3 93:9,20
94:10,14 95:12
96:2,10,15
97:19 98:5,16
99:12,18 100:2
100:19 101:1
101:16 102:5
102:13,20,21
103:20 104:8
104:15,23
105:9,19 106:1
106:8,14 107:6
107:20 108:2
108:18 109:12
109:17,22
110:12,20
112:9,13,19
113:2,7,8
116:17,23
117:11 118:10
118:17,24
119:8,16

Ellen Blair Smith, M.D.

Page 411

| | | | |
|---|---|---|---|
| 120:11,17 | 184:1,21 | 240:10 242:1,4 | **Johnson's** 10:15 |
| 121:1,12,18,23 | 185:16 186:23 | 242:14 243:12 | 92:24 97:11 |
| 122:1,11,14 | 187:23 188:17 | 243:20 244:4 | 103:17 299:14 |
| 123:2,10,12,14 | 188:20 189:3,7 | 244:17 245:2 | 306:4,5 308:20 |
| 123:16 124:1 | 189:12 190:9 | 245:16 246:6,7 | 309:12 310:7 |
| 124:15 126:1 | 190:13,14,19 | 246:21 247:7 | 311:2,8,13,15 |
| 126:14,20 | 190:22 191:8 | 247:12,23 | 326:22 340:7 |
| 127:14,24 | 193:12,15 | 248:3,6,21 | 353:18 354:4,8 |
| 128:17,23 | 194:6 195:15 | 249:8,19 250:8 | **Join** 327:22 |
| 130:2,7,11,13 | 195:22 196:7,9 | 250:15,24 | **journal** 9:19,22 |
| 130:17 131:7 | 196:22 197:8 | 251:3,16,18 | 10:19 30:6 |
| 131:15,18 | 197:12,20 | 252:1,4,21 | 329:7,10,15 |
| 132:5 133:4 | 198:4 199:4,21 | 253:13,16 | **journals** 51:20 |
| 134:15 135:3 | 201:4,10,14 | 254:14 257:17 | 167:6 |
| 136:17,22 | 202:11 203:13 | 259:6,15 260:8 | **JPMorgan** 4:5 |
| 137:11 138:3 | 203:22 205:16 | 261:5,23 262:9 | 386:3 |
| 138:23 139:9 | 206:9,24 207:8 | 265:14,19,22 | **judge** 181:22 |
| 139:19 141:9 | 207:17 208:18 | 266:12 267:23 | 304:24 305:5 |
| 141:22 142:12 | 208:21,23 | 268:18 269:6 | **judging** 182:11 |
| 142:18 143:3,5 | 209:1,4,15 | 269:24 270:11 | **Judith** 7:11 |
| 143:15,23 | 210:1,4,13,20 | 271:14 273:6 | **Judy** 26:22 |
| 144:5,11,17,23 | 210:22 211:17 | 274:10,18,21 | **Julie** 77:18 |
| 145:6,9,17 | 212:1,19 | 275:1,19,23 | **July** 8:8 |
| 147:22 149:15 | 213:10,22 | 276:15,22 | **jump** 288:17 |
| 151:10 152:7 | 214:11 215:22 | 277:7,15 278:5 | 374:1 |
| 152:13,19 | 216:2,6,10,18 | 278:14,24 | **junction** 50:18 |
| 153:18,20,22 | 216:22 217:9 | 279:5,19 280:1 | 341:15 |
| 154:9 155:6,9 | 217:17 218:4 | 281:9 282:5,17 | **jury's** 304:5 |
| 156:4,16 157:5 | 218:19 219:6 | 286:11,14,19 | **just--** 78:20 |
| 157:18 158:8 | 220:19 221:9 | 287:8,16,17,19 | |
| 160:22 161:17 | 221:15,19 | 288:2,14 | **K** |
| 162:5,22 | 222:10,15,20 | 289:19,23 | **K** 5:3 263:1 |
| 163:11 164:21 | 223:17 224:1 | 290:4,12 | 386:19 |
| 166:6,13,23 | 224:11,22 | 291:17 292:2,8 | **K-u-n-z** 322:5 |
| 167:7,16,21 | 225:5,10 226:3 | 292:15 294:6 | **Kahn** 325:14 |
| 168:8,23 | 226:7,15 227:8 | 294:10,14,19 | **Karen** 2:6 5:24 |
| 169:23 170:8 | 228:8,14,17,22 | 297:1 300:21 | 37:8 383:17 |
| 171:1,6 172:13 | 229:16,22 | 304:19,22 | 388:6 |
| 173:4 174:24 | 230:2,12,14,19 | 305:3 309:18 | **Katherine** 4:10 |
| 175:11,19,22 | 231:2,18 232:2 | 309:23 310:9 | 269:15 386:8 |
| 176:3,11,16,24 | 232:19 233:19 | 310:16 311:4 | **katherine.mc...** |
| 178:10 179:6 | 233:21 234:5,9 | 313:2,17 | 4:13 386:11 |
| 179:12,18 | 234:13,17,24 | 314:17 316:18 | **Kathryn** 9:13 |
| 180:17,21 | 235:3,4,10 | 323:20 324:15 | **keep** 50:21 |
| 181:4,21 | 236:2,9,16,20 | 327:22 328:13 | 184:8 193:22 |
| 182:10 183:3 | 237:2,19 238:7 | 329:20 330:14 | 235:1,3 269:4 |
| 183:12,19 | 238:19 239:1,9 | 332:2 335:1,8 | 317:11 374:23 |
| | | 335:13 337:2 | |
| | | 338:11,17,24 | |
| | | 339:12,17 | |
| | | 340:9 342:9,12 | |
| | | 342:15 343:11 | |
| | | 344:2,14 345:3 | |
| | | 345:10 347:2 | |
| | | 347:14 348:23 | |
| | | 349:4 350:21 | |
| | | 375:11,12 | |
| | | 378:13 380:1 | |
| | | 384:7 386:2 | |
| | | **January** 1:13 | |
| | | 2:5 11:6 12:15 | |
| | | 13:23 19:23 | |
| | | 20:24 21:2,9 | |
| | | 21:20 285:15 | |
| | | 339:10 380:11 | |
| | | 381:3 383:13 | |
| | | 388:2 | |
| | | **Jason** 330:1,7 | |
| | | **Jersey** 1:1 5:5 | |
| | | 383:1 386:21 | |
| | | **job** 304:5 | |
| | | **John** 77:14 | |
| | | **Johnson** 1:3,3 | |
| | | 2:3,3 4:3,3 | |
| | | 10:15 90:21,21 | |
| | | 94:19,19,21,21 | |
| | | 95:6,6 103:14 | |
| | | 103:15,22,22 | |
| | | 104:3,3 108:20 | |
| | | 108:21,24,24 | |
| | | 109:2,2,7,7 | |
| | | 110:6,6 297:17 | |
| | | 297:17 299:9,9 | |
| | | 301:15,15 | |
| | | 303:12,12,22 | |
| | | 303:22,24,24 | |
| | | 305:7,7,15,16 | |
| | | 311:12,15,23 | |
| | | 311:23,24,24 | |
| | | 312:3,3 316:4 | |
| | | 316:5,13,13 | |
| | | 353:18 354:3 | |
| | | 383:3,3 386:1 | |
| | | 386:1 | |

Ellen Blair Smith, M.D.

**Kemble** 5:4
386:20
**kept** 50:21
**key** 371:16
372:12
**kidding** 311:17
**killer** 345:13
**kind** 23:2,6
24:16 58:24
101:13 144:14
146:20 191:13
255:10 263:17
**Klatt** 4:16 6:10
6:13,15 15:20
15:24 16:1
213:9 228:18
297:5,6 299:1
299:3,16,21,24
300:5,16,22
301:3,9,18
302:2,14 303:8
303:15,19
304:2,7,12,20
304:24 305:5
305:13,20,24
306:6,10,16
307:3,24
308:10 309:24
324:11,17
327:13,20
330:15 334:24
336:19 342:11
342:13,18
347:5 350:23
351:2,5,11,14
351:16,20
352:1,5,11
353:24 354:10
355:4 356:8
357:2,15,17,20
358:1,7,12,15
359:1,15
360:12,24
361:11 362:4,9
362:12 363:4,9
363:21 364:1
365:1,8 366:1

366:6,15 367:5
367:20,23
368:3,14,18,20
368:23 369:7
369:13 371:6
371:13,21
372:7,20 373:7
373:20 374:12
374:24 375:21
376:9 377:7,19
378:6,11,22
379:4,12,20
386:14
**Klatt's** 369:6
**KLF4** 372:20
**Kluwer** 10:3
**knew** 26:3
104:24 284:21
298:12
**know** 13:7,16
14:10 15:12
17:24 19:13
25:22 26:14,18
26:23 27:1,1,7
33:23 34:5,6,6
34:11 36:15
37:9,17,20
42:6 43:2
54:20 56:16
69:14,18 70:17
71:22 72:1,2
72:17,20 75:11
75:24 76:5,10
76:13,14 77:10
77:12 78:8,13
79:6 82:23
95:5 100:7,8
100:11,12,12
100:13 101:24
103:13,18,24
104:7,15 105:2
105:10,14
108:22 114:20
128:15 133:2
135:15,21
136:9 137:4
138:2,10,14

140:8,18
141:19 150:16
152:3,12,13
156:4 159:9
162:16 163:24
164:24 174:6
191:9 193:17
196:19 202:21
212:5,7,8
214:11 217:10
221:4,10,13,16
222:10,11,15
222:20 223:19
224:9 226:16
228:16 239:23
248:13 249:5,7
252:21 258:2
258:22 259:15
259:19 261:21
264:5,17 265:5
266:22 268:14
269:9,19
270:22 273:22
281:21 283:10
283:21,22,22
284:2,5,6,13
284:14,24
285:1,1,2,3,5,8
285:9,10 286:6
287:2,5,5
288:12,12
294:3 297:9,15
297:18,18,20
298:2 299:23
300:12 301:17
302:14,22,24
303:3 304:9,11
304:16 305:20
306:6,16,19
308:17 315:19
329:22,23
330:4,6,7,23
331:21 338:7
338:13,20
339:14 341:24
342:3 343:22
343:23 344:20

346:11 356:10
359:10,21,24
359:24 361:17
362:17 369:11
374:21 377:1,8
**knowing** 155:14
**knowledge**
75:22 103:21
**known** 13:8 28:7
311:16,17
314:15 318:20
382:12
**knows** 302:11
304:6
**Kruppel-like**
372:21
**Kupelnick** 9:6

**———— L ————**
**L** 2:6 3:12 5:24
383:17 385:10
**L.D** 388:6
**L.L.P** 4:4 386:2
**lab** 23:13 101:7
101:14,20
281:8 284:23
323:7 326:4
**labeled** 43:9
90:8 312:2
**laboratory** 92:2
200:19 281:2
325:10
**labs** 105:16
**lack** 45:20 46:13
195:13,18
197:3 231:12
244:1 254:19
255:10 291:13
291:21 292:9
326:24
**lacks** 166:3
**ladies** 268:3
**Langseth** 9:9
49:12 197:13
197:21 251:1
252:22 317:13
318:16 321:9

**language** 172:21
197:9 206:17
348:23,24
353:5
**large** 10:13
212:17 250:3
**largely** 205:24
330:24
**larger** 55:4,6
63:8 124:20
179:4 322:17
324:1 325:22
**lasted** 307:15
**late** 341:5
**latency** 224:24
225:7,13,22
**latest** 102:23
**Laurel** 60:5
**law** 307:8
**Lawrence** 156:5
298:13,15,24
**lawyer** 361:15
**lawyers** 24:20
78:21 259:20
**lead** 246:9
**leader** 342:1
**leading** 275:10
275:21 309:18
309:23 330:15
336:19 339:5
**leads** 202:19
274:22
**leaning** 44:21
**learn** 184:7
**learned** 240:17
**leave** 41:19
275:19 323:15
**lectures** 30:14
**Lee** 23:13
**left** 153:24
194:17 275:21
280:4 308:5
**left-hand** 212:20
256:9 318:14
**legal** 242:18
**Leigh** 3:4 14:9
25:13,19,24

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 994 of 1035
PageID: 242173
Ellen Blair Smith, M.D.

Page 413

| | | | | |
|---|---|---|---|---|
| 40:9 72:22 | 195:4 326:10 | **limited** 45:19 | 151:11,22,24 | 282:7 284:1,8 |
| 122:14 145:1 | 332:24 350:2 | 46:13 61:19 | 158:3 160:8 | 285:16 286:8 |
| 175:11 193:15 | 369:23 376:22 | 64:5 108:13,14 | 162:14 165:6 | 287:20 289:1 |
| 196:8 228:9 | **LHG** 1:5 383:5 | 166:1 194:20 | 173:23 223:10 | 289:10,13 |
| 233:22 275:20 | **LIABILITY** 1:5 | 334:12,15 | 285:24 286:21 | 292:16 293:7 |
| 287:18 313:18 | 383:5 | **limiting** 131:4 | 287:8,21 312:8 | 295:8 312:5,23 |
| 335:8 380:3 | **Liberty** 388:9 | **Linda** 8:16 | 315:1 | 313:4,10 314:7 |
| 385:2 | **life** 97:9 99:11 | **line** 34:18 42:5 | **listen** 361:21 | 314:9,21 |
| **leigh.odell@b...** | 112:24 113:1 | 74:22 78:24 | **listening** 361:22 | 328:17 332:4 |
| 3:9 385:7 | 146:21 148:9 | 88:22 122:6 | 361:23 | 332:14 336:22 |
| **length** 110:14 | 283:2 341:2,15 | 153:5,6,24 | **listing** 146:10 | 337:11 338:14 |
| 200:21 322:19 | 379:11 | 326:19 | **lists** 56:2 63:1,4 | 338:17 339:1 |
| 348:8 | **lifetime** 17:21 | **lines** 155:14 | 75:3 223:4,5 | 343:17 344:3,7 |
| **lengthy** 55:1 | 204:16 209:11 | 325:24 326:8 | **literature** 7:19 | 344:15 345:2,3 |
| **let's** 24:13 55:19 | **ligation** 159:20 | **link** 117:17 | 22:3,9 40:3 | 349:5 |
| 71:2 90:4 | 169:9 212:3 | 212:23 213:15 | 57:5 59:5,11 | **litigation** 1:5 |
| 118:12,17,24 | 263:12 268:19 | 355:16 356:20 | 59:24 60:18 | 12:17 13:5,15 |
| 122:2 145:8,13 | 268:24 269:10 | 357:1 359:2 | 61:6 70:3,8 | 13:22 14:5,8 |
| 159:6 193:21 | 269:22 270:5,8 | **list** 10:12,13 | 74:9 82:17 | 14:22 16:3,16 |
| 197:8 203:18 | 270:12,14,21 | 54:22 55:1,16 | 83:11 85:18 | 16:24 18:6,24 |
| 233:12 234:24 | 271:2,10,19,24 | 56:14 62:20,22 | 89:19 95:13 | 19:11,16 20:4 |
| 235:1,3 260:21 | 272:11,15,18 | 63:5,7,8,9,11 | 97:22 98:9 | 20:19 21:3 |
| 260:21,22 | 273:2,3,4,11 | 63:14,15,16,20 | 117:16,20 | 22:1,15,18,23 |
| 286:19 299:24 | 273:12,22,24 | 64:1,10,11,14 | 118:1,3,21 | 24:1,4,5,10 |
| 302:23 342:16 | 274:6 277:10 | 84:11 132:15 | 119:9,10 127:9 | 25:3,7 27:2,5 |
| 343:1 352:2,6 | 278:9,16,20,21 | 145:21 146:7 | 127:10,16,18 | 27:11,14,21 |
| 364:1 | 279:12,14,21 | 147:4,13 | 128:1,19,22 | 28:1,4,5,11,16 |
| **Lethal** 345:21 | **light** 100:13 | 148:11 149:7,8 | 129:2 130:18 | 29:22 30:3,11 |
| **lethality** 345:11 | 179:4 | 149:16,20 | 130:23 131:8 | 35:23 37:23 |
| 345:21,22,22 | **limit** 131:5 | 150:7 151:10 | 131:20 132:6 | 41:7 42:11 |
| **letter** 7:16 | 260:12 | 151:13,21,22 | 132:10 133:11 | 44:13 54:9,11 |
| 105:20,22 | **limitation** | 157:11,15 | 136:23 137:14 | 54:15 63:11,12 |
| 106:2,7,9,17 | 118:18,20 | 158:4,9,12,13 | 137:15 138:4,6 | 70:10,23 71:6 |
| 106:22 107:7 | 119:9,18 | 158:15 160:3 | 138:15,24 | 71:8,13,23 |
| 107:11,18 | 122:11 131:19 | 160:10,22 | 139:2,3 141:1 | 72:16 73:12,15 |
| 108:5 265:17 | 136:23 138:4 | 162:9,11 166:2 | 141:23 146:10 | 73:16,20,21,24 |
| 265:23 315:20 | 174:1 | 167:6 280:11 | 146:13 151:23 | 75:9,13,18,19 |
| 316:14 324:16 | **limitations** | 280:13 285:18 | 166:1,7 173:6 | 76:2,11 77:8 |
| 324:21 | 117:16,22 | 286:1,1,22 | 177:21 185:21 | 80:9,22 81:11 |
| **letters** 149:19 | 118:3 122:7 | 287:10,22,23 | 206:10 212:6 | 82:8,12 83:5 |
| **level** 95:12 | 127:15 128:4 | 314:10,21,21 | 231:24 236:4 | 83:10,16,24 |
| 100:10 164:19 | 128:18,21 | 330:5 | 247:13 263:2 | 84:5,20 85:3 |
| 173:19,23,24 | 129:1,5 130:18 | **listed** 56:1 63:19 | 268:9 270:14 | 85:13,22 86:11 |
| 200:12 202:9 | 130:22 132:6 | 75:3 76:1 | 272:15 273:12 | 86:20 89:2,4,8 |
| 248:11 249:3 | 132:10 173:15 | 111:2 146:23 | 273:21,22 | 89:16,18,20 |
| 249:16 323:9 | 174:2 220:21 | 147:3,6,10,15 | 274:4 278:11 | 90:2,17 91:2,7 |
| **levels** 146:19 | 250:14 | 147:23 148:14 | 278:19 280:8 | 91:13,17 92:5 |

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 995 of 1035
PageID: 242174
Ellen Blair Smith, M.D.

Page 414

92:11,20 93:9
93:10 99:1,7
101:11 102:1,4
103:10 104:17
105:12 110:13
165:13 202:14
211:14 220:4
231:18 237:21
259:7 283:14
284:3 285:6,14
298:16,19
338:4,5,9,12
338:19 339:13
339:19 349:23
376:3,12 383:5
388:8
**litigations** 16:21
**little** 34:4 42:15
65:6,9 72:14
136:5 144:24
173:9 288:17
315:23 316:5
320:15 339:3
374:2
**live** 368:4
**live-action**
322:12
**lives** 261:2
**living** 367:24
**LLC** 5:14,14
12:4 387:7,7
**LLP** 3:18 4:10
4:16 5:3,10,16
385:16 386:8
386:14,20
387:2,8
**local** 16:8
275:10,22
**locate** 251:3
**located** 26:13,19
**Logan** 4:11
386:9
**logical** 151:3
**long** 28:7 186:9
245:7 253:22
294:4 308:17
**long-term**

120:11 207:19
207:24 209:7
211:6,13,18
281:21
**longer** 37:16
144:24
**longest** 225:23
**Longo** 10:17
70:11 71:2,6
71:12,13 73:11
73:15 74:13,15
93:4 110:9,13
259:13 302:3
302:24 310:5
310:13 311:1
**Longo's** 71:23
72:3,16 97:3
101:10 301:20
302:12 303:21
305:6,14 309:6
309:10,14
310:18 312:20
**look** 12:14 25:5
45:6,15 47:6
47:13 48:1
50:6,7 58:20
77:21 90:4
102:12 114:1,5
121:9,21
122:16,17
124:16,19,22
125:3 126:20
134:4,20
160:23 163:16
166:4 169:22
172:13 175:10
188:7 192:12
194:7 198:12
200:5 204:13
204:21 206:15
207:21 223:17
223:21 224:23
225:3 226:21
227:12 229:13
230:3 233:12
237:5 239:1,7
246:3 247:20

250:24 253:10
253:23 254:6
255:14,17
258:21 259:6
260:21,23
264:24 265:22
271:22 274:13
277:13,23
282:17 285:16
291:10 292:23
292:24 293:3
293:12,21
303:11 308:2
315:23 318:13
320:5 321:14
325:11 334:3
335:9 336:1
348:3 350:14
353:21,21
354:15,19
367:16 368:21
369:4,9
**looked** 40:20
49:2 58:4 59:3
71:5 75:2,4
77:23 78:1
102:5 104:1
118:2 121:2,13
132:20 152:24
153:2 157:20
160:3,18
165:24 224:1
224:11 235:17
235:22 240:20
244:11 249:20
285:17 294:15
294:23 322:20
325:23 326:11
327:17,24
353:5 357:8
367:18 368:13
369:16,18
**looking** 39:12
46:3 47:8,20
48:10 49:5
53:12,20 55:3
57:10 58:24

65:18 72:15
94:2 112:13
118:1 131:23
136:23 139:14
145:20 147:9
150:20 169:11
179:18 188:22
191:22 192:16
210:4,22 225:8
228:1 234:3,18
246:15 251:16
252:5 256:3
263:3,9 265:21
265:24 268:3
269:12,24
270:23 271:1,3
272:19 283:9
284:19 290:18
300:1,7,13
301:14 319:24
344:8 345:3
350:1,6 351:3
352:13 353:4
369:1,22
**looks** 58:16
138:24 142:2
169:24 227:13
322:5,9 326:6
335:11 350:5
**loose-leaf** 41:16
**loosely** 84:1
**lose** 156:22
295:18
**lost** 73:9 77:1
148:19 194:22
239:15 286:18
296:14
**lot** 13:16 37:1
56:9 81:8
95:23 192:12
288:16 298:4
329:23 330:20
342:1 374:2
**lots** 146:9
254:13
**Lough-** 298:23
**love** 215:11

244:3 341:23
**low** 129:7
244:15 257:2
260:16
**low.'** 195:11
**lower** 136:5,9
183:4,7 203:14
203:20 211:10
211:12,18
227:20 270:5
270:11 364:10
364:20
**lowers** 348:20
**lowest** 195:9
260:22 262:2
**Lozano** 37:8
**lunch** 145:3
161:23
**Lusignac** 297:22
297:23 298:1

---

**M**

**M** 3:4 5:15 7:17
385:2 387:8
**M.D** 1:12 2:2
6:6 7:9,11,13
7:17 11:4,5,10
379:23 381:2
382:1,6,12
383:12 384:2
**ma'am** 28:19
191:8
**machine** 2:8
**macrophages**
325:16
**magnitude**
211:10,12
**Main** 5:16 387:9
**majority** 22:5
146:4 148:18
150:23 268:6
295:5 310:20
315:4 319:2
322:18
**making** 125:23
182:18 197:3
253:11 376:10

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 996 of 1035
PageID: 242175
Ellen Blair Smith, M.D.

