# Exhibit 24

**Case**: *Charmaine Lloyd, et al. v. Johnson & Johnson, et al. (Plaintiff Eva Echeverria only).*
**Case No.**: BC628228 (JCCP No. 4872)
**Motion(s)**: Motions in Limine

**Tentative:** Deny Defendants' motion in limine no. 1

---

**Motion papers considered**:

- On May 26, 2017, Defendants filed two Joint Motions in Limine: (1) To Exclude the General Causation Opinions of Plaintiff's Proposed Experts (which addresses the general causation opinions of Drs. Cramer, Ness, Colditz, Siemiatycki, and Plunkett); and (2) To Exclude the Case Specific Opinions of Plaintiff's Proposed Experts (which addresses the specific causation opinions of Drs. Cramer, Ness, Yessaian, and Godleski).

- On June 12, 2017, Plaintiff filed two oppositions to Defendants' three motions. Plaintiff indicates she no longer intends to call Dr. Colditz, Dr. Ness, or Mr. Steinberg.

- On June 20, 2017, Defendants filed three replies, corresponding with their three motions. Defendants also filed objections to the declarations of Drs. Cramer, Siemiatycki, Yessaian, Godleski, and Plunkett.

---

## I. Background

This coordinated proceeding arises out of the products Plaintiff purchased from Defendants Johnson & Johnson, Johnson & Johnson Consumer Companies, Inc. (collectively "Johnson"), and which contain talc supplied by Imerys Talc America, Inc. ("Imerys") (Johnson and Imerys collectively referred to as, "Defendants"). Plaintiff alleges she developed ovarian cancer arising from the defective nature of talcum powder. The products at issue include Johnson & Johnson Baby Powder and Shower to Shower.

The background and applicable law concerning this motion is set forth in the tentative Order re Specific Causation experts (Drs. Cramer, Yessaian, and Godleski).

This document addresses the general causation opinions of Drs. Cramer and Siemiatycki. A separate tentative opinion addresses the proposed testimony of Dr. Plunkett.

## II. Defendants' Objections

Defendants' object to each of the declarations filed by Echevarria's experts, on the ground their declarations are inadmissible expert opinions, for the reasons stated in their motions

1

in limine. These objections are overruled. The Court must consider the experts' opinions in order to determine their admissibility. Defendants' objections require the circular conclusion that, because the experts' opinions are (from Defendants' perspective) inadmissible based on the arguments made in the motions in limine, the opinions must likewise be deemed inadmissible insofar as Echevarria seeks to rely on them to argue against Defendants' motions in limine. Such roundabout logic is not a proper basis for an objection.

## II.  Defendants' Motion in Limine No. 1 Is Denied

### A. Summary of Arguments

Daniel Cramer, M.D. is a Professor of Epidemiology and a Professor of Obstetrics, Gynecology, and Reproductive Biology at Harvard, as well as a Professor of Gynecology and Reproductive Science at Brigham And Women's Hospital. Jack Siemiatycki, M.D. is a Professor of Epidemiology at the University of Montreal and an Adjunct Professor of Epidemiology at McGill University. Plaintiff tenders these witnesses to opine that there is a general causal link between talc and ovarian cancer.

Defendants argue that the experts misapplied the "Bradford Hill" factors, used to demonstrate that an association between two events—here, talc use and ovarian cancer—is actually a causal relationship. Defendants identify the Bradford Hill factors as (1) strength of association; (2) consistency of association; (3) dose-response relationship; (4) biological plausibility; (5) temporal relationship; (6) consideration of alternative explanation; and (7) specificity. Defendants argue the experts' analysis regarding the first four factors is insufficient. As to the strength and consistency of the association between talc and ovarian cancer, Defendants argue the experts ignore the bulk of the evidence, in part by relying on one type of study (case-control studies) over another type (cohort studies). Defendants argue cohort studies are more accurate, and that Plaintiff's experts would not have reached the conclusions they now present had they incorporated the cohort studies more fully into their analysis. Defendants also argue the experts fail to demonstrate that there is a dose-response relationship between talc and ovarian cancer, and argue that their biological plausibility theories are too hypothetical to be permissible as evidence. Defendants also argue the experts' testimony should be inadmissible because it was exclusively produced for litigation, and contradicts previous work they have done.

In opposition, Plaintiff argues (1) these are well-credentialed experts who are entitled to present their evidence to a jury; (2) Defendants' arguments go to the weight of the evidence, rather than to its admissibility; (3) the experts adhered to the Bradford Hills factors; (4) the legal standard for causation is lower than the scientific standard; and (5) the change of position over the previous years is due to the existence of new evidence, not changing stances to suit litigation.

