# Exhibit 25

```
                                           Page 1

 1        IN THE CIRCUIT COURT OF THE 11th JUDICIAL CIRCUIT
                IN AND FOR MIAMI-DADE COUNTY, FLORIDA
 2                   CIRCUIT CIVIL DIVISION
 3                CASE NO.: 2019-017627-CA-01
 4
 5   ROBERT A. SUGARMAN, Individually and as
     Personal Representative of the Estate of
 6   MARILYN WENDY SESKIN,
 7             Plaintiff,
 8   v.
 9   JOHNSON & JOHNSON,
     JOHNSON & JOHNSON CONSUMER
10   INC., f/k/a JOHNSON & JOHNSON,
     CONSUMER COMPANIES, INC.,
11   and PUBLIX SUPER MARKETS, INC.,
12             Defendants.
13   _____/
14
15
16
17                        Miami-Dade County Courthouse
                          73 West Flagler Street
18                        Miami, Florida 33130
                          Friday, February 9, 2023
19                        9:32 a.m. - 4:37 p.m.
20
21
22
23          This cause came on for hearing before the
24   Honorable William Thomas, Circuit Court Judge, in
25   Courtroom 13-1, pursuant to notice.
```

```
                                                    Page 2
 1    APPEARANCES:
 2    ATTORNEYS ON BEHALF OF THE PLAINTIFF:
 3              LANCE V. OLIVER, ESQUIRE
                LAURA K. STEMKOWSKI, ESQUIRE
 4              OLUTOLA "TOLA" FAMILONI, ESQUIRE
                RIDGE MAZINGO, ESQUIRE
 5              MOTLEY RICE, LLC
                28 Bridgeside Boulevard
 6              Mount Pleasant, South Carolina  29464
                (843) 216-9061
 7              Loliver@motleyrice.com
                lstemkowski@motleyrice.com
 8              tfamiloni@motleyrice.com
                rmazingo@motleyrice.com
 9
10              MICHAEL J. PENDELL, ESQUIRE
                MOTLEY RICE, LLC
11              20 Church Street
                Hartford, Connecticut 06103
12              (860) 882-1681
                Mpendell@motleyrice.com
13
14              LEIGH O'DELL, ESQUIRE
                BEASLEY ALLEN LAW FIRM
15              272 Commerce Street
                Montgomery, Alabama 36104
16              (334) 269-2343
                Leigh.odell@beasleyallen.com
17
18    ATTORNEYS ON BEHALF OF THE JOHNSON & JOHNSON DEFENDANTS:
19              SYDNEY SCOTT, ESQUIRE
                GIBSON DUNN & CRUTCHER, LLP
20              811 Main Street
                Suite 3000
21              Houston, Texas 77002
                (346) 718-6963
22              Sascott@gibsondunn.com
23
24
25
```

```
                                                    Page 3

  1     APPEARANCES: (Continued)
  2
  3              ANTHONY J. BALZANO, ESQUIRE
                 ALLISON BROWN, ESQUIRE
  4              JOSEPH A. CARUSO, ESQUIRE
                 SKADDEN ARPS SLATE MEAGHER & FLOM, LLP
  5              One Manhattan West
                 395 9th Avenue
  6              New York, New York 10001
                 (212) 735-2173
  7              Anthony.balzano@skadden.com
                 Allison.brown@skadden.com
  8              joseph.caruso@skadden.com
  9
 10              HASSIA DIOLOMBI, ESQUIRE
                 SHOOK HARDY & BACON, LLP
 11              2555 Grand Boulevard
                 Kansas City, Missouri 64108
 12              (816) 474-6550
                 Hdiolombi@shb.com
 13              Hdiolombi@shb.com
 14
 15              JENNIFER A. MCLOONE, ESQUIRE
                 SHOOK HARDY & BACON, LLP
 16              201 South Biscayne Boulevard
                 Suite 3200
 17              Miami, Florida 33131
                 (305) 358-5171
 18              Jmcloone@shb.com
 19
 20              MICHAEL RAYFIELD, ESQUIRE
                 SHOOK HARDY & BACON, LLP
 21              One Rockefeller Plaza
                 Suite 2801
 22              New York, New York 10020
                 (212) 989-8844
 23              Mrayfield@shb.com
 24
 25
```

Page 4

1                        I N D E X

2   PROCEEDING                                          PAGE

3   Motion to Partially Exclude the Report and
    Expert Testimony of Jennifer Permuth, Ph.D.         7
4

    Motion to Exclude the Opinions of Dr. Freidenfelds  30
5

    Motion to Exclude Certain Opinions of Dr. Felix     57
6

    Motion to Exclude the Opinions of Dr. Sitelman      62
7

    Motion to Partially Exclude the Expert
8   Testimony of Jeffrey Boyd, Ph.D.                    75

9   Motion to Exclude the Opinions of Dr. Roberta Ness  95

10  Motion to Exclude Argument About Plaintiff's
    Counsel, Lawyer-Driven Litigation, Advertising      150
11

    Motion in Limine No. 35 to Exclude References to
12  Corp. Restructuring and Bankruptcy                  156

13  Motion in Limine No. 4 Regarding Imerys
    Documents and Testimony                             163
14

    Motion in Limine No. 13 Regarding References to or
15  Evidence of the IARC'S Designation of "Domestic
    Talc Products" as a "High Priority" for Re-Review   169
16

    Motion in Limie No. 22 Regarding References to or
17  Evidence of Foreign Labeling of JJCI Products       171

18  Motion to Exclude the Opinions of Dr. Rigler        177

19  Motion to Exclude the Opinions of Dr. Plunkett      210

20  Motion to Exclude the Opinions of Dr. Chan          259

21  Motion in Limine No. 15 Regarding References to
    or Evidence of IWGACP Work                          284
22

    Motion in Limine No. 7 to Exclude References to
23  the Voluntary Recall of Lot #22318RB                292

24  Motion in Limine No. 31 to Exclude any References
    J&J's Decision to Discontinue Talc-Based Powder     296

25

Page 5

1          (Hearing proceedings commenced at 9:32 a.m.)

2          THE COURT:  All right, folks.  You all can be

3     seated.

4          Let me tell you what I've been doing.  We have

5     our 200 jurors, which is good news.  We didn't

6     reserve a courtroom, which is the bad news.

7          So I have been back there trying to contact

8     the judges who did reserve the courtroom to see is

9     your case going, is it not.  And I also requested

10    they give us a courtroom -- if no courtrooms are

11    available here, I asked that they give us a

12    courtroom over at the children's courthouse just

13    for jury selection.  And nobody can tell me

14    anything right now.  So I've been trying.

15         I even went downstairs and I looked at the

16    courtrooms, well, maybe we can use this courtroom;

17    no, that's too small.  So that's where we're at.

18         It doesn't change anything for purposes of our

19    pretrial.  We still need to do all these pretrial

20    things, but it could potentially impact what

21    happens on Monday.

22         Now, the worst that could happen is that we

23    have 200 people, we keep them downstairs, we bring

24    them up at 25 at a pop, we disqualify all those who

25    can't stay here for the time period that is

Page 6

1    required -- that gets rid of a lot -- with the

2    thought that we could get down to about seventy

3    people that you all can question, and then we can

4    go from there.  But again, I'm talking to you in

5    hypotheticals because I don't know what's going to

6    happen.  That was the original plan.  So that's

7    what I've been trying to deal with this morning.

8         I get a little frustrated because Andrew, who

9    was an excellent JA, he left, but he knows if you

10   order 200 jurors, you can't do that in this

11   courtroom, so you always order a larger courtroom

12   when you order 200 jurors.  And he didn't do it,

13   and by the time it had already been done, all the

14   other judges, the larger courtrooms, the judges are

15   starting trials on the same day.

16        I'll let you know when I know what courtroom.

17   And so, logistically, I don't know if they're going

18   to give us a problem walking 200 people to the

19   children's courthouse.  It shouldn't be.

20        All right.  Where do you want to start?

21        MR. OLIVER:  Well, Your Honor, we were going

22   to hear the motion regarding Plaintiff's motion to

23   exclude Publix's expert.  However, as you know,

24   Publix is no longer in this case, so I believe

25   either we pick or they pick.

Page 7

1          THE COURT:  We start with the plaintiff, then

2     we go to the defendant.  We'll go until we've

3     resolved everything.

4          MR. OLIVER:  So plaintiff will start with

5     Dr. Permuth, Jennifer Permuth.  It's a motion to

6     exclude under Daubert.

7          Do I need to go to the podium, Your Honor?

8          THE COURT:  Wherever you're comfortable, sir.

9          MR. OLIVER:  Okay.  I guess the question I

10    have, I know at the beginning of the last hearing,

11    Your Honor had not had a chance to read some of our

12    paperwork --

13          THE COURT:  I did.  I got your emails.  Thank

14    you.

15          MR. OLIVER:  Okay.  So you have read the

16    motion to exclude Dr. Jennifer Permuth?

17          THE COURT:  I have.

18          MR. OLIVER:  Okay.  So let me start at the

19    beginning.  I'll try to be brief.  And obviously,

20    Your Honor, if you have a question, just interrupt

21    me and let me know specifically.

22          Essentially, what defendants would like

23    Jennifer Permuth to do in this case is testify that

24    Dr. Seskin has a gene mutation that increases her

25    risk for ovarian cancer.  The problem with that is

Page 8

1      Dr. Permuth has absolutely no methodology --

2          THE COURT:  Counsel, I'm listening to you, I'm

3      just trying to get the computer to turn on.

4          MR. OLIVER:  That's okay.

5          And I want to be really clear.  She has the

6      genetic testing.  The genetic testing mutation that

7      she has is c.456+A>T.  That is the mutation that

8      the testing identified.

9          And what the testing said about that was

10     current and limited data suggest women who carry

11     one FANCC mutation may have an elevated risk of

12     developing breast cancer, which we knew, and that's

13     mainly due to BRCA 1 and 2, which Dr. Seskin did

14     not.  The next sentence says, "Correlation between

15     FANCC mutations and increased risk of other cancers

16     is not yet known."

17         And Dr. Permuth, at her depositions, agreed

18     that the correlation or the risk between this

19     mutation and ovarian cancer is not yet known.  She

20     didn't do that research herself.  Nobody has done

21     that research.

22         What she does is she relies on a handful of

23     papers.  Those papers are merely talking about this

24     family of genes and saying we need to do further

25     research, and by the way, we've identified some

Page 9

1      women in the historical record who have ovarian

2      cancer and also have this gene mutation and there

3      may be four or five of them.

4          THE COURT:  I'm sorry to cut you off.  As I

5      was looking at this, the part of this that -- well,

6      even if that is true, why can't you just point that

7      out during the cross-examination?

8          MR. OLIVER:  Well, Your Honor, the reason we

9      can't -- I mean, we could point that in the

10     cross-examination if Your Honor allowed it and if

11     Daubert allowed it, but Daubert doesn't now, under

12     Florida law, does not allow pure opinion testimony.

13         And in fact, if you look at her -- and this

14     part you may not have seen because it was an

15     addendum to her report, but what she wants to say,

16     she wants to couch her opinion in qualifying

17     language that says this could have been suggestive

18     of a substantial causing factor.  And she puts it

19     on a risk chart and she doesn't put talc on her

20     risk chart and she says this is the thing.

21         The problem under Daubert is that they have

22     the burden of proving that she has a sound

23     methodology and they have to have something other

24     than her speculative opinion, which this is her

25     opinion, she doesn't have anything to back it up

Page 10

1          other than --

2               THE COURT:  So what you're saying is that it's

3          not as if she's coming in and testifying that she

4          had this gene, and because she had this gene, she

5          is -- it's definitive that she is at a higher risk.

6               MR. OLIVER:  That's right.

7               THE COURT:  She is saying that, okay, she had

8          this gene and that could have, and the problem with

9          that "could have" is that the research is still

10         undeveloped.

11              MR. OLIVER:  That's right.  And she admits the

12         research --

13              THE COURT:  To a reasonable degree of

14         scientific --

15              MR. OLIVER:  She can't say that.  And Your

16         Honor has ruled in Rolle v. Burke, and I believe

17         that that is not an acceptable opinion under

18         Daubert, that's obviously consistent with all of

19         the Daubert law.

20              That is essentially where we are with that.  I

21         want to be clear about something:  Plaintiffs tried

22         to be very narrow with our Daubert motions.  We are

23         not saying Dr. Permuth can't testify.  She does

24         have opinions, for example, about the validity of

25         the talc studies.  If she wants to testify to that,

Page 11

1    she can.  What she can't do is come in and present

2    a risk chart to the jury that says this woman has

3    an elevated risk of ovarian cancer because of this

4    gene when there is literally no science whatsoever

5    that establishes that.

6        And I'll leave you with this:  She relies on a

7    paper, a number of papers that talk about this

8    issue.  And those papers, at the end of their

9    conclusions, explicitly state we, the authors of

10   this paper, cannot use this -- and they are not

11   about this mutation, about a lot of mutations -- to

12   establish, nor have we tried to establish the risk

13   relationship between ovarian cancer and this group

14   of genes.  We haven't done that because we don't

15   have enough information.  We need more information.

16   We are saying this should be studied more.

17       And Dr. Permuth, when she was questioned at

18   her deposition, she agreed with that.  If we

19   said -- for example, if I wanted to cross her and

20   say, "What is the risk?"  She would say, "I don't

21   know."  And you rely on this paper, and in this

22   paper, the authors who wrote this paper you rely on

23   say they don't know because they didn't have enough

24   information.

25       So that's where we are on that.  It's very

Page 12

1    narrow.  She shouldn't be able to say there's a

2    risk when there's no risk.  That's just not true.

3        THE COURT:  But does anybody say there's no

4    risk?

5        MR. OLIVER:  Yes.  Actually, so this is

6    interesting.  We questioned defendant's own other

7    experts, and Dr. Felix, who is a pathologist, he

8    was questioned about it.  He reviewed the patient's

9    risk factors and said I'm not aware of a genetic

10   risk at this time with this patient.  He had the

11   records.

12       There is another one of defendant's doctors, I

13   can't remember if it's Osann or Saenz, who said the

14   same thing, that this is unknown.  And this is --

15       THE COURT:  Can you help me understand, when

16   you say it's unknown, what I'm trying to understand

17   is that I thought the whole purpose of all of this

18   is that when you isolate this gene, this gene is

19   there, that -- I was going to use correlation, but

20   I don't want to do that.  There is no correlation.

21       MR. OLIVER:  I can explain.

22       THE COURT:  Having this gene alone, does it

23   put you at a higher risk?

24       MR. OLIVER:  No.  No.  Actually, this is a

25   great question.  So BRCA 1 and BRCA 2, which your

Page 13

1      Honor may be familiar with, do raise a woman's risk

2      for ovarian cancer and breast cancer dramatically.

3      And those genes were tested for and Marilyn Seskin

4      was negative for those genes.

5           BRCA 1 and BRCA 2 are related to and part of

6      the FANCC family, which Dr. Seskin had, but within

7      the FANCC family, for women of Ashkenazi Jewish

8      heritage, you have to go down and actually identify

9      the specific deleterious mutation, right?  So if

10     you have BRCA 1 and 2, she could absolutely testify

11     to that.

12          She got the testing, and the medical record

13     says, yeah, you got the testing and you have this

14     mutation.  That mutation simply means this is a

15     mutation in your gene sequencing that causes some

16     things that interfere with cell regeneration.

17     That's the best I can do as a nondoctor, right.

18          We don't know what that means.  We don't know

19     if it leads to cancer.  We know in BRCA 1 and 2, it

20     does, but this isn't BRCA 1 and 2.

21          THE COURT:  And there's been no additional

22     studies to actually say conclusively it --

23          MR. OLIVER:  That's right, absolutely.  And I

24     want to read from her treating physician.  Her

25     treating physician, her surgeon, defendant cited

Page 14

1           his testimony in their motion, he said there was

2           further study.

3                Well, when I asked him this question, I said,

4           "To your knowledge sitting here today, is there any

5           research establishing that there is an association

6           between FANCC, the family, and ovarian cancer?"

7                "I'm not aware of any.  I know that it's being

8           studied."

9                "So sitting here today, you don't know of any

10          article or study establishing a causal connection

11          between FANCC and ovarian cancer, do you?"

12               "I do not."

13               So I want to leave you with this, Your Honor.

14          You asked, well, isn't this a cross-examination

15          question.  You know, defendants could ask my doctor

16          on cross-examination.  They could use this genetic

17          testing and say she had this gene mutation.  Of

18          course, my expert is going to say she did, I'm

19          aware of it, it doesn't cause a rise in ovarian

20          cancer.

21               I'm not saying they can't use her medical

22          records.  I'm saying if they are going to use an

23          expert and offer expert testimony, that expert has

24          to have a solid basis in methodology for her

25          opinion, and in the case of Dr. Permuth, she simply

 1      doesn't.

 2           THE COURT:  So I don't understand.  Are you

 3      saying that you have no objection to them

 4      testifying that she has this unique mutation?  But

 5      the problem is that you're saying that they can't

 6      explain that --

 7           MR. OLIVER:  I mean, it's a fact that she has

 8      the mutation, but --

 9           THE COURT:  Without explaining what it means,

10      it doesn't have any --

11           MR. OLIVER:  That's right.  And under Daubert,

12      their burden.  They wanted to cross my expert and

13      say she had a gene mutation, and he says she sure

14      did, you know what Dr. Chan is going to say?  He's

15      going to say there is no risk associated with that,

16      that we know of.

17           THE COURT:  There is no known.

18           MR. OLIVER:  And what he'll say,

19      interestingly, you know, he counsels people to get

20      protective surgeries, take oophorectomies and that

21      kind of thing if they have BRCA 1 and 2.  He is

22      going to say there is no guidance for me to do

23      that.  I can't tell a woman -- if a woman has BRCA

24      1 and 2, I can recommend protective surgeries,

25      which is a huge deal, right.

Page 16

1          If she has this gene mutation, I can't do that
2      because we don't have an established --
3          THE COURT:  All right.  Who is responding to
4      this one?
5          MS. SCOTT:  I am, Your Honor.  If you don't
6      mind, Your Honor, I've prepared a couple slides
7      just to walk us through.  It might be because I'm
8      an English major, it's easy for me to have pictures
9      to go with the science.  I'll hand this to Your
10     Honor and I have a copy for Mr. Oliver as well.
11         MR. OLIVER:  Thank you.
12         THE COURT:  All right.  Nobody is questioning
13     her qualifications.
14         MS. SCOTT:  Yes, no one is questioning her
15     qualifications, and we are going to go a little bit
16     out of order, Your Honor, if you don't mind.  I
17     just want to take a step back and do some table
18     setting on what the standard actually is here.
19         So if we turn to slide eight where we talk
20     about our standard, our burden -- non-burden,
21     actually, as a defendant in this case.  We don't
22     have the burden to conclusively prove that anything
23     was the cause of Ms. Seskin's cancer.
24         What we are allowed to do under Florida law is
25     to provide an alternative cause, a possible cause.

Page 17

1    To say that we have to show some sort of conclusive

2    connection between this genetic mutation and her

3    ovarian cancer impermissibly shifts the burden to

4    the defendants.  And as the Third DCA in the Union

5    Carbide Corp. case that I've cited here on the

6    slide shows, that's reversible error.  And so if

7    you think about what the standard is under

8    Daubert --

9        Yes, Your Honor.

10        THE COURT:  I'm crunching up my face because

11    it's almost like you're saying there is one Daubert

12    standard for the plaintiff and a different Daubert

13    standard for the defense.  There still has to be a

14    scientific basis for the opinion.  You just can't

15    go and find somebody and say, you have that gene,

16    and this is what that gene generally or what we

17    believe that gene does, and because without any

18    research, without anything, say that's possible;

19    therefore, ladies and gentlemen, you'll find

20    against the plaintiff, find that they didn't meet

21    their burden because they didn't prove -- remember

22    their standard -- within a reasonable degree of

23    medical probability that this injury occurred as a

24    result of this, all because we are saying there is

25    all these other things that are possible, but are

Page 18

1       you saying these other things are possible within a

2       degree of medical certainty?

3            And if you can't say it within -- if you have

4       somebody saying all these things are possible

5       within a reasonable degree of medical certainty, I

6       agree, but you just can't make it up.

7            MS. SCOTT:  And that's not what we are doing

8       here, Your Honor.  The Daubert standard applies to

9       both sides equally, right?  So they need to be

10      qualified.  Undisputed.

11           The only issue is:  Is it helpful to the trier

12      of fact?  That's undisputed.  What is at issue here

13      is her methodology, and she did have a methodology

14      and it was a reliable one.  If we point to --

15           THE COURT:  No, the only issue here is whether

16      or not her opinion is supported by the scientific

17      community, and what I'm hearing is that everybody

18      is saying that this all needs to continue to be

19      tested.  Nobody -- the scientific community is not

20      saying conclusively -- this is what they're

21      arguing -- they are not saying that you can

22      correlate this mutation to a higher risk of cancer.

23           And if you have somebody that says, oh, yes,

24      you can, you can correlate the mutation to a higher

25      risk of cancer, then this is easy.  Then I'll deny

Page 19

1          the Daubert motion, I'll let your expert testify

2          because they don't challenge your expert's

3          qualifications.

4               But they are saying to me -- and I think your

5          paper suggests it as well -- that your witness is

6          not coming in and saying there is a direct

7          correlation.  Your witness is coming in and saying,

8          well, these things are possible.

9               MS. SCOTT:  She is saying more than it's

10         possible, Your Honor.  She is saying it's

11         biologically plausible, which is a term of art in

12         the science.  She is also saying that it is

13         biological plausible that it can contribute to

14         her --

15              THE COURT:  Here is the only question I asked

16         you:  Can she say that that this mutation

17         correlates to cancer within a reasonable degree of

18         scientific probability?  Because if she can't, if

19         you're telling me that she can come in and say

20         maybe, possibly, probably, and you're telling me

21         Judge Thomas, that's enough, then I'm going to

22         commit reversible error.

23              If you're right, it's going to be reversible

24         error and they are leading me into it so they can't

25         complain later because there is no way I'm allowing

Page 20

1      you to introduce evidence that simply says maybe,

2      possibly, plausibly, unless you can say at the end

3      of it, to a reasonable degree of medical certainty.

4           MS. SCOTT:  And I think that's ultimately

5      where we get at, Your Honor, because not only is

6      Ms. Permuth basing her opinion on her 20 years of

7      experience in genetic counseling and studying

8      epidemiological studies, there is peer reviewed

9      literature that does support this connection.  In

10     fact, we cite excerpts from that literature in our

11     brief.

12          THE COURT:  Cite one peer reviewed literature

13     that says there is a correlation between the

14     mutation and cancer.

15          MS. SCOTT:  We have cited in our brief the

16     Kobayashi paper, which says that there are

17     mutations of Fanconi Anemia genes, which describe

18     the FANCC mutation that Dr. Seskin undeniably had,

19     that have been demonstrated to cause breast cancer

20     and ovarian cancer susceptibility in cases

21     from non-BRCA 1 and BRCA 2 families.

22          And I do also think it's important to take a

23     step back and talk a little bit about the science

24     because I think it's been glossed over a little

25     bit.  As I mentioned, as an English major, it's not

Page 21

1              my favorite part of the discussion, but if we go to

2              slide four, Your Honor, we talk about what FANCC

3              is.  I wanted to pause briefly on that, what the

4              mutation is that she has.

5                   It's called FANCC.  It's one of 22 genes that

6              make up the Fanconi anemia family or class of

7              genes.  And these genes, when functioning properly,

8              they repair double breaks in our DNA that generally

9              occur during the DNA replication process.  And so

10             when functioning properly, these genes repair those

11             double-strained DNA.

12                  When they're not functioning properly, they

13             don't.  And so these Fanconi Anemia genes, like

14             BRCA 1, BRCA 2, there's five -- there's 11 Fanconi

15             anemia genes there are cancer susceptibility genes.

16             There are five that are known to cause ovarian

17             cancer and breast cancer.  As Your Honor is aware,

18             BRCA 1 and BRCA 2 are two of those breast cancer

19             susceptibility genes.

20                  FANCC has the same pathway.  It functions the

21             same way as BRCA 1 and BRCA 2.  The only difference

22             is the way that it's inherited.  So BRCA 1 BRCA 2

23             are inherited -- I'm taking you back to

24             eighth grade biology class -- BRCA 1 and BRCA 2 are

25             dominant genes, so if both your parents have it --

Page 22

1    excuse me, if one parent has it, then you can get

2    it.

3         FANCC, which is Dr. Seskin has, is very rare.

4    It's recessive.  So both of your parents have to

5    have the recessive gene in order for you to get

6    that mutation.  So what the science is starting to

7    establish -- because now BRCA 1 and BRCA 2 have

8    been studied for 30 some-odd years we are just now

9    at the point we have that conclusive connection.

10   FANCC is starting to be studied more.

11        It's not studied as much because FANCC

12   happens -- because it's recessive, it doesn't

13   happen as often as BRCA 1 BRCA 2, but people are

14   starting to study it.  Dr. Permuth has studied

15   those studies that are looking at that connection

16   and people are starting to see that yes, there is a

17   connection between FANCC and ovarian cancer.

18        THE COURT:  Who?

19        MS. SCOTT:  Dr. Kobayashi.  There are several

20   other --

21        THE COURT:  And I want to know their language.

22   Are they saying things like "there appears to be,"

23   "there is a good chance," like what is the

24   language?  Because counsel is representing -- and I

25   didn't look at the studies, I'm being very candid

Page 23

1      with you, but counsel is saying that at the end of

2      the studies, they are making it clear that more

3      studies need to occur.  The science has not

4      basically come to a conclusion in this regard, so

5      that's why I keep asking.

6          I will never be able to counter your experts'

7      expertise in the medical profession.  And your

8      expert, like you, can sound so artful when you say

9      it, okay, that's why in my little brain, okay, what

10     I say is I default to what I know:  Have they

11     satisfied the standard?  Is this something a proven

12     tested methodology?

13         And if it's not, if it's still experimental,

14     if it's still something that is unresolved, then it

15     doesn't satisfy Daubert.  I don't care how talented

16     and the qualifications of the person offering it.

17     Daubert requires it to be tested and proven, and

18     that's why I objected to this whole idea of

19     possibilities and plausibility.

20         Because if this was Frye, we would have a

21     whole 'nother conversation, I was saying this the

22     other day with the expert from Publix.  What?  And

23     because I didn't get it.  And that's why I said

24     bring the witness here, let me ask some questions

25     because maybe that will help me understand it.

Page 24

1          I say the same thing here.  But you all don't

2     seem to be in disagreement of your witness'

3     qualifications, you seem to be in disagreement as

4     to where the science currently is.  They are saying

5     the science is unresolved and there has been

6     absolutely no studies that you can point to that

7     creates a correlation between the mutation and

8     cancer, higher risk of cancer.

9          You seem to be saying, well, people have

10    looked at this and they are saying that, well,

11    there may be.  It's possible.  That's what I'm

12    hearing you say.  And if that's the best you can

13    say, the motion to exclude your expert in this

14    limited area will be granted.

15         MS. SCOTT:  There is the West Valen paper

16    which does say that there is a strong correlation

17    between FANCC and ovarian cancer and breast cancer.

18         THE COURT:  And has that been peer reviewed?

19         MS. SCOTT:  It has been peer reviewed.  It's

20    one of the papers that one of our other experts,

21    Dr. Boyd, who also on this issue has reviewed.

22         THE COURT:  Okay.  What else?  Go ahead.

23         MS. SCOTT:  And so when I started out with the

24    standard, I meant on the standard of their claims

25    because that's the way that the Court is looking at

Page 25

1    our right to defend our position, is to be able to

2    put in alternative cause evidence.  And that's all

3    that Dr. Permuth and Dr. Boyd -- who plaintiffs

4    have also sought to exclude on this very issue --

5    are trying to do, is to provide an alternative

6    cause.

7         If plaintiffs get to go up there and say that

8    talc definitively caused Ms. Seskin's cancer, then

9    we are afforded the opportunity to put our experts

10   on and to say, actually, here is another cause,

11   FANCC or her endometriosis or whatever else the

12   case may be.

13        THE COURT:  By the way, I don't disagree with

14   that statement.

15        MS. SCOTT:  Right.  And so under Daubert, we

16   are looking at reliable methodology.  And

17   Dr. Permuth has employed a reliable methodology.

18   She has a wealth of experience, unchallenged.  She

19   has reviewed peer reviewed literature.  She has

20   reviewed Dr. Seskin's medical records, and that,

21   under Florida case law, is reliable.

22        And so as Your Honor asked plaintiffs, the

23   issue here is whatever -- the complaints really

24   here go to the weight of her testimony, not the

25   admissibility.  So to the extent they have issues

Page 26

1      with the correctness of her science, they can

2      cross-examine her on.  That's what Daubert

3      instructs, vigorous cross-examination, not

4      exclusion.

5           And one final point, Your Honor.  Dr. Permuth

6      herself, I think I heard Mr. Oliver mention that

7      Dr. Permuth admitted there was no connection

8      between FANCC and ovarian cancer in the literature,

9      and that's just not true.  She actually testified

10     in her deposition that FANCC mutation has been

11     associated with ovarian cancer, and that based on

12     the scientific literature we are seeing, that FANCC

13     mutations, particularly the one that Dr. Seskin

14     had, are associated with ovarian cancer.

15          THE COURT:  All right.  Can I ask the

16     plaintiff:  I'm looking at this case, R.J. Reynolds

17     Tobacco versus Mack, and the case says, "By

18     excluding appellant's alternate causation evidence

19     on the basis that its expert could not testify to a

20     reasonable degree of medical probability, the trial

21     court improperly shifted the burden of proof as to

22     causation to appellant."

23          And they went on to say that all the defense

24     was trying to do was not prove -- was not to prove,

25     but basically instead they were attempting to

Page 27

1          diminish your argument that it was caused by their

2          product.

3                    MR. OLIVER:   Judge, it's a great question.   I

4          litigate a lot of tobacco cases I had this come up

5          in one of my tobacco cases and I'll give you the

6          paradigm that happened in our case because it was

7          very important.

8                    This same argument -- Mack, by the way, I

9          think was right at the time that Florida had

10         adopted Daubert.   The standard that Mack is talking

11         about does not, per Your Honor's comments earlier,

12         modify the preponderance of the evidence standard

13         the defendants bear to support their expert.

14                   In the case I was working on, our expert, in a

15         tobacco case, admitted alcohol consumption can

16         decrease your ability to quit.   He admitted that,

17         right?   And the judge excluded evidence that our

18         client had an alcohol problem and was consuming

19         alcohol because they didn't have an expert who said

20         I think this contributed to his inability to quit.

21         And the case was ultimately reversed.

22                   The difference there is that when our expert

23         admitted that there was this connection, it was an

24         established fact that drinking alcohol reduces your

25         ability to quit smoking within the medical

Page 28

1    community.  What we have here -- so that holding,

2    as Your Honor, I think, recognized earlier, it

3    doesn't modify the Daubert standard.  The Daubert

4    standard, which they bear the preponderance of the

5    evidence showing they have reliable methodology,

6    requires them to come forward with something.  They

7    can't just make something up and say there is a

8    risk or there is a connection when there's not.

9        We go to Kobayashi.  I read the Kobayashi

10   article.  There's a lot of stuff in these articles

11   that I don't understand, but Marilyn Seskin's gene

12   mutation is not in that article.  This is her gene

13   mutation.  This is what Jennifer Permuth says she

14   has, and that is not in Kobayashi.

15       And Kobayashi doesn't connect this gene

16   mutation to an increased risk of ovarian cancer.

17   And Kobayashi doesn't quantify that increased risk

18   of ovarian cancer.

19       Alinozi is another one of the articles that

20   she relied on another one where the authors were

21   perfectly clear that we have identified two

22   instances in a gene database, only two people who

23   had this mutation and had ovarian cancer.  And they

24   said if you want to figure out if this is a risk

25   factor, you've got to have a lot of people.  I

Page 29

1    don't know this for a fact, but I understand based

2    on reading the genetic studies establishing risk

3    have to have a lot of people in them.

4         THE COURT:  Well, counsel acknowledges it's

5    not as studied as others.

6         MR. OLIVER:  Right, but it's not -- there is

7    no study establishing a risk factor.  Imagine if

8    the shoe was on the other foot.  We have, I

9    believe, 38 out of 40 epidemiological studies

10   showing the connection between talcum powder use

11   and ovarian cancer.  That's plenty, right?  Under

12   Daubert.

13        But what if my client came in and said, well,

14   people have theorized that this happened, and you

15   said, Mr. Sugarman, how many studies have shown an

16   increased risk?  And he said, well, none.  Well,

17   that's where they are.  None have shown that.

18        Now, where it gets confusing, Judge, is this

19   thing about FANCC.  FANCC is a family of genes.  It

20   causes another type of cancer that's not ovarian,

21   it's not breast.  It's called Fanconi anemia, I

22   believe.

23        The thing is, Dr. Marilyn Seskin didn't have

24   Fanconi anemia.  She has that gene family because

25   she is of Ashkenazi Jewish heritage, but that alone

Page 30

1      is like the first step.

2              THE COURT:  I get it.

3              Anything else, ma'am?

4          MS. SCOTT:  I think it's worth mentioning,

5      Your Honor, only because Mr. Oliver mentioned it as

6      well about his own expert, his own expert actually

7      testified that he is not absolutely certain that

8      FANCC genes could not contribute to ovarian cancer,

9      and also, coauthored a peer reviewed paper that

10     said that it's plausible that damaging mutations

11     and other genes in that same BRCA family, or same

12     FA family, could confer a risk of ovarian cancer.

13             THE COURT:  Do you anticipate he is going to

14     say that on the witness stand?

15         MS. SCOTT:  Well, it would be nice.

16             THE COURT:  The Court, having heard from all

17     parties, fully considered the arguments of all

18     counsel, the motion to limit the testimony of

19     Dr. Jennifer Permuth is granted.  The Court is

20     finding that there is insufficient evidence

21     presented there is a causal connection between the

22     mutation and increased likelihood of getting

23     cancer.

24             What else?  Defense motion next.

25         MS. SCOTT:  We'll go with Dr. Freidenfelds.

Page 31

1          So, Your Honor, the J&J defendants have brought a

2     motion to exclude Dr. Lara Freidenfelds.

3               MR. OLIVER:  It's Freidenfelds.

4               MS. SCOTT:  Freidenfelds.

5               MR. OLIVER:  I pronounce everything wrong.

6               MS. SCOTT:  Freidenfelds.

7               Plaintiff intends Dr. Freidenfelds, who is a

8     historian who has devoted her career to studying

9     menstruation and reproduction, including pregnancy,

10     to come in and opine on the J&J defendants'

11     corporate practices and their state of mind.  And

12     to do this, plaintiffs want to put Dr. Freidenfelds

13     on the stand potentially for days to methodically

14     slog through --

15               THE COURT:  Potentially for days?

16               MS. SCOTT:  I mean, to slog through a bunch of

17     internal documents to add this historical context

18     to reams of documents.  But Dr. Freidenfelds is

19     unqualified to do any of this, Your Honor.

20               She is not a mind reader, so she can't tell

21     the jury what the J&J defendants think or knew or

22     understood about anything.  She doesn't have any

23     expertise in anything related to this case.

24               THE COURT:  Give me examples of how she is

25     going to read the minds of J&J.

Page 32

1          MS. SCOTT:  She is going to come in, Your

2     Honor, and say that J&J acted -- to read documents

3     and talk about J&J's marketing, and they marketed

4     to women and they marketed saying it was safe and

5     effective.  She is going to offer all those sorts

6     of opinions that aim to get in the corporate

7     practices and corporate mind of the J&J defendants,

8     but she doesn't have any expertise in J&J, none in

9     talc, none in cancer, none in any topic that is

10    relevant to this case.  Again, she is an expert in

11    menstruation and reproduction.

12         THE COURT:  You list here that she is a

13    historian of health, reproduction, and parenting in

14    America.

15         MS. SCOTT:  That's from her website.  That's

16    how she markets herself.  Her expertise, she's

17    written books on menstruation and reproduction.

18         THE COURT:  Has she done any work on the

19    history of health and history of reproduction and

20    the history of parenting in America?

21         MR. OLIVER:  Yes.

22         MS. SCOTT:  Broadly, Your Honor, but broadly

23    being a historian does not qualify you to come in

24    here and tell the jury about J&J's corporate mind,

25    their corporate practices, their advertisements,

Page 33

1    how those advertisements might have affected women

2    who may or may not have seen them, especially when

3    she didn't speak to any women who may or may not

4    have seen those ads.

5        THE COURT:  I know, but if I was to grant

6    this, wouldn't this be the same -- I think about

7    the tobacco cases because that's the only thing I

8    have to draw my experience on when I look at this.

9    But in the tobacco cases, you know, they hire these

10   experts that do stay on the witness stand for about

11   two, two and-a-half days, and they go through the

12   history of advertising with cigarettes, you know.

13       They talk about how they started.  They even

14   go as far as to talk about when they started

15   transitioning to this idea of light, when they

16   started advertising to children, where they placed

17   their advertisements.

18       And the experts normally testify that how that

19   increased the number of individuals who started

20   smoking.  And that person is just a historian.

21   That person is not necessarily somebody who is in

22   the mind of R.J. Reynolds, okay?

23       Now even though in that case, they do have

24   senate testimony and things like that, and they

25   have the words of the executives -- I don't know if

Page 34

1    that's in this case -- but you would basically be

2    saying that somebody who is a historian is not

3    qualified to come in and basically outline how your

4    client advertised and what the effect of that

5    advertisement was on people using your product.

6        MS. SCOTT:  Your Honor, we are not wholesale

7    saying that historians can't testify.  As you have

8    observed, there have been historians in tobacco

9    cases, but those historians were actually qualified

10   to talk about that history.

11       We don't have that here.  And don't take my

12   word for I it, take Dr. Freidenfelds' word about

13   it.  We asked her about all of this in her

14   deposition.  We asked:  Do you have expertise in

15   marketing or advertisement, FDA cosmetic

16   regulations, talc or talc mining, Johnson &

17   Johnson, epidemiology, any of these things.

18       I mean, basically what Dr. Freidenfelds is

19   going to -- she is completely unqualified, and just

20   because she is a historian does not mean that she

21   is an expert in the particular history that is

22   relevant here.

23       THE COURT:  Well, let's make sure we're clear:

24   Not just a historian, she is a historian of health,

25   reproduction, and parenting in America.  I don't

Page 35

1    know what "parenting in America" means.

2         MS. SCOTT:  But she is not an expert in

3    marketing.  She is not an expert in Johnson &

4    Johnson.  She is not an expert in ovarian cancer.

5    She knows menstruation and pregnancy and generally

6    health, and that's too broad.  That's too general.

7    Just being a historian does not qualify you -- a

8    historian of science -- does not qualify you to

9    come in here and tell the jury everything from

10   astrophysics to zoology no more than us having

11   juris doctorates qualifies us to come and tell a

12   jury everything from antitrust to zoning law.

13        She is unqualified.  And so what she is going

14   to do, as I mentioned -- if you flip the page to

15   slide four -- she is going to come in here and put

16   a historical gloss on unambiguous documents, even

17   though history is irrelevant.

18        For instance, she wants to tell the jury about

19   how World War I era Johnson & Johnson ads show that

20   J&J persistently marketed their products as pure

21   and safe.  She wants to come and talk about Johnson

22   & Johnson's corporate practices and she wants to

23   tell the jury what's in the minds of --

24        THE COURT:  Didn't you just agree that you

25   market the product as pure and safe?  Are you going

Page 36

1    to say you didn't market your product as pure and

2    safe?

3         MS. SCOTT:  We marketed our product as pure

4    and safe, Your Honor, but we don't need a historian

5    to come in and say -- to talk about ads that say

6    pure and safe to say that we marketed our ads as

7    pure and safe.  It's unnecessary.

8         THE COURT:  Well, what is she saying about

9    your product that you disagree with?

10        MS. SCOTT:  It's not just about our product,

11   Your Honor.  She is going to come in here and try

12   to tell the jury -- she is going to read documents

13   and she is going to tell the injury what we thought

14   in the documents.

15        It's in her deposition transcript, which we

16   put here on slide four.  She was asked, "Do you

17   intend to testify about what any Johnson & Johnson

18   person was thinking over the course of the '60s,

19   '70s and '80s beyond about talcum powder use and

20   ovarian cancer risk?"  The relevant things in this

21   case.

22        She said, "I would testify as to what they are

23   thinking if they wrote it in a document."

24        So by her own words, she is going to come in

25   here, she is going to read documents, and she is

Page 37

1          going to tell the jury what to think about them,

2          what inferences to draw, and that is impermissible

3          and improper expert testimony.

4               THE COURT:  Let me say this:  Are you

5          objecting to these documents coming into evidence?

6          Are any documents that they seek to admit through

7          this witness in terms of documents of statements by

8          Johnson & Johnson, do you object to them on

9          authenticity or any other basis?

10               MS. SCOTT:  I'm not sure what documents --

11          particularly what documents she is going to speak

12          about until she gets up, if permitted, to get up on

13          the stand.

14               THE COURT:  But you have their exhibit list,

15          right?

16               MS. SCOTT:  We do have their exhibit list.

17               THE COURT:  Let me ask it another way:  We

18          don't have to limit it to this doctor.  Are there

19          any documents that they attribute to Johnson &

20          Johnson that you have objected to coming into

21          evidence?

22               MS. SCOTT:  I'm sure there are.  I can't give

23          you any specifics at this time.

24               THE COURT:  Well, the reason I'm asking you

25          that question is because I intend to -- and I

Page 38

1      haven't heard from counsel yet, but I tend to agree

2      with you.  I'm trying to understand that if the

3      document comes into evidence and the document says

4      what the document says, I don't understand why any

5      witness should then be able to say, oh, when

6      Johnson & Johnson says this, this is what Johnson &

7      Johnson means.  That, to me, is problematic.

8           However, I don't see a problem with someone

9      saying Johnson & Johnson is advertising this, and

10     then saying based upon that advertisement, that

11     appeals to women who have just given birth, okay?

12     I don't have a problem with that because, again, I

13     think that's a fair correlation.

14          That's not saying what Johnson & Johnson

15     thinks or thought.  It's just simply saying, well,

16     Johnson & Johnson did this advertisement, and women

17     basically started -- more women started using their

18     products or trusted their products.  I don't have a

19     problem with that.

20          But I do have a problem if they are going to

21     come in and start, as you've indicated, basically

22     trying to get into the mind of Johnson & Johnson

23     about what they were thinking and what they were

24     doing.

25          MS. SCOTT:  Yes, Your Honor, and to the

Page 39

1       hypothetical that you posed, reproduction is not

2       even an issue here.  Dr. Seskin never had children.

3       This case is about talc and primary peritoneal

4       cancer.

5           And so she is going to go beyond just looking

6       at advertisements.  She is also going to say things

7       like Johnson & Johnson was aware of research

8       demonstrating health hazards.  She is going to

9       say -- try to tell the jury that J&J suppressed

10      research.

11          THE COURT:  But is that based upon things that

12      are contained -- like is there a basis for her

13      saying that, not her just concluding that, is there

14      something in the record, for example -- and I'm

15      making this up -- is there a memo that you all

16      turned in discovery that says, "We are aware, okay,

17      of the cancer risk of our talc, but we are making

18      lots of money, so let's just keep selling it"?

19          MS. SCOTT:  Absolutely not.

20          THE COURT:  Now, if that was in there, her

21      testifying that Johnson & Johnson was aware of the

22      risk, well, I don't know what the problem is, and

23      evidence that Johnson & Johnson was aware of the

24      risk is because I have this memo, and this is what

25      the memo says.  It's not saying what Johnson &

Page 40

1    Johnson thought, it's just basically saying Johnson

2    & Johnson says this.

3         And that's what experts do.  Experts rely upon

4    opinion, they rely upon hearsay, in order to

5    ultimately come to a conclusion.

6         MS. SCOTT:  Your Honor, she is not qualified

7    to do that.  It's wrong because that's the invading

8    the jury's function to look at the documents

9    themselves and draw their own inferences and their

10   own conclusions, and to have a purported expert get

11   up on the stand with the imprimatur of an expert,

12   with the imprimatur of a historian come in who is

13   unqualified, give irrelevant opinions that are

14   unhelpful to the trier of fact is improper under

15   the Daubert standard.

16        And so she did not -- she also didn't have a

17   reliable method.  She basically cherry-picked

18   documents, and that's on five where we talk about

19   the poisonous fruit from a poisonous tree.  She

20   cherry-picked documents from the plaintiffs, she

21   follows the trail of those documents and only finds

22   documents that confirm her unreliable opinions.

23        THE COURT:  But is she taking the documents

24   out of context?

25        MS. SCOTT:  Yes, Your Honor.

Page 41

```
 1            THE COURT:  So you mean, like, for example, is

 2       she referring to let's say there is a document that

 3       has 20 pages and the document speaks to an issue,

 4       she is only taking the bad things out of the

 5       document and not making any reference to anything

 6       within that same document that contextually

 7       basically explains why that, quote, unquote, bad

 8       thing was said or done?

 9            MS. SCOTT:  That's what we anticipate, Your

10       Honor, and we anticipate they are going to get

11       out -- the plaintiffs are going to dump Johnson &

12       Johnson documents in through an expert, she is

13       going to give an expert spin with, again, the

14       imprimatur or the endorsement of being an expert,

15       and that's highly prejudicial and it's improper

16       under Daubert.

17            If she is allowed to testify, which we don't

18       think that she should be because she's unqualified,

19       unreliable, it's unhelpful, then we are going to

20       have to spend days going back and putting those

21       same documents in context or showing her other

22       documents that do put those in context.  And while

23       we haven't seen that with Dr. Freidenfelds because

24       to my understanding and knowledge, there has never

25       been a historian in any of these talc cases.
```

Page 42

1          We have seen that with other experts, like

2     Dr. Plunkett, who we'll talk about later today, who

3     get up on the stand for days, plaintiffs' attorneys

4     use her to dump those documents in, she provides

5     her expert gloss, and then we have to spend days

6     afterwards putting everything into context.  All of

7     this can be avoided and it should be avoided

8     because she's unqualified, doesn't have a reliable

9     method, and it's unhelpful to the trier of fact.

10          THE COURT:  All right.  Let me hear, what do

11    you want to do?

12          MR. OLIVER:  Your Honor, let me tell you, it

13    sounds to me like what the defendants want to do is

14    avoid having to cross-examine the witness, which I

15    understand the trial would be quicker if they

16    didn't have to cross-examine Dr. Freidenfelds.

17          First of all, let me be clear, I don't plan on

18    putting her up for days.  She actually has multiple

19    sclerosis.  It puts her stamina down a little bit,

20    so I'm cognizant of that, and we are not going to

21    have her up for days.

22          Let me just go back to the beginning.  We

23    started with Ms. Scott talking about marketing, all

24    right?  And what she didn't tell you is that this

25    book, The Modern Period, had a significant portion

Page 43

1      of it that related to the marketing and use of

2      tampons by women, and what women and consumers of

3      tampons expected out of that product.

4           She teaches marketing courses at Marymount

5      University.  She lectures on -- and I had written

6      this down.  She lectures on how advertising relates

7      to the ways that people seek health care -- in

8      particular women -- to how they think about their

9      bodies and how they care for their bodies.  She

10     looks critically at how businesses work.

11          That's what she's done in her books, that's

12     what she's done in her research.  When she was a

13     graduate student, she worked on the research for

14     The Cigarette Century, the guy who wrote that book.

15     She was his understudy for that book.

16          So when defendants say she doesn't have

17     expertise, the first point is you have to take that

18     with a grain of salt because they are just ignoring

19     it and acting like it doesn't happen.  She has it,

20     we've put it in, they are not talking about it.

21     That's really point one.

22          Point two is:  What is Dr. Freidenfelds going

23     to do?  When she said I'm only -- in terms of

24     reading minds or intent, I'm only going to say what

25     the defendants' document says, if you read all the

Page 44

1     testimony, what she says is, look, I'm not going to

2     stand up and say that Dr. Gavin Hildick-Smith, who

3     wrote a memo that said our minds have asbestos in

4     them, and you know what, if you look hard enough,

5     you can find it in our baby powder too.  That's in

6     a memo -- roughly, I'm paraphrasing -- from 1971 or

7     1972.

8          She is not going to say to the jury, and I'm

9     not going to ask her to say:  Did Dr. Hildick-Smith

10    and Mr. Lead, did they intend to defraud people?

11    She is not going to answer that question.  She is

12    going to say:  I can't get into their minds.  What

13    I can tell you is I reviewed a historical record of

14    documents and it was sufficient for me to reach

15    opinions about what knowledge the company had, what

16    statements they made consistently throughout a

17    certain period of time, and whether those

18    statements were contradicted by internal knowledge

19    they had, right?

20         She is not going to say what they intended to

21    do; she is going to talk about what they did and

22    put that in historical context.  So, for example,

23    how is she going to put it in historical context?

24    One question we would ask is:  Well, what was

25    happening in 1971?  I just showed you a memo,

Page 45

1    Dr. Freidenfelds.  Can you tell the jury what is

2    happening in 1971?

3         And she is going to say:  Well, in 1971,

4    asbestos had become a big subject, right?  Only in

5    the last ten years had people began to understand

6    that asbestos might cause cancer.  So there are

7    these scientists out there -- they didn't

8    necessarily work for J&J, they were all over the

9    place -- who were looking for asbestos.

10        So why is that important about this memo?

11   Well, J&J was following this science, right?  Their

12   memos showed that they knew this -- and some of the

13   memos say this is a cancer, you know, this is a

14   carcinogen, we know it causes cancer, it might

15   cause cancer, it's needlelike particles.

16        That's the kind of context she is going to

17   offer.  She is not going to just repeat what

18   documents say.  She is not going to say that any

19   particular person acted with fraudulent intent.

20   She is going to say that the defendants'

21   statements, based on her review of the historical

22   record, were false, right, and they were misleading

23   because they had knowledge that said that wasn't

24   true.

25        She is going to talk about actions they took

Page 46

1      based on the documents she reviewed.  So, for

2      example, to suppress the science and those kinds of

3      things.  There are a lot of memos that talk about

4      that too.  We are going to get together with our

5      buddies in trade associations and tamp down this

6      tamp down that, and yadda, yadda, yadda.

7          So that's what she is generally going to do.

8      It is not going to take multiple days for our

9      direct.  And the basis of everything she is doing,

10     when you set aside her expertise and study that

11     she's done, it's their documents.

12         And they ask her these silly questions at the

13     deposition.  Did you review all the documents?  And

14     she said, you know what, I have a set of documents,

15     some of those were gathered by the lawyers.  When

16     they retained me, they had to give me something to

17     see if I could do this.  I looked at that.

18         And we gave her access to Johnson & Johnson's

19     production database in a multi-district litigation

20     for these cases that has millions and millions of

21     documents.  And we didn't limit her.  We didn't

22     talk to her.

23         They asked her about her search terms that she

24     used to look at that record.  And I didn't know

25     what they were, right, and she said I went through

Page 47

1    all these documents, I reviewed thousands of

2    documents.  I would follow the trails.  I started

3    here and I did research.

4         I looked at primary sources, secondary

5    sources.  This is just the kind of research I would

6    do to write a book or an article.

7         So the last thing -- and I think Your Honor

8    has seen these types of witnesses in tobacco cases,

9    but a Ph.D. in the history of science, I cited a

10   motion because I thought it was important.  Ten

11   years ago, I had never heard of that, so I started

12   looking up -- I was like, well, where is a good

13   explanation of what these degrees are?

14        So you go to Harvard's website, where she

15   went.  You go to Princeton's website, she didn't go

16   there, but obviously, similar school.  History of

17   science is a multidisciplinary approach, and the

18   courses actually say you are going to study

19   geology, biology, chemistry, anthropology, which is

20   what her undergraduate was in, right?

21        You are going to study all of these and you

22   are going to learn to read, synthesize, deal with

23   epidemiology and talk about scientific subjects

24   from a historical perspective, which is exactly

25   what she's doing here.  And interestingly, she may

Page 48

1    be the most qualified witness to talk about this

2    because she personally has focused on women's

3    health issues, and this is a women's health issue.

4    She was aware that women used talcum powder --

5        THE COURT:  But what about the question that

6    counsel said, that her testimony is invading the

7    province of the jury?  That it's ultimately the

8    jury's decision to conclude -- it's one thing to

9    just put in facts, it's another thing to then tell

10   the jurors what you gleaned from those facts, and I

11   think that's part of what counsel is objecting to.

12       They are saying, well, isn't is that the

13   jury's conclusion?  You are using your marker or

14   designation as an expert to tell the jurors this is

15   what you need to think about this statement that

16   they made, as compared to allowing the jurors to

17   come to that conclusion on their own.

18       MR. OLIVER:  I mean, there are really two

19   answers to that.  First of all, as a legal matter,

20   I think it's 90.703, but it might be 90.702, the

21   Florida case law has been clear for years that

22   testimony should not be excluded because it goes to

23   the ultimate issue, so long as the expert is

24   qualified they can do that.

25       THE COURT:  But why is it helpful?  In other

Page 49

1     words, the testimony has to be helpful, and just
2     basically spoonfeeding the jurors -- meaning that
3     the jurors won't be able to synthesize it, the
4     jurors won't be able to understand it, and an
5     expert has to come in and basically synthesize it
6     in such a way that the jurors can basically go back
7     into that jury room and make practical use of the
8     information that came in.
9          MR. OLIVER:  And that's exactly what she's
10    doing.  In order to understand these documents, in
11    order to understand the context of these
12    documents -- I could go get 20,000 advertisements
13    from Johnson & Johnson and walk through them over a
14    three-week period with the jury and go through them
15    one by one, and they would get the idea, but we
16    would be here for three weeks for just the
17    advertising part.
18         Somebody like Dr. Freidenfelds, with the
19    advertising documents, with the scientific
20    documents can take examples, synthesize that
21    information for the jury, and give them the ability
22    that they need to understand sort of the
23    whole pastiche of what was going on without us
24    simply reading documents to them.  And, quite
25    frankly, even if we read documents to them, they

Page 50

1   don't have the understanding of scientific terms

2   that she has.

3       A great example of one of the things she'll

4   comment on -- we questioned her about this at her

5   deposition -- is disclosures on medical articles.

6   Johnson & Johnson would get people behind the

7   scenes, go write this article, and they would fund

8   the article.  And then when the article would come

9   out in a peer reviewed article, it didn't say

10  anything about Johnson & Johnson, it said Dr. Joe

11  Smith, no conflicts.

12      And Dr. Freidenfelds is going to testify I do

13  peer reviewed articles.  I understand ethical

14  conflicts.  It's one of the things I've done as a

15  historian all the time.

16      Should you be making disclosures if you're

17  getting $20,000?  Absolutely.  Why?  Well, it shows

18  bias in your study, and that has to be part of the

19  situation.

20      So that's the kind of thing I could show the

21  jurors the document, and without a witness to

22  explain why that matters, they are going to be

23  like -- you know, somebody who doesn't do peer

24  reviewed literature would say, well, what is the

25  big deal?  Dr. Freidenfelds is going to explain

Page 51

1      what the big deal is, right?  She is going to

2      explain what the big deal is with regard to these

3      memos that have all this information in it.

4          Like why is that a big deal?  Well, it's a big

5      deal because there was this research going on, it

6      was well known at this point that cancer was being

7      caused by this, and you know, average everyday

8      citizens, this wasn't something they were on to,

9      right?  And all these ads that we've looked at that

10     continued for 40 years, they all said it was pure

11     and safe, right?  And then she applies her

12     marketing expertise --

13         THE COURT:  Counsel said something I thought

14     was interesting.  Counsel said that there have

15     never been -- I don't know how many of these cases

16     have been tried, but previously, there had never

17     been a historical expert presented in any of those

18     cases, so why do we need a historical expert in

19     this case?

20         And by the way, that includes the case where

21     there was a $1.6 billion verdict against Johnson &

22     Johnson.

23         MR. OLIVER:  I don't think that's accurate.

24     There has been similar testimony to what

25     Dr. Freidenfelds has said, and Ms. Scott actually

Page 52

1     alluded to it.  Dr. Plunkett, who is going to be

2     here, is a toxicologist and she has offered similar

3     testimony to this.

4          There is a Dr. Steinberg -- he is not a

5     doctor.  I always want to call him a doctor.

6     Mr. Steinberg, who used to be in this case, but

7     he's gotten elderly and I don't think he does this

8     anymore.  But he was in the big verdict, and he had

9     some regulatory background and expertise and he

10    went through some of these documents and explained

11    what they meant and how they were in context.

12         So a lot of different witnesses have done

13    exactly this.  When they say there's never been a

14    historian, they just mean that a person with this

15    degree hasn't done it, and what we know from, I

16    think, Kumho Tire from the supreme court, and every

17    court that's followed it because they have to, is

18    that Daubert doesn't rely on that type of

19    schematism, right?

20         We don't require -- tobacco doesn't even make

21    the same argument.  We don't require somebody to

22    work for the cigarette company to talk about

23    cigarette design.

24         THE COURT:  I want to tell you, the first

25    tobacco case I tried, I had such a problem with the

Page 53

1          historical expert.  I remember -- and the

2          plaintiffs were freaking out because I said --

3                MR. OLIVER:  Do you remember who it was?

4                THE COURT:  I don't.

5                MR. OLIVER:  Was it Dr. Proctor?

6                THE COURT:  It's Proctor.

7                MR. OLIVER:  Okay.

8                THE COURT:  He was on the stand for two

9          and-a-half days, direct and cross-examination, but

10         before he even got up there, I remember saying to

11         the plaintiff, I'm not sitting here listening to

12         somebody tell me what a document says.  And I asked

13         them, and I said -- because obviously I did not try

14         the first tobacco case, many tobacco cases have

15         been tried.

16               And so I asked:  Appellate courts let him do

17         that?  And the reason why I asked that is because

18         it didn't make sense to me that you can just put

19         somebody up there under the auspices of being a

20         historian and we have to sit here and listen to

21         them tell us the history of advertising in tobacco

22         cases and then show documents about, okay, you

23         know, this advertisement, that advertisement.

24               And I just I had such a problem with it.  But

25         I acquiesced because the appellate courts of all

Page 54

1    the tobacco cases that have gone up, they have

2    never stricken the expert.  They have never said

3    that that is improper testimony.  And I'm inclined

4    to do the same thing in this case.

5        Ma'am?

6        MS. SCOTT:  I think, Your Honor, the salient

7    difference between the tobacco cases and the case

8    that we have here is that Ms. Freidenfelds is

9    fundamentally unqualified to offer any of the

10   opinions on any topic in this case.  She did not

11   teach a marketing class.  She teaches an abortion

12   class where I think she testified that they looked

13   at a marketing website.

14       THE COURT:  Counsel said that she actually did

15   marketing and she did research, so are you saying

16   that that representation is not accurate?

17       MS. SCOTT:  I'm saying that in her deposition,

18   she said that she was not an expert in marketing or

19   advertisement.  She has very little experience in

20   that.  She has no experience in talc or primary

21   peritoneal cancer or ovarian cancer or any of the

22   issues --

23       THE COURT:  Well, let's just be clear.  In the

24   tobacco context, what I remember of Dr. Proctor, he

25   just got turned onto this, and all of a sudden,

Page 55

1       started researching and collecting all these
2       documents.  Somebody delivered all of these
3       documents to him, and he just started going through
4       the documents and then he started putting it all
5       together and then he became the conduit to a lot of
6       these plaintiff cases.
7           But I remember his testimony, how it started
8       was there were all these documents, they were
9       actually going to get rid of them, okay?  They were
10      held for a period of time, and he says, I'll take
11      them.  And he just started going through all the
12      documents with his research people.  That's how he
13      got to the point where he was in his ability to
14      come and present.
15          It wasn't that he had -- he was an executive
16      for the tobacco companies.  It wasn't that he had
17      done marketing research on cigarette smoking or he
18      had worked in marketing.  It was -- I think -- he's
19      a doctor.  I don't know what he is a doctor of.
20          MR. OLIVER:  He is a doctor of Ph.D., history
21      of science.
22          THE COURT:  And that is what allowed him to
23      come in and do what he did.  I'm not sure that this
24      is any different.
25          MS. SCOTT:  Your Honor, if I may, I mean,

Page 56

1      that's not what Dr. Freidenfelds has done.  She has

2      not gone and exhausted all the documents and come

3      to any opinions.  She has gotten a stack of

4      documents from the plaintiffs' lawyer, she used

5      search terms based on that limited stack, and then

6      she went and confirmed whatever opinions that she

7      had --

8           THE COURT:  Ma'am, here is the problem with

9      that argument:  One is if she's foolish enough to

10     get on the witness stand and not consider a

11     document that is totally contrary to a position

12     that she's taken, and you then get up there and you

13     say, okay, you read this document?  I did.  Okay,

14     and you brought out this statement?  I did.  Go to

15     page 3.  Okay.

16          And on page 3, it says, "Although we make that

17     statement, we wholly disavow it because we believe

18     that the safety of our customers are the main

19     focus, and profit over someone's health will never

20     be the benchmark of our success," and you bring

21     that to her attention.  The jury gets to weigh

22     that.  And they get to weigh whether or not that

23     shows that you were aware of the harmful effects of

24     your product, or whether or not you even, being

25     aware, you decided to do what you do.

Page 57

1          I really do think this is one of those cases

2     where it has to go to weight rather than

3     admissibility.  Your motion to exclude is denied.

4          Plaintiff, what would you like to discuss?

5          MR. PENDELL:  Your Honor, I think we are going

6     to discuss Juan Felix.

7          All right.  Good morning, Your Honor.  Thank

8     you for letting me be here.  I'm excited.

9          I want to talk about defense's pathologist,

10    his name is Dr. Felix.  Again, this is a pretty

11    narrow motion.

12         A couple things.  First opinion, Dr. Felix

13    cannot testify there is a safe level of asbestos

14    exposure.  He is not an expert in asbestos

15    exposure.  He admits that, he's not qualified to do

16    that.

17         Second, Dr. Felix, in order to bolster his

18    opinion, he says unknown, unnamed thought leaders,

19    so folks he was unable to name, that agree with him

20    that there was no association between talc and

21    ovarian cancer, and also, that asbestos does not

22    cause ovarian cancer.  So obviously, Your Honor,

23    it's Hornbook law in Florida that an expert witness

24    cannot take the stand and act as a mouthpiece for

25    other unknown people that he says the experts agree

Page 58

1        with me without citing the literature, peer

2        reviewed, disclosing the names of these people who

3        supposedly --

4             THE COURT:  So he is just going to say there

5        are other people out there that agree with me

6        without identifying who they are?

7             MR. PENDELL:  That's correct.  And he is going

8        to call them thought leaders.  The biggest piece of

9        our motion is his testimony that talc does not

10       migrate from the perineum to the ovaries, and that

11       in-plane particles are contaminants.

12            First, I want to premise this, Your Honor, by

13       saying I absolutely agree that an expert witness

14       can be qualified through experience alone.

15       100 percent true.  The problem here is when you

16       delve into Dr. Felix's experience, he does not have

17       the experience to back up that opinion, and here is

18       the reason why.

19            Dr. Felix admitted that in 99 percent of his

20       patients' cases, he never uses this PLM process

21       that he was talking about to look for talc

22       particles.  So if he sees 100 patients in a year,

23       99 of them, he does not use this technique to look

24       for talc particles.  He does not do it.  And this

25       is how you would be able to make a determination

Page 59

1          about migration and whether it's in-plane

2          contamination.

3               He also admits that with regards to the

4          1 percent of the cases -- so if we went back to my

5          hypothetical, the one out of the 100 times he does

6          look at it using PLM, he acknowledges at the time,

7          before he even goes to look in there, that there is

8          not going to be any talc.  That's not what he's

9          looking for and he already knows it's not going to

10         be there.  He is looking for something else.

11              He uses this as his entire opinion to say,

12         well, I've never seen it, so therefore, it can't

13         possibly happen.

14              THE COURT:  I'm sorry, he is familiar with the

15         test?

16              MR. PENDELL:  Correct.

17              THE COURT:  And he's testified that he's

18         utilized the test?

19              MR. PENDELL:  Correct.

20              THE COURT:  Okay.  And you are saying that but

21         because when he utilized the test, he wasn't

22         specifically looking for the talc that we are

23         talking about, that somehow disqualifies him from

24         being able to give the opinion about the issue on

25         the issue of migration?

Page 60

1          MR. PENDELL:  Almost.  There is one more step
2      in that process.  Not only that he wasn't looking
3      for talc, but in the 1 percent of cases where he
4      actually went through this process to look for
5      anything, he knew before he did that process that
6      talc wasn't going to be there.
7          So his opinion is the equivalent of saying
8      gravity doesn't exist because I've never fallen out
9      of a tree.  That is what he is saying here; this
10     can't be possible because I've never seen it.  I've
11     never looked for it, and I knew when I used this
12     device to look at pathology slides, I knew it
13     wasn't going to be there even before I looked, and
14     based on that, this medical concept is not
15     possible.
16         That is the entire basis of his opinion.  It
17     cannot be that he's never tried to look for it.  He
18     knew ahead of time when he was looking at these
19     types of slides that it wasn't going to be there
20     and that's not why he was looking for it, he was
21     looking at something else that he knew was going to
22     be there, and he was confirming it through this
23     process.
24         THE COURT:  What if he was looking at it and
25     you're right, he excluded it, then he was using

Page 61

1    this test and he looked at it and he was wrong?

2    You're suggesting that because he's already

3    excluded it, he used the test, but you're saying

4    that if he had seen the talc or he had seen it, he

5    would, what?  I mean, what if it was there?  And he

6    said he had excluded it, but what if he looked at

7    it in performing a test and it was there?

8         MR. PENDELL:  I understand where you're going

9    with that point, Your Honor, but here is the

10   problem with that:  99 out of 100 times, he didn't

11   look at all.  So the basis of his opinion is out of

12   100 patients, he looked at one slide and he didn't

13   see it, therefore, it's not possible.

14        He would never be able to -- that would never

15   pass muster if he wrote an article that he tried to

16   submit to a peer reviewed publication for an

17   opinion.  That would never pass muster there.

18        THE COURT:  But my question though is:  You're

19   not saying he wasn't qualified to do the test in

20   the 1 percent that he did, are you?

21        MR. PENDELL:  He is a pathologist and he is

22   qualified to use the PLM machine to look for stuff.

23        THE COURT:  Then it sounds like fun

24   cross-examination.  Get up there and cross-examine

25   on that.  That's not me excluding him.

Page 62

1          Motion is denied.  Good argument.

2          MR. BALZANO:  I was going to have fun saying

3     some things.  Thank you, Your Honor.

4          MR. PENDELL:  Thank you, Your Honor.

5          THE COURT:  Defense, next motion?

6          MR. BALZANO:  I guess we'll do Dr. Sitelman

7     too because Sitelman is our motion on their

8     pathologist.

9          THE COURT:  Okay.

10         MR. PENDELL:  You might as well just deny this

11    motion too.

12         MR. BALZANO:  There is a little bit of a

13    speculation piece.  So J&J is moving to exclude

14    Dr. Sitelman, which is plaintiff's pathologist in

15    this case.

16         And so Dr. Sitelman did use the same PLM,

17    which stands for polarized light microscope, and my

18    understanding is it just shoots a light, and if

19    there are certain particles -- like talc, starch,

20    aluminum, silicon, there's a bunch of particles --

21    that when you shoot this light at it, it lights up

22    and they call it a birefringent particle.

23         So fundamentally, we are moving to exclude two

24    opinions that Dr. Sitelman had.  Dr. Sitelman

25    looked at a series of -- I think with PLM, he

Page 63

1    reviewed about 40 pathology slides of Dr. Seskin's

2    tissue and he found a number of birefringent

3    particles.

4         THE COURT:  Can I just pause you?  You all

5    keep saying something.  Are we going to continue to

6    refer to the plaintiff as doctor?

7         MS. STEMKOWSKI:  She was a doctor.

8         THE COURT:  I know, but she is not a doctor

9    here.  She is a plaintiff.  So why are we calling

10   her doctor?

11        MR. BALZANO:  I'm happy to call her

12   Ms. Seskin.

13        THE COURT:  You all keep doing it -- and by

14   the way, both sides are doing it.  Just a thought

15   go ahead.  I'm so sorry.

16        MR. BALZANO:  So Dr. Sitelman, the issue with

17   this is a birefringent particle is not necessarily

18   talc.  So he used PLM, he saw birefringent

19   particles, and he is going to now get up here and

20   say that is likely talc.  And the kicker here is

21   that you can use --

22        THE COURT:  I'm sorry, go back.  I'm so sorry

23   because I interrupted you and kind of lost my train

24   of thought.  You told me about the light.  I'm

25   sorry.

Page 64

1            MR. BALZANO:  No worries.

2            So Dr. Sitelman used the polarized light

3       microscope to look at 40 pathology slides and he

4       saw birefringent particles, and based on that, he

5       is going to say that those particles are likely

6       talc.  But the problem here is that is complete

7       speculation there is further tests that you can do

8       with different microscopes, something called the

9       TEM.

10           THE COURT:  But does he say why it's likely

11      talc?

12           MR. BALZANO:  So he relies on the fact he

13      assumes that it's because of her exposure, and

14      that's about it.

15           THE COURT:  He's saying it's likely talc

16      because of the case?

17           MR. BALZANO:  Because Mr. Sugarman testified

18      that she used talc.  So the kicker is that you can

19      definitively say if it's talc or not.  You can use

20      something called TEM, which stands for transmission

21      electron microscopy, and that actually shoots

22      electrons at the particle and tells you the

23      composition.

24           I'm a little rusty, but I believe talc is

25      magnesium.  It will literally give you a reading

Page 65

1      telling you the chemical composition and you can

2      definitively say if it was talc.

3            In this case, plaintiffs could have taken the

4      pathology and given it to another expert,

5      Dr. Rigler, who has done this before.  It's called

6      a tissue digestion where you put it in some type of

7      solvent and it destroys all the organic material,

8      and then you take the TEM machine and you look at

9      the particles and you can see if it is actually

10     talc.

11           He didn't do that here, so it is complete

12     speculation to say these birefringent particles,

13     which could be a lot of different things, are talc.

14     And --

15           THE COURT:  Are you saying that that's the

16     only way to identify that it's talc, is by

17     performing that confirmatory test?

18           MR. BALZANO:  I believe the only way to

19     definitively determine if birefringent particle is

20     talc, or asbestos, any -- to identify what the

21     chemical composition of that particle is, you need

22     to do TEM, or you can use SEM, but it's both based

23     on they shoot an electron and then it gives you a

24     chemical composition of what the particle is.  So

25     it's complete speculation for him to --

Page 66

1          THE COURT:  Why wouldn't you just do that?  I

2      don't understand.

3          MR. BALZANO:  It's a good question for

4      plaintiffs.  I'm not sure why they didn't do a

5      tissue digestion or why they didn't use TEM or SEM

6      to say whether or not definitively Marilyn Seskin

7      had talc in her pathology.

8          That leads me to my second point.  My second

9      point is not only is Dr. Sitelman going to say that

10     the birefringent particles he saw were likely talc,

11     he is going to say that the talc was from her use

12     of Johnson's baby powder, but there is a much more

13     likely explanation, which it could just be

14     contamination from when they put the slides

15     together at the hospital in Cleveland Clinic.  When

16     you take the pathology slides, you need to stain

17     them and put extra cover sheets on it.  I'm not

18     really -- I don't really understand the complete

19     process --

20         THE COURT:  Why does he conclude that it was

21     from a Johnson & Johnson product?

22         MR. BALZANO:  So he basically just rules out

23     contamination because he says that the particles

24     within the same plane as the tissue, but what's

25     funny is -- and Dr. Sitelman agrees to this at his

Page 67

1    deposition -- there were particles that he found

2    outside the plane of the tissue, and that means

3    that it was from some type of contaminant from the

4    laboratory because as they were putting the slides

5    together, if it's outside the plane of the tissue,

6    obviously it wasn't in the tissue.

7         THE COURT:  We don't exclude witnesses because

8    you believe that there may be aspects of their

9    testimony that they didn't properly take into

10   account or properly exclude.  That's called

11   cross-examination.

12        I'm going to ask counsel to refer to your

13   first argument.  The second one, I will deny that,

14   but as to the first one, I need to hear from the

15   plaintiff.

16        MS. STEMKOWSKI:  On why we didn't use TEM or

17   SEM?

18        THE COURT:  No, I don't really care why you

19   didn't do it, but counsel's argument is it's

20   basically you're speculating, you don't know what

21   the composition of the product is --

22        MS. STEMKOWSKI:  Sure.

23        THE COURT:  -- and you didn't do anything to

24   basically discern what is the composition of the

25   product, and you are concluding it's talc, and they

Page 68

1    are arguing you're concluding that it's talc

2    because you have a case that is based upon talc.

3         MS. STEMKOWSKI:  Sure, so I can answer that

4    for you.

5         So basically, Dr. Sitelman did a rule in/rule

6    out diagnosis, like most doctors do.  So he said,

7    all right, so there are things that can be

8    birefringent, right?  We know it's a pretty small

9    universe, talc is one of them.  Starch, sand,

10   calcifications, those types of things.

11        So he looks at her medical records, he looks

12   at the testimony, and he looks at her exposure

13   history, which is something that he can consider as

14   an expert.  And so for her entire life, she only

15   used Johnson's baby powder talc.

16        And so he's looking at these slides and he

17   says I identify birefringent particles, so let me

18   see what she could have been exposed to.  Okay, so

19   she has a huge exposure to talc, but there's no

20   evidence in the record that she was exposed to

21   other likely birefringent particles.  So we have

22   that there.

23        The next thing he has to say is well, it could

24   be contamination, so I need too look at that.  And

25   so he did, as Mr. Balzano said, in the plaintiff

Page 69

1          tissue, right?  So with this microscope, super

2          technical, you can basically toggle between

3          magnifications, and he can say based off of his

4          experience -- he's done this thousand of times over

5          40 years.

6               He can say that this particle is appearing in

7          the plaintiff tissue, meaning that it was in her

8          body when it was removed versus out of plane, which

9          he did acknowledge that some of the particles he

10         saw were out of plane.  In fact, we are going to

11         show examples of that to the jury so they can

12         clearly see in plane, out of plane.  Those things

13         are both true.

14              So he has that.  So he says, okay, some of

15         these particles cannot be contamination because I

16         have experience as a pathologist saying this is --

17              THE COURT:  I don't want to go into the

18         contamination, I want to stick with the -- so your

19         answer to the question appears to be that he ruled

20         it out by simply looking at what her exposure was,

21         he looked at her medical records, he looked at her

22         history, and he says that, well, this is the only

23         thing that it could be based upon a review of what

24         I know about her?

25              MS. STEMKOWSKI:  Well, there is more to this,

Page 70

1           Your Honor.  There is also literature that supports
2           his argument.  We cite articles in our motions, one
3           of them is the Johnson article from 2020, which I
4           have here, in which they do a test -- and PLM is
5           one of them -- and the scientists are looking for
6           talc in women's genital tissue.  So they are able
7           to characterize how talc looks under PLM
8           microscopes.
9                THE COURT:  Did he testify that he looked?
10               MS. STEMKOWSKI:  Yes, so he did that.  So he
11          says that these particles are consistent with what
12          the literature has found talc looks like in her
13          tissue.  So the literature supports him, he
14          ruled in, ruled out --
15               THE COURT:  Why didn't he just do --
16               MS. STEMKOWSKI:  Well, let me tell you, Your
17          Honor, it is incredibly expensive.  Very expensive.
18          Actually, in our other case we have in Sarasota
19          County, we did that testing and they still say it's
20          contamination.
21               So we would have spent all this money to have
22          an expert conclude, in fact, the other case found
23          talc, and they still say it's a contaminant.  So it
24          would not move the ball forward one way or the
25          other for our case in our opinion.

Page 71

1            But here, we have an expert who is qualified

2        to say more likely than not, I believe this is

3        talc.

4            THE COURT:  Anything else?

5            MR. BALZANO:  For just the point on the

6        differential diagnosis, the point I think Your

7        Honor gets it differential diagnosis, you don't

8        have some type of machine that you can go that can

9        spit out the exact diagnosis.  Dr. Sitelman had

10       that here, or Dr. Rigler could have done that for

11       him.  He says he's an expert, that's another point.

12           And then also, for the cited article, Johnson

13       2020, Dr. Sitelman is not qualified.  He doesn't

14       have experience.  He hasn't made a career of

15       identifying talc.  He's a pathologist.  He hasn't

16       made a year of identifying talc using PLM.

17           And also --

18           THE COURT:  All he's saying is it's

19       consistent -- meaning that if there's medical

20       literature out there and you go to a doctor and the

21       doctor refers to the medical literature and then

22       the doctor looks at the slides and he says, well,

23       this is consistent with what the medical literature

24       says, why is that not a fair reason for concluding

25       that it was talc?

Page 72

1          MR. BALZANO:  I think I'll just go back to the

2     TEM.  He had -- again, it's not like it's a

3     differential diagnosis.

4          THE COURT:  No, I agree.  First of all, I

5     agree with.  I think that they may say it was

6     expensive, they may say I don't know what he's

7     going to say when asked about that, but again, I

8     don't think based upon what you all have presented

9     that this is a basis for me to exclude the opinion

10    testimony.

11         MR. BALZANO:  And I'll say one more thing

12    about contamination.  I know you don't want to hear

13    about contamination, but I think there is an

14    important point that I really want to talk about

15    with Dr. Felix.  I think we should talk quickly

16    about it.

17         When talc or any particle, when any foreign

18    particle is lodged in a live person's tissue, there

19    is a foreign body response that triggers

20    inflammation.  And the point here is although

21    Dr. Sitelman says, well, it's not contamination

22    because it's in the same field, it's in the same

23    surface as the pathology, as the tissue, there was

24    no foreign body response.  And that's why there was

25    no inflammation encasing the particle.  And that's

Page 73

```
 1        why it was most likely contamination, because if

 2        you look at the particles and the contaminants on

 3        the ones that clearly no one disputes --

 4        Dr. Sitelman does not dispute --

 5             THE COURT:  Who says that?

 6             MR. BALZANO:  That there's foreign body --

 7             THE COURT:  No, that it's most likely

 8        contamination?  Because you said there was no

 9        inflammation, okay, so you're saying the conclusion

10        is that it's most likely contamination.  Says who?

11             MR. BALZANO:  Dr. Felix, and there's a couple

12        of studies.  There's at least one textbook -- well,

13        it's basis of pathology that -- I don't want to get

14        too much into Dr. Felix's opinion, but it's the

15        basis of pathology that when there is a foreign

16        particle, your body does everything it can to get

17        that particle out.  It has a response.

18             That's why the FDA, in 2016, there's no more

19        powders.  It's not just talc, it's corn starch,

20        it's all types of powders that's not supposed to be

21        in your body.  The FDA, in 2016, said that there

22        shouldn't be powder on surgical gloves anymore

23        because it causes -- when a surgeon is operating in

24        live tissue, it causes inflammation.  It causes a

25        foreign body response.
```

Page 74

1          And here, when you look at the pathology

2     slides, there was no foreign body response.  When

3     you pair that with the fact that when you look at

4     the slides, the particles outside the plane, so it

5     looks like there was some type of contamination at

6     least on the slides that are not on the plaintiff

7     tissue --

8          THE COURT:  But the point that I want to add

9     is that -- and I'm not suggesting that you're

10    wrong.  You may be absolutely correct.

11         The question though is that you're asking me

12    not to allow him to present his conclusion because

13    you have evidence that suggests that his conclusion

14    is wrong.

15         MR. BALZANO:  Right.  Well, because it goes to

16    the fact that it's an unreliable methodology.  It

17    is unreliable to look at a pathology slide when all

18    of the physical evidence you see shows you that it

19    is contamination.  There is no foreign body

20    response, you see contaminants on different, you

21    know, parts of the slide not in the plaintiff

22    tissue.  The fact that he could have --

23         THE COURT:  I'm sorry, I don't know anything

24    about this, so how do I exclude it by saying that

25    it was obvious, this doesn't support it.  I just

Page 75

1    think it has to go to the jury and you do your best

2    at your cross-examination and hope you land some

3    punches.

4         It's denied.  What else from the plaintiff?

5    I'm still trying to get my computer logged on.

6         MR. OLIVER:  We'll do Boyd.

7         MS. STEMKOWSKI:  Your Honor, we have

8    plaintiff's motion to exclude Dr. Boyd.  Do you

9    want to take a minute?

10        THE COURT:  No, go ahead.  I can listen.

11        MS. STEMKOWSKI:  This is actually going to be

12   very straightforward for you, Your Honor.

13   Dr. Jeffrey Boyd we are seeking to exclude only a

14   specific cause opinion, and this is in the same

15   vein as Dr. Permuth.  You've already excluded

16   Dr. Permuth's opinion --

17        THE COURT:  Who is arguing this for the

18   defense?

19        MS. SCOTT:  I am, Your Honor.

20        THE COURT:  Okay.  Go ahead, ma'am.

21        MS. STEMKOWSKI:  So Dr. Permuth has been

22   excluded correctly in a CC opinion.  Dr. Boyd

23   intends to offer the same opinion, but with less.

24   So during his deposition, he said that --

25        THE COURT:  I'm sorry, he is going to offer

Page 76

1        the same opinion with less, is that what you said?

2             MS. STEMKOWSKI:  That's what I said.

3             THE COURT:  Okay.  Go ahead.

4             MS. STEMKOWSKI:  So during his deposition, he

5        said that the FANCC gene could be considered

6        suggestive of the cause of primary peritoneal

7        carcinoma, but then he went on to say that he would

8        not be comfortable saying it is more likely than

9        not that this particular mutation was the cause of

10       Dr. Seskin's primary peritoneal cancer.

11            So he has said I can't said more likely than

12       not, I can said it's suggestive.  And I would say,

13       Your Honor, that if Dr. Permuth can't come in here

14       and said that it's suggestive, neither can

15       Dr. Boyd.

16            So -- but I want to go a little bit further

17       with him because I think that defendants are going

18       to say, well, Dr. Boyd is also a molecular

19       epidemiologist and he can talk about FANCC and the

20       Ashkenazi heritage and he provides more context.

21       But if you again look at the literature that he is

22       citing to support his opinion, it does not support

23       his opinion.

24            And, in fact, he says, "I would say that there

25       is insufficient literature at this point to put

Page 77

1      FANCC gene in the same category as, for example,

2      the BRCA 1 and 2 genes in terms of a very high

3      degree of certainty in terms of the causal

4      relationship."

5           THE COURT:  So what literature is he relying

6      upon to support his opinion if it's insufficient

7      literature?

8           MS. STEMKOWSKI:  Right, so he cites five.  So

9      he has five articles he identifies during his

10     deposition, and I want to read to you from those

11     articles so there is no confusion what they say.

12          One of them is the Frey article, and that

13     says, "Although some studies have demonstrated

14     FANCC heterozygous mutations to marginally increase

15     the risk of breast cancer and early pancreatic

16     cancer, other studies have failed to demonstrate an

17     increased cancer risk, and to our knowledge, there

18     are currently no risk reduction guidelines

19     associated with that finding."  That's one.

20          The second is the Pan article, and that's

21     actually aimed at identifying the germ line

22     mutations at FANCC and high-risk breast cancer

23     patients in China.  It is not about ovarian cancer,

24     it is about breast cancer.  It is not studying

25     ovarian cancer in the slightest.

Page 78

1           The third is the Westphalen case, and that is

2       looking at potential therapeutic responses to

3       cancer based on genetic defects.  Nowhere in any of

4       these studies is there a sentence that says FANCC

5       causes ovarian cancer or has been suggested as an

6       increased risk.  It does not exist in those five

7       articles and, Your Honor, for that reason, his

8       opinion has to be excluded.

9           THE COURT:  You did the deposition?

10          MS. STEMKOWSKI:  Yes.

11          THE COURT:  How does he come to the conclusion

12      that at least it's suggestive?

13          MS. STEMKOWSKI:  Sure.  So I have no

14      scientific background, so it's in the family, as

15      Mr. Oliver was saying.  FANCC is in the same family

16      as BRCA 1 and BRCA 2 and the Fanconi anemia family,

17      and he says that it is a deleterious pathogenic

18      mutation that affects how someone's genes can

19      replicate if damaged.

20          So he says that, okay, if she is -- this gene

21      is in the same ovarian cancer susceptibility

22      family, although it is not one of them, and it has

23      a similar background in what it does, right?  So it

24      affects how genes replicate.

25          And so the theory being, I think, is that if

Page 79

1    there is injury to a gene, it cannot fix itself.  I

2    think.  And so he takes that and he says FANCC is

3    suggestive of ovarian cancer.

4         And again, he is attempting to offer medical

5    causation opinion and he cannot say more likely

6    than not that it can do so.

7         THE COURT:  Response?

8         MS. SCOTT:  Yes, Your Honor.

9         So Dr. Boyd has been studying the BRCA 1,

10   BRCA 2, FANCC family of genes for 30 years.  He's

11   been setting up laboratories.  He's really a

12   pioneer.  He's been on the forefront of this.

13        And what Dr. Boyd did was he, using that

14   extensive experience studying these genes, he

15   looked at the 22 Fanconi anemia genes, saw that

16   five of those genes -- as we talked about earlier,

17   BRCA 1, BRCA 2, three others -- breast cancer and

18   ovarian cancer susceptibility genes, increased

19   risk.  Again, FANCC, they are parallel.  Same

20   family, same function.  FANCC causes other sorts of

21   cancers, and now, peer reviewed studies are

22   starting to establish that FANCC also causes

23   ovarian cancer.

24        And I just want to correct my friend on the

25   other sides here, that Westphalen case that

Page 80

1          Dr. Boyd relied on actually says, under results,
2          "We identified a strong correlation between
3          elevated alterations in a core set of
4          HRR-associated genes beyond BRCA 1, BRCA 2, such
5          as," and then references FANCC, "particularly in
6          breast, ovarian, pancreatic, and prostate cancer."
7              So this article is one that Dr. Boyd
8          explicitly relies on strong correlation.  He also
9          uses his over 30 years of experience researching
10         these specific genes to come to his opinion that
11         the FANCC mutation that Dr. Seskin indisputably had
12         was a suggestive cause of her cancer.
13             Now, he doesn't have to come in here and say
14         it's more likely than not.  I mean, we looked at
15         the case law, Your Honor, and we looked at Mack,
16         and it said that excluding alternative causation
17         evidence on the basis that the expert could not
18         testify to a reasonable degree of medical
19         probability improperly shifted the burden to the
20         defendants -- it's not our burden -- and that's
21         reversible error.  And the Third DCA agreed with
22         that.
23             And so we don't have to prove more likely than
24         not, we just have to prove a reliable method.  And
25         he employed a reliable method.  And a reliable

Page 81

1          method means it's more than speculative, it's more

2          than conjecture, and that is what we have here.

3                  And plenty of cases that we've cited in our

4          papers say experience, just experience and

5          reviewing medical records is enough.  Here, we have

6          even more than that.  We have these peer reviewed

7          articles, one of which establishes a strong

8          correlation.

9                  So even though the science, as we talked about

10         earlier, is evolving, there is a sufficient

11         basis --

12                 THE COURT:  But what did he do -- other than

13         the peer reviewed article, what did he do to come

14         to that conclusion separate and apart from the peer

15         reviewed article?

16                 MS. SCOTT:  He has studied this family of

17         genes, so he has his background knowledge.

18                 THE COURT:  I guess tell me, when he's asked

19         the question and he's going to opine that there is

20         a suggestive correlation, without looking at the

21         peer reviewed article, how does he come to that

22         conclusion?

23                 MS. SCOTT:  He comes to the conclusion based

24         on the science, Your Honor.  Based on the fact that

25         BRCA 1 and BRCA 2, which are, again, known -- they

Page 82

1       cause ovarian cancer, okay?  He is going to look

2       and see that FANCC, which functions the same way,

3       does the same thing, repairs those double breaks in

4       the DNA, and if they're not repaired, they cause

5       cancer, FANCC does cause cancers, and the strong

6       correlation is now emerging that it's also

7       connected to ovarian cancer.  By looking at those

8       parallels, those two genes that function the exact

9       same way, he expects it is a -- he expects, as the

10      literature is confirming, that FANCC --

11          THE COURT:  But I don't understand.

12          MS. SCOTT:  -- is a suggestive cause.

13          THE COURT:  See, that's my point though.

14      Where is it at in terms of the research?  Meaning,

15      has somebody -- has anybody ever done anything to

16      basically be able to come in and say that this is a

17      cause?

18          Because -- the only reason I'm saying that is

19      because you can get an expert -- and I'm not saying

20      this is your expert -- but you can get an expert to

21      say anything you want them to say and then you can

22      go out there and find somebody that wrote an

23      article.  So the question is that -- and I love the

24      language that you all are using, suggestive.  I

25      don't even know what that means.  What does that

Page 83

1          mean, it's suggestive?

2                MS. SCOTT:  Likely.  He says what it means in

3          his deposition, possible, likely, suggestive.  It

4          suggests a cause.  It suggests that it is a cause

5          of her ovarian cancer.

6                And the article that I have read to you, Your

7          Honor, establishes that strong correlation.  And so

8          there is a basis, and that's all that we need.  We

9          do not need to prove the science.  No science is

10         provable, right?  Like, I mean, it's tested, but I

11         mean, science is evolving art.

12               THE COURT:  You are absolutely right, but when

13         was the first Johnson & Johnson case?

14               MS. SCOTT:  I believe in 2017.

15               THE COURT:  2017?

16               MS. STEMKOWSKI:  2014.

17               THE COURT:  2014.  And in that time -- but

18         people started studying this whole issue of --

19               MS. STEMKOWSKI:  1980s.

20               THE COURT:  -- of whether or not the powder

21         basically caused ovarian cancer not in 2014, right?

22               And so my question is:  Are you really telling

23         me since 1986, and we are now in 2024, that no

24         scientific literature, no scientist has been able

25         to correlate with any reasonable degree of

Page 84

1       certainty that the talc actually causes the ovarian

2       cancer?  I'm sorry.

3              MS. SCOTT:  I can answer yes to that question.

4              THE COURT:  To that one, right.

5              But my point in saying that is it's

6       uncomfortable -- maybe that doesn't matter -- but

7       it's uncomfortable to be here 38 years after the

8       literature began, and the most you can say is that

9       there is an article that is suggestive.

10             MS. SCOTT:  The article is strong correlation.

11      I can show you the article.  I can pull it up and

12      show it to you.  It says there is a strong

13      correlation.

14             But the issue is that because FANCC is not --

15      it's not in a large population of people, it's just

16      not studied as much, but it's now being studied

17      because of the parallel between these known ovarian

18      cancer and breast cancer genes.  And let's be real,

19      Your Honor.  People weren't really studying BRCA 1

20      and BRCA 2 the way they are now because it was a

21      women's health issue, and now people are focusing

22      more on women's health, and the natural progression

23      is now we're looking at these other genes in the

24      same family.

25             THE COURT:  I know, but the point though is

Page 85

 1          that isn't there supposed to be more, when we're

 2          talking about Daubert, aren't we supposed to be

 3          able to say there is this understanding within the

 4          scientific community?  It's not a situation where

 5          we're saying, well, we have four doctors who say

 6          this, and four doctors who say that, and then you

 7          say, oh, well, there's an understanding, there is

 8          an acceptance within the scientific community.

 9              Well, no, there is no acceptance within the

10          scientific community.  It's still being studied.

11          Nobody knows the answer.

12              And so I don't think in a court of law, if

13          it's still being studied and no one knows the

14          answer, I don't think, under Daubert, you get to

15          come in and say, well, some people say that there

16          is a correlation.

17              MS. SCOTT:  And Your Honor, that's not what

18          we're saying.  The community, under Daubert, is not

19          the entire scientific community.  It's the

20          scientific community that's dedicated to this

21          particular issue.

22              And the scientific community that is looking

23          at these issues -- because these are the papers

24          that we've cited.  These are the papers that our

25          experts have relied on.  This scientific community

Page 86

1    is establishing this link.

2         THE COURT:  So your doctor, if asked, is it

3    the universal understanding within the scientific

4    community that there is -- is there a universal

5    opinion within the scientific community that what

6    you are opining today is accepted?

7         MS. SCOTT:  I think that his specific -- in

8    his community of people, there would be people in

9    the community that would say yes.

10        THE COURT:  That's not the answer to my

11   question, because you can always find people in

12   your community that --

13        MS. SCOTT:  That's the relevant community,

14   Your Honor.

15        THE COURT:  You're right, and I'm not saying

16   that, but are there people in the community that

17   say it's not?

18        MS. SCOTT:  No, Your Honor.  They might say

19   that it's inconclusive, but there is no one -- and

20   plaintiffs have cited no studies -- where someone

21   has said absolutely not, can't happen, zilch, no

22   way.

23        All the articles that we have cited have said

24   it's possible.  Everything from it's possible,

25   we're looking more into it, to a strong

Page 87

1          correlation.  And Dr. Boyd is part of that

2          community.  He is a leader in that community.

3                  THE COURT:  Okay.  So you're telling me that

4          in the community that we are talking about, if he

5          is asked the question, he would say that there is

6          still more studies that need to be done because

7          it's not conclusive within our community?

8                  Because there are medical professionals that

9          will tell you, okay, you know, what is the standard

10         for when you are replacing a knee, okay?  And they

11         would tell you -- and by the way, you ask any of

12         the orthopedist professionals that testify, they

13         will all say this is the standard procedure that

14         you use.  It's not experimental, it's not

15         hypothetical, this is what you do.

16                 What I'm hearing from you is that, yeah, there

17         are people that think it's inconclusive.  There are

18         people who think it's possible.  Some may even

19         think there's a strong likelihood.  But within the

20         scientific community, there is no common

21         understanding in terms of the way it occurs.

22                 And so my question is:  If there is no

23         understanding within the community -- and I'm

24         accepting it to be the community that your doctor

25         is a part of -- how does that satisfy Daubert?

Page 88

1           MS. SCOTT:  Your Honor, I'm not saying that

2       there is no understanding within the community.

3       The community are the people who have researched

4       it, and the people who have researched it have said

5       there is a potential link.  From potential link to

6       strong correlation.  No one inside this community

7       is saying it's not possible.

8           THE COURT:  No, they're not saying it's not

9       possible, but they're saying it's inconclusive.

10          MS. SCOTT:  When you asked me about the

11      community, I was thinking more -- I'm sorry, that's

12      my fault, I was thinking more generally.

13          When I'm talking about the community of people

14      who are actually studying these issues, there

15      are -- the community of people studying these

16      issues are observing and starting to establish a

17      link.  And yes, there is a gradation from a

18      potential link -- and we've cited the papers -- to

19      strong correlation.

20          THE COURT:  So when do we get to a point where

21      it would be -- so you're saying that as long as

22      someone in the community says it's possible, it

23      satisfies Daubert?  Just by saying it's possible,

24      that's enough for an expert to come in and testify

25      that that satisfies Daubert?

Page 89

1           MS. SCOTT:  Daubert requires a reliable

2       methodology, and that's what Dr. Boyd said.  When I

3       speak about possibility --

4           THE COURT:  Wait a minute, let's do all of

5       Daubert.  Daubert requires a reliable methodology

6       and it has to be based upon something that is

7       generally accepted within the scientific community.

8           That's why I keep asking you:  Is it generally

9       accepted in the scientific community or is it just

10      something that maybe the small group of people that

11      you were able to find says it's possible?

12          Because that's the part that I'm struggling

13      with.  Because if we start just basically going on

14      a scientific community -- by the way, if this was

15      Frye, we wouldn't be having this conversation,

16      right?  It would be one of those things where

17      almost anyone can come in and say anything, and

18      your doctor would have been able to come in and say

19      that.

20          But everybody said no, we don't want to use

21      Frye, we want to use Daubert, at least here in

22      Florida, okay?  So the court said we are going to

23      use Daubert and they said this is what is required.

24      And one of the things that is required is, yes,

25      reliability of methodology, but also, it has to be

Page 90

1          something that is based upon -- that is generally

2          accepted within the scientific community to which

3          the expert belongs.

4               I suggest to you that that hasn't been

5          satisfied because it's still being studied.  Nobody

6          really knows.  And what happens if tomorrow there

7          is a study, someone writes a paper and says that we

8          researched this, and originally it was

9          inconclusive, now we're saying there is a less

10         likelihood that it causes ovarian cancer.  Because

11         that's the problem with possible.

12              (Telephone interruption.)

13              THE COURT:  This is Judge Simon about your

14         courtroom.  I'm going to take it only because it's

15         about your courtroom.

16              (Discussion off the record.)

17              THE COURT:  All right.  We got 6-1.  We don't

18         have a problem.

19              Go ahead, ma'am.

20              MS. SCOTT:  Your Honor, I do believe that it's

21         generally accepted within this community that

22         studies these issues that FANCC is a suggestive

23         cause of ovarian cancer.  Now --

24              THE COURT:  Can I ask another question?

25              MS. SCOTT:  Yes, Your Honor.

Page 91

1              THE COURT:  Do you have a case where the trial

2         court either excluded it or allowed it, and then an

3         appellate court opined on the decision of the trial

4         court?  Because this is not the first Johnson &

5         Johnson case, right?  These cases have been tried

6         all around the country, right?

7              MS. SCOTT:  That's correct, Your Honor.

8              THE COURT:  And this is not a new issue,

9         right?  So has this been -- I always like to get

10        guidance from what other people have done -- not

11        trial judges, they make errors like I do.  But

12        appellate courts, we all got to listen to them,

13        right?

14             And so if appellate courts have spoken to what

15        a trial judge did and said, well, judge, you should

16        have allowed this, or judge, you should not have

17        allowed this, is there any guidance that you have

18        in that regard?

19             MS. SCOTT:  Not from an appellate court, Your

20        Honor, but Dr. Boyd has been able to testify in

21        talc trials on other genetic mutations based on

22        his, you know, unchallenged qualifications and his

23        reliable method.

24             THE COURT:  All right.  Anything else?

25             MS. SCOTT:  I mean, I think, Your Honor, just

Page 92

1      thinking about, again, the standard, Dr. Boyd used

2      a reliable method.  We don't have to come in here

3      and prove -- excuse me, we don't have to come in

4      here and disprove cause.

5           We have the right to present evidence of an

6      alternative cause, and that's exactly what Dr. Boyd

7      is going to do, and it's not so out of step with --

8      it's not out of step with the literature.

9           THE COURT:  I'm going to ask them the same

10     question.

11          Can I ask the plaintiff:  Are you aware of any

12     case law that -- because counsel is arguing -- and

13     I want to be consistent.  If you're going to make

14     an error, make the same error consistently through.

15          But counsel is making the argument that it

16     satisfies Daubert because no one is questioning the

17     qualifications of their expert, and the literature

18     supports the conclusion that this is suggestive,

19     that there is a link towards ovarian cancer.  So?

20          MS. STEMKOWSKI:  Sure.  So I'm not aware of

21     any decision in the United States where Dr. Boyd

22     has been overturned, but he's also never brought

23     this opinion about FANCC in another court.

24          THE COURT:  He's never done that?

25          MS. STEMKOWSKI:  Not on FANCC.  He has opined

Page 93

1          in other talcum powder cases on genetics, but not

2          on FANCC.  Not to my knowledge.

3              THE COURT:  Is there a difference between

4          other genetic testimony that he would provide and

5          FANCC?

6              MS. STEMKOWSKI:  Well, sure.  If he came in,

7          Your Honor, and he said that BRCA 1 causes ovarian

8          cancer, that's genetic testimony.  He would be

9          absolutely able to say that because that's what the

10         literature says.  BRCA 1 is linked to ovarian

11         cancer.

12             But the difference here is that the literature

13         on FANCC, it's the potential link, it's possible,

14         it's suggestive.  And they do have a burden by a

15         preponderance of the evidence to establish the

16         alternative cause.  They just can't come in here,

17         like you said earlier, and say, well, I think it

18         might be this.

19             And we have one article where it's the strong

20         correlation, but what you notice is it's breast

21         cancer, ovarian cancer, pancreatic cancer.  There

22         is no -- let me back up.

23             BRCA 1 and 2 is a 20 to 30 percent increased

24         risk in women.  If they have that, that is the

25         increased risk.  There is no piece of literature --

Page 94

1          THE COURT:  That even assigns a percentage to

2     the risk.

3          MS. STEMKOWSKI:  Exactly.  And I want to point

4     out a couple more things, Your Honor.  Their own

5     experts disagree with him.

6          So Dr. Saenz is another expert that we did not

7     Daubert, but she is probably going to come.  And

8     she said during her deposition, at present, there

9     is no conclusive evidence that FANCC mutation

10    increases your risk of developing ovarian cancer.

11    That's her deposition at 150, lines 11 through 15.

12    Dr. Felix, the pathologist that you just heard

13    about at page 59, lines 12 through 17, he agrees.

14         And, you know, I want to just repeat that when

15    I asked him at his deposition, well, what does the

16    literature say, Dr. Boyd?  "I would say that

17    there's insufficient literature at this point,

18    insufficient data to put the FANCC gene in the same

19    category as, for example, the BRCA 1 and 2 genes in

20    terms of a very high degree of certainty in terms

21    of the causal relationship."

22         He is saying himself that the literature is

23    not there.  He is taking pieces of literature and

24    he is saying if we look at it like this, we can say

25    there is a risk.  And that is insufficient for

Page 95

1           Daubert.

2                   THE COURT:  Anything else, ma'am?

3                   I tend to agree.  The motion to limit the

4           opinion of Dr. Boyd is granted.  Thank you.

5                   MS. STEMKOWSKI:  Thank you, Your Honor.

6                   THE COURT:  All right.  Defense, I think we

7           are up to you.

8                   MR. CARUSO:  Motion to exclude Dr. Ness, Your

9           Honor.  Joe Caruso for the defense.

10                  THE COURT:  I'm just laughing because you all

11          are challenging everyone's expert.

12                  MR. CARUSO:  All right, Your Honor.  I would

13          like to focus just on a few pieces in our motion.

14          More specifically, I'd like to talk about Dr. Ness'

15          failure to look at the specific disease that

16          Dr. Seskin had in this case, which is primary

17          peritoneal cancer.

18                  Dr. Ness' analysis, as is true for all experts

19          in plaintiff's case, look at ovarian cancer, which

20          is a clinically similar -- treated in the same

21          way -- cancer to ovarian cancer, but are different

22          from an etiological standpoint, and that's borne

23          out in the literature, and Dr. Ness didn't even

24          attempt to address this literature.

25                  THE COURT:  I'm sorry, she didn't have ovarian

Page 96

```
 1      cancer?
 2           MR. CARUSO:  She had primary peritoneal
 3      cancer, which has a different ICD code.  It's a
 4      different cancer.  They are similar, but they are
 5      similar in the sense that they are treated the same
 6      way, and from a clinical perspective, doctors tend
 7      to voice them in similar breaths because they are
 8      treated the same way.
 9           But we are not here to talk about her
10      treatment, we are here to talk about what caused
11      her cancer, and from that perspective, they are
12      different.  What plaintiffs point to to say, no,
13      no, no, they are the same, let's forget about that
14      there's no literature that's tying talc to primary
15      peritoneal cancer, which is a cancer of the stomach
16      lining as opposed to the ovary.  They say let's
17      forget about that, Dr. Ness says it's the same
18      thing.
19           Well, Dr. Ness, how do you say that?  Let's go
20      to their own motion.  This is the testimony that
21      the plaintiffs point to to say that it's the same
22      thing.
23           This is what the plaintiffs point to for
24      Dr. Ness to disregard the primary peritoneal
25      literature and focus on ovarian.
```

Page 97

1          "Question:  You were asked some questions

2      about different types of genital cancers earlier?

3          "Answer:  Yes.

4          "Question:  And when you refer to epithelial

5      ovarian cancer, did you include in your analysis

6      thinking of fallopian type cancer?

7          "Answer:  Yes, I did.

8          "Question:  Do you also include in your

9      definition of epithelial ovarian cancer peritoneal

10     cancer?

11         "Answer:  Yes, I do."

12         Cited just her deposition testimony.  She has

13     no methodology, no reliable methodology to go to

14     and point to literature saying that talc use is

15     associated to primary peritoneal cancer.  It's only

16     associated under their theory of the case with

17     ovarian cancer and it's not acceptable under

18     Daubert.

19         THE COURT:  Did you ask that question?  Did

20     you take the deposition?

21         MR. CARUSO:  I did not.

22         THE COURT:  Okay.

23         MR. CARUSO:  So as Your Honor just said, when

24     you have an expert and you're talking about FANCC,

25     when nobody knows the answer, it's still being

Page 98

1      studied, cannot come in here and say that there's a

2      correlation.

3          This is being studied.  We have three peer

4      reviewed literatures in 2007, 2015, 2020, that

5      show -- and I can grab them for you here if you

6      want -- that say there is a difference in the

7      etiology, in the causes of these cancers.  We

8      looked at them, they have different risk factors.

9          And if Dr. Ness came in here said, yeah, I

10     looked at those, I disagree with them for XYZ

11     reason, that's a different discussion.  She didn't

12     even address them.  That's unacceptable under

13     Daubert.

14         MS. O'DELL:  Good morning, Your Honor, Leigh

15     O'Dell for the plaintiff.  I feel like I've been

16     dressed up for a long time and this is the first

17     time I've gotten to say something.

18         Let me take this on and begin by talking about

19     Dr. Ness' qualifications because I think it's

20     helpful here.  Dr. Ness has been studying the issue

21     of talc and ovarian cancer since before 2000.  She

22     has been a primary researcher on some of the

23     studies, the epidemiological studies that consider

24     the question of is there a connection, a causal

25     link between the genital use of talc and ovarian

Page 99

1      cancer.

2            And in those studies, when you look at the

3      defined number of women who have cases -- in other

4      words, they have cancer -- what the researchers do,

5      they include not only ovarian cancer, but fallopian

6      tube cancer and primary peritoneal cancer.  That's

7      part of the disease pelvic carcinoma.  And

8      the Levanon article is one of the articles we cited

9      in our papers.

10            It defines it as those diseases are all the

11      same because they are right there in the same area

12      from a physiological perspective.  Researchers now

13      believe that epithelial ovarian cancer to include

14      fallopian tube, and primary peritoneal starts in

15      the fallopian tube and the cancer seeds it from the

16      fallopian tubes there to the ovaries and into the

17      peritoneal cavity, which is right there.

18            And so what Dr. Ness said is I considered

19      those together, and that's supported by the

20      literature.  And that was what her -- when you say

21      she's not considered primary peritoneal, it's

22      really -- I don't think it would be accurate

23      because she studied it for 24 years and she's been

24      part of the ovarian cancer research coalition that

25      has studied --

```
                                              Page 100

 1              THE COURT:  What counsel said is that it's

 2      different.  Cancer of the stomach is different --

 3      I'm saying stomach.

 4              MR. CARUSO:  Stomach lining.

 5              THE COURT:  Stomach lining is different from

 6      cancer of the ovary.  And so the question you seem

 7      to be saying is that, no, no, no, because they are

 8      all in generally the same area, they just lump them

 9      all together, and all of the research that applies

10      to ovarian cancer equally applies to this cancer

11      that your client died from, or suffered from.

12              MS. O'DELL:  She did die, sadly.

13              And if I could be say this, Your Honor, this

14      is not cancer of the stomach.  Primary peritoneal

15      is just not cancer of the stomach, so we --

16              MR. CARUSO:  Abdominal lining.

17              MS. O'DELL:  With respect to my colleague, I

18      mean, let's just be clear, that's not what we're

19      talking about.

20              We are talking about a pelvic carcinoma

21      disease of those three entities because they are

22      essentially contiguous.  So Dr. Morrissey,

23      Dr. Seskin's treater, Ms. Seskin's treater, he says

24      they have similar etiologies, similar treatments,

25      similar outcomes.
```

Page 101

1              When you look at the literature itself, which
2       is cited in Dr. Ness' opposition to this motion,
3       one of the studies that the defendants will spend a
4       lot of time talking about is the O'Brien study.
5       And it looks at certain cohort studies, and when
6       they look at the cancers they are studying, and
7       it's an epithelial ovarian cancer study, but when
8       they look at those cancers, they are looking at
9       fallopian tube, primary peritoneal, and ovarian
10      cancer.  They are all taken together.  And that's
11      the data that's considered in order to evaluate --
12              THE COURT:  So are you telling me there is no
13      particular study or research as it relates to the
14      specific type of cancer that your client suffered?
15      It's all linked to ovarian?
16              MS. O'DELL:  No, sir.  I'm saying that all of
17      the 40 studies that considered the causal
18      connection between talc and ovarian cancers, refer
19      to it, include primary peritoneal cancers because
20      they are considered a part of the same disease.
21      That's what I'm saying.
22              When you look at -- and I can list study after
23      study.  The O'Brien study.  The Kramer study, which
24      was published in 2016.  As a part of that disease
25      set, they include ovary, fallopian tube, and

Page 102

1     primary peritoneal.

2         THE COURT:  But is there any research that

3     speaks separately as to the type of cancer that

4     your client suffered from?

5         MS. O'DELL:  The body of literature that we

6     are relying on is the 40 years of 40 studies that

7     includes primary peritoneal --

8         THE COURT:  I know, but I don't want to just

9     talk about the literature that you're relying upon,

10    I want to talk about literature that exists.

11        MS. O'DELL:  In terms of the studies that

12    focus on this -- and I just want to point out a

13    couple other things for the record.  Dr. Morrissey,

14    from a cellular perspective, they are the same;

15    from a treatment perspective, they are the same;

16    and histologically, their serous subtype is what

17    Dr. Seskin says, and they are all a part of that

18    serous carcinoma.  So the literature --

19        THE COURT:  How are they different?

20        MS. O'DELL:  They are essentially only

21    different to the degree you have those millimeters

22    from the fallopian tube and the ovary to this --

23    we're talking about if the fallopian tube is here

24    and the ovary is here, we are talking about the

25    lining that's right here.  And so when you think of

Page 103

1          epithelial ovarian cancer as a disease group --

2          they call it pelvic carcinoma as well -- they are

3          all a part of the same disease set.

4               So to somehow for the defendants to argue that

5          the 40 years of literature that studied this

6          disease as a pelvic carcinoma, they don't apply to

7          primary peritoneal is absolutely inconsistent with

8          the science, it's inconsistent --

9               THE COURT:  But counsel said he had articles

10          that actually speak to the differences.

11               MR. CARUSO:  Yes, and I can distribute that if

12          you want.  This is the Jordan study.  In the bottom

13          section of the abstract on the left-hand side --

14               THE COURT:  I'm half blind and you give me

15          this print that's like 10 font.

16               Okay, go ahead.

17               MR. CARUSO:  I can read it.  At the bottom

18          there on the left-hand side, "The strikingly

19          similar patterns of risk for serous ovarian and

20          fallopian tube cancers, and the somewhat different

21          results for primary peritoneal cancer suggest that

22          peritoneal cancers may develop along a different

23          pathway."  That is Jordan 2007.

24               I'm going to pass out now Sorenson 2015,

25          another peer reviewed piece of literature.  Reading

Page 104

1       again from the conclusion here, "In contrast,

2       observed differences in risk profile,

3       clinicopathologic and prognostic factors as well as

4       in the molecular patterns indicate that peritoneal

5       cancer and ovarian cancer may be linked to

6       different carcinogenic pathways."

7           I'm going to hand out Fortner 2020, another

8       peer reviewed piece of literature.  Conclusion of

9       this paper, which by the way, Dr. Osann, in her

10      report, notes as evidence of the differences

11      between these different types of cancers.

12          "Ovarian, fallopian tube, and primary

13      peritoneal cancers appear to have shared and

14      distinct etiological pathways, although most risk

15      factors appear to have similar associations by

16      anatomic site."

17          So that's when you were asking earlier, what's

18      the difference, right?  They are close to each

19      other, that's essentially how they relate them to

20      each other.  They tend to metastasize in the same

21      area.

22          I should have noted this while we were

23      discussing Jordan a few moments ago.  Jordan looks

24      at talc specifically, right?  So they say, okay,

25      let's take all of -- as counsel previously pointed

Page 105

1    out, a lot of the literature, despite the

2    representation, they don't go in their method

3    section and say we counted ICD code 10.9, 10.1,

4    whatever.  Because they do have different ICD

5    codes, primary peritoneal, ovarian, fallopian; they

6    are distinct cancers.

7         But interestingly, Jordan looks at the

8    distinct cancers and they looked at when they could

9    use perineal or genital use of talc.  And they

10   broke it down and they said, okay, we see no

11   increased risk for primary peritoneal cancer.  We

12   see a slightly increased risk for ovarian cancer,

13   again, suggestive of different etiologies between

14   these two cancers.

15        You see in that particular study a slight

16   increase for ovarian cancer.  You do not see that

17   for primary peritoneal cancer.

18        And another thing to note, Your Honor, is when

19   you go to accredited websites, the American Cancer

20   Society, they note on their website the differences

21   between these cancers.  One of which, obviously, in

22   my opinion, points to the fact that they are

23   different cancers.  Men can get primary peritoneal

24   cancer.  Men can't get ovarian cancer.  They are

25   different cancers.

Page 106

1          And their own expert, Dr. Sitelman, in his

2     deposition says, yes, if you look at them under a

3     microscope, they are both serous type cancers, so

4     they come from the same cell, but right now, we

5     think of them as much different.  He says that.

6     They are different cancers.  And I think the --

7          THE COURT:  So what are we missing here?  When

8     I say "we," what are they missing here?  Meaning

9     that they are going to have their expert come in

10    and testify as to ovarian cancer as if it is

11    peritoneal cancer?

12         MR. CARUSO:  Correct, and whether or not they

13    can do that in part depends on what methodology did

14    they use to come in here and say that.  They didn't

15    even engage with this literature.  It's not on

16    their reliances.  She never looked at it.

17         And for her to just come in here -- and the

18    best evidence they have, they cite in their motion,

19    her testimony is:  Did you think they're the same?

20    Yes, I do.

21         Based on what?  How is she able to come in

22    here and say that?

23         THE COURT:  Did anybody ask her that question?

24         MR. CARUSO:  I didn't come in at that

25    deposition, sir, but it's a great question

Page 107

1    because --

2          THE COURT:  But why wasn't that deposition

3    taken?  This seems like an important witness and

4    you seem to have a serious concern with --

5          MR. CARUSO:  I do, Your Honor.

6          THE COURT:  So my question is:  Why wouldn't

7    you take that deposition so the Court would have a

8    record and I would know, for example, what was the

9    answer to your last question?

10         MR. CARUSO:  Well, part of the record you

11   could look at is what studies did she look at,

12   right?  That's on her reliance list.

13         THE COURT:  I'm not willing to do that.  I

14   want to hear the answer to:  What will she say to

15   you in response to that question?  Maybe we need to

16   get her on the phone.

17         MR. CARUSO:  I think the only thing she can

18   say, Your Honor, is that I didn't look at that

19   literature.  It's not on her reliance list.

20         THE COURT:  But I'm not sure she needs to look

21   at the literature.  I need to know what is the

22   basis for her saying that I can treat these two

23   cancers the same, because that is the answer that I

24   would to hear.

25         Well, were you aware of this literature, no,

Page 108

1    okay?  I don't think that in and of itself
2    disqualifies her from testifying, but the answer to
3    that question may.
4        MR. CARUSO:  Right, and I think what they
5    might point to, which they have previously done, is
6    when she listed out what makes these concerns the
7    same, one thing they note is treatment, right?
8    These cancers are treated the same, and oftentimes
9    in the clinical setting, that is why they are
10   conflated so often.
11       But we are not here to talk about treatment
12   and how to best treat these concerns, we are here
13   to talk about the cause of them.  And the
14   literature is clear that there are differences
15   between these two cancers.
16       And despite the representation that the
17   literature is equally clear, that they go through
18   and, you know, say that this is study applies to
19   both ovarian, peritoneal, and fallopian cancers,
20   that is just not borne out.  In the method sections
21   of these papers, they have been going on -- they
22   have 40 different papers.
23       I would like to see in those papers where they
24   point out each time, yes, we are including primary
25   peritoneal.  Yes, we are including primary

Page 109

1    fallopian.  They are not doing that, Your Honor.

2         THE COURT:  I know, but the one article that

3    you have, it says that --

4         MR. CARUSO:  Which one, I'm sorry?

5         THE COURT:  I don't know, this one.

6         MR. CARUSO:  Jordan, yes.

7         THE COURT:  It says that it is strikingly

8    similar, and it suggests that peritoneal cancers

9    may develop along a different pathway.  Tell me the

10   significance.  I don't understand the significance

11   of that.

12        MR. CARUSO:  So that sentence is speaking to

13   the similar patterns of risk for serous ovarian and

14   fallopian tube cancers, right?  And the somewhat

15   different results, which is what I was talking

16   about with respect to talc --

17        THE COURT:  But what is the different pathway?

18   What is the significance of the different pathway?

19        MR. CARUSO:  It's a different etiology.  And

20   it's more clear --

21        THE COURT:  So what significance does it have

22   to this conversation?

23        MR. CARUSO:  It's significant because what

24   they're taking about here, they are talking about

25   talc, right?  They are talking about we looked at

Page 110

1          perineal usage of talc, we saw a slight increased

2          risk for ovarian, none for peritoneal.

3                  It's suggestive of a different pathway, right?

4          A different etiology.  And that's what Dr. Ness is

5          trying to come in here and say, I've looked at the

6          literature and it's the same thing, right?  Ovarian

7          and primary peritoneal, we can just lump them all

8          together because they are treated the same.  But

9          that's not a proper basis.

10                 MS. O'DELL:  Your Honor, whenever you're

11         ready.

12                 THE COURT:  I'm ready.  Go ahead.

13                 MS. O'DELL:  I would say a couple things.

14                 Number one, even in Jordan, if you look at

15         Jordan on the right side of introduction, it says

16         all three of these may be variants of the same

17         malignancy.  If you'll look, paragraph 2 on the

18         right-hand side, it talks about, traditionally, the

19         similarities.  "Their close histological and

20         clinical similarities, all three may be variants of

21         the same malignancy."

22                 THE COURT:  It says they've been classified as

23         separate, but given the close histological and

24         clinical similarities, all three may be variants of

25         the same malignancy.

Page 111

1          MS. O'DELL:  Yes, sir.  And I would just point

2      out, this is a 2008 article, and since then, the

3      literature has developed and they consider them as

4      part of the same disease.  Let me just point out --

5          THE COURT:  But I'm going to ask you the same

6      question I asked counsel.  When your expert is

7      asked the question:  Are they different or are they

8      the same?  And if they are the same, how do you

9      characterize them as the same?  Why do you

10     characterize them as the same?

11         MS. O'DELL:  Because they are -- and let me

12     just say the ICD-9 codes that my respected counsel

13     cited don't make a bit of difference for this.  I

14     mean, we are not talking ICD-9 codes.  We are not

15     talking about what the disease is itself, and from

16     a clinician's perspective, what Dr. Ness would say,

17     as an epidemiologist, has looked at this for

18     decades, she would say are they slightly different

19     in terms of where they're located?  You know, they

20     are contiguous.  But the histological type is the

21     same; the way it is caused is the same from a talc

22     perspective, and because you're dealing with the

23     same cell type.

24         And so one of the other experts said,

25     Dr. Osann, which is one of defendants' experts, she

Page 112

1     says -- when asked on cross-examination at

2     deposition, she said she'd usually consider it the

3     same.  They are usually dealt with together.

4          And so when you look at her treater, he says

5     they are usually dealt with together.  They are

6     usually combined.

7          THE COURT:  But what does the language mean

8     when it says there is a separate pathway?  What

9     does that mean?

10         MS. O'DELL:  Well, one, that's part of the, I

11     would say dicta, from a legal perspective.  In the

12     article, there's a separate pathway.  There is no

13     evidence in the literature that's cited by Dr. Ness

14     or any of the other experts that would suggest that

15     there's a completely different causal mechanism for

16     the way that genital talc causes ovarian cancer,

17     whether it be the fallopian tube, ovary, or --

18         THE COURT:  It says, "There is a suggestion

19     that peritoneal cancer may develop along a

20     different pathway."  I'm trying to understand what

21     the significance of that is, and did your expert

22     consider that there may be a different pathway for

23     the development of peritoneal cancer.

24         MS. O'DELL:  Dr. Ness has considered that, not

25     only for purposes of this case, but for purposes of

Page 113

1       her scientific literature where she's been a

2       principal investigator on epidemiological studies

3       which gathered the design of those, would gather

4       women who have the cancer that's being studied, and

5       within that group, within those cases, they are not

6       only ovarian cancer, they are fallopian tube and

7       primary peritoneal.

8            So yes, has in her own research she considered

9       the differences, to the degree there are?  Yes.

10           THE COURT:  But here is what I don't think you

11      are allowed to do, and I think this is what the

12      defense is concerned about:  You cannot take all of

13      the literature and all of the adverse things that

14      happen for somebody diagnosed with ovarian cancer

15      and try your case as if you're trying it with

16      somebody having ovarian cancer when your client has

17      peritoneal cancer.

18           And you seem to be saying, well, it's the same

19      thing.  And they're saying that, well, who says

20      that?  Where is that coming from, that it's the

21      same thing?

22           And that's why I'm asking, okay, what

23      scientific literature is out there that says that

24      it's the same thing?

25           MS. O'DELL:  Well, Your Honor, I think we have

Page 114

1          to be careful with the terms, and I do think this

2          is really a matter for cross-examination for any of

3          these witnesses because you have studies that we

4          are going to put in front of the jury, and they

5          include not just ovarian cancer, they include

6          primary peritoneal cancer, and they are evaluating

7          the effect of talc to cause primary peritoneal

8          cancer.

9               Now, within the researchers, they group those

10         three things together because they feel that that

11         is an appropriate grouping.  Dr. Osann --

12              THE COURT:  So are you telling me that the

13         testimony is going to be that all of the

14         research -- or the scientific community accepts

15         that all the research associated with ovarian

16         cancer equally applies to peritoneal cancer?

17              MS. O'DELL:  It does in relation to this body

18         of literature because primary peritoneal cancers

19         are included in those studies.

20              THE COURT:  Okay.  I think you need to get

21         your expert on the phone.  I think I need to talk

22         to your expert.

23              MR. OLIVER:  Your Honor, can I add something

24         for the record?  Absolutely, but there is a piece

25         that's been missing from this that I don't think

Page 115

1           anybody talked about, and it may be because I took

2           this deposition.  It was a long time ago.

3                Her treating physician, who is a gynecological

4           oncologist, Dr. Morrissey, actually says -- and

5           I've been reading this.  They asked him a question

6           about what kind of cancer and he says, "Gynecologic

7           primary, which would encompass ovary, fallopian

8           tube, and uterus.  It's not primary peritoneal

9           carcinoma.  It's gynecologic primary."

10               THE COURT:  So she doesn't even have

11          peritoneal cancer?

12               MR. OLIVER:  She has cancer on her ovaries, in

13          her peritoneal, and her own treating physician

14          says -- her own treating physician --

15               THE COURT:  Well, that's a difference.  That's

16          an important fact.

17               MR. OLIVER:  Her own treating physician says

18          these cancers, it's the same cell.  They start in

19          the fallopian tube, based on the literature, they

20          go to the ovaries, they go to the peritoneum.  He

21          says, when they ask him:  Why did you talk about

22          where it was?

23               He said, well, that's how we do it.  We look

24          at where the most massive tumor was.

25               Was it on her ovaries?  Yes, it was.

Page 116

1           THE COURT:  You all should have started with

2      that.  That's a big difference.  That's a big

3      difference than you just saying --

4           MR. CARUSO:  Your Honor --

5           THE COURT:  You've got --

6           MS. BROWN:  I'm Alli Brown, and I just came

7      forward only because I wanted to respond to that

8      point.

9           That testimony actually comes from what was

10     happening during the surgery, so it was before the

11     pathology was finalized.  They do sort of like a

12     frozen check to see what it is.  And the surgeon

13     was testifying sort of at that time we didn't know.

14     And as Mr. Caruso points out, for purposes of

15     treatment, it doesn't really matter.

16          So just in fairness, I think it's a little bit

17     being taken out of context, and I did want to

18     assure the Court the final pathology report is

19     primary peritoneal cancer, no one disputes that.

20     And while purposes for treatment, the surgeon isn't

21     really interested either way if it's peritoneal or

22     ovarian.  From a causative standpoint, it's

23     actually quite an important question that's

24     obviously central to this case.

25          MR. OLIVER:  Your Honor, Dr. Morrissey gave

Page 117

1      that testimony when the final pathology report was

2      presented to his face by their lawyer.  And they

3      were trying to get him to say it's all different,

4      and he said it doesn't matter.  I said that.  I'm

5      the one who wrote it to give it to the pathologist.

6      The pathologist does their thing and I wrote, you

7      know, peritoneal because that's where the biggest

8      massive tumor was.  It was on her ovaries, it was

9      on her peritoneum, it could have been all three.

10         The reason they deposed this man was to try to

11     get him to say what they want him to say in this

12     courtroom, and he wouldn't do it.

13         THE COURT:  What did you want to say, ma'am?

14         MS. O'DELL:  Thank you.  I'll pick up where

15     Mr. Oliver left off, and I thank him for pointing

16     that out more clearly than I had before.

17         But my point being, what he was saying, she

18     was diagnosed at very late stage -- I should have

19     started here, I'm sorry, Your Honor -- very late

20     stage of ovarian cancer, which means it had spread

21     throughout the pelvis.

22         You look at her medical records.  You heard

23     Mr. Oliver talk about the pathology report saying

24     there was cancer on the ovarian surface.  There are

25     other places it refers to primary peritoneal.  Her

Page 118

1          death certificate says fallopian tube cancer.  So

2          it's in evidence that it was throughout the pelvis.

3                  THE COURT:  Okay, I need to understand.  I

4          need to understand.  When you all stand up in your

5          opening statement, okay, you are going to tell

6          these jurors that your experts are going to come in

7          and your client died of, what?

8                  MR. OLIVER:  High grade serous cell cancer.

9                  THE COURT:  Okay.  I don't know what that

10         means.

11                 MR. OLIVER:  That is the type of cancer that

12         Dr. Seskin was diagnosed with.  That is the type of

13         cancer that every single --

14                 THE COURT:  What is it?  It's cancer of the,

15         what?

16                 MR. OLIVER:  It's cancer of the either

17         ovaries, fallopian tubes, or peritoneum.  It is the

18         cell type that was on her ovaries, and it was on

19         her peritoneum, and I believe it was on her

20         fallopian tubes as well.

21                 THE COURT:  I'm trying to understand the

22         significance of this conversation because somehow

23         the defense has the impression that you all are

24         going to be presenting testimony that your client

25         died or contracted peritoneal cancer.

Page 119

1          You now seem to be telling me -- and you may

2     have said it before and I didn't hear it, but you

3     seem to be taking the position that, no, she died

4     of this type of cancer that encompasses, okay, the

5     ovaries, the fallopian tubes, the peritoneal, all

6     of that, but nobody ever isolated and said that it

7     was peritoneal cancer.

8          MS. O'DELL:  There are different references in

9     the records at different times.  As Mr. Oliver

10     mentioned, her pathology report talks about cancer

11     on the surface of the ovary.  There is a reference

12     in the medical records to primary peritoneal.

13     There are references in the death certificate to

14     fallopian tube cancer.  She was a late stage woman

15     with disease throughout her pelvis.

16          THE COURT:  I know, but ma'am, my point is

17     that their argument -- I think their argument

18     diminishes significantly if you are telling me that

19     there are -- the medical experts that are going to

20     come in and testify that your client died of

21     ovarian, peritoneal, and other types of cancer.

22     I'm sorry, I look at his argument and I say, oh,

23     well, ovarian cancer was also a cause of her death,

24     so then I would deny the motion.

25          But I was approaching this as if she died from

Page 120

1    peritoneal cancer as the primary cause of her

2    death.

3         MS. O'DELL:  Her cancer, her pelvic carcinoma

4    is the cause, or was the cause, of her death.  And

5    that's what Dr. Ness will say.

6         Excuse me, just to be clear, she is a general

7    causation witness.  She will say the genital use of

8    talcum powder can cause the type cancer that

9    Dr. Seskin had.  And then there will be another

10   witness --

11        THE COURT:  And the type of cancer that she

12   had was:  Fill in the blank.

13        MS. O'DELL:  Well, she had pelvic carcinoma,

14   which includes, and we have reference in the

15   medical records, to cancer on the ovary to primary

16   peritoneal.

17        THE COURT:  So she didn't just have one type

18   of cancer?

19        MS. O'DELL:  It's just throughout the pelvic

20   area, Your Honor.

21        THE COURT:  Do we know where it started?

22        MR. OLIVER:  We don't.

23        MR. CARUSO:  Your Honor, the pathology report

24   is clear.  So as they pointed out in the

25   deposition, Dr. Morrissey is a surgeon.  And during

Page 121

1    the surgery, as Ms. Brown pointed out, he could not

2    make a determination as to where it was.  That

3    wasn't his role.

4         So he took it, gave it to the pathologist, and

5    the pathologist, undisputed in this case, makes a

6    finding of primary peritoneal carcinoma.  There was

7    involvement of the surface of the ovary, and there

8    was a mature teratoma, which is a benign finding on

9    the ovary.  The primary tumor site, the primary

10   cancer site, her diagnosis is a primary peritoneal

11   cancer.

12        And it is important not just for us, it was

13   important for Dr. Seskin.  In the medical records,

14   she has correspondence with her treating physician.

15   She went got a consultation at MD Anderson, the

16   leading cancer center in America, and they made it

17   a note in the chart from a prior doctor's visit

18   that she had ovarian carcinoma.

19        She responded to that doctor and said there is

20   a mistake in my medical chart.  I do not have

21   ovarian carcinoma.  The pathology was specific for

22   primary peritoneal cancer.  They are just treated

23   the same.

24        That is the language of the record.  It was

25   important to her, it's important in the literature.

Page 122

1    It is true that they are distinct cancers.  It is

2    not the same sort of let's just lump them all

3    together.

4        Some studies have, but not every one, most of

5    them don't even identify what they're calling it,

6    they just say epithelial ovarian cancer.  And they

7    are making the assumption that, oh, well, they are

8    clinically similar, so they must be talking about

9    all the same of the pelvic carcinomas.  No, that's

10   not true.

11       THE COURT:  What they're saying, at least what

12   I heard, is that at the time that her cancer was

13   discovered, it had basically infiltrated all of

14   these different parts, and nobody was able to say

15   that it started here or it started there, and all

16   of the areas were affected.  So she had cancer of

17   her ovarian, she had cancer of -- I mean --

18       MR. CARUSO:  So, Your Honor, cancer obviously

19   metastasizes, right?  And you can start with

20   pancreatic cancer and end up having lung cancer.

21   It's still pancreatic cancer.

22       THE COURT:  But normally the doctors can say

23   where it started.

24       MR. CARUSO:  Correct, they did that here.

25       THE COURT:  It originated here and it spread

Page 123

1        here.

2             MR. CARUSO:  And that's exactly what the

3        purpose of the pathology report was.  What is the

4        source of this cancer?

5             And after analyzing it, the pathologist in

6        this case, Dr. Seskin's treating pathologist, said

7        this is suggestive -- not suggestive.  He says this

8        favors primary peritoneal cancer.  That's what it

9        is.

10            There was minor involvement on the surface of

11       the ovary, and the main mass on the ovary was a

12       mature teratoma.  That's a benign finding.  It's

13       not related to the cancer.

14            These are distinct etiologies, distinct

15       cancers, and I worry that we are getting a little

16       far afield from the main point here, which is

17       Dr. Ness' methodology as to addressing them.

18            THE COURT:  Well, we are not getting far

19       afield because, as I said, I think your argument

20       diminishes if, in fact, she had ovarian cancer as

21       well.  And so the point -- your whole point is

22       that, well, they're different.

23            And so my point is but they're testifying that

24       she had all of it, that the entire area was

25       impacted by the cancer.  And now you're saying,

Page 124

1     well, the pathology seemed to suggest something

2     different.

3          MR. CARUSO:  Yes, the pathology report doesn't

4     suggest something different; it says something

5     different.  It says --

6          THE COURT:  I think you need to reach out to

7     your doctor.  See if your doctor is able to have a

8     15-minute conversation with the Court.

9          MS. O'DELL:  I would be glad to do that, Your

10    Honor.

11         THE COURT:  What's next?

12         Do you need a break?  Let's take a break.

13         MR. OLIVER:  Your Honor, would you like a copy

14    of a surgical report where he confirmed -- well, he

15    confirmed in his deposition, but --

16         THE COURT:  This is Dr. Ness?  Dr. Ness is the

17    doctor we're talking about, right?

18         MR. OLIVER:  Sure, but Dr. Ness is an expert.

19    Dr. Morrissey is -- and I think one of the things

20    that's happened here, Your Honor, is we've gotten

21    general causation expert and we're talking about a

22    specific cause issue.  But the thing that wasn't

23    said is every one of our experts -- our experts,

24    not theirs.  I understand their experts can say

25    what they want them to say.

Page 125

1          Our experts are all going to say -- you know,

2      Dr. Chan, specific causation.  Does it affect your

3      conclusion at all from a geographic standpoint, the

4      largest mass of the tumor was in the peritoneum, or

5      was diagnosed as primary peritoneal, and he is

6      going to say it doesn't affect it because the

7      literature is the same because the cell type is the

8      same.

9          I can have melanoma on my private parts.  She

10     can have melanoma on her private parts.  It's a

11     different type of cancer.  I've got primary cancer

12     on something different than what she has, but it's

13     the same cancer.

14          MS. O'DELL:  And Your Honor, I would just --

15          THE COURT:  We are taking a break.  We'll come

16     back.

17          (A recess was taken at 11:54 a.m. and the

18  proceedings resumed at 12:05 p.m.:)

19          THE COURT:  Let's go back on the record.

20          MS. O'DELL:  How do you want to do this in

21     terms of speaking with Dr. Ness?

22          THE COURT:  Where is Dr. Ness located?

23          MS. O'DELL:  She's in Houston.

24          THE COURT:  I can't call from here.

25          MS. O'DELL:  Can I put her on my cell phone?

Page 126

 1          Is that appropriate?

 2              THE COURT:  I don't know how loud that is

 3      going to be.  Go ahead, you can try.

 4              (A speakerphone telephone call was placed.)

 5              DR. NESS:  Hello?

 6              MS. O'DELL:  Hi, Dr. Ness.  This is Leigh.

 7      I'm in the courtroom with Judge Thomas.  I've got

 8      you on speaker and you are on the bench in front of

 9      Judge Thomas.  He has a question for you.

10              THE COURT:  Can you hear me?

11              DR. NESS:  I can.  Good morning, Your Honor.

12              THE COURT:  All right.  Good morning.

13              One of the conversations we've been having is

14      a basis of your opinion, and the conversation about

15      whether or not this was ovarian cancer, or if it

16      was primary peritoneal cancer, and whether or not

17      it makes a difference.  So my question to you is:

18      Your understanding and your testimony is going to

19      be what type of cancer was this?

20              DR. NESS:  Yes, okay, so let me just be real

21      clear about this:  They are the same.  There really

22      isn't a distinction between the two, Your Honor.

23      And the reason that I say that is based upon just

24      the literature at this point is exceptionally clear

25      that the genesis, the origin of these tumors, you

Page 127

1     know, whether they are found on histology lining

2     the ovary, whether they are found in the fallopian

3     tube, whether they are found in the peritoneum, all

4     of those tumors derive from the exact same thing,

5     and that is fallopian tube tissue.

6          They are called FIT tumors.  So they spread to

7     all these different places because they are all

8     contiguous; however, they all derive from the exact

9     same tumor type.  So they are the same.  There is

10    really not a distinction between tumors that are

11    found lining the ovarian tissue or tumors that are

12    found lining in the peritoneal tissue.

13         THE COURT:  Well, when you say they are the

14    same, because there is -- this is a Jordan study, I

15    don't know how else to characterize it, and the

16    defense gave me this, and it says the following:

17    It says that the strikingly similar patterns of

18    risk of serous ovarian and fallopian tube cancers

19    and the somewhat different results from primary

20    peritoneal cancer suggests that the peritoneal

21    cancers may develop along a different pathway.

22         What does that mean?

23         DR. NESS:  Well, that's the opinion of a

24    single author, and what you'll hear from me in the

25    courtroom is that we never rely on a single

Page 128

1    opinion.  So peritoneal tumors and ovarian tumors,

2    there is a slew of literature that suggests that

3    they have very similar risk factors.

4         You know, you may find one study outlier there

5    where they find different risk factors for the two,

6    but the fact of the matter is, you know, I can show

7    you numerous papers that will say that serous

8    tumors derive from these FIT precursor cells and

9    that they spread to all these different places.

10   And I can find you numerous papers that show that

11   the risk factors are very, very similar.

12        THE COURT:  There was an argument that at the

13   end of all of this, her diagnosis was primary

14   peritoneal cancer.  You're saying that that has no

15   significance to this conversation?

16        DR. NESS:  That is correct.  That is exactly

17   100 percent, 1,000 percent what I am saying.  That

18   is my opinion.

19        THE COURT:  I'm going to let the defense ask

20   any questions that they may have of you.

21        MR. CARUSO:  Cross her on these points?

22        THE COURT:  Well, you can ask her whatever

23   questions you have.

24        MR. CARUSO:  Fair enough.

25        So, Dr. Ness, I just want to ask a few

1    questions about how you went about confirming that

2    these risk factors are sufficiently similar that

3    you do not need to address studies like Jordan

4    2007, Fortner 2020, and Sorenson 2015, which

5    suggest the opposite.

6         DR. NESS:  Okay, well, let me be clear about

7    something:  You know, you're catching me

8    unprepared.  You know, I'm not testifying until the

9    week of the 20th, and I have not reviewed this

10   particular aspect of the literature, so I can't

11   throw back at you references.

12        MS. O'DELL:  Dr. Ness, this is Leigh.  I'll

13   point out, the Court needs to know that those

14   references that were just listed are not something

15   that Dr. Ness was asked about at her deposition.

16   They are certainly not something --

17        THE COURT:  But they didn't take her

18   deposition.

19        MS. O'DELL:  They did take her deposition.

20        THE COURT:  Oh, you took her deposition?

21        MS. O'DELL:  She's been deposed.

22        MR. CARUSO:  I did not, but her deposition was

23   taken.

24        THE COURT:  Okay, when I asked did you take

25   her deposition, I'm not talking about did you

Page 130

1      personally take it; I'm talking about did your team

2      take the deposition.  That's why I thought -- okay.

3              MS. O'DELL:  Dr. Ness' testimony was very

4      clear that she considered them to be part of the

5      same disease, just like she stated, and no further

6      questions were asked.

7              DR. NESS:  That's correct.  I mean, this is a

8      complete curve ball out of nowhere, so I know now

9      that when I come to trial, I will be prepared to

10     answer these questions with lots of references.

11             THE COURT:  All right.  Do you have any other

12     questions?  She says she's not prepared because the

13     literature that you're making reference to, she

14     doesn't have it in front of her, so she hasn't had

15     a chance to be able to properly respond so it.

16             Did you all provide this literature to her?

17             MS. O'DELL:  She was not examined on this

18     literature at her deposition.

19             MR. CARUSO:  It was in the briefing on this

20     point, and I think this is part of our point, Your

21     Honor, that she has not engaged with this

22     literature.

23             THE COURT:  You've got give her an opportunity

24     to respond to it.  What she is saying is that I may

25     have a perfectly good reason to be able to respond

Page 131

1         to it, but you haven't -- I don't know it, so I

2         can't respond to it.

3              And by the way, if she can't respond to it,

4         it's hard for the Court to make a conclusion as a

5         matter of law that her opinion should be excluded.

6              MR. CARUSO:  But her obligation in conducting

7         her general causation analysis was to take the

8         literature and apply it to the specific cancer.

9         That was her obligation.

10             DR. NESS:  Wait, wait, wait, I --

11             THE COURT:  No, Doctor, you have to wait.

12        Doctor, we'll let you know when we need you to

13        speak, okay?

14             DR. NESS:  Sorry.  Apologies.

15             MR. CARUSO:  She looked at ovarian cancer

16        literature, which, in some cases, in the

17        methodologies of the studies, include -- they state

18        explicitly in this study, we will look at ovarian,

19        fallopian, and peritoneal cancers.  In other

20        studies, there is no mention of peritoneal cancer.

21             THE COURT:  But what you're doing -- and I

22        will accept that's your argument.  The problem is

23        that you can't ask me to exclude a witness based

24        upon studies that you've never presented to the

25        witness to allow the witness to explain to you why

Page 132

1    those studies are not either reliable or why those

2    studies were not considered.  That just is

3    fundamentally unfair.

4        And I don't know enough about the science for

5    me to just say, oh, you found these articles and

6    she didn't consider them.  She didn't find them,

7    she didn't know anything about them, oh, I'm going

8    to eliminate her testimony.  I won't do that.

9        You've got to give the expert -- especially

10   since you deposed the expert.  And when you deposed

11   her, you didn't even ask anything about this.  And

12   so now you want me to exclude her based upon the

13   fact that you found articles that you never asked

14   her about.  I find that to be fundamentally unfair.

15       MR. CARUSO:  Well, Your Honor, we do have in

16   our --

17       THE COURT:  Doctor, we don't need you any

18   further.  Thank you.

19       DR. NESS:  Okay.  Thank you very much, sir.

20       MS. O'DELL:  Thank you, Doctor.

21       THE COURT:  Go ahead, sir.

22       MR. CARUSO:  Our experts, such as Dr. Osann,

23   do engage with this literature in her report, such

24   as Fortner, and she goes through why there is a

25   meaningful difference here, and that difference is

Page 133

```
 1        not addressed in plaintiff's reports.  And it's
 2        their obligation under Daubert to match up the
 3        specific condition that is alleged in the case with
 4        the literature, and they have not done that here.
 5        And it's not our obligation to show them the
 6        literature that conflicts with their position.
 7        Their methodology has to be sound.
 8             THE COURT:  It may not be -- if you take the
 9        position it is not your obligation, I personally do
10        not think that this is good practice.  I'm just
11        being candid with you.
12             If you are going to challenge their expert on
13        this level, you have to ask the expert about the
14        studies.  How can we as lawyers -- we are not the
15        science people.  How many times have you all sat up
16        here and said, Judge, I'm not a science person;
17        Judge, I'm going to do the best I can.  Why?
18        Because that's not our field.  That's not part of
19        our brain that works.  They are.
20             We have to give them an opportunity to educate
21        us so that we are making informed decisions, not
22        basically saying -- and you saw it.  You got my
23        attention.  I said, okay, we spent, how long, about
24        35 minutes on this.  All because I was like, well,
25        I don't understand that, what does this mean?
```

Page 134

1           And then I find out that you did take her

2      deposition and you never asked her about it.  So

3      I'm not excluding her based upon that.  It's

4      denied.

5           MR. CARUSO:  Understood, Your Honor.

6           THE COURT:  Next motion?

7           MR. CARUSO:  Can I address other points in

8      Dr. Ness' --

9           THE COURT:  Sure.

10          MR. CARUSO:  Okay.  So I would also like to

11     address her methodology as to her asbestos opinions

12     and her heavy metals opinions.

13          THE COURT:  Okay.

14          MR. CARUSO:  With respect to her asbestos

15     opinion, she is going to try and come in here and

16     tell the jury that Johnson's baby powder is

17     contaminated with asbestos, all talcum powders are

18     contaminated with asbestos, and that is considered,

19     in my opinion, to be one of the causes of

20     Dr. Seskin primary peritoneal cancer.  And her

21     basis for saying talcum powder is contaminated with

22     asbestos is her review of about 50

23     plaintiff-selected documents out of the tens of

24     thousands, hundreds of thousands of documents.

25          And when we said, okay, well, how do you know

Page 135

1      what they mean?  Because these are sophisticated

2      testing documents, obviously very complex, as we've

3      heard in previous motions.  And she said, well, I

4      can read the English language.

5           That is not a sufficient basis.  If that's all

6      it takes, to read these, then the jury can do that.

7      She does not need to come in here then.

8           THE COURT:  Let's just be honest.  I'm not

9      sure it's fair to put jurors -- I wouldn't even put

10     myself -- on the same level of somebody who is a

11     doctor who has studied this and they are reading

12     the literature as compared to us.

13          Do you know how many times, your motions, I

14     had to read them?  And I don't consider myself dumb

15     or thick, but as I was reading it, I was like,

16     okay, what did he just say?  Because you all start

17     throwing around that jargon and it's foreign to me.

18          So my brain is immediately saying, okay,

19     invader, invader, ignore it, ignore it, and then

20     I've got to refocus myself and I've got to read it

21     again.  And it's not, well, they said it, Judge,

22     they wrote it in a motion, so it should be that

23     easy.  No.

24          Sometimes it requires a level of knowledge, a

25     level of sophistication that I don't think most

Page 136

1    jurors, all the jurors are required to do, there is

2    no educational requirement for jurors.  Hopefully

3    they can read and they can write.

4         MR. CARUSO:  Right, so I'll go to this point

5    then, Your Honor.  If that is true, correct, that

6    you need some sort of sophistication, and Dr. Osann

7    is a highly educated individual, perhaps more than

8    some of our jurors will be, they have an expert

9    coming in here who is going to testify that, okay,

10   I've looked at all of this information and I

11   determine that there is a chance of asbestos

12   contamination in Johnson's baby powder.  They can

13   have that expert -- I'm sure we are going to argue

14   about that, we already did, but it's not Dr. Ness.

15        THE COURT:  You're right.  I don't allow

16   cumulative testimony.  And, in fact, I don't know

17   why Dr. Ness needs to testify that baby powder

18   contains asbestos; I think Dr. Ness needs to

19   testify asbestos was a cause of the injury.  I

20   don't think she needs to say it was from baby

21   powder.  I think she can say asbestos is a cause of

22   the cancer that the plaintiff succumbed to.

23        MR. CARUSO:  And even just to supplement that

24   point, Your Honor, even if she wants to do that,

25   her basis for saying so is the IARC Monograph,

Page 137

```
 1         which looks at a completely different type of

 2         asbestos exposure.  It's completely inapposite as

 3         to what type of exposure they are alleging here

 4         with Dr. Seskin.

 5              What they are going to come in here and say is

 6         that Johnson's baby powder was contaminated with --

 7         we'll take one example -- .00002 percent asbestos.

 8         The types of studies that the IARC Monograph is

 9         looking at are studies where, during World War II,

10         women were working in factories and getting huge

11         amounts, occupational amounts of asbestos exposure.

12         That's a completely different scenario.

13              It's not applicable to the type of allegations

14         that are made in this case where it's, you know,

15         trace amounts of asbestos exposure that they are

16         alleging.  So even on that ground, she can't come

17         in here without doing a comprehensive review of

18         this literature and say this.

19              THE COURT:  Do you want to respond?

20              MS. O'DELL:  Yes, please.  I mean, what

21         Dr. Ness will say is I've seen evidence that there

22         is asbestos in Johnson's baby powder, and she is

23         going to base that on the opinions of Dr. Rigler,

24         going to testify to his testing.

25              THE COURT:  Why does she need to testify to
```

Page 138

1       that?  Why would we care what she thinks is in the

2       baby powder?

3             MS. O'DELL:  She needs some basis to include

4       it in her systematic review to say this literature

5       that shows asbestos can cause ovarian cancer is

6       relevant.  And I think clearly --

7             THE COURT:  I'm sorry, what is her purpose for

8       testifying?  Testify to say what?

9             MS. O'DELL:  Let me back up.  Dr. Ness is an

10      epidemiologist who can testify to the health

11      effects of Johnson's baby powder, whatever its

12      constituents are, which include asbestos, platy

13      talc --

14            THE COURT:  Why is she testifying as to

15      Johnson's baby powder?  Why isn't she just

16      testifying as to the chemicals -- like, for

17      example, why is she says Johnson & Johnson as

18      compared to testifying if there's magnesium in it

19      and talc, whatever is in it, that should be her

20      opinion.  How is she qualified to basically then

21      testify as to Johnson & Johnson's product?

22            MS. O'DELL:  Well, I would use the analogy of

23      a pathologist and an oncologist.  The pathologist

24      looks at a slide and identifies the type of cancer,

25      what's there, but an oncologist takes that

Page 139

1    information and he or she evaluates it from a
2    health perspective.
3         Well, that's what Dr. Ness is doing.  As an
4    epidemiologist, she will testify to the health
5    effects of asbestos and that asbestos can cause
6    ovarian cancer.
7         THE COURT:  I don't have a problem with that.
8    I have a problem with you saying she's going to say
9    that the product had asbestos.  She can say this is
10    what asbestos -- this is what a product containing
11    asbestos will do if it is -- if the body comes in
12    contact with it, okay?  That's consistent with what
13    I saw in the pathology of this particular
14    plaintiff.
15         MS. O'DELL:  Right.
16         THE COURT:  But she can't say -- because you
17    have other people saying --
18         MS. O'DELL:  She will not go into that in
19    detail.
20         THE COURT:  She doesn't go into it at all as
21    it relates to Johnson & Johnson.  All she should
22    simply say is asbestos, this is what it does, this
23    is how it affects the body, this is what it causes.
24         MS. O'DELL:  She can certainly --
25         THE COURT:  She cannot say:  So Johnson &

Page 140

1        Johnson product contained asbestos, so this is what

2        Johnson & Johnson's product did to the plaintiff.

3            MS. O'DELL:  She is not going to say that

4        because she is not case-specific.  She is a general

5        causation expert.  And she is going to testify that

6        asbestos and other constituents that witnesses will

7        talk about are in Johnson's baby powder can cause

8        ovarian cancer.

9            THE COURT:  No, she can testify -- without

10       making reference to what other people testify to --

11       asbestos and other constituents cause cancer.

12           MS. O'DELL:  Right.

13           THE COURT:  Not the way you phrased it.  And

14       by the way, it's your job to link it and put it all

15       together.

16           MS. O'DELL:  I think we will do that, Your

17       Honor.

18           THE COURT:  What's your next issue?

19           MR. CARUSO:  My next issue with Dr. Ness --

20       and I can anticipate where you're going to go with

21       it based on what we just discussed -- is she has a

22       similar opinion as to heavy metals, except even

23       less attached to any sort of --

24           THE COURT:  That baby powder has heavy metals

25       in it too?

Page 141

1          MR. CARUSO:  No, she is going to testify based

2      on one paper from 1997 from a supplier of our talc

3      that there were increased levels of chromium,

4      cobalt, and nickel.  And she has not done a single

5      review on this.

6          THE COURT:  I don't understand that.  I don't

7      understand how she can testify to that.  I'm

8      assuming there is somebody else who can testify to

9      what was in your product.  I don't think this

10     doctor is that person.

11         MR. CARUSO:  And the related point, Your

12     Honor -- I agree with that.  The related point is

13     she can't come in here and say that those

14     constituent metals are linked to cancer because we

15     asked her:  Have you done a comprehensive search on

16     the topic of whether heavy metals in the presence

17     of talc powders contribute to their

18     carcinogenicity?  I have not.

19         Then we asked her:  Have you done it for

20     chromium, cobalt, nickel?  No, I haven't.

21         So even though she can't come in and say

22     what's in the baby powder, she can't --

23         THE COURT:  What is the basis of her saying

24     that heavy metals contribute to cancer?

25         MS. O'DELL:  Well, there is evidence in

Page 142

```
 1          Johnson & Johnson's own documents that other
 2          witnesses can talk about that there is nickel at
 3          high levels of 1,800 parts per million, chromium,
 4          and cobalt.  And then what Dr. Ness can testify to
 5          is the health effects of those constituents, and
 6          particularly the International Agency for the
 7          Research on Cancer has determined that nickel and
 8          chromium are group 1 known carcinogens.
 9              THE COURT:  But is she doing that just because
10          she read an article or is she doing that because
11          she studied it?
12              MS. O'DELL:  She's read a comprehensive review
13          and the literature in the comprehensive review that
14          was done by --
15              THE COURT:  I don't understand that.  Is that
16          what we're coming down to in terms of experts, we
17          give them some literature, some peer reviewed
18          article, and we say, okay, you've read it, now come
19          in and tell us what it says?
20              MS. O'DELL:  No, sir, that's not it at all.
21          What we're saying is the product as a whole, just
22          like a cigarette, has numerous constituents, and
23          they, combined together, can cause ovarian cancer.
24          And that's what Dr. Ness is going to say, but
25          within the product itself, the presence of these
```

Page 143

1    substances that explain the biologic mechanisms by

2    which it causes cancer.

3        THE COURT:  My question though is:  How is she

4    qualified to speak about metals causing cancer

5    other than the fact that she's read an article that

6    says it?

7        MS. O'DELL:  It's more than that.  She's read

8    comprehensive reviews of that literature and she is

9    a cancer researcher for 25 years who has --

10       THE COURT:  So she's seen it?  Has she seen

11   and been part of studies of which metals have

12   caused cancer?  Because I don't think experts are

13   conduits to basically come in here and basically

14   put out what the literature is.  Experts don't just

15   come in and say, oh, by the way, this is what the

16   literature says and I agree with it.

17       MS. O'DELL:  No, sir, but she as a cancer

18   researcher can take the literature from her

19   perspective as someone who has done these studies

20   on women with ovarian cancer, and other types of

21   cancer for that matter, and she can assimilate that

22   literature and help explain why --

23       THE COURT:  But she's never done it as it

24   relates to metals?

25       MS. O'DELL:  Well, there is a difference, Your

Page 144

1          Honor, in saying she's not written a study that has

2          to do with nickel per se in women in saying that

3          the scientific literature, the consensus is that

4          nickel is an inflammatory agent that causes such a

5          reaction that it's not a possible carcinogen or a

6          probable carcinogen, but the World Health

7          Organization has determined it is a known

8          carcinogen to cause cancer.

9               And so it is just a small part, but a part of

10         Dr. Ness' opinion that says the presence of these

11         constituents help explain the mechanism by which

12         talcum powder causes ovarian cancer.

13              THE COURT:  So you're doing exactly what I

14         said.  It's not based upon any firsthand knowledge,

15         you're just basically repeating what the literature

16         says?

17              MS. O'DELL:  Your Honor, if that was the rule,

18         that an expert could never testify to somebody

19         else's article, they could never read the

20         literature, assimilate it, formulate an opinion and

21         testify to it, you had to be an author of the

22         study, then frankly --

23              THE COURT:  I didn't say she had to be an

24         author of the study.  What she has to have been is

25         she has to have at least experienced -- if she's

Page 145

1     never come in contact with metals causing cancer,

2     if she's never done any studies of metals causing

3     cancer and the only basis is that she read an

4     article, scientific article, well respected

5     article, and that article says it, my whole point

6     is that she's just a conduit to whoever did that

7     study.

8         You're coming in and wrapping her up in this

9     cloud of, I guess, credibility based upon something

10    that somebody else did.  So I'm not saying that she

11    can never -- or no one can ever testify about a

12    study that they weren't part of.  We have talked

13    about multiple studies that I would allow people to

14    come in and testify to.  But I have to be that it

15    has to be related to something that they have done.

16    I mean, something they have seen.

17        MS. O'DELL:  Well, it is related to something

18    she has done.

19        THE COURT:  Has she ever seen a cancer that

20    was caused by a carcinoma caused by metal?

21        MS. O'DELL:  I can say with 90 percent

22    certainty that she has.

23        THE COURT:  Okay.

24        MS. O'DELL:  But let me just say this, Judge:

25    When we get to this part of her opinion, I will lay

Page 146

1    the foundation.  So she lays that foundation that,

2    yes, she has seen this in her --

3         THE COURT:  The problem that you're going to

4    have -- and I don't know why you would ever want to

5    put yourself in this position, but I'm either going

6    to stop her, or I'm going to give a curative

7    instruction.  I'm going to strike it from the

8    record and give a curative instruction telling the

9    jurors to disregard the testimony.

10        Why anybody would ever want to put their

11   expert in that position -- your expert is going to

12   get frustrated because your expert is going to

13   think that they are certainly capable of doing

14   that, they are going to think that the Court is

15   somehow suggesting that they are not as qualified

16   as they think they are, and it just affects the

17   entire presentation.  It doesn't make sense that

18   you would proceed that way.

19        Now, I've seen lawyers proceed that way, but I

20   need you all to know that I'm not shy in saying

21   that.  If I think that your expert is basically

22   giving an opinion that your expert should not be

23   giving, it's better to do it now rather than wait

24   until your expert is on the witness stand and me do

25   it in front of the jury.

Page 147

1           MS. O'DELL:  Yes, Your Honor.  Just to be

2      clear, what Dr. Ness has considered as part of her

3      opinion in this area is not one article.  It is

4      compilation of all the literature that deals with

5      nickel, chromium, and cobalt as gathered and

6      synthesized by the International Agency for the

7      Research on Cancer.  So it's not just one peer

8      reviewed paper, it is comprehensive --

9           THE COURT:  So?

10          MS. O'DELL:  -- that says, that concludes, and

11     it's generally accepted, that nickel can cause

12     cancer.

13          THE COURT:  I'm not suggesting that the

14     articles are not accurate.  What I'm suggesting is

15     that the only reason she knows any of this is

16     because she just simply read an article.  She's

17     never treated a patient, she's never done a study,

18     all she's doing -- what's the difference of going

19     and finding an orthopedic doctor who has never done

20     a surgery, never done a surgery on the knee, but

21     you call him as a witness and they come in and say,

22     oh, I read these articles and this is all the

23     problems with the knee.

24          Well, how do you know that?  Have you ever

25     done a surgery?  No.  Well, then why would you be

Page 148

1    able to come in and testify about --

2        Yeah, anybody can open up a book and see the

3    anatomy and shows what the knee -- how the knee is

4    structured, but that doesn't make you qualified to

5    come into court and give an opinion based upon a

6    surgery of a knee if you've never done surgery on a

7    knee.  You have to have --

8        And by the way, I'm not saying she had to have

9    the leading study, I'm not saying she had to have

10   treated 50 people, but she had to have had some

11   exposure to metal causing a carcinoma in order for

12   her to come in and give an opinion that it does.

13       MS. O'DELL:  In her work as professor of

14   public health at the University of Texas, Your

15   Honor, I am confident that she has dealt with heavy

16   metals extensively.

17       THE COURT:  Then you're good.

18       MS. O'DELL:  Okay.

19       MR. CARUSO:  Your Honor, we --

20       MS. O'DELL:  I just can't point to an article

21   that she's written.

22       THE COURT:  I'm telling you I'm not excluding

23   her based upon that at this time because you're

24   telling me that you're able to relate it.  If you

25   are not able to relate it, I'm telling you I will

Page 149

1     ask the jurors to strike her testimony and

2     disregard it.

3          MS. O'DELL:  Understood.

4          MR. CARUSO:  We asked her, and she said, "I

5     have not reviewed that literature in detail,"

6     period.

7          THE COURT:  No, I'm not talking about

8     literature.  I'm talking about whether or not she

9     herself has ever treated someone where she has --

10     it has been suggested that it was metals that

11     basically, or some metal product that caused the

12     carcinoma.  And if the answer to that question is I

13     have, I think she's allowed to testify.

14          MS. O'DELL:  Thank you, Your Honor.

15          MR. CARUSO:  But also, Your Honor, it needs to

16     be related to the product that we're talking about

17     and she has no basis to say that these metals are

18     in talcum powder.

19          THE COURT:  She doesn't have to say.  You

20     asked me to have her not to say it.  All she's

21     going to testify to is if these metals are present,

22     these metals can cause cancer.  She's not going to

23     testify that it was present in talc or in Johnson &

24     Johnson's product.  They have other experts who are

25     going to testify to that.

Page 150

1           What she is saying is that metals, this is how

2       the metals, when introduced into the body, can

3       cause cancer.  And I think if she's had that

4       experience -- and you're representing to me that

5       you believe it's there -- I will overrule the

6       objection and I will allow her to testify to that.

7       And if she doesn't, then she won't testify to it.

8           MS. O'DELL:  Thank you, Your Honor.

9           MR. CARUSO:  Thank you, Your Honor.

10           THE COURT:  Thank you.

11           Next?  Plaintiff, I believe you're up.

12           MR. OLIVER:  We don't have any more Dauberts,

13       Your Honor.  Do you want to move on to MILs?

14           MR. CARUSO:  We have Dr. Chan.

15           MR. OLIVER:  I don't think we have any more

16       Dauberts.

17           THE COURT:  We've got to do everything, so

18       what's next?

19           MR. OLIVER:  Okay.  We'll do attorney

20       advertising, motion in limine.

21           THE COURT:  Attorney advertising?

22           MR. OLIVER:  Yes.  We filed a motion in limine

23       to keep out mention of attorney advertising.  One

24       of the things that the defendants have done in

25       other cases -- and I cited some of this in the

Page 151

1    motion, and I reread it after three years that I

2    wrote it, and I couldn't believe it.  I was like, I

3    can't believe they're saying this stuff in trials.

4         They are going to go in, if allowed, and at

5    some point in the trial, they will make the

6    argument that the reason they took baby powder off

7    the market is because they have been inundated with

8    lawsuits, and what one of the attorneys said was

9    it's 1-800 Sue Me, 1-800 Sue Johnson & Johnson, and

10   they need another defendant.  It's stuff that's

11   totally irrelevant.

12        Now, let me tell you why --

13        THE COURT:  Wait a minute, they are saying

14   that during the trial?

15        MR. OLIVER:  They are saying that during the

16   trial.  I don't think it was Ms. Brown, just to be

17   clear.  It was one of her colleagues who tried

18   another case, and that colleague actually gave an

19   interview about it to Law 360.

20        And I want to be clear about something, Your

21   Honor.  The reason they do that that is their

22   theory of why they took it off the market.  They

23   say our product is completely safe, we took it off

24   the market dastardly attorneys doing all this.

25        Now, there is a piece of evidence in our case,

Page 152

1    and I want to be clear.  I don't want you to hear

2    this from them first.  They asked my client when he

3    and his wife decided to file a lawsuit and they did

4    see an advertisement.  It wasn't my advertisement.

5    He didn't call the person on the advertisement, he

6    called me because we've been friends -- he

7    testified to all this.  He called me because we've

8    been friends for 12 years before any of this

9    happened and asked some questions and then retained

10   me.

11       It doesn't -- and in their motion, they talk

12   about this.  And I reread their opposition.  It's

13   very circular.  They were like, well, we have to

14   know why they filed a lawsuit.  And I'm like, that

15   is not relevant.  The relevant thing is did my

16   client get exposed to the product --

17       THE COURT:  I have never allowed a party,

18   plaintiff or defendant, to testify that, oh, I was

19   in the accident and then I called my lawyer before

20   I called the doctor.  Or I called my lawyer and --

21   I think it's dangerous, a slippery, slippery slope

22   to get into.

23       If you want to ask questions in jury selection

24   about lawyers advertising, I guess that's really

25   local lawyers more than anything else because I

Page 153

1         think we have some lawyers who are local, Morgan &

2         Morgan, Rubenstein Law, they are all over the air

3         waves.  I just did a trial with Rubenstein Law and

4         I allowed them to ask the question because they are

5         local and they advertise extensively here, and they

6         need to know whether or not jurors think that

7         that's a problem.

8              But I don't know -- and I guess I'm about to

9         hear -- why lawyer advertising is relevant in this

10        case.

11             MR. OLIVER:  Your Honor, can I leave you with

12        one fact just to make it clear?  My client didn't

13        see this until she was a month from her death, and

14        she suffered with cancer for three years.  I just

15        want to make it clear this is not a situation where

16        she saw some advertisement, filed a lawsuit at

17        diagnosed.  This happened right before she died.

18             THE COURT:  All right.  Let me hear from the

19        defense.

20             MS. SCOTT:  Your Honor, a big part of the

21        basis of this motion in limine is they want to

22        prevent us from coming in here and disparaging

23        plaintiffs, plaintiffs' attorneys, or their claims

24        or things of that nature, and that is absolutely

25        not what we are going to do, but it is a part of

Page 154

1     this case.  I mean, the testimony of the plaintiff

2     here is that they saw a lawyer ad, and afterwards,

3     they said that's the basis of my belief now that I

4     have this ovarian cancer.

5          So we are allowed to ask questions about the

6     basis of the claim, the validity of the claim, the

7     credibility of the witness for bringing the claim.

8          THE COURT:  What is the relevance of that?  Is

9     it any different if she saw an ad that wasn't a

10    lawyer ad?  She just saw an ad.  If you want to ask

11    because you think it's relevant, I was driving one

12    day and I saw a billboard and it made me -- and

13    after I saw that billboard, then I called my

14    lawyer.  I mean, I don't know why you need to say

15    that.  I don't understand why it is -- what does it

16    go to show?

17         MS. SCOTT:  The relevance, Your Honor, is that

18    the basis of this lawsuit is not the science, as

19    they are going to try to say.  They are going to

20    try to say the science supports their theory of the

21    case, but the motivation for bringing this lawsuit

22    was not the science.  It was seeing this ad and

23    saying, oh, it's an ad, let's investigate and see

24    if we have a claim.

25         THE COURT:  I disagree.  And by the way, you

Page 155

1    cannot stand here and tell me that the motivation

2    of somebody who has carcinoma and is dying from

3    carcinoma is because they saw an ad.

4         The motivation is that I'm dying from

5    carcinoma.  Somebody may have told me that I have a

6    right, but the motivation isn't because I saw a

7    sign.  No.  Somebody telling you that you have a

8    right to file a lawsuit doesn't mean that that's

9    the reason you filed the lawsuit.  You filed the

10   lawsuit because you were dying of carcinoma and you

11   believed that the defendant is responsible for your

12   injury.

13        So I'm excluding it.  I don't think it's even

14   close.

15        What else?

16        MR. CARUSO:  Should we do Dr. Chan now, motion

17   to exclude?

18        THE COURT:  Let's do that after lunch.  I

19   don't want to do another Daubert motion.

20        MR. OLIVER:  Do you want us to do more MILs

21   until 1:00?

22        THE COURT:  Yes, and then we'll come back and

23   do Dr. Chan.

24        MR. PENDELL:  I was going to say, Your Honor,

25   I think Dr. Chan is easy.

Page 156

1              MR. CARUSO:  I would disagree.

2              THE COURT:  Of course.  Let's do it after

3        lunch.  Let's go ahead and do another motion in

4        limine, if the defense has another motion in

5        limine.

6              MS. SCOTT:  We've got quite a few.

7              MR. OLIVER:  Which one are we doing, Sydney?

8              MS. SCOTT:  I think we'll go to our motion in

9        limine 35, which is related to the bankruptcy, and

10       it might be a quick one to go over, Your Honor.

11       Motion in limine 35, we talked a little bit about

12       the bankruptcy issue on Monday.  The motion in

13       limine 35 goes to excluding evidence that's a

14       reference to LTL, which is the successor in

15       interest of JJCI's --

16             THE COURT:  I'm sorry, aren't they a

17       defendant?

18             MS. SCOTT:  LTL?  Or LLT?  They are a

19       defendant, but the issue in this motion in limine

20       is that evidence related to their restructuring

21       should be excluded as irrelevant because it doesn't

22       have any bearing in this case to the extent we need

23       to talk about it.  For example, telling the jury

24       who LTL is, we have a stipulation in the jury

25       instructions that discuss who LTL is.

Page 157

1              THE COURT:  Well, if punitive damages are in

2       the case, certainly that would be relevant and

3       probative.

4              MS. SCOTT:  For punitive damages, Your Honor,

5       but the financials of LTL wouldn't be relevant and

6       we can stipulate to those numbers.

7              THE COURT:  No, no, what I'm saying -- what I

8       don't allow is I don't allow people to stipulate

9       away bad facts, okay?  I think they have a right

10      prove their case, and if they want to prove it

11      without accepting your stipulation, I think they

12      have a right to do that.

13             But I agree with you that, for purposes of the

14      liability, I don't know why we need to get into the

15      restructuring.  That, to me, is not relevant and

16      probative to anything.  It's just liable; how are

17      you liable, okay?

18             But when it comes to punitive damages -- and

19      now this is if what counsel represented to me on

20      the Zoom is accurate, and I'm not saying it is,

21      that's just what counsel said, I think it's

22      relevant and probative to the issue of punitive

23      damages.

24             MS. SCOTT:  It is to the extent of the

25      financials or the amount, Your Honor, the net worth

Page 158

1       of the defendant.

2              THE COURT:  And why you did what you did.

3       They allege that what you did was basically you

4       restructured and you took all the money out of the

5       company and you basically then put some money into

6       this other entity for the sole purpose of just

7       resolving lawsuits, but it was a small fraction of

8       the value of -- I'm not saying it's true, ma'am.

9              MS. SCOTT:  I understand.

10             THE COURT:  I'm just saying that's what they

11      are saying.  And if that is, in fact, what

12      happened, then I just don't see how it's relevant

13      and probative.

14             MS. SCOTT:  It's not an allegation in this

15      case, Your Honor, and it's fundamentally not true.

16      We funded our liabilities to the full amount of all

17      litigation, which is why the Third Circuit said you

18      are not insolvent and so you cannot file for

19      bankruptcy.  It also specifically said that you did

20      not file this bankruptcy in bad faith and was not

21      going to penalize for trying to find an efficient

22      and effective way to resolve the tens of thousands

23      of talc claims that have been brought against

24      Johnson & Johnson.

25             Furthermore, Your Honor, this sort of evidence

Page 159

1          has been excluded in all of these cases, almost all

2          these cases because it's not relevant and it's

3          highly prejudicial and it allows the plaintiff to

4          come in here and say the facts that they said on

5          Monday, which are patently false, as pointed out --

6               THE COURT:  Well, they have to have evidence.

7          They can't just come in and make it up.  They have

8          to have -- first of all, they have to have a

9          witness who is able to say it, okay, and they have

10         to have evidence to support it.  They can't just

11         make it up.

12              MS. SCOTT:  Well, I mean, I won't say they

13         made it up, but they did misquote or misrepresent

14         what happened with the bankruptcy.  And if they are

15         allowed to do that in front of the jury, then J&J

16         has already been poisoned in the mind of jury, and

17         it's going to be very hard if not impossible to

18         undo.

19              THE COURT:  Here is what I will do:  I will

20         say that they cannot make any statements in that

21         regard during opening statement, and if they plan

22         on introducing any evidence to that effect, then I

23         will, as soon as they are going to call the witness

24         for that, they need to request a sidebar.  We'll

25         have an in-camera conversation outside the presence

Page 160

1        of the jury, and at that time, I will be able to

2        ask the witness questions -- what is the witness

3        going to testify to -- and then I'll then decide

4        I'm letting it in or I'm not.

5                MR. MAZINGO:  Your Honor, good afternoon.

6        Ridge Mazingo for the plaintiff.

7                But, Your Honor, you hit the nail on the head

8        overall.  Just to elucidate a couple things, you

9        know, number one, we don't intend -- we are not

10       going to make this a mini-trial on the bankruptcy.

11       We are not going to contend the defendants don't

12       have a legal right to file bankruptcy.

13               You know, at the time we wrote this motion, we

14       assumed this was going to be a bifurcated trial, as

15       Your Honor probably did.  It was defendants who

16       suggested doing it all in one; that wasn't our

17       decision.

18               We had not planned to bring it up in phase

19       one.  This was going to be a phase two issue for

20       punitive damages, as Your Honor talked ability.

21       But it is plainly relevant to punitive damages, as

22       you stated, and one of those reasons is because we

23       are going to call a financial expert, Matt Diaz, to

24       testify about defendants' financials and he can't

25       fully and accurately do that without mentioning the

Page 161

1    bankruptcy.

2        One of the defendants solely exists because of

3    the bankruptcy, and their financials are rather

4    peculiar because it was a rather peculiar

5    bankruptcy procedure.  And you can't fully and

6    accurately testify about the financials of this

7    company without mentioning the bankruptcy.

8        THE COURT:  All right.  Well, I don't know

9    what he is doing to say, I don't know what the

10    basis of all of that is, but I'm assuming he has

11    the financials and I'm assuming he has a basis, so

12    your motion in limine is --

13        Well, first of all, I'm going to say it's

14    granted in the sense that it will not come in for

15    purposes of liability, okay?  And if it does come

16    in, the only possible relevance it would have would

17    be as to punitive damages, and the Court will

18    conduct an in-camera review outside the presence of

19    the jury before that testimony is presented to the

20    jury to make sure that it is based on facts and

21    based upon sound reasoning.

22        Anything else on this motion?

23        MR. MAZINGO:  No, Your Honor.

24        THE COURT:  Thank you.

25        What other motion in limine?

Page 162

1          MR. PENDELL:  Can I pick one of their motions?

2     Can we do the IARC one?  I think that's probably

3     easy.

4          THE COURT:  Motions in limine should be easy

5     anyway.  Just give me the motion and let's go.

6          MS. SCOTT:  That's our motion.

7          MR. PENDELL:  I just asked if I could pick one

8     of their motions since it's a very easy one.

9          THE COURT:  Well, let them argue it if it's

10    their motion.

11         MS. SCOTT:  All right, Your Honor.  Motion in

12    limine number four goes to excluding documents from

13    a now bankrupt manufacturer of talc.  Defendants

14    seek to move to exclude internal documents that are

15    authored by that nonparty, third-party, and alleged

16    coconspirator called Imerys as hearsay, as

17    irrelevant and hearsay testimony because, one,

18    there was no conspiracy.  And so we filed --

19         THE COURT:  Is there a conspiracy count here?

20         MS. SCOTT:  There is, and we have moved for

21    summary judgment on their conspiracy claim.  We

22    rested on our papers for that.

23         But there is no conspiracy.  There is no

24    alleged agreement.  The only thing that the

25    plaintiffs have alleged is that we were a

Page 163

1       participant in a trade organization --

2               THE COURT:  Ma'am, I'm sorry to cut you off.

3       See, this is why motions in limine are somewhat

4       easier.  There is a conspiracy count.  Summary

5       judgment has not been granted as it relates to the

6       conspiracy count, and you want me to exclude

7       evidence of the conspiracy from the trial.

8               MS. SCOTT:  Not only because they don't have a

9       claim, but also because those are hearsay

10      statements that do not fall under one of the

11      assumptions.  In addition, in order get in a

12      coconspirator statement, the plaintiff needs to

13      prove or at least put forward a prima facie showing

14      of conspiracy that's independent of the document

15      that they are seeking to admit.

16              THE COURT:  But if I exclude it, then how are

17      they able to establish what you call the predicate

18      in order introduce it?  In other words, if they,

19      during the trial, establish the predicate that you

20      say they are required to establish, and then you

21      stand up and you say, objection, Judge, they didn't

22      establish the predicate, and I say overruled, I

23      find that the predicate has been established, then

24      I wouldn't exclude it.

25              But if I say sustained; counsel, do you want

Page 164

1        to continue to try to lay the predicate?  And

2        counsel tries to lay the predicate, then -- do you

3        see what I mean?  How do I do this now when I don't

4        know if they can lay the predicate or not?

5              MS. SCOTT:  Understood, Your Honor, but --

6              THE COURT:  I think what you should do is it

7        should be a contemporaneous objection.

8              Do you have a conspiracy count?

9              MR. FAMILONI:  We do, yes.

10             THE COURT:  And they have a conspiracy, count.

11       I'm trying to understand how the statements of the,

12       quote, unquote, coconspirators -- or, by the way,

13       any statements in furtherance of the conspiracy

14       cannot be admitted assuming they are able to

15       satisfy the predicate.

16             MS. SCOTT:  Well, because Florida law states,

17       Your Honor, that there must be independent evidence

18       to prove a conspiracy and each member's

19       participation in it before admitting a

20       coconspirator hearsay statement.

21             THE COURT:  Okay, but how do we get there?

22       If, in fact, I grant your motion, so what are they

23       to do at trial in order to establish -- you are

24       saying establish what the conspiracy is and then --

25       independently establish what the conspiracy is,

Page 165

1     don't use the statements to establish the

2     conspiracy.  Independently establish the

3     conspiracy.  Once you've independently established

4     the conspiracy, then -- and you are able to lay the

5     predicate for the coconspirator statements, then

6     you can elicit those statements.  But how can they

7     do that if I tell them they can't do it at all?

8          MS. SCOTT:  Understood, Your Honor.

9          One further point that I'll make, a lot of

10    these documents post-date Ms. Seskin's succession

11    of use of talc powder.  So she stopped using talc

12    powder in 1994.  That's the only sworn evidence

13    that we have about her -- the end of her use of

14    talc powder.

15         So we believe that documents that post-date

16    her alleged use should be excluded also as

17    irrelevant.

18         THE COURT:  Documents that -- what do the

19    documents say?

20         MS. SCOTT:  The documents are internal

21    documents of a nonparty coconspirator.

22         MR. FAMILONI:  Your Honor, that's part of our

23    argument is that they were vague.  We don't know

24    what documents they are specifically referring to.

25    However, the documents and reasonings that form our

Page 166

 1    elements are actually their own produced documents

 2    that we will bring out in trial, to your earlier

 3    point.

 4         THE COURT:  Okay.  So I'm just trying to

 5    understand:  Any documents after 1994, after the

 6    period that you say that the plaintiff stopped

 7    using your product, you're saying those documents

 8    should be excluded because they are not --

 9         MS. SCOTT:  They are not relevant, Your Honor,

10    because whatever the conspiracy could not be

11    affecting her after she stopped using -- allegedly

12    stopped using Johnson & Johnson baby powder.

13         THE COURT:  But what if the documents -- see,

14    because she stopped using it doesn't mean the

15    conspiracy ends.  If she stopped using the product,

16    but the conspiracy is ongoing.  You remain part of

17    the conspiracy until you affirmatively withdraw

18    from the conspiracy by some affirmative word or

19    act.  Meaning you call the police and say to the

20    police, hey, or you tell the police I withdraw from

21    this.

22         And by the way, there have been people who

23    have been convicted because they agreed to do --

24    and when I say "convicted," I know this is not a

25    criminal case, but people have been convicted

Page 167

1         because they agreed to part -- I agree to rob the

2         bank, okay?  And because they agreed to rob the

3         bank and they did some act in furtherance of

4         robbing the bank, then they changed their mind

5         after they robbed the bank, then they said I'm

6         done, I'm not robbing any more banks, but they

7         kept -- the people kept robbing banks.  And then he

8         got swept up and charged with the conspiracy for

9         all the banks that were robbed, and he says, but I

10        only agreed to rob the one bank.

11             There was no affirmative action on your part

12        showing that you withdrew from the conspiracy, so

13        all of your acts were taken to be in furtherance of

14        the overall conspiracy, and it doesn't stop because

15        you say I stopped after the first bank.

16             So I think it depends upon the document, what

17        the document says, and I can't grant that motion.

18             MS. SCOTT:  Understood.

19             THE COURT:  You need to make a contemporaneous

20        objection.

21             MS. SCOTT:  Understood, Your Honor.

22             MR. FAMILONI:  I would just add, Your Honor,

23        she actually stopped her use of the baby powder in

24        2019.  She stopped her diaphragm use of the baby

25        powder in 1994.  She continued using the product

Page 168

1    past the date 2016 date that they stated, but the

2    specific use of her diaphragm she stopped much

3    earlier.

4         THE COURT:  Okay.  Well, I don't make a

5    finding as to when because I don't know the facts

6    the way you all know them, I'll just simply stand

7    on the motion in limine is denied.  I think you

8    need to make a contemporaneous objection at the

9    time.

10        What is the other motion in limine?  Next?

11        MR. PENDELL:  I had asked if we could do the

12   IARC one.  Can we do that?  It's going to take four

13   minutes.

14        THE COURT:  You can pick one.  You don't have

15   to keep letting him pick them.

16        MR. PENDELL:  She hasn't let me pick one yet

17   though, Your Honor.

18        THE COURT:  You picked the last one.

19        MR. PENDELL:  No, no, they did a different

20   one.

21        THE COURT:  Oh, that was a different one?

22        MR. PENDELL:  Yes.

23        THE COURT:  Okay.  Well, it's your turn now.

24        MR. PENDELL:  Okay.  I would like to pick the

25   IARC motion, which is theirs, but it's very simple

Page 169

1          to settle this controversy, I think.

2                THE COURT:  Go ahead.

3                MR. PENDELL:  I'm happy to start.

4                MS. SCOTT:  Okay.  On MIL 13, J&J defendants

5          seek to exclude any misleading characterization

6          that IARC, which is International Agency of

7          Research of Cancer, has classified talc as 2B

8          carcinogen, and the fact that in March 2019, the

9          IARC advisory group identified domestic talc

10         products as a high priority for re-review, look at

11         talc in 2024.

12               We believe plaintiff intends to present

13         evidence that IARC has designated domestic talc,

14         along with 50 other substances, as high priority

15         re-review, but this evidence is irrelevant and

16         highly speculative.  There is no guarantee that

17         there will be any review by IARC.  It's not slated

18         to occur until June 2024.  We are now in February,

19         so four months from now.

20               THE COURT:  So let me make sure I understand:

21         Has there been any paper issued or any affirmative

22         statement made that they are going to review it?

23         Or is this just -- I don't understand where it's

24         coming from.  Where is this coming from?

25               MS. SCOTT:  So there is a statement that says

Page 170

1    it's on the list to be re-reviewed sometime in

2    2024, but there's no guarantee it will be

3    re-reviewed.  If they do re-review it, they said

4    they would do it in June of this year.

5         It's not relevant.  It's highly speculative,

6    and it would require us to speculate as to the

7    meaning of why it's on the list with 50 other

8    substances and why it's relevant and why it

9    matters.  It doesn't.  It would be a complete side

10   show, Your Honor.

11        MR. PENDELL:  Your Honor, this is easy:  None

12   of this is relevant because our people are going to

13   refer to the IARC stuff as, for talc particles, a

14   Group 2B, which is known as a possible carcinogen

15   to humans.  And IARC classifies talc fibers as

16   Group 1, which is a known human carcinogen, and

17   that is how we are going to refer to it in front of

18   the jury.  That is how our experts are going to

19   refer to it.

20        THE COURT:  Are you going to be making any

21   reference to the fact that they are going to be

22   re-reviewed, along with 50 other substances, in

23   June of 2024?

24        MR. PENDELL:  Not in the first instance, but

25   of course, if opposing counsel would like to ask

Page 171

1        that of one of our experts, they will be prepared

2        to respond.  But in the first instance, no, Your

3        Honor.

4             THE COURT:  Motion granted unless you open up

5        the door.

6             MS. SCOTT:  Okay.  Thank you, Your Honor.

7             THE COURT:  What's next?  We've still got four

8        minutes.  I'm trying to give you a taste for the

9        way the trial is going to go.

10             MS. SCOTT:  We can do MIL 22.

11             THE COURT:  What is it, ma'am?

12             MS. SCOTT:  The J&J defendants are moving to

13        exclude evidence related to the foreign labeling of

14        JJCI's products, or to foreign labeling

15        requirements generally.  There is just no way that

16        any foreign labeling is relevant to this case that

17        is based on a U.S. citizen using talc that was

18        purchased in the United States.

19             THE COURT:  Where was it manufactured?

20             MS. SCOTT:  It depends on the time, Your

21        Honor.

22             THE COURT:  Well, was it ever manufactured in

23        a foreign jurisdiction?

24             MS. SCOTT:  Post 2003 -- well, manufacturing,

25        I'm not sure the exact place, but there was talc

Page 172

1          that was sourced from mines in China, but prior to

2          that, it was in Vermont, and even earlier than

3          that --

4               THE COURT:  Who put the labeling on the

5          packages when it was sent here?  Did they follow

6          United States standards?

7               MS. SCOTT:  Well, the actual product was

8          manufactured in the United States.  What we are

9          trying to exclude is evidence of warning labels

10         that are under different -- under foreign

11         regulatory regimes for Johnson & Johnson baby

12         powder --

13              THE COURT:  Meaning that the warning labels

14         were not warning labels used in the United States?

15              MS. SCOTT:  Correct.

16              THE COURT:  These were warning labels used in

17         another country?

18              MS. SCOTT:  Right, they are foreign bottles.

19              THE COURT:  Why were you using warning labels

20         used in another country?

21              MR. FAMILONI:  Well, Your Honor, for example,

22         we think it's relevant because I'm going to use

23         Canada Workplace Hazardous Materials Information

24         System.  They warn of the dangers of talc, and

25         that's often referenced or cited by OSHA, which is

Page 173

1      our domestic regulation system in terms of what

2      materials are safe or hazardous.  And so we believe

3      there is a connection there about defendants'

4      notice, awareness of the dangers of their product.

5           THE COURT:  No, I'm not -- because then nobody

6      is obligated to follow -- what the foreign labels

7      say, they don't have the same standards that we

8      have.  Their standards are probably a lot -- I

9      shouldn't say this, but their standards probably a

10     lot less than our standards.

11          And so it's unfair to look at what is on a

12     label in a foreign country that doesn't have the

13     requirements that we have and try to apply them to

14     what is going on here.  And I think the probative

15     value would be substantially outweighed by the

16     danger of unfair prejudice because they don't have

17     the same standards.

18          MR. FAMILONI:  But, Your Honor, to rebut that,

19     respectfully of course, is that this same

20     organization indicated that if you are using talc

21     that contains more than .1 percent of crystalline

22     silica or asbestos, it will meet their criteria for

23     carcinogenicity.  That is still, in this country, a

24     standard that is equally dangerous.  We forbid that

25     level of crystallizing asbestos in our talc.

Page 174

```
 1          THE COURT:  I'm not talking about any foreign
 2     country.  Talk about what happened in the good
 3     ol' -- make America great.  No, I shouldn't say
 4     that.
 5          We are only going to be talking about what
 6     happens here in the United States.  We are not
 7     going to be talking about everything else going on
 8     with every foreign country.
 9          MR. FAMILONI:  I have one more thing, Your
10     Honor.  It's relevant to our punitive damages claim
11     because Johnson & Johnson employees generally got
12     this warning, but the public, as consumers who
13     still bought this product, regardless of
14     jurisdiction or country where this was sold, they
15     had the benefit of the warning, yet the average
16     consumer in the United States did not get benefit
17     of that warning.
18          THE COURT:  You know, that's interesting that
19     you say that because I was always wondering:  When
20     we talk about punitive damages, do we talk about
21     punitive damages and the continuing manufacture of
22     this product worldwide or are we talking about what
23     they do within a jurisdiction of which an American
24     court has authority?
25          Because, by the way, you can make cigarettes
```

Page 175

1        that, here, we have all these codes and standards

2        and you know what you know, so you stop making them

3        here, but you mass produce them in China and you

4        sell them in China because China doesn't have the

5        same regulations and the same prohibitions.

6            So when we talk about punitive damages, I

7        always thought that we have to talk about it in the

8        context of the United States, not what they're

9        doing worldwide, but I may be wrong.  I don't know.

10           MR. FAMILONI:  I have no indication that

11       you're wrong, Your Honor.  You know, if I was going

12       to make a social argument, of course I think it

13       should apply broadly because, of course, the safety

14       of an individual is not just respective of an

15       American citizen.

16           But in terms of this court and the

17       jurisdiction, I can't say that it should apply --

18       that you should take into consideration a worldwide

19       standard.

20           THE COURT:  What about the law?  What does the

21       law say we do when we seek punitive damages?  If

22       Johnson & Johnson says we totally stopped all

23       distribution of baby powder in the United States,

24       but you have evidence, yeah, but you're still

25       producing it in the world, you're still producing

Page 176

1          it in all these other countries, is that relevant

2          to punitive damages here in the United States?

3              I don't know the answer.  I'm asking.  I would

4          think not.  I would think that we have to look

5          about what's happening here in the United States

6          because our laws are so different than what happens

7          in another country, so.

8              MR. FAMILONI:  Honestly, I can't make the

9          argument otherwise.

10             THE COURT:  All right.  The motion is granted.

11         Well, the motion in limine was to preclude you

12         making reference to foreign labeling?

13             MS. SCOTT:  Labeling of Johnson & Johnson

14         products.

15             THE COURT:  Granted.

16             Lunchtime.  We'll be in recess.  We are only

17         taking recess for 45 minutes.  It will be until

18         1:45 p.m.

19             (A recess was taken at 1:04 p.m. and the

20    proceedings resumed at 1:48 p.m.:)

21             THE COURT:  You can be seated.

22             What's our next motion?

23             MR. BALZANO:  Good afternoon, Your Honor.

24         I'll argue defendants' motion to exclude

25         Dr. Rigler.

Page 177

1          THE COURT:  Okay.  Is this another Daubert?

2          MR. BALZANO:  Yes.

3          THE COURT:  Okay.

4          MR. BALZANO:  So Dr. Rigler is plaintiff's

5      asbestos expert, for lack of a better term, but he

6      didn't test any of the alleged bottles that the

7      plaintiff used for asbestos, and he didn't even do

8      an exposure analysis to figure out how much

9      asbestos the plaintiff was exposed to.

10          He does do -- and I want to focus on his

11     exposure analysis because I think that's one of the

12     most important parts.  That's his only

13     case-specific opinion.

14          This is the exposure analysis that Dr. Rigler

15     conducted in this case.  And again, it doesn't deal

16     with asbestos, it only deals with the amount

17     alleged that the plaintiff was exposed to, and this

18     exposure analysis is complete speculation.  He

19     relied on -- and I think my colleague was talking a

20     little bit about this before, about the usage and

21     the history of usage in this case.

22          The only information we have from the decedent

23     in this case a plaintiff fact sheet that she signed

24     four or five days before she passed away.

25          MR. OLIVER:  Your Honor, that is false.  They

Page 178

1        keep saying that and we need to correct the record.

2        That is false information that they keep repeating.

3             THE COURT:  You'll have your chance.

4             MR. BALZANO:  So in that plaintiff fact sheet,

5        she alleged -- they ask what was your exposure,

6        what was your use of Johnson's baby powder, and

7        they put down 1949 to 1994.  So from that plaintiff

8        fact sheet, the only information we have is until

9        1994.

10            And Dr. Rigler relied on that plaintiff fact

11       sheet, he relied on the testimony of the plaintiff,

12       Mr. Sugarman, the husband, and he relied on a

13       college friend of the decedent for her usage in

14       1970 to 1974, 50 years ago.  And I want to start

15       with the first time.

16            So when you look at the exposure sheet, that's

17       what he starts with.  He starts with the 1970 to

18       1974 exposure, which is based on the friend --

19       Diana Ronell is the name of the friend.  And when

20       you look at Ms. Ronell's testimony, she says that

21       they would go on trips together sometimes.  They

22       would go to the lake, they would go on some camping

23       trips, and she would see her use allegedly

24       Johnson's baby powder.

25            And when asked how many times, she would say a

Page 179

1        few times.  It was vague.  Maybe three or four

2        times.  She couldn't give a specific number.

3             And Dr. Rigler, from that testimony alone,

4        extrapolates it out to two applications a day,

5        seven days a week, 365 days.  The 4 grams number, I

6        mean, we don't really have any testimony about how

7        much she would apply.  We're not even sure how she

8        would apply it necessarily.

9             So from that, his exposure assessment is

10       completely speculative.  And then when you look at

11       the 1975 to 2018 period, if you isolate 1975 to

12       1993, we don't have any information about that

13       because the decedent met Mr. Sugarman in 1993, I

14       believe.  So from 1975 to 1993, there is no

15       information, but still in the exposure, still those

16       two applications a day, seven days a week, 4 grams.

17            Then when we get to Mr. Sugarman, Mr. Sugarman

18       testified in his deposition -- and this is what we

19       were talking a little bit about before.  He

20       testified in his deposition that the 1994 time

21       period end date on the plaintiff fact sheet was

22       supposed to only be in relation to the use of her

23       diaphragm.

24            But first off, again, the only information we

25       have from the plaintiff, again, is the plaintiff

Page 180

1    fact sheet.  And second, why would Dr. Seskin

2    put -- when you look at the plaintiff fact sheet,it

3    asks:  When did you use Johnson's baby powder?

4    From 1949 to 1994.  She wasn't using her diaphragm

5    when she was born in 1949.

6        So it seems like a weird interpretation of

7    that question to say the '94 end date was

8    diaphragm, but the 1949 start date was any use, or

9    use when you were a baby.  So all this is to say,

10   Your Honor, that this exposure analysis -- again,

11   only talc, not asbestos -- he just had assumption

12   upon assumption upon assumption, and it's

13   completely speculative.

14       And I don't think it will help the jury -- one

15   last point.  I don't think it will help the jury

16   because it's not like he's doing some type of

17   complex math.  He admits in his deposition that

18   this is just simple math.  He just takes two times

19   365 times four.

20       THE COURT:  All right.  Who is this witness

21   again?

22       MR. BALZANO:  He is plaintiff's asbestos

23   testing expert.  I think he has a degree in

24   microbiology, but he has experience in -- he's a

25   microscopist.

                                            Page 181

1              THE COURT:  All right.

2              MR. OLIVER:  So, Your Honor, one thing I want

3      to make clear, at least at this point, I'm going to

4      focus on this exposure analysis.  That, quite

5      frankly, is not the main point of Dr. Rigler's

6      testimony.  And they don't seem to be challenging

7      that, so if we need to talk about that with you, I

8      do want them to raise that.  I just want to make

9      that clear so I can respond just to this part of it

10     because this is by far not the part that's not most

11     important.

12             So the first thing I want to do is make clear

13     a couple things.  Dr. Rigler's exposure analysis,

14     he's done this type of analysis before.  Your Honor

15     has to remember that the exposure analysis here is

16     exposure to the product, Johnson's baby powder, not

17     a specific level of exposure to asbestos or fibrous

18     talc or the ingredients, just like a cigarette.

19             Your Honor has done cigarette cases.  No

20     expert in a cigarette case comes in and says I know

21     which carcinogen caused the cancer, and you had too

22     high a level of plutonium.  We know plutonium is in

23     cigarettes, but so are 600 other carcinogens.  So

24     it's exposure to the product.

25             He used 4 grams as a conservative estimate.

Page 182

1        He actually got that from a peer reviewed article

2    that he sent me.  There is a J&J document that he

3    also relies on where they surveyed women using

4    talcum powder in the genital area.

5        They used 8 grams as a regular measure, and he

6    can obviously show the jury what a gram sized

7    application of this powder looks like, but that's

8    where he got that.  So he went with the lower

9    number, which was something reported in a study,

10   and the higher number is one that is actually

11   reported in J&J's own documentation.

12       THE COURT:  So we don't know how much she

13   would use?

14       MR. OLIVER:  Well, she didn't testify to that

15   because she died before we scheduled a preservation

16   deposition and she died before we could get that to

17   happen.  So what does the testimony show about her

18   usage?

19       THE COURT:  The husband didn't know?

20       MR. OLIVER:  Well, I'm going there.  I'm going

21   there.  And I'm going to start in the beginning

22   with her college roommate.  Well, I'll start with

23   the sworn statement.

24       So her sworn statement in this case, the fact

25   worksheet, she wrote from birth to 1994.  At

Page 183

1      Mr. Sugarman's deposition, he explained that at the

2      time that Marilyn Seskin filled this out, she was

3      about four weeks from her death.  She could not

4      fill it out herself, he filled it out for her by

5      asking the questions and she was able to sign it.

6           So when they ask about this thing about when

7      did she start using it, he said, well, she told me

8      it was used on her as a baby.  So she didn't

9      understand that we are not talking about usage as a

10     baby; she just said, well, I used the product when

11     I was a baby because I know my parents put it on

12     me.

13          And that continued until '94.  When they asked

14     him about '94, they said something like, did she

15     stop then?  And he said, well, she stopped using it

16     on her diaphragm.  And they ask a series of

17     questions, and it got kind of entertaining at one

18     point.  He finally said, ma'am, we didn't need

19     birth control anymore, that's what she meant.  She

20     stopped putting it on her diagram in '94.

21          Why?  She was 55.  We didn't need birth

22     control.  Then they asked follow-up questions; did

23     she keep using it on her underwear?  Absolutely she

24     kept using it on her underwear.

25          How do you know?  I saw it -- we have some of

Page 184

1    the bottles, by the way.

2        I saw it in her underwear.  I did the laundry

3    in the house, I saw it in her underwear.  And on

4    several occasions, he testified that he bought the

5    product for her very close to her death, before she

6    had filed this lawsuit and realized that there was

7    a connection between these products.

8        So the usage as defendants have characterized

9    it is not exactly accurate, but these limitations

10   that they're talking about in Dr. Rigler's exposure

11   analysis, he is not going to quibble with those.

12   If they ask him, well, you didn't have any

13   information about what happened between the time

14   her college roommate saw her use it when they were

15   camping and when she met Mr. Sugarman later in

16   life, Dr. Rigler is going to say, that's right,

17   this is an assumption.  I'm telling the jury it's

18   an assumption that people use this in a habitual

19   way, just like deodorant.

20       THE COURT:  You called it an assumption.  How

21   is it not just pure speculation?

22       MR. OLIVER:  Well, Your Honor, it's not

23   speculation because it's a reasonable inference for

24   the jury to draw that, look, she was using it.  She

25   said she used it her whole life.

Page 185

1          Her sheet says I used it my whole life in this

2     manner, right?  Her sworn sheet.  And her roommate

3     saw her use it when she was in her 20s, and then

4     her husband has oodles of testimony about the

5     manners in which he knew she used it and that kind

6     of thing.

7          So there is no speculation, she said she used

8     the product.  You get the details of how she used

9     the product and the frequency with which she used

10    the product more from the testimony than you do the

11    fact worksheet because the fact worksheet asked a

12    set of specific questions that she, quite frankly,

13    filled out while she was on her death bed.

14         THE COURT:  So I'm just trying to understand

15    your point, sir.  Is it your point that this

16    particular witness cannot testify that she used the

17    product or how often she used the product?

18         MR. BALZANO:  I think the point is that this

19    really goes to it's not helpful to the trier of

20    fact.  As plaintiff's counsel points out, there's

21    plenty of testimony, and the jury can hear that

22    testimony and the jury can decide how much

23    exposure.

24         THE COURT:  Did the roommate testify, the

25    college roommate?

Page 186

1              MR. OLIVER:  Yes.

2              THE COURT:  Oh.

3              MR. OLIVER:  By deposition.

4              MR. BALZANO:  So I don't know why we need

5        this.  And as plaintiff's counsel said, this isn't

6        the most important part of his testimony.  I don't

7        know why we need to get up and say 137,000 --

8              THE COURT:  Yeah, why can't you just do that

9        math?

10              MR. OLIVER:  There's an answer to that, and

11        it's a really good one.  The epidemiological

12        literature that establishes the talcum powder

13        connection between ovarian cancer, it measures

14        exposure in terms of -- and different articles use

15        different terms, but for the most part, it's

16        dosages a day, or usages a day, right?

17              And he is putting it in those terms based on

18        the literate so that if the defendants cross and

19        they want to say, they didn't even tell you how

20        many applications she had, right, we have this

21        information from an expert who said, look, I

22        counted out the applications based on the evidence,

23        I did the math, and I've done this before, I know

24        what I'm looking for in terms of application.

25              THE COURT:  I don't understand.  But why

Page 187

1    can't -- the husband is going to testify and the

2    husband is going to testify about how often she

3    would use it and he is going to testify

4    approximately how much of it she would use.

5            MR. OLIVER:  That's true.

6            THE COURT:  The college roommate is going to

7    testify by deposition and she is going to testify

8    that she used the product.  I don't understand the

9    need to have this witness just basically -- really,

10   all this witness is doing is exactly what they've

11   already said and just putting it in maybe a neater

12   package.

13           MR. OLIVER:  First of all, I don't agree that

14   he's doing exactly what they've already said

15   because those people are not in any measure going

16   to quantify the number of doses.  And if you

17   remember from the defendants' summary judgment

18   motion, Your Honor, one of the things they

19   complaint about -- albeit incorrectly -- is dosage,

20   right?

21           They want to talk about dosage of

22   constituents, but the fact of the matter is what we

23   care about under the law is dosages of product,

24   right?  And so they criticize us for not talking

25   about the dosage of the product.

Page 188

1          Well, we fix that criticism by giving them an

2      absolute number and dosage of the product, which

3      will allow --

4          THE COURT:  Where is the dosage number on

5      here?

6          MR. OLIVER:  Well, dose is applications.  It's

7      total applications.

8          THE COURT:  But all it was was math.  All he

9      did was just basically take a number and multiply

10     it out.  If you take 365 -- right?

11         MR. BALZANO:  It's just multiplication, Your

12     Honor.

13         MR. OLIVER:  That's right, Your Honor.

14         THE COURT:  So you have dosage.  Even if they

15     cut someone from saying there's no dosage, it is in

16     the record, you just have to do the math.

17         What is he adding other than taking a

18     calculator and multiplying it out to get dosage?

19         MR. OLIVER:  I think, Your Honor, what he's

20     doing is very similar to a federal 1006 exhibit.

21     There is a counterpart in the Florida rules, I just

22     don't remember the number.

23         But essentially, I could give the jury all of

24     the medical bills in this case and just say go add

25     it up, but I don't.  I give them a specific sheet

Page 189

1          of paper on top of the medical bills, which is

2          provided for under the rules of evidence.

3                  THE COURT:  That is because it is voluminous

4          calculations.

5                  MR. OLIVER:  That's true.

6                  THE COURT:  This is not voluminous

7          calculations.  I'm looking at this and the only

8          numbers I see are applications per day, two; times

9          per week, seven; number of days, 365; number of

10         years, four; applications, 2,920.

11                 That's very, very basic math.  This is not --

12         and I agree with you, if this was medical bills

13         where you've got to go to multiple sheets in order

14         to get the number, I get it.  That's not what we

15         have here.

16                 So I don't think this doctor should basically

17         be able to present -- I think you can do this in

18         argument.  I think you can put it together.

19         Meaning you put together -- in other words, in your

20         closing argument, you can pull this sheet up and

21         you can present this as your closing argument as

22         compared to him testifying to it.

23                 MR. OLIVER:  Sure.

24                 THE COURT:  Assuming that the evidence is

25         going to come in as you just indicated from the

Page 190

1      witnesses.

2           MR. OLIVER:  Right.  I mean, I don't have a

3      problem with that, and I agree that I can do that

4      through argument, but I also agree that it's

5      appropriate to summarize this type of evidence

6      through an expert.

7           THE COURT:  Motion in limine, at least as to

8      this part, is granted.

9           MR. BALZANO:  Thank you, Your Honor.

10          MR. OLIVER:  Now, do defendants want to talk

11     about the other stuff with Dr. Rigler?  Because if

12     they do, I need to know.

13          MR. BALZANO:  So I want to talk about next his

14     opinion about asbestos being above ambient levels.

15          MR. OLIVER:  Okay.

16          MR. BALZANO:  So the next opinion Dr. Rigler

17     gives is -- so, again, Dr. Rigler, like plaintiff's

18     counsel said, they do have -- they allege some

19     bottles that Mr. Sugarman found in his house that

20     Marilyn Seskin allegedly used.  He didn't test that

21     bottle though to see if that contained asbestos.

22          They didn't test that bottle, and like we were

23     talking about earlier with Dr. Sitelman, Dr. Rigler

24     can do a tissue digestion to see if Dr. Seskin's

25     tissue contained --

Page 191

1          THE COURT:  You mean the actual bottle of talc

2     powder that she used, he didn't test it?

3          MR. BALZANO:  He didn't test it.

4          MR. OLIVER:  Neither did the defendants.

5          THE COURT:  But my question is:  But why does

6     he need to test it if the ingredients -- do you put

7     different ingredients in the product?

8          MR. BALZANO:  No.  And Your Honor, I think the

9     more important point is that he didn't test

10    Dr. Seskin's tissue either, so there is no

11    connection.  He could have digested her tissue to

12    see if there was asbestos, what we were talking

13    about earlier with Dr. Sitelman, to see if there

14    was asbestos in Dr. Seskin's tissue.  He didn't do

15    that either.

16          So he has no connection to this case.  And

17    what the opinion that he wants to come in here and

18    say is that Dr. Seskin had exposure to asbestos

19    above ambient levels, meaning above levels that are

20    just in the air.

21          THE COURT:  But how does he know that?

22          MR. BALZANO:  Exactly.  And one more point --

23          THE COURT:  How does he say he knows that, is

24    my question.

25          MR. BALZANO:  Well, in another case that

Page 192

1    plaintiff's counsel has, the Matthey case, this was

2    a deposition in 2020, we asked them.  So this is

3    September 11, 2020, and we asked them:  "We just

4    want to make sure when you come into trial and you

5    get on the stand, you are not going to tell the

6    jury that Ms. Matthey had an exposure to asbestos

7    in the excess of ambient?  You are not going to

8    tell them that, are you?

9         "ANSWER:  I would have to think about that.

10         "QUESTION:  Okay.

11         "ANSWER:  I can't make an answer to that right

12    now as I sit here.

13         "QUESTION:  All right.  Sitting here today,

14    you have not formed the opinion that Ms. Matthey

15    was exposed to asbestos in the excess of ambient,

16    fair?

17         "ANSWER:  That is fair."

18         And then at our deposition in the Sugarman

19    case, he says, "All right.  And my question,

20    Dr. Rigler, is today you've offered an opinion that

21    Dr. Seskin was exposed to asbestos in excess of

22    ambient, but you weren't able to do that in 2020 in

23    Ms. Matthey's case.  Can you explain why you are

24    now able to make that opinion?"

25         And he starts to read the deposition, and then

Page 193

1    he says -- so this was September 11th of 2020 --
2    "I've had time to think about it.  I've had time to
3    think about that since that time, and again, based
4    on what I talked about earlier and the questions I
5    answered earlier, it would be my opinion, you know,
6    more likely than not, she would have been exposed
7    to a level above ambient."
8           THE COURT:  Does he say why he says that?
9           MR. BALZANO:  He had more time to think about
10   it.  In 2020 --
11          THE COURT:  No, that's why he's now able to
12   answer it, but why can he say now to a reasonable
13   degree of certainty that -- more likely than not, I
14   think is what he said -- that she was exposed to
15   levels above ambient?
16          MR. BALZANO:  Well, first off, I think he is
17   probably going to be relying on -- and this is what
18   another portion of our motion is, is he relies on
19   litigation testing from -- he used to work at a
20   laboratory, MAS Material.  I'm not really sure what
21   it stands for.
22          But he used to work there and that laboratory
23   was retained.  There is another expert, Dr. Longo,
24   in this litigation, and they tested baby powder and
25   they say that they found asbestos, but it's all

Page 194

1        litigation reports.  It's all litigation tests.

2        It's all funded by plaintiff's attorneys and --

3              THE COURT:  Well, does that mean that it

4        didn't be relied upon?

5              MR. BALZANO:  No, no, no, and I think the

6        important point is, in 2020, he had those tests.

7        Those tests happened in 2017 and 2018.

8              THE COURT:  What I'm trying to get to, and

9        maybe we'll just ask the plaintiffs, I'm trying to

10       get to:  There has to be -- he can't just say it.

11       He has to have a basis for saying it.

12             So what is the basis for saying it?

13             MR. BALZANO:  I don't know what his basis is.

14             MR. OLIVER:  So the basis for him saying it is

15       the body of his work that he performed, not

16       specifically this case, but for these cases.

17       Dr. Longo is not our expert, but Dr. Rigler at the

18       time was like his partner in the lab.  Dr. Rigler

19       went out and started his own lab called Aspects

20       Labs.  They actually use the same space, they just

21       had a different financial arrangement now or

22       something.

23             So what they did in the context of this

24       litigation, I believe through the MDL proceeding up

25       in Philadelphia, was they gathered up samples of

Page 195

1        Johnson's baby powder.  Some Imerys railcar

2        samples, which were also Johnson's baby powder,

3        Imerys is just the supplier of the raw talc.

4             So they gathered up these samples.  Some of

5        them came from places that they got them off the

6        internet.  They bought them.  Others came from

7        things that the defendants produced.  And they did

8        a three-step process to test for asbestos.

9             What Dr. Rigler will testify to is, yes, I

10       tested these bottles of baby powder, I tested them

11       from this decade, this decade, this decade, I used

12       these methodologies, and he has exact numbers, but

13       between 70 and 72 percent of the time with regard

14       to Johnson's baby powder, I found asbestos

15       structures -- and he has pictures of them and all

16       that stuff -- in the bottle.

17            So that testimony goes to defect and they have

18       arguments about that.  I just want to make sure we

19       are not confusing that.

20            But that also forms the basis of his opinion

21       regarding above ambient exposure.  Above ambient

22       exposure -- ambient exposure is what you and I get

23       walking down the streets of New York or Miami,

24       right?  There might be asbestos in the air.

25            What Dr. Rigler is going to say is, look, I've

Page 196

1      tested baby powder.  72 percent of the time, it has

2      asbestos in it.  When it has asbestos in it, I can

3      tell you, using mathematical calculations, roughly

4      how many fibers are in a gram of that powder.  This

5      is sort of accepted industry science on how you do

6      that math.

7           He is not going to say -- he will certainly

8      say I'm assuming her testimony is true, right, that

9      she used the product.  I mean, I believe it.  And

10     he is going to say if I believe the testimony of

11     record, and this woman used this her whole life on

12     her genitalia from age of sexual maturity to her

13     death, then this would be above ambient exposure.

14          Because you or I don't have that.  That's the

15     definition of ambient is just background.  But what

16     she has has to be far greater than background

17     because she was using it in a time period during

18     decades which we know it had asbestos exposure in

19     it.

20          THE COURT:  If her testimony, or if the

21     testimony about how often she used it, if that

22     testimony is accepted, wouldn't that just

23     automatically be above ambient?

24          MR. OLIVER:  That I believe is true, yes.  I

25     mean, he is going to say that based on his

Page 197

1       testing --

2           THE COURT:  So I guess the reason I'm asking

3       is why then -- I understand if he explained ambient

4       the way you just explained what ambient is, why is

5       it necessary for him to then come in and opine that

6       her exposure was above ambient?  Because it doesn't

7       seem like that's a complicated fact that an expert

8       would need to opine on because ambient is just

9       basically saying this is just normal exposure based

10      upon everyday living, walking around, existing.

11          MR. OLIVER:  He will need to explain that.

12          THE COURT:  Right, he would explain that.

13          MR. OLIVER:  Sure, sure.

14          THE COURT:  I don't know if this is really --

15      if we should be fighting over this, because if he

16      explains what ambient is, and then he says, well,

17      her exposure was above ambient because, okay, she

18      used the baby powder -- accepting the testimony as

19      true, she used the baby powder for this period of

20      time, that by definition would be ambient exposure.

21          MR. OLIVER:  And maybe to put some of it in

22      context on why he needs to say this, the defendants

23      are going to put on a case that -- first of all,

24      they're going to tell everybody that talc is

25      everywhere.  It's everywhere, it's everywhere.

Page 198

1          Talc is everywhere.  It's on your medicine, it's on
2          your this, it's on your that.
3                And they are going to say the same thing about
4          asbestos.  There is asbestos out there just
5          flouting around in the air, right?
6                So it matters -- which is not true, right?  It
7          matters to have an expert say, look, you know,
8          people who are just walking around and not using
9          this product, they are not getting exposed to the
10         same level of asbestos as somebody who is walking
11         down the street, right?  You would have to be in a
12         construction job or, you know, doing something like
13         that where you are exposed to an extra level of
14         asbestos.  That's why we need the testimony.
15               THE COURT:  I get it.
16               MR. BALZANO:  I think the problem here -- and
17         to go back to the exposure assessment, I started
18         with this, he could have calculated based on his
19         assumption how much -- because that's more
20         complicated math -- to see how much asbestos
21         Dr. Seskin was exposed to based on her alleged use.
22         But he didn't do that.
23               There is no connection, I think that's the
24         point here, is that Dr. Rigler, he is just going to
25         get in here and say, yeah, the talcum powder that

Page 199

1      she used exposed her to asbestos above ambient

2      levels, but there's nothing to back that up.  There

3      is no connection to this case.

4          He didn't look at the tissue.  He didn't look

5      at her bottle.  He didn't even conduct some type of

6      exposure analysis for asbestos.

7          THE COURT:  I don't understand that argument

8      because what he is saying is he's accepting that

9      her use is factually supported by the record.

10     Meaning if, in fact, her use is incorrect, meaning

11     the jury rejects the testimony regarding her use,

12     then his opinions all go away, right?  Because his

13     opinion is based upon the testimony that has been

14     presented in the record.

15         And so I don't know anything requiring him to

16     basically say that it's this many parts per

17     milliter of exposure.  All he needs to say is that

18     it's above ambient.  I don't think he needs to

19     quantify it, like to say how much above ambient.  I

20     don't know why that is required.

21         MR. BALZANO:  I think it would be important

22     for him to look at studies and look at the ambient

23     level of asbestos to try to add some type of value,

24     some type of expert value.

25         THE COURT:  Why?

Page 200

1          MR. BALZANO:  I mean, to add expert value to

2      the case.  I mean, in 2020 --

3          THE COURT:  I would think that if he didn't,

4      you would be happy about that, because if he did,

5      that would just make their case stronger and your

6      case weaker.  If he didn't, that makes your

7      cross-examination more colorful and it makes your

8      argument to the jury more powerful.

9          MR. BALZANO:  Understood, Your Honor, but I

10     would just leave you with the fact that he just

11     sort of changed his mind from 2020 to 2023.  He had

12     more time to think about it.  I don't think that is

13     emblematic of a well thought out --

14         THE COURT:  You all just stood up there about

15     three and a half hours ago and you told me that

16     science is forever evolving.  Science doesn't

17     just --

18         MR. BALZANO:  Not this science though, to be

19     fair.  It's different science.

20         THE COURT:  Motion in limine is granted as to

21     the -- I'm sorry, I granted it as to the exposure

22     and I'm denying it as to the ambient levels.

23         MR. BALZANO:  And there is one more portion in

24     the motion, but I would like to rest on the papers

25     for it.  It's really complicated.

Page 201

1          THE COURT:  It's really convoluted?

2          MR. BALZANO:  Complicated asbestos science.

3          MR. OLIVER:  Both.

4          THE COURT:  Okay.  Tell me what it is.

5          MR. BALZANO:  So the bulk of Dr. Rigler, what

6      we expect the bulk of Dr. Rigler's opinion will be

7      when he used to work at this other MAS lab and

8      their testing of Johnson's baby powder.  They

9      tested a number of bottles, and there is a couple

10     portions of this.

11          I mean, we say that it's unreliable.  We argue

12     that it's unreliable testing because when you look

13     at the asbestos -- so when plaintiff stands up here

14     and talk about tremolite or anthophyllite, there is

15     an asbestiform version of tremolite, which is

16     asbestos, and then there is a non-asbestiform

17     version of tremolite.  Not all tremolite is

18     asbestos.

19          THE COURT:  Okay.

20          MR. BALZANO:  And it depends on how it grows

21     in the earth.  The asbestiform is needlelike, and I

22     think the tensile strength, it doesn't break

23     easily.  The vast majority of tremolite and

24     anthophyllite is not non-asbestiform.  It doesn't

25     grow in that habit.

Page 202

1          But what happens is when you're dealing with

2      these really, really tiny, really small particles,

3      is if you take a non-asbestiform tremolite and you

4      break it, some of it can sometimes look like a

5      needle, but it didn't grow in an asbestiform habit.

6      So to identify tremolite, to look at talc and see

7      tremolite, that's not necessarily asbestos.  And

8      it's unreliable because, you know, you cannot

9      distinguish between asbestiform and non-asbestiform

10     using the methods that Dr. Longo --

11          THE COURT:  Who says that?

12          MR. BALZANO:  Who says that you cannot

13     distinguish?  So there are a bunch of definitions

14     from various public health authorities and public

15     agencies.

16          THE COURT:  I know, but you have to tell me --

17     you're saying his opinion is unreliable.  I need to

18     know it's unreliable because it's not the proper

19     methodology.  It's unreliable because it's not

20     proper application to the facts in this case.  It's

21     unreliable --

22          That's what I need, and you can't just talk to

23     me about -- you've got to give me something

24     specific that I can hang my hat on.

25          MR. BALZANO:  So when you look at a bunch of

Page 203

1    government agencies, they all define asbestos as
2    tremolite asbestos, or something grown in an
3    asbestiform habit.  And the methodology that he
4    relies on is something called AHERA.
5         It is escaping me what it stands for right
6    now, but it is some type of government protocol, I
7    think issued by OSHA.  And that was primarily for
8    when they were abating schools.  Like schools would
9    have asbestos or buildings would have asbestos and
10   they were abating it.
11        Now, those counting methodologies, when they
12   would look at the air to see if there were
13   particles in the air, and if they saw tremolite,
14   they would characterize it as asbestos tremolite,
15   but that's because they knew beforehand that there
16   was asbestos in the walls.  So they don't have to
17   worry about misidentifying non-asbestiform
18   tremolite with asbestiform tremolite.
19        And these are the counting procedures that
20   Dr. Rigler and Dr. Longo used when they were
21   looking at talc.  They would see tremolite and they
22   would count it as a fiber.  Under these procedures,
23   you would need to count, I think it was either
24   three or five fibers to say that something --
25   because sometimes it could be contamination if you

Page 204

1    just found one, so they had counting protocols.

2         So there are a lot of -- so non-asbestiform is

3    what we call cleavage, a cleavage fragment, and we

4    say that there are a lot of authorities that say

5    there is no scientific proof to show that the

6    non-asbestiform version of tremolite or

7    anthophyllite are harmful.

8         THE COURT:  So the gist of what you're saying

9    to me is that you don't believe that he has

10   properly tested or the proper amount of asbestos,

11   at least the tremolite asbestos, and therefore, his

12   opinion is unreliable?

13        MR. BALZANO:  Right.

14        MR. OLIVER:  Your Honor, so first of all, let

15   me just back up and say that Dr. Rigler applied the

16   counting rules that have been endorsed by the EPA,

17   which have a five-to-one aspect ratio, and OSHA has

18   even done -- well, actually, he applied OSHA, which

19   is a three-to-one.  I think EPA has done a

20   five-to-one.

21        These are the accepted counting rules within

22   the industry.  They are the majority counting

23   rules --

24        THE COURT:  He is going to testify to that?

25        MR. OLIVER:  Oh, he is absolutely going to

Page 205

1    testify to it.  And they are going to put up an

2    expert who is going to talk about some different

3    counting rules, and the interesting thing is nobody

4    follows those counting rules except Johnson &

5    Johnson and other industry participants who want to

6    get away from asbestos lawsuits.

7          THE COURT:  OSHA doesn't follow it?

8          MR. OLIVER:  No, they follow the three-to-one.

9    They follow what Dr. Rigler did, right?  So he's

10   following the accepted regulatory and scientific

11   counting rules.

12         In terms of whether tremolite that is a

13   cleavage fragment is dangerous, the authorities

14   also agree -- and this is in the peer reviewed

15   literature -- that we don't know whether it's the

16   chemical composition of the asbestos or the

17   needlelike shape, but there are many scientific

18   authorities -- in fact, the majority position --

19   that say, look, it's the needlelike shape that

20   matters.

21         So when you take a rock of tremolite and throw

22   it on the ground, the rock isn't going to hurt you.

23   But if you shatter it with a ball and it turns into

24   little shards, there are tons of scientists out

25   there that are going to say that's the problem,

Page 206

1        it's the needlelike shape.

2            And, in fact, the FDA convened an

3        international working group on this issue.  Now,

4        the FDA hasn't finalized this yet, but the working

5        group recommended to FDA to follow the process for,

6        you know, finding the asbestos that Dr. Rigler

7        recommended, they are using the same rules, and in

8        that working group statement, they say everybody

9        agrees it's the needlelike shape that is the

10       problem, not necessarily the chemical composition.

11       That's why we have six different types of asbestos

12       and they all have a different chemical composition,

13       but we know they all form cancer because they all

14       tend to come in this needlelike shape, as does

15       talc.

16           So there's absolutely no problem with the

17       methodology used, but here is the best part, Your

18       Honor.  They are complaining about cleavage

19       fragments.  Dr. Rigler testified when I counted, I

20       didn't count cleavage fragments, and 96 percent of

21       what we counted in our test are what are called

22       bundles.

23           Bundles are multiple strands of asbestos or

24       fibrous material, you know, laying on one another.

25       96 percent were bundles.  Bundles can't be cleavage

Page 207

1       fragments.  They are mutually exclusive.

2           Cleavage fragment is what it sounds like.  He

3       said he didn't count those, and anyway, 96 percent

4       were bundles.

5           So this argument is simply something that a

6       bunch of old asbestos scientists might sit around a

7       bar and debate and say, well, that's interesting,

8       I'll look at this paper, I'll look at that paper,

9       but it is not anything that has to do with Daubert.

10          THE COURT:  Anything else?

11          MR. BALZANO:  I would like to sit with the

12      asbestos scientists.  I'm sure it would be fun.

13          But just on the bundles point, so, again,

14      Dr. Rigler worked at MAS, and MAS has done all of

15      this talcum powder testing in the auspices of

16      litigation.  They all were being paid by

17      plaintiffs' attorneys to do these tests.

18          And this bundle point, there was -- it is so

19      subjective, so if I could hand up -- I'm sorry, I

20      don't have a copy for you, counsel.

21          MR. OLIVER:  That's okay.

22          MR. BALZANO:  This is just from page 11 of our

23      motion.  This just shows how subjective this type

24      of microscope and this type of testing is.

25          When you -- they would have various TEM, they

Page 208

1      would use that type of microscope to look at these

2      fibers and bundles.  And at a certain point, they

3      weren't finding as many bundles.  I don't have the

4      numbers in front of me, but they were finding

5      something like 40 percent of the tremolite or

6      anthophyllite particles that they were identifying,

7      they were saying were bundles.

8          And then at some point, that shot up to like

9      93 percent.  And what they would do is they were

10     looking and they were just -- it is so subjective

11     to just look at that picture and say, well, that

12     looks like a bundle.  Or, well, that looks like a

13     fiber.

14         And there is just no methodology behind --

15     it's just the eyes of the microscopist when they

16     are looking at that particular particle.

17         THE COURT:  Isn't it just about counting and

18     what you see?

19         MR. OLIVER:  It's a five-to-one aspect ratio,

20     or three-to-one.  Those are measurements that every

21     singer fiber satisfied.  Those are the counting

22     rules.

23         So it's not arbitrary.  They didn't make this

24     up.  That's what they followed.

25         MR. BALZANO:  So counsel is talking about --

Page 209

1           THE COURT:  This one here is a single fiber?

2           MR. BALZANO:  That's what the MAS scientists

3       say, and then the other one, they're saying is a

4       bundle.

5           So I don't want to get confused with the

6       counting rules.  There is a difference between

7       counting what you see as a fiber, and then when

8       we're talking about bundles, a bundle is something

9       where, when you look at the fiber, it sort of is

10      breaking up, and what that shows you is that it

11      grew that way.  And that's why it matters, because

12      it's whether or not it's asbestiform.

13          THE COURT:  Why would this be a bundle?

14          MR. BALZANO:  I agree.  I don't think it's a

15      bundle.

16          MR. OLIVER:  Your Honor, that argument cannot

17      stand.  I cannot look at that and tell you anything

18      about this, and neither can he.  That is insanity,

19      all right?

20          Our doctors have the absolute -- the rules,

21      right?  The rules for counting.  And J&J is going

22      to say we have our own rules that we wish somebody

23      would adopt.  We wish the FDA would do what we want

24      them to do because then we would never get in

25      trouble.  But the FDA hasn't agreed to do that.

Page 210

1           THE COURT:  I get it.  The motion is denied.

2           What else?

3           MR. BALZANO:  Thank you, Your Honor.

4           THE COURT:  Thank you.

5           MS. SCOTT:  We have one last motion to exclude

6       on -- I'm sorry, two more motions to exclude.  This

7       one on Dr. Plunkett.

8           THE COURT:  Okay.

9           MS. SCOTT:  Your Honor, the J&J defendants

10      have moved to exclude the testimony of Dr. Laura

11      Plunkett.  We are going to focus our argument today

12      on three buckets of her opinions, and I'm just

13      going to start off by saying that Dr. Plunkett is a

14      toxicologist and a pharmacologist, but that's by

15      training.

16          Her profession is she's been a paid consultant

17      and expert witness traveling the circuit offering

18      exert opinions.  And I'm not saying that to malign

19      her character in any way, everyone has to make a

20      living, I'm just saying that based on our

21      experience with her, particularly in this talc

22      litigation, we have a sense of what sort of

23      opinions she's going to offer, and particularly,

24      the inadmissible opinions that she is going to

25      offer.

Page 211

1          As I started off, those opinions fall under

2     three buckets.  The first bucket is on opinions on

3     FDA regulations.  The second opinion is on what I

4     referred to earlier with Dr. Freidenfelds corporate

5     mind reading, and then again this reading

6     unambiguous corporate documents into the record and

7     putting her own expert spin on those documents.

8          Courts around the country have excluded

9     Dr. Plunkett's testimony on these sorts of opinions

10    and we would submit that this Court should join

11    those courts as well.  I'll go one by one and talk

12    about those buckets.

13         So the first one is on FDA regulations.

14    Dr. Plunkett intends to come in and talk about --

15         THE COURT:  What's her background?

16         MS. SCOTT:  She's a pharmacologist and

17    toxicologist.

18         THE COURT:  Okay.  I think you said that.  Go

19    ahead.

20         MS. SCOTT:  Yes, Your Honor, and she's been a

21    consultant for 25 to 30 or so years.  She intends

22    to tell the jury things like J&J defendants failed

23    to comply with FDA regulations governing things

24    like warning labels and cosmetic.  She doesn't have

25    a lot of experience in cosmetic.  As a

Page 212

1          toxicologist, she focuses on drugs and drug

2          labeling.

3               But in any event, plaintiff admits in their

4          response that Dr. Plunkett is going to come in and

5          talk about the applicability of the FDA regulation

6          to cosmetics -- that is, which regulations apply --

7          and she is also going to say whether or not the

8          defendants met those requirements -- that is,

9          whether the defendants complied.  And that's pure

10         legal opinion, Your Honor.

11              Moreover, Dr. Plunkett has never worked for

12         the FDA.  She has almost no experience with

13         cosmetics.  She is not qualified to offer these

14         sorts of opinions.

15              She is clearly opining on the law, and in a

16         similar case involving talc litigation, a trial

17         court in California -- and we have the language

18         here on the slide -- precluded Dr. Plunkett from

19         opining that talc-based powders should have been

20         labeled to warn of the risk for two reasons.

21         First, she can't give a legal opinion, and second,

22         she's not qualified on FDA regulations or the

23         applicability of their labeling.

24              So I think plaintiffs responded in their

25         response that she is a scientist and she is going

Page 213

1         to give her views on the law as a scientist, but

2         that makes her even less qualified to opine --

3              THE COURT:  I'm sure they didn't say that.

4         Did they really say that, she is going to give her

5         views on the law?

6              MS. SCOTT:  The response at 35, Your Honor,

7         her opinions in this case do not come from

8         interpreting statutes and regulations as a lawyer,

9         but as a scientist.

10             Another case that we have cited on this slide,

11        Your Honor --

12             THE COURT:  But when do I let anyone come in

13        and interpret the law?  I don't understand that.

14        She is going to come in and interpret the law as a

15        scientist?

16             MS. SCOTT:  I agree with that, Your Honor.

17        You are not supposed to come in here and tell the

18        jury what the law is, opine on what the law is.

19        That is your job, obviously, of course is to

20        instruct the jury on the law and they will follow

21        the law that is given by you, not by an expert.

22             THE COURT:  Is there any dispute as to what

23        the FDA regulations require?

24             MS. SCOTT:  There are instances where, for

25        example, she talks about whether or not we

Page 214

1     misbranded our products, whether they need to be

2     labeled, and I think the legal dispute there is

3     whether we needed to label or not under the FDA's

4     regulations, and she is going to come in and say

5     yes, defendants were supposed to label these to

6     label baby powder under the FDA regulations.

7          THE COURT:  So what she's saying is that she

8     is going to point to a specific provision of the

9     FDA regulations and say, under this particular

10    regulation, it requires products to be labeled and

11    this is what the labels should require?

12         That, to me, is not interpreting the law.

13    That's just simply saying what the rules and

14    regulations are as it relates to that.

15         The only other way that could happen is if you

16    all are under agreement as to this is what it

17    requires, and I then instruct the jurors.  Because

18    if not, who is going to come in and tell the jurors

19    that this is what the label -- you are required to

20    have a label, you are not required to have a label.

21    This is what the regulations say, this is what the

22    regulations don't say.  Somebody has to do that.

23         MS. SCOTT:  They are not supposed to give an

24    opinion as to the law.

25         THE COURT:  It's not an opinion as to the law.

Page 215

1          What it is is that there was a statute that was

2          passed, or the FDA has regulations.  This is what

3          the regulations are, okay?

4              And then they would say you either complied

5          with those regulations or you didn't, here is the

6          reason you didn't comply with those regulations.  I

7          don't know why that -- I don't think that is what

8          would disqualify the testimony.

9              MS. SCOTT:  To say whether or not the

10         defendants complied with the law or comply with the

11         regulations?

12             THE COURT:  Whether or not you met the FDA

13         regulations.  That's what experts do all the time

14         experts.  Experts come in all the time and they say

15         this is the law as it relates -- this is the law as

16         it relates to standard of care.

17             Did the plaintiff meet that standard of care?

18         No.  Why not?  And this is why they didn't meet it.

19             MS. SCOTT:  But Your Honor, we are not talking

20         about standard of care that requires expert

21         testimony.  We are talking about here is a cited

22         regulation, here are some words in the cited

23         regulation, and let me interpret the legal meaning

24         of these words.  So whether or not something has

25         been, for example, misbrand or adulterated --

Page 216

1          THE COURT:  But ma'am, if you all don't

2     agree -- in other words, I would understand that if

3     you're telling me, Judge Thomas, we agree what the

4     rules and the regulations are and we agree to how

5     they are to be applied.  But when you don't agree,

6     then somebody has to come in.

7          They may give one interpretation, you may give

8     another interpretation, but the only other way --

9     because how are the jurors going to know what to do

10    unless you're telling me that I, as the judge, have

11    to basically say here are the regulations that

12    apply, this is what the regulations mean, and then

13    you argue what actually happened.  But otherwise, I

14    don't know how it's done.

15         MS. SCOTT:  It is the province of the Court to

16    instruct the jury on the law.

17         THE COURT:  But the problem is you don't

18    agree.  I'm going to have a mini trial and you all

19    are going to basically come in and you are going to

20    testify to me what the FDA regulations are, what --

21    so I have to decide these are the regulations.  So

22    I'll then say, okay, these are the regulations that

23    apply to this case.  That may be the easiest part

24    of this.

25         Then the next question is going to be what

Page 217

```
 1         Johnson & Johnson was doing.  This is what Johnson
 2         & Johnson was doing.  Then you look at the
 3         regulations, you look at what Johnson & Johnson was
 4         doing, and you say Johnson & Johnson failed to
 5         comply in this regard because the label required 14
 6         point font; Johnson & Johnson didn't have 14 point
 7         font.
 8              The label required that you list out all the
 9         ingredients of your product, Johnson & Johnson
10         didn't put all the ingredients of their product
11         there.  What did they leave out?  They left out
12         asbestos.  They left out, you know, metals.  They
13         left out all these other things.
14              Go ahead.
15              MS. SCOTT:  Your Honor, the issue is we are
16         not going to be -- if I'm understanding you
17         correctly, we are not going to be fighting over --
18         we are not fighting over any ambiguity in the
19         regulations.  The regulations are what they are.
20              You can't have an expert come and make the
21         legal opinion, have a legal conclusion that a party
22         complied or did not comply with those regulations.
23         That's pure legal opinion.  She's tried it before
24         and courts have said no, you're not allowed to give
25         a legal opinion.
```

Page 218

1        But unless you have other questions, I can

2    move on to the second bucket.

3        THE COURT:  Go ahead.

4        MS. SCOTT:  The second bucket, Your Honor,

5    contains Dr. Plunkett's opinions about the J&J

6    defendants' business practices.  And so she plans

7    to tell the jury things like what J&J defendants

8    knew and when, opine on whether their actions were

9    reasonable --

10        THE COURT:  There is another witness that is

11    going to testify to this?

12        MS. SCOTT:  Yes, Your Honor, with, we believe,

13    the same sort of reading unambiguous documents in

14    order to put an expert spin to come to a

15    conclusion.  And courts have likewise prevented

16    Dr. Plunkett from coming in and giving any express

17    opinions about defendants' motive or intent.

18        THE COURT:  I don't understand what qualifies

19    Dr. Plunkett to come in -- I mean, I guess she's

20    not the, quote, unquote, historian of medicine or

21    whatever the last person's title they had, so what

22    allows her to look at documents and then come in

23    and say this is what Johnson & Johnson did and this

24    is when they did it?  I'm trying to understand

25    that.

Page 219

1          MS. SCOTT:  We agree, Your Honor.  She can't

2     come in here and do that, and that's what courts

3     have said.  She can't come in and read documents

4     and speak to a party's motive or intent.  Such

5     opinions are speculative.

6          The Echevarria case that I mentioned earlier

7     from the California trial court said Dr. Plunkett

8     is not qualified to opine on corporate behavior.

9     She's a pharmacologist.  Plaintiff can put into

10    evidence documents and testimony to show corporate

11    activity and they can argue that.  They don't need

12    an expert to be on the stand --

13         THE COURT:  I don't know if they can even put

14    that in through her.  I'm assuming somebody gave

15    her some documents and she looked at the documents

16    and she is going to come in and testify, okay,

17    Johnson & Johnson did this and Johnson & Johnson

18    did that.  I don't know how that informs her

19    ultimate opinion.

20         All right.  We'll hear from them in a minute.

21         What is the next one?

22         MS. SCOTT:  Just to take a step back on the

23    FDA regulations, in addition to it being improper

24    legal opinion, she's just not qualified to opine on

25    FDA regulations.  She's never worked for the FDA,

Page 220

1          she's never been an employee, she's never consulted

2          for, she's not speaking on their behalf.

3              THE COURT:  So what you're telling me is all

4          she really is doing is reading the regulations and

5          saying whether or not you complied with them?

6              MS. SCOTT:  Yes.  As a pharmacologist, she --

7              THE COURT:  She's never applied the

8          regulations, she's never been in charge with

9          enforcing the regulations, she didn't write the

10         regulations?  So she is just doing -- she has a

11         nice degree and then she is reading the regulations

12         and she is saying this is what they are because I

13         read them, and this is what Johnson & Johnson did

14         or did not do because I know the facts of the case?

15             MS. SCOTT:  Precisely, Your Honor.

16             THE COURT:  All right.  What's the third

17         bucket?

18             MS. SCOTT:  The third bucket is one we've

19         spoken about before, particularly with

20         Dr. Freidenfelds, and that is Dr. Plunkett's

21         narrative testimony based on unambiguous documents.

22         Again, plaintiff's counsel wants to put her on the

23         stand to interpret and put an expert spin on our

24         company documents.  She has a track record of doing

25         that in other cases.

Page 221

1          THE COURT:  I don't understand.  Let's turn it

2     in for a minute because it's the same argument and

3     I need you to help me understand because I don't

4     understand how -- she is a pharmacologist?

5          MS. SCOTT:  Yes, Your Honor.

6          THE COURT:  I don't understand how this

7     person, being that, gets to basically look at the

8     regulations, and then come in and say what they

9     are, and then come in and say how they didn't

10    comply with the regulations.  Then I also don't

11    know how they then get to look at their corporate

12    documents and say what they knew or what they

13    should have known.  I don't understand how she's

14    qualified to do that.

15         MS. O'DELL:  Well, let me take a step back and

16    really explain maybe a little bit more fully what

17    my counterpart did what her qualifications are.

18         She is a toxicologist.  She has a Ph.D.

19    in pharmacology.  She also is a -- she's an FDA

20    regulatory specialist; she has a certification for

21    that.

22         She's been in this industry for 25 years where

23    she has consulted with cosmetic manufacturers, even

24    back in 1990 when the condom manufacturers were

25    addressing the question of talc, and whether talc

Page 222

1    is a hazard, she consulted then to condom

2    manufacturers.  So she is someone who has been in

3    the industry and has been interacting with the FDA.

4    She's never been employed by the FDA, but I'm not

5    sure to be a regulatory expert you have an

6    employment at the FDA.

7         What she has been is she is certified in that

8    area.  She has been consulting --

9         THE COURT:  Certified in what area?

10        MS. O'DELL:  As an FDA regulatory specialist.

11        THE COURT:  What is that?  I don't know what

12   that means.

13        MS. O'DELL:  I think it's just a certification

14   through the Food and Drug Administration.

15        THE COURT:  To do what?  A certification that

16   allows you to do what?

17        MS. O'DELL:  To consult -- to understand the

18   regulatory framework and to consult with companies

19   and assist them as they are interacting with the

20   FDA.  Consultants are hired all the time by

21   manufacturers, both in pharmaceuticals, cosmetics,

22   and others, in order to understand the regulatory

23   framework and interact with the FDA and what's

24   required under FDA regulations.

25        In this case, it is particularly important to

Page 223

1    have someone speak to the cosmetic regulatory

2    framework because it's not like a pharmaceutical

3    where drug companies are required to establish

4    safety, demonstrate that to the FDA, go through

5    certain testing protocols in order for a product to

6    be on the market.  That's not the way cosmetics

7    work.

8         Cosmetics work where it's the company's duty

9    to ensure the safety of their product, ensure --

10   and it's all on the company.  They have no duty to

11   have the product approved by the FDA before it goes

12   on the market.  They have no duty to test it.  They

13   have no duty to send adverse event reports to the

14   FDA like you would have in a pharmaceutical or

15   medical device.  It's a very different regulatory

16   environment.

17        And so what Dr. Plunkett can do is assist the

18   jury in understanding, okay, whatever you heard

19   about FDA in other context and think you know it,

20   that's not how cosmetics work, and here are some of

21   the principles.  For example, 740.1 is one of the

22   regulations, and it says that a cosmetic shall bear

23   a warning to prevent a health hazard that may be

24   associated with a product.

25        THE COURT:  But in other words, I've heard

Page 224

1   counsel say that nobody disagreed with what the

2   regulations say.  The regulations say what the

3   regulations say.

4       The question is about you then go one step

5   further and you then have your doctor say that

6   Johnson & Johnson failed to comply with that

7   regulation, and they are saying how is she

8   qualified to then basically tell the jurors that we

9   failed to comply with the regulation when all she's

10  really doing is reading the regulation and then

11  accepting some facts that I guess the plaintiff put

12  in front of her, and then saying, okay, they didn't

13  comply because they didn't do this and they didn't

14  do this?

15      MS. O'DELL:  It's more than that.  She has

16  gone through as a toxicologist and pharmacologist,

17  and she's done a risk assessment to determine if

18  there is a hazard associated with Johnson's baby

19  powder.  And based on that finding, her opinion

20  that there is a hazard, she has said a reasonable

21  company in the same circumstance would have

22  provided a warning that Johnson's baby powder can

23  cause ovarian cancer.

24      Her opinion is going to be, to your point, a

25  standard of care opinion.  As a reasonable company,

Page 225

1       based on this information that they had internally,

2       and based on the regulation, a reasonable company

3       would have had added a warning.  That's one of the

4       things that she will say.

5            She will say her opinion is that the presence

6       of asbestos and fibrous talc in the product not on

7       the bottle is consistent with the FDA definition of

8       misbranding.  Because if you branded it

9       appropriately, you would have those ingredients.

10           Lastly, a cosmetic product with no benefit --

11      we are not talking about a drug where you are

12      weighing risk and benefit.  You are talking about a

13      cosmetic benefit that has a risk of causing a

14      deadly cancer.  Like in the case of Ms. Seskin.

15           And in that setting when you have the presence

16      of asbestos, that's an adulterated product.  That

17      is consistent with the FDA standard of it being

18      adulterated.

19           So what Dr. Plunkett has done, similar to

20      Dr. Freidenfelds, but in totally different focus,

21      her focus is on the regulatory interaction between

22      Johnson & Johnson with not only the FDA, but also

23      the national toxicology program.

24           THE COURT:  But I don't understand.  If the

25      standard of care, if you're testifying that she's

Page 226

1        really a standard of care expert --

2            MS. O'DELL:  In many respects.  Regulatory

3        standard.

4            THE COURT:  I understand.

5            If she is coming in and testifying that they

6        failed to meet the standard of care for the

7        labeling of products, or for -- I don't know

8        exactly what the standard of care is, or any other

9        company with the information that Johnson & Johnson

10       would have put these items on their product, and

11       the failure to do that is falling below the

12       standard of care.  And the standard of care are the

13       FDA regulations?

14           MS. O'DELL:  Well, yes, Your Honor.  They fail

15       today act reasonably because they didn't warn, and

16       the basis for that is what the FDA has said is

17       required for warning, which is a hazard that may

18       cause.  It's not that you have to prove beyond a

19       reasonable doubt.

20           THE COURT:  But she doesn't get to say that.

21       That's your argument.

22           MS. O'DELL:  She is not going to say that.

23           THE COURT:  But see, I think that -- and the

24       fear that I have is that that's the way you all use

25       these experts.  And you use these experts kind of

Page 227

1     to basically direct the jurors to the ultimate

2     conclusion that you want.  And I'm not talking

3     about -- I'm talking about the legal conclusion

4     that you want.

5          And I think that's part of what this motion is

6     about.  I'm getting a little uncomfortable because

7     it's almost like the expert is telling the jurors:

8     Accept these facts, and I'm the expert and I'm

9     going to tell you what the law is, and this is the

10    conclusion that you should draw.  And that's really

11    called summation by the lawyers at the end of the

12    trial.

13         Now, I guess part of this is saying that,

14    well, what is stopping her from being able to come

15    in and say that they fell below the standard of

16    care for labeling and here is why they fell below

17    that standard of care.  And I'm not sure what there

18    would be to stop her from saying that.

19         The problem though is that, in doing that, she

20    is actually going to provide opinion testimony as

21    to what the regulations are and how those

22    regulations are to be applied.  That may be part of

23    the problem of how is she qualified to do that.

24         MS. O'DELL:  Well, she is qualified in the

25    sense that she does this when she consults with

Page 228

1        cosmetic manufacturers and she does that all the
2        time, but Your Honor, you can't do that in a
3        vacuum.
4              THE COURT:  But you didn't argue to me -- oh,
5        no, they argued to me about Publix.
6              MS. O'DELL:  But you cannot do that in a
7        vacuum.  If there is going to be a standard of care
8        and they failed to act reasonably because they did
9        not provide information on the bottle about the
10       constituents or about a warning, it cannot be in a
11       vacuum.  She has to have a basis to offer the
12       opinion.
13             THE COURT:  I agree.  I think what you're
14       saying to me is that her testimony is they failed
15       to act reasonably on the labeling of the bottle
16       because they failed to put the ingredients on the
17       product on the bottle.
18             Well, what requires them to put the label on
19       the bottle?  The FDA regulations require that.
20             Okay.  And then the FDA regulations are there.
21       Or she could say FDA regulations section 4332-1,
22       okay?  And then she says that's the basis of my
23       opinion.  But I don't know if she can say anything
24       beyond that.
25             MS. O'DELL:  We are not offering her to say

Page 229

1      beyond that.  We are offering her to say they did

2      not have a warning.  I think she can say that,

3      that's a fact.  The bottle has never had a warning.

4              THE COURT:  So the bottle never had a warning?

5              MS. O'DELL:  Zero warning for the entire time

6      it was on the market.  Never mentioned ovarian

7      cancer.  No warning.

8          Your Honor, we would put her forward to say

9      here is the bottle.  It's never had a warning.

10     This is my opinion about hazard and the hazard this

11     product creates.  The FDA regulation requires when

12     there is a hazard that may be associated, you shall

13     warn.  That would be -- and the failure to do that

14     is the failure to act responsibly or reasonably.

15             THE COURT:  Okay.  I'm not sure I have a

16     problem with that.

17         So what about their documents that you intend

18     to --

19             MS. O'DELL:  Well, this is a complicated,

20     complex story.  It happens over 50 years.  And

21     Dr. Plunkett has looked at thousands of documents.

22     She's had, similarly to Dr. Freidenfelds, access to

23     our database.  She's been studying this issue for

24     almost seven years, I think.  And she has read

25     these documents and to put in context what J&J

Page 230

1           knew, when they knew it, just the facts, and what

2           that means from a regulatory standpoint.

3                   THE COURT:  But I don't understand.

4                   MS. O'DELL:  For example --

5                   THE COURT:  No, ma'am.  It's one thing for me

6           to allow a historian to do that, but then if you're

7           just basically telling me you can just go find an

8           expert -- and by the way, they call your expert --

9           they say her job has been basically -- she's

10          testified 150 times since 2003 in deposition and

11          trial.

12                  So you can't possibly stand there and tell me

13          you can find a reputable expert, and then you then

14          basically give them all the information you can

15          give them about the company, and they basically get

16          to introduce all of that evidence and say, well,

17          they should have known.

18                  MS. O'DELL:  But Your Honor --

19                  THE COURT:  Do it through your historian.  Do

20          it through that medical historian that you talked

21          about.  It shouldn't be that I allow it to come in

22          over their objection.  I'm not turning every single

23          witness that you intend to call here into some

24          historian about what people knew or should have

25          known.  No.  I think that's going too far.

Page 231

1          MS. O'DELL:  Yes, sir.  Let me just draw the

2     distinction between Dr. Plunkett and

3     Dr. Freidenfelds.

4          Dr. Freidenfelds is going to talk about

5     marketing, the communication to women as consumers.

6     You heard that argument.

7          Dr. Plunkett is very different.  She is going

8     to be talking about J&J and the talc supplier,

9     Imerys, their interaction with regulatory agencies

10     and what they were saying to regulatory agents,

11     what they were not saying to regulatory agencies,

12     how that affected --

13          THE COURT:  I'm sorry to say this:  Who cares

14     what she thinks about what they were doing and who

15     they were talking to?  The issue is whether or not

16     their product fell below the standard of care.

17          You don't get, as an expert, to come in here

18     and say, oh, and you know how I know their product

19     fell below the standard of care?  I found a memo

20     from them.  Oh, I found a communication where they

21     said this or they said that, so they knew that this

22     should have happened.

23          No.  She is a standard of care expert.  She is

24     not somebody -- I'm not turning this trial, or any

25     other trial that I'm turning into, is where you

Page 232

1          have somebody -- and I agreed with you on the

2          historian because I think that's appropriate in

3          light of what I heard.  I just don't think that's

4          the same thing here.

5              And you're right, there is a distinction

6          between these two witnesses, and one is just a

7          professional who has not studied the historical

8          documents except for purposes of this litigation.

9          The other one has basically looked back at all of

10         these documents from a historical perspective and I

11         think that's different.

12             MS. O'DELL:  Well, I will say this,

13         Dr. Plunkett --

14             THE COURT:  Please don't talk me out of the

15         other decision that I made with the other

16         historian.

17             MS. O'DELL:  I will not.  I promise I won't.

18             But I will say that when you're talking about

19         what Dr. Plunkett intends to testify to in terms of

20         J&J's documents to put them into context, and that

21         is -- and I'll give you an example.

22             THE COURT:  I don't know what that means.

23             MS. O'DELL:  I'm trying to explain, Your

24         Honor.  Maybe I'm not being quick enough.

25             But the National Toxicology Program considered

Page 233

1      talc and whether it was -- should be regulated as a

2      carcinogen, and so there are documents associated

3      with that process in the '90s and the 2000s, and

4      that's a regulatory interaction.  And what

5      Dr. Plunkett's opinion is, based on her review of

6      the documents, how they essentially circle the

7      wagon and put the full court press on to prevent --

8      and I'm talking about Johnson & Johnson and Imerys,

9      the talc supplier.

10         When they worked to ensure that in 2000, that

11      talc would not be listed as a carcinogen, despite

12      the evidence that was in place at that time,

13      including their knowledge that there was asbestos

14      in talcum powder, J&J knew that.  And J&J was

15      working day and night to ensure that the National

16      Toxicology Program would not --

17         THE COURT:  What gives her authority to come

18      in and say that?

19         MS. O'DELL:  She would say from a regulatory

20      standpoint, because she's dealt with the National

21      Toxicology Program as well, as part of her work as

22      a regulatory specialist, she would say Johnson &

23      Johnson's lack of candor to the National Toxicology

24      Program, the way they worked to ensure that talc

25      was not listed as a carcinogen was not consistent

Page 234

1    with a responsible company because in the face of

2    that evidence, and in the face of the regulatory

3    framework, what they would have done is said we are

4    going to war because there was significant

5    evidence, including asbestos evidence, that talc

6    could cause ovarian cancer.

7         So that is a regulatory sort of event that she

8    is specially equipped for to explain.  That is

9    because she has regulatory expertise.  She has

10   dealt with the National Toxicology Program, she's

11   dealt with the FDA, she's dealt with other

12   regulatory agencies.

13        And so for her to be able to evaluate how they

14   started --

15        THE COURT:  Too far.  I think you're going too

16   far with her.  I am not permitting her to come in

17   here and testify looking at their documents, and

18   after looking at their documents, talking about

19   what they knew or should have known, what they

20   should have done.

21        She can testify about -- and I'll hear from

22   you if you want to be heard on this.

23        She can testify about whether or not they

24   violated the standard of care.  She can testify

25   about how she concluded that they violated the

Page 235

1    standard of care because the regulation says this,

2    they failed to comply with the regulation.

3         And to be honest with you, I believe you said

4    something, and I'm trying to remember what you

5    said, I believe she may be even -- this is what I

6    want to hear from you about -- she may be even able

7    to testify about the things that Johnson & Johnson

8    knew and the things that they did not as it relates

9    to the standard of care, and that information was

10   not -- I mean, that information did not lead them

11   to put it on the label.

12        But this idea of Johnson & Johnson knew this,

13   so they lobbied for this, or Johnson & Johnson knew

14   that, and so they went and tried to circumvent this

15   over here, she can't testify to any of that.  None

16   of that.

17        You want to respond?

18        MS. SCOTT:  Yes, Your Honor.  I'll start with

19   your last point first.

20        We would disagree that anyone would be able to

21   come in and talk about what J&J knew, we talked

22   about that.  But to Your Honor's earlier point,

23   Dr. Freidenfelds, these are her opinions.  I mean,

24   she is going to come in here and talk about what we

25   were aware of in the '60s, '70s.

Page 236

```
 1          THE COURT:  No.  No, she's not.  She's not.
 2     She's not.  I think she can talk about the standard
 3     of care.  I think she can say --
 4          Now, I think if you're talking about standard
 5     of care in the sense as to the labeling and your
 6     failure to put the warnings on the labeling in
 7     violation of -- arguably, in violation of FDA
 8     regulations, if there is a memo that is -- or some
 9     statement that says -- and I rarely think this is
10     there, but it can be something akin to this:  Hey,
11     you know the FDA requires us to put the ingredients
12     on our labels, but in order to do that, that's
13     going to cost us this amount of money, so let's not
14     do it.  Well, if we don't do it, that's going to be
15     a violation of our standard of care.  Well, we
16     don't care, we'll wait until we get caught.
17          If there is that memo that's there, I think
18     she can make reference to it.  But if she's just
19     basically taking memos and she's associating it
20     with your conduct or your behavior or a regulation,
21     I don't think she can do that.
22          MS. SCOTT:  That's what she intends to do,
23     Your Honor, and so -- but earlier, I was making the
24     point that all the things that they want to do with
25     Dr. Plunkett, to Your Honor's point, they can do
```

Page 237

1        with Dr. Freidenfelds.  All of her opinions track.

2             But on the FDA point --

3             THE COURT:  Because she's a historian, I

4        overruled the objection and I'm not preventing you

5        from -- to the extent that this witness can

6        actually testify about documents that were in

7        Johnson & Johnson's possession and control that

8        went to this issue, I'm not preventing that

9        historian from talking about those documents.

10            I'm stopping this witness from talking about

11       those documents because I think you are utilizing

12       this witness in a manner that is inconsistent with

13       her expertise.

14            Go ahead, you were saying.

15            MS. SCOTT:  Thank you, Your Honor.

16            Just to touch on the FDA point, this whole

17       standard of care, I think it's a Trojan horse.  I

18       think it's a backdoor way to get in a pure legal

19       opinion, but the point I'll make is, again, she's

20       not qualified to do this.  Again, she's a

21       toxicologist.  Drugs is her game, okay?  Not

22       cosmetics.

23            THE COURT:  She said that she's consulted with

24       companies on --

25            MS. SCOTT:  She has consulted, perhaps, but on

Page 238

1          drugs.

2               THE COURT:  They told me it was on also on

3          warning labels.

4               MS. SCOTT:  And there is an instance in the

5          '90s, I think I heard condoms, which is a medical

6          device, not a cosmetic.

7               But in any event, not only is she unqualified,

8          her methods are unreliable.  So, for example, the

9          FDA interpreted its own regulation related to talc

10         baby powder in 2014.  It said labels aren't

11         required.

12              In addition, she does things like say the FDA

13         doesn't regulate cosmetics.  That's not true.

14              THE COURT:  Well, didn't they say labels

15         aren't required unless they -- did it say they may?

16         And so they didn't actually say you don't have to

17         put labels on, they actually said that you may be

18         required to put labels on if your product does

19         these things?

20              MS. SCOTT:  The FDA, in response to a

21         citizens' petition in 2014 that said, hey, FDA,

22         talc baby powder should have labels on it.  The FDA

23         wrote back, said we looked at things, we checked it

24         out, they don't need to put labels on.  The science

25         isn't there.  They don't need to put labels on this

Page 239

1         Johnson & Johnson baby powder.

2             THE COURT:  Did they say they don't need to

3         put labels on unless this?  Or did they just say

4         no, you don't have to put labels on?

5             MS. SCOTT:  They don't have to put labels on.

6             THE COURT:  That's the FDA?

7             MS. SCOTT:  That was the FDA's response to a

8         citizen petition who said, FDA, take a look at

9         this.

10            THE COURT:  So I don't understand then.  How

11        is this person coming in testifying that the FDA

12        requires labels if the FDA says you are not

13        required to have labels?

14            MR. OLIVER:  Your Honor --

15            MS. O'DELL:  Let me.

16            Your Honor, that is a mischaracterization of

17        what happens with a citizens' petition, with

18        respect.  The citizen's petition asked for a

19        specific label in 1998.  It was not, "Please warn

20        about ovarian cancer generally."

21            This was a petition that was filed by the

22        Cancer Prevention Coalition, and it was not acted

23        on until 2014, and that's part of what I would put

24        ford forward with Dr. Plunkett.

25            THE COURT:  What would happen in 2014?

Page 240

1          MS. O'DELL:  In 2014, there was a letter from

2     the FDA that said we have looked at the evidence

3     and we don't believe this label that was suggested

4     to us is appropriate based on what they viewed at

5     that time.  But it was not a comprehensive view of

6     the data and it's certainly not the data that we

7     have now.

8          THE COURT:  But my question, ma'am, is:  Has

9     the FDA ever required Johnson & Johnson to put a

10     label on the talc -- is it talc baby powder, baby

11     powder?

12          MS. O'DELL:  Johnson's baby powder with talc,

13     Your Honor, and FDA cannot require a label under

14     the cosmetic regulation that was in place.  They

15     cannot require a label.

16          It is the manufacturer's duty to put the label

17     on the product.  The only way they can require --

18     and, you know, this may seem shocking to you, it

19     sort of was to me when I got in the case, but the

20     FDA could not require a label unless they went to

21     court and sued a manufacturer in order to

22     require --

23          THE COURT:  But if they thought it was serious

24     enough and causing the type of harm that you all

25     are speaking of, then isn't it their obligation to

Page 241

1          go to court and make sure that a label is placed on

2          the product?  And the fact that they didn't put a

3          label on the product --

4              See, here is what I'm concerned with.  I'm

5          concerned with -- you're using the FDA regulations

6          through this particular witness, but nowhere are

7          you going to say that the FDA required them to put

8          a label on their product.

9              You're saying, I think, that Johnson & Johnson

10         fell below the standard of care because knowing

11         what they know, a reasonable manufacturer would

12         have put the label on their product.  But the law

13         didn't require them to put the --

14             MS. O'DELL:  We did, Your Honor.

15             THE COURT:  Tell me how.

16             MS. O'DELL:  I'm sorry, forgive me for saying

17         this again, but the regulation says it's not "may."

18         It says -- and this is to the manufacturer.

19             It says in 740.1 that I mentioned before, it

20         says it shall bear a warning.  That's the duty of

21         the manufacturer.  "It shall bear a warning to

22         prevent a health hazard that may be associated with

23         a product."

24             THE COURT:  So help me understand what that's

25         saying.  Are you telling me the FDA has a

Page 242

```
 1        regulation that says that it places the

 2        responsibility on the manufacturer; if the

 3        manufacturer is aware that there is a hazard of

 4        their product, although the FDA doesn't say put a

 5        label on your product, they are saying that if you

 6        learn that there is a hazard associated with your

 7        product, you must put a label on the product?

 8             MS. O'DELL:  It says shall.  "Shall bear a

 9        warning to prevent a health hazard that may be

10        associated with your product."

11             That's what the standard is.  And because it's

12        a cosmetic -- and there are thousands and thousands

13        and thousands of cosmetics on the market.  They go

14        on the market every day.  They are unregulated.

15        They are often untested.

16             The FDA can't say, hey, I'm going to look at

17        everything on the shelf and I'm going to bring a

18        lawsuit every time I think there's going to be a

19        warning.

20             THE COURT:  I know, but they can do it once

21        the public becomes aware of the level of the hazard

22        as you all -- you want to have a historian come in

23        here and you're going to have a historian tell us

24        about all they should have known, not ten years

25        ago, not 15 years ago, not 20 years ago.  So I'm
```

Page 243

1    sorry, this is not -- this whole idea people

2    started becoming alarmed about this issue of talc,

3    it wasn't just yesterday.

4        So it's one thing to sit up here and say that

5    somebody just put a product on there and nobody is

6    complaining about it, but this particular product

7    was on their radar.  And so they absolutely could

8    have gone to court and sued based upon the

9    information and all the testing that was being

10    done.  You all are telling me they started doing

11    this testing a long time ago; it wasn't just within

12    the last five, ten years.

13        So I don't accept that.  But I'm not sure that

14    I disagree with you in the context of the FDA

15    doesn't require cosmetic products to immediately

16    have a label, but the FDA standard says that if you

17    learn, okay, that your product is hazardous, or may

18    be hazardous, you shall place a label on, then I

19    think the FDA, in essence, is assaying, okay,

20    manufacturer, your failure to do that would fall

21    below the standard of care that is required of you,

22    even though we are not going around telling Johnson

23    & Johnson and Procter & Gamble to put a label on,

24    we are telling you basically the onus is on you.

25        MS. O'DELL:  100 percent.  It is

Page 244

1    self-regulated and --

2         THE COURT:  What do you want to say?

3         MS. SCOTT:  Your Honor, I mean, just going

4    back to the FDA has already said particularly and

5    specifically about Johnson & Johnson's baby powder,

6    they said the citizens who were saying, hey, look,

7    there is this issue with ovarian cancer, they said

8    we want a "may cause" label.  And the FDA said we

9    looked at the science, no, we are not saying that

10   Johnson & Johnson has to do that.

11        And of course, I mean, the FDA has the

12   authority to enforce its own regulations.

13        THE COURT:  But that doesn't change what

14   counsel is saying.  Counsel is saying that whether

15   the FDA chose not to put a specific label or adopt

16   a specific recommendation as to a label, that's one

17   thing, but the FDA regulation, even without the

18   adoption of that specific request, the FDA

19   regulations still say that if you become aware that

20   your product is hazardous, you shall put the

21   necessary warning labels on your product.

22        So I haven't heard you say that's not what the

23   regulations say.  Is that what the regulation says?

24        MS. SCOTT:  I'm not sure, Your Honor, but I

25   know the FDA was interpreting its own regulations

Page 245

1        when it did this.

2              But in any event --

3              THE COURT:  Did what?

4              MS. SCOTT:  When the FDA responded that there

5        is no label necessary on Johnson & Johnson's baby

6        powder.

7              THE COURT:  But that doesn't mean -- they

8        didn't release you from the standard of care that

9        is already in the regulation.  They, according to

10       plaintiff's counsel, they passed that on to you.

11       They said, you know, we are not going to take on

12       that immediate responsibility, but we are willing

13       to pass that on to you and make the manufacturer

14       responsible.

15             MS. O'DELL:  I'm happy to --

16             THE COURT:  One minute.  I'm still over here.

17             MS. SCOTT:  I'm just reading from the FDA's

18       response on this, but Your Honor, to the extent

19       that this goes to some legal opinion wrapped into a

20       standard of care and our awareness, I think

21       Dr. Plunkett, not only is she not qualified because

22       cosmetics is not what she is an expert in, even if

23       she has some consulting experience, that does not

24       make her an expert in it.  But to the extent

25       awareness and all that and knowledge is relevant,

Page 246

1      her testimony would be cumulative because

2      Dr. Freidenfelds is going to come in here and give

3      that testimony about what we knew, when we knew it,

4      at various points in time.

5           THE COURT:  I agree, and that's why I'm not

6      going to allow it.  I'm not going to allow

7      cumulative testimony and I'm not going to allow

8      this particular witness -- I think if they are

9      going to introduce about what you knew and when you

10     knew it, that testimony should come in through the

11     historian who is testifying.

12          But I'm not excluding this witness from

13     testifying about the standard of care, and that

14     includes being able to make reference to the FDA

15     regulations.  I will allow that to be part of that.

16     And if there are -- that doesn't mean I'm saying

17     that she can't refer to documents that go to the

18     standard of care, because I don't know what that

19     is.  And I'm assuming they told you what documents

20     they were.

21          MS. SCOTT:  Quite frankly, Your Honor, I don't

22     know what the standard of care is when you're

23     talking about a legal regulation that we are not

24     challenging that what the words say.  I don't know

25     what the standard of care is.

Page 247

1          And to the extent we are talking about some

2     industry standard of care, she is not in the

3     industry.  This is not her industry.  She is not an

4     expert.  She is completely unqualified to give

5     these opinions.

6          THE COURT:  What's the standard of care in

7     what industry?

8          MS. O'DELL:  Well, it would be in cosmetics,

9     and how a reasonable cosmetic company would have

10    conducted themselves under these circumstances with

11    the information that they had available.

12         THE COURT:  I'll accept that.

13         MS. O'DELL:  So, Your Honor, just to be clear

14    because I want to make sure that I understand,

15    there are certain documents that provide facts for

16    Dr. Plunkett in terms of her standard of care

17    opinion.  So, for example, if there is a document

18    that J&J sent to the FDA that had certain

19    representations about the safety of the product,

20    and that's not consistent with what was known in

21    the literature, the scientific literature, can

22    Dr. Plunkett testify to that?  She has testified --

23         THE COURT:  What does the document say?

24         MS. O'DELL:  It would be, for example, there

25    is -- that it is safe and there is no evidence,

Page 248

1    credible evidence that it causes ovarian cancer.

2    We would say that that's not true and that's not

3    been true for decades.

4         THE COURT:  But why don't you introduce that

5    through your historian?  Meaning, the only purpose

6    of this witness is to say that there is a standard

7    of care, and that standard of care to the extent

8    that the -- or I don't even know if she can

9    actually even say that it causes cancer.

10        MS. O'DELL:  She is not going to testify as to

11   cause.  That will be Dr. Ness and Dr. Chan.

12   Dr. Ness will give a general causation opinion.

13        She is a toxicologist, and so based on that,

14   she would testify to the mechanism, part of the

15   mechanism for how it can cause cancer, the

16   migration through the fallopian tubes, and that

17   talc and its constituents can cause inflammation,

18   that's sort of the mechanism by which we put

19   forward that talc can cause cancer; that if it's

20   applied to the genital area, it can ascend the

21   genital tract, reach the ovaries and fallopian

22   tubes, et cetera.

23        THE COURT:  You want to have the

24   pharmacologist testify to that?

25        MS. O'DELL:  She's a toxicologist as well.

Page 249

1    She studied in that area.  That's very much within

2    her area of expertise to do that.

3         THE COURT:  I always love when you use these

4    witnesses and they can tell us when the sun is

5    going to come up and where the moon is going to go

6    down.  Okay.  So you were asking me for guidance?

7         MS. O'DELL:  So, for example, the FDA letter

8    that counsel for Johnson & Johnson mentioned,

9    that's something typically that Dr. Plunkett would

10   speak to.  What does the letter say, what was known

11   in the scientific literature at that time, and

12   whether they acted as a reasonable company in

13   response to that process.

14        Because there were two citizens' petitions,

15   there's evidence that Johnson & Johnson

16   collaborated with somebody at the FDA, that they

17   actually ended up -- that person went to work with

18   a lobbying group on behalf of cosmetics, and

19   there's a whole back story of why the FDA did what

20   they did.

21        THE COURT:  Who is going to tell us that back

22   story?

23        MS. O'DELL:  Well, Dr. Plunkett has done that

24   in the past because it's from a regulatory --

25        THE COURT:  Let's keep it in the past.  I

Page 250

1      don't think she should be coming in and telling us

2      a back story about how the FDA did anything.  Why

3      is she qualified to testify about what the FDA did

4      and why they did it?

5           MS. O'DELL:  Your Honor, she has done what

6      experts do; and that is, they looked at corporate

7      documents.  She puts them in context for the jury

8      to help explain what was happening, what Johnson &

9      Johnson -- the information they had, what they were

10     doing, not their thoughts, what they were actually

11     doing, and put that in context for the jury so they

12     would understand it in terms of the regulatory

13     framework.  And I think it's clearly within the

14     case law that --

15           And 3M is an example.  You know, they explain

16     the basis of their admissible opinion through

17     commenting on documents and evidence that have been

18     produced in litigation.

19           If they want to cross-examine her that she

20     hasn't looked at enough documents, or she's omitted

21     a document in giving her opinion, then so be it.

22     Let them examine her.

23           But she has looked at thousands of documents

24     and synthesized her opinions based on that

25     evidence, and so for that reason, Your Honor, as it

Page 251

1          relates specifically to the regulatory

2          interactions, I believe that Dr. Plunkett is not

3          only qualified, but she can comment on those

4          documents in a way that speaks to was Johnson &

5          Johnson acting as a reasonable company.

6              And that's what she's done in other cases,

7          what I would do here.  It would be narrow.  It

8          would not in any way overlap with Dr. Freidenfelds.

9          It would be focused on the regulatory aspects.

10             MS. SCOTT:  Your Honor, not qualified.  I just

11         want to take the example that my friend on the

12         other side said about the letter, what Dr. Plunkett

13         would say about the letter.

14             She would say what it says; the jury doesn't

15         need that.  She would say what was known.  You can

16         show another document.  Dr. Freidenfelds, she will

17         establish what was known at that time, right?

18             And then were they reasonable, and I'm

19         struggling, Your Honor, to figure out what is the

20         basis.  And I'm going back to our conversation on

21         Monday with the Publix expert and whether that

22         expert was qualified to talk about a reasonable

23         standard, when all she had -- at least she had some

24         retail experience, 30 years.

25             Dr. Plunkett doesn't have any experience.

Page 252

1    She's been a consultant dibbling and dabbling with

2    all sorts of things, mostly on the drug side.  So

3    what qualifies her as an expert under the Daubert

4    standard to come in here and tell jury what is

5    reasonable for Johnson & Johnson to do?  I'm

6    struggling with it.

7        THE COURT:  Well, what they're saying is that

8    it's cosmetic, it's really cosmetic companies, and

9    she has consulted -- I'm being told that she had

10   consulted with this issue of what you put on a

11   label, what you don't put on a label, and then she

12   has also worked with the FDA.  And so what she has

13   coming in and saying is that this is what the FDA

14   says, and Johnson & Johnson fell below the standard

15   of care as required by the FDA because they knew

16   their product had become hazardous, and once they

17   knew their product had become hazardous, in

18   accordance with the FDA, they were required to put

19   the labels on their product.  They didn't do that.

20       And so I don't imagine it's that much of a

21   stretch to say -- like she is not coming in and

22   saying that, okay, I work for Johnson & Johnson, or

23   I work for a company like Johnson & Johnson.  What

24   she is saying is that there is a standard of care

25   in relation to when labels need to be placed on the

Page 253

1    product.

2         That standard is really set out with the FDA,

3    which places the responsibility on the

4    manufacturer, and this is what the manufacturer is

5    supposed to do when they become aware.  Johnson &

6    Johnson became aware -- and she has to be able to

7    say when she thinks -- based upon the documents

8    that I reviewed, this is when I believe Johnson &

9    Johnson became aware, and Johnson & Johnson should

10   have properly labeled their product once they

11   became aware that it was hazardous.  They didn't do

12   it.

13        I don't know why that is a stretch.  Now, I'm

14   not allowing much beyond that, but I'm overruling

15   the objection as to much beyond that, but I am

16   going to allow her to provide the opinion as

17   articulated by counsel and attempted to be

18   articulated by the Court consistent with that.

19        MS. SCOTT:  Could I just?

20        THE COURT:  You can.

21        MS. SCOTT:  Please, Your Honor.

22        I mean, she has no cosmetic experience.  I

23   mean, it would be better if we knew what cosmetic

24   company she actually consulted with, but we don't

25   know that.

Page 254

1          Moreover, Your Honor, if we're talking about

2     if she did a project as a consultant 30 years ago,

3     you got me on threshold issues earlier this

4     morning.  Is five enough to be an expert in the

5     cosmetic industry?  Is it ten?  Surely we don't

6     have five, we don't have ten.

7          She's not an expert in this field to even

8     opine on what is reasonable.  I think that's my

9     hangup, Your Honor, particularly in light of our

10    conversation on Monday.  There is no basis for her

11    to give that opinion.

12         THE COURT:  What is she is an expert in?

13         MS. O'DELL:  She is an expert in pharmacology

14    toxicology and regulatory affairs.  And we've

15    talked about that in terms of is --

16         THE COURT:  All right, I'm not going to go

17    through it again.  We can sit here all day.

18         MS. SCOTT:  One more point, Your Honor,

19    please.

20         THE COURT:  Go ahead.

21         MS. SCOTT:  The court in Echevarria listened

22    to Dr. Plunkett give testimony for two days, and

23    the only thing he said with regard to her FDA

24    opinion that she got out that was salient to him in

25    those two days was that she took a couple of FDA

Page 255

1          courses.

2               THE COURT:  That's it?

3               MS. SCOTT:  That's all that's written in the

4          opinion, Your Honor.  In the opinion, he says --

5               THE COURT:  So her experience in FDA

6          regulations is that she took a couple FDA courses?

7               MS. O'DELL:  I would disagree with that, Your

8          Honor.

9               MS. SCOTT:  That's what was salient to the

10         court.

11              THE COURT:  Where is the resume?  Where is the

12         curriculum vitae that she is going to tell us about

13         when she gets on the witness stand and testifies?

14              MS. O'DELL:  Let me get it, Your Honor.

15              MS. SCOTT:  Your Honor, if I may show you the

16         Echevarria opinion --

17              THE COURT:  Who is this from?

18              MS. SCOTT:  It's from a trial court in

19         California.

20              THE COURT:  Oh, but I don't do anything

21         with --

22              MS. SCOTT:  I know how you feel about trial

23         courts, Your Honor, but this trial court --

24              THE COURT:  I can make an error the same way

25         they made an error.

Page 256

1          MS. SCOTT:  Understood, Your Honor.

2          MS. O'DELL:  Your Honor, that's one case.

3     She's testified in state court in Georgia, state

4     court in Philadelphia, state court in --

5          THE COURT:  Florida?

6          MS. O'DELL:  This is the first ovarian cancer

7     case in Florida, so she has not testified in

8     Florida yet.  She has testified in Florida in other

9     cases, but not in a talc/ovarian cancer case.

10    She's testified in Missouri state court.

11         I mean, they are focused on that decision.  I

12    understand she did testify in that case to much of

13    what we've talked about today.  Part of her opinion

14    was not allowed in regard to talking about 740.1,

15    but we believe the court erred --

16         THE COURT:  This particular judge said that

17    she's taken a few courses and she may have given

18    advice, but she is not qualified to opine as to FDA

19    regulations or their applicability to labeling.

20         MS. SCOTT:  I'll just --

21         MS. O'DELL:  We disagree with that opinion,

22    Your Honor.

23         THE COURT:  But there is no basis for it.  I

24    mean, there is not a lot of detailed explanation as

25    to --

Page 257

1           MS. SCOTT:  The basis, Your Honor, was two

2      days of testimony.  And I'll also add --

3           THE COURT:  Oh, this is after he actually took

4      the testimony from the witness?

5           MS. SCOTT:  Yes, Your Honor.  And in addition,

6      what --

7           THE COURT:  This is at trial or before trial?

8           MS. SCOTT:  I believe this is --

9           MS. O'DELL:  Do you have a copy for me?

10          THE COURT:  A Daubert motion was filed before

11     trial.  So it had to have been because they're

12     saying she may not give a legal opinion, so it

13     couldn't have been -- it had to have been before,

14     because otherwise, it would have said the court is

15     striking the testimony or something like that.

16          MS. O'DELL:  And there was a new trial ordered

17     in that case after the verdict.  But the point, I

18     mean, if you're talking about qualifications --

19          THE COURT:  Let me just stop you.  I'm going

20     to keep my ruling the same, but it's with this

21     danger, and I keep saying this and lawyers always

22     want to test me; they're saying, will he really do

23     that?  I will.

24          If your witness takes the witness stand and I

25     find that she is not qualified to give the opinion

Page 258

1     that she's given, I will send the jury out.  I
2     won't let them start the cross-examine.  I will
3     send the jury out and I will tell you what I'm
4     about to do, and when the jury comes back in, she
5     will be gone and I will tell them to disregard
6     everything that she just said.
7          MS. O'DELL:  I understand, Your Honor.  What
8     is reflected in her expert report was reflected in
9     her CV is that she has expertise in cosmetics for
10    all the reasons I've said.
11         THE COURT:  I'm allowing you -- the objection
12    is overruled -- well, granted in part, denied in
13    part.  I'm allowing you to present her, but it's
14    with that caveat that if I think --
15         And by the way, I will not grant a mistrial.
16    I will not -- don't ask me for a mistrial if I
17    strike your witness because this is something that
18    you have total control over.  You know what her
19    background is.  You know what her experience is.
20    And I may not know the full breadth of it.  I'm
21    assuming you have the transcript from when she's
22    testified in this case, so you know what she
23    testified to.
24         What year was this?
25         MS. O'DELL:  2017, I believe.

Page 259

1          THE COURT:  Okay, so that was about seven

2     years ago.  So you know what it's going to be.

3          So if it's consistent with what was found in

4     this order, then there is no reason to believe that

5     my decision should be any different.  And the only

6     difference is that's done before trial and I'm

7     doing this -- I would be doing this during trial,

8     and you cannot argue to me that you are prejudiced

9     because now one of your key witnesses has just been

10    stricken.

11         MS. O'DELL:  I understand.

12         THE COURT:  Next?

13         MS. O'DELL:  Thank you.

14         MS. SCOTT:  Thank you, Your Honor.

15         THE COURT:  Let's go.

16         MR. OLIVER:  We are going to take their motion

17    to exclude Dr. Chan so we can get that out of the

18    way.  It's the last one.

19         THE COURT:  Okay.

20         MR. CARUSO:  Thank you, Your Honor.

21         We are going to move again to strike the

22    general causation opinion of Dr. Chan on similar

23    grounds, and additional grounds as to what we spoke

24    about with Dr. Ness earlier about the differences

25    between primary peritoneal and ovarian cancer, but

Page 260

1        I don't know if we need to rehash that again.

2            The next piece that I want to talk about more

3        specifically, and I think more importantly, is his

4        opinions as to Dr. Seskin in this case, his

5        specific cause opinions in this case.  And the way

6        Dr. Chan went about concluding that talc was the

7        cause of Dr. Seskin's ovarian cancer, he described

8        as a differential diagnosis or etiology going

9        through the different types of causes ruling them

10       in, ruling them out, and he described his own

11       method as nonmathematical, which is fine.

12           But it becomes quite apparent what he means by

13       that when you go through what he ruled in, what he

14       ruled out.  Understanding that differential

15       etiologies are generally something that we are not

16       going to quibble over as to whether they are a

17       reliable method, but the way he applied it is

18       completely unreliable.

19           So he himself testified that he ballparks the

20       risk ratio for talc and ovarian cancer between 1.22

21       and 1.36 is the risk ratio.  So 22 to --

22           THE COURT:  What does ballpark mean?

23           MR. CARUSO:  He looked at a group of about

24       five different studies.  There's about 40 and he

25       looked at the ultimate risk ratios in there and he

Page 261

1        said generally, they are about 1.22 to 1.36.  He

2        didn't describe any further as to how he arrived at

3        that conclusion, but that was his conclusion.

4            And then he has this process of ruling in.  So

5        he rules in talc as one of them.  He then rules in

6        her diaphragm usage.  So when he says talc is

7        contributing to ovarian cancer, his opinion as to

8        that is perineal usage.  So putting it in the

9        underwear, applying it to the genital area, that's

10       perennial usage of talc.

11           He then says her diaphragm usage of talc put

12       her at an increased -- and even greater risk.  He

13       thinks that's up there with the highest risk.  And

14       when asked, well, what basis do you have to say

15       that, he says, well, I think it makes intuitive

16       sense, and I have this Penacolinski study from

17       2018.

18           THE COURT:  He really said it's intuitive?

19           MR. CARUSO:  Yes, he says it's intuitive.  And

20       here is the most incredible thing about this:  When

21       you go to the study he cites, it does not report an

22       increased risk ratio.  It's protected.

23           There is not a single study out there, not one

24       that you can point to that looks at diaphragm usage

25       and identifies it as a risk.  There are nine.

Page 262

1    Eight of them have no statistically significant

2    association, the other most recent one actually

3    finds a statistically significant protective

4    effect.

5         He has absolutely no basis to say increased

6    risk.  That's what he rules in.  So he has talc,

7    ballpark, 22 to 36 percent.  Diaphragm usage, not

8    even close on data.  It's a huge analytical gap.

9         Then we go, okay, what did you rule out?  How

10   did you determine that absent those things, what

11   did you rule out as other potential causes?

12        Well, let's go through some of them.  First,

13   we asked him about hormone replacement therapy,

14   which he didn't even know about.  There is a whole

15   body of literature published in Lancet in 2015 --

16        THE COURT:  Did she have hormone replacement

17   therapy?

18        MR. CARUSO:  Yes.  There are records here,

19   Your Honor, I mean, incredible records from her

20   time getting treated by Dr. Travin, her

21   gynecologist.  So 18 years of hormone replacement

22   therapy, and this was at the begrudge of some of

23   her doctors because she took this into her own

24   hands.

25        I'm passing up to the Court two different

Page 263

1      medical records one from 2012, one from 2013 where

2      they note --

3              THE COURT:  I can't read that.

4              MR. CARUSO:  Well, you can read this, Your

5      Honor, I believe.  That says "way too high," and

6      it's in reference to her hormones; her estrogen,

7      described there as estradiol, and her testosterone.

8              And in 2015, the Lancet published a review of

9      51 different epidemiological studies and they

10     conclude that there was strong suggestive evidence,

11     not just of a correlation, but of a causal

12     relationship between hormone replacement therapy

13     and ovarian cancer.  And I can pass up that study

14     to you as well.

15             Dr. Chan wasn't even aware of this.  He didn't

16     know it was a risk.  He knew there were some risks

17     confer odd the breast cancer, but he had no clue

18     about ovarian cancer.  And to his credit, we don't

19     doubt his credentials as a treater, as a good

20     treating oncologist, but he testified at a

21     deposition in 2020 that, well, I'm not really too

22     good at looking at associations and determining

23     cause.

24             THE COURT:  He's an expert or a treater?

25             MR. CARUSO:  In this case, he is their general

Page 264

1    and specific causation expert.  He never treated

2    Dr. Seskin.

3         THE COURT:  Okay.

4         MR. CARUSO:  So he admits himself that he's

5    not very good at looking at this type of literature

6    and looking at associations and finding causation

7    evidenced by that.

8         Then we asked him, okay, so you didn't know

9    about that, what about her history of

10   endometriosis?  In your report, Dr. Chan, you cite

11   a study, Saavalainen I believe is how you pronounce

12   it, where individuals with the type of

13   endometriosis that Dr. Seskin had puts you at a

14   37 percent increased risk of ovarian cancer.

15        Well, you know, I don't think that applies

16   here.  I ruled that one out as a significant cause

17   too, higher than his own risk ratio for talc.

18        THE COURT:  Did he say why he ruled it out?

19        MR. CARUSO:  He says that it's more so for

20   clear cell cancer, which it does have a higher risk

21   ratio in that study, but his own study -- so he

22   dismisses it as less important in the serous type,

23   which Dr. Seskin had, and more so in the clear

24   cell, which is fine and true under the terms of

25   that study, but also in that study, a higher risk

Page 265

1    ratio reported than for his own estimate as to

2    talc.  Well, I rule that out.  I don't think it's

3    too substantial.

4         Okay, fine.  What about age?  Dr. Seskin was

5    66 years old when she was diagnosed with ovarian

6    cancer.  In your own report, Dr. Chan, you cited a

7    paper that for individuals with serous type

8    cancers, there is a 4 percent increase year over

9    year every year above the age of 50.

10        She was 66 when she was diagnosed; 16 times

11   four is 64 percent increased risk for ovarian

12   cancer.  How did you rule that out as a possible

13   cause?

14        Well, you know, I don't think it's an

15   independent cause.  Why not?  I just don't think

16   it's an independent cause.

17        Okay, Dr. Chan.  What about protective

18   factors?  Because not only are there risk factors

19   for ovarian cancers, there's also protective

20   factors, things that women can have or don't have

21   that reduce their risk.  Let's go through some of

22   the things that Dr. Seskin had.

23        She never had children.  Children, so when you

24   have a child, obviously you stop ovulation for a

25   period.  The running theory is that is what reduces

Page 266

1          a woman's risk of ovarian cancer because you cease

2          to ovulate for that period of time resulting in

3          lower damages to the ovary, in theory, and that's

4          what reduces it in the literature that he cites in

5          his report.  Never had that, so no protective

6          factor there.

7               Never took oral contraceptives, right?

8          Another 30 to 40 percent reduction in ovarian

9          cancer.  She never took oral contraceptives,

10         undisputed.  Well, you know, who cares.

11              When we have breastfeeding.  Never had a

12         child, so obviously never breastfed.  Another thing

13         in his report that he just ignores.

14              So essentially, he has this whole process,

15         this differential etiology of going in -- he rules

16         in talc at 22 to 36 percent chance, he doesn't even

17         acknowledge really that the diaphragm studies are

18         contradicting --

19              THE COURT:  All right, you are going back over

20         it.

21              What do you want say?

22              MR. PENDELL:  Thank you, Your Honor.

23              Counsel is being selective with the facts,

24         telling you the things that he thinks are important

25         that support what he's trying to do here and

Page 267

1    ignoring everything else.

2        Okay.  So let's start first.  Dr. Chan is not

3    really going to talk about general causation other

4    than, obviously, the general causation undergirds.

5    For example, he has read and is familiar with and

6    has given general causation opinions -- by the way,

7    in the motion, they like to talk about the Monroe

8    case all the time.  Because that's his general

9    causation opinion, that was another case he

10   testified in Georgia.  And although I understand

11   Your Honor is free to rule whatever you want

12   because this is Florida, but Georgia does recognize

13   the Daubert standard, it is what they used.

14       And what they never tell you is he was

15   permitted to testify on general causation in that

16   case.  I watched his testimony.  I'm happy to send

17   you the link.  It's actually quite good.

18       Some of the things he explains in that case,

19   for example, he talks about age.  They like to talk

20   about age.  Well, he didn't consider her age.

21       He did consider her age, and what he says in

22   the Monroe case is, yes, age is a factor, but here

23   is why age is a factor:  It's not just because you

24   are old, you get cancer.  The longer you live, the

25   longer you are exposed to environmental factors and

Page 268

1    all the other types of things that happen to you.

2         So age combined with things like talc use, or

3    all these other types of things, that all sort of

4    goes -- that's why in this case he completely rule

5    out age, okay?

6         THE COURT:  He is going to say that in this

7    case, he doesn't rule out age?

8         MR. PENDELL:  He'll say he can't completely

9    rule out age, he absolutely will say that.  But

10   here is the good news for me:  The standard is not

11   he has to subtract every other possible cause.  The

12   rule is a substantial cause, and there can be

13   multiple substantial causes.  So even if what

14   counsel is telling you is true, it doesn't mean

15   that talc also was not a substantial cause.

16        Now, on the endometriosis thing, it is not

17   just -- it is true he is going to tell you, and the

18   literature backs this up, the serous type, the type

19   of endometriosis that they want to suggest that she

20   would have had, is a different cell type.  But

21   there's controversy in the records as to whether

22   she even had that.

23        It's my turn, thank you.

24        She had a medical record that says they had

25   exploratory surgery to see whether or not she had

Page 269

1        it.  We have no pathology report.  We have nothing

2        else that says definitively she had it add all.

3             So he takes that into consideration and says,

4        well, look, I don't know 100 percent that she had

5        this.  In any event, it's, to me, something that I

6        can rule out because of the cell type of this

7        cancer that she had, and endometriosis cell types

8        are usually clear, not the serous.

9             He looks at -- and by the way, Dr. Chan, just

10       a little bit about his background:  Not only has he

11       been a doctor, he's a gynecologic oncologist.  He

12       treats thousands of women for these very types of

13       conditions, ovarian cancers.

14            And by the way, ovarian cancers, going back to

15       what was talked about before, if you asked him:

16       Dr. Chan, as a gynecologic oncologist who does this

17       more multiple years, teaches medical students at

18       Dartmouth -- very good school -- Stanford -- very

19       good school -- University of California San

20       Francisco -- pretty good school, not as good as the

21       other two probably -- and he is going to tell you

22       that ovarian cancer at large includes cancer of the

23       fallopian tube, cancer of the ovaries, cancer of

24       the peritoneal.

25            This is all ovarian cancer.  He treats women

Page 270

1    for this.  This is what he does.

2        He is going to say that he looked at all the

3    things that could possibly be causes, he weighed

4    them, and I appreciate that opposing counsel has

5    not satisfied that he has ruled stuff out to the

6    same extent that they would like it to have happen,

7    but he did what doctors do in the real world, which

8    is when you're trying to figure out what causes

9    somebody to have cancer, you have to think about

10   all the things that you know that cause cancer.

11       So he looked at those studies because he does

12   believe talc causes cancer.  He says that not only

13   was he taught that in medical school, he teaches

14   his medical students that.  He tells his wife and

15   his daughters not to use talc.

16       He does say when he treats his own patients,

17   although he doesn't do an epidemiological study --

18   and by the way, let's step back for a moment on

19   that.  They make a lot of hay out of the fact that

20   he says things in his testimony about the studies,

21   well, I'm not very good at doing that.  He's not an

22   epidemiologist.  He does not get down as an

23   epidemiologist does and write studies about

24   population level data, but that doesn't mean that

25   he is unqualified to do this analysis as a treating

Page 271

1    physician.  And if that were the test, as Your

2    Honor knows, having tried tobacco cases and all

3    these other types of cases, no pulmonologist, no

4    cancer doctors would be allowed to testify because

5    they don't do epidemiology.  They read and rely on

6    studies, just like everybody else does.

7        The fact is that they are quibbling with his

8    conclusions, not his methodology.  If they have a

9    problem, if they think that there is something that

10   he did not consider as a differential factor that

11   he should have, that's cross-examination.

12       He explains what he looked at, why he looked

13   at those, what the evidence said about it, and why

14   we could rule them in or rule them out.  That is a

15   differential diagnosis.

16       THE COURT:  Do you want to reply?

17       MR. CARUSO:  Yes, I do.

18       So, first, I want to talk a little bit about

19   what he mentioned about Dr. Chan's testimony as to

20   age and why you get more cancer is because of

21   environmental exposures.  He's testified that one

22   of the reasons why it increases is because as you

23   age, DNA is prone to making more errors.  More

24   replications occur, which is a known cause of

25   cancers, DNA replication errors.

Page 272

1          Second, he talks about endometriosis being a

2     controversial diagnosis in this case.  It is not a

3     controversial diagnosis.  The plaintiff's fact

4     sheet, she listed it as a prior medical history.

5     Nobody has quibbled over that in her medical

6     records over 30 years after the diagnosis.

7     Dr. Chan's point was that there was not a confirmed

8     pathological finding of that, and if we want to go

9     back to pathology, the pathology is --

10          THE COURT:  Well, respond to counsel's

11     argument.  I don't want to get bogged down into

12     what he did or didn't testify to, but counsel said

13     something and shook my head and said yeah, but I

14     want you to tell me why it's no.

15          Counsel said that, okay, these other things

16     may be deemed to be substantial causes, and he may

17     not have maybe even properly considered them, but

18     that does not mean that he cannot testify that the

19     talc was a substantial cause of the injury that is

20     being complained of.  So let's assume that you're

21     right and he didn't; you tell the jurors that, you

22     cross-examine him on that, and the jurors can

23     basically say that either based upon what I'm

24     hearing, I don't find that talc was a substantial

25     cause of the injury, or they can find that, well,

Page 273

1    maybe there were these other causes that were

2    substantial causes, but that included talc.

3         Because it doesn't -- and there is a jury

4    instruction we normally give that talks about

5    although you may identify other causes, if you can

6    still glean that this is a substantial cause --

7    what's your response?

8         MR. CARUSO:  I have two responses to that,

9    Your Honor.  One, Dr. Chan's mechanism of action in

10   this case, his theory as to how talc causes cancer

11   relies on what we describe as an inflammation

12   theory, right?

13        So essentially their position is talc is

14   applied to the vaginal area, it goes up through the

15   vagina, up through the reproductive tract, lands on

16   the ovaries, causes inflammation, and that's what

17   induces the cancer.  That's the theory.

18        So we asked Dr. Chan, well, do you have any

19   evidence at all that there was inflammation in

20   Dr. Seskin's body?  No, not at all.

21        Well, how can you come in here and say that

22   inflammation was the cause of it?  Well, it's just

23   not in the medical records.

24        That's fine.  Well, okay, not in the medical

25   records, we agree there is no evidence of

Page 274

1     inflammation for Dr. Seskin specifically, and

2     that's fine to have your general causation theory

3     for inflammation, but specifically not for

4     Dr. Seskin.

5          And then he does not -- so he goes, okay, he

6     concedes none in the medical records, but there are

7     two pathologists in this case who went in and

8     looked for inflammation, and there is no signs of

9     inflammation, and that's sort of independent

10    because he didn't even look at those reports.  He

11    had the capacity to go look at the pathology

12    reports and confirm his own theory and he did not

13    do it.

14         THE COURT:  So I don't understand.  So are you

15    telling me that I should exclude a witness if they

16    didn't feel it was necessary to review certain

17    types of evidence because their opinion is no

18    longer reliable based upon the facts?  I'm trying

19    to understand your argument.

20         MR. CARUSO:  No, the reason to exclude him is

21    because he has -- his whole theory rests on

22    inflammation occurring in Dr. Seskin.  Cancer being

23    induced by inflammation.  There is no evidence of

24    inflammation in this case.  None.

25         And if he wants to have a general theory as

Page 275

1          to, okay, inflammation causes cancer generally,

2          that's fine, and we'll be happy to have him talk to

3          that as a general causation expert.  But as to

4          Dr. Seskin --

5               THE COURT:  All right.  So what they're saying

6          is that the problem is that it's not that he is

7          generally speaking about causations of cancer, he

8          is being very specific about what caused the cancer

9          in this case, which was the presence of

10         inflammation?

11              MR. CARUSO:  Correct.

12              THE COURT:  But counsel is arguing but there

13         is no evidence of any presence of inflammation.  I

14         think what counsel is arguing is that he is taking

15         a general theory and he is applying it to the

16         specific facts of this case and saying that the

17         general theory applies to your plaintiff.

18              MR. PENDELL:  Counsel is mixing and matching

19         general causation with specific causation, and as

20         Your Honor has thankfully, I'm very happy you've

21         made abundantly clear since I've known you on

22         Monday, you are not going to allow cumulative

23         testimony.

24              Dr. Chan is not a general causation expert

25         here.  He is not going to get up there and talk

Page 276

1        about general causation.

2            And by the way, counsel's statement that there

3        is no evidence that she suffered any inflammation,

4        that's incorrect because Dr. Sitelman is going

5        to -- he is our expert.  He is going to get up

6        there and say that he saw it in her pathology

7        slides in the PLM.

8            THE COURT:  There is going to be evidence in

9        the records that she suffered from inflammation?

10            MR. PENDELL:  Correct.  He is going to say he

11        saw it in the slides.  So that's number one.

12            Dr. Chan's role here is not to sit here and

13        say this is the mechanism by which cancer is caused

14        because that's general causation and we are not

15        going to give cumulative testimony.  His job is

16        after that general testimony has come in, he is

17        going to come in and he is going to say -- now he

18        could do that if we were putting him up as a

19        general causation expert.  We are not.

20            He is going to come in and say I looked at all

21        the things that this lady was exposed to that could

22        have potentially contributed to her cancer; age,

23        endometriosis, the BRCA 1 and 2 genes, talc.  Based

24        on all the information I've seen, the testimony,

25        her medical records, I believe that talc

Page 277

1    substantially contributed to her cancer.

2        Cancer gets caused -- one of the ten key

3    characteristics of a carcinogen, there's a famous

4    doctor that I happen to be friends with who came up

5    with these ten key characteristics of carcinogens,

6    and one of them is if a chemical compound is

7    capable of or causes inflammation in a human being.

8    As part of the general causation analysis, I do

9    expect that you are going to hear that one of the

10   things --

11       THE COURT:  Not from Dr. Chan.

12       MR. PENDELL:  Not from Dr. Chan, but from

13   another doctor, you are going to hear that the talc

14   causes inflammation in parts of this area, and that

15   is what causes the cancer.

16       THE COURT:  Do you want to respond?

17       MR. CARUSO:  Yes.

18       So I didn't get to the second prong of the

19   significant factor, right?  So you said why is it

20   that he can't come in here and say, well, talc is

21   just one of many significant contributing factors.

22       THE COURT:  Substantial.

23       MR. CARUSO:  Substantial.  Because it's not

24   reliable for an expert to look at other causes with

25   conceded higher risk ratios than talc and dismiss

Page 278

1     them as substantial causes, and then look at one

2     that he himself identifies as a lower risk and say

3     that one is significant.

4          You can't hold both of those opinions in your

5     hands at the same time.  It's not reliable

6     application of the methodology.

7          THE COURT:  Well, isn't that for -- the jurors

8     can either reject his opinion and his explanation,

9     or they can accept it or they can do any -- I guess

10    anything that's in between.  We tell the jurors

11    that.

12         Just because an expert testifies, they are

13    tree free to accept the opinion, reject it, or give

14    it whatever weight they deem it deserves.  And when

15    you cross-examine him and he says I discounted

16    these other substantial causes because I'm

17    attributing this substantial cause, but I can't

18    rule out or I can't include these other substantial

19    causes, the jury can decide whether or not that's

20    appropriate and whether or not they want to make an

21    allowance for that when they award whatever amount

22    of money they award --

23         MR. CARUSO:  Well, that's true, Your Honor.

24         THE COURT:  -- whether zero or something

25    higher.

Page 279

1            MR. CARUSO:  But what an expert can't do is

2       come and offer testimony that there is such an

3       analytical gap between the information that they

4       are interpreting, such as the diaphragm studies,

5       for example.  Ruling that in, he thinks that puts

6       her at an increased risk because it makes intuitive

7       sense.

8            When you look at the data, it's just not

9       there, and you can't just come in here and offer

10      pure opinion.

11           THE COURT:  You didn't say anything about the

12      diaphragm.  I didn't see you say anything about the

13      diaphragm study.  He said your doctor is going to

14      come in and testify that as it relates to the

15      diaphragm study and whether or not it's an

16      increased risk, the increased risk ratio, he is

17      going to say it's intuitive.

18           MR. PENDELL:  Well, again, stepping aside from

19      cherry-picking of testimony, and I'd like to look

20      at the testimony again and come back to you tell

21      you exactly what he said.  But, look, the use of

22      talc in the vaginal/peritoneum area causes an

23      increase in cancer.

24           So in addition to using that talc, putting it

25      on, putting it on her diaphragm, collectively all

Page 280

1          those things increased her risk of getting cancer.

2          They are going to say the studies say what they

3          say, our experts are going to say -- there's

4          clearly disagreement what the experts say about --

5              THE COURT:  But I don't understand.  An expert

6          is actually going to come in and testify in

7          response to somebody asking the question about

8          their ability to -- or what is the basis for them

9          actually testifying to a set of facts as an expert,

10         and the expert responds, well, it's just intuitive,

11         you've got to explain more.  You can't just say

12         it's intuitive, can you?  I don't know what that

13         means.

14             MR. PENDELL:  Can I see the testimony?

15             MR. CARUSO:  Yes.  I have a copy for you.  The

16         intuitive statement is on page 138.

17             And I have a copy for you as well Your Honor.

18         That's where the testimony begins.

19             THE COURT:  Well, no, he doesn't say it's just

20         intuitive.  He says it's intuitive, and then he

21         explains, "By placing the talc powder closer to the

22         cervix, which is near the diaphragm, on the

23         diaphragm, it would enhance the exposure, increase

24         the risk based on just the anatomical location of

25         the cervix and placement of the diaphragm."

Page 281

1          So what he's saying is -- yeah, he did say

2      it's intuitive, but what he's saying is that you're

3      putting it in closer proximity to the area that is

4      susceptible, that is prone to basically developing

5      cancer.

6          MR. CARUSO:  But that's pure opinion

7      testimony.  There is no data.  This is the study he

8      relies upon.  I'll hand this up.  This is pure

9      opinion testimony not permitted under Daubert.

10          He can't just say it because he thinks that's

11      what's going to happen.  That's not what happens,

12      and the evidence shows it.  This is a

13      meta-analysis, so there's a total of nine

14      individual studies looking at this diaphragm usage.

15          So essentially, physicians used to tell

16      patients to dust your diaphragm in talc to keep it

17      clean.  That's what Dr. Seskin alleged she did and

18      that's how we get here.

19          And studies have looked at this, right?  Are

20      women who do this, are they at an increased risk of

21      ovarian cancer?  They find the opposite.  There is

22      risk ratio under one; it sits at about .8.  There

23      is not a single study that Dr. Chan can point to

24      that is going to show something different because

25      it doesn't exist.  And he can't just say, well, I

Page 282

1      think it should exist.  It makes intuitive sense to

2      me.

3              THE COURT:  So what you're saying is that

4      putting the talc on the diaphragm and then

5      inserting the diaphragm to the point that it is

6      closer to the internal organs, that there is no

7      evidence or any study that he can point to that

8      says that that increases the risk of inflammation?

9              MR. CARUSO:  100 percent correct.

10             MR. PENDELL:  Untrue, Your Honor.

11             So, again, going back to the actual testimony

12     where he explained why it is -- because you are

13     going to hear about something else in this case, in

14     general causation that, by the way, Dr. Chan is

15     able to talk about and would talk about if we were

16     doing cumulative evidence called migration.  And

17     what happens is when they put talc in their body,

18     it migrates through that part of the body.

19             THE COURT:  Who is saying this?

20             MR. PENDELL:  All of our medical experts will

21     say this if given the opportunity.

22             THE COURT:  Is Dr. Chan going to say this?

23             MR. PENDELL:  If you let him say that, he

24     absolutely will.

25             THE COURT:  Go ahead.

Page 283

1          MR. PENDELL:  And there are studies that back

2     it up.  Even the FDA agrees that migration is a

3     phenomenon that actually happens.

4          So the idea you can take it and put it on your

5     diaphragm and put it up there in that cavity, it's

6     absolutely plausible and the science backs it up

7     that it could migrate throughout that part of her

8     body.  And you are going to hear evidence of that.

9     He testified to that.  That is in his testimony

10    about that phenomenon.

11         They are quibbling with his conclusions.  They

12    don't like his conclusions.

13         THE COURT:  Okay, but the migration occurs.

14    Does that mean it increases your risk ratio?

15         MR. PENDELL:  Of course it increases your risk

16    ratio, Your Honor, because it's a dose-response

17    relationship.  The more you have over the longer

18    period of time, the more your risk goes up.  He

19    will talk about that as well.

20         So the short answer is yes, it increases your

21    risk.

22         THE COURT:  All right.  The Court, having

23    heard from all parties, fully considered the

24    arguments of all counsel.  The motion is denied.

25         We only have about ten more minutes, so do the

Page 284

```
 1          substantive motions in limine that have something

 2          to do with opening statements or jury selection.

 3          What else do we have?

 4               MR. OLIVER:  Your Honor, I've got one.  Is it

 5          our choice or your choice?

 6               THE COURT:  It's yours.  Go ahead.

 7               MR. OLIVER:  Okay.  The defendants have moved

 8          to exclude evidence of the International Working

 9          Group on Asbestos in Consumer Products, it's called

10          the IWGACP.  And I think that comes up in opening,

11          I'm trying to remember.  I'm not sure.

12               But the point is this:  In, I think, 2020,

13          right after the FDA found asbestos in Johnson's

14          baby powder, they got this group of top scientists

15          together.  It was eight separate agencies, federal

16          agencies, EPA, FDA, OSHA, NIOSH, National Institute

17          of Health, and some others, National Geological

18          Service.  There is one in there I never even heard

19          of.

20               But all the agencies got together and they

21          formed this international working group, and the

22          working group was tasked with a couple of things.

23          One of the things they were tasked with doing --

24          and I referenced this with Dr. Rigler -- was coming

25          up with some testing methodology.
```

Page 285

1           What is the standard way that we identify

2      asbestos, right?  So they issued a document that

3      recommended the testing procedure that Dr. Rigler

4      used more or less.

5           THE COURT:  Who are these people?

6           MR. OLIVER:  They are top scientists in the

7      country gathered up by the federal agencies.  I

8      don't know who they are.

9           MS. O'DELL:  Subject matter experts.

10          MR. OLIVER:  They are just subject matter

11     experts that the FDA reached out to.  We have the

12     names of them, that's all publicly available

13     information.

14          So they get together.  They go out and

15     interview people, they ask for comment period, as

16     it typical, and they got comments.  Some of the

17     comments they got were from Dr. Rigler.  They end

18     up adopting the testing procedure that Dr. Rigler

19     advocated for that some other people advocated for.

20          They also said that statement that I talked

21     about earlier with regard to this debate between

22     asbestiform fibers and cleavage fragments.  They

23     said we think that the majority of the evidence or

24     something -- the quote is in our brief -- the

25     needlelike shape of the product is what matters,

Page 286

```
 1        not necessarily its chemical composition.  And

 2        that's not the only place that comes up, there is

 3        actually defendant documents that acknowledge that

 4        that is a problem.

 5             THE COURT:  Okay.  What is the relevance of

 6        this document?

 7             MR. OLIVER:  The relevance of this document is

 8        that our experts intend to rely on it and they will

 9        talk about --

10             THE COURT:  For what purpose?

11             MR. OLIVER:  So Dr. Rigler will rely on it

12        because he is going to talk about the fact that the

13        needlelike shape, as opposed to just the chemical

14        composition, is one of the reasons asbestos is

15        dangerous.  Because they are going to cross him on

16        it.  They are going to ask him about --

17             THE COURT:  Where was this document published

18        at?

19             MR. OLIVER:  Did you say where?

20             THE COURT:  Where?

21             MR. OLIVER:  I think it's in the federal

22        register.  It's publicly available.

23             THE COURT:  So it's authoritative?

24             MR. OLIVER:  Absolutely.

25             MS. SCOTT:  No, Your Honor.
```

Page 287

1           THE COURT:  Who says it's authoritative?

2           MR. OLIVER:  Our experts.

3           THE COURT:  They say it's authoritative?

4           MR. OLIVER:  Yes, they will say it's

5       authoritative.  Our experts will, their experts may

6       not.

7           MS. SCOTT:  Your Honor, this working group

8       paper was just that; it was a working group, it was

9       an executive summary, it's preliminary.  I think it

10      expressly says this does not represent the

11      recommendations or the policies of the FDA, I think

12      somewhere else, it might say something like

13      shouldn't be relied on.

14          But it's irrelevant and plaintiffs can't

15      backdoor -- it's also hearsay, Your Honor.  It's

16      not authoritative.  It's not a public record.  I'm

17      not sure it's even in the federal register, but you

18      might be able to Google it and find it on the

19      internet.

20          Plaintiffs can't backdoor this hearsay, not

21      authoritative, preliminary working group paper with

22      their experts.  That's the law.  And so we think

23      that it needs to be excluded on those bases.

24          THE COURT:  So can I ask again:  Where is it

25      published?  You said it's authoritative.

Page 288

1          MS. O'DELL:  It is for sure on the FDA website

2     as an authoritative document that was put together

3     by this group of subject matter experts on testing

4     of asbestos from the federal agencies that

5     Mr. Oliver mentioned.

6          THE COURT:  Ma'am, they are saying that it's

7     on the FDA website as an authoritative source.

8          MS. SCOTT:  It's on the website, but the FDA

9     itself says these aren't our policies, these aren't

10    our recommendations, don't rely on them.  So take

11    it for what it's worth.

12         THE COURT:  Is that accurate?

13         MR. OLIVER:  That part is, but can I give some

14    clarification for how we are going to use this?

15    Because you asked that, Your Honor, and I want to

16    be clear.  It's very unlikely that I am -- first of

17    all, I'm not showing this to the jury in opening.

18    Not the document.

19         It's very unlikely that I will try to

20    introduce it as substantive evidence directly, but

21    what is going to happen is this issue is going to

22    become relevant because it's part of defendants'

23    defense.  They are always going to bring up this

24    cleavage fragments and chemical composition and

25    needlelike shape.  They argue about that a lot.

Page 289

1              We don't think it matters our experts will
2       preemptively explain that that doesn't matter.  And
3       they may use reference to that; if I say
4       Dr. Rigler, you know, tell me the basis for this,
5       he'll say, well, I was part of this.
6              THE COURT:  I'm excluding it because the FDA
7       says that it is not to be relied upon for any
8       purposes.  It's not an authoritative -- they are
9       saying it's not an authoritative source.  It should
10      not be relied upon.  I don't know how it becomes
11      authoritative.
12             MR. OLIVER:  They didn't say it's not an
13      authoritative source.
14             THE COURT:  Read to me.
15             MS. SCOTT:  It says that it does not represent
16      recommendations or policies of the FDA or any other
17      federal agency or proposed changes any regulations
18      of the U.S. government.  It also says that -- the
19      working group itself says neither this executive
20      summary, nor any other presentations at the public
21      meeting by members of the working group, represent
22      proposed or preliminary recommendations or policies
23      of the FDA or any other agency.
24             I will correct myself and say, since we cited
25      it in our response, it is in the federal register,

Page 290

 1        so I do apologize to my colleague, but it is not

 2        authoritative.  It is a bunch of people got

 3        together and said, hey, here are our thoughts,

 4        let's write them down.

 5             THE COURT:  I know, but that doesn't mean it's

 6        not authoritative.  Authoritative means that it is

 7        somethings that relied upon by the professionals

 8        within the industry, and the question -- that's the

 9        question.  Are professionals going to say we rely

10        upon this?

11             And I agree with you, I don't think it should

12        come in if the FDA is saying don't rely upon it,

13        but it doesn't sound like the FDA is saying it's

14        not authoritative.  Because there could be

15        something that you had a group of reputable people

16        get together, they wrote a series of

17        recommendations; okay, now people within the

18        industry use that as the model for how they

19        actually make these decisions.  Whether the FDA

20        chooses to accept it or not, the industry has

21        accepted it and I think then it becomes

22        authoritative.

23             MS. SCOTT:  There is no evidence that the

24        industry has accepted it.  And I'll also point out,

25        Your Honor, rule of evidence 706, that

Page 291

1    authoritative publications can only be used during

2    cross-examination.  So just because their experts

3    used it doesn't mean it's authoritative.

4        THE COURT:  Well, I don't know how -- I'm not

5    here ruling about how -- counsel said he is

6    preempting and I don't know anything about how he's

7    preempting, but I'm not going to -- and I was

8    inclined to exclude it because you read it to me

9    and I thought, well, how could it come?

10       But because of the issue of it being an

11   authoritative source, I still think you're saying

12   it's not, counsel is saying it is, I mean, I guess

13   before -- so before you introduce it, I think they

14   have to lay the predicate that it's an

15   authoritative source.  And if they lay the

16   predicate it's an authoritative source, I'll allow

17   it.  If they fail to lay the predicate as an

18   authoritative source, I'll deny it.

19       MS. SCOTT:  Given, Your Honor, that it needs

20   to have some sort of predicate, this working group

21   paper should not be mentioned in opening statement.

22       THE COURT:  Correct.

23       MR. OLIVER:  I actually made a mistake.  I

24   wasn't planning on doing that anyway.

25       THE COURT:  Next motion in limine?

Page 292

1          MS. SCOTT:  We are going to talk about the

2      voluntary recall.

3          THE COURT:  Johnson & Johnson's voluntary

4      recall?

5          MS. SCOTT:  Yes, Your Honor, our motion in

6      limine number seven.

7          Back in 2018, two years after Ms. Seskin was

8      diagnosed with her primary peritoneal cancer, the

9      FDA, through some testing, found very trace amounts

10     of chrysotile asbestos and a single bottle in one

11     lot of Johnson & Johnson baby powder.  Subsequent

12     testing done, independent testing done revealed

13     that there was no asbestos in that lot, that it

14     might have been a contamination error, something of

15     that nature.  However, we are seeking to exclude

16     that evidence as irrelevant.

17         THE COURT:  Let me make sure I understand what

18     you just said.  The reason for the recall was that

19     a batch of the product was suspected to have been

20     contaminated with asbestos?

21         MS. SCOTT:  They thought one bottle in one lot

22     had trace amounts -- or the FDA thought one bottle

23     in one lot had trace amounts of asbestos.

24         THE COURT:  So there was a recall as to that

25     batch?

Page 293

1              MS. SCOTT:  Just to that batch, Your Honor,

2       and it was a batch that was manufactured in 2018.

3       The recall was in 2019.  All of this post-dates

4       Dr. Seskin's diagnosis of primary peritoneal

5       cancer, and so for that reason, it is irrelevant.

6              Moreover --

7              THE COURT:  Let me ask them how they intend to

8       use it.

9              MS. STEMKOWSKI:  Yes, Your Honor.

10             First off, it is relevant.  It's relevant

11       because it shows defect and control by defendant.

12       So defendants testified just now that they had

13       possession of a lot that when it left their

14       factories, they found trace amounts of asbestos.

15             And it was the FDA who found it, that was an

16       independent laboratory called AMA Laboratories.

17       It's actually a dye scientists who they previously

18       hired as an expert.

19             So they find asbestos, they contact J&J.  J&J

20       then goes and tests an aliquot, which is like a

21       sample of a sample.  They test that bottle, or they

22       test that sample, and they find asbestos again, and

23       so they recalled this lot.

24             So that's what we're talking about but I want

25       to be really clear because the motion seems to talk

Page 294

1      about both the FDA testing and the recall.  So we

2      are focusing just or not recall right now and why

3      that's relevant.  So it's to our defect and it

4      shows their control.

5           THE COURT:  But it happened after your client

6      was diagnosed with --

7           MS. STEMKOWSKI:  Sure, but Your Honor,

8      post-accident evidence is admissible in Florida.

9      So we have Murray v. Alvin Vineyards.  That's a

10     Second DCA opinion from 1983.  It's a fun opinion.

11          He was hit in the eye by a champagne bottle,

12     and afterwards, the company put a warning saying

13     don't shoot the champagne this way, and when they

14     got up to say, well, that label has nothing to do

15     with what happened to this gentleman, the plaintiff

16     was able to introduce evidence saying if they get

17     up and they say the product is safe -- which is

18     what they are going to do in this case -- and we

19     are able to impeach them with the evidence that

20     they've had to change the label, that this has

21     happened after the fact and it's relevant.

22          THE COURT:  But I think it's something

23     different.  I think if they get up there and they

24     say that we have never had asbestos in our product,

25     then I think you may be able to use that to

Page 295

1    basically impeach them that is not true.  In fact,

2    asbestos was found in your product on this time.

3         But if they basically just deny your

4    allegations without more, I don't think that opens

5    up the door to you introducing the fact that

6    asbestos was found in their product.  I think it's

7    how they do it, how they choose to do it and

8    whether or not they open the door.  If they don't

9    open the door, I don't think it's relevant.

10        MS. STEMKOWSKI:  Your Honor, we have never

11   been in a case where they have not claimed that

12   their product is asbestos-free and 100 percent

13   safe.  So if they get up and they do that, which we

14   anticipate they will, then this recall is

15   absolutely relevant.

16        THE COURT:  As I just said, if they open the

17   door, then I will allow it in.  When I say "open

18   the door," you cannot just do it and make the

19   decision that they've opened the door on their own.

20        You have to request a sidebar and you have to

21   say, Judge Thomas, I believe they've opened the

22   door consistent with your ruling.  I now ask for

23   per in addition to go ahead and introduce evidence

24   as it relates to the recall.

25        MR. OLIVER:  Could I do that post their

Page 296

1      opening?

2            THE COURT:  I'm sorry?

3            MR. OLIVER:  The problem is I have to open

4      first as plaintiff and I know they're going to say

5      it, but when they say it, my opening is over.  And

6      at that point, I can't talk to them.

7            THE COURT:  Well, opening is not evidence

8      anyway.  Opening is just what you believe the facts

9      are going to show.

10            Next?

11            MS. STEMKOWSKI:  Thank you, Your Honor.

12            MR. OLIVER:  For our choice, Your Honor, we

13      are going to do something, the discontinuation of

14      the marketing of their product in 2020 following

15      the recall.

16            MS. SCOTT:  I'm sorry, which number is that?

17            MR. OLIVER:  I don't know what number it is.

18      It's the fact that you guys stopped marketing your

19      product, stopped selling it, stopped making it, all

20      that, in the United States.

21            MS. SCOTT:  Okay.

22            MR. OLIVER:  While you are looking for that,

23      I'll explain it because we don't have a lot of

24      time.

25            So in May of 2020, after the recall, Johnson &

Page 297

1           Johnson announced that it would no longer -- it did

2           not recall all of its existing stock.  It announced

3           it would no longer sell talc-based Johnson's baby

4           powder.

5               In fact, if you go to their website now, or

6           Amazon or anything like that, you look and you say

7           why can't I get talc-based baby powder?  Johnson &

8           Johnson has a statement we love your baby, so we've

9           decided it's the best thing in the world and our

10          science says, blah, blah, blah.

11              The point is this is relevant to the fact of

12          the defect.  It makes it more likely that it's

13          defective and it fails the consumer expectation

14          test, because one of the things they are going to

15          show -- and it's in their PowerPoints.  They have a

16          bunch of PowerPoints about why they discontinued

17          it.

18              So they blame the lawyers for that, but they

19          also say --

20              THE COURT:  I'm sorry, they are going to

21          introduce evidence in this case as to why they

22          discontinued the baby powder product?

23              MR. OLIVER:  Yes, they have a PowerPoint and

24          an executive who testifies about that, and she

25          talks about in her PowerPoints there are different

Page 298

1        factors.  One of the things they do is they blame

2        the lawyers --

3            THE COURT:  I don't understand.  Why then --

4        you are seeking to exclude that or you want to

5        include that?

6            MR. OLIVER:  They are seeking to exclude it.

7        If you exclude it, I don't guess they'll talk about

8        it, right?  They don't want to talk about it at

9        all.

10           But why is it relevant to our case

11       affirmatively?  It is relevant to our case

12       affirmatively because it makes it more likely one

13       of our elements, which is defect.  That's something

14       the jury could look at and say, well, wait, these

15       defendants have gotten up for however long and

16       they've told us this product is perfectly safe and

17       yadda, yadda, yadda, and this finding of --

18           THE COURT:  How is that not subsequent

19       remedial measures?  How is that not basically

20       saying that, okay, you brought it to my attention

21       and now we're going to take a corrective action,

22       and you can't use the fact that I've taken a

23       corrective action against me in a litigation?

24           MR. OLIVER:  The reason that it's not

25       subsequent remedial measures is because the case

Page 299

1    law that Ms. Stemkowski cited -- the reason it's

2    not subsequent remedial measures is because the

3    case law Ms. Stemkowski cited says that in Florida,

4    plaintiffs can use evidence of subsequent remedial

5    measures to show things like defect.

6         Now, if you're --

7         MS. SCOTT:  That's actually --

8         MR. OLIVER:  You're right, let me look at

9    this.  Here is what the statute says:  To prove

10   ownership or control or the feasibility of

11   precautionary measures, controversial or

12   impeachment, it allows us to do that for the

13   purpose of impeachment.

14        So when they come in and say our product was

15   perfectly safe and the FDA tested this a thousand

16   times -- and they say that, right?  The FDA started

17   testing powders back in the '70s.  Then we are

18   allowed to say, well, the FDA found it.

19        And when say that introduce those citizens'

20   petitions and they say the FDA said we didn't have

21   to warn, I'm allowed to turn around and say the FDA

22   found asbestos --

23        THE COURT:  I'm sorry, I missed something.

24        MR. OLIVER:  -- and you decided to discontinue

25   the product.  They are sort of related.

Page 300

1          THE COURT:  The whole point was that you

2     wanted to introduce evidence that -- because they

3     voluntarily discontinued use of the product,

4     correct?  No one made them do it.  They voluntarily

5     did it.

6          MR. OLIVER:  That's not true as to the recall,

7     but it is true as to the discontinuation.

8          THE COURT:  That's my point.  There is a

9     difference between maybe a mandatory recall as

10    compared to they are deciding that they are just

11    not going to manufacture the product in the United

12    States.  Or anywhere, I don't know.

13         MR. OLIVER:  It's both now.

14         THE COURT:  Okay.  So I just don't see -- I

15    just don't see the relevance of that or why --

16    well, first of all, I think you definitely can't

17    affirmatively use it.

18         I think depending upon what they say and

19    whether or not, again, they open the door, they

20    potentially may make it an issue, but

21    affirmatively, I don't think it comes in.

22         MR. OLIVER:  And Your Honor, under what

23    circumstances would you say that they open the

24    door?  What would they have to say?

25         THE COURT:  I don't know.  I can't tell you

Page 301

1     that.  I will sit here and listen to the case as

2     I'm signing orders and you all think I'm not paying

3     attention but I am, and I think it's really not for

4     me to say.  I think it's for you to flag it.

5          And then you will -- I will take a break.  Why

6     do you think they opened the door?  You will tell

7     me -- and I may even say, can you read that back to

8     me, please?  I will then make a decision as to

9     whether or not the door was opened or it wasn't.

10          I will say that when you open the door, I

11     allow them to drive a Mack truck through it because

12     I think if you think you're going to open the door,

13     I think you should say, Judge, can we have a

14     moment?  And I don't do lots of moments, by the

15     way.  That's the other thing.  I don't try cases

16     by, "Can I have a moment?"  Because that's why

17     trials end up being three weeks long.

18          But if you actually are really concerned, hold

19     off in asking that line of questions until you can

20     get to the Court and say, Judge, we just need

21     guidance.  I plan on asking this, but I don't want

22     to open the door, okay?

23          That way I will tell you I think if you ask

24     that question, you are opening the door.  You

25     choose how you want to proceed.

Page 302

1          MS. SCOTT:  We appreciate the guidance, Your

2      Honor.

3          MR. OLIVER:  Your Honor, I want to put

4      something on the record because I knew I had a case

5      here, and this is simply not it.  It's actually

6      67 So.2d 220 from 1953 from the Florida Supreme

7      Court.

8          THE COURT:  You said 1953?

9          MR. OLIVER:  Yes, Your Honor.  Anyway, I just

10     wanted that on the record because we put it in our

11     papers and my notes on the case -- I am

12     paraphrasing this -- suggest that evidence of the

13     same or similar defect are relevant whether before

14     or after the plaintiff used the product, right, and

15     I think that goes to defect.

16         I think the fact that they pulled it off the

17     market goes to the consumer expectations test

18     because that's how we prove defect.

19         THE COURT:  And I disagree with you.  You

20     don't know why they pulled their product.  You want

21     the jury to assume that the reason why they pulled

22     their product was because of a defect.

23         They could have realized that the liability

24     associated with having to defend all of these cases

25     that could come and so forth is greater than the

Page 303

1    money they were going to make from selling the

2    product, and it didn't necessarily mean -- people

3    make business decisions all the time and I'm not

4    sure whether or not we can speculate as to why they

5    did.

6         Now, if you have a smoking gun, you have a

7    document from them that says:  There's too much

8    asbestos in our product, there is no way for us to

9    manufacture this the way we need to, we've got to

10   stop manufacturing it, we are killing too many

11   people.

12        MR. OLIVER:  Unfortunately, I don't have that.

13   That would be a great case though.

14        THE COURT:  Of course you don't.  We've got to

15   stop.

16        All right.  Let me tell you all, I'm going to

17   do this because I want to give you the layout for

18   Monday.  Okay.  We have two hundred jurors coming

19   in.  The plan is we don't have the courtroom for

20   the entire trial, just to let you know.  We have

21   the courtroom for jury selection.

22        So if you have people, logistic people, who

23   are assisting you during the proceedings, they

24   should set up here in this courtroom.  They can set

25   up starting Monday.  I don't think there is anybody

Page 304

1          using the courtroom.  They can come and they can

2          set up their screen, the equipment and the like.

3               When you arrive on Monday, the first thing you

4          should do when you sit at the lawyers' tables, you

5          should situate yourself so that your back is to the

6          Court, to the bench, because the jurors are going

7          to be this way and I'm going there.  You want to be

8          facing them, you don't want to be facing me.

9               We are going to bring in the jurors.  We'll go

10         through the -- we'll bring 50 at a time and we'll

11         tell them -- we'll question them only as to time,

12         how long the trial is going to take.

13              Of the 50, we may get ten, may get 20, I don't

14         know.  We send the ones that cannot stay away; we

15         keep the other 20.  And we do that until we get

16         about 60, 70 jurors that you all can then question,

17         okay?

18              I ask questions, and then after I'm done

19         asking questions, I let you all ask questions, and

20         we obviously do this until we have a jury.

21              I'm curious, how many strikes per side?

22              MR. OLIVER:  Three is what defendants have

23         said before.

24              THE COURT:  Perfect.

25              MS. DIOLOMBI:  Alternate strike.

Page 305

1              THE COURT:  I'm sorry?

2              MS. DIOLOMBI:  "Alternate strike" was all I

3         said, Your Honor.  Hassia Diolombi for J&J.

4              THE COURT:  You said what, I'm sorry?

5              MS. DIOLOMBI:  So three strikes for the main

6         panel and then one strike for the alternates?

7              THE COURT:  Well, I give everybody one strike

8         per alternate.  So if I choose three alternates,

9         you get three strikes for alternates, okay?

10             But when I say one strike per alternate, that

11        means if you don't use your strike on alternate

12        number one, you lose it.  It doesn't carry to

13        alternate number two, okay?

14             All right, perfect.  Our public relations

15        department sent me an email that they got a request

16        from -- is it CVN?  They used to do my asbestos and

17        my tobacco cases.  They are great because they set

18        up and you never know they're there.  And they

19        don't say anything, they're quiet, they never

20        interrupt.

21             So I'm told that they are going to be setting

22        up probably on Tuesday or Wednesday, whenever we

23        start going the opening statements.

24             MS. BROWN:  Your Honor, could I just say one

25        thing about CVN?  They have videoed a bunch of

Page 306

1          these.  Our only request would be that the Court

2          would instruct counsel not to refer to the fact

3          that it's being recorded.

4                  THE COURT:  You mean to the jury?

5                  MS. BROWN:  Correct.

6                  THE COURT:  Oh, absolutely.

7                  MR. OLIVER:  I'm not going to do that.

8                  MS. BROWN:  Thank you, Your Honor.

9                  THE COURT:  No one should make reference.

10         They are like a little fly on the wall that we see

11         but we don't see.

12                 MS. BROWN:  Thank you.

13                 THE COURT:  The other thing is that -- and

14         this is important.  I need you all to please,

15         please, please pay attention to what I'm about to

16         say.  It will make your experience here a lot

17         better.

18             You all see that I'm probably not your typical

19         judge, and I'll accept that, okay, and I take pride

20         in that.  I'm very direct.  When I really am

21         comfortable with what I know what I'm doing, you

22         are just going to get rulings, okay?

23             You may just know deep in your heart I'm

24         wrong.  You are saying the judge is just wrong and

25         you just need to tell me that I'm wrong, but I'm

Page 307

1    not giving you access to me.  You're saying, Judge,

2    I need a sidebar.  Denied.  Judge, I really need a

3    sidebar.  Denied, next question.

4        Just stay calm, okay?  The world is not going

5    to open up.  We won't release the witness, and the

6    first opportunity that you have to bring it to my

7    attention, if I'm really wrong, I'll correct it.

8    Put the witness back on the witness stand.

9        And normally when I say "wrong," I wasn't

10   allowing the witness to do something that you

11   thought I should allow the witness to do.  When I

12   get the opportunity, I will correct myself if I'm

13   wrong and I'll say call the witness back, and I'll

14   simply tell the jurors, ladies and gentlemen, we

15   have a couple more questions for this witness,

16   okay?

17       What you cannot do is you cannot attempt to

18   argue with me on the record.  Trust me, it's not

19   something you want to do.

20       You are allowed to object.  Hearsay,

21   relevance, asked and answered, that type of thing.

22   That's your objection.  Your objection should not

23   be, Judge, she is not qualified to say that, she's

24   only a pharmacist, you know.  Judge, objection,

25   Judge, counsel knows better than that.  He knows

Page 308

1          the witness didn't say that, okay?

2               Those are speaking objections, and you get one

3          warning, and then after I give you one warning, I

4          will give you a speaking response in front of the

5          jury, okay?  And so I don't want to become a part

6          of this trial, but the good thing about me is if

7          you invite me in, I come willingly, okay?

8               So if you don't want to me to be a part of the

9          trial, I'll just sit up here and say overruled and

10         sustained while I'm signing my orders, doing what

11         I'm doing.  It becomes your case, you get to try

12         your case.

13              But if you invite me, I'm telling you -- and

14         you all probably get a sense of it -- and I just

15         tell you what I think, okay?  And I prefer not to

16         do that.

17              The other thing is that I take very few

18         breaks, sidebar breaks, okay?  If you need a

19         personal break, you just need to say, Judge, can we

20         take a personal break at this time.

21              When we take a personal break, everybody has

22         to take a personal break at the same time.  I'm not

23         taking a personal break at 9:00 and then taking

24         another one at 10:00, okay?  If you have some

25         personal situation, you have to eat at a certain

Page 309

1          time, you have to go to the bathroom at a certain

2          time because you have certain personal issues, I

3          don't need to know the specifics of it, but I need

4          to know you have that personal issue, because if

5          you need to take a break and I'm denying you the

6          break, but you really need to go, I need to know

7          that so that I am sensitive to the fact that you

8          have something personal and I'm not just denying it

9          because I have a stronger bladder than you do.

10              MR. OLIVER:  Judge Thomas, at this time, I

11         would like to let you know that my client does have

12         one of those issues and it's serious.  He has

13         Crohn's disease.  He has advised me that there will

14         be times during this trial that he will have to

15         leave and go to the bathroom.  I'm sure you're

16         familiar with the condition.

17              THE COURT:  In that situation, it will be

18         brief situations, and by the way, we'll let the

19         jurors know there are times when the lawyers or the

20         parties may have to exit the courtroom temporarily,

21         but that has nothing to do -- it's more personal

22         and we'll come up with some language so that there

23         is no negative inference from that.  And obviously,

24         the Court takes no -- if your client needs to

25         leave, personal representatives need to get up and

Page 310

1        leave, they can get up and leave.  Half the time, I

2        don't even know they're there, except when they're

3        called to testify.

4             And we take breaks every day -- and I'm saying

5        this to the plaintiff because you start off first.

6        Every day, we take breaks at the same time.  We

7        take lunch at 1:00 every day, we take 45 minutes to

8        an hour for lunch.  Every day, we will break around

9        4:30, 5:00.  That may be adjusted depending what's

10       going on with the jurors or what's going on with

11       the Court, but you should have witnesses available

12       and ready to go up to and including 5:00.

13            What I suggest you do, if you have deposition

14       testimony, you hold onto it, keep it in your pocket

15       so that if you fall short of a witness and you need

16       to fill the time, you can read a deposition or play

17       a video.  That kind of gives you cover.

18            But please don't put me -- please don't put me

19       in a position where it is 3:00 and you tell me,

20       Judge, everything is going faster than anticipated.

21       We don't have a witness.  If you test me, I will

22       rise to the test, okay?  I am telling you, you need

23       to have witnesses.  You've got to fill that time.

24       I'm only looking at the plaintiff because obviously

25       the pressure is on you because you go first.

Page 311

1        And at the end of every day, I say to the

2    plaintiff:  Who are you calling next?  That gives

3    you, the defense, an idea of who you need to

4    prepare for, and then when they're done, you will

5    know when to start lining up your witnesses and

6    have witnesses and have people here, okay, so

7    there's no break.

8        Judge, they finished earlier than we expected,

9    we don't have anybody here until Thursday, okay,

10   that's a problem.  And I'm telling you all, it's a

11   problem.  And I'm not recessing.  I'm going to say

12   call your next witness.  Judge, we have nobody.

13   Unfortunately, we need access to the record.  You

14   have access to the record.

15       And you can move for a mistrial.  And if you

16   move for a mistrial, whoever causes the mistrial

17   will be responsible for all the fees associated

18   with the other side's preparation of the case if

19   it's your fault for the mistrial.

20       If the jurors are responsible for the mistrial

21   or the Court is responsible for the mistrial, no

22   harm, no foul.  If you are responsible for the

23   mistrial, I will immediately after the end of the

24   trial issue a rule to show cause as to why you

25   should not be responsible for paying all of the

Page 312

1    other side's attorneys' fees and costs for

2    requiring this Court to grant mistrial.

3         And I will have an evidentiary hearing, I will

4    make my findings, and you can take it to the Third

5    District Court of Appeal or whoever else you need

6    to take it to if you disagree with the findings

7    that I've made.  In other words, you probably don't

8    want a mistrial.

9         And by the way, mistrial includes doing

10   something that I told you not to do that you did

11   and the other side is forced to ask for a mistrial,

12   okay?  You all know what it costs to get this case

13   where it is.  Nobody wants to have to do the case

14   all over again.  Let the jury make a decision on

15   the merits.

16        And that includes, by the way, if you don't

17   like the way the case is going.  Sometimes,

18   strategically, people want to kind of say, yeah,

19   let's do this again.  This is not coming out the

20   way I want it to come out, and so they kind of

21   incite a mistrial.  I'll go with you, but there are

22   consequences if you invite a mistrial.  I'm just

23   letting you all know that.

24        This is just me -- I don't know if this is a

25   suggestion.  I try not to get involved if there is

Page 313

1    no objection.  I'm assuming if there is no

2    objection, everybody is okay with the testimony

3    coming in.  If there is an objection, I'll rule on

4    it.

5        But sometimes y'all don't object when y'all

6    should be objecting, okay?  And there is only so

7    much I can take of it.  So what I will then do is

8    send the jury out and I will say, what are you

9    doing?  I won't do it in front of the jury, but

10   I'll send the jury out because I don't understand.

11       Judge, there is no objection.  I know there is

12   no objection, but under what rule of evidence are

13   you allowed to do that?  I'm not sitting here

14   letting you -- ba, ba, ba, ba, ba.  That's my

15   guidance to you.  It will never be in front jury,

16   but when it happens, sometimes you're wondering

17   what did I do, what exactly just happened?  And I'm

18   letting you know what just happened, okay?

19       I'm trying to think of something else that you

20   all need to know.  Before closing arguments, I need

21   you all to let me know how much time you're

22   requesting for closing arguments.  I don't

23   necessarily give you the time that you're

24   requesting; I give you the time based upon the

25   length of the trial, the complexity of the case.

Page 314

1      And I will give you a reasonable amount of time,

2      but if you come in and you tell me, Judge, we need

3      six hours, I can tell you right now that's not

4      happening, but I will give you time that I think is

5      reasonable.

6          I think the law says that it can't be

7      arbitrary, it has to be based on the complexity of

8      the issues that the jury has to decide, as well as

9      the length of the trial, how many witnesses

10     testified and the like.  And so hopefully you all

11     will be reasonable.  And if you are reasonable, I

12     will try to be equally as reasonable.

13         Do you all have any questions that you want to

14     ask me?

15         MR. OLIVER:  Do we have forty-five minutes, an

16     hour for opening?

17         THE COURT:  I think that's fair.

18         MR. OLIVER:  And then Your Honor, one of the

19     things that's important here, you said we need to

20     have deposition testimony ready to go and we'd like

21     to do that, but we need to figure out how to submit

22     this all to you.

23         THE COURT:  Submit what to me?

24         MR. OLIVER:  The deposition designations.

25         MS. STEMKOWSKI:  How do you want to hear

Page 315

1    objections, Your Honor?  If we can't settle

2    something between ourselves, how would you like us

3    to present that you, before the jury, after the

4    jury?

5         THE COURT:  I think what we do is on Monday,

6    you all should give me the actual transcript, I

7    want you to highlight -- I don't care who made the

8    objection.  It doesn't matter to me who is

9    objecting, I just want to know the objection.

10        So what you do is you highlight the objection,

11   tell me what the objection is, and then I will go

12   through those while you're doing your jury

13   selection and I will do the best I can to rule on

14   them, and anything that I was unable to rule on

15   because I don't understand it, I need

16   clarification, then those will be the ones we can

17   take up at the end of the day so that you all can

18   then cut the video or edit the transcript as is

19   necessary.  But I just need the transcript, I need

20   it to just be highlighted, and I will then say

21   overruled or sustained.

22        MR. OLIVER:  And how much time will we get

23   with the panel during the voir dire?

24        THE COURT:  How much time do you want?

25        MR. OLIVER:  As much as I'm entitled to, Your

Page 316

1     Honor.  I'm committed to getting it all done at the

2     end of the day on Monday, but I would like at least

3     an hour and a half, if not two hours with the

4     panel.

5          MS. BROWN:  Your Honor, can I make a

6     suggestion as to that?  Would it be possible -- I

7     know Your Honor looked at the questionnaire we

8     jointly submitted and you had no objections to the

9     substance.  I've tried eight of these cases now,

10    and my experience has been with these

11    questionnaires that the actual open panel voir dire

12    is much more productive if we do have some

13    information from them in advance.

14         Would it be possible to have them fill out the

15    questionnaire or a portion of the questionnaire

16    before we --

17         THE COURT:  They will have a questionnaire.

18    You will get the questionnaire today.  Hopefully

19    you will get that questionnaire today.  Let me get

20    Brandon.

21         They normally send out the questionnaire the

22    business day before, but sometimes -- so you should

23    get the questionnaires and have them in your

24    mailboxes, if they are not already there.

25         Did we get the question mares from jury pool?

Page 317

1        THE BAILIFF:  Not yet, Your Honor.

2        THE COURT:  Can you call them and ask them

3    when will we be getting the questionnaires?

4        THE BAILIFF:  Definitely, Your Honor.

5        THE COURT:  Thank you.

6        So he is going to call.  Hopefully you'll get

7    them today so you'll have them all weekend.  Now,

8    those questionnaires are not as helpful, they are

9    just very basic.  They just say have you ever

10   served on a jury, you know, what do you do for a

11   living, spouse, do you have kids, any legal

12   experience, medical experience.  You know, it's

13   just basic type of thing.

14       But just so that you all know -- and I'm

15   saying this because I'm so much more direct than

16   y'all are, y'all are up there and you don't want to

17   offend anybody, I'm not as concerned about that.

18   So I will go through a lot of what's on your

19   questionnaire before you all even get up there.

20       MS. BROWN:  Okay.

21       THE COURT:  I'll knock it out, it's almost

22   going to be like rapid fire, so hopefully you'll

23   have enough people taking notes.  And I'm going to

24   tell them I'm asking all of you the same question.

25       So, for example, I have your questionnaire

Page 318

1          here, and one of the first questions is -- I'm not

2          going to ask have you ever been in the military.

3          Let me ask something really important.  To your

4          knowledge, have you or a family member ever used

5          talc, okay, and I'll just go down every single

6          person.  I'll say first row; in the first row, how

7          many people if your family members have ever used

8          talc?

9               And because the room is a little bit bigger, I

10         may ask them to stand up or we may have a

11         microphone, they will answer the question, I go to

12         the next one, and by the time we get to the end,

13         they'll know what we're doing.

14              MS. BROWN:  Is it paddles with numbers?

15              THE COURT:  No, we are not as sophisticated

16         with the paddles yet.  And I actually have a

17         fill-in bailiff and no JA, so we are really going

18         to be a little disjointed on Monday.

19              MS. BROWN:  The jurors will say their number,

20         is that how it will work?

21              THE COURT:  Yes.  Well, just so that you know,

22         the first group that comes in, we are really

23         bringing them in hopefully in the order that they

24         appear on the sheet, but the only purpose is for us

25         to just line them up just to get enough jurors that

Page 319

1          you can question, and then those jurors would again

2          be in order based upon the sheet.

3               I really don't even care how they come in, the

4          first 50, I just need to know, okay, you can't be

5          here, get them out, get enough so you all can

6          question them.  Because if we spend all the time

7          lining 200 jurors up, sometimes that becomes --

8          that takes 45 minutes.  Why?

9               We don't need -- we just need to know they're

10         here.  Get them in, who are you, can you stay, can

11         you not stay, and then the people that we

12         ultimately want to question, we will then line

13         those up in the order that they appear on the sheet

14         that you will be given.

15              We normally give a sheet, but unfortunately, I

16         don't think we're going to be able to do it this

17         way because I don't have a JA.  It normally has all

18         the jurors across in the order that they are

19         seated.  We probably won't be able to do that.

20              Any other questions?

21              MS. BROWN:  I have two.  Number one, will you

22         hardship for a two-week trial or a three-week

23         trial?  I know we have a dispute on how long this

24         will take.

25              THE COURT:  You're telling me it's going to

Page 320

1      be --

2            MS. BROWN:  I say two, Judge.  I've done these

3      in seven days.

4            THE COURT:  You've done these in seven days?

5            MS. BROWN:  With this firm, yes, South

6      Carolina.

7            MR. OLIVER:  Your Honor, they did a

8      mesothelioma trial in a totally different situation

9      than this.  It was not an ovarian cancer trial, so

10     it's a different case.  We've said this is a

11     three-week trial all along.  We've looked at our

12     calendar and I think at some point Your Honor asked

13     us when we were going to finish and we told you, I

14     believe, that it was going to take us -- we sent an

15     email to Andrew, went back and forth.

16           So we still think it's going to take three

17     weeks, that's our best estimate.  That includes

18     time for them.  Our part is not going to take three

19     weeks.

20           THE COURT:  Well, here is what I think we

21     should do, because I also am suspect of three

22     weeks.

23           MR. OLIVER:  We have a holiday in there too,

24     Judge.

25           THE COURT:  You have one day.  But I also

Page 321

1      suspect it's not going to be three weeks, but the

2      problem is:  What happens if it is, and then a

3      juror cannot stay?

4          Now, the option is that I think we tell the

5      jurors that the Court -- I say the Court -- the

6      Court anticipates being able to complete this trial

7      in two weeks, but it may -- there may be some

8      situations where it may go over, so we need to know

9      your availability for the next three weeks, okay?

10     That way if somebody has a hardship on the third

11     week, that doesn't automatically disqualify them,

12     but we may have to pick an alternate for everybody

13     that has a concern for the third week so we can

14     have somebody to replace.  So instead of normally

15     three alternates, we may want to take five or six

16     alternates so we cover for any lag if we don't get

17     it done in two weeks.

18         And by the way, the other thing -- and I'm

19     concerned about this and I'll let you all tell me

20     how you feel about it.  Whenever you all tell me

21     that the case is going to be three weeks, that

22     causes me to work harder during the day.  I cancel

23     my motion calendar because you see how motion

24     calendar goes.  It can be like two and a half

25     hours.

Page 322

1          I cancel motion calendars and I just simply

2     say I'm just going to focus on this trial, which

3     means we are starting every day at 8:30.  And I

4     tell the jurors that; look, folks, we've got to

5     start at 8:30 just so we're here.

6          You know, I tell my little one, unfortunately,

7     you've got to go to the library because I'm going

8     to pick you up at 5:00 rather than picking you up

9     at 4:30.  And we just work longer.

10         The concern I have is that some of the

11    evidence in this case can be a little bit

12    challenging for jurors to sit here for seven hours

13    to receive it.  And that's my concern.

14         If this was just an automobile accident case

15    where I say, no, I want to get it done, I may be

16    able to work those hours, but because of the

17    breadth of the testimony, it may be a little more

18    challenging to have people sit there.  Because I'm

19    not sure how much of it is going to sink in if

20    you're just sitting here for too long of a time.

21    At some point, you may start daydreaming.

22         But I'll let you all tell me what you feel

23    about that.  And maybe it depends upon how the case

24    is going, you know, because as the case proceeds,

25    within two or three days, you'll have a better

Page 323

1       sense of is it closer to the ten days or is it

2       closer to the third week.

3               MR. OLIVER:  And from plaintiff's perspective,

4       since we are obviously going first, Your Honor, I

5       can make a commitment that after the first three

6       days, after we've put on two witnesses, I'm more

7       than happy to report back to you and say we think

8       this has changed or we think we're right on track

9       and it's taking as long as we think it's going to

10      take.

11              THE COURT:  Or we're behind.

12              MR. OLIVER:  Absolutely.  I'm going to tell

13      you whatever is happening.

14              THE COURT:  All right.  Do you have anything

15      else?

16              MS. BROWN:  Just one more, Your Honor.  In

17      terms of use of documents in opening, is it a

18      situation where it's okay to show documents we have

19      a good faith basis to believe will come into

20      evidence --

21              THE COURT:  You do.

22              MS. BROWN:  -- and we do so at our own peril?

23              THE COURT:  Well, it's not at your own peril.

24      Here is what I require for opening:  I require you

25      to show any documents you intend to use during

Page 324

1      opening to the other side.  The other side then has

2      an opportunity to object to those documents prior

3      to the opening.

4          If they do not object prior to the opening, I

5      do not break.  So if you're 20 minutes into your

6      opening, and all of a sudden, you put a document up

7      and the other side says objection, I'm going to say

8      overruled.

9          And the reason why I'm saying that is -- now,

10     that's assuming you put on the record, Judge, we've

11     complied with your requirement, we showed the other

12     side our PowerPoint presentation, our documents.

13     They have lodged no objection.  Once you do that,

14     as far as I'm concerned, you satisfied any

15     obligation, and if they slept on it, they just

16     slept on it and we just proceed and I'm not

17     breaking up an opening statement because someone

18     decides to object at the eleventh hour to a

19     document.

20         MR. PENDELL:  Your Honor, may I ask a

21     question?  Is that rule just for opening?

22         THE COURT:  As compared to what?

23         MR. PENDELL:  In other words, do I have to

24     somehow a document before I have a witness on the

25     stand?

Page 325

```
1          THE COURT:  You have to show the document to
2     opposing counsel --
3          MR. PENDELL:  Here in court.
4          THE COURT:  -- before you show it to the
5     witness.
6          MR. PENDELL:  But not prior to that time?
7          THE COURT:  You all should have had a
8     meet-and-confer.  Hopefully you're say staying at
9     the same hotel.  Your meet-and-confer should have
10    been:  Here are all the documents I intend to
11    introduce, what is your objection?  Which ones do
12    you object to?
13         If there is no objection, then you should mark
14    the document -- all your documents should be
15    premarked and given to Rod at the beginning of the
16    trial.  But you should then mark -- the document
17    should be handed to Rod so that Rod has the
18    documents and he can mark them, and documents that
19    you object to because predicate or something along
20    that line, then you don't -- obviously you have to
21    lay the predicate and then you would make a
22    contemporaneous objection if you believe that the
23    predicate hasn't listen laid, and then will I rule.
24         But all your documents have to have been
25    reviewed because there is nothing more painful in a
```

Page 326

1    case like this when you all are all of a sudden

2    saying I've never seen that document.  They didn't

3    put that on the witness list, okay?  Those things

4    are problematic.

5        MS. BROWN:  And I'm happy to confer with

6    counsel.  I have some ideas of how we've done it in

7    the past.  If we exchange direct documents a

8    sufficient time in advance, I've found we are able

9    to work this all out without what Your Honor is

10   contemplating.

11       The one thing I do want to clarify with the

12   Court is that documents we are going to use on

13   cross, we of course don't need to show to the other

14   side before cross-examination, right?

15       THE COURT:  Well, not before, but when you go

16   to approach the witness, you need to show the

17   document.

18       MS. BROWN:  I understand, Your Honor.

19       MR. PENDELL:  Your Honor, just to clarify

20   because I heard opposing counsel say something

21   that's different, which is why I asked the

22   question.

23       In general, we have an exhibit list.  We are

24   to exchange exhibit lists, say whether we have

25   objections to certain documents and make them

Page 327

```
 1         before the trial starts so we know ahead of time
 2         what everybody is doing.  That is different than I
 3         have this doctor who is going to testify tomorrow,
 4         and here are the document five specific documents
 5         off that list that I'm going to use with him.
 6              THE COURT:  No, no.
 7              MR. PENDELL:  Okay.
 8              THE COURT:  I do not require you to, in
 9         advance, give the specific documents that you're
10         going to use for a witness in advance.  I just
11         require you to have the conversation about all your
12         exhibits, but no, you don't have to identify
13         specific documents you're going to use with each
14         witness.
15              MS. BROWN:  The reason we've done it in the
16         past, Your Honor, like the night before, you send
17         the ten documents you are going to put the doctor
18         on direct is because our exhibit lists are like
19         thousands of documents, and so that's been my
20         experience.
21              THE COURT:  I will say this:  I do not require
22         it, but I will encourage it.
23              MS. BROWN:  It just makes it easier, but I'll
24         confer with counsel and see what we can do.
25              THE COURT:  And obviously what applies to one
```

Page 328

1         would apply to the other.

2              Any other questions?

3              MR. OLIVER:  Anybody on my team?

4              MS. BROWN:  Last one.  You would anticipate

5         opening Tuesday?  Monday would be all jury

6         selection?

7              THE COURT:  What we will do is we will do

8         Monday all jury selection, and if for some reason

9         we do finish a little earlier, maybe we can take up

10        some of these extraneous issues that we haven't

11        resolved today.  So yes, don't plan on opening on

12        Monday, just plan on jury selection, and then

13        anything else that's remaining that we need to talk

14        about.

15             MS. BROWN:  Thank you, Your Honor.  We

16        appreciate that.

17             THE COURT:  Anything else?

18             MR. OLIVER:  Thank you, Your Honor.

19             MS. SCOTT:  Thank you, Your Honor.

20             (The hearing was concluded at 4:37 p.m.)

21

22

23

24

25

Page 329

1                    HEARING CERTIFICATE

2

3              I, CHRISTINE SAVOUREUX-MARINER, Florida

4    Professional Reporter, certify that I was authorized

5    to and did stenographically report the foregoing

6    proceedings and that this transcript is a true

7    record of the proceedings before the Court.

8              I further certify that I am not a

9    relative, employee, attorney, or counsel for any of

10   the parties, nor am I a relative or employee of any

11   of the parties' attorney or counsel connected with

12   the action, nor am I financially interested in the

13   action.

14

               Dated this 11th day of February, 2024.

15

16

17

                    CHRISTINE SAVOUREUX-MARINER

18                  Florida Professional Reporter

19

20

21

22

23

24

25

**[& - 2]**                                                                                                Page 1

| & |
|---|

**&**  1:9,9,10 2:18
2:19 3:4,10,15
3:20 34:16
35:3,19,22
36:17 37:8,19
38:6,6,9,14,16
38:22 39:7,21
39:23,25 40:2
41:11 46:18
49:13 50:6,10
51:21 66:21
83:13 91:4
138:17,21
139:21,25
140:2 142:1
149:23 151:9
153:1 158:24
166:12 172:11
174:11 175:22
176:13 205:4
217:1,2,3,4,6,9
218:23 219:17
219:17 220:13
224:6 225:22
226:9 233:8,22
235:7,12,13
237:7 239:1
240:9 241:9
243:23,23
244:5,10 245:5
249:8,15 250:8
251:4 252:5,14
252:22,23
253:5,8,9 292:3

292:11 296:25
297:7

| 0 |
|---|

**00002**  137:7
**01**  1:3
**06103**  2:11

| 1 |
|---|

**1**  8:13 12:25
13:5,10,19,20
15:21,24 20:21
21:14,18,21,22
21:24 22:7,13
59:4 60:3
61:20 77:2
78:16 79:9,17
80:4 81:25
84:19 93:7,10
93:23 94:19
142:8 170:16
173:21 276:23
**1,000**  128:17
**1,800**  142:3
**1-800**  151:9,9
**1.22**  260:20
261:1
**1.36**  260:21
**1.36.**  261:1
**1.6**  51:21
**10**  103:15
**10.1**  105:3
**10.9**  105:3
**100**  58:15,22
59:5 61:10,12
128:17 243:25

269:4 282:9
295:12
**10001**  3:6
**10020**  3:22
**1006**  188:20
**10:00**  308:24
**11**  21:14 94:11
192:3 207:22
**11:54**  125:17
**11th**  1:1 193:1
329:14
**12**  94:13 152:8
**12:05**  125:18
**13**  4:14 169:4
**13-1**  1:25
**137,000**  186:7
**138**  280:16
**14**  217:5,6
**15**  4:21 94:11
124:8 242:25
**150**  4:10 94:11
230:10
**156**  4:12
**16**  265:10
**163**  4:13
**169**  4:15
**17**  94:13
**171**  4:17
**177**  4:18
**18**  262:21
**1949**  178:7
180:4,5,8
**1953**  302:6,8
**1970**  178:14,17

**1971**  44:6,25
45:2,3
**1972**  44:7
**1974**  178:14,18
**1975**  179:11,11
179:14
**1980s**  83:19
**1983**  294:10
**1986**  83:23
**1990**  221:24
**1993**  179:12,13
179:14
**1994**  165:12
166:5 167:25
178:7,9 179:20
180:4 182:25
**1997**  141:2
**1998**  239:19
**1:00**  155:21
310:7
**1:04**  176:19
**1:45**  176:18
**1:48**  176:20

| 2 |
|---|

**2**  8:13 12:25
13:5,10,19,20
15:21,24 20:21
21:14,18,21,22
21:24 22:7,13
77:2 78:16
79:10,17 80:4
81:25 84:20
93:23 94:19
110:17 276:23

**[2,920 - 57]**                                                                    Page 2

| | | | |
|---|---|---|---|
| **2,920** 189:10 | **2019** 167:24 | **269-2343** 2:16 | 189:9 |
| **20** 2:11 20:6 | 169:8 293:3 | **272** 2:15 | **37** 264:14 |
| 41:3 93:23 | **2019-017627** | **28** 2:5 | **38** 29:9 84:7 |
| 242:25 304:13 | 1:3 | **2801** 3:21 | **395** 3:5 |
| 304:15 324:5 | **2020** 70:3 71:13 | **284** 4:21 | **3:00** 310:19 |
| **20,000** 49:12 | 98:4 104:7 | **292** 4:23 | **3m** 250:15 |
| 50:17 | 129:4 192:2,3 | **29464** 2:6 | |

| | | | |
|---|---|---|---|
| **200** 5:5,23 6:10 | 192:22 193:1 | **296** 4:24 | **4** |
| 6:12,18 319:7 | 193:10 194:6 | **2b** 169:7 | |
| **2000** 98:21 | 200:2,11 | 170:14 | **4** 4:13 179:5,16 |
| 233:10 | 263:21 284:12 | | 181:25 265:8 |
| **2000s** 233:3 | 296:14,25 | **3** | **40** 29:9 51:10 |
| **2003** 171:24 | **2023** 1:18 | | 63:1 64:3 69:5 |
| 230:10 | 200:11 | **3** 56:15,16 | 101:17 102:6,6 |
| **2007** 98:4 | **2024** 83:23 | **30** 4:4 22:8 | 103:5 108:22 |
| 103:23 129:4 | 169:11,18 | 79:10 80:9 | 208:5 260:24 |
| **2008** 111:2 | 170:2,23 | 93:23 211:21 | 266:8 |
| **201** 3:16 | 329:14 | 251:24 254:2 | **4332-1** 228:21 |
| **2012** 263:1 | **20s** 185:3 | 266:8 272:6 | **45** 176:17 310:7 |
| **2013** 263:1 | **20th** 129:9 | **3000** 2:20 | 319:8 |
| **2014** 83:16,17 | **210** 4:19 | **305** 3:17 | **474-6550** 3:12 |
| 83:21 238:10 | **212** 3:6,22 | **31** 4:24 | **4:30** 310:9 |
| 238:21 239:23 | **216-9061** 2:6 | **3200** 3:16 | 322:9 |
| 239:25 240:1 | **22** 4:16 21:5 | **33130** 1:18 | **4:37** 1:19 |
| **2015** 98:4 | 79:15 171:10 | **33131** 3:17 | 328:20 |
| 103:24 129:4 | 260:21 262:7 | **334** 2:16 | |
| 262:15 263:8 | 266:16 | **3442** 329:17 | **5** |
| **2016** 73:18,21 | **220** 302:6 | **346** 2:21 | |
| 101:24 168:1 | **22318rb** 4:23 | **35** 4:11 133:24 | **50** 134:22 |
| **2017** 83:14,15 | **24** 99:23 | 156:9,11,13 | 148:10 169:14 |
| 194:7 258:25 | **25** 5:24 143:9 | 213:6 | 170:7,22 |
| **2018** 179:11 | 211:21 221:22 | **358-5171** 3:17 | 178:14 229:20 |
| 194:7 261:17 | **2555** 3:11 | **36** 262:7 266:16 | 265:9 304:10 |
| 292:7 293:2 | **259** 4:20 | **360** 151:19 | 304:13 319:4 |
| | | **36104** 2:15 | **51** 263:9 |
| | | **365** 179:5 | **55** 183:21 |
| | | 180:19 188:10 | **57** 4:5 |

[59 - accepted]

**59** 94:13
**5:00** 310:9,12
  322:8

**6**

**6-1** 90:17
**60** 304:16
**600** 181:23
**60s** 36:18
  235:25
**62** 4:6
**64** 265:11
**64108** 3:11
**66** 265:5,10
**67** 302:6

**7**

**7** 4:3,22
**70** 195:13
  304:16
**706** 290:25
**70s** 36:19
  235:25 299:17
**718-6963** 2:21
**72** 195:13 196:1
**73** 1:17
**735-2173** 3:6
**740.1** 223:21
  241:19 256:14
**75** 4:8
**77002** 2:21

**8**

**8** 182:5 281:22
**80s** 36:19
**811** 2:20

**816** 3:12
**843** 2:6
**860** 2:12
**882-1681** 2:12
**8:30** 322:3,5

**9**

**9** 1:18 111:12
  111:14
**90** 145:21
**90.702** 48:20
**90.703** 48:20
**90s** 233:3 238:5
**93** 208:9
**94** 180:7 183:13
  183:14,20
**95** 4:9
**96** 206:20,25
  207:3
**989-8844** 3:22
**99** 58:19,23
  61:10
**9:00** 308:23
**9:32** 1:19 5:1
**9th** 3:5

**a**

**a.m.** 1:19 5:1
  125:17
**abating** 203:8
  203:10
**abdominal**
  100:16
**ability** 27:16,25
  49:21 55:13
  160:20 280:8

**able** 12:1 23:6
  25:1 38:5 49:3
  49:4 58:25
  59:24 61:14
  70:6 82:16
  83:24 85:3
  89:11,18 91:20
  93:9 106:21
  122:14 124:7
  130:15,25
  148:1,24,25
  159:9 160:1
  163:17 164:14
  165:4 183:5
  189:17 192:22
  192:24 193:11
  227:14 234:13
  235:6,20
  246:14 253:6
  282:15 287:18
  294:16,19,25
  319:16,19
  321:6 322:16
  326:8
**abortion** 54:11
**above** 190:14
  191:19,19
  193:7,15
  195:21,21
  196:13,23
  197:6,17 199:1
  199:18,19
  265:9
**absent** 262:10

**absolute** 188:2
  209:20
**absolutely** 8:1
  13:10,23 24:6
  30:7 39:19
  50:17 58:13
  74:10 83:12
  86:21 93:9
  103:7 114:24
  153:24 183:23
  204:25 206:16
  243:7 262:5
  268:9 282:24
  283:6 286:24
  295:15 306:6
  323:12
**abstract** 103:13
**abundantly**
  275:21
**accept** 131:22
  227:8 243:13
  247:12 278:9
  278:13 290:20
  306:19
**acceptable**
  10:17 97:17
**acceptance**
  85:8,9
**accepted** 86:6
  89:7,9 90:2,21
  147:11 196:5
  196:22 204:21
  205:10 290:21
  290:24

[accepting - advertisement]    Page 4

**accepting** 87:24
  157:11 197:18
  199:8 224:11
**accepts** 114:14
**access** 46:18
  229:22 307:1
  311:13,14
**accident** 152:19
  294:8 322:14
**accordance**
  252:18
**account** 67:10
**accredited**
  105:19
**accurate** 51:23
  54:16 99:22
  147:14 157:20
  184:9 288:12
**accurately**
  160:25 161:6
**acknowledge**
  69:9 266:17
  286:3
**acknowledges**
  29:4 59:6
**acquiesced**
  53:25
**act** 57:24
  166:19 167:3
  226:15 228:8
  228:15 229:14
**acted** 32:2
  45:19 239:22
  249:12

**acting** 43:19
  251:5
**action** 167:11
  273:9 298:21
  298:23 329:12
  329:13
**actions** 45:25
  218:8
**activity** 219:11
**acts** 167:13
**actual** 172:7
  191:1 282:11
  315:6 316:11
**actually** 12:5
  12:24 13:8,22
  16:18,21 25:10
  26:9 30:6 34:9
  42:18 47:18
  51:25 54:14
  55:9 60:4
  64:21 65:9
  70:18 75:11
  77:21 80:1
  84:1 88:14
  103:10 115:4
  116:9,23
  151:18 166:1
  167:23 182:1
  182:10 194:20
  204:18 216:13
  227:20 237:6
  238:16,17
  248:9 249:17
  250:10 253:24
  257:3 262:2

267:17 280:6,9
  283:3 286:3
  290:19 291:23
  293:17 299:7
  301:18 302:5
  318:16
**ad** 154:2,9,10
  154:10,22,23
  155:3
**add** 31:17 74:8
  114:23 167:22
  188:24 199:23
  200:1 257:2
  269:2
**added** 225:3
**addendum**
  9:15
**adding** 188:17
**addition** 163:11
  219:23 238:12
  257:5 279:24
  295:23
**additional**
  13:21 259:23
**address** 95:24
  98:12 129:3
  134:7,11
**addressed**
  133:1
**addressing**
  123:17 221:25
**adjusted** 310:9
**administration**
  222:14

**admissibility**
  25:25 57:3
**admissible**
  250:16 294:8
**admit** 37:6
  163:15
**admits** 10:11
  57:15 59:3
  180:17 212:3
  264:4
**admitted** 26:7
  27:15,16,23
  58:19 164:14
**admitting**
  164:19
**adopt** 209:23
  244:15
**adopted** 27:10
**adopting**
  285:18
**adoption**
  244:18
**ads** 33:4 35:19
  36:5,6 51:9
**adulterated**
  215:25 225:16
  225:18
**advance** 316:13
  326:8 327:9,10
**adverse** 113:13
  223:13
**advertise** 153:5
**advertised** 34:4
**advertisement**
  34:5,15 38:10

[advertisement - allow]                                                    Page 5

| | | | |
|---|---|---|---|
| 38:16 53:23,23 | **afternoon** | 216:4,5,18 | **alarmed** 243:2 |
| 54:19 152:4,4,5 | 160:5 176:23 | 219:1 228:13 | **albeit** 187:19 |
| 153:16 | **age** 196:12 | 246:5 273:25 | **alcohol** 27:15 |
| **advertisements** | 265:4,9 267:19 | 290:11 | 27:18,19,24 |
| 32:25 33:1,17 | 267:20,20,21 | **agreed** 8:17 | **alinozi** 28:19 |
| 39:6 49:12 | 267:22,23 | 11:18 80:21 | **aliquot** 293:20 |
| **advertising** | 268:2,5,7,9 | 166:23 167:1,2 | **allegation** |
| 4:10 33:12,16 | 271:20,23 | 167:10 209:25 | 158:14 |
| 38:9 43:6 | 276:22 | 232:1 | **allegations** |
| 49:17,19 53:21 | **agencies** 202:15 | **agreement** | 137:13 295:4 |
| 150:20,21,23 | 203:1 231:9,11 | 162:24 214:16 | **allege** 158:3 |
| 152:24 153:9 | 234:12 284:15 | **agrees** 66:25 | 190:18 |
| **advice** 256:18 | 284:16,20 | 94:13 206:9 | **alleged** 133:3 |
| **advised** 309:13 | 285:7 288:4 | 283:2 | 162:15,24,25 |
| **advisory** 169:9 | **agency** 142:6 | **ahead** 24:22 | 165:16 177:6 |
| **advocated** | 147:6 169:6 | 60:18 63:15 | 177:17 178:5 |
| 285:19,19 | 289:17,23 | 75:10,20 76:3 | 198:21 281:17 |
| **affairs** 254:14 | **agent** 144:4 | 90:19 103:16 | **allegedly** |
| **affect** 125:2,6 | **agents** 231:10 | 110:12 126:3 | 166:11 178:23 |
| **affected** 33:1 | **ago** 47:11 | 132:21 156:3 | 190:20 |
| 122:16 231:12 | 104:23 115:2 | 169:2 211:19 | **alleging** 137:3 |
| **affecting** | 178:14 200:15 | 217:14 218:3 | 137:16 |
| 166:11 | 242:25,25,25 | 237:14 254:20 | **allen** 2:14 |
| **affects** 78:18,24 | 243:11 254:2 | 282:25 284:6 | **alli** 116:6 |
| 139:23 146:16 | 259:2 | 295:23 327:1 | **allison** 3:3 |
| **affirmative** | **agree** 18:6 | **ahera** 203:4 | **allison.brown** |
| 166:18 167:11 | 35:24 38:1 | **aim** 32:6 | 3:7 |
| 169:21 | 57:19,25 58:5 | **aimed** 77:21 | **allow** 9:12 |
| **affirmatively** | 58:13 72:4,5 | **air** 153:2 | 74:12 131:25 |
| 166:17 298:11 | 95:3 141:12 | 191:20 195:24 | 136:15 145:13 |
| 298:12 300:17 | 143:16 157:13 | 198:5 203:12 | 150:6 157:8,8 |
| 300:21 | 167:1 187:13 | 203:13 | 188:3 230:6,21 |
| **afforded** 25:9 | 189:12 190:3,4 | **akin** 236:10 | 246:6,6,7,15 |
| **afield** 123:16 | 205:14 209:14 | **alabama** 2:15 | 253:16 275:22 |
| 123:19 | 213:16 216:2,3 | | 291:16 295:17 |

**[allow - apologies]**

301:11 307:11

**allowance**
278:21

**allowed**  9:10,11
16:24 41:17
55:22 91:2,16
91:17 113:11
149:13 151:4
152:17 153:4
154:5 159:15
217:24 256:14
271:4 299:18
299:21 307:20
313:13

**allowing**  19:25
48:16 253:14
258:11,13
307:10

**allows**  159:3
218:22 222:16
299:12

**alluded**  52:1

**alterations**  80:3

**alternate**  26:18
304:25 305:2,8
305:10,11,13
321:12

**alternates**
305:6,8,9
321:15,16

**alternative**
16:25 25:2,5
80:16 92:6
93:16

**aluminum**
62:20

**alvin**  294:9

**ama**  293:16

**amazon**  297:6

**ambient**  190:14
191:19 192:7
192:15,22
193:7,15
195:21,21,22
196:13,15,23
197:3,4,6,8,16
197:17,20
199:1,18,19,22
200:22

**ambiguity**
217:18

**america**  32:14
32:20 34:25
35:1 121:16
174:3

**american**
105:19 174:23
175:15

**amount**  157:25
158:16 177:16
204:10 236:13
278:21 314:1

**amounts**
137:11,11,15
292:9,22,23
293:14

**analogy**  138:22

**analysis**  95:18
97:5 131:7

177:8,11,14,18
180:10 181:4
181:13,14,15
184:11 199:6
270:25 277:8
281:13

**analytical**
262:8 279:3

**analyzing**
123:5

**anatomic**
104:16

**anatomical**
280:24

**anatomy**  148:3

**anderson**
121:15

**andrew**  6:8
320:15

**anemia**  20:17
21:6,13,15
29:21,24 78:16
79:15

**announced**
297:1,2

**answer**  44:11
68:3 69:19
84:3 85:11,14
86:10 97:3,7,11
97:25 107:9,14
107:23 108:2
130:10 149:12
176:3 186:10
192:9,11,11,17
193:12 283:20

318:11

**answered**
193:5 307:21

**answers**  48:19

**anthony**  3:3

**anthony.balz...**
3:7

**anthophyllite**
201:14,24
204:7 208:6

**anthropology**
47:19

**anticipate**
30:13 41:9,10
140:20 295:14
328:4

**anticipated**
310:20

**anticipates**
321:6

**antitrust**  35:12

**anybody**  12:3
82:15 106:23
115:1 146:10
148:2 303:25
311:9 317:17
328:3

**anymore**  52:8
73:22 183:19

**anyway**  162:5
207:3 291:24
296:8 302:9

**apart**  81:14

**apologies**
131:14

**apologize** 290:1
**apparent**
260:12
**appeal** 312:5
**appeals** 38:11
**appear** 104:13
104:15 318:24
319:13
**appearances**
2:1 3:1
**appearing** 69:6
**appears** 22:22
69:19
**appellant** 26:22
**appellant's**
26:18
**appellate** 53:16
53:25 91:3,12
91:14,19
**applicability**
212:5,23
256:19
**applicable**
137:13
**application**
182:7 186:24
202:20 278:6
**applications**
179:4,16
186:20,22
188:6,7 189:8
189:10
**applied** 204:15
204:18 216:5
220:7 227:22

248:20 260:17
273:14
**applies** 18:8
51:11 100:9,10
108:18 114:16
264:15 275:17
327:25
**apply** 103:6
131:8 173:13
175:13,17
179:7,8 212:6
216:12,23
328:1
**applying** 261:9
275:15
**appreciate**
270:4 302:1
328:16
**approach**
47:17 326:16
**approaching**
119:25
**appropriate**
114:11 126:1
190:5 232:2
240:4 278:20
**appropriately**
225:9
**approved**
223:11
**approximately**
187:4
**arbitrary**
208:23 314:7

**area** 24:14
99:11 100:8
104:21 120:20
123:24 147:3
182:4 222:8,9
248:20 249:1,2
261:9 273:14
277:14 279:22
281:3
**areas** 122:16
**arguably** 236:7
**argue** 103:4
136:13 162:9
176:24 201:11
216:13 219:11
228:4 259:8
288:25 307:18
**argued** 228:5
**arguing** 18:21
68:1 75:17
92:12 275:12
275:14
**argument** 4:10
27:1,8 52:21
56:9 62:1
67:13,19 70:2
92:15 119:17
119:17,22
123:19 128:12
131:22 151:6
165:23 175:12
176:9 189:18
189:20,21
190:4 199:7
200:8 207:5

209:16 210:11
221:2 226:21
231:6 272:11
274:19
**arguments**
30:17 195:18
283:24 313:20
313:22
**arps** 3:4
**arrangement**
194:21
**arrive** 304:3
**arrived** 261:2
**art** 19:11 83:11
**artful** 23:8
**article** 14:10
28:10,12 47:6
50:7,8,8,9
61:15 70:3
71:12 77:12,20
80:7 81:13,15
81:21 82:23
83:6 84:9,10,11
93:19 99:8
109:2 111:2
112:12 142:10
142:18 143:5
144:19 145:4,4
145:5,5 147:3
147:16 148:20
182:1
**articles** 28:10
28:19 50:5,13
70:2 77:9,11
78:7 81:7

[articles - assumption]                                           Page 8

86:23 99:8
103:9 132:5,13
147:14,22
186:14
**articulated**
253:17,18
**asbestiform**
201:15,16,21
201:24 202:3,5
202:9,9 203:3
203:17,18
204:2,6 209:12
285:22
**asbestos** 44:3
45:4,6,9 57:13
57:14,21 65:20
134:11,14,17
134:18,22
136:11,18,19
136:21 137:2,7
137:11,15,22
138:5,12 139:5
139:5,9,10,11
139:22 140:1,6
140:11 173:22
173:25 177:5,7
177:9,16
180:11,22
181:17 190:14
190:21 191:12
191:14,18
192:6,15,21
193:25 195:8
195:14,24
196:2,2,18

198:4,4,10,14
198:20 199:1,6
199:23 201:2
201:13,16,18
202:7 203:1,2,9
203:9,14,16
204:10,11
205:6,16 206:6
206:11,23
207:6,12
217:12 225:6
225:16 233:13
234:5 284:9,13
285:2 286:14
288:4 292:10
292:13,20,23
293:14,19,22
294:24 295:2,6
295:12 299:22
303:8 305:16
**ascend** 248:20
**ashkenazi** 13:7
29:25 76:20
**aside** 46:10
279:18
**asked** 5:11 14:3
14:14 19:15
25:22 34:13,14
36:16 46:23
53:12,16,17
72:7 81:18
86:2 87:5
88:10 94:15
97:1 111:6,7
112:1 115:5

129:15,24
130:6 132:13
134:2 141:15
141:19 149:4
149:20 152:2,9
162:7 168:11
178:25 183:13
183:22 185:11
192:2,3 239:18
261:14 262:13
264:8 269:15
273:18 288:15
307:21 320:12
326:21
**asking** 23:5
37:24 74:11
89:8 104:17
113:22 176:3
183:5 197:2
249:6 280:7
301:19,21
304:19 317:24
**asks** 180:3
**aspect** 129:10
204:17 208:19
**aspects** 67:8
194:19 251:9
**assaying**
243:19
**assessment**
179:9 198:17
224:17
**assigns** 94:1
**assimilate**
143:21 144:20

**assist** 222:19
223:17
**assisting**
303:23
**associated**
15:15 26:11,14
77:19 80:4
97:15,16
114:15 223:24
224:18 229:12
233:2 241:22
242:6,10
302:24 311:17
**associating**
236:19
**association**
14:5 57:20
262:2
**associations**
46:5 104:15
263:22 264:6
**assume** 272:20
302:21
**assumed**
160:14
**assumes** 64:13
**assuming** 141:8
161:10,11
164:14 189:24
196:8 219:14
246:19 258:21
313:1 324:10
**assumption**
122:7 180:11
180:12,12

184:17,18,20
198:19
**assumptions**
163:11
**assure** 116:18
**astrophysics**
35:10
**attached**
140:23
**attempt** 95:24
307:17
**attempted**
253:17
**attempting**
26:25 79:4
**attention** 56:21
133:23 298:20
301:3 306:15
307:7
**attorney**
150:19,21,23
329:9,11
**attorneys** 2:2
2:18 42:3
151:8,24
153:23 194:2
207:17 312:1
**attribute** 37:19
**attributing**
278:17
**auspices** 53:19
207:15
**authenticity**
37:9

**author** 127:24
144:21,24
**authored**
162:15
**authoritative**
286:23 287:1,3
287:5,16,21,25
288:2,7 289:8,9
289:11,13
290:2,6,6,14,22
291:1,3,11,15
291:16,18
**authorities**
202:14 204:4
205:13,18
**authority**
174:24 233:17
244:12
**authorized**
329:4
**authors** 11:9,22
28:20
**automatically**
196:23 321:11
**automobile**
322:14
**availability**
321:9
**available** 5:11
247:11 285:12
286:22 310:11
**avenue** 3:5
**average** 51:7
174:15

**avoid** 42:14
**avoided** 42:7,7
**award** 278:21
278:22
**aware** 12:9
14:7,19 21:17
39:7,16,21,23
48:4 56:23,25
92:11,20
107:25 235:25
242:3,21
244:19 253:5,6
253:9,11
263:15
**awareness**
173:4 245:20
245:25

**b**

**ba** 313:14,14
313:14,14,14
**baby** 44:5
66:12 68:15
134:16 136:12
136:17,20
137:6,22 138:2
138:11,15
140:7,24
141:22 151:6
166:12 167:23
167:24 172:11
175:23 178:6
178:24 180:3,9
181:16 183:8
183:10,11
193:24 195:1,2

195:10,14
196:1 197:18
197:19 201:8
214:6 224:18
224:22 238:10
238:22 239:1
240:10,10,12
244:5 245:5
284:14 292:11
297:3,7,8,22
**back** 5:7 9:25
16:17 20:23
21:23 41:20
42:22 49:6
58:17 59:4
63:22 72:1
93:22 125:16
125:19 129:11
138:9 155:22
198:17 199:2
204:15 219:22
221:15,24
232:9 238:23
244:4 249:19
249:21 250:2
251:20 258:4
266:19 269:14
270:18 272:9
279:20 282:11
283:1 292:7
299:17 301:7
304:5 307:8,13
320:15 323:7
**backdoor**
237:18 287:15

287:20

**background**
52:9 78:14,23
81:17 196:15
196:16 211:15
258:19 269:10

**backs** 268:18
283:6

**bacon** 3:10,15
3:20

**bad** 5:6 41:4,7
157:9 158:20

**bailiff** 317:1,4
318:17

**ball** 70:24
130:8 205:23

**ballpark**
260:22 262:7

**ballparks**
260:19

**balzano** 3:3
62:2,6,12 63:11
63:16 64:1,12
64:17 65:18
66:3,22 68:25
71:5 72:1,11
73:6,11 74:15
176:23 177:2,4
178:4 180:22
185:18 186:4
188:11 190:9
190:13,16
191:3,8,22,25
193:9,16 194:5
194:13 198:16

199:21 200:1,9
200:18,23
201:2,5,20
202:12,25
204:13 207:11
207:22 208:25
209:2,14 210:3

**bank** 167:2,3,4
167:5,10,15

**bankrupt**
162:13

**bankruptcy**
4:12 156:9,12
158:19,20
159:14 160:10
160:12 161:1,3
161:5,7

**banks** 167:6,7
167:9

**bar** 207:7

**base** 137:23

**based** 4:24
26:11 29:1
38:10 39:11
45:21 46:1
56:5 60:14
64:4 65:22
68:2 69:3,23
72:8 78:3
81:23,24 89:6
90:1 91:21
106:21 115:19
126:23 131:23
132:12 134:3
140:21 141:1

144:14 145:9
148:5,23
161:20,21
171:17 178:18
186:17,22
193:3 196:25
197:9 198:18
198:21 199:13
210:20 212:19
220:21 224:19
225:1,2 233:5
240:4 243:8
248:13 250:24
253:7 272:23
274:18 276:23
280:24 297:3,7
313:24 314:7
319:2

**bases** 287:23

**basic** 189:11
317:9,13

**basically** 23:4
26:25 34:1,3,18
38:17,21 40:1
40:17 41:7
49:2,5,6 66:22
67:20,24 68:5
69:2 82:16
83:21 89:13
122:13 133:22
138:20 143:13
143:13 144:15
146:21 149:11
158:3,5 187:9
188:9 189:16

197:9 199:16
216:11,19
221:7 224:8
227:1 230:7,9
230:14,15
232:9 236:19
243:24 272:23
281:4 295:1,3
298:19

**basing** 20:6

**basis** 14:24
17:14 26:19
37:9 39:12
46:9 60:16
61:11 72:9
73:13,15 80:17
81:11 83:8
107:22 110:9
126:14 134:21
135:5 136:25
138:3 141:23
145:3 149:17
153:21 154:3,6
154:18 161:10
161:11 194:11
194:12,13,14
195:20 226:16
228:11,22
250:16 251:20
254:10 256:23
257:1 261:14
262:5 280:8
289:4 323:19

**batch** 292:19
292:25 293:1,2

**bathroom**
  309:1,15
**bear**  27:13 28:4
  223:22 241:20
  241:21 242:8
**bearing**  156:22
**beasley**  2:14
**beasleyallen....**
  2:16
**becoming**
  243:2
**bed**  185:13
**began**  45:5
  84:8
**beginning**  7:10
  7:19 42:22
  182:21 325:15
**begins**  280:18
**begrudge**
  262:22
**behalf**  2:2,18
  220:2 249:18
**behavior**  219:8
  236:20
**belief**  154:3
**believe**  6:24
  10:16 17:17
  29:9,22 56:17
  64:24 65:18
  67:8 71:2
  83:14 90:20
  99:13 118:19
  150:5,11 151:2
  151:3 165:15
  169:12 173:2

179:14 194:24
196:9,10,24
204:9 218:12
235:3,5 240:3
251:2 253:8
256:15 257:8
258:25 259:4
263:5 264:11
270:12 276:25
295:21 296:8
320:14 323:19
325:22
**believed**  155:11
**belongs**  90:3
**bench**  126:8
  304:6
**benchmark**
  56:20
**benefit**  174:15
  174:16 225:10
  225:12,13
**benign**  121:8
  123:12
**best**  13:17
  24:12 75:1
  106:18 108:12
  133:17 206:17
  297:9 315:13
  320:17
**better**  146:23
  177:5 253:23
  306:17 307:25
  322:25
**beyond**  36:19
  39:5 80:4

226:18 228:24
229:1 253:14
253:15
**bias**  50:18
**bifurcated**
  160:14
**big**  45:4 50:25
  51:1,2,4,4 52:8
  116:2,2 153:20
**bigger**  318:9
**biggest**  58:8
  117:7
**billboard**
  154:12,13
**billion**  51:21
**bills**  188:24
  189:1,12
**biologic**  143:1
**biological**
  19:13
**biologically**
  19:11
**biology**  21:24
  47:19
**birefringent**
  62:22 63:2,17
  63:18 64:4
  65:12,19 66:10
  68:8,17,21
**birth**  38:11
  182:25 183:19
  183:21
**biscayne**  3:16
**bit**  16:15 20:23
  20:25 42:19

62:12 76:16
111:13 116:16
156:11 177:20
179:19 221:16
269:10 271:18
318:9 322:11
**bladder**  309:9
**blah**  297:10,10
  297:10
**blame**  297:18
  298:1
**blank**  120:12
**blind**  103:14
**bodies**  43:9,9
**body**  69:8
  72:19,24 73:6
  73:16,21,25
  74:2,19 102:5
  114:17 139:11
  139:23 150:2
  194:15 262:15
  273:20 282:17
  282:18 283:8
**bogged**  272:11
**bolster**  57:17
**book**  42:25
  43:14,15 47:6
  148:2
**books**  32:17
  43:11
**born**  180:5
**borne**  95:22
  108:20
**bottle**  190:21
  190:22 191:1

195:16 199:5
225:7 228:9,15
228:17,19
229:3,4,9
292:10,21,22
293:21 294:11
**bottles**  172:18
177:6 184:1
190:19 195:10
201:9
**bottom**  103:12
103:17
**bought**  174:13
184:4 195:6
**boulevard**  2:5
3:11,16
**boyd**  4:8 24:21
25:3 75:6,8,13
75:22 76:15,18
79:9,13 80:1,7
87:1 89:2
91:20 92:1,6,21
94:16 95:4
**brain**  23:9
133:19 135:18
**branded**  225:8
**brandon**
316:20
**brca**  8:13 12:25
12:25 13:5,5,10
13:19,20 15:21
15:23 20:21,21
21:14,14,18,18
21:21,21,22,22
21:24,24 22:7,7

22:13,13 30:11
77:2 78:16,16
79:9,10,17,17
80:4,4 81:25,25
84:19,20 93:7
93:10,23 94:19
276:23
**breadth**  258:20
322:17
**break**  124:12
124:12 125:15
201:22 202:4
301:5 308:19
308:20,21,22
308:23 309:5,6
310:8 311:7
324:5
**breaking**
209:10 324:17
**breaks**  21:8
82:3 308:18,18
310:4,6
**breast**  8:12
13:2 20:19
21:17,18 24:17
29:21 77:15,22
77:24 79:17
80:6 84:18
93:20 263:17
**breastfed**
266:12
**breastfeeding**
266:11
**breaths**  96:7

**bridgeside**  2:5
**brief**  7:19
20:11,15
285:24 309:18
**briefing**  130:19
**briefly**  21:3
**bring**  5:23
23:24 56:20
160:18 166:2
242:17 288:23
304:9,10 307:6
**bringing**  154:7
154:21 318:23
**broad**  35:6
**broadly**  32:22
32:22 175:13
**broke**  105:10
**brought**  31:1
56:14 92:22
158:23 298:20
**brown**  3:3
116:6,6 121:1
151:16 305:24
306:5,8,12
316:5 317:20
318:14,19
319:21 320:2,5
323:16,22
326:5,18
327:15,23
328:4,15
**bucket**  211:2
218:2,4 220:17
220:18

**buckets**  210:12
211:2,12
**buddies**  46:5
**buildings**  203:9
**bulk**  201:5,6
**bunch**  31:16
62:20 202:13
202:25 207:6
290:2 297:16
305:25
**bundle**  207:18
208:12 209:4,8
209:13,15
**bundles**  206:22
206:23,25,25
207:4,13 208:2
208:3,7 209:8
**burden**  9:22
15:12 16:20,20
16:22 17:3,21
26:21 80:19,20
93:14
**burke**  10:16
**business**  218:6
303:3 316:22
**businesses**
43:10

**c**

**c.456**  8:7
**ca**  1:3
**calcifications**
68:10
**calculated**
198:18

[calculations - cancer]                                                Page 13

| | | | |
|---|---|---|---|
| **calculations** | **calm** 307:4 | 93:8,11,21,21 | 126:15,16,19 |
| 189:4,7 196:3 | **camera** 159:25 | 93:21 94:10 | 127:20 128:14 |
| **calculator** | 161:18 | 95:17,19,21,21 | 131:8,15,20 |
| 188:18 | **camping** | 96:1,3,4,11,15 | 134:20 136:22 |
| **calendar** | 178:22 184:15 | 96:15 97:5,6,9 | 138:5,24 139:6 |
| 320:12 321:23 | **canada** 172:23 | 97:10,15,17 | 140:8,11 |
| 321:24 | **cancel** 321:22 | 98:21 99:1,4,5 | 141:14,24 |
| **calendars** | 322:1 | 99:6,6,13,15,24 | 142:7,23 143:2 |
| 322:1 | **cancer** 7:25 | 100:2,6,10,10 | 143:4,9,12,17 |
| **california** | 8:12,19 9:2 | 100:14,15 | 143:20,21 |
| 212:17 219:7 | 11:3,13 13:2,2 | 101:7,10,14 | 144:8,12 145:1 |
| 255:19 269:19 | 13:19 14:6,11 | 102:3 103:1,21 | 145:3,19 147:7 |
| **call** 52:5 58:8 | 14:20 16:23 | 104:5,5 105:11 | 147:12 149:22 |
| 62:22 63:11 | 17:3 18:22,25 | 105:12,16,17 | 150:3 153:14 |
| 103:2 125:24 | 19:17 20:14,19 | 105:19,24,24 | 154:4 169:7 |
| 126:4 147:21 | 20:20 21:15,17 | 106:10,11 | 181:21 186:13 |
| 152:5 159:23 | 21:17,18 22:17 | 112:16,19,23 | 206:13 224:23 |
| 160:23 163:17 | 24:8,8,17,17 | 113:4,6,14,16 | 225:14 229:7 |
| 166:19 204:3 | 25:8 26:8,11,14 | 113:17 114:5,6 | 234:6 239:20 |
| 230:8,23 | 28:16,18,23 | 114:8,16,16 | 239:22 244:7 |
| 307:13 311:12 | 29:11,20 30:8 | 115:6,11,12 | 248:1,9,15,19 |
| 317:2,6 | 30:12,23 32:9 | 116:19 117:20 | 256:6,9 259:25 |
| **called** 21:5 | 35:4 36:20 | 117:24 118:1,8 | 260:7,20 261:7 |
| 29:21 64:8,20 | 39:4,17 45:6,13 | 118:11,13,14 | 263:13,17,18 |
| 65:5 67:10 | 45:14,15 51:6 | 118:16,25 | 264:14,20 |
| 127:6 152:6,7 | 54:21,21 57:21 | 119:4,7,10,14 | 265:6,12 266:1 |
| 152:19,20,20 | 57:22 76:10 | 119:21,23 | 266:9 267:24 |
| 154:13 162:16 | 77:15,16,17,22 | 120:1,3,8,11,15 | 269:7,22,22,23 |
| 184:20 194:19 | 77:23,24,25 | 120:18 121:10 | 269:23,25 |
| 203:4 206:21 | 78:3,5,21 79:3 | 121:11,16,22 | 270:9,10,12 |
| 227:11 282:16 | 79:17,18,23 | 122:6,12,16,17 | 271:4,20 |
| 284:9 293:16 | 80:6,12 82:1,5 | 122:18,20,20 | 273:10,17 |
| 310:3 | 82:7 83:5,21 | 122:21 123:4,8 | 274:22 275:1,7 |
| **calling** 63:9 | 84:2,18,18 | 123:13,20,25 | 275:8 276:13 |
| 122:5 311:2 | 90:10,23 92:19 | 125:11,11,13 | 276:22 277:1,2 |

277:15 279:23
280:1 281:5,21
292:8 293:5
320:9
**cancers**  8:15
79:21 82:5
97:2 98:7
101:6,8,18,19
103:20,22
104:11,13
105:6,8,14,21
105:23,25
106:3,6 107:23
108:8,15,19
109:8,14
114:18 115:18
122:1 123:15
127:18,21
131:19 265:8
265:19 269:13
269:14 271:25
**candid**  22:25
133:11
**candor**  233:23
**capable**  146:13
277:7
**capacity**  274:11
**carbide**  17:5
**carcinogen**
45:14 144:5,6,8
169:8 170:14
170:16 181:21
233:2,11,25
277:3

**carcinogenic**
104:6
**carcinogenicity**
141:18 173:23
**carcinogens**
142:8 181:23
277:5
**carcinoma**  76:7
99:7 100:20
102:18 103:2,6
115:9 120:3,13
121:6,18,21
145:20 148:11
149:12 155:2,3
155:5,10
**carcinomas**
122:9
**care**  23:15 43:7
43:9 67:18
138:1 187:23
215:16,17,20
224:25 225:25
226:1,6,8,12,12
227:16,17
228:7 231:16
231:19,23
234:24 235:1,9
236:3,5,15,16
237:17 241:10
243:21 245:8
245:20 246:13
246:18,22,25
247:2,6,16
248:7,7 252:15
252:24 315:7

319:3
**career**  31:8
71:14
**careful**  114:1
**cares**  231:13
266:10
**carolina**  2:6
320:6
**carry**  8:10
305:12
**caruso**  3:4 95:8
95:9,12 96:2
97:21,23 100:4
100:16 103:11
103:17 106:12
106:24 107:5
107:10,17
108:4 109:4,6
109:12,19,23
116:4,14
120:23 122:18
122:24 123:2
124:3 128:21
128:24 129:22
130:19 131:6
131:15 132:15
132:22 134:5,7
134:10,14
136:4,23
140:19 141:1
141:11 148:19
149:4,15 150:9
150:14 155:16
156:1 259:20
260:23 261:19

262:18 263:4
263:25 264:4
264:19 271:17
273:8 274:20
275:11 277:17
277:23 278:23
279:1 280:15
281:6 282:9
**case**  1:3 5:9
6:24 7:23
14:25 16:21
17:5 25:12,21
26:16,17 27:6
27:14,15,21
31:23 32:10
33:23 34:1
36:21 39:3
48:21 51:19,20
52:6,25 53:14
54:4,7,10 62:15
64:16 65:3
68:2 70:18,22
70:25 78:1
79:25 80:15
83:13 91:1,5
92:12 95:16,19
97:16 112:25
113:15 116:24
121:5 123:6
133:3 137:14
140:4 151:18
151:25 153:10
154:1,21
156:22 157:2
157:10 158:15

166:25 171:16
177:13,15,21
177:23 181:20
182:24 188:24
191:16,25
192:1,19,23
194:16 197:23
199:3 200:2,5,6
202:20 212:16
213:7,10
216:23 219:6
220:14 222:25
225:14 240:19
250:14 256:2,7
256:9,12
257:17 258:22
260:4,5 263:25
267:8,9,16,18
267:22 268:4,7
272:2 273:10
274:7,24 275:9
275:16 282:13
294:18 295:11
297:21 298:10
298:11,25
299:3 301:1
302:4,11
303:13 308:11
308:12 311:18
312:12,13,17
313:25 320:10
321:21 322:11
322:14,23,24
326:1

**cases** 20:20
27:4,5 33:7,9
34:9 41:25
46:20 47:8
51:15,18 53:14
53:22 54:1,7
55:6 57:1
58:20 59:4
60:3 81:3 91:5
93:1 99:3
113:5 131:16
150:25 159:1,2
181:19 194:16
220:25 251:6
256:9 271:2,3
301:15 302:24
305:17 316:9
**catching** 129:7
**category** 77:1
94:19
**caught** 236:16
**causal** 14:10
30:21 77:3
94:21 98:24
101:17 112:15
263:11
**causation** 26:18
26:22 79:5
80:16 120:7
124:21 125:2
131:7 140:5
248:12 259:22
264:1,6 267:3,4
267:6,9,15
274:2 275:3,19

275:19,24
276:1,14,19
277:8 282:14
**causations**
275:7
**causative**
116:22
**cause** 1:23
14:19 16:23,25
16:25 20:19
21:16 25:2,6,10
45:6,15 57:22
75:14 76:6,9
80:12 82:1,4,5
82:12,17 83:4,4
90:23 92:4,6
93:16 108:13
114:7 119:23
120:1,4,4,8
124:22 136:19
136:21 138:5
139:5 140:7,11
142:23 144:8
147:11 149:22
150:3 224:23
226:18 234:6
244:8 248:11
248:15,17,19
260:5,7 263:23
264:16 265:13
265:15,16
268:11,12,15
270:10 271:24
272:19,25
273:6,22

278:17 311:24
**caused** 25:8
27:1 51:7
83:21 96:10
111:21 143:12
145:20,20
149:11 181:21
275:8 276:13
277:2
**causes** 13:15
29:20 45:14
73:23,24,24
78:5 79:20,22
84:1 90:10
93:7 98:7
112:16 134:19
139:23 143:2
144:4,12 248:1
248:9 260:9
262:11 268:13
270:3,8,12
272:16 273:1,2
273:5,10,16
275:1 277:7,14
277:15,24
278:1,16,19
279:22 311:16
321:22
**causing** 9:18
143:4 145:1,2
148:11 225:13
240:24
**caveat** 258:14
**cavity** 99:17
283:5

[cc - circular]                                                        Page 16

cc  75:22
cease  266:1
cell  13:16 106:4
    111:23 115:18
    118:8,18 125:7
    125:25 264:20
    264:24 268:20
    269:6,7
cells  128:8
cellular  102:14
center  121:16
central  116:24
century  43:14
certain  4:5 30:7
    44:17 62:19
    101:5 208:2
    223:5 247:15
    247:18 274:16
    308:25 309:1,2
    326:25
certainly
    129:16 139:24
    146:13 157:2
    196:7 240:6
certainty  18:2
    18:5 20:3 77:3
    84:1 94:20
    145:22 193:13
certificate
    118:1 119:13
    329:1
certification
    221:20 222:13
    222:15

certified  222:7
    222:9
certify  329:4,8
cervix  280:22
    280:25
cetera  248:22
challenge  19:2
    133:12
challenging
    95:11 181:6
    246:24 322:12
    322:18
champagne
    294:11,13
chan  4:20
    15:14 125:2
    150:14 155:16
    155:23,25
    248:11 259:17
    259:22 260:6
    263:15 264:10
    265:6,17 267:2
    269:9,16
    273:18 275:24
    277:11,12
    281:23 282:14
    282:22
chan's  271:19
    272:7 273:9
    276:12
chance  7:11
    22:23 130:15
    136:11 178:3
    266:16

change  5:18
    244:13 294:20
changed  167:4
    200:11 323:8
changes  289:17
character
    210:19
characteristics
    277:3,5
characterizati...
    169:5
characterize
    70:7 111:9,10
    127:15 203:14
characterized
    184:8
charge  220:8
charged  167:8
chart  9:19,20
    11:2 121:17,20
check  116:12
checked  238:23
chemical  65:1
    65:21,24
    205:16 206:10
    206:12 277:6
    286:1,13
    288:24
chemicals
    138:16
chemistry
    47:19
cherry  40:17
    40:20 279:19

child  265:24
    266:12
children  33:16
    39:2 265:23,23
children's  5:12
    6:19
china  77:23
    172:1 175:3,4,4
choice  284:5,5
    296:12
choose  295:7
    301:25 305:8
chooses  290:20
chose  244:15
christine  329:3
    329:17
chromium
    141:3,20 142:3
    142:8 147:5
chrysotile
    292:10
church  2:11
cigarette  43:14
    52:22,23 55:17
    142:22 181:18
    181:19,20
cigarettes
    33:12 174:25
    181:23
circle  233:6
circuit  1:1,1,2
    1:24 158:17
    210:17
circular  152:13

[circumstance - collectively]                                        Page 17

**circumstance**
  224:21
**circumstances**
  247:10 300:23
**circumvent**
  235:14
**cite**  20:10,12
  70:2 106:18
  264:10
**cited**  13:25
  17:5 20:15
  47:9 71:12
  81:3 85:24
  86:20,23 88:18
  97:12 99:8
  101:2 111:13
  112:13 150:25
  172:25 213:10
  215:21,22
  265:6 289:24
  299:1,3
**cites**  77:8
  261:21 266:4
**citing**  58:1
  76:22
**citizen**  171:17
  175:15 239:8
**citizen's**  239:18
**citizens**  51:8
  238:21 239:17
  244:6 249:14
  299:19
**city**  3:11
**civil**  1:2

**claim**  154:6,6,7
  154:24 162:21
  163:9 174:10
**claimed**  295:11
**claims**  24:24
  153:23 158:23
**clarification**
  288:14 315:16
**clarify**  326:11
  326:19
**class**  21:6,24
  54:11,12
**classified**
  110:22 169:7
**classifies**
  170:15
**clean**  281:17
**clear**  8:5 10:21
  23:2 28:21
  34:23 42:17
  48:21 54:23
  100:18 108:14
  108:17 109:20
  120:6,24
  126:21,24
  129:6 130:4
  147:2 151:17
  151:20 152:1
  153:12,15
  181:3,9,12
  247:13 264:20
  264:23 269:8
  275:21 288:16
  293:25

**clearly**  69:12
  73:3 117:16
  138:6 212:15
  250:13 280:4
**cleavage**  204:3
  204:3 205:13
  206:18,20,25
  207:2 285:22
  288:24
**cleveland**  66:15
**client**  27:18
  29:13 34:4
  100:11 101:14
  102:4 113:16
  118:7,24
  119:20 152:2
  152:16 153:12
  294:5 309:11
  309:24
**clinic**  66:15
**clinical**  96:6
  108:9 110:20
  110:24
**clinically**  95:20
  122:8
**clinician's**
  111:16
**clinicopathol...**
  104:3
**close**  104:18
  110:19,23
  155:14 184:5
  262:8
**closer**  280:21
  281:3 282:6

  323:1,2
**closing**  189:20
  189:21 313:20
  313:22
**cloud**  145:9
**clue**  263:17
**coalition**  99:24
  239:22
**coauthored**
  30:9
**cobalt**  141:4,20
  142:4 147:5
**coconspirator**
  162:16 163:12
  164:20 165:5
  165:21
**coconspirators**
  164:12
**code**  96:3 105:3
**codes**  105:5
  111:12,14
  175:1
**cognizant**
  42:20
**cohort**  101:5
**collaborated**
  249:16
**colleague**
  100:17 151:18
  177:19 290:1
**colleagues**
  151:17
**collecting**  55:1
**collectively**
  279:25

| | | | |
|---|---|---|---|
| **college** 178:13 | 161:14,15 | 306:21 | 87:4,7,20,23,24 |
| 182:22 184:14 | 189:25 191:17 | **coming** 10:3 | 88:2,3,6,11,13 |
| 185:25 187:6 | 192:4 197:5 | 19:6,7 37:5,20 | 88:15,22 89:7,9 |
| **colorful** 200:7 | 206:14 211:14 | 113:20 136:9 | 89:14 90:2,21 |
| **combined** | 212:4 213:7,12 | 142:16 145:8 | 114:14 |
| 112:6 142:23 | 213:14,17 | 153:22 169:24 | **companies** 1:10 |
| 268:2 | 214:4,18 | 169:24 218:16 | 55:16 222:18 |
| **come** 11:1 | 215:14 216:6 | 226:5 239:11 | 223:3 237:24 |
| 19:19 23:4 | 216:19 217:20 | 250:1 252:13 | 252:8 |
| 27:4 28:6 | 218:14,19,22 | 252:21 284:24 | **company** 44:15 |
| 31:10 32:1,23 | 219:2,3,16 | 303:18 312:19 | 52:22 158:5 |
| 34:3 35:9,11,15 | 221:8,9 227:14 | 313:3 | 161:7 220:24 |
| 35:21 36:5,11 | 230:21 231:17 | **commenced** 5:1 | 223:10 224:21 |
| 36:24 38:21 | 233:17 234:16 | **comment** 50:4 | 224:25 225:2 |
| 40:5,12 48:17 | 235:21,24 | 251:3 285:15 | 226:9 230:15 |
| 49:5 50:8 | 242:22 246:2 | **commenting** | 234:1 247:9 |
| 55:14,23 56:2 | 246:10 249:5 | 250:17 | 249:12 251:5 |
| 76:13 78:11 | 252:4 273:21 | **comments** | 252:23 253:24 |
| 80:10,13 81:13 | 276:16,17,20 | 27:11 285:16 | 294:12 |
| 81:21 82:16 | 277:20 279:2,9 | 285:17 | **company's** |
| 85:15 88:24 | 279:14,20 | **commerce** 2:15 | 223:8 |
| 89:17,18 92:2,3 | 280:6 290:12 | **commit** 19:22 | **compared** |
| 93:16 94:7 | 291:9 299:14 | **commitment** | 48:16 135:12 |
| 98:1 106:4,9,14 | 302:25 304:1 | 323:5 | 138:18 189:22 |
| 106:17,21,24 | 308:7 309:22 | **committed** | 300:10 324:22 |
| 110:5 118:6 | 312:20 314:2 | 316:1 | **compilation** |
| 119:20 125:15 | 319:3 323:19 | **common** 87:20 | 147:4 |
| 130:9 134:15 | **comes** 38:3 | **communication** | **complain** 19:25 |
| 135:7 137:5,16 | 81:23 116:9 | 231:5,20 | **complained** |
| 141:13,21 | 139:11 157:18 | **community** | 272:20 |
| 142:18 143:13 | 181:20 258:4 | 18:17,19 28:1 | **complaining** |
| 143:15 145:1 | 284:10 286:2 | 85:4,8,10,18,19 | 206:18 243:6 |
| 145:14 147:21 | 300:21 318:22 | 85:20,22,25 | **complaint** |
| 148:1,5,12 | **comfortable** | 86:4,5,8,9,12 | 187:19 |
| 155:22 159:4,7 | 7:8 76:8 | 86:13,16 87:2,2 | |

**complaints**
25:23
**complete** 64:6
65:11,25 66:18
130:8 170:9
177:18 321:6
**completely**
34:19 112:15
137:1,2,12
151:23 179:10
180:13 247:4
260:18 268:4,8
**complex** 135:2
180:17 229:20
**complexity**
313:25 314:7
**complicated**
197:7 198:20
200:25 201:2
229:19
**complied** 212:9
215:4,10
217:22 220:5
324:11
**comply** 211:23
215:6,10 217:5
217:22 221:10
224:6,9,13
235:2
**composition**
64:23 65:1,21
65:24 67:21,24
205:16 206:10
206:12 286:1
286:14 288:24

**compound**
277:6
**comprehensive**
137:17 141:15
142:12,13
143:8 147:8
240:5
**computer** 8:3
75:5
**conceded**
277:25
**concedes** 274:6
**concept** 60:14
**concern** 107:4
321:13 322:10
322:13
**concerned**
113:12 241:4,5
301:18 317:17
321:19 324:14
**concerns** 108:6
108:12
**conclude** 48:8
66:20 70:22
263:10
**concluded**
234:25 328:20
**concludes**
147:10
**concluding**
39:13 67:25
68:1 71:24
260:6
**conclusion** 23:4
40:5 48:13,17

73:9 74:12,13
78:11 81:14,22
81:23 92:18
104:1,8 125:3
131:4 217:21
218:15 227:2,3
227:10 261:3,3
**conclusions**
11:9 40:10
271:8 283:11
283:12
**conclusive** 17:1
22:9 87:7 94:9
**conclusively**
13:22 16:22
18:20
**condition** 133:3
309:16
**conditions**
269:13
**condom** 221:24
222:1
**condoms** 238:5
**conduct** 161:18
199:5 236:20
**conducted**
177:15 247:10
**conducting**
131:6
**conduit** 55:5
145:6
**conduits**
143:13
**confer** 30:12
263:17 325:8,9

326:5 327:24
**confident**
148:15
**confirm** 40:22
274:12
**confirmatory**
65:17
**confirmed** 56:6
124:14,15
272:7
**confirming**
60:22 82:10
129:1
**conflated**
108:10
**conflicts** 50:11
50:14 133:6
**confused** 209:5
**confusing**
29:18 195:19
**confusion**
77:11
**conjecture** 81:2
**connect** 28:15
**connected** 82:7
329:11
**connecticut**
2:11
**connection**
14:10 17:2
20:9 22:9,15,17
26:7 27:23
28:8 29:10
30:21 98:24
101:18 173:3

[connection - contraceptives]                                    Page 20

184:7 186:13
191:11,16
198:23 199:3
**consensus**
144:3
**consequences**
312:22
**conservative**
181:25
**consider**  56:10
68:13 98:23
111:3 112:2,22
132:6 135:14
267:20,21
271:10
**consideration**
175:18 269:3
**considered**
30:17 76:5
99:18,21
101:11,17,20
112:24 113:8
130:4 132:2
134:18 147:2
232:25 272:17
283:23
**consistent**
10:18 70:11
71:19,23 92:13
139:12 225:7
225:17 233:25
247:20 253:18
259:3 295:22
**consistently**
44:16 92:14

**conspiracy**
162:18,19,21
162:23 163:4,6
163:7,14 164:8
164:10,13,18
164:24,25
165:2,3,4
166:10,15,16
166:17,18
167:8,12,14
**constituent**
141:14
**constituents**
138:12 140:6
140:11 142:5
142:22 144:11
187:22 228:10
248:17
**construction**
198:12
**consult**  222:17
222:18
**consultant**
210:16 211:21
252:1 254:2
**consultants**
222:20
**consultation**
121:15
**consulted**  220:1
221:23 222:1
237:23,25
252:9,10
253:24

**consulting**
222:8 245:23
**consults**  227:25
**consumer**  1:9
1:10 174:16
284:9 297:13
302:17
**consumers**  43:2
174:12 231:5
**consuming**
27:18
**consumption**
27:15
**contact**  5:7
139:12 145:1
293:19
**contained**
39:12 140:1
190:21,25
**containing**
139:10
**contains**  136:18
173:21 218:5
**contaminant**
67:3 70:23
**contaminants**
58:11 73:2
74:20
**contaminated**
134:17,18,21
137:6 292:20
**contamination**
59:2 66:14,23
68:24 69:15,18
70:20 72:12,13

72:21 73:1,8,10
74:5,19 136:12
203:25 292:14
**contemplating**
326:10
**contemporan...**
164:7 167:19
168:8 325:22
**contend**  160:11
**context**  31:17
40:24 41:21,22
42:6 44:22,23
45:16 49:11
52:11 54:24
76:20 116:17
175:8 194:23
197:22 223:19
229:25 232:20
243:14 250:7
250:11
**contextually**
41:6
**contiguous**
100:22 111:20
127:8
**continue**  18:18
63:5 164:1
**continued**  3:1
51:10 167:25
183:13
**continuing**
174:21
**contraceptives**
266:7,9

[contracted - count]                                                      Page 21

contracted
  118:25
contradicted
  44:18
contradicting
  266:18
contrary  56:11
contrast  104:1
contribute
  19:13 30:8
  141:17,24
contributed
  27:20 276:22
  277:1
contributing
  261:7 277:21
control  183:19
  183:22 237:7
  258:18 293:11
  294:4 299:10
controversial
  272:2,3 299:11
controversy
  169:1 268:21
convened  206:2
conversation
  23:21 89:15
  109:22 118:22
  124:8 126:14
  128:15 159:25
  251:20 254:10
  327:11
conversations
  126:13

convicted
  166:23,24,25
convoluted
  201:1
copy  16:10
  124:13 207:20
  257:9 280:15
  280:17
core  80:3
corn  73:19
corp  4:12 17:5
corporate
  31:11 32:6,7,24
  32:25 35:22
  211:4,6 219:8
  219:10 221:11
  250:6
correct  58:7
  59:16,19 74:10
  79:24 91:7
  106:12 122:24
  128:16 130:7
  136:5 172:15
  178:1 275:11
  276:10 282:9
  289:24 291:22
  300:4 306:5
  307:7,12
corrective
  298:21,23
correctly  75:22
  217:17
correctness
  26:1

correlate  18:22
  18:24 83:25
correlates
  19:17
correlation
  8:14,18 12:19
  12:20 19:7
  20:13 24:7,16
  38:13 80:2,8
  81:8,20 82:6
  83:7 84:10,13
  85:16 87:1
  88:6,19 93:20
  98:2 263:11
corresponden...
  121:14
cosmetic  34:15
  211:24,25
  221:23 223:1
  223:22 225:10
  225:13 228:1
  238:6 240:14
  242:12 243:15
  247:9 252:8,8
  253:22,23
  254:5
cosmetics  212:6
  212:13 222:21
  223:6,8,20
  237:22 238:13
  242:13 245:22
  247:8 249:18
  258:9
cost  236:13

costs  312:1,12
couch  9:16
counsel  4:10
  8:2 22:24 23:1
  29:4 30:18
  38:1 48:6,11
  51:13,14 54:14
  67:12 92:12,15
  100:1 103:9
  104:25 111:6
  111:12 157:19
  157:21 163:25
  164:2 170:25
  185:20 186:5
  190:18 192:1
  207:20 208:25
  220:22 224:1
  244:14,14
  245:10 249:8
  253:17 266:23
  268:14 270:4
  272:12,15
  275:12,14,18
  283:24 291:5
  291:12 306:2
  307:25 325:2
  326:6,20
  327:24 329:9
  329:11
counsel's  67:19
  272:10 276:2
counseling  20:7
counsels  15:19
count  162:19
  163:4,6 164:8

| | | | |
|---|---|---|---|
| 164:10 203:22 | 213:19 244:11 | 66:1,20 67:7,18 | 122:11,22,25 |
| 203:23 206:20 | 283:15 303:14 | 67:23 69:17 | 123:18 124:6,8 |
| 207:3 | 326:13 | 70:9,15 71:4,18 | 124:11,16 |
| **counted** 105:3 | **courses** 43:4 | 72:4 73:5,7 | 125:15,19,22 |
| 186:22 206:19 | 47:18 255:1,6 | 74:8,23 75:10 | 125:24 126:2 |
| 206:21 | 256:17 | 75:17,20,25 | 126:10,12 |
| **counter** 23:6 | **court** 1:1,24 | 76:3 77:5 78:9 | 127:13 128:12 |
| **counterpart** | 5:2 7:1,8,13,17 | 78:11 79:7 | 128:19,22 |
| 188:21 221:17 | 8:2 9:4 10:2,7 | 81:12,18 82:11 | 129:13,17,20 |
| **counting** | 10:13 12:3,15 | 82:13 83:12,15 | 129:24 130:11 |
| 203:11,19 | 12:22 13:21 | 83:17,20 84:4 | 130:23 131:4 |
| 204:1,16,21,22 | 15:2,9,17 16:3 | 84:25 85:12 | 131:11,21 |
| 205:3,4,11 | 16:12 17:10 | 86:2,10,15 87:3 | 132:17,21 |
| 208:17,21 | 18:15 19:15 | 88:8,20 89:4,22 | 133:8 134:6,9 |
| 209:6,7,21 | 20:12 22:18,21 | 90:13,17,24 | 134:13 135:8 |
| **countries** 176:1 | 24:18,22,25 | 91:1,2,3,4,8,19 | 136:15 137:19 |
| **country** 91:6 | 25:13 26:15,21 | 91:24 92:9,23 | 137:25 138:7 |
| 172:17,20 | 29:4 30:2,13,16 | 92:24 93:3 | 138:14 139:7 |
| 173:12,23 | 30:16,19 31:15 | 94:1 95:2,6,10 | 139:16,20,25 |
| 174:2,8,14 | 31:24 32:12,18 | 95:25 97:19,22 | 140:9,13,18,24 |
| 176:7 211:8 | 33:5 34:23 | 100:1,5 101:12 | 141:6,23 142:9 |
| 285:7 | 35:24 36:8 | 102:2,8,19 | 142:15 143:3 |
| **county** 1:1,17 | 37:4,14,17,24 | 103:9,14 106:7 | 143:10,23 |
| 70:19 | 39:11,20 40:23 | 106:23 107:2,6 | 144:13,23 |
| **couple** 16:6 | 41:1 42:10 | 107:7,13,20 | 145:19,23 |
| 57:12 73:11 | 48:5,25 51:13 | 109:2,5,7,17,21 | 146:3,14 147:9 |
| 94:4 102:13 | 52:16,17,24 | 110:12,22 | 147:13 148:5 |
| 110:13 160:8 | 53:4,6,8 54:14 | 111:5 112:7,18 | 148:17,22 |
| 181:13 201:9 | 54:23 55:22 | 113:10 114:12 | 149:7,19 |
| 254:25 255:6 | 56:8 58:4 | 114:20 115:10 | 150:10,17,21 |
| 284:22 307:15 | 59:14,17,20 | 115:15 116:1,5 | 151:13 152:17 |
| **course** 14:18 | 60:24 61:18,23 | 116:18 117:13 | 153:18 154:8 |
| 36:18 156:2 | 62:5,9 63:4,8 | 118:3,9,14,21 | 154:25 155:18 |
| 170:25 173:19 | 63:13,22 64:10 | 119:16 120:11 | 155:22 156:2 |
| 175:12,13 | 64:15 65:15 | 120:17,21 | 156:16 157:1,7 |

| | | | |
|---|---|---|---|
| 158:2,10 159:6 | 202:11,16 | 252:7 253:18 | 298:18 299:23 |
| 159:19 161:8 | 204:8,24 205:7 | 253:20 254:12 | 300:1,8,14,25 |
| 161:17,24 | 207:10 208:17 | 254:16,20,21 | 301:20 302:7,8 |
| 162:4,9,19 | 209:1,13 210:1 | 255:2,5,10,11 | 302:19 303:14 |
| 163:2,16 164:6 | 210:4,8 211:10 | 255:17,18,20 | 304:6,24 305:1 |
| 164:10,21 | 211:15,18 | 255:23,24 | 305:4,7 306:1,4 |
| 165:18 166:4 | 212:17 213:3 | 256:3,4,4,5,10 | 306:6,9,13 |
| 166:13 167:19 | 213:12,22 | 256:15,16,23 | 309:17,24 |
| 168:4,14,18,21 | 214:7,25 | 257:3,7,10,14 | 310:11 311:21 |
| 168:23 169:2 | 215:12 216:1 | 257:19 258:11 | 312:2,5 314:17 |
| 169:20 170:20 | 216:15,17 | 259:1,12,15,19 | 314:23 315:5 |
| 171:4,7,11,19 | 218:3,10,18 | 260:22 261:18 | 315:24 316:17 |
| 171:22 172:4 | 219:7,13 220:3 | 262:16,25 | 317:2,5,21 |
| 172:13,16,19 | 220:7,16 221:1 | 263:3,24 264:3 | 318:15,21 |
| 173:5 174:1,18 | 221:6 222:9,11 | 264:18 266:19 | 319:25 320:4 |
| 174:24 175:16 | 222:15 223:25 | 268:6 271:16 | 320:20,25 |
| 175:20 176:10 | 225:24 226:4 | 272:10 274:14 | 321:5,5,6 |
| 176:15,21 | 226:20,23 | 275:5,12 276:8 | 323:11,14,21 |
| 177:1,3 178:3 | 228:4,13 229:4 | 277:11,16,22 | 323:23 324:22 |
| 180:20 181:1 | 229:15 230:3,5 | 278:7,24 | 325:1,3,4,7 |
| 182:12,19 | 230:19 231:13 | 279:11 280:5 | 326:12,15 |
| 184:20 185:14 | 232:14,22 | 280:19 282:3 | 327:6,8,21,25 |
| 185:24 186:2,8 | 233:7,17 | 282:19,22,25 | 328:7,17 329:7 |
| 186:25 187:6 | 234:15 236:1 | 283:13,22,22 | **courthouse** |
| 188:4,8,14 | 237:3,23 238:2 | 284:6 285:5 | 1:17 5:12 6:19 |
| 189:3,6,24 | 238:14 239:2,6 | 286:5,10,17,20 | **courtroom** 1:25 |
| 190:7 191:1,5 | 239:10,25 | 286:23 287:1,3 | 5:6,8,10,12,16 |
| 191:21,23 | 240:8,21,23 | 287:24 288:6 | 6:11,11,16 |
| 193:8,11 194:3 | 241:1,15,24 | 288:12 289:6 | 90:14,15 |
| 194:8 196:20 | 242:20 243:8 | 289:14 290:5 | 117:12 126:7 |
| 197:2,12,14 | 244:2,13 245:3 | 291:4,22,25 | 127:25 303:19 |
| 198:15 199:7 | 245:7,16 246:5 | 292:3,17,24 | 303:21,24 |
| 199:25 200:3 | 247:6,12,23 | 293:7 294:5,22 | 304:1 309:20 |
| 200:14,20 | 248:4,23 249:3 | 295:16 296:2,7 | **courtrooms** |
| 201:1,4,19 | 249:21,25 | 297:20 298:3 | 5:10,16 6:14 |

courts  53:16,25
  91:12,14 211:8
  211:11 217:24
  218:15 219:2
  255:23
cover  66:17
  310:17 321:16
creates  24:7
  229:11
credentials
  263:19
credibility
  145:9 154:7
credible  248:1
credit  263:18
criminal
  166:25
criteria  173:22
critically  43:10
criticism  188:1
criticize  187:24
crohn's  309:13
cross  9:7,10
  11:19 14:14,16
  15:12 26:2,3
  42:14,16 53:9
  61:24,24 67:11
  75:2 112:1
  114:2 128:21
  186:18 200:7
  250:19 258:2
  271:11 272:22
  278:15 286:15
  291:2 326:13
  326:14

crunching
  17:10
crutcher  2:19
crystalline
  173:21
crystallizing
  173:25
cumulative
  136:16 246:1,7
  275:22 276:15
  282:16
curative  146:6
  146:8
curious  304:21
current  8:10
currently  24:4
  77:18
curriculum
  255:12
curve  130:8
customers
  56:18
cut  9:4 163:2
  188:15 315:18
cv  258:9
cvn  305:16,25

**d**

d  4:1
dabbling  252:1
dade  1:1,17
damaged  78:19
damages  157:1
  157:4,18,23
  160:20,21
  161:17 174:10

174:20,21
  175:6,21 176:2
  266:3
damaging
  30:10
danger  173:16
  257:21
dangerous
  152:21 173:24
  205:13 286:15
dangers  172:24
  173:4
dartmouth
  269:18
dastardly
  151:24
data  8:10 94:18
  101:11 240:6,6
  262:8 270:24
  279:8 281:7
database  28:22
  46:19 229:23
date  165:10,15
  168:1,1 179:21
  180:7,8
dated  329:14
dates  293:3
daubert  7:6
  9:11,11,21
  10:18,19,22
  15:11 17:8,11
  17:12 18:8
  19:1 23:15,17
  25:15 26:2
  27:10 28:3,3

29:12 40:15
  41:16 52:18
  85:2,14,18
  87:25 88:23,25
  89:1,5,5,21,23
  92:16 94:7
  95:1 97:18
  98:13 133:2
  155:19 177:1
  207:9 252:3
  257:10 267:13
  281:9
dauberts
  150:12,16
daughters
  270:15
day  6:15 23:22
  154:12 179:4
  179:16 186:16
  186:16 189:8
  233:15 242:14
  254:17 310:4,6
  310:7,8 311:1
  315:17 316:2
  316:22 320:25
  321:22 322:3
  329:14
daydreaming
  322:21
days  31:13,15
  33:11 41:20
  42:3,5,18,21
  46:8 53:9
  177:24 179:5,5
  179:16 189:9

**[days - demonstrate]**

254:22,25
257:2 320:3,4
322:25 323:1,6
**dca** 17:4 80:21
294:10
**deadly** 225:14
**deal** 6:7 15:25
47:22 50:25
51:1,2,4,5
177:15
**dealing** 111:22
202:1
**deals** 147:4
177:16
**dealt** 112:3,5
148:15 233:20
234:10,11,11
**death** 118:1
119:13,23
120:2,4 153:13
183:3 184:5
185:13 196:13
**debate** 207:7
285:21
**decade** 195:11
195:11,11
**decades** 111:18
196:18 248:3
**decedent**
177:22 178:13
179:13
**decide** 160:3
185:22 216:21
278:19 314:8

**decided** 56:25
152:3 297:9
299:24
**decides** 324:18
**deciding**
300:10
**decision** 4:24
48:8 91:3
92:21 160:17
232:15 256:11
259:5 295:19
301:8 312:14
**decisions**
133:21 290:19
303:3
**decrease** 27:16
**dedicated**
85:20
**deem** 278:14
**deemed** 272:16
**deep** 306:23
**default** 23:10
**defect** 195:17
293:11 294:3
297:12 298:13
299:5 302:13
302:15,18,22
**defective**
297:13
**defects** 78:3
**defend** 25:1
302:24
**defendant** 7:2
13:25 16:21
151:10 152:18

155:11 156:17
156:19 158:1
286:3 293:11
**defendant's**
12:6,12
**defendants**
1:12 2:18 7:22
14:15 17:4
27:13 31:1,10
31:21 32:7
42:13 43:16,25
45:20 76:17
80:20 101:3
103:4 111:25
150:24 160:11
160:15,24
161:2 162:13
169:4 171:12
173:3 176:24
184:8 186:18
187:17 190:10
191:4 195:7
197:22 210:9
211:22 212:8,9
214:5 215:10
218:6,7,17
284:7 288:22
293:12 298:15
304:22
**defense** 17:13
26:23 30:24
62:5 75:18
95:6,9 113:12
118:23 127:16
128:19 153:19

156:4 288:23
311:3
**defense's** 57:9
**define** 203:1
**defined** 99:3
**defines** 99:10
**definitely**
300:16 317:4
**definition** 97:9
196:15 197:20
225:7
**definitions**
202:13
**definitive** 10:5
**definitively**
25:8 64:19
65:2,19 66:6
269:2
**defraud** 44:10
**degree** 10:13
17:22 18:2,5
19:17 20:3
26:20 52:15
77:3 80:18
83:25 94:20
102:21 113:9
180:23 193:13
220:11
**degrees** 47:13
**deleterious**
13:9 78:17
**delivered** 55:2
**delve** 58:16
**demonstrate**
77:16 223:4

**demonstrated**
  20:19 77:13
**demonstrating**
  39:8
**denied**  57:3
  62:1 75:4
  134:4 168:7
  210:1 258:12
  283:24 307:2,3
**deny**  18:25
  62:10 67:13
  119:24 291:18
  295:3
**denying**  200:22
  309:5,8
**deodorant**
  184:19
**department**
  305:15
**depending**
  300:18 310:9
**depends**  106:13
  167:16 171:20
  201:20 322:23
**deposed**  117:10
  129:21 132:10
  132:10
**deposition**
  11:18 26:10
  34:14 36:15
  46:13 50:5
  54:17 67:1
  75:24 76:4
  77:10 78:9
  83:3 94:8,11,15

97:12,20 106:2
106:25 107:2,7
112:2 115:2
120:25 124:15
129:15,18,19
129:20,22,25
130:2,18 134:2
179:18,20
180:17 182:16
183:1 186:3
187:7 192:2,18
192:25 230:10
263:21 310:13
310:16 314:20
314:24
**depositions**
  8:17
**derive**  127:4,8
  128:8
**describe**  20:17
  261:2 273:11
**described**
  260:7,10 263:7
**deserves**
  278:14
**design**  52:23
  113:3
**designated**
  169:13
**designation**
  4:15 48:14
**designations**
  314:24
**despite**  105:1
  108:16 233:11

**destroys**  65:7
**detail**  139:19
  149:5
**detailed**  256:24
**details**  185:8
**determination**
  58:25 121:2
**determine**
  65:19 136:11
  224:17 262:10
**determined**
  142:7 144:7
**determining**
  263:22
**develop**  103:22
  109:9 112:19
  127:21
**developed**
  111:3
**developing**
  8:12 94:10
  281:4
**development**
  112:23
**device**  60:12
  223:15 238:6
**devoted**  31:8
**diagnosed**
  113:14 117:18
  118:12 125:5
  153:17 265:5
  265:10 292:8
  294:6
**diagnosis**  68:6
  71:6,7,9 72:3

121:10 128:13
260:8 271:15
272:2,3,6 293:4
**diagram**
  183:20
**diana**  178:19
**diaphragm**
  167:24 168:2
  179:23 180:4,8
  183:16 261:6
  261:11,24
  262:7 266:17
  279:4,12,13,15
  279:25 280:22
  280:23,25
  281:14,16
  282:4,5 283:5
**diaz**  160:23
**dibbling**  252:1
**dicta**  112:11
**die**  100:12
**died**  100:11
  118:7,25 119:3
  119:20,25
  153:17 182:15
  182:16
**difference**
  21:21 27:22
  54:7 93:3,12
  98:6 104:18
  111:13 115:15
  116:2,3 126:17
  132:25,25
  143:25 147:18
  209:6 259:6

300:9
**differences**
103:10 104:2
104:10 105:20
108:14 113:9
259:24
**different** 17:12
52:12 55:24
64:8 65:13
74:20 95:21
96:3,4,12 97:2
98:8,11 100:2,2
100:5 102:19
102:21 103:20
103:22 104:6
104:11 105:4
105:13,23,25
106:5,6 108:22
109:9,15,17,18
109:19 110:3,4
111:7,18
112:15,20,22
117:3 119:8,9
122:14 123:22
124:2,4,5
125:11,12
127:7,19,21
128:5,9 137:1
137:12 154:9
168:19,21
172:10 176:6
186:14,15
191:7 194:21
200:19 205:2
206:11,12

223:15 225:20
231:7 232:11
259:5 260:9,24
262:25 263:9
268:20 281:24
294:23 297:25
320:8,10
326:21 327:2
**differential**
71:6,7 72:3
260:8,14
266:15 271:10
271:15
**digested** 191:11
**digestion** 65:6
66:5 190:24
**diminish** 27:1
**diminishes**
119:18 123:20
**diolombi** 3:10
304:25 305:2,3
305:5
**dire** 315:23
316:11
**direct** 19:6 46:9
53:9 227:1
306:20 317:15
326:7 327:18
**directly** 288:20
**disagree** 25:13
36:9 94:5
98:10 154:25
156:1 235:20
243:14 255:7
256:21 302:19

312:6
**disagreed**
224:1
**disagreement**
24:2,3 280:4
**disavow** 56:17
**discern** 67:24
**disclosing** 58:2
**disclosures**
50:5,16
**discontinuation**
296:13 300:7
**discontinue**
4:24 299:24
**discontinued**
297:16,22
300:3
**discounted**
278:15
**discovered**
122:13
**discovery** 39:16
**discuss** 57:4,6
156:25
**discussed**
140:21
**discussing**
104:23
**discussion** 21:1
90:16 98:11
**disease** 95:15
99:7 100:21
101:20,24
103:1,3,6 111:4
111:15 119:15

130:5 309:13
**diseases** 99:10
**disjointed**
318:18
**dismiss** 277:25
**dismisses**
264:22
**disparaging**
153:22
**disprove** 92:4
**dispute** 73:4
213:22 214:2
319:23
**disputes** 73:3
116:19
**disqualifies**
59:23 108:2
**disqualify** 5:24
215:8 321:11
**disregard**
96:24 146:9
149:2 258:5
**distinct** 104:14
105:6,8 122:1
123:14,14
**distinction**
126:22 127:10
231:2 232:5
**distinguish**
202:9,13
**distribute**
103:11
**distribution**
175:23

| | | | |
|---|---|---|---|
| **district** 46:19 | 167:17 182:2 | 218:22 219:3 | 227:19 231:14 |
| 312:5 | 247:17,23 | 219:10,15,15 | 243:10 250:10 |
| **division** 1:2 | 250:21 251:16 | 220:21,24 | 250:11 259:7,7 |
| **dna** 21:8,9,11 | 285:2 286:6,7 | 221:12 229:17 | 270:21 282:16 |
| 82:4 271:23,25 | 286:17 288:2 | 229:21,25 | 284:23 291:24 |
| **doctor** 14:15 | 288:18 303:7 | 232:8,10,20 | 306:21 308:10 |
| 37:18 52:5,5 | 324:6,19,24 | 233:2,6 234:17 | 308:11 312:9 |
| 55:19,19,20 | 325:1,14,16 | 234:18 237:6,9 | 313:9 315:12 |
| 63:6,7,8,10 | 326:2,17 327:4 | 237:11 246:17 | 318:13 327:2 |
| 71:20,21,22 | **documentation** | 246:19 247:15 | **domestic** 4:15 |
| 86:2 87:24 | 182:11 | 250:7,17,20,23 | 169:9,13 173:1 |
| 89:18 121:19 | **documents** | 251:4 253:7 | **dominant** |
| 124:7,7,17 | 4:13 31:17,18 | 286:3 323:17 | 21:25 |
| 131:11,12 | 32:2 35:16 | 323:18,25 | **door** 171:5 |
| 132:17,20 | 36:12,14,25 | 324:2,12 | 295:5,8,9,17,18 |
| 135:11 141:10 | 37:5,6,7,10,11 | 325:10,14,18 | 295:19,22 |
| 147:19 152:20 | 37:19 40:8,18 | 325:18,24 | 300:19,24 |
| 189:16 224:5 | 40:20,21,22,23 | 326:7,12,25 | 301:6,9,10,12 |
| 269:11 277:4 | 41:12,21,22 | 327:4,9,13,17 | 301:22,24 |
| 277:13 279:13 | 42:4 44:14 | 327:19 | **dosage** 187:19 |
| 327:3,17 | 45:18 46:1,11 | **doing** 5:4 18:7 | 187:21,25 |
| **doctor's** 121:17 | 46:13,14,21 | 38:24 46:9 | 188:2,4,14,15 |
| **doctorates** | 47:1,2 49:10,12 | 47:25 49:10 | 188:18 |
| 35:11 | 49:19,20,24,25 | 63:13,14 109:1 | **dosages** 186:16 |
| **doctors** 12:12 | 52:10 53:22 | 131:21 137:17 | 187:23 |
| 68:6 85:5,6 | 55:2,3,4,8,12 | 139:3 142:9,10 | **dose** 188:6 |
| 96:6 122:22 | 56:2,4 134:23 | 144:13 146:13 | 283:16 |
| 209:20 262:23 | 134:24 135:2 | 147:18 151:24 | **doses** 187:16 |
| 270:7 271:4 | 142:1 162:12 | 156:7 160:16 | **double** 21:8,11 |
| **document** | 162:14 165:10 | 161:9 175:9 | 82:3 |
| 36:23 38:3,3,4 | 165:15,18,19 | 180:16 187:10 | **doubt** 226:19 |
| 41:2,3,5,6 | 165:20,21,24 | 187:14 188:20 | 263:19 |
| 43:25 50:21 | 165:25 166:1,5 | 198:12 217:1,2 | **downstairs** |
| 53:12 56:11,13 | 166:7,13 211:6 | 217:4 220:4,10 | 5:15,23 |
| 163:14 167:16 | 211:7 218:13 | 220:24 224:10 | |

**dr** 4:4,5,6,9,18
4:19,20 7:5,16
7:24 8:1,13,17
10:23 11:17
12:7 13:6
14:25 15:14
20:18 22:3,14
22:19 24:21
25:3,3,17,20
26:5,7,13 29:23
30:19,25 31:2,7
31:12,18 34:12
34:18 39:2
41:23 42:2,16
43:22 44:2,9
45:1 49:18
50:10,12,25
51:25 52:1,4
53:5 54:24
56:1 57:10,12
57:17 58:16,19
62:6,14,16,24
62:24 63:1,16
64:2 65:5 66:9
66:25 68:5
71:9,10,13
72:15,21 73:4
73:11,14 75:8
75:13,15,16,21
75:22 76:10,13
76:15,18 79:9
79:13 80:1,7,11
87:1 89:2
91:20 92:1,6,21
94:6,12,16 95:4

95:8,14,16,18
95:23 96:17,19
96:24 98:9,19
98:20 99:18
100:22,23
101:2 102:13
102:17 104:9
106:1 110:4
111:16,25
112:13,24
114:11 115:4
116:25 118:12
120:5,9,25
121:13 123:6
123:17 124:16
124:16,18,19
125:2,21,22
126:5,6,11,20
127:23 128:16
128:25 129:6
129:12,15
130:3,7 131:10
131:14 132:19
132:22 134:8
134:20 136:6
136:14,17,18
137:4,21,23
138:9 139:3
140:19 142:4
142:24 144:10
147:2 150:14
155:16,23,25
176:25 177:4
177:14 178:10
179:3 180:1

181:5,13
184:10,16
190:11,16,17
190:23,23,24
191:10,13,14
191:18 192:20
192:21 193:23
194:17,17,18
195:9,25
198:21,24
201:5,6 202:10
203:20,20
204:15 205:9
206:6,19
207:14 210:7
210:10,13
211:4,9,14
212:4,11,18
218:5,16,19
219:7 220:20
220:20 223:17
225:19,20
229:21,22
231:2,3,4,7
232:13,19
233:5 235:23
236:25 237:1
239:24 245:21
246:2 247:16
247:22 248:11
248:11,12
249:9,23 251:2
251:8,12,16,25
254:22 259:17
259:22,24

260:4,6,7
262:20 263:15
264:2,10,13,23
265:4,6,17,22
267:2 269:9,16
271:19 272:7
273:9,18,20
274:1,4,22
275:4,24 276:4
276:12 277:11
277:12 281:17
281:23 282:14
282:22 284:24
285:3,17,18
286:11 289:4
293:4
**dramatically**
13:2
**draw** 33:8 37:2
40:9 184:24
227:10 231:1
**dressed** 98:16
**drinking** 27:24
**drive** 301:11
**driven** 4:10
**driving** 154:11
**drug** 212:1
222:14 223:3
225:11 252:2
**drugs** 212:1
237:21 238:1
**due** 8:13
**dumb** 135:14
**dump** 41:11
42:4

**dunn** 2:19
**dust** 281:16
**duty** 223:8,10
  223:12,13
  240:16 241:20
**dye** 293:17
**dying** 155:2,4
  155:10

**e**

**e** 4:1
**earlier** 27:11
  28:2 79:16
  81:10 93:17
  97:2 104:17
  166:2 168:3
  172:2 190:23
  191:13 193:4,5
  211:4 219:6
  235:22 236:23
  254:3 259:24
  285:21 311:8
  328:9
**early** 77:15
**earth** 201:21
**easier** 163:4
  327:23
**easiest** 216:23
**easily** 201:23
**easy** 16:8 18:25
  135:23 155:25
  162:3,4,8
  170:11
**eat** 308:25
**echevarria**
  219:6 254:21

255:16
**edit** 315:18
**educate** 133:20
**educated** 136:7
**educational**
  136:2
**effect** 34:4
  114:7 159:22
  262:4
**effective** 32:5
  158:22
**effects** 56:23
  138:11 139:5
  142:5
**efficient** 158:21
**eight** 16:19
  262:1 284:15
  316:9
**eighth** 21:24
**either** 6:25 91:2
  116:21 118:16
  132:1 146:5
  191:10,15
  203:23 215:4
  272:23 278:8
**elderly** 52:7
**electron** 64:21
  65:23
**electrons** 64:22
**elements** 166:1
  298:13
**elevated** 8:11
  11:3 80:3
**eleventh** 324:18

**elicit** 165:6
**eliminate** 132:8
**else's** 144:19
**elucidate** 160:8
**email** 305:15
  320:15
**emails** 7:13
**emblematic**
  200:13
**emerging** 82:6
**employed**
  25:17 80:25
  222:4
**employee** 220:1
  329:9,10
**employees**
  174:11
**employment**
  222:6
**encasing** 72:25
**encompass**
  115:7
**encompasses**
  119:4
**encourage**
  327:22
**ended** 249:17
**endometriosis**
  25:11 264:10
  264:13 268:16
  268:19 269:7
  272:1 276:23
**endorsed**
  204:16

**endorsement**
  41:14
**ends** 166:15
**enforce** 244:12
**enforcing** 220:9
**engage** 106:15
  132:23
**engaged** 130:21
**english** 16:8
  20:25 135:4
**enhance** 280:23
**ensure** 223:9,9
  233:10,15,24
**entertaining**
  183:17
**entire** 59:11
  60:16 68:14
  85:19 123:24
  146:17 229:5
  303:20
**entities** 100:21
**entitled** 315:25
**entity** 158:6
**environment**
  223:16
**environmental**
  267:25 271:21
**epa** 204:16,19
  284:16
**epidemiologi...**
  20:8 29:9
  98:23 113:2
  186:11 263:9
  270:17

[epidemiologist - evolving]    Page 31

**epidemiologist**
76:19 111:17
138:10 139:4
270:22,23
**epidemiology**
34:17 47:23
271:5
**epithelial** 97:4
97:9 99:13
101:7 103:1
122:6
**equally** 18:9
100:10 108:17
114:16 173:24
314:12
**equipment**
304:2
**equipped** 234:8
**equivalent** 60:7
**era** 35:19
**erred** 256:15
**error** 17:6
19:22,24 80:21
92:14,14
255:24,25
292:14
**errors** 91:11
271:23,25
**escaping** 203:5
**especially** 33:2
132:9
**esquire** 2:3,3,4
2:4,10,14,19
3:3,3,4,10,15
3:20

**essence** 243:19
**essentially** 7:22
10:20 100:22
102:20 104:19
188:23 233:6
266:14 273:13
281:15
**establish** 11:12
11:12 22:7
79:22 88:16
93:15 163:17
163:19,20,22
164:23,24,25
165:1,2 223:3
251:17
**established**
16:2 27:24
163:23 165:3
**establishes** 11:5
81:7 83:7
186:12
**establishing**
14:5,10 29:2,7
86:1
**estate** 1:5
**estimate** 181:25
265:1 320:17
**estradiol** 263:7
**estrogen** 263:6
**et** 248:22
**ethical** 50:13
**etiological**
95:22 104:14
**etiologies**
100:24 105:13

123:14 260:15
**etiology** 98:7
109:19 110:4
260:8 266:15
**evaluate** 101:11
234:13
**evaluates** 139:1
**evaluating**
114:6
**event** 212:3
223:13 234:7
238:7 245:2
269:5
**everybody**
18:17 89:20
197:24 206:8
271:6 305:7
308:21 313:2
321:12 327:2
**everyday** 51:7
197:10
**everyone's**
95:11
**evidence** 4:15
4:17,21 20:1
25:2 26:18
27:12,17 28:5
30:20 37:5,21
38:3 39:23
68:20 74:13,18
80:17 92:5
93:15 94:9
104:10 106:18
112:13 118:2
137:21 141:25

151:25 156:13
156:20 158:25
159:6,10,22
163:7 164:17
165:12 169:13
169:15 171:13
172:9 175:24
186:22 189:2
189:24 190:5
219:10 230:16
233:12 234:2,5
234:5 240:2
247:25 248:1
249:15 250:17
250:25 263:10
271:13 273:19
273:25 274:17
274:23 275:13
276:3,8 281:12
282:7,16 283:8
284:8 285:23
288:20 290:23
290:25 292:16
294:8,16,19
295:23 296:7
297:21 299:4
300:2 302:12
313:12 322:11
323:20
**evidenced**
264:7
**evidentiary**
312:3
**evolving** 81:10
83:11 200:16

[exact - experience]                                                    Page 32

**exact** 71:9 82:8
  127:4,8 171:25
  195:12
**exactly** 47:24
  49:9 52:13
  92:6 94:3
  123:2 128:16
  144:13 184:9
  187:10,14
  191:22 226:8
  279:21 313:17
**examination**
  9:7,10 14:14,16
  26:3 53:9
  61:24 67:11
  75:2 112:1
  114:2 200:7
  271:11 291:2
  326:14
**examine** 26:2
  42:14,16 61:24
  250:19,22
  258:2 272:22
  278:15
**examined**
  130:17
**example** 10:24
  11:19 39:14
  41:1 44:22
  46:2 50:3 77:1
  94:19 107:8
  137:7 138:17
  156:23 172:21
  213:25 215:25
  223:21 230:4

232:21 238:8
  247:17,24
  249:7 250:15
  251:11 267:5
  267:19 279:5
  317:25
**examples** 31:24
  49:20 69:11
**excellent** 6:9
**except** 140:22
  205:4 232:8
  310:2
**exceptionally**
  126:24
**excerpts** 20:10
**excess** 192:7,15
  192:21
**exchange** 326:7
  326:24
**excited** 57:8
**exclude** 4:3,4,5
  4:6,7,9,10,11
  4:18,19,20,22
  4:24 6:23 7:6
  7:16 24:13
  25:4 31:2 57:3
  62:13,23 67:7
  67:10 72:9
  74:24 75:8,13
  95:8 131:23
  132:12 155:17
  162:14 163:6
  163:16,24
  169:5 171:13
  172:9 176:24

210:5,6,10
  259:17 274:15
  274:20 284:8
  291:8 292:15
  298:4,6,7
**excluded** 27:17
  48:22 60:25
  61:3,6 75:15,22
  78:8 91:2
  131:5 156:21
  159:1 165:16
  166:8 211:8
  287:23
**excluding**
  26:18 61:25
  80:16 134:3
  148:22 155:13
  156:13 162:12
  246:12 289:6
**exclusion** 26:4
**exclusive** 207:1
**excuse** 22:1
  92:3 120:6
**executive** 55:15
  287:9 289:19
  297:24
**executives**
  33:25
**exert** 210:18
**exhausted** 56:2
**exhibit** 37:14
  37:16 188:20
  326:23,24
  327:18

**exhibits** 327:12
**exist** 60:8 78:6
  281:25 282:1
**existing** 197:10
  297:2
**exists** 102:10
  161:2
**exit** 309:20
**expect** 201:6
  277:9
**expectation**
  297:13
**expectations**
  302:17
**expected** 43:3
  311:8
**expects** 82:9,9
**expensive**
  70:17,17 72:6
**experience** 20:7
  25:18 33:8
  54:19,20 58:14
  58:16,17 69:4
  69:16 71:14
  79:14 80:9
  81:4,4 150:4
  180:24 210:21
  211:25 212:12
  245:23 251:24
  251:25 253:22
  255:5 258:19
  306:16 316:10
  317:12,12
  327:20

**experienced**
144:25
**experimental**
23:13 87:14
**expert** 4:3,7
6:23 14:18,23
14:23,23 15:12
19:1 23:8,22
24:13 26:19
27:13,14,19,22
30:6,6 32:10
34:21 35:2,3,4
37:3 40:10,11
41:12,13,14
42:5 48:14,23
49:5 51:17,18
53:1 54:2,18
57:14,23 58:13
65:4 68:14
70:22 71:1,11
80:17 82:19,20
82:20 88:24
90:3 92:17
94:6 95:11
97:24 106:1,9
111:6 112:21
114:21,22
124:18,21
132:9,10
133:12,13
136:8,13 140:5
144:18 146:11
146:11,12,21
146:22,24
160:23 177:5

180:23 181:20
186:21 190:6
193:23 194:17
197:7 198:7
199:24 200:1
205:2 210:17
211:7 213:21
215:20 217:20
218:14 219:12
220:23 222:5
226:1 227:7,8
230:8,8,13
231:17,23
245:22,24
247:4 251:21
251:22 252:3
254:4,7,12,13
258:8 263:24
264:1 275:3,24
276:5,19
277:24 278:12
279:1 280:5,9
280:10 293:18
**expert's** 19:2
**expertise** 23:7
31:23 32:8,16
34:14 43:17
46:10 51:12
52:9 234:9
237:13 249:2
258:9
**experts** 12:7
23:6 24:20
25:9 33:10,18
40:3,3 42:1

57:25 85:25
94:5 95:18
111:24,25
112:14 118:6
119:19 124:23
124:23,24
125:1 132:22
142:16 143:12
143:14 149:24
170:18 171:1
215:13,14,14
226:25,25
250:6 280:3,4
282:20 285:9
285:11 286:8
287:2,5,5,22
288:3 289:1
291:2
**explain** 12:21
15:6 50:22,25
51:2 131:25
143:1,22
144:11 192:23
197:11,12
221:16 232:23
234:8 250:8,15
280:11 289:2
296:23
**explained**
52:10 183:1
197:3,4 282:12
**explaining** 15:9
**explains** 41:7
197:16 267:18
271:12 280:21

**explanation**
47:13 66:13
256:24 278:8
**explicitly** 11:9
80:8 131:18
**exploratory**
268:25
**exposed** 68:18
68:20 152:16
177:9,17
192:15,21
193:6,14 198:9
198:13,21
199:1 267:25
276:21
**exposure** 57:14
57:15 64:13
68:12,19 69:20
137:2,3,11,15
148:11 177:8
177:11,14,18
178:5,16,18
179:9,15
180:10 181:4
181:13,15,16
181:17,24
184:10 185:23
186:14 191:18
192:6 195:21
195:22,22
196:13,18
197:6,9,17,20
198:17 199:6
199:17 200:21
280:23

| | | | |
|---|---|---|---|
| **exposures** 271:21 | 81:24 105:22 | 298:1 | **fallen** 60:8 |
| **express** 218:16 | 115:16 123:20 | **facts** 48:9,10 | **falling** 226:11 |
| **expressly** 287:10 | 128:6 132:13 | 157:9 159:4 | **fallopian** 97:6 |
| **extensive** 79:14 | 136:16 143:5 | 161:20 168:5 | 99:5,14,15,16 |
| **extensively** 148:16 153:5 | 153:12 158:11 | 202:20 220:14 | 101:9,25 |
| **extent** 25:25 | 164:22 169:8 | 224:11 227:8 | 102:22,23 |
| 156:22 157:24 | 170:21 177:23 | 230:1 247:15 | 103:20 104:12 |
| 237:5 245:18 | 178:4,8,10 | 266:23 274:18 | 105:5 108:19 |
| 245:24 247:1 | 179:21 180:1,2 | 275:16 280:9 | 109:1,14 |
| 248:7 270:6 | 182:24 185:11 | 296:8 | 112:17 113:6 |
| **extra** 66:17 | 185:11,20 | **factually** 199:9 | 115:7,19 118:1 |
| 198:13 | 187:22 197:7 | **fail** 226:14 | 118:17,20 |
| **extraneous** 328:10 | 199:10 200:10 | 291:17 | 119:5,14 127:2 |
| **extrapolates** 179:4 | 205:18 206:2 | **failed** 77:16 | 127:5,18 |
| **eye** 294:11 | 229:3 241:2 | 211:22 217:4 | 131:19 248:16 |
| **eyes** 208:15 | 270:19 271:7 | 224:6,9 226:6 | 248:21 269:23 |
| **f** | 272:3 286:12 | 228:8,14,16 | **false** 45:22 |
| | 294:21 295:1,5 | 235:2 | 159:5 177:25 |
| **f** 1:10 | 296:18 297:5 | **fails** 297:13 | 178:2 |
| **fa** 30:12 | 297:11 298:22 | **failure** 95:15 | **familiar** 13:1 |
| **face** 17:10 | 302:16 306:2 | 226:11 229:13 | 59:14 267:5 |
| 117:2 234:1,2 | 309:7 | 229:14 236:6 | 309:16 |
| **facie** 163:13 | **factor** 9:18 | 243:20 | **families** 20:21 |
| **facing** 304:8,8 | 28:25 29:7 | **fair** 38:13 | **familoni** 2:4 |
| **fact** 9:13 15:7 | 266:6 267:22 | 71:24 128:24 | 164:9 165:22 |
| 18:12 20:10 | 267:23 271:10 | 135:9 192:16 | 167:22 172:21 |
| 27:24 29:1 | 277:19 | 192:17 200:19 | 173:18 174:9 |
| 40:14 42:9 | **factories** 137:10 293:14 | 314:17 | 175:10 176:8 |
| 64:12 69:10 | **factors** 12:9 | **fairness** 116:16 | **family** 8:24 |
| 70:22 74:3,16 | 98:8 104:3,15 | **faith** 158:20 | 13:6,7 14:6 |
| 74:22 76:24 | 128:3,5,11 | 323:19 | 21:6 29:19,24 |
| | 129:2 265:18 | **fall** 163:10 | 30:11,12 78:14 |
| | 265:18,20 | 211:1 243:20 | 78:15,16,22 |
| | 267:25 277:21 | 310:15 | 79:10,20 81:16 |
| | | | 84:24 318:4,7 |

**[famous - financially]** Page 35

famous 277:3
fancc 8:11,15
  13:6,7 14:6,11
  20:18 21:2,5,20
  22:3,10,11,17
  24:17 25:11
  26:8,10,12
  29:19,19 30:8
  76:5,19 77:1,14
  77:22 78:4,15
  79:2,10,19,20
  79:22 80:5,11
  82:2,5,10 84:14
  90:22 92:23,25
  93:2,5,13 94:9
  94:18 97:24
fanconi 20:17
  21:6,13,14
  29:21,24 78:16
  79:15
far 33:14
  123:16,18
  181:10 196:16
  230:25 234:15
  234:16 324:14
faster 310:20
fault 88:12
  311:19
favorite 21:1
favors 123:8
fda 34:15 73:18
  73:21 206:2,4,5
  209:23,25
  211:3,13,23
  212:5,12,22

213:23 214:6,9
215:2,12
216:20 219:23
219:25,25
221:19 222:3,4
222:6,10,20,23
222:24 223:4
223:11,14,19
225:7,17,22
226:13,16
228:19,20,21
229:11 234:11
236:7,11 237:2
237:16 238:9
238:12,20,21
238:22 239:6,8
239:11,12
240:2,9,13,20
241:5,7,25
242:4,16
243:14,16,19
244:4,8,11,15
244:17,18,25
245:4 246:14
247:18 249:7
249:16,19
250:2,3 252:12
252:13,15,18
253:2 254:23
254:25 255:5,6
256:18 283:2
284:13,16
285:11 287:11
288:1,7,8 289:6
289:16,23

290:12,13,19
292:9,22
293:15 294:1
299:15,16,18
299:20,21
fda's 214:3
  239:7 245:17
fear 226:24
feasibility
  299:10
february 1:18
  169:18 329:14
federal 188:20
  284:15 285:7
  286:21 287:17
  288:4 289:17
  289:25
feel 98:15
  114:10 255:22
  274:16 321:20
  322:22
fees 311:17
  312:1
felix 4:5 12:7
  57:6,10,12,17
  58:19 72:15
  73:11 94:12
felix's 58:16
  73:14
fell 227:15,16
  231:16,19
  241:10 252:14
fiber 203:22
  208:13,21
  209:1,7,9

fibers 170:15
  196:4 203:24
  208:2 285:22
fibrous 181:17
  206:24 225:6
field 72:22
  133:18 254:7
fighting 197:15
  217:17,18
figure 28:24
  177:8 251:19
  270:8 314:21
file 152:3 155:8
  158:18,20
  160:12
filed 150:22
  152:14 153:16
  155:9,9 162:18
  184:6 239:21
  257:10
fill 120:12
  183:4 310:16
  310:23 316:14
  318:17
filled 183:2,4
  185:13
final 26:5
  116:18 117:1
finalized
  116:11 206:4
finally 183:18
financial
  160:23 194:21
financially
  329:12

**financials**
157:5,25
160:24 161:3,6
161:11
**find** 17:15,19
17:20 44:5
82:22 86:11
89:11 128:4,5
128:10 132:6
132:14 134:1
158:21 163:23
230:7,13
257:25 272:24
272:25 281:21
287:18 293:19
293:22
**finding** 30:20
77:19 121:6,8
123:12 147:19
168:5 206:6
208:3,4 224:19
264:6 272:8
298:17
**findings** 312:4
312:6
**finds** 40:21
262:3
**fine** 260:11
264:24 265:4
273:24 274:2
275:2
**finish** 320:13
328:9
**finished** 311:8

**fire** 317:22
**firm** 2:14 320:5
**first** 30:1 42:17
43:17 48:19
52:24 53:14
57:12 58:12
67:13,14 72:4
83:13 91:4
98:16 152:2
159:8 161:13
167:15 170:24
171:2 178:15
179:24 181:12
187:13 193:16
197:23 204:14
211:2,13
212:21 235:19
256:6 262:12
267:2 271:18
288:16 293:10
296:4 300:16
304:3 307:6
310:5,25 318:1
318:6,6,22
319:4 323:4,5
**firsthand**
144:14
**fit** 127:6 128:8
**five** 9:3 21:14
21:16 40:18
77:8,9 78:6
79:16 177:24
203:24 204:17
204:20 208:19
243:12 254:4,6

260:24 314:15
321:15 327:4
**fix** 79:1 188:1
**flag** 301:4
**flagler** 1:17
**flip** 35:14
**flom** 3:4
**florida** 1:1,18
3:17 9:12
16:24 25:21
27:9 48:21
57:23 89:22
164:16 188:21
256:5,7,8,8
267:12 294:8
299:3 302:6
329:3,18
**flouting** 198:5
**fly** 306:10
**focus** 56:19
95:13 96:25
102:12 177:10
181:4 210:11
225:20,21
322:2
**focused** 48:2
251:9 256:11
**focuses** 212:1
**focusing** 84:21
294:2
**folks** 5:2 57:19
322:4
**follow** 47:2
172:5 173:6
183:22 205:7,8

205:9 206:5
213:20
**followed** 52:17
208:24
**following** 45:11
127:16 205:10
296:14
**follows** 40:21
205:4
**font** 103:15
217:6,7
**food** 222:14
**foolish** 56:9
**foot** 29:8
**forbid** 173:24
**forced** 312:11
**ford** 239:24
**forefront** 79:12
**foregoing** 329:5
**foreign** 4:17
72:17,19,24
73:6,15,25 74:2
74:19 135:17
171:13,14,16
171:23 172:10
172:18 173:6
173:12 174:1,8
176:12
**forever** 200:16
**forget** 96:13,17
**forgive** 241:16
**form** 165:25
206:13
**formed** 192:14
284:21

**forms** 195:20
**formulate**
  144:20
**forth** 302:25
  320:15
**fortner** 104:7
  129:4 132:24
**forty** 314:15
**forward** 28:6
  70:24 116:7
  163:13 229:8
  239:24 248:19
**foul** 311:22
**found** 63:2 67:1
  70:12,22 127:1
  127:2,3,11,12
  132:5,13
  190:19 193:25
  195:14 204:1
  231:19,20
  259:3 284:13
  292:9 293:14
  293:15 295:2,6
  299:18,22
  326:8
**foundation**
  146:1,1
**four** 9:3 21:2
  35:15 36:16
  85:5,6 162:12
  168:12 169:19
  171:7 177:24
  179:1 180:19
  183:3 189:10
  265:11

**fraction** 158:7
**fragment** 204:3
  205:13 207:2
**fragments**
  206:19,20
  207:1 285:22
  288:24
**framework**
  222:18,23
  223:2 234:3
  250:13
**francisco**
  269:20
**frankly** 49:25
  144:22 181:5
  185:12 246:21
**fraudulent**
  45:19
**freaking** 53:2
**free** 267:11
  278:13 295:12
**freidenfelds** 4:4
  30:25 31:2,3,4
  31:6,7,12,18
  34:12,18 41:23
  42:16 43:22
  45:1 49:18
  50:12,25 51:25
  54:8 56:1
  211:4 220:20
  225:20 229:22
  231:3,4 235:23
  237:1 246:2
  251:8,16

**frequency**
  185:9
**frey** 77:12
**friday** 1:18
**friend** 79:24
  178:13,18,19
  251:11
**friends** 152:6,8
  277:4
**front** 114:4
  126:8 130:14
  146:25 159:15
  170:17 208:4
  224:12 308:4
  313:9,15
**frozen** 116:12
**fruit** 40:19
**frustrated** 6:8
  146:12
**frye** 23:20
  89:15,21
**full** 158:16
  233:7 258:20
**fully** 30:17
  160:25 161:5
  221:16 283:23
**fun** 61:23 62:2
  207:12 294:10
**function** 40:8
  79:20 82:8
**functioning**
  21:7,10,12
**functions** 21:20
  82:2

**fund** 50:7
**fundamentally**
  54:9 62:23
  132:3,14
  158:15
**funded** 158:16
  194:2
**funny** 66:25
**further** 8:24
  14:2 64:7
  76:16 130:5
  132:18 165:9
  224:5 261:2
  329:8
**furtherance**
  164:13 167:3
  167:13
**furthermore**
  158:25

**g**

**gamble** 243:23
**game** 237:21
**gap** 262:8
  279:3
**gather** 113:3
**gathered** 46:15
  113:3 147:5
  194:25 195:4
  285:7
**gavin** 44:2
**gene** 7:24 9:2
  10:4,4,8 11:4
  12:18,18,22
  13:15 14:17
  15:13 16:1

17:15,16,17
22:5 28:11,12
28:15,22 29:24
76:5 77:1
78:20 79:1
94:18
**general** 35:6
120:6 124:21
131:7 140:4
248:12 259:22
263:25 267:3,4
267:6,8,15
274:2,25 275:3
275:15,17,19
275:24 276:1
276:14,16,19
277:8 282:14
326:23
**generally** 17:16
21:8 35:5 46:7
88:12 89:7,8
90:1,21 100:8
147:11 171:15
174:11 239:20
260:15 261:1
275:1,7
**genes** 8:24
11:14 13:3,4
20:17 21:5,7,7
21:10,13,15,15
21:19,25 29:19
30:8,11 77:2
78:18,24 79:10
79:14,15,16,18
80:4,10 81:17

82:8 84:18,23
94:19 276:23
**genesis** 126:25
**genetic** 8:6,6
12:9 14:16
17:2 20:7 29:2
78:3 91:21
93:4,8
**genetics** 93:1
**genital** 70:6
97:2 98:25
105:9 112:16
120:7 182:4
248:20,21
261:9
**genitalia**
196:12
**gentleman**
294:15
**gentlemen**
17:19 307:14
**geographic**
125:3
**geological**
284:17
**geology** 47:19
**georgia** 256:3
267:10,12
**germ** 77:21
**getting** 30:22
50:17 123:15
123:18 137:10
198:9 227:6
262:20 280:1
316:1 317:3

**gibson** 2:19
**gibsondunn.c.**
2:22
**gist** 204:8
**give** 5:10,11
6:18 27:5
31:24 37:22
40:13 41:13
46:16 49:21
59:24 64:25
103:14 117:5
130:23 132:9
133:20 142:17
146:6,8 148:5
148:12 162:5
171:8 179:2
188:23,25
202:23 212:21
213:1,4 214:23
216:7,7 217:24
230:14,15
232:21 246:2
247:4 248:12
254:11,22
257:12,25
273:4 276:15
278:13 288:13
303:17 305:7
308:3,4 313:23
313:24 314:1,4
315:6 319:15
327:9
**given** 38:11
65:4 110:23
213:21 256:17

258:1 267:6
282:21 291:19
319:14 325:15
**gives** 65:23
190:17 233:17
310:17 311:2
**giving** 146:22
146:23 188:1
218:16 250:21
307:1
**glad** 124:9
**glean** 273:6
**gleaned** 48:10
**gloss** 35:16
42:5
**glossed** 20:24
**gloves** 73:22
**go** 6:4 7:2,2,7
13:8 16:9,15
17:15 21:1
24:22 25:7,24
28:9 30:25
33:11,14 39:5
42:22 47:14,15
47:15 49:6,12
49:14 50:7
56:14 57:2
63:15,22 69:17
71:8,20 72:1
75:1,10,20 76:3
76:16 82:22
90:19 96:19
97:13 103:16
105:2,19
108:17 110:12

| | | | |
|---|---|---|---|
| 115:20,20 | 223:11 245:19 | 89:13,22 90:14 | 187:15 189:25 |
| 125:19 126:3 | 268:4 273:14 | 92:7,9,13 94:7 | 192:5,7 193:17 |
| 132:21 136:4 | 274:5 283:18 | 103:24 104:7 | 195:25 196:7 |
| 139:18,20 | 293:20 302:15 | 106:9 108:21 | 196:10,25 |
| 140:20 151:4 | 302:17 321:24 | 111:5 114:4,13 | 197:23,24 |
| 154:16 156:3,8 | **going** 5:9 6:5 | 118:5,6,24 | 198:3,24 |
| 156:10 162:5 | 6:17,21 12:19 | 119:19 125:1,6 | 204:24,25 |
| 169:2 171:9 | 14:18,22 15:14 | 126:3,18 | 205:1,2,22,25 |
| 178:21,22,22 | 15:15,22 16:15 | 128:19 132:7 | 209:21 210:11 |
| 188:24 189:13 | 19:21,23 30:13 | 133:12,17 | 210:13,23,24 |
| 198:17 199:12 | 31:25 32:1,5 | 134:15 136:9 | 212:4,7,25 |
| 211:11,18 | 34:19 35:13,15 | 136:13 137:5 | 213:4,14 214:4 |
| 217:14 218:3 | 35:25 36:11,12 | 137:23,24 | 214:8,18 216:9 |
| 223:4 224:4 | 36:13,24,25 | 139:8 140:3,5 | 216:18,19,19 |
| 230:7 237:14 | 37:1,11 38:20 | 140:20 141:1 | 216:25 217:16 |
| 241:1 242:13 | 39:5,6,8 41:10 | 142:24 146:3,5 | 217:17 218:11 |
| 246:17 249:5 | 41:11,13,19,20 | 146:6,7,11,12 | 219:16 224:24 |
| 254:16,20 | 42:20 43:22,24 | 146:14 147:18 | 226:22 227:9 |
| 259:15 260:13 | 44:1,8,9,11,12 | 149:21,22,25 | 227:20 228:7 |
| 261:21 262:9 | 44:20,21,23 | 151:4 153:25 | 230:25 231:4,7 |
| 262:12 265:21 | 45:3,16,17,18 | 154:19,19 | 234:4,15 |
| 272:8 274:11 | 45:20,25 46:4,7 | 155:24 158:21 | 235:24 236:13 |
| 282:25 284:6 | 46:8 47:18,21 | 159:17,23 | 236:14 241:7 |
| 285:14 295:23 | 47:22 49:23 | 160:3,10,11,14 | 242:16,17,18 |
| 297:5 304:9 | 50:12,22,25 | 160:19,23 | 242:23 243:22 |
| 309:1,6,15 | 51:1,5 52:1 | 161:13 168:12 | 244:3 245:11 |
| 310:12,25 | 55:3,9,11 57:5 | 169:22 170:12 | 246:2,6,6,7,9 |
| 312:21 314:20 | 58:4,7 59:8,9 | 170:17,18,20 | 248:10 249:5,5 |
| 315:11 317:18 | 60:6,13,19,21 | 170:21 171:9 | 249:21 251:20 |
| 318:5,11 321:8 | 61:8 62:2 63:5 | 172:22 173:14 | 253:16 254:16 |
| 322:7 326:15 | 63:19 64:5 | 174:5,7,7 | 255:12 257:19 |
| **goes** 48:22 59:7 | 66:9,11 67:12 | 175:11 181:3 | 259:2,16,21 |
| 74:15 132:24 | 69:10 72:7 | 182:20,20,21 | 260:8,16 |
| 156:13 162:12 | 75:11,25 76:17 | 184:11,16 | 266:15,19 |
| 185:19 195:17 | 81:19 82:1 | 187:1,2,3,6,7 | 267:3 268:6,17 |

| | | | |
|---|---|---|---|
| 269:14,21 | 327:17 | **grand** 3:11 | **grouping** |
| 270:2 275:22 | **good** 5:5 22:23 | **grant** 33:5 | 114:11 |
| 275:25 276:4,5 | 47:12 57:7 | 164:22 167:17 | **grow** 201:25 |
| 276:8,10,15,17 | 62:1 66:3 | 258:15 312:2 | 202:5 |
| 276:17,20 | 98:14 126:11 | **granted** 24:14 | **grown** 203:2 |
| 277:9,13 | 126:12 130:25 | 30:19 95:4 | **grows** 201:20 |
| 279:13,17 | 133:10 148:17 | 161:14 163:5 | **guarantee** |
| 280:2,3,6 | 160:5 174:2 | 171:4 176:10 | 169:16 170:2 |
| 281:11,24 | 176:23 186:11 | 176:15 190:8 | **guess** 7:9 62:6 |
| 282:11,13,22 | 263:19,22 | 200:20,21 | 81:18 145:9 |
| 283:8 286:12 | 264:5 267:17 | 258:12 | 152:24 153:8 |
| 286:15,16 | 268:10 269:18 | **gravity** 60:8 | 197:2 218:19 |
| 288:14,21,21 | 269:19,20,20 | **great** 12:25 | 224:11 227:13 |
| 288:23 290:9 | 270:21 308:6 | 27:3 50:3 | 278:9 291:12 |
| 291:7 292:1 | 323:19 | 106:25 174:3 | 298:7 |
| 294:18 296:4,9 | **google** 287:18 | 303:13 305:17 | **guidance** 15:22 |
| 296:13 297:14 | **gotten** 52:7 | **greater** 196:16 | 91:10,17 249:6 |
| 297:20 298:21 | 56:3 98:17 | 261:12 302:25 | 301:21 302:1 |
| 300:11 301:12 | 124:20 298:15 | **grew** 209:11 | 313:15 |
| 303:1,16 304:6 | **governing** | **ground** 137:16 | **guidelines** |
| 304:7,9,12 | 211:23 | 205:22 | 77:18 |
| 305:21,23 | **government** | **grounds** 259:23 | **gun** 303:6 |
| 306:7,22 307:4 | 203:1,6 289:18 | 259:23 | **guy** 43:14 |
| 310:10,10,20 | **grab** 98:5 | **group** 11:13 | **guys** 296:18 |
| 311:11 312:17 | **gradation** | 89:10 103:1 | **gynecologic** |
| 317:6,22,23 | 88:17 | 113:5 114:9 | 115:6,9 269:11 |
| 318:2,17 | **grade** 21:24 | 142:8 169:9 | 269:16 |
| 319:16,25 | 118:8 | 170:14,16 | **gynecological** |
| 320:13,14,16 | **graduate** 43:13 | 206:3,5,8 | 115:3 |
| 320:18 321:1 | **grain** 43:18 | 249:18 260:23 | **gynecologist** |
| 321:21 322:2,7 | **gram** 182:6 | 284:9,14,21,22 | 262:21 |
| 322:19,24 | 196:4 | 287:7,8,21 | |
| 323:4,9,12 | **grams** 179:5,16 | 288:3 289:19 | **h** |
| 324:7 326:12 | 181:25 182:5 | 289:21 290:15 | **habit** 201:25 |
| 327:3,5,10,13 | | 291:20 318:22 | 202:5 203:3 |

[habitual - helpful]    Page 41

| | | | |
|---|---|---|---|
| **habitual** 184:18 | 250:8 314:4 | 229:10,10,12 | 314:25 |
| **half** 33:11 53:9 | 323:13 | 241:22 242:3,6 | **heard** 26:6 |
| 103:14 200:15 | **happens** 5:21 | 242:9,21 | 30:16 38:1 |
| 310:1 316:3 | 22:12 90:6 | **hazardous** | 47:11 94:12 |
| 321:24 | 174:6 176:6 | 172:23 173:2 | 117:22 122:12 |
| **hand** 16:9 | 202:1 229:20 | 243:17,18 | 135:3 223:18 |
| 103:13,18 | 239:17 281:11 | 244:20 252:16 | 223:25 231:6 |
| 104:7 110:18 | 282:17 283:3 | 252:17 253:11 | 232:3 234:22 |
| 207:19 281:8 | 313:16 321:2 | **hazards** 39:8 | 238:5 244:22 |
| **handed** 325:17 | **happy** 63:11 | **hdiolombi** 3:12 | 283:23 284:18 |
| **handful** 8:22 | 169:3 200:4 | 3:13 | 326:20 |
| **hands** 262:24 | 245:15 267:16 | **he'll** 15:18 | **hearing** 1:23 |
| 278:5 | 275:2,20 323:7 | 268:8 289:5 | 5:1 7:10 18:17 |
| **hang** 202:24 | 326:5 | **head** 160:7 | 24:12 87:16 |
| **hangup** 254:9 | **hard** 44:4 | 272:13 | 272:24 312:3 |
| **happen** 5:22 | 131:4 159:17 | **health** 32:13,19 | 328:20 329:1 |
| 6:6 22:13 | **harder** 321:22 | 34:24 35:6 | **hearsay** 40:4 |
| 43:19 59:13 | **hardship** | 39:8 43:7 48:3 | 162:16,17 |
| 86:21 113:14 | 319:22 321:10 | 48:3 56:19 | 163:9 164:20 |
| 182:17 214:15 | **hardy** 3:10,15 | 84:21,22 | 287:15,20 |
| 239:25 268:1 | 3:20 | 138:10 139:2,4 | 307:20 |
| 270:6 277:4 | **harm** 240:24 | 142:5 144:6 | **heart** 306:23 |
| 281:11 288:21 | 311:22 | 148:14 202:14 | **heavy** 134:12 |
| **happened** 27:6 | **harmful** 56:23 | 223:23 241:22 | 140:22,24 |
| 29:14 124:20 | 204:7 | 242:9 284:17 | 141:16,24 |
| 152:9 153:17 | **hartford** 2:11 | **hear** 6:22 42:10 | 148:15 |
| 158:12 159:14 | **harvard's** | 67:14 72:12 | **held** 55:10 |
| 174:2 184:13 | 47:14 | 107:14,24 | **hello** 126:5 |
| 194:7 216:13 | **hassia** 3:10 | 119:2 126:10 | **help** 12:15 |
| 231:22 294:5 | 305:3 | 127:24 152:1 | 23:25 143:22 |
| 294:15,21 | **hat** 202:24 | 153:9,18 | 144:11 180:14 |
| 313:17,18 | **hay** 270:19 | 185:21 219:20 | 180:15 221:3 |
| **happening** | **hazard** 222:1 | 234:21 235:6 | 241:24 250:8 |
| 44:25 45:2 | 223:23 224:18 | 277:9,13 | **helpful** 18:11 |
| 116:10 176:5 | 224:20 226:17 | 282:13 283:8 | 48:25 49:1 |

[helpful - honor]                                                    Page 42

| | | | |
|---|---|---|---|
| 98:20 185:19 | 111:20 | **holding**  28:1 | 114:23 116:4 |
| 317:8 | **histologically** | **holiday**  320:23 | 116:25 117:19 |
| **heritage**  13:8 | 102:16 | **honest**  135:8 | 120:20,23 |
| 29:25 76:20 | **histology**  127:1 | 235:3 | 122:18 124:10 |
| **heterozygous** | **historian**  31:8 | **honestly**  176:8 | 124:13,20 |
| 77:14 | 32:13,23 33:20 | **honor**  6:21 7:7 | 125:14 126:11 |
| **hey**  166:20 | 34:2,20,24,24 | 7:11,20 9:8,10 | 126:22 130:21 |
| 236:10 238:21 | 35:7,8 36:4 | 10:16 13:1 | 132:15 134:5 |
| 242:16 244:6 | 40:12 41:25 | 14:13 16:5,6,10 | 136:5,24 |
| 290:3 | 50:15 52:14 | 16:16 17:9 | 140:17 141:12 |
| **hi**  126:6 | 53:20 218:20 | 18:8 19:10 | 144:1,17 147:1 |
| **high**  4:15 77:2 | 230:6,19,20,24 | 20:5 21:2,17 | 148:15,19 |
| 77:22 94:20 | 232:2,16 237:3 | 25:22 26:5 | 149:14,15 |
| 118:8 142:3 | 237:9 242:22 | 28:2 30:5 31:1 | 150:8,9,13 |
| 169:10,14 | 242:23 246:11 | 31:19 32:2,22 | 151:21 153:11 |
| 181:22 263:5 | 248:5 | 34:6 36:4,11 | 153:20 154:17 |
| **higher**  10:5 | **historians**  34:7 | 38:25 40:6,25 | 155:24 156:10 |
| 12:23 18:22,24 | 34:8,9 | 41:10 42:12 | 157:4,25 |
| 24:8 182:10 | **historical**  9:1 | 47:7 54:6 | 158:15,25 |
| 264:17,20,25 | 31:17 35:16 | 55:25 57:5,7,22 | 160:5,7,15,20 |
| 277:25 278:25 | 44:13,22,23 | 58:12 61:9 | 161:23 162:11 |
| **highest**  261:13 | 45:21 47:24 | 62:3,4 70:1,17 | 164:5,17 165:8 |
| **highlight**  315:7 | 51:17,18 53:1 | 71:7 75:7,12,19 | 165:22 166:9 |
| 315:10 | 232:7,10 | 76:13 78:7 | 167:21,22 |
| **highlighted** | **history**  32:19 | 79:8 80:15 | 168:17 170:10 |
| 315:20 | 32:19,20 33:12 | 81:24 83:7 | 170:11 171:3,6 |
| **highly**  41:15 | 34:10,21 35:17 | 84:19 85:17 | 171:21 172:21 |
| 136:7 159:3 | 47:9,16 53:21 | 86:14,18 88:1 | 173:18 174:10 |
| 169:16 170:5 | 55:20 68:13 | 90:20,25 91:7 | 175:11 176:23 |
| **hildick**  44:2,9 | 69:22 177:21 | 91:20,25 93:7 | 177:25 180:10 |
| **hire**  33:9 | 264:9 272:4 | 94:4 95:5,9,12 | 181:2,14,19 |
| **hired**  222:20 | **hit**  160:7 | 97:23 98:14 | 184:22 187:18 |
| 293:18 | 294:11 | 100:13 105:18 | 188:12,13,19 |
| **histological** | **hold**  278:4 | 107:5,18 109:1 | 190:9 191:8 |
| 110:19,23 | 301:18 310:14 | 110:10 113:25 | 200:9 204:14 |

206:18 209:16
210:3,9 211:20
212:10 213:6
213:11,16
215:19 217:15
218:4,12 219:1
220:15 221:5
226:14 228:2
229:8 230:18
232:24 235:18
236:23 237:15
239:14,16
240:13 241:14
244:3,24
245:18 246:21
247:13 250:5
250:25 251:10
251:19 253:21
254:1,9,18
255:4,8,14,15
255:23 256:1,2
256:22 257:1,5
258:7 259:14
259:20 262:19
263:5 266:22
267:11 271:2
273:9 275:20
278:23 280:17
282:10 283:16
284:4 286:25
287:7,15
288:15 290:25
291:19 292:5
293:1,9 294:7
295:10 296:11

296:12 300:22
302:2,3,9 305:3
305:24 306:8
314:18 315:1
316:1,5,7 317:1
317:4 320:7,12
323:4,16
324:20 326:9
326:18,19
327:16 328:15
328:18,19
**honor's** 27:11
235:22 236:25
**honorable** 1:24
**hope** 75:2
**hopefully** 136:2
314:10 316:18
317:6,22
318:23 325:8
**hormone**
262:13,16,21
263:12
**hormones**
263:6
**hornbook**
57:23
**horse** 237:17
**hospital** 66:15
**hotel** 325:9
**hour** 310:8
314:16 316:3
324:18
**hours** 200:15
314:3 316:3
321:25 322:12

322:16
**house** 184:3
190:19
**houston** 2:21
125:23
**hrr** 80:4
**huge** 15:25
68:19 137:10
262:8
**human** 170:16
277:7
**humans** 170:15
**hundred**
303:18
**hundreds**
134:24
**hurt** 205:22
**husband**
178:12 182:19
185:4 187:1,2
**hypothetical**
39:1 59:5
87:15
**hypotheticals**
6:5

**i**

**iarc** 136:25
137:8 162:2
168:12,25
169:6,9,13,17
170:13,15
**iarc's** 4:15
**icd** 96:3 105:3
105:4 111:12
111:14

**idea** 23:18
33:15 49:15
235:12 243:1
283:4 311:3
**ideas** 326:6
**identified** 8:8
8:25 28:21
80:2 169:9
**identifies** 77:9
138:24 261:25
278:2
**identify** 13:8
65:16,20 68:17
122:5 202:6
273:5 285:1
327:12
**identifying**
58:6 71:15,16
77:21 208:6
**ignore** 135:19
135:19
**ignores** 266:13
**ignoring** 43:18
267:1
**ii** 137:9
**imagine** 29:7
252:20
**imerys** 4:13
162:16 195:1,3
231:9 233:8
**immediate**
245:12
**immediately**
135:18 243:15
311:23

[impact - inflammation]                                              Page 44

| | | | |
|---|---|---|---|
| **impact** 5:20 | **improperly** | **incorrectly** | **indication** |
| **impacted** | 26:21 80:19 | 187:19 | 175:10 |
| 123:25 | **inability** 27:20 | **increase** 77:14 | **indisputably** |
| **impeach** | **inadmissible** | 105:16 265:8 | 80:11 |
| 294:19 295:1 | 210:24 | 279:23 280:23 | **individual** |
| **impeachment** | **inapposite** | **increased** 8:15 | 136:7 175:14 |
| 299:12,13 | 137:2 | 28:16,17 29:16 | 281:14 |
| **impermissible** | **incite** 312:21 | 30:22 33:19 | **individually** |
| 37:2 | **inclined** 54:3 | 77:17 78:6 | 1:5 |
| **impermissibly** | 291:8 | 79:18 93:23,25 | **individuals** |
| 17:3 | **include** 97:5,8 | 105:11,12 | 33:19 264:12 |
| **important** | 99:5,13 101:19 | 110:1 141:3 | 265:7 |
| 20:22 27:7 | 101:25 114:5,5 | 261:12,22 | **induced** 274:23 |
| 45:10 47:10 | 131:17 138:3 | 262:5 264:14 | **induces** 273:17 |
| 72:14 107:3 | 138:12 278:18 | 265:11 279:6 | **industry** 196:5 |
| 115:16 116:23 | 298:5 | 279:16,16 | 204:22 205:5 |
| 121:12,13,25 | **included** | 280:1 281:20 | 221:22 222:3 |
| 121:25 177:12 | 114:19 273:2 | **increases** 7:24 | 247:2,3,3,7 |
| 181:11 186:6 | **includes** 51:20 | 94:10 271:22 | 254:5 290:8,18 |
| 191:9 194:6 | 102:7 120:14 | 282:8 283:14 | 290:20,24 |
| 199:21 222:25 | 246:14 269:22 | 283:15,20 | **inference** |
| 264:22 266:24 | 312:9,16 | **incredible** | 184:23 309:23 |
| 306:14 314:19 | 320:17 | 261:20 262:19 | **inferences** 37:2 |
| 318:3 | **including** 31:9 | **incredibly** | 40:9 |
| **importantly** | 108:24,25 | 70:17 | **infiltrated** |
| 260:3 | 233:13 234:5 | **independent** | 122:13 |
| **impossible** | 310:12 | 163:14 164:17 | **inflammation** |
| 159:17 | **inconclusive** | 265:15,16 | 72:20,25 73:9 |
| **impression** | 86:19 87:17 | 274:9 292:12 | 73:24 248:17 |
| 118:23 | 88:9 90:9 | 293:16 | 273:11,16,19 |
| **imprimatur** | **inconsistent** | **independently** | 273:22 274:1,3 |
| 40:11,12 41:14 | 103:7,8 237:12 | 164:25 165:2,3 | 274:8,9,22,23 |
| **improper** 37:3 | **incorrect** | **indicate** 104:4 | 274:24 275:1 |
| 40:14 41:15 | 199:10 276:4 | **indicated** 38:21 | 275:10,13 |
| 54:3 219:23 | | 173:20 189:25 | 276:3,9 277:7 |

277:14 282:8
**inflammatory**
144:4
**information**
11:15,15,24
49:8,21 51:3
136:10 139:1
172:23 177:22
178:2,8 179:12
179:15,24
184:13 186:21
225:1 226:9
228:9 230:14
235:9,10 243:9
247:11 250:9
276:24 279:3
285:13 316:13
**informed**
133:21
**informs** 219:18
**ingredients**
181:18 191:6,7
217:9,10 225:9
228:16 236:11
**inherited** 21:22
21:23
**injury** 17:23
36:13 79:1
136:19 155:12
272:19,25
**insanity** 209:18
**inserting** 282:5
**inside** 88:6
**insolvent**
158:18

**instance** 35:18
170:24 171:2
238:4
**instances** 28:22
213:24
**institute** 284:16
**instruct** 213:20
214:17 216:16
306:2
**instruction**
146:7,8 273:4
**instructions**
156:25
**instructs** 26:3
**insufficient**
30:20 76:25
77:6 94:17,18
94:25
**intend** 36:17
37:25 44:10
160:9 229:17
230:23 286:8
293:7 323:25
325:10
**intended** 44:20
**intends** 31:7
75:23 169:12
211:14,21
232:19 236:22
**intent** 43:24
45:19 218:17
219:4
**interact** 222:23
**interacting**
222:3,19

**interaction**
225:21 231:9
233:4
**interactions**
251:2
**interest** 156:15
**interested**
116:21 329:12
**interesting** 12:6
51:14 174:18
205:3 207:7
**interestingly**
15:19 47:25
105:7
**interfere** 13:16
**internal** 31:17
44:18 162:14
165:20 282:6
**internally**
225:1
**international**
142:6 147:6
169:6 206:3
284:8,21
**internet** 195:6
287:19
**interpret**
213:13,14
215:23 220:23
**interpretation**
180:6 216:7,8
**interpreted**
238:9
**interpreting**
213:8 214:12

244:25 279:4
**interrupt** 7:20
305:20
**interrupted**
63:23
**interruption**
90:12
**interview**
151:19 285:15
**introduce** 20:1
163:18 230:16
246:9 248:4
288:20 291:13
294:16 295:23
297:21 299:19
300:2 325:11
**introduced**
150:2
**introducing**
159:22 295:5
**introduction**
110:15
**intuitive** 261:15
261:18,19
279:6,17
280:10,12,16
280:20,20
281:2 282:1
**inundated**
151:7
**invader** 135:19
135:19
**invading** 40:7
48:6

[investigate - johnson]                                    Page 46

**investigate**
  154:23
**investigator**
  113:2
**invite** 308:7,13
  312:22
**involved**
  312:25
**involvement**
  121:7 123:10
**involving**
  212:16
**irrelevant**
  35:17 40:13
  151:11 156:21
  162:17 165:17
  169:15 287:14
  292:16 293:5
**isolate** 12:18
  179:11
**isolated** 119:6
**issue** 11:8
  18:11,12,15
  24:21 25:4,23
  39:2 41:3 48:3
  48:23 59:24,25
  63:16 83:18
  84:14,21 85:21
  91:8 98:20
  124:22 140:18
  140:19 156:12
  156:19 157:22
  160:19 206:3
  217:15 229:23
  231:15 237:8

  243:2 244:7
  252:10 288:21
  291:10 300:20
  309:4 311:24
**issued** 169:21
  203:7 285:2
**issues** 25:25
  48:3 54:22
  85:23 88:14,16
  90:22 254:3
  309:2,12 314:8
  328:10
**items** 226:10
**iwgacp** 4:21
  284:10

---
## j

**j** 2:10 3:3
**j&j** 31:1,10,21
  31:25 32:2,7,8
  35:20 39:9
  45:8,11 62:13
  159:15 169:4
  171:12 182:2
  209:21 210:9
  211:22 218:5,7
  229:25 231:8
  233:14,14
  235:21 247:18
  293:19,19
  305:3
**j&j's** 4:24 32:3
  32:24 182:11
  232:20
**ja** 6:9 318:17
  319:17

**jargon** 135:17
**jeffrey** 4:8
  75:13
**jennifer** 3:15
  4:3 7:5,16,23
  28:13 30:19
**jewish** 13:7
  29:25
**jjci** 4:17
**jjci's** 156:15
  171:14
**jmcloone** 3:18
**job** 140:14
  198:12 213:19
  230:9 276:15
**joe** 50:10 95:9
**johnson** 1:9,9,9
  1:9,10,10 2:18
  2:18 34:16,17
  35:3,4,19,19,21
  36:17,17 37:8,8
  37:19,20 38:6,6
  38:6,7,9,9,14
  38:14,16,16,22
  38:22 39:7,7,21
  39:21,23,23,25
  40:1,1,2 41:11
  41:12 46:18
  49:13,13 50:6,6
  50:10,10 51:21
  51:22 66:21,21
  70:3 71:12
  83:13,13 91:4,5
  138:17,17,21
  139:21,21,25

  140:1,2 142:1
  149:23 151:9,9
  158:24,24
  166:12,12
  172:11,11
  174:11,11
  175:22,22
  176:13,13
  205:4,5 217:1,1
  217:1,2,3,3,4,4
  217:6,6,9,9
  218:23,23
  219:17,17,17
  219:17 220:13
  220:13 224:6,6
  225:22,22
  226:9,9 233:8,8
  233:22 235:7,7
  235:12,12,13
  235:13 237:7
  239:1,1 240:9,9
  241:9,9 243:22
  243:23 244:5
  244:10,10
  245:5 249:8,8
  249:15,15
  250:8,9 251:4,5
  252:5,5,14,14
  252:22,22,23
  252:23 253:5,6
  253:8,9,9,9
  292:3,11,11
  296:25 297:1,7
  297:8

[johnson's - kind]                                                    Page 47

**johnson's** 35:22
46:18 66:12
68:15 134:16
136:12 137:6
137:22 138:11
138:15,21
140:2,7 142:1
149:24 178:6
178:24 180:3
181:16 195:1,2
195:14 201:8
224:18,22
233:23 237:7
240:12 244:5
245:5 284:13
292:3 297:3
**join** 211:10
**jointly** 316:8
**jordan** 103:12
103:23 104:23
104:23 105:7
109:6 110:14
110:15 127:14
129:3
**joseph** 3:4
**joseph.caruso**
3:8
**juan** 57:6
**judge** 1:24
19:21 27:3,17
29:18 90:13
91:15,15,16
126:7,9 133:16
133:17 135:21
145:24 163:21

216:3,10
256:16 295:21
301:13,20
306:19,24
307:1,2,23,24
307:25 308:19
309:10 310:20
311:8,12
313:11 314:2
320:2,24
324:10
**judges** 5:8 6:14
6:14 91:11
**judgment**
162:21 163:5
187:17
**judicial** 1:1
**june** 169:18
170:4,23
**juris** 35:11
**jurisdiction**
171:23 174:14
174:23 175:17
**juror** 321:3
**jurors** 5:5 6:10
6:12 48:10,14
48:16 49:2,3,4
49:6 50:21
118:6 135:9
136:1,1,2,8
146:9 149:1
153:6 214:17
214:18 216:9
224:8 227:1,7
272:21,22

278:7,10
303:18 304:6,9
304:16 307:14
309:19 310:10
311:20 318:19
318:25 319:1,7
319:18 321:5
322:4,12
**jury** 5:13 11:2
31:21 32:24
35:9,12,18,23
36:12 37:1
39:9 44:8 45:1
48:7 49:7,14,21
56:21 69:11
75:1 114:4
134:16 135:6
146:25 152:23
156:23,24
159:15,16
160:1 161:19
161:20 170:18
180:14,15
182:6 184:17
184:24 185:21
185:22 188:23
192:6 199:11
200:8 211:22
213:18,20
216:16 218:7
223:18 250:7
250:11 251:14
252:4 258:1,3,4
273:3 278:19
284:2 288:17

298:14 302:21
303:21 304:20
306:4 308:5
312:14 313:8,9
313:10,15
314:8 315:3,4
315:12 316:25
317:10 328:5,8
328:12
**jury's** 40:8 48:8
48:13

**k**

**k** 1:10 2:3
**kansas** 3:11
**keep** 5:23 23:5
39:18 63:5,13
89:8 150:23
168:15 178:1,2
183:23 249:25
257:20,21
281:16 304:15
310:14
**kept** 167:7,7
183:24
**key** 259:9 277:2
277:5
**kicker** 63:20
64:18
**kids** 317:11
**killing** 303:10
**kind** 15:21
45:16 47:5
50:20 63:23
115:6 183:17
185:5 226:25

| | | | |
|---|---|---|---|
| 310:17 312:18 | 72:6,12 74:21 | 202:16,18 | 313:21 315:9 |
| 312:20 | 74:23 82:25 | 205:15 206:6 | 316:7 317:10 |
| **kinds**  46:2 | 84:25 87:9 | 206:13,24 | 317:12,14 |
| **knee**  87:10 | 91:22 94:14 | 215:7 216:9,14 | 318:13,21 |
| 147:20,23 | 102:8 107:8,21 | 217:12 219:13 | 319:4,9,23 |
| 148:3,3,6,7 | 108:18 109:2,5 | 219:18 220:14 | 321:8 322:6,24 |
| **knew**  8:12 | 111:19 116:13 | 221:11 222:11 | 327:1 |
| 31:21 45:12 | 117:7 118:9 | 223:19 226:7 | **knowing** |
| 60:5,11,12,18 | 119:16 120:21 | 228:23 231:18 | 241:10 |
| 60:21 185:5 | 125:1 126:2 | 231:18 232:22 | **knowledge** |
| 203:15 218:8 | 127:1,15 128:4 | 236:11 240:18 | 14:4 41:24 |
| 221:12 230:1,1 | 128:6 129:7,8 | 241:11 242:20 | 44:15,18 45:23 |
| 230:24 231:21 | 129:13 130:8 | 244:25 245:11 | 77:17 81:17 |
| 233:14 234:19 | 131:1,12 132:4 | 246:18,22,24 | 93:2 135:24 |
| 235:8,12,13,21 | 132:7 134:25 | 248:8 250:15 | 144:14 233:13 |
| 246:3,3,9,10 | 135:13 136:16 | 253:13,25 | 245:25 318:4 |
| 252:15,17 | 137:14 146:4 | 255:22 258:18 | **known**  8:16,19 |
| 253:23 263:16 | 146:20 147:24 | 258:19,20,22 | 15:17 21:16 |
| 302:4 | 152:14 153:6,8 | 259:2 260:1 | 51:6 81:25 |
| **knock**  317:21 | 154:14 157:14 | 262:14 263:16 | 84:17 142:8 |
| **know**  6:5,16,16 | 160:9,13 161:8 | 264:8,15 | 144:7 170:14 |
| 6:17,23 7:10,21 | 161:9 164:4 | 265:14 266:10 | 170:16 221:13 |
| 11:21,23 13:18 | 165:23 166:24 | 269:4 270:10 | 230:17,25 |
| 13:18,19 14:7,9 | 168:5,6 174:18 | 280:12 285:8 | 234:19 242:24 |
| 14:15 15:14,16 | 175:2,2,9,11 | 289:4,10 290:5 | 247:20 249:10 |
| 15:19 22:21 | 176:3 181:20 | 291:4,6 296:4 | 251:15,17 |
| 23:10 29:1 | 181:22 182:12 | 296:17 300:12 | 271:24 275:21 |
| 33:5,9,12,25 | 182:19 183:11 | 300:25 302:20 | **knows**  6:9 35:5 |
| 35:1 39:22 | 183:25 186:4,7 | 303:20 304:14 | 59:9 85:11,13 |
| 44:4 45:13,14 | 186:23 190:12 | 305:18 306:21 | 90:6 97:25 |
| 46:14,24 50:23 | 191:21 193:5 | 306:23 307:24 | 147:15 191:23 |
| 51:7,15 52:15 | 194:13 196:18 | 309:3,4,6,11,19 | 271:2 307:25 |
| 53:23 55:19 | 197:14 198:7 | 310:2 311:5 | 307:25 |
| 63:8 67:20 | 198:12 199:15 | 312:12,23,24 | **kobayashi** |
| 68:8 69:24 | 199:20 202:8 | 313:11,18,20 | 20:16 22:19 |

**[kobayashi - lectures]**                                     Page 49

28:9,9,14,15,17
**kramer**  101:23
**kumho**  52:16

**l**

**lab**  194:18,19
   201:7
**label**  173:12
   214:3,5,6,19,20
   214:20 217:5,8
   228:18 235:11
   239:19 240:3
   240:10,13,15
   240:16,20
   241:1,3,8,12
   242:5,7 243:16
   243:18,23
   244:8,15,16
   245:5 252:11
   252:11 294:14
   294:20
**labeled**  212:20
   214:2,10
   253:10
**labeling**  4:17
   171:13,14,16
   172:4 176:12
   176:13 212:2
   212:23 226:7
   227:16 228:15
   236:5,6 256:19
**labels**  172:9,13
   172:14,16,19
   173:6 211:24
   214:11 236:12
   238:3,10,14,17

238:18,22,24
238:25 239:3,4
239:5,12,13
244:21 252:19
252:25
**laboratories**
   79:11 293:16
**laboratory**  67:4
   193:20,22
   293:16
**labs**  194:20
**lack**  177:5
   233:23
**ladies**  17:19
   307:14
**lady**  276:21
**lag**  321:16
**laid**  325:23
**lake**  178:22
**lance**  2:3
**lancet**  262:15
   263:8
**land**  75:2
**lands**  273:15
**language**  9:17
   22:21,24 82:24
   112:7 121:24
   135:4 212:17
   309:22
**lara**  31:2
**large**  84:15
   269:22
**larger**  6:11,14
**largest**  125:4

**lastly**  225:10
**late**  117:18,19
   119:14
**laughing**  95:10
**laundry**  184:2
**laura**  2:3
   210:10
**law**  2:14 9:12
   10:19 16:24
   25:21 35:12
   48:21 57:23
   80:15 85:12
   92:12 131:5
   151:19 153:2,3
   164:16 175:20
   175:21 187:23
   212:15 213:1,5
   213:13,14,18
   213:18,20,21
   214:12,24,25
   215:10,15,15
   216:16 227:9
   241:12 250:14
   287:22 299:1,3
   314:6
**laws**  176:6
**lawsuit**  152:3
   152:14 153:16
   154:18,21
   155:8,9,10
   184:6 242:18
**lawsuits**  151:8
   158:7 205:6
**lawyer**  4:10
   56:4 117:2

152:19,20
153:9 154:2,10
154:14 213:8
**lawyers**  46:15
   133:14 146:19
   152:24,25
   153:1 227:11
   257:21 297:18
   298:2 304:4
   309:19
**lay**  145:25
   164:1,2,4 165:4
   291:14,15,17
   325:21
**laying**  206:24
**layout**  303:17
**lays**  146:1
**lead**  44:10
   235:10
**leader**  87:2
**leaders**  57:18
   58:8
**leading**  19:24
   121:16 148:9
**leads**  13:19
   66:8
**learn**  47:22
   242:6 243:17
**leave**  11:6
   14:13 153:11
   200:10 217:11
   309:15,25
   310:1,1
**lectures**  43:5,6

**left** 6:9 103:13
103:18 117:15
217:11,12,13
293:13
**legal** 48:19
112:11 160:12
212:10,21
214:2 215:23
217:21,21,23
217:25 219:24
227:3 237:18
245:19 246:23
257:12 317:11
**leigh** 2:14
98:14 126:6
129:12
**leigh.odell** 2:16
**length** 313:25
314:9
**letter** 240:1
249:7,10
251:12,13
**letting** 57:8
160:4 168:15
312:23 313:14
313:18
**levanon** 99:8
**level** 57:13
133:13 135:10
135:24,25
173:25 181:17
181:22 193:7
198:10,13
199:23 242:21
270:24

**levels** 141:3
142:3 190:14
191:19,19
193:15 199:2
200:22
**liabilities**
158:16
**liability** 157:14
161:15 302:23
**liable** 157:16
157:17
**library** 322:7
**life** 68:14
184:16,25
185:1 196:11
**light** 33:15
62:17,18,21
63:24 64:2
232:3 254:9
**lights** 62:21
**likelihood**
30:22 87:19
90:10
**likely** 63:20
64:5,10,15
66:10,13 68:21
71:2 73:1,7,10
76:8,11 79:5
80:14,23 83:2,3
193:6,13
297:12 298:12
**likewise** 218:15
**limie** 4:16
**limine** 4:11,13
4:14,21,22,24

150:20,22
153:21 156:4,5
156:9,11,13,19
161:12,25
162:4,12 163:3
168:7,10
176:11 190:7
200:20 284:1
291:25 292:6
**limit** 30:18
37:18 46:21
95:3
**limitations**
184:9
**limited** 8:10
24:14 56:5
**line** 77:21
301:19 318:25
319:12 325:20
**lines** 94:11,13
**lining** 96:16
100:4,5,16
102:25 127:1
127:11,12
311:5 319:7
**link** 86:1 88:5,5
88:17,18 92:19
93:13 98:25
140:14 267:17
**linked** 93:10
101:15 104:5
141:14
**list** 32:12 37:14
37:16 101:22
107:12,19

170:1,7 217:8
326:3,23 327:5
**listed** 108:6
129:14 233:11
233:25 272:4
**listen** 53:20
75:10 91:12
301:1 325:23
**listened** 254:21
**listening** 8:2
53:11
**lists** 326:24
327:18
**literally** 11:4
64:25
**literate** 186:18
**literature** 20:9
20:10,12 25:19
26:8,12 50:24
58:1 70:1,12,13
71:20,21,23
76:21,25 77:5,7
82:10 83:24
84:8 92:8,17
93:10,12,25
94:16,17,22,23
95:23,24 96:14
96:25 97:14
99:20 101:1
102:5,9,10,18
103:5,25 104:8
105:1 106:15
107:19,21,25
108:14,17
110:6 111:3

| | | | |
|---|---|---|---|
| 112:13 113:1 | 123:15 156:11 | 319:23 322:20 | 205:19 207:8,8 |
| 113:13,23 | 177:20 179:19 | 323:9 | 208:1,11 209:9 |
| 114:18 115:19 | 205:24 221:16 | **longer** 6:24 | 209:17 217:2,3 |
| 121:25 125:7 | 227:6 269:10 | 267:24,25 | 218:22 221:7 |
| 126:24 128:2 | 271:18 306:10 | 274:18 283:17 | 221:11 239:8 |
| 129:10 130:13 | 318:9,18 322:6 | 297:1,3 322:9 | 242:16 244:6 |
| 130:16,18,22 | 322:11,17 | **longo** 193:23 | 269:4 274:10 |
| 131:8,16 | 328:9 | 194:17 202:10 | 274:11 277:24 |
| 132:23 133:4,6 | **live** 72:18 73:24 | 203:20 | 278:1 279:8,19 |
| 135:12 137:18 | 267:24 | **look** 9:13 22:25 | 279:21 297:6 |
| 138:4 142:13 | **living** 197:10 | 33:8 40:8 44:1 | 298:14 299:8 |
| 142:17 143:8 | 210:20 317:11 | 44:4 46:24 | 322:4 |
| 143:14,16,18 | **llc** 2:5,10 | 58:21,23 59:6,7 | **looked** 5:15 |
| 143:22 144:3 | **llp** 2:19 3:4,10 | 60:4,12,17 | 24:10 46:17 |
| 144:15,20 | 3:15,20 | 61:11,22 64:3 | 47:4 51:9 |
| 147:4 149:5,8 | **llt** 156:18 | 65:8 68:24 | 54:12 60:11,13 |
| 186:12 205:15 | **lobbied** 235:13 | 73:2 74:1,3,17 | 61:1,6,12 62:25 |
| 247:21,21 | **lobbying** | 76:21 82:1 | 69:21,21 70:9 |
| 249:11 262:15 | 249:18 | 94:24 95:15,19 | 79:15 80:14,15 |
| 264:5 266:4 | **local** 152:25 | 99:2 101:1,6,8 | 98:8,10 105:8 |
| 268:18 | 153:1,5 | 101:22 106:2 | 106:16 109:25 |
| **literatures** 98:4 | **located** 111:19 | 107:11,11,18 | 110:5 111:17 |
| **litigate** 27:4 | 125:22 | 107:20 110:14 | 131:15 136:10 |
| **litigation** 4:10 | **location** 280:24 | 110:17 112:4 | 219:15 229:21 |
| 46:19 158:17 | **lodged** 72:18 | 115:23 117:22 | 232:9 238:23 |
| 193:19,24 | 324:13 | 119:22 131:18 | 240:2 244:9 |
| 194:1,1,24 | **logged** 75:5 | 169:10 173:11 | 250:6,20,23 |
| 207:16 210:22 | **logistic** 303:22 | 176:4 178:16 | 260:23,25 |
| 212:16 232:8 | **logistically** 6:17 | 178:20 179:10 | 270:2,11 |
| 250:18 298:23 | **loliver** 2:7 | 180:2 184:24 | 271:12,12 |
| **little** 6:8 16:15 | **long** 48:23 | 186:21 195:25 | 274:8 276:20 |
| 20:23,24 23:9 | 88:21 98:16 | 198:7 199:4,4 | 281:19 316:7 |
| 42:19 54:19 | 115:2 133:23 | 199:22,22 | 320:11 |
| 62:12 64:24 | 243:11 298:15 | 201:12 202:4,6 | **looking** 9:5 |
| 76:16 116:16 | 301:17 304:12 | 202:25 203:12 | 22:15 24:25 |

**[looking - making]**                                    Page 52

25:16 26:16
39:5 45:9
47:12 59:9,10
59:22 60:2,18
60:20,21,24
68:16 69:20
70:5 78:2
81:20 82:7
84:23 85:22
86:25 101:8
137:9 186:24
189:7 203:21
208:10,16
234:17,18
263:22 264:5,6
281:14 296:22
310:24
**looks** 43:10
68:11,11,12
70:7,12 71:22
74:5 101:5
104:23 105:7
137:1 138:24
182:7 208:12
208:12 261:24
269:9
**lose** 305:12
**lost** 63:23
**lot** 4:23 6:1
11:11 27:4
28:10,25 29:3
46:3 52:12
55:5 65:13
101:4 105:1
165:9 173:8,10

204:2,4 211:25
256:24 270:19
288:25 292:11
292:13,21,23
293:13,23
296:23 306:16
317:18
**lots** 39:18
130:10 301:14
**loud** 126:2
**love** 82:23
249:3 297:8
**lower** 182:8
266:3 278:2
**lstemkowski**
2:7
**ltl** 156:14,18,24
156:25 157:5
**lump** 100:8
110:7 122:2
**lunch** 155:18
156:3 310:7,8
**lunchtime**
176:16
**lung** 122:20

**m**

**ma'am** 30:3
54:5 56:8
75:20 90:19
95:2 117:13
119:16 158:8
163:2 171:11
183:18 216:1
230:5 240:8
288:6

**machine** 61:22
65:8 71:8
**mack** 26:17
27:8,10 80:15
301:11
**made** 44:16
48:16 71:14,16
121:16 137:14
154:12 159:13
169:22 232:15
255:25 275:21
291:23 300:4
312:7 315:7
**magnesium**
64:25 138:18
**magnifications**
69:3
**mailboxes**
316:24
**main** 2:20
56:18 123:11
123:16 181:5
305:5
**major** 16:8
20:25
**majority**
201:23 204:22
205:18 285:23
**make** 18:6 21:6
28:7 34:23
49:7 52:20
53:18 56:16
58:25 91:11
92:13,14
111:13 121:2

131:4 146:17
148:4 151:5
153:12,15
159:7,11,20
160:10 161:20
165:9 167:19
168:4,8 169:20
174:3,25
175:12 176:8
181:3,8,12
192:4,11,24
195:18 200:5
208:23 210:19
217:20 236:18
237:19 241:1
245:13,24
246:14 247:14
255:24 270:19
278:20 290:19
292:17 295:18
300:20 301:8
303:1,3 306:9
306:16 312:4
312:14 316:5
323:5 325:21
326:25
**makes** 108:6
121:5 126:17
200:6,7 213:2
261:15 279:6
282:1 297:12
298:12 327:23
**making** 23:2
39:15,17 41:5
50:16 92:15

**[making - mean]**                                                    Page 53

122:7 130:13
133:21 140:10
170:20 175:2
176:12 236:23
271:23 296:19
**malign**  210:18
**malignancy**
110:17,21,25
**man**  117:10
**mandatory**
300:9
**manhattan**  3:5
**manner**  185:2
237:12
**manners**  185:5
**manufacture**
174:21 300:11
303:9
**manufactured**
171:19,22
172:8 293:2
**manufacturer**
162:13 240:21
241:11,18,21
242:2,3 243:20
245:13 253:4,4
**manufacturer's**
240:16
**manufacturers**
221:23,24
222:2,21 228:1
**manufacturing**
171:24 303:10
**march**  169:8

**mares**  316:25
**marginally**
77:14
**marilyn**  1:6
13:3 28:11
29:23 66:6
183:2 190:20
**mariner**  329:3
329:17
**mark**  325:13
325:16,18
**marker**  48:13
**market**  35:25
36:1 151:7,22
151:24 223:6
223:12 229:6
242:13,14
302:17
**marketed**  32:3
32:4 35:20
36:3,6
**marketing**  32:3
34:15 35:3
42:23 43:1,4
51:12 54:11,13
54:15,18 55:17
55:18 231:5
296:14,18
**markets**  1:11
32:16
**marymount**
43:4
**mas**  193:20
201:7 207:14
207:14 209:2

**mass**  123:11
125:4 175:3
**massive**  115:24
117:8
**match**  133:2
**matching**
275:18
**material**  65:7
193:20 206:24
**materials**
172:23 173:2
**math**  180:17,18
186:9,23 188:8
188:16 189:11
196:6 198:20
**mathematical**
196:3
**matt**  160:23
**matter**  48:19
84:6 114:2
116:15 117:4
128:6 131:5
143:21 187:22
285:9,10 288:3
289:2 315:8
**matters**  50:22
170:9 198:6,7
205:20 209:11
285:25 289:1
**matthey**  192:1
192:6,14
**matthey's**
192:23
**mature**  121:8
123:12

**maturity**
196:12
**mazingo**  2:4
160:5,6 161:23
**mcloone**  3:15
**md**  121:15
**mdl**  194:24
**meagher**  3:4
**mean**  9:9 15:7
31:16 34:18,20
41:1 48:18
52:14 55:25
61:5 80:14
83:1,10,11
91:25 100:18
111:14 112:7,9
122:17 127:22
130:7 133:25
135:1 137:20
145:16 154:1
154:14 155:8
159:12 164:3
166:14 179:6
190:2 191:1
194:3 196:9,25
200:1,2 201:11
216:12 218:19
235:10,23
244:3,11 245:7
246:16 253:22
253:23 256:11
256:24 257:18
260:22 262:19
268:14 270:24
272:18 283:14

290:5 291:3,12
303:2 306:4
**meaning**   49:2
69:7 71:19
82:14 106:8
166:19 170:7
172:13 189:19
191:19 199:10
199:10 215:23
248:5
**meaningful**
132:25
**means**   13:14,18
15:9 35:1 38:7
67:2 81:1
82:25 83:2
117:20 118:10
222:12 230:2
232:22 260:12
280:13 290:6
305:11 322:3
**meant**   24:24
52:11 183:19
**measure**   182:5
187:15
**measurements**
208:20
**measures**
186:13 298:19
298:25 299:2,5
299:11
**mechanism**
112:15 144:11
248:14,15,18
273:9 276:13

**mechanisms**
143:1
**medical**   13:12
14:21 17:23
18:2,5 20:3
23:7 25:20
26:20 27:25
50:5 60:14
68:11 69:21
71:19,21,23
79:4 80:18
81:5 87:8
117:22 119:12
119:19 120:15
121:13,20
188:24 189:1
189:12 223:15
230:20 238:5
263:1 268:24
269:17 270:13
270:14 272:4,5
273:23,24
274:6 276:25
282:20 317:12
**medicine**   198:1
218:20
**meet**   17:20
173:22 215:17
215:18 226:6
325:8,9
**meeting**   289:21
**melanoma**
125:9,10
**member**   318:4

**member's**
164:18
**members**
289:21 318:7
**memo**   39:15,24
39:25 44:3,6,25
45:10 231:19
236:8,17
**memos**   45:12
45:13 46:3
51:3 236:19
**men**   105:23,24
**menstruation**
31:9 32:11,17
35:5
**mention**   26:6
131:20 150:23
**mentioned**
20:25 30:5
35:14 119:10
219:6 229:6
241:19 249:8
271:19 288:5
291:21
**mentioning**
30:4 160:25
161:7
**merely**   8:23
**merits**   312:15
**mesothelioma**
320:8
**met**   179:13
184:15 212:8
215:12

**meta**   281:13
**metal**   145:20
148:11 149:11
**metals**   134:12
140:22,24
141:14,16,24
143:4,11,24
145:1,2 148:16
149:10,17,21
149:22 150:1,2
217:12
**metastasize**
104:20
**metastasizes**
122:19
**method**   40:17
42:9 80:24,25
81:1 91:23
92:2 105:2
108:20 260:11
260:17
**methodically**
31:13
**methodologies**
131:17 195:12
203:11
**methodology**
8:1 9:23 14:24
18:13,13 23:12
25:16,17 28:5
74:16 89:2,5,25
97:13,13
106:13 123:17
133:7 134:11
202:19 203:3

[methodology - morrissey]                                        Page 55

| | | | |
|---|---|---|---|
| 206:17 208:14 | military 318:2 | misbranded | moment 270:18 |
| 271:8 278:6 | millimeters | 214:1 | 301:14,16 |
| 284:25 | 102:21 | misbranding | moments |
| **methods** | **million** 142:3 | 225:8 | 104:23 301:14 |
| 202:10 238:8 | **millions** 46:20 | mischaracteri... | **monday** 5:21 |
| **miami** 1:1,17 | 46:20 | 239:16 | 156:12 159:5 |
| 1:18 3:17 | **milliter** 199:17 | misidentifying | 251:21 254:10 |
| 195:23 | **mils** 150:13 | 203:17 | 275:22 303:18 |
| **michael** 2:10 | 155:20 | misleading | 303:25 304:3 |
| 3:20 | **mind** 16:6,16 | 45:22 169:5 | 315:5 316:2 |
| **microbiology** | 31:11,20 32:7 | misquote | 318:18 328:5,8 |
| 180:24 | 32:24 33:22 | 159:13 | 328:12 |
| **microphone** | 38:22 159:16 | misrepresent | **money** 39:18 |
| 318:11 | 167:4 200:11 | 159:13 | 70:21 158:4,5 |
| **microscope** | 211:5 | **missed** 299:23 | 236:13 278:22 |
| 62:17 64:3 | **minds** 31:25 | **missing** 106:7,8 | 303:1 |
| 69:1 106:3 | 35:23 43:24 | 114:25 | **monograph** |
| 207:24 208:1 | 44:3,12 | **missouri** 3:11 | 136:25 137:8 |
| **microscopes** | **mines** 172:1 | 256:10 | **monroe** 267:7 |
| 64:8 70:8 | **mini** 160:10 | **mistake** 121:20 | 267:22 |
| **microscopist** | 216:18 | 291:23 | **montgomery** |
| 180:25 208:15 | **mining** 34:16 | **mistrial** 258:15 | 2:15 |
| **microscopy** | **minor** 123:10 | 258:16 311:15 | **month** 153:13 |
| 64:21 | **minute** 75:9 | 311:16,16,19 | **months** 169:19 |
| **migrate** 58:10 | 89:4 124:8 | 311:20,21,23 | **moon** 249:5 |
| 283:7 | 151:13 219:20 | 312:2,8,9,11,21 | **morgan** 153:1 |
| **migrates** | 221:2 245:16 | 312:22 | 153:2 |
| 282:18 | **minutes** 133:24 | **mixing** 275:18 | **morning** 6:7 |
| **migration** 59:1 | 168:13 171:8 | **model** 290:18 | 57:7 98:14 |
| 59:25 248:16 | 176:17 283:25 | **modern** 42:25 | 126:11,12 |
| 282:16 283:2 | 310:7 314:15 | **modify** 27:12 | 254:4 |
| 283:13 | 319:8 324:5 | 28:3 | **morrissey** |
| **mil** 169:4 | **misbrand** | **molecular** | 100:22 102:13 |
| 171:10 | 215:25 | 76:18 104:4 | 115:4 116:25 |
| | | | 120:25 124:19 |

**motion** 4:3,4,5
4:6,7,9,10,11
4:13,14,16,18
4:19,20,21,22
4:24 6:22,22
7:5,16 14:1
19:1 24:13
30:18,24 31:2
47:10 57:3,11
58:9 62:1,5,7
62:11 75:8
95:3,8,13 96:20
101:2 106:18
119:24 134:6
135:22 150:20
150:22 151:1
152:11 153:21
155:16,19
156:3,4,8,11,12
156:19 160:13
161:12,22,25
162:5,6,10,11
164:22 167:17
168:7,10,25
171:4 176:10
176:11,22,24
187:18 190:7
193:18 200:20
200:24 207:23
210:1,5 227:5
257:10 259:16
267:7 283:24
291:25 292:5
293:25 321:23
321:23 322:1

**motions** 10:22
70:2 135:3,13
162:1,4,8 163:3
210:6 284:1
**motivation**
154:21 155:1,4
155:6
**motive** 218:17
219:4
**motley** 2:5,10
**motleyrice.c...**
2:7,7,8,8,12
**mount** 2:6
**mouthpiece**
57:24
**move** 70:24
150:13 162:14
218:2 259:21
311:15,16
**moved** 162:20
210:10 284:7
**moving** 62:13
62:23 171:12
**mpendell** 2:12
**mrayfield** 3:23
**multi** 46:19
**multidiscipli...**
47:17
**multiple** 42:18
46:8 145:13
189:13 206:23
268:13 269:17
**multiplication**
188:11

**multiply** 188:9
**multiplying**
188:18
**murray** 294:9
**muster** 61:15
61:17
**mutation** 7:24
8:6,7,11,19 9:2
11:11 13:9,14
13:14,15 14:17
15:4,8,13 16:1
17:2 18:22,24
19:16 20:14,18
21:4 22:6 24:7
26:10 28:12,13
28:16,23 30:22
76:9 78:18
80:11 94:9
**mutations** 8:15
11:11 20:17
26:13 30:10
77:14,22 91:21
**mutually** 207:1

| n |
|---|

**n** 4:1
**nail** 160:7
**name** 57:10,19
178:19
**names** 58:2
285:12
**narrative**
220:21
**narrow** 10:22
12:1 57:11
251:7

**national** 225:23
232:25 233:15
233:20,23
234:10 284:16
284:17
**natural** 84:22
**nature** 153:24
292:15
**near** 280:22
**neater** 187:11
**necessarily**
33:21 45:8
63:17 179:8
202:7 206:10
286:1 303:2
313:23
**necessary**
197:5 244:21
245:5 274:16
315:19
**need** 5:19 7:7
8:24 11:15
18:9 23:3 36:4
48:15 49:22
51:18 65:21
66:16 67:14
68:24 83:8,9
87:6 107:15,21
114:20,21
118:3,4 124:6
124:12 129:3
131:12 132:17
135:7 136:6
137:25 146:20
151:10 153:6

**[need - notice]**

| | | | |
|---|---|---|---|
| 154:14 156:22 | 288:25 | 144:10 147:2 | **nice** 30:15 |
| 157:14 159:24 | **needs** 18:18 | 248:11,12 | 220:11 |
| 167:19 168:8 | 107:20 129:13 | 259:24 | **nickel** 141:4,20 |
| 178:1 181:7 | 136:17,18,20 | **net** 157:25 | 142:2,7 144:2,4 |
| 183:18,21 | 138:3 149:15 | **never** 23:6 39:2 | 147:5,11 |
| 186:4,7 187:9 | 163:12 197:22 | 41:24 47:11 | **night** 233:15 |
| 190:12 191:6 | 199:17,18 | 51:15,16 52:13 | 327:16 |
| 197:8,11 | 287:23 291:19 | 54:2,2 56:19 | **nine** 261:25 |
| 198:14 202:17 | 309:24 | 58:20 59:12 | 281:13 |
| 202:22 203:23 | **negative** 13:4 | 60:8,10,11,17 | **niosh** 284:16 |
| 214:1 219:11 | 309:23 | 61:14,14,17 | **non** 16:20 |
| 221:3 238:24 | **neither** 76:14 | 92:22,24 | 20:21 201:16 |
| 238:25 239:2 | 191:4 209:18 | 106:16 127:25 | 201:24 202:3,9 |
| 251:15 252:25 | 289:19 | 131:24 132:13 | 203:17 204:2,6 |
| 260:1 301:20 | **ness** 4:9 95:8 | 134:2 143:23 | **nondoctor** |
| 303:9 306:14 | 95:14,18,23 | 144:18,19 | 13:17 |
| 306:25 307:2,2 | 96:17,19,24 | 145:1,2,11 | **nonmathemat...** |
| 308:18,19 | 98:9,19,20 | 147:17,17,19 | 260:11 |
| 309:3,3,5,6,6 | 99:18 101:2 | 147:20 148:6 | **nonparty** |
| 309:25 310:15 | 110:4 111:16 | 152:17 209:24 | 162:15 165:21 |
| 310:22 311:3 | 112:13,24 | 212:11 219:25 | **normal** 197:9 |
| 311:13 312:5 | 120:5 123:17 | 220:1,1,7,8 | **normally** 33:18 |
| 313:20,20 | 124:16,16,18 | 222:4 229:3,4,6 | 122:22 273:4 |
| 314:2,19,21 | 125:21,22 | 229:9 264:1 | 307:9 316:21 |
| 315:15,19,19 | 126:5,6,11,20 | 265:23 266:5,7 | 319:15,17 |
| 319:4,9,9 321:8 | 127:23 128:16 | 266:9,11,12 | 321:14 |
| 326:13,16 | 128:25 129:6 | 267:14 284:18 | **note** 105:18,20 |
| 328:13 | 129:12,15 | 294:24 295:10 | 108:7 121:17 |
| **needed** 214:3 | 130:3,7 131:10 | 305:18,19 | 263:2 |
| **needle** 202:5 | 131:14 132:19 | 313:15 326:2 | **noted** 104:22 |
| **needlelike** | 134:8 136:14 | **new** 3:6,6,22,22 | **notes** 104:10 |
| 45:15 201:21 | 136:17,18 | 91:8 195:23 | 302:11 317:23 |
| 205:17,19 | 137:21 138:9 | 257:16 | **nother** 23:21 |
| 206:1,9,14 | 139:3 140:19 | **news** 5:5,6 | **notice** 1:25 |
| 285:25 286:13 | 142:4,24 | 268:10 | 93:20 173:4 |

**number** 11:7
33:19 63:2
99:3 110:14
160:9 162:12
179:2,5 182:9
182:10 187:16
188:2,4,9,22
189:9,9,14
201:9 276:11
292:6 296:16
296:17 305:12
305:13 318:19
319:21
**numbers** 157:6
189:8 195:12
208:4 318:14
**numerous**
128:7,10
142:22

**o**

**o'brien** 101:4
101:23
**o'dell** 2:14
98:14,15
100:12,17
101:16 102:5
102:11,20
110:10,13
111:1,11
112:10,24
113:25 114:17
117:14 119:8
120:3,13,19
124:9 125:14
125:20,23,25

126:6 129:12
129:19,21
130:3,17
132:20 137:20
138:3,9,22
139:15,18,24
140:3,12,16
141:25 142:12
142:20 143:7
143:17,25
144:17 145:17
145:21,24
147:1,10
148:13,18,20
149:3,14 150:8
221:15 222:10
222:13,17
224:15 226:2
226:14,22
227:24 228:6
228:25 229:5
229:19 230:4
230:18 231:1
232:12,17,23
233:19 239:15
240:1,12
241:14,16
242:8 243:25
245:15 247:8
247:13,24
248:10,25
249:7,23 250:5
254:13 255:7
255:14 256:2,6
256:21 257:9

257:16 258:7
258:25 259:11
259:13 285:9
288:1
**object** 37:8
307:20 313:5
324:2,4,18
325:12,19
**objected** 23:18
37:20
**objecting** 37:5
48:11 313:6
315:9
**objection** 15:3
150:6 163:21
164:7 167:20
168:8 230:22
237:4 253:15
258:11 307:22
307:22,24
313:1,2,3,11,12
315:8,9,10,11
324:7,13
325:11,13,22
**objections**
308:2 315:1
316:8 326:25
**obligated** 173:6
**obligation**
131:6,9 133:2,5
133:9 240:25
324:15
**observed** 34:8
104:2

**observing**
88:16
**obvious** 74:25
**obviously** 7:19
10:18 47:16
53:13 57:22
67:6 105:21
116:24 122:18
135:2 182:6
213:19 265:24
266:12 267:4
304:20 309:23
310:24 323:4
325:20 327:25
**occasions** 184:4
**occupational**
137:11
**occur** 21:9 23:3
169:18 271:24
**occurred** 17:23
**occurring**
274:22
**occurs** 87:21
283:13
**odd** 22:8
263:17
**offend** 317:17
**offer** 14:23
32:5 45:17
54:9 75:23,25
79:4 210:23,25
212:13 228:11
279:2,9
**offered** 52:2
192:20

**offering** 23:16
210:17 228:25
229:1
**oftentimes**
108:8
**oh** 18:23 38:5
85:7 119:22
122:7 129:20
132:5,7 143:15
147:22 152:18
154:23 168:21
186:2 204:25
228:4 231:18
231:20 255:20
257:3 306:6
**okay** 7:9,15,18
8:4 10:7 23:9,9
24:22 33:22
38:11 39:16
53:7,22 55:9
56:13,13,15
59:20 62:9
68:18 69:14
73:9 75:20
76:3 78:20
82:1 87:3,9,10
89:22 97:22
103:16 104:24
105:10 108:1
113:22 114:20
118:3,5,9 119:4
126:20 129:6
129:24 130:2
131:13 132:19
133:23 134:10

134:13,25
135:16,18
136:9 139:12
142:18 145:23
148:18 150:19
157:9,17 159:9
161:15 164:21
166:4 167:2
168:4,23,24
169:4 171:6
177:1,3 190:15
192:10 197:17
201:4,19
207:21 210:8
211:18 215:3
216:22 219:16
223:18 224:12
228:20,22
229:15 237:21
243:17,19
249:6 252:22
259:1,19 262:9
264:3,8 265:4
265:17 267:2
268:5 272:15
273:24 274:5
275:1 283:13
284:7 286:5
290:17 296:21
298:20 300:14
301:22 303:18
304:17 305:9
305:13 306:19
306:22 307:4
307:16 308:1,5

308:7,15,18,24
310:22 311:6,9
312:12 313:2,6
313:18 317:20
318:5 319:4
321:9 323:18
326:3 327:7
**ol** 174:3
**old** 207:6 265:5
267:24
**oliver** 2:3 6:21
7:4,9,15,18 8:4
9:8 10:6,11,15
12:5,21,24
13:23 15:7,11
15:18 16:10,11
26:6 27:3 29:6
30:5 31:3,5
32:21 42:12
48:18 49:9
51:23 53:3,5,7
55:20 75:6
78:15 114:23
115:12,17
116:25 117:15
117:23 118:8
118:11,16
119:9 120:22
124:13,18
150:12,15,19
150:22 151:15
153:11 155:20
156:7 177:25
181:2 182:14
182:20 184:22

186:1,3,10
187:5,13 188:6
188:13,19
189:5,23 190:2
190:10,15
191:4 194:14
196:24 197:11
197:13,21
201:3 204:14
204:25 205:8
207:21 208:19
209:16 239:14
259:16 284:4,7
285:6,10 286:7
286:11,19,21
286:24 287:2,4
288:5,13
289:12 291:23
295:25 296:3
296:12,17,22
297:23 298:6
298:24 299:8
299:24 300:6
300:13,22
302:3,9 303:12
304:22 306:7
309:10 314:15
314:18,24
315:22,25
320:7,23 323:3
323:12 328:3
328:18
**olutola** 2:4
**omitted** 250:20

**once** 165:3
  242:20 252:16
  253:10 324:13
**oncologist**
  115:4 138:23
  138:25 263:20
  269:11,16
**ones** 73:3
  304:14 315:16
  325:11
**ongoing** 166:16
**onus** 243:24
**oodles** 185:4
**oophorectom...**
  15:20
**open** 148:2
  171:4 295:8,9
  295:16,17
  296:3 300:19
  300:23 301:10
  301:12,22
  307:5 316:11
**opened** 295:19
  295:21 301:6,9
**opening** 118:5
  159:21 284:2
  284:10 288:17
  291:21 296:1,5
  296:7,8 301:24
  305:23 314:16
  323:17,24
  324:1,3,4,6,17
  324:21 328:5
  328:11

**opens** 295:4
**operating**
  73:23
**opine** 31:10
  81:19 197:5,8
  213:2,18 218:8
  219:8,24 254:8
  256:18
**opined** 91:3
  92:25
**opining** 86:6
  212:15,19
**opinion** 9:12,16
  9:24,25 10:17
  14:25 17:14
  18:16 20:6
  40:4 57:12,18
  58:17 59:11,24
  60:7,16 61:11
  61:17 70:25
  72:9 73:14
  75:14,16,22,23
  76:1,22,23 77:6
  78:8 79:5
  80:10 86:5
  92:23 95:4
  105:22 126:14
  127:23 128:1
  128:18 131:5
  134:15,19
  138:20 140:22
  144:10,20
  145:25 146:22
  147:3 148:5,12
  177:13 190:14

  190:16 191:17
  192:14,20,24
  193:5 195:20
  199:13 201:6
  202:17 204:12
  211:3 212:10
  212:21 214:24
  214:25 217:21
  217:23,25
  219:19,24
  224:19,24,25
  225:5 227:20
  228:12,23
  229:10 233:5
  237:19 245:19
  247:17 248:12
  250:16,21
  253:16 254:11
  254:24 255:4,4
  255:16 256:13
  256:21 257:12
  257:25 259:22
  261:7 267:9
  274:17 278:8
  278:13 279:10
  281:6,9 294:10
  294:10
**opinions** 4:4,5
  4:6,9,18,19,20
  10:24 32:6
  40:13,22 44:15
  54:10 56:3,6
  62:24 134:11
  134:12 137:23
  199:12 210:12

  210:18,23,24
  211:1,2,9
  212:14 213:7
  218:5,17 219:5
  235:23 237:1
  247:5 250:24
  260:4,5 267:6
  278:4
**opportunity**
  25:9 130:23
  133:20 282:21
  307:6,12 324:2
**opposed** 96:16
  286:13
**opposing**
  170:25 270:4
  325:2 326:20
**opposite** 129:5
  281:21
**opposition**
  101:2 152:12
**option** 321:4
**oral** 266:7,9
**order** 6:10,11
  6:12 16:16
  22:5 40:4
  49:10,11 57:17
  101:11 148:11
  163:11,18
  164:23 189:13
  218:14 222:22
  223:5 236:12
  240:21 259:4
  318:23 319:2
  319:13,18

| | | | |
|---|---|---|---|
| **ordered** 257:16 | **ovarian** 7:25 | 121:21 122:6 | **overall** 160:8 |
| **orders** 301:2 | 8:19 9:1 11:3 | 122:17 123:20 | 167:14 |
| 308:10 | 11:13 13:2 | 126:15 127:11 | **overlap** 251:8 |
| **organic** 65:7 | 14:6,11,19 17:3 | 127:18 128:1 | **overrule** 150:5 |
| **organization** | 20:20 21:16 | 131:15,18 | **overruled** |
| 144:7 163:1 | 22:17 24:17 | 138:5 139:6 | 163:22 237:4 |
| 173:20 | 26:8,11,14 | 140:8 142:23 | 258:12 308:9 |
| **organs** 282:6 | 28:16,18,23 | 143:20 144:12 | 315:21 324:8 |
| **origin** 126:25 | 29:11,20 30:8 | 154:4 186:13 | **overruling** |
| **original** 6:6 | 30:12 35:4 | 224:23 229:6 | 253:14 |
| **originally** 90:8 | 36:20 54:21 | 234:6 239:20 | **overturned** |
| **originated** | 57:21,22 77:23 | 244:7 248:1 | 92:22 |
| 122:25 | 77:25 78:5,21 | 256:6,9 259:25 | **ovulate** 266:2 |
| **orthopedic** | 79:3,18,23 80:6 | 260:7,20 261:7 | **ovulation** |
| 147:19 | 82:1,7 83:5,21 | 263:13,18 | 265:24 |
| **orthopedist** | 84:1,17 90:10 | 264:14 265:5 | **own** 12:6 30:6 |
| 87:12 | 90:23 92:19 | 265:11,19 | 30:6 36:24 |
| **osann** 12:13 | 93:7,10,21 | 266:1,8 269:13 | 40:9,10 48:17 |
| 104:9 111:25 | 94:10 95:19,21 | 269:14,22,25 | 94:4 96:20 |
| 114:11 132:22 | 95:25 96:25 | 281:21 320:9 | 106:1 113:8 |
| 136:6 | 97:5,9,17 98:21 | **ovaries** 58:10 | 115:13,14,17 |
| **osha** 172:25 | 98:25 99:5,13 | 99:16 115:12 | 142:1 166:1 |
| 203:7 204:17 | 99:24 100:10 | 115:20,25 | 182:11 194:19 |
| 204:18 205:7 | 101:7,9,15,18 | 117:8 118:17 | 209:22 211:7 |
| 284:16 | 103:1,19 104:5 | 118:18 119:5 | 238:9 244:12 |
| **outcomes** | 104:12 105:5 | 248:21 269:23 | 244:25 260:10 |
| 100:25 | 105:12,16,24 | 273:16 | 262:23 264:17 |
| **outlier** 128:4 | 106:10 108:19 | **ovary** 96:16 | 264:21 265:1,6 |
| **outline** 34:3 | 109:13 110:2,6 | 100:6 101:25 | 270:16 274:12 |
| **outside** 67:2,5 | 112:16 113:6 | 102:22,24 | 295:19 323:22 |
| 74:4 159:25 | 113:14,16 | 112:17 115:7 | 323:23 |
| 161:18 | 114:5,15 | 119:11 120:15 | **ownership** |
| **outweighed** | 116:22 117:20 | 121:7,9 123:11 | 299:10 |
| 173:15 | 117:24 119:21 | 123:11 127:2 | |
| | 119:23 121:18 | 266:3 | |

| p | | | |
|---|---|---|---|
| **p.m.** 1:19 | **papers** 8:23,23 | 144:9,9 145:12 | 66:23 67:1 |
| 125:18 176:18 | 11:7,8 24:20 | 145:25 147:2 | 68:17,21 69:9 |
| 176:19,20 | 81:4 85:23,24 | 153:20,25 | 69:15 70:11 |
| 328:20 | 88:18 99:9 | 165:22 166:16 | 73:2 74:4 |
| **package** 187:12 | 108:21,22,23 | 167:1,11 181:9 | 170:13 202:2 |
| **packages** 172:5 | 128:7,10 | 181:10 186:6 | 203:13 208:6 |
| **paddles** 318:14 | 162:22 200:24 | 186:15 190:8 | **particular** |
| 318:16 | 302:11 | 206:17 216:23 | 34:21 43:8 |
| **page** 4:2 35:14 | **paperwork** | 227:5,13,22 | 45:19 76:9 |
| 56:15,16 94:13 | 7:12 | 233:21 239:23 | 85:21 101:13 |
| 207:22 280:16 | **paradigm** 27:6 | 246:15 248:14 | 105:15 129:10 |
| **pages** 41:3 | **paragraph** | 256:13 258:12 | 139:13 185:16 |
| **paid** 207:16 | 110:17 | 258:13 277:8 | 208:16 214:9 |
| 210:16 | **parallel** 79:19 | 282:18 283:7 | 241:6 243:6 |
| **painful** 325:25 | 84:17 | 288:13,22 | 246:8 256:16 |
| **pair** 74:3 | **parallels** 82:8 | 289:5 308:5,8 | **particularly** |
| **pan** 77:20 | **paraphrasing** | 320:18 | 26:13 37:11 |
| **pancreatic** | 44:6 302:12 | **partially** 4:3,7 | 80:5 142:6 |
| 77:15 80:6 | **parent** 22:1 | **participant** | 210:21,23 |
| 93:21 122:20 | **parenting** | 163:1 | 220:19 222:25 |
| 122:21 | 32:13,20 34:25 | **participants** | 244:4 254:9 |
| **panel** 305:6 | 35:1 | 205:5 | **parties** 30:17 |
| 315:23 316:4 | **parents** 21:25 | **participation** | 283:23 309:20 |
| 316:11 | 22:4 183:11 | 164:19 | 329:10,11 |
| **paper** 11:7,10 | **part** 9:5,14 | **particle** 62:22 | **partner** 194:18 |
| 11:21,22,22 | 13:5 21:1 | 63:17 64:22 | **parts** 74:21 |
| 19:5 20:16 | 48:11 49:17 | 65:19,21,24 | 122:14 125:9 |
| 24:15 30:9 | 50:18 87:1,25 | 69:6 72:17,18 | 125:10 142:3 |
| 90:7 104:9 | 89:12 99:7,24 | 72:25 73:16,17 | 177:12 199:16 |
| 141:2 147:8 | 101:20,24 | 208:16 | 277:14 |
| 169:21 189:1 | 102:17 103:3 | **particles** 45:15 | **party** 152:17 |
| 207:8,8 265:7 | 106:13 107:10 | 58:11,22,24 | 162:15 217:21 |
| 287:8,21 | 111:4 112:10 | 62:19,20 63:3 | **party's** 219:4 |
| 291:21 | 130:4,20 | 63:19 64:4,5 | **pass** 61:15,17 |
| | 133:18 143:11 | 65:9,12 66:10 | 103:24 245:13 |

263:13
**passed** 177:24
215:2 245:10
**passing** 262:25
**past** 168:1
249:24,25
326:7 327:16
**pastiche** 49:23
**patently** 159:5
**pathogenic**
78:17
**pathological**
272:8
**pathologist**
12:7 57:9
61:21 62:8,14
69:16 71:15
94:12 117:5,6
121:4,5 123:5,6
138:23,23
**pathologists**
274:7
**pathology**
60:12 63:1
64:3 65:4 66:7
66:16 72:23
73:13,15 74:1
74:17 116:11
116:18 117:1
117:23 119:10
120:23 121:21
123:3 124:1,3
139:13 269:1
272:9,9 274:11
276:6

**pathway** 21:20
103:23 109:9
109:17,18
110:3 112:8,12
112:20,22
127:21
**pathways**
104:6,14
**patient** 12:10
147:17
**patient's** 12:8
**patients** 58:20
58:22 61:12
77:23 270:16
281:16
**patterns** 103:19
104:4 109:13
127:17
**pause** 21:3 63:4
**pay** 306:15
**paying** 301:2
311:25
**peculiar** 161:4
161:4
**peer** 20:8,12
24:18,19 25:19
30:9 50:9,13,23
58:1 61:16
79:21 81:6,13
81:14,21 98:3
103:25 104:8
142:17 147:7
182:1 205:14
**pelvic** 99:7
100:20 103:2,6

120:3,13,19
122:9
**pelvis** 117:21
118:2 119:15
**penacolinski**
261:16
**penalize** 158:21
**pendell** 2:10
57:5 58:7
59:16,19 60:1
61:8,21 62:4,10
155:24 162:1,7
168:11,16,19
168:22,24
169:3 170:11
170:24 266:22
268:8 275:18
276:10 277:12
279:18 280:14
282:10,20,23
283:1,15
324:20,23
325:3,6 326:19
327:7
**people** 5:23 6:3
6:18 15:19
22:13,16 24:9
28:22,25 29:3
29:14 34:5
43:7 44:10
45:5 50:6
55:12 57:25
58:2,5 83:18
84:15,19,21
85:15 86:8,8,11

86:16 87:17,18
88:3,4,13,15
89:10 91:10
133:15 139:17
140:10 145:13
148:10 157:8
166:22,25
167:7 170:12
184:18 187:15
198:8 230:24
243:1 285:5,15
285:19 290:2
290:15,17
303:2,11,22,22
311:6 312:18
317:23 318:7
319:11 322:18
**percent** 58:15
58:19 59:4
60:3 61:20
93:23 128:17
128:17 137:7
145:21 173:21
195:13 196:1
206:20,25
207:3 208:5,9
243:25 262:7
264:14 265:8
265:11 266:8
266:16 269:4
282:9 295:12
**percentage**
94:1
**perennial**
261:10

**perfect** 304:24
305:14
**perfectly** 28:21
130:25 298:16
299:15
**performed**
194:15
**performing**
61:7 65:17
**peril** 323:22,23
**perineal** 105:9
110:1 261:8
**perineum**
58:10
**period** 5:25
42:25 44:17
49:14 55:10
149:6 166:6
179:11,21
196:17 197:19
265:25 266:2
283:18 285:15
**peritoneal** 39:3
54:21 76:6,10
95:17 96:2,15
96:24 97:9,15
99:6,14,17,21
100:14 101:9
101:19 102:1,7
103:7,21,22
104:4,13 105:5
105:11,17,23
106:11 108:19
108:25 109:8
110:2,7 112:19

112:23 113:7
113:17 114:6,7
114:16,18
115:8,11,13
116:19,21
117:7,25
118:25 119:5,7
119:12,21
120:1,16 121:6
121:10,22
123:8 125:5
126:16 127:12
127:20,20
128:1,14
131:19,20
134:20 259:25
269:24 292:8
293:4
**peritoneum**
115:20 117:9
118:17,19
125:4 127:3
279:22
**permitted**
37:12 267:15
281:9
**permitting**
234:16
**permuth** 4:3
7:5,5,16,23 8:1
8:17 10:23
11:17 14:25
20:6 22:14
25:3,17 26:5,7
28:13 30:19

75:15,21 76:13
**permuth's**
75:16
**persistently**
35:20
**person** 23:16
33:20,21 36:18
45:19 52:14
133:16 141:10
152:5 221:7
239:11 249:17
318:6
**person's** 72:18
218:21
**personal** 1:5
308:19,20,21
308:22,23,25
309:2,4,8,21,25
**personally** 48:2
130:1 133:9
**perspective**
47:24 96:6,11
99:12 102:14
102:15 111:16
111:22 112:11
139:2 143:19
232:10 323:3
**petition** 238:21
239:8,17,18,21
**petitions**
249:14 299:20
**ph.d.** 4:3,8 47:9
55:20 221:18
**pharmaceutical**
223:2,14

**pharmaceutic...**
222:21
**pharmacist**
307:24
**pharmacologist**
210:14 211:16
219:9 220:6
221:4 224:16
248:24
**pharmacology**
221:19 254:13
**phase** 160:18
160:19
**phenomenon**
283:3,10
**philadelphia**
194:25 256:4
**phone** 107:16
114:21 125:25
**phrased** 140:13
**physical** 74:18
**physician** 13:24
13:25 115:3,13
115:14,17
121:14 271:1
**physicians**
281:15
**physiological**
99:12
**pick** 6:25,25
117:14 162:1,7
168:14,15,16
168:24 321:12
322:8

| | | | |
|---|---|---|---|
| **picked**  40:17 | 67:15 68:25 | 153:23 162:25 | **plm**  58:20 59:6 |
| 40:20 168:18 | 69:7 74:6,21 | 194:9 207:17 | 61:22 62:16,25 |
| **picking**  279:19 | 75:4 92:11 | 212:24 287:14 | 63:18 70:4,7 |
| 322:8 | 98:15 134:23 | 287:20 299:4 | 71:16 276:7 |
| **picture**  208:11 | 136:22 139:14 | **plaintiff's**  4:10 | **plunkett**  4:19 |
| **pictures**  16:8 | 140:2 150:11 | **plan**  6:6 42:17 | 42:2 52:1 |
| 195:15 | 152:18 154:1 | 159:21 301:21 | 210:7,11,13 |
| **piece**  58:8 | 159:3 160:6 | 303:19 328:11 | 211:14 212:4 |
| 62:13 93:25 | 163:12 166:6 | 328:12 | 212:11,18 |
| 103:25 104:8 | 169:12 177:7,9 | **plane**  58:11 | 218:16,19 |
| 114:24 151:25 | 177:17,23 | 59:1 66:24 | 219:7 223:17 |
| 260:2 | 178:4,7,10,11 | 67:2,5 69:8,10 | 225:19 229:21 |
| **pieces**  94:23 | 179:21,25,25 | 69:12,12 74:4 | 231:2,7 232:13 |
| 95:13 | 180:2 201:13 | **planned**  160:18 | 232:19 236:25 |
| **pioneer**  79:12 | 212:3 215:17 | **planning** | 239:24 245:21 |
| **place**  45:9 | 219:9 224:11 | 291:24 | 247:16,22 |
| 171:25 233:12 | 275:17 294:15 | **plans**  218:6 | 249:9,23 251:2 |
| 240:14 243:18 | 296:4 302:14 | **platy**  138:12 | 251:12,25 |
| 286:2 | 310:5,24 311:2 | **plausibility** | 254:22 |
| **placed**  33:16 | **plaintiff's**  6:22 | 23:19 | **plunkett's** |
| 126:4 241:1 | 62:14 75:8 | **plausible**  19:11 | 211:9 218:5 |
| 252:25 | 95:19 133:1 | 19:13 30:10 | 220:20 233:5 |
| **placement** | 177:4 180:22 | 283:6 | **plutonium** |
| 280:25 | 185:20 186:5 | **plausibly**  20:2 | 181:22,22 |
| **places**  117:25 | 190:17 192:1 | **play**  310:16 | **pocket**  310:14 |
| 127:7 128:9 | 194:2 220:22 | **plaza**  3:21 | **podium**  7:7 |
| 195:5 242:1 | 245:10 272:3 | **pleasant**  2:6 | **point**  9:6,9 |
| 253:3 | 323:3 | **please**  137:20 | 18:14 22:9 |
| **placing**  280:21 | **plaintiffs**  10:21 | 232:14 239:19 | 24:6 26:5 |
| **plainly**  160:21 | 25:3,7,22 31:12 | 253:21 254:19 | 43:17,21,22 |
| **plaintiff**  1:7 2:2 | 40:20 41:11 | 301:8 306:14 | 51:6 55:13 |
| 7:1,4 17:12,20 | 42:3 53:2 56:4 | 306:15,15 | 61:9 66:8,9 |
| 26:16 31:7 | 65:3 66:4 | 310:18,18 | 71:5,6,11 72:14 |
| 53:11 55:6 | 86:20 96:12,21 | **plenty**  29:11 | 72:20 74:8 |
| 57:4 63:6,9 | 96:23 153:23 | 81:3 185:21 | 76:25 82:13 |

**[point - practical]**

84:5,25 88:20
94:3,17 96:12
96:21,23 97:14
102:12 108:5
108:24 111:1,4
116:8 117:17
119:16 123:16
123:21,21,23
126:24 129:13
130:20,20
136:4,24
141:11,12
145:5 148:20
151:5 165:9
166:3 180:15
181:3,5 183:18
185:15,15,18
191:9,22 194:6
198:24 207:13
207:18 208:2,8
214:8 217:6,6
224:24 235:19
235:22 236:24
236:25 237:2
237:16,19
254:18 257:17
261:24 272:7
281:23 282:5,7
284:12 290:24
296:6 297:11
300:1,8 320:12
322:21
**pointed**  104:25
120:24 121:1
159:5

**pointing**  117:15
**points**  105:22
116:14 128:21
134:7 185:20
246:4
**poisoned**
159:16
**poisonous**
40:19,19
**polarized**  62:17
64:2
**police**  166:19
166:20,20
**policies**  287:11
288:9 289:16
289:22
**pool**  316:25
**pop**  5:24
**population**
84:15 270:24
**portion**  42:25
193:18 200:23
316:15
**portions**  201:10
**posed**  39:1
**position**  25:1
56:11 119:3
133:6,9 146:5
146:11 205:18
273:13 310:19
**possession**
237:7 293:13
**possibilities**
23:19

**possibility**  89:3
**possible**  16:25
17:18,25 18:1,4
19:8,10 24:11
60:10,15 61:13
83:3 86:24,24
87:18 88:7,9,22
88:23 89:11
90:11 93:13
144:5 161:16
170:14 265:12
268:11 316:6
316:14
**possibly**  19:20
20:2 59:13
230:12 270:3
**post**  165:10,15
171:24 293:3
294:8 295:25
**potential**  78:2
88:5,5,18 93:13
262:11
**potentially**  5:20
31:13,15
276:22 300:20
**powder**  4:24
29:10 36:19
44:5 48:4
66:12 68:15
73:22 83:20
93:1 120:8
134:16,21
136:12,17,21
137:6,22 138:2
138:11,15

140:7,24
141:22 144:12
149:18 151:6
165:11,12,14
166:12 167:23
167:25 172:12
175:23 178:6
178:24 180:3
181:16 182:4,7
186:12 191:2
193:24 195:1,2
195:10,14
196:1,4 197:18
197:19 198:25
201:8 207:15
214:6 224:19
224:22 233:14
238:10,22
239:1 240:10
240:11,12
244:5 245:6
280:21 284:14
292:11 297:4,7
297:22
**powders**  73:19
73:20 134:17
141:17 212:19
299:17
**powerful**  200:8
**powerpoint**
297:23 324:12
**powerpoints**
297:15,16,25
**practical**  49:7

**practice** 133:10
**practices** 31:11
32:7,25 35:22
218:6
**precautionary**
299:11
**precisely**
220:15
**preclude**
176:11
**precluded**
212:18
**precursor**
128:8
**predicate**
163:17,19,22
163:23 164:1,2
164:4,15 165:5
291:14,16,17
291:20 325:19
325:21,23
**preempting**
291:6,7
**preemptively**
289:2
**prefer** 308:15
**pregnancy** 31:9
35:5
**prejudice**
173:16
**prejudiced**
259:8
**prejudicial**
41:15 159:3

**preliminary**
287:9,21
289:22
**premarked**
325:15
**premise** 58:12
**preparation**
311:18
**prepare** 311:4
**prepared** 16:6
130:9,12 171:1
**preponderance**
27:12 28:4
93:15
**presence**
141:16 142:25
144:10 159:25
161:18 225:5
225:15 275:9
275:13
**present** 11:1
55:14 74:12
92:5 94:8
149:21,23
169:12 189:17
189:21 258:13
315:3
**presentation**
146:17 324:12
**presentations**
289:20
**presented**
30:21 51:17
72:8 117:2
131:24 161:19

199:14
**presenting**
118:24
**preservation**
182:15
**press** 233:7
**pressure**
310:25
**pretrial** 5:19,19
**pretty** 57:10
68:8 269:20
**prevent** 153:22
223:23 233:7
241:22 242:9
**prevented**
218:15
**preventing**
237:4,8
**prevention**
239:22
**previous** 135:3
**previously**
51:16 104:25
108:5 293:17
**pride** 306:19
**prima** 163:13
**primarily**
203:7
**primary** 39:3
47:4 54:20
76:6,10 95:16
96:2,14,24
97:15 98:22
99:6,14,21
100:14 101:9

101:19 102:1,7
103:7,21
104:12 105:5
105:11,17,23
108:24,25
110:7 113:7
114:6,7,18
115:7,8,9
116:19 117:25
119:12 120:1
120:15 121:6,9
121:9,10,22
123:8 125:5,11
126:16 127:19
128:13 134:20
259:25 292:8
293:4
**princeton's**
47:15
**principal** 113:2
**principles**
223:21
**print** 103:15
**prior** 121:17
172:1 272:4
324:2,4 325:6
**priority** 4:15
169:10,14
**private** 125:9
125:10
**probability**
17:23 19:18
26:20 80:19
**probable** 144:6

[probably - project]                                                     Page 68

| | | | |
|---|---|---|---|
| **probably** 19:20 | **procedures** | 141:9 142:21 | 302:14,20,22 |
| 94:7 160:15 | 203:19,22 | 142:25 149:11 | 303:2,8 |
| 162:2 173:8,9 | **proceed** 146:18 | 149:16,24 | **production** |
| 193:17 269:21 | 146:19 301:25 | 151:23 152:16 | 46:19 |
| 305:22 306:18 | 324:16 | 166:7,15 | **productive** |
| 308:14 312:7 | **proceeding** 4:2 | 167:25 172:7 | 316:12 |
| 319:19 | 194:24 | 173:4 174:13 | **products** 4:15 |
| **probative** | **proceedings** | 174:22 181:16 | 4:17 35:20 |
| 157:3,16,22 | 5:1 125:18 | 181:24 183:10 | 38:18,18 |
| 158:13 173:14 | 176:20 303:23 | 184:5 185:8,9 | 169:10 171:14 |
| **problem** 6:18 | 329:6,7 | 185:10,17,17 | 176:14 184:7 |
| 7:25 9:21 10:8 | **proceeds** | 187:8,23,25 | 214:1,10 226:7 |
| 15:5 27:18 | 322:24 | 188:2 191:7 | 243:15 284:9 |
| 38:8,12,19,20 | **process** 21:9 | 196:9 198:9 | **profession** 23:7 |
| 39:22 52:25 | 58:20 60:2,4,5 | 217:9,10 223:5 | 210:16 |
| 53:24 56:8 | 60:23 66:19 | 223:9,11,24 | **professional** |
| 58:15 61:10 | 195:8 206:5 | 225:6,10,16 | 232:7 329:4,18 |
| 64:6 90:11,18 | 233:3 249:13 | 226:10 228:17 | **professionals** |
| 131:22 139:7,8 | 261:4 266:14 | 229:11 231:16 | 87:8,12 290:7,9 |
| 146:3 153:7 | **procter** 243:23 | 231:18 238:18 | **professor** |
| 190:3 198:16 | **proctor** 53:5,6 | 240:17 241:2,3 | 148:13 |
| 205:25 206:10 | 54:24 | 241:8,12,23 | **profile** 104:2 |
| 206:16 216:17 | **produce** 175:3 | 242:4,5,7,7,10 | **profit** 56:19 |
| 227:19,23 | **produced** | 243:5,6,17 | **prognostic** |
| 229:16 271:9 | 166:1 195:7 | 244:20,21 | 104:3 |
| 275:6 286:4 | 250:18 | 247:19 252:16 | **program** |
| 296:3 311:10 | **producing** | 252:17,19 | 225:23 232:25 |
| 311:11 321:2 | 175:25,25 | 253:1,10 | 233:16,21,24 |
| **problematic** | **product** 27:2 | 285:25 292:19 | 234:10 |
| 38:7 326:4 | 34:5 35:25 | 294:17,24 | **progression** |
| **problems** | 36:1,3,9,10 | 295:2,6,12 | 84:22 |
| 147:23 | 43:3 56:24 | 296:14,19 | **prohibitions** |
| **procedure** | 66:21 67:21,25 | 297:22 298:16 | 175:5 |
| 87:13 161:5 | 138:21 139:9 | 299:14,25 | **project** 254:2 |
| 285:3,18 | 139:10 140:1,2 | 300:3,11 | |

**promise** 232:17
**prone** 271:23
　281:4
**prong** 277:18
**pronounce**
　31:5 264:11
**proof** 26:21
　204:5
**proper** 110:9
　202:18,20
　204:10
**properly** 21:7
　21:10,12 67:9
　67:10 130:15
　204:10 253:10
　272:17
**proposed**
　289:17,22
**prostate** 80:6
**protected**
　261:22
**protective**
　15:20,24 262:3
　265:17,19
　266:5
**protocol** 203:6
**protocols** 204:1
　223:5
**provable** 83:10
**prove** 16:22
　17:21 26:24,24
　80:23,24 83:9
　92:3 157:10,10
　163:13 164:18
　226:18 299:9

302:18
**proven** 23:11
　23:17
**provide** 16:25
　25:5 93:4
　130:16 227:20
　228:9 247:15
　253:16
**provided** 189:2
　224:22
**provides** 42:4
　76:20
**province** 48:7
　216:15
**proving** 9:22
**provision** 214:8
**proximity**
　281:3
**public** 148:14
　174:12 202:14
　202:14 242:21
　287:16 289:20
　305:14
**publication**
　61:16
**publications**
　291:1
**publicly** 285:12
　286:22
**published**
　101:24 262:15
　263:8 286:17
　287:25
**publix** 1:11
　6:24 23:22

228:5 251:21
**publix's** 6:23
**pull** 84:11
　189:20
**pulled** 302:16
　302:20,21
**pulmonologist**
　271:3
**punches** 75:3
**punitive** 157:1
　157:4,18,22
　160:20,21
　161:17 174:10
　174:20,21
　175:6,21 176:2
**purchased**
　171:18
**pure** 9:12 35:20
　35:25 36:1,3,6
　36:7 51:10
　184:21 212:9
　217:23 237:18
　279:10 281:6,8
**purported**
　40:10
**purpose** 12:17
　123:3 138:7
　158:6 248:5
　286:10 299:13
　318:24
**purposes** 5:18
　112:25,25
　116:14,20
　157:13 161:15
　232:8 289:8

**pursuant** 1:25
**put** 9:19 12:23
　25:2,9 31:12
　35:15 36:16
　41:22 43:20
　44:22,23 48:9
　53:18 65:6
　66:14,17 76:25
　94:18 114:4
　125:25 135:9,9
　140:14 143:14
　146:5,10 158:5
　163:13 172:4
　178:7 180:2
　183:11 189:18
　189:19 191:6
　197:21,23
　205:1 217:10
　218:14 219:9
　219:13 220:22
　220:23 224:11
　226:10 228:16
　228:18 229:8
　229:25 232:20
　233:7 235:11
　236:6,11
　238:17,18,24
　238:25 239:3,4
　239:5,23 240:9
　240:16 241:2,7
　241:12,13
　242:4,7 243:5
　243:23 244:15
　244:20 248:18
　250:11 252:10

252:11,18
261:11 282:17
283:4,5 288:2
294:12 302:3
302:10 307:8
310:18,18
323:6 324:6,10
326:3 327:17
**puts**  9:18 42:19
250:7 264:13
279:5
**putting**  41:20
42:6,18 55:4
67:4 183:20
186:17 187:11
211:7 261:8
276:18 279:24
279:25 281:3
282:4

**q**

**qualifications**
16:13,15 19:3
23:16 24:3
91:22 92:17
98:19 221:17
257:18
**qualified**  18:10
34:3,9 40:6
48:1,24 57:15
58:14 61:19,22
71:1,13 138:20
143:4 146:15
148:4 212:13
212:22 213:2
219:8,24

221:14 224:8
227:23,24
237:20 245:21
250:3 251:3,10
251:22 256:18
257:25 307:23
**qualifies**  35:11
218:18 252:3
**qualify**  32:23
35:7,8
**qualifying**  9:16
**quantify**  28:17
187:16 199:19
**question**  6:3
7:9,20 12:25
14:3,15 19:15
27:3 37:25
44:11,24 48:5
61:18 66:3
69:19 74:11
81:19 82:23
83:22 84:3
86:11 87:5,22
90:24 92:10
97:1,4,8,19
98:24 100:6
106:23,25
107:6,9,15
108:3 111:6,7
115:5 116:23
126:9,17 143:3
149:12 153:4
180:7 191:5,24
192:10,13,19
216:25 221:25

224:4 240:8
280:7 290:8,9
301:24 304:11
304:16 307:3
316:25 317:24
318:11 319:1,6
319:12 324:21
326:22
**questioned**
11:17 12:6,8
50:4
**questioning**
16:12,14 92:16
**questionnaire**
316:7,15,15,17
316:18,19,21
317:19,25
**questionnaires**
316:11,23
317:3,8
**questions**  23:24
46:12 97:1
128:20,23
129:1 130:6,10
130:12 152:9
152:23 154:5
160:2 183:5,17
183:22 185:12
193:4 218:1
301:19 304:18
304:19,19
307:15 314:13
318:1 319:20
328:2

**quibble**  184:11
260:16
**quibbled**  272:5
**quibbling**
271:7 283:11
**quick**  156:10
232:24
**quicker**  42:15
**quickly**  72:15
**quiet**  305:19
**quit**  27:16,20
27:25
**quite**  49:24
116:23 156:6
181:4 185:12
246:21 260:12
267:17
**quote**  41:7
164:12 218:20
285:24

**r**

**r.j.**  26:16 33:22
**radar**  243:7
**railcar**  195:1
**raise**  13:1
181:8
**rapid**  317:22
**rare**  22:3
**rarely**  236:9
**rather**  57:2
146:23 161:3,4
322:8
**ratio**  204:17
208:19 260:20
260:21 261:22

264:17,21
265:1 279:16
281:22 283:14
283:16
**ratios** 260:25
277:25
**raw** 195:3
**rayfield** 3:20
**reach** 44:14
124:6 248:21
**reached** 285:11
**reaction** 144:5
**read** 7:11,15
13:24 28:9
31:25 32:2
36:12,25 43:25
47:22 49:25
56:13 77:10
83:6 103:17
135:4,6,14,20
136:3 142:10
142:12,18
143:5,7 144:19
145:3 147:16
147:22 192:25
219:3 220:13
229:24 263:3,4
267:5 271:5
289:14 291:8
301:7 310:16
**reader** 31:20
**reading** 29:2
43:24 49:24
64:25 103:25
115:5 135:11

135:15 211:5,5
218:13 220:4
220:11 224:10
245:17
**ready** 110:11
110:12 310:12
314:20
**real** 84:18
126:20 270:7
**realized** 184:6
302:23
**really** 8:5 25:23
43:21 48:18
57:1 66:18,18
67:18 72:14
79:11 83:22
84:19 90:6
99:22 114:2
116:15,21
126:21 127:10
152:24 179:6
185:19 186:11
187:9 193:20
197:14 200:25
201:1 202:2,2,2
213:4 220:4
221:16 224:10
226:1 227:10
252:8 253:2
257:22 261:18
263:21 266:17
267:3 293:25
301:3,18
306:20 307:2,7
309:6 318:3,17

318:22 319:3
**reams** 31:18
**reason** 9:8
37:24 53:17
58:18 71:24
78:7 82:18
98:11 117:10
126:23 130:25
147:15 151:6
151:21 155:9
197:2 215:6
250:25 259:4
274:20 292:18
293:5 298:24
299:1 302:21
324:9 327:15
328:8
**reasonable**
10:13 17:22
18:5 19:17
20:3 26:20
80:18 83:25
184:23 193:12
218:9 224:20
224:25 225:2
226:19 241:11
247:9 249:12
251:5,18,22
252:5 254:8
314:1,5,11,11
314:12
**reasonably**
226:15 228:8
228:15 229:14

**reasoning**
161:21
**reasonings**
165:25
**reasons** 160:22
212:20 258:10
271:22 286:14
**rebut** 173:18
**recall** 4:23
292:2,4,18,24
293:3 294:1,2
295:14,24
296:15,25
297:2 300:6,9
**recalled** 293:23
**receive** 322:13
**recent** 262:2
**recess** 125:17
176:16,17,19
**recessing**
311:11
**recessive** 22:4,5
22:12
**recognize**
267:12
**recognized**
28:2
**recommend**
15:24
**recommendat...**
244:16
**recommendat...**
287:11 288:10
289:16,22
290:17

**recommended**
  206:5,7 285:3
**record**  9:1
  13:12 39:14
  44:13 45:22
  46:24 68:20
  90:16 102:13
  107:8,10
  114:24 121:24
  125:19 146:8
  178:1 188:16
  196:11 199:9
  199:14 211:6
  220:24 268:24
  287:16 302:4
  302:10 307:18
  311:13,14
  324:10 329:7
**recorded**  306:3
**records**  12:11
  14:22 25:20
  68:11 69:21
  81:5 117:22
  119:9,12
  120:15 121:13
  262:18,19
  263:1 268:21
  272:6 273:23
  273:25 274:6
  276:9,25
**reduce**  265:21
**reduces**  27:24
  265:25 266:4
**reduction**
  77:18 266:8

**refer**  63:6
  67:12 97:4
  101:18 170:13
  170:17,19
  246:17 306:2
**reference**  41:5
  119:11 120:14
  130:13 140:10
  156:14 170:21
  176:12 236:18
  246:14 263:6
  289:3 306:9
**referenced**
  172:25 284:24
**references**  4:11
  4:14,16,21,22
  4:24 80:5
  119:8,13
  129:11,14
  130:10
**referred**  211:4
**referring**  41:2
  165:24
**refers**  71:21
  117:25
**reflected**  258:8
  258:8
**refocus**  135:20
**regard**  23:4
  51:2 91:18
  159:21 195:13
  217:5 254:23
  256:14 285:21
**regarding**  4:13
  4:14,16,21 6:22

  195:21 199:11
**regardless**
  174:13
**regards**  59:3
**regeneration**
  13:16
**regimes**  172:11
**register**  286:22
  287:17 289:25
**regular**  182:5
**regulate**  238:13
**regulated**  233:1
  244:1
**regulation**
  173:1 212:5
  214:10 215:22
  215:23 224:7,9
  224:10 225:2
  229:11 235:1,2
  236:20 238:9
  240:14 241:17
  242:1 244:17
  244:23 245:9
  246:23
**regulations**
  34:16 175:5
  211:3,13,23
  212:6,22 213:8
  213:23 214:4,6
  214:9,14,21,22
  215:2,3,5,6,11
  215:13 216:4
  216:11,12,20
  216:21,22
  217:3,19,19,22

  219:23,25
  220:4,8,9,10,11
  221:8,10
  222:24 223:22
  224:2,2,3
  226:13 227:21
  227:22 228:19
  228:20,21
  236:8 241:5
  244:12,19,23
  244:25 246:15
  255:6 256:19
  289:17
**regulatory**  52:9
  172:11 205:10
  221:20 222:5
  222:10,18,22
  223:1,15
  225:21 226:2
  230:2 231:9,10
  231:11 233:4
  233:19,22
  234:2,7,9,12
  249:24 250:12
  251:1,9 254:14
**rehash**  260:1
**reject**  278:8,13
**rejects**  199:11
**relate**  104:19
  148:24,25
**related**  13:5
  31:23 43:1
  123:13 141:11
  141:12 145:15
  145:17 149:16

156:9,20
171:13 238:9
299:25
**relates** 43:6
101:13 139:21
143:24 163:5
214:14 215:15
215:16 235:8
251:1 279:14
295:24
**relation** 114:17
179:22 252:25
**relations**
305:14
**relationship**
11:13 77:4
94:21 263:12
283:17
**relative** 329:9
329:10
**release** 245:8
307:5
**relevance** 154:8
154:17 161:16
286:5,7 300:15
307:21
**relevant** 32:10
34:22 36:20
86:13 138:6
152:15,15
153:9 154:11
157:2,5,15,22
158:12 159:2
160:21 166:9
170:5,8,12

171:16 172:22
174:10 176:1
245:25 288:22
293:10,10
294:3,21 295:9
295:15 297:11
298:10,11
302:13
**reliability**
89:25
**reliable** 18:14
25:16,17,21
28:5 40:17
42:8 80:24,25
80:25 89:1,5
91:23 92:2
97:13 132:1
260:17 274:18
277:24 278:5
**reliance** 107:12
107:19
**reliances**
106:16
**relied** 28:20
80:1 85:25
177:19 178:10
178:11,12
194:4 287:13
289:7,10 290:7
**relies** 8:22 11:6
64:12 80:8
182:3 193:18
203:4 273:11
281:8

**rely** 11:21,22
40:3,4 52:18
127:25 271:5
286:8,11
288:10 290:9
290:12
**relying** 77:5
102:6,9 193:17
**remain** 166:16
**remaining**
328:13
**remedial**
298:19,25
299:2,4
**remember**
12:13 17:21
53:1,3,10 54:24
55:7 181:15
187:17 188:22
235:4 284:11
**removed** 69:8
**repair** 21:8,10
**repaired** 82:4
**repairs** 82:3
**repeat** 45:17
94:14
**repeating**
144:15 178:2
**replace** 321:14
**replacement**
262:13,16,21
263:12
**replacing** 87:10
**replicate** 78:19
78:24

**replication**
21:9 271:25
**replications**
271:24
**reply** 271:16
**report** 4:3 9:15
104:10 116:18
117:1,23
119:10 120:23
123:3 124:3,14
132:23 258:8
261:21 264:10
265:6 266:5,13
269:1 323:7
329:5
**reported** 182:9
182:11 265:1
**reporter** 329:4
329:18
**reports** 133:1
194:1 223:13
274:10,12
**represent**
287:10 289:15
289:21
**representation**
54:16 105:2
108:16
**representations**
247:19
**representative**
1:5
**representatives**
309:25

**represented**
157:19
**representing**
22:24 150:4
**reproduction**
31:9 32:11,13
32:17,19 34:25
39:1
**reproductive**
273:15
**reputable**
230:13 290:15
**request** 159:24
244:18 295:20
305:15 306:1
**requested** 5:9
**requesting**
313:22,24
**require** 52:20
52:21 170:6
213:23 214:11
228:19 240:13
240:15,17,20
240:22 241:13
243:15 323:24
323:24 327:8
327:11,21
**required** 6:1
89:23,24 136:1
163:20 199:20
214:19,20
217:5,8 222:24
223:3 226:17
238:11,15,18
239:13 240:9

241:7 243:21
252:15,18
**requirement**
136:2 324:11
**requirements**
171:15 173:13
212:8
**requires** 23:17
28:6 89:1,5
135:24 214:10
214:17 215:20
228:18 229:11
236:11 239:12
**requiring**
199:15 312:2
**reread** 151:1
152:12
**research** 8:20
8:21,25 10:9,12
14:5 17:18
39:7,10 43:12
43:13 47:3,5
51:5 54:15
55:12,17 82:14
99:24 100:9
101:13 102:2
113:8 114:14
114:15 142:7
147:7 169:7
**researched**
88:3,4 90:8
**researcher**
98:22 143:9,18
**researchers**
99:4,12 114:9

**researching**
55:1 80:9
**reserve** 5:6,8
**resolve** 158:22
**resolved** 7:3
328:11
**resolving** 158:7
**respect** 100:17
109:16 134:14
239:18
**respected**
111:12 145:4
**respectfully**
173:19
**respective**
175:14
**respects** 226:2
**respond** 116:7
130:15,24,25
131:2,3 137:19
171:2 181:9
235:17 272:10
277:16
**responded**
121:19 212:24
245:4
**responding**
16:3
**responds**
280:10
**response** 72:19
72:24 73:17,25
74:2,20 79:7
107:15 212:4
212:25 213:6

238:20 239:7
245:18 249:13
273:7 280:7
283:16 289:25
308:4
**responses** 78:2
273:8
**responsibility**
242:2 245:12
253:3
**responsible**
155:11 234:1
245:14 311:17
311:20,21,22
311:25
**responsibly**
229:14
**rest** 200:24
**rested** 162:22
**restructured**
158:4
**restructuring**
4:12 156:20
157:15
**rests** 274:21
**result** 17:24
**resulting** 266:2
**results** 80:1
103:21 109:15
127:19
**resume** 255:11
**resumed**
125:18 176:20
**retail** 251:24

[retained - risk]                                                    Page 75

| | | | |
|---|---|---|---|
| **retained** 46:16 | **reviews** 143:8 | 136:4,15 | 176:25 177:4 |
| 152:9 193:23 | **reynolds** 26:16 | 139:15 140:12 | 177:14 178:10 |
| **revealed** | 33:22 | 153:17,18 | 179:3 184:16 |
| 292:12 | **rice** 2:5,10 | 155:6,8 157:9 | 190:11,16,17 |
| **reversed** 27:21 | **rid** 6:1 55:9 | 157:12 160:12 | 190:23 192:20 |
| **reversible** 17:6 | **ridge** 2:4 160:6 | 161:8 162:11 | 194:17,18 |
| 19:22,23 80:21 | **right** 5:2,14 | 172:18 176:10 | 195:9,25 |
| **review** 4:15 | 6:20 10:6,11 | 180:20 181:1 | 198:24 201:5 |
| 45:21 46:13 | 13:9,17,23 | 184:16 185:2 | 203:20 204:15 |
| 69:23 134:22 | 15:11,25 16:3 | 186:16,20 | 205:9 206:6,19 |
| 137:17 138:4 | 16:12 18:9 | 187:20,24 | 207:14 284:24 |
| 141:5 142:12 | 19:23 25:1,15 | 188:10,13 | 285:3,17,18 |
| 142:13 161:18 | 26:15 27:9,17 | 190:2 192:11 | 286:11 289:4 |
| 169:10,15,17 | 29:6,11 37:15 | 192:13,19 | **rigler's** 181:5 |
| 169:22 170:3 | 42:10,24 44:19 | 195:24 196:8 | 181:13 184:10 |
| 233:5 263:8 | 45:4,11,22 | 197:12 198:5,6 | 201:6 |
| 274:16 | 46:25 47:20 | 198:11 199:12 | **rise** 14:19 |
| **reviewed** 12:8 | 51:1,9,11 52:19 | 203:5 204:13 | 310:22 |
| 20:8,12 24:18 | 57:7 60:25 | 205:9 209:19 | **risk** 7:25 8:11 |
| 24:19,21 25:19 | 68:7,8 69:1 | 209:21 219:20 | 8:15,18 9:19,20 |
| 25:19,20 30:9 | 74:15 77:8 | 220:16 232:5 | 10:5 11:2,3,12 |
| 44:13 46:1 | 78:23 83:10,12 | 251:17 254:16 | 11:20 12:2,2,4 |
| 47:1 50:9,13,24 | 83:21 84:4 | 266:7,19 | 12:9,10,23 13:1 |
| 58:2 61:16 | 86:15 89:16 | 272:21 273:12 | 15:15 18:22,25 |
| 63:1 79:21 | 90:17 91:5,6,9 | 275:5 277:19 | 24:8 28:8,16,17 |
| 81:6,13,15,21 | 91:13,24 92:5 | 281:19 283:22 | 28:24 29:2,7,16 |
| 98:4 103:25 | 95:6,12 99:11 | 284:13 285:2 | 30:12 36:20 |
| 104:8 129:9 | 99:17 102:25 | 294:2 298:8 | 39:17,22,24 |
| 142:17 147:8 | 104:18,24 | 299:8,16 | 77:15,17,18,22 |
| 149:5 170:1,3 | 106:4 107:12 | 302:14 303:16 | 78:6 79:19 |
| 170:22 182:1 | 108:4,7 109:14 | 305:14 314:3 | 93:24,25 94:2 |
| 205:14 253:8 | 109:25 110:3,6 | 323:8,14 | 94:10,25 98:8 |
| 325:25 | 110:15,18 | 326:14 | 103:19 104:2 |
| **reviewing** 81:5 | 122:19 124:17 | **rigler** 4:18 65:5 | 104:14 105:11 |
| | 126:12 130:11 | 71:10 137:23 | 105:12 109:13 |

110:2 127:18
128:3,5,11
129:2 212:20
224:17 225:12
225:13 260:20
260:21,25
261:12,13,22
261:25 262:6
263:16 264:14
264:17,20,25
265:11,18,21
266:1 277:25
278:2 279:6,16
279:16 280:1
280:24 281:20
281:22 282:8
283:14,15,18
283:21
**risks** 263:16
**rmazingo** 2:8
**rob** 167:1,2,10
**robbed** 167:5,9
**robbing** 167:4
167:6,7
**robert** 1:5
**roberta** 4:9
**rock** 205:21,22
**rockefeller**
3:21
**rod** 325:15,17
325:17
**role** 121:3
276:12
**rolle** 10:16

**ronell** 178:19
**ronell's** 178:20
**room** 49:7
318:9
**roommate**
182:22 184:14
185:2,24,25
187:6
**roughly** 44:6
196:3
**row** 318:6,6
**rubenstein**
153:2,3
**rule** 68:5,5
144:17 262:9
262:11 265:2
265:12 267:11
268:4,7,9,12
269:6 271:14
271:14 278:18
290:25 311:24
313:3,12
315:13,14
324:21 325:23
**ruled** 10:16
69:19 70:14,14
260:13,14
264:16,18
270:5
**rules** 66:22
188:21 189:2
204:16,21,23
205:3,4,11
206:7 208:22
209:6,20,21,22

214:13 216:4
261:5,5 262:6
266:15
**ruling** 257:20
260:9,10 261:4
279:5 291:5
295:22
**rulings** 306:22
**running** 265:25
**rusty** 64:24

**s**

**saavalainen**
264:11
**sadly** 100:12
**saenz** 12:13
94:6
**safe** 32:4 35:21
35:25 36:2,4,6
36:7 51:11
57:13 151:23
173:2 247:25
294:17 295:13
298:16 299:15
**safety** 56:18
175:13 223:4,9
247:19
**salient** 54:6
254:24 255:9
**salt** 43:18
**sample** 293:21
293:21,22
**samples** 194:25
195:2,4
**san** 269:19

**sand** 68:9
**sarasota** 70:18
**sascott** 2:22
**sat** 133:15
**satisfied** 23:11
90:5 208:21
270:5 324:14
**satisfies** 88:23
88:25 92:16
**satisfy** 23:15
87:25 164:15
**savoureux**
329:3,17
**saw** 63:18 64:4
66:10 69:10
79:15 110:1
133:22 139:13
153:16 154:2,9
154:10,12,13
155:3,6 183:25
184:2,3,14
185:3 203:13
276:6,11
**saying** 8:24
10:2,7,23 11:16
14:21,22 15:3,5
17:11,24 18:1,4
18:18,20,21
19:4,6,7,9,10
19:12 22:22
23:1,21 24:4,9
24:10 32:4
34:2,7 36:8
38:9,10,14,15
39:13,25 40:1

| | | | |
|---|---|---|---|
| 48:12 53:10 | 208:7 209:3 | 69:14,22 70:11 | 255:4 261:6,11 |
| 54:15,17 58:13 | 210:13,18,20 | 71:11,22,24 | 261:15,19 |
| 59:20 60:7,9 | 214:7,13 220:5 | 72:21 73:5,10 | 263:5 264:19 |
| 61:3,19 62:2 | 220:12 224:7 | 76:24 77:13 | 267:21 268:24 |
| 63:5 64:15 | 224:12 227:13 | 78:4,17,20 79:2 | 269:2,3 270:12 |
| 65:15 69:16 | 227:18 228:14 | 80:1 83:2 | 270:20 278:15 |
| 71:18 73:9 | 231:10,11 | 84:12 88:22 | 280:20 282:8 |
| 74:24 76:8 | 237:14 241:9 | 89:11 90:7 | 287:1,10 288:9 |
| 78:15 82:18,19 | 241:16,25 | 93:10 96:17 | 289:7,15,18,19 |
| 84:5 85:5,18 | 242:5 244:6,9 | 100:23 102:17 | 297:10 299:3,9 |
| 86:15 88:1,7,8 | 244:14,14 | 106:2,5 109:3,7 | 303:7 314:6 |
| 88:9,21,23 90:9 | 246:16 252:7 | 110:15,22 | 324:7 |
| 94:22,24 97:14 | 252:13,22,24 | 112:1,4,8,18 | **scenario** 137:12 |
| 100:3,7 101:16 | 257:12,21,22 | 113:19,23 | **scenes** 50:7 |
| 101:21 107:22 | 275:5,16 281:1 | 115:4,6,14,17 | **scheduled** |
| 113:18,19 | 281:2 282:3,19 | 115:21 118:1 | 182:15 |
| 116:3 117:17 | 288:6 289:9 | 123:7 124:4,5 | **schematism** |
| 117:23 122:11 | 290:12,13 | 127:16,17 | 52:19 |
| 123:25 128:14 | 291:11,12 | 130:12 138:17 | **school** 47:16 |
| 128:17 130:24 | 294:12,16 | 142:19 143:6 | 269:18,19,20 |
| 133:22 134:21 | 298:20 306:24 | 143:16 144:10 | 270:13 |
| 135:18 136:25 | 307:1 310:4 | 144:16 145:5 | **schools** 203:8,8 |
| 139:8,17 | 317:15 324:9 | 147:10 167:9 | **science** 11:4 |
| 141:23 142:21 | 326:2 | 167:17 169:25 | 16:9 19:12 |
| 144:1,2 145:10 | **says** 8:14 9:17 | 175:22 178:20 | 20:23 22:6 |
| 146:20 148:8,9 | 9:20 11:2 | 181:20 185:1 | 23:3 24:4,5 |
| 150:1 151:3,13 | 13:13 15:13 | 192:19 193:1,8 | 26:1 35:8 |
| 151:15 154:23 | 18:23 20:1,13 | 197:16 202:11 | 45:11 46:2 |
| 157:7,20 158:8 | 20:16 26:17 | 202:12 223:22 | 47:9,17 55:21 |
| 158:10,11 | 28:13 38:3,4,6 | 228:22 235:1 | 81:9,24 83:9,9 |
| 164:24 166:7 | 39:16,25 40:2 | 236:9 239:12 | 83:11 103:8 |
| 178:1 188:15 | 43:25 44:1 | 241:17,18,19 | 132:4 133:15 |
| 194:11,12,14 | 53:12 55:10 | 241:20 242:1,8 | 133:16 154:18 |
| 197:9 199:8 | 56:16 57:18,25 | 243:16 244:23 | 154:20,22 |
| 202:17 204:8 | 66:23 68:17 | 251:14 252:14 | 196:5 200:16 |

| | | | |
|---|---|---|---|
| 200:16,18,19 | 35:2 36:3,10 | 236:22 237:15 | **see** 5:8 22:16 |
| 201:2 238:24 | 37:10,16,22 | 237:25 238:4 | 38:8 46:17 |
| 244:9 283:6 | 38:25 39:19 | 238:20 239:5,7 | 61:13 65:9 |
| 297:10 | 40:6,25 41:9 | 244:3,24 245:4 | 68:18 69:12 |
| **scientific** 10:14 | 42:23 51:25 | 245:17 246:21 | 74:18,20 82:2 |
| 17:14 18:16,19 | 54:6,17 55:25 | 251:10 253:19 | 82:13 105:10 |
| 19:18 26:12 | 75:19 79:8 | 253:21 254:18 | 105:12,15,16 |
| 47:23 49:19 | 81:16,23 82:12 | 254:21 255:3,9 | 108:23 116:12 |
| 50:1 78:14 | 83:2,14 84:3,10 | 255:15,18,22 | 124:7 148:2 |
| 83:24 85:4,8,10 | 85:17 86:7,13 | 256:1,20 257:1 | 152:4 153:13 |
| 85:19,20,22,25 | 86:18 88:1,10 | 257:5,8 259:14 | 154:23 158:12 |
| 86:3,5 87:20 | 89:1 90:20,25 | 286:25 287:7 | 163:3 164:3 |
| 89:7,9,14 90:2 | 91:7,19,25 | 288:8 289:15 | 166:13 178:23 |
| 113:1,23 | 153:20 154:17 | 290:23 291:19 | 189:8 190:21 |
| 114:14 144:3 | 156:6,8,18 | 292:1,5,21 | 190:24 191:12 |
| 145:4 204:5 | 157:4,24 158:9 | 293:1 296:16 | 191:13 198:20 |
| 205:10,17 | 158:14 159:12 | 296:21 299:7 | 202:6 203:12 |
| 247:21 249:11 | 162:6,11,20 | 302:1 328:19 | 203:21 208:18 |
| **scientist** 83:24 | 163:8 164:5,16 | **screen** 304:2 | 209:7 226:23 |
| 212:25 213:1,9 | 165:8,20 166:9 | **se** 144:2 | 241:4 268:25 |
| 213:15 | 167:18,21 | **search** 46:23 | 279:12 280:14 |
| **scientists** 45:7 | 169:4,25 171:6 | 56:5 141:15 | 300:14,15 |
| 70:5 205:24 | 171:10,12,20 | **seated** 5:3 | 306:10,11,18 |
| 207:6,12 209:2 | 171:24 172:7 | 176:21 319:19 | 321:23 327:24 |
| 284:14 285:6 | 172:15,18 | **second** 57:17 | **seeds** 99:15 |
| 293:17 | 176:13 210:5,9 | 66:8,8 67:13 | **seeing** 26:12 |
| **sclerosis** 42:19 | 211:16,20 | 77:20 180:1 | 154:22 |
| **scott** 2:19 16:5 | 213:6,16,24 | 211:3 212:21 | **seek** 37:6 43:7 |
| 16:14 18:7 | 214:23 215:9 | 218:2,4 272:1 | 162:14 169:5 |
| 19:9 20:4,15 | 215:19 216:15 | 277:18 294:10 | 175:21 |
| 22:19 24:15,19 | 217:15 218:4 | **secondary** 47:4 | **seeking** 75:13 |
| 24:23 25:15 | 218:12 219:1 | **section** 103:13 | 163:15 292:15 |
| 30:4,15,25 31:4 | 219:22 220:6 | 105:3 228:21 | 298:4,6 |
| 31:6,16 32:1,15 | 220:15,18 | **sections** 108:20 | **seem** 24:2,3,9 |
| 32:22 34:6 | 221:5 235:18 | | 100:6 107:4 |

**[seem - shifted]** Page 79

113:18 119:1,3
181:6 197:7
240:18
**seemed** 124:1
**seems** 107:3
180:6 293:25
**seen** 9:14 33:2
33:4 41:23
42:1 47:8
59:12 60:10
61:4,4 137:21
143:10,10
145:16,19
146:2,19
276:24 326:2
**sees** 58:22
**selected** 134:23
**selection** 5:13
152:23 284:2
303:21 315:13
328:6,8,12
**selective** 266:23
**self** 244:1
**sell** 175:4 297:3
**selling** 39:18
296:19 303:1
**sem** 65:22 66:5
67:17
**senate** 33:24
**send** 223:13
258:1,3 267:16
304:14 313:8
313:10 316:21
327:16

**sense** 53:18
96:5 146:17
161:14 210:22
227:25 236:5
261:16 279:7
282:1 308:14
323:1
**sensitive** 309:7
**sent** 172:5
182:2 247:18
305:15 320:14
**sentence** 8:14
78:4 109:12
**separate** 81:14
110:23 112:8
112:12 284:15
**separately**
102:3
**september**
192:3 193:1
**sequencing**
13:15
**series** 62:25
183:16 290:16
**serious** 107:4
240:23 309:12
**serous** 102:16
102:18 103:19
106:3 109:13
118:8 127:18
128:7 264:22
265:7 268:18
269:8
**served** 317:10

**service** 284:18
**seskin** 1:6 7:24
8:13 13:3,6
20:18 22:3
26:13 29:23
39:2 63:12
66:6 80:11
95:16 102:17
118:12 120:9
121:13 134:20
137:4 180:1
183:2 190:20
191:18 192:21
198:21 225:14
260:4 264:2,13
264:23 265:4
265:22 274:1,4
274:22 275:4
281:17 292:7
**seskin's** 16:23
25:8,20 28:11
63:1 76:10
100:23,23
123:6 165:10
190:24 191:10
191:14 260:7
273:20 293:4
**set** 46:10,14
80:3 101:25
103:3 185:12
253:2 280:9
303:24,24
304:2 305:17
**setting** 16:18
79:11 108:9

225:15 305:21
**settle** 169:1
315:1
**seven** 179:5,16
189:9 229:24
259:1 292:6
320:3,4 322:12
**seventy** 6:2
**several** 22:19
184:4
**sexual** 196:12
**shape** 205:17
205:19 206:1,9
206:14 285:25
286:13 288:25
**shards** 205:24
**shared** 104:13
**shatter** 205:23
**shb.com** 3:12
3:13,18,23
**she'd** 112:2
**she'll** 50:3
**sheet** 177:23
178:4,8,11,16
179:21 180:1,2
185:1,2 188:25
189:20 272:4
318:24 319:2
319:13,15
**sheets** 66:17
189:13
**shelf** 242:17
**shifted** 26:21
80:19

**[shifts - situate]** Page 80

| | | | |
|---|---|---|---|
| **shifts** 17:3 | **shows** 17:6 | **significantly** | **singer** 208:21 |
| **shocking** | 50:17 56:23 | 119:18 | **single** 118:13 |
| 240:18 | 74:18 138:5 | **signing** 301:2 | 127:24,25 |
| **shoe** 29:8 | 148:3 207:23 | 308:10 | 141:4 209:1 |
| **shook** 3:10,15 | 209:10 281:12 | **signs** 274:8 | 230:22 261:23 |
| 3:20 272:13 | 293:11 294:4 | **silica** 173:22 | 281:23 292:10 |
| **shoot** 62:21 | **shy** 146:20 | **silicon** 62:20 | 318:5 |
| 65:23 294:13 | **side** 103:13,18 | **silly** 46:12 | **sink** 322:19 |
| **shoots** 62:18 | 110:15,18 | **similar** 47:16 | **sir** 7:8 101:16 |
| 64:21 | 170:9 251:12 | 51:24 52:2 | 106:25 111:1 |
| **short** 283:20 | 252:2 304:21 | 78:23 95:20 | 132:19,21 |
| 310:15 | 312:11 324:1,1 | 96:4,5,7 100:24 | 142:20 143:17 |
| **shot** 208:8 | 324:7,12 | 100:24,25 | 185:15 231:1 |
| **show** 17:1 | 326:14 | 103:19 104:15 | **sit** 53:20 192:12 |
| 35:19 50:20 | **side's** 311:18 | 109:8,13 122:8 | 207:6,11 243:4 |
| 53:22 69:11 | 312:1 | 127:17 128:3 | 254:17 276:12 |
| 84:11,12 98:5 | **sidebar** 159:24 | 128:11 129:2 | 301:1 304:4 |
| 128:6,10 133:5 | 295:20 307:2,3 | 140:22 188:20 | 308:9 322:12 |
| 154:16 170:10 | 308:18 | 212:16 225:19 | 322:18 |
| 182:6,17 204:5 | **sides** 18:9 | 259:22 302:13 | **site** 104:16 |
| 219:10 251:16 | 63:14 79:25 | **similarities** | 121:9,10 |
| 255:15 281:24 | **sign** 155:7 | 110:19,20,24 | **sitelman** 4:6 |
| 296:9 297:15 | 183:5 | **similarly** | 62:6,7,14,16,24 |
| 299:5 311:24 | **signature** | 229:22 | 62:24 63:16 |
| 323:18,25 | 329:17 | **simon** 90:13 | 64:2 66:9,25 |
| 325:1,4 326:13 | **signed** 177:23 | **simple** 168:25 | 68:5 71:9,13 |
| 326:16 | **significance** | 180:18 | 72:21 73:4 |
| **showed** 44:25 | 109:10,10,18 | **simply** 13:14 | 106:1 190:23 |
| 45:12 324:11 | 109:21 112:21 | 14:25 20:1 | 191:13 276:4 |
| **showing** 28:5 | 118:22 128:15 | 38:15 49:24 | **sits** 281:22 |
| 29:10 41:21 | **significant** | 69:20 139:22 | **sitting** 14:4,9 |
| 163:13 167:12 | 42:25 109:23 | 147:16 168:6 | 53:11 192:13 |
| 288:17 | 234:4 262:1,3 | 207:5 214:13 | 313:13 322:20 |
| **shown** 29:15,17 | 264:16 277:19 | 302:5 307:14 | **situate** 304:5 |
| | 277:21 278:3 | 322:1 | |

[situation - speaks]                                                    Page 81

| | | | |
|---|---|---|---|
| **situation** 50:19 | **slog** 31:14,16 | **someone's** | 240:19 248:18 |
| 85:4 153:15 | **slope** 152:21 | 56:19 78:18 | 268:3 274:9 |
| 308:25 309:17 | **small** 5:17 68:8 | **somethings** | 291:20 299:25 |
| 320:8 323:18 | 89:10 144:9 | 290:7 | **sorts** 32:5 |
| **situations** | 158:7 202:2 | **somewhat** | 79:20 211:9 |
| 309:18 321:8 | **smith** 44:2,9 | 103:20 109:14 | 212:14 252:2 |
| **six** 206:11 | 50:11 | 127:19 163:3 | **sought** 25:4 |
| 314:3 321:15 | **smoking** 27:25 | **soon** 159:23 | **sound** 9:22 |
| **sized** 182:6 | 33:20 55:17 | **sophisticated** | 23:8 133:7 |
| **skadden** 3:4 | 303:6 | 135:1 318:15 | 161:21 290:13 |
| **skadden.com** | **so.2d** 302:6 | **sophistication** | **sounds** 42:13 |
| 3:7,7,8 | **social** 175:12 | 135:25 136:6 | 61:23 207:2 |
| **slate** 3:4 | **society** 105:20 | **sorenson** | **source** 123:4 |
| **slated** 169:17 | **sold** 174:14 | 103:24 129:4 | 288:7 289:9,13 |
| **slept** 324:15,16 | **sole** 158:6 | **sorry** 9:4 59:14 | 291:11,15,16 |
| **slew** 128:2 | **solely** 161:2 | 63:15,22,22,25 | 291:18 |
| **slide** 16:19 17:6 | **solid** 14:24 | 74:23 75:25 | **sourced** 172:1 |
| 21:2 35:15 | **solvent** 65:7 | 84:2 88:11 | **sources** 47:4,5 |
| 36:16 61:12 | **somebody** | 95:25 109:4 | **south** 2:6 3:16 |
| 74:17,21 | 17:15 18:4,23 | 117:19 119:22 | 320:5 |
| 138:24 212:18 | 33:21 34:2 | 131:14 138:7 | **space** 194:20 |
| 213:10 | 49:18 50:23 | 156:16 163:2 | **speak** 33:3 |
| **slides** 16:6 | 52:21 53:12,19 | 200:21 207:19 | 37:11 89:3 |
| 60:12,19 63:1 | 55:2 82:15,22 | 210:6 231:13 | 103:10 131:13 |
| 64:3 66:14,16 | 113:14,16 | 241:16 243:1 | 143:4 219:4 |
| 67:4 68:16 | 135:10 141:8 | 296:2,16 | 223:1 249:10 |
| 71:22 74:2,4,6 | 144:18 145:10 | 297:20 299:23 | **speaker** 126:8 |
| 276:7,11 | 155:2,5,7 | 305:1,4 | **speakerphone** |
| **slight** 105:15 | 198:10 209:22 | **sort** 17:1 49:22 | 126:4 |
| 110:1 | 214:22 216:6 | 116:11,13 | **speaking** |
| **slightest** 77:25 | 219:14 231:24 | 122:2 136:6 | 109:12 125:21 |
| **slightly** 105:12 | 232:1 243:5 | 140:23 158:25 | 220:2 240:25 |
| 111:18 | 249:16 270:9 | 196:5 200:11 | 275:7 308:2,4 |
| **slippery** 152:21 | 280:7 321:10 | 209:9 210:22 | **speaks** 41:3 |
| 152:21 | 321:14 | 218:13 234:7 | 102:3 251:4 |

[specialist - started]                                                    Page 82

specialist
  221:20 222:10
  233:22
specially  234:8
specific  13:9
  75:14 80:10
  86:7 95:15
  101:14 121:21
  124:22 125:2
  131:8 133:3
  140:4 168:2
  177:13 179:2
  181:17 185:12
  188:25 202:24
  214:8 239:19
  244:15,16,18
  260:5 264:1
  275:8,16,19
  327:4,9,13
specifically
  7:21 59:22
  95:14 104:24
  158:19 165:24
  194:16 244:5
  251:1 260:3
  274:1,3
specifics  37:23
  309:3
speculate  170:6
  303:4
speculating
  67:20
speculation
  62:13 64:7
  65:12,25

177:18 184:21
184:23 185:7
speculative
9:24 81:1
169:16 170:5
179:10 180:13
219:5
spend  41:20
42:5 101:3
319:6
spent  70:21
133:23
spin  41:13
211:7 218:14
220:23
spit  71:9
spoke  259:23
spoken  91:14
220:19
spoonfeeding
49:2
spouse  317:11
spread  117:20
122:25 127:6
128:9
stack  56:3,5
stage  117:18,20
119:14
stain  66:16
stamina  42:19
stand  30:14
31:13 33:10
37:13 40:11
42:3 44:2 53:8
56:10 57:24

118:4 146:24
155:1 163:21
168:6 192:5
209:17 219:12
220:23 230:12
255:13 257:24
307:8 318:10
324:25
standard  16:18
16:20 17:7,12
17:13,22 18:8
23:11 24:24,24
27:10,12 28:3,4
40:15 87:9,13
92:1 173:24
175:19 215:16
215:17,20
224:25 225:17
225:25 226:1,3
226:6,8,12,12
227:15,17
228:7 231:16
231:19,23
234:24 235:1,9
236:2,4,15
237:17 241:10
242:11 243:16
243:21 245:8
245:20 246:13
246:18,22,25
247:2,6,16
248:6,7 251:23
252:4,14,24
253:2 267:13
268:10 285:1

standards
  172:6 173:7,8,9
  173:10,17
  175:1
standpoint
  95:22 116:22
  125:3 230:2
  233:20
stands  62:17
  64:20 193:21
  201:13 203:5
stanford
  269:18
starch  62:19
  68:9 73:19
start  6:20 7:1,4
  7:18 38:21
  89:13 115:18
  122:19 135:16
  169:3 178:14
  180:8 182:21
  182:22 183:7
  210:13 235:18
  258:2 267:2
  305:23 310:5
  311:5 322:5,21
started  24:23
  33:13,14,16,19
  38:17,17 42:23
  47:2,11 55:1,3
  55:4,7,11 83:18
  116:1 117:19
  120:21 122:15
  122:15,23
  194:19 198:17

211:1 234:14
243:2,10
299:16
**starting** 6:15
22:6,10,14,16
79:22 88:16
303:25 322:3
**starts** 99:14
178:17,17
192:25 327:1
**state** 11:9 31:11
131:17 256:3,3
256:4,10
**stated** 130:5
160:22 168:1
**statement**
25:14 48:15
56:14,17 118:5
159:21 163:12
164:20 169:22
169:25 182:23
182:24 206:8
236:9 276:2
280:16 285:20
291:21 297:8
324:17
**statements** 37:7
44:16,18 45:21
159:20 163:10
164:11,13
165:1,5,6 284:2
305:23
**states** 92:21
164:16 171:18
172:6,8,14

174:6,16 175:8
175:23 176:2,5
296:20 300:12
**statistically**
262:1,3
**statute** 215:1
299:9
**statutes** 213:8
**stay** 5:25 33:10
304:14 307:4
319:10,11
321:3
**staying** 325:8
**steinberg** 52:4
52:6
**stemkowski** 2:3
63:7 67:16,22
68:3 69:25
70:10,16 75:7
75:11,21 76:2,4
77:8 78:10,13
83:16,19 92:20
92:25 93:6
94:3 95:5
293:9 294:7
295:10 296:11
299:1,3 314:25
**stenographic...**
329:5
**step** 16:17
20:23 30:1
60:1 92:7,8
195:8 219:22
221:15 224:4
270:18

**stepping**
279:18
**stick** 69:18
**stipulate** 157:6
157:8
**stipulation**
156:24 157:11
**stock** 297:2
**stomach** 96:15
100:2,3,4,5,14
100:15
**stood** 200:14
**stop** 146:6
167:14 175:2
183:15 227:18
257:19 265:24
303:10,15
**stopped** 165:11
166:6,11,12,14
166:15 167:15
167:23,24
168:2 175:22
183:15,20
296:18,19,19
**stopping**
227:14 237:10
**story** 229:20
249:19,22
250:2
**straightforward**
75:12
**strained** 21:11
**strands** 206:23
**strategically**
312:18

**street** 1:17 2:11
2:15,20 198:11
**streets** 195:23
**strength** 201:22
**stretch** 252:21
253:13
**stricken** 54:2
259:10
**strike** 146:7
149:1 258:17
259:21 304:25
305:2,6,7,10,11
**strikes** 304:21
305:5,9
**striking** 257:15
**strikingly**
103:18 109:7
127:17
**strong** 24:16
80:2,8 81:7
82:5 83:7
84:10,12 86:25
87:19 88:6,19
93:19 263:10
**stronger** 200:5
309:9
**structured**
148:4
**structures**
195:15
**struggling**
89:12 251:19
252:6
**student** 43:13

| | | | |
|---|---|---|---|
| **students** 269:17 270:14 | **study** 14:2,10 22:14 29:7 | **subjects** 47:23 **submit** 61:16 | **sudden** 54:25 324:6 326:1 |
| **studied** 11:16 14:8 22:8,10,11 22:14 29:5 81:16 84:16,16 85:10,13 90:5 98:1,3 99:23,25 103:5 113:4 135:11 142:11 232:7 249:1 | 46:10 47:18,21 50:18 90:7 101:4,7,13,22 101:23,23,23 103:12 105:15 108:18 127:14 128:4 131:18 144:1,22,24 145:7,12 | 211:10 314:21 314:23 **submitted** 316:8 **subsequent** 292:11 298:18 298:25 299:2,4 **substance** 316:9 | **sue** 151:9,9 **sued** 240:21 243:8 **suffered** 100:11 101:14 102:4 153:14 276:3,9 **sufficient** 44:14 81:10 135:5 326:8 |
| **studies** 10:25 13:22 20:8 22:15,25 23:2,3 24:6 29:2,9,15 73:12 77:13,16 78:4 79:21 86:20 87:6 90:22 98:23,23 99:2 101:3,5,17 102:6,11 107:11 113:2 114:3,19 122:4 129:3 131:17 131:20,24 132:1,2 133:14 137:8,9 143:11 143:19 145:2 145:13 199:22 260:24 263:9 266:17 270:11 270:20,23 271:6 279:4 280:2 281:14 281:19 283:1 | 147:17 148:9 182:9 261:16 261:21,23 263:13 264:11 264:21,21,25 264:25 270:17 279:13,15 281:7,23 282:7 **studying** 20:7 31:8 77:24 79:9,14 83:18 84:19 88:14,15 98:20 101:6 229:23 **stuff** 28:10 61:22 151:3,10 170:13 190:11 195:16 270:5 **subject** 45:4 285:9,10 288:3 **subjective** 207:19,23 208:10 | **substances** 143:1 169:14 170:8,22 **substantial** 9:18 265:3 268:12,13,15 272:16,19,24 273:2,6 277:22 277:23 278:1 278:16,17,18 **substantially** 173:15 277:1 **substantive** 284:1 288:20 **subtract** 268:11 **subtype** 102:16 **success** 56:20 **succession** 165:10 **successor** 156:14 **succumbed** 136:22 | **sufficiently** 129:2 **sugarman** 1:5 29:15 64:17 178:12 179:13 179:17,17 184:15 190:19 192:18 **sugarman's** 183:1 **suggest** 8:10 90:4 103:21 112:14 124:1,4 129:5 268:19 302:12 310:13 **suggested** 78:5 149:10 160:16 240:3 **suggesting** 61:2 74:9 146:15 147:13,14 **suggestion** 112:18 312:25 316:6 |

suggestive 9:17
76:6,12,14
78:12 79:3
80:12 81:20
82:12,24 83:1,3
84:9 90:22
92:18 93:14
105:13 110:3
123:7,7 263:10
suggests 19:5
74:13 83:4,4
109:8 127:20
128:2
suite 2:20 3:16
3:21
summarize
190:5
summary
162:21 163:4
187:17 287:9
289:20
summation
227:11
sun 249:4
super 1:11 69:1
supplement
136:23
supplier 141:2
195:3 231:8
233:9
support 20:9
27:13 74:25
76:22,22 77:6
159:10 266:25

supported
18:16 99:19
199:9
supports 70:1
70:13 92:18
154:20
supposed 73:20
85:1,2 179:22
213:17 214:5
214:23 253:5
supposedly
58:3
suppress 46:2
suppressed
39:9
supreme 52:16
302:6
sure 15:13
34:23 37:10,22
55:23 66:4
67:22 68:3
78:13 92:20
93:6 107:20
124:18 134:9
135:9 136:13
161:20 169:20
171:25 179:7
189:23 192:4
193:20 195:18
197:13,13
207:12 213:3
222:5 227:17
229:15 241:1
243:13 244:24
247:14 284:11

287:17 288:1
292:17 294:7
303:4 309:15
322:19
surely 254:5
surface 72:23
117:24 119:11
121:7 123:10
surgeon 13:25
73:23 116:12
116:20 120:25
surgeries 15:20
15:24
surgery 116:10
121:1 147:20
147:20,25
148:6,6 268:25
surgical 73:22
124:14
surveyed 182:3
susceptibility
20:20 21:15,19
78:21 79:18
susceptible
281:4
suspect 320:21
321:1
suspected
292:19
sustained
163:25 308:10
315:21
swept 167:8
sworn 165:12
182:23,24

185:2
sydney 2:19
156:7
synthesize
47:22 49:3,5,20
synthesized
147:6 250:24
system 172:24
173:1
systematic
138:4

**t**

t 8:7
table 16:17
tables 304:4
take 15:20
16:17 20:22
34:11,12 43:17
46:8 49:20
55:10 57:24
65:8 66:16
67:9 75:9
90:14 97:20
98:18 104:25
107:7 113:12
124:12 129:17
129:19,24
130:1,2 131:7
133:8 134:1
137:7 143:18
168:12 175:18
188:9,10 202:3
205:21 219:22
221:15 239:8
245:11 251:11

| | | | |
|---|---|---|---|
| 259:16 283:4 | 65:13,16,20 | 243:2 248:17 | 95:14 96:9,10 |
| 288:10 298:21 | 66:7,10,11 | 248:19 256:9 | 102:9,10 |
| 301:5 304:12 | 67:25 68:1,2,9 | 260:6,20 261:5 | 108:11,13 |
| 306:19 308:17 | 68:15,19 70:6,7 | 261:6,10,11 | 114:21 115:21 |
| 308:20,21,22 | 70:12,23 71:3 | 262:6 264:17 | 117:23 140:7 |
| 309:5 310:4,6,7 | 71:15,16,25 | 265:2 266:16 | 142:2 152:11 |
| 310:7 312:4,6 | 72:17 73:19 | 268:2,15 | 156:23 174:2 |
| 313:7 315:17 | 84:1 91:21 | 270:12,15 | 174:20,20 |
| 319:24 320:14 | 96:14 97:14 | 272:19,24 | 175:6,7 181:7 |
| 320:16,18 | 98:21,25 | 273:2,10,13 | 187:21 190:10 |
| 321:15 323:10 | 101:18 104:24 | 276:23,25 | 190:13 201:14 |
| 328:9 | 105:9 109:16 | 277:13,20,25 | 202:22 205:2 |
| **taken** 56:12 | 109:25 110:1 | 279:22,24 | 211:11,14 |
| 65:3 101:10 | 111:21 112:16 | 280:21 281:16 | 212:5 231:4 |
| 107:3 116:17 | 114:7 138:13 | 282:4,17 297:3 | 232:14 235:21 |
| 125:17 129:23 | 138:19 141:2 | 297:7 318:5,8 | 235:24 236:2 |
| 167:13 176:19 | 141:17 149:23 | **talcum** 29:10 | 251:22 260:2 |
| 256:17 298:22 | 158:23 162:13 | 36:19 48:4 | 267:3,7,19 |
| **takes** 79:2 | 165:11,11,14 | 93:1 120:8 | 271:18 275:2 |
| 135:6 138:25 | 169:7,9,11,13 | 134:17,21 | 275:25 282:15 |
| 180:18 257:24 | 170:13,15 | 144:12 149:18 | 282:15 283:19 |
| 269:3 309:24 | 171:17,25 | 182:4 186:12 | 286:9,12 292:1 |
| 319:8 | 172:24 173:20 | 198:25 207:15 | 293:25 296:6 |
| **talc** 4:15,24 | 173:25 180:11 | 233:14 | 298:7,8 328:13 |
| 9:19 10:25 | 181:18 191:1 | **talented** 23:15 | **talked** 79:16 |
| 25:8 32:9 | 195:3 197:24 | **talk** 11:7 16:19 | 81:9 115:1 |
| 34:16,16 39:3 | 198:1 202:6 | 20:23 21:2 | 145:12 156:11 |
| 39:17 41:25 | 203:21 206:15 | 32:3 33:13,14 | 160:20 193:4 |
| 54:20 57:20 | 210:21 212:16 | 34:10 35:21 | 230:20 235:21 |
| 58:9,21,24 59:8 | 212:19 221:25 | 36:5 40:18 | 254:15 256:13 |
| 59:22 60:3,6 | 221:25 225:6 | 42:2 44:21 | 269:15 285:20 |
| 61:4 62:19 | 231:8 233:1,9 | 45:25 46:3,22 | **talking** 6:4 8:23 |
| 63:18,20 64:6 | 233:11,24 | 47:23 48:1 | 27:10 42:23 |
| 64:11,15,18,19 | 234:5 238:9,22 | 52:22 57:9 | 43:20 58:21 |
| 64:24 65:2,10 | 240:10,10,12 | 72:14,15 76:19 | 59:23 85:2 |

87:4 88:13
97:24 98:18
100:19,20
101:4 102:23
102:24 109:15
109:24,25
111:14,15
122:8 124:17
124:21 129:25
130:1 149:7,8
149:16 174:1,5
174:7,22
177:19 179:19
183:9 184:10
187:24 190:23
191:12 208:25
209:8 215:19
215:21 225:11
225:12 227:2,3
231:8,15
232:18 233:8
234:18 236:4
237:9,10
246:23 247:1
254:1 256:14
257:18 293:24
**talks** 110:18
119:10 213:25
267:19 272:1
273:4 297:25
**tamp** 46:5,6
**tampons** 43:2,3
**tasked** 284:22
284:23

**taste** 171:8
**taught** 270:13
**teach** 54:11
**teaches** 43:4
54:11 269:17
270:13
**team** 130:1
328:3
**technical** 69:2
**technique**
58:23
**telephone**
90:12 126:4
**tell** 5:4,13
15:23 31:20
32:24 35:9,11
35:18,23 36:12
36:13 37:1
39:9 42:12,24
44:13 45:1
48:9,14 52:24
53:12,21 70:16
81:18 87:9,11
109:9 118:5
134:16 142:19
151:12 155:1
165:7 166:20
186:19 192:5,8
196:3 197:24
201:4 202:16
209:17 211:22
213:17 214:18
218:7 224:8
227:9 230:12
241:15 242:23

249:4,21 252:4
255:12 258:3,5
267:14 268:17
269:21 272:14
272:21 278:10
279:20 281:15
289:4 300:25
301:6,23
303:16 304:11
306:25 307:14
308:15 310:19
314:2,3 315:11
317:24 321:4
321:19,20
322:4,6,22
323:12
**telling** 19:19,20
65:1 83:22
87:3 101:12
114:12 119:1
119:18 146:8
148:22,24,25
155:7 156:23
184:17 216:3
216:10 220:3
227:7 230:7
241:25 243:10
243:22,24
250:1 266:24
268:14 274:15
308:13 310:22
311:10 319:25
**tells** 64:22
270:14

**tem** 64:9,20
65:8,22 66:5
67:16 72:2
207:25
**temporarily**
309:20
**ten** 45:5 47:10
242:24 243:12
254:5,6 277:2,5
283:25 304:13
323:1 327:17
**tend** 38:1 95:3
96:6 104:20
206:14
**tens** 134:23
158:22
**tensile** 201:22
**teratoma** 121:8
123:12
**term** 19:11
177:5
**terms** 37:7
43:23 46:23
50:1 56:5 77:2
77:3 82:14
87:21 94:20,20
102:11 111:19
114:1 125:21
142:16 173:1
175:16 186:14
186:15,17,24
205:12 232:19
247:16 250:12
254:15 264:24
323:17

**test** 59:15,18,21
61:1,3,7,19
65:17 70:4
177:6 190:20
190:22 191:2,3
191:6,9 195:8
206:21 223:12
257:22 271:1
293:21,22
297:14 302:17
310:21,22
**tested** 13:3
18:19 23:12,17
83:10 193:24
195:10,10
196:1 201:9
204:10 299:15
**testified** 26:9
30:7 54:12
59:17 64:17
152:7 179:18
179:20 184:4
206:19 230:10
247:22 256:3,7
256:8,10
258:22,23
260:19 263:20
267:10 271:21
283:9 293:12
314:10
**testifies** 255:13
278:12 297:24
**testify** 7:23
10:23,25 13:10
19:1 26:19

33:18 34:7
36:17,22 41:17
50:12 57:13
70:9 80:18
87:12 88:24
91:20 106:10
119:20 136:9
136:17,19
137:24,25
138:8,10,21
139:4 140:5,9
140:10 141:1,7
141:8 142:4
144:18,21
145:11,14
148:1 149:13
149:21,23,25
150:6,7 152:18
160:3,24 161:6
182:14 185:16
185:24 187:1,2
187:3,7,7 195:9
204:24 205:1
216:20 218:11
219:16 232:19
234:17,21,23
234:24 235:7
235:15 237:6
247:22 248:10
248:14,24
250:3 256:12
267:15 271:4
272:12,18
279:14 280:6
310:3 327:3

**testifying** 10:3
15:4 39:21
108:2 116:13
123:23 129:8
138:8,14,16,18
189:22 225:25
226:5 239:11
246:11,13
280:9
**testimony** 4:3,8
4:13 9:12 14:1
14:23 25:24
30:18 33:24
37:3 44:1 48:6
48:22 49:1
51:24 52:3
54:3 55:7 58:9
67:9 68:12
72:10 93:4,8
96:20 97:12
106:19 114:13
116:9 117:1
118:24 126:18
130:3 132:8
136:16 146:9
149:1 154:1
161:19 162:17
178:11,20
179:3,6 181:6
182:17 185:4
185:10,21,22
186:6 195:17
196:8,10,20,21
196:22 197:18
198:14 199:11

199:13 210:10
211:9 215:8,21
219:10 220:21
227:20 228:14
246:1,3,7,10
254:22 257:2,4
257:15 267:16
270:20 271:19
275:23 276:15
276:16,24
279:2,19,20
280:14,18
281:7,9 282:11
283:9 310:14
313:2 314:20
322:17
**testing** 8:6,6,8
8:9 13:12,13
14:17 70:19
135:2 137:24
180:23 193:19
197:1 201:8,12
207:15,24
223:5 243:9,11
284:25 285:3
285:18 288:3
292:9,12,12
294:1 299:17
**testosterone**
263:7
**tests** 64:7 194:1
194:6,7 207:17
293:20
**texas** 2:21
148:14

**[textbook - think]**

| | | | |
|---|---|---|---|
| **textbook** 73:12 | **thing** 9:20 | 69:12 89:16,24 | 72:13,15 75:1 |
| **tfamiloni** 2:8 | 12:14 15:21 | 94:4 102:13 | 76:17 78:25 |
| **thank** 7:13 | 24:1 29:19,23 | 110:13 113:13 | 79:2 85:12,14 |
| 16:11 57:7 | 33:7 41:8 47:7 | 114:10 124:19 | 86:7 87:17,18 |
| 62:3,4 95:4,5 | 48:8,9 50:20 | 150:24 153:24 | 87:19 91:25 |
| 117:14,15 | 54:4 68:23 | 160:8 181:13 | 93:17 95:6 |
| 132:18,19,20 | 69:23 72:11 | 187:18 195:7 | 98:19 99:22 |
| 149:14 150:8,9 | 82:3 96:18,22 | 211:22,23 | 102:25 106:5,6 |
| 150:10 161:24 | 105:18 107:17 | 217:13 218:7 | 106:19 107:17 |
| 171:6 190:9 | 108:7 110:6 | 225:4 235:7,8 | 108:1,4 113:10 |
| 210:3,4 237:15 | 113:19,21,24 | 236:24 238:12 | 113:11,25 |
| 259:13,14,20 | 117:6 124:22 | 238:19,23 | 114:1,20,21,25 |
| 266:22 268:23 | 127:4 152:15 | 252:2 262:10 | 116:16 119:17 |
| 296:11 306:8 | 162:24 174:9 | 265:20,22 | 123:19 124:6 |
| 306:12 317:5 | 181:2,12 183:6 | 266:24 267:18 | 124:19 130:20 |
| 328:15,18,19 | 185:6 198:3 | 268:1,2,3 270:3 | 133:10 135:25 |
| **thankfully** | 205:3 230:5 | 270:10,20 | 136:18,20,21 |
| 275:20 | 232:4 243:4 | 272:15 276:21 | 138:6 140:16 |
| **theirs** 124:24 | 244:17 254:23 | 277:10 280:1 | 141:9 143:12 |
| 168:25 | 261:20 266:12 | 284:22,23 | 146:13,14,16 |
| **theorized** 29:14 | 268:16 297:9 | 297:14 298:1 | 146:21 149:13 |
| **theory** 78:25 | 301:15 304:3 | 299:5 314:19 | 150:3,15 |
| 97:16 151:22 | 305:25 306:13 | 326:3 | 151:16 152:21 |
| 154:20 265:25 | 307:21 308:6 | **think** 17:7 19:4 | 153:1,6 154:11 |
| 266:3 273:10 | 308:17 317:13 | 20:4,22,24 26:6 | 155:13,25 |
| 273:12,17 | 321:18 326:11 | 27:9,20 28:2 | 156:8 157:9,11 |
| 274:2,12,21,25 | **things** 5:20 | 30:4 31:21 | 157:21 162:2 |
| 275:15,17 | 13:16 17:25 | 33:6 37:1 | 164:6 167:16 |
| **therapeutic** | 18:1,4 19:8 | 38:13 41:18 | 168:7 169:1 |
| 78:2 | 22:22 33:24 | 43:8 47:7 | 172:22 173:14 |
| **therapy** 262:13 | 34:17 36:20 | 48:11,15,20 | 175:12 176:4,4 |
| 262:17,22 | 39:6,11 41:4 | 51:23 52:7,16 | 177:11,19 |
| 263:12 | 46:3 50:3,14 | 54:6,12 55:18 | 180:14,15,23 |
| **thick** 135:15 | 57:12 62:3 | 57:1,5 62:25 | 185:18 188:19 |
| | 65:13 68:7,10 | 71:6 72:1,5,8 | 189:16,17,18 |

191:8 192:9
193:2,3,9,14,16
194:5 198:16
198:23 199:18
199:21 200:3
200:12,12
201:22 203:7
203:23 204:19
209:14 211:18
212:24 214:2
215:7 222:13
223:19 226:23
227:5 228:13
229:2,24
230:25 232:2,3
232:11 234:15
236:2,3,4,9,17
236:21 237:11
237:17,18
238:5 241:9
242:18 243:19
245:20 246:8
250:1,13 254:8
258:14 260:3
261:15 264:15
265:2,14,15
270:9 271:9
275:14 282:1
284:10,12
285:23 286:21
287:9,11,22
289:1 290:11
290:21 291:11
291:13 294:22
294:23,25

295:4,6,9
300:16,18,21
301:2,3,4,6,12
301:12,13,23
302:15,16
303:25 308:15
313:19 314:4,6
314:17 315:5
319:16 320:12
320:16,20
321:4 323:7,8,9
**thinking**   36:18
36:23 38:23
88:11,12 92:1
97:6
**thinks**   38:15
138:1 231:14
253:7 261:13
266:24 279:5
281:10
**third**   17:4 78:1
80:21 158:17
162:15 220:16
220:18 312:4
321:10,13
323:2
**thomas**   1:24
19:21 126:7,9
216:3 295:21
309:10
**thought**   6:2
12:17 36:13
38:15 40:1
47:10 51:13
57:18 58:8

63:14,24 130:2
175:7 200:13
240:23 291:9
292:21,22
307:11
**thoughts**
250:10 290:3
**thousand**   69:4
299:15
**thousands**   47:1
134:24,24
158:22 229:21
242:12,12,13
250:23 269:12
327:19
**three**   49:14,16
79:17 98:3
100:21 110:16
110:20,24
114:10 117:9
151:1 153:14
179:1 195:8
200:15 203:24
204:19 205:8
208:20 210:12
211:2 301:17
304:22 305:5,8
305:9 319:22
320:11,16,18
320:21 321:1,9
321:15,21
322:25 323:5
**threshold**   254:3
**throw**   129:11
205:21

**throwing**
135:17
**thursday**   311:9
**time**   5:25 6:13
12:10 27:9
37:23 44:17
50:15 55:10
59:6 60:18
83:17 98:16,17
101:4 108:24
115:2 116:13
122:12 148:23
160:1,13 168:9
171:20 178:15
179:20 183:2
184:13 193:2,2
193:3,9 194:18
195:13 196:1
196:17 197:20
200:12 215:13
215:14 222:20
228:2 229:5
233:12 240:5
242:18 243:11
246:4 249:11
251:17 262:20
266:2 267:8
278:5 283:18
295:2 296:24
303:3 304:10
304:11 308:20
308:22 309:1,2
309:10 310:1,6
310:16,23
313:21,23,24

314:1,4 315:22
315:24 318:12
319:6 320:18
322:20 325:6
326:8 327:1
**times** 59:5
61:10 69:4
119:9 133:15
135:13 178:25
179:1,2 180:18
180:19 189:8
230:10 265:10
299:16 309:14
309:19
**tiny** 202:2
**tire** 52:16
**tissue** 63:2 65:6
66:5,24 67:2,5
67:6 69:1,7
70:6,13 72:18
72:23 73:24
74:7,22 127:5
127:11,12
190:24,25
191:10,11,14
199:4
**title** 218:21
**tobacco** 26:17
27:4,5,15 33:7
33:9 34:8 47:8
52:20,25 53:14
53:14,21 54:1,7
54:24 55:16
271:2 305:17

**today** 14:4,9
42:2 86:6
192:13,20
210:11 226:15
256:13 316:18
316:19 317:7
328:11
**together** 46:4
55:5 66:15
67:5 99:19
100:9 101:10
110:8 112:3,5
114:10 122:3
140:15 142:23
178:21 189:18
189:19 284:15
284:20 285:14
288:2 290:3,16
**toggle** 69:2
**tola** 2:4
**told** 63:24
155:5 183:7
200:15 238:2
246:19 252:9
298:16 305:21
312:10 320:13
**tomorrow** 90:6
327:3
**tons** 205:24
**took** 45:25
115:1 121:4
129:20 151:6
151:22,23
158:4 254:25
255:6 257:3

262:23 266:7,9
**top** 189:1
284:14 285:6
**topic** 32:9
54:10 141:16
**total** 188:7
258:18 281:13
**totally** 56:11
151:11 175:22
225:20 320:8
**touch** 237:16
**towards** 92:19
**toxicologist**
52:2 210:14
211:17 212:1
221:18 224:16
237:21 248:13
248:25
**toxicology**
225:23 232:25
233:16,21,23
234:10 254:14
**trace** 137:15
292:9,22,23
293:14
**track** 220:24
237:1 323:8
**tract** 248:21
273:15
**trade** 46:5
163:1
**traditionally**
110:18
**trail** 40:21

**trails** 47:2
**train** 63:23
**training** 210:15
**transcript**
36:15 258:21
315:6,18,19
329:6
**transitioning**
33:15
**transmission**
64:20
**traveling**
210:17
**travin** 262:20
**treat** 107:22
108:12
**treated** 95:20
96:5,8 108:8
110:8 121:22
147:17 148:10
149:9 262:20
264:1
**treater** 100:23
100:23 112:4
263:19,24
**treating** 13:24
13:25 115:3,13
115:14,17
121:14 123:6
263:20 270:25
**treatment**
96:10 102:15
108:7,11
116:15,20

**[treatments - two]**

**treatments**
100:24
**treats** 269:12
269:25 270:16
**tree** 40:19 60:9
278:13
**tremolite**
201:14,15,17
201:17,23
202:3,6,7 203:2
203:13,14,18
203:18,21
204:6,11
205:12,21
208:5
**trial** 26:20
42:15 91:1,3,11
91:15 130:9
151:5,14,16
153:3 160:10
160:14 163:7
163:19 164:23
166:2 171:9
192:4 212:16
216:18 219:7
227:12 230:11
231:24,25
255:18,22,23
257:7,7,11,16
259:6,7 303:20
304:12 308:6,9
309:14 311:24
313:25 314:9
319:22,23
320:8,9,11

321:6 322:2
325:16 327:1
**trials** 6:15
91:21 151:3
301:17
**tried** 10:21
11:12 51:16
52:25 53:15
60:17 61:15
91:5 151:17
217:23 235:14
271:2 316:9
**trier** 18:11
40:14 42:9
185:19
**tries** 164:2
**triggers** 72:19
**trips** 178:21,23
**trojan** 237:17
**trouble** 209:25
**truck** 301:11
**true** 9:6 12:2
26:9 45:24
58:15 69:13
95:18 122:1,10
136:5 158:8,15
187:5 189:5
196:8,24
197:19 198:6
238:13 248:2,3
264:24 268:14
268:17 278:23
295:1 300:6,7
329:6

**trust** 307:18
**trusted** 38:18
**try** 7:19 36:11
39:9 53:13
113:15 117:10
126:3 134:15
154:19,20
164:1 173:13
199:23 288:19
301:15 308:11
312:25 314:12
**trying** 5:7,14
6:7 8:3 12:16
25:5 26:24
38:2,22 75:5
110:5 112:20
113:15 117:3
118:21 158:21
164:11 166:4
171:8 172:9
185:14 194:8,9
218:24 232:23
235:4 266:25
270:8 274:18
284:11 313:19
**tube** 99:6,14,15
101:9,25
102:22,23
103:20 104:12
109:14 112:17
113:6 115:8,19
118:1 119:14
127:3,5,18
269:23

**tubes** 99:16
118:17,20
119:5 248:16
248:22
**tuesday** 305:22
328:5
**tumor** 115:24
117:8 121:9
125:4 127:9
**tumors** 126:25
127:4,6,10,11
128:1,1,8
**turn** 8:3 16:19
168:23 221:1
268:23 299:21
**turned** 39:16
54:25
**turning** 230:22
231:24,25
**turns** 205:23
**two** 21:18
28:21,22 33:11
33:11 43:22
48:18 53:8
62:23 82:8
105:14 107:22
108:15 126:22
128:5 160:19
179:4,16
180:18 189:8
210:6 212:20
232:6 249:14
254:22,25
257:1 262:25
269:21 273:8

274:7 292:7
303:18 305:13
316:3 319:21
319:22 320:2
321:7,17,24
322:25 323:6
**tying** 96:14
**type** 29:20
52:18 65:6
67:3 71:8 74:5
97:6 101:14
102:3 106:3
111:20,23
118:11,12,18
119:4 120:8,11
120:17 125:7
125:11 126:19
127:9 137:1,3
137:13 138:24
180:16 181:14
190:5 199:5,23
199:24 203:6
207:23,24
208:1 240:24
264:5,12,22
265:7 268:18
268:18,20
269:6 307:21
317:13
**types** 47:8
60:19 68:10
73:20 97:2
104:11 119:21
137:8 143:20
206:11 260:9

268:1,3 269:7
269:12 271:3
274:17
**typical** 285:16
306:18
**typically** 249:9

**u**

**u.s.** 171:17
289:18
**ultimate** 48:23
219:19 227:1
260:25
**ultimately** 20:4
27:21 40:5
48:7 319:12
**unable** 57:19
315:14
**unacceptable**
98:12
**unambiguous**
35:16 211:6
218:13 220:21
**unchallenged**
25:18 91:22
**uncomfortable**
84:6,7 227:6
**undeniably**
20:18
**under** 7:6 9:11
9:21 10:17
15:11 16:24
17:7 25:15,21
29:11 40:14
41:16 53:19
70:7 80:1

85:14,18 97:16
97:17 98:12
106:2 133:2
163:10 172:10
172:10 187:23
189:2 203:22
211:1 214:3,6,9
214:16 222:24
240:13 247:10
252:3 264:24
281:9,22
300:22 313:12
**undergirds**
267:4
**undergraduate**
47:20
**understand**
12:15,16 15:2
23:25 28:11
29:1 38:2,4
42:15 45:5
49:4,10,11,22
50:13 61:8
66:2,18 82:11
109:10 112:20
118:3,4,21
124:24 133:25
141:6,7 142:15
154:15 158:9
164:11 166:5
169:20,23
183:9 185:14
186:25 187:8
197:3 199:7
213:13 216:2

218:18,24
221:1,3,4,6,13
222:17,22
225:24 226:4
230:3 239:10
241:24 247:14
250:12 256:12
258:7 259:11
267:10 274:14
274:19 280:5
292:17 298:3
313:10 315:15
326:18
**understanding**
41:24 50:1
62:18 85:3,7
86:3 87:21,23
88:2 126:18
217:16 223:18
260:14
**understood**
31:22 134:5
149:3 164:5
165:8 167:18
167:21 200:9
256:1
**understudy**
43:15
**underwear**
183:23,24
184:2,3 261:9
**undeveloped**
10:10
**undisputed**
18:10,12 121:5

266:10

**undo** 159:18

**unfair** 132:3,14
173:11,16

**unfortunately**
303:12 311:13
319:15 322:6

**unhelpful**
40:14 41:19
42:9

**union** 17:4

**unique** 15:4

**united** 92:21
171:18 172:6,8
172:14 174:6
174:16 175:8
175:23 176:2,5
296:20 300:11

**universal** 86:3
86:4

**universe** 68:9

**university** 43:5
148:14 269:19

**unknown** 12:14
12:16 57:18,25

**unnamed** 57:18

**unnecessary**
36:7

**unprepared**
129:8

**unqualified**
31:19 34:19
35:13 40:13
41:18 42:8
54:9 238:7

247:4 270:25

**unquote** 41:7
164:12 218:20

**unregulated**
242:14

**unreliable**
40:22 41:19
74:16,17
201:11,12
202:8,17,18,19
202:21 204:12
238:8 260:18

**unresolved**
23:14 24:5

**untested**
242:15

**untrue** 282:10

**usage** 110:1
177:20,21
178:13 182:18
183:9 184:8
261:6,8,10,11
261:24 262:7
281:14

**usages** 186:16

**use** 5:16 11:10
12:19 14:16,21
14:22 29:10
36:19 42:4
43:1 49:7
58:23 61:22
62:16 63:21
64:19 65:22
66:5,11 67:16
87:14 89:20,21

89:23 97:14
98:25 105:9,9
106:14 120:7
138:22 165:1
165:11,13,16
167:23,24
168:2 172:22
178:6,23
179:22 180:3,8
180:9 182:13
184:14,18
185:3 186:14
187:3,4 194:20
198:21 199:9
199:10,11
208:1 226:24
226:25 249:3
268:2 270:15
279:21 288:14
289:3 290:18
293:8 294:25
298:22 299:4
300:3,17
305:11 323:17
323:25 326:12
327:5,10,13

**used** 46:24 48:4
52:6 56:4
60:11 61:3
63:18 64:2,18
68:15 92:1
172:14,16,20
177:7 181:25
182:5 183:8,10
184:25 185:1,5

185:7,8,9,16,17
187:8 190:20
191:2 193:19
193:22 195:11
196:9,11,21
197:18,19
199:1 201:7
203:20 206:17
267:13 281:15
285:4 291:1,3
302:14 305:16
318:4,7

**uses** 58:20
59:11 80:9

**using** 34:5
38:17 48:13
59:6 60:25
71:16 79:13
82:24 165:11
166:7,11,12,14
166:15 167:25
171:17 172:19
173:20 180:4
182:3 183:7,15
183:23,24
184:24 196:3
196:17 198:8
202:10 206:7
241:5 279:24
304:1

**usually** 112:2,3
112:5,6 269:8

**uterus** 115:8

**utilized** 59:18
59:21

**[utilizing - warn]** Page 95

| | | | |
|---|---|---|---|
| **utilizing** 237:11 | **viewed** 240:4 | **want** 6:20 8:5 | 236:24 242:22 |
| **v** | **views** 213:1,5 | 10:21 12:20 | 244:2,8 247:14 |
| **v** 1:8 2:3 10:16 | **vigorous** 26:3 | 13:24 14:13 | 248:23 250:19 |
| 294:9 | **vineyards** | 16:17 22:21 | 251:11 257:22 |
| **vacuum** 228:3 | 294:9 | 28:24 31:12 | 260:2 266:21 |
| 228:7,11 | **violated** 234:24 | 42:11,13 52:5 | 267:11 268:19 |
| **vagina** 273:15 | 234:25 | 52:24 57:9 | 271:16,18 |
| **vaginal** 273:14 | **violation** 236:7 | 58:12 69:17,18 | 272:8,11,14 |
| 279:22 | 236:7,15 | 72:12,14 73:13 | 277:16 278:20 |
| **vague** 165:23 | **visit** 121:17 | 74:8 75:9 | 288:15 293:24 |
| 179:1 | **vitae** 255:12 | 76:16 77:10 | 298:4,8 301:21 |
| **valen** 24:15 | **voice** 96:7 | 79:24 82:21 | 301:25 302:3 |
| **validity** 10:24 | **voir** 315:23 | 89:20,21 92:13 | 302:20 303:17 |
| 154:6 | 316:11 | 94:3,14 98:6 | 304:7,8 307:19 |
| **value** 158:8 | **voluminous** | 102:8,10,12 | 308:5,8 312:8 |
| 173:15 199:23 | 189:3,6 | 103:12 107:14 | 312:18,20 |
| 199:24 200:1 | **voluntarily** | 116:17 117:11 | 314:13,25 |
| **variants** 110:16 | 300:3,4 | 117:13 124:25 | 315:7,9,24 |
| 110:20,24 | **voluntary** 4:23 | 125:20 128:25 | 317:16 319:12 |
| **various** 202:14 | 292:2,3 | 132:12 137:19 | 321:15 322:15 |
| 207:25 246:4 | **w** | 146:4,10 | 326:11 |
| **vast** 201:23 | | 150:13 151:20 | **wanted** 11:19 |
| **vein** 75:15 | **wagon** 233:7 | 152:1,1,23 | 15:12 21:3 |
| **verdict** 51:21 | **wait** 89:4 | 153:15,21 | 116:7 300:2 |
| 52:8 257:17 | 131:10,10,10 | 154:10 155:19 | 302:10 |
| **vermont** 172:2 | 131:11 146:23 | 155:20 157:10 | **wants** 9:15,16 |
| **version** 201:15 | 151:13 236:16 | 163:6,25 | 10:25 35:18,21 |
| 201:17 204:6 | 298:14 | 177:10 178:14 | 35:22 136:24 |
| **versus** 26:17 | **walk** 16:7 | 181:2,8,8,12 | 191:17 220:22 |
| 69:8 | 49:13 | 186:19 187:21 | 274:25 312:13 |
| **video** 310:17 | **walking** 6:18 | 190:10,13 | **war** 35:19 |
| 315:18 | 195:23 197:10 | 192:4 195:18 | 137:9 234:4 |
| **videoed** 305:25 | 198:8,10 | 205:5 209:5,23 | **warn** 172:24 |
| **view** 240:5 | **wall** 306:10 | 227:2,4 234:22 | 212:20 226:15 |
| | **walls** 203:16 | 235:6,17 | 229:13 239:19 |

299:21
**warning**  172:9
  172:13,14,16
  172:19 174:12
  174:15,17
  211:24 223:23
  224:22 225:3
  226:17 228:10
  229:2,3,4,5,7,9
  238:3 241:20
  241:21 242:9
  242:19 244:21
  294:12 308:3,3
**warnings**  236:6
**watched**
  267:16
**waves**  153:3
**way**  8:25 19:25
  21:21,22 24:25
  25:13 27:8
  37:17 49:6
  51:20 63:14
  65:16,18 70:24
  82:2,9 84:20
  86:22 87:11,21
  89:14 95:21
  96:6,8 104:9
  111:21 112:16
  116:21 131:3
  140:13,14
  143:15 146:18
  146:19 148:8
  154:25 158:22
  164:12 166:22
  168:6 171:9,15

174:25 184:1
184:19 197:4
209:11 210:19
214:15 216:8
223:6 226:24
230:8 233:24
237:18 240:17
251:4,8 255:24
258:15 259:18
260:5,17 263:5
267:6 269:9,14
270:18 276:2
282:14 285:1
294:13 301:15
301:23 303:8,9
304:7 309:18
312:9,16,17,20
319:17 321:10
321:18
**ways**  43:7
**we've**  7:2 8:25
  43:20 51:9
  81:3 85:24
  88:18 124:20
  126:13 135:2
  150:17 152:6,7
  156:6 171:7
  220:18 254:14
  256:13 297:8
  303:9,14
  320:10,11
  322:4 323:6
  324:10 326:6
  327:15

**weaker**  200:6
**wealth**  25:18
**website**  32:15
  47:14,15 54:13
  105:20 288:1,7
  288:8 297:5
**websites**  105:19
**wednesday**
  305:22
**week**  49:14
  129:9 179:5,16
  189:9 319:22
  319:22 320:11
  321:11,13
  323:2
**weekend**  317:7
**weeks**  49:16
  183:3 301:17
  320:17,19,22
  321:1,7,9,17,21
**weigh**  56:21,22
**weighed**  270:3
**weighing**
  225:12
**weight**  25:24
  57:2 278:14
**weird**  180:6
**wendy**  1:6
**went**  5:15
  26:23 46:25
  47:15 52:10
  56:6 59:4 60:4
  76:7 121:15
  129:1 182:8
  194:19 235:14

237:8 240:20
249:17 260:6
274:7 320:15
**west**  1:17 3:5
  24:15
**westphalen**
  78:1 79:25
**whatsoever**
  11:4
**wholesale**  34:6
**wholly**  56:17
**wife**  152:3
  270:14
**william**  1:24
**willing**  107:13
  245:12
**willingly**  308:7
**wish**  209:22,23
**withdraw**
  166:17,20
**withdrew**
  167:12
**witness**  19:5,7
  23:24 24:2
  30:14 33:10
  37:7 38:5
  42:14 48:1
  50:21 56:10
  57:23 58:13
  107:3 120:7,10
  131:23,25,25
  146:24 147:21
  154:7 159:9,23
  160:2,2 180:20
  185:16 187:9

187:10 210:17
218:10 230:23
237:5,10,12
241:6 246:8,12
248:6 255:13
257:4,24,24
258:17 274:15
307:5,8,8,10,11
307:13,15
308:1 310:15
310:21 311:12
324:24 325:5
326:3,16
327:10,14
**witnesses** 47:8
52:12 67:7
114:3 140:6
142:2 190:1
232:6 249:4
259:9 310:11
310:23 311:5,6
314:9 323:6
**woman** 11:2
15:23,23
119:14 196:11
**woman's** 13:1
266:1
**women** 8:10
9:1 13:7 32:4
33:1,3 38:11,16
38:17 43:2,2,8
48:4 93:24
99:3 113:4
137:10 143:20
144:2 182:3

231:5 265:20
269:12,25
281:20
**women's** 48:2,3
70:6 84:21,22
**wondering**
174:19 313:16
**word** 34:12,12
166:18
**words** 33:25
36:24 49:1
99:4 163:18
189:19 215:22
215:24 216:2
223:25 246:24
312:7 324:23
**work** 4:21
32:18 43:10
45:8 52:22
148:13 193:19
193:22 194:15
201:7 223:7,8
223:20 233:21
249:17 252:22
252:23 318:20
321:22 322:9
322:16 326:9
**worked** 43:13
55:18 207:14
212:11 219:25
233:10,24
252:12
**working** 27:14
137:10 206:3,4
206:8 233:15

284:8,21,22
287:7,8,21
289:19,21
291:20
**workplace**
172:23
**works** 133:19
**worksheet**
182:25 185:11
185:11
**world** 35:19
137:9 144:6
175:25 270:7
297:9 307:4
**worldwide**
174:22 175:9
175:18
**worries** 64:1
**worry** 123:15
203:17
**worst** 5:22
**worth** 30:4
157:25 288:11
**wrapped**
245:19
**wrapping**
145:8
**write** 47:6 50:7
136:3 220:9
270:23 290:4
**writes** 90:7
**written** 32:17
43:5 144:1
148:21 255:3

**wrong** 31:5
40:7 61:1
74:10,14 175:9
175:11 306:24
306:24,25
307:7,9,13
**wrote** 11:22
36:23 43:14
44:3 61:15
82:22 117:5,6
135:22 151:2
160:13 182:25
238:23 290:16

**x**

**x** 4:1
**xyz** 98:10

**y**

**y'all** 313:5,5
317:16,16
**yadda** 46:6,6,6
298:17,17,17
**yeah** 13:13
87:16 98:9
148:2 175:24
186:8 198:25
272:13 281:1
312:18
**year** 58:22
71:16 170:4
258:24 265:8,9
265:9
**years** 20:6 22:8
45:5 47:11
48:21 51:10

**[years - zoom]**                                                     Page 98

69:5 79:10
80:9 84:7
99:23 102:6
103:5 143:9
151:1 152:8
153:14 178:14
189:10 211:21
221:22 229:20
229:24 242:24
242:25,25
243:12 251:24
254:2 259:2
262:21 265:5
269:17 272:6
292:7
**yesterday**
243:3
**york**  3:6,6,22
3:22 195:23

**z**

**zero**  229:5
278:24
**zilch**  86:21
**zoning**  35:12
**zoology**  35:10
**zoom**  157:20