# Exhibit 28

1

IN THE CIRCUIT COURT OF THE TWENTIETH JUDICIAL CIRCUIT

ST. CLAIR COUNTY, ILLINOIS

| | |
|---|---|
| COLLEEN CADAGIN, As Executrix of the Estate of ELIZABETH DRISCOLL, deceased, | ) ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) No. 18-L-572 ) |
| JOHNSON & JOHNSON, JOHNSON & JOHNSON CONSUMER COMPANIES, INC., IMERYS TALC AMERICA, INC., F/K/A LUZENAC AMERICA, INC., and WALGREEN CO., | ) ) ) ) ) ) |
| Defendants. | ) |

REPORT OF PROCEEDINGS
(CONDUCTED BY WAY OF ZOOM CONFERENCING.)

Before the HONORABLE CHRISTOPHER KOLKER, Circuit Judge

April 20, 2021

APPEARANCES:

    MR. PAUL W. JOHNSON, MR. TED MEADOWS,
    MS. LEIGH O'DELL, MR. DAVID DEARING,
    MR. JOHN J. DRISCOLL & MR. JOHN BARICEVIC
        Attorneys at Law
        On Behalf of the Plaintiff; and,

    MR. MARK HEGARTY & MR. W. JASON RANKIN
        Attorneys at Law
        On Behalf of the Defendants.

MARY JO JALINSKY, CSR
Official Court Reporter
C.S.R. License No. 084-003202

2

1      BE IT REMEMBERED AND CERTIFIED that heretofore, on

2   to-wit:  April 20, 2021, being one of the regular

3   judicial days of this Court, the matter as hereinbefore

4   set forth came on for hearing before the HONORABLE

5   CHRISTOPHER KOLKER, Circuit Judge in and for the

6   Twentieth Judicial Circuit, St. Clair County, Illinois,

7   and the following was had of record, to-wit:

8                              * * * * * * *

9           THE COURT:  As we get started, I know I have

10  said it with this crowd before, all of your briefs were

11  extremely well written.  I appreciate it.  Although many

12  of them were repetitive and all that, that's okay, I

13  understand that.  But I appreciate well written, well

14  documented briefs.

15      I will say for the Johnson & Johnson defendants I'm

16  really starting to like how you guys had it set up at

17  the beginning with the table of contents and everything.

18      But anyway, with that being said, the first thing

19  -- it made most sense to me to go through the individual

20  experts first and then go to the motion for summary

21  judgment because of the assumptions within the motion

22  for summary judgment of whether or not the expert

23  testimony is admissible.

24      Godleski would be the first one I think, although I

3

1   don't really care.  How I understand it when I read it

2   is that the defendant argued basically that Godleski --

3   that's G-O-D-L-E-S-K-I, it's Dr. John Godleski -- lacked

4   support that talc in tissue can cause cancer.  Even if

5   he could, there's no basis to conclude that the

6   plaintiff's exposure crossed that threshold that could

7   cause cancer.  He didn't rule out other possible causes.

8   All of his opinions are irrelevant, not helpful to the

9   jury.

10      He can't identify the source of talc used, and that

11  it could have been J&J but it could have been, whatever,

12  Target brand or something else.  And I think each of the

13  briefs argued that every one of the plaintiff's experts

14  didn't know how much she used and really for how long,

15  and defendant assumed the only period of time that she

16  used the talc was '66 to '70, while the plaintiff said

17  no, there's other circumstantial evidence that shows she

18  used more.  I could go through what the plaintiff's

19  arguments were, but if you want to add on to that,

20  Mr. Hegarty, please go ahead.

21      MR. HEGARTY:  Thank you, Your Honor.  It would

22  be helpful -- I would like to start with Dr. Ellen

23  Smith.  She is the plaintiff's general and case specific

24  causation expert and she really lays the groundwork from

4

1  which we should look at all the other experts.

2          THE COURT:  Well, then let me start over with

3  the notes I made from reviewing --

4          MR. HEGARTY:  Okay, thank you.

5          THE COURT:  -- the arguments on that one.

6          MR. HEGARTY:  Thank you.

7          THE COURT:  You do point out that she's a

8  gynecological oncologist that opines that perineal --

9  God, I'm not going to pronounce it right --

10  P-E-R-I-N-E-A-L talc can cause ovarian cancer and that

11  plaintiff's use of it was a substantial contributing

12  cause.

13      The defendant alleges the manner in which she uses

14  the Brandford Hill framework is not generally accepted

15  and that basically her just saying that that's what she

16  used isn't enough.  That she makes a 1.2 to 1.5

17  association, which she says -- which you claim she's

18  said is both significant and nonsignificant or something

19  along those lines.

20      You also argue that the results are -- it's a

21  results oriented methodology and that the dose response

22  relationship hasn't been established between that use of

23  talc and ovarian cancer.  Different studies she

24  contended showed dose responses.  At least in one of

5

1    them you argue the study authors denied that.

2        She also claims biological plausibility -- these

3    are great words -- is satisfied but the FDA says

4    otherwise, and it goes against gravity and the flow of

5    bodily fluids.

6        And again, like I think in every one of these, that

7    she has no evidence that plaintiff was actually exposed

8    to talc but relies on Dr. Rigler.  That she has no basis

9    for her opinions on fragrances and heavy metals in talc,

10   that she can't rule in talc as a cause because she takes

11   no account of the extent of the plaintiff's exposure.

12       And I think in every expert you guys argue that

13   they have failed to rule out other potential causes.

14       Is that fair?

15       MR. HEGARTY:  I think that's a good summary,

16   Your Honor.  And consistent with what Your Honor has

17   said previously, and given the fact that you have all

18   the briefs and exhibits, I just want to emphasize a few

19   of the key grounds, and not even all the key grounds you

20   mentioned but a few of the key grounds we think are the

21   most important to consider in deciding to -- whether to

22   exclude Dr. Smith's testimony in this case.

23       And as the -- Your Honor mentioned -- and by the

24   way, good morning.  Mark Hegarty for the Johnson &

6

1    Johnson defendants.

2              THE COURT:  Good morning, Mark.

3              MR. HEGARTY:  It's important to look past Dr.

4    Smith and plaintiff's label of her general causation

5    opinion.  And she is the only witness for plaintiff who

6    will be giving a general causation opinion.  As you

7    know, there's general causation, can talcum powder

8    exposure cause the type of ovarian cancer that Miss

9    Driscoll had, serous carcinoma, and its specific

10   causation.  Did it cause her occurrence of serous

11   carcinoma.

12        And it's important to look past the label of her

13   general causation opinion as a Bradford Hill analysis

14   and examine what she actually did to reach her opinions.

15   And we talked and Your Honor mentioned about the

16   deficiencies in her opinions as it relates to certainly

17   the Bradford Hill criteria, strength of association,

18   consistency of the studies, dose-response and biological

19   plausibility.

20        But I just want to focus for purposes of general

21   causation on her opinions as they relate to the

22   consistency factor.  And as we cite on page five of our

23   reply brief, establishing the consistency factor under

24   Brandford Hill requires the different studies that

7

1    examine the same exposure disease relationship generally

2    yield similar results.  But for her consistency

3    analysis, Dr. Smith looked at the two different types of

4    epidemiologic studies that have examined ovarian cancer

5    occurrence in talc users versus non-users to determine

6    whether the studies show an association between talcum

7    powder use and ovarian cancer.  An association is shown

8    in an epidemiologic study when the results are

9    statistically significant, meaning that statistical

10   chance has been eliminated.  And the two different types

11   of studies looking for an association between talcum

12   powder use and ovarian cancer are retrospective case

13   control studies which look back at talcum powder use

14   after ovarian cancer has been diagnosed and the

15   prospective cohort studies which involve healthy women

16   who have been followed forward and monitored for ovarian

17   cancer occurrence.

18        As we cite in the briefing, Dr. Smith agreed that

19   there is inconsistency between the two different types

20   of studies and also between the retrospective case

21   control studies themselves.  In particular, none of the

22   forward-looking prospective studies showed an

23   association between talcum powder use and ovarian cancer

24   while only half of the retrospective case control

8

1    studies showed an association.

2        A properly performed Brandford Hill methodology

3    would call the consistency factor not satisfied based on

4    these study results, yet Dr. Smith's opinion is that

5    there is consistency.  And she comes to that opinion by

6    cherry picking of a subset of studies that find an

7    association and ignoring the importance of statistical

8    significance by just looking at whether the overall

9    estimate is positive.

10       This is the very example of an improper results

11   driven methodology, as further demonstrated by the fact

12   that her opinions are directly contrary to the findings

13   of the National Cancer Institute and FDA, which we

14   referenced in our briefing.

15           THE COURT:  Right, the FDA that does or doesn't

16   regulate cosmetics, right?

17           MR. HEGARTY:  Well, Your Honor, it is the Food

18   and Drug Administration and the Food, Drug and Cosmetic

19   Act.  The FDA does have regulatory authority over

20   cosmetics.

21       But this is just an example of how her methodology

22   as to general causation cannot be considered as

23   generally accepted because she doesn't apply it

24   properly.

9

1       Now, I want to next turn to her case specific

2   causation opinions.  That is that the plaintiff, Miss

3   Driscoll's, use of talcum powder was a substantial

4   contributing factor to her ovarian cancer.  And Dr.

5   Smith, likewise, failed to apply a reliable methodology

6   as to this opinion.

7       Again, it's important to look past the label of

8   differential diagnosis, as plaintiff calls what he did,

9   and examine just exactly how she came to this opinion.

10  And here I want to just focus on two aspects of her

11  opinion as to Miss Driscoll that showed that Dr. Smith

12  is really not applying any methodology at all and that

13  what she is doing has been expressly rejected by

14  Illinois courts.

15          First, Dr. Smith's approach -- and I don't

16  think it even can be called a methodology -- the case

17  specific causation was to simply rely on being told the

18  plaintiff used talcum powder.  In other words, all she

19  needed to come to her causation opinion was to be told

20  that plaintiff had ovarian cancer and used talcum

21  powder.  That was it.

22      This is clear from her testimony that at the time

23  she came to her opinion she said that she had no details

24  about plaintiff's talcum powder use.  No generally

10

1    accepted methodology for case specific causation

2    requires only knowledge of a disease and an alleged

3    exposure.  In fact, Dr. Smith testified that she was

4    unaware of any method under current medicine or science

5    to determine whether talc was the cause of a patient's

6    ovarian cancer.  And that testimony is at pages 39 and

7    40 of her deposition.  She also testified that she has

8    never done in her practice or otherwise what she is

9    doing in this case.  This is at pages 50 and 51 of her

10   deposition.

11       So, Dr. Smith cannot be applying a generally

12   accepted methodology or even a methodology based on her

13   experience and observions.

14       Now, related Dr. Smith's approach to causation as

15   to plaintiff, Miss Driscoll employed a method that

16   doesn't require any finding of a harmful dose, that the

17   plaintiff was exposed to a harmful dose.  Again, all Dr.

18   Smith needed to know was whether Miss Driscoll had ever

19   used talcum powder.  That was enough for her to say that

20   talcum powder was a substantial contributing factor.

21       And we've cited in Johnson & Johnson defendant's

22   reply briefing Dr. Smith's showing or testimony as to

23   this flawed methodology.  She was asked at her

24   deposition, Question, does it matter to you how many

11

1    times she -- being the plaintiff -- applied talc to her

2    genital region?  Dr. Smith's answer was simply, No.

3    Really no more is needed for the court to exclude her

4    opinions, but Dr. Smith repeatedly doubled down on this

5    improper methodology as to dose.  She testified that not

6    only that she need not -- that she didn't need to know

7    the details of any exposure, she could not say and

8    didn't need to say what necessary dosage was to cause

9    ovarian cancer.

10        Analogous to Dr. Smith's method is the any exposure

11   theory that has been rejected by Illinois courts in

12   cases involving lung disease allegedly from asbestos

13   exposure.

14        Now, plaintiff in her brief talked about Dr.

15   Smith's consideration of the length of time of use.  But

16   I ask the court to not just look at the brief but to

17   read her testimony because she came to her opinion

18   before having any knowledge about the duration or extent

19   of product use and certainly before she received this

20   affidavit from the plaintiff's sister or the testimony

21   of plaintiffs sister about her talc use.  In fact, I

22   think it's truly remarkable as to the magnitude of the

23   opinion that she came to based on so little information.

24        And one final related point that concerns this

12

1    entire case, plaintiff claims that asbestos, heavy

2    metals, fibrous talc and fragrance are part of Dr.

3    Smith's opinions, yet none of these substances are

4    referenced in her expert report in this case as they

5    relate to the plaintiff.  She admitted she's not an

6    expert on these substances and hasn't analyzed all of

7    the literature and has no knowledge of the plaintiff's

8    asbestos exposure allegedly from talc or any exposure to

9    heavy metals, fibrous talc and fragrance.  What I mean

10   is she has absolutely no information about plaintiff's

11   exposure levels to any of these substances from talc, no

12   information on exposure levels from the scientific and

13   medical literature that cause ovarian cancer or whether

14   any talcum powder that the plaintiff actually used

15   contained asbestos, heavy metals, fibrous talc and

16   fragrance, as none of the powder that she used was

17   tested.  She has none of this information and hasn't

18   applied any methodology --

19            THE COURT:  You expect them to go back into

20   1970 and find the exact bottles that she used as opposed

21   to just using general J&J bottles of talc that they were

22   able to obtain and test?

23            MR. HEGARTY:  Well, Your Honor, there have been

24   cases where the plaintiff has had powder remaining, and

13

1  we do challenge the reliance on evidence, as we will

2  talk about with Dr. Rigler, that concerns the content or

3  testing of bottles that the plaintiff did not use.  We

4  don't think that is sufficient evidence to prove

5  exposure to asbestos, heavy metals, fibrous talc by the

6  plaintiff in this case.

7      But that aside, she should -- Dr. Smith should not

8  be allowed to testify about exposures to substances when

9  she has no information about what harmful levels of

10  those substances are or that the plaintiff was exposed

11  to these such harmful levels.

12      And what plaintiff says is that all of these

13  substances are constituents of talcum powder that

14  contributed to being a carcinogen, but that's a lawyer

15  litigation opinion and not one that's a result of a

16  generally accepted methodology.  In other words, Dr.

17  Smith has not shown through any methodology that all of

18  these substances have a carcinogenic effect for ovarian

19  cancer when they are in talc or there is any showing at

20  all what levels are in talc.

