# Exhibit 52

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2                FOR THE DISTRICT OF NEW JERSEY

3

4    _____

                                    )

5    IN RE JOHNSON & JOHNSON        )

     TALCUM POWDER PRODUCTS         ) MDL NO. 16-2738 (MAS)(RLS)

6    MARKETING SALES PRACTICES,     )

     AND PRODUCTS LIABILITY         )

7    LITIGATION                     )

     _____)

8

9

10

11

12

13        DEPOSITION OF REBECCA SMITH-BINDMAN, M.D.

14                San Francisco, California

15                Wednesday, March 20, 2024

16                      Volume I

17

18

19

20

21   Reported by:

     CATHERINE A. NOLASCO, RMR, CRR, BS

22   CSR No. 8239

23   Job No. 6498236

24

25   PAGES 1 - 215

Page 18

1 November 2023 -- your expert report?
2       THE WITNESS: I was just given the 21.
3       MR. HEGARTY: Twenty-one. Okay. Let me --
4 let's go off the record quick. That's my fault.
5       (Discussion Off the Record.)
6       (Exhibit 2 was marked for identification by
7       the court reporter.)
8       MR. HEGARTY: Okay. We are back on the
9 record.
10      I had marked previously, as Exhibit No. 2,
11 Dr. Smith-Bindman -- Smith-Bindman's 2021 amended
12 report. I meant to have marked, as Exhibit No. 2, her
13 November 23rd, 2023, second amended report.
14      Q   And is, now, Exhibit No. 2 your November 23rd,
15 2023, second amended report?
16      A   It is.
17      Q   And can you look through it and does it appear
18 to be what you believe to be the entirety of your
19 November 23rd, 2023, second amended report?
20      A   Yes.
21      Q   Okay. Thank you.
22      I'm going to mark next, as -- I'll tell you
23 which one -- as Exhibit No. 3, your 2022 paper,
24 "Association Between the Frequent Use of Perineal Talcum
25 Powder Products and Ovarian Cancer: a" systemic --

Page 19

1 "Systematic Review and Meta-analysis."
2       I'm going to mark that as Exhibit No. 3.
3       (Exhibit 3 was marked for identification by
4       the court reporter.)
5       MS. O'DELL: I'm just going to put that in the
6 basket since she's going to be looking at that one.
7 BY MR. HEGARTY:
8       Q   And do you have a copy of Exhibit No. 3,
9 Dr. Smith-Bindman?
10      A   Yes.
11      Q   What journal was Exhibit No. 3 published in?
12      A   JGIM, Journal of General Internal Medicine.
13      Q   Had you ever published in that journal before?
14      A   I think so.
15      Q   Your 2022 -- well, first of all, I'm going to
16 call it -- I'll refer to it as the Woolen paper; is that
17 fair?
18      A   Yes.
19      Q   Your 2022 Woolen paper was based on a meta
20 analysis that you started for litigation, correct?
21      A   I --
22      MS. O'DELL: Object to form.
23      THE WITNESS: I wouldn't characterize it that
24 way.
25      MR. HEGARTY: Let me ask in a different way,

Page 20

1 then.
2       Q   You generated a version of the same meta
3 analysis you published in 2022 as part of your work as
4 an expert for Plaintiffs in the talc litigation,
5 correct?
6       A   I would also say that differently. I -- I did
7 a review, and then the Woolen review was a new review
8 from scratch.
9       Q   You initially set out the review along the
10 lines of what was published that you said started from
11 scratch in the reports you prepared for the MDL dated
12 November 18, 2018, correct?
13      MS. O'DELL: Object- --
14      THE WITNESS: Yes.
15 BY MR. HEGARTY:
16      Q   You did not start the review that you describe
17 in your November 2018 report prior to being contacted by
18 Plaintiffs' counsel in this litigation, correct?
19      A   Correct.
20      Q   You subsequently set out your meta analysis
21 that you had done as part of your work on the talc
22 litigation in your second amended report of July 2021,
23 correct?
24      A   I don't understand the question.
25      Q   You continued to talk about the meta analysis

Page 21

1 you had done as part of your work in the talc litigation
2 in your first amended report --
3       A   Yes.
4       Q   -- correct?
5       A   Yes.
6       Q   And in your most recent amended report, now
7 you talk about the Woolen 2022 paper, correct?
8       A   That's correct.
9       Q   And is it -- are you telling me that none of
10 the work that went into the Woolen paper and getting it
11 published was done as part of your work in any of the
12 amended reports that you prepared?
13      A   That's correct.
14      Q   You did not include -- let me ask a different
15 way.
16      Was any of the work that went into the meta
17 analysis that eventually became the 2022 Woolen report
18 invoiced to Plaintiffs' counsel in this litigation?
19      A   It is correct that none of that work was paid
20 for by Plaintiff counsel.
21      Q   Was any percentage of thought or initiation or
22 the genesis of the 2022 Woolen paper part of your work
23 in this litigation?
24      MS. O'DELL: Object to the form.
25      THE WITNESS: The idea for doing a systematic

6 (Pages 18 - 21)

Page 22

1 review on the topic grew out of my work as an expert,
2 but the actual work on the new systematic review led by
3 Woolen was deliberately and very explicitly new work led
4 by Dr. Woolen. I helped guide him, and I was a
5 participant, but it was very deliberately started from
6 scratch without any of the insights that I may have
7 learned from the prior review.
8 BY MR. HEGARTY:
9    Q   Is it fair to say, though, that you would not
10 have done the meta analysis that was published as of
11 2022 Woolen paper if you had not been contacted by
12 Plaintiffs' counsel to work on the talc litigation?
13    A   I would agree that this was a new area
14 entirely for me. I didn't know anything about this
15 topic area before I was approached to be an expert.
16 Once I learned about the topic, then I became interested
17 in -- in wanting to produce this work in the scientific
18 literature. So in terms of a topic area, this was
19 entirely new to me from the expert witness work that I
20 did.
21    Q   Would you agree that if you had never been
22 contacted by Plaintiffs' counsel to work on this case,
23 you would not have prepared the 2022 Woolen meta
24 analysis?
25    MS. O'DELL: Object to the form. Speculation.

Page 23

1    THE WITNESS: I have contributed or led a
2 number of systematic reviews, probably a half dozen or
3 so. I went down this area of investigation because I
4 was contacted about this, but whether or not I could
5 have gotten to that same place, I would have no idea.
6    MR. HEGARTY: Let me see if you can answer it
7 this way.
8    Q   Would you agree that it's more likely than not
9 you would not have done the -- the meta analysis set out
10 in the 2022 Woolen paper if you had never been contacted
11 about serving as an expert witness for Plaintiffs in the
12 talc litigation?
13    A   I think that's probably true.
14    Q   Now, with regard to the -- the manner in which
15 you define frequency in your 2022 Woolen paper, the 2022
16 [sic] O'Brien study of the four cohorts looked at
17 frequency of use as well, correct?
18    A   In a limited number of those papers, it did
19 look at frequency of use. I think there are four
20 papers, and I think they were able to look at frequency
21 in two of them.
22    Q   The 2022 [sic] O'Brien study defined frequency
23 as greater or equal to once a week.
24    Does that sound right to you?
25    MS. O'DELL: And if you need to see the

Page 24

1 O'Brien paper --
2    THE WITNESS: I would need to see it.
3    MR. HEGARTY: We have a copy of the O'Brien
4 paper in -- it should be --
5    MS. O'DELL: Do you want to see that?
6    THE WITNESS: I don't mind.
7    MR. HEGARTY: Yeah, it's right here.
8    And we'll go ahead and mark that as Exhibit
9 No. 4. I think we're on Exhibit No. 4, aren't we?
10    MS. FLAGEOLLET: Yep.
11    (Exhibit 4 was marked for identification by
12    the court reporter.)
13 BY MR. HEGARTY:
14    Q   So I've had marked, as Exhibit No. 4, the 2020
15 O'Brien study that I had just referenced in my question.
16    Do you have a copy of that paper in front of
17 you, Doctor?
18    A   I do.
19    Q   If you look at the very first page in the
20 abstract, it -- when it talks about exposure, it looks
21 at ever long-term greater than 20 -- greater than or
22 equal to 20 years and frequent greater than or equal to
23 once per week; is that correct?
24    A   I do see that in the abstract. I'm just
25 checking the -- yes.

Page 25

1    Q   Thank you.
2    The 2020 O'Brien study, as you found -- or let
3 me start over again.
4    The 2022 [sic] O'Brien study, as you even
5 state in the 2020 Woolen paper, found as its main
6 conclusion that there was no statistically significant
7 association between genital talc use and ovarian cancer,
8 correct?
9    MS. O'DELL: Where -- where are you reading,
10 please? Just --
11    MR. HEGARTY: I'm reading at the end of the
12 first paragraph under the "INTRODUCTION" section.
13    MS. O'DELL: Of O'Brien?
14    MR. HEGARTY: No. I'm sorry. No. Of Woolen
15 2022.
16    MS. O'DELL: Thank you.
17    THE WITNESS: I just want to clarify
18 something.
19    We cite the explicit conclusion of O'Brien
20 that they didn't find a statistically significant
21 association. I would not interpret their results as
22 finding that. They did find a statistically significant
23 association, but they do conclude that they didn't. So
24 we cite what they concluded, but I don't agree that that
25 was what they found.

7 (Pages 22 - 25)

Page 26

1 BY MR. HEGARTY:
2   Q   In your 2022 Woolen paper, you actually state
3 the main conclusion was that there was no statistically
4 significant association between genital talc use and
5 ovarian cancer, correct?
6   A   I would state again: We cited what they
7 concluded, which is what they concluded. We cited
8 that -- their main conclusion.
9   Q   Just agree -- can you agree, though, that in
10 the first paragraph under the "INTRODUCTION" section,
11 when you're referring to the Woolen paper, you use the
12 two words "main conclusion"?
13   A   Again, in its main conclusion. So that's not
14 my main conclusion of their study. Those are important
15 differences.
16   Q   Understood.
17     The 2022 [sic] O'Brien paper also found no
18 association between use of talc greater or equal to once
19 a week and ovarian cancer, correct? In other words, it
20 found no statistically significant association between
21 use at that amount -- that level and ovarian cancer,
22 right?
23     MS. O'DELL: Object to the form.
24     THE WITNESS: No, I -- I would not agree with
25 that conclusion.

Page 27

1 BY MR. HEGARTY:
2   Q   What's wrong -- what part of my question do
3 you not agree with and tell me why?
4   A   Several parts of it.
5     I think they had many results that show a
6 significant association between that powder use 1 --
7 greater than once per week and ovarian cancer. So there
8 are -- I'm looking specifically at Table 3 in their
9 report. And in Table 3, they -- they look at the
10 results, use powder, at the top part of that greater
11 than one time per week. They show it for three
12 individual studies, and then the pooled estimate is
13 1.09. It goes from 0.97 to 1.23. I think that's an
14 important result.
15     And then in the bottom half of their table,
16 they show it for the pooled estimate greater than 1 who
17 used greater than once a week and have patent
18 reproductive tract. They show an estimate of 1.19, 1.03
19 to 1.37. I think both of those show a meaningful
20 association.
21   Q   In epidemiologic terms, the fact that the
22 confidence interval range was from .97 to 1.23 with
23 regard to the 1.09 adjusted odds ratio means that you --
24 means that the result could be due to chance, correct?
25   A   I believe that interpretation of epidemiology

Page 28

1 results where if it overlaps 1, you no longer believe
2 it's real is a little bit of an outdated interpretation.
3 So the movement is away from considering the edge of the
4 confidence interval, the edge of what we understand and,
5 rather, look at the confidence interval as giving you
6 some understanding of the precision of the estimate, but
7 the greatest strength is in the point estimate, and that
8 is for the 1.09.
9     And the fact that the confidence interval is
10 wider, I agree with you; in the past that would have --
11 the language that would have been used is it's not
12 statistically significant, but -- but there's really
13 been a very strong shift away from that rigorous
14 interpretation of that, is if it's aligned towards the
15 most likely answer is, for that estimate, there's a 9
16 percent increase in risk and the precision is -- is
17 wider than -- than it -- than it would be if it didn't
18 overlap 1.
19   Q   Having a confidence interval that crosses 1
20 also means you cannot reject a null hypothesis, correct?
21   A   Again, I think historically that was often
22 used as a cut-off, a threshold, and I think -- I think
23 Dr. Rothman has written about this very eloquently, and
24 it's gotten hundreds of leading biostatisticians to sign
25 on to a statement that says: We no longer consider that

Page 29

1 a meaningful conclusion.
2   Q   Did you sign on to that statement?
3   A   I'm not sure if I was at a medical school when
4 that statement was written, but --
5   Q   I'm talking about: Did you sign on to the
6 800-or-so --
7   A   I'm saying it was --
8   Q   -- group?
9   A   -- it was before my time. It was before I did
10 training. They're even older than I am.
11   Q   You mentioned a short time ago that you took
12 notes on the NCI PDQ?
13   A   (Witness nods head.)
14   Q   Is that correct?
15   A   I did.
16   Q   Did you review the NCI PDQ from March 6th,
17 2024?
18   A   I did.
19     MR. HEGARTY: I'm going to mark that as my
20 next exhibit.
21     MS. O'DELL: I'm sorry.
22     THE WITNESS: I'm not sure about the date. It
23 was the recent PDQ.
24     MR. HEGARTY: Well, I'll go ahead and mark it,
25 and we'll all get to look at the date.