Page 415

male 88:5
maligat 327:1
malignancy
  281:5 326:23
  327:1
malignant 327:4
  327:5
manner 61:10
  262:4
MANSUKHA...
  4:16 386:14
manual 163:15
manufacturers
  104:4
Margaret 3:4
  9:20 12:20,22
  193:15 385:2
margaret.tho...
  3:10 385:8
mark 5:3 10:17
  20:12 37:15
  38:14 40:7
  41:5 42:15
  43:7 44:12
  52:24 56:12
  99:13 106:1
  113:2 123:6
  124:6 153:11
  156:17 163:6
  171:1 175:18
  175:22 184:21
  189:8 197:16
  203:4,9 207:13
  215:15,15
  216:16,18
  226:3 238:19
  245:14 299:24
  333:5,16 352:2
  352:6 386:19
marked 20:14
  38:15 39:11
  40:11 41:8
  42:10 44:14
  53:2 99:16
  106:4 113:4
  124:8 154:1
  157:3 160:19

163:9 171:3
176:1 184:23
189:9 197:18
203:11 207:15
215:21 216:4
216:20 226:5
238:22 277:22
300:3 309:7
317:12 333:8
333:19 352:8
market 109:19
  110:1,6 388:9
marketed 103:5
MARKETING
  1:4 383:4
marking 160:16
  216:2 309:5
marks 6:23
  117:8 194:3
  277:4 320:23
MAS 10:15
master 63:11
material 61:19
  81:7 103:6
  262:17
materials 7:7
  22:15 28:4
  39:9,13,15,20
  39:22 40:16,19
  53:18 54:8
  56:2 62:22
  63:15 64:8,23
  65:13 71:9
  81:11 86:5
  94:17 106:15
  110:24 263:21
  285:18 286:1
  286:22 287:9
  287:22 314:10
  314:20,24
  332:22 336:23
matrix 369:21
matter 66:1 67:2
  68:13 69:10
  132:17,20
  218:3,4 319:22
matters 16:5

Maura 284:22
MC 351:22
McBETH 4:10
  386:8
MDL 1:4 12:9
  12:13 16:17
  18:4,5 19:4
  22:19 26:9,12
  73:16 74:12
  75:17 76:23
  383:4
mean 18:8 34:9
  60:23 82:15
  83:3 88:3 93:6
  95:22 97:7,13
  97:14 98:7
  100:9,9,10
  101:14 106:14
  116:4 119:14
  129:10,17
  131:6 135:15
  136:9 137:1,2
  151:22 159:8
  171:15 196:19
  205:13 206:2
  211:23 212:4
  224:15 233:9
  244:15 246:15
  252:24 254:13
  268:1 287:5
  290:11 331:16
  351:6 358:8
meaning 177:18
means 100:12
  139:3 170:2
  191:10,11
  366:20 373:21
meant 241:6
  291:12
measure 294:7,9
  294:11
measured
  326:23 368:8
measuring
  176:10
mech- 365:22
mechanism

120:23 144:13
214:6 319:4
337:7 338:22
mechanisms
  144:21 258:7
  281:3 365:23
media 30:10
  220:3
medic- 151:4
medical 12:3
  22:9 32:4,10
  35:16 57:5
  59:5,11,23
  60:18 61:6
  74:9 85:18
  117:20 141:23
  148:15 149:9
  150:12 151:4,6
  153:3,9 154:7
  154:12 166:1
  167:9 168:10
  191:12 255:1
  262:23 330:12
  338:14,21
  339:20
medicine 173:20
meet 13:10 44:9
meeting 22:4,9
  22:11
meetings 13:14
  13:21 14:1,17
  14:18,22
member 329:5
  378:4
members 150:3
  161:13
memorialized
  326:18
memory 310:1
  310:21 355:9
  355:22
menopausal
  272:1
menstruation
  319:3 347:5
mention 85:11
  98:17 206:2

318:7
mentioned
  14:14 16:16
  17:5 20:2
  34:17 58:3
  70:10 84:20
  111:12 146:24
  147:12 148:8
  169:24 273:23
  293:9 327:16
  350:18,19
mentioning
  56:20 204:8
mentors 87:8
mere 368:8
mesothelial
  328:1
mesothelioma
  113:13 116:21
  136:8 369:17
messed 317:15
met 11:22 14:7
  283:11 288:24
  289:10 290:5
  292:16
meta 236:17
  290:16
meta-analyses
  128:11 134:10
  135:22 136:21
  166:4,7 173:13
  173:16,17
  174:4,7 200:4
  203:15 229:15
  235:17 236:10
  245:17,21
  246:22 247:14
  248:8,21 249:1
  258:11 290:17
meta-analysis
  7:20 9:5,17
  10:4,20 113:20
  114:10 116:2,3
  119:14 125:21
  125:23 134:13
  174:11,15,20
  175:1 232:3,4

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 997 of 1035
PageID: 242176
Ellen Blair Smith, M.D.

Page 416

236:5 247:3,8
248:19 253:19
292:19 349:20
355:8
**meta-analytic**
129:7
**metabolic**
369:19
**metals** 10:22
61:11 91:11
331:24 343:18
376:15
**metastasis**
372:14,16
**metastasized**
243:10
**meth-** 59:8
**method** 164:24
**methodology**
53:17 57:3,21
59:9 60:14
61:4,16,24
62:6,12 80:10
80:14 133:8,10
249:9 304:13
305:6 310:6
311:1
**methods** 114:13
174:5
**Michael** 4:16
9:6 37:8
386:14
**Michigan** 285:3
**micrograms**
326:20
**micronized**
322:6
**microns** 322:19
**microscopy**
100:14
**middle** 353:6
**migrate** 263:22
266:5 316:6
318:17,21
319:1,10,15
323:17 324:13
324:23 339:15

362:15
**migrates** 321:5
347:15
**migrating**
316:16
**migration** 92:16
262:10 264:6
264:11 268:10
268:13 277:9
278:16 279:21
316:24 317:10
319:17 321:14
322:21 323:15
325:4 362:17
**mike** 148:19
185:10 230:15
234:7 297:6
342:10
**mil** 327:11
**millers** 138:7,16
139:1,15
**milligrams**
326:19
**milliliter** 326:20
**million** 77:24
**Mills** 138:13,22
**mind** 67:21
188:19 189:6
275:14 315:13
336:20
**mine** 109:24
189:1 233:13
299:23
**mine's** 233:16
**mined** 297:14,16
**mineral** 101:2
140:20
**mineral-induc...**
371:3
**mineralogists**
141:19
**mineralogy**
101:4
**minerals** 77:24
141:3,20
**miners** 138:7,13
138:15,22

139:1,15
**mines** 297:13,16
297:20 299:4,6
299:17 306:20
**minimal** 49:8
**minority** 194:15
194:21,22
195:1
**minus** 148:4
**minute** 132:1
193:21 222:6
274:16 331:2
**minutes** 74:18
74:19 145:7,12
193:7,18
342:11
**mis-** 130:17
**mischaracteri...**
75:21 252:19
316:19,22
327:21
**mischaracteri...**
299:12 324:16
**misclassificati...**
113:22 114:17
129:13 130:3
130:19
**misleading**
72:14 123:22
299:12
**misrepresents**
250:21 300:14
**missed** 98:15
107:15 143:23
**misses** 60:23
**missing** 20:8
51:7,10 184:20
185:2 226:24
228:5 269:13
**misspoke**
180:22
**misstated**
150:21
**misstates** 76:4
87:21 98:14
108:9 139:6
157:14 207:5

254:10 293:20
299:12 301:22
303:17 304:16
305:11 307:2
324:17 354:7
359:20
**mistake** 187:13
208:10 227:5
**misunderstan...**
196:2,6
**misunderstood**
107:14 110:2
**mitogenesis**
371:18
**mix** 59:1
**mixed** 84:12,13
84:24
**mklatt@grsm...**
4:19 386:17
**model** 201:24
**modeling** 195:6
**modest** 174:18
177:7,9,12,17
178:5,8 180:13
180:20,23
182:3 183:5,5
190:15 191:2
203:24
**modulate** 372:1
372:1
**modulated**
372:3
**modulation**
371:17
**modulator**
372:24
**Mohamed**
349:18
**molecular** 323:9
350:2
**molecules**
325:12
**moment** 120:4
159:2 193:22
204:13 224:7
288:10 314:20
315:7 323:14

368:17
**monitoring** 36:7
38:8
**monkeys** 266:21
266:22 267:4,5
267:5,9,17
**monogram**
313:13
**monograph**
123:4,9,11,17
123:20 124:11
124:20 125:4
140:9 313:21
332:11 351:3
351:10,12,18
351:21 352:3
352:15 353:2
354:18,22
355:6 357:3
359:2,16,16
360:15 361:12
361:13,24
362:1
**Monographs**
7:21 10:22
**Montgomery**
3:6 385:4
**month** 21:9
**Montreal**
317:24
**morning** 11:16
11:17 88:18
110:16
**Morristown** 5:5
386:21
**mort-** 127:4
**mortality**
125:10 127:4
238:4 353:10
**motal-** 322:14
**mothers** 377:23
379:13,14
**motile** 324:3
**motility** 322:14
369:19 372:13
372:16
**Mount** 5:4

Ellen Blair Smith, M.D.

386:20
**move** 71:2 171:7
  197:10 295:15
**moved** 325:3
**moving** 40:6
  235:1 276:17
  276:20 288:17
  350:9
**MRA** 369:23
**msilver@coug...**
  5:7 386:23
**mucinous**
  213:20 240:15
  240:21 241:12
**multiday** 300:6
  300:23
**multiple** 97:12
  169:16 174:6
  202:8 218:8
  319:19 352:18
**Musser** 7:17
  324:19
**mutations** 149:5
  282:2 350:5
  367:17 379:9
  379:15

**N**

**N** 3:1 4:1 5:1
  11:1
**N.W** 5:10 387:3
**NAEEM** 5:15
  387:8
**name** 11:21
  14:11 34:19
  35:2,2 93:5
  138:21 169:11
  266:23 267:10
  283:1 284:11
  284:12 287:6,6
  297:6 381:2
  382:15
**named** 326:18
**nanopart**
  325:14
**nanoparticles**
  282:24

**nanoscale** 141:3
**nanotalc** 325:15
**napkins** 293:24
  295:10,23
  296:11
**Narod** 10:10
  255:1 257:16
  261:1
**narrative**
  327:13
**National** 8:10
  9:22 162:18
  165:19 166:18
**nature** 24:8
  225:18 249:21
**nausea** 341:22
**NC-** 162:23
**NCI** 162:13,18
  162:23 163:7
  164:17 165:14
  166:24 167:7
  168:11,16
**NCI's** 162:10
**NCRA** 388:7
**necessarily** 6:23
  60:21,21 129:4
  171:16 183:24
  371:23
**necessary** 51:16
  191:23 196:11
  346:17
**necrosis** 325:16
**need** 15:11
  58:24 102:11
  102:16 120:7
  159:2 193:6
  198:2 202:9
  204:13 205:15
  214:5 230:17
  237:15 246:3
  264:21 277:13
  277:20 308:1
  320:7,14
  341:21,22,23
  341:23 342:1,2
  342:13,18
  346:6,20,21

358:5 369:4,9
**needed** 202:9
  206:19
**needelike** 140:7
**needs** 116:24
  207:7 228:19
**negative** 99:4,8
  144:14,18
  206:2,14
  372:21,23
  373:7,11,12,20
  374:12
**neither** 374:21
  387:14
**never** 88:4 142:2
  159:17 189:14
  202:5,10 225:7
  283:11 293:15
  299:5,6 347:4
  347:7 376:23
  378:3
**Nevertheless**
  73:19
**new** 1:1 5:5
  326:2 337:19
  337:21 350:6
  383:1 386:21
**Newcastle** 291:9
**Newhouse** 291:8
**Newport** 3:13
  385:11
**newspaper** 66:9
**Newton** 320:2
  321:17 322:3
**nickel** 332:11,16
  332:24 376:23
**Nicole** 284:22
  326:3
**NIH** 8:10
**nine** 182:21
  183:1 367:10
**nitrogen** 282:1
**Nodded** 160:15
**non-significant**
  125:8
**noncoated**
  181:10,13

**nonenvironm...**
  118:8
**nonfibrous**
  328:3
**nonflagellated**
  263:4
**nonoccupatio...**
  119:20 121:13
  125:16 130:20
  134:2,7,11,14
  134:17,21
  136:3,13
**nonoccupatio...**
  355:24
**nonresponsive**
  213:9 300:21
**nope** 230:16
  265:6 277:16
**normal** 323:11
  326:7,8,19
  328:1,2 374:20
**Norway** 317:24
**NOS** 291:11
**NOTARY**
  382:23
**note** 6:20,23
  58:3 90:4
  180:1 189:12
  203:6 211:9,23
  214:18 219:8
  238:11 250:18
  250:22
**noted** 127:1
  136:12 186:2
  286:12,13,15
  353:7 382:3
**notes** 40:3
  129:12 137:15
  308:2 383:23
**notice** 7:5 38:13
  38:21 39:1,17
  40:20
**noting** 232:12
**NSAIDs** 276:16
  280:5,8,13,16
  281:14
**nulliparity**

84:12 149:6
  169:9
**nullity** 196:16
  196:19
**number** 19:9
  20:13 26:11
  38:14 39:8
  40:8 41:5
  42:10 44:12
  53:1,13 90:12
  90:19 91:10,19
  91:22 92:7,8
  92:13,15 94:1
  96:5 99:13
  100:3 102:6
  106:2 108:13
  108:14 113:3
  123:7 124:7
  131:19 132:2,4
  132:7 135:14
  135:16 153:15
  155:3,4 160:17
  163:6 168:18
  174:22 177:6
  183:18 189:8
  191:11 197:17
  197:21 203:10
  204:15 207:14
  212:15 236:1
  238:21 244:14
  255:5 256:11
  261:21 262:2
  266:13 295:20
  309:15 321:13
  330:4 335:6
  347:20 348:14
**numbered** 2:5
**numbers** 131:24
  212:16,17
  227:18 229:7
  233:13 234:4
  245:8 254:24
  254:24 289:16
  348:2
**numerous**
  146:15 273:13
**nurses** 227:14

Ellen Blair Smith, M.D.

Page 418

| | | | | |
|---|---|---|---|---|
| **Nurses'** 215:13 | 95:16,18 96:8 | 161:12 162:20 | 228:21 229:20 | 291:23 292:6 |
| 216:11,23 | 96:13,22 98:3 | 164:18 165:22 | 229:24 230:11 | 292:12 293:19 |
| 221:5 293:13 | 98:13 99:9,23 | 166:10,20 | 231:16,21 | 294:8,12,17 |
| 293:17 | 100:4,24 | 167:4,10,12,20 | 232:16 233:17 | 296:12 298:20 |
| **Nutrition** | 101:12 102:2 | 168:5,14 169:4 | 233:20,23 | 298:22 299:11 |
| 324:21 | 102:11,15 | 169:13 170:6 | 234:2,6,16 | 299:19,22 |
| | 103:16 104:6 | 170:19,24 | 235:7,20 236:7 | 300:14,18 |
| **O** | 104:13,18,20 | 172:4 173:1 | 236:13,18,23 | 301:8,16,22 |
| **O** 11:1 | 105:3,6,17 | 174:16 175:3,7 | 237:17,24 | 302:4,10 303:6 |
| **O'Dell** 3:7,7 | 106:11,24 | 175:9,16,20 | 239:5 240:6 | 303:14,16 |
| 6:11,14 14:9 | 107:13 108:3,8 | 176:7,13,20,22 | 241:23 242:8 | 304:1,3,10,15 |
| 14:17 15:23 | 109:9,15,20 | 178:7 179:3,10 | 243:7,15 244:1 | 304:19 305:2 |
| 17:2,4 20:6,8 | 110:8,18 112:8 | 179:15 180:15 | 244:9,23 | 305:10,17,22 |
| 21:4 24:6,13 | 112:11,18,23 | 180:19 181:1,8 | 245:14 246:3 | 306:1,8,11,24 |
| 25:2,13,16,19 | 116:15,19 | 181:24 182:6 | 246:14 247:1 | 307:2 308:13 |
| 26:4 29:10,13 | 118:4,13,16 | 182:20 183:11 | 247:10,22 | 309:9,21 310:4 |
| 34:3,8 35:20 | 119:12 120:3,6 | 183:13,22 | 248:1,4,18 | 310:11,17 |
| 38:17,19 39:12 | 120:9,16,18 | 184:16 185:3,7 | 249:6,14 250:6 | 311:6 313:3,19 |
| 39:19 40:10,24 | 121:8,16,20 | 186:21 187:2 | 250:11,20 | 313:20 314:19 |
| 41:19,22 42:14 | 122:10,13,16 | 189:5 190:5,11 | 251:2,14,23 | 316:21,23 |
| 48:16,21 51:15 | 122:22 123:8 | 190:17 193:6 | 252:18 253:12 | 320:12,17 |
| 51:24 52:9,12 | 123:11,13,21 | 193:11,17,20 | 253:15 254:9 | 321:2 324:9,12 |
| 53:8 54:5 | 124:10 125:18 | 195:21 196:3,5 | 257:15 259:2 | 325:2 327:15 |
| 55:13 57:9 | 126:10,18 | 196:18 197:1 | 259:11 260:6 | 328:8,24 330:9 |
| 58:10 59:13,16 | 127:12,21 | 197:11 199:1 | 260:20 261:15 | 331:1 332:3 |
| 60:1,6,9,20 | 128:6,20 | 199:20 201:3,5 | 261:18 262:7 | 333:10 335:10 |
| 61:7,13,18 | 129:20,23 | 201:12,20 | 264:21,24 | 335:14 336:21 |
| 62:4,9,16 | 130:6,9,12,15 | 203:17 205:14 | 265:7,10,13,18 | 337:9 338:12 |
| 64:12 65:2 | 131:1,4,12,22 | 206:6,22 207:4 | 266:11 267:12 | 338:19 339:6 |
| 66:4,22 67:4 | 132:24 134:9 | 208:16,20,24 | 268:16 269:2,4 | 339:13,19 |
| 67:17,20 68:4 | 134:22 136:16 | 209:2,9,23 | 269:20 270:10 | 340:11 342:5 |
| 68:9,20,23 | 136:18 137:6 | 210:9,12,15,21 | 271:3,6 272:12 | 342:22 343:21 |
| 69:8,17,24 | 137:23 138:17 | 211:15,20 | 272:19,23 | 344:11,24 |
| 70:20 71:11,17 | 139:5,17 | 212:12 213:13 | 273:9,16,18 | 345:8 346:12 |
| 72:5,10,18 | 140:14 141:17 | 214:3 215:14 | 274:15,19 | 347:12 348:16 |
| 73:1,7,17 | 142:8,17 143:2 | 215:18,23 | 275:14,17,21 | 349:3 350:17 |
| 74:13,17 75:15 | 143:8,21 144:2 | 216:8,16 217:6 | 276:10,19,23 | 351:7,18 |
| 75:20 76:3,15 | 144:9,16 145:2 | 217:16 218:2 | 277:12 278:3 | 353:20 354:6 |
| 76:20 78:12,17 | 145:12,15 | 218:17 219:3 | 278:12,17 | 354:23 356:11 |
| 78:19 79:12 | 147:20 149:11 | 220:13 221:7 | 279:3,7,22 | 356:23 357:12 |
| 80:24 81:4,14 | 151:9,20 | 221:14,17 | 280:18 281:18 | 357:16,19,21 |
| 81:21 84:23 | 152:10,16 | 222:3,5,9,13 | 282:14 286:3 | 357:23 358:3 |
| 85:5,20 86:2,7 | 153:17,19,21 | 222:18 223:15 | 286:13 287:1,3 | 358:14,23 |
| 86:12,17,22 | 155:1,7,11 | 223:20,22 | 287:12,15,24 | 359:9,18 |
| 87:3,20 89:9 | 156:11,14,20 | 224:3,7,14 | 288:6,10 | 360:21 361:8 |
| 91:23 93:6,17 | 156:24 157:13 | 225:2,6 226:14 | 289:15,22 | 362:2,5,10 |
| 94:8,13 95:7 | 158:5,23 159:2 | 227:6 228:3,11 | 290:1,10 291:5 | 363:2,7,20,23 |

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 1000 of 1035
PageID: 242179
Ellen Blair Smith, M.D.

Page 419

364:23 365:6
365:20 366:4
366:13 367:3
368:1,12,17,19
368:21 369:2
369:10 371:5
371:11,19
372:5,18 373:5
373:15,17
374:8,19
375:19 376:5
377:3,5,18
378:2,9,15,17
379:1,10,19,21
380:5,8 385:5
385:5
**O'Dell's** 368:24
369:8
**O'DELL** 3:4
385:2
**O'REARDON**
3:18 385:16
**oath** 382:12
**OB/GYNs** 152:4
**obesity** 84:12,21
85:4
**obj-** 59:17
183:11
**object** 17:2 24:6
29:10 34:3
35:20 42:14
48:16,21 51:15
51:24 52:9,12
55:13,14 57:9
58:10 59:13,17
60:1,20 61:7
61:13,18 62:4
62:9,16 66:4
68:4,14 69:17
69:24 70:20
71:11,17 72:5
72:10 73:7
75:15,20 76:3
76:15,20 78:12
78:17 80:24
81:4,14,21
84:23 85:5,20

86:2,7,12,17
86:22 87:20
89:9 93:17
95:16 96:8,13
96:22 98:3,13
99:9,23 100:4
100:24 101:12
102:2 103:16
104:13,18
105:17 106:11
108:8 109:9,15
109:20 110:8
110:19 112:8
116:15,19
119:12 120:16
120:18 121:8
121:20 125:18
126:10,18
127:21 128:20
130:15 131:1
131:22 134:9
137:6 138:17
143:8,21 144:9
144:16 147:20
149:11 151:9
151:20 152:10
152:16 155:1
157:13 158:23
161:12 162:20
164:18 165:22
166:10,20
167:4,20
168:14 169:4
170:6 172:4
173:1 174:16
176:13,23
178:7 179:3
180:15 181:1,2
181:8,24
182:20 186:21
190:17 195:21
196:18 197:1
197:11 199:1
199:20 201:5
201:12 203:17
206:6,22 207:4
209:9 211:15

211:20 212:12
213:13 217:6
218:2 219:3
220:13 221:7
221:14,17
222:5,13,18
223:15,20,23
224:14 225:6
231:16,21
232:16 235:7
235:20 236:7
236:13,18,23
236:23 237:24
240:6 243:7,15
244:1,9,23
245:15 246:14
247:1,10 248:1
248:18 249:6
249:14 250:11
250:20 252:18
254:10 257:15
260:6,20
261:15,15
262:7 266:11
269:2 272:12
273:9 277:12
278:3,12,17
279:3,7,22
280:18 281:18
282:14 286:3
286:10 287:4
287:12 289:15
289:22 290:1
291:5,23 292:6
292:12 294:8
294:12,17
296:12 298:20
298:22 309:24
311:4 313:2
314:17 316:18
316:18 323:20
324:15 327:13
328:13 329:20
332:2 335:1
337:2 338:11
338:17,24
339:12,17

340:9 343:21
344:11,24
345:8 347:12
353:20 354:6
358:23 359:9
363:2,7,23
365:6,20 367:3
368:1,12 371:5
371:11,19
372:5 374:8
379:10
**Object-** 66:22
288:6
**objection** 6:4
15:21 24:15
64:12 66:22
73:5 89:13
91:23 104:6
107:13 108:4
110:18 112:11
118:4 120:7
121:16 127:12
128:6 130:6
132:24 134:22
136:18 139:5
139:17 140:14
141:17 142:8
142:17 167:10
167:12 168:5
170:19 175:3
176:7 179:10
179:15 180:19
183:13,22
187:2 190:5
196:3 201:3,20
213:9 214:3
217:16 218:17
222:9 225:2
226:14 227:6
229:20,24
237:17 242:8
248:3 250:6
254:9 270:10
276:10 286:11
286:13,14
287:1,24
290:10 293:19

299:11,19,22
300:14,18,21
301:16,22
302:4 303:6,14
303:16 304:1,3
305:10,17
306:24 309:18
309:23 310:9
310:16 313:17
324:11 327:20
330:14,15
334:24 336:19
346:12 348:16
349:3 356:23
357:12 359:18
359:20 360:21
361:8 362:10
364:23 366:4
366:13 369:3
369:10 372:18
373:15 374:19
375:19 376:5
377:3,5,18
378:2,9 379:19
**objections** 38:20
41:1 304:22
**objective** 301:19
**Observational**
9:5
**observations**
205:23
**observe** 205:12
**observed** 185:15
186:3
**obstetrician**
16:8 148:19
154:3 155:18
**Obstetricians**
8:13
**obstetricians/...**
168:19
**obstetrics** 8:18
329:9
**obtain** 45:19
94:14
**obtained** 101:20
238:13

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 1001 of 1035
PageID: 242180
Ellen Blair Smith, M.D.