Defendants' reply largely reiterates their initial argument. They argue Plaintiff is trying to fabricate a legitimate scientific dispute where there is none. Defendants reiterate that Plaintiff's experts ignore cohort studies, refer to statistically weak associations as "strong" associations, and rely on studies that do not find a dose-response relationship to conclude that there is a dose-response relationship. They also argue Plaintiff's experts need to provide additional evidence regarding biological plausibility. Finally, Defendants again argue that Plaintiff's experts' opinions should be disregarded because they are "litigation driven."

## B. Analysis

The Court's responsibility is to ascertain whether the underlying facts relied upon by Plaintiff's experts are sufficient to support the conclusions they reached. The Court concludes the opinions are admissible.

Much of Defendants' argument goes to the weight of evidence, not its admissibility. The experts clearly relied on the Bradford Hills factors in creating their opinions. (See Cramer Decl. Exh. 1, p. 9-10, 14-17; Siemiatycki Decl. Exh. 1, p. 16-19) While Defendants may have valid critiques of their application of those factors, such critiques should be resolved by the jury. For example, regarding the strength or consistency of an association between talc and ovarian cancer for the general population, both experts indicate there is an odds ratio of 1.3.  Defendants argue this ratio would, by definition, not be considered a "strong" association, because a 2.0 ratio is typically required. (See *Cooper v. Takeda Pharmaceuticals America, Inc. supra*, 239 Cal.App.4th at 593 ["By demonstrating a relative risk greater than 2.0 that a product causes a disease, epidemiological studies thereby become admissible to prove that the product at issue was more likely than not responsible for causing a particular person's disease."].) As Plaintiff correctly argues, however, Defendants' portrayal of the 2.0 requirement is deceptive as applied to general causation; rather, this issue arises in the specific causation analysis. (*Daubert v. Merrell Dow Pharmaceuticals Inc.* (9th Cir. 1995) 43 F.3d 1311, 1321 fn. 16 ["A statistical study showing a

3

relative risk of less than two could be combined with other evidence to show it is more likely than not that the accused cause is responsible for a particular plaintiff's injury."].)

An odds ratio of 2.0 provides a vital benchmark for admissibility from a legal standpoint. However, from a scientific perspective, whether an odds ratio of 1.3 represents an association that, when supplemented with other factors, could be sufficient for purposes of general causation is a jury question. While it may be appropriate for Defendants to argue that a 1.3 ratio is not a "strong" association, this is an issue a jury must weigh.

Additionally, whether case-control studies or cohort studies[1] are more persuasive, and whether Cramer and Siemiatycki over-relied on one or the other, may appropriately be used at trial to argue that their conclusions regarding a strong or consistent association between talc and ovarian cancer are wrong. This is a matter for direct examination and cross-examination, however, rather than outright exclusion. At multiple points in his opinion, Cramer addresses why he believes the biases that allegedly make case-control studies less reliable than cohort studies are not as big an issue as others claim them to be. (See Cramer Decl. Exh. 1, p. 8-12.) Siemiatycki similarly disputes allegations of bias in case-control studies. (See Siemiatycki Decl. Exh. 1, p. 43.) This type of expert dispute is more appropriate for resolution by a jury, than resolution by a court. (Cf. *Davis v. Honeywell International Inc.* (2016) 245 Cal.App.4th 477, 480 ["Having reviewed much of the commentary and scientific literature cited in support of and against the 'every exposure' theory, we conclude the theory is the subject of legitimate scientific debate. Because in ruling on the admissibility of expert testimony the trial court 'does not resolve scientific controversies' [citation], it is for the jury to resolve the conflict between the every exposure theory and any competing expert opinions."].)

Defendants argue that this is not a matter for scientific dispute, because other scientists do not agree with Cramer and Siemiatycki's point-of-view. It cannot be disputed, however, that Cramer and Siemiatycki are experts in their field. (Indeed, internal documents from Defendants

---

[1] Case-control studies examine women who already have ovarian cancer, as well as women without ovarian cancer, and ask them to report their use of talc over their lifetime to that point. Thus, it is backward-looking. Cohort studies examine women who do not yet have ovarian cancer, ask them to report their use of talc, and then observe whether they develop ovarian cancer. It is thus forward-looking, or at least focused on the present. Defendants argue case-control studies are less effective, because women may exaggerate or misremember their use of talc prior to their diagnosis with ovarian cancer. Among other things, Cramer disputes that this occurred in the case-control studies he relies upon, based on the fact that women in the case-control studies and women in the cohort studies reported relatively similar levels of talc use. If the case-control women were all exaggerating the amount of talc they had used, Cramer argues, then that exaggeration would show up in the amount of reported use.

4

show that they once viewed Cramer as particularly objective and near the top of the field (Oppo. 30, Robinson Decl. Exh. 6.). Similarly, Siemiatycki chaired the International Agency for Research on Cancer's working group that concluded talc was "possibly" carcinogenic when used in the perineal area. (Oppo. 17, Siemiatycki Decl. Exh. 1, p. 4-6.)) While there may be a valid general point of view that cohort studies are superior to case controlled studies, there is no showing that case controlled studies relied upon by Cramer and Siemiatycki are without value or that the reasons they find them to be valid are unsupported. The issue is the weight to be afforded each, about which there is room for debate in this context.