21      What Dr. Smith and plaintiff says is that because

22  studies of this material at specific exposure levels

23  show some type of carcinogenicity, the mere presence of

24  this material in talc causes cancer, but there is no

14

1    scientific or medical data or any type of data that has

2    shown this.  It is, again, just a no dose or any

3    exposure kind of opinion.

4        In the end, her methodology doesn't require a

5    review of medical records, doesn't require any testing,

6    doesn't require any information or study about exposure

7    levels that can cause harm, doesn't require any

8    information about the plaintiff's exposure levels, it

9    doesn't require any analysis of other risk factors or

10   the occurrence of the disease without risk.  All she

11   requires is that the plaintiff used talc to say that it

12   was a substantially contributing factor to the ovarian

13   cancer.  That's not a generally accepted methodology.

14       And for these reasons and the other reasons that we

15   set out in our briefing, we ask the court to exclude Dr.

16   Smith's opinions, including any opinions about asbestos,

17   fibrous talc, heavy metals and fragrance.

18       Thank you, Your Honor.

19           THE COURT:  Plaintiff argued in response that,

20   first of all, the expert doesn't need to disprove every

21   possible cause, which I believe is a correct recitation

22   of Illinois law.  And they don't need to rule out every

23   possible potential -- you know, if aliens could have

24   landed on planet earth and inserted ovarian cancer.  We

15

1    don't need experts to spend time researching that and

2    ruling that out.  Of course, that's the way it is.  It

3    can be what's a substantial factor is pointed out

4    repeatedly I think in each of plaintiff's responsive

5    briefs and also I would argue a little bit of common

6    sense.

7        Plaintiff says that Dr. Smith's methodology is

8    reliable and qualified, that the association is met by

9    the 20 to 50 percent increased risk.  Although, as I

10   read it, it looks like there may even be some that shows

11   70 percent increased risk and there's no specific

12   threshold that really needs to be met anyway, which

13   makes sense to me.

14       Dr. Smith opines on the biologic plausibility that

15   it's reliable and that there's evidence in the

16   literature and studies that talc reaches ovaries either

17   by migration or inhalation.

18       Of course, she relies on Rigler and Longo to

19   support what talc contains, but that all of these are

20   questions potentially for the jury to hear really and

21   not for a Frye hearing.  The case in defendant's brief

22   that they kind of leaned on initially was the Carl case

23   that then got reversed on the New Jersey reviewing

24   court.

16

1      Mr. Johnson, you're the lead or Mr. Meadows, do you

2  guys have anything to add to any of that?

3          MR. JOHNSON:  Well, before Leigh O'Dell speaks

4  up on behalf of Dr. Smith's testimony --

5          THE COURT:  I'm sorry, Miss O'Dell, I didn't

6  mean to leave you out of it.

7          MS. O'DELL:  No problem, Judge.

8          MR. JOHNSON:  I'm sorry, but just before she

9  gets into the weeds of that testimony, let me just point

10  out that what Mr. Hegarty just said -- and Your Honor is

11  well aware of the Illinois case law -- as to how well

12  accepted methodologies are applied in a given

13  circumstance is a matter of cross examination --

14          THE COURT:  Right.

15          MR. JOHNSON:  -- contrary evidence --

16          THE COURT:  Right.

17          MR. JOHNSON:  -- at trial.  And that's the --

18  that's the point.  I didn't hear anything challenging

19  that differential diagnosis is a novel theory under

20  Illinois law.

21          THE COURT:  Right.

22          MR. HEGARTY:  My response to that, Your Honor,

23  is that what she called a differential diagnosis is not

24  the differential diagnosis method.

1          THE COURT:  That's what you guys can argue.

2          MR. HEGARTY:  Well, I think that that goes to

3   the admissibility of her testimony, Rule 702.  She's not

4   applying a reliable methodology.  She's calling what

5   she's doing a differential diagnosis, but it's not a

6   differential diagnosis methodology when all you need to

7   know is an exposure to conclude that it was a

8   substantial contributing factor.

9          THE COURT:  Miss O'Dell, anything else?

10          MS. O'DELL:  I would only say, Your Honor, that

11   the differential diagnosis she considered all the

12   medical history of Miss Driscoll.  She considered the

13   evidence of her usage.  It wasn't just that she used in

14   a vacuum.  She considered her years of usage in light of

15   the epidemiology which shows an increased risk over

16   years of usage.  And she considered all of her other

17   medical factors that might contribute or not contribute

18   to her ovarian cancer.  She ruled all those in.  She

19   ruled out the ones that were not relevant and she came

20   to the conclusion that talcum powder which shows a

21   consistent statistically significant increased risk of

22   ovarian cancer was a substantial contributing cause of

23   her injury.

24          And so Dr. Smith is eminently qualified.  She

18

1   practiced GYN oncology for more than 28 years, and her

2   testimony would assist the jury in understanding the

3   evidence in this case.  And so we think the motion

4   should be denied.

5           THE COURT:  Yeah, and is this the one also

6   where the defendant argued that not having babies or

7   having long menstrual cycles might be in cause of

8   cancer?

9           MR. HEGARTY:  I'm not sure that was exactly the

10  argument, Your Honor.  There are factors that relate to

11  increased risk or decreased risk based on (Inaudible.),

12  number of pregnancies and the other factors we've cited.

13  I'm not saying that those are going to be argued

14  necessarily in this case but the point --

15          THE COURT:  Not if we have women on the jury

16  probably.

17          MR. HEGARTY:  Well, the point was being made,

18  Your Honor, that I do think under the methodology she

19  purported to apply, she contended she was ruling in and

20  ruling out all these other factors where she did not.

21  And again, I go back to the fact that I don't think

22  there's any authority under Illinois law that says that

23  if you are in the vicinity of what is alleged to be a

24  carcinogen, that is all you need to know in order to

19

1    conclude that being in the vicinity is a substantial

2    contributing factor to causing disease.  And that's what

3    Dr. Smith did.

4           THE COURT:  I don't have any trouble with her

5    methodology, the way she applied the framework.  Her

6    methodology, when I reviewed it, is reliable.  She is

7    certainly qualified.  There's enough strength in

8    association, increased risk.  I also point out, as

9    Mr. Johnson did preliminarily, that she's been accepted

10   in all these other courts and she's met all the

11   qualifications.

12       The motion to exclude Dr. Smith is denied.

13       Next one.  Which do you want to go to next,

14   Mr. Hegarty?

15          MR. HEGARTY:  Your Honor, I'll go back to where

16   Your Honor started and Dr. Godleski, if that's okay.

17          THE COURT:  Okay, Dr. Godleski already stated

18   when I did my little summary about what I summarized of

19   what the defendant argued.  Do you have anything briefly

20   to add, Mr. Hegarty?

21          MR. HEGARTY:  Yeah, I think that I would like

22   to elaborate on a couple of points that are set out in

23   our motion.  And again, I think it's helpful to talk

24   about these things because assuming the court -- or if

20

1    the court denies our motion for summary judgement, then

2    we're going to be talking about these a lot.

3            THE COURT:  Right.

4            MR. HEGARTY:  And Dr. Godleski's opinions in

5    this case concern his finding of 16 talc particles

6    in the reproductive tract tissue of the plaintiff.  And

7    this motion doesn't contest, again just for purposes of

8    this motion, the methodology he used to claim to find

9    those 16 particles.  We're going to take issue with that

10   methodology, but not for purposes of this motion.

11       This motion is about what Dr. Godleski and

12   plaintiff proposes to do with this finding of 16

13   particles.  What we ask the court to exclude him from

14   testifying about this finding, to exclude him from

15   saying that there's a substantial amount of talc in the

16   plaintiff's tissues because of this finding, and most

17   importantly, to exclude his opinion that the 16

18   particles is -- and I'm quoting from this report --

19   contributory evidence for the link between the presence

20   of talc and the development of ovarian cancer.

21       And I want to focus on that opinion to begin with,

22   because Dr. Godleski has no methodology to allow him to

23   link the finding of these particles to ovarian cancer

24   causation.  What I mean is that there's no scientific or

21

1    medical literature that links the finding of talc

2    particles in tissue to ovarian cancer risk or causation.

3        The studies that have been done and are cited by

4    plaintiff, some of which are authored by Dr. Godleski,

5    report finding talc particles in the tissue of women who

6    have used talc, but the necessary next step of looking

7    for an association or correlation between that finding

8    and ovarian cancer risk or causation have not been done

9    by Dr. Godleski or anyone else.

10        And just a little bit more about the studies that

11    plaintiff cites in her brief, as I mentioned, they

12    involve taking the finding of talc in tissue.  They

13    don't involve taking the finding of talc in tissue to

14    the next step in showing that that finding has anything

15    to do with ovarian cancer risk or causation.

16        They look at in many cases tissue from plaintiffs

17    who have filed lawsuits and claim talc use and report

18    finding talc like -- while at the same time find talc in

19    the tissues of women who did not use talc and cite other

20    studies that likewise found the same.  So these studies

21    claim to have found talc in tissues but have not done

22    anything, employed no methodology to show that you can

23    draw any causation conclusions from it.

24        So we have we have here is a series of anecdotal

22

1   reports that have not been shown to have clinical

2   significance.  In other words, there is no scientific or

3   medical nexus or connection between talc particles in

4   tissue and ovarian cancer causation.

5        Also important is that there's no scientific or

6   medical literature showing what dose or volume of talc

7   particles in tissue is sufficient to cause ovarian

8   cancer.  And certainly Dr. Godleski cannot show that

9   plaintiff reached a dose or volume in her tissues that

10  caused ovarian cancer.  Without such a scientific and

11  medically established nexus, Dr. Godleski has no grounds

12  to offer his opinion that the finding of these particles

13  is contributory evidence of a causal link between

14  plaintiff's talc use and her ovarian cancer, and merely

15  showing the presence of an exposure or the existence of

16  an exposure is insufficient to reach any type of causal

17  opinion, which is what we just talked about, if that is

18  exactly what Dr. Godleski proposes to do.

19       Now, plaintiff tries to distinguish Dr. Godleski's

20  opinion that talc particles are contributory evidence of

21  a causal link from actual causation opinion that could

22  only be done through a full causation analysis, which

23  plaintiffs admit Dr. Godleski did not do.  In fact,

24  plaintiff calls his opinion only a partial causation

23

1    opinion.  Now, we're not aware of any different standard

2    applicable to a partial causation opinion.  There is no

3    distinction.  I don't think the jury would be able to

4    parse his words from the substantial contributing factor

5    standard.  The bottom line is that he's offering a

6    causation opinion without following a generally

7    recognized methodology to get there.

8        And I want to go back to where we started and

9    talked about with Dr. Smith.  We talked about Brandford

10   Hill.  Dr. Godleski did not apply this methodology.  We

11   talked about differential diagnosis.  He didn't apply

12   that methodology.  In reality, there's no causation

13   methodology behind it, and it's the very definition of

14   ipse dixit, that is it's an assertion made without

15   proof.

16       So what we have here is testimony from Dr. Godleski

17   about talc particles he found that doesn't assist the

18   trier of fact to understand the evidence or to determine

19   a fact in issue because they have no scientific or

20   medical meaning.

21       And along these same lines, Dr. Godleski's finding

22   of 16 particles is not evidence of plaintiff's use of

23   Johnson's baby powder or that talc did reach the

24   reproductive tract from powder use, which is what the

24

1    plaintiff contends.  And this is not a factual finding

2    by Dr. Godleski but an expert opinion that the court

3    needs to assess under the general acceptance standard.

4    But Dr. Godleski testified that he cannot identify these

5    particles that's specific to Johnson's baby powder or

6    any source.  He cannot identify when they came to be in

7    tissue and there's absolutely nothing unique in this

8    finding to talc users, as this finding had been reported

9    in users and non-users.

10       What is missing under this methodology are studies

11   showing this type of finding is actually evidence of

12   talcum powder use.  It is that studies showing that it's

13   a marker of talcum powder use.  So again, there's

14   nothing about this testimony that will aid the trier of

15   fact in making its decision in this case.

16       And plaintiff also argues that the finding of 16

17   particles demonstrates the frequency, regularity and

18   proximity of Miss Driscoll's exposure to talcum powder

19   products.

20       First of all, this is an asbestos concept that has

21   not been adopted in Illinois as to talcum powder

22   exposure.

23       Second, finding 16 particles of talc isn't evidence

24   of the frequency, regularity or proximity of Miss

25

1   Driscoll's use of talcum powder because Dr. Godleski

2   applies no methodology to correlate finding 16, or 12,

3   or 20 talc particles to the frequency, regularity and

4   proximity of talc users.  There just aren't any studies

5   that do this, and no generally accepted methodology can

6   do there.

7        And finally, Dr. Godleski's extrapolation of his

8   opinion where he goes from 16 talc particles to

9   thousands of talc particles in tissue is not the product

10  of a generally accepted methodology.  It's not because

11  he relies on studies doing this involving asbestos and

12  lung tissue where these studies have not been done

13  involving talc and reproductive tract tissues.

14       In the end he's doing the same thing that he's

15  doing with all his opinions, he jumps to the end of the

16  race without putting in the work to get there.  Studies

17  can be done looking at talc particles in tissue and

18  ovarian cancer risks.  Studies can be done looking at

19  talc particles in reproductive tissue in trying to see

20  if I can extrapolate that to the entirety of the tissue,

21  but those have not been done, and Dr. Godleski has not

22  done them.  And without that support, there's no

23  scientific basis for his opinion.

24       Now, as the court will read and you probably heard

26

1   other courts have allowed Dr. Godleski to testify to

2   these types of opinions.  We disagree with those courts,

3   but no court in Illinois has considered Dr. Godleski's

4   opinion and certainly this court hasn't, as to Miss

5   Driscoll.  We're here to try Miss Driscoll's case and

6   determine what evidence is going to be admitted here.

7   And we know the court will look at Dr. Godleski's

8   opinions and the legal authorities from a clean slate.

9   And we ask that based on the briefing, the arguments in

10   our briefing, the arguments here today, that the court

11   exclude Dr. Godleski's opinions in this case as they

12   relate this finding of 16 talc particles.

13        THE COURT:  As to the plaintiff's response,

14   first they note that Dr. Godleski -- oh, I'm getting

15   feedback now from somebody.  I'm going to mute

16   Mr. Baricevic since he's the closest.  It's first off

17   that he was Harvard -- he's been a professor at Harvard,

18   now is a profession emeritus at Harvard and actually

19   taught, if I'm correct, at the Harvard teaching hospital

20   for awhile and some other things -- that his opinions

21   and methodologies aren't new or novel, they are based on

22   longstanding principles of pathology and microscopy.