8 (Pages 26 - 29)

Page 30

1    It should be the thick document.  No, not that
2  one.  It would be the --
3    MS. O'DELL:  I would state --
4    MR. HEGARTY:  -- that one.
5    MS. O'DELL:  -- for the record:  I haven't
6  seen the March 6th.  The latest is the October 16th,
7  so --
8    MR. HEGARTY:  So we'll mark -- I'm going to
9  mark it as Exhibit No. 5.
10    MS. O'DELL:  So I'm sure Dr. Smith-Bindman was
11  probably looking at the October version.
12    MR. HEGARTY:  I think we'll all see that it
13  has not changed with regard to the particular section
14  that we're interested in.
15    (Exhibit 5 was marked for identification by
16    the court reporter.)
17    MR. HEGARTY:  So I've marked, as Exhibit No.
18  5, NCI PDQ for "Ovarian, Fallopian Tube, and Primary
19  Peritoneal Cancer Prevention, Health Professional
20  Version."
21    Q   If you look over to the second-to-the-last
22  page of that document, do you see where it was updated
23  March 6th, 2024?
24    A   I see the updated date, yep.
25    Q   And that was just two weeks ago; is that

Page 31

1  correct?
2    A   Yes.
3    Q   Would you please turn over to the section of
4  Exhibit No. 5 that talks about perineal talc exposure.
5  The copy I gave you is not page numbered.
6    A   Yes.  No, I'm there.
7    Q   But it's towards the latter part of it.  If
8  you could please tell me when you can find it.
9    A   I'm there.
10    Q   I'm really interested in asking you about the
11  portion of Exhibit No. 5, the NCI PDQ, that talks about
12  your study.
13    A   Yes.
14    Q   So if you could turn over to the next page
15  right in the middle section where it makes reference to
16  your study as -- as reference 10 and the O'Brien study
17  as reference 11.
18    Do you see where I am referring you to?
19    A   I do.
20    Q   The statements that are describing your paper
21  and your paper in reference to O'Brien are the same as
22  the previous PD- -- NCI PDQ you reviewed, correct?
23    A   Correct.
24    Q   The NCI PDQ refers to your study as a meta
25  analysis that used a highly selected subset analysis of

Page 32

1  one prospective cohort study, correct?
2    A   It does say that.
3    Q   It is referring to your use of a subset of
4  data from the 2020 O'Brien study, correct?
5    MS. O'DELL:  Object to form.
6    THE WITNESS:  It's referring to my use of data
7  from the National -- the NHS Study I.
8  BY MR. HEGARTY:
9    Q   That data was included in the 2020 O'Brien
10  study, correct?
11    A   No.  O'Brien looked at data from the NHS I.
12  O'Brien didn't look at data on frequent talc exposure
13  that -- as we defined it in that publication.
14    Q   The NCI PDQ goes on to state that the subset
15  analysis of the prospective study was inconsistent with
16  the main findings of the original report, citing to the
17  2020 O'Brien study, correct?
18    A   I'm not sure what that statement was supposed
19  to mean.  I don't know if they're trying to say it was
20  inconsistent with the main findings of the initial
21  report of that population, the Gertig study, or if they
22  mean the findings that O'Brien found in -- in her
23  analysis of the NHS I, but in either case, the results
24  of that analysis were positive.  So it's confusing to me
25  what they were intending to communicate with that

Page 33

1  citation.  In the -- in the O'Brien study, the results
2  are positive for the NHS I, and the original publication
3  in the Gertig study is positive -- the O'Brien study.
4    So I'm not sure which results they're
5  referring to, but in either case, whether it's the
6  original Gertig or the subset that O'Brien did, the
7  results in Woolen are consistent with both of those
8  prior publications.
9    Q   Let's see if we can reach -- at least reach an
10  agreement as to the following:  The NCI PDQ says:  "The
11  subset analysis of the prospective study was
12  inconsistent with the main findings of the original
13  report."
14    It says that, correct?
15    A   It does.
16    Q   After that statement, it makes a reference to
17  11, which is the 2020 O'Brien study, correct?
18    A   It does.
19    Q   The next sentence after that citation to the
20  2020 O'Brien study says:  "However, because of the
21  structure of this analysis, the results should be
22  interpreted with care."
23    Did I read that correctly --
24    A   You --
25    Q   -- and is that a correct statement from that

9 (Pages 30 - 33)

Page 34

1 NCI PDQ?

2    A    You read it --

3        MS. O'DELL:  Object to form.

4        THE WITNESS:  You read it correctly.  That

5 does -- I don't know what that sentence is supposed to

6 suggest.

7 BY MR. HEGARTY:

8    Q    Do you agree with that sentence?

9    A    That the structure of the analysis -- the

10 results should be interpreted -- I do not.

11        The systematic review by Woolen was done at

12 exemplary level and laid out every step of the way and

13 followed every guideline.  So I'm not sure what they

14 mean by that.

15        THE REPORTER:  Counsel, I believe someone is

16 trying to join by Zoom.

17        MR. HEGARTY:  Okay.  Let's go off the record.

18        (Mr. Lapinski joined the deposition

19        proceedings.)

20 BY MR. HEGARTY:

21    Q    The statements that we just went over in the

22 March 2024 NCI PDQ have been in that NCI PDQ in the

23 prior versions for at least a year.

24        Can we agree with that?

25        MS. O'DELL:  Object to the form.

Page 35

1        Mark, would you mind restating that?

2        MR. HEGARTY:  Sure.

3        MS. O'DELL:  I'm not sure I understood your

4 question.

5 BY MR. HEGARTY:

6    Q    The statements we read from the March 6th,

7 2024, NCI PDQ, as it relates to your paper and the

8 comments about O'Brien, have been previously set out in

9 other versions of the NCI PDQ, correct?

10    A    Yes.

11    Q    So today is not the first time you're reading

12 those statements, correct?

13    A    Correct.

14    Q    When you first read those statements, did you

15 ever reach out to the board members to discuss what they

16 mean by those statements or their characterization of

17 your paper or the O'Brien paper?

18    A    I did not.

19    Q    Why not?

20    A    I am familiar with the PDQ process.  I served

21 on this PDQ for many years.

22        The quality of the review was poor.  They

23 reviewed 7 of 48 studies, and my reading is every

24 statement or almost every statement is false on how they

25 summarized it, and so the entire summary is just a

Page 36

1 really shoddy piece of work.

2        And the way that process works is it's not a

3 process that's peer-reviewed.  It's not open for

4 external criticism.  There's no formal mechanism to say

5 that that work is shoddy work, and it doesn't really

6 have -- other than the context of this case, does not

7 have much of an impact on people's thinking.  So there's

8 just no mechanism to say this is a terrible report.

9    Q    Do you know any of the individuals on the

10 current NCI PDQ board?

11    A    I'm not --

12    Q    I can bring it up if we need to.

13    A    I think we'd have to.  I'm not sure.  The

14 person who ran it when I was on it is long gone.

15    Q    You do agree, though, that because of your

16 involvement, you can contact NCI PDQ board members and

17 comment on what is in an NCI PDQ, correct?

18    A    There is nothing that would hinder me from

19 contacting them, but there's no process for that to be

20 formally included in their process of -- of rereviewing.

21    Q    Do you have any intention, sitting here today,

22 to reach out to any of the current board members about

23 the statements in the NCI PDQ as it relates to your

24 paper?

25    A    I do not.

Page 37

1    Q    Yet you have, for various -- over various

2 times in your career, with regard to various parts of

3 your work, given interviews that have been cited in

4 newspaper articles, correct?

5    A    Across all topics?

6    Q    Across whatever kind of topics you're -- that

7 are -- let me start over again.

8        With regard to all topics.

9    A    Yes, I have.

10    Q    Across all topics.

11    A    Yes, I have.

12    Q    You've also done videos on YouTube, correct?

13    A    I believe that educational meetings that I've

14 led have been posted on YouTube, but I -- I've

15 personally never been involved in that.  So I led a

16 meeting in the fall with a hundred lecturers, and I --

17 someone on my team uploaded them, but I've never done

18 informational interviews for YouTube.

19    Q    Do you have social media accounts?

20    A    I -- I believe that my lab has a Twitter

21 account.  I don't think we post very much, and I

22 personally never post on it.  I can't actually tell you

23 what we posted.

24    Q    Did you help create any of the content on your

25 university's website as it relates to you?

10 (Pages 34 - 37)

Page 38

1    A   Yes.
2    Q   You have commented on the potential effects of
3 radiation and cancer in various newspaper articles,
4 correct?
5    A   Yes.
6    Q   Have you ever contacted a newspaper article,
7 ever done a video on YouTube, ever put anything on the
8 content of your university website as it relates to the
9 NCI PDQ's characterization of your Woolen paper?
10   A   No.
11   Q   Have you used any of these communication
12 outlets in any way to discuss your Woolen paper in any
13 respect?
14   A   I don't believe so.
15   Q   Have you used any of these communication
16 outlets to discuss your opinions in the talc litigation?
17   A   I have not.
18       Can -- can -- I don't know if I can clarify
19 something that I said.  I have spoken to newspapers and
20 various outlets about research projects that I've been
21 contacted about.  I have never reached out to newspapers
22 or any other outlet to describe my work in the absence
23 of it being generated from them to ask about my -- about
24 my work.
25   Q   Now, with regard to your 2022 article, that

Page 39

1 is, the Woolen article, you collaborated with Sean
2 Woolen and Ann Lazar, correct?
3    A   Yes.
4    Q   At the time that you began collaborating with
5 them about the 2022 Woolen paper -- that became the 2022
6 Woolen paper, were they aware that you are an expert
7 witness for Plaintiffs in talc cases?
8    A   Absolutely.
9    Q   Other than you and Dr. Woolen and Dr. Lazar,
10 was anyone else involved in any aspect of the study, its
11 preparation and publication?
12       MS. O'DELL:  Let's make -- Mark, during
13 Dr. Smith-Bindman's October 1nd, 2020, deposition -- if
14 you're laying the foundation -- I'm not objecting.  I'm
15 just saying:  There was a long line of questions that
16 followed all of this.
17       MR. HEGARTY:  Understood, and I'm -- just one
18 question about --
19       MS. O'DELL:  Sure.
20       MR. HEGARTY:  -- about that.
21       MS. O'DELL:  I just wanted to make you aware
22 of that.
23       THE WITNESS:  I'm hesitating because I do not
24 remember if we had an editor who edited the manuscript
25 or not.

Page 40

1 BY MR. HEGARTY:
2    Q   Are you talking about an editor at the journal
3 level?
4    A   No.  There's an editor that I've worked with on
5 various papers who doesn't bring content expertise, but
6 who has edited some of our papers before publication.
7    Q   Who is that?
8    A   Chris Tachibana.  I don't -- I actually have
9 no recollection if she was involved or not, but I was
10 looking if we had thanked her.  I don't remember, but
11 that's a possibility.
12   Q   At the time the Woolen paper was published in
13 2022, did either Dr. Woolen or Dr. Lazar work for you?
14   A   No.  No.  No.
15   Q   At the time of publication, were you
16 supervising them in any way?
17   A   No.
18   Q   Were you filling out evaluations for them?
19   A   No.
20   Q   What funds paid for their time?
21   A   I have academic funds that I can use for that
22 kind of work.  Dr. Woolen was not paid, and Dr. Lazar
23 was paid as a biostatistical consultant from one of the
24 funds.
25   Q   Is there any documentation of the amount of

Page 41

1 cost that went into getting the Woolen paper published?
2       MS. O'DELL:  Object to the form.
3       THE WITNESS:  There would be a track record of
4 having paid it.  It almost certainly wouldn't have gone
5 to Dr. Lazar.  It would have gone to the statistical
6 bio-consulting service, and so it would be possible to
7 possibly find records of how that were paid.
8 BY MR. HEGARTY:
9    Q   Are those documents you provided to counsel
10 for Plaintiffs?
11       MS. O'DELL:  I'll represent:  No.
12 BY MR. HEGARTY:
13   Q   Are there any other accounting documents that
14 you're aware of that would relate to the work in getting
15 -- in getting the Woolen paper published; that is, the
16 -- where you had to itemize the -- the cost and expenses
17 that went into the published paper?
18       MS. O'DELL:  Object to the form.
19       THE WITNESS:  The only cost that could exist
20 would be the cost to pay the biostatistical consultants,
21 and that would be findable with some digging through the
22 financial records.  Not by me, but someone at UCSF, and
23 I don't believe that this journal has a publication
24 cost, but if there -- if there was, there could be a
25 cost for that.