Page 420

obviate 221:2
obviously
  173:23
OC 271:24
Occasionally
  81:5
occupational
  111:15 118:6,9
  119:11,13,17
  121:3,6 122:9
  125:7 127:5,10
  130:19 132:14
  134:8,11,14,16
  136:2,4 353:11
  354:17 355:18
  355:22 356:19
  356:21 359:4
occurred 13:21
  186:8,9
occurs 109:23
odds 136:1,2
  174:14 175:1,2
  176:6 178:4
  180:6,9 181:22
  182:16 183:7
  184:10,11,14
  185:14 186:3
  189:13,20
  190:15,23
  203:7,14,15,23
  203:24 207:18
  207:24 208:1
  208:13 209:5,7
  211:3,6,10,12
  211:19 217:19
  289:20 295:22
offer 92:4
  241:16
offered 69:6
  83:5 165:13
offering 59:21
  161:8 201:17
  201:18 202:14
  237:22 240:12
  344:16 345:7
office 382:19
officer 384:3,21

official 318:2
oftentimes
  15:16
oh 17:22 25:14
  26:14 27:3
  51:6 54:2
  57:24,24 75:6
  75:19 80:14
  93:22 111:4
  113:7 115:10
  115:12 123:10
  135:22 145:19
  148:1 153:13
  155:9 156:13
  164:15 178:23
  194:21 204:20
  209:17 216:8
  228:15 241:6
  251:10 252:7
  253:15 255:20
  255:21 259:4
  266:1 269:16
  269:21 271:8
  275:18 283:22
  290:6 297:24
  327:23 335:15
  339:18,24
  350:23 370:14
  370:15
Ohio 5:17 387:9
okay 11:21 13:7
  13:19 15:5,6
  15:18,24 20:10
  22:8 26:6
  33:21 36:18
  37:3 40:9,14
  41:3,17,18
  42:3,8,16 43:9
  43:24 44:22
  46:8,12 47:5,6
  47:13,18 48:1
  48:4,18 50:6
  50:12 52:15
  53:6,15,22
  54:2,2,4 55:8
  55:21 57:24
  60:8,11 63:3

64:7,19,22
65:12 67:3,19
70:13 71:4
73:14,18 75:1
75:7 77:17
79:13,21 80:19
83:22,23 87:3
87:24 88:23
92:15 94:5,13
99:21 101:19
102:10,19
103:1 105:3,5
105:8 110:2
112:2 113:2
115:14 117:1,3
117:13 118:16
120:1 122:5,8
123:2,6 124:4
124:5,13,15
129:23 130:12
132:19 139:9
141:10,12
144:1,4,19
145:9 153:11
154:3,14
156:16,20
157:18 158:8
159:24 160:18
160:21 162:13
163:14,18,19
164:16 165:8
172:23 173:4,8
173:10,11
177:14 178:19
179:18 180:1
185:5,8,13
186:19 189:22
192:6 194:24
195:14 196:22
197:8,20,23
198:16 200:7
202:24 203:9
204:2 208:20
209:10,15
210:3,3,6,8,8,9
211:1 212:7
213:3 214:21

215:4,4,6,10
216:2,9 217:9
218:10,23
219:16,19
221:9,19 222:8
224:7 225:10
225:17,24
226:23 228:17
230:17,19,20
231:9,18
232:21 234:13
234:16 235:1,2
239:23 240:3
240:10 241:6
244:21 246:10
246:10,12
248:6,17 251:6
251:13 252:8
252:15,16
254:22 256:4,8
256:11,13
257:7,12
258:11 259:10
261:7 264:23
265:19 266:1
268:23 269:9
270:3 272:10
274:13 275:3
275:23 276:6
277:19,23
278:1 282:21
286:19 288:18
288:19 291:17
297:24 298:4,6
298:9 299:1
307:23 311:23
315:7 317:18
321:13 325:2
333:18 334:12
335:7 336:8
337:15 339:11
340:11 342:12
342:15 343:15
345:17,22
347:19 348:1
348:12 349:11
349:15 350:10

350:21 352:4
356:14,20
358:14 360:12
361:1,11 364:1
370:20 378:15
379:1
Okey-doke
  308:16 343:16
older 159:13
omission 205:13
  227:5
omits 217:4
omitted 214:18
  292:5
once 17:23 23:7
  69:4 147:7
  184:7 204:13
  293:24
oncologist 255:2
oncologists
  259:14
oncology 10:9
  13:11 284:21
one-half 194:19
one-third
  194:19
ones 14:14 17:20
  55:11 56:6
  136:6 259:11
  282:23
ongoing 89:21
  330:19
oop 233:16
oophorectomy
  8:15 33:17
  35:6 172:11
open 263:13
open-ended
  117:24
opened 366:17
operations
  324:20
opine 61:4
  167:24 260:8
opined 90:20
  168:1
opining 158:21

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 1002 of 1035
PageID: 242181
Ellen Blair Smith, M.D.

Page 421

166:16 167:24
**opinion** 45:11
60:16 64:9
70:6 81:24
83:6,6,9,10
85:3 89:7,14
90:12,16 91:1
91:4,11,12,16
92:7,10,15,16
92:22 93:15
99:7 109:17,22
109:23 110:4
110:20,22
111:1 117:12
132:21 133:7
133:15 141:24
142:14 143:6
144:21 148:15
149:18 161:10
165:13 166:8,9
166:23 167:1,8
167:14,17,18
168:9,9 170:9
178:4 179:7,8
187:1 201:18
202:14 214:12
214:13,13
225:12 231:19
241:16 242:22
245:17,21
253:17,19
260:18 261:13
261:13 289:9
296:7 316:11
319:8,15 321:4
336:3,16,21
337:23 346:8
**opinions** 23:18
32:12,17 42:11
54:9 59:21
62:1,7 65:15
66:14 69:21
70:7,19 72:3
78:5 80:2,5
81:20 90:9
91:6,19,24
92:4,19 105:21

106:10 109:5
109:13 112:10
128:2 138:11
139:20 142:5,6
144:13 157:11
161:8 168:4,7
211:14,18
237:22 240:12
296:4 331:17
337:10,11,21
338:6 340:1
344:15 345:6
**opportunities**
337:24
**opportunity**
246:16
**opposed** 118:8
128:11 325:22
**oral** 1:11 2:1 7:5
146:17 169:6
271:10 384:4
**order** 58:23
156:19 320:9
336:2
**ore** 78:3 97:12
**organization**
35:17 104:9,12
149:10 152:21
152:22 162:19
**organizational**
164:9
**organizations**
150:1,1,9
151:5 164:10
**organs** 318:22
347:16
**original** 384:6
**originally** 296:3
**originals** 269:18
**osmetic** 9:4
**Ottawa** 291:8
**ought** 188:7
**outcome** 387:18
**outer** 274:8
**outliers** 212:5
**outlined** 340:1
**outside** 101:24

263:5,18 264:1
298:16 324:4
**ovarian** 7:19 8:4
8:6,6,9,11,14
8:19,22 9:5,9
9:12,16,20,23
10:4,7,10,20
28:24 29:6,19
30:14,17,23
31:1,5,12,17
31:21 32:14
33:4 35:8 36:8
58:17,17,20
61:12,17 62:1
62:7,14 78:6
82:1,9,12,22
83:7,18 84:2,6
84:21 85:4,12
86:21 87:7,13
89:3,6,15
90:13 91:5
110:23 112:4
113:13 114:9
114:13 115:2
116:21 117:13
117:18 118:2
125:9 126:7
127:19 128:3
128:10 131:5
131:10,21
132:22 133:8
135:4,8 136:24
137:14 139:24
142:1,3,6,11
142:14,20,23
143:7,13,19
144:8 145:23
146:14,16,16
146:20 147:24
149:2 151:19
153:4 154:8
155:17 156:2
157:7 159:11
159:17 160:4
162:11 163:7
163:21 165:12
165:21 167:1,3

168:1,2,21
169:1,20 170:4
170:10,14
172:8,19
174:18 176:15
180:10 181:19
185:23 189:18
191:14,19,20
198:7,20
199:12 208:15
212:3,24
213:18,21
214:2,6 217:19
220:6 221:11
222:17,23
224:21 235:13
236:4 237:10
238:5 239:12
240:13,15,21
240:24 241:2,8
241:9,13,17
243:6,9,22
245:19 246:13
246:23 247:4,9
247:21 253:21
255:4 257:22
258:14 260:9
261:2,10
263:12 270:4
270:12 272:16
273:5,8,24
274:6 275:9
277:10 278:23
280:8,17
281:14,15
283:5,8 284:20
288:4 296:11
298:17 313:6
313:10 314:7
322:15 323:1,5
323:8 325:24
326:7,9,19
328:2,2,12
329:12,18
330:2,11,22
334:14 335:21
336:17 338:22

340:21,24
341:4 343:19
344:5 345:12
345:13,23,24
346:1,7,9
349:12 350:4,5
350:15 355:16
356:3 357:10
357:11 358:20
358:21 359:3,6
359:12 360:3,9
360:17 361:20
368:16 369:15
370:3,5 376:2
376:11,16,18
377:11,24
378:5 379:8,17
**ovaries** 266:15
268:15 317:7
318:18,23
319:2,6,11,16
321:5,16
323:18 359:6
360:16 361:19
362:16 364:21
**ovary** 7:22
127:2 324:7
339:16 353:9
**overall** 107:18
116:4 135:10
199:8 203:6
208:1 209:5
227:19 229:7
**overlapping**
243:16
**overpowers**
278:20
**oversimplified**
373:19
**owned** 297:15
297:20,21
298:1 299:17
**ownership**
306:20
**Oxford** 10:6
**oxidative** 276:1
283:7

Ellen Blair Smith, M.D.

**oxygen** 281:4,24

**P**

**P** 3:1,1,4 4:1,1
5:1,1 11:1
385:2
**P-u-b-M-e-d**
111:7
**P.C** 3:5 385:3
**p.m** 2:6 161:21
161:23,24
162:3 193:24
194:1,2,5
230:21,22,23
231:1 277:1,2
277:3,6 296:20
296:21,22,24
308:4,6,7,9
320:21,22
321:1 343:5,6
343:7,9 379:24
380:10
**P.O** 3:6 5:4
385:4 386:21
**pa-** 279:13
**page** 6:2 7:2 8:2
9:2 10:2 43:1,3
43:11,11 45:3
46:2,3,5,5 47:4
47:14 48:1,5
50:7,10,13
57:8 80:7
83:22 84:17
90:5,7 93:21
94:9,24 102:6
102:22 111:8
111:21 114:2
115:5,11 124:2
124:16 145:20
145:21 163:19
164:1 165:1
172:14 173:5
174:10 178:14
178:16 180:2
184:2 186:15
192:17 194:17
197:15 198:12

204:17,18,21
205:1 206:15
210:13,23
212:19 219:19
229:2 230:6,11
233:12,13,15
233:15 234:3
237:3 238:9,12
239:2,8,9,10
239:14,16,17
245:16 246:4
251:7,9,11
252:5,9,10
253:8,13
255:19,22
256:3,6 257:21
262:9 265:22
269:13,18,19
269:22,23
270:1 271:4,6
271:7,14,22
272:3 274:13
274:20 312:10
315:18,24
318:13,16
348:2,4 352:21
352:24 357:3
370:12,12,13
370:21 384:18
385:21 387:21
**PAGE/LINE**
381:4
**pages** 163:16
234:21 251:12
352:6
**paginated**
163:15 251:8
**paid** 16:3 19:21
35:23 71:13
73:21 80:23
81:19 101:10
101:13,18,20
298:18
**pain** 154:21,24
155:20 341:21
**pains** 145:16
**paper** 33:15,18

34:17,19 35:5
35:10 36:3
51:17 59:8
63:6 76:8 93:3
95:2 115:23
121:21 122:3
126:3,4,5,6,15
128:22 129:12
129:21 130:3
133:20 139:7
139:11 167:8
170:23 171:2,7
171:20,24
172:2,5,23
175:2 177:12
178:17 184:14
184:17 187:3
190:15 192:16
193:13 194:7,9
195:16 196:2
196:16 197:9
197:16 199:4
202:7 203:23
204:9,12
205:15 206:3
208:13 212:2,3
214:21,22,23
216:3,10,11,13
216:23 217:13
217:18,24
218:11 219:17
221:10 226:8,9
230:3,4,6
231:7 232:1,3
232:6 234:18
237:3 238:17
244:5,8 252:22
253:1,2,5
257:14,16
269:22 270:7
270:17,23
271:23 274:11
276:14 283:24
284:22 317:13
317:21 323:22
326:5,17
327:16 333:7

333:14 347:1,4
347:8,21
348:13 361:5
362:7
**paper's** 204:9
**papers** 57:15
147:10 148:24
159:10 215:7
215:11,15
229:12 249:18
273:13 283:6
283:13,16,18
284:14,18,19
284:23 321:13
329:11 332:20
333:1 347:9
350:6,13
**papilloma**
346:16
**par-** 253:16
**paragraph** 43:2
43:3 45:7,10
45:10,13,16
46:4 47:7,7,13
47:14,19 48:7
48:9,15 49:3
50:8,9,13 58:3
94:3,5,24
114:20 115:7,9
116:12 124:23
125:4 126:21
126:23 146:23
148:11 151:11
178:19 186:2
194:18 212:20
245:24 246:7
251:19 252:6
252:11 253:17
253:18 255:18
256:11,12,16
257:1 258:5
266:2 274:22
275:4 315:24
318:15 353:7
370:20
**paragraphs**
48:19 357:5

**parameters**
260:24
**paraphrase**
328:18
**paraphrasing**
91:21 114:12
126:24 186:7
205:20 213:17
317:3 318:20
356:16
**parentheses**
43:22
**parenthesis**
42:22 51:11
**parity** 271:24
**part** 62:23 73:15
102:17 135:6
140:18 153:6
154:18 187:3
215:1 225:21
228:4 269:13
309:9 318:10
319:7 322:15
345:19 364:10
364:20 365:21
365:23 366:9
367:23 368:2
375:8
**part-** 318:24
**partially** 85:6,8
**particle** 322:15
324:3 325:20
**particles** 25:20
140:7 263:4,24
268:5 318:17
318:21 319:1,5
319:9 321:18
322:3,6,11,16
322:17,18
325:15,22
339:14 363:5
364:3
**particular** 59:21
60:18 61:4
69:21
**particularly**
212:11 213:24

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 1004 of 1035
PageID: 242183
Ellen Blair Smith, M.D.

Page 423

225:15,15
254:12 264:19
**particulate**
263:23 267:7
317:5 319:21
360:4
**particulates**
266:5 316:6
321:14,23
322:2 324:1,22
359:12
**parties** 2:14
384:9,23
387:16
**parts** 77:24
**party** 384:13
**pass** 322:11
**passage** 80:8,13
266:17
**passages** 52:3,6
**passing** 319:22
**pasting** 218:9
**patent** 263:19
**path** 322:22
**pathogenesis**
283:7
**patholo-** 129:18
**pathologic**
129:18
**pathology**
113:12 116:8
**pathway** 31:9
**pathways**
369:22
**patient** 18:1
31:15,19 33:4
231:7 273:1
335:22 341:13
341:15 378:5
378:21
**patient's** 16:10
**patients** 31:4,8
31:13,23 32:2
32:8,14,17,21
33:1,13,24
34:13 35:11,18
36:7,15,24

37:19 38:3,9
88:20 172:6
174:22 191:18
217:15 268:4
270:12 321:19
335:20 336:2
340:17,20,24
**patients'** 33:9
**Paula** 3:17
14:10 385:15
**pause** 244:17
**pbrown@bhol...**
3:20 385:18
**PDQ** 162:15,17
163:7 164:2,17
164:20,22
165:1 167:7
168:11,16
272:21
**PDQ)-Health**
8:12
**PDQs** 162:16
164:9
**peek** 234:14
**peer** 30:6 56:22
**peer-reviewed**
51:20 70:7
71:16 74:6
164:8 167:5
337:17
**pelvic** 84:13
148:3 149:1
268:2 363:14
363:16
**pending** 122:15
268:17
**Penninkilampi**
9:17 49:10,19
207:9,13
210:23 212:10
213:10,23
214:14,17,18
217:4,22
218:14,24
219:1,11,17
220:10,20
221:4,15,19

227:12,19,20
227:22 229:2
229:18 236:21
237:15 250:16
291:7,11 292:3
292:18 330:5
**Penninkilamp...**
229:5,7
**Pennsylvania**
4:11 386:9
388:10
**people** 97:16,16
118:7 119:20
155:15,24
161:15 168:22
191:19 276:14
295:13 326:4
349:19,24
355:24
**per-** 276:3
**percent** 22:8,9
22:10,11 97:4
97:5,6 152:12
176:9,14,14
177:2 180:10
181:18 189:21
257:24 258:14
260:9,11,21
261:3,9,24
309:19 315:6
**percentage**
152:1 260:23
**percentages**
22:6
**perform** 174:7
195:6 302:22
**performance**
251:21
**performed**
101:7,24
105:15 222:11
236:3 250:9
257:9
**performing** 19:3
**perineal** 8:18
9:4,8,16 10:7
165:6,11 198:7

198:19 199:12
201:1 208:14
211:2,6,13
212:22 213:21
220:5 222:17
222:22 224:17
316:24 317:4
318:24 319:9
328:22 340:21
**perineum**
143:13 200:15
266:6 316:7
319:22 321:5
323:16 324:14
339:16
**period** 110:5
186:8 245:11
253:22 309:22
321:20 328:16
**periodically**
103:4
**periods** 332:1
**peristalsis** 263:1
**peritoneal** 8:11
163:22 174:19
262:18 263:5,5
263:7,18 266:6
267:8 274:8
316:7 318:18
319:2,22
321:19 322:1
322:22 323:4
323:24 324:24
**peritoneum**
268:3 317:7
324:23
**permanent**
159:5
**permit** 191:23
194:9 196:11
**persists** 109:24
**person** 60:23
191:18 267:24
284:11 382:14
**person's** 120:14
**personal** 5:8
18:18,21 33:3

103:20 179:7,8
387:1
**personally**
18:10,11 34:6
303:1 382:11
**pertain** 29:9,22
30:2 94:18
119:17 349:22
**pertained** 16:9
**pertaining** 13:5
13:15 14:4,22
29:18 84:24
131:9,20
239:21 268:13
295:9
**pertains** 74:3
119:10 264:18
**petition** 265:12
315:9
**Petitions** 106:3
**Ph.D** 7:17 11:3
**Pharmacopeia**
104:5
**Philadelphia**
4:11 386:9
388:10
**Phone** 118:22
**phrase** 47:8,20
139:20 151:16
233:8,9 238:14
262:12
**phrased** 82:5
156:10
**phraseology**
48:10 57:6,8
**physician** 16:13
16:21 17:14
366:10
**physicians** 8:3,8
33:12,22 34:11
35:11 36:11
37:9,12,17,22
38:2,2,7,7
146:5 168:15
172:11
**pick** 58:22
**picture** 132:18

Ellen Blair Smith, M.D.

211:23
**PID** 148:21
**piece** 287:20
**pieces** 166:7
**Pier** 77:18,23
303:12 312:2,3
312:22
**Pier's** 300:9
301:5
**pile** 40:2,7
**Pitocin** 365:15
**place** 74:20
194:22 200:20
208:4 230:10
245:23 251:14
251:23 388:9
**placed** 63:5
321:24,24
322:6
**places** 134:12
159:12
**plaintiffs** 14:8
22:19 24:21
26:13 35:24
73:20,21 75:12
76:1,2 78:22
298:19 376:4
**plaintiffs'** 3:3
22:4,11 27:14
55:24 56:5
86:1 94:17
96:3,7,12
260:4 284:10
285:5 385:1
**plans** 30:1
**platy** 142:22
**plausibility**
274:23 337:6
**plausible** 317:4
**play** 372:12,13
**plays** 283:4
**Plaza** 3:13
385:11
**please** 6:20,21
11:8 15:12,16
20:5 28:18
37:7 45:4 46:1

47:4,17 48:2
48:23 73:4
90:5 112:18
113:23 156:12
170:23 177:1
190:12 193:11
209:2 239:5
248:5 253:3
255:19 264:24
275:15 300:2
305:22 335:9
348:4 352:22
357:23 358:6
359:23 369:5
**plethora** 202:19
**plot** 227:12
**plowed** 289:9
**plowing** 235:3
**Plunkett** 259:9
260:1
**plus** 148:4
342:20
**point** 41:20
84:17 139:13
156:17 158:8
160:3 178:15
215:7 226:20
236:21 260:16
268:7 270:13
284:9
**pointed** 205:13
**pointing** 231:6
251:24
**points** 219:7
232:8 280:22
331:4
**pol-** 325:20,22
**polarized**
100:13
**politically**
212:10
**polymorphisms**
326:15
**pooled** 9:13
173:13 203:1
**poor** 143:12
**poorly** 82:6

243:8
**population**
227:18 263:15
**populations**
114:11 295:17
**portion** 154:14
166:1 186:16
186:23 199:14
208:13 231:6
**portions** 299:6
**pos-** 182:22
**posed** 108:3
128:1 296:3
**posing** 196:7
225:18
**position** 87:11
196:15,17
234:1 361:6
**positive** 99:5,6
99:10 116:7
125:8 127:3
353:10 372:23
373:11
**possessed**
147:18
**possession** 6:21
56:13
**possibility** 172:8
236:15
**possible** 103:2
147:14,19,21
195:5 200:14
201:8,22 202:4
202:17 225:23
260:22
**post** 229:15
338:5
**poster-** 363:9
**posterior** 364:4
364:12
**postgraduate**
149:18
**postings** 30:9,10
30:10
**postmenopausal**
244:13
**postulated**

339:2
**postulates**
182:23
**postulating**
87:11
**pot** 290:19
**potential** 154:20
155:17,19
186:4 214:6
249:22 266:5
316:6 324:22
331:18 357:9
358:19
**potentially**
379:17
**pouring** 293:5
**powder** 1:3 9:12
10:7,16 31:16
31:20,24 32:3
32:19,22 33:1
33:5,10,14,16
34:1,14 35:9
35:13,19 36:9
36:16 37:13,19
38:4,9 78:3
87:12 88:4,7
88:11,14 90:21
92:24 94:21
95:6,14 96:21
97:11 103:17
103:23 108:24
109:18 140:6
142:10,22,22
151:18 153:4
154:6,6,8,23
155:22 156:1
168:20 205:22
207:19 240:20
241:7 253:10
253:24,24
254:16 288:5
293:5 295:9
296:10 297:17
299:5,9,15
301:15 303:10
303:13,22
305:8,16 306:4

306:5,7 308:21
309:12 310:7
311:2,9,13,15
312:24 322:4
325:7 326:21
326:22 328:11
328:20 329:13
329:17 331:6
331:19 332:1
335:21 336:16
336:17 340:6,7
342:3 344:1,5
353:19 354:4,9
376:21 383:3
**powder's** 266:14
**powders** 142:13
142:14,19
143:7 144:11
206:19 275:7
304:2 312:7
328:18 343:19
**power** 45:20
46:13 254:20
254:24 255:11
255:13 257:2,9
257:13,19
**practice** 80:12
80:21,22 81:18
81:18 82:21
147:18
**practices** 1:4
294:5 383:4
**practicing** 37:16
**practitioners**
150:24
**precise** 137:12
143:16 261:13
350:8
**predicated**
154:23
**predisposition**
83:20 172:7
**Predominance**
355:20
**predominant**
355:21
**predominantly**

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 1006 of 1035
PageID: 242185
Ellen Blair Smith, M.D.