It would also be appropriate for a jury to resolve Defendants' arguments regarding dose-response relationship.[2] Defendants' sole argument, again, is to cite to a number of studies that concluded there was no dose-response relationship between talc and ovarian cancer. Cramer's report addresses this issue, noting, for example, that the lack of a dose-response relationship in other studies—in contrast to his own recent work—may be explained by controlling for whether women have had tubal ligation or a hysterectomy, or by controlling for the use of hormone therapy during menopause. (Cramer Decl. Exh. 1, p. 12-13.) Defendants argue vigorously that three journals have rejected this logic and that the Court should as well. However, the Court is not determining who is the "best" expert but only whether there is sufficient evidence to put the matter to the jury.

Siemiatycki places particular reliance on the Terry study, completed in 2013, which, Siemiatycki argues, provided breakdowns regarding the duration and frequency of talc usage that may explain the lack of a dose-response relationship in previous studies. (Siemiatycki Decl. Exh. 1, p. 51) The Terry study does not reach particularly ground-breaking conclusions regarding a dose-response relationship with talc. (Robinson Decl. Exh. 4.) In contrast to Defendants' portrayal of the study, however, it did provide hypotheses for why such a response was difficult to measure. It also notes that the issue was unaddressed in certain other studies, rather than, as Defendants argue, specifically studied and shown to be lacking, and also highlights various studies where a "significant" dose-response was found, again in contradiction to Defendants arguments that no such response has been uncovered. (Id. ["Though dose response was not addressed in previous meta-analyses [citations] some individual studies have reported significant

---

[2] Dose-response relationship refers to evidence that an increase or decrease in exposure to a product—talc—leads to a demonstrable increase or decrease in the likelihood of a negative outcome—ovarian cancer.

5

dose-response [citations] while others have not [citations].") Of particular note, one of the studies that Terry notes found a significant does-response relationship was the 1999 study conducted by Cramer.

While the jury may ultimately disagree with Plaintiff's experts' attempts to explain away previous, contradictory results, the Court does not conclude at this stage that they are so beyond the norm as to warrant excluding the evidence altogether.

The same result applies to the issue of biological plausibility.[3] Defendants' argue there is no evidence that the common biological explanations for cancer apply here—there is no evidence talc inflames the ovaries such that cancer develops; there is no evidence talc suppresses a woman's immune system such that the ovaries become more susceptible to cancer; and there is no showing talc is mutagenic (i.e. alters DNA), which they contend is essential to demonstrating that it might cause cancer. In short, they contend there is no showing of a cogent biological mechanism by which talc might lead to ovarian cancer. They contend the experts' opinions are mere speculation.

Siemiatycki opines that inflammation is biologically plausible, if not completely proven mechanism. That inflammation has not been shown is not discussed. Cramer argues that talc may promote an immune response and, like asbestos, may yet be shown to be mutagenic. (Opposition 34, Cramer Decl. Exh. 1 p. 14-17.) He compares the results of certain talc tests with the results of tests evaluating asbestos to demonstrate that talc may yet be mutagenic. (Opposition 35, Cramer Decl. Exh. 1 p. 15.)

That there is no evidence yet to support these theories is not the test—they must only be plausible. This is sufficient for the Court to conclude their testimony about general causation should be presented to the jury. While the evidence here is not strong, it is sufficient.

Finally, while it is true that Cramer and Siemiatycki in the past reached other conclusions, Siemiatycki has been particularly clear (and emphatic) about the role new evidence published over the past decade has played in altering his opinions. (See Siemiatycki Decl. Exh. 1, p. 51; Robinson Decl. Exh. 5 [Siemiatycki Depo. 190:12-193:10].) While Plaintiff does not point to any similar explanation from Cramer, his analysis likewise relied heavily on studies

---

[3] Biological plausibility refers to the existence of a plausible explanation for how one event—exposure to talc—might lead to another—ovarian cancer. By definition, these issues only come up where there has not yet been proof of causation. Experts are expected only to demonstrate that there is, at least, a plausible biological theory that could support a conclusion of causation.

6

published in more recent years. (See Cramer Decl. Exh. 1, p. 13, 17 [citing Zhang (2015), Wu (2015), and Terry (2013)].)

To a large extent this is a question of the credibility of the witness. As with all of the foregoing, while Defendants may certainly point to prior inconsistent statements to impeach Plaintiff's experts, Plaintiff's experts should have an opportunity to present their evidence to the jury and then explain why they have changed their opinions.

For the reasons stated above, Defendants' Motion in Limine No. 1 is DENIED as to Drs. Cramer and Siemiatycki. The Court rules separately as to Dr. Plunkett. The Motion is moot as to Drs. Ness and Colditz.