23   That if there's a link or not, that's an issue for the

24   jury to hear.  That his testimony has been found

27

1    reliable they say every single time.  Of all the

2    particles found, talc was the only carcinogen.  That the

3    evidence of exposure is enough, and that the -- really

4    the point of it is is that the presence of talc is

5    contributory evidence for the causal link, as

6    Mr. Hegarty also pointed out.  And that Dr. Godleski

7    doesn't need to prove whether or not she used the talc

8    because we have other people who are going to testify as

9    to her use.

10        With that being said, I think -- do you guys have

11    other stuff to add on the plaintiff's side?

12            MR. DEARING:  Good morning, Your Honor, David

13    Dearing.  I'll handle this particular motion, and I have

14    a beautiful six-page outline I'm going to skip most of

15    now.  I also have a PowerPoint presentation and I'll

16    probably go back on that, as well.

17            THE COURT:  By way, I have never seen so many

18    footnotes in briefs in my life.

19            MR. DEARING:  We have created so many of them

20    we feel like we're getting good at it, Your Honor.  And

21    on that note, this is not a new brief and not a new

22    argument from the defendant.

23            THE COURT:  I gathered that.

24            MR. DEARING:  It survived Daubert hearings and

28

1    Frye hearings.  This will be the 11 trial, hopefully,

2    where his opinion has been admitted, his exact same

3    opinions, unlike maybe some of the other experts where

4    specific causation sometimes lends itself to nuanced

5    opinions.  These are the exact same opinions that are

6    being offered in this case that Dr. Godleski has offered

7    in the ten previous trials, with the possible exception

8    that Miss Driscoll frankly had more talc in her tissue

9    than most of the other plaintiffs have had.

10        With that aside, the defendants are arguing now

11   what they've done in every case.  What they're doing is

12   they try to conflate this contributory negligence

13   opinion of Dr. Godleski into something much larger than

14   it is so that they can try to get it excluded.  But the

15   fact of the matter is Dr. Godleski found a significant

16   amount of talc in the very organ of origin of the

17   cancer, in her right ovary and right fallopian tube

18   where these cancers started.  The defendant's own

19   experts, own pathologists agree this is where the cancer

20   likely started.  So it's more than just finding talc in

21   tissue.  There's a proximity nexus between where the

22   talc was and where the cancer started.

23        The other thing Dr. Godleski says, which Mr.

24   Hegarty left out, was that Dr. Godleski also observed

29

1   evidence of inflammation associated with the particles

2   he saw.  That's very important because that's not just

3   showing talc next to cancer, that's showing talc causing

4   a reaction from the tissue.  And our studies and our

5   experts will testify that it's this chronic inflammatory

6   action that ultimately leads to the development of

7   cancer.  So the talc particles aren't just sitting there

8   and tissues reacting to them.

9       I will forego my description of Dr. Godleski's

10  methodology because I believe it's well establish in his

11  report, which is also in evidence.  You know, he teaches

12  this technique, like you said, at Harvard.  And this

13  technique is taught all over the world, not just by Dr.

14  Godleski.  It's in text books.  But he's also actually

15  published these exact findings.  They're consistent

16  (Distorted audio.) with his statement.

17      So what I would like to do is sort of skip down to

18  this actual causation statement that the defendants seem

19  to take exception to.  And I'm going to ask Katie, if

20  she would, to at least pull up one slide, and that's

21  slide 12.  And this is the statement that's right in his

22  report and it's essentially the statement that's been

23  offered in every trial.  Based on the findings in this

24  case, it can be stated to a reasonable degree of medical

30

1    certainty that the talc found in this case confirms the

2    patient's exposure and is contributory evidence for a

3    causal link between the presence of talc and the

4    development of this patient's ovarian cancer.

5        This statement is not intended to be a full

6    statement of causation, and it never had been --

7            THE COURT:  I understand.

8            MR. DEARING:  -- Despite the fact that

9    defendants want to characterize it that way.  It's one

10   piece of this causation puzzle.  Katie, would you put up

11   slide 13.  There are several disciplines of science that

12   go in to establish cancer causation.  You know, the

13   causation puzzle includes testimony of cell studies, and

14   inflammation studies, and migration studies, and

15   epidemiology studies, and the metaanalysis, and the pool

16   studies.

17       Katie, can you just run through 14, 15, 16 and 17

18   as I talk about them.  These are the cell studies that

19   are considered in the causation analysis.  And there are

20   inflammation studies -- the next slide -- and there are

21   migration studies, and there are epidemiology studies,

22   many epidemiology studies that we've already discussed

23   that show a statistically significant increased risk of

24   ovarian cancer in women that use talc in the genital

1    area.

2        There are several metaanalysis and pool studies,

3    and our experts will testify that these are the most

4    robust of epidemiology studies because they take into

5    account the most cases and they are blended in a way

6    that's statistically significant.

7        And then, of course, Dr. Godleski himself has

8    actually published this very opinion in at least two

9    studies -- slide 11.  This is one of the studies.  The

10   second quote, It documents exposure by demonstrating the

11   presence of talc in these tissues and provides evidence

12   and support of the role of talc in the epidemiological

13   association with ovarian cancer in case controlled

14   studies.

15       These opinions went through a vigorous peer

16   reviewed process by other scientists.  And it's not just

17   Dr. Godleski's opinions, as you can see, there's eight

18   or nine scientists that contributed to this study.

19       And then slide 18.  Here's another study on

20   migration specifically, but he also notes as one of the

21   contributing authors, Given the ongoing concerns

22   regarding talc -- he's talking about the ovarian cancer

23   concerns -- particularly with regard to its

24   epidemiological association with ovarian cancer, these

32

1    findings are important and offer new insight into the

2    biologic potential of talc.

3        That's exactly what he's talking about.  He's

4    talking about how finding talc in tissue is important

5    but when there are other studies, other science that

6    supports the nexus, the causal nexus between talc and

7    ovarian cancer, finding talc in tissues where cancer

8    originated takes on an even greater importance.

9        So, Judge, I think I'll leave it there.

10        Actually, will you pull up slide 19?

11        THE COURT:  Famous lawyer last words,

12    Mr. Dearing.  I'll leave it there, one last word.

13        MR. DEARING:  The very first trial this was

14    brought up in was in Federal Court, and our Federal

15    Court Judge acknowledged that Dr. Godleski's opinions

16    were admissible because he was qualified, the opinion

17    was relevant and stems from reliable methodologies.

18        And then the last side, slide 20, is a list of the

19    trials where his opinions have been admitted.

20        The bottom line is the Frye standard is a much

21    lower bar than Daubert, I believe, and clearly he meets

22    the Frye standard for admissibility of his opinions, and

23    that includes this partial causation opinion that he

24    wants to add.

33

1    You know, he's not saying it's a complete causation

2    opinion.  What he's doing is he's adding one piece of

3    that causation puzzle, and that is, you know, the

4    presence of talc in the ovarian tissue where the cancer

5    originated contributes to the causation opinion.

6         THE COURT:  Last word briefly, Mr. Hegarty?

7         MR. HEGARTY:  Sure, yeah, thank you, Your

8    Honor.  Your Honor mentioned qualifications, his use of

9    scanning electron microscopy.  We're not challenging

10   that for purposes of this motion.  There may be

11   questions directed at that at some point but not for

12   purposes of today.

13   Counsel referenced the epidemiologic studies, the

14   general causation.  I'm not here to argue that for the

15   purpose of Dr. Godleski.  He doesn't argue it himself

16   since he did not do a causation analysis, and that's not

17   the basis of our motion.  Our motion is that he doesn't

18   have a generally accepted methodology.

19   To go from a finding of particles to a partial or

20   causation opinion, because he's done nothing to do that.

21   All he does it call it that, and that's not generally

22   accepted to just say based on my whatever analysis or

23   opinion, that that is evidence of a causal association.

24   There has to be studies that show that there's a

34

1  relationship between the finding of talc particles and

2  ovarian cancer risk or causation.  And those studies

3  have not been done, including by Dr. Godleski.

4      THE COURT:  With all that of that said,

5  certainly it looks like Dr. Godleski is qualified.  It

6  appears to me his methodology and the way he used it has

7  all been generally accepted.  He's been accepted in

8  multiple courts.  So, as plaintiff pointed out early on,

9  I'm not even sure how much of a, quote, Frye hearing we

10  need.  Motion to exclude Dr. Godleski is denied.

11     Who do you want to take up next, Mr. Hegarty?

12     MR. HEGARTY:  I'd like to take up Dr. Plunkett

13  next, Your Honor.

14     THE COURT:  And Dr. Plunkett, as I recall -- or

15  in my outline, defendant argued that the plaintiff --

16  these are some -- some sort of variant of this seems to

17  run through for each of the plaintiff's experts, at

18  least this argument by defendant that Dr. Plunkett

19  didn't reliably perform the risk assessment analysis.

20  She's the one the defendant argued she previously

21  offered a general causation opinion but then backed away

22  from it and now contends that she didn't perform a

23  general causation analysis.

24     Her opinions treat exposure to trace amounts of

35

1    talc the same as long term to raw asbestos.  Her any

2    exposure argument increases -- she has an argument any

3    exposure increases risk, that that lacks scientific

4    basis.  That fibrous talc opinion should be out because

5    there's no evidence that plaintiff was exposed to that,

6    and that there's no link to ovarian, and that Dr.

7    Plunkett's also the one the defendant argues there's no

8    link about the heavy metals linking to ovarian cancer.

9    That she doesn't quantify the amount of talc, which

10   also, again, runs through for every one of the experts.

11        Defendant pointed out that chromium and nickel may

12   also be found in food.  There's no science linking

13   fragrances to ovarian cancer.  Doctor Plunkett fails to

14   consider the extent of plaintiff's exposure.  And then

15   Dr. Plunkett -- and that's P-L-U-N-K-E-T-T, Mary Jo, I'm

16   sorry -- that her opinions about the business practices

17   should be excluded, and the opinion that defendant

18   downplayed the risk of talc in not telling consumers.

19   They say she's never been in product safety.  That

20   there's no reliable methodology.  She was never a part

21   of an NTP hearing.  She shouldn't testify on legal and

22   regulatory matters because she has no legal or

23   regulatory training.  And her testimony about the state

24   of mind or FDA's state of mind is improper.

36

1      I will go ahead and say the plaintiff's

2  arguments -- because Plunkett was probably, for me, the

3  most interesting one for a couple reasons -- but that

4  Dr. Plunkett's methods are not new and novel.  She's

5  been allowed to testify on these things in multiple

6  courts.  That she was a consultant for pharmaceutical

7  companies in the areas of pharmacology, toxicology and

8  regulatory standards and has helped companies with FDA

9  regulations, requirements and has advised companies if

10  warnings are indeed appropriate or not, and has helped

11  again through FDA sort of issues.  That her use of human

12  health risk assessment and her opinions is generally

13  accepted.

14      Plaintiff argues it's used by all U.S. agencies.

15  She used weight of the evidence assessment.  She ID'd

16  hazards of the J&J powder exposure and defining the dose

17  response relationships between talc and risk of adverse

18  side effects.  And her opinions on labeling are not

19  speculation nor inference but rather opinions to show

20  how Johnson & Johnson's actions differ from what a,

21  quote, reasonable drug manufacturer, unquote, would do.

22      So, again Mr. Hegarty, are you going to carry all

23  the weight for this one too?

24          MR. HEGARTY:  I am, Your Honor, if that's all

37

1    right.

2            THE COURT:  It's fine with me.  Who's on the

3    other side for this one since they're all ganging up on

4    you?

5            MR. MEADOWS:  I'm tagging in, Judge.

6            THE COURT:  All right.  So, Mr. Hegarty, please

7    go ahead.

8            MR. HEGARTY:  Thank you, Your Honor.  Again,

9    Mark Hegarty for the Johnson & Johnson defendants.

10          As the court may have surmised from the briefing,

11   Dr. Plunkett is essentially a professional witness who

12   testifies exclusively for plaintiffs in cases like this.

13   She is a witness the plaintiffs intend to use as a

14   platform to talk about internal documents and other

15   concepts that the jury is more than capable of handling

16   itself.

17          And as I did with the other experts, I'm just going

18   to focus on some of the key aspects of the reasons that

19   her opinions should be excluded and not cover all the

20   grounds the court has read in analyzing the briefing.

21          And I want to begin by talking about her flawed

22   methodology as it relates to asbestos, heavy metals,

23   so-called fibrous talc and fragrance.  And first, as to

24   asbestos, as we discussed, asbestos exposure is

38

1  irrelevant in this case because plaintiff's case

2  specific expert, Dr. Smith, doesn't have any evidence

3  about asbestos exposure by the plaintiff.

4          THE COURT:  Can you slow down a little bit?

5          MR. HEGARTY:  Sure.

6          THE COURT:  My court reporter's -- our

7  courtroom is the only one where the big screen in our

8  courtroom doesn't sync right, so it's like those 1970's

9  cartoons -- was that Johnny Sokko -- where the mouth

10  moves at a different pace than the words that are trying

11  to be -- and it drives her bananas.  So she's trying to

12  keep up, but if we could slow down our cadence, it would

13  help her out a lot.

14          MR. HEGARTY:  Sure, yeah, I was an Ultra-Man

15  fan in the 1970's.

16          THE COURT:  Right, I forgot all about that one.

17          MR. HEGARTY:  And I understand that, yeah.  And

18  the giant robot, right?  Johnny Sokko.

19          THE COURT:  Right.

20          MR. HEGARTY:  You and I are the same vintage.

21  We could only get -- when I was growing up we could only

22  get four channels.

23          THE COURT:  Right.  I think we only had three

24  so you were lucky.

39

1          MR. HEGARTY:  The antenna was a little bit more

2    powerful, but I will definitely slow down.  Starting

3    over, I guess, a little bit, as we discussed, asbestos

4    exposure is irrelevant in this case because plaintiff

5    doesn't have any evidence about exposure to asbestos by

6    the plaintiff.  And I want to reference back to Dr.

7    Godleski who didn't find any asbestos or fibrous talc in

8    the plaintiff's tissue.  And there's no information from

9    Dr. Plunkett or any expert about what exposure levels to

10   asbestos or these substances are necessary to cause

11   harm, let alone ovarian cancer.  So therefore, her

12   testimony is not relevant as to asbestos and will not

13   help the jury.