11 (Pages 38 - 41)

Page 42

1  BY MR. HEGARTY:
2    Q   You said that you have access to funding --
3  funding as part of your work.
4        Do you have to do an accounting, that is,
5  prepare a physical document of the accounting of use of
6  that funds -- did you have to prepare an accounting, as
7  far as use of that funds, for the Woolen paper?
8    A   The amount of money was -- was not very much,
9  and if you're spending money on the -- the -- it's
10  called the CTSI, the biostatistical consulting, there
11  would be no other documentation needed.
12        In general, I have incredible detailed records
13  I have to provide for everything I spend, but internal
14  UCSF money for biostatistical consulting would be just
15  accepted as necessary.
16    Q   So would that have been the only expense that
17  you would have had as part of the 2022 Woolen paper?
18    A   Yes.
19    Q   And as you indicated, there would be no
20  separate document accounting for what that expense would
21  be; is that right?
22    A   That's correct.
23    Q   The 2022 Woolen paper focused on frequency of
24  talcum powder use, correct?
25    A   Yes.

Page 43

1    Q   You agree that there is more likelihood for
2  exposure misclassification when patients provide
3  frequency data versus "ever/never" use data, correct?
4    A   I would not agree with that.
5    Q   Why would you not agree with that?
6    A   I think "ever" is a very broad category.  As I
7  state in the report, that could be once or twice.  It
8  could be a thousand or 10,000 times.  It's such a broad
9  range that I think perhaps the capacity to say ever
10  "yes" or "no" might be easy to remember, but it wouldn't
11  be a meaningful remember; whereas, I think asking about
12  frequent talcum powder use is asking about a habitual
13  activity that I think women are likely to remember.
14        And I think in detailed surveys the most
15  common amount of talcum powder use is daily, and I think
16  women who use it daily would have a good remembrance
17  that this was part of their daily routine, like
18  moisturizer or something like that.
19    Q   Let me ask it in a different way, which I
20  think tracks what you're saying.
21        Do you agree that there is more likelihood for
22  misremembering the frequency of talcum powder use as
23  compared to whether you ever use talcum powder?
24    A   I -- I do understand the question, and I'm not
25  sure that I would agree with that.  I think I couldn't

Page 44

1  personally answer the question have I ever used it.  I
2  think that -- kind of, I've been around talcum powder,
3  but I don't know if I ever used it; whereas, if you're
4  asking women are they using it frequently, meaning kind
5  of every day, I think women would remember that very
6  clearly.
7    Q   Let me ask it, then, still a different way.
8        If we're talking about not just did you use it
9  frequently, but if you're talking about the specific
10  number of times you used it in a month versus just if
11  you ever used it, do you agree that there's more
12  likelihood for misremembering the number of times you
13  use it in a month versus ever or never using it?
14    A   I -- I'm not sure that I agree with that.  I
15  just -- I couldn't answer the question of ever/not ever.
16  I'd be unable to.  Whereas, if your question is getting
17  at would a woman know if she used it three or four times
18  a week, is there lack of precision between three and
19  four, which I think is what you're getting at, there
20  might be.  But if there's lack of precision between
21  using it a lot versus have you ever used it, I'm not
22  sure that "Have you ever used it?" is a reliable answer
23  just because I couldn't answer that question.
24        MR. HEGARTY:  Let's go off the record.
25        (Recess.)

Page 45

1        MR. HEGARTY:  We're back on the record after a
2  short break.  I want to leave the PDQ question, Doctor,
3  that we just talked about, but I did have the
4  opportunity to pull up the PDQ screen and prevention
5  editorial board from the website.
6    Q   Would you mind scrolling through that website
7  on my laptop and tell me if you know any of the
8  individuals that are listed there.
9    A   I know Joanne Elmore from UCLA, and I think I
10  might know Joe Wrubbel from Connecticut, but I can't
11  remember.
12    Q   How well --
13    A   Not well.
14    Q   How well do you know Dr. Elmore?
15    A   Fairly well.
16    Q   How would you describe her reputation-wise?
17    A   It's good.
18    Q   Do you have any criticisms of her capabilities
19  as a scientist?
20    A   I don't.
21    Q   Any criticisms you just provided at this
22  deposition as it relates to their review of perineal
23  talc as set out in the NCI PDQ you're saying apply to
24  her too, right?
25    A   The way the reviews get done is an individual

12 (Pages 42 - 45)

Page 46

1 person takes the lead on each one.
2      I am very confident that Joanne Elmore didn't
3 do that particular review.
4    Q   Every board member of the NCI PDQ signs off on
5 every sentence in the NCI PDQ?
6    A   No, I don't think that's true.
7    Q   And I don't mean that in a formal way, but
8 they put their name to the -- the NCI PDQ as being on
9 the board, correct?
10      MS. O'DELL:  Object to the form.
11      THE WITNESS:  No, I don't -- I don't think
12 it's that kind of document.  I think there are documents
13 that the NCI puts out that have that kind of weight.
14 This does not.
15      This is a group of scientists who, together,
16 help the public and other physicians understand the
17 medical literature, but it's not a degree of every one
18 of those scientists stands behind everything that comes
19 out of that.  There remains a lot of internal
20 disagreements about things that get published on the
21 PDQ.  It's not a uniform, "We support this."
22 BY MR. HEGARTY:
23    Q   You have no personal knowledge of Dr. Elmore's
24 or anyone else on the board's involvement with the NCI
25 PDQ that we marked as Exhibit No. 5 in this case,

Page 47

1 correct?
2    A   I do not.
3    Q   You have no personal knowledge of what any of
4 the board members did with regard to reviewing of the
5 documents or preparing the NCI PDQ we've marked as
6 Exhibit No. 5 --
7    A   I --
8    Q   -- correct?
9    A   -- do not.
10    Q   Do you feel comfortable enough with Dr. Elmore
11 to talk with her about the NCI PDQ?
12    A   I would, yeah.
13    Q   If -- assume for my question -- the purpose of
14 my question, hypothetical, that Dr. Elmore agrees with
15 what's set out in the NCI PDQ with regard to perineal
16 talc exposure.
17      Would the criticisms that you have told me
18 today about it apply to her as well?
19      MS. O'DELL:  Object to the form.
20      THE WITNESS:  I don't believe I criticized a
21 person.  I criticized the quality of the work, and
22 whoever wrote that did a very poor job.
23 BY MR. HEGARTY:
24    Q   And if Dr. Elmore reviewed it and found it to
25 be correct, would you be critical of her?

Page 48

1      MS. O'DELL:  Object to the form.  Assumes
2 facts.
3      THE WITNESS:  I disagree with almost every
4 statement in that PDQ.  If it were Joanne's or if Joanne
5 agreed to it, I'd be happy to have a vigorous discussion
6 with Joanne, and if we end up being together in some
7 location in the near future, I will, for your
8 suggestion, raise it with her and share my views of it.
9 BY MR. HEGARTY:
10    Q   But what you know about Dr. Elmore, is she
11 capable of reviewing the studies that you reviewed,
12 including those in the NCI PDQ, and coming to
13 conclusions about what they mean?
14    A   I -- I respect Joanne as an epidemiologist.  I
15 think she would be able to do such a task.
16    Q   I want to talk about specific parts of your --
17 of the 2022 Woolen paper, and I'm going to cite to
18 specific parts of it.
19      So do you have a copy in front of you?
20    A   I do.
21    Q   First of all, the study does not report on the
22 finding -- does not report findings on any specific sub
23 type of ovarian cancer, correct?
24    A   That's correct.
25    Q   If you look at the background section, the

Page 49

1 very first section on the first page, the first sentence
2 says (as read):  "Risk of ovarian cancer in women with
3 frequent perineal talcum powder product is not well
4 understood."
5      Did I read that correctly?
6      MS. O'DELL:  Can I just ask -- I'm sorry,
7 Mark.  I got lost.  You're in Woolen --
8      MR. HEGARTY:  I'm in the very first page, the
9 very first sentence.
10      MS. O'DELL:  Oh, yeah.  I'm sorry.
11      THE WITNESS:  Yeah.
12      MS. O'DELL:  Okay.  Forgive.  Thank you.
13      THE WITNESS:  Yes.  And I'm sorry.  You're
14 asking me if that is what the first sentence says?
15      MR. HEGARTY:  Yes.
16      THE WITNESS:  Yes.
17 BY MR. HEGARTY:
18    Q   That was -- that statement was true in 2022,
19 and it's true today, correct?
20    A   I believe our systematic review changed that
21 sentence.  I think it's much better understood since
22 this publication came out.
23    Q   In 2022 when you wrote that sentence, that
24 sentence was true, correct?
25    A   Yes.

13 (Pages 46 - 49)

Page 50

1    Q   Now, this study looked at frequency only, that
2  is, frequency of talcum powder use only, correct?
3    A   Yes.
4    Q   It did not account for duration of use,
5  correct?
6    A   Correct.
7    Q   It does not measure cumulative use, correct?
8    A   Correct.
9    Q   So --
10   A   I'm hesitating.  The focus was on frequency of
11  use.  For many of the included articles, they provided
12  information on cumulative use.
13   Q   My question, though, was:  Your 2022 Woolen
14  paper does not measure cumulative use, correct?
15       MS. O'DELL:  Object to form.
16       MR. HEGARTY:  Or let me say it differently.
17       THE WITNESS:  Yeah.
18  BY MR. HEGARTY:
19   Q   Your 2020 [sic] Woolen paper does not report
20  findings as to cumulative use?
21   A   Correct.
22   Q   So frequency of use is an acceptable measure
23  of exposure in an epidemiologic study involving talc,
24  correct?
25   A   Yes.

Page 51

1    Q   Looking at the "METHODS" section, it says that
2  the quality assessment using a Newcastle-Ottowa Scale
3  was performed independently by two reviewers.
4       Who were those two reviewers?
5    A   Sean Woolen and myself.
6    Q   Had you ever used a Newcastle-Ottowa Scale
7  prior to this publication?
8    A   I had not.
9    Q   I'm sorry?
10   A   I had not.
11   Q   Okay.  Thank you.
12       Looking at the "CONCLUSIONS" section at the
13  bottom of the first page, left-hand column, it states:
14  "This review suggests an increased risk of ovarian
15  cancer associated with frequent perineal powder exposure
16  of 31 to 65%," correct?
17       MS. O'DELL:  You're back in the abstract?
18       MR. HEGARTY:  I'm still in the abstract.
19  That's what I said.  First page --
20       THE WITNESS:  Still in the abstract.
21       MR. HEGARTY:  -- bottom left-hand corner,
22  conclusion.
23   Q   Did I read that conclusion correctly?
24   A   Yes.
25   Q   You did not include or -- let me state -- let

Page 52

1  me restate that.
2       You did not state in that conclusion that
3  frequent perineal powder exposure causes ovarian cancer,
4  correct?
5    A   Correct.
6    Q   In fact, nowhere in this paper do you say that
7  talcum powder use causes ovarian cancer, correct?
8    A   I would have to read it more carefully, but I
9  -- I wouldn't be surprised if what you're saying is
10  true.  I would have to read it to -- to remember that.
11   Q   Looking over at the "INTRODUCTION" section,
12  right-hand column, second paragraph, the first line says
13  (as read):  "The differences in conclusions between the
14  meta analyses are at least partially due to the
15  inconsistent talcum powder exposure questions regarding
16  the frequency and type of exposure."
17       Did I read that correctly?
18   A   Yes.
19   Q   Can you cite for me any publication in any
20  journal who has made a similar statement as the one I
21  just read?
22       MS. O'DELL:  Object to the form.  Vague.
23       THE WITNESS:  My recollection is that maybe in
24  the Health Canada and Taher studies they might have said
25  something about -- about this similar issue.

Page 53

1  BY MR. HEGARTY:
2    Q   Please turn to the next page.
3       Under the section "Search Strategy and
4  Information Sources" --
5    A   Mm-hmm.
6    Q   -- do you see that section?
7    A   Mm-hmm.
8    Q   It says, in the first line (as read):
9  "Comprehensive searches were performed by an expert
10  health science informationist -- informationist from
11  inception of the relevant databases" in August -- "to
12  August 2nd, 2022 [sic]."
13       Who was that?
14   A   At one of the UCSF sites at Mt. Zion they have
15  a amazing library search team of professionals.  So it
16  would have been someone in that group.
17   Q   Do you know who that someone was --
18   A   No.
19   Q   -- by name?
20   A   No.
21   Q   Looking under the "Eligibility Criteria and
22  Study Selection" section, second paragraph, the first
23  couple lines reads (as read):  "Studies were screened
24  for inclusion using prespecified selection criteria by a
25  single author S.W.  Selection criteria included

**Page 54**

1 publication of primary data, reporting on multiple times
2 per week (greater than or equal to two times per week)
3 perineal exposure to talcum powder including direct
4 application of talcum powder to the perineum and rectum,
5 application to underwear or sanitary napkins, or on
6 birth control devices -- devices like diaphragms and
7 risk for ovarian malignancy."
8     Did I read that correctly?
9     A   Yes.
10    Q   That described the selection criteria for the
11 studies to include, correct?
12    A   Yes.
13    Q   Now, the O'Brien data did not meet that
14 criteria, correct?
15    A   Correct.
16    Q   Why did you include it, then?
17    A   We didn't include the O'Brien study.  We
18 included data from the Nurses' Health Initiative Study,
19 and I learned about that study in -- in more detail from
20 the O'Brien publication, but we didn't use the O'Brien
21 publication.  It didn't -- none of the -- none of the
22 pieces that they pulled from the existing cohorts could
23 be used.  So that was a second request to get
24 unpublished data from whichever the cohorts had relevant
25 data.  So that's described in the next paragraph.