Page 425

31:9,11
predominoc-
355:21
preeclampsia
329:24
prefer 41:16
164:8 190:16
preliminary
366:16
premature
115:3,20 116:9
126:8 130:5
preparation
143:12 158:15
330:20
prepare 164:22
prepared 74:1
preparing 21:10
21:20
preponderance
278:19
prepub 56:19
prepublication
56:22 350:20
prescribe
281:14
presence 14:19
95:14 96:24
97:23 98:18
103:3 107:8,24
110:10,10
142:10,12
143:5 308:20
309:11 310:14
311:3 312:24
343:18
present 5:20
14:21 72:21
311:8 332:1
presentations
30:13
presented
283:19
presently
340:20
presents 70:3
presidential

322:24
Press 10:6
presume 286:23
287:10 288:1
pretty 88:6
135:13 161:15
279:17,18
298:11 327:6
328:7 335:12
346:2,4
Prevention 8:11
10:19 163:7
prevents 44:21
previewed 226:1
previously
38:19 93:10
259:12 306:19
333:18
priest 341:24
Primary 8:11
163:22
principles 179:9
print 56:11
153:23 333:19
printed 361:5,7
362:7
printout 99:18
prior 16:19 17:8
33:9,24 34:14
35:12,18 36:8
38:4,9 39:19
56:11 59:20
70:16 89:4
107:15 184:5
193:5 203:15
204:3 338:4,8
338:12,19
339:8,10,13,19
342:20 359:21
privilege 24:19
privileged 25:4
pro- 39:3
pro-carcinoge...
338:15
pro-inflamma...
326:1,12 328:4
prob- 82:5

255:21
probable 201:15
202:5
probably 14:2
57:18 98:7
101:13 120:21
120:24 130:1
132:18 158:14
175:11 258:22
345:9,18
358:24
problem 130:4
143:4 255:23
procedure 2:11
279:16
proceed 79:22
162:6 304:23
proceeding
387:16
proceedings
383:21
process 164:22
304:17 338:1
369:24 370:8
374:20
processes
369:20
processing
109:24
prod- 24:18
produced 2:2
52:16 53:1
104:17 105:12
216:11 290:14
290:15 327:19
product 24:18
25:15 35:13
297:17 302:19
304:14
production
325:12,21
326:11
products 1:3,4
5:8 10:16
31:16,20,24
32:3,19,22
33:1,6,10,14

34:1,15 35:19
36:9,16 37:14
37:19 38:4,10
66:10 78:3
87:4 88:4,7
90:21 92:24
93:16 94:19
95:15 96:21
100:20 103:13
103:15,19,23
104:4 106:19
107:4,12 108:7
108:13,14,20
108:20,21
109:2,8,18
110:6 120:15
142:10 154:23
156:1 168:20
241:8 288:5
305:16 326:2
329:17 336:16
340:6 353:19
376:21,24
383:3,4 387:1
professional
8:12 34:12
36:12 80:11,21
81:18 163:8
professionally
36:15
profiles 243:13
progestins
146:18
prognosis
278:22
progress 29:23
282:4 317:9
349:13,23
350:14
progression
280:23 338:23
progressive
281:7
proliferation
326:14 372:22
373:2,8,13,21
374:13,17,17

promise 147:9
315:2
promote 275:7
prone 220:2,23
221:1
proof 299:16
330:20
propelled
321:24
properties 371:9
property 371:22
372:17 373:13
373:24
proportion
152:3
Proposal 198:13
251:20 252:3
proposition
197:24 198:4
pros- 371:16
prospective 9:23
200:10 214:24
222:21 232:15
237:9,16
246:16 247:13
247:16 248:5
248:11,15,16
249:3,16,21
250:18,22
251:22 252:17
253:5 279:20
prospectively
249:11 250:2
prostanoid
371:16
protected 24:18
69:1
protective
270:14 271:9
280:13,16
281:7
protein 369:19
371:7
prove 268:7
proved 382:12
proven 200:15
243:22

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 1007 of 1035
PageID: 242186
Ellen Blair Smith, M.D.

Page 426

56:7 68:1 72:7
136:13
**provided** 22:15
39:4 52:21
56:5,15 65:21
65:23 66:13,16
67:23 68:2,8
69:4,5,16,22
86:5 94:16
96:1,3,6,12
168:11 259:16
259:19 260:3
340:3
**provides** 245:22
**providing** 52:20
**provisions** 2:11
**PTGS2** 371:14
**PTI** 5:14,14
387:7,7
**public** 30:21
328:21 366:17
366:21 382:23
**publication**
49:15 56:11
81:7 87:13
157:6 160:23
162:14 226:19
234:11,21
318:2 329:16
**publications**
28:21,23 29:2
330:18 333:15
**published** 29:5
33:15 35:4
70:6 71:20
74:8 97:24
125:20 149:9
149:16,21
154:11 157:7
160:4 166:24
252:23 284:21
312:5,23
329:12 333:17
337:11,16
376:7
**publishing**
328:15

**PubMed** 57:21
58:15 111:5,7
**pull** 45:1 175:5
265:3 312:16
317:12 332:19
351:16
**pulling** 315:13
333:1
**punch** 346:20
**puny** 155:3
**pure** 142:3,22
**purely** 47:1
**purported** 112:3
**purpose** 249:11
299:7
**purposes** 54:9
94:9 160:2
382:17
**pursuant** 2:10
384:11,20
**put** 52:10 55:18
58:16,16,17
122:18 139:20
147:13 159:6
170:2 208:9
260:17 267:6
295:24 300:2
**putting** 236:16

---
### Q
**qual-** 126:15
**qualifications**
303:4
**quantify** 19:9
152:8 172:18
**quantitate** 152:5
182:1 291:6
**quantitated**
291:8
**quantities** 77:24
**quarrels** 244:4
**queried** 293:15
**queries** 46:14
254:1,16
**query** 327:7
**question** 21:16
23:12 24:7

28:18 30:17
32:6,7 33:19
34:4 42:1
61:21 64:20
65:3,4 66:6,7
66:23 67:15,18
68:12,13,21
69:9,13 70:1
72:11,23 73:2
75:10,23 76:21
76:24 78:23
83:3,14 84:17
86:24 89:13
95:19,21,22
97:20 100:1
107:15,17,21
108:2 110:3,3
117:24 119:22
122:15 127:24
130:10 134:20
137:12 141:8
141:18 143:1
143:15,16
144:3,6 156:12
158:6 166:13
168:22,24
170:21 176:5
176:16,18
178:3 180:18
187:21 190:12
195:16 196:6
202:12,13
205:17 210:12
210:16 213:22
216:6 217:4
218:24 225:17
232:20 239:6,8
241:24 242:3
244:19 245:15
248:2,2 254:2
256:22 258:15
261:6,8,12,24
262:3,4 268:16
286:4,10,12,17
287:18 289:24
291:17 296:2
302:6 309:1

311:7 323:15
328:9 333:21
340:12,13
350:8 355:12
359:23 368:22
368:24 370:1
373:18 378:19
379:5
**questionable**
197:4
**questioned**
300:6,10
**questioning**
34:18 57:18
70:16 215:3
308:11
**questions** 13:17
15:7,16 41:23
53:24 68:24
69:12 88:22
102:18 103:2
120:2 122:6
137:4 178:15
196:7 216:1
286:7 297:2
308:14,19,22
309:2 313:7,8
315:8 329:1,2
331:3,23 334:1
335:20,23
338:3 340:16
342:6,8 343:14
349:5 350:22
369:6,8 378:14
379:2
**quick** 233:19
**quicker** 24:15
60:9 120:1
209:22
**quit** 185:8
**quite** 48:22
377:20
**quo-** 51:9
**Quotation** 6:23
**quotations**
51:14 52:11
186:14

**quote** 6:24 45:18
46:5,12,15
48:10 49:6,7
49:21 51:8
62:13,13 80:9
80:12 92:23,24
93:15 103:1,6
111:15,16
114:7,14,24
115:6 125:4,10
126:24 127:5
139:21 145:22
145:23 148:11
148:12 150:10
153:3,4,7
178:24 186:2
188:4 189:18
195:17,19
196:10,12
197:15,23
198:9,16,20
199:17 206:18
213:1 219:22
220:7,12,12
230:5,7 231:10
233:6,7 245:17
245:19 257:2,4
262:13,13
266:15 275:6
286:8 291:24
**quoted** 51:3,4
52:4 187:3
199:16
**quotes** 45:21
51:23 139:21
231:14
**quoting** 51:12

---
### R
**R** 3:1,17 4:1,16
5:1 11:1 93:5,8
385:15 386:14
**rabbit** 268:15
**raised** 103:3
**Raman** 25:21
**Ramirez** 5:21
**ran** 54:7 258:12

Ellen Blair Smith, M.D.

**random** 298:11
**randomized**
  200:10 201:24
  246:17 248:7
**range** 257:22,24
  258:9,13
  260:16,17,19
  261:9,14,20
  263:24 322:16
**ranked** 330:4
**rappel@seyfa...**
  5:13 387:5
**rare** 253:21
  346:14
**rarity** 255:4
**rat** 268:14
**rate** 19:2 114:9
  181:9 229:6
  307:9,11,15
**rates** 138:15,24
  139:15 275:24
**ratio** 136:1,2
  174:14 175:1,2
  176:6 178:4
  180:6,9 182:17
  183:7 184:11
  184:11,15
  185:15 186:3
  189:13,20
  190:15,23
  203:7,14,24,24
  207:18 208:1,2
  208:14 209:5,7
  211:3,6,10,12
  211:19 238:3,4
  289:20
**ratios** 181:22
  203:15 217:19
  238:5 295:22
**raw** 80:5 103:6
**RDR** 2:7 5:24
  388:6
**re-** 205:14
**rea-** 50:21
**reach** 25:9 28:10
  28:13 61:1
  85:21,24 86:4

86:9,14 89:14
89:24 98:1
133:7 213:11
255:7 266:15
317:6 337:21
**reached** 82:8
  85:16 89:19
  129:11 133:16
  156:7 202:15
  213:7 214:14
  231:19 243:21
**reaching** 166:9
**reaction** 317:8
**reactions** 288:4
**reactive** 281:4
  281:24 282:1
**read** 23:9 45:16
  45:16,22 46:17
  46:19 47:8,16
  47:23 49:22
  54:13 57:14
  61:2,19 76:8
  77:3 80:13,17
  90:23 103:7
  106:12 107:22
  114:6 125:11
  125:13 133:11
  133:12,13,23
  134:2,3 139:11
  150:13 152:17
  153:6 154:15
  154:18 157:16
  158:9,12,13
  159:3,9 162:16
  165:8 166:21
  186:17,20
  192:4 198:21
  199:18 232:8
  245:20 251:15
  252:2 259:20
  276:4 283:11
  283:13,16,18
  284:14 290:2
  294:24 300:5,8
  300:9,11,22
  302:16 303:18
  314:2 315:2,3

316:9 328:19
328:23 332:8
332:20 350:16
350:20 359:10
361:1 380:4
382:1
**reading** 23:2
  48:12 50:19,21
  86:24 115:8,16
  125:1 138:13
  138:21 139:7
  153:10 155:14
  159:1 163:23
  182:15 204:18
  204:19 208:17
  209:6 254:19
  256:16 262:19
  262:20 272:2
  275:14 284:7
  284:20 307:20
  321:9 330:7
  356:11 357:5
  374:6
**reads** 126:24
**ready** 79:22
  162:6 317:2
  331:13
**real** 187:7 189:1
  233:19 262:5
  322:21 345:13
**really** 140:17
  174:22 212:13
  212:16 327:8,9
  327:10
**realtime** 86:8
  107:23 108:10
  140:16 142:9
  144:5,20
  150:19 383:18
  383:19 388:7
**reams** 7:7
**reanalysis** 80:5
**reason** 76:17
  99:21 107:10
  108:4 134:6
  190:22 205:8
  218:6 224:22

225:3 257:12
302:12 324:5
381:4
**reasonable**
  252:13
**reasons** 225:5
  225:19 278:15
  291:19 384:19
**reassert** 38:22
**REATH** 4:10
  386:8
**recall** 23:12 32:1
  34:19 35:10
  49:7 52:3 57:7
  65:16 66:1
  106:21 112:13
  112:15 121:12
  121:17 137:13
  150:22 153:1
  186:4,7,12
  187:5 220:2,24
  221:1,3 225:11
  225:14 236:11
  236:15,20
  249:11,22
  250:4,13
  279:14 310:18
  313:7,8 315:11
  315:16 316:17
  316:20 317:22
  331:7,8 334:1
  340:22
**recalling** 279:16
**receipt** 384:15
**receive** 18:6,9
  18:11 367:12
**received** 116:23
  125:5 356:17
**recess** 79:17
  117:6 119:4
  161:23 194:1
  230:22 277:2
  296:21 308:6
  320:21 343:6
**recognize**
  105:24 149:24
  162:18 163:24

164:17 190:1
287:13
**recognized**
  271:9
**recollection**
  113:9
**recommend**
  25:8 33:13,23
  34:13 35:5,11
  38:3 154:4
  155:18
**recommendat...**
  154:22
**recommended**
  25:20 33:8
  35:17 36:6,14
  36:19 38:1
**recommending**
  154:16
**recommends**
  35:10
**record** 2:11
  38:22 79:16,19
  95:9 117:5,9
  119:3,6 131:13
  139:6 154:15
  156:15 157:10
  160:2 161:21
  162:2 171:5
  186:20 191:6
  193:13,24
  194:4 207:5
  210:18 230:18
  230:19,21,24
  277:1,6 296:16
  296:18,20,23
  300:15 301:23
  303:17 304:23
  305:2,11 307:2
  307:24 308:4,8
  312:14 320:11
  320:24 343:1,5
  343:8 346:4
  354:7 358:4
  379:24 380:2
  384:4,23
**recorded** 15:9

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 1009 of 1035
PageID: 242188
Ellen Blair Smith, M.D.

Page 428

**records** 19:13
  56:13
**rectal** 375:17,23
**redeem** 175:16
**reduced** 273:2
**REES** 4:16
  386:14
**refer** 11:18 26:7
  27:4 58:11
  62:21 107:24
  111:11,14,21
  123:17 124:11
  127:17 207:18
  209:20 233:6
  277:17 354:23
  355:1
**reference** 54:24
  62:20 63:6,7,8
  63:12 64:10
  65:17 94:17
  114:11 164:10
  164:13 208:5
  223:4 258:16
  285:18 286:22
  317:19
**referenced** 51:5
  169:15 254:23
  264:10 286:7
  312:21 313:24
  337:12
**references** 39:23
  54:22 55:7
  56:2 57:14
  58:4,22 63:10
  93:19 133:17
  149:14 155:3
  162:22 164:8
  165:24 166:3
  167:5 285:17
  285:24 287:9
  287:22 312:8
  314:12 349:5
**referred** 107:7
  138:7 147:17
  162:14 165:2
  181:6 184:13
  273:7 287:21

306:18 329:7
336:3 340:6
352:15,18
366:16
**referring** 22:14
  34:20 51:7,10
  58:13 64:1
  85:8 95:8
  99:24 110:13
  129:21 169:13
  173:8 191:24
  221:20,24
  223:2,13,16
  232:22 233:1
  237:2 259:3
  264:12,18
  312:11 329:21
  340:7
**reflect** 6:23
  20:18 112:6
  186:4
**reflective** 151:6
**reflects** 176:9
  205:24
**reframe** 217:3
**refresh** 102:16
  106:24 113:9
  193:7 355:9
**regard** 67:4
  151:5 212:23
  288:20 312:21
**regarding** 25:3
  146:10,13
  154:20 201:6
  305:15 310:19
  312:23 313:5
  313:13 314:7
  316:24 329:12
  331:17 332:4
  332:15
**regardless** 19:2
  24:23
**regards** 240:15
**registered** 87:14
  88:2 383:17
**Registration**
  388:8

**Registry** 317:24
**regularly** 80:11
**regulator**
  372:21 373:8
  373:12,20
  374:13
**regulatory**
  328:10
**Reid** 111:22
  112:14,15,20
  113:3,16,22
  114:17 115:19
  115:22 119:14
  125:21,22
  126:3,4,5
  128:13,14,17
  128:24 129:21
  130:2 131:24
  135:12 354:20
  354:24 355:1,5
  355:7 356:6
**reject** 266:20
**rejected** 266:16
**rejecting** 214:9
**relate** 112:9
**related** 288:13
  356:5 387:15
**RELATES** 1:6
  383:6
**relating** 360:8
**relation** 156:2
  241:10 259:1
  332:11 376:2
**relationship**
  23:20 34:12
  36:12 89:2,5
  89:15 112:3
  127:18 188:4,8
  195:14,18
  197:3,7 204:24
  205:7 214:9,10
  250:3 285:6
  330:21
**relative** 135:10
  136:8 176:14
  189:15 197:4
  227:15,19

238:3 335:2
**relatively**
  184:14 185:14
  186:3 244:13
  253:21 264:6
**relevant** 59:10
  59:11 60:17
  61:5 64:9
  65:14 78:5
  158:21 161:7,9
  161:10 167:8
  167:11,14,17
  168:12 268:9
  268:12 296:4
  314:6 344:15
**reliable** 245:18
  245:22 246:23
  247:4 248:9
  253:20 327:7
**reliance** 63:9,16
  64:1,10,14
**reliant** 354:4
**relied** 57:21
  81:11,19 95:24
  249:2 311:7
  319:8 332:21
  337:12 355:14
**rely** 80:22 81:2
  93:2 302:5,10
  319:14 321:4
  331:16 332:3
  332:13
**relying** 235:18
  305:15 309:9
  337:20 356:3
**remainder**
  22:12
**remains** 61:22
  213:22 227:21
**remark** 253:8
  253:11 254:4
**remarkable**
  327:10
**remarkably**
  46:22 48:19
**remember** 35:2
  52:14 93:18

95:22 98:4
112:5 133:1,3
135:2,14
138:12,19,21
139:7,12
153:10 159:18
233:11 253:11
259:1,2 264:9
264:15 283:1
302:17 308:22
308:23 309:2
317:23 328:23
329:2 330:3,6
335:23 353:22
356:1
**remend** 154:4
**render** 214:1
  336:2
**rendered** 32:13
  32:17 90:1
  214:12
**RENEE** 5:9
  387:2
**repair** 275:24
  371:2 374:18
**repeat** 15:4
  190:11
**repeated** 281:23
**repeatedly**
  143:12
**rephrase** 15:16
  15:17 21:18
  29:15 34:10
  65:5 66:6
  67:15,21 82:3
  89:23 97:20
  118:19 216:7
  226:16 369:2
**replace** 6:21
**replicated**
  232:14
**replow** 289:8
**report** 7:9,11
  9:23 29:9 30:6
  32:13,18 35:18
  41:6 42:9,18
  43:20 44:1,3,7

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 1010 of 1035
PageID: 242189
Ellen Blair Smith, M.D.

Page 429

44:10,13,17
45:1,4 46:1,4,6
47:1,4 48:2,4
49:5,6,24 50:4
50:7 51:14
52:3,7,16
53:16 54:3,14
57:3 62:21,23
65:1,17 70:9
73:24 74:5,8
74:12 77:11,13
80:7 83:6 90:1
90:5 93:3,21
96:16,18 97:3
97:10 98:6,10
98:21,22 99:1
106:12 112:6
113:16 133:5,6
134:12,18
135:17 139:2
139:14,18,19
139:23 145:18
157:17 158:15
160:14 162:23
164:5,11,14
167:23 171:8
177:24 179:19
180:1,6 184:10
186:14 188:1,3
188:23 189:13
191:21,22
196:10 197:15
197:23 198:9
198:24 199:10
199:15 200:3
202:24 203:3,6
204:7 205:10
206:5,8,10,14
207:17 208:13
212:9 213:24
218:7 219:7,9
225:1,10
226:13 227:2
235:12,18
237:22 238:9
238:14 240:4
245:16 250:17

253:14 257:21
258:17,21
259:3,4,5,16
259:24 261:9
261:18 262:10
266:13,18
270:17,23
271:1,15 272:3
272:7,11
273:13 276:16
278:6 280:2,7
280:11 288:21
292:22 295:21
302:16 309:6
309:15 310:2
311:13 312:10
314:11,23
319:18 336:23
336:24 337:10
337:13 340:2
352:16 376:15
376:19
**reported** 2:8
174:15 203:15
208:2 211:3
221:10 288:3
383:21
**reporter** 5:23
11:8 28:17
111:6 352:7
380:3,6 383:18
383:18
**Reporter's** 6:18
6:20,23 383:10
**reporting**
114:10 195:4
**reports** 70:11
71:6,15,24
72:4,13,16
73:11,12,15,20
74:12 76:22
80:22 81:9
86:11 93:10
96:1,2 102:23
206:11 209:4
259:7 260:3,7
273:14 278:20

312:6
**represent** 297:8
**representing**
352:14
**represents**
172:24
**reproducible**
183:17
**reproductive**
319:5 363:5,18
366:11
**request** 65:20,23
**requested**
384:13
**requesting**
65:22 71:3
**requests** 38:21
42:5
**required** 61:1
**requires** 253:22
**reread** 193:4
**research** 9:3
111:5 163:4
198:13 199:9
214:6 251:20
252:3 319:12
346:23
**researcher**
326:18
**resident** 13:12
**residents** 262:24
**residing** 383:19
**resources**
149:19
**respect** 71:5
88:22 90:19
91:15 100:19
103:22 110:22
126:7 127:16
135:4,7 161:5
165:20 166:24
168:8 170:5
174:3 232:5
241:15 261:6
276:15 288:14
290:8
**respected**

104:11 150:1
151:4 162:19
**respond** 39:16
89:13 120:4,6
144:3
**responded**
71:23 76:11
77:10 78:9,15
79:7
**responding** 79:4
**response** 76:18
82:2 188:1
192:1,11,20
194:10,13
195:6,23
196:21,24
204:10 206:4
206:11 237:1
292:9,16,18,19
293:8 294:7,9
294:11,16
295:4,6 315:9
317:8 326:6,9
327:10 333:24
334:10,21,22
368:24 369:19
**responses**
194:16 294:23
325:12 371:3
**responsibility**
336:10
**responsible**
185:6,7
**responsive**
40:21 202:12
**restate** 75:23
**restated** 186:14
**resticker** 228:23
**restricted**
205:21
**result** 114:12
183:17 189:17
202:2 376:7
**resulted** 300:23
301:9
**resulting** 323:2
**results** 99:7,8

101:20 187:11
208:6,11,19
218:22 220:1
220:11 230:7
231:11 232:9
232:23 233:6
257:4 290:8,13
290:15 335:2
348:19 369:14
370:2
**retained** 24:3,9
24:24 25:1
54:10,14 55:11
83:10,12 84:20
90:2,17 91:7
91:13,17 92:4
92:11,20
283:14 285:13
307:13 376:3
**retention** 37:22
54:18 55:5
91:2
**retired** 37:16
**retrieve** 277:14
**retrograde**
319:3 357:9
358:20 359:5
359:11 360:2
**retrospective**
173:19 247:17
248:3,23
**returned** 384:15
384:17
**returning**
179:19 218:14
**reveal** 66:24
**revealed** 344:23
345:1
**reverse** 341:12
**review** 7:19 9:16
10:23 30:7
48:14 57:5
59:4,9,23
60:17 61:10
63:19 64:2
65:13 66:17
74:11 76:6

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 1011 of 1035
PageID: 242190
Ellen Blair Smith, M.D.

Page 430

86:6 89:10
95:12 96:1
105:19 111:24
112:2 113:12
116:8 129:19
151:23 173:5
205:15 266:20
268:9,12
282:18,21
284:1 286:2,6
286:23 287:11
309:14 313:4,9
313:20,23,24
314:6,24
329:22 332:4,7
332:11,14,21
336:22 338:20
**reviewed** 53:18
54:8,18,19
55:11 63:22,24
64:8,24 66:2
73:12,20,24
76:8 81:12
89:18 98:20,21
99:19,20 102:7
111:1,2 117:17
118:21 119:10
119:18 128:2
130:23 138:10
155:4 161:2
213:6 231:24
266:13 273:21
282:7 287:16
287:19 353:15
**reviewing** 21:11
22:3,3,8,12
83:11 86:10,15
137:13 146:10
205:17
**reviews** 193:13
**rheumatoid**
282:5
**rid** 291:12
346:15
**right** 17:7 24:13
40:7 47:3,16
50:14 55:19

56:21 57:2
58:6 61:1 70:5
73:13 83:12
87:1 92:5 95:3
111:19 115:18
123:12,14,15
124:14 126:1
128:23 129:15
131:11 140:22
145:17 154:9
157:5 164:23
165:9 184:1,6
184:11 188:11
188:22 189:7
200:6 202:23
204:18 206:18
207:8 209:19
210:2 215:2
217:3 218:13
219:5,9 221:23
222:4 223:7,12
232:19,24
248:4 254:3
255:17 256:8
256:24 258:6,8
266:4,22
267:24 280:19
293:21 295:24
300:7 315:14
333:20 337:18
353:16 354:12
355:10 356:9
364:13 366:18
368:6,7 371:10
376:4 378:7
**right-hand**
124:22 256:8
256:10,14
274:14 353:4,6
357:4
**Rigler** 10:17
93:6
**rigor** 80:10
**ring** 75:7 77:15
77:19 138:8
285:20,22
**rings** 138:9

**rise** 263:17
**risk** 8:6,14,19,22
9:4,9,12,19
10:4,7,20 29:6
31:4,7,10,12
33:3,16 35:5,7
35:15 97:9
116:5 135:10
135:10 136:8
145:23 146:3,9
146:14 147:24
148:12,22
149:4,8,9,16
149:20,22
150:8 151:5,11
151:19,24
152:2,4 157:6
158:4,22
159:10,10,14
159:16 160:3
161:16,16
162:10,11,14
163:21 165:12
166:24 167:2,6
167:22 168:2
168:13 169:1
169:10,16,18
169:19,20
170:4,10,14
171:19,22
172:6,10,19
181:19 189:15
189:17 197:4
198:8,20 199:8
199:13 205:12
213:18 227:15
227:19 229:7
238:3 239:24
240:1,20,23
241:1,2 243:13
247:4,8 257:22
260:9,19,22
261:10,14
262:1,5 271:8
272:16,21
273:2,5,8
278:23 280:8

281:14,17
328:21 335:6
340:20 341:17
343:19 350:7
375:8,23
376:15 379:17
**risk-assessment**
172:18
**risk-reducing**
33:8,13,23
34:13 35:12,17
38:3
**risks** 212:4
240:8 335:2
**ROBINSON**
3:12 385:10
**rodent** 267:13
**rodents** 319:21
**role** 18:17 283:4
372:12,13
**room** 308:5
**Ross** 9:17
**rough** 6:20,21
22:2
**ROYSTON**
5:14 387:7
**RSA** 5:24
**Rule** 2:13 7:9,11
**rules** 2:10 15:3
**run** 54:10
**running** 258:23
**rush** 53:21

_____
**S**
**S** 3:1 4:1 5:1 9:9
11:1
**S-h-u-l-k-a**
327:24
**S-j-ö-r-s-e-n**
320:1
**sacrifice** 267:8
**Saed** 283:10
284:10,13
285:6,7 325:23
327:9 328:6
376:1,10
**Saed's** 327:16

339:3
**safe** 212:22
**safely** 286:23
**safety** 103:2
324:20
**sales** 1:4 295:16
383:4
**salpingectomy**
172:12 271:11
**salpingo-ooph...**
271:11
**Sambucetti**
350:4
**sample** 108:23
299:17 300:19
310:22 312:4
**samples** 97:4,5
97:12 108:14
109:3 110:9
299:9 309:11
309:16,20,21
310:20 311:24
**Samuel** 7:16
**San** 3:19 385:17
**sanitary** 293:24
295:10,23
296:11
**Saturday** 39:5,5
**saw** 55:5 66:11
284:23 310:3
**saying** 130:7,13
154:11 155:16
169:24 242:19
288:8 307:14
355:13 356:7
358:12 359:2
374:6,10
**says** 43:1 45:18
46:12 48:10
57:11 103:1,17
114:7,24
115:10 116:8
129:8 155:2
165:20 168:16
172:17 175:4
187:10 195:17
199:9 233:24

Ellen Blair Smith, M.D.