14          THE COURT:  Let me stop you there.  First off,

15   I mean, can't that, A, be an issue for a jury, but, B,

16   plaintiff argued that I thought -- I don't remember who

17   they said, the EPA maybe has said that any exposure

18   isn't safe.

19          MR. HEGARTY:  And I think that is a -- that is

20   a flawed methodology, Your Honor, that would be rejected

21   by Illinois courts because to say that there's no safe

22   dose -- which is I think along the lines of what you're

23   talking about or what plaintiff says, there's no known

24   safe level of asbestos -- means that they're arguing

40

1    that any exposure to asbestos causes harm.  Which we

2    cite a number of references to courts in this state that

3    have rejected that proposition.  There -- any -- an

4    expert who purports to rely on an any exposure theory is

5    not applying a generally accepted methodology.  And

6    that's what we have here.  And the cases we cite, we

7    cite Wannall [ph] and McKinney and Nolan, and there's a

8    recent Krumwiede v. Penco case that talks about the fact

9    that these any exposure theories are not scientifically

10   valid, and that's what plaintiffs are relying on,

11   including Dr. Plunkett.  She's relying on an any

12   exposure theory or really just being in the vicinity.

13        THE COURT:  The other thing -- I don't know if

14   it's in this one or another one, that plaintiff's

15   argument is, well, you guys don't -- there's no -- the

16   defendant doesn't say what's acceptable and what's not.

17   And I know that's not your job.

18        MR. HEGARTY:  Right, it's not our job.  It's

19   their burden to show that -- what exposure levels are

20   capable of causing ovarian cancer and that a plaintiff

21   was exposed to that exposure level.  And none of their

22   experts do that.  So that is what we believe a flaw in

23   her methodology that should lead to her being excluded

24   in this case.

41

1          And what she does have, Your Honor, is these

2     studies looking at heavy occupational exposure to raw

3     asbestos.  That is exposure by women working in asbestos

4     factories that have looked at that exposure with regard

5     to ovarian cancer risk.  But there's no generally

6     accepted methodology that can properly apply those

7     studies to someone using talcum powder.  And Dr.

8     Plunkett herself doesn't quantify the two exposures to

9     show any similarity.  And again, in realty what she is

10    applying is a no dose or any exposure theory just like

11    their other experts.

12         She looks at these heavy occupational exposure

13    studies and findings as to those studies and concludes

14    that any exposure to asbestos from talc causes cancer.

15    The problem is that opinion just leaps over the concept

16    of dose and dose shown to be harmful and just requires

17    there is an exposure.

18         Now, the same thing is true with regard to her

19    testimony about fibrous talc, heavy metals and

20    fragrance.  There are no studies showing that these

21    exposures caused ovarian cancer generally, and there are

22    no studies showing harmful exposure levels to these

23    studies that can cause ovarian cancer from talcum powder

24    use.  For her opinion it boils down to the general

42

1    concept that these substances have evidence of being a

2    carcinogen in some context without any analysis of the

3    dose, just saying that if these substances are in talcum

4    powder they cause cancer.  Again, that's just a no dose

5    or any exposure opinion that's been rejected by the

6    courts in Illinois.

7        And again, what the plaintiffs say is these are all

8    constituents of talcum powder that contribute to being a

9    carcinogen.  But as I talked about earlier, Dr. Plunkett

10   has not shown through any methodology that these

11   substances have a carcinogenic effect for ovarian cancer

12   when they are allegedly in talc.  And there's no showing

13   at what levels they are in talc.

14       Again, what Dr. Plunkett and plaintiff say is that

15   because some studies of the raw material at specific

16   exposure levels show carcinogenicity, the mere alleged

17   presence of this material proves they can cause cancer,

18   but there's no scientific or medical data or any type of

19   data that has shown this.

20       Another way to look at this as to her opinion as to

21   the mineral talc, she calls the mineral talc a

22   carcinogen, and then she purports to reference these

23   other constituents without any methodology or data to

24   show that they add to or otherwise affect talc

43

1    carcinogenicity when they are in talc.  In essence, it's

2    her just speculating that because in other context

3    looking at these substances alone as specific doses,

4    there's a showing of carcinogenicities and not even

5    ovarian carcinogenicities, they must be contributing if

6    they are in talc.

7         Such speculation is not the subject of a generally

8    accepted methodology, and again, it's the example of

9    jumping to the finish line without running the race.

10   And I think there's a real danger with the kind of

11   opinions Dr. Plunkett and plaintiff intend to offer

12   because they are not scientific.  If they are being

13   offered by an expert to give them credibility that they

14   don't deserve, it's not sound science.  In fact, it's

15   false to simply say that a person is at risk for cancer

16   simply because they were around what is called a

17   carcinogen.  There has to be scientific data to show

18   that this exposure was at a level capable of causing the

19   disease of interest.  And Dr. Plunkett doesn't have that

20   as to asbestos, fibrous talc, heavy metals or fragrance,

21   which is why her opinions should be excluded.

22        Now, I want to talk a moment about her opinions as

23   they relate to business practices, legal and regulatory

24   practices, warnings, knowledge and intent.  And those

44

1    opinions should be excluded, starting with her business

2    practices opinion.  They are supposedly based on her own

3    specific experiences which amount to no more than her

4    say so.  It's just her individual experience without a

5    methodology to show that they're reliably applied to the

6    facts of this case.  In other words, she cannot show

7    that her unique individual experience on business

8    practices is a generally accepted methodology to offer

9    opinions about the defendant's business practices.

10        More importantly, these and her other opinions

11   about legal regulatory warning issues and internal

12   documents are all just improper subjects from expert

13   testimony.  What regulations say and how they are

14   applied are just legal issues decided either by the

15   court or factual issues decided by the jury.

16        For example, Dr. Plunkett wants to get on the stand

17   and read a regulation about warnings, interpret the

18   regulations and offer an opinion as to whether the

19   defendants complied with a regulation.  That gets into a

20   legal conclusion, and the jury is more than capable of

21   reading the regulations and deciding for itself whether

22   the company's complied with the regulation.  The jury

23   can likewise read and interpret for itself internal

24   company documents, and it doesn't need someone like Dr.

45

1    Plunkett doing its interpretation for them.  That's what

2    plaintiff's going to ask Dr. Plunkett to do, look at a

3    document and give her spin on it.

4        And as the court's going to see with these

5    documents that plaintiffs intend to use, the jury does

6    not need assistance in reading and understanding.  And

7    they also are going to ask Dr. Plunkett to testify about

8    motives, intent, the state of mind of the folks in these

9    documents.  Not a proper subject of expert testimony.

10        And what we really want to alert the court by this

11   motion is what Dr. Plunkett has done at other trials.

12   She's given a binder of internal documents and spends

13   her time, sometimes more than a day on the stand,

14   telling the jury who can read and understand the

15   documents themselves what the documents say and what she

16   thinks about them and what she thinks the authors

17   intended by their statements.  She is essentially like

18   an attorney for the plaintiff sitting on the stand as a

19   supposed expert and arguing to the jury about the

20   meaning of hundreds of documents, what the authors

21   meant, where the documents are no more specialized than

22   an e-mail or a memo.  These are not documents with

23   complicated data or difficult scientific concepts but

24   folks talking to each other about matters easily

46

1    understood by the jury.  Having someone just parrot what

2    internal documents say and talk about what they mean is

3    not what Rule 702 allows and is not the job of an

4    expert.  That's the job of an attorney during closing

5    argument after the document has been admitted into

6    evidence.  Before that the jury can read the document

7    itself when it comes into evidence.

8        Now, courts have allowed Dr. Plunkett to testify as

9    to these matters.  The courts have also excluded these

10   opinions.  But this will not shortcut what this court

11   has to decide as to how far it's going to let a witness

12   like Dr. Plunkett assume the role of the court and the

13   jury to talk about matters the jury is fully capable of

14   of handling and should handle itself.

15       So we would ask the court to exclude Dr. Plunkett's

16   opinions about business practice, the meaning of FDA

17   regulations and statutes, compliance with FDA

18   regulations, warnings and adequacy of labeling, content

19   of internal documents, the intended motive of the

20   authors and folks of these documents, and then as the

21   court mentioned (Distorted audio.)

22       THE COURT:  Whoa.  The last one -- now I'm

23   getting feedback from somebody.  And Ted, you're going

24   to take this one up, right?

47

1              MR. MEADOWS:  Yes, Your Honor.  I had a little

2    difficulty hearing you.  I'm getting a lot of feedback

3    also.

4              THE COURT:  Let me mute everybody else.  Is

5    that better?

6              MR. MEADOWS:  Much better for me, yes.

7              THE COURT:  Okay.  A couple things, going back

8    to Mr. Hegarty real quickly, as it relates to getting

9    into state of mind and things like that, again, what the

10   plaintiffs argue is that they don't say -- she's not

11   going to talk about their state of mind but really what

12   reasonable companies do and I guess reasonable companies

13   by reverse inference don't do, and then she's going to

14   use her experience in advising companies on FDA warnings

15   and stuff like that to assist with that and that

16   whatever.  That's a little bit different than talking

17   about her state of mind, right?  You have to un-mute.

18   You have to un-mute.  Mark.  There you go.

19             MR. HEGARTY:  Sorry, Your Honor.  I think if

20   you look at their briefing on that point, I don't think

21   they say exactly that.  I think they actually admit that

22   she does intend to comment on what the authors of these

23   documents were intending or thinking when they wrote

24   them.  And in my experience from other trials, that's

48

1    what she has tried to do is to go beyond, is to

2    interpret the meaning of these documents or intent of

3    these documents.

4        But even aside from that, these are documents that

5    the jury could easily understand and read themselves

6    once they are admitted into evidence.  They don't need

7    an expert witness with any specialized knowledge to

8    assist them in their reading of the English language.

9    And that's what we have going on here is someone who's

10   going to be talking about subject areas that are not

11   scientifically complicated or scientific data but simply

12   somebody -- what somebody is saying in an e-mail or a

13   memo.

14            THE COURT:  Isn't that something we would take

15   up at trial?

16            MR. HEGARTY:  Well, we will take it up at

17   trial.  There's no doubt about that.

18            THE COURT:  Okay.

19            MR. HEGARTY:  But I think it is -- and I

20   recognize that perhaps it is difficult to rule on that

21   motion in a vacuum --

22            THE COURT:  Right.

23            MR. HEGARTY:  -- without seeing the documents.

24   But there are certainly concepts like state of mind,

49

1    motive, intent, and the proper role of a Rule 702 -- an

2    expert in a Rule 702, that I think the court can give

3    clarity by its decision as it relates to this motion.

4              THE COURT:  Okay with that, Mr. Meadows?

5    Sorry.

6              MR. MEADOWS:  Yes, Your Honor.  Thank you.  And

7    I think the brief makes the points that we want to make,

8    but I'll just -- in quick response to the questions

9    about motive and intent, I have put Dr. Plunkett on the

10   stand numerous times in the talc litigation and in

11   different courts.  I have never known her to speak to

12   what somebody's intent was at the time they wrote

13   something.  She does look at internal documents that go

14   back many decades, the J&J documents that have been in

15   their files for many decades, that do show what in

16   company was, how they were --

17             THE COURT:  Can we stop for one minute and take

18   a short break?

19             MR. MEADOWS:  Certainly.

20             THE COURT:  Thanks.

21             (Whereupon a brief recess was taken, and the

22             proceedings subsequently continued, as

23             follows:)

24             THE COURT:  Going back on the record.

50

1    Mr. Meadows, I apologize.  I rudely interrupted you so

2    we could we could take a short break, so please continue

3    if you remember where you left off.

4              MR. MEADOWS:  Yes, and no apology necessary,

5    Judge.  I too have children, and they are no longer

6    teens but they still need us.  I'll put it that way.

7         In any event, Judge, I'll try to speed this along.

8    I think that getting to the issue at hand, whether Dr.

9    Plunkett is qualified under Frye, I think there's

10   more -- she has more than enough qualifications.  They

11   go back decades.  You already mentioned the fact that

12   she worked for industry for Environ for a number of

13   years, which is an industry group.

14             THE COURT:  Right.

15             MR. MEADOWS:  She did risk assessment, which is

16   the very methodology she's using here to assess products

17   and whether or not they're a potential risk to

18   consumers.  She actually assessed talc in the 1990s long

19   before she ever met a lawyer or went to work for

20   plaintiffs' lawyers or certainly met me.

21        And then she spent the last several decades not

22   only doing litigation work, but working for industry,

23   and in particular, cosmetic companies in assessing risk.

24        And I think it's important to note, Your Honor,

51

1    that that's really what the issue is here.  Much of what

2    defense attempts to do with Dr. Plunkett is similar to

3    what they're doing with the Frye standard.  They put on

4    her a much heavier burden than what she's really

5    offering.  And while she has given causation opinions

6    before, she is not doing so in this case.  It's

7    unnecessary when you have witnesses like those who have

8    been described by Miss O'Dell and Mr. Dearing who can

9    carry the water on causation.  It's a heavy enough

10   burden for Dr. Plunkett just to assess risk.  And risk

11   is much different from causation when it comes to making

12   a determination as to whether or not a product,

13   especially a cosmetic which provides no health benefits,

14   should provide warnings to consumers.

15       So that's what she's doing, and she's not doing an

16   exhaustive review and an assessment like the gynecologic

17   oncologist is doing in this.

18       So part of her methodology in that is not only

19   looking at studies but in looking at internal documents

20   to see what the company -- how the company was assessing

21   risk at different points in time.  And that stretches

22   back to the 1940s in this case when studies first

23   started coming out and the companies started looking at

24   studies and memorializing what they were seeing in

52

1    studies in their own internal documents.  And so she

2    does that to assess risk and make a determination as to

3    whether or not J&J should have been warning during those

4    particular time periods.

5        So I think she's qualified to give opinions and she

6    also shows a good methodology, although that certainly

7    would be subject to cross examine under <u>Frye</u> by defense,

8    but I think she does show that she's using risk

9    assessment, which is an accepted methodology in

10   Illinois, as I understand it.  And she also is doing

11   what people in her line of work do every day in the way

12   she looks at the materials that are offered to her on a

13   day-to-day basis by industry.  She's doing the same

14   thing in this case to reach her opinions in the case.