**Page 55**

1     Q   The inclusion criteria set out in the section
2 "Eligibility Criteria and Study Selection" did not
3 include a requirement that the women in the study had
4 patent tubes, correct?
5     A   Correct.
6     Q   Carrying over still in the same eligibility
7 criteria section to the next paragraph at the top on the
8 right-hand column, there's a reference to the Sister
9 Study at the very end of that section, correct?
10    A   Yes.
11    Q   The Sister Study actually collected data on
12 two or more times of talc use per week, correct?
13    A   We looked at the study protocols for all of
14 those, and indeed the Sister Study did have questions
15 about the number of times per week in their -- in their
16 questionnaire.
17    Q   Are you saying, in this part of the paper,
18 that there were only two women who met the eligibility
19 requirement from the Sister Study data?
20    A   Yes.  We reached out to the person who
21 basically oversees the data for the Sister Study and the
22 NH I [sic] study.  Because they had the relevant
23 questions in the Sister Study and in the NH -- NHS I
24 study, we asked for those data, and what we were told is
25 that -- they wouldn't share the data for the Sister

**Page 56**

1 Study because there were two patients who reported the
2 high-use category, and that just wasn't enough to be
3 meaningful.  So they told us there were only two
4 patients who reported frequent use in that study.
5     Q   That was provided to you orally?
6     A   I think it was probably a written document
7 from O'Brien to Woolen explaining that.
8     Q   So does that mean that you never got access to
9 the Sister Study data?
10    A   That's correct.
11    Q   So the statement at the end of this is based
12 on the statement that the number that met your criteria
13 was only two?
14    A   Yes.
15    Q   Turning to the section "Data Extraction," in
16 the middle it says that the reference group was "women
17 who reported no talc exposure"; is that accurate?  In
18 other words, you compared the group with frequent use
19 versus women who had no talc exposure?
20    A   Yes.
21    Q   The next line says:  "When duplicate reports
22 of the same subject were published, the publication
23 reporting the highest talc use was selected."
24     Was there any duplication of study subjects
25 included in any of the results?

**Page 57**

1     A   Not that I remember.  I think we were careful
2 to try to make sure that patients were only reported
3 once.
4     Q   The very end of that section says:
5 "Disagreements in data extraction were resolved by
6 consensus."
7     Who were they resolved between by consensus?
8 In other words, who was making that resolution?
9     A   The three authors.
10    I want to correct something from -- the paper
11 says the data extraction were performed by two authors,
12 which it were -- which it was, but Dr. Lazar actually
13 did the data extraction for all those studies as well.
14    Q   Please turn over to the page that has Table 1
15 on it and Table 2.
16    A   Yes.
17    Q   Looking at the text, you know, on the
18 left-hand column, it refers to the age range of included
19 women as being between 18 and 79.
20    Is that at the point in time -- at what point
21 in time is that?  At the time of their reporting of talc
22 use or at what other -- at what time?
23    A   For the case control studies, they would
24 report when they were enrolled in the trial.  For the
25 NHS I, I -- I don't remember if it was when they were

15 (Pages 54 - 57)

Page 58

1 enrolled in the trial or at the end of follow-up. I
2 believe it's at enrollment, but I'd have to check.
3     Q    Carrying over to the next column, it states
4 that the range of frequent talcum powder use was defined
5 as four to seven times per week, correct?
6     A    Can you say that one more time?
7     Q    Sure.
8          Carrying over to the -- to the right-hand
9 column at the text on the page we're looking at, it says
10 the range of frequent talcum powder use was defined as
11 four to seven times per week, correct?
12    A    Yes.
13    Q    Do you recall, in your prior reports in the
14 MDL, you defined the frequency range as three or more
15 times per week?
16    A    Yes.
17    Q    And with regard to what you actually report in
18 the findings, you report yet a different number,
19 correct?
20         MS. O'DELL:  Object to the form.
21         THE WITNESS:  I think there's a difference
22 between what we set out to require for inclusion and
23 what the articles actually found.  So we set out to
24 include use that was at least several times per week,
25 but the articles that reported on frequent use, in fact,

Page 59

1 had average use that was higher than we required.
2 BY MR. HEGARTY:
3     Q    In the end, you reported on as frequent use
4 two or more times per week, correct?
5     A    Yeah.
6     Q    But the initial eligibility requirement was
7 four to seven times per week, correct?
8         MS. O'DELL:  Object to the form.
9         THE WITNESS:  No, it didn't say that.  The
10 eligibility was greater than two times per week, but the
11 articles ended up identifying higher use than that.
12 BY MR. HEGARTY:
13    Q    Looking down at Table No. 2, only four studies
14 report actual weekly talcum powder use:  Booth, Mills,
15 Schildkraut, and O'Brien, correct?
16         MS. O'DELL:  Object to the --
17         THE WITNESS:  I would agree if you look in
18 this table.  Some of the numbers show times per week,
19 and some show a lifetime exposure.
20         For each of those papers that had a lifetime
21 exposure, we calculated how many years the women were
22 followed, how many times per week that 10,000 lifetime
23 exposure would correspond to.  So we reported in the
24 language that they use, but when you do the simple math,
25 you end up getting a way to estimate the weekly

Page 60

1 exposure.
2 BY MR. HEGARTY:
3     Q    In your simple math, did you assume one time
4 per day of use?
5     A    When it said 20 times per month, we took that
6 to mean 20 days of exposure.
7     Q    What did you do when it said 10,000 or more
8 lifetime uses?
9     A    We divided it by, I believe, the age of the
10 average person to come up with an estimate of how many
11 times per week they would have used talc to get
12 approximately that -- that level, but we included
13 studies if the amount of exposure would have been at
14 least two times per -- per week, but assuming one time
15 per day.
16    Q    That assumption would not account for women if
17 they reported using -- if they reported, as far as their
18 lifetime use, based on five times use a day, correct?
19    A    That's correct.
20    Q    The Cook 2000 -- or -- I'm sorry -- the Cook
21 1997 paper also reported use of between 5- and 10,000
22 lifetime uses, correct?
23    A    Do you have the Cook paper?
24    Q    I do not have the Cook paper.
25         Let's go off the record real quick.

Page 61

1         (Discussion Off the Record.)
2         MR. HEGARTY:  Okay.  We can go back on the
3 record.
4     Q    When we took a short break, Doctor, I was
5 asking you about the Cook 1997 paper, and we both had an
6 opportunity to pull that up.
7         And are you looking at it now?
8     A    I am.
9     Q    And in particular, Table 3 provides use of
10 talcum powder between 5,001 and 10,000 uses for lifetime
11 days, correct?
12    A    Yes.
13    Q    And from that -- go ahead.
14    A    I'm sorry.  It says "lifetime days."
15         When you asked your question earlier about if
16 a person had used it five times a day, in this case, it
17 would count once for each day the way they extracted.  I
18 never thought about that -- or hadn't thought about the
19 issue in ages, but --
20    Q    Okay.  Thank --
21    A    -- so this would take that away.
22    Q    But with regard to Table 3, you used the
23 number of greater than 10,000, correct?
24    A    Yes.
25    Q    Cook also provides from 5,001 to 10,000 uses,

16 (Pages 58 - 61)

Page 62

1 correct?
2     A   Yes.
3     Q   You did not use that data, correct?
4     A   Did not.
5     Q   Why did you not use that data?
6     A   As we laid out in the "METHODS," we took the
7 highest frequency use, and so 10,000 is the highest
8 frequency use.
9     Q   So even though you might have had data that
10 was greater than two times per week, you still took the
11 highest data that was available, correct?
12    A   Yes.
13    Q   Why did you do that?  Let me ask it a
14 different way.
15        If you had additional data that would then
16 have satisfied what you were reporting on in this paper,
17 why did you not include it too?
18    A   There are several reasons.  First, we were
19 trying to get at -- I think we say in the paper
20 approximate daily use.  So that would be the highest
21 number.  So if someone -- if there was a material
22 difference between women who reported twice a week, four
23 times a week or seven times a week, we were trying to
24 get at seven times a week, the highest use.  So that's
25 the first.

Page 63

1        The second is you can't pull multiple data
2 points from one study in a systematic review method.
3 You have to represent each study with a single estimate.
4 There are ways of combining data within one systematic
5 review and then using that in a weighted way in an
6 overall review, and I've done that for a systematic
7 review on an unrelated topic, but in general, each study
8 should be represented by a single reflection of the
9 work.  So you can't take multiple points.  It just would
10 -- it would make it impossible to weight the work
11 appropriately.
12    Q   You did that not only as to the Cook paper,
13 but there were other papers as well that reported on
14 frequent use that might have been in the greater than 2
15 times a week, but if it had a greater number, you used
16 the greater number?
17    A   That's correct.
18    Q   There was one set of numbers that I could not
19 quantify as it relates to the number of exposed cases
20 and the number of exposed controls, and that is the
21 Harlow 1992 paper.
22        Do you have the Harlow 1992 paper?
23    A   I think you -- I think you nailed the two
24 papers that I have to find on my computer.
25    MR. HEGARTY:  Let's go off the record real

Page 64

1 quick.
2        (Discussion Off the Record.)
3        MR. HEGARTY:  We can go back on the record.
4 We took just a moment to find the Harlow 1992 paper.
5     Q   I was looking at the relative risk number that
6 you use for Harlow, which was the 1.8 number with a
7 confidence interval of 1.1 to 3.0 that is shown in Table
8 1 for greater than 10,000.
9        Do you see where I'm referring to?
10    A   I'm seeing for greater than 30 applications
11 per month in Table 2.
12        Am I in the wrong table?
13    Q   Okay.  Let me come back out to Table 2.
14    A   I'm sorry.
15    Q   Which number did you use?
16    A   It seems to be the same number, but let me
17 see.  Applications per month.
18    Q   And as you're saying that -- because you
19 reported on greater than 10,000 uses, which would more
20 correspond -- which would correspond to what's reported
21 in Table 3, correct?
22    A   The point estimate is the same.  So I just
23 need to look at my paper to see what number corresponds
24 to the number.
25        I think I -- I think I gave you that number

Page 65

1 incorrectly.  I think you are correct that for Harlow
2 58 ...
3        (Pause.)
4     Q   And what I'm asking about is --
5     A   Yeah.
6     Q   -- for the number greater than 10,000, I'm not
7 seeing the numbers 58 and 41 that you report in Table 3,
8 and I'm hoping you can explain the difference.
9        Let's go ahead and go off the record.
10        (Discussion Off the Record.)
11        MR. HEGARTY:  Okay.  Let's go back on the
12 record.
13        When we took a short break, I asked
14 Dr. Smith-Bindman to explain to me, from using Table 3,
15 the -- the numbers reported there as far as the cases it
16 controls versus the numbers reported in the Woolen 2022
17 paper in Table No. 2.
18    Q   Are you -- are you ready to do that?
19    A   I am.
20    Q   Okay.  Can you explain it to me?
21    A   I can.
22        So the numbers that we extracted from the
23 Harlow paper were not from Table 3, but they're from
24 Table 2 that talk about the applications of talc per
25 month.  So the number that was actually extracted was

17 (Pages 62 - 65)

Page 66

1 greater than 30 applications per month from Table 2.
2 That shows you the 58 cases and 41 controls that align
3 with the numbers in both Table 2 and Figure 2.
4     Q   Why did you use those numbers from the greater
5 than 30 times per month from Table 2 versus the numbers
6 from the greater than 10,000 times, which you reported
7 in your paper, that are in Table 3?
8     MS. O'DELL:  Object to the form.
9     Table 3 in Harlow?
10     MR. HEGARTY:  In Harlow.  Yes.  Thank you.
11     THE WITNESS:  In Harlow.
12     I think we were trying to get at the most
13 number of applications per month, and the greater than
14 30 most directly reflects that question, how many times
15 per month, and that's -- the answer is 30.  That's
16 daily.
17 BY MR. HEGARTY:
18     Q   A related question is, then:  Why didn't you
19 report in this -- in Table 2 of your Woolen paper the
20 greater-than-30-times-per-month number?
21     A   I believe that's an error.
22     Q   Okay.  Thank you.
23     If you look at the bottom of this -- of the
24 page we're looking at, the footnotes under Table 2,
25 there's a reference in the last footnote to only using

Page 67

1 the -- the data from -- that O'Brien -- that Dr. O'Brien
2 provided --
3     A   I'm sorry.
4     Q   I'm sorry.
5     A   We've left --
6     Q   The very -- the very last footnote --
7     A   No.  We're back on Woolen.  We've left Harlow.
8     Q   No, no -- yeah, we left Harlow.  We're now
9 back to your Woolen paper.
10     A   Okay.  Fantastic.  Let me move.  Let me move.
11     Q   Okay.  I'm glad -- now we're on Table 2 on
12 your Woolen paper in -- at the bottom of that page in
13 Footnote 5.
14     First of all, we talked earlier about you
15 using data from the O'Brien 2020 paper that was
16 unpublished, correct?
17     A   Again, from the NHS I cohort that was not
18 published.
19     Q   That's right.  Thank you.
20     You then report in this footnote that (as
21 read):  "We included data on women with intact fallopian
22 tubes," correct?
23     A   Yes.
24     Q   And then you make the statement after that "to
25 harmonize with other publications," correct?