249:20 250:2
257:6 316:5
334:11 348:17
353:7 354:18
354:22 355:15
355:16,20
356:20 357:4,8
360:19,24
373:4,11
**scale** 249:18
291:9
**scan** 114:19
**scarf** 230:15
**Schoeve** 2:7
5:24 383:17
388:6
**science** 243:23
**scientific** 12:14
35:16 51:17
59:5,10,11,23
60:17 61:6
70:3 80:10
81:9 85:18
89:10 92:1,4
149:9 150:1
151:4 162:19
249:18 280:21
289:12 324:19
326:21 338:14
338:20 339:20
344:3
**scientifically**
169:2 170:11
170:15 171:18
171:21
**scientist** 69:20
72:3
**scope** 42:10
212:14
**score** 172:6,10
291:11
**scoring** 35:5
169:20
**Scott** 4:4 11:21
38:17 74:17
86:24 209:23
215:14 274:15

276:19 375:12
384:7 386:2
**screen** 86:8
107:23 108:10
140:16 142:9
144:6,20
**screening** 36:7
38:8
**SCULLY** 4:16
386:14
**se** 323:23
**seal** 382:19
**search** 58:15
344:12
**searches** 54:7,10
57:22 96:11
**searching** 58:8
97:22 110:24
**second** 42:22
43:2,3,10 46:4
46:5 57:13,17
57:20,24 59:17
60:7 62:17
88:13 102:21
114:2 118:24
122:4,19,20,21
179:19 181:12
194:18 198:12
205:18 219:23
239:15,16
245:24 248:24
252:11 308:1
351:17,22,23
**seconds** 181:17
**section** 46:5,17
57:4 90:8 94:6
94:24 102:22
111:9,11 114:2
114:5 134:15
163:20 165:9
172:14 198:13
208:6,11,19
219:20 220:20
237:3 252:1
266:12 276:16
296:1 312:9
319:17

**sections** 249:9,9
**see** 23:10 43:23
45:13 46:10,17
47:9 48:12
49:24 50:16,19
50:24 53:20
57:15,23 67:7
67:10 80:13,17
90:7,10,23
92:13 93:23
94:2 102:22
103:1,7 105:24
112:16 114:20
121:10,24
125:1,11 127:6
130:1 146:1
150:18 159:4
159:12,22
163:23 165:1,5
170:22 172:17
172:21 178:19
180:5 184:9
185:24 188:8
192:2,19,22,23
193:1,3,4
196:13,22
197:6 198:14
198:21 202:2
203:13,18
204:7,17,23
206:17 207:24
208:11,12
209:6,8,10
211:1 212:7,19
219:19,22
220:8 221:22
223:5 228:10
228:17 230:2
231:9 232:7
233:19 237:5
237:12,13
238:14,17
239:20,22
245:20,21
246:8 251:7,18
252:15 255:14
255:16 258:1

262:19,20
264:7,21
265:14 266:17
272:2 275:1
276:3 283:2
285:18 302:19
316:2 317:13
318:7 322:2
334:7 348:6,10
348:12 357:5
369:11 370:20
371:13 372:6,7
372:10
**seeing** 106:21
159:18 246:2
252:3 268:2
323:6,8,10
**seen** 38:24 44:16
54:20,23 99:12
106:6 142:2
159:17,19,22
161:4,6 162:22
163:12 164:1,2
165:23 170:4
226:9 240:16
258:18,20
259:9 263:16
323:22 324:6
335:11 347:1,4
347:7
**selected** 86:6
260:4
**selection** 45:20
46:14 250:4
**self-proliferat...**
373:22
**SEM** 302:21
**semi-solid**
326:24
**senior** 13:12
**sense** 63:13
97:18 307:13
**sent** 56:9 101:14
311:23
**sent-** 115:16
**sentence** 45:15
46:8 50:16,22

51:2 57:12,13
57:17,20 58:1
94:12 111:22
113:16 114:22
115:16 126:23
154:10,19
165:9 178:22
192:1 195:13
195:16 199:17
209:19 212:21
219:23 230:4
237:8 246:9
275:15 276:3
312:9 316:24
331:14 334:4
348:7 356:15
361:1 374:14
**sentences** 46:21
49:4 50:1
114:6
**separate** 12:5
40:2 243:6
**September**
12:18
**Serena** 10:7
**series** 13:17
308:19 315:8
335:19 340:12
340:16
**serous** 208:7,9
213:18 220:6
221:11 224:17
224:21 229:3,6
238:2 241:2,8
242:23,24
243:1,13,19,23
258:12 260:12
334:15
**serve** 12:16
**served** 16:15
17:6 38:19
72:13 76:23
384:9
**serves** 310:1,21
**service** 315:9
**Services** 101:18
388:8

Ellen Blair Smith, M.D.

serving 12:13 16:12
Session 6:8 162:1
set 20:12,17 40:2 53:24 55:4 106:15 118:1,3,21 119:9 127:16 127:17 130:18 138:4 235:19 257:13 267:17
sets 172:20
setting 271:19
seven 163:16
severe 261:4
SEYFARTH 5:10 387:2
SGA 157:7
SGL 149:21
SGO 8:6 151:21 157:8 272:21 273:6 283:20
SGO's 158:4
Shane 5:21
share 24:4 108:11
shared 87:9
shares 328:11
SHAW 5:10 387:2
SHOOK 4:4 386:2
short 45:21 46:14 117:2 153:9 186:8 225:12 244:13 244:15,17 276:20
shorthand 2:8 123:18
shot 263:10
should've 208:9
show 105:22 159:23 178:12 195:13,17 295:4,5 296:9

303:21 304:13 305:7 307:12 309:5 333:5 334:21
showed 197:2 238:2 311:18 325:14 368:15 369:14 370:3
Shower 10:16 10:16 97:11,11 103:18,18 308:21,21 309:12,12 310:7,8 311:2 311:2,9,9,19 311:19 331:6,6 331:19,20 336:17,17 340:7,8
showing 125:6 343:18 356:17 362:14
shown 212:22 319:21 362:15 384:9
shows 199:10 273:24 330:20
Shukla 367:14 367:19 368:14 368:24 369:8 370:1,21
Shulka 327:23 327:24,24
sic 60:5 138:13 141:4 199:10 284:22 291:9 322:9 324:23
side 16:14 71:22 194:17
sides 69:22 70:4
Siemiatycki 9:10
sign 380:4
signal 369:20
signature 6:17 381:1 382:2 384:12,14,18

significance 63:4 97:9 142:5 182:18 183:2 220:16 295:19 296:15
significant 49:14 99:5 121:15 125:17 129:6,9 136:6 136:14 168:20 177:6 181:3,5 181:14,16,18 181:20 183:7 189:17,23,24 190:2,6,8,20 199:8 204:15 205:23 220:16 224:20 227:15 227:22 229:5 235:12 238:3 261:4 267:21 272:5 274:1 278:22 289:17 289:18 290:20 328:21 329:17 334:13 335:4 337:4
significantly 181:12
SILVER 5:3 296:17 343:1 386:19
similar 46:22,23 48:19 49:1 135:11 143:16 212:23 227:11 227:18 235:19 235:23 324:1
simple 83:15 123:18 287:17
simultaneously 301:1 304:18 362:21
single 43:10 108:23 111:22 113:16 118:5 128:11 134:13

147:10 173:18 173:18 183:16 211:21 212:6 272:13 278:20 281:19 289:19 293:14 294:22 295:6 315:3,3 362:14
single-digit 233:13
single-nucleot... 326:15
sir 16:14 28:22 29:1,4 39:18 90:11 93:12 106:6 155:7 158:7 173:7 185:11 197:14 305:23 357:24
Sister 222:21,21
sisters 227:14 255:9 377:23 379:14,15
sit 282:10 378:7
site 118:6 173:18
sitting 55:9 65:24 112:14 174:3 241:15 244:7
situ 16:10
situation 245:22 292:10 378:20
six 229:13 267:4 293:23
Sixteen 9:5
size 177:17 182:2 322:19 324:1
sjames@shb.c... 4:8 386:6
Sjösten 262:24 267:24 322:4 362:19 363:10 365:13 366:6
skin 337:5
skip 298:4

skipping 298:10
slightly 203:18 227:19
small 131:18 132:2,4,7 153:23 174:22 177:17,17 183:17 191:11 194:15,21,22 195:1 212:16 244:12,15 245:8 266:13 295:17 322:17 335:6
small-number... 183:16
smaller 40:2 183:4,5,20 203:20 324:2 325:19,20
smart 295:15
Smith 1:12 2:2 6:6 7:5,9,13 11:3,10,16,18 12:2 14:24 20:16 24:14 25:5 38:24 40:15 41:4,10 41:22 42:8,17 43:24 44:16,20 44:24 47:4,14 49:3,6 50:6,9 50:11 52:15 53:5,11,16 55:9 57:4,13 58:3 62:19 67:12 70:9 72:18,23 73:5 75:2 79:21 80:1,7 90:4,8 98:16 99:19 107:1,14,20 117:11 118:14 119:8 123:2 124:12 126:21 137:24 145:1,2 145:17,21

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 1014 of 1035
PageID: 242193
Ellen Blair Smith, M.D.

Page 433

150:21 153:14
155:12 156:11
157:5,10 161:3
162:6 163:11
169:14 171:7
172:15 173:4
175:1 176:3
179:18 180:2
182:8,12 184:2
188:11 189:19
193:7 194:6
196:9 204:18
205:16 206:24
207:9,17 208:5
208:12 210:15
213:23 216:12
216:22 217:4
219:16 226:1,7
230:14 231:2
237:2 239:2,6
239:17 261:5
265:23 274:11
276:15 277:7
280:5 286:9
288:15 293:10
297:1,6 300:2
308:14 321:2
342:6 343:12
348:3 358:5
359:23 379:23
380:1 381:2
382:1,6,11
383:12 384:2
**Smith's** 253:13
**Smith-Bindman**
258:10,16
259:16
**smokers** 137:10
**smoking** 84:14
138:1
**snippets** 339:3
**snowballing**
281:23
**social** 30:10
**societies** 329:3
**SOD2** 371:6
**solid** 273:4

**somebody**
145:14 147:11
148:8 198:2
267:22,23
**somebody's**
267:21
**sooner** 181:17
**sophisticated**
195:6
**sorry** 21:14,15
21:17 28:19
34:24 48:24
53:5 58:1
65:11 67:11,13
77:1 87:3 95:3
97:21 105:4
111:4 112:19
115:15 118:13
119:23 120:5
123:8 128:8
129:24 130:10
131:24 137:22
139:10 148:7
148:19 153:22
155:9 156:13
157:2,21,23
158:2,24
176:20,21
180:21 182:7
185:10 192:24
200:1 209:3,17
209:23 210:11
217:7 222:8
223:8 230:16
239:14 245:6
246:5 253:4
267:2,3,11,12
269:4 273:17
273:19 275:18
288:8 289:3
292:21 294:3
299:21 305:24
313:18 320:12
320:20 326:20
344:21 350:10
353:22 357:17
358:15 364:6

367:22 370:12
**sort** 19:3 38:8
107:15 209:24
234:24 337:20
364:16 367:16
376:10
**sought** 167:5
**sounds** 215:22
**source** 52:7,8
158:16
**sources** 18:15,19
51:13 63:19,21
63:24 64:1
147:16 150:12
**spacing** 267:9
**speak** 128:7
185:19 197:9
**SPEAKER**
194:23
**speaking** 108:3
167:17 286:11
286:14,15
301:1 304:18
362:21
**speaks** 261:19
337:6
**specialty** 146:5
**species** 78:2
281:4 282:1,1
**specific** 49:4
95:9 117:19
146:11 240:14
244:6 251:14
251:23 277:14
286:5 308:24
309:2 325:11
331:11 332:24
336:3 363:18
**specifically**
22:21 104:7
122:3 142:3
187:4 199:18
253:9,23 254:5
264:18 350:14
**specifications**
103:21
**specificity**

288:20
**specified** 311:14
340:10
**spectroscopy**
25:21
**speculate**
104:20
**Speculation**
330:16
**speeches** 30:14
**spell** 35:1
312:13 320:4
**spelling** 322:9
**spend** 173:9
**spent** 14:4 19:10
19:15,23 20:18
21:2,19,22,24
22:3
**sperm** 322:19
**spiritual** 341:24
**spoke** 313:12
**sponsor** 163:1
**sposure** 118:6
**spouses** 355:23
**sprays** 154:5
155:22
**Square** 4:11
386:9
**stabilized**
325:15
**stack** 54:6
**stage** 330:19
346:1
**stand** 287:7
**standard** 19:2
51:23 164:20
281:13 327:1
**standardized**
238:4
**starch** 268:1,3,5
363:11,13,17
366:7,11
**start** 61:5 87:23
118:12 170:9
173:12 174:1
174:10 202:4
210:18 241:6

284:7 286:19
295:16 313:21
319:18 329:14
**started** 115:17
125:20 376:2
**starting** 282:3
327:9
**starts** 34:21
45:11 46:8
47:8,19 48:9
50:16 93:5,7
114:22 124:24
194:18 233:15
263:1
**state** 2:7 50:9
73:5 80:8
139:23 198:16
211:5 212:21
245:17 283:8
285:2 382:7,24
383:20
**stated** 2:11
73:14 121:10
134:12 196:9
207:6 240:8,11
**statement** 72:11
87:16 108:12
152:14,17
153:2,10,12
154:11,15
155:24 156:8
168:11 186:17
186:19 191:21
192:7 194:12
197:16 213:4
224:13,15
240:4 246:12
249:23 257:2
264:7,9,10,17
264:22 266:8,9
270:21 296:15
316:14 317:3
361:4,18
**statement's**
362:9
**statements**
30:21 107:11

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 1015 of 1035
PageID: 242194
Ellen Blair Smith, M.D.

Page 434

108:5 113:21
113:23 151:3
255:12 273:7
319:13
**states** 1:1 104:5
125:4 165:14
239:12 275:6
330:24 383:1
**stating** 242:6
358:18
**station** 272:14
**statistical**
128:15 173:17
174:5,6 181:14
190:6 220:15
295:18 296:14
**statistically**
121:15 125:17
129:6 136:6,13
177:5 181:3,5
181:11 183:6
189:16,23
190:1,20 199:7
224:20 227:15
227:22 229:5
235:12 238:2
272:5 274:1
278:22 289:17
290:20 334:13
335:4
**statistics** 238:5
**status** 169:6
271:24 272:1
**steering** 3:3
161:14 385:1
**stenographic**
383:23
**step** 60:13 321:7
**steps** 325:17
374:2 379:16
**sterilization**
146:13
**Steven** 7:17
10:10 255:1
**stew** 290:19
**sticker** 40:14
300:2

**stickered** 41:11
**stimulate**
365:16
**Stipulation** 6:4
**Stockholm**
318:1
**stomach** 181:10
**stop** 24:13 32:22
36:16
**stopped** 275:22
**story** 69:22 70:4
304:11
**straighten** 185:3
**straightening**
210:2
**stratification**
195:4
**Street** 2:9 3:5
4:5 5:10 385:3
386:3 387:3
388:9
**strength** 129:7
134:13 135:5,7
135:10,22
177:21 181:23
182:2 190:10
289:6,7,10
**stress** 276:1
283:7
**strike** 21:23
32:7 52:5
110:21 113:14
240:16 310:12
329:13 348:22
**strong** 149:4
177:3 178:5
180:13,20,23
190:3,7,15,24
289:14,21
290:2 324:10
360:8
**strongly** 88:7
127:3 319:20
353:10
**students** 262:23
**studied** 148:3
249:10 281:20

282:15 303:7
**studies** 9:6
23:14 29:8,17
40:2 43:10
45:19 47:21
48:11 49:8
54:13,18,19
56:1,5,10
87:14 108:17
111:16,24
112:2,7 118:6
119:17,19
121:2,7,13
125:6,16 127:4
128:11,12,12
129:16 132:11
132:14,15,20
133:23 134:2,3
134:7,8,16,17
134:21 136:2,3
136:13 137:17
138:7,10,13,19
138:22 139:14
148:3,4 149:2
155:4 159:23
163:1 169:16
173:3,17,18,21
173:22 174:21
175:4 183:18
188:19 192:13
194:14,15
195:1,4 200:9
202:8 209:14
214:24 220:2,5
220:12,15,17
220:22,23
221:2,21
224:16 225:4,9
225:11 227:13
229:15 231:23
232:14,15,17
232:18,23
235:22,22
236:1,3,10,12
236:16 237:10
237:20,23
238:1 246:16

247:14,14,17
247:17,19,20
248:5,10,14,16
248:23 249:3
249:17 250:8
250:10,18,23
251:22 252:17
252:17 253:9
253:23 254:5,8
254:15,20
255:3 257:2
258:11 266:20
266:24 268:13
277:8,13 279:9
279:15 281:2
282:18 285:11
285:23 286:2
288:3 290:3,11
290:14,15,19
291:10,14
292:4,24 293:2
293:3 294:15
294:19,20,22
294:24 295:3,6
295:8 296:9,13
312:17 314:4
319:19,21
320:1 321:22
322:5,17,20
323:7,9 330:18
330:23 332:15
334:21 343:17
344:3 349:6,11
349:15,21
353:10,14,17
353:23 354:2,8
354:11,16
355:7,8,17,22
355:23 356:1,2
356:8,17
362:18 365:2
365:17
**study** 9:23 23:13
46:13 50:23
111:19,22
112:14,15,20
112:21 113:1,3

113:9,11,22
116:7 117:22
121:9 129:7
131:24 134:24
142:2 169:21
169:23 173:13
174:20 175:23
179:14,19,20
183:16,16
184:1,3,6
185:17 187:9,9
187:18,23
188:6,7,10,12
189:6,8,18
191:22 192:9
195:10 196:10
197:13 199:10
200:16,21
201:21,23
202:8 207:11
207:13,21
210:23 211:22
212:13,18,20
213:23 214:14
214:17 215:12
215:13 217:4,5
217:22 218:5
218:15,24
222:1,2,16,21
222:22 223:1,3
223:14,21
224:19 225:8
225:16,24
227:2,9 229:21
230:7 231:3,11
232:9 233:7
235:24 236:14
236:21 237:15
238:8,8,20
239:1,8,11,23
244:16 245:8,9
245:18 246:23
247:4,8 248:10
249:16,20,21
250:1,12,16
251:1 253:20
253:22 255:6

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 1016 of 1035
PageID: 242195
Ellen Blair Smith, M.D.

Page 435

267:13,21,23
269:7,9,17
270:6,11
271:13 272:13
273:23 277:18
279:11,13
285:19,23
286:5,20,21,24
287:9,11,13
288:13 289:12
289:20 290:9
290:23 291:1,2
291:7,16,18,19
291:22 292:1,3
292:4,5 293:9
293:12,13,14
293:17 315:3
318:6,10 320:2
322:8,11,13
323:7 327:23
330:5 333:23
349:16 362:14
362:19,19,20
366:2 367:14
368:21,24
369:4,9,14
370:21
**studying** 132:3
138:15 254:13
333:2
**stuff** 150:15
166:5 283:12
337:5 339:3,4
**sub-** 187:3
**subalteration**
369:18
**subject** 40:24
66:1 68:13
69:10 186:12
298:10,11,17
308:11
**subjects** 9:5
366:2
**submitted** 19:20
30:5 51:19
109:3 366:21
**submitting**

19:22
**subscribed**
382:15 388:1
**subsequent**
268:4 314:5
**subsequently**
258:20
**subset** 40:7
131:8 232:13
**substance** 23:17
30:5,6 202:1
**substances**
331:22
**substantial**
60:24 195:3
**substantiate**
360:1
**substantive**
42:24
**subtype** 9:20
85:8 237:11
239:13,24
240:2 258:12
**subtypes** 240:24
243:5
**sufficient**
196:20 242:6
**suggest** 115:1
120:22 205:23
206:1
**suggested** 38:6
108:16 177:16
224:18 284:6
316:14 317:20
378:23
**suggesting**
189:17 324:7
**suggestion**
25:17 333:22
334:16
**suggestive** 220:6
**suggests** 171:24
177:9 198:6
199:11 255:2
319:4 330:10
**Suite** 3:18 4:5
4:11,17 5:16

385:16 386:3,9
386:15 387:9
388:9
**sum** 170:3
**summarizes**
359:15
**summary** 90:9
151:1 184:11
189:1
**sun's** 263:17
**Sunday** 39:5,6
**Super** 258:4
265:19
**superficially**
76:9 77:4
**supplied** 306:10
306:18
**supplier** 109:1
**suppliers** 97:12
108:13
**supply** 188:16
**support** 80:2,5
125:5 165:10
212:6 235:6
262:21 272:13
319:15 321:4
341:23 345:5
356:17
**supported** 115:3
115:24 147:6
**supporting**
319:8
**supportive**
166:12 270:8
334:20
**supports** 93:14
99:7 127:9
141:23 186:24
272:15 279:20
289:5
**suppose** 259:20
**supposed** 60:4
224:10 305:4
**suppressive**
146:19
**sure** 11:20 17:3
17:4 20:6 24:7

29:16 33:20
34:7,10 45:16
51:16 57:17
65:4,8 69:22
70:17,24 72:19
73:1,10 74:24
76:16 77:2
79:12 82:14
84:16 112:17
113:24 121:23
142:21 151:17
170:24 174:7
175:9,19 176:4
184:9 188:24
188:24 189:3
192:15 193:14
205:19 210:1
210:20,20
215:22 234:17
274:18 275:19
277:15,19
307:10 335:10
342:7,22,23
345:15 354:14
374:24
**surface** 275:10
**surgery** 33:9,13
33:23 34:13
35:12,18 38:3
159:16 321:20
**surgical** 279:16
363:17
**surprised** 293:6
**surrounding**
323:4
**survey** 103:5
168:22
**suspected**
200:14
**sustained** 214:5
**swap** 320:16
**swear** 11:8
**Swenson** 37:8
**switch** 315:7
320:20
**sworn** 2:4 11:11
384:3 388:1

**synergistic**
169:3 170:12
171:9,11
**synergy** 169:22
170:1,2
**system** 35:5,15
169:20 172:10
**Systematic** 7:19
9:16
**Systems** 383:19
388:7