15       So I think that she would be valuable for a jury to

16   hear because she does have knowledge of industry and the

17   way industry conducts day-to-day businesses.  She

18   understands the lingo, is able to explain that to the

19   jury, which can be quite specialized at times, as well.

20       So I think -- Your Honor, I would ask that you deny

21   defense motion to strike Dr. Plunkett.

22           THE COURT:  Mr. Hegarty, last word?  Oh, I

23   muted you, so hold on.  I need to un-mute you again.

24   There you go.

53

1          MR. HEGARTY:  Thank you.  Yeah, just quickly, I

2    think the comments about what her testimony is going to

3    get into really prove our point.  The references made as

4    to how the company was assessing risk, whether the

5    company should have been warning during the relevant

6    time period based on the documents, that's the job of

7    the jury, Your Honor.  The jury can look at the

8    documents once they're admitted into evidence and decide

9    for itself those two issues.  And the lawyer can argue

10   what he wants to argue or she wants to argue during

11   closing argument about what those documents mean.  But

12   it's improper for Dr. Plunkett to get on the stand and

13   act in the role of a lawyer during closing argument and

14   argue what she says the documents -- what she concludes

15   based on what the documents say about how the company

16   was assessing risk and when they should have been

17   warned.  These are issues that the jury is more than

18   capable of handling for itself and determining for

19   itself when it reads the documents.

20          THE COURT:  With that being said, again, I have

21   read the briefs.  I think Mr. -- I'm sorry Ms. -- Dr.

22   Plunkett is qualified.  Her methodology certainly passes

23   all the tests needed to be able to at least present

24   evidence in court.  I think her, you know, toxicological

54

1    opinion, you know, as the plaintiff points out, it's

2    building a foundation for Dr. Smith's.

3        In any event, I do recognize that there's probably

4    going to be issues with objections at trial with Dr.

5    Plunkett's testimony that will certainly need to be side

6    barred or taken back in chambers maybe to be argued, but

7    we'll just have to see how that comes out at trial.  I

8    recognize that and kind of glad that we're able to get a

9    heads up.

10        The motion to exclude Dr. Plunkett is denied.

11        And that leaves us with Dr. Rigler, at least as far

12    as the motions to exclude.  I assume, Mr. Hegarty, this

13    is you again?

14            MR. HEGARTY:  Yes.

15            THE COURT:  You're carrying all the water

16    today.

17            MR. HEGARTY:  Just me and Jason.  So I didn't

18    know if you wanted to pass along your notes first or you

19    want me to just jump in, Judge?

20            THE COURT:  I'll be happy to go over some of

21    mine.

22            MR. HEGARTY:  Whatever you want to do.  I would

23    be happy to jump in and just go.  Whatever you want,

24    Your Honor.

55

1          THE COURT:  Again, you guys argued that his

2    opinions are irrelevant because none of the plaintiff's

3    specific cause experts offer admissible opinions that

4    asbestos or fibrous talc played a role in causing her

5    cancer, or the small amount that Dr. Rigler detected

6    would be consistent with asbestos exposure.

7          Defendants argue that he didn't use generally

8    accepted methodology in testing talc samples for

9    asbestos and fibrous talc.  None of the samples were

10   from what plaintiff used.  Small amounts were detected,

11   although when I read that argument repeatedly I

12   wondered, well, what amounts are supposed to be?  I

13   don't know if it's -- you know, it may be

14   microscopically small, but good Lord, there are some

15   things that can be microscopically small and still be

16   hugely problematic even if it's a small sample.

17         And then there was a lot of discussion about the

18   detection of fibrous talc and whether or not it

19   differentiated with asbestiform talc and non-asbestiform

20   talc.  And the fibrous talc they tested wasn't the

21   asbestiform talc that the IARC deems carcinogenic.  No

22   harmful amounts were in the samples they got.  There's

23   talking about bundles versus cleavage in the talc

24   samples, if I recall all of that correctly as well.

56

1      And then plaintiffs say in response that the NOISH

2  says there's no evidence for a safe level of asbestos --

3  I think that there's no safe level of asbestos.  That in

4  samples the labs got 68 percent of amphibole asbestos,

5  A-M-P-H-I-B-O-L-E, and 98 percent fibrous talc.  That

6  Dr. Smith says that the product was a substantial cause

7  of plaintiff's cancer.  Dr. Godleski didn't need to find

8  asbestos in the plaintiff's tissue for tests to be

9  relevant.  It was enough that Rigler found asbestos in

10  the majority of samples during the relevant timeframe.

11  I guess it's the IARC does not provide what a safe level

12  is.

13      Plaintiff argued they testified any asbestos form

14  amphibole, and then Longo first -- that's L-O-N-G-O --

15  first eliminated non-asbestos fibers that need not meet

16  criteria.  And there no distinction between asbestos and

17  cleavage fragments or fibers versus bundles and whether

18  or not a fiber is asbestos form.

19      It gets a little bit more technical with Rigler.

20  Is this going to be you, Ms. O'Dell?

21          MS. O'DELL:  Yes, sir, it will.

22          THE COURT:  So, again, a little bit more

23  technical on Dr. Rigler, but please go ahead.

24          MR. HEGARTY:  Thank you, Your Honor.  Again,

57

1    Mark Hegarty for the Johnson & Johnson defendants.

2        And with regard to the testing results that Dr.

3    Rigler purports to talk about, it's important to note

4    that none of those tests involve any talcum powder that

5    the plaintiff used in this case, Miss Driscoll.  And a

6    number of the tests, in fact, essentially half of the

7    tests that he performed concerned a product she never

8    used, Shower to Shower.  So much of his testimony will

9    be about products that plaintiff never used.  Actually,

10   all of his testimony will be about products that

11   plaintiff never used, and the vast majority of the

12   products he tested were not even from the time period

13   that plaintiff allegedly used Johnson baby powder, from

14   1966 to 1970.

15       And the test results that Dr. Rigler intends to

16   discuss purportedly found what he calls asbestos in a

17   certain percentage of samples and what he calls fibrous

18   talc --

19            THE COURT:  Right.

20            MR. HEGARTY:  -- in a certain percentage of

21   samples.  And I say what he calls asbestos in fibrous

22   talc because, as we said in our briefing, these labels

23   are loosely applied and do not reflect what he actually

24   saw.  And we'll come back to that in a moment.  But as

58

1  we've been talking about throughout this morning, the

2  issue of asbestos in talc is a major point of contention

3  in this case, both as to its relevance as it relates to

4  Miss Driscoll and as to his very presence at all.

5      And first as to relevance, as we talked about, this

6  is ground number one why the court should exclude his

7  testimony.  The entire issue of asbestos in talcum

8  powder is irrelevant because it played no role.  It's

9  undisputed that no witness will testify that plaintiff

10 had any asbestos in her tissues or any physical finding

11 reflecting asbestos exposure, such as lung tissue damage

12 or any other supposed marker of asbestos exposure.

13     And Dr. Smith -- I know we talked about her -- did

14 not attribute plaintiff's ovarian cancer to asbestos

15 exposure.  This is what she said at page 67 of her

16 deposition.  Question, is it your opinion that asbestos

17 in talcum powder products that Miss Driscoll used

18 contributed to cause her ovarian cancer?  Answer, I have

19 no knowledge that there was asbestos in her baby powder

20 products demonstrated in the information that I've seen.

21     So the testimony is clear that Dr. Smith,

22 plaintiff's only case specific causation witness, is not

23 basing her opinions on alleged exposure to asbestos.  So

24 given this testimony, Dr. Rigler's testimony about

59

1    asbestos is irrelevant.

2         Now, in addition and importantly, the testing of

3    bottles not used by the plaintiff cannot be used to show

4    that the talcum powder the plaintiff actually used was

5    of the same sort.

6         Now, Dr. Rigler wants to talk about seven bottles

7    he tested during the time period at issue, and he says

8    he found asbestos in two of those bottles -- again, not

9    used by the plaintiff -- and said that's enough to show

10   that plaintiff was exposed to asbestos from talc.  But

11   that is pure speculation for a witness or anyone else to

12   argue that these tests reflect or represent the bottles

13   that plaintiff used.  In fact, it's speculation on

14   speculation.  Speculation that any bottles she purchased

15   contained asbestos, speculation as to any levels of

16   asbestos in those bottles, it's speculation as to the

17   amount of actual exposure by plaintiff to asbestos.

18        In a separate but related ground to exclude his

19   testimony is the concept we've been talking about, that

20   is dose or level of exposure.  Plaintiff has no witness

21   who will testify about the dose or level of exposure to

22   asbestos they allege plaintiff had from her use of

23   talcum powder or what dose or exposure to asbestos is

24   necessary to cause ovarian cancer and that plaintiff was

60

1    exposed to such a harmful dose.

2         Again, plaintiff is advancing a really no dose or

3    any exposure theory as it relates to asbestos that has

4    been rejected under Illinois law in the cases that we

5    cite.

6         And Your Honor, you mentioned that the amount that

7    Dr. Rigler contends that he found through his testing,

8    .00017 or one seven -- 1.7 hundred thousandths of a

9    percent as the median bottle.  The highest concentration

10   was .0092 of a percent.  And that's in comparison to the

11   1 percent threshold that EPA uses to define an asbestos

12   containing material.

13        More importantly, the studies that have linked

14   asbestos exposure to ovarian cancer have involved heavy

15   occupational exposure to asbestos.  There are no studies

16   showing an association between the levels of exposure

17   that Dr. Rigler wants to discuss and ovarian cancer.

18        So, again, there's no basis to say that exposure to

19   asbestos at the levels that he wants to talk about is

20   even relevant to ovarian cancer risk.

21        And as to his testimony about so-called fibrous

22   talc, again, it's irrelevant in this case.  No finding

23   of fibrous talc in this case.  There are no studies

24   showing that fibrous talc is harmful, let alone can

61

1  cause ovarian cancer.  And we'll refer the court to the

2  briefing on this subject, but what Dr. Rigler calls

3  fibrous talc is not talc containing asbestos or talc

4  containing -- talc that is asbestos form but -- and

5  there are no studies showing that fibrous talc is

6  carcinogenic.

7      In addition to being irrelevant, his opinions

8  should be excluded because his findings are not based on

9  a generally accepted methodology.  And particularly, he

10  calls structures asbestos that are not, minerals that

11  are asbestos also come in non-asbestiform.  When these

12  non-asbestiform materials break they can form long and

13  thick fragments -- thin fragments which the court

14  mentioned are cleavage fragments.

15      There are no studies that show these cleavage

16  fragments cause harm, including ovarian cancer.  In

17  fact, the studies that have been done show that they

18  don't cause harm.  So it's important to distinguish

19  these fragments from true asbestos, yet Dr. Rigler

20  doesn't do that by his cattiness.  He calls cleavage

21  fragments asbestos.

22          Now, plaintiffs in their opposition refer to

23  methods that are used to identify asbestos.  They talked

24  about the Asbestos Hazard Emergency Report Act.  But

62

1    those methods do not distinguish between asbestos and

2    cleavage fragments despite -- all they look at is length

3    and width of the particle.  And plaintiff talked about

4    transmission electron microscopy or TEM, energy

5    dispersion -- dispersive X-ray analysis or EDXA;

6    selected area diffraction or SAED, but these methods are

7    not (Inaudible.) in this motion.  The challenge here is

8    that these methods cannot receive cleavage fragments or

9    other particles from asbestos.

10        Now, also the plaintiff in their opposition throws

11   a lot of references around concerning asbestos, cleavage

12   fragments, elongated particles, and again, this is

13   technical.  I refer the court to the briefing on these

14   issues.  But the bottom line is that the distinction

15   between asbestos and cleavage fragments means something.

16   It's real.  They are two different types of minerals

17   with two different types of risk profiles.  It's not

18   scientifically, medically, methodologically sound to not

19   distinguish between the two structures, as government

20   and regulatory authorities do and to not distinguish

21   between the two between in terms of their potential

22   effect on tissue.

23        Now, I want to go back to where we started where we

24   have been talking about today.  This is a case about

63

1   Miss Elizabeth Driscoll.  We're not trying some generic

2   talc case dealing with just certain generic issues.  The

3   claim in this case is that the baby powder that Miss

4   Driscoll used contained asbestos that caused her to

5   develop ovarian cancer, whether it contained fibrous

6   talc and caused her to develop ovarian cancer.

7       There are no tests showing any bottles she used

8   contained asbestos or fibrous talc.  There have been no

9   finding of asbestos or fibrous talc in her tissues, and

10  there's no evidence of dose generally that is harmful,

11  or specifically that Miss Driscoll was exposed a harmful

12  dose.

13      While maybe in some of these other cases these huge

14  evidentiary holes can be argued have been filled, but

15  that's not what we have here.  The case is about

16  exposure to baby powder, not about asbestos and fibrous

17  talc.  And this is not just me saying this but

18  plaintiff's expert, Dr. Smith, saying this.

19      So, while we ultimately may talk about asbestos in

20  cleavage fragments, we should never get that far because

21  Dr. Rigler's opinions are irrelevant.  We've not --

22  we've been through impermissible speculation about the

23  powder that Miss Driscoll used and do not in anyway

24  include necessary dose information for anyone to show

64

1  harm.  So we'd ask that Dr. Rigler's opinions be

2  excluded.

3          THE COURT:  Before we go over to plaintiff's

4  response -- and I'm getting feedback so I'm going to

5  mute you, Mr. Hegarty.  Then I'll un-mute you in a

6  second.  But this argument that nobody tested the

7  bottles of talc that she used, you know, back in

8  whatever -- I'll just say for the sake of argument in

9  the seventies -- I don't find that to have -- really to

10 have any merit.  I mean, I think oftentimes experts go

11 back and check, you know, whatever.  The easy example,

12 at least for me -- and I know there are differences in

13 the way it operates and all that, but if somebody smoked

14 Marlboros or whatever, Chesterfields in the seventies, I

15 mean, we understand that those cigarettes can still be

16 tested.  They don't need the exact cigarettes that

17 somebody used then.  I mean, that's -- to me that's a

18 bit of a -- I understand that defendants have to make

19 that argument, but it's an -- it sets up an

20 impossibility.  But I don't expect you to address it,

21 but if you want to, Mr. Hegarty, you can feel free to.

22         MR. HEGARTY:  I will address it just briefly.

23 And Your Honor, courts have kept out this testimony.

24 There's an opinion out of Georgia called Hanson.

65

1    There's an opinion out of Wisconsin called <u>Chapp</u> where

2    the evidence was the same.  I tested some bottles that

3    were not used by the plaintiff and I want to try to

4    extrapolate that to what the plaintiff used, and the

5    courts there concluded that that's purely speculation.