Page 68

1     A   Yes.
2     Q   What other publications specifically called
3 out their data as "women with intact fallopian tubes"?
4     A   I think the other studies looked at open tubes
5 versus closed tubes and showed the results for ovarian
6 cancer risk as it varied by talc and whether the tubes
7 were open or not.  Of those studies that showed that
8 patent fallopian tubes had higher risks were Kramer,
9 Harlow, and Whittlemore.  I think in terms of reporting
10 it that way, I think -- I believe that Whittlemore
11 reported it that way; although, it was a little bit
12 ambiguous in that publication.
13     Q   Do you agree that there were at least some of
14 the -- at least some of the studies in Table 2 did not
15 break down their figures by whether the women had intact
16 tubes or non-intact tubes?
17     A   Absolutely.
18     Q   So the extent that you then used O'Brien data
19 on women with intact tubes, that's potentially
20 inconsistent with some of the other studies who did not
21 report one way or the other, correct?
22     MS. O'DELL:  Object to the form.
23     I think Dr. Smith-Bindman said repeatedly it's
24 not the O'Brien data; it's the Nurses' Health Study
25 data.

Page 69

1     MR. HEGARTY:  Okay.  That's what I meant.
2     Q   Did you -- when I -- when I asked that
3 question, I meant the Nurses' Health Study data.
4     Did -- so same question, making reference to
5 the Nurses' Health Study data.
6     A   I think many of the studies adjusted in the
7 multivariate analysis for whether or not the tubes were
8 patent or not patent.  In the O'Brien study, that wasn't
9 an available adjustment.  So most consistent to get at
10 the question, which is does talcum powder cause ovarian
11 cancer, to be consistent with the intent of those other
12 papers, which is to account for patent tubes, I believe
13 choosing the representation of the cohort who had patent
14 tubes made the most sense in terms of consistency.
15     Q   Do you agree, though, that there -- to the
16 extent that you're comparing a set of data with -- of
17 women with intact fallopian tubes to a set of data that
18 didn't distinguish it and, therefore, would include
19 women with intact and with not intact fallopian tubes,
20 there could be some inconsistency?
21     A   I think there was an adjustment for that, but
22 the degree that the results are not stratified, which I
23 think is what you're getting at, presented separately, I
24 think there is not perfect consistency on that issue
25 where everyone was with open tubes or not.

18 (Pages 66 - 69)

Page 70

1    Q   Did you have all the Nurses' Health Study data
2 that included women with and without intact tubes?
3        MS. O'DELL:  Object to the form.
4        THE WITNESS:  We did have results on all
5 women.
6 BY MR. HEGARTY:
7    Q   Could you have included all women in this
8 analysis?
9    A   Yes, we could have.
10    Q   Did you do that and -- and see if it made a
11 difference?
12    A   At the time of doing the study, we had not
13 done that, but I saw that that was raised by you guys,
14 and when I saw that, I thought that was a valid point to
15 evaluate, and at that point I did reach out, I think, in
16 December to ask the biostatistician to do a sensitivity
17 analysis to evaluate the impact had we made that other
18 decision.
19    Q   Who is the biostatistician you reached out to?
20    A   The same.  Lazar.
21    Q   Has that sensitivity analysis been done?
22    A   Yes.
23    Q   Do you have documentation of that sensitivity
24 analysis?
25    A   Yes.

Page 71

1    Q   Is that something you brought with you today?
2    A   I think we sent it to you.  I think it's one
3 of those documents that was recently shared.  I was
4 given these results about a week ago or so by Ann, and I
5 forwarded them to the lawyers.
6        MS. O'DELL:  And they were provided.
7        MR. HEGARTY:  Is that in the email?
8        MS. O'DELL:  Yes.  It was provided in keeping
9 with the requirements for disclosure, and they were
10 actually put in early, was Saturday, and it was in the
11 DropBox that was provided to you.
12        MR. HEGARTY:  Understood.  My question is more
13 specific than that.
14        Is that in the email that -- that was provided
15 in that DropBox?
16        MS. O'DELL:  Correct.  I can represent -- she
17 doesn't know what's in the DropBox.  I'll represent that
18 it was in the DropBox.
19        MR. HEGARTY:  I will go ahead and show you a
20 copy of that email that we were provided.  It should be
21 just a single page.  Did we not get it?
22        MS. O'DELL:  I'm happy to provide a -- a copy
23 if you want to mark it.
24        MR. HEGARTY:  We may not have gotten a copy
25 that -- oh, wait.  We got it.  We got it.  We'll mark

Page 72

1 that -- the email we were provided as the next exhibit,
2 which is Exhibit --
3        MS. FLAGEOLLET:  Six.
4        MR. HEGARTY:  -- 6.
5        (Exhibit 6 was marked for identification by
6        the court reporter.)
7        THE WITNESS:  Thank you.
8        MR. HEGARTY:  So I've marked, as Exhibit No.
9 6, a document we were provided prior to the deposition.
10    Q   Can you tell me what this document is, what
11 Exhibit 6 is?
12    A   Yes.
13        I reached out to the biostatistician on the
14 Woolen paper to ask her a sensitivity analysis if she
15 would recalculate the overall results by using the
16 number from the Nurses' Health Study of all women rather
17 than those with open fallopian tubes.
18    Q   Is this the only document that you have
19 reporting on that sensitivity analysis?
20    A   Yes.
21    Q   Would Dr. Lazar have -- based on how you
22 understand she works, have additional documents that
23 would reflect the sensitivity analysis that she did?
24    A   I suspect she could have some SAS programming
25 code, but -- but that would be all.

Page 73

1    Q   The SAS programming code wouldn't be something
2 -- would that be something you could print out that
3 would show the data input and the results she got from
4 the sensitivity analysis?
5    A   I'm going to have to say I don't know the
6 answer to that.  There's probably some -- some
7 documentation of her code.
8    Q   What were the results when she -- let me back
9 up again.
10        So what she did was do the same study analysis
11 but included the entirety of the Nurses' Health Study
12 women with and without patent tubes?
13    A   That's correct.
14    Q   What did she find when she did that
15 sensitivity -- sensitivity analysis?
16    A   And I should say she included about four
17 sensitivity analyses in the published paper where we
18 included all those results as supplemental materials.
19        For this sensitivity, she basically swapped
20 out the numbers for O'Brien's NHS I data for all women
21 versus just with patent tubes, and the impact was very
22 small on the overall estimate.  The overall estimate had
23 a point estimate of 1.47 with a confidence interval of
24 about 1.35 to 1.68.  When she swapped it out, the point
25 estimate was 1.41 with a confidence interval of 1.24 to

19 (Pages 70 - 73)

Page 74

1  1.64, so a very small change.
2      Q   Okay.  You can put that aside.  We may -- we
3  may come back to it.
4          Had you thought about doing that sensitivity
5  analysis since you -- before you had read some -- or
6  understood there was some commentary about the use of
7  patent versus tot- -- the tot- -- patent women versus
8  the totality of women?
9          MS. O'DELL:  Object to the form.
10         You may answer.
11         THE WITNESS:  Had I thought of it, we would
12  have done it.  I didn't think of it.  I thought it was a
13  -- a valid question that was raised by -- by your team.
14  BY MR. HEGARTY:
15     Q   Turning over to the next page of the Woolen
16  paper, the page that includes the discussion part of it,
17  you took it -- you mentioned you did several sensitivity
18  analysis [sic] that included running -- running the
19  analysis without the Wu paper, correct?  The Wu data, I
20  should say.  And I'm looking at the top left-hand side
21  of the page with a discussion on it on the --
22     A   Yes.
23     Q   -- right-hand column.
24     A   Yes, we did.  Yes, we did.
25     Q   Did you also do that same sensitivity analysis

Page 75

1  excluding the Schildkraut data?
2      A   I believe we did, but let me see if I can find
3  it.
4          MS. O'DELL:  If you need the supplemental
5  tables, Doctor, just let us know.
6          MR. HEGARTY:  They should be at the back of
7  that copy.
8          MS. O'DELL:  Okay.
9          THE WITNESS:  I -- I don't -- I don't see that
10  we did that, but --
11  BY MR. HEGARTY:
12     Q   The reason I ask about Schildkraut was that
13  their definition -- that paper's definition of body
14  powder included cornstarches, correct?
15     A   I believe it -- I believe it did.
16     Q   Did you consider doing a sensitivity analysis
17  without Schildkraut because of the way they define body
18  powder use?
19     A   The fact that we didn't do that sensitivity
20  analysis suggests that we didn't think about doing that
21  sensitivity analysis.
22     Q   Looking over in the "DISCUSSION" section, the
23  second paragraph, the first line says:  "The precise
24  mechanism whereby talcum powder causes ovarian cancer is
25  not fully understood."

Page 76

1          That was a true statement in 2022, correct?
2      A   Yes.
3      Q   That's still a true statement, correct?
4      A   I think we've made a lot of progress in
5  understanding the mechanism since then.  So I think the
6  statement's true in that we don't know the precise
7  mechanism, but we have a lot more supporting evidence of
8  how it happens than we did at the time of this
9  publication.
10     Q   Talking generally about your paper as it
11  relates to frequency, you actually state in your amended
12  report, as you had stated previously, that with regard
13  to the Gertig study, that -- you say a potential
14  weakness of the Gertig study was that frequency but not
15  duration was measured so that clear lifetime exposure
16  was missing.
17         That statement applies to your study as well,
18  right?
19     A   I think that statement suggests that it would
20  be good to have a combination of frequency and duration.
21  I don't think one invalidates the other, but it would be
22  better, particularly in a cohort study where you have
23  the opportunity to ask questions as broadly as possible,
24  for them to have added that other question.
25     Q   But my question, though, is:  As -- as it

Page 77

1  relates to the statements you made about Gertig and it
2  only reporting on frequency of data as a potential
3  weakness, that applies to your paper too?
4          MS. O'DELL:  Object to the form.
5  BY MR. HEGARTY:
6      Q   In other words, what would be the difference
7  in between how you characterize your reporting of
8  frequency versus how Gertig characterized its reporting
9  of frequency?  And that's referring to the 2000 paper.
10     A   I think in my criticism of the published work,
11  I was talking about broadly how these papers contribute
12  to our knowledge and how they could have been better.
13  And so I think it doesn't invalidate what they report on
14  frequency, which is important, but it would have also
15  been good if they gave us a combined frequency and
16  duration.  That would have been even better.
17         In our review, some of the contributing papers
18  did do frequency and duration, which was even better.  I
19  don't think it invalidates any results about frequency.
20  It's just saying it would be better to have more detail
21  than -- I don't think I levied those criticisms lightly.
22  It was a cohort study that should have asked that from
23  the very beginning.
24     Q   So your comment about it would have been
25  better would apply to your paper too, right?

Page 78

1    A   The -- the criticisms of a systematic review
2 were different.  I didn't have a capacity to tell the
3 investigators what to ask.  I was just pooling what they
4 did ask, and so you wouldn't consider that a criticism
5 of a systematic review.  You pool what's been published,
6 and what's been published is reliably on frequency and
7 not duration.  So I wouldn't levy that against our --
8 our paper.
9    Q   If you look at the "Strengths and Limitations"
10 section, you actually say in the first line that "The
11 primary strength of our study is our focus on frequent
12 users of perineal talcum powder," correct?
13    A   I believe you, but I'm not sure --
14    Q   Sure.
15    A   -- where I say that.
16    Q   Look at the "Strengths and Limitations"
17 section --
18    A   Oh.
19    Q   -- the heading "Strengths and Limitations" --
20    A   Oh, yes.  Yes.
21    Q   -- and the first line under that.
22    A   Yes.
23    Q   The first line under the "Strengths and
24 Limitations" section says:  "The primary strength of our
25 study is our focus on frequent users of perineal talcum

Page 79

1 powder," correct?
2    A   Yes.
3    Q   That would then also -- that should also apply
4 is -- in other words, that same statement should apply
5 to the Gertig 2000 paper, right?
6        MS. O'DELL:  Object to the form.
7        THE WITNESS:  I'm not sure what you're asking.
8 BY MR. HEGARTY:
9    Q   Well, Gertig also focused on frequency of
10 perineal talcum powder use, correct?
11    A   Yes.
12    Q   That would also mean that that's a primary
13 strength of that study, just as you say focusing on
14 frequency is a primary strength of your study, correct?
15        MS. O'DELL:  Object to the form.
16        THE WITNESS:  I think -- I mean, the primary
17 strength of the Gertig study is it's a large cohort
18 study that followed women for decades.  That's the
19 primary strength of that study.
20        To address the importance of what -- whether
21 talcum powder is a risk factor, you need to assess
22 frequency, and I think they did that, so I think that is
23 a strength of the study.
24 BY MR. HEGARTY:
25    Q   Turning over to the last page of your study,