**T**

**T** 3:7,8,14,19
4:7,12,18 5:6
5:12,18 385:5
385:6,12,17
386:5,10,16,22
387:4,10
388:10
**T-a-h-e-r**
349:18
**table** 39:13
132:1 180:3
184:6,9 192:19
192:19 193:1,3
207:22 209:21
228:5,7,24
229:2 239:3,21
256:1,2,5,6
334:18,20
**tables** 133:13
**tablet** 181:10
**tabulating** 146:9
**Taher** 349:17,18
**take** 12:8 18:9
48:23 55:8
117:2 145:3,15
159:2 191:19
193:18,21
234:14 264:24
276:20 321:7
334:3 379:16
**taken** 2:4 17:13
79:17 114:7
117:6 119:4
131:13 161:23

194:1 195:12
195:13,17
205:22 230:22
277:2 296:21
308:6 320:21
326:18 343:6
383:13 384:22
387:17
**takes** 191:18
356:15
**talc** 4:15 7:14
8:4,18,22 9:4,9
9:16,23 10:4
10:10,20 12:9
12:13 16:17
18:4,5 22:19
28:21,24 29:5
29:18 30:14,21
30:23 32:13
36:22 58:16,18
62:13 66:10
75:12,18,19
76:1,10 77:8
83:6 86:21
87:4,6,11
90:13 91:5
97:23 98:17
99:14 100:20
103:3,6 106:19
107:12 108:6
109:2,7,18
110:6 120:15
123:3,9,22,23
132:22 135:4
135:11 138:16
139:1,15,21,24
140:3,5,8,12
140:20 141:1,2
141:2,7,15,20
141:24 142:3,6
142:13,14,18
142:22 143:1,6
143:11,12,18
143:19 144:7,7
144:11,12,22
151:13 152:18
153:8 158:3

160:7 165:6,11
165:21 167:24
168:1 169:18
170:5 171:18
171:22 174:19
180:11 186:10
186:11 192:13
198:6,20
199:11 201:1,8
201:11,15,22
202:17,20
206:21 207:2
208:14 209:7
211:2,6,13,18
212:22,23
213:17 214:1,7
217:19 220:5
222:17,23
224:17 229:6
235:13 236:4
240:13 241:16
242:7,13,22
243:22,23
245:11 246:12
247:20 254:6
257:23 260:10
260:23 263:21
264:18 266:9
268:1,1 275:16
283:1 288:13
295:14 296:6
297:8,9,14,16
298:17 299:4,4
299:5 306:18
306:22 310:14
310:19,21,23
311:3 313:13
314:14,15
316:15,15
317:1,4 318:17
318:24 319:4,8
319:15 321:5
321:15 323:11
323:16,23
324:5,6,13
326:10,21,22
327:11,18,19

328:3 330:11
330:21 334:14
338:7 339:14
339:21 340:21
341:3 343:19
344:4,8 345:4
346:8,9,24
347:2,15,15
349:12 350:15
357:9 358:19
359:5,16 360:7
360:8,16
361:12,19,24
362:14,17,24
365:19 366:7
368:15 369:14
370:3 371:1
375:2,7,14,16
375:22 376:2
376:10 377:17
378:5 386:13
**talc-based**
297:17 376:21
**talc-containing**
140:4,12,23
141:15 275:7
**talc/ovarian**
152:15
**talcum** 1:3
31:15,19,24
32:3,19,22
33:1,5,10,14
33:16 34:1,14
35:8,13,19
36:8,16 37:13
37:19 38:4,9
78:3 87:11
88:4,6,11
95:14 96:20
103:13,23
140:6 142:10
143:7 151:18
153:3 154:6,6
154:8,23 156:1
168:20 240:20
241:7 253:10
253:24,24

254:16 266:14
288:5 295:9
296:10 311:14
312:24 313:14
325:7 326:21
328:11,18,20
329:13,16
332:1 335:21
336:16 340:6
343:24 383:3
**Talcum-conta...**
140:19
**talk** 120:1 122:2
122:2,3 135:4
191:7,13
224:10 228:2
243:10 249:10
364:1 371:14
372:8
**talked** 78:21
105:6 110:14
122:9 130:18
130:21 131:16
136:11 154:10
221:18 237:19
250:15 259:12
264:2 298:23
360:5 367:14
375:12
**talking** 23:11
34:5 70:13,21
86:1 94:11
120:19 131:7
131:11 132:3
136:9 247:24
248:14 256:19
323:1 325:5
356:2 359:14
360:10,15
**tape** 116:24
321:3,10
**TARIQ** 5:15
387:8
**tariq.naeem@...**
5:19 387:11
**teach** 262:23
**technique** 97:15

100:11,15
302:13,15
**technology** 23:8
**Tecum** 7:5
**tell** 11:11 36:15
36:21,24 37:1
137:1 219:13
235:21 259:17
274:5 299:8
306:21 340:17
340:19 341:3
376:6
**TEM** 100:14
302:21
**ten** 13:1,17
**tend** 136:5,6
**ter-** 336:3
**term** 140:8,24
178:8,11,12
242:18
**terminology**
64:17 65:5
148:23 171:8
177:12,15
178:11 179:1
184:15 200:5
349:8
**terms** 23:1,4,5
24:14,16 25:2
68:12 97:15
120:20 181:10
182:2 225:8
255:11 317:10
337:9 338:5
**Terry** 9:13
203:1,4,7,9,14
204:9,12 205:9
206:16 207:1
269:7,9,15
270:7,17
271:13,16
274:10 275:12
276:8 278:9,15
**Terry's** 274:1
**test** 205:23
302:19 309:21
310:13

Ellen Blair Smith, M.D.

tested 103:14
108:20 110:9
299:18 309:20
379:15
testified 11:13
70:18 75:12
77:4,7 96:6
157:19 340:19
368:23
testify 68:10
testifying
151:18 307:20
testimony 16:6
17:23 46:24
50:3 68:7 69:6
76:4,7,9,12,19
77:3,11 81:19
87:21 93:10
98:14 151:17
157:14 301:20
307:7,15
324:17 352:18
359:21 384:5
384:21
testing 80:2 81:3
98:17,20 99:6
99:8,10,14,19
100:8 101:6,10
101:24 103:10
104:16 105:11
105:14,15
107:8,24
108:12 110:13
236:3 303:21
305:14 306:22
306:22 309:10
310:5 311:2
312:20
tests 10:12,13
299:4,4,5
Texas 2:8,10 4:6
4:17 383:20
386:4,15
text 51:11 52:8
56:8 65:1
102:7,17
134:18 188:14

233:10
thank 15:14,19
16:1 20:7
53:10,15 54:6
59:18 62:17
73:8 74:14
79:14 113:7
114:4 119:21
120:9 122:24
123:10,15
124:10 153:19
189:11 193:2
196:8 197:22
210:21 215:9
217:1,2 224:8
228:21 238:24
251:10 252:7
255:20 256:18
268:17 273:18
274:19 276:23
286:15 297:1,3
335:13 342:6
346:15 361:11
367:22 378:11
379:20 380:1
Thanks 38:17
256:7
That'd 22:7
342:4
theirs 100:16
220:18
therapeutic
338:1
therapy 341:10
341:10
therefor 384:19
thing 67:2
117:21 122:21
135:19 136:10
142:21 147:2
171:15 186:13
189:2 219:9
282:3 322:10
335:17 360:1
371:14 372:7
things 37:1
42:24 56:16

70:22 81:7
118:9 130:21
131:16 138:2
146:11 147:6
147:11,12,15
148:14 170:2
190:8 219:8
254:13 263:18
272:17 361:7
think 13:4 23:13
25:2 34:4
40:21 49:2
51:17 52:1
55:3,15,22
64:5,13,15
67:17 68:20
69:1 70:3,24
72:23 74:16
75:21 81:16
89:17 91:24,24
93:5,6 96:17
97:19 102:4
103:17 107:14
107:15 110:2
116:1,20 124:2
126:2 127:15
128:7,24 129:3
129:4,9 131:17
133:16 135:15
141:5,9 142:9
143:23 144:17
147:8,8 148:2
152:11 153:5
157:14 161:15
164:19 166:4,6
166:14 168:15
168:23 170:13
177:14,16
179:11 184:22
185:18 187:6,6
187:8,21 188:7
191:13 193:18
200:4,7,8
202:11 204:17
206:7 209:21
212:2 215:20
217:10 218:8

220:24 228:3,4
228:12 230:10
230:14 231:5
233:17 234:7
234:13,15
241:22 242:12
242:13,17
246:3 247:3
256:20 258:10
259:14 260:16
261:20 264:13
265:23 267:16
270:18,20
271:3 272:4,4
276:11,13
278:18 279:13
280:19,20
281:1,7,19,21
282:9 283:23
284:16,23
286:4 289:2,5
291:9,14
292:22 296:2
297:22 301:24
305:12 306:8
306:11,14
307:14 308:1
314:10 315:14
316:4 321:11
323:6,21
324:18 328:7,9
329:19,21
330:3,17
333:15 335:11
335:16 336:9
337:22 343:2
346:23 347:1
347:23 349:6
349:24 353:5
362:13 363:19
367:8 370:17
370:18 373:16
374:1,5 377:9
377:20
thinking 101:13
306:13 347:6,7
third 34:22 35:3

45:10 245:24
251:9 253:16
253:17 266:2
third-party
105:15
Thompson 3:4,8
3:8,9 12:20,22
13:7,8,10,15
14:4,19,21
23:24 24:4,10
24:17 25:9,24
26:7 27:4,7
284:6 385:2,6
385:6,7
thought 26:3
36:22 102:3
114:8 135:9,23
135:23 155:9
157:18 158:2
187:6,7 216:8
225:7 293:13
336:7 358:7
365:4 372:12
thoughts 227:8
thousands
104:16,16
105:11,11
threat 99:11
three 37:17,22
38:1,6 45:7
235:21,22
243:5 251:11
252:2 278:20
301:24 326:8
326:10 357:4
three-quarters
114:21
threshold 255:3
threw 155:19
throwing 53:7
tied 273:1
tiers 173:19
tilted 366:2
time 8:15 11:7
14:3,16 15:11
17:6 19:13,15
19:23 20:18

21:2,7,19,22
21:24 22:2,5
25:3,6 48:23
55:8 64:5,6
79:16,20 87:11
88:9 109:10
117:5,9 119:3
119:7 131:17
133:11 153:10
158:11,13
161:17,21
162:3 163:12
170:13 173:9
181:11 186:9
193:10,24
194:4 230:21
231:1 236:2
245:10 258:17
268:7 276:11
277:1,6 285:15
293:15 294:1,4
296:20,24
297:2 299:18
308:4,9 309:22
320:24 321:21
338:2 340:5
341:1 342:13
342:19 343:5,9
350:7 354:1
376:6 377:21
379:24 384:21
**times** 131:9
146:15 168:24
252:2 293:23
333:14 352:19
361:2 362:3
**tiny** 255:10
**tissue** 87:7 288:4
376:22
**tissues** 347:16
**title** 285:20
**titled** 102:23
163:20 198:13
**Titus-Ernstoff**
8:16 169:17
**TNF-alpha**
325:15,21

**today** 12:8,23
13:23 15:5,11
38:14 39:21
40:16,20 41:15
42:19 43:21
55:9 64:6
65:24 90:13
102:8 112:14
128:5 130:24
165:14 166:9
174:3 201:18
222:11 235:17
240:13 241:15
242:22 244:8
247:13 249:20
250:2,16 259:8
264:2 269:6
277:8 281:12
282:10 288:16
289:7 296:4
298:5,12 313:4
315:8 328:8
329:1 333:14
333:22,23
338:3 340:2,5
344:16 345:7
349:1 352:19
353:5 355:14
378:7
**today's** 11:6
39:8,21
**told** 25:19 31:15
31:19 32:21
36:21 133:18
165:23 201:21
229:11 317:15
342:2 377:16
378:3
**tomorrow**
263:17
**tool** 172:18
**tools** 174:7
**top** 19:12 84:14
163:19 205:4,5
206:17 212:20
279:23 293:21
302:17 306:14

328:22 329:23
329:24 330:1
364:15
**topic** 59:3,7,24
60:18 61:4,6
61:11,17 67:5
69:21 95:13
112:23 166:19
276:20 315:10
325:3
**topics** 57:6,16
57:22 58:12,12
59:21 309:3
329:23 331:1
**total** 21:22,24
106:13,15
**totality** 213:5
231:23 240:19
272:14 274:4
280:10 336:22
**touch** 284:7
**Tower** 4:5 386:3
**town** 23:5
**toxic** 331:17
332:9
**track** 346:4
**tract** 87:5
262:16 263:19
263:22 275:9
316:16 319:6
319:10 322:22
323:17 324:14
347:15 363:6
363:18 364:11
364:20 366:12
**Traher** 349:17
**trained** 146:5
**training** 13:13
**transcript** 6:20
6:22 383:22
384:4,16
**transcription**
372:24 373:10
373:11 383:23
**transcriptionist**
358:16
**transection**

369:20
**transformation**
327:6
**translocation**
357:9 358:20
359:5,12 360:3
360:16 361:19
362:17
**transport** 263:2
267:7 322:10
365:21,24
**transported**
87:5 322:7
323:23 339:15
**transposition**
43:19
**transversing**
323:2
**travel** 319:5
**Travis** 4:5 386:3
**treat** 340:24
**treated** 88:20
**treating** 16:20
17:13
**treatment** 16:9
154:5 246:15
246:19
**treatments**
155:19
**tremolite** 133:2
299:15 311:18
312:4
**trend** 204:15
205:12,20,23
231:12
**trending** 334:22
**trial** 88:11 202:1
246:17
**trials** 200:11
246:17
**tried** 210:7
268:14
**trivial** 191:12,14
**true** 91:15
140:20 142:24
222:10,14,19
222:24 333:3

382:3 383:22
384:4
**trusted** 332:23
**truth** 11:11,12
11:12 146:6
212:18 261:21
**try** 54:22 56:12
59:1 60:9 65:8
65:10 67:19
120:1,2 178:15
233:5
**trying** 35:7
42:23 64:17
67:16 172:9
175:16 211:2
223:10 307:12
**tu-** 269:10
**tubal** 146:13
159:20 169:9
212:3 263:2,12
268:18,23
269:10,21
270:5,8,14,21
271:1,10,19,24
272:11,15,17
273:1,3,4,11
273:12,22,24
274:6 277:10
278:9,16,19,21
279:12,14,20
322:10,13
**tube** 8:11 163:22
263:7 322:13
323:3 326:7
339:16 365:23
**tubes** 266:15
273:1 317:6
323:12
**TUCKER** 5:16
387:8
**tumor** 325:16
372:13,15
**turn** 45:3,24
47:3 48:2,4
54:3 102:21
111:21 163:14
178:14 180:2

Ellen Blair Smith, M.D.

Page 439

192:17 225:24
239:17 315:18
352:21 357:3
370:11
**turned** 124:14
**turning** 18:4
92:22
**two** 26:14 45:6
46:21 48:19
49:4 62:24
63:4 77:21
78:10 79:8
128:10 130:18
130:21 134:10
135:21 150:9
156:18 158:14
168:4 170:2
198:1 216:17
229:12,15
234:18 235:22
258:24 260:7
267:1,4 278:20
330:18 343:23
348:2 366:24
367:11
**type** 81:11
132:11,13,19
133:1 195:2
242:10 243:9
248:5 250:12
353:17 354:2
**types** 132:15
232:23 281:16
344:9 353:22
**typo** 208:22

_____
**U**
**U.S** 250:3
354:13
**Uh-huh** 212:1
272:23 275:5
364:14 372:11
**Uh-oh** 269:12
**UK** 354:14
**ultimately**
273:13 282:1
**ultrasonograp...**

322:12
**Um** 267:10
**Um-hum** 45:2,5
45:8,12,14
46:7,11,16
47:10,12,15,22
48:3,6,13 49:9
49:11,13,16,18
49:20 50:15,20
51:1 111:10,10
113:10,10
115:18 125:2,2
126:22 154:17
165:3 172:16
175:7 178:18
219:21,24
234:5,9 239:19
274:24 329:4,6
333:12 340:18
341:16 364:5
372:9
**Ummm** 66:3
**unaware** 293:16
**UNCERTIFI...**
6:20
**unchanged**
144:21
**unclear** 34:5
**uncomfortable**
155:22 190:23
**uncontrolled**
373:1
**undergoing** 35:6
**underlying** 59:5
236:10,11
**undermine**
336:15
**underpowered**
255:10
**understand**
12:10 15:3,15
23:8,23 24:7
26:11 35:22
36:1 39:7
41:11 54:24
62:24 65:2
66:7 70:2 71:8

71:12,15,19
73:3 74:5,8
76:4 77:2,7
82:15,16 92:3
95:18,20 97:2
97:16 100:16
101:6,10
102:13 106:17
107:6 108:15
108:18 109:1
116:9,10,14
129:11,12
140:11 151:17
168:3,6 177:11
177:19 181:21
182:3,5,10,16
200:21,24
201:4,10
206:19 217:12
217:17 233:8
244:18 247:12
249:13 250:5,7
280:21 290:24
291:4 293:11
295:20 296:8
299:3 301:12
302:7 337:24
359:22
**understanding**
51:22 101:19
101:23 107:2
196:1 338:13
**understood**
20:22 23:9
37:2 38:23
41:2 51:6
67:22 79:3,5
119:24 204:6
235:15 345:15
**undertake** 95:13
**undetermined**
207:3
**unfair** 76:24
89:17
**unfortunately**
163:14 194:20
**UNIDENTIFI...**

194:23
**unimportant**
177:9,10,15
191:12,15
**unintelligible**
362:22
**Union** 5:14 8:21
387:7
**United** 1:1 104:4
330:24 383:1
**universally**
262:13,22
263:14,20
264:14
**University** 10:6
283:8
**unknown** 323:2
**unnecessarily**
57:18
**unpublished**
81:2,3,5 86:10
**unquote** 188:4
**unreliable** 60:19
**unstabilization**
325:21
**unusual** 211:21
345:23,24
346:1
**up-to-date**
225:4,9 333:7
333:13
**upper** 316:16
319:10 324:14
**uprate** 370:24
**upregulated**
370:7,24
**upregulation**
325:24 372:8
**usage** 31:24 32:3
33:5,10,14,24
34:14 35:13,18
36:8 38:4,9
288:5 346:24
**use** 8:4 9:8,12,16
9:23 10:4,7,20
33:15 35:9
57:6 64:17

88:6,11,12
142:23 146:16
146:17 149:19
149:22 153:6,8
154:4,6,16,22
155:18,21
156:1 158:14
158:15 164:8
169:7 174:19
177:12,14,20
178:8,11,12,13
178:23,24
182:1,3 185:14
190:21 191:3
192:10 198:6
198:19 199:11
205:11,21
207:19,24
208:14 209:7
209:13 211:2,6
211:13 212:22
212:24 213:17
213:21 214:20
219:4 220:6
222:17,23
224:17 229:6
231:13 235:13
235:14 253:24
257:23 260:10
260:23,24
271:10,24
295:9 296:6,9
325:10 330:11
334:14 340:21
375:2,4,7,22
376:21,23
377:17 378:5
**user** 109:7
211:18
**users** 245:11
375:14
**uses** 227:10
**usually** 56:17,21
56:22 70:5
178:14
**uterine** 263:1
347:3 365:16

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 1021 of 1035
PageID: 242200
Ellen Blair Smith, M.D.

Page 440

375:14
**uterus** 263:6
  323:4 365:22

---

**V**

**V** 34:21 35:1
**V-** 35:1
**V-i-d** 34:24
**V-i-t** 34:22
**vagina** 263:6
  266:6 267:7
  316:7 318:17
  319:1 321:24
  322:1,6 323:3
  324:23 364:13
  364:15
**vaginal** 154:5,5
  155:19 321:18
  364:3,12 375:8
**vague** 81:15
  109:9 118:4
  127:22 128:6
  131:2 137:7
  138:18 244:10
  286:4
**Valentine** 35:1
**valid** 200:5
  245:18 246:1
  246:22 247:3
  248:9 253:20
  294:5,7 302:3
**validate** 200:18
**validated**
  172:20 173:2
**validity** 197:4
  249:18
**value** 149:3
  159:20,20
  301:21 303:10
**variation** 239:24
  240:1
**various** 78:3
  260:24 330:19
  339:2 350:1
**vary** 149:3
**vast** 22:5 146:4
  310:20 315:4

**vault** 321:18
**verbal** 15:7,8
**verbally** 253:3
**verbatim** 50:1
  51:13 52:4,8
**verify** 352:12
**verifying** 356:12
**version** 6:20
  8:12 163:8
  228:5 347:20
**versions** 56:19
  234:18
**versus** 56:15
  63:5 118:7
  130:19 141:15
  189:14 227:20
  229:12 248:7
**videographer**
  5:21 11:2,5
  79:15,19 117:4
  117:8 119:2,6
  161:20 162:2
  185:12 193:23
  194:3 230:17
  230:20,24
  276:24 277:4
  296:19,23
  308:3,8 320:7
  320:10,14,19
  320:23 342:14
  342:16,20
  343:4,8 379:22
**videographic**
  321:3
**Videotaped** 7:5
**VIDEOTAPE...**
  1:11 2:1
**view** 146:12
  268:23 273:11
  328:11
**viewing** 146:8
**virus** 346:17
**visuals** 50:14
**Vitae** 7:13
**Vitonis** 169:17
  169:23 170:22
  171:1

**vitro** 323:6
  327:11 360:7
**Vitronis** 8:16
**void** 218:9
**volume** 1:14
  10:23 234:22
  357:18,20,22
**vote** 152:2
**vulvar** 344:13
  375:2

---

**W**

**wade** 145:18
**wait** 60:4 135:16
  135:16 140:15
  191:7 239:5
  370:14,16
**waived** 2:14
**walking** 173:9
  321:6
**want** 43:7 53:24
  54:21 55:16,18
  69:21 70:17
  72:2 75:23
  84:10 87:22
  95:24 98:7
  121:11 123:22
  131:13 135:15
  145:11 147:13
  150:15,16
  151:16 155:15
  156:1,22 160:2
  175:5,18
  182:22 191:7
  192:15 202:2
  205:14 214:23
  214:24 224:23
  225:20 251:15
  265:3,22
  268:15 286:5
  289:8 300:20
  311:20 312:16
  333:5,16
  341:20 345:14
  346:5 354:15
  355:13 356:15
  369:11,11

374:16,21
  379:16
**wanted** 259:20
  325:4 360:13
**warning** 107:4
**warranted**
  237:11 250:18
  250:23 348:15
**wash** 118:7
**washed** 221:11
  322:2
**Washington**
  5:11 387:3
**wasn't** 129:24
  202:12 205:13
  261:6 311:14
**waste** 193:9
**watch** 322:13
**way** 11:18 15:5
  54:17 55:10
  56:4 58:16
  63:23 67:15
  110:1 114:21
  137:5 148:10
  151:16 159:6
  159:14 194:19
  200:5,13
  206:11 215:23
  245:18 246:23
  247:4,8 248:10
  253:20 257:23
  260:10 281:7
  286:9 288:16
  305:3 328:10
  332:8,10
  336:12,15
  347:16 373:3
**Wayne** 283:8
  285:2
**ways** 59:1
**we'll** 15:12
  40:13 55:22
  117:2 122:3
  156:20 173:9
  185:3,3 193:20
  193:22 215:8
  342:13

**we're** 12:8 38:13
  64:5 83:22
  84:16 94:8,9
  94:11 124:2
  131:7,10 136:9
  145:18 157:21
  157:24,24
  176:4 184:2,22
  192:15 210:4
  210:22 234:17
  246:15 255:24
  256:3 265:6,8
  281:10,11
  323:6 330:20
  369:17
**we've** 17:20
  39:11 74:17
  90:15 108:19
  110:14 122:9
  129:13 130:18
  130:21 131:16
  136:11 154:9
  190:4 204:1
  215:20 235:22
  237:19 249:20
  250:1,15
  259:11 264:2
  277:8 324:6
  340:16 346:15
**weak** 176:12,15
  176:19 177:9
  178:5,11,13,23
  180:13,20,23
  181:7 184:14
  185:14 186:3
  188:4 190:15
  191:2,3,10,11
  264:6
**weaker** 182:16
  183:4,5
**weakness**
  250:14
**weaknesses**
  117:15
**website** 152:18
**websites** 149:13
  164:9 274:5

Ellen Blair Smith, M.D.