6        And it's particularly important here because half

7    of the tests that were done by Dr. Rigler concerned a

8    product that Miss Driscoll never used.

9            THE COURT:  Right, the Shower to Shower, right?

10            MR. HEGARTY:  Shower to Shower.  And also, the

11    number of bottles he tested during the relevant time

12    period, seven, only two of which he reported finding

13    asbestos.

14        So I do think that there's a good faith and

15    certainly a legal basis to argue that it would be

16    speculation -- it is speculation of what Dr. Rigler is

17    purporting to do here, impermissible speculation where

18    there is no methodology that has been done to try to

19    extrapolate to show that there is a reliable -- that you

20    can draw a reliable opinion from trying to extrapolate

21    testing done on product years ago to what a particular

22    plaintiff used, particularly where the testimony here is

23    of a sister --

24            THE COURT:  I understand.  I do understand.

66

1          MR. HEGARTY:  Okay.

2          THE COURT:  And you've made the argument.

3          MR. HEGARTY:  Thank you.

4          THE COURT:  But just for the sake of preventing

5   feedback -- and you can un-mute yourself or raise your

6   hand if you want to try to interrupt Ms. O'Dell, but

7   I'll give her the same respect that she gave --

8          MR. HEGARTY:  Thank you.

9          THE COURT:  -- you.  Ms. O'Dell, plaintiff's

10  response, if any.

11         MS. O'DELL:  Your Honor, there are some things

12  I'd like to take up just to make sure the record is

13  clear.  And let me just -- I'm going to start with some

14  of the last comments that Mr. Hegarty made because I

15  believe that maybe in the heat of battle he would --

16  painted with a broader brush than would be appropriate.

17         For example, the Hanson decision he referred to in

18  Georgia does not involve the same testing that is at

19  issue here, does not involve the same experts, does not

20  involve the same samples.  And so to suggest that

21  somehow these samples and the testing results from these

22  samples have been excluded in that court, that would not

23  be accurate.

24         Second, in regard to Johnson's baby powder, which

67

1   is the particular product that Miss Driscoll used, and

2   Shower to Shower, they are different in the sense that

3   they're two products, but the talc that was used to make

4   those products is the same.  And the talc that Dr. Longo

5   and Dr. Rigler tested involved the same talc.  It came

6   from the same mines.  And so those samples are equally

7   relevant to Miss Driscoll's use because it's talking

8   about the same material that made up the product.

9       You'll see also in the testing -- well, let me stop

10  there.  Let me pick up another line.

11      You know, there will be testimony from Miss

12  Driscoll's sister about her use of talc.  There will be

13  testimony from other family members about seeing talc

14  over the years in her bathroom.  And so certainly

15  there's specific testimony about a period of time, but

16  as Your Honor has commented this morning, there's

17  circumstantial evidence this was a feminine hygiene

18  practice that she used for many years.  So let me make

19  that comment.

20      Quickly, just to be conscious of the court's time,

21  you know, I'll try to be brief but I do want to point

22  out a couple things as we go through, Your Honor, that

23  might be of help.

24      First, let me share my screen if I can.  And I'm

68

1   assuming what you can see here is this slide, Your

2   Honor, with sort of constituents of Johnson's baby

3   powder and Shower to Shower.  You've heard a lot today

4   about dose and specific dose of specific constituents of

5   Johnson's baby powder, but you have testimony, Your

6   Honor, of Dr. Smith's consideration of exposure and

7   dose, and that's for the years of Miss Driscoll's usage.

8   There is no requirement that there be a specific dose

9   calculation of the constituents.

10       Much like in a cigarette case for long cancer, you

11  focus on the number of pack years.  You don't focus on

12  the specific dose of the 70 chemicals that are contained

13  in the actual cigarettes.  And so the dose arguments in

14  that sense are a red herring, if you will.

15       Each of these elements have been evaluated by The

16  International Agency For the Research of Cancers, and we

17  refer to that often, Judge, as I-A-R-C --

18           THE COURT:  Uh-huh.

19           MS. O'DELL:  -- or IARC.  And they have

20  evaluated these constituents of Johnson's baby powder

21  and found that they're either a possible carcinogen in

22  the case of plain talc, or in the case of fibrous talc

23  -- which we're going to talk about a little bit more,

24  and I'll try to be brief -- but that is a needle-like

69

1    fiber that has been determined by IARC in the 2012

2    monograph to be a human carcinogen for ovarian cancer.

3    We see that in asbestos.  The 2012 monograph, as the

4    court is aware, determined that asbestos and amphibole

5    asbestos -- which is what Dr. Rigler tested for --

6    causes or can cause ovarian cancer.  And then you'll see

7    some of the other constituents here.  And so it's all

8    those constituents they work together, they're one

9    product, that cause ovarian cancer, and these

10   constituents help explain what you see in the

11   epidemiological literature.

12        Now, I'm not going to go over Dr. Rigler's

13   qualifications, but he is a Ph.D.  He's tested materials

14   for asbestos and other fibers for more than 30 years.

15   He's eminently qualified.  You know, in the argument

16   previously -- and I know the court is aware -- and Your

17   Honor, I'm going to skip around some.  I have a nice

18   robust 57 slide deck here, but I'm not going to go

19   through it all.  I'm just going to go through a few

20   because I want to -- because this is so technical, let

21   me just go through a couple things.  As and I mentioned,

22   Dr. Rigler is eminently qualified.  The lab that he was

23   working for at the time of these studies has been used

24   by the U.S. Government, by major corporations.  They're

70

1    certified by basically every agency.

2        And as I mentioned, this analysis that will be the

3    subject of Dr. Rigler's testimony is of historical baby

4    powder, Shower to Shower, and Imerys is the talc

5    supplier, Your Honor, and they supplied talc for

6    Johnson's baby powder and Shower to Shower from the

7    1960's -- there were other corporate names but

8    essentially the same mine -- from the 1960's to the

9    early 2000's.  And these samples -- to address some of

10   the arguments in the briefing just so the court is clear

11   -- were produced in the MDL.  The chain of custody is

12   clear.  They came from Johnson & Johnson.  They were

13   produced by specific protocol.  They were divided at a

14   joint lab.  There's nothing about these samples' chain

15   of custody that is at issue.

16       And then what Dr. Rigler and Dr. Longo did is they

17   used a specific methodology to test them for the

18   presence of asbestos and --

19           THE COURT:  Miss O'Dell?

20           MS. O'DELL:  Yes, sir.

21           THE COURT:  Can you slow down a little bit for

22   the court reporter?

23           MS. O'DELL:  I sure can.  Pretty rare that this

24   southern voice is too fast, but I'm sorry, this is a

71

1   favorite topic, so I apologize.

2       So let me just -- and I'll try to be brief.  The

3   result after they apply their methodology was that 68

4   percent of the samples contained amphibole asbestos and

5   98 percent contained --

6           THE COURT:  Uh-oh.

7           (Distorted audio.)

8           THE COURT:  Okay, Ms. O'Dell, wait.  Wait, Ms.

9   O'Dell.

10          MS. O'DELL:  Yes, sir?

11          THE COURT:  We froze up right after 60 percent

12  amphibole.

13          MS. O'DELL:  Okay, I'm sorry, Your Honor.

14          THE COURT:  Don't be sorry.  It's not your

15  fault.  I'm going to blame it on Judge Rudolf down the

16  hallway.  He's probably doing something to take up all

17  of our bandwidth.  You started with the 98 percent.  And

18  from your briefing I know where you're going, but for

19  the record, please go ahead.

20          MS. O'DELL:  Yes, sir, thank you.  And I'll --

21  again, I'll try to be brief.  But, you know, the results

22  of this testing was that 68 percent of the samples were

23  positive for amphibole asbestos and that 98 percent were

24  positive for fibrous talc.

72

1        And the way that they did this testing, Your Honor,

2    was that they used three methodologies.  This

3    methodology of, one, evaluating the shape of the fiber

4    or the morphology; the second they evaluated the

5    chemistry; and then the crystalline structure.

6        Let me just say very briefly that this methodology

7    is methodology that has been employed by the FDA, by --

8    and let me just -- I'll flip through some slides here if

9    you'll bear with me, Your Honor.  And you can see that

10   this is the testing machine that they used, the testing

11   microscope, transmission electron microscope.  But very

12   briefly, Your Honor, they used these three methods, TEM,

13   EDXA for chemistry, and then an SAED machine to

14   determine the crystalline structure.  And in each of

15   these samples they looked to see if the fiber itself had

16   an aspect ratio of greater than five to one and they

17   were at least five microns in length.  That was their

18   methodology.

19       And my point, Your Honor, is that this methodology

20   and the way they counted the fibers, in other words,

21   they evaluated the shape or the needle-like structure,

22   is something that has been accepted by numerous

23   agencies.

24            THE COURT:  You know what, Ms. O'Dell, that

73

1    symbol for micron, the kind of upside down UN thing --

2            MS. O'DELL:  Yes, sir.

3            THE COURT:  I bet I stared at that last night

4    for 45 seconds trying to figure out if my eyes were dead

5    or what that was.  So I have now learned something new

6    that I'm sure I'll see again.  So...

7            MS. O'DELL:  You might see a little bit of

8    this, but we'll try not to emphasize it too much.  But

9    this method -- and this from Dr. Rigler's report -- this

10   is the method that they used.  You know, the

11   International Standards Organization, they use the same

12   sort of criteria for determining a fiber or elongated

13   particle.  EPA uses the same.

14       J&J -- this is from a J&J document -- when they are

15   looking at an asbestiform -- and, Your Honor, just very

16   quickly, asbestiform is not necessarily asbestos.  That

17   relates to the shape or the morphology of the particular

18   mineral.  So talc can be asbestiform -- in other words,

19   it's needle-like -- as can asbestos.  J&J acknowledges

20   that in their own documents.  They talk about elongated

21   particles with parallel sides and an aspect ratio.  They

22   use something that is less conservative than what Dr.

23   Rigler used.

24       Dr. Rigler and Dr. Longo have published on this

74

1    method.  This ASTM, it's called the American Section of

2    Testing Methods -- it's a widely known and respected

3    organization -- they used the same methodology that Dr.

4    Rigler and Dr. Longo used in performing the testing

5    here.  J&J again acknowledges that this is the

6    appropriate methodology.

7          And then actually, the FDA, they commissioned this

8    test that you see on the screen here.  AMA Analytical

9    Services tested actually 2018 bottles of Johnson's baby

10   powder and found chrysotile asbestos, as well as a talc

11   fiber or fibrous talc.

12            THE COURT:  So chrysotile for the court

13   reporter --

14            MS. O'DELL:  Chrysotile --

15            THE COURT:  Thank you.

16            MS. O'DELL:  Yes, C-H-R-Y-S-O-T-I-L-E.  So,

17   Your Honor, this is not novel.  This is generally

18   accepted.  And it's what -- it's the methodology that

19   Dr. Rigler and Longo safely applied to each sample.

20          So I'm just going to move quickly through this, but

21   in each sample -- this is one to give you a sense --

22   they did TM testing for the morphology in every sample.

23   Every sample that's positive they found a particle or

24   fiber that had an affect ratio of greater than five to

75

1   one.  They noted it.  They had a 2200 page report that

2   in great detail documents every finding.

3       This is -- you know, Mr. Hegarty made comments

4   about the microscopic amounts they found in the samples.

5   This is a TM grid, which is actually microscopic.  This

6   is how you test, you know, these samples.  And it's not

7   surprising that we would find a microscopic amount

8   because the sample is microscopic.  And the generally

9   accepted method is to take those findings and

10  extrapolate those findings across the particular bottle

11  of talc in this instance.

12      So just in sum, they had to sort of check all the

13  boxes before Dr. Rigler made a determination that a

14  sample contained asbestos, and this particular method

15  was used exactly for fibrous talc.  So all three steps

16  were confirmed before there was a finding that there was

17  either asbestos or fibrous talc in the samples.

18      And let me just give you a sense, Your Honor, just

19  very briefly of how much in terms of fiber structures

20  would be found in a nine ounce bottle.  This is a 1978

21  sample.  In this particular bottle they found that there

22  were 63,800 asbestos structures per gram.  And if you

23  calculate that across the whole bottle, then it's over

24  16 million asbestos fibers.  Which for Miss Driscoll

76

1    over the years that she used Johnson's baby powder, she

2    would use multiple bottles, many bottles of Johnson's

3    baby powder, and so the exposure is quite extensive.

4         So, lastly I'll just talk briefly about the

5    findings on fibrous talc.  I have mentioned the overall

6    findings of nearly every bottle contained talc fibers.

7    And let me just be specific about one thing.  It's

8    fibrous talc is the same thing as talc fibers or

9    asbestiform talc.  And you'll see that in Dr. Rigler's

10   deposition, Your Honor, at -- excuse me here, at page

11   153 through 154.  It's very specific.  Those are the

12   same -- it's the same mineral, the same structure, the

13   same needle-like shape, but it's just a different name

14   for the same thing.

15        And then lastly, Your Honor, just to give you a

16   sense, every bottle of Johnson's baby powder essentially

17   has millions of fibers of talc which have been

18   determined to be human carcinogens by IARC.  And so we

19   believe this testimony is not only relevant but that the

20   testing that was done is -- it was done in keeping with

21   the standards in the industry and it should be admitted

22   and the motion should be denied.

23        So thank you for your patience, Your Honor, and I

24   apologize if I went longer than I should right before

77

1    lunch.

2            THE COURT:  No problem.  Let me un-mute

3    Mr. Hegarty.  There we go.  Okay, Mr. Hegarty.

4            MS. O'DELL:  Your Honor, may I say one thing?

5    Excuse me, Mr. Hegarty.  With your indulgence, Your

6    Honor, I failed to mention this and it's a bit of a

7    significant point, is the MDL court evaluated this

8    report and these opinions and found it to be admissible

9    under the Daubert standard.  Thank you.

10           THE COURT:  Thank you.

11        Mr. Hegarty, last word?

12           MR. HEGARTY:  Yeah, thank you, Your Honor.

13    Quickly, just a few responses -- responsive points.

14    With regard to my reference to the Hanson and the Chapp

15    cases, that reference concerned the methodology that the

16    experts were purportedly applying that the court

17    rejected.  That testing did involve a different product,

18    but the testing was not the basis for the exclusion.