Page 80

1 the "Conflict of Interest" section.  Tell me when you're
2 there.
3    A   Yes.
4    Q   You disclosed that you have served as a paid
5 expert witness for the plaintiffs in the talcum powder
6 litigation, correct?
7    A   Yes.
8    Q   You agree that it's important for the reader
9 of your Woolen 2022 paper to know that, correct?
10    A   Yes.
11    Q   That -- so that a reader could evaluate
12 whether there's a conflict of interest that you have as
13 it relates to the results of this paper in relation to
14 your work in the talc litigation, correct?
15    A   Yes.
16    Q   You can put that paper aside.
17        I want to talk for now -- let me start over
18 again.
19        I want to talk more -- in more detail about
20 your Second Amended Expert Report.  So if you could have
21 that with you.
22    A   I do have that.  I'm just checking the time,
23 and I'm going to have to go to the bathroom --
24    Q   Okay.
25    A   -- before we get to the end, if this is a good

Page 81

1 break.
2        MR. HEGARTY:  It's a good break because we're
3 switching to -- to the -- another document --
4        THE WITNESS:  Perfect.
5        MR. HEGARTY:  -- so let's go ahead and take
6 that break.
7        THE WITNESS:  Great.
8        (Recess.)
9        MR. HEGARTY:  We are back on the record.
10        I have one other question as it relates to
11 Exhibit No. 6.  It's the email Dr. Lazar to you dated
12 March 4, 2024.
13        Do you still have that exhibit in front of
14 you, Doctor?
15    A   I do.
16    Q   Can you explain to me what -- if you can, what
17 Dr. Lazar is talking about in the first paragraph?
18    A   Yes.
19        She's saying to generate the graphs that we
20 used in the manuscript -- and she generated those graphs
21 for each of the sensitivity analysisn [sic] -- that the
22 program she's using, STATA, she's not sure what happens
23 when she generates the graphs.  The confidence intervals
24 are coming out wrong.  So she said if I want the graphs,
25 she will dig in and figure it out, but, otherwise, the

21 (Pages 78 - 81)

Page 82

1 point estimate she just used with SAS. SAS is
2 notoriously not good with graphs.
3      Q   Had you responded to this email that is the
4 March 4, 2024, email?
5      A   It seems likely that I did.
6          MR. HEGARTY:  Can we get a copy of that email?
7 We'll follow up on it.
8          MS. O'DELL:  (Nods head.)
9 BY MR. HEGARTY:
10     Q   Do you remember what you -- what your
11 follow-up was?
12     A   I'm going to guess I said, "Thanks.  This is
13 great.  Don't need the graphs."
14     Q   You're saying here today you don't need the
15 graphs.
16         Why don't you need the graphs?
17     A   The change -- there's nothing I would do with
18 those graphs.  I wanted to know the impact on the
19 results.  She's giving me the impact on the results.
20 The graphs don't inform that at all.  That would just be
21 if I was publishing them, and we're not publishing them.
22 There's no -- there's nothing to them to publish.
23     Q   To know what is happening with the -- the
24 graphs with this new analysis, that is, the specifics of
25 it, we'd have to talk to Dr. Lazar; is that correct?

Page 83

1          MS. O'DELL:  Object to the form.
2          THE WITNESS:  You mean what's wrong with the
3 software?
4 BY MR. HEGARTY:
5      Q   Or what she's seeing when she's doing the
6 software, what she's running it.  You would -- she would
7 have those details and not you, correct?
8      A   That's correct.
9      Q   You can put that aside.
10         So now we're talking about Exhibit No. 1, I
11 believe, which is your Second Amended Expert Report.
12         Is that, indeed, Exhibit No. 1?
13         MS. O'DELL:  It's 2.
14         MR. HEGARTY:  Two.  I'm sorry.
15     Q   So now we're going to talk about in more
16 detail Exhibit No. 2, your second amended report.
17         If you could first turn to page 4 just before
18 the paragraph -- I'm sorry.  I need to back up.
19         Page 4, four lines down from the top.  Tell me
20 when you're on page 4.
21     A   I'm there.
22     Q   There's a line you added after the phrase "nor
23 does it confirm the specific component in talcum powder
24 products that make them carcinogenic."  You added:
25 "- asbestiform talc, platy talc, asbestos, heavy metals,

Page 84

1 and fragrances may all play a role."
2         Do you see where I'm reading?
3      A   I do.
4      Q   Now, you say they "may all play a role."
5         Which of these substances, in your opinion, to
6 a reasonable degree of medical or scientific certainty,
7 do play a role in talcum powder use causing ovarian
8 cancer?
9      A   I think the evidence that I have looked at the
10 most closely is asbestiform talc and asbestos.  I know
11 less about the etiology and the mechanism of how heavy
12 metals and fragrances may play a role.  Nonetheless, in
13 reading about the harmful effects of those in IARC
14 reports, they have a role in carcinogenesis.  I just
15 have seen less detailed mechanistic evidence related to
16 those.
17     Q   Can you quantify the role of asbestiform talc
18 and asbestos in talcum powder use causing ovarian
19 cancer?
20         MS. O'DELL:  Object to the form.
21         You may answer.
22         THE WITNESS:  I believe strongly that those
23 ingredients in talcum powder products causes the ovarian
24 cancer.
25         MR. HEGARTY:  When I say "quantify," let me be

Page 85

1 more clear.
2      Q   Are you able to assign a percentage of their
3 contribution or other -- in other- -- or otherwise
4 quantify in some numerical fashion the extent of their
5 contribution as it relates to -- as compared to platy
6 talc versus heavy -- heavy metals, fragrances and
7 everything else in -- as alleged in -- as is in talcum
8 powder?
9      A   The epidemiology describes the exposure.
10 That's the -- that's the cause of avagia [phonetic].  In
11 terms of guessing which of the components numerically, I
12 think it's mostly the asbestos and the asbestiform talc,
13 but I don't have a way to attach a numerical number
14 there.
15     Q   Have you developed any new or additional
16 expertise on asbestos and ovarian cancer since your
17 October 2021 deposition?
18     A   I've read a lot more papers since then about
19 the few lines of evidence that I think are important,
20 the mechanism, both basic science and different sort of
21 cellular studies that have shown the impact of asbestos
22 and talc and on ovarian cell lines and ovarian cancer.
23 So I've read a number of papers about that that I cite
24 in this report.
25         And then I've seen a good amount of testing

22 (Pages 82 - 85)

Page 150

1  Q   This falls into category two, correct?
2  A   I'm going to trust you, but it sounds about
3 right. I --
4      MS. O'DELL: Easy --
5 BY MR. HEGARTY:
6  Q   It requires an annual report, right?
7  A   It's definitely an annual report.
8  Q   In each of the years you've served as an
9 expert witness for Plaintiffs in this litigation, have
10 you filled out an annual report disclosing that work?
11  A   I have.
12  Q   And have you provided all the information that
13 was requested in that report?
14  A   It's -- the reports at the University of
15 California are very explicit. I have to give an amount
16 of money for what work, any paid travel, all of that.
17 That's been disclosed every year.
18  Q   And do you still have copies of those forms
19 that you submitted as part of that policy?
20  A   They're kept as a running total. So I don't
21 possess them, but they're online, and I can go through
22 the 50-such reports I filed over the last ten years.
23      MR. HEGARTY: And we will follow up, and we'll
24 make a request for those documents. You don't have to
25 decide about it now, but I'm just giving you a heads-up.

Page 151

1      MS. O'DELL: Yeah. And we'll just tell you
2 we'll object, and we'll talk about it later.
3      MR. HEGARTY: Okay. I'll make a request, but
4 we'll follow up.
5  Q   If you would turn, next, over to page 35 of
6 your report.
7      You revised the dose response section between
8 this report and your prior report.
9      Do you stand behind the statement you
10 previously made in the -- in your reports about dose
11 response?
12  A   Can you be more explicit about what -- what
13 statements? I'm guessing I stand by it, but I don't
14 know what statements.
15  Q   Well, let me just ask it separately.
16      With regard to your prior statements as it
17 relates to dose response in your initial report and your
18 first amended report, do you stand by those statements?
19  A   I'd have to see what those statements were.
20      MS. O'DELL: Can I just make an objection.
21      Objection to the form to the degree it's vague
22 and it's calling her to make detailed analysis of
23 something that's not in front of her.
24      But to the degree you remember and can
25 respond, please do so.

Page 152

1      THE WITNESS: I mean, I remember wanting to go
2 through the individual studies in more detail this time,
3 but I don't remember what -- what led me to want to do
4 that. I don't remember what the report said before.
5 BY MR. HEGARTY:
6  Q   Well, with regard to the statements you made
7 in your prior reports, is there any uncertainty that you
8 would stand behind those statements still here today?
9  A   I don't know what those statements are. If --
10 if there was an error that I cited one study as showing
11 a dose report and it didn't and I corrected it in this
12 report, then I would stand by this report and
13 acknowledge I made a mistake.
14      If I said something in the prior report that
15 was important to know how I changed my view, I'd need to
16 know what it was to know how I changed it. I don't
17 remember a meaningful change in my position on dose
18 report [sic].
19  Q   The -- the Woolen 2022 paper did not look at
20 dose response, correct?
21  A   I think, taken into context, the Woolen
22 contributes a great deal to dose response. So if you --
23 if you look at the other systematic reviews, like Taher
24 and Penninkilampi that looked at any exposure, there are
25 several systematic reviews, and they have point

Page 153

1 estimates of 1.28 to 1.35 with any use, and then Woolen
2 shows multiple, and the point estimate is higher, 1.47.
3 I think that shows strong evidence of dose response even
4 though within the paper itself it didn't evaluate the
5 dose response.
6      MR. HEGARTY: The next paper I want to mark as
7 an exhibit is a paper you referenced that you had read
8 earlier or that your counsel had referenced that you
9 read earlier, a 2024 paper by Chang. This is going to
10 be marked as an exhibit.
11      MS. O'DELL: Make sure it's in your binder.
12      THE WITNESS: Is that the one?
13      MS. O'DELL: It could be. I'm not sure.
14      MR. HEGARTY: That is Exhibit, what, 13?
15      MS. FLAGEOLLET: Yeah.
16      (Exhibit 13 was marked for identification by
17 the court reporter.)
18 BY MR. HEGARTY:
19  Q   Do you have any comments with respect to this
20 paper that you would add to your November 2023 report?
21      MS. O'DELL: Object to the form in the sense
22 that she didn't comment on it in her November 2023
23 report. So you -- I'm not sure what you're asking her.
24 BY MR. HEGARTY:
25  Q   Did you understand my question?

39 (Pages 150 - 153)

Page 174

1      MR. HEGARTY:  We have also -- you also
2  provided to you [sic] notes in a red book that you've
3  shown me, and we're going to designate those notes that
4  were created October 2021 as it relates to your --
5  your work in the talcum powder litigation as Exhibit No.
6  21.
7      (Exhibit 21 was marked for identification by
8      the court reporter.)
9      MR. HEGARTY:  And we'll not go ahead and mark
10  those now, but we'll designate those and copy those as
11  an exhibit to the transcript.
12      MS. O'DELL:  So we'll get those scanned and
13  provide them to the court reporter.
14  BY MR. HEGARTY:
15      Q   You mentioned that you have looked at -- or
16  looked at or received additional reports from other
17  experts since your October 2021 deposition.
18      Have you had any communication with any expert
19  that you understood or understand is an expert for
20  Plaintiffs in the MDL litigation since October 2021?
21      A   I have not.
22      Q   You brought with you three notebooks, or is it
23  two notebooks?
24      A   Three.
25      Q   Three notebooks.  I will designate those

Page 175

1  notebooks as Exhibit 22.  And we'll make arrangements to
2  copy those, and those notebooks are a literature
3  notebook, a -- a report and testimony notebook.  And
4  remind me what the third notebook is.
5      A   And my -- my own depositions.
6      Q   Your own depositions.  Thank you.
7      Let's go off the record real quick.
8      (Discussion Off the Record.)
9      (Exhibit 22, Exhibit 23, and Exhibit 24 were
10      marked for identification by the court
11      reporter.)
12      MR. HEGARTY:  We can go back on the record.
13      The next documents I've marked as Exhibits
14  23 and 24 are additional documents produced since
15  October 2021.  And those are reviewer comments from the
16  Annals of Internal Medicine and then the February 15,
17  2021, letter to Dr. Woolen from Dr. Chang regarding the
18  acceptance of your paper.
19  THE WITNESS:  Yep.
20      MS. O'DELL:  Give me just a second.
21      MR. HEGARTY:  Let's go ahead and go off the
22  record.
23      (Discussion Off the Record.)
24      MR. HEGARTY:  Okay.  Let's go back on the
25  record.