Page 441

**week** 258:23 293:23,24
**week-and-a-h...** 258:23
**weeks** 158:14 258:24
**Weiderpass** 9:10
**weigh** 278:24 301:19
**weight** 116:1 165:10 279:13 319:19
**weighted** 121:6
**Weiner** 267:13
**Welch** 8:20
**welcome** 124:19 354:23
**well-known** 330:12
**well-respected** 152:20
**went** 87:10 106:12 133:12 218:9 245:8 267:14,16,17 283:24
**Wera** 10:5,21
**weren't** 56:21 81:7 365:16
**West** 3:18 385:16
**WHI** 253:2 277:18
**wholeheartedly** 206:23
**wholly** 115:3,23
**wide** 183:18 322:16
**widely** 243:11
**Wiener** 267:13
**William** 8:20 10:17
**willing** 55:15 156:2 303:8 336:5 337:22 348:21

**window** 366:19 366:20
**withdraw** 355:10
**witness** 2:2 11:4 11:9 12:13 14:10 25:14 26:6 28:19 29:12 60:4,8 60:11 67:3,8 67:10,13 68:7 68:15,19 69:15 74:24 93:7 94:11 95:20 102:19 104:22 105:1,5,8 111:7 112:24 118:15,23 120:5,8 121:24 122:17,20,23 122:24 123:23 124:13 129:22 129:24 144:4 145:4,8,10,14 145:16 156:13 156:19,22 157:1 161:19 170:22 175:5,8 175:10,14 176:21 182:9 184:18 185:1,5 185:8,13 188:15,18,24 189:5 193:9,14 193:19 194:24 198:2 210:3,11 215:17 222:8 224:6,9 228:6 228:10,12,15 228:24 233:24 234:10,20 235:2 238:24 239:7 242:2 246:5 264:23 265:1,8,11 271:5,7 272:21 272:24 273:17

273:19 275:18 288:8 297:3 302:8 350:24 351:4,6,9,13 351:15,17,19 351:22 352:4 356:6 358:11 358:13 367:19 367:22 380:4,7 381:2 384:2,5 384:9
**witnesses** 69:7
**Wolf** 7:11 26:22 26:23 27:8,10 28:7 44:6,9 48:9
**Wolf's** 44:13 45:24 46:3,6 48:2,4 49:24
**Wolters** 10:3
**woman** 200:15 263:19 279:18 288:5
**women** 35:6 114:8 125:6 127:4 155:21 156:1 159:8,15 202:2 227:14 244:13 250:3 255:8 260:23 279:15 317:9 319:2 323:10 328:21 353:11 354:16 355:18 356:18 365:19 375:2,7,22 376:21,23 377:10,12,13 377:22,24 379:7,13
**women's** 8:3,8 172:19 222:15 238:8,19 244:18
**Woodruff** 87:8 322:24
**word** 46:9 50:17

58:21 82:17,19 83:1 89:22 114:22 115:17 116:23 140:22 143:8 178:9,13 178:23 183:1 185:19 190:7,7 190:21 246:2 247:5,5 290:2 290:21 315:3 324:18,24 378:6
**wording** 44:3,4 46:24 47:1 50:4,4,5 51:2,3
**words** 182:3 220:24 264:15 274:22 359:11 361:5 362:7
**work** 18:16 19:3 21:23 24:18 25:14 82:7 83:15,24 84:5 85:3,13 86:20 89:2,4 150:13 150:16 206:19 207:7 235:22 289:4 305:4 307:6 327:16 350:4
**worked** 16:2
**workers** 118:7 137:10
**working** 19:10 22:1 26:8,12 29:21 124:24 126:24 146:8 200:22 201:7 317:21 318:8 318:10 350:3 353:7 357:7
**works** 29:23 137:5 349:12 349:23 350:14
**world** 263:5,18 274:8 330:23
**worries** 350:12

**worrying** 185:9
**worthy** 166:21
**wouldn't** 72:2 76:14 150:8 151:3 152:9 176:19 188:19 224:12 341:12 354:4
**Wright** 330:1,8
**write** 33:17 43:24 128:22 202:6 234:11
**writing** 44:6,9 88:15 157:16 376:2
**writings** 28:3
**written** 28:4 52:4 234:20 276:12 316:15 326:2
**wrong** 130:14 230:10 239:16 240:11 341:14 360:23
**wrote** 193:4 258:2,17,19 330:1,8 362:8 362:11
**Wu** 43:11
**www.fda.gov** 7:15
**www.golkow.c...** 388:11

**X**
**XRD** 302:21

**Y**
**y'all** 191:7
**yeah** 25:19 26:1 26:17 38:18 40:10 41:24 54:5 56:24 57:2 64:5 79:5 83:22 94:11 124:17 135:18 135:19 137:21

145:11,12
152:11 155:11
157:16 159:13
179:11 191:1
192:23 193:12
193:19 208:22
208:22 226:24
228:6,15,16,24
233:20 246:6
246:10 256:3
258:17 272:9
272:24 274:19
317:15 318:7
335:15 336:1
336:11 339:8
345:23 357:6
370:18
**year** 13:13
329:22 370:16
370:17,18
**years** 13:9 28:9
110:5 146:8
154:7 186:10
202:19 217:13
244:14,24
283:9 297:15
298:24 366:24
367:11
**Yep** 175:14
351:23

_____
**Z**
**Zerm-** 320:2
**Zermanitokis**
322:8
**zero** 100:9
**Zervomanokl...**
362:20
**Zervomanokl...**
364:2 365:13

_____
**0**
**0.9** 174:21
**00000** 234:1
**01/07/19** 7:15
**01/2018** 9:17
**02/09/17** 7:3

**04/01/14** 7:16
**05-2011** 8:16
**05/2018** 10:21
**05/24/11** 7:20
**06/05/14** 10:8
**06/12/13** 9:14
**07-1992** 8:20
**07962** 5:5
386:21
**08/22/1985**
10:12
**09-30-21** 388:7
**09/04/18** 7:3
**09/11/09** 9:21

_____
**1**
**1** 1:14,14 6:20
7:3 20:13,14
90:12 169:6
200:12 202:9
202:20 233:15
239:3 260:16
318:13 343:22
343:23 376:17
**1.01** 229:8
**1.04** 335:5
**1.05** 335:3
**1.07** 335:4,5
**1.1** 174:23
**1.13** 227:21
**1.15** 229:10
**1.16** 189:16
335:2
**1.2** 258:12
**1.22** 227:20
**1.24** 203:7,14,19
203:20 227:22
229:9
**1.25** 207:19
208:1 209:7
211:7 212:7
229:7
**1.26** 199:8 335:4
**1.27** 209:13
**1.29** 180:6,9,23
**1.3** 174:23 175:2
176:6 177:1

178:4 179:2
**1.30** 227:21
**1.31** 208:2,21,22
209:5 211:3
212:7 227:20
**1.33** 189:13,15
189:20 203:19
203:21
**1.34** 229:10
**1.35** 199:8
209:13
**1.37** 135:21
**1.39** 227:23
**1.4** 184:11
**1.42** 209:12
**1.43** 209:13
**1.45** 116:6
135:20 189:16
**1.46** 199:9
**1.5** 174:21
258:12
**1.55** 229:8
**1.56** 43:12,15,17
**1.6** 174:23
**1.75** 116:5
129:10 135:12
**1.77** 43:15,15
135:18
**10** 7:21 74:19
123:7 124:7,8
145:6,12 184:2
351:1 362:3
**10-minute** 145:4
**10/1/2002** 10:12
**10/15/07** 9:10
**10:34** 79:16,17
**10:53** 79:18,20
**100-microgram**
327:11
**100C** 7:21 10:23
111:3 122:17
123:9,20,24
124:4 127:23
133:14 313:14
358:17
**101** 229:22
230:1

**106** 7:16
**10s** 350:24
**11** 6:7 8:3
153:15,17
154:1 351:1
**11,933** 9:5
**11/14/18** 10:18
**11/16/18** 7:9,11
**11/19/98** 8:23
**11:39** 117:5,6
**11:55** 117:7,10
**11:57** 119:3,4
**11:58** 119:5,7
**1100** 5:16
174:21 387:9
**113** 7:18
**11th** 388:1
**12** 8:5 156:18
157:3 197:15
202:19 335:6
360:11
**12.4** 244:14,24
**12:32** 144:23
**12:54** 161:21,23
**121** 370:13,19
370:21
**124** 7:21
**1294** 115:13
**13** 8:7 160:17,19
351:1
**14** 8:10 163:6,9
184:20,20
271:14,22
272:3 351:1
361:1
**1490** 3:18
385:16
**15** 6:4 8:13 21:6
22:10 74:18
169:15 171:2,3
238:9,12
**15-degree** 366:3
**1510** 4:17
386:15
**154** 8:3
**157** 8:5
**16** 8:17 45:3

47:4,5,14
175:23 176:1
194:14 245:16
253:8,13,15
257:21 262:9
342:20
**16-2738** 1:5
383:5
**160** 8:7
**162** 6:9
**163** 8:10
**1650** 388:9
**169** 8:13
**17** 8:21 56:17
184:22,23
262:9 283:23
**176** 8:17
**18** 9:3 56:17
93:21 94:9,24
111:8 189:8,9
312:10 330:18
**184** 8:21
**189** 9:3
**19** 3:13 9:8
111:8 197:17
197:18,21
251:2 317:12
317:19 318:13
385:11
**19103** 388:10
**19103-6996** 4:11
386:9
**1917** 5:4 386:21
**193** 123:13,23
**1958** 192:17
194:17
**1960's** 10:16
**1960s** 309:22
**197** 9:8
**1971** 321:16
**1979** 87:9 88:10
88:11 323:1
**1982** 293:2,14
**199** 370:15
**1990's** 10:17
**1990s** 295:14
309:22

Ellen Blair Smith, M.D.

| | | | | |
|---|---|---|---|---|
| **1991** 93:3 | 110:10 223:2 | **2019** 1:13 2:5 | 178:16 254:23 | **334.269.2343** |
| 311:13 | 223:11,14 | 11:6 380:11 | **27** 10:11 234:22 | 3:7 385:5 |
| **1992** 88:12 | 310:2 370:12 | 381:3 382:21 | 300:3,10,12 | **334.954.7555** |
| 174:11 | 386:9 | 383:13 388:2 | 301:10 305:13 | 3:7 385:5 |
| **1994** 88:13 | **20004** 5:11 | **202.463.2400** | 312:2 | **34** 97:5,6 |
| **1995** 179:23 | 387:3 | 5:12 387:4 | **28** 10:13 299:15 | **343** 6:12 |
| **1996** 16:7 | **2000s** 325:23 | **202.828.5371** | 300:1,3,7,12 | **350** 5:4 386:20 |
| **1998** 16:7 | **2003** 9:3 | 5:11 387:4 | 300:24 305:13 | **352** 6:13 10:22 |
| **1999** 184:3 | **2006** 202:16,18 | **202.828.5393** | 311:16,17 | **356** 186:15 |
| | **2007** 99:13 | 5:12 387:5 | **280** 357:3 | **3600** 209:11 |
| **2** | **2008** 49:12 | **203** 9:11 | **29** 10:14 180:10 | **36104** 3:6 385:4 |
| **2** 6:23 7:4 38:14 | 125:22 252:22 | **207** 9:15 | 181:18 309:6,7 | **378** 6:14 |
| 38:15 57:8 | **2009** 125:20,22 | **21** 9:15 90:5,7 | **297** 6:10 | **379** 6:15 |
| 80:7 90:19 | 370:15 | 207:14,15 | **2B** 201:2,8,19 | **38** 7:4 |
| 91:10 117:9 | **2010** 50:23 | 260:17 | 202:17 | **381** 6:17 |
| 132:1 169:6 | 99:14 107:7,24 | **215.988.2700** | | **383** 6:18 |
| 192:19 195:3 | 216:3 217:5,12 | 4:12 386:10 | **3** | |
| 207:21,22 | 217:18,23 | **215.988.2706** | **3** 6:3 7:6 40:8,11 | **4** |
| 209:21,21 | 218:16 219:2 | 4:12 386:10 | 91:19,22 92:7 | **4** 7:8 41:5,8 |
| 210:5,14,23 | 221:6,10 | **215.988.2757** | 92:8 145:20,21 | 42:10 92:13,15 |
| 211:5 228:24 | 223:18 224:12 | 4:13 386:11 | 194:4 239:2,8 | 173:23 239:21 |
| 229:2 243:9 | 229:18 253:1 | **216** 9:18,22 | 239:9,10,14 | 249:16 277:5 |
| 251:11 256:2,5 | 292:5 357:14 | **216.592.5000** | 251:7 252:9 | 330:4 372:21 |
| 256:6 328:5 | 358:17 359:16 | 5:18 387:10 | 271:4,6,7 | **4:13** 320:23 |
| **2.0** 191:11 | 359:17 361:13 | **216.592.5009** | 277:5 | 231:1 |
| **2.1** 135:21 | 361:24 | 5:18 387:11 | **3-3-87** 300:20 | **40** 7:6 13:8 |
| **2.10** 116:6 | **2011** 35:4 | **216.696.3675** | **3:41** 230:21,22 | 146:8 298:24 |
| **2.27s** 136:7 | 125:21 126:4,5 | 5:17 387:10 | **30** 10:19 14:1 | **41** 7:8 |
| **2.28** 135:21 | 169:17 358:24 | **218** 3:5 385:3 | 176:9,14,14 | **41,654** 255:9 |
| **2.4.6** 7:21 | **2012** 125:20 | **22** 9:18 216:3,4 | 177:2 181:12 | **4160** 3:6 385:4 |
| **2.5** 7:7 | 351:20 352:14 | 260:17 | 181:17 333:6,8 | **42** 212:19 |
| **2.53s** 136:7 | 353:2 358:17 | **226** 10:3 | 333:11 335:9 | **429** 244:15 |
| **2:03** 161:24 | 360:15 362:1 | **23** 9:3,22 216:19 | 347:20,24 | **44** 7:10 |
| 162:3 | **2013** 35:4 | 216:20 | 348:14 384:15 | **44113-7213** 5:17 |
| **2:44** 193:24 | 206:24 269:7 | **238** 10:6 | **30'** 195:10 | 387:9 |
| 194:1 | **2014** 105:19 | **24** 10:3 226:4,5 | **30(b)(5)** 2:13 | **46** 210:23 |
| **2:56** 194:2,5 | 106:2 107:7 | 347:22 371:2 | **30(f)(i)** 384:12 | **47** 219:19 237:3 |
| **20** 7:3 9:11 13:3 | 220:4 253:2 | **2450** 4:5 386:3 | **300** 10:11,13 | **48** 342:21 |
| 13:19 21:6,6 | **2015** 43:11 | **248** 234:21 | **308** 6:11 | **4th** 2:9 |
| 22:9,11 28:9 | **2016** 10:10 | **25** 10:6 238:21 | **309** 10:14 | |
| 186:10 203:10 | 253:5 | 238:22 | **31** 10:22 352:7,8 | **5** |
| 203:11 257:24 | **2017** 8:8 12:15 | **253** 233:12 | 355:15,16 | **5** 7:10 44:12,14 |
| 258:14 260:9 | 12:18 13:23 | **254** 10:9 | **31st** 19:19,20 | 74:21 239:17 |
| 260:21 261:3,9 | 49:17 285:14 | **256** 124:16 | **32** 342:20 | 265:22 291:11 |
| 261:24 358:17 | 285:15 339:10 | 352:21,24 | **33** 189:21 | 315:18 320:24 |
| **200,000** 255:5,7 | **2018** 19:21 | **257** 234:21 | **33%** 189:17 | 322:19 326:19 |
| **2000** 4:11 | 20:19 49:10,19 | **26** 7:9,11 10:9 | **333** 10:19 | 327:11 |

Ellen Blair Smith, M.D.

Page 444

**5,000** 307:11,16
**5,240** 132:3
**5:17** 277:1,2
**5:37** 277:3,6
**50** 257:24
  258:14,14
  260:9,11 261:9
  327:11
**500** 2:9
**501** 3:18 385:16
**51** 152:12
**512.391.0183**
  4:19 386:17
**512.391.0197**
  4:18 386:16
**512.582.6485**
  4:18 386:16
**512.695.1708**
  3:8 385:6
**5150** 388:9
**53** 7:12

———————
**6**
———————
**6** 7:12 53:1,2,13
  229:2 239:18
  256:3
**6:05** 296:20,21
**6:16** 296:22,24
**600** 4:5 18:23
  307:3,21 386:3
**61,000** 244:12
**61,576** 255:8
**619.338.1100**
  3:19 385:17
**619.338.1101**
  3:20 385:18
**63** 97:4
**66** 97:7 309:19
**68** 312:15
**690** 388:8

———————
**7**
———————
**7** 7:14 43:1,3
  50:7,10 99:13
  99:16,22 100:3
  102:6 335:6
**7:06** 308:4,6

**7:39** 308:7,9
**7:56** 320:21
**70** 136:8
**70s** 87:6 110:9
**713.227.8008**
  4:7 386:5
**713.227.9508**
  4:7 386:5
**713.546.5644**
  4:6 386:4
**75** 22:8
**77002-2926** 4:6
  386:4
**78701** 4:17
  386:15

———————
**8**
———————
**8** 7:16 46:3 48:5
  106:2,4 265:16
  265:18 315:14
  315:19 371:1,2
**8,525** 9:13
**8:00** 320:22
  321:1
**8:32** 343:5,6
**8:43** 343:7,9
**800** 307:11
**800.898.2034**
  3:8 385:6
**812** 204:21
  205:2
**816** 4:17 386:15
**817** 204:18
**819** 270:1
  274:13,21
**82** 54:20
**820** 206:15
**855.674.1818**
  3:9 385:7
**877.370.3377**
  388:10

———————
**9**
———————
**9** 1:13 2:5 7:18
  113:3,4 126:13
  129:21 173:5
  174:10 194:14

  233:15 380:11
  381:3 383:13
**9-9-1975** 299:14
**9,859** 9:13
**9:22** 379:24
**9:23** 2:6 380:10
**9:24** 2:6 11:7
**90** 315:6 366:21
**90-day** 366:19
**917.591.5672**
  388:11
**92** 175:23
**92101** 3:19
  385:17
**92660** 3:13
  385:11
**93** 201:8 358:17
**949.456.0037**
  3:14 385:12
**949.720.1288**
  3:14 385:12
**949.720.1292**
  3:15 385:13
**95%** 189:15
**950** 5:16 387:9
**973.267.0058**
  5:6 386:22
**973.267.6442**
  5:6 386:23
**973.631.6045**
  5:5 386:22
**975** 5:10 387:3
**99** 7:14
**9th** 11:6

Exhibit 44

Human Reproduction Vol.19, No.4 pp.991–995, 2004
Advance Access publication February 12, 2004

DOI: 10.1093/humrep/deh156

# Retrograde migration of glove powder in the human female genital tract

A.C.E.Sjösten[1], H.Ellis[2] and G.A.B.Edelstam[1]

[1]Karolinska Institutet, Department of Obstetrics & Gynaecology at Stockholm Söder Hospital, s-118 83 Stockholm, Sweden and[2]Department of Anatomy, Guy's, King's and St Thomas' School of Biomedical Sciences, London Bridge, London SEI 9RT, UK

[3]To whom corespondence should be addressed. E-mail: anette.sjosten@sos.sll.se

BACKGROUND: This study in humans was undertaken to evaluate earlier results from animal research showing a retrograde migration of glove powder from the vagina into the intra-abdominal cavity. METHODS: One study group was gynaecologically examined with powdered gloves the day before an abdominal hysterectomy and another group 4 days pre-operatively. There were two control groups similarly examined with powder-free gloves. Cell smears were taken from the peritoneal fluid and during the operation further smears were taken from the Fallopian tubes, uterine cavity and cervical canal. RESULTS: Statistically significant differences were found for large starch particles at all locations between the study and control groups examined 1 day pre-operatively. Considering small starch particles, there were significant differences in cervix ($P < 0.001$), uterus ($P < 0.01$) and the Fallopian tubes ($P < 0.01$). The combined results also show significant differences between both large and small starch particles in cervix, uterus and the Fallopian tubes. There were also differences between the study and control groups examined 4 days pre-operatively, but these were not statistically significant except for small and large starch particles in uterus ($P < 0.01$, $P < 0.05$) and cervix ($P < 0.05$, $P < 0.05$). CONCLUSIONS: This study has pointed out a retrograde migration of starch also in humans after a gynaecological examination with powdered gloves. Consequently, powder or any other potentially harmful substance that can migrate from the vagina should be avoided.

Key words: female/gloves/retrograde migration/starch particles/vaginal examination

## Introduction

Earlier case reports suggest that intra-abdominal granulomas or adhesions due to starch particles were caused by starch powder used on gloves during vaginal examination. An initial indication of retrograde flow through the Fallopian tubes was the finding of intraperitoneal starch granulomas (Paine and Smith, 1957). Later the first case of starch peritonitis in a patient without previous surgery was reported (Saxen et al., 1963). A recent investigation detected talcum particles on the ovaries in women who had used perineal talc applications (Heller et al., 1996). In contrast, tubal ligation prevents the access of mediators that reach the peritoneal cavity through the Fallopian tubes (Ylikorkala, 2001).

Powder-free gloves have been available for 20 years, but starch-powdered gloves are still available and in use (Sjösten et al., 1999).

It is well documented that starch-powdered gloves are not appropriate for abdominal surgery (Ellis, 1990; Holmdahl et al., 1994), and intraperitoneally, starch particles can initiate inflammatory reaction and the formation of adhesions (Edelstam et al., 1992; diZerega, 1994), although the mechanism by which starch increases the propensity of tissues to

form adhesions is not known. Reduced peritoneal fibrinolysis and activation of leukocytes by particulate starch granules have been suggested as possible mechanisms. Activated leukocytes, particularly macrophages, produce supernormal amounts of oxygen-free radicals, prostaglandin $E_2$, thromboxane $B_2$ and various cytokines (Osman and Jensen, 1999). Starch particles also increase the eicosanoid production which may contribute to the inflammatory or immune reactions and development of adhesions (Chegini and Rong, 1999). If already injured mesothelial surface of the peritoneum is exposed to starch, more dense adhesions are created compared to the effect of peritoneal trauma or starch separately. Application of glove powder on minimally or severely traumatized peritoneum facilitates tumour cell adhesion and growth alone (van den Tol et al., 2001). Histological re-evaluation after tubal reconstructive surgery due to peritubal or peri-ovarian adhesions has shown residual starch from powdered gloves (Yaffe et al., 1980).

A causal connection has been shown between operative tissue damage, intra-abdominal ischaemia, infections, reactions to foreign materials such as sutures, particles of gauze, glove dusting powder and post-operative adhesions

Downloaded from http://humrep.oxfordjournals.org/ by guest on September 30, 2014

**A.C.E.Sjösten, H.Ellis** and **G.A.B.Edelstam**

(Myllärniemi, 1967; Holmdahl *et al.*, 1996). One of the proven causes of post-operative intestinal adhesions is microscopic foreign bodies which are present in up to 93% of adhesions (Duron *et al.*, 1997). After open abdominal or pelvic surgery, a third of the patients are readmitted at least twice during the subsequent 10 years for a disorder directly or possibly related to adhesions (Ellis *et al.*, 1999).

Our previous investigation in a rabbit model indicated a retrograde migration of glove powder from the vagina into the intra-abdominal cavity (Edelstam *et al.*, 1997). The amount that reaches the peritoneum is sufficient to significantly increase formation of post-operative adhesions after a standardized trauma (Sjösten et el., 2000).

Therefore, this subsequent study in humans was done to investigate whether starch particles from powdered gloves also in humans might gain access to the abdominal cavity through the vagina after a gynaecological examination with powdered gloves.

## Materials and methods

### Patients

The participants in the study were divided into four different groups. Informed consent was obtained from all participants. All had a routine gynaecological examination before an elective laparotomy for total or subtotal hysterectomy due to fibroids or menometrorrhagia. Group I: examined 1 day pre-operatively with (i) powdered gloves (Gammex® Ansell GmbH, Germany; *n* = 17, mean age 51 years) or (ii) powder-free gloves (Biogel® Regent Medical, SLL) (*n* = 15, mean age 51 years). Group II: examined 4 days pre-operatively with (i) powdered gloves (*n* = 12, mean age 53 years) or (ii) powder-free gloves (*n* = 14, mean age 52 years). Patients with cancer of the uterus were excluded as well as women with ongoing menstrual bleeding. The premenopausal women were examined regardless of the follicular or luteal phase of the menstrual cycle. A third of all women in the study were post-menopausal. Any medication that might have influenced the tubal patency had not been taken except in the case of three patients who had an asthmatic disease and needed to take terbutaline occasionally. The medication was not taken during the investigations. There were no other significant differences for patient characteristics. Sexual activity, cyclic changes or hormonal effect where not considered in this study.