19    The basis for exclusion was the improper methodology to

20    try to extrapolate those findings to the plaintiff and

21    the plaintiff's use of the product.

22        There's a reference again we talked about to the

23    constituents and there was a comment made there's no

24    requirement of a dose showing in this state.  Well,

78

1    that's just absolutely wrong.  We can look no further

2    than the asbestos cases, McKinney, Nolan, Krumwiede, and

3    there is a finding.  There is a requirement in that

4    there be more than a di minimis exposure.  And so there

5    is a requirement of showing in the asbestos cases and

6    presumably as it relates to nickel, or acromion, or

7    fibrous talc that there has to be a showing of some dose

8    level and that that dose level is capable of causing

9    harm, and that's not shown as to any of the experts in

10    this case.

11         There was a reference made to fibrous talc, and

12    this is a repeated inaccuracy that plaintiffs make that

13    it's, that the IARC -- 2012 IARC monograph relates to

14    fibrous talc.  The phrase "fibrous talc" is nowhere

15    contained in the 2012 IARC monograph.  The 2012 IARC

16    monograph talks about the six regulated forms of

17    asbestos and talc containing asbestos.  It does not in

18    any way refer to fibrous talc, nor make any finding as

19    it relates to fibrous talc.  And these testing methods

20    that were talked about are testing methods that show

21    that they -- that plaintiffs show a fiber.  It doesn't

22    show that they're asbestos, yet that's what plaintiff's

23    expert, Dr. Rigler, purports to say is that all fibers

24    that he found are asbestos.  Asbestos is a term of art.

79

1    It's not something you just call any particle that

2    reaches a certain length and width.

3        And there's references to these exposure levels

4    where the argument was made that the plaintiff's

5    exposure was quite extensive.  Well, no expert, Dr.

6    Smith, Dr. Godleski, no expert of the plaintiff as

7    related to Ms. Driscoll has looked at those exposures

8    and said they're quite extensive, has looked at those

9    exposures and said that is an exposure level that's been

10   shown to cause ovarian cancer and that she was actually

11   exposed to that exposure level.

12       Again, I invite the court to read the testimony of

13   Dr. Smith, read her report.  There's not a single

14   reference in her report to a finding of asbestos or

15   heavy metals or fibrous talc as it relates to Miss

16   Driscoll.  There just isn't.  So this is all a side show

17   as to what this case -- this case about Miss Driscoll is

18   about, and that includes Dr. Rigler's testimony.

19           THE COURT:  Thank you.  Let me pause you guys

20   for a minute again.  Thank you for the argument.  The

21   court's again reviewed the briefing -- very good

22   briefing by the parties again -- and finds that Rigler,

23   as the other experts identified by the plaintiff thus

24   far, that his methodology is generally accepted and

80

1   reliable and the application is also generally accepted,

2   and his testing procedures and that he is indeed

3   qualified.  There are some issues I understand that are

4   jury issues that may come up, but that -- those are

5   questions for the jury to consider at the appropriate

6   time, and they may come up as other motions may come up.

7   So the motion to exclude Dr. Rigler is denied.

8       That leaves us with the motion for summary

9   judgment, which I would call the main event.  Who for

10  the defendant is going to argue that?  You again,

11  Mr. Hegarty?

12          MR. HEGARTY:  Me again, Your Honor.

13          THE COURT:  I hope they pay you extra for all

14  of this, although Jason has picked up a lot of the

15  workload up until now as well, I should say.

16          MR. HEGARTY:  We try to be efficient, Your

17  Honor, and if the court does deny our summary judgment

18  motion Jason and I will be doing the motions in limine

19  on June 1.  So I do intend to split that one up.  I just

20  thought for efficiency sake or effectiveness sake that

21  -- and given that the court said a lot of these are

22  related and intermingled --

23          THE COURT:  They are.

24          MR. HEGARTY:  -- that it makes sense for me to

81

1    talk about them all together.

2              THE COURT:  And I should say with all the

3    parties -- I'll say it again because I can't say it

4    enough -- all the attorneys on both sides of the "V" in

5    this case are extremely professional.  I'm sure I've

6    said it to you before how much I appreciate that.

7    You're all ultra prepared.  You're not table bangers.

8    You're not screamers, at least yet, which I also

9    appreciate.  You're not -- I haven't ran across that

10   with this crowd, so you all should be commended for

11   that.  Now, you all may hate my rulings or not hate my

12   rulings or whatever.  I can brag about this case that I

13   have I think aggravated both sides.  I know plaintiff

14   was aggravated with me a year ago for continuing the

15   trial.

16       But with all that being said, we are now at the

17   motion for summary judgment.  I can go through my notes

18   on that, as well.  I can also jump to what I thought to

19   be the more interesting or the most, I don't know,

20   interesting part of all this, and that's the strict

21   liability product liability Statute of Repose being ten

22   years.  And I get -- I understood the argument you made,

23   Mr. Hegarty -- whoever wrote the brief, if it was Jason

24   or not -- that in fact, the plaintiff has pled strict

82

1  liability and whatever count it was -- in fact, it's

2  still up on my computer I think -- and that there is a

3  ten-year Statute of Repose.  And there's --

4  preliminarily, Mr. Johnson, your argument was, well,

5  wait a minute, under Dintelman this is actually a

6  negligence failure to warn product count.  And then the

7  defendant came back and said, well, in Dintelman they

8  dismissed the strict liability product counts, so this

9  should be sort of dismissed, even though it's a motion

10  for summary judgment.  And I wanted to bring that back

11  up to you guys, and even though it's a little bit of an

12  odd event, before we get started I kind of wanted to

13  throw that at Mr. Johnson.  And again, I know this is a

14  motion for a summary judgment, but maybe you could help

15  clarify this for me from the plaintiff's point of view

16  since the headline of it says strict liability in that

17  count.  But is it a negligence count or not?

18          MR. JOHNSON:  Well, as I pointed out in my

19  briefing, Your Honor, if we're going to submit under

20  what is technically the 400 second of IPI, strict

21  products liability section of the IPI.  Nevertheless, if

22  we're going to go forward with this failure to warn

23  count -- which we intend to do -- we would be submitting

24  400.07(d) as in dog, and by the notes on use, we would

83

1   have to define ordinary care in 10.01.

2       I cannot think of more negligence-based language

3   than fault and ordinary care.  So one of our points --

4   and this is one of our points against the argument of

5   timeliness under the Statute of Repose is it doesn't

6   apply here, because what we are really asserting in our

7   count -- our counts -- I think it's Count I and VIII, I

8   believe, in the second amended complaint are fault-based

9   negligence principles, failure to warn.

10      And so the interesting thing about this argument is

11  if the court were inclined to grant the motion, then all

12  we would do is change the heading, right?  We would just

13  --

14          THE COURT:  Right.  I get -- and maybe a little

15  bit of the wording within those two counts.  So let me

16  -- and let me put this back on you, Mr. Johnson.  I know

17  you bring up other reasons why fraudulent concealment

18  and other things, why you argue -- why plaintiff argues

19  it would still not be right.  As I often do in these

20  cases is I throw it back to you and say, I don't know,

21  is that something you want to do; do you want to amend?

22          MR. JOHNSON:  First of all, with all respect to

23  the Court, we don't have to decide this necessarily

24  today.  We know what the issues are.

84

1          THE COURT:  Right.

2          MR. JOHNSON:  And as I mention, if the court

3  would be inclined to grant that, then we would come back

4  and just call it negligent failure to warn.

5          THE COURT:  Right, right.

6          MR. JOHNSON:  In which case, Judge, the whole

7  argument doesn't apply.

8          THE COURT:  Right.

9          MR. JOHNSON:  Can I just point out briefly the

10  other way to look at this.  If you want to say, okay,

11  Johnson, you're wrong, the Statute of Repose does apply,

12  according to J&J's argument -- as you're aware from your

13  light reading -- 1966 is their argument about first

14  usage.

15          THE COURT:  Right.

16          MR. JOHNSON:  First sale, first sale in their

17  world.  You know, if we say that the injury occurred

18  during this Statute of Repose period, you know, ten

19  Years after the first sale, and then we apply the

20  discovery rule of the Statute of Repose here, the death

21  occurred -- the death occurred in September of 2016.

22  We're well within the repose period.  So if you want to

23  say it does apply, we're well within the repose period

24  within -- we filed within two years after the death

85

1    occurred.  We don't think it does apply.  And as Your

2    Honor pointed out, you recognize that we also plead

3    fraudulent concealment.

4            THE COURT:  Yeah, and I guess we're getting

5    close enough to trial where in the interest of fairness,

6    I guess -- I mean, we're getting towards the point where

7    you're going to have to choose a lane of which way are

8    you going?  Are you going under the negligence theory?

9            MR. JOHNSON:  Well, Your Honor, if you're going

10   to grant the motion, then we certainly are going to ask

11   leave of court to change our heading to negligence

12   instead of strict products liability failure to warn.

13   Yes, we would be asking for that leave of court in that

14   event.

15           THE COURT:  But right now you're not prepared

16   to say that's the route you're headed?

17           MR. JOHNSON:  Well, we would like to have the

18   -- having articulated the court's very much aware of the

19   issue, we don't need to really do this today I don't

20   think.  We can come back perhaps on June 1st and talk to

21   the Court about it.  It's not going to affect trial

22   preparation for Misters Hegarty and Rankin in any way,

23   shape or form.

24           THE COURT:  Okay.  Well, with that being said,

86

1    a lot of these arguments that were brought up were also

2    brought up, as we mentioned early on, in the motions to

3    exclude the experts, including that the defendant says

4    there's no specific causation -- there's no general or

5    specific causation, and that the experts can't say how

6    much was needed to be used to cause and no sufficient

7    testimony in how much she used it.

8          Again, that it could have been caused by not having

9    a baby or long menstrual periods, who knows.  They bring

10   up the product liability, the Statute of Repose.  And

11   then there's a preemption argument brought up that it's

12   preempted by the FDA because of a letter -- because they

13   rejected a cancer warning about seven years ago.  Of

14   course, we don't know what evidence was provided

15   throughout all that, or what evidence was even available

16   then, or if the letter was really binding and legal or

17   not.

18         Defendant also argues there was no evidence that

19   there was a duty to warn because they didn't know at the

20   time the product was used.  And the first study was

21   allegedly in 1971.  They argue there's no negligent

22   misrepresentation or breach of express warranty because

23   general statements that products are safe aren't

24   actionable and there's no evidence Miss Driscoll relied

87

1    on them, except that she bought them.  Which I would say

2    is -- I don't think somebody -- well, people buy -- who

3    knows, but it seems that that's -- that could be an

4    inference allowed.  But as to the conspiracy claims,

5    there's no evidence that defendant entered into an

6    agreement with anyone.

7        Then there's some -- going again into the expert

8    stuff but still, as I think Mr. Hegarty just argued, you

9    have to show exposure's not just de minimis.

10       There's also, again, what I brought up about the

11   Dintelman arguments back and forth.

12       So, with that being said, Mr. Hegarty, go ahead.

13       MR. HEGARTY:  Okay, thank you, Your Honor.

14   Mark Hegarty for the Johnson & Johnson defendants.  With

15   regards to the arguments made as to general and case

16   specific causation, we really covered those, and they

17   relate to the admissibility of the experts' opinions.

18       I'm focusing on the other grounds, some of which

19   the court has already mentioned here.  The first as it

20   relates to plaintiff's strict liability warranty --

21   strict liability and warranty claims.  As Your Honor

22   noted, the counts themselves, Counts I and VIII, are

23   labeled as strict liability claims, and they are barred

24   by Illinois' ten-year Statute of Repose which runs from

88

1    the date of the first sale.

2        And that first sale, according to -- as alleged by

3    the plaintiff, is 1966.  So, based on this undisputed

4    fact, there's no factual or legal authority that these

5    strict liability claims can proceed.  And as to the

6    warranty claims, they're subject to a four-year

7    limitation period that also starts with the date of

8    first sale, which again goes back to 1966.  So,

9    therefore, these claims are untimely.

10       Now, as we have heard, the plaintiff characterizes

11   her strict liability count as actually a negligence

12   cause of action.  Now, they actually have negligence

13   cause of action in their second amended complaint, their

14   Counts II, VII, IX and XIV.  And to the extent they are

15   asserting strict liability claims, as we have shown,

16   they are time barred.  And I know this brings up this

17   allegation of fraudulent concealment, but for that to

18   hold the day and if they are indeed still asserting

19   strict liability claims they have to show that there

20   were specific affirmative acts by the defendants in both

21   of them to prevent the plaintiff from discovering their

22   claims and that such acts did prevent the plaintiff from

23   discovering their claims.  And the only evidence they

24   cite in their brief are to patents for cornstarch and

89

1  that there was advertisements for Johnson's baby powder.

2  These are not affirmative acts that can steal anything

3  from the plaintiff or deceive her.  There is no evidence

4  in the record that Miss Driscoll relied on anything from

5  Johnson & Johnson -- the Johnson & Johnson defendants

6  had prevented her from discovering her claims.  There's

7  nothing in the record that would allow the court to find

8  these strict liability claims -- if they are strict

9  liability claims -- to be tolled and asserted in this

10  case.

11      As to plaintiff's failure to warn claim, I want to

12  highlight the key evidence in law that disposes of this

13  claim.  And first, the warning claims should be

14  dismissed based on plaintiff's own admission.

15  Plaintiff's warning claims are that the Johnson &

16  Johnson defendants failed to warn plaintiff of the

17  pertinent risk from talcum powder use that is ovarian

18  cancer, the disease she developed.  But to show this,

19  the plaintiff must show that the Johnson & Johnson

20  defendants knew or should have known about this risk

21  from baby powder during the time of plaintiff's use.

22      As we said in our briefing, plaintiff allegedly

23  used Johnson's baby powder from 1966 to 1970.  That's

24  based on the affidavit and testimony if Miss Carney as

90

1    far as her personality goes.  There's no testimony in

2    this case from Miss Driscoll about any use of talcum

3    powder.  And it's undisputed from plaintiff's evidence

4    that her own expert, Dr. Plunkett -- which the court

5    said she can testify -- is that there's no requirement

6    of a warning, in her opinion, with regard to ovarian

7    cancer until 1982 at the earliest.  That's based on a

8    single study published at the time.  And because

9    plaintiff's case is that warnings were not required

10   until years after the plaintiff last used baby powder,

11   her failure to warn claim must be dismissed.