Page 176

1      Q   First, looking at Exhibit 2023 -- I'm sorry --
2  Exhibit 23, these are comments you received as part of
3  the rejection by the Annals of Internal Medicine,
4  correct?
5      A   They're definitely -- they're definitely
6  comments.  I think if they were together with this
7  cover, then they're -- then they're -- then they're
8  those comments from Annals of Internal Medicine.
9      Q   This is a document you've seen before?
10      A   I've seen this document, but I've just
11  realized that -- did these two documents come together?
12      Q   No.  They are separate documents.  They are
13  not related.
14      A   Okay.  I think they are Annals of Internal
15  Medicine comments, but ...
16      Q   This was part -- this -- these were received
17  as part of the -- that journal rejecting your Woolen
18  2022 paper?
19      A   I think that's what you asked for, yes.
20      Q   And it specifically refers in this -- these
21  comments to lines -- and did you receive a lined
22  manuscript in conn-- -- in addition to these comments?
23      MS. O'DELL:  Objection to the form.
24      THE WITNESS:  I don't believe I did.  I think
25  I got these comments through Dr. Woolen forwarding me

Page 177

1  the comments, but not the actual document.
2  BY MR. HEGARTY:
3      Q   Looking at the first comment, lines 132 to
4  137, second line, it says (as read):  "It's unclear
5  whether studies that examined talcum powder applications
6  from both the perineum and 'other' sites/used were
7  excluded [sic] or excluded."
8      What's the answer to that?
9      A   So in the paper, we extracted information that
10  described perineal exposure, ignoring the other site.
11  So we didn't extract information for underarm exposure,
12  but if it was any genital exposure, that's what we took,
13  ignoring the other exposures.
14      Q   The next paragraph below says (as read):
15  "They defined genital use as 'including on underwear or
16  sanitary napkins'" -- this is in reference to the
17  Schildkraut study.
18      A   Yes.
19      Q   -- "'or on birth control devices like
20  diaphragms,' which was apparently excluded from this
21  analy- -- meta-analysis."
22      Is that correct?
23      A   We excluded exposures that were only
24  diaphragmatic exposure, as opposed to if there was
25  genital exposure that also had other exposures, we kept

45 (Pages 174 - 177)

Page 178

1 them in with the understanding that there were a small
2 percent of patients who may have had just sanitary
3 napkin exposure, but if it was just diaphragm, we didn't
4 include it. If it was perineal exposure plus the
5 Schildkraut included these other exposures, they were
6 included.
7     Q    Looking at paragraph 3, lines 163 to 164, I
8 believe you answered this earlier, that the reference
9 group was nonusers of talcum powder, correct?
10    A    As line 163 to 164?
11    Q    Yes.
12    A    Yes.
13    Q    Line four -- or paragraph 4 says (as read):
14 "Since the OR and RR are equal only when there is no
15 effect, is it appropriate to combine them?"
16        Is that -- is it appropriate to combine them?
17    A    I mean, this question is: How can you compare
18 case control studies and cohort studies?
19        And yes, I think it's appropriate to combine
20 them.
21    Q    Looking at paragraph 5, it purported to
22 identify an error where the number of women reported
23 with ovarian cancer was 2,000 -- 204,377.
24        Was that correct?
25    A    They're -- they're saying that an earlier

Page 179

1 draft we listed the number of person years of follow-up,
2 which is the number of people times the number of years
3 as subjects, and that's wildly off, yes. I don't see
4 that draft in any other paper, but this was an obvious
5 error.
6     Q    Turning to the next page --
7     A    In the -- in our old draft, not in the -- not
8 in the published manuscript.
9     Q    Turn to the next page, paragraph 7, lines 260
10 to 262. It says (as read): "Differential recall by
11 cases versus controls is an important concern in
12 case-control studies."
13        Do you agree with that statement?
14    A    I think it's a -- it's an important potential
15 control -- a -- an important potential concern.
16    Q    And do you see where they raise the issue of
17 including -- or any reference -- let me start over
18 again.
19        It goes on to say (as read): "Do you have any
20 references to support your claim that recall bias is
21 unlikely to have made much of an effect on the studies
22 included in this meta-analysis?"
23        Did you put such -- any such reference in the
24 paper itself?
25    A    We did, and we explained why we didn't think

Page 180

1 it was an important bias.
2     Q    Looking down under reviewer No. 2's comments,
3 it -- in particular the paragraph that reads -- that
4 starts: "Misclassification of talc."
5     A    Yes.
6     Q    It says (as read): "Misclassification of talc
7 as an IARC Group 1 carcinogen." Then it refers to lines
8 92 and 94. It goes on to say (as read): "Talc-based
9 body power -- based body powder (perineal use of) should
10 be classified -- should be correctly classified as
11 'possibly carcinogenic to humans (carcinogen group 2B)',
12 as per -- per IARC."
13        Is that correct?
14    A    That's a very incorrect statement, but one
15 that others have shared. IARC considers talc-based
16 products that have asbestiform talc as being a group 1
17 carcinogen.
18    Q    The next line reads: "According to the IARC
19 asbestos and talc containing asbestiform fibers are
20 classified as group 1 carcinogens, but perineal --
21 perineal use of talc-based" body "powder is not."
22        Do you agree with that statement?
23    A    I strongly disagree with that statement.
24    Q    For reasons you've told me about already?
25    A    Yes.

Page 181

1     Q    The next paragraph says: "In the Results and
2 Discussion, an explanation for the exclusion of duration
3 and cumulative talc exposure should be included."
4        Did you provide an explanation in your Woolen
5 2022 paper?
6     A    We did not. This is saying you should have
7 done a different topic, and that's not something usually
8 included in a paper that -- why we chose not to do a
9 different topic.
10    Q    The next paragraph says that at least the
11 draft they read states (as read): "Recall bias on these
12 studies is unlikely to be meaningful given publicity
13 related to talc did not exist at the time these studies
14 was completed."
15        Recall bias is not dependent upon publicity of
16 an exposure versus an outcome, correct?
17    A    I would disagree with that. There's -- you
18 only misremember something if you think it's important.
19 So you misremember your smoking if you have lung cancer
20 because you know how important it is. But there's no
21 reason to misremember something that has no material
22 difference. So I think it's -- I think the publicity
23 would be a potential reason to misremember, where you
24 know that's supposed to be harmful, and so you are more
25 likely to remember that if you have the disease.

46 (Pages 178 - 181)

Page 182

1    Q    Asking in a different way, though: Recall
2 bias isn't just exclusive to those exposures that have
3 been publicized, correct?
4    A    I think the issue with recall bias is a
5 differential remembering between cases and not cases.
6        So if you're saying that everyone misremembers
7 all the time, that is true. But if it's a differential
8 misremembering, that's important to the study, and so
9 the differential misremembering would be related to an
10 exposure or a beneficial exposure that you want to
11 remember. Like mammography, if you have breast cancer,
12 there's very differential remembering because women
13 attribute a -- a importance to that. If there's nothing
14 important about it, then there's misremembering equally
15 in the cases and control.
16    Q    Did you make any revisions to your manuscript
17 based on the reviewer comments that we marked as Exhibit
18 23?
19    A    Extensively.
20    Q    Looking at Exhibit No. 24 --
21    A    Twenty-four.
22    Q    -- that is the acceptance of your paper.
23        Did you subsequently receive galley sheets?
24        There's also a reference to -- in the second
25 paragraph of the email, to receiving a line numbered

Page 183

1 version of your manuscript attached thereto.
2        Do you have any of those kinds of documents?
3    A    No, this -- I forwarded this. This was from
4 Dr. Woolen, so he would have those.
5    Q    Thank you.
6        MS. O'DELL: And this was Exhibit -- what
7 number was the exhibit? Because --
8        THE WITNESS: Actually, it's not numbered.
9        MR. HEGARTY: I thought it was -- I thought we
10 put 24 on it.
11        THE WITNESS: I think I have this, but I don't
12 have a number on it.
13        MR. HEGARTY: I think, yeah, the exhibit
14 number is there.
15        THE WITNESS: Did I lose the exhibit number?
16        MS. FLAGEOLLET: It should be 24.
17        THE WITNESS: Oh, there it is. I'm sorry.
18        MS. O'DELL: Actually, Exhibit 24 is a
19 February 15th, 2021, email.
20        MR. HEGARTY: Right. That's what I was
21 talking about. And 23 was the Annals of Internal
22 Medicine comments.
23        MS. O'DELL: Okay. So you have not marked
24 that? Okay. Excuse me.
25        MR. HEGARTY: Which one have I not marked?

Page 184

1        Yeah, that should be 24, and this is 23.
2        Which -- which one have I not marked?
3        THE WITNESS: I was responding to a different
4 one.
5        MR. HEGARTY: Oh, let me see that.
6        Okay. Let's go ahead and mark this one as the
7 next exhibit, Exhibit 25.
8        (Exhibit 25 was marked for identification by
9        the court reporter.)
10 BY MR. HEGARTY:
11    Q    Can you tell me what Exhibit 25 is?
12    A    Twenty-five is what you were just asking
13 about. That's the acceptance.
14    Q    But in terms of the Exhibit 24, there is a
15 reference in it to saying a copy of the line-numbered
16 version of the manuscript is attached hereto, and that's
17 what I asked you about before.
18    A    Okay.
19    Q    Did you ever receive that?
20    A    I did not.
21    Q    Did you ever see any galley sheets?
22    A    No.
23    Q    Can I have that one back real quick?
24    A    Yeah, this one is marked 25.
25        MR. HEGARTY: Let's go ahead and go off the

Page 185

1 record.
2        (Discussion Off the Record.)
3        MR. HEGARTY: Okay. We are back on the
4 record.
5        I want to start by looking back at Exhibit No.
6 24. I think I misidentified what that was based on my
7 questions.
8    Q    Exhibit 24 is a copy of an email to Dr. Woolen
9 from Ms. Chang where the Annals of Internal Medicine are
10 rejecting publication of the -- what became the Woolen
11 2022 paper, correct?
12    A    Mm-hmm.
13    Q    "Yes"?
14    A    Yes.
15    Q    And this is the email that forwarded the
16 reviewer comments that we talked about earlier, correct?
17    A    Yes.
18    Q    Did you consider resubmitting your paper to
19 the Annals of Internal Medicine after the revisions --
20 after revisions were made?
21    A    As opposed to taking their referral?
22    Q    Yes.
23    A    Again, I'm -- I'm trying to remember what
24 happened, but in general, this letter doesn't say they
25 didn't take it because of the flaws. They didn't take

47 (Pages 182 - 185)

Page 186

1 it because it's less likely to influence clinical
2 practice, and so that letter wouldn't suggest that
3 fixing whatever flaws they identified would lead to it
4 having a better chance to change practice, so I --
5 reading this letter, we would not have resubmitted it.
6    Q   Okay.  Thank you.
7       Since October of 2021, your last deposition,
8 have you told any patient of yours that -- with ovarian
9 cancer that it was caused by use of talcum powder?
10   A   No.
11   Q   Since October of 2021, have you determined
12 that any patient's ovarian cancer was caused by either
13 use of talcum powder or exposure to asbestos?
14   A   No.
15   Q   Since October of 2021, have you told anyone to
16 stop using talcum powder?
17   A   Yes.
18   Q   Who have you told?
19   A   I tell friends all the time not to use talcum
20 powder, particularly friends who have grandchildren.
21   Q   Since October of 2021, have you communicated
22 with any scientific or medical organization with regard
23 to your opinions in this litigation?
24   A   I have not.
25   Q   In particular, have you communicated with FDA

Page 187

1 or any other regulatory authority since October of 2021?
2    A   I have not.
3    Q   Have you communicated with any medical society
4 or organization about your opinions in this case since
5 October of 2021?
6    A   I have not.
7    Q   Since October of 2021, have you become aware
8 of any US scientific or medical group, entity,
9 organization who has made the statement that talc use
10 can cause ovarian cancer?
11      MS. O'DELL:  Object to the form.  Vague.
12      THE WITNESS:  So you're excluding the
13 Canadian --
14      MR. HEGARTY:  Correct.
15      THE WITNESS:  -- report?
16 BY MR. HEGARTY:
17   Q   I'm talking exclusively as to the United
18 States.
19   A   The NCI has a statement, I believe, on talcum
20 powder and ovarian cancer.
21   Q   My question was specifically whether -- that
22 you're aware of any US scientific or medical group has
23 made the statement that talcum powder use can cause
24 ovarian cancer.
25   A   I believe the NCI has made that statement.