### Surgical procedure

An abdominal subtotal or total hysterectomy was undertaken with the operating team and the nurse who set up the instrument tray wearing powder-free gloves. Immediately the abdominal cavity was opened, peritoneal fluid was collected and cell smears were then taken from the peritoneal fluid. From the fimbriae of the Fallopian tubes, additional cell smears were taken per-operatively and when the uterus had been removed, i.e. post-operatively from the uterine cavity and the cervical canal. For making the smears sterile, forceps or peans were used. Smears from the fimbriae of the Fallopian tubes were omitted if they were not removed during the hysterectomy.

### Cell smears

The cell smears were quantitatively standardized on ~1 cm² of one-half of a glass slide with the other blank side serving as control for contamination with air-borne starch particles. All the slides were stained with May–Grünewald Giemsa by a biochemical assistant wearing powder-free gloves in a laboratory where only powder-free

**Table I.** Small and large starch particles on day 1 after examination with powdered (Ia) and powder-free (Ib) gloves respectively

| | | No. of patients | Total no. of particles | Median | Range | Mean | P |
|---|---|---|---|---|---|---|---|
| **Cervix** | | | | | | | |
| Small | Ia | 17 | 70 | 1 | 14 | 4.1 | < 0.001 |
| | Ib | 15 | 0 | 0 | 0 | 0 | |
| Large | Ia | 17 | 46 | 0 | 24 | 2.7 | < 0.01 |
| | Ib | 15 | 1 | 0 | 1 | 0.01 | |
| **Uterus** | | | | | | | |
| Small | Ia | 17 | 104 | 2 | 48 | 6.1 | < 0.01 |
| | Ib | 15 | 0 | 0 | 0 | 0 | |
| Large | Ia | 17 | 22 | 0 | 10 | 1.3 | < 0.01 |
| | Ib | 15 | 1 | 0 | 1 | 0 | |
| **Fallopian tubes** | | | | | | | |
| Small | Ia | 12 | 34 | 1.5 | 16 | 2.8 | < 0.01 |
| | Ib | 13 | 0 | 0 | 0 | 0 | |
| Large | Ia | 12 | 18 | 0 | 10 | 1.5 | < 0.05 |
| | Ib | 13 | 0 | 0 | 0 | 0 | |
| **Peritoneal fluid** | | | | | | | |
| Small | Ia | 13 | 13 | 1 | 4 | 1.0 | NS |
| | Ib | 13 | 3 | 0 | 3 | 0.2 | |
| Large | Ia | 13 | 12 | 0 | 6 | 0.9 | < 0.05 |
| | Ib | 13 | 0 | 0 | 0 | 0 | |

NS = not significant.

gloves were used. The slides were coded and analysed by two independent investigators with a Zeiss 4/76 microscope using polarized light at magnification ×250. The starch particles were counted in a standardized procedure for all slides. The numbers on the blank side (i.e. contamination) were subtracted from that in the smears so that the number of starch particles on each slide represent the net number without contaminating particles. Since there are differences in the size of starch particles they where divided into two sizes: (i) smaller than a leukocyte and (ii) larger than a leukocyte. Leukocytes for comparison in size were always present in the smears. The study was approved by the local ethics committee.

### Statistics

Non-parametric Mann–Whitney *U*-tests and Fisher's exact test were used and values are given as SEM for the group. Differences were considered significant at the $P < 0.001$, $P < 0.01$ and $P < 0.05$ levels. All statistical tests were computerized and carried out with statistics programs (Statistica™; Statsoft, USA).

## Results

### Group I: examined 1 day pre-operatively with (i) powdered gloves (n = 17) and (ii) powder-free gloves (n = 15)

Starch particles were found in the cell smears with more particles found on the slides from the patients examined with powdered gloves. The differences were significant at all locations in the genital tract for small particles (cervix $P < 0.001$, uterus and Fallopian tubes $P < 0.01$) and large particles (cervix and uterus $P < 0.01$ and Fallopian tubes $P < 0.05$) but only for large particles in the peritoneal fluid ($P < 0.05$). However, in two patients examined with powdered gloves, no particles were found. On the contrary, in three patients examined with powder-free gloves, a few particles were found (Table I and Figure 1).

Downloaded from http://humrep.oxfordjournals.org/ by guest on September 30, 2014



**Figure 1.** Median and range value for the retrograde transportation of small and large starch particles respectively, in different locations 1 day after a gynaecological examination with or without powdered gloves. The negative range value in the starch group for cervix, uterus and peritoneal fluid are due to contamination with airborne starch particles.

*Group II: examined 4 days pre-operatively with (i) powdered gloves (n = 12) and (ii) powder-free gloves (n = 14)*

There were significantly more small starch particles as well as large particles (cervix and uterus $P < 0.05$) after examination with powdered gloves. The differences were the same for small particles but less significant for large particles (uterus $P < 0.05$). The differences were non-significant in the Fallopian tubes and the peritoneal fluid (Table II and Figure 2.

**Discussion**

Medical gloves for use in surgery were introduced in 1896. Since then, several additives have been tried to facilitate manufacturing and to reduce the hazards associated with glove use (Ellis, 1990). Rubber and glove lubricants are the two main components in modern gloves. Starch powder as a glove lubricant can lead to complications such as granulomatous peritonitis (Giercksky *et al.*, 1994), adhesion formation (van den Tol *et al.*, 2001) and potentiation of infection (Renz and Gemsa, 1997), with subsequent intestinal obstruction, infertility and chronic pelvic pain.

**Table II.** Numbers of small and large starch particles after examination with powdered (IIa) and powder-free (IIb) gloves respectively, day 4

| | | No. of patients | Total no. of particles | Median | Range | Mean | P |
|---|---|---|---|---|---|---|---|
| **Cervix** | | | | | | | |
| Small | IIa | 12 | 26 | 1 | 2 | 2.1 | < 0.05 |
| | IIb | 14 | 0 | 0 | 0 | 0 | |
| Large | IIa | 12 | 9 | 0 | 3 | 0.8 | < 0.05 |
| | IIb | 14 | 0 | 0 | 0 | 0 | |
| **Uterus** | | | | | | | |
| Small | IIa | 12 | 21 | 3 | 20 | 1.8 | < 0.01 |
| | IIb | 14 | 2 | 0 | 0 | 0.1 | |
| Large | IIa | 12 | 7 | 0 | 3 | 0.6 | < 0.05 |
| | IIb | 14 | 0 | 0 | 0 | 0 | |
| **Fallopian tubes** | | | | | | | |
| Small | IIa | 11 | 16 | 1 | 5 | 1.4 | NS |
| | IIb | 14 | 4 | 0 | 1 | 0.2 | |
| Large | IIa | 11 | 2 | 0 | 1 | 0.2 | NS |
| | IIb | 14 | 0 | 0 | 0 | 0 | |
| **Peritoneal fluid** | | | | | | | |
| Small | IIa | 9 | 14 | 1 | 5 | 1.6 | NS |
| | IIb | 11 | 3 | 0 | 1 | 0.3 | |
| Large | IIa | 9 | 2 | 0 | 1 | 0.2 | NS |
| | IIb | 11 | 0 | 0 | 0 | 0 | |

NS = not significant.

Downloaded from http://humrep.oxfordjournals.org/ by guest on September 30, 2014

A.C.E.Sjösten, H.Ellis and G.A.B.Edelstam



**Figure 2.** Median and range value for the retrograde transportation of small and large starch particles respectively, in different locations 4 days after a gynaecological examination with or without powdered gloves. The negative range value in the starch group for cervix, Fallopian tube and peritoneal fluid are due to contamination with airborne starch particles.

Downloaded from http://humrep.oxfordjournals.org/ by guest on September 30, 2014

The possibility of retrograde migration of starch particles in the female genital tract into the intraperitoneal cavity has been suspected for several decades (Saxen *et al*., 1963). The present study in humans has attempted to investigate whether previous results from animal research—that starch particles can migrate from the vagina into the abdominal cavity (Edelstam *et al*., 1997)—reflects the case in humans. This study indicates such a retrograde migration of starch particles after gynaecological examination with powdered gloves. There were statistically significant differences between study and control groups in cervix, uterus and Fallopian tubes on the first day after vaginal examination with powdered gloves compared to powder-free examination. The low number of starch particles in the cell smear of the peritoneal fluid may reflect differences in the total amount of fluid and that it might have been better to collect all the fluid and after centrifugation prepare cell smears. However, with the present approach a significant difference between pre-operative examination with powdered and powder-free was demonstrated. The lower number of particles on the fourth day might indicate that absorption of starch particles had started, or that the particles had adhered to the peritoneum. In previous animal studies, most particles were found on the third day after

deposition in the vagina (Edelstam *et al*., 1997). The numbers found in the controls indicate that the presence of starch particles in the peritoneal cavity is in accordance with reported persistance for up to 18 months (Ellis, 1971). Our present patients have been examined in that time before the referral for hysterectomy.

A considerable number of gynaecologists wears starch-powdered gloves (Sjösten *et al*., 1999), despite evidence of starch-induced complications. The starch particles can migrate not only from the vagina into the cervical canal and the uterine cavity but also through the Fallopian tubes into the peritoneal fluid. Women exposed to intra-abdominal surgical trauma 1–4 days after a gynaecological examination with powdered gloves may be at increased risk of intra-abdominal adhesions. But even without a surgical procedure there is a risk of intra-abdominal or peri-tubal adhesions due to the examination with powdered gloves (Osser *et al*., 1989). Ongoing subclinical PID can cause infective tissue damage. An extensive study by Myllärniemi (1967) showed that talc, starch powder and lint in the abdominal cavity tended to accumulate in the traumatized areas of the peritoneum so that the foreign material contaminating the peritoneal tissues could act together with other

traumatizing conditions, possibly preventing the resorption of fibrinous adhesions. This corresponds to our previous finding in the rabbit model that starch particles deposited in the vagina can migrate in a retrograde direction from the vagina into the abdominal cavity and, combined with an intra-abdominal trauma, generate dense adhesions (Sjösten *et al.*, 2000). Since there are indications towards retrograde migration of powder, it must not be used regardless of cyclic variations or sexual activity.

In conclusion, our results show that starch particles can migrate from the vagina into the cervical canal, the uterine cavity and through the Fallopian tubes up to 4 days after a gynaecological examination with powdered gloves. Glove powder contributes to adverse intra-abdominal reactions, which include adhesion formation and adhesion-related complications such as chronic pelvic pain and bowel obstruction. Tubal and pelvic adhesions are a major cause of female infertility. Since evidence suggests that a retrograde migration could be a general mechanism, our recommendation is that we should be critical of harmful substances, e.g. glove powder, that could migrate from the vagina to abdominal cavity.

## Acknowledgements

We thank Associate Professor Mr Göran Granath for statistical analyses. This study was supported by Karolinska Institutet, Stockholm, Sweden.

## References

Chegini N and Rong H (1999) Postoperative exposure to glove powders modulates production of peritoneal eicosanoids during peritoneal wound healing. Eur J Surg 165,698–704.

di Zerega GS (1994) Contemporary adhesion prevention. Fertil Steril 61,219–235.

Duron JJ, Ellian N and Olivier O (1997) Post-operative peritoneal adhesions and foreign bodies. Eur J Surg 579(Suppl),15–16.

Edelstam GAB, Lundkvist E., Laurent TC et al (1992) The concentration and turnover of intraperitoneal hyaluronan during inflammation. Inflammation 16,459–469.

Edelstam GAB, Sjösten ACE and Ellis H (1997) Retrograde migration of starch in the genital tract of rabbits. Inflammation 21,489–499.

Ellis H (1971) The cause and prevention of postoperative intraperitoneal adhesions. Surg Gynecol Obstet 133, 497–511.

Ellis H (1990) The hazards of surgical glove dusting powder. Surg Gynecol Obstet 171,521–527.

Ellis H, Moran JB, Thompson NJ et al (1999) Adhesion-related hospital readmissions after abdominal and pelvic surgery: a retrospective cohort study. Lancet 9163,1476–1480.

Giercksky KE, Qvist H, Nesland TM et al (1994) Multiple glove powder granulomas masquerading as peritoneal carcinomatosis. J Am Coll Surg 179,299–304.

Heller DS, Westhoff C, Katz N et al (1996) The relationship between perineal cosmetic talc usage and ovarian talc particle burden. Am J Obstet Gynecol 174,1507–1510.

Holmdahl L, Al-Jabreen M and Risberg B (1994) Experimental models for qantitative studies on adhesion formation in rats and rabbits. Eur Surg Res 26,248–256.

Holmdahl L, Al-Jabreen M and Risberg B (1994) The impact of starch-powdered gloves on the formation of adhesions in rats. Eur J Surg 160,257–261.

Myllärniemi H (1967) Foreign material in adhesion formation after abdominal surgery. Acta Chir Scand 377,1–48.

Osman MO and Jensen SL (1999) Surgical gloves: current problems. World J Surg 23,630–637.

Osser S, Persson K and Liedholm P (1989) Tubal infertility and silent chlamydial salpingitis. Hum Reprod 4,280–284.

Paine CG and Smith P (1957) Starch granulomata. J Clin Pathol 10,51–55.

Renz H and Gemsa D (1997) Effects of powder on infection risks and associated mechanisms. Eur J Surg 579(Suppl),35–38.

Saxen L, Kissinen A. and Saxen E (1963) Peritoneal foreign-body reaction caused by condom emulsion. Lancet 2,1295–1296.

Sjösten ACE, Blomgren H and Edelstam GAB (1999) Precautions taken to prevent adhesions—a questionnaire study among Swedish obstetricians and gynaecologists. Eur J Surg 165,736–741.

Sjösten ACE, Ellis H and Edelstam GAB (2000) Post-operative consequences of glove powder used pre-operatively in the vagina in the rabbit model. Hum Reprod 15,1573–1577.

van den Tol M.P., Haverlag R, Jeekel J et al (2001) Glove powder promotes adhesion formation and facilitates tumour cell adhesion and growth. Br J Surg 88,1258–1263.

Yaffe H, Beyth Y and Levij IS (1980) Foreign body granulomas in peritubal and periovarian adhesions: a possible cause for unsuccessful reconstructive surgery in infertility. Fertil Steril 33,277–279.

Ylikorkala O (2001) Tubal ligation reduces the risk of ovarian cancer. Acta Obstet Gynecol Scand 80,875–877.

*Submitted on December 11, 2002; resubmitted on November 21, 2003; accepted on November 26, 2003*

Downloaded from http://humrep.oxfordjournals.org/ by guest on September 30, 2014

Exhibit 45

# Migration of a Particulate Radioactive Tracer from the Vagina to the Peritoneal Cavity and Ovaries

P. F. VENTER,   M. ITURRALDE

## SUMMARY

In this report we describe a radionuclide procedure designed to evaluate the migration of a particulate radioactive tracer from the vagina to the peritoneal cavity and ovaries, as well as the determination of the patency of the pathways between these two extremes of the female reproductive system.

$^{99m}$Tc-labelled human albumin microspheres ($^{99m}$Tc-HAM) were deposited in the posterior fornices of 24 patients a day before they were to undergo different gynaecological operations. During this period sequential images were obtained and after the operation radioactivity levels in the removed organs and tissues were counted with a scintillation detector.

In 14 out of 21 cases, the ovaries and fallopian tubes were counted separately from the uterus. Nine were positive (radioactivity levels were sufficiently high in the tubes and ovaries) and 5 were negative (no substantial radioactivity levels could be detected in either the tubes or the ovaries). The 5 negative results all occurred in patients with proved tubal damage as a result of previous infection.

All the results were either true positive or true negative, providing evidence of migration, or obstruction, of $^{99m}$Tc-HAM from the vagina through the uterus and tubes to the peritoneal cavity and ovaries.

*S. Afr. med. J.*, **55**, 917 (1979).

In the female, the peritoneal cavity is linked with the outside via the fallopian tubes, the uterus and the vagina, and there is evidence of migration of different substances in either direction. For example, malignant cells from ovarian carcinoma can be demonstrated in the posterior fornix of the vagina.[1] After menstruation the gonococcus can penetrate the cervix and gain access through the uterus and tubes to the peritoneal cavity and ovaries.[2] For pregnancy to occur, spermatozoa have to move up the uterus and the ova down the tube. Retrograde menstruation is also a well-known phenomenon. After insufflation, air and gases pass easily from the vagina into the peritoneal cavity up to the diaphragm. Radio-opaque contrast media are introduced with great ease through the uterus and

tubes into the peritoneal cavity, and tubal patency is easily demonstrated during peritoneoscopy by injection of a dye through the cervix and into the tubes.[3]

Does this also hold for inert chemical substances? Will a chemical substance deposited in the vagina later appear in the peritoneal cavity? Such migration could well explain the aetiological role of chemical substances in certain gynaecological diseases. It has already been suggested that talcum powder is one of these potentially dangerous inert chemical products. Electron micrographic slides of removed human ovaries have shown asbestos particles resting on them, and there is evidence that these particles originated from talc used to dust condoms.[4]

To demonstrate the upward migration of chemical substances we made use of radionuclide imaging and counting techniques.

## MATERIAL AND METHODS

The subjects of this study were 24 adult women, both Blacks and Whites, from the Academic Hospitals of the University of the Orange Free State in Bloemfontein. All had been admitted to hospital for elective gynaecological surgical operations (Table I). The radionuclide procedure was explained and the necessary consent obtained

### TABLE I. SURGICAL INDICATION AND OPERATIVE PROCEDURE

| Number of patients | Surgical indication | Operative procedure |
|---|---|---|
| 4 | Sterilization | Fimbriectomy |
| 7 | Ca. breast stage III | Bilateral salpingo-oöphorectomy |
| 1 | Ca. breast stage III | Hysterectomy and bilateral salpingo-oöphorectomy |
| 2 | Postmenopausal bleeding | Dilatation and curettage |
| 2 | Postmenopausal bleeding | Hysterectomy and bilateral salpingo-oöphorectomy |
| 3 | Menorrhagia | Dilatation and curettage |
| 4 | Menorrhagia | Hysterectomy and bilateral salpingo-oöphorectomy |
| 1 | Pelvic infection | Hysterectomy and bilateral salpingo-oöphorectomy |

### Procedure

The patient was placed in the supine position with the buttocks slightly elevated. The cervix and posterior fornix were exposed with a Cusco vaginal speculum and between 10 and 15 mCi of $^{99m}$Tc-labelled human albumin microspheres (HAM) in a volume of less than 3 ml was

Department of Obstetrics and Gynaecology, University of the Orange Free State and Academic Hospitals, Bloemfontein
P. F. VENTER, M.MED. (O. & G.), F.R.C.O.G., *Professor*

Department of Nuclear Medicine, University of the Orange Free State and Academic Hospitals, Bloemfontein
M. ITURRALDE, M.D., D.M., *Professor and Head*

Date received: 22 November 1978.
Reprint requests to: Professor M. Iturralde, Dept of Nuclear Medicine, University of the Orange Free State, PO Box 339 (M. 27), Bloemfontein, 9300 RSA.

918                                    S A  M E D I E S E  T Y D S K R I F                        2 Junie 1979

deposited in the posterior fornix. The patient was kept in this position for about 2 hours. The vulva was covered with a sanitary towel, and the legs were pressed together to prevent the radionuclide solution streaming from the vagina and thus lowering count levels.

In a few cases images were obtained, 4 and 24 hours after deposition of the radioactive tracer, with a Nuclear Chicago Pho/Gamma III scintillation camera (Figs 1 and 2). In most cases a count was performed on removed surgical specimens as a whole or separately on the uterus

and adnexae, for 1 000 seconds in a 12,7-cm well scintillation detector. In one case a piece of the anterior peritoneum, fluid from the pouch of Douglas and blood were also included in the count, to determine the possibility of reabsorption into the bloodstream from the vaginal mucosa.

Radiation exposure to the patients was low owing to the short half-life of $^{99m}$Tc (6 hours), and in most cases it was almost negligible since the target organs had been surgically removed.



**Fig. 1. Scintiphotographs showing positive $^{99m}$Tc-HAM migration: A — from the vagina to the uterus (4 hours after deposition); B — in both tubes (6 hours after deposition); C — reaching the peritoneal cavity and ovaries 24 hours after deposition (markers in the anterior superior iliac spines).**



**Fig. 2. Scintiphotographs showing negative $^{99m}$Tc-HAM migration: A — in the left tube (4 hours after deposition); the right tube is patent; B — in both tubes; 24 hours after deposition radioactivity remains in the uterus (markers in the anterior superior iliac spines).**

Case 3:16-md-02738-MAS-RLS    Document 33123-4    Filed 08/22/24    Page 1035 of 1035
PageID: 242214

## RESULTS

A total of 24 patients were examined. Because radionuclide material streamed away from the vagina in 3 patients, these cases were considered technically defective and were not included in the final analysis.

Of the remaining 21 cases 16 were positive, that is sufficiently high radioactivity levels were obtained as evidence of migration of the radioactive tracer to the uterus or the tubes and ovaries. The results were negative in 5 cases; in 2 of them the radioactive microspheres did not pass from the vagina to the uterus and in the other 3 there was no migration to the adnexae or fimbria. In the latter, it was impossible to determine radioactivity levels in the uterus because the latter was not removed.

### TABLE II. SUMMARY OF RESULTS

| Patient | Tissue examined | Radioactivity present (+) or absent (−) |
|---|---|---|
| 1 | Organ imaging fimbria | Uterus, adnexa, fimbria + |
| 2 | Organ imaging | Uterus and adnexa + |
| 3 | Organ imaging fimbria | Uterus, adnexa, fimbria + |
| 4 | Organ imaging adnexa | Uterus +, adnexa + |
| 5 | Uterus and adnexa | Uterus +, adnexa − |
| 6 | Endometrium | Endometrium − |
| 7 | Organ imaging endometrium | Uterus and endometrium + |
| 8 | Organ imaging endometrium | Uterus and endometrium − |
| 9 | Endometrium | Endometrium + |
| 10 | Uterus and adnexa | Uterus and adnexa + |
| 11 | Adnexa | Adnexa + |
| 12 | Uterus and adnexa | Uterus and adnexa + |
| 13 | Uterus and adnexa | Uterus, adnexa + |
| 14 | Endometrium | Endometrium + |
| 15 | Uterus and adnexa | Uterus +, adnexa − |
| 16 | Adnexa | Adnexa + |
| 17 | Adnexa | Adnexa + |
| 18 | Fimbria | Fimbria − |
| 19 | Uterus and adnexa | Uterus and adnexa + |
| 20 | Adnexa | Adnexa − |
| 21 | Adnexa | Adnexa − |

In 14 out of 21 cases it was possible to measure radioactivity levels in the adnexa separately from the uterus. Nine of these showed marked radioactivity in the tubes and ovaries, while in 5 the radioactivity levels were not much higher than the background. In all 5 of these patients, severe tubal occlusion due to previous infection was confirmed by study of the removed specimens (Table II).

In 1 case, radioactivity levels in blood were not much higher than the background, which indicated that radioactive tracer had not reached the adnexa through the blood supply owing to local reabsorption in the vaginal mucosa.

## DISCUSSION

Evidence is available for migration of different substances in either direction within the female reproductive system between the peritoneal cavity and ovaries via the tubes, uterus and vagina, and the outside. Various living organisms actively follow this pathway in both directions. Gases, fluids, dyes and contrast media can easily be introduced from the vagina into the peritoneal cavity. If transit can take place so easily, it is probably the same for many chemical substances used for hygienic, cosmetic or medicinal purposes, many of which may have potential carcinogenic or irritating properties.

To prove this would be of great practical value, because migration of certain chemical substances could play an important aetiological role in gynaecological diseases and especially in carcinoma of the ovary.

We found the use of a particulate radioactive agent such as $^{99m}$Tc-HAM with a size range of $30 - 50$ $\mu$m to be a suitable and safe means of imaging and evaluating tubal patency and demonstrating the possibility of transit of particles from the vagina to the peritoneal cavity and ovaries.

Results obtained by this technique correlated with findings in the surgically removed specimens, thus demonstrating the accuracy of this radionuclide procedure.

REFERENCES

1. Graham, R. and Graham, R. C. (1967): Brit. J. Obstet. Gynaec., 74, 371.
2. Schwarz, R. H. in Monet, G. R. G., ed. (1974): Diseases in Obstetrics and Gynaecology, pp. 381 - 395. London: Harper & Row.
3. Jordan, J. A. (1974): Clinics Obstet. Gynaec., 1, 395.
4. News and Comment (1978): S. Afr. med. J., 54, 14.