12        Now, plaintiff's opposition to this key piece of

13   the timeline comes down to the testimony from Dr.

14   Plunkett about other alleged effects of talcum powder,

15   not ovarian cancer or any condition that Miss Driscoll

16   had, or not any cancer or harmful condition reported in

17   women using talc, but other alleged effects reported in

18   the literature and documents going back to before the

19   plaintiff's use.  But the warning claims must fit the

20   claimed injuries.  And this case is about ovarian

21   cancer.  And that same expert, Dr. Plunkett, testified

22   unequivocally that such warnings were not required until

23   1982.  And the case we would cite for that proposition

24   include the Wannall case and the McKinney case out of

91

1    Illinois.

2         And it's really key there's no authority that a

3    failure to warn claim can proceed based on what is

4    alleged that a defendant knew or should have known about

5    some other alleged condition that's not the alleged

6    injury in this case.  Nothing plaintiff cites before or

7    during the time of use in this case shows a risk of

8    ovarian cancer from talc use.  It's not just us saying

9    this.  It's plaintiff's own expert saying it.

10        Again, Dr. Plunkett says that in the face of

11   everything that she references in her review of the

12   medical literature and everything she cites to,

13   including references to studies from the forties or

14   fifties and sixties, the risk of ovarian cancer was not

15   required to be warned about, according to her, until

16   1982.  And this could not be more definitive for summary

17   judgment as to plaintiff's warning (Inaudible.)

18        And as to the preemption issue that the court

19   raised, there is no issue -- there can be no dispute

20   that the cosmetic FDA has regulatory authority over it.

21   Likewise, there's no dispute that the FDA in exercising

22   that regulatory authority expressly considered and

23   rejected the same warning claims the plaintiff is making

24   here in denying the two (Inaudible.) positions in 2014.

92

1    The state law claims, Seeking to require warnings would

2    be in conflict with FDA or preempt.

3        Now, plaintiff's opposition comes down to an effort

4    to compare what FDA did in 2014 to what FDA did in the

5    Reid case that's cited, Reid v. Johnson, but there could

6    be no dispute the FDA here made a final determination

7    that rejected ovarian cancer warnings.  And the FDA set

8    out in detail its analysis and reasoning for its

9    (Distorted audio.)

10       Now, plaintiff challenges the preemptive effect of

11   this ruling by referring to evidence it claims showed

12   some kind of side discussion between Johnson & Johnson

13   and FDA.  Now, this is disputed, but such a dispute does

14   not create a question of fact for trial.  Application

15   for the preemption doctrine is a matter of law for the

16   court, and there is no part of that consideration that

17   involves the court getting into the inter-workings of

18   FDA.  But in any event, nothing that plaintiff cites

19   shows that FDA's decision was based on anything but the

20   science.

21       Now, as to the civil conspiracy claims, as we note

22   in our briefing, civil conspiracy requires evidence of

23   an agreement that a third party committed a tortious

24   act.  But none of the activities that plaintiff relies

93

1    on support a civil conspiracy cause of action.  Things

2    like memberships in trade associations, exchanges in

3    drafting information, going to meetings, discussing

4    information on science and communicating with the

5    government.  Because conspiracy claims are protected

6    activities under the First Amendment or not otherwise

7    actionable under Illinois law.

8         And this kind of claim can be made in every case

9    and nothing cited by plaintiff shows a conspiracy, but

10   what this claim is really about is an effort to open the

11   floodgates to a lot of irrelevant documents involving

12   nonparties.  In particular those involving the talc

13   supplier, Imerys Talc America, who's now a party to the

14   case.  The court should look at this claim and reject it

15   for what it is.

16        But we also move for summary judgment as to

17   plaintiff's negligent misrepresentation and breech of

18   express warranty claims.  Plaintiff's opposition to

19   summary judgment did not respond to those motions.

20   There's no evidence to show reliance by the plaintiff

21   that an express warranty ever existed or that plaintiff

22   received any express warranty or any of the other

23   elements of these claims.  So we would argue -- we would

24   ask the court to enter a summary judgment as to these

94

1  claims, as well.

2      And so for the reasons we set out in our briefing,

3  Your Honor, we ask the court to grant the Johnson &

4  Johnson defendants' summary judgment in this case.

5          THE COURT:  Thank you.  Is this going to be you

6  -- oh.  Let me mute Mr. Hegarty.  Is this going to be

7  you, Mr. Johnson?

8          MR. JOHNSON:  It is, Your Honor.

9          THE COURT:  Okay, please go ahead.

10         MR. JOHNSON:  Thank you.  First of all, with

11 respect to the failure to warn.  Mr. Hegarty's comments

12 do not take into consideration the fact that the

13 operative complaint in front of the court now and in

14 front of the parties now is the second amended

15 complaint.  His comments were based on a previous

16 version of the complaint.  The complaint at issue is the

17 second amended complaint which goes back and recites

18 from Plunkett's report studies going back to the 1930s

19 showing the adverse health effects and the increased

20 risks of ovarian cancer on a timeline going from the

21 1930's.  And I know Mr. Meadows can comment on this

22 momentarily, but I wanted to bring that to the court's

23 attention, the mistaken reference to the abandoned

24 complaint.  We are now on the second amended complaint,

95

1    pages 9 through 12 of which have a timeline going from

2    the 1930's and in large part is based on Plunkett's

3    report in this case.

4              THE COURT:  What's the date that that was

5    filed?  I want to make sure the complaint I was looking

6    at this morning is the operative one.

7              MR. JOHNSON:  I am not sure, Your Honor.

8              THE COURT:  I can just pull that up and make

9    sure it says second amended.

10             MR. JOHNSON:  I believe February 28th or so of

11   2020; February 28th of 2020, I believe.

12             THE COURT:  Okay.  You mean the -- the one I --

13   the second amended I show was filed March 13, 2020.

14             MR. JOHNSON:  Okay, March 13th.

15             THE COURT:  Got it.

16             MR. JOHNSON:  And likewise, for the same

17   reasons, the second amended complaint makes different

18   allegations about the hazards, that is hazardous health

19   hazards, and the increased risk of ovarian cancer.  And

20   it goes back to the 1930's.  It doesn't stop at 1982 on

21   a peer reviewed study.  It goes back much further in

22   time than that.  And all the court need do is look at

23   the allegations in the second amended complaint,

24   Plunkett's report, to verify what I just said.

96

1          The warranty claims, again, we are alleging the

2     Fraudulent Concealment Statute, and we have again pled

3     in our second amended complaint pages from the page 8 to

4     page 12 page frame of conspiracy with the talc

5     manufacturer, Imerys Talc America, Inc., and we go on

6     for pages of allegations and, in addition, have

7     supplemented that with hundreds of pages of exhibits in

8     the record that we filed for these hearings about the

9     nature and extent of the conspiracy between the two

10    entities, Johnson & Johnson entities and Emerys.  They

11    do not have a right, Your Honor -- they have a right to

12    petition the government, they have a right to petition

13    regulatory agencies, but they do not have a right -- as

14    we have alleged and have evidence to support --

15    providing disinformation, misinformation to the

16    consuming public, including Elizabeth Driscoll, about

17    the adverse health hazards and increased risks of

18    obtaining ovarian cancer from perineal genital use of

19    Johnson's baby powder.  Political speech does not go

20    that far, to say the least, Your Honor.  At the very

21    least, there are substantial, and I mean substantial

22    questions of fact at this point of the record at this

23    point here today on April 20th, certainly enough

24    questions of fact and issues to decide at a trial

97

1    subject to cross examines to deny their motion now.

2        I'm jumping around a lot.  The civil conspiracy --

3    the civil conspiracy again is alleged in good faith in

4    the second amended complaint and it is again the

5    combination with the Johnson & Johnson entities and

6    Imerys Health America, Inc. joining up with this task

7    force which Your Honor has read about in the briefing,

8    can read about in the second amended complaint

9    allegations and the records we have filed for this

10   hearing to find out the depth to which the

11   conspiratorial actors went to suppress meaningful

12   information to the healthcare industry and, more

13   importantly, to the consuming public about the adverse

14   health hazards associated with talc use generally and

15   the increased risk of ovarian cancer for perineal

16   genital use in particular.

17       The express warranty and implied warranty, I think

18   Your Honor made the comment well taken earlier in your

19   introductory comments based on your notes, and that is I

20   think the evidence of reliance is the continued use, the

21   continued purchasing over time.

22       And again, in the second amended complaint we

23   alleged with specificity in quotation marks the extent

24   of the advertising clichets that were used for the

98

1    advertising for Johnson & Johnson's baby powder for

2    decades.

3        And Your Honor, I can't tell you -- when we

4    represent ladies in the MDL process in talcum powder

5    litigation I can't tell you how many people tell me on

6    the phone, Mr. Johnson, we've relied -- you know,

7    generations of our family have relied on these

8    representations, these advertisements, we grew up with

9    Johnson's baby powder, we grew up with these it's safe

10   and it -- you know, it's for use for hygienic purposes

11   for the babies, so on and so forth.

12       The purchasing and continued use and the total

13   suppression of information supports at least the chance

14   to plead and prove at trial the conspiratorial nature of

15   this combination with the J&J entities and Imerys Talc

16   America, Inc.

17       And for the same reason, the express and implied

18   warranty counts survive at this point in time, Your

19   Honor.  We have plead fraudulent concealment for reasons

20   stated in the second amended complaint and in the

21   briefing and in the records presented in the court.

22   We've presented enough evidence to at least be able to

23   have the ability at trial to plead and prove the

24   warranty, both express and implied counts.

99

1          Reference was made to the preemption.  Your Honor,

2     preemption does not take away the failure to warn claims

3     here.  Again, a non-binding, not of record FDA letter

4     not approving the specific warning requested by the

5     applicants in that letter, does not make a nationwide

6     preemption doctrine, nor one for this court.  The

7     failure to warn claims survive.  The failure to warn

8     claims thrive here because there is -- well, we have had

9     the discussion about strict liability versus negligence.

10    Whatever we decide to do there, we still are entitled

11    to, with all respect, prove at trial the failure to warn

12    on behalf of Miss Driscoll that contributed to cause,

13    was a substantial cause in her ovarian cancer diagnosis

14    and her subsequent death.

15          That's it, Your Honor.

16          THE COURT:  Last word, Mr. Hegarty?  Hold on.

17    Hold on.  Okay, last word, Mr. Hegarty.

18          MR. HEGARTY:  Sure.  Thank you, Your Honor,

19    again.  Mr. Johnson made a reference to my mistaken

20    reference to an earlier complaint that's not true.  My

21    argument and our argument is based on the second amended

22    complaint.  And I will refer the court to the

23    allegations in that second amended complaint as they

24    relate to the failure to warn claim.  The studies that

100

1    are referenced in that -- that part of the complaint in

2    no way demonstrate a risk of ovarian cancer, nor do they

3    allege a risk of ovarian cancer from talcum powder use.

4    They concern other alleged hazards.  They concern

5    hazards from asbestos exposure.  But none of those

6    studies before the time period that Miss Driscoll

7    allegedly last used talcum powder report on, or

8    reference, or make -- or comment on a risk of ovarian

9    cancer from talcum powder use.  And this is clear from

10   Dr. Plunkett's testimony.  It is unequivocal.  She's

11   testified multiple times that a warning for ovarian

12   cancer, in her opinion, was not required until 1982 at

13   the earliest.  And that's an opinion that includes all

14   of this science that's referenced in the second amended

15   complaint.  So she looked at all of that science and

16   said still no warning about a risk of ovarian cancer was

17   required until 1982, years after plaintiff's evidence

18   shows that Miss Driscoll last used baby powder.

19        As it relates to the warranty claims, it's

20   undisputed that they are time barred.  The same with the

21   strict liability claims.  There's no factual grounds

22   here for the court to find a tolling as it relates to

23   those claims.  Plaintiff still has their negligence

24   claims that they can proceed upon if the court denies

101

1    the motion for summary judgment.

2        Civil conspiracy claim, I invite the court to read

3    the evidence.  The evidence that's cited does not

4    support a civil conspiracy claim under Illinois law.

5    None of the acts allege the activities that the record

6    that they present shows amounts to a civil conspiracy.

7    What this is, Your Honor, is an effort to try to

8    introduce a bunch of documents that they contend come in

9    because of the count of civil conspiracy, which they

10   don't show civil conspiracy and in the end they dismiss

11   the civil conspiracy count, which is what's been

12   happening in these cases.  This is just a claim that's

13   used to try to get documents into evidence of third

14   parties that should not come into evidence.

15       Express warranty, Your Honor, there is no -- I

16   invite the plaintiff to show us an express warranty

17   given to Miss Driscoll.  There is no express warranty in

18   this case and there's certainly no showing of reliance.

19   And I don't think the case law supports any implied

20   showing of reliance, and certainly not as to an express

21   warranty that doesn't exist.

22       So, as to all these claims that in the end will

23   just drop out if this case goes to trial, we ask the

24   court to do some housekeeping right now and narrow this

102

1    case to what it should be if this case does go to trial

2    on July 12th.  Thank you.

3              THE COURT:  No, thank you.  And thank all the

4    parties again and for your patience.  And thank you for

5    not going until 7:00 tonight.

6        After reviewing the pleadings and the arguments of

7    counsel, the court finds there's enough evidence to go

8    to trial or to give to a jury at this point in time on

9    these counts.

10        The motion for summary judgment is denied at this

11    time.  And I'll see you all on the first.  Is that

12    right?

13              MR. HEGARTY:  Yes, Your Honor.

14              THE WITNESS:  Thank you.  Take care.

15              (End of proceedings.)

16                          * * * * * * *

17

18

19

20

21

22

23

24

103

```
 1  STATE OF ILLINOIS              )

 2  TWENTIETH JUDICIAL CIRCUIT )    SS.

 3  COUNTY OF ST. CLAIR            )

 4

 5

 6

 7          I, MARY JO JALINSKY, CSR No. 084-003202, one of

 8  the Official Court Reporters in and for the Twentieth

 9  Judicial Circuit, St. Clair County, Illinois, do hereby

10  certify that I reported in shorthand the proceedings had

11  in the above-entitled cause; that I thereafter caused

12  the foregoing to be transcribed into typewriting, which

13  I certify to be a true and accurate transcript of the

14  proceedings.

15

16

17                                    _____

18                                    MARY JO JALINSKY, C.S.R.
                                      Official Court Reporter
19
    Dated this ____28th____ day
20  of _____April_____, 2021.

21

22

23

24
```