Page 188

1    Q   Where has the NCI made that statement?
2    A   I can see if I can find it for you, but they
3 have a statement online that I think describes that.
4    Q   A statement online under what section of the
5 website or what part of the website?
6    A   I -- I can't remember exactly where I would
7 have found that.
8    Q   You said you could find it for me.
9       What would you [sic] take to find it?
10   A   I can look in my documents.
11      MR. HEGARTY:  Okay.  Let's go ahead and go off
12 the record.
13      (Discussion Off the Record.)
14      MR. HEGARTY:  Okay.  We can go back on the
15 record.
16      We took a short break for Dr. Smith-Bindman to
17 find the statement she was thinking about as it relates
18 to NCI and whether talcum powder use can cause ovarian
19 cancer.
20   Q   In looking at your materials, what did you
21 find, Dr. Smith-Bindman?
22   A   It said asbestos causes ovarian cancer.
23   Q   Going back to my question:  Are you aware of
24 any scientific or medical group in the United States,
25 since your last deposition, who has made the statement

Page 189

1 that talc use can cause ovarian cancer?
2    A   No.
3    Q   Are you aware of anyone as of today, March 20,
4 2024, outside of witnesses hired by the plaintiffs in
5 this litigation, who has stated that talc use can cause
6 ovarian cancer?
7    A   I'm not sure I -- is that also in the United
8 States?
9    Q   No, it's worldwide.
10   A   So, I mean, I think IARC states that the use
11 of talcum powder can cause ovarian cancer.
12   Q   How about we limit it to an individual, not an
13 entity?
14   A   I think a lot of the mechanistic studies that
15 are shown on a cellular level get changes suggest that
16 talcum powder can cause ovarian cancer and this is a
17 mechanism by doing so.
18   Q   My question, though, is:  As to individuals
19 who have made statements, are you aware of any
20 individuals who have made statements outside of experts
21 for Plaintiffs in this litigation?
22   A   And outside of publications?
23   Q   Outside of publications.
24   A   So public statements.
25      No, I don't -- I'm not sure of something that

48 (Pages 186 - 189)

Page 194

1    A   Wait. Wait. Wait. The carryover.
2    Q   The carryover paragraph.
3    A   Top right?
4    Q   In the top right corner on page 383.
5        Are you there with me?
6    A   I am.
7    Q   Right up here (indicating).
8    A   "However, it is unclear"?  That sentence?
9    Q   Well, I'm not at the sentence yet.  I want to
10 make sure we're -- you're focusing on the --
11   A   They're not systematically different.
12   Q   Okay.  The sentence reads:  "The observed
13 increase" --
14       Do you see where I'm reading?
15   A   Yes.  Next sentence, yeah.
16   Q   (As read):  "The observed increase in
17 self-reported genital talc use and follow-up" -- which
18 is just what we talked about -- "relative to enrollment
19 among ovarian cancer survivors may indicate recall bias
20 is present and potentially driving some of the
21 previously observed differences in effect estimates
22 between" the "studies collecting genital powder exposure
23 status retrospectively versus prospectively."
24       Did I read that correctly?
25   A   You did.

Page 195

1    Q   Do you agree with that statement?
2    A   I would not agree that -- that -- they're
3  making a very large conclusion about a small difference.
4    Q   Do you actually -- is it -- strike that.
5        Is it your opinion that this paper actually
6  supports your opinions in this case?
7    A   I do.
8    Q   And how does it support your opinions in this
9  case?
10   A   It suggests that there's consistency in
11 reporting of talc use.  Even though it's an imperfect
12 agreement, which is what you're pointing out, it's very
13 good agreement.
14   Q   You can set that aside.
15       If you could take -- find your Woolen paper,
16 which I think is Exhibit 1 or 2.
17       Do you know what exhibit the Woolen paper is?
18       MS. O'DELL:  I don't.  She has her version in
19 front of her.
20       THE WITNESS:  Yes.
21       MS. FLAGEOLLET:  Three.
22 BY MR. HEGARTY:
23   Q   Turn over to the page that has "Strengths and
24 Limitations."  It's --
25   A   Yep.  I'm there.

Page 196

1    Q   You make reference in the left-hand column to
2  the -- O'Brien's reporting of women with patent tube
3  [sic] versus unpatent tubes.
4        Do you see that in the --
5    A   In the "Strengths and Limitations"?
6    Q   No, in the section on the other side that
7  begins "The pooled odd [sic] ratio."
8    A   Yes.
9    Q   And there --
10   A   Yes.
11   Q   -- you refer to the differences between the
12 patent and the nonpatent findings, correct?
13   A   Yes.
14   Q   You've seen, before, an editorial by Gossett
15 as it relates to this article, correct?
16   A   Yes.
17       MR. HEGARTY:  I'm going to show you that
18 editorial that I'll mark as Exhibit 27.
19       (Exhibit 27 was marked for identification by
20       the court reporter.)
21       MS. O'DELL:  Yeah, this has been marked
22 before, Mark.
23       MR. HEGARTY:  Oh, I understand, but this is
24 now in reference to the statements made in this article.
25       MS. O'DELL:  But you're going to ask her about

Page 197

1  this article.
2        MR. HEGARTY:  Well, I'm just going to ask
3  her -- you probably want me to use my time on something
4  that's already been covered, so you should be happy with
5  it.
6    Q   If you turn over to the second page, the
7  left-hand column --
8        MS. O'DELL:  You got four minutes, so knock
9  yourself out.
10       MR. HEGARTY:  I'm not sure about that part.
11 I've got -- I think I've got about six, but --
12   Q   Dr. Gossett -- by the way, do you know her?
13   A   I do know her.
14   Q   She makes a statement, in essence, that
15 because there's -- that the P value for heterogeneity
16 comparing these groups is 1.5.  Statistically, they're
17 no different.
18       Isn't that what she's saying in this
19 editorial?
20       MS. O'DELL:  Are you -- are you pointing her
21 to a specific page?
22       MR. HEGARTY:  Yeah, I'm pointing her to the
23 second page over in the left-hand column, the line that
24 reads (as read):  "The fact that there are no
25 significant differences in the HRs in the patent and

50 (Pages 194 - 197)

Page 206

1    A   Yes, you did.
2    Q   And, in fact, is that what you include in your
3 report?
4    A   Yes.
5    Q   And you were asked a number of questions about
6 this cell study, the Mandarino study, as well as Emi and
7 others.
8        As you've reviewed these cell studies that
9 have considered the effect of talc on different cells
10 and different cell lines, has the data been
11 consistent -- generally consistent across studies?
12    A   Yeah.
13       MR. HEGARTY:  Objection to the form.
14       THE WITNESS:  Yes, it has.
15 BY MS. O'DELL:
16    Q   I want to ask you to recall the series of
17 questions that were posed by counsel regarding testing
18 of talcum powder products in 2022.
19    A   Yes.
20    Q   Do you recall that?
21    A   I do.
22    Q   And maybe 2021 as -- as well.
23       If -- if -- do you have any understanding of
24 whether those tests included Johnson's Baby Powder?
25    A   I believe I was asked about tests that were

Page 207

1 more cosmetic in general that could have talcum powder
2 rather than the specific testing that I think I was
3 referring to, which is from a decade earlier.
4    Q   And if the testing that was done in 2022 by
5 the FDA was testing of cosmetics like eye shadow and
6 other cosmetics not including Johnson's Baby Powder or
7 Shower to Shower, would that have limited relevance to
8 your opinions in this case?
9       MR. HEGARTY:  Objection to the form.
10       THE WITNESS:  It's unrelated to the case.
11 BY MS. O'DELL:
12    Q   Let me ask if you would take out your paper --
13 the Woolen paper, which was previously marked, I
14 believe, as Exhibit 3.  And -- and then, also, we -- in
15 relation -- so you can compare them, we had a discussion
16 about the Harlow 1992 paper.
17       Do you recall that?
18    A   I do.
19    Q   And -- and to my memory, the Harlow paper was
20 not marked; you just referred to it.
21    A   Yes.
22    Q   And so if you'll turn in the Woolen paper,
23 Exhibit 3, to Table 2.
24       MR. HEGARTY:  Can you give me just a second,
25 Leigh?  I don't need to go off the record.  I just need

Page 208

1 to find my copy of it.  For some reason, it's hiding
2 from me.  Okay.  I found it.  Go ahead.
3 BY MS. O'DELL:
4    Q   And -- and you were --
5       MR. HEGARTY:  What page again?  I'm sorry.
6       MS. O'DELL:  We were -- in Woolen, we were on
7 Table 2.
8       MR. HEGARTY:  Okay.  Thank you.
9 BY MS. O'DELL:
10    Q   And specifically, I want to direct your
11 attention to line 5 --
12    A   Yes.
13    Q   -- and -- which is the Harlow 1992 --
14    A   Yes.
15    Q   -- paper.
16       And you were asked a series of questions about
17 the data that was extracted from the Harlow paper, and,
18 if I recall, you, in response to questions, told counsel
19 that the data that was extracted was from Harlow Table
20 2.
21       MR. HEGARTY:  Object to form.
22       THE WITNESS:  Yes.
23 BY MS. O'DELL:
24    Q   And -- and -- and so, Doctor, I want to just
25 ask you, first:  Was the data that was included in the

Page 209

1 Woolen study from the Harlow paper correct?
2    A   Yes, it was.
3    Q   And was the data that was extracted from the
4 Harlow paper that was included to generate the point
5 estimate that you report in the paper -- was that
6 accurate?
7    A   Yes --
8       MR. HEGARTY:  Objection.
9       THE WITNESS:  -- that's correct.
10 BY MS. O'DELL:
11    Q   And you -- you mentioned that, you know, it's
12 referred to in Table 2 of Woolen the Harlow
13 specification of talc exposure use is -- is referenced
14 as greater-than-10,000-lifetime applications.
15    A   It does say that in the table.
16    Q   And -- and is that some- -- is that something
17 you would change or leave as-is?
18       MR. HEGARTY:  Objection to the form.
19       THE WITNESS:  The data that were extracted
20 from the paper reflect greater-than-30-times-a-week
21 exposure, and it's characterized as
22 greater-than-10,000-lifetime exposures, but I'd prefer
23 it said greater than 30 times per month because that's
24 what we actually extracted, but the description of it is
25 -- is inaccurate.  The abstracted data is completely

53 (Pages 206 - 209)

Page 210

1  accurate.
2  BY MS. O'DELL:
3      Q    And do you stand by the -- a hundred percent
4  the results that are reported in the Woolen paper?
5      A    Absolutely.
6          Can I just add:  The point estimates are the
7  same for greater-than-10,000 exposures or greater than
8  30 times a month, and so when we were checking the
9  numbers, I think it was an oversight that we described
10 it as greater than 10,000 when, in fact, it was the
11 exact number greater than 30 times per month.
12     Q    And when you said --
13         THE REPORTER:  I'm sorry.  You trailed off.
14         THE WITNESS:  The numbers that were extracted
15 are correct.  The point estimate is the same for greater
16 than 10,000 or greater than 30 times per month, and the
17 description in Table 2 says greater-than-10,000-lifetime
18 exposures, but, indeed, reflects greater than 30 times
19 per month.  You get the same point estimate, but the
20 data we abstracted were greater than 30 times per month.
21 BY MS. O'DELL:
22     Q    You were asked a number of -- still on Woolen.
23 You were asked a number of studies -- "studies."  Excuse
24 me -- a number of questions about the studies that
25 adjusted for patent versus nonpatent --

Page 211

1      A    Yes.
2      Q    -- but didn't report separate data for both
3  patent and women with nonpatent --
4      A    Yes.
5      Q    -- tubes.
6          And if, in fact, some of the women that were
7  included in the study -- studies had had hysterectomy or
8  had had tuballigation, cutting off the flow or exposure
9  of talcum powder applied perineally to the ovaries,
10 would that, in fact, have depressed the point estimate
11 for those individual studies?
12         MR. HEGARTY:  Objection to the form.
13         THE WITNESS:  The point estimates would be
14 even higher and further from the null if they were
15 limited to women who had patent tubes.
16 BY MS. O'DELL:
17     Q    And so to the degree that counsel for Johnson
18 & Johnson has tried to draw a distinction, is that a
19 distinction, in your mind, that's meaningful?
20         MR. HEGARTY:  Objection to the form.
21         THE WITNESS:  I think had we had data to limit
22 to women with open tubes based on the study results that
23 almost uniformly showed the results were higher, there
24 was a greater chance of cancer in women who had open
25 tubes.  Had we been able to extract that data from each

Page 212

1  study, the point estimate would clearly be higher than
2  we found.
3          MS. O'DELL:  I have nothing further.  Thank
4  you, Doctor.
5          I should ask --
6          MR. HEGARTY:  Thank you.  I'll just state on
7  the record:  We have some materials that need to be
8  copied and then provided as exhibits.  That would
9  include the notebook pages, the three pages of notes,
10 and then the notebooks we marked.
11         Leigh, will you take possession of those and
12 make those copies, or do you want to do it in a
13 different way?
14         MS. O'DELL:  I would like to talk to
15 Catherine, our court reporter, about taking possession
16 of the notebooks that will stay here in -- in San
17 Francisco.  I'll take possession of the notes and make
18 sure they're scanned and provided and, of course,
19 returned to you, Dr. Smith-Bindman, but I will take
20 possession of those.
21         MR. HEGARTY:  So you'll make arrangements with
22 the court reporter on how to get the notebooks copied
23 and --
24         THE WITNESS:  The notebooks will stay with the
25 court reporter?

Page 213

1          MR. HEGARTY:  -- included within the -- to the
2  exhibits -- included as an exhibit and then provided to
3  the parties?
4          MS. O'DELL:  Yes.
5          MR. HEGARTY:  Okay.
6          MS. O'DELL:  Yes.  I think -- I guess I want
7  to be clear:  I'm taking responsibility for the notes
8  because some of the notes in Dr. Smith-Bindman's
9  notebooks were not related to talc.  So I want to
10 oversee that process, but we're going to provide the
11 notebooks --
12         MR. HEGARTY:  Okay.
13         MS. O'DELL:  -- to Golkow and the court
14 reporting service and let them handle --
15         MR. HEGARTY:  Okay.
16         MS. O'DELL:  -- all of the details on that.
17 Thank you very much.
18         MR. HEGARTY:  All right.  I don't think I have
19 anything else.  Thank you.
20         MS. O'DELL:  We're off the record.
21         (TIME NOTED:  2:25 p.m.)
22
23
24
25

54 (Pages 210 - 213)