Exhibit 21

1          SUPERIOR COURT OF THE STATE OF CALIFORNIA

2                    COUNTY OF ALAMEDA

3             BEFORE THE HONORABLE FRANK ROESCH

4                      DEPARTMENT 17

5                        ---oOo---

6    PATRICIA SCHMITZ,

7          Plaintiff,

8    vs.                          No. RG18923615

9    JOHNSON & JOHNSON, et
     al.,

10

          Defendants.

11   _____/

12

13           REPORTER'S TRANSCRIPT OF PROCEEDINGS

              (William Longo, Ph.D.)

14

              Tuesday, April 30, 2019

15

                  Full Session

16

17

18

19         Taken before EARLY K. LANGLEY
                 RMR, RSA, B.A.
20               CSR No. 3537

21

22

              **Aiken Welch Court Reporters**

23            **One Kaiser Plaza, Suite 250**
              **Oakland, California 94612**

24            **(510) 451-1580/(877) 451-1580**
                **Fax:  (510) 451-3797**

25              **www.aikenwelch.com**

2

1    APPEARANCES OF COUNSEL ON THE RECORD:

2

3    For the Plaintiff:

4            JOSEPH SATTERLEY
             DENYSE CLANCY
5            Kazan, McClain, Satterley & Greenwood
             55 Harrison Street, Suite 400
6            Oakland, California 94607
             (510) 302-1000
7            Jsatterley@kazanlaw.com
             Dclancy@kazanlaw.com
8

9    For the Defendant Colgate-Palmolive Corp.:

10           GARY D. SHARP
             ANDREW SHARP
11           Foley & Mansfield
             2185 N. California Blvd., Suite 575
12           Walnut Creek, California 94596
             (510) 590-9500
13           Gsharp@foleymansfield.com
             Asharp@foleymansfield.com
14

15           PETER M. MULARCZYK
             Foley & Mansfield
16           300 South Grand Avenue, Suite 2800
             Los Angeles, California 90071
17           (213) 283-2100
             Pmularczyk@foleymansfield.com
18

19

20

21

22

23

24

25

3

For the Defendants Johnson & Johnson and Johnson &
Johnson Consumer Inc.:

        ALEXANDER G. CALFO
        King & Spalding LLP
        633 West 5th Street Suite 1700
        Los Angeles, California 90071
        (213) 443-4355
        Acalfo@kslaw.com

        CORI C. STEINMANN
        King & Spalding LLP
        500 West 2nd Street, Suite 1800
        Austin, Texas 78701
        (512) 457-2000
        Csteinmann@kslaw.com

        MICHAEL BATTLE
        Barnes & Thornburg LLP
        1717 Pennsylvania Ave., Suite 500
        Washington, D.C. 20006
        (202) 289-1313
        Michael.battle@btlaw.com

4

1                    INDEX - (Pages 1-331)

2                         SESSIONS

3    DATE                                              PAGE

4    Tuesday, April 30, 2019

5    **Morning Session**                                  23
     **Afternoon Session**                               167
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5

1                    INDEX - (Pages 1-331)

2                  INDEX OF EXAMINATIONS

3                      CHRONOLOGICAL

4

5   WILLIAM LONGO, Ph.D. (for the Plaintiff)
          Direct Examination By Mr. Satterley        62
6         Cross-Examination By Mr. Calfo            260

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

6

1                    INDEX - (Pages 1-331)

2                  INDEX OF EXAMINATIONS

3                         ALPHA

4     WITNESSES:                                    PAGE

5

      WILLIAM LONGO, Ph.D. (for the Plaintiff)
6          Direct Examination By Mr. Satterley        62
           Cross-Examination By Mr. Calfo            260
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

7

1                     INDEX - (Pages 1-331)

2
                         INDEX OF EXHIBITS
3

4
    PLAINTIFF'S                                ID    EV    WD
5
    3571    3571                                     27
6           Document entitled Colgate's
            Talc Powder, Ex. 4
7           Deposition of Diana Scala
            in Dannielle
8           Ann Polakow v. Brenntag
            North America, Inc. LACSC
9           Case No. BC599544

10  3572    3572                                     27
            Document entitled
11          Technology Information
            Center Colgate-Palmolive
12          Company, Ex. 5
            Deposition of Diana Scala
13          in Dannielle Ann Polakow v.
            Brenntag North America,
14          Inc.
            LACSC Case No. BC599545
15
    3583    3583                                     27
16          Membership List of the CTFA
            Talk Subcommittee, Ex. 16
17          Deposition of Diana Scala
            in
18          Dannielle Ann Polakow v.
            Brenntag North America,
19          Inc. LACSC Case No.
            BC599556
20
    3584    3584                                     27
21          Letter dated 2-5-74 to
            J.P. Simko from R. Shimps
22          with attachments, Ex. 17
            Deposition
23          of Diana Scala in Dannielle
            Ann Polakow v. Brenntag
24          North America, Inc. LACSC
            Case No.
25          BC599557

8

| | | |
|---|---|---|
| 1 | 3585 | 3585 | 27 |

1  3585    3585                                    27
          Letter dated 11-18-74 to
2         I. Stewart from J.P. Simko
          with attachment, Ex. 18
3         Deposition of Diana Scala
          in Dannielle Ann Polakow v.
4         Brenntag North America,
          Inc.
5         LACSC Case No. BC599558

6  3586    3586                                    27
          Letter dated 12-10-74 to
7         J.P. Simko from G. Grieger
          with attachment Ex. 19
8         Deposition of Diana Scala
          in Dannielle Ann Polakow v.
9         Brenntag North America,
          Inc.
10        LACSC Case No. BC599559

11 3587    3587                                    27
          Meeting Notes of CTFA Talc
12        Subcommittee dated
          12-4-74, Ex. 20
13        Deposition of Diana
          Scala in Dannielle Ann
14        Polakow v. Brenntag North
          America, Inc. LACSC Case
15        No.
          BC599560
16
   3591    3591                                    27
17        Document entitled Amphibole
          Minerals in Cosmetic Talc
18        Part I: X-ray Diffraction
          Method and Part II: Optical
19        Microscopy and
          Dispersion-Staining
20        Method, Ex. 24 Deposition
          of Diana Scala in Dannielle
21        Ann Polakow
          v. Brenntag North America,
22        Inc. LACSC Case No.
          BC599564
23

24

25

9

| | | | |
|---|---|---|---|
| 1 | 3598 | 3598 | 27 |
| 2 | | Talc Subcommittee Minutes on the letterhead of The | |
| 3 | | Cosmetic, Toiletry and Fragrance | |
| 4 | | Association, Inc., Ex. 31 Deposition of Diana Scala | |
| 5 | | in Dannielle Ann Polakow v. Brenntag North America, | |
| 6 | | Inc. LACSC Case No. BC599571 | |
| 7 | 3602 | 3602 | 28 |
| 8 | | Letter dated 8-□6□-76 to J.P. Simko from G. Grieger | |
| 9 | | on the letterhead of Walter C. | |
| 10 | | McCrone Associates with attachments, Ex. 35 | |
| 11 | | Deposition of Diana Scala in Dannielle | |
| 12 | | Ann Polakow v. Brenntag North America, Inc. LACSC | |
| 13 | | Case No. BC599575 | |
| 14 | 3605 | 3605 | 28 |
| 15 | | Letter dated 11□-1□-76 to G. Grieger from J.P. Simko | |
| 16 | | with attachments, Ex. 38 Deposition of Diana Scala | |
| 17 | | in Dannielle Ann Polakow v. Brenntag North America, | |
| 18 | | Inc. LACSC Case No. BC599578 | |
| 19 | 3606 | 3606 | 28 |
| 20 | | Face Sheet entitled Instructions for Keeping | |
| 21 | | Laboratory Notebooks issued to P. Briscese - | |
| 22 | | Book Number dated 3□-10□-76 □ 3□-28□-78, Ex. 39 | |
| 23 | | Deposition of Diana Scala in Dannielle | |
| 24 | | Ann Polakow v. Brenntag North America, Inc. LACSC | |
| 25 | | Case No. BC599579 | |

| | | | |
|---|---|---|---|
| 1 | 3607 | 3607 | 28 |
| 2 | | Minutes from CTFA Task Force on Round Robin | |
| 3 | | Testing of Consumer Talcum Products | |
| 4 | | for Asbestiform Amphibole Minerals dated 5□-17□-77, | |
| 5 | | Ex. 40 Deposition of Diana Scala | |
| 6 | | in Dannielle Ann Polakow v. Brenntag North America, | |
| 7 | | Inc. LACSC Case No. BC599580 | |
| 8 | 3608 | 3608 | 28 |
| 9 | | Letter dated 11□-16□-77 to J.P. Simko from L. McCrone | |
| 10 | | with attachment, Ex. 41 Deposition of Diana Scala | |
| 11 | | in Dannielle Ann Polakow v. Brenntag North America, | |
| 12 | | Inc. LACSC Case No. BC599581 | |
| 13 | 3610 | 3610 | 28 |
| 14 | | Letter dated 11□-16□-77 to J.P. Simko from L. McCrone | |
| 15 | | with attachment, Ex. 43 Deposition of Diana Scala | |
| 16 | | in Dannielle Ann Polakow v. Brenntag North America, | |
| 17 | | Inc. LACSC Case No. BC599583 | |
| 18 | 3611 | 3611 | 28 |
| 19 | | Letter dated 7□-26□-83 to G. Roach from R. Ellis with | |
| 20 | | attachment, Ex. 44 Deposition of | |
| 21 | | Diana Scala in Dannielle Ann Polakow v. Brenntag | |
| 22 | | North America, Inc. LACSC Case No. | |
| 23 | | BC599584 | |
| 24 | | | |
| 25 | | | |

| | | | |
|---|---|---|---|
| 1 | 3612 | 3612 | 28 |
| 2 | | Letter dated 8‐18‐-83 to D. Palenik from J.P. Simko | |
| 3 | | with attachment, Ex. 45 Deposition of Diana Scala | |
| 4 | | in Dannielle Ann Polakow v. Brenntag North America, | |
| 5 | | Inc. LACSC Case No. BC599585 | |
| 6 | 3613 | 3613 | 28 |
| 7 | | Letter dated 10‐27‐-83 to J.P. Simko from D. Palenik | |
| 8 | | with attachment, Ex. 46 Deposition of Diana Scala | |
| 9 | | in Dannielle Ann Polakow v. Brenntag North America, | |
| 10 | | Inc. LACSC Case No. BC599586 | |
| 11 | 3614 | 3614 | 28 |
| 12 | | Letter dated 1‐24‐-84 to D. Palenik from J.P. Simko | |
| 13 | | with attachment, Ex. 47 Deposition | |
| 14 | | of Diana Scala in Dannielle Ann Polakow v. Brenntag | |
| 15 | | North America, Inc. LACSC Case No. | |
| 16 | | BC599587 | |
| 17 | 1065 | 1065 | 36 |
| 18 | | MAS report of November 5, 2018, entitled Verification | |
| 19 | | of the Lee Poye J3‐fs TEM Analysis of J&J's | |
| 20 | | Historical Vermont Talc‐]Containing Shower to | |
| 21 | | Shower Talcum Powder Samples | |
| 22 | 1080 | 1080 | 36 |
| 23 | | MAS Analysis of J&J's Historical Talc Samples | |
| 24 | | from the 1960s, January 2019 | |
| 25 | | | |

| | | | |
|---|---|---|---|
| 1 | 1081 | 1081 | 36 |
| 2 | | MAS Analysis of J&J's Historical Talc Samples | |
| 3 | | from the 1970s, January 2019 | |
| 4 | 1082 | 1082 | 36 |
| 5 | | MAS Analysis of J&J's Historical Talc Samples | |
| 6 | | from the 1980s, January 2019 | |
| 7 | 1083 | 1083 | 36 |
| 8 | | MAS Analysis of J&J's Historical Talc Samples | |
| 9 | | from the 1990s, January 2019 | |
| 10 | 1084 | 1084 | 36 |
| 11 | | MAS Analysis of J&J's Historical Talc Samples | |
| 12 | | from the 2000s, January 2019 | |
| 13 | 1091 | 1091 | 36 |
| 14 | | MAS Cashmere Bouquet App. A | |
| | 1092 | 1092 | 36 |
| 15 | | MAS Cashmere Bouquet App. B | |
| 16 | 1093 | 1093 | 37 |
| 17 | | MAS Cashmere Bouquet App. B+C20 | |
| 18 | 1097 | 1097 | 37 |
| 19 | | MAS Analysis of Cashmere Bouquet Appendix B | |
| 20 | 1098 | 1098 | 37 |
| 21 | | MAS Analysis of Cashmere Bouquet Appendix C | |
| 22 | 1096 | 1096 | 37 |
| 23 | | Provisionally admitted after redaction: 1096 MAS Analysis of Cashmere | |
| 24 | | Bouquet Appendix A | |
| 25 | 1046 | NIST standard | 38 |

13

| 1 | 1047 | Animation of heavy liquid separation | 40 |
| 2 | | | |
| 3 | 1099 | 1990 advertisement in a magazine called *Asbestos Issues*, June of 1990 | 40 |
| 4 | | | |
| 5 | 640 | Telex, Val Chisone to J&J, bates JNJAZ55_000009320 | 52 |
| 6 | 158 | Report by Zeitz entitled "CONFIDENTIAL New Reagent | 52 |
| 7 | | Systems - Plant Trial at Windsor | |
| 8 | | Minerals, Inc.", bates JNJMX68_000004996-000005044 | |
| 9 | | | |
| 10 | 155 | J&J memo from Nashed, Subj: Talc/Asbestos, bates JNJMX68-000004646-000004647 | 52 |
| 11 | | | |
| 12 | 171 | CTFA Task Force on Round Robin Testing of Consumer | 52 |
| 13 | | Talc Products for Asbestiform | |
| 14 | | Amphibole Minerals, bates WCD000164-WCD000166 | |
| 15 | 174 | Letter report from McCrone to Cyprus Windsor with | 52 |
| 16 | | related documents attached, bates | |
| 17 | | JNJMX68_000012851-000012860 | |
| 18 | 430 | 11/20/1989, (Amended 06/05/1991) J&J | 52 |
| 19 | | Authorization for Interim Specification Subj: Cyprus | |
| 20 | | Windsor Minerals Grade 66 Talc, bates | |
| 21 | | JNJMX68_000000439-000000442 | |
| 22 | 660 | Battelle Memorial Institute: □Phase Report on | 52 |
| 23 | | Pilot□]Plant Beneficiation of Italian Run□-of- | |
| 24 | | Mine Talc" to J&J, bates JNJAZ55_000000577□] | |
| 25 | | 000000596 | |

14

| | | | |
|---|---|---|---|
| 1 | 713 | Report by EMV Associates entitled ☐Consultant Report to Johnson & Johnson . 9 Talc Samples☐h, bates JNJMX68_000008981☐] 000009004 | 52 |
| 5 | 752 | J&J Standard Test Method 7024B, Analysis of Powdered Talc for Asbestiform Minerals by Transmission Electron Microscopy, bates JNJNL61_000043150☐] 000043154 | 53 |
| 9 | 172 | J&J Worldwide Specification, "Analysis of Powdered Talc for Asbestiform Minerals by Transmission Electron Microscopy", bates JNJNL61_000005032-000005040 | 53 |
| 13 | 724 | Letter report from McCrone to Windsor Minerals, bates JNJMX68_000012750☐] 000012751 | 55 |
| 16 | 719 | McCrone letter report to Windsor with handwritten note, bates JNJMX68_000013080 | 57 |
| 18 | 726 | Mark Floyd/Forensic Analytical TEM Report on JBP, bates JNJ14T5_000004099☐] 000004100 | 58 |
| 21 | 163 | Report entitled "Meeting with Dr. Langer on July 9 Concerning Analytical Analysis of Talc", bates JNJAZ55_000005743-000005748 | 59 |

15

| | | | |
|---|---|---|---|
| 160 | Letter from Blount to J&J attorneys (Hatcher, Esq.), bates JNJNL61_000052427 | 61 | |
| 3580 | Excerpt from Environment Asbestos: You'll Be All Right If You Just Stop breathing, Ex. 13 Deposition of Diana Scala in Dannielle Ann Polakow v. Brenntag North America, Inc. LACSC Case No. BC599553 | 302 | |
| 3582 | Letter dated 8-3-72 to A. Weissler from S. Lewin with attachments, Ex. 15 Deposition of Diana Scala in Dannielle Ann Polakow v. Brenntag North America, Inc. LACSC Case No. BC599555 | 303 | |
| 3588 | Document from The Cosmetic, Toiletry and Fragrance Association, Inc. Talc Task Force Minutes, Ex. 21 Deposition of Diana Scala in Dannielle Ann Polakow v. Brenntag North America, Inc. LACSC Case No. BC599561 | 309 | |
| 3590 | News Release from the Cosmetic, Toiletry and Fragrance Association dated 3-8-76, Ex. 23 Deposition of Diana Scala in Dannielle Ann Polakow v. Brenntag North America, Inc. LACSC Case No. BC599563 | 309 | |

| | | | |
|---|---|---|---|
| 1 | 3592 | 3592 | 311 |
| 2 | | Paper entitled Consumer Talcums and Powders: Mineral | |
| 3 | | and Chemical Characterization, Ex. 25 | |
| 4 | | Deposition of Diana Scala in Dannielle Ann | |
| 5 | | Polakow v. Brenntag North America, Inc. LACSC Case | |
| 6 | | No. BC599565 | |
| 7 | 3593 | 3593 | 311 |
| 8 | | New York Times Article dated 3-10-76 entitled Asbestos | |
| 9 | | Found in Ten Powders, Ex. 26 Deposition of Diana | |
| 10 | | Scala in Dannielle Ann Polakow v. | |
| 11 | | Brenntag North America, Inc. LACSC Case No. | |
| 12 | | BC599566 | |
| 13 | 3596 | Document from The Cosmetic Toiletry and Fragrance | 318 |
| 14 | | Association Talc Subcommittee 20 | |
| 15 | | Minutes, Ex. 29 Deposition of Diana Scala in Dannielle | |
| 16 | | Ann Polakow v. Brenntag North | |
| 17 | | America, Inc. LACSC Case No. BC599569 | |
| 18 | | | |
| 19 | 3597 | 3597 Letterhead of The Cosmetic Toiletry and Fragrance | 319 |
| 20 | | Association letter dated 3-15-76 to | |
| 21 | | H. Eiermann from N. Estrin with attachments, Ex. 30 | |
| 22 | | Deposition of Diana Scala in | |
| 23 | | Dannielle Ann Polakow v. Brenntag North America, | |
| 24 | | Inc. LACSC Case No. BC599570 | |
| 25 | | | |

| | | |
|---|---|---|
| 3600 | Call Report dated 4-19-76 to Colgate-Palmolive from Cyprus Industrial Minerals Company, Ex. 33 Deposition of Diana Scala in Dannielle Ann Polakow v. Brenntag North America, Inc. LACSC Case No. BC599573 | 325 |
| 3601 | Call Report dated 6-4-76 to Colgate-Palmolive from Cyprus Industrial Minerals Company, Ex. 34 Deposition of Diana Scala in Dannielle Ann Polakow v. Brenntag North America, Inc. LACSC Case No. BC599574 | 325 |
| 3603 | Call Report dated 9-16-76 between Colgate-Palmolive and Cyprus Industrial Minerals Company, Ex. 36 Deposition of Diana Scala in Dannielle Ann Polakow v. Brenntag North America, Inc. LACSC Case No. BC599576 | 325 |
| 3604 | Call Report dated 9-16-76 between Colgate-Palmolive and Cyprus Industrial Minerals Company, Ex. 36 Deposition of Diana Scala in Dannielle Ann Polakow v. Brenntag North America, Inc. LACSC Case No. BC599576 | 325 |
| 4687 | All documents responsive to Request for Admission No. 79] JNJNL61_000009898, , in Leavitt v. Johnson & Johnson, et al. ACSC RG17882401 | 332 |

18

| | | | |
|---|---|---|---|
| 1<br>2<br>3 | 790 | FDA Memo of Meeting between J&J and FDA, Subj: Asbestos Particles in Talc, bates Kazan_FDA_FOIA 000149□]000152 | 332 |
| 4<br>5 | 407 | 01/10/1973, Notes of meeting with RT Vanderbilt, bates JNJNL61_000008340 | 332 |
| 6<br>7<br>8 | 670 | Email from Telofski to Mann Subj: RE: JB Powder w China Talc, bates JNJ14T5_000004485□] 000004487 | 332 |
| 9<br>10<br>11<br>12 | 679 | McCrone Report titled □Examination of Johnson and Johnson□'s Baby Powder□, bates JNJMX68□]000006930□] 000006932 | 332 |
| 13<br>14<br>15<br>16 | 3014 | Exhibit 22  Email String Bates JNJ 000555402 to 555493, Deposition of Donald L. Hicks, Volume 2, taken August 17, 2018 in Leavitt v. Johnson & Johnson, et al., ACSC RG17882401 | 332 |
| 17<br>18<br>19<br>20<br>21<br>22<br>23<br>24<br>25 | 3088 | Exhibit 45 □ Memo dated March 29, 1994, JNJ000684386, Deposition of John Hopkins, Taken on September 27, 2018 in Leavitt v. Johnson & Johnson, et al., ACSC RG17882401, Volume 1 | 332 |

19

| | | | |
|---|---|---|---|
| 1 | 5917 | Exhibit 21  Evaluation by | 332 |
| 2 | | Electron Microscopy Techniques of Asbestos Contamination in | |
| 3 | | Industrial, Cosmetic and Pharmaceutical Talcs, | |
| 4 | | Deposition of Joanne Waldstreicher, | |
| 5 | | taken September 14, 2018 in Leavitt v. Johnson & | |
| 6 | | Johnson, et al. ACSC RG17882401 | |
| 7 | | | |
| 8 | 3573 | 3573 Document entitled National Safety Council | 332 |
| 9 | | Transactions, Ex. 6 Deposition of Diana | |
| 10 | | Scala in Dannielle Ann Polakow v. Brenntag North | |
| 11 | | America, Inc. LACSC Case No. | |
| 12 | | BC599546 | |
| 13 | 3574 | 3574 Document entitled 24th | 332 |
| 14 | | Annual Safety Congress and Exposition in Louisville | |
| 15 | | October 14 ☐ | |
| 16 | | 18, Ex. 7 Deposition of Diana Scala in Dannielle | |
| 17 | | Ann Polakow v. Brenntag North | |
| 18 | | America, Inc. LACSC Case No. BC599547 | |
| 19 | 3577 | 3577 Document dated 1957 Excerpt | 333 |
| 20 | | from the New England Journal of Medicine dated | |
| 21 | | 1☐-4☐-62, Ex 10 Deposition of Diana | |
| 22 | | Scala in Dannielle Ann Polakow v. Brenntag North | |
| 23 | | America, Inc. LACSC Case No. | |
| 24 | | BC599550 | |
| 25 | | | |

| | | | |
|---|---|---|---|
| 1 | 3578 | 3578 | 333 |
| 2 | | National Safety Council Document dated 1966, Ex. 11 | |
| 3 | | Deposition of Diana Scala in | |
| 4 | | Dannielle Ann Polakow v. Brenntag North America, | |
| 5 | | Inc. LACSC Case No. BC599551 | |
| 6 | 3581 | 3581 | 333 |
| 7 | | Rules and Regulations 6□-7□-72, Ex. 14 Deposition | |
| 8 | | of Diana Scala in Dannielle Ann | |
| 9 | | Polakow v. Brenntag North America, Inc. LACSC Case | |
| 10 | | No. BC599554 | |
| 11 | 3594 | 3594 | 333 |
| 12 | | Memorandum of a Telephone Conversation dated 3□-1□-76 between Dr. Shapiro and Dr. | |
| 13 | | Langer, Ex. 27 Deposition of Diana Scala in Dannielle | |
| 14 | | Ann Polakow v. Brenntag North | |
| 15 | | America, Inc. LACSC Case No. BC599567 | |
| 16 | 3595 | 3595 | 333 |
| 17 | | J&J document dated 3□-14□-76 entitled | |
| 18 | | Examination of American and British Talcum | |
| 19 | | Powder Products by Dr. Pooley, Ex. 28 Deposition | |
| 20 | | of Diana Scala in Dannielle Ann | |
| 21 | | Polakow v. Brenntag North America, Inc. LACSC Case | |
| 22 | | No. BC599568 | |
| 23 | | | |
| 24 | | | |
| 25 | | | |

| 1 | 3599 | 3599 | 333 |

Three☐-page Memorandum
dated 3☐-18☐-76 to R.
Schaffner from the Director
☐] Division of
Cosmetics Technology, Ex.
32 Deposition of Diana
Scala in Dannielle Ann
Polakow v.
Brenntag North America,
Inc. LACSC Case No.
BC599572

22

1                    INDEX - (Pages 1-331)

2                    INDEX OF EXHIBITS

3   DEFENDANT'S                          ID      EV      WD

4        (No exhibits handled on the
         record.)
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

23

1                          --oOo--

2                    P R O C E E D I N G S

3                          --oOo--

4          Tuesday, April 30, 2019 - 8:44 a.m.

5                    **(Morning Session)**

6          (Whereupon, the following proceedings were held

7   outside the presence of the jury:)

8          THE COURT:  On the record.

9          This is Schmitz v. Johnson & Johnson and

10  Colgate.

11         If I might impose on the lawyers to state your

12  names for the record.

13         MR. SATTERLEY:  Good morning, Your Honor.  Joe

14  Satterley for the plaintiff.

15         MS. CLANCY:  Good morning, Your Honor.  Denyse

16  Clancy for the plaintiff.

17         MR. CALFO:  Good morning, Your Honor.

18  Alexander Calfo for the Johnson & Johnson defendants.

19         MR. BATTLE:  Good morning, Your Honor.  Mike

20  Battle for the Johnson & Johnson defendants.

21         MR. GARY SHARP:  Good morning, Your Honor.

22  Gary Sharp and Pete Mularczyk.

23         MR. ANDREW SHARP:  Good morning, Your Honor.

24  Andrew Sharp for Colgate.

25         THE COURT:  All right.  Counsel had an

24

 1    agreement about one document and we're just going to

 2    put that into evidence.

 3              What number is it?

 4              MR. SATTERLEY:  Well, Your Honor, so the record

 5    is perfected, what we're moving into evidence is all

 6    the Scala documents, and they have objections to

 7    several of them.  So.

 8              THE COURT:  We're only going to deal with

 9    Number 3611 at this point in time.

10              MR. SATTERLEY:  But the ones they didn't object

11    to, Your Honor, there's some testing documents in the

12    ones they don't object to that I would typically use.

13              THE COURT:  All right.

14              MR. SATTERLEY:  So if I could go ahead and seek

15    admission of all the Scala documents to which they do

16    not object and I can identify for the record those

17    numbers.

18              THE COURT:  I had forgotten that there was a

19    lot of numbers.  The list that I had was only the

20    contested ones.

21              MR. SATTERLEY:  So there's no objection to 3571

22    which was Exhibit 4 to Scala.

23              THE COURT:  Mr. Bir, are you getting these?

24              MR. GARY SHARP:  No objection, Your Honor.

25              MR. SATTERLEY:  There's no objection to 3572,

25

1    which was Exhibit 5 to the Scala deposition.  We'll put

2    Exhibit 6 to the side; we still need to resolve that

3    one.  Put Exhibit 7 to the side; we still need to

4    resolve that one.

5         So let me just move forward to the next one

6    where there's no objection.

7         That would be Exhibit 16, which is

8    Exhibit 3583.  There's no objection to 3583.

9         MR. GARY SHARP:  No objection, Your Honor.

10         MR. SATTERLEY:  There's no objection to 3584,

11    which is Exhibit 17 to Scala's deposition.

12         THE COURT:  We'll get them all at once.

13         MR. SATTERLEY:  There's no objection to 3585,

14    which is Exhibit 18.

15         THE COURT:  Just give me the numbers.

16         MR. SATTERLEY:  3586.

17         3587.

18         MR. MULARCZYK:  I'm sorry.  Could we do it by

19    the Scala deposition number.  That's how we have it

20    listed.

21         THE COURT:  Mr. Satterley, you're going to have

22    to give me both numbers.

23         MR. SATTERLEY:  I'll go back to Exhibit 19,

24    which was 3586.

25         Exhibit 20 is 3587.

26

1              Exhibit 24, which is 3591.

2              Exhibit 31, which is 3598.

3              Exhibit 35, which is 3602.

4              Exhibit 38, which is 3605.

5              Exhibit 39, which is 3606.

6              Exhibit 40, which is 3607.

7              Exhibit 41, which is 3608.

8              Exhibit 43, which is 3610.

9              And the one that I think counsel just indicated

10     they're going to withdraw their objection is 3611,

11     which is Scala Exhibit 44.

12              Exhibit 45 is 3612.

13              Exhibit 46 is 3613.

14              Exhibit 47 is 3614.

15              We seek the admission of each of those at

16     this -- at the time, Your Honor.

17              THE COURT:  All right.  As soon as Mr. Sharp

18     and Mr. Mularczyk are ready, we'll hear from them.

19              Do you stipulate all of those into evidence?

20              MR. GARY SHARP:  Yes, Your Honor.

21              THE COURT:  All right.  Mr. Calfo.

22              MR. CALFO:  Yes, Your Honor.

23              THE COURT:  Have you any objection to any of

24     those exhibits?

25              MR. CALFO:  No, Your Honor.

27

1              THE COURT:  All right.  So the record is

2    accurate, these are the exhibits that are being

3    admitted into evidence:

4              3571, 3572, 3583, 3584, 3585, 3586, 3587, 3591,

5    3598.

6              3602, 3605, 3606, 3607, 3608, 3610, 3611, 3612,

7    3613, and 3614.

8              Those are all in evidence.

9              (Whereupon, Plaintiff's Exhibit 3571 was

10             received into evidence.)

11             (Whereupon, Plaintiff's Exhibit 3572 was

12             received into evidence.)

13             (Whereupon, Plaintiff's Exhibit 3583 was

14             received into evidence.)

15             (Whereupon, Plaintiff's Exhibit 3584 was

16             received into evidence.)

17             (Whereupon, Plaintiff's Exhibit 3585 was

18             received into evidence.)

19             (Whereupon, Plaintiff's Exhibit 3586 was

20             received into evidence.)

21             (Whereupon, Plaintiff's Exhibit 3587 was

22             received into evidence.)

23             (Whereupon, Plaintiff's Exhibit 3591 was

24             received into evidence.)

25             (Whereupon, Plaintiff's Exhibit 3598 was

28

```
1              received into evidence.)
2              (Whereupon, Plaintiff's Exhibit 3602 was
3              received into evidence.)
4              (Whereupon, Plaintiff's Exhibit 3605 was
5              received into evidence.)
6              (Whereupon, Plaintiff's Exhibit 3606 was
7              received into evidence.)
8              (Whereupon, Plaintiff's Exhibit 3607 was
9              received into evidence.)
10             (Whereupon, Plaintiff's Exhibit 3608 was
11             received into evidence.)
12             (Whereupon, Plaintiff's Exhibit 3610 was
13             received into evidence.)
14             (Whereupon, Plaintiff's Exhibit 3611 was
15             received into evidence.)
16             (Whereupon, Plaintiff's Exhibit 3612 was
17             received into evidence.)
18             (Whereupon, Plaintiff's Exhibit 3613 was
19             received into evidence.)
20             (Whereupon, Plaintiff's Exhibit 3614 was
21             received into evidence.)
22             MR. SATTERLEY:  With this witness we've met and
23    conferred; we have some agreements regarding
24    admissibility of exhibits with the -- prior to
25    Dr. Longo's testimony.
```

29

1           THE COURT:  All right.  Do you want to state

2    those?

3           MR. SATTERLEY:  Yes, Your Honor.  These are all

4    photographs that relates to the testing of the J&J, the

5    Colgate.

6           THE COURT:  Just tell me the exhibit numbers.

7           MR. SATTERLEY:  Yes, Your Honor.

8           1065, 1080, 1081, 1082, 1083, and 1084, 1091,

9    1092, 1093, 1096, 1097, 1098.

10           Should be a total of 12 exhibits.  I have them

11    for Your Honor in binders organized.  I provided them

12    to counsel both electronically and a hardcopy.  It's my

13    understanding there's no objection with the exception

14    of J&J has objections to photographs of the J&J bottle

15    that accompanies the -- each -- they don't have

16    objection for demonstrative purposes, but they don't

17    want the actual photograph of the bottle to be received

18    into evidence.

19           THE COURT:  Is the photograph part of the

20    exhibit?

21           MR. SATTERLEY:  Yes.  It is, Your Honor.

22           THE COURT:  How can I accept part of an exhibit

23    into evidence?

24           MR. SATTERLEY:  I wanted to resolve that issue

25    with Your Honor, show Your Honor the exhibit.

30

```
1              THE COURT:  All right.

2              MR. SATTERLEY:  And I've tendered to

3   Your Honor --

4              THE COURT:  Which number --

5              MR. SATTERLEY:  This is 1080, Exhibit 1080, if

6   you go behind Tab Number 1.  Tabs 2 through 11 there's

7   no objections to.  Tab 1.  Tab 1 is -- and what

8   occurred here, Your Honor, is J&J produced these

9   photographs in response to discovery under -- behind

10  Tab 1.

11             And these were the actual bottles that

12  Dr. Longo, the samples came from.  And so, for example,

13  to put in context, if we could go to the fourth

14  photograph on page 4 of 1080, you'll see that J&J has

15  marked the date of the product, and so this is

16  important evidence for the jury to consider in context

17  of the sample that's being analyzed, and many of these

18  bottles have the dates on them and J&J provided those

19  dates -- provided these bottles to us exactly in this

20  fashion.

21             So it puts context on the date of the sample in

22  question.  And these are the historical.

23             So like I said, all the photographs behind

24  Tabs 2 through 11, there's no objection to.  That's the

25  testing -- the photographs of the actual test.
```

31

1          THE COURT:  So what you're telling me is that

2     there's more than one bottle that is pictured?

3          MR. SATTERLEY:  That's --

4          THE COURT:  And these are the bottles that the

5     samples that Longo tested actually came in.

6          MR. SATTERLEY:  Came from.

7          THE COURT:  Came from.

8          MR. SATTERLEY:  Because J&J's labs made the

9     sample splits and then with the chain of custody said

10    this is the sample you're getting and --

11         THE COURT:  I understand.  I'm just asking

12    questions here.  And the writing on the -- the typed

13    writing that's taped to one bottle, for example, is

14    something that was written by Johnson & Johnson and

15    taped on to the bottle by Johnson & Johnson.

16         MR. SATTERLEY:  That's the way that it was

17    produced in the course of discovery, Your Honor.

18         THE COURT:  So if you ask your witness, Longo,

19    do you recognize these and he's going to say that's

20    exactly how I got them from Mr. Satterley.

21         MR. SATTERLEY:  The samples were not received

22    in the bottles themselves.  The samples -- J&J's own

23    lab took the samples and gave us the sample numbers.

24    You can see it says "JPBP" -- it's got a number of 188

25    or 093, and the chain of custody document matches up so

32

1    the dates are matched up, and he can explain that

2    through the chain of custody process.

3              But this just gives the context to the dates.

4              Counsel advised me they have no objection to

5    demonstrative for these.  At the very least, I'd like

6    to demonstrate some of these, but I think they're

7    actually -- should come into evidence so the jury can

8    evaluate the dates of the various samples as

9    represented by J&J.

10             THE COURT:  All right.

11             Ms. Steinmann, you're standing there.

12             MS. STEINMANN:  Your Honor.

13             THE COURT:  I presume that you're going to tell

14   me what the objection is.

15             MS. STEINMANN:  The objection is just that

16   these aren't evidence of anything in this case.

17   Dr. Longo is going to be able to tell the jury what the

18   dates were and there is no reason to put in 99 photos

19   of different Johnson & Johnson bottles.  It's not

20   evidence of anything.  Demonstrative-wise I agree --

21             THE COURT:  That's not an evidentiary

22   objection.  Maybe it's a -- maybe the argument is 352

23   cumulative.  But the concept that they don't need to is

24   not --

25             MS. STEINMANN:  Sorry, Your Honor.  Formal

33

1    objection --

2         THE COURT:  They have to -- they get to put on

3    their case.

4         MS. STEINMANN:  Formal objection is 352.  I was

5    just explaining the reasons for our objection, which is

6    I believe these are fair for a demonstrative, but I

7    don't think they have any relevance to go back to the

8    jury.  And she didn't use those bottles, and we just

9    don't want the jury to get the misimpression that all

10   of these bottles came from Mrs. Koretoff --

11   Mrs. Schmitz, I'm sorry.

12        THE COURT:  Okay.  If that's the objection,

13   it's overruled.

14        MS. STEINMANN:  Thank you, Your Honor.

15        THE COURT:  So what number is that exhibit?

16        MR. SATTERLEY:  That's 1080.

17        THE COURT:  All right.  The following

18   exhibits -- other than that one, do you stipulate that

19   all the rest of the list that was read by Mr. Satterley

20   may be admitted into evidence?

21        MS. STEINMANN:  Your Honor, I believe I was

22   walking in, but if it's what he said to me --

23        THE COURT:  I'll read it to you, if you'd like.

24        MS. STEINMANN:  Okay.

25        Is this it?

34

1          MR. SATTERLEY:  I provided hardcopies to -- to

2     all counsel.  These are the J&J's and Colgate is right

3     there.

4          MS. STEINMANN:  Just give me one second to get

5     through them.

6          THE COURT:  Of course.

7          MS. STEINMANN:  Yes, Your Honor.  This appears

8     to be what was sent to us and we did stipulate to

9     these.

10         THE COURT:  All right.  Mr. Sharp, have you any

11    objection to any of these exhibits?

12         MR. GARY SHARP:  No, Your Honor.

13         MR. MULARCZYK:  Your Honor, I just have one

14    objection.  I'm sorry.  Are we talking about the

15    Johnson & Johnson ones or the ones pertaining to

16    Colgate?

17         THE COURT:  Yes.  We're talking about the 1065

18    through 1098 list that was read into the record by

19    Mr. Satterley.

20         MR. MULARCZYK:  So the only objection that I

21    have -- I'm okay with all the photographs.  The one

22    objection I have is a document here.  It's a chain of

23    custody document.  It's 1096.  And my objection is that

24    this contains a list of samples that aren't at issue in

25    this case and that Dr. Longo is not relying on.

35

1          So.

2          MR. SATTERLEY:  Are you talking about this list

3     right here?

4          MR. MULARCZYK:  Correct.

5          THE COURT:  What number?

6          MR. MULARCZYK:  There's a whole host of samples

7     that are not subject to this case at all in this list.

8     This is 1096.

9          THE COURT:  I understand, but in this binder

10    what tab is it?

11         MR. SATTERLEY:  Your Honor, you don't have the

12    correct binder right there.  1096.  If I could tender

13    it to the Court.  It's in the second box.

14         This is the first I'm hearing of this

15    objection, but I can agree if they don't cross-examine

16    on -- that he didn't test these other 43 bottles -- or

17    41 bottles, I will agree to redact that and only put

18    the ones -- the bottles that he did test.  What

19    occurred -- well -- and that's my offer is, as long as

20    they don't cross-examine on those other bottles that

21    were not tested, I have no problem redacting this

22    document and making it only the bottles that were

23    tested.

24         THE COURT:  All right.  So we'll redact the

25    bottles that weren't tested.

36

1              MR. SATTERLEY:  Yes.

2              THE COURT:  That sounds like a perfectly good

3      way of approaching the problem.

4              MR. SATTERLEY:  Yes, Your Honor.

5              MR. MULARCZYK:  Thank you, Your Honor.

6              THE COURT:  Okay.  So, for the record, the

7      following exhibits are admitted into evidence:

8              1065, 1080, 1081, 1082, 1083, 1084, 1091, 1092,

9      1093, 1097, 1098.

10             (Whereupon, Plaintiff's Exhibit 1065 was

11             received into evidence.)

12             (Whereupon, Plaintiff's Exhibit 1080 was

13             received into evidence.)

14             (Whereupon, Plaintiff's Exhibit 1081 was

15             received into evidence.)

16             (Whereupon, Plaintiff's Exhibit 1082 was

17             received into evidence.)

18             (Whereupon, Plaintiff's Exhibit 1083 was

19             received into evidence.)

20             (Whereupon, Plaintiff's Exhibit 1084 was

21             received into evidence.)

22             (Whereupon, Plaintiff's Exhibit 1091 was

23             received into evidence.)

24             (Whereupon, Plaintiff's Exhibit 1092 was

25             received into evidence.)

37

```
 1            (Whereupon, Plaintiff's Exhibit 1093 was
 2            received into evidence.)
 3            (Whereupon, Plaintiff's Exhibit 1097 was
 4            received into evidence.)
 5            (Whereupon, Plaintiff's Exhibit 1098 was
 6            received into evidence.)
 7            (Whereupon, Plaintiff's Exhibit 1096 was marked
 8            for identification and provisionally admitted
 9            after redaction.)
10            THE COURT:  1096 is provisionally admitted, but
11   the actual document will be redacted after testimony of
12   the witness who will itemize the ones that he actually
13   tested.
14            That means that you can't show that one on the
15   screen.
16            MR. SATTERLEY:  Yes, Your Honor.  We have three
17   additional stipulations with regards to demonstrative
18   evidence.  And this is Exhibits 1046, 1047, and 1099.
19            1046 is a NIST standard, and I don't believe
20   there's any objection --
21            For demonstrative purposes only; correct?
22            MR. CALFO:  Correct.
23            THE COURT:  All right.  So 1046 won't be
24   admitted into evidence, but you may show it on the
25   screen.
```

38

1          (Whereupon, Plaintiff's Exhibit 1046 was marked

2          for identification.)

3          MR. SATTERLEY:  Yes, Your Honor.

4          MR. MULARCZYK:  Well, we have an objection to

5    that one specifically for all purposes.  I didn't have

6    an objection to the animation that he proposed, but I

7    did have an objection to that for all purposes.  It

8    wasn't something that was disclosed in this case, it

9    wasn't something that was referenced as reliance

10   material in his deposition, and so for that reason it

11   shouldn't be permitted in this case.

12         THE COURT:  All right.  So it's a demonstrative

13   tool.

14         MR. SATTERLEY:  Yes, just demonstrative,

15   Your Honor.  We're not seeking its admission.

16         THE COURT:  All right.  What is it?

17         MR. SATTERLEY:  It's just -- it's a tremolite.

18   The NIST -- NIST is the National Institute for

19   Standards and Technology, and this shows what tremolite

20   the standard is.

21         THE COURT:  Is that the image that you're

22   showing me there that I can see from here?

23         MR. SATTERLEY:  Pardon?

24         THE COURT:  No, no.  I can see it from here.

25   Oh, it's not just one page.

39

1          MR. SATTERLEY:  It is, I think, three pages and

2     it shows what under the microscope the standard of

3     tremolite is, and all Dr. Longo does is says -- gives

4     an opinion that he has -- that he's -- his lab took

5     these photographs.

6          THE COURT:  All right.  I'll allow it as a

7     demonstrative.  I won't allow it into evidence.

8          MR. SATTERLEY:  And the heavy liquid separation

9     animation is 1046 is what I showed in opening

10    statement.  Counsel advised me they have no objection

11    to it for demonstrative purposes only the animation of

12    the heavy liquid separation, as 1047.

13         THE COURT:  All right.  That can be shown on

14    the monitor, but it won't be in evidence.

15         MR. SATTERLEY:  Yes, Your Honor.  And the final

16    is the 1990 advertisement in a magazine called *Asbestos*

17    *Issues*, June of 1990.  And this is Exhibit 1099.  And

18    it's --

19         No objection for demonstrative purposes?

20         MR. CALFO:  No objection for demonstrative

21    purposes.

22         THE COURT:  Mr. Mularczyk?

23         MR. SATTERLEY:  The 1990 ad.

24         THE COURT:  All right.  Mr. Mularczyk is

25    shaking his head no.

40

1          MR. MULARCZYK:  No objection, Your Honor, I'm

2     sorry.

3          THE COURT:  All right, so that one also can be

4     shown to the jury, but it's not in evidence.

5          (Whereupon, Plaintiff's Exhibit 1047 was marked

6              for identification.)

7          (Whereupon, Plaintiff's Exhibit 1099 was marked

8              for identification.)

9          MR. SATTERLEY:  While I'm meeting and

10    conferring with Mr. Calfo, Ms. Clancy has a few issues

11    that she may want to raise.

12         MS. CLANCY:  Ms. Steinmann.

13         MS. STEINMANN:  I'm sorry, but, Your Honor, we

14    were sent a grouping of exhibits early this morning,

15    and they also just were nice enough to provide me a

16    copy, but I'm still going through them as we've been

17    talking, so I'm not prepared to address these yet.

18    We've just got them this morning, so.

19         MS. CLANCY:  These were all documents to which

20    Johnson & Johnson responded to an RFA saying that they

21    kept them in the ordinary course of business, and so at

22    the time they were created, I didn't anticipate there

23    would be, well, actually an objection to them.  So if

24    we could just take two minutes to allow Ms. Steinmann

25    to look at the documents.

41

```
 1          THE COURT:  Are you going to be using them with
 2    this witness?
 3          MS. CLANCY:  Yes, Your Honor.
 4          THE COURT:  All right.  Well, let's take a
 5    minute and take a look at it.  We'll take a short
 6    recess.
 7          MS. CLANCY:  Thank you, Your Honor.
 8          MR. MULARCZYK:  When this issue is resolved, I
 9    don't know if the Court remembers, but we still had a
10    motion in limine on this witness, and -- with the full
11    expectation that this Court is not going to turn around
12    this witness and send him home, I just would ask for a
13    few minutes so we can address it and we just have a
14    ruling on it before we move forward.
15          THE COURT:  All right.
16          While Ms. Steinmann is looking at all those
17    documents, we are going to Amotion in limine.  It is
18    Motion in Limine -- Joint Motion in Limine Number --
19    I've forgotten the numbers -- like, 7 or 8, or
20    something.  It's Number 1 --
21          MR. MULARCZYK:  It's 3A.
22          THE COURT:  Well -- oh, it's -- oh --
23          MR. MULARCZYK:  It's -- it's Colgate's Motion
24    in Limine 3A.
25          THE COURT:  Yes, there you go.  It was also
```

1    Whitaker, Clark & Daniels' motion.

2         And by the way, I -- I want to point out to you

3    that on Exhibit 23 to the Scala deposition, where it

4    says "F. Roesch, R-o-e-s-c-h, at the top in what

5    appears to be maybe even my handwriting, that's not my

6    handwriting.  And I am no relation to Fred Roesch.

7         MR. GARY SHARP:  It is spelled differently.

8         THE COURT:  No, it's not.

9         MR. GARY SHARP:  I thought it was R-o-a-c-h.

10   Exhibit 23, Your Honor?

11        THE COURT:  Yes.

12        MR. SATTERLEY:  As I was reading through the

13   document the other day, I was thinking, "I wonder if

14   he's related."

15        THE COURT:  All right.  I have this motion

16   actually as Motion in Limine Number 2 of

17   Colgate-Palmolive.

18        MR. MULARCZYK:  Oh, okay.  All right.

19        MS. CLANCY:  Isn't that the one he already

20   ruled on, Number 2?

21        MR. MULARCZYK:  We never argued this one.

22        MS. CLANCY:  We argued one motion in limine for

23   you on Dr. Longo on -- on chain of custody.

24        MR. MULARCZYK:  So there was one on samples,

25   and there was on Longo.  Two separate motions.

43

1          MS. CLANCY:  Correct.

2          I think -- I think, Your Honor, where -- I'm a

3   little confused, because we argued one on the

4   authenticity of the samples, and then they filed

5   another motion also alleging authenticity of the

6   samples and -- and other of what -- Dr. Longo's

7   opinions.  I just want to make sure I'm responding to

8   the correct one, because the Court has already ruled on

9   the one with regard to authenticity of the samples.

10          THE COURT:  This is -- it's -- it's this motion

11   right here, this --

12          MS. CLANCY:  What is -- what is the --

13          THE COURT:  I would say that's nine inches of

14   Colgate --

15          MS. CLANCY:  The 9-inch motion?  Well,

16   unfortunately, that doesn't differentiate it from other

17   any of Colgate's other motions, so --

18          THE COURT:  This is -- this is the biggest one.

19          MS. CLANCY:  Oh, the biggest one.  What's the

20   title of it?

21          THE COURT:  Plaintiffs' -- it is Defendant

22   Colgate-Palmolive Company's Motion in Limine to Exclude

23   Testimony of Plaintiff's Expert Dr. William Longo

24   Regarding Unreliable Testing Performed on Undisclosed,

25   Unauthenticated Containers of Cashmere Bouquet.

44

1          MS. CLANCY:  I think that's the one that the

2     Court has already ruled on, but --

3          THE COURT:  My note shows that it's passed.

4          MS. CLANCY:  Okay.  All right.  Well --

5          THE COURT:  You may be confusing it with the

6     Egilman motion.

7          MR. MULARCZYK:  Your Honor, there was one about

8     the authenticity of the samples themselves.

9          THE COURT:  That was --

10         MR. MULARCZYK:  It was Joint -- it was Joint

11    Defense, I think, Motion in Limine Number 1, maybe, or

12    Colgate Number 1.

13         THE COURT:  All right.  Well, go ahead,

14    Mr. Mularczyk.

15         MR. MULARCZYK:  All right.  So since -- since

16    this motion is fresh in your mind, Your Honor --

17         THE COURT:  I must confess that while I read

18    the motion, I didn't look at all the exhibits.

19         MR. MULARCZYK:  And I don't blame you.

20         So this is -- this is a really focused motion.

21    Generally speaking, I don't have a concern with

22    Dr. Longo speaking about the testing that he personally

23    did, but where it becomes problematic is when he

24    attempts to extrapolate from his own handful -- subset

25    of testing that he's done to try to say whether or not

45

1   what the plaintiff used was contaminated and at what

2   levels specifically.

3          There is an opinion that he has specifically

4   within his -- within his declaration and that he

5   offered in his deposition, which is, basically, anybody

6   including Ms. Schmitz, who used Cashmere Bouquet at any

7   time would have been exposed to asbestos and at

8   significant levels or substantial levels.

9          And so, again, I've got no problem with him

10  coming in here and talking about the samples he's

11  tested.  It's well within -- well within his realm.

12         But there is nothing that he has done

13  scientifically, whether it's some sort of analysis or

14  calculation, whether it be mathematical or statistical

15  or anything at all, that allows him to make the jump

16  from the small subset of samples that he has tested to

17  the -- to the entire product line or even to the

18  products that Ms. Schmitz used.  There's simply nothing

19  there.  Nothing at all.

20         And I think it's inappropriate to allow him to

21  do that under *Sargon*.  I don't think he's demonstrated

22  that.  And so if we're going to keep him to -- if we

23  are going to keep him in his lane and have him talk

24  about his samples that he has looked at personally, no

25  problem.  But as soon as he makes that jump to what

46

| | |
|---|---|
| 1 | Ms. Schmitz used and whether that's appropriate, I |
| 2 | think it's not, and I don't think it's supported. |
| 3 | THE COURT:  All right.  Does Johnson & |
| 4 | Johnson -- |
| 5 | MR. CALFO:  We join. |
| 6 | THE COURT:  You concur with that? |
| 7 | MR. CALFO:  Yes, Your Honor. |
| 8 | THE COURT:  All right. |
| 9 | Ms. Clancy. |
| 10 | MS. CLANCY:  Okay.  Yes, Your Honor.  So within |
| 11 | the nine inches of exhibits that Colgate attached, I'm |
| 12 | assuming that they attached Dr. Longo's report in this |
| 13 | case, where they stated that there were no scientific |
| 14 | calculations, no data, no math whatsoever to support |
| 15 | his opinions, and that's absolutely belied by his |
| 16 | report. |
| 17 | He's testified in his deposition -- and he |
| 18 | provided voluminous testing -- that not only has he |
| 19 | examined the actual samples of Cashmere Bouquet and |
| 20 | Johnson & Johnson -- |
| 21 | THE COURT:  Well, they're -- they're not saying |
| 22 | that.  They're saying that he's incapable of opining |
| 23 | that because he found asbestos in the samples that he |
| 24 | looked at of the Colgate-Palmolive product, that -- |
| 25 | that other bottles may have had asbestos in them, too. |

47

1          MS. CLANCY:  Yeah, sure.  So he found in the

2     Colgate bottles, 100 percent contained asbestos.

3          THE COURT:   100 percent of the samples, not --

4          MS. CLANCY:  Correct.

5          THE COURT:  -- 100 percent of the bottles.

6          MS. CLANCY:  And he also found -- went through

7     the Colgate historical documents, where Colgate found

8     asbestos in their samples.

9          He's also reviewed the mechanism of testing

10    that Colgate used in order to analyze whether or not it

11    had asbestos, which, as the Court heard yesterday and

12    as we heard from Scala, is the XRD method, which is

13    incapable of being sensitive to asbestos below a

14    certain level.  2 percent to 1 percent is the

15    scientific evidence.

16          And so, therefore, under *Lyons v. Colgate*, the

17    Court of Appeals expressly held that where you have an

18    expert who analyze d the sample at issue, who has

19    looked at the historical document, who has looked at

20    the testing samples, the testing that was used by the

21    corporation, to see that it was wholly deficient to

22    find whether there was asbestos there in the first

23    instance, that it is absolutely permissible for that

24    expert to say whether or not when the plaintiff

25    breathed -- that the plaintiff would have had

1    substantial exposure to asbestos by use of the product.

2         And that *Colgate v. Lyons* decision was

3    expressly found, especially in a situation where the

4    plaintiff had a lifetime use or it was for decades of

5    use of a product, that for the expert to say that it

6    would have been a substantial exposure upon use of the

7    product was permissible testimony.

8         Anything with respect to, "Well, you can't say,

9    because you didn't test her actual bottle that she

10   used," or "You can't say that literally every bottle

11   had asbestos in it because you couldn't test every

12   single bottle," that goes, the Court held -- went to

13   the weight and not the admissibility of that opinion.

14        The -- Dr. Longo in his report set forth the

15   careful calculations, where he analyzed each of

16   Ms. Schmitz' personal use exposures from each of the

17   products, calculating the number of grams in the

18   products, the amount of ounces used in her lifetime,

19   and the -- the resultant exposure that would have

20   ensued as a result of her use of the products.

21        This is square on with what the Court of

22   Appeals has held is admissible based on, actually,

23   Defendant Colgate's same objections in that case.

24        THE COURT:  Mr. Mularczyk.

25        MR. MULARCZYK:  So I guess I'll have to live

1   with the Lyons decision forever, but that was a summary

2   judgment case, okay, has no applicability to the issue

3   that we're raising here.

4        Let's make sure we understand what his

5   expertise is.  He's a material scientist.  He's an

6   analyst.  He tests the products that are before him, or

7   his lab tests the products that they're looking at.

8   He's -- he's not an individual that has anything in his

9   background that allows him to make this statistical

10  leap about what Ms. Schmitz may have used and how often

11  and so forth.

12       He, himself, testified at his deposition that

13  the reason he gets from his subset of 58 samples to

14  what Ms. Schmitz used was because he took the number of

15  positives, divided it by the total number of samples he

16  tested, and says, "Well, that's the percentage.  I'm

17  going to be a little bit conservative, because there's

18  some nondetects" -- and he tested some samples where he

19  found nothing, by the way -- and then he says, "I'm

20  going to take that percentage and apply it to the

21  universe of products."

22       That's -- that's not expertise, Your Honor.  I

23  could do that for anything.

24       THE COURT:  Well, you can -- it goes to the

25  weight, though.  It goes not to admissibility.

50

1              The motion is denied.

2              All right.  Are we ready to proceed?

3              MS. CLANCY:  I just was going to find out

4    which --

5              THE COURT:  Still on the record.

6              Ms. Steinmann is going to give us the word as

7    soon as she's ready.

8              Ms. Steinmann, how much more time do you need?

9              MS. STEINMANN:  I -- I think I'm ready.

10             THE COURT:  All right.  I don't want to press

11   you.  If you need a few more minutes, that would be

12   fine.

13             MS. STEINMANN:  I'm done.

14             THE COURT:  All right.

15             MS. CLANCY:  Can I just look at which ones

16   you've --

17             MS. STEINMANN:  Yes.

18             MS. CLANCY:  May I meet and confer with her for

19   one minute, Your Honor?

20             THE COURT:  Yes.

21             MS. CLANCY:  Thank you.

22             (Counsel conferring at counsel table out of the

23   hearing of the reporter.)

24             MS. CLANCY:  Your Honor, we have a stack of

25   agreed.  If I could read into the record and then we

51

```
1   have a very small stack of disagreed.
2           THE COURT:  All right.
3           MS. CLANCY:  Agreed exhibits which plaintiffs
4   offer into evidence are Plaintiff's 640, 158, 155, 171,
5   174, 430, 660, 713, 752, and 172.
6           THE COURT:  Ms. Steinmann, do you stipulate
7   those documents into evidence?
8           MS. STEINMANN:  Yes, Your Honor.
9           THE COURT:  Mr. Sharp?  Mr. Mularczyk?
10          MR. MULARCZYK:  Just subject to the same
11  objection regarding the applicability -- well, hearsay
12  as to Colgate and then the instruction that we
13  requested.
14          THE COURT:  All right.  Well, the hearsay as to
15  Colgate, which one?  I mean, you know.
16          MR. MULARCZYK:  My understanding is these are
17  all Johnson & Johnson documents, so all of them as
18  against Colgate.
19          THE COURT:  Oh, all right.  Well, it's just the
20  issue about that the jury can't take evidence of
21  malfeasance by Johnson & Johnson and attribute it to
22  Colgate?
23          MR. MULARCZYK:  Correct.
24          THE COURT:  Okay.  You will get an instruction
25  on that.  You'll just have to continue working it out.
```

52

1          MR. CALFO:  Your Honor, we're both getting an

2     instruction; right?

3          THE COURT:  Oh, yeah, yeah, yeah.  It goes both

4     ways.  It actually will be one -- it's all in one

5     instruction more likely than not.

6          All right.  All of those exhibits are in

7     evidence.  I'll read them for the record:

8          640, 158, 155, 171, 174, 430, 660, 713, 752,

9     and 172.

10          (Whereupon, Plaintiff's Exhibit 640 was

11          received into evidence.)

12          (Whereupon, Plaintiff's Exhibit 158 was

13          received into evidence.)

14          (Whereupon, Plaintiff's Exhibit 155 was

15          received into evidence.)

16          (Whereupon, Plaintiff's Exhibit 171 was

17          received into evidence.)

18          (Whereupon, Plaintiff's Exhibit 174 was

19          received into evidence.)

20          (Whereupon, Plaintiff's Exhibit 430 was

21          received into evidence.)

22          (Whereupon, Plaintiff's Exhibit 660 was

23          received into evidence.)

24          (Whereupon, Plaintiff's Exhibit 713 was

25          received into evidence.)

53

1          (Whereupon, Plaintiff's Exhibit 752 was

2          received into evidence.)

3          (Whereupon, Plaintiff's Exhibit 172 was

4          received into evidence.)

5          What documents are you offering that you do not

6          have agreement on?

7          MS. CLANCY:  Sure.  Should I -- there's just a

8   few, so should I take them one at a time -- and I want

9   to give an overarching change so there's one thing on

10  the table.  For each of these, we're offering Johnson &

11  Johnson has responded to request for admission, in this

12  case stating that they -- the true and correct copy of

13  these -- these are true and correct copies and that

14  they were maintained in the ordinary course of business

15  of Johnson & Johnson.

16         THE COURT:  So it's an admission that they're

17  business records?

18         MR. SATTERLEY:  That's correct.

19         MS. CLANCY:  So the -- then we'll get -- they

20  have objections on top of that.

21         So the first one is Document 724.

22         MR. SATTERLEY:  I can address 724, Your Honor.

23  Their objection, I understand, is that this document

24  relates to industrial talc instead of cosmetic.

25         THE COURT:  What is it?

54

1              MR. SATTERLEY:  It's a McCrone letter to them

2      talking about the presence of amphiboles and asbestos,

3      fibers of asbestos in talc, in Vermont -- in the

4      Vermont mines where they were making baby powder with

5      this talc.

6              And they say this relates to industrial talc,

7      not cosmetic talc.  But the testimony of Dr. Hopkins,

8      who the jury will hear, Your Honor has already ruled,

9      he says, and the other documents show, HC, the word

10     "HC" stands for Hammondsville cosmetic, and "HC" are --

11     is on the sample number on here quite a bit.

12     Your Honor has already overruled the general motion in

13     limine with regards to industrial talc or any reference

14     to industrial talc.

15             This, I think, falls squarely within that.

16     But, more importantly, it's going to be for the jury to

17     assess whether or not it's cosmetic talc like we claim

18     and like Dr. Hopkins admits through the documents that

19     HC stands for Hammondsville cosmetic or whether it's

20     industrial talc which that's their argument.

21             THE COURT:  All right.

22             MS. STEINMANN:  Your Honor, with respect to

23     that document, yes, we do dispute that HC, and

24     Dr. Hopkins also disputes it, that it is cosmetic talc.

25     He says it can be designated for industrial talc

55

1    including a specific document that says roofing

2    materials.

3           So we believe that that particular document

4    under 352 and relevance is not relevant to this case

5    and is also misleading and also requires us to have a

6    little minitrial of what HC actually means and what it

7    doesn't mean.

8           THE COURT:  All right.  I'll admit the document

9    into evidence.  The objection is overruled.

10          Next one?

11          MS. CLANCY:  That was 724.

12          THE COURT:  724 will be in evidence.

13          (Whereupon, Plaintiff's Exhibit 724 was

14          received into evidence.)

15          MS. CLANCY:  The next one is 719.

16          MR. SATTERLEY:  719 is a letter from McCrone

17   once again to Windsor Minerals and it's signed by

18   Thomas Kremer and James Millette, and it's related to

19   1986.  It's identification of chrysotile asbestos in

20   talc.  We believe this is relevant to demonstrate that

21   chrysotile asbestos was actually found in the talc

22   samples.  And there's been a lot of discussion about

23   McCrone and Dr. Millette, and there will be further

24   discussion about Thomas Kremer.  And so we believe this

25   is relevant and important for the jury to understand

56

1    the identification of chrysotile as found in these

2    samples.

3         MS. STEINMANN:  Your Honor, our response to

4    this is -- and I believe there's no dispute; there may

5    be, but -- this is specifically dealing with a mine in

6    California that cosmetic talc was never ever mined out

7    of, not for J&J or for any other company.

8         THE COURT:  I think this was the Windsor mines?

9         MR. SATTERLEY:  Windsor Minerals is not

10   California.  Windsor Minerals is Vermont.  It's Windsor

11   Minerals.

12        MS. STEINMANN:  These testing results, as

13   Dr. Hopkins explains, are from a California western

14   mine.

15        THE COURT:  Did Windsor mines have mines

16   outside of Vermont?

17        MS. STEINMANN:  Johnson & Johnson only got

18   their talc from Vermont.  I can't speak for Windsor

19   mines.

20        THE COURT:  Okay.  Well, you got to persuade me

21   that Windsor doesn't refer to the mines called Windsor

22   mines in Vermont before I can even really seriously

23   consider your objection.

24        MS. STEINMANN:  Nowhere in here does it say

25   Windsor mines.  It says "WMI," which is a designation

| | |
|---|---|
| 1 | as Hopkins explains, which stands for this western mine |
| 2 | in California. |
| 3 | MR. SATTERLEY:  Well, Hopkins, Your Honor, has |
| 4 | no basis whatsoever to explain away the document.  The |
| 5 | document says Windsor Minerals.  There's no Windsor |
| 6 | Mineral California talc mines that I've ever heard of. |
| 7 | So if that's their argument, that's an argument they |
| 8 | can make to the jury that that's not relating to this, |
| 9 | but there's certainly no documents to support that |
| 10 | argument. |
| 11 | THE COURT:  All right.  It seems that the |
| 12 | parties have different visions of what it actually |
| 13 | stands for.  We'll let the jury decide it.  719 will be |
| 14 | in evidence. |
| 15 | (Whereupon, Plaintiff's Exhibit 719 was |
| 16 | received into evidence.) |
| 17 | MR. SATTERLEY:  The next document is 726, |
| 18 | Your Honor.  This is 2004 testing of Johnson & Johnson |
| 19 | Baby Powder by Forensic Analytical. |
| 20 | This was received by Johnson & Johnson at the |
| 21 | time.  Forensic Analytical in Hayward, California |
| 22 | tested off-the-shelf baby powder, found asbestos in it, |
| 23 | anthophyllite asbestos.  It was immediately -- this |
| 24 | report was transferred. |
| 25 | THE COURT:  What's the objection? |

58

1          MS. STEINMANN:  Your Honor, this was testing

2     done by a new station.  It was not done by the request

3     or at the request of Johnson & Johnson, and we believe

4     it has hearsay and is irrelevant.

5          THE COURT:  Well, it's not a business record?

6          MS. STEINMANN:  It is -- it was in our files.

7     It was sent to us.

8          MR. SATTERLEY:  Your Honor, at the very least,

9     this goes to notice.  We're going to hear who Mark

10    Floyd is today.

11         THE COURT:  It only goes to notice.  726 will

12    be in evidence.

13         (Whereupon, Plaintiff's Exhibit 726 was

14         received into evidence.)

15         MR. SATTERLEY:  Your Honor, Exhibit 163 is a

16    1971 document regarding their meeting with Dr. Langer

17    concerning analytical analysis of talc, and this shows

18    that -- this gives them knowledge that with regard to

19    fibrous minerals in 1971 were identified.  It goes to

20    the fibrous content.  It goes to asbestos, their

21    knowledge of asbestos in the product.  In this 1971

22    document in their files it says Johnson's product he

23    estimated 5 percent, and the other 25 percent of the

24    particles to be fibrotic, some of which could be

25    asbestos.

1          I believe their objection is that it relates to

2     ovarian tissue, but at no point in this document do

3     they talk about ovarian cancer.  They just talk about

4     the findings of talc and asbestos in ovarian tissue.

5          MS. CLANCY:  Uterine tissue.

6          MR. SATTERLEY:  Uterine tissue.

7          THE COURT:  Ms. Steinmann.

8          MS. STEINMANN:  Your Honor, a couple of things.

9     The document itself actually says "uterine tissue" on

10    the very first page.  And this is, again, dealing with

11    the Tenovus study, which was solely directed at

12    studying uterine tissue for the development of ovarian

13    cancer and whether it was or was not caused by talcum

14    powder.  That was the subject of an MIL, and we believe

15    that this document is irrelevant and misleading under

16    352.

17         THE COURT:  Can I see the document?

18         MR. SATTERLEY:  Yes, Your Honor.  While I'm

19    handing the document to the Court, while Your Honor did

20    say ovarian cancer should not be discussed, this

21    document never talks about ovarian cancer.

22         THE COURT:  Just let me read it.  163 will be

23    in evidence.

24         (Whereupon, Plaintiff's Exhibit 163 was

25         received into evidence.)

60

1            MR. SATTERLEY:  The final -- the final

2     document --

3            MS. STEINMANN:  Your Honor, if I could, if it

4     is coming into evidence, could we just ask -- ask that

5     the word "uterus" be redacted.

6            THE COURT:  Oh, I don't think that that's so

7     prejudicial.

8            MR. SATTERLEY:  And the final document,

9     Your Honor, relates to documents already been displayed

10    to the jury in the cross-examination of Alice Blount.

11    This is a 1998 letter from Alice Blount to the attorney

12    for Johnson & Johnson.  It was authenticated by

13    Dr. Blount, and --

14            THE COURT:  What number is it?

15            MR. SATTERLEY:  This is Exhibit 160, and this

16    is April 23, 1998, where she identifies the --

17            THE COURT:  I remember.

18            MR. SATTERLEY:  -- sample.

19            THE COURT:  I remember the testimony.

20            What's the objection to that?

21            MS. STEINMANN:  Your Honor, foundation and

22    hearsay.

23            THE COURT:  Oh, she looked at the letter and

24    said, I sent this to their lawyer.  That will be

25    admitted into evidence.  That's Number 160.

61

1          (Whereupon, Plaintiff's Exhibit 160 was

2          received into evidence.)

3          MS. STEINMANN:  Your Honor, I also just want to

4     make sure, I believe that that had been sent with the

5     Blount records, so I want to make sure that there's not

6     duplicate copies being submitted.  I didn't have a

7     chance to cross-reference --

8          MR. SATTERLEY:  We won't put two copies of the

9     same things in evidence.  We still have to address the

10    Blount documents later.

11         With that, Your Honor, we're prepared for the

12    jury to come in.

13         THE COURT:  All right.  Is there anything you

14    would like to raise, Mr. Calfo?

15         MR. CALFO:  Nothing, Your Honor.

16         THE COURT:  Nobody else is standing up.  Let's

17    bring the jury in.

18         (Whereupon, the jury having entered the

19    courtroom, the following proceedings were held:)

20         THE COURT:  Good morning, ladies and gentlemen.

21         THE JURY:  Good morning.

22         THE COURT:  Sorry to keep you waiting so long.

23    The record should reflect that all the jurors are in

24    their appropriate seats, counsel are present, and we're

25    ready to proceed.

62

1          We are not going back to the video.  You're

2     going to see a witness this morning.

3          Would you please call your next witness,

4     Mr. Satterley.

5          MR. SATTERLEY:  Yes.  Good morning, Your Honor.

6     Good morning, ladies and gentlemen.

7          Dr. William Longo.

8          WILLIAM LONGO, Ph.D. (for the Plaintiff)

9                    sworn as a witness,

10                   testified as follows:

11         THE CLERK:  Thank you, sir.  Please take a

12    seat.

13         Could you please state your full name and spell

14    it for the record.

15         THE WITNESS:  William Edward Longo, L-o-n-g-o.

16         THE COURT:  Mr. Satterley, you may inquire on

17    direct examination.

18         MR. SATTERLEY:  Thank you.

19    DIRECT EXAMINATION BY MR. SATTERLEY:

20      Q.  Good morning, Dr. Longo.

21      A.  Good morning.

22      Q.  Have we requested you to come talk with the

23    folks here in Alameda County regarding your testing of

24    various talc products for the presence of asbestos?

25      A.  Yes, sir, you did.

63

1          Q.  And have we -- have you brought with you

2     photographic evidence of the testing and testing

3     results of what you found?

4          A.  Yes, I did.

5          Q.  Have I also asked you to analyze the case of

6     Patricia Schmitz with regards to her exposures, the

7     types of exposures she would have, to asbestos from

8     cosmetic talc products?

9          A.  Yes.  That's correct.

10         Q.  Before we get to your specific opinions in this

11    case, let's talk a little bit about you and yourself.

12              Tell us, where did you go to college, college

13    forward as far as your education.

14         A.  I went to the University of Florida.  I

15    received a bachelor's of science in microbiology.  I

16    went on to graduate school in material science and

17    engineering.  I received a master's of science in

18    material science and engineering, and finished up in

19    1983 with a Ph.D. in material science and engineering.

20    All at the University of Florida.

21         Q.  So when I call you "doctor," you're not a

22    medical doctor?

23         A.  No, sir, I'm not.

24         Q.  Tell us about material science.  What is that?

25         A.  It's an engineering field that literally is the

64

1    study of materials, and you can break these materials

2    down to approximately five groups.

3            Plastics or polymers, ceramics or minerals like

4    asbestos, metals, or metallurgy.  And then composites

5    where you may have a polymer that has a metal content

6    of it where they mix two different things.

7            And then an area I spent a lot of time in, in

8    graduate school is biomaterials, things that are

9    implanted into the body like an artificial knee or a

10   hip replacement or an interocular lens if you have

11   cataract surgery.

12           And as a material scientist, we are taught and

13   learn all the properties of these different materials:

14   strength, weaknesses, ability to withstand corrosion or

15   not, and what are the right materials to use for any

16   particular type of engineering project.  For example --

17   and I use this example a lot.  If you're building a new

18   bridge, the new Bay Bridge that went up, a material

19   scientist would have been involved in that.  And he

20   would be the go-between the civil engineer and the

21   mechanical engineer and the engineer who designed that

22   bridge.

23           What is the best concrete?  What are the new

24   types of metal alloys that could be used that are

25   stronger, cheaper, better corrosion resistance.  So a

65

1    material scientist would have been involved in most of

2    those aspects.

3         All your major semiconductor advances over the

4    years has been due to material scientists.  I don't

5    know about now, but the CEO of Intel was a material

6    scientist at one point in the past.

7         So we understand where the products and

8    materials should be used, what kind of temperature --

9    strengths, temperature, resistance, et cetera.  And

10   also as a material scientist, we -- they develop new

11   materials.  Again, the semiconductor advances, the

12   ceramics on the -- that were developed for the space

13   shuttle, the -- even as simple as the changeover, if

14   your result is me, from the metal soda can to the

15   aluminum soda can.  That was a material scientist who

16   came up with that particular aluminum/copper alloy,

17   mixture of two metals, to be able to make that into a

18   one-step process.

19        The last thing material that scientists do a

20   lot about is almost forensic engineering:  What went

21   wrong?  Is there a contaminant here?  Why did this

22   break?  What's in these ingredients that shouldn't be

23   in these ingredients?  Say, a manufacturer is making

24   injection molding of these polyethylene plastic cups

25   and all of a sudden in the field they're not holding up

66

1    and they're leaking.

2          The material scientist could probably go in and

3    figure out where in that engineering molding process,

4    is it the right materials, is it the right polymer.

5    And that's what I do at my lab a lot, is the forensic

6    engineering side of things.

7          Q.  So let me talk about your lab.  You currently

8    have a lab of how many employees?

9          A.  We have a lab in Suwanee, Georgia, and

10   currently I think we're up to about 46 employees.

11         Q.  And what are the type of professionals work

12   with you in your lab, what type of scientists?

13         A.  I have other material scientists like myself.

14   We have physicists.  We have inorganic chemists;

15   organic chemists; microbiologists; industrial

16   hygienists; geologists; mineralogists; mechanical

17   engineering; physicists -- I think I may have said

18   that.  I think that covers it.  Oh, and electron

19   microscopist specialist; polarized light microscopist

20   specialist; and, of course, the support staff, the

21   admin people that really run the company.

22         Q.  And with regards to asbestos, how long have

23   you -- have you been involved in the analysis for the

24   presence of asbestos?

25         A.  Yes, sir, I have.

67

1          Q.  For how long?

2          A.  A little bit over 30 years.

3          Q.  And with regards to asbestos issues, have you

4     made presentations or publications involving asbestos

5     or asbestos exposure?

6          A.  I have.

7          Q.  Have you tested many different products for the

8     presence of asbestos over the course of your career?

9          A.  Yes, sir.  Early years myself and also our lab.

10         Q.  And approximately how many products or

11    specimens have you examined, you and your laboratory

12    examined, to determine whether asbestos is present or

13    not?

14         A.  A large number of different types of products,

15    but just pure numbers of samples, our laboratory is

16    approaching close to 400,000 individual analysis of

17    samples, different samples for asbestos.

18         Q.  And some of the testing and testing results

19    have you published in the peer-reviewed literature?

20         A.  We have.

21         Q.  And have you made presentations regarding your

22    findings of asbestos in some of the samples?

23         A.  Yes, sir, we have.

24         Q.  And with regards to your professional

25    organizations, what are some of the associations,

68

1    organizations you belong to?

2        A.  The American Industrial Hygiene Association,

3    the Materials Research Society, the Microscopist

4    Society, the American -- I've said that already.

5    American Industrial Hygiene, the American Society of

6    Testing Materials, the Ceramics Society, Materials and

7    Methods Group.  There's a number of them.  Adjunct

8    member of the American Conference of Governmental

9    Industrial Hygienists.  I'm not an American

10   Industrial -- a Governmental Industrial Hygienist, but

11   you can be an adjunct on to that.  And also I am a

12   board certified forensic engineer.

13       Q.  Now, with regards to industrial hygiene, you

14   said you're not a member of -- you're not a member of

15   the American Conference of Government Industrial

16   Hygienists?

17       A.  No.  I'm not a full member.  You have to have

18   worked for the government to be an -- as an industrial

19   hygienist, but you can be an adjunct member so you can

20   get the information.

21       Q.  Have you reviewed and studied the scientific

22   literature on industrial hygiene about asbestos over

23   the course of your career?

24       A.  Yes, I have.

25       Q.  And in developing your expertise as a forensic

69

1    engineer and material scientist, have you studied

2    exposures to asbestos that occur -- that individuals

3    have occurred historically?

4        A.  I have.

5        Q.  And have you reviewed those scientific

6    literature in that regard?

7        A.  Yes, sir, I have.

8        Q.  Do you, Dr. Longo, have specialized knowledge,

9    skill, and experience regarding exposures to asbestos

10   that folks have had based upon your review of the

11   scientific literature?

12       A.  Yes, sir.

13       Q.  Now, have you -- well, let me ask you about

14   your laboratory.  Is your laboratory certified by any

15   organization?

16       A.  It is.

17       Q.  And what organization has certified your

18   laboratory?

19       A.  We're certified by the American -- the American

20   Industrial Hygiene Association for analyzing asbestos

21   air samples.  As well as asbestos bulk samples.  We're

22   certified by the National Voluntary Laboratory

23   Accreditation Program for the analysis of asbestos by

24   transmission electron microscopy as well as bulk

25   samples by polarized light microscopy.

70

1          We're an International Standards Organization
2    certified for quality control, QC, as well as some
3    specialized testing, including water analysis for
4    asbestos.  And we're also certified by O -- by ISO to
5    certify other laboratories that they follow a
6    particular type of analysis or protocol.  And we're --
7    also we have -- we're registered laboratory for the --
8    for the FDA.  So that we can analyze all types of
9    pharmaceutical-type materials from Schedule 2 on down.
10          We are certified by the DEA to handle those
11    types of products that come into the laboratory.
12    Again, Schedule 2 on down.
13          I guess that covers it, other than individual
14    certifications from groups that come in so that they
15    feel comfortable that when we do work or analysis for
16    them.
17    Q.  What type of organizations have you consulted
18    with over the course of your career with regards to
19    testing materials including asbestos?
20    A.  The FAA.  We have consulted for the General
21    Services Administration, the Environmental Protection
22    Agency.  NATO in Germany, when the Berlin Wall came
23    down, we were asked to analyze to see if that wall had
24    asbestos in it.
25          We have -- we have consulted for the Department

71

1    of Defense; for the U.S. Treasury; for National

2    Institutes of Health; for the CDC, Center for Disease

3    Control; and a number of companies outside this kind of

4    environment where we do problem-solving for them as

5    well as just regular analysis.

6        Q.  Now, you're consulting at my request, me and

7    Ms. Clancy's request, in this case.

8            Have you done this in the past where you've

9    testified in cases involving injury and litigation?

10       A.  Yes, I have.

11       Q.  And have you testified at the request of

12   plaintiffs as well as the request of defendants in

13   litigation?

14       A.  I have.

15       Q.  I want to ask you about the ASTM D22.  What is

16   that?

17       A.  The American Society of Testing Materials is a

18   nonprofit organization, where most anybody can join,

19   and it is the largest group out there that develops

20   standards or testing for almost anything.  There's

21   40- -- almost 40,000 members now.

22           And the D22 committee, is what I'm a member of

23   produces methods -- testing methods which, essentially,

24   is just a recipe, go from A to Z, so that labs can

25   standardize particular tests for analysis of different

72

1    types of matrices -- water, dust, et cetera -- for

2    asbestos.

3        Q.  And how long have you been a part of the D22

4    committee or subcommittee?

5        A.  Since approximately 1989 or so.

6        Q.  And did you have any role in leading that

7    committee in the past or being part of leadership of

8    that committee?

9        A.  Not leadership in the committee, but I was

10   tasked to being the shepherd or the person to push

11   through and write the test method for analyzing dust

12   for asbestos, building dust.  The -- and I spent six

13   years doing that.

14       Q.  Now, with regards to the tools that you use as

15   a material scientist for the identification of

16   asbestos, the jury has already heard last week from Lee

17   Poye about the transmission electron microscope.  You

18   utilize that tool?

19       A.  We do.

20       Q.  How many TEMs do you have?

21       A.  Currently, we have four.

22       Q.  And how long have you had specialized

23   knowledge, skill, and experience in utilizing the

24   transmission electron microscope?

25       A.  Over 30 years.

73

1      Q.   The jury has heard about the scanning electron

2   microscope.  Do you have a scanning electron

3   microscope?

4      A.   We do.

5      Q.   And how long have you utilized the scanning

6   electron microscope in your laboratory?

7      A.   Over 30 years.

8      Q.   The jury has heard about polarized light

9   microscopes.  Do you have polarized light microscopes

10   in your lab?

11      A.   We do.

12      Q.   How many?

13      A.   I think around 10.

14      Q.   And how long has your laboratory utilized

15   polarized light microscopes historically?

16      A.   Over 30 years.

17      Q.   Will you -- do you have specialized knowledge

18   and experience in explaining what is seen under these

19   microscopes and what's identified and how they're

20   characterized?  Will you be able to do that -- do that

21   today?

22      A.   Yes, sir, I believe so.

23      Q.   With -- specifically with regard to industrial

24   hygiene, you mentioned that you're a member of the

25   American Industrial Hygiene Association.

74

1           How much literature have you looked at with

2    regard to asbestos in terms of exposures over the

3    course of your career?

4       A.  I think the number of published papers I've

5    reviewed has to be in the hundreds.

6       Q.  And with regards to your analysis of exposures,

7    do you review and consider historical company

8    documents?

9       A.  Yes, sir, I do.

10      Q.  And specifically in this case, have you

11   reviewed and looked at some of the Johnson & Johnson

12   historical documents regarding asbestos issues?

13      A.  Yes, I have.

14      Q.  And have you specifically looked at some of the

15   Colgate documents regarding asbestos issues?

16      A.  Yes, sir.

17      Q.  And in some of these historical documents --

18   and we'll talk about them a little bit later -- are

19   there technical-type terms mentioned in some of them

20   that you can help explain some of these terms?

21      A.  Yes, sir, I believe so.

22      Q.  The jury's probably heard of some of them, but

23   we -- we may go through some -- some more of those.

24           I asked you about your organizations, and I

25   just want to make sure -- I don't know -- the National

75

1    Asbestos Council, were you a member of that

2    organization?

3        A.  Yes, sir, I am.

4        Q.  The Environmental Information Association, are

5    you a member of that organization?

6        A.  Yes, sir, I am.

7        Q.  The Electron --

8        A.  The National Asbestos Council, that morphed

9    into the Environmental Information Association.  So

10   that's really one group.

11       Q.  Okay.  I see.

12           And then the Electron Microscopy Society

13   association, are you member of that organization?

14       A.  Yes, sir.  Yes, sir.

15       Q.  The Microbeam Analysis Society, are you a

16   member of that organization?

17       A.  That, too.

18       Q.  Are you a member -- have you been a member of

19   the New York Academy of Science?

20       A.  I have been a member in the past.

21       Q.  Have you been a member of the National

22   Institute of Building Sciences?

23       A.  Yes, sir.  I still am.

24       Q.  Have you been a member of the Society for

25   Ultrastructural Pathology?

76

1          A.  Yes, sir, I have been.

2          Q.  And in the past, have some of the publications

3    that you've published and been the co-author been on

4    asbestos issues with pathologists?

5          A.  Yes.

6          Q.  Okay.  Does your laboratory -- in addition to

7    looking at products, has your laboratory looked at

8    tissue, human tissue, for asbestos, the presence of

9    asbestos?

10         A.  We have.

11         Q.  The American College of Forensic Examiners, are

12   you a member of that organization?

13         A.  Yes, sir.  That's actually the one I'm board

14   certified in and now have been made -- been elected to

15   be a diplomat in that organization.

16         Q.  And have you -- specifically with regard to

17   talc and exposures from talc, have you studied the

18   scientific literature from an exposure perspective to

19   form the basis of your opinions here today?

20         A.  Yes.

21              MR. SATTERLEY:  Your Honor, at this time, I

22   would offer Dr. Longo as an expert in material science,

23   asbestos testing, and exposure.

24              THE COURT:  Mr. Calfo, do you wish to inquire

25   of this witness on his qualifications?

1          MR. CALFO:  Your Honor, we'll reserve our

2     questioning for later.

3          THE COURT:  Mr. Mularczyk?

4          MR. MULARCZYK:  No questioning at this time,

5     Your Honor.

6          THE COURT:  All right.

7          Ladies and gentlemen, this witness will be

8     certified as an expert in material science, forensic

9     engineering, testing for asbestos, and exposure to

10    asbestos.

11         During this trial, you will hear testimony from

12    expert witnesses.  The law allows an expert to state

13    opinions about matters in his or her field of expertise

14    even if he or she does not witness any of the events

15    involved in the trial.

16         You do not have to accept an expert's opinion.

17    As with any other witness it is up to you to decide

18    whether you believe the expert's testimony and choose

19    to use it as a basis for your decision.  You may

20    believe all, part, or none of an expert's testimony.

21         In deciding whether to believe an expert's

22    testimony, you should consider the expert's training

23    and experience, the facts that the expert relied on,

24    the reasons for the expert's opinion.

25         The law allows expert witnesses to be asked

78

1    questions that are based on assumed facts.  These are

2    sometimes called hypothetical questions.

3            In determining the weight to give to the

4    expert's opinion that is based on assumed facts, you

5    should consider whether the assumed facts are true.

6            If expert witnesses disagree with one another,

7    you should weigh each opinion against the others.  You

8    should examine the reasons given for each opinion and

9    the facts or other matters that each witness relied

10   upon.  You may also compare the experts'

11   qualifications.

12           With that in mind, Mr. Satterley, you may

13   inquire on direct examination.

14           MR. SATTERLEY:  Thank you, Your Honor.

15   BY MR. SATTERLEY:

16      Q.  Dr. Longo, I'll jump to the -- your opinions

17   first.  Then we are going to backtrack and go through a

18   lot of the bases for your opinions.

19           Do you have an opinion, Dr. Longo, based upon

20   everything you've looked at -- internal company

21   documents, historical documents, the scientific

22   literature, all the testing that you've done -- whether

23   or not Johnson & Johnson Baby Powder historically has

24   included asbestos as a part of it?

25      A.  I do have an opinion.

79

1          Q.  And what is your opinion?

2          A.  That it does.

3          Q.  Do you have an opinion, Dr. Longo, based upon

4    historical review of company documents, your review of

5    the scientific literature, your own -- your

6    laboratory's own testing of Cashmere Bouquet product,

7    whether the Cashmere Bouquet historically has included

8    asbestos as a part of it?

9               MR. MULARCZYK:  Objection.  Foundation.

10              THE COURT:  It's overruled.

11              THE WITNESS:  Yes, I do have an opinion.

12   BY MR. SATTERLEY:

13         Q.  And what is your opinion?

14         A.  That that product does.

15         Q.  And with regards to this case, did you evaluate

16   Ms. Schmitz' exposure to those products, both Johnson &

17   Johnson Baby Powder and Cashmere Bouquet?

18         A.  Yes, I did.

19         Q.  And have you reviewed testimony of her and her

20   sisters that was given under oath with the attorneys

21   for these companies?

22         A.  Yes.

23         Q.  And have you developed an opinion or formed an

24   opinion with regards to her exposures to asbestos from

25   these products?

80

1    A.  Yes, I did.

2    Q.  And what is your opinion?

3    A.  That she was exposed to asbestos from the use

4    of these two manufacturers' products.

5    Q.  And did you issue a signed report with your

6    calculations regarding the exposures she had?

7    A.  I did.

8    Q.  And in your opinion, based upon her many years

9    of use of these products and being around the products

10   when her family members were using them, do you have an

11   opinion whether those exposures was a substantial

12   exposure to asbestos from their products?

13        MR. MULARCZYK:  Objection.  Foundation.

14        THE COURT:  Sustained.

15   BY MR. SATTERLEY:

16   Q.  We'll go through the math in a little bit.

17        With regards to Johnson & Johnson -- let's

18   start with Johnson & Johnson -- have you reviewed

19   historical documents with regards to their testing,

20   testing done by laboratories at their request?

21   A.  Yes.

22   Q.  And with regards to Colgate-Palmolive, have you

23   reviewed testing by laboratories of the Cashmere

24   Bouquet product for the presence of asbestos?

25   A.  Yes.

81

1      Q.  And based upon your review of the historical

2  documents, do you have an opinion whether it was

3  documented back in the 19- -- with regards to Johnson &

4  Johnson first, back in the 1960s and the 1970s,

5  asbestos being present?

6          MR. CALFO:  Objection, Your Honor.  No

7  foundation for this witness.

8          MR. MULARCZYK:  And hearsay, Your Honor.

9          THE COURT:  Overruled on both.

10          THE WITNESS:  Yes, I do have an opinion.

11  BY MR. SATTERLEY:

12      Q.  And with -- and with --

13      A.  That it is -- that it does.

14      Q.  What is your opinion?

15      A.  The opinion is that it does.

16      Q.  Okay.  And we'll go through some of the

17  documents here in a little bit.

18          With regards to Colgate-Palmolive, once again,

19  did you look at the historical documents in the 1970s,

20  '80s, and '90s regarding the Cashmere Bouquet product?

21      A.  Yes, sir.

22      Q.  And based upon your review of the historical

23  documents of the Cashmere Bouquet product, was it

24  documented in the '70s, '80s, '90s and forth -- so

25  forth, the presence of asbestos?

82

1          MR. MULARCZYK:  Same objections, Your Honor.

2          THE COURT:  It's overruled.

3          THE WITNESS:  Yes, it was.

4    BY MR. SATTERLEY:

5      Q.  First of all, I want to -- I want to ask you a

6    question -- a few questions.  Counsel --

7          Oh, there it is.  That's what I was looking for

8    right there.

9          Counsel for Johnson & Johnson told the folks on

10   the jury that you personally have made $30 million

11   working for plaintiffs' lawyers.

12         Is that true?

13         MR. CALFO:  Objection, Your Honor.  Misstates

14   opening statement.  I said the company did.

15         MR. SATTERLEY:  I disagree.

16         THE COURT:  It's overruled.  The jury will --

17         THE WITNESS:  No, I have not made $30 million

18   working for plaintiffs' attorneys personally.

19   BY MR. SATTERLEY:

20     Q.  You and your company, the company you work for,

21   MAS, that's --

22         You're the president of the company; correct?

23     A.  Yes, I am.

24     Q.  Okay.  Is it -- it is true, though, over the

25   course of 30-some-odd years you've charged for your

83

1  time in litigation to both plaintiffs -- plaintiffs and

2  defendants in these forensic situations?

3      A.  Yes, I have.

4      Q.  And would it be fair to say, over 30-some-odd

5  years, you have charged -- your company has charged

6  both for your time and all the other folks working --

7  involved in forensic issues, litigation issues, well

8  over $30 million?

9      A.  My time; other individuals that have testified;

10  all the testing we did over the years, especially in

11  the property damage litigation, where we did forensic

12  engineering to identify the products, that would be

13  fair.  That's what our company has billed over

14  30 years.

15      Q.  With regards to advertising, a Johnson &

16  Johnson lawyer told the folks on the jury that you

17  started advertising for plaintiffs' lawyers -- to get

18  plaintiffs' cases 30-some-odd years ago.

19          Is that true?

20      A.  That is not true.

21      Q.  We've marked for identification purposes

22  Exhibit 1099.  And if I could --

23          It's okay.

24          Let's see.  Is the projector on?

25          May I approach, Your Honor?

84

1          THE COURT:  You may.

2    BY MR. SATTERLEY:

3          Q.  I'm handing you, Dr. Longo, Exhibit 1095.  I

4    shared it with counsel previously, another copy,

5    courtesy copy --

6          THE COURT:  Is it 1095 or 1099?

7          MR. SATTERLEY:  1099, Your Honor.

8          -- another courtesy copy.

9    BY MR. SATTERLEY:

10         Q.  Is this a journal called *Asbestos Issues*, dated

11   June 1990?

12         A.  It is.

13         Q.  And by this point in time --

14         If I can figure out how to... there we go.

15         By this point in time, 1990, were you

16   already -- did you already have specialized skill on

17   utilizing the transmission electron microscope?

18         A.  Yes, sir.

19         Q.  And did you already consider yourself to be an

20   expert on utilizing the transmission electron

21   microscope?

22         A.  Yes.  I had spent a lot of time, especially in

23   graduate school, as well as in my career at that point,

24   dealing with interpreting, analyzing samples on the

25   transmission electron microscope.

85

1      Q.  It says in this 1990, "Asbestos management

2  strategies for new era building owners."

3          Did your company place an ad in this -- in this

4  journal?

5      A.  We did.

6      Q.  And did this journal relate to building issues?

7      A.  Yes, sir.

8      Q.  All right.  And is this the advertisement that

9  was placed in this journal in 1990?

10     A.  It was.

11     Q.  Does this in any way relate to you trying to

12 get business from mesothelioma victims so you can

13 testify in a courtroom like this?

14     A.  No, not at all.

15     Q.  If somebody were to say this ad right here

16 proves that you were trying to be an expert for people

17 suffering from asbestos disease, would that be

18 accurate?

19     A.  No, sir.

20     Q.  The person in the ad with -- this is you over

21 here on the right; correct?

22     A.  Yes.  I've hardly aged at all.

23     Q.  Okay.

24     A.  Yes, that's me.

25     Q.  Okay.  And this fellow on the left, who's that?

86

1          A.   That's Mr. George Yamate.

2          Q.   Who is George Yamate?

3          A.   George Yamate is the author of the TEM

4     protocol -- and you may hear something about it --

5     typically called the Level 1, Level 2, Level 3

6     analysis.  There was a draft method issued in the early

7     1980s or so for the EPA, and it's still a widely used

8     protocol, especially Level 2, in our industry.  And

9     George Yamate was the author of that.

10         Q.   I want to show you this part right here.

11    It's -- it's hard to read.  I've got it blown up here.

12    I showed it to counsel.

13              First of all, it says on here, "final clearance

14    lab," "the final clearance lab."  What does "the final

15    clearance" mean?

16         A.   Final clearance in this industry is that when

17    there is an abatement of removing asbestos, especially

18    in schools, there's a requirement that they do a final

19    air clearance, which means that once the contractor

20    says, "Yes, we're all done.  We got all the asbestos

21    out.  Everything is clean.  There's no asbestos dust

22    left in this area that we did this in containment" --

23    final air clearance would involve going in and taking

24    air samples while the consultant uses a leaf blower at

25    a hundred miles an hour to disturb any dust that may be

87

1    laying anywhere to see if there's asbestos present

2    before you let the kids back in the school.

3         That's final air clearance, and it's sort of a

4    term now of art that everybody uses.  "Yes, we've got

5    some final air clearance samples coming," we know

6    exactly what that is.  And that's what we were

7    advertising for.

8    Q.  This paragraph here, it says, "Professional

9    asbestos consultants and contractors know that when the

10   job demands the best final air clearance testing by

11   TEM, you go to the people whose rigorous in-house

12   quality control measures produce TEM results and

13   professional support that stands up to the toughest

14   tests you may face."

15        That was included; correct?

16   A.  Yes, sir.

17   Q.  And you -- had you and Mr. Yamate in a

18   courtroom somewhere in Georgia; right?

19   A.  Yes, it was.  It was in rural Georgia, and we

20   took this ad in the courtroom to say that "If you use

21   our laboratory and somebody challenges your final air

22   clearance, saying, 'Oh, it's not really clean,' or 'You

23   should have did this,' we would come in and defend our

24   data.  We would" -- "If it goes to court, we would be

25   working for you, saying, 'No, this is what the' --

88

1    'This is the analysis we did, and it's correct.'"

2          That's what that ad was about.

3          Q.  And the folks that would be hiring you for this

4    would be building owners or contractors, people doing

5    asbestos abatement?

6          A.  Yes, sir.

7          Q.  Okay.  This had absolutely nothing to do with

8    talc issues?

9          A.  No.

10         Q.  Had nothing to do with mesothelioma victims?

11         A.  No.

12         Q.  Had nothing to do with plaintiff lawyers or

13   anything like that?

14         A.  No, sir.

15         Q.  Now I want to switch gears and talk about

16   testing and testing methods.  Tell us about the

17   strengths of utilizing transmission electron microscope

18   for the identification of asbestos.

19         A.  Its strengths are that it's the most sensitive

20   method out there in that it can detect single asbestos

21   fibers and fully characterize them in that if you see a

22   single small fiber, you can get the chemistry of it,

23   utilizing EDXA, or the energy dispersive x-ray.  So you

24   can do microchemistry.

25         You can get crystalline structure information

89

1   by doing the diffraction patterns.  I know Mr. Poye

2   probably went through all that when he was here,

3   diffraction patterns.

4        And it allows you to take photographs of these

5   micro- -- these -- these microscopic fibers.

6        And so if you have something there, you can

7   fully characterize it.  So it still is the most

8   sensitive method for this type of analysis.

9        Q.  I want to show you what's already in evidence,

10  Exhibit 326.  This is 1974, January 3rd.

11       MR. SATTERLEY:  May I approach, Your Honor?

12       THE COURT:  You may.

13  BY MR. SATTERLEY:

14       Q.  January 3, 1974, on Johnson & Johnson

15  letterhead.  And you've seen this in the past and

16  considered this; correct?

17       A.  I have.

18       Q.  And this is from A.J. Goudie to Dr. Gaughran

19  and Dr. Shelley, "Purchase of a transmission electron

20  microscope plus attachments."

21       Do you see that?

22       A.  I do.

23       Q.  And Dr. Goudie says, "Over the past three

24  years, there seems to have been general agreement that

25  transmission electron microscope is the only absolute

1    proof with electron diffraction for the identification

2    of asbestos in talc."

3            Do you agree with the statement that was said

4    in 1974?

5        A.  Yes and no.  I would agree, in 1974, that was

6    the absolute best instrument to use, but only for the

7    positive identification.

8            The "no" part is, it's not -- if you don't see

9    asbestos by TEM using that at the time, it doesn't mean

10   that there's no asbestos present.  It just means you

11   didn't detect it.

12           So, yes, it is the most -- at that time, it was

13   the best method to use for absolute identification.

14           THE COURT:  Mr. Satterley, if you're moving on

15   to something else, would you please identify the

16   document that you have on the screen by the exhibit

17   number.

18           MR. SATTERLEY:  I apologize, Your Honor.  I

19   thought I did.  326.

20           THE COURT:  All right.

21           MR. SATTERLEY:  I apologize.

22           The next document that's already into evidence,

23   Exhibit 238.  And may I approach again, Your Honor?

24           THE COURT:  You may.

25   BY MR. SATTERLEY:

1      Q.  This is March 1974, a confidential Johnson &

2   Johnson memorandum.

3          MR. SATTERLEY:  I provided a copy to counsel.

4   Another copy.

5   BY MR. SATTERLEY:

6      Q.  And flip over to the second page, page 2.

7          To put this into context, on the first page,

8   does it say it's -- it's to the Windsor Minerals,

9   Windsor, Vermont, from R.C. Reynolds, Dartmouth

10  College?

11         Do you see that on the first page?

12     A.  Yes, sir, I do.

13     Q.  And this -- "Subject:  Analysis of talc

14  products and ores for asbestiform amphiboles"?

15     A.  Yes, sir.

16     Q.  And on the second page, it says, where I've

17  highlighted here on Exhibit 238, "For the reasons

18  described above, a concentration technique is

19  mandatory" --

20         MR. SATTERLEY:  I apologize, Your Honor.

21  Mrs. Schmitz.

22         -- "for the reasons described above, a

23  concentration technique is mandatory because it brings

24  the amphiboles into a reasonable concentration range

25  for optical or other methods of analysis.

92

1           "Such a method has been developed, and it" --

2      "it is described in this report."

3           Have you considered this document in your

4      analysis of what's known as the concentration method?

5           A.  I have.

6           Q.  And based upon this document and many other

7      documents, was the concentration method a method that

8      was discussed within Johnson & Johnson way back in the

9      1970s?

10          A.  Yes, sir, it was.  Early '70s.

11          Q.  And I would like to show you another document

12     that you -- I believe you considered.

13          This is Exhibit 329.  It's already into

14     evidence.  This is dated June 3, 1973, on Johnson &

15     Johnson letterhead.

16          And do you see it's signed off by

17     Dr. D.R. Petterson?

18          A.  I can't see who it's signed off by on --

19          Q.  The name at the bottom -- oh, I'm sorry.

20          MR. SATTERLEY:  May I approach, Your Honor, and

21     hand the witness -- I apologize.

22          THE WITNESS:  I believe you're correct, but I

23     just wanted to check.

24     BY MR. SATTERLEY:

25          Q.  Thanks for helping me out there.  All right.

93

1           You see now, Doctor, that -- D.R. Petterson's

2     name at the bottom?

3           A.  I do.

4           Q.  And it's carbon-copied to W. Ashton?

5           A.  Yes, sir.

6           Q.  And have you considered many documents from

7     Bill Ashton, or William Ashton, historically with

8     regard to Johnson & Johnson?

9           A.  Yes, sir.

10          Q.  And it says in -- it says in the third

11    paragraph -- it says, "Note the use of the

12    concentration technique is the drafted specification

13    for the analysis of asbestos.

14          "Also, I have discussed with Shelley that the

15    samples to be sent by Dr. Rolle will be on 20 recent

16    samples of powder in which we found no

17    tremolite/actinolite by optical technique."

18          I want to stop right there and ask you to

19    explain the optical technique and why you would analyze

20    using a concentration technique if there are no

21    tremolite or actinolite identified.

22          A.  The optical technique is using polarized light

23    microscopy, and that is a very good technique as long

24    as the amount of asbestos in there is high enough for

25    it to detect.

94

1        Every analytical method has an analytical

2   sensitivity/detection limit, where the analyte -- and

3   we all call it analytes -- the asbestos is at a

4   concentration still in there but lower than the optical

5   microscope can detect.  You say it's nondetect.

6        So in order to increase the ability to detect

7   it or get a better analytical sensitivity, you go to

8   the concentration method, which is -- literally, you're

9   looking for needles in a haystack.  That might take you

10  a long time.  You may miss them.

11       If you get rid of the hay and just look for the

12  needles, because the needles are all now concentrated,

13  you can come back and say, "Yes, there are all these

14  needles in the haystack.  I just couldn't see them

15  before because there was so much hay, I had to weed

16  through."

17       And that's what the concentration does.

18  Q.  Is the concentration method a preparation

19  method that's done before you put it onto the filter

20  before it goes into the microscope itself?

21  A.  Yes, sir.  That's a good point.

22       These techniques -- polarized light microscopy,

23  XRD, x-ray diffraction, and especially transmission

24  electron microscopy -- it's all about the sample

25  preparation and how good a job you do and how you

95

1    concentrate it, how you put it together before it goes

2    into what we call tools.

3           Because the analytical transmission electron

4    microscope is just going to give you the same

5    information that it would give you no matter what.

6    It's all about sample preparation.

7           So you prepare the sample in a way that gives

8    the best opportunity to see if you can detect the

9    asbestos at the lower -- the best analytical

10   sensitivity you can.  That's all done before you get to

11   the electron microscope.

12          All these techniques, it's all about sample

13   preparation.

14   Q.   And with regards to the presence of platy talc,

15   if you prepare a sample where it has lots of platy talc

16   on it, will that -- does that potentially obstruct the

17   analyst's ability to see the asbestos materials?

18   A.   Yes.  You're covering it up, especially in the

19   transmission electron microscope, or the TEM --

20   everybody calls it TEM.

21          If I have an asbestos fiber here and I have a

22   platy talc on top of it -- we're imaging by using an

23   electron beam, which goes real good for resolution, but

24   it only has so much strength.  So it can't go through

25   stuff that builds up.

96

1          So if here's my asbestos fiber and I have a

2    platy talc here, I go, "Okay.  Well, I can see it."

3    But if I start getting more and more platy talc on here

4    because it's so concentrated with it, pretty soon, it's

5    like that.  You can't find it, no matter how much you

6    look for it, TEM, if you have too many talc particles

7    in there.

8          Good analogy is that I have a big bowl of

9    spaghetti, and there's a couple of meatballs in there,

10   and I'm just looking at the bowl, and I can't see them.

11   But if I take it and spread it out or I get rid of the

12   spaghetti, the meatballs stand right out.

13         And -- and that's with both polarized light

14   microscope and especially with TEM.  If you have too

15   much talc in there, you can't see the asbestos fibers.

16         So what they used to do -- or still -- people

17   still do it -- is, they dilute the sample to spread all

18   that talc out so that you can find the asbestos fibers.

19   But if you dilute the talc particles, you're diluting

20   the asbestos fibers, too.  So now I'm spreading it out

21   and making it harder and harder to find something if

22   it's present.

23         If I use the concentration method, I get the

24   talc out of there, and I can concentrate the asbestos

25   down, better opportunity to see if it's really

97

1      positive, detectable or not.

2          Q.  This 1974 Johnson & Johnson document says,

3      "Shelley reports that Pooley" -- you know who

4      Dr. Pooley is?

5          A.  Yes, sir, I do.

6          Q.  -- "that Pooley has found actinolite in our

7      Vermont talc by his concentration technique.  Italian

8      talc by the same technique appears to be free of

9      amphiboles.  I have sent the report referred to

10     I.W. Sloan on to Roger Miller for their study."

11         Do you see that?

12         A.  Yes, sir.

13         Q.  Is this one example in 1973 of the use of the

14     concentration method by analysts finding asbestos that

15     they otherwise would not find by optical microscope?

16         A.  That is correct.

17         Q.  One other exhibit and then I want to talk -- I

18     want to show the animation on the heavy liquid

19     separation.

20         This is Exhibit 330.

21         MR. SATTERLEY:  May I approach, Your Honor?

22         THE COURT:  Yes, you may.

23         MR. SATTERLEY:  It's already into evidence.

24     BY MR. SATTERLEY:

25         Q.  This is November 26, 1974, on Johnson & Johnson

98

1   letterhead.  And it, Dr. Longo, is signed by a --

2   signature on the second page, John P. Schelz --

3   S-c-h-e-l-z.

4           Do you see that?

5       A.  Yes, sir, I do.

6       Q.  Is this a document you considered in

7   formulating your opinions in analyzing this case?

8       A.  Yes.

9       Q.  And it says, "It's a review of experimental

10  techniques for the concentration of asbestos minerals

11  in talc, Project Number 0503-00."

12          Do you see that?

13      A.  I do.

14      Q.  It says, "Our preliminary investigation of

15  experimental technique for the concentration of

16  asbestos minerals in talc has been in two areas:"  And

17  then they have a whole section on -- at the top.

18          Do you see that?

19      A.  I do.

20      Q.  And Dr. Fred Pooley is referenced there.

21      A.  Yes, sir, he is.

22      Q.  And I want to focus on the second.

23          It says, "The concentration of

24  actinolite/tremolite" -- by the way, actinolite and

25  tremolite, is that a form of asbestos?

99

1          A.  It is.

2          Q.  And we'll show photographs.

3               Have you seen actinolite/tremolite asbestos

4     under your microscopes?

5          A.  We have.

6          Q.  And have you taken photographs of them and

7     demonstrated for the presence of talc?

8          A.  Yes, sir.

9          Q.  It says, "The concentration of actinolite,

10    tremolite, and chrysotile from talc by individual heavy

11    liquid separation technique developed by Dr. Robert

12    Reynolds, Dartmouth College.  Dr. Reynolds of the

13    Department of Earth Science has been requested by

14    Mr. V. Zeitz" --

15              You know Vernon Zeitz?  You know that name?

16         A.  I've have see it on documents.

17         Q.  -- "of Windsor Materials (sic) to work on the

18    actinolite concentration technique.  This method

19    utilizes the difference in densities between actinolite

20    and other amphiboles and talc to effect separation in a

21    heavy liquid medium."

22              Do you see that?

23         A.  I do.

24         Q.  Is that what's sometimes referred to as the

25    heavy liquid separation?

100

1      A.  It is.

2      Q.  So when we talk concentration and we talk heavy

3  liquid separation, are we basically talking about the

4  same process?

5      A.  It is the same process, but you can concentrate

6  by other methods for other things, like if you're --

7  it's calcium carbonate and -- you can dissolve out the

8  calcium carbonate with a slight acid solution.  That's

9  not what we're dealing with here.  They're all

10  concentration methods, but this one uses liquid that is

11  heavier density than, say, water, to cause things to

12  sink versus causing things to float.

13      Amphibole asbestos will sink, the talc will

14  float because of their different densities.

15      Q.  It says, "Following Dr. Reynold's procedure, we

16  have been able to detect tremolite by optical

17  microscopy dispersion staining in the separated

18  fraction from a sample containing initially as little

19  as 0.01 percent by weight tremolite in Vermont talc."

20      And I want -- and I want to ask you:  The

21  separation process, can be utilized by both the TEM and

22  by a regular microscope?

23      A.  Yes, sir.

24      Q.  Okay.  And can -- can the separation method

25  be -- once it's separated and prepped out, can it be

101

1    looked under what's called a "PLM," a polarized light

2    microscope?

3         A.  Yes, it can.

4         Q.  Now I want to switch gears and talk about the

5    animation.  And this is Exhibit 1047 for demonstrative

6    purposes only.

7              Have you in the past, Dr. Longo -- well, did

8    you actually assist in the preparation of this

9    animation?

10         A.  I did.

11         Q.  And you told me and my graphics people how

12    to -- how the heavy liquid separation process occurred?

13         A.  Yes.

14         Q.  And let me --

15              Does this heavy liquid separation animation

16    truly -- accurately demonstrate the process of heavy

17    liquid separation?

18         A.  It does.

19         Q.  And as we see this animation perceived through,

20    if you can talk us through what -- what's happening?

21         A.  Here's the centrifuge tube.  You have talc in

22    the bottom.  And then you're putting a heavy liquid

23    density material in there so that you can separate the

24    talc from any potential amphiboles that might be

25    present.  So you shake it up and get the talc

1   distributed through there and put it in a centrifuge

2   where you're spinning it anywhere from 7,000 to

3   9,000 rpm.  After you're done, you'll have a talc plug

4   at the top, since it floats, and most of your

5   amphibole -- potential amphibole asbestos minerals will

6   come to the bottom of the centrifuge tube.

7        Once that happens, you can remove the tip.  We

8   use a technique by flash freezing the centrifuge tube

9   in liquid nitrogen and using sort of a guillotine-type

10  apparatus to just cut the tip off, and then put that in

11  solution, filter it, and then analyze it.

12       We normally use 30 milligrams of talc when we

13  do this.  And we can put the entire amount of the

14  collected material on a TEM filter.

15       If you use 30 milligrams of talc and filtered

16  that on to a TEM filter without doing this, the sample

17  would be black.  It would be so thick the electron

18  beams can't go through the sample.  You would never be

19  able to do that.

20       So this increases the sensitivity almost

21  10,000 times for the finding of potential amphibole

22  asbestos.

23       Q.  Have you utilized, you and your laboratory,

24  utilized the heavy liquid separation technique with

25  regards to samples of Johnson & Johnson, historical

103

1    samples provided by Johnson & Johnson, for preparation

2    in this case?

3         A.  Yes, I have.

4         Q.  Have you, you and your laboratory, analyzed

5    Cashmere Bouquet utilizing the heavy liquid separation

6    for the identification of asbestos?

7         A.  Yes, we have.

8         Q.  And have you issued reports and photographs and

9    documented asbestos after utilizing the heavy liquid

10   separation?

11        A.  Yes.

12        Q.  Have you and your laboratory utilizing heavy

13   liquid separation preparation and utilize that under a

14   transmission electron microscope?

15        A.  Yes, we have.

16        Q.  Have you utilized the heavy liquid separation

17   for -- have you utilized the heavy liquid separation

18   specifically regarding Cashmere Bouquet under a

19   polarized light microscope?

20        A.  Yes.

21        Q.  And will -- a little bit later will you be able

22   to demonstrate the photographs and what's represented

23   in the photographs?

24        A.  Yes.

25        Q.  Using the heavy liquid separation, the

104

1    concentration method, did you and your laboratory find

2    asbestos in the Colgate Cashmere Bouquet products that

3    you tested?

4        A.  Yes, we did.

5        Q.  And did you -- did I specifically send -- ask

6    you to have someone from your lab go to the RJ Lee

7    Group to pick up Cashmere Bouquet samples?

8        A.  Yes.

9        Q.  And one of your analysts named Zach, did he go

10   up to Pittsburgh, or around Pittsburgh, to get the

11   Cashmere Bouquet samples with the -- that was with the

12   RJ Lee Group?

13       A.  Yes, he did.

14       Q.  And do you -- did you guys have a chain of

15   custody and document what was -- what was a part of

16   that Cashmere Bouquet product?

17       A.  Yes, sir.

18       Q.  We'll talk about that in a little bit.

19           Oh, did you find -- did you analyze 20 samples

20   from the samples you received?

21       A.  Yes.

22       Q.  And of the 20 samples of Cashmere Bouquet,

23   historic Cashmere Bouquet, that you analyzed in your

24   laboratory, how many of them had asbestos in them?

25       A.  All of them.

105

1     Q.  All 20?

2     A.  Yes, sir.

3     Q.  This next exhibit that's in evidence, 251.

4         MR. SATTERLEY:  May I approach, Your Honor?

5         THE COURT:  You may.

6  BY MR. SATTERLEY:

7     Q.  This is dated November 24, 1976.  This is by

8  Mr. Ashton to Mr. Lee.  Once again, it's Exhibit 251.

9         Is this a document you've considered in

10  analyzing this case?

11     A.  Yes, I have.

12     Q.  And it's signed off by Mr. Ashton, and it's

13  copied to Dr. Semple and Dr. Petterson on Johnson &

14  Johnson letterhead there.

15         And it says -- in 1976 to Mr. George Lee,

16  "Attached is a copy of a disturbing proposal request

17  which the FDA has currently made available to qualified

18  bidders.  The scope of the work is the separation of

19  asbestos in foods, drugs, and talc for identification

20  and determination.  I find this proposal more

21  disturbing than other proposals up to now because it

22  aims at separation and isolation of asbestos from a

23  wide scope of products and animal tissues.  Up to now,

24  our main problems have had to do with the

25  identification, whereas, now it looks like the FDA is

106

1    getting into the separation and isolation methodology

2    which will mean concentration procedures.  As I have

3    pointed out many times, there are many talcs on all

4    markets which will be hard-pressed in supporting purity

5    claims when ultra-sophisticated assay separation and

6    isolation techniques are applied.  Chances are that the

7    FDA proposal will open up the" -- "open up new problem

8    areas with asbestos and talc minerals."

9         Is that the process by which you utilize on the

10   talcs that you analyzed that we're going to talk about

11   later?

12        A.  Yes, it is.

13        Q.  Does that isolation and separation of asbestos

14   from talc allow you to see under the microscope the

15   asbestos that was present?

16        A.  Yes, it did.

17        Q.  And have you also, Dr. Longo, had talc samples

18   analyzed by other techniques like XRD or optical

19   microscope analysis where no asbestos was present but

20   then you looked at it by TEM and asbestos would be

21   present?

22        A.  Correct.  The XRD would be nondetectable.

23   Regular PLM nondetectable in some cases.  Some cases

24   you do find it by regular PLM.  Where the TEM or the --

25   using heavy concentration method or PLM heavy

107

1    concentration method had the highest percentage of

2    positives where the other techniques on the same sample

3    were negative.

4        Q.  Based upon your analysis of all -- all aspects

5    of this case, did the FDA ever adopt or require the

6    isolation and separation method and require folks to

7    utilize this to find asbestos in talc?

8        A.  No.  They never -- they never finalized that.

9        Q.  The next document, before our mid-morning

10   break, Exhibit 234.

11           MR. SATTERLEY:  May I approach, Your Honor?

12           THE COURT:  You may.

13           MR. SATTERLEY:  It's already into evidence.

14   Provide a copy to counsel.  This is entitled,

15   Exhibit 234, "Proposed Specs for Analyzing Talcs for

16   Asbestos."

17           And the first page is dated May 16, 1973.  And

18   this is on Johnson & Johnson letterhead; correct?

19       A.  It is.

20       Q.  And just to put it into context, this is signed

21   off by Tom Shelley and carbon-copied to a number of

22   other people, including Dr. Fuller, Dr. Goudie,

23   Dr. Nashed, and Dr. Petterson; correct?

24       A.  That is correct.

25       Q.  And he says, with regards to the third

108

1    paragraph, "England is considering method of

2    preconcentrating the asbestos so as to be able to

3    analyze by x-ray.  They find no asbestos by doing this

4    with Italian talc.  They find, Pooley, 0.05 percent of

5    a tremolite type in Vermont."

6         Is that a document you considered in coming to

7    your opinions in this case?

8         A.  It is.

9         Q.  And did you find asbestos in Vermont talcs?

10        MR. CALFO:  Objection.  There's no foundation

11   for that from this document, Your Honor.

12        MR. SATTERLEY:  I'm asking a separate question.

13        THE COURT:  He asked whether he found it.

14        THE WITNESS:  We have.

15   BY MR. SATTERLEY:

16        Q.  If we flip over to page 2, under the Pooley

17   method, talking about the -- the preconcentration of

18   asbestos followed by x-ray diffraction analysis.

19        Now, this -- they called this the "Pooley

20   method" here.  It says, "This technique has not been

21   written up yet, but evidently when applied to Vermont

22   talc, 0.05 percent of tremolite talc is found.  The

23   limitation of this method is that it may be too

24   sensitive."

25        Do you see that?

109

1    A.  I do.

2    Q.  And from a material standpoint -- from a

3 material science standpoint, do you find that the

4 analytical -- the heavy liquid separation is too

5 sensitive?

6    A.  No.  Saying something is too sensitive in the

7 analytical world makes no sense.  You're always

8 striving to get better and better detection limits to

9 be able to fully characterize.  That's how all progress

10 is made through the years in analytical equipment:

11 making it better, more sensitive so you can get the

12 information.  Now, what you do with that information

13 may or may not use it, but -- it's just something that

14 is foreign to our -- to me that you would say some

15 analytical method is too sensitive.

16    MR. SATTERLEY:  Your Honor, it may be a good

17 time for the mid-morning break.

18    THE COURT:  What time is it?  It's 10:30.

19    MR. SATTERLEY:  Is that okay?

20    THE COURT:  Sure.  We will take our mid-morning

21 break.  Come back in 15 minutes.

22    Please remember the admonition that it is your

23 duty as jurors not to converse amongst yourselves or

24 with anyone else on any subject connected with the

25 trial or to form or express any opinion thereon until

110

1    the matter is submitted to you.

2            Enjoy your break.

3            (Whereupon, the jury having exited the

4    courtroom, the following proceedings were held:)

5            THE COURT:  The record will reflect the jurors

6    have departed the courtroom.

7            Is there anything we need to put on the record?

8            MR. SATTERLEY:  Nothing from the plaintiff,

9    Your Honor.

10           MR. CALFO:  No, Your Honor.

11           THE COURT:  Enjoy your break.

12           MR. MULARCZYK:  Thank you, Your Honor.

13               (Recess taken.)

14           (Whereupon, the following proceedings were held

15   outside the presence of the jury:)

16           MR. SATTERLEY:  We want -- we'd like to put

17   Your Honor on notice that we've agreed that I've met

18   and conferred with counsel that I'm going to use two

19   scales as demonstratives under the Elmo, if I can

20   figure out how to do this, just for -- to -- for the

21   detection limit, not right this second but later this

22   morning.  It's a demonstrate testify to show the

23   limitations of detection.  And counsel, I've shared

24   this with counsel and both counsel agrees.

25           THE COURT:  All right.

111

1          Ms. Hill, please bring the jury in.

2          What was the last number?

3          THE WITNESS:  Your Honor, I think it's 0234.

4          MS. CLANCY:  Thank you.

5          (Whereupon, the jury having entered the

6     courtroom, the following proceedings were held:)

7          THE COURT:  The record will reflect that all

8     the jurors are in their appointed seats, counsel are

9     present, and William Longo is in the witness box.

10          Please recall that you're still under oath.

11          THE WITNESS:  Yes, Your Honor.

12          THE COURT:  You may continue with your direct

13     examination of this witness.

14          MR. SATTERLEY:  Thank you, Your Honor.

15     BY MR. SATTERLEY:

16     Q.  Dr. Longo, we're going to continue to just talk

17     on one more document on -- regarding asbestos and talc.

18     This is Exhibit 350.

19          MR. SATTERLEY:  May I approach again,

20     Your Honor?

21          THE COURT:  You may.

22     BY MR. SATTERLEY:

23     Q.  And this is from the same Tom Shelley we saw

24     earlier.  March the 30th, 1973.

25          And is this a document you've considered in

112

1    evaluating the issue -- issues in this case?

2        A.  Yes, sir.

3        Q.  And this is carbon-copied to a large number of

4    folks, including many of the folks we talked about

5    earlier:  Petterson, Nashed, Hildick-Smith, Rolle,

6    Goudie, Fuller, and Dr. -- or Mr. Dean in England;

7    correct?

8        A.  That is correct.

9        Q.  And it relates to asbestos talc -- or talc

10   asbestos patents.  And Dr. Pooley.  It says, "Harold,

11   we will want to carefully consider the Pooley patents

12   re asbestos in talc.  It's quite possible that we may

13   wish to keep the whole thing confidential rather than

14   allow it to be published in patent form and thus let

15   the whole world know."

16        Do you see that?

17       A.  I do.

18        Q.  Have you ever seen any patents developed by

19   Johnson & Johnson or any of the scientists at Johnson &

20   Johnson regarding the concentration technique, heavy

21   liquid separation, to identify asbestos in talc?

22       A.  No.  None exists that I can tell.

23        Q.  Now, you've reviewed, you said earlier,

24   historical testing of baby powder and talcum powder for

25   the presence of asbestos going back into the 1970s and

113

1    beforehand; correct?

2         A.  That is correct.

3         Q.  And have you also -- or do you understand that

4    the Shower -- the Shower to Shower product -- you

5    looked at some of the -- Lee Poye's analysis of Shower

6    to Shower; correct?

7         A.  We did.

8         Q.  And, based upon all the materials you reviewed,

9    do you understand that the Vermont talc was the source

10   of Shower to Shower for many years, including in the

11   1970s?

12        A.  That is correct.

13        Q.  And is it important to look at the Shower to

14   Shower product and the analysis of Shower to Shower in

15   understanding whether or not asbestos was present in

16   Vermont talcs?

17        A.  It is.

18        Q.  Now, the concentration method, the heavy liquid

19   separation method, is there a limitation with regards

20   to the ability to see chrysotile with that method?

21        A.  There is.

22        Q.  And what is that limitation?

23        A.  The limitation is the density of chrysotile

24   asbestos is very close to the density of talc.

25             Talc is approximately -- you have 2.7 to

114

1    2.6 grams per cubic centimeter.  Like a sugar cube, how

2    much that weighs, how many grams will fit in a sugar

3    cube.

4         And chrysotile is about 2.5, 2.4.

5         So you would not expect to see chrysotile using

6    the method as written.  It will float up to the top

7    with the talc.  Also, anthophyllite asbestos has a

8    density close to talc.  If it doesn't have any iron.

9    If it has iron, the density increases and you will --

10   if it's present in the amount necessary, you'll find it

11   by the heavy liquid density separation.  So those are

12   the two drawbacks currently for the heavy liquid

13   density separation.

14       Q.  Well, those drawbacks that you can't find

15   chrysotile -- the drawback that you can't find

16   chrysotile asbestos with the heavy liquid separation,

17   in your opinion, Dr. Longo, is that a reason why you

18   should never ever, ever, ever use it?

19       A.  No.  That would be silly.  You can find

20   tremolite, actinolite, all the tremolite asbestos solid

21   solution series.  The majority of what you find in

22   anthophyllite has iron in it.  So -- and, of course,

23   the solid solution series with the other asbestiform

24   minerals that can form when anthophyllites form.  So,

25   no.  You're -- yeah, it's simple.  Why throw the baby

115

1    out with the bath water when you can get so much

2    information using that?

3        Q.  Historically going back into the 1970s, was

4    Shower to Shower examined for -- and chrysotile

5    asbestos been documented in that product?

6        A.  It has.

7        Q.  And I'd like to show you what's already

8    admitted into evidence.

9            MR. SATTERLEY:  Your Honor.  May I approach

10   again?

11           THE COURT:  You may.

12   BY MR. SATTERLEY:

13       Q.  This is Exhibit 0278, the University of

14   Minnesota Space Science Center.

15           Have you considered this, Dr. Longo, in your

16   analysis of whether or not there's asbestos in Vermont

17   talcs?

18       A.  Yes.

19       Q.  And does -- was this the analysis of Shower to

20   Shower product back in 19' -- in the early 1970s for

21   the identification of asbestos?

22       A.  Yes, sir, it was.

23       Q.  If you can flip over to page 4.  And do they

24   describe -- and just so that we --

25           Let me zoom out.  Zoom out.

116

1          The University of Minnesota Space Science

2    Center.  Page 4.

3          Do they utilize the electron microscope to

4    identify chrysotile asbestos?

5          A.  Yes, sir, they do.

6          Q.  And do they indicate that they were taking

7    photographs -- well, first of all, they did a

8    diffraction pattern and they take photographs of the

9    chrysotile asbestos they located in the Shower to

10   Shower product?

11         A.  That is correct.

12         Q.  And if we flip over to the Figure 17A and 18A.

13   They take a picture of -- it says "S to S grid."  And

14   they got a grid number there?

15         A.  Correct.

16         Q.  And is that -- is that a photograph of a

17   chrysotile asbestos fiber in the Shower to Shower

18   product in the early 1970s by Dr. Hutchinson?

19         A.  Yes, sir.  That's actually a chrysotile bundle

20   and that's sitting on a foam -- formed -- foam bar grid

21   covering.  And that's -- that would be classic

22   asbestos.

23         Q.  And over here on the next page, two pages

24   later, page 25 of this exhibit, Figure 18A, once again,

25   Shower to Shower.

1          Does this demonstrate the chrysotile asbestos

2     in the Shower to Shower product?

3          A.  Yes and no.

4          Q.  Well, tell me yes and no.

5          A.  Yes, it has the morphology and this is what you

6     would expect.  But they also, if you go to the previous

7     page, they have their diffraction patterns associated

8     with this.  And you can't hardly see it there, but it

9     has some classic streaking on it.  That's a little

10    small.

11         But they did two things.  It has to have the

12    right morphology tubular structure and then the

13    diffraction pattern showing the right crystalline

14    structure.

15         Q.  If we flip to the next page.  This one is the

16    one you said "yes and no" to.  What about the next page

17    here, Figure 18B, what does this demonstrate?

18         A.  Again, it demonstrates bundles of chrysotile

19    asbestos along with the other information, so you have

20    chrysotile here.

21         Q.  And does this assist in your opinion -- or does

22    this add to your opinion, I should say, that there is

23    historically asbestos documented in Vermont talc?

24         A.  Yes, sir.

25         Q.  The next document already into evidence is

118

1    Exhibit 6 -- 679.

2         MR. SATTERLEY:  And request permission to

3    approach, Your Honor?

4         THE COURT:  You may.

5    BY MR. SATTERLEY:

6         Q.  And this is October 27, 1972.  An examination

7    of Johnson & Johnson Baby Powder sent to Dr. Goudie.

8    Exhibit 679.

9         And have you seen and considered this

10   examination by McCrone from 1972, Dr. Longo?

11        A.  Yes, sir, I did.

12        Q.  And did McCrone -- McCrone laboratory identify

13   asbestos in this examination in 1972?

14        A.  They did.

15        Q.  By the way, let me talk about McCrone for a few

16   minutes.

17        Walter McCrone, did you know who he was?

18        A.  Yes, sir.  Everybody does in the microscopy

19   field.

20        Q.  Was he recognized as someone that was very --

21   very good at the PLM, the polarized light microscope?

22        A.  He was a polarized light microscope expert.

23        Q.  As far as his involvement with the transmission

24   electron microscope, was Walter McCrone known to be a

25   TEM person?

1        A.  Well, he understood it, but he didn't routinely

2    do transmission electron microscopy.  His area and the

3    McCrone Atlas that every PLM lab has was polarized

4    light microscopy of all types of minerals.  I mean, he

5    was the one who looked at the Shroud of Turin.  He's

6    that good of an optical microscopist.

7        Q.  With regards to McCrone laboratory, have you

8    previously in the past stated that McCrone laboratory

9    is an outstanding laboratory?

10       A.  Yes, sir, I have.

11       Q.  And have you said that they're one of the

12   leaders in the world, McCrone is one of the leaders in

13   the world, in the microscope world?

14       A.  Yes, sir.  I've worked for some of the same

15   clients that they had done analysis for back in the

16   '70s and '80s where I was defending them and saying,

17   they used McCrone.  They used a very good lab to tell

18   them that there was asbestos or not in a product.

19   There was a little -- it was a fertilizer company.  So

20   I have stated that a number of times.

21       Q.  And was -- when you stated that a number of

22   times, and gave those opinions about McCrone, was that

23   prior to your analysis of all these internal documents

24   you've looked at in talc litigation?

25       A.  Yes, sir.  It was before that where I was able

120

1    to get documents from McCrone to start looking at the

2    type of analysis they were doing, and some of the

3    things they were doing -- and you have to understand.

4    Walter McCrone very rarely -- after about 1960 very

5    rarely was in the laboratory.  He was running the

6    McCrone Research Center, a nonprofit that did teaching,

7    et cetera.  It was others that were actually in charge

8    of McCrone after about 1960 or so.  Every now and then

9    he would, but very rarely.

10        Q.  And do you have -- have you formed opinions and

11    criticisms of some of the analysts of -- from Walter

12    McCrone that you've seen from looking at some of these

13    McCrone reports involving talc?

14        A.  Yes, sir, I have criticized them.

15        Q.  And what opinions have you formed?

16        A.  Things like, you know, willingness to change

17    little things -- change on reports, saying things like

18    they've never found asbestos in all the talc samples

19    they ever used.  That was a letter sent out to a trade

20    organization, even though they had data that showed

21    asbestos, internal data, for their talcum powder or

22    baby powder companies they were working for.

23            So, you know, it changed my opinion a little

24    bit of them.  They're still great scientists there, but

25    it sort of -- you know, it sort of was, oh, okay.

121

1    Q.  So, is it fair to say you got analyzed, analyst

2    by analyst, with regards to what they've done

3    historically?

4    A.  Not only that, you have to look at what methods

5    they were using.  Are they using the best method

6    available?  Is the results consistent -- do the results

7    make sense or can they make these statements, like this

8    talc sample -- this talcum powder sample or cosmetic

9    talc sample was negative and therefore it's free of

10   asbestos?

11        Nobody can ever say that.  No analytical

12   technique can ever say it's free of anything.  All's

13   you can say is, it's down to our detection limit, it's

14   below our detection limit, and it may or may not be

15   there.

16        Making broad statements like there's nothing

17   in -- we didn't find anything so it's asbestos-free or

18   it's -- anything.  Like water.  Well, we analyzed this

19   water using the EPA method, there's no lead, it's

20   lead-free.  You can't say that.  All's you can say is,

21   here's the method we used, here's the analytical

22   sensitivity.  We can't say if there's anything there or

23   not below that.

24   Q.  This 1972 McCrone report, where it's produced

25   to us by Johnson & Johnson, Exhibit 0679, it says, "Do

122

1    not use this report.  Replace by another version."

2         Have you considered this?

3    A.  I have.

4    Q.  And in this report, do they actually document

5    asbestos and talk about asbestos found in Batch

6    Samples 108T and 109T?

7    A.  Yes, sir, they did.  They reported it as

8    present.

9    Q.  And specifically with regard to tremolite, in

10   the report that says, "Do not use this report," do they

11   totally -- do they list the total tremolite content of

12   the two samples would be approximately 0.5 percent for

13   108T and about 0.2 to 0.2 -- 0.2 to 0.3 percent for

14   109T?

15   A.  Yes.

16   Q.  And in the new report, the revised report, is

17   it dated the same date?

18   A.  It is.

19   Q.  And does it have -- is this information, these

20   numbers and calculations, removed from the report?

21   A.  They are.

22   Q.  And then the next document I think it's related

23   to this document here.  This is Exhibit 225.

24        MR. SATTERLEY:  Request permission to approach,

25   Your Honor?

123

1          THE COURT:  You may.

2     BY MR. SATTERLEY:

3          Q.  And just so we're clear, the -- well, let me

4     just withdraw that and go right to this report.

5          225 into evidence.  It says, "McCrone study

6     being redone."  Something...

7          A.  I think that says, "New one is in master

8     file" -- in --

9          Q.  Oh.  "New one is in master talc file."

10         Do you see that?

11         A.  Yes, sir.

12         Q.  And we see this -- over here, it says,

13    "Walter C. McCrone" there?

14         A.  Yes.

15         Q.  And if we go to the letter itself, it's dated

16    the same day, October the 27th?

17         A.  Yes, sir, it is.

18         Q.  And it says -- this is from a fellow named

19    Ian Stewart.

20         You recognize -- or did you -- you recognize

21    Ian Stewart to be an analyst that worked at McCrone?

22         A.  Yes, sir.  He was both a PLM and electron

23    optics guy.  I've known Ian for almost 30 years.

24         Q.  Did Ian Stewart work for McCrone for many, many

25    years before he went to the RJ Lee Company?

124

1       A.  Yes, sir, he did.

2       Q.  And have you read and seen reports and letters

3   from Ian Stewart many times in the past?

4       A.  Specifically in cosmetic talc it's -- since

5   I've been involved in this, but in other litigation in

6   the past, especially when he was at the RJ Lee Group,

7   yes, sir.

8       Q.  It says -- Ian Stewart says, "Here is our

9   report on the baby powder samples.  I hope to have the

10  Shower to Shower report out to you soon, but something

11  always seems to break loose when I sit down to write

12  it.  Yours sincerely."  And it's signed by Ian Stewart;

13  correct?

14      A.  Yes, sir.

15      Q.  Moving forward in time, in the '70s, are there

16  many other tests and testing results where McCrone does

17  analysis for talc samples?

18      A.  Yes, sir.

19      Q.  And are there instances where McCrone reports

20  there's no asbestos?

21      A.  A lot of instances, yes, sir.

22      Q.  And is there reports where McCrone reports

23  there's asbestos present?

24      A.  Yes, sir.

25      Q.  I want to show you another document,

125

1    Exhibit 158.

2            And this is a -- Exhibit 158 is a confidential

3    document.  "New reagent system plant trial at Windsor

4    Minerals."

5            Have you considered this, Dr. Longo?

6        A.  Yes, sir, I have.

7        Q.  And how is this significant in your opinions

8    here?

9        A.  It's significant in that they were trying out

10   different flotation, meaning, one of the ways to clean

11   up the processed talc after it's been milled is to --

12   or before milling is to flotate it to -- just like

13   concentration method.  You put in a type of surfactant

14   and it bubbles, sticks to the talc, the big heavy stuff

15   and chunks can go to the bottom.

16           Here they were experimenting with a way to

17   flotate out and remove chrysotile asbestos.

18           And you have to ask yourself, if there's no

19   asbestos in here, why are you trying to develop a

20   system to remove something that's not in the product?

21   Or not in being milled.

22           So this is important to show -- and we're going

23   to be working on this to see if we can use this

24   technology from that data to concentrate the

25   chrysotile.

126

1          MR. CALFO:  Your Honor, I move to strike.  That

2     was complete speculation.

3          THE COURT:  The jury will ignore the last two

4     sentences of the witness.

5     BY MR. SATTERLEY

6          Q.  Dr. Longo, it says, "The use of citric acid in

7     the depression of chrysotile asbestos and other mineral

8     species has been developed at Windsor Minerals in

9     response to the potential need for a means to exclude

10    extremely low levels of these contaminants from the

11    finished product of the beneficiation process."

12          Correct?

13          A.  Yes, sir.

14          Q.  Is that what you're talking about with regards

15    to trying to remove asbestos from the product?

16          MR. CALFO:  Your Honor, again, objection.

17    Calls for speculation on the part of this witness.  No

18    foundation.

19          THE COURT:  That -- that's overruled.  He's

20    interpreting the document.

21          THE WITNESS:  Yes, sir.

22    BY MR. SATTERLEY:

23          Q.  It says, "The use of these systems is strongly

24    urged by this writer to provide the protection against

25    what are currently considered to be materials

127

1    presently" -- "presenting a severe health hazard and

2    are potentially present in all talc ores in use at this

3    time."

4            And it's signed off by Vernon Zeitz; correct?

5        A.  That is correct.

6        Q.  And health hazards is beyond your area of

7    expertise; correct?

8        A.  Yes, sir, it is.

9        Q.  And then if we flip over to Table 15 of this

10   1974 document.

11           And it says, "Asbestiform fibers counted by

12   Walter C. McCrone," and it's got "ore, product, ore,

13   product, ore, product."

14           And then it's got fiber identification,

15   "probably chrysotile, probably chrysotile," and the

16   fifth one down has got eight and it says "chrysotile,"

17   and the final one says "chrysotile"; correct?

18       A.  Correct.

19       Q.  Is this further documentary evidence of the

20   presence of asbestos, in your opinion, in the Vermont

21   ore and product?

22           MR. CALFO:  Objection, Your Honor.  No

23   foundation.  Calls for speculation on the part of this

24   witness.

25           THE COURT:  Overruled.

128

1          THE WITNESS:  Yes, it does, especially at these

2    concentrations, because they're talking about counts

3    per EM grid.  So these are the number of fibers found

4    on an individual grid at the detection limits that they

5    were using at the time, which were somewhat antiquated.

6    BY MR. SATTERLEY:

7          Q.  Moving forward from 1974 to 1975, I would like

8    to present you with what's been admitted as

9    Exhibit 724, dated November the 5th, 1975, from Walter

10   McCrone -- from the McCrone laboratory, Gene Grieger,

11   to Vernon Zeitz.

12         Now, Vernon Zeitz, we saw his name on the last

13   document; right?

14         A.  Yes, sir.

15         Q.  And this one is -- is written to him from

16   McCrone -- from Gene Grieger, senior research physicist

17   at McCrone; correct?

18         A.  That is correct.

19         Q.  And does he document and report and have an

20   attachment regarding the presence of -- presence of

21   fibers or bundles with regards to the material they're

22   looking at?

23         A.  That is correct.  They do.

24         Q.  It talks about Table 1 showing "actual fiber

25   counts and the approximate equivalent concentration in

129

1    parts per million of amphibole particles, which we

2    found in these samples.

3         "Some of them seem rather high.  One had ten,

4    and one had nine amphiboles.  Most of these come in

5    bundles of one, two, or three fibers, with anywhere

6    from two to five amphiboles in a bundle?"

7         Do you see that?

8    A.  Yes, I do.

9    Q.  Now -- and then there's a chart on the next

10   page; correct?

11   A.  There is.

12   Q.  And we see the references here to the

13   amphiboles found; right?

14        Oh, I'm sorry.  "Fibers of asbestos found,"

15   correct, Dr. Longo?

16   A.  That is correct.

17   Q.  And some of these reference to "HC."  Do you

18   see the -- the sample being HC?

19   A.  I do.

20   Q.  And based upon your review of the internal

21   documents, do you have an opinion as to what HC

22   represents?

23        MR. CALFO:  Objection.  Calls for speculation

24   from this witness.  No foundation.

25        THE COURT:  Mr. Satterley, you put a circle

130

1    around one that's not on the same level even though --

2              MR. SATTERLEY:  I'm sorry, Your Honor.

3              THE COURT:  Your yellow marker mismarked it.

4              MR. SATTERLEY:  I'm upside down.  Which one?

5              THE COURT:  It's the third one down.  That one

6    is not an HC.

7              MR. SATTERLEY:  Oh.

8              Oh, it is HC, Your Honor.  There's two HCs

9    right beside each other.

10             THE COURT:  All right.

11             MR. SATTERLEY:  And both of those are HC.

12             THE COURT:  Okay.  I -- I stand corrected.

13             MR. SATTERLEY:  I apologize, Your Honor.  I was

14   trying to do it upside down.

15             THE COURT:  All right.  The objection is

16   overruled.

17             You may respond to the question.

18   BY MR. SATTERLEY:

19        Q.  Do you have an opinion about HC and what that

20   represents based upon all the internal documents you've

21   looked at?

22        A.  The H stands for Hammondsville, and the C

23   stands for cosmetic.

24        Q.  In your opinion, Dr. Longo, is this another

25   instance of confirmed fibers of asbestos in the

131

1    cosmetic talc back in 1975?

2         MR. CALFO:  Objection.  Calls for speculation.

3    No foundation for this witness.

4         THE COURT:  That's overruled.

5         THE WITNESS:  Yes, it does.

6    BY MR. SATTERLEY:

7         Q.  Now, in your testing -- and we're going to get

8    to your testing in a little bit -- you have taken

9    photographs, you've done count sheets, you've done

10   selected area electron diffraction you've done

11   chemistry analysis, EDS; correct?

12        A.  That is correct.

13        Q.  And you've produced all -- or you've printed

14   all that out and made detailed reports of that and

15   turned it of to the attorneys for these companies;

16   correct?

17        A.  That is correct.

18        Q.  And in -- in your testing, in your analysis,

19   we're able to look at the actual photographs and the

20   length and the width of the various fibers you found;

21   correct?

22        A.  That is correct.

23        Q.  Okay.  In -- in -- in many of these historical

24   testings -- not all of them, but in many of them -- do

25   we have that same advantage, to look at the

132

1    photographs?

2         A.  No, most of the time not.  Very rare.

3         Q.  All right.  Do we have most of the underlying

4    raw data, being the chemistry, the selected area

5    electron diffraction, to analyze ourselves to see --

6    see what it says?

7         A.  Sometimes you have the selected area electron

8    diffraction and occasionally a count sheet, but it's

9    mostly this type of information, where they just

10   say, "We found this."

11        Q.  The next one is Exhibit 713.

12            MR. SATTERLEY:  May I approach again,

13   Your Honor?

14            THE COURT:  You may.

15   BY MR. SATTERLEY:

16        Q.  This is 1977, going forward in time.

17   EMV Associates, you understand that to be a laboratory

18   that Johnson & Johnson sent materials to for analysis

19   on a few occasions?

20        A.  Yes, sir.

21        Q.  And is this analysis of nine talc samples that

22   you have read and considered in formulating your

23   opinions?

24        A.  I have.

25        Q.  And is this dated, Exhibit 713, April the 1st,

133

1    1977?

2         A.  That is correct.

3         Q.  By the EMV Associates; correct?

4         A.  Yes, sir.

5         Q.  And do they have on this -- in this instance,

6    do they have pictures of -- of things we can look at,

7    the chemistry and the morphology of what's depicted

8    there?

9         A.  Yes.

10        Q.  And is there reference to composite?

11             Do you know what a composite is?

12        A.  Composite typically means that you have mixed a

13   couple different sources into something.  Say, for

14   example, you take a composite of maybe two different or

15   three different areas of the talc from a mine or -- and

16   make it all one composite so you can try to analyze

17   what's from these two or three different areas.

18        Q.  And here, they say, with regards to --

19             Well, first of all, I've heard before

20   composites and blending.  Do you know what blending --

21   blending of talc is?

22        A.  Blending is -- can be the same thing, but

23   you're just mixing it all together.  And typically,

24   blending and milling -- or blending, you're putting in

25   some of the other nontalc ingredients.  Just depends on

134

1    who was saying it.

2         Q.  And it says, "Both large and small" -- "A

3    composite, both large and small fibrous tremolite

4    particles found.  See Figure 4."

5         And then it says right below that, "Old stock

6    composite, one small fibrous tremolite particle was

7    found.  See Figure 6."

8         Do you see that?

9         A.  Yes, sir.

10        Q.  So if we go over to Figure 4, that's what we

11   were looking at just a few minutes ago; right?

12        A.  Yes.

13        Q.  And then we've got -- Figure 6 here, we've got

14   more photographs from 1977 with the chemistry; right?

15        A.  Yes, we do.

16        Q.  If we zoom in on the top photo, "800X," does

17   that mean 800 magnification?

18        A.  It does.

19        Q.  And the jury heard last Thursday, when Mr. Poye

20   was here, the difference between talc, platy talc and

21   fibrous talc and fibers and asbestiform.

22        Are you able -- from this -- this 1977 photo,

23   are you able to determine, is this fibrous?

24        A.  It meets the definition of a -- of fibrous,

25   yes, sir.  It's got parallel sides, and it has an

135

1    aspect ratio easily equal to or greater than 5 to 1.

2    That looks like an aspect ratio more than on the lines

3    of 20, 30, 40 to 1.  And we are looking at a bundle.

4        Q.  How do we know that's a bundle?

5        A.  Well, a bundle is defined as either two or

6    three fibers parallel touching, and if you look closely

7    on the sides or the bottom, you can see what looks like

8    a splayed end coming off, and you can see individual

9    fibers, even from this xerox copy of -- of this

10   photomicrograph, is what we call them.  That's a

11   bundle.

12       Q.  And I want to use J&J's definition -- this is

13   Exhibit 430, which is into evidence -- on asbestos.

14   And this is a Johnson & Johnson document.  The

15   definition here they have for asbestos, under the J4-1

16   and the TM7024 -- and we'll talk about those methods in

17   a little bit -- it says, "Asbestos is defined to be the

18   fibrous serpentine chrysotile and the fibrous form of

19   the amphibole group as represented by amosite,

20   anthophyllite, crocidolite, tremolite, and actinolite."

21       Is that your understanding of the definition of

22   asbestos?

23       A.  Yes, sir, the fibrous form of it.

24       Q.  And so if we -- if -- if we have a fibrous form

25   of serpentine, curved serpentine, would that

136

1    definition -- would that meet the definition of

2    asbestos?

3        A.  Yes, sir.  Either curved or straight.  But

4    typically, curved is seen in bulk samples, and every

5    now and then, you will see it in a TEM because of the

6    higher magnification and the smaller particles.

7            But that is a typical definition, fibrous forms

8    of these amphibole -- amphibole groups.

9        Q.  Okay.  So right here, back -- Ms. Clancy points

10   out -- where it says "fibrous tremolite" under the J&J

11   definition that we just read, does that fibrous

12   tremolite used in their definition equate to asbestos?

13       A.  Yes, sir, it does.

14       Q.  One other document, and then I'm going to

15   bounce back to heavy liquid for a minute.

16           Exhibit 726, are you familiar with Forensic

17   Analytical out of Hayward, California?

18       A.  Yes, sir, I am.

19       Q.  And a fellow named Mark Floyd?

20       A.  Yes, sir.  I know Mr. Floyd.

21       Q.  Mr. Floyd, is he an analyst that identifies

22   asbestos in materials and has written in reports in

23   that regard for many years?

24       A.  Many years.  Doing it almost as long as me.

25       Q.  And have -- in fact, have you analyzed or seen

137

1    his reports with regards to the presence of asbestos in

2    talc?

3        A.  Yes, sir, I have.

4        Q.  And this into evidence as Exhibit 726.  Does

5    this, Dr. Longo, document the presence of asbestos in

6    off-the-shelf Johnson's Baby Powder in 2004?

7        A.  Yes, sir, it does.

8        Q.  And is -- Mr. Floyd signs off on it right here?

9        A.  Yes.  That's his -- that's his initials.

10           MR. CALFO:  Objection, Your Honor.  There is no

11   foundation for this witness to testify about this.

12           MR. SATTERLEY:  Let's zoom in.

13           THE COURT:  That's overruled.

14   BY MR. SATTERLEY:

15       Q.  Do you see Mr. Floyd -- Mark Floyd, his name

16   right there, Dr. Longo?

17       A.  Yes, sir, I do.

18       Q.  And with regards to this Johnson's Baby Powder

19   off the shelf, "AN" -- it says, "Asbestos type AN."

20   What type of asbestos was he reporting in 2004 on

21   Johnson's Baby Powder?

22           MR. CALFO:  Objection.  Calls for speculation

23   from this witness.

24           THE COURT:  Overruled.

25           THE WITNESS:  "AN" stands for anthophyllite.

138

1    BY MR. SATTERLEY:

2        Q.  And just to understand what has happened here,

3    you understand that this sample was sent to Mr. Floyd

4    by a television -- television station in Sacramento?

5        A.  Yes, sir.

6        Q.  And does this, in your view, Dr. Longo, add to

7    the -- all the other samples showing the presence of

8    asbestos in Johnson's Baby Powder in the '70s, '80s,

9    '90s, and -- and into the 2000s?

10            MR. CALFO:  Objection.  No foundation.  Calls

11   for speculation from this witness.

12            THE COURT:  That's overruled.

13            THE WITNESS:  Yes, it does.

14   BY MR. SATTERLEY:

15       Q.  Now, we've introduced lots of documents into

16   evidence, and I'm not going to go over all of them with

17   you, obviously, Dr. Longo.

18            But are there other instances in the historical

19   documents regarding Johnson's Baby Powder where

20   asbestos has been documented?

21       A.  Yes, sir.

22       Q.  Okay.  And with regard to Cashmere Bouquet,

23   Colgate-Palmolive, have you also looked at the -- some

24   of the historical documents regarding the presence of

25   asbestos in -- in the Cashmere Bouquet product?

139

1    A.  Yes, I have.

2    Q.  And I'm going to -- not going to go over very

3   many, but there are a few into evidence that I wanted

4   to ask you about.

5        By the way, do you have a whole binder full of

6   Colgate reliance?  I think I -- it's on the -- right

7   next to the screen.

8    A.  Yes, sir, I do.

9    Q.  No.  Up.  Up.

10    A.  I knew they were here somewhere.

11    Q.  Okay.  But do you have two binders?  Are those

12   Cashmere Bouquet reliance materials?

13    A.  They are.

14    Q.  And do they document, going all the way back

15   into the late 1960s and the 1970s, the presence of

16   asbestos in Cashmere Bouquet?

17        MR. MULARCZYK:  Objection.  Hearsay.  Vague.

18        THE COURT:  It's vague.  You may rephrase your

19   question.

20   BY MR. SATTERLEY:

21    Q.  Okay.  Are there many --

22        THE COURT:  We don't do that Joe McCarthy

23   business of, "Do you have it in the satchel?"

24        MR. SATTERLEY:  I understand.  Yes, Your Honor.

25   Yes, Your Honor.

140

1   BY MR. SATTERLEY:

2       Q.  Do you have reliance lists, Dr. Longo,

3   regarding identification of asbestos before you?

4       A.  I do.

5       Q.  All right.  One of the reliance lists, does it

6   include documents -- this is going to be

7   Exhibit 3584 -- from McCrone to Joe Simko at

8   Colgate-Palmolive in 1974?

9       A.  Yes, sir, it does.

10      Q.  And we heard from the corporate representative

11  yesterday, Ms. Scala, Diana Scala --

12          THE COURT:  Does that have a number on it?

13          MR. SATTERLEY:  Yes.  This is Exhibit 3584,

14  Your Honor.

15  BY MR. SATTERLEY:

16      Q.  And this is February 5, 1974, regarding the

17  samples designated 516.  And you considered this,

18  Dr. Longo; correct?

19      A.  Yes, sir, I did.

20      Q.  And did McCrone report back to Colgate in 1974

21  that all three samples had chrysotile asbestos in them?

22      A.  Yes, sir, they did.

23      Q.  And in this particular instance, was there

24  photographs taken -- photomicrographs taken -- Scala

25  Exhibit 18 -- this is Scala Exhibit Number -- were

141

1    there photomicrographs of -- of the Cashmere Bouquet

2    Sample 516 by McCrone back in 1974?

3        A.  Yes, sir.

4        Q.  And what we've got displayed on the screen

5    here, based upon what McCrone reports in 1974 and based

6    upon your analysis of -- of -- of this report, do you

7    have an opinion whether this is documenting asbestos?

8        A.  It shows what asbestos -- what chrysotile

9    asbestos would look like under the transmission

10   electron microscope.

11       Q.  And you talked about both straight and curved.

12   Does it show some curved fibers?

13       A.  Fibers and bundles, yes.

14       Q.  Okay.  And is this just one instance of the

15   identification of asbestos in the -- in the Colgate

16   product?

17       A.  Yes, sir.

18       Q.  And we know other photographs here -- let me

19   just -- too many papers here.

20           Dr. Longo, in 1974, does McCrone report back to

21   Colgate that it's a chrysotile fiber in the North

22   Carolina Regal sample?

23       A.  Yes, they do.

24       Q.  And when we get to your photographs in a little

25   bit, do you have photographs where you have materials

142

1    that look like -- is that platy talc at the top?

2         A.  It's either platy talc or calcium carbonate or

3    one of the other accessory minerals.  That's not

4    typically a talc look.

5             What's more like talc is at the top of the

6    chrysotile fiber.  It's more of a plate shape, little

7    irregular plate shape.  That, in my opinion, is what

8    the morphology of platy talc should look like.

9         Q.  Is that, in your view, fiber?

10        A.  Yes, sir.  That meets all the current regulated

11   asbestos definitions by transmission electron

12   microscopy.  It has parallel sides and has an aspect

13   ratio, the length divided by the width, of 5 to 1 or

14   greater.  That's, oh, probably in the 20- to 30-to-1

15   range.

16        Q.  The previous photograph here, does it say

17   "chrysotile fibers" here at the bottom?

18        A.  Yes, sir, it does.

19        Q.  And is that, in your opinion, a fiber,

20   Dr. Longo?

21        A.  Yes, sir.  That meets the definition.  There

22   are counting rules for determining fibers of asbestos

23   or bundles.  That's classic.

24        Q.  Is -- is there, in this photograph, examples of

25   the talc or talc particles blocking part of the view of

143

1    fiber -- a chrysotile fiber?

2        A.  Yes, sir.  You can see at the top end of the

3    fiber, it looks like we have a talc -- very large talc

4    plate laying over it.  Then you have some smaller talc

5    plates to the right of the fiber.

6            So that's a pretty heavily loaded sample, to

7    see that much in one area of the TEM.  TEM grid.

8    Excuse me.

9        Q.  Now, in regards to your opinions on historical

10   identification of asbestos in Cashmere Bouquet, other

11   than McCrone, are there other laboratories that have

12   likewise found asbestos in the Cashmere Bouquet

13   product?

14       A.  Yes, sir.

15       Q.  And have you included those in your reliance

16   materials?

17       A.  I have.

18       Q.  And who are some of the other laboratories?

19           MR. MULARCZYK:  Objection.  Hearsay.

20           THE COURT:  Overruled.

21           THE WITNESS:  Besides McCrone, you have -- oh,

22   god, I'm having a mental...

23           There's -- there's -- I'm sorry.

24   BY MR. SATTERLEY:

25       Q.  Yeah, you've got your binders there.

144

1      A.  Yeah, let me just look.

2      Q.  It's not a memory test.

3      A.  I'm trying to go off -- yeah, test -- memory

4  test.

5          Mt. Sinai.  We have, you know, some of the FDA

6  work in the early years.  Johns-Manville.  Cyprus, I

7  believe, did some testing.  So there was some others.

8      Q.  Is -- did Johnson -- in your materials, did

9  Johnson & Johnson --

10     A.  Johnson & Johnson, too.  I'm sorry.

11     Q.  And Fred Pooley, specifically?

12     A.  Yes, sir.

13     Q.  And Mark Floyd at Forensic Analytical, did --

14  does his lab at Hayward look at Cashmere Bouquet and

15  found asbestos?

16     A.  I believe so.

17     Q.  Now, heavy liquid separation.  Historically,

18  you mentioned Dr. Pooley did heavy liquid separation

19  and found asbestos in talc; correct?

20     A.  Correct.

21     Q.  You mentioned that -- and we showed

22  documents -- at Dartmouth, Dr. Reynolds looked at

23  heavy liquid -- heavy liquid separation and found

24  asbestos in talc?

25     A.  Correct.

145

1          Q.  Have you reviewed the test, the test results --

2     excuse me -- the testimony of Dr. Alice Blount?

3          A.  I have.

4          Q.  And have you seen her published paper?

5          A.  Yes, sir.  In 1990, 1991, peer-reviewed

6     published paper doing the exact same thing.

7          Q.  And using the heavy liquid separation, did

8     Dr. Blount report and publish upon asbestos in talc

9     products?

10         A.  Yes, sir.

11         Q.  And specifically into evidence is Exhibit 160,

12    is the letter from Dr. Blount to one of the attorneys

13    for Johnson & Johnson in 1998.

14              And have you considered this with regards to

15    Sample I?

16         A.  Yes, sir, I have.

17         Q.  And in 1998, this letter indicated that

18    Sample I was Vermont, Johnson & Johnson talc; correct?

19         A.  Yes, sir.  It was a Johnson & Johnson

20    off-the-shelf product.  And in that time period, it

21    would have been from Vermont.  1989, 1990, the talc

22    source was Vermont during that time.

23              THE COURT:  Mr. Satterley, I neglected to write

24    down the exhibit number.  I don't know whether you said

25    it or not.

146

1          MR. SATTERLEY:  160, Your Honor.

2          THE COURT:  Thank you.

3    BY MR. SATTERLEY:

4      Q.  And you understand that -- Dr. Blount to be a

5    geologist/mineralogist?

6      A.  Yes, sir.

7      Q.  And have you considered her, not only her

8    published work but her testimony and her handwritings

9    and her letters back in the '90s regarding her testing

10   of this product?

11     A.  In her published paper.

12     Q.  Okay.  So we've got Dr. Pooley, Dr. Reynolds,

13   Dr. Blount, Lee Poye, and MAS, your lab.  In all five

14   of those instances, when heavy liquid separation was

15   done with regards to looking for asbestos in cosmetic

16   talc products, were asbestos identified?

17         MR. CALFO:  Objection, Your Honor.  There is no

18   foundation for -- for all those.

19         THE COURT:  It's overruled.

20         THE WITNESS:  Yes, sir.  Asbestos was

21   identified using the heavy liquid density separation

22   method, both the protocol, or the method, for TEM as

23   well as PLM, where we actually used the Blount method

24   that she published in 1990.

25   BY MR. SATTERLEY:

147

1      Q.  Now, in all the materials you reviewed, have

2  you seen, since the Blount publication -- since the --

3  in -- in the early 1990s -- have you seen Johnson &

4  Johnson testing where they tested their talc by heavy

5  liquid separation at any time in the last 28 years,

6  since that paper was published?

7      A.  No, sir, I've never seen any documents saying

8  that they were using...

9      Q.  At any point in time, have you seen any

10  documents that Colgate-Palmolive or any of their

11  analysts tested their talc by using the heavy liquid

12  separation method?

13     A.  No, sir.

14     Q.  Now I want to talk about negative tests.

15        You mentioned limitations of XRD.  Tell us your

16  opinion about reports regarding XRT -- XRD that report

17  nondetect, from an analytical standpoint, for the

18  identification of asbestos in talc.  What does that

19  mean to you?

20     A.  It means that the concentration of asbestos, if

21  present, wasn't greater than the detection limit,

22  which, for XRD, is pretty high, depending on what

23  you're looking at.

24        So your detection limit in XRD is probably -- a

25  really good XRD with good technicians may be for

148

1    tremolite .2, .3 percent by weight.  Today, you may get

2    down to .1.  But in the '70s, it was around .4, .5.

3          Anthophyllite is even higher, and so is

4    chrysotile.

5          So using XRD and getting a negative in XRD only

6    tells you is -- there's not a -- really a lot of

7    asbestos in here, and that's it.

8       Q.  With regards to the use of XRD, have you

9    studied the -- what's called the J4-1 method?

10      A.  Yes, sir.

11      Q.  And is it your understanding that the J4-1

12   method was a method adopted by industry -- the

13   Cosmetics, Toiletries and Fragrances Association -- in

14   1976?

15      A.  Yes, sir, it was.

16      Q.  And did the J4-1 method have the x-ray

17   diffraction as the first step in the process?

18      A.  They did.

19      Q.  And did J4-1 method -- did the J4-1 method ever

20   include a TEM analysis?

21      A.  No, sir.

22      Q.  Did the J4-1 method ever include heavy liquid

23   separation?

24      A.  It did not.

25      Q.  Did the J4-1 method have a stop, you stop

149

1    analyzing, if you don't find anything by x-ray

2    diffraction or optical microscope?

3         A.  I'm sorry.  Could you repeat that?

4         Q.  Sure.  Let me just show you what's already into

5    evidence.  It's 727.

6              This is the -- this is the J4-1 -- the actual

7    J4-1 method into evidence.  It says "J4-1" over here.

8    Over here.

9         A.  Yes, sir.  I'm familiar --

10        Q.  You recognize that, sir?

11        A.  I'm familiar with this document.

12        Q.  Okay.  And at the bottom, it's got, "x-ray

13   diffraction" here, "acid leach" over here, "optical

14   microscopy," and then "fibrous morphology," and "stop.

15   Stop.  Stop."

16             Do you see that?

17        A.  Yes, sir.

18        Q.  All right.  So your understanding of the way

19   the J4-1 method works is, if you don't find anything in

20   the --

21        A.  X-ray diffraction.

22        Q.  -- x-ray diffraction showing amphibole, you

23   stop; correct?

24        A.  Correct.

25        Q.  Okay.  So -- but if you do find a peak, then

150

1    you would go over to the optical microscopy and look

2    for fibrous materials; correct?

3        A.  Correct.

4        Q.  And if you don't find anything, you stop?

5        A.  Correct.  Well, if you do find, you stop.  It

6    says, "Asbestiform amphiboles present."  If you don't

7    find it, it's stop to the right, which says

8    "Asbestiform amphiboles absent."

9            That's -- so it was "as soon as you find a

10   negative test, you stop" type of protocol.

11       Q.  Based upon analytical techniques and what was

12   known, do you have an opinion whether or not this was

13   an appropriate technique for the already -- the

14   identification of asbestos?

15           MR. CALFO:  Objection, Your Honor.  This

16   witness had no knowledge of what was known in the '70s.

17           THE COURT:  That's overruled.  He may opine.

18   You can cross-examine him about it.

19           THE WITNESS:  It's an appropriate method to

20   find out information, but you have to be very careful

21   with it, if you understand the detection limits.  There

22   is products out there that has enough asbestos in it

23   that it's fine.

24           But when you're dealing with cosmetic talcs and

25   you're dealing with trace levels, the XRD method is --

151

1    should be done with -- very carefully.

2           Today, it's -- I don't think it's worthwhile to

3    analyze by XRD at all for Italian and Vermont talcs.

4    It doesn't give you -- even if it's positive, you can't

5    determine if it's fibrous or not because it doesn't

6    give you morphology.  So why do it?

7    BY MR. SATTERLEY:

8        Q.  Exhibit 171 is the CTFA minutes, 1977.  And it

9    says, with regards to the J4-1 method --

10          First of all, just -- you -- you've looked --

11   you reviewed the CTFA minute meetings; correct?

12       A.  Yes, sir, I have.

13       Q.  It says, with regard to the J4-1, "Test and

14   verify CTFA Method J4-1 for this purpose:  Assurance

15   that method is accurate, reliable, and practical.  He

16   reported" -- "He then reported these objectives have

17   not yet been achieved."

18          And it's reported in 1977 that six out of the

19   seven labs failed to identify spiked talc with

20   asbestos; correct?

21       A.  With tremolite.

22       Q.  And from an analytical standpoint, does this

23   demonstrate the inadequacies or the weaknesses of the

24   XRD method?

25          MR. CALFO:  Objection, Your Honor.  Calls for

152

1    speculation on the part of this witness.

2            THE COURT:  Overruled.

3            THE WITNESS:  Yes.  It has -- it has detection

4    elements.  So if you do a spiked sample and you can't

5    find it, then how can -- for this particular asbestos,

6    how can you find it in an unknown sample?

7            It's -- it's just not a very good method for

8    these types of analysis of cosmetic talc.  Even today,

9    with state-of-the-art equipment, the concentrations

10   that are typically present are going to be lower than

11   what the XRD can see.

12           And couple that with the fact you can't tell if

13   it's fibrous or not, is -- is an issue.

14   BY MR. SATTERLEY:

15       Q.  And it's referring to a "Dr. Schelz,"

16   S-c-h-e-l-z, "then proposed a round-robin partial

17   retest."

18           Do you see that?

19       A.  Yes, sir.

20       Q.  And then I'd like to show you what's into

21   evidence and what you considered, 233.  This is

22   Johnson & Johnson document, March 1, 1978, to Charles

23   Haynes at the Cosmetics, Toiletry and Fragrance

24   Association.

25           And it's talking about the -- "I'm enclosing a

153

1    table which breaks the code for the recently completed

2    CTFA task force on round-robin testing of the consumer

3    talcum products for asbestiform amphibole minerals."

4            Do you see that?

5        A.  Yes, sir, I do.

6        Q.  It says, "The names and addresses and phone

7    numbers are also included for those individuals who

8    participated whose products were involved."

9            Do you see that?

10       A.  Yes, I do.

11       Q.  And he -- he writes in this confidential 1978

12   memo, which is Exhibit 233, "Please contact me" -- and

13   there's a phone number -- "upon receipt of this letter

14   so that I may destroy the only other copy of this

15   table, which is in my possession."

16           Have you ever seen, Dr. Longo, the table that

17   would break the code regarding the round-robin?

18       A.  No, sir.

19       Q.  It says on the second -- on this Johnson &

20   Johnson letterhead, second page, "Destroy your copy of

21   the table.  Your participation in the final important

22   phase of the round-robin is appreciated.  Thank you

23   very much.

24           "Sincerely, John P. Schelz, Chairman, CTFA task

25   force on round-robin testing of consumer talcum

154

1    products."

2           Do you see that?

3       A.  Yes, I do.

4       Q.  And he carbon copies the vice-president of

5    science of the CTFA, Dr. Estrin; right?

6       A.  Yes, sir.

7       Q.  And also someone from the Bristol-Myers

8    Products Company; correct?

9       A.  That is correct.

10      Q.  And on the last document, Ms. Clancy points out

11   that John Schelz is identified as the chairman of the

12   CTFA task force.

13          Do you see that?

14      A.  I do.

15      Q.  Now, you've seen and evaluated many documents

16   from Johnson & Johnson, or their consultants, where it

17   says "nondetect."

18          Have you --

19      A.  I have.

20      Q.  -- not?

21      A.  Yes, sir, I have.

22      Q.  And have you identified and seen many documents

23   where it says they're looking for asbestos and they're

24   saying "nonquantifiable"?

25      A.  I have.

155

1      Q.  How can -- if you are of the opinion that

2  there's asbestos in these cosmetic talc products, how

3  can that possibly be when there are so many documents

4  that say "nondetect"?

5          MR. MULARCZYK:  Calls for speculation.

6          MR. CALFO:  It calls for speculation from this

7  witness.

8          THE COURT:  That's overruled.

9          THE WITNESS:  It's all about the sample

10 preparation and detection limit, the reason you would

11 have a nondetect.  And there is a lot of nondetect

12 analysis by TEM for Johnson & Johnson.  But it's all

13 about the detection limit.

14          If you set -- if you have a detection limit

15 that is higher than most, anytime that others,

16 including me, have found asbestos in the product, then

17 it's not surprising.  If your method is not sensitive

18 enough, you're not going to detect it.  You have to

19 have -- if your detection limit is up here but your

20 asbestos level is down here -- and think of a line,

21 can't find it if it goes below this detection limit --

22 and it's down here, you're going to have negative after

23 negative after negative.  When you do find it, you've

24 hit those one or two samples that has a very high

25 concentration of asbestos in it.

156

1              It's all about the sample preparation and how

2      you do the analysis.  If you can have a really

3      sensitive method or not.

4              Q.  You talked about the tools you use.  As a

5      demonstrative, I have two tools.  I've got a bathroom

6      scale that I got at Walgreen's.

7              Do you see it says "Walgreens" on it there?

8              A.  Yes.

9              Q.  And I've got this type of scale, which -- what

10     do you call this type of scale?

11             A.  I would call that a jeweler scale.

12             Q.  And if we --

13             A.  A not -- a "not very sensitive one" jeweler

14     scale.  But it should work for what you're doing.

15             Q.  So, for example, in thinking about detection

16     limit, if we have this -- and I've got a half-full box

17     of paperclips -- and we put it on the scale, the

18     bathroom scale I got at Walgreen, does it detect

19     anything?

20             A.  No.  It's not -- it doesn't have a sensitive

21     detection limit.

22             Now, you would -- not looking what's there, you

23     didn't know that, you would report that there's nothing

24     there.  There's nothing on the scale.  But that doesn't

25     make that half a box of paperclips disappear.  So you

157

1  can't say there's nothing there unless you know what

2  your detection limit is, et cetera.  It's all about the

3  sample prep.

4      Q.  This one I don't know how to use.

5      A.  Don't forget -- don't forget the tear button.

6      Q.  Okay.  So let's move this off here.  And put

7  this on.

8          MS. CLANCY:  True it.

9  BY MR. SATTERLEY:

10     Q.  True it.

11         All right.  Let's see what happens here.

12         Now, this scale is more sensitive.  Does it

13 detect and pick up the same paperclips that we couldn't

14 pick up with the bathroom scale?

15     A.  Yes, sir.  It's more sensitive, so now you have

16 a scale that has a better, more sensitive detection

17 limit.  And that's what we have done and others have

18 done using this concentration method to increase the

19 sensitivity.

20     Q.  Now -- so the two expressions, or the two --

21 does "ND," does that stand for nondetect?

22     A.  Correct.

23     Q.  Like you -- there's many reports that say

24 nondetect with regard to samples; correct?

25     A.  Correct.  When they did the analysis, they did

158

1    not detect any asbestos.  So they put in, you know, ND.

2         Q.  And then there's NQ.

3             What does "NQ" represent?

4         A.  In these tests, because you don't see this very

5    often at all, NQ would mean nonquantifiable.

6         Q.  And are you familiar with the test method

7    written by Johnson & Johnson called 7024, TM7024?

8         A.  Yes.

9         Q.  And have you analyzed in great detail the Test

10   Method 7024?

11        A.  Yes, sir, I have.  It's a TEM method.

12        Q.  And the 7024 method for the identification of

13   asbestos, in your opinion, does it have limitations?

14        A.  Yes, sir, it does.

15        Q.  And what limitations does the TM7024 have?

16        A.  Well, you start off with the biggest one.  It

17   doesn't use the heavy concentration method to prepare

18   the sample.

19             So you have to dilute the sample, say -- again,

20   we'll go back to the 30 or 40 milligrams.

21   50 milligrams talc.  In order to make it where you can

22   get it on these little TEM grids, you may have to

23   dilute that a thousand times.

24             So you start off with that.  The second problem

25   with it is that it uses this "got to find five fibers."

159

1    And because you dilute it so much, it doesn't allow

2    you -- let me go back before that.

3          It doesn't allow you to expand the area you're

4    looking at.

5          So, if we're in this courtroom and we're

6    looking for our -- you got a -- a good example of this:

7    You got an acre of grass, high grass, and somebody asks

8    you, can you go find the ten golf balls that might be

9    out there?  But we're only going to let you look at

10   this little area over here and see if you find

11   anything.

12         Well, that's what happens with this method.

13   You're looking at these little TEM grids and it doesn't

14   allow you to expand the area to keep looking to see if

15   you can get a better sensitivity.

16         So, if I'm only allowed to look at a little

17   area of that one acre versus walking around the whole

18   acre, which -- which one of those tests have I -- have

19   a better chance to run into those golf balls?

20         And that's the second problem with this.  They

21   give you a time limit to how long you can spend doing

22   the analysis.

23   Q.   Well, let me -- let me -- so time limit.

24         But let me go back to this.

25         You said five fiber requirement?

160

1          A.  Of any one type of asbestos.

2          Q.  Explain that.

3          A.  Well, if I analyzed the sample, with all the

4    limitations it has on it, and I find four tremolite

5    fibers, they will say that is nonquantifiable because

6    you have to find five to make it, quote, above

7    background.

8          Not even -- to me, it even makes it a little

9    bit worse.  If you find four tremolite asbestos fibers

10   and four actinolite asbestos fibers -- now, those two

11   are related; a little bit more iron in the tremolite

12   chemistry will give you actinolite -- you still say

13   it's nonquantifiable because you didn't have five

14   actinolite and five tremolite or more.  Now, say you

15   have four tremolite, four actinolite, and four

16   anthophyllite asbestos.  It's still nonquantifiable

17   because you don't have five of each.

18         So, instead of just going, okay, here's what it

19   is, we found these five, this is the concentration, but

20   we don't believe it's above background, even though

21   there is no background of this, that would be a way to

22   at least give you the information and make a decision,

23   but the reports just say nonquantifiable.

24         Q.  And have you seen instances where an analyst at

25   McCrone named Kent Sprague writes letters regarding

161

1    analysis of talc and says, there's no asbestiform

2    minerals there, but we see the backup sheet and the

3    backup data and we see, in fact, that there was

4    asbestos present?

5         A.  Yes, sir.

6         Q.  This is Exhibit 174, which is into evidence.

7    And, for example, this letter right here, Exhibit 174,

8    is dated 1990.  And Kent Sprague reports no

9    quantifiable asbestiform minerals; right?

10        A.  Yes, sir.

11        Q.  All right.  And in this instance, we have some

12   of the backup data.  A count sheet.  And by the way, in

13   most of the reports where it says nonquantifiable, do

14   we have the backup data?

15        A.  No.  Just about all of them we do not.

16        Q.  There's only a few examples of the backup data,

17   the count sheets like we've got here?

18        A.  Yes, sir.

19        Q.  All right.  In this backup data, does it

20   demonstrate anthophyllite present?

21        A.  It does.

22        Q.  And does it give the length and the width?

23        A.  Yes.  The length is 20 and a width is 1.5,

24   which is probably more likely than that a bundle.  And

25   if you divide 20 by 1.5, you would have an aspect ratio

1    of about 7 and a half to 1.

2        Q.  And in -- would that -- does that meet the

3    definition, anthophyllite, of regulated asbestos?

4        A.  Yes, sir.  It meets that definition as well as

5    the aspect ratio definition of the 7024 method.

6        Q.  And so is this an example of, if you just rely

7    upon the report that says no quantifiable asbestos and

8    don't have the backup data, you would be misled into

9    believing there's no asbestos present?

10           MR. CALFO:  Objection.  Calls for speculation

11   on the part of this witness.

12           THE COURT:  That's overruled.

13           THE WITNESS:  Yes, sir.  It would be very

14   unclear what that -- for somebody like me very unclear

15   what that means, nonquantifiable.  It's either you can

16   count it or you -- or it's not there and you don't.

17   BY MR. SATTERLEY:

18       Q.  And in this specific sample also -- we go a

19   couple pages over.  Chrysotile.  The structure is a

20   fiber.  Type is chrysotile.  And the length and the

21   width.  And it says SAED -- SAED and EDS checked off

22   yes; right?

23       A.  Yes, sir.

24           So, again, it's chrysotile asbestos and it --

25   they have all the right boxes checked for it to be

163

1    asbestos.

2        Q.  And the next page -- and, in fact, at the

3    bottom of the next page it says "chrysotile fiber";

4    correct?

5        A.  Yes, sir.

6        Q.  All right.  So in this one -- in this one

7    letter where it says no asbestiform by McCrone, the

8    McCrone Group, no quantifiable amounts of asbestiform,

9    we have two instances of asbestos, chrysotile asbestos

10   fiber and anthophyllite asbestos fiber; correct?

11       A.  That is correct.

12       Q.  That's Exhibit 174.

13          Now, the -- back to the method.  The 7024.

14   It's into evidence as Exhibit 172.  It's the actual

15   J&J Method 7024.

16          You've read this in detail; correct?

17       A.  I have.

18       Q.  And this is a J&J method specification;

19   correct?

20       A.  Yes, sir, it is.

21       Q.  Background correction.  Now, what is that?

22       A.  Background correction is that there is stray

23   asbestos fibers floating around in the air that somehow

24   gets on the sample and could confound the results.  Or

25   that your laboratory you're using or your lab you've

164

1    got cross-contamination because you've got some stray

2    asbestos fibers getting in with the analysis.

3         So they call it background correction.

4         Q.  And in the protocol and specification, what

5    does J&J say about background correction?  Says it has

6    not been necessary.  How is that significant or

7    important?

8         A.  Well, it's significant because it verifies the

9    same thing we say.  For these types of asbestos,

10   tremolite, actinolite, anthophyllite -- you do not have

11   background levels of this material.  It's not used

12   in -- in very few asbestos products.  Labs don't

13   typically have that poor of laboratory use that they

14   will cross-contaminate.  So there's no such thing as

15   a -- ambiguous background level.  Asbestos fibers are

16   heavier than air.  They do not stay in the air for

17   eternity.  They fall out, obeying the basic laws of

18   gravity.  You don't have this, quote, background

19   causing contamination levels that somehow interfere in

20   your analysis.  And I agree with that.  We have seen no

21   background contamination in any of the processed

22   blanks, any of the QCs that we've done on any of these

23   samples.  The filters doing the exact same type of

24   analysis are clean, so, therefore, below detection

25   limit of the analysis.

165

1    Q.  So you're running blanks to make sure you don't

2    have contamination in the lab?

3    A.  Correct.  Blanks.  Processed blanks where you

4    do the exact same thing you did to the sample you're

5    analyzing, except you don't put talc in it:  heavy

6    liquid, centrifuge, the whole thing.  And we analyze

7    the exact same area.

8    Q.  So with J&J, when they say, "Background

9    contamination" -- "Background correction has not been

10   necessary, the amount of background asbestos detected

11   has been insignificant in comparison to the levels of

12   asbestos found in contaminated samples," do you agree

13   with that?

14   A.  I agree that it's been insignificant.  It's --

15   essentially, in our lab and others, it doesn't exist.

16   So it does not interfere with the analysis.  So when

17   you find a single fiber or a single bundle in the

18   analysis of tremolite, actinolite, anthophyllite, it is

19   significant.  It shows that that came from the cosmetic

20   talc itself and not from some stray contamination out

21   of the lab, in the air from somewhere, what -- whatever

22   it may be.

23   Q.  Last question before lunch.

24       MR. SATTERLEY:  Can I get one more question in,

25   Your Honor.

166

```
 1           THE COURT:  I was going to cut you off right
 2   there.
 3           MR. SATTERLEY:  I saw you were going to cut me
 4   off.
 5           THE COURT:  I was going to.  One important
 6   question.
 7   BY MR. SATTERLEY:
 8      Q.  It's preparation and analysis time.
 9   Preparation time per sample, including preparation of
10   related materials is one hour.
11           In your opinion, Dr. Longo, is that reasonable?
12      A.  Not for what we do on the heavy liquid
13   separation, on the preparation, one hour.  We don't --
14   we don't give time limits to our scientists at the
15   laboratory to either prepare a sample or to analyze the
16   sample.  Their only requirement is to do it right.
17           MR. SATTERLEY:  Now would be a good time for
18   lunch, Your Honor.
19           THE COURT:  Ladies and gentlemen.  We are going
20   to go to lunch and come back at 1:30.
21           Remember the admonition that it is your duty as
22   jurors not to converse amongst yourselves or with
23   anyone else on any subject connected with the trial or
24   to form or express any opinion thereon until the matter
25   is submitted to you.
```

167

1          Enjoy your lunch.  See you back in an hour and

2     a half.

3          (Whereupon, the jury having exited the

4     courtroom, the following proceedings were held:)

5          THE COURT:  The record will reflect that the

6     jurors have departed the courtroom.

7          Is there anything you need to talk about?

8          MR. SATTERLEY:  Not from the plaintiff's

9     perspective, Your Honor.

10          MR. CALFO:  No, Your Honor.

11          MR. MULARCZYK:  No, Your Honor, thank you.

12          THE COURT:  All right.  I will see you at 1:30.

13          THE WITNESS:  Thank you, Your Honor.

14               (Lunch break taken.)

15                    (**Afternoon Session**)

16          (Whereupon, the following proceedings were held

17     outside the presence of the jury:)

18          THE COURT:  All right.  We're back in session.

19          Is everybody here?

20          Okay.  All counsel are here, it appears.

21          Ms. Hill, please bring in the jury.

22          (Whereupon, the jury having entered the

23     courtroom, the following proceedings were held:)

24          THE COURT:  Good afternoon, ladies and

25     gentlemen.  The record reflect will that the jurors are

168

1    all in their preassigned seats, counsel is at counsel

2    table, and Mr. Longo is back in the witness box.

3            You will recall you're still under oath?

4            THE WITNESS:  Yes, Your Honor.

5            THE COURT:  Mr. Satterley, you may continue

6    with your direct examination of this witness.

7            MR. SATTERLEY:  Good afternoon, Dr. Longo.

8            Good afternoon, everyone.

9            THE WITNESS:  Good afternoon.

10   BY MR. SATTERLEY:

11       Q.  We left off talking about the Johnson & Johnson

12   TM7024 and the -- where we were talking about the

13   preparation and analysis time.  I read to you,

14   "Preparation time per sample, including preparation of

15   related materials, is one hour."

16           How long does the prep time take in your lab

17   for heavy liquid separation analysis?

18       A.  Probably two hours.  Two to three hours to do

19   multiple samples.

20       Q.  It says, under this J&J method, TM7024.

21   "Analysis search time."  Search time.  Does that mean

22   looking under the microscope looking for the asbestos

23   fibers or bundles?

24       A.  Yes, sir.

25       Q.  It says, "The search time per sample is a

169

1    maximum of two hours."

2         Correct?

3    A.   That's what it states.

4    Q.   And, from an analytical point of view, you

5    believe it's appropriate, or -- is it even possible to

6    find 20 different asbestos fibers or bundles in a

7    two-hour time frame?

8    A.   No.  That would be impossible.

9    Q.   Is it appropriate, in your view, to put an

10   arbitrary time limit like two hours for searching for

11   asbestos in a sample?

12   A.   No.  Because, to me, that puts pressure on the

13   microscopist to get done.  It's more preferable to let

14   the microscopist take the time he needs till he feels

15   satisfied that he has an adequate search and/or

16   adequate analysis.  A sample that may have 15 or 20

17   asbestos fibers in it, it'd probably take two full

18   days.

19   Q.   Also on the Exhibit 172, under Section 13,

20   there is a -- I got this one highlighted.  This is

21   still 172.  Page 7.  I'm going to figure this thing out

22   eventually.

23        Under definition of fiber:  It says, "An

24   elongated particle with parallel sides and an aspect

25   ratio K" -- oh, "greater than 3 to 1."

170

1          Do you see that?

2     A.  Yes, sir.

3     Q.  Is it your understanding that's Johnson &

4  Johnson's definition of a fiber, that's greater than

5  3 to 1?

6     A.  Yes, sir.

7     Q.  And in some of the regulatory definitions, does

8  regulatory -- some of the regulatory definitions

9  describe a fiber as being greater than 3 to 1?

10     A.  Well, that's greater than or equal to 3 to 1.

11  Some of the OSHA documents for fibers are greater

12  than -- greater than or equal to 3 to 1.  So that

13  follows along the Federal Government on occupational

14  exposure for sizes of the fiber -- for the aspect ratio

15  of the fibers.

16     Q.  And it says, "The definition employed may vary

17  with the needs of the client."

18          Do you see that?

19     A.  Yes.

20     Q.  Have you seen in any of the regulatory

21  framework -- whether it be OSHA, EPA, ISO -- that the

22  definition of what a fiber is needs to vary depending

23  upon who the client is or what the client needs?

24     A.  No.  There's two definitions of fibers on

25  aspect ratios.  One is greater than or equal to 3 to 1

171

1    for occupational exposure analysis and the other one is

2    the standard TEM analysis where it's greater than or

3    equal to 5 to 1 aspect ratio.  Those are the only two

4    aspect ratios that I know of for optical microscopy or

5    transmission electron microscopy.

6         Q.  This 7024, this method that we've been talking

7    about, is this generally accepted in the scientific

8    organizations as a proper way to analyze samples for

9    the presence of asbestos?

10        A.  It's not in any of the standard protocols.

11   Using this type of method it has evolved since then.

12   And it's -- you know, in order to be fair, there's been

13   this running debate, is it McCrone's method or is it

14   J&J's method, depending on who you ask.

15        Q.  The -- let's switch gears now and take this to

16   the side, and let's go to -- let's go to testing and

17   testing results.

18             What is the NIST or the NIST standard?

19        A.  That is the National Institute of Standard and

20   Technology, and all laboratories that are certified or

21   doing this work should have a NIST standard for all the

22   regulated asbestos.  They sell you a bottle of

23   tremolite asbestos that's certified by the National

24   Institutes of Standard and Technology, and a bottle of

25   anthophyllite, chrysotile, amosite, crocidolite.  And

172

1    it's a requirement to have these standards in your lab

2    for your certifications.

3         MR. SATTERLEY:  May I approach, Your Honor?

4         THE COURT:  You may.

5    BY MR. SATTERLEY:

6         Q.  This is marked for identification purposes only

7    as 1046.  Is this a NIST standard of tremolite asbestos

8    that your laboratory has and photographs were taken by

9    your laboratory?

10        A.  Yes.  This is our NIST standard for tremolite

11   and those are our photographs.

12        Q.  And we're going to display now the 1046.  And

13   it's hard to see.  But does it say "1867 bulk asbestos

14   uncommon" and then identifies tremolite?

15        A.  Yes.

16        Q.  And did your laboratory take the NIST standard,

17   put it under the TEM, and take photographs of it so

18   that we could see what the standard tremolite asbestos,

19   according to the National Institute of Standards and

20   Technology, what it looks like?

21        A.  Yes.

22        Q.  If we go to the second page of 1046, do the

23   photographs reflect -- reflected here represent

24   tremolite that your laboratory took from the tremolite

25   standard of the National Institute of Standards and

173

1    Technology?

2        A.  Yes.  Those are two asbestos tremolite

3    structures on the left-hand side, and on the right-hand

4    side is the corresponding chemistry for the --

5    essentially the pattern that tremolite has for the one

6    on the very -- the very tall one is silicon and then --

7        Q.  This right here?

8        A.  Yes.

9            And then magnesium and then calcium.

10       Q.  This?

11       A.  And then sometimes a little iron to the further

12   on the right.

13           Then that really big peak all the way to the

14   right is copper, because it's on a copper grid.

15       Q.  That's the grid itself?

16       A.  Correct.

17       Q.  And you said iron.  Is this a little iron peak

18   there?

19       A.  Yeah.  Sometimes it's there, sometimes it's

20   not.

21       Q.  And this right here, that I put my -- that's

22   the calcium?

23       A.  Correct.

24       Q.  And is that calcium distinguish tremolite from

25   anthophyllite or talc?

174

1      A.  It does.

2      Q.  If you had no calcium there and you had this

3  pattern, would that be consistent with anthophyllite?

4      A.  It would be -- yes.  It would be close to

5  anthophyllite or fibrous talc.

6      Q.  And is fibrous talc and anthophyllite

7  chemistry, the chemistry of it, substantially similar?

8      A.  It is.

9      Q.  And by the way, the photographs that we're

10  seeing here on this NIST standard, is this a -- a

11  fiber?

12      A.  No.  The -- both those, in my opinion, based on

13  the photographs, are bundles of fibers.

14      Q.  And what is it about the photograph, the

15  appearance, that represents it as a bundle of fibers?

16      A.  Well, it's kind of hard to see from this far

17  back, but on the bottom right-hand end, you'll see what

18  looks like almost little protrusions sticking out of

19  the bottom.  If you can then see this under the

20  microscope, you can see the striations that these are

21  individual fibers all packed together.  And that's the

22  definition of a bundle:  parallel fibers that are

23  touching, not spread apart.

24          And the top one the same thing.  This one's a

25  little different in that you can see one, two, three,

175

1    four, five, six, a number of individual fibers, and you

2    have one long one on the top right-hand side.

3           So these would be two bundles of tremolite

4    asbestos.

5        Q.  And then the last page, on the NIST standard,

6    does it show the diffraction pattern or the selected

7    area electron diffraction image?

8        A.  Yes.

9        Q.  And we heard from Mr. Poye about this the other

10   day.  But can you just remind us again.  What are we

11   seeing in here and how do we know this is an amphibole

12   or asbestos based upon this diffraction pattern?

13       A.  Well, nobody -- at least we don't -- just base

14   something on a diffraction pattern.  We look at three

15   things:  The morphology.  Is it fibrous?  Does it meet

16   the definition?  Very important, the microchemistry.

17   Does it have a tremolite chemistry, the right ratios of

18   magnesium, the calcium, and the one tall silicon peak?

19   And does it have an amphibole-type d-spacing -- that's

20   the -- that's the distance between the row of atoms --

21   that are consistent with tremolite?

22           So it's not just one thing.  Everything goes

23   through a series of diagnostic tests.  You know, A,

24   yes.  It has the right morphology.  It's fibrous.

25   Check.

176

1          Second, the chemistry.  Does the chemistry

2     match?  And tremolite is very distinct.  Check.

3          Does it have an amphibole diffraction spacing

4     between the atoms that are in the range of what you

5     would expect for tremolite which are off standard x-ray

6     cards for x-ray diffraction?  Check.

7          And there it is.

8          You can't -- you just can't rely on one thing.

9     You put it all together and it says, yes, by all the

10    standards, this is tremolite asbestos.

11         Q.  Now, if somebody were to say, Dr. Longo, wait a

12    second, you didn't measure the space and do what's

13    called a zone-axis measurement of this, so how can you

14    possibly know that's an amphibole pattern, because you

15    didn't measure it?  Is that a fair criticism, in your

16    view?

17         A.  Absolutely not.

18         Q.  And why -- why do you say that?

19         A.  You don't need a zone-axis diffraction pattern.

20    If all's you had was a diffraction pattern and no

21    chemistry to go along with it, then, yes, you need to

22    do at least one zone-axis diffraction, and you have --

23    and that's how microscopists would have done it in the

24    '70s and early '80s before EDXA or the microchemistry

25    got so good, for lack of a better word.  So you don't

177

1    need that.  It's not required in any of the standard

2    protocols to do that.

3        Q.  Did George Yamate, years ago, 30 years ago,

4    suggest zone-axis measurements?

5        A.  George Yamate said for EPA Level 3, and if it's

6    going to be a -- if it's going to be a legal case, you

7    need to do zone -- you need to do a couple zone-axis

8    diffraction patterns to verify.

9        Q.  Now, I'm going to switch gears back to -- away

10   from the standard to the -- your testing, actually.

11       Do you -- do you employ the methods for the

12   identification of asbestos that have been recognized,

13   the International Standard Organization methods, the

14   other methods, for the proper identification of

15   asbestos?

16       A.  Yes.

17       Q.  And have -- did you employ -- you and your lab

18   employed those clearly-defined methods in the

19   identification, in the characterization of asbestos in

20   talc?

21       A.  Yes, we did.

22       Q.  Anywhere, in any of the methods that you

23   examined for the identification of asbestos in talc, is

24   there a requirement that you do what's called a, quote,

25   backscatter analysis?

178

1        A.  No.

2        Q.  If somebody were to come to this courtroom and

3    say, I'm state of the art, I use backscatter analysis

4    and I can determine there's no asbestos here because

5    the backscatter analysis that I use, is that in any

6    method whatsoever for the identification of asbestos?

7        A.  No.  That would not be, in my opinion, a -- a

8    method used to identify different types of asbestos.

9    That was not -- backscatter detectors and transmission

10   electron microscopes were never designed to do

11   irregular surfaces like asbestos fibers.  It has to

12   be -- we did it in graduate school.  It has to be a

13   polished surface so you can see all the different

14   orientations of the crystal.  If it's round like

15   asbestos fiber or bundle, it is very difficult to

16   identify without numerous standards, and that's even in

17   the published papers about that.

18        So it's not recognized in any -- any agency as

19   a method for the identification of asbestos.

20        Q.  So let's -- let's jump right into the -- these

21   books.  You have binders over -- box -- two boxes of

22   binders next to you, do you not, Doctor?

23        A.  Yes, sir.

24        Q.  And within the -- the binders -- and these are

25   already admitted into evidence.

179

1          Just so the record is clear, I'm going to start

2     with the box that's got the J&J -- the box that J&J

3     tested.

4          A.   Okay.

5          Q.   Okay?  And let's start --

6          By the way, did you and your laboratory look at

7     historical samples provided by J&J at J&J's lab over

8     the last several months, in the last year or so?

9          A.   Probably the last year, yes.

10         Q.   Let's take a step back before we get to these

11    real quick.

12         Originally a couple years ago, did you -- did I

13    provide you samples that I got from collectors -- from

14    one collector, and did other lawyers provide you

15    samples to look at that got -- purchased from eBay and

16    purchased -- or got from individual clients that had

17    claims, and did you analyze a whole bunch of J&J

18    products a couple years ago?

19         A.   Yes.

20         THE COURT:  Do you want to ask just one

21    question at a time.

22         MR. SATTERLEY:  I'm sorry.  I apologize,

23    Your Honor.

24         THE COURT:  Go ahead.  Just start over.

25         I don't know which one he answered there, but

180

1    go ahead.

2         THE WITNESS:  Yes, yes, yes, and yes.

3    BY MR. SATTERLEY:

4         Q.  Let me break it down.

5         A couple years ago, did I provide you three

6    samples?

7         A.  Yes.

8         Q.  Did I provide an affidavit from a collector?

9         A.  Yes.

10        Q.  Did you analyze those three samples that I

11   provided to you a couple years ago?

12        A.  Yes.

13        Q.  Did other attorneys from other law firms

14   provide you samples?

15        A.  Yes.

16        Q.  Did you -- some of those samples -- were some

17   of those samples that you understood were obtained off

18   eBay?

19        A.  That is correct.

20        Q.  And were -- some of those samples, did you

21   understand were obtained from individual clients that

22   had a claim against J&J?

23        A.  Yes.

24        Q.  Okay.  And did you analyze all those samples in

25   2017, the fall of 2017?

181

1      A.  Yes.

2      Q.  And did you issue a written report with

3  photographs and -- and come to opinions and conclusions

4  about those -- those specific samples?

5      A.  Yes.

6      Q.  And were you examined by J&J lawyers in detail

7  about those samples?

8      A.  A number of times.

9      Q.  Okay.  Did you do what's called a particle size

10  distribution to verify the particle size of the talc

11  and things in the samples?

12      A.  Yes.

13      Q.  All right.  Did you -- subsequent to all that

14  work, the three samples I provided you, the eBay, the

15  clients, did we provide you samples that we got

16  directly from J&J?

17      A.  Yes, sir.

18      Q.  Okay.  And before we got the samples from J&J,

19  directly from J&J, did J&J lawyers cross-examine you

20  and criticize you with regards to the samples that you

21  had off eBay?

22      A.  Yes.

23      Q.  Okay.  Did they accuse of maybe -- or suggest

24  that the lawyers contaminated the samples?

25      A.  Yes.

182

1      Q.  Did they suggest maybe the samples were

2  contaminated in some -- by some other third party?

3          MR. CALFO:  Your Honor, this is improper

4  direct.

5          THE COURT:  May I see counsel at sidebar.

6          MR. SATTERLEY:  In the interests of time, I'll

7  move on.

8          THE COURT:  All right.

9          MR. SATTERLEY:  Okay.

10  BY MR. SATTERLEY:

11      Q.  Subsequent to -- to -- in the original analysis

12  you did, did you report, in your opinion, accurate

13  findings of all the asbestos you -- you found?

14      A.  Yes, sir.

15      Q.  And did you take photographs of them?

16      A.  Yes.

17      Q.  And did you take EDS of them?

18      A.  We did.

19      Q.  And did you take selected area electron

20  diffraction?

21      A.  Yes, sir.

22      Q.  All the backup data?

23      A.  Yes.

24      Q.  Okay.  Now, subsequent to all that, did you

25  obtain directly from me or lawyers representing

183

1    individuals samples J&J provided from their historical

2    collection?

3         A.  Yes, sir.

4         Q.  Okay.  And what we have in these binders -- do

5    you have in the binders results from some of the

6    historical samples that you've analyzed?

7         A.  Yes, sir.

8         Q.  And as a matter of fact, did Johnson & Johnson

9    also provide photographs and dates, if we go to the

10   1960s, the historical samples from the 1960s?  This is

11   Exhibit 1080 in evidence.

12        So, for example, this one is a photograph of

13   one of the historical samples that your lab and

14   laboratory analyzed; correct?

15        A.  Correct.

16        Q.  And the way it worked was -- and you correct me

17   if I am wrong, but you -- your lab got just a very

18   small portion of each of the samples so that another

19   laboratory, a laboratory hired by Johnson & Johnson

20   lawyers, could look at those as well; correct?

21        A.  That is correct.

22        Q.  All right.  And included in Exhibit 1080, do

23   you have -- you have photographs of your findings,

24   including photographs of PLM, TEM, and so forth?

25        A.  Yes.  Yes, that's correct.

184

1     Q.  And do you have also the -- the EDS, the

2  chemistry, for example, the chemistry of what you

3  found?

4     A.  Correct.

5     Q.  Okay.  And do you have the selected area

6  electron --

7     A.  Yes.

8     Q.  And so in the binder, Number 1080, are there

9  the identification -- photographs of the identification

10  of asbestos and fibrous talc in this binder?

11     A.  Yes.  The results are the photographs for both

12  the transmission electron microscopy as well as the

13  polarized light microscopy for positive samples,

14  typically using the Blount method for PLM.

15     Q.  And many of the photographs, do they also --

16  the samples, have the date of the sample, according to

17  J&J?  This was 1966 or '67, according to what they

18  provided to us?

19     A.  Yes, sir.

20     Q.  And let me just go through the record real

21  quick so that we have the record real clear.

22        The 1970s -- is that 1081 historical samples --

23  the photographs of the historical samples from the

24  1970s?

25     A.  Yes.

185

1      Q.  And did your lab and laboratory break the

2  samples down by sample numbers and have an M number,

3  M -- like, for example, M69042, is that a sample --

4  sample number that your lab analyzed?

5      A.  Yeah.  This would be our sample tracking

6  numbers, where -- when we log samples in, we go ahead

7  and give it a sample tracking number so that we can

8  keep track of it.

9      Q.  And I'm going to come back to the '70s in a

10  little bit.

11      In the 1980s, did -- all the photographs of

12  asbestos that you found in the 1980s, is it

13  Exhibit 1082?

14      A.  Yes, it is.

15      Q.  And does it have -- are these true and accurate

16  photo- -- photographs of the -- of the asbestos

17  anthophyllite, tremolite, actinolite that you found --

18  you and your laboratory found in the Johnson's Baby

19  Powder in the 1980s?

20      A.  Yes, sir.

21      Q.  In the 1990s -- Exhibit 1083, does it have

22  photographs of nine different samples in the 1990s

23  where asbestos is identified, documented in -- in this

24  in this binder?

25      A.  Yes, sir.

186

1    Q.  And in the 2000s -- and this is going to be --

2    the 2000s, this is going to be Exhibit 1084.  Are there

3    five different samples where photographs were taken

4    regarding the presence of tremolite and asbestos in the

5    2000s?

6    A.  Yes.

7    Q.  And did you -- have you also prepared and

8    provided to Johnson & Johnson a report on Chinese talc,

9    where you analyzed Chinese talc for the presence of

10   asbestos?

11   A.  Yes, sir.

12   Q.  And did you document asbestos from the Chinese

13   talc from Johnson's Baby Powder?

14   A.  Yes.

15   Q.  And the last binder is 1065.  This is a

16   verification of Lee Poye's TEM analysis of J&J

17   historical Vermont Shower sample -- Shower to Shower

18   samples.  And did you take photographs and verify the

19   presence of asbestos from Lee Poye's analysis?

20   A.  Yes, we did.

21   Q.  And he was here the other day, and he testified

22   that you and your lab verified 98 percent of asbestos

23   that he found in the Shower to Shower.

24   A.  That is correct.

25   Q.  Now, obviously, I'm not going to go through all

187

1    these pictures today.  There are literally -- there's a

2    heck of a lot.  So -- but I -- what I do want to do is

3    have you explain some things to us.

4        A.  All right.

5        Q.  And, for example, if you could go to the 19- --

6            Before I go to the 1960s, some of the samples

7    that you looked at, at the request of me and the other

8    lawyers, in 2017, were those samples going back into

9    the '50s and the '40s and the '30s, very old samples?

10       A.  Yes, sir.

11       Q.  Okay.  And did -- did you document the asbestos

12   and take photographs of asbestos in those very old

13   samples?

14       A.  I did.

15       Q.  Okay.  Now, the '60s -- if you could go to the

16   binders that's the '60s.  And let's just pick out so we

17   can explain what PLM -- if you could tell me a tab

18   number that would explain what -- what PLM photographs

19   look like so we can talk about what you found.

20       A.  Let's just go to Tab -- pick one here -- Tab 3.

21       Q.  Tab 3.  Okay.  And we have page numbers at the

22   bottom.

23       A.  That would be page 41.

24       Q.  All right.  So tell you what.  I'm going to

25   take it out of the binder, make it easier for you.

188

1    There you go.  It's hard to see because of the light.

2         MR. SATTERLEY:  Your Honor, may I turn the

3    light off?  Maybe -- I don't know if the reflection

4    will -- the front light here?

5         THE COURT:  I don't think that's a reflection.

6         MR. SATTERLEY:  Not going to work?

7         THE CLERK:  I think it's the reflection from

8    the...

9         MR. SATTERLEY:  It might be here, on...

10        Oh, there we go.  That -- that helps out right

11   there.  That helps out.

12   BY MR. SATTERLEY:

13        Q.  Dr. Longo, what are we looking at?

14        A.  This is a photomicrograph using polarized light

15   microscopy.  And in this particular case, for this

16   sample here, the analyst identified this as

17   actinolite/tremolite.

18        Now, this is known as dispersion staining,

19   which is part of what happens in polarized light

20   microscopy.  There is actually no staining involved.

21   It's just a matter of changing the characteristics of

22   the optical microscope, cutting the light down and

23   changing the F-stop.

24        And so what we're looking at is light being

25   refracted around the bundle under dispersion staining.

189

1    And because of the color of that light being refracted

2    around the fiber under -- under polarized light, it

3    gives you a certain color.

4          And that color there, you would say is sort of

5    yellowish-golden, and it's parallel to the light, so

6    that the light is coming in one direction, parallel to

7    it.  And when it refracts around the bundle, it will

8    refract in this light -- in this -- they call it a

9    vibration, but it's actually the wavelength of light.

10          And the analyst will say, "Okay.  That is a

11    goldish -- that is a yellowish-gold," and has a chart

12    that they look up and say, "Okay.  At this color, it's

13    going to be this refractive indices," meaning 1.62 or

14    1.61.

15          And then he'll -- go to the next one.  He'll go

16    to the perpendicular direction.

17    Q.   The next slide?

18    A.   The next slide.

19    Q.   All right.  So -- so this -- before --

20    A.   That's -- you're putting a purple one on there.

21    That's not the next side.  Turn it up --

22    Q.   Oh, this way.  Double-sided.

23    A.   Turn -- turn the one you have upside down.

24    Q.   Oh.  All right.

25    A.   Now, that is that -- that is the exact same

190

1   bundle.  He's now rotated it so the light is going

2   through at a different direction, and you'll get a

3   darker reddish color there.  And then he can do the

4   refractive indices, and say, "This is in the range of

5   actinolite/tremolite."

6         These analysts that I have -- this particular

7   person has been doing this for almost 30 years.  He's a

8   geologist, trained at McCrone, or Walter McCrone's

9   group, back 30 years ago to do this.  All our analysts

10  were trained by Walter McCrone many, many, many years

11  ago, because that's what they -- what he did, and this

12  is how -- the protocol.

13        So they look at this, and then they have some

14  other stuff that they do.  Extinction angle.  If you

15  keep turning it to some point, the light refracted

16  through the material will be the same as the light

17  around the material on a particular angle.  So it

18  disappears.  And when it disappears, they call it the

19  extinction angle.

20        And so tremolite and actinolite, if you turn it

21  slightly oblique, start going this way, it just fades

22  out.  They'll go, "Okay.  That's indicative of

23  tremolite/actinolite."

24        Then the refractive indices -- and then they --

25  and everybody likes the next one because it's such a

191

1    pretty color.  It's called elongation.  Now you can put

2    the purple up.

3         Q.  Before I get the purple one out, let me just

4    ask a couple questions.

5              It says, "actinolite/tremolite."  You -- and

6    you described this as bundles.

7         A.  Yeah.  Go back to the previous one.

8         Q.  Well, I mean, why -- why can't -- why can't

9    this just be a cleavage fragment?  This is a cleavage

10   fragment, Dr. Longo, isn't it?

11        A.  No.  No, it's not.

12        Q.  Why not?

13        A.  If you -- you can't quite see it from there.

14   If you look at it, you can see striations in the bundle

15   itself.  I don't know if you can -- you actually see

16   lines going through it.  It's hard to see on this one.

17   We'll get a better -- just because you're blowing it

18   up.

19             So it's difficult to see here, just because

20   you're blowing it up, but it actually has striations

21   going through it that make up this.

22             And it's large.  This is 88.5 micrometers in

23   length.  If you want to know the aspect ratio, you

24   don't measure the whole bundle.  The protocol tells you

25   to measure the individual fibers.

192

1          And I know it's hard to see it.  We might have

2     a better example, because it's bigger than this one.

3          So the aspect ratios on here are all running

4     about -- in this particular one between 160- and

5     200-to-1 aspect ratio.  This is a bundle.  This is not

6     a cleavage fragment.

7          And it's meeting the counting protocols for

8     aspect ratios greater than 5 to 1, individual fibers,

9     and, therefore, is a regulated asbestos bundle.

10    Q.   The purple one that you -- this page 43 --

11    A.   This is called elongation.  When you turn it in

12    this direction -- you have to put another filter in

13    there.  It's a 530-nanometer filter that, again,

14    changes the vibration of the light, gives you these

15    beautiful colors.

16         But it tells you how fast the light goes

17    through the crystal via the orientation, either this

18    way or that way.  And if you switch it the other way,

19    it changes colors, and these particular colors will

20    tell you what type of asbestos this is.

21         So it's a very involved analysis.

22    Q.   And is it your opinion that this is --

23         Let's zoom it back out.

24         -- tremolite?

25    A.   Well, it's actinolite/tremolite.  We don't

193

1   differentiate between actinolite and tremolite.  You

2   have to --

3         Q.  Under PLM?

4         A.  Under PLM, because you have to go to another

5   RI, refractive indices, fluid.

6             And since both of those are regulated asbestos,

7   tremolite and/or actinolite, and actinolite is part of

8   the whole solid solution series of tremolite --

9   meaning, eons ago, when it all formed, what -- if there

10  was a little bit more iron present, you could get more

11  on the actinolite side; if there's less iron, you get

12  more on the tremolite side.

13            Since it's regulated, we don't go the extra

14  step.

15        Q.  So on this particular one, this has got

16  M68503-009; right?

17        A.  Right.  And it has -- you can see the "BL" on

18  there.  That means that was the Blount -- this is a

19  Blount PLM.

20        Q.  You used the Blount method?

21        A.  Yes, sir.

22        Q.  Under the -- the same number, M68503-009, we

23  have a TEM photograph.  That's going to be on page 50

24  of this exhibit.  And explain what this represents.

25        A.  This is a tremolite -- it's either a fiber or a

194

1    bundle.  I would have to be sitting at the microscope

2    so I could adjust the focal plane and go in higher

3    magnification to tell you if it was either a fiber or a

4    bundle.

5        But it -- either way, it's still a regulated

6    asbestos structure, meeting the counting rules.  In --

7    in this particular case, it's tremolite.

8        Q.  And do you include with this in your report --

9    it's part of exhibit -- the exhibit here, the chemistry

10   and the selected area electron diffraction?

11       A.  Yes.

12       Q.  And throughout these binders, you do that with

13   regards to the photographs, provide for the TEM, the

14   selected area electron diffraction and EDS?

15       A.  Yes.

16       Q.  If we go to Tab 4, I want to ask you about

17   page 59 and 60.  And page 59 has the pretty purple with

18   the blue.  There is an arrow right here, and it says

19   "actinolite/tremolite elongation."

20       A.  Yes.

21       Q.  Is this another example of asbestos fibers

22   documented by the PLM method?

23       A.  Yes.  And if you go to page 57, it's that same

24   asbestos bundle.  And you can see the striations a

25   little bit easier on page 57.

195

1      Q.  57?

2      A.  You just had it in your hand.

3      Q.  This one right here?

4      A.  Yes.  I don't know if you can see it -- my

5  glasses are -- need a new prescription -- but if you

6  look at that closely on the ends you can actually see

7  individual fibers on each end of that bundle.

8      Q.  Oh, I see.  It's a different magnification,

9  then; right?

10     A.  That's at a hundred times.  There you go.

11        Now, see on the very -- on each end, you can

12  see what looks like little fibers protruding out of

13  that, that's a classic bundle.

14     Q.  I got it upside down.

15     A.  Now that you have turned it right side up, it's

16  still a bundle.

17     Q.  It's still a bundle.

18     A.  So that's almost 70 micrometers long, and if

19  you take one of those little fibers in there for the

20  width, because that's how you determine the aspect

21  ratio on the PLM, you easily have something that's

22  200 to 1 or greater for your aspect ratio in that.

23        And interesting, TEM, even though we have

24  positive TEM samples for this same thing, you never see

25  these large bundles.  Every microscopist in the country

196

1    understands that TEM is biased against these very large

2    bundles.  And we don't know why.  It gets caught up in

3    the sample prep, because everything you see is smaller

4    than that in TEM.  Even though TEM is more sensitive.

5           So there is room for both analysis here, the

6    large stuff and the smaller asbestos stuff, using these

7    two different techniques.

8       Q.  Did you find asbestos in samples -- in many of

9    the samples from the '70s as well?

10      A.  Yes, sir.

11      Q.  And what about the '80s?

12      A.  Yes, sir.

13      Q.  And what about the '90s?

14      A.  Yes.

15      Q.  And let's go up to the binder that's listed as

16   the '80s.  Exhibit 1082.

17          And, once again, the photographs with the

18   numbers are on there; correct?

19      A.  That is correct.

20      Q.  So, for example, this one right here, we look

21   and zoom in, it says "1985" on it, I think, on the

22   bottle -- the actual bottle itself.  J&J BPC1985;

23   right?

24      A.  That is correct.

25      Q.  If you could, just in the '80s, give us a

1    representative sample -- well, let me -- let me pick

2    one out because I don't know what I'm looking at here.

3           Let's look at Tab 2, page 14.  It's upside down

4    again.  Oh, now it's upside down.  I don't know how to

5    use this thing.

6           Anyway, Dr. Longo, what's represented here?

7    A.   This is another tremolite/actinolite bundle,

8    and this is again under elongation, so it's measuring

9    the speed of the light through the -- essentially the

10   crystalline fiber.

11          This is at a magnification of 200 times, and

12   it's showing you some of the striations of the

13   individual fibers that you can see if you go back to

14   page 13, which would be the other side of what you

15   have.

16          And this is under dispersion staining.  And it

17   shows you under a hundred X that -- and, again,

18   dispersion staining one goes around the bundle, so you

19   see more what's happening on the edges.  It again shows

20   individual fibers.

21          And this is a bundle that's 64 micrometers --

22   63.4 micrometers in length.  So these are all large

23   bundles that we're finding by the Blount PLM method.

24   Q.   And if we flip over to page 16, I see that this

25   is marked anthophyllite on part of the structure -- or

1    part of the bundle and talc on another part of the

2    bundle.  Explain that.

3         A.  Well, it's either a transitional but more

4    likely what we're looking at here is the anthophyllite

5    bundling on a particle of talc, because the

6    anthophyllite is all the way from one end to the other.

7    When you have these transitional anthophyllite talc

8    fibers, you'll see that it's almost growing, looks like

9    one is growing inside the other.  But here we have it

10   on the edge, and what we have next to it looks like a

11   talc -- under a talc plate.  So we see this sometimes

12   where you have an asbestos fiber sitting on or under a

13   talc plate.

14        Q.  And then, if we go over to 17, page 17, we have

15   talc and anthophyllite right next to each other.

16   Bundles of both; correct?

17        A.  It's either bundles or a small plate.  And

18   here's one of the ways you can tell the difference

19   between asbestos and talc.  The very thick portion of

20   the talc plate, the colors aren't similar, and then

21   between where we have the talc in the anthophyllite

22   bundle, it's almost a darkish bluish color, and that

23   tells you that is not anthophyllite.

24            So we -- and then we have that one bundle

25   anthophyllite.  And, again, I believe it's laying on

199

1    top of the talc particle.

2        Q.  Then we go to page 19.  We have anthophyllite

3    bundle crossed polar.  What's that mean?

4        A.  The optical -- the polarized light microscope

5    has two polarizing lens, one on the bottom and one on

6    the top.  And polarized light is like polarized

7    sunglasses.  It causes -- the light is scattering

8    everywhere and it grabs the light and that only is

9    going in one direction.  That's why you don't get the

10   glare and stuff when you used polarized light

11   microscopes.  You can -- if you fish, you can see the

12   fish better.

13       Now, if you got two of them, you can change the

14   direction pretty drastically and get another direction

15   in there.  So in crossed polars, we have the polars

16   turned crossways to each other.  And so now we're

17   seeing just the anthophyllite portion where the arrow

18   is.  Everything else you see there that we are looking

19   at that talc plate is talc.  And you can see that is

20   definitely a different color.  And you can also see

21   some of the individual striations there.

22       Q.  And do you include in the photographs, the TEM

23   photographs from the same sample?  For example, Tab 2,

24   does it have both TEM photographs as well as

25   PLM photographs?

200

1      A.  Yes, sir.

2      Q.  In the interests of time, I'm not going to go

3  through every decade or every -- but are there

4  confirmed photographic evidence of asbestos in the

5  '60s, '70s, '80s, '90s, and 2000s?

6      A.  Yes, sir.

7      Q.  Any question in your mind regarding that?

8      A.  No, none whatsoever.

9      Q.  Have you confirmed, in your opinion, what has

10  been documented in the documentary evidence of what we

11  went over earlier about Johnson & Johnson Baby Powder?

12         MR. CALFO:  Objection, no foundation.  Calls

13  for speculation on the part of this witness.

14         THE COURT:  That's overruled.

15         THE WITNESS:  I'm sorry.  Could you repeat it.

16  BY MR. SATTERLEY:

17      Q.  Yeah.  Have you, in your opinion, confirmed and

18  taken photographs of the presence of asbestos in

19  Johnson & Johnson Baby Powder that were -- was

20  documented in the documents we went over this morning?

21      A.  Yes.

22      Q.  Back in -- historical?

23      A.  Yes.  We -- finding the same thing.

24      Q.  With regards to -- we don't have your reports

25  in here, just the photographs, but do you have the

201

1    reports, your reports, with you?

2        A.  Yes, sir, I do.

3        Q.  And, with regards to the Johnson & Johnson Baby

4    Powder, the -- what percentage of positives did you

5    find, meaning what percentage had asbestos in them?

6        A.  For the 72 samples, what I call historical,

7    57 containers and 15 railroad car samples, we had an

8    overall total positive of approximately 68 percent of

9    the 72 we analyzed.

10       Q.  So does that mean, Dr. Longo, that if 68

11   percent was positive, that means 30 -- was 32 percent

12   there's no asbestos there, in any of those bottles?

13       A.  No.  Doesn't mean that.

14       Q.  Well, why not?  Why not?

15       A.  It means --

16           MR. CALFO:  Objection, Your Honor.  This calls

17   for speculation.  There's no asbestos.

18           THE COURT:  That's overruled.

19           THE WITNESS:  Well, it's just below your

20   detection limit.  So at some point all's you can say

21   is, it's below our detection limit, we can't verify if

22   it's there, and we can't verify.  And nobody can ever

23   say, it's pure and it's not there, because you can't

24   get to that low of detection limit.  All's you can say

25   is nondetect.  We can't verify it's there or not there.

202

1    BY MR. SATTERLEY:

2        Q.  How many fibers would have to be there in order

3    for you to even detect it in the method that you're

4    using?

5        A.  Right now we have our detection limit that we

6    used here, and I'm just going to scan through the

7    report real quick.  We've gotten our detection limit

8    down for these analysis to 3,000 asbestos fibers or

9    bundles per gram of talc.  So we have to have at least

10   that many there, in one sample.  Then most of them are

11   5 and 6,000 fibers or bundles of asbestos per gram.

12           So think of it as this:  If my detection limit

13   is 6,000, that means I have to find -- for me to find

14   one fiber, it has to be at least 6,000 fibers and

15   bundles per gram of cosmetic talc to find one.  Because

16   it's spread out through there.

17       Q.  And have you -- have you done the calculation

18   with regard to the 7024 with regards to how many

19   asbestos fibers would need to be there per gram under

20   their method?

21       A.  Approximately 14 million for one fiber to be

22   there using --

23       Q.  For one fiber?

24       A.  To be using that method.

25       Q.  But wait a second.  Their -- their method says

203

1    they have as many as 20 or 5 fibers of any -- of each

2    variety; right?

3         A.  Correct.

4         Q.  So you're saying 14 million for one fiber, so

5    how many asbestos fibers could be present under the

6    7024 method and still qualify as nonquantifiable?

7         A.  It works out to be about 6' -- well, you take

8    four fibers, it's around 58 million before you -- you'd

9    have to have one more fiber to get that fifth fiber

10   before you would say, yes, it has asbestos in it.

11        If you only had four tremolites, that would

12   work out to a little bit over 50 million asbestos

13   fibers or bundle per gram to find one, because the

14   detection limit is so bad in that protocol.

15        Q.  And if you had -- had to find four or five of

16   the same of each variety, so you could have -- you

17   could have four tremolite, four anthophyllite, four

18   actinolite, and four chrysotile and still call it

19   nonquantifiable, what number are we talking about

20   asbestos fibers present and still be able to say it's

21   nonquantifiable?

22        A.  A little bit over 200 million fibers and

23   bundles per gram.

24        Q.  I apologize.

25        All right.  Now let me switch gears and talk

204

1    with you about Colgate, Colgate testing.  And Cashmere

2    Bouquet.  Last year, at the request of other attorneys,

3    did you analyze 3 -- or did you analyze 38 samples of

4    Cashmere Bouquet?

5        A.  Yes.

6        Q.  And did you take photographs and document what

7    your laboratory found in tab, what's called Appendix A,

8    Appendix B, and Appendix C?

9        A.  Correct.

10       Q.  And we marked as Appendix A -- it's into

11   evidence, I should say, as 1091, photographs from

12   Appendix A.

13           And what does that represent?

14       A.  Appendix A is the samples that we received from

15   the law firm of Simon Greenstone.

16       Q.  And did you document a photograph of the

17   containers, photograph of the analysis?  Did you

18   photograph what was identified?

19       A.  Yes, sir.  But to be fair, to be included in

20   that, we videotaped the opening up of the seal,

21   Cashmere Bouquet face powder samples that we got.

22       Q.  These were sealed?

23       A.  Not all of them.  But 20 out of these 25 were

24   sealed with the manufacturer's sort of a paper-type

25   covering over than the entire area.  Underneath it

205

1    would be the talcum powder.  Sort of a -- they're round

2    and they were all still sealed.

3        Q.  Now, I want to -- I'm not going to go through

4    all the photographs in Appendix A, but I want to go

5    through a few of them just so that we can understand

6    what they represent.  And I'm just going to randomly

7    pick.  If you go to sample, under Tab 12, which is

8    M68072.  If you go to -- it's page 220.

9        A.  Okay.

10       Q.  What are we seeing here in the Cashmere

11   Bouquet, one of the samples?

12       A.  I'm sorry.  What page are you on?

13       Q.  220.  It's got a number, M68072.

14       A.  That is a -- it looks like -- if I were to pick

15   that -- let me see if I can find it.  All right.  Hold

16   on.  That would be a tremolite/actinolite bundle for

17   001003.  Oh, I'm sorry.  We're on -- I'm on the wrong

18   one.  You said 220; right?

19       Q.  Yeah.  220.

20       A.  That would be Number 4 out of that sample.

21   That is a crushed tremolite/actinolite bundle.  When I

22   say "crushed," looking at it, it looks like, because

23   this material is milled, meaning it's all ground up to

24   make a certain size, it looks like that was pushed down

25   and caused that bundle to spread apart instead of

206

1    saying that's three bundles.

2          So that's a tremolite/actinolite.  Very large

3    bundle.

4          Q.  And if we flip over to this, what does this

5    represent?  This is page 219.  Immediately pre --

6          A.  This is under crossed polars, and this one is a

7    really good example on how you can see some of the

8    individual fibers that are consistent with what a

9    bundle should be.  And they're all going in the same

10   direction, and you can see these individual fibers that

11   make up this bundle.  At these magnifications this

12   bundle is approximately about 200 to 250 micrometers in

13   length.

14         So think of it as on a TEM grid.  I don't know

15   if Lee Poye showed what TEM grids look like, but this

16   would cover two TEM grids -- openings.

17         Q.  And let's see.  And just so if we can get a --

18   if you can flip to Tab 3.  You document a photograph,

19   the container, this is the Cashmere Bouquet face powder

20   in the way it came to you?

21         A.  Yes.  This was another sealed container, which

22   we videoed when we opened them to have it documented

23   that it was sealed.

24         Q.  If you flip over to page 71 of this same

25   sample, it says "elongation," and it's got that pink,

207

1    and it's got a blue -- once again, what does that

2    represent?

3        A.  That's most likely a talc fiber.  It's not

4    asbestos.  No asbestos was found for the PLM in this

5    particular sample.  Only the TEM.

6        Q.  So, in this particular sample, we go over to

7    the TEM, was tremolite asbestos found in this Cashmere

8    Bouquet product?

9        A.  Yes.

10       Q.  Is that a photograph -- this is page 76 there,

11   sir.

12       A.  Yes.  That's a photograph of an asbestos

13   tremolite structure.

14       Q.  And do you include in this the chemistry and

15   SAED?

16       A.  Yeah.  If you go to the very next page,

17   page 77, you can see the chemistry -- the magnesium,

18   the silicon, and the calcium peak -- which, if you

19   remember, looks identical to the NIST standard,

20   National Institutes of Science and Technology.  What

21   they say is tremolite asbestos.  So it's a perfect

22   match.

23       Q.  Well, let me -- why isn't that a cleavage

24   fragment, Dr. Longo?  Why isn't that just a cleavage

25   fragment and not asbestos?

208

1          A.  Well, by all the counting rules in TEM, this is

2     regulated asbestos.  It has the appropriate chemistry,

3     appropriate diffraction pattern for the d-spacings.  It

4     has the appropriate morphology greater than -- greater

5     than or equal to 5 micrometers in length.  This is

6     3.8 micrometers in length.  Has to have an aspect ratio

7     of at least 5 to 1 or greater.  It matches that.  And

8     in this particular case, again, it's on -- just looking

9     at the results here, that would be -- and, again, I

10    would have to be sitting at the microscope to change

11    the focus, but it looks very close to being a bundle

12    just on this two-dimensional plane because of the back

13    end of it has those little bumps.  Let's see what the

14    microscopist said.

15         Q.  Are you talking about down here, the box down

16    here?

17         A.  The microscopist called it a fiber.  And that

18    would be the best position because you can change the

19    focal plane.

20         Q.  Is it difficult sometimes where there's a

21    photograph like this on calling something a fiber

22    versus a bundle when it's a close call?

23         A.  Yes and no.  It's difficult if you're just

24    looking at a two-dimensional photograph sitting here,

25    because you're not sitting at the microscope.  If

209

1    you're at the microscope and that is your -- and you

2    even said you got to distinguish fibers and bundles,

3    it's a lot easier because you can change the focal

4    plane, you can change the contrast, and the microscope

5    has a little gizmo you can flip in and increase the

6    magnification by ten times.  So --

7        Q.  "Gizmo," is that a technical term?

8        A.  It is.  If you ever worked in a lab, you'd call

9    it a "gizmo."

10        Q.  So --

11        A.  It's actually binoculars that you can put in

12    and open up a -- open up a small screen so you can

13    focus in on it.

14        Q.  In the Cashmere Bouquet, of the 38 samples --

15    and this is just A.  We've got B, Appendix B.  Is that

16    another -- this 1092, and that is photographic evidence

17    of the samples and the results and the asbestos that

18    was identified; correct?

19        A.  Yes, sir.

20        Q.  And was this sent to you by -- these five

21    samples sent to you by a different law firm?

22        A.  Levy Konigsberg in New York.

23        Q.  And then Appendix C, was this -- this is

24    Exhibit 1093 -- these eight additional Cashmere Bouquet

25    products that you analyzed, your laboratory analyzed,

210

1    took photographs of for the presence of asbestos?

2        A.  That is correct.

3        Q.  And is there a total of 38 that's a part of

4    this report from last fall?

5        A.  Yes, sir.

6        Q.  And of the 38 samples -- this is going to be

7    Appendix C of the 38 samples -- how many did you find

8    asbestos in?

9        A.  30 of 38.

10       Q.  On Appendix C, 1093, the last one, Tab 8, does

11   that include Cashmere Bouquet, it came in this

12   container?

13       A.  Yes, sir.

14       Q.  And this is page 337 of the photographs here.

15           Is that tremolite asbestos, sir?

16       A.  337?

17       Q.  Yes, sir.

18       A.  I'm sorry.  What appendix?

19       Q.  Appendix C.

20       A.  Oh.

21       Q.  September of 2018.  Page --

22       A.  Yes, that's tremolite there.  All the way to

23   the back.

24       Q.  The very last sample.

25       A.  Yes.  That would be a tremolite structure that

211

1    is laying on top of the -- one of the TEM grids.  You

2    can see on the left-hand side how you have the little

3    right angle area, dark?

4        Q.  Right here?

5        A.  Yes.

6        Q.  This is -- this is the grid -- the edge of the

7    grid here?

8        A.  Correct.  So that structure is laying on --

9    over the grid.

10       Q.  Is -- so this is described as 4.2 microns in

11   length and 0.4 microns in diameter.

12           Is the fact that it's -- the grid -- it's going

13   underneath the grid, I guess?

14       A.  Over the grid.

15       Q.  Over the grid?

16       A.  Yes.

17       Q.  Does that mean that it could be much longer

18   than that, you just can't tell?

19       A.  That's correct.  You could only -- the rules

20   only allow you to measure the length from where the

21   grid ends and the fiber or bundle starts.

22       Q.  And does the chemistry and the diffraction

23   pattern match up with regards to the rules, all the

24   methods, in calling this asbestos?

25       A.  Yes, it does.

212

1      Q.  Now, if somebody were to come into this

2   courtroom and sa, no, no, no, Dr. Longo has got it

3   wrong, that's a cleavage fragment, under the -- under

4   the rules of identifying asbestos set forth by these

5   various methods you've been telling us about, would

6   that be -- would that be accurate?

7      A.  No.  It has very specific regulated --

8   health-regulated rules, and this is what you have to

9   count.  You have to follow the protocol.  If you use a

10   certain type of protocol -- and these are in all the

11   protocols for these rules for TEM -- you have to follow

12   them.

13      Q.  Now I'm going to switch and go to the

14   20 samples that I requested to your analyst, Zach, go

15   and pick up from RJ Lee, J&J and Colgate's experts.

16      A.  Okay.

17      Q.  The actual quantity of samples was more than

18   20; correct?

19      A.  Yes.

20      Q.  At the time of your report in this case, had

21   your laboratory analyzed 20 of those samples?

22      A.  Yes.

23      Q.  And have we marked the chain of custody for

24   those as 1096?

25      A.  I'm looking for them.

213

1       Q.  It's a -- the skinny binder.

2       A.  Yes.  Thank you.

3       Q.  And if we look at the first three, just the

4   photographs -- this is going to be on page 11 -- we see

5   what the container looks like for the first three;

6   right?

7       A.  Yes.

8       Q.  And they're dated according to what RJ Lee and

9   Colgate has provided to you; correct?  The '70, '70,

10  '73 to '77?

11      A.  Yes.

12      Q.  And if we look at the next three, did you --

13  did you and your laboratory just pick the first 20?

14      A.  Yes.

15      Q.  And was there problems with a couple of those

16  so you had to extend to 22?

17      A.  There was.

18      Q.  And tell us what the problem was.

19      A.  They were in methanol.  They weren't --

20      Q.  What's --

21      A.  They weren't in a powder.  The sample bottles

22  had alcohol in them, methanol, which is a form of

23  alcohol, mixed with it, so we didn't want to analyze

24  those since they weren't starting with just the talcum

25  powder.  It's different, you know, the protocol, so we

214

1  just extended it to 22 and did not analyze the ones in
2  methanol.
3      Q.  So the -- into evidence the jury can take a
4  look at the photographs of the various containers of
5  the Cashmere Bouquet that goes along with the chain of
6  custody; correct?
7      A.  Correct.  Now, we didn't receive the
8  containers; we just received samples from the
9  containers.
10     Q.  RJ Lee, the laboratory for Colgate, was the one
11  you guys had to actually go to Pittsburgh, Zach had to
12  go to Pittsburgh, to pick these up?
13     A.  Yes, sir.
14     Q.  In Appendix B do you have the results of the --
15  PLM results for these Colgate -- these Colgate samples?
16     A.  Yes, sir.
17     Q.  And I have Appendix B having 15 different --
18  excuse me -- 17 different samples.  Was there 16 or 17
19  that was positive by PLM?
20     A.  Let me get the report, because I don't want
21  to -- for these 20 samples just to make sure.
22         THE COURT:  While he's looking for that,
23  Mr. Satterley, you referred to this as "Appendix B."
24  What -- what is the --
25         MR. SATTERLEY:  To his report.

215

1          THE COURT:  What is the exhibit number?

2          MR. SATTERLEY:  Oh, I apologize.  1097.

3          THE COURT:  All right.  So that's -- that's

4    1097?

5          MR. SATTERLEY:  Yes, Your Honor.  1097.

6    BY MR. SATTERLEY:

7        Q.  And, Dr. Longo, let me see if I can help you

8    out with regards to -- the first -- if we go to Tab 1,

9    the first group of photographs relate to a talc bundle.

10       A.  Yeah.  The first set of photographs, there was

11   16 positives by PLM --

12       Q.  Okay.

13       A.  -- and this one was not one of them --

14       Q.  Okay.

15       A.  -- the very first one.

16       Q.  So -- and we'll get to the TEM in a little bit.

17          So 16 of the 20 by PLM had asbestos in them, in

18   your opinion?

19       A.  Yes, sir.

20       Q.  And did you document that and photograph it and

21   produce it as a report so Colgate could take a look at

22   that?

23       A.  Yes, sir, I did.

24       Q.  And -- and once -- since I've got this up here,

25   this is page 4 of 1097.  How do you know that's a talc

216

1    fiber bundle?

2        A.  Well, that's -- that's in elongation, but if

3    you go to -- if you go to page 2 --

4        Q.  Oh, page 2.

5        A.  Now, these samples had lots of other stuff in

6    it, but if you look where that is, where the talc fiber

7    is, you'll notice that from the other ones we looked at

8    and were more yellowish-gold than in this particular

9    case, in parallel, parallel dispersion, dispersion

10   staining, alls you get is this new blue color, this

11   nice bluish color.

12       That tells you it is -- it is talc for these

13   types of samples, as well as the other information that

14   we gleaned from the crystalline analysis by polarized

15   light microscopy.

16       Q.  Dr. Longo, has J&J counsel in the past accused

17   you of misidentifying things as asbestos?

18       A.  Yes, sir.

19       Q.  Okay.  Well, why didn't you just identify this

20   as asbestos and say, "This is asbestos," instead of

21   talc?

22       A.  Because it's not.  That wouldn't be right.

23       MR. CALFO:  Your Honor, I object.  Vague and

24   ambiguous as to "this."  Is it a photograph?

25       MR. SATTERLEY:  Yeah, the photograph.  That's

1    what we're talking about.

2          MR. CALFO:  I thought that was Colgate.

3    BY MR. SATTERLEY:

4       Q.  Whether it's Colgate or Johnson & Johnson --

5          THE COURT:  Well, it's --

6    BY MR. SATTERLEY:

7       Q.  -- my question is --

8          THE COURT:  It's 18 minutes of 3:00.  We are

9    going to take our afternoon recess and come back in 15

10   minutes.

11         Ladies and gentlemen of the jury, it is your

12   duty as jurors not to converse amongst yourselves or

13   with anyone else on any subject connected with the

14   trial or to form or express any opinion thereon until

15   the matter is submitted to you.

16         I'll see you back in 15 minutes.

17         (Whereupon, the following proceedings were held

18   outside the presence of the jury:)

19         THE COURT:  All right.  It appears that all of

20   the jurors have departed from the courtroom.

21         Is there anything we need to put on the record

22   before we go on break?

23         MR. SATTERLEY:  Your Honor, the only thing is

24   that I understand Your Honor made rulings sometime

25   today with regard to certain documents.  We would just

218

 1    like to incorporate those documents into evidence

 2    regarding -- some J&J documents.

 3           And then at some point, we need to address the

 4    few remaining objections to the Scala exhibits.  And I

 5    don't know if Your Honor wants to do it at the end of

 6    the day or tomorrow morning or whenever Your Honor --

 7           THE COURT:  I'm happy to do it at the end of

 8    the day.  We'll send the jury home at 4:30.

 9           MR. SATTERLEY:  That's fine, Your Honor.

10           THE COURT:  Okay.  Anything else?

11           We are in recess.

12           MR. SATTERLEY:  Yes, Your Honor.

13           MR. GARY SHARP:  Thank you, Your Honor.

14               (Recess taken.)

15           (Whereupon, the jury having entered the

16    courtroom, the following proceedings were held:)

17           THE COURT:  Okay.  The record reflects that all

18    the jurors are present in their appointed seats,

19    counsel are at counsel table, and we're ready to

20    proceed.

21           Go ahead, Mr. Satterley.

22           MR. SATTERLEY:  Thank you, Your Honor.

23    BY MR. SATTERLEY:

24       Q.  We were talking about Cashmere Bouquet and

25    specifically about 1097, the PLM results, and I was

219

1    asking specifically about some of the photographs.

2         If we can go to the very first -- or the second

3    sample, I'm going to ask you about this.  We have

4    anthophyllite and then a talc plate here and then talc

5    at the other end?

6    A.  Yes, sir.

7    Q.  Explain that.

8    A.  Well, that's called the intergrowth or

9    transitional.  So you have anthophyllite as well as

10   talc.  So when it was formed, you get two different

11   minerals, essentially, on one fiber, or bundle here in

12   this case.

13   Q.  I saw that in this -- these pictures, to me --

14   and you can correct me if I am wrong -- there appears

15   to be several photographs.  Is this a photograph of the

16   same structure that we just looked at?

17   A.  Yes, sir.  It's under crossed polars, and it's

18   at a magnification -- a higher magnification of 200 --

19   400 times.  The other one was 100.

20        And this just shows the -- so this is at 400

21   under crossed polars, and you can see that it has fiber

22   structures that go all the way through.  So it's known

23   as an intergrowth.  So it's -- it's not only

24   anthophyllite, but it has some fibrous talc associated

25   with it.

220

1    Q.  Is this, the next page, page 11, the same fiber

2    that is being analyzed with -- it's got a different

3    color background.  Is that the same?

4    A.  Yes, sir.  This has no filters.  It's not under

5    dispersion staining.  It's not an image in that

6    530-nanometer plate.  It's just under crossed --

7    crossed polars.

8         So you're seeing the talc plate that it's

9    laying on.  And this may be, in fact, actually other

10   asbestos fibers laying on top of it, but it's too small

11   for us to resolve and -- and adequately identify on

12   that plate.  It has anthophyllite on one end and talc

13   on the other.

14   Q.  And the reason why I asked this question is,

15   we, or maybe the jury, when they look through these

16   photographs when they're evaluating this case -- there

17   would be several photographs that appear to be the same

18   structure but different colors and different

19   backgrounds.  That's just different ways in which

20   you're looking at it under the microscope?

21   A.  Yes, different wavelengths, a lot of which will

22   give you different colors.  Some of them -- and you

23   have to just remember to take a look at what the

24   magnifications are.  Same fiber, but it's bigger, it's

25   typically at a higher magnification.  So smaller ones

221

1    are anywhere from 100 to 200, and then you'll also have

2    up to 400.

3        Q.  And then this one, for example, this one is on

4    page 12.  It looks like it's -- it's going this

5    direction, and this one, it's going this direction.  Is

6    that the same situation, it's perpendicular?

7        A.  Yes.  It's on a stage that you can rotate.  So

8    here, we have parallel dispersion, and then here, we

9    have perpendicular dispersion.  And since you're

10   changing it, the fiber -- or bundle here, to the

11   direction of the light under dispersion staining, the

12   vibrations that come through change and give you

13   different -- these different colors that then they can

14   then match to the refractive indices, which then will

15   put it in either tremolite, actinolite, anthophyllite,

16   or if there was some other type of asbestos present.

17       Q.  The Colgate lawyer wanted me to point that you

18   had gone to another sample, M69934.  This is yet

19   another sample with asbestos in it; correct?

20       A.  Yes, sir.

21       Q.  And I wanted to ask about this.  It says,

22   "Elongation at 400 magnification, tremolite."

23           Is this asbestos, Dr. Longo?

24       A.  Yes, sir.  You're -- we're looking at, again,

25   the exact same structure, higher magnification, under a

222

1    different type of filter, giving you this color.

2         Q.  And do we have, once again, over here, page --

3    two pages over, page 31, exact same structure?

4         A.  Oh, you -- you've moved on me.

5         Q.  I'm sorry.  Page --

6         A.  Now we're on -- now we're on Sample 5.

7         Q.  Yeah.  Sorry.

8              Page 29 and page 30 and page 31, are those all

9    the -- of Exhibit 1097, all the same structure under

10   the microscope?

11             THE COURT:  Well, before -- let him answer the

12   question over again as posed.  He was still on the last

13   sample.

14             MR. SATTERLEY:  I apologize, Your Honor.

15             THE COURT:  Because I'm confused.  And I

16   don't -- and maybe nobody else is, but I'm confused.

17             So what -- so what is that?

18             THE WITNESS:  That's actinolite/tremolite.  But

19   let's just start from the beginning of this one so

20   people can look at it and -- and understand what

21   it's -- what's going on.

22             So this is -- and we're starting on page --

23   BY MR. SATTERLEY:

24        Q.  22?

25        A.  -- 20 -- 22 now.  Now, you've gone to something

223

1    different.

2          Q.  I'm sorry.  I was moving too fast.

3              All right.  Do you want to go to a different

4    one?

5          A.  Let's start from the beginning.  So move it up

6    so we can see the -- see the numbers underneath, the

7    actual title of this.  Just move the whole thing

8    straight up.

9              Okay.  There you go.

10             That identifies what we found in this

11   particular case, going from right to left at the

12   bottom.  This was done by the International Standards

13   Organization, polarized light microscopy.  No heavy

14   liquid density separation was done.  The sample number

15   is M69934-005ISO, and this would be the first structure

16   found under this method.

17             So now we're starting.  So this is under

18   dispersion staining, and you can see we have a lot of

19   stuff in here.  And then over to the upper right, you

20   see the actinolite/tremolite bundle, and it's

21   32.6 micrometers long.

22             And we're in parallel dispersion.  That's

23   the -- usually the first thing up on the particular

24   sample.

25             Now, if you go to the next page, page 23,

224

1    that's the perpendicular under dispersion staining.

2    You can see the change in color which is consistent for

3    tremolite/actinolite at these wavelengths.

4         Q.  And now.

5         A.  And now we're getting to the elongation.  Now

6    it's at 400 times.  So it's been to this, you know,

7    north -- sort of the northeast direction.  And that

8    matches the colors it ought to be.  And then under

9    crossed polars --

10        Q.  Can we go to the next page, 25?

11        A.  Well, you go to 25.  We're still on this one

12   structure, because we're going through all the

13   different analytical procedures for identifying it.

14   Here we have it under crossed polars.  And then the

15   very next one is the last one you would have with

16   crossed polars out.  Now you're just looking at it

17   under the light.  And you can see the individual

18   striations in there.  The polarizers are out.  And this

19   is regulated asbestos.  It's going to be approximately

20   33 microns long, and those individual fibers in there

21   would give you aspect ratios of over a hundred to one,

22   closer to 200 to 1.  So it meets all the regulations

23   that -- for these PLM analysis.  For this.

24        Q.  Let's keep going through this Tab 4 just so we

25   can talk through -- a complete through one sample so we

225

1    know what we're looking at.

2         A.  So if you go to the very next sample, the very

3    next page where you have that 88.6.  Now, pull it up so

4    you can see the bottom.  This would be the second

5    structure that we're finding under the ISO method.  So

6    you see the 0002?  And, again, under parallel

7    dispersion.  In this case you have more of the golden

8    yellow.  And then the next page would give you the

9    perpendicular dispersion.  Not that page.

10   Page Number 28.

11        Q.  Go back.

12        A.  It's hard to see in this lighting.  And then we

13   would go on.  Actinolite, tremolite -- the next one

14   would be the elongation, page 29.

15        Q.  The pink or purple, is that always going to be

16   the elongation?

17        A.  Yes.  It's got the right colors at the right

18   direction under the polarizers and under the -- under

19   the 530-nanometer plate.

20        Then the next one is crossed polars.

21        Q.  Now, this is page 30 of Exhibit 1097; is that

22   correct?

23        A.  Correct.

24        Then the very next one is this same structure

25   again without crossed polars.

226

1          Q.  Is there any question in your mind, Dr. Longo,

2     that this is regulated asbestos in the Cashmere Bouquet

3     product?

4          A.  No, sir.

5              Now, just for completion, let's go to the very

6     next page, page 32.  Now, here is the exact same sample

7     under the Blount method.

8              THE COURT:  That's not the next page.

9              THE WITNESS:  It should be.  Page 32?

10             MR. SATTERLEY:  Yes, Your Honor.

11             THE COURT:  Well, it's a different sample on

12    the left.

13             THE WITNESS:  Yes, sir, it is, but it's just an

14    example of the -- now the Blount PLM with the same

15    sample.

16    BY MR. SATTERLEY:

17         Q.  Because BL, is that the -- right there.  Does

18    that mean the Blount method as opposed to an ISO

19    method?

20         A.  Correct.

21             THE COURT:  Then the 002 and the 001 are

22    different.

23             THE WITNESS:  Yes, sir.  This is 005.

24             Now, one of the things you'll notice, it

25    seems -- even though it has some big particles in

227

1   there, there's not as much clutter around.  It has

2   removed -- and this is -- a lot of this is not talc,

3   this is other ingredients there are in the -- in the

4   Cashmere Bouquet.  You can see, even though you have

5   these big particles, it's not all this small, cluttered

6   stuff around, so it shows you how the talc is removed

7   and cleans the sample up.

8   BY MR. SATTERLEY:

9       Q.  And the magnification level is different also.

10  It's a hundred magnification as opposed to what you

11  were talking about earlier was 400?

12      A.  No.  All the dispersion staining is typically a

13  hundred.

14      Q.  Oh, okay.

15      A.  400 would be elongation.  And if you go to the

16  very next page, page 34.

17      Q.  I see.  Let me stop there so I can clear my

18  confusion.

19          So when see something that's a hundred, if the

20  shape looks different, it's because it's a different

21  magnification, like a hundred to 400?

22      A.  Correct.

23      Q.  Okay.  All right.  Now we're on page -- am I on

24  the right page here, page 33?

25      A.  That's 33.  So now we're in perpendicular --

228

1    parallel.  But if you go to the very next page --

2    because this is a good example of a very fibrous

3    bundle.

4        Q.  No, wait a second.  Let me -- no.  This one

5    says perpendicular --

6        A.  Perpendicular.  If you go to page 34.

7        Q.  Okay.  I see.  I see.

8        A.  In this particular one, you can absolutely see

9    the single fibers in the elongation, as well as the

10   next pages, so this is a very good example of a very

11   fibrous bundle.

12       Q.  So what we're seeing here on page 34 is a

13   close-up -- closer up view of what we were looking at

14   on page 33, 32, 31; correct?

15       A.  That is correct.  It's -- we were looking at

16   100.  This is now 400.

17       Q.  And there we got page 35.  Is that yet

18   another -- the crossed polar of the asbestos in the

19   Cashmere Bouquet product?

20       A.  Yes, sir.  The same structure.  It just shows

21   you a little bit more detail of the fibers.

22            And then the -- without the polarizers -- and,

23   again, you can -- you can see the individual fibers.

24   And so on.

25       Q.  And it goes -- you have a whole bunch of

229

1    photographs that just demonstrate -- do you have a

2    whole bunch of photographs that demonstrate the

3    presence of asbestos in the Cashmere Bouquet product?

4        A.  Yes, sir.

5        Q.  There's one other term that you used.  If we

6    flip over to Tab 10 to the elongation, page 159.

7            Is this Tab 10 yet another asbestos bundle in

8    a Cashmere Bouquet product?

9        A.  Yes, sir.

10       Q.  And page 160 -- actually, 161.  "Aperture

11   diagram partially closed."  What's that mean?

12       A.  Diaphragm.

13           So that the aperture, which lets the light

14   through, is slightly closed to increase the -- increase

15   the contrast so that you can resolve these individual

16   fibers in the bundles better.  It's just a -- it's an

17   optical microscopist's technique for changing the

18   contrast.  Instead of hitting a darker button, it can

19   change the light and get you a better contrast.

20       Q.  Based upon the PLM results, Dr. Longo, are you

21   of the opinion that there's asbestos in Cashmere

22   Bouquet talcum powder?

23           MR. MULARCZYK:  Objection.  Vague.

24           THE WITNESS:  Yes, sir.

25           THE COURT:  I'm going to overrule that.  You

230

1    can inquire on cross-examination.

2         THE WITNESS:  Yes, sir, for the samples that we

3    tested.

4    BY MR. SATTERLEY:

5    Q.  Well, the four of them by PLM you didn't find

6    asbestos.

7    A.  By PLM we did not.

8    Q.  What about by TEM?

9    A.  Yes, sir.  The other four were positive because

10   we're looking at two different types of structures, and

11   so we only analyze those four by TEM.  Since the Blount

12   PLM and the ISO PLM were positive, the negative ones we

13   checked to see if the TEM, which is more sensitive,

14   could determine if it was present or not.

15   Q.  And Exhibit 1098, the folder, does that

16   represent photographs of some of the TEM results from

17   the Cashmere Bouquet product?

18   A.  Yes, sir.

19   Q.  And if we go to -- and did you find asbestos in

20   all four of the negatives by PLM?

21   A.  Yes, sir, we did.

22   Q.  And the second -- that Tab 2, page 9 of

23   Exhibit 1098, what does this represent?

24   A.  This is a tremolite bundle, and these are one

25   of these even with the photograph you don't have any

231

1    doubt telling that's a bundle.  You can see one, two,

2    three, four, five, six -- I can see six individual

3    fibers there.  Some of those were -- where you've

4    circled actually have two -- two or three pushed

5    together, and, actually, you have one that almost has a

6    splayed end, which you normally do not see on TEM

7    because of the size.

8         Q.  And splayed ends, is that a classic

9    identification of a bundle?

10        A.  No.  It's more of a classic identification of

11   commercial asbestos that's been added to bulk samples.

12   Very rarely do you see splayed bundles in TEM at all

13   because of the size you're looking at.  It's the bulk

14   samples.

15        Q.  I apologize.  I should have asked the question

16   this way:  The fact that this is -- these have splayed

17   ends and they're a bundle, does that indicate to you

18   that this is asbestos?

19        A.  No.  It tells us it's asbestos by meets all the

20   counting definitions, has the right chemistry, has the

21   right diffraction pattern.  This is regulated tremolite

22   asbestos.  But if you just -- as being interested in

23   this, this is what you would normally see in a product

24   where the asbestos has been added at very high

25   concentrations.  It's very rare to see a splayed bundle

232

1    of tremolite in these talcum powders because tremolite

2    is brittle.  So when they mill it, it grinds up.  So

3    it's just interesting to see.

4         Q.  And in this, you have -- you have -- do you

5    have the chemistry -- the calcium, magnesium, the

6    silica?

7         A.  Correct.  You have the -- again, it's almost a

8    fingerprint.  It's a ratio of magnesium to silica to

9    calcium, all based on the height of the calcium peak.

10        Q.  And do you have the diffraction pattern, the

11   SAED, that meets all the requirements that this is

12   asbestos?

13        A.  Yes, sir.

14        Q.  Now, back on this photograph, I just want to

15   ask, this part right here, is part of the film on the

16   grid torn there?

17        A.  It's torn and gone.  That's -- that's a carbon

18   film that is put on to the sample, the filter before we

19   dissolve the filter away.

20            That carbon film is actually only about 10 to

21   20 nanometers thick, about 15 to 20 atoms thick, so

22   it's very fragile.  And the way it's done is, the

23   sample is collected on a filter.  That filter is then

24   coated with carbon, and then a small piece of that

25   filter is put on the TEM grid and then put on filter

233

1    paper that's soaked with chloroform, and it slowly

2    dissolves away the filter and just leaves a replica of

3    the filter.

4            See all those little holes?  Those are all the

5    pores that are in the filter that made a replica of

6    what you're seeing.

7        Q.  And the fact that the film is partially gone

8    there, does that in any way detract from the fact that

9    this is a regulated asbestos bundle of tremolite?

10       A.  Oh, no.  It's -- it's not uncommon to see torn

11   films from just putting it in and out of the microscope

12   because you're going under pressure changes, because

13   it's so fragile.

14       Q.  The same tab, Tab 2, what is depicted here, the

15   photograph on page 12?

16       A.  Page 12 is another tremolite asbestos.  I

17   believe if I was -- I think you can call this a bundle,

18   and it's either laying on top or underneath a talc

19   plate.  That thing in the middle.

20       Q.  This thing right here?

21       A.  Yes, sir.

22       Q.  And the chemistry, does the chemistry match up

23   to be a regulated tremolite?

24       A.  Yes, sir, it does.

25       Q.  And once again, the selected area electron

234

1    diffraction, does it match up?

2        A.  It does.

3        Q.  We have another one here on this sample.  And

4    what does this represent?

5        A.  This represents talc, fibrous talc.

6        Q.  And is it labeled as talc there?

7        A.  That's correct.  This is not asbestos.  This is

8    fibrous talc in the sample.

9        Q.  And does it have the chemistry of talc?

10       A.  Yes.

11       Q.  And does it have the diffraction pattern of

12   talc?

13       A.  Yes.

14       Q.  So I'm not going to go through all these

15   photographs of all the asbestos in the TEM, but is

16   there any question in your mind, Dr. Longo, that

17   there's asbestos documented by TEM in the Cashmere

18   Bouquet samples that you received from the RJ Lee

19   Group?

20       A.  No, there's no doubt.

21       Q.  And has it been documented and photographed and

22   produced to the defendants, the lawyers for Colgate?

23       A.  Yes, sir.

24       Q.  Now, if somebody were to say to this jury that

25   you've never written a letter about or written a report

235

1    regarding the presence of asbestos in J&J products,

2    would that be true?

3        A.  I've written reports.  I'm not sure who I'm

4    supposed to send the letter to.

5        Q.  Have you issued those reports and produced them

6    and produced them to J&J and been examined by J&J's

7    lawyers on many occasions?

8        A.  Yes, sir.

9        Q.  Now I want to switch gears and talk about

10   Patricia Schmitz.

11       Do you have your written, signed report that

12   you issued back in March of this year?

13       A.  Yes, sir, I do.

14       Q.  Does it outline many of the items that you

15   reviewed, including her deposition?

16       A.  Her six volumes of deposition, yes.

17       Q.  And did you review the testimony of her

18   sisters?

19       A.  Yeah.  Joni and Susan.  I also reviewed that.

20   So eight depositions.  Or actually nine.

21       Q.  By the way, I should have asked this question

22   earlier:  What does it mean if you find one fiber

23   bundle by TEM?  How many fibers is that per gram?

24       A.  Depending on the detection limit, either one

25   fiber or one bundle can run anywhere from 6,000 to

236

1    9,000 individual fibers in bundles per gram.

2         Q.  And how does that equate in terms of how many

3    fibers per bottle?

4         A.  Well, if you have a 9-ounce bottle, every ounce

5    is 28.4 grams, I believe, and if you have nine of

6    those, multiple that 28.4 by 9 by 9,000 fibers.

7         Q.  Tell the folks on the jury what you did with

8    regards to your evaluation of Mrs. Schmitz' exposure to

9    asbestos from her talcum powder usage and being near

10   her family members when the product was being used?

11        A.  I read all her depositions, as well as her

12   sisters' depositions, and then went through and said,

13   okay, well, she stated that, you know, when her sisters

14   were young and with her mother for three months, that

15   she would be there once a day for both sisters when the

16   sisters got bathed, and the mother would use Johnson

17   Baby Powder.  And she said she was standing right

18   there.  So that would be -- every day for those three

19   months would be two exposures, or two applications.

20            You know, and then -- and I'm going on to be --

21   you know, two times two and a half weeks after that for

22   1.7 years with the sisters, then diapering the sisters,

23   which she helped her mother.  So I added up all those

24   applications.

25            And I tried to be conservative because she

237

1   would say things like diapering, you know, three to

2   four times per week.  I would put 2.5 times per week

3   just for the times being missed, and that sort of

4   thing.

5          So when her mother applied the Johnson Baby

6   Powder to herself, she would be standing there.  So I

7   added that up.

8          And so at the end of the day, I could get 2,199

9   Johnson Baby Powder applications.

10     Q.  Those 2,199, was that relating solely to 1957

11  to 1967?

12     A.  Yes, sir.

13     Q.  Did you likewise evaluate the total number of

14  Johnson's Baby Powder applications relating to Vermont

15  talc source from '68 to 2003?

16     A.  And that's a good point.  I broke it down into

17  the different mines.  So the '57 to '67, Johnson &

18  Johnson was using their -- their Italy source for talc.

19  And then I broke it down from 1968 to 2003, which was

20  the Vermont talc source that Johnson & Johnson was

21  using.

22          And for the -- for 1968 to 2003, when Patricia

23  was 10 years old in '68 until she was 13 in 1971,

24  testified that she used Johnson Baby Powder three to

25  four times a week for her personal bathing.  So three

238

1   to four times a week, using three and a half times a

2   week times the three years that she did that, '68

3   to '71, was 825 applications.

4           Then she testified that she was present and

5   assisted when her mother was incapacitated because of a

6   bad shoulder, that she would bathe her two to four

7   times a week from 1998 to 2' -- approximately four

8   times a week from 1998 to 2005.  So I said three times

9   a week times 52 weeks times five years.

10      Q.  And you have a total of 1,605 applications?

11      A.  Correct.

12      Q.  Let me stop you right there.  I would like for

13  you to assume -- well, nowhere in her deposition or her

14  sisters' deposition was there any discussion or

15  questions about her father having Alzheimer's; correct?

16      A.  That is correct.

17      Q.  About caring for him in the hospital bed in

18  their house in their dining room; correct?

19      A.  No, sir.  That never came out in the testimony.

20      Q.  So if there was -- I'd like for you to assume

21  that there's additional testimony that Patricia Schmitz

22  helped take care of her father for roughly ten years,

23  the last ten years of his life, and utilized Johnson's

24  Baby Powder during those ten years, you haven't taken

25  that -- you haven't added that into this calculation;

239

1    correct?

2         A.  No, not at all.  That was -- that information

3    was never brought out in any of the depositions.

4         Q.  So that would be on top of the calculations

5    that you've already made here in this report; correct?

6         A.  Yes.

7         Q.  And there would be additional exposure that

8    would be additive of the exposure assessment you have

9    in Mrs. Schmitz' case?

10        A.  That is correct.

11        Q.  With regard to the Chinese-sourced talc, how

12   many applications in -- to Chinese-sourced talc?

13        A.  312.  From -- again from 2004 to 2005, three

14   times a week, when her mother needed help again.

15        Q.  And then Cashmere Bouquet, did you do a similar

16   type of calculation with regards to her testimony

17   regarding her use of Cashmere Bouquet?

18        A.  Yes, sir, I did.

19        Q.  And what -- how many total applications of

20   Cashmere Bouquet did she have according to her

21   testimony?

22        A.  According to her testimony, she used it from

23   1970 to 2005.  And that she probably -- and she stated

24   that she used almost every day after bathing, she

25   stated she probably did not use Cashmere Bouquet

240

1    20 percent of those days.  So not every day during that

2    time.

3              So daily minus 20 percent is 392 (sic) days of

4    use instead of 365, times 35 years.

5         Q.  And what's the total application of Cashmere

6    Bouquet?

7         A.  That works out to 10,220 applications.

8         Q.  Did you also consider Avon and her -- the fact

9    that she used Avon product?

10        A.  Yes, sir, I did.

11        Q.  And what's the total application from 1980 to

12   2005 regarding her use of Avon?

13        A.  3,250 applications of Avon talcum powder.

14        Q.  So what opinions have you developed based

15   upon -- and -- and what calculations have you developed

16   based upon her exposure, the description she has of

17   exposure, your knowledge of -- of this product with

18   regards to, first, Johnson & Johnson?

19        A.  Well, the first opinion in -- for each of

20   these, that she would have had significant exposure to

21   cosmetic talcum powder from these three different

22   manufacturers:  Johnson & Johnson, Colgate-Palmolive --

23   Cashmere Bouquet -- and Avon.

24              The second opinion is -- based on our testing,

25   based on historical documents, based on the percentages

241

1   that we find positive, it's my opinion that more likely

2   than not, when she used any of these products --

3           MR. CALFO:  Your Honor, I object to this.  He's

4   not an expert in statistics.

5           THE COURT:  It's overruled.

6           You can answer that question.

7           THE WITNESS:  Thank you, Your Honor.

8           -- that she would have had a significant

9   exposure to airborne asbestos -- and it's

10  interesting -- significantly over background, even

11  though there is no background of tremolite/

12  anthophyllite in the natural environment, unless there

13  is a source.

14          So you can use the IARC number of 1.0 times

15  10 to the minus 5 fibers per cc --

16  BY MR. SATTERLEY:

17      Q.  You went too fast for me.  10 to the minus --

18  10 to the minus 5 --

19      A.  0 -- 0.0000.

20      Q.  How many --

21      A.  Five zeros.  A .1 followed by four -- excuse

22  me.  Four zeros and a .1.  I did that backwards.

23      Q.  Four zeros and a -- a 1?

24      A.  And a 1.

25      Q.  And that's the IARC background number?

242

1           A.  Yes.

2           Q.  Okay.  And using that IARC back- -- background

3    number, based upon everything you know of Patricia

4    Schmitz, based upon everything you know of the

5    historical testing, based upon everything you know of

6    the scientific literature, did she have significant

7    exposures above background to asbestos from Johnson's

8    Baby Powder?

9           A.  Yes.

10          Q.  Did she have significant exposure above

11   background to Cashmere -- to asbestos from Cashmere

12   Bouquet --

13          A.  Yes.

14          Q.  -- talc?

15          MR. MULARCZYK:  Objection.  Foundation.

16          THE COURT:  It's overruled.

17   BY MR. SATTERLEY:

18          Q.  Go ahead.

19          A.  Yes.

20          Q.  And -- and -- and is it -- in terms of exposure

21   to asbestos, is it important to you that these products

22   were intended to be shaken out into the air?

23          A.  Yes.

24          Q.  And why is that important?

25          A.  Because these products are designed to be --

243

1    not intentionally, but the way they're designed and

2    milled and ground and used, these particles become very

3    airborne very easily.  You're not starting with an

4    asbestos product that you have to grind, sand, or do

5    something to get exposure.

6            This is just merely shaking a very fine powder

7    out that gets airborne very easily and stays airborne

8    very easily because of the sizes of those microscopic

9    particles.  Excuse me.

10           So the way it's designed, you're shaking out a

11   very fine powder that causes exposure because it gets

12   airborne very easily.  And with those accessory

13   minerals, such as tremolite or anthophyllite asbestos,

14   in there, that's what causes the exposure.

15       Q.  And is that -- would it be fair to say this

16   product is not -- the asbestos in this product is not

17   encapsulated?

18       A.  No, there is no encapsulation involved here.

19   It's just a mixture of cosmetic- or pharmaceutical-

20   grade talcum powder with trace amounts of --

21   potentially trace amounts of amphibole asbestos that we

22   can detect using these protocols we're using.

23       Q.  Now, one other concept I want to talk with you

24   about in terms of exposure is a concept called

25   re-entrainment.  What is re-entrainment?

244

1          A.  It's an industrial hygiene word, and it's

2     really just a fancy word for getting the dust off the

3     surface and getting it back up into the air.

4          You know, it's like taking a rug out and

5     beating on it.  And that dust that's gotten into that

6     throw rug over time will start coming out, and you can

7     see it, or sweeping up dust, where, if it's the right

8     lighting, you can see the dust that's moving as well as

9     what's getting up in the air.

10          So you're disturbing what's happened before,

11     that's now on a surface, and you're disturbing it again

12     by either sweeping or wiping or sometimes even walking

13     through it, because your foot going down causes

14     pressure for it to come up.

15          So it is redistributing asbestos dust that has

16     been put onto a surface after use.

17          Q.  And do you have an opinion, Dr. Longo,

18     whether -- I would like for you to assume the testimony

19     will be that occasionally her sisters and herself would

20     clean up the baby powder or the Cashmere Bouquet after

21     they -- they applied it to their body or to their

22     family members.

23          And the cleaning up process, does that result

24     in additional exposures?

25          MR. MULARCZYK:  Objection.  Foundation.

245

 1          THE COURT:  Overruled.

 2          THE WITNESS:  Yes.  In my opinion, it does.

 3   BY MR. SATTERLEY:

 4      Q.  And by the way, Dr. Longo, you weren't in --

 5   in -- at their house on Bay -- Bay Street over in

 6   Alameda at any point in time; correct?

 7      A.  I was not.

 8      Q.  And -- and nobody -- you have not seen anybody

 9   measure the level of dust that they were exposed to

10   from any -- any powder product; correct?

11      A.  That is correct.

12      Q.  You've not seen any instruction or direction

13   from any company saying, "Hey, you better measure the

14   amount of dust you're breathing in" at any point in

15   time, have you?

16      A.  I have not.

17      Q.  Now, in addition to your analysis, have you

18   relied upon published papers, where published papers

19   talk about --

20          Are you familiar with the Gordon paper in 2014?

21      A.  I am.

22      Q.  And have you relied upon the Gordon paper?

23      A.  I have.

24      Q.  And does the Gordon paper have information

25   regarding exposure and exposure that occurs with

246

1    regards to Cashmere Bouquet product?

2         A.  That paper was all -- was all about exposure

3    from using Cashmere Bouquet products.

4         Q.  And it was -- was that paper specifically

5    studying exposures to cosmetic talc products in terms

6    of what an individual may have?

7         A.  Yes.

8         Q.  And have you also read the Anderson paper,

9    Elizabeth Anderson, with a company called Exponent?

10        A.  I have.

11        Q.  And have you looked at the underlying data from

12   that paper with regards to the Cashmere Bouquet product

13   and whether or not it has asbestos in it?

14        A.  I have.

15        Q.  And based upon your analysis of that published

16   paper, the Anderson paper, and the underlying data,

17   does the underlying data support the fact that there's

18   asbestos in the Cashmere Bouquet product?

19        A.  Not the way the paper is written, no.

20        Q.  Well, what do you mean?

21        A.  Well, it says that it's all cleavage frag;

22   there is no asbestos there.

23        Q.  Okay.  And the paper itself says it's all

24   cleavage fragments?

25        A.  That's what I recall, yes, that -- in my

247

1    opinion, it's redefined what asbestos is.

2        Q.  And have you had, in part of your reliance

3    materials, the underlying data from the lab in Hayward

4    to the Anderson paper?

5        A.  Yes, sir.

6        Q.  And does the underlying data demonstrate

7    anthophyllite asbestos being present in the Cashmere

8    Bouquet product?

9        A.  Yes, sir, it does.

10       Q.  And in your reliance materials, do you also

11   rely upon, with regard to Cashmere Bouquet, J&J

12   documentation from a -- from a Mr. Rolle in 1976

13   regarding finding of anthophyllite in Cashmere Bouquet?

14       A.  Yes, sir, I do.

15       Q.  And do you also rely upon J&J internal document

16   from I.W. Sloan, dated March 31, 1976, finding

17   anthophyllite in the Cashmere Bouquet product?

18       A.  Yes, sir, I do.

19       Q.  And do you also -- have you also read and

20   reviewed the Colorado School of Mines 1973 analysis of

21   Cashmere Bouquet Sample Number 9 regarding the presence

22   of asbestos?

23       A.  Yes, sir.

24       Q.  So based upon everything that you've analyzed,

25   is there any question in your mind, Dr. Longo, that

248

1    there's asbestos historically found in Cashmere

2    Bouquet?

3        A.  No, sir, there's not.

4        Q.  Any question in your mind that asbestos's

5    historically found in Johnson & Johnson Baby Powder?

6        A.  No, there's no question in my mind.

7        Q.  Now, me and my law firm, Ms. Clancy's law firm,

8    are paying you for your time here today; correct?

9        A.  Yes, sir.  My company will send a bill.

10       Q.  And MAS, what is -- what do they -- the hourly

11   rate for your time?

12       A.  I charge $550 an hour, no matter what I do,

13   either in litigation or out of litigation.

14       Q.  And do you consult with and -- and testify at

15   the request of defendants in litigation?

16       A.  Yes, sir, I do.  But to be fair, actual

17   testimony, deposition and trials, is primarily for

18   plaintiffs, like 95 percent of the time.

19       Q.  And does your -- my -- your hourly rate, does

20   that change whether or not you're hired by a company to

21   assist in litigation or whether they're hired by

22   Ms. Schmitz or somebody like me?

23       A.  No.  It's the same price for either side.

24       Q.  J&J's -- the lawyers said that you've changed

25   your methodology regarding analysis of talc.

249

1           Have you done that?

2      A.  No.

3      Q.  J&J's lawyers said that you now call something

4   a bundle because it sounds more like asbestos.

5           Is that accurate?

6      A.  No, that's not accurate.

7      Q.  Is --

8      A.  They're both regulated asbestos.

9      Q.  Is --

10     A.  A fiber is a regulated asbestos.  A bundle is

11  regulated asbestos.  It makes no difference which one

12  it is.

13     Q.  Is -- is -- if there is a bundle of tremolite

14  that meets -- that has the chemical makeup, meets the

15  SAED to amphibole, and it's a bundle, is there any way

16  a scientist, based upon the methods, can call it a

17  cleavage fragment?

18     A.  No, none.  It doesn't make any sense.  It's --

19  a cleavage fragment can't form a bundle.  You're

20  breaking a rock, and you get pieces.  It's like

21  breaking a glass bottle.

22          Now, all those pieces microscopy would have to

23  be perfect fibers all lining up together, in which

24  they're all pointed in the same direction, and they're

25  all touching.  That is an impossibility, for a cleavage

250

| | |
|---|---|
| 1 | fragment or to smash up a rock and -- and make a |
| 2 | bundle.  There should be no dispute about that. |
| 3 | Q.  J&J's counsel said that the concentration |
| 4 | method Dr. Longo uses simply does not work. |
| 5 | Is that true? |
| 6 | A.  No, that's not true at all.  It's -- it's -- it |
| 7 | works really well.  I'm not the only one who's done |
| 8 | that.  Alice Blount did it and published it in a |
| 9 | peer-reviewed paper.  Johnson & Johnson was looking at |
| 10 | it all the way back in the '70s. |
| 11 | I don't know how it doesn't work, other than, |
| 12 | no, it can't find chrysotile asbestos.  But that |
| 13 | doesn't eliminate the fact that it's very good at |
| 14 | concentrating amphibole asbestos, if present, at the |
| 15 | concentrations that it can find. |
| 16 | Q.  J&J's counsel said, "Dr. Pooley concluded |
| 17 | 45 years ago that the concentration method doesn't |
| 18 | work." |
| 19 | Have you seen any documentation where |
| 20 | Dr. Pooley, 45 years ago, said the concentration method |
| 21 | and the heavy liquid separation doesn't work? |
| 22 | A.  No, sir.  I've seen the opposite.  He was |
| 23 | looking at patenting that method in England.  That's |
| 24 | not something that you would say doesn't work, if |
| 25 | you're thinking about getting a patent. |

251

1        Q.  J&J's counsel said --

2            MR. CALFO:  I object.  Move to strike.  That's

3    speculation.  Pure speculation.

4            THE COURT:  You may inquire on

5    cross-examination.

6    BY MR. SATTERLEY:

7        Q.  J&J's counsel said, "he FDA discontinued the

8    concentration method because it doesn't work a long

9    time ago."

10           Have you seen any documentation from the FDA or

11   otherwise that said they dis- -- adopted or

12   discontinued the concentration method?

13       A.  No.  They sort of threw up -- I mean, what --

14   there's an explanation for that, if you would like me

15   to state what they actually said.

16           THE COURT:  Just answer the question.  If he

17   wants an explanation, he'll ask.

18           THE WITNESS:  Sorry, Your Honor.

19           No.

20   BY MR. SATTERLEY:

21       Q.  Couple other documents.  Then I'm going to sit

22   down.

23           This is already into evidence.  It's

24   Exhibit 163.

25           MR. SATTERLEY:  May I approach, Your Honor?

252

1          THE COURT:  You may.

2          MR. SATTERLEY:  And I'll hand you both of these

3     documents at the same time.  They're both into

4     evidence.  This is 163, and this one is 313.

5     BY MR. SATTERLEY:

6          Q.  And I want to ask you about Dr. Langer,

7     Dr. Arthur Langer.  You personally met Dr. Arthur

8     Langer?

9          A.  Yes, I have, a number of times.

10         Q.  Is Dr. Arthur Langer a -- a mineralogist?

11         A.  He is.

12         Q.  And has Dr. Arthur Langer been associated years

13    ago with the Mt. Sinai School of Medicine?

14         A.  He was at one point.

15         Q.  And this first document I want to show you

16    is -- it's -- that you've seen -- you've seen these --

17    both these documents in the past; correct?

18         A.  Yes, sir, I have.

19         Q.  And in doc- -- this 163, July 9, 1971, does

20    this relate to Dr. Langer's analysis of talc back in

21    1971?

22         A.  It does.

23         Q.  And does Dr. Langer, in this 1971 J&J

24    memorandum, talk about analysis of talc by use of the

25    light and the electron microscope of Johnson's Baby

253

1  Powder?

2       A.  It does.

3       Q.  And does he -- does this J&J internal

4  memorandum talk about the meeting they had with

5  Dr. Langer, where Dr. Langer demonstrated his technique

6  for observing fibrous materials in the Johnson's Baby

7  Powder?

8       A.  It does.

9       Q.  And does this memorandum in 1971 talk about

10  Dr. Langer's finding talc and chrysotile in tissue in

11  1971 from folks being exposed to talcum powder product?

12      A.  Yes, sir.

13      Q.  And your lab has done analysis both those

14  products and on tissue; correct?

15      A.  That is correct.

16      Q.  And in this 1971 memorandum, does it say,

17  "Using electron microscopy, Dr. Langer has demonstrated

18  to me the presence of some very fine fibers at

19  moderately high magnification, which he identified as

20  chrysotile asbestos by the typical tubular appearance

21  of the fiber"?

22          Do you see that?

23      A.  Yes, sir.

24      Q.  And did we see in -- in some of the photographs

25  from Dr. Hutchinson at the University of Minnesota the

254

1    tubular appearance of chrysotile that's sort of --

2    that's being referenced there?

3         A.  Yes, sir, that's true.  It's actually tubular.

4    It looks like a straw, a soda straw, that you're

5    looking through.

6         Q.  And he -- the summary of this internal J&J

7    document says, "Chrysotile is identified in the

8    electron microscope by its" characteristics --

9    "characteristic tubular appearance at high

10   magnification."

11        Correct?

12        A.  Yes, sir.

13        Q.  Now, the next document I want to ask you

14   about --

15        By the way, Dr. Langer is a noted mineralogist

16   that you've interacted with in meetings in the past;

17   correct?

18        A.  Either in meetings or as an expert on the other

19   side of me.

20        Q.  Okay.

21        A.  Both ways.

22        Q.  The next document I want to ask you about

23   relates to Exhibit 313.  This is November of 1972, and

24   it's on Johnson & Johnson letterhead.  It's into

25   evidence.  And it's called "Antagonistic Personalities

255

1    in the Talc Story in the United States," and this is

2    written by Dr. Gavin Hildick-Smith, carbon copy to

3    Dr. Fuller, Dr. Nashed, Dr. Petterson, Dr. Sauchuk

4    Dr. Shelley, and Mr. Zeitz; correct?

5        A.  Yes, sir.

6        Q.  And they -- in this 1972 memorandum, they say,

7    "The increase in the profile of talc as a potential

8    health hazard has been actively promoted by a number of

9    individuals for a variety of reasons."

10            Then they go on to identify individuals, and I

11   want to ask you -- Dr. Selikoff, have you read many

12   papers from Dr. Selikoff at Mt. Sinai?

13       A.  I have.

14       Q.  Is Dr. Selikoff, in your opinion, a well-

15   regarded expert on asbestos -- asbestos and health

16   issues?

17       A.  Yes, sir.  He's considered the pioneer of all

18   that.

19       Q.  It says, "Dr. Selikoff of Mt. Sinai Hospital,

20   who is an epidemiologist heavily involved with asbestos

21   and its adverse effects on health," he -- "has

22   observed (sic) considerable financing from a variety of

23   sources for research into the epidemiology of asbestos,

24   with particular reference to its industrial hazards.

25            "He retains a press agent on a full-time basis,

256

1    who gives him media exposure at regular intervals.

2         "Although he has stated that he doesn't believe

3    that talc is a health hazard and" larger -- "largely

4    concerns his activities with asbestos, he played a

5    significant role in the first talc meeting with the FDA

6    when he initiated proceedings by showing particularly

7    alarming pictures of patients suffering from cancer

8    relating to asbestos.

9         "It is believed that Dr. Selikoff wrote the

10   Merliss paper or at least edited it and provided

11   references for it.  See attached."

12        My question to you, Dr. Longo:  Have you read

13   and considered the Mt. Sinai work with regard to

14   asbestos in talc in the 1970s --

15        A.  Yes, I have.

16        Q.  -- what was published in the scientific

17   literature?

18        A.  Yes, sir.

19        Q.  And do you find that to be scientifically

20   useful in understanding the history of -- of asbestos

21   in talc?

22        A.  Yes.

23        Q.  They also have on their antagonistic

24   personalities list Dr. Langer, who works with

25   Dr. Selikoff and is a microscopist.

257

1          Do you consider yourself a microscopist?

2      A.  Not an antagonistic one, no.

3      Q.  Okay.  But are you -- you're a -- a

4  microscopist; correct?

5      A.  Yes, sir.  I'm a material science engineer

6  that's spent a lot of time in microscopy.  I'm a

7  microscopist, TEM microscopist, SEM.  So yes.

8      Q.  It says, "There are several other" --

9  "Dr. Selikoff's department who have the same mental

10  attitude as Dr. Selikoff."

11          Have you, over the course of your career, met

12  some of the other folks or -- or, I guess, read some of

13  the papers published by some of the other folks,

14  Dr. Arthur Rolle, Dr. -- forgot the other names.

15          Have you read some of the other Mt. Sinai

16  studies?

17      A.  Yeah.  There was, you know, Ivan Rubin.  There

18  was Dr. Rolle.  Obviously, Dr. Langer, who stands out

19  the most.  But, yes, I have looked over Selikoff's

20  guys' works in the past.

21      Q.  There are several other names here, and I'm not

22  going to go through them all, but I wanted to ask about

23  Dr. Lewin.

24          Dr. Lewin, who is a professor of analytical

25  chemistry at New York University, have you looked at

258

1    and considered Dr. Lewin's results and his findings of

2    asbestos in -- in talc?

3        A.  Yes, sir, I have.

4        Q.  They conclude, "We believe that the Selikoff

5    group, Mr. Kretchmer's group, Dr. Lewin, and

6    Dr. Weissler are in constant communication, although

7    there is some disagreement between Dr. Selikoff and

8    Mr. Kretchmer over Mr. Kretchmer's publicity and

9    Dr. Selikoff's research findings which were not

10   accurately presented in the newspaper."

11          My question to you is, have you ever taken all

12   the -- the reports that you've issued and put them in a

13   scientific journal?

14       A.  Not yet, no.

15       Q.  And have you just recently, in the past few

16   years, analyzed talc for the presence of asbestos?

17       A.  Yes, sir.  I only started doing that two years

18   ago.

19       Q.  Okay.  And prior to analyzing talc for the

20   presence of asbestos just a couple years ago, did you

21   know that Johnson's Baby Powder had asbestos in it?

22       A.  I had no idea.

23       Q.  Prior to analyzing the presence of asbestos in

24   Cashmere Bouquet just a few years ago, did you have any

25   clue whatsoever that it had asbestos in it?

259

1        A.  Not until the 2015 paper came out and I was

2   talking to Dr. Millette and others, who were starting

3   to do this work.  But before that, never considered

4   that talcum powder would have asbestos in it that --

5   that we're finding.

6        Q.  When you said 2016 (sic), you mean the Gordon

7   paper in 2014?

8        A.  20- --

9        Q.  2014?

10       A.  2014, 2015.

11       Q.  Okay.

12       A.  That's when I started noticing it.

13       Q.  And -- and prior to a couple years ago, when

14  you were analyzing this talc, had you ever had access

15  and reviewed the historical internal documents of

16  Johnson & Johnson regarding the presence of asbestos in

17  talc?

18       A.  No, not until I got involved.

19       Q.  And prior to just a couple years ago, had you

20  reviewed any internal company documents historically of

21  Cashmere Bouquet?

22       A.  No, sir.

23       Q.  Have all of the opinions been stated here

24  today, Dr. Longo, to a reasonable degree of scientific

25  certainty?

1    A.  Yes, sir.

2        MR. SATTERLEY:  I might have -- I may have

3  follow-up questions, depending on what questions these

4  folks ask you.  Okay?

5        THE WITNESS:  Sure.

6        MR. SATTERLEY:  Thank you so much.

7        THE COURT:  Mr. Calfo.

8        MR. CALFO:  Yes, Your Honor.

9  CROSS-EXAMINATION BY MR. CALFO:

10   Q.  Good afternoon, Dr. Longo.

11   A.  Good afternoon.

12   Q.  I'm just going to ask you one question right

13  off the bat.

14   A.  Sure.

15   Q.  You just told this jury under oath that you

16  have only started analyzing cosmetic talc two years

17  ago.  Didn't you just tell the jury that under oath?

18   A.  Let's see.  2017, 2018, 2019.  Yes, sir.

19   Q.  Okay.  Good.  We'll talk about that a little

20  bit later.

21   A.  I guess two and a half years now.

22   Q.  Okay.  Let's start with a -- a few things, if

23  we could --

24   A.  Yes, sir.

25   Q.  -- that I told the jury in opening.

261

1          MR. CALFO:  Your Honor, I would like to

2     publish, if I could, Defense Exhibit 421331.

3          MR. SATTERLEY:  It's not in evidence,

4     Your Honor.

5          MR. CALFO:  It's a demonstrative, Your Honor.

6          THE COURT:  I haven't seen it.

7          MR. CALFO:  May I -- may I approach?

8          THE COURT:  Can we talk at sidebar.

9          (Whereupon, a sidebar between the Court and

10    counsel was had and not reported.)

11    BY MR. CALFO:

12        Q.  Dr. Longo, what I am going to ask you is this:

13    Do you agree with this statement?  You've never tested

14    cosmetic talc when you weren't being paid to do it by

15    the plaintiffs' lawyers; isn't that right, sir?

16        A.  That is correct.

17        Q.  And, in fact, you told the jury some numbers,

18    but isn't it true, Dr. Longo, that 100 percent of your

19    work in talc litigation is for the plaintiffs'

20    attorneys?

21        A.  Yes, that's correct.

22        Q.  In the last 30 years, working as an expert for

23    plaintiff law firms, you told us your company billed

24    $30 million; is that right?

25        A.  Yes, sir.  About a million a year.

262

1      Q.  In fact, you've testified before, Dr. Longo,
2  that the money you've made working as a litigation
3  consultant and expert witness has allowed your lab to
4  survive; isn't that right?
5      A.  That's a true statement.
6      Q.  And one of the things that you mentioned before
7  is, you've got to keep your lights on; right?
8      A.  Yes, sir.  If you work in the office, you need
9  to keep the lights on.
10     Q.  And just so there's no mistake, you own
11  75 percent of your company, don't you?
12     A.  Yes, sir, I do.
13     Q.  And you billed $30 million just to the
14  plaintiffs' lawyers; true?
15     A.  I believe that's correct.  For all the work we
16  do, all the different scientists that work on the
17  projects, yes, sir.
18     Q.  You're not a geologist; true?
19     A.  I do not have a degree in geology.
20     Q.  And you don't have a degree in mineralogy, do
21  you, Dr. Longo?
22     A.  No, I don't.
23     Q.  So let me ask you this:  If the plaintiffs'
24  lawyers, when they hired you, were looking for somebody
25  who had a degree in geology and mineralogy, that

263

1    wouldn't have been you, would it?

2         A.  Well, if that was their criteria.  I don't have

3    a degree in geology or mineralogy, so...

4         Q.  Dr. Longo, you've never been to any of the

5    mines that you just told us about, have you?

6         A.  No, sir, I haven't.

7         Q.  And you mentioned -- I -- did you mention you

8    worked for NASA?

9         A.  Yes, sir.

10        Q.  Did you mention you work for ASTM?

11        A.  I didn't mention I worked for NASA, but I have,

12   but I've never worked for ASTM.

13        Q.  Okay.  Well, the truth is, none of that work

14   that you had done that's on your resumé had anything to

15   do with testing cosmetic talc powder; isn't that right?

16        A.  Yes and no.  And I'll explain, if you like.

17        Q.  Go ahead, Doctor.

18        A.  No, it doesn't have anything to do with

19   analyzing cosmetic talc, per se, but it has everything

20   to do with the fact that we saw problems for scientists

21   for microscopic issues, and all of these studies that

22   we have done for all these different companies involved

23   some sort of development and understanding the problem

24   and using the best methodology.

25             So that's --

264

1      Q.  Doctor, we're going to go --

2      A.  -- that's the "yes and no" part.

3      Q.  We are going to go through some of the

4   documents that you told the jury about with Johnson &

5   Johnson.

6          First of all, you don't know anyone at

7   Johnson & Johnson; you didn't work there.  Right?

8      A.  You're correct on that.

9      Q.  All right.  We'll get into that in a little

10  bit.

11         But before we do, no government agency has ever

12  asked you to test cosmetic talc; isn't that right, sir?

13     A.  That's correct.

14     Q.  And you've not written a written,

15  peer-reviewed, published paper anywhere in the world in

16  any way relating to cosmetic talc; isn't that right?

17     A.  That's correct.  We have not published these

18  results yet.

19     Q.  And Doctor, if plaintiff lawyers were looking

20  for somebody who was well published in the scientific

21  literature on cosmetic talc, that would not have been

22  you, would it?

23     A.  No, it would not.

24     Q.  So let me ask you this.  You told the jury a

25  little bit about your background in material science.

265

1    You remember that?

2        A.  Yes, sir.

3        Q.  You didn't take any courses whatsoever that

4    dealt with asbestos in undergraduate studies, did you?

5        A.  That is correct.

6        Q.  In other words, you didn't go to college to

7    study asbestos, did you?

8        A.  No, sir, I didn't.

9        Q.  In fact, you didn't become interested in

10   material science until after college; true?

11       A.  Well, after my undergraduate degree, I -- my

12   whole life, I was going to be a veterinarian.  I mean,

13   studied it, everything in my life since I was 6 years

14   old.  Got my four-year degree and got rejected from

15   veterinary school.  Couldn't believe it.

16            So I was looking -- I didn't have a Plan B, so

17   I was looking for a job, and the material science

18   department had an opening for a lab tech, because I had

19   to support myself.

20       Q.  So Doctor, as I understand it -- --

21       A.  And they invited me to be a graduate student

22   there, and I said, "No, no.  I'm going to veterinary

23   school.  I'm doing post baccalaureate."

24            And they said, "Well, I think maybe the board

25   would have a better idea" -- "it might be better if you

266

```
 1   were in graduate school."
 2        I said, "Ah, okay," and I never looked back.
 3   So that's how I became a material scientist.
 4        Q.  And I thank you for that.  Thank you for that,
 5   Doctor.  We appreciate it.
 6        A.  You're welcome.
 7        Q.  Now, you didn't take any courses that
 8   specifically dealt with asbestos to get your master's,
 9   did you?
10        A.  No.
11        Q.  Is that true?
12        A.  That's true.
13        Q.  And you didn't take a single class that dealt
14   specifically with asbestos during your Ph.D. work, did
15   you, Doctor?
16        A.  Not per se, no.
17        Q.  In fact -- I think Mr. Satterley asked you --
18   you're not a medical doctor; right?
19        A.  No, sir, I'm not.
20        Q.  And when we talk about Ms. Schmitz -- you don't
21   treat patients; true?
22        A.  No, sir, I don't.
23        Q.  And you didn't review any of Ms. Schmitz's
24   medical records; true?
25        A.  That is true, I did not.
```

267

1        Q.  And I think you told me under oath that you

2   cannot say one way or the other what caused

3   Ms. Schmitz' mesothelioma.  True?

4        A.  No, sir.  I never talk about causation effects.

5   I let that -- others do --

6        Q.  And --

7        A.  -- debate or discuss that.

8        Q.  And one of the things you told me in your

9   deposition -- in fact, I think you volunteered it --

10  is, you don't know where -- you are not going to opine

11  where her mesothelioma originated.  True?

12       A.  No, sir.  I don't talk about medical issues.

13       Q.  Okay.  Now, you mentioned a little bit about

14  industrial hygiene; right?

15       A.  Yes, sir.

16       Q.  And you took no undergraduate or graduate -- or

17  graduate courses in industrial hygiene; isn't that

18  right?

19       A.  That is correct.

20       Q.  And you're not a certified industrial

21  hygienist; true?

22       A.  That's true.  I'm not.

23       Q.  And you never took the test to be become

24  certified; correct?

25       A.  That is correct.

268

1    Q.  And -- and we're going to -- as I told you, we

2  are going to talk about some internal Johnson & Johnson

3  documents.  You told us you never worked at Johnson &

4  Johnson; right?

5    A.  That's still correct.

6    Q.  And you don't know Dr. Hopkins personally;

7  true?

8    A.  That's true.

9    Q.  And you don't know any recipient of any of the

10 Johnson & Johnson documents, do you, sir?

11   A.  No, sir, I don't.

12   Q.  And you've never spoken to any of them, have

13 you?

14   A.  No, sir, I haven't.

15   Q.  So let's talk a little bit about your

16 testifying in asbestos litigation.  And I think you

17 told us since 1989 or 1990.  Is that correct, Doctor?

18   A.  I think I gave my first deposition in '91 or

19 so; '92, maybe, the latest.

20       MR. CALFO:  Let's pull up Defense

21 Exhibit 42125, which -- I think the plaintiffs had a

22 different exhibit, which was --

23       I can't remember.  Do you remember, Counsel?

24       MR. SATTERLEY:  It was a defense exhibit.  It

25 was, I think, 199 or something like that.

269

1        MR. CALFO:  Your Honor, can we fix it, get the

2   number?  I have my exhibit, but I think the plaintiff

3   used his.

4        THE COURT:  You can publish that one.

5   BY MR. CALFO:

6        Q.  And Doctor, I don't want to belabor this too

7   much, but this was an advertisement you ran 30 years

8   ago.  And you ran that ad also in the National Asbestos

9   Council magazine; true?

10       A.  That's true.

11       Q.  And did you tell the jury you weren't

12  advertising your litigation or lawsuit -- lawsuit

13  services here?

14       A.  Yes, sir.  I was advertising our final air

15  clearance and what a good job we did.

16       Q.  So, even though you chose to picture yourself

17  in a courtroom in that photograph.  That's true?

18       A.  That's true.

19       Q.  And you told the jury you were advertising your

20  laboratory services, but this photograph is not in your

21  fancy lab, is it, sir?

22       A.  It's not in our lab, no.

23       Q.  You're wearing a suit, aren't you?

24       A.  Yes, sir.

25       Q.  You're not wearing a lab coat; true?

270

1        A.   That's still true.

2        Q.   And your quote there, on the top, if we look,

3    it says, "Will your TEM laboratory's data make it

4    through the toughest meeting of your life?"

5            Do you see that, sir?

6        A.   Yes, sir.

7        Q.   And that meeting you're portraying is a

8    courtroom; true?

9        A.   Yes, sir.  If our client -- the data was

10   challenged and we had to go defend it for our client,

11   we would do it.

12       Q.   So the meeting that you are portraying is there

13   in a courtroom; true?

14       A.   That's true.

15       Q.   Let's go to the next one.

16            "Not only" -- if we can find it there.  "Not

17   only will the data stand up in court" --

18            MR. CALFO:  Can we pull that up?

19            Let me put it on the Elmo.

20            MR. SATTERLEY:  It's 1099.

21   BY MR. CALFO:

22       Q.   "Not only will the data stand up in court, so

23   will the professionals who documented it."

24            Right?

25       A.   Yes, sir.  I think it's missing some stuff.

271

1          Q.  I think I heard you tell Mr. Satterley that

2    language means standing up in court for final air

3    clearance samples.

4              Did you tell Mr. Satterley that?

5          A.  Yes, sir.

6          Q.  By the way, just so we're clear, final air

7    clearance samples, those are air samples taken from

8    buildings like schools where asbestos has been removed;

9    isn't that right?

10         A.  That is correct.

11         Q.  But, Doctor, you've never testified in court to

12   defend your air clearance results, have you?

13         A.  No, sir, I haven't.  We're that good.

14         Q.  And if we look at the bottom of your

15   advertisement, it says, "Professional asbestos

16   consultants and contractors know that when the job

17   demands the best final air clearance testing by TEM,

18   you go to the people whose rigorous in-house quality

19   control measures produce TEM results and professional

20   support that stands up in the toughest tests you may

21   face."  Isn't that right?

22         A.  Yes, sir, that's what it states.

23         Q.  And again, Doctor, what you're talking about

24   are the toughest tests you face in court; isn't that

25   true?

272

1          A.  For clients who are taken in there, yes, sir.

2          Q.  And, since this ad was run, your business in

3     litigation has really picked up, hasn't it, sir?

4          A.  Since the ad, not really.  It's -- had nothing

5     to do with getting involved in litigation a couple

6     years later.

7          Q.  Well, since this ad ran in the National

8     Asbestos Council magazine, you've given about 3,000

9     depositions; right?

10         A.  Yes, sir.  Over 30 years, that's about correct.

11         Q.  And you testify, on average, once or twice a

12    week; isn't that true, sir?

13         A.  That is correct.

14         Q.  And you've testified in front of juries just

15    like we have now hundreds of times, haven't you, sir?

16         A.  Yes.  That's correct.

17         Q.  And you've been designated as an expert several

18    thousand times by plaintiffs' lawyers suing for money

19    in litigation, haven't you, sir?

20         A.  That's probably correct, yes.

21         Q.  And you've testified to this:  You think every

22    plaintiff's attorney in the country lists you in any

23    type of asbestos litigation; isn't that right, sir?

24         A.  Yes, sir, I think that's happened.

25         Q.  Let's talk about some of the work you've done

273

1    for plaintiff law firms before you ever started working

2    on cosmetic talc.  Okay?

3        A.  That's fine.

4        Q.  And by the way, you know, people have been

5    testing cosmetic talc for over 70 years; right?

6        A.  That's what it looks like.

7        Q.  And you just told the jury the first time you

8    ever got involved was two or three years ago; right?

9        A.  Two and a half years ago, that's correct.

10       Q.  But you've been doing asbestos litigation for

11   decades and decades and decades; isn't that right,

12   Doctor?

13       A.  Over a few decades, yes, sir.

14       Q.  For the better part of your career, Doctor,

15   you've run tests on asbestos-containing products;

16   right?

17       A.  Yes, sir.  That's my area of interest.

18       Q.  And why don't you tell the jury about the

19   asbestos-containing products -- well, let me ask you

20   this:  You've testified about asbestos-containing

21   automotive brakes; true?

22       A.  That's true.

23       Q.  Asbestos-containing boiler insulation?

24       A.  That is correct.

25       Q.  Automotive brake clutches?

274

1        A.  Yes, sir.

2        Q.  Compressors?

3        A.  If it has a certain type of gasket in it, yes,

4    sir.

5        Q.  Cement pipe?

6        A.  Yes.

7        Q.  Has a lot of asbestos in it, doesn't it?

8        A.  20 -- let's see -- runs anywhere from 15 to

9    22 percent asbestos.

10       Q.  And we don't have it in the courtroom, but

11   there are ceiling tiles that have asbestos that you've

12   testified about; true?

13       A.  That's -- in the past, that's correct.

14       Q.  Floor tiles with asbestos in it?

15       A.  Yes, sir.

16       Q.  Gaskets have a lot of asbestos, don't they,

17   sir?

18       A.  Industrial gaskets have quite a bit, about

19   70 percent.  Anywhere from 65 to 85 percent depending

20   on what specification, what pressure, what temperature

21   it has to be at.

22       Q.  Insulating cement.  You testified about all the

23   asbestos in that, haven't you, sir?

24       A.  Yes, sir.

25       Q.  Joint compound?

275

1        A.   That's correct.

2        Q.   And joint compound is the stuff you put on your

3   construction walls?

4        A.   For drywall, the seams.  Typically known as mud

5   where they can take a seam, put drywall on it, sand it

6   to the point where you can't tell where that seam is

7   anymore, or nail hole, or what have you.

8        Q.   I'm going to ask your help with this, Doctor.

9             What's Monokotay (phonetic)?  I don't even know

10  how to say it.

11       A.   Monokotay?

12       Q.   Yeah.  What is that?

13       A.   Well, at this point I could just make up

14  anything.  I think what you're trying to say is

15  Monokote fireproofing, Monokote 2 -- 1, 2, and 3.

16       Q.   And that has asbestos in it?

17       A.   Yes, sir.  That was a fireproofing that was

18  manufactured by W.R. Grace from about 1961 to 1971.

19  Had approximately 10 percent chrysotile asbestos,

20  35 percent vermiculite, and 65 percent gypsum.  Or

21  55 percent gypsum.

22       Q.   Just to round this off, I don't want to take

23  too much time, but you've testified in cases because

24  pipe has insulation around it, with asbestos; right?

25       A.   Yes, sir.

276

1        Q.  Packing?

2        A.  Yes.

3        Q.  Textured paint?

4        A.  Some textured paints do, not all.

5        Q.  And wire has asbestos.  You've testified about

6    that, haven't you?

7        A.  Yes, sir.  Primarily for defendants, because

8    for whatever -- because it doesn't release asbestos

9    like some of the other asbestos products.

10       Q.  Now, you were paid by plaintiffs' attorneys in

11   lawsuits to test those asbestos-containing products,

12   weren't you?

13       A.  No.  I wasn't paid by defense -- plaintiffs'

14   attorneys to test the wire.  That was defense

15   attorneys.  And many of those tests we did on our own

16   for research.  But some of those tests were paid for by

17   plaintiffs' attorneys.

18       Q.  Doctor, you were hired to measure the amount of

19   asbestos those products have in them, weren't you?

20       A.  In some cases, yes; in some cases, no.

21       Q.  And of those products, most of them had

22   asbestos where the product was intentionally added as

23   part of its design; true?

24       A.  That is true.

25       Q.  And some of them, like the gaskets, I think you

277

1    told us, could contain as much as 85 percent asbestos;

2    true?

3        A.  Industrial gaskets, that's very true.

4        Q.  And that's different from a product that may

5    have a trace amount of asbestos as an accessory

6    ingredient; true?

7        A.  It's different concentrations, that's true, but

8    a completely different type of product.  One's been

9    manufactured with asbestos and you actually have to do

10   something to it to get high exposures.

11       The other one, even though there are trace

12   amounts, is a very fine powder that you shake out on to

13   your body every day if you use it continuously.  So you

14   can't compare one with just a little bitty trace versus

15   one that has a lot of asbestos.  It all depends what

16   you do to that one with all the asbestos.

17       Q.  Doctor, what you've done for 30 years is you

18   come into court and you talk about all those

19   asbestos-containing products and all the dust and that

20   the people breathe; right?  That's what you've been

21   doing.  You've done tests on that.

22       A.  Yeah.  But you're kind of embellishing what I

23   do.

24           MR. CALFO:  Your Honor, I move to strike.

25           THE COURT:  He can answer the question.

278

1          MR. CALFO:  Okay.  Please do.

2          THE COURT:  He's responding directly to your

3     question.

4          THE WITNESS:  What I do is just don't go in and

5     say all this dust comes flying out.  We look at

6     particular type of work practices.  You can take an

7     asbestos gasket that has 70 percent asbestos in it,

8     pick it out, put -- it's new, put it on a flange, you

9     don't get exposed -- or you can't -- too low to measure

10    it.  But when they take that gasket off at a later date

11    and use a power grinder at 4500 rpm that's using air

12    blowing around, yes, you get very high exposures.

13         What we're talking about here is powder that is

14    as fine as cement powder that you are putting on your

15    body.  So you can't compare one has a lot of asbestos

16    in it versus another one that's a very fine powder

17    because of the asbestos content.

18         So it's different.

19    BY MR. CALFO:

20    Q.  Well, let me -- for example, here, in some of

21    the Johnson's Baby Powder bottles you tested, you

22    detected no asbestos; right, Doctor?

23    A.  That is correct.

24    Q.  In fact, I told the jury in opening of the

25    bottles you claim to find asbestos in, the lowest

279

1    concentration was 0.0000033.  Do you remember finding

2    asbestos of that amount, percent by weight?

3        A.  Yes.  By weight percent, yes.

4        Q.  So we all know what we're talking about here,

5    just so we're clear, you've been talking all day about

6    Johnson's Baby Powder and Cashmere Bouquet; right?

7        A.  Yes, sir.

8        Q.  And so we all know what we're talking about

9    here today, when you talk about talcum powders used on

10   babies, you're talking about Johnson's Baby Powder;

11   right?

12       A.  Yes, sir.

13       Q.  And, in fact, of the bottles of Johnson's Baby

14   Powder you claim to find asbestos in, the highest

15   amount was 0.035; true?

16       A.  By weight percent, not by fiber bundle count.

17   That's true.

18       Q.  And before you got heavy into cosmetic talc

19   lawsuits in the last two or three years, about 35 to

20   40 percent of MAS's business came from consulting in

21   litigation; true?

22       A.  That's true.

23       Q.  But in the past year, your litigation

24   consulting increased to about 70 percent of your entire

25   business; isn't that right?

280

1       A.  That is correct.

2       Q.  And the jump from 40 to 70 percent is primarily

3   due to your work now in talc litigation, which is just

4   in the last two or three years; right, Doctor?

5       A.  That is very true.

6       Q.  Now, before we talk about your testing, let's

7   talk about what you were asked to do, okay?

8           It wasn't, I think you said, until 2016, or was

9   it 2017 that you started getting involved in cosmetic

10  talc litigation?

11      A.  It was the end, I believe, of 2016 -- 2017 when

12  we -- after researching and picked the type of analysis

13  we were going to do and draw the heavy liquid.  I think

14  it was early 2017 we started doing the first analysis.

15      Q.  Okay, Doctor.  And it wasn't until late 2016

16  when you were asked by Mr. Satterley that you got

17  involved in cosmetic talc litigation; right?

18      A.  That is correct.

19      Q.  And you've testified, I think you just told us,

20  under oath, that prior to 2016, you had never tested a

21  cosmetic talc powder at all for any reason; right?

22      A.  I don't think so.  I can't find any record of

23  cosmetic talc versus industrial talc.

24      Q.  Where I'm going with this is, so if the

25  plaintiff lawyers, when they hired you, were looking

281

1    for somebody who had been in the practice of testing

2    cosmetic talc before 2016, that would not have been

3    you; right?

4          A.  That's correct.

5          Q.  In 2016 what happened is you received samples

6    of Johnson & Johnson talc from three plaintiff law

7    firms; right?

8          A.  That's correct.  2016, 20' -- early 2017, I

9    think.

10         Q.  Thank you, Doctor.

11             And one of the law firms that you received the

12   samples from was Mr. Satterley's firm and Ms. Clancy's

13   firm, the Kazan firm; true?

14         A.  That is true.

15         Q.  The other firm was the Lanier law firm?

16         A.  That is true.

17         Q.  And the other one I think you told us about was

18   the Simon Greenstone Panatier firm; true?

19         A.  That is correct.

20         Q.  And the plaintiff lawyers at that time didn't

21   just send you Johnson & Johnson talc to test, did they?

22         A.  At some point we also received Cashmere Bouquet

23   and we've also received others.  Avon, I believe; Jean

24   Nate, I think; certainly Chanel; and Beverly Hills --

25         Q.  And by the way --

282

1          A.  Giorgio Beverly Hills.

2          Q.  By the way, you mentioned Avon.  Is it your

3    opinion that all the Avon products that Ms. Schmitz

4    used had asbestos in them?

5          A.  Based on our analysis of Avon products, I would

6    say more likely than not, yes.

7          Q.  And, Doctor, on the very same day you were sent

8    the samples your lab purchased two bottles each of

9    Johnson's Baby Powder and Gold Bond; right?

10          You know what Gold Bond medicated powder is?

11          A.  Yes, sir.  I'm just trying to think.  I think

12    you're correct.

13          Q.  But you know -- or let me ask it this way:  But

14    you knew from the very start, when you were hired, your

15    work was going to primarily involve Johnson & Johnson;

16    right?

17          A.  That's what we were asked to test the most,

18    yes.

19          Q.  Because it was clear to you the interest of

20    these plaintiff lawyers was in Johnson & Johnson --

21          MR. SATTERLEY:  Objection, Your Honor.

22          THE COURT:  Sustained.

23    BY MR. CALFO:

24          Q.  In fact, almost one year after you got --

25          By the way, you got bottles of Cashmere Bouquet

283

1    in 2016 and 2017, didn't you?

2        A.  2017, yes, sir.

3        Q.  Almost one year after you got the bottles of

4    Cashmere Bouquet and Gold Bond powder, you hadn't even

5    tested them after a year, had you?

6        A.  No, I don't think so.

7        Q.  Is that true?

8        A.  That's true.

9        Q.  And when these three plaintiff law firms came

10   to you -- and they paid you to test the Johnson's Baby

11   Powder; right?

12       A.  Yes, sir.  Like with all clients, when we agree

13   to do work, we -- we will bill them for our work.

14       Q.  And when these three plaintiff law firms came

15   to you, Doctor, and they paid you to test the bottles

16   of Johnson's Baby Powder, they asked you to look for

17   amphiboles; right?

18       A.  Yes, sir.

19       Q.  And plaintiffs' attorneys didn't say to you,

20   look for asbestos or asbestiform amphibole, they just

21   told you to look for amphibole; right?

22       A.  I'm trying to remember back.  They were just,

23   you know, look to see if there's any regulated asbestos

24   in the product is what I believe happened.  And that's

25   what we did.  We didn't choose or pick what regulated

284

1    asbestos was in there.  We just analyzed what was

2    there.

3        Q.  Doctor, do you remember testifying in a case

4    called *Blinkinsop*?

5        A.  Yes, sir, I think so.

6            MR. CALFO:  Your Honor, just to make this --

7    we're getting to the end of the day -- may I show the

8    witness the testimony to see if it refreshes his

9    memory?

10           MR. SATTERLEY:  Can I get a copy?

11           MR. CALFO:  Of course.  You can look at it.

12           THE COURT:  What page are you showing?

13           MR. CALFO:  I'm showing the witness page 215.

14           MR. SATTERLEY:  250?

15           MR. CALFO:  215.

16   BY MR. CALFO:

17       Q.  Doctor, please just look at page -- lines 10

18   through 12, okay?  And let me just ask you this,

19   Doctor:  The plaintiffs' lawyers didn't ask you to look

20   for asbestos, they asked you to look for amphiboles;

21   right?

22       A.  That's what it states, yes.

23       Q.  And not all amphiboles are asbestos; true?

24       A.  That's true.

25       Q.  In fact, there are asbestos varieties that --

285

1    maybe I'll do it this way:  You've seen the chart of --

2    have you -- well, let me -- let me publish what -- we

3    can't publish it until I get --

4         THE COURT:  That's the one you used in opening

5    statement?

6         MR. CALFO:  Yes, Your Honor.

7         THE COURT:  You can publish it.

8    BY MR. CALFO:

9    Q.   This is just for -- Doctor, I want you to help

10   us educate the jury real quickly, if we could.

11        Now, asbestos varieties are on the left and

12   nonasbestos varieties are on the right.

13        Do you see that, sir?

14   A.   I see that's what it states.

15   Q.   And, for some, the asbestos version and

16   nonasbestos versions have different names; right,

17   Doctor?

18   A.   Yes, sir.

19   Q.   So, for example, if we look on the right, the

20   nonasbestos form is called riebeckite and the asbestos

21   form on the left is crocidolite; right, Doctor?

22   A.   That's what it states.

23   Q.   And there are asbestos types of tremolite and

24   nonasbestos types of tremolite; right, Doctor?  Just

25   generally.

286

1      A.  Well, yeah, depending if it's just pieces of

2  rock of tremolite versus fibrous, that would be

3  correct.

4      Q.  So let me just ask it.  There are asbestos

5  types of tremolite, there are nonasbestos types of

6  tremolite; right, Doctor?

7      A.  Yes.  The same mineral, the same chemistry,

8  same everything except one is pieces of rock, the other

9  is fibrous.

10      Q.  And sometimes the nonasbestos tremolite can be

11  referred to as common or massive tremolite; right?

12      A.  Sometimes, yes.

13      Q.  And sometimes nonasbestos tremolite can be

14  referred to as just tremolite; right?

15      A.  Typically not, at least not in my area.  When

16  you say "tremolite," you either have to define it as

17  tremolite nonasbestiform or cleavage fragment tremolite

18  or tremolite asbestos.  Not called just "tremolite."  I

19  don't agree with that.

20      Q.  Well, let me -- let me just ask you this:

21  There are asbestos types of anthophyllite; true?

22      A.  Fibrous anthophyllite, which is asbestos.

23      Q.  And nonasbestos types of anthophyllite; true?

24      A.  True if it is, in fact, pieces of cleavage

25  fragment, not fibrous, that's true.

287

1      Q.  And so, Doctor, if you were asked to look for

2  amphiboles and not asbestos, what you were asked to do

3  is look for any of the amphiboles, not just on the left

4  side but also the nonasbestos versions; right?

5      A.  We looked to characterize it if it had cleavage

6  fragments versus asbestos.  We -- we characterize what

7  is present.  Not just looking for one thing or the

8  other.

9      Q.  Well, staying with this chart, you also were

10  not asked to look for chrysotile asbestos, were you?

11      A.  It's been too long.  I just don't recall.

12      Q.  Maybe we can talk about that tomorrow, because

13  we've got four minutes.

14          Now, Doctor, we've heard and will likely hear

15  of testing --

16          MR. CALFO:  And maybe, since we don't have

17  time, I'll move on, Your Honor.

18          THE COURT:  It's your cross-examination.

19          MR. CALFO:  So I move to strike the question.

20  BY MR. CALFO:

21      Q.  Doctor, you've analyzed about a hundred bottles

22  of Johnson's talcum powder; right?

23      A.  107.

24      Q.  And you've never reported finding any

25  chrysotile; right?

288

1      A.   That's correct.  You wouldn't for this -- using

2   this protocol.

3      Q.   And that's because one of the drawbacks of the

4   concentration method -- or I think you called it the

5   Blount method; is that right?

6      A.   Well, there's the concentration method, Blount

7   PLM, and then ISO 22262-2 is the talc heavy density

8   liquid method for PLM, TEM, and SEM.

9      Q.   So where I'm going with this is one of the

10  drawbacks of the concentration method is you can't find

11  chrysotile; right?

12     A.   That's correct.

13     Q.   So now, I think you also conduct PLM tests

14  without the concentration method; is that true?

15     A.   That's true.

16     Q.   And to this day, using that method, you still

17  haven't found chrysotile in the Johnson's talc; true?

18     A.   That's true.

19     Q.   And one thing I think you criticized Johnson &

20  Johnson for doing was not adopting the concentration

21  method.  Right?

22     A.   That's right.

23     Q.   To this day, the concentration method has not

24  been adopted or approved by any regulatory agency in

25  the United States; right, Doctor?

289

1          A.  That is correct.

2          Q.  That would include the EPA; right?

3          A.  Heavy density liquid they don't recommend, but

4     they do have other concentration methods that they have

5     laid out from acid dissolution to remove soluble

6     materials to muffle furnace to remove polymer or

7     plastic-type materials.  So it concentrates, just not

8     heavy liquid density.

9          Q.  That would include the Mine Safety and Health

10    Administration; correct, Doctor?

11         A.  That is correct.

12         Q.  And that would include the Occupational Safety

13    and Health Administration, or OSHA; true?

14         A.  That is true.

15         Q.  All right.

16            MR. CALFO:  Your Honor, I'm going into a new

17    area.  Would this be an appropriate time?  I hate to

18    ask the Court, but I am --

19            THE COURT:  We'll go home on that one.

20            MR. CALFO:  Thank you, Your Honor.

21            THE COURT:  Ladies and gentlemen, we're going

22    to end for the day.  We'll see you back here tomorrow

23    morning.  We'll get started again with the

24    cross-examination of this same witness.

25            Have a pleasant evening.  Don't forget the

290

1    admonition that it's your duty as jurors not to

2    converse amongst yourselves or with anyone else on any

3    subject connected with the trial or to form or express

4    any opinion thereon until the matter is submitted to

5    you.

6            Have a pleasant evening.

7            (Whereupon, the following proceedings were held

8    outside the presence of the jury:)

9            THE COURT:  The jurors have departed the

10   courtroom.

11           THE WITNESS:  Your Honor, may I be excused?

12           THE COURT:  Until tomorrow.  You've got to be

13   back here.

14           THE WITNESS:  Oh, I'll be back.

15           MR. SATTERLEY:  Leave everything except your

16   report -- anything you brought you can take with you.

17   Anything that was presented to you, leave it.

18           THE WITNESS:  It's right here.  I haven't taken

19   any of that.

20           THE COURT:  All right.  Is there anything we

21   need to put on the record regarding today's proceeding?

22           MR. SATTERLEY:  The only thing, at the end of

23   the day, Your Honor said, the Scala exhibits --

24           THE COURT:  We'll get to that.

25           Mr. Calfo, Mr. Sharp, is there anything we need

291

1    to put on the record?

2         MR. GARY SHARP:  No, Your Honor.

3         MR. MULARCZYK:  No, Your Honor.

4         THE COURT:  All right.  Let's move on to the

5    exhibits that Mr. Satterley would like to offer into

6    evidence.

7         What would you like to offer into evidence,

8    Mr. Satterley?

9         MR. SATTERLEY:  I'm sorry?

10        THE COURT:  What would you like to offer into

11   evidence?

12        MR. SATTERLEY:  Your Honor, I apologize.  I

13   don't have at my fingertips the disputed exhibits here.

14   Yes.

15        The disputed exhibits are Trial Exhibit 3573,

16   3574, 3577, 3578, 3580, 3581, 3582, 3588, 3590, 3592,

17   3593, 3594, 3595, 3596, 3597, 3599, 3600, 3601, 3603.

18   3604, and 3611.

19        THE COURT:  All right.  You can keep that.

20        MR. MULARCZYK:  Do you have a set of the

21   documents to look at as we go through each one?  Okay.

22        THE COURT:  All right.  Do you have any

23   objection to those?

24        MR. MULARCZYK:  Yes, Your Honor.  It would help

25   me -- I don't have that list in front of me.  I have

292

1    the ones that we've submitted objections to based on

2    the exhibit number for the deposition.  If we could

3    go --

4              THE COURT:  I can coordinate.

5              Number 6 on the Scala deposition is 3573.

6              MR. MULARCZYK:  Correct.  Our objection to this

7    is based on authenticity, hearsay, and relevance.

8              THE COURT:  All right.  First -- the first

9    thing is that -- authenticity.  The witness testified

10   that this is a document from the National Safety

11   Council but claimed that she'd never seen it before.

12             MR. MULARCZYK:  And part of the problem with

13   almost all of the documents to which we've objected to

14   is exactly that position.  They were documents that

15   were put in front of her that she'd never seen before,

16   and so --

17             THE COURT:  I understand.  Ms. Clancy or

18   Mr. Satterley, what is the authenticity that has been

19   demonstrated to the Court regarding Exhibit 3573?

20             MR. SATTERLEY:  Your Honor, this was produced

21   by Colgate in response to discovery, number one.

22   Number two, we cite to the Evidence Code 1414.  It's

23   authentic because it's in a monthly periodical and

24   Colgate has admitted that they're continuously a member

25   of the National Safety Council since 1911.  We believe

293

1    that, because it was in a monthly periodical, that is a

2    presumption of authenticity.  And so we believe this is

3    admissible.  And we cite to, I think, in our -- the

4    *Greenspan* case and also to the *StreetScenes v. ITC*

5    *Group* case, 103 Cal.App.4th 233.  As well as Evidence

6    Code Section 645.

7         THE COURT:  Okay.  You're mixing more than just

8    authenticity here.  That's okay.

9         Mr. Mularczyk, why isn't this a document that

10   was in the possession of your client who was a member

11   of the organization that published this document and

12   why isn't it relevant to show what they knew and when

13   they knew it?

14        MR. MULARCZYK:  Well, to address the first

15   point, nothing that Mr. Satterley said is actually

16   evidence.  There is -- nobody has testified that this

17   was a monthly periodical, that Colgate was receiving

18   it, that Colgate was aware of it.  This was a document

19   that was passed in front of Ms. Scala for the first

20   time in front of her deposition, and then --

21        THE COURT:  I understand.  She's testifying for

22   Colgate, and it was in Colgate's possession, but she'd

23   never seen it before.

24        MR. MULARCZYK:  Nobody has said that.  There's

25   been no evidence --

294

1          THE COURT:  Mr. Satterley just told me that it

2    was produced by Colgate in the production of documents.

3          MR. MULARCZYK:  As an attachment to the

4    exhibit.  As an exhibit to her deposition transcript.

5    We produced her deposition transcript in the exhibit

6    that was attached to it.

7          What's important --

8          THE COURT:  Oh, all right.  Let me get that

9    straightened out.

10         Mr. Satterley, was this produced by Colgate in

11   a request for production of documents or was this

12   produced by you at the deposition and then?

13         MR. RIVAMONTE:  Your Honor, Ian Rivamonte for

14   the plaintiff.  It was produced by Colgate in response

15   to plaintiff's document requests as set forth in our

16   brief.

17         MR. MULARCZYK:  Let me make something clear.

18   The document production --

19         THE COURT:  You had it in your possession to

20   produce it; right?

21         MR. MULARCZYK:  We received this because we had

22   a copy of her transcript with the exhibits attached to

23   her transcript.  That's how we received a copy of this.

24   I think it's --

25         THE COURT:  Wait.  I'm hearing two different

295

1    things.  I'm hearing that the lawyers for Colgate

2    brought it to Ms. Scala's deposition.

3         MR. MULARCZYK:  No.

4         THE COURT:  Isn't that what you just told me?

5         MR. RIVAMONTE:  No, Your Honor.  During

6    Ms. Scala's deposition, it was the plaintiffs' counsel

7    in that case.  The *Polakow* case that brought it.

8         THE COURT:  I don't much care who produced it.

9    Unless it was Colgate.

10        MR. RIVAMONTE:  Colgate did produce it,

11   Your Honor, in response to plaintiff's discovery

12   request in this case.

13        THE COURT:  Got it.  Okay.

14        All right.  Mr. Satterley, how is this an

15   authentic document?

16        MR. SATTERLEY:  Well, we -- number one, we

17   believe that they produced --

18        THE COURT:  They haven't admitted it.

19        MR. SATTERLEY:  No, I don't believe they have

20   admitted it.  We believe that they produced it in

21   response to our discovery request asking to produce all

22   documents regarding what they knew or should have

23   known, and they produced this document.

24        They should have or could have as -- not

25   produced it and said they didn't.  It's not a document.

1    It is a periodical.  The Court -- you know, there's --

2          I apologize, Mr. Rivamonte, I've been working

3    with Dr. -- asking questions of Dr. Longo all day, so

4    my mind's -- beside myself right now.  Can you help me

5    out.

6          MR. RIVAMONTE:  Yes, I can.

7          May I, Your Honor?

8          THE COURT:  Sure.  Of course.

9          MR. RIVAMONTE:  So Evidence Code Section 645.1

10   has a presumption that a periodical published more than

11   regular issue in average intervals not exceeding three

12   months is presumed authentic.

13         Here, Your Honor, Exhibit 35' -- I believe it's

14   3573 or Scala Exhibit 6, if you look at the contents

15   page of that, if you look at my trial brief, the

16   plaintiff's trial brief, my declaration, Exhibit E, the

17   contents page says that it's a monthly periodical of

18   the National Safety Council.  Therefore, under Evidence

19   Code 645.1, there is a presumption that it is authentic

20   and now the burden shifts to Colgate to prove that it

21   is not.

22         THE COURT:  All right.  Presuming that it's an

23   authentic periodical, how is it relevant when the

24   corporate representative testifies that she doesn't --

25   she's never seen it before?  Colgate has never seen it

297

1    before.

2         MR. SATTERLEY:  Knew or -- okay.

3         MR. RIVAMONTE:  Your Honor, it is relevant to

4    know this.  In *People v. ConAgra*, *ConAgra* was -- for

5    example, in that case, *ConAgra* was a member of several

6    trade organizations.  Those trade organizations issued

7    periodicals and other reports about the hazards related

8    to *ConAgra*'s product.  In that case the appellate court

9    found that, for the purposes of notice, those -- those

10   publications from those trade organizations in which

11   *ConAgra* belonged in is deemed notice of knowledge of

12   the actual hazard in the product.  Here it is the same

13   thing.  National Safety Council, Colgate was a member

14   and therefore there is at least notice here since

15   Colgate was a member that -- of asbestos-related health

16   hazards as set forth in that National Safety Council

17   publication.

18        THE COURT:  Well, how do you bridge the gap

19   between the witness testifying for Colgate that says

20   that Colgate's never seen this before, that they didn't

21   have it in their possession?

22        MR. RIVAMONTE:  Under --

23        THE COURT:  In *ConAgra* they had all that stuff

24   in their possession, didn't they?

25        MR. RIVAMONTE:  Yes.  But in

298

1    *Anderson v. Owens-Corning*, the standard is knew or

2    should have known.  So even though -- if Ms. Scala

3    claims that she does not -- or Colgate does not know of

4    this document in particular, it should have known it

5    based on its membership in the National Safety Council

6    during that time.

7            Colgate was a member of that council for, I

8    think since its inception, if I recall correctly.

9            And Colgate was also a member of several

10   committees in the National Safety Council, some of

11   which relate to asbestos, as I recall correctly.

12           So, for that reason, Your Honor, it's a

13   should-have-known standard.  Knowledge would be great.

14   Actual knowledge would be fantastic, but we're not --

15   for purposes of notice and purposes of

16   *Anderson v. Owens-Corning*, the should-have-known

17   standard applies.

18           THE COURT:  Is that correct about Owens' claim?

19           MR. MULARCZYK:  No, Your Honor.  You can't --

20   the way it works with authenticity and with the known

21   or knowable standard is you can't simply make the

22   argument and say so and then that's the case.  That's

23   not how it works.  You actually have to submit evidence

24   and make a connection between the defendant and the

25   topic or the harm or the injury that they should or

299

1    should have been aware of.  There is nothing in this

2    document, there is no evidence that's been presented in

3    this case that Colgate had receipt of this document,

4    that this document should have told Colgate anything or

5    that it should have advised him of any harm or injury.

6    There's just no connection here.  There's nothing at

7    all.

8         MR. GARY SHARP:  Your Honor, if I might,

9    because I've been around forever, I know these

10   documents from a historic state-of-the-art standpoint.

11   It's not true.  Colgate is not mentioned anyplace in

12   any of the National Safety Council pages, either by way

13   of membership, either by way of board of directors,

14   either by way of membership on a committee.  If

15   Mr. Rivamonte can show us that we were on a committee,

16   then we can have that discussion.  I've never seen it.

17        We have a list of every publication that was

18   maintained by Colgate, which was attached to the

19   deposition as Exhibit Number 5, which has been admitted

20   into evidence, the National Safety Council or the

21   *National Safety News* does not appear on this list.

22        These were not within Colgate's possession.

23        THE COURT:  All right.  The objection is going

24   to be sustained on this one.

25        Let's move to the next one, 3574, Number 7.

300

1          MR. MULARCZYK:  The same.

2          MR. GARY SHARP:  Same objection.

3          MR. RIVAMONTE:  Your Honor, I would like to

4    reiterate here.  At this stage we're talking about

5    authenticity.  And it's a very low standard.  The

6    question is whether the document produced or at issue

7    is fake.

8          THE COURT:  The difficulty is that you have --

9    you may have a document that is an authentic newspaper

10   article, but you have a witness from the company saying

11   that they never saw it before, that the company had

12   never seen it before.  That's the -- the difficulty is

13   not so much that it's -- it says that it's a magazine

14   article and, on the face of it, it says that it's

15   published more than X-number of times.  But the problem

16   here is that there's evidently no evidence that Colgate

17   had it in their possession so that they can be charged

18   with having knowledge of what it said.

19         Maybe that wouldn't be true for *The New York*

20   *Times*, but for something like this, I'm going to

21   sustain the objection to that one as well.

22         Moving on.  Your next one is 3577.  The

23   objection is sustained on that one.  That's my motion

24   in limine.  Actually, let's go back.

25         Do you want to argue that one?

301

1          MR. MULARCZYK:  Well, Your Honor, I would...

2          MR. GARY SHARP:  Again, Your Honor, we have

3    within our documents the volumes of the *New England*

4    *Journal of Medicine* that we maintained.  It was well

5    after this date.  We did not have this.  It was not in

6    the possession of Colgate, and, again, there was no

7    reason for us to have had this document.  Ms. Scala was

8    not aware of it until it was presented to her at

9    deposition.

10          MR. MULARCZYK:  And, yes, this was the subject

11   of the motion in limine.

12          THE COURT:  How does this -- we made a ruling

13   on the motion in limine that there would not be

14   children dying of inhalation of talcum powder, of

15   aspiration of talcum powder.  The motion -- the

16   objection is sustained for 3577.

17          The next one is 3578, which is Number 11.

18          MR. GARY SHARP:  Again, National Safety

19   Council, Your Honor.

20          THE COURT:  And it was -- and the witness was

21   emphatic that this was not received by Colgate.

22          MR. RIVAMONTE:  I stand by my previous

23   arguments, Your Honor.

24          THE COURT:  So that's sustained as well.

25          The next one is 3580, an article from *The New*

302

1    *York Times.*

2            It's certainly relevant.

3            MR. GARY SHARP:  Your Honor, we have no

4    objection.

5            THE COURT:  All right.  That one will be in

6    evidence.

7            (Whereupon, Plaintiff's Exhibit 3580 was

8            admitted into evidence.)

9            THE COURT:  The next one after that is 3581,

10   which is -- corresponds to Number 14, which is -- which

11   are OSHA rules and regulations, which is -- it's the

12   law.

13           What would be your objection?

14           MR. GARY SHARP:  Your Honor, with respect to

15   OSHA, I have no objection as long as the entire code

16   section is attached.

17           THE COURT:  Now, this is...

18           MR. SATTERLEY:  Well, wait a second.  I would

19   object --

20           THE COURT:  It's three pages long.

21           MR. SATTERLEY:  I would object to them

22   putting --

23           THE COURT:  Hold on.

24           The exhibit is the exhibit.

25           Do you have an objection to the way the exhibit

303

1    exists at this point in time?  Is it only part of an

2    exhibit that includes other relevant, pertinent

3    material?

4         MR. GARY SHARP:  Your Honor, if we can meet and

5    confer with plaintiffs.  The problem is the copy I have

6    I can't read it, and I think between us we should be

7    able to come up with a clean copy.

8         THE COURT:  Maybe you should just let it go.

9    The jury won't be able to read it either.

10        MR. GARY SHARP:  That is absolutely true and...

11        THE COURT:  In any event, I don't mind letting

12   him talk about it, and if you want to get a cleaner

13   copy, Mr. Satterley, you can do that.

14        MR. GARY SHARP:  Thank you, Your Honor.

15        THE COURT:  The next one is 3582, corresponding

16   to Number 15.  What's the objection to this?

17        MR. MULARCZYK:  Hearsay, Your Honor.  It's

18   just -- it's a report of finding by Dr. Lewin in

19   testing that he had done, so we object on the basis of

20   hearsay.

21        THE COURT:  All right.

22        (Whereupon, Plaintiff's Exhibit 3582 was marked

23        for identification.)

24        MR. RIVAMONTE:  Your Honor, this letter is

25   admissible under the hearsay rules.  Number one, it's

304

1    an ancient document.  It's over 30 years old.  In the

2    *ConAgra* case again, the authors of this document is

3    presumed to have known what they were talking about and

4    it's been typically relied upon.  And, number two, it's

5    also admissible under the official -- the government

6    records hearsay exception because this was a document

7    drafted by the FDA and it's between two FDA employees.

8    So under, I believe it's 1271, it is admissible for

9    that purpose -- I'm sorry, 1280.

10            THE COURT:  It wasn't drafted by the FDA.  It

11   was directed to the FDA.  It was drafted by Seymour

12   Lewin, a professor of chemistry someplace.

13            MR. RIVAMONTE:  Let me check, Your Honor.

14            3583, Your Honor.

15            MR. SATTERLEY:  No.  3582; right?

16            THE COURT:  This is 3582.

17            MR. SATTERLEY:  3582.  Exhibit 15.

18            Here it is.

19            MR. RIVAMONTE:  So, Your Honor, this is also

20   admissible for notice purposes because this document

21   was produced by Colgate and it was in Colgate's

22   possession at the time.

23            THE COURT:  It was produced by Colgate in

24   the --

25            MR. RIVAMONTE:  Response to discovery,

305

1    Your Honor.

2         THE COURT:  All right.  Is that right, that

3    Colgate had this document in their possession?

4         MR. MULARCZYK:  No.  Again, this is information

5    that was received during the course of depositions of

6    corporate -- corporate witnesses, so -- here's my --

7         Here's another take I have on this, Your Honor.

8         So there was a follow-up -- two follow-up

9    studies that were done, one by Dr. Lewin and one by the

10   FDA, on these exact same samples that they want to

11   introduce into evidence now.

12        So to the extent they're asking for this one to

13   be admitted, there are two follow-ups that say the

14   complete opposite in his final rulings that should be

15   admitted as well.

16        So to the extent that the Court is inclined, if

17   this comes in, then it certainly opens the door to all

18   of it, but our position -- the position we're

19   maintaining is that this was produced as part of

20   deposition transcripts when these documents were shown

21   to corporate representatives at depositions.  What we

22   produced were the transcripts along with the exhibits

23   that were previously produced by plaintiffs.  These

24   were not in possession of Colgate prior to that time.

25        So, in our view, that's the position we

306

1    maintain, but -- leave it at that.

2         THE COURT:  All right.

3         MR. SATTERLEY:  I just want to verify.  So it's

4    Colgate's position that, even though it's produced in

5    response to discovery with the Quinn Emanuel Bates

6    Number QECPC2, and it has several numbers, it's

7    Colgate's position that those Bates numbers don't mean

8    anything, and I just want to clarify that's Colgate's

9    position with regard to this because it was our

10   understanding that that came from the repository with

11   the Bates numbers on it.  But now Colgate has taken a

12   new position I've never heard of before.

13        THE COURT:  Well, I am just trying to figure it

14   out here.  Did this...

15        MR. GARY SHARP:  Your Honor.

16        THE COURT:  Which is it?

17        MR. GARY SHARP:  So, under discovery

18   obligations, a --

19        THE COURT:  I understand that.  The question

20   is --

21        MR. GARY SHARP:  What we received in the course

22   of litigation these were not in the Colgate files.

23   These were received during the course of litigation by

24   counsel and then were attached to depositions where

25   people have been asked about them.

307

1          THE COURT:  All right.  Mr. Satterley?

2     Mr. Satterley, did you receive this as a business

3     record or just one of those general "all documents that

4     you may have"?

5          MR. SATTERLEY:  Well, Your Honor, they were

6     produced in response to our discovery and I -- you

7     know, it sounds like its Colgate's position that

8     there's no identifying marks or numbers or Bates

9     numbers that would demonstrate what they are.  So we

10    believe that it's -- the one that I have -- I have one

11    with Bates numbers on them.  His copy doesn't have

12    Bates numbers on them.  Mine has Quinn Emanuel Bates

13    numbers on them.

14         MR. GARY SHARP:  And, Your Honor, in the --

15         MR. SATTERLEY:  So it's my -- other Colgate

16    counsel told me in the past that if it has the Quinn

17    Emanuel Bates numbers on it, it's part of their

18    repository, but it's now Colgate's taken the position,

19    that's fine.  That just puts me on notice where they

20    are with regards to other documents, so.

21         THE COURT:  All right.  So I'm going to accept

22    as true that they did not have this document back in

23    1972.

24         MR. SATTERLEY:  If we prove otherwise, we'll

25    bring it to the Court for reconsideration.

308

1      THE COURT:  All right.  And so that one the

2   objection is sustained.

3      The next one is 3588, which corresponds to 21,

4   which is the CTFA minutes.

5      What's the objection to this?

6      MR. GARY SHARP:  Your Honor, this is a CTFA

7   document.  We're not going to challenge authenticity

8   because I'm assuming at some point somebody from the

9   CTFA has probably produced this.  It was not a document

10   that was ever in the Colgate files.  This document

11   actually came from Whittaker Clark & Daniels.  We are

12   not challenging authenticity, though, however.

13      THE COURT:  Wasn't the testimony that Colgate

14   was involved with this CTFA?

15      MR. GARY SHARP:  Yes.  Colgate was a member of

16   the CTFA.  This happens to be something that Colgate

17   was not present at and there is no indication that this

18   document was ever sent to and/or received by Colgate.

19      MR. MULARCZYK:  And, as a matter of course, we

20   stipulate on the CTFA documents where it indicates we

21   were present.  We don't dispute those.  The ones that

22   raise concern for us are the ones in which we weren't

23   present.

24      THE COURT:  All right.  I am persuaded that it

25   should be allowed in.  So the objection is overruled.

309

1          (Whereupon, Plaintiff's Exhibit 3588 was

2          received into evidence.)

3          The next one is 3590, which corresponds to 23.

4          MR. RIVAMONTE:  This is another CTFA document,

5    Your Honor.  It's a news release.

6          THE COURT:  Is there an objection to this one?

7          MR. GARY SHARP:  Other than your name is on it.

8    But no, Your Honor.

9          THE COURT:  I also find that objectionable.

10          MR. GARY SHARP:  Let the record reflect there

11    was laughter in the courtroom.

12          THE COURT:  That one will be in evidence.

13          (Whereupon, Plaintiff's Exhibit 3590 was

14          received into evidence.)

15          THE COURT:  The next one is 3592.  The Sinai

16    study.

17          What's the objection to this one?

18          MR. MULARCZYK:  Same thing as for Dr. Lewin.

19    It's hearsay.

20          MR. SATTERLEY:  Well, Your Honor, this is --

21    this goes to notice, exception to the hearsay rule,

22    issue of notice.  This is a published study regarding

23    the very product at issue in this case, that the

24    corporate representative admitted that they knew that

25    it was going on at the time, and this, at the very

310

1    least, should come in for the issue of notice.

2         MR. RIVAMONTE:  Similar to *The New York Times*

3    article, Your Honor.  This is a publication in a

4    medical journal -- or a scientific journal, I should

5    say.

6         MR. SATTERLEY:  *Journal of Toxicology and*

7    *Environmental Health*.

8         THE COURT:  It's really a question of whether

9    they had notice at the time, and I'm persuaded that

10   they had notice at the time.

11        MR. GARY SHARP:  Your Honor, if I might, this

12   is similar to every medical article which might come up

13   in a trial with respect to medical, and they're

14   referred to, certainly.  They're quoted from.  They

15   don't come into evidence because they're still

16   inadmissible hearsay.

17        THE COURT:  I don't disagree with that, but the

18   distinguishing factor is that with the Sinai group it

19   was a *New York Times* article and then there was

20   interaction between the industry group and the people

21   who wrote the article.

22        MR. GARY SHARP:  Certainly.

23        THE COURT:  And that's where it distinguishes

24   this, that it was a bone of contention and it was

25   maneuvering, if you will, around what was -- what was

311

1    printed.

2         MR. GARY SHARP:  Well, again, Your Honor, what

3    we're doing is we're now sending back to the jury room

4    to lay people medical or scientific articles that have

5    been testified to by the experts and have been

6    explained by the experts.  We don't send the textbooks

7    or the articles back to the jury room.

8         THE COURT:  I agree with that.  This isn't one

9    of those.

10        MR. GARY SHARP:  Thank you, Your Honor.

11        THE COURT:  This is something that was

12   published, that the industry group addressed it.  And

13   it's the fact that the industry group addressed it that

14   makes it what's in there.  And it is hearsay, no

15   question about it.  But it goes to notice, not to the

16   truth of the matter.

17        MR. GARY SHARP:  Thank you, Your Honor.

18        THE COURT:  So that's 3592 -- and, actually,

19   3593 can both be admitted into evidence, because I'm

20   going to presume that it is the same.

21        (Whereupon, Plaintiff's Exhibit 3592 was marked

22        for identification.)

23        (Whereupon, Plaintiff's Exhibit 3593 was

24        received into evidence.)

25        MR. GARY SHARP:  And that's for notice only;

312

1    correct, Your Honor?

2         THE COURT:  The next one is 3594, which is 27.

3         MR. MULARCZYK:  So the objection to this,

4    Your Honor, it is hearsay within hearsay.  It's a

5    document that purports to describe a telephone

6    conversation.

7         MR. GARY SHARP:  Again, it's not a Colgate

8    document and it's never appeared in the Colgate files.

9         THE COURT:  We have somebody, looks like it's

10   named Shapiro, and we have Langer.  Beyond a doubt,

11   it's a hearsay document; right?

12        MR. RIVAMONTE:  Your Honor, in our trial brief

13   we submitted a declaration from the custodian of

14   records from the FDA, and that declaration

15   authenticates this document, number one; and, number

16   two, confirms that this document was kept in the

17   regular course of the FDA.

18        So in that sense, Your Honor, it's admissible

19   as a business record, under the business record

20   exception.  It's also --

21        THE COURT:  This is a government record?

22        MR. RIVAMONTE:  It is maintained as a

23   government record, yes, Your Honor.  It's part of the

24   FDA files as a declaration from the FDA.  It's attached

25   as an exhibit.

313

1          THE COURT:  So it's an FDA business record.

2          MR. RIVAMONTE:  Yes.  It was kept in the

3    regular course of the FDA's business.

4          THE COURT:  Where is the evidence that shows

5    that?

6          MR. RIVAMONTE:  Let me look it up, Your Honor.

7          MR. SATTERLEY:  The declaration we submitted, I

8    believe.

9          MR. RIVAMONTE:  It was part of the trial brief.

10   It was in my declaration.  I will give you the exact

11   exhibit number.

12         THE COURT:  All right.  If it's a business

13   record and it's been authenticated by a declaration.

14         MR. MULARCZYK:  Well, it seems like that only

15   addresses the first layer of hearsay and not the

16   underlying telephonic conversation.  The business

17   record exception is that it actually exists only

18   applies to the document itself.  It doesn't apply to

19   the second layer of hearsay within the document which

20   describes the underlying telephonic conversation, which

21   is actually the title of the document itself.

22         MR. RIVAMONTE:  Your Honor, just for the

23   record, it's Exhibit V as in Victor to my declaration.

24   It is a declaration of Tobin Ballinger, and in that

25   declaration, in that Exhibit B, there is an

314

1    authentication page by the FDA certifying that this

2    document, along with others, is part of -- maintained

3    in the regular course of the FDA's business.

4          In terms of the --

5          THE COURT:  You didn't -- did you subpoena the

6    document to court and -- with the declaration by the

7    custodian?

8          MR. RIVAMONTE:  It was a FOIA request done by

9    my office and when the request was made --

10         THE COURT:  All right.  So it's a Freedom of

11   Information Act request and they sent it back saying

12   these are the documents we have.

13         MR. RIVAMONTE:  Yes, Your Honor.

14         THE COURT:  That's insufficient to authenticate

15   it.  If you have a declaration of a custodian as would

16   come with documents that were subpoenaed to the Court

17   for trial, that would take care of the problem in terms

18   of authentication.

19         And that they also say that it's made in the

20   regular course and scope of business with the other

21   necessary assertions, it can get past the hearsay

22   objection.  But it -- but I'm going to sustain the

23   objection on this one.  I don't see that having

24   occurred.

25         The next one is 3595, which is the submission

315

1    to the FDA.

2          MR. MULARCZYK:  So, again, our objection to

3    this is authenticity.

4          THE COURT:  How many pages are on this one?

5          MR. RIVAMONTE:  It consists of two documents,

6    Your Honor.  I think we only want -- it's kind of weird

7    because in the copy, as you'll see, there's one --

8    there's two documents per page.

9          THE COURT:  Yes.  I have four documents

10   altogether plus a page that does not make sense to me.

11   It says "remote user."  That's right.  Remote user.

12         MR. RIVAMONTE:  So, Your Honor, we want the

13   McCrone document, which is dated March 12, 1976.

14   That's two pages.

15         And then we want the Johnson & Johnson --

16         THE COURT:  Well.  All right.

17         MR. RIVAMONTE:  There's three documents total,

18   total of four pages.

19         THE COURT:  There has been testimony that these

20   were the documents that were sent by the trade group,

21   the CTFA, in order to influence the FDA; isn't that

22   what the testimony was?

23         MR. MULARCZYK:  I don't recall that testimony,

24   Your Honor.  And I would -- one is a Johnson & Johnson

25   document.  One is a McCrone document that wasn't a

316

1   communication with Colgate.  I think we have challenges

2   to authenticity as to both.  We have challenges to

3   hearsay as to both.  And I believe one of the documents

4   actually discusses a -- the McCrone document also seems

5   to reference a verbal agreement that was made, so

6   there's a multiple hearsay layer issue with respect to

7   the McCrone document.

8             THE COURT:  Well, my recollection of testimony,

9   and I'm blanking out at the moment as to who gave the

10  testimony, was that the trade group put together a

11  package of letters regarding the incorrect assertions

12  in the Sinai Medical School study and it was sent to

13  the FDA.  But maybe I'm not correct about that.

14            MR. SATTERLEY:  I think you're correct.  Diana

15  Scala testified about that.  And also there's testimony

16  that hadn't already been played from Mr. Hopkins on

17  that -- in that regard.

18            THE COURT:  Maybe it was Mr. Hopkins'

19  testimony.  I don't remember exactly whose testimony it

20  was.  But that's my recollection.  And if that's --

21  if -- with that testimony underpinning this, I will

22  admit it into evidence.

23            The next one is 3596, the CTFA minutes.

24            MR. MULARCZYK:  Your Honor, just as a

25  clarification on the last one, which document are you

317

1    admitting?  Or subject to the testimony, because

2    there's a few in there.

3            THE COURT:  There's -- there are three letters.

4            MR. MULARCZYK:  Okay.

5            THE COURT:  And one of them is from Johnson &

6    Johnson, one of them is from McCrone, and one of them

7    is from Sterling Drug.  And the other page that says

8    "remote user," I don't know what that means.

9            Mr. Satterley?

10           MR. MULARCZYK:  It has a little note --

11           MR. SATTERLEY:  We don't need that.

12           MR. MULARCZYK:  I think that's a little note

13   left by the plaintiff's attorney.

14           MR. SATTERLEY:  I don't, but we don't -- we

15   won't seek the admission of that, Your Honor.

16           THE COURT:  All right.  We're going to tear

17   that out.

18           MR. MULARCZYK:  Just like that.

19           THE COURT:  Just like that.  All right.

20           MR. MULARCZYK:  We'll -- and we'll -- we'll

21   check the -- we'll go back and check the testimony

22   that's underpinning the admission of these, and -- and

23   we'll circle back with the Court in the morning.

24           THE COURT:  All right.  3596, CTFA minutes.  If

25   you have no different objections, I'm going to admit

318

```
 1   that.
 2           MR. GARY SHARP:  Your Honor, what tab?  I'm
 3   sorry.
 4           MR. SATTERLEY:  29, Mr. Simko.  Colgate was
 5   present, so --
 6           MR. MULARCZYK:  Yeah, we'll withdraw the
 7   objection.
 8           THE COURT:  All right.  That one will be in.
 9           (Whereupon, Plaintiff's Exhibit 3596 was
10           received into evidence.)
11           THE COURT:  The next one as well?  3597, which
12   is 30, which -- oh, maybe I'm confusing the letters.
13           MR. GARY SHARP:  Yes.  I -- now -- now that I
14   see this, I -- I believe that is what happened,
15   Your Honor.
16           MR. SATTERLEY:  Yeah.  This is the -- this is
17   the March submission to the FDA enclosing all the
18   industry members of the CTFA, and there was
19   testimony -- specific testimony about this, about
20   Christopher Costello working for Colgate.
21           THE COURT:  These are the same letters as in --
22   except there's more of them here.
23           MR. SATTERLEY:  That's correct.
24           MR. MULARCZYK:  Can I -- can I get back to the
25   Court on this in the morning again, just review the
```

319

1    testimony?

2         THE COURT:  All right.  Is there one from

3    Colgate?

4         MR. SATTERLEY:  There's -- I have one --

5    there's a -- a letter and an internal -- a memo that

6    was submitted to the FDA; March 15, 1976, letter from

7    Costello to Norman Estrin, and Norman Estrin turns

8    around and submits all of this to the FDA.

9         MR. GARY SHARP:  And, Your Honor, no objection

10   to those portions.

11        THE COURT:  Well, the document is what the

12   document is.  If you have objections to other portions,

13   we are going to deal with it, but first, let me do

14   this.

15        3595 I'm going to strike from being admitted

16   into evidence, because it's going to be duplicated

17   3597.  So 3595 is out because it's a duplication.

18        3597 will be in, but the Court will reconsider

19   it if Mr. Mularczyk can find some evidence that nobody

20   talked about it.

21        (Whereupon, Plaintiff's Exhibit 3597 was

22        received into evidence.)

23        MR. MULARCZYK:  I'm not -- I'm not looking for

24   a way out.  I just want to confirm what the --

25        THE COURT:  All right.  The next one is 3599,

320

1    Exhibit Number 32.  It's a memorandum from HEW,

2    somebody there, to Robert Schaffner.

3            MR. GARY SHARP:  Yes, Your Honor.  Again, this

4    is an internal FDA document that has not been

5    authenticated.

6            MR. MULARCZYK:  We object on that and on

7    hearsay.

8            MR. RIVAMONTE:  Your Honor, this is one of the

9    documents that the FDA produced in response our FOIA

10   request.  It's Exhibit V, as in Victor, to my

11   declaration in the trial brief.

12           THE COURT:  Yeah.  I think it's -- I don't

13   remember what the witness, Diana Scala, said about it.

14   Do you?

15           MR. GARY SHARP:  It was just read to her,

16   Your Honor.

17           THE COURT:  All right.  It's not in evidence.

18           Then we have 3600, which is 33.

19           MR. GARY SHARP:  Yes, Your Honor.  In this --

20   this next series are allegedly to be call reports

21   that -- they're Cyprus documents.  They are not Colgate

22   documents.  They did not appear in Colgate files.

23           THE COURT:  Well, the testimony, if I recall,

24   is that the witness said that Cyprus mailed these

25   things in an offer -- in attempting to solicit business

321

1    from Colgate.

2              MR. GARY SHARP:  No.  Let me rephrase that,

3    Your Honor.

4              The testimony from Ms. Scala was -- again,

5    these were simply put in front of her, and she was --

6    they were read to her.  These are -- nothing with

7    respect to Colgate or Colgate employees would verify

8    anything that's in this document from Cyprus.

9              And, again, this is a hearsay within hearsay,

10   because they purport to be conversations that took

11   place by a gentleman at Cyprus, who, apparently, was in

12   sales, and they've memorandums to his boss at the time

13   that they were attempting, apparently, to gain

14   Colgate's business, which they were not able to do

15   until they bought the company.

16             MR. SATTERLEY:  Your Honor, first of all, many

17   of these documents have statements of what Colgate

18   personnel managers said.  Those would be party

19   admissions, the portions of the documents.  The

20   documents themselves have been authenticated --

21             THE COURT:  They would be party admissions if

22   somebody was standing here to testify that "They told

23   me."

24             But what we have is a document that was written

25   a long time ago, and the witness that talked about the

322

```
 1    document, if at all, doesn't say that "Somebody told
 2    me."
 3         MR. SATTERLEY:  These --
 4         THE COURT:  That's a difficult problem from the
 5    perspective of saying that it's a -- it's an admission.
 6         MR. SATTERLEY:  These documents were all
 7    produced as business records by Cyprus.  We have
 8    testimony from the Cyprus corporate representative we
 9    could tender -- tender to Your -- to Your Honor, if we
10    haven't already done so.
11         MR. RIVAMONTE:  We have.
12         MR. SATTERLEY:  And so these are business
13    records from 19 -- this one is from 1976, and so we can
14    authenticate these as business records, and there are
15    statements of -- of a party within the business record.
16         And it would be just -- if they had a record of
17    Ms. Schmitz --
18         THE COURT:  I don't have a problem with this
19    being a business record, but I need to see the evidence
20    from Cyprus that describes it as their business record.
21         MR. SATTERLEY:  We -- we provide will that to
22    Your Honor.
23         MR. RIVAMONTE:  Exhibit BB to my declaration,
24    Your Honor, is the deposition testimony of Henry
25    Mulryan, who was a -- who -- who worked for Cyprus and
```

323

```
 1   has personal knowledge about how these call reports are
 2   generated in the normal course of Cyprus's business.
 3         MR. SATTERLEY:  He was -- the president of
 4   Cyprus was deposed.  And also, if Your Honor will --
 5   may recall, his/he's the signator of one of the other
 6   letters that --
 7         THE COURT:  Are you going to read that to
 8   the -- read that information to the jury because this
 9   guy is unavailable?
10         MR. SATTERLEY:  We have designated
11   Mr. Mulryan's deposition.  If the Court requires it for
12   foundation purposes, we certainly would.
13         First, I think that its authentication as a
14   business record, as a preliminary matter, the Court
15   can -- can take that and determine itself that it's a
16   business record and otherwise admissible.
17         But if the Court requires us to read that
18   portion of Mr. Mr. Mulryan's testimony, we certainly
19   can do that, if -- if need be.
20         MR. MULARCZYK:  I think Your Honor is still
21   going to run into the same problem, because it's not
22   going to be Mr. Mulryan saying, "This is what Colgate
23   told me."
24         THE COURT:  No, no, no.  But if he identifies
25   the document as being a business record for Cyprus,
```

324

1    authenticates that, that's an exception to the hearsay

2    rule.

3           MR. MULARCZYK:  But the statement is being

4    made --

5           MR. GARY SHARP:  Your Honor, the statement

6    contained within this record is something the

7    plaintiffs wish to -- to show to prove the truth of the

8    matter asserted.  So it is the hearsay statement within

9    the document that is the objection.

10          I -- again, I'm not going to force them to read

11    a transcript for authentication.  I believe these

12    are -- probably purport to be Cyprus documents.  I have

13    no reason to believe that someone has done something to

14    them.

15          It's the hearsay statements within those Cyprus

16    documents that -- that we're placing our objection,

17    because they -- it's a salesperson, who is trying to

18    get something to his boss to convince him to allow

19    making calls on Colgate that, apparently, are taking

20    hours and -- and lunches.

21          THE COURT:  Well --

22          MR. GARY SHARP:  They are seeking to have those

23    statements made by Colgate employees, allegedly, on a

24    third-hand basis as something to prove the truth of the

25    matter asserted.

1          MR. RIVAMONTE:  Your Honor, if you look at the

2    recipient, who are -- who are -- the persons who took

3    part in this three-hour lunch in April 19, 1976 --

4          THE COURT:  I -- I -- I saw that.

5          MR. RIVAMONTE:  Yeah, Mr. Simko is in there.

6    So Colgate employees were --

7          THE COURT:  My ruling is going to be that if we

8    can see that these are Cyprus -- genuinely business

9    records, then I will admit them into evidence.

10         If they're not, the -- the other objection that

11   it's a hearsay document or a double hearsay document is

12   one that goes to something else.  I mean, hearsay

13   doesn't apply if there is an exception to the hearsay

14   rule.  Hearsay within hearsay, we can give them a

15   limiting instruction, if we need to.

16         But -- so that would mean that 3600, 3601, 3603

17   are all in.  And 3604 as well.

18         (Whereupon, Plaintiff's Exhibit 3600 was

19         received into evidence.)

20         (Whereupon, Plaintiff's Exhibit 3601 was

21         received into evidence.)

22         (Whereupon, Plaintiff's Exhibit 3603 was

23         received into evidence.)

24         (Whereupon, Plaintiff's Exhibit 3604 was

25         received into evidence.)

326

```
 1              MR. GARY SHARP:  And, Your Honor, we'll --
 2   we'll draft proposed limiting instruction for the
 3   Court.
 4              THE COURT:  I -- I have one that sort of aims
 5   in this direction, and we can talk about it.  Let's
 6   finish this first, though.
 7              MR. GARY SHARP:  Thank you, Your Honor.
 8              THE COURT:  I also wanted to do one other
 9   thing, is that counsel need not request leave of Court
10   to approach the witness every single time.
11              If you want to make the record clear, just say,
12   "I'm going to show you this document, Mr. Witness," and
13   then just --
14              MR. GARY SHARP:  Thank you, Your Honor.
15              MR. SATTERLEY:  We appreciate it, Your Honor.
16              MS. CLANCY:  And then don't do it in a menacing
17   fashion.  And then don't approach in a menacing
18   fashion.
19              THE COURT:  Well, now I'm going -- I'm not
20   worried about that in this case.
21              Okay.  So 3600, in; 3601, in; 3603, in; 3604,
22   that's also going to be in; 3605 -- 3611, which is
23   Number 44 --
24              MR. RIVAMONTE:  It's the one with Mr. Roach.
25              THE COURT:  Pardon?
```

327

```
 1              MR. RIVAMONTE:  The one you mentioned earlier
 2   this morning.
 3              THE COURT:  Oh, no, no, no.  That's -- that's
 4   not spelled like me.  The other one --
 5              MR. RIVAMONTE:  Oh, the other one.
 6              THE COURT:  It's 3590 --
 7              MR. RIVAMONTE:  Oh, okay.
 8              THE COURT:  -- has printing in the upper
 9   right-hand corner that looks, strangely, like mine with
10   the name F. Roesch, R-o-e-s-c-h, which is how you spell
11   my name.  It's an unusual spelling.  It's not real
12   common.  But I'm not related.
13              Okay.  Let's move on.
14              MR. SATTERLEY:  Colgate did have a facility in
15   Berkeley, Your Honor.
16              THE COURT:  Okay.  So we have the -- this
17   McCrone document with a picture on it that's --
18              MR. GARY SHARP:  Which tab are we at,
19   Your Honor?  Which tab?
20              THE COURT:  This is 44.  It's a letter directed
21   to Ms. Grace Roach of the Colgate-Palmolive Company --
22              MR. SATTERLEY:  I thought we agreed --
23              THE COURT:  -- July 1983.
24              MR. SATTERLEY:  I thought, Mr. Sharp --
25              MR. GARY SHARP:  Yeah.
```

328

1           MR. SATTERLEY:  -- you -- you agreed to this

2      one; right?

3           MR. GARY SHARP:  Yes.

4           THE COURT:  All right.  So that one will be in

5      evidence.

6           And that -- that completes that.

7           MS. CLANCY:  That completes all the Scala

8      exhibits, Your Honor.

9           THE COURT:  All right.

10          THE REPORTER:  What -- what was Number 44 that

11      you just admitted?  Was that 36- --

12          THE COURT:  3611.

13          MR. SATTERLEY:  A letter from McCrone to

14      Ms. Grace Roach.

15          THE REPORTER:  Okay.  Thanks.

16          MS. CLANCY:  Oh, Your Honor, may I just -- to

17      help the -- to assist the court reporter and the

18      Clerk -- I gave Mr. Satterley the wrong exhibit number

19      today on something.  I just need to read it into the

20      record.  I told him one of the exhibits that was

21      admitted was 727, but the actual exhibit number is

22      3591.

23          THE COURT:  Okay.

24          MR. SATTERLEY:  There was no objection at the

25      time, so I just rocked and rolled.

329

```
 1              THE COURT:  Mr. Bir?  Mr. Bir --
 2              THE CLERK:  Yes?
 3              THE COURT:  -- we are going to admit another
 4    exhibit here.
 5              MS. CLANCY:  It was already admitted.
 6              THE COURT:  Oh, it was already admitted?
 7              MS. CLANCY:  I just read the --
 8              THE COURT:  So we need to delete one.
 9              MS. CLANCY:  When he said, "I'm now showing you
10    727," that's because I gave him the wrong sticky.
11              THE COURT:  So -- all right.  So both of those
12    are in evidence.  They're just different documents?
13              MS. CLANCY:  No.  727 is not evidence.  It's
14    3591.  And I had some sort of --
15              MR. SATTERLEY:  It's the same document, though.
16              MS. CLANCY:  It's the same, yeah.
17              MR. SATTERLEY:  It's the J4-1 method; right?
18              MS. CLANCY:  Yes.
19              It's the same document.  I gave him the wrong
20    document number.
21              THE COURT:  Okay.
22              MS. CLANCY:  So I didn't want there to be
23    any -- I've made more confusion --
24              THE COURT:  Well, now, I'm easily confused.
25              Okay.  I have a -- a limited -- evidence
```

330

1   admitted for limited purpose instruction that -- I'll

2   just show it to you.  And if you -- if you want to --

3          MR. SATTERLEY:  Can we get a copy, by chance,

4   Your Honor, or --

5          THE COURT:  All right.  Is there anything else

6   we need to talk about before we let the reporter go

7   home?

8          MR. SATTERLEY:  The only thing is, there was

9   some evidentiary rulings Your Honor made -- evidentiary

10  rulings Your Honor made, I believe, regarding some

11  additional J&J documents, and earlier, I had requested

12  that they be received into evidence.

13         When I did that, it was at a break, and I

14  didn't hear Your Honor respond, "Okay, those are

15  received into evidence," like you did yesterday.

16         This morning you issued a ruling.  It

17  was the --

18         THE COURT:  What numbers are you talking about?

19         MR. SATTERLEY:  These are Exhibit 4687, 0790,

20  407 --

21         THE COURT:  Wait.

22         MR. SATTERLEY:  And I'm reading from

23  Your Honor's order.

24         THE COURT:  4687?

25         MR. SATTERLEY:  4687, yes, Your Honor.

331

1          THE COURT:  That's in evidence.

2          MR. SATTERLEY:  Yes.  The -- so -- so I guess

3    the question is, I have a list here that Your Honor

4    signed yesterday --

5          THE COURT:  Well, my Clerk is on the job.

6          MR. SATTERLEY:  Okay.

7          THE COURT:  If I signed that order, he put them

8    into evidence.

9          MR. SATTERLEY:  Okay.  That's all I wanted to

10   make sure.

11         THE COURT:  And I'm looking at the list of

12   documents that the Clerk has as in evidence, and 4687

13   is there.

14         MR. SATTERLEY:  Okay.

15         THE COURT:  So I think that if we use that as

16   an exemplar, you are going to be fine.

17         MR. SATTERLEY:  I was just making sure the

18   court reporter has it reflected on the transcript.

19         THE COURT:  All right.

20         MR. SATTERLEY:  Thank you, Your Honor.

21         MS. STEINMANN:  Your Honor, what time would you

22   like us back tomorrow?

23         THE COURT:  9:00.

24         MR. SATTERLEY:  And one last thing, because

25   Dr. Longo will be going in the morning, I'm going to

332

1    meet and confer with defense counsel.  Dr. Horn, I may

2    have to move him to either Thursday or Monday.  I'll

3    send an email to counsel to let -- let them know about

4    that.

5              THE COURT:  All right.  We're in recess.

6              (Whereupon, Plaintiff's Exhibit 4687 was

7              received into evidence.)

8              (Whereupon, Plaintiff's Exhibit 790 was

9              received into evidence.)

10             (Whereupon, Plaintiff's Exhibit 407 was

11             received into evidence.)

12             (Whereupon, Plaintiff's Exhibit 670 was

13             received into evidence.)

14             (Whereupon, Plaintiff's Exhibit 679 was

15             received into evidence.)

16             (Whereupon, Plaintiff's Exhibit 3014 was

17             received into evidence.)

18             (Whereupon, Plaintiff's Exhibit 3088 was

19             received into evidence.)

20             (Whereupon, Plaintiff's Exhibit 5917 was

21             received into evidence.)

22             (Whereupon, Plaintiff's Exhibit 3573 was marked

23             for identification.)

24             (Whereupon, Plaintiff's Exhibit 3574 was marked

25             for identification.)

333

1          (Whereupon, Plaintiff's Exhibit 3577 was marked

2          for identification.)

3          (Whereupon, Plaintiff's Exhibit 3578 was marked

4          for identification.)

5          (Whereupon, Plaintiff's Exhibit 3581 was marked

6          for identification.)

7          (Whereupon, Plaintiff's Exhibit 3594 was marked

8          for identification.)

9          (Whereupon, Plaintiff's Exhibit 3595 was marked

10         for identification.)

11         (Whereupon, Plaintiff's Exhibit 3599 was marked

12         for identification.)

13

14                  (Whereupon, the proceedings

15                  were concluded at 5:25 p.m.)

16

17

18

19

20

21

22

23

24

25

334

```
 1   STATE OF CALIFORNIA    )
 2                          )      ss.
 3   COUNTY OF ALAMEDA      )
 4
 5        I, EARLY K. LANGLEY, do hereby certify:
 6        That foregoing proceedings were held in the
 7   above-entitled action at the time and place therein
 8   specified;
 9        That said proceedings were taken before me at said
10   time and place, and was taken down in shorthand by me,
11   a Certified Shorthand Reporter of the State of
12   California, and was thereafter transcribed into
13   typewriting, and that the foregoing transcript
14   constitutes a full, true and correct report of said
15   proceedings that took place;
16        IN WITNESS WHEREOF, I have hereunder subscribed my
17   hand on April 30, 2019.
18
19
20
21
22        _____
          EARLY K. LANGLEY, CSR No. 3537
23        State of California
24
25
```

1        SUPERIOR COURT OF THE STATE OF CALIFORNIA

2                    COUNTY OF ALAMEDA

3           BEFORE THE HONORABLE FRANK ROESCH

4                      DEPARTMENT 17

5                        ---oOo---

6    PATRICIA SCHMITZ,

7         Plaintiff,

8    vs.                        No. RG18923615

9    JOHNSON & JOHNSON, et
     al.,

10

11        Defendants.
     _____/

12

13           REPORTER'S TRANSCRIPT OF PROCEEDINGS

14                (William Longo, Ph.D.)

15             Tuesday, April 30, 2019

16                    Full Session

17

18

19         Taken before EARLY K. LANGLEY
                   RMR, RSA, B.A.
20                 CSR No. 3537

21

22

23        Aiken Welch Court Reporters
          One Kaiser Plaza, Suite 250
          Oakland, California 94612
24        (510) 451-1580/(877) 451-1580
             Fax:  (510) 451-3797
25              www.aikenwelch.com

**Page 2**

```
1   APPEARANCES OF COUNSEL ON THE RECORD:
2
3   For the Plaintiff:
4       JOSEPH SATTERLEY
        DENYSE CLANCY
5       Kazan, McClain, Satterley & Greenwood
        55 Harrison Street, Suite 400
6       Oakland, California 94607
        (510) 302-1000
7       Jsatterley@kazanlaw.com
        Dclancy@kazanlaw.com
8
9   For the Defendant Colgate-Palmolive Corp.:
10      GARY D. SHARP
        ANDREW SHARP
11      Foley & Mansfield
        2185 N. California Blvd., Suite 575
12      Walnut Creek, California 94596
        (510) 590-9500
13      Gsharp@foleymansfield.com
        Asharp@foleymansfield.com
14
15      PETER M. MULARCZYK
        Foley & Mansfield
16      300 South Grand Avenue, Suite 2800
        Los Angeles, California 90071
17      (213) 283-2100
        Pmularczyk@foleymansfield.com
18
19
20
21
22
23
24
25
```

**Page 3**

```
1   For the Defendants Johnson & Johnson and Johnson &
    Johnson Consumer Inc.:
2
3       ALEXANDER G. CALFO
        King & Spalding LLP
4       633 West 5th Street Suite 1700
        Los Angeles, California 90071
5       (213) 443-4355
        Acalfo@kslaw.com
6
        CORI C. STEINMANN
7       King & Spalding LLP
        500 West 2nd Street, Suite 1800
8       Austin, Texas 78701
        (512) 457-2000
9       Csteinmann@kslaw.com
10      MICHAEL BATTLE
        Barnes & Thornburg LLP
11      1717 Pennsylvania Ave., Suite 500
        Washington, D.C. 20006
12      (202) 289-1313
        Michael.battle@btlaw.com
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
1               INDEX - (Pages 1-331)
2                    SESSIONS
3   DATE                                      PAGE
4   Tuesday, April 30, 2019
5   Morning Session                            23
    Afternoon Session                         167
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 5**

```
1               INDEX - (Pages 1-331)
2            INDEX OF EXAMINATIONS
3               CHRONOLOGICAL
4
5   WILLIAM LONGO, Ph.D. (for the Plaintiff)
        Direct Examination By Mr. Satterley   62
6       Cross-Examination By Mr. Calfo       260
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 6**

INDEX - (Pages 1-331)

INDEX OF EXAMINATIONS

ALPHA

WITNESSES:                                    PAGE

WILLIAM LONGO, Ph.D. (for the Plaintiff)

Direct Examination By Mr. Satterley 62
Cross-Examination By Mr. Calfo    260

**Page 7**

INDEX - (Pages 1-331)

INDEX OF EXHIBITS

PLAINTIFF'S                          ID    EV    WD

3571    3571                          27
        Document entitled Colgate's
        Talc Powder, Ex. 4
        Deposition of Diana Scala
        in Dannielle
        Ann Polakow v. Brenntag
        North America, Inc. LACSC
        Case No. BC599544

3572    3572                          27
        Document entitled
        Technology Information
        Center Colgate-Palmolive
        Company, Ex. 5
        Deposition of Diana Scala
        in Dannielle Ann Polakow v.
        Brenntag North America,
        Inc.
        LACSC Case No. BC599545

3583    3583                          27
        Membership List of the CTFA
        Talc Subcommittee, Ex. 16
        Deposition of Diana Scala
        in
        Dannielle Ann Polakow v.
        Brenntag North America,
        Inc. LACSC Case No.
        BC599556

3584    3584                          27
        Letter dated 2-5-74 to
        J.P. Simko from R. Shimps
        with attachments, Ex. 17
        Deposition
        of Diana Scala in Dannielle
        Ann Polakow v. Brenntag
        North America, Inc. LACSC
        Case No.
        BC599557

**Page 8**

3585    3585                          27
        Letter dated 11-18-74 to
        I. Stewart from J.P. Simko
        with attachment, Ex. 18
        Deposition of Diana Scala
        in Dannielle Ann Polakow v.
        Brenntag North America,
        Inc.
        LACSC Case No. BC599558

3586    3586                          27
        Letter dated 12-10-74 to
        J.P. Simko from G. Grieger
        with attachment Ex. 19
        Deposition of Diana Scala
        in Dannielle Ann Polakow v.
        Brenntag North America,
        Inc.
        LACSC Case No. BC599559

3587    3587                          27
        Meeting Notes of CTFA Talc
        Subcommittee dated
        12-4-74, Ex. 20
        Deposition of Diana
        Scala in Dannielle Ann
        Polakow v. Brenntag North
        America, Inc. LACSC Case
        No.
        BC599560

3591    3591                          27
        Document entitled Amphibole
        Minerals in Cosmetic Talc
        Part I: X-ray Diffraction
        Method and Part II: Optical
        Microscopy and
        Dispersion-Staining
        Method, Ex. 24 Deposition
        of Diana Scala in Dannielle
        Ann Polakow
        v. Brenntag North America,
        Inc. LACSC Case No.
        BC599564

**Page 9**

3598    3598                          27
        Talc Subcommittee Minutes
        on the letterhead of The
        Cosmetic, Toiletry and
        Fragrance
        Association, Inc., Ex. 31
        Deposition of Diana Scala
        in Dannielle Ann Polakow v.
        Brenntag North America,
        Inc. LACSC Case No.
        BC599571

3602    3602                          28
        Letter dated 8-6-76 to
        J.P. Simko from G. Grieger
        on the letterhead of Walter
        C.
        McCrone Associates with
        attachments, Ex. 35
        Deposition of Diana Scala
        in Dannielle
        Ann Polakow v. Brenntag
        North America, Inc. LACSC
        Case No. BC599575

3605    3605                          28
        Letter dated 11-1-76 to
        G. Grieger from J.P. Simko
        with attachments, Ex. 38
        Deposition of Diana Scala
        in Dannielle Ann Polakow v.
        Brenntag North America,
        Inc.
        LACSC Case No. BC599578

3606    3606                          28
        Face Sheet entitled
        Instructions for Keeping
        Laboratory Notebooks issued
        to P. Briscese -
        Book Number dated 3-10-76
        - 3-28-78, Ex. 39
        Deposition of Diana Scala
        in Dannielle
        Ann Polakow v. Brenntag
        North America, Inc. LACSC
        Case No. BC599579

Case 3:16-md-02738-MAS-RLS    Document 33132-2    Filed 08/23/24    Page 339 of 1320

**10**

| # | | | |
|---|---|---|---|
| 1 | 3607 | 3607 | 28 |
| 2 | | Minutes from CTFA Task Force on Round Robin Testing of Consumer Talcum Products | |
| 3 | | | |
| 4 | | for Asbestiform Amphibole Minerals dated 5‑17‑77, Ex. 40 Deposition of Diana Scala | |
| 5 | | | |
| 6 | | in Dannielle Ann Polakow v. Brenntag North America, Inc. LACSC Case No. | |
| 7 | | BC599580 | |
| 8 | 3608 | 3608 | 28 |
| 9 | | Letter dated 11‑16‑77 to J.P. Simko from L. McCrone with attachment, Ex. 41 | |
| 10 | | Deposition of Diana Scala in Dannielle Ann Polakow v. | |
| 11 | | Brenntag North America, Inc. | |
| 12 | | LACSC Case No. BC599581 | |
| 13 | 3610 | 3610 | 28 |
| 14 | | Letter dated 11‑16‑77 to J.P. Simko from L. McCrone with attachment, Ex. 43 | |
| 15 | | Deposition of Diana Scala in Dannielle Ann Polakow v. | |
| 16 | | Brenntag North America, Inc. | |
| 17 | | LACSC Case No. BC599583 | |
| 18 | 3611 | 3611 | 28 |
| 19 | | Letter dated 7‑26‑83 to G. Roach from R. Ellis with attachment, Ex. 44 | |
| 20 | | Deposition of | |
| 21 | | Diana Scala in Dannielle Ann Polakow v. Brenntag North America, Inc. LACSC | |
| 22 | | Case No. | |
| 23 | | BC599584 | |
| 24 | | | |
| 25 | | | |

**11**

| # | | | |
|---|---|---|---|
| 1 | 3612 | 3612 | 28 |
| 2 | | Letter dated 8‑18‑83 to D. Palenik from J.P. Simko with attachment, Ex. 45 | |
| 3 | | Deposition of Diana Scala in Dannielle Ann Polakow v. | |
| 4 | | Brenntag North America, Inc. | |
| 5 | | LACSC Case No. BC599585 | |
| 6 | 3613 | 3613 | 28 |
| 7 | | Letter dated 10‑27‑83 to J.P. Simko from D. Palenik with attachment, Ex. 46 | |
| 8 | | Deposition of Diana Scala in Dannielle Ann Polakow v. | |
| 9 | | Brenntag North America, Inc. | |
| 10 | | LACSC Case No. BC599586 | |
| 11 | 3614 | 3614 | 28 |
| 12 | | Letter dated 1‑24‑84 to D. Palenik from J.P. Simko with attachment, Ex. 47 | |
| 13 | | Deposition | |
| 14 | | of Diana Scala in Dannielle Ann Polakow v. Brenntag North America, Inc. LACSC | |
| 15 | | Case No. | |
| 16 | | BC599587 | |
| 17 | 1065 | 1065 | 36 |
| 18 | | MAS report of November 5, 2018, entitled Verification of the Lee Poye J3‑fs TEM Analysis of J&J's | |
| 19 | | Historical Vermont | |
| 20 | | Talc‑Containing Shower to Shower Talcum Powder Samples | |
| 21 | | | |
| 22 | 1080 | 1080 | 36 |
| 23 | | MAS Analysis of J&J's Historical Talc Samples from the 1960s, January 2019 | |
| 24 | | | |
| 25 | | | |

**12**

| # | | | |
|---|---|---|---|
| 1 | 1081 | 1081 | 36 |
| 2 | | MAS Analysis of J&J's Historical Talc Samples from the 1970s, January 2019 | |
| 3 | | | |
| 4 | 1082 | 1082 | 36 |
| 5 | | MAS Analysis of J&J's Historical Talc Samples from the 1980s, January 2019 | |
| 6 | | | |
| 7 | 1083 | 1083 | 36 |
| 8 | | MAS Analysis of J&J's Historical Talc Samples from the 1990s, January 2019 | |
| 9 | | | |
| 10 | 1084 | 1084 | 36 |
| 11 | | MAS Analysis of J&J's Historical Talc Samples from the 2000s, January 2019 | |
| 12 | | | |
| 13 | 1091 | 1091 | 36 |
| | | MAS Cashmere Bouquet App. A | |
| 14 | | | |
| | 1092 | 1092 | 36 |
| 15 | | MAS Cashmere Bouquet App. B | |
| 16 | 1093 | 1093 | 37 |
| 17 | | MAS Cashmere Bouquet App. B+C20 | |
| 18 | 1097 | 1097 | 37 |
| 19 | | MAS Analysis of Cashmere Bouquet Appendix B | |
| 20 | 1098 | 1098 | 37 |
| 21 | | MAS Analysis of Cashmere Bouquet Appendix C | |
| 22 | 1096 | 1096 | 37 |
| 23 | | Provisionally admitted after redaction: 1096 MAS Analysis of Cashmere | |
| 24 | | Bouquet Appendix A | |
| 25 | 1046 | NIST standard | 38 |

**13**

| # | | | |
|---|---|---|---|
| 1 | 1047 | Animation of heavy liquid separation | 40 |
| 2 | | | |
| 3 | 1099 | 1990 advertisement in a magazine called *Asbestos Issues*, June of 1990 | 40 |
| 4 | | | |
| 5 | 640 | Telex, Val Chisone to J&J, bates JNJAZ55_000009320 | 52 |
| 6 | 158 | Report by Zeitz entitled "CONFIDENTIAL New Reagent Systems - Plant Trial at Windsor | 52 |
| 7 | | | |
| 8 | | Minerals, Inc.", bates JNJMX68_000004996-000005044 | |
| 9 | | | |
| 10 | 155 | J&J memo from Nashed, Subj: Talc/Asbestos, bates JNJMX68-000004646-000004648 | 52 |
| 11 | | | |
| 12 | 171 | CTFA Task Force on Round Robin Testing of Consumer Talc Products for Asbestiform | 52 |
| 13 | | | |
| 14 | | Amphibole Minerals, bates WCD000164-WCD000166 | |
| 15 | 174 | Letter report from McCrone to Cyprus Windsor with related documents attached, bates | 52 |
| 16 | | | |
| 17 | | JNJMX68_000012851-000012860 | |
| 18 | 430 | 11/20/1989, (Amended 06/05/1991) J&J Authorization for Interim | 52 |
| 19 | | | |
| 20 | | Specification Subj: Cyprus Windsor Minerals Grade 66 Talc, bates | |
| 21 | | JNJMX68_000000439-000000442 | |
| 22 | 660 | Battelle Memorial Institute: "Phase Report on | 52 |
| 23 | | | |
| | | Pilot‑Plant Beneficiation of Italian Run‑of- | |
| 24 | | | |
| | | Mine Talc" to J&J, bates JNJAZ55_000000577‑‑ | |
| 25 | | | |
| | | 000000596 | |

| # | Ex. | Description | Page |
|---|---|---|---|
| 1 | 713 | Report by EMV Associates entitled □Consultant Report to Johnson & Johnson . 9 Talc Samples□h, bates JNJMX68_000008981□] 000009004 | 52 |
| 5 | 752 | J&J Standard Test Method 7024B, Analysis of Powdered Talc for Asbestiform Minerals by Transmission Electron Microscopy, bates JNJNL61_000043150□] 000043154 | 53 |
| 10 | 172 | J&J Worldwide Specification, "Analysis of Powdered Talc for Asbestiform Minerals by Transmission Electron Microscopy", bates JNJNL61_000005032-000005040 | 53 |
| 14 | 724 | Letter report from McCrone to Windsor Minerals, bates JNJMX68_000012750□] 000012751 | 55 |
| 16 | 719 | McCrone letter report to Windsor with handwritten note, bates JNJMX68_000013080 | 57 |
| 19 | 726 | Mark Floyd/Forensic Analytical TEM Report on JBP, bates JNJ14T5_000004099□] 000004100 | 58 |
| 21 | 163 | Report entitled "Meeting with Dr. Langer on July 9 Concerning Analytical Analysis of Talc", bates JNJAZ55_000005743-000005748 | 59 |

**16**

| # | Ex. | Description | Page |
|---|---|---|---|
| 1 | 3592 | Paper entitled Consumer Talcums and Powders: Mineral and Chemical Characterization, Ex. 25 Deposition of Diana Scala in Dannielle Ann Polakow v. Brenntag North America, Inc. LACSC Case No. BC599565 | 311 |
| 7 | 3593 | 3593 New York Times Article dated 3□-10□-76 entitled Asbestos Found in Ten Powders, Ex. 26 Deposition of Diana Scala in Dannielle Ann Polakow v. Brenntag North America, Inc. LACSC Case No. BC599566 | 311 |
| 13 | 3596 | Document from The Cosmetic Toiletry and Fragrance Association Talc Subcommittee 20 Minutes, Ex. 29 Deposition of Diana Scala in Dannielle Ann Polakow v. Brenntag North America, Inc. LACSC Case No. BC599569 | 318 |
| 19 | 3597 | 3597 Letterhead of The Cosmetic Toiletry and Fragrance Association letter dated 3-15-76 to H. Eiermann from N. Estrin with attachments, Ex. 30 Deposition of Diana Scala in Dannielle Ann Polakow v. Brenntag North America, Inc. LACSC Case No. BC599570 | 319 |

**15**

| # | Ex. | Description | Page |
|---|---|---|---|
| 1 | 160 | Letter from Blount to J&J attorneys (Hatcher, Esq.), bates JNJNL61_000052427 | 61 |
| 3 | 3580 | Excerpt from Environment Asbestos: You'll Be All Right If You Just Stop breathing, Ex. 13 Deposition of Diana Scala in Dannielle Ann Polakow v. Brenntag North America, Inc. LACSC Case No. BC599553 | 302 |
| 8 | 3582 | Letter dated 8□-3□-72 to A. Weissler from S. Lewin with attachments, Ex. 15 Deposition of Diana Scala in Dannielle Ann Polakow v. Brenntag North America, Inc. LACSC Case No. BC599555 | 303 |
| 13 | 3588 | Document from The Cosmetic, Toiletry and Fragrance Association, Inc. Talc Task Force Minutes, Ex. 21 Deposition of Diana Scala in Dannielle Ann Polakow v. Brenntag North America, Inc. LACSC Case No. BC599561 | 309 |
| 19 | 3590 | News Release from the Cosmetic, Toiletry and Fragrance Association dated 3□]8□]76, Ex. 23 Deposition of Diana Scala in Dannielle Ann Polakow v. Brenntag North America, Inc. BC599563 | 309 |

**17**

| # | Ex. | Description | Page |
|---|---|---|---|
| 1 | 3600 | Call Report dated 4□-19□-76 to Colgate-Palmolive from Cyprus Industrial Minerals Company, Ex. 33 Deposition of Diana Scala in Dannielle Ann Polakow v. Brenntag North America, Inc. LACSC Case No. BC599573 | 325 |
| 6 | 3601 | Call Report dated 6□-4□-76 to Colgate-Palmolive from Cyprus Industrial Minerals Company, Ex. 34 Deposition of Diana Scala in Dannielle Ann Polakow v. Brenntag North America, Inc. LACSC Case No. BC599574 | 325 |
| 11 | 3603 | Call Report dated 9□-16□-76 between Colgate-Palmolive and Cyprus Industrial Minerals Company, Ex. 36 Deposition of Diana Scala in Dannielle Ann Polakow v. Brenntag North America, Inc. LACSC Case No. BC599576 | 325 |
| 17 | 3604 | Call Report dated 9□-16□-76 between Colgate-Palmolive and Cyprus Industrial Minerals Company, Ex. 36 Deposition of Diana Scala in Dannielle Ann Polakow v. Brenntag North America, Inc. LACSC Case No. BC599576 | 325 |
| 22 | 4687 | All documents responsive to Request for Admission No. 79□] JNJNL61_000009898, , in Leavitt v. Johnson & Johnson, et al. ACSC RG17882401 | 332 |

**18**

| # | No. | Description | Col |
|---|-----|-------------|-----|
| 1–3 | 790 | FDA Memo of Meeting between J&J and FDA, Subj: Asbestos Particles in Talc, bates Kazan_FDA_FOIA 000149□000152 | 332 |
| 4–5 | 407 | 01/10/1973, Notes of meeting with RT Vanderbilt, bates JNJNL61_00008340 | 332 |
| 6–8 | 670 | Email from Telofski to Mann Subj: RE: JB Powder w China Talc, bates JNJ14T5_000004485□000004487 | 332 |
| 9–12 | 679 | McCrone Report titled □Examination of Johnson and Johnson□'s Baby Powder□, bates JNJMX68□000006930□000006932 | 332 |
| 13–16 | 3014 | Exhibit 22  Email String Bates JNJ 000555402 to 555493, Deposition of Donald L. Hicks, Volume 2, taken August 17, 2018 in Leavitt v. Johnson & Johnson, et al., ACSC RG17882401 | 332 |
| 17–20 | 3088 | Exhibit 45 □ Memo dated March 29, 1994, JNJ000684386, Deposition of John Hopkins, Taken on September 27, 2018 in Leavitt v. Johnson & Johnson, et al., ACSC RG17882401, Volume 1 | 332 |
| 21–25 | | | |

**20**

| # | No. | Description | Col |
|---|-----|-------------|-----|
| 1–5 | 3578 | 3578 National Safety Council Document dated 1966, Ex. 11 Deposition of Diana Scala in Dannielle Ann Polakow v. Brenntag North America, Inc. LACSC Case No. BC599551 | 333 |
| 6–9 | 3581 | 3581 Rules and Regulations 6□-7□-72, Ex. 14 Deposition of Diana Scala in Dannielle Ann Polakow v. Brenntag North America, Inc. LACSC Case No. BC599554 | 333 |
| 10–15 | 3594 | 3594 Memorandum of a Telephone Conversation dated 3□-1□-76 between Dr. Shapiro and Dr. Langer, Ex. 27 Deposition of Diana Scala in Dannielle Ann Polakow v. Brenntag North America, Inc. LACSC Case No. BC599567 | 333 |
| 16–21 | 3595 | 3595 J&J document dated 3□-14□-76 entitled Examination of American and British Talcum Powder Products by Dr. Pooley, Ex. 28 Deposition of Diana Scala in Dannielle Ann Polakow v. Brenntag North America, Inc. LACSC Case No. BC599568 | 333 |
| 22–25 | | | |

**19**

| # | No. | Description | Col |
|---|-----|-------------|-----|
| 1–7 | 5917 | Exhibit 21  Evaluation by Electron Microscopy Techniques of Asbestos Contamination in Industrial, Cosmetic and Pharmaceutical Talcs, Deposition of Joanne Waldstreicher, taken September 14, 2018 in Leavitt v. Johnson & Johnson, et al. ACSC RG17882401 | 332 |
| 8–12 | 3573 | 3573 Document entitled National Safety Council Transactions, Ex. 6 Deposition of Diana Scala in Dannielle Ann Polakow v. Brenntag North America, Inc. LACSC Case No. BC599546 | 332 |
| 13–18 | 3574 | 3574 Document entitled 24th Annual Safety Congress and Exposition in Louisville October 14 □ 18, Ex. 7 Deposition of Diana Scala in Dannielle Ann Polakow v. Brenntag North America, Inc. LACSC Case No. BC599547 | 332 |
| 19–24 | 3577 | 3577 Document dated 1957 Excerpt from the New England Journal of Medicine dated 1□-4□-62, Ex 10 Deposition of Diana Scala in Dannielle Ann Polakow v. Brenntag North America, Inc. LACSC Case No. BC599550 | 333 |
| 25 | | | |

**21**

| # | No. | Description | Col |
|---|-----|-------------|-----|
| 1–8 | 3599 | 3599 Three□-page Memorandum dated 3□-18□-76 to R. Schaffner from the Director □ Division of Cosmetics Technology, Ex. 32 Deposition of Diana Scala in Dannielle Ann Polakow v. Brenntag North America, Inc. LACSC Case No. BC599572 | 333 |
| 9–25 | | | |

22

```
 1              INDEX - (Pages 1-331)

 2                INDEX OF EXHIBITS

 3    DEFENDANT'S                    ID    EV    WD

 4        (No exhibits handled on the
           record.)

 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

23

```
 1                    --oOo--

 2              P R O C E E D I N G S

 3                    --oOo--

 4        Tuesday, April 30, 2019 - 8:44 a.m.

 5                (Morning Session)

 6        (Whereupon, the following proceedings were held

 7    outside the presence of the jury:)

 8        THE COURT:  On the record.

 9        This is Schmitz v. Johnson & Johnson and

10    Colgate.

11        If I might impose on the lawyers to state your

12    names for the record.

13        MR. SATTERLEY:  Good morning, Your Honor.  Joe

14    Satterley for the plaintiff.

15        MS. CLANCY:  Good morning, Your Honor.  Denyse

16    Clancy for the plaintiff.

17        MR. CALFO:  Good morning, Your Honor.

18    Alexander Calfo for the Johnson & Johnson defendants.

19        MR. BATTLE:  Good morning, Your Honor.  Mike

20    Battle for the Johnson & Johnson defendants.

21        MR. GARY SHARP:  Good morning, Your Honor.

22    Gary Sharp and Pete Mularczyk.

23        MR. ANDREW SHARP:  Good morning, Your Honor.

24    Andrew Sharp for Colgate.

25        THE COURT:  All right.  Counsel had an
```

24

```
 1    agreement about one document and we're just going to

 2    put that into evidence.

 3        What number is it?

 4        MR. SATTERLEY:  Well, Your Honor, so the record

 5    is perfected, what we're moving into evidence is all

 6    the Scala documents, and they have objections to

 7    several of them.  So.

 8        THE COURT:  We're only going to deal with

 9    Number 3611 at this point in time.

10        MR. SATTERLEY:  But the ones they didn't object

11    to, Your Honor, there's some testing documents in the

12    ones they don't object to that I would typically use.

13        THE COURT:  All right.

14        MR. SATTERLEY:  So if I could go ahead and seek

15    admission of all the Scala documents to which they do

16    not object and I can identify for the record those

17    numbers.

18        THE COURT:  I had forgotten that there was a

19    lot of numbers.  The list that I had was only the

20    contested ones.

21        MR. SATTERLEY:  So there's no objection to 3571

22    which was Exhibit 4 to Scala.

23        THE COURT:  Mr. Bir, are you getting these?

24        MR. GARY SHARP:  No objection, Your Honor.

25        MR. SATTERLEY:  There's no objection to 3572,
```

25

```
 1    which was Exhibit 5 to the Scala deposition.  We'll put

 2    Exhibit 6 to the side; we still need to resolve that

 3    one.  Put Exhibit 7 to the side; we still need to

 4    resolve that one.

 5        So let me just move forward to the next one

 6    where there's no objection.

 7        That would be Exhibit 16, which is

 8    Exhibit 3583.  There's no objection to 3583.

 9        MR. GARY SHARP:  No objection, Your Honor.

10        MR. SATTERLEY:  There's no objection to 3584,

11    which is Exhibit 17 to Scala's deposition.

12        THE COURT:  We'll get them all at once.

13        MR. SATTERLEY:  There's no objection to 3585,

14    which is Exhibit 18.

15        THE COURT:  Just give me the numbers.

16        MR. SATTERLEY:  3586.

17        3587.

18        MR. MULARCZYK:  I'm sorry.  Could we do it by

19    the Scala deposition number.  That's how we have it

20    listed.

21        THE COURT:  Mr. Satterley, you're going to have

22    to give me both numbers.

23        MR. SATTERLEY:  I'll go back to Exhibit 19,

24    which was 3586.

25        Exhibit 20 is 3587.
```

26

```
1        Exhibit 24, which is 3591.
2        Exhibit 31, which is 3598.
3        Exhibit 35, which is 3602.
4        Exhibit 38, which is 3605.
5        Exhibit 39, which is 3606.
6        Exhibit 40, which is 3607.
7        Exhibit 41, which is 3608.
8        Exhibit 43, which is 3610.
9        And the one that I think counsel just indicated
10  they're going to withdraw their objection is 3611,
11  which is Scala Exhibit 44.
12       Exhibit 45 is 3612.
13       Exhibit 46 is 3613.
14       Exhibit 47 is 3614.
15       We seek the admission of each of those at
16  this -- at the time, Your Honor.
17       THE COURT:  All right.  As soon as Mr. Sharp
18  and Mr. Mularczyk are ready, we'll hear from them.
19       Do you stipulate all of those into evidence?
20       MR. GARY SHARP:  Yes, Your Honor.
21       THE COURT:  All right.  Mr. Calfo.
22       MR. CALFO:  Yes, Your Honor.
23       THE COURT:  Have you any objection to any of
24  those exhibits?
25       MR. CALFO:  No, Your Honor.
```

27

```
1        THE COURT:  All right.  So the record is
2   accurate, these are the exhibits that are being
3   admitted into evidence:
4        3571, 3572, 3583, 3584, 3585, 3586, 3587, 3591,
5   3598.
6        3602, 3605, 3606, 3607, 3608, 3610, 3611, 3612,
7   3613, and 3614.
8        Those are all in evidence.
9        (Whereupon, Plaintiff's Exhibit 3571 was
10       received into evidence.)
11       (Whereupon, Plaintiff's Exhibit 3572 was
12       received into evidence.)
13       (Whereupon, Plaintiff's Exhibit 3583 was
14       received into evidence.)
15       (Whereupon, Plaintiff's Exhibit 3584 was
16       received into evidence.)
17       (Whereupon, Plaintiff's Exhibit 3585 was
18       received into evidence.)
19       (Whereupon, Plaintiff's Exhibit 3586 was
20       received into evidence.)
21       (Whereupon, Plaintiff's Exhibit 3587 was
22       received into evidence.)
23       (Whereupon, Plaintiff's Exhibit 3591 was
24       received into evidence.)
25       (Whereupon, Plaintiff's Exhibit 3598 was
```

28

```
1        received into evidence.)
2        (Whereupon, Plaintiff's Exhibit 3602 was
3        received into evidence.)
4        (Whereupon, Plaintiff's Exhibit 3605 was
5        received into evidence.)
6        (Whereupon, Plaintiff's Exhibit 3606 was
7        received into evidence.)
8        (Whereupon, Plaintiff's Exhibit 3607 was
9        received into evidence.)
10       (Whereupon, Plaintiff's Exhibit 3608 was
11       received into evidence.)
12       (Whereupon, Plaintiff's Exhibit 3610 was
13       received into evidence.)
14       (Whereupon, Plaintiff's Exhibit 3611 was
15       received into evidence.)
16       (Whereupon, Plaintiff's Exhibit 3612 was
17       received into evidence.)
18       (Whereupon, Plaintiff's Exhibit 3613 was
19       received into evidence.)
20       (Whereupon, Plaintiff's Exhibit 3614 was
21       received into evidence.)
22       MR. SATTERLEY:  With this witness we've met and
23  conferred; we have some agreements regarding
24  admissibility of exhibits with the -- prior to
25  Dr. Longo's testimony.
```

29

```
1        THE COURT:  All right.  Do you want to state
2   those?
3        MR. SATTERLEY:  Yes, Your Honor.  These are all
4   photographs that relates to the testing of the J&J, the
5   Colgate.
6        THE COURT:  Just tell me the exhibit numbers.
7        MR. SATTERLEY:  Yes, Your Honor.
8        1065, 1080, 1081, 1082, 1083, and 1084, 1091,
9   1092, 1093, 1096, 1097, 1098.
10       Should be a total of 12 exhibits.  I have them
11  for Your Honor in binders organized.  I provided them
12  to counsel both electronically and a hardcopy.  It's my
13  understanding there's no objection with the exception
14  of J&J has objections to photographs of the J&J bottle
15  that accompanies the -- each -- they don't have
16  objection for demonstrative purposes, but they don't
17  want the actual photograph of the bottle to be received
18  into evidence.
19       THE COURT:  Is the photograph part of the
20  exhibit?
21       MR. SATTERLEY:  Yes.  It is, Your Honor.
22       THE COURT:  How can I accept part of an exhibit
23  into evidence?
24       MR. SATTERLEY:  I wanted to resolve that issue
25  with Your Honor, show Your Honor the exhibit.
```

**30**

1    THE COURT:  All right.

2    MR. SATTERLEY:  And I've tendered to

3  Your Honor --

4    THE COURT:  Which number --

5    MR. SATTERLEY:  This is 1080, Exhibit 1080, if

6  you go behind Tab Number 1.  Tabs 2 through 11 there's

7  no objections to.  Tab 1.  Tab 1 is -- and what

8  occurred here, Your Honor, is J&J produced these

9  photographs in response to discovery under -- behind

10  Tab 1.

11    And these were the actual bottles that

12  Dr. Longo, the samples came from.  And so, for example,

13  to put in context, if we could go to the fourth

14  photograph on page 4 of 1080, you'll see that J&J has

15  marked the date of the product, and so this is

16  important evidence for the jury to consider in context

17  of the sample that's being analyzed, and many of these

18  bottles have the dates on them and J&J provided those

19  dates -- provided these bottles to us exactly in this

20  fashion.

21    So it puts context on the date of the sample in

22  question.  And these are the historical.

23    So like I said, all the photographs behind

24  Tabs 3 through 11, there's no objection to.  That's the

25  testing -- the photographs of the actual test.

**31**

1    THE COURT:  So what you're telling me is that

2  there's more than one bottle that is pictured?

3    MR. SATTERLEY:  That's --

4    THE COURT:  And these are the bottles that the

5  samples that Longo tested actually came in.

6    MR. SATTERLEY:  Came from.

7    THE COURT:  Came from.

8    MR. SATTERLEY:  Because J&J's labs made the

9  sample splits and then with the chain of custody said

10  this is the sample you're getting and --

11    THE COURT:  I understand.  I'm just asking

12  questions here.  And the writing on the -- the typed

13  writing that's taped to one bottle, for example, is

14  something that was written by Johnson & Johnson and

15  taped on to the bottle by Johnson & Johnson.

16    MR. SATTERLEY:  That's the way that it was

17  produced in the course of discovery, Your Honor.

18    THE COURT:  So if you ask your witness, Longo,

19  do you recognize these and he's going to say that's

20  exactly how I got them from Mr. Satterley.

21    MR. SATTERLEY:  The samples were not received

22  in the bottles themselves.  The samples -- J&J's own

23  lab took the samples and gave us the sample numbers.

24  You can see it says "JPBP" -- it's got a number of 188

25  or 093, and the chain of custody document matches up so

**32**

1  the dates are matched up, and he can explain that

2  through the chain of custody process.

3    But this just gives the context to the dates.

4    Counsel advised me they have no objection to

5  demonstrative for these.  At the very least, I'd like

6  to demonstrate some of these, but I think they're

7  actually -- should come into evidence so the jury can

8  evaluate the dates of the various samples as

9  represented by J&J.

10    THE COURT:  All right.

11    Ms. Steinmann, you're standing there.

12    MS. STEINMANN:  Your Honor.

13    THE COURT:  I presume that you're going to tell

14  me what the objection is.

15    MS. STEINMANN:  The objection is just that

16  these aren't evidence of anything in this case.

17  Dr. Longo is going to be able to tell the jury what the

18  dates were and there is no reason to put in 99 photos

19  of different Johnson & Johnson bottles.  It's not

20  evidence of anything.  Demonstrative-wise I agree --

21    THE COURT:  That's not an evidentiary

22  objection.  Maybe it's a -- maybe the argument is 352

23  cumulative.  But the concept that they don't need to is

24  not --

25    MS. STEINMANN:  Sorry, Your Honor.  Formal

**33**

1  objection --

2    THE COURT:  They have to -- they get to put on

3  their case.

4    MS. STEINMANN:  Formal objection is 352.  I was

5  just explaining the reasons for our objection, which is

6  I believe these are fair for a demonstrative, but I

7  don't think they have any relevance to go back to the

8  jury.  And she didn't use those bottles, and we just

9  don't want the jury to get the misimpression that all

10  of these bottles came from Mrs. Koretoff --

11  Mrs. Schmitz, I'm sorry.

12    THE COURT:  Okay.  If that's the objection,

13  it's overruled.

14    MS. STEINMANN:  Thank you, Your Honor.

15    THE COURT:  So what number is that exhibit?

16    MR. SATTERLEY:  That's 1080.

17    THE COURT:  All right.  The following

18  exhibits -- other than that one, do you stipulate that

19  all the rest of the list that was read by Mr. Satterley

20  may be admitted into evidence?

21    MS. STEINMANN:  Your Honor, I believe I was

22  walking in, but if it's what he said to me --

23    THE COURT:  I'll read it to you, if you'd like.

24    MS. STEINMANN:  Okay.

25    Is this it?

34

```
1        MR. SATTERLEY:  I provided hardcopies to -- to
2   all counsel.  These are the J&J's and Colgate is right
3   there.
4        MS. STEINMANN:  Just give me one second to get
5   through them.
6        THE COURT:  Of course.
7        MS. STEINMANN:  Yes, Your Honor.  This appears
8   to be what was sent to us and we did stipulate to
9   these.
10       THE COURT:  All right.  Mr. Sharp, have you any
11  objection to any of these exhibits?
12       MR. GARY SHARP:  No, Your Honor.
13       MR. MULARCZYK:  Your Honor, I just have one
14  objection.  I'm sorry.  Are we talking about the
15  Johnson & Johnson ones or the ones pertaining to
16  Colgate?
17       THE COURT:  Yes.  We're talking about the 1065
18  through 1098 list that was read into the record by
19  Mr. Satterley.
20       MR. MULARCZYK:  So the only objection that I
21  have -- I'm okay with all the photographs.  The one
22  objection I have is a document here.  It's a chain of
23  custody document.  It's 1096.  And my objection is that
24  this contains a list of samples that aren't at issue in
25  this case and that Dr. Longo is not relying on.
```

35

```
1        So.
2        MR. SATTERLEY:  Are you talking about this list
3   right here?
4        MR. MULARCZYK:  Correct.
5        THE COURT:  What number?
6        MR. MULARCZYK:  There's a whole host of samples
7   that are not subject to this case at all in this list.
8   This is 1096.
9        THE COURT:  I understand, but in this binder
10  what tab is it?
11       MR. SATTERLEY:  Your Honor, you don't have the
12  correct binder right there.  1096.  If I could tender
13  it to the Court.  It's in the second box.
14       This is the first I'm hearing of this
15  objection, but I can agree if they don't cross-examine
16  on -- that he didn't test these other 43 bottles -- or
17  41 bottles, I will agree to redact that and only put
18  the ones -- the bottles that he did test.  What
19  occurred -- well -- and that's my offer is, as long as
20  they don't cross-examine on those other bottles that
21  were not tested, I have no problem redacting this
22  document and making it only the bottles that were
23  tested.
24       THE COURT:  All right.  So we'll redact the
25  bottles that weren't tested.
```

36

```
1        MR. SATTERLEY:  Yes.
2        THE COURT:  That sounds like a perfectly good
3   way of approaching the problem.
4        MR. SATTERLEY:  Yes, Your Honor.
5        MR. MULARCZYK:  Thank you, Your Honor.
6        THE COURT:  Okay.  So, for the record, the
7   following exhibits are admitted into evidence:
8        1065, 1080, 1081, 1082, 1083, 1084, 1091, 1092,
9   1093, 1097, 1098.
10       (Whereupon, Plaintiff's Exhibit 1065 was
11       received into evidence.)
12       (Whereupon, Plaintiff's Exhibit 1080 was
13       received into evidence.)
14       (Whereupon, Plaintiff's Exhibit 1081 was
15       received into evidence.)
16       (Whereupon, Plaintiff's Exhibit 1082 was
17       received into evidence.)
18       (Whereupon, Plaintiff's Exhibit 1083 was
19       received into evidence.)
20       (Whereupon, Plaintiff's Exhibit 1084 was
21       received into evidence.)
22       (Whereupon, Plaintiff's Exhibit 1091 was
23       received into evidence.)
24       (Whereupon, Plaintiff's Exhibit 1092 was
25       received into evidence.)
```

37

```
1        (Whereupon, Plaintiff's Exhibit 1093 was
2        received into evidence.)
3        (Whereupon, Plaintiff's Exhibit 1097 was
4        received into evidence.)
5        (Whereupon, Plaintiff's Exhibit 1098 was
6        received into evidence.)
7        (Whereupon, Plaintiff's Exhibit 1096 was marked
8        for identification and provisionally admitted
9        after redaction.)
10       THE COURT:  1096 is provisionally admitted, but
11  the actual document will be redacted after testimony of
12  the witness who will itemize the ones that he actually
13  tested.
14       That means that you can't show that one on the
15  screen.
16       MR. SATTERLEY:  Yes, Your Honor.  We have three
17  additional stipulations with regards to demonstrative
18  evidence.  And this is Exhibits 1046, 1047, and 1099.
19       1046 is a NIST standard, and I don't believe
20  there's any objection --
21       For demonstrative purposes only; correct?
22       MR. CALFO:  Correct.
23       THE COURT:  All right.  So 1046 won't be
24  admitted into evidence, but you may show it on the
25  screen.
```

**38**

1   (Whereupon, Plaintiff's Exhibit 1046 was marked
2   for identification.)
3        MR. SATTERLEY:  Yes, Your Honor.
4        MR. MULARCZYK:  Well, we have an objection to
5   that one specifically for all purposes.  I didn't have
6   an objection to the animation that he proposed, but I
7   did have an objection to that for all purposes.  It
8   wasn't something that was disclosed in this case, it
9   wasn't something that was referenced as reliance
10  material in his deposition, and so for that reason it
11  shouldn't be permitted in this case.
12       THE COURT:  All right.  So it's a demonstrative
13  tool.
14       MR. SATTERLEY:  Yes, just demonstrative,
15  Your Honor.  We're not seeking its admission.
16       THE COURT:  All right.  What is it?
17       MR. SATTERLEY:  It's just -- it's a tremolite.
18  The NIST -- NIST is the National Institute for
19  Standards and Technology, and this shows what tremolite
20  the standard is.
21       THE COURT:  Is that the image that you're
22  showing me there that I can see from here?
23       MR. SATTERLEY:  Pardon?
24       THE COURT:  No, no.  I can see it from here.
25  Oh, it's not just one page.

**39**

1        MR. SATTERLEY:  It is, I think, three pages and
2   it shows what under the microscope the standard of
3   tremolite is, and all Dr. Longo does is says -- gives
4   an opinion that he has -- that he's -- his lab took
5   these photographs.
6        THE COURT:  All right.  I'll allow it as a
7   demonstrative.  I won't allow it into evidence.
8        MR. SATTERLEY:  And the heavy liquid separation
9   animation is 1046 is what I showed in opening
10  statement.  Counsel advised me they have no objection
11  to it for demonstrative purposes only the animation of
12  the heavy liquid separation, as 1047.
13       THE COURT:  All right.  That can be shown on
14  the monitor, but it won't be in evidence.
15       MR. SATTERLEY:  Yes, Your Honor.  And the final
16  is the 1990 advertisement in a magazine called *Asbestos
17  Issues*, June of 1990.  And this is Exhibit 1099.  And
18  it's --
19            No objection for demonstrative purposes?
20       MR. CALFO:  No objection for demonstrative
21  purposes.
22       THE COURT:  Mr. Mularczyk?
23       MR. SATTERLEY:  The 1990 ad.
24       THE COURT:  All right.  Mr. Mularczyk is
25  shaking his head no.

**40**

1        MR. MULARCZYK:  No objection, Your Honor, I'm
2   sorry.
3        THE COURT:  All right, so that one also can be
4   shown to the jury, but it's not in evidence.
5        (Whereupon, Plaintiff's Exhibit 1047 was marked
6   for identification.)
7        (Whereupon, Plaintiff's Exhibit 1099 was marked
8   for identification.)
9        MR. SATTERLEY:  While I'm meeting and
10  conferring with Mr. Calfo, Ms. Clancy has a few issues
11  that she may want to raise.
12       MS. CLANCY:  Ms. Steinmann.
13       MS. STEINMANN:  I'm sorry, but, Your Honor, we
14  were sent a grouping of exhibits early this morning,
15  and they also just were nice enough to provide me a
16  copy, but I'm still going through them as we've been
17  talking, so I'm not prepared to address these yet.
18  We've just got them this morning, so.
19       MS. CLANCY:  These were all documents to which
20  Johnson & Johnson responded to an RFA saying that they
21  kept them in the ordinary course of business, and so at
22  the time they were created, I didn't anticipate there
23  would be, well, actually an objection to them.  So if
24  we could just take two minutes to allow Ms. Steinmann
25  to look at the documents.

**41**

1        THE COURT:  Are you going to be using them with
2   this witness?
3        MS. CLANCY:  Yes, Your Honor.
4        THE COURT:  All right.  Well, let's take a
5   minute and take a look at it.  We'll take a short
6   recess.
7        MS. CLANCY:  Thank you, Your Honor.
8        MR. MULARCZYK:  When this issue is resolved, I
9   don't know if the Court remembers, but we still had a
10  motion in limine on this witness, and -- with the full
11  expectation that this Court is not going to turn around
12  this witness and send him home, I just would ask for a
13  few minutes so we can address it and we just have a
14  ruling on it before we move forward.
15       THE COURT:  All right.
16       While Ms. Steinmann is looking at all those
17  documents, we are going to Amotion in limine.  It is
18  Motion in Limine -- Joint Motion in Limine Number --
19  I've forgotten the numbers -- like, 7 or 8, or
20  something.  It's Number 1 --
21       MR. MULARCZYK:  It's 3A.
22       THE COURT:  Well -- oh, it's -- oh --
23       MR. MULARCZYK:  It's -- it's Colgate's Motion
24  in Limine 3A.
25       THE COURT:  Yes, there you go.  It was also

**42**

1    Whitaker, Clark & Daniels' motion.
2         And by the way, I -- I want to point out to you
3    that on Exhibit 23 to the Scala deposition, where it
4    says "F. Roesch, R-o-e-s-c-h, at the top in what
5    appears to be maybe even my handwriting, that's not my
6    handwriting.  And I am no relation to Fred Roesch.
7         MR. GARY SHARP:  It is spelled differently.
8         THE COURT:  No, it's not.
9         MR. GARY SHARP:  I thought it was R-o-a-c-h.
10   Exhibit 23, Your Honor?
11        THE COURT:  Yes.
12        MR. SATTERLEY:  As I was reading through the
13   document the other day, I was thinking, "I wonder if
14   he's related."
15        THE COURT:  All right.  I have this motion
16   actually as Motion in Limine Number 2 of
17   Colgate-Palmolive.
18        MR. MULARCZYK:  Oh, okay.  All right.
19        MS. CLANCY:  Isn't that the one already
20   ruled on, Number 2?
21        MR. MULARCZYK:  We never argued this one.
22        MS. CLANCY:  We argued one motion in limine for
23   you on Dr. Longo on -- on chain of custody.
24        MR. MULARCZYK:  So there was one on samples,
25   and there was on Longo.  Two separate motions.

**43**

1         MS. CLANCY:  Correct.
2         I think -- I think, Your Honor, where -- I'm a
3    little confused, because we argued one on the
4    authenticity of the samples, and then they filed
5    another motion also alleging authenticity of the
6    samples and -- and other of what -- Dr. Longo's
7    opinions.  I just want to make sure I'm responding to
8    the correct one, because the Court has already ruled on
9    the one with regard to authenticity of the samples.
10        THE COURT:  This is -- it's -- it's this motion
11   right here, this --
12        MS. CLANCY:  What is -- what is the --
13        THE COURT:  I would say that's nine inches of
14   Colgate --
15        MS. CLANCY:  The 9-inch motion?  Well,
16   unfortunately, that doesn't differentiate it from other
17   any of Colgate's other motions, so --
18        THE COURT:  This is -- this is the biggest one.
19        MS. CLANCY:  Oh, the biggest one.  What's the
20   title of it?
21        THE COURT:  Plaintiffs' -- it is Defendant
22   Colgate-Palmolive Company's Motion in Limine to Exclude
23   Testimony of Plaintiff's Expert Dr. William Longo
24   Regarding Unreliable Testing Performed on Undisclosed,
25   Unauthenticated Containers of Cashmere Bouquet.

**44**

1         MS. CLANCY:  I think that's the one that the
2    Court has already ruled on, but --
3         THE COURT:  My note shows that it's passed.
4         MS. CLANCY:  Okay.  All right.  Well --
5         THE COURT:  You may be confusing it with the
6    Egilman motion.
7         MR. MULARCZYK:  Your Honor, there was one about
8    the authenticity of the samples themselves.
9         THE COURT:  That was --
10        MR. MULARCZYK:  It was Joint -- it was Joint
11   Defense, I think, Motion in Limine Number 1, maybe, or
12   Colgate Number 1.
13        THE COURT:  All right.  Well, go ahead,
14   Mr. Mularczyk.
15        MR. MULARCZYK:  All right.  So since -- since
16   this motion is fresh in your mind, Your Honor --
17        THE COURT:  I must confess that while I read
18   the motion, I didn't look at all the exhibits.
19        MR. MULARCZYK:  And I don't blame you.
20        So this is -- this is a really focused motion.
21   Generally speaking, I don't have a concern with
22   Dr. Longo speaking about the testing that he personally
23   did, but where it becomes problematic is when he
24   attempts to extrapolate from his own handful -- subset
25   of testing that he's done to try to say whether or not

**45**

1    what the plaintiff used was contaminated and at what
2    levels specifically.
3         There is an opinion that he has specifically
4    within his -- within his declaration and that he
5    offered in his deposition, which is, basically, anybody
6    including Ms. Schmitz, who used Cashmere Bouquet at any
7    time would have been exposed to asbestos and at
8    significant levels or substantial levels.
9         And so, again, I've got no problem with him
10   coming in here and talking about the samples he's
11   tested.  It's well within -- well within his realm.
12        But there is nothing that he has done
13   scientifically, whether it's some sort of analysis or
14   calculation, whether it be mathematical or statistical
15   or anything at all, that allows him to make the jump
16   from the small subset of samples that he has tested to
17   the -- to the entire product line or even to the
18   products that Ms. Schmitz used.  There's simply nothing
19   there.  Nothing at all.
20        And I think it's inappropriate to allow him to
21   do that under *Sargon*.  I don't think he's demonstrated
22   that.  And so if we're going to keep him to -- if we
23   are going to keep him in his lane and have him talk
24   about his samples that he has looked at personally, no
25   problem.  But as soon as he makes that jump to what

**46**

1 Ms. Schmitz used and whether that's appropriate, I
2 think it's not, and I don't think it's supported.
3     THE COURT: All right. Does Johnson &
4 Johnson --
5     MR. CALFO: We join.
6     THE COURT: You concur with that?
7     MR. CALFO: Yes, Your Honor.
8     THE COURT: All right.
9     Ms. Clancy.
10     MS. CLANCY: Okay. Yes, Your Honor. So within
11 the nine inches of exhibits that Colgate attached, I'm
12 assuming that they attached Dr. Longo's report in this
13 case, where they stated that there were no scientific
14 calculations, no data, no math whatsoever to support
15 his opinions, and that's absolutely belied by his
16 report.
17     He's testified in his deposition -- and he
18 provided voluminous testing -- that not only has he
19 examined the actual samples of Cashmere Bouquet and
20 Johnson & Johnson --
21     THE COURT: Well, they're -- they're not saying
22 that. They're saying that he's incapable of opining
23 that because he found asbestos in the samples that he
24 looked at of the Colgate-Palmolive product, that --
25 that other bottles may have had asbestos in them, too.

**47**

1     MS. CLANCY: Yeah, sure. So he found in the
2 Colgate bottles, 100 percent contained asbestos.
3     THE COURT: 100 percent of the samples, not --
4     MS. CLANCY: Correct.
5     THE COURT: -- 100 percent of the bottles.
6     MS. CLANCY: And he also found -- went through
7 the Colgate historical documents, where Colgate found
8 asbestos in their samples.
9     He's also reviewed the mechanism of testing
10 that Colgate used in order to analyze whether or not it
11 had asbestos, which, as the Court heard yesterday and
12 as we heard from Scala, is the XRD method, which is
13 incapable of being sensitive to asbestos below a
14 certain level. 2 percent to 1 percent is the
15 scientific evidence.
16     And so, therefore, under *Lyons v. Colgate*, the
17 Court of Appeals expressly held that where you have an
18 expert who analyze d the sample at issue, who has
19 looked at the historical document, who has looked at
20 the testing samples, the testing that was used by the
21 corporation, to see that it was wholly deficient to
22 find whether there was asbestos there in the first
23 instance, that it is absolutely permissible for that
24 expert to say whether or not when the plaintiff
25 breathed -- that the plaintiff would have had

**48**

1 substantial exposure to asbestos by use of the product.
2     And that *Colgate v. Lyons* decision was
3 expressly found, especially in a situation where the
4 plaintiff had a lifetime use or it was for decades of
5 use of a product, that for the expert to say that it
6 would have been a substantial exposure upon use of the
7 product was permissible testimony.
8     Anything with respect to, "Well, you can't say,
9 because you didn't test her actual bottle that she
10 used," or "You can't say that literally every bottle
11 had asbestos in it because you couldn't test every
12 single bottle," that goes, the Court held -- went to
13 the weight and not the admissibility of that opinion.
14     The -- Dr. Longo in his report set forth the
15 careful calculations, where he analyzed each of
16 Ms. Schmitz' personal use exposures from each of the
17 products, calculating the number of grams in the
18 products, the amount of ounces used in her lifetime,
19 and the -- the resultant exposure that would have
20 ensued as a result of her use of the products.
21     This is square on with what the Court of
22 Appeals has held is admissible based on, actually,
23 Defendant Colgate's same objections in that case.
24     THE COURT: Mr. Mularczyk.
25     MR. MULARCZYK: So I guess I'll have to live

**49**

1 with the Lyons decision forever, but that was a summary
2 judgment case, okay, has no applicability to the issue
3 that we're raising here.
4     Let's make sure we understand what his
5 expertise is. He's a material scientist. He's an
6 analyst. He tests the products that are before him, or
7 his lab tests the products that they're looking at.
8 He's -- he's not an individual that has anything in his
9 background that allows him to make this statistical
10 leap about what Ms. Schmitz may have used and how often
11 and so forth.
12     He, himself, testified at his deposition that
13 the reason he gets from his subset of 58 samples to
14 what Ms. Schmitz used was because he took the number of
15 positives, divided it by the total number of samples he
16 tested, and says, "Well, that's the percentage. I'm
17 going to be a little bit conservative, because there's
18 some nondetects" -- and he tested some samples where he
19 found nothing, by the way -- and then he says, "I'm
20 going to take that percentage and apply it to the
21 universe of products."
22     That's -- that's not expertise, Your Honor. I
23 could do that for anything.
24     THE COURT: Well, you can -- it goes to the
25 weight, though. It goes not to admissibility.

50

1    The motion is denied.
2    All right.  Are we ready to proceed?
3    MS. CLANCY:  I just was going to find out
4  which --
5    THE COURT:  Still on the record.
6    Ms. Steinmann is going to give us the word as
7  soon as she's ready.
8    Ms. Steinmann, how much more time do you need?
9    MS. STEINMANN:  I -- I think I'm ready.
10    THE COURT:  All right.  I don't want to press
11  you.  If you need a few more minutes, that would be
12  fine.
13    MS. STEINMANN:  I'm done.
14    THE COURT:  All right.
15    MS. CLANCY:  Can I just look at which ones
16  you've --
17    MS. STEINMANN:  Yes.
18    MS. CLANCY:  May I meet and confer with her for
19  one minute, Your Honor?
20    THE COURT:  Yes.
21    MS. CLANCY:  Thank you.
22    (Counsel conferring at counsel table out of the
23  hearing of the reporter.)
24    MS. CLANCY:  Your Honor, we have a stack of
25  agreed.  If I could read into the record and then we

51

1  have a very small stack of disagreed.
2    THE COURT:  All right.
3    MS. CLANCY:  Agreed exhibits which plaintiffs
4  offer into evidence are Plaintiff's 640, 158, 155, 171,
5  174, 430, 660, 713, 752, and 172.
6    THE COURT:  Ms. Steinmann, do you stipulate
7  those documents into evidence?
8    MS. STEINMANN:  Yes, Your Honor.
9    THE COURT:  Mr. Sharp?  Mr. Mularczyk?
10    MR. MULARCZYK:  Just subject to the same
11  objection regarding the applicability -- well, hearsay
12  as to Colgate and then the instruction that we
13  requested.
14    THE COURT:  All right.  Well, the hearsay as to
15  Colgate, which one?  I mean, you know.
16    MR. MULARCZYK:  My understanding is these are
17  all Johnson & Johnson documents, so all of them as
18  against Colgate.
19    THE COURT:  Oh, all right.  Well, it's just the
20  issue about that the jury can't take evidence of
21  malfeasance by Johnson & Johnson and attribute it to
22  Colgate?
23    MR. MULARCZYK:  Correct.
24    THE COURT:  Okay.  You will get an instruction
25  on that.  You'll just have to continue working it out.

52

1    MR. CALFO:  Your Honor, we're both getting an
2  instruction; right?
3    THE COURT:  Oh, yeah, yeah, yeah.  It goes both
4  ways.  It actually will be one -- it's all in one
5  instruction more likely than not.
6    All right.  All of those exhibits are in
7  evidence.  I'll read them for the record:
8    640, 158, 155, 171, 174, 430, 660, 713, 752,
9  and 172.
10    (Whereupon, Plaintiff's Exhibit 640 was
11    received into evidence.)
12    (Whereupon, Plaintiff's Exhibit 158 was
13    received into evidence.)
14    (Whereupon, Plaintiff's Exhibit 155 was
15    received into evidence.)
16    (Whereupon, Plaintiff's Exhibit 171 was
17    received into evidence.)
18    (Whereupon, Plaintiff's Exhibit 174 was
19    received into evidence.)
20    (Whereupon, Plaintiff's Exhibit 430 was
21    received into evidence.)
22    (Whereupon, Plaintiff's Exhibit 660 was
23    received into evidence.)
24    (Whereupon, Plaintiff's Exhibit 713 was
25    received into evidence.)

53

1    (Whereupon, Plaintiff's Exhibit 752 was
2    received into evidence.)
3    (Whereupon, Plaintiff's Exhibit 172 was
4    received into evidence.)
5    What documents are you offering that you do not
6    have agreement on?
7    MS. CLANCY:  Sure.  Should I -- there's just a
8  few, so should I take them one at a time -- and I want
9  to give an overarching change so there's one thing on
10  the table.  For each of these, we're offering Johnson &
11  Johnson has responded to request for admission, in this
12  case stating that they -- the true and correct copy of
13  these -- these are true and correct copies and that
14  they were maintained in the ordinary course of business
15  of Johnson & Johnson.
16    THE COURT:  So it's an admission that they're
17  business records?
18    MR. SATTERLEY:  That's correct.
19    MS. CLANCY:  So the -- then we'll get -- they
20  have objections on top of that.
21    So the first one is Document 724.
22    MR. SATTERLEY:  I can address 724, Your Honor.
23  Their objection, I understand, is that this document
24  relates to industrial talc instead of cosmetic.
25    THE COURT:  What is it?

**54**

1     MR. SATTERLEY: It's a McCrone letter to them
2 talking about the presence of amphiboles and asbestos,
3 fibers of asbestos in talc, in Vermont -- in the
4 Vermont mines where they were making baby powder with
5 this talc.
6     And they say this relates to industrial talc,
7 not cosmetic talc. But the testimony of Dr. Hopkins,
8 who the jury will hear, Your Honor has already ruled,
9 he says, and the other documents show, HC, the word
10 "HC" stands for Hammondsville cosmetic, and "HC" are --
11 is on the sample number on here quite a bit.
12 Your Honor has already overruled the general motion in
13 limine with regards to industrial talc or any reference
14 to industrial talc.
15     This, I think, falls squarely within that.
16 But, more importantly, it's going to be for the jury to
17 assess whether or not it's cosmetic talc like we claim
18 and like Dr. Hopkins admits through the documents that
19 HC stands for Hammondsville cosmetic or whether it's
20 industrial talc which that's their argument.
21     THE COURT: All right.
22     MS. STEINMANN: Your Honor, with respect to
23 that document, yes, we do dispute that HC, and
24 Dr. Hopkins also disputes it, that it is cosmetic talc.
25 He says it can be designated for industrial talc

**55**

1 including a specific document that says roofing
2 materials.
3     So we believe that that particular document
4 under 352 and relevance is not relevant to this case
5 and is also misleading and also requires us to have a
6 little minitrial of what HC actually means and what it
7 doesn't mean.
8     THE COURT: All right. I'll admit the document
9 into evidence. The objection is overruled.
10     Next one?
11     MS. CLANCY: That was 724.
12     THE COURT: 724 will be in evidence.
13     (Whereupon, Plaintiff's Exhibit 724 was
14     received into evidence.)
15     MS. CLANCY: The next one is 719.
16     MR. SATTERLEY: 719 is a letter from McCrone
17 once again to Windsor Minerals and it's signed by
18 Thomas Kremer and James Millette, and it's related to
19 1986. It's identification of chrysotile asbestos in
20 talc. We believe this is relevant to demonstrate that
21 chrysotile asbestos was actually found in the talc
22 samples. And there's been a lot of discussion about
23 McCrone and Dr. Millette, and there will be further
24 discussion about Thomas Kremer. And so we believe this
25 is relevant and important for the jury to understand

**56**

1 the identification of chrysotile as found in these
2 samples.
3     MS. STEINMANN: Your Honor, our response to
4 this is -- and I believe there's no dispute; there may
5 be, but -- this is specifically dealing with a mine in
6 California that cosmetic talc was never ever mined out
7 of, not for J&J or for any other company.
8     THE COURT: I think this was the Windsor mines?
9     MR. SATTERLEY: Windsor Minerals is not
10 California. Windsor Minerals is Vermont. It's Windsor
11 Minerals.
12     MS. STEINMANN: These testing results, as
13 Dr. Hopkins explains, are from a California western
14 mine.
15     THE COURT: Did Windsor mines have mines
16 outside of Vermont?
17     MS. STEINMANN: Johnson & Johnson only got
18 their talc from Vermont. I can't speak for Windsor
19 mines.
20     THE COURT: Okay. Well, you got to persuade me
21 that Windsor doesn't refer to the mines called Windsor
22 mines in Vermont before I can even really seriously
23 consider your objection.
24     MS. STEINMANN: Nowhere in here does it say
25 Windsor mines. It says "WMI," which is a designation

**57**

1 as Hopkins explains, which stands for this western mine
2 in California.
3     MR. SATTERLEY: Well, Hopkins, Your Honor, has
4 no basis whatsoever to explain away the document. The
5 document says Windsor Minerals. There's no Windsor
6 Mineral California talc mines that I've ever heard of.
7 So if that's their argument, that's an argument they
8 can make to the jury that that's not relating to this,
9 but there's certainly no documents to support that
10 argument.
11     THE COURT: All right. It seems that the
12 parties have different visions of what it actually
13 stands for. We'll let the jury decide it. 719 will be
14 in evidence.
15     (Whereupon, Plaintiff's Exhibit 719 was
16     received into evidence.)
17     MR. SATTERLEY: The next document is 726,
18 Your Honor. This is 2004 testing of Johnson & Johnson
19 Baby Powder by Forensic Analytical.
20     This was received by Johnson & Johnson at the
21 time. Forensic Analytical in Hayward, California
22 tested off-the-shelf baby powder, found asbestos in it,
23 anthophyllite asbestos. It was immediately -- this
24 report was transferred.
25     THE COURT: What's the objection?

58

```
 1        MS. STEINMANN:  Your Honor, this was testing
 2   done by a new station.  It was not done by the request
 3   or at the request of Johnson & Johnson, and we believe
 4   it has hearsay and is irrelevant.
 5        THE COURT:  Well, it's not a business record?
 6        MS. STEINMANN:  It is -- it was in our files.
 7   It was sent to us.
 8        MR. SATTERLEY:  Your Honor, at the very least,
 9   this goes to notice.  We're going to hear who Mark
10   Floyd is today.
11        THE COURT:  It only goes to notice.  726 will
12   be in evidence.
13        (Whereupon, Plaintiff's Exhibit 726 was
14          received into evidence.)
15        MR. SATTERLEY:  Your Honor, Exhibit 163 is a
16   1971 document regarding their meeting with Dr. Langer
17   concerning analytical analysis of talc, and this shows
18   that -- this gives them knowledge that with regard to
19   fibrous minerals in 1971 were identified.  It goes to
20   the fibrous content.  It goes to asbestos, their
21   knowledge of asbestos in the product.  In this 1971
22   document in their files it says Johnson's product he
23   estimated 5 percent, and the other 25 percent of the
24   particles to be fibrotic, some of which could be
25   asbestos.
```

59

```
 1        I believe their objection is that it relates to
 2   ovarian tissue, but at no point in this document do
 3   they talk about ovarian cancer.  They just talk about
 4   the findings of talc and asbestos in ovarian tissue.
 5        MS. CLANCY:  Uterine tissue.
 6        MR. SATTERLEY:  Uterine tissue.
 7        THE COURT:  Ms. Steinmann.
 8        MS. STEINMANN:  Your Honor, a couple of things.
 9   The document itself actually says "uterine tissue" on
10   the very first page.  And this is, again, dealing with
11   the Tenovus study, which was solely directed at
12   studying uterine tissue for the development of ovarian
13   cancer and whether it was or was not caused by talcum
14   powder.  That was the subject of an MIL, and we believe
15   that this document is irrelevant and misleading under
16   352.
17        THE COURT:  Can I see the document?
18        MR. SATTERLEY:  Yes, Your Honor.  While I'm
19   handing the document to the Court, while Your Honor did
20   say ovarian cancer should not be discussed, this
21   document never talks about ovarian cancer.
22        THE COURT:  Just let me read it.  163 will be
23   in evidence.
24        (Whereupon, Plaintiff's Exhibit 163 was
25          received into evidence.)
```

60

```
 1        MR. SATTERLEY:  The final -- the final
 2   document --
 3        MS. STEINMANN:  Your Honor, if I could, if it
 4   is coming into evidence, could we just ask -- ask that
 5   the word "uterus" be redacted.
 6        THE COURT:  Oh, I don't think that that's so
 7   prejudicial.
 8        MR. SATTERLEY:  And the final document,
 9   Your Honor, relates to documents already been displayed
10   to the jury in the cross-examination of Alice Blount.
11   This is a 1998 letter from Alice Blount to the attorney
12   for Johnson & Johnson.  It was authenticated by
13   Dr. Blount, and --
14        THE COURT:  What number is it?
15        MR. SATTERLEY:  This is Exhibit 160, and this
16   is April 23, 1998, where she identifies the --
17        THE COURT:  I remember.
18        MR. SATTERLEY:  -- sample.
19        THE COURT:  I remember the testimony.
20        What's the objection to that?
21        MS. STEINMANN:  Your Honor, foundation and
22   hearsay.
23        THE COURT:  Oh, she looked at the letter and
24   said, I sent this to their lawyer.  That will be
25   admitted into evidence.  That's Number 160.
```

61

```
 1        (Whereupon, Plaintiff's Exhibit 160 was
 2          received into evidence.)
 3        MS. STEINMANN:  Your Honor, I also just want to
 4   make sure, I believe that that had been sent with the
 5   Blount records, so I want to make sure that there's not
 6   duplicate copies being submitted.  I didn't have a
 7   chance to cross-reference --
 8        MR. SATTERLEY:  We won't put two copies of the
 9   same things in evidence.  We still have to address the
10   Blount documents later.
11        With that, Your Honor, we're prepared for the
12   jury to come in.
13        THE COURT:  All right.  Is there anything you
14   would like to raise, Mr. Calfo?
15        MR. CALFO:  Nothing, Your Honor.
16        THE COURT:  Nobody else is standing up.  Let's
17   bring the jury in.
18        (Whereupon, the jury having entered the
19   courtroom, the following proceedings were held:)
20        THE COURT:  Good morning, ladies and gentlemen.
21        THE JURY:  Good morning.
22        THE COURT:  Sorry to keep you waiting so long.
23   The record should reflect that all the jurors are in
24   their appropriate seats, counsel are present, and we're
25   ready to proceed.
```

62

1    We are not going back to the video.  You're
2  going to see a witness this morning.
3    Would you please call your next witness,
4  Mr. Satterley.
5    MR. SATTERLEY:  Yes.  Good morning, Your Honor.
6  Good morning, ladies and gentlemen.
7    Dr. William Longo.
8    WILLIAM LONGO, Ph.D. (for the Plaintiff)
9    sworn as a witness,
10    testified as follows:
11    THE CLERK:  Thank you, sir.  Please take a
12  seat.
13    Could you please state your full name and spell
14  it for the record.
15    THE WITNESS:  William Edward Longo, L-o-n-g-o.
16    THE COURT:  Mr. Satterley, you may inquire on
17  direct examination.
18    MR. SATTERLEY:  Thank you.
19  DIRECT EXAMINATION BY MR. SATTERLEY:
20    Q.  Good morning, Dr. Longo.
21    A.  Good morning.
22    Q.  Have we requested you to come talk with the
23  folks here in Alameda County regarding your testing of
24  various talc products for the presence of asbestos?
25    A.  Yes, sir, you did.

63

1    Q.  And have we -- have you brought with you
2  photographic evidence of the testing and testing
3  results of what you found?
4    A.  Yes, I did.
5    Q.  Have I also asked you to analyze the case of
6  Patricia Schmitz with regards to her exposures, the
7  types of exposures she would have, to asbestos from
8  cosmetic talc products?
9    A.  Yes.  That's correct.
10    Q.  Before we get to your specific opinions in this
11  case, let's talk a little bit about you and yourself.
12    Tell us, where did you go to college, college
13  forward as far as your education.
14    A.  I went to the University of Florida.  I
15  received a bachelor's of science in microbiology.  I
16  went on to graduate school in material science and
17  engineering.  I received a master's of science in
18  material science and engineering, and finished up in
19  1983 with a Ph.D. in material science and engineering.
20  All at the University of Florida.
21    Q.  So when I call you "doctor," you're not a
22  medical doctor?
23    A.  No, sir, I'm not.
24    Q.  Tell us about material science.  What is that?
25    A.  It's an engineering field that literally is the

64

1  study of materials, and you can break these materials
2  down to approximately five groups.
3    Plastics or polymers, ceramics or minerals like
4  asbestos, metals, or metallurgy.  And then composites
5  where you may have a polymer that has a metal content
6  of it where they mix two different things.
7    And then an area I spent a lot of time in, in
8  graduate school is biomaterials, things that are
9  implanted into the body like an artificial knee or a
10  hip replacement or an interocular lens if you have
11  cataract surgery.
12    And as a material scientist, we are taught and
13  learn all the properties of these different materials:
14  strength, weaknesses, ability to withstand corrosion or
15  not, and what are the right materials to use for any
16  particular type of engineering project.  For example --
17  and I use this example a lot.  If you're building a new
18  bridge, the new Bay Bridge that went up, a material
19  scientist would have been involved in that.  And he
20  would be the go-between the civil engineer and the
21  mechanical engineer and the engineer who designed that
22  bridge.
23    What is the best concrete?  What are the new
24  types of metal alloys that could be used that are
25  stronger, cheaper, better corrosion resistance.  So a

65

1  material scientist would have been involved in most of
2  those aspects.
3    All your major semiconductor advances over the
4  years has been due to material scientists.  I don't
5  know about now, but the CEO of Intel was a material
6  scientist at one point in the past.
7    So we understand where the products and
8  materials should be used, what kind of temperature --
9  strengths, temperature, resistance, et cetera.  And
10  also as a material scientist, we -- they develop new
11  materials.  Again, the semiconductor advances, the
12  ceramics on the -- that were developed for the space
13  shuttle, the -- even as simple as the changeover, if
14  your result is me, from the metal soda can to the
15  aluminum soda can.  That was a material scientist who
16  came up with that particular aluminum/copper alloy,
17  mixture of two metals, to be able to make that into a
18  one-step process.
19    The last thing material that scientists do a
20  lot about is almost forensic engineering:  What went
21  wrong?  Is there a contaminant here?  Why did this
22  break?  What's in these ingredients that shouldn't be
23  in these ingredients?  Say, a manufacturer is making
24  injection molding of these polyethylene plastic cups
25  and all of a sudden in the field they're not holding up

**66**

1 and they're leaking.

2     The material scientist could probably go in and

3 figure out where in that engineering molding process,

4 is it the right materials, is it the right polymer.

5 And that's what I do at my lab a lot, is the forensic

6 engineering side of things.

7     Q. So let me talk about your lab. You currently

8 have a lab of how many employees?

9     A. We have a lab in Suwanee, Georgia, and

10 currently I think we're up to about 46 employees.

11     Q. And what are the type of professionals work

12 with you in your lab, what type of scientists?

13     A. I have other material scientists like myself.

14 We have physicists. We have inorganic chemists;

15 organic chemists; microbiologists; industrial

16 hygienists; geologists; mineralogists; mechanical

17 engineering; physicists -- I think I may have said

18 that. I think that covers it. Oh, and electron

19 microscopist specialist; polarized light microscopist

20 specialist; and, of course, the support staff, the

21 admin people that really run the company.

22     Q. And with regards to asbestos, how long have

23 you -- have you been involved in the analysis for the

24 presence of asbestos?

25     A. Yes, sir, I have.

**67**

1     Q. For how long?

2     A. A little bit over 30 years.

3     Q. And with regards to asbestos issues, have you

4 made presentations or publications involving asbestos

5 or asbestos exposure?

6     A. I have.

7     Q. Have you tested many different products for the

8 presence of asbestos over the course of your career?

9     A. Yes, sir. Early years myself and also our lab.

10     Q. And approximately how many products or

11 specimens have you examined, you and your laboratory

12 examined, to determine whether asbestos is present or

13 not?

14     A. A large number of different types of products,

15 but just pure numbers of samples, our laboratory is

16 approaching close to 400,000 individual analysis of

17 samples, different samples for asbestos.

18     Q. And some of the testing and testing results

19 have you published in the peer-reviewed literature?

20     A. We have.

21     Q. And have you made presentations regarding your

22 findings of asbestos in some of the samples?

23     A. Yes, sir, we have.

24     Q. And with regards to your professional

25 organizations, what are some of the associations,

**68**

1 organizations you belong to?

2     A. The American Industrial Hygiene Association,

3 the Materials Research Society, the Microscopist

4 Society, the American -- I've said that already.

5 American Industrial Hygiene, the American Society of

6 Testing Materials, the Ceramics Society, Materials and

7 Methods Group. There's a number of them. Adjunct

8 member of the American Conference of Governmental

9 Industrial Hygienists. I'm not an American

10 Industrial -- a Governmental Industrial Hygienist, but

11 you can be an adjunct on to that. And also I am a

12 board certified forensic engineer.

13     Q. Now, with regards to industrial hygiene, you

14 said you're not a member of -- you're not a member of

15 the American Conference of Government Industrial

16 Hygienists?

17     A. No. I'm not a full member. You have to have

18 worked for the government to be an -- as an industrial

19 hygienist, but you can be an adjunct member so you can

20 get the information.

21     Q. Have you reviewed and studied the scientific

22 literature on industrial hygiene about asbestos over

23 the course of your career?

24     A. Yes, I have.

25     Q. And in developing your expertise as a forensic

**69**

1 engineer and material scientist, have you studied

2 exposures to asbestos that occur -- that individuals

3 have occurred historically?

4     A. I have.

5     Q. And have you reviewed those scientific

6 literature in that regard?

7     A. Yes, sir, I have.

8     Q. Do you, Dr. Longo, have specialized knowledge,

9 skill, and experience regarding exposures to asbestos

10 that folks have had based upon your review of the

11 scientific literature?

12     A. Yes, sir.

13     Q. Now, have you -- well, let me ask you about

14 your laboratory. Is your laboratory certified by any

15 organization?

16     A. It is.

17     Q. And what organization has certified your

18 laboratory?

19     A. We're certified by the American -- the American

20 Industrial Hygiene Association for analyzing asbestos

21 air samples. As well as asbestos bulk samples. We're

22 certified by the National Voluntary Laboratory

23 Accreditation Program for the analysis of asbestos by

24 transmission electron microscopy as well as bulk

25 samples by polarized light microscopy.

70

1    We're an International Standards Organization
2  certified for quality control, QC, as well as some
3  specialized testing, including water analysis for
4  asbestos. And we're also certified by O -- by ISO to
5  certify other laboratories that they follow a
6  particular type of analysis or protocol. And we're --
7  also we have -- we're registered laboratory for the --
8  for the FDA. So that we can analyze all types of
9  pharmaceutical-type materials from Schedule 2 on down.
10    We are certified by the DEA to handle those
11  types of products that come into the laboratory.
12  Again, Schedule 2 on down.
13    I guess that covers it, other than individual
14  certifications from groups that come in so that they
15  feel comfortable that when we do work or analysis for
16  them.
17    Q. What type of organizations have you consulted
18  with over the course of your career with regards to
19  testing materials including asbestos?
20    **A. The FAA. We have consulted for the General**
21  **Services Administration, the Environmental Protection**
22  **Agency. NATO in Germany, when the Berlin Wall came**
23  **down, we were asked to analyze to see if that wall had**
24  **asbestos in it.**
25    We have -- we have consulted for the Department

71

1  of Defense; for the U.S. Treasury; for National
2  Institutes of Health; for the CDC, Center for Disease
3  Control; and a number of companies outside this kind of
4  environment where we do problem-solving for them as
5  well as just regular analysis.
6    Q. Now, you're consulting at my request, me and
7  Ms. Clancy's request, in this case.
8    Have you done this in the past where you've
9  testified in cases involving injury and litigation?
10    **A. Yes, I have.**
11    Q. And have you testified at the request of
12  plaintiffs as well as the request of defendants in
13  litigation?
14    **A. I have.**
15    Q. I want to ask you about the ASTM D22. What is
16  that?
17    **A. The American Society of Testing Materials is a**
18  **nonprofit organization, where most anybody can join,**
19  **and it is the largest group out there that develops**
20  **standards or testing for almost anything. There's**
21  **40- -- almost 40,000 members now.**
22    **And the D22 committee, is what I'm a member of**
23  **produces methods -- testing methods which, essentially,**
24  **is just a recipe, go from A to Z, so that labs can**
25  **standardize particular tests for analysis of different**

72

1  **types of matrices -- water, dust, et cetera -- for**
2  **asbestos.**
3    Q. And how long have you been a part of the D22
4  committee or subcommittee?
5    **A. Since approximately 1989 or so.**
6    Q. And did you have any role in leading that
7  committee in the past or being part of leadership of
8  that committee?
9    **A. Not leadership in the committee, but I was**
10  **tasked to being the shepherd or the person to push**
11  **through and write the test method for analyzing dust**
12  **for asbestos, building dust. The -- and I spent six**
13  **years doing that.**
14    Q. Now, with regards to the tools that you use as
15  a material scientist for the identification of
16  asbestos, the jury has already heard last week from Lee
17  Poye about the transmission electron microscope. You
18  utilize that tool?
19    **A. We do.**
20    Q. How many TEMs do you have?
21    **A. Currently, we have four.**
22    Q. And how long have you had specialized
23  knowledge, skill, and experience in utilizing the
24  transmission electron microscope?
25    **A. Over 30 years.**

73

1    Q. The jury has heard about the scanning electron
2  microscope. Do you have a scanning electron
3  microscope?
4    **A. We do.**
5    Q. And how long have you utilized the scanning
6  electron microscope in your laboratory?
7    **A. Over 30 years.**
8    Q. The jury has heard about polarized light
9  microscopes. Do you have polarized light microscopes
10  in your lab?
11    **A. We do.**
12    Q. How many?
13    **A. I think around 10.**
14    Q. And how long has your laboratory utilized
15  polarized light microscopes historically?
16    **A. Over 30 years.**
17    Q. Will you -- do you have specialized knowledge
18  and experience in explaining what is seen under these
19  microscopes and what's identified and how they're
20  characterized? Will you be able to do that -- do that
21  today?
22    **A. Yes, sir, I believe so.**
23    Q. With -- specifically with regard to industrial
24  hygiene, you mentioned that you're a member of the
25  American Industrial Hygiene Association.

**74**

1          How much literature have you looked at with
2  regard to asbestos in terms of exposures over the
3  course of your career?
4      **A. I think the number of published papers I've**
5  **reviewed has to be in the hundreds.**
6      Q. And with regards to your analysis of exposures,
7  do you review and consider historical company
8  documents?
9      **A. Yes, sir, I do.**
10     Q. And specifically in this case, have you
11 reviewed and looked at some of the Johnson & Johnson
12 historical documents regarding asbestos issues?
13     **A. Yes, I have.**
14     Q. And have you specifically looked at some of the
15 Colgate documents regarding asbestos issues?
16     **A. Yes, sir.**
17     Q. And in some of these historical documents --
18 and we'll talk about them a little bit later -- are
19 there technical-type terms mentioned in some of them
20 that you can help explain some of these terms?
21     **A. Yes, sir, I believe so.**
22     Q. The jury's probably heard of some of them, but
23 we -- we may go through some -- some more of those.
24     I asked you about your organizations, and I
25 just want to make sure -- I don't know -- the National

**75**

1  Asbestos Council, were you a member of that
2  organization?
3      **A. Yes, sir, I am.**
4      Q. The Environmental Information Association, are
5  you a member of that organization?
6      **A. Yes, sir, I am.**
7      Q. The Electron --
8      **A. The National Asbestos Council, that morphed**
9  **into the Environmental Information Association.  So**
10 **that's really one group.**
11     Q. Okay.  I see.
12     And then the Electron Microscopy Society
13 association, are you member of that organization?
14     **A. Yes, sir.  Yes, sir.**
15     Q. The Microbeam Analysis Society, are you a
16 member of that organization?
17     **A. That, too.**
18     Q. Are you a member -- have you been a member of
19 the New York Academy of Science?
20     **A. I have been a member in the past.**
21     Q. Have you been a member of the National
22 Institute of Building Sciences?
23     **A. Yes, sir.  I still am.**
24     Q. Have you been a member of the Society for
25 Ultrastructural Pathology?

**76**

1      **A. Yes, sir, I have been.**
2      Q. And in the past, have some of the publications
3  that you've published and been the co-author been on
4  asbestos issues with pathologists?
5      **A. Yes.**
6      Q. Okay.  Does your laboratory -- in addition to
7  looking at products, has your laboratory looked at
8  tissue, human tissue, for asbestos, the presence of
9  asbestos?
10     **A. We have.**
11     Q. The American College of Forensic Examiners, are
12 you a member of that organization?
13     **A. Yes, sir.  That's actually the one I'm board**
14 **certified in and now have have been made -- been elected to**
15 **be a diplomat in that organization.**
16     Q. And have you -- specifically with regard to
17 talc and exposures from talc, have you studied the
18 scientific literature from an exposure perspective to
19 form the basis of your opinions here today?
20     **A. Yes.**
21     MR. SATTERLEY:  Your Honor, at this time, I
22 would offer Dr. Longo as an expert in material science,
23 asbestos testing, and exposure.
24     THE COURT:  Mr. Calfo, do you wish to inquire
25 of this witness on his qualifications?

**77**

1      MR. CALFO:  Your Honor, we'll reserve our
2  questioning for later.
3      THE COURT:  Mr. Mularczyk?
4      MR. MULARCZYK:  No questioning at this time,
5  Your Honor.
6      THE COURT:  All right.
7      Ladies and gentlemen, this witness will be
8  certified as an expert in material science, forensic
9  engineering, testing for asbestos, and exposure to
10 asbestos.
11     During this trial, you will hear testimony from
12 expert witnesses. The law allows an expert to state
13 opinions about matters in his or her field of expertise
14 even if he or she does not witness any of the events
15 involved in the trial.
16     You do not have to accept an expert's opinion.
17 As with any other witness it is up to you to decide
18 whether you believe the expert's testimony and choose
19 to use it as a basis for your decision.  You may
20 believe all, part, or none of an expert's testimony.
21     In deciding whether to believe an expert's
22 testimony, you should consider the expert's training
23 and experience, the facts that the expert relied on,
24 the reasons for the expert's opinion.
25     The law allows expert witnesses to be asked

**78**

1 questions that are based on assumed facts. These are
2 sometimes called hypothetical questions.
3         In determining the weight to give to the
4 expert's opinion that is based on assumed facts, you
5 should consider whether the assumed facts are true.
6         If expert witnesses disagree with one another,
7 you should weigh each opinion against the others. You
8 should examine the reasons given for each opinion and
9 the facts or other matters that each witness relied
10 upon. You may also compare the experts'
11 qualifications.
12        With that in mind, Mr. Satterley, you may
13 inquire on direct examination.
14        MR. SATTERLEY: Thank you, Your Honor.
15 BY MR. SATTERLEY:
16   Q. Dr. Longo, I'll jump to the -- your opinions
17 first. Then we are going to backtrack and go through a
18 lot of the bases for your opinions.
19        Do you have an opinion, Dr. Longo, based upon
20 everything you've looked at -- internal company
21 documents, historical documents, the scientific
22 literature, all the testing that you've done -- whether
23 or not Johnson & Johnson Baby Powder historically has
24 included asbestos as a part of it?
25   **A. I do have an opinion.**

**79**

1   Q. And what is your opinion?
2   **A. That it does.**
3   Q. Do you have an opinion, Dr. Longo, based upon
4 historical review of company documents, your review of
5 the scientific literature, your own -- your
6 laboratory's own testing of Cashmere Bouquet product,
7 whether the Cashmere Bouquet historically has included
8 asbestos as a part of it?
9        MR. MULARCZYK: Objection. Foundation.
10        THE COURT: It's overruled.
11        THE WITNESS: Yes, I do have an opinion.
12 BY MR. SATTERLEY:
13   Q. And what is your opinion?
14   **A. That that product does.**
15   Q. And with regards to this case, did you evaluate
16 Ms. Schmitz' exposure to those products, both Johnson &
17 Johnson Baby Powder and Cashmere Bouquet?
18   **A. Yes, I did.**
19   Q. And have you reviewed testimony of her and her
20 sisters that was given under oath with the attorneys
21 for these companies?
22   **A. Yes.**
23   Q. And have you developed an opinion or formed an
24 opinion with regards to her exposures to asbestos from
25 these products?

**80**

1   **A. Yes, I did.**
2   Q. And what is your opinion?
3   **A. That she was exposed to asbestos from the use**
4 **of these two manufacturers' products.**
5   Q. And did you issue a signed report with your
6 calculations regarding the exposures she had?
7   **A. I did.**
8   Q. And in your opinion, based upon her many years
9 of use of these products and being around the products
10 when her family members were using them, do you have an
11 opinion whether those exposures was a substantial
12 exposure to asbestos from their products?
13        MR. MULARCZYK: Objection. Foundation.
14        THE COURT: Sustained.
15 BY MR. SATTERLEY:
16   Q. We'll go through the math in a little bit.
17        With regards to Johnson & Johnson -- let's
18 start with Johnson & Johnson -- have you reviewed
19 historical documents with regards to their testing,
20 testing done by laboratories at their request?
21   **A. Yes.**
22   Q. And with regards to Colgate-Palmolive, have you
23 reviewed testing by laboratories of the Cashmere
24 Bouquet product for the presence of asbestos?
25   **A. Yes.**

**81**

1   Q. And based upon your review of the historical
2 documents, do you have an opinion whether it was
3 documented back in the 19- -- with regards to Johnson &
4 Johnson first, back in the 1960s and the 1970s,
5 asbestos being present?
6        MR. CALFO: Objection, Your Honor. No
7 foundation for this witness.
8        MR. MULARCZYK: And hearsay, Your Honor.
9        THE COURT: Overruled on both.
10        THE WITNESS: Yes, I do have an opinion.
11 BY MR. SATTERLEY:
12   Q. And with -- and with --
13   **A. That it is -- that it does.**
14   Q. What is your opinion?
15   **A. The opinion is that it does.**
16   Q. Okay. And we'll go through some of the
17 documents here in a little bit.
18        With regards to Colgate-Palmolive, once again,
19 did you look at the historical documents in the 1970s,
20 '80s, and '90s regarding the Cashmere Bouquet product?
21   **A. Yes, sir.**
22   Q. And based upon your review of the historical
23 documents of the Cashmere Bouquet product, was it
24 documented in the '70s, '80s, '90s and forth -- so
25 forth, the presence of asbestos?

Page 82 to 85 of 934
Case 3:16-md-02738-MAS-RLS    Document 33132-2    Filed 08/23/24    Page 357 of 1320    22 of 85 sheets
PageID: 249352

82

```
 1        MR. MULARCZYK:  Same objections, Your Honor.
 2        THE COURT:  It's overruled.
 3        THE WITNESS:  Yes, it was.
 4   BY MR. SATTERLEY:
 5        Q. First of all, I want to -- I want to ask you a
 6   question -- a few questions.  Counsel --
 7        Oh, there it is.  That's what I was looking for
 8   right there.
 9        Counsel for Johnson & Johnson told the folks on
10   the jury that you personally have made $30 million
11   working for plaintiffs' lawyers.
12        Is that true?
13        MR. CALFO:  Objection, Your Honor.  Misstates
14   opening statement.  I said the company did.
15        MR. SATTERLEY:  I disagree.
16        THE COURT:  It's overruled.  The jury will --
17        THE WITNESS:  No, I have not made $30 million
18   working for plaintiffs' attorneys personally.
19   BY MR. SATTERLEY:
20        Q. You and your company, the company you work for,
21   MAS, that's --
22        You're the president of the company; correct?
23        A. Yes, I am.
24        Q. Okay.  Is it -- it is true, though, over the
25   course of 30-some-odd years you've charged for your
```

83

```
 1   time in litigation to both plaintiffs -- plaintiffs and
 2   defendants in these forensic situations?
 3        A. Yes, I have.
 4        Q. And would it be fair to say, over 30-some-odd
 5   years, you have charged -- your company has charged
 6   both for your time and all the other folks working --
 7   involved in forensic issues, litigation issues, well
 8   over $30 million?
 9        A. My time; other individuals that have testified;
10   all the testing we did over the years, especially in
11   the property damage litigation, where we did forensic
12   engineering to identify the products, that would be
13   fair.  That's what our company has billed over
14   30 years.
15        Q. With regards to advertising, a Johnson &
16   Johnson lawyer told the folks on the jury that you
17   started advertising for plaintiffs' lawyers -- to get
18   plaintiffs' cases 30-some-odd years ago.
19        Is that true?
20        A. That is not true.
21        Q. We've marked for identification purposes
22   Exhibit 1099.  And if I could --
23        It's okay.
24        Let's see.  Is the projector on?
25        May I approach, Your Honor?
```

84

```
 1        THE COURT:  You may.
 2   BY MR. SATTERLEY:
 3        Q. I'm handing you, Dr. Longo, Exhibit 1095.  I
 4   shared it with counsel previously, another copy,
 5   courtesy copy --
 6        THE COURT:  Is it 1095 or 1099?
 7        MR. SATTERLEY:  1099, Your Honor.
 8        -- another courtesy copy.
 9   BY MR. SATTERLEY:
10        Q. Is this a journal called *Asbestos Issues*, dated
11   June 1990?
12        A. It is.
13        Q. And by this point in time --
14        If I can figure out how to... there we go.
15        By this point in time, 1990, were you
16   already -- did you already have specialized skill on
17   utilizing the transmission electron microscope?
18        A. Yes, sir.
19        Q. And did you already consider yourself to be an
20   expert on utilizing the transmission electron
21   microscope?
22        A. Yes.  I had spent a lot of time, especially in
23   graduate school, as well as in my career at that point,
24   dealing with interpreting, analyzing samples on the
25   transmission electron microscope.
```

85

```
 1        Q. It says in this 1990, "Asbestos management
 2   strategies for new era building owners."
 3        Did your company place an ad in this -- in this
 4   journal?
 5        A. We did.
 6        Q. And did this journal relate to building issues?
 7        A. Yes, sir.
 8        Q. All right.  And is this the advertisement that
 9   was placed in this journal in 1990?
10        A. It was.
11        Q. Does this in any way relate to you trying to
12   get business from mesothelioma victims so you can
13   testify in a courtroom like this?
14        A. No, not at all.
15        Q. If somebody were to say this ad right here
16   proves that you were trying to be an expert for people
17   suffering from asbestos disease, would that be
18   accurate?
19        A. No, sir.
20        Q. The person in the ad with -- this is you over
21   here on the right; correct?
22        A. Yes.  I've hardly aged at all.
23        Q. Okay.
24        A. Yes, that's me.
25        Q. Okay.  And this fellow on the left, who's that?
```

86

1    A. That's Mr. George Yamate.

2    Q. Who is George Yamate?

3    A. George Yamate is the author of the TEM
4 protocol -- and you may hear something about it --
5 typically called the Level 1, Level 2, Level 3
6 analysis. There was a draft method issued in the early
7 1980s or so for the EPA, and it's still a widely used
8 protocol, especially Level 2, in our industry. And
9 George Yamate was the author of that.

10    Q. I want to show you this part right here.
11 It's -- it's hard to read. I've got it blown up here.
12 I showed it to counsel.

13        First of all, it says on here, "final clearance
14 lab," "the final clearance lab." What does "the final
15 clearance" mean?

16    A. Final clearance in this industry is that when
17 there is an abatement of removing asbestos, especially
18 in schools, there's a requirement that they do a final
19 air clearance, which means that once the contractor
20 says, "Yes, we're all done. We got all the asbestos
21 out. Everything is clean. There's no asbestos dust
22 left in this area that we did this in containment" --
23 final air clearance would involve going in and taking
24 air samples while the consultant uses a leaf blower at
25 a hundred miles an hour to disturb any dust that may be

87

1 laying anywhere to see if there's asbestos present
2 before you let the kids back in the school.

3        That's final air clearance, and it's sort of a
4 term now of art that everybody uses. "Yes, we've got
5 some final air clearance samples coming," we know
6 exactly what that is. And that's what we were
7 advertising for.

8    Q. This paragraph here, it says, "Professional
9 asbestos consultants and contractors know that when the
10 job demands the best final air clearance testing by
11 TEM, you go to the people whose rigorous in-house
12 quality control measures produce TEM results and
13 professional support that stands up to the toughest
14 tests you may face."

15        That was included; correct?

16    A. Yes, sir.

17    Q. And you -- had you and Mr. Yamate in a
18 courtroom somewhere in Georgia; right?

19    A. Yes, it was. It was in rural Georgia, and we
20 took this ad in the courtroom to say that "If you use
21 our laboratory and somebody challenges your final air
22 clearance, saying, 'Oh, it's not really clean,' or 'You
23 should have did this,' we would come in and defend our
24 data. We would" -- "If it goes to court, we would be
25 working for you, saying, 'No, this is what the' --

88

1 'This is the analysis we did, and it's correct.'"

2        That's what that ad was about.

3    Q. And the folks that would be hiring you for this
4 would be building owners or contractors, people doing
5 asbestos abatement?

6    A. Yes, sir.

7    Q. Okay. This had absolutely nothing to do with
8 talc issues?

9    A. No.

10    Q. Had nothing to do with mesothelioma victims?

11    A. No.

12    Q. Had nothing to do with plaintiff lawyers or
13 anything like that?

14    A. No, sir.

15    Q. Now I want to switch gears and talk about
16 testing and testing methods. Tell us about the
17 strengths of utilizing transmission electron microscope
18 for the identification of asbestos.

19    A. Its strengths are that it's the most sensitive
20 method out there in that it can detect single asbestos
21 fibers and fully characterize them in that if you see a
22 single small fiber, you can get the chemistry of it,
23 utilizing EDXA, or the energy dispersive x-ray. So you
24 can do microchemistry.

25        You get crystalline structure information

89

1 by doing the diffraction patterns. I know Mr. Poye
2 probably went through all that when he was here,
3 diffraction patterns.

4        And it allows you to take photographs of these
5 micro- -- these -- these microscopic fibers.

6        And so if you have something there, you can
7 fully characterize it. So it still is the most
8 sensitive method for this type of analysis.

9    Q. I want to show you what's already in evidence,
10 Exhibit 326. This is 1974, January 3rd.

11        MR. SATTERLEY: May I approach, Your Honor?

12        THE COURT: You may.

13 BY MR. SATTERLEY:

14    Q. January 3, 1974, on Johnson & Johnson
15 letterhead. And you've seen this in the past and
16 considered this; correct?

17    A. I have.

18    Q. And this is from A.J. Goudie to Dr. Gaughran
19 and Dr. Shelley, "Purchase of a transmission electron
20 microscope plus attachments."

21        Do you see that?

22    A. I do.

23    Q. And Dr. Goudie says, "Over the past three
24 years, there seems to have been general agreement that
25 transmission electron microscope is the only absolute

90

1  proof with electron diffraction for the identification
2  of asbestos in talc."
3      Do you agree with the statement that was said
4  in 1974?
5  A. Yes and no.  I would agree, in 1974, that was
6  the absolute best instrument to use, but only for the
7  positive identification.
8      The "no" part is, it's not -- if you don't see
9  asbestos by TEM using that at the time, it doesn't mean
10 that there's no asbestos present.  It just means you
11 didn't detect it.
12     So, yes, it is the most -- at that time, it was
13 the best method to use for absolute identification.
14     THE COURT:  Mr. Satterley, if you're moving on
15 to something else, would you please identify the
16 document that you have on the screen by the exhibit
17 number.
18     MR. SATTERLEY:  I apologize, Your Honor.  I
19 thought I did.  326.
20     THE COURT:  All right.
21     MR. SATTERLEY:  I apologize.
22     The next document that's already into evidence,
23 Exhibit 238.  And may I approach again, Your Honor?
24     THE COURT:  You may.
25 BY MR. SATTERLEY:

92

1      "Such a method has been developed, and it" --
2  "it is described in this report."
3      Have you considered this document in your
4  analysis of what's known as the concentration method?
5  A. I have.
6  Q. And based upon this document and many other
7  documents, was the concentration method a method that
8  was discussed within Johnson & Johnson way back in the
9  1970s?
10 A. Yes, sir, it was.  Early '70s.
11 Q. And I would like to show you another document
12 that you -- I believe you considered.
13     This is Exhibit 329.  It's already into
14 evidence.  It's dated June 3, 1973, on Johnson &
15 Johnson letterhead.
16     And do you see it's signed off by
17 Dr. D.R. Petterson?
18 A. I can't see who it's signed off by on --
19 Q. The name at the bottom -- oh, I'm sorry.
20     MR. SATTERLEY:  May I approach, Your Honor, and
21 hand the witness -- I apologize.
22     THE WITNESS:  I believe you're correct, but I
23 just wanted to check.
24 BY MR. SATTERLEY:
25 Q. Thanks for helping me out there.  All right.

91

1  Q. This is March 1974, a confidential Johnson &
2  Johnson memorandum.
3      MR. SATTERLEY:  I provided a copy to counsel.
4  Another copy.
5  BY MR. SATTERLEY:
6  Q. And flip over to the second page, page 2.
7      To put this into context, on the first page,
8  does it say it's -- it's to the Windsor Minerals,
9  Windsor, Vermont, from R.C. Reynolds, Dartmouth
10 College?
11     Do you see that on the first page?
12 A. Yes, sir, I do.
13 Q. And this -- "Subject:  Analysis of talc
14 products and ores for asbestiform amphiboles"?
15 A. Yes, sir.
16 Q. And on the second page, it says, where I've
17 highlighted here on Exhibit 238, "For the reasons
18 described above, a concentration technique is
19 mandatory" --
20     MR. SATTERLEY:  I apologize, Your Honor.
21 Mrs. Schmitz.
22     -- "for the reasons described above, a
23 concentration technique is mandatory because it brings
24 the amphiboles into a reasonable concentration range
25 for optical or other methods of analysis.

93

1      You see now, Doctor, that -- D.R. Petterson's
2  name at the bottom?
3  A. I do.
4  Q. And it's carbon-copied to W. Ashton?
5  A. Yes, sir.
6  Q. And have you considered many documents from
7  Bill Ashton, or William Ashton, historically with
8  regard to Johnson & Johnson?
9  A. Yes, sir.
10 Q. And it says in -- it says in the third
11 paragraph -- it says, "Note the use of the
12 concentration technique is the drafted specification
13 for the analysis of asbestos.
14     "Also, I have discussed with Shelley that the
15 samples to be sent by Dr. Rolle will be on 20 recent
16 samples of powder in which we found no
17 tremolite/actinolite by optical technique."
18     I want to stop right there and ask you to
19 explain the optical technique and why you would analyze
20 using a concentration technique if there are no
21 tremolite or actinolite identified.
22 A. The optical technique is using polarized light
23 microscopy, and that is a very good technique as long
24 as the amount of asbestos in there is high enough for
25 it to detect.

94

 1      Every analytical method has an analytical
 2  sensitivity/detection limit, where the analyte -- and
 3  we all call it analytes -- the asbestos is at a
 4  concentration still in there but lower than the optical
 5  microscope can detect.  You say it's nondetect.
 6      So in order to increase the ability to detect
 7  it or get a better analytical sensitivity, you go to
 8  the concentration method, which is -- literally, you're
 9  looking for needles in a haystack.  That might take you
10  a long time.  You may miss them.
11      If you get rid of the hay and just look for the
12  needles, because the needles are all now concentrated,
13  you can come back and say, "Yes, there are all these
14  needles in the haystack.  I just couldn't see them
15  before because there was so much hay, I had to weed
16  through."
17      And that's what the concentration does.
18      Q.  Is the concentration method a preparation
19  method that's done before you put it onto the filter
20  before it goes into the microscope itself?
21      **A.  Yes, sir.  That's a good point.**
22      These techniques -- polarized light microscopy,
23  XRD, x-ray diffraction, and especially transmission
24  electron microscopy -- it's all about the sample
25  preparation and how good a job you do and how you

95

 1  concentrate it, how you put it together before it goes
 2  into what we call tools.
 3      Because the analytical transmission electron
 4  microscope is just going to give you the same
 5  information that it would give you no matter what.
 6  It's all about sample preparation.
 7      So you prepare the sample in a way that gives
 8  the best opportunity to see if you can detect the
 9  asbestos at the lower -- the best analytical
10  sensitivity you can.  That's all done before you get to
11  the electron microscope.
12      All these techniques, it's all about sample
13  preparation.
14      Q.  And with regards to the presence of platy talc,
15  if you prepare a sample where it has lots of platy talc
16  on it, will that -- does that potentially obstruct the
17  analyst's ability to see the asbestos materials?
18      **A.  Yes.  You're covering it up, especially in the**
19  **transmission electron microscope, or the TEM --**
20  **everybody calls it TEM.**
21      **If I have an asbestos fiber here and I have a**
22  **platy talc on top of it -- we're imaging by using an**
23  **electron beam, which goes real good for resolution, but**
24  **it only has so much strength.  So it can't go through**
25  **stuff that builds up.**

96

 1      So if here's my asbestos fiber and I have a
 2  platy talc here, I go, "Okay.  Well, I can see it."
 3  But if I start getting more and more platy talc on here
 4  because it's so concentrated with it, pretty soon, it's
 5  like that.  You can't find it, no matter how much you
 6  look for it, TEM, if you have too many talc particles
 7  in there.
 8      Good analogy is that I have a big bowl of
 9  spaghetti, and there's a couple of meatballs in there,
10  and I'm just looking at the bowl, and I can't see them.
11  But if I take it and spread it out or I get rid of the
12  spaghetti, the meatballs stand right out.
13      And -- and that's with both polarized light
14  microscope and especially with TEM.  If you have too
15  much talc in there, you can't see the asbestos fibers.
16      So what they used to do -- or still -- people
17  still do it -- is, they dilute the sample to spread all
18  that talc out so that you can find the asbestos fibers.
19  But if you dilute the talc particles, you're diluting
20  the asbestos fibers, too.  So now I'm spreading it out
21  and making it harder and harder to find something if
22  it's present.
23      If I use the concentration method, I get the
24  talc out of there, and I can concentrate the asbestos
25  down, better opportunity to see if it's really

97

 1  positive, detectable or not.
 2      Q.  This 1974 Johnson & Johnson document says,
 3  "Shelley reports that Pooley" -- you know who
 4  Dr. Pooley is?
 5      **A.  Yes, sir, I do.**
 6      Q.  -- "that Pooley has found actinolite in our
 7  Vermont talc by his concentration technique.  Italian
 8  talc by the same technique appears to be free of
 9  amphiboles.  I have sent the report referred to
10  I.W. Sloan on to Roger Miller for their study."
11      Do you see that?
12      **A.  Yes, sir.**
13      Q.  Is this one example in 1973 of the use of the
14  concentration method by analysts finding asbestos that
15  they otherwise would not find by optical microscope?
16      **A.  That is correct.**
17      Q.  One other exhibit and then I want to talk -- I
18  want to show the animation on the heavy liquid
19  separation.
20      This is Exhibit 330.
21      MR. SATTERLEY:  May I approach, Your Honor?
22      THE COURT:  Yes, you may.
23      MR. SATTERLEY:  It's already into evidence.
24  BY MR. SATTERLEY:
25      Q.  This is November 26, 1974, on Johnson & Johnson

**98**

1  letterhead.  And it, Dr. Longo, is signed by a --
2  signature on the second page, John P. Schelz --
3  S-c-h-e-l-z.
4         Do you see that?
5  A. Yes, sir, I do.
6  Q. Is this a document you considered in
7  formulating your opinions in analyzing this case?
8  A. Yes.
9  Q. And it says, "It's a review of experimental
10  techniques for the concentration of asbestos minerals
11  in talc, Project Number 0503-00."
12         Do you see that?
13  A. I do.
14  Q. It says, "Our preliminary investigation of
15  experimental technique for the concentration of
16  asbestos minerals in talc has been in two areas:"  And
17  then they have a whole section on -- at the top.
18         Do you see that?
19  A. I do.
20  Q. And Dr. Fred Pooley is referenced there.
21  A. Yes, sir, he is.
22  Q. And I want to focus on the second.
23         It says, "The concentration of
24  actinolite/tremolite" -- by the way, actinolite and
25  tremolite, is that a form of asbestos?

**99**

1  A. It is.
2  Q. And we'll show photographs.
3         Have you seen actinolite/tremolite asbestos
4  under your microscopes?
5  A. We have.
6  Q. And have you taken photographs of them and
7  demonstrated for the presence of talc?
8  A. Yes, sir.
9  Q. It says, "The concentration of actinolite,
10  tremolite, and chrysotile from talc by individual heavy
11  liquid separation technique developed by Dr. Robert
12  Reynolds, Dartmouth College.  Dr. Reynolds of the
13  Department of Earth Science has been requested by
14  Mr. V. Zeitz" --
15         You know Vernon Zeitz?  You know that name?
16  A. I've have see it on documents.
17  Q. -- "of Windsor Materials (sic) to work on the
18  actinolite concentration technique.  This method
19  utilizes the difference in densities between actinolite
20  and other amphiboles and talc to effect separation in a
21  heavy liquid medium."
22         Do you see that?
23  A. I do.
24  Q. Is that what's sometimes referred to as the
25  heavy liquid separation?

**100**

1  A. It is.
2  Q. So when we talk concentration and we talk heavy
3  liquid separation, are we basically talking about the
4  same process?
5  A. It is the same process, but you can concentrate
6  by other methods for other things, like if you're --
7  it's calcium carbonate and -- you can dissolve out the
8  calcium carbonate with a slight acid solution.  That's
9  not what we're dealing with here.  They're all
10  concentration methods, but this one uses liquid that is
11  heavier density than, say, water, to cause things to
12  sink versus causing things to float.
13         Amphibole asbestos will sink, the talc will
14  float because of their different densities.
15  Q. It says, "Following Dr. Reynold's procedure, we
16  have been able to detect tremolite by optical
17  microscopy dispersion staining in the separated
18  fraction from a sample containing initially as little
19  as 0.01 percent by weight tremolite in Vermont talc."
20         And I want -- and I want to ask you:  The
21  separation process, can be utilized by both the TEM and
22  by a regular microscope?
23  A. Yes, sir.
24  Q. Okay.  And can -- can the separation method
25  be -- once it's separated and prepped out, can it be

**101**

1  looked under what's called a "PLM," a polarized light
2  microscope?
3  A. Yes, it can.
4  Q. Now I want to switch gears and talk about the
5  animation.  And this is Exhibit 1047 for demonstrative
6  purposes only.
7         Have you in the past, Dr. Longo -- well, did
8  you actually assist in the preparation of this
9  animation?
10  A. I did.
11  Q. And you told me and my graphics people how
12  to -- how the heavy liquid separation process occurred?
13  A. Yes.
14  Q. And let me --
15         Does this heavy liquid separation animation
16  truly -- accurately demonstrate the process of heavy
17  liquid separation?
18  A. It does.
19  Q. And as we see this animation perceived through,
20  if you can talk us through what -- what's happening?
21  A. Here's the centrifuge tube.  You have talc in
22  the bottom.  And then you're putting a heavy liquid
23  density material in there so that you can separate the
24  talc from any potential amphiboles that might be
25  present.  So you shake it up and get the talc

**102**

1  distributed through there and put it in a centrifuge
2  where you're spinning it anywhere from 7,000 to
3  9,000 rpm.  After you're done, you'll have a talc plug
4  at the top, since it floats, and most of your
5  amphibole -- potential amphibole asbestos minerals will
6  come to the bottom of the centrifuge tube.
7        Once that happens, you can remove the tip.  We
8  use a technique by flash freezing the centrifuge tube
9  in liquid nitrogen and using sort of a guillotine-type
10 apparatus to just cut the tip off, and then put that in
11 solution, filter it, and then analyze it.
12       We normally use 30 milligrams of talc when we
13 do this.  And we can put the entire amount of the
14 collected material on a TEM filter.
15       If you use 30 milligrams of talc and filtered
16 that on to a TEM filter without doing this, the sample
17 would be black.  It would be so thick the electron
18 beams can't go through the sample.  You would never be
19 able to do that.
20       So this increases the sensitivity almost
21 10,000 times for the finding of potential amphibole
22 asbestos.
23    Q.  Have you utilized, you and your laboratory,
24 utilized the heavy liquid separation technique with
25 regards to samples of Johnson & Johnson, historical

**104**

1  concentration method, did you and your laboratory find
2  asbestos in the Colgate Cashmere Bouquet products that
3  you tested?
4     A.  Yes, we did.
5     Q.  And did you -- did I specifically send -- ask
6  you to have someone from your lab go to the RJ Lee
7  Group to pick up Cashmere Bouquet samples?
8     A.  Yes.
9     Q.  And one of your analysts named Zach, did he go
10 up to Pittsburgh, or around Pittsburgh, to get the
11 Cashmere Bouquet samples with the -- that was with the
12 RJ Lee Group?
13    A.  Yes, he did.
14    Q.  And do you -- did you guys have a chain of
15 custody and document what was -- what was a part of
16 that Cashmere Bouquet product?
17    A.  Yes, sir.
18    Q.  We'll talk about that in a little bit.
19       Oh, did you find -- did you analyze 20 samples
20 from the samples you received?
21    A.  Yes.
22    Q.  And of the 20 samples of Cashmere Bouquet,
23 historic Cashmere Bouquet, that you analyzed in your
24 laboratory, how many of them had asbestos in them?
25    A.  All of them.

**103**

1  samples provided by Johnson & Johnson, for preparation
2  in this case?
3     A.  Yes, I have.
4     Q.  Have you, you and your laboratory, analyzed
5  Cashmere Bouquet utilizing the heavy liquid separation
6  for the identification of asbestos?
7     A.  Yes, we have.
8     Q.  And have you issued reports and photographs and
9  documented asbestos after utilizing the heavy liquid
10 separation?
11    A.  Yes.
12    Q.  Have you and your laboratory utilizing heavy
13 liquid separation preparation and utilize that under a
14 transmission electron microscope?
15    A.  Yes, we have.
16    Q.  Have you utilized the heavy liquid separation
17 for -- have you utilized the heavy liquid separation
18 specifically regarding Cashmere Bouquet under a
19 polarized light microscope?
20    A.  Yes.
21    Q.  And will -- a little bit later will you be able
22 to demonstrate the photographs and what's represented
23 in the photographs?
24    A.  Yes.
25    Q.  Using the heavy liquid separation, the

**105**

1     Q.  All 20?
2     A.  Yes, sir.
3     Q.  This next exhibit that's in evidence, 251.
4        MR. SATTERLEY:  May I approach, Your Honor?
5        THE COURT:  You may.
6  BY MR. SATTERLEY:
7     Q.  This is dated November 24, 1976.  This is by
8  Mr. Ashton to Mr. Lee.  Once again, it's Exhibit 251.
9        Is this a document you've considered in
10 analyzing this case?
11    A.  Yes, I have.
12    Q.  And it's signed off by Mr. Ashton, and it's
13 copied to Dr. Semple and Dr. Petterson on Johnson &
14 Johnson letterhead there.
15       And it says -- in 1976 to Mr. George Lee,
16 "Attached is a copy of a disturbing proposal request
17 which the FDA has currently made available to qualified
18 bidders.  The scope of the work is the separation of
19 asbestos in foods, drugs, and talc for identification
20 and determination.  I find this proposal more
21 disturbing than other proposals up to now because it
22 aims at separation and isolation of asbestos from a
23 wide scope of products and animal tissues.  Up to now,
24 our main problems have had to do with the
25 identification, whereas, now it looks like the FDA is

**106**

1  getting into the separation and isolation methodology
2  which will mean concentration procedures.  As I have
3  pointed out many times, there are many talcs on all
4  markets which will be hard-pressed in supporting purity
5  claims when ultra-sophisticated assay separation and
6  isolation techniques are applied.  Chances are that the
7  FDA proposal will open up the" -- "open up new problem
8  areas with asbestos and talc minerals."
9      Is that the process by which you utilize on the
10  talcs that you analyzed that we're going to talk about
11  later?
12     **A.** Yes, it is.
13     **Q.** Does that isolation and separation of asbestos
14  from talc allow you to see under the microscope the
15  asbestos that was present?
16     **A.** Yes, it did.
17     **Q.** And have you also, Dr. Longo, had talc samples
18  analyzed by other techniques like XRD or optical
19  microscope analysis where no asbestos was present but
20  then you looked at it by TEM and asbestos would be
21  present?
22     **A.  Correct.  The XRD would be nondetectable.**
23  **Regular PLM nondetectable in some cases.  Some cases**
24  **you do find it by regular PLM.  Where the TEM or the --**
25  **using heavy concentration method or PLM heavy**

**107**

1  **concentration method had the highest percentage of**
2  **positives where the other techniques on the same sample**
3  **were negative.**
4      **Q.** Based upon your analysis of all -- all aspects
5  of this case, did the FDA ever adopt or require the
6  isolation and separation method and require folks to
7  utilize this to find asbestos in talc?
8      **A.  No.  They never -- they never finalized that.**
9      **Q.** The next document, before our mid-morning
10  break, Exhibit 234.
11     MR. SATTERLEY:  May I approach, Your Honor?
12     THE COURT:  You may.
13     MR. SATTERLEY:  It's already into evidence.
14  Provide a copy to counsel.  This is entitled,
15  Exhibit 234, "Proposed Specs for Analyzing Talcs for
16  Asbestos."
17     And the first page is dated May 16, 1973.  And
18  this is on Johnson & Johnson letterhead; correct?
19     **A.** It is.
20     **Q.** And just to put it into context, this is signed
21  off by Tom Shelley and carbon-copied to a number of
22  other people, including Dr. Fuller, Dr. Goudie,
23  Dr. Nashed, and Dr. Petterson; correct?
24     **A.  That is correct.**
25     **Q.** And he says, with regards to the third

**108**

1  paragraph, "England is considering method of
2  preconcentrating the asbestos so as to be able to
3  analyze by x-ray.  They find no asbestos by doing this
4  with Italian talc.  They find, Pooley, 0.05 percent of
5  a tremolite type in Vermont."
6      Is that a document you considered in coming to
7  your opinions in this case?
8      **A.** It is.
9      **Q.** And did you find asbestos in Vermont talcs?
10     MR. CALFO:  Objection.  There's no foundation
11  for that from this document, Your Honor.
12     MR. SATTERLEY:  I'm asking a separate question.
13     THE COURT:  He asked whether he found it.
14     THE WITNESS:  We have.
15  BY MR. SATTERLEY:
16     **Q.** If we flip over to page 2, under the Pooley
17  method, talking about the -- the preconcentration of
18  asbestos followed by x-ray diffraction analysis.
19     Now, this -- they called this the "Pooley
20  method" here.  It says, "This technique has not been
21  written up yet, but evidently when applied to Vermont
22  talc, 0.05 percent of tremolite talc is found.  The
23  limitation of this method is that it may be too
24  sensitive."
25     Do you see that?

**109**

1      **A.** I do.
2      **Q.** And from a material standpoint -- from a
3  material science standpoint, do you find that the
4  analytical -- the heavy liquid separation is too
5  sensitive?
6      **A.  No.  Saying something is too sensitive in the**
7  **analytical world makes no sense.  You're always**
8  **striving to get better and better detection limits to**
9  **be able to fully characterize.  That's how all progress**
10  **is made through the years in analytical equipment:**
11  **making it better, more sensitive so you can get the**
12  **information.  Now, what you do with that information**
13  **may or may not use it, but -- it's just something that**
14  **is foreign to our -- to me that you would say some**
15  **analytical method is too sensitive.**
16     MR. SATTERLEY:  Your Honor, it may be a good
17  time for the mid-morning break.
18     THE COURT:  What time is it?  It's 10:30.
19     MR. SATTERLEY:  Is that okay?
20     THE COURT:  Sure.  We will take our mid-morning
21  break.  Come back in 15 minutes.
22     Please remember the admonition that it is your
23  duty as jurors not to converse amongst yourselves or
24  with anyone else on any subject connected with the
25  trial or to form or express any opinion thereon until

29 of 85 sheets    Case 3:16-md-02738-MAS-RLS    Document 33132-2    Filed 08/23/24    Page 364 of 1320
Page 110 to 113 of 334
PageID: 249359

**110**

1  the matter is submitted to you.

2          Enjoy your break.

3          (Whereupon, the jury having exited the

4  courtroom, the following proceedings were held:)

5          THE COURT:  The record will reflect the jurors

6  have departed the courtroom.

7          Is there anything we need to put on the record?

8          MR. SATTERLEY:  Nothing from the plaintiff,

9  Your Honor.

10         MR. CALFO:  No, Your Honor.

11         THE COURT:  Enjoy your break.

12         MR. MULARCZYK:  Thank you, Your Honor.

13         (Recess taken.)

14         (Whereupon, the following proceedings were held

15  outside the presence of the jury:)

16         MR. SATTERLEY:  We want -- we'd like to put

17  Your Honor on notice that we've agreed that I've met

18  and conferred with counsel that I'm going to use two

19  scales as demonstratives under the Elmo, if I can

20  figure out how to do this, just for -- to -- for the

21  detection limit, not right this second but later this

22  morning.  It's a demonstrate testify to show the

23  limitations of detection.  And counsel, I've shared

24  this with counsel and both counsel agrees.

25         THE COURT:  All right.

**111**

1          Ms. Hill, please bring the jury in.

2          What was the last number?

3          THE WITNESS:  Your Honor, I think it's 0234.

4          MS. CLANCY:  Thank you.

5          (Whereupon, the jury having entered the

6  courtroom, the following proceedings were held:)

7          THE COURT:  The record will reflect that all

8  the jurors are in their appointed seats, counsel are

9  present, and William Longo is in the witness box.

10         Please recall that you're still under oath.

11         THE WITNESS:  Yes, Your Honor.

12         THE COURT:  You may continue with your direct

13  examination of this witness.

14         MR. SATTERLEY:  Thank you, Your Honor.

15  BY MR. SATTERLEY:

16     Q.  Dr. Longo, we're going to continue to just talk

17  on one more document on -- regarding asbestos and talc.

18  This is Exhibit 350.

19         MR. SATTERLEY:  May I approach again,

20  Your Honor?

21         THE COURT:  You may.

22  BY MR. SATTERLEY:

23     Q.  And this is from the same Tom Shelley we saw

24  earlier.  March the 30th, 1973.

25         And is this a document you've considered in

**112**

1  evaluating the issue -- issues in this case?

2     A.  Yes, sir.

3     Q.  And this is carbon-copied to a large number of

4  folks, including many of the folks we talked about

5  earlier:  Petterson, Nashed, Hildick-Smith, Rolle,

6  Goudie, Fuller, and Dr. -- or Mr. Dean in England;

7  correct?

8     A.  That is correct.

9     Q.  And it relates to asbestos talc -- or talc

10  asbestos patents.  And Dr. Pooley.  It says, "Harold,

11  we will want to carefully consider the Pooley patents

12  re asbestos in talc.  It's quite possible that we may

13  wish to keep the whole thing confidential rather than

14  allow it to be published in patent form and thus let

15  the whole world know."

16         Do you see that?

17     A.  I do.

18     Q.  Have you ever seen any patents developed by

19  Johnson & Johnson or any of the scientists at Johnson &

20  Johnson regarding the concentration technique, heavy

21  liquid separation, to identify asbestos in talc?

22     A.  No.  None exists that I can tell.

23     Q.  Now, you've reviewed, you said earlier,

24  historical testing of baby powder and talcum powder for

25  the presence of asbestos going back into the 1970s and

**113**

1  beforehand; correct?

2     A.  That is correct.

3     Q.  And have you also -- or do you understand that

4  the Shower -- the Shower to Shower product -- you

5  looked at some of the -- Lee Poye's analysis of Shower

6  to Shower; correct?

7     A.  We did.

8     Q.  And, based upon all the materials you reviewed,

9  do you understand that the Vermont talc was the source

10  of Shower to Shower for many years, including in the

11  1970s?

12     A.  That is correct.

13     Q.  And is it important to look at the Shower to

14  Shower product and the analysis of Shower to Shower in

15  understanding whether or not asbestos was present in

16  Vermont talcs?

17     A.  It is.

18     Q.  Now, the concentration method, the heavy liquid

19  separation method, is there a limitation with regards

20  to the ability to see chrysotile with that method?

21     A.  There is.

22     Q.  And what is that limitation?

23     A.  The limitation is the density of chrysotile

24  asbestos is very close to the density of talc.

25         Talc is approximately -- you have 2.7 to

**114**

1   2.6 grams per cubic centimeter.  Like a sugar cube, how
2   much that weighs, how many grams will fit in a sugar
3   cube.
4        And chrysotile is about 2.5, 2.4.
5        So you would not expect to see chrysotile using
6   the method as written.  It will float up to the top
7   with the talc.  Also, anthophyllite asbestos has a
8   density close to talc.  If it doesn't have any iron.
9   If it has iron, the density increases and you will --
10  if it's present in the amount necessary, you'll find it
11  by the heavy liquid density separation.  So those are
12  the two drawbacks currently for the heavy liquid
13  density separation.
14      Q.  Well, those drawbacks that you can't find
15  chrysotile -- the drawback that you can't find
16  chrysotile asbestos with the heavy liquid separation,
17  in your opinion, Dr. Longo, is that a reason why you
18  should never ever, ever, ever use it?
19      **A.  No.  That would be silly.  You can find**
20  **tremolite, actinolite, all the tremolite asbestos solid**
21  **solution series.  The majority of what you find in**
22  **anthophyllite has iron in it.  So -- and, of course,**
23  **the solid solution series with the other asbestiform**
24  **minerals that can form when anthophyllites form.  So,**
25  **no.  You're -- yeah, it's simple.  Why throw the baby**

**115**

1   **out with the bath water when you can get so much**
2   **information using that?**
3       Q.  Historically going back into the 1970s, was
4   Shower to Shower examined for -- and chrysotile
5   asbestos been documented in that product?
6       A.  It has.
7       Q.  And I'd like to show you what's already
8   admitted into evidence.
9        MR. SATTERLEY:  Your Honor.  May I approach
10  again?
11       THE COURT:  You may.
12  BY MR. SATTERLEY:
13      Q.  This is Exhibit 0278, the University of
14  Minnesota Space Science Center.
15       Have you considered this, Dr. Longo, in your
16  analysis of whether or not there's asbestos in Vermont
17  talcs?
18      A.  Yes.
19      Q.  And does -- was this the analysis of Shower to
20  Shower product back in 19' -- in the early 1970s for
21  the identification of asbestos?
22      **A.  Yes, sir, it was.**
23      Q.  If you can flip over to page 4.  And do they
24  describe -- and just so that we --
25       Let me zoom out.  Zoom out.

**116**

1        The University of Minnesota Space Science
2   Center.  Page 4.
3        Do they utilize the electron microscope to
4   identify chrysotile asbestos?
5       **A.  Yes, sir, they do.**
6       Q.  And do they indicate that they were taking
7   photographs -- well, first of all, they did a
8   diffraction pattern and they take photographs of the
9   chrysotile asbestos they located in the Shower to
10  Shower product?
11      **A.  That is correct.**
12      Q.  And if we flip over to the Figure 17A and 18A.
13  They take a picture of -- it says "S to S grid."  And
14  they got a grid number there?
15      **A.  Correct.**
16      Q.  And is that -- is that a photograph of a
17  chrysotile asbestos fiber in the Shower to Shower
18  product in the early 1970s by Dr. Hutchinson?
19      **A.  Yes, sir.  That's actually a chrysotile bundle**
20  **and that's sitting on a foam -- formed -- foam bar grid**
21  **covering.  And that's -- that would be classic**
22  **asbestos.**
23      Q.  And over here on the next page, two pages
24  later, page 25 of this exhibit, Figure 18A, once again,
25  Shower to Shower.

**117**

1        Does this demonstrate the chrysotile asbestos
2   in the Shower to Shower product?
3       **A.  Yes and no.**
4       Q.  Well, tell me yes and no.
5       **A.  Yes, it has the morphology and this is what you**
6   **would expect.  But they also, if you go to the previous**
7   **page, they have their diffraction patterns associated**
8   **with this.  And you can't hardly see it there, but it**
9   **has some classic streaking on it.  That's a little**
10  **small.**
11       But they did two things.  It has to have the
12  right morphology tubular structure and then the
13  diffraction pattern showing the right crystalline
14  structure.
15      Q.  If we flip to the next page.  This one is the
16  one you said "yes and no" to.  What about the next page
17  here, Figure 18B, what does this demonstrate?
18      **A.  Again, it demonstrates bundles of chrysotile**
19  **asbestos along with the other information, so you have**
20  **chrysotile here.**
21      Q.  And does this assist in your opinion -- or does
22  this add to your opinion, I should say, that there is
23  historically asbestos documented in Vermont talc?
24      **A.  Yes, sir.**
25      Q.  The next document already into evidence is

118

1  Exhibit 6 -- 679.

2      MR. SATTERLEY:  And request permission to

3  approach, Your Honor?

4      THE COURT:  You may.

5  BY MR. SATTERLEY:

6  Q. And this is October 27, 1972.  An examination

7  of Johnson & Johnson Baby Powder sent to Dr. Goudie.

8  Exhibit 679.

9      And have you seen and considered this

10 examination by McCrone from 1972, Dr. Longo?

11 **A. Yes, sir, I did.**

12 Q. And did McCrone -- McCrone laboratory identify

13 asbestos in this examination in 1972?

14 **A. They did.**

15 Q. By the way, let me talk about McCrone for a few

16 minutes.

17     Walter McCrone, did you know who he was?

18 **A. Yes, sir.  Everybody does in the microscopy**

19 **field.**

20 Q. Was he recognized as someone that was very --

21 very good at the PLM, the polarized light microscope?

22 **A. He was a polarized light microscope expert.**

23 Q. As far as his involvement with the transmission

24 electron microscope, was Walter McCrone known to be a

25 TEM person?

119

1  **A. Well, he understood it, but he didn't routinely**

2  **do transmission electron microscopy.  His area and the**

3  **McCrone Atlas that every PLM lab has was polarized**

4  **light microscopy of all types of minerals.  I mean, he**

5  **was the one who looked at the Shroud of Turin.  He's**

6  **that good of an optical microscopist.**

7  Q. With regards to McCrone laboratory, have you

8  previously in the past stated that McCrone laboratory

9  is an outstanding laboratory?

10 **A. Yes, sir, I have.**

11 Q. And have you said that they're one of the

12 leaders in the world, McCrone is one of the leaders in

13 the world, in the microscope world?

14 **A. Yes, sir.  I've worked for some of the same**

15 **clients that they had done analysis for back in the**

16 **'70s and '80s where I was defending them and saying,**

17 **they used McCrone.  They used a very good lab to tell**

18 **them that there was asbestos or not in a product.**

19 **There was a little -- it was a fertilizer company.  So**

20 **I have stated that a number of times.**

21 Q. And was -- when you stated that a number of

22 times, and gave those opinions about McCrone, was that

23 prior to your analysis of all these internal documents

24 you've looked at in talc litigation?

25 **A. Yes, sir.  It was before that where I was able**

120

1  **to get documents from McCrone to start looking at the**

2  **type of analysis they were doing, and some of the**

3  **things they were doing -- and you have to understand.**

4  **Walter McCrone very rarely -- after about 1960 very**

5  **rarely was in the laboratory.  He was running the**

6  **McCrone Research Center, a nonprofit that did teaching,**

7  **et cetera.  It was others that were actually in charge**

8  **of McCrone after about 1960 or so.  Every now and then**

9  **he would, but very rarely.**

10 Q. And do you have -- have you formed opinions and

11 criticisms of some of the analysts of -- from Walter

12 McCrone that you've seen from looking at some of these

13 McCrone reports involving talc?

14 **A. Yes, sir, I have criticized them.**

15 Q. And what opinions have you formed?

16 **A. Things like, you know, willingness to change**

17 **little things -- change on reports, saying things like**

18 **they've never found asbestos in all the talc samples**

19 **they ever used.  That was a letter sent out to a trade**

20 **organization, even though they had data that showed**

21 **asbestos, internal data, for their talcum powder or**

22 **baby powder companies they were working for.**

23     **So, you know, it changed my opinion a little**

24 **bit of them.  They're still great scientists there, but**

25 **it sort of -- you know, it sort of was, oh, okay.**

121

1  Q. So, is it fair to say you got analyzed, analyst

2  by analyst, with regards to what they've done

3  historically?

4  **A. Not only that, you have to look at what methods**

5  **they were using.  Are they using the best method**

6  **available?  Is the results consistent -- do the results**

7  **make sense or can they make these statements, like this**

8  **talc sample -- this talcum powder sample or cosmetic**

9  **talc sample was negative and therefore it's free of**

10 **asbestos?**

11     Nobody can ever say that.  No analytical

12 technique can ever say it's free of anything.  All's

13 you can say is, it's down to our detection limit, it's

14 below our detection limit, and it may or may not be

15 there.

16     Making broad statements like there's nothing

17 in -- we didn't find anything so it's asbestos-free or

18 it's -- anything.  Like water.  Well, we analyzed this

19 water using the EPA method, there's no lead, it's

20 lead-free.  You can't say that.  All's you can say is,

21 here's the method we used, here's the analytical

22 sensitivity.  We can't say if there's anything there or

23 not below that.

24 Q. This 1972 McCrone report, where it's produced

25 to us by Johnson & Johnson, Exhibit 0679, it says, "Do

Page 122 to 125 of 354
Case 3:16-md-02738-MAS-RLS    Document 33132-2    Filed 08/23/24    Page 367 of 1320
PageID: 249362
92 of 85 sheets

**122**

1  not use this report.  Replace by another version."
2        Have you considered this?
3  **A. I have.**
4        Q. And in this report, do they actually document
5  asbestos and talk about asbestos found in Batch
6  Samples 108T and 109T?
7  **A. Yes, sir, they did.  They reported it as**
8  **present.**
9        Q. And specifically with regard to tremolite, in
10 the report that says, "Do not use this report," do they
11 totally -- do they list the total tremolite content of
12 the two samples would be approximately 0.5 percent for
13 108T and about 0.2 to 0.2 -- 0.2 to 0.3 percent for
14 109T?
15 **A. Yes.**
16       Q. And in the new report, the revised report, is
17 it dated the same date?
18 **A. It is.**
19       Q. And does it have -- is this information, these
20 numbers and calculations, removed from the report?
21 **A. They are.**
22       Q. And then the next document I think it's related
23 to this document here.  This is Exhibit 225.
24       MR. SATTERLEY:  Request permission to approach,
25 Your Honor?

**123**

1        THE COURT:  You may.
2  BY MR. SATTERLEY:
3        Q. And just so we're clear, the -- well, let me
4  just withdraw that and go right to this report.
5        225 into evidence.  It says, "McCrone study
6  being redone."  Something...
7  **A. I think that says, "New one is in master**
8  **file" -- in --**
9        Q. Oh.  "New one is in master talc file."
10       Do you see that?
11 **A. Yes, sir.**
12       Q. And we see this -- over here, it says,
13 "Walter C. McCrone" there?
14 **A. Yes.**
15       Q. And if we go to the letter itself, it's dated
16 the same day, October the 27th?
17 **A. Yes, sir, it is.**
18       Q. And it says -- this is from a fellow named
19 Ian Stewart.
20       You recognize -- or did you -- you recognize
21 Ian Stewart to be an analyst that worked at McCrone?
22 **A. Yes, sir.  He was both a PLM and electron**
23 **optics guy.  I've known Ian for almost 30 years.**
24       Q. Did Ian Stewart work for McCrone for many, many
25 years before he went to the RJ Lee Company?

**124**

1  **A. Yes, sir, he did.**
2        Q. And have you read and seen reports and letters
3  from Ian Stewart many times in the past?
4  **A. Specifically in cosmetic talc it's -- since**
5  **I've been involved in this, but in other litigation in**
6  **the past, especially when he was at the RJ Lee Group,**
7  **yes, sir.**
8        Q. It says -- Ian Stewart says, "Here is our
9  report on the baby powder samples.  I hope to have the
10 Shower to Shower report out to you soon, but something
11 always seems to break loose when I sit down to write
12 it.  Yours sincerely."  And it's signed by Ian Stewart;
13 correct?
14 **A. Yes, sir.**
15       Q. Moving forward in time, in the '70s, are there
16 many other tests and testing results where McCrone does
17 analysis for talc samples?
18 **A. Yes, sir.**
19       Q. And are there instances where McCrone reports
20 there's no asbestos?
21 **A. A lot of instances, yes, sir.**
22       Q. And is there reports where McCrone reports
23 there's asbestos present?
24 **A. Yes, sir.**
25       Q. I want to show you another document,

**125**

1  Exhibit 158.
2        And this is a -- Exhibit 158 is a confidential
3  document.  "New reagent system plant trial at Windsor
4  Minerals."
5        Have you considered this, Dr. Longo?
6  **A. Yes, sir, I have.**
7        Q. And how is this significant in your opinions
8  here?
9  **A. It's significant in that they were trying out**
10 **different flotation, meaning, one of the ways to clean**
11 **up the processed talc after it's been milled is to --**
12 **or before milling is to flotate it to -- just like**
13 **concentration method.  You put in a type of surfactant**
14 **and it bubbles, sticks to the talc, the big heavy stuff**
15 **and chunks can go to the bottom.**
16       **Here they were experimenting with a way to**
17 **flotate out and remove chrysotile asbestos.**
18       And you have to ask yourself, if there's no
19 asbestos in here, why are you trying to develop a
20 system to remove something that's not in the product?
21 Or not in being milled.
22       So this is important to show -- and we're going
23 to be working on this to see if we can use this
24 technology from that data to concentrate the
25 chrysotile.

**126**

1    MR. CALFO:  Your Honor, I move to strike.  That
2 was complete speculation.
3    THE COURT:  The jury will ignore the last two
4 sentences of the witness.
5 BY MR. SATTERLEY:
6    Q. Dr. Longo, it says, "The use of citric acid in
7 the depression of chrysotile asbestos and other mineral
8 species has been developed at Windsor Minerals in
9 response to the potential need for a means to exclude
10 extremely low levels of these contaminants from the
11 finished product of the beneficiation process."
12    Correct?
13    A. Yes, sir.
14    Q. Is that what you're talking about with regards
15 to trying to remove asbestos from the product?
16    MR. CALFO:  Your Honor, again, objection.
17 Calls for speculation on the part of this witness.  No
18 foundation.
19    THE COURT:  That -- that's overruled.  He's
20 interpreting the document.
21    THE WITNESS:  Yes, sir.
22 BY MR. SATTERLEY:
23    Q. It says, "The use of these systems is strongly
24 urged by this writer to provide the protection against
25 what are currently considered to be materials

**127**

1 presently" -- "presenting a severe health hazard and
2 are potentially present in all talc ores in use at this
3 time."
4    And it's signed off by Vernon Zeitz; correct?
5    A. That is correct.
6    Q. And health hazards is beyond your area of
7 expertise; correct?
8    A. Yes, sir, it is.
9    Q. And then if we flip over to Table 15 of this
10 1974 document.
11    And it says, "Asbestiform fibers counted by
12 Walter C. McCrone," and it's got "ore, product, ore,
13 product, ore, product."
14    And then it's got fiber identification,
15 "probably chrysotile, probably chrysotile," and the
16 fifth one down has got eight and it says "chrysotile,"
17 and the final one says "chrysotile"; correct?
18    A. Correct.
19    Q. Is this further documentary evidence of the
20 presence of asbestos, in your opinion, in the Vermont
21 ore and product?
22    MR. CALFO:  Objection, Your Honor.  No
23 foundation.  Calls for speculation on the part of this
24 witness.
25    THE COURT:  Overruled.

**128**

1    THE WITNESS:  Yes, it does, especially at these
2 concentrations, because they're talking about counts
3 per EM grid.  So these are the number of fibers found
4 on an individual grid at the detection limits that they
5 were using at the time, which were somewhat antiquated.
6 BY MR. SATTERLEY:
7    Q. Moving forward from 1974 to 1975, I would like
8 to present you with what's been admitted as
9 Exhibit 724, dated November the 5th, 1975, from Walter
10 McCrone -- from the McCrone laboratory, Gene Grieger,
11 to Vernon Zeitz.
12    Now, Vernon Zeitz, we saw his name on the last
13 document; right?
14    A. Yes, sir.
15    Q. And this one is -- is written to him from
16 McCrone -- from Gene Grieger, senior research physicist
17 at McCrone; correct?
18    A. That is correct.
19    Q. And does he document and report and have an
20 attachment regarding the presence of -- presence of
21 fibers or bundles with regards to the material they're
22 looking at?
23    A. That is correct.  They do.
24    Q. It talks about Table 1 showing "actual fiber
25 counts and the approximate equivalent concentration in

**129**

1 parts per million of amphibole particles, which we
2 found in these samples.
3    "Some of them seem rather high.  One had ten,
4 and one had nine amphiboles.  Most of these come in
5 bundles of one, two, or three fibers, with anywhere
6 from two to five amphiboles in a bundle?"
7    Do you see that?
8    A. Yes, I do.
9    Q. Now -- and then there's a chart on the next
10 page; correct?
11    A. There is.
12    Q. And we see the references here to the
13 amphiboles found; right?
14    Oh, I'm sorry.  "Fibers of asbestos found,"
15 correct, Dr. Longo?
16    A. That is correct.
17    Q. And some of these reference to "HC."  Do you
18 see the -- sample being HC?
19    A. I do.
20    Q. And based upon your review of the internal
21 documents, do you have an opinion as to what HC
22 represents?
23    MR. CALFO:  Objection.  Calls for speculation
24 from this witness.  No foundation.
25    THE COURT:  Mr. Satterley, you put a circle

Page 130 to 133 of 334
Case 3:16-md-02738-MAS-RLS    Document 33132-2    Filed 08/23/24    Page 369 of 1320
PageID: 249364
34 of 85 sheets

**130**

1  around one that's not on the same level even though --
2      MR. SATTERLEY:  I'm sorry, Your Honor.
3      THE COURT:  Your yellow marker mismarked it.
4      MR. SATTERLEY:  I'm upside down.  Which one?
5      THE COURT:  It's the third one down.  That one
6  is not an HC.
7      MR. SATTERLEY:  Oh.
8      Oh, it is HC, Your Honor.  There's two HCs
9  right beside each other.
10     THE COURT:  All right.
11     MR. SATTERLEY:  And both of those are HC.
12     THE COURT:  Okay.  I -- I stand corrected.
13     MR. SATTERLEY:  I apologize, Your Honor.  I was
14 trying to do it upside down.
15     THE COURT:  All right.  The objection is
16 overruled.
17     You may respond to the question.
18 BY MR. SATTERLEY:
19     Q.  Do you have an opinion about HC and what that
20 represents based upon all the internal documents you've
21 looked at?
22     **A.  The H stands for Hammondsville, and the C**
23 **stands for cosmetic.**
24     Q.  In your opinion, Dr. Longo, is this another
25 instance of confirmed fibers of asbestos in the

**131**

1  cosmetic talc back in 1975?
2      MR. CALFO:  Objection.  Calls for speculation.
3  No foundation for this witness.
4      THE COURT:  That's overruled.
5      THE WITNESS:  Yes, it does.
6  BY MR. SATTERLEY:
7      Q.  Now, in your testing -- and we're going to get
8  to your testing in a little bit -- you have taken
9  photographs, you've done count sheets, you've done
10 selected area electron diffraction you've done
11 chemistry analysis, EDS; correct?
12     **A.  That is correct.**
13     Q.  And you've produced all -- or you've printed
14 all that out and made detailed reports of that and
15 turned it of to the attorneys for these companies;
16 correct?
17     **A.  That is correct.**
18     Q.  And in -- in your testing, in your analysis,
19 we're able to look at the actual photographs and the
20 length and the width of the various fibers you found;
21 correct?
22     **A.  That is correct.**
23     Q.  Okay.  In -- in -- in many of these historical
24 testings -- not all of them, but in many of them -- do
25 we have that same advantage, to look at the

**132**

1  photographs?
2      **A.  No, most of the time not.  Very rare.**
3      Q.  All right.  Do we have most of the underlying
4  raw data, being the chemistry, the selected area
5  electron diffraction, to analyze ourselves to see --
6  see what it says?
7      **A.  Sometimes you have the selected area electron**
8  **diffraction and occasionally a count sheet, but it's**
9  **mostly this type of information, where they just**
10 **say, "We found this."**
11     Q.  The next one is Exhibit 713.
12     MR. SATTERLEY:  May I approach again,
13 Your Honor?
14     THE COURT:  You may.
15 BY MR. SATTERLEY:
16     Q.  This is 1977, going forward in time.
17 EMV Associates, you understand that to be a laboratory
18 that Johnson & Johnson sent materials to for analysis
19 on a few occasions?
20     **A.  Yes, sir.**
21     Q.  And is this analysis of nine talc samples that
22 you have read and considered in formulating your
23 opinions?
24     **A.  I have.**
25     Q.  And is this dated, Exhibit 713, April the 1st,

**133**

1  1977?
2      **A.  That is correct.**
3      Q.  By the EMV Associates; correct?
4      **A.  Yes, sir.**
5      Q.  And do they have on this -- in this instance,
6  do they have pictures of -- of things we can look at,
7  the chemistry and the morphology of what's depicted
8  there?
9      **A.  Yes.**
10     Q.  And is there reference to composite?
11     Do you know what a composite is?
12     **A.  Composite typically means that you have mixed a**
13 **couple different sources into something.  Say, for**
14 **example, you take a composite of maybe two different or**
15 **three different areas of the talc from a mine or -- and**
16 **make it all one composite so you can try to analyze**
17 **what's from these two or three different areas.**
18     Q.  And here, they say, with regards to --
19     Well, first of all, I've heard before
20 composites and blending.  Do you know what blending --
21 blending of talc is?
22     **A.  Blending is -- can be the same thing, but**
23 **you're just mixing it all together.  And typically,**
24 **blending and milling -- or blending, you're putting in**
25 **some of the other nontalc ingredients.  Just depends on**

**134**

1  who was saying it.

2      Q.  And it says, "Both large and small" -- "A

3  composite, both large and small fibrous tremolite

4  particles found.  See Figure 4."

5      And then it says right below that, "Old stock

6  composite, one small fibrous tremolite particle was

7  found.  See Figure 6."

8      Do you see that?

9      A.  Yes, sir.

10      Q.  So if we go over to Figure 4, that's what we

11  were looking at just a few minutes ago; right?

12      A.  Yes.

13      Q.  And then we've got -- Figure 6 here, we've got

14  more photographs from 1977 with the chemistry; right?

15      A.  Yes, we do.

16      Q.  If we zoom in on the top photo, "800X," does

17  that mean 800 magnification?

18      A.  It does.

19      Q.  And the jury heard last Thursday, when Mr. Poye

20  was here, the difference between talc, platy talc and

21  fibrous talc and fibers and asbestiform.

22      Are you able -- from this -- this 1977 photo,

23  are you able to determine, is this fibrous?

24      A.  It meets the definition of a -- of fibrous,

25  yes, sir.  It's got parallel sides, and it has an

**135**

1  aspect ratio easily equal to or greater than 5 to 1.

2  That looks like an aspect ratio more than on the lines

3  of 20, 30, 40 to 1.  And we are looking at a bundle.

4      Q.  How do we know that's a bundle?

5      A.  Well, a bundle is defined as either two or

6  three fibers parallel touching, and if you look closely

7  on the sides or the bottom, you can see what looks like

8  a splayed end coming off, and you can see individual

9  fibers, even from this xerox copy of -- of this

10  photomicrograph, is what we call them.  That's a

11  bundle.

12      Q.  And I want to use J&J's definition -- this is

13  Exhibit 430, which is into evidence -- on asbestos.

14  And this is a Johnson & Johnson document.  The

15  definition here they have for asbestos, under the J4-1

16  and the TM7024 -- and we'll talk about those methods in

17  a little bit -- it says, "Asbestos is defined to be the

18  fibrous serpentine chrysotile and the fibrous form of

19  the amphibole group as represented by amosite,

20  anthophyllite, crocidolite, tremolite, and actinolite."

21      Is that your understanding of the definition of

22  asbestos?

23      A.  Yes, sir, the fibrous form of it.

24      Q.  And so if we -- if -- if we have a fibrous form

25  of serpentine, curved serpentine, would that

**136**

1  definition -- would that meet the definition of

2  asbestos?

3      A.  Yes, sir.  Either curved or straight.  But

4  typically, curved is seen in bulk samples, and every

5  now and then, you will see it in a TEM because of the

6  higher magnification and the smaller particles.

7      But that is a typical definition, fibrous forms

8  of these amphibole -- amphibole groups.

9      Q.  Okay.  So right here, back -- Ms. Clancy points

10  out -- where it says "fibrous tremolite" under the J&J

11  definition that we just read, does that fibrous

12  tremolite used in their definition equate to asbestos?

13      A.  Yes, sir, it does.

14      Q.  One other document, and then I'm going to

15  bounce back to heavy liquid for a minute.

16      Exhibit 726, are you familiar with Forensic

17  Analytical out of Hayward, California?

18      A.  Yes, sir, I am.

19      Q.  And a fellow named Mark Floyd?

20      A.  Yes, sir.  I know Mr. Floyd.

21      Q.  Mr. Floyd, is he an analyst that identifies

22  asbestos in materials and has written in reports in

23  that regard for many years?

24      A.  Many years.  Doing it almost as long as me.

25      Q.  And have -- in fact, have you analyzed or seen

**137**

1  his reports with regards to the presence of asbestos in

2  talc?

3      A.  Yes, sir, I have.

4      Q.  And this into evidence as Exhibit 726.  Does

5  this, Dr. Longo, document the presence of asbestos in

6  off-the-shelf Johnson's Baby Powder in 2004?

7      A.  Yes, sir, it does.

8      Q.  And is -- Mr. Floyd signs off on it right here?

9      A.  Yes.  That's his -- that's his initials.

10      MR. CALFO:  Objection, Your Honor.  There is no

11  foundation for this witness to testify about this.

12      MR. SATTERLEY:  Let's zoom in.

13      THE COURT:  That's overruled.

14  BY MR. SATTERLEY:

15      Q.  Do you see Mr. Floyd -- Mark Floyd, his name

16  right there, Dr. Longo?

17      A.  Yes, sir, I do.

18      Q.  And with regards to this Johnson's Baby Powder

19  off the shelf, "AN" -- it says, "Asbestos type AN."

20  What type of asbestos was he reporting in 2004 on

21  Johnson's Baby Powder?

22      MR. CALFO:  Objection.  Calls for speculation

23  from this witness.

24      THE COURT:  Overruled.

25      THE WITNESS:  "AN" stands for anthophyllite.

138

1  BY MR. SATTERLEY:
2      Q. And just to understand what has happened here,
3  you understand that this sample was sent to Mr. Floyd
4  by a television -- television station in Sacramento?
5      A. Yes, sir.
6      Q. And does this, in your view, Dr. Longo, add to
7  the -- all the other samples showing the presence of
8  asbestos in Johnson's Baby Powder in the '70s, '80s,
9  '90s, and -- and into the 2000s?
10         MR. CALFO:  Objection.  No foundation.  Calls
11 for speculation from this witness.
12         THE COURT:  That's overruled.
13         THE WITNESS:  Yes, it does.
14 BY MR. SATTERLEY:
15     Q. Now, we've introduced lots of documents into
16 evidence, and I'm not going to go over all of them with
17 you, obviously, Dr. Longo.
18        But are there other instances in the historical
19 documents regarding Johnson's Baby Powder where
20 asbestos has been documented?
21     A. Yes, sir.
22     Q. Okay.  And with regard to Cashmere Bouquet,
23 Colgate-Palmolive, have you also looked at the -- some
24 of the historical documents regarding the presence of
25 asbestos in -- in the Cashmere Bouquet product?

139

1      A. Yes, I have.
2      Q. And I'm going to -- not going to go over very
3  many, but there are a few into evidence that I wanted
4  to ask you about.
5         By the way, do you have a whole binder full of
6  Colgate reliance?  I think I -- it's on the -- right
7  next to the screen.
8      A. Yes, sir, I do.
9      Q. No.  Up.  Up.
10     A. I knew they were here somewhere.
11     Q. Okay.  But do you have two binders?  Are those
12 Cashmere Bouquet reliance materials?
13     A. They are.
14     Q. And do they document, going all the way back
15 into the late 1960s and the 1970s, the presence of
16 asbestos in Cashmere Bouquet?
17        MR. MULARCZYK:  Objection.  Hearsay.  Vague.
18        THE COURT:  It's vague.  You may rephrase your
19 question.
20 BY MR. SATTERLEY:
21     Q. Okay.  Are there many --
22        THE COURT:  We don't do that Joe McCarthy
23 business of, "Do you have it in the satchel?"
24        MR. SATTERLEY:  I understand.  Yes, Your Honor.
25 Yes, Your Honor.

140

1  BY MR. SATTERLEY:
2      Q. Do you have reliance lists, Dr. Longo,
3  regarding identification of asbestos before you?
4      A. I do.
5      Q. All right.  One of the reliance lists, does it
6  include documents -- this is going to be
7  Exhibit 3584 -- from McCrone to Joe Simko at
8  Colgate-Palmolive in 1974?
9      A. Yes, sir, it does.
10     Q. And we heard from the corporate representative
11 yesterday, Ms. Scala, Diana Scala --
12        THE COURT:  Does that have a number on it?
13        MR. SATTERLEY:  Yes.  This is Exhibit 3584,
14 Your Honor.
15 BY MR. SATTERLEY:
16     Q. And this is February 5, 1974, regarding the
17 samples designated 516.  And you considered this,
18 Dr. Longo; correct?
19     A. Yes, sir, I did.
20     Q. And did McCrone report back to Colgate in 1974
21 that all three samples had chrysotile asbestos in them?
22     A. Yes, sir, they did.
23     Q. And in this particular instance, was there
24 photographs taken -- photomicrographs taken -- Scala
25 Exhibit 18 -- this is Scala Exhibit Number -- were

141

1  there photomicrographs of -- of the Cashmere Bouquet
2  Sample 516 by McCrone back in 1974?
3      A. Yes, sir.
4      Q. And what we've got displayed on the screen
5  here, based upon what McCrone reports in 1974 and based
6  upon your analysis of -- of -- this report, do you
7  have an opinion whether this is documenting asbestos?
8      A. It shows what asbestos -- what chrysotile
9  asbestos would look like under the transmission
10 electron microscope.
11     Q. And you talked about both straight and curved.
12 Does it show some curved fibers?
13     A. Fibers and bundles, yes.
14     Q. Okay.  And is this just one instance of the
15 identification of asbestos in the -- in the Colgate
16 product?
17     A. Yes, sir.
18     Q. And we know other photographs here -- let me
19 just -- too many papers here.
20        Dr. Longo, in 1974, does McCrone report back to
21 Colgate that it's a chrysotile fiber in the North
22 Carolina Regal sample?
23     A. Yes, they do.
24     Q. And when we get to your photographs in a little
25 bit, do you have photographs where you have materials

142

1  that look like -- is that platy talc at the top?
2      A. It's either platy talc or calcium carbonate or
3  one of the other accessory minerals. That's not
4  typically a talc look.
5          What's more like talc is at the top of the
6  chrysotile fiber. It's more of a plate shape, little
7  irregular plate shape. That, in my opinion, is what
8  the morphology of platy talc should look like.
9      Q. Is that, in your view, fiber?
10     A. Yes, sir. That meets all the current regulated
11 asbestos definitions by transmission electron
12 microscopy. It has parallel sides and has an aspect
13 ratio, the length divided by the width, of 5 to 1 or
14 greater. That's, oh, probably in the 20- to 30-to-1
15 range.
16     Q. The previous photograph here, does it say
17 "chrysotile fibers" here at the bottom?
18     A. Yes, sir, it does.
19     Q. And is that, in your opinion, a fiber,
20 Dr. Longo?
21     A. Yes, sir. That meets the definition. There
22 are counting rules for determining fibers of asbestos
23 or bundles. That's classic.
24     Q. Is -- is there, in this photograph, examples of
25 the talc or talc particles blocking part of the view of

143

1  fiber -- a chrysotile fiber?
2      A. Yes, sir. You can see at the top end of the
3  fiber, it looks like we have a talc -- very large talc
4  plate laying over it. Then you have some smaller talc
5  plates to the right of the fiber.
6          So that's a pretty heavily loaded sample, to
7  see that much in one area of the TEM. TEM grid.
8  Excuse me.
9      Q. Now, in regards to your opinions on historical
10 identification of asbestos in Cashmere Bouquet, other
11 than McCrone, are there other laboratories that have
12 likewise found asbestos in the Cashmere Bouquet
13 product?
14     A. Yes, sir.
15     Q. And have you included those in your reliance
16 materials?
17     A. I have.
18     Q. And who are some of the other laboratories?
19         MR. MULARCZYK: Objection. Hearsay.
20         THE COURT: Overruled.
21         THE WITNESS: Besides McCrone, you have -- oh,
22 god, I'm having a mental...
23         There's -- there's I'm sorry.
24 BY MR. SATTERLEY:
25     Q. Yeah, you've got your binders there.

144

1      A. Yeah, let me just look.
2      Q. It's not a memory test.
3      A. I'm trying to go off -- yeah, test -- memory
4  test.
5          Mt. Sinai. We have, you know, some of the FDA
6  work in the early years. Johns-Manville. Cyprus, I
7  believe, did some testing. So there was some others.
8      Q. Is -- did Johnson -- in your materials, did
9  Johnson & Johnson --
10     A. Johnson & Johnson, too. I'm sorry.
11     Q. And Fred Pooley, specifically?
12     A. Yes, sir.
13     Q. And Mark Floyd at Forensic Analytical, did --
14 does his lab at Hayward look at Cashmere Bouquet and
15 found asbestos?
16     A. I believe so.
17     Q. Now, heavy liquid separation. Historically,
18 you mentioned Dr. Pooley did heavy liquid separation
19 and found asbestos in talc; correct?
20     A. Correct.
21     Q. You mentioned that -- and we showed
22 documents -- at Dartmouth, Dr. Reynolds looked at
23 heavy liquid -- heavy liquid separation and found
24 asbestos in talc?
25     A. Correct.

145

1      Q. Have you reviewed the test, the test results --
2  excuse me -- the testimony of Dr. Alice Blount?
3      A. I have.
4      Q. And have you seen her published paper?
5      A. Yes, sir. In 1990, 1991, peer-reviewed
6  published paper doing the exact same thing.
7      Q. And using the heavy liquid separation, did
8  Dr. Blount report and publish upon asbestos in talc
9  products?
10     A. Yes, sir.
11     Q. And specifically into evidence is Exhibit 160,
12 is the letter from Dr. Blount to one of the attorneys
13 for Johnson & Johnson in 1998.
14         And have you considered this with regards to
15 Sample I?
16     A. Yes, sir, I have.
17     Q. And in 1998, this letter indicated that
18 Sample I was Vermont, Johnson & Johnson talc; correct?
19     A. Yes, sir. It was a Johnson & Johnson
20 off-the-shelf product. And in that time period, it
21 would have been from Vermont. 1989, 1990, the talc
22 source was Vermont during that time.
23         THE COURT: Mr. Satterley, I neglected to write
24 down the exhibit number. I don't know whether you said
25 it or not.

**146**

1    MR. SATTERLEY:  160, Your Honor.
2    THE COURT:  Thank you.
3    BY MR. SATTERLEY:
4    Q. And you understand that -- Dr. Blount to be a
5    geologist/mineralogist?
6    A. Yes, sir.
7    Q. And have you considered her, not only her
8    published work but her testimony and her handwritings
9    and her letters back in the '90s regarding her testing
10   of this product?
11   **A. In her published paper.**
12   Q. Okay.  So we've got Dr. Pooley, Dr. Reynolds,
13   Dr. Blount, Lee Poye, and MAS, your lab.  In all five
14   of those instances, when heavy liquid separation was
15   done with regards to looking for asbestos in cosmetic
16   talc products, were asbestos identified?
17       MR. CALFO:  Objection, Your Honor.  There is no
18   foundation for -- for all those.
19       THE COURT:  It's overruled.
20       THE WITNESS:  Yes, sir.  Asbestos was
21   identified using the heavy liquid density separation
22   method, both the protocol, or the method, for TEM as
23   well as PLM, where we actually used the Blount method
24   that she published in 1990.
25   BY MR. SATTERLEY:

**147**

1    Q. Now, in all the materials you reviewed, have
2    you seen, since the Blount publication -- since the --
3    in -- in the early 1990s -- have you seen Johnson &
4    Johnson testing where they tested their talc by heavy
5    liquid separation at any time in the last 28 years,
6    since that paper was published?
7    **A. No, sir, I've never seen any documents saying**
8    **that they were using...**
9    Q. At any point in time, have you seen any
10   documents that Colgate-Palmolive or any of their
11   analysts tested their talc by using the heavy liquid
12   separation method?
13   **A. No, sir.**
14   Q. Now I want to talk about negative tests.
15       You mentioned limitations of XRD.  Tell us your
16   opinion about reports regarding XRT -- XRD that report
17   nondetect, from an analytical standpoint, for the
18   identification of asbestos in talc.  What does that
19   mean to you?
20   **A. It means that the concentration of asbestos, if**
21   **present, wasn't greater than the detection limit,**
22   **which, for XRD, is pretty high, depending on what**
23   **you're looking at.**
24       So your detection limit in XRD is probably -- a
25   really good XRD with good technicians may be for

**148**

1    tremolite .2, .3 percent by weight.  Today, you may get
2    down to .1.  But in the '70s, it was around .4, .5.
3        Anthophyllite is even higher, and so is
4    chrysotile.
5        So using XRD and getting a negative in XRD only
6    tells you is -- there's not a -- really a lot of
7    asbestos in here, and that's it.
8    Q. With regards to the use of XRD, have you
9    studied the -- what's called the J4-1 method?
10   **A. Yes, sir.**
11   Q. And is it your understanding that the J4-1
12   method was a method adopted by industry -- the
13   Cosmetics, Toiletries and Fragrances Association -- in
14   1976?
15   **A. Yes, sir, it was.**
16   Q. And did the J4-1 method have the x-ray
17   diffraction as the first step in the process?
18   **A. They did.**
19   Q. And did J4-1 method -- did the J4-1 method ever
20   include a TEM analysis?
21   **A. No, sir.**
22   Q. Did the J4-1 method ever include heavy liquid
23   separation?
24   **A. It did not.**
25   Q. Did the J4-1 method have a stop, you stop

**149**

1    analyzing, if you don't find anything by x-ray
2    diffraction or optical microscope?
3    **A. I'm sorry.  Could you repeat that?**
4    Q. Sure.  Let me just show you what's already into
5    evidence.  It's 727.
6        This is the -- this is the J4-1 -- the actual
7    J4-1 method into evidence.  It says "J4-1" over here.
8    Over here.
9    **A. Yes, sir.  I'm familiar --**
10   Q. You recognize that, sir?
11   **A. I'm familiar with this document.**
12   Q. Okay.  And at the bottom, it's got, "x-ray
13   diffraction" here, "acid leach" over here, "optical
14   microscopy," and then "fibrous morphology," and "stop.
15   Stop.  Stop."
16       Do you see that?
17   **A. Yes, sir.**
18   Q. All right.  So your understanding of the way
19   the J4-1 method works is, if you don't find anything in
20   the --
21   **A. X-ray diffraction.**
22   Q. -- x-ray diffraction showing amphibole, you
23   stop; correct?
24   **A. Correct.**
25   Q. Okay.  So -- but if you do find a peak, then

**150**

1  you would go over to the optical microscopy and look
2  for fibrous materials; correct?
3      **A. Correct.**
4      Q. And if you don't find anything, you stop?
5      **A. Correct. Well, if you do find, you stop. It**
6  **says, "Asbestiform amphiboles present." If you don't**
7  **find it, it's stop to the right, which says**
8  **"Asbestiform amphiboles absent."**
9      That's -- so it was "as soon as you find a
10 negative test, you stop" type of protocol.
11     Q. Based upon analytical techniques and what was
12 known, do you have an opinion whether or not this was
13 an appropriate technique for the already -- the
14 identification of asbestos?
15     MR. CALFO: Objection, Your Honor. This
16 witness had no knowledge of what was known in the '70s.
17     THE COURT: That's overruled. He may opine.
18 You can cross-examine him about it.
19     THE WITNESS: It's an appropriate method to
20 find out information, but you have to be very careful
21 with it, if you understand the detection limits. There
22 is products out there that has enough asbestos in it
23 that it's fine.
24     But when you're dealing with cosmetic talcs and
25 you're dealing with trace levels, the XRD method is --

**151**

1  should be done with -- very carefully.
2      Today, it's -- I don't think it's worthwhile to
3  analyze by XRD at all for Italian and Vermont talcs.
4  It doesn't give you -- even if it's positive, you can't
5  determine if it's fibrous or not because it doesn't
6  give you morphology. So why do it?
7  BY MR. SATTERLEY:
8      Q. Exhibit 171 is the CTFA minutes, 1977. And it
9  says, with regards to the J4-1 method --
10     First of all, just -- you -- you've looked --
11 you reviewed the CTFA minute meetings; correct?
12     **A. Yes, sir, I have.**
13     Q. It says, with regard to the J4-1, "Test and
14 verify CTFA Method J4-1 for this purpose: Assurance
15 that method is accurate, reliable, and practical. He
16 reported" -- "He then reported these objectives have
17 not yet been achieved."
18     And it's reported in 1977 that six out of the
19 seven labs failed to identify spiked talc with
20 asbestos; correct?
21     **A. With tremolite.**
22     Q. And from an analytical standpoint, does this
23 demonstrate the inadequacies or the weaknesses of the
24 XRD method?
25     MR. CALFO: Objection, Your Honor. Calls for

**152**

1  speculation on the part of this witness.
2      THE COURT: Overruled.
3      THE WITNESS: Yes. It has -- it has detection
4  elements. So if you do a spiked sample and you can't
5  find it, then how can -- for this particular asbestos,
6  how can you find it in an unknown sample?
7      It's -- it's just not a very good method for
8  these types of analysis of cosmetic talc. Even today,
9  with state-of-the-art equipment, the concentrations
10 that are typically present are going to be lower than
11 what the XRD can see.
12     And couple that with the fact you can't tell if
13 it's fibrous or not, is -- is an issue.
14 BY MR. SATTERLEY:
15     Q. And it's referring to a "Dr. Schelz,"
16 S-c-h-e-l-z, "then proposed a round-robin partial
17 retest."
18     Do you see that?
19     **A. Yes, sir.**
20     Q. And then I'd like to show you what's into
21 evidence and what you considered, 233. This is
22 Johnson & Johnson document, March 1, 1978, to Charles
23 Haynes at the Cosmetics, Toiletry and Fragrance
24 Association.
25     And it's talking about the -- "I'm enclosing a

**153**

1  table which breaks the code for the recently completed
2  CTFA task force on round-robin testing of the consumer
3  talcum products for asbestiform amphibole minerals."
4      Do you see that?
5      **A. Yes, sir, I do.**
6      Q. It says, "The names and addresses and phone
7  numbers are also included for those individuals who
8  participated whose products were involved."
9      Do you see that?
10     **A. Yes, I do.**
11     Q. And he -- he writes in this confidential 1978
12 memo, which is Exhibit 233, "Please contact me" -- and
13 there's a phone number -- "upon receipt of this letter
14 so that I may destroy the only other copy of this
15 table, which is in my possession."
16     Have you ever seen, Dr. Longo, the table that
17 would break the code regarding the round-robin?
18     **A. No, sir.**
19     Q. It says on the second -- on this Johnson &
20 Johnson letterhead, second page, "Destroy your copy of
21 the table. Your participation in the final important
22 phase of the round-robin is appreciated. Thank you
23 very much.
24     "Sincerely, John P. Schelz, Chairman, CTFA task
25 force on round-robin testing of consumer talcum

**154**

1    products."
2            Do you see that?
3    **A. Yes, I do.**
4    Q. And he carbon copies the vice-president of
5    science of the CTFA, Dr. Estrin; right?
6    **A. Yes, sir.**
7    Q. And also someone from the Bristol-Myers
8    Products Company; correct?
9    **A. That is correct.**
10   Q. And on the last document, Ms. Clancy points out
11   that John Schelz is identified as the chairman of the
12   CTFA task force.
13           Do you see that?
14   **A. I do.**
15   Q. Now, you've seen and evaluated many documents
16   from Johnson & Johnson, or their consultants, where it
17   says "nondetect."
18           Have you --
19   **A. I have.**
20   Q. -- not?
21   **A. Yes, sir, I have.**
22   Q. And have you identified and seen many documents
23   where it says they're looking for asbestos and they're
24   saying "nonquantifiable"?
25   **A. I have.**

**155**

1    Q. How can -- if you are of the opinion that
2    there's asbestos in these cosmetic talc products, how
3    can that possibly be when there are so many documents
4    that say "nondetect"?
5            MR. MULARCZYK: Calls for speculation.
6            MR. CALFO: It calls for speculation from this
7    witness.
8            THE COURT: That's overruled.
9            THE WITNESS: It's all about the sample
10   preparation and detection limit, the reason you would
11   have a nondetect. And there is a lot of nondetect
12   analysis by TEM for Johnson & Johnson. But it's all
13   about the detection limit.
14           If you set -- if you have a detection limit
15   that is higher than most, anytime that others,
16   including me, have found asbestos in the product, then
17   it's not surprising. If your method is not sensitive
18   enough, you're not going to detect it. You have to
19   have -- if your detection limit is up here but your
20   asbestos level is down here -- and think of a line,
21   can't find it if it goes below this detection limit --
22   and it's down here, you're going to have negative after
23   negative after negative. When you do find it, you've
24   hit those one or two samples that has a very high
25   concentration of asbestos in it.

**156**

1            It's all about the sample preparation and how
2    you do the analysis. If you can have a really
3    sensitive method or not.
4    Q. You talked about the tools you use. As a
5    demonstrative, I have two tools. I've got a bathroom
6    scale that I got at Walgreen's.
7            Do you see it says "Walgreens" on it there?
8    **A. Yes.**
9    Q. And I've got this type of scale, which -- what
10   do you call this type of scale?
11   **A. I would call that a jeweler scale.**
12   Q. And if we --
13   **A. A not -- a "not very sensitive one" jeweler
14   scale. But it should work for what you're doing.**
15   Q. So, for example, in thinking about detection
16   limit, if we have this -- and I've got a half-full box
17   of paperclips -- and we put it on the scale, the
18   bathroom scale I got at Walgreen, does it detect
19   anything?
20   **A. No. It's not -- it doesn't have a sensitive
21   detection limit.**
22           Now, you would -- not looking what's there, you
23   didn't know that, you would report that there's nothing
24   there. There's nothing on the scale. But that doesn't
25   make that half a box of paperclips disappear. So you

**157**

1    can't say there's nothing there unless you know what
2    your detection limit is, et cetera. It's all about the
3    sample prep.
4    Q. This one I don't know how to use.
5    **A. Don't forget -- don't forget the tear button.**
6    Q. Okay. So let's move this off here. And put
7    this on.
8            MS. CLANCY: True it.
9    BY MR. SATTERLEY:
10   Q. True it.
11           All right. Let's see what happens here.
12           Now, this scale is more sensitive. Does it
13   detect and pick up the same paperclips that we couldn't
14   pick up with the bathroom scale?
15   **A. Yes, sir. It's more sensitive, so now you have
16   a scale that has a better, more sensitive detection
17   limit. And that's what we have done and others have
18   done using this concentration method to increase the
19   sensitivity.**
20   Q. Now -- so the two expressions, or the two --
21   does "ND," does that stand for nondetect?
22   **A. Correct.**
23   Q. Like you -- there's many reports that say
24   nondetect with regard to samples; correct?
25   **A. Correct. When they did the analysis, they did**

**158**

1  not detect any asbestos.  So they put in, you know, ND.

2      Q. And then there's NQ.

3         What does "NQ" represent?

4      **A. In these tests, because you don't see this very**

5  **often at all, NQ would mean nonquantifiable.**

6      Q. And are you familiar with the test method

7  written by Johnson & Johnson called 7024, TM7024?

8      **A. Yes.**

9      Q. And have you analyzed in great detail the Test

10  Method 7024?

11      **A. Yes, sir, I have.  It's a TEM method.**

12      Q. And the 7024 method for the identification of

13  asbestos, in your opinion, does it have limitations?

14      **A. Yes, sir, it does.**

15      Q. And what limitations does the TM7024 have?

16      **A. Well, you start off with the biggest one.  It**

17  **doesn't use the heavy concentration method to prepare**

18  **the sample.**

19         So you have to dilute the sample, say -- again,

20  we'll go back to the 30 or 40 milligrams.

21  50 milligrams talc.  In order to make it where you can

22  get it on these little TEM grids, you may have to

23  dilute that a thousand times.

24         So you start off with that.  The second problem

25  with it is that it uses this "got to find five fibers."

**159**

1  And because you dilute it so much, it doesn't allow

2  you -- let me go back before that.

3         It doesn't allow you to expand the area you're

4  looking at.

5         So, if we're in this courtroom and we're

6  looking for our -- you got a -- a good example of this:

7  You got an acre of grass, high grass, and somebody asks

8  you, can you go find the ten golf balls that might be

9  out there?  But we're only going to let you look at

10  this little area over here and see if you find

11  anything.

12         Well, that's what happens with this method.

13  You're looking at these little TEM grids and it doesn't

14  allow you to expand the area to keep looking to see if

15  you can get a better sensitivity.

16         So, if I'm only allowed to look at a little

17  area of that one acre versus walking around the whole

18  acre, which -- which one of those tests have I -- have

19  a better chance to run into those golf balls?

20         And that's the second problem with this.  They

21  give you a time limit to how long you can spend doing

22  the analysis.

23      Q. Well, let me -- let me -- so time limit.

24         But let me go back to this.

25         You said five fiber requirement?

**160**

1      **A. Of any one type of asbestos.**

2      Q. Explain that.

3      **A. Well, if I analyzed the sample, with all the**

4  **limitations it has on it, and I find four tremolite**

5  **fibers, they will say that is nonquantifiable because**

6  **you have to find five to make it, quote, above**

7  **background.**

8         Not even -- to me, it even makes it a little

9  bit worse.  If you find four tremolite asbestos fibers

10  and four actinolite asbestos fibers -- now, those two

11  are related; a little bit more iron in the tremolite

12  chemistry will give you actinolite -- you still say

13  it's nonquantifiable because you didn't have five

14  actinolite and five tremolite or more.  Now, say you

15  have four tremolite, four actinolite, and four

16  anthophyllite asbestos.  It's still nonquantifiable

17  because you don't have five of each.

18         So, instead of just going, okay, here's what it

19  is, we found these five, this is the concentration, but

20  we don't believe it's above background, even though

21  there is no background of this, that would be a way to

22  at least give you the information and make a decision,

23  but the reports just say nonquantifiable.

24      Q. And have you seen instances where an analyst at

25  McCrone named Kent Sprague writes letters regarding

**161**

1  analysis of talc and says, there's no asbestiform

2  minerals there, but we see the backup sheet and the

3  backup data and we see, in fact, that there was

4  asbestos present?

5      **A. Yes, sir.**

6      Q. This is Exhibit 174, which is into evidence.

7  And, for example, this letter right here, Exhibit 174,

8  is dated 1990.  And Kent Sprague reports no

9  quantifiable asbestiform minerals; right?

10      **A. Yes, sir.**

11      Q. All right.  And in this instance, we have some

12  of the backup data.  A count sheet.  And by the way, in

13  most of the reports where it says nonquantifiable, do

14  we have the backup data?

15      **A. No.  Just about all of them we do not.**

16      Q. There's only a few examples of the backup data,

17  the count sheets like we've got here?

18      **A. Yes, sir.**

19      Q. All right.  In this backup data, does it

20  demonstrate anthophyllite present?

21      **A. It does.**

22      Q. And does it give the length and the width?

23      **A. Yes.  The length is 20 and a width is 1.5,**

24  **which is probably more likely than that a bundle.  And**

25  **if you divide 20 by 1.5, you would have an aspect ratio**

**162**

1  of about 7 and a half to 1.
2      Q. And in -- would that -- does that meet the
3  definition, anthophyllite, of regulated asbestos?
4      A. Yes, sir. It meets that definition as well as
5  the aspect ratio definition of the 7024 method.
6      Q. And so is this an example of, if you just rely
7  upon the report that says no quantifiable asbestos and
8  don't have the backup data, you would be misled into
9  believing there's no asbestos present?
10      MR. CALFO: Objection. Calls for speculation
11  on the part of this witness.
12      THE COURT: That's overruled.
13      THE WITNESS: Yes, sir. It would be very
14  unclear what that -- for somebody like me very unclear
15  what that means, nonquantifiable. It's either you can
16  count it or you -- or it's not there and you don't.
17  BY MR. SATTERLEY:
18      Q. And in this specific sample also -- we go a
19  couple pages over. Chrysotile. The structure is a
20  fiber. Type is chrysotile. And the length and the
21  width. And it says SAED -- SAED and EDS checked off
22  yes; right?
23      A. Yes, sir.
24      So, again, it's chrysotile asbestos and it --
25  they have all the right boxes checked for it to be

**163**

1  asbestos.
2      Q. And the next page -- and, in fact, at the
3  bottom of the next page it says "chrysotile fiber";
4  correct?
5      A. Yes, sir.
6      Q. All right. So in this one -- in this one
7  letter where it says no asbestiform by McCrone, the
8  McCrone Group, no quantifiable amounts of asbestiform,
9  we have two instances of asbestos, chrysotile asbestos
10  fiber and anthophyllite asbestos fiber; correct?
11      A. That is correct.
12      Q. That's Exhibit 174.
13      Now, the -- back to the method. The 7024.
14  It's into evidence as Exhibit 172. It's the actual
15  J&J Method 7024.
16      You've read this in detail; correct?
17      A. I have.
18      Q. And this is a J&J method specification;
19  correct?
20      A. Yes, sir, it is.
21      Q. Background correction. Now, what is that?
22      A. Background correction is that there is stray
23  asbestos fibers floating around in the air that somehow
24  gets on the sample and could confound the results. Or
25  that your laboratory you're using or your lab you've

**164**

1  got cross-contamination because you've got some stray
2  asbestos fibers getting in with the analysis.
3      So they call it background correction.
4      Q. And in the protocol and specification, what
5  does J&J say about background correction? Says it has
6  not been necessary. How is that significant or
7  important?
8      A. Well, it's significant because it verifies the
9  same thing we say. For these types of asbestos,
10  tremolite, actinolite, anthophyllite -- you do not have
11  background levels of this material. It's not used
12  in -- in very few asbestos products. Labs don't
13  typically have that poor of laboratory use that they
14  will cross-contaminate. So there's no such thing as
15  a -- ambiguous background level. Asbestos fibers are
16  heavier than air. They do not stay in the air for
17  eternity. They fall out, obeying the basic laws of
18  gravity. You don't have this, quote, background
19  causing contamination levels that somehow interfere in
20  your analysis. And I agree with that. We have seen no
21  background contamination in any of the processed
22  blanks, any of the QCs that we've done on any of these
23  samples. The filters doing the exact same type of
24  analysis are clean, so, therefore, below detection
25  limit of the analysis.

**165**

1      Q. So you're running blanks to make sure you don't
2  have contamination in the lab?
3      A. Correct. Blanks. Processed blanks where you
4  do the exact same thing you did to the sample you're
5  analyzing, except you don't put talc in it: heavy
6  liquid, centrifuge, the whole thing. And we analyze
7  the exact same area.
8      Q. So with J&J, when they say, "Background
9  contamination" -- "Background correction has not been
10  necessary, the amount of background asbestos detected
11  has been insignificant in comparison to the levels of
12  asbestos found in contaminated samples," do you agree
13  with that?
14      A. I agree that it's been insignificant. It's --
15  essentially, in our lab and others, it doesn't exist.
16  So it does not interfere with the analysis. So when
17  you find a single fiber or a single bundle in the
18  analysis of tremolite, actinolite, anthophyllite, it is
19  significant. It shows that that came from the cosmetic
20  talc itself and not from some stray contamination out
21  of the lab, in the air from somewhere, what -- whatever
22  it may be.
23      Q. Last question before lunch.
24      MR. SATTERLEY: Can I get one more question in,
25  Your Honor.

**166**

1    THE COURT:  I was going to cut you off right
2  there.
3    MR. SATTERLEY:  I saw you were going to cut me
4  off.
5    THE COURT:  I was going to.  One important
6  question.
7  BY MR. SATTERLEY:
8    Q.  It's preparation and analysis time.
9  Preparation time per sample, including preparation of
10  related materials is one hour.
11    In your opinion, Dr. Longo, is that reasonable?
12    **A.  Not for what we do on the heavy liquid**
13  **separation, on the preparation, one hour.  We don't --**
14  **we don't give time limits to our scientists at the**
15  **laboratory to either prepare a sample or to analyze the**
16  **sample.  Their only requirement is to do it right.**
17    MR. SATTERLEY:  Now would be a good time for
18  lunch, Your Honor.
19    THE COURT:  Ladies and gentlemen.  We are going
20  to go to lunch and come back at 1:30.
21    Remember the admonition that it is your duty as
22  jurors not to converse amongst yourselves or with
23  anyone else on any subject connected with the trial or
24  to form or express any opinion thereon until the matter
25  is submitted to you.

**167**

1    Enjoy your lunch.  See you back in an hour and
2  a half.
3    (Whereupon, the jury having exited the
4  courtroom, the following proceedings were held:)
5    THE COURT:  The record will reflect that the
6  jurors have departed the courtroom.
7    Is there anything you need to talk about?
8    MR. SATTERLEY:  Not from the plaintiff's
9  perspective, Your Honor.
10    MR. CALFO:  No, Your Honor.
11    MR. MULARCZYK:  No, Your Honor, thank you.
12    THE COURT:  All right.  I will see you at 1:30.
13    THE WITNESS:  Thank you, Your Honor.
14    (Lunch break taken.)
15    **(Afternoon Session)**
16    (Whereupon, the following proceedings were held
17  outside the presence of the jury:)
18    THE COURT:  All right.  We're back in session.
19    Is everybody here?
20    Okay.  All counsel are here, it appears.
21    Ms. Hill, please bring in the jury.
22    (Whereupon, the jury having entered the
23  courtroom, the following proceedings were held:)
24    THE COURT:  Good afternoon, ladies and
25  gentlemen.  The record reflect will that the jurors are

**168**

1  all in their preassigned seats, counsel is at counsel
2  table, and Mr. Longo is back in the witness box.
3    You will recall you're still under oath?
4    THE WITNESS:  Yes, Your Honor.
5    THE COURT:  Mr. Satterley, you may continue
6  with your direct examination of this witness.
7    MR. SATTERLEY:  Good afternoon, Dr. Longo.
8    Good afternoon, everyone.
9    THE WITNESS:  Good afternoon.
10  BY MR. SATTERLEY:
11    Q.  We left off talking about the Johnson & Johnson
12  TM7024 and the -- where we were talking about the
13  preparation and analysis time.  I read to you,
14  "Preparation time per sample, including preparation of
15  related materials, is one hour."
16    How long does the prep time take in your lab
17  for heavy liquid separation analysis?
18    **A.  Probably two hours.  Two to three hours to do**
19  **multiple samples.**
20    Q.  It says, under this J&J method, TM7024.
21  "Analysis search time."  Search time.  Does that mean
22  looking under the microscope looking for the asbestos
23  fibers or bundles?
24    **A.  Yes, sir.**
25    Q.  It says, "The search time per sample is a

**169**

1  maximum of two hours."
2    Correct?
3    **A.  That's what it states.**
4    Q.  And, from an analytical point of view, you
5  believe it's appropriate, or -- is it even possible to
6  find 20 different asbestos fibers or bundles in a
7  two-hour time frame?
8    **A.  No.  That would be impossible.**
9    Q.  Is it appropriate, in your view, to put an
10  arbitrary time limit like two hours for searching for
11  asbestos in a sample?
12    **A.  No.  Because, to me, that puts pressure on the**
13  **microscopist to get done.  It's more preferable to let**
14  **the microscopist take the time he needs till he feels**
15  **satisfied that he has an adequate search and/or**
16  **adequate analysis.  A sample that may have 15 or 20**
17  **asbestos fibers in it, it'd probably take two full**
18  **days.**
19    Q.  Also on the Exhibit 172, under Section 13,
20  there is a -- I got this one highlighted.  This is
21  still 172.  Page 7.  I'm going to figure this thing out
22  eventually.
23    Under definition of fiber:  It says, "An
24  elongated particle with parallel sides and an aspect
25  ratio K" -- oh, "greater than 3 to 1."

170

1          Do you see that?

2     A. Yes, sir.

3     Q. Is it your understanding that's Johnson &

4  Johnson's definition of a fiber, that's greater than

5  3 to 1?

6     A. Yes, sir.

7     Q. And in some of the regulatory definitions, does

8  regulatory -- some of the regulatory definitions

9  describe a fiber as being greater than 3 to 1?

10    A. Well, that's greater than or equal to 3 to 1.

11 Some of the OSHA documents for fibers are greater

12 than -- greater than or equal to 3 to 1.  So that

13 follows along the Federal Government on occupational

14 exposure for sizes of the fiber -- for the aspect ratio

15 of the fibers.

16    Q. And it says, "The definition employed may vary

17 with the needs of the client."

18         Do you see that?

19    A. Yes.

20    Q. Have you seen in any of the regulatory

21 framework -- whether it be OSHA, EPA, ISO -- that the

22 definition of what a fiber is needs to vary depending

23 upon who the client is or what the client needs?

24    A. No.  There's two definitions of fibers on

25 aspect ratios.  One is greater than or equal to 3 to 1

171

1  for occupational exposure analysis and the other one is

2  the standard TEM analysis where it's greater than or

3  equal to 5 to 1 aspect ratio.  Those are the only two

4  aspect ratios that I know of for optical microscopy or

5  transmission electron microscopy.

6     Q. This 7024, this method that we've been talking

7  about, is this generally accepted in the scientific

8  organizations as a proper way to analyze samples for

9  the presence of asbestos?

10    A. It's not in any of the standard protocols.

11 Using this type of method it has evolved since then.

12 And it's -- you know, in order to be fair, there's been

13 this running debate, is it McCrone's method or is it

14 J&J's method, depending on who you ask.

15    Q. The -- let's switch gears now and take this to

16 the side, and let's go to -- let's go to testing and

17 testing results.

18         What is the NIST or the NIST standard?

19    A. That is the National Institute of Standard and

20 Technology, and all laboratories that are certified or

21 doing this work should have a NIST standard for all the

22 regulated asbestos.  They sell you a bottle of

23 tremolite asbestos that's certified by the National

24 Institutes of Standard and Technology, and a bottle of

25 anthophyllite, chrysotile, amosite, crocidolite.  And

172

1  it's a requirement to have these standards in your lab

2  for your certifications.

3          MR. SATTERLEY:  May I approach, Your Honor?

4          THE COURT:  You may.

5  BY MR. SATTERLEY:

6     Q. This is marked for identification purposes only

7  as 1046.  Is this a NIST standard of tremolite asbestos

8  that your laboratory has and photographs were taken by

9  your laboratory?

10    A. Yes.  This is our NIST standard for tremolite

11 and those are our photographs.

12    Q. And we're going to display now the 1046.  And

13 it's hard to see.  But does it say "1867 bulk asbestos

14 uncommon" and then identifies tremolite?

15    A. Yes.

16    Q. And did your laboratory take the NIST standard,

17 put it under the TEM, and take photographs of it so

18 that we could see what the standard tremolite asbestos,

19 according to the National Institute of Standards and

20 Technology, what it looks like?

21    A. Yes.

22    Q. If we go to the second page of 1046, do the

23 photographs reflect -- reflected here represent

24 tremolite that your laboratory took from the tremolite

25 standard of the National Institute of Standards and

173

1  Technology?

2     A. Yes.  Those are two asbestos tremolite

3  structures on the left-hand side, and on the right-hand

4  side is the corresponding chemistry for the --

5  essentially the pattern that tremolite has for the one

6  on the very -- the very tall one is silicon and then --

7     Q. This right here?

8     A. Yes.

9          And then magnesium and then calcium.

10    Q. This?

11    A. And then sometimes a little iron to the further

12 on the right.

13         Then that really big peak all the way to the

14 right is copper, because it's on a copper grid.

15    Q. That's the grid itself?

16    A. Correct.

17    Q. And you said iron.  Is this a little iron peak

18 there?

19    A. Yeah.  Sometimes it's there, sometimes it's

20 not.

21    Q. And this right here, that I put my -- that's

22 the calcium?

23    A. Correct.

24    Q. And is that calcium distinguish tremolite from

25 anthophyllite or talc?

45 of 85 sheets
Case 3:16-md-02738-MAS-RLS    Document 33132-2    Filed 08/23/24    Page 380 of 1320
PageID: 249375
Page 174 to 177 of 334

174

1    A. It does.
2    Q. If you had no calcium there and you had this
3  pattern, would that be consistent with anthophyllite?
4    A. It would be -- yes. It would be close to
5  anthophyllite or fibrous talc.
6    Q. And is fibrous talc and anthophyllite
7  chemistry, the chemistry of it, substantially similar?
8    A. It is.
9    Q. And by the way, the photographs that we're
10  seeing here on this NIST standard, is this a -- a
11  fiber?
12    A. No. The -- both those, in my opinion, based on
13  the photographs, are bundles of fibers.
14    Q. And what is it about the photograph, the
15  appearance, that represents it as a bundle of fibers?
16    A. Well, it's kind of hard to see from this far
17  back, but on the bottom right-hand end, you'll see what
18  looks like almost little protrusions sticking out of
19  the bottom. If you can then see this under the
20  microscope, you can see the striations that these are
21  individual fibers all packed together. And that's the
22  definition of a bundle: parallel fibers that are
23  touching, not spread apart.
24    And the top one the same thing. This one's a
25  little different in that you can see one, two, three,

175

1  four, five, six, a number of individual fibers, and you
2  have one long one on the top right-hand side.
3    So these would be two bundles of tremolite
4  asbestos.
5    Q. And then the last page, on the NIST standard,
6  does it show the diffraction pattern or the selected
7  area electron diffraction image?
8    A. Yes.
9    Q. And we heard from Mr. Poye about this the other
10  day. But can you just remind us again. What are we
11  seeing in here and how do we know this is an amphibole
12  or asbestos based upon this diffraction pattern?
13    A. Well, nobody -- at least we don't -- just base
14  something on a diffraction pattern. We look at three
15  things: The morphology. Is it fibrous? Does it meet
16  the definition? Very important, the microchemistry.
17  Does it have a tremolite chemistry, the right ratios of
18  magnesium, the calcium, and the one tall silicon peak?
19  And does it have an amphibole-type d-spacing -- that's
20  the -- that's the distance between the row of atoms --
21  that are consistent with tremolite?
22    So it's not just one thing. Everything goes
23  through a series of diagnostic tests. You know, A,
24  yes. It has the right morphology. It's fibrous.
25  Check.

176

1    Second, the chemistry. Does the chemistry
2  match? And tremolite is very distinct. Check.
3    Does it have an amphibole diffraction spacing
4  between the atoms that are in the range of what you
5  would expect for tremolite which are off standard x-ray
6  cards for x-ray diffraction? Check.
7    And there it is.
8    You can't -- you just can't rely on one thing.
9  You put it all together and it says, yes, by all the
10  standards, this is tremolite asbestos.
11    Q. Now, if somebody were to say, Dr. Longo, wait a
12  second, you didn't measure the space and do what's
13  called a zone-axis measurement of this, so how can you
14  possibly know that's an amphibole pattern, because you
15  didn't measure it? Is that a fair criticism, in your
16  view?
17    A. Absolutely not.
18    Q. And why -- why do you say that?
19    A. You don't need a zone-axis diffraction pattern.
20  If all's you had was a diffraction pattern and no
21  chemistry to go along with it, then, yes, you need to
22  do at least one zone-axis diffraction, and you have --
23  and that's how microscopists would have done it in the
24  '70s and early '80s before EDXA or the microchemistry
25  got so good, for lack of a better word. So you don't

177

1  need that. It's not required in any of the standard
2  protocols to do that.
3    Q. Did George Yamate, years ago, 30 years ago,
4  suggest zone-axis measurements?
5    A. George Yamate said for EPA Level 3, and if it's
6  going to be a -- if it's going to be a legal case, you
7  need to do zone -- you need to do a couple zone-axis
8  diffraction patterns to verify.
9    Q. Now, I'm going to switch gears back to -- away
10  from the standard to the -- your testing, actually.
11    Do you -- do you employ the methods for the
12  identification of asbestos that have been recognized,
13  the International Standard Organization methods, the
14  other methods, for the proper identification of
15  asbestos?
16    A. Yes.
17    Q. And have -- did you employ -- you and your lab
18  employed those clearly-defined methods in the
19  identification, in the characterization of asbestos in
20  talc?
21    A. Yes, we did.
22    Q. Anywhere, in any of the methods that you
23  examined for the identification of asbestos in talc, is
24  there a requirement that you do what's called a, quote,
25  backscatter analysis?

178

1      A. No.

2      Q. If somebody were to come to this courtroom and

3  say, I'm state of the art, I use backscatter analysis

4  and I can determine there's no asbestos here because

5  the backscatter analysis that I use, is that in any

6  method whatsoever for the identification of asbestos?

7      **A. No. That would not be, in my opinion, a -- a**

8  **method used to identify different types of asbestos.**

9  **That was not -- backscatter detectors and transmission**

10 **electron microscopes were never designed to do**

11 **irregular surfaces like asbestos fibers. It has to**

12 **be -- we did it in graduate school. It has to be a**

13 **polished surface so you can see all the different**

14 **orientations of the crystal. If it's round like**

15 **asbestos fiber or bundle, it is very difficult to**

16 **identify without numerous standards, and that's even in**

17 **the published papers about that.**

18     So it's not recognized in any -- any agency as

19 a method for the identification of asbestos.

20     Q. So let's -- let's jump right into the -- these

21 books. You have binders over -- box -- two boxes of

22 binders next to you, do you not, Doctor?

23     A. Yes, sir.

24     Q. And within the -- the binders -- and these are

25 already admitted into evidence.

179

1      Just so the record is clear, I'm going to start

2  with the box that's got the J&J -- the box that J&J

3  tested.

4      **A. Okay.**

5      Q. Okay? And let's start --

6      By the way, did you and your laboratory look at

7  historical samples provided by J&J at J&J's lab over

8  the last several months, in the last year or so?

9      **A. Probably the last year, yes.**

10     Q. Let's take a step back before we get to these

11 real quick.

12     Originally a couple years ago, did you -- did I

13 provide you samples that I got from collectors -- from

14 one collector, and did other lawyers provide you

15 samples to look at that got -- purchased from eBay and

16 purchased -- or got from individual clients that had

17 claims, and did you analyze a whole bunch of J&J

18 products a couple years ago?

19     **A. Yes.**

20     THE COURT: Do you want to ask just one

21 question at a time.

22     MR. SATTERLEY: I'm sorry. I apologize,

23 Your Honor.

24     THE COURT: Go ahead. Just start over.

25     I don't know which one he answered there, but

180

1  go ahead.

2      THE WITNESS: Yes, yes, yes, and yes.

3  BY MR. SATTERLEY:

4      Q. Let me break it down.

5      A couple years ago, did I provide you three

6  samples?

7      A. Yes.

8      Q. Did I provide an affidavit from a collector?

9      A. Yes.

10     Q. Did you analyze those three samples that I

11 provided to you a couple years ago?

12     A. Yes.

13     Q. Did other attorneys from other law firms

14 provide you samples?

15     A. Yes.

16     Q. Did you -- some of those samples -- were some

17 of those samples that you understood were obtained off

18 eBay?

19     **A. That is correct.**

20     Q. And were -- some of those samples, did you

21 understand were obtained from individual clients that

22 had a claim against J&J?

23     A. Yes.

24     Q. Okay. And did you analyze all those samples in

25 2017, the fall of 2017?

181

1      A. Yes.

2      Q. And did you issue a written report with

3  photographs and -- and come to opinions and conclusions

4  about those -- those specific samples?

5      A. Yes.

6      Q. And were you examined by J&J lawyers in detail

7  about those samples?

8      **A. A number of times.**

9      Q. Okay. Did you do what's called a particle size

10 distribution to verify the particle size of the talc

11 and things in the samples?

12     A. Yes.

13     Q. All right. Did you -- subsequent to all that

14 work, the three samples I provided you, the eBay, the

15 clients, did we provide you samples that we got

16 directly from J&J?

17     A. Yes, sir.

18     Q. Okay. And before we got the samples from J&J,

19 directly from J&J, did J&J lawyers cross-examine you

20 and criticize you with regards to the samples that you

21 had off eBay?

22     A. Yes.

23     Q. Okay. Did they accuse of maybe -- or suggest

24 that the lawyers contaminated the samples?

25     A. Yes.

182

1    Q. Did they suggest maybe the samples were
2  contaminated in some -- by some other third party?
3        MR. CALFO: Your Honor, this is improper
4  direct.
5        THE COURT: May I see counsel at sidebar.
6        MR. SATTERLEY: In the interests of time, I'll
7  move on.
8        THE COURT: All right.
9        MR. SATTERLEY: Okay.
10 BY MR. SATTERLEY:
11   Q. Subsequent to -- to -- in the original analysis
12 you did, did you report, in your opinion, accurate
13 findings of all the asbestos you -- you found?
14   A. Yes, sir.
15   Q. And did you take photographs of them?
16   A. Yes.
17   Q. And did you take EDS of them?
18   A. We did.
19   Q. And did you take selected area electron
20 diffraction?
21   A. Yes, sir.
22   Q. All the backup data?
23   A. Yes.
24   Q. Okay. Now, subsequent to all that, did you
25 obtain directly from me or lawyers representing

183

1  individuals samples J&J provided from their historical
2  collection?
3    A. Yes, sir.
4    Q. Okay. And what we have in these binders -- do
5  you have in the binders results from some of the
6  historical samples that you've analyzed?
7    A. Yes, sir.
8    Q. And as a matter of fact, did Johnson & Johnson
9  also provide photographs and dates, if we go to the
10 1960s, the historical samples from the 1960s? This is
11 Exhibit 1080 in evidence.
12       So, for example, this one is a photograph of
13 one of the historical samples that your lab and
14 laboratory analyzed; correct?
15   A. Correct.
16   Q. And the way it worked was -- and you correct me
17 if I am wrong, but you -- your lab got just a very
18 small portion of each of the samples so that another
19 laboratory, a laboratory hired by Johnson & Johnson
20 lawyers, could look at those as well; correct?
21   A. That is correct.
22   Q. All right. And included in Exhibit 1080, do
23 you have -- you have photographs of your findings,
24 including photographs of PLM, TEM, and so forth?
25   A. Yes. Yes, that's correct.

184

1    Q. And do you have also the -- the EDS, the
2  chemistry, for example, the chemistry of what you
3  found?
4    A. Correct.
5    Q. Okay. And do you have the selected area
6  electron --
7    A. Yes.
8    Q. And so in the binder, Number 1080, are there
9  the identification -- photographs of the identification
10 of asbestos and fibrous talc in this binder?
11   A. Yes. **The results are the photographs for both**
12 **the transmission electron microscopy as well as the**
13 **polarized light microscopy for positive samples,**
14 **typically using the Blount method for PLM.**
15   Q. And many of the photographs, do they also --
16 the samples, have the date of the sample, according to
17 J&J? This was 1966 or '67, according to what they
18 provided to us?
19   A. Yes, sir.
20   Q. And let me just go through the record real
21 quick so that we have the record real clear.
22       The 1970s -- is that 1081 historical samples --
23 the photographs of the historical samples from the
24 1970s?
25   A. Yes.

185

1    Q. And did your lab and laboratory break the
2  samples down by sample numbers and have an M number,
3  M -- like, for example, M69042, is that a sample --
4  sample number that your lab analyzed?
5    A. Yeah. **This would be our sample tracking**
6  **numbers, where -- when we log samples in, we go ahead**
7  **and give it a sample tracking number so that we can**
8  **keep track of it.**
9    Q. And I'm going to come back to the '70s in a
10 little bit.
11       In the 1980s, did -- all the photographs of
12 asbestos that you found in the 1980s, is it
13 Exhibit 1082?
14   A. Yes, it is.
15   Q. And does it have -- are these true and accurate
16 photo- -- photographs of the -- of the asbestos
17 anthophyllite, tremolite, actinolite that you found --
18 you and your laboratory found in the Johnson's Baby
19 Powder in the 1980s?
20   A. Yes, sir.
21   Q. In the 1990s -- Exhibit 1083, does it have
22 photographs of nine different samples in the 1990s
23 where asbestos is identified, documented in -- in this
24 in this binder?
25   A. Yes, sir.

**186**

1    Q. And in the 2000s -- and this is going to be --
2    the 2000s, this is going to be Exhibit 1084.  Are there
3    five different samples where photographs were taken
4    regarding the presence of tremolite and asbestos in the
5    2000s?
6    A. Yes.
7    Q. And did you -- have you also prepared and
8    provided to Johnson & Johnson a report on Chinese talc,
9    where you analyzed Chinese talc for the presence of
10   asbestos?
11   A. Yes, sir.
12   Q. And did you document asbestos from the Chinese
13   talc from Johnson's Baby Powder?
14   A. Yes.
15   Q. And the last binder is 1065.  This is a
16   verification of Lee Poye's TEM analysis of J&J
17   historical Vermont Shower sample -- Shower to Shower
18   samples.  And did you take photographs and verify the
19   presence of asbestos from Lee Poye's analysis?
20   A. Yes, we did.
21   Q. And he was here the other day, and he testified
22   that you and your lab verified 98 percent of asbestos
23   that he found in the Shower to Shower.
24   A. That is correct.
25   Q. Now, obviously, I'm not going to go through all

**187**

1    these pictures today.  There are literally -- there's a
2    heck of a lot.  So -- but I -- what I do want to do is
3    have you explain some things to us.
4    A. All right.
5    Q. And, for example, if you could go to the 19- --
6    Before I go to the 1960s, some of the samples
7    that you looked at, at the request of me and the other
8    lawyers, in 2017, were those samples going back into
9    the '50s and the '40s and the '30s, very old samples?
10   A. Yes, sir.
11   Q. Okay.  And did -- did you document the asbestos
12   and take photographs of asbestos in those very old
13   samples?
14   A. I did.
15   Q. Okay.  Now, the '60s -- if you could go to the
16   binders that's the '60s.  And let's just pick out so we
17   can explain what PLM -- if you could tell me a tab
18   number that would explain what -- what PLM photographs
19   look like so we can talk about what you found.
20   A. Let's just go to Tab -- pick one here -- Tab 3.
21   Q. Tab 3.  Okay.  And we have page numbers at the
22   bottom.
23   A. That would be page 41.
24   Q. All right.  So tell you what.  I'm going to
25   take it out of the binder, make it easier for you.

**188**

1    There you go.  It's hard to see because of the light.
2    MR. SATTERLEY:  Your Honor, may I turn the
3    light off?  Maybe -- I don't know if the reflection
4    will -- the front light here?
5    THE COURT:  I don't think that's a reflection.
6    MR. SATTERLEY:  Not going to work?
7    THE CLERK:  I think it's the reflection from
8    the...
9    MR. SATTERLEY:  It might be here, on...
10   Oh, there we go.  That -- that helps out right
11   there.  That helps out.
12   BY MR. SATTERLEY:
13   Q. Dr. Longo, what are we looking at?
14   A. This is a photomicrograph using polarized light
15   microscopy.  And in this particular case, for this
16   sample here, the analyst identified this as
17   actinolite/tremolite.
18   Now, this is known as dispersion staining,
19   which is part of what happens in polarized light
20   microscopy.  There is actually no staining involved.
21   It's just a matter of changing the characteristics of
22   the optical microscope, cutting the light down and
23   changing the F-stop.
24   And so what we're looking at is light being
25   refracted around the bundle under dispersion staining.

**189**

1    And because of the color of that light being refracted
2    around the fiber under -- under polarized light, it
3    gives you a certain color.
4    And that color there, you would say is sort of
5    yellowish-golden, and it's parallel to the light, so
6    that the light is coming in one direction, parallel to
7    it.  And when it refracts around the bundle, it will
8    refract in this light -- in this -- they call it a
9    vibration, but it's actually the wavelength of light.
10   And the analyst will say, "Okay.  That is a
11   goldish -- that is a yellowish-gold," and has a chart
12   that they look up and say, "Okay.  At this color, it's
13   going to be this refractive indices," meaning 1.62 or
14   1.61.
15   And then he'll -- go to the next one.  He'll go
16   to the perpendicular direction.
17   Q. The next slide?
18   A. The next slide.
19   Q. All right.  So -- so this -- before --
20   A. That's -- you're putting a purple one on there.
21   That's not the next side.  Turn it up --
22   Q. Oh, this way.  Double-sided.
23   A. Turn -- turn the one you have upside down.
24   Q. Oh.  All right.
25   A. Now, that is that -- that is the exact same

49 of 85 sheets
Case 3:16-md-02738-MAS-RLS    Document 33132-2    Filed 08/23/24    Page 384 of 1320
PageID: 249379
Page 190 to 193 of 334

**190**

1   bundle. He's now rotated it so the light is going
2   through at a different direction, and you'll get a
3   darker reddish color there. And then he can do the
4   refractive indices, and say, "This is in the range of
5   actinolite/tremolite."
6         These analysts that I have -- this particular
7   person has been doing this for almost 30 years. He's a
8   geologist, trained at McCrone, or Walter McCrone's
9   group, back 30 years ago to do this. All our analysts
10  were trained by Walter McCrone many, many, many years
11  ago, because that's what they -- what he did, and this
12  is how -- the protocol.
13        So they look at this, and then they have some
14  other stuff that they do. Extinction angle. If you
15  keep turning it to some point, the light refracted
16  through the material will be the same as the light
17  around the material on a particular angle. So it
18  disappears. And when it disappears, they call it the
19  extinction angle.
20        And so tremolite and actinolite, if you turn it
21  slightly oblique, start going this way, it just fades
22  out. They'll go, "Okay. That's indicative of
23  tremolite/actinolite."
24        Then the refractive indices -- and then they --
25  and everybody likes the next one because it's such a

**191**

1   pretty color. It's called elongation. Now you can put
2   the purple up.
3         Q. Before I get the purple one out, let me just
4   ask a couple questions.
5         It says, "actinolite/tremolite." You -- and
6   you described this as bundles.
7         A. Yeah. Go back to the previous one.
8         Q. Well, I mean, why -- why can't -- why can't
9   this just be a cleavage fragment? This is a cleavage
10  fragment, Dr. Longo, isn't it?
11        A. No. No, it's not.
12        Q. Why not?
13        A. If you -- you can't quite see it from there.
14  If you look at it, you can see striations in the bundle
15  itself. I don't know if you can -- you actually see
16  lines going through it. It's hard to see on this one.
17  We'll get a better -- just because you're blowing it
18  up.
19        So it's difficult to see here, just because
20  you're blowing it up, but it actually has striations
21  going through it that make up this.
22        And it's large. This is 88.5 micrometers in
23  length. If you want to know the aspect ratio, you
24  don't measure the whole bundle. The protocol tells you
25  to measure the individual fibers.

**192**

1         And I know it's hard to see it. We might have
2   a better example, because it's bigger than this one.
3         So the aspect ratios on here are all running
4   about -- in this particular one between 160- and
5   200-to-1 aspect ratio. This is a bundle. This is not
6   a cleavage fragment.
7         And it's meeting the counting protocols for
8   aspect ratios greater than 5 to 1, individual fibers,
9   and, therefore, is a regulated asbestos bundle.
10        Q. The purple one that you -- this page 43 --
11        A. This is called elongation. When you turn it in
12  this direction -- you have to put another filter in
13  there. It's a 530-nanometer filter that, again,
14  changes the vibration of the light, gives you these
15  beautiful colors.
16        But it tells you how fast the light goes
17  through the crystal via the orientation, either this
18  way or that way. And if you switch it the other way,
19  it changes colors, and these particular colors will
20  tell you what type of asbestos this is.
21        So it's a very involved analysis.
22        Q. And is it your opinion that this is --
23        Let's zoom it back out.
24        -- tremolite?
25        A. Well, it's actinolite/tremolite. We don't

**193**

1   differentiate between actinolite and tremolite. You
2   have to --
3         Q. Under PLM?
4         A. Under PLM, because you have to go to another
5   RI, refractive indices, fluid.
6         And since both of those are regulated asbestos,
7   tremolite and/or actinolite, and actinolite is part of
8   the whole solid solution series of tremolite --
9   meaning, eons ago, when it all formed, what -- if there
10  was a little bit more iron present, you could get more
11  on the actinolite side; if there's less iron, you get
12  more on the tremolite side.
13        Since it's regulated, we don't go the extra
14  step.
15        Q. So on this particular one, this has got
16  M68503-009; right?
17        A. Right. And it has -- you can see the "BL" on
18  there. That means that was the Blount -- this is a
19  Blount PLM.
20        Q. You used the Blount method?
21        A. Yes, sir.
22        Q. Under the -- the same number, M68503-009, we
23  have a TEM photograph. That's going to be on page 50
24  of this exhibit. And explain what this represents.
25        A. This is a tremolite -- it's either a fiber or a

194

1 bundle. I would have to be sitting at the microscope
2 so I could adjust the focal plane and go in higher
3 magnification to tell you if it was either a fiber or a
4 bundle.
5     But it -- either way, it's still a regulated
6 asbestos structure, meeting the counting rules. In --
7 in this particular case, it's tremolite.
8     Q. And do you include with this in your report --
9 it's part of exhibit -- the exhibit here, the chemistry
10 and the selected area electron diffraction?
11     A. Yes.
12     Q. And throughout these binders, you do that with
13 regards to the photographs, provide for the TEM, the
14 selected area electron diffraction and EDS?
15     A. Yes.
16     Q. If we go to Tab 4, I want to ask you about
17 page 59 and 60. And page 59 has the pretty purple with
18 the blue. There is an arrow right here, and it says
19 "actinolite/tremolite elongation."
20     A. Yes.
21     Q. Is this another example of asbestos fibers
22 documented by the PLM method?
23     A. Yes. And if you go to page 57, it's that same
24 asbestos bundle. And you can see the striations a
25 little bit easier on page 57.

195

1     Q. 57?
2     A. You just had it in your hand.
3     Q. This one right here?
4     A. Yes. I don't know if you can see it -- my
5 glasses are -- need a new prescription -- but if you
6 look at that closely on the ends you can actually see
7 individual fibers on each end of that bundle.
8     Q. Oh, I see. It's a different magnification,
9 then; right?
10     A. That's at a hundred times. There you go.
11     Now, see on the very -- on each end, you can
12 see what looks like little fibers protruding out of
13 that, that's a classic bundle.
14     Q. I got it upside down.
15     A. Now that you have turned it right side up, it's
16 still a bundle.
17     Q. It's still a bundle.
18     A. So that's almost 70 micrometers long, and if
19 you take one of those little fibers in there for the
20 width, because that's how you determine the aspect
21 ratio on the PLM, you easily have something that's
22 200 to 1 or greater for your aspect ratio in that.
23     And interesting, TEM, even though we have
24 positive TEM samples for this same thing, you never see
25 these large bundles. Every microscopist in the country

196

1 understands that TEM is biased against these very large
2 bundles. And we don't know why. It gets caught up in
3 the sample prep, because everything you see is smaller
4 than that in TEM. Even though TEM is more sensitive.
5     So there is room for both analysis here, the
6 large stuff and the smaller asbestos stuff, using these
7 two different techniques.
8     Q. Did you find asbestos in samples -- in many of
9 the samples from the '70s as well?
10     A. Yes, sir.
11     Q. And what about the '80s?
12     A. Yes, sir.
13     Q. And what about the '90s?
14     A. Yes.
15     Q. And let's go up to the binder that's listed as
16 the '80s. Exhibit 1082.
17     And, once again, the photographs with the
18 numbers are on there; correct?
19     A. That is correct.
20     Q. So, for example, this one right here, we look
21 and zoom in, it says "1985" on it, I think, on the
22 bottle -- the actual bottle itself. J&J BPC1985;
23 right?
24     A. That is correct.
25     Q. If you could, just in the '80s, give us a

197

1 representative sample -- well, let me -- let me pick
2 one out because I don't know what I'm looking at here.
3     Let's look at Tab 2, page 14. It's upside down
4 again. Oh, now it's upside down. I don't know how to
5 use this thing.
6     Anyway, Dr. Longo, what's represented here?
7     A. This is another tremolite/actinolite bundle,
8 and this is again under elongation, so it's measuring
9 the speed of the light through the -- essentially the
10 crystalline fiber.
11     This is at a magnification of 200 times, and
12 it's showing you some of the striations of the
13 individual fibers that you can see if you go back to
14 page 13, which would be the other side of what you
15 have.
16     And this is under dispersion staining. And it
17 shows you under a hundred X that -- and, again,
18 dispersion staining one goes around the bundle, so you
19 see more what's happening on the edges. It again shows
20 individual fibers.
21     And this is a bundle that's 64 micrometers --
22 63.4 micrometers in length. So these are all large
23 bundles that we're finding by the Blount PLM method.
24     Q. And if we flip over to page 16, I see that this
25 is marked anthophyllite on part of the structure -- or

**198**

1  part of the bundle and talc on another part of the
2  bundle.  Explain that.
3      A.  Well, it's either a transitional but more
4  likely what we're looking at here is the anthophyllite
5  bundling on a particle of talc, because the
6  anthophyllite is all the way from one end to the other.
7  When you have these transitional anthophyllite talc
8  fibers, you'll see that it's almost growing, looks like
9  one is growing inside the other.  But here we have it
10  on the edge, and what we have next to it looks like a
11  talc -- under a talc plate.  So we see this sometimes
12  where you have an asbestos fiber sitting on or under a
13  talc plate.
14      Q.  And then, if we go over to 17, page 17, we have
15  talc and anthophyllite right next to each other.
16  Bundles of both; correct?
17      A.  It's either bundles or a small plate.  And
18  here's one of the ways you can tell the difference
19  between asbestos and talc.  The very thick portion of
20  the talc plate, the colors aren't similar, and then
21  between where we have the talc in the anthophyllite
22  bundle, it's almost a darkish bluish color, and that
23  tells you that is not anthophyllite.
24      So we -- and then we have that one bundle
25  anthophyllite.  And, again, I believe it's laying on

**199**

1  top of the talc particle.
2      Q.  Then we go to page 19.  We have anthophyllite
3  bundle crossed polar.  What's that mean?
4      A.  The optical -- the polarized light microscope
5  has two polarizing lens, one on the bottom and one on
6  the top.  And polarized light is like polarized
7  sunglasses.  It causes -- the light is scattering
8  everywhere and it grabs the light and that only is
9  going in one direction.  That's why you don't get the
10  glare and stuff when you used polarized light
11  microscopes.  You can -- if you fish, you can see the
12  fish better.
13      Now, if you got two of them, you can change the
14  direction pretty drastically and get another direction
15  in there.  So in crossed polars, we have the polars
16  turned crossways to each other.  And so now we're
17  seeing just the anthophyllite portion where the arrow
18  is.  Everything else you see there that we are looking
19  at that talc plate is talc.  And you can see that is
20  definitely a different color.  And you can also see
21  some of the individual striations there.
22      Q.  And do you include in the photographs, the TEM
23  photographs from the same sample?  For example, Tab 2,
24  does it have both TEM photographs as well as
25  PLM photographs?

**200**

1      A.  Yes, sir.
2      Q.  In the interests of time, I'm not going to go
3  through every decade or every -- but are there
4  confirmed photographic evidence of asbestos in the
5  '60s, '70s, '80s, '90s, and 2000s?
6      A.  Yes, sir.
7      Q.  Any question in your mind regarding that?
8      A.  No, none whatsoever.
9      Q.  Have you confirmed, in your opinion, what has
10  been documented in the documentary evidence of what we
11  went over earlier about Johnson & Johnson Baby Powder?
12      MR. CALFO:  Objection, no foundation.  Calls
13  for speculation on the part of this witness.
14      THE COURT:  That's overruled.
15      THE WITNESS:  I'm sorry.  Could you repeat it.
16  BY MR. SATTERLEY:
17      Q.  Yeah.  Have you, in your opinion, confirmed and
18  taken photographs of the presence of asbestos in
19  Johnson & Johnson Baby Powder that were -- was
20  documented in the documents we went over this morning?
21      A.  Yes.
22      Q.  Back in -- historical?
23      A.  Yes.  We -- finding the same thing.
24      Q.  With regards to -- we don't have your reports
25  in here, just the photographs, but do you have the

**201**

1  reports, your reports, with you?
2      A.  Yes, sir, I do.
3      Q.  And, with regards to the Johnson & Johnson Baby
4  Powder, the -- what percentage of positives did you
5  find, meaning what percentage had asbestos in them?
6      A.  For the 72 samples, what I call historical,
7  57 containers and 15 railroad car samples, we had an
8  overall total positive of approximately 68 percent of
9  the 72 we analyzed.
10      Q.  So does that mean, Dr. Longo, that if 68
11  percent was positive, that means 30 -- was 32 percent
12  there's no asbestos there, in any of those bottles?
13      A.  No.  Doesn't mean that.
14      Q.  Well, why not?  Why not?
15      A.  It means --
16      MR. CALFO:  Objection, Your Honor.  This calls
17  for speculation.  There's no asbestos.
18      THE COURT:  That's overruled.
19      THE WITNESS:  Well, it's just below your
20  detection limit.  So at some point all's you can say
21  is, it's below our detection limit, we can't verify if
22  it's there, and we can't verify.  And nobody can ever
23  say, it's pure and it's not there, because you can't
24  get to that low of detection limit.  All's you can say
25  is nondetect.  We can't verify it's there or not there.

Page 202 to 205 of 334
Case 3:16-md-02738-MAS-RLS    Document 33132-2    Filed 08/23/24    Page 387 of 1320 PageID: 249382
52 of 85 sheets

**202**

1  BY MR. SATTERLEY:

2      Q. How many fibers would have to be there in order

3  for you to even detect it in the method that you're

4  using?

5      A. Right now we have our detection limit that we

6  used here, and I'm just going to scan through the

7  report real quick. We've gotten our detection limit

8  down for these analysis to 3,000 asbestos fibers or

9  bundles per gram of talc. So we have to have at least

10  that many there, in one sample. Then most of them are

11  5 and 6,000 fibers or bundles of asbestos per gram.

12      So think of it as this: If my detection limit

13  is 6,000, that means I have to find -- for me to find

14  one fiber, it has to be at least 6,000 fibers and

15  bundles per gram of cosmetic talc to find one. Because

16  it's spread out through there.

17      Q. And have you -- have you done the calculation

18  with regard to the 7024 with regards to how many

19  asbestos fibers would need to be there per gram under

20  their method?

21      A. Approximately 14 million for one fiber to be

22  there using --

23      Q. For one fiber?

24      A. To be using that method.

25      Q. But wait a second. Their -- their method says

**203**

1  they have as many as 20 or 5 fibers of any -- of each

2  variety; right?

3      A. Correct.

4      Q. So you're saying 14 million for one fiber, so

5  how many asbestos fibers could be present under the

6  7024 method and still qualify as nonquantifiable?

7      A. It works out to be about 6' -- well, you take

8  four fibers, it's around 58 million before you -- you'd

9  have to have one more fiber to get that fifth fiber

10  before you would say, yes, it has asbestos in it.

11      If you only had four tremolites, that would

12  work out to a little bit over 50 million asbestos

13  fibers or bundle per gram to find one, because the

14  detection limit is so bad in that protocol.

15      Q. And if you had -- had to find four or five of

16  the same of each variety, so you could have -- you

17  could have four tremolite, four anthophyllite, four

18  actinolite, and four chrysotile and still call it

19  nonquantifiable, what number are we talking about

20  asbestos fibers present and still be able to say it's

21  nonquantifiable?

22      A. A little bit over 200 million fibers and

23  bundles per gram.

24      Q. I apologize.

25      All right. Now let me switch gears and talk

**204**

1  with you about Colgate, Colgate testing. And Cashmere

2  Bouquet. Last year, at the request of other attorneys,

3  did you analyze 3 -- or did you analyze 38 samples of

4  Cashmere Bouquet?

5      A. Yes.

6      Q. And did you take photographs and document what

7  your laboratory found in tab, what's called Appendix A,

8  Appendix B, and Appendix C?

9      A. Correct.

10      Q. And we marked as Appendix A -- it's into

11  evidence, I should say, as 1091, photographs from

12  Appendix A.

13      And what does that represent?

14      A. Appendix A is the samples that we received from

15  the law firm of Simon Greenstone.

16      Q. And did you document a photograph of the

17  containers, photograph of the analysis? Did you

18  photograph what was identified?

19      A. Yes, sir. But to be fair, to be included in

20  that, we videotaped the opening up of the seal,

21  Cashmere Bouquet face powder samples that we got.

22      Q. These were sealed?

23      A. Not all of them. But 20 out of these 25 were

24  sealed with the manufacturer's sort of a paper-type

25  covering over than the entire area. Underneath it

**205**

1  would be the talcum powder. Sort of a -- they're round

2  and they were all still sealed.

3      Q. Now, I want to -- I'm not going to go through

4  all the photographs in Appendix A, but I want to go

5  through a few of them just so that we can understand

6  what they represent. And I'm just going to randomly

7  pick. If you go to sample, under Tab 12, which is

8  M68072. If you go to -- it's page 220.

9      A. Okay.

10      Q. What are we seeing here in the Cashmere

11  Bouquet, one of the samples?

12      A. I'm sorry. What page are you on?

13      Q. 220. It's got a number, M68072.

14      A. That is a -- it looks like -- if I were to pick

15  that -- let me see if I can find it. All right. Hold

16  on. That would be a tremolite/actinolite bundle for

17  001003. Oh, I'm sorry. We're on -- I'm on the wrong

18  one. You said 220; right?

19      Q. Yeah. 220.

20      A. That would be Number 4 out of that sample.

21  That is a crushed tremolite/actinolite bundle. When I

22  say "crushed," looking at it, it looks like, because

23  this material is milled, meaning it's all ground up to

24  make a certain size, it looks like that was pushed down

25  and caused that bundle to spread apart instead of

**206**

1  saying that's three bundles.

2      So that's a tremolite/actinolite.  Very large

3  bundle.

4      Q.  And if we flip over to this, what does this

5  represent?  This is page 219.  Immediately pre --

6      A.  This is under crossed polars, and this one is a

7  really good example on how you can see some of the

8  individual fibers that are consistent with what a

9  bundle should be.  And they're all going in the same

10  direction, and you can see these individual fibers that

11  make up this bundle.  At these magnifications this

12  bundle is approximately about 200 to 250 micrometers in

13  length.

14      So think of it as on a TEM grid.  I don't know

15  if Lee Poye showed what TEM grids look like, but this

16  would cover two TEM grids -- openings.

17      Q.  And let's see.  And just so if we can get a --

18  if you can flip to Tab 3.  You document a photograph,

19  the container, this is the Cashmere Bouquet face powder

20  in the way it came to you?

21      A.  Yes.  This was another sealed container, which

22  we videoed when we opened them to have it documented

23  that it was sealed.

24      Q.  If you flip over to page 71 of this same

25  sample, it says "elongation," and it's got that pink,

**207**

1  and it's got a blue -- once again, what does that

2  represent?

3      A.  That's most likely a talc fiber.  It's not

4  asbestos.  No asbestos was found for the PLM in this

5  particular sample.  Only the TEM.

6      Q.  So, in this particular sample, we go over to

7  the TEM, was tremolite asbestos found in this Cashmere

8  Bouquet product?

9      A.  Yes.

10      Q.  Is that a photograph -- this is page 76 there,

11  sir.

12      A.  Yes.  That's a photograph of an asbestos

13  tremolite structure.

14      Q.  And do you include in this the chemistry and

15  SAED?

16      A.  Yeah.  If you go to the very next page,

17  page 77, you can see the chemistry -- the magnesium,

18  the silicon, and the calcium peak -- which, if you

19  remember, looks identical to the NIST standard,

20  National Institutes of Science and Technology.  What

21  they say is tremolite asbestos.  So it's a perfect

22  match.

23      Q.  Well, let me -- why isn't that a cleavage

24  fragment, Dr. Longo?  Why isn't that just a cleavage

25  fragment and not asbestos?

**208**

1      A.  Well, by all the counting rules in TEM, this is

2  regulated asbestos.  It has the appropriate chemistry,

3  appropriate diffraction pattern for the d-spacings.  It

4  has the appropriate morphology greater than -- greater

5  than or equal to 5 micrometers in length.  This is

6  3.8 micrometers in length.  Has to have an aspect ratio

7  of at least 5 to 1 or greater.  It matches that.  And

8  in this particular case, again, it's on -- just looking

9  at the results here, that would be -- and, again, I

10  would have to be sitting at the microscope to change

11  the focus, but it looks very close to being a bundle

12  just on this two-dimensional plane because of the back

13  end of it has those little bumps.  Let's see what the

14  microscopist said.

15      Q.  Are you talking about down here, the box down

16  here?

17      A.  The microscopist called it a fiber.  And that

18  would be the best position because you can change the

19  focal plane.

20      Q.  Is it difficult sometimes where there's a

21  photograph like this on calling something a fiber

22  versus a bundle when it's a close call?

23      A.  Yes and no.  It's difficult if you're just

24  looking at a two-dimensional photograph sitting here,

25  because you're not sitting at the microscope.  If

**209**

1  you're at the microscope and that is your -- and you

2  even said you got to distinguish fibers and bundles,

3  it's a lot easier because you can change the focal

4  plane, you can change the contrast, and the microscope

5  has a little gizmo you can flip in and increase the

6  magnification by ten times.  So --

7      Q.  "Gizmo," is that a technical term?

8      A.  It is.  If you ever worked in a lab, you'd call

9  it a "gizmo."

10      Q.  So --

11      A.  It's actually binoculars that you can put in

12  and open up a -- open up a small screen so you can

13  focus in on it.

14      Q.  In the Cashmere Bouquet, of the 38 samples --

15  and this is just A.  We've got B, Appendix B.  Is that

16  another -- this 1092, and that is photographic evidence

17  of the samples and the results and the asbestos that

18  was identified; correct?

19      A.  Yes, sir.

20      Q.  And was this sent to you by -- these five

21  samples sent to you by a different law firm?

22      A.  Levy Konigsberg in New York.

23      Q.  And then Appendix C, was this -- this is

24  Exhibit 1093 -- these eight additional Cashmere Bouquet

25  products that you analyzed, your laboratory analyzed,

**210**

1    took photographs of for the presence of asbestos?
2    **A. That is correct.**
3    Q. And is there a total of 38 that's a part of
4    this report from last fall?
5    **A. Yes, sir.**
6    Q. And of the 38 samples -- this is going to be
7    Appendix C of the 38 samples -- how many did you find
8    asbestos in?
9    **A. 30 of 38.**
10    Q. On Appendix C, 1093, the last one, Tab 8, does
11    that include Cashmere Bouquet, it came in this
12    container?
13    **A. Yes, sir.**
14    Q. And this is page 337 of the photographs here.
15        Is that tremolite asbestos, sir?
16    **A. 337?**
17    Q. Yes, sir.
18    **A. I'm sorry. What appendix?**
19    Q. Appendix C.
20    **A. Oh.**
21    Q. September of 2018. Page --
22    **A. Yes, that's tremolite there. All the way to**
23    **the back.**
24    Q. The very last sample.
25    **A. Yes. That would be a tremolite structure that**

**211**

1    is laying on top of the -- one of the TEM grids. You
2    can see on the left-hand side how you have the little
3    right angle area, dark?
4    Q. Right here?
5    **A. Yes.**
6    Q. This is -- this is the grid -- the edge of the
7    grid here?
8    **A. Correct. So that structure is laying on --**
9    **over the grid.**
10    Q. Is -- so this is described as 4.2 microns in
11    length and 0.4 microns in diameter.
12        Is the fact that it's -- the grid -- it's going
13    underneath the grid, I guess?
14    **A. Over the grid.**
15    Q. Over the grid?
16    **A. Yes.**
17    Q. Does that mean that it could be much longer
18    than that, you just can't tell?
19    **A. That's correct. You could only -- the rules**
20    **only allow you to measure the length from where the**
21    **grid ends and the fiber or bundle starts.**
22    Q. And does the chemistry and the diffraction
23    pattern match up with regards to the rules, all the
24    methods, in calling this asbestos?
25    **A. Yes, it does.**

**212**

1    Q. Now, if somebody were to come into this
2    courtroom and sa, no, no, no, Dr. Longo has got it
3    wrong, that's a cleavage fragment, under the -- under
4    the rules of identifying asbestos set forth by these
5    various methods you've been telling us about, would
6    that be -- would that be accurate?
7    **A. No. It has very specific regulated --**
8    **health-regulated rules, and this is what you have to**
9    **count. You have to follow the protocol. If you use a**
10    **certain type of protocol -- and these are in all the**
11    **protocols for these rules for TEM -- you have to follow**
12    **them.**
13    Q. Now I'm going to switch and go to the
14    20 samples that I requested to your analyst, Zach, go
15    and pick up from RJ Lee, J&J and Colgate's experts.
16    **A. Okay.**
17    Q. The actual quantity of samples was more than
18    20; correct?
19    **A. Yes.**
20    Q. At the time of your report in this case, had
21    your laboratory analyzed 20 of those samples?
22    **A. Yes.**
23    Q. And have we marked the chain of custody for
24    those as 1096?
25    **A. I'm looking for them.**

**213**

1    Q. It's a -- the skinny binder.
2    **A. Yes. Thank you.**
3    Q. And if we look at the first three, just the
4    photographs -- this is going to be on page 11 -- we see
5    what the container looks like for the first three;
6    right?
7    **A. Yes.**
8    Q. And they're dated according to what RJ Lee and
9    Colgate has provided to you; correct? The '70, '70,
10    '73 to '77?
11    **A. Yes.**
12    Q. And if we look at the next three, did you --
13    did you and your laboratory just pick the first 20?
14    **A. Yes.**
15    Q. And was there problems with a couple of those
16    so you had to extend to 22?
17    **A. There was.**
18    Q. And tell us what the problem was.
19    **A. They were in methanol. They weren't --**
20    Q. What's --
21    **A. They weren't in a powder. The sample bottles**
22    **had alcohol in them, methanol, which is a form of**
23    **alcohol, mixed with it, so we didn't want to analyze**
24    **those since they weren't starting with just the talcum**
25    **powder. It's different, you know, the protocol, so we**

**214**

1  just extended it to 22 and did not analyze the ones in
2  methanol.
3      Q. So the -- into evidence the jury can take a
4  look at the photographs of the various containers of
5  the Cashmere Bouquet that goes along with the chain of
6  custody; correct?
7      A. Correct. Now, we didn't receive the
8  containers; we just received samples from the
9  containers.
10     Q. RJ Lee, the laboratory for Colgate, was the one
11 you guys had to actually go to Pittsburgh, Zach had to
12 go to Pittsburgh, to pick these up?
13     A. Yes, sir.
14     Q. In Appendix B do you have the results of the --
15 PLM results for these Colgate -- these Colgate samples?
16     A. Yes, sir.
17     Q. And I have Appendix B having 15 different --
18 excuse me -- 17 different samples. Was there 16 or 17
19 that was positive by PLM?
20     A. Let me get the report, because I don't want
21 to -- for these 20 samples just to make sure.
22     THE COURT: While he's looking for that,
23 Mr. Satterley, you referred to this as "Appendix B."
24 What -- what is the --
25     MR. SATTERLEY: To his report.

**215**

1      THE COURT: What is the exhibit number?
2      MR. SATTERLEY: Oh, I apologize. 1097.
3      THE COURT: All right. So that's -- that's
4  1097?
5      MR. SATTERLEY: Yes, Your Honor. 1097.
6  BY MR. SATTERLEY:
7      Q. And, Dr. Longo, let me see if I can help you
8  out with regards to -- the first -- if we go to Tab 1,
9  the first group of photographs relate to a talc bundle.
10     A. Yeah. The first set of photographs, there was
11 16 positives by PLM --
12     Q. Okay.
13     A. -- and this one was not one of them --
14     Q. Okay.
15     A. -- the very first one.
16     Q. So -- and we'll get to the TEM in a little bit.
17 So 16 of the 20 by PLM had asbestos in them, in
18 your opinion?
19     A. Yes, sir.
20     Q. And did you document that and photograph it and
21 produce it as a report so Colgate could take a look at
22 that?
23     A. Yes, sir, I did.
24     Q. And -- and once -- since I've got this up here,
25 this is page 4 of 1097. How do you know that's a talc

**216**

1  fiber bundle?
2      A. Well, that's -- that's in elongation, but if
3  you go to -- if you go to page 2 --
4      Q. Oh, page 2.
5      A. Now, these samples had lots of other stuff in
6  it, but if you look where that is, where the talc fiber
7  is, you'll notice that from the other ones we looked at
8  and were more yellowish-gold than in this particular
9  case, in parallel, parallel dispersion, dispersion
10 staining, alls you get is this new blue color, this
11 nice bluish color.
12     That tells you it is -- it is talc for these
13 types of samples, as well as the other information that
14 we gleaned from the crystalline analysis by polarized
15 light microscopy.
16     Q. Dr. Longo, has J&J counsel in the past accused
17 you of misidentifying things as asbestos?
18     A. Yes, sir.
19     Q. Okay. Well, why didn't you just identify this
20 as asbestos and say, "This is asbestos," instead of
21 talc?
22     A. Because it's not. That wouldn't be right.
23     MR. CALFO: Your Honor, I object. Vague and
24 ambiguous as to "this." Is it a photograph?
25     MR. SATTERLEY: Yeah, the photograph. That's

**217**

1  what we're talking about.
2      MR. CALFO: I thought that was Colgate.
3  BY MR. SATTERLEY:
4      Q. Whether it's Colgate or Johnson & Johnson --
5      THE COURT: Well, it's --
6  BY MR. SATTERLEY:
7      Q. -- my question is --
8      THE COURT: It's 18 minutes of 3:00. We are
9  going to take our afternoon recess and come back in 15
10 minutes.
11     Ladies and gentlemen of the jury, it is your
12 duty as jurors not to converse amongst yourselves or
13 with anyone else on any subject connected with the
14 trial or to form or express any opinion thereon until
15 the matter is submitted to you.
16     I'll see you back in 15 minutes.
17     (Whereupon, the following proceedings were held
18 outside the presence of the jury:)
19     THE COURT: All right. It appears that all of
20 the jurors have departed from the courtroom.
21     Is there anything we need to put on the record
22 before we go on break?
23     MR. SATTERLEY: Your Honor, the only thing is
24 that I understand Your Honor made rulings sometime
25 today with regard to certain documents. We would just

**218**

1  like to incorporate those documents into evidence
2  regarding -- some J&J documents.
3          And then at some point, we need to address the
4  few remaining objections to the Scala exhibits.  And I
5  don't know if Your Honor wants to do it at the end of
6  the day or tomorrow morning or whenever Your Honor --
7          THE COURT:  I'm happy to do it at the end of
8  the day.  We'll send the jury home at 4:30.
9          MR. SATTERLEY:  That's fine, Your Honor.
10         THE COURT:  Okay.  Anything else?
11         We are in recess.
12         MR. SATTERLEY:  Yes, Your Honor.
13         MR. GARY SHARP:  Thank you, Your Honor.
14         (Recess taken.)
15         (Whereupon, the jury having entered the
16  courtroom, the following proceedings were held:)
17         THE COURT:  Okay.  The record reflects that all
18  the jurors are present in their appointed seats,
19  counsel are at counsel table, and we're ready to
20  proceed.
21         Go ahead, Mr. Satterley.
22         MR. SATTERLEY:  Thank you, Your Honor.
23  BY MR. SATTERLEY:
24      Q.  We were talking about Cashmere Bouquet and
25  specifically about 1097, the PLM results, and I was

**219**

1  asking specifically about some of the photographs.
2          If we can go to the very first -- or the second
3  sample, I'm going to ask you about this.  We have
4  anthophyllite and then a talc plate here and then talc
5  at the other end?
6      A.  Yes, sir.
7      Q.  Explain that.
8      A.  Well, that's called the intergrowth or
9  transitional.  So you have anthophyllite as well as
10  talc.  So when it was formed, you get two different
11  minerals, essentially, on one fiber, or bundle here in
12  this case.
13      Q.  I saw that in this -- these pictures, to me --
14  and you can correct me if I am wrong -- there appears
15  to be several photographs.  Is this a photograph of the
16  same structure that we just looked at?
17      A.  Yes, sir.  It's under crossed polars, and it's
18  at a magnification -- a higher magnification of 200 --
19  400 times.  The other one was 100.
20         And this just shows the -- so this is at 400
21  under crossed polars, and you can see that it has fiber
22  structures that go all the way through.  So it's known
23  as an intergrowth.  So it's -- it's not only
24  anthophyllite, but it has some fibrous talc associated
25  with it.

**220**

1      Q.  Is this, the next page, page 11, the same fiber
2  that is being analyzed with -- it's got a different
3  color background.  Is that the same?
4      A.  Yes, sir.  This has no filters.  It's not under
5  dispersion staining.  It's not an image in that
6  530-nanometer plate.  It's just under crossed --
7  crossed polars.
8          So you're seeing the talc plate that it's
9  laying on.  And this may be, in fact, actually other
10  asbestos fibers laying on top of it, but it's too small
11  for us to resolve and -- and adequately identify on
12  that plate.  It has anthophyllite on one end and talc
13  on the other.
14      Q.  And the reason why I asked this question is,
15  we, or maybe the jury, when they look through these
16  photographs when they're evaluating this case -- there
17  would be several photographs that appear to be the same
18  structure but different colors and different
19  backgrounds.  That's just different ways in which
20  you're looking at it under the microscope?
21      A.  Yes, different wavelengths, a lot of which will
22  give you different colors.  Some of them -- and you
23  have to just remember to take a look at what the
24  magnifications are.  Same fiber, but it's bigger, it's
25  typically at a higher magnification.  So smaller ones

**221**

1  are anywhere from 100 to 200, and then you'll also have
2  up to 400.
3      Q.  And then this one, for example, this one is on
4  page 12.  It looks like it's -- it's going this
5  direction, and this one, it's going this direction.  Is
6  that the same situation, it's perpendicular?
7      A.  Yes.  It's on a stage that you can rotate.  So
8  here, we have parallel dispersion, and then here, we
9  have perpendicular dispersion.  And since you're
10  changing it, the fiber -- or bundle here, to the
11  direction of the light under dispersion staining, the
12  vibrations that come through change and give you
13  different -- these different colors that then they can
14  then match to the refractive indices, which then will
15  put it in either tremolite, actinolite, anthophyllite,
16  or if there was some other type of asbestos present.
17      Q.  The Colgate lawyer wanted me to point that you
18  had gone to another sample, M69934.  This is yet
19  another sample with asbestos in it; correct?
20      A.  Yes, sir.
21      Q.  And I wanted to ask about this.  It says,
22  "Elongation at 400 magnification, tremolite."
23         Is this asbestos, Dr. Longo?
24      A.  Yes, sir.  You're -- we're looking at, again,
25  the exact same structure, higher magnification, under a

222

1  **different type of filter, giving you this color.**
2      Q. And do we have, once again, over here, page --
3  two pages over, page 31, exact same structure?
4      **A. Oh, you -- you've moved on me.**
5      Q. I'm sorry. Page --
6      **A. Now we're on -- now we're on Sample 5.**
7      Q. Yeah. Sorry.
8          Page 29 and page 30 and page 31, are those all
9  the -- of Exhibit 1097, all the same structure under
10 the microscope?
11         THE COURT: Well, before -- let him answer the
12 question over again as posed. He was still on the last
13 sample.
14         MR. SATTERLEY: I apologize, Your Honor.
15         THE COURT: Because I'm confused. And I
16 don't -- and maybe nobody else is, but I'm confused.
17         So what -- so what is that?
18         THE WITNESS: That's actinolite/tremolite. But
19 let's just start from the beginning of this one so
20 people can look at it and -- and understand what
21 it's -- what's going on.
22         So this is -- and we're starting on page --
23 BY MR. SATTERLEY:
24     Q. 22?
25     A. -- 20 -- 22 now. Now, you've gone to something

223

1  **different.**
2      Q. I'm sorry. I was moving too fast.
3          All right. Do you want to go to a different
4  one?
5      **A. Let's start from the beginning. So move it up
6  so we can see the -- see the numbers underneath, the
7  actual title of this. Just move the whole thing
8  straight up.**
9          Okay. There you go.
10         That identifies what we found in this
11 particular case, going from right to left at the
12 bottom. This was done by the International Standards
13 Organization, polarized light microscopy. No heavy
14 liquid density separation was done. The sample number
15 is M69934-005ISO, and this would be the first structure
16 found under this method.
17         So now we're starting. So this is under
18 dispersion staining, and you can see we have a lot of
19 stuff in here. And then over to the upper right, you
20 see the actinolite/tremolite bundle, and it's
21 32.6 micrometers long.
22         And we're in parallel dispersion. That's
23 the -- usually the first thing up on the particular
24 sample.
25         Now, if you go to the next page, page 23,

224

1  that's the perpendicular under dispersion staining.
2  You can see the change in color which is consistent for
3  tremolite/actinolite at these wavelengths.
4      Q. And now.
5      **A. And now we're getting to the elongation. Now
6  it's at 400 times. So it's been to this, you know,
7  north -- sort of the northeast direction. And that
8  matches the colors it ought to be. And then under
9  crossed polars --**
10     Q. Can we go to the next page, 25?
11     **A. Well, you go to 25. We're still on this one
12 structure, because we're going through all the
13 different analytical procedures for identifying it.
14 Here we have it under crossed polars. And then the
15 very next one is the last one you would have with
16 crossed polars out. Now you're just looking at it
17 under the light. And you can see the individual
18 striations in there. The polarizers are out. And this
19 is regulated asbestos. It's going to be approximately
20 33 microns long, and those individual fibers in there
21 would give you aspect ratios of over a hundred to one,
22 closer to 200 to 1. So it meets all the regulations
23 that -- for these PLM analysis. For this.**
24     Q. Let's keep going through this Tab 4 just so we
25 can talk through -- a complete through one sample so we

225

1  know what we're looking at.
2      **A. So if you go to the very next sample, the very
3  next page where you have that 88.6. Now, pull it up so
4  you can see the bottom. This would be the second
5  structure that we're finding under the ISO method. So
6  you see the 0002? And, again, under parallel
7  dispersion. In this case you have more of the golden
8  yellow. And then the next page would give you the
9  perpendicular dispersion. Not that page.**
10 Page Number 28.
11     Q. Go back.
12     **A. It's hard to see in this lighting. And then we
13 would go on. Actinolite, tremolite -- the next one
14 would be the elongation, page 29.**
15     Q. The pink or purple, is that always going to be
16 the elongation?
17     **A. Yes. It's got the right colors at the right
18 direction under the polarizers and under the -- under
19 the 530-nanometer plate.**
20         Then the next one is crossed polars.
21     Q. Now, this is page 30 of Exhibit 1097; is that
22 correct?
23     **A. Correct.**
24         Then the very next one is this same structure
25 **again without crossed polars.**

**226**

1    Q. Is there any question in your mind, Dr. Longo,
2  that this is regulated asbestos in the Cashmere Bouquet
3  product?
4    A. No, sir.
5      Now, just for completion, let's go to the very
6  next page, page 32. Now, here is the exact same sample
7  under the Blount method.
8      THE COURT: That's not the next page.
9      THE WITNESS: It should be. Page 32?
10      MR. SATTERLEY: Yes, Your Honor.
11      THE COURT: Well, it's a different sample on
12  the left.
13      THE WITNESS: Yes, sir, it is, but it's just an
14  example of the -- now the Blount PLM with the same
15  sample.
16  BY MR. SATTERLEY:
17    Q. Because BL, is that the -- right there. Does
18  that mean the Blount method as opposed to an ISO
19  method?
20    A. Correct.
21      THE COURT: Then the 002 and the 001 are
22  different.
23      THE WITNESS: Yes, sir. This is 005.
24      Now, one of the things you'll notice, it
25  seems -- even though it has some big particles in

**227**

1  there, there's not as much clutter around. It has
2  removed -- and this is -- a lot of this is not talc,
3  this is other ingredients there are in the -- in the
4  Cashmere Bouquet. You can see, even though you have
5  these big particles, it's not all this small, cluttered
6  stuff around, so it shows you how the talc is removed
7  and cleans the sample up.
8  BY MR. SATTERLEY:
9    Q. And the magnification level is different also.
10  It's a hundred magnification as opposed to what you
11  were talking about earlier was 400?
12    A. No. All the dispersion staining is typically a
13  hundred.
14    Q. Oh, okay.
15    A. 400 would be elongation. And if you go to the
16  very next page, page 34.
17    Q. I see. Let me stop there so I can clear my
18  confusion.
19      So when see something that's a hundred, if the
20  shape looks different, it's because it's a different
21  magnification, like a hundred to 400?
22    A. Correct.
23    Q. Okay. All right. Now we're on page -- am I on
24  the right page here, page 33?
25    A. That's 33. So now we're in perpendicular --

**228**

1  parallel. But if you go to the very next page --
2  because this is a good example of a very fibrous
3  bundle.
4    Q. No, wait a second. Let me -- no. This one
5  says perpendicular --
6    A. Perpendicular. If you go to page 34.
7    Q. Okay. I see. I see.
8    A. In this particular one, you can absolutely see
9  the single fibers in the elongation, as well as the
10  next pages, so this is a very good example of a very
11  fibrous bundle.
12    Q. So what we're seeing here on page 34 is a
13  close-up -- closer up view of what we were looking at
14  on page 33, 32, 31; correct?
15    A. That is correct. It's -- we were looking at
16  100. This is now 400.
17    Q. And there we got page 35. Is that yet
18  another -- the crossed polar of the asbestos in the
19  Cashmere Bouquet product?
20    A. Yes, sir. The same structure. It just shows
21  you a little bit more detail of the fibers.
22      And then the -- without the polarizers -- and,
23  again, you can -- you can see the individual fibers.
24  And so on.
25    Q. And it goes -- you have a whole bunch of

**229**

1  photographs that just demonstrate -- do you have a
2  whole bunch of photographs that demonstrate the
3  presence of asbestos in the Cashmere Bouquet product?
4    A. Yes, sir.
5    Q. There's one other term that you used. If we
6  flip over to Tab 10 to the elongation, page 159.
7      Is this Tab 10 yet another asbestos bundle in
8  a Cashmere Bouquet product?
9    A. Yes, sir.
10    Q. And page 160 -- actually, 161. "Aperture
11  diagram partially closed." What's that mean?
12    A. Diaphragm.
13      So that the aperture, which lets the light
14  through, is slightly closed to increase the -- increase
15  the contrast so that you can resolve these individual
16  fibers in the bundles better. It's just a -- it's an
17  optical microscopist's technique for changing the
18  contrast. Instead of hitting a darker button, it can
19  change the light and get you a better contrast.
20    Q. Based upon the PLM results, Dr. Longo, are you
21  of the opinion that there's asbestos in Cashmere
22  Bouquet talcum powder?
23      MR. MULARCZYK: Objection. Vague.
24      THE WITNESS: Yes, sir.
25      THE COURT: I'm going to overrule that. You

230

1  can inquire on cross-examination.

2      THE WITNESS:  Yes, sir, for the samples that we

3  tested.

4  BY MR. SATTERLEY:

5      Q.  Well, the four of them by PLM you didn't find

6  asbestos.

7      A.  By PLM we did not.

8      Q.  What about by TEM?

9      A.  Yes, sir.  The other four were positive because

10  we're looking at two different types of structures, and

11  so we only analyze those four by TEM.  Since the Blount

12  PLM and the ISO PLM were positive, the negative ones we

13  checked to see if the TEM, which is more sensitive,

14  could determine if it was present or not.

15      Q.  And Exhibit 1098, the folder, does that

16  represent photographs of some of the TEM results from

17  the Cashmere Bouquet product?

18      A.  Yes, sir.

19      Q.  And if we go to -- and did you find asbestos in

20  all four of the negatives by PLM?

21      A.  Yes, sir, we did.

22      Q.  And the second -- that Tab 2, page 9 of

23  Exhibit 1098, what does this represent?

24      A.  This is a tremolite bundle, and these are one

25  of these even with the photograph you don't have any

231

1  doubt telling that's a bundle.  You can see one, two,

2  three, four, five, six -- I can see six individual

3  fibers there.  Some of those were -- where you've

4  circled actually have two -- two or three pushed

5  together, and, actually, you have one that almost has a

6  splayed end, which you normally do not see on TEM

7  because of the size.

8      Q.  And splayed ends, is that a classic

9  identification of a bundle?

10      A.  No.  It's more of a classic identification of

11  commercial asbestos that's been added to bulk samples.

12  Very rarely do you see splayed bundles in TEM at all

13  because of the size you're looking at.  It's the bulk

14  samples.

15      Q.  I apologize.  I should have asked the question

16  this way:  The fact that this is -- these have splayed

17  ends and they're a bundle, does that indicate to you

18  that this is asbestos?

19      A.  No.  It tells us it's asbestos by meets all the

20  counting definitions, has the right chemistry, has the

21  right diffraction pattern.  This is regulated tremolite

22  asbestos.  But if you just -- as being interested in

23  this, this is what you would normally see in a product

24  where the asbestos has been added at very high

25  concentrations.  It's very rare to see a splayed bundle

232

1  of tremolite in these talcum powders because tremolite

2  is brittle.  So when they mill it, it grinds up.  So

3  it's just interesting to see.

4      Q.  And in this, you have -- you have -- do you

5  have the chemistry -- the calcium, magnesium, the

6  silica?

7      A.  Correct.  You have the -- again, it's almost a

8  fingerprint.  It's a ratio of magnesium to silica to

9  calcium, all based on the height of the calcium peak.

10      Q.  And do you have the diffraction pattern, the

11  SAED, that meets all the requirements that this is

12  asbestos?

13      A.  Yes, sir.

14      Q.  Now, back on this photograph, I just want to

15  ask, this part right here, is part of the film on the

16  grid torn there?

17      A.  It's torn and gone.  That's -- that's a carbon

18  film that is put on to the sample, the filter before we

19  dissolve the filter away.

20      That carbon film is actually only about 10 to

21  20 nanometers thick, about 15 to 20 atoms thick, so

22  it's very fragile.  And the way it's done is, the

23  sample is collected on a filter.  That filter is then

24  coated with carbon, and then a small piece of that

25  filter is put on the TEM grid and then put on filter

233

1  paper that's soaked with chloroform, and it slowly

2  dissolves away the filter and just leaves a replica of

3  the filter.

4      See all those little holes?  Those are all the

5  pores that are in the filter that made a replica of

6  what you're seeing.

7      Q.  And the fact that the film is partially gone

8  there, does that in any way detract from the fact that

9  this is a regulated asbestos bundle of tremolite?

10      A.  Oh, no.  It's -- it's not uncommon to see torn

11  films from just putting it in and out of the microscope

12  because you're going under pressure changes, because

13  it's so fragile.

14      Q.  The same tab, Tab 2, what is depicted here, the

15  photograph on page 12?

16      A.  Page 12 is another tremolite asbestos.  I

17  believe if I was -- I think you can call this a bundle,

18  and it's either laying on top or underneath a talc

19  plate.  That thing in the middle.

20      Q.  This thing right here?

21      A.  Yes, sir.

22      Q.  And the chemistry, does the chemistry match up

23  to be a regulated tremolite?

24      A.  Yes, sir, it does.

25      Q.  And once again, the selected area electron

Page 234 to 297 of 334
Case 3:16-md-02738-MAS-RLS    Document 33132-2    Filed 08/23/24    Page 395 of 1320
PageID: 249390
66 of 85 sheets

234

1 diffraction, does it match up?

2    **A. It does.**

3    Q. We have another one here on this sample. And

4 what does this represent?

5    **A. This represents talc, fibrous talc.**

6    Q. And is it labeled as talc there?

7    **A. That's correct. This is not asbestos. This is**

8 **fibrous talc in the sample.**

9    Q. And does it have the chemistry of talc?

10    **A. Yes.**

11    Q. And does it have the diffraction pattern of

12 talc?

13    **A. Yes.**

14    Q. So I'm not going to go through all these

15 photographs of all the asbestos in the TEM, but is

16 there any question in your mind, Dr. Longo, that

17 there's asbestos documented by TEM in the Cashmere

18 Bouquet samples that you received from the RJ Lee

19 Group?

20    **A. No, there's no doubt.**

21    Q. And has it been documented and photographed and

22 produced to the defendants, the lawyers for Colgate?

23    **A. Yes, sir.**

24    Q. Now, if somebody were to say to this jury that

25 you've never written a letter about or written a report

235

1 regarding the presence of asbestos in J&J products,

2 would that be true?

3    **A. I've written reports. I'm not sure who I'm**

4 **supposed to send the letter to.**

5    Q. Have you issued those reports and produced them

6 and produced them to J&J and been examined by J&J's

7 lawyers on many occasions?

8    **A. Yes, sir.**

9    Q. Now I want to switch gears and talk about

10 Patricia Schmitz.

11    Do you have your written, signed report that

12 you issued back in March of this year?

13    **A. Yes, sir, I do.**

14    Q. Does it outline many of the items that you

15 reviewed, including her deposition?

16    **A. Her six volumes of deposition, yes.**

17    Q. And did you review the testimony of her

18 sisters?

19    **A. Yeah. Joni and Susan. I also reviewed that.**

20 **So eight depositions. Or actually nine.**

21    Q. By the way, I should have asked this question

22 earlier: What does it mean if you find one fiber

23 bundle by TEM? How many fibers is that per gram?

24    **A. Depending on the detection limit, either one**

25 **fiber or one bundle can run anywhere from 6,000 to**

236

1 9,000 individual fibers in bundles per gram.

2    Q. And how does that equate in terms of how many

3 fibers per bottle if you have a 9-ounce bottle, every ounce

4    **A. Well, if you have a 9-ounce bottle, every ounce**

5 **is 28.4 grams, I believe, and if you have nine of**

6 **those, multiple that 28.4 by 9 by 9,000 fibers.**

7    Q. Tell the folks on the jury what you did with

8 regards to your evaluation of Mrs. Schmitz' exposure to

9 asbestos from her talcum powder usage and being near

10 her family members when the product was being used?

11    **A. I read all her depositions, as well as her**

12 **sisters' depositions, and then went through and said,**

13 **okay, well, she stated that, you know, when her sisters**

14 **were young and with her mother for three months, that**

15 **she would be there once a day for both sisters when the**

16 **sisters got bathed, and the mother would use Johnson**

17 **Baby Powder. And she said she was standing right**

18 **there. So that would be -- every day for those three**

19 **months would be two exposures, or two applications.**

20    You know, and then -- and I'm going on to be --

21 you know, two times two and a half weeks after that for

22 1.7 years with the sisters, then diapering the sisters,

23 which she helped her mother. So I added up all those

24 applications.

25    And I tried to be conservative because she

237

1 would say things like diapering, you know, three to

2 four times per week. I would put 2.5 times per week

3 just for the times being missed, and that sort of

4 thing.

5    So when her mother applied the Johnson Baby

6 Powder to herself, she would be standing there. So I

7 added that up.

8    And so at the end of the day, I could get 2,199

9 Johnson Baby Powder applications.

10    Q. Those 2,199, was that relating solely to 1957

11 to 1967?

12    **A. Yes, sir.**

13    Q. Did you likewise evaluate the total number of

14 Johnson's Baby Powder applications relating to Vermont

15 talc source from '68 to 2003?

16    **A. And that's a good point. I broke it down into**

17 **the different mines. So the '57 to '67, Johnson &**

18 **Johnson was using their -- their Italy source for talc.**

19 **And then I broke it down from 1968 to 2003, which was**

20 **the Vermont talc source that Johnson & Johnson was**

21 **using.**

22    And for the -- for 1968 to 2003, when Patricia

23 was 10 years old in '68 until she was 13 in 1971,

24 testified that she used Johnson Baby Powder three to

25 four times a week for her personal bathing. So three

**238**

1  to four times a week, using three and a half times a
2  week times the three years that she did that, '68
3  to '71, was 825 applications.
4        Then she testified that she was present and
5  assisted when her mother was incapacitated because of a
6  bad shoulder, that she would bathe her two to four
7  times a week from 1998 to 2' -- approximately four
8  times a week from 1998 to 2005.  So I said three times
9  a week times 52 weeks times five years.
10  **Q.** And you have a total of 1,605 applications?
11  **A. Correct.**
12  **Q.** Let me stop you right there.  I would like for
13  you to assume -- well, nowhere in her deposition or her
14  sisters' deposition was there any discussion or
15  questions about her father having Alzheimer's; correct?
16  **A. That is correct.**
17  **Q.** About caring for him in the hospital bed in
18  their house in their dining room; correct?
19  **A. No, sir.  That never came out in the testimony.**
20  **Q.** So if there was -- I'd like for you to assume
21  that there's additional testimony that Patricia Schmitz
22  helped take care of her father for roughly ten years,
23  the last ten years of his life, and utilized Johnson's
24  Baby Powder during those ten years, you haven't taken
25  that -- you haven't added that into this calculation;

**239**

1  correct?
2  **A. No, not at all.  That was -- that information
3  was never brought out in any of the depositions.**
4  **Q.** So that would be on top of the calculations
5  that you've already made here in this report; correct?
6  **A. Yes.**
7  **Q.** And there would be additional exposure that
8  would be additive of the exposure assessment you have
9  in Mrs. Schmitz' case?
10  **A. That is correct.**
11  **Q.** With regard to the Chinese-sourced talc, how
12  many applications in -- to Chinese-sourced talc?
13  **A. 312.  From -- again from 2004 to 2005, three
14  times a week, when her mother needed help again.**
15  **Q.** And then Cashmere Bouquet, did you do a similar
16  type of calculation with regards to her testimony
17  regarding her use of Cashmere Bouquet?
18  **A. Yes, sir, I did.**
19  **Q.** And what -- how many total applications of
20  Cashmere Bouquet did she have according to her
21  testimony?
22  **A. According to her testimony, she used it from
23  1970 to 2005.  And that she probably -- and she stated
24  that she used almost every day after bathing, she
25  stated she probably did not use Cashmere Bouquet**

**240**

1  **20 percent of those days.  So not every day during that
2  time.**
3        So daily minus 20 percent is 392 (sic) days of
4  use instead of 365, times 35 years.
5  **Q.** And what's the total application of Cashmere
6  Bouquet?
7  **A. That works out to 10,220 applications.**
8  **Q.** Did you also consider Avon and her -- the fact
9  that she used Avon product?
10  **A. Yes, sir, I did.**
11  **Q.** And what's the total application from 1980 to
12  2005 regarding her use of Avon?
13  **A. 3,250 applications of Avon talcum powder.**
14  **Q.** So what opinions have you developed based
15  upon -- and -- and what calculations have you developed
16  based upon her exposure, the description she has of
17  exposure, your knowledge of -- of this product with
18  regards to, first, Johnson & Johnson?
19  **A. Well, the first opinion in -- for each of
20  these, that she would have had significant exposure to
21  cosmetic talcum powder from these three different
22  manufacturers:  Johnson & Johnson, Colgate-Palmolive --
23  Cashmere Bouquet -- and Avon.
24        The second opinion is -- based on our testing,
25  based on historical documents, based on the percentages**

**241**

1  that we find positive, it's my opinion that more likely
2  than not, when she used any of these products --
3        MR. CALFO:  Your Honor, I object to this.  He's
4  not an expert in statistics.
5        THE COURT:  It's overruled.
6        You can answer that question.
7        THE WITNESS:  Thank you, Your Honor.
8        -- that she would have had a significant
9  exposure to airborne asbestos -- and it's
10  interesting -- significantly over background, even
11  though there is no background of tremolite/
12  anthophyllite in the natural environment, unless there
13  is a source.
14        So you can use the IARC number of 1.0 times
15  10 to the minus 5 fibers per cc --
16  BY MR. SATTERLEY:
17  **Q.** You went too fast for me.  10 to the minus --
18  10 to the minus 5 --
19  **A. 0 -- 0.0000.**
20  **Q.** How many --
21  **A. Five zeros.  A .1 followed by four -- excuse
22  me.  Four zeros and a .1.  I did that backwards.**
23  **Q.** Four zeros and a -- a 1?
24  **A. And a 1.**
25  **Q.** And that's the IARC background number?

**242**

```
 1        A. Yes.
 2        Q. Okay.  And using that IARC back- -- background
 3   number, based upon everything you know of Patricia
 4   Schmitz, based upon everything you know of the
 5   historical testing, based upon everything you know of
 6   the scientific literature, did she have significant
 7   exposures above background to asbestos from Johnson's
 8   Baby Powder?
 9        A. Yes.
10        Q. Did she have significant exposure above
11   background to Cashmere -- to asbestos from Cashmere
12   Bouquet --
13        A. Yes.
14        Q. -- talc?
15        MR. MULARCZYK:  Objection.  Foundation.
16        THE COURT:  It's overruled.
17   BY MR. SATTERLEY:
18        Q. Go ahead.
19        A. Yes.
20        Q. And -- and -- and is it -- in terms of exposure
21   to asbestos, is it important to you that these products
22   were intended to be shaken out into the air?
23        A. Yes.
24        Q. And why is that important?
25        A. Because these products are designed to be --
```

**243**

```
 1   not intentionally, but the way they're designed and
 2   milled and ground and used, these particles become very
 3   airborne very easily.  You're not starting with an
 4   asbestos product that you have to grind, sand, or do
 5   something to get exposure.
 6            This is just merely shaking a very fine powder
 7   out that gets airborne very easily and stays airborne
 8   very easily because of the sizes of those microscopic
 9   particles.  Excuse me.
10        So the way it's designed, you're shaking out a
11   very fine powder that causes exposure because it gets
12   airborne very easily.  And with those accessory
13   minerals, such as tremolite or anthophyllite asbestos,
14   in there, that's what causes the exposure.
15        Q. And is that -- would it be fair to say this
16   product is not -- the asbestos in this product is not
17   encapsulated?
18        A. No, there is no encapsulation involved here.
19   It's just a mixture of cosmetic- or pharmaceutical-
20   grade talcum powder with trace amounts of --
21   potentially trace amounts of amphibole asbestos that we
22   can detect using these protocols we're using.
23        Q. Now, one other concept I want to talk with you
24   about in terms of exposure is a concept called
25   re-entrainment.  What is re-entrainment?
```

**244**

```
 1        A. It's an industrial hygiene word, and it's
 2   really just a fancy word for getting the dust off the
 3   surface and getting it back up into the air.
 4        You know, it's like taking a rug out and
 5   beating on it.  And that dust that's gotten into that
 6   throw rug over time will start coming out, and you can
 7   see it, or sweeping up dust, where, if it's the right
 8   lighting, you can see the dust that's moving as well as
 9   what's getting up in the air.
10        So you're disturbing what's happened before,
11   that's now on a surface, and you're disturbing it again
12   by either sweeping or wiping or sometimes even walking
13   through it, because your foot going down causes
14   pressure for it to come up.
15        So it is redistributing asbestos dust that has
16   been put onto a surface after use.
17        Q. And do you have an opinion, Dr. Longo,
18   whether -- I would like for you to assume the testimony
19   will be that occasionally her sisters and herself would
20   clean up the baby powder or the Cashmere Bouquet after
21   they -- they applied it to their body or to their
22   family members.
23        And the cleaning up process, does that result
24   in additional exposures?
25        MR. MULARCZYK:  Objection.  Foundation.
```

**245**

```
 1        THE COURT:  Overruled.
 2        THE WITNESS:  Yes.  In my opinion, it does.
 3   BY MR. SATTERLEY:
 4        Q. And by the way, Dr. Longo, you weren't in --
 5   in -- at their house on Bay -- Bay Street over in
 6   Alameda at any point in time; correct?
 7        A. I was not.
 8        Q. And -- and nobody -- you have not seen anybody
 9   measure the level of dust that they were exposed to
10   from any -- any powder product; correct?
11        A. That is correct.
12        Q. You've not seen any instruction or direction
13   from any company saying, "Hey, you better measure the
14   amount of dust you're breathing in" at any point in
15   time, have you?
16        A. I have not.
17        Q. Now, in addition to your analysis, have you
18   relied upon published papers, where published papers
19   talk about --
20        Are you familiar with the Gordon paper in 2014?
21        A. I am.
22        Q. And have you relied upon the Gordon paper?
23        A. I have.
24        Q. And does the Gordon paper have information
25   regarding exposure and exposure that occurs with
```

246

1  regards to Cashmere Bouquet product?
2      **A. That paper was all -- was all about exposure**
3  **from using Cashmere Bouquet products.**
4      Q. And it was -- was that paper specifically
5  studying exposures to cosmetic talc products in terms
6  of what an individual may have?
7      **A. Yes.**
8      Q. And have you also read the Anderson paper,
9  Elizabeth Anderson, with a company called Exponent?
10     **A. I have.**
11     Q. And have you looked at the underlying data from
12 that paper with regards to the Cashmere Bouquet product
13 and whether or not it has asbestos in it?
14     **A. I have.**
15     Q. And based upon your analysis of that published
16 paper, the Anderson paper, and the underlying data,
17 does the underlying data support the fact that there's
18 asbestos in the Cashmere Bouquet product?
19     **A. Not the way the paper is written, no.**
20     Q. Well, what do you mean?
21     **A. Well, it says that it's all cleavage frag;**
22 **there is no asbestos there.**
23     Q. Okay. And the paper itself says it's all
24 cleavage fragments?
25     **A. That's what I recall, yes, that -- in my**

247

1  **opinion, it's redefined what asbestos is.**
2      Q. And have you had, in part of your reliance
3  materials, the underlying data from the lab in Hayward
4  to the Anderson paper?
5      **A. Yes, sir.**
6      Q. And does the underlying data demonstrate
7  anthophyllite asbestos being present in the Cashmere
8  Bouquet product?
9      **A. Yes, sir, it does.**
10     Q. And in your reliance materials, do you also
11 rely upon, with regard to Cashmere Bouquet, J&J
12 documentation from a -- from a Mr. Rolle in 1976
13 regarding finding of anthophyllite in Cashmere Bouquet?
14     **A. Yes, sir, I do.**
15     Q. And do you also rely upon J&J internal document
16 from I.W. Sloan, dated March 31, 1976, finding
17 anthophyllite in the Cashmere Bouquet product?
18     **A. Yes, sir, I do.**
19     Q. And do you also -- have you also read and
20 reviewed the Colorado School of Mines 1973 analysis of
21 Cashmere Bouquet Sample Number 9 regarding the presence
22 of asbestos?
23     **A. Yes, sir.**
24     Q. So based upon everything that you've analyzed,
25 is there any question in your mind, Dr. Longo, that

248

1  there's asbestos historically found in Cashmere
2  Bouquet?
3      **A. No, sir, there's not.**
4      Q. Any question in your mind that asbestos's
5  historically found in Johnson & Johnson Baby Powder?
6      **A. No, there's no question in my mind.**
7      Q. Now, me and my law firm, Ms. Clancy's law firm,
8  are paying you for your time here today; correct?
9      **A. Yes, sir. My company will send a bill.**
10     Q. And MAS, what is -- what do they -- the hourly
11 rate for your time?
12     **A. I charge $550 an hour, no matter what I do,**
13 **either in litigation or out of litigation.**
14     Q. And do you consult with and -- and testify at
15 the request of defendants in litigation?
16     **A. Yes, sir, I do. But to be fair, actual**
17 **testimony, deposition and trials, is primarily for**
18 **plaintiffs, like 95 percent of the time.**
19     Q. And does your -- my -- your hourly rate, does
20 that change whether or not you're hired by a company to
21 assist in litigation or whether they're hired by
22 Ms. Schmitz or somebody like me?
23     **A. No. It's the same price for either side.**
24     Q. J&J's -- the lawyers said that you've changed
25 your methodology regarding analysis of talc.

249

1      Have you done that?
2      **A. No.**
3      Q. J&J's lawyers said that you now call something
4  a bundle because it sounds more like asbestos.
5      Is that accurate?
6      **A. No, that's not accurate.**
7      Q. Is --
8      **A. They're both regulated asbestos.**
9      Q. Is --
10     **A. A fiber is a regulated asbestos. A bundle is**
11 **regulated asbestos. It makes no difference which one**
12 **it is.**
13     Q. Is -- is -- if there is a bundle of tremolite
14 that meets -- that has the chemical makeup, meets the
15 SAED to amphibole, and it's a bundle, is there any way
16 a scientist, based upon the methods, can call it a
17 cleavage fragment?
18     **A. No, none. It doesn't make any sense. It's --**
19 **a cleavage fragment can't form a bundle. You're**
20 **breaking a rock, and you get pieces. It's like**
21 **breaking a glass bottle.**
22     Now, all those pieces microscopy would have to
23 be perfect fibers all lining up together, in which
24 they're all pointed in the same direction, and they're
25 all touching. That is an impossibility, for a cleavage

250

1  fragment or to smash up a rock and -- and make a
2  bundle.  There should be no dispute about that.
3      Q.  J&J's counsel said that the concentration
4  method Dr. Longo uses simply does not work.
5          Is that true?
6      A.  No, that's not true at all.  It's -- it's -- it
7  works really well.  I'm not the only one who's done
8  that.  Alice Blount did it and published it in a
9  peer-reviewed paper.  Johnson & Johnson was looking at
10 it all the way back in the '70s.
11         I don't know how it doesn't work, other than,
12 no, it can't find chrysotile asbestos.  But that
13 doesn't eliminate the fact that it's very good at
14 concentrating amphibole asbestos, if present, at the
15 concentrations that it can find.
16     Q.  J&J's counsel said, "Dr. Pooley concluded
17 45 years ago that the concentration method doesn't
18 work."
19         Have you seen any documentation where
20 Dr. Pooley, 45 years ago, said the concentration method
21 and the heavy liquid separation doesn't work?
22     A.  No, sir.  I've seen the opposite.  He was
23 looking at patenting that method in England.  That's
24 not something that you would say doesn't work, if
25 you're thinking about getting a patent.

251

1      Q.  J&J's counsel said --
2          MR. CALFO:  I object.  Move to strike.  That's
3  speculation.  Pure speculation.
4          THE COURT:  You may inquire on
5  cross-examination.
6  BY MR. SATTERLEY:
7      Q.  J&J's counsel said, "he FDA discontinued the
8  concentration method because it doesn't work a long
9  time ago."
10         Have you seen any documentation from the FDA or
11 otherwise that said they dis- -- adopted or
12 discontinued the concentration method?
13     A.  No.  They sort of threw up -- I mean, what --
14 there's an explanation for that, if you would like me
15 to state what they actually said.
16         THE COURT:  Just answer the question.  If he
17 wants an explanation, he'll ask.
18         THE WITNESS:  Sorry, Your Honor.
19         No.
20 BY MR. SATTERLEY:
21     Q.  Couple other documents.  Then I'm going to sit
22 down.
23         This is already into evidence.  It's
24 Exhibit 163.
25         MR. SATTERLEY:  May I approach, Your Honor?

252

1          THE COURT:  You may.
2          MR. SATTERLEY:  And I'll hand you both of these
3  documents at the same time.  They're both into
4  evidence.  This is 163, and this one is 313.
5  BY MR. SATTERLEY:
6      Q.  And I want to ask you about Dr. Langer,
7  Dr. Arthur Langer.  You personally met Dr. Arthur
8  Langer?
9      A.  Yes, I have, a number of times.
10     Q.  Is Dr. Arthur Langer a -- a mineralogist?
11     A.  He is.
12     Q.  And has Dr. Arthur Langer been associated years
13 ago with the Mt. Sinai School of Medicine?
14     A.  He was at one point.
15     Q.  And this first document I want to show you
16 is -- it's -- that you've seen -- you've seen these --
17 both these documents in the past; correct?
18     A.  Yes, sir, I have.
19     Q.  And in doc- -- this 163, July 9, 1971, does
20 this relate to Dr. Langer's analysis of talc back in
21 1971?
22     A.  It does.
23     Q.  And does Dr. Langer, in this 1971 J&J
24 memorandum, talk about analysis of talc by use of the
25 light and the electron microscope of Johnson's Baby

253

1  Powder?
2      A.  It does.
3      Q.  And does he -- does this J&J internal
4  memorandum talk about the meeting they had with
5  Dr. Langer, where Dr. Langer demonstrated his technique
6  for observing fibrous materials in the Johnson's Baby
7  Powder?
8      A.  It does.
9      Q.  And does this memorandum in 1971 talk about
10 Dr. Langer's finding talc and chrysotile in tissue in
11 1971 from folks being exposed to talcum powder product?
12     A.  Yes, sir.
13     Q.  And your lab has done analysis both those
14 products and on tissue; correct?
15     A.  That is correct.
16     Q.  And in this 1971 memorandum, does it say,
17 "Using electron microscopy, Dr. Langer has demonstrated
18 to me the presence of some very fine fibers at
19 moderately high magnification, which he identified as
20 chrysotile asbestos by the typical tubular appearance
21 of the fiber"?
22         Do you see that?
23     A.  Yes, sir.
24     Q.  And did we see in -- in some of the photographs
25 from Dr. Hutchinson at the University of Minnesota the

254

1  tubular appearance of chrysotile that's sort of --
2  that's being referenced there?
3      A. Yes, sir, that's true. It's actually tubular.
4  It looks like a straw, a soda straw, that you're
5  looking through.
6      Q. And he -- the summary of this internal J&J
7  document says, "Chrysotile is identified in the
8  electron microscope by its" characteristics --
9  "characteristic tubular appearance at high
10  magnification."
11      Correct?
12      A. Yes, sir.
13      Q. Now, the next document I want to ask you
14  about --
15      By the way, Dr. Langer is a noted mineralogist
16  that you've interacted with in meetings in the past;
17  correct?
18      A. Either in meetings or as an expert on the other
19  side of me.
20      Q. Okay.
21      A. Both ways.
22      Q. The next document I want to ask you about
23  relates to Exhibit 313. This is November of 1972, and
24  it's on Johnson & Johnson letterhead. It's into
25  evidence. And it's called "Antagonistic Personalities

255

1  in the Talc Story in the United States," and this is
2  written by Dr. Gavin Hildick-Smith, carbon copy to
3  Dr. Fuller, Dr. Nashed, Dr. Petterson, Dr. Sauchuk
4  Dr. Shelley, and Mr. Zeitz; correct?
5      A. Yes, sir.
6      Q. And they -- in this 1972 memorandum, they say,
7  "The increase in the profile of talc as a potential
8  health hazard has been actively promoted by a number of
9  individuals for a variety of reasons."
10      Then they go on to identify individuals, and I
11  want to ask you -- Dr. Selikoff, have you read many
12  papers from Dr. Selikoff at Mt. Sinai?
13      A. I have.
14      Q. Is Dr. Selikoff, in your opinion, a well-
15  regarded expert on asbestos -- asbestos and health
16  issues?
17      A. Yes, sir. He's considered the pioneer of all
18  that.
19      Q. It says, "Dr. Selikoff of Mt. Sinai Hospital,
20  who is an epidemiologist heavily involved with asbestos
21  and its adverse effects on health," he -- "has
22  observed (sic) considerable financing from a variety of
23  sources for research into the epidemiology of asbestos,
24  with particular reference to its industrial hazards.
25      "He retains a press agent on a full-time basis,

256

1  who gives him media exposure at regular intervals.
2      "Although he has stated that he doesn't believe
3  that talc is a health hazard and" larger -- "largely
4  concerns his activities with asbestos, he played a
5  significant role in the first talc meeting with the FDA
6  when he initiated proceedings by showing particularly
7  alarming pictures of patients suffering from cancer
8  relating to asbestos.
9      "It is believed that Dr. Selikoff wrote the
10  Merliss paper or at least edited it and provided
11  references for it. See attached."
12      My question to you, Dr. Longo: Have you read
13  and considered the Mt. Sinai work with regard to
14  asbestos in talc in the 1970s --
15      A. Yes, I have.
16      Q. -- what was published in the scientific
17  literature?
18      A. Yes, sir.
19      Q. And do you find that to be scientifically
20  useful in understanding the history of -- of asbestos
21  in talc?
22      A. Yes.
23      Q. They also have on their antagonistic
24  personalities list Dr. Langer, who works with
25  Dr. Selikoff and is a microscopist.

257

1      Do you consider yourself a microscopist?
2      A. Not an antagonistic one, no.
3      Q. Okay. But are you -- you're a -- a
4  microscopist; correct?
5      A. Yes, sir. I'm a material science engineer
6  that's spent a lot of time in microscopy. I'm a
7  microscopist, TEM microscopist, SEM. So yes.
8      Q. It says, "There are several other" --
9  "Dr. Selikoff's department who have the same mental
10  attitude as Dr. Selikoff."
11      Have you, over the course of your career, met
12  some of the other folks or -- or, I guess, read some of
13  the papers published by some of the other folks,
14  Dr. Arthur Rolle, Dr. -- forgot the other names.
15      Have you read some of the other Mt. Sinai
16  studies?
17      A. Yeah. There was, you know, Ivan Rubin. There
18  was Dr. Rolle. Obviously, Dr. Langer, who stands out
19  the most. But, yes, I have looked over Selikoff's
20  guys' works in the past.
21      Q. There are several other names here, and I'm not
22  going to go through them all, but I wanted to ask about
23  Dr. Lewin.
24      Dr. Lewin, who is a professor of analytical
25  chemistry at New York University, have you looked at

**258**

1  and considered Dr. Lewin's results and his findings of
2  asbestos in -- in talc?
3      **A. Yes, sir, I have.**
4      Q. They conclude, "We believe that the Selikoff
5  group, Mr. Kretchmer's group, Dr. Lewin, and
6  Dr. Weissler are in constant communication, although
7  there is some disagreement between Dr. Selikoff and
8  Mr. Kretchmer over Mr. Kretchmer's publicity and
9  Dr. Selikoff's research findings which were not
10  accurately presented in the newspaper."
11      My question to you is, have you ever taken all
12  the -- the reports that you've issued and put them in a
13  scientific journal?
14      **A. Not yet, no.**
15      Q. And have you just recently, in the past few
16  years, analyzed talc for the presence of asbestos?
17      **A. Yes, sir.  I only started doing that two years**
18  **ago.**
19      Q. Okay.  And prior to analyzing talc for the
20  presence of asbestos just a couple years ago, did you
21  know that Johnson's Baby Powder had asbestos in it?
22      **A. I had no idea.**
23      Q. Prior to analyzing the presence of asbestos in
24  Cashmere Bouquet just a few years ago, did you have any
25  clue whatsoever that it had asbestos in it?

**259**

1      **A. Not until the 2015 paper came out and I was**
2  **talking to Dr. Millette and others, who were starting**
3  **to do this work.  But before that, never considered**
4  **that talcum powder would have asbestos in it that --**
5  **that we're finding.**
6      Q. When you said 2016 (sic), you mean the Gordon
7  paper in 2014?
8      **A. 20- --**
9      Q. 2014?
10      **A. 2014, 2015.**
11      Q. Okay.
12      **A. That's when I started noticing it.**
13      Q. And -- and prior to a couple years ago, when
14  you were analyzing this talc, had you ever had access
15  and reviewed the historical internal documents of
16  Johnson & Johnson regarding the presence of asbestos in
17  talc?
18      **A. No, not until I got involved.**
19      Q. And prior to just a couple years ago, had you
20  reviewed any internal company documents historically of
21  Cashmere Bouquet?
22      **A. No, sir.**
23      Q. Have all of the opinions been stated here
24  today, Dr. Longo, to a reasonable degree of scientific
25  certainty?

**260**

1      **A. Yes, sir.**
2      MR. SATTERLEY:  I might have -- I may have
3  follow-up questions, depending on what questions these
4  folks ask you.  Okay?
5      THE WITNESS:  Sure.
6      MR. SATTERLEY:  Thank you so much.
7      THE COURT:  Mr. Calfo.
8      MR. CALFO:  Yes, Your Honor.
9  CROSS-EXAMINATION BY MR. CALFO:
10      Q. Good afternoon, Dr. Longo.
11      **A. Good afternoon.**
12      Q. I'm just going to ask you one question right
13  off the bat.
14      **A. Sure.**
15      Q. You just told this jury under oath that you
16  have only started analyzing cosmetic talc two years
17  ago.  Didn't you just tell the jury that under oath?
18      **A. Let's see.  2017, 2018, 2019.  Yes, sir.**
19      Q. Okay.  Good.  We'll talk about that a little
20  bit later.
21      **A. I guess two and a half years now.**
22      Q. Okay.  Let's start with a -- a few things, if
23  we could --
24      **A. Yes, sir.**
25      Q. -- that I told the jury in opening.

**261**

1      MR. CALFO:  Your Honor, I would like to
2  publish, if I could, Defense Exhibit 421331.
3      MR. SATTERLEY:  It's not in evidence,
4  Your Honor.
5      MR. CALFO:  It's a demonstrative, Your Honor.
6      THE COURT:  I haven't seen it.
7      MR. CALFO:  May I -- may I approach?
8      THE COURT:  Can we talk at sidebar.
9      (Whereupon, a sidebar between the Court and
10  counsel was had and not reported.)
11  BY MR. CALFO:
12      Q. Dr. Longo, what I am going to ask you is this:
13  Do you agree with this statement?  You've never tested
14  cosmetic talc when you weren't being paid to do it by
15  the plaintiffs' lawyers; isn't that right, sir?
16      **A. That is correct.**
17      Q. And, in fact, you told the jury some numbers,
18  but isn't it true, Dr. Longo, that 100 percent of your
19  work in talc litigation is for the plaintiffs'
20  attorneys?
21      **A. Yes, that's correct.**
22      Q. In the last 30 years, working as an expert for
23  plaintiff law firms, you told us your company billed
24  $30 million; is that right?
25      **A. Yes, sir.  About a million a year.**

262

1    Q. In fact, you've testified before, Dr. Longo,
2    that the money you've made working as a litigation
3    consultant and expert witness has allowed your lab to
4    survive; isn't that right?
5    **A. That's a true statement.**
6    Q. And one of the things that you mentioned before
7    is, you've got to keep your lights on; right?
8    **A. Yes, sir. If you work in the office, you need**
9    **to keep the lights on.**
10    Q. And just so there's no mistake, you own
11    75 percent of your company, don't you?
12    **A. Yes, sir, I do.**
13    Q. And you billed $30 million just to the
14    plaintiffs' lawyers; true?
15    **A. I believe that's correct. For all the work we**
16    **do, all the different scientists that work on the**
17    **projects, yes, sir.**
18    Q. You're not a geologist; true?
19    **A. I do not have a degree in geology.**
20    Q. And you don't have a degree in mineralogy, do
21    you, Dr. Longo?
22    **A. No, I don't.**
23    Q. So let me ask you this: If the plaintiffs'
24    lawyers, when they hired you, were looking for somebody
25    who had a degree in geology and mineralogy, that

263

1    wouldn't have been you, would it?
2    **A. Well, if that was their criteria. I don't have**
3    **a degree in geology or mineralogy, so...**
4    Q. Dr. Longo, you've never been to any of the
5    mines that you just told us about, have you?
6    **A. No, sir, I haven't.**
7    Q. And you mentioned -- I -- did you mention you
8    worked for NASA?
9    **A. Yes, sir.**
10    Q. Did you mention you work for ASTM?
11    **A. I didn't mention I worked for NASA, but I have,**
12    **but I've never worked for ASTM.**
13    Q. Okay. Well, the truth is, none of that work
14    that you had done that's on your resumé had anything to
15    do with testing cosmetic talc powder; isn't that right?
16    **A. Yes and no. And I'll explain, if you like.**
17    Q. Go ahead, Doctor.
18    **A. No, it doesn't have anything to do with**
19    **analyzing cosmetic talc, per se, but it has everything**
20    **to do with the fact that we saw problems for scientists**
21    **for microscopic issues, and all of these studies that**
22    **we have done for all these different companies involved**
23    **some sort of development and understanding the problem**
24    **and using the best methodology.**
25    **So that's --**

264

1    Q. Doctor, we're going to go --
2    **A. -- that's the "yes and no" part.**
3    Q. We are going to go through some of the
4    documents that you told the jury about with Johnson &
5    Johnson.
6    First of all, you don't know anyone at
7    Johnson & Johnson; you didn't work there. Right?
8    **A. You're correct on that.**
9    Q. All right. We'll get into that in a little
10    bit.
11    But before we do, no government agency has ever
12    asked you to test cosmetic talc; isn't that right, sir?
13    **A. That's correct.**
14    Q. And you've not written a written,
15    peer-reviewed, published paper anywhere in the world in
16    any way relating to cosmetic talc; isn't that right?
17    **A. That's correct. We have not published these**
18    **results yet.**
19    Q. And Doctor, if plaintiff lawyers were looking
20    for somebody who was well published in the scientific
21    literature on cosmetic talc, that would not have been
22    you, would it?
23    **A. No, it would not.**
24    Q. So let me ask you this. You told the jury a
25    little bit about your background in material science.

265

1    You remember that?
2    **A. Yes, sir.**
3    Q. You didn't take any courses whatsoever that
4    dealt with asbestos in undergraduate studies, did you?
5    **A. That is correct.**
6    Q. In other words, you didn't go to college to
7    study asbestos, did you?
8    **A. No, sir, I didn't.**
9    Q. In fact, you didn't become interested in
10    material science until after college; true?
11    **A. Well, after my undergraduate degree, I -- my**
12    **whole life, I was going to be a veterinarian. I mean,**
13    **studied it, everything in my life since I was 6 years**
14    **old. Got my four-year degree and got rejected from**
15    **veterinary school. Couldn't believe it.**
16    **So I was looking -- I didn't have a Plan B, so**
17    **I was looking for a job, and the material science**
18    **department had an opening for a lab tech, because I had**
19    **to support myself.**
20    Q. So Doctor, as I understand it -- --
21    **A. And they invited me to be a graduate student**
22    **there, and I said, "No, no. I'm going to veterinary**
23    **school. I'm doing post baccalaureate."**
24    **And they said, "Well, I think maybe the board**
25    **would have a better idea" -- "it might be better if you**

266

1  were in graduate school."
2        I said, "Ah, okay," and I never looked back.
3  So that's how I became a material scientist.
4        Q. And I thank you for that.  Thank you for that,
5  Doctor.  We appreciate it.
6        A. You're welcome.
7        Q. Now, you didn't take any courses that
8  specifically dealt with asbestos to get your master's,
9  did you?
10       A. No.
11       Q. Is that true?
12       A. That's true.
13       Q. And you didn't take a single class that dealt
14  specifically with asbestos during your Ph.D. work, did
15  you, Doctor?
16       A. Not per se, no.
17       Q. In fact -- I think Mr. Satterley asked you --
18  you're not a medical doctor; right?
19       A. No, sir, I'm not.
20       Q. And when we talk about Ms. Schmitz -- you don't
21  treat patients; true?
22       A. No, sir, I don't.
23       Q. And you didn't review any of Ms. Schmitz's
24  medical records; true?
25       A. That is true, I did not.

267

1        Q. And I think you told me under oath that you
2  cannot say one way or the other what caused
3  Ms. Schmitz' mesothelioma.  True?
4        A. No, sir.  I never talk about causation effects.
5  I let that -- others do --
6        Q. And --
7        A. -- debate or discuss that.
8        Q. And one of the things you told me in your
9  deposition -- in fact, I think you volunteered it --
10  is, you don't know where -- you are not going to opine
11  where her mesothelioma originated.  True?
12       A. No, sir.  I don't talk about medical issues.
13       Q. Okay.  Now, you mentioned a little bit about
14  industrial hygiene; right?
15       A. Yes, sir.
16       Q. And you took no undergraduate or graduate -- or
17  graduate courses in industrial hygiene; isn't that
18  right?
19       A. That is correct.
20       Q. And you're not a certified industrial
21  hygienist; true?
22       A. That's true.  I'm not.
23       Q. And you never took the test to become
24  certified; correct?
25       A. That is correct.

268

1        Q. And -- and we're going to -- as I told you, we
2  are going to talk about some internal Johnson & Johnson
3  documents.  You told us you never worked at Johnson &
4  Johnson; right?
5        A. That's still correct.
6        Q. And you don't know Dr. Hopkins personally;
7  true?
8        A. That's true.
9        Q. And you don't know any recipient of any of the
10  Johnson & Johnson documents, do you, sir?
11       A. No, sir, I don't.
12       Q. And you've never spoken to any of them, have
13  you?
14       A. No, sir, I haven't.
15       Q. So let's talk a little bit about your
16  testifying in asbestos litigation.  And I think you
17  told us since 1989 or 1990.  Is that correct, Doctor?
18       A. I think I gave my first deposition in '91 or
19  so; '92, maybe, the latest.
20          MR. CALFO:  Let's pull up Defense
21  Exhibit 42125, which -- I think the plaintiffs had a
22  different exhibit, which was --
23          I can't remember.  Do you remember, Counsel?
24          MR. SATTERLEY:  It was a defense exhibit.  It
25  was, I think, 199 or something like that.

269

1          MR. CALFO:  Your Honor, can we fix it, get the
2  number?  I have my exhibit, but I think the plaintiff
3  used his.
4          THE COURT:  You can publish that one.
5  BY MR. CALFO:
6        Q. And Doctor, I don't want to belabor this too
7  much, but this was an advertisement you ran 30 years
8  ago.  And you ran that ad also in the National Asbestos
9  Council magazine; true?
10       A. That's true.
11       Q. And did you tell the jury you weren't
12  advertising your litigation or lawsuit -- lawsuit
13  services here?
14       A. Yes, sir.  I was advertising our final air
15  clearance and what a good job we did.
16       Q. So, even though you chose to picture yourself
17  in a courtroom in that photograph.  That's true?
18       A. That's true.
19       Q. And you told the jury you were advertising your
20  laboratory services, but this photograph is not in your
21  fancy lab, is it, sir?
22       A. It's not in our lab, no.
23       Q. You're wearing a suit, aren't you?
24       A. Yes, sir.
25       Q. You're not wearing a lab coat; true?

270

1    A. That's still true.
2    Q. And your quote there, on the top, if we look,
3  it says, "Will your TEM laboratory's data make it
4  through the toughest meeting of your life?"
5        Do you see that, sir?
6    A. Yes, sir.
7    Q. And that meeting you're portraying is a
8  courtroom; true?
9    A. Yes, sir.  If our client -- the data was
10 challenged and we had to go defend it for our client,
11 we would do it.
12   Q. So the meeting that you are portraying is there
13 in a courtroom; true?
14   A. That's true.
15   Q. Let's go to the next one.
16        "Not only" -- if we can find it there.  "Not
17 only will the data stand up in court" --
18        MR. CALFO:  Can we pull that up?
19        Let me put it on the Elmo.
20        MR. SATTERLEY:  It's 1099.
21 BY MR. CALFO:
22   Q. "Not only will the data stand up in court, so
23 will the professionals who documented it."
24        Right?
25   A. Yes, sir.  I think it's missing some stuff.

271

1    Q. I think I heard you tell Mr. Satterley that
2  language means standing up in court for final air
3  clearance samples.
4        Did you tell Mr. Satterley that?
5    A. Yes, sir.
6    Q. By the way, just so we're clear, final air
7  clearance samples, those are air samples taken from
8  buildings like schools where asbestos has been removed;
9  isn't that right?
10   A. That is correct.
11   Q. But, Doctor, you've never testified in court to
12 defend your air clearance results, have you?
13   A. No, sir, I haven't.  We're that good.
14   Q. And if we look at the bottom of your
15 advertisement, it says, "Professional asbestos
16 consultants and contractors know that when the job
17 demands the best final air clearance testing by TEM,
18 you go to the people whose rigorous in-house quality
19 control measures produce TEM results and professional
20 support that stands up in the toughest tests you may
21 face."  Isn't that right?
22   A. Yes, sir, that's what it states.
23   Q. And again, Doctor, what you're talking about
24 are the toughest tests you face in court; isn't that
25 true?

272

1    A. For clients who are taken in there, yes, sir.
2    Q. And, since this ad was run, your business in
3  litigation has really picked up, hasn't it, sir?
4    A. Since the ad, not really.  It's -- had nothing
5  to do with getting involved in litigation a couple
6  years later.
7    Q. Well, since this ad ran in the National
8  Asbestos Council magazine, you've given about 3,000
9  depositions; right?
10   A. Yes, sir.  Over 30 years, that's about correct.
11   Q. And you testify, on average, once or twice a
12 week; isn't that true, sir?
13   A. That is correct.
14   Q. And you've testified in front of juries just
15 like we have now hundreds of times, haven't you, sir?
16   A. Yes.  That's correct.
17   Q. And you've been designated as an expert several
18 thousand times by plaintiffs' lawyers suing for money
19 in litigation, aren't you, sir?
20   A. That's probably correct, yes.
21   Q. And you've testified to this:  You think every
22 plaintiff's attorney in the country lists you in any
23 type of asbestos litigation; isn't that right, sir?
24   A. Yes, sir, I think that's happened.
25   Q. Let's talk about some of the work you've done

273

1  for plaintiff law firms before you ever started working
2  on cosmetic talc.  Okay?
3    A. That's fine.
4    Q. And by the way, you know, people have been
5  testing cosmetic talc for over 70 years; right?
6    A. That's what it looks like.
7    Q. And you just told the jury the first time you
8  ever got involved was two or three years ago; right?
9    A. Two and a half years ago, that's correct.
10   Q. But you've been doing asbestos litigation for
11 decades and decades and decades; isn't that right,
12 Doctor?
13   A. Over a few decades, yes, sir.
14   Q. For the better part of your career, Doctor,
15 you've run tests on asbestos-containing products;
16 right?
17   A. Yes, sir.  That's my area of interest.
18   Q. And why don't you tell the jury about the
19 asbestos-containing products -- well, let me ask you
20 this:  You've testified about asbestos-containing
21 automotive brakes; true?
22   A. That's true.
23   Q. Asbestos-containing boiler insulation?
24   A. That is correct.
25   Q. Automotive brake clutches?

**274**

1    A. Yes, sir.

2    Q. Compressors?

3    A. If it has a certain type of gasket in it, yes,

4  sir.

5    Q. Cement pipe?

6    A. Yes.

7    Q. Has a lot of asbestos in it, doesn't it?

8    A. 20 -- let's see -- runs anywhere from 15 to

9  22 percent asbestos.

10    Q. And we don't have it in the courtroom, but

11  there are ceiling tiles that have asbestos that you've

12  testified about; true?

13    A. That's -- in the past, that's correct.

14    Q. Floor tiles with asbestos in it?

15    A. Yes, sir.

16    Q. Gaskets have a lot of asbestos, don't they,

17  sir?

18    A. Industrial gaskets have quite a bit, about

19  70 percent. Anywhere from 65 to 85 percent depending

20  on what specification, what pressure, what temperature

21  it has to be at.

22    Q. Insulating cement. You testified about all the

23  asbestos in that, haven't you, sir?

24    A. Yes, sir.

25    Q. Joint compound?

**275**

1    A. That's correct.

2    Q. And joint compound is the stuff you put on your

3  construction walls?

4    A. For drywall, the seams. Typically known as mud

5  where they can take a seam, put drywall on it, sand it

6  to the point where you can't tell where that seam is

7  anymore, or nail hole, or what have you.

8    Q. I'm going to ask your help with this, Doctor.

9       What's Monokotay (phonetic)? I don't even know

10  how to say it.

11    A. Monokotay?

12    Q. Yeah. What is that?

13    A. Well, at this point I could just make up

14  anything. I think what you're trying to say is

15  Monokote fireproofing, Monokote 2 -- 1, 2, and 3.

16    Q. And that has asbestos in it?

17    A. Yes, sir. That was a fireproofing that was

18  manufactured by W.R. Grace from about 1961 to 1971.

19  Had approximately 10 percent chrysotile asbestos,

20  35 percent vermiculite, and 65 percent gypsum. Or

21  55 percent gypsum.

22    Q. Just to round this off, I don't want to take

23  too much time, but you've testified in cases because

24  pipe has insulation around it, with asbestos; right?

25    A. Yes, sir.

**276**

1    Q. Packing?

2    A. Yes.

3    Q. Textured paint?

4    A. Some textured paints do, not all.

5    Q. And wire has asbestos. You've testified about

6  that, haven't you?

7    A. Yes, sir. Primarily for defendants, because

8  for whatever -- because it doesn't release asbestos

9  like some of the other asbestos products.

10    Q. Now, you were paid by plaintiffs' attorneys in

11  lawsuits to test those asbestos-containing products,

12  weren't you?

13    A. No. I wasn't paid by defense -- plaintiffs'

14  attorneys to test the wire. That was defense

15  attorneys. And many of those tests we did on our own

16  for research. But some of those tests were paid for by

17  plaintiffs' attorneys.

18    Q. Doctor, you were hired to measure the amount of

19  asbestos those products have in them, weren't you?

20    A. In some cases, yes; in some cases, no.

21    Q. And of those products, most of them had

22  asbestos where the product was intentionally added as

23  part of its design; true?

24    A. That is true.

25    Q. And some of them, like the gaskets, I think you

**277**

1  told us, could contain as much as 85 percent asbestos;

2  true?

3    A. Industrial gaskets, that's very true.

4    Q. And that's different from a product that may

5  have a trace amount of asbestos as an accessory

6  ingredient; true?

7    A. It's different concentrations, that's true, but

8  a completely different type of product. One's been

9  manufactured with asbestos and you actually have to do

10  something to it to get high exposures.

11       The other one, even though there are trace

12  amounts, is a very fine powder that you shake out on to

13  your body every day if you use it continuously. So you

14  can't compare one with just a little bitty trace versus

15  one that has a lot of asbestos. It all depends what

16  you do to that one with all the asbestos.

17    Q. Doctor, what you've done for 30 years is you

18  come into court and you talk about all those

19  asbestos-containing products and all the dust and that

20  the people breathe; right? That's what you've been

21  doing. You've done tests on that.

22    A. Yeah. But you're kind of embellishing what I

23  do.

24       MR. CALFO: Your Honor, I move to strike.

25       THE COURT: He can answer the question.

278

1      MR. CALFO:  Okay.  Please do.

2      THE COURT:  He's responding directly to your

3  question.

4      THE WITNESS:  What I do is just don't go in and

5  say all this dust comes flying out.  We look at

6  particular type of work practices.  You can take an

7  asbestos gasket that has 70 percent asbestos in it,

8  pick it out, put -- it's new, put it on a flange, you

9  don't get exposed -- or you can't -- too low to measure

10  it.  But when they take that gasket off at a later date

11  and use a power grinder at 4500 rpm that's using air

12  blowing around, yes, you get very high exposures.

13      What we're talking about here is powder that is

14  as fine as cement powder that you are putting on your

15  body.  So you can't compare one has a lot of asbestos

16  in it versus another one that's a very fine powder

17  because of the asbestos content.

18      So it's different.

19  BY MR. CALFO:

20  Q.  Well, let me -- for example, here, in some of

21  the Johnson's Baby Powder bottles you tested, you

22  detected no asbestos; right, Doctor?

23  A.  That is correct.

24  Q.  In fact, I told the jury in opening of the

25  bottles you claim to find asbestos in, the lowest

279

1  concentration was 0.0000033.  Do you remember finding

2  asbestos of that amount, percent by weight?

3  A.  Yes.  By weight percent, yes.

4  Q.  So we all know what we're talking about here,

5  just so we're clear, you've been talking all day about

6  Johnson's Baby Powder and Cashmere Bouquet; right?

7  A.  Yes, sir.

8  Q.  And so we all know what we're talking about

9  here today, when you talk about talcum powders used on

10  babies, you're talking about Johnson's Baby Powder;

11  right?

12  A.  Yes, sir.

13  Q.  And, in fact, of the bottles of Johnson's Baby

14  Powder you claim to find asbestos in, the highest

15  amount was 0.035; true?

16  A.  By weight percent, not by fiber bundle count.

17  That's true.

18  Q.  And before you got heavy into cosmetic talc

19  lawsuits in the last two or three years, about 35 to

20  40 percent of MAS's business came from consulting in

21  litigation; true?

22  A.  That's true.

23  Q.  But in the past year, your litigation

24  consulting increased to about 70 percent of your entire

25  business; isn't that right?

280

1  A.  That is correct.

2  Q.  And the jump from 40 to 70 percent is primarily

3  due to your work now in talc litigation, which is just

4  in the last two or three years; right, Doctor?

5  A.  That is very true.

6  Q.  Now, before we talk about your testing, let's

7  talk about what you were asked to do, okay?

8      It wasn't, I think you said, until 2016, or was

9  it 2017 that you started getting involved in cosmetic

10  talc litigation?

11  A.  It was the end, I believe, of 2016 -- 2017 when

12  we -- after researching and picked the type of analysis

13  we were going to do and draw the heavy liquid.  I think

14  it was early 2017 we started doing the first analysis.

15  Q.  Okay, Doctor.  And it wasn't until late 2016

16  when you were asked by Mr. Satterley that you got

17  involved in cosmetic talc litigation; right?

18  A.  That is correct.

19  Q.  And you've testified, I think you just told us,

20  under oath, that prior to 2016, you had never tested a

21  cosmetic talc powder at all for any reason; right?

22  A.  I don't think so.  I can't find any record of

23  cosmetic talc versus industrial talc.

24  Q.  Where I'm going with this is, so if the

25  plaintiff lawyers, when they hired you, were looking

281

1  for somebody who had been in the practice of testing

2  cosmetic talc before 2016, that would not have been

3  you; right?

4  A.  That's correct.

5  Q.  In 2016 what happened is you received samples

6  of Johnson & Johnson talc from three plaintiff law

7  firms; right?

8  A.  That's correct.  2016, 20' -- early 2017, I

9  think.

10  Q.  Thank you, Doctor.

11      And one of the law firms that you received the

12  samples from was Mr. Satterley's firm and Ms. Clancy's

13  firm, the Kazan firm; true?

14  A.  That is true.

15  Q.  The other firm was the Lanier law firm?

16  A.  That is true.

17  Q.  And the other one I think you told us about was

18  the Simon Greenstone Panatier firm; true?

19  A.  That is correct.

20  Q.  And the plaintiff lawyers at that time didn't

21  just send you Johnson & Johnson talc to test, did they?

22  A.  At some point we also received Cashmere Bouquet

23  and we've also received others.  Avon, I believe; Jean

24  Nate, I think; certainly Chanel; and Beverly Hills --

25  Q.  And by the way --

Page 282 to 285 of 334
Case 3:16-md-02738-MAS-RLS    Document 33132-2    Filed 08/23/24    Page 407 of 1320
PageID: 249402
720 of 85 sheets

**282**

1    A. Giorgio Beverly Hills.

2    Q. By the way, you mentioned Avon. Is it your

3 opinion that all the Avon products that Ms. Schmitz

4 used had asbestos in them?

5    A. Based on our analysis of Avon products, I would

6 say more likely than not, yes.

7    Q. And, Doctor, on the very same day you were sent

8 the samples your lab purchased two bottles each of

9 Johnson's Baby Powder and Gold Bond; right?

10    You know what Gold Bond medicated powder is?

11    A. Yes, sir. I'm just trying to think. I think

12 you're correct.

13    Q. But you know -- or let me ask it this way: But

14 you knew from the very start, when you were hired, your

15 work was going to primarily involve Johnson & Johnson;

16 right?

17    A. That's what we were asked to test the most,

18 yes.

19    Q. Because it was clear to you the interest of

20 these plaintiff lawyers was in Johnson & Johnson --

21    MR. SATTERLEY: Objection, Your Honor.

22    THE COURT: Sustained.

23 BY MR. CALFO:

24    Q. In fact, almost one year after you got --

25    By the way, you got bottles of Cashmere Bouquet

**283**

1 in 2016 and 2017, didn't you?

2    A. 2017, yes, sir.

3    Q. Almost one year after you got the bottles of

4 Cashmere Bouquet and Gold Bond powder, you hadn't even

5 tested them after a year, had you?

6    A. No, I don't think so.

7    Q. Is that true?

8    A. That's true.

9    Q. And when these three plaintiff law firms came

10 to you -- and they paid you to test the Johnson's Baby

11 Powder; right?

12    A. Yes, sir. Like with all clients, when we agree

13 to do work, we -- we will bill them for our work.

14    Q. And when these three plaintiff law firms came

15 to you, Doctor, and they paid you to test the bottles

16 of Johnson's Baby Powder, they asked you to look for

17 amphiboles; right?

18    A. Yes, sir.

19    Q. And plaintiffs' attorneys didn't say to you,

20 look for asbestos or asbestiform amphibole, they just

21 told you to look for amphibole; right?

22    A. I'm trying to remember back. They were just,

23 you know, look to see if there's any regulated asbestos

24 in the product is what I believe happened. And that's

25 what we did. We didn't choose or pick what regulated

**284**

1 asbestos was in there. We just analyzed what was

2 there.

3    Q. Doctor, do you remember testifying in a case

4 called *Blinkinsop*?

5    A. Yes, sir, I think so.

6    MR. CALFO: Your Honor, just to make this --

7 we're getting to the end of the day -- may I show the

8 witness the testimony to see if it refreshes his

9 memory?

10    MR. SATTERLEY: Can I get a copy?

11    MR. CALFO: Of course. You can look at it.

12    THE COURT: What page are you showing?

13    MR. CALFO: I'm showing the witness page 215.

14    MR. SATTERLEY: 250?

15    MR. CALFO: 215.

16 BY MR. CALFO:

17    Q. Doctor, please just look at page -- lines 10

18 through 12, okay? And let me just ask you this,

19 Doctor: The plaintiffs' lawyers didn't ask you to look

20 for asbestos, they asked you to look for amphiboles;

21 right?

22    A. That's what it states, yes.

23    Q. And not all amphiboles are asbestos; true?

24    A. That's true.

25    Q. In fact, there are asbestos varieties that --

**285**

1 maybe I'll do it this way: You've seen the chart of --

2 have you -- well, let me -- let me publish what -- we

3 can't publish it until I get --

4    THE COURT: That's the one you used in opening

5 statement?

6    MR. CALFO: Yes, Your Honor.

7    THE COURT: You can publish it.

8 BY MR. CALFO:

9    Q. This is just for -- Doctor, I want you to help

10 us educate the jury real quickly, if we could.

11    Now, asbestos varieties are on the left and

12 nonasbestos varieties are on the right.

13    Do you see that, sir?

14    A. I see that's what it states.

15    Q. And, for some, the asbestos version and

16 nonasbestos versions have different names; right,

17 Doctor?

18    A. Yes, sir.

19    Q. So, for example, if we look on the right, the

20 nonasbestos form is called riebeckite and the asbestos

21 form on the left is crocidolite; right, Doctor?

22    A. That's what it states.

23    Q. And there are asbestos types of tremolite and

24 nonasbestos types of tremolite; right, Doctor? Just

25 generally.

73 of 85 sheets    Case 3:16-md-02738-MAS-RLS    Document 33132-2    Filed 08/23/24    Page 408 of 1320
PageID: 249403
Page 286 to 289 of 334

**286**

1    A. Well, yeah, depending if it's just pieces of
2  rock of tremolite versus fibrous, that would be
3  correct.
4    Q. So let me just ask it. There are asbestos
5  types of tremolite, there are nonasbestos types of
6  tremolite; right, Doctor?
7    A. Yes. The same mineral, the same chemistry,
8  same everything except one is pieces of rock, the other
9  is fibrous.
10    Q. And sometimes the nonasbestos tremolite can be
11  referred to as common or massive tremolite; right?
12    A. Sometimes, yes.
13    Q. And sometimes nonasbestos tremolite can be
14  referred to as just tremolite; right?
15    A. Typically not, at least not in my area. When
16  you say "tremolite," you either have to define it as
17  tremolite nonasbestiform or cleavage fragment tremolite
18  or tremolite asbestos. Not called just "tremolite." I
19  don't agree with that.
20    Q. Well, let me -- let me just ask you this:
21  There are asbestos types of anthophyllite; true?
22    A. Fibrous anthophyllite, which is asbestos.
23    Q. And nonasbestos types of anthophyllite; true?
24    A. True if it is, in fact, pieces of cleavage
25  fragment, not fibrous, that's true.

**287**

1    Q. And so, Doctor, if you were asked to look for
2  amphiboles and not asbestos, what you were asked to do
3  is look for any of the amphiboles, not just on the left
4  side but also the nonasbestos versions; right?
5    A. We looked to characterize it if it had cleavage
6  fragments versus asbestos. We -- we characterize what
7  is present. Not just looking for one thing or the
8  other.
9    Q. Well, staying with this chart, you also were
10  not asked to look for chrysotile asbestos, were you?
11    A. It's been too long. I just don't recall.
12    Q. Maybe we can talk about that tomorrow, because
13  we've got four minutes.
14        Now, Doctor, we've heard and will likely hear
15  of testing --
16        MR. CALFO: And maybe, since we don't have
17  time, I'll move on, Your Honor.
18        THE COURT: It's your cross-examination.
19        MR. CALFO: So I move to strike the question.
20  BY MR. CALFO:
21    Q. Doctor, you've analyzed about a hundred bottles
22  of Johnson's talcum powder; right?
23    A. 107.
24    Q. And you've never reported finding any
25  chrysotile; right?

**288**

1    A. That's correct. You wouldn't for this -- using
2  this protocol.
3    Q. And that's because one of the drawbacks of the
4  concentration method -- or I think you called it the
5  Blount method; is that right?
6    A. Well, there's the concentration method, Blount
7  PLM, and then ISO 22262-2 is the talc heavy density
8  liquid method for PLM, TEM, and SEM.
9    Q. So where I'm going with this is one of the
10  drawbacks of the concentration method is you can't find
11  chrysotile; right?
12    A. That's correct.
13    Q. So now, I think you also conduct PLM tests
14  without the concentration method; is that true?
15    A. That's true.
16    Q. And to this day, using that method, you still
17  haven't found chrysotile in the Johnson's talc; true?
18    A. That's true.
19    Q. And one thing I think you criticized Johnson &
20  Johnson for doing was not adopting the concentration
21  method. Right?
22    A. That's right.
23    Q. To this day, the concentration method has not
24  been adopted or approved by any regulatory agency in
25  the United States; right, Doctor?

**289**

1    A. That is correct.
2    Q. That would include the EPA; right?
3    A. Heavy density liquid they don't recommend, but
4  they do have other concentration methods that they have
5  laid out from acid dissolution to remove soluble
6  materials to muffle furnace to remove polymer or
7  plastic-type materials. So it concentrates, just not
8  heavy liquid density.
9    Q. That would include the Mine Safety and Health
10  Administration; correct, Doctor?
11    A. That is correct.
12    Q. And that would include the Occupational Safety
13  and Health Administration, or OSHA; true?
14    A. That is true.
15    Q. All right.
16        MR. CALFO: Your Honor, I'm going into a new
17  area. Would this be an appropriate time? I hate to
18  ask the Court, but I am --
19        THE COURT: We'll go home on that one.
20        MR. CALFO: Thank you, Your Honor.
21        THE COURT: Ladies and gentlemen, we're going
22  to end for the day. We'll see you back here tomorrow
23  morning. We'll get started again with the
24  cross-examination of this same witness.
25        Have a pleasant evening. Don't forget the

Page 290 to 293 of 334
Case 3:16-md-02738-MAS-RLS    Document 33132-2    Filed 08/23/24    Page 409 of 1320
PageID: 249404
74 of 85 sheets

**290**

1 admonition that it's your duty as jurors not to
2 converse amongst yourselves or with anyone else on any
3 subject connected with the trial or to form or express
4 any opinion thereon until the matter is submitted to
5 you.
6         Have a pleasant evening.
7         (Whereupon, the following proceedings were held
8 outside the presence of the jury:)
9         THE COURT:  The jurors have departed the
10 courtroom.
11         THE WITNESS:  Your Honor, may I be excused?
12         THE COURT:  Until tomorrow.  You've got to be
13 back here.
14         THE WITNESS:  Oh, I'll be back.
15         MR. SATTERLEY:  Leave everything except your
16 report -- anything you brought you can take with you.
17 Anything that was presented to you, leave it.
18         THE WITNESS:  It's right here.  I haven't taken
19 any of that.
20         THE COURT:  All right.  Is there anything we
21 need to put on the record regarding today's proceeding?
22         MR. SATTERLEY:  The only thing, at the end of
23 the day, Your Honor said, the Scala exhibits --
24         THE COURT:  We'll get to that.
25         Mr. Calfo, Mr. Sharp, is there anything we need

**291**

1 to put on the record?
2         MR. GARY SHARP:  No, Your Honor.
3         MR. MULARCZYK:  No, Your Honor.
4         THE COURT:  All right.  Let's move on to the
5 exhibits that Mr. Satterley would like to offer into
6 evidence.
7         What would you like to offer into evidence,
8 Mr. Satterley?
9         MR. SATTERLEY:  I'm sorry?
10         THE COURT:  What would you like to offer into
11 evidence?
12         MR. SATTERLEY:  Your Honor, I apologize.  I
13 don't have at my fingertips the disputed exhibits here.
14 Yes.
15         The disputed exhibits are Trial Exhibit 3573,
16 3574, 3577, 3578, 3580, 3581, 3582, 3588, 3590, 3592,
17 3593, 3594, 3595, 3596, 3597, 3599, 3600, 3601, 3603.
18 3604, and 3611.
19         THE COURT:  All right.  You can keep that.
20         MR. MULARCZYK:  Do you have a set of the
21 documents to look at as we go through each one?  Okay.
22         THE COURT:  All right.  Do you have any
23 objection to those?
24         MR. MULARCZYK:  Yes, Your Honor.  It would help
25 me -- I don't have that list in front of me.  I have

**292**

1 the ones that we've submitted objections to based on
2 the exhibit number for the deposition.  If we could
3 go --
4         THE COURT:  I can coordinate.
5         Number 6 on the Scala deposition is 3573.
6         MR. MULARCZYK:  Correct.  Our objection to this
7 is based on authenticity, hearsay, and relevance.
8         THE COURT:  All right.  First -- the first
9 thing is that -- authenticity.  The witness testified
10 that this is a document from the National Safety
11 Council but claimed that she'd never seen it before.
12         MR. MULARCZYK:  And part of the problem with
13 almost all of the documents to which we've objected to
14 is exactly that position.  They were documents that
15 were put in front of her that she'd never seen before,
16 and so --
17         THE COURT:  I understand.  Ms. Clancy or
18 Mr. Satterley, what is the authenticity that has been
19 demonstrated to the Court regarding Exhibit 3573?
20         MR. SATTERLEY:  Your Honor, this was produced
21 by Colgate in response to discovery, number one.
22 Number two, we cite to the Evidence Code 1414.  It's
23 authentic because it's in a monthly periodical and
24 Colgate has admitted that they're continuously a member
25 of the National Safety Council since 1911.  We believe

**293**

1 that, because it was in a monthly periodical, that is a
2 presumption of authenticity.  And so we believe this is
3 admissible.  And we cite to, I think, in our -- the
4 *Greenspan* case and also to the *StreetScenes v. ITC
5 Group* case, 103 Cal.App.4th 233.  As well as Evidence
6 Code Section 645.
7         THE COURT:  Okay.  You're mixing more than just
8 authenticity here.  That's okay.
9         Mr. Mularczyk, why isn't this a document that
10 was in the possession of your client who was a member
11 of the organization that published this document and
12 why isn't it relevant to show what they knew and when
13 they knew it?
14         MR. MULARCZYK:  Well, to address the first
15 point, nothing that Mr. Satterley said is actually
16 evidence.  There is -- nobody has testified that this
17 was a monthly periodical, that Colgate was receiving
18 it, that Colgate was aware of it.  This was a document
19 that was passed in front of Ms. Scala for the first
20 time in front of her deposition, and then --
21         THE COURT:  I understand.  She's testifying for
22 Colgate, and it was in Colgate's possession, but she'd
23 never seen it before.
24         MR. MULARCZYK:  Nobody has said that.  There's
25 been no evidence --

**294**

1  THE COURT:  Mr. Satterley just told me that it

2  was produced by Colgate in the production of documents.

3  MR. MULARCZYK:  As an attachment to the

4  exhibit.  As an exhibit to her deposition transcript.

5  We produced her deposition transcript in the exhibit

6  that was attached to it.

7  What's important --

8  THE COURT:  Oh, all right.  Let me get that

9  straightened out.

10  Mr. Satterley, was this produced by Colgate in

11  a request for production of documents or was this

12  produced by you at the deposition and then?

13  MR. RIVAMONTE:  Your Honor, Ian Rivamonte for

14  the plaintiff.  It was produced by Colgate in response

15  to plaintiff's document requests as set forth in our

16  brief.

17  MR. MULARCZYK:  Let me make something clear.

18  The document production --

19  THE COURT:  You had it in your possession to

20  produce it; right?

21  MR. MULARCZYK:  We received this because we had

22  a copy of her transcript with the exhibits attached to

23  her transcript.  That's how we received a copy of this.

24  I think it's --

25  THE COURT:  Wait.  I'm hearing two different

**295**

1  things.  I'm hearing that the lawyers for Colgate

2  brought it to Ms. Scala's deposition.

3  MR. MULARCZYK:  No.

4  THE COURT:  Isn't that what you just told me?

5  MR. RIVAMONTE:  No, Your Honor.  During

6  Ms. Scala's deposition, it was the plaintiffs' counsel

7  in that case.  The *Polakow* case that brought it.

8  THE COURT:  I don't much care who produced it.

9  Unless it was Colgate.

10  MR. RIVAMONTE:  Colgate did produce it,

11  Your Honor, in response to plaintiff's discovery

12  request in this case.

13  THE COURT:  Got it.  Okay.

14  All right.  Mr. Satterley, how is this an

15  authentic document?

16  MR. SATTERLEY:  Well, we -- number one, we

17  believe that they produced --

18  THE COURT:  They haven't admitted it.

19  MR. SATTERLEY:  No, I don't believe they have

20  admitted it.  We believe that they produced it in

21  response to our discovery request asking to produce all

22  documents regarding what they knew or should have

23  known, and they produced this document.

24  They should have or could have as -- not

25  produced it and said they didn't.  It's not a document.

**296**

1  It is a periodical.  The Court -- you know, there's --

2  I apologize, Mr. Rivamonte, I've been working

3  with Dr. -- asking questions of Dr. Longo all day, so

4  my mind's -- beside myself right now.  Can you help me

5  out.

6  MR. RIVAMONTE:  Yes, I can.

7  May I, Your Honor?

8  THE COURT:  Sure.  Of course.

9  MR. RIVAMONTE:  So Evidence Code Section 645.1

10  has a presumption that a periodical published more than

11  regular issue in average intervals not exceeding three

12  months is presumed authentic.

13  Here, Your Honor, Exhibit 35' -- I believe it's

14  3573 or Scala Exhibit 6, if you look at the contents

15  page of that, if you look at my trial brief, the

16  plaintiff's trial brief, my declaration, Exhibit E, the

17  contents page says that it's a monthly periodical of

18  the National Safety Council.  Therefore, under Evidence

19  Code 645.1, there is a presumption that it is authentic

20  and now the burden shifts to Colgate to prove that it

21  is not.

22  THE COURT:  All right.  Presuming that it's an

23  authentic periodical, how is it relevant when the

24  corporate representative testifies that she doesn't --

25  she's never seen it before?  Colgate has never seen it

**297**

1  before.

2  MR. SATTERLEY:  Knew or -- okay.

3  MR. RIVAMONTE:  Your Honor, it is relevant to

4  know this.  In *People v. ConAgra*, *ConAgra* was -- for

5  example, in that case, *ConAgra* was a member of several

6  trade organizations.  Those trade organizations issued

7  periodicals and other reports about the hazards related

8  to *ConAgra*'s product.  In that case the appellate court

9  found that, for the purposes of notice, those -- those

10  publications from those trade organizations in which

11  *ConAgra* belonged in is deemed notice of knowledge of

12  the actual hazard in the product.  Here it is the same

13  thing.  National Safety Council, Colgate was a member

14  and therefore there is at least notice here since

15  Colgate was a member that -- of asbestos-related health

16  hazards as set forth in that National Safety Council

17  publication.

18  THE COURT:  Well, how do you bridge the gap

19  between the witness testifying for Colgate that says

20  that Colgate's never seen this before, that they didn't

21  have it in their possession?

22  MR. RIVAMONTE:  Under --

23  THE COURT:  In *ConAgra* they had all that stuff

24  in their possession, didn't they?

25  MR. RIVAMONTE:  Yes.  But in

**298**

1  *Anderson v. Owens-Corning*, the standard is knew or
2  should have known.  So even though -- if Ms. Scala
3  claims that she does not -- or Colgate does not know of
4  this document in particular, it should have known it
5  based on its membership in the National Safety Council
6  during that time.
7       Colgate was a member of that council for, I
8  think since its inception, if I recall correctly.
9       And Colgate was also a member of several
10  committees in the National Safety Council, some of
11  which relate to asbestos, as I recall correctly.
12      So, for that reason, Your Honor, it's a
13  should-have-known standard.  Knowledge would be great.
14  Actual knowledge would be fantastic, but we're not --
15  for purposes of notice and purposes of
16  *Anderson v. Owens-Corning*, the should-have-known
17  standard applies.
18      THE COURT:  Is that correct about Owens' claim?
19      MR. MULARCZYK:  No, Your Honor.  You can't --
20  the way it works with authenticity and with the known
21  or knowable standard is you can't simply make the
22  argument and say so and then that's the case.  That's
23  not how it works.  You actually have to submit evidence
24  and make a connection between the defendant and the
25  topic or the harm or the injury that they should or

**299**

1  should have been aware of.  There is nothing in this
2  document, there is no evidence that's been presented in
3  this case that Colgate had receipt of this document,
4  that this document should have told Colgate anything or
5  that it should have advised him of any harm or injury.
6  There's just no connection here.  There's nothing at
7  all.
8       MR. GARY SHARP:  Your Honor, if I might,
9  because I've been around forever, I know these
10  documents from a historic state-of-the-art standpoint.
11  It's not true.  Colgate is not mentioned anyplace in
12  any of the National Safety Council pages, either by way
13  of membership, either by way of board of directors,
14  either by way of membership on a committee.  If
15  Mr. Rivamonte can show us that we were on a committee,
16  then we can have that discussion.  I've never seen it.
17      We have a list of every publication that was
18  maintained by Colgate, which was attached to the
19  deposition as Exhibit Number 5, which has been admitted
20  into evidence, the National Safety Council or the
21  *National Safety News* does not appear on this list.
22      These were not within Colgate's possession.
23      THE COURT:  All right.  The objection is going
24  to be sustained on this one.
25      Let's move to the next one, 3574, Number 7.

**300**

1       MR. MULARCZYK:  The same.
2       MR. GARY SHARP:  Same objection.
3       MR. RIVAMONTE:  Your Honor, I would like to
4  reiterate here.  At this stage we're talking about
5  authenticity.  And it's a very low standard.  The
6  question is whether the document produced or at issue
7  is fake.
8       THE COURT:  The difficulty is that you have --
9  you may have a document that is an authentic newspaper
10  article, but you have a witness from the company saying
11  that they never saw it before, that the company had
12  never seen it before.  That's the -- the difficulty is
13  not so much that it's -- it says that it's a magazine
14  article and, on the face of it, says that it's
15  published more than X-number of times.  But the problem
16  here is that there's evidently no evidence that Colgate
17  had it in their possession so that they can be charged
18  with having knowledge of what it said.
19      Maybe that wouldn't be true for *The New York
20  Times*, but for something like this, I'm going to
21  sustain the objection to that one as well.
22      Moving on.  Your next one is 3577.  The
23  objection is sustained on that one.  That's my motion
24  in limine.  Actually, let's go back.
25      Do you want to argue that one?

**301**

1       MR. MULARCZYK:  Well, Your Honor, I would...
2       MR. GARY SHARP:  Again, Your Honor, we have
3  within our documents the volumes of the *New England
4  Journal of Medicine* that we maintained.  It was well
5  after this date.  We did not have this.  It was not in
6  the possession of Colgate, and, again, there was no
7  reason for us to have had this document.  Ms. Scala was
8  not aware of it until it was presented to her at
9  deposition.
10      MR. MULARCZYK:  And, yes, this was the subject
11  of the motion in limine.
12      THE COURT:  How does this -- we made a ruling
13  on the motion in limine that there would not be
14  children dying of inhalation of talcum powder, of
15  aspiration of talcum powder.  The motion -- the
16  objection is sustained for 3577.
17      The next one is 3578, which is Number 11.
18      MR. GARY SHARP:  Again, National Safety
19  Council, Your Honor.
20      THE COURT:  And it was -- and the witness was
21  emphatic that this was not received by Colgate.
22      MR. RIVAMONTE:  I stand by my previous
23  arguments, Your Honor.
24      THE COURT:  So that's sustained as well.
25      The next one is 3580, an article from *The New*

302

1    *York Times.*

2         It's certainly relevant.

3         MR. GARY SHARP:  Your Honor, we have no

4    objection.

5         THE COURT:  All right.  That one will be in

6    evidence.

7         (Whereupon, Plaintiff's Exhibit 3580 was

8         admitted into evidence.)

9         THE COURT:  The next one after that is 3581,

10   which is -- corresponds to Number 14, which is -- which

11   are OSHA rules and regulations, which is -- it's the

12   law.

13        What would be your objection?

14        MR. GARY SHARP:  Your Honor, with respect to

15   OSHA, I have no objection as long as the entire code

16   section is attached.

17        THE COURT:  Now, this is...

18        MR. SATTERLEY:  Well, wait a second.  I would

19   object --

20        THE COURT:  It's three pages long.

21        MR. SATTERLEY:  I would object to them

22   putting --

23        THE COURT:  Hold on.

24        The exhibit is the exhibit.

25        Do you have an objection to the way the exhibit

303

1    exists at this point in time?  Is it only part of an

2    exhibit that includes other relevant, pertinent

3    material?

4         MR. GARY SHARP:  Your Honor, if we can meet and

5    confer with plaintiffs.  The problem is the copy I have

6    I can't read it, and I think between us we should be

7    able to come up with a clean copy.

8         THE COURT:  Maybe you should just let it go.

9    The jury won't be able to read it either.

10        MR. GARY SHARP:  That is absolutely true and...

11        THE COURT:  In any event, I don't mind letting

12   him talk about it, and if you want to get a cleaner

13   copy, Mr. Satterley, you can do that.

14        MR. GARY SHARP:  Thank you, Your Honor.

15        THE COURT:  The next one is 3582, corresponding

16   to Number 15.  What's the objection to this?

17        MR. MULARCZYK:  Hearsay, Your Honor.  It's

18   just -- it's a report of finding by Dr. Lewin in

19   testing that he had done, so we object on the basis of

20   hearsay.

21        THE COURT:  All right.

22        (Whereupon, Plaintiff's Exhibit 3582 was marked

23        for identification.)

24        MR. RIVAMONTE:  Your Honor, this letter is

25   admissible under the hearsay rules.  Number one, it's

304

1    an ancient document.  It's over 30 years old.  In the

2    *ConAgra* case again, the authors of this document is

3    presumed to have known what they were talking about and

4    it's been typically relied upon.  And, number two, it's

5    also admissible under the official -- the government

6    records hearsay exception because this was a document

7    drafted by the FDA and it's between two FDA employees.

8    So under, I believe it's 1271, it is admissible for

9    that purpose -- I'm sorry, 1280.

10        THE COURT:  It wasn't drafted by the FDA.  It

11   was directed to the FDA.  It was drafted by Seymour

12   Lewin, a professor of chemistry someplace.

13        MR. RIVAMONTE:  Let me check, Your Honor.

14        3583, Your Honor.

15        MR. SATTERLEY:  No.  3582; right?

16        THE COURT:  This is 3582.

17        MR. SATTERLEY:  3582.  Exhibit 15.

18        Here it is.

19        MR. RIVAMONTE:  So, Your Honor, this is also

20   admissible for notice purposes because this document

21   was produced by Colgate and it was in Colgate's

22   possession at the time.

23        THE COURT:  It was produced by Colgate in

24   the --

25        MR. RIVAMONTE:  Response to discovery,

305

1    Your Honor.

2         THE COURT:  All right.  Is that right, that

3    Colgate had this document in their possession?

4         MR. MULARCZYK:  No.  Again, this is information

5    that was received during the course of depositions of

6    corporate -- corporate witnesses, so -- here's my --

7         Here's another take I have on this, Your Honor.

8         So there was a follow-up -- two follow-up

9    studies that were done, one by Dr. Lewin and one by the

10   FDA, on these exact same samples that they want to

11   introduce into evidence now.

12        So to the extent they're asking for this one to

13   be admitted, there are two follow-ups that say the

14   complete opposite in his final rulings that should be

15   admitted as well.

16        So to the extent that the Court is inclined, if

17   this comes in, then it certainly opens the door to all

18   of it, but our position -- the position we're

19   maintaining is that this was produced as part of

20   deposition transcripts when these documents were shown

21   to corporate representatives at depositions.  What we

22   produced were the transcripts along with the exhibits

23   that were previously produced by plaintiffs.  These

24   were not in possession of Colgate prior to that time.

25        So, in our view, that's the position we

**306**

1  maintain, but -- leave it at that.
2      THE COURT:  All right.
3      MR. SATTERLEY:  I just want to verify.  So it's
4  Colgate's position that, even though it's produced in
5  response to discovery with the Quinn Emanuel Bates
6  Number QECPC2, and it has several numbers, it's
7  Colgate's position that those Bates numbers don't mean
8  anything, and I just want to clarify that's Colgate's
9  position with regard to this because it was our
10 understanding that that came from the repository with
11 the Bates numbers on it.  But now Colgate has taken a
12 new position I've never heard of before.
13     THE COURT:  Well, I am just trying to figure it
14 out here.  Did this...
15     MR. GARY SHARP:  Your Honor.
16     THE COURT:  Which is it?
17     MR. GARY SHARP:  So, under discovery
18 obligations, a --
19     THE COURT:  I understand that.  The question
20 is --
21     MR. GARY SHARP:  What we received in the course
22 of litigation these were not in the Colgate files.
23 These were received during the course of litigation by
24 counsel and then were attached to depositions where
25 people have been asked about them.

**307**

1      THE COURT:  All right.  Mr. Satterley?
2  Mr. Satterley, did you receive this as a business
3  record or just one of those general "all documents that
4  you may have"?
5      MR. SATTERLEY:  Well, Your Honor, they were
6  produced in response to our discovery and I -- you
7  know, it sounds like its Colgate's position that
8  there's no identifying marks or numbers or Bates
9  numbers that would demonstrate what they are.  So we
10 believe that it's -- the one that I have -- I have one
11 with Bates numbers on them.  His copy doesn't have
12 Bates numbers on them.  Mine has Quinn Emanuel Bates
13 numbers on them.
14     MR. GARY SHARP:  And, Your Honor, in the --
15     MR. SATTERLEY:  So it's my -- other Colgate
16 counsel told me in the past that if it has the Quinn
17 Emanuel Bates numbers on it, it's part of their
18 repository, but it's now Colgate's taken the position,
19 that's fine.  That just puts me on notice where they
20 are with regards to other documents, so.
21     THE COURT:  All right.  So I'm going to accept
22 as true that they did not have this document back in
23 1972.
24     MR. SATTERLEY:  If we prove otherwise, we'll
25 bring it to the Court for reconsideration.

**308**

1      THE COURT:  All right.  And so that one
2  objection is sustained.
3      The next one is 3588, which corresponds to 21,
4  which is the CTFA minutes.
5      What's the objection to this?
6      MR. GARY SHARP:  Your Honor, this is a CTFA
7  document.  We're not going to challenge authenticity
8  because I'm assuming at some point somebody from the
9  CTFA has probably produced this.  It was not a document
10 that was ever in the Colgate files.  This document
11 actually came from Whittaker Clark & Daniels.  We are
12 not challenging authenticity, though, however.
13     THE COURT:  Wasn't the testimony that Colgate
14 was involved with this CTFA?
15     MR. GARY SHARP:  Yes.  Colgate was a member of
16 the CTFA.  This happens to be something that Colgate
17 was not present at and there is no indication that this
18 document was ever sent to and/or received by Colgate.
19     MR. MULARCZYK:  And, as a matter of course, we
20 stipulate on the CTFA documents where it indicates we
21 were present.  We don't dispute those.  The ones that
22 raise concern for us are the ones in which we weren't
23 present.
24     THE COURT:  All right.  I am persuaded that it
25 should be allowed in.  So the objection is overruled.

**309**

1      (Whereupon, Plaintiff's Exhibit 3588 was
2      received into evidence.)
3      The next one is 3590, which corresponds to 23.
4      MR. RIVAMONTE:  This is another CTFA document,
5  Your Honor.  It's a news release.
6      THE COURT:  Is there an objection to this one?
7      MR. GARY SHARP:  Other than your name is on it.
8  But no, Your Honor.
9      THE COURT:  I also find that objectionable.
10     MR. GARY SHARP:  Let the record reflect there
11 was laughter in the courtroom.
12     THE COURT:  That one will be in evidence.
13     (Whereupon, Plaintiff's Exhibit 3590 was
14     received into evidence.)
15     THE COURT:  The next one is 3592.  The Sinai
16 study.
17     What's the objection to this one?
18     MR. MULARCZYK:  Same thing as for Dr. Lewin.
19 It's hearsay.
20     MR. SATTERLEY:  Well, Your Honor, this is --
21 this goes to notice, exception to the hearsay rule,
22 issue of notice.  This is a published study regarding
23 the very product at issue in this case, that the
24 corporate representative admitted that they knew that
25 it was going on at the time, and this, at the very

**310**

1    least, should come in for the issue of notice.

2        MR. RIVAMONTE:  Similar to *The New York Times*

3    article, Your Honor.  This is a publication in a

4    medical journal -- or a scientific journal, I should

5    say.

6        MR. SATTERLEY:  *Journal of Toxicology and*

7    *Environmental Health*.

8        THE COURT:  It's really a question of whether

9    they had notice at the time, and I'm persuaded that

10   they had notice at the time.

11       MR. GARY SHARP:  Your Honor, if I might, this

12   is similar to every medical article which might come up

13   in a trial with respect to medical, and they're

14   referred to, certainly.  They're quoted from.  They

15   don't come into evidence because they're still

16   inadmissible hearsay.

17       THE COURT:  I don't disagree with that, but the

18   distinguishing factor is that with the Sinai group it

19   was a *New York Times* article and then there was

20   interaction between the industry group and the people

21   who wrote the article.

22       MR. GARY SHARP:  Certainly.

23       THE COURT:  And that's where it distinguishes

24   this, that it was a bone of contention and it was

25   maneuvering, if you will, around what was -- what was

**311**

1    printed.

2        MR. GARY SHARP:  Well, again, Your Honor, what

3    we're doing is we're now sending back to the jury room

4    to lay people medical or scientific articles that have

5    been testified to by the experts and have been

6    explained by the experts.  We don't send the textbooks

7    or the articles back to the jury room.

8        THE COURT:  I agree with that.  This isn't one

9    of those.

10       MR. GARY SHARP:  Thank you, Your Honor.

11       THE COURT:  This is something that was

12   published, that the industry group addressed it.  And

13   it's the fact that the industry group addressed it that

14   makes it what's in there.  And it is hearsay, no

15   question about it.  But it goes to notice, not to the

16   truth of the matter.

17       MR. GARY SHARP:  Thank you, Your Honor.

18       THE COURT:  So that's 3592 -- and, actually,

19   3593 can both be admitted into evidence, because I'm

20   going to presume that it is the same.

21       (Whereupon, Plaintiff's Exhibit 3592 was marked

22       for identification.)

23       (Whereupon, Plaintiff's Exhibit 3593 was

24       received into evidence.)

25       MR. GARY SHARP:  And that's for notice only;

**312**

1    correct, Your Honor?

2        THE COURT:  The next one is 3594, which is 27.

3        MR. MULARCZYK:  So the objection to this,

4    Your Honor, it is hearsay within hearsay.  It's a

5    document that purports to describe a telephone

6    conversation.

7        MR. GARY SHARP:  Again, it's not a Colgate

8    document and it's never appeared in the Colgate files.

9        THE COURT:  We have somebody, looks like it's

10   named Shapiro, and we have Langer.  Beyond a doubt,

11   it's a hearsay document; right?

12       MR. RIVAMONTE:  Your Honor, in our trial brief

13   we submitted a declaration from the custodian of

14   records from the FDA, and that declaration

15   authenticates this document, number one; and, number

16   two, confirms that this document was kept in the

17   regular course of the FDA.

18       So in that sense, Your Honor, it's admissible

19   as a business record, under the business record

20   exception.  It's also --

21       THE COURT:  This is a government record?

22       MR. RIVAMONTE:  It is maintained as a

23   government record, yes, Your Honor.  It's part of the

24   FDA files as a declaration from the FDA.  It's attached

25   as an exhibit.

**313**

1        THE COURT:  So it's an FDA business record.

2        MR. RIVAMONTE:  Yes.  It was kept in the

3    regular course of the FDA's business.

4        THE COURT:  Where is the evidence that shows

5    that?

6        MR. RIVAMONTE:  Let me look it up, Your Honor.

7        MR. SATTERLEY:  The declaration we submitted, I

8    believe.

9        MR. RIVAMONTE:  It was part of the trial brief.

10   It was in my declaration.  I will give you the exact

11   exhibit number.

12       THE COURT:  All right.  If it's a business

13   record and it's been authenticated by a declaration.

14       MR. MULARCZYK:  Well, it seems like that only

15   addresses the first layer of hearsay and not the

16   underlying telephonic conversation.  The business

17   record exception is that it actually exists only

18   applies to the document itself.  It doesn't apply to

19   the second layer of hearsay within the document which

20   describes the underlying telephonic conversation, which

21   is actually the title of the document itself.

22       MR. RIVAMONTE:  Your Honor, just for the

23   record, it's Exhibit V as in Victor to my declaration.

24   It is a declaration of Tobin Ballinger, and in that

25   declaration, in that Exhibit B, there is an

**314**

1 authentication page by the FDA certifying that this
2 document, along with others, is part of -- maintained
3 in the regular course of the FDA's business.
4    In terms of the --
5    THE COURT:  You didn't -- did you subpoena the
6 document to court and -- with the declaration by the
7 custodian?
8    MR. RIVAMONTE:  It was a FOIA request done by
9 my office and when the request was made --
10    THE COURT:  All right.  So it's a Freedom of
11 Information Act request and they sent it back saying
12 these are the documents we have.
13    MR. RIVAMONTE:  Yes, Your Honor.
14    THE COURT:  That's insufficient to authenticate
15 it.  If you have a declaration of a custodian as would
16 come with documents that were subpoenaed to the Court
17 for trial, that would take care of the problem in terms
18 of authentication.
19    And that they also say that it's made in the
20 regular course and scope of business with the other
21 necessary assertions, it can get past the hearsay
22 objection.  But it -- but I'm going to sustain the
23 objection on this one.  I don't see that having
24 occurred.
25    The next one is 3595, which is the submission

**315**

1 to the FDA.
2    MR. MULARCZYK:  So, again, our objection to
3 this is authenticity.
4    THE COURT:  How many pages are on this one?
5    MR. RIVAMONTE:  It consists of two documents,
6 Your Honor.  I think we only want -- it's kind of weird
7 because in the copy, as you'll see, there's one --
8 there's two documents per page.
9    THE COURT:  Yes.  I have four documents
10 altogether plus a page that does not make sense to me.
11 It says "remote user."  That's right.  Remote user.
12    MR. RIVAMONTE:  So, Your Honor, we want the
13 McCrone document, which is dated March 12, 1976.
14 That's two pages.
15    And then we want the Johnson & Johnson --
16    THE COURT:  Well.  All right.
17    MR. RIVAMONTE:  There's three documents total,
18 total of four pages.
19    THE COURT:  There has been testimony that these
20 were the documents that were sent by the trade group,
21 the CTFA, in order to influence the FDA; isn't that
22 what the testimony was?
23    MR. MULARCZYK:  I don't recall that testimony,
24 Your Honor.  And I would -- one is a Johnson & Johnson
25 document.  One is a McCrone document that wasn't a

**316**

1 communication with Colgate.  I think we have challenges
2 to authenticity as to both.  We have challenges to
3 hearsay as to both.  And I believe one of the documents
4 actually discusses a -- the McCrone document also seems
5 to reference a verbal agreement that was made, so
6 there's a multiple hearsay layer issue with respect to
7 the McCrone document.
8    THE COURT:  Well, my recollection of testimony,
9 and I'm blanking out at the moment as to who gave the
10 testimony, was that the trade group put together a
11 package of letters regarding the incorrect assertions
12 in the Sinai Medical School study and it was sent to
13 the FDA.  But maybe I'm not correct about that.
14    MR. SATTERLEY:  I think you're correct.  Diana
15 Scala testified about that.  And also there's testimony
16 that hadn't already been played from Mr. Hopkins on
17 that -- in that regard.
18    THE COURT:  Maybe it was Mr. Hopkins'
19 testimony.  I don't remember exactly whose testimony it
20 was.  But that's my recollection.  And if that's --
21 if -- with that testimony underpinning this, I will
22 admit it into evidence.
23    The next one is 3596, the CTFA minutes.
24    MR. MULARCZYK:  Your Honor, just as a
25 clarification on the last one, which document are you

**317**

1 admitting?  Or subject to the testimony, because
2 there's a few in there.
3    THE COURT:  There's -- there are three letters.
4    MR. MULARCZYK:  Okay.
5    THE COURT:  And one of them is from Johnson &
6 Johnson, one of them is from McCrone, and one of them
7 is from Sterling Drug.  And the other page that says
8 "remote user," I don't know what that means.
9    Mr. Satterley?
10    MR. MULARCZYK:  It has a little note --
11    MR. SATTERLEY:  We don't need that.
12    MR. MULARCZYK:  I think that's a little note
13 left by the plaintiff's attorney.
14    MR. SATTERLEY:  I don't, but we don't -- we
15 won't seek the admission of that, Your Honor.
16    THE COURT:  All right.  We're going to tear
17 that out.
18    MR. MULARCZYK:  Just like that.
19    THE COURT:  Just like that.  All right.
20    MR. MULARCZYK:  We'll -- and we'll -- we'll
21 check the -- we'll go back and check the testimony
22 that's underpinning the admission of these, and -- and
23 we'll circle back with the Court in the morning.
24    THE COURT:  All right.  3596, CTFA minutes.  If
25 you have no different objections, I'm going to admit

**318**

1  that.

2  MR. GARY SHARP: Your Honor, what tab? I'm

3  sorry.

4  MR. SATTERLEY: 29, Mr. Simko. Colgate was

5  present, so --

6  MR. MULARCZYK: Yeah, we'll withdraw the

7  objection.

8  THE COURT: All right. That one will be in.

9  (Whereupon, Plaintiff's Exhibit 3596 was

10  received into evidence.)

11  THE COURT: The next one as well? 3597, which

12  is 30, which -- oh, maybe I'm confusing the letters.

13  MR. GARY SHARP: Yes. I -- now -- now that I

14  see this, I -- I believe that is what happened,

15  Your Honor.

16  MR. SATTERLEY: Yeah. This is the -- this is

17  the March submission to the FDA enclosing all the

18  industry members of the CTFA, and there was

19  testimony -- specific testimony about this, about

20  Christopher Costello working for Colgate.

21  THE COURT: These are the same letters as in --

22  except there's more of them here.

23  MR. SATTERLEY: That's correct.

24  MR. MULARCZYK: Can I -- can I get back to the

25  Court on this in the morning again, just review the

**319**

1  testimony?

2  THE COURT: All right. Is there one from

3  Colgate?

4  MR. SATTERLEY: There's -- I have one --

5  there's a -- a letter and an internal -- a memo that

6  was submitted to the FDA; March 15, 1976, letter from

7  Costello to Norman Estrin, and Norman Estrin turns

8  around and submits all of this to the FDA.

9  MR. GARY SHARP: And, Your Honor, no objection

10  to those portions.

11  THE COURT: Well, the document is what the

12  document is. If you have objections to other portions,

13  we are going to deal with it, but first, let me do

14  this.

15  3595 I'm going to strike from being admitted

16  into evidence, because it's going to be duplicated

17  3597. So 3595 is out because it's a duplication.

18  3597 will be in, but the Court will reconsider

19  it if Mr. Mularczyk can find some evidence that nobody

20  talked about it.

21  (Whereupon, Plaintiff's Exhibit 3597 was

22  received into evidence.)

23  MR. MULARCZYK: I'm not -- I'm not looking for

24  a way out. I just want to confirm what the --

25  THE COURT: All right. The next one is 3599,

**320**

1  Exhibit Number 32. It's a memorandum from HEW,

2  somebody there, to Robert Schaffner.

3  MR. GARY SHARP: Yes, Your Honor. Again, this

4  is an internal FDA document that has not been

5  authenticated.

6  MR. MULARCZYK: We object on that and on

7  hearsay.

8  MR. RIVAMONTE: Your Honor, this is one of the

9  documents that the FDA produced in response our FOIA

10  request. It's Exhibit V, as in Victor, to my

11  declaration in the trial brief.

12  THE COURT: Yeah. I think it's -- I don't

13  remember what the witness, Diana Scala, said about it.

14  Do you?

15  MR. GARY SHARP: It was just read to her,

16  Your Honor.

17  THE COURT: All right. It's not in evidence.

18  Then we have 3600, which is 33.

19  MR. GARY SHARP: Yes, Your Honor. In this --

20  this next series are allegedly to be call reports

21  that -- they're Cyprus documents. They are not Colgate

22  documents. They did not appear in Colgate files.

23  THE COURT: Well, the testimony, if I recall,

24  is that the witness said that Cyprus mailed these

25  things in an offer -- in attempting to solicit business

**321**

1  from Colgate.

2  MR. GARY SHARP: No. Let me rephrase that,

3  Your Honor.

4  The testimony from Ms. Scala was -- again,

5  these were simply put in front of her, and she was --

6  they were read to her. These are -- nothing with

7  respect to Colgate or Colgate employees would verify

8  anything that's in this document from Cyprus.

9  And, again, this is a hearsay within hearsay,

10  because they purport to be conversations that took

11  place by a gentleman at Cyprus, who, apparently, was in

12  sales, and they've memorandums to his boss at the time

13  that they were attempting, apparently, to gain

14  Colgate's business, which they were not able to do

15  until they bought the company.

16  MR. SATTERLEY: Your Honor, first of all, many

17  of these documents have statements of what Colgate

18  personnel managers said. Those would be party

19  admissions, the portions of the documents. The

20  documents themselves have been authenticated --

21  THE COURT: They would be party admissions if

22  somebody was standing here to testify that "They told

23  me."

24  But what we have is a document that was written

25  a long time ago, and the witness that talked about the

**322**

1  document, if at all, doesn't say that "Somebody told

2  me."

3        MR. SATTERLEY:  These --

4        THE COURT:  That's a difficult problem from the

5  perspective of saying that it's a -- it's an admission.

6        MR. SATTERLEY:  These documents were all

7  produced as business records by Cyprus.  We have

8  testimony from the Cyprus corporate representative we

9  could tender -- tender to Your -- to Your Honor, if we

10  haven't already done so.

11        MR. RIVAMONTE:  We have.

12        MR. SATTERLEY:  And so these are business

13  records from 19 -- this one is from 1976, and so we can

14  authenticate these as business records, and there are

15  statements of -- of a party within the business record.

16        And it would be just -- if they had a record of

17  Ms. Schmitz --

18        THE COURT:  I don't have a problem with this

19  being a business record, but I need to see the evidence

20  from Cyprus that describes it as their business record.

21        MR. SATTERLEY:  We -- we provide will that to

22  Your Honor.

23        MR. RIVAMONTE:  Exhibit BB to my declaration,

24  Your Honor, is the deposition testimony of Henry

25  Mulryan, who was a -- who -- who worked for Cyprus and

**323**

1  has personal knowledge about how these call reports are

2  generated in the normal course of Cyprus's business.

3        MR. SATTERLEY:  He was -- the president of

4  Cyprus was deposed.  And also, if Your Honor will --

5  may recall, his/he's the signator of one of the other

6  letters that --

7        THE COURT:  Are you going to read that to

8  the -- read that information to the jury because this

9  guy is unavailable?

10        MR. SATTERLEY:  We have designated

11  Mr. Mulryan's deposition.  If the Court requires it for

12  foundation purposes, we certainly would.

13        First, I think that its authentication as a

14  business record, as a preliminary matter, the Court

15  can -- can take that and determine itself that it's a

16  business record and otherwise admissible.

17        But if the Court requires us to read that

18  portion of Mr. Mr. Mulryan's testimony, we certainly

19  can do that, if -- if need be.

20        MR. MULARCZYK:  I think Your Honor is still

21  going to run into the same problem, because it's not

22  going to be Mr. Mulryan saying, "This is what Colgate

23  told me."

24        THE COURT:  No, no, no.  But if he identifies

25  the document as being a business record for Cyprus,

**324**

1  authenticates that, that's an exception to the hearsay

2  rule.

3        MR. MULARCZYK:  But the statement is being

4  made --

5        MR. GARY SHARP:  Your Honor, the statement

6  contained within this record is something the

7  plaintiffs wish to -- to show to prove the truth of the

8  matter asserted.  So it is the hearsay statement within

9  the document that is the objection.

10        I -- again, I'm not going to force them to read

11  a transcript for authentication.  I believe these

12  are -- probably purport to be Cyprus documents.  I have

13  no reason to believe that someone has done something to

14  them.

15        It's the hearsay statements within those Cyprus

16  documents that -- that we're placing our objection,

17  because they -- it's a salesperson, who is trying to

18  get something to his boss to convince him to allow

19  making calls on Colgate that, apparently, are taking

20  hours and -- and lunches.

21        THE COURT:  Well --

22        MR. GARY SHARP:  They are seeking to have those

23  statements made by Colgate employees, allegedly, on a

24  third-hand basis as something to prove the truth of the

25  matter asserted.

**325**

1        MR. RIVAMONTE:  Your Honor, if you look at the

2  recipient, who are -- who are -- the persons who took

3  part in this three-hour lunch in April 19, 1976 --

4        THE COURT:  I -- I -- I saw that.

5        MR. RIVAMONTE:  Yeah, Mr. Simko is in there.

6  So Colgate employees were --

7        THE COURT:  My ruling is going to be that if we

8  can see that these are Cyprus -- genuinely business

9  records, then I will admit them into evidence.

10        If they're not, the -- the other objection that

11  it's a hearsay document or a double hearsay document is

12  one that goes to something else.  I mean, hearsay

13  doesn't apply if there is an exception to the hearsay

14  rule.  Hearsay within hearsay, we can give them a

15  limiting instruction, if we need to.

16        But -- so that would mean that 3600, 3601, 3603

17  are all in.  And 3604 as well.

18        (Whereupon, Plaintiff's Exhibit 3600 was

19        received into evidence.)

20        (Whereupon, Plaintiff's Exhibit 3601 was

21        received into evidence.)

22        (Whereupon, Plaintiff's Exhibit 3603 was

23        received into evidence.)

24        (Whereupon, Plaintiff's Exhibit 3604 was

25        received into evidence.)

83 of 85 sheets Case 3:16-md-02738-MAS-RLS    Document 33132-2    Filed 08/23/24    Page 418 of 1320
Page 326 to 329 of 334
PageID: 249413

326

1      MR. GARY SHARP:  And, Your Honor, we'll --
2  we'll draft proposed limiting instruction for the
3  Court.
4      THE COURT:  I -- I have one that sort of aims
5  in this direction, and we can talk about it.  Let's
6  finish this first, though.
7      MR. GARY SHARP:  Thank you, Your Honor.
8      THE COURT:  I also wanted to do one other
9  thing, is that counsel need not request leave of Court
10  to approach the witness every single time.
11      If you want to make the record clear, just say,
12  "I'm going to show you this document, Mr. Witness," and
13  then just --
14      MR. GARY SHARP:  Thank you, Your Honor.
15      MR. SATTERLEY:  We appreciate it, Your Honor.
16      MS. CLANCY:  And then don't do it in a menacing
17  fashion.  And then don't approach in a menacing
18  fashion.
19      THE COURT:  Well, now I'm going -- I'm not
20  worried about that in this case.
21      Okay.  So 3600, in; 3601, in; 3603, in; 3604,
22  that's also going to be in; 3605 -- 3611, which is
23  Number 44 --
24      MR. RIVAMONTE:  It's the one with Mr. Roach.
25      THE COURT:  Pardon?

327

1      MR. RIVAMONTE:  The one you mentioned earlier
2  this morning.
3      THE COURT:  Oh, no, no, no.  That's -- that's
4  not spelled like me.  The other one --
5      MR. RIVAMONTE:  Oh, the other one.
6      THE COURT:  It's 3590 --
7      MR. RIVAMONTE:  Oh, okay.
8      THE COURT:  -- has printing in the upper
9  right-hand corner that looks, strangely, like mine with
10  the name F. Roesch, R-o-e-s-c-h, which is how you spell
11  my name.  It's an unusual spelling.  It's not real
12  common.  But I'm not related.
13      Okay.  Let's move on.
14      MR. SATTERLEY:  Colgate did have a facility in
15  Berkeley, Your Honor.
16      THE COURT:  Okay.  So we have the -- this
17  McCrone document with a picture on it that's --
18      MR. GARY SHARP:  Which tab are we at,
19  Your Honor?  Which tab?
20      THE COURT:  This is 44.  It's a letter directed
21  to Ms. Grace Roach of the Colgate-Palmolive Company --
22      MR. SATTERLEY:  I thought we agreed --
23      THE COURT:  -- July 1983.
24      MR. SATTERLEY:  I thought, Mr. Sharp --
25      MR. GARY SHARP:  Yeah.

328

1      MR. SATTERLEY:  -- you -- you agreed to this
2  one; right?
3      MR. GARY SHARP:  Yes.
4      THE COURT:  All right.  So that one will be in
5  evidence.
6      And that -- that completes that.
7      MS. CLANCY:  That completes all the Scala
8  exhibits, Your Honor.
9      THE COURT:  All right.
10      THE REPORTER:  What -- what was Number 44 that
11  you just admitted?  Was that 36- --
12      THE COURT:  3611.
13      MR. SATTERLEY:  A letter from McCrone to
14  Ms. Grace Roach.
15      THE REPORTER:  Okay.  Thanks.
16      MS. CLANCY:  Oh, Your Honor, may I just -- to
17  help the -- to assist the court reporter and the
18  Clerk -- I gave Mr. Satterley the wrong exhibit number
19  today on something.  I just need to read it into the
20  record.  I told him one of the exhibits that was
21  admitted was 727, but the actual exhibit number is
22  3591.
23      THE COURT:  Okay.
24      MR. SATTERLEY:  There was no objection at the
25  time, so I just rocked and rolled.

329

1      THE COURT:  Mr. Bir?  Mr. Bir --
2      THE CLERK:  Yes?
3      THE COURT:  -- we are going to admit another
4  exhibit here.
5      MS. CLANCY:  It was already admitted.
6      THE COURT:  Oh, it was already admitted?
7      MS. CLANCY:  I just read the --
8      THE COURT:  So we need to delete one.
9      MS. CLANCY:  When he said, "I'm now showing you
10  727," that's because I gave him the wrong sticky.
11      THE COURT:  So -- all right.  So both of those
12  are in evidence.  They're just different documents?
13      MS. CLANCY:  No.  727 is not evidence.  It's
14  3591.  And I had some sort of --
15      MR. SATTERLEY:  It's the same document, though.
16      MS. CLANCY:  It's the same, yeah.
17      MR. SATTERLEY:  It's the J4-1 method; right?
18      MS. CLANCY:  Yes.
19      It's the same document.  I gave him the wrong
20  document number.
21      THE COURT:  Okay.
22      MS. CLANCY:  So I didn't want there to be
23  any -- I've made more confusion --
24      THE COURT:  Well, now, I'm easily confused.
25      Okay.  I have a -- a limited -- evidence

**330**

1  admitted for limited purpose instruction that -- I'll
2  just show it to you.  And if you -- if you want to --
3      MR. SATTERLEY:  Can we get a copy, by chance,
4  Your Honor, or --
5      THE COURT:  All right.  Is there anything else
6  we need to talk about before we let the reporter go
7  home?
8      MR. SATTERLEY:  The only thing is, there was
9  some evidentiary rulings Your Honor made -- evidentiary
10 rulings Your Honor made, I believe, regarding some
11 additional J&J documents, and earlier, I had requested
12 that they be received into evidence.
13     When I did that, it was at a break, and I
14 didn't hear Your Honor respond, "Okay, those are
15 received into evidence," like you did yesterday.
16     This morning you issued a ruling.  It
17 was the --
18     THE COURT:  What numbers are you talking about?
19     MR. SATTERLEY:  These are Exhibit 4687, 0790,
20 407 --
21     THE COURT:  Wait.
22     MR. SATTERLEY:  And I'm reading from
23 Your Honor's order.
24     THE COURT:  4687?
25     MR. SATTERLEY:  4687, yes, Your Honor.

**331**

1      THE COURT:  That's in evidence.
2      MR. SATTERLEY:  Yes.  The -- so -- so I guess
3  the question is, I have a list here that Your Honor
4  signed yesterday --
5      THE COURT:  Well, my Clerk is on the job.
6      MR. SATTERLEY:  Okay.
7      THE COURT:  If I signed that order, he put them
8  into evidence.
9      MR. SATTERLEY:  Okay.  That's all I wanted to
10 make sure.
11     THE COURT:  And I'm looking at the list of
12 documents that the Clerk has as in evidence, and 4687
13 is there.
14     MR. SATTERLEY:  Okay.
15     THE COURT:  So I think that if we use that as
16 an exemplar, you are going to be fine.
17     MR. SATTERLEY:  I was just making sure the
18 court reporter has it reflected on the transcript.
19     THE COURT:  All right.
20     MR. SATTERLEY:  Thank you, Your Honor.
21     MS. STEINMANN:  Your Honor, what time would you
22 like us back tomorrow?
23     THE COURT:  9:00.
24     MR. SATTERLEY:  And one last thing, because
25 Dr. Longo will be going in the morning, I'm going to

**332**

1  meet and confer with defense counsel.  Dr. Horn, I may
2  have to move him to either Thursday or Monday.  I'll
3  send an email to counsel to let -- let them know about
4  that.
5      THE COURT:  All right.  We're in recess.
6      (Whereupon, Plaintiff's Exhibit 4687 was
7      received into evidence.)
8      (Whereupon, Plaintiff's Exhibit 790 was
9      received into evidence.)
10     (Whereupon, Plaintiff's Exhibit 407 was
11     received into evidence.)
12     (Whereupon, Plaintiff's Exhibit 670 was
13     received into evidence.)
14     (Whereupon, Plaintiff's Exhibit 679 was
15     received into evidence.)
16     (Whereupon, Plaintiff's Exhibit 3014 was
17     received into evidence.)
18     (Whereupon, Plaintiff's Exhibit 3088 was
19     received into evidence.)
20     (Whereupon, Plaintiff's Exhibit 5917 was
21     received into evidence.)
22     (Whereupon, Plaintiff's Exhibit 3573 was marked
23     for identification.)
24     (Whereupon, Plaintiff's Exhibit 3574 was marked
25     for identification.)

**333**

1      (Whereupon, Plaintiff's Exhibit 3577 was marked
2      for identification.)
3      (Whereupon, Plaintiff's Exhibit 3578 was marked
4      for identification.)
5      (Whereupon, Plaintiff's Exhibit 3581 was marked
6      for identification.)
7      (Whereupon, Plaintiff's Exhibit 3594 was marked
8      for identification.)
9      (Whereupon, Plaintiff's Exhibit 3595 was marked
10     for identification.)
11     (Whereupon, Plaintiff's Exhibit 3599 was marked
12     for identification.)
13
14         (Whereupon, the proceedings
15          were concluded at 5:25 p.m.)

334

```
1    STATE OF CALIFORNIA     )

2                            )     ss.

3    COUNTY OF ALAMEDA       )

4

5            I, EARLY K. LANGLEY, do hereby certify:

6        That foregoing proceedings were held in the

7    above-entitled action at the time and place therein

8    specified;

9        That said proceedings were taken before me at said

10   time and place, and was taken down in shorthand by me,

11   a Certified Shorthand Reporter of the State of

12   California, and was thereafter transcribed into

13   typewriting, and that the foregoing transcript

14   constitutes a full, true and correct report of said

15   proceedings that took place;

16       IN WITNESS WHEREOF, I have hereunder subscribed my

17   hand on April 30, 2019.

18

19

20

21

22           _____
              EARLY K. LANGLEY, CSR No. 3537
23            State of California

24

25
```

Exhibit 22

1

```
 1  State of South Carolina
                              In the Court of Common Pleas
 2  County of Hampton

 3  JAMES COLEMAN SIZEMORE, as        )
    Personal Representative of        )
 4  The Estate of JAMES CALVIN        )
    SIZEMORE, Deceased,               )
 5                                    )
                    Plaintiff,        )    2016-CP-25-00440
 6                                    )
    -vs-                              )
 7                                    )
    BOWATER PAPER MILL, et al.,       )
 8                                    )
                    Defendants.       )
 9                                    )
    _____   )
10  County of Richland               )
                                     )
11  BETH-ANEE F. JOHNSON and          )
    JOHN W. GREENLEY, JR.,            )
12                                    )
                    Plaintiffs,       )    2018-CP-40-01781
13                                    )
    -vs-                              )
14                                    )
    JOHNSON & JOHNSON, et al.,        )
15                                    )
                    Defendants.       )
16                                    )
    _____   )
17  County of Richland               )
                                     )
18  CHARLES T. HOPPER and             )
    REBECCA HOPPER,                   )
19                                    )
                    Plaintiffs,       )    2019-CP-40-00076
20                                    )
    -vs-                              )
21                                    )    May 7, 2019
    AIR & LIQUID SYSTEMS              )
22  CORPORATION, et al.,              )    TRANSCRIPT OF RECORD
                                     )
23                  Defendants.       )    PRETRIAL MOTIONS
                                     )
24  _____   )

25
```

2

1  B E F O R E:

2  **Chief Justice Jean Toal (Ret.)**, Supreme Court
   Acting Circuit Court Judge
3

4

5  A P P E A R A N C E S:

6  Theile B. McVey, Esquire
   Jonathan M. Holder, Esquire
7  Charles W. (Trey) Branham, III, Esquire
   Attorneys for Plaintiffs Sizemore and Hopper
8
   W. Christopher Swett, Esquire
9  Nathan Finch, Esquire
   Attorneys for Plaintiffs Beth-Anee Johnson
10  and Johnson W. Greenley, Jr.

11  Yancey A. McLeod, III, Esquire
   Attorney for Defendant Waste Management
12
   Phillip C. Reid, Esquire
13  Attorney for Defendant Crosby Valve, Inc.

14  Louis P. Herns, Esquire
   Matthew R. Schroll, Esquire
15  Attorneys for Defendant Johnson & Johnson

16  Jennifer M. Techman, Esquire
   Attorney for Defendant Lincoln Electric and Hobart
17  Brothers and others

18  Allyson Twilley, Esquire
   Attorney for Defendant Shell Oil Company
19
   Robert O. Meriwether, Esquire
20  Attorney for Defendant Air & Liquid Systems and others

21  Ashley Brathwaite, Esquire
   Attorney for Defendant Covil Corporation
22

23

24
                  Reported by:
25                Diane L. Marcengill, RPR, CRR, CRC
                  Circuit Court Reporter

3

I N D E X

Witnesses                                                    Page

     Sizemore Case                                      1, 138
     J&J Case                                           17
     Hopper Case                                        184

E x h i b i t s

For Plaintiff Beth-Anee Johnson:

Marked          Description              I.D.      Admitted

   1    List of preadmitted            128
        exhibits

For the Defendants:

Marked          Description              I.D.      Admitted

        None offered.

4

1          (WHEREUPON, court convened with all parties

2    present and the following proceedings were had

3    commencing at 9:11 a.m.)

4          THE COURT:  Crosby's motion for summary judgment.

5          Mr. Reid.

6          MR. REID:  Thank you, your Honor.  Good morning.

7          THE COURT:  Good morning.

8          MR. REID:  Your Honor, I think our motions for

9    summary judgment can be defined as one governed by the

10   Henderson case and Lorman case.

11         There is no exposure evidence against Crosby, and

12   Crosby is therefore entitled to summary judgment.

13         Mr. Sizemore was deposed twice in a 1999 case and

14   over ten days in a Louisiana case that was a

15   predecessor to this one in 2016.  And the entirety of

16   what he said about Crosby was that he didn't remember

17   working with Crosby valves.

18         On top of that, there is no coworker testimony in

19   this case that any work was done by Mr. Sizemore on or

20   near a Crosby valve or near others who worked on a

21   Crosby valve.

22         Nothing the plaintiffs have submitted with their

23   brief creates any genuine issue of material fact for

24   trial.  They have submitted to your Honor three

25   documents relating to three sites.

5

1       One is Oconee, where Mr. Sizemore stopped working

2   in 1972.   In his deposition, he said he thought he had

3   insulation and gasket exposure at Oconee but did not

4   even generically say what sort of equipment or place

5   that that exposure took place.   And we know from his

6   deposition that he did a lot of pipefitting, joining

7   pipes to other sections of pipe.

8       In addition to Mr. Sizemore's own testimony, they

9   have submitted testimony from two other gentlemen who I

10  am loath to describe as coworkers because they didn't

11  know Mr. Sizemore; rather, they also worked at Oconee

12  but in very different circumstances.

13      One is Steve Simpson.   Mr. Simpson didn't begin at

14  Oconee until 1977, five years after Mr. Sizemore

15  departed that site.   He never mentioned Mr. Sizemore in

16  his deposition.

17      And if the Court looks at page 297 to 298 of his

18  deposition, Mr. Simpson said he could not remember

19  working on or seeing anyone else work on a Crosby

20  valve.   So that amounts to no evidence.

21      The other gentleman who worked at Oconee whose

22  testimony they have submitted is Mr. Taylor, who also

23  never mentioned Mr. Sizemore.   Mr. Taylor started there

24  in 1972, so I suppose there's some potential for

25  overlap.   But most importantly, Mr. Taylor said that

6

1  since Oconee was in a startup phase, there wasn't any

2  gasket or packing work performed in 1972.

3      There is also in the records submitted by the

4  plaintiffs some Crosby documents related to Florida

5  Power & Light.  Crosby sold 13 valves each to five

6  different Florida Power & Light sites.  Two of those 65

7  valves had asbestos, both at Sanford.

8      If the Court looks at Mr. Sizemore's deposition

9  testimony about Sanford, he never even mentions valves

10 at all, much less relief valves or Crosby relief

11 valves.

12     The third site on which they submitted some

13 documents is Fort Howard, a paper mill in Wisconsin.

14 And, specifically, what the plaintiffs have submitted

15 is a 1952 purchase order for four valves costing $8.  I

16 think that tells you something about the size of the

17 valves.

18     There's nothing in that purchase order suggesting

19 those valves had any asbestos on them.  And while the

20 plaintiffs informed the Court that Mr. Sizemore worked

21 at that plant, they don't point out that he wasn't

22 there until 1986, 34 years after that purchase order

23 came out.  So we don't know where those valves went, if

24 they were still there, if they were even in the same

25 building that Mr. Sizemore worked three and a half

7

decades later.

So, in short, I would ask the Court to consider a quote from Lorman.  The Court said:  Appellants would have us adopt a rule that if a plaintiff can present any evidence that a company's asbestos-containing product was at the workplace while the plaintiff was at the workplace, a jury question has been established.

Lorman rejected that proposition and granted summary judgment.  The Court should here as well because on this record, it would require speculation to think that there could be any exposure that Mr. Sizemore may have had to Crosby products.

So, for that reason, we move for summary judgment.

And as the Court knows, we also have a pending motion on personal jurisdiction, and, of course --

THE COURT:  I thought I had dealt with that, Mr. Reid.  Have I not?

MR. REID:  Not in this case.  I was here last October.  I think we had a hearing in the Nolan case on that issue.

THE COURT:  Uh-huh.

MR. REID:  The contention in the plaintiff's brief here is not that there's general jurisdiction but rather specific jurisdiction.

I think it's clear from the U.S. Supreme Court

8

1  case we have cited in our brief that to establish

2  personal jurisdiction, they have to demonstrate that

3  there was Crosby product in this state, activity by

4  Crosby directed to the state that actually caused the

5  injury.  For the very reasons I've cited about their

6  lack of evidence at Oconee, I think the Court is duty

7  bound to grant us that motion as well.

8       So I'll respond to any questions the Court may

9  have and may want to respond to the plaintiff's

10 argument, but that's it.

11      THE COURT:  All right, sir.  I'll go on and hear

12 from plaintiff, and you will certainly have a chance in

13 reply.

14      Mr. Branham.

15      MR. BRANHAM:  Good morning, your Honor.  Nice to

16 see you again.

17      THE COURT:  Thank you.  Same here.

18      MR. BRANHAM:  Your Honor, as Mr. Reid said,

19 Mr. Sizemore was deposed twice in a 1999 case and then

20 over a course of, I believe it was, ten volumes in the

21 instant case.

22      And the one thing that is crystal clear from

23 Mr. Sizemore's testimony, both then and in this case,

24 is that he was an expert on boilers.  All he did for

25 30 years was work on boilers and associated systems.

9

He knew more about boilers than any client I've ever
had.  He was flown all over the country to handle
boilers.

Crosby's valves, the type that we're talking about
in this case, go on boilers.  They're safety relief
valves.  They are designed to relieve pressure when it
becomes too high.

What Mr. Sizemore said in his 2001 deposition at
page 67 when he was asked about boiler inspections and
whether he did those, and he repeatedly talked about
that, and he says down at the very last sentence at
line 18 through 20:  And normally they would check or
replace the relief valves on the steam drum.

That's what we're talking about, relief valves on
steam drums.  That's where they go.  And so I agree
with Mr. Reid that he didn't say Crosby.  He didn't.
And that's not any great surprise because they're
covered in asbestos, right?  You don't see the name on
them.  But he sure knew he was working on them.

So when you combine that with the fact that Crosby
sold not only to Oconee, but, according to their own
documents, they sold to Celanese, Diamond Shamrock,
Dupont, Exxon, Farmland, Fluor, Fiber Industries, Hurst
(phonetic) Fibers, Hercules, Marathon, PPG,
Westinghouse.

10

1    I didn't read them all off, but the ones I just

2    read are places Mr. Sizemore testified he worked.

3          THE COURT:  And many of them in South Carolina.

4          MR. BRANHAM:  Yes, your Honor.

5          So as your Honor knows, these cases are hard

6    because you are going back 50-some-odd years to connect

7    the dots.  But that's exactly what we've done here.

8          Mr. Sizemore worked on boilers that had these

9    valves, and he specifically talks about doing boiler

10   inspections on these types of valves.  The only

11   evidence -- the only evidence in this case is valves

12   sold by Crosby or manufactured by Crosby.  So when you

13   put all of those things together, you have in fact

14   connected the dots.

15         And so both on the issue of personal jurisdiction,

16   we meet that test in terms of the frequency, proximity.

17   He's talked about working on these types of valves, and

18   he talked about now he normally did it, which certainly

19   infers frequency.  And given his general testimony

20   about boiler work over the course of 50 years, I think

21   he more than surpasses the Henderson and Lorman

22   requirements, and for those reasons, I think you should

23   deny summary judgment.

24         THE COURT:  Just so the record is clear -- and we

25   have all tried these cases a number of times now with

11

1  each other, but so the record in this particular case

2  is clear, Crosby valves are very specialty valves, and

3  they are, for the most past, safety release valves on

4  boilers or other steam-generated-type equipment,

5  correct?

6      MR. BRANHAM:  So generally, yes, your Honor.  The

7  only thing I would take issue with is they're some sort

8  of special, really nuanced valve, because there were a

9  number of manufacturers.

10     THE COURT:  There are a number of different kinds

11 of valves, but what they make is a safety release

12 valve --

13     MR. BRANHAM:  Relief.

14     THE COURT:  -- of varying sizes and so forth.

15     MR. BRANHAM:  Some as big as you can walk through

16 and some smaller.

17     THE COURT:  Some smaller.

18     And the record in this case, from sales records

19 for Crosby for materials supplied by Crosby in

20 discovery, indicates sales of these type valves to

21 many, many different industries for which Mr. Sizemore

22 worked, correct?

23     MR. BRANHAM:  So some are supplied by Crosby; some

24 are supplied by other defendants in the case.  For

25 instance, we have got some documents from Foster

12

1  Wheeler which indicate Crosby valves.

2       THE COURT:  Right.  But Crosby valves are among

3  those that are sold to various -- to a multitude of

4  places in which Mr. Sizemore worked.

5       MR. BRANHAM:  Yes, your Honor.

6       THE COURT:  And at the times when Mr. Sizemore

7  worked there.

8       MR. BRANHAM:  At or before.

9       THE COURT:  All right.  And that's your contention

10  as to why both the motion for dismissal for lack of

11  personal jurisdiction as well as the motion for summary

12  judgment should both be denied?

13       MR. BRANHAM:  Yes, your Honor.

14       THE COURT:  All right, sir.

15       Mr. Reid, any reply?

16       MR. REID:  Your Honor, I think we're confined to a

17  record that's before the Court, and there's nothing in

18  this record that supports the suggestion that Crosby

19  valves are covered in asbestos, as Mr. Branham says.

20  That's just not there.

21       Secondly --

22       THE COURT:  I don't think that's the -- I think

23  the averment about exposure has to do with the

24  gasketing and packing and other material within the

25  Crosby valve rather than, I think, the -- as I

1    understand it, the pertinence of the argument "covered

2    in asbestos" is an explanation for why Crosby was not

3    identified.

4        We know that Crosby's logo generally appears on

5    its valves, correct?

6        MR. REID:  That's correct.  And they're not

7    insulated, so he would have every reason to see the

8    Crosby logo if he was working anywhere near them.

9        Secondly, there are not any documents in this

10   record about Celanese, Dupont, or any of the other

11   places other than the ones I mentioned.

12       Third, most of our --

13       THE COURT:  Has material been produced that is

14   available to plaintiff that plaintiff would --

15   plaintiff avers that they have material which has been

16   supplied by Crosby and others that presumably would be

17   introduced and used in evidence in this case that shows

18   a variety of sales by Crosby to a variety of different

19   companies that use boilers and other type equipment

20   that requires safety valves in South Carolina.

21       Is he incorrect about that?

22       MR. REID:  Nothing has been put -- nothing was

23   submitted in connection with their summary judgment

24   motion, and I have not been provided anything of that

25   nature by the plaintiffs.

14

1          I want to point out that our typical valve on a

2     boiler was an H series valve, safety valve.  And as the

3     records from the Florida plant suggest, it was

4     extremely rare for us to have an asbestos gasket.  So

5     he could be near Crosby valves that are being worked

6     on.  And the record doesn't support that he was.  But

7     even if he was, most of our valves didn't have

8     asbestos.  In fact, most didn't even have gaskets or

9     packing at all.  Two out of 65 in Florida did, at a

10    site where he never even said the word valves.

11         And it's not like we have a monopoly, that we're

12    the only relief valve maker out there.  He was asked

13    about other -- he mentioned other valve makers

14    generally, and we have got records of other safety-type

15    valves at some of these sites.  So to suggest that

16    because there's some generic reference to relief valves

17    doesn't get you anywhere.  We still have to guess what

18    sort of relief valve it is.

19         Moreover, there's not anyplace in this record

20    where he says he went in and did work on the internal

21    components of a relief valve.  At one point he mentions

22    removal of a relief valve that apparently was sent off

23    elsewhere and calibrated.  So there simply isn't a

24    record to support exposure.

25         In short, your Honor, this is a case that

15

1    illustrates the difference between conjecture and

2    speculation on one hand and inference on the other.

3    You can't just draw inferences from this record.

4    There's no -- there's nothing that would suggest that

5    it's more likely than not that he worked on a Crosby

6    valve.  The jury would have to speculate, and in most

7    instances on multiple levels, to think there was

8    exposure.

9         So, in short, you know, this is their moment to

10   put forth the evidence to demonstrate to the Court what

11   it was that creates a general issue of material fact,

12   and they simply have not done it.

13        THE COURT:  Thank you, Mr. Reid.

14        Well, as we know in motions for summary judgment,

15   the evidence is viewed in the light most favorable to

16   the nonmoving party, which in this case would be

17   plaintiff.

18        I believe that there is sufficient evidence in

19   this record to indicate a frequency, regularity, and

20   proximity to safety release valves, some of which sold

21   by Crosby in many places in which Mr. Sizemore worked

22   in South Carolina over a 47-year career, to indicate

23   exposure, potential exposure sufficient to meet, at

24   this moment in the proceedings, the requirements of

25   Lorman, and therefore I would deny the motion for

1  summary judgment.

2       Similarly, I will deny the motion to dismiss on

3  personal jurisdiction grounds for the same reasons,

4  that the record at this moment is sufficient enough to

5  move forward beyond a dismissal.

6       Now, that's the motions in limine.

7       Now, I will say this:  Boy, have we jumped through

8  some hoops about trying to keep all this train on the

9  track.

10      At the moment, as we know, Hampton has cases for

11 the week of May the 13th.  They do not have cases for

12 the week of May the 20th.  We are scheduled at this

13 time.  The jury has been summoned.  And so while we

14 would be in a position to try this case beginning on

15 Monday, the 20th, and we have got the motions in limine

16 to deal with, here is what I would suggest we do -- but

17 I don't want to prevail on your kindness too much, both

18 Mr. Reid and Mr. McLeod from out of town.  I know

19 you're anxious to dispose of this and get on to other

20 business that you have.

21      We can either go on and run through these motions

22 in limine now or we can do that after we finish with

23 J&J.  I want to dispose of everything I possibly can

24 today so that these things -- each of these trains

25 stays on the track until we see what, if anything, we

1  can try.

2      So I'm going to turn to you-all first, Mr. Reid,

3  because you and Mr. McLeod come from afar, and ask what

4  you prefer.

5      MR. REID:  Your Honor, the practical answer is I

6  have a 6:30 flight.  So I would suggest perhaps just in

7  the event that there's some potential that it might

8  impact our case, that we move to Johnson & Johnson and

9  we'll --

10      THE COURT:  That's great.  If that's okay with

11  y'all.  Thank you very much for accommodating me.  So

12  we'll go on now and move to the Johnson & Johnson case.

13      And we'll come back to Sizemore, of course.

14      Madam Court Reporter, we're moving now to

15  Beth-Anee Johnson against Johnson & Johnson.  And that

16  is a Charleston case.

17      That would be Mr. Chris Swett and others from

18  Motley Rice for plaintiff.  And on defense side,

19  Mr. Louis Herns heads the defense team.

20      Take your time getting set up and when you're

21  ready, we'll proceed.

22      I'm sorry.  I keep trying to make this case be

23  from Charleston.  It's here.

24      The first thing would be the summary judgment

25  motions.  Let me just be sure I have got my hand on

18

those.

MR. HERNS:  We did not file a summary judgment motion on behalf of Johnson & Johnson or Johnson & Johnson Consumer, Inc.

THE COURT:  You have no summary judgment motions?

MR. HERNS:  Yes, ma'am.  That's correct.

THE COURT:  And, Mr. Swett, you have no summary judgment motions?

MR. SWETT:  Your Honor, there was originally, if you saw some in the file.  The retailers filed summary judgment motions.  It's since been dismissed.

THE COURT:  And all that's out of the way.  So we can proceed to the various motions in limine and other matters.

MR. SWETT:  Yes, your Honor.

THE COURT:  All right.  Well, I have plaintiff's motions in limine, then, and I'll start with those, if everybody can stay on track with that.

All right.  The first plaintiffs motion in limine is the omnibus motion.  I'll just tick down this thing, and if we've got one that is contested, then we'll go there.

The first is collateral source.  Of course, the collateral source including sources independent of defendant here, including social security benefits,

19

1  including comp, I would grant the motion to exclude
2  them unless defendant has anything they wish to say
3  about that.
4      MR. HERNS:  Excuse me, your Honor.  I'd like to
5  introduce to you Mr. Matt Schroll from the Nelson
6  Mullins law firm in Baltimore.  He will be arguing this
7  motion.
8      THE COURT:  All right.  You may proceed, sir.
9      MR. SCHROLL:  Good morning, your Honor.
10     THE COURT:  You're going to oppose this motion, as
11  I understand it?
12     MR. SCHROLL:  I just want to introduce and state
13  for the record that there are a number of these that we
14  have agreed to already, and number 1 is one of them.
15     THE COURT:  Okay.  Very good.
16     MR. SCHROLL:  If you wanted us to identify the
17  ones where I think we have stated --
18     THE COURT:  That's good.  Let me go through the
19  notebook so I can keep up.
20     One is agreed to.
21     Two is settlements with other defendants.
22     MR. SWETT:  It's agreed to, your Honor.
23     THE COURT:  Very good.
24     Three is the American Tort System.
25     MR. SWETT:  It's agreed to, your Honor.

1        THE COURT:  Four is the effect of claims on

2   insurance premiums.

3        MR. SWETT:  It's agreed to, your Honor.

4        THE COURT:  Five is asbestos companies in

5   bankruptcy.

6        MR. SWETT:  That is agreed to.

7        I just want to make sure that that does include,

8   in fact, Imerys as well.

9        MS. BROWN:  Yes, your Honor.

10       THE COURT:  Yes.  I understand the agreement would

11  be with regard to any company that's in bankruptcy,

12  right?

13       MS. BROWN:  Yes, your Honor.

14       THE COURT:  Very good.

15       6, any reference to any ruling by another court on

16  admissibility of the testimony of a witness.

17       MR. SWETT:  Your Honor, they oppose this one.  You

18  know, I'd certainly argue our position and then let

19  them state their position.

20       We don't believe that the fact that any other

21  judge or court has excluded an expert's testimony is

22  relevant in this case.  You are the sole gatekeeper in

23  this court as to qualifying experts as to whether or

24  not they are qualified on a specific area.

25       The way we dealt with this specific issue in the

21

1  last trial was we agreed -- or all the parties agreed

2  that we could ask our expert:  Well, you've been

3  qualified as an expert in this court.  And that was

4  okay, but we agreed not to ask our expert, Well, have

5  you been recognized as an expert in other courts across

6  the country?

7      And based on the fact that we agreed not to ask

8  that, they agreed that therefore it wasn't necessary to

9  ask them if they have ever been excluded by any other

10  courts in the country, and we would be willing to make

11  that same agreement in this case.

12      THE COURT:  That's the way we have done it before.

13      How about it, sir?

14      MR. SCHROLL:  We agree to that.

15      THE COURT:  Very good.  So neither side will

16  reference anything other than if they have been

17  admitted as an expert in this case or in South

18  Carolina, but I would think that what you're going to

19  end up doing is saying "in this case" and confine it,

20  both sides, to that.

21      MS. BROWN:  Your Honor, good morning.  I'm Alli

22  Brown for J&J.  And I would just clarify to the extent,

23  though, that they open the door by suggesting that you

24  have been qualified by courts around the country, then

25  we would be entitled --

22

1        THE COURT:  Sure.  They go at their peril if they

2  try to do that, but my bet is they will be careful.

3        MS. BROWN:  Thank you, Judge.

4        THE COURT:  Seven, any mention that other

5  defendants not present were sued by plaintiff.

6        MR. SWETT:  That's agreed to, your Honor.

7        THE COURT:  Very good.

8        Number 8, felonies and convictions not involving

9  dishonesty or moral turpitude.

10       MR. SWETT:  That's greed to, your Honor.

11       THE COURT:  Ten, past alcohol or drug use.

12       MR. SWETT:  That's agreed to, your Honor.

13       THE COURT:  11, other nonlife-threatening medical

14  conditions.

15       MR. SWETT:  This one is opposed.  If I may be

16  heard on this one, your Honor.

17       THE COURT:  Yes, sir.

18       MR. SWETT:  So, in this case, there are two

19  medical conditions specifically I know the defendants

20  raise in their briefing.  One is the fact that

21  Mrs. Johnson had or has endometriosis.  The other is

22  that she had or has chronic inflammation.  And we don't

23  believe those are relevant.  Now, I'll tell you why.

24       They argue for two reasons that they may be

25  relevant in their briefing.  One is as to causation of

23

1    mesothelioma, and the other is as to damages for

2    reducing life expectancy.

3          Johnson & Johnson has two causation experts, maybe

4    more, in this case.  I know Dr. Diette and

5    Dr. Attanoos.  They have both admitted in their

6    depositions that there is absolutely no evidence that

7    her endometriosis caused or contributed to her

8    mesothelioma.

9          They both admitted -- and the page cite for

10   Dr. Attanoos is page 72 of his deposition in this case,

11   and Dr. Diette is pages 59 through 60 and 74 through

12   75.

13         They both admitted that there's no evidence that

14   chronic inflammation caused or contributed to her

15   mesothelioma.  So we don't think it's relevant for

16   causation.

17         As to the damages issue, neither of their

18   experts -- none of their experts will say that her life

19   expectancy was shortened because of either

20   endometriosis or chronic inflammation.  So we don't see

21   any way that these nonlife-threatening medical

22   conditions are relevant in this case.  It's just a --

23   you know, if they want to throw it out there, it's just

24   to make the jury speculate about medical issues that

25   aren't at issue.

24

1          Thank you, your Honor.

2          THE COURT:  All right, sir.  Say your name for me

3     again.

4          MR. SCHROLL:  Yes, your Honor.  May I be heard?

5          THE COURT:  Say your name.

6          MR. SCHROLL:  Matthew, Schroll, S-c-h-r-o-l-l.

7          THE COURT:  Very good.

8          MR. SCHROLL:  Thank you, Judge.

9          Your Honor, as to the two points raised by counsel

10    as to causation, it's not a matter of whether or not

11    these conditions caused peritoneal mesothelioma, but

12    our causation experts will discuss literature noting

13    that these processes are correlated with the occurrence

14    of peritoneal mesothelioma.

15         And this sort of dovetails with the number 12 --

16         THE COURT:  Correlated is not any kind of medical

17    term that I'm familiar with.  What do you mean by that?

18         MR. SCHROLL:  So, your Honor, our causation

19    experts will testify that the occurrence of peritoneal

20    mesothelioma, particularly among women, occurs without

21    exposure to asbestos.  You're familiar with --

22         THE COURT:  I'm very familiar with that, and we're

23    going to have a big discussion about Dr. Attanoos.  I

24    qualified him as an expert in the Boyd-Bostic case.  I

25    have read very carefully what's been said here, and I

25

1   have looked very carefully at his writings, et cetera,

2   and I've got some concerns about the opinion he

3   expresses, the flat opinion that there's no asbestos in

4   J&J talc and there's no -- that her mesothelioma was

5   not caused by asbestos.

6       And so if you've got something to offer that

7   relates endometriosis and chronic inflammation to her

8   mesothelioma, I want to know about it.

9       What I understand him to say is it's idiopathic or

10  spontaneous, and there are a lot of different ways

11  those terms are used in his evolving testimony about

12  this issue.  But I don't pretend to remember every

13  single thing that's been said, but I've read it all

14  pretty recently, and I don't see anything that suggests

15  that endometriosis or chronic inflammation caused her

16  to develop mesothelioma.

17      MR. SCHROLL:  Well, your Honor, I would suggest

18  that it's not -- again, it doesn't suggest that those

19  disease processes caused her peritoneal mesothelioma,

20  but the fact that they -- that she has them, that

21  they're there and that there is literature that

22  Dr. Attanoos will say and rely on that shows that,

23  among occurrences of peritoneal mesotheliomas, that

24  these other disease processes are also present, bears

25  on his opinion about wealth of knowledge that shows

26

1    that peritoneal mesotheliomas among women are unrelated

2    to asbestos exposure.

3         THE COURT:  I don't get that connection at all.  I

4    don't understand that connection one bit.

5         He does opine that 60 to 70 percent of women who

6    have peritoneal mesothelioma develop it either

7    spontaneously, idiopathically or it's not caused by

8    asbestos.  And, frankly, I'm still hunting for what the

9    scientific foundation for those assertions is.  But how

10   do you leap from that to saying endometriosis or

11   chronic inflammation bears on that?

12        MR. SCHROLL:  Your Honor, I would suggest that the

13   literature that Dr. Attanoos would rely on shows that

14   the presence of those is consistent with the peritoneal

15   mesothelioma being idiopathic or spontaneous.

16        THE COURT:  So, no, sir.  At most, there's some

17   observation that some of these folks also have

18   inflammation and/or endometriosis, but there's -- not

19   even Attanoos says that either of these diseases have

20   any impact on the diagnosis that he makes that they are

21   not caused by -- that the mesos are not caused by

22   asbestos, one, and, two, that they are spontaneous or

23   idiopathic.  He doesn't relate this chronic

24   inflammation or endometriosis to either of those.

25        MR. SCHROLL:  I --

27

1        THE COURT:  He observes that some of the people

2    who have mesothelioma also have these other conditions.

3    He doesn't make the link between those two from a

4    medical standpoint other than they both exist.  He

5    doesn't have any testimony that says the one causes the

6    other.

7        MR. SCHROLL:  Your Honor, your link, I would agree

8    as you state to causation, but I think it's no

9    different than in other asbestos case saying that there

10   was the presence of pleural plaques.  It would be

11   indicative --

12       THE COURT:  No, sir.  Pleural plaques are a direct

13   indication that something has happened relative to the

14   impact of asbestos.

15       Endometriosis and chronic inflammation, I have

16   never seen any literature that suggests that those are

17   indicators of the development of mesothelioma --

18       MR. SCHROLL:  Well, your Honor --

19       THE COURT:  -- or the impact of asbestos on the

20   body.

21       MR. SCHROLL:  Your Honor, I would submit to you

22   again that Dr. Attanoos is not going to say that those

23   disease processes are causal, but he will rely on

24   literature that notes that they occur at the same time

25   in a number of cases.

28

1     THE COURT:  Unless he can relate them in a

2     causative way, that is simply an observation that

3     causes the jury to speculate about something when he

4     can't tie it to the development of the disease at all.

5          MR. SCHROLL:  Your Honor, again, I think there's

6     an issue about a difference between stating that those

7     cause it definitively and just noting that they occur

8     in a number of peritoneal mesothelioma cases that are

9     unrelated to asbestos.  So I understand --

10         THE COURT:  Mr. Schroll, I will say this:  I've

11    never heard a medical witness yet say it definitively.

12    They all testify to a reasonable degree of medical

13    certainty.  And I'm assuming that that's the way that

14    Dr. Attanoos will testify as well.

15         He's not -- definitively has never been the

16    standard for any kind of medical testimony, but there's

17    got to be some causative connection to a reasonable

18    degree of medical certainty, and I don't see it in this

19    material, all of which I read again last night.  I read

20    Attanoos' article again this morning.

21         MR. SCHROLL:  I understand, your Honor, and I'll

22    just -- I'll note again that Dr. Attanoos will not come

23    in and say those are causal.  He will just note the

24    presence.  I'll move on to --

25         THE COURT:  Well, then, my response on number 11

1  is I will grant the motion.

2       MR. SCHROLL:  Well, your Honor.  I'm sorry.  I

3  didn't get to address counsel's second argument about

4  our argument about how it relates to plaintiff's health

5  condition, pain and suffering.

6       THE COURT:  Life expectancy.  You don't have any

7  expert that says life expectancy is impacted by either

8  of these conditions, as I understand it.

9       MR. SCHROLL:  Your Honor, my understanding is that

10 there's also a lost wage claim here, and we believe

11 that that bears on the plaintiffs ability to make that

12 lost wage claim about whether or not she can continue

13 to work independent of the diagnosis of peritoneal

14 mesothelioma.

15      THE COURT:  I think that's a stretch, and I'm

16 going to grant the motion.

17      MR. SCHROLL:  Thank you, your Honor.

18      THE COURT:  Number 12, asbestos generally as the

19 cause of plaintiffs mesothelioma.  This is:  Defendant

20 should be precluded from stating or indicating in the

21 presence of the jury that the plaintiffs mesothelioma

22 is caused by anything other than asbestos exposure.

23      I assume that's contested.

24      MR. SWETT:  It is, your Honor.  I think that is a

25 catchall that included the previous one, and it also

1    includes the spontaneous.  I think if we address the

2    other issues, we don't specifically have to address

3    number 12.  It's going to be addressed either way.

4         THE COURT:  I agree with you.  I'll deny this one

5    as it stands, and we'll move on to the more specific

6    about Dr. Attanoos, et cetera.

7         The second motion in limine is to exclude

8    defamatory comments by defense counsel aimed at

9    prejudicing the jury.  I'm sure you all will have

10   agreed upon this.

11        MR. SWETT:  Your Honor, in fairness, there was an

12   agreement that they would not say that this is a scam,

13   a fraud perpetrated by plaintiffs' lawyers, and there

14   was one more, but --

15        THE COURT:  Lawyer-made sham.

16        MR. SWETT:  Right.  I would respectfully

17   request -- just a little bit of background.  I'm not

18   going to get into all the facts of what happened

19   previous, but we have had, across the country, rulings

20   on this issue, and it doesn't matter.  They still get

21   up and do it in closing argument, and at that point

22   it's too late.

23        So I would ask for a ruling such that sanctions

24   are in play, but I do want to address three specific

25   areas that touch on this.

1   And one would be we would ask that they be

2   precluded from stating or insinuating that this is just

3   greedy plaintiffs' lawyers looking for the next big

4   target.

5   I mean, there are ways to insinuate these things

6   that they do, and when they do it throughout the entire

7   trial, they tie it all together in closing arguments,

8   and it's very prejudicial.

9   Another example would be talking about 1-800

10  plaintiffs' lawyers' ads.  Well, we don't run ads,

11  Motley Rice, and the plaintiff in this case didn't find

12  us through an ad.  She researched herself and

13  determined that there were papers out there that showed

14  asbestos in baby powder, and that's how she decided to

15  sue Johnson & Johnson in this case.  That's what the

16  record says.  So we would ask they not be allowed to

17  interject anything about plaintiff lawyer advertising.

18  Another question that they like to ask is

19  nobody -- and it ties in with one of the other motions

20  in limine that we're going to get that's related.  They

21  ask questions without foundation to come back and make

22  these same arguments.

23  One example is:  Well, no one other than

24  plaintiff's lawyers ever told you that Johnson's baby

25  powder caused your mesothelioma.

1     Well, in this case, there's no foundation for that
2   question.  She was asked in her deposition.  Her
3   doctor -- she never asked her doctor what caused her
4   mesothelioma.  Her doctor never told her what he
5   thought, her treating doctor.  And that's because, as
6   she said, his objective is to treat.  He could care
7   less about causation.  She's dying.  She's scheduled
8   the middle of next week to go back and have another
9   surgery, just sit in the hospital two more weeks just
10  so she can live a couple more months.  They're not
11  worried about what caused her disease; they're trying
12  to treat her.

13     And that's the equivalent of asking the age-old
14  question:  When did you stop beating your spouse?
15  There's no foundation.  It is a --

16     THE COURT:  Well, Mr. Swett, let me just shorten
17  this and tell you-all this, and I've tried several of
18  these cases and many, many other asbestos cases, and I
19  think all of you-all well understand how we operate in
20  South Carolina.  We don't do it the way it apparently
21  is done in some other states.

22     We don't allow any reference to the attorneys
23  involved, to the defendants.  We don't allow y'all to
24  call them killers.  We don't allow them to attack
25  y'all.  We don't allow them to delve into how the

33

1   plaintiff selected her lawyer.  We don't allow any

2   talking about looking for a big target or the next big

3   payday or anything of that nature.

4       And I know these lawyers well, particularly

5   Mr. Herns, and I don't think they will violate that.

6   But I will indicate very firmly on both sides that,

7   first of all, there will be no references of that kind

8   by either party being pejorative to the other party, to

9   their lawyers, to their organizations.

10      We're going to try this on the basis of evidence,

11  and the status of the two lawyers, two sides and their

12  lawyers, is not evidence of anything.  So that won't be

13  done.  Just as the Golden Rule will not play a part in

14  this, just as the reptile arguments and things of that

15  nature, that's just not how I allow cases to be tried.

16  And I'm not alone in this.  That's how we try cases in

17  South Carolina.  We try them on the basis of the

18  evidence presented.

19      I know you were very disquieted at the way your

20  case was pursued in New Jersey, I believe it was.  That

21  won't happen here.  I don't know who those lawyers were

22  for J&J there, but Mr. Herns is the lead lawyer in this

23  case here.  I have every confidence that this case will

24  be tried as it should be.  And I have every confidence

25  in you, Mr. Swett, that you will try it that way too.

1        MR. SWETT:  Thank you, your Honor.  If I may just

2    raise one point that's related to that.

3        There is an issue that was opposed in the

4    response, so I wanted to just address this one specific

5    issue and see if we can get agreement or ruling one way

6    or the other.

7        It was argued in closing argument tied into this

8    whole lawyer-made thing that plaintiffs didn't even

9    send this case to their expert until after they had

10   already filed the lawsuit.

11       THE COURT:  We're not going to allow that to

12   happen.  That's not evidence of anything, those kinds

13   of things.  You're quite right about that.  We can't,

14   as we sit, think of all of them.  And I know you were

15   in a bind about that when it finally was argued that

16   way because then you have to decide, am I going to

17   object in front of the jury when it's a jury argument

18   or I'm not.

19       But I think the lawyers well understand that I

20   just don't permit such things, and I will deal with

21   motions for sanctions if I have to, if those things

22   occur, but I just don't believe they will.

23       So be comforted by that, Mr. Swett, and if you see

24   anything along those lines, and I say this to the

25   defense counsel as well, you immediately stop the

35

proceedings, approach the bench, and we'll deal with
them.

     MR. SWETT:  Thank you, your Honor.

     THE COURT:  All right, sir.

     So with respect to excluding defamatory comments,
that was number 2.  That's granted.

     With regard to number 3, plaintiffs motion in
limine regarding other asbestos exposure, that
defendant be prohibited from referencing other
potential exposures to asbestos unless they make an
offer of proof as to substantial exposure, I don't
routinely grant this.  It rarely comes up.  But do you
have something?

     MS. BROWN:  I just want to revisit the prior
ruling just for a point of clarification, as I
understand your Honor is, perhaps, granting that
motion.

     Mr. Swett and I had a conversation earlier this
week.  We were, of course, disappointed by the motion,
and I assured him we intend to operate appropriately in
the courtroom and consistent with your Honor's ruling.

     But one point of clarification I would seek, your
Honor.  We don't intend to argue that the only person
to tell Ms. Johnson that she has mesothelioma from baby
powder were the lawyers, but I do think it's fair

1    testimony that the jury should hear that the medical

2    records do not attribute her mesothelioma to baby

3    powder and that her doctors have not told her that her

4    mesothelioma was caused by baby powder.

5         And so I just want to clarify with your Honor so

6    as to not run afoul of the ruling --

7         THE COURT:  What is that evidence of?  What is

8    that evidence of?  I mean, their argument is this:

9    That everyone has their own role to play in treating a

10   sick person.

11        Frankly, in commercial asbestos cases, I have

12   almost never seen a medical record where the doctor

13   says anything other than this is mesothelioma.  The

14   doctors do not get into saying, and occurred because he

15   worked around gaskets at Bowater.  They just don't do

16   it that way.

17        So it's really not evidence one way or another

18   because the doctors don't -- that's just not their

19   role.  Their role is to diagnose the pathology or

20   disease as they see it.  And if they can tell what

21   caused the disease, i.e., doctors many times do say

22   asbestos caused mesothelioma, and they back that up

23   with whatever they observed on their tissue samples and

24   their slides and their other physical examination of

25   the patient.  Even postmortem slides sometimes is the

1  only way you can really tell.

2       MS. BROWN:  Understood.

3       THE COURT:  But for the doctor -- whether the

4  doctor has told a patient, hey, this is asbestos from

5  your job, or this is asbestos because of baby powder, I

6  don't think that's pertinent to anything.

7       MS. BROWN:  Your Honor, we would confine our

8  questioning and argument, then, to simply just the

9  objective facts of the medical records, you know, who

10  she treated with, what the chest slides showed, what

11  the pathology showed.

12       THE COURT:  And it will show mesothelioma.

13       MS. BROWN:  Understood, your Honor.

14       THE COURT:  I am not -- I have read some of the

15  voluminous material, but I'm not saying that I am

16  completely familiar with all of her medical records,

17  and I don't know whether any of them have any kind of

18  material that indicates asbestos as the cause of the

19  mesothelioma she suffers from.

20       Normally, that's hard to do if they're living.  So

21  I don't know about that.  But whatever they say, they

22  say, but --

23       MS. BROWN:  Understood.

24       THE COURT:  -- I would not allow you to say, hey,

25  they never told her baby powder caused it.

38

1        MS. BROWN:  Understood, your Honor.  We will argue

2    then just the objective, what the medical records show

3    in terms of her chest films and things like that.

4        THE COURT:  Sure.  And I think that's fine.

5        MS. BROWN:  Thank you, Judge.

6        MR. SWETT:  I assume you're talking about

7    biomarkers, is sort of where we're going with this.

8        MS. BROWN:  Sure.

9        MR. SWETT:  That's fine.

10       THE COURT:  Okay.  Do we understand each other?

11       MS. BROWN:  We do, your Honor.  Thank you.

12       THE COURT:  Very well.

13       Then we're on -- then, of course, number 3

14   regarding other exposure is granted.

15       Now we come to number 4.  This is the motion in

16   limine to exclude testimony of defendant's --

17       MR. SCHROLL:  I'm sorry, your Honor.  I think that

18   colloquy related to the previous motion.  I don't think

19   we were heard on number 3.

20       THE COURT:  All right.  Well, number 3.

21       MR. SCHROLL:  It was opposed, your Honor.

22       THE COURT:  All right.  What is it -- go ahead,

23   Mr. Swett.

24       MR. SWETT:  Thank you, your Honor.

25       THE COURT:  I'm trying to move this thing along.

1  I'm obviously not succeeding.

2       MR. SWETT:  Your Honor, it's not disputed in this

3  case that she's had no other asbestos exposure.  She

4  testified to it.  Their experts say she had no other

5  asbestos exposure.  Our experts say she had no other

6  asbestos exposure.

7       There's one reference -- the only thing I can

8  possibly think that this comes up.  I'm sure I will be

9  corrected.  There's one medical record where she said

10  that at one point in time she may have lived in a house

11  that had asbestos siding on it.

12       Now, that should be excluded based under all of

13  your previous rulings because, as you know, the law is

14  and the science is static asbestos does not increase

15  one's risk.  There's no evidence that it was

16  manipulated, she was around it.  There's no evidence of

17  proximity, frequency.  I mean, it should be excluded.

18  I'll leave it at that unless there's new issues raised.

19       THE COURT:  Mr. Schroll, is this asbestos

20  siding -- you want to be able to say something about

21  it?

22       MR. SCHROLL:  That's one issue, your Honor.

23       THE COURT:  I would deny on that.  I'm not going

24  to let you talk about unmanipulated building material.

25  Now, if there was some other thing about Sheetrock was

1  hung at one point with a joint compound --

2      MR. SCHROLL:  Your Honor, may we have the

3  opportunity to ask her if it was manipulated in her

4  presence?

5      THE COURT:  Well, I don't know if you're going to

6  have a chance to ask her or not because I don't know

7  whether she's going to be able to take the stand.

8      MR. SCHROLL:  If she's not, then we're not able

9  to, your Honor, but I think it's a statement that was

10  in her medical record, that she reports living in a

11  house that had asbestos siding at one point, and I

12  think we're entitled to ask her anything about that,

13  about whether or not it was manipulated in her

14  presence.

15      THE COURT:  Well, maybe you will have a reversible

16  error in the record, but I'm not going to allow you to

17  ask her about asbestos siding or joint compound because

18  I see nothing in the record that indicates that she was

19  exposed to any respirable asbestos from those two

20  things.

21      If you can show that as we get into trial, then I

22  might reverse myself.  But at the present moment in

23  time, I'm inclined to grant this motion.

24      MR. SCHROLL:  The other item, your Honor, that we

25  noted in our opposition was the testimony of plaintiffs

1   mother where she recalled having a conversation with

2   the plaintiff at the time she was living in Boise,

3   Idaho, and Ms. Johnson expressed to her mother that she

4   was concerned about potential asbestos exposure at that

5   time.

6        And this came up in Ms. Janet Jones' deposition,

7   her mother, and she testified that that conversation

8   happened in realtime.  We also think that that's

9   something that we should be able to ask the plaintiff

10   if she recalls that instance and why she believed that

11   at that time.

12        THE COURT:  Mr. Swett.

13        MR. SWETT:  With respect to that, your Honor, the

14   testimony that they're referring to, one, the plaintiff

15   was deposed in this case, and they asked her straight

16   up:  Is there anywhere you possibly think you could

17   have been exposed to asbestos other than potentially in

18   baby powder?  She said no.

19        Plaintiffs mother is, like, 80 years old.  She's

20   had a stroke.  She's got dementia.  At the very end of

21   her deposition, she recalled this hearsay that --

22   basically, she recalled her daughter telling her when

23   they were in Utah that some of the people were getting

24   sick out there and she -- according to the mother, it

25   may have related to asbestos.  But there was no

1    specifics about anything.

2        I mean, the full testimony is in the response.

3    One, it's speculative, it's hearsay, and it doesn't

4    satisfy any of the requirements in terms of actual,

5    identifiable exposure.

6        THE COURT:  I will not allow it.

7        And your objection is, of course, preserved for

8    the record.

9        MR. SCHROLL:  Thank you, your Honor.

10       THE COURT:  All right.  Number 4, motion in limine

11   to exclude testimony of defendant witnesses' personal

12   use of Johnson & Johnson baby powder.

13       Yes.  I must say that I had heartburn when

14   Dr. Hopkins testified the last time in Boyd-Bostic

15   about he uses J&J baby powder, his grandchildren use

16   J&J baby powder; some prefer cornstarch, he prefers

17   talc, and all that kind of business.  That's not

18   evidence of anything, so I would grant that motion.

19       MR. SCHROLL:  Your Honor, may I be heard?

20       THE COURT:  Yes, sir.

21       MR. SCHROLL:  Your Honor, I think it's -- the

22   point that plaintiffs were making in their motion is

23   that they were arguing that it's not necessarily

24   evidence of causation, but I'll note for the record,

25   your Honor, that plaintiffs are seeking punitive

1   damages in this case.  They're going to put in evidence

2   in an attempt to prove the defendant's willful, wanton

3   or reckless conduct.

4       Count 4 of their complaint is for fraud and

5   misrepresentation, which I believe is still a count

6   that they're pursuing in this case.

7       In the paragraphs in that count, they're alleging

8   that defendants failed to disclose and intentionally

9   misrepresented facts to the plaintiff, that they -- the

10  defendants knew that the misrepresentations were false

11  and acted with reckless disregard towards the

12  plaintiff.

13      And, your Honor, it's relevant as a -- does this

14  testimony make more or less -- a fact more or less

15  probable.  The allegation --

16      THE COURT:  Why in the world does Dr. Hopkins'

17  personal use of Johnson's baby powder or the fact that

18  his grandchildren use it make more or less probable the

19  willful, wanton, and reckless conduct, if any, of

20  Johnson & Johnson?

21      MR. SCHROLL:  Your Honor, it makes it less

22  probable because Dr. Hopkins was responsible for

23  product safety and toxicology during much of the same

24  time period that plaintiff alleges she was using baby

25  powder.

1    And it's testimony that the jury can hear and that

2    they can draw an inference that it's less probable that

3    the person in charge of product safety and toxicology

4    would be using a product that he knew to be hazardous,

5    that he knew to have asbestos in it, and that he would

6    endanger his own children and himself through that

7    product.

8    THE COURT:  I don't see it, and I would grant the

9    motion to forbid any reference to his personal use or

10   the use of his grandchildren.  I don't think that's

11   evidence that is at all pertinent.  And I think to the

12   extent that it is, its prejudicial value way outweighs

13   any probative value it might have.  It's, in my view,

14   an attempt to appeal to the emotions of the jury.

15   There are plenty of very good ways -- Dr. Hopkins

16   is a respected scientist and a respected member of

17   Johnson & Johnson's leadership and performs very

18   credibly when he testifies.  I don't think he needs

19   this kind of emotional tug and pull to make his point

20   about his bona fides, so I will not allow that kind of

21   testimony.

22   MR. SCHROLL:  Thank you, your Honor.

23   THE COURT:  All right.  Number 5, plaintiff's

24   motion in limine to exclude questions based on facts

25   not in evidence lacking foundation with the attempt to

45

attack plaintiffs counsel.  Y'all have agreed upon
that.

MR. SWETT:  We have addressed that, your Honor.

THE COURT:  Very good.  That's granted.

Number 6 is plaintiffs motion in limine to exclude
questions about political blogs of any expert witness.
Agreed?

MR. SWETT:  Yes, your Honor.

MR. SCHROLL:  Your Honor, I think in our response
we agreed to the extent that plaintiffs don't open the
door by discussing alleged targeted advertising of
African-Americans.

THE COURT:  You know, that came up before.  I have
not seen it offered in any case that we have had.

What do you say to that, Mr. Swett?

MR. SWETT:  This is a specific exhibit that they
are trying to backdoor out of the case.  And your Honor
has ruled on this exhibit, and we might as well address
it because I assume they're going to --

THE COURT:  All right.  Let's see it.

MR. SWETT:  I'm sure you guys are familiar with
this one.

For the record, your Honor, that's P535.  It's
from the time period 1992.  I'll direct the Court's
attention to the back page.  As of 1992, number 5, item

46

number 5.

    THE COURT:  Talc is an adult-focused business and
baby-focused line.  Longer term investigating, moving
brand to a different franchise, short-term supplement
in the plan with periodic adult promotional support,
period, five adult FSI.

    MR. SWETT:  Is it the one on negative -- it might
be six.

    May I?  It's on the second page, if I may.

    THE COURT:  I see number 2.

    MR. BRANHAM:  Right, but I want to address the one
on the back first, your Honor, because you have already
ruled on this.  It's -- may I see the exhibit?

    THE COURT:  Yep.

    MR. SWETT:  It's number 2, sorry.

    So in 1992, Johnson & Johnson was aware of
negative publicity.  They knew doctors were concerned
about inhalation of talc.  Specifically, it mentions
cancer.  So they were concerned.  They knew.  That's
notice.

    Now, in the same year -- flip over on the first
page.  I don't care to argue they were targeting a
certain ethnic group.  The point of this document is
knowing in 1992 -- this is during the time period that
Mrs. Johnson's still using baby powder.  They are

47

1  increasing their marketing efforts to any group of

2  people knowing that there is a cancer link between

3  their talc and -- knowing there is a link between their

4  talc and cancer, they are increasing marketing.  They

5  are looking for new growth opportunities despite --

6       THE COURT:  This is one of Johnson & Johnson's

7  documents dated 8/5/92:  Major opportunities.  Number

8  2, investigate ethnic, paren, African-American,

9  Hispanic, closed parens, opportunities to grow

10  franchise.

11       Johnson's baby powder has high usage rate among

12  African-Americans, 52 percent, and among Hispanics,

13  37.6 percent, additional usage.  Indices are high for

14  African-American and Hispanic females for Johnson's

15  baby powder talc, 139 and 101, respectively.  Hispanic

16  females also have a high index against Johnson's baby

17  powder cornstarch.

18       The brand can increase volume in 1993 by targeting

19  these groups.  The brand will institute an adult

20  Hispanic media program and potentially launch adult

21  black print efforts.

22       All right.

23       MR. SWETT:  So the way you allowed this document

24  to come in in the first trial, I just asked Dr. Hopkins

25  about it.  I pointed to the second page.  I said:

48

Dr. Hopkins, y'all were aware in 1992 that doctors were
worried about the cancer link to talc.

And I flipped over to the first:  And,
Dr. Hopkins, you agree with me that even in 1992,
knowing that, Johnson & Johnson still looked for major
growth opportunities to continue selling and up their
sale of this talc that's causing cancer.

I mean, it's very relevant to the issue of
knowledge and basically what did they do once they had
that knowledge.

THE COURT:  Let's stop here and say this number 6
had nothing to do with that.  That had to do with
Dr. Richard Kradin, who is a potential expert for
plaintiff, who published a political blog at a certain
point in time after the most recent presidential
election.  And I would certainly grant a motion to
prohibit any questions about political blogs by any
expert witnesses.  So that, no question about it.

This is a different thing.  This is an evidentiary
piece of material.  I don't know if this is the
appropriate time to discuss it, but what do you have to
say, Mr. Schroll?

MR. SCHROLL:  I think it's appropriate.  It's
specifically identified in a later motion in limine, so
I think now is appropriate.

1      THE COURT:  Sure.

2      MR. SCHROLL:  I would say that based on counsel's

3  representations that it's not evidence that he intends

4  to use, should he then use the document, in the very

5  least, that number 2 paragraph should be redacted so

6  that the inflammatory part of that document is not

7  shown to the jury.

8      THE COURT:  What's inflammatory about it?  I mean,

9  y'all -- what he's saying is he wants to use it to

10  point out that at a point in time when there was

11  negative publicity in the health community and negative

12  doctor endorsement because of cancer linkage, Johnson's

13  opportunity profile was to investigate targeting

14  African-American and Hispanic cohorts to grow the

15  franchise.  I mean, that's basically the import of this

16  document in part.

17      How is -- everything is prejudicial if it's not in

18  your favor.  What is inflammatory about this in a way

19  that is unrelated to the proof that they seek to make

20  and the big proof and -- as you know, the heart and

21  soul of this battle of these J&J cases is when did they

22  know and what did they know and what did they do about

23  what they knew.

24      MR. SCHROLL:  I think what counsel first cited was

25  on the second page, number 2.  That does not mention

1    any race or ethnicity issues.  And then --

2         THE COURT:  Well, it says -- it does not.  It does

3    not.  It says that major obstacles include number 2,

4    the negative publicity from the health community on

5    talc inhalation, dust, negative doctor endorsement,

6    cancer linkage continues.

7         And so they're using that to show that J&J in 1993

8    knew that there was concern being expressed in the

9    medical community about the linkage between Johnson's

10   products, and specifically baby powder, and cancer.

11   And at the same time in that very same planning

12   document for major opportunities, the advertising

13   profile would include targeting a specific -- two

14   ethnic groups who like baby powder and use it a lot.

15   What's -- I mean --

16        MR. SCHROLL:  Your Honor, when I was --

17        THE COURT:  It's not a pretty picture, but what

18   is -- what makes it inadmissible?

19        MR. SCHROLL:  Well, your Honor, I would say that

20   when you talk about prejudice, is it overly prejudice

21   that it outweighs its probative value?  I would submit

22   to you that counsel can make his point that there was,

23   on the second page, the number 2 paragraph, and then on

24   the first page, it can be investigate opportunities to

25   grow the franchise, that point can be made without

51

1  mentioning ethnic, African-American or Hispanic.

2  That's just inflammatory, and it sort of injects race

3  and ethnicity into an issue to a point that I believe

4  counsel is not trying to make.

5      THE COURT:  Well, the argument would be that

6  Johnson & Johnson injected that issue into it because

7  of the advertising campaign they planned, and this is

8  evidence of it from their records.

9      MR. SCHROLL:  But, your Honor, and I would just

10  submit that it's very inflammatory and overly

11  prejudicial and it's not relevant.

12      The fact that it's certain ethnic groups that are

13  targeted is not relevant to counsel's point that

14  they're arguing that it was to investigate

15  opportunities to grow the franchise.

16      THE COURT:  Let me just say this:  At the moment

17  I'm inclined to admit it, as I did before, but I will

18  allow you to revisit this issue if you can give me some

19  better information, and it can be in the form of legal

20  research from other courts as to this very issue and

21  whether anyone has made the determination that the

22  prejudicial nature of this material outweighs its

23  probative value.

24      I won't close the door to you on that argument.  I

25  understand the argument.  It was the same argument that

52

1  was made before.  I allowed it.  But I will revisit it.

2  I will permit you to submit additional material if you

3  would like.

4       MR. SCHROLL:  Thank you, your Honor.

5       THE COURT:  All right.  Item seven, motion in

6  limine to preclude defense experts, including

7  Dr. Attanoos, from offering any nonexpert opinions or

8  opinions for which they are not qualified, unreliable

9  opinions lacking foundation at trial.

10       This is a point of concern to me, and so I turn --

11  I'll be honest with you.  I have had concerns about

12  both of the experts, the big experts in this case,

13  Attanoos for J&J and Longo for y'all.

14       Longo's situation has been clarified rather

15  considerably because he now uses, as I understand it,

16  72 samples that are all from the historic files of J&J.

17  The biggest thing I have been concerned about with

18  Longo was the chain of custody with these cans of baby

19  powder that pass through various hands of various

20  plaintiffs' lawyers and then came down, and I have

21  agonized a lot about that before.

22       Apparently, that's been cured.  Now, they have

23  still got all kind of contentions that we'll hear

24  about, about the reliability of below-the-waist testing

25  and other things that relate to Longo's testimony.

53

1    But I'm at Attanoos right now.  And, specifically,

2    Mr. Swett, if I could target your argument a little bit

3    here.

4        MR. SWETT:  Yes, your Honor.

5        THE COURT:  You have focused, as I understand it,

6    on two big opinions of Dr. Attanoos.  One is that her

7    mesothelioma was not the result of exposure to

8    Johnson's baby powder, but rather it occurred

9    spontaneously or idiopathically.

10        MR. SWETT:  Yes, your Honor.

11        THE COURT:  And you contend that he is not a

12   reliable expert who meets the tests of the rules and

13   therefore not qualified to offer this opinion.

14        MR. SWETT:  Yes, your Honor.

15        THE COURT:  Am I focused on what you're concerned

16   about?

17        MR. SWETT:  I can address that first, your Honor,

18   yes.

19        THE COURT:  All right, sir.

20        MR. SWETT:  So Dr. Attanoos intends to give the

21   opinion that Johnson's baby powder could not have

22   caused Mrs. Johnson's mesothelioma.  This opinion lacks

23   foundation and is unreliable.

24        Sort of back up a bit prior to 2018, before he

25   started testifying for Johnson & Johnson.  Even now he

54

1   will admit -- I won't even back up.  Even now he will

2   admit that amphibole asbestos exposure above background

3   causes mesothelioma.  Not just pleural mesothelioma,

4   peritoneal mesothelioma, which is what is at issue

5   here.  He admits that.

6       Now, he knows -- he admits that Mrs. Johnson used

7   baby powder for 20-plus years, but he specifically

8   chose in this case not to follow his own methodology

9   for looking at whether or not an exposure is causative

10  of mesothelioma.

11      I mean, he's testified that his methodology --

12  whenever you have a potential exposure and you want to

13  determine whether or not that caused or contributed to

14  mesothelioma -- is you look to see whether or not there

15  was any asbestos in the material, determine the fiber

16  type, know what level the product releases asbestos,

17  and basically whether or not that person was exposed

18  above background.

19      He doesn't follow that methodology here.  And I'll

20  get to it later, the lack of foundation he relies on or

21  attempts to rely on.  But here he didn't even look

22  whether or not Johnson's baby powder had asbestos in

23  it.  I mean, there's been testing in this record.

24  Johnson & Johnson's own expert, Dr. Sanchez, has tested

25  Johnson's baby powder.  He didn't rely on that.

55

1          Notably, Dr. Sanchez now has found asbestos in
2    Johnson's baby powder.  But they didn't give him those
3    results.
4          He didn't rely on Dr. Longo's testing of Johnson's
5    baby powder.  He has seen no testing of baby powder or
6    the ore, the Vermont talc that it came from.  None of
7    them.
8          So he didn't follow number 1.  And because he
9    didn't look to see whether or not there was asbestos in
10   the baby powder, he doesn't know what type of fibers
11   are involved, he doesn't know at what levels asbestos
12   fibers are released, and he certainly can't know
13   whether she was exposed to above background levels of
14   asbestos or not.
15         He didn't look at any of the fiber release studies
16   that are in evidence; Dr. Longo's fiber release study.
17   He didn't even look at any of the peer-reviewed
18   literature.  He admitted he hasn't even looked at the
19   peer-reviewed literature that addressed whether or not
20   there was asbestos in baby powder in general.  He said
21   something like he tried to read Blount's article, but
22   he didn't.
23         I mean, he hasn't looked at any of the pertinent
24   evidence in this case.  Instead, while choosing to
25   ignore the actual evidence in this case, he instead

56

1    claims to base his opinion on evidence that can't form

2    the basis of this opinion.

3        He relies on, one, epidemiological studies of talc

4    miners in Italy where it's documented that those talc

5    mines, non-Johnson & Johnson talc mines, are free of

6    asbestos.  He focuses on toxicological studies of rats

7    exposed to Italian cosmetic grade talc with no

8    asbestos.  And he focuses on mortality studies of

9    non-Johnson & Johnson Vermont talc mines.

10       He does that so -- if we just back up, he looks at

11   everything non-J&J, everything arguably -- yeah, there

12   are talc miners is Italy, but they're not exposed to

13   asbestos-containing talc.  And he ignores everything

14   that's pertinent in this case.  He doesn't look at any

15   of the testing of the products at issue in this case.

16   He doesn't look at any of the testing at the mines, the

17   specific Johnson & Johnson mines at issue in this case.

18       It's like an ostrich who sticks his head in the

19   sand.  He doesn't want to know because he wants to be

20   able to give his opinion.  And it will come out -- if

21   he is allowed to testify, it will come out -- this is

22   important, I think.  Since he's testified for Johnson &

23   Johnson, I think he's been retained in 25 cases,

24   non-J&J cases included, he has said every single one of

25   those mesotheliomas, men included, are all spontaneous.

1    There's 25 or 30 cases he's been retained in since

2    2018, men, women, young people, old people, people with

3    pleural plaques, biomarkers of asbestos exposure.

4    Since Johnson & Johnson has retained him, he said

5    every -- there was one he said was commercial

6    asbestos-related.  Every other one he said spontaneous.

7    He has no factual foundation for his opinions.

8         So if we're dealing specifically with his

9    spontaneous mesothelioma opinion, it's sort of a moving

10   target.  But I think the most important thing to focus

11   on here, one, he didn't follow his own methodology.  I

12   don't know how he can even give this opinion about

13   whether or not her use of baby powder affected her

14   meso.

15        But then the second part is he wants to call it

16   spontaneous.  And I think the only key part we need to

17   look at with that is before 2018, Dr. Attanoos

18   consistently opined that 60 to 75 percent of female

19   mesothelioma patients had a known history of asbestos

20   exposure.  Now that he's been retained by Johnson &

21   Johnson, spontaneous mesotheliomas comprise 60 to

22   90 percent of female mesothelioma cases.

23        And if we look at the evidence in this case, what

24   he purports to rely on, I asked him specifically.  I

25   said:  Okay -- in his deposition, I said:  Okay,

1   Dr. Attanoos, you don't think she had any asbestos

2   exposure.  And I'm looking at all your various

3   opinions, and you say idiopathic.  You say spontaneous.

4       He defines spontaneous as a naturally occurring

5   mesothelioma caused by age and genetics.  All right?

6   And idiopathic is a mesothelioma without a known cause.

7       So I said:  Dr. Attanoos, when you're faced with a

8   case like this, how do you determine whether or not

9   you're going to call this an idiopathic mesothelioma,

10  no known cause, versus one that you're going to tell a

11  jury is spontaneous, i.e., caused by genetics and age?

12  Because that's important.  How do you reach that

13  difference?  How do you reach that conclusion?

14      And he said, page 84 to -- no, 86 to 87 of his

15  deposition.  I said:  Wouldn't you need genetic testing

16  to determine whether or not it's a spontaneous

17  mesothelioma?

18      His answer:  You would need genetic testing to see

19  if there was any constitutional basis to say whether

20  the individual had a cancer previous position.

21      And he goes on, and then he says:  And ultimately

22  before you would say that this is a naturally occurring

23  mesothelioma.

24      Well, you know, he hasn't seen any formal genetic

25  testing in this case.  Absolutely none.  So he has no

59

1    foundation to come in here and say this is a

2    spontaneous mesothelioma versus an idiopathic

3    mesothelioma, and we believe he should be precluded,

4    one, from even offering an opinion whether her use of

5    baby powder did or didn't cause her mesothelioma.  He's

6    got no basis for that.  It's unreliable.

7         The peer-reviewed studies they claim he relies on,

8    they're all unrelated to Johnson's baby powder.

9    They're Italian non-asbestos mines.  They're rat

10   studies with non-asbestos Italian talc.  He doesn't

11   have a proper basis.

12        What he's attempting to do is it's sort of like a

13   general automobile expert who has knowledge about

14   general automobiles but has no knowledge about specific

15   speedometers or instrument panels.  He wants to rely on

16   these Italian studies generally, but he doesn't want to

17   get down to the specifics of what's at issue in this

18   case.  He's not qualified.  So that's the basis of the

19   argument on that issue.

20        We'll address the USGS, which is another big

21   issue.

22        That chart, I'm sure you're familiar with the

23   chart where he wants to talk about the asbestos

24   consumption and how it relates to the meso rates and so

25   they can't correlate.  That's another big issue.

60

1        But I can stop now on the first issue.

2        THE COURT:  Let's stop now on the first issue.

3        Well, no.  I mean, the whole thing is a -- you are

4   wanting to preclude him from the basic opinion, A, baby

5   powder did not cause her mesothelioma; B, her

6   mesothelioma is naturally occurring because of age and

7   genetics or idiopathic.  You want him to be precluded

8   from both of those things.

9        MR. SWETT:  Yes, your Honor.  And then there would

10  be a C.

11        THE COURT:  And the C --

12        MR. SWETT:  C is the USGS.  So over the years, the

13  USGS puts together -- it's published.  And it's

14  Production of Talc.  So he puts this chart up -- and I

15  think he did it in our prior cases.  He puts this chart

16  up that shows the talc, the ebb and flow of production

17  of talc.  You know, it sort of goes up and down.

18        He overlays it with the rate of mesothelioma

19  amongst women.  And he comes in and he says, well,

20  because the production of talc went up and down and the

21  rate of meso in women stayed -- he says it stayed

22  stagnant or constant -- he says, therefore, cosmetic

23  talc powders in Johnson's baby powder have no relation

24  to mesotheliomas in females.

25        Well, that has no foundation because I got

1  Dr. Attanoos to admit in his deposition, one, he didn't

2  know that the USGS data was compiled on a voluntary

3  basis.  Industry voluntarily submits that.  There's no

4  hard-and-fast certainty with that data.

5       He's not aware whether or not Johnson & Johnson

6  ever provided any data for any given year to the USGS.

7       He's not aware whether or not any data on the

8  production of cosmetic talc in any given year came from

9  Vermont mines.

10       As the USGS data shows a rise in production of

11  cosmetic talc, Dr. Attanoos doesn't know how much, if

12  any, of that relates to Johnson's baby powder.  He

13  can't say one way or the other.

14       So for one year when production or use of talc

15  went up amongst the general public, he doesn't know if

16  the use of Johnson's baby powder went up or down.

17       Perhaps a bigger issue, a bigger problem, is he

18  acknowledges that cosmetic talc wasn't just used in

19  powders.  It was used in chewing gum.  You have seen

20  the slides.  They argue that a hundred products are

21  made of talc: chewing gum, pills.  He doesn't know how

22  much of that data for any given year is actually in the

23  powder form versus chewing gum.

24       And this is important because he admits that talc

25  or asbestos-containing talc has to be in the aerosol

62

1  form, has to be respirable to cause meso.  So for any

2  given year he's relying on this data, he doesn't know

3  how much of that talc that's being produced is actually

4  used in respirable aerosol products.

5      I mean, that's crucial.  It's just really

6  disingenuous.  When we really dug into the basis of

7  this opinion that he's coming in attempting to tell

8  juries, it lacks foundation.  It's very disingenuous.

9  It's unreliable.

10     You know, for any given year, zero percent of that

11  cosmetic talc production could be from Johnson's baby

12  powder.  Zero percent could be from aerosol products.

13  100 percent could be just from one manufacturer that

14  produced talc to make chewing gum.

15     THE COURT:  I think I understand the argument,

16  Mr. Swett.

17     MR. SWETT:  I apologize, your Honor.

18     Additionally, I think it's cumulative if he's even

19  allowed to testify.  They have got two experts coming

20  in to say the exact same thing.  That's an additional

21  basis.

22     And, finally, we don't think he should be able to

23  talk about any other causes causing her mesothelioma.

24  You know, radiation is a recognized cause.  I went

25  through all of them, all the known causes that could

1  cause meso. I went to his deposition, and I said: You

2  can't say to a reasonable degree of medical certainty

3  that this caused it, this caused it, this caused it?

4      He said -- in this case, and he said: No, there's

5  no evidence that any of those other causes caused her

6  mesothelioma.

7      So we don't think he should be able to interject

8  any other causes of mesothelioma other than asbestos in

9  this case because there's no evidence of any other risk

10  factors in this case.

11      Thank you, your Honor.

12      THE COURT: All right.

13      MS. BROWN: May I be heard, your Honor?

14      THE COURT: Yes, of course.

15      MS. BROWN: Thank you.

16      Your Honor, as I understand, there are three

17  issues that plaintiffs are seeking to exclude

18  Dr. Attanoos on, and so I'll take them in turn, and, of

19  course, if your Honor has any questions, I'll answer

20  those as well.

21      But the first is that plaintiffs seek to exclude

22  Dr. Attanoos from testifying that baby powder did not

23  cause Ms. Johnson's mesothelioma. And, of course,

24  plaintiffs own experts agree that when you are trying

25  to answer a question about what caused a disease in a

64

1   person, the best place to look is the epidemiology.

2        And so they're going to bring Dr. Kradin, their

3   specific causation expert, and he will testify, like

4   all of the plaintiffs case specific experts do, that

5   you look to the studies, the epidemiology studies, the

6   studies in people who were exposed to this product to

7   see if it's causing disease.

8        And, in fact, Dr. Kradin will agree that the very

9   best place to look, the very best epidemiology, is that

10  of the miners and the millers of cosmetic talc, the

11  people who were exposed to the highest levels of

12  cosmetic talc.

13       And so that is exactly what Dr. Attanoos has done

14  here.  His opinion that Ms. Johnson's mesothelioma was

15  not caused by baby powder is informed in part by his

16  review and study of the cosmetic talc epidemiology, and

17  that includes studies of the miners and millers in the

18  Johnson & Johnson's Vermont talc mines as well as

19  Johnson & Johnson's Italian talc mines.

20       And I was surprised to hear counsel suggest that

21  the Italian talc mines have no asbestos, which seems

22  contrary to the plaintiffs case here because, of

23  course, those are the very mines that Johnson & Johnson

24  used to source its baby powder for decades.  And, in

25  fact, that is the very mine from which the powder that

1    went into some of the Dr. Longo's samples came.  And

2    counsel appears to be admitting that that mine, based

3    on the epidemiology, doesn't have asbestos.

4        But there's complete agreement from the experts on

5    both sides that to answer that very sort of threshold

6    question, was her disease caused by this product, we

7    should look at the epi.  And that is what Dr. Attanoos

8    has done here to answer that sort of top line question.

9        Now, as counsel points out, his opinion is also

10   informed by, for example, the animal data.  And so

11   counsel refers to an animal study that involved

12   injecting Johnson & Johnson's cosmetic talc, Italian

13   talc grade 50, into animals along with chrysotile.

14   And, of course, the animals that received chrysotile

15   got mesothelioma, and the ones that got cosmetic talc,

16   nothing happened.  And so that also informs part of

17   Dr. Attanoos' opinion that cosmetic talcum powder could

18   not have caused Ms. Johnson's mesothelioma.

19       And so it is that threshold level your Honor is

20   very familiar with, the South Carolina standard for

21   reliability here.  It is consistent in the case law

22   that a reliable and appropriate methodology to employ

23   with a question about whether a product causes disease

24   is to review the published peer-reviewed epidemiology,

25   which, to answer that very first question, is what

1  Dr. Attanoos did.

2       On the second question, your Honor, I understand

3  there's an effort to exclude Dr. Attanoos from saying

4  that Ms. Johnson's mesothelioma was unrelated to

5  asbestos exposure.  And I understand that -- to be

6  quite frank, your Honor, the experts and the

7  peer-reviewed literature is not consistent in terms of

8  how they use the term idiopathic, spontaneous,

9  naturally occurring, not related.  And I would suggest

10 that there's not a lot of meaning in the differences

11 between those terms.

12      At bottom, Dr. Attanoos' opinion is that her

13 peritoneal mesothelioma, one of the rarest forms of

14 mesothelioma, particularly in women, was not caused by

15 asbestos exposure.  And he bases that opinion on a

16 number of factors.

17      It is -- and he bases that opinion on his review

18 of her pathology in this case, of the fact that there

19 was no evidence of any asbestos exposure in the actual

20 pathology that he reviewed.

21      He bases that opinion on his review of the

22 published literature that has, in the most recent five

23 to ten years, looked into women specifically, has taken

24 the statistics of mesothelioma generally and broken

25 them down by gender and looked at whether women's

1   mesothelioma, and particularly peritoneal mesothelioma,

2   could be attributed to asbestos exposure.  And we cite

3   in our opposition on page 15 to 16 at least 10 to 15

4   studies, peer-reviewed studies, on which Dr. Attanoos

5   relies for the proposition that peritoneal mesothelioma

6   in women is most often unrelated to asbestos exposure.

7         And I understand counsel and the court's

8   hesitation about the term spontaneous.  And perhaps we

9   can sort of assist this process and move it along here.

10  We would agree that Dr. Attanoos will not use the term

11  spontaneous.

12        I read some of your Honor's rulings in some of the

13  prior trials, and I understand the Court has a concern

14  about the idea that this sort of just happened.  The

15  gist of his opinion, though, is that it's unrelated to

16  asbestos exposure.  And so if the Court has some

17  hesitation about him suggesting it sort of popped out

18  of nowhere by using the term spontaneous, he will

19  confine his opinion to what the published literature

20  says about peritoneal mesothelioma in women not being

21  related to asbestos exposure.

22        And here, in Ms. Johnson's case, in a woman who

23  has absolutely no markers of asbestos exposure, and

24  Dr. Attanoos has reviewed all of the medical records,

25  all of the pathology, all of the available documented

68

1  evidence, he's coupled that with his review of the

2  peer-reviewed literature to opine that here this rare

3  peritoneal mesothelioma was not caused by asbestos.

4      And then -- sorry.  Did your Honor have a

5  question?

6      THE COURT:  No.  I'll wait until you complete,

7  then I'll ask questions.

8      MS. BROWN:  Additionally, there was some

9  suggestion that he -- I think I understand counsel to

10  be concerned that he's not relying on their paid

11  litigation expert, Dr. Longo.  And, in fact, I would

12  suggest that what this expert does and what experts

13  should do is rely on the peer-reviewed literature, on

14  the science that takes place outside of the courtroom.

15      And that's, in fact, what Dr. Attanoos has done

16  here.  In forming his opinion that cosmetic talc

17  doesn't have asbestos, he relies not only on the

18  epidemiology, but he relies on studies like that that

19  was run by NIOSH and Harvard, by the government, in the

20  '70s of Johnson & Johnson's Vermont talc mines, studies

21  where they went in over a three-year period and

22  collected air samples from the mine and made a

23  determination that Johnson & Johnson's talc in Vermont

24  did not have asbestos.  That is a published,

25  peer-reviewed article funded by the government on which

69

1    he relies.

2         And so I would suggest to the Court that the fact

3    that he does not rely on their paid expert in

4    litigation is certainly not a reason to exclude him.

5    If anything, it is evidence of a more reliable method

6    that he's taken to approach this question of whether

7    there is asbestos in cosmetic talc.

8         Finally, your Honor, there is some discussion

9    about the USGS data.  And I would suggest to the Court

10   that all of the issues that Mr. Swett has raised are

11   fodder for cross-examination.  Here comes Dr. Attanoos

12   with a graph that shows talc consumption in the United

13   States and a graph that shows peritoneal mesothelioma

14   rates, and he says:  Look, they don't correlate.  You

15   don't see as cosmetic talc use went up, 30 years later

16   peritoneal mesothelioma went up.

17        And if counsel wants to cross him on, yeah, well,

18   you don't know how much of that was baby powder, well,

19   that's fair for cross-examination, but that's not a

20   reason to exclude the argument, Judge.

21        This is based on published USGS data to which

22   Johnson & Johnson contributes.  This is an argument

23   that is in the peer-reviewed literature.  The idea that

24   there's no correlation between USGS data and peritoneal

25   mesothelioma rates has been published in part by

1 plaintiffs experts, Dr. Finkelstein, and then a

2 response by Dr. Diette.  And so there is a body of

3 scientists in the published literature who have

4 analyzed cosmetic talc consumption and mesothelioma

5 rates.

6      And so I would suggest, your Honor, that there is

7 more than a reliable opinion to the extent that

8 Mr. Swett wants to cross on where the data came from or

9 what it's made up of, that's appropriate for cross.

10 But as a gatekeeper, your Honor, Dr. Attanoos more than

11 meets the reliability test under South Carolina.

12      THE COURT:  Okay.  Now, how are you doing, Court

13 Reporter?

14      THE COURT REPORTER:  I'm fine.

15      THE COURT:  All right.  Let me ask you a couple

16 questions, Ms. Brown.

17      MS. BROWN:  Sure.

18      THE COURT:  Dr. Attanoos' opinion that

19 Mrs. Johnson's mesothelioma is unrelated to asbestos is

20 very much informed by his contention that Johnson's

21 baby powder does not contain asbestos, it seems to me,

22 that she used -- she had a heavy use of Johnson &

23 Johnson's baby powder for an extended period of time,

24 but he excludes baby powder as a source for any

25 asbestos exposure on the front end because he doesn't

71

1    believe that baby powder has any asbestos in it, right?

2        MS. BROWN:  Your Honor is correct.

3        THE COURT:  Okay.  All right.  And it seems to me,

4    he kind of backs into this thing that it must be

5    spontaneous or idiopathic.  He doesn't have any kind of

6    direct information as to -- if it's spontaneous, and

7    that means it's genetic, he agrees that he's conducted

8    no genetic test and doesn't know if any genetic test

9    has been conducted on Ms. Johnson, so that can't

10   possibly be genetic or age-related infirmities, cannot

11   be to a reasonable degree of medical certainty an

12   underpinning for the opinion that her cancer is

13   spontaneous, that is, related to genetic or age

14   manifestations.  He doesn't have anything on that, does

15   he?

16       MS. BROWN:  If I could jump in on that, your

17   Honor, as you know, he reviewed in great detail all the

18   pathology that's available here.  And as you know,

19   Ms. Johnson was diagnosed at a fairly young age for

20   mesothelioma.  She has a history of cancer in her

21   family.  And what he found in terms of his review of

22   the pathology also supports his opinion here.

23       What he found was not one, not two, not three,

24   four different neoplasms.  So in addition to the tumor,

25   the peritoneal mesothelioma, he found cancer of the

72

1    appendix, another rare tumor that even their experts

2    agree has nothing to do with asbestos exposure.  He

3    found a fibroid, benign tumor of the ovary, and then he

4    found another lymphoma neoplasm as well.

5         THE COURT:  Right, but he -- in the face of all

6    that, he does not contend that those things caused her

7    mesothelioma.

8         MS. BROWN:  Oh, correct, your Honor.

9         THE COURT:  He doesn't contend that either her

10   genetic history or her age or even those specific

11   physical conditions caused her mesothelioma.  He simply

12   says it's spontaneous.

13        MS. BROWN:  Well, your Honor, I would suggest

14   there's a little nuance there.

15        So the evidence of these other cancers that even

16   Dr. Kradin, their own expert, when deposed said, of

17   course, I'm not even contending they have anything to

18   do with asbestos exposure, is indicative of a genetic

19   process perhaps going on that would --

20        THE COURT:  Well, there are a lot of genetic

21   processes that go on in every human being, but we're

22   talking about him relating, as a scientist, a genetic

23   process to the development of mesothelioma.  And there

24   is nothing in his testimony that indicates he can do

25   that, correct?

1    MS. BROWN:  Well, your Honor, I would disagree

2  just a little bit with the Court.  The bottom of his

3  opinion is it wasn't asbestos.  And I understand the

4  Court and counsel's concern with the term spontaneous,

5  and he's not going to use that.  But it's evidence -- I

6  mean, there's sort of a whole bucket of evidence that

7  it wasn't asbestos.

8    THE COURT:  Well, I mean, we don't have res ipsa

9  loquitur in this state or anything close to it, and you

10  can't simply say, well, she had all these other

11  conditions and I say it's not asbestos because I say,

12  as a foundational matter, this baby powder does not

13  contain asbestos and I don't contend she had asbestos

14  exposure from someplace else.  So, therefore, I back

15  into the idea that it has to have been either

16  spontaneous or hint, hint, hint, she really has got a

17  lot of cancer in her family.

18    MS. BROWN:  Well, your Honor, a couple things.  He

19  looked at the pathology.  There is no objective marker

20  in the pathology that she was exposed to asbestos at

21  all.

22    THE COURT:  Well, he looked at the pathology, but

23  the pathology revealed nothing to him about asbestos

24  and this mesothelioma.  It didn't reveal anything one

25  way or another to him.

74

1        MS. BROWN:  Well, there was an absence of

2   any marker.  Your Honor is correct.  There was an

3   absence of any marker to suggest that it was asbestos

4   exposure.  I understand your Honor's concern that he's

5   trying to backdoor an opinion, but that opinion is

6   essentially separate, and that opinion is based on the

7   idea that cosmetic talc does not contain mesothelioma.

8        THE COURT:  Okay.  Now, let's go into that,

9   because that's really the foundation of it.

10        MS. BROWN:  I agree, your Honor, right.

11        THE COURT:  Here is the place that I'm very

12   concerned.  There is a world of J&J testing, and we

13   have sure had the battles about that and the boxfuls

14   given to the jury and big boxfuls that say, hey, we

15   have tested it all these millions of times and we never

16   found any asbestos.  He has not been provided with any

17   of Johnson & Johnson's testing, as I understand it.

18        MS. BROWN:  The same with their expert.

19   Dr. Kradin hasn't looked at it either.

20        THE COURT:  I'm not talking about him now.

21   Because Dr. Attanoos is going to make affirmative

22   conclusions that baby powder -- Johnson & Johnson's

23   baby powder never contains any asbestos.

24        MS. BROWN:  Not true, your Honor.  In fact, the

25   concern -- I understand the Court's concern.  He is not

75

1    going to speak to what's in baby powder.  He's not here

2    to say 100 percent asbestos-free.  That is not his

3    opinion.  As your Honor correctly points out, he hasn't

4    reviewed all the testing.  That's not his piece of the

5    puzzle.  He doesn't know how to interpret microscopy

6    tests anyway.  What he is going to opine on is based on

7    the epidemiology.  Whatever is --

8         THE COURT:  Well, he's not an epidemiologist.

9    He's a pathologist.

10        MS. BROWN:  Correct, your Honor.  But as part of

11   his general practice, as a practicing physician who

12   sits on the U.S./Canadian international mesothelioma

13   panel, part of what he does as a pathologist --

14        THE COURT:  Well, what specific epidemiology is he

15   going to rely on?  I have read his articles.  I have

16   read all of that.  I don't see what he's relying on.

17   He's got the generalities about women, and they evolved

18   over time, but at the moment, it's 70 percent of women

19   who have mesotheliomas, they're spontaneous,

20   idiopathic, but they're not related to asbestos.

21        MS. BROWN:  Sure.

22        THE COURT:  And there's no specific test that he

23   can point to that has even tested for the presence of

24   asbestos, but he's going to exclude asbestos as a

25   possibility for their mesothelioma based on his kind of

1   general view of what epidemiology as a science shows.

2       What he's really doing is this:  He's saying --

3   he's into that old debate over the good asbestos and

4   the bad asbestos.  Oh, there's some asbestos that's not

5   really asbestiform.  It's asbestos, but it's

6   non-asbestiform asbestos and, therefore, it doesn't

7   ever cause any problems.  It's only the asbestiform.

8   Some go even further and say, oh, it's only crocidolite

9   that causes the problem, not even chrysotile.

10      He's not a geologist or anything close to that.

11  But that's the real foundation of his opinion that this

12  baby powder, which he will admit when you drill down to

13  it, does contain amphiboles, some of it does.  It's

14  been tested.  It's been shown to have it.  J&J's own

15  testing has shown that.  But he's going to say it's not

16  the bad kind of stuff that causes mesothelioma.

17      MS. BROWN:  And perhaps it would give the Court

18  comfort, we're not going to solicit that opinion from

19  him at all.  He is not going to talk about what is in a

20  bottle --

21      THE COURT:  Well, then, if he's not going to talk

22  about that, what is going to be the foundation of his

23  opinion that Johnson & Johnson's baby powder, which we

24  now will all agree, has some asbestos in it?

25      MS. BROWN:  We would disagree with that, your

77

1   Honor, that's there's asbestos --

2       THE COURT:  Well, there's going to be proof that

3   there's some asbestos in it, whether it's the good

4   asbestos or the bad asbestos or a trace of it or a lot

5   of it or whatnot, that all is a big debate.  But he's

6   going to categorically say that it cannot possibly have

7   ever caused mesothelioma, that baby powder can.

8       MS. BROWN:  And, your Honor, he will base that not

9   on a review of what I would agree he has not done in

10  this case, which is review the testing that Dr. Longo

11  did, the testing that Dr. Sanchez did.  That's not what

12  he's qualified to do.  That's not what he did.

13      THE COURT:  So what is he going to base it on?

14      MS. BROWN:  So he's going to base that on his

15  review of the large epidemiology studies of the miners

16  and millers of cosmetic talc.

17      THE COURT:  The miners and millers of cosmetic

18  talc have nothing to do with cosmetic consumption of

19  baby powder.  These people don't -- are not respirating

20  highly refined and packaged baby powder.  What they are

21  respirating is something that occurs when they are in

22  the mines.

23      MS. BROWN:  Understood.

24      THE COURT:  There is a whole contention about what

25  happens when you respirate highly refined, very small

1   particle cosmetic baby powder.  The millers and miners,

2   none of them have ever respirated any of that or were

3   they tested for that.

4        MS. BROWN:  Well, the reason, though, Judge, it's

5   important when you think about how -- the plaintiffs

6   claims here.  Their claim is that the asbestos is

7   contaminating the mine.

8        THE COURT:  They are -- no, they are contending --

9   couple of things.  They're contending that there is

10  asbestos in the talc mines from which this material was

11  produced and that the refinement that takes place to

12  produce the product, which is baby powder, makes

13  whatever is in that baby powder highly respirable.

14       MS. BROWN:  Understood, your Honor.  And even

15  though their expert will agree, though, that the people

16  with the most exposure to what gets into baby powder

17  are the miners and the millers.

18       THE COURT:  No, I think there is a real scientific

19  debate about that.  Some say that there's the highest

20  exposure when it's mined.  That depends on, when you

21  drill down to it, how much asbestos there is in the

22  particular mines that you're talking about.

23       MS. BROWN:  Understood, Judge.

24       THE COURT:  But these cases, for the consumption

25  of cosmetic talc products, depends on a much more

1  specific analysis of how this product is used and was

2  respirated than mining.

3      MS. BROWN:  Sure.  And on that, a couple things

4  there.  One, at least the expert in this case would

5  agree.  I understand other experts may take a different

6  position, but at least Dr. Kradin would say miners and

7  millers have the highest amount of exposure.

8      But to your Honor's concern that when it gets into

9  the product maybe it's in a different form,

10 Dr. Attanoos would also rely on the extensive

11 evaluation that the FDA has done on the finished

12 product.  So there, as your Honor well knows --

13     THE COURT:  Well, that kind of depends on which

14 year you're talking about.  We know that, you know,

15 OSHA as well as the FDA's look at asbestos-containing

16 products, and particularly the FDA's look at baby

17 powder products, has evolved tremendously over the

18 years.  So, you know, you would have to -- I would have

19 know from Dr. Attanoos exactly what year he's talking

20 about.

21     But what concerns me, he has a blanket opinion

22 that excludes this baby powder as -- well, first of

23 all, he says her mesothelioma is not caused by

24 asbestos.

25     MS. BROWN:  Correct, Judge.

1    THE COURT:  That's the first thing.  And that is

2    highly informed by his contention that it could never

3    have come from baby powder.

4    MS. BROWN:  And informed in part, Judge, by the

5    FDA testing, just to answer your question, is square in

6    the heart of the plaintiffs usage in this case.

7    So as your Honor heard in the previous trials,

8    there is a scare, it's in the newspaper, and the FDA

9    gets on top of this and does this 1970s testing, which

10   is really in the heart of the alleged usage here.  And

11   so that would also inform Dr. Attanoos' opinion that

12   what was tested by the FDA in the '70s, what was

13   addressed again in the 1980s, as your Honor well knows

14   in the form of the citizens' petition about whether

15   baby powder needs a warning.  I mean, they do a

16   worst-case scenario test, as your Honor well knows, and

17   say -- let's assume worst-case scenario, thousands of

18   times more than what the plaintiff even allege here,

19   would somebody be exposed to more than background, and

20   they say no, no warning required and then continue on,

21   as your Honor knows, and test as recently as 2009 and

22   2010.  So that also would inform his opinions here in

23   this case as well as the work of the FDA.

24   THE COURT:  Well, I am much troubled by this.

25   I will hear one more time from you, Mr. Swett,

1  briefly, please, sir, and let's go on and see what we

2  can do about closing this matter one way or another.

3          MS. BROWN:  Thank you, your Honor.

4          MR. SWETT:  Very briefly, your Honor.

5          I know Dr. Kradin's not at issue here, but I do

6  want to draw a distinction because he does rely on epi

7  studies.  He relies on epi studies showing that

8  asbestos exposure relates to mesothelioma and increases

9  the risk.

10          Dr. Attanoos here -- there are no cosmetic talc

11  epidemiologic studies.  There are none.  Dr. Attanoos

12  relies on studies not dealing with this product,

13  whereas Kradin deals with studies dealing with

14  asbestos.  That's what we're talking about.  You know,

15  we asked him, based on a hypothetical question, you

16  know, assuming what our experts found, you know, would

17  this amount of asbestos have caused meso?  Yes.

18          Dr. Attanoos doesn't do that.  He starts off out

19  the gate, well, baby powder didn't have asbestos.  But

20  he didn't even look at any of the testing.  He didn't

21  look at any peer-reviewed literature dealing with this

22  product.  He didn't even look at Blount.  Blount's

23  peer-reviewed.  That deals with Johnson's baby powder.

24  That showed asbestos in Johnson's baby powder.  He

25  didn't look at that.

82

1        He looked at peer-reviewed literature dealing with
2   Italian non-asbestos-containing talc.  And despite what
3   Mrs. Brown said, the rats weren't injected with
4   Johnson's baby powder from Italy.  It wasn't the same
5   grade.  It was not Johnson's Italian baby powder.  And
6   it was not -- any of the studies that he relies on,
7   they're Italian, non-J&J mines, they're
8   non-asbestos-containing talc.  It's not the product at
9   issue here.  You can't draw the correlation.

10       Finally, as your Honor pointed out, there's
11  nothing to draw the other leap that he makes.  The
12  first leap that he makes is from -- you know, he says
13  it's an unfounded assertion that baby powder didn't
14  have asbestos.

15       The second leap that he makes that he's got no
16  support for is to somehow say, well, her mesothelioma
17  was not only caused by asbestos, it was caused by age
18  and genetics, because he admittedly says you would need
19  testing to confirm that, you would need testing to give
20  that opinion, and he admitted he's done no testing
21  here.  So I don't know how he can say her meso was
22  caused by age and genetics with no foundation at all.
23  It's unreliable.

24       Basically, what we have here is Dr. Attanoos wants
25  to say anything but asbestos caused this lady's meso,

1  but really I didn't even look to see if she was exposed

2  to asbestos.  That's basically what we have.

3       THE COURT:  I understand.

4       All right.  You know, what I've done in the past

5  is to come down on the side of saying it's a battle of

6  the experts, and, you know, that's what it's going to

7  be.  But I am deeply concerned about this testimony of

8  Dr. Attanoos.

9       MS. BROWN:  And, your Honor, if it alleviates some

10 of the Court's concern, as counsel again raised this

11 idea he's going to opine on what's in asbestos, we will

12 not solicit an opinion from him that baby powder does

13 not have asbestos.  That is not his area of expertise,

14 and he's not going to come in and talk about it.

15      MR. SWETT:  But that forms the whole basis of

16 where he starts with that premise.

17      THE COURT:  But he is going to say that her

18 mesothelioma was not caused by Johnson & Johnson baby

19 powder.  He's going to say that?

20      MS. BROWN:  Yes, your Honor, based on the

21 epidemiology of women who get peritoneal mesothelioma

22 who have no --

23      THE COURT:  Again, I've read those articles, not

24 only his, but the citations he gives for the statements

25 he makes, and I've got to say it's the most attenuated

84

1    stuff in the world.  His opinion is by far the most

2    affirmative suggestion excluding baby powder as a

3    source than any of the sources in his studies that he

4    talks about that talk about gender and the impact that

5    gender has on peritoneal mesothelioma, and that's what

6    gives me great concern.

7         And when he's asked about it, and I noticed this a

8    couple times in his deposition, he'll say, well, they

9    didn't say exactly that, but that's the inference from

10   what they say.

11        Nobody says it definitively like he does that --

12   first of all, that 70 percent of peritoneal

13   mesotheliomas are caused by something other than

14   asbestos.  Nobody says it that way.  He puts together a

15   group of observations to come up with that statement,

16   and I have found no one else who says -- and I can sure

17   stand to be corrected, but I have found no one else who

18   says, about a specific situation like this one, this

19   mesothelioma could not have been caused by asbestos and

20   could not have been caused by baby powder.

21        That's what's got me worried is taking him all the

22   way to the end to the definitive, acceptable degree of

23   medical certainty, expressing those opinions, when the

24   literature he uses is a much more general discussion of

25   statistics that doesn't take the final dive he takes

1    and express the opinion he expresses.

2         MS. BROWN:  And I would just suggest to the Court

3    to the extent your Honor is inclined to consider this

4    further, is to look at footnote 12 on page 15 and 16 of

5    our brief, which cites the studies that I think may

6    give the Court comfort that it's just not Dr. Attanoos

7    who's saying, well, this had nothing to do with

8    asbestos, but this is here published literature in

9    addition to his own peer-reviewed work that has studied

10   women who get this very rare peritoneal mesothelioma,

11   have asked them, interviewed them about asbestos

12   exposure, looked at lung fibers and concluded that

13   their mesothelioma was unrelated to asbestos.

14        And so the extent your Honor wants to look at

15   the -- you know, what he's relying on, I would point

16   the Court to that footnote.

17        THE COURT:  I understand.

18        MS. BROWN:  Thank you, Judge.

19        THE COURT:  Well, all right.  I will tell you

20   this.  My current inclination is to limit very

21   extremely what Dr. Attanoos can say.  I will try to

22   make a final determination about that and e-mail all of

23   you about it as quickly as I can.  But I am very, very

24   reluctant to allow him free rein to express the opinion

25   he expressed in the report from his office he made on

Beth-Anee Johnson where he flat-out says that her

mesothelioma cannot be caused by asbestos and that

Johnson & Johnson baby powder does not contain

asbestos.

Those two things are worrisome to me in terms of

whether he has got the expertise and uses a scientific

method that is recognized, is using peer-reviewed

material that expresses that opinion, all those kinds

of normal indicia that experts must use.

I'm not saying -- I'm not slamming the door to him

right now, but I am deeply concerned about that --

MS. BROWN:  Understood, your Honor.

THE COURT:  -- and I will try to clarify my

thinking in the next couple of days.

MS. BROWN:  We appreciate that.

THE COURT:  The thing you just handed me, which,

obviously, I haven't had a chance to completely study,

but I appreciate you bringing it to me, I will study

that in detail before I make any determination about

this, and I will try to give you something on that

quickly.

MS. BROWN:  We appreciate that, Judge.  And to the

extent it helps take some work off your plate, I know

one of the things you said you're concerned about is

he's going to get up there and say baby powder doesn't

1  have asbestos, and we won't elicit that testimony.

2        THE COURT:  I understand, and I appreciate that,

3  and that helps me considerably in how I evaluate what

4  I'm going to do here.

5        MS. BROWN:  And I would also say no, he doesn't

6  have to say the word spontaneous.  His opinion --

7        THE COURT:  I understand.

8        MS. BROWN:  -- is not based on asbestos.

9        THE COURT:  Yes, ma'am.  And that may be the way

10  to solve this problem because I don't want to simply

11  deprive -- this is a clash of the experts without

12  regard to what happens here.  And y'all have experts

13  who have very different opinions about this, and I

14  don't want to prevent from you from being able to put

15  your case on in that regard, but I don't want to

16  violate the injunction of *Watson vs. Ford Motor Company*

17  and other cases from South Carolina that make it clear

18  that the judge has the responsibility to look on the

19  front end to see whether this expert is within a field

20  of expertise with the kind of scientific foundation,

21  peer-reviewed methodology that makes these a legitimate

22  expression of expert opinion.  That's what's got me

23  concerned.

24        MS. BROWN:  Understood, your Honor.  Thank you.

25        THE COURT:  Okay.  Let's see what else we've got

88

1  here.  That was seven.  And I think that's the end of

2  the -- seven was the end of the plaintiffs motions in

3  limine.

4        MR. SWETT:  Yes, your Honor.

5        THE COURT:  All right.  Now, have we got --

6  Johnson & Johnson, have we got separate motions in

7  limine?

8        MR. HERNS:  Yes, ma'am, your Honor.

9        THE COURT:  All right.  Tell me where to look,

10  Louis.

11       MR. HERNS:  It's in the large notebook, Johnson &

12  Johnson motions in limine.

13       THE COURT:  I see replies to plaintiffs motions in

14  limine.  J&J motions in limine, Longo, omnibus and

15  punitive damages.  Is that the one you're looking at?

16       MR. HERNS:  Yes, ma'am.

17       THE COURT:  Okay.  Now, what time are we?

18       Court reporter, we're going to take a little

19  break.

20       Let's -- I always keep mine so fast, but what is

21  it, about 11:05?  Why don't we be back here at 11:20 or

22  thereabouts, so we all may be refreshed, and we'll go

23  again.

24       (WHEREUPON, a recess was taken from 11:03 a.m. to

25  11:22 a.m.)

1    THE COURT:  Before I leave this issue of

2  Dr. Attanoos, I am looking at the document that bears

3  the date April 6th, 2019, Richard L. Attanoos, Boverton

4  Park House, Boverton Park Drive Vale of Glamorgan in

5  Wales.  And this is an opinion letter to Lucy Wilson,

6  Willcox & Savage, Norfolk, Virginia, Re Beth-Anee

7  Johnson.

8    And I am looking at a summary and opinion, and I

9  am going to list for you the paragraphs in the opinion

10  that give me the most concern so that you may know what

11  I'm thinking about as we depart here today.

12    Page 16, the paragraph -- the second paragraph on

13  the page:  The epidemiological evidence correlating

14  time trends, incidents by gender, and commercial

15  asbestos use indicate that a significant portion of

16  pleura in almost all of the peritoneal mesothelioma in

17  women in the United States appear unrelated to

18  asbestos, citing Price, McGawfcar (phonetic) -- whom I

19  certainly remember very well from the Bostic trial --

20  and Attanoos.

21    I do not find that opinion to be -- at the moment

22  to be sufficiently reliable for Dr. Attanoos to express

23  that opinion.

24    This contrasts -- the next paragraph:  This

25  contrasts with pleural mesothelioma arising in men as

1  epidemiological and mineralogic studies show commercial
2  amphibole asbestos causes the majority of diffuse
3  malignant pleural mesotheliomas in males. This is
4  usually from occupational sources of exposure.
5      As those two opinions are juxtaposed with each
6  other, I do not find them reliable.
7      With respect to -- page 17, paragraph 4 on the
8  page: With respect to chrysotile asbestos, Ms. Johnson
9  details a history of potential exposure to various
10  building products which may have contained chrysotile
11  asbestos, including but not limited to drywall, joint
12  compound and siding.
13     I do not find that to be reliable enough to be an
14  opinion he can express, nor do I find it consistent
15  with the evidence as I know it at the moment.
16     Then the paragraph that begins: With respect to
17  malignant mesothelioma and chrysotile asbestos, I will
18  state epidemiological studies have shown that exposure
19  to chrysotile presents a risk of pleural mesothelioma
20  only when chrysotile or is contaminated with tremolite
21  asbestos or other amphibole asbestos and that the risk
22  even under those conditions is very low and is due to
23  the degree of contamination and so forth through the
24  rest of that paragraph, citing McDonald and Liddell.
25     And, finally, on that page in paragraph 3 from the

1   bottom, it says:  Epidemiological studies do not show

2   that chrysotile causes malignant peritoneal

3   mesothelioma.

4        I do not find that that is a reliable summary of

5   the epidemiological studies that I know of from the

6   material submitted to me in this case.

7        And then on page 20, the third paragraph on the

8   page:  Given the latent period for mesothelioma and so

9   forth.

10       The next paragraph:  Accordingly, this evidence

11  indicates that Johnson & Johnson cosmetic talcum

12  powder, a product sourced from Italy and Vermont, did

13  not contain asbestos.

14       The next paragraph:  On the basis of the

15  epidemiology, mineralogical evidence, clinical studies

16  and animal toxicological studies, any exposure to

17  Johnson & Johnson talcum powders, including Johnson &

18  Johnson baby powder that Ms. Johnson may have had,

19  would not pose a risk for her peritoneal mesothelioma.

20       I find that those paragraphs are not supported by

21  any reasonable expert confidence on Dr. Attanoos' part,

22  nor the kinds of scientific evidence, peer-reviewed

23  studies and whatnot that would support his ability to

24  opine in that way.

25       And then, finally, the paragraph:  Accordingly,

1   even if Johnson & Johnson talcum powder brands contain

2   cosmetic talc from mining sources which in themselves

3   contained trace elements of asbestiform, mineral, or

4   non-asbestiform, amphibole fragments, the overall

5   effect on human disease and specifically in

6   mesothelioma induction is inconsequential and

7   de minimis because consistently no mesotheliomas are

8   observed in the epidemiological or clinical studies of

9   heavily exposed subjects or even high-dose

10   toxicological animal studies.

11       And continuing on the next page, 21, the next

12   paragraph:  For consumers exposed to Johnson & Johnson

13   talcum powder, such as baby powder via infrequent

14   exposures, the cumulative dose would be orders of

15   magnitude below the levels experienced in the talc

16   miners and millers.

17       I do not find that that paragraph has any basis in

18   the scientific material that has been cited in

19   Dr. Attanoos' report.

20       The next paragraph:  Any exposure to Johnson &

21   Johnson talcum powder brands and baby powder that

22   Ms. Johnson may have had would not pose a risk for her

23   peritoneal mesothelioma.

24       I do not find that he is able to express that

25   opinion to a reasonable degree of scientific or medical

1  certainty.

2      And the paragraph on page 21, the last paragraph

3  starts:  The scientific literature also indicates that

4  a significant and often substantial portion of the

5  mesotheliomas have no identical asbestos exposure for

6  malignant mesotheliomas not clearly attributable to

7  some proven external agent.  The term spontaneous or

8  naturally occurring mesothelioma has been used.  This

9  comprises some 60 to 90 percent of female mesothelioma

10 cases and the fraction of spontaneous or naturally

11 occurring mesotheliomas are the highest in North

12 American women with extrathoracic mesothelioma, citing

13 himself 2018.

14     I do not find that there is sufficient scientific

15 support for the expression of that opinion by

16 Dr. Attanoos in court.

17     And finally:  In summary, I consider, based on the

18 information available with a reasonable degree of

19 medical certainty that -- it says "Mr. Johnson," but

20 I'm sure it's a typo.  It's Ms. Johnson's malignant

21 peritoneal mesothelioma was of a spontaneous or

22 naturally occurring neoplasm which arose unrelated to

23 any prior asbestos exposure.

24     I do not consider that Dr. Attanoos has the

25 sufficient scientific background or sufficient

1  information from the literature or from the information

2  about Mrs. Johnson's malignant peritoneal mesothelioma

3  to make this -- to testify as to this conclusion to a

4  reasonable degree of medical certainty.

5       Now, that is currently what I'm thinking, but I'm

6  not -- as I've said before, I'm not closing the door

7  completely, but I wanted -- rather than do some kind of

8  e-mailing back and forth, I just felt the simple thing

9  to do was to list out the paragraphs that give me the

10  most concern about the medical report, because the

11  bottom line is that's what we've got to deal with,

12  that's the kind of -- the preview or outline of

13  Dr. Attanoos' testimony.

14       MS. BROWN:  And, your Honor, I understand your

15  concerns about the reliability of those opinions.

16  Would it be helpful and could we, with the Court's

17  indulgence, submit a short submission with the

18  underlying scientific data --

19       THE COURT:  That's exactly what I'm inviting you

20  to do.  That's why I felt, in fairness -- and, of

21  course, it also gives the plaintiff a chance to look

22  over this medical opinion one more time and say

23  whatever they want to say as well.

24       MS. BROWN:  Sure thing.  Thank you, your Honor.

25       THE COURT:  But, obviously, we're on a short

1   string, but the sooner you can deal with that the

2   better so that we can see where we are.

3          MS. BROWN:  Yes.  Thank you, Judge.

4          THE COURT:  Now, we are at J&J's motion in limine,

5   Dr. Longo.

6          MS. BROWN:  That's me, Judge.

7          THE COURT:  All right, ma'am.

8          MS. BROWN:  Back again.

9          I'll be short, your Honor.  I know we have been

10  doing a lot of motions this morning, and you have heard

11  from Dr. Longo in the past, and we have made this

12  motion in the past.  And so certainly we raise three

13  issues in our motion relating to grounds to exclude

14  Dr. Longo.

15         Your Honor is well familiar with Dr. Longo's

16  methodology, which he admits by using TEM, the type of

17  microscopy, he is unable to distinguish between

18  asbestos and non-asbestiform.  And I will submit, your

19  Honor, we will leave that argument on the papers.  We

20  will leave our argument on PLM, another type of

21  microscopy that he uses, on the paper as well.

22         But what I do want to raise with the Court is

23  something your Honor hit on this morning and I think

24  you have been concerned with in some of the other

25  trials, and that has to do with some of the province of

96

1    where these bottles came from that he tests and what he

2    does with the information in some of the testing of

3    bottles that were bought off of eBay or given by a

4    plaintiff's lawyer or, you know, things like that and

5    that come from time periods, your Honor, that have

6    absolutely nothing to do with the alleged usage in this

7    case.  And so I would focus our oral argument here on

8    Dr. Longo's sort of extrapolation.  And there are sort

9    of two points to that, your Honor.

10       So as I understand your Honor's ruling in some of

11   the previous trials, you were concerned about the fact

12   that some of these bottles were purchased off of eBay,

13   were with plaintiffs' lawyers before Dr. Longo tested

14   them, came from places without a proper chain of

15   custody --

16       THE COURT:  I'll stop you right there and say

17   this:  I understand now that Dr. Longo has done some

18   revision of his presentation and has used 72 samples

19   that are taken from the historic records or files of

20   J&J.

21       I certainly could solve that thing by saying

22   Dr. Longo can express opinions only based on the

23   material from the J&J records and not from these

24   bottles off of eBay or produced by plaintiffs' lawyers.

25   I always did have a little bit of heartburn about that,

1  and I don't mind making that ruling.

2      I see my friend is standing there wanting to say a

3  little something.

4      MR. FINCH:  Yes, your Honor.  This relates to one

5  test.  Dr. Longo did two types of tests.  One, he

6  tested Johnson's baby powder to determine if there is,

7  in fact, asbestos in it.

8      THE COURT:  Right.

9      MR. FINCH:  He did that from -- initially, he did

10  that from bottles supplied to him from multiple

11  sources.  And then more recently he has done that from

12  both bottles of Johnson's baby powder from the

13  historical either repository or from museums and also

14  from Imerys talc mines.

15      There is one -- another test that he does, which

16  is called the below-the-waist fiber release test, which

17  your Honor let us use in the Boyd -- both of the

18  Boyd-Bostic trials.  That is based on one of the

19  bottles that he got from a collector at the Kazan firm,

20  which has been the subject of -- what it is, is it has

21  a certain amount of asbestos in it.  He uses that to do

22  fiber release testing just as if he had a piece of

23  Kaylo from an unknown providence and he says, what's

24  the fiber release from Kaylo?

25      His opinions about what's the amount of asbestos

1    fiber that come from a container of cosmetic talcum

2    powder which has asbestos in it is based on that

3    particular study and based on the Gordon Millette

4    article involving a different cosmetic talcum powder

5    that shows fiber release.  And he has a range of

6    exposures based on that, taking into account the

7    possibility --

8         THE COURT:  Right.  In the Gordon Millette, I

9    don't have a problem with that.  I mean, they don't

10   like -- they fuss about Dr. Millette and his hands

11   on --

12        MS. BROWN:  Well, it's not J&J.  But that's cross,

13   I understand, Judge.

14        THE COURT:  I don't have any heartburn about the

15   Gordon Millette.

16        MS. BROWN:  Right.

17        THE COURT:  But I do have a little concern about

18   the below-the-waist because it uses those other sources

19   that -- frankly, I guess I'm trying to protect you from

20   yourself a little bit.  I would think that appellate

21   review would have a little more concern about the chain

22   of custody with those in this situation.  With these

23   others, there can be no question about it.

24        MR. FINCH:  I understand that, your Honor.  But

25   the fact of the matter is, it's what's in our record.

1          Now, there are some subsequent testing he has

2    done, which is not yet available that we can't use in

3    this trial that would not be a chain of custody issue.

4    But for the purposes of the below-the-waist video, you

5    let us testify to that and also play the video in both

6    Boyd-Bostic trials.

7          THE COURT:  I get that.  I let Dr. Attanoos go

8    wild in the Boyd-Bostic too, and I've given some

9    thought to all of that.

10          MR. FINCH:  So we would just say that this is no

11    different than -- in terms of the extrapolation

12    argument, this is no different than -- and we cited

13    this in our paper -- when Berman and Middleton does

14    tests on asbestos-containing joint compound, they don't

15    know where it came from, and they show what's the fiber

16    level of that.

17          Dr. Longo has some asbestos-containing talcum

18    powder that happened to come from Johnson & Johnson.

19    He said this is what the fiber release is of this kind

20    of thing that has asbestos in it, and the rest is

21    fodder for cross-examination, I would submit, your

22    Honor.

23          THE COURT:  Well, here is kind of the way I'm

24    looking at this thing, and correct me if I'm wrong.  I

25    don't want to make a ruling on an assumption that's not

1  correct, but the Gordon Millette -- the heart and soul
2  of what you want out of the below-the-waist is how
3  these fibers release, and that leads to how respirable
4  they are and --
5     MR. FINCH:  And the range of exposure.
6     THE COURT:  And it makes a lot of sense.  I mean,
7  opposing counsel doesn't love this very much, but, you
8  know, it's one thing when you are breathing in a rawer
9  form of asbestos in an industrial or commercial setting
10  as it's, you know, being thrown about in the workplace
11  and so forth.  But it is another thing -- and this is
12  what I think Longo's point is, when you -- what you're
13  breathing in may be much lower content of asbestos in
14  it than in a commercial setting, for example.
15     MR. FINCH:  Yes, your Honor.
16     THE COURT:  But it's so much more respirable, at
17  least that's his argument, because of the very, very
18  ground-up nature of it and the silky platform upon
19  which it moves into the system of respiration, which is
20  the talc, it's the played talc itself.  That's what I
21  have devined out of what he's trying to say.  That you
22  that could you get out of Gordon Millette just as easy
23  as you can get out of below-the-waist.  You just don't
24  have that beautiful, little film with the dark -- and
25  that and the Tinsley lighting and all that, I think

1    that's fine.  I don't think there's anything wrong with

2    that, and I'd let it in with no problem about that.

3         What I'm trying to do is not go into evidence that

4    relies on the bottles that are not as verifiable as

5    these are that they're J&J.

6         MR. FINCH:  Well, here's the issue, your Honor.

7    He has two foundations for his opinion about what is

8    the fiber release from asbestos-contaminated talc

9    powder.  One is the peer-reviewed Gordon Millette

10   paper.  The other is his own below-the-waist testing.

11        THE COURT:  Sure.

12        MR. FINCH:  The third is testing that is not at

13   issue in this case because it has not been produced to

14   the defendants yet.

15        So as long as he can give the opinion, I have

16   tested Johnson's baby powder and I believe it contains

17   asbestos because of the historical samples I got from

18   the company, and as long as he is not precluded from

19   giving an opinion, based on my review of information

20   both in the peer-reviewed literature and elsewhere, it

21   is my opinion the range of asbestos exposure associated

22   with using cosmetic talcum powder is .1 fibers per cc

23   to 1 fibers per cc.

24        THE COURT:  Right.

25        MR. FINCH:  If that is permissible, then I don't

102

1    need to --

2        THE COURT:  I'm cool with all that.  What I'm

3    saying we ought not to use in this trial is the actual

4    film, the below-the-waist film.

5        MR. FINCH:  If that is what your Honor is getting

6    at -- as long as we don't get sandbagged when I've got

7    Longo on the stand and say, Oh, no, he can't testify to

8    his exposure estimate because below-the-waist video and

9    below-the-waist container is out --

10       THE COURT:  Yeah, they're not going to do that.

11   If I say it's out, they're not going to refer to it.

12       MR. FINCH:  But I want to make sure that it's in

13   that he can give an exposure estimate --

14       THE COURT:  He's going to be able to give the

15   exposure estimate because that's platformed on a lot

16   more than just that film.  It is platformed on all of

17   his other studies that he has done.

18       All right.  So that's the way I would solve our

19   problem here.  Number one, I would say no information

20   about the cans of baby powder that are more problematic

21   in terms of who they came from, where they came from,

22   how old they were and so forth and so on.  So you use

23   the J&J supplied material.

24       And two, no showing the below-the-waist film.

25   That's how I would solve your Longo issue.

1    MS. BROWN:  And I have a couple of points of

2    clarification.  It would be not only just the video,

3    but the underlying study.  Meaning, we're not talking

4    about this can from the '40s that came from a

5    plaintiff's lawyer's dad and he did --

6        THE COURT:  No.  And he's cool with that.  He

7    wants to be able to give that range of particles and

8    all that kind of stuff, which comes from a lot more

9    than just those old cans in the '40s.  And it certainty

10   comes from a lot more and different material than that

11   film in the blackened room with the Tinsley light.  So

12   I think we understand each other.

13       MS. BROWN:  Understood, your Honor.

14       And I would just address, they have another

15   expert, an industrial hygienist, who relies on

16   below-the-waist.  And similarly, that opinion would be

17   out under your Honor's ruling.  He needs to rely on

18   Gordon or the published literature as opposed to what

19   your Honor has now excluded.

20       THE COURT:  Well, and I think they can adjust it

21   the way that they need to.

22       MR. SWETT:  Well, one point of clarification, your

23   Honor.  An expert witness is certainly able to rely on

24   inadmissible evidence.

25       THE COURT:  Well, that's true.  That's true.  All

1   right.  Let me revise that.

2       All right.  The other expert can rely on stuff

3   that's not in evidence, studies that are not in

4   evidence.

5       MS. BROWN:  Well, your Honor, then let me, if I

6   could briefly, sort of raise the prejudice issues with

7   this below-the-waist.  The very reason why your Honor,

8   I believe, is excluding it via Longo --

9       THE COURT:  The only way it's prejudicial is that

10  it used those old cans, and I'm just trying to be

11  consistent there, but all the rest of the reason why

12  you say it's prejudicial, oh, that Tinsley light is

13  terrible, oh, it shows -- in that darkened room, that's

14  not a fair way.  I disagree with that.  I think all

15  that's perfectly fine.

16      I think the other expert can refer to studies that

17  show that without describing it in such a way that it

18  gets into Dr. Longo and his below-the-waist studies.

19  They'll figure out a way to do that.

20      MR. SWETT:  Here is the issue, your Honor.  I

21  think we're in agreement.  You're allowing Dr. Longo to

22  testify about his range.  He's not going to talk about

23  the underlying study and the below-the-waist.

24      THE COURT:  That's right.

25      MR. SWETT:  Our other expert, who is an industrial

1  hygienist, is just going to rely on that range to do

2  his calculations.

3      MS. BROWN:  But, Judge, if that's going to happen,

4  then I have to cross on below-the-waist.  I mean --

5      THE COURT:  Well, then you open the door, my dear,

6  it's going to be open.

7      MS. BROWN:  I understand.  But, I mean, if someone

8  is going to get up and rely on this can from Italy --

9      THE COURT:  I give you a little bit, and if it's

10  not enough, you're just going to have to make that

11  determination.

12      MS. BROWN:  But just to revisit that, Judge, why

13  the second expert shouldn't be allowed --

14      THE COURT:  I think the second expert can say, I

15  rely on the range that Dr. Longo -- I'm going to allow

16  Dr. Longo to testify as to the range.  If what he or

17  she, whoever it is, is going to say is, I rely on that

18  range to then give my opinion, I'm going to allow that.

19  If you want to get into below-the-waist, then, you

20  know, that's your choice.

21      MS. BROWN:  Understood, your Honor.

22      And then just for the record, then, to finish the

23  arguments that are in our brief --

24      THE COURT:  Sure.  And they're preserved.  To the

25  extent I haven't completely granted what you asked for,

1    your position is preserved.

2        MS. BROWN:  Okay.  On extrapolation, Dr. Longo, of

3    course, is taking a couple of fibers that he claims to

4    find and without any reliable method or any reliable

5    science assuming that that is indicative of the entire

6    bottle.

7        THE COURT:  Exactly.  That's why you-all don't

8    like Millette's glove thing.  I mean, I get that, but

9    you'll be able to cross-examine fiercely on that.

10       MS. BROWN:  Understood, your Honor.

11       And, finally, just a point that I think counsel

12   agree and has via e-mail correspondence, the plaintiffs

13   in this case did not put Dr. Longo up for a deposition.

14   They have not given him any Johnson-specific

15   information, and so I would just ask for guidance from

16   the Court per their agreement that Dr. Longo not be

17   giving any opinion as it relates to Ms. Johnson and her

18   exposure here having not been offered, he didn't do a

19   report in this case, and they wouldn't put him up for a

20   deposition here.  And so I just want to clarify with

21   the Court that he's restricted to his testing and not

22   to any opinions about Ms. Johnson.

23       MR. SWETT:  I disagree with the characterization.

24   Myself and Mr. Herns had an agreement where they didn't

25   need to depose Dr. Longo, we didn't need to depose

1 Dr. Hopkins, but --

2       THE COURT:  I'm not restricting Dr. Longo about

3 talking about Beth-Anee Johnson's case.

4       MR. SWETT:  And the agreement was basically -- the

5 range is basically what we're talking about.  Dr. Longo

6 is going to testify that using -- an individual using

7 Johnson's baby powder, such and such would have this

8 range of exposure.

9       THE COURT:  That's right.

10       MR. SWETT:  I mean, that's basically --

11       THE COURT:  I'm going to allow him to do that.

12       MS. BROWN:  And based on below-the-waist?  The

13 range is going to be based on below-the-waist?

14       MR. SWETT:  It's going to be based on all of his

15 testing, including the peer-reviewed literature.  I

16 thought we just agreed on that, that it can be based on

17 everything he's done.

18       MS. BROWN:  I understood your Honor to be

19 excluding below-the-waist from the range.

20       THE COURT:  No, no.  I'm excluding you showing

21 that test and referring to it in that way, but the

22 ranges are in part a product of that below-the-waist,

23 but they're also in part a product of other -- what you

24 think are kind of off-the-wall sort of studies he's

25 done.  But I'm going to let him give the range.  I'm

1  just not going to let him dramatize it by --

2        MS. BROWN:  With the video.

3        THE COURT:  With the video.

4        MS. BROWN:  Understood, your Honor.

5        THE COURT:  Okay?

6        MS. BROWN:  Thank you.

7        THE COURT:  And all the other things you wish I

8  would do about Dr. Longo --

9        MS. BROWN:  Are in the papers for your review.

10        THE COURT:  That big, huge hunk of paper that

11  would exclude him or limit his opinions, I'm not going

12  to do that.

13        MS. BROWN:  Understood.  Thank you.

14        THE COURT:  Now, number 2 is the omnibus.

15        MR. HERNS:  Yes, your Honor.  Louis Herns on

16  behalf of Johnson & Johnson.

17        THE COURT:  Yes, Louis.

18        I'm just trying to get here where I'm -- okay.

19        Any reference to other cosmetic powder litigation,

20  I will grant that.

21        MR. HERNS:  Other talc powder litigation.  We have

22  agreed to that, your Honor.  Plaintiff's counsel will

23  not agree -- will agree not to mention other lawsuits.

24        THE COURT:  Absolutely.

25        MR. HERNS:  But we can use past lawsuits for

1  impeachment purposes.

2       THE COURT:  Certainly.  And we're always pretty

3  careful about how we do that so that we don't

4  inadvertently mention the name of a case or something.

5  We just call it a sworn statement or things of that

6  nature.  We try not to say testimony given in another

7  case or anything like that.  But yes, you will be

8  protected about that.

9       MR. HERNS:  Number 2 is prohibit any reference to

10  media reports about litigation.

11       THE COURT:  Absolutely.  That would be granted.

12  No question about it.

13       MR. HERNS:  We agreed about that.

14       We could not agree about number 3, any reference

15  to adverse reactions to talcum powder that are not at

16  issue in this case.

17       THE COURT:  What are we talking about, like

18  ovarian cancer?  Other types of cancer?

19       MR. HERNS:  Yes, ma'am.

20       THE COURT:  You know, there's always this debate

21  that they have.  It's about notice.  You know, Johnson

22  & Johnson says, we didn't know, or this material

23  doesn't cause any kind of badness because there's no

24  asbestos in it and it doesn't cause cancer.

25       I certainly think they're going to have to be

mighty careful here.  I agree with you, Louis, that the
prejudicial effect may outweigh the probative value,
depending on how far they go, and I don't want this to
be a trial of every claim that's been made against
Johnson & Johnson for every kind of cancer.

But they do have the right to investigate and
illustrate to the jury the issue of notice, when
Johnson had notice, the fact that they knew their
product was causing certain things.

Certainly, it's not evidence that they were sued
for that, and you could never put that in front of a
jury.  I don't know what else they may have that would
cause other cancers, like ovarian cancer or something,
from Johnson & Johnson products to be in a format where
it's admissible evidence, but I'm not going to say
right now I would completely exclude anything, but
they'd have to be mighty, mighty careful.

And if that comes up, Mr. Swett, that y'all see
that -- feel like you need to raise something along
those lines, you know, of other kinds of cancer, then
let's have a sidebar about that when the piece of
evidence comes up so that I would be sure that we're
not tying it to, hey, they have been sued about
something before.  That would not be proper.

MR. FINCH:  That wasn't our intent.  Our argument

1    is basically two points.

2        May I approach so I can be -- can you hear me,

3    your Honor?

4        THE COURT:  I can.  I got the hearing aids tuned

5    up pretty good.

6        MR. FINCH:  Okay.  So our argument is, basically

7    it's the fact that Johnson & Johnson was on notice of a

8    potential ovarian cancer problem and they're

9    investigating their talc is no different than in a

10   mesothelioma case that a defendant was on notice of the

11   fact that breathing asbestos can cause a problem.

12       THE COURT:  You don't need to go further.  I get

13   that argument, and I don't want to completely preclude

14   you, but how you're going to present why they were on

15   notice is what I'm inquiring about because they're not

16   going to be on notice if it's just the fact that they

17   were sued or even that a verdict was rendered.

18       MR. FINCH:  No, no, this has nothing -- this goes

19   back 40 years.

20       THE COURT:  That's some kind of evidence out of

21   their files or --

22       MR. HERNS:  It has to do with a different disease.

23   We're talking mesothelioma with Ms. Johnson, her

24   breathing in, allegedly, asbestos dust in baby powder

25   and then ovarian cancer that comes in --

1      THE COURT:  Generally gotten by use of talcum

2    powder as a feminine hygiene product.  I get there is a

3    different way of entry into the body of the material,

4    and I've got some sensitivity to that.

5      So, again, I will have to see what they're talking

6    about.  My inclination is not to let it be done, but

7    I'm not going to close the door until I see is there

8    some document out of their files or something that I

9    think constitutes notice fairly enough and related

10   enough.

11     So what I'm telling you is I'm not going to close

12   the door completely, but I'm very hesitant to let other

13   scary kind of diseases, like ovarian cancer, get into

14   the picture unless I see a piece of evidence that I

15   think is fairly admissible in this case.

16     MR. HERNS:  Thank you, your Honor.

17     MR. SWETT:  And just way of example, your Honor,

18   we attached -- most of it's going to be internal

19   documents.  There is a question-and-answer document

20   from 1985 where Johnson & Johnson prepared these

21   questions and proposed answers to media if any of these

22   questions came up.  And the fact that they were

23   preparing answers for questions like, you know, talc

24   has been linked to cancer in this journal, to ovarian

25   cancer, and there's questions like, well, what's the

113

1    relationship between talc and ovarian cancer?  And then

2    talc is closely related to asbestos.  Is it likely the

3    two react in the same way?

4         So that's certainly from their internal file --

5         THE COURT:  I know.  And if we get to the point

6    where you're going to offer that into evidence, I'm

7    going to want to take a real good look at the document

8    before I make it on the basis of this motion in limine.

9         MR. FINCH:  Also, if I understand your Honor's

10   ruling, if in some way the --

11        THE COURT:  Right now I'm not granting his motion

12   in limine.  So y'all need to just kind of cool it for a

13   minute.  But I'm telling you that I'm not going to

14   permit this to just go to the jury until I have a

15   chance to look at the specific thing you're talking

16   about.  You got me?

17        MR. FINCH:  Yes, your Honor.

18        THE COURT:  Okay.  All right.

19        MR. HERNS:  Number 4, your Honor, we have reached

20   an agreement.  Mr. Swett is not to highlight the

21   accessory minerals noted on the notice or knowledge

22   documents --

23        THE COURT:  Excellent.

24        MR. HERNS:  -- and so that was not an issue.

25        Number 5, any references to foreign regulatory

1   actions, including Health Canada, Mr. Swett has agreed

2   not to reference the Health Canada draft screening

3   assessment, nor will he reference foreign regulator

4   actions in his opening or closing.

5        Number 6, any reference to irrelevant cosmetic

6   talc products containing asbestos that plaintiff was

7   not exposed to, including Claire's makeup.  Mr. Swett

8   has stated he will not reference the FDA findings

9   concerning Claire's makeup, but we would like to be

10  able for Dr. Sanchez to give some general background

11  information about talc, not associating it with

12  Mrs. Johnson, but just give some background information

13  as to how talc is used and has been used.

14       THE COURT:  I don't have any problem with that,

15  and he did that before, so I don't think that would run

16  afoul of this.

17       MR. SWETT:  The only clarification on my agreement

18  with the Claire's and Justice, finding asbestos in

19  those products, there is one document that I'm not

20  going to move it into evidence, but I want to use it as

21  a demonstrative document.

22       As you know, there is an issue in this case.

23  Dr. Hopkins will say that the FDA doesn't regulate

24  talc; the FDA could have withdrew it if there was any

25  asbestos in it.  Well, there is an FDA document which

in and of itself is a hearsay exception. It's Statement from FDA Commissioner, Director of the Center for Food Safety and Applied Nutrition, on tests confirming a 2017 finding of asbestos contamination in certain cosmetic talc products and new steps that FDA is pursuing to improve cosmetic safety. That's dated March 2019, this year.

There are statements in this document. I don't intend to put it in front of the jury, but this just happened last Friday in a trial --

THE COURT: I haven't looked at it yet, so my ruling is going to be Claire's makeup is out. If there's some FDA document, and that FDA document is kind of late in the game, in my view, but I'll take a look at it. So I'm not going to rule on this document right now.

MR. SWETT: Right, your Honor. I just want to clarify, I did make an agreement with Mr. Herns, but it did not include what I was trying to just clarify. It didn't include being able to cross-examine Hopkins. For example, in this document, the FDA says: We don't regulate talc. We can't remove a talc product from the market if it contains asbestos.

That's directly relevant in this case. And that's the only admissions from the FDA I wanted to use with

1  Dr. Hopkins.

2       THE COURT:  I gotcha.  And that doesn't have

3  anything to do with what we've been talking about, so

4  that's fine.  We'll fight that battle when we come to

5  it.

6       All right.  Below-the-waist, I have taken that

7  out.

8       MR. HERNS:  That's been addressed.

9       Number 8, any reference to any alleged defect or

10 litigation concerning Johnson & Johnson non-talc

11 products.  We're in agreement with that, and Johnson &

12 Johnson will not reference any actions it took

13 addressing the issues with non-talc products.

14      THE COURT:  Great.

15      MR. HERNS:  Number 9 has been addressed.  That was

16 addressing plaintiff's P535, improperly going after

17 demographic characteristics.  That's the Hispanics and

18 the African-Americans.  We have already addressed that.

19      THE COURT:  Yeah, but I'm going to say this:

20 We've talked about the admissibility of that document.

21 But any reference to preying on people of color, being

22 a racist or a sexist corporation or anything like that,

23 as you know, is not something I would permit one bit.

24      MR. HERNS:  Yes, ma'am.

25      THE COURT:  So that would be way, way a bridge too

1    far.

2         MR. HERNS:  The last one, number 10, exclude all

3    internal Imerys and Cyprus documents and testimony.

4    The history is in 1988, Johnson & Johnson sold the

5    Windsor talc mines to Cyprus mines.  The mines were in

6    Vermont.  There has been no relationship between Imerys

7    and J&J.  They're distinct and separate entities with

8    their own corporate beings, and at no point has Imerys

9    or Johnson & Johnson been married at the hip.  They

10   have had no corporate relationships with one another.

11        Johnson & Johnson had no control over the input or

12   drafting of the documents that Imerys made, and they do

13   not contain any statements made by Johnson & Johnson.

14   They're internal documents of Imerys only and squarely

15   hearsay pursuant to Rule 802.  The statements do not

16   fall under any exception to the hearsay rule.  In order

17   to be a party opponent exception, it's got to be the

18   party opponent.

19        THE COURT:  I agree, and I tell you what.  I was

20   kind of nervous in the service about the Imerys and

21   Cyprus documents in Boyd-Bostic, but I justified it on

22   the basis they were a party at the commencement of the

23   trial.  And, therefore, I allowed it as party

24   opponent-type documents.  They are out now.

25        MR. HERNS:  They're out now.

1          THE COURT:  Mr. Swett.

2          MR. SWETT:  Your Honor, I've got two Imerys

3    documents, the only two that we sought to admit in this

4    case.  They fall squarely within hearsay exceptions.

5          THE COURT:  What are they?

6          MR. SWETT:  I have copies, your Honor.  I can

7    bring them up.  You have previously allowed these in.

8    P5 and P14.

9          Your Honor, I can argue the basis of admissibility

10   when you're ready.

11         THE COURT:  All right.  Tell me about it.

12         MR. SWETT:  Your Honor, Plaintiff's Exhibit 5 is a

13   lab report.  This is a dispute between -- Johnson &

14   Johnson owned Windsor Minerals.  This is when they

15   owned Windsor Minerals.  It's a dispute between Windsor

16   Minerals and the Illinois EPA.  Cyprus came in and

17   tested the mines, Johnson & Johnson's mines, and they

18   found tremolite asbestos in the mines.

19         So, one, it's offered for non-hearsay purposes.

20   It's offered for notice.  Johnson & Johnson can't say

21   they didn't have notice of this.  They were involved in

22   this dispute.  This is a dispute between their mines.

23   They certainly knew about this.

24         But, regardless, if it's hearsay, it falls

25   squarely into the hearsay exception under 803(16),

1    ancient document exception.  It's 20 years or older.

2    It's of apparent authenticity because it's right out of

3    Cyprus' files, and we have got the Cyprus corporate

4    representative, Pat Downey, who authenticates this

5    document.  We have got that deposition.  We can play

6    that deposition in court to authenticate this document

7    if we need to.

8         It's also a business record of Cyprus.  We have

9    Pat Downey admitting that in this deposition.  So this

10   document falls squarely within a hearsay exception, and

11   it's very relevant in this case because this is Johnson

12   & Johnson's mines that Cyprus found asbestos in.

13        THE COURT:  All right.

14        MR. SWETT:  The second document --

15        THE COURT:  How about 14?

16        MR. SWETT:  The second document is again an

17   ancient document, falls within 803(16), more than

18   20 years old.  It is from Imerys' files.  You know,

19   Dr. Hopkins has testified he's familiar with this

20   document.  He's been cross-examined with this document

21   multiple times now in court.  I have done it in every

22   trial I have been in.  It basically shows that they

23   were on notice that there is asbestos in the

24   Hammondsville mine and the Argonaut mine.  Those are

25   the mines that the asbestos came from for the baby

1   powder.  All we need is one hearsay exception, and we
2   have got the ancient document exception.
3        THE COURT:  So you also add to this, this was the
4   mine from which their product was sourced, and you're
5   saying that Dr. Hopkins, the corporate representative
6   of J&J, is familiar with this document and familiar
7   with the analysis contained of the material that was
8   supplied to his company from these mines?
9        MR. SWETT:  Yes, your Honor.  He's testified about
10  this document in every trial.  His response is -- he
11  has no response to the Hammondsville, but he says the
12  Argonaut mine in here, the East Argonaut wasn't the
13  mine that the talc came from.  He differentiates.  But
14  still he's familiar with this document and it falls
15  within a hearsay exception.
16       MS. BROWN:  Your Honor, if I could, there's
17  something a little bit unfair here.  He's familiar with
18  the document because plaintiff's counsel has shown it
19  to him.  This is not a document that plaintiffs have
20  any evidence that ever went to Johnson & Johnson in the
21  ordinary course.  This is a document that they have
22  taken from another company's files who is not present
23  in this case to explain or contextualize or give any
24  testimony about this document, and they put it in front
25  of Hopkins, and that's the only reason he has seen it

1  before.

2       THE COURT:  Are you saying that with respect to 14

3  and 5 or just 14?

4       MS. BROWN:  Yes, your Honor.  No evidence that

5  either of those documents ever went to Johnson &

6  Johnson.  And Imerys isn't here.  What's different

7  about this case than the Boyd-Bostic cases is no one is

8  here to get up and explain or contextualize.

9       THE COURT:  With respect to the Windsor mines, J&J

10  owned those mines, so --

11       MS. BROWN:  Up until 1989, correct, your Honor.

12       THE COURT:  Right.  So the document -- the first

13  one, P5, comes in.

14       MS. BROWN:  Understood.

15       THE COURT:  P14 --

16       MR. HERNS:  We had sold the mine in '88, your

17  Honor.

18       THE COURT:  Uh-huh.  Were you still using material

19  from that mine?  Yes.

20       MS. BROWN:  Yes, they were our supplier, Judge.

21  But in terms of the internal company documents that

22  were made after we sold it, that never went to us.  How

23  would we know --

24       THE COURT:  Well, that's going to depend on what

25  Hopkins says.  So I'm going to reserve ruling on that

122

1  one.  5 comes in.  14 is questionable.  Let's see what

2  Hopkins says.

3      MS. BROWN:  If they can lay a foundation with

4  Hopkins.

5      THE COURT:  That's right.

6      MS. BROWN:  Understood.

7      MR. SWETT:  Well, your Honor, just for

8  clarification on 14, we're not offering that for

9  notice.  That is a separate hearsay exception.  That is

10  a business record and it's an ancient document.  It

11  doesn't matter if Johnson & Johnson was aware of it.

12      THE COURT:  Yeah, but -- this Windsor mine one,

13  number 5, they owned it at that time.  It's their

14  business record.  They didn't own this mine at this

15  time.

16      MR. SWETT:  Right, but they were -- that was --

17  the talc that they were using for the baby powder was

18  being supplied from that mine.

19      THE COURT:  I understand, but did they know about

20  this report?  Was it in their records?

21      MR. SWETT:  It doesn't matter because we're not

22  offering it for notice.  We're offering it as a

23  separate hearsay exception for the truth of the matter

24  asserted that these mines did have asbestos in them.

25  We have an exception for that.

1      THE COURT:  Are you just going to get it in as an

2  ancient document?

3      MS. BROWN:  There's no foundation, Judge.  They

4  need to lay foundation for the witness.  That's the

5  problem without Imerys.

6      MR. SWETT:  I have the Pat Downey deposition.

7      MS. BROWN:  You have to authenticate.  That

8  doesn't lay foundation to use this document.

9      THE COURT:  No.  There is a difference in that.

10  All right.  But I'm not going to get into those -- I

11  have already told you what I'm going to do.  I'm going

12  to look and see what happens when we try this case.

13      5 is in.  14 is probably in, but I'll wait and see

14  what happens foundationally when we get there.

15      Okay.  So number 10, I think we have resolved all

16  we need to resolve about 10, because the two documents

17  we're talking about that 10 refers to are the ones that

18  are up here right now.

19      MR. SWETT:  That's the only ones, your Honor.

20  That's all the Imerys Bates-stamped documents that we

21  intend to --

22      THE COURT:  I gotcha.

23      MS. BROWN:  All right.

24      THE COURT:  Gotcha.  Okay.

25      Now, what else have we got, Louis, in terms of

124

1    J&J?  We got Longo.  We did omnibus and punitive

2    damages.

3         MR. HERNS:  Yes, your Honor.  That's the last one.

4         THE COURT:  Hang on.

5         MR. HERNS:  Your Honor, we're going to rest on the

6    papers for the motion to strike punitive damages.  And

7    I understand that you will bifurcate punitive damages

8    during the course of the trial.

9         THE COURT:  Right.  You got your -- your position

10   is preserved and on the record, which is that you would

11   like to strike punitive damages.  I decline to strike

12   them at this time.  I think that would be premature.

13   But I will bifurcate, just as I have done in the past.

14   That means we will not discuss anything -- the only

15   thing that will be said in the first part of the trial

16   on liability is the jury will be voir dired on the

17   verdict form and asked to -- if they find any liability

18   on the part of J&J, then they will be asked whether the

19   conduct was willful, reckless or wanton.  And if they

20   say yes to that, and only if they say yes to that, will

21   we proceed.  But they will not otherwise be instructed

22   about punitive damages and everything.

23        You are very familiar with that methodology.  And

24   that's how I will do it.  And to the extent you want

25   something further, you put it in this motion.  Your

1  position is protected.

2        MR. HERNS:  Thank you, your Honor.

3        THE COURT:  All right.  So we have got that.

4        Now, have we done everything in J&J?

5        MR. HERNS:  I believe so, your Honor.

6        THE COURT:  Now, y'all have got -- Louis has

7  supplied me with a trial -- a confidential trial memo

8  and verdict form and --

9        MR. HERNS:  Voir dire.

10       THE COURT:  -- voir dire.  And I'm not going to go

11  through all the voir dire right now.

12       Y'all are very familiar with how I charge these

13  things.  We will try to have a little charge conference

14  before we get started here.

15       Thank God we're trying this thing in Richland

16  County, due to my years, but it will be quick because

17  y'all pretty much know what I do about voir dire.

18       Plaintiff has submitted more detailed voir dire

19  where they want me to pin the jury down on their

20  attitudes about whether they could find a company like

21  J&J -- whether they believe that they could ever find

22  if they had asbestos in their baby powder and this kind

23  of thing.  I don't get that specific and try to nail a

24  jury down.

25       As both sides know, I will try to ask them some

126

1  general questions to determine whether or not they can

2  be fair.  And I will have those up for y'all and Walker

3  will distribute them to you before we select the jury.

4  I try to get them out to you by e-mail.  And then if

5  y'all have got some heartburn about them, you can take

6  a look at them, and we can talk about them before we

7  select the jury.

8      What else do we need, Mr. Swett?

9      MR. SWETT:  I have two more issues.  May I just

10  approach with our pretrial materials?

11      THE COURT:  Yes, sir.

12      MR. SWETT:  I've got plaintiff's final witness

13  list, plaintiff's proposed voir dire, plaintiff's page

14  and lines, our final exhibit list, and our verdict

15  form.

16      THE COURT:  Wonderful.  And thank you for giving

17  me a hard copy.  I saw them in your e-mail.

18      And can I depend upon you, Louis, to get me that

19  material, or is it in what you handed me?

20      MR. HERNS:  Yes, ma'am.  I will get you that

21  material and have it ready to go, probably send it to

22  you this week.

23      THE COURT:  Okay.  Now, I'm looking at this final

24  witness list and -- well, it looks like you're staying

25  within the lines that we talked about, Mr. Swett,

1    numbers-wise and time-wise.

2        I'm going to be a little fiercer than I've been in

3    the past about keeping everybody to timelines and, you

4    know, trying to move this thing along.  As you-all

5    know, you don't have a three-week judge and you don't

6    have a four-week judge.  You've got a two-week judge.

7    And I feel fully confident that we will get this matter

8    resolved in that time frame, if by any chance a miracle

9    does not occur and y'all settle this case.

10       MR. SWETT:  There's one issue that sort of relates

11   to that that we have been trying to work on is -- you

12   know, if you remember the last trial, we had some

13   admissions that you allowed us to play so that we don't

14   take so long with Dr. Hopkins.  They agreed to those,

15   you know, short video clips, and we agreed to let them

16   bring Dr. Hopkins out of turn and put him -- basically,

17   do their direct of him in our case, and then we

18   cross-examine him one time instead of calling him as an

19   adverse witness, then putting him up in our case and

20   cross him.

21       So we're trying to work on that.  I think he's

22   available Thursday.  We would be willing to allow them

23   to put him on the stand out of turn with an instruction

24   to the jury very early on Thursday.  They do their

25   direct, we'll cross him, we'll finish Hopkins on

1  Thursday.

2      THE COURT:  That's great.  I think that makes a

3  lot more sense, and I certainly think it makes more

4  sense to the jury when you do it that way.

5      MS. BROWN:  And the only reason I haven't

6  finalized that with Mr. Swett, we're waiting to confirm

7  with Dr. Hopkins himself, but we believe that will be

8  the day.

9      THE COURT:  That would be highly satisfactory if

10  it can be done that way.  Okay.

11      MR. SWETT:  The only other issue, your Honor, I

12  think -- you know, we're trying to streamline

13  everything today so we don't have to worry about it at

14  trial.  We had a list of documents we're seeking to

15  preadmit.  I don't know if I gave a copy of that.

16      THE COURT:  Yes.

17      MR. SWETT:  I think there's only a handful of

18  objections.  If we can go ahead and maybe rule on those

19  and I can put that in the record so we have all that

20  straightened out.

21      THE COURT:  All right.  I'm looking at it.  So

22  which ones have we got any dustup about?

23      MR. SWETT:  I don't know yet, but as they're

24  announced, I can give you a copy.

25      MS. BROWN:  So, your Honor, the first one to

1    address is Plaintiff's Exhibit 31.

2         THE COURT:  Hang on.  Plaintiff's Exhibit 31.

3         MS. BROWN:  Two brief objections to this document.

4         Number one, this document is not complete.  And so

5    what you're seeing is something that was taken out of a

6    much larger 20 or 25-page document.

7         And so I object, one, on the fact that it's not a

8    complete document.  But, two, what the entire document

9    makes clear is that this is a document about mines in

10   Korea, India, Brazil, Austria and Kashmir that were

11   used to supply other places around the world and have

12   no bearing on the issues in this case regarding U.S.

13   talc.

14        And so I would submit, one, it's incomplete, and,

15   two, there would be an attempt by plaintiffs to use

16   what they're saying about these other worldwide sources

17   to mislead or confuse the jury that that had anything

18   to do with what was going on in Vermont and Italy.

19        MR. SWETT:  Your Honor, this document applies

20   worldwide.  They're saying worldwide.  They even

21   reference their Windsor mines.  As this document --

22   Hopkins has laid the foundation that this document is

23   from 1978.  In 1978, they had, quote, no control system

24   to prevent asbestos contamination at levels detectable

25   by TEM in our finished product worldwide.

1      MS. BROWN:  And, your Honor, that is just belied

2  by --

3      THE COURT:  Well, here is what the thing says:  65

4  percent of our product worldwide is made from U.S.

5  sourced, Windsor mine, WMI, talc.

6      And then it goes on:  In the U.S., and Italian

7  sourced talc, we have excellent long-term audit

8  information.

9      So I think this document speaks for itself.  I

10  think it's got something in it for both sides.  I will

11  overrule the objection.  It's admitted.

12      MS. BROWN:  And, your Honor, can it be admitted in

13  its complete form?  We're missing, like, 25 pages.

14      THE COURT:  If y'all want to junk up this record

15  with something the jury is not going to read, you can

16  do that, but I'm not dealing with that right now.  I'm

17  just dealing with this.  This comes in.  Y'all can

18  decide what you want to do with the rest of it.

19      MS. BROWN:  I understand, Judge.

20      The next one would be Plaintiff's 87.

21      THE COURT:  87?

22      MS. BROWN:  Yes, Judge.

23      THE COURT:  All right.

24      MS. McVEY:  Chief Justice, may I interrupt for

25  just a second?  Are you going to take a lunch break

1  before we reach Sizemore, do you think?  I'm just

2  wondering if --

3          THE COURT:  Yes, I have to.  I'm sorry.

4          MS. McVEY:  That's all right.  You-all can keep

5  going.  I just want to know if the rest of us can sneak

6  out.

7          THE COURT:  Well, yeah.  What time is it?

8          MS. BROWN:  12:15.

9          THE COURT:  Oh, man.  How many have we got?

10          MR. SWETT:  It looks like only four or five, your

11  Honor.

12          THE COURT:  We will be back here at 2:15 or

13  thereabouts.

14          MS. McVEY:  Yes, ma'am.  Thank you.  Sorry for the

15  interruption.

16          THE COURT:  All right.  Keep going.

17          MS. BROWN:  Plaintiff's 87.

18          THE COURT:  All right.  I got it.

19          MS. BROWN:  My objection here, your Honor, has to

20  do with a little bit of what we discussed this morning,

21  which is this idea of other injuries not involving

22  those claimed in this case.

23          And so what this document clearly, by the subject

24  line, is talking about is the risk of aspiration in

25  kids.  And what happened around this time, 1966, there

was an issue with the cap on baby powder, and it led to
two changes:  One, a warning went on the product about
children dumping it close to their face and they could
choke, and two, J&J changed the top to make it safer
for kids.  But the prejudice of using this document to
suggest that talc is dangerous when it talks about
something completely different that's not at issue in
this case, and therefore we object on the prejudice
grounds and irrelevant.

THE COURT:  Overruled.  Admitted.

What's the next one, Mr. Swett?

MS. BROWN:  I had two objections, your Honor, to
the Blount article.  I understand your Honor's prior
ruling is that the article itself goes back to the
jury.

THE COURT:  What exhibit is it?

MS. BROWN:  I have two.  And what Mr. Swett
identified is 157 and 158.

MR. SWETT:  This is the Blount article from
Johnson & Johnson's own files with the cheat sheet on
the back, your Honor, the key.  They want to keep it
out.

THE COURT:  All right.  And it's got that key that
everybody keeps worrying about.  I understand the
objections.  Overruled.  Admitted.

133

1        MS. BROWN:  And, your Honor, on 158, it also has a

2   Cyprus fax, which would be another basis of the

3   objection on 158.  Looks like there is a fax contained

4   in the back, which I would object to as hearsay.

5        THE COURT:  Overruled.  Admitted.

6        MS. BROWN:  Along those same lines, 361, objection

7   on hearsay to a letter from Alice Blount.

8        THE COURT:  I remember that one.

9        Overruled.  Admitted.  I mean, frankly, the best

10  thing you've got going for you is that video, they feel

11  like they've got to play it.  She doesn't come off very

12  good on that one, so y'all have a little on your side.

13       MS. BROWN:  Yes, Judge.

14       Final, Judge, would be 413.

15       THE COURT:  Which one?

16       MS. BROWN:  413.

17       I just don't -- I don't know if this is something

18  Mr. Swett printed off the Internet.  This has never

19  been authenticated.  I just don't even know what it is

20  or what it purports to be.

21       MR. SWETT:  Your Honor, if you look at the bottom,

22  this is --

23       THE COURT:  This is USGS.

24       MR. SWETT:  -- self-authenticating, specific

25  hearsay exception for a governmental document.  It's

1  relevant because it shows that -- I think this is the

2  one that shows occurrence of asbestos in the Vermont

3  talc mines.  And Dr. Sanchez will testify all the

4  Vermont talc mines, the mineralogy is similar.  So the

5  fact that they found anthophyllite asbestos here in the

6  Vermont talc mines is definitely relevant in this case.

7        MS. BROWN:  Just for the record, this is the

8  Chester talc mine.  No question in this case the

9  Chester talc mine was ever used for cosmetic talc, and

10  I would object on the prejudice of attempting to

11  suggest this stands for something that's not at issue

12  in this case.

13        THE COURT:  I understand that this is being

14  offered because of the testimony of Dr. Sanchez, who is

15  a principal witness of defense.  Dr. Sanchez is going

16  to testify, just like he has when I've heard him

17  before, that all these Vermont talc mines are of the

18  same composition, and they want to introduce this USGS,

19  that is, U.S. Geologic Survey, Department of the United

20  States Government, document to show that there is

21  anthophyllite asbestos and questionably actinolite

22  asbestos in the Carleton quarry, which is one of the --

23  which is the Chester talc mine.  And it's in Windsor

24  County, Vermont, like the Windsor talc mine is, so they

25  are introducing it for that purpose.

1        I consider that an appropriate purpose, and I will

2    overrule the objection and admit it.

3        MS. BROWN:  Understood, your Honor.

4        That's all the objections.

5        MR. SWETT:  So just for the record, your Honor, I

6    have a document that's entitled "Plaintiff's Exhibits

7    Pre-Admitted" that I'm going to mark maybe or add to

8    the record.

9        And just for the record, all of these are admitted

10   by consent with the exceptions of P5 was admitted over

11   objection, P31 was admitted over objection, P87 was

12   admitted over objection, P157 was admitted over

13   objection, P158 was admitted over objection, P361 was

14   admitted over objection, P14 the Court is reserving

15   ruling on, and the remaining approximately 65 exhibits

16   have been pre-admitted by consent.

17       Is that correct?

18       MS. BROWN:  Correct.

19       MR. SWETT:  I'll mark this as an exhibit when I

20   get a clean copy, your Honor.

21       THE COURT:  Mine are going to reflect that same

22   thing now.

23       Okay.  Is that it?

24       MS. BROWN:  Yes, your Honor.

25       THE COURT:  Are we done with J&J?

1      MR. SWETT:  Do we happen to know which courtroom

2  we're going to start in, your Honor?

3      THE COURT:  I will find that out, and hopefully I

4  will do a better job of finding that out and not lead

5  you astray, because you will want to work through Jim

6  Truitt to get set up the way you'd like to be set up.

7      Thank God this isn't Darlington County anymore.  I

8  think we'll have an easier time of setting up the

9  technology, and certainly facility-wise it's going to

10  be easier by far than what we dealt with with those

11  poor people in Darlington that still don't have a

12  decent courthouse.

13      MR. SWETT:  I apologize, one really last issue.

14  We don't have to deal with it now, but I want to raise

15  it.  We had filed way back when -- I'll get you the

16  exact date.

17      March 20th we filed in the Devay and Dupree cases

18  motion to consolidate.  Johnson & Johnson replied to

19  those motions on April 16th.  So that is ripe.  And I'm

20  not going to argue the motion right now, but I did

21  anticipate that maybe we would argue it today because I

22  don't know if we have another opportunity before the

23  July trial, especially in light of the fact that they

24  removed all those cases saying they were similar enough

25  to be overseen by one judge.

137

1          THE COURT:  Yes, I saw your comment on that.  And

2     I think, in fairness to J&J, that deserves some

3     ventilation.  And we'll try to figure out a time to

4     make that happen before any July trial on it, although

5     I am very attracted to the idea of consolidation, as

6     y'all know.  But I want them to be fully heard about

7     that, so we'll figure out a time convenient to all to

8     make that happen.  And I'm not going to make any

9     prejudgment about these cases until I have taken a look

10     at them and given -- J&J just filed something with me,

11     didn't you, Louis?

12          MR. HERNS:  Yes, ma'am.

13          THE COURT:  On opposing consolidation.  I want to

14     have a chance to look at that, and then we'll schedule

15     some time to deal with that.

16          MR. SWETT:  Thank you, your Honor.

17          MR. FINCH:  Thank you, your Honor.

18          MS. BROWN:  Thank you, your Honor.

19          THE COURT:  Okay.  And where would we consolidate

20     them?

21          MR. SWETT:  Your Honor, they are both pending in

22     the same venue, Charleston County.

23          THE COURT:  Okay.  Just to give me some kind of

24     heads-up as to what I would be looking at if I did and

25     how that could work down there.

138

1        MR. HERNS:  July in Charleston is not a good

2   thing.

3        THE COURT:  It's good for me because that's when I

4   start going to the beach for about a month, my beach

5   out at IOP, so I love it.

6        Okay.  We'll come back on the rest of Sizemore and

7   Hopper.

8        Are there Hopper folks that are still here?  Okay.

9   I haven't forgotten about you.  We're going to get to

10  you, I promise.  All right.  Thank you.

11        (Lunch recess taken from 12:25 p.m. to 1:27 p.m.)

12        THE COURT:  Are we ready to proceed on Sizemore?

13        MS. McVEY:  Yes, ma'am.

14        THE COURT:  We have dealt with the motion for

15  summary judgment, so now we're to plaintiff's motions

16  in limine; am I right?

17        MS. McVEY:  Yes, your Honor.

18        THE COURT:  Plaintiff's motion in limine number 1,

19  collateral source.

20        MR. McLEOD:  Is this the omnibus motion?

21        THE COURT:  Yes.

22        MR. McLEOD:  Your Honor, just to make things a

23  little simpler, we will stipulate to 1, 2, 3, 4, and

24  10.

25        MS. McVEY:  And 10?

1          THE COURT:  And 10?

2          MR. McLEOD:  (Nods head.)

3          THE COURT:  All right.  So that was number 5, that

4    any corporations which once made, manufactured, sold or

5    distributed asbestos are in bankruptcy.  I would grant.

6          What's the problem?

7          MR. McLEOD:  It's the same as it always is.  We

8    agreed not to use the term bankruptcy, but to the

9    extent that there's any -- we have some affidavits to

10   bankruptcy trust in this case that we --

11         THE COURT:  I gotcha.  Well, overruled.  Granted.

12         All right.  Any reference to any rulings by

13   another court on the scope of admissibility of

14   testimony of any witnesses.

15         Why aren't we granting that, Mr. McLeod?

16         MR. McLEOD:  Your Honor, same as we always do,

17   just to the extent that they open the door to it to

18   bolster the credibility of their own witnesses, we

19   would --

20         THE COURT:  Well, they're not going to do that.

21   They're going to qualify them as an expert, so it's

22   granted.

23         Any questions to experts to define causation.  I

24   would grant that.  We don't ever let the experts give

25   the instructions to the jury, but we do allow them to

1  testify as to causation.  That's what experts do.  So

2  that's granted.

3      Any mention or reference to the other defendants

4  not present sued by the plaintiff.  That's the *Smith*

5  *vs. Tiffany* issue that we continue to be in

6  disagreement about.  Granted.

7      MR. McLEOD:  As long as it's on the record that

8  it's over our objection.

9      THE COURT:  Over your objection.  No question

10  about it, Mr. McLeod.

11      Felonies and convictions not involving dishonesty

12  or moral turpitude.

13      MR. McLEOD:  We have actually got a larger stand

14  on its own motion on this, so I suggest we wait, pass

15  on this.

16      THE COURT:  Just defer on this.

17      All right.  Past alcohol use, we have agreed.

18  Tobacco use or smoking.  Well, he smoked.  I don't

19  allow them to ask questions about, hey, you didn't obey

20  the warnings on cigarette packages, so no warnings

21  wouldn't be any good.  I know y'all would like to

22  pursue that.  I would grant.

23      MR. McLEOD:  Over our objections, of course.  We

24  think we should be allowed to go into that.  And to the

25  extent that tobacco use goes to life expectancy, it's

1 relevant to the case.

2     THE COURT:  I agree.  I understand your argument,

3 and I will grant the motion.

4     Other nonlife-threatening medical conditions.

5 There isn't any person who will testify that any of

6 this other stuff caused his death, so I would grant.

7     MR. McLEOD:  Over objection.

8     THE COURT:  Over objection.

9     Asbestos generally as the cause of Mr. Sizemore's

10 mesothelioma.  That's what the experts say.  That's

11 what the medical experts say.

12     MR. McLEOD:  Well, your Honor, that's not

13 necessarily true, but in this case, I don't believe

14 that we're contesting the diagnosis.

15     THE COURT:  Okay.  Very good.

16     Any mention of asbestos use being patriotic,

17 winning the war.  Well, nobody has ever done that.  I

18 would grant that.

19     And any mention of any asbestos-related lawsuit

20 filed by the decedent of the plaintiff.  Well, Smith

21 and Machin govern that.  I know the defendants

22 disagree.  I would grant over their objection.

23     MR. REID:  Your Honor, if I may just touch on that

24 one.

25     THE COURT:  Certainly, Mr. Reid.

1    MR. REID:  And we can wait until trial to craft

2    how we do this, but Mr. Sizemore did have a 2000 or

3    1999 asbestosis suit.  And we don't need to go into the

4    details there, but the testimony will be used.

5    THE COURT:  Testimony can be used.  We always

6    figure out a way to do that that masks any reference to

7    other litigation.  But I'm certainly not going to

8    preclude the use of testimony that's under oath from

9    him even if it was in another matter.  That can be

10    done.

11    MR. REID:  Thank you for the clarification.

12    THE COURT:  All right.  That's the first one.

13    Then this is number 2, plaintiff's motion in

14    limine to exclude evidence defendant lacked knowledge

15    asbestos caused mesothelioma.

16    What are we talking about?

17    MR. McLEOD:  Are you going to go?

18    MR. BRANHAM:  I'm happy to follow you.

19    MR. McLEOD:  This is the same motion.  This was

20    filed in, Taylor, Jolly, Waters, Glenn.  The Court has

21    routinely rejected this.  Whether or not these

22    defendants were aware goes directly to the facts of

23    case.  It's a question of fact for the jury.

24    MR. BRANHAM:  Over our objection, your Honor.

25    THE COURT:  All right.  Denied over their

143

1  objection.

2       Three.

3       MR. REID:  Your Honor, just -- counsel and we

4  agreed we would keep it short.  I think most of these

5  are offered by the Court's past rulings, and this is

6  one I think the parties will agree that we're not

7  contesting compliance with OSHA is conclusive.  We're

8  contesting it's relevant, and I think they will rely on

9  their brief.

10      MR. BRANHAM:  True.

11      THE COURT:  So --

12      MR. REID:  The Court has permitted this in the

13 past.

14      THE COURT:  Yes, that's correct.  So I deny.

15      Four, plaintiff's motion in limine to exclude

16 improper comments and questions by defendants and their

17 witnesses.  All those things are things I would not

18 allow.  Background asbestos is fine, but none of the

19 specifics about them breathing it, there's asbestos in

20 the courtroom, you have it in your lungs, at risk,

21 fibers in common household products.  I would grant

22 with regard to that.

23      Five.

24      MR. BRANHAM:  They just have to have evidence of

25 what they're going to say?

1      THE COURT:  Yeah, you will make an offer of proof.

2   So granted, which simply means that they are not

3   precluded, but they have got to make an offer of proof

4   that shows that they've got --

5      MR. BRANHAM:  There's going to be plenty of

6   evidence of other asbestos.

7      MR. McLEOD:  It's not really an issue.

8      THE COURT:  No big deal here.

9      Six.

10      MR. REID:  I think this is one you routinely

11   denied, your Honor.

12      THE COURT:  That's right.  Denied.  They want to

13   exclude unduly speculative and unreliable opinion

14   testimony related to evidence.  And the kind we're

15   talking about is the reconstruction, safe level,

16   potency, literature.

17      Seven.

18      MR. BRANHAM:  Judge, this is one we actually do

19   disagree about and we need to argue about a little bit.

20      So the motion here is to exclude criminal history

21   of Mr. Sizemore.  To just give you a little bit of

22   background, as the Court knows, Mr. Sizemore was

23   deposed over a total of about ten days.  He was asked

24   on a couple of different occasions, if memory serves,

25   whether he had been convicted of anything.  And he

145

1    actually said yes to a number of things.  I think one
2    was assault and that sort of thing.

3         Then there was -- and I think it was right at the
4    end of the deposition where he was asked if he had ever
5    been convicted of conspiracy.  And he said no, and he
6    was adamant about it.  And the defendants had some
7    record that they showed him and he again denied it.

8         And so just for completeness sake, and I
9    understand it's not in the record, but what Calvin told
10   me was, he said, I think that was my brother, but it
11   was not me.  I mean, he was very serious about it not
12   being him.  And the fact that he had admitted to other
13   criminal convictions in the past I think lends some
14   credibility to that issue.

15        But now what they're trying to do is somehow say,
16   well, he was convicted of a conspiracy, he didn't admit
17   it, we ought to be able to get that in in order to make
18   him look like a bad guy.

19        I don't think that's what the law of South
20   Carolina says.  First of all, a conviction, as I
21   understand it --

22        THE COURT:  It was more than ten years old?

23        MR. BRANHAM:  It was more than ten years old.  And
24   also conspiracy has not been defined as a crime of
25   moral turpitude.  And so I think you have those two

1   things.  And even if either one or both of those things

2   was not true, I think the Court still has the

3   discretion to look at it and say, is this relevant to

4   anything?  Does it make him -- should it be admitted?

5   Is it more prejudicial?  And I think it's clearly more

6   prejudicial, particularly when he was willing to admit

7   his other issues.

8           THE COURT:  Mr. McLeod.

9           MR. McLEOD:  I'll take this one, your Honor.

10          We disagree with the plaintiff's take on it.

11  First of all, it was conspiracy to obtain prescription

12  drugs.  And it is inherently dishonest, so we disagree

13  entirely on their analysis that this particular

14  conspiracy doesn't involve dishonesty.

15          Importantly, the records that we have obtained say

16  that it happened in 1996.  And in his deposition just a

17  few years later, he denied it but then later admitted

18  to it.  And the same thing happened in the most recent

19  2016 depositions.

20          So not only does the actual conviction itself

21  represent dishonesty in the type of conspiracy that it

22  was, we're able to use this to impeach his telling the

23  truth in his deposition, which is inherently so

24  important in this case given all of the incredible

25  testimony that Mr. Sizemore gave.  It just doesn't make

1    any sense, okay.  He testified to being exposed to

2    insulation from a boiler the same year of this

3    conviction.  The boiler wasn't even installed until

4    '86.  And the record is replete that he was aware of

5    asbestos and the dangers of asbestos in the '80s.

6         So his credibility is at the heart of this case.

7    Not only is it admissible because it's a crime

8    involving dishonesty, it's also admissible because he,

9    right there in the deposition, he didn't tell the truth

10   about it.  Or his statements are inconsistent, and

11   pursuant to, of course, Rule 32, we can use the

12   deposition for any purpose to impeach him on his

13   credibility.

14        So we think that this is not sort of the normal

15   situation because he wasn't -- according to the

16   transcripts, he wasn't honest in his deposition.  And

17   given that we're talking about testimony, his testimony

18   is critical to the products that he's identified, the

19   products in our case that he hasn't identified, and so

20   his testimony is critical.

21        So because of that, the credibility of that

22   testimony is really outweighed by any prejudicial --

23   prejudice that it may cause to the plaintiffs.  That's

24   our position.

25        MR. BRANHAM:  Judge, again, I mean, I understand

1    why Mr. McLeod wants to use it, but I don't think

2    wanting to use it is good enough to be able to use it.

3    Right?

4        What he's trying -- I mean, in fact, when you

5    listen to what he says, he wants to be able to say our

6    client wasn't telling the truth when he said he didn't

7    remember Crosby products.  So is that what we're trying

8    to do here?  Because that doesn't make any sense.

9        But at the end of the day, we're more than ten

10   years old.  The records in this case about where he

11   worked and what he worked on and things that he did

12   match up.  So there really isn't the indicia of

13   untruthfulness to Mr. Sizemore.

14       He admitted to prior crimes.  He said he didn't,

15   and I agree that it is inconsistent.  So now the

16   question for the Court is:  Is it something that should

17   be admitted because it is not unduly prejudicial?  It's

18   your decision.  You have the discretion to make this

19   decision, and I think if you look at the overall

20   prejudice from bringing in a conviction that he did

21   deny but isn't relevant to anything that's going on,

22   and there is nothing in South Carolina law that

23   establishes conspiracy as a crime of moral turpitude,

24   which is what's required in order to admit the

25   conviction.

1        THE COURT:  All right.  I'll grant it over

2   objection.

3        Nine -- 8, exclude reference to his children's

4   criminal history.

5        MR. McLEOD:  We responded to both of those motions

6   together, your Honor.  Our argument was strongest for

7   Mr. Sizemore because he was inconsistent in talking and

8   admitting he was arrested.  So I presume if you denied

9   the first, you're going to -- or grant the first,

10  you're going to grant the second but over our

11  objection.

12       THE COURT:  Granted over defendants' objection.

13       MR. BRANHAM:  Judge, this next one is corporate

14  representative hearsay.  I know we have talked about

15  this before, but there is -- I want to -- there's been

16  something that's come up in discovery that I just want

17  to point out to your Honor about why this is a proper

18  motion.

19       So Mr. Martin, who is Crosby's corporate

20  representative, has been testifying for a long time in

21  many cases saying:  We were competitors with

22  Consolidated valves.  We didn't use their valves and we

23  didn't sell their valves, and whatever they said to do

24  with their valves is different than what we did with

25  our valves.  And this comes down in large ways to

1  whether you insulate the valves or not.

2       So we found a sales record demonstrating that

3  Foster Wheeler, which is a boiler manufacturer, was

4  purchasing Consolidated safety relief valves from

5  Crosby, which is directly contradicted by what

6  Mr. Martin has been testifying to in case after case

7  after case.  He says it never happened.

8       And so now we know that to be untrue, that it, in

9  fact, did happen.  And this is the reason why corporate

10 representatives cannot come to court and talk about

11 things about which they have no personal knowledge,

12 because he doesn't know.  He just has learned that they

13 never sold Consolidated valves.  Turns out that's not

14 true.  And then when you confront him about it:  Now

15 you agree you were selling Consolidated valves, right?

16 Because we have these invoices that shows you were.

17      And he's like:  Well, I've never seen -- that's

18 the first time I've ever seen that, and I certainly

19 can't agree that as a matter of -- of course we were

20 doing it.  Right?

21      So unless I can prove in every instance for every

22 year and every day of every year, he's never going to

23 admit that Crosby was selling Consolidated valves when

24 I have some evidence that they were and he has no

25 personal knowledge that they were not.

1       And so this is exactly the type of thing that

2   we're trying to get at with a corporate hearsay rule.

3   And you granted this before.  This is not a new motion.

4   But he has to come here with personal knowledge.  He

5   can't just make it up any more than Mr. Sizemore could

6   do it.

7       MR. REID:  Your Honor, I was prepared before I

8   heard those specific comments to say something to the

9   effect that at the Glenn trial, we had no issue ever

10  arise in this respect with Crosby.

11      THE COURT:  That's correct.

12      MR. REID:  And I think it's best handled on a

13  question-by-question basis at trial.  Even in light of

14  those comments, my position remains the same, and I

15  think the Court would be well advised to look at that

16  exhibit when it has a chance to see it.

17      What it is, is a purchase order from somebody else

18  from 1952 which uses the name Consolidated.  I don't

19  know if it's because whoever wrote the purchase order

20  to Foster Wheeler is treating it like Kleenex or

21  something interchangeable with a Crosby valve, which is

22  elsewhere described on that invoice.

23      There's absolutely no proof that we ever had a

24  relationship with Consolidated.  Mr. Martin has been

25  with Crosby since 1972 or '74.  I can't remember

152

1    exactly the year he started, but he will testify:  In

2    my term with the company, we've never had a

3    relationship with Crosby, and I think -- with

4    Consolidated.  And I think it's best for the trial --

5    for the Court to hear that in context, hear it in the

6    context of the larger testimony which is given and make

7    a ruling on that sort of specific point at trial.

8         So this is one I would respectfully say either it

9    be denied and the Court can handle on it a

10   question-by-question basis, and if things pan out like

11   they did --

12        THE COURT:  Well, this is targeted to a particular

13   issue, so I'll defer and look at the document before I

14   make a ruling on it.  If it was kind of a generalized

15   thing, I would stick with what I've done in the past,

16   but you're talking about something very specific.  So

17   let's just take a look at it.  I'm fine with that,

18   Mr. Reid.

19        MR. BRANHAM:  Thank you, your Honor.

20        MR. REID:  Just to jump to number 10.

21        MR. BRANHAM:  I don't think it's an issue.

22        MR. REID:  We're not going to go there.

23        THE COURT:  Withdrawn?

24        MR. BRANHAM:  Yes, your Honor.

25        THE COURT:  Number 11.

153

1      MR. BRANHAM:  Judge, I don't think there is a

2 number 11.  I think that's it.

3      THE COURT:  This is an easy way to do it, just to

4 list the rulings that were made in these other cases.

5      Do we simply want to put that in the record and do

6 it that way?

7      MR. BRANHAM:  I think that's fine.

8      MR. McLEOD:  I don't know what she's looking at.

9      MS. McVEY:  It's the list of prior rulings.

10      MR. McLEOD:  Did I get that?

11      THE COURT:  If you will look on the index to

12 motions in limine briefly ruled on by the Court in

13 prior cases, this is strike punitive damages from

14 plaintiff's complaint or bifurcate, is the first one.

15      Of course, I always bifurcate in the way that I

16 have enunciated.

17      MR. McLEOD:  Your Honor, I hate to do this, but I

18 really think we need to go through each one and get the

19 objection on the record.  It won't take long.

20      THE COURT:  I'm going to bifurcate.  Are you going

21 to object to that?

22      MR. McLEOD:  To the punitive damages phase?  No,

23 your Honor.

24      THE COURT:  Second one is voir dire.  I'm not

25 going to allow direct voir dire examination.

154

1          MR. McLEOD:  We --

2          THE COURT:  Are you asking for direct voir dire

3    examination?

4          MR. McLEOD:  Your Honor, we would like to submit a

5    few questions for the Court to ask.

6          THE COURT:  That's not what we're talking about

7    here.  We're just talking about whether you -- the

8    lawyers have finally given up on that because they

9    understand South Carolina doesn't do that except in

10   death penalty cases and then in a very limited way.

11         This is asking the lawyers be allowed to directly

12   voir dire the jury.  I have always denied that, and

13   that's what this is about.

14         MR. McLEOD:  Are you -- just so I'm clear, are you

15   looking at the submissions on Ms. McVey --

16         THE COURT:  I'm looking at the plaintiff's

17   notebook here.  That's what I started out.

18         MR. McLEOD:  I don't have that in front of me.

19         MS. McVEY:  Yancey, I can give it to you.

20         MR. McLEOD:  This is our motion in limine.

21         THE COURT:  I haven't gotten to yours yet.

22         MR. McLEOD:  Yes, ma'am.

23         THE COURT:  I haven't gotten to yours yet.  I'm

24   starting with the plaintiff's.  And if you will look at

25   number 11 on page 2, which is where we are now, voir

155

1    dire.  See number 2?

2        MR. McLEOD:  Yes, ma'am, I see it.

3        THE COURT:  These were two defendants who wanted

4    to directly voir dire potential jurors.  I deny that.

5        MR. McLEOD:  I'm not -- yes, your Honor.  I

6    understand.  We didn't --

7        THE COURT:  She's just going down.  She goes down

8    all of them.  Some she loves; some she doesn't love.

9    This one she doesn't love.  Plaintiffs always want to

10   directly voir dire the jury.

11       MS. McVEY:  That is true.

12       THE COURT:  I don't allow it for the plaintiffs.

13   I don't allow it for the defendants.

14       MR. McLEOD:  I don't believe we asked for that in

15   this case, Your Honor.

16       THE COURT:  Three, knowledge of trade

17   organizations.  I always allow that.  Y'all don't like

18   it.

19       All right.  So I deny any motions that seek to

20   preclude argument on the imputation of knowledge of a

21   trade association to a defendant.  I always allow

22   information about what trade -- the positions that

23   trade associations took, as you know.  And y'all always

24   object to that, and you can preserve your position on

25   that right now.

1      MR. McLEOD:  Sure, over our objection,

2 particularly when there's no evidence that the trade

3 organization had anything to do with our company or we

4 had knowledge.

5      THE COURT:  I understand all that.

6      MR. McLEOD:  Thank you.

7      THE COURT:  Setoff settlements, number 4.  I

8 always deny any motions about setoff.  I'd rather

9 handle those post-trial by enforcing the provisions of

10 the Contributions Among Joint Tortfeasors Act of South

11 Carolina.  So I don't do any separate determination

12 before trial starts in that regard.

13      MR. McLEOD:  Yes, your Honor.

14      THE COURT:  And I don't think y'all have any

15 problem with that.  I think everybody prefers to have

16 it done that way.

17      MR. McLEOD:  I think our motion that we made

18 stands on its own.

19      THE COURT:  To publish the pleadings.  Of course,

20 I always deny defendants' motions to publish the

21 pleadings to the jury because I think it is a backdoor

22 way of violating the provisions of *Smith vs. Tiffany* by

23 naming parties who are no longer parties to the

24 litigation because they settled or were dismissed.

25      And you object to that, so it's over your

1    objection.

2           MR. McLEOD:  We object to that.  In this case,

3    your Honor, in particular, he had a separate claim in

4    1999 that we believe ought to be able to be commented

5    on.

6           THE COURT:  Right.  And I think we settled that

7    hash some time ago.

8           MR. McLEOD:  Over our objection.

9           THE COURT:  Over your objection.

10           Governmental regulatory agencies.  This is to

11    preclude experts from testifying about what the EPA and

12    OSHA and all those governmental agencies have to say.

13    And I, of course, always allow that information to come

14    into evidence.  So I deny any defense attempt to

15    preclude reference to governmental regulations.

16           Reptile and the Golden Rule.  I always grant

17    defendant's motions to prevent any use of Golden Rule

18    or reptile arguments, anything of that nature.

19           MS. McVEY:  Your Honor, I understand the Golden

20    Rule.  And, of course, we're not going to do that, but

21    I think sometimes defendants think that reptile extends

22    to conversations and questions to the corporate

23    representative about safety, about protecting workers,

24    about that kind of thing.  I think --

25           THE COURT:  It doesn't extend to that.  The

158

1   reptile theory is an attempt to get the jury to place

2   themselves in the footprint of the plaintiff in the

3   action and ask the juror to be afraid or take a

4   community collective action, things of that nature.

5   That's what the Golden Rule is about.

6       The Golden Rule is not about knowledge and

7   activity of a corporate defendant in the face of

8   knowledge about a known danger.  It doesn't extend to

9   that kind of thing, but it -- the reptile is just a

10  synonym for Golden Rule, as far as I'm concerned.

11      And, of course, I grant all defense motions to

12  enforce the Golden Rule and not allow any reptile

13  arguments.

14      MR. McLEOD:  Your Honor, and I think the question

15  about, you know, safety such --

16      THE COURT:  Safety is a different issue.

17      MR. McLEOD:  The end user, and maybe our

18  employees, but when they start doing it geared to the

19  general public, I think it gets into --

20      THE COURT:  No, they're very well aware of that.

21  I haven't had plaintiffs do anything about saying

22  you've got to be the voice of the public and you've got

23  to ensure that you as the jury will protect the public.

24  That doesn't happen in our trials, and it won't happen

25  in this one.

1          Diseases other than mesothelioma.

2          Mr. Branham.

3          MR. BRANHAM:  Judge, this is the issue of when

4     they knew about asbestosis and the harm it can cause

5     and how it relates to the knowledge of hazards of

6     asbestos throughout history and knowing about the

7     hazards of asbestos and that it can create the disease

8     asbestosis is certainly relevant in proving the

9     knowledge of the hazards of asbestosis.

10         THE COURT:  Right.  In the past, I have denied any

11    attempt by defense to preclude any reference to

12    knowledge issues with respect to asbestos-related

13    diseases and when the company might have been aware of

14    them.  So it's over the defendants' objection, but we

15    have allowed questions along those lines in the past,

16    and it's primarily come up in the records of the

17    companies about such things.

18         Number 9, products not at issue.  And this is --

19    the big thing there is the use of catalogs and other

20    kind of corporate documents to indicate what kind of

21    products they sold and whether those products included

22    the specification of asbestos-containing product.  I

23    always deny defendants' motions in that regard.

24         MR. REID:  Your Honor, if I may just observe, I

25    think all the rest are about motions in limine --

160

1  plaintiff's opposition to motions in limine filed by

2  other parties.

3       THE COURT:  They all are, but they all relate to

4  things that are a potential issue here, which is the

5  reason plaintiff listed them.

6       MR. BRANHAM:  The idea is just to streamline it

7  because it's usually the same stuff over and over.

8       MS. McVEY:  If they want to go straight to their

9  motions, I'm happy to do that.  This is just a way to

10 encompass all of them, but whatever they want to do,

11 your Honor, or whatever you want to do.

12      THE COURT:  All right.  Then we'll quit doing

13 that.  They insisted on going through them one by one.

14 Now they don't want to do that.

15      All right.  Let's go to number 12.

16      Theile, what is it?

17      MS. McVEY:  I don't know what they want to argue

18 on their motions in limine.  I thought we encompassed

19 them all, so maybe the thing to do -- Yancey, tell her

20 what you want to do.

21      THE COURT:  Let's get to their notebook on their

22 motions in limine.  I don't want to spend all afternoon

23 long.

24      MR. McLEOD:  I'm trying to streamline it as well,

25 your Honor.  We don't need a notebook to know what the

1  Court ruled previously.

2      THE COURT:  Well, what I do need is some kind of a

3  motions notebook from you that details your defense

4  motions.  I have one from John Crane.  All I've got

5  from you on motions in limine is your omnibus, which we

6  have taken care of.  We have dealt with that.  We just

7  got finished doing that, haven't we, or have we?

8      MR. McLEOD:  We were starting to go through our

9  motions in the omnibus.

10      THE COURT:  Okay.  Then let's just do that.  I'm

11  looking on page 2 of our omnibus.

12      One, use of the term poison or similar references

13  in front of the jury, kill, poison, to murder.  I grant

14  that, but I caution you that it is perfectly

15  permissible for the plaintiffs to say that the

16  defendant died because of asbestos contained in your

17  products.  But pejorative-type terms, like poisoned or

18  killed or murdered, have not been used by plaintiff's

19  counsel before, and I'm sure will not be used this

20  time.

21      So grant that, but understanding that the leveling

22  of the accusation that your defendant caused the death

23  of plaintiff is -- they are permitted to do that.

24      MR. BRANHAM:  Just so that I'm clear, I know about

25  kill and murder, and that's fine.  I had not heard the

162

 1   inclusion of poison before.  I mean, it is a toxin.

 2        THE COURT:  What you're going to say is the

 3   defendant died of mesothelioma, and he contracted that

 4   while breathing asbestos-laden materials placed in

 5   equipment that Crosby manufactured.

 6        MR. BRANHAM:  Sounds like a good way to put it.

 7        THE COURT:  That's what he's going to say, and

 8   that's perfectly legitimate.  That's what he claims.

 9        MR. McLEOD:  If he wants to say in closing

10   statement to the extent the evidence at trial --

11   there's evidence that this --

12        THE COURT:  Well, they're certainly not going

13   to --

14        MR. McLEOD:  I mean, whatever the evidence at

15   trial is, your Honor, and the term poison we believe

16   is --

17        THE COURT:  We have tried these cases many times.

18   The evidence is going to be conflicting.

19        MR. McLEOD:  We believe it's prejudicial to use

20   that term.

21        THE COURT:  To use which term?

22        MR. McLEOD:  Poisoned.

23        THE COURT:  Mr. McLeod -- I'm sorry.  I'm getting

24   a little testy too.

25        I granted your motion on poison, killed, murdered

1  and all of that.  Your motion is granted.

2       MR. McLEOD:  Thank you, your Honor.

3       THE COURT:  The only thing that I have cautioned

4  you is that they will be permitted to draw the

5  connection between the death of the plaintiff and

6  exposure to asbestos materials that were used in

7  connection with your client's products.  That, I think,

8  is completely legitimate and that is how they have

9  always phrased it, as I know from all the trials I have

10  had.

11       All right.  Lack of insurance.  Granted.  You

12  can't refer to insurance.

13       Defendants' attorneys and amounts spent defending

14  this case.  No reference to that.  Granted.

15       Other cases involving counsel mentioning any other

16  cases where defendants or counsel may have been

17  involved.  That's granted, but certainly material or in

18  the form of sworn statements, depositions, testimony

19  used in other cases when it is relevant can be brought

20  forward as evidence, and it will be referred to as a

21  sworn statement or a statement under oath and not be

22  referred to as testimony in another case.

23       MR. McLEOD:  Thank you, your Honor.

24       I think this actually came up a good bit in the

25  Glenn trial where I feel like sometimes we're not

164

allowed to publish pleadings or talk about Mr. --
apparently Mr. Sizemore's previous asbestosis case, but
then when it comes to cross-examination of our
witnesses, they talk a lot about previous cases that we
have.

THE COURT:  No, they -- I never allow them to do
that.  They cannot refer to any sworn statements as
testimony in another case.  And if they start doing
that, you need to get up and object, because that's
against my instructions.  All you can do is impeach a
witness by saying:  You gave a sworn statement to this
effect and, you know, use that sworn statement to
impeach.  That can be done, but I will protect you on
that.

MR. McLEOD:  Thank you, your Honor.

THE COURT:  Lack of corporate representative
mentioning the presence or absence.  That's granted.
We don't allow that.

Illnesses, mentioning the alleged exposure of
family members.  This is not a bystander case, so
that's granted.

Probable testimony, mentioning the probable
testimony of a witness who is absent or unavailable.
If they're unavailable and they're not going to
testify, you can't mention their testimony.

1      MR. BRANHAM:  Judge, if they have got an expert

2  who they tendered in the case and we deposed that

3  person and they don't call that expert, right, I would

4  intend to talk about what that expert -- here is what

5  that expert -- I might say in opening:  Here is what

6  he's going to come in here any say, and then they

7  decide not to call them and I comment on the fact that

8  they didn't call the expert in closing.

9      THE COURT:  They're going to do that at their

10  risk.  They're going to tell you who they are going to

11  call, and if you refer to it in your opening statement

12  and then they don't call that person, you will be

13  permitted to cover yourself in that regard.  I have

14  seen y'all talk about that's going to happen several

15  times, but it never has actually happened.

16      Personal beliefs of counsel.  Granted.  Can't do

17  that.

18      Improper or prejudicial comparisons, like the Erin

19  Brockovich, cigarettes, all that.  Granted.  Can't do

20  that.

21      Concert of action among defendants.  I never have

22  understood that completely.  But, normally, unless

23  there is some direct evidence of a conspiracy or

24  concert of action, I would grant that.  Right now it's

25  y'all and y'all alone, so there would be nobody else

166

1    you would be talking about.

2         Inflammatory photographs or videotapes.  They are

3    always going to be presented to counsel before they are

4    shown to the jury, so that's granted.

5         13, publishing evidence prior to the admission.

6    We don't do that.  That's granted.

7         Religious or political beliefs.  That's 14.

8    Granted.  Don't refer to that.

9         15, any reference to wealth or power or corporate

10   size.  That's granted.  I always instruct the jury

11   everyone is on equal footing.

12        16, any references to statements or arguments that

13   the jury should send a message.  We don't allow that.

14        MR. BRANHAM:  Judge, go back one second on the

15   corporate size issue.

16        THE COURT:  Yes, sir.

17        MR. BRANHAM:  One of the things where that can get

18   touched on is if they had worldwide offices and they're

19   saying, I didn't know anything about the hazards of

20   asbestos.

21        THE COURT:  I think that's fair.

22        MR. BRANHAM:  I just didn't want to run afoul of

23   that.

24        THE COURT:  You have at least one exhibit where

25   that's probably going to be discussed, and that goes to

1    knowledge because of all the places they were.  But

2    that's not a reference that they should be -- that poor

3    little plaintiffs should be compared to the relative

4    size of the corporation.

5        All right.  That's all the motions in the omnibus

6    motions.

7        Number 2 is causation requirements in South

8    Carolina.  Exclude any testimony that there's no safe

9    level of exposure, each and every exposure.  I deny

10   that routinely over your objection.

11       MR. McLEOD:  Over our objection.  We believe any

12   testimony, including as part of a total cumulative

13   dose, no matter how small that may be, is in direct

14   conflict with the Lorman standard that the plaintiffs

15   are allowed an exception to prove causation and over

16   our objection.

17       THE COURT:  It's a battle of the experts, and

18   there is a good, strong body of experts that say that

19   it's a cumulative dose situation, that each and every

20   dose contributes to the overall situation.  So I

21   understand your experts say no to that and theirs say

22   yes.

23       MR. McLEOD:  Sure.  And our argument is we

24   disagree with their experts, but it's a little

25   different than that.

168

1       THE COURT:  Well, you say that that violates

2  Lorman, and they say -- I disagree and have before.  I

3  think frequency, regularity and proximity can be shown

4  by experts who talk about this cumulative effect of the

5  doses.  But there will be plenty of competing evidence

6  about how that works.  I don't think you will be

7  disadvantaged there.

8       Motion in limine number 3, exclude simulations,

9  videos and photographs from Longo's firm.  I will deny

10  that.  I have limited Longo in the Johnson & Johnson

11  case, and y'all were probably here for that and know

12  that Dr. Longo now has a cleaner way of making his

13  projections about respirability because he's now using

14  samples that are more clearly in a chain of custody.

15       It doesn't have much impact on your case, though,

16  because these industrial exposure cases are a little

17  bit different in that regard, but I would not exclude

18  MAS because it's unreliable or misleading, or confusion

19  or junk science.  I have dealt with that many times

20  before.  Dr. Longo will be permitted to testify.

21       What he does that y'all don't like in this case is

22  not the below-the-waist stuff.  He does the gaskets and

23  he shows how all this stuff flies in the air when you

24  use a vibrating brush or something else or putty knife

25  or whatnot to knock off the gasketing that is glued to

169

1    the flanges, and I would allow him to do that.

2        MR. McLEOD:  I was actually thinking this might be

3    a moot point since they're not bringing Charlie Aye,

4    your Honor.

5        THE COURT:  That's generally who comes up and does

6    that, so I don't know.

7        MR. BRANHAM:  We may very well play the Longo

8    videos.

9        MR. McLEOD:  As long as we're able to

10   cross-examine.

11       THE COURT:  You will be able to cross-examine him.

12       MR. McLEOD:  Over our objection still.

13       THE COURT:  The arguments in the motion, of

14   course, are a little bit pejorative when you talk about

15   Dr. Longo and his associates being hired guns who

16   designed these tests and all that kind of stuff, but

17   we'll move on.

18       Number 4, Crosby Valves' motion to preclude

19   improper hypotheticals.

20       Yes, sir.

21       MR. McLEOD:  Your Honor, this has always come up

22   in asbestos litigation, and this is actually a really

23   important one, and I would beg the Court's indulgence

24   just very briefly.

25       THE COURT:  Yes, sir.

170

1          MR. McLEOD:  Let me explain to the Court what that

2     is about.

3          THE COURT:  Why certainly.

4          MR. McLEOD:  As you know, we have just about been

5     talking about it all day, the Lorman standard is what

6     we have here.  And you have heard our motion for

7     summary judgment.  You know, regardless of what

8     plaintiff says from the bench, it's our position that

9     the evidence in this case, as we sit here today

10    pretrial at summary judgment stage, that there is no

11    evidence that Mr. Sizemore was exposed to a Crosby

12    valve.

13         Now, I'm not rearguing our summary judgment

14    motion, but here is the thing.  We deposed these

15    experts, and typically the plaintiff's experts at the

16    time of the deposition don't really have -- aren't

17    prepared to offer testimony to case-specific

18    defendants.

19         And the way that the plaintiffs get around letting

20    us sort of know what their testimony is, is they

21    reserve the right to ask hypotheticals at trial, which

22    is -- I'm not suggesting that hypotheticals are not

23    proper, but it has the effect of preventing us from

24    knowing -- we don't know what the hypotheticals are

25    going to be.  So all we can do is go back to the rules

171

1  and the law and say, okay, well, they're not allowed to

2  give an expert or ask an expert to make assumptions

3  based on facts that are not existing in the record,

4  okay.

5      And this is different from a normal auto

6  accident-type case.  We have different causation

7  standards here.  The Lorman standard says mere presence

8  to static asbestos is not exposure.  I think the Court

9  mentioned that today with the asbestos paneling.  It's

10 just not enough.  It doesn't meet the Lorman standard.

11     So the fact that Crosby valves might have been in

12 some of the facilities where Mr. Sizemore worked is not

13 enough.  That is just static asbestos, and it doesn't

14 establish exposure.

15     And so that be as it may, we understand the Court

16 denied our motion for summary judgment.  But what's

17 going to happen at trial is because they don't have

18 evidence to meet that Lorman standard, what they do is

19 ask hypotheticals and ask their expert to assume

20 situations that do meet the Lorman standard.

21     Well, assume Crosby valves are in this facility

22 and assume Mr. Sizemore worked with and around them.

23 There's no evidence of that.  Assume Mr. Sizemore did

24 this on a frequent and regular basis.  Well, there's no

25 evidence of that.  And then they get their expert to

1    say, oh, yes, that would have been enough to cause

2    Mr. Sizemore's disease.

3         And this motion is based on the fact that not only

4    is that not permitted by the rules because there's no

5    evidence, underlying evidence for those hypotheticals,

6    but it means that the expert's causation opinions are

7    inherently unreliable because they're not based on

8    facts and evidence.  And this is how they attempt to

9    get around the Lorman standard.

10        So just for an example, if there was one record in

11   the case that one Crosby valve is right here, it's not

12   enough to meet the Lorman standard on a typical case.

13   But if they come in and generate facts through a

14   hypothetical that satisfies that Lorman standard and

15   allows their expert to testify, and to the jury it

16   sounds -- it's so prejudicial because here is an expert

17   doctor saying, oh, well, if he says it, it must be

18   true.

19        So there is an extreme possibility for prejudice

20   in this situation.  And this motion is tailored --

21   we're not saying that they can't ask hypothetical

22   questions, but they must be based on the evidence

23   that's presented at trial.

24        And as we sit here today, there's no evidence that

25   Mr. Sizemore ever was exposed to any -- a Crosby valve,

173

1  much less an asbestos-containing one, because, quite

2  frankly, all these valves were.  So, quite frankly, the

3  evidence is nonexistent.

4       I'm sure Mr. Branham is going to stand up and try

5  and connect some dots, and he talked about release

6  valves and those could have been Crosby's, but that's

7  not what the Lorman standard says.  It says:  Exposure

8  to a specific product on a regular basis in proximity

9  to where the defendant worked.

10       We don't have the evidence in this case of that,

11  and they should not be able to ask hypotheticals of

12  their experts.  And if they do, the testimony should be

13  stricken if it's not based on the evidence.

14       MR. BRANHAM:  Your Honor, if the motion is to

15  preclude me from asking a hypothetical that is not

16  based in the facts, I agree.  We clearly disagree what

17  the facts are.

18       THE COURT:  Yes, and that's just it.  The biggest

19  thing that undergirds the arguments that Mr. McLeod is

20  making is the assumption that nothing but direct

21  evidence is real evidence of Crosby valves being in

22  these various plants.

23       Now, I've got to tell you, I have tried a bunch of

24  these asbestos cases now involving a discrete group of

25  locations in the State of South Carolina where miles

174

1    upon miles upon miles of piping and tubing and other

2    kinds of conduits for transmitting very high

3    temperature materials are contained.  Crosby valves are

4    generally shown to be at these places by use of sales

5    records of Crosby or purchase order records of the

6    corporations.  They are rarely shown by having direct

7    testimony from these folks who work there.  They will

8    tell you a lot about valves and what they look like and

9    so forth, but only intermittently do they, in a 47-year

10   career like this man had, get down to the granular

11   ability to identify a specific piece of equipment at a

12   specific time.  But those gaps are filled in, as is

13   permitted, by circumstantial evidence by connecting the

14   dots, that is, by showing purchase records, purchase

15   orders, sales records, the service personnel, the work

16   service personnel at particular sites and so forth.

17        So I certainly am not going to grant such a motion

18   as that.  The hypotheticals are going to be proper if

19   they're based on properly admitted evidence, whether

20   that evidence is direct evidence or circumstantial

21   evidence.  And the rules of South Carolina say that

22   direct evidence and circumstantial evidence are to be

23   given the very same weight.  That's what the cases say,

24   whether they're in the criminal context or civil

25   context.  So I would deny the motion.

1          MR. McLEOD:  Real quick, your Honor.  I think --

2    just real quick, real quick.  I just want to make the

3    point that Lorman itself, including numerous, numerous,

4    numerous cases all over the country, granted summary

5    judgment based on the fact that they're only records of

6    the products existing in the facility, no testimony of

7    actual exposure to those products.  That's one thing.

8    And I think that the Court is just a little bit -- I'm

9    not suggesting --

10         THE COURT:  This is more than just the presence of

11   stuff.  This is evidence of how these workers worked,

12   of how they deal with this equipment, of how they

13   service these records.  I mean, we don't need to plow

14   this kind of ground.  This is the battle of being able

15   to convince a jury, Mr. McLeod.  But this is not

16   something where all you've got is a couple purchase

17   records.  I used that as an example.

18         But before these cases are finished, there is a

19   good deal of evidence about how these men worked, what

20   kind of things they worked on, what kind of things they

21   were present next to when they were being worked on.

22   And in many cases, there are valves and pumps and the

23   kinds of things that your clients made and sold to the

24   facilities involved.

25         So I am not going to make some overall precluding

ruling.  These cases are always a combination of direct
and circumstantial evidence coming from many different
directions.  At the end, before the case is submitted
to the jury, and at the end of the plaintiff's case
before defendant even has to put up a case, I make
evaluations as to whether that evidence is sufficient
to move to the next stage.

        This is very premature, in my view, to ask for
some overall conclusive thing because it's a
combination of a lot of different kinds of evidence.
And I now have the experience of having heard many of
these cases, and I think -- and I have at times granted
judgments at the end of the presentation of the
plaintiff's case because they did not connect a
particular defendant.  I have let that defendant out.
I have granted a few motions for summary judgment where
there was absolutely no product identification.

        But this case is not that case, in my view, so I
deny it.

        MR. McLEOD:  Thank you, your Honor.

        THE COURT:  All right.  What else have we got?  I
think that's the end of the defendants' motions in
limine.

        MR. REID:  Your Honor, I think everything left
falls under the umbrella of scheduling.

1       MR. BRANHAM:  Do we need to talk about your

2  corporate rep or is the moving of the trial date going

3  to solve that problem?

4       THE COURT:  Let's talk about the trial date.

5  That's the most practical thing we need to talk about.

6       MR. REID:  Agreed.

7       THE COURT:  Y'all sat very patiently through all

8  of Johnson & Johnson, and it looks at the present time

9  as if Johnson & Johnson will go.

10       I pushed the scheduling of Sizemore because the

11  thing had been removed, and I just didn't know whether

12  Judge Seymour, who is not in this country -- she is on

13  a trip overseas and will not be back until several

14  weeks from now.  And I just didn't know whether she

15  would have the opportunity to rule on these removal

16  matters.  But as it develops, she did have the

17  opportunity to rule, and ruled at the end of last week.

18       So all of these asbestos cases, four of them that

19  have been removed, have now been sent back to the

20  appropriate circuit courts.

21       So it looks to me as if J&J's case is going to try

22  beginning the 13th.

23       I can do one of two things.  I really feel for

24  y'all because I jerked you around a bunch, and I did it

25  in the hopes that I could get things to the point where

1  we would settle, everybody would settle, and I have

2  achieved that to some extent because there are just two

3  of you left in the case at the moment, Crosby and Waste

4  Management.

5      I wish there was some way that y'all could come

6  together and compose the remaining cases.  It would

7  have been easy if I had just granted the defendants'

8  motion for summary judgment, and it would be over on a

9  very thin scintilla of evidence.  I have let the cases

10  go forward, as I normally do.

11      But y'all need to know something.  And we can

12  either try to skate around a little bit, hope we get --

13  J&J gets to the brink and then settles, or we can just

14  go on now and put everybody out of their misery and

15  tell Mylinda Nettles to let the jury go and Sizemore is

16  off.

17      What should we do?

18      MS. McVEY:  Our preference is to give it some time

19  to see what J&J does because Sizemore is ready to go.

20      THE COURT:  It is.  That's the sad part about it

21  is y'all have worked so hard and done such a good job

22  of getting everything to me, including your pretrial

23  briefs and voir dire questions and all that.  So it is

24  absolutely ready to go.

25      MR. REID:  Couple things, your Honor.

1    THE COURT:  Yes, sir.

2    Give me some wisdom here, Mr. Reid.  I don't know

3    what to do.

4    MR. REID:  Your Honor, I'm afraid I'm short on

5    that this afternoon.

6    Overall, I think I'd like to have the Court put us

7    off.

8    THE COURT:  That's a very legitimate request.  I

9    understand that.

10    MR. REID:  In part because --

11    THE COURT:  You've got to line up experts and pay

12    them and make reservations and do all that kind of

13    thing.

14    MR. REID:  And I have taken the time since the

15    Court informed us by e-mail on Friday about the

16    possibility of the movement of the trial to the 20th.

17    I'm going to have some expert difficulties that

18    effectively would have me putting on my case if there's

19    time available before the plaintiffs go.

20    THE COURT:  And that's problematic too.

21    MR. REID:  That leaves me without knowing what I'm

22    responding to when I go second.  So we respectfully

23    request that.  And I recognize the Court may want to

24    have some time go by, so I guess I would say this:  My

25    preference would be to tell us this afternoon, but if

1  you could otherwise pick a date like noon Friday or

2  something like that.  I don't know what the prospects

3  are for this talc case.  I don't get involved with

4  those kind of cases.  All I know about it is what I

5  heard this morning.

6      THE COURT:  Well, you sat in the same -- you

7  listened to the same thing I listened to, and it didn't

8  sound to me like there was much settlement talk going

9  on.

10      MS. McVEY:  I understand it puts all -- part of

11  the good news with having a block is it puts pressure

12  on both sides, right?  And so we, of course, have to

13  pay our experts and line them up just like they do and

14  get ready to go.

15      The concern is that because Crosby's position

16  typically in resolving these cases is they don't

17  resolve, is that we're going to be right back here with

18  Crosby no matter what.  And so we would prefer to keep

19  marching forward.  And if we don't go and J&J goes,

20  then we don't go.

21      THE COURT:  Here is the other thing that I have to

22  take into account as well.  Hampton is a small county,

23  and I feel keenly the responsibility I have to Mylinda

24  Nettles, the clerk of court there.  If the overwhelming

25  possibility is this case will not be tried, we owe it

1  to her to tell her that, and that's what's also driving

2  my concern.

3       MS. McVEY:  I understand.  I just -- I hate to be

4  this ready and not be given the opportunity to go, but

5  I understand.

6       MR. BRANHAM:  Judge, I agree with everything that

7  she said.  But, you know, there has been some recent

8  history around the country of J&J resolving these

9  cases.

10      Now, I sat there and listened to what you listened

11 to this morning too, and I agree with you.  It sounds

12 like they're going to try that case.  But given the

13 posture nationwide of these nationwide removals and how

14 much it's apparent that we're involved in a lot of

15 that, that that's putting a ton of stress on J&J

16 counsel because they can't get it removed fast enough.

17 They're still removing cases.  They didn't remove them

18 all at once.  So I have no idea or no inside

19 information about how that's playing out nationwide,

20 but I do think the J&J cases are in a little bit

21 different posture than they have been.

22      And, again, who knows.  I heard the same thing you

23 did.  But even a couple of days, I think, waiting to

24 see makes some sense.

25      THE COURT:  Mr. Reid, anything further?

182

1        MR. REID:  I can't tell you anything you don't

2    already know about the prospects of that case settling

3    or what difficulties Hampton County may have by keeping

4    it there, so I will not comment further on that.

5        To be honest, I think I'm duty bound, because of

6    our expert difficulties, of formally moving for a

7    postponement of the trial date.

8        THE COURT:  I understand.  I consider what you

9    said as a formal motion in that regard, and I'll regard

10   it as such.

11       MR. REID:  Thank you.

12       THE COURT:  But I'm going to continue the case not

13   just because of that, Mr. Reid, and that's not said

14   with disrespect.

15       MR. REID:  Understood.

16       THE COURT:  But that wouldn't alone drive me.

17   What's driving me is responsibility I feel to the clerk

18   in a small county and to our court administration to

19   have some certainty about what's going to go on.

20       So I will continue the Sizemore case.

21       MS. McVEY:  Thank you, your Honor.  We would ask,

22   because Hampton County is such a small county, it would

23   be beneficial, I think, to go ahead and get another

24   trial date from Hampton County when we can try this

25   case again.

1      THE COURT:  I'll do some investigation on that,

2  and I think I can get probably a fairly quick date.  Of

3  course, I have got to look at these other cases I have

4  blocked for the summertime, but let me explore that

5  with Mylinda and with court administration, and I'll

6  get back to you promptly on that with some suggested

7  dates, and then y'all can look at them and see how that

8  might dovetail or not dovetail with schedules for both

9  plaintiff's counsel and defense counsel.  So I will be

10  mindful for the need for us to work on that together.

11      MS. MCVEY:  Thank you, your Honor.

12      The last thing before Mr. Reid and Mr. McLeod go

13  is we do want to schedule --

14      THE COURT:  Glenn.

15      (Off-the-record discussion about scheduling.)

16      THE COURT:  Let me try for something.  What would

17  the 10th or 11th be like for you all, Theile and Trey?

18      MS. McVEY:  I can do -- the 10th is better, if

19  that suits, but I can make the 11th work.

20      THE COURT:  I'm going to write June the 10th down

21  here.  It's going to take doing a little bit of calling

22  around to see if that will work.

23      Trey.

24      MS. McVEY:  He's okay.

25      MR. BRANHAM:  Yes, your Honor.

184

1    THE COURT:  I'm going to try for the 10th.

2  Tentatively put that in your calendars, and then I'll

3  get back to you, or Walker will, on that.  Okay?

4    Get my brain back together again.  I've got Glenn

5  stuff thrown all about every which way, so how about

6  each side try to get me up an agenda on what we need to

7  do on Glenn.

8    MS. McVEY:  I will e-mail everybody.

9    THE COURT:  So y'all kind of get together on that,

10  and we'll tentatively say the 10th is going to be it.

11    All right.  We have got one more little round of

12  stuff here, which is Hopper.

13    THE COURT:  What I have on Hopper is this is

14  plaintiff's motion for an expedited trial.

15    MS. McVEY:  Yes, ma'am.  Your Honor, I think this

16  is just a formality, but as you know, under our

17  statute, plaintiffs who have been diagnosed with

18  mesothelioma can move for an expedited trial basis.

19  The statute says 120 days from the date you grant the

20  motion.  We're actually seeking to put Hopper on the

21  November block, the November 2019 block in this case.

22    Your Honor, the Hopper case is in pretty good

23  shape.  He was diagnosed with mesothelioma in October

24  of 2018.  We have answered discovery for the

25  defendants.  We have given the releases to get any

1   other records they want.  We have answered, of course,

2   their request to produce interrogatories.  Mr. Hopper

3   has been deposed.

4       Your Honor, since he was diagnosed in October of

5   2018 asking for a November trial date, it's pushing

6   things for Mr. Hopper, and he would like to live to see

7   his trial date.  So we would ask for an order granting

8   the motion for expedited trial and for you to schedule

9   it for the November block.

10      THE COURT:  And his deposition is now complete?

11      MS. McVEY:  Yes, ma'am.

12      THE COURT:  All right.  How many defendants are

13  there in the case?

14      MS. McVEY:  There are a lot.  I mean, there are a

15  lot.

16      MR. MERIWETHER:  I have a list which I can read,

17  but you would get tired.

18      THE COURT:  Robert, just roughly tell.

19      MR. MERIWETHER:  At least 60.

20      MR. BRANHAM:  Agreed.

21      MR. MERIWETHER:  Rather a lot, really.

22      THE COURT:  And the case is?

23      MS. McVEY:  Richland County case.

24      THE COURT:  A Richland County case.

25      Ms. McVey, anything else?

1        MS. McVEY:  No, ma'am.

2        THE COURT:  Ms. Techman is here.

3        Ms. Techman, who do you represent?

4        MS. TECHMAN:  Good afternoon, your Honor.  I have

5    quite a few of the 60-plus defendants.  Jennifer

6    Techman.

7        We filed a response to the motion.  I don't know

8    if the Court has it.  It's filed on behalf of CVS

9    Corporation, Foster Wheeler Energy Corporation, General

10   Electric Company, Hobart Brothers, Ingersoll Rand,

11   Spirax-Sarco, the Lincoln Electric Company and Trane.

12   And now that I have read that, if your Honor would like

13   it, I can hand this copy up.

14       THE COURT:  That would be great.  Thank you so

15   much.

16       MS. TECHMAN:  Appreciate you letting me use it.

17       Your Honor, you touched on my clients' concerns.

18   We certainly understand that Mr. Hopper would like to

19   have his day in court.  The defendants simply are

20   concerned that we have sufficient time to fully

21   investigate the case.

22       There are a lot of parties in the matter.  There

23   are multiple states at issue.  There are, I believe,

24   more than 20 work sites at issue.  Much of the

25   discovery is out of the control of the defendants.  A

1  lot of the records are in the hands of third parties.

2  We don't have the ability to make those folks move any

3  faster than they move.

4      So our request is simply that the Court hold the

5  plaintiff's motion in abeyance because at this point my

6  clients contend that we can't make a good-faith finding

7  that the defendants would not be prejudiced by an

8  expedited trial.

9      THE COURT:  How many of these job sites are in

10  South Carolina?

11      MR. BRANHAM:  A lot.

12      THE COURT:  A bunch?

13      MR. MERIWETHER:  Your Honor, I can speak briefly

14  to that.  I had taken a quick check in my materials.

15  By the way, I did a thumbnail count as well.  I got 66.

16  I can be off by one.

17      For the work history which we could deduce for

18  Mr. Hopper from his complaint, his answers to

19  interrogatories and his deposition testimony, I've got

20  from 1963 to 1969 as a Navy seaman, and eventually he

21  was in the first group of the SEALs.

22      MS. McVEY:  Your Honor, we disclaim the Navy

23  exposure, just as an aside.

24      MR. MERIWETHER:  That will make life easier.  I've

25  got '64 to 2004 during which he's in industrial job

1  sites in South Carolina, North Carolina, Georgia,

2  Alabama, Georgia and the Gulf of Mexico.  I've got him

3  specifically in Lancaster, South Carolina at Clark

4  Controls, at the Westinghouse turbine plant up in

5  Charlotte, Duke Energy at various sites in South

6  Carolina and North Carolina.  Got him at some of the

7  places with which you are familiar, such as Bowater and

8  the Dupont May plant right outside of Camden.  But I've

9  also got him in some places that you probably haven't

10 run across before, but the Wansley power plant down in

11 Carrollton, Georgia, Mitsubishi up in Chesapeake,

12 Virginia.  We've got the Eastover International Paper

13 Mill here in Columbia.  We have got -- outside of

14 Columbia anyway.  We have got Childersburg Alabama

15 Paper Mill down there.

16     MS. McVEY:  Your Honor, we agree there is a lot of

17 work sites.

18     MR. MERIWETHER:  I'm just saying we have got a

19 bunch, and it is a bunch of states.  So I think it's

20 easier just to say South Carolina, Georgia, North

21 Carolina, Virginia, Alabama.  I don't think we have got

22 Tennessee, but I could have missed it.

23     MS. McVEY:  Your Honor, just in brief response to

24 that, this is not dissimilar to lots of cases you had

25 before you, of course.  The Hill case, the Sizemore

189

1    case, they're complex cases, we agree.  The statute in

2    South Carolina contemplates this and says, and you know

3    this, without a trial date, nothing happens.  Right?

4        So they certainly could move for a continuance if

5    they feel like they aren't ready by the time the trial

6    date pops around, but he's a fellow with mesothelioma

7    who is very sick, and we want to get him a trial date.

8        THE COURT:  What have we got scheduled past July?

9        MS. McVEY:  So we're scheduled, I think, for July,

10   September.  There is a November block that was open.

11   The only thing that's been moved to the November block

12   is the Sam Nicholas case.

13       MR. MERIWETHER:  Which I think is a living meso

14   from our good friend --

15       MS. McVEY:  It's my case, yes.  It is currently

16   removed, like some of the other --

17       THE COURT:  Is that the one Hendricks has?

18       MS. McVEY:  No.  No, ma'am.  That's Covil.  It has

19   still got Judge Seymour.  I expect it will be remanded,

20   but it hasn't been yet.

21       THE COURT:  So at the present time, really,

22   November has overflowed, but it has --

23       MS. McVEY:  Sam Nicholas.  We would ask Hopper to

24   go in that block.

25       MR. MERIWETHER:  Would it go -- is Sam Nicholas

1   still living?

2        MS. McVEY:  Yes.

3        THE COURT:  So Hopper would go behind that?

4        MS. McVEY:  Yes.

5        THE COURT:  Okay.  I will grant the motion.

6        MS. TWILLEY:  Excuse me, your Honor.  Allyson

7   Twilley on behalf of Shell Oil Company.  I have one

8   other ground.

9        THE COURT:  Come on up here.  I don't want to jump

10  the gun if you have got something you want to say.

11       Come right on up and go ahead with your full name

12  for the court reporter.

13       MS. TWILLEY:  Allyson Twilley for Shell Oil

14  Company.

15       Your Honor, we object to the motion to expedite

16  because the requirements of the Asbestos Act have not

17  been satisfied, specifically the requirement of the

18  report that has to be served.

19       The report that was served in this case, it

20  doesn't meet all the requirements of the act.

21       THE COURT:  Well, specifically in what way is it

22  delinquent?  I mean, are we talking about some

23  nitpicking things or some really important things?

24       MS. TWILLEY:  Well, there are some specifications

25  that are in the statute as to what the report must

191

1  contain before a case can be put on an active trial

2  docket or expedited, for that matter.

3       So the report has to contain a diagnosis of

4  mesothelioma.  And the one that the plaintiffs have

5  filed does state that.  However, the report also has to

6  conclude to a reasonable degree of medical certainty

7  that exposure to asbestos was a proximate cause of the

8  diagnosis of mesothelioma.

9       And the report that was attached as Exhibit A to

10  the plaintiff's motion does not contain a conclusion,

11  anything to that effect.

12       THE COURT:  This is a medical report that says he

13  has mesothelioma, but it doesn't say to a reasonable

14  degree of medical certainty?  I'm sure we can repair

15  that rather quickly.

16       MS. TWILLEY:  It doesn't address asbestos or

17  anything like that.  It's just a pathology report.  And

18  there's one other requirement that the report must

19  contain under Section 44-135.

20       THE COURT:  It has a diagnosis of mesothelioma,

21  but it doesn't have this other little conclusion which

22  is?

23       MS. TWILLEY:  There's two.  There's one additional

24  one that the report must contain a conclusion that the

25  exposed person's medical findings were not more

1    probably the result of other causes revealed by the

2    exposed person's employment in that industry.

3        The report we have been provided does not contain

4    that, so that's the ground of our objection.

5        THE COURT:  Very good.  Well, mesothelioma, at

6    least in the industrial setting, is pretty much a

7    signature cancer, so I don't think that's going to be

8    disqualifying.  I would overrule that objection.

9        Anything else?

10       MS. TWILLEY:  We just wanted to put our objection

11   on the record that it's a requirement of the Act.

12       THE COURT:  I understand that completely.  That's

13   what Ms. Techman wants to do as well, and she's got a

14   bunch of clients and you have got an important client

15   and you need to be protected in that regard.  I have no

16   dilemmas with that at all, and you are protected.

17       I will set it as the second case in the November

18   block.

19       MS. McVEY:  Thank you, your Honor.  I will submit

20   an order to you.

21       THE COURT:  Exactly, detailing that.

22       Now, what else have we got?

23       MS. McVEY:  Your Honor, there are a couple of -- I

24   think there's some that are easier than others.  The

25   next one I think would be we have a motion to amend the

1  Hopper complaint to add two defendants.

2         THE COURT:  Which defendants?

3         MS. McVEY:  Armstrong, it's a steam trap company,

4  and Southern Insulation.  And this just came out in

5  discovery.  I circulated the amended complaint to all

6  the defendants.  There were no true objections.  Danny

7  White objected that he didn't have time to look at the

8  complaint, and Ms. Twilley just said he is withdrawing

9  that.  And Kirk Morgan, who represents Ford Motor

10  Company, also couldn't consent.

11         MALE SPEAKER:  We'll withdraw that objection.

12         THE COURT:  Good.  Bring that up here.  I'll sign

13  it.

14         MS. McVEY:  Thank you, your Honor.

15         Your Honor, just one final administrative motion.

16  Southern Insulation is a little bit like Covil and Star

17  Davis.  They're defunct companies.  The only assets

18  that we're even aware of are insurance proceeds.  We'd

19  like to move to appoint a receiver, Protopappas.

20         THE COURT:  I will do that.

21         MS. McVEY:  Thank you, your Honor.

22         THE COURT:  And you have got destructive testing?

23         MS. McVEY:  Yes, ma'am.  I'll let Mr. Branham

24  argue that.

25         MR. BRANHAM:  Trey Branham for the plaintiffs.

194

1          Just to reorient you, we acquired from Lincoln

2     Electric Company in the Taylor case after argument a

3     couple of welding rods that they created.  And we had

4     this discussion about Mr. Longo being involved in the

5     creation of the rods.

6          THE COURT:  I know.

7          MR. BRANHAM:  What the Court ruled was that if we

8     got the rods and a little bit of the flux, which is the

9     coating of the rods that has asbestos in it, is if we

10    wanted to conduct destructive testing on those rods, I

11    either needed the consent of Lincoln or I needed to

12    come back to talk to you.  So here I am.

13         Here is the disagreement that we're having.  What

14    Lincoln wants to know before they will even talk about

15    consenting is who am I sending it to, who is my

16    consulting expert, what is the test that my consulting

17    expert is going to do, and what are the results that my

18    consulting expert obtains.

19         Now, we have a consulting expert rule for a

20    reason, which is so that I can fully and fairly

21    investigate my claim.  And ordering me to violate and

22    disclose the consulting expert privilege before I even

23    know what the results are is patently unfair, and there

24    is a reason for that, right?  There is a reason they

25    don't want to tell me what Dr. Longo figured out or

1  what tests they have done, right, because it's

2  consulting expert.  I understand that.

3      And so their arguments about why they should do

4  that fail.  And let me explain to you.

5      Their first argument is that I'm forcing them into

6  a forced spoliation situation, right?  I'm going to

7  destroy some of the rods.  They have a limited number

8  of rods, therefore, they're going to be in a situation

9  of spoliation.  Untrue.  They have got court orders

10 ordering them to turn over the rods.  You can't have

11 spoliation if the Court has ordered you to do

12 something.

13     Two, they made these rods.  These aren't rods that

14 they made during the course of business when they were

15 making asbestos-containing rods.  They made these after

16 that, after they had stopped doing that.  If they run

17 out of rods and they think they need some more, they

18 know how to make them.  I don't have that luxury.  And

19 so there is no forced spoliation, your Honor.

20     The need to do this is really clear.  Every expert

21 that has tested their rods comes back with results, and

22 then the way they attack these results are several

23 ways, which is the rods are old, they're contaminated,

24 we don't know where they were, must have been somebody

25 sprinkling asbestos on them, you didn't decontaminate

1   the rods.  They go at the origin of the rods.

2       And it's funny because they're already doing this

3   here despite Dr. Longo's sworn testimony under oath

4   that he was there for the creation of the rods, which

5   their corporate representative was not, and that the

6   rods were created to be exactly the same kind of rods

7   that they made back in the day.

8       They lead in their response with:  These are not

9   the same kind of rods.  These are different, special,

10  designed specifically for a different kind of test.  So

11  they're already going at these to attack them

12  apparently fearful of what they might reveal.

13      And so we ought to be able to do the destructive

14  testing.  They haven't given me all the rods.  They

15  gave me a few.  They still have some left.  They

16  presumably didn't give me all the flux, the coating on

17  the rods.  They have some left.  So it's not that I'm

18  going to be able to do a test that they can't do.

19      And this is the type of issue that goes straight

20  to the heart of the Hopper case and lots of other cases

21  like it.  Their argument in these cases is that these

22  rods cannot under any circumstances release fibers.

23  That's their argument.  Never.  Not any.

24      So let's test their rods that they made and then

25  we can argue about whether that evidence comes in or

1    not, but I shouldn't have to disclose who I'm sending

2    it to or what I'm doing with it or anything else.

3    That's consulting expert privilege.  I am entitled to

4    investigate my case without opening it to the world.

5    Just like they have done, creating these rods,

6    apparently having some of them tested, not disclosing

7    the results.  And I haven't gone looking for that.  Or

8    when I did, I stopped.

9         But if the Court's going to order me to disclose

10   the protocol that my consulting expert is going to use

11   and the results of whatever it is that he or she does,

12   then they should have to do the same thing.  Any tests

13   that they have done, any information that they have

14   gleaned from testing their own rods, it's what's good

15   for the goose is good for the gander.

16        I don't think they should have to do that.  But if

17   I'm going to have to do it, I'm in an unfair position,

18   they should have to do it too.  So that's where we are,

19   and what I'd ask you to do is allow me to do the

20   testing.

21        THE COURT:  All right.  Ms. Techman.

22        MS. TECHMAN:  Jennifer Techman for Lincoln

23   Electric and Hobart Brothers.

24        Your Honor, I'll start with Mr. Branham's last

25   point, what's good for the goose is good for the

198

1    gander.

2        Just to remind the Court, when we were last here

3    on plaintiff's motion to compel production of these

4    experimental welding rods that were made in the lab,

5    plaintiff contended that they were entitled to get all

6    the details notwithstanding my client's assertion of

7    consulting expert privilege.  The Court has heard that

8    matter in detail, and I won't reargue those points

9    here.

10        But if we're going to apply the goose and gander

11   rule, I would say we're at the gander point of that

12   rule.  You have already ruled that they were entitled

13   to the details with regard to Lincoln's consulting

14   expert, Dr. Longo.  The gander portion of that means

15   that, as you ruled, we should get to know who is going

16   to test these experimental rods and what they're going

17   to do with them.

18        And, in fact, your Honor, I think that you have

19   already ruled on that.  Page 67 of the transcript from

20   the proceeding on the motion to compel, you state:  I

21   would ask that your Honor please require that in

22   order -- in your order that Lincoln get 72 hours'

23   notice of any destructive testing.  And this was your

24   statement following:  THE COURT:  He doesn't have any

25   trouble with that.  He is very much going to engage in

199

1  a protocol where you are notified before any testing is

2  done.

3       And I think that is the point where we are.  They

4  wanted tests.  They haven't done anything yet, but

5  they're here to discuss that.  And you get the chance

6  to know who is going to do the testing and why they

7  are doing it in connection with that, so forth.  I

8  think that is reasonable, and I will certainly do that.

9       Your Honor, I have attached the excerpt from the

10  proceedings to the response of Lincoln and Hobart to

11  plaintiff's motion for destructive testing.  But I also

12  would like to make very clear so that the Court is not

13  later surprised by this, a very important point.

14       Lincoln, and there are only Lincoln rods at issue.

15  I believe the motion was styled as destructive testing

16  with regard to Lincoln and Hobart, but the only issue

17  is with regards to Lincoln.

18       Lincoln's position is testing of these rods is

19  irrelevant.  These are experimental, lab-made rods that

20  are now nearly 30 years old.  They are not

21  representative or materially the same as the rod used

22  by Mr. Taylor.  We would be comparing apples and

23  oranges.  So I want to make sure that the Court is

24  aware, Rule 401, threshold question, these are not

25  relevant on the issue of was Mr. Hopper exposed from

1  handling these experimental lab-made rods.  He never

2  handled them, and they wouldn't be representative of

3  what he did handle.

4      THE COURT:  What about Longo?  Longo says they're

5  made to be exactly what he did handle.

6      MS. TECHMAN:  I believe that Longo said that he

7  watched the rods be made to assure himself that they

8  complied with the formula for the litigation at the

9  time, which was what was commonly called fume testing.

10 The theory being as the rod is burned, does the fume

11 expose someone?

12     That is not the claim in Mr. Hopper's case.  That

13 is not the claim in welding rod litigation in asbestos

14 anywhere in the country.

15     THE COURT:  Well, why would you make them -- you

16 made them.  Why would you make them if you weren't

17 going to make them to be just like the ones that you

18 used that Hopper would have used?  What would have been

19 the point of making them something different from the

20 ones that are now being alleged to be defective?

21     MS. TECHMAN:  I'm very glad you asked because

22 that's the heart of the matter.  They were made for the

23 litigation as it was asserted three decades ago, and

24 that was fume litigation.

25     Mr. Hopper, I believe plaintiff's will claim,

1    could have had potential exposure from handling the

2    rods, not from handling it and breathing the fumes.

3    That's not the claim in this case.  Instead they may

4    say rods are on the floor and got stepped on --

5        THE COURT:  That doesn't make any sense to me.  I

6    don't care what kind of exposure.  I'm asking the more

7    fundamental question:  Why would you have made the rods

8    to be any different from the rods that were in

9    existence at the time?  What would have been the point

10   of that?

11       MS. TECHMAN:  The rods were made to address the

12   claim in fume litigation, your Honor.  Which is not the

13   claim at issue in this lit -- I simply -- I understand

14   your frustration and you may be unsatisfied with my

15   explanation.  I want the Court not to be surprised

16   later if there is some testing of these experimental

17   rods, I don't want the Court to feel like we were not

18   candid.

19       I want you to know that it will be Lincoln's

20   position that the results of any of that testing is

21   wholly irrelevant and also unnecessary, your Honor,

22   because plaintiffs have testing from someone named

23   Laurie Todd.  They have testing done on actual

24   production rods by a gentleman named Schuster.

25       And also you may recall the last time we were

1  here, we talked about how this is not the first request

2  for the experimental rods.  This is, to my knowledge,

3  at least the third request.  At least two times prior

4  to this courts determined that the rods were protected

5  by privilege, that there were exceptional

6  circumstances -- let me make my point, please.  I'll

7  get to it.

8          THE COURT:  Yes, ma'am.

9          MS. TECHMAN:  Twice five rods were given to

10 different plaintiffs' firms in asbestos litigation.  We

11 never saw the material again.  No test was done, or

12 that test was and it was fantastic for the welding

13 defendant.

14         I don't know if Mr. Branham has spoken with the

15 other members of the plaintiffs' asbestos bar who have

16 already been through this very exercise.

17         With regard to spoliation, Lincoln's concern is

18 that if we keep giving five, five, five, eventually, of

19 course, there will be none and we will be -- we will

20 have a motion to compel, and our response will be:  We

21 have nothing to give you.

22         THE COURT:  Mr. Branham makes the contention that

23 you know exactly how these things are made, and if you

24 need to make some more, you can do that.

25         MS. TECHMAN:  Does that leapfrog over the issue of

1  why we need to manufacture rods --

2       THE COURT:  Don't ask me a question.  Answer that

3  question first.  Mr. Branham contends that you can --

4  that your company, if they run out of these -- you call

5  them experimental, Longo calls them very same as the

6  ones that Hopper handled -- but whatever it is,

7  Mr. Branham asserts that y'all have exact information

8  about the experimental rods quote/unquote and how they

9  are made and that you can duplicate them.  Is that so?

10      MS. TECHMAN:  I think I understand the Court's

11 question:  Could Lincoln remanufacture a production

12 rod, not an experimental rod?

13      THE COURT:  No.  My question is we have got some

14 rods that they say are the same.  You call them

15 experimental.  They call them the same as the

16 production rods.  Presumably you have some information

17 within Lincoln as to how the production rods were made,

18 and if there's some difference, how these rods were

19 made and have the ability to remake these.  That's what

20 I'm asking.  Can't you do that?

21      MS. TECHMAN:  I don't know, Judge.  But I don't

22 even know if we even have to reach that question

23 respectfully --

24      THE COURT:  I'm asking because I need to know

25 because of the other arguments you're making.  So I'm

204

1  asking you one more time:  Can't you remake these rods?

2      MS. TECHMAN:  Could Lincoln remanufacture

3  production rods of the type that Mr. Hopper used?

4      THE COURT:  Ms. Techman, don't rephrase my

5  question one more time.  I am asking.  They are in

6  existence now.  Some rods you still have and some you

7  have turned over to the plaintiff pursuant to my order.

8      MS. TECHMAN:  Correct.

9      THE COURT:  And if you run out of the ones you

10 have turned over to plaintiff, you have got some more

11 left, but if you run out of them, can you remake some

12 that are just like these?

13     MS. TECHMAN:  I don't know, Judge, is the most

14 candid answer I could give the Court.  I don't know.

15 Could they follow the same formula?  It seems logical

16 to me.  But would they remanufacture the experimental

17 rod that was representative for testing in the fume

18 litigation, I don't know why they would because that's

19 not the nature of the claim anymore because the science

20 has shown that that's not a viable --

21     THE COURT:  It doesn't make any sense to me that

22 you would have made it any different from the one that

23 Hopper handled.  This idea of it's a fume claim and

24 therefore we made it different because of that, that

25 doesn't make any sense to me.

1    What makes sense to me is that you would remake a

2    rod that was like the one he handled so it could be

3    tested.  And it wouldn't matter what kind of claim he

4    was making.  The beginning point of any kind of testing

5    would be to remake one that's like the one he handled,

6    whatever his claim is about, what the thing did or did

7    not do.

8         MS. TECHMAN:  I think my assumption is that

9    30 years ago, if the company was trying to make a

10    mock-up of a product to assess something, they would

11    have built that mock-up based on the nature of the

12    claim at the time.  And we have come 30 years from

13    that.  The claim is different.

14         THE COURT:  I think I understand your argument.

15         Now, have you turned over to them any testing you

16    have done including the name of the tester, the

17    protocol engaged in and the result of the testing?

18         MS. TECHMAN:  I believe plaintiffs' bar does have

19    testing by Laurie Todd and by Schuster.

20         Correct?

21         MR. BRANHAM:  Judge, I think we're confused.  What

22    I'm talking about is who they hired to do their

23    internal testing for rods that they have not produced.

24    There are plaintiffs' experts that have tested some

25    rods that were found elsewhere.  We talked about that.

206

1          But my point in what she said, which is incorrect,

2     is that I asked and was given their consulting expert

3     information.  That's not correct.  All I got -- the

4     initial motion said I want it all.  Right?  And then I

5     filed an amended motion to say all I want are the rods

6     and the flux.  And, actually, the asbestos sample which

7     they say they're now out of.  But I got two of the

8     three based on your order.  But that's all I've gotten.

9     I have gotten the rods and the flux.  I have gotten no

10    internal information of what Lincoln's test results

11    from its consulting experts are, which is exactly what

12    she's asking of me.

13          THE COURT:  All right.

14          Have you done internal testing by internal

15    consulting expert on these rods that are like the ones

16    that you gave Mr. Branham?

17          MS. TECHMAN:  I don't know the answer to that,

18    your Honor.  My point was if plaintiffs --

19          THE COURT:  Let's get this piece of it first.

20          He wants sauce for the goose, sauce for the

21    gander.  If you want his consulting expert, the

22    protocol to be used and the results, he wants that same

23    information of your internal experts who have already

24    tested this material.  And I can't believe that hadn't

25    been so.  Surely to goodness you have internal experts

207

1   who have tested and used a certain protocol and gotten

2   results.   And that's what we talked about last time.

3   That's what you quoted out, the remarks I made at our

4   last hearing.

5        What I want to have done is you give them your

6   internal experts, their protocol and what the results

7   are, and I will require him to give you his expert, his

8   consulting expert, the protocol and the results, but I

9   want those two things to go in parallel.

10        MS. TECHMAN:   Your Honor, he's already discovered

11   my expert.   I asked you to clear the courtroom.   I

12   asked you to take us in camera.   You said no, that

13   horse is out of the barn.   This is Dr. Bill Longo.

14   They know him.   I think they have called him.   I think

15   they have those answers.   I'm simply asking you to do

16   what you said when we were last here on plaintiff's

17   motion, which is that you would give Lincoln assurances

18   with regard to these finite resources.

19        THE COURT:   I've heard this argument once already.

20   I'm trying to get a real specific piece of information,

21   and I don't think I'm being played with directly.

22        I want to know, A, have you got someone who

23   internally has tested this material, had a protocol and

24   has results?   And you're saying that person is Bill

25   Longo?

208

1      MS. TECHMAN:  I'm saying --

2      THE COURT:  No, no.  Please answer my question.

3      MS. TECHMAN:  Your Honor, I am.

4      THE COURT:  You're saying that this person is Bill

5  Longo?

6      MS. TECHMAN:  Your Honor, my answer is that I

7  don't know if testing regarding handling was done on

8  these experimental rods.  I doubt it personally.

9  Because this product was made for fume litigation, not

10  handling.

11      What I can tell the Court is that testing by

12  Lincoln of production rods, the type of rod Mr. Hopper

13  could have potentially actually used, has been done and

14  if the plaintiffs --

15      THE COURT:  I'm not talking about that.  I am

16  talking about whether testing has been done on these

17  rods that were made specially and that he's now got a

18  piece of along with the flux.  Has that material been

19  tested internally?

20      MS. TECHMAN:  Don't know, your Honor.

21      THE COURT:  Let me tell you what I'm going to do

22  then.  I'm going to order that Lincoln provide --

23      MS. TECHMAN:  Pardon me --

24      THE COURT:  -- the name of the person who tested

25  the same rod that you have given to Mr. Branham and its

1  flux and whatever else goes along with it, the protocol

2  that was used and the result that is obtained.  I'm

3  going to direct the company do that within ten days.

4      I am going to direct that when that is received,

5  that Mr. Branham will have 30 days to identify for you

6  the expert that's going to test this very same stuff,

7  the protocol to be used, and when he gets a result,

8  he's going to give that to you.

9      But what's going to happen first, don't dodge me

10 around by talking about production rods or 30 years ago

11 or fume or anything like this.  You have got a certain

12 kind of rod that I made y'all produce by order to

13 Mr. Branham.  And you also produced the flux that went

14 with it.  I am going to require the company to give to

15 Mr. Branham the name of whoever tested it, the

16 protocols used and results obtained within ten days.

17     MS. TECHMAN:  May I ask a question?

18     THE COURT:  Yes, ma'am.

19     MS. TECHMAN:  Twice, to my information and belief,

20 the sample of five experimental rods were delivered to

21 different plaintiffs' firms.

22     THE COURT:  Good.  If they were delivered to

23 several different people to test, I want to know the

24 name of each person to whom they were delivered, the

25 protocol used and the results obtained.

1      MS. TECHMAN:  Your Honor, we have never at Lincoln

2  been told whether any testing was done or who did it or

3  how they did it or what the results were.

4      Now, one of those folks was a gentleman named

5  Bobby Hatten.  And Mr. Branham and I talked briefly

6  after the motion to compel hearing, and I thought that

7  Mr. Branham was potentially going to speak to

8  Mr. Hatten.  I don't know.  I'll certainly let him

9  speak to that, but he may have better information than

10 me about the testing that has been done on these rods

11 because it was twice given to two different plaintiffs'

12 firms for testing.

13     THE COURT:  I'm not talking about given to a

14 plaintiff's firm.  I am talking about internal testing

15 by Lincoln.  There's no way that they would have given

16 samples to a plaintiff's firm and not done some testing

17 internally.  I do not conceive that any company would

18 have done it that way.  They would have done some

19 baseline testing before they ever turned over anything

20 to a plaintiff.  That's what I want.  I want to know

21 who tested it internally, I want to know what protocol

22 they used, and I want to know what the results are, and

23 I want those to be given to Mr. Branham.

24     MS. TECHMAN:  So I'm clear, with regard to the

25 Court's ruling, you are requiring Lincoln to

1  potentially divulge its consulting expert privilege?

2       THE COURT:  That's correct, because you are asking

3  that the plaintiff do the same, and I'm going to put

4  you on the same footing.  The reason that I'm making

5  this order is because you have been required to give

6  the samples, but now you want to know before he tests

7  it who his expert is, what the protocol is that's going

8  to be used, and you want the results.  And I'm going to

9  allow that because I'm going to precede it by making

10  you give up, exactly right, the internal testing that's

11  been done -- not what you sent to another plaintiff --

12  the internal testing that Lincoln did, who they used,

13  what protocol and what result.  Yes, I'm ordering that

14  that be done within ten days.

15       MS. TECHMAN:  And this is without regard to your

16  ruling on plaintiff's motion to compel, despite the

17  fact that you have said that plaintiffs need to let us

18  know --

19       THE COURT:  I'm going to adopt the very procedure

20  I just outlined to you, which is I'm going to require

21  you to give up that information, and then I'm going to

22  allow you to receive the name of the expert, the

23  protocol to be used, and the results obtained.  So

24  that's how it's going to work.

25       Do you understand?

1          MS. TECHMAN:  Thank you.

2          MR. BRANHAM:  Just one point of clarification.

3   Should we be able to reach an agreement with Lincoln

4   about whether or not we need to exchange that

5   information, are we free to work that out?

6          THE COURT:  Absolutely.  Always.  But in the

7   absence of any agreement, this is how it's going to be

8   done.  True sauce for goose, true sauce for gander.  So

9   if you will get me an order to that effect, that's what

10  we'll do.

11         What else?

12         MR. BRANHAM:  Judge, if we need to, Georgia Power

13  is a defendant in the Hopper case.  They have a

14  personal jurisdiction motion they have filed.  We have

15  taken some discovery.  We have some dispute about the

16  discovery, and I think that counsel for Georgia Power

17  wants to be assured that if he gets this heard at a

18  later point in time, he's not going to be prejudiced by

19  not having it heard immediately.

20         THE COURT:  No worries.  I'm not going to use the

21  old saw, oh, you waited so long, the time just went by

22  and so forth and so on.

23         MR. HAZELTON:  Andy Hazelton appearing for Georgia

24  Power Corporation.  For the record, my official

25  position is I want to go forward with my motion today.

1    That's my official official position.

2           THE COURT:  Understood.  And your official

3    official position will be granted if that's what you

4    want to do.  Mr. Branham is prepared.  But I also will

5    assure you that no prejudice will obtain by having it

6    heard at some later date.

7           MR. HAZELTON:  Thank you, your Honor.

8           THE COURT:  What else?

9           MS. McVEY:  I think that's it.

10          THE COURT:  Holy moly.

11          MS. McVEY:  Your Honor, the only other thing is we

12   have filed a motion to expedite the Rollins case.

13          THE COURT:  I got it.

14          MS. McVEY:  So it's the same type of case as

15   Hopper.  The Rollins case was filed immediately after

16   Chief Justice Beatty's order saying asbestos dockets

17   would go into general --

18          MR. MERIWETHER:  Circulation.

19          MS. McVEY:  -- general circulation, for lack of a

20   better word.  I am concerned.  I'd like to get that

21   motion heard.  I believe you can hear it as a circuit

22   court judge, but I don't want to -- I wanted to raise

23   that, that Mr. Early told me that they were concerned

24   about hearing that today.

25          THE COURT:  Well --

214

1       MR. MERIWETHER:  Your Honor, I don't know if Will

2  is here, but I have -- Robert Meriwether.  I have some

3  clients in the Rollins case.  It's my position that

4  Rollins, I don't think you had appearances by most of

5  the defendants in Rollins, and so I don't think there's

6  any way to effectively have given notice to the

7  defendants.

8       THE COURT:  Well, I agree with that.  And,

9  furthermore, I don't think y'all got any -- I mean, who

10 knows what the next order will be about all this, but I

11 don't think there's any real need for Mr. Early to be

12 concerned.

13      MS. McVEY:  I agree.  And so since we're not going

14 to hear it today, I'm wondering if we can hear it on

15 June 10th when we do the Fisher.

16      THE COURT:  Yeah.  And I will just say in a little

17 more general fashion since there are still some who

18 have suffered through this whole day because they have

19 various interests in asbestos litigation, if there are

20 other things that are in that same posture that you

21 want to at least get some resolution, if possible, then

22 we'll try to turn June 10th, if I can secure everything

23 forward, into a day when we hear other asbestos things

24 that are ripe to be heard.

25      MALE SPEAKER:  That sounds great.

1          THE COURT:  Does that make sense?

2          MALE SPEAKER:  Yes, your Honor.

3          THE COURT:  Why don't we just do it that way.  In

4    the meantime, what we're trying to do is get together

5    and get our steering committee to come forward with at

6    least some suggestions from both sides of the bar as to

7    how we want to go forward.  And I don't know if that

8    will be complete by June 10th.  Perhaps we'll have a

9    little bit better idea of how we're moving with some

10   kind of memo that I might tweak and get to the Chief on

11   kind of what's happening with this docket.

12         MS. McVEY:  Thank you, your Honor.

13         MR. MERIWETHER:  Thank you, your Honor.

14         I would simply say that for those of us who do

15   have folks in Rollins, we would also be interested to

16   see which judge gets assigned Rollins.

17         THE COURT:  I don't think anything has been

18   decided about this whole thing anyway.

19         You would want to know that before you start

20   jumping on the road of starting to hear motions.

21         MR. MERIWETHER:  Precisely.  And if no other

22   reason, some of the judges before whom I have appeared

23   would take it amiss if someone else accelerated one of

24   their cases.

25         MS. McVEY:  Except that it is a living

216

1  mesothelioma case, so we need to make sure.

2        THE COURT:  We'll figure out something about that.

3        MS. McVEY:  Thank you, your Honor.

4        THE COURT:  Okay.  Court is in recess.

5        (WHEREUPON, proceedings adjourned at 3:17 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

217

```
 1                    Certificate of Reporter
 2
 3         I, Diane L. Marcengill, Official Court Reporter
 4  for the Tenth Judicial Circuit of the State of South
 5  Carolina, do hereby certify that the foregoing is a
 6  true, accurate, and complete transcript of record of a
 7  portion of the proceedings had and evidence introduced
 8  in the trial of the captioned case, relative to appeal,
 9  in the Circuit Court for Richland and Hampton Counties,
10  South Carolina, on the 7th day of May 2019.
11  This transcript may contain quoted material.  Such
12  material is reproduced as read by the speaker.
13  I do further certify that I am neither of kin, counsel,
14  nor interest to any party hereto.
15                           May 8, 2019
16
17  _____
18         Diane L. Marcengill, RPR, CRR, CRC
            Circuit Court Reporter
19
20
21
22
23
24
25
```

Exhibit 24

```
STATE OF SOUTH CAROLINA   IN THE COURT OF COMMON PLEAS
COUNTY OF RICHLAND         FOR THE FIFTH JUDICIAL
CIRCUIT

------------------------x
MICHAEL L. PERRY and      :
LONNIE L LONG,            :    C/A No.
                          :
         Plaintiff(s),    :    2023-CP-40-04072
                          :
      vs.                 :
                          :
AMERICAN INTERNATIONAL    :
INDUSTRIES, et al.,       :
                          :
         Defendant(s).    :
------------------------x
```

_____

Pre-Trial Hearing
_____

BEFORE:  HONORABLE JEAN H. TOAL

LOCATION: Richland County Judicial Center
          1701 Main Street
          Columbia, South Carolina 29201

DATE TAKEN:  Tuesday, July 30, 2024

TIME BEGAN:  11:07 a.m.

TIME ENDED:  5:39 p.m.

REPORTED BY:  Corinne J. Blair,
              Certified Real-Time Reporter
              Certified Court Reporter
              Registered Professional Reporter
              Certified Live-Note Reporter


EveryWord, Inc.
P.O. Box 1459
Columbia, South Carolina 29202
803-212-0012

APPEARANCES:

On behalf of the Plaintiffs:

     RACHEL A. GROSS, ESQUIRE

     E-MAIL: rgross@dobslegal.com

     DEAN OMAR BRANHAM SHIRLEY, LLP

     BENJAMIN H. ADAMS, ESQUIRE

     E-MAIL:  badams@dobslegal.com

       DEAN OMAR BRANHAM SHIRLEY, LLP

       302 North Market Street, Suite 300

       Dallas, Texas  75202

     (214) 722-5990


     THEILE B. McVEY, ESQUIRE

     E-MAIL:  tmcvey@kassellaw.com

       KASSEL McVEY, Attorneys at Law

       1330 Laurel Street

       P.O. Box 1476

       Columbia, South Carolina 29202-1476

     (803) 256-4242

On Behalf of Johnson & Johnson; LTL Management, LLC;
J&J Holdco (NA), Inc.; Janssen Pharmaceuticals, Inc.;
and Kenvue, Inc.:

    MITCH BROWN, ESQUIRE

    E-MAIL:  mitchell.brown@nelsonmullins.com

    MATTHEW BOGAN, ESQUIRE

    E-MAIL:  matthew.bogan@nelsonmullins.com

        NELSON MULLINS RILEY & SCARBOROUGH, LLP

        Meridian

        1320 Main Street, 17th Floor

        Columbia, South Carolina 29201

    (800) 237-2000


    KIM BUENO, ESQUIRE

    E-MAIL: kim.bueno@butlersnow.com

    CHRISTOPHER R. COWAN, ESQUIRE

    E-MAIL:  chris.cowan@butlersnow.com

    AMY M. PEPKE, ESQUIRE

    E-MAIL:  amy.pepke@butlersnow.com

        BUTLER SNOW

        1400 Lavaca Street, Suite 1000

        Austin, Texas  78701

    (737) 802-1820

On behalf of Vi-Jon:

    KURT ROZELSKY, ESQ.

        SPENCER FANE

        27 Cleveland Street, Suite 201

        Greensviille, South Carolina  29601

    KURT ROZELSKY, ESQ.

    (864) 695-5200


    STEPHEN J. McCONNEL, ESQUIRE

    E-MAIL:  smconnell@reedsmith.com

    MELISSA GEIST, ESQUIRE

    E-MAIL:  mgeist@reedsmith.com

        REED SMITH, L.L.P.

        Three Logan Square

        1717 Arch Street, Suite 3100

        Philadelphia, PA 19103

    (215) 851-8121


On behalf of Long's Drug Stores of South Carolina:

    DANIEL ADDISON, ESQ.

    E-MAIL: daddison@hallboothsmith.com

        HALL BOOTH SMITH, P.C.

        11215 N. Community House Road

        Charlotte, North Carolina 28277

    (980) 859-0380

On behalf of American International Industries:

    STEPHANIE G. FLYNN, ESQUIRE

    E-MAIL:  sgflynn@foxrothschild.com

        FOX ROTHSCHILD

        2 W. Washington Street, Suite 1100

        Greenville, SC 29601

    (864) 751-7607

```
 1              (Hearing begins at 11:07 a.m.)

 2

 3          MS. McVEY:  Your Honor, I believe you

 4     remember Rachel Gross from the plaintiffs'

 5     case?

 6          THE COURT:  Yes.

 7          MS. McVEY:  And Ben Adams, who tried the

 8     Glenn case with us, is also here representing

 9     the Perrys.

10          THE COURT:  Very good.

11          And for the defense, Mr. Brown.

12          MR. BROWN:  Mitch Brown, Nelson Mullins,

13     for the Johnson & Johnson defendants.

14          MS. PEPKE:  Amy Pepke with Butler Snow of

15     the Johnson & Johnson defendants.

16          MR. COWAN:  Chris Cowan, Your Honor, for

17     the Johnson & Johnson defendants.

18          MS. BUENO:  Kim Bueno from Butler Snow for

19     Johnson & Johnson defendants.

20          THE COURT:  Very good.

21          MR. McCONNELL:  Your Honor, Steve

22     McConnell on behalf of defendant Vi-Jon.

23          THE COURT:  All right.

24          MR. McCONNELL:  Melissa Geist.  She's with

25     Reed Smith.
```

```
 1              MR. ROZELSKY:  Kurt Rozelsky, Spencer,

 2       Fane, local counsel for Vi-Jon.

 3              THE COURT:  All right.  Now, before we

 4       begin, Mr. Early --

 5              MR. EARLY:  PTI Royston.

 6              THE COURT:  Right.  Mr. Early represents

 7       PTI Royston, and I'd like to put on the record

 8       the status of PTI Royston in this case at this

 9       time.  Mr. Early.

10              MR. EARLY:  Yes, ma'am.  Plaintiffs and I

11       have come to an agreement where I'm no longer

12       in the case.

13              THE COURT:  Very good.  So PTI Royston is

14       out of the case now.

15              MS. McVEY:  And, Your Honor, that also

16       goes for Cosmetic Specialties; that they have

17       resolved, as well.

18              THE COURT:  All right.  Cosmetic

19       Specialties has resolved, so they're gone.  So

20       now the case is Johnson & Johnson, Long's

21       Drugstore.  Is that it?

22              MS. McVEY:  And Vi-Jon.

23              THE COURT:  And Vi-Jon.

24              MS. McVEY:  And, Your Honor, there are a

25       couple of additional defendants, but we are
```

```
 1         very close to resolution.  They're represented

 2         by Mr. Meriwether and Mr. Glenn.

 3              THE COURT:  Mr. Glenn, Mr. Meriwether,

 4         welcome.

 5              MR. MERIWETHER:  Thank you, Your Honor.

 6         We're delighted to be here for a very brief

 7         period.  We are virtually resolved.

 8              THE COURT:  Great.  Now, Vi-Jon, if y'all

 9         are going to participate, you need to be up

10         here at counsel table and not sitting in the

11         back.  Y'all have got to figure out a way to

12         make everybody --

13              MS. McVEY:  Your Honor, I was remiss in

14         not also mentioning that AII Clubman, is also

15         in this case.  They're in default, as you

16         recall.

17              THE COURT:  Right.  AII Clubman is in

18         default.  And so they would be in this case for

19         damages, only.

20              MS. McVEY:  That's right.

21              THE COURT:  And if everybody else

22         resolves, then we'll figure out a way to have a

23         damages hearing for them.

24              MS. McVEY:  Okay.  Thank you, Your Honor.

25              THE COURT:  All right.
```

```
 1              MS. BUENO:  Your Honor, if I may, on

 2      behalf of Johnson & Johnson, just so the record

 3      is clear, there are four entities that we are

 4      representing.

 5              THE COURT:  Right.

 6              MS. BUENO:  So Johnson & Johnson; Kenvue

 7      Inc.; LLT Management, LLC; and Johnson &

 8      Johnson Holdco (NA) Inc., just for the record.

 9              THE COURT:  Right.  Okay.

10              MS. BUENO:  Thank you.

11              THE COURT:  Very good.

12          Okay.  And, you know, what I understand to

13      be the situation now -- y'all can sit.  You can

14      see how everybody is going to be...

15          Miss Flynn, you got something before we

16      get started?

17              MS. FLYNN:  Yes, Your Honor.  I'm here on

18      behalf of American International Industries.  I

19      do have just a quick statement for the Court

20      whenever we get started.

21              THE COURT:  Yeah.  Is it something that

22      has to do with the status in the case?

23              MS. FLYNN:  Your Honor, last evening we

24      filed a motion to stay, just based on the fact

25      that we've got a petition for a writ of cert
```

1       pending with the Supreme Court.

2              THE COURT:  A writ of cert on this case?

3              MS. FLYNN:  Your correct, Your Honor.

4       That's filed a few weeks ago.  That's been

5       fully briefed.  They've responded to it before

6       the Supreme Court.  We've replied and that's

7       pending before the South Carolina Supreme Court

8       on this default issue.

9              So that's -- we just filed a motion to

10      stay last night.  I know they haven't had a

11      chance to respond to it.

12             THE COURT:  What is the basis -- before

13      I've done anything by way of a final ruling,

14      what's the basis for an appeal at this time?

15             MS. FLYNN:  I believe the Court might be

16      aware of the basis for an appeal.  It's that

17      the first amended complaint became the

18      operative complaint once it was filed.  We

19      responded to the first amended complaint.  The

20      second amended complaint was then filed.  We

21      responded to that.  We also, by virtue of our

22      responses to that, those became the operative

23      complaints and we obviated the default.

24             THE COURT:  Right.  I understand the

25      merits of the claim.  How is that appealable

1    now?

2        MS. FLYNN:  It's a novel issue that South

3    Carolina Courts have not ruled upon in an

4    appellate decision as to whether the filing of

5    the first submitted complaint moves to the

6    original complaint and becomes the operative

7    complaint.

8        THE COURT:  I get all that, but let's

9    say -- let's put that question aside for a

10   moment.  This matter has not concluded yet.

11   You've been placed in default, but then it gets

12   to be a default hearing.  Tell me the reason of

13   appellate court proceedings that allows you at

14   this moment to appeal.

15       MS. FLYNN:  We filed a petition for a writ

16   of cert so that the Court could address that

17   novel question and decide whether the case --

18       THE COURT:  Yeah, but even a petition for

19   certiorari also has to await the conclusion of

20   the case.  Your case isn't concluded yet.  This

21   is the same thing that's driving me nuts about

22   the case that I spent all morning on, which is

23   this business of filing appeals before you can

24   file appeals.

25       So I simply say that by means of saying

 1    this.  You proceed at your peril.  I don't know

 2    how you're up there when we haven't concluded

 3    your case here.  All that's happened is you've

 4    been placed in default.  You can contest that

 5    when the case is concluded.  I don't understand

 6    your basis for going up there now, and I don't

 7    see that as staying the activities here, but I

 8    may stand to be corrected by my betters.  I'm

 9    nothing but a simple judge.  But I just say

10    that to you to let you know that you might not

11    want to stray too far from here.

12        MS. McVEY:  And, Your Honor, just to be

13    clear, this is feeling a lot like Sarah Plant,

14    right, where they remove the case the morning

15    of trial; that they filed last night at

16    midnight, the day before this pretrial hearing

17    that they've known about for weeks or months or

18    however long, a motion to stay our case for a

19    living plaintiff.

20        Now, I expect, if you even entertain that,

21    you're going to deny it.  And if you deny it, I

22    expect they're going to even want to appeal

23    that.  And I have several court orders from

24    where a denial of a motion to stay has been

25    appealed by some of these asbestos defendants

1      which the Court of Appeals says is not

2      immediately appealable.

3          Now, I want to put on the record that if

4      anybody tries to stay our case or move our case

5      the morning at trial, whatever it is that has

6      happened in the past, recent past on this, we

7      will be moving for sanctions.

8          This is a living plaintiff.  We've spent

9      money.  Our experts are coming.  So I just warn

10     everybody, because the writ of certiorari, this

11     extraordinary thing is about a default. (sic)

12     Can you imagine the Supreme Court granting a

13     writ of certiorari for every single default in

14     the state?

15         THE COURT:  No, I cannot.  And that's

16     simply what I'm saying; is I regard that as

17     something that is intended -- that is submitted

18     for purposes of delay, and we will deal with it

19     accordingly.  But, you know, you do what you

20     got to do.

21         But it gets to be a point where the

22     sanctity of these rules aren't going to be

23     enforced.  And people aren't going to do this

24     anymore.  And clients need to be told, "Hey,

25     you can't do that in South Carolina."  In some

```
 1        states, they let all this stuff proceed with
 2        appeal and everything.  We're a small state
 3        with a small bench and a small appellate court,
 4        and we have various rules in that regard.
 5            So I tell you that.  I wouldn't stray far
 6        from here if you're going to really insist upon
 7        that.  And if I were you, I would look at my
 8        clients a little bit more strongly about
 9        whether you proceed like this.  This business
10        of last-minute attempts to stay proceedings in
11        this court have never been successful.
12            MS. FLYNN:  Your Honor, if I may preface
13        it by saying we don't want to stay the case.
14        We want to participate in the case.  That's
15        all --
16            THE COURT:  But you want to stay your
17        situation in the case, for sure.  And all
18        that -- all that means is just everybody else
19        would try it and then I'd have to come back
20        here and try your case with a plaintiff that
21        might or might not be alive at that time.  No.
22            MS. FLYNN:  What we want to do is avoid
23        that piecemeal approach.  We want the entire
24        case to be tried once and for all --
25            THE COURT:  Yeah, but it's not going to be
```

```
 1      binding on you.  You can't have a foot in both
 2      camps.  If you say you're on appeal now, it's
 3      not going to bind you.  If you have a
 4      legitimate appeal, then you come back at some
 5      later time and try your case.  You see the bind
 6      you're in?
 7          MS. FLYNN:  I understand, Your Honor.
 8          THE COURT:  All right.  I just -- that's
 9      how it is with me.  I wouldn't stray far from
10      being involved in this case, but it's up to you
11      and your client.
12          MS. FLYNN:  Yes, Your Honor.
13          THE COURT:  The fact it is novel is not
14      going to make one piece of difference about
15      whether it's appealable or not at this time.
16      Okay.
17          Summary judgment.  The first one is
18      Johnson & Johnson.
19          MR. BROWN:  Your Honor, Mitch Brown.  I
20      just want to introduce Ms. Pepke, who's going
21      to argue this.  I did want to -- especially
22      since Ms. McVey mentioned what she did, I
23      wanted to bring up an issue so that we don't
24      run off any rails on this one, which is this is
25      an effort, as I understand it, to amalgamate
```

1      entities or otherwise blur entities or create

2      success reliability, which we understand -- and

3      if she agrees, it's not an issue -- but we

4      understand it to be an issue for the Court

5      because we believe that's an equitable issue.

6           THE COURT:  I don't understand what --

7      you've got to give me a little background about

8      what you're talking about.

9           MR. BROWN:  I'm talking about -- well,

10     maybe Ms. Pepke should argue the motions first,

11     but I'm giving you a clear indication here.  I

12     just want to -- I want to give --

13          THE COURT:  Are you trying to stop the

14     trial of this case?

15          MR. BROWN:  I'm trying to give you some

16     forewarning, Your Honor, that we believe that

17     these issues about success reliability,

18     amalgamation, and things like that are matters

19     for the Court.  They're not jury questions.

20     Now, if Ms. McVey agrees with that, then --

21          THE COURT:  Oh, okay.  I get what you're

22     saying.

23          MR. BROWN:  That's what the issue is.  I

24     just want to bring it --

25          THE COURT:  I got you --

```
 1          MR. BROWN:  I don't want to surprise

 2     anybody.

 3          THE COURT:  I'm following you now.  I'm

 4     tracking you.

 5          MR. BROWN:  Okay.  Thank you.  Ms. Pepke

 6     will argue the motion.

 7          MS. PEPKE:  Good morning -- or actually,

 8     good afternoon, Your Honor.  I'm going -- we

 9     have a lot of motions on the docket, so I am

10     going to do my best not to reargue what's not

11     briefed, and focus on the issue that really

12     needs to be decided considering the plaintiffs'

13     response.

14          (Clarification requested by the

15          official court reporter.)

16          THE COURT:  She's going to pick you up a

17     lot better if you come there.

18          MS. PEPKE:  How's this?  Okay.  Wave at

19     me.  I will admit to having a tendency to get

20     excited and go fast.  Just flag me down.

21          Again, good afternoon, Your Honor.  We've

22     moved for summary judgment on four discrete

23     issues, although I will note, we have a

24     footnote on this success reliability issue.  We

25     filed a motion to dismiss.  Your Honor denied
```

```
 1        that motion to dismiss.  But we had
 2        incorporated those arguments into our motion
 3        for summary judgment.  That's kind of where
 4        Mr. Brown was going.
 5             THE COURT:  I get that.  I was just not
 6        tracking.
 7             MS. PEPKE:  There are a lot of parties and
 8        a lot of issues.  I'll focus on the four
 9        substantive claims that we addressed in our
10        motion.
11             First was the negligence, per se.  I
12        understand plaintiffs' response on that to
13        concede, in essence, that they are not pursuing
14        that anymore.  They had no response.  So I'm
15        not going to reargue those points unless they
16        contest that, but they had no section rebutting
17        our arguments for negligence, per se.
18             That takes us to our challenge to their
19        fraud and fraudulent misrepresentation claim.
20             As Your Honor is well aware, one of the
21        elements of those claims is reliance.  In their
22        response, they, essentially, concede.  They
23        have no evidence that Mr. Perry relied on any
24        misrepresentation by our client.  They attached
25        a few exhibits.  One, a guidebook that went to
```

1    a hospital, not to Mr. Perry.  They attached an

2    ad from 1965, which is before he was born.  No

3    evidence that he saw any of that.

4        What they argue in response isn't that

5    Mr. Perry relied on anything; they assert a

6    novel argument.  I'm going to call it reliance

7    by proxy.  They argue that representations that

8    the Johnson & Johnson defendants or Johnson &

9    Johnson made to the FDA was the fraud and the

10   misrepresentation.  And that induced the FDA to

11   act, and I guess not requiring a warning label

12   or not pulling the product, or requesting that

13   the product be pulled, and that is what led to

14   Mr. Perry's injuries.

15       So they have -- they cite no case law for

16   this reliance by proxy argument.  And I would

17   suggest, Your Honor, that what they really are

18   arguing is fraud on the FDA.  And fraud on the

19   FDA, as I'm sure you're aware, is a claim that

20   is pre-empted under Buckman (ph) of the United

21   States Supreme Court.  They simply have no case

22   law to support their position that this would

23   somehow satisfy the reliance element of their

24   fraud or fraudulent misrepresentation claim

25   and, therefore, it should be dismissed.

 1          That takes us to our third issue, which is

 2     the conspiracy to commit fraudulent

 3     misrepresentation.

 4          Obviously, Your Honor, it requires the

 5     underlying claim of fraudulent

 6     misrepresentation.  If they do not have that,

 7     they do not have conspiracy.  In addition, they

 8     have no evidence of -- of the actual

 9     conspiracy, even if there was the underlying

10     fraudulent misrepresentation claim.  They have

11     no overt act by Johnson & Johnson or any of the

12     J&J defendants, much less evidence that the

13     purpose of some conspiracy was to injure

14     Mr. Perry.  And that is the Sky Dive Myrtle

15     Beach case, 426 South Carolina 175, 2019.  The

16     plaintiff must prove defendant acted for the

17     purpose of injuring the plaintiff.  They have

18     absolutely no evidence of that.

19          And, again, to the extent what they're

20     arguing is it was a conspiracy to submit and

21     persuade the FDA not to require a warning label

22     or not to act on the allegations of asbestos in

23     talc, that is, of course, a fraud on the FDA

24     argument, which is completely pre-empted under

25     Buckman.

```
 1              The last claim that we addressed in our

 2        motion for summary judgment was the loss of

 3        consortium claim.  At the time we filed, we had

 4        not seen evidence of a marriage.  Perhaps

 5        before Mr. Long's deposition, we received a

 6        copy of a marriage certificate from Ontario.

 7        I'll be quite frank with Your Honor.  I spent

 8        quite a bit of time looking at this because it

 9        was interesting and I wasn't sure what the

10        answer was.

11              At the time they were married in 2009,

12        same-sex marriage, of course, was not legal in

13        South Carolina.  There was a statute and also a

14        constitutional provision that outlawed same-sex

15        marriage; that it was not recognized in South

16        Carolina at the time.

17              I could not determine what that meant for

18        the recognizing of marriage today, although I

19        did find, in full disclosure to the Court, a

20        district court opinion, the Braddocks case that

21        would seem to indicate that South Carolina

22        statute and the constitutional amendment were

23        invalid from the beginning.

24              And so I think that means that the

25        marriage is recognized now in South Carolina.
```

1        I just want to flag it, because I, quite

2        frankly, am not sure what the right answer is

3        on that.

4            And, of course, if the marriage is not

5        valid in South Carolina, then there is no

6        consortium claim under the statute.  It must be

7        espoused.

8            THE COURT:  Well, you argue that if the

9        marriage is not valid.  South Carolina

10       certainly recognizes the validity of marriage

11       in other states.  And sometimes other states

12       have different requirements for age, and so

13       forth, than South Carolina.  And South

14       Carolina, nevertheless, recognizes marriages

15       from other states that might not have been

16       legal in this state.

17           And all states had to deal with that way,

18       way before we ever got into the current

19       situation of same-sex marriages.  And the --

20       uniformly, it has been ruled that New York

21       statutory differences don't invalidate the

22       recognition of a marriage from a state where

23       they're different.  Marriages would have been

24       illegal under South Carolina law, because they

25       offended some separate provision, such as

```
 1      penniless marriages.  It may be in a different
 2      category, but for same-sex marriages that were
 3      entered into in a jurisdiction where those
 4      marriages were legal, my understanding is --
 5      the few pieces of litigation I've seen is that
 6      they would be recognized here.
 7          MS. PEPKE:  I believe that was the issue
 8      in the Braddocks case.
 9          THE COURT:  Right.  Exactly.  And that's
10      one of ours.
11          MS. PEPKE:  Well, it is out of the United
12      States District Court for --
13          THE COURT:  Exactly.  But Braddocks was
14      the influence upon the South Carolina Supreme
15      Court.
16          MS. PEPKE:  Yes.
17          THE COURT:  When we first dealt with the
18      issue, when it was brought to us by
19      Judge Condon, on the issue of whether to issue
20      a marriage license, and Braddocks, which dealt
21      with a different factor scenario, to wit, the
22      very thing we're talking about here, is
23      something I would certainly rely on to say the
24      marriage, if it is not otherwise the product of
25      some separate illegality, would be recognized
```

1    here.

2        MS. PEPKE:  Understood, Your Honor.  And

3    all I wanted to do was flag it and how I have,

4    um, kind of chased it down since we filed our

5    motion.

6        THE COURT:  Yeah.

7        MS. PEPKE:  Thank you, Your Honor.

8        Do you have any other questions for me

9    right now?

10       THE COURT:  I don't.

11       MS. PEPKE:  All right.

12       THE COURT:  All right.  Ms. McVey.

13       MS. McVEY:  Thank you, Your Honor.

14       Let me just start with the marriage.  It's

15   clearly valid.  It's a clearly -- in their

16   motion, they just say we've not seen any

17   evidence that there was a marriage, although

18   they both testified extensively about their

19   marriage, their long and loving marriage.

20       Then we actually gave them -- by the way,

21   I've never had a defendant ask me for a

22   straight couple, a heterosexual couple, a

23   marriage license ever.  Never.  Never had that

24   happen.  Never had to give one.

25       So when we did that, now we're going maybe

1      South Carolina doesn't recognize gay marriage.

2          THE COURT:  I'm prepared to rule that the

3      marriage would be recognized under the

4      authority of the federal litigation and,

5      therefore, consortium could be solved.

6      Consortium damage could be solved.  So I don't

7      think we need a whole big, long thing about it.

8          MS. McVEY:  Thank you.  And I just

9      footnote that to you, much like she did, to say

10     because this is a gay couple, there may be some

11     issues we need to address down the line so we

12     aren't inadvertently triggering something in

13     the jury, much like we would with an

14     interracial couple, that kind of thing.  I just

15     want to flag it for the Court.

16         THE COURT:  Yes, I'm sensitive to that.  I

17     have no doubt but what Mr. Brown and his

18     co-counsel will be sensitive to that, as well,

19     and we will figure out some appropriate things

20     to do, if we need to, to be sure that the case

21     is fairly tried and that no untoward feelings

22     about this sort of thing and this sort of

23     marriage get in there that might be solved in

24     voir dire, or there might be some other way to

25     solve it.  Simply by an instruction from me,

```
 1        which is generally the way I try to deal with

 2        these things, rather than have people be forced

 3        to take positions about matters.  But we'll

 4        figure out a way to deal with that.

 5             MS. McVEY:  Thank you, Your Honor.

 6             Just briefly, I know you've read all the

 7        briefing.  We extensively went through

 8        Mr. Perry's use of Johnson & Johnson baby

 9        powder.  And he used it, he testified, from

10        1974 to 2019.  He testified he was allergic to

11        deodorant, and he used Johnson & Johnson baby

12        powder from the time his mom taught him to use

13        it all the way up until 2019, and he would

14        apply it, as he said, from his neck down, under

15        his armpits, all down the body to his feet.  He

16        testified he bought at least ten bottles every

17        year of Johnson & Johnson baby powder.  So that

18        Mr. Johnson -- they do not dispute that Mr.

19        Johnson -- I'm sorry, Mr. Perry was exposed to

20        Johnson & Johnson baby powder extensively.

21        That's not where they go.  I'm not going to go

22        into detail, but you know that he described

23        that when he used it what a mess it made.  It

24        went everywhere.  He had to clean it up.  He

25        inhaled it.  It was a white cloud.  He
```

1    testified as to his – that his mom taught him

2    to use Johnson & Johnson baby powder from the

3    time he's a little guy all the way up, and that

4    he was around her when she was using Johnson &

5    Johnson baby powder.

6        He testified -- and this is important,

7    because they didn't mention this to you.  He

8    testified that he and his family were brand

9    loyal to Johnson & Johnson.  And he testified,

10   "We've always used it.  We all touched it.  We

11   all trusted it.  That was part of our culture."

12   And they trusted it because of the

13   representations that Johnson & Johnson made to

14   the public, including Mr. Perry.  Right.  And

15   you'll see it; we put it in there, the

16   handbooks, the ads, "Mom, put this powder on

17   your babies, it's safe for them."  He relied on

18   that.

19       And while Johnson & Johnson was making

20   these false representations about how safe it

21   was, Johnson & Johnson -- we have this in our

22   briefing -- knew for decades that the talc they

23   used to manufacture the body powder contained

24   asbestos, and they knew that beginning in 1949.

25       And, Your Honor, in our brief from pages

1    six to nine, we kind of outline all the

2    testing, decades worth of testing.  And that's

3    not all of it.  That's just in the brief.

4         Johnson & Johnson mislead and concealed

5    the known information from the public,

6    including Mr. Perry.  They lied to regulatory

7    bodies, and courts.  And why did they do that;

8    what was the motive?  Well -- and we cite this

9    in all the exhibits in the paper -- they

10   describe their baby powder as the golden egg,

11   the flagship product, the sacred cow.  Johnson

12   & Johnson sought to -- and you see it in their

13   documents -- to capitalize on the mother and

14   baby emotional bond, the trustworthiness

15   associated with the brand.  And they noted it

16   would be very bad for business and damage

17   Johnson & Johnson's reputation if it ever came

18   out that the baby powder contained asbestos.

19   And we cite to that testimony.

20        Johnson & Johnson adopted a strategy over

21   decades of being ruthless.  And you see that in

22   the Johnson & Johnson memo in the NIOSH study.

23        They were generating marginal scientific

24   data for national coverage for defending the

25   product.  They were buying the science.

```
 1              Johnson & Johnson memo from 1975 discusses

 2       management authorizations for additional talc

 3       safety studies.  And they even started

 4       attacking the public health community by

 5       creating what they called enemies list.  In

 6       1972, that J&J had an antagonistic

 7       personalities memo.  (sic)

 8           At the same time they were doing all this,

 9       they knew all their testing; they were

10       promoting the purity of the brand and made

11       other claims to the public that Johnson &

12       Johnson knew it could not support.

13           THE COURT:  Ms. McVey.

14           MS. McVEY:  Yes.

15           THE COURT:  I'm very familiar with your

16       filing on this.  I have tried a good many

17       Johnson & Johnson cases.  Very familiar with

18       the contentions that are made, both sides,

19       about the records of Johnson & Johnson.

20           I will deny the motion on the summary

21       judgment as to the negligence to the first

22       issue.  So, all right.

23           What else do I have to --

24           MS. McVEY:  Your Honor, they moved for a

25       summary judgment on the fraudulent
```

```
 1    misrepresentation and the fraud.

 2            THE COURT:  Right.

 3            MS. McVEY:  And that's really what I was

 4    going through, what Johnson & Johnson was

 5    representing to the public and --

 6            THE COURT:  I've tried those cases before.

 7    The fraud is -- the representations they made

 8    to the public in the face of the testing that

 9    they had done, that's clearly a contested

10    matter of fact.  And, therefore, I will deny

11    summary judgment with respect to the fraud

12    count.

13            MS. McVEY:  Thank you, Your Honor.

14            The last one, they moved to, is conspiracy

15    and we are going to withdraw our conspiracy

16    claim against Johnson & Johnson.

17            THE COURT:  Very good.

18            Negligence, per se, challenges to fraud,

19    and the consortium would go -- yes, ma'am.

20            MS. McVEY:  Pardon me, Your Honor.  I just

21    wanted to address negligence, per se.  They

22    said we didn't address it.  That was

23    inadvertent.

24            We have a statute -- filing a statute in

25    South Carolina is, of course, evidence of
```

```
 1    negligence, per se.  And in this case, the

 2    evidence that they violated a statute is a

 3    strict liability statute, right?

 4         THE COURT:  That's right.  I've tried

 5    these cases many times and that's the basis for

 6    it.  Certainly, your projections are noted, and

 7    your positions are protected.

 8         MS. PEPKE:  Thank you, Your Honor.

 9         MS. McVEY:  Thank you, Your Honor.

10         THE COURT:  Okay.  That summary moment is

11    Johnson & Johnson, et al.

12         MR. BROWN:  Your Honor, may I mention one

13    other thing on this mode of trial issue before?

14    Just wanting to make sure, I understand Your

15    Honor just ruled, which is understandable and

16    we get that.  It's the other entities that are

17    being locked in and Ms. Bueno listed out, and I

18    think they are asserting that all of them also

19    committed fraud or also committed things --

20         THE COURT:  They are.

21         MR. BROWN:  -- and if they are asserting

22    that they are mere continuations, they're

23    amalgamated, that type of thing --

24         THE COURT:  Indicated.

25         MR. BROWN:  -- our point is, it would be a
```

```
 1        court matter, not a jury matter.  That issue of

 2        whether they should be disregarded as separate

 3        would be not for a jury; it would be for the

 4        Court.  The only reason I bring it up is

 5        because of what Ms. McVey said, especially

 6        that's a mode of trial issue.  If she wants it

 7        to be in front of a jury -- I still don't know.

 8        Maybe she doesn't.  But if she wants that --

 9             THE COURT:  She wants it to be in front of

10        a jury.  She wants the whole group to be for

11        the jury on the theory of amalgamation.  And we

12        certainly -- that's certainly a recognized

13        platform in South Carolina.  Kincaid comes to

14        mind.

15             MR. BROWN:  Right.  The -- I understand

16        that she would want them there --

17             THE COURT:  Yeah.

18             MR. BROWN:  -- for a jury determination.

19        The issue I'm raising, which I'm trying to be

20        clear here -- maybe not doing a good job -- is

21        the question of whether there should be success

22        reliability or --

23             THE COURT:  I'm not going to have a trial

24        within a trial, or a trial before the trial,

25        Mr. Brown, on that issue.  If I'm wrong about
```

1         it, your position on appeal will be protected,

2         but I intend to allow all parties to go

3         forward.

4              MR. BROWN:  Understood.

5              THE COURT:  If you got some other find

6         that you want to make to protect your position,

7         fine, but I'm not going to spend a whole lot of

8         time on having some kind of separate proceeding

9         before I try this case.  This case is going to

10        be tried Monday.  I'm not going -- y'all

11        springed this right at the last on me.  I've

12        got this huge stack of boxes just recently with

13        all of your contentions on.  I'm not going to

14        stop this thing and go through a brief

15        determination on that.

16             MR. BROWN:  I don't think you need to stop

17        it, Your Honor.  I just think it's the Court's

18        decision, not the jury's decision.

19             MS. McVEY:  Your Honor, I'm sorry to

20        interrupt you, but I haven't seen any of your

21        briefing on this.  I don't actually know what

22        you're talking about.  I do know that she

23        denied the motion to dismiss, again --

24             THE COURT:  That's correct.

25             MS. McVEY:  -- and so we are going forward

```
 1          with this, but I -- it's hard for me to make it

 2          --

 3                MR. BROWN:  We'll file a brief on it.  And

 4          make --  I mean, there are a couple --

 5                MS. McVEY:  These are jury questions and

 6          we need to know -- everybody goes on the jury

 7          form --

 8                THE COURT:  Yes.

 9                MS. McVEY:  -- that you denied the motion

10          to dismiss.  That's our expectation.

11                MR. BROWN:  So we don't know until she

12          just tells us that all these issues of success

13          or -- reliability, amalgamation, are going to

14          be determined by the jury, if she wants them to

15          be, instead of Court.  We're saying the Court

16          is the one that decides that, if they're not

17          genuine issues of material fact that are at

18          play.  And I think --

19                THE COURT:  Your contentions about that

20          will be noted when you are reduced to some sort

21          of briefing, Mr. Brown.  But this is late in

22          the day to do that.

23                MR. BROWN:  Understood.

24                THE COURT:  I sometime ago denied the

25          motion to take these parties out of the case.
```

 1          And this comes very late.  And I probably will

 2          simply deny it and let you preserve your

 3          position going forward.

 4              MR. BROWN:  Okay.  Your Honor, we'll file

 5          something.

 6              THE COURT:  Very good.

 7              MS. McVEY:  Thank you.

 8              THE COURT:  I'm not trying to limit you in

 9          what you file.  I'm trying to preserve your

10          position, but my intention is just to move

11          forward.

12              MR. BROWN:  Understood.

13              THE COURT:  Okay.  All right.  Now, Long's

14          Drugstores.

15              MR. ADDISON:  Afternoon, Judge.  How are

16          you?

17              THE COURT:  I'm fine.

18              MR. ADDISON:  I'm not going to belabor too

19          much.  I think you got my memo in front of you.

20          I don't think you need a whole lot of

21          information from me.  Ms. McVey and I were

22          talking beforehand.  Their response -- they're

23          actually revoking some information.  Their

24          response that Mr. Long -- who testified that he

25          bought the product from my client, Long's

```
 1        Drugstores -- their indication is that is not
 2        accurate.  There is no testimony from
 3        Mr. Long's within his very long deposition --
 4        four-day long deposition -- that he bought any
 5        type of talc-containing materials from my
 6        client.
 7             THE COURT:  Did you attend his deposition?
 8             MR. ADDISON:  No, ma'am.  We were not a
 9        party at the time.
10             THE COURT:  When did you become a party?
11             MR. ADDISON:  In the second amended
12        complaint in February.
13             THE COURT:  All right.  Have you asked
14        them for any information since that time about
15        this?
16             MR. ADDISON:  We have.  I talked to Ms.
17        McVey.  Basically, Mr. Long --
18             THE COURT:  I'm talking about
19        interrogatories --
20             MR. ADDISON:  -- and Mr. Perry -- yes,
21        ma'am.  We submitted all of that.  Mr. Perry
22        has not submitted any kind of information to us
23        that he's ever purchased from Long's
24        Drugstores.
25             THE COURT:  All right.  Well, I'll see
```

1        what she has to stay.

2            MR. ADDISON:  I'll rely on my brief.  If

3        you need anything else, I'll answer --

4            THE COURT:  Well, your brief is a rather

5        short thing.  It just said we didn't do it.

6            All right.  Ms. McVey.

7            MS. McVEY:  Your Honor, thank you.  And

8        let me be clear that I am incorporating our

9        brief in response -- our 19-page brief or 50

10       some exhibits, the corporate representative

11       testimony of Long's and others.

12           Mr. Addison is correct in that Mr. Perry

13       was deposed before Long's was a defendant in

14       the case.  So the testimony we have is not --

15       we don't have anything from Mr. Perry that he

16       purchased from Long's.  What we have, and our

17       basis for filing against Long's was that

18       Mr. Perry worked in the hotel business.  He

19       traveled to Columbia often and there were

20       several hotels where he would come and stay in

21       Columbia.  He did use the talcum powders in

22       Columbia, including Gold Bond.  At the time,

23       Long's had three stores in Columbia.  They -- I

24       think one or two had kind of small retail-like

25       places where they likely sold Gold Bond and

1          Johnson & Johnson.  But he is correct that Mr.

2          Perry did not testify that he actually bought

3          the product from Long's Drugstore.

4              THE COURT:  So what is your basis for

5          including them in?  I know he says he purchased

6          Gold Bond when he was traveling, but his

7          deposition was taken before you added Long's.

8              What I'm trying to do is pick some piece

9          of evidence that you're going to put in that

10         shows that he actually made a purchase from

11         Long's, either by way of his testimony or

12         somebody else's.  So tell me what that is.

13             MS. McVEY:  I don't have that, Your Honor.

14         What I do have is that he bought talcum powder

15         here.  He did not say that he bought it from

16         Long's.

17             THE COURT:  All right.  Very good.

18             MS. McVEY:  Thank you, Your Honor.

19             THE COURT:  I will grant the motion for

20         summary judgment as to Long's.

21             MR. ADDISON:  Your Honor, we had --

22             THE COURT:  Sir.

23             MR. ADDISON:  There was several.  We also

24         had consortium and -- all three counts you're

25         granting?

1          THE COURT:  I'm granting you summary

2     judgment and letting you out of the case.

3          MR. ADDISON:  That's what I'm asking.

4     Thank you.  That's all I'm asking.  I just

5     wanted to be clear.

6          THE COURT:  All right.  We're going to

7     file a Form 4 that just says your motion is

8     granted.  I'm not going to spend any time on it

9     other than that.

10          All right.  Vi-Jon.

11          MS. GEIST:  Melissa Geist.

12          OFFICIAL COURT REPORTER:  Spell your last

13     name.

14          MS. GEIST:  G-E-I-S-T.

15          Justice Toal, good afternoon.  May it

16     please the Court.  Your Honor, I haven't had

17     the pleasure of being in front of you yet, so I

18     just wanted to introduce myself.  Again, my

19     name is Melissa Geist.  I represent Vi-Jon.

20          And, Your Honor, I think it's important to

21     just -- let me briefly introduce Vi-Jon and who

22     they are, just so Your Honor is generally

23     aware.  So I think Your Honor had said a couple

24     of times, this is a small court, small

25     courtroom.  Vi-Jon is a small company.  They

1      have two manufacturing sites in Tennessee

2      and --

3            THE COURT:  I'm familiar with Vi-Jon.

4      Vi-Jon makes Equate and Wal-Mart sells it,

5      right?

6            MS. GEIST:  At certain points in time,

7      Your Honor.

8            THE COURT:  I understand we're going to

9      talk about what those are.  I'm not completely

10     unfamiliar.  I know Equate.

11           MS. GEIST:  Thank you.  Thank you, Your

12     Honor.  I was just going to say that Vi-Jon has

13     manufactured nail polish remover, mouthwash,

14     antibacterial soap, and, at times, you are

15     correct, Your Honor, Vi-Jon has manufactured

16     talcum powder products for retailers like

17     Wal-Mart at certain times.  And we are here --

18     your Honor is correct -- because at times

19     Vi-Jon manufactured the Equate baby powder

20     product.

21           But, Your Honor, I'm standing in front of

22     you, again, seeking summary judgment and

23     dismissal of the case as to Vi-Jon, because

24     there is no evidence that would -- that would

25     permit this case to go forward.

```
 1              Our position is Vi-Jon should not even be
 2      here next week, Your Honor.  And the reason, I
 3      think, is very, very simple.  Earlier today,
 4      Your Honor, in connection with other arguments,
 5      you said a couple of times, let's talk about
 6      the heart and soul of the case.  The heart and
 7      soul of the case with respect to Vi-Jon, the
 8      claims Mr. Perry has against Vi-Jon, is
 9      plaintiffs must prove that Mr. Perry used the
10      Equate product and that it contained asbestos.
11              THE COURT:  Right.  Number 1.
12              MS. GEIST:  Number 1 --
13              THE COURT:  Excuse me.
14              MS. GEIST:  Number 1, Your Honor, core
15      part of the case:  Is there proof that there
16      was asbestos in the Equate --
17              THE COURT:  Yeah, that -- that's -- hang
18      on for a minute.
19              MS. GEIST:  Yes, Judge.
20              THE COURT:  You say that y'all
21      manufactured talcum powder from July of 2016.
22      I don't know what the evidence will show about
23      that.  Ms. McVey can tell us in a minute.  But
24      he testified he used Equate from 2003 to 2018
25      or '19.  That would encompass the period of
```

```
 1        time when you say that Vi-Jon was manufacturing

 2        Equate.  So let's go on to talk about the

 3        second half of it.

 4             MS. GEIST:  Okay.  Well, the second half,

 5        Your Honor --

 6             THE COURT:  Does it contain asbestos?

 7             MS. GEIST:  Well, the first part is, there

 8        was no evidence of asbestos in the Equate

 9        product.  The primary testing expert on behalf

10        of plaintiffs --as I'm sure you're very

11        familiar -- is Dr. Longo.

12             Dr. Longo never tested a single bottle of

13        Equate.  Dr. Longo is the primary testifying

14        expert for plaintiffs on testing.  There is

15        nobody that is going to get up in the

16        plaintiffs' case and stand before the jury and

17        say that they tested a bottle of Equate and

18        found asbestos.  There is no evidence of that

19        in this case.

20             THE COURT:  All right.  Other ways that

21        asbestos in a particular product is -- proves

22        by showing that the product used talc from

23        certain mines and showing that those mines

24        contained asbestos.  So what's the deal about

25        that?
```

```
 1          MS. GEIST:  Well, Your Honor, we
 2     understand, because we asked Dr. Longo at his
 3     deposition, "Did you test the Equate product?"
 4          "No."
 5          THE COURT:  Okay.  He didn't test it.
 6          MS. GEIST:  He didn't test it, and he
 7     doesn't intend to for purposes of this case.
 8          THE COURT:  Right.  I got you.
 9          MS. GEIST:  And we understand -- although
10     we're guessing a little bit -- we understand
11     that plaintiff's counsel will ask hypothetical
12     questions of Dr. Longo in front of the jury and
13     ask questions like, you know, "Have you found
14     veins of asbestos in certain mines?  Assuming
15     that Vi-Jon's talc used in the Equate brand
16     product came from those mines, can you conclude
17     that the product contained asbestos."
18          THE COURT:  Right.
19          MS. GEIST:  We assume that that is going
20     to be --
21          THE COURT:  Okay.  If it is, what evidence
22     have they got that as to what mines Equate got
23     its talc from?
24          MS. GEIST:  Well, Your Honor, if we are at
25     trial here in front of Your Honor next week,
```

```
 1          obviously, a Vi-Jon representative will testify

 2          about the source of the talc that --

 3               THE COURT:  Well, they, obviously, have

 4          deposed --

 5               MS. GEIST:  Well --

 6               THE COURT:  After I figure out whether

 7          there will be any evidence that can be put

 8          before the jury next week that shows that the

 9          mines in which Equate produced its material

10          contained asbestos, is there some evidence

11          along those lines?

12               MS. GEIST:  Well, Your Honor, my

13          understanding is that Dr. Longo has found,

14          through glass hole testing or otherwise, veins

15          of asbestos in certain mines.

16               THE COURT:  And is there proof for which

17          mines Equate used to create its talc?

18               MS. GEIST:  There will be evidence of

19          which mines Vi-Jon --

20               THE COURT:  And is one of those mines a

21          mine that Longo says had asbestos in it?

22               MS. GEIST:  That's correct, Your Honor.

23               THE COURT:  Then that's all I need to

24          know.

25               MS. GEIST:  Your Honor, can I just address
```

1       that point, though, because I am not aware of a

2       case, either under South Carolina precedent or

3       anywhere, that says just because there was a

4       finding of asbestos in certain areas of a mine

5       that the actual product that came out of those

6       mines was contaminated with asbestos.  It's too

7       big of an evidentiary leap, Your Honor, and I'm

8       not aware of any precedential court finding,

9       ruling, that has said you don't actually have

10      to test the product.

11              THE COURT:  That's not what I'm offering.

12      What I'm offering is that summary judgment is a

13      -- is a certain point in a case.  And in

14      summary judgment, all inferences are looked at

15      in favor of the non-moving party, in this case,

16      the plaintiff.  And if there is a scintilla of

17      evidence that will support their contention

18      that the mines that were used to create Equate

19      contain asbestos, then that's enough to get

20      them past summary judgment.  Whether they're

21      going to have enough to prove it acceptably

22      enough for me to let Equate go to the jury, I

23      don't know at this time, but I'm at a very

24      preliminary stage, and they do have a little

25      bit of evidence about that.

```
 1            MS. GEIST:  And I appreciate that, Your

 2       Honor, but I don't believe that that can be the

 3       law going forward at this stage of the case.  I

 4       was thinking of an analogy, Your Honor.  We

 5       were thinking about this argument, thinking of

 6       how I wanted to present it to the Court.  And

 7       it occurred to me that we often in -- you know,

 8       in drug -- pharmaceutical litigation, you have

 9       cases of contaminated medication, contaminated

10       pills, but it never means that you can assume

11       that every single product or pill that came out

12       of that pharmaceutical company was

13       contaminated.  It's simply eliminates to a

14       batch or batches.  And then, Your Honor, at the

15       end of the day, the plaintiff still needs to

16       prove that he or she ingested a pill that was

17       actually contaminated.

18            THE COURT:  But here's what -- I probably

19       recited the wrong standard -- I know I did --

20       just a moment ago.

21            Scintilla is not the test.  It's whether

22       there is a genuine issue of material fact.  You

23       and I are debating right now this genuine issue

24       of material fact.  QED.  There is a genuine

25       issue of material fact, and, therefore, I'm not
```

1     going to grant summary judgment.

2        MS. GEIST:  Your Honor, should I turn to

3     the second point?  Because I think the second

4     point is, frankly, dispositive.  Even if --

5     even if assuming -- let's assume, for purposes

6     of this argument, that there was asbestos found

7     in the Equate brand product.  The second part

8     of our argument is that the exposure to

9     Mr. Perry does not meet the requirement --

10        THE COURT:  The law passed --

11        MS. GEIST:  -- under South Carolina law,

12     in the Henderson test.  And, Your Honor, I

13     really, on this point --

14        THE COURT:  I'm not going to make summary

15     judgment determinations.  That's a huge

16     material issue of fact.  It's going to depend

17     on what the experts say.  This is always a

18     battle of the experts.  But summary judgment

19     will not be warranted on that basis.

20        MS. GEIST:  But, Your Honor, may I

21     approach, because I want to get to what the

22     expert has to say on that?

23        THE COURT:  You can just tell me briefly,

24     but, see, I'm not in the business of weighing

25     the experts at this time.  They're going to

1    have an expert that says one thing, and you're

2    going to have an expert that says another

3    thing.  That's not what summary judgment is

4    about.

5        MS. GEIST:  And, Your Honor, I agree with

6    you.  And that, typically, is how cases

7    proceed.  The expert for the plaintiff says one

8    thing; the expert for the defendant comes in

9    and says something, and the jury has to weigh

10   what those experts say and make a decision.

11   But here it is very rare when a plaintiff's

12   expert makes the argument for you, and that is

13   our position.  Dr. Longo always does a dose

14   calculation and exposure calculation, and he

15   did it in this case.

16       And that's, Your Honor, what I would like

17   to hand up to you, if I may approach?

18       THE COURT:  I'm not going to get into a

19   qualification of Longo in the connection with

20   this particular motion.  We got a ways to go in

21   this hearing today.  We've got a whole section

22   of it that's going to deal with whether these

23   experts can be allowed to testify.  This is

24   always what happens with Longo.  Frankly, it's

25   going to happen with y'all's experts, as well.

1    I've got a lot of questions in all kind of

2    ways.  But, ma'am, let me just simplify this

3    thing.  All of your position's completely

4    protected in your very excellent motion, your

5    brief, and your presentation, but I will deny

6    the motion on summary judgment.

7        MS. GEIST:  Your Honor, just for the

8    record, can I just add one thing and then I

9    promise I will sit down?

10       THE COURT:  All right.

11       MS. GEIST:  All right.  So you had said

12   something about you understand Dr. Longo's

13   calculation, and we all do.  But in this

14   case -- this is why I'm trying to make the

15   point, Judge, because this is a different case

16   for a different company.  Dr. Longo made that

17   calculation of dose, or exposure to the

18   products at issue for seven products.  He could

19   not and did not make it for the Equate product

20   manufactured by Vi-Jon.

21       And when we asked him at his deposition:

22   Why didn't you do it, here on page 7 of his

23   notes that were produced before his deposition,

24   here are the dose calculations, exposure

25   calculations for seven other products, nothing

1        with the Equate brand product.  And, Your

2        Honor, we asked him when he was being deposed

3        -- I think it was maybe a week ago, "Why didn't

4        you do it for Equate?"  And he told us, quote,

5        I didn't really have enough information to do

6        that.

7            So it is an admission by the primary

8        expert on behalf of Mr. Perry that he could

9        not -- based on the testimony from Mr. Perry,

10       based on the evidence in the case to date, he

11       could not say how much exposure Mr. Perry had

12       with respect to the Equate product.

13           And what we know, Judge, in this case,

14       Mr. Perry never bought it.  Never once; not a

15       single bottle.  He never bought the product.

16           His testimony was when his spouse and he

17       would shower together and his spouse would get

18       out of the shower first and he would grab the

19       Equate, if that would happen, then he was

20       possibly also using the Equate brand product.

21       But we know from his spouse, Lonnie Long, who

22       testified last week, he said, "My spouse,

23       Mr. Perry, the plaintiff, used Johnson &

24       Johnson powder 95 percent of the time.  The

25       other 5 percent are" --

```
 1              THE COURT:  Okay.  I --
 2              MS. GEIST:  Maybe the Equate --
 3              THE COURT:  You made your --
 4              MS. GEIST:  -- products, Your Honor, but
 5      how can -- how can that rise to the level of
 6      what's required?
 7              THE COURT:  I understand.  You made your
 8      point.
 9              MS. GEIST:  Thank you, Judge.
10              THE COURT:  All right.  Ms. McVey.
11              MS. McVEY:  Ms. Gross.
12              THE COURT:  Ms. Gross.
13              MS. GROSS:  Yes, Your Honor.
14              THE COURT:  I mean, I want one sentence
15      here.
16              MS. GROSS:  There may be two, but I'll be
17      fast, I promise.
18              So, first, of course, Mr. Perry used it on
19      himself.  His husband purchased it.
20              THE COURT:  I'm not worried about that.
21      All I'm concentrated on is whether there's
22      expert testimony --
23              MS. GROSS:  Got it.
24              THE COURT:  -- that Equate was made from
25      mines that contained asbestos.
```

1          MS. GROSS:  Yes, ma'am.  From two experts.

2     It's not just Dr. Longo.  It's Mr. Bailey, as

3     well.  Mr. Bailey has testified that --

4          THE COURT:  Mark Bailey has testified.

5     Montana, Canada (sic), Vermont.  And which mine

6     was Equate made from?

7          MS. GROSS:  Equate was made during the

8     period at issue -- it was sold by Barretts.  It

9     was made from Montana.

10         THE COURT:  Montana.  Okay.  We all got

11    Montana -- testimony.  That's all I need to

12    know at this time.  Whether I'll let you go to

13    the jury with it is another question, but right

14    now, it's a genuine issue of material fact and

15    you got that.

16         MS. GROSS:  And just for the record, it's

17    not just the money.  It's actually hundreds of

18    bottles of products containing the Montana

19    talc.  It could have been tested by both

20    Mr. Bailey and Dr. Longo.  It's what's inside

21    of the bottle that counts.  And I talked about

22    that.  So just so the record's clear on that,

23    as well.

24         THE COURT:  Thank you, ma'am.

25         MS. GROSS:  Thank you.

```
 1            THE COURT:  All right.  The motion is
 2       denied.
 3            All right.  Plaintiffs' motion -- motions
 4       in liminé.
 5            All right.  I hope plaintiffs and
 6       defendants, that there's been some kind of
 7       consultation about these things --
 8            MS. McVEY:  Your Honor, I was wondering --
 9            THE COURT:  -- examination of all my old
10       rulings, because I'm probably not going to hear
11       too much on those.  I want to let people
12       preserve their positions, but Plant was one of
13       the latest in a series of talc cases I tried.
14       I will say this -- and y'all can chew on this.
15       I will take a break before we start this.  But
16       the main thing that I want to concentrate on is
17       the expert testimony.
18            Plant was my latest examination of all of
19       this.  And I must say to you that the impact of
20       more recent examination of the big issue, which
21       is, hey, crocidolite is the terrible bad
22       asbestos, but chrysotile is the good asbestos.
23       And by the way, it has these cleavage
24       fragments.  The concept being those cleavage
25       fragments can't worm their way down into the
```

1          areas of the lung where mesothelioma is

2          created.

3               I'm going to be looking very carefully at

4          what experts can say to all of that.  I am

5          particularly concerned about, on the defense

6          side, and it's Sanchez and McCrone.  That's his

7          big bailiwick, but he cannot diagnose

8          mesothelioma, nor can a lot of these experts.

9               And the big takeaway from Plant is, I did

10         not allow these non-medical experts to testify

11         about what causes mesothelioma.  They can

12         testify about deposits and that kind of thing,

13         but what causes mesothelioma has got to be

14         someone that's got some qualification.

15              A lot of these experts -- well, you had

16         one, particularly in the old days, who

17         testified all around that mesothelioma -- and

18         wanted to testify mesothelioma of the plaintiff

19         in the case was idiopathic or spontaneous.

20              Idiopathic simply means we don't know what

21         caused it.  Spontaneous is not any kind of

22         medical diagnosis that has stood up to more

23         recent examination of this issue of the cause

24         of mesothelioma.

25              So, I'm going to -- what I'm going to be

1        doing is looking at these experts and just give

2        you all fair warning in advance.  All the rest

3        of these routine motions that I have decided a

4        thousand times, I hope we can sail through and

5        concentrate our efforts on what kind of expert

6        testimony is going to be allowed and the ambit

7        of that.

8            I rarely knock experts out totally, even

9        though each side always wants me to knock out

10       the other side's expert completely.  I don't do

11       that.

12           I think these toxic tort cases are the

13       battle of the experts, but I do put some

14       scrutiny on what those experts are qualified to

15       testify about.  And so that's the way I'm going

16       to be driving with some of this.

17           Ms. McVey.

18           MS. McVEY:  Your Honor, I think that makes

19       sense.

20           Just for the record -- and I know we gave

21       you copies -- we filed for everybody to have

22       their pretrial hearing transcripts in Plant,

23       Jolly, and Taylor.  I think it captures almost

24       every --

25           THE COURT:  It does.  I looked back on

1        those and made notes.

2            MS. McVEY:  So if we were to take a break,

3        I think I can check with somebody and see what

4        kind of agreement we have.

5            THE COURT:  That would be so nice.  The

6        Omnibus ones, it looks to me like you ought to

7        be able to check off pretty easily.  And then

8        we can spend some time on the ones that are

9        really the very principle position taken.

10           Okay.  It is now 1:00.  How much time do

11       we need?  The court reporter's the one we need

12       to give real mercy.

13           MS. McVEY:  We're happy to do anything you

14       want.  We're here to stay here to work if you

15       want.  If people want to grab a little sandwich

16       so no one gets cranky, I'm good with that.

17           THE COURT:  How about 1:15 or as close

18       thereof as we can get?  Does that give you

19       enough time?

20           MS. McVEY:  You said 1:15?

21           THE COURT:  I mean -- excuse me.  2:15.

22       2:15.

23               (A luncheon recess was taken from

24       1:00 p.m. to 2:14 p.m.)

25               (Court resumed session at 2:14 p.m.)

```
 1          THE COURT:  All right.  We're on

 2     plaintiffs' motions in liminé.  Okay.

 3          MS. McVEY:  And, Your Honor, the easiest

 4     thing may be to start with the plaintiffs'

 5     Omnibus, and we can tell you we've agreed on

 6     some and some with a few caveats that we can --

 7          THE COURT:  All right.

 8          MS. McVEY:  -- probably just walk through.

 9          THE COURT:  Okay.

10          MS. McVEY:  If you look at Omnibus,

11     starting with the first one, collateral source,

12     we agree to that one.

13          THE COURT:  Hang on.  Yeah, all right.

14     What about it?

15          MS. McVEY:  We've agreed.

16          THE COURT:  Agreed.  Okay.  On 1B,

17     circumstances of informal counsel.

18          MS. McVEY:  Your Honor, my understanding

19     is we agreed to that one, as well.

20          MS. BUENO:  Agreed.

21          THE COURT:  All right.  1C, exposure to

22     substances other than talc or asbestos.

23          Ms. McVey?

24          MS. McVEY:  We agreed to that one.

25          THE COURT:  All right.  Motion in liminé
```

1      1D, reference to or evidence of Dr. Longo's

2      address -- arrest.

3           MS. McVEY:  Agreed.

4           THE COURT:  Very good.  All right.

5           Dr. Longo and the confederate flag.

6           MS. McVEY:  Agreed.

7           THE COURT:  Suggestion that defendants are

8      not held to the standards of an expert.

9           MS. McVEY:  We agreed.

10         MS. BUENO:  Agreed.  Your Honor, we agreed

11     to follow the pattern instructions here that

12     Your Honor has given.  We stand on our briefing

13     on other explanation.

14         THE COURT:  Yeah.  Well, y'all know what

15     my instructions are and that's what I'm going

16     to do.

17         1G, suggestion that the plaintiffs are

18     held to the standard of an expert.

19         MS. McVEY:  We agree.

20         THE COURT:  All right.  Past or future

21     compromise settlement resolutions.

22         MS. McVEY:  We agreed.

23         MS. BUENO:  We agree with the caveat that

24     -- that the actual nexus of their motion kind

25     of bled over into our defendants' motion in

```
 1       liminé number 9, about publishing parts of the

 2       complaint.

 3            THE COURT:  Yeah.  You know that I'm not

 4       going to do that, so I understand you reserve

 5       your right to argue that, with Smith versus

 6       Tiffany and Mason versus Carasi (ph).  Okay.

 7            1H, past or future compromise resolutions.

 8       Agreed.  And statements by the courts.

 9            MS. BUENO:  We agree, Your Honor, as it

10       relates to witnesses that are in this trial.

11       If there are orders related to witnesses that

12       come up during examination of other experts, we

13       agree to approach before using those.

14            THE COURT:  Yeah.  I never allow it in

15       evidence.  You can argue that as a piece of

16       support for whatever position you're taking in

17       legal arguments made, but I never allow that

18       kind of thing in evidence before the jury.  So

19       just so you know.

20            MS. BUENO:  Thank you.

21            THE COURT:  All right.  Motion in liminé

22       1J.

23            MS. McVEY:  Your Honor, I think we need to

24       argue this one.  This is --

25            THE COURT:  All right.  You go forward.
```

1           MS. McVEY:  Thank you, Your Honor.

2           This really has to do with preventing

3      Johnson & Johnson, or Vi-Jon, but particularly

4      Johnson & Johnson, to come in and say, "This

5      company has always acted ethically.  We've

6      always done the right thing by customers."  And

7      if they're going to say that, then we believe

8      it opens the door to a lot of other bad stuff

9      that Johnson & Johnson's done, not just as it

10     relates to talc.

11          And we give you some examples in our

12     briefing, but, you know, that they were sued by

13     DOJ for illegal marketing of Risperdal; that

14     they've been subject to congressional

15     investigation.  All of that stuff that would

16     not necessarily come in unless they were having

17     people vouch for what a great, safe, ethical

18     company Johnson & Johnson is.  That's what

19     we're seeking to prevent.

20          THE COURT:  All right.  Counsel.

21          MS. PEPKE:  Thank you, Your Honor.

22          We just wanted to be clear on this.  We

23     agree that we're not going to vouch or bolster

24     as that is defined under South Carolina law.

25     We're not going to vouch for the credibility.

```
1        We personally believe in a witness or our
2        witnesses believe --
3           THE COURT:  Well, if you specifically
4        address "We've always been ethical on this sort
5        of thing," you say that, you're going to open
6        the door.
7           MS. PEPKE:  Agree, Your Honor, but we also
8        need to rebut anything that plaintiffs put on
9        in their case.  They get up and --
10          THE COURT:  Oh, sauce for the goose is
11       sauce for the gander.  If they open the door,
12       it's always out there.  So if they open the
13       door, then we'll talk about it.
14          MS. PEPKE:  Okay.  Thank you, Your Honor.
15          THE COURT:  You're not precluded from
16       arguing, if they open the door, but I have
17       never seen it happen that it went that far with
18       any of the cases I've had.
19          MS. PEPKE:  Thank you, Your Honor.
20          THE COURT:  All right.  Ms. McVey, so, all
21       right, we understand each other on vouching and
22       bolstering.  We'll grant that.
23           Insincere use of apologies and other
24       similar unprofessional behavior.
25           What do you mean by that?
```

```
 1          MS. McVEY:  Here's what we mean.  If --
 2     what I want to avoid happening is that Johnson
 3     & Johnson's lawyer goes up to Mr. Perry and
 4     says, "We're just so sorry that you have this
 5     mesothelioma."  It just puts him in a very
 6     awkward position in front of the jury.  If they
 7     want to apologize to him sitting at the table,
 8     privately, I think that's totally valid if they
 9     feel that way, personally.  But just putting it
10     in front of the jury just feels like what is
11     Mr. Perry supposed to do with all that?
12     "That's okay.  Don't worry about it."  I just
13     think that doesn't need to be done in front of
14     a jury.
15          THE COURT:  All right.  Counsel.
16          MS. PEPKE:  Your Honor, I was actually
17     surprised to find case law on this, but it is
18     completely appropriate for the defendants to
19     appropriately and in a limited fashion to
20     acknowledge Mr. Perry's unfortunate diagnosis.
21          THE COURT:  Yes.  She's talking about
22     something a little different, as I understand
23     it.  Ms. McVey, listen to me on this.
24          MS. McVEY:  I'm sorry.
25          THE COURT:  What she's saying is she's
```

```
 1          trying to prevent you from going up to the

 2          plaintiff, or the plaintiff's husband, and

 3          saying, "We're so sorry you're dying of

 4          mesothelioma."

 5               If in the -- in the course of the

 6          testimony of your witness they say, "Our heart

 7          goes out to Perry," or something of that

 8          nature, you know, "you're suffering" or

 9          something like that, that's often done.  It

10          needs to be done with a dead pan (ph), I'm sure

11          y'all went through it that way.  That, I have

12          no problem with.  And I'll point Ms. McVey to,

13          she wants to avoid that awkward position of

14          putting this plaintiff and the plaintiff's

15          husband in the position of having to directly

16          confront that with them.  You say you're not

17          going to do that, so I think we've resolved it.

18               MS. PEPKE:  Well, I just want to be clear.

19          We have in the past, counsel, when, you know,

20          plaintiff takes the stand, perhaps a limited

21          acknowledgment that --

22               THE COURT:  I will grant her motion, if

23          that's what you're going to do, because I'm not

24          going to let you put the plaintiff -- they're

25          emotional enough as it is.  I'm not going to
```

```
 1          put them in the awkward spot of having to say,

 2          "Well, thank you so much for telling me how

 3          sorry you are that I'm about to die."  Just

 4          don't do that.

 5              MS. PEPKE:  Understood, Your Honor.

 6              THE COURT:  But if your witness wants to

 7          testify along those lines, you know, a brief

 8          sort of thing, just representing Johnson &

 9          Johnson, I don't have any problem with.

10              MS. PEPKE:  We understand that.  Thank

11          you.

12              THE COURT:  All right.  Very good.  So

13          granted, with the limitations we've discussed.

14              All right.  Mention of Clubman talc on

15          American International Industries.

16              MS. BUENO:  Your Honor, this motion is

17          written very broadly.  I think we've talked and

18          we have an understanding about what we are and

19          are not going to do regarding Clubman talc,

20          speaking on behalf of J&J defendants.

21              We understand that Clubman is in default.

22          And let me just be clear.  It's defendant's

23          position that cosmetic talc did not cause

24          Mr. Perry's mesothelioma.  So the last thing

25          we're going to do --
```

```
 1              THE COURT:  I know that's your position.
 2              MS. BUENO:  But it's relevant here, Your
 3         Honor, because we're not going to point the
 4         finger at Clubman talc.
 5              THE COURT:  You don't get to take up
 6         Clubman talc, either, is what she's saying.
 7              MS. BUENO:  Correct.  But what this motion
 8         filed by plaintiff seeks to do so is to
 9         eliminate any reference of it.  All I want to
10         make sure we have the ability to do, as
11         defendants, is give the jury an accurate
12         portrait of Mr. Perry's talc use over time.
13         How many bottles of Johnson & Johnson talc he
14         said he used; how many bottles of Clubman,
15         Equate, and all the others.  There's many, many
16         different talcs.
17              So we opposed this motion, which was any
18         mention of Clubman talc.  And we opposed it
19         because --
20              THE COURT:  Here's what she's trying to
21         avoid.  And let me see if I can get some peace
22         going here.  These people are in default.  They
23         don't have the ability to say a darn thing.
24         They're in default, therefore, they're liable.
25         Their talc caused his injury.  Period.  So
```

1          Clubman is off base and American International

2          is off base to you.

3               On the other hand, you can't blame it all

4          on Clubman just because they're in default.

5               MS. BUENO:  Understood.  The only thing

6          that we seek to do, and the only evidence we'll

7          offer is to be able to talk to Mr. Perry about

8          his use over time to avoid the false impression

9          that Johnson's baby powder was the only talc he

10         was using.

11              THE COURT:  That's legit.

12              MS. BUENO:  Thank you.

13              THE COURT:  All right.  It's granted, with

14         the limitations that have been expressed.

15              Motion in liminé 1M, exclude mention of

16         Long's previous lawsuits that are unrelated to

17         Michael Perry.

18              MS. McVEY:  I think we agree on this.  He

19         had a prior worker's compensation claim that we

20         just wanted to keep --

21              THE COURT:  Well, I'll grant that.

22              Number 1N, exclude information in Michael

23         Perry's medical records unrelated to his cancer

24         diagnosis, specifically, Michael Perry's sexual

25         history.

```
 1          MS. McVEY:  Your Honor, there are some

 2     comments in the records talking about sexual

 3     history or sexual partners.  And we don't think

 4     that's probative of any issue here.  And when

 5     we were discussing it with Ms. Bueno, you know,

 6     she made the comment if he's not going to

 7     testify that "I've always been faithful or we

 8     have a perfect marriage," then she won't use

 9     those records.  And if that's the deal, then I

10     think we're good.

11          THE COURT:  Well, I wouldn't let that

12     happen if they were a man and a woman that's

13     married.  I'm not going to let you get into

14     anybody's sexual history, don't care what.  So

15     let me tell you that's off base.  If they --

16     they will describe their marriage as a loving

17     marriage.  And you don't get to refute that by

18     talking about his sexual history.

19          I'd say the same thing if it were

20     Mrs. Perry.  Just because Mr. Perry will say

21     "Mrs. Perry and I have this long, loving

22     relationship," I don't let people bring up,

23     well, she's, he, "she's strayed a little bit on

24     him, didn't she?"  That's not going to happen.

25          MS. BUENO:  Understood, Your Honor.  And
```

1     just so we're very clear about what the records

2     are here, this motion is very broad, as you

3     see.  It seeks to exclude any evidence outside

4     of his cancer diagnosis that comes --

5          THE COURT:  Yes, ma'am.  And I'm going to

6     grant that motion.

7          MS. BUENO:  And here's the concern:  There

8     is a loss of consortium claim.  And the sexual

9     history portion aside, there are discussions

10    about separation and divorce and issues in the

11    marriage that are appropriate when you have a

12    loss of consortium claim.  Those are things

13    that should be fair game, depending on the

14    testimony.  I do not intend to bring those in

15    affirmatively.  But if there is --

16         THE COURT:  They're going to testify they

17    have a loving relationship.  Just count on

18    that.  I am not going to allow you to get into

19    the problems with the marriage.  I have never

20    allowed that in a loss of consortium case and,

21    frankly, most people are pretty sensitive to

22    just not getting into that, one way or another.

23    But I will tell you, if it comes to that, I

24    will not allow you to introduce any evidence of

25    the problems in the marriage or the sexual

1    history or anything like that.

2        MS. BUENO:  Understood.  And with that

3    understanding, Your Honor, as it relates to the

4    marriage and the sexual history, we ask for

5    your ruling on this motion to be limited to

6    that because it is broader.  It's seeking to

7    exclude anything in the medical records outside

8    of his cancer diagnosis.  There are other

9    things --

10        THE COURT:  Well, what other things are we

11    talking about?

12        MS. BUENO:  Well, for example, he had

13    prior accidents that affected quality of life

14    and caused -- he has mental health issues.  I

15    don't know.  The point is, depending on what

16    evidence comes --

17        THE COURT:  I'm not going to -- I am very

18    unlikely to allow any of those things in.

19    We're talking about mesothelioma, which he got,

20    and what happened as a result of the

21    mesothelioma.  His other medical history is not

22    pertinent as to whether it caused him to get

23    mesothelioma.

24        MS. BUENO:  Understood.  But we do have

25    claims by the plaintiffs about different

1        damages over time.

2            THE COURT:  You'll have to prove it's

3        damages related to mesothelioma.  You can't

4        undercut them by showing he had damages in

5        other things.  I've never allowed that.

6            MS. BUENO:  Understood.  There's also

7        medical records about family history and other

8        issues for -- for a long period of time,

9        including mesothelioma.

10           THE COURT:  I don't let that kind of stuff

11       in.  Let me tell you, this case is all about

12       his mesothelioma; what caused it; what he has

13       suffered as a result of it.  I will not allow

14       the material in.

15           MS. BUENO:  Understood.

16           THE COURT:  And your position on that is

17       preserved for later use. (sic)

18           MS. BUENO:  Thank you.  And to the extent

19       there is a medical record that is outside of

20       his cancer diagnosis that we wish to offer, I

21       will raise that with the Court in advance.

22           THE COURT:  Certainly.

23           All right.  Granted, with the caveats I

24       have put on it.

25           All right.  That's the -- that's the --

```
 1        that's the Omnibus; am I right?

 2              MS. McVEY:  Yes, ma'am.

 3              THE COURT:  Ms. McVey, so we come down to

 4        number 2.  This is plaintiffs motion in liminé

 5        number 2:  Misleading statements about the

 6        FDA's regulatory authority and statements that

 7        the talc is generally regarded as safe.

 8              MS. McVEY:  So, Your Honor, we discussed

 9        this.

10              Johnson & Johnson agrees not to use that

11        graph that they made; generally regarded as

12        safe.  I think they've agreed not to do that.

13              Where we really have a strong disagreement

14        is FDA's authority.  And, as you know, you've

15        tried these cases now a bunch of times.  The

16        FDA does not have -- we want to prevent them

17        from arguing that the FDA has approved talc or

18        found any level of asbestos to be safe in talc.

19        We want to make clear that the FDA authority

20        does not include -- let me say that backwards.

21              Talc can be sold without the FDA ever

22        approving it, right --

23              THE COURT:  Right.

24              MS. McVEY:  -- or testing it or any of

25        that stuff; that the FDA does not have ability
```

1    to issue a recall for talc.  They can put

2    public safety out there.  The only thing that

3    they can regulate -- and it's on their website

4    and you've heard it -- is its color additives.

5         So by allowing them to kind of wiggle room

6    with the FDA and suggest how the FDA approved

7    talc in products and said it was safe is what

8    we're trying to prevent them from doing.

9         THE COURT:  Well, let me say a couple of

10    things about that.

11         Kind of going at it backwards.  For years

12    it's been the good asbestos, and the bad

13    asbestos.  Now, the FDA has put a kibosh on

14    chrysotile, crocidolite, amosite, tremolite and

15    all of them.  And the very latest with what

16    they did with chrysotile.  So, you know, you

17    don't --

18         MS. McVEY:  That's the EPA.

19         THE COURT:  I mean, that's the EPA, right.

20         MS. McVEY:  So this is FDA and what I just

21    don't want them to do is say, "Look, the FDA

22    said this talc was safe and that if we let it

23    be sold, then whatever asbestos was in there is

24    perfectly fine."  The FDA has no authority,

25    other than color additives, to regulate this

```
 1    talc.

 2         THE COURT:  I agree.

 3         MS. BUENO:  Your Honor, so the motion, as

 4    it's written, asks us not to argue that talc

 5    has to be approved by the FDA.  We know that.

 6    That is not our argument.  But as outlined in

 7    our response brief, the FDA does have authority

 8    to monitor cosmetic products.  We outline that

 9    with screen-shots from the FDA website that

10    talks about exactly what the FDA has authority

11    to do.  And to the extent that evidence comes

12    in, it will be related, specifically, to what

13    the FDA can and cannot do.

14         THE COURT:  How's that pertinent to this

15    case?

16         MS. BUENO:  This is how it's pertinent:

17    Because one of the things the FDA does have the

18    ability to do is put a warning label on things.

19    And as Your Honor's well aware -- and we'll

20    talk about it later this afternoon -- there was

21    a citizen's petition, a variety of them, but

22    the one at issue asks the FDA to put a warning

23    label for asbestos on cosmetic talc.  There was

24    a response letter saying, "We don't think

25    that's appropriate."  That is evidence.
```

```
 1            THE COURT:  Well, if we're going to get

 2       into that, we're going to impeach the CFTA and

 3       all the shenanigans they went through to hide

 4       the ball from the public to pressure the

 5       governmental entities not to put -- to put out

 6       the warnings they wanted to put out.  I mean,

 7       that's a slippery slope.

 8            MS. BUENO:  Well, I disagree, Your Honor,

 9       with that characterization.  I don't think that

10       what you just said is going to be in evidence,

11       because I don't think it's factual, but you are

12       correct that I am sure the plaintiffs will seek

13       to offer such evidence.  But the evidence --

14            THE COURT:  -- offered it before in cases

15       I've tried.

16            MS. BUENO:  As defendants have offered

17       evidence about the FDA citizen's petitions and

18       responses and the like.

19            THE COURT:  I'm not going to spend this

20       very limited amount of time we have with this

21       trial, and we talked about how long this trial

22       is going to be after awhile, but I'm not going

23       to spend it having a back and forth and back

24       and forth about the FDA and all that kind of

25       thing.  EPA is something that is a little bit
```

1         more to the point, because they do regulate.

2              FDA does very little by way of

3         regulations.  And, therefore, I'm not going to

4         get into a whole bunch of excitement.  All the

5         FDA did was to say that if it's added to food,

6         it is generally regarded as safe.

7              MS. BUENO:  That's not something that

8         we're seeking to offer.  What we're seeking to

9         offer is a variety of evidence coming in at

10        every trial about what the FDA has done

11        regarding cosmetic talc.

12             THE COURT:  Yeah, but the point of that is

13        to say, "Hey, we were well within what they

14        did," and so forth.  The FDA didn't do anything

15        that said, "Hey, it's okay to put asbestos in

16        your talc."

17             MS. BUENO:  Absolutely not.  But the FDA

18        did testing in 1976.  They considered a

19        citizen's petition in 1986.  They held a talc

20        symposium in 1994.

21             THE COURT:  So what -- what does that have

22        to do with this case?

23             MS. BUENO:  Well, because they're going to

24        be offering evidence of state-of-the-art, what

25        was commonly known by the cosmetic industry.

1    (sic)  That's all part of it.  The FDA was

2    having symposia, where they were inviting

3    industry and they were inviting others to have

4    these conversations.  That is evidence that's

5    relevant to deal with plaintiffs' claims that

6    J&J was doing something wrong.  If they're

7    going to offer state-of-the-art evidence, what

8    the FDA was doing, testing, finding --

9         THE COURT:  But what authority did they

10   have to do much of anything?

11        MS. BUENO:  Well, you know what, they can

12   look at our brief, our response brief to this

13   motion.  It's on page 3.  There is a list of

14   exactly what the FDA has authority to do.  It's

15   on the website now, and it's been consistent

16   over time.  And the FDA says in the title on

17   this --

18        THE COURT:  You can say it all day.  I can

19   rule on every one of these things without

20   having to hear any arguments.  I'm not going to

21   go back and forth all day long on this thing.

22        MS. BUENO:  Understood.  But the FDA --

23   look, I think we're at a closer agreement than

24   Your Honor thinks.

25        MS. McVEY:  I think this will help.  We

1    are not seeking to prevent you from using the

2    FDA testing.  Right?  We're just talking about

3    something different.

4        What we're talking about is that you can't

5    come in and say the FDA had authority to

6    regulate this talc or said the talc was safe,

7    because they didn't.

8        MS. BUENO:  We are not going to say that

9    the FDA had the authority to recall; that the

10   FDA --

11       THE COURT:  She's asking a specific

12   question.  She's asking whether you're going to

13   say that the FDA had the authority to say talc

14   is safe.

15       MS. McVEY:  And, therefore, it's salable.

16       THE COURT:  And, therefore, it's okay to

17   sell.

18       MS. BUENO:  I don't think the FDA has ever

19   said that.

20       THE COURT:  But I don't want you to be

21   saying it at trial.

22       MS. BUENO:  Well, what we're going to be

23   saying is what the FDA did.  They tested it in

24   1976; here were their findings.

25       THE COURT:  Yeah, you're going to say that

```
 1    means it's safe.

 2         MS. BUENO:  No, I'm not going to say that

 3    means it's safe.  I'm going to say that's what

 4    they found at that time.  This is what they

 5    said when they said, "We do not need a warning

 6    label."

 7         THE COURT:  Right.

 8         MS. BUENO:  This is not a health hazard.

 9         THE COURT:  Then we're going to have to

10    get into a thing of why the testing that they

11    did was wrong, how it was influenced very much

12    by the cosmetic, talc, fragrance association

13    and all that other thing.  I'm not going to

14    have a trial within a trial about something

15    this minor.

16         MS. BUENO:  Okay.  So this is not minor,

17    Your Honor, from defendant's perspective.

18         What the FDA was doing at the time that

19    the plaintiffs' accused us of the fraudulent

20    behavior, that is very significant; what the

21    FDA was doing to test; what the FDA was doing

22    to pull the industry together and have

23    conversations.

24         THE COURT:  Okay.  I -- I understand your

25    position.  Ms. McVey.
```

 1          MS. McVEY:  Your Honor, it's a really

 2     simple motion.  All we're asking to do is

 3     acknowledge that the FDA did not have the

 4     authority to either issue any kind of recalls,

 5     or regulate this talc, what asbestos goes in

 6     talc; that it never said that talc was safe

 7     with asbestos in it.

 8          What they're going to do is they're going

 9     to say the FDA did this and did that, and use

10     it for causation purposes, as if that has

11     anything to do with causation.

12          THE COURT:  The way this thing is headed,

13     it talks about the FDA having limited power

14     over cosmetic product safety.  And that is,

15     essentially, what this motion has addressed; am

16     I right?

17          MS. McVEY:  That's right.

18          THE COURT:  And so what you're asking is

19     that they be precluded from making misleading

20     statements about the FDA's regulatory authority

21     over cosmetic talcs or irrelevant arguments

22     that the FDA has declared talc to be GRAS.  All

23     right.  We solved GRAS.  So you don't need

24     that.

25          But I am going to grant the motion that

1          the defendants be precluded from making

2          misleading statements about the FDA's

3          regulatory authority over cosmetic talcs.  They

4          don't have any pre-market approval, sharing of

5          safety data on any of that other situation.

6          The fact that they did not put a warning label

7          on, to me, that's proof by the negative.  I'm

8          not going to allow that.

9              MS. McVEY:  Thank you, Your Honor.

10             THE COURT:  All right.  Where are we now?

11     Number 3.  To Preclude Evidence About Talc

12     Pleurodesis.

13             MS. GROSS:  Yes.  So, Your Honor --

14             THE COURT:  This is about sticking talc

15     inside somebody's lungs.

16             MS. GROSS:  That's exactly it.  It just

17     causes the one time --

18             THE COURT:  Are you all in agreement about

19     this?

20             MS. GROSS:  No.  I don't think they wanted

21     to argue it.

22             THE COURT:  Oh, okay.  Well, I understand

23     you don't -- you don't want them to go into it,

24     but the one thing about pleurodesis is you

25     don't -- it specifically does not encompass

1          using talc that has asbestos in it, right?

2               MS. GROSS:  Well, it, specifically, calls

3          for some pharmaceutical talc, but the bigger

4          picture is they want to use the fact that some

5          physicians still do this procedure where they

6          inject it once to cause a scarring reaction

7          when someone is already sick as evidence that

8          talc, in general, is safe.

9               THE COURT:  Yeah.  I understand it.

10               MS. GROSS:  Yes.  Okay.

11               THE COURT:  Okay.  Counsel.

12               MR. COWAN:  Thank you, Your Honor.

13          Christopher Cowan, C-O-W-A-N.

14               It's nice to be in this courtroom.  I've

15          never been here before.  So, thank you.

16               I've heard you say two things, Your Honor:

17          One was that talc pleurodesis uses talc that

18          doesn't have asbestos.

19               THE COURT:  Asbestos-free.  That's what I

20          understand the procedure to be.

21               MR. COWAN:  Well, not according to

22          plaintiffs' expert.  So Dr. Longo has tested

23          talc that's used in talc pleurodesis and has

24          found exactly, according to Dr. Longo, the same

25          asbestos amount that is used and that he says

1    is in Johnson's baby powder.  He found that

2    .001 percent to 2.002 percent asbestos in talc

3    pleurodesis --

4        THE COURT:  So what?  What is the

5    relevancy of this talc pleurodesis?

6        MR. COWAN:  And I heard you say the other

7    thing was that -- I heard plaintiffs' counsel

8    say some doctors use it, right, and --

9        THE COURT:  What's the pertinence of that

10   to whether Johnson & Johnson's baby powder had

11   asbestos that caused this problem?

12       MR. COWAN:  So, if the amount of asbestos

13   -- assuming plaintiffs' experts are correct,

14   and the amount of asbestos in that talc that's

15   used in pleurodesis, it's the same as it is in

16   Johnson's baby powder.  Okay.  Let's just

17   assume that's true.  Assume plaintiffs are

18   right.  Then what has been going on for the

19   last 30- to 40 years is a human trial with talc

20   that contains a very small, ultra-trace amount

21   of asbestos.

22       THE COURT:  So what?  What does that have

23   to do with Johnson & Johnson's liability in

24   this case?

25       MR. COWAN:  Because they are going to

1          argue that Johnson & Johnson has never

2          conducted any tests, and no tests are out there

3          for Johnson's Baby Powder or Johnson's talc.

4              THE COURT:  What is the relevance of talc

5          pleurodesis with other doctors and so forth in

6          the 40-year history of using it to what Johnson

7          & Johnson's doing with its talc?

8              MR. COWAN:  Because if plaintiffs' experts

9          are correct and the amount of asbestos in that

10         talc is the same as what they say is in

11         Johnson's Baby Powder, then there is a dose

12         problem and a causation problem for plaintiffs'

13         case.

14             THE COURT:  I don't see that -- I mean, I

15         can't connect those dots.  I don't see that.

16             MR. COWAN:  I understand, Your Honor, and

17         I would just state one more thing:  It's not

18         just some doctor.  Dr. Gibney, who is

19         plaintiffs' thoracic surgeon, was deposed in

20         this case.  They have subpoenaed him for trial.

21         He has -- and his colleagues routinely conduct

22         talc pleurodesis operations, and they are

23         unaware of any connection between that

24         procedure, which apparently, according to their

25         experts, has the exact same amount of asbestos

```
 1        in it.  They're unaware of that ever having

 2        caused mesothelioma.  That's -- that's the

 3        point.

 4             THE COURT:  I am granting this motion.

 5             MR. COWAN:  Okay.  Thank you, Your Honor.

 6             THE COURT:  Okay.  Number 4, plaintiffs'

 7        motion in liminé, precluding reference to or

 8        introducing complaint, full caption, or settled

 9        or dismissed defendants.  All right.  This is

10        Smith versus Tiffany; Mason versus Carasi.

11             Yes, ma'am.  Ms. McVey.  You're citing

12        those cases for the proposition that you can't

13        do this.

14             MS. McVEY:  And you --

15             THE COURT:  I ruled that every way in

16        every case I tried.

17             MS. PEPKE:  And, Your Honor, this is the

18        part I want to clarify, and I have spent a lot

19        of time with Smith versus Tiffany and, also,

20        Edwards versus --

21             THE COURT:  You can't imagine how much

22        time I've spent.

23             MS. PEPKE:  You got me beat by a mile.  I

24        have no doubt.  And I've also read Your Honor's

25        prior rulings on this.  And my -- I'm troubled
```

```
 1    squaring the cases with 43G -- 43G on this
 2    point.
 3        I understand Your Honor's rulings about
 4    the caption of the case.  And what I think
 5    you've said before is the defendants can't say
 6    there were 40 defendants when this case started
 7    and 38 have settled.  But what we can say is we
 8    think that there are 38 other corporations that
 9    the evidence shows contributed to the
10    plaintiffs' injury.  And what we want to say is
11    -- and plaintiffs said that, too.  And we want
12    to do that in this case, because in the
13    complaint, he has paragraph allegations within
14    the body --
15        THE COURT:  Here's what Smith versus
16    Tiffany and Mason versus Carasi say:  The cases
17    of this type, because of the provisions of the
18    South Carolina Contribution Among the Joint
19    Tortfeasors Act, we don't allow you to refer to
20    other non-defendants on a potential
21    contribution to this case.
22        The case is tried on the basis of the
23    defendants that are in the case.  And if a
24    verdict is rendered, then post-trial, the judge
25    allocates responsibility and allocates
```

1    contributions made by settling parties.

2        That is how the Legislature chose to set

3    this up, and that is how the South Carolina

4    Supreme Court ruled on this matter about what

5    can be said about non-present defendants,

6    defendants that settle, defendants who were in

7    the caption but are no longer.  You can only

8    talk about those people that are in the case.

9    There's one exception to that, and one

10   exception, only.  And that is the empty chair.

11   And the empty chair works like this:

12       You got to be able to show that the empty

13   chair is completely responsible for this,

14   despite all the badness I may have done; that

15   the intervening badness of the absent

16   defendant, the empty chair, is the cause of

17   plaintiff's injury.

18       That can't be shown in this case.  I have

19   not seen a case in which it's been done.  I

20   have had a couple of -- maybe one or two

21   defendants the whole time I've been doing this,

22   who tried the empty chair.  Blew up in their

23   face.

24       But y'all are not trying this on the basis

25   of the empty chair.  You are wanting to get

1   these captions in and everything to try to

2   suggest to the jury, "Well, we all bear some

3   responsibility in this, so keep in mind, cut

4   down what you would otherwise look to us for

5   because there's some other badness going on

6   here."

7        The Supreme Court has said that the

8   General Assembly cut that out when they passed

9   this Contributions Among Joint Tortfeasors.

10  And we may all have some concept about whether

11  that's the best way to do it.

12       That may work in wreck cases, but it

13  doesn't work in these sophisticated types of

14  tort.

15       I don't get to decide that, nor does the

16  Supreme Court.  We've got to go by what the

17  Legislature put in this law.

18       South Carolina Supreme Courts interpret

19  it.  I'm going to follow it.  And, therefore,

20  you're not going to be able to get into any of

21  that.

22       MS. PEPKE:  I agree, Your Honor.  We have

23  preserved our objections.  And I have read

24  Smith versus Tiffany very, very clearly on that

25  point.  And my argument here is just a little

1        more nuanced.

2            The allegations in the complaint -- and

3        I'm going to read, like, the Court an example

4        of what I'm speaking about.  Aren't even

5        directed at a certain defendant.  This is how

6        we -- this is why Smith versus Tiffany is not

7        quite on point.

8            For example, plaintiff alleges in its

9        complaint, paragraph 11, that he was exposed to

10       asbestos-containing products at various times

11       throughout his life from non-occupational work

12       maintaining vehicles working on bricks.

13           We should be allowed, under 4 -- under

14       South Carolina Rule of Civil --

15           THE COURT:  And what would be the end of

16       that?  It's to shift the responsibility to

17       somebody else who's not in the case.  We don't

18       do that in this state because of the

19       Contributions Among Joint Tortfeasors.  So I

20       don't care what they say in the complaint.

21       That's not the basis for allowing an absent

22       defendant to be put into the middle of this

23       case.

24           MS. PEPKE:  But, Your Honor, wouldn't it

25       be a basis if we can make it -- if we can get

 1      there -- now, we have the burden to get there,

 2      but wouldn't it be part of the dots that we

 3      would connect for an empty chair --

 4          THE COURT:  You're just not going to be

 5      able to connect those dots by putting in the

 6      complaint.  You're not going to be able to

 7      connect those dots by just kind of having some

 8      kind of general reference to this other thing.

 9          If you have hard evidence that shows not

10      just that there was some bricks involved and

11      other things, but that despite all your

12      conduct, this, and this alone, would supersede

13      and intervene and cause an injury, then we

14      would look at that.  But right now, I don't see

15      anything on the horizon like that, and,

16      therefore, I am not going to allow -- what you

17      asked for is a complaint full caption or a

18      settlement to dismiss the defendants.  That's

19      what you asked for.  Not going to allow the

20      complaint.  Not going to allow this, the

21      settlement to dismiss the defendants for the

22      reasons I have stated.

23          MS. PEPKE:  Thank you, Your Honor.

24          THE COURT:  All right.  Five:  Plaintiffs'

25      motion in liminé 5 to preclude defendants'

1    counsel and witnesses from making disparaging

2    remarks about the plaintiffs' counsel.

3        MS. McVEY:  And, Your Honor, we have

4    largely agreed on that.  This is just to

5    prevent anybody from saying that the talc

6    litigation is a plaintiff's attorney creation;

7    that we run out of people to sue and so we

8    started suing these talc defendants.

9        And I think, according to defendant, that

10   they're not going to do that.

11       THE COURT:  There's no defense that is

12   going to be participating in any way by Mr.

13   Brown to allow any of that.  So I'm completely

14   comfortable about that, and I caution you the

15   same way, Ms. McVey, that you can't disparage

16   them.

17       MS. McVEY:  Agreed.

18       THE COURT:  All right.  Six, plaintiffs'

19   motion in liminé to exclude evidence or

20   arguments related to Betty Bell related to

21   against American International Industries or to

22   any other individuals who were the subjects of

23   peer reviewed scientific studies.

24       Ms. McVey, or Ms. Gross.

25       MS. GROSS:  This is one that we argued in

1        the Payne and Plant case last year, and you

2        granted pretty quickly without issue.  You

3        said, "We're not going to have a trial within a

4        trial."  I think they might want to argue it.

5        That's what I have in my notes, so...

6            THE COURT:  This is the settlement

7        meetings of the workers' comp claims?

8            MS. GROSS:  Yes.  This is all part and

9        it's actually kind of lumped in with the next

10       MIL, which is trying to keep out evidence of

11       J&J suing the authors of those --

12           THE COURT:  Yeah, I got you.

13           MS. BUENO:  And the only thing I wanted to

14       mention is it's also wrapped in with Johnson &

15       Johnson's motion number 12.  So we sought to

16       exclude, in their entirety, the two articles.

17       Actually, there was three articles:  Two by

18       Dr. Moline and one by Dr. Emery that formed the

19       basis of these others.

20           My understanding is Your Honor has ruled

21       on that in the past and denied our --

22           THE COURT:  Yeah.  Let me just -- those

23       are reliance materials and there's sometimes an

24       examination that's made about reliance

25       materials, but I am not going to allow any

1          introduction of arguments, documents of

2          evidence on this workers' comp claim at

3          settlement meetings.  I'm not going to allow

4          that.

5               MS. BUENO:  Well, then I think that we

6          have then your rulings on plaintiffs' motion in

7          liminé 6 and 7.  We are not opposing motion in

8          liminé number 7.  So that one's agreed.

9               THE COURT:  All right.

10               MS. BUENO:  On number 6, then, I hear you

11          granting; is that correct, Your Honor?

12               THE COURT:  What's that?

13               MS. BUENO:  You just granted motion in

14          liminé --

15               THE COURT:  I granted 6; that's correct.

16          And 7, I'll also grant.

17               MS. BUENO:  Yes; 7 was agreed, Your Honor.

18               THE COURT:  Yes.  So we've got 8, exclude

19          arguments that workplace asbestos exposure

20          standards are proxy for "safe."  All right.

21               MR. ADAMS:  Yes, Your Honor.  Ben Adams.

22          Good to see you, again.  I was in the Glenn

23          trial.  Thanks for having me here again.

24               The lawyers for Johnson & Johnson, they

25          sometimes bring an expert who says, "Well, if

1       you add up the exposure from Johnson's Baby

2       Powder, it would be below the OSHA workplace

3       exposure limits."

4              So the exposures from our product, if you

5       added them up, it would be below the OSHA

6       permissible exposure limits, and, therefore, it

7       must be safe.  That's the argument that Johnson

8       & Johnson will make.

9              The problem is that the OSHA permissible

10      exposure levels have never been safe for the

11      disease mesothelioma.  OSHA says that

12      themselves.  That's number 1.

13             So OSHA says these levels, these

14      permissible exposure levels for in the

15      workplace, they're not safe for the disease of

16      mesothelioma.  And so this -- this testimony

17      from the defendants' expert is unreliable

18      because OSHA, itself, in the very regulations

19      says these levels are not safe for the disease

20      mesothelioma.

21             It's also attenuated under 403, because

22      Mr. Perry never used talc as part of a

23      workplace exposure.  He only -- it's only part

24      of his personal use.  So Mr. Perry, he wasn't

25      occupationally exposed to industrial talc, you

1        know, in a factory or something.  He only used

2        talc as part of his personal use.

3            So OSHA doesn't even apply, because he

4        wasn't exposed in the workplace.  It was just

5        his personal use.

6            So for those two reasons, we believe the

7        Court should preclude argument or reference to

8        the OSHA permissible levels as evidence that

9        their talc powders were safe.

10           THE COURT:  Okay.  All right.  Mr. Cowan.

11           MR. COWAN:  Yes, Your Honor.  I think

12       we're talking past each other, because I -- I

13       don't think that anybody is going to come in

14       and say the OSHA permissible exposure level,

15       .1 fibers per cc, is safe.

16           The fact that the OSHA permissible

17       exposure levels is .1 fibers per cc, however,

18       is incredibly relevant, because, number 1, the

19       plaintiffs' experts have actually injected this

20       issue into the case.  They are relying on

21       studies, exposure studies that literally talk

22       about the .1 fibers per cc OSHA PEL.  And, in

23       fact, one of the exposure consumer studies that

24       Dr. Longo is relying on, one of only four,

25       expressly compares their finding to the OSHA

```
 1        PEL of .1 fibers per cc.  That exposure study

 2        did not say that .1 fibers per cc was safe, but

 3        it did note that the hypothetical exposure to

 4        asbestos and talc, assuming a sub-trace level,

 5        would be a 107,000 times lower than .1 fibers

 6        per cc.

 7             THE COURT:  Well, what is it you want to

 8        tell the jury about .1 --

 9             MR. COWAN:  So, here's the point:

10             Number 1, I have to be able to

11        cross-examine Dr. Longo on OSHA, because it's

12        in the study that he is relying on, and he's

13        actually stating that the study itself -- and

14        the only way that I --

15             THE COURT:  I will tell you, I will get

16        him -- I will tell you how we go about experts

17        in this court.  I'm not having trials within a

18        trial, where we spend all our time talking

19        about reliance documents.

20             MR. COWAN:  It's not going to be that,

21        sir -- or, ma'am, I'm sorry.  It's not going to

22        be about going through a trial within a trial

23        of reliance materials.  It really is about the

24        substance of his opinion, because it's --

25             THE COURT:  But I allow these experts to
```

1       be cross-examined about the substance of their

2       opinion, and I don't allow experts to testify

3       about things that are outside their ability to

4       have an opinion about.

5                MR. COWAN:  Absolutely.

6                THE COURT:  I -- what she's asking and

7       what I'm inclined to agree with is not to use

8       this safe levels of exposure thing.  You can

9       talk about OSHA limits.  Just don't use that to

10      try to inject into it an opinion about OSHA as

11      to what's safe and what isn't.

12               MR. COWAN:  Absolutely, Your Honor.

13               THE COURT:  You see what I'm saying?

14               MR. COWAN:  I do.

15               THE COURT:  Okay.  I don't want you

16      cross-examining.  If Longo's got some things

17      about the OSHA standards, standards is one

18      thing.  Elements of safe level is another one.

19      That's what she wants y'all to stay away from.

20               I will grant that, but that doesn't

21      preclude you from talking about OSHA levels of

22      exposure.  And standards of exposure.  That's

23      perfectly fair game.  So, am I clear?

24               MR. COWAN:  I think you are, Your Honor.

25               THE COURT:  All right.  Thank you.  Let's

1         go on to 9:  9 is plaintiffs' motion in liminé

2         to exclude hearsay opinions of Dr. Su.

3              MR. ADAMS:  Yes, Your Honor.  Dr. --

4              THE COURT:  First of all, is Dr. Su even

5         going to be in this thing?

6              MR. ADAMS:  No.

7              THE COURT:  Well, then, we're passing

8         right over that.  We don't need that.  Dr. Su

9         isn't going to be in the picture.

10             MR. ADAMS:  Well, actually, he's not an

11        expert who's going to come testify from the

12        witness stand.  But they do try to get in an

13        affidavit that he signed that -- that that's

14        what the motion is targeted at.

15             THE COURT:  Well, how are they going to

16        get his affidavit or his video in if he's not

17        going to be --

18             MR. ADAMS:  I don't know.

19             THE COURT:  Well, I can tell you I'm not

20        going to let it in.  But I don't have to

21        otherwise deal with the content of his opinion

22        because he's not testifying, right?

23             MR. ADAMS:  That's correct.

24             THE COURT:  All right.  Number 10, Exclude

25        Speculative Evidence of Alternative Asbestos

1        Exposure.

2            MS. GROSS:  That one's me, Your Honor.

3            So we had a similar motion to this in the

4    Payne and Plant cases last year.  In Perry,

5    there's two theoretical potential hypothetical

6    alternative exposures that we've touched on.

7    One is this:  He was around -- or he could have

8    been around some work being done at hotels.

9            There's no expert on either side who's

10   going to say that it contributed to his disease

11   to a reasonable degree of medical certainty,

12   including defendants' own experts, of course.

13           The other is this brake work that's kind

14   of been glossed over.  There's going to be no

15   expert on either side that's going to say that

16   his brake work would be the sole cause, much

17   that it could be this third-party chair --

18   empty chair defense that they might want to

19   utilize.

20           The other thing I want to make really

21   clear is you granted this motion in Payne and

22   Plant.  And that if Your Honor recalls, which I

23   know you do, throughout the Plant trial, the

24   defendants kept trying to inject these possible

25   hypothetical exposures by cross-examining

1          Ms. Plant, cross-examining her mother.

2          Sometimes they talked to her about art

3          supplies.

4                So if Your Honor grants this motion, I'm

5          hoping that it's very clear on the record that

6          no alternative exposures can be discussed in

7          the trial with any of the witnesses, because

8          there is no expert on either side that is

9          either going to say it's the sole cause or to a

10         reasonable degree of medical certainty

11         contributed to his disease.

12                THE COURT:  All right.

13                MS. GROSS:  I summed it up real quick.

14                THE COURT:  I understand.

15                All right.  Yes, ma'am.

16                MS. BUENO:  Your Honor, I am surprised by

17         the argument, which doesn't reflect what was in

18         the brief.

19                The brief, itself, filed by plaintiff,

20         seeks to exclude one type of alternative

21         exposure, which is alleged exposure from

22         hotels.  But what I heard counsel just say was

23         that they're roping into this brake work, which

24         I think she said had been kind of glossed over,

25         which is also very surprising, Your Honor,

1       because Dr. Haber, the causation expert for

2       plaintiffs, was recently deposed, and he was

3       asked the question about his long and lengthy

4       opinion in his report about brake exposure and

5       friction work causing Mr. Perry's mesothelioma.

6       And he was asked, "If you take the talc and

7       cosmetic talc aside, if we say, hypothetically,

8       Mr. Perry was never exposed to cosmetic talc --

9       or asbestos in cosmetic talc, is it your

10      opinion that the brake work would have caused

11      his mesothelioma?"  And Dr. Haber said, "Yes."

12      He said that the brake work that Mr. Perry

13      performed from 1984 to 1987 -- 72 brake jobs,

14      where he was blowing out and working on drum

15      brakes and grinding them down, Dr. Haber said

16      that was enough to cause his mesothelioma.

17          And I think it's notable that the motion

18      that's before you doesn't talk about brake work

19      at all, because each and every single one of

20      plaintiffs' experts has alleged that the brake

21      work, along with the talc exposure, that they

22      were all and both substantial factors in his

23      mesothelioma.

24          And so --

25          THE COURT:  Okay.  You don't like the bad

1    brake work.  She mentioned brake work.  You

2    don't like that.  How about the hotel?

3        MS. BUENO:  Hotels.  So, well, let me tell

4    you what the evidence is and what the evidence

5    will be.

6        Mr. Perry was deposed at length.  We've

7    got two different sets of circumstances.  One,

8    all of the renovations that were done at his

9    hotels over the years.  He worked at a variety

10    of different hotels, starting in Illinois --

11        THE COURT:  Yeah, but the bottom line is

12    this:  Whether the library or drywall or

13    anything else, there's no expert that says that

14    any of that had any effect on him.  They can't

15    quantify any of it.

16        MS. BUENO:  Well -- but here's why it

17    matters, separate and apart from causation.

18    Okay.  It matters for this reason:

19        Mr. Perry testified, over and over again,

20    that when he was at the Embassy Suites, he was

21    told that the building next to him, which

22    happened to finally be the Hotel Venice -- it

23    was renovated.  It was the old library building

24    -- that that was condemned because of asbestos.

25        THE COURT:  So what?  I'm not going to

1       allow any of that, because you haven't got any

2       expert that ties any of that to any of his

3       mesothelioma.  We'll talk in a minute about

4       this brake work.  That might be something

5       different.

6           Ms. Gross might have been a little bit

7       over-expansive when she did that, because the

8       thing I'm looking at right now says "hotels."

9       I am granting that.

10          MS. BUENO:  Your Honor, and one other

11      thing, just -- just because I need to ask Your

12      Honor's thoughts on it.

13          When Mr. Perry was diagnosed with cancer

14      and he went to the medical university, he met

15      with two doctors there; one of whom is going to

16      be on the stand with us.  And that doctor,

17      Dr. Gibney, asked him, "Have you been exposed

18      to any asbestos in your life?"  And this was on

19      July the 11th of 2023.  And Dr. Gibney's note

20      says, quote, Mr. Perry denies any direct

21      exposure; however, he did use a lot of talc

22      throughout his life as a swimmer.  He also used

23      to work at the Embassy Suites, adjacent to the

24      old county library, which, apparently, had a

25      lot of asbestos in the walls.

1          The reason I point this out, Your Honor,

2     is because to the extent plaintiffs want to

3     stand up and cross-examine any of the witnesses

4     or talk to Dr. Gibney about statements in the

5     medical record where Mr. Perry attributed his

6     mesothelioma to talc use --

7          THE COURT:  We're getting way off.  I'm

8     not going to spend all day long on this.  My

9     ruling is, he came into the hotel.  On brake

10    work, that's not a part of this motion, so I'm

11    not going to get into any of the rest of that.

12    Okay?

13         MS. BUENO:  Thank you.

14         THE COURT:  Very good.  All right.

15         Now, number 11.

16         MS. GROSS:  So number 11 is one that we

17    didn't really have to engage with --

18         THE COURT:  Is this the eggshell

19    plaintiff?

20         MS. GROSS:  This is the eggshell

21    plaintiff, but I just want to be very clear

22    that it's that one, but it's also --

23         THE COURT:  He doesn't have --

24         MS. GROSS:  -- it's whatever genetic

25    mutations the defendants come up with --

1          THE COURT:  He doesn't have a BAP-1

2     mutation, does he?

3          MS. GROSS:  He doesn't have any mutations.

4          THE COURT:  Well, then I'm granting it.

5          MS. GROSS:  Great.  Thank you.

6          THE COURT:  Number 12.  Motion in liminé

7     number 12, exclude evidence or argument that

8     asbestos markers must be present to diagnose

9     asbestos-induced mesothelioma.

10         Ms. McVey.

11         MS. McVEY:  Your Honor, this is kind --

12    you heard this before that some of the defense

13    experts will say, without evidence of pleural

14    plaques or asbestosis, then you can't relate

15    it.  That's not a scientifically valid theory.

16    There's no studies that support that.

17         And if you look at the Helsinki criteria,

18    which is, you know, kind of the gold standard

19    of association, it says, specifically,

20    "However, in the absence -- in the absence of

21    such markers, a history of significant

22    occupational domestic or environmental exposure

23    to asbestos will suffice for attribution."

24         Your Honor, so we just seek them to

25    prevent from saying, because he didn't have

1        pleural plaques or asbestosis, that meso is not

2        asbestos-related.

3              THE COURT:  All right.  Well, here's what

4        I'm going to do about that, Ms. McVey.  I'm

5        going to deny your motion on this.  That is

6        something you can impeach him on.

7              This thing has very questionable

8        scientific merit, but I'm sure you'll impeach

9        him with evidence.  You can deal with that.

10             Number 13.  Motion in liminé Number 13,

11       preclude corporate representative hearsay.

12             I have ruled on this a million times.  I

13       don't need a whole lot of going around the

14       bush.

15             The very nature of a 30(b)(6) witness is

16       that they, quite often, rely on information

17       from other sources, because you can't ever

18       have -- and, particularly, with Johnson &

19       Johnson, something like that, you can't have

20       one person that has personal knowledge about

21       this.  They rely on the records and they are

22       enormous.

23             And I've known Dr. Hopkins, I've known

24       that many, many times.  He's the 30(b)(6).  I

25       don't know if you're going to use him now.  He

```
 1        used to be the one in all the cases I've tried.

 2              And enormous volumes of material came in.

 3        Memoranda and all kinds of things from Johnson

 4        & Johnson.  He was copied on a lot of it, but

 5        not all of it.  And he spoke from his knowledge

 6        of -- he spoke for the corporation.  His

 7        knowledge was not just personal, but knowledge

 8        gleaned from records and interviews and all

 9        kinds of other things.

10           MS. McVEY:  But there's one little

11        specific thing in here, real quick.

12              THE COURT:  All right.

13           MS. McVEY:  First, Judge, normally, you

14        grant -- normal hearsay rules apply.  What we

15        mean by that, he can certainly read the records

16        into the record.  He has personal knowledge

17        that he testified to that, but he can't tell a

18        story made up from these records somehow.

19        Somehow give a narrative to it.  But this one's

20        even more specific, because it's Johnson &

21        Johnson specific.  So I want Ms. Gross to talk

22        about this one piece.

23           MS. GROSS:  It is very Johnson & Johnson

24        specific, and I'll make it really quick.

25              They have a relatively new corporate
```

     1          representative.  He became the corporate

     2          representative in the spring of last year.  His

     3          name is Dr. Kuffner.  He'll come here.  You'll

     4          see him.  And what they try to do is they sort

     5          of try to launder expert testimony in through

     6          Dr. Kuffner, because he has a medical degree,

     7          even though he's a corporate representative.

     8          He's not an epidemiology degree. (sic)  I don't

     9          want to go into it too much, but what you need

    10          to know is Dr. Kuffner has no personal

    11          knowledge about anything about anything with

    12          Johnson & Johnson before 2013.  They want to

    13          bring it -- typically, what they do is they try

    14          to get 200 -- over 250 pages admitted through

    15          Dr. Kuffner.  It's called, "The Comprehensive

    16          Report," and it includes information on topics,

    17          honestly, they didn't seem to preclude it.  It

    18          includes information on awareness of cancer,

    19          talc pleurodesis, which Your Honor just granted

    20          that MIL.  The geology section was written by a

    21          Johnson & Johnson --

    22               THE COURT:  Who is Johnson talc baby

    23          powder review written by?

    24               MS. GROSS:  It was sort of a group of

    25          people.  It --

1          THE COURT:  -- internal Johnson & Johnson

2     document.

3          MS. GROSS:  Yes, ma'am.

4          THE COURT:  All right.

5          And this is Johnson & Johnson's cut on all

6     that stuff from their point of view.

7          MS. GROSS:  Yes.  And, you know, what they

8     try to do with Dr. Kuffner that makes it --

9          THE COURT:  What I'm not going to allow is

10     Kuffner to start getting into what -- for

11     example, through Drew Van Orden from R.J. Lee

12     would say that it's his knowledge about what

13     Johnson & Johnson's factual situation is with

14     respect to sourcing of the quality of the

15     things and so forth.  I'm not going to allow

16     that kind of thing to do.

17          I am not going to exclude him from

18     speaking from records to say what Johnson &

19     Johnson's factual situation is.  He'll often be

20     doing that.  But I'm not going to allow him to

21     get these opinions that are in like the -- I am

22     familiar with this document, and it's got stuff

23     in it.  It's just plain all ordinary stuff from

24     the records of J&J, but then it's got a whole

25     bunch of experts and their opinions.  And I'm

1    not going to let him be the conduit for

2    offering those opinions.  But the corporate

3    records that relate to testing that and all

4    that kind of thing, perfectly okay.

5        MS. GROSS:  The other thing they try to

6    have Dr. Kuffner -- and this is the last point

7    I would like to make for Your Honor, because

8    it's completely consistent with what you just

9    said.

10       They will try to have him testify at trial

11   about the opinions of Johnson's baby powder.

12   They do this by -- making a foundation for

13   historical documents and --

14       THE COURT:  Well, he's not going to be

15   allowed to testify about his opinions.  He's

16   not there to offer opinions.  He is there to

17   testify about the records of Johnson & Johnson.

18       There's plenty in their records where they

19   say, "Don't tell them what we found."

20       It's the factual material that's generated

21   from their records is what he's going to be

22   testifying to, but he can't go off on a tangent

23   and start offering opinions.  They got plenty

24   of other opinion good people, witnesses who can

25   do that.

```
 1            MS. GROSS:  Thank you, Your Honor.

 2            THE COURT:  All right.  All right.

 3            Fourteen -- so that's -- that's a denial

 4       with some indication of granting the

 5       restrictions on using it as an opinion-based

 6       document for Kuffner to use.  Okay.

 7            So now we've got number 14, Plaintiffs' --

 8       preclude discussion of "worst case scenario for

 9       comparisons" and "no-observed adverse effects

10       level."  This is Christy Barlow.

11            MR. ADAMS:  This is Dr. Barlow, Your

12       Honor, who I'm sure you've seen before.

13            THE COURT:  I've seen Dr. Barlow before.

14            MR. ADAMS:  A question for you.  The

15       gatekeeper question for an expert is:  Are

16       their opinions reliable and do they assist the

17       trier of fact?

18            In this case, Dr. Barlow's opinions on

19       this specific topic are not just unreliable,

20       they're demonstrably false in Johnson &

21       Johnson's own documents.

22            Number 1, Dr. Barlow testifies 0.1 percent

23       asbestos in the product, itself, is the worst

24       case scenario, 0.1 percent asbestos in the

25       product.  Except Johnson & Johnson's own
```

```
 1      records, starting in 1972, said there was

 2      0.5 percent asbestos in the product.  So

 3      Dr. Barlow used it.  And by the way, Johnson &

 4      Johnson never gave Dr. Barlow any of their

 5      records.  So Dr. Barlow makes an assumption

 6      that's demonstrably false based on records that

 7      Johnson & Johnson didn't give her.  That's

 8      number 1.

 9          Number 2, Dr. Barlow makes a second

10      assumption about the amount of asbestos that

11      gets into the air when Johnson's Baby Powder is

12      used.  She uses 0.1 percent of the -- this,

13      when you measure the fibers in the air.

14          THE COURT:  Tell you what, let me just

15      kind of tell you what we're going to do here

16      from my perspective.

17          This is the battle of the experts.  Now,

18      you're going to vigorously cross-examine her.

19      As she gets up there and says some of that

20      stuff, you're going to vigorously cross-examine

21      her and point out the error of her ways.  If

22      that error is too severe, I'm going to strike

23      her testimony.  So they go with danger and

24      warning signs all over the place.  Some of this

25      stuff is highly-unreliable, not supported by
```

1    anything else in the scientific records, but I

2    am not going to preclude her from the worst

3    case scenario or no-observed adverse effects

4    level.  But if she can't back that up by some

5    information that's going to -- in some cases,

6    she hasn't been able to do, I'm going to strike

7    her testimony.

8         MR. ADAMS:  Yes, Your Honor.

9         THE COURT:  Okay?

10         MR. ADAMS:  Understood.

11         THE COURT:  So denied with a big, huge red

12    star caveat.

13         Fifteen.  Plaintiffs' motion in liminé to

14    exclude any speculative testimony that blames

15    lab contamination for the presence of asbestos

16    in the talc sample.

17         You know, I will just say one thing to you

18    people; that is that that's always the refuge

19    of scoundrels.  It's this thing, when you can't

20    think of anything else to say, "Oh, it must

21    have been contaminated in the lab."  And I have

22    seen some pretty outrageous things happen about

23    what they have seen might have been the

24    contamination when there's no way -- the thing

25    could have been contaminated.  So I will just

```
 1          say this to you, and it's a warning to both

 2          sides.  You get anything that starts talking

 3          about laboratory contamination, you better have

 4          some direct evidence there was laboratory

 5          contamination.

 6               This is often the way of attacking the

 7          other side's experts.  They say, "We tested

 8          Johnson & Johnson baby powder and we found

 9          asbestos."  And they say, "Oh, it must have

10          been lab contamination of the slides that you

11          used," and all that kind of stuff.

12               I'm going to tell you, I'll listen to a

13          little bit of it, but if it's not supported by

14          something other than we just kind of speculate

15          that is, because we know our lab was so pure it

16          never had asbestos in it, I'm going to strike

17          it all, and I'm going to instruct the jury to

18          draw an adverse inference.

19               So you're playing with fire if you do

20          that.  That's all I'm saying.  So, I think my

21          views on expected testimony are clear.  I'm

22          saying to you, counsel, that I sympathize with

23          your concern about blaming lab contamination on

24          every time they find the results, lab

25          contamination, and I say it, if they don't say
```

1      that, they better back it up, otherwise the

2      penalties are going to be severe.

3           MR. ADAMS:  Understood, Your Honor.  Thank

4      you.

5           THE COURT:  Sixteen, plaintiffs' motion in

6      liminé to exclude the testimony of Dr. Matthew

7      Sanchez.  I got a lot of questions here.

8           And I'll tell you another thing.

9      Dr. Sanchez, we're going to talk about how long

10     this trial's going to take.  I spent four days

11     listening to McCrone and Dr. Matthew Sanchez.

12     I will never repeat that again.  Yes, ma'am.

13          MS. GROSS:  I'm going to try to go through

14     this as quickly as I can.

15          THE COURT:  Yes, ma'am.

16          MS. GROSS:  Okay.  So our ask is that we

17     would like Your Honor to strike Dr. Sanchez in

18     his entirety.  Not partially; entirely.  For

19     these reasons that were outlined in our brief,

20     so I'm not going to hem and haw over them.  I'm

21     just going to hit the high points.

22          The first is Dr. Sanchez cannot define

23     what his definition of asbestos is.

24          THE COURT:  Yeah.  He's an asbestiform

25     guy, and that is totally discredited as a means

1      of isolating asbestos from what I can tell in

2      this day and age.

3          MS. GROSS:  And we're going to talk to you

4      about the two main points under that, but the

5      real main point under that is this whole

6      population requirement that I'm going to

7      explain to you in a minute.

8          THE COURT:  I know --

9          MS. GROSS:  You know --

10         THE COURT:  I know this.  I don't need to

11     have instruction.  It's 3:15 and I don't need

12     to spend an hour on Dr. Sanchez.

13         MS. GROSS:  The next is, he uses the bulk

14     building testing method, and sort of

15     extrapolates it to look at talc under a

16     microscope with a completely different

17     microscope and there's all -- we walked through

18     it all.  There's all the peer review

19     publications that say you can't do that.  It's

20     bad signs.

21         And then the third, and perhaps the most

22     damning, is when he applies his definition of

23     population asbestos as a ratio using this bulk

24     building method looking under the microscope

25     and looks at photos of raw tremolite, the raw

1    mix-standard tremolite, he says almost a

2    hundred percent of the time, it's not asbestos.

3        And then when you follow up with a

4    question, if you had a hundred of them that

5    look exactly like that, it's still not asbestos

6    for a variety of reasons.  We put the whole

7    chart in there.  I brought them to hand them to

8    Your Honor.  It's kind of small.  If you want

9    to see the photos blown up, I can hand them to

10   you.  But what the Watson case --

11       THE COURT:  But his definition of asbestos

12   in the final analysis, he's a geologist.

13       MS. GROSS:  That's correct.

14       THE COURT:  So his definition of asbestos

15   has nothing to do with the asbestos properties

16   that are identified by most experts.  He says

17   that it's cleavage fragments versus

18   asbestiform.  Everything is to be divided in

19   those two ways.  I don't know of anybody else

20   that does it that way.

21       And he denominates -- he further

22   denominates, if you really want to drill him

23   down, that chrysotile is a cleavage

24   fragment-type asbestos, so it really isn't

25   asbestos.

1           The latest pronouncement from the EPA will

2      give life to that.

3           So I am very concerned about Sanchez,

4      about both his methodology and slides, but also

5      his ability to opine about what is asbestos,

6      and even worse, he also gets into what can

7      cause mesothelioma.  He has no training in

8      that, whatsoever.

9           So I certainly will never let him testify

10     to that.  That's not going to happen.  But even

11     this very laborious thing that takes up

12     internal -- an eternal jury time is all about

13     the final analysis, if these cleavage fragments

14     are too thick in a form to worm their way into

15     the part of the lining of the mesothelia

16     lining, and cause mesothelioma.  He bases that

17     on the geology that he uses.  He has no

18     training, as a physician, to say for how things

19     worm their way into lined -- 25 years in

20     causing mesothelioma than the man on the street

21     does.

22          So that's what I'm concerned about, about

23     Dr. Sanchez.

24          So I'm telling you that I am close to

25     saying that Sanchez is going to be excluded.

1          And so what I'm going to do with you -- I

2     understand your argument.  I've read all the

3     stuff.  I lived through it.  So let's see what

4     the other side has to say.

5          MS. GROSS:  All right.

6          MR. COWAN:  Thank you, Your Honor.

7          Dr. Sanchez is not going to testify that

8     anything causes mesothelioma.  He's not a

9     medical doctor.  He's not going to testify as

10    to causation.  He is not going to testify as to

11    what can and cannot worm their way through a

12    lung.

13         His entire testimony will be focused on

14    what he found as a geologist in the bottles

15    that he has tested.  And his -- his analysis of

16    the mine sources that are at issue in this

17    case.

18         THE COURT:  But what does that have to do

19    with this case at all?  I mean, he's a

20    geologist and he looked at these samples, and

21    he -- he won't have a say they're asbestos, but

22    yet he tries to discuss the more acknowledged

23    categories of asbestos, including, for example,

24    chrysotile, and say that these cleavage

25    fragments are chrysotile and it's not asbestos.

1          If that's what he's going to testify to, I'm

2      not going to allow them to testify.

3          MR. COWAN:  Well, I would say the flip

4      side is the same then.  What is the relevance

5      of Dr. Longo's testimony?

6          THE COURT:  Well, we're not on Dr. Longo

7      right now.

8          MR. COWAN:  I understand who we're dealing

9      with, but if a geologist and a microscopist,

10     his testimony about what he believes is and is

11     not asbestos within that bottle is not

12     relevant, simply because he does not think some

13     of the particles are not asbestos --

14         THE COURT:  Well, that's the only basis

15     he's got for saying.

16         He's got this theory that he has put

17     forward that asbestos can only be asbestiform

18     fibers, and cleavage fragments cannot be

19     asbestos.  That's his theory, based on his

20     geological observance of material.

21         MR. COWAN:  It's also contingent with how

22     the EPA defines asbestos.

23         THE COURT:  Was.  Was.

24         MR. COWAN:  I believe that that regulation

25     is still in place.

```
 1              THE COURT:  It might be.  But everything
 2      that's happened since then is a huge variance
 3      with the concept that asbestiform, as Matthew
 4      Sanchez defines it in these slides,
 5      characterizing it that way as a comparison with
 6      cleavage fragments, that's the other thing so
 7      mind-boggling about this thing.
 8           He kind of works backwards to it.  He
 9      takes these cleavage fragments.  And he takes
10      these cleavage fragments, slaps them on
11      something, then he works back to it.  These
12      other things, well, they got to be something
13      else.  They're not cleavage fragments.  Oh,
14      well, I guess they're asbestiform.  Then he
15      goes through all this malarkey about how
16      asbestiform works.
17           MR. COWAN:  I don't think that I will be
18      convincing Your Honor anything about
19      Dr. Sanchez today, but I will say that if
20      plaintiff believes there has been this c-change
21      (ph) in what is and what is not asbestos, then
22      they are more than capable of cross-examining
23      Dr. Sanchez on his -- on his opinions.  And I
24      think I'll just leave it at that.
25              THE COURT:  Okay.
```

```
 1              MR. COWAN:  Thank you, Your Honor.

 2              THE COURT:  All right.

 3              MS. GROSS:  A couple of quick things:  The

 4       issue is with his methodology with how he got

 5       there.  And that methodology is unreliable.

 6              You heard him.  You heard counsel say that

 7       he uses the EPA's definition.  The EPA's

 8       definition in the whole building analysis,

 9       which has never been meant to be extrapolated

10       to use looking at cosmetic talc under a TEM --

11       a giant TEM microscope that they used

12       throughout the Plant trial.  Countless peer

13       review publications have said that is improper

14       and is junk science --

15              THE COURT:  That's this whole thing about

16       the kinds of microscopy we use, the JE --

17       whatever one, the TEM, all that kind of thing.

18       Well, that's the battle of the experts.

19              MS. GROSS:  And we know his opinion -- his

20       method -- excuse me.  We know his methodology

21       doesn't work.  And we know his definitions

22       don't work, because he looks at raw asbestos

23       under a microscope and he says it's not

24       asbestos.

25              So we know that his methodology is
```

```
 1        unreliable.  We know the Court should exercise
 2        its gatekeeping function.
 3             Unless you have questions for me further,
 4        I'm going to leave it at that, but I could go
 5        on for hours.
 6             THE COURT:  Yeah, I understand.  I'm very
 7        shaky-shaky about Sanchez, because I -- you
 8        know, that's the part of it that really bothers
 9        me the worst, is you get stuff that's
10        acknowledged to be raw asbestos.  He puts it
11        under a microscope and says it's not asbestos.
12             MS. GROSS:  It's also been noted
13        throughout these peer review publications that
14        we cited in the brief that you read that if you
15        use this method that he says, like just looking
16        at the aspect ratio concept, unless it's
17        20-to-one, it doesn't count.  You can say it's
18        not asbestos, right?  If you look at the charts
19        that we included in one, I think it's in
20        Dr. Parker's article.  It's on page 8 of our
21        motion.  It talks about how, if you use
22        Dr. Sanchez's method, you miss a massive
23        amount.  If you use this 20-to-one aspect ratio
24        minimum, you're going to find 13 percent of
25        fibers --
```

        1           THE COURT:  Yeah, 98 percent of raw

        2      asbestos.  Not asbestos, if you use Sanchez's

        3      approach.

        4           MS. GROSS:  That's correct.

        5           THE COURT:  And the only question I got is

        6      this, you know, it's the battle of the experts.

        7      You know, they're going to be doing the same,

        8      you know, attack on your experts.

        9           I am -- as I say, I am very, very

       10      questionable about Sanchez and this aspect

       11      ratio is not supported now by anybody.  McCrone

       12      use to be -- they were the big defenders of

       13      J&J.  They came up with all this business.

       14      It's now been thoroughly discounted by later

       15      expert examination.

       16           I don't know.  I'm very hesitant about it.

       17           MR. COWAN:  Your Honor, may I at least

       18      address the --

       19           THE COURT:  I mean, you know, one thing

       20      that's said about Sanchez, if you're using PLM,

       21      and you're using it in bulk materials, then his

       22      thing may have some pertinence, but that's not

       23      what we're talking about here.  We're talking

       24      about the much finer expert examination of

       25      processed and marketed talcum powder and

 1    whether it has asbestos in it.  And his methods

 2    simply don't get in the hemisphere of dealing

 3    with the sophisticated determinations you have

 4    to make in this thing.  He's way back in the

 5    geology of it and some kind of very basic, much

 6    more basic world.

 7         I mean, my family was in the sand-mining

 8    business for many, many years.  And so I am

 9    sensitive to mining techniques and what you can

10    use to examine them.

11         We used a lot of sophisticated glass

12    capacitor and other kind of uses, because we

13    have very high ISO and very low FE.  But the

14    way you examine those kind of minerals is about

15    the way he's examining this stuff, and it's a

16    much grosser examination to yield results.

17    And, you know, something like sand, even very

18    fine mill sand, then it is a sophistication it

19    takes to look at talc, and, particularly,

20    cosmetic talc.

21         And that's what's got me about taking this

22    very gross measuring device of Sanchez and

23    particularly taking up a bunch of court time

24    with all this nonsense when it really doesn't

25    have much ability to look at and tease out

```
 1          whether there is or there isn't asbestos in
 2          cosmetic talc.  And particularly when you got a
 3          guy who defines asbestos in a very different
 4          way.
 5               MR. COWAN:  May I respond, Your Honor?
 6               THE COURT:  Yes, of course.
 7               MR. COWAN:  I'm not sure if you want me at
 8          the --
 9               MS. GROSS:  I had a couple -- I had a
10          couple of quick points.
11               THE COURT:  Let Mr. Cowan do it.
12               MR. COWAN:  I'll be very brief.
13               THE COURT:  Let him respond.
14               MR. COWAN:  I don't think she needs to be
15          convincing you anymore.  I think I need to get
16          up here for a moment.
17               Your Honor, I understand the point about
18          R-93 and your concerns there.  The issue,
19          though, is that Dr. Sanchez does not just look
20          at these samples but the PLM, using that EPA
21          R-93.  He uses XRD.  He uses R-93 on the PLM.
22          He uses 22662-1 TEM.  He used a different
23          methodology in his previous iterations of
24          reports, and then switched to the ISO.
25               Regardless, he is using all three.
```

```
1         THE COURT:  He's using those various

2    devices.  You're quite right about that,

3    Mr. Cowan.  Here's what's got me worried about

4    this:  He's got this mindset that about

5    98 percent of what the rest of the world will

6    say is asbestos, in his view, it's not

7    asbestos.

8         MR. COWAN:  Well, I --

9         THE COURT:  And that's -- that's what --

10   putting a guy like that in front of a jury to

11   take up a couple of hours with all this

12   malarkey.  He gets into -- when the bottom line

13   is, he has got such a grossly different way of

14   defining the basic substance we're talking

15   about than anybody else that will testify.

16        MR. COWAN:  I respectfully, obviously,

17   disagree with the statement that you just made.

18   However, at the end of the day, this is a

19   battle of the experts.  I have problems with

20   Dr. Longo's methodologies, which we will be

21   discussing later.  We'll be discussing that.

22        I have not tried to completely exclude

23   every opinion that he's ever had.  I have an

24   issue with one portion of his PLM analysis.

25        But this is going to be a battle of the
```

1    experts.  They, obviously, have ammo to use on

2    cross-examination.  He has a Ph.D. in geology,

3    who has been studying national occurring

4    asbestos for the last 24 years.  He is a

5    qualified expert that is actually using

6    published methodologies that you, sir, may --

7    ma'am, may disagree with.  But at the end of

8    the day, they are still published

9    methodologies.  And, in fact --

10        THE COURT:  Well, I mean, there are a lot

11   of things published that now, in the light of

12   what we now know, just don't hold any water.

13   But, you know, I mean, I spent a fascinating

14   day about three years ago in the

15   newly-renovated Peabody Museum at Yale, which

16   is just one of my favorites in the world.  My

17   husband and daughter went there and my sister

18   went to med school there, so I was up visiting.

19   And they have this whole exhibit on asbestos,

20   and it was absolutely fascinating to trace

21   through how these rocks were examined.  This,

22   of course, asbestos is naturally occurring

23   among talc and other things.  They had these

24   things and then they had the -- the examination

25   of what they look like as your examination got

```
 1        more sophisticated and more sophisticated.

 2        Looked at different kinds of light microscopy

 3        and other ways of looking at these things.  And

 4        the progression that has been made since

 5        McCrone landed on this theory of asbestiform

 6        and non-asbestiform years and years ago is

 7        staggering.  And that's what I'm sensitive to.

 8        The world has changed since they hatched up

 9        this way of looking at things.  And for a long

10        time, people bought it.  But it has turned out

11        to not be a very believable thing in this day

12        and age.

13            MR. COWAN:  I would just -- Your Honor, if

14        we're going to talk about how things have

15        changed, that Dr. Longo's methodology has been

16        around -- I mean, he use to --

17            THE COURT:  Please don't get into

18        Dr. Longo.  We don't --

19            MR. COWAN:  Oh, I understand, but things

20        have changed.  Methodologies have remained

21        relatively constant.  And so I would just -- I

22        would say, and you, obviously -- I haven't been

23        to that museum.  I'd like to go, but -- and you

24        may know more about this than I do at this

25        point.  You've been doing this for awhile.  But
```

1      as I see it --

2           THE COURT:  That exhibit's probably long

3      since gone since I saw it.

4           MR. COWAN:  But as I see it, this really

5      is an issue of weight versus admissibility.

6      There is no doubt that --

7           THE COURT:  Watson versus Ford Motor

8      Company.  And in that case, we said there comes

9      a time when it's so outside the mainstream that

10     even though you've got this highly-educated

11     expert, that expert can't offer opinions on

12     what that expert is being offered for.

13          In that case, it was a guy from -- he was

14     an expert in big naval engines, and he was

15     offered as an expert on cruise control.  He

16     never looked at a cruise control or dealt with

17     it.  Didn't know nothing about it.

18          So even though he was degreed and lettered

19     and brilliant about magnetic interference,

20     which is what he thought it was,

21     electromagnetic interference, turned out that

22     had nothing to do with the cruise control, and

23     we reversed that case for that reason.

24          And said the judge has got the

25     responsibility to look on the front-end and see

1    whether these opinions that are going to be

2    offered have really got the kind of scientific

3    acceptability to them.  They've got to have

4    some basic ability.

5        And what this guy is, is a geologist, who

6    has rarely found asbestos in anything.  And

7    that is light years away from the mainstream

8    from most people that have looked at these

9    materials over time.

10        MR. COWAN:  Just so you know, he has found

11    asbestos in the bottle of Johnson's baby

12    powder.

13        THE COURT:  Oh, wow.  That's since I last

14    saw him.

15        MR. COWAN:  Well, if he comes here, we'll

16    talk about it.

17        But regardless, I understand the Court's

18    gatekeeping rule, and I understand there are

19    factors that need to be addressed.

20        And one of those is, obviously, whether or

21    not the methodology is published.  It is.  And

22    one of them is whether or not the methodology

23    is testable.  It is.  And the fact that the

24    Court, I understand -- and I don't think I'm

25    going to convince you otherwise -- you don't,

```
 1        Your Honor, agree with Dr. Sanchez --

 2            THE COURT:  I am sure of one thing; that

 3     asbestos can include some fibers that are

 4     little, strong, skinny fibers, and it can also

 5     contain these --

 6            MR. COWAN:  Well --

 7            THE COURT:  -- fragments.  But I am also

 8     convinced that the majority opinion of people

 9     who look at those -- this, that both of those

10     are asbestos.

11            MR. COWAN:  Okay.  There are many, many

12     publications that would disagree with you.

13            THE COURT:  Oh, yeah.  I know.

14            MR. COWAN:  But regardless, that's kind of

15     the point.

16            THE COURT:  Okay.

17            MR. COWAN:  I mean, the fact that there is

18     a disagreement doesn't make it inadmissible.

19            THE COURT:  All right.

20            MR. COWAN:  Thank you.

21            MS. GROSS:  One final point.  There is no

22     methodology.  There isn't.  This R-93 thing,

23     R-93 is meant to be used as a PLM.

24            What Dr. Sanchez does, is he takes that

25     and he extrapolates it and he uses it with a
```

1        TEM, that giant microscope we put up for trial

2        last year.  He completely misuses the testing

3        methods.  There is no methodology.  There is no

4        scientific publication or science on earth that

5        says what he's doing is good science.  None.

6             Where I deposed Dr. Longo, and I know we

7        don't want to get into it, but because we

8        touched on the battle of the experts, I just

9        want to be clear.  What Dr. Longo does is he

10       uses the methods prescribed by AHERA, ISO,

11       which Your Honor talked about.  You know all

12       that.  That's the difference.

13            THE COURT:  I don't want to do that part.

14            MS. GROSS:  Okay.

15            THE COURT:  I, at the present time, am not

16       ready to rule Matthew Sanchez out completely,

17       so I am holding out on the motion to exclude

18       his testimony completely.  But I am very, very

19       concerned, and the concerns I have voiced at

20       considerable length to all of you today.  I

21       will see how things develop.

22            When Sanchez begins to testify, if there

23       isn't a proper foundation laid right to begin

24       with before getting into this mind-numbing

25       scenario that he goes through, I am going to

```
 1        entertain a motion to exclude his testimony and

 2        you're going to suffer the consequences of

 3        having him in front of the jury, an expert

 4        who's disqualified, because I think he is right

 5        on the edge.  And what we said in Watson versus

 6        Ford Motor Company was outside of what all is

 7        accepted.

 8            So with that, I am denying the motion, but

 9        it's with a lot of caveats.

10            Seventeen.

11            MS. GROSS:  It may be easier for Your

12        Honor to argue the Diette and the Weill one at

13        the same time.

14            THE COURT:  Diette and who?

15            MS. GROSS:  Weill.  Dr. Weill.  It's

16        Number 21.  Because we move to strike them for

17        the same reason -- partially strike them for

18        the same reason.

19            THE COURT:  Well, let me just say this

20        about both of these to begin with:  I'm not

21        allowing anybody to testify that Mr. Perry's

22        mesothelioma is spontaneous or idiopathic.

23            With respect to Diette, he is a

24        pulmonologist.  I don't think he has got

25        enough -- he is a COPD man and an asthma man.
```

1      He doesn't have any background in mesothelioma,

2      as I understand it.  I've limited him in the

3      Plant case and said that he could not give a

4      specific causation opinion about the

5      plaintiff's mesothelioma; that it was

6      spontaneous.  And I did that with respect to

7      Dr. Diette, Dr. Weill, and Dr. Feingold.  And

8      I'm going to make those same rulings today.

9           So if that helps, they are not going to be

10      allowed to opine on the cause of the

11      mesothelioma of Mr. Perry.  They are not

12      qualified to do that.

13           Now, the only reason I let them in is that

14      I am so far confident that given the confidence

15      of defense attorneys -- and I'm relying,

16      particularly, on Mr. Brown in this regard, I

17      think they understand this ruling and will so

18      instruct their clients.

19           I had one witness that, despite all my

20      rulings -- that was Dr. Attanoos.  Attanoos.

21      And Attanoos is so egotistical about what he

22      knew and what he didn't know that he would not

23      follow my instructions.

24           MS. GROSS:  Dr. Feingold did it last year

25      in the Plant trial, as well.

```
 1          THE COURT:  Dr. Feingold did a little bit
 2     of it in this very room.  I'm not going to
 3     permit that.  I'm saying they cannot testify as
 4     to the cause of his mesothelioma.  Not only can
 5     they not testify that it was spontaneous or
 6     idiopathic; meaning, I don't know or it just
 7     kind of happened, they are not going to be able
 8     to testify to that.  And if they now start
 9     testifying that they know the cause of the
10     mesothelioma, I'll strike all the testimony.
11          So they need to be instructed to stay
12     between the guardrails.  And that's how I'm
13     going to deal with this.  So that ought to deal
14     with 17.  That's Diette.
15          MS. GROSS:  And 21.
16          THE COURT:  Twenty-one?
17          MS. GROSS:  Yes, ma'am.
18          THE COURT:  That's --
19          MS. GROSS:  Weill.
20          THE COURT:  -- Weill.  And the other one
21     is not being offered yet.
22          MS. GROSS:  Feingold's not in this case.
23          THE COURT:  Feingold's not in this case;
24     just Diette and Feingold.
25          MS. GROSS:  Diette and Weill.
```

```
 1              THE COURT:  And Weill.

 2              MS. GROSS:  Yes, ma'am.

 3              MS. BUENO:  Your Honor, may I respond?

 4         Understanding Your Honor's ruling, I do

 5    think it's important for you to understand what

 6    has happened in recent months leading up to

 7    this trial.

 8              THE COURT:  All right.

 9              MS. BUENO:  I have right here your Order

10    in the Plant trial --

11              THE COURT:  Yes, ma'am.

12              MS. BUENO:  -- where you excluded these

13    two experts at issue, Dr. Diette and Dr. Weill.

14    And what you did is, you said, on the third

15    page, that they are able to testify, generally,

16    about the rates of mesothelioma cancer in

17    women, which are spontaneous or naturally

18    occurring, but you said they are excluded from

19    testifying about the specific plaintiff's

20    cause, and you explained why in great detail.

21    And you said, "The Court finds these doctors

22    have not made an attempt to determine the

23    products at issue contained asbestos at all."

24    You criticized them for not looking at fiber

25    type, for not reviewing any studies, for not
```

```
 1        considering the presence or lack of presence of

 2        asbestos in the products, and additional

 3        deficiencies.  And you, basically, said these

 4        doctors cannot say that this was naturally

 5        occurring, because they haven't considered the

 6        potential exposure for this plaintiff.

 7            So what we did is made a very concerted

 8        effort to fix it, to fix these deficiencies.

 9        And what Your Honor may not be aware of is that

10        in the reports that Dr. Diette and Dr. Weill

11        served in this case, which are attached as

12        exhibits to our response, they made an

13        exhaustive effort to review, in detail, all of

14        the materials that you criticized them for not

15        reviewing previously.

16            And I've got those reports here.  I'm

17        looking, for example, at Dr. Weill's report.

18        And it starts on page 1 with the chart of

19        materials reviewed and it goes multiple pages.

20        He reviewed all of Dr. Longo's testing --

21            THE COURT:  Let me just say this,

22        Ms. Bueno:  Part of my problem with them is not

23        reviewing the specifics of Ms. Plant.  But the

24        other part of my problem with those two is they

25        don't have any information about -- sufficient
```

1        to make a diagnosis of Ms. Plant's

2        mesothelioma.

3            So it's not just information about the

4        general thing.  I have no confidence in the

5        opinion that these cancers are spontaneous and

6        these cancers are idiopathic.  I would never

7        allow idiopathic to be put before a jury,

8        because that just means "I don't know."

9            Spontaneous occurrence of mesothelioma is

10       rare as hen's teeth.  Mesothelioma is a

11       signature cancer, and it is almost invariably

12       caused by asbestos.  And that is what troubles

13       me about these experts.  They pretend to say

14       that there is actually data out there to

15       support the diagnosis of spontaneity, and even

16       go far enough to say that hers -- Ms. Perry's

17       is spontaneous or idiopathic, but they don't

18       have any scientific basis for that, because

19       this -- this opinion is -- the spontaneity

20       is -- we can't explain it any other way, so it

21       must have been spontaneous.  Idiopathic is, we

22       just can't explain it at all.  It's just

23       something that happens.

24            That's not a scientific diagnosis or a

25       scientific opinion, in my view.  And I

1        absolutely will not let that go to a jury.  I

2        don't care whether they have now done a whole

3        bunch of studies about asbestos or not.  The

4        opinion they offer is not a scientifically

5        reliable opinion.

6            MS. BUENO:  I think the opinion they offer

7        is a little different than what you're stating.

8        So let me explain to the Court exactly what

9        they testified to.

10           Here's what they testified to:

11           They said, we have reviewed -- both of

12       them independently -- reviewed these materials

13       that the Court has asked us to.  We've looked

14       at the data.  We've looked at Dr. Longo's

15       reports.  We've looked at Dr. Bailey's reports.

16       Right?  And we have now considered in our mind,

17       even if they are correct about the amount of

18       asbestos they say in talc, would that be enough

19       to have caused this patient's mesothelioma?

20       And they both have concluded that, based on

21       epidemiology and exposure assessments and

22       published literature and the like, they have

23       come to a conclusion that cosmetic talc was not

24       the cause.

25           Then they say -- both of them -- Dr. Weill

1    testified about this most recently in his depo.

2    He said, "Look, I have considered all of this,

3    and even if there is this sub ultra-trace

4    amount of asbestos that plaintiffs claim, it's

5    my opinion, to a reasonable degree of medical

6    certainty, it is not enough to cause

7    Mr. Perry's mesothelioma."

8         THE COURT:  And yet they know nothing

9    about Mr. Perry.  They haven't examined

10    Mr. Perry.  They haven't examined Mr. Perry's

11    details about his lungs, or anything like that.

12    This is all based on their just kind of general

13    opinion that if you can't explain it, it's

14    spontaneous.  Well, they may not be able to

15    explain it, but the doctors that have looked at

16    him do explain it.  And it's not a proper

17    counter to the doctors who do explain it.

18         MS. BUENO:  There is not a doctor --

19         THE COURT:  There's no explanation for it.

20    It's spontaneous.  That is not something I find

21    as justified in any scientific --

22         MS. BUENO:  That's not what they're

23    saying.  They're saying, if it was

24    asbestos-related, I know it's not talc for

25    these reasons.  And so if it's not

1    asbestos-related, then I believe it's naturally

2    occurring, because there are cases of that.

3    That is their opinion.  It's not talc.  I don't

4    have enough --

5        THE COURT:  How do they exclude talc?

6        MS. BUENO:  Because they look at the

7    epidemiology.  Like Dr. Diette goes into great

8    detail into the miners and millers studies and

9    how --

10        THE COURT:  I'm not talking about any of

11    that stuff.  I'm familiar with all of that old

12    stuff.  Even Vogner appealed it at one point.

13    That's not enough.

14        MS. BUENO:  They are epi --

15        THE COURT:  I'm asking what they looked at

16    in Perry and in the products Perry used.  They

17    didn't look at any of that.

18        MS. BUENO:  Well, they looked at it.  They

19    looked at all of the data that plaintiffs

20    allege related to asbestos content in the

21    products used.

22        THE COURT:  I'm asking you a very specific

23    question, Ms. Bueno.

24        MS. BUENO:  Yes.

25        THE COURT:  They propose to say Perry's

1        mesothelioma cannot be caused by talc.  They

2        want to make that opinion to the jury.

3             MS. BUENO:  They want to say --

4             THE COURT:  They are not qualified.  They

5        don't know anything.  They haven't examined

6        Perry.  They haven't examined his lung slide or

7        anything like that.  They don't have the

8        ability to do that.  They're not trained in

9        that.

10             MS. BUENO:  Then it would be the same for

11        Dr. Haber, who plaintiffs wish to put on the

12        stand and say the opposite.

13             THE COURT:  You-all are going to be going

14        one expert after another.  We're talking about

15        this expert.

16             MS. BUENO:  Okay.  This expert, both

17        Dr. Diette and Dr. Weill, are qualified,

18        according to you, in the Plant case to come to

19        the jury and say, there are a certain number of

20        cases where there has not been identified

21        asbestos exposure and plaintiffs have

22        mesothelioma, and those are called either

23        naturally-occurring or spontaneous, according

24        to the literature.  They have said that.  And

25        Dr. Brody, plaintiff's pathology expert, will

 1          say that.

 2              So then here is the point, then.  They are

 3          allowed to say there are a certain number of

 4          cases --

 5              THE COURT:  They are not allowed to say

 6          anything about the diagnosis of Mr. Perry,

 7          because they're not qualified to do that.

 8          That's my ruling.  That's the same ruling I

 9          made in Plant.  And the fact that you may have

10          studied it at length and decided that you got

11          down on some other facets of the case makes no

12          difference in my ruling.  I am not going to

13          allow them to express a medical opinion that

14          they're not qualified to express.

15              MS. BUENO:  Is there anything for future

16          knowledge from Your Honor -- because we tried

17          to rectify the Plant situation by having them

18          review the material that you identified in your

19          order.  Is there anything that a pulmonologist

20          can do to come and offer an opinion that

21          cosmetic talc is not to blame, having reviewed

22          the epidemiology and the medical literature,

23          the exposure studies, et cetera?

24              THE COURT:  I am not going to rule in the

25          abstract on that.

 1          MS. BUENO:  Okay.  Thank you.

 2          THE COURT:  All right.  Where are we?

 3          MS. McVEY:  Number 18, I think, Your

 4     Honor.

 5          THE COURT:  All right, 18.  To preclude

 6     defendants, and their lawyers, and their

 7     witnesses from offering statements regarding

 8     their personal use of talcum powder products.

 9     All right.  I will grant that.

10          MS. BUENO:  Thank you, Your Honor.

11          THE COURT:  Plaintiff -- motion in liminé

12     19, to exclude the 1986 letter from H.W.

13     Swanson to Phillippe Douillet.

14          MS. BUENO:  Your Honor, may I respond to

15     this one, please?

16          THE COURT:  I ruled, and then I guess it

17     just kind of passes over everybody.

18          MS. BUENO:  Well, Your Honor, I think

19     that --

20          THE COURT:  This goes back to Bell and all

21     that kind of stuff.

22          MS. BUENO:  No, no, it does not.  It does

23     not.  And that's why I think it's important.

24     It actually overlaps with a motion you heard on

25     Dr. Barlow earlier.  And so this is --

```
 1              THE COURT:  And I let Barlow in.

 2              MS. BUENO:  You did.

 3              THE COURT:  Barlow is not going to be the

 4         wedge where you're going to get this Douillet

 5         thing in.

 6              MS. BUENO:  Oh, no, no, no.  It's the FDA

 7         Citizen's Petition Response.  That's what this

 8         is, Your Honor.

 9              So plaintiffs' motion in liminé 19 is the

10         1986 FDA response to a citizen's petition that

11         outlined the worst-case scenario the FDA --

12              THE COURT:  This isn't FDA.  This is a

13         letter between two people, and I am not going

14         to allow it.

15              MS. BUENO:  It is not.  It is the FDA's

16         response to the citizen's petition.  That's

17         exactly what it is.  The title of it is --

18              THE COURT:  And it contains false and

19         unreliable expert opinion that they just kind

20         of throw in there.  It's not their opinion.

21         It's some other expert.  And, therefore, its

22         probative value is strongly outweighed by its

23         prejudicial effect, in my view.

24              MS. BUENO:  It can be offered for other

25         purposes, as well, as far as notice and other
```

1    issues, as well.

2        THE COURT:  Well, you've got a lot of

3    other ways of proving that than that

4    Swanson/Douillet letter, so I'm not letting it

5    in.

6        All right, 20.  Motion in liminé regarding

7    admissibility of documents without sponsoring

8    witnesses.

9        MS. McVEY:  This is really simple.  So

10   Johnson & Johnson has entered a stipulation

11   that certain documents within a Bates range are

12   both authentic and business records.

13       THE COURT:  Right, right.

14       MS. McVEY:  All right.  And so, as you

15   know -- and I'm going to hand you what we

16   filed, and the defendants already have a

17   copy -- is our motion to pre-admit exhibits.

18       THE COURT:  Yeah, yeah, yeah.

19       MS. McVEY:  And you'll see -- we just want

20   them to follow the stipulation that they've

21   agreed to.  In other words, if we put in a

22   Johnson & Johnson document that they have

23   agreed is authentic and a business record, it

24   should be admitted into evidence without having

25   to have a sponsor witness.

```
 1          THE COURT:  I agree.  And that's going to

 2     be resolved before we get to trial.  I am not

 3     going to get into a position where I've got to

 4     interrupt a trial for a whole bunch of that

 5     nonsense.

 6          MS. McVEY:  Your Honor, it's important

 7     because we're going to move these cases fast,

 8     as you know.

 9          THE COURT:  Right.  If these are J&J

10     documents, they're coming in.  Yes, ma'am.

11          MS. PEPKE:  Your Honor, I think the point

12     is premature.  Authenticity and business

13     records does not necessarily equal

14     admissibility.  It will in most cases.

15          THE COURT:  My friend, I rule on all these

16     things in advance.  I don't have a bunch of

17     evidence fighting while I'm trying these cases.

18     Time is too precious to do that.  I try to try

19     these cases in a week.  We're going to talk

20     about what we're going to do with this case.

21     But I'm not spending a bit of time as a witness

22     is on the stand or when the documents are up.

23          We pre-admit in the cases I try.  So she's

24     got a pre-admit list, and we're not going to

25     have any debate once trial starts.  If it's a
```

1      Johnson & Johnson exhibit -- a Johnson &

2      Johnson record that has been given to y'all,

3      that y'all have given her, or she's got some

4      other places and you agree it's a J&J record,

5      it's coming in.

6      MS. PEPKE:  Your Honor, I understand that

7      ruling.  We just received that pre-admit list.

8      That wasn't with this motion.  It came in

9      later.  We haven't thoroughly reviewed it.  If

10     we have an objection, for example, hearsay

11     within hearsay in that document --

12     THE COURT:  Hearsay within hearsay is not

13     going to be the kind of thing that we will

14     knock out in a business record, but whatever.

15     MS. PEPKE:  403 and 401, that would also

16     be proper basis to object that are not covered

17     by authenticity or business record.

18     If we have objections to that list, all

19     we're saying is we want to be able to bring it

20     to you, not while a witness is on the stand.

21     THE COURT:  Well, I'm not going, in the

22     middle of a trial, to go through a whole bunch

23     of nonsense about this.  If you all -- if you

24     think that I will take a big thing like this

25     and have you object to it for all these various

1     reasons, and have me sit down and do that, I'm

2     not going to do that.

3         MS. PEPKE:  Understood.  If we have

4     specific ones in a very limited set, we would

5     like to approach you on that.

6         MS. McVEY:  Your Honor, just to be quick.

7     I'm sorry.  If you all would get us any

8     objections by Thursday to this list of

9     documents --

10        MS. PEPKE:  That, we can do.

11        MS. McVEY:  That way, we can identify --

12        THE COURT:  I'll see what I can do.

13        MS. PEPKE:  That's what we're asking.

14        THE COURT:  Okay.

15        MS. McVEY:  Thank you very much.  Just so

16    I understand, y'all are going to get us

17    anything by Thursday?

18        THE COURT:  That's good.  Y'all are good.

19    All right.  Twenty-one.  That's Weill.  We've

20    already dealt with that.

21        Twenty-two.

22        MS. McVEY:  All right.  Your Honor, 22 is

23    a spoliation motion that you heard in the

24    McBrayer case.  And we argued that -- Ally

25    Brown came down from -- came down, and

```
 1        Mr. Bernardo, and we argued about documents

 2        that have been spoliated.  And you entered an

 3        order which Johnson & Johnson has.  And I just

 4        handed the order to you.

 5            Nothing at all has changed since that

 6        order was entered.  So we would ask you to

 7        enter the same order in the Perry case and give

 8        the same spoliation charge.

 9            MR. COWAN:  Your Honor, I'm not going to

10        re-litigate this at all, but I would like to

11        put something on the record.

12            THE COURT:  Do what?

13            MR. COWAN:  I'm not going to re-litigate

14        this at all.  I understand your prior order,

15        Your Honor.  I just would like to put something

16        on the record just very briefly because --

17            THE COURT:  Okay.

18            MR. COWAN:  We understand the order.

19        Obviously, we respectfully disagree with the

20        order, but we've incorporated our McBrayer

21        briefing in our response we filed with the

22        Court.  If the Court grants the relief,

23        however, if the Court signs the same order,

24        defendants note that the Court's order has

25        previously stated "requires plaintiff to inform
```

```
 1      defense counsel of what tests plaintiff
 2      contends are included in the scope of the
 3      order." I think it's the last page of the
 4      order, Your Honor.
 5           And it requires that be done in a
 6      sufficient time before trial.  We are now less
 7      than a week --
 8           THE COURT:  Hold on a minute.  I'm
 9      looking.
10           MR. COWAN:  Yes, Your Honor.
11           THE COURT:  Is what you're talking about,
12      "In addition, it is hereby ordered that Johnson
13      & Johnson and its lawyers and experts are
14      precluded from suggesting limitations to kinds
15      of testing due to lack of underlying data when
16      the underlying data does not exist because of
17      J&J's conduct"?
18           MR. COWAN:  No.  I believe it comes right
19      after that.  If I could take a look at the
20      order you're looking at?
21           THE COURT:  Oh, it's, "Finally, plaintiff
22      is instructed to inform defense counsel for
23      what tests plaintiff contends were included in
24      the scope of this or in a sufficient time
25      period to review before trial"?
```

```
 1            MR. COWAN:  Correct.  So I'm referring to
 2        that provision.
 3            THE COURT:  Right, right.
 4            MR. COWAN:  So that provision provides
 5        that they need to provide notice of the tests
 6        that they believe are within the scope of the
 7        order.
 8            McBrayer's order was signed and entered
 9        nearly three years ago, obviously, before this
10        case was even filed.  But it's fair to say that
11        when it got filed, this case, that plaintiff
12        was pretty sure they were going to be trying to
13        get this order, again, understandably, because
14        they were before the same judge.
15            So I would respectfully submit that, at a
16        minimum, they could have identified these tests
17        three weeks ago when they filed this motion for
18        entry of this order.  We are now less than a
19        week away from trial and we have not been told
20        what tests that they believe are within the
21        scope of this order.
22            So my suggestion is that Your Honor --
23        that this order can be signed, but it's too
24        late.  The time has elapsed.  We don't have
25        enough time to be dealing with which tests are
```

```
 1        you going to be claiming today, and, by the
 2        way, what evidence are you going to be putting
 3        on that proves that that particular underlying
 4        data from McCrone, R.J. Lee, wherever it's
 5        from, that we, Johnson & Johnson, ever had the
 6        underlying data to begin to preserve --
 7             THE COURT:  Well, that's just an argument
 8        against the whole law.
 9             MR. COWAN:  No, no.  It's not, Your Honor,
10        because if we had enough time, they could tell
11        us what the evidence was.  They could tell us
12        what the test was.  And then we could have time
13        to prepare a response.
14             THE COURT:  Well, let me tell you this:
15        This order, which is an order involving Johnson
16        & Johnson, was signed by me in --
17             MR. COWAN:  2021.
18             THE COURT:  -- 2021.  All right.  Your
19        client has known about this for a very long
20        time.  That's one.
21             Number 2, your client has jumped through
22        every hoop imaginable from the Texas two-step
23        to Lord knows what to put a stop on the trial
24        of Johnson & Johnson cases in state court, and
25        that includes in this court.  Now, suddenly,
```

1        you come up at the last minute with an issue

2        that has been around a long time and try to put

3        it back on the plaintiff that you have been

4        surprised by what's going on here.

5              MR. COWAN:  I'm not surprised at all.  The

6        issue is --

7              THE COURT:  Well, then, if you're not

8        surprised, I don't get the problem.

9              MR. COWAN:  May I -- may I respond?  The

10       problem is that it is plaintiff's burden under

11       that order to provide us the tests.  They have

12       failed to do so.

13             THE COURT:  I haven't signed the order

14       yet.  That's the first thing.

15             MR. COWAN:  I totally understand, but the

16       issue is that they sought the entry of this

17       order at the end of the -- right before the

18       beginning of trial.

19             THE COURT:  Mr. Cowan, let me see what

20       Ms. McVey has to say about that.

21             MR. COWAN:  Thank you, Your Honor.

22             MS. McVEY:  Your Honor, they know exactly

23       what tests we're talking about.  They answered

24       discovery where they said whether they got the

25       underlying data for each of these tests or not.

```
 1        If they need to give you a list of the stuff

 2        they've already provided to us, then I'm sure

 3        we can do that.  But this is not that kind of

 4        issue.  This order, by the way, was right

 5        before they felt like this for the first time.

 6        Do you remember that?

 7             THE COURT:  Yes, I do.

 8             MS. McVEY:  And so it's now been years

 9        that they've known about this.  It's not a

10        surprise what tests we're talking about, but

11        certainly if they need us to give them a list,

12        we'll give them a list.  But they know.  They

13        answered discovery.

14             THE COURT:  Yeah.  That's very much my

15        feeling about the matter.

16             MR. COWAN:  Can we get a deadline by which

17        we can get that list?

18             MS. McVEY:  We'll reproduce your discovery

19        responses to you on Thursday.

20             THE COURT:  I'm not going back and forth

21        on this, Mr. Cowan.  Really, this whole shock

22        and surprise of "they're treating us so bad,"

23        I'm frankly ashamed of you for making that kind

24        of argument here.  Johnson & Johnson well knows

25        about this stuff.  Y'all have been back and
```

```
 1          forth about this stuff many a time.  This is no

 2          magic or mystery here going on.

 3              MR. COWAN:  Your Honor, I'll sit down.

 4              THE COURT:  Good.

 5              Ms. McVey, get your order form.  I'll sign

 6          it --

 7              MS. McVEY:  Yes, ma'am.

 8              THE COURT:  -- and then provide the

 9          materials for him as quickly as you can.

10              MS. McVEY:  I will do that.

11              THE COURT:  All right.  Twenty-three, to

12          exclude expert hearsay opinions.

13              MS. McVEY:  Your Honor, I think we agree

14          on that one.

15              MS. BUENO:  We do.

16              THE COURT:  All right.  Now, what is 24?

17              MS. McVEY:  That's it, Your Honor.

18                  (A discussion was held

19              off-the-record.)

20              THE COURT:  This is motion in liminé by

21          the defense now to exclude or partially exclude

22          certain opinions of Dr. Longo.

23              We're not going to spend all day on this.

24          I'm not going to do it.  I'll send you a list

25          of my rulings.
```

```
 1              MS. BUENO:  Your Honor, there's just a few
 2         that we think need to be argued.  If you'd like
 3         to rule on the papers on any of these, we're
 4         happy to have you do that, or we can go
 5         through --
 6              THE COURT:  Yeah, but I have to even go to
 7         do that.  That's my problem.
 8              MS. BUENO:  I apologize.
 9              THE COURT:  J&J Omnibus, Number 1, media
10         reports about talc litigation presence,
11         asbestos and talc.
12              All right.  Yes, ma'am.
13              MS. BUENO:  Your Honor, are we looking at
14         the same thing, Number 1A, the omnibus for J&J,
15         which is media reports and articles?
16              THE COURT:  That's just what I read.
17              MS. BUENO:  Okay.  I apologize.
18              Yes, Your Honor.  So this is -- this is a
19         motion that just seeks to exclude on hearsay
20         grounds articles about Johnson & Johnson.  We
21         called out one, in particular, which is a
22         Reuters article from 2018.  It attaches some
23         documents and other things that may, indeed,
24         come into evidence, but the article, itself, or
25         anything about a report or writing is
```

1        absolutely hearsay.

2              THE COURT:  I'm familiar with the article.

3              Ms. McVey.

4              MS. McVEY:  Your Honor, as to the Reuters

5        article itself --

6              THE COURT:  Yes.

7              MS. McVEY:  -- generally, we would agree

8        that it doesn't come in with this exception.

9        If they're going to say, "It's not like we

10       stopped selling talc because of safety concerns

11       or this news article."

12             THE COURT:  They can open the door.  I'm

13       going to grant this, but if they open the door

14       by saying that they didn't stop selling talc

15       because of safety concerns, then a whole lot of

16       stuff comes in.

17             MS. McVEY:  I'm sorry.  Just before you

18       get there with that, there's also prior news

19       articles that we believe would come in for

20       notice or knowledge or other things like that.

21       I don't know that they're seeking to exclude

22       those.

23             THE COURT:  Well, prior knowledge is going

24       to come in, but it can come in in a variety of

25       different ways.  I've been asked to look right

1    now at specific articles about what they knew

2    and what they didn't know.

3        MS. McVEY:  And the only one that we're

4    agreeing that shouldn't come in for notice or

5    some other reason is that Reuters article, and

6    that's that 2018 one.

7        THE COURT:  What are you saying about

8    other articles?

9        MS. McVEY:  I'm saying that you shouldn't

10    grant the motion as to those other articles

11    because they could come in for other reasons.

12    They haven't identified any other articles

13    they're talking about.

14        THE COURT:  That's fine.  I'm just saying

15    I'm going to rule on Reuters.  That's it.

16    That's the one that I've got in front of me.

17    Okay.

18        1B, motion to exclude any reference to the

19    Golden Rule and Reptile Theory and all that.

20        I always exclude any kind of reference of

21    that sort.  So, yes, granted.

22        MS. McVEY:  Judge, I'm sorry.  We agreed

23    not to the Golden Rule.  They take this Reptile

24    Theory to mean that you cannot ask any safety

25    questions.

1          THE COURT:  The Reptile Theory is that

2     crazy thing that the defense invented as a

3     scare tactic, if you were going to talk about

4     the Reptile Theory.

5          MS. McVEY:  Right.  I can do it the way

6     the motion is written, if you're granting it.

7     We're allowed to ask safety questions,

8     obviously.  Companies have duties to put out

9     safe products and do safe things.  And so we

10    want to be able to ask those questions, which

11    you've allowed us to do in every case.

12         THE COURT:  All I'm doing is ruling out

13    the Reptile Theory, which is the level of

14    reptilian bar that's appealed to by certain

15    arguments.  That has nothing to do with safety.

16    Safety is always something you can ask about.

17         I grant it on the basis of the Reptile

18    Theory and Golden Rule.  And our state enforces

19    the Golden Rule, and I do, too.  All right.

20         Johnson & Johnson Motion in Liminé

21    Number 2, exclude each and every exposure from

22    cumulative dose, causation --

23         FEMALE SPEAKER:  I think you skipped 1C.

24         THE COURT:  Where?

25         MS. BUENO:  1C through G.

```
 1          THE COURT:  1C, motion to exclude any

 2     reference to counsel's personal beliefs.

 3     Granted.

 4          Motion to exclude evidence and argument

 5     that J&J improperly marketed or targeted

 6     consumer general practice, characteristics

 7     warranty.  Why should I grant that?

 8          MS. BUENO:  Your Honor, what we're talking

 9     about here are different documents suggesting

10     that Johnson & Johnson targeted for either

11     racial groups or women instead of men.  And

12     they've been portrayed by plaintiffs in the

13     past about racism and sexism within the

14     marketing department at Johnson & Johnson.

15          Mr. Perry is a man.  He's a white man.

16     There's just no reason to be bringing race into

17     the equation.

18          THE COURT:  I agree with that.  I'll grant

19     it.

20          MS. McVEY:  Your Honor, just briefly.

21     They've not identified what documents they're

22     talking about.  So in a vacuum --

23          THE COURT:  Exactly.  I will rule that I'm

24     not going to let targeted consumers that would

25     introduce the topic of race or gender.  I'll
```

```
 1        agree with that.  I don't know what demographic

 2        characteristics means, so I'm not going to rule

 3        on that.  But race or gender and improper

 4        marketing to the -- well, projected to those

 5        particular groups, I'm going to grant that.

 6            Motion to exclude evidence in reference to

 7        other plaintiffs' lawsuits and verdicts.  All

 8        right.  Granted.

 9            MS. McVEY:  Your Honor, just to clarify on

10        that one, we do have adverse event reports from

11        Johnson & Johnson.  They're not claims, of

12        course, but it's like when they report on a bad

13        outcome.

14            THE COURT:  Yeah.  Adverse events are

15        always going to be admitted.  This thing is

16        talking about other claims or lawsuits.

17            MS. McVEY:  The only time that you've let

18        other lawsuits in is if it has been notice for

19        knowledge, right, the first time they were sued

20        in a case alleging asbestos in their talc?

21        You, typically, let that in for notice for

22        knowledge.

23            THE COURT:  I agree.  Things that go to

24        notice can come in, but drilling down the

25        details of other claims and other verdicts, no.
```

1    I will grant on that.

2         1F, motion to exclude evidence of foreign

3    proceedings, including any evidence of talc

4    screening assessment.

5         I don't even know what that is.

6         MS. BUENO:  Your Honor, the Health Canada

7    assessment was a Canadian regulatory document

8    related to ovarian cancer and non-cancer lung

9    effects.  It's irrelevant.  It's been trying to

10   be used in other cases.

11        We're seeking in this motion to exclude

12   anything from a foreign regulatory or

13   proceedings perspective.  Particularly Health

14   Canada was discussed.

15        THE COURT:  Well, I don't know what other

16   foreign materials you're talking about, and I

17   don't know whether they would be pertinent or

18   not.

19        With respect to Health Canada, what have

20   you got to say, Ms. McVey?

21        MS. McVEY:  Banning chrysotile --

22   chrysotile is banned in 80 or 90 countries.

23        THE COURT:  Oh, yeah.  I've permitted

24   testimony about the bans on chrysotile.

25        MS. BUENO:  That's not our motion, Your

1          Honor.  Our motion is about foreign

2          proceedings, regulatory investigations that,

3          specifically, calls out Health Canada and the

4          like.  It does not talk about bans.

5              THE COURT:  Well, I'll grant on that, but

6          I'm not going to grant on just kind of a

7          general universe of other kinds of regulatory

8          issues that relate to what chrysotile is not

9          permitted to be sold.  We've already had in

10         many of these cases the information that the

11         USA moved very slowly in this area as opposed

12         to many other countries that banned any use of

13         asbestos.  You know, that goes to notice, that

14         kind of thing.  All right.

15             Three, Johnson & Johnson's excluding each

16         and every exposure, cumulative dose, causation

17         opinions.

18             Jolly.

19             MS. BUENO:  1G was agreed to, Your Honor.

20         This was a specific hearsay statement by

21         Mr. Perry about something that he had overheard

22         from an unknown medical doctor at an oyster

23         roast.

24             MS. McVEY:  We agreed to that.

25             THE COURT:  Very good.  All right.

1          Now we come to each and every exposure.  I

2     have dealt with this in Jolly.  I have been

3     affirmed in Jolly.  So, Mitch, I don't know

4     what you can say, but...

5          MR. BROWN:  Here's what I would say, Your

6     Honor.  The plaintiff cites in the Jolly

7     opinion and the Glenn opinion, but the most

8     recent looking at this issue was the state

9     Supreme Court in Scapa.

10          THE COURT:  Scapa Waycross, I'm very

11     familiar.  I was affirmed in that one, too.

12          MR. BROWN:  You were affirmed, and the

13     Court of Appeals was affirmed, and the Supreme

14     Court affirmed the Court of Appeals in a very

15     relatively short -- I think I set a record for

16     how quick they affirmed your case on that one.

17          However, it's important because what the

18     plaintiffs do is they say, all right, we're not

19     going to talk about each and every exposure.

20     But then, in fact, that's what the nature of

21     their experts really do.  So the things such as

22     this, omitting material facts, opinions that

23     talk about there's no safe level, opinions that

24     say they're in direct conflict with the

25     controlling legal standard -- which Your Honor

1    was part of the Henderson case that set the

2    controlling legal standard -- opinions that are

3    divorced of all context.

4        The Court of Appeals in the Scapa case

5    adopted David Norton's Haskin case.  And they

6    also adopted this case from Texas and cited it

7    with approval, Merrell Dow Pharmaceuticals

8    versus Havner, for what is required to be

9    proven for specific causation.  And it says the

10   plaintiff has to do more than simply introduce

11   into evidence epidemiological studies that show

12   a substantially elevated risk.  It goes on to

13   say they have to prove that they are studies

14   where similarities between himself and

15   individuals in the study include proof that he

16   was exposed to the same toxin, exposure to the

17   dose level was comparable to those in the

18   study, exposure to the toxin occurred before

19   the onset of the injury, the latency period of

20   the injury is consistent with the individuals

21   in the study.

22       We are just wanting a ruling from Your

23   Honor that their experts' opinions have to be

24   consistent with that law.  That is required

25   law.  The case that I would ask the Court not

```
 1          to follow, which the Supreme Court declined to

 2          say whether they liked it or didn't like it,

 3          specifically, is the Rost case from

 4          Pennsylvania.  I think, Your Honor, that that

 5          case runs afoul of your Henderson opinion.  I

 6          can't remember if you actually wrote it.  I

 7          think you were on it.  But that case runs afoul

 8          of the Henderson opinion about regularity,

 9          proximity, and the frequency, and strays over

10          into allowing -- well, it depends on what type

11          of disease it is, and we might allow brief

12          exposure to be good enough.

13              That's not the test.  That's not the legal

14          standard.  And, Your Honor, we would

15          respectfully request that the Court adhere to

16          the standards enunciated in the Edwards versus

17          Scapa Court of Appeals and Supreme Court case,

18          which is the latest and greatest on this topic.

19              The last thing I'll say is that there has

20          been this cumulative dose testimony that the

21          Supreme Court cleared up what was allowed.  And

22          in their opinion, they have one sentence in

23          here.

24              THE COURT:  Here's what they say.  This

25          Court has -- this is Scapa.  This Court has
```

1    recently refused the cumulative dose theory

2    within each and every exposure theory, which is

3    what you're trying to do right now, concluding

4    that an expert opinion which states that a

5    certain -- quote, A certain exposure

6    contributes to an individual's cumulative dose

7    does not espouse the view that each and every

8    breath of asbestos is substantially causative

9    of mesothelioma.  Quoting Jolly.  Rather, this

10   Court viewed testimony regarding plaintiff's

11   cumulative dose of background information

12   essential for the jury's understanding of

13   medical causation, which must be based on

14   science.  Edwards.

15        Also, Gardner against ADCO.  That was one

16   of Jerry Hill's cases.  He understands this

17   area very well.  Rejected the admissibility --

18   a challenge to admissibility of Brody's

19   testimony.  Same sort of thing, each and every

20   exposure.

21        I've ruled on this.  The Supreme Court's

22   ruled on it several times.  Jolly and Scapa are

23   two of the best cases on the subject.  So I'm

24   not going to spend a lot of time on this.

25        MR. BROWN:  Understood.

```
 1              THE COURT:  I am going to deny it, Mr.

 2      Brown.  Your position is preserved.  And if you

 3      want to argue to the Supreme Court, if it comes

 4      to that, you know, I think what these --

 5      this -- you cherrypick one little point out of

 6      here and call it the Scapa opinion.  But this

 7      opinion talks about everything that contributes

 8      to it.  It uses the Helsinki criteria and so

 9      forth.  I am certainly not going to exclude

10      that.

11              MR. BROWN:  Understood.

12              THE COURT:  Okay.

13              MR. BROWN:  Your Honor, let me make this

14      one point:  The cumulative dose, all right, the

15      Supreme Court stated in the Edwards case that

16      it was proper for Dr. Frank to explain to the

17      jury that the amount of asbestos accumulates in

18      the body; the likelihood to develop

19      mesothelioma increases.

20              THE COURT:  The Court in Scapa did not buy

21      your argument in any respect, whatsoever.  They

22      agreed that what I charged in Jolly was the

23      correct way to look at it.  And the way that I

24      managed it in Scapa, which was the same way,

25      was also correct.
```

1          So I'm, again, not buying that there's

2     been some big change in Scapa.  I think it

3     exactly tracks what I and Gary Hill have been

4     doing for a long time with that position.

5          THE COURT:  Number 4.  Johnson & Johnson

6     defendant's motion in liminé, number 3, to

7     exclude all evidence of -- this is number --

8     exclude all evidence in reference to the

9     bankruptcy proceedings.

10          MS. BUENO:  Yes, Your Honor.  We are

11     moving to exclude any reference to bankruptcy,

12     because it's irrelevant.  The jury's going to

13     have to decide whether or not Johnson &

14     Johnson's talcum powder products was a

15     proximate cause of Mr. Perry's cancer.  That's

16     why we're here.  This bankruptcy has absolutely

17     nothing to do with it.  It would be irrelevant

18     and it would take us down a huge rabbit hole

19     and cause undue delay and waste the jury's time

20     and the Court's time.

21          And there's no reason that plaintiffs want

22     to offer this evidence, except for the purposes

23     of suggesting that Johnson & Johnson is a bad

24     actor.  And I filed a reply brief last night,

25     which I'm sure Your Honor doesn't have and

```
 1          hasn't had a chance to read.  I think it was
 2          yesterday, actually.  But we pointed out what I
 3          think is very important.
 4               Plaintiffs had filed a response to this
 5          motion, and then they filed an amended
 6          response.  And what they did in their amended
 7          response, I think, is very notable.  And I've
 8          got both of them here if Your Honor doesn't
 9          have it in front of you.
10          THE COURT:  I'm looking at one of them
11          right here.
12          MS. BUENO:  Is it the one that says
13          "response" or "amended response"?
14          THE COURT:  I got it.
15          MS. BUENO:  Okay.  Which one are you
16          looking at, Your Honor?
17          THE COURT:  I'm looking at both of them.
18          MS. BUENO:  Okay.  Great.  So if you'll
19          turn with me to the "response," the original
20          one that was filed, and go to page 6, there's a
21          section C with two paragraphs under it.  And if
22          you look at the "amended response" and go to
23          page 6, you'll see there's just one paragraph.
24          Plaintiffs amended their response to get rid of
25          the paragraph at the bottom where they said,
```

1      quote, Given that all relevant evidence is

2      admissible, plaintiff asks this Court to allow

3      them to introduce evidence of LLT bankruptcy

4      proceedings only to explain historical context

5      relating to LLT's existence and liabilities and

6      its relevance in this litigation.  Unless J&J

7      opens the door and calls into question the

8      purpose of LLT bankruptcy proceedings,

9      plaintiffs do not intend to introduce evidence

10     showing J&J orchestrated the corporate

11     restructuring, sham bankruptcies and subsequent

12     events to avoid and limit its talc liabilities.

13         In other words, plaintiffs seek to admit

14     evidence relating to LLT bankruptcy proceedings

15     only to provide context and explain to the jury

16     how and why LLT is liable, not to show J&J is a

17     bad actor.  That is the way plaintiffs

18     initially responded, and then rescinded by

19     amending and taking --

20         THE COURT:  Let me tell you what's going

21     to happen here.  They sued -- you all are the

22     ones that created this monster with this

23     bankruptcy, that was later dismantled, and with

24     this Texas two-step and all the rest of it.  So

25     you created all these other corporations;

```
1    therefore, they had to sue all of the other

2    ones or you would have tried to step out of it

3    on the basis that they didn't sue the real

4    responsible party.  So they sued all of them.

5         Now you don't want them to tell the jury

6    anything about these corporations and what they

7    are and when they were created and why.

8         MS. BUENO:  Two responses:  First of all,

9    Johnson & Johnson has never sought to avoid

10   liability.  We have been front and center in

11   every single trial.

12        THE COURT:  I'm not even going there.

13        MS. BUENO:  Every single trial that has

14   gone to trial has been Johnson & Johnson

15   involved, not just these other entities.

16        But, number 2, we are absolutely willing

17   to enter into a stipulation, as we've done in

18   other cases, including the one that the same

19   plaintiff's counsel just tried in Oregon called

20   the Lee case, where we entered into a

21   stipulation to read the jury about what LLT

22   was.  And we worked on language of that to talk

23   about the corporate structure, when the company

24   was created, what the purpose of it was, why

25   the name change was, et cetera.
```

```
1           We're very willing to enter into a similar

2      stipulation to provide that information.  And

3      that answer is exactly what plaintiffs had

4      originally responded about seeking to admit

5      evidence only to provide context to explain to

6      the jury how and why LLT is liable.  We will

7      stipulate to those type of corporate

8      restructuring and things about LLT.  There's no

9      reason not to do it.

10          What we're seeking to avoid by this motion

11     is a side show of argument about why Johnson &

12     Johnson engaged in this type of restructuring.

13          THE COURT:  Well, why did they engage in

14     this type of restructuring?  To avoid

15     liability.  That's the only reason they did it.

16     I was here with a bunch of these J&J cases on

17     my docket when all of that came down.  And all

18     of them were stopped and stayed by a bankruptcy

19     that turned out to be not legitimate.  And then

20     we went through the Texas two-step.  That

21     turned out not to be legitimate.

22          These -- these corporations weren't

23     established for some theoretical idea of

24     restructuring.  They were structured to try to

25     throw all the liability into a corporation that
```

1      had no assets so J&J can go on their merry way

2      forward.

3          MS. BUENO:  And, Your Honor, obviously,

4      Johnson & Johnson disagrees with that

5      characterization.  We have it in our briefing.

6      I know you've read it.  The bankruptcy was

7      created to bring some certainty.

8          THE COURT:  Bring some certainty?  It was

9      created to stop all the litigation.

10         MS. BUENO:  To bring certainty --

11         THE COURT:  If you call that a euphuism

12     for bring certainty, that's what it was -- the

13     certainty that they wouldn't have to try these

14     cases that had been pending on dockets all over

15     the country.

16         MS. BUENO:  Obviously, we disagree.

17     Plaintiffs have a fraud claim here.

18         THE COURT:  Yes.

19         MS. BUENO:  Bankruptcies cannot form the

20     basis of a fraud claim.

21         THE COURT:  Well, there's some exceptions

22     to that now.  Legitimate bankruptcies cannot be

23     the basis of a fraud.  This didn't turn out to

24     be in that conventional framework.

25         MS. BUENO:  Well, as addressed in our

```
 1    briefing -- and I know Your Honor has read the

 2    Third Circuit opinion --

 3         THE COURT:  I have.

 4         MS. BUENO:  -- there was not a finding of

 5    bad faith.  The Third Circuit, specifically,

 6    indicated that there was not such a bad faith

 7    finding.  And I'll remind the Court of the

 8    Noerr-Pennington doctrine, which I'm sure

 9    you're familiar with, as well.

10         THE COURT:  Very.

11         MS. BUENO:  That a person cannot be sued

12    in tort for exercising First Amendment rights,

13    including the right to seek redress of

14    grievances in litigation, including bankruptcy

15    like this.

16         So here's -- here's -- Your Honor's

17    personal thoughts on all of this aside, from an

18    evidentiary perspective, it is not relevant --

19    the bankruptcy, itself, is not relevant in this

20    case.

21         THE COURT:  Well, if you say there's no

22    skin in it, then why isn't it relevant?

23    They've got to have some explanation as to what

24    these companies are about.

25         MS. BUENO:  They have no expert witness
```

 1    who's going to come here and talk about

 2    bankruptcy and how it works.  This is all going

 3    to be attorney argument.  That's what's going

 4    to happen.  It's going to be all attorney

 5    argument about how we're bad actors.  We have a

 6    right to seek redress in bankruptcy court.

 7         THE COURT:  I'm not going to even get into

 8    all that.

 9         MS. BUENO:  There's no reason to.  There's

10    no reason to turn this trial, which I know Your

11    Honor wants to move along --

12         THE COURT:  I do.  I'm going to tell you

13    what I'm going to do about this.  I am going to

14    deny this motion, as it's made to exclude all

15    evidence and reference to LLT Management and

16    bankruptcy proceedings.  I'm going to deny

17    that.

18         They are a party in this case.  They are a

19    party that you created.  You made them a party

20    in this case.

21         But here's what I will do:  I will be

22    happy to look at the stipulation that you

23    entered into your argument and receive whatever

24    comments that Ms. Gross and Ms. McVey would

25    like to make about that.  And if I decide that

```
 1        that's something that would be a way to solve

 2        this matter, I will be glad to use that.

 3             MS. BUENO:  Understood.  Thank you, Your

 4        Honor.

 5             And my last comment is that the LTL, which

 6        it was called at that time, created in October

 7        of 2021, had nothing -- that corporate

 8        restructuring can be discussed without what

 9        happened next, which is the bankruptcy.  So we

10        can have the jury understand that timing of the

11        creation of LTL, and that the liability were

12        put there, and the creation of the new

13        entities.  That is all fine.  We are not

14        suggesting that needs to be excluded.  But what

15        we're asking to be excluded is the bankruptcy,

16        itself, because that is the part --

17             THE COURT:  And I'm denying that right

18        now, but I'll see what your stipulation says.

19             MS. BUENO:  Thank you, Your Honor.

20             THE COURT:  And if I can live with that,

21        that's what I'll do.

22             MS. BUENO:  That's what we'll do.  We'll

23        get that for you.

24             THE COURT:  All right.  Johnson & Johnson

25        Defendant's motion in liminé to preclude
```

 1          reference to or reliance on defendant's net

 2          worth and sales outside of South Carolina.

 3               Well, I bifurcated these matters, so I

 4          don't -- no reference is made at all until you

 5          get to the punitive damages, if you get there.

 6          And the way my bifurcation works is the way

 7          most people's works.  I have a verdict form,

 8          and at the end of the verdict form, it says, if

 9          you find -- essentially, if you find for the

10          plaintiff that the conduct was negligent,

11          then -- or whatever the formula works.  If you

12          find for the plaintiff in that regard, then

13          answer this question:  Was the conduct willful,

14          wanton and reckless?  If they answer yes -- and

15          that's all I ask them to do; yes or no.  If

16          they answer yes, then we go to the second

17          phase, which is the punitive phase.  And when

18          the punitive phase comes, yes, we will give

19          them information, and I'll require y'all to

20          supply the information about all of these

21          corporations and their net worth and matters

22          and all that kind.

23               Sales outside South Carolina, I don't

24          generally deal with that.  I've never been

25          asked or allowed the jury to discuss sales out

1    of South Carolina.  But net worth, well,

2    certainly.  Yes.  If it's in the punitive

3    phase.

4        MS. PEPKE:  The South Carolina piece was

5    an alternative argument.  In the first

6    instance, you're right on.  We're talking about

7    bifurcation, holding the financial net worth --

8        THE COURT:  We're going to bifurcate.  I

9    do that always.

10       MS. PEPKE:  And for this Court to follow

11   Brown, the Brown case, about what financial

12   information is relevant.  We actually just

13   deposed their economist --

14       THE COURT:  I'm very familiar with the

15   Brown case.

16       MS. PEPKE:  And we just want the

17   irrelevant financial information excluded that

18   he went through, which was like gross sales.

19   everything Brown said that can't be

20   mentioned --

21       THE COURT:  Well, as I say, I am very

22   familiar with Brown.

23       MS. PEPKE:  Thank you.

24       MS. McVEY:  Your Honor, I told them that

25   we agreed to the net worth information only

```
 1          comes in if there's a punitive finding.  But

 2          their motion goes much further and wants to

 3          limit us to any out-of-state sales or conduct.

 4          And, you know, when you look at BMW versus Gore

 5          and State Farm versus Campbell, they don't

 6          limit you to what happened.

 7                  THE COURT:  Well, that's true.

 8                  MS. McVEY:  You know, they really don't.

 9          And, in fact, I think it was Gore that said

10          lawful out-of-state conduct may be probative

11          when it demonstrates that the deliberateness

12          and culpability of the defendant's actions in a

13          state where it is tortuous, but that conduct

14          must have a nexus to the specific harm suffered

15          by the plaintiff.  And of course, here, it

16          would, right?

17                  THE COURT:  Yeah.

18                  MS. McVEY:  The powder contained asbestos,

19          which they sold, and they hid all this stuff.

20          All the other evidence is coming in because

21          we've got to prove reprehensibility to get a

22          punitive case, but, also, with regard to fraud.

23          And so the jury is going to be charged on that.

24          If it's just about the net worth number, we

25          agree that comes in later, but we don't agree
```

1          that we're limited just to net worth of sales

2          in South Carolina.

3                THE COURT:  I understand your contention,

4          and certainly on fraud and reprehensibility.

5          Definitely find that would come in.  That will

6          be subject to what it is you're actually going

7          to propose, and I have to look at that and see.

8                MS. McVEY:  Yes, ma'am.  Thank you.

9                THE COURT:  All right.

10               Number 5, summary evidence.  Exclude

11         plaintiffs' summary evidence chart.  The

12         Decades of Evidence Chart, I've seen that many,

13         many times.

14               MR. COWAN:  Your Honor, I have not seen a

15         ruling from this Court on that, if it's ever

16         been challenged before, but we do challenge it

17         here.

18               There are a number of issues.  The first

19         and foremost at this point, Your Honor, is that

20         I have no idea which chart they're going to

21         use.  There seem to be about four or five or

22         six different versions of the same thing.

23               THE COURT:  Well, if we're talking

24         theoretically, then I'm not going to deal with

25         anything about that until I see what you're

1      talking about.

2           MR. COWAN:  Okay.

3           THE COURT:  Okay.  I'm not -- I'm going to

4      deny the motion based on a theoretical

5      conversation.  If you've got an actual chart

6      that you're fixing to offer, then it better be

7      discussed before we try the case is all I have

8      to say.

9           MR. COWAN:  There is one on the current

10      motion to pre-admit that is different than any

11      motion I've ever seen, so --

12           THE COURT:  Well, you're going to have to

13      bring it to my attention.  And if you do, I'll

14      rule upon it.

15           MS. McVEY:  And I'll move that they

16      pre-admit so they can see what we're going to

17      do. (sic)

18           THE COURT:  Right, right.

19           Johnson & Johnson motion in liminé

20      number 6.  Exclude all evidence of and

21      reference to alleged adverse reactions to

22      talcum powder not at issue, including ovarian

23      cancer.

24           MS. BUENO:  Your Honor, this motion is

25      related to ovarian cancer, but also to infant

1          asphyxiation and other types of adverse events

2          related to -- allegedly related to talcum

3          powder use.  I'll start with ovarian cancer,

4          because it forms the bulk of the motion.

5                We believe ovarian cancer related to talc

6          should be out for a variety of reasons.  First,

7          there's a different mechanism of action that's

8          alleged between ovarian cancer and talc use,

9          and mesothelioma and talc use.  It's a totally

10         different disease.  Certainly Mr. Perry, as a

11         man, does not have ovarian cancer risk.  It's a

12         different source, different science.  All of

13         this is different.  Part of our motion seeks to

14         exclude IR reclassification of talc recently

15         into group 2A, which was related to talc,

16         itself, not talc including or involving

17         asbestos.

18               And so the ovarian cancer science is very

19         different from that related to mesothelioma.

20               Courts routinely grant this motion and

21         include ovarian cancer, discussion, documents,

22         and allegations in cases involving

23         mesothelioma.  We ask the Court to do the same

24         thing here, because it would be very unduly

25         prejudicial for plaintiffs to allege that talc

1    causes all these other diseases, including and

2    not limited to ovarian cancer.

3         It would also cause significant undue

4    delay if we had to get into rebutting plaintiff

5    experts on why there is no science to support

6    allegations of ovarian cancer.

7         Now, I'll share with Your Honor that

8    there's two case-specific issues that might

9    overlap with ovarian cancer in this case.  And,

10   first, Mr. Perry has some testimony about

11   having concern about talc after seeing TV ads

12   related to ovarian cancer and talc.  So that is

13   one way that this may come in.  Another way

14   that plaintiffs may attempt to get it in is the

15   fact that some medical records have reference

16   to Mr. Perry's mother potentially having

17   ovarian cancer, which, through discovery, we

18   believe is not the case; that her cancer was

19   limited to lung cancer and, perhaps, uterine

20   cancer.  But because it is in the medical

21   records, we have concern that there will be, at

22   least, a speculation and suggestion that his

23   mother used a lot of talc, too, and had ovarian

24   cancer.

25        So what we're seeking to do here is to

1    exclude ovarian cancer entirely from this

2    trial, because it is not relevant and it is

3    unduly prejudicial, but then also specific

4    references that have been discussed in

5    Mr. Perry's case.

6            THE COURT:  Okay.

7            MS. BUENO:  So that's ovarian.  And then

8    there's also a second prong to that.  Do you

9    want me to address that now or turn it over?

10           THE COURT:  What second prong?

11           MS. BUENO:  The second prong is exhibits

12   related to infant asphyxiation.  And we

13   actually include three exhibits that are

14   attached, Exhibits H, I and J.  H and I are

15   related to allegations and specific documents

16   that have to do with concerns about infants

17   breathing in the talc and having problems with

18   it.  And there's -- Exhibit H is an e-mail from

19   a gentleman named Todd True that talks about

20   concerns with keeping Johnson's Baby Powder on

21   the baby aisle because of these infant

22   asphyxiations.

23           THE COURT:  Well, that's one of J&J's only

24   documents.

25           MS. BUENO:  It is.  This is irrelevant,

1     prejudicial argument.  It has nothing to do

2     with this case to be talking about infant

3     inhalation of powder.

4          THE COURT:  You know, the touchstone of

5     liability in these type cases is based on

6     foreseeability.  All this goes directly to

7     foreseeability.

8          MS. BUENO:  Infant asphyxiation has

9     nothing to do with alleged asbestos.

10          THE COURT:  Well, let's put infant

11     asphyxiation to the side for a minute.  All the

12     rest of this stuff about ovarian cancer is very

13     directly related to foreseeability.  This is --

14     the contention is -- and it's a contention

15     based out of your records that y'all knew for

16     years; that there are cases in which the

17     ovarian cancer was attributed to asbestos in

18     your products.

19          MS. BUENO:  Well, that's the concern here,

20     is because the science and the allegations

21     right now related to ovarian cancer are not

22     asbestos-related, Your Honor.  And we see that

23     in the IR reclassification that we attached as

24     Exhibit J and we're seeking to exclude.

25          The science here relates to talc not

```
 1    containing asbestos, and allegations.
 2         THE COURT:  I mean, we're going to get
 3    into a trial in a trial --
 4         MS. BUENO:  Exactly.
 5         THE COURT:  -- trying to show that y'all
 6    have known the foreseeable risk of your
 7    product, and that is relevant to their
 8    arguments.  That's kind of a foundational sort
 9    of thing.  And this is material right out of
10    your own records.
11         MS. BUENO:  And, again, the argument here
12    is relevance to Mr. Perry, who's, obviously, a
13    male.  Ovarian cancer issues are not relevant
14    and then it's also unduly prejudicial, as well
15    as undue delay, because it would create a trial
16    in a trial.
17         THE COURT:  Shoot, if Mr. Perry was
18    Ms. Perry, you'd be making the same argument
19    about ovarian cancer.  You just didn't want to
20    exclude it on the basis of sex.  You wanted to
21    exclude it on the basis of it's
22    highly-prejudicial, and that's what you're
23    really saying.
24         MS. BUENO:  Well, I think it would be
25    irrelevant in any case, regardless of the
```

```
 1        plaintiff's gender.  But I think here there's

 2        an additional reason of relevance, certainly.

 3            THE COURT:  Okay.  Well, I know Brown

 4        versus Ford Motor Company very well, and I am

 5        going to deny the motion.

 6            All right.  Johnson & Johnson's motion.

 7        Defendants' motion in liminé to preclude

 8        reference to or reliance on inmate studies.

 9            MS. McVEY:  We agree on this one.

10            THE COURT:  Agreed.  Granted.

11            Johnson & Johnson, number 8, exclude

12        evidence and argument regarding certain

13        advertising campaigns that focused on babies

14        and the mother-infant bond.

15            MS. BUENO:  Your Honor, this is also

16        relevance and a 403 argument.

17            We anticipate plaintiffs are going to show

18        the jury a lot of documents.  In fact,

19        Plaintiff's Exhibit 1 on their exhibit list

20        that we got late last night is a Power Point

21        called Baby Camp that talks about the baby

22        franchise.

23            Mr. Perry never used Johnson's Baby Powder

24        or any other type of talc, for that matter, as

25        a child -- I mean, as an infant.
```

1          The evidence is he started using it in

2     1974 at the age of five.  So we don't have a

3     situation here of a baby and mother type use.

4     Mr. Perry does not allege any use during

5     diapering of other babies.

6          It's simply irrelevant to have evidence

7     related to this alleged J&J effort to develop a

8     mother-baby bond.  It's not relevant in this

9     case, and we ask for it to be excluded on that

10    basis.

11         THE COURT:  I understand.  Well, all

12    right.  They contend that the foundation of

13    their branding approach was the mother-baby

14    image of Johnson's Baby Powder.  And they say

15    that that appeal is a golden egg conceptual

16    table use, the essence of Johnson & Johnson's

17    marketing from the very beginning.  Trust us

18    because we developed this for babies, the most

19    vulnerable that that can be.  And that's why

20    they want to use it.  And I think that's

21    legitimate.  That is what the advertising

22    campaign was.

23         You say it's not relevant, because you

24    can't show he was a baby when he used it.

25    That's not the point.  The point was what

1    projection and image did you put before the

2    public about the reliability and trust that you

3    can put in the product, when it turned out in

4    your internal records it was known for years it

5    had asbestos in it.

6        So -- and your own records say, we've got

7    to be sure this doesn't get out because our

8    image is the mother-child image that we are

9    projecting.  You have internal records that say

10    that.  They're going to be able to use that.

11        MS. BUENO:  Your Honor, I hear you, and I

12    hear your ruling.  I would disagree with the

13    fact that there is any document that says we

14    have to be careful this doesn't get out,

15    because Johnson & Johnson was not aware of

16    these allegations at that time.  We were aware

17    of the allegations, but there is nothing to

18    suggest there was knowledge of asbestos in talc

19    that we were trying to hide or conceal.  I know

20    Your Honor disagrees.  I know Your Honor

21    disagrees.

22        THE COURT:  It was brought to my attention

23    here, and in other cases I've tried, that talk

24    about that, specifically, in the internal

25    memos, about what to be sure is kept

```
 1    confidential and what is not.  And it's based

 2    on not wanting the general public to have the

 3    image of this is the safe baby company

 4    interfered with by showing that there's

 5    asbestos in this material.

 6         Now, your projection all along is, well,

 7    it's not enough to cause any problem, this kind

 8    of thing, because it's changed over time.  But

 9    you are stuck with what the internal records

10    show.  Dr. Hopkins had to deal with the very

11    same stuff.  He was the expert of -- or the

12    corporate rep that y'all had.  I am going to

13    deny that motion.

14         Motion number 9, publish pleadings to the

15    jury.  Denied.  Smith versus Till.

16         Motion number 10, exclude all reference to

17    the interagency working group on asbestos in

18    consumer products.

19         MR. COWAN:  Your Honor, are you familiar

20    with the white paper on that?

21         THE COURT:  Yes.

22         OFFICIAL COURT REPORTER:  With the what?

23    I'm sorry.

24         THE COURT:  The white paper.

25         MR. COWAN:  I was asking if the Court was
```

1    aware of the white paper.

2        THE COURT:  IWGACP, which is the

3    Interagency Working Group on Asbestos in

4    Consumer Products.  They have minutes, and they

5    also have a white paper, and that's what he's

6    talking about.

7        MR. COWAN:  Yes.  Your Honor, so we would

8    seek to exclude reference to the white paper,

9    primarily as the plaintiff's experts are apt to

10   state -- or the plaintiff's counsel are apt to

11   argue that the white paper is somehow the

12   FDA's, or some other governmental agency's,

13   position.  That is simply just not the case.

14   And it says so at the beginning of the

15   document.

16       And the other issue is that -- that it is

17   hearsay, and, therefore, it's not admissible

18   evidence.  And it's certainly not a public

19   record, because no public agency has claimed

20   ownership of it.  It is simply a working

21   document of potential recommendations from a

22   group of persons to agencies in the United

23   States, none of whom have adopted the

24   recommendations that are provided --

25       THE COURT:  The Interagency Working Group

1    was created by whom?

2        MR. COWAN:  A number of different agencies

3    provide their representative.

4        THE COURT:  Federal agencies, correct?

5        MR. COWAN:  Correct.

6        THE COURT:  Created this working group,

7    and they issued a white paper?

8        MR. COWAN:  That is correct.

9        THE COURT:  And then the FDA got a lot of

10    importunate from everybody about this.  And the

11    FDA said, Neither the executive summary nor any

12    of the presentations at the public meeting by

13    members of the working group represent the

14    proposed or preliminary recommendations of the

15    policies of the FDA or any other federal

16    agency.

17        MR. COWAN:  That's correct.

18        THE COURT:  Now, that's what they said

19    about it.  That's certainly what can be said

20    about it if any reference is made to it here.

21    But, innocently, a study group, that is what it

22    is, a collection of agency personnel who looked

23    at certain issues and made a white paper

24    report, just like articles written that people

25    rely on for expressing opinions.  I don't

1     get --

2         MR. COWAN:  I understand, Your Honor.  I

3     would push back a little bit here that this

4     white paper is not a published peer-reviewed

5     article.  It has not gone, specifically,

6     through the peer review process yet.  It has

7     yet to do so.  And so, this is not a

8     peer-reviewed article, just like any other.  It

9     is also not, as Your Honor stated, the position

10    of any --

11        THE COURT:  -- of any kind.  It is simply

12    a working group composed of a lot of different

13    agencies that got together and studied issues

14    and made a report.

15        MR. COWAN:  And made a recommendation.

16        THE COURT:  And made recommendations.

17        MR. COWAN:  But that no federal agency

18    actually adopted.

19        THE COURT:  Well, I think that can be made

20    clear if it's discussed with the jury.  I would

21    not preclude any reference to it.

22        MR. COWAN:  Well, I would suggest, at a

23    bare minimum, that it's not admissible

24    evidence, much like a published paper isn't

25    going to go back to the jury.

```
 1          THE COURT:  I don't agree with that.  I
 2     think they probably have witnesses that will
 3     talk about it.
 4          MR. COWAN:  I think it's on their exhibit
 5     list.
 6          THE COURT:  I will deny excluding any
 7     reference to it or argument about it, but I'm
 8     certainly not going to admit it into evidence.
 9          MR. COWAN:  Okay.
10          I think the last one --
11          MS. BUENO:  Can I say something?
12          MR. COWAN:  Go ahead.
13          MS. BUENO:  Your Honor, this may be
14     inappropriate, and if it is, you'll tell me to
15     sit down.  But in light of your ruling, I would
16     ask you to reconsider your ruling on
17     plaintiffs' motion in liminé, number 19, which
18     was the 1986 FDA citizen's petition, which is
19     similar to the Interagency Working Group, which
20     you just ruled is admissible, was not a
21     government endorsement, as we've discussed.
22          THE COURT:  Wait a minute.  Hold it.  Hold
23     the phone.  I don't even know what you're
24     talking about.  Are you talking about the
25     Douillet --
```

1          MS. BUENO:  I am.  I am.

2          THE COURT:  I said that couldn't come in.

3          MS. BUENO:  You did.  You did, but what

4     I'm doing is --

5          THE COURT:  That's two people talking

6     about this issue.

7          MS. BUENO:  It is not.  And that's where I

8     think the Court doesn't understand what it is.

9          That was the title of the plaintiffs'

10    motion, but it was an FDA response to a

11    citizen's petition.  It was written to the

12    person who -- who submitted the petition.

13         THE COURT:  I'm real familiar with that

14    claim, and it's got more explanations on it.

15         MS. BUENO:  Okay.  I understood.  I heard

16    what you just ruled about the white paper and

17    how it was not a government endorsement.

18         THE COURT:  Yeah, and here I am trying to

19    give you a little something, and --

20         MS. BUENO:  But you just allowed it to

21    come in against our request.

22         THE COURT:  Yes, ma'am, with some caveats

23    that this couldn't -- it couldn't be viewed as

24    a government position on anything, which is the

25    real thing you would like said about it.  And I

```
 1      agree with that.  It's simply a group of people

 2      that got together and issued a white paper.

 3      It's not coming into evidence, but it can be

 4      relied upon by people when they talk about it.

 5           Douillet was an issue of having that not

 6      come into evidence, that letter, and I said no.

 7           MS. BUENO:  But we also requested it to be

 8      able to have people rely on it and talk about

 9      it.  And my understanding from your ruling --

10           THE COURT:  I am not going to recover

11      covered ground.

12           MS. BUENO:  Thank you, Your Honor.

13      Understood.

14           MR. COWAN:  I believe number 11 is

15      region 9.

16           THE COURT:  Excluded evidence of the

17      Region 9 response.

18           MR. COWAN:  You're familiar with the

19      Eldorado story, Your Honor?

20           THE COURT:  Yes.

21           MR. COWAN:  Okay.  This is the Region 9

22      response related to that story.

23           The EPA, as you know, has regional

24      offices.  This is a 2006 response to an R.J.

25      Lee report or a response to the initial report.
```

 1          It is -- it's -- plaintiff is expected to

 2      offer it as a preliminary report written by

 3      this office as evidence that the EPA --

 4          THE COURT:  What they're trying to do is

 5      something we've talked about before.  It's this

 6      old business of these non-asbestiform cleavage

 7      fragments versus asbestiform.  And the EPA said

 8      that they will distinguish --

 9          MR. COWAN:  Actually, the EPA never said

10      that.  The EPA Region 9 office in 2006 said

11      that.

12          THE COURT:  Well, whatever the Region 9

13      response is, the issue is whether evidence

14      about that can be put forward.  I don't even

15      know what you're referring to.  You're

16      referring to a document that you're trying to

17      exclude or a reference to it.

18          MR. COWAN:  Yes, Your Honor.  It's a --

19      it's a preliminary report --

20          THE COURT:  You're talking about a

21      preliminary report, you don't want it to come

22      into evidence?

23          MR. COWAN:  That's correct.

24          THE COURT:  It's not going to come into

25      evidence.  It can be referred to and I'm not

1      going to exclude that.

2           MR. COWAN:  Thank you.

3           THE COURT:  All right.  Johnson & Johnson

4      motion in liminé number 12, to preclude

5      references to or reliance on articles by

6      Drs. Moline, Emory, and Gordon.

7           MS. BUENO:  Your Honor has ruled on this

8      and you've denied this motion --

9           THE COURT:  That's correct.

10          MS. BUENO:  -- in the past.

11          THE COURT:  All right.  Johnson &

12     Johnson's motion to partially exclude the

13     opinions of Dr. Haber.

14          MS. BUENO:  Your Honor, Dr. Haber, as you

15     well know, is the pulmonology expert that

16     plaintiffs will offer.  He is the one and only

17     expert who will give a causation opinion in

18     this case.  He is qualified to give the

19     pulmonology opinions that are within his

20     wheelhouse.  We are not seeking to exclude

21     anything that is within his specialty.

22          However, we do have objections to him

23     speaking about things that are entirely outside

24     of his qualifications.

25          What plaintiff seeks to do with Dr. Haber

```
 1          is to use him as the expert who will be a

 2          conduit for all company documents, as well as

 3          the alleged -- or the story about alleged

 4          asbestos in talc.

 5               The Decades of Evidence Chart, which Your

 6          Honor is so well familiar with, they seek to

 7          offer that chart through Dr. Haber.

 8               Dr. Haber has been excluded by another

 9          court, as outlined in our brief, in Louisiana

10          State Court, where that Court held Dr. Haber

11          has no education, qualifications or experience

12          in testing and analyzing the content of talc

13          for contamination of asbestos.  It would be

14          inappropriate to allow him to opine beyond his

15          qualifications.

16               We are asking Your Honor to make a very

17          similar ruling here, and to exclude Dr. Haber

18          from talking about testing and analyzing the

19          content of talc for contamination of asbestos.

20               Dr. Haber is admittedly someone who has

21          not used an XRD, SEM, TEM or PLM microscope.

22          He has never, personally, tested Johnson &

23          Johnson talcum powder or any other powder.

24               He's never, personally, looked at

25          materials to determine whether or not they
```

1    contained asbestos.

2         He's never used any of the different

3    microscopes that he will criticize in this case

4    and talk, specifically, about Johnson & Johnson

5    should have done this; should have done that;

6    should have looked at this; should have looked

7    at that, when he has no qualifications to offer

8    those opinions.

9         In fact, recently, he was asked about the

10    types of testing for asbestos, and his answer

11    to that was, "I'm not your guy to start telling

12    you what tests to do.  I don't do those tests."

13    But yet despite his admitted lack of

14    qualifications, plaintiffs seek to offer him

15    for a variety of opinions, and, specifically,

16    on page 2 of our motion, we outline some of

17    those opinions, including, but not limited to,

18    the Decades of Evidence Chart.

19         The point here, Your Honor, is that

20    plaintiff has experts.  Dr. Longo has done

21    testing.  Dr. Bailey has done testing.  They

22    have experts that will have qualifications to

23    allow them to opine on asbestos testing and

24    asbestos contamination.  Dr. Haber just simply

25    is not that person.  And he should be precluded

```
 1          from testifying about different definitions of
 2          asbestos, about different product sources,
 3          asbestos content, and the list goes on and on.
 4          And we know from recent trials, that's exactly
 5          what plaintiffs seek to do with Dr. Haber.
 6          With that, I'll stop unless you have any
 7          questions.
 8               THE COURT:  Right.
 9               MR. ADAMS:  Your Honor?
10               THE COURT:  Yes.
11               MR. ADAMS:  Dr. Haber is our specific
12          medical causation expert.  They like to refer
13          to him as a pulmonologist, but his designation
14          is our specific causation expert.  And just
15          like the plaintiffs in this case, defense has a
16          specific causation expert, as well.  And so
17          what happens --
18               THE COURT:  Dr. Haber is a pulmonologist
19          who has treated people with mesothelioma; isn't
20          that correct?
21               MR. ADAMS:  That is correct.
22               THE COURT:  All right.  And out of that
23          treatment experience, he is using information
24          about the occupational and exposure history.
25               MR. ADAMS:  Absolutely.
```

```
 1              THE COURT:  And information about the

 2    chemistry and geology and so forth to examine

 3    whether a person has mesothelioma, right?

 4              MR. ADAMS:  As an occupational medicine

 5    doctor who has to investigate --

 6              THE COURT:  Right, okay.

 7              MR. ADAMS:  -- the sources of the disease,

 8    the cause of the disease, and the treatment for

 9    that specific problem.

10              THE COURT:  Right.

11              MR. ADAMS:  Yes.  He's relied on all those

12    specialties, just like a standard is routinely

13    done in cases like this.

14              THE COURT:  Right.

15              MR. ADAMS:  Their medical causation expert

16    relies on all the same things as Dr. Haber.

17              THE COURT:  And the difference between

18    Dr. Haber, for example, and Mr. Sanchez, for

19    example, is that Mr. Sanchez knows nothing

20    about the treatment of patients who have

21    mesothelioma, right?

22              MR. ADAMS:  Because he's not a medical

23    doctor.

24              THE COURT:  And beyond that, has no

25    knowledge about the treatment of people with
```

1          mesothelioma; doesn't know anything about

2          mesothelioma.  Haber's foundational knowledge

3          base is that and he relies on certain things to

4          diagnose and treat occupational mesothelioma

5          patients, correct?

6               MR. ADAMS:  Correct.  And he's published

7          on it, as well.

8               THE COURT:  Yes, sir.  And he's published

9          on it.  And his field of knowledge that he

10         relies upon is a field of knowledge commonly

11         relied on by pulmonologists who treat

12         occupationally-contracted mesothelioma, right?

13              MR. ADAMS:  That's correct.

14              THE COURT:  All right.

15              MS. BUENO:  Your Honor, Dr. Weill, you

16         excluded earlier his case-specific causation

17         opinions for Mr. Perry.  Dr. Weill is also a

18         pulmonologist.  Dr. Weill has also treated

19         patients with mesothelioma.  He has observed

20         and considered their occupational and exposure

21         history, as well as their asbestos exposure.

22         All of the same things --

23              THE COURT:  Why did I -- did I exclude

24         Weill totally?  No.  I simply said, Weill

25         cannot express an opinion about Mr. Perry's

1    condition and state that it is idiopathic or

2    spontaneous.  Isn't that what I ruled?

3         MS. BUENO:  You did, but here's the

4    problem with what --

5         THE COURT:  I'm not going to get into

6    revisiting all my other rulings every time I

7    come to another one.

8         MS. BUENO:  Dr. Haber has done nothing in

9    his analysis of this case that Dr. Weill didn't

10   do.  He has no qualification that Dr. Weill

11   doesn't have.  Both of them considered all the

12   same things --

13        THE COURT:  Yes, but he is dealing with a

14   diagnosed mesothelioma.  And he is simply

15   offering opinions about that diagnosed

16   mesothelioma born out of his experience

17   treating mesothelioma.

18        Dr. Weill is trying to express an opinion

19   that it's spontaneous or idiopathic, but he

20   knows nothing about that situation as it

21   affects Mr. Perry.

22        MS. BUENO:  That's not true.  Dr. Haber

23   and Dr. Weill know the exact same thing.  They

24   both relied on reviewing deposition

25   transcripts.  They both relied on and reviewed

1          the occupational history, the alleged asbestos

2          exposure, and Dr. Haber wants to come up on the

3          stand and say, "I have reviewed this and I

4          conclude it's caused by talcum powder."

5               THE COURT:  Yes.

6               MS. BUENO:  Dr. Weill wants to come and

7          say, "I've looked at all the same things --"

8               THE COURT:  And I don't know what caused

9          it.

10               MS. BUENO:  No.  He's going to say --

11               THE COURT:  I don't know what caused it.

12               MS. BUENO:  -- I believe -- this is what

13          he said:  He says, if it is asbestos-related,

14          it's not caused by talcum powder because

15          there's not a level of asbestos in talcum

16          powder, even believing plaintiffs that would be

17          causative.  So if it's asbestos-related,

18          there's another source, or it could be

19          naturally occurring and I, Dr. Weill, have

20          treated patients who I have personally

21          diagnosed with naturally occurring

22          mesothelioma.

23               Dr. Weill has done that in his clinical

24          practice.  He just testified about that at his

25          recent depo.  And in those patients, he has

```
 1        examined their occupational history.  He's

 2        looked for every exposure, and he hasn't

 3        identified one, and he has made the same

 4        conclusion:  If you do not have an

 5        asbestos-related mesothelioma, then I will lead

 6        to a reasonable degree of medical certainty

 7        that that is naturally occurring, because we

 8        know it happens.  And there's not a doctor who

 9        gets up on the stand who's going to say, there

10        are not cases of naturally occurring

11        mesothelioma.

12             So, Your Honor, to allow Dr. Haber with

13        the same qualifications --

14             THE COURT:  Okay.  It's 5:00 now.  I'm not

15        going to revisit my ruling of Dr. Weill.

16             MS. BUENO:  This is on Dr. Haber.

17             THE COURT:  This is on Dr. Haber now.

18             MS. BUENO:  I seek to exclude a causation

19        opinion related to Mr. Perry by Dr. Haber,

20        because there's absolutely no reason he should

21        be able to say it's talcum powder related.

22             THE COURT:  All right.  I hear you.

23             MR. ADAMS:  In response --

24             THE COURT:  It's 5:00.  We still got a

25        mountain of stuff to do.  Now, come on.
```

```
 1              MR. ADAMS:  No, I'm good.

 2              THE COURT:  I deny the motion.

 3          All right.  The next thing I've got is

 4      Vi-Jon.  Have we already done that?  Vi-Jon's

 5      motion in liminé to exclude the testimony of

 6      Lonnie Long's use of talcum powder.  Did we

 7      already do that?

 8              MR. McCONNELL:  No, Your Honor, we did

 9      not.  And, Your Honor, we also have another

10      dreaded Omnibus motion, but my proposal -- and

11      there's 35 subparts, but here's my proposal:

12      We talked with the plaintiff lawyers.  We

13      agreed on a lot of them.  And there's some --

14      I'm going to withdraw, and then I'm going to

15      try to make as few remaining as possible.  And,

16      Your Honor, they are much simpler than what

17      you've been dealing with.  And my proposal

18      would be to submit them to you with your

19      experience and knowledge.  You will find them

20      very easy to rule on, and that's it.  We'll

21      just go with it.

22              THE COURT:  Hey, I like that.

23              MR. McCONNELL:  Okay.

24              THE COURT:  Let's just do it that way.

25              MR. McCONNELL:  All right.  So let me look
```

```
 1        at our Omnibus motion.

 2            MS. McVEY:  Do you want to go through them

 3        now or do you want to --

 4            THE COURT:  Do them now?  I thought you

 5        said you were going to --

 6            MR. McCONNELL:  I'm going to tell you now

 7        which ones I'm withdrawing and that are agreed

 8        to.

 9            THE COURT:  How about you all just --

10            MS. McVEY:  Yeah.  I'll --

11            MR. McCONNELL:  That's fine.

12            THE COURT:  How about you all just do that

13        and submit them to me and I'll --

14            MR. McCONNELL:  That's fine.  Yeah, let's

15        do that.

16            And then, Your Honor, in addition to the

17        Omnibus, and Your Honor was just starting to

18        mention the others, we had a motion to exclude

19        testimony of Lonnie Long's talc use outside the

20        presence of Michael Perry.  And then we had the

21        motion to exclude Dr. Longo.

22            Your Honor, your ruling in denying our

23        motion for summary judgment, I believe, takes

24        care of --

25            THE COURT:  Yes, it does.
```

1          MR. McCONNELL:  -- of that motion, as

2     well.

3          And then we had a motion to exclude

4     evidence regarding duty-to-warn.  That was just

5     premised on the notion that there's no evidence

6     that we ever knew there was asbestos in our

7     talc.

8          And then we have two other motions that

9     really go together, excluding products not

10    identified in discovery and excluding products

11    not at issue.  That whole point is just of all

12    the various products we made that contain talc,

13    private label products, the only one at issue

14    in this case is Equate and we think it ought to

15    stay that way.  That's it.

16         THE COURT:  All right.

17         MR. McCONNELL:  Thank you, Your Honor.

18         MS. McVEY:  Just briefly in response to

19    that.  If it were to come in, other products --

20    I don't know that it would -- we would need to

21    show notice of some defect (sic) if we had that

22    kind of evidence.  I'm just not sure --

23         THE COURT:  I don't either.  You-all give

24    me a chart on that.  Okay.

25         MR. McCONNELL:  Thank you, Your Honor.

```
 1              THE COURT:  Now, all right.  Now, is that

 2       the end of it?

 3              MS. BUENO:  No, Your Honor.  I think

 4       there's three motions from Johnson & Johnson

 5       that you might have overlooked.  We have a

 6       motion to exclude Dr. Madigan.

 7              THE COURT:  Hang on.

 8              MS. BUENO:  I think those came in later.

 9       They were delivered by us.  They were not part

10       of the original notebook.

11              (A discussion was held

12              off-the-record.)

13              THE COURT:  All right.  Dr. Madigan.

14              MS. BUENO:  Okay.  Dr. Madigan.

15              THE COURT:  A little small thing like this

16       at 5:00 in the afternoon.  I want you to

17       summarize this for me.

18              MS. BUENO:  I'm going to summarize it

19       quickly, Your Honor.  I'm assuming that you

20       have experience with Dr. Madigan?

21              THE COURT:  Yes, I have.

22              MS. BUENO:  He has a new opinion that is

23       relatively new to him.  It's a general

24       causation opinion, which he previously did not

25       offer.  You're aware of his prior testimony
```

1    regarding his probability assessment about

2    bottles.  You're aware of his trends data.

3    We've moved on both of those.  I'll stand on

4    the papers.  The only issue I'd like to ask for

5    argument on relates to this general causation

6    opinion.

7        He is offering a general opinion that he

8    says, quote, There is sufficient evidence that

9    lifetime asbestos exposures, as found in

10    regular use of cosmetic talc, can cause or

11    contribute to the development of pleural and

12    peritoneal mesothelioma.

13        This opinion should be excluded first on

14    qualifications.  Dr. Madigan is a statistician.

15    You just ruled that plaintiffs can bring

16    Dr. Haber to talk about causation.  Dr. Madigan

17    does not have any reason to be coming as a

18    statistician and talking about causation.  He's

19    not a medical doctor.

20        He also bases his opinion on two studies

21    that have problems.  His opinion is based on

22    two asbestos exposure studies.  Number 1,

23    Stephan (ph), which Your Honor's familiar with.

24    This is Dr. Longo's below-the-waist study.

25        Dr. Longo testified -- and I think Your

1          Honor might be surprised by this -- but

2          Dr. Longo testified he is not relying on his

3          below-the-waist study in this case.  When asked

4          why, he said, "Because that relates to Italian

5          talc and that is not at issue in this case."

6               So, Dr. Longo is not relying on his own

7          study because of relevance.  Dr. Madigan should

8          not either.

9               The second study that Dr. Madigan relies

10         on is the Gordon study.  And low and behold

11         that is also Italian talc, which has its own

12         problems, based on the testing methodology that

13         I'm sure Your Honor has seen several times

14         before.

15              Both of these, Stephan and Gordon, which

16         Madigan relies for his general causation

17         opinion, are admittedly outlier studies.  He

18         does not consider other studies with different

19         results.  So, Your Honor, we've briefed this.

20         I know you've got a thick binder in front of

21         you and it's 5:00.  I ask Your Honor to exclude

22         the general causation opinion of Dr. Madigan.

23         This is simply outside of his expertise.

24              THE COURT:  All right.

25              MR. ADAMS:  Quickly, Your Honor, it's not

1       outside Dr. Madigan's expertise to give the

2       general causation opinion, because he has

3       specialized knowledge and expertise in

4       epidemiology, which is closely linked to

5       statistics.  He's published over 30 papers on

6       epidemiology.  He's taught courses at the

7       college level on epidemiology, including at

8       Columbia, where he was the chief of the

9       Department of Statistics.

10      What his general causation opinion is, is

11      here are the published peer-reviewed studies on

12      the levels of asbestos released into the air

13      from the use of cosmetic talc, including the

14      talc used in Johnson's Baby Powder for over 70

15      years.  Here's the air levels.  And he compares

16      them to the level of asbestos in the air in

17      epidemiology literature -- over a dozen studies

18      -- that increases the risk of disease, and it

19      shows that the levels in the air are above the

20      levels in the epidemiological studies that

21      prove asbestos cause disease.  That's the

22      general causation opinion.  He's absolutely

23      qualified to give it.

24      It's false that Italian talc is not at

25      issue in this case, even though that is what

 1    was measured in Gordon and Stephan, because

 2    Johnson & Johnson used exclusively Italian talc

 3    for seven months, between 1979 and 1980, when

 4    there was a strike going on and they couldn't

 5    use Vermont talc.

 6         Mr. Perry was using Johnson's Baby Powder

 7    every single day, multiple times a day, during

 8    that entire seven-month period.  And so Italian

 9    talc is at issue in this case.  Mr. Perry was

10    exposed to it and it did contribute to his

11    disease.

12         Unless you need to hear anything else --

13         THE COURT:  All right.  That's it.

14    Anything in reply?

15         MS. BUENO:  Dr. Madigan is offering

16    testimony about epidemiology.  He's done that

17    in the past.  Your Honor's probably seen it,

18    where he talks about the power of different

19    studies.  All of that's fair.  That's fine for

20    him to talk about epidemiology.

21         Where I ask Your Honor to draw the line is

22    when he comes to an opinion -- like a medical

23    doctor would -- that there's sufficient

24    evidence that asbestos exposure is found in

25    regular use of talc caused or developed

 1     mesothelioma.  That's a step too far.  He's a

 2     statistician.

 3          He can talk about what the epidemiology

 4     says.  He can talk about the powers of those

 5     studies and everything else, as he's done in

 6     the past, but this new opinion where he's

 7     taking a leap, where he's now saying, "I can

 8     opine on general causation," that's too far for

 9     a statistician.

10          THE COURT:  You know, I just don't see

11     this as some great big problem.  I mean, the

12     majority of people that have looked at this

13     issue at any time in the recent past have come

14     to the conclusion that exposure to talc with

15     asbestos causes mesothelioma, or can cause

16     mesothelioma.  And the question is levels of

17     exposure and how that increases the probability

18     or possibility that someone develops

19     mesothelioma.  I don't see this as some great

20     big deal.  That's kind of common knowledge now.

21          MS. BUENO:  Well, I hear what Your Honor

22     is saying, but Dr. Madigan is a perfect

23     example, because what he relies on in his

24     charts and his report, do you know what they

25     are?  They're asbestos studies.  So I think it

```
 1        is common knowledge.  And I think nobody would

 2        disagree that if you're exposed to asbestos --

 3             THE COURT:  Well, that's what he's being

 4        asked to talk about.

 5             MS. BUENO:  It's different when you start

 6        talking about cosmetic talc, because there's a

 7        genuine disagreement.  There is a genuine

 8        disagreement --

 9             THE COURT:  Well, yes, ma'am, but there is

10        a vast amount of agreement -- there's a vast

11        amount of material, in which anyone can rely,

12        that says that talc does have asbestos in it.

13             You and J&J continue to insist that talc

14        does not have asbestos in it.  It all has to do

15        with the way you define asbestos.  And I get

16        all of that, but I am not going to exclude

17        Madigan's testimony.

18             MS. BUENO:  Your Honor, we have

19        Dr. Longo's motion, and then a motion on tissue

20        testing and that would be it.

21             THE COURT:  All right.  Longo.

22             MR. COWAN:  I will be very brief.  The

23        papers -- may I approach?

24             THE COURT:  Yeah.

25             MR. COWAN:  The paper that we filed has
```

1          many exhibits.  I'm trying to make this as

2          simple as possible.  This is about specific

3          opinions that Dr. Longo has concerning his PLM

4          heavy liquid separation testing for chrysotile,

5          not for amphibole, not as TEM.  It is specific

6          to his chrysotile findings and the methodology

7          that he is using, but not only that, but the

8          way he is applying the methodology.

9               THE COURT:  What is different about this

10         argument from the argument I received in Plant

11         about this very same witness?

12              MR. COWAN:  I have not seen your ruling on

13         Plant.  I apologize if I did not see that.

14              THE COURT:  Well, I moved that they --

15         every time Longo testifies, the defense always

16         says, he can't offer opinion about chrysotile.

17         We have a different opinion about chrysotile

18         that's different from crocidolite, et cetera,

19         et cetera.  It's a basic split between defense

20         and plaintiff as to chrysotile.

21              Longo has his opinions.  He's

22         cross-examined at length about them.  I have

23         ruled in every case he's been on that he can

24         testify.

25              MR. COWAN:  I'm going to sit down, Your

 1    Honor.  I did not know that you had ruled in

 2    Plant.  And Plant's counsel did not inform me

 3    about it.

 4        THE COURT:  I've been down this road many

 5    times in the past.  I'm going to deny the

 6    motion.

 7        Now, what's the last one?

 8        MS. BUENO:  The last motion, Your Honor,

 9    is a motion to exclude tissue testing in this

10    case.

11        There has not been any tissue testing

12    done, so you might be wondering why I'm sitting

13    here asking you to exclude it.  Here's why:

14    You filed and you signed a motion, you may

15    recall, on July the 10th, ordering the division

16    of tissue in this case.

17        THE COURT:  I don't know why this ends up

18    being one of the most contentious things I deal

19    with in these asbestos cases, and some of the

20    outrageous things that have been done about

21    this just defies the imagination.

22        MS. BUENO:  Well, Your Honor, let me give

23    you a chance to set the scene here, because I

24    don't know what has happened in the past.  I

25    just know what we've done in here.

```
 1              We asked, on June the 20th, for
 2      plaintiffs' assistance to get the tissue
 3      divided.  And it took us a while to get an
 4      order to you.  After diligence of defense
 5      counsel, we have all sorts of correspondence
 6      attached to the motion --
 7              THE COURT:  Right.
 8              MS. BUENO:  -- but we finally got an order
 9      to Your Honor.
10              THE COURT:  Yes, ma'am.
11              MS. BUENO:  One of the reasons for delay
12      was because our expert, Dr. Roggli, who was
13      going to analyze the tissue for us, because of
14      the delay of getting an order and getting the
15      division, realized he wasn't going to be able
16      to get it done before trial.  So we had to
17      find, in a very quick second, another expert to
18      analyze it.
19              Your Honor entered the order on July
20      the 10th, which is 20 days ago.  Dr. Longo was
21      deposed on the 16th of July, I believe.  16th.
22      And he testified that he would be analyzing it
23      for plaintiffs, but it would take him two- to
24      three weeks to get any type of results because
25      it's a process, as our folks said, too.
```

1          The tissue was not divided by July

2     the 24th, which is when we filed this motion.

3     And our motion, basically, says we're out of

4     time.  We don't have time to get this tissue

5     divided.  That was July the 24th.

6          Now it's almost a week later and I was

7     informed today by plaintiffs' counsel that the

8     tissue has been divided and has been sent to

9     the respective experts.  I have been unable to

10    even confirm that our expert even has it

11    in-hand.  But we are asking Your Honor to just

12    exclude the tissue testing because we are;

13    we're out of time.  We're less than a week from

14    trial.  And it was our idea, I must say, to get

15    it done in the beginning.  Plaintiffs did not

16    do any tissue testing.  We asked for it.  And

17    as soon we asked, they said, "Well, we want to

18    do it, too," but it hasn't been done.

19         Dr. Longo says it's going to take him two

20    or three weeks.  It's not going to happen

21    before trial.  And we can't get into a

22    situation where there's a surprise the morning

23    of opening statements about what this tissue

24    allegedly says or doesn't say.  We would need

25    time for reports.  We would need time for

```
 1      depositions.  We would need time for other
 2      experts to analyze it.  We're simply out of
 3      time.  So that was the basis for our motion.
 4      And I understand plaintiffs oppose it.
 5            THE COURT:  Ms. McVey.
 6            MS. McVEY:  Your Honor, this is a much
 7      different situation.  You know, in Glenn, we
 8      had a much different issue.  We had an issue
 9      where the tissue wasn't divided by an impartial
10      third-party --
11            THE COURT:  Yes.
12            MS. McVEY:  -- and it became a whole
13      thing.  Here, we wanted to alleviate that.  And
14      so Johnson & Johnson's counsel and plaintiffs'
15      counsel, we went back and forth trying to come
16      up with an order that we could send to MUSC, to
17      an independent third-party, to have tissue
18      divided.  And it's the same order that we used
19      in the Mauze (ph) case, that you had signed.
20      That was the order that we sent to Johnson &
21      Johnson, initially.  It's an order that you
22      already signed, having MUSC divide it.
23            Johnson & Johnson didn't like that order
24      exactly.  They wanted to change it.  So we went
25      back and forth to do that.
```

```
 1            The morning that we all agreed on the

 2       order that we would submit to you, Ms. Bueno

 3       wrote and said, do not submit the order to you

 4       now because Dr. Roggli doesn't have time to do

 5       the testing.  And I said to her then, that's

 6       not my issue.  Right?  That's y'all's issue.

 7            And so I wrote to you and I said, Look,

 8       they said they don't have to.  They don't have

 9       an expert to do it.  That's not really our

10       problem.  We have an expert that can do it.

11            And then Ms. Bueno said we have an expert

12       now that can do it, too.  Okay.  This will work

13       for the judge, which is what we did, the

14       consent order.  You signed it on the 10th.

15            On the 10th, that very day --

16            THE COURT:  I signed it as soon as I got

17       it.  If the implication is somehow or another

18       that it sat on my desk for awhile is not the

19       case.

20            MS. BUENO:  No, that was not the

21       implication, Your Honor.

22            THE COURT:  All right.

23            MS. McVEY:  Well, the implication seems to

24       be that somehow we held this up.  That's not

25       exactly at all what happened.  What we did
```

1    immediately when we got your order, we sent

2    it -- we'd already been in touch with general

3    counsel and the pathologist's office and we

4    sent to them both saying, "The judge has signed

5    an order.  Please split the tissue.  And, by

6    the way, we have a trial coming up on

7    August 5th.  We know time is of the essence."

8        After that order, we went -- we probably

9    -- and I can give you all the correspondence.

10   But between Mr. Adams, Ms. Gross and me, we

11   e-mailed or called them almost everyday to say,

12   "Where is it?"

13       Finally on Monday -- no.  On Friday and

14   Saturday, we reached out and said, "We've got

15   to have it."  Monday, I wrote general counsel

16   of MUSC and said, "You're in violation of a

17   court order, and we now have a hearing with

18   Chief Justice Toal tomorrow."  This was

19   yesterday.

20       The fact that we're having it here today,

21   MUSC overnighted the tissue.  They divided it

22   and they split it.  And they sent to where

23   Johnson & Johnson told us to send it and we

24   sent it to our expert.  FedEx shows that it was

25   delivered to both experts before 8:30 this

1    morning.

2        Dr. Longo's reviewed this digestion and

3    we'll make him available for a deposition.  We

4    believe that we should be able to do the

5    digestion.  Our expert can do it.

6        I'm sorry if their expert doesn't have the

7    time to do that, but this is not as a result of

8    our delay.  It's MUSC's, if anybody's, and that

9    would penalize the plaintiffs.  Because what

10   they're going to do -- and you've seen them do

11   it before.  They did it in Plant.  Why didn't

12   plaintiffs pass the tissue?  And it becomes a

13   humongous thing.

14       THE COURT:  I know.  I'm very familiar

15   with it.

16       MS. McVEY:  And so, Your Honor, we believe

17   that we should be able to test the tissue.  Our

18   expert can do it.  I bet their expert can do

19   it, too.

20       THE COURT:  That would be my bet.

21       MS. McVEY:  But we believe we should go

22   forward.  We did everything we could to get

23   this to you and to MUSC as soon as we could.

24       THE COURT:  All right.

25       MS. BUENO:  Last word, Your Honor.

```
 1          There's no -- I'm not trying to point the

 2     finger at anybody here for causing delay.  It's

 3     just where we are.  We are less than a week

 4     before trial.  And to have a situation now

 5     where we don't know -- we haven't talked to our

 6     expert to see if this work can be done.

 7          Dr. Longo, himself, testified under oath

 8     that he needed two or three weeks and wouldn't

 9     be able to do it any shorter.  Now I hear

10     counsel saying otherwise.  I'm not sure that

11     this can get done.  And it --

12          THE COURT:  Well, if it can't get done,

13     we'll revisit it, but I'm denying this motion.

14          MS. BUENO:  And then we need probably an

15     opportunity to have reports, to get the

16     reports --

17          THE COURT:  Ms. Bueno, I have seen

18     miracles accomplished when a trial date is in

19     prospect.  And my guess is that something will

20     be done here.  But I'm not going to rule on

21     things in the abstract.  I did what I needed to

22     do to get this order out.  Apparently, the

23     snafu was all along the line.  I can't be

24     responsible for those, but now both sides have

25     the tissue samples and I'm not going to rule at
```

```
 1      this time, even though they now have it, that

 2      no tissue -- information can be put in at

 3      trial.  I deny the motion.

 4          Okay.  What else?

 5          MS. McVEY:  I think that's it for motions.

 6      What I'd like to do is send an e-mail with just

 7      some housekeeping things, and I'll do that

 8      tomorrow morning.

 9          We need to address the Clubman issue and

10      what the jury will be told about that, and some

11      other evidentiary issues.  I think we can do it

12      via e-mail to the Court.

13          Our expectation, what we've told

14      everybody, is that this case will take two

15      weeks to try.

16          THE COURT:  And as you know, I don't like

17      that.

18          MS. McVEY:  I know, but you remember

19      what -- you can't get the trial done in a week.

20      Remember even with Plant, we had to kill

21      ourselves to get it done in eight trial days, I

22      guess.

23          THE COURT:  Well, I don't function, and

24      y'all don't function well in this and we just

25      say, okay, it's going to be two weeks, and then
```

```
 1      we yank it down at the very end.  I want some

 2      limitations on number of witnesses, number of

 3      experts, amount of time each side has, how long

 4      the experts' testimony is going to take, all of

 5      that, like I always do.

 6           MS. McVEY:  Absolutely.

 7           THE COURT:  So here's what I want to have

 8      happen:

 9           I want y'all to immediately propose --

10      make specific proposals on how this case should

11      be tried; what witnesses are going to be used;

12      what the time frame is going to be for them,

13      and the like.

14           MS. McVEY:  Yes, ma'am.

15           THE COURT:  And submit those to me by --

16      what, today is Tuesday?

17           MS. McVEY:  Yes, ma'am.

18           THE COURT:  I need them by Thursday or

19      early Friday, because I have to be able to make

20      some rulings on them so y'all will know what's

21      going to happen.

22           MS. McVEY:  Yes, ma'am.

23           THE COURT:  So I would really like for you

24      to get together on this, if it's at all

25      possible.  And I can tell you, I do not want to
```

```
 1        jam it up for two weeks.  I want everything to
 2        be tried and ready to go to the jury within the
 3        mid-point of the second week, so that we'll
 4        have a day for the jury to be instructed, and
 5        deliberate, and another day if they should need
 6        it.  I don't want this thing jammed down to
 7        something that's going to be on a Friday and
 8        the jury doesn't get the case until 3:00 in the
 9        afternoon.  I'm not going to do it that way.
10             MS. McVEY:  And what we'll propose to do
11        and what we have done in the past, I send an
12        e-mail saying, here's the proposed time limits
13        for each witness:  Direct, cross, redirect.
14        We'll keep it moving.  I think the jury should
15        be told that it's going to go into a second
16        week.
17             THE COURT:  I want to be able to tell the
18        jury that, but I also want to be able to tell
19        them that they have limitations in place that
20        will have it going to them so they don't have
21        to stay here on a Friday late.
22             MS. McVEY:  A hundred percent.  And we
23        don't have any duplicative witnesses.  In other
24        words --
25             THE COURT:  And I don't know, it may end
```

1    with the first verdict.  Period.  It may have

2    to go forward if there's some kind of need for

3    the second stage of bifurcation.  It might end

4    with a defense verdict right up, as many of my

5    J&J cases have done.  And that may happen.  But

6    I want to allow the time for the longest case

7    scenario.

8         MS. McVEY:  Absolutely.

9         THE COURT:  And that doesn't happen unless

10    I get the case tried by early Wednesday, at the

11    latest.  And I'll be trying to push it earlier

12    than that, if I possibly can.

13        MS. McVEY:  I have been in many trials

14    with you.  I know how hard you push.  I'm

15    respectful of it and I appreciate you don't

16    want to waste the jury's time.

17        THE COURT:  I have respect for the jury.

18    I don't keep them here till late at night.

19    Most days, I start promptly at 9:30.  I have

20    them in their seats before that.  You know, the

21    first day is always a waste, in some respects,

22    because the jury selection, as hard as I move,

23    still takes until the afternoon.  And then

24    you've got opening statements, and you might be

25    able to get up one witness, if any.  So I want

1       this thing to move along.

2            MS. McVEY:  We are on the same page.

3            THE COURT:  Now, also, I will want some

4       advance information about voir dire questions.

5       I'd like you to get those to me as soon as you

6       can.  You probably already got those halfway

7       prepared anyway.  I want you to get those to

8       me.  If they come in tomorrow, that would be

9       good, so that I can look at these voir dire

10      questions, decide what I'm going to ask and so

11      forth.  But please note, we don't have

12      lawyer-conducted voir dire.  And I am rather

13      sparse in what I do about voir dire,

14      particularly as it gets into juror's special

15      opinions about matters.  I just don't think

16      that's -- that's something I want to go to.

17           And that's why I -- Mitch knows how voir

18      dire works and he'll be able to guide you all.

19      You are as the second line a component on this

20      and will be able to guide your troops on that.

21      But I want all that to me --

22           MS. McVEY:  Yes, ma'am.

23           THE COURT:  -- so I'll be ready.  If

24      you're going to have slide decks for those

25      opening arguments, I'm going to want those in

```
 1      advance so that I can rule on them without

 2      having false starts so if we get mad at each

 3      other about what goes in and what goes out. I

 4      want it to move smooth.

 5           MS. McVEY:  Excellent, Your Honor.

 6           MS. BUENO:  So what I heard you saying,

 7      just for scheduling purposes, is that we're

 8      going to be closing this case on Wednesday.

 9           THE COURT:  Trying to as hard as we can.

10           MS. BUENO:  The 14th.

11           THE COURT:  Yes, ma'am.

12           MS. BUENO:  So when we were talking, I

13      just want to make sure I have that in mind when

14      we're scheduling our witnesses.  So it sounds

15      to me that our witnesses will be early that

16      week, or Friday, even, of the first week.

17           THE COURT:  That's correct.  That's

18      correct.

19           MS. BUENO:  Okay.  And then, obviously, to

20      the extent there is witness scheduling issues,

21      we'll discuss that with plaintiffs and bring

22      any issues to your attention.  There may be

23      somebody we have an issue with, but we can all

24      talk through that.

25           MS. McVEY:  Absolutely.
```

```
 1              MS. BUENO:  I heard you say opening slides

 2         that we would exchange in advance.

 3              THE COURT:  Yes.  Exchange them in

 4         advance.

 5              MS. BUENO:  And get them to you.  And when

 6         do you want those, knowing that we won't maybe

 7         see them again until Monday?  How do we submit

 8         them and when?

 9              THE COURT:  Put them on my front doorstep.

10              MS. McVEY:  I think, Judge, it may be

11         easier that we exchange them Sunday night.

12              THE COURT:  Y'all can exchange them Sunday

13         night, see if you can come to some

14         understanding.  Then I don't need it.

15              MS. McVEY:  And then if we need something,

16         maybe Judge --

17              THE COURT:  I can always come in early

18         enough to deal with the slide decks and things

19         of that nature before jury selection begins.

20              MS. McVEY:  Perfect.

21              THE COURT:  If not, while jury selection

22         is on, I can decide if there's some context

23         that I need to resolve.  Hopefully, that won't

24         be the case.

25              MS. BUENO:  And then on a regular basis,
```

```
 1        we already talked about, you know, providing

 2        information the night before for a witness,

 3        demonstrative exhibits.  We can bring them to

 4        your attention.

 5             THE COURT:  Exactly.

 6             MS. BUENO:  Do you give us time in the

 7        morning of a trial date to bring those issues

 8        to your attention?

 9             THE COURT:  If I've got something that's

10        got to be decided, is bring you in at 8:30 or

11        something like that.  Depending on how big or

12        lengthy the issue is.

13             MS. BUENO:  Did you say how long you will

14        go in the day?

15             THE COURT:  I try to let them out of here

16        by 5:30.  And sometimes I can let them out a

17        little sooner.  They've got home obligations

18        and I'm sensitive to that.  And depending on

19        whether we have jurors that got childcare

20        obligations, I may let them go earlier.  I just

21        have to see what kind of jury we've got.

22             MS. BUENO:  And an hour for lunch?

23             THE COURT:  Yeah, an hour to an hour 15

24        for lunch, and I take a break mid-morning and a

25        break mid-afternoon.  And seeing how well it
```

```
 1    goes, try to let them go between five and 5:30,
 2    as I can.
 3         MS. BUENO:  Terrific.  And we will submit
 4    voir dire questions to you tomorrow.  And then
 5    do we need to submit any kind of joint
 6    statement of the case or is that something --
 7         MS. McVEY:  I'll tell you what, can I
 8    e-mail you and I'll give you a proposal of what
 9    we've done in the past?  And then we can give
10    it to you.
11         THE COURT:  Yep.  Yeah, yeah.
12         MS. BUENO:  Do you have a length of time
13    for opening statements that you allow?
14         THE COURT:  Generally, they are about 45
15    minutes.  Forty to 45 minutes.  Sometimes I
16    limit testimony to 30.  I know TB (sic) always
17    wants one hour apiece.  But I would like to
18    start with the concept it would be 45 minutes.
19         MS. McVEY:  What we've typically done,
20    plaintiffs get an hour and defendants split an
21    hour.  But we can visit that.  You're going to
22    be so proud of how fast we move this case.  I
23    don't want you to make any decisions right now.
24    Everybody's tired.
25         MS. BUENO:  Do I assume correctly that you
```

```
 1        do not allow exhibits to be used in opening, if

 2        they haven't yet been offered into evidence?

 3             THE COURT:  I try to get you to pre-admit

 4        everything and I look at this -- snafus, I

 5        wouldn't want to see them.  You don't have to

 6        do in front of a jury.

 7             MS. McVEY:  So if it's pre-admitted, then

 8        it would be used in open --

 9             THE COURT:  That's correct.  Anything

10        that's got any question about it, then the

11        lawyers, generally, let me know.  And if

12        there's some real question about it, depending

13        on what the witness says, I tell them, "Don't

14        refer to that in opening statement."  But,

15        generally, we've got all that hashed out so you

16        know exactly what you can refer to.

17             MS. BUENO:  Thank you.

18             THE COURT:  I try to do it that way.

19             MS. BUENO:  Okay.  And then we'll talk

20        about other issues.

21             THE COURT:  Right.

22             THE COURT:  All right.  Let's talk about

23        instructions to the jury to begin with.  I try

24        to get all those resolved well before the close

25        of the trial.  I then have them printed and I
```

1     give the jurors all copies of the charges.  I

2     read them to the jury without them having it,

3     and then I give them each a copy of the charges

4     to take with them in the jury room as they

5     deliberate.  I also allow jurors to take notes.

6     I don't require them to.  And I give them an

7     instruction about, you know, that it's for

8     their benefit and can't be used in substitution

9     for their memory of events, et cetera, et

10    cetera.  So I have a kind of standard thing I

11    tell them about note-taking.

12         When each expert comes, I remind them that

13    the experts are there because they're qualified

14    and we have a quick voir dire of

15    qualifications, and I qualify them in the areas

16    that they're being offered for.  I tell the

17    jury that.  And I also -- I always tell the

18    jury that you are the sole judges of the

19    credibility of the witnesses and you may

20    take -- you may make that judgment and take all

21    of what they say or none of what they say or

22    some of what they say.  That is how I handle

23    the experts.

24         MS. McVEY:  Your Honor, for jury charges,

25    what I plan to do is take the Sarah Plant

1    charge.

2        THE COURT:  Yes, I've got -- Theile has

3    got a world of different charges that I've

4    made.  I'm sure Mitch has got a bunch of them,

5    as well.

6        MS. McVEY:  I'll just redline what I

7    changed.

8        THE COURT:  Exactly.  But y'all, I think

9    y'all can work off of that and come to

10   something.  If there's a dispute that needs to

11   be resolved, I can resolve them.  But I want to

12   do that in time to have them printed and ready

13   and go to the jury so everything will be ready

14   to give to the jury.

15       MS. McVEY:  We'll take care of that.

16       THE COURT:  That's fine.

17       MS. McVEY:  And the verdict forms, as

18   well.

19       THE COURT:  Yeah.  Verdict forms are

20   another thing.  Sometimes the parties do wait

21   until the trial has moved along a little bit.

22   But I like the verdict forms as soon as you can

23   get them to me, so we can know what we're

24   doing, what we're looking at as the trial

25   proceeds, adjust according to what happens in

1    the trial.

2         MS. McVEY:  Thank you, Your Honor.

3         THE COURT:  Okay.  Anything else I need to

4    advise about?  Any questions anybody has?

5         Now, Ms. Flynn.

6         MS. FLYNN:  Yes, ma'am.

7         THE COURT:  What in the world is this

8    about opinion?

9         MS. FLYNN:  What I was going to say, I

10   think there was a disconnect maybe a little bit

11   earlier when we were having this discussion.

12        THE COURT:  Yes.

13        MS. FLYNN:  And what I was saying, we

14   filed a motion to stay.  We filed a motion to

15   stay with this Court, with you, because we know

16   that you have jurisdiction.  We filed a

17   petition for a writ of cert with the Supreme

18   Court, but they have not accepted it yet.  But

19   that's just pending.  So we know that the

20   jurisdiction is with you, this Court.  That's

21   what we filed is a motion to stay with you.  So

22   that's what's pending on the record.  I wanted

23   to make sure that that was clear.

24        THE COURT:  Okay.  I was slightly

25   misinformed, although, again, I don't

```
 1          understand a cert, when I haven't ruled on a --
 2          or I have a default hearing.  But be that as it
 3          may, I was trying to sort through all of that.
 4          But you will be here?
 5               MS. FLYNN:  Yes, Your Honor.  We will
 6          definitely be here.  We also filed joinders --
 7               THE COURT:  Yes.  Please let the record
 8          reflect that you have joined in all of the
 9          motions that any of the defense had, and the
10          rulings you have accepted to just as your
11          counterparts at the defense table has.  So your
12          situation will be totally covered, Ms. Flynn.
13          If I need to craft a special order to that, I
14          will.  We'll make sure you're protected about
15          all that.
16               MS. FLYNN:  In terms of a motion to stay,
17          I assume that that is denied, right?
18               THE COURT:  Yes, ma'am.  I'll get Eva to
19          search it out.  I haven't seen it, but --
20               MS. FLYNN:  I do have copies with me.
21               THE COURT:  That would be helpful.
22               MS. McVEY:  And, Your Honor, I just -- for
23          the record, I'm objecting to the joint Clubman
24          or AAI joining any motions.
25               THE COURT:  Oh, okay.  I understand.  All
```

1    right.

2         As for the defaulting party, they cannot

3    legitimately fuss with anything that's going to

4    be admitted in the liability portion of the

5    trial.

6         MS. McVEY:  Right.

7         THE COURT:  The damage portions, only.

8    But I'm not going to bifurcate in such a way

9    that they would have some special standing on

10   damages.  I'm going to have to figure out how

11   that stands.

12        MS. McVEY:  And I'm going to e-mail around

13   it, what I've been calling a charge.  It's not

14   really a charge, but what the jury will be told

15   about Clubman to differentiate what's been

16   decided for Clubman versus what has not been

17   decided for Johnson & Johnson and others.

18        THE COURT:  Yep.  Yep.  So we'll have to

19   figure that out.

20        MS. BUENO:  Yes.  And we'll comment on

21   that.  I mean, I think it's important for the

22   jury to understand that it was a default as to

23   a finding of liability.  And we'll talk about

24   that.

25        THE COURT:  Well, you're going to get to

```
1        argue eventually.  That's something I've got to

2        work out.

3            MS. BUENO:  Oh, no.  And I hope you don't

4        misunderstand.  I'm not suggesting that we

5        would argue against them.  I just think that

6        one of the questions that the jury's going to

7        have to decide is whether or not cosmetic talc

8        had anything to do with Mr. Perry's --

9            THE COURT:  Right.  And they don't get to

10       argue against that.  For the purposes of them,

11       it is assumed that the terms of the complaint

12       are true and sound and they are bound by them,

13       because they defaulted.

14           MS. BUENO:  Exactly.  And something like

15       that is exactly what we were --

16           MS. McVEY:  Listen to what she's saying.

17       This is interesting.  What she wants you to

18       charge them, if it's a technical issue, is the

19       allegations that's been decided against them.

20       Now that it's been determined if their product

21       is unreasonably dangerous and ineffective.

22           THE COURT:  And it has been determined

23       that.  You deferred it.  They defaulted.

24       Therefore, they're bound.  But I'm going to

25       make it clear they don't get to hide behind all
```

```
 1        of the evidence, a defective product, because

 2        it's all of their fault.  That influences

 3        whether it's J&J fault.

 4             MS. BUENO:  Absolutely not.

 5             THE COURT:  So we'll figure out someway to

 6        sort that out.

 7             MS. BUENO:  Okay.  Thank you, Your Honor.

 8             THE COURT:  All right.

 9             Okay.  Court is it adjourned.

10             (Court is adjourned at 5:39 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                       CERTIFICATE

 2   STATE OF NORTH CAROLINA  )

 3   COUNTY OF GUILFORD            )

 4

 5              I, Corinne J. Blair,  Certified Real-Time

 6   Reporter, Certified Court Reporter, Registered

 7   Professional Reporter, and Certified LiveNote

 8   Reporter, certify that the foregoing transcript of the

 9   proceedings taken at the July 29th, 2024 session of

10   Richmond County Superior Court is a true and accurate

11   transcript of said proceedings recorded by me, is

12   contained in one volume, and was transcribed by me.

13              I further certify that I am not a relative,

14   employee, attorney or counsel of any of the parties;

15   nor financially interested in the outcome of this

16   action.

17

18              This 31st day of July, 2024.

19

20

21

22   _____
     Corinne J. Blair, CRR, CCR, RPR, CLR
23   Certified Real-Time Reporter
     Certified Court Reporter
24   Registered Professional Reporter
     Certified LiveNote Reporter
25
```

Exhibit 25

Case 3:16-md-02738-MAS-RLS    Document 32132-2    Filed 06/23/24    Page 886 of 1320
Case 3:16-md-02738-FLW-LHG    Document 9742-22    Filed 05/07/19    Page 3 of 39 PageID:
PageID: 269881
47700

# EXHIBIT E16

FILED
Superior Court of California
County of Los Angeles

JUL 23 2018

Sherri R. Ca........ ...cer/Clerk
By ___Alfredo Morales___ deputy
ALFREDO MORALES

# SUPERIOR COURT OF CALIFORNIA

# COUNTY OF LOS ANGELES

| | |
|---|---|
| Coordinated Proceeding<br>Special Title (Rule 3.550)<br><br>LAOSD ASBESTOS CASES | Case No.: JCCP 4674 |
| CAROLYN WEIRICK, et al.,<br><br>    Plaintiffs,<br><br>vs.<br><br>BRENNTAG NORTH AMERICA, INC.,<br>et al.,<br><br>    Defendants. | Included Action Case No.: BC656425<br><br>**RULINGS ON MOTIONS<br>IN LIMINE** |

This case is an included action within the LAOSD Asbestos Cases, Judicial

Council Coordination Proceeding (JCCP) No. 4674.

This Court's rulings on certain motions in limine are set forth on the attached pages. Exhibit A are the rulings on the Plaintiff's Motions in Limine. Exhibit B are the rulings on the defense motions in limine.

The rulings are presented in three columns. Only the third column constitutes the Court's ruling. The first two columns are summaries prepared by the Court's research attorney. These are left in for the convenience of the parties and the trial judge, who might otherwise need to review all the pleadings to get an understanding of the contentions. Where appropriate, this Court has reviewed the original of the motion papers, including the evidence and testimony submitted.

The parties may not bring additional motions in limine during trial except with leave of the trial judge assigned.

With respect to any motions in limine that rely upon Evidence Code § 352, the Court has weighed the probative value (if any) of the evidence against the prejudicial effect of its admission, as well as the potential for such evidence to be cumulative, confuse the jury, or cause undue consumption of time.

The concept of admissibility evolves with trial. As the trial evolves, it may be that evidence originally thought inadmissible becomes admissible in light of the admission of other evidence not anticipated at the beginning of trial. Also, by placing new facts in issue, a party can make previously inadmissible evidence admissible to prevent unfairness to the other side. A motion in limine should be a shield against the incitement of passion and prejudice, not a sword that is used to

2

1   lead the jury to inferences of factual conclusions that are not true or otherwise

2   improper.

4       Unless an in limine ruling is revised by the Court, compliance is expected,

5   and counsel should advise the Court outside the presence of the jury before allowing

6   a witness to go outside the bounds of a motion in limine. Counsel are ordered to

7   familiarize themselves with, and comply with, LASC Local Rule 3.57 (e).

DATED: July 23 2018

JOHN J. KRALIK
Acting Asbestos Coordination
Judge of the Superior Court

3

Case 3:16-md-02738-FLW-LHG   Document 9741-22   Filed 05/07/19   Page 3 of 89 PageID:
PageID: 47764

# Exhibit B

**Defense MILs Re: BC656425 (Weirick)**

**Date:**       6-25-18
**Time:**       9:00 am

| No. | What to Exclude | Arguments | Ruling |
|---|---|---|---|
| 1 | "[E]vidence or making any reference during trial to diseases allegedly caused by or associated to asbestos-free talc, including ovarian cancer and talcosis." (Motion, p. 1.) | **Defendants contend:**<br><br>"Defendant Chanel, Inc. ("Chanel"), on behalf of itself and the remaining defendants, hereby moves this Court *in limine* for an order precluding Plaintiffs Carolyn Weirick and Elvira Graciela Escudero Lora ("Plaintiffs") from introducing evidence or making any reference during trial to diseases allegedly caused by or associated to asbestos-free talc, including ovarian cancer and talcosis. This is an asbestos action. Plaintiffs allege that Plaintiff Carolyn Weirick ("Weirick") was diagnosed with mesothelioma, a cancer in the lining of her lung, after having allegedly breathed asbestos fibers through her use and general presence around talcum powder products allegedly contaminated with asbestos. Plaintiffs' experts concede that talc alone – absent contamination of asbestos – does not cause mesothelioma. Accordingly, any reference to diseases potentially related to the perineal use of uncontaminated talc (ovarian cancer) and mining and milling of talc (talcosis) would be wholly irrelevant, misleading, and would severely prejudice Defendants by inflaming the jury. Chanel requests an order precluding any evidence or reference to diseases not at issue, including ovarian cancer and talcosis. Similarly, Chanel requests an order precluding reference to the IARC classification for perineal talc use." (Motion, p. 1.) | **Granted:**<br><br>The Court finds that the motion should be granted. In light of the recent publicity and sizeable verdicts in the talc-only cases, the threat of prejudice is too great to allow Plaintiffs to present arguments and evidence regarding ovarian cancer, talcosis, and other non-asbestos injuries allegedly arising out of exposure to talc. The potential prejudice outweighs the probative value. (See, e.g., *Downing v. Barrett Mobile Home Transport* (1974) 38 Cal.App.3d 519 [injury from prior accident held irrelevant where plaintiff did not claim the subject incident caused the injury].) |

1

"Recently, lawsuits pertaining to ovarian cancer have been widely
publicized and followed by national news. These lawsuits are often
brought by individuals that believe that their perineal use of
uncontaminated baby powder contributed to or caused such ovarian
cancer. Specifically, the plaintiffs in these lawsuits believe that the
talc in the baby powders contributed to their cancer. These lawsuits
are unrelated to Chanel, and only relate to the use of baby powder
products or other similar products intended to be used in the
perineal region. By contrast, Chanel No. 5 was intended to be used
as a fragrance, not for personal or feminine hygiene purposes.
Critically, Plaintiffs do not allege that Weirick has been diagnosed
with ovarian cancer from perineal use of talcum powders. In fact,
Plaintiffs' experts do not even claim that talc itself caused
Weirick's disease, but rather that trace levels of asbestos within the
talc caused her mesothelioma. Indeed, Plaintiffs' occupational
medicine expert Dr. Jacqueline Moline concedes that talc absent
asbestos contamination has never been proven to cause
mesothelioma. (*See* **Exhibit A** to the Declaration of Nicole A.
Harrison at 72:7-17)." (Id. at pp. 1-2.)

"Similarly, talcosis has been studied epidemiologically as it relates
to miners and millers of talc, that is, workers who have spent eight
hours per day, five days per week in talc mines. In other words,
there is a potential association between talcosis and prolonged
exposure to talc. Here, Weirick's alleged use and general presence
around talc-containing products, including Chanel No. 5, is a mere
and miniscule fraction of the work talc miners and millers perform
around talc. Most importantly, Plaintiffs do not allege that Weirick
has been diagnosed with talcosis. Like ovarian cancer, talcosis is a
very different disease than mesothelioma, both in cause and source.
Indeed, uncontaminated talc is believed to be a cause of ovarian
cancer and talcosis. By contrast, Plaintiffs claim that asbestos

2

within the talc in talcum powder products caused Weirick's
mesothelioma, not the talc itself." (Id. at p. 2.)

"This is not an ovarian cancer case. The disease process of ovarian
cancer is markedly different than that of mesothelioma. They
involve two different parts of the body, have different causes, and
the epidemiology and scientific literature regarding the two
diseases do not overlap. The same applies to talcosis. Accordingly,
introducing evidence or even referencing ovarian cancer, talcosis,
and other such diseases would be irrelevant to the claims made by
Plaintiffs, and would result in a waste of the Court's time and
resources. The only admissible evidence at trial is relevant
evidence. Cal. Evid. Code § 350. Plaintiffs should therefore be
precluded from introducing any evidence or referencing during trial
any diseases not at issue in the case, including ovarian cancer and
talcosis." (Id. at p. 4.)

"[I]f Plaintiffs are allowed to reference diseases such as ovarian
cancer and talcosis – two diseases that are thought to potentially be
caused from exposure to talc – the jury may be misled to believe
that talc causes mesothelioma, not asbestos. Moreover, lawsuits
pertaining to ovarian cancer have been widely publicized and
followed by the national news recently. These lawsuits are often
brought by individuals that believe that their perineal use of baby
powder contributed to or caused such ovarian cancer. Given the
wide publicity such cases and their recent verdicts have received, as
well as the personal nature of such lawsuits, it is very likely that
reference to ovarian cancer will prejudice Defendants, including
Chanel, by enflaming the jury. Specifically, such evidence could
result in the jury believing that all products containing talc are
dangerous, regardless of the evidence or expert testimony offered at
trial. Accordingly, it is critical that Plaintiffs not be permitted to

reference diseases not at issue in the case, including ovarian cancer and talcosis." (Id. at pp. 4-5.)

"For the same reasons stated above, any reference to or introduction of the IARC classification for perineal talc use should be precluded. Talc is not a carcinogen. The IARC monographs have differentiated the possible carcinogenicity of talc as it relates to perineal use, which is differentiated from talc not used for perineal purposes. Given that Plaintiffs' allegations are that asbestos contamination in talcum products caused her disease and not the talc itself, any reference to the IARC classification for perineal talc use should be precluded, as it is not only irrelevant, but highly prejudicial, misleading, and serves to do nothing more than inflame and confuse the jury." (Id. at p. 5.)

**Plaintiffs contend:**

"Defendants move to exclude reference to the association between talc and ovarian cancer. As with any other product liability claim, the relationship between talc and ovarian cancer is probative of the defendant's knowledge of the hazards of talc; relevant to an analysis of the consumer expectations and risk/benefit tests for design defect; relevant to the analysis of allegations of a failure to warn; and material to establishing the element of malice in support of a prayer for punitive damages. In this case, such evidence is also particularly relevant to the issue of the presence of asbestos in Defendants' talc, an issue which Defendants themselves vehemently dispute and upon which they even sought summary judgment. Defendants have actually attempted to discredit studies linking talc with ovarian cancer by pointing to the presence of asbestos in the talc as a confounding factor in those studies. Thus, the ovarian cancer discussion is relevant to the center-most issue in the case: whether the talc has asbestos in it." (Opposition, p. 2.)

4

"Consumer expectations" test: "The fact that talc itself is a recognized carcinogen1 for ovarian cancer is directly relevant to the "consumer expectations" test for Plaintiff's strict liability design defect claims. A product is defective in design if it fails to perform as safely as the ordinary consumer would expect. (CACI 1203.) Evidence that talc puts its users at risk for *cancer* goes to the crux of the consumer expectations test; that Plaintiff developed another type of cancer due to the use of the product is inapposite. From the consumer or user's perspective, cancer was never the expected result of cosmetic or baby powder use." (Id. at pp. 2-3.)

"Risk/benefit" test: "CACI 1204 provides a product is defective if the benefits are outweighed by the risks, and/or the availability, cost, and feasibility of a safer alternative design rendered the harm from a product whose benefits outweigh its risks unnecessary and preventable under the circumstances. Defendants have repeatedly acknowledged that there is no actual health or medicinal benefit to the use of talcum powders. J&J has stated that the "Safety of cosmetic powders has been a concern, especially among health professionals. They have decided that powders provide no health benefit. Therefore, the potential for harm from respirables or accidental over exposure should be avoided. Mothers are now being advised not to use baby powder, especially talc baby powders." Thus, in light of baby talc's complete lack of "benefit," any risk of association with ovarian cancer is unjustified. Further, Defendants admitted that the use of cornstarch instead of talc was an available and feasible alternative design, and that it is not aware of any risks associated with the substitution of cornstarch." (Id. at p. 3.)

Failure to warn: "On the basis of ongoing ovarian cancer research, Defendants were aware that their product contained asbestos.

Furthermore, J&J was aware that asbestos in talc was reaching the ovaries in research studies. [¶]This knowledge is relevant to Plaintiff's failure to warn claim insofar as J&J was aware of an early link between talc and cancer, but nevertheless failed to warn of it. J&J's conduct pertaining to early indications that talc was a cause of ovarian cancer are relevant to J&J's failure to exercise reasonable care and disregard for the health and safety of its customers and users." (Id. at pp. 3-4.)

"The hazard posed by the product --- i.e., the risk of cancer created by the application or inhalation of talc --- is the hazard about which J&J was aware and should have warned. Whether the particular cancer which arises is the same from one talc user to the next is irrelevant for purposes of judging the defendant's knowledge of the hazard and its obligation to warn or find a safer design. So, whether Mrs. Weirick developed a cancer of the lining of her lungs versus of her ovaries doesn't alter the fact that the defendants were aware that talc could cause cancer and should have warned its consumers." (Id. at p. 4.)

"Further, CACI 1203 and 1204 don't require that a Plaintiff prove a specific harm was contemplated by the defendant when it incorporated the hazardous design or failed to warn, just that it appreciated there was a risk of harm from the product or from whatever created the hazard. Indeed, CACI 1203 speaks only to the requirement that the product "didn't perform as safely" as a consumer would expect and the consumer "was harmed," and CACI 1204 requires only that plaintiff show the defendant made the product, that the plaintiff "was harmed," and that the product's design was a substantial factor in "causing harm." There is no additional requirement that the plaintiff show a particular harm, or the same harm, as any other victim of the product's defective design. A defective product may pose a danger in multiple different

6

| | | ways, and evidence that it caused different kinds of harm but from the same hazardous condition doesn't render such evidence irrelevant or inadmissible. For example, a defective airbag in a vehicle might cause facial lacerations, brain injury, even death. The fact that the outcomes might differ when a defective airbag deploys simply means the airbag posed a risk of harm to the driver about which the defendant should have warned[.]"  (Id. at pp. 4-5.)  Presence of asbestos during exposure period:  "The presence or absence of asbestos in talc implicated to induce ovarian cancers is relevant not only to J&J's knowledge of the hazards of talc, but that talc is acknowledged to contain asbestos as a regular contaminant ("possible contamination of the talc with asbestos needed to be borne in mind"). [¶]  Defendants acknowledge that the risk of ovarian cancer from talc was known well back into the 1960s. Interestingly, they blame the ovarian cancer association on the presence of asbestos during that era. Thus, this evidence is probative for two reasons: 1. Defendants admit the presence of asbestos in talc during the relevant time period, and 2. Despite an awareness of a risk during that time, they failed to warn or recall the product. Presence of asbestos in the ovaries from the use of talc is well known to the talc industry."  (Id. at p. 6.) | |

| No. | What to Exclude | Arguments | Ruling |
|---|---|---|---|
| 15 | "[E]vidence of, or having [Plaintiffs'] experts rely upon, three sets of test results: Dr. Seymour Lewin's 1972 preliminary report to the FDA; Dr. Lewin's | **Defendants contend:**  "Defendants Johnson & Johnson and Johnson & Johnson Consumer Inc. (hereinafter, "J&J Defendants") seek an in limine order precluding Plaintiffs from presenting evidence of or testimony related to or relying on certain documents from the 1970s that purportedly identified asbestos contamination in some cosmetic talcum powders. Such documents are hearsay and may | **Denied:**  The notice of motion identifies three test results.  The first is Dr. Lewin's 1972 preliminary report to the FDA.  Defendants claim Plaintiffs will try to introduce secondary sources – |

7

| | 1973 final report to the FDA; and a 1976 article by Drs. Arthur Rohl and Arthur Langer, titled *Consumer Talcums and Powders: Mineral and Chemical Characterization*." (Notice of Motion, p. 1.) | only be invoked to the extent that an expert may reasonably rely on them. The documents at issue are misleading and consequently entirely unreliable—some have been disavowed by the authors of the cited studies, some have been deemed unreliable by the U.S. Food and Drug Administration ("FDA"), and some have nothing whatsoever to do with the J&J Defendants' products—Johnson's Baby Powder and Shower to Shower—on their face. As a result, the J&J Defendants respectfully request exclusion of all reference to these documents at trial." (Motion, p. 1,)

"First, the J&J Defendants seek to exclude what are acknowledged as preliminary results of testing conducted by Dr. Seymour Lewin, including second-hand accounts purporting to set forth such results. These preliminary results and accounts, alleging that tremolite and chrysotile were found in several cosmetic talcum powders, including the J&J Defendants' products, differ from Dr. Lewin's final, official report to the FDA, which did not identify quantifiable levels of tremolite or chrysotile in the J&J Defendants' products. The inaccuracy of some of these accounts was recognized by Dr. Lewin himself, who wrote a letter to the editor explaining that the Wall Street Journal, for example, had misreported his findings. Preliminary test results contradicted by the final reported results, let alone second-hand accounts of such repudiated test results, are not a reliable basis for an expert's opinion." (Id. at p. 1; see also id. at pp. 3-5.)

"Second, the J&J Defendants seek to exclude tests performed in the 1970s by Dr. Arthur Rohl, Dr. Arthur Langer, and five co-authors (the "Rohl/Langer testing"). Drs. Rohl and Langer reported "asbestiform" particles in a subset of samples taken from several brands of cosmetic talc. But the article does not indicate whether any of these results purporting to show asbestos contamination | e.g., a *Wall Street Journal* article and Johnson & Johnson internal documents – that detail Dr. Lewin's preliminary findings. Defendants contend the secondary sources should be excluded because (1) the *WSJ* article misreports the preliminary findings, and (2) the preliminary findings contradict Dr. Lewin's final report. (See Motion, pp. 3-5.)

The Court believes that the Wall Street Journal article should not be admitted for the truth of matter asserted based on the present state of the record. But it may be referenced by experts for its historical significance in the debate.

Otherwise, the Court denies the motion under LASC 3.57(a) and *Kelly v. New West Fed. Sav.* (1996) 49 Cal. App. 4th 659. First, it is unclear which, if any, secondary sources Plaintiffs intend to introduce. The Court will not issue an advisory opinion as to a category of |

8

involve the J&J Defendants' products." (Id. at p. 1; see also id. at pp. 5-7.)

"Further, Drs. Rohl and Langer acknowledged that the testing methods they used were incapable of distinguishing asbestos from non-asbestiform amphiboles. As the Rohl/Langer testing does not, on its face, mention any of the J&J Defendants' products and does not distinguish between asbestos and non-asbestiform amphiboles, it is not the sort of reliable test result that Plaintiffs' experts are permitted to rely on to prove that the J&J Defendants' products contained asbestos. At least one other court has agreed and excluded such evidence for this reason." (Id. at pp. 1-2; see also id. at pp. 5-7.)

**Plaintiffs contend:**

"Defendants filed motion in limine to preclude Plaintiff and her experts from relying on what they call "unreliable" test results from the 1970s concerning its talc containing products and ore sources. Defendant claims that tests performed in the 1970s with a "positive" test result, i.e. showing that cosmetic talcum powders including Johnson & Johnson Baby Powder contained asbestos, are "unreliable." But there is no factual or legal support for Johnson & Johnson's arguments and its motion simply highlights the issues the jury must decide." (Opposition, p. 2.)

"There is nothing "unreliable" about testing done in the 1970s that shows asbestos in cosmetic talcum powders, including Johnson & Johnson Baby Powder. To the contrary, the testing confirmed what was already well-known to the talc industry—namely, that talc was contaminated with asbestos. Testing done in the 1970s confirmed the presence of asbestos in cosmetic talc, including Johnson & Johnson Baby Powder. And even if Johnson & Johnson was correct

potential documents. The admission of the documents may depend on when they are offered and on the examination of the witness at issue. Second, the fact that Dr. Lewin's final report contains different findings than the preliminary report does not necessarily justify exclusion and both reports are part of the history of the product. Defendants' evidence fails to establish unreliability, and they fail to identify another basis justifying exclusion. Cross-examination and targeted objections at trial are the proper ways to resolve this issue.

The second test result is Dr. Lewin's 1973 final report. Despite identifying it in the notice of motion, Defendants do not appear to actually seek exclusion. The moving brief does not argue that the final report is unreliable and inadmissible. This portion of the motion is moot.

| | | that the amphiboles found in these cosmetic talc samples in the 1970s were "nonasbestiform" amphiboles, that fact would not make the studies unreliable or irrelevant. The underlying presence of nonasbestiform amphiboles in talc is significant for the presence of asbestos and, thus, relevant to this case." (Id.; see also id. at pp. 4-6.) | The third test result is the 1976 report by Dr. Rohl and Dr. Langer. Defendants contend the result should be excluded because (1) the report fails to identify the products that contained asbestos – i.e., it fails to identify a Johnson & Johnson product, and (2) the FDA found the result unreliable. (See Motion, p. 5.) |
|---|---|---|---|
| | | "The term asbestos is generally used as "[a] name applied to a group of naturally fibrous minerals." (A.N. Rohl, Langer et al., Consumer Talcums and Powders: Mineral and Chemical Characteristics, J. OF TOX. AND ENV. H. (1976) p. 277, attached as Exhibit A to Langhoff Declaration.) "Asbestiform" is a synonym of asbestos. Mrs. Weirick and her experts thus contend that a substantial amount of the amphiboles present in Johnson & Johnson Baby Powder were, in fact, asbestiform (i.e., fibrous) and thus capable of causing disease." (Id. at p. 2; see also id. at pp. 6-11.) | The Court disagrees. Dr. Langer's 1976 report detected asbestos in cosmetic talc. In 2015, he testified that he stands behind the report and has never retracted. (See Langhoff Decl., Ex. E, pp. 62-64.) The FDA's contrary finding does not, itself, prove unreliability as a matter of law, but it can be weighed by the jury. |
| | | "NIOSH's current recommended exposure limit ("REL") states that particles are countable, and thus regulated as asbestos, if they include "any fiber or fragment of a mineral longer than 5 microns with a minimum aspect ratio of 3:1 . . . ." NIOSH further indicates that a "covered mineral" is any mineral having the crystal structure and elemental composition of one of the asbestos varieties…or one of their nonasbestiform analogs." The evidence in this case will be that substantial numbers of particles meeting NIOSH's definition of regulated asbestos (i.e., fibers more than 5 microns in length with a minimum aspect ratio of 3:1) were found in cosmetic talc, including Johnson & Johnson talcum powder products and source ores, in the 1970s." (Id. at pp. 2-3; see also id. at pp. 14-15.) | As noted elsewhere, the early work on this issue is part of the historical record of notice and the development of the science to be considered by the present-day experts or other competent witnesses. |
| | | "The issues raised in this motion go to the weight of evidence, and thus fall squarely within the realm of cross-examination, and Johnson & Johnson's ability to present its own evidence. These are | |

10

| | | not issues of admissibility. Because they are liable for harm caused by asbestos-containing Johnson & Johnson talcum powder products, Defendants predictably take issue with the "positive" test results showing that cosmetic talc, and particularly Johnson & Johnson Baby Powder, contained asbestos. To the extent that Defendants take issue with the testing results, it may present its own evidence, as well as cross examine Plaintiff's expertsand challenge their theories. Defendants are well-protected by their ability to present their own evidence and experts, as well as cross-examine those retained by Plaintiff." (Id.a t p. 3; see also id. at pp. 16-18.)<br><br>"Under Kelly v. New West Federal Savings (1996) 49 Cal.App.4th 659, a motion in limine is not a mechanism for Defendants to strike unfavorable evidence. Simply because evidence is damaging to Johnson & Johnson and/or Imerys, does not mean it is inadmissible. Johnson & Johnson is confusing "unduly prejudicial" with damaging. They are not the same. (People v. Coddington (2000) 23 Cal.4th 529 ["Prejudicial" is not synonymous with "damaging"]; Vorse v. Sarasy (1997) 53 Cal.App.4th 998, 1008-09 [evidence is not prejudicial merely because it undermines the opponent's position].) Plaintiff therefore requests that Johnson & Johnson's motion in limine on this issue be denied in its entirety." (Id. at p. 3; see also id. at pp. 19-20.)<br><br>Moreover, hearsay exceptions apply to the test results. (See id. at p. 18.) | The Court does not opine on the ultimate issue of whether any particular document will be admitted in evidence, or for what purpose, but an in limine motion is inappropriate.<br><br>The Court shares Defendants' concern about prejudice since Dr. Langer's report fails to identify a Johnson & Johnson product. However, Plaintiffs identify some relevant, non-hearsay uses – e.g., notice of asbestos hazards in cosmetic talc and failure to warn. The Court does not assess at this point whether the document can be admitted for the truth of what it asserts. Defendants should make specific objections at trial so the trial judge can rule in context. The fact that no Johnson & Johnson product is referenced can be established through cross-examination. The motion is denied. |

| No. | What to Exclude | Arguments | Ruling |
|---|---|---|---|

| 16 | "[I]ntroducing, referencing, or having its experts rely upon the article authored by Ronald E. Gordon, Sean Fitzgerald, and James Millette, entitled *Asbestos in Commercial Cosmetic Talcum Powder as a Cause of Mesothelioma in Women* (the "Article") or its contents." (Notice of Motion, p. 1.) | **Defendants contend:**

"Defendants seek an order prohibiting any party, witness or attorney from making any direct or indirect reference to the article entitled Asbestos in Commercial Cosmetic Talcum Powder as a Cause of Mesothelioma in Women (the "Article"), or relying on same. Defendants anticipate that Plaintiffs and/or their experts will attempt to rely on the Article as evidence that Defendants' products, including Johnson's Baby Powder, Shower to Shower, and Chanel No. 5, were contaminated with asbestos, but it is undisputed that the article concerns products not at issue in this trial." (Motion, p. 1.)

"The Article was written by Plaintiff's purported expert Dr. Gordon and coauthors Mr. Sean Fitzgerald and Dr. James Millette, who also testify as expert witnesses for plaintiffs. (See August 9, 2016 Deposition of Sean Fitzgerald ("Fitzgerald Dep.") 175:21-23, Exhibit P to the Declaration of Jennifer T. Stewart ("Stewart Decl.").) The Article does not test, discuss, or mention any of Defendants' talcum powder products at issue in this case. Instead, the Article involves a product manufactured by Colgate (Cashmere Bouquet) that is not at issue in this case. As a result, the Article is, first and foremost, entirely irrelevant. It is also inadmissible hearsay."

"In addition, the Article is not the proper basis for expert reliance. First, the Article lacks value as expert reliance material because the testing underlying the Article is fundamentally flawed and has been excluded in a number of jurisdiction due to lack of authentication. Second, the Article is essentially a compilation of reports and testimony prepared by plaintiffs' experts in the context of litigation. Plaintiffs are not entitled to repackage expert reports and testimony from other cases and present it in entirely different litigation. Third, | **Granted:**

Expert testimony regarding tested samples may be excluded based on a "chain of custody" claim. (See *People v. Catlin* (2001) 26 Cal.4th 81, 134.) "In a chain of custody claim, '"[t]he burden on the party offering the evidence is to show to the satisfaction of the trial court that, taking all the circumstances into account including the ease or difficulty with which the particular evidence could have been altered, it is reasonably certain that there was no alteration.

The requirement of reasonable certainty is not met when some vital link in the chain of possession is not accounted for, because then it is as likely as not that the evidence analyzed was not the evidence originally received. Left to such speculation the court must exclude the evidence. [Citations.] Conversely, when it is the barest speculation that there was tampering, it is proper to admit the evidence |

12

| | | the Article is akin to a case report, which is unreliable and irrelevant to the issue of causation and, if admitted directly or as a basis of expert opinion, would greatly prejudice Defendants, confuse the issues, and mislead the jurors.<br><br>"Finally, Defendants would be extremely prejudiced if Plaintiffs were permitted to mislead the jurors into believing that the Article relates to products at issue in this case when it does not."<br><br>**Plaintiffs contend:**<br><br>"Defendants' motion assert that the article is "irrelevant because it does not test, discuss, or mention any of the talcum powder products at issue in this case – Johnson's Baby Powder." (Mot., p. 1). What Defendants fail to note is that the talc used in the 50 containers of Cashmere Bouquet analyzed in the article is the same talc used in Johnson's Baby Powder. 1 The Italian talc used in Cashmere Bouquet was supplied by the same supplier of Italian talc to Johnson & Johnson: defendants Cyprus Amax Minerals and Imerys Talc America. This fact alone makes the article's findings of asbestos in Cashmere Bouquet's Italian talc directly relevant to the asbestos content of the same Italian talc used in Johnson's Baby Powder and supplied by defendant Imerys." (Opposition, p. 2.)<br><br>"Further, the article provides relevant and crucial data regarding the releasability of asbestos from cosmetic body talcum powder products that contain trace amounts of asbestos by weight. (Exhibit A at paragraph 48.) Plaintiff's experts rely on the article and the exposure data, and confirm that the data published by Gordon, et al. is consistent with historical publications and current testing of the Italian ore.2 Plaintiff's expert materials analyst and microscopist, Steven Compton, PhD, analyzed talc ore from defendant Imerys' Italian talc mines (the same talc at issue in the article) and | and let what doubt remains go to its weight." [Citations.]'"  (Id.)<br><br>The Court has examined the article and its reliability in a previous proceeding in these consolidated cases, **Alfaro v. Imerys Talc, No. B277284.** The Article chronicles testing of vintage Cashmere Bouquet samples by Plaintiffs' expert, Dr. Gordon, and two other experts often employed by plaintiff firms – Mr. Fitzgerald and Dr. Millett.  As such, it is more a part of the litigation science rather than the purely disinterested science.  Mr. Fitzgerald and Dr. Millett are not designated in this case and their potential biases are not subject to cross-examination. Also, Cashmere Bouquet is not at issue in this case.  In the Court's view, allowing the Article, or allowing Plaintiffs' experts to testify about the Article's results cause prejudice.<br><br>The motion is granted. |

13

concluded that "the asbestos content of samples found to contain amphibole and chrysotile fibers range from approximately 1.7 to 660 million fibers per gram. After estimating the mass of the fibers, this corresponds to a quantity ranging from 0.00002% to 0.68% by weight." Relying on the data published by Gordon, et al., Dr. Compton opined that "Fiber release studies of consumer talc products within this range documented elevated concentrations of airborne asbestos fibers during use of those products. It is expected that aerosolization of these samples or any powder consumer product containing these samples as a constituent ingredient would likewise result in elevated concentrations of airborne asbestos fibers." This includes Johnson & Johnson Baby Powder. (Id. at p. 4.) Accordingly, the Gordon, et al. publication is relevant to the products at issue in this case and Mrs. Weirick's exposure to asbestos therefrom." (Id. at p. 3.)

"Defendants' motion is based on the false premise that the findings in the article are unreliable because it involves testing conducted while the authors were consulting in litigation. Defendants' essentially argue, without any evidence or legal authority, that the Plaintiffs and/or their counsel paid for the article or that its authors have some sort of interest or financial stake in the litigation and that somehow Plaintiffs and/or their counsel interfered with the peer-review process. There is no factual support for this; indeed, one of the authors, Mr. Fitzgerald, has previously testified that no law firm or attorneys representing plaintiffs paid for or otherwise influenced the authoring or publication of the article. (Excerpts from Fitzgerald Depo. dated Nov. 6, 2014, at 14:4-8, 67:10-68:22, 72:7-13, 72:18-25, 74:15-25, 82:9-14, attached as Exhibit C.)"

"Defendant cites to no legal authority to support this position either. It therefore requests this Court to announce, as a new rule of law, that where the author of an article is an expert in related

14

litigation in which the article is to be offered at trial, it should be
assumed that the author has a financial stake in the litigation
generally and his article cannot be referenced. Again, Defendant
cites no authority for this novel position, and requests an illogical
inference from the circumstances, particularly in the context of
specialized asbestos-related scholarship, which often necessarily
intersects with expert witnesses used in asbestos litigation. Indeed,
Defendants' own experts purport to be authors of scientific
scholarship and they will almost certainly attempt to refer to such
work as support for their opinions.4

Defendants' criticisms of the article are not a proper basis for an
evidentiary challenge, but are just accusations having no factual or
legal support. It is the jury's role to determine the relative value of
the experts' bases for their opinions, not a matter for this Court to
decide at the in limine stage."

"It is well-established that an expert witness may testify about the
reasons for his opinion and the matter upon which it is based.
Specifically, Evidence Code section 802 provides: "A witness
testifying in the form of an opinion may state on direct examination
the reasons for his opinion and the matter . . . upon which it is
based, unless he is precluded by law from using such reasons or
matter as a basis for his opinion." An expert may rely on
inadmissible evidence to form his or her opinion. Evidence Code
section 801, subdivision (b), expressly permits an expert to rely
upon inadmissible evidence (such as hearsay articles) if it is "of a
type that reasonably may be relied upon by an expert in forming an
opinion upon the subject to which his testimony relates . . . ." (See
Isaacs v. Huntington Memorial Hospital (1985) 38 Cal.3d 112, 133;
1 Jefferson, Cal. Evidence Benchbook (4th ed. 2010) § 30.40, p.
680.) It follows that expert witnesses may testify about an article or

15

| | | treatise upon which they reasonably base their opinion, even if that article or treatise is otherwise inadmissible." | |
| | | The article's findings are consistent with testing performed in 1976 at Mt. Sinai and testing by Colgate.  (See id. at pp. 6-9.) | |
| | | The article can be used for non-hearsay purposes.  (See id. at p. 9.) | |
| | | The article is not prejudicial.  (See id. at p. 10.) | |

| No. | What to Exclude | Arguments | Ruling |
|---|---|---|---|
| 22 | Opinons and testimony by Plaintiffs' expert Dr. David Fractor. | The binders the parties provided to the Court do not include this motion or the opposition.<br><br>The Court conducted a conference call with the parties on June 19th, and they admitted they had not filed briefs yet.  Defendants served the motion on Lexis File & serve on June 20th but did not submit a hard copy to the Court as required.  Plaintiffs submitted their opposition to the Court on June 21st.<br><br>**Defendants contend:**<br><br>"Dr. Fractor admitted that he did not consider the actual deposition testimony in this case in which both Plaintiffs testified regarding the *actual* household services performed by Plaintiff Carolyn Weirick ("Weirick"), nor did he consider the fact that Plaintiffs hired individuals to assist with certain services well before Weirick's diagnosis. Dr. Fractor admitted that he simply provides a "benchmark" of household services for the average adult, and that he expects the jury to adjust the benchmark based upon the actual evidence in this case. Allowing the jury to hear a calculation of | **Denied:**<br><br>The motion does appear to be untimely.  The Court held the final status conference on June 11th.  Under the Court's protocol, the parties were required to meet and confer at the hearing and then provide the remaining motions in limine to the Court.  Defendants did not e-serve this motion until June 20th, and never submitted a hard copy.  The Court did not grant Defendants leave to file the motion late.<br><br>But the Court denies the motion for a separate reason.  This Court has held in other |

household services that far exceed the actual evidence in this case will be prejudicial to Defendants." (Motion ,pp. 1-2.)

"David Fractor, Ph.D. ("Fractor") was deposed on June 1, 2018. Prior to his deposition, Plaintiffs produced Fractor's Loss Summary Reports, which calculated $8,484 in past household services and $438,323 in future household services. (Declaration of Lindsay Weiss ("Weiss Decl."), Exhibit A.) In making his determination regarding household services, Fractor testified that he used the Dollar Value of a Day to come up with the annual replacement costs for services that Weirick can no longer perform. (Weiss Decl., Exhibit B at 40:15-3; 43:25-44:14.) However, Fractor conceded that his valuation did not take into consideration the deposition testimony offered by the Plaintiffs regarding the activities Weirick does and does not perform around the house. (*Id.* at 44:15-48:6.) Fractor testified that his valuation is solely a "benchmark" that the jury can use to either add or subtract to, based on their opinion of whether Weirick falls within the general Dollar Value of a Day mold his calculations were based on. (*Id.*) Fractor has no opinion one way or another as [to] whether Weirick falls above or b[e]llow the national average with regard to the activities that are listed on The Dollar Value of a Day tables which he used to calculate damages in this case. (Id. at 48:2-6)." (Id. at p. 2.)

"In *In re Lockheed Litig. Cases* (2004) 115 Cal.App.4th 558, 563, the Court of Appeals construed Evidence Code section 801(b) to require that a trial court must determine that the matter relied on by an expert "provide[s] a reasonable basis for the particular opinion offered." The Court rejected the plaintiffs' argument that Evidence Code section 801(b) requires the trial court only to determine whether the type of matter on which an expert relied in forming his or her opinion is the type of matter on which an expert can reasonably rely in forming an opinion, without regard to whether

actions in the coordinated *LAOSD Asbestos Cases* that "loss of household services" is recoverable by personal-injury asbestos plaintiffs. Defendants contend Dr. Fractor's opinion is unusual because he created a generic value based on the Dollar Value of a Day tables instead of quantifying the actual value of the actual household services Ms. Weirick provides. In *McKinney v. California Portland Cement*, however, the Court of Appeal affirmed a similar approach. The expert there used the Cornell University study – which "analyzed what people did around the home such as home repair and maintenance, automobile maintenance, yard work, cooking, cleaning, shopping and general home maintenance" – and "assumed that decedent was an average provider based on the study criteria." (*McKinney* (2002) 96 Cal.App.4th 1214, 1229.) The expert "presented an estimated value of an average provider's services in the

17

the matter on which the expert relied reasonably supports the particular opinion offered. (*In re Lockheed Litig. Case, supra*, 115 Cal.App.4th at p. 563.) The matter relied on must provide a reasonable basis for the particular opinion offered. (*Sargon Enterprises, Inc. v. University of Sothern California* (2012) 55 Cal.4th at p. 770, citing *In re Lockheed Litig. Cases, supra*, at p. 564.) It is therefore improper to use conjectural and speculative matters to support an expert's opinion on any subject because those types of matters render the opinion unreliable and irrelevant. (*Korsak v. Atlas Hotels, Inc.* (1992) 2 Cal.App.4th 1516, 1524; see also *Jennings v. Palomar Pomerado Health Sys., Inc.* (2003) 114 Cal.App.4th 1108, 1118—expert must offer "reasoned explanation illuminating why the facts have convinced the expert.")" (Id. at pp. 3-4.)

"In addition, Evidence Code section 802 provides that "[a] witness testifying in the form of an opinion may state…the reasons for his opinion and the matter…upon which it is based, unless he is precluded by law from using such reasons or matter as a basis for his opinion….[t]he court in its discretion may require that a witness before testifying in the form of an opinion be first examined concerning the matter upon which his opinion is based." Thus, under Evidence Code section 802, not only may the trial court inquire into the expert's reasons for an opinion, and examine experts concerning the matter on which they base their opinion before admitting their testimony, it may also inquire into whether that material actually supports the expert's reasoning. (*Sargon Enterprises, Inc. v. University of Southern California, supra,* 55 Cal.4th at p. 771.)" (Id. at p. 4.)

"Fractor calculates loss of household services beginning in February 2017 (the date of Weirick's diagnosis) through July 2, 2041. (Weiss Decl., Exhibit A). In calculating loss of household

home[.]" (Id.) The Court of Appeal held that the "estimate, **coupled with the evidence of [decedent's] actual work around the house**, was properly presented for the jury's consideration." (Id. [emphasis added].) Subject to specific objections to specific evidence at trial, Plaintiffs here probably should receive the same opportunity to combine estimate evidence and "actual work" evidence. If Dr. Fractor has not done so, he can be subject to cross-examination on that point.

18

services, Fractor uses the Dollar Value of a Day survey tables,
which he concedes provides benchmark numbers for average adults
performing household services. (Weiss Decl., Exhibit B at 43:25-
44:14). Despite the fact that Fractor was provided Weirick's
deposition testimony, in which she testified regarding the services
she actually performs – and those she does not – Fractor claims that
he could not rely upon the deposition testimony to provide him the
accurate number of hours a person spends performing certain
services. (*Id*. at 44:15-45:11). Fractor admitted that he did not try to
"parse it out at all" and did not determine which services Weirick
actually performed. (*Id.* at 45:21-46:11). Fractor did not take into
consideration the fact that Weirick testified that she has employed a
housekeeper, a gardener and a nanny for some time and prior to her
diagnosis, and he did not consider the testimony where Weirick
actually discussed the amount of cooking, grocery shopping, bill
paying and handyman work that Weirick performed prior to her
diagnosis. (*Id*. at 46:12-48:1). Fractor testified that he simply
provides a benchmark and then lets "the testimony drive that
number at trial." (*Id*. at 46:24-47:1)." (Id. at pp. 4-5.)

"Similarly, Fractor did not take into consideration any of the
testimony that Weirick's spouse gave regarding the services
Weirick's spouse actually performed for the family home. (*Id*. at
47:16-20). Fractor has no opinion as to whether or not Weirick falls
above or below the national average concerning the various
activities that are listed on the Dollar Value of a Day tables, which
he used to prepare his calculations in this case. (*Id*. at 48:2-6)." (Id.
at p. 5.)

"In addition, Dr. Fractor adopts the calculations performed by
Plaintiffs' expert Karen Luckett with regard to damages associated
with household services, and did not verify the accuracy of the
information provided by Luckett nor did he perform his own

investigation or research as to Plaintiffs' household services. Defendants refer the Court to their Motion *in Limine* No. 23, which challenges the foundation for Luckett's opinions in this matter. Accordingly, for the reasons set forth in Motion *in Limine* No. 23, Defendants respectfully request that the Court issue an order precluding Dr. Fractor from adopting the opinions of Karen Luckett." (Id.)

**Plaintiffs contend:**

"Defendants improperly seek to preclude Plaintiffs' economist Dr. David Fractor from providing opinions regarding Plaintiff Carolyn Weirick's loss of household services. First, Defendants' motion should be denied because it is untimely. Dr. Fractor was deposed in this matter on June 1, 2018 and Defendants did not file the instant motion until 19 days later on June 19, 2018, eight days after all motions *in limine* were due to the Court." (Opposition, p. 2.)

"Second, even if this motion is considered by the Court, it should still be denied because Dr. Fractor's opinions regarding loss of household services are admissible under Evidence Code Section 801 and *McKinney v. California Portland Cement Co.* (2002) 96 Cal.App.4th 1214." (Id.)

"The plaintiff seeking recovery has the burden to prove the "reasonable value" of the household services he or she will no longer be able to provide in the future as a result of his injuries and death. That evidence must come from an expert economist. (Evid. Code, section 801(a).)2 Plaintiffs have therefore designated Dr. Fractor to offer opinions regarding, among other things, the value of Carolyn's future household services. Dr. Fractor used the "Dollar Value of a Day"3 to come up with a benchmark number for Carolyn's loss of household services, both past and future. It is a

number that the jury can use, and then based upon the evidence
presented at trial regarding Carolyn's specific household duties and
her inability to perform those duties, evaluate whether Carolyn's
loss is more or less than the number provided by Dr. Fractor." (Id.
at p. 3.)

"Dr. Fractor's valuation of future loss of household services also
includes services that Carolyn would have provided to her children
had she not developed mesothelioma. To prove the reasonable cost
of outside services, plaintiffs asked Life Care Planner Karen
Luckett to prepare a report. Based on Dr. Fractor's review of
Luckett's report, and his conversation with her, Dr. Fractor has
formed opinions regarding the economic value of that component."
(Id.)

"Under California law, an economist may rely only on estimates
derived from statistical data in forming an opinion about loss of
household services. The Court in *McKinney v. California Portland
Cement Co.* held that it was appropriate for Plaintiffs' economist
Dr. Ben-Zion's rely on the Cornell Universe study that analyzed
household services to calculate
Plaintiffs' loss. *McKinney v. California Portland Cement Co.*
(2002) 96 Cal.App.4th 1214, 1229. The Court stated that Dr. Ben-
Zion's use of the study "presented an estimated value of an average
provider's services in the home. This estimate, coupled with the
evidence of Roland McKinney's actual work around the house, was
properly presented for the jury's consideration. (*Id.*) Dr. Ben-Zion
explained at trial that the jury then evaluates the evidence regarding
the particular individual and household duties performed by that
individual, and then decides whether that individual did more or
less than the average and had more than average skills in
determining the value of the services. (*Id.*)" (Id. at pp. 3-4.)

21

|  |  | "Here, Dr. Fractor does exactly what California law allows him to do, relies on a study that provides statistical data regarding household services, comes up with a benchmark for the jury and allows the jury to decide whether Carolyn's services would fall above or below his benchmark number. Defendants fail to acknowledge the law and argue that Dr. Fractor's opinions are speculative and should not be admissible because he did not take into consideration Carolyn's testimony about her inability to perform certain household duties. Striking Dr. Fractor's opinions regarding future loss of household services or limiting the number is not for the judge to decide. It is for the fact finder determine after all of the evidence is presented."  (Id. at p. 4.)

Dr. Fractor may rely on Karen Luckett's report no matter whether it is hearsay.  (See id. at pp. 4-5.)

Dr. Fractor is qualified to testify about a Life Care Plan, and his opinions are relevant to the "household services" component of future economic damages.  (See id. at pp. 5-7.) |  |
|---|---|---|---|

| No. | What to Exclude | Arguments | Ruling |
|---|---|---|---|
| 23 | Opinons and testimony by Plaintiffs' expert Karen Luckett. | During the June 19th conference call, Plaintiffs informed the Court that they would be filing an opposition.  They provided a hard copy to the Court on June 21st.

**Defendants contend:**

"The expert discovery cut-off in this action was May 14, 2018. On February 23, 2018, Plaintiffs designated Karen Luckett as an expert witness, and the parties agreed Ms. Luckett would be deposed on May 14, 2018. Just days before Ms. Luckett's scheduled deposition, however, Plaintiffs unilaterally removed the deposition | **Denied:**

Ms. Luckett's deposition occurred after the discovery cutoff, but the Court declines to exclude her on this ground. Her deposition finished last week, and Defendants were able to question her. Defendants did not suffer prejudice. |

22

from the case's calendar, providing no explanation at the time. Later, Plaintiffs would explain that Ms. Luckett suffered "toxic poisoning" that precluded her from testifying as scheduled. Once her deposition eventually convened, however, Ms. Luckett testified she had been ready and able to testify."  (Motion, p. 3.)

"This feels like game-playing that exceeds even the usual scenario of late-deposed experts. Even so, defendants would not complain for this reason alone. But there is more here than the flouting of deadlines. Defendants eventually deposed Ms. Luckett on May 22, 2018. After that deposition, she dramatically revised her report— and plaintiffs have now offered Ms. Luckett for yet another deposition. So, a late report has been supplanted by an even later one, and a late, still-untaken deposition is meant to supplement her prior, late testimony. Ms. Luckett gets to "fix" her report and her testimony, and defendants—and their reciprocal damages expert— are left to react at the last minute."  (Id.)

"Ms. Luckett is not qualified to opine on life care plans for patients with mesothelioma. Her experience and expertise in life care planning is with plaintiffs who have been diagnosed with orthopedic injuries – not cancers, let alone mesothelioma. Accordingly, many of Ms. Luckett's opinions are speculative and lack foundation. As an example: Ms. Luckett included costs for future medical costs—such as alternative therapies, surgical interventions, and hospitalizations — based solely on her independent research on cancer from the American Cancer Society's website and not in relation to Ms. Weirick's current condition or recommendations from Ms. Weirick's treating physicians."  (Id. at p. 4.)

"Ms. Luckett's opinion regarding the future value of Ms. Weirick's medical services is inadmissible. Ms. Luckett improperly calculated

The Court finds Ms. Luckett qualified to testify.  She is a practicing life-care planner. She has testified in 70 cases, including cases involving personal injuries and products liability, and has never been disqualified.  (See Blumenfeld-James Decl., Ex. A, pp. 8-9.) Markedly, she testified that she agreed with Defendants' standards and methodology (the International Academy of Life Care Planners Standards of Practice) and followed the steps.  (See id. at Ex. A, pp. 220-224.)

Defendants' assertion – Ms. Luckett is unqualified because she hasn't worked on many mesothelioma cases – is unpersuasive.  "[T]here is no requirement that the expert have experience in the particular field of his or her testimony[.]"  (Wegner et al., Cal. Practice Guide:  Civil Trials and Evidence (The Rutter Group 2018) ¶ 8:737.) The expert can testify if he or she shows "a 'special'

Ms. Weirick's future medical damages based on the amounts that providers bill for medical services and equipment, rather than the lesser amounts accepted as full payment." (Id.)

"Ms. Luckett's life care plan includes damages for loss of future household services, which is not a proper element of economic loss pursuant to Civil Code Section 1431.2(b)(1). Compounding this error, Ms. Luckett's calculations are further flawed because she used an average value of all services performed by married homemakers, rather than basing her calculations on the specific, more limited services Ms. Weirick actually performed before her mesothelioma diagnosis. Similarly, Ms. Luckett's life care plan includes costs for Ms. Weirick's children that are simply not recoverable in a personal injury action—such as expenses for her three children to attend college and receive grief counseling and financial planning services. It is well established under California law that there is no right to recovery for loss of parental consortium in a personal injury action." (Id.)

**Plaintiffs contend:**

"Karen Luckett was offered for deposition on May 14, 2018, the last day of expert discovery. (Blumenfeld-James Dec. ¶ 2). However, on May 8, 2018 Ms. Luckett experienced an incident with her car that caused her to inhale toxic fumes that burned her lungs making it hard for her to breath and talk. This made it impossible for Ms. Luckett to finish her work on the case, and sit for deposition on May 14, 2018." (Opposition, p. 2.)

Defendants did not experience prejudice: "In their motion, Defendants make the factual statement that Ms. Luckett's deposition took place after the close of expert discovery. But what they do not state, is how this prejudiced them. The reason for this is

knowledge of the subject matter." (Id.)  In accordance with the International Academy of Life Care Planners Standards of Practice (see Blumenfeld-James Decl., Ex. B, p. 7), Ms. Luckett said she "did research on it and I read the medical records and talked to the doctors for a recommendation." (Id. at Ex. A, pp. 220-224.)

The parties' dispute about the cost of future medical care is a trial issue.  The various manners in which such damages are estimated are normally subject to dispute because of the unsettled nature of the medical marketplace. This matter should be addressed through cross-examination.

As to loss of future household services, which includes loss of services to children, the motion is denied without prejudice to specific objection at trial to particular items.  It would appear that the Plaintiff can recover the value of

simple: It did not. Plaintiffs agreed to take Defendants' economist after Ms. Luckett was deposed. (Blumenfeld-James Dec. ¶ 4). Defendants' expert was on vacation from June 1 until June 18. (*Id.*) As a result, Ms. Dolan has not yet issued her report/opinions. As such, she has had ample time to review the materials and express her opinion. The fact that Ms. Luckett's deposition took place after May 14, 2018, has no prejudicial effects on Defendants." (Id. at p. 3.)

Ms. Luckett is qualified and has never been disqualified as an expert: "Karen Luckett is an experienced life care planner, who followed the normal process of life care planning in this case. Defendants allege that because she has not worked with many cases involving an individual diagnosed with mesothelioma, she is somehow unable to provide an opinion in this case. However, this is not accurate. Life Care Planners, often encounter new injuries or types of care, and are provided with a guideline of how to handle this situation. During her deposition, Ms. Luckett was shown the International Academy of Life Care Planners Standards of Practice by defense counsel. (Blumenfeld-James Dec. Exhibit B). This is the guideline that explains how a life care planner would handle a new situation. And as Ms. Luckett explained, she did exactly that in this case[.]" (Id. at p. 4; see also id. at pp. 5-6.)

Ms. Luckett's opinions regarding the costs of future medical care should be addressed by cross-examination, not exclusion. (See id. at p. 7.)

Plaintiffs are entitled to recover loss of future household services: "the annotated CACI explains that Plaintiffs are entitled to future loss of household services when the injury occurs, which is now. As the Court explained in *Overly v. Ingalls Shipyard, Inc.*, which is cited in CACI: [']Although the parties do not distinguish between

services that she would have provided to her son during her lifetime had there not been the injury alleged.

The Court does grant the motion in part to exclude the claimed damages for the loss of the ability to pay college tuition. Among other things, this represents a double recovery for loss of income. Damages for grief counseling are likewise excluded as they do not appear to be proximately caused by the event at issue. Rather, they are an ineluctable fact of life irrespective of the cause or timing of a parent's death.

the different types of lost years damages that were awarded, we note that lost household services damages, are different than other types of future earnings included in this category. Generally household services damages represent the detriment suffered when injury prevents a person form contributing some or all of his or her customary services to the family unit. The justification for awarding this type of damage as compensated for the value of the services he would have performed during the lost years which, because of the injury, will now have to be performed by someone else.[']"  (Id.)

"Ms. Luckett's opinions regarding Ms. Weirick's children fall under "household services" component of the Ms. Weirick's future economic damages. Plaintiffs' household services include services she contributes to the family unit, and here the family unit includes a three minor children, one of whom is autistic. As stated above, "(g)enerally household services damages represent the detriment suffered when injury prevents a person *from **contributing some or all of his or her customary services to the family unit**. (Overly* at 174 (emphasis added).)"  (Id. at p. 8.)

"While the value of household services can be calculated using statistical data regarding the contributions of an "average" provider, California also recognizes that the economic value of a particular individual's contribution may, on a case-by-case basis, be may be more or less than the average. An expert may rely not just on estimates derived from statistical data but actual, case-specific evidence. (*McKinney v. California Portland Cement Co.* (2002) 96 Cal.App.4th 1214, 1229.) The specifics of this particular case demonstrate that Carolyn Weirick's contribution to her household was substantially greater than the average, and the life care plan supports plaintiffs' ability, through their experts, to meet their burden of proving the reasonable value of all potential loss."  (Id.)

| | | "But for Ms. Weirick's diagnosis with mesothelioma, she would have continued to work to support both her wife and her sons. Her future inability to provide income and other support for the additional costs and expenses associated with her sons was caused by the disease which resulted from defendants' negligence and strict liability. Defendant should not be able to sidestep the peculiarities of this family's situation. Stated otherwise, Carolyn Weirick's family situation is an "eggshell" situation, whereby defendant must take him as they find him and, in this case, they must take the financial burden occasioned by her disease and eventual death." (Id. at pp. 8-9.) | |
|---|---|---|---|

| No. | What to Exclude | Arguments | Ruling |
|---|---|---|---|
| 25 | Opinions and testimony by Plaintiffs' expert William Longo. | **Defendants contend:**<br><br>"Over the last year, Dr. Longo has received 35 containers of purported J&J talcum powder products from various sources, including three different plaintiff law firms. Those law firms obtained these containers from a hodgepodge of sources: some came from unrelated plaintiffs, others came from unidentified "collectors," and still others were purchased on sites like eBay. Most had been opened and used before Dr. Longo received them for testing. Dr. Longo purports to have found trace levels of "asbestos" in 20 out of 35 samples that he tested." (Motion, p. 1.)<br><br>"Dr. Longo's testing of the samples was unreliable at every step and must be excluded. First, Plaintiffs have failed to establish that the samples Dr. Longo analyzed contained the J&J Defendants' talcum powder in its original, unaltered condition. Most of the samples are more than a half-century old, and there is no information about how they were handled or stored before Dr. | **Denied in part; Granted in part:**<br><br>The first issue regards chain of custody. Dr. Longo ultimately tested 35 Johnson & Johnson containers – 32 Baby Powder and three Shower-to-Shower. (See Opposition, p. 7.) Confusingly, portions of the parties' briefs discuss 30 containers while other portions discuss 35.<br><br>Expert testimony about tested samples may be excluded based on a "chain of custody" claim. (See *People v. Catlin* |

27

Longo received them—other than that most had been opened.
There is a real risk that the samples Dr. Longo tested were
contaminated after they were manufactured and sold. This is a
particularly troubling possibility because Dr. Longo identified
richterite—a mineral not known to be present in the talc mines at
issue but present in insulation in the 1970s—in some of the
samples and did not identify amphiboles in any brand new, "off-
the-shelf," sealed samples that he tested. Similarly, because it is
possible for people to refill talcum powder containers, there is a
real risk that the products Dr. Longo tested were not manufactured
by the J&J Defendants at all." (Id.; see also id. at pp. 4-11.)

"In sum, serious chain of custody issues make it impossible to
know whether Dr. Longo was in fact testing the J&J Defendants'
talcum powder in its original, unaltered condition. As a result, his
testing must be excluded, as two other California courts and
additional courts in other jurisdictions have concluded with respect
to similar testing conducted under similar circumstances." (Id. at
pp. 1-2; see also id. at pp. 4-11.)

"Second, Dr. Longo did not adhere to a generally accepted
methodology for identifying asbestos. Dr. Longo performed an
analysis that he admits is incapable of distinguishing between
asbestiform and non-asbestiform fibers—in other words, between
minerals that are asbestos and minerals that are not. Instead, Longo
assumes that the amphibole particles he detected were asbestos
even though the asbestiform varieties of these minerals are
exceedingly rare, and has repeatedly been unable to point to any
support for this assumption. He further assumes, without
foundation and indeed contrary to his findings, that the purported
contamination he identifies is homogeneous throughout the tested
samples." (Id. at p. 2; see also id. at pp. 11-16.)

(2001) 26 Cal.4th 81, 134.) "In
a chain of custody claim,
"'[t]he burden on the party
offering the evidence is to
show to the satisfaction of the
trial court that, taking all the
circumstances into account
including the ease or difficulty
with which the particular
evidence could have been
altered, it is reasonably certain
that there was no alteration. [¶]
The requirement of reasonable
certainty is not met when some
vital link in the chain of
possession is not accounted
for, because then it is as likely
as not that the evidence
analyzed was not the evidence
originally received. Left to
such speculation the court
must exclude the evidence.
[Citations.] Conversely, when
it is the barest speculation that
there was tampering, it is
proper to admit the evidence
and let what doubt remains go
to its weight." [Citations.]'"
(Id.)

In this case, the contamination
alleged is a very low level, so
low that it is detectable only by

"Third, Dr. Longo cannot extrapolate the results of his analysis of the samples to conclude that the talcum powder Ms. Weirick actually used would have been contaminated with asbestos. He conducts no analysis, statistical or otherwise, to reach this conclusion. Dr. Longo is not entitled to simply guess that his test results are applicable to the Johnson's Baby Powder or Shower to Shower actually used by Ms. Weirick. " (Id. at p. 2; see also id. at pp. 16-19.)

"Finally, Dr. Longo has issued multiple reports and supplemental reports in this case, all of which set forth the results of one test method for identifying amphibole particles: TEM analysis. Because Dr. Longo has never referred to any other testing in his reports and deposition, he should be precluded about doing so at trial." (Id. at p. 2; see also id. at pp. 19-20.)

**Chanel contends:**

Chanel filed a separate motion in limine concerning Dr. Longo. It is Chanel's motion in limine no. 29. Chanel contends Dr. Longo should be excluded because (1) he admitted that he never tested a Chanel product, (2) he did not review tests from other labs that detected asbestos in Chanel products, (3) he "had no information about the source of any talc incorporated into Chanel No. 5, including whether Chanel ever sourced its talc from the Vermont mine that many of the samples Dr. Longo tested contained[,]" and (4) "he conceded that asbestos contamination within talc mines is inconsistent and varied." (Chanel MIL No. 29, p. 1.)

**Plaintiffs contend:**

"At least four courts, two in Los Angeles County, California, one in Middlesex County, New Jersey, and one in Darlington County,

the Plaintiffs' experts using electronic microscopes. As such it is necessary that there be some assurance that the sample was free from the possibility of contamination from any number of sources.

Here, the samples came from multiple sources (clients, collectors, and off-the-shelf purchases by the plaintiff firms) and multiple eras (unknown, 1950s, 1960s, 1970s, 1990s, 2000s, and 2010s). Plaintiffs claim "Dr. Longo has chain of custody documentation for each of the 30 [now 35] samples he tested." (Opposition, p. 15.) They cite Dr. Longo's expert report, sections 2, 3, and 4. (See id. at p. 15 n. 66.) These sections contain transport slips that merely identify the person who sent the sample, by UPS or FedEx, and the person who received the delivery. (See Stewart Decl., Ex. A.) The testing charts, similarly, say nothing about chain of custody. (See id. at Ex. 9, pp. 3-4, 9-22.) None of this

South Carolina, have considered and denied Johnson & Johnson's challenges to Dr. Longo's opinions. In the first mesothelioma trial against Johnson & Johnson, Judge Simpson ruled that based on the extensive documentation before him, a 402 hearing was unnecessary and Dr. Longo would be allowed to testify as to his testing of the historical samples. Similarly, Judge Ana Viscomi, in the state court of New Jersey, after hearing Dr. Longo's testimony during a full contested hearing, ordered that 'What the Court found compelling was the testimony of Dr. Longo insofar as he found that by doing the testing, the consistency of the product throughout and some of the tests that he conducted revealed the presence of asbestos. Some did not and so based upon his argument as to the consistency, which the Court found compelling, as to it being an indicia of reliability, the Court finds that it would be appropriate to deny the motion to exclude, allow the testimony, but certainly there are issues that would go to the weight of the evidence.'" (Opposition, p. 1.)

"In South Carolina, Dr. Longo was permitted to testify regarding his analyses of Johnson & Johnson baby powder that included talc from the Vermont mine. The samples about which he was permitted to testify were limited to the Vermont talc due to the plaintiff's exposure occurring only during years in which that talc was incorporated into Johnson's Baby Powder." (Id. at pp. 1-2.) In West Covina, Judge Gloria White-Brown overruled all of Johnson & Johnson's objections to Dr. Longo's testimony in the Anderson trial. Notably, Johnson & Johnson has requested in the alternative a 402 hearing regarding Dr. Longo; in the Anderson case, with Dr. Longo literally waiting in the hall, counsel for Johnson & Johnson waived this request. In the ongoing Brick v. Johnson & Johnson matter, Johnson & Johnson and Plaintiffs' counsel reached an agreement permitting Dr. Longo regarding the exact same testing at issue in the instant Motion." (Id. at pp. 1-2.)

evidence clears up the gap between the manufacture dates and the testing dates. Plaintiffs' showing fails to explain how the samples were stored, repackaged, delivered, etc. (See Opposition, pp. 9-10.)

On this record, under California law, this Court finds Plaintiffs' "chain of custody" showing inadequate. The motion is granted as to the test results for these samples and Dr. Longo's related testimony and opinions. Given the low levels of asbestos to which the Plaintiffs' experts are referring, the samples must have a chain of custody that prevents contamination.

As for Defendants' other arguments, the gatekeeper role of a court "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant

"The substance of Johnson & Johnson's challenge to Dr. Longo in this case is the same as that which has been repeatedly – and unanimously – rejected by every judge who has considered the issue. In fact, the development of additional evidence since the last hearings on this subject have only continued to support and buttress Dr. Longo's work." (Id. at p. 2.)

Dr. Longo's methodology (the Blount method) is recognized and approved. Defendants' experts endorse and use it. (See id. at pp. 3-11.)

The FDA method is inadequate: "Not even the FDA follows the "FDA Method,"58 and neither do Defendants' experts. Firstly, it is misleading to suggest there is an "FDA Method." What Defendants reference here is the test for Absence from Asbestos published by the United States Pharmacopeia (USP), a private standards organization. The current USP test method for asbestos in talc doesn't even require TEM analysis, carries a significant risk of false negatives and the USP panel brought together to modernize the standard says as much.59 Dr. Longo stated that, "the USP...uses IR and...of course infrared analysis is a method that has been discredited many years ago for determining the amount of asbestos in anything, and it's not recognized by anybody, and XRD, of course, has its problems and optical has its problems...But the technique...is not really designed to see the concentrations of trace [asbestos] in the characterizations such as we can do with TEM. Hopefully the USP will be a TEM method because that is the most precise method."" (Id. at p. 11.)

Asbestiform v. non-asbestiform: Defendants accurately point out that Dr. Longo did not attempt to distinguish asbestiform vs. non-asbestiform, referring to the growth habit of the particles he

field." (*Sargon* (2012) 55 Cal.4th 747, 772.) The court should "exclude expert opinion testimony that is (1) based on matter of a type on which an expert may not reasonably rely, (2) based on reasons unsupported by the material on which the expert relies, or (3) speculative." (Id. at 771-72.)

"But courts must also be cautious in excluding expert testimony. The trial court's gatekeeping role does not involve choosing between competing expert opinions. The high court warned that the gatekeeper's focus 'must be solely on principles and methodology, not on the conclusions that they generate.'" (Id. at 772.)

"The court must not weigh an opinion's probative value or substitute its own opinion for the expert's opinion. Rather, the court must simply determine whether the matter relied on can provide a reasonable basis for the opinion or whether that

31

identified. He complied with the EPA/AHERA counting protocol for regulated asbestos fibers.61 As discussed and established in connection with Plaintiff's Motion in Limine #14, no asbestos counting methods require a prerequisite geological finding that a regulated particle is "asbestiform" or not, including AHERA. "Asbestiform" is a commercial geological distinction designed to designate certain asbestos deposits as commercially desirable or not. It has zero relevance to the health hazard of the material." (Id. at p. 12.)

Dr. Longo may rely on "off the shelf" and historical samples: "There are five reasons why Dr. Longo may rely upon the samples he tested. First, as an expert material scientist, Dr. Longo and countless other researchers routinely rely upon historical samples to determine their contents. Second, the samples are what they purport to be: Johnson & Johnson talc with no signs or allegations that they are contaminated or have ever been tampered with. Third, ten samples for which there can be no "authenticity" challenge (off the shelf and client-owned samples) are consistent in every way with the other twenty samples. Another sample was obtained directly from Johnson & Johnson. Fourth, Dr. Longo took an extra step to confirm the uniformity of the samples by running a particle size distribution analysis. Fifth, the results are precisely in line with dozens of Johnson & Johnson's internal tests, third party testing, and admissions." (Id. at p. 15; see also id. at pp. 16-22.)

Experts reasonably rely on "off the shelf" and historical samples. (See id.at pp. 22-24.)

Authentication is unnecessary since Plaintiffs do not seek to introduce the talc ore or historical containers. (See id. at pp. 24-27.)

opinion is based on a leap of logic or conjecture. The court does not resolve scientific controversies. Rather, it conducts a 'circumscribed inquiry' to 'determine whether, as a matter of logic, the studies and information cited by experts adequately support the conclusion that the expert's general theory or technique is valid.'" (Id.)

"If the opinion is based on materials on which the expert may reasonably rely and is grounded in logic flowing from those materials, the opinion should be allowed even when the court or other experts disagree with its conclusion or the methods and materials used to arrive at it." (Wegner et al., Cal. Practice Guide: Civil Trials and Evidence (The Rutter Group 2018) ¶ 11:77.)

Defendants contend Dr. Longo failed to "adhere to a generally accepted methodology for identifying asbestos." (Motion, p. 2.)

| | | California law permits experts to rely on historical samples; and Dr. Longo has adequate foundation to testify about Ms. Weirick's exposures. (See id. at pp. 27-28.)<br><br>Plaintiffs properly disclosed Dr. Longo's SEM analysis. (See id. at p. 29.)<br><br>As to Chanel, Dr. Longo will not testify directly that talc used in Chanel products contained asbestos, but he may answer hypothetical questions that ask him to assume Chanel used Italian talc in Chanel No. 5. He will be able to lay foundation to answer the hypotheticals. (See id. at p. 30.) | Under *Sargon*, the Court is not supposed to pick one scientific method over another; the Court's role, simply, is to determine whether the expert used a recognized, viable method. There is at least some evidence that defendants' experts and consultants have used these methods. (See Opposition, p. 7; see also, e.g., Blumenfeld-James Decl., Ex. 6.) A defense geology expert, Mickey Gunter, said he had no criticism of the "Blount Method." (See id. at Ex. 17, pp. 165-166.)<br><br>Dr. Longo also utilizes scanning electron microscopy ("SEM"). Defendants suggest his SEM findings should be excluded because Plaintiffs failed to disclose his SEM analysis. The Court declines to adopt the argument because Dr. Longo testified about his SEM findings at his deposition, and Defendants cross-examined him. (See Opposition, p. 29; see also |

33

| | | | Blumenfeld-James Decl., Ex. 40.) |
|---|---|---|---|
| | | | Dr. Longo's counting methodology also appears to be a matter of legitimate scientific debate, at least on this record. |
| | | | Accordingly, the motion is denied as to Dr. Longo's methodology, his use of TEM and SEM, and his counting methodology. This is a scientific debate that the Court cannot resolve as a matter of law. |
| | | | Dr. Longo's ability to extrapolate requires different analysis. Dr. Longo's expert report states: "Based on the results of our analysis, it can be stated, that individuals who used Johnson & Johnson's Baby Powder or Valiant Shower to Shower talc products would have, more likely than not, been exposed to fibrous amphibole asbestos. (See Stewart Decl., Ex. A, p. 25.) He reached this opinion by detecting asbestos in 17 of |

| | | | 30 containers. (See id. at Ex. A, pp. 2, 23.) Plaintiffs fail to show how these results provide a reliable means to extrapolate a likelihood of asbestos contamination and exposures above background levels. A 57% positive rate among containers lacking "chain of custody" evidence is a dubious foundation. The opposition papers fail to cure this deficiency. Dr. Longo's extrapolation of general conclusions about the product from these samples is excluded.

Plaintiffs did address Chanel's separate argument, and quoted the foundation for Dr. Longo's opinion that the product contains asbestos. This foundation is inadequate to support the opinion given, and that opinion is excluded. |
|---|---|---|---|

| No. | What to Exclude | Arguments | Ruling |
|---|---|---|---|
| 27 | Opinions and testimony by | Defendants contend: | Denied in part; Granted in part: |

| Plaintiffs' expert Dr. Steven Compton. | Dr. Steven Compton did not test any sample actually used by Ms. Weirick. He tested 13 samples obtained by Alan Seagrave from the Italian mines and 15 samples from the Argonaut mine in Vermont. He intends to testify that the samples contained asbestos. He also intends to testify that (1) all or most talc from the mines contained asbestos, and (2) because of the extensive contamination, the bottles used by Ms. Weirick must have contained asbestos. | Defendants do not assert a "chain of custody" claim. It's undisputed that Dr. Compton received the talc samples from Defendants' experts. |
|---|---|---|
| | His testimony should be excluded because (1) he used an improper methodology that failed to determine whether the fibers he observed constituted asbestiform, and (2) his opinion that all or most talc from the mines contained asbestos is based on speculation and conjecture. His testing of a few samples is insufficient to support this leap. (See Motion, pp. 1-2; see also id. at pp. 4-8.) | Defendants contend Dr. Compton employed an unscientific methodology. They claim he admitted that his methodology "does not distinguish between the asbestos and non-asbestos varieties of the amphibole minerals he identified." |
| | The Court should prohibit Dr. Compton from testifying about Chinese mines and the Hamm and Rainbow Vermont mines because he did not test samples from these sources. (See id. at pp. 8-9.) | (Motion, p. 2.) Defendants say this is a problem "because the EPA and ISO [International Organization for Standardization] methods that Dr. Compton claims to be following make that distinction |
| | **Chanel contends:** | – they define 'asbestos' as the *asbestiform* version of the mineral." (Motion, p. 2.) |
| | Chanel filed a separate motion in limine – Chanel motion in limine no. 30. Chanel contends "[t]here are many issues with Dr. Compton's opinions and anticipated testimony. First, Dr. Compton's methodology was improper, is not generally accepted by the scientific community, and is therefore unreliable. Dr. Compton is also not a geologist with the requisite educational background to opine on the morphology and geological components of the minerals he tested. On those bases alone, Dr. Compton's opinions and testimony attendant to his testing of Italian talc should be excluded from trial. Moreover, specifically as to Chanel, Dr. Compton has no basis to offer any opinions that Chanel | Again, the Court's role under *Sargon* 2012) 55 Cal.4[th] 747 is to determine whether the expert used a recognized, viable scientific method, not to choose one method over another. |

36

No. 5 was contaminated with asbestos. Dr. Compton has only tested Italian talc. He has not tested a Chanel product for this case, despite having one in his very possession. Dr. Compton further testified during his deposition that he does not know the origin of the talc incorporated into any Chanel No. 5, and has not formed the opinion that any Chanel product has ever contained asbestos. Accordingly, even assuming Dr. Compton's findings of asbestos in some of the Italian talc tested are accurate and reliable – which, as will be explained in greater detail below, they are not – there is absolutely no foundation for Plaintiffs to assert that Dr. Compton's testing of Italian talc therefore establishes that the talc incorporated into Chanel No. 5 was necessarily contaminated with asbestos. Just because Dr. Compton allegedly found asbestos in *some* (not all) of the Italian talc samples he tested using unreliable methodologies, does not therefore mean that *all* Italian talc incorporated into talcum powder products were contaminated." (Chanel's Motion, pp. 1-2.)

**Plaintiffs contend:**

"[N]ear the end of 2015, Imerys' lawyers hired two expert geologists/mineralogists (Alan Segrave and Defendants' expert Matthew Sanchez, Ph.D.), provided them a paid trip to Italy, and gave them a tour of the talc mines in Val Chisone/Val Germanasca. Segrave and Sanchez collected samples of talc and associated minerals they considered representative of the Italian-mined talc historically sold by Imerys and its predecessors to Johnson & Johnson and many other talc product manufacturers. Segrave and Sanchez analyzed the samples and submitted reports to Imerys's lawyers, concluding that talc produced from the Italian mines did not now and had never contained asbestos.1 Segrave produced his samples to Plaintiffs' expert Dr. Compton for analysis. Dr.

At this point, this court cannot say that Dr. Compton's methods are so unreliable that the jury should not be able to consider them. This is a matter best demonstrated through oppositional evidence or cross-examination as both parties' experts will be examining essentially the same samples.

Likewise, on this record, the Court cannot determine that Dr. Compton's counting rules are so unreliable that they must be excluded. The appropriateness appears to be the subject of a debate between the parties' witnesses, and an issue for the trier of fact.

At this point, the testing methodology employed by Dr. Compton seems reasonably subject to scientific dispute, and the Court declines to exclude it under *Sargon*.

In summary, the Court denies the motion as to Dr. Compton's methodology and counting methodology.

37

Compton found that 11 of 13 samples did, in fact, contain asbestos." (Opposition, p. 2.)

"Dr. Compton also recently tested 15 samples he received from Dr. Sanchez, initially collected by Johnson & Johnson expert Mickey Gunter from the Argonaut mine in Vermont.3 Dr. Compton detected amphibole fibers in ten of the fifteen samples, including 6 of the 7 talc samples provided. . . . As a preliminary matter, it must be noted that very similar motions against Dr. Compton have been filed in multiple talc trials, and either rejected by the court or waived by the Defendants each time." (Id. at pp. 2-3.)

"In the Herford case tried in October of 2017 in Pasadena in front of Judge C. Edward Simpson, the Court allowed Dr. Compton to testify about his testing of Mr. Segrave's Italian samples: "I think [Dr. Compton] can testify about his tests, what he tested, and I think he might also be able to testify that based upon his tests the mine from which the product was taken contained asbestos." In the recent Anderson trial, Defendant J&J filed a similar motion in limine, but chose not to argue the MIL. Dr. Compton testified regarding his analysis of both the Italian source ore and the Vermont source ore, and was subject to cross-examination regarding these tests. In the Brick matter, currently in trial in Los Angeles County before Judge Stephen Moloney, Defendants J&J and Imerys filed a similar MIL, but an agreement was reached pursuant to which Dr. Compton was permitted to testify regarding his analysis of both Italian and Vermont mine samples. Finally, in the Lyons matter, recently in trial in San Francisco, Defendant Colgate's challenge to Dr. Compton's analysis of the Italian samples (again, the Vermont samples were not at issue) was summarily denied." (Id. at p. 3.)

As to the extrapolation opinions of Dr. Compton, the Court grants the motion based upon the same analysis as contained in Motion in Limine 25. The analysis appears to be a logical leap that cannot be supported by quantitative analysis. Plaintiffs do not appear to oppose this aspect of the motion.

The Court excludes opinions about the content of the actual containers of talc used by Ms. Weirick. Plaintiffs do not appear to oppose this aspect of the motion.

The Court excludes opinions about the Guagxi region of China or the Hamm or Rainbow mines in Vermont. Plaintiffs do not seem to oppose this aspect of the motion.

As with motion 25, there is insufficient foundation for Dr. Compton to testify regarding Chanel's product, and his

| | Dr. Compton utilized accepted scientific testing methods: "J&J has seized upon one sentence taken out of context in the method that Dr. Compton uses from his tests, ISO 10312. They claim that the method cannot distinguish between asbestos and non-asbestos, and therefore is an unreliable method. Their critiques are clearly taken out of context. ISO stands for the International Organization for Standardization, and is one of the primary international organizations that promulgates testing methodology. The title of the particular method that Dr. Compton uses is: "Ambient air - Determination of asbestos fibers- Direct transfer transmission electron microscopy method."16 (Emphasis added) So the method that Defendants vehemently claim cannot ever determine the presence of asbestos fibers was actually created for the explicit purpose of doing just that." (Id. at p. 5.)<br><br>"In addition, the ISO includes this language in the introduction to the method that Dr. Compton utilizes: 'This international Standard is based on transmission electron microscopy, which has adequate resolution to allow detection of small fibers, and is currently the only technique capable of unequivocal identification of the majority of individual fibers of asbestos.'" (Id.)<br><br>Dr. Compton utilized ISO 10312 to analyze the talc samples received from Alan Segrave for the presence of asbestos. While the Defendants lawyers spend several pages of their motion complaining that Dr. Compton "did not apply a scientific methodology to identify asbestos,"19 their retained experts do not share that view. Mickey Gunter, an expert who has been retained in other cosmetic talc cases by J&J, was particularly clear on this point when testifying about Dr. Compton's methodology in analyzing the Italian talc samples: Q. With regard to Dr. Compton's analysis of the samples that he obtained, do you have any criticism of the methodology that he used in doing so? A. Maybe not the | opinions regarding the Chanel product, if any, are excluded. |

methodology, but the results." (Id. at pp. 5-6.) "Dr. Compton
employed the same methodology in analyzing the Vermont
samples, collected by the same Mickey Gunter who endorsed that
method with respect to the Italian samples." (Id. at p. 6.)

Dr. Compton's analysis of samples from the Italian mines is a
reliable basis for his exposure and causation opinions: "Although
Defendants' Motion combines the representativeness of the Italian
talc samples and the Vermont talc samples into one issue, in fact
these are very distinct. Dr. Compton, relying on the type of
materials on which experts in his field typically relies, has an
adequate foundation to opine that the Italian talc samples he
analyzed are representative of the current and past mining output of
the Italian talc mines that provided talc that was incorporated into
Johnson and Johnson talc products, Chanel talc products, and
numerous other brands of talc products. Because he has not
reviewed similar evidence of the representativeness of the Vermont
talc samples, he will not offer any opinions on that issue." (Id. at p.
9.)

"As described above, the Italian talc samples Dr. Compton tested
that form the basis of his report26 were obtained from Italy by Alan
Segrave, a geologist hired by Imerys27 and also retained by Chanel
in this case. Defendants' attorneys criticize Dr. Compton for
extrapolating from the findings based on these samples to the mine
as a whole, both in terms of its presentday and historical
composition. Yet that is exactly what Mr. Segrave, in his report to
Imerys' attorneys, concluded. Segrave described the 'current
mining activity of the Fontane deposit as a homogenous talc
horizon' and, moreover, concluded that 'the talc deposit is
homogenous throughout for past-mined horizons having similar
carbonate purity.'" (Id.)

40

"Mr. Segrave's testimony in a recent deposition makes perfectly clear that the samples he collected (in which Dr. Compton found asbestos, and Mr. Segrave reported none) are representative of all Italian talc ever produced from that mine[.]" (Id. at p. 10.) "Accordingly, Dr. Compton's opinion regarding the asbestos content of the Italian talc mines are based on his own analysis of samples from that mine that, in the stated opinion of Imerys' and Chanel's own retained expert Alan Segarve, are representative of current and historical talc mining. Dr. Compton does not profess to have undertaken any geological analysis of the mine to determine the representativeness of the samples. To the extent that Defendants' attorneys want to impeach the opinion of their own retained witness Alan Segrave, they certainly are free to do so. But under Evidence Code Sec. 801, the stated opinion of Mr. Segrave is "of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates," and Dr. Compton is certainly justified in relying on aspects of the study commissioned and paid for by Imerys. Dr. Compton's testimony should be allowed." (Id. at pp. 10-11.)

Chanel: "In addition to similar methodological criticisms raised by Defendants Imerys and Johnson and Johnson, Chanel also urges exclusion of Dr. Compton's Italian talc opinions because he testified in deposition that "1) he had not conducted any testing on a Chanel product attendant to this case; 2) he did not know the source of talc incorporated into Chanel No. 5; and 3) he had no opinion as to whether Chanel No. 5 has ever been contaminated with asbestos."30 Plaintiffs will not elicit any opinions from Dr. Compton that contradict his deposition testimony, but will ask Dr. Compton hypothetical questions based on the evidence in this case. Specifically, after Dr. Compton was deposed, Chanel's corporate representative Amy Wyatt confirmed in her deposition that Chanel No. 5 body powder used Italian talc until 2010." (Id. at p. 11.)

41

| No. | What to Exclude | Arguments | Ruling |
|-----|-----------------|-----------|--------|
| 28 | Opinions and testimony by Plaintiffs' expert Dr. James Webber. | **Defendants contend:** | **Denied:** |
| | | The Court should exclude Dr. James Webber and his report because he appeared for one day of deposition, the deposition did not finish, and Plaintiffs failed to offer him for another day of deposition before the expert discovery closed. (See Motion, p. 1; see also id. at pp. 2-4.) | Defendants' argument – Dr. Webber should be excluded because he failed to finish his deposition – should be resolved by the time of trial. In his expert report, Dr. |
| | | Dr. Webber intends to testify that, in the 1970s, the cosmetics industry "confounded" the FDA's attempt to "develop a sensitive and reliable method for detecting asbestos in talc[.]" (Id.) His opinion and testimony "about the actions and motivations of the cosmetics industry . . . are not a proper subject for expert testimony." (Id. at p. 1; see also id. at pp. 4-6.) | Webber opines that the talc industry "obstruct[ed]" the FDA's efforts to develop an asbestos-detection method for talc. (Id. at Ex. B, p. 13.) Defendants argue this is an "[im]proper subject for expert |
| | | The Court also should exclude Dr. Webber because he is unqualified to testify about the FDA's interactions with the cosmetics industry in the 1970s. (See id. at pp. 2, 7-8.) | testimony[,]" citing federal district court rulings from New York, Florida, Minnesota, and Pennsylvania. (Motion, p. 1.) |
| | | **Plaintiffs contend:** | "Expert opinion testimony is 'helpful' (and, therefore, |
| | | "Imerys has argued, and intends to argue to the jury, that the FDA has given its talc some seal of approval based on testing of their products and lack of required warnings. However, what Imerys failed to disclose is the genesis of the method used and the cosmetic talc industry's efforts in thwarting development of a sensitive and reliable method. Dr. James Webber – an environmental health scientist, regulator, and microscopist with decades of experience developing methods for the detection of asbestos in materials - is qualified as an expert to provide the jury | 'permissible') where the subject matter is sufficiently beyond the scope of common experience to be of assistance to the trier of fact." (Wegner et al., Cal. Practice Guide: Civil Trials and Evidence (The Rutter Group 2018) ¶ 8:701.) |

an opinion regarding the development of the methods used for detection of asbestos in talc and the cosmetic talc industry's role in confounded regulatory agency efforts as such information is well beyond the common experience of the jury." (Opposition, p. 2.)

All parties had the opportunity to depose Dr. Webber: "Dr. Webber has already given two depositions in this case, with a third day of deposition scheduled for June 11. The first day of his deposition took place on April 6, 2018, with questioning by counsel for Johnson & Johnson. His second day of deposition occurred on May 25, 2018, when he was further questioned by Johnson & Johnson and also by counsel for Imerys. Between these two depositions, Dr. Webber underwent surgery for a complete knee replacement and was medically unavailable to testify.1 Notably, Johnson & Johnson and Imerys both stipulated that their questioning of Dr. Webber was complete as of May 25, 2018, barring any need for follow-up based on testimony elicited by counsel for Chanel in the final session of his deposition.2 Accordingly, as all parties will have had the opportunity to depose Dr. Webber regarding his opinions in this matter and in light of Dr. Webber's medical treatment between deposition sessions, Dr. Webber should not be precluded from testifying based on the incompleteness of his deposition." (Id. at pp. 2-3.)

Dr. Webber is qualified: "Plaintiffs' expert, Dr. James Webber is an environmental health scientist specializing in the measurement and analysis of materials, determining the constituent ingredients in materials, and characterizing those materials and ingredients from a laboratory and public health perspective.3 Dr. Webber's expertise spans over 40 years and includes asbestos research, asbestos analysis, certification of laboratories for asbestos testing and analysis, environmental chemistry, standards and regulation development, aerosol research, and trace metal analysis. (See

"The jury need not be wholly ignorant of the subject matter of the opinion … if that were the test, little expert opinion testimony would ever be heard. Instead, the statute declares that *even if the jury has some knowledge* of the matter, expert opinion may be admitted whenever it would 'assist' the jury." (Id. [emphasis in original].) This is a liberal standard. "Expert opinion testimony is excluded 'only when it would add *nothing at all* to the jury's common fund of information." (Id. at ¶ 8:728 [emphasis in original].)

As to this specific opinion, the Court grants the motion. It is an argumentative viewpoint of an advocate based upon historical events. Dr. Webber may be a helpful witness in authenticating certain historical events. He may even be a witness to some of them. The argument regarding the import of the events is better left to the lawyers.

43

Exhibit A at 1-4.) Dr. Webber has expertise in the analysis of various substances, including asbestos and talc, through the use of various analytical methodologies and equipment including x-ray diffraction (XRD), polarized light microscopy (PLM) phase contrast microscopy (PCM) and transmission electron microscopy (TEM) with selected area electron diffraction (SAED) and Electron Dispersive Spectroscopy (EDS). (Id.) He has conducted analysis for asbestos (measurement, identification, quantification) in thousands of samples of various products and materials in the public and private sector, and trained other technicians to do so as well. (Id.) Dr. Webber received his Ph.D. from the School of Public Health at the State University of New York at Albany in 1999 based on his dissertation A Paleolimnolical Reconstruction of Airborne Asbestos Concentrations in the Fibrous-Talc Region of St. Lawrence County, New York, from 1872 to 1998, relating to asbestos in talc and exposure in the environment as a result.4" (Id. at pp. 3-4.)

"Johnson and Johnson asserts that Dr. Webber is not qualified to offer an opinion regarding the development of "a sensitive and reliable method for detection of asbestos in talc" by the Food & Drug Administration (FDA) (Motion at 4.) What Defendants' fails to note is that Dr. Webber has spent vast majority of his career - 33 years - in the regulatory sphere developing methods for the detection of asbestos in products and materials, water, soil, and air. At the New York State Department of Health, Dr. Webber worked directly with federal regulatory agencies, including the Environmental Protection Agency, in developing methods for detection of asbestos[.]" (Id. at p. 4.) "Indeed, as part of the methods development work Dr. Webber did as a regulator, he specifically developed programs to test the efficacy of these methods, the very same methods being considered by the FDA in

the 1970's6 , upon which he offers an opinion in this case[.]"  (Id.
at p. 5.)

"Dr. Webber has been qualified as an expert regarding asbestos in
talc, methods for detection of asbestos in talc, and industry's role in
shaping and confounding those methods in our California courts as
well as in New Jersey8 and New York9 . This case is no different
and Defendants' has failed to show otherwise. Last year, Dr.
Webber offered the same opinion Defendants' now seek to
preclude in the Polakow matter before the Honorable H. Chester
Horn,10 the Depoian matter before the Honorable Charles F.
Palmer11, and the Blount matter before the Honorable Randolph
Rhoades12."  (Id. at p. 7.)

Dr. Webber's opinions concerning the cosmetic industry's efforts
to "confound" the FDA are a proper subject of expert testimony:
"[E]ven if, as Defendants' argues, the jurors are able to read the
same industry documents and published methods as Dr. Webber,
certainly the intricate details and implications of each analytical
method, their development, significance of the cosmetic talc
industry's involvement in their development, and the consequences
are well beyond "the common knowledge that men of ordinary
education could reach a conclusion as intelligently" as Dr. Webber.
The Polakow, Depoian, and Blount courts agreed that Dr. Webber's
specific opinion Defendants'seek to exclude is "sufficiently beyond
common experience" and "would assist the trier of fact" (See
Exhibits D, I, J & K). Johnson and Johnson offers only nonbinding
opinions from out-of-state courts to support its assertion that our
courts require something other than exclusion only when an
expert's opinion "would add mothing at all to the jury's common
fund of information." (McDonald (1984) 37 Cal.3d at 367)."  (Id. at
p. 10; see also id. at pp. 11-14.)

45

| No. | What to Exclude | Arguments | Ruling |
|-----|-----------------|-----------|--------|
| 29 | Opinions and testimony by Plaintiffs' expert Dr. John Maddox. | **Defendants contend:**<br><br>Dr. John Maddox intends to testify that the Johnson & Johnson and Chanel products used by Ms. Weirick caused her injuries. (See Motion, p. 1.) Dr. Maddox's opinions should be excluded because he relied on Dr. Longo's and Dr. Compton's flawed testing results. Particularly, Dr. Maddox relied on Dr. Longo's and Dr. Compton's unsupported conclusions that all or most talc from the source mines, as well as the finished products Ms. Weirick used, contained asbestos. (See Motion, pp. 1, 4-10.)<br><br>Additionally, Dr. Maddox's opinions ignore the universe of other testing results conducted by universities, government agencies, Defendants, and independent labs. (See id. at p. 10.)<br><br>**Plaintiffs contend:**<br><br>"Defendants falsely assert that Dr. Maddox only relied on the works of Dr. Longo and Dr. Compton for his opinion. This is simply not the case. In his deposition, Dr. Maddox clearly details some of the materials he relies on for his opinion that consumer talcum powders, such as those manufactured by Johnson and Johnson and Chanel, are routinely contaminated with asbestos." (Opposition, p. 3.) "At the start, Dr. Maddox provided a list of reliance articles that support his various opinions." (Id.) "The list is 55 pages, and contains approximately 30 articles are listed in the "Talc" section. Defendants' assertion that Dr. Maddox solely relies on the works of Dr. Longo and Dr. Compton is disingenuous and without support. Dr. Maddox outlines in his reference list all of the articles on which he relies." (Id. at p. 4.) "Furthermore, when asked about specific foundation for Dr. Maddox's opinions | **Denied without prejudice:**<br><br>Dr. Maddox is a pathologist. Defendants seek to exclude him because he relied on Dr. Longo's and Dr. Compton's "flawed testing" and the "inappropriate extrapolations made by Plaintiffs' counsel from the binomial table created by Plaintiffs' statistician, Dr. Lynne Stokes." (Motion, p. 1.)<br><br>Defendants concede Dr. Maddox is qualified to "tell the jury that [] Ms. Weirick has developed mesothelioma." (Id.) But they claim he is unqualified to say whether the relevant Johnson & Johnson and Chanel products contained asbestos. They contend Dr. Longo's and Dr. Compton's reports fail to provide Dr. Maddox sufficient foundation to discuss the "frequency with which [Ms. Weirick's] containers were contaminated, the level of contamination, or that her exposures to these products was a substantial |

46

regarding asbestos content of Johnson and Johnson products and Chanel products, Dr. Maddox cites not just to the work of Dr. Longo and Dr. Compton, but also testing found in defendants' own records, performed by their own consultants, the RJ Lee group[.]" (Id.) "Furthermore, later in his deposition, Dr. Maddox recalled an additional basis for his opinion that Johnson's baby powder had asbestos, the articles by Dr. Blount, an employee of Johnson and Johnson, who published an article regarding asbestos content of Johnson and Johnson products[.]" (Id. at p. 5.) "Finally, Dr. Maddox specifically cites to the paper by Millette, Fitzerald and Gordon paper of 2014[.]" (Id. at p. 6.) "Thus, Dr. Maddox relies on a wide variety of materials as foundation for his opinions in this case, including published scientific and medical literature, corporate documents, testing of source ore, and testing of finished products at issue, all of which are the type of documents upon which an occupational medicine physician may reasonably rely. Dr. Maddox's opinions flow in a reasoned chain of logic from these materials, using appropriate, published methodology." (Id.)

"The issues raised by Defendants in their Motion fall squarely within the realm of vigorous cross-examination, not a 402 hearing. They go to the weight and credibility of evidence (matters for the jury's consideration), rather than admissibility or sufficiency." (Id. at p. 7.) "Specifically, the argument that Dr. Maddox's reliance on the works of Dr. Compton and Dr. Longo cannot be excluded simply because Defendant's have criticisms of certain aspects of them. There is no justification or legal basis to exclude Dr. Maddox's reliance of these studies. Medical experts routinely rely on their testing and the scientific work of others as evidence of what does and does not contain asbestos. Dr. Maddox certainly does not have expertise himself to conduct such testing. As such, it is not at all unusual or out of the norm for a Medical expert to rely on testing of others who have the expertise to undertake such

factor in causing her disease." (Id.)

The Court's rulings exclude some, but not all, of the evidence upon which Dr. Maddox relies. If Dr. Maddox continues to hold the same opinion based on evidence that has not been excluded, then The Trial Court, in its discretion, can decide whether a 402 hearing is necessary regarding whether Dr. Maddox has sufficient independent foundation for his opinion.

| | | testing, to help inform their opinions in the present case." (Id.) "As manufacturers of asbestos-containing talcum powders, Defendants predictably take issue with expert testimony and opinions regarding the contamination of their talc with asbestos. Defendants' challenge to Dr. Maddox's opinions is the proper subject of vigorous cross-examination, governed by Evidence Code sections 761, 767, 773 and 780, and not an evidentiary hearing under Evidence Code section 402." (Id.) | |
|---|---|---|---|

| No. | What to Exclude | Arguments | Ruling |
|---|---|---|---|
| 30 | Opinions and testimony by Plaintiffs' expert Dr. Jacqueline Moline. | **Defendants contend:**<br><br>"Dr. Moline intends to tell the jury that plaintiff Carolyn Weirick ("Ms. Weirick") was exposed to asbestos through her use of Johnson's Baby Powder and Shower to Shower talcum powder ("Johnson's talcum powder products"), and that this exposure was a substantial factor in causing her mesothelioma. However, Dr. Moline admitted that she does not know how much asbestos, if any, Ms. Weirick was allegedly exposed to from her use of Johnson's Baby Powder or Shower to Shower. Thus, Dr. Moline's causation opinion is wholly without basis and should be excluded." (Motion, p. 1.)<br><br>"Defendants anticipate that Dr. Moline may also attempt to tell the jury about the ~50 other plaintiffs in other asbestos litigation who she has concluded developed mesothelioma from exposure to cosmetic talc. Defendants have no information regarding these other plaintiffs, their medical and exposure histories, or their lawsuits (including their allegations of asbestos exposure). Such testimony is not only irrelevant but is highly prejudicial to Defendants and will only result in undue consumption of time and juror confusion." (Id.; see also id. at pp. 3-4.) | **Granted in part. Otherwise denied without prejudice:**<br><br>Defendants contend Dr. Moline should be excluded because she failed to quantify the dose Ms. Weirick inhaled.<br><br>Plaintiff cites to *Davis v. Honeywell* (2012) 245 Cal. App.4th 477, which holds that the "every exposure" theory is a jury question. Such testimony may be admissible, but Dr. Moline cannot go further in arguing that Plaintiff was exposed to a specific quantifiable dose unless she has a basis for doing so. Apparently she does not.<br><br>As with Motion in Limine 29 |

Dr. Moline's opinions lack foundation: "Dr. Moline agrees that asbestos-related mesothelioma is a dose-response disease. (Deposition of Dr. Moline ("Moline Dep."), attached as Exhibit A to Stewart Decl., at 39:15-22.) According to Dr. Moline, only "nontrivial exposures to asbestos" should be considered a substantial factor in the development of mesothelioma. (Id. at 39:23-40:11, 44:22-45:11,) Dr. Moline explained that a "nontrivial exposure" is an exposure "orders of magnitude above background that are associated with increased risk of developing disease." (Id. at 40:12-18.)" (Id. at pp. 1-2.)

"Accordingly, by Dr. Moline's own standard, Ms. Weirick would have to be exposed to a "nontrivial" level of asbestos "orders of magnitude above background" from her use of Johnson's talcum powder products in order for Dr. Moline to consider the Johnson's talcum powder products a substantial factor in the development of her mesothelioma. Yet, Dr. Moline admitted at deposition: [1] She has not done a dose calculation to determine how much asbestos Ms. Weirick may have been exposed to through her use of Johnson's talcum powder products (id. at 224:21-225:5; 229:11-25.); [2] She has not calculated a cumulative asbestos fiber dose for Ms. Weirick from her use of Johnson's talcum powder products (id. at 230:7-10); and [3] She has not done a quantitative analysis with respect to the amount of asbestos she believes Ms. Weirick may have been exposed to through her use of Johnson's talcum powder products (id. at 227:23-228:4; 229:11-25.)" (Id. at pp. 1-2.)

"Dr. Moline clearly has no idea how much asbestos, if any, Ms. Weirick was exposed to from her use of Johnson's talcum powder products Thus, Dr. Moline has absolutely no basis— let alone a reasonable one— on which to opine that Ms. Weirick was exposed to a "nontrivial" amount of asbestos "orders of magnitude above

Plaintiffs and Dr. Moline must verify that she is able to testify to a reasonable degree of scientific certainty without reliance upon the evidence excluded by this Court. Plaintiffs state that there is enough evidence to establish exposure to asbestos through use of the product. The trial court can decide whether that is so.

Dr. Molina's testimony about asbestos fibers appears to be the subject of the same debate that is occurring between other expert witnesses. The Court is not prepared to take sides by excluding Plaintiffs' evidence at this point.

Dr. Molina's testimony about the specifics of other asbestos cases is excluded.

background" from her use of Johnson's talcum powder products. Dr. Moline likewise has zero basis on which to opine Ms. Weirick's use of Johnson's talcum powder products was a substantial factor in the development of her mesothelioma. Dr. Moline's causation opinion is entirely lacking in foundation and purely speculative. Dr. Moline's causation opinion is guesswork—not science. Accordingly, Dr. Moline's causation opinion must be excluded pursuant to the standards set forth in Sargon." (Id. at p. 2.)

"In addition, Dr. Moline should not be allowed to rely on the binomial spreadsheet prepared by Plaintiffs' statistical expert, Dr. Stokes, to opine about the probability of Ms. Weirick's exposure. (Exh. A to Stewart Decl. (Moline Dep.), at 227:23-230:25.) Dr. Moline is not an expert in statistics. (Id. at 141:11-13.) All she did was review an affidavit of Dr. Stokes' opinions. She never spoke to Dr. Stokes nor did she ever review Dr. Stokes' deposition testimony. (Id. at 198:16-199:23.) She is also unqualified to conduct her own statistical probability analyses. (Id. at 141:11-13.) She should, therefore, be precluded from offering any opinion about the probability of Ms. Weirick being exposed to asbestos-contaminated talcum powder or the statistics underlying such an analysis." (Id. at pp. 2-3.)

**Chanel contends:**

"Plaintiffs allege that Plaintiff Carolyn Weirick ("Weirick") was diagnosed with mesothelioma, a cancer in the lining of her lung, after having allegedly breathed asbestos fibers through her use and general presence around talcum powder products allegedly contaminated with asbestos. As against Chanel, Plaintiffs allege that Chanel No. 5 After Bath Powder ("Chanel No. 5) has, at some point, been contaminated with asbestos, and that Weirick's mother

occasionally applied Chanel No. 5 in Weirick's presence, thereby potentially exposing Weirick to asbestos fibers." (Chanel Motion, p. 1.)

"Dr. Moline is an Occupational Medicine Specialist, retained by Plaintiffs to offer opinions in this matter. It is anticipated the Dr. Moline will be offered at trial to opine that 1) Weirick's presence around her mother while she applied Chanel No. 5 resulted in exposure to asbestos, such that it was a substantial factor in causing Weirick's mesothelioma; 2) asbestos fibers shorter than 5 microns in length can be carcinogenic; and 3) nonasbestiform fibers can cause mesothelioma. However, Dr. Moline's opinions on these subjects are lacking in foundation and should be excluded:

- "Dr. Moline is not aware of any testing conducting on Chanel talcum powderproducts, does not know who supplied talc to Chanel, or which mines the talc in Chanel No. 5 was sourced from (other than through a representation made by Plaintiffs' counsel that Chanel used Italian talc).

- "Dr. Moline's belief that asbestos fibers shorter than 5 microns in length can be carcinogenic is not a generally accepted opinion in the medical or scientific community and is based on a study merely identifying asbestos fibers in the pleura; importantly, the presence of asbestos fibers only identify exposure to asbestos – which everyone experiences through background levels of asbestos – not causation.

- "The basis for Dr. Moline's opinion as to nonasbestiform fibers potentially causing mesothelioma is irrelevant, unsubstantiated, and unreliable." (Id. at pp. 1-2.)

**Plaintiffs contend:**

"Defendant's move to preclude Dr. Moline from opining that Mrs. Weirick's exposure to Johnson's Baby Powder, Shower to Shower and Chanel No. 5 After Bath Powder caused or contributed to her disease. At the outset it must be brought to the Court's attention that Dr. Moline's opinions regarding these issues have never been excluded or limited by any Court to Plaintiffs' knowledge. She has testified for many years, across the country, and despite having motions such as the ones filed here, filed in many cases, they have not, to plaintiffs' knowledge been granted. If Dr. Moline's opinions had been excluded in the past Defendants would have attached said orders to their motions. Notably Dr. Moline testified in several recent cases involving Johnson's Baby Powder exposure including the Stephen Lanzo case in New Jersey, the Joanne Anderson case here in Los Angeles, and in the Ilene Brick case here in Los Angeles. Dr. Moline's opinions in this case are not new or novel, or unusual in any way, but are consistent is testimony that has been admitted all over the country for many years." (Opposition, p. 2.)

"Specifically addressing Defendants' motions, talc-containing Johnson's Baby Powder and Shower to Shower powder contains asbestos and has for decades. Chanel has also sold asbestos-containing Chanel No. 5 After Bath Powder for decades. The evidence to be presented at this trial, in the form of expert testimony, historical testing results, internal Johnson & Johnson documents, testing of ore sources, and corporate representative testimony, will overwhelmingly establish the fact that Johnson's Baby Powder, Shower to Shower, and Chanel No. 5 After Bath Powder contained asbestos for decades." (Id.)

"In light of the clear evidence of asbestos content in Defendants' products, Dr. Moline holds the opinion that Mrs. Weirick's decades-long use of Johnson & Johnson baby powder and Shower

52

to Shower exposed her to significant amounts of asbestos and substantially contributed to cause her mesothelioma. Dr. Moline also holds the opinion that Mrs. Weirick's mother's use of Chanel No. 5 After Bath Powder, also caused Mrs. Weirick be exposed to significant amounts of asbestos and substantially contributed to cause her mesothelioma." (Id.)

Dr. Moline relied on reliable materials – Dr. Longo's report, Dr. Compton's report, Dr. Stokes's statistical analysis, Dr. Alice Blount's work, corporate documents, historical tests, etc. (See id. at pp. 4-10.)

Dr. Molines is not required to identify a numerical dose of exposure: "Defendants seem to be arguing that Dr. Moline has testified that in order to reach a causation opinion she must first (a) perform a dose calculation to determine how much asbestos Ms. Weirick may have been exposed to (b) calculate a cumulative asbestos fiber dose for Mrs. Weirick for her use of Johnson's talcum products, and finally (c) a quantitative analysis with respect to the amount of asbestos she believes Mrs. Weirick may have been exposed to through her use of Johnson's talcum powder products. No case, and no testimony by Dr. Moline, supports this conclusion. In fact, the court in Davis v. Honeywell, 245 Cal. App. 4th 477 (2012), held that California law does not require any quantification of dose in order to establish causation in a mesothelioma case." (Id. at p. 10.)

Dr. Moline should be allowed to testify about other mesothelioma plaintiffs: "The issues raised by Defendants in their Motion fall squarely within the realm of vigorous cross-examination, not a 402 hearing. They go to the weight and credibility of evidence (matters for the jury's consideration), rather than admissibility or sufficiency." (Id. at p. 13.) "Specifically, the argument that Dr.

53

Moline's examination of ~50 other people diagnosed with mesothelioma for which talcum powder was a cause cannot be excluded simply because those individuals had legal cases. There is no justification for such a position; no legal basis to exclude this information that Dr. Moline properly relies upon to help inform her opinion in this case. Medical experts routinely rely on their experience and training when giving testimony in front of a jury. It is not at all unusual or out of the norm for a Medical expert to rely on other patients or cases they have seen and evaluated (whether in litigation or not) to help inform their opinions in the present case. As a manufacturer asbestos-containing talcum powder, the Defendants predictably take issue with expert testimony and opinions regarding the contamination of their talc with asbestos. Defendants' challenge to Dr. Moline's opinions is the proper subject of vigorous cross-examination, governed by Evidence Code sections 761, 767, 773 and 780, and not an evidentiary hearing under Evidence Code section 402." (Id.)

Dr. Moline has foundation to opine concerning the asbestos content of Chanel No. 5 After Bath Powder. (See id. at pp. 13-16.)

Dr. Moline should be allowed to testify regarding asbestos fibers shorter than five microns and the distinction between asbestiform and non-asbestiform. (See id. at pp. 16-19.)

Exhibit 26



**ATLANTA**
Corporate Headquarters
3945 Lakefield Court
Suwanee, GA 30024
(770) 866-3200   FAX (770) 866-3259

# The Analysis of Johnson & Johnson's Historical Product Containers and Imerys' Historical Railroad Car Samples from the 1960's to the Early 2000's for Amphibole Asbestos

## 2nd Supplemental Report



Anthophyllite Bundle 1967

**William E. Longo, Ph.D.**

**Mark W. Rigler, Ph.D.**

**Materials Analytical Services, LLC**
**3945 Lakefield Court**
**Suwanee, GA 30024**

**February 1, 2019**

**ATLANTA**
Corporate Headquarters
3945 Lakefield Court
Suwanee, GA 30024
(770) 866-3200   FAX (770) 866-3259



## The Analysis of Johnson & Johnson's Historical Product Containers and Imerys' Historical Railroad Car Samples from the 1960's to the Early 2000's for Amphibole Asbestos

## Supplemental Report

This supplemental report contains the following new information obtained by MAS:

1. In the previous reports, Lee Poye STS samples 20180061-31F (STS 065) and 20180061-31G (STS 065) was assumed to be two samples from the same J&J container STS 065. This assumption was based on that both samples had the same J&J container I.D. of STS 065. Recently we examined container photographs of STS 065 and discovered that the J&J I.D. STS 065 was for two containers in a single package. The 31F sample is for a white STS "Regular" container and for sample 31G,"peach color" STS container that has a "SPICE" label at the top of the container. This new information changed the total number of containers/samples analyzed from 71 to 72 and the total positive samples from 49 to 50. This report was corrected to reflect this information.
2. Correct typographical errors and editing for clarification.
3. This 2nd Supplement Report does not contain any new analytical data.

## Overview

### Historical J&J Containers

This 2nd supplemental report describes the procedures and methodology used by both MAS and J[3] Resources Inc. to analyze 72 separate historical containers and samples of Johnson & Johnson's (J&J) Baby Powder (JBP), Shower to Shower (STS) and Imerys' railroad car cosmetic talcum powder for the possible presence of amphibole asbestos. The J&J and Imerys' containers and samples analyzed for this report were all supplied by both J&J and Imerys from their historical inventory.

The 72 J&J and Imerys-supplied historical cosmetic talcum powder containers/samples analyzed for this report, were chosen from the 1960's, 1970's, 1980's, 1990's and early 2000's.

The 72 product sample set consisted of 57 JBP (with Asian)/STS containers, and 15 historical Imerys' samples that were described as "railroad car" samples. The source of the talcum powder for these historical JBP/STS and Imerys containers/samples came from both the Italian

**ATLANTA**
Corporate Headquarters
3945 Lakefield Court
Suwanee, GA 30024
(770) 866-3200   FAX (770) 866-3259



(1960's, JBP/STS and Vermont (1960's, 1970's, 1980's, 1990's, early 2000) talc mines.  Included in this report are seven Asian Historical JBP samples that MAS analyzed from possibly only the 1980's. The source of the talc that J&J used for these historical Asian samples was from the Dongyang talc mine in Korea.

Of the 57 Historical JBP/STS containers reported here, 34 were JBP (with Asian) and 23 were STS.

**Historical Imerys Samples**

The additional 15 historical Imerys-supplied railroad car samples incorporated into this supplemental report were chosen from 1989, the 1990's and the early 2000's.

The addition of 15 Imerys' samples brings the total number of both historical containers (JBP/STS) and historical samples (Imerys) that MAS has now analyzed for the MDL to 72.  This is in addition to the 35 JBP/STS containers (March 11, 2018 Supplemental Report) that were supplied by both plaintiffs' counsel and MAS.

This now would bring the total number of J&J/Imerys cosmetic talcum powder samples analyzed by MAS to 107.

**J³ and MAS' Analysis of Historical STS Samples**

Of the 57 historical JBP/STS talcum powder containers that were analyzed and reported here, 41 JBP (with Asian)/STS containers were analyzed by MAS and 16 STS containers (MAS verified by ATEM & PLM) were previously analyzed by Lee Poye of J³ Resources Inc., located in Houston, Texas.

For the Lee Poye ATEM analysis, initially MAS was unable to verify the results of two J³ ATEM STS sample analyses (20180061-63D and 20180061-10D).  Both of these samples were reported to contain one asbestos anthophyllite structure in each.  These two STS samples were not reported in our November 11, 2018 Supplemental Report since we could not verify if they were either positive or negative for amphibole asbestos.

Since the November 11, 2018 report, MAS has received the 16 STS samples (16 containers) from Lee Poye and has analyzed all of these samples by the PLM/Blount method.  The two STS samples (20180061-63D and 20180061-10D) that MAS could not verify by ATEM, were positive for regulated amphibole by the Blount/PLM method.

The two STS containers positive for amphibole asbestos are now included into this supplemental report.  Our November 11, 2018 expert report provided analysis of 55 historical J&J product containers, and with the addition of these two now verified (Lee Poye STS product

Page **3** of **56**

**ATLANTA**
Corporate Headquarters
3945 Lakefield Court
Suwanee, GA 30024
(770) 866-3200   FAX (770) 866-3259



containers 20180061-63D and 20180061-10D), this 2nd supplemental report is now providing the analytical results for 57 historical JBP/STS containers.

Also, when MAS analyzed five J[3] ATEM non-detect STS samples by the Blount/PLM method, four of these five J[3] ATEM non-detects were found to be positive for amphibole asbestos by the Blount/PLM method.  The one remaining ATEM non-detect J[3] STS sample (20180061-02D), was also found to be a non-detect for asbestos by the PLM/Blount method.

As described in our November 11, 2018 report, MAS sent a number of the historical J&J samples to J[3] Resources for both PLM and XRD analysis using the ISO 22262-1 and ISO 22262-3 protocols. For this supplemental report, 19 additional historical J&J samples (18 containers) (M69042, M69248 and M68233) were sent to Lee Poye for XRD analysis using the ISO 22262-3 method.

**Cosmetic Talc Analytical Methods**

The three principle analytical methods used by both J[3] and MAS for the analysis of the 57 J&J cosmetic talc containers were X-ray diffraction (XRD), polarized light microscopy (PLM) and analytical transmission electron microscopy (ATEM).  For the 15 individual historical Imerys' railroad car samples, were only analyzed by the PLM (ISO & Blount) and ATEM methods.  The Imerys' railroad car samples were not analyzed by XRD.  The reasons for this will be discussed later in this report.

The three analytical methods used in this report all have strengths and weaknesses where it is expected, that amount of amphibole asbestos content would be at or below 0.1 wt. %.

**XRD**

For cosmetic talc the XRD has the advantage of analyzing very large samples as compared to either PLM or ATEM.  The disadvantages are 1) poor analytical sensitivity for bulk cosmetic talc samples when the potential amphibole asbestos concentration is typically below 0.1 to 0.3 weight % (wt.%), and 2) XRD cannot determine the crystalline habit  (fibrous vs. non-fibrous) of amphibole minerals.  However, for the majority these samples, XRD (ISO 22263-3) was used so that a comparison of the results to both PLM and ATEM analysis could be made in this report.

Page **4** of **56**

**ATLANTA**
Corporate Headquarters
3945 Lakefield Court
Suwanee, GA 30024
(770) 866-3200   FAX (770) 866-3259



**PLM**

The PLM method is primarily used today for the analysis of asbestos-added products where the asbestos-content of these products are typically over 1 % by weight.[1,2,3]

The strengths of the method are that it can positively identify the different regulated asbestos mineral types and provide a qualitative estimate of the weight percent of asbestos. The primary weaknesses of the method are 1) analytical sensitivity issues for samples that may contain less than 0.1 wt. % of asbestos such as cosmetic talcs and 2) because asbestos fiber and bundle structure resolution in the PLM method is dependent on the wave length of light, asbestos particles must be at least 0.5 µm in the smallest dimension to be visible. Interesting enough, Dr. Walter McCrone stated: "*I have never seen rolled talc plates as fibers*" page 44, 3rd paragraph. For these analysis the ISO 22262-1 PLM method was used.

**ATEM**

It is well recognized that the use of an analytical transmission electron microscope (ATEM) is the only analytical method with the appropriate sensitivity for the analysis of trace mineral concentrations that can be much less than 0.01 wt. %.

ATEM Strengths are: 1) it can positively identify potential fibrous chrysotile and amphibole asbestos structures by energy dispersive X-ray analysis (EDXA) for mineral fiber chemistry and crystalline structure information by selective area electron diffraction (SAED) and 2) The ATEM provides good morphology information that can, in most cases, distinguish between single fibers and bundles of regulated asbestos fibers.

The primary weakness for ATEM analyses of amphibole asbestos in cosmetic talcs is the sample preparation where overloading issues with the talc particles affects the analytical sensitivity of typical ATEM sample preparation procedures. Increasing analytical sensitivity usually involves the examination of hundreds of TEM grid openings and requires significant hours of TEM instrumentation time. Also, the ATEM is typically biased against detecting very large asbestos bundles that are routinely found by PLM.

---

[1] ISO 22262-1: 2012E Air Quality Bulk Materials Part 1: Sampling and Qualitative Determination of Asbestos in Commercial Buk Samples.
[2] The Asbestos Particle Atlas, Dr. Walter C. McCrone, Director McCrone Research Institute, Ann Arbor Science, 1980.
[3] EPA/600/R-93/116.

Page **5** of **56**

**ATLANTA**
Corporate Headquarters
3945 Lakefield Court
Suwanee, GA 30024
(770) 866-3200   FAX (770) 866-3259



### Heavy Liquid Separation: PLM and ATEM Method

The concern over analytical sensitivity for amphibole asbestos in cosmetic grade talc was first published in the peer-reviewed literature by A. M. Blount.[4,5] It was estimated by Dr. Blount that for every 1,000 amphibole particles present there would be approximately 1,000,000 talc particles.  To overcome this problem the author described the use of a heavy liquid density separation method that reduced the number of talc particles as compared to the potential presence of amphibole asbestos thereby increasing analytical sensitivity for the PLM analysis of the talc samples.

In addition to increasing the analytical sensitivity of the PLM analysis for cosmetic grade talc using the heavy liquid separation method as published by Blount, the heavy liquid separation method can also be used to substantially increase the analytical sensitivity of the ATEM analysis of cosmetic talc samples as described in the ISO 22262-2 bulk materials method.[6]

Reducing the amount of talc increases the sensitivity of the ATEM analysis and it also increases the amphibole sensitivity by the ATEM method.  It would also increase the efficiency of the analyst by eliminating the need to examine hundreds of TEM grid openings to achieve reasonable analytical sensitivity.

References for the use of heavy liquid density separation of cosmetic talc during the sample preparation stage was described first by Dr. Fred Pooley in 1971, the Colorado School of Mines Research Institute in 1973 and by Windsor Minerals, Inc., Dartmouth College in 1974.[7, 8,9]

---

[4] A.M. Blount "Amphibole Content of Cosmetic and Pharmaceutical Talcs", Environ. Health Perspectives, Vol. 94, 1991, pp. 225-230.

[5] Process Mineralogy IX: The Minerals, Metals and Materials Society, 1990, A.M. Blount "Detection and Quantification of Asbestos and Other Trace Minerals in Powdered Industrial-Mineral Samples", pp. 557-570.

[6] ISO 22262-2: 2014E Air Quality-Bulk Materials Part 2: Quantitative Determination of Asbestos by Gravimetric and Microscopical Methods.

[7] March, 1974: to Windsor Minerals, Inc., Windsor, Vermont from R.C. Reynolds, Jr., Department of Earth Sciences, Dartmouth College, Hanover, New Hampshire: "Analysis of Talc Products and Ores for Asbestiform Amphiboles".

[8] Research and Engineering Center, August 11, 1971 Memo to File. FDA Meeting-Asbestos in Cosmetic Talc, August 3, 1971-Washington, D.C.

[9] Colorado School of Mines Research Institute "A Procedure to Examine Talc for the Presence of Chrysotile and Tremolite-Actionlite Fibers".

**ATLANTA**
Corporate Headquarters
3945 Lakefield Court
Suwanee, GA 30024
(770) 866-3200   FAX (770) 866-3259



**Over All Summary of Results**

**J&J and Imerys**

The 57 JBP/STS containers (including the 7 historical Asian JBP containers) and the 15 individual Imerys' railroad car samples gives a total of 72 historical containers/samples that were incorporated into this supplemental report.

A summary of these results are as follows;

1.  The analysis of 34 historical JBP (with Asian) containers found that 24 were positive or 71 % positive.
2.  The analysis of 23 historical STS containers found that 18 were positive or 78 % positive.
3.  The analysis of 15 individual Imerys' railroad car samples found that 8 were positive or 53 % positive.

Excluding the seven JBP Asian historical containers would then give a total of 65 JBP/STS & Imerys' containers/railroad car samples analyzed; 44 were positive (68 %) for amphibole asbestos.

A summary of the results excluding the Asian JBP containers:

1.  27 historical JBP container analyses; 18 were positive or 67 % positive.
2.  23 historical STS container analyses; 18 were positive or 78 % positive.
3.  15 individual Imerys' railroad car samples; 8 were positive or 53 % positive.

**XRD**

All 50 JBP/STS (Italian and Vermont talc mine source) talcum powder samples analyzed by XRD were found to be negative or non-detect by this method.  Of the seven Asian JBP containers analyzed, two were positive and one sample was inconclusive.   The 15 Imerys' railroad car samples were not analyzed XRD.

**PLM**

When 56 of the JBP/STS containers and Imerys samples were analyzed by MAS using PLM (ISO 22262-1) method (no heavy liquid density separation), 18 of the samples were positive for regulated amphibole asbestos or 32 % positive.

**ATLANTA**
Corporate Headquarters
3945 Lakefield Court
Suwanee, GA 30024
(770) 866-3200   FAX (770) 866-3259



The Blount/PLM heavy density method found that out of the 72 JBP/STS and Imerys' containers/samples analyzed, 41 or 57 %, were positive for regulated amphibole asbestos.

For the ISO PLM method the amount of asbestos found for the positive samples were all <0.1 %.  The Blount PLM method the amount of asbestos found ranged from <0.1 % to 0.7 %.

**ATEM**

The ISO 22262-2 ATEM (MAS and Lee Poye verified) analysis showed that in 70 JBP (With Asian)/STS and Imerys' railroad car talcum powder samples, 42 or 60 %, contained detectable amounts of amphibole asbestos fibers and bundles (tremolite solid solution series and or anthophyllite solid solution series). Neither chrysotile nor anthophyllite without iron was detected in any of the ATEM samples.

By ATEM, the amphibole asbestos concentration for the 42 positive JBP/STS and Imerys talcum powder samples ranged from between 4,370 fibers-bundles/gram to 268,000 fibers-bundles/gram of talcum powder.

All of analysis (PLM, Blount/PLM and ATEM), 50 (69 %) of the 72 container/samples were positive for regulated amphibole asbestos.

Two different regulated amphibole asbestos types were found.  These were the tremolite asbestos solid solution series amphiboles which includes tremolite, winchite, richterite, and actinolite (only tremolite was detected by ATEM) and the anthophyllite asbestos solid solution series that includes anthophyllite, iron-rich anthophyllite, ferro-anthophyllite, cummingtonite and grunerite.  Only iron-rich anthophyllite solid solution series asbestos structures were detected.

As expected, no anthophyllite asbestos (without iron) or chrysotile fibers/bundles were found in any of the 42 positive J&J  talcum powder samples we analyzed by ATEM.  A more detailed explanation for the lack of anthophyllite (without) iron or chrysotile fiber findings can be found in the Discussion and Conclusion Section of this report.

**Fibrous Talc MAS Analysis**

In addition to tremolite series and anthophyllite series amphibole asbestos, 42 of the 57 JBP (with Asian)/STS and Imerys' talcum powder samples analyzed by ATEM were observed to contain fibrous talc.  A semi-quantitative calculation for the amount fibrous talc for each of the positive ATEM samples was also done.  The concentration for each of the fiber talc positive ATEM samples ranged from 290,000 talc fibers per gram to 1,020,000 talc fibers per gram of product.

Page **8** of **56**

**ATLANTA**
Corporate Headquarters
3945 Lakefield Court
Suwanee, GA 30024
(770) 866-3200   FAX (770) 866-3259



The 16 J³ ATEM container analysis did not provide enough information to perform a semi-quantitative fibrous talc calculation, and therefore, was reported as not applicable (NA).

The ISO 22262-1 PLM method found that for the 56 Italian, Vermont and China sourced talc containers/samples analyzed by MAS, 55 (98 %) contained fibrous talc. The Blount/PLM method showed that of 72 analyzed, 20 (28 %) contained fibrous talc.

## Materials and Methods

### Sample Log-In Procedure

The JBP/STS and Imerys' talcum powder samples that were analyzed by MAS for this report were provided by both Johnson & Johnson and Imerys from their historical sample depository.  The J&J historical samples were received by MAS in four separate sets and logged into MAS' sample tracking system and assigned to MAS project numbers as follows; **M68233**, two samples received at MAS on February 9, 2018. **M68503**, 75 samples received at MAS on March 29, 2018. **M69042**, 10 samples received at MAS on July 17, 2018 and **M69248**, seven Asian samples received at MAS on August 21, 2018. The Imerys historical samples were received by MAS in two separate sets and logged into MAS' sample tracking system and were assigned MAS project numbers as follows; **M69751**, 43 samples received at MAS on 12/7/2018 and **M69757**, 37 samples were received at MAS on 12/10/2018.


### ISO-22262-1 and 3 PLM/XRD (J³ Resources)

On June 1, 2018, 75 J&J sample splits from M68503 and four spiked samples (tremolite and anthophyllite asbestos) were sent to Lee Poye for PLM and XRD analysis by ISO 22262-1 and 3.

On November 28, 2018, 10 sample splits from M69042, seven sample splits from M69248 (Asian JBP Containers), and four spiked samples (tremolite and anthophyllite asbestos) were sent to Lee Poye for XRD analysis by ISO 22262-3.  The results were provided to MAS from J³ in a December 12, 2018 report and the data was added to this supplemental report.

On December 12, 2018, two sample splits from project M68233 were sent to Lee Poye for XRD analysis.

The results were provided to MAS from J³ in a December 20, 2018 report and the data was added to this supplemental report.

### Muffle Furnace

Approximately 1 to 2 grams (Sartorius Research Balance) of the 72 talcum powder samples was removed from each of the JBP/STS containers and Imerys samples and placed in a 15 ml glass

**ATLANTA**
Corporate Headquarters
3945 Lakefield Court
Suwanee, GA 30024
(770) 866-3200   FAX (770) 866-3259



scintillation vials. The scintillation vials were then placed in a Fisher Scientific Iso-temp muffle furnace Model #650 at 400°F for a minimum of 4 hours to remove any organic material.

## ISO-22262-1 PLM (MAS)

Approximately 60 to 100 milligrams each of the 56 talcum powder samples were analyzed by the ISO 22262-1 PLM method.  Three mounts of the talcum powder sample are placed on two glass slides, a drop of the 1.605 refractive index fluid was placed onto each of the three talcum powder mounts, stirred with the point of a scalpel blade, and then covered with an 18 x 18 mm glass cover slip.  The entire area of the three coverslip mounts were examined (972 mm$^2$). Positive identification of amphibole asbestos was done by morphology, refractive indices, elongation, angle of extinction, and birefringence.  For positive samples, a visual estimation of the quantity of asbestos observed was based on eye calibration through review of lab generated weight percent standards.  Visual calibration was augmented by the use of area percent charts.

## PLM/Blount Method

Approximately 60 to 100 mg (Sartorius Research Balance) from each of the 72 JBP/STS and Imerys' muffled talcum powder sample aliquots were placed into individual labeled Eppendorf micro-centrifuge tubes (MCT) (Premium 1.5mL MCT Graduated Tubes Cat. No. 05-408-12).

## Density Separation

Approximately 1.2 ml of Heavy Liquid (Lithium heteropolytungstates solution, GeoLiquids, Inc., Cat. No. LST010 with a stated density 2.85 g/cc diluted with distilled water to a density of 2.810 (determined by a VWR Hydrometer model number 34620-1109) was added to the MCT containing the 100 mg of the JBP/STS and Imerys' talcum powder samples and mixed with a disposable mixing rod for 10 to 20 seconds. The combined talc and LST heavy liquid (density 2.810 grams/cc) samples were placed into a vacuum desiccator (JEOL EMDSC-U10A) to remove air bubbles for 3 minutes at a pressure of approximately 8 Torr prior to centrifugation.

The MCT sample tubes were then placed in an Eppendorf micro-centrifuge (Model No. 5415D) set at 7,000 RPM for a total of 10 minutes at room temperature.  After removal of the MCT tubes from the centrifuge, the talc/heavy liquid was pipetted off from the top of the centrifuge tube, distilled water was added, mixed and the sample was re-centrifuged as described above. This step was repeated two more times.  After the third centrifugation/heavy liquid removal step, the heavy particles were removed from the bottom of the centrifuge tube with a pipette with several drops of water containing the heavy particles then transferred to a glass

**ATLANTA**
Corporate Headquarters
3945 Lakefield Court
Suwanee, GA 30024
(770) 866-3200   FAX (770) 866-3259



microscope slide and allowed to dry.  The heavy particle residue on the glass slide was then analyzed by the ISO 22262-01 PLM method.

## ATEM-ISO 22262-2 TEM Sample Preparation

### Density Separation

Approximately 20 to 60 mg (Sartorius Research Balance) from the muffled talc sample aliquot was placed into a labeled Eppendorf micro-centrifuge tube (MCT) (Premium 1.5mL MCT Graduated Tubes Cat. No. 05-408-12).  Approximately 1.2 ml of Heavy Liquid (Lithium heteropolytungstates solution, GeoLiquids, Inc., Cat. No. LST010 density 2.85 g/cc) was added to the MCT containing the talc samples prepped and mixed with a disposable mixing rod for approximately 10 to 20 seconds. The combined talc and LST heavy liquid samples were then placed into a vacuum desiccator (JEOL EMDSC-U10A) to remove air bubbles for 15 minutes at a vacuum pressure of approximately 8 Torr prior to centrifugation.

The MCT sample tubes were then placed in an Eppendorf micro-centrifuge (Model No. 5415D) set at 9,000 RPM for total of 90 minutes at room temperature.  After removal of the MCT tubes from the centrifuge, they were flash frozen in liquid nitrogen and the MCT tip was immediately removed with a pre-cleaned 6 inch steel cleaver into a clean 45 mL flat bottom disposable centrifuge tube. Figure 1 shows the cut area on the MCT tip.

Figure 1:

**Cut Line for Removal of MCT Tip**



Red line is showing cut area on MCT tip

**ATLANTA**
Corporate Headquarters
3945 Lakefield Court
Suwanee, GA 30024
(770) 866-3200   FAX (770) 866-3259



Deionized water was added to the centrifuge tube to bring the volume to approximately 45 ml. The 45 ml centrifuge tube was capped and inverted by hand 5 times to distribute the collected material in the bottom of the MCT tip. The 45 ml mixture was then immediately and continuously filtered onto a 25 mm Polycarbonate filter (PC) with a 22μm pore size. After the mixture was filtered, the excess heavy liquid was washed through the filter with the addition of approximately 100 ml of deionized water. The prepared PC filter was placed in a new disposable plastic 47mm petri dish and allowed to dry at ambient room temperature in a HEPA hood for a minimum of 2 hours. The processed PC filter samples were directly prepared onto TEM 100 μm size grids (2 for analysis and 1 for archive) using either the standard TEM filter preparation protocol for MCE filters or for the PC filters.[10, 11, 12, 13, 14, 13, 14]

## ATEM Amphibole Analysis Procedure

JEOL 1200EX ATEMs equipped with either a Noran or an Advanced Analysis Technologies (light element) energy dispersive x-ray analyzer (EDXA) were employed for this analysis. ATEM samples were analyzed at a screen magnification of 20,000X. Amphibole fibers or bundles with substantially parallel sides and an aspect ratio of 5:1 or greater, and at least 0.5μm in length were counted as regulated asbestos fibers and bundles per standard TEM counting rules as described by ASTM D5755, ASTM D5756, ISO 10312, ISO 13794, AHERA (TEM section only) and D7712-11.[10,11,12,13,14,15]

Positive identification of amphibole asbestos requires EDXA for mineral chemistry confirmation and selected area electron diffraction (SAED) for each amphibole type. At times, amphibole bundles may have a diameter that is too thick to acquire a SAED pattern, then, only the mineral chemistry can be used. For anthophyllite series asbestos, two separate angle SAED were acquired.

---

[10] D5755-09 "Standard Test Method for Microvacuum Sampling and Indirect Analysis of Dust by Transmission Electron Microscopy for Asbestos Structure Loading.

[11] D5756-02 "Standard Test Method for Microvacuum Sampling and Indirect Analysis of Dust Loading by Transmission Electron Microscopy for Asbestos Mass Surface.

[12] ISO 10312 1995-05-01, "Ambient Air Determination of Asbestos Fibers-Direct-Transfer Transmission Electron Microscopy Method.

[13] ISO 13794 1999 07-15, "Ambient Air-Determination of Asbestos Fibres-Indirect-Transfer Transmission Electron Microscopy Method.

[14] U.S. Environmental Protection Agency (USEPA) 1987. Asbestos Hazard Emergency Response Act, 40 CFR Part 763, Appendix A to Subpart E, USEPA, Washington D.C.

[15] D7712-11 "Standard Terminology for Sampling and Analysis of Asbestos."

**ATLANTA**
Corporate Headquarters
3945 Lakefield Court
Suwanee, GA 30024
(770) 866-3200   FAX (770) 866-3259



## Counting Rules

100 grid openings were analyzed for each of the JBP/STS and Imerys talcum powder samples. The 100 grid opening counts were split evenly between two grids.

All amphibole fibers/bundles that meet the above-stated size criteria were recorded on the MAS TEM structure count bench sheets for each sample. Length and width of each amphibole fiber/bundle was recorded and identified. Every amphibole structure identified and counted by the analyst required observation of an EDXA spectra matching the mineral chemistry for that particular amphibole and a SAED amphibole pattern. EDXA spectra and SAED patterns are recorded/saved for every asbestos amphibole structure found in the samples. Photomicrographs were taken of the amphibole fibers/bundles found from each of the samples that were positive for amphibole asbestos.

Results were reported as either amphibole asbestos fibers/bundles (structures) per gram of talc or in weight percent.  Analytical sensitivity/detection limits were reported as structures per gram.  The weight percent analytical sensitivity/detection limit was not provided in the November 11, 2018, since the procedure for calculating the detection limit is to use a theoretical mathematical calculation of one arbitrary minimal fiber dimension.  Instead of an arbitrary fiber dimension, a more accurate represented fiber size would be too use an average size for all of the detected amphibole fibers structures analyzed by ATEM in these samples. The average amphibole asbestos structure size was 12.1 μm x 1.1 μm, with an aspect ratio of 11:1. For this report, the more accurate weight detection limit was added to the data sets.

## Fibrous Talc Estimation

A number of the JBP (with Asian)/STS and Imerys talcum powder samples were found to contain fibrous talc during both types of the PLM analysis as well as the ATEM analysis. A full quantitative analysis of the number of fibrous (asbestiform) talc particles was not done at this time.  For the ATEM, a semi-quantitative estimate of the number of fibrous talc particles present in four random grid openings and observed throughout the 100 grid openings was scored as follows:

1) Abundant :  (>11 fibrous talc particles)
2) Common:    (4 to 10 fibrous talc particles)
3) Trace:        (1 to 3 fibrous talc particles)

Page **13** of 56

**ATLANTA**
Corporate Headquarters
3945 Lakefield Court
Suwanee, GA 30024
(770) 866-3200   FAX (770) 866-3259



This estimation was based on the talc fibers/bundles having at least a 5:1 aspect ratio or greater, at least 0.5μm in length and substantially parallel sides. One representative talc fiber or bundle was recorded (EDXA, SAED and photographed) for each of the samples that contained fibrous talc.  Also, the finding of fibrous talc on random grid openings provided an overall estimate of how many talc fibers were on 100 grid openings analyzed for each of the samples.

For both PLM methods a visual estimation was made of the identified talc fibers and was reported as either trace or moderate (common).

**Process Laboratory Blanks**

For each set of samples that were prepared by the heavy liquid method, one process laboratory blank was prepared with each set of samples. These process blank MCE filters were prepared in the same exact manner as the talc samples (heavy liquid, filtration on MCE/PC filters, etc.) but without any talc material. For the TEM analysis, 100 grid openings were analyzed for each of the process blanks per sample set.

# Results

### J[3] RESOURCES INC. ANALYSIS

### XRD ISO 22262-3 Method

### J[3] Analysis

Lee Poye of J[3] Resources analyzed 57 JBP/STS containers by the ISO 22262-3 XRD method. Of the 57 JBP/STS containers analyzed, 54 were non-detects, two were positive, and one was inconclusive by the XRD method.

For 50 JBP/STS containers where the source of the talc was either the Italian or Vermont mines, all were non-detects by XRD.  The other seven were Asian historical JBP containers (the source of the talc was from the Korea mine) had two positive and one inconclusive and the other four samples were non-detects.  The 15 Imerys railroad car samples were not analyzed by XRD.

A summary of all the XRD results are shown in Tables 7 & 8 to this report.

**ATLANTA**
Corporate Headquarters
3945 Lakefield Court
Suwanee, GA 30024
(770) 866-3200   FAX (770) 866-3259



**PLM ISO 22262-1 Method**

**J³ Analysis**

Using the ISO 22262-1 PLM method, J³ Resources found that out of 38 samples analyzed, all were negative or non-detects.  A summary of the J³ results are also shown in Table 8 in this report.

**ATEM of Historical J&J Vermont Talc Shower to Shower Talcum Powder**

On July 18, 2018 Lee Poye of J³ Resources, Inc. issued a report (to Joe Satterley of the Kazan Law Firm) of his analysis of 16 historical J&J Vermont talc Shower to Shower talcum powder samples that were split by J&J from their historical Shower to Shower (STS) containers that ranged in date from 1978 to 1986.[16]

Of the 16 STS containers  analyzed by Lee Poye using the ISO 22262-2 heavy liquid TEM method, 11 of the 16 samples (69%) were positive for anthophyllite asbestos (solid solution series) and five samples were below the detection limit of the method.  A summary of the 11 positive results are shown in Table 1.

<div align="center">

**Table 1**

**J³ TEM Results for Positive Vermont Talc Shower to Shower Samples**

</div>

| Laboratory Control Number | J&J Sample Identification Number | STS Container Year | Mass Fraction Percent Wt. | Anthophyllite Asbestos (f/b) Concentration per g |
|---|---|---|---|---|
| 20180070-07D | 2014.001.0397 | 1978 | $7.3 \times 10^{-4}$ | 82,370 |
| 20180061-37D | STS001 | 1982 | $3.0 \times 10^{-5}$ | 9,257 |
| 20180061-38D | STS002 | 1980 | $3.0 \times 10^{-3}$ | 53,416 |
| 20180061-45D | STS009 | 1982 | $1.9 \times 10^{-3}$ | 9,000 |
| 20180061-52D | STS016 | 1980 - 1981 | $4.0 \times 10^{-3}$ | 70,126 |
| 20180061-63D | STS027 | 1980 | $3.5 \times 10^{-5}$ | 7,419 |
| 20180061-65D | STS029 | 1980 - 1981 | $9.2 \times 10^{-3}$ | 95,321 |
| 20180061-10D | STS044 | 1980 - 1981 | $2.6 \times 10^{-5}$ | 12,209 |
| 20180061-15D | STS049 | 1978 | $1.3 \times 10^{-3}$ | 60,507 |
| 20180061-31F | STS065 | 1986 | $2.9 \times 10^{-3}$ | 21,964 |
| 20180061-31G | STS065 | 1986 | $5.2  \times 10^{-4}$ | 29,715 |

---

[16] J3 Report for the Analysis of Shower to Shower Talc Samples, July 18, 2018.



The above results were reported by J[3] as a mass fraction or weight percent. The calculations to the corresponding anthophyllite fiber/bundle concentrations per gram was done by MAS using the information provided on the J[3] TEM count sheets.

**Verification of Lee Poye's STS Results**

Lee Poye arrived at MAS on the morning of October 31, 2018 with one TEM grid box that contained the prepared TEM grids for J[3] project number JHI898969 for the J&J Vermont Talc STS samples.  This information was confirmed by Lee Poye, that the TEM grids he brought to MAS was for the historical STS samples that he had previously analyzed.

In turn, MAS provided Mr. Poye with MAS TEM grid boxes for the 10 historical JBP talcum powder samples (MAS M69042).   The MAS verification of the J[3] analysis was only for the 11 positive TEM sample analysis, the five sample results that were below the detection limit were not verified by MAS, and those results were accepted as true by MAS.

MAS was able to verify nine of the 11 ATEM positive historical STS talcum powder samples reported by J[3].  The nine positive MAS verified STS ATEM samples, two non-verified STS positive ATEM samples, and the five samples that were below the ATEM detection limit, were included in this overall report and are identified in summary Tables 3 and 4.

A full report of the MAS verification analysis, verified count sheets, asbestos structure photo-micrographs, EDXA and SAED data is provided with this report.[17]

The overall summary of the results for the three analytical methods used for the 57 JBP/STS containers and 15 Imerys' historical railroad car samples analyzed for this report are summarized in Tables 2, 3, 4, 5, 6, 7, 8 and 9.   These summary tables have been organized by decade from the 1960's (Table 2), 1970's (Table 3), 1980's (Table 4), 1990's (Table 5) early 2000's, (Table 6), Asian (Table 7, XRD only), XRD and PLM (Table 8), and Fibrous (Table 9).

**ISO-22262-1 Analysis**

The ISO 22262-1 PLM analysis showed that out of the 72 JBP (with Asian)/STS containers and 15 Imerys' railroad car samples analyzed by MAS and J[3], 18 containers (25%) had detectable amounts of regulated amphibole asbestos, the rest were either non-detects or contained actinolite/tremolite  cleavage fragments that had an aspect ratio of < 3:1.

Results for all 18 positive samples were found to contain <0.1 % asbestos.  Also, for these positive ISO PLM samples, both regulated actinolite/tremolite and or anthophyllite asbestos were found.

---

[17] Verification of Lee Poye's TEM Analysis of J&J's Historical Vermont Talc-Containing Shower to Shower Talcum Powder Samples, November 5, 2018.

**ATLANTA**
Corporate Headquarters
3945 Lakefield Court
Suwanee, GA 30024
(770) 866-3200  FAX (770) 866-3259



A summary of the MAS & J³ ISO 22262-1 PLM analysis results are shown in Tables 2, 3, 4, 5 and 6 in this report.

**Comparison of the J³ ISO PLM to MAS ISO PLM Analysis for the Same Sample Set**

Both MAS and J³ analyzed the same 22 J&J/STS talc samples by the ISO22262-1 PLM method. Where all 22 of the J³ ISO PLM results were found to be negative, MAS found that 8 of the 21 were positive.  A summary of this data is shown in Table 8.

**PLM/Blount Method**

The Blount/PLM method showed that out of the 72 historical JBP (with Asian)/STS containers and Imerys' railroad car samples analyzed by MAS, 41 (57%) had detectable amounts of regulated amphibole asbestos and the rest were either non-detects or contained only tremolite/actinolite cleavage fragments that had an aspect ratio that was less than 3:1.

These 72 historical containers/samples analysis by the Blount/PLM also includes the 16 Lee Poye historical STS containers that were sent to MAS from J³ on Nov 14, 2018 and received at MAS on Nov 16, 2018.

Results for 41 positive samples were reported as an estimated weight percent range of from < 0.1% to 0.7 %.  Also, for these positive Blount/PLM samples, both regulated actinolite/tremolite and or anthophyllite asbestos was detected.

The summary of the MAS Blount/PLM results are shown in Tables 2, 3, 4, 5, and 6 in this report.

**ATEM ISO 22262-2 Method**

The ISO 22262-2 ATEM heavy liquid separation method showed that out of the 70 historical JBP/STS containers and Imerys' railroad cars samples, 42 (60 %) contained regulated asbestos fibers and bundles. Two types of asbestos amphiboles were detected in these samples, they were either the tremolite asbestos solid solution series and or the anthophyllite solid solution series asbestos.  Only the iron-rich anthophyllite asbestos was detected in the ATEM.

The amphibole asbestos structures per gram of talc ranged from below our analytical sensitivity/detection limit of approximately 3,000 - 9,400 fibers/bundles per gram to an amphibole asbestos concentration that ranged from 4,400 - 268,000 fibers-bundles/gram of talc.  Also, for the positive ATEM samples the results were also expressed as a weight percent.

**ATLANTA**
Corporate Headquarters
3945 Lakefield Court
Suwanee, GA 30024
(770) 866-3200   FAX (770) 866-3259



Tables 2 through 6 also provide the summary of ATEM findings for each of the 42 positive ATEM samples that were detected and the identification of the asbestos type for each of the measured amphibole asbestos fiber or bundles. This data includes length and width of the asbestos structure, individual fiber/bundle aspect ratios, and the average aspect ratio for each sample set.

All MAS and ISO PLM, Blount/PLM, ATEM analytical data, and photo-micrographs can be found in notebooks provided with this report that are labeled Historical 1960's, 1970's, 1980's, 1990's Early 2000's and JBP (with Asian)/STS and Imerys' Analysis.

Each of these notebooks contain ISO PLM and Blount bench sheets and optical photo-micrographs for each sample.  ATEM count sheets, EDXA spectra, SAED micrographs, and ATEM photo-micrographs for each of the regulated amphibole asbestos structures analyzed are included.

All the $J^3$ XRD and ISO PLM analyses are summarized in Tables 7 & 8.  Also provided in Table 8 is a comparison of the $J^3$ ISO-PLM to the MAS ISO-PLM for the same sample analyses.

**Fibrous Talc JBP (with Asian)/STS Containers and Imerys Railroad Car Samples**

The MAS ISO 22262-1 PLM analysis showed that fibrous talc was found in 56 of 57 total samples (55 of 55 JBP (with Asian)/STS and Imerys analyzed by this method and of the 72 samples analyzed by the Blount/PLM method, 28 of the samples were positive for fibrous talc.

The MAS ISO 22262-1 and Blount PLM samples had concentrations of fibrous talc that ranged from trace to common (moderate) amounts.

For the MAS ISO 22262-2 ATEM analysis (no $J^3$ ATEM results), 42 of the 56 containers/samples (74%) analyzed contained trace amounts of fibrous talc. The estimated amount of fibrous talc per gram ranged from 290,000 talc fibers to 1,020,000 talc fibers per gram of cosmetic talcum powder.

No attempt was made to determine the amount of talc in 16 $J^3$ STS sample analysis ATEM bench sheets since it was unclear to us regarding the $J^3$ data collecting parameters and the amount of fibrous talc detected in the samples. This data is summarized in Table 9.

**ATLANTA**
Corporate Headquarters
3945 Lakefield Court
Suwanee, GA 30024
(770) 866-3200  FAX (770) 866-3259



**Process Blanks**

All of the process blanks that were run with each set of talcum powder samples were found to be negative for any asbestos fiber types.  The ATEM bench sheets and summary are provide in a separate document supplied with this report.

## Discussion

### XRD ISO 22262-3

All of the historical JBP/STS containers, where the source of the talc was either Italian or Vermont were found to be negative or non-detect by XRD.  For the seven (7) Asian samples, two (2) of the samples were positive by the XRD analysis and one sample was inconclusive.  The source of the talc that J&J used in these Asian products was from the Korean Dongyang talc mine in Korea.  This talc mine has been characterized in the past as an asbestiform tremolite asbestos talc mine.  The documentation concerning the Dongyang mine Korea talc deposit and J&J's use of the talc from that has been produced to J&J in the *Leavitt* deposition.

The results show that the XRD method for either the Italian or Vermont cosmetic talc samples was inadequate to detect any tremolite or anthophyllite amphiboles at the concentrations found by the other analytical methods used (ISO PLM, Blount PLM and ATEM).

For the Asian historical J&J cosmetic talc samples, two of the seven were positive for amphibole asbestos. When these same samples were analyzed by the ISO-PLM, Blount/PLM and ATEM methods, six of seven samples were found to be positive for tremolite asbestos.

Based on these results there seems to be little value, even as a screening tool, to use XRD for cosmetic talcum powder samples when the source of talc is either from the Italian or Vermont mines.  However, if the source of talc is from the Dongyang mine in Korea, there may be some limited value to use XRD as a preliminary screening tool for a tremolitic type talc mine.

Since all 42 Vermont-sourced cosmetic talc samples were found to be negative for amphibole asbestos, there was no useful reason to analyze these additional 15 Imerys railroad car samples by XRD since the source of these Imerys cosmetic talc samples is from the same Vermont talc mines.

### MAS PLM-ISO 22262-1 Method

The ISO PLM analysis performed by MAS detected 18 positives out of 56 samples that were analyzed.  Many of the samples analyzed contained tremolite/actinolite cleavage fragments that had a typical aspect ratio of less than 3:1. No anthophyllite cleavage fragments were detected in any of the samples.  For the positive samples, both regulated tremolite/actinolite and anthophyllite asbestos was detected at an estimated concentration of <0.1 weight percent.

Page **19** of **56**



**ATLANTA**
Corporate Headquarters
3945 Lakefield Court
Suwanee, GA 30024
(770) 866-3200   FAX (770) 866-3259

All of the asbestos structures identified were large bundles that were typically greater than 50 microns long and 10 to 20 microns wide. No individual asbestos bundles were detected in any of these samples with widths less than 5 to 10 microns. However, individual fibers contained in these large bundles could be resolved with dispersive staining. The estimated average aspect ratio of the individual asbestos fibers in the bundles was greater than 20:1.

Lee Poye of J[3] Resources analyzed 22 historical JBP/STS by the ISO PLM that were provided by MAS, and their 16 historical Vermont STS samples by this method. All 38 ISO PLM analysis were reported as non-detects.

When the same 21 historical JBP/STS samples were analyzed by MAS, 8 of the samples were found to be positive.

These differing results between the two labs will require further investigation to understand the reason for these differences.

**Blount/PLM Method**

The Blount /PLM method heavy liquid separation method was able to increase the analytical sensitivity of the PLM analysis as compared to the ISO PLM method without heavy liquid separation. Of the 72 historical JBP (with Asian)/STS containers/samples analyzed by this method, 41 (57 %) were positive for regulated amphibole asbestos. For the positive samples, both regulated actinolite/tremolite and or anthophyllite asbestos were detected at a weight percent concentration for range of between <0.1% to 0.7 %. The estimated average aspect ratio of the individual asbestos fibers in the bundles was greater than 20:1.

When Dr. Blount published her heavy liquid separation PLM results in 1989/1990, one of the samples (sample I) was analyzed for tremolite asbestos. This sample was later determined to be a container of Johnson's Baby Powder.[3, 4] The source talc used by J&J, for their JBP product at that time (1989-1990), would have been from Vermont.

Our use of Blount PLM method, in particular for the Vermont sourced cosmetic talc samples, shows that Alice Blount was right and that her method increases the sensitivity of the PLM analysis for the detection of amphibole asbestos.

Dr. Blount published the use of the heavy liquid separation method in 1989/1990, however this was not a new technology for the analysis of cosmetic talc by PLM. Historical documents produced by J&J in this litigation shows that J&J was aware of the heavy liquid separation ("preconcentrating") of talc for the detection of asbestos in the early 1970s.[8] In 1973, a two

**ATLANTA**
Corporate Headquarters
3945 Lakefield Court
Suwanee, GA 30024
(770) 866-3200   FAX (770) 866-3259



part heavy liquid separations method report, for both chrysotile and tremolite-actinolite fibers, was done by the Colorado School of Mines on behalf of Johnson & Johnson.[7]

For this report, the Colorado School of Mines stated in their Summary and Conclusion section that the heavy liquid concentrates are examined by optical microscopy (PLM), and that "the procedure is capable of detecting fibers present at a level of approximately 10 ppm or less".[8] A 10 ppm (parts per million) detection limit calculates to a weight percent of 0.001 % which is consistent with our Blount PLM analysis of <0.1 % for positive samples.

In March of 1974, R.C. Reynolds Jr. wrote a report for Windsor Minerals Inc. entitled "Analysis of Talc Products and Ores for Asbestiform Amphiboles".[9] This method also used heavy liquid separation and PLM analysis. The purpose of the study was to "develop methods for measuring the concentration of asbestiform amphiboles in fine-grained talc products and talc ores". The report concluded that using this method detected 170 ppm (0.017 weight percent) of actinolite in a talc product and 2,300 ppm (0.23 weight percent) of actinolite in the talc ore.

Even though Johnson & Johnson was aware from as early as 1973 that the heavy liquid separation PLM method increased the sensitivity for the detection asbestos in talc, they never incorporated this method for the routine analysis of their talc sources. Even when Dr. Blount published her heavy liquid separation PLM method in 1990, J&J still did not incorporate this more sensitive PLM method for the detection of asbestos in their cosmetic talc products.

It is clear from our data that the use of the Blount/PLM heavy liquid separation method increases the analytical sensitivity for the analysis of cosmetic talc samples like the JBP/STS products as compared to the ISO PLM method. Since some of the ISO 22262-1 PLMs were positive for the same samples that were non-detects by the Blount method, it's recommended that both PLM methods should be used to evaluating  cosmetic talc samples for asbestos.

### J[3] Resources, Inc.

Our ATEM results for the historical JBP/STS samples are in agreement with the J[3] Resources, Inc. ATEM for the STS samples that they analyzed. For the nine J[3] samples that we verified form their TEM grids, J[3] also reported nine positive TEM samples and all contained regulated amphibole asbestos fibers/bundles. This correlates to 100 % agreement between the two labs for those nine samples.

For the 49 asbestos fibers and or bundles reported by J[3] in the 9 nine ATEM samples we examined, we verified 48 as regulated asbestos structures. This shows a 98 % validation rate



**ATLANTA**
Corporate Headquarters
3945 Lakefield Court
Suwanee, GA 30024
(770) 866-3200   FAX (770) 866-3259

between the labs. Additional analysis may in fact increase the overall verification percentage. Also, 90 % of the regulated anthophyllite asbestos structures were bundles.

The two J[3] ATEM samples (20180061-65D and 20180061-10D) that MAS did not verify, were verified to contained amphibole asbestos by the Blount PLM method.  Even though we did not verify these two J[3] samples by ATEM, we did find that these two J&J containers/samples were positive for regulated amphibole asbestos.  For this reason, STS samples 20180061-65D and 20180061-10D were added to the overall list of positive 1980s historical J&J STS Vermont sourced talc containers.

## ATEM-ISO 22262-2 Method

The ISO 22262-2 heavy liquid talc preparation method for the direct ATEM analysis of approximately 20 to 60 mg of talc on a 25 mm PC filter did not cause any significant overloading of the TEM grids with talc particles. The overall TEM grid particle loading was estimated at approximately 15 to 20 %. This consisted of talc particles and/or fibers as well as detectible amphibole asbestos.  The ATEM results showed that out of the 70 JBP/STS and Imerys samples analyzed by ATEM, both the MAS and Lee Poye's analyses, 42 were positive for either the tremolite solid solution series (tremolite, winchite, richterite and actinolite) in this case only tremolite was detected, and or the anthophyllite sold solution series (anthophyllite, iron-rich anthophyllite and cummingtonite) asbestos. Each of the tremolite or anthophyllite asbestos solid solution series amphibole mineral types are regulated asbestos.[18]  Only iron-rich anthophyllite sold solution series asbestos structures was detected.

If the same weight of talc (approximately 20 to 60 mg) had been directly filtered onto a 25 mm PC filter, the TEM sample preparations would have been too severely overloaded with talc particles to be analyzed.

The heavy liquid density ATEM sample preparations demonstrated the utility of the ISO 22262-2 talc method by increasing the analytical sensitivity of the typical ATEM bulk talc analysis for the potential detection of amphibole asbestos.  For these analyses the analytical ATEM achieved sensitivity/detection limits ranging from approximately 3,000 - 9,400  fibers-bundles/gram of talc.  It also increased the analyst's efficiency without talc particle overloading issues.

This TEM talc loading problem vs. analytical sensitivity issued was been solved by the use of the heavy liquid density procedure, and should be the standard protocol for TEM cosmetic talc analysis.

---

[18] Current Intelligence Bulletin 62: "Asbestos Fibers and Other Elongated Mineral Particles".
State of the Science and Roadmap for Research" Revised Edition. NIOSH CIB62-Asbestos.

Page **22** of **56**

**ATLANTA**
Corporate Headquarters
3945 Lakefield Court
Suwanee, GA 30024
(770) 866-3200   FAX (770) 866-3259



As compared to either the XRD or the two PLM methods, the ATEM provides the most sensitive method for the detection of regulated amphibole asbestos in cosmetic talc.

**Numerical Structure Count vs. Weight Percent**

Our ATEM analysis showed that the asbestos fiber/bundle concentration, in the 41 positive samples ranged from approximately 4,400 to 268,000 fibers-bundles per gram of talcum powder. These positive results were also reported in weight percent that is based on a mathematical calculation. Also the analytical sensitivity or detection limit for the weight percent used here was based on the average size of all amphibole asbestos structures detected (187) in the 41 positive ATEM samples. This average size was determined to be 12.1 µm x 1.1 µm, with an aspect ratio of 11:1.

However, just reporting ATEM weight percent data does not provide any useful information for determining potential airborne exposure to asbestos structures of the bulk talc material being tested. The Introduction to the ISO 10312 Ambient Air TEM Method states the reasoning for this:

*"Because the best available medical evidence indicates that the numerical fibre concentration and the fibre sizes are the relevant parameters for evaluation of the inhalation hazards, a fibre counting technique is the only logical approach".*

Also, reporting the analytical sensitivity in weight by the ATEM method is very misleading since it is based on the theoretical mathematical calculation of one minimal fiber size which can give a computed analytical sensitivity in the millionths of a percent range. The misleading part of this is that in order to find that one small fiber during the ATEM analysis, you must have a real numerical fiber-bundle concentration per gram of talc for the analysis to possibly find that one fiber, otherwise this ATEM theoretical analytical sensitivity expressed in weight percent is meaningless.

An example of this problem can be found with the 2010 FDA report of the testing of cosmetic talcs that is published on their website. In that report, FDA states a TEM average limit of detection of 0.0000021 % wt. or 2.1 x 10[6],[19] However, when the ATEM analytical sensitivity was calculated from actual AMA TEM bench sheets, the numerical fiber concentration needed to find that one fiber was 13,500,000 fibers per gram of talc.[20] A one fiber analytical sensitivity of that magnitude would have caused all of the ATEM analyses reported here to be non-detects.

---

[19] www.FDA.gov.
[20] AMA Analytical Services, Inc. Report of Cosmetic Grade Talc, 2010.

Page **23** of 56

**ATLANTA**
Corporate Headquarters
3945 Lakefield Court
Suwanee, GA 30024
(770) 866-3200   FAX (770) 866-3259



## Crystalline Habit and Asbestiform Definitions

Each of the analytical protocols referenced in this report (PLM and TEM) all have a definition for asbestiform that is some variation of the following statement:

*Asbestiform: specific type of mineral fibrosity in which the fibers and fibrils possess high tensile strength and flexibility.*[13]

This definition of asbestiform in these protocols is only a general geological definition that might be used in the field to evaluate a particular commercial asbestos mine site, because the more fibrous, the greater economic value of the mine.

If this wasn't meant to be a general geological definition, then the methods would have incorporated into the counting protocols the procedures necessary for the determination or measurement of either the tensile strength or flexibility of the microscopic asbestos fibers and bundles.  Of course, the methods do not measure flexibility or strength since that type of measurement is impossible by either PLM or ATEM.   None of these methods even define what high tensile strength is, or how many measurements constitute a population.  Interesting enough, as compared to the commercial forms of asbestos (chrysotile, amosite and crocidolite), both tremolite and anthophyllite asbestos have low tensile strength and poor flexibility and yet are regulated asbestos fibers.[21]

Also, the vast majority of the fibrous amphibole asbestos structures reported here were bundles (as defined by parallel fibers in an asbestos structure that are closer than one fiber diameter to each other.

It is unreasonable to think that breaking up a non-fibrous asbestos can form multiple individual fibers all in close proximity and parallel to each other and that meets the definition of a bundle. That is why fibrous mineral bundles have been recognized in the published literature as asbestiform for many years.

In Blount's publication, she states the following:

*"In addition, the tendency to bring down a disproportional number of larger particles has the true asbestiform amphiboles one generally sees some particles showing bundles of fibrils which removes any doubt about the nature of the amphibole".*[5]

---

[21] "Asbestos in Ontario, Ontario Department of Mines and Northern Affairs." Industrial Mineral Report 36, 1971.



**ATLANTA**
Corporate Headquarters
3945 Lakefield Court
Suwanee, GA 30024
(770) 866-3200   FAX (770) 866-3259

Dr. Wiley in her 1999 ASTM International publication stated that the finding of bundles shows that the structure should be considered asbestiform.[22]

The total amount of regulated asbestos structures counted in the 42 positive ATEM samples was 187 bundles and fibers. Asbestos bundles, as compared to fibers, was approximately 96 % of the regulated asbestos structures counted in the ATEM positive samples.

By definition, these asbestos bundles are all classified as asbestiform.  Nevertheless, all fibers and bundles reported by the ATEM method are regulated asbestos structures regardless of the geological definition for asbestiform.

For the single tremolite or anthophyllite fibers reported here, they all have been verified as to have formed in a fibrous crystalline habit since they are both fibrous and crystalline as well as meet the health based counting rules for regulated asbestos.[23]

**Aspect Ratio**

Another aspect that must be considered is the milling process that is required to produce cosmetic grade talc and how it effects the overall asbestos size distribution and aspect ratios. This milling effects the asbestos size distribution in talcs was first discussed by Rohl, et al. in 1976.[24]  In their publication the authors discuss how the talc milling process will break large fibers into a new size distribution in the submicroscopic range.

The average aspect ratio of the regulated asbestos tremolite and anthophyllite fibers and bundles measure by our ATEM analysis was approximately 11:1.  This average aspect ratio was consistent with Campbell data for milled tremolite and anthophyllite asbestos. Our measured average aspect ratios were also consistent with Blount's data for tremolite asbestos reported in sample I (identified as JBP).[4, 25]

For just the tremolite asbestos structure aspect ratios reported here, are also consistent with the NIST tremolite asbestos standard, Blount's tremolite asbestos findings for the off the shelf cosmetic talc container she tested, Campbell's milled tremolite asbestos and Langer & Nolan's

---

[22] A.G. Wylie "The Habit of Asbestiform Amphiboles: Implications for the Analysis of Bulk Samples", ASTM Advances in Environmental Measurements Methods for Asbestos, STP 1342, Jan. 2000.

[23] Manual of Mineralogy, Twenty-First Edition, Revised, Cornelis Klein and Cornelis S. Hurlbert, Jr., John Wiley and Sons, 1999.

[24] Rohl, et al., "Consumer Talcum and Powders: Mineral and Chemical Characterization", Journal of Toxicology and Environmental Health, 2: pp. 255-284, 1976.

[25] Bureau of Mines Information Circular/Dept. of the Interior, Campbell, W.J., Blake, R.L., Brown, L.I., Cather, E.E. and Sjoberg, J.J.: United States Department of the Interior, "Selected Silicate Minerals and Their Asbestiform Varieties" IC 8751 1977.

**ATLANTA**
Corporate Headquarters
3945 Lakefield Court
Suwanee, GA 30024
(770) 866-3200   FAX (770) 866-3259



published tremolite asbestos aspect ratio of 10.9 to 1. In the Blount publication, it was reported that the average aspect for non-asbestiform tremolite (cleavage fragments) was approximately 2:1.

Asbestiform tremolite/anthophyllite aspect ratio summary is as follows:

1. MDL ATEM analysis:  :   11:1
2. Blount              :    9:1
3. Campbell          :    9:1
4. Langer             :   11:1
5. J&J 3/11/2018     :   10:1
6. NIST 1875 Tre. Std.  :   10:1

All of these independent laboratory tremolite asbestos aspect ratio data shows that the tremolite and anthophyllite structures detected by our ATEM analysis shows that they are in fact asbestiform.

As anticipated and discussed below, neither chrysotile nor non-iron containing anthophyllite asbestos was found in any of the samples that were analyzed by ISO 22262-02 ATEM analysis.

**So Called Background Asbestos**

Of the 42 positive ATEM amphibole asbestos samples analyzed by MAS, nine of the JBP/STS talcum powder samples had only one amphibole asbestos fiber or bundle detected in 100 grid openings which represents the analytical sensitivity/limit of detection for this analysis.

Because tremolite/anthophyllite are non-commercial accessory amphibole minerals and are associated with talc, which is known to contain varying amounts of amphibole asbestos such as tremolite or anthophyllite, any positive findings are scientifically valid due to the amphibole minerals present in the talc.

There are no known commercial asbestos-containing products that used tremolite as an added ingredient, and only one specialty product ever used anthophyllite asbestos (corrosive resistant polymer chemical piping used at some chemical processing plants).

Further, there are no commercial amphibole tremolite/anthophyllite mines in North America, and tremolite and anthophyllite asbestos is not routinely analyzed at trace levels by typical commercial TEM laboratories. For these reasons it can be stated that: 1) there are no background air levels of tremolite/anthophyllite that could have interfered with or contaminated our JBP/STS and Imerys talcum sample analysis, and 2) for each set of JBP/STS

**ATLANTA**
Corporate Headquarters
3945 Lakefield Court
Suwanee, GA 30024
(770) 866-3200   FAX (770) 866-3259



and Imerys talcum samples that were prepared and analyzed at this laboratory a process laboratory blank was prepared simultaneously to determine if there was any possible cross-contamination. [26,27]

When these process laboratory blanks were analyzed by ATEM, no asbestos, including either tremolite, chrysotile or anthophyllite asbestos structures were found. Therefore, it can be stated that there was no cross-contamination during sample preparation of the JBP/STS talcum powder samples.  Also, it is not our expectation that tremolite/anthophyllite asbestos would become a part of these homogenized talc products at a level identified as a matter of contamination prior to our custody of the samples. To do so would be practically impossible.

Also, these historical 72 JBP/STS containers and Imerys railroad samples came from their respective archived facilities.  It is reasonable that the talcum powder in either the J&J containers or the Imerys railroad car samples were authentic and original to the specified date of manufacture (J&J containers) or time of product processing (Imerys).  That is the talcum powder contained in these historical J&J container samples we analyzed, was the original talcum powder that was put into the container by J&J.

**Non-Detects**

For the 70 JBP (with Asian)/STS and Imerys talcum powder samples analyzed, ATEM results for 28 JBP/STS and Imerys talcum powder samples were less than the limit of detection of approximately 3,000 to 9,400 amphibole fibers/bundles per gram of talc. This result cannot be characterized to mean the samples do not contain amphibole asbestos. Rather, it can only be said that if there is any amphibole asbestos present, the number of fiber and bundles per gram of talc are at less than the detection limit for the ISO 22262-2 heavy liquid separation ATEM analysis used by this laboratory.

**Chrysotile and Anthophyllite**

As anticipated, neither chrysotile nor non-iron containing anthophyllite asbestos was found in any of the 70 samples that were analyzed by the ISO 22262-02 ATEM analysis.  However, iron-rich anthophyllite was detected by ATEM because of its increased density.

---

[26] R.F. Dodson, M.F. O'Sullivan, D.R. Brooks and J.R. Bruce, "Asbestos Content of Omentum and Mesentery in Non-occupationally Exposed Individuals", Toxicology and Industrial Health, 2001: 17: pp. 138-143.
[27] R.J. Lee, D.R. Van Orden, "Airborne Asbestos in Buildings", Regulatory Toxicology and Pharmacology, 50 (2008) pp. 217-225.

**ATLANTA**
Corporate Headquarters
3945 Lakefield Court
Suwanee, GA 30024
(770) 866-3200   FAX (770) 866-3259



As with the ATEM method used here, the Blount PLM also uses heavy liquid separation in the sample preparation methodology.

The following is an explanation for the ATEM and Blount PLM chrysotile and anthophyllite results.

**ATEM Chrysotile Separation**

The ATEM heavy liquid method is specific for the asbestos tremolite solid solution series and the iron-rich anthophyllite solid solution series. The reason for this is that the heavy liquid solutions used for ATEM talc separation process had a density of 2.85 g/cm³. Therefore, any minerals with a similar density or lower would not be separated by this method such as chrysotile, which has a density of between 2.5 to 2.6 g/cm³. [28] The density for chrysotile is 0.020 g/cm³ to 0.025 g/cm³ less than the heavy liquid density used for the ATEM method and therefore, chrysotile asbestos would likely not be separated during JBP/STS and Imerys talcum sample preparation process.

As with the chrysotile non-detects reported here and in well over a hundred cosmetic talc analyses performed by MAS, the ATEM heavy liquid method has never detected chrysotile asbestos in the talcum powder, nor would we expect to have a positive result for chrysotile.

**ATEM Anthophyllite Solid Solution Series Separation**

The density of anthophyllite ranges from 2.85 to 3.20 g/cm³. This range of densities is primarily due to the addition of iron (Fe) into the chemical structure. For example, anthophyllite is part of a solid solution series (anthophyllite, iron-rich anthophyllite, ferro-anthophyllite, cummingtonite and grunerite) with a chemical formula of $Mg_7Si_8O_{22}(OH)_2$ to approximately $Fe_7Mg_5Si_8O_{22}(OH)_2$. Without Fe being present, the density of anthophyllite would be at the lower end of the density gradient of 2.85 g/cm³. Again, since anthophyllite is a solid solution series, the amount of iron atoms that can be substituted into the molecular formula of anthophyllite depends on the iron content of the surrounding rocks. This iron atom substituted could be 0, 1, 2 or higher which accounts for the range of anthophyllite densities described here.

With a low to non-iron anthophyllite density of approximately 2.85 to 2.86 or 2.87 g/cm³, which is the same or very close as the heavy liquid used for the ATEM analysis, one would not expect much separation of this type of either low-iron or non-iron containing anthophyllite from the

---

[28] Manual of Mineralogy, Twenty-First Edition, Revised, Cornelis Klein and Cornelis S. Hurlbert, Jr., John Wiley and Sons, 1999.

**ATLANTA**
Corporate Headquarters
3945 Lakefield Court
Suwanee, GA 30024
(770) 866-3200   FAX (770) 866-3259



talcum powders using the ISO 22262-2 ATEM method and typically would not be detected by our analysis if present.

As expected, all of the anthophyllite series asbestos structures detected in these talcum powder samples by ATEM were iron-rich; no low iron or non-iron anthophyllite was detected in any of the ATEM samples. For the Vermont talc sourced samples, only three samples contained detectable amounts tremolite series asbestos fibers/bundles. However, this does not mean actinolite/tremolite is not present in significant concentrations in the Vermont talc mines. The ISO 22262-2 and Blount/PLM analysis detected regulated actinolite/tremolite asbestos in 30 of the JBP/STS containers and Imerys railroad car samples. These results is further verification of the utility of using both PLM (with and without heavy liquid separation) and ATEM for analyzing cosmetic talc samples.

**Blount PLM Separation**

As described above, the ATEM detected only iron-rich anthophyllite asbestos primarily in the Vermont-sourced talcum powder samples which is consistent with the Blount PLM results. Comparing the type of asbestos detected (tremolite and anthophyllite) between the Blount PLM and ATEM analysis where the same sample is positive by both methods, the asbestos types found (either anthophyllite and or actinolite/tremolite) can be different between the two as already discussed in this report.

For example, the analysis for the historical JBP/STS and Imerys samples, showed a number of samples where the only type of asbestos detected by ATEM was the iron-rich anthophyllite, while the Blount PLM not only detected the anthophyllite but also detected actinolite/tremolite. This amphibole asbestos detection difference between the two methods may at times be a function of the different heavy liquid densities used for the Blount/PLM and ATEM protocols.

The Blount PLM protocol specifies a heavy liquid density of 2.810 $g/cm^3$ as compared to the 1SO 22262-2 ATEM method that uses a heavy liquid density of 2.85 $cm^3$. This difference of 0.04 $g/cm^3$ is lower than the density of a low to non-iron anthophyllite. This lower density liquid used in the Blount PLM method would likely be more efficient in separating out the tremolite than the higher density liquid used by the ATEM method. Quite simply, the actinolite/tremolite structures would sink faster in the lower density liquid used by the Blount/PLM method. Also, the lower density liquid would be more efficient in separating out the low to non-iron anthophyllite asbestos.

This difference in the heavy liquid density between the two methods maybe explain why the number of positive Blount/PLMs for amphibole asbestos and the corresponding ATEM amphibole asbestos analysis were non-detect.

Page **29** of **56**

**ATLANTA**
Corporate Headquarters
3945 Lakefield Court
Suwanee, GA 30024
(770) 866-3200   FAX (770) 866-3259



This density difference coupled with the ATEM's bias to the large amphibole asbestos bundles detected by the PLM method shows how important it is to use both of these methods when analyzing cosmetic talc samples.

These overall results are both consistent with and validates our earlier March 11, 2018 Supplemental JBP/STS Report and subsequent analysis of plaintiffs' personal JBP/STS containers.

However, for our testimony, we will only be relying on this report and any future supplemental reports involving the analysis of historical JBP/STS and Imerys containers and samples except for the earlier two JBP samples used in both our Below the Waist and Baby powdering studies.

These results are also consistent with MVA's analysis of talc ore samples from both the Italian and Vermont talc mines where originally the samples were collected by or on behalf of defendant experts.[29, 30]

Also, our analytical results are consistent with the historical analysis of both Johnson & Johnson's product samples as well as the analysis of talc ore from both the Italian and Vermont mines that have been performed in the past.[31,32,33,34,35,36,37,38,39,40]

In addition to the above references, we are also relying on the current MAS Johnson & Johnson reliance document list that contains 102 references.[41]

---

[29] D.R. Veblen and C.W. Burnham, "New Biopyriboles Chester, Vermont: I. Descriptive Mineraology", American Mineralogist, 63: 1000-1009, 1978.

[30] R.L. Virta, "The Phase Relationship of Talc and Amphiboles in a Fibrous Talc Sample, Bureau of Mines Report of Investigations 8923, United States Department of the Interior, 1985.

[31] November 26, 1990 McCrone Environmental Services Report to Michael J. Keener from Kent Sprague concerning Samples CWM 90-28, 9-29 and 90-30

[32] New Reageant Systems-Plant Trial at Windsor Minerals, Inc.

[33] March, 1974 Memo to: Windsor Minerals, Inc., Windsor, Vermont From R.C. Reynolds, Jr. Department of Earth Sciences, Dartmouth College, New Hampshire

[34] Forensic Analytical: Quantitative Analysis Report, Asbestos in Bulk Material.

[35] May 15, 1984 MSHIA visit to Cyprus Industrial Minerals Company, South Plainfield Mill.

[36] Nov. 19, 1975 McCrone Assoc., Inc. Letter to Mr. Vernon Zeitz from Gene Grieger concerning talc orr sample analysis.

[37] Env. Consultant Report to Johnson & Johnson, April 1, 1977

[38] EMV Consultant Report to Johnson & Johnson, April 1, 1977

[39] Jan. 30, 1987 to J.A. Molnar and R.N. Miller from Joseph Schmidt Talc Analysis.

[40] March 14, 1988 to Mathew A. Nunes from Al Dickey, R.J. Lee Group Ref: Talc Samples 879-57 Talc L.

[41] Johnson & Johnson Reliance and Reviewed Documents (95).

Page **30** of 56

**ATLANTA**
Corporate Headquarters
3945 Lakefield Court
Suwanee, GA 30024
(770) 866-3200   FAX (770) 866-3259



The ATEM and ISO PLM analysis also showed that the majority of the JBP/STS talcum powder samples contained fibrous (asbestiform) talc as compared to the platy talc that is present in all of JBP/STS and Imerys talcum powder samples. It has been reported by others that fibrous talc is a geological metamorphic transformation of anthophyllite to fibrous talc.[42,43]

## Conclusion

All Italian or Vermont talc sourced samples that were analyzed by XRD for asbestos were found to be negative or non-detect.  These results show that the XRD method is not a useful tool at all for analyzing cosmetic talc samples (Italian or Vermont sourced talc) for the presence of asbestos amphiboles.  Both the ISO and Blount PLM methods have better analytical sensitivities than XRD for these types of samples.  It would be highly recommended that the Stimuli Group drop any consideration of using the XRD for their rewrite of USP 40 method.[44]

The use of the ISO 22262-1 PLM analysis was not as sensitive as the Blount PLM method, but both methods have their strengths and weakness.  On one hand the Blount PLM method has higher sensitivity, but is limited by the type of anthophyllite asbestos it can detect.  The ISO PLM has lower sensitivity, but can detect the entire anthophyllite solid solution series.  Also, these two PLM methods can detect the very large bundles that are typically missed by the ATEM analysis.  There are few examples where the sample was positive by PLM and negative by ATEM.

It is recommend then that both the ISO PLM and the Blount method should be used as a screening tool for cosmetic talc analysis.  Negative samples should then be required to be analyzed by the heavy liquid density ATEM method, which is still the best tool for these types of analysis.

Our ATEM analysis showed that the Italian and Vermont talc mines have a very distinct asbestos type profile from each other when analyzed by this method.  The historical samples from the Italian mine contained primarily regulated tremolite asbestos fibers/bundles while the Vermont mine contained primarily anthophyllite asbestos.  However, for the MDL samples that contained Vermont sourced talc, the PLM results show that only six positive samples contained anthophyllite only, the rest of the positive PLM samples, for the two methods, had detectable amounts of regulated actinolite/tremolite asbestos.   These results show that anthophyllite asbestos maybe more prevalent in Vermont talc when analyzed by ATEM, but significant concentrations of actinolite/tremolite asbestos is also present as shown in the PLM analysis.

---

[42] MVA Report: MVA11730 "Investigation of Italian Talc Samples for Asbestos", August 1, 2018.
[43] MVA Report: MVA12588 "Investigation of Talc Samples for Asbestos" April 23, 2018.
[44] Stimuli to the Revision Process-Modernization of Asbestos Testing in USP Talc.

**ATLANTA**
Corporate Headquarters
3945 Lakefield Court
Suwanee, GA 30024
(770) 866-3200   FAX (770) 866-3259



It is clear from these results that the three talc mines (Italian, Vermont and Korean) J&J used to manufacture their historical talcum powder products all contain asbestiform/regulated amphibole asbestos structures.

These overall results are both consistent and validates our earlier March 11, 2018 Supplemental JBP/STS Report and subsequent analysis of plaintiffs' personal JBP containers.

The most sensitive analytical method was ATEM with the ISO 22262-02 heavy liquid separation. It detected 42 positive samples out of the 70 JBP/STS and Imerys' talcum powder samples with a range in concentration of from approximately 4,400 fibers-bundles/gram to 268,000 fibers-bundles/gram of talc.  Both tremolite series and anthophyllite series regulated asbestos were found in these samples.

There was a total of 50 positive containers (ATEM and PLM combined) out of the 72 tested that gave an overall 69 % positive result for the historical JBP/STS containers and Imerys' railroad car samples that were tested for this report.

These results are also consistent with our past analysis of Johnson & Johnson cosmetic talc samples that contained tremolite and anthophyllite regulated asbestos fibers, and with MVA's analysis of both the Italian and Vermont talc mine ore samples.

Based on the results of our analysis, it is our opinion that individuals who used Johnson & Johnson talcum powder products (Johnson's Baby Powder and Shower to Shower) in the past would have, more likely than not, been exposed to significant airborne levels of both regulated amphibole asbestos and fibrous (asbestiform) talc.


William E. Longo, Ph.D.
President

Mark W. Rigler, Ph.D.
Chief Science Officer and Senior Consultant

**ATLANTA**
Corporate Headquarters
3945 Lakefield Court
Suwanee, GA 30024
(770) 866-3200   FAX (770) 866-3259



## Table 2

### Summary of Results for Johnson & Johnson's
### 1960's Historical JBP & STS Samples

| MAS Sample Number | Client Sample ID | Year of Mnfr. | Amphibole Asbestos Structures/g | Amphibole Asbestos wt. % | Analytical Sensitivity Structures/g | ISO PLM wt. % | Blount PLM wt. % |
|---|---|---|---|---|---|---|---|
| M68503-010 **JBP** | 2018-0060-04 **JBP** 167 | 1960 | 31,400 | 0.00056 | 8,500 | NAD | <0.1 Trem/Act |
| M68503-009 **JBP** | 2018-0060-03 **JBP** 166 | 1962 | 17,700 | 0.0000057 | 8,800 | NAD | <0.1 Trem/Act |
| M68503-024 **JBP** | 2018-0060-76 **JBP** 119 | 1963 | <8,972 | <0.0000268 | 9,000 | NAD | NAD |
| M68503-004 **JBP** | 2018-0056-25 **JBP** 232 | 1964 | <2,990 | <0.0000268 | 3,000 | <0.1 Trem/Act | NAD |
| M68503-014 **JBP** | 2018-0060-20 **JBP** 183 | 1965 | 17,300 | 0.000044 | 8,700 | NAD | NAD |
| M68503-011 **JBP** | 2018-0060-06 **JBP** 169 | 1966 | <6,072 | <0.0000268 | 6,100 | NAD | NAD |
| M68503-027 **STS** | 2018-0061-09 **STS** 043 | 1966 | <2,998 | <0.0000268 | 3,000 | NAD | NAD |
| M68503-019 **JBP** | 2018-0060-44 **JBP** 087 | 1967 | 8,930 | 0.000045 | 8,900 | NAD | NAD |
| M69042-003 **JBP** | 20180056-31 **JBP** 238 | 1967 | 18,000 | 0.0000033 | 9,000 | NAD | NAD |
| M69042-005 **JBP** | 20180060-25 **JBP** 188 | 1967 | <8,740 | <0.0000268 | 8,700 | NAD | NAD |
| M69042-006 **JBP** | 20180060-49 **JBP** 092 | 1967 | <5,932 | <0.0000268 | 5,900 | NAD | NAD |
| M69042-007 **JBP** | 20180060-50 **JBP** 093 | 1967 | <5,930 | <0.0000268 | 5,900 | NAD | NAD |
| M68503-038 **JBP** | 2018-0061-40 **STS** 004 | 1968 | <3,045 | <0.0000268 | 3,050 | NAD | NAD |
| M68503-026 **STS** | 2018-0061-08 **STS** 042 | 1969 | 268,000 | 0.0064 | 8,650 | <0.1 Trem/Act | <0.1 Trem/Act |

**ATLANTA**
Corporate Headquarters
3945 Lakefield Court
Suwanee, GA 30024
(770) 866-3200   FAX (770) 866-3259



### M68503-010

| Str. # | Length (µm) | Width (µm) | Aspect Ratio | Structure Type | Asbestos Type |
|--------|-------------|------------|--------------|----------------|---------------|
| -1 | 7.0 | 0.7 | 10.0 | Bundle | Tremolite |
| -2 | 12.0 | 0.9 | 13.3 | Bundle | Tremolite |
| -3 | 20.0 | 3.5 | 5.7 | Bundle | Tremolite |
| -4 | 3.7 | 0.5 | 7.4 | Bundle | Tremolite |

**Average Aspect Ratio: 9.1**

### M68503-009

| Str. # | Length (µm) | Width (µm) | Aspect Ratio | Structure Type | Asbestos Type |
|--------|-------------|------------|--------------|----------------|---------------|
| -1 | 3.8 | 0.72 | 5.3 | Bundle | Tremolite |
| -2 | 3.5 | 0.42 | 8.3 | Bundle | Tremolite |

**Average Aspect Ratio: 6.8**

### M68503-014

| Str. # | Length (µm) | Width (µm) | Aspect Ratio | Structure Type | Asbestos Type |
|--------|-------------|------------|--------------|----------------|---------------|
| -1 | 8.6 | 1.3 | 6.6 | Bundle | Tremolite |
| -2 | 7.9 | 0.84 | 9.4 | Bundle | Tremolite |

**Average Aspect Ratio: 8.0**

### M68503-019

| Str. # | Length (µm) | Width (µm) | Aspect Ratio | Structure Type | Asbestos Type |
|--------|-------------|------------|--------------|----------------|---------------|
| -1 | 20.0 | 1.0 | 20.0 | Bundle | Anthophyllite |

**Average Aspect Ratio: 20.0**

### M69042-003

| Str. # | Length (µm) | Width (µm) | Aspect Ratio | Structure Type | Asbestos Type |
|--------|-------------|------------|--------------|----------------|---------------|
| -1 | 4.52 | 0.44 | 10.3 | Bundle | Tremolite |
| -2 | 3.4 | 0.42 | 8.1 | Bundle | Anthophyllite |

**Average Aspect Ratio: 9.2**

**ATLANTA**
Corporate Headquarters
3945 Lakefield Court
Suwanee, GA 30024
(770) 866-3200   FAX (770) 866-3259



### M68503-026

| Str. # | Length (μm) | Width (μm) | Aspect Ratio | Structure Type | Asbestos Type |
|--------|-------------|------------|--------------|----------------|---------------|
| -1 | 7.1 | 0.4 | 17.8 | Bundle | Tremolite |
| -2 | 10.6 | 1.8 | 5.9 | Bundle | Tremolite |
| -3 | 3.1 | 0.23 | 13.5 | Fiber | Tremolite |
| -4 | 7.6 | 0.8 | 9.5 | Bundle | Tremolite |
| -5 | 3.2 | 0.5 | 6.4 | Bundle | Tremolite |
| -6 | 7.3 | 1.2 | 6.1 | Bundle | Tremolite |
| -7 | 7.3 | 0.7 | 10.4 | Bundle | Tremolite |
| -8 | 9.8 | 1.8 | 5.4 | Bundle | Tremolite |
| -9 | 4.3 | 0.8 | 5.4 | Bundle | Tremolite |
| -10 | 7.0 | 0.8 | 8.8 | Bundle | Tremolite |
| -11 | 7.4 | 1.1 | 6.7 | Bundle | Tremolite |
| -12 | 13.3 | 0.7 | 19.0 | Bundle | Tremolite |
| 13 | 3.7 | 0.45 | 8.2 | Bundle | Tremolite |
| -14 | 3.4 | 0.6 | 5.7 | Bundle | Tremolite |
| -15 | 3.2 | 0.23 | 13.9 | Bundle | Tremolite |
| -16 | 30.8 | 4.0 | 7.7 | Bundle | Tremolite |
| -17 | 2.8 | 0.5 | 5.6 | Bundle | Tremolite |
| -18 | 7.9 | 0.92 | 8.6 | Bundle | Tremolite |
| -19 | 7.5 | 0.8 | 9.4 | Bundle | Tremolite |
| -20 | 3.9 | 0.6 | 6.5 | Bundle | Tremolite |
| -21 | 4.1 | 0.6 | 6.8 | Bundle | Tremolite |
| -22 | 3.0 | 0.46 | 6.5 | Bundle | Tremolite |
| -23 | 24.4 | 3.0 | 8.1 | Bundle | Tremolite |
| -24 | 6.5 | 1.1 | 5.9 | Bundle | Tremolite |
| -25 | 8.6 | 0.92 | 9.3 | Bundle | Tremolite |
| -26 | 27.6 | 3.7 | 7.5 | Bundle | Tremolite |
| -27 | 18.4 | 2.3 | 8.0 | Bundle | Tremolite |
| -28 | 75.9 | 4.6 | 16.5 | Bundle | Tremolite |
| -29 | 9.2 | 1.4 | 6.6 | Bundle | Tremolite |
| -30 | 4.6 | 0.7 | 6.6 | Bundle | Tremolite |
| -31 | 6.9 | 1.0 | 6.9 | Bundle | Tremolite |

**Average Aspect Ratio: 8.7**

**WWW.MASTEST.COM**

**ATLANTA**
Corporate Headquarters
3945 Lakefield Court
Suwanee, GA 30024
(770) 866-3200   FAX (770) 866-3259



## Table 3
## Summary of Results for Johnson & Johnson's
## 1970's Historical JBP & STS Samples

| MAS/J³ Sample Number | Client Sample ID | Year of Mnfr. | Amphibole Asbestos Structures/g | Amphibole Asbestos wt. % | Analytical Sensitivity Structures/g | ISO PLM wt. % | Blount PLM wt. % |
|---|---|---|---|---|---|---|---|
| M68503-005 JBP | 2018-0056-30 JBP 237 | 1970 | <8,778 | <0.0000268 | 8,780 | NAD | NAD |
| M69042-009 JBP | 20180060-68 JBP 111 | 1970 | <6,371 | <0.0000268 | 6,370 | <0.1 Trem/Act | NAD |
| M68503-029 JBP | 2018-0061-17 STS 051 | 1971 | <8,417 | <0.0000268 | 8,400 | NAD | NAD |
| M68503-021 JBP | 2018-0060-54 JBP 097 | 1972 | <5,918 | <0.0000268 | 5,920 | NAD | NAD |
| M68503-023 JBP | 2018-0060-64 JBP107 | 1973 | 8,760 | 0.000017 | 8,730 | <0.1 Anth | <0.1 Anth |
| M68503-028 STS | 2018-0061-12 STS 046 | 1974 | 17,500 | 0.000098 | 5,800 | NAD | <0.1 Anth |
| 02D STS | 20180061-02D STS 1611A | 1975 | <9,400 | <0.0000268 | 9,400 | P³-NAD | NAD |
| M69042-001 JBP | 20180056-02D JBP 209 | 1975 | 22,400 | 0.000232 | 4,470 | <0.1 Trem/Act <0.1 Anth | <0.1 Trem/Act |
| M68503-046 STS | 2018-0061-57 STS 021 | 1975 | <5,863 | <0.0000268 | 5,900 | NAD | NAD |
| M68503-042 STS | 2018-0061-49 STS 013 | 1976 | 23,600 | 0.0024 | 5,890 | <0.1 Trem/Act <0.1 Anth | <0.1 Trem/Act |
| M68233-001 JBP | 2018-0015-01A1 JBP 084 | 1978 | 7,240 | 0.00001 | 7,240 | <0.1 Trem/Act | <0.1 Trem/Act |
| M68233-002 JBP | 2018-0015-01A2 JBP 084 | 1978 | 22,130 | 0.00023 | 7,400 | <0.1 Trem/Act | <0.1 Trem/Act |
| M68503-057 JBP | 2018-0070-10 2014.001.0612JBP | 1977 | 8,360 | 0.000038 | 8,360 | <0.1 Trem/Act <0.1 Anth | NAD |
| M68503-020 JBP | 2018-0060-53 JBP 096 | 1978 | 34,800 | 0.000053 | 8,690 | <0.1 Trem/Act <0.1 Anth | <0.1 Trem/Act |
| M69042-002 JBP | 20180056-06 JBP 213 | 1978 | 63,800 | 0.00048 | 9,120 | <0.1 Trem/Act <0.1 Anth | <0.1 Trem/Act <0.1 Anth |
| M69042-004 JBP | 20180056-34 JBP 241 | 1978 | 18,000 | 0.000012 | 6,020 | <0.1 Trem/Act <0.1 Anth | <0.1Trem/Act <0.1 Anth |
| M69042-008 JBP | 20180060-67 JBP 110 | 1978 | 18,100 | 0.00086 | 6,020 | <0.1 Anth | <0.1 Anth |
| 07D STS | 20180070-07D 2014.001.0397 | 1978 | 82,000 | 0.00073 | 9,100 | J³-NAD | 0.2 Trem/Act 0.5 Anth |
| 15D STS | 20180061-15D STS 049 | 1978 | 61,000 | 0.0013 | 8,700 | J³-NAD | 0.3 Trem/Act |
| 50D STS | 20180061-50D STS 1605A | 1978 | <9,300 | <0.0000268 | 9,300 | J-³NAD | <0.1 Anth |
| M68503-059 JBP | 2018-0070-16 JBP 2014.001.1363 | 1979 | 17,100 | 0.00024 | 8,560 | <0.1 Trem/Act <0.1 Anth | <0.1 Trem/Act <0.1 Anth |

NAD: No asbestos detected    J³NAD: Samples analyzed by Lee Poye

**ATLANTA**
Corporate Headquarters
3945 Lakefield Court
Suwanee, GA 30024
(770) 866-3200   FAX (770) 866-3259



### M68503-023

| Str. # | Length (µm) | Width (µm) | Aspect Ratio | Structure Type | Asbestos Type |
|---|---|---|---|---|---|
| -1 | 12.0 | 0.8 | 15.0 | Bundle | Anthophyllite |

**Average Aspect Ratio: 10.7**

### M68503-028

| Str. # | Length (µm) | Width (µm) | Aspect Ratio | Structure Type | Asbestos Type |
|---|---|---|---|---|---|
| -1 | 18.8 | 1.8 | 10.4 | Bundle | Anthophyllite |
| -2 | 5.7 | 0.4 | 14.3 | Bundle | Anthophyllite |
| -3 | 6.0 | 0.9 | 6.7 | Bundle | Anthophyllite |

**Average Aspect Ratio: 10.5**

### M69042-001

| Str. # | Length (µm) | Width (µm) | Aspect Ratio | Structure Type | Asbestos Type |
|---|---|---|---|---|---|
| -1 | 14.4 | 0.4 | 36.0 | Fiber | Anthophyllite |
| -2 | 2.3 | 0.4 | 5.8 | Fiber | Anthophyllite |
| -3 | 15.7 | 2.0 | 7.9 | Bundle | Anthophyllite |
| -4 | 10.0 | 0.2 | 50 | Fiber | Anthophyllite |
| -5 | 22.5 | 2.5 | 9 | Bundle | Anthophyllite |

**Average Aspect Ratio: 21.7**

### M68503-042

| Str. # | Length (µm) | Width (µm) | Aspect Ratio | Structure Type | Asbestos Type |
|---|---|---|---|---|---|
| -1 | 19.0 | 2.0 | 9.5 | Bundle | Anthophyllite |
| -2 | 29.0 | 2.0 | 14.5 | Bundle | Anthophyllite |
| -3 | 6.7 | 0.8 | 8.4 | Bundle | Anthophyllite |
| -4 | 40.0 | 6.0 | 6.7 | Bundle | Anthophyllite |

**Average Aspect Ratio: 9.8**

### M68233-001

| Str. # | Length (µm) | Width (µm) | Aspect Ratio | Structure Type | Asbestos Type |
|---|---|---|---|---|---|
| -1 | 6.8 | 0.9 | 7.6 | Fiber | Anthophyllite |

**Average Aspect Ratio: 7.6**

**ATLANTA**
Corporate Headquarters
3945 Lakefield Court
Suwanee, GA 30024
(770) 866-3200   FAX (770) 866-3259



### M68233-002

| Str. # | Length (µm) | Width (µm) | Aspect Ratio | Structure Type | Asbestos Type |
|--------|-------------|------------|--------------|----------------|---------------|
| -1 | 27.7 | 0.7 | 36.7 | Bundle | Anthophyllite |
| -2 | 16.4 | 2.6 | 6.3 | Bundle | Anthophyllite |
| -3 | 7.6 | 0.5 | 15.2 | Fiber | Anthophyllite |

**Average Aspect Ratio: 19.4**

### M68503-057

| Str. # | Length (µm) | Width (µm) | Aspect Ratio | Structure Type | Asbestos Type |
|--------|-------------|------------|--------------|----------------|---------------|
| -1 | 8.0 | 1.5 | 5.3 | Bundle | Tremolite |

**Average Aspect Ratio: 5.3**

### M68503-020

| Str. # | Length (µm) | Width (µm) | Aspect Ratio | Structure Type | Asbestos Type |
|--------|-------------|------------|--------------|----------------|---------------|
| -1 | 8.5 | 0.42 | 20.2 | Bundle | Anthophyllite |
| -2 | 2.7 | 0.44 | 6.1 | Bundle | Tremolite |
| -3 | 4.62 | 0.62 | 7.5 | Bundle | Anthophyllite |
| -4 | 21.1 | 0.98 | 21.5 | Bundle | Anthophyllite |

**Average Aspect Ratio: 13.8**

### M69042-002

| Str. # | Length (µm) | Width (µm) | Aspect Ratio | Structure Type | Asbestos Type |
|--------|-------------|------------|--------------|----------------|---------------|
| -1 | 35.4 | 1.8 | 19.7 | Bundle | Anthophyllite |
| -2 | 12.4 | 1.1 | 11.3 | Bundle | Anthophyllite |
| -3 | 6.4 | 1.1 | 5.8 | Bundle | Anthophyllite |
| -4 | 6.0 | 0.7 | 8.6 | Bundle | Anthophyllite |
| -5 | 34.5 | 1.1 | 31.4 | Bundle | Anthophyllite |
| -6 | 11.5 | 1.2 | 9.6 | Bundle | Anthophyllite |
| -7 | 11.5 | 1.0 | 11.5 | Bundle | Anthophyllite |

**Average Aspect Ratio: 14.0**

**ATLANTA**
Corporate Headquarters
3945 Lakefield Court
Suwanee, GA 30024
(770) 866-3200   FAX (770) 866-3259



### M69042-004

| Str. # | Length (µm) | Width (µm) | Aspect Ratio | Structure Type | Asbestos Type |
|--------|-------------|------------|--------------|----------------|---------------|
| -1 | 13.4 | 0.4 | 33.5 | Fiber | Anthophyllite |
| -2 | 4.2 | 0.38 | 11.1 | Bundle | Anthophyllite |
| -3 | 13.4 | 0.63 | 21.3 | Bundle | Anthophyllite |

**Average Aspect Ratio: 21.9**

### M69042-008

| Str. # | Length (µm) | Width (µm) | Aspect Ratio | Structure Type | Asbestos Type |
|--------|-------------|------------|--------------|----------------|---------------|
| -1 | 3.9 | 0.5 | 7.8 | Bundle | Anthophyllite |
| -2 | 7.8 | 1.5 | 5.2 | Bundle | Anthophyllite |
| -3 | 5.3 | 0.5 | 10.6 | Bundle | Anthophyllite |

**Average Aspect Ratio: 7.9**

**ATLANTA**
Corporate Headquarters
3945 Lakefield Court
Suwanee, GA 30024
(770) 866-3200   FAX (770) 866-3259



### 07D

| Str. # | Length (μm) | Width (μm) | Aspect Ratio | Structure Type | Asbestos Type |
|--------|-------------|------------|--------------|----------------|---------------|
| -1 | 3.5 | 0.25 | 14 | Fiber | Anthophyllite |
| -2 | 6.0 | 0.4 | 15 | Bundle | Anthophyllite |
| -3 | 7.5 | 0.2 | 37.5 | Bundle | Anthophyllite |
| -4 | 11.0 | 0.6 | 18.3 | Bundle | Anthophyllite |
| -5 | 4.0 | 0.25 | 16 | Bundle | Anthophyllite |
| -6 | 14.0 | 1.1 | 12.7 | Bundle | Anthophyllite |
| -7 | 8.5 | 0.4 | 21.3 | Bundle | Anthophyllite |
| -8 | 9.0 | 0.7 | 12.9 | Bundle | Anthophyllite |

**Average Aspect Ratio: 18.5**

### 15D

| Str. # | Length (μm) | Width (μm) | Aspect Ratio | Structure Type | Asbestos Type |
|--------|-------------|------------|--------------|----------------|---------------|
| -1 | 6.6 | 0.7 | 9.4 | Bundle | Anthophyllite |
| -2 | 5.2 | 0.22 | 23.6 | Bundle | Anthophyllite |
| -3 | 20.3 | 0.92 | 22.1 | Bundle | Anthophyllite |
| -4 | 27.0 | 1.5 | 18 | Bundle | Anthophyllite |
| -5 | 5.9 | 0.22 | 26.8 | Fiber | Anthophyllite |

**Average Aspect Ratio: 20.0**

### M68503-059

| Str. # | Length (μm) | Width (μm) | Aspect Ratio | Structure Type | Asbestos Type |
|--------|-------------|------------|--------------|----------------|---------------|
| -1 | 12.0 | 0.4 | 30.0 | Bundle | Anthophyllite |
| -2 | 17.0 | 2.5 | 6.8 | Bundle | Anthophyllite |

**Average Aspect Ratio: 18.4**

Page **40** of **56**

**ATLANTA**
Corporate Headquarters
3945 Lakefield Court
Suwanee, GA 30024
(770) 866-3200   FAX (770) 866-3259



## Table 4

## Summary of Results for Johnson & Johnson's
## 1980's Historical JBP & STS Samples

| MAS/J³ Sample Number | Client Sample ID | Year of Mnfr. | Amphibole Asbestos Structures/g | Amphibole Asbestos wt. % | Analytical Sensitivity Structures/g | ISO PLM wt. % | Blount PLM wt. % |
|---|---|---|---|---|---|---|---|
| 10D **STS** | 20180061-10D **STS** 044 | 1980 | N/A | N/A | N/A | J³-NAD | 0.2 Tre/Act <0.1 Anth |
| 38D **STS** | 20180061-38D **STS** 002 | 1980 | 53,000 | 0.003 | 7,600 | J³-NAD | 0.2 Tre/Act 0.2 Anth |
| 63D **STS** | 20180061-63D **STS** 027D | **1980-1981** | N/A | N/A | N/A | J³-NAD | 0.2 Tre/Act 0.2 Anth |
| 52D **STS** | 20180061-52D **STS** 016 | 1981 | 70,000 | 0.004 | 7,800 | J³-NAD | 0.2 Tre/Act 0.5 Anth |
| 65D **STS** | 20180061-65D **STS** 029 | 1981 | 95,000 | 0.0092 | 7,300 | J³-NAD | 0.2 Tre/Act 0.2 Anth |
| 37D **STS** | 20180061-37D **STS** 001 | 1982 | 9,300 | 0.00005 | 9,300 | J³-NAD | <0.1 Tre/Act <0.1 Anth |
| 45D **STS** | 20180061-45D **STS** 009 | 1982 | 9,000 | 0.0019 | 9,000 | J³-NAD | <0.1 Tre/Act |
| 51D **STS** | 20180061-51D **STS** 1606A | 1982 | <9,400 | N/A | 9,400 | J³-NAD | <0.1 Tre/Act |
| 66D **STS** | 20180061-66D **STS** 1610A | 1982 | <9,400 | N/A | 9,400 | J³-NAD | 0.1 Tre/Act |
| 21D **STS** | 20180061-21D **STS** 1614A | 1983 | <8,300 | N/A | 8,300 | J³-NAD | <0.1 Tre/Act <0.1 Anth |
| M68503-001 **JBP** | 2018-0051-34 **JBP** 294 | 1984 | 18,700 | 0.000036 | 6,240 | <0.1Tre/Act | <0.1 Tre/Act |
| M69042-010 **JBP** | 2018-0070-86 2014.001.5102 **JBP** | 1985 | 12,500 | 0.000035 | 6,200 | <0.1Tre/Act | <0.1 Anth |
| 31F **STS** | 20180061-31F **STS** 065 | 1986 | 22,000 | 0.0029 | 7,300 | J³-NAD | 0.3 Tre/Act < 0.1 Anth |
| 31G **STS** | 20180061-31G **STS** 065 | 1986 | 30,000 | 0.00052 | 7,500 | J³-NAD | 0.7 Tre/Act |
| M69751-037 **Imerys** | 20180314-03 **Imerys** | 1989 | 59,000 | 0.000089 | 4500 | <0.1 Tre/Act | <0.1 Tre/Act <0.1 Anth |

NAD: no asbestos detected.  J-³NAD: Samples analyzed by Lee Poye.

**ATLANTA**
Corporate Headquarters
3945 Lakefield Court
Suwanee, GA 30024
(770) 866-3200   FAX (770) 866-3259



### 38D

| Str. # | Length (μm) | Width (μm) | Aspect Ratio | Structure Type | Asbestos Type |
|--------|-------------|------------|--------------|----------------|---------------|
| -1 | 3.2 | 0.6 | 5.3 | Bundle | Anthophyllite |
| -2 | 3.6 | 0.7 | 5.1 | Bundle | Anthophyllite |
| -3 | 18.9 | 1.5 | 12.6 | Bundle | Anthophyllite |
| -4 | 6.0 | 0.9 | 6.7 | Bundle | Anthophyllite |
| -5 | 6.2 | 1.1 | 5.6 | Bundle | Anthophyllite |
| -6 | 3.5 | 0.4 | 8.9 | Fiber | Anthophyllite |
| -7 | 6.0 | 0.3 | 20.0 | Bundle | Anthophyllite |
| -8 | 3.1 | 0.25 | 12.4 | Bundle | Anthophyllite |

**Average Aspect Ratio: 9.6**

### 52D

| Str. # | Length (μm) | Width (μm) | Aspect Ratio | Structure Type | Asbestos Type |
|--------|-------------|------------|--------------|----------------|---------------|
| -1 | 46.5 | 1.5 | 31 | Bundle | Anthophyllite |
| -2 | 29.2 | 1.5 | 19.5 | Bundle | Anthophyllite |
| -3 | 10.0 | 0.5 | 20 | Bundle | Anthophyllite |
| -4 | 22.5 | 1.3 | 17.3 | Bundle | Anthophyllite |
| -5 | 11.7 | 1.0 | 11.7 | Bundle | Anthophyllite |
| -6 | 9.5 | 1.0 | N/A | Bundle | Talc |
| -7 | 31.0 | 1.0 | 31 | Bundle | Anthophyllite |
| -8 | 9.0 | 0.25 | 36 | Fiber | Anthophyllite |
| -9 | 3.8 | 0.3 | 12.7 | Bundle | Anthophyllite |

**Average Aspect Ratio: 22.4**

Page **42** of 56

**ATLANTA**
Corporate Headquarters
3945 Lakefield Court
Suwanee, GA 30024
(770) 866-3200   FAX (770) 866-3259



## 65D

| Str. # | Length (μm) | Width (μm) | Aspect Ratio | Structure Type | Asbestos Type |
|--------|-------------|------------|--------------|----------------|---------------|
| -1 | 18.0 | 1.5 | 12 | Bundle | Anthophyllite |
| -2 | 14.3 | 1.5 | 9.5 | Bundle | Anthophyllite |
| -3 | 20.2 | 1.3 | 15.5 | Bundle | Anthophyllite |
| -4 | 11.2 | 0.7 | 16 | Bundle | Anthophyllite |
| -5 | 6.8 | 0.7 | 9.7 | Bundle | Anthophyllite |
| -6 | 13.3 | 0.7 | 19 | Bundle | Anthophyllite |
| -7 | 22.3 | 1.5 | 14.9 | Bundle | Anthophyllite |
| -8 | 17.0 | 0.22 | 77.3 | Fiber | Anthophyllite |
| -9 | 28.0 | 2.5 | 11.2 | Bundle | Anthophyllite |
| -10 | 9.5 | 1.3 | 7.3 | Bundle | Anthophyllite |
| -11 | 12.0 | 0.8 | 15 | Bundle | Anthophyllite |
| -12 | 10.2 | 0.4 | 25.5 | Bundle | Anthophyllite |
| -13 | 23.0 | 3.5 | 6.6 | Bundle | Anthophyllite |

**Average Aspect Ratio: 18.4**

## 37D

| Str. # | Length (μm) | Width (μm) | Aspect Ratio | Structure Type | Asbestos Type |
|--------|-------------|------------|--------------|----------------|---------------|
| -1 | 15.8 | 2.6 | 6.1 | Bundle | Anthophyllite |

**Average Aspect Ratio: 6.1**

## 45D

| Str. # | Length (μm) | Width (μm) | Aspect Ratio | Structure Type | Asbestos Type |
|--------|-------------|------------|--------------|----------------|---------------|
| -1 | 17.5 | 2.2 | 8.0 | Bundle | Anthophyllite |

**Average Aspect Ratio: 8.0**

WWW.MASTEST.COM

**ATLANTA**
Corporate Headquarters
3945 Lakefield Court
Suwanee, GA 30024
(770) 866-3200   FAX (770) 866-3259



### M68503-001

| Str. # | Length (μm) | Width (μm) | Aspect Ratio | Structure Type | Asbestos Type |
|---|---|---|---|---|---|
| -1 | 9.89 | 0.46 | 21.5 | Bundle | Anthophyllite |
| -2 | 3.2 | 0.59 | 5.4 | Bundle | Tremolite |
| -3 | 10.4 | 1.38 | 7.5 | Bundle | Tremolite |

**Average Aspect Ratio: 11.5**

### M69042-010

| Str. # | Length (μm) | Width (μm) | Aspect Ratio | Structure Type | Asbestos Type |
|---|---|---|---|---|---|
| -1 | 9.2 | 1.5 | 6.1 | Bundle | Anthophyllite |
| -2 | 8.9 | 0.42 | 21.2 | Bundle | Anthophyllite |

**Average Aspect Ratio: 11.5**

### 31F

| Str. # | Length (μm) | Width (μm) | Aspect Ratio | Structure Type | Asbestos Type |
|---|---|---|---|---|---|
| -1 | 21.6 | 1.3 | 16.6 | Bundle | Anthophyllite |

**Average Aspect Ratio: 16.6**

### 31G

| Str. # | Length (μm) | Width (μm) | Aspect Ratio | Structure Type | Asbestos Type |
|---|---|---|---|---|---|
| -1 | 30.1 | 0.7 | 43 | Bundle | Anthophyllite |
| -2 | 13.5 | 0.7 | 19.3 | Bundle | Anthophyllite |
| -3 | 7.0 | 0.7 | 10 | Bundle | Anthophyllite |
| -4 | 22.5 | 1.5 | 15 | Bundle | Anthophyllite |

**Average Aspect Ratio: 21.8**

Page **44** of **56**

**ATLANTA**
Corporate Headquarters
3945 Lakefield Court
Suwanee, GA 30024
(770) 866-3200   FAX (770) 866-3259



# Table 5
## Summary of Results for Johnson & Johnson's
## 1990's Historical JBP & Imerys Samples

| MAS/J³ Sample Number | Client Sample ID | Year of Mnfr. | Amphibole Asbestos Structures/g | Amphibole Asbestos wt. % | Analytical Sensitivity Structures/g | ISO PLM wt. % | Blount PLM wt. % |
|---|---|---|---|---|---|---|---|
| M69757-005 | 20180343-03A Imerys | 1990 | 27000 | 0.000010 | 4500 | <0.1 Tre/Act <0.1 Anth | <0.1 Tre/Act <0.1 Anth |
| M69757-007 | 20180358-01A Imerys | 1990 | 39000 | 0.00030 | 4300 | <0.1 Tre/Act | <0.1 Tre/Act <0.1 Anth |
| M69751-039 | 20180320-01A Imerys | 1991 | <4400 | <0.0000268 | 4400 | NAD | NAD |
| M69751-040 | 20180320-13A Imerys | 1991 | 13000 | 0.000015 | 4500 | NAD | <0.1 Tre/Act |
| M68503-016 JBP | 2018-0060-33 JBP 001 | 1994 | <9000 | <0.0000268 | 9000 | NAD | NAD |
| M69757-004 | 20180339-05A Imerys | 1994 | <4400 | <0.0000268 | <4400 | NAD | NAD |
| M69751-036 | 20180313-02A Imerys | 1995 | 4400 | 0.00000022 | 4400 | NAD | NAD |
| M68503-017 JBP | 2018-0060-38 JBP 006 | 1996 | <9000 | <0.0000268 | 9000 | NAD | NAD |
| M69757-006 | 20180344-04A Imerys | 1996 | <4400 | <0.0000268 | 4400 | NAD | NAD |
| M69751-002 | 20180315-021A Imerys | 1999 | <4400 | <0.0000268 | 4400 | NAD | NAD |

NAD: no asbestos detected.

Page **45** of **56**

WWW.MASTEST.COM

**ATLANTA**
Corporate Headquarters
3945 Lakefield Court
Suwanee, GA 30024
(770) 866-3200   FAX (770) 866-3259



### M69757-005

| Str. # | Length (μm) | Width (μm) | Aspect Ratio | Structure Type | Asbestos Type |
|--------|-------------|------------|--------------|----------------|---------------|
| -1 | 2.32 | 0.21 | 11.0 | Bundle | Anthophyllite |
| -2 | 6.1 | 0.42 | 14.5 | Bundle | Anthophyllite |
| -3 | 4.4 | 0.84 | 5.2 | Bundle | Anthophyllite |
| -4 | 2.72 | 0.42 | 6.5 | Bundle | Anthophyllite |
| -5 | 8.7 | 0.38 | 22.9 | Bundle | Anthophyllite |
| -6 | 4.82 | 0.76 | 6.3 | Bundle | Anthophyllite |

**Average Aspect Ratio: 11.1**

### M69757-007

| Str. # | Length (μm) | Width (μm) | Aspect Ratio | Structure Type | Asbestos Type |
|--------|-------------|------------|--------------|----------------|---------------|
| -1 | 5.6 | 1.1 | 5.1 | Bundle | Anthophyllite |
| -2 | 4.6 | 0.64 | 7.2 | Bundle | Anthophyllite |
| -3 | 9.9 | 0.36 | 27.5 | Fiber | Anthophyllite |
| -4 | 10.9 | 0.35 | 31.1 | Bundle | Anthophyllite |
| -5 | 11.7 | 1.4 | 8.4 | Bundle | Anthophyllite |
| -6 | 11.6 | 1.1 | 10.5 | Bundle | Actinolite |
| -7 | 11.8 | 1.6 | 7.4 | Bundle | Anthophyllite |
| -8 | 8 | 1.3 | 6.2 | Bundle | Anthophyllite |
| -9 | 49.4 | 2.1 | 23.5 | Bundle | Talc-Anth |

**Average Aspect Ratio: 11.1**

### M69751-040

| Str. # | Length (μm) | Width (μm) | Aspect Ratio | Structure Type | Asbestos Type |
|--------|-------------|------------|--------------|----------------|---------------|
| -1 | 7.4 | 0.62 | 11.9 | Bundle | Anthophyllite |
| -2 | 14.9 | 0.74 | 20.1 | Bundle | Anthophyllite |
| -3 | 6.72 | 0.62 | 10.8 | Bundle | Anthophyllite |

**Average Aspect Ratio: 11.1**

**ATLANTA**
Corporate Headquarters
3945 Lakefield Court
Suwanee, GA 30024
(770) 866-3200   FAX (770) 866-3259



### M69751-036

| Str. # | Length (μm) | Width (μm) | Aspect Ratio | Structure Type | Asbestos Type |
|--------|-------------|------------|--------------|----------------|---------------|
| -1 | 6.3 | 0.18 | 35.0 | Bundle | Tremolite |

**Average Aspect Ratio: 35.0**

## Table 6
## Summary of Results for Johnson & Johnson's
## 2000's Historical Imerys Samples

| MAS/J³ Sample Number | Client Sample ID | Year of Mnfr. | Amphibole Asbestos Structures /g | Amphibole Asbestos wt. % | Analytical Sensitivity Structures/g | ISO PLM wt. % | Blount PLM wt. % |
|------|------|------|------|------|------|------|------|
| M69751-001 | 2018-0315-01A | 2001-2002 | 4400 | 0.000017 | 4400 | NAD | NAD |
| M69751-006 | 2018-0316-020A | 2000 | 4600 | 0.0000024 | 4600 | NAD | <0.1 Tre/Act |
| M69751-007 | 2018-0316-021A | 2000 | 8700 | 0.000024 | 4300 | NAD | NAD |
| M69751-038 | 2018-0317-04A | 2000 | <4400 | <0.0000268 | 4400 | NAD | NAD |
| M69751-004 | 2018-0315-040A | 2001 | <4300 | <0.0000268 | 4300 | NAD | NAD |
| M69751-008 | 2018-0316-022A | 2003 | <4400 | <0.0000268 | 4400 | NAD | NAD |

NAD: no asbestos detected.

### M69751-001

| Str. # | Length (μm) | Width (μm) | Aspect Ratio | Structure Type | Asbestos Type |
|--------|-------------|------------|--------------|----------------|---------------|
| -1 | 10.5 | 1.2 | 8.8 | Bundle | Tremolite |

**Average Aspect Ratio: 8.8**

**ATLANTA**
Corporate Headquarters
3945 Lakefield Court
Suwanee, GA 30024
(770) 866-3200   FAX (770) 866-3259



**M69751-006**

| Str. # | Length (μm) | Width (μm) | Aspect Ratio | Structure Type | Asbestos Type |
|--------|-------------|------------|--------------|----------------|---------------|
| -1 | 8.2 | 0.5 | 16.4 | Bundle | Tremolite |

**Average Aspect Ratio: 35.0**

**M69751-007**

| Str. # | Length (μm) | Width (μm) | Aspect Ratio | Structure Type | Asbestos Type |
|--------|-------------|------------|--------------|----------------|---------------|
| -1 | 16.0 | 1 | 16.0 | Bundle | Tremolite |
| -2 | 7.6 | 0.9 | 8.4 | Bundle | Tremolite |

**Average Aspect Ratio: 12.2**

**Table 7**
**Summary of J³ XRD & PLM Analysis**
**Asian**

| MAS Sample Number | Date of Manuf. | ISO XRD |
|-------------------|----------------|---------|
| M69248-001 | N/A | NAD |
| M69248-002 | 1979 | inconclusive |
| M69248-003 | 1980-1984 | positive |
| M69248-004 | N/A | NAD |
| M69248-005 | N/A | NAD |
| M69248-006 | 1982 | NAD |
| M69248-007 | N/A | positive |

NAD: no asbestos detected  N/A: dates of manufacture not provided by J&J

**ATLANTA**
Corporate Headquarters
3945 Lakefield Court
Suwanee, GA 30024
(770) 866-3200   FAX (770) 866-3259



**Table 8**
**Summary of J³ XRD & PLM Analysis**
**1960's**

| MAS Sample Number | Date of Manuf. | ISO XRD | J3 ISO PLM % | MAS ISO PLM % |
|---|---|---|---|---|
| M68503-010 | 1960 | NAD | NAD | NAD |
| M68503-009 | 1962 | NAD | NAD | NAD |
| M68508-024 | 1963 | NAD | NAD | NAD |
| M68503-004 | 1964 | NAD | NAD | <0.1 Trem/Act |
| M68503-014 | 1965 | NAD | NAD | NAD |
| M68503-011 | 1966 | NAD | NAD | NAD |
| M68503-027 | 1966 | NAD | NAD | NAD |
| M69042-007 | 1966-1967 | NAD | --- | NAD |
| M69042-003 | 1967 | NAD | --- | NAD |
| M69042-005 | 1967 | NAD | --- | NAD |
| M69042-006 | 1967 | NAD | --- | NAD |
| M68503-019 | 1967 | NAD | NAD | NAD |
| M68503-038 | 1968 | NAD | NAD | NAD |
| M68503-026 | 1969 | NAD | NAD | <0.1 Trem/Act |

NAD: no asbestos detected

**ATLANTA**
Corporate Headquarters
3945 Lakefield Court
Suwanee, GA 30024
(770) 866-3200   FAX (770) 866-3259



## Summary of J³ XRD & J³/ MAS PLM Analysis

## 1970's

| MAS Sample Number | Date of Manuf. | ISO XRD | J3 ISO PLM % | MAS ISO PLM % |
|---|---|---|---|---|
| M68503-005 | 1970 | NAD | NAD | NAD |
| M69042-009 | 1970 | NAD | ---* | <0.1 Trem/Act |
| M68503-029 | 1971 | NAD | NAD | NAD |
| M68503-021 | 1972 | NAD | NAD | NAD |
| M68503-023 | 1973 | NAD | NAD | <0.1 Anth. |
| M68503-028 | 1974 | NAD | NAD | NAD |
| 02D | 1975 | NAD | NAD | --- |
| M69042-001 | 1975 | NAD | --- | <0.1 Trem/Ac <0.1 Anth |
| M68503-046 | 1975 | NAD | NAD | NAD |
| M68503-042 | 1976 | NAD | NAD | <0.1 Trem/Act <0.1 Anth |
| M68233-001 | 1978 | NAD | __ | <0.1 Trem/Act |
| M68233-002 | 1978 | NAD | __ | <0.1 Trem/Act |
| M68503-057 | 1978 | NAD | NAD | <0.1 Trem/Act <0.1 Anth |
| M68503-020 | 1978 | NAD | NAD | <0.1 Anth |
| M69042-002 | 1978 | NAD | --- | <0.1 Trem/Act <0.1 Anth |
| M69042-004 | 1978 | NAD | __ | <0.1 Trem/Act <0.1 Anth |
| M69042-008 | 1978 | NAD | ---- | <0.1 Anth |
| 07D | 1978 | NAD | NAD | -- |
| 15D | 1978 | NAD | NAD | -- |
| 50D | 1978 | NAD | NAD | -- |
| M68503-059 | 1979 | NAD | NAD | <0.1 Trem/Act <0.1 Anth |

NAD: no asbestos detected   *: not analyzed

**ATLANTA**
Corporate Headquarters
3945 Lakefield Court
Suwanee, GA 30024
(770) 866-3200   FAX (770) 866-3259



## Summary of J³ XRD & PLM Analysis

## 1980's

| MAS/P³ Sample Number | Date of Manuf. | ISO XRD | J3 ISO PLM | MAS ISO PLM |
|---|---|---|---|---|
| 10D | 1980 | NAD | NAD | --* |
| 38D | 1980 | NAD | NAD | -- |
| 63D | 1980-1981 | NAD | NAD | -- |
| 52D | 1981 | NAD | NAD | -- |
| 65D | 1981 | NAD | NAD | -- |
| 37D | 1982 | NAD | NAD | -- |
| 45D | 1982 | NAD | NAD | -- |
| 51D | 1982 | NAD | NAD | -- |
| 66D | 1982 | NAD | NAD | -- |
| 21D | 1983 | NAD | NAD | -- |
| M68503-001 | 1984 | NAD | NAD | <0.1% Trem/Act |
| M69042-010 | 1985 | NAD | --- | <0.1% Trem/Act |
| 31F | 1986 | NAD | NAD | -- |
| 31G | 1986 | NAD | NAD | -- |

**NAD: no asbestos detected, *: not analyzed**

**ATLANTA**
Corporate Headquarters
3945 Lakefield Court
Suwanee, GA 30024
(770) 866-3200   FAX (770) 866-3259



## Summary of J³ XRD Analysis

### 1990's

| MAS Sample Number | Date of Manuf. | ISO XRD |
|---|---|---|
| M69757-005 | 1990 | N/A |
| M69757-007 | 1990 | N/A |
| M69751-039 | 1991 | N/A |
| M69751-040 | 1991 | N/A |
| M68503-016 | 1994 | NAD |
| M69757-004 | 1994 | N/A |
| M69751-036 | 1995 | N/A |
| M68503-017 | 1996 | NAD |
| M69757-006 | 1996 | N/A |
| M69751-002 | 1999 | N/A |

**NAD: no asbestos detected    N/A: Sample not analyzed**

## Summary of J³ XRD Analysis

### Early 2000's

| MAS Sample Number | Date of Manuf. | ISO XRD |
|---|---|---|
| M69751-005 | 2000 | N/A |
| M69751-007 | 2000 | N/A |
| M69751-039 | 2000 | N/A |
| M69751-040 | 2000 | N/A |
| M69751-004 | 2001 | N/A |
| M69751-036 | 2001 | N/A |

**N/A: not analyzed**

Page **52** of **56**

**ATLANTA**
Corporate Headquarters
3945 Lakefield Court
Suwanee, GA 30024
(770) 866-3200   FAX (770) 866-3259



## Table 9

## Occurrence of Fibrous Talc in Historical J&J Cosmetic Talcum Powders

### 1960's

| Sample # | Date of Manufacture | TEM Analysis F.T | Talc Fibers per gram | ISO22262-1 PLM Analysis |
|---|---|---|---|---|
| M68503-010 | 1960 | Trace | 852,000 | Trace |
| M68503-009 | 1962 | Trace | 882,000 | Trace |
| M68503-024 | 1963 | Trace | 896,000 | Trace |
| M68503-004 | 1964 | Trace | 298,000 | Trace |
| M68503-014 | 1965 | Trace | 864,000 | Trace |
| M68503-027 | 1966 | Trace | 290,000 | Trace |
| M68503-011 | 1967 | NSD | N/A | Trace |
| M68503-019 | 1967 | Trace | 892,000 | Trace |
| M69042-003 | 1967 | Trace | 890,000 | Moderate |
| M69042-005 | 1967 | Trace | 873,000 | Moderate |
| M69042-006 | 1967 | NSD | N/A | Moderate |
| M69042-007 | 1967 | NSD | N/A | Moderate |
| M68503-038 | 1968 | Trace | 304,000 | Trace |
| M68503-026 | 1969 | Trace | 864,000 | Trace |

**N/A: Not applicable, fibrous talc calculations not possible**

**ATLANTA**
Corporate Headquarters
3945 Lakefield Court
Suwanee, GA 30024
(770) 866-3200   FAX (770) 866-3259



# 1970's

| Sample # | Date of Manufacture | TEM Analysis F.T | Talc Fibers per gram | ISO22262-1 PLM Analysis |
|---|---|---|---|---|
| M68503-005 | 1970 | Trace | 877,000 | Trace |
| M69042-009 | 1970 | Trace | 637,000 | Moderate |
| M68503-029 | 1971 | Trace | 1,020,000 | Trace |
| M68503-021 | 1972 | NSD | N/A | Trace |
| M68503-023 | 1973 | Trace | 876,000 | Trace |
| M68503-028 | 1974 | NSD | N/A | Trace |
| 02D | 1975 | 1 Fiber* | N/A | N/A |
| M69042-001 | 1975 | NSD | N/A | N/A |
| M68503-046 | 1975 | NSD | N/A | Trace |
| M68503-042 | 1976 | NSD | N/A | Trace |
| M68233-001 | 1978 | NSD | N/A | Trace |
| M68233-002 | 1978 | Trace | 735,00 | Trace |
| M68503-057 | 1977 | NSD | N/A | Trace |
| M68503-020 | 1978 | Trace | 868,000 | Trace |
| M69042-002 | 1978 | Trace | 890,000 | Moderate |
| M69042-004 | 1978 | Trace | 603,000 | Moderate |
| M69042-008 | 1978 | NSD | N/A | Moderate |
| 07D | 1978 | 1 Fiber | N/A | NSD |
| 15D | 1978 | None reported | N/A | NSD |
| 50D | 1978 | 3 Fibers | N/A | NSD |
| M68503-059 | 1979 | Trace | 855,000 | Trace |

*No criteria provide by P³ for fibrous talc estimation.   N/A:  Not applicable, fibrous talc calculations not possible

**ATLANTA**
Corporate Headquarters
3945 Lakefield Court
Suwanee, GA 30024
(770) 866-3200   FAX (770) 866-3259



## 1980's

| Sample # | Date of Manufacture | TEM Analysis F.T | Talc Fibers per gram | ISO22262-1 PLM Analysis |
|----------|---------------------|------------------|----------------------|-------------------------|
| 38D | 1980 | None Reported | N/A | N/A |
| 52D | 1981 | None Reported | N/A | N/A |
| 65D | 1981 | None Reported | N/A | N/A |
| 37D | 1982 | 2 Fibers* | N/A | N/A |
| 45D | 1982 | 3 Fibers | N/A | N/A |
| 51D | 1982 | None Reported | N/A | N/A |
| 66D | 1982 | None Reported | N/A | N/A |
| 21D | 1983 | 1 Fiber | N/A | N/A |
| M68503-001 | 1984 | Trace | 624,000 | Trace |
| M69042-010 | 1985 | Trace | 624,000 | Moderate |
| 31F | 1986 | 1 Fiber | N/A | N/A |
| 31G | 1986 | 2 Fibers | N/A | N/A |
| M69751-037 | 1989 | Trace | 548,000 | Moderate |

*No criteria provide by P³ for fibrous talc estimation.   N/A: Not applicable, fibrous talc calculations not possible

## 1990's

| Sample # | Date of Manufacture | TEM Analysis F.T | Talc Fibers Per gram | ISO22262-1 PLM Analysis |
|----------|---------------------|------------------|----------------------|-------------------------|
| M69757-005 | 1990 | Trace | 434,000 | Moderate |
| M69757-007 | 1990 | Trace | 478,000 | Moderate |
| M69751-039 | 1991 | Trace | 497,000 | Moderate |
| M69751-040 | 1991 | Trace | 451,000 | Moderate |
| M68503-016 | 1994 | Trace | 898,000 | Trace |
| M69757-004 | 1994 | Trace | 403,000 | Trace |
| M69751-036 | 1995 | Trace | 438,000 | Moderate |
| M68503-017 | 1996 | Trace | 895,000 | Trace |
| M69757-006 | 1996 | Trace | 439,000 | Moderate |
| M69751-002 | 1999 | NSD | N/A | Moderate |

N/A: Not applicable, fibrous talc calculations not possible

WWW.MASTEST.COM

**ATLANTA**
Corporate Headquarters
3945 Lakefield Court
Suwanee, GA 30024
(770) 866-3200   FAX (770) 866-3259



## Early 2000's

| Sample # | Date of Manufacture | TEM Analysis F.T | Talc Fibers Per gram | ISO22262-1 PLM Analysis |
|---|---|---|---|---|
| M69751-001 | 2000 | Trace | 471,000 | Moderate |
| M69751-006 | 2000 | Trace | 439,000 | Trace |
| M69751-007 | 2000 | Trace | 458,000 | Trace |
| M69571-038 | 2000 | Trace | 437,000 | Moderate |
| M69751-004 | 2001 | Trace | 434,000 | Moderate |
| M69751-008 | 2003 | NSD | N/A | Trace |

**N/A**: Not applicable, fibrous talc calculations not possible

## Asian

| Sample # | Date of Manufacture | TEM Analysis F.T | Talc Fibers per gram | ISO22262-1 PLM Analysis |
|---|---|---|---|---|
| M69248-001 | Unknown* | Trace | 577,000 | Trace |
| M69248-002 | 1979 | Trace | 582,000 | Trace |
| M69248-003 | 1980-1984 | Trace | 930,000 | Trace |
| M69248-004 | unknown | Trace | 860,000 | Trace |
| M69248-005 | unknown | Trace | 870,000 | Trace |
| M69248-006 | 1982 | NSD | N/A | Trace |
| M69248-007 | unknown | NSD | N/A | Trace |

**\*J&J did not provide date of manufacture.  N/A:  Not applicable, fibrous talc calculations not possible**

Exhibit 27



**ATLANTA**
Corporate Headquarters
3945 Lakefield Court
Suwanee, GA 30024
(770) 866-3200  FAX (770) 866-3259

# 4th Supplemental MDL Report

# Analysis of Non-Historical J&J's Talcum Powder Consumer Product Containers and J&J Chinese Historical Talc Retain Samples



Anthophyllite Bundle 1967

**William E. Longo, Ph.D., CEO**

**Materials Analytical Services, LLC**
**3945 Lakefield Court**
**Suwanee, GA 30024**

**April 29, 2024**

**LOS ANGELES**  3020 OLD RANCH PARKWAY   SUITE 300   SEAL BEACH, CA 90740   (562) 799-5530   FAX (562) 799-5531
**WWW.MASTEST.COM**

# 4th MDL Supplemental Report

This supplemental report contains the following new information obtained by MAS since the 2nd & 3rd Supplement MDL Reports were issued on February 1, 2019 and November 17, 2023. This supplemental report was issued to fix typographical errors.

 Also, when the last MDL report was issued, MAS was not analyzing cosmetic talc samples for chrysotile using the heavy liquid separation (HLS) sample preparation method.  After reviewing the Colorado School of Mines (CSM) protocol for the analysis of chrysotile using a HLS sample preparation method with PLM analysis, MAS worked on developing a more efficient protocol for the detection of chrysotile in cosmetic talc samples.  The Colorado School of Mines developed this

MAS has analyzed 40 JBP containers that were all manufactured with J&J's Chinese talc source. MAS has also analyzed 11 J&J Chinese talc retains along with two additional JBP Vermont sourced talc containers.

All additional J&J talcum powder product analysis Reports have been previously provided to defense council on behalf of J&J, and I have been questioned by J&J defense council on all of these sample analysis reports during numerous depositions.   These Reports provide all of the sample chain-of-custodies, the analytical protocols used for that particular set of samples and results.

Therefore, this Supplement report will only contain the results for the 43 additional analyses that were performed after our last MDL Supplement Report was issued on February 1, 2019.

## J&J Vermont Talc Source

Table 1 provides the J&J sample information and analytical results for the three JBP containers were talcum powder was sourced from Vermont.

## J&J Chinese Talc Source

The overall results show that out of the 43 J&J talcum powder samples analyzed that contained Chinese sourced talc, 40 or 93% were positive for either amphibole asbestos and or chrysotile. As discussed above, the Reports for 41 of the 43 JBP and Shower to Shower sample sets have been provided to J&J, and those reports will contain the full methodology used for each set of

sample analysis. Therefore, there was not any reason to duplicate the methodology here in this report.

Besides J&J talcum powder container samples, MAS also received 11 Chinese retained talc samples that consisted of two Imerys retains and nine J&J retains. The results of these 11 samples are shown in Table 7. Tables 1` thru 7 can be found at the end of this report.

All 11 of the China Guangxi Providence talc sourced sample retains were found to be positive for chrysotile asbestos at a concentration that ranged from 0.0008% to 0.002%. For the 42 Chinese sourced J&J talcum powder products and 11 retain samples, a total of 50 samples were positive for asbestos out of the 53 samples (94%).

<div align="center">

**DISCUSSION/CONCLUSION**

</div>

**<u>Colorado School of Mines (w HLS) Sample Preparation of Cosmetic Talc</u>**

This section reviews the development of the double density cosmetic talc sample preparation method, by the CSM, on behalf of J&J, for the concentration of chrysotile and amphibole asbestos in talc samples.

The sample preparation part of the MAS chrysotile analysis is based on the work done by the CSM in the early 1970's for the detection specifically of possible chrysotile and amphibole asbestos in J&J sourced Vermont talcum powder, from the Frostbite mine, using double heavy liquid separation (<2.9 g/cc & >2.9 g/cc).

An overview of this method development by CSM is as follows:

**A January 17, 1973 Windsor Minerals document** sent by R.N. Miller to Mr. Bill Ashton of J&J, subject: "Core samples, diamond drill holes, **Frostbite mine**" informs Bill Ashton that Windsor Minerals was sending 1/8 split of retain samples from the cosmetic ore sampling done in these holes. The memo goes on to say, "This is the material which was sent to Colorado identified as CN core and on which we conducted our pilot production runs which yielded Grade 66 material." (JNJ 000682638)

Cosmetic Talc Core Samples mailed to CSM:

Hole Numbers

1. 30-71-S      4. 32-71-S

2. 30-B-71-S   5. 34-71-S

3. 30-C-71-S

**February 26, 1973 CSM document for, Project no. <u>C10704</u>, reported their analysis to W.H. Ashton,** where these same five Frostbite core samples were prepared with heavy liquid separation (HLS) with two different densities (<2.9 & >2.9) and with acid leaching. **(JNJNL61_000008084 thru JNJNL61_000008089)**. The "as received samples" were first analyzed using x-ray diffraction and microscopic studies without HLS.

The results stated that "Relative to possible asbestos type minerals, samples **30-71-S and 30-B-71-S contain slight traces of tremolite-actinolite minerals. Sample 32-71-S** is suspected to **contain a very minor amount of serpentine which maybe chrysotile**.

**As further outlined in the 1973 Report,** the next phase of study was that the 5 Frostbite talc ore samples were first fractionated using HLS and then with acid dissolution, then analyzed by XRD. The report describes the HLS method as follows:  Each of the ground talc ore was separated into fractions by centrifugation in heavy liquids: specific gravity <2.90 and specific gravity >2.90.  After the x-ray diffraction of the >2.90 specific gravity fractions, the sample was leached with 1:1 HCL to remove magnesite.  The insoluble residue was then examined for amphiboles with a petrographic microscope.  In both Phase 1 and Phase 2, possible serpentine was detected in Frostbite ground talc ore sample 32-71-S.

In the last phase of this analysis, CSM attempted to verify the presence of serpentine in sample 32-71-S <2.65 fraction by step scan x-ray diffraction over the critical diffraction peaks of serpentine which is in the 7Å and 14Å region. **T<u>he initial result suggested that serpentine, not chlorite, was present.</u>**

Microscopic examination of the <2.65 fraction identified a very minor (1%) amounts of possible serpentine fibers that was facilitated by staining with 1% iodine in glycerin.

**The report recommended that further work be done on this sample (32-71-S)**.  It has been suggested in the past by some that this statement meant that more work was needed on the heavy liquid separation sample preparation method.  That suggestion is not true.

**The April 2, 1973 CSM document for Project no. <u>C10704</u>, reported their analysis to W.H. Ashton,** where the primary objective of the studies was to determine the presence or absence of tremolite and chrysotile in talc bearing head samples labeled 1 through 4.

For the HLS sample preparation and analysis, by CSM, the four head talc ore samples were first ground into two size ranges of minus 200 plus 325 and minus 325. The samples were then prepared with CSM's double heavy liquid separation method and acid dissolution, analyzed by XRD and or optical microscopy.  For optical microscopy of tremolite analysis, RI fluid 1.600 was used for their PLM analysis of the tremolite asbestos.   MAS has been criticized in the past for using 1.605 RI fluid because it was not high enough as suggested by J&J's experts, even though the CSM used 1.600 RI fluid which is a lower RI fluid.

**Results:**

<u>Chrysotile (HLS <2.65 g/cc)</u>

1) **Minus 200 plus 325 mesh**: Chrysotile abundance was estimated as <0.0001% in sample 3 and <0.0006% for sample 4.
2) **Plus 325 mesh**: Chrysotile abundance was estimated as <0.0007% in samples 2, 3 and <0.0006% for sample 4.

<u>Tremolite (HLS >2.90 g/cc)</u>

1) Minus 200 plus 325 mesh:  possible tremolite was found in sample 2 estimated at <0.002%

2) **Minus 325 mesh**:  No tremolite was detected in any of the four samples.

These four samples were labeled "head" samples, which defined as average grade feed that goes into the mill before the flotation process.  There was no identification of the source of the talc samples in the April 2, 1973 Report.  However, it is most likely these head samples were collected in the same area that sample 32-71-S was collected from the Frostbite mine so "that further work be done on this sample 32-71-S".

It would seem reasonable to conclude that the next set of talc samples analyzed was fulfilling that further work statement about Frostbite sample 32-71-S.  Also, there were only 36 days between the CSM February and April reports, and all three of these reports have the same CSM Project no. C10704.

**December 27, 1973:** CSM prepared the following report for Johnson & Johnson, "A Procedure to Examine Talc for the Presence of Chrysotile and Tremolite-Actinolite Fibers for Project C10704". (JNJ 000268037 to 045).[1]

This CSM report provides the methodology using double density heavy liquid separation for chrysotile and amphibole asbestos.  It reports a detection limit of 10 ppm (0.00001%) and verification of asbestos types, after separation, was done by optical microscopy.

This also stated the following: Electron Microscopy (EM) examination employing selected area electron diffraction and/or x-ray emission spectrography may be required in order to specifically identify small fibrous particulates; CSM recognized that EM would be needed to identify for small particles.

---

[1] December 27, 1973, Colorado School of Mines protocol entitled "A procedure to Examine Talc for the Presence of Chrysotile and Tremolite-Actinolite Fibers" Herman Ponder Director, Jerry Krause Senior Scientist and James Link Director Mining Division.

Nowhere in this report was there even a suggestion by the CSM that their double density heavy liquid method for sample preparation, for both chrysotile and amphibole asbestos, was anything but a sound scientific method.

In fact, this sample preparation was approved and signed off by the following individuals from the Colorado School of Mines Research Institute: Herman Ponder, Director, James M. Link, Director Mining Division, and Jerry Krause, Senior Scientist Mining Division.

In the Introduction Section, the second paragraph states the Following;

> *the impurity level becomes very low (<<1%), it is necessary to examine amounts of sample in order to detect the impurity. **As a result of the requirement to detect the proverbial "needle in a haystack,"** we have evolved a procedure which preconcentrates the impurities prior to examination. The net effect is that a large initial sample is fractioned in order to reject the majority from further examination.*

This was one of the reasons that MAS decided to use heavy liquid separation in late 2020 for cosmetic talc analysis as described above by the CSM method.

**Johns-Manville**

Another indication of how confident the CSM was in their double density separation method is that they informed Johns-Manville that they thought this heavy liquid separation method they developed, was good enough to be considered for a patent (JNJMX68_000007044 to 000007046).

In an October 29, 1973 letter from V.E Wolkodoff of Johns-Manville to Mr. Caneer, Colorado School of Mines, in response to a phone call from Mr. Caneer, Mr. Wolkodoff writes the following:

*"Specifically, we were interested in your advanced technology used to separate felted masses of asbestos by heavy liquid separation preparatory to staining of chrysotile by iodine as worked out by Morton and Baker of Johns-Manville".*

Mr. Wolkodoff further writes, *"I understand your position completely on specific techniques being worked for other companies which are proprietary and, as you had indicated, will probably be patented."*

This letter confirms CSM was both developing this sample preparation method for J&J and thought it was such an advancement in talc sample preparation technology for PLM analysis, they were considering to protect it with a patent.[2]

---

[2] October 29, 1973 letter from V.E Wolkodoff of Johns-Manville to Mr. Caneer, Colorado School of Mines.

With that said, I have seen no indication or documents that J&J's CSM double density talcum powder sample preparation method was ever patented, or shared with the FDA when they struggled with their own development of a concentration method, or over a period of 50 to 60 years, there is no evidence that J&J ever had their main outside QA labs (McCrone or the R.J. Lee Group) use the much superior CSM sample preparation method when they were analyzing J&J's talcum powder by XRD, PLM and or TEM for asbestos. The lack of use of the CSM sample preparation method by these two outside labs, explains why hundreds, if not thousands of J&J's talc sample analyses for asbestos were found to be non-detects by the McCrone and RJ Lee labs.

I believe the reason that the CSM talc sample concentration preparation method for chrysotile and amphibole asbestos was never adopted by the talc and cosmetic industries can be summed up by the following statements by Dr. Robert Rolle of J&J in two documents. The first document is a May 22, 1973 Report entitled Proposed Specs for Analyzing Talc for Asbestos. On the third page concerning Dr. Pooley's preconcentration method for tremolite, Dr. Rolle states, "This technique has not been written up yet, but evidently when applied to Vermont talc, 0.5% of the tremolite-type is found."  Dr. Nashed of J&J received this report on May 23, 1973 (JNJAZ56_000001892 to 1989)[3]

> *"The limitation of this method is that it may be too sensitive."*

The second document is a February 18th, 1975 memo to Dr. Rolle where he states, "I have also enclosed our test method for the proposed Xray technique which was drawn up by Boots Ltd in conjunction with Dr. Pooley" (JNJNL61_000062953)[4]

> *"We deliberately have not included a concentration technique as we felt it would not be in worldwide company interest to do this."*

### Other Asbestos Concentration Methods for Cosmetic Talc Yardley LTD. Method

A J&J produced document JNJ00026450 to 4509 **redacted)** that also has a Bate stamp number DX8011.0010 to .0010 **un-redacted**) entitled "A Method for the Separation of Impurities from Talc", is a double density separation sample preparation method that is very similar to the CSM double density sample preparation method.  The primary differences involves the density for the heavy liquid that was used.  Where the CSM method uses 2.65 g/cc for the chrysotile and >2.90 g/cc for the amphibole asbestos, the Yardley method uses 2.69 g/cc for chrysotile and 2.83 g/cc for amphibole asbestos.  Also, the Yardley method uses a centrifuge speed of 3,000 rpm for 5 minutes, the CSM method uses a centrifuge speed of 800 rpm for two intervals of 30

---

[3] May 22, 1973 Report where the Subject, entitled "Proposed Specs for Analyzing Talc For Asbestos".

[4] February 18th, 1975 memo to Dr. Rolle.

minutes. The 1991 published Blount[5] sample preparation method for amphibole asbestos, uses 2.81 g/cc and a centrifuge speed of 7,000 rpm for 10 minutes.

Each of these heavy liquid separation methods are using slightly different density liquids and different centrifuge speeds and times. The main point of this is that scientists are apparently using different densities and centrifugation times in an effort to increase analytical sensitivity. There is no right or wrong, the only thing important is that heavy liquid separation of asbestos from talcum powder is a well-researched method developed by J&J almost 50 years ago, published by Dr. Blount in 1990/91, and is also an International Standards Organization protocol (ISO 22262-1 &2) method, as well as used by the New York Environmental Laboratory Accreditation Program.

### Physical Prosperities of Tremolite & Anthophyllite

In the December 27, 1973 CSM Research report, it is noteworthy that tremolite was detected in the minus 200 plus 325 samples, but not in the minus 325. These findings are consistent with the Pang et al. publication in 1987.[6] For this study, they spiked talc with tremolite (1.0% and 0.1%) and ground these samples for two size ranges: 1) 50% was minus 325 and 2) 100% minus 325.

The results showed that for the TEM analysis (100 grid openings) the 1% spiked tremolite sample, at 50% minus 325, the number of tremolite fibers detected was 1,592, and for the 100% minus 325, the number of tremolite fibers was reduced to 91 structures or 5% detected.

For the 0.1 wt. percent, for the TEM analysis (100 grid openings) the 0.1 % tremolite spiked sample at 50% minus 325, the number of tremolite fibers detected was 88 and for the 100% minus 325, the number of tremolite fibers was reduced to 0 structures detected.

What is important about this study is first that the tremolite used was characterized by the authors as tremolite asbestos/asbestiform due to the aspect ratio. Second, the asbestos fibers/talc spiked samples were ground so that there were two different particle size populations for two sample sets 1st set, 50% of the sample would pass through a 325 mesh per inch sieve (45 μm opening), 2nd set, 100% of the sample would pass through the 325 mesh.

The Pang publication showed that when the talc was ground to the point that the size of the talc particles was small enough that 100% of the powder went through a 325 mesh, it either greatly reduced (1.0% spiked sample) or eliminated (0.1%) which is consistent with what CSM reported to J&J in their April 2, 1973 Protocol.

---

[5] Blount,, A.M. "Amphibole Content of Cosmetic and Pharmaceutical Talcs", Environmental Health Perspectives, Vol. 94, pp. 225-230, 1991
[6] Thomas W.S. Pang, et al., "Determination of tremolite Asbestos in Talc Powder Samples" Ann. Occup. Hyg., Vol. 31, No. 2, pp 219-225, 1987.

The reason for the tremolite asbestos being ground up is due the physical properties of tremolite asbestos, as well as anthophyllite asbestos, where both tremolite and anthophyllite have low tensile strengths (brittle), not flexible like chrysotile, and to a lesser degree, amosite and crocidolite.[7]  Since tremolite asbestos is brittle, the grinding to a minus 325 mesh size, by both the CSM and the Pang research, simply broke the tremolite fibers/bundles into particles.

The CSM results also showed that chrysotile was not affected when ground to a minus 325 mesh size because chrysotile has high tensile strength, good flexibility and is the reason that most all asbestos-containing cloth is woven out of chrysotile and not ever from tremolite or anthophyllite asbestos.  However, the size and width of the chrysotile bundles may be affected in the milling operation, and that would account for the 5 to 20 µm in length to 2 to 4 µm in width range that we see in the cosmetic talcs, as well as the UCC SG-210 chrysotile.

Additionally, this data suggests that that cosmetic talc being milled to either a minus 200, and in some cases, a minus 325, is lowering the tremolite and or anthophyllite concentrations in the talcum powder, unless the concentration is so high in the talc ore, that a significant amount of the amphibole asbestos survives the milling process as demonstrated with the MDL samples in our 2019 report, as well as for the samples reported here, that were positive for either tremolite or anthophyllite.

The Pang study clearly shows that milling talc to either minus 200 or minus 325 sieve size greatly reduces the amount fibrous tremolite asbestos detected by TEM, which would also have an effect on the amount detected by PLM.

For many years the Cosmetic, Toiletry Fragrance Association (CTFA) J4-1 method for the detection of asbestiform amphibole minerals (tremolite or anthophyllite) in cosmetic talc first, by XRD and if the talcum powder sample is negative for either tremolite and or anthophyllite, the analysis is stopped, and the sample declared as not to contain asbestos.  On the other hand, if the sample is positive by XRD, then the sample is analyzed by PLM to determine if the tremolite or anthophyllite is positive.

The J4-1 sample preparation method for PLM is located on page 10 at Note 1, and states the following:  "Talcs to be analyzed and the tremolite used to prepare standard samples must be finer than 325 mesh (maximum particle size of 44 microns)."  The Tekmar Analytical Mill (Model A-10) is recommended in the method section.

Since the J4-1 PLM method requires that 100% talc sample be milled to a minus 325 sieve size will cause most, if not all of the fibrous tremolite asbestos to be ground to non-asbestos particulates if tremolite asbestos is present in the sample, causing many false negative results to be reported.

---

[7] M.A. Vos, Asbestos in Ontario, Industrial Mineral Report, Ontario Department of Mines and Northern Affairs, Ontario, Canada 1971.

This discussion goes to the whole issue of the general geological definition of "asbestiform" that appears in many of the standard TEM protocols, including the ASTM D5755-09 method I was the primary author. [8] This general definition is as follows:

*"asbestiform-a special type of fibrous habit in which the fibers are separable into thinner fibers and ultimately into fibrils.  This habit accounts for greater flexibility and higher tensile strength than other habits of the same mineral."*

This is only a general definition that a geologist might be interested in when evaluating a potential asbestos mine, since the more fibrous the asbestos deposit, the more economic value the mine would have.[13] The economic value which depends on the grading of the asbestos where the most important factors are fiber or fiber length, tensile strength, flexibility, and spinnability among others, as shown in the Table 8.

**Table 8**

**Physical Properties of Asbestos**

**M.A. Vos, Asbestos in Ontario**

| Asbestos Type | Tensile strength (PSI) | Flexibility | Spinnability |
|---|---|---|---|
| Chrysotile | 80,000-100,000 | High | Very Good |
| Amosite | 16,000 - 90,000 | Good | Good |
| Crocidolite | 100,000-300,000 | Good | Good |
| Tremolite solid solution series | <1,000 - 8,000 | Poor | Poor |
| Anthophyllite | 4,000 or less | Poor | Poor |

As the above table shows, the physical properties of tremolite and anthophyllite asbestos low tensile strength, poor flexibility and spinnability, as compared to the other three asbestos types found in products, and yet are regulated asbestos.

In a recent publication by Germine & Puffer entitled "Anthophyllite Asbestos from Staten Island, New York: Longitudinal Fiber Splitting", the authors concluded that the low quality characteristics of anthophyllite asbestos from the Staten Island mine are consistent with the anthophyllite asbestos of the Finland mine.[9] These characteristics include low aspect ratios, longitudinal splitting rather than crystal growth and "rather brittle such that they could not be woven in the manner of high quality chrysotile." This paper verifies that that anthophyllite

---

[8] ASTM D5755-09 Dust Method
[9] Mark Germine and John H. Puffer, "Anthophyllite asbestos from Staten Island, New York: Longitudinal fiber Splitting", Archives of Environmental & Occupational Health, (2021)
https://doi.org/10.1080/19338244.2021.1873095

asbestos is brittle causing low tensile strength, not flexible or separated into single fibrils, and would not meet the disputed general geological asbestiform definition for commercial asbestos added products they also state in the last sentence of their paper "anthophyllite and amosite fibers are not asbestiform like chrysotile fibers but are never less potentially dangerous."

If this asbestiform definition was meant to be more than a general geological one, then the various analytical methods, using this definition, would have incorporated how to measure the tensile strength or flexibility of the microscopic asbestos fibers and bundles. Of course, the methods do not provide a means to measure flexibility and tensile strength since that type of measurement is impossible to accomplish by either PLM or TEM. Also, none of these analytical methods define what high tensile strength is, or how many measurements constitute a population.

### MAS's PLM Analysis of Chrysotile in Cosmetic Talc using the CSM Method

The PLM analysis performed by MAS showed that the six containers that were analyzed by the CSM sample preparation method with heavy liquid separation (HLS) was positive for chrysotile asbestos.

MAS's PLM analysis was able to both detect and determine the amount of chrysotile bundles in the sample with HLS because MAS uses PLM microscopes that has higher resolution and analytical sensitivity capabilities, than your standard PLM microscope which is more suited for analyzing asbestos added products (AAP).

In AAP (chrysotile) samples, as compared to cosmetic talc samples, have a much higher population of very large size chrysotile bundles and orders of magnitude higher concentration levels of chrysotile.

The PLM analysis of AAP samples does not challenge the resolution of the typical PLM microscope optics, or burden the microscopist with very long sample analysis times.  For example, in most PLM labs, including MAS's, the typical time required for an experienced PLM microscopist to analyze AAP, where the majority of the AAP samples contain approximately 10 to 25 % asbestos, will only take about 15 and 20 minutes to complete the analysis.

With a cosmetic talc sample on the other hand, a typical PLM analysis at MAS, for either chrysotile or amphiboles asbestos, would routinely take 2 to 4 hours for a positive sample and a minimum of 20 minutes to one hour for a negative sample, if there are no pigments in the sample.  In order to both detect and analyze the small size of the chrysotile bundles (10 to 20 μm in length), that are typically found in cosmetic grade talcum powder, through the use of dispersion staining, the PLM microscope must have "flat" objective lenses, and a HD video camera attached to the PLM microscope that is interfaced to a high definition monitor.

The MAS PLM microscopes are Leica DM2700P PLM microscopes, where all of the objective lens including the 10X central stop dispersion lens are the flat type, also known as infinity lens, LED light source, and are coupled with state-of-the-art HD digital camera and 37" HD monitor. To detect chrysotile bundles, it is highly recommended that this type of PLM microscope setup should be used for the PLM analysis of cosmetic talc samples.

It is also my opinion that the PLM analyst must first analyze prepared talcum powder standards, containing UCC SG-210 or RG-144 chrysotile, to become familiar with both the size of chrysotile structures found in cosmetic talc, as well as the difference in the refractive indices for the chrysotile as compared chrysotile added products.

Both the RG-144 and RG-210 Calidria chrysotile and the chrysotile found in the talcum powder samples typically shows central stop dispersion colors (CSDS) from blues ($\alpha$) to golden yellows ($\gamma$) in 1.550 liquid, and blue to a dark gold in 1.560 liquid.   MAS has been reporting this range of CSDS colors for the chrysotile detected in the cosmetic talc samples for almost two years using 1.550 RI liquid.  During that time, experts retained by a number of cosmetic talc manufacturers, and have repeatedly testified that MAS's CSDS findings are not appropriate for chrysotile. Therefore, in their opinions, MAS was and has been misidentifying fibrous/platy talc edge or cellulose as chrysotile.

Additionally, Dr. Gunter, while working as a defense expert for Gold Bond defense counsel, analyzed samples of RG-144 and SG-210 Calidria chrysotile, that MAS provided to him, and he confirmed in a recent deposition that "Calidria chrysotile can produce a range of CDSC colors from bluish to golden-yellow in 1.550 liquid.[10]  Dr. Gunter's Calidria chrysotile results are consistent with our laboratory's findings, which validates our PLM chrysotile findings in the cosmetic talc samples.[11]

Dr. Gunter's testimony about his Calidria CSDS results is in direct contradiction to his original criticism of the "yellow-gold" dispersion color, as well as Dr. Matt Sanchez and Mr. Alan Seagrave's past testimony on this issue.

It is my opinion that when these defense experts were testifying that our laboratory was misidentifying fibrous talc or talc plates on edge for chrysotile based on the CSDS "yellow color", as it turns out, the opposite was true they were the ones misidentifying chrysotile as fibrous talc or talc plates on edge.

---

[10] Deposition of Dr. Mickey Gunter, Woods, Jesse & Sarah vs. Kolmar Laboratories Inc. et al. Supreme Court in the State of New York, County of Monroe, #E202000384

[11] Expert Report, October 9, 2023 "Comparison of Ri's and Chrysotile Structure Size Union Carbide's SG-210 Chrysotile product from the Coaling Mine California, Montanan Talc, Fibrous talc and Reduced Size NIST 1866b Chrysotile Standard.

**Birefringence Measurements**

The key optical property to differentiate fibrous talc from chrysotile asbestos, when using the PLM method, is determining the difference in the birefringence (BIR) value between these two elongated minerals. Most PLM analysts will just use the PLM cross-polar condition to visually estimate the magnitude of the BIR (Low, Moderate or High) by the amount of brightness and change in wavelength colors that are observed.

This visual estimate of the amount of birefringence is typically done under cross-polar conditions and is a subjective interpretation by the PLM analyst, therefore, it lead to errors. A more accurate determination of BIR is to calculate the numerical BIR value by simply subtracting the measured perpendicular RI from the measured parallel RI (n ∥ - n _|_).

The subtracted BIR results give the analyst a numerical BIR value that is either classified as **Low (<0.01)**, **Moderate (0.01 to 0.05)** and **High (>0.05)**.

Fibrous talc and/or talc plates on edge will have a calculated BIR value that is typically at the high end of Moderate (0.045) to greater than 0.05 which is in the High BIR range. Chrysotile on the other hand, will have BIR values that range from the middle to the upper end of the Low range to the lower end of the Moderate range. The average calculated range BIR's, for the detected chrysotile bundles from the powder samples for CSM PLM method had a range of **0.005 to 0.017** which falls in the LOW end of BIR to the low end of Moderate classifications when done by calculation.

The BIR difference between fibrous talc and chrysotile, as demonstrated by MAS, is also verified by the EPA in their 600/R-93/116 PLM methodology document as shown in Table 2-2, page 21.[12]

Table 2-2, "Optical Properties of Asbestos Fibers", provides four sets of refractive indexes measured from chrysotile bundles that have an overall average BIR of 0.011. In that same table, EPA published a range chrysotile BIR's of 0.004 to 0.017 (Low to moderate). This BIR range reported by EPA, was from the Maximum and Minimum values obtained from references 2, 11, 12, and 18 located in Section 2.2.

The method that EPA used for the BIR was to subtract the highest alpha from the highest gamma, then subtract the lowest alpha from the lowest gamma. The EPA referenced BIR method is the same way that MAS determined the BIR for the chrysotile bundles found in the J&J talcum powder samples reported here.

The EPA R93 protocol also provides RI and BIR data for both fibrous talc and Flat Cellulose Ribbons that can be found in their Table 2.5. For the RI's of fibrous talc example, EPA reports

---

[12] EPA/600/R-93/116. Test Method – Method for the Determination of Asbestos in Bulk Building Materials

refractive index 1.600-1.540 with a measured BIR of 0.06, and for cellulose ribbons, the reported EPA RI's are 1.580-1.530 with a measured BIR of 0.05 as shown in Table 9.

**Table 9**

**EPA-R93: Optical Properties of Selected Fibers**

**Fibrous Talc & Cellulose Ribbons**

| Fiber Type | RI Parallel/Perpendicular | BIR Calculations |
|---|---|---|
| Fibrous Talc | 1.600-1.540 | 0.060 "High" |
| Cellulose | 1.580-1.530 | 0.050 high end of Moderate |

In summary, this data demonstrates that the reported chrysotile bundles in the J&J talcum powder container samples analyzed by MAS have both the appropriate range of refractive indexes and BIR demonstrating that chrysotile asbestos was correctly identified in each container samples and it also demonstrates that fibrous talc particles or talc plates on edge were not misidentified as chrysotile.

## CSM PLM Validation Procedure for CSM Sample Preparation Method

**J&J MDL Talcum Powder Sample Totals**

The February 1, 2019 MDL Supplement Report for the historical J&J talcum powder products (JBP & STS) analysis demonstrated that both the Italian and the Vermont mines that J&J sourced their talcum powder from contained significant amounts of amphibole asbestos (tremolite & anthophyllite/cummingtonite). Additionally, the 15 MDL historical Imerys talc ore samples sourced from their Vermont mine, were found to contain tremolite asbestos. The Imerys historical retains were samples of mostly West Windsor Grade 66 which was the product that J&J used for JBP and STS form the late 1960s to 2003.

Between the MDL historical and non-historical J&J talcum powder products, along with the retain samples, MAS has analyzed a total of 118 J&J talcum powder samples from the Italian, Vermont and Chinese talc mine sources. The following is a breakdown between the three talc mines for the number of talc samples from each mine that MAS has analyzed along with the number of positive samples for each group.

**1960 to 1968:** Italian Historical J&J Containers: of the **14 analyzed, 7 were positive** (50%) asbestos

**1968 to 2003:** Vermont Historical J&J Containers: of the **36 samples analyzed, 29** were positive (81%) for asbestos

**1968 to 2003:** Vermont Historical Imerys Retains: of the **15 samples analyzed, 8 were positive** (53%) for asbestos

**1968 to 2003:**   Vermont Non-historical J&J Containers: of the **3 samples analyzed, 3 were positive** (100%) for asbestos

**2003 to 2021:**  Chinese Non-historical J&J Containers: of the **43 samples analyzed, 40 were positive** (93%) for asbestos

**2003 to 2021:**  Chinese Historical J&J/Imerys Retains: of the **11 samples analyzed, 11 were positive** (100%) for asbestos

All total, for the three talc mine sources that suppled J&J talcum powder for their two body powder products sold in the United States, MAS has analyzed **96 containers of J&J talcum powder products** that had detectable concentrations **of asbestos in 82%** of the containers. Additionally, the **26 historical talc ore samples that MAS has analyzed**, sourced from the Vermont and Chinese talc mines, found **73% positive for asbestos**. [13]

Sincerely,

_____

William E. Longo, Ph.D., CEO

---

[13] MAS Chart of J&J Testing (Current as of September 16, 2021)

4th Supplemental MDL Report 4-29-2024

## Table 1

### JBP Talcum Powder Sample Container Descriptions

| | MAS Sample No. | Sender | Date of Manufacture | Sample size (oz) | Source of Sample | ATEM Amphibole Asbestos | PLM Amphibole Asbestos % | CSM Chrys % |
|---|---|---|---|---|---|---|---|---|
| 1 | M66514-001 | SGPB | Circa 1980 | 9 oz. | Carolyn Weirick | 247,000 s/g anthophyllite | N/A | N/A |
| 2 | M70484-001 | SGP | 1994 | 15 oz. | Linda Zimmerman | NAD | NAD | 0.01-0.10% |
| 3 | M71046-001 | SGPB | 1996 | 9 oz. | Marie Colley | NAD | NAD | 0.002-0.01% |

These three additional Vermont sourced JBP samples were all found to be positive for either amphibole asbestos or chrysotile.

### J&J Chinese Talc Source Container Analysis

Tables 2 thru 6provides the J&J sample information and analytical results for the 40 JBP containers were talcum powder was sourced from China.

**Table 2**

**JBP Talcum Powder Sample Container Descriptions and Analysis Results**

**Samples 1 thru 8**

| | MAS Sample No. | Sender | Date of Manufacture | Source of Sample | ATEM Amphibole Asbestos | PLM Amphibole Asbestos % | CSM Chrys % |
|---|---|---|---|---|---|---|---|
| 1 | M66507-001 | SGPB JBP | 2004 | Gail Koretoff | NAD | N/A | 0.0003-0.001% 779,600 bundles/g |
| 2 | M66508-001 | SGPB JBP | 2017 | Off the Shelf-CVS | NAD | N/A | 0.001-0.002% 412,700 bundles/g |
| 3 | M66509-001 | SGPB JBP | 2017 | Off the Shelf-CVS | NAD | N/A | 0.0002-0.001% 463,000 bundles/g |
| 4 | M66513-001 | SGPB JBP | 2010 | Earl Wheeler | NAD | N/A | 0.0002-0.001% 181,900 bundles/g |
| 5 | M66515-001 | SGPB JBP | 2012 | Pauline Citizen | 8,740 s/g Tremolite | N/A | 0.01-0.10% |
| 6 | M66516-001 | SGPB | 2012 | Pauline Citizen | 8,694 s/g Tremolite | N/A | N/A |
| 7 | M68379-001 | SGPB | 2004 | JoAnne Anderson | NAD | N/A | N/A |

| | MAS Sample No. | Sender | Date of Manufacture | Source of Sample | | PLM Amphibole Asbestos % | N/A |
|---|---|---|---|---|---|---|---|
| 8 | M68379-002 | SGPB | 2004 | JoAnne Anderson | 7,160 s/g Tremolite | N/A | N/A |

**Table 3**

**J&J Talcum Powder Sample Container Descriptions and Analysis Results**

**Samples 9 thru 16**

| | MAS Sample No. | Sender | Date of Manufacture | Source of Sample | ATEM Amphibole Asbestos | PLM Amphibole Asbestos % | CSM Chrys % |
|---|---|---|---|---|---|---|---|
| 9 | M66352-001 | Lanier JBP | 2012 | Krystal Kim | NAD | N/A | N/A |
| 10 | M66352-002 | Lanier JBP | 2014 | Krystal Kim | 17,200 s/g | N/A | N/A |
| 11 | M68483-001 | SGPB JBP | 2012 | Nancy Cabibi | NAD | N/A | N/A |
| 12 | M67420-001 | #1 Lanier JBP | 2017 | off the shelf Imperial Westwood | NAD | N/A | 0.0002-0.0008% 428,000 bundles/g |
| 13 | M67420-002 | #2 Lanier JBP | 2017 | off the shelf Imperial Westwood | NAD | N/A | 0.0002-0.0006% 489,000 bundles/g |

| 14 | M67420-003 | #3 Lanier JBP | 2012 | off the shelf Imperial Westwood | 18,800 s/g anthophyllite | N/A | N/A |
| 15 | M67420-004 | #4 Lanier JBP | 2017 | off the shelf Imperial Westwood | NAD | N/A | 0.0002-0.0005% 332,000 bundles/g |
| 16 | M67420-005 | #5 Lanier JBP | 2017 | off the shelf Imperial Westwood | NAD | N/A | 0.0002-0.001% 460,100 bundles/g |

**Table 4**

**J&J Talcum Powder Sample Container Description & Analysis**

**Samples 17 thru 24**

| | MAS Sample No. | Sender | Date of Manufacture | Source of Sample | ATEM Amphibole Asbestos | PLM Amphibole Asbestos % | CSM Chrys % |
|---|---|---|---|---|---|---|---|
| 17 | M65329-013 | MAS | 2016 | Off the shelf Publix Control Sample | NAD | N/A | 0.0005-0.0008% 288,900 b/g |
| 18 | M70484-001 | SGP JBP | 2016 | Linda Zimmerman | NAD | N/A | 0.001-0.01% |
| 19 | M70877-001 | Kazan JBP | 2012 | Dan Doyle | NAD | NAD | 0.01-0.02% |
| 20 | M70877-002 | Kazan JBP | 2017 | Dan Doyle | NAD | NAD | 0.001-0.002% |
| 21 | M71095-001 | Simmons JBP | 2014 | Janet Titley | NAD | NAD | 0.001-0.002% |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 22 | M71166-001 | MAS JBP | 2018 | off the shelf CVS | N/A | NAD | 0.0015-0.0017 |
| 23 | M71166-001 | MAS JBP | 2019 | off the shelf CVS | N/A | NAD | 0.001-0.003% |
| 24 | M71166-001 | MAS JBP | 2019 | off the shelf Walgreens | N/A | NAD | 0.001-0.003% |

**Table 5**

**J&J Talcum Powder Sample Container Description & Analysis**

**Samples 25 thru 32**

| | MAS Sample No. | Sender | Date of Manufacture | Source of Sample | ATEM Amphibole Asbestos | PLM Amphibole Asbestos % | CSM Chrys % |
|---|---|---|---|---|---|---|---|
| 25 | M71180-001 | HFM JBP | 2020 | off the shelf Target | N/A | NAD | 0.002-0.003% |
| 26 | M71211-001 | Weitz JBP | 2019 | off the shelf Holly Johnson-Walmart | N/A | N/A | 0.001-0.002% |
| 27 | M71211-002 | Weitz JBP | 2019 | off the shelf | N/A | N/A | 0.001-0.002 |

| | | | | Holly Johnson-Walmart | | | |
|---|---|---|---|---|---|---|---|
| 28 | M71211-003 | Weitz JBP | 2019 | off the shelf<br>Holly Johnson Walmart | N/A | N/A | 0.001% |
| 29 | M71211-004 | Weitz JBP | 2019 | off the shelf<br>Holly Johnson Walmart | N/A | N/A | 0.001-0.002% |
| 30 | M71211-005 | Weitz JBP | 2019 | off the shelf<br>Holly Johnson-Walmart | N/A | N/A | 0.001-0.002 |
| 31 | M71211-006 | Weitz JBP | 2019 JBP | off the shelf<br>Holly Johnson-Walmart | N/A | N/A | 0.001-0.002% |
| 32 | M71211-007 | Weitz JBP | 2019 JBP | off the shelf<br>Holly Johnson-Walmart | N/A | N/A | 0.001-0.002% |

Table 6

J&J Talcum Powder Sample Container Description & Analysis

Samples 33 thru 42

| | MAS Sample No. | Sender | Date of Manufacture | Source of Sample | ATEM Amphibole Asbestos | PLM Amphibole Asbestos % | CSM Chrys % |
|---|---|---|---|---|---|---|---|
| 33 | M71180-008 | Weitz JBP | 2019 | off the shelf Holly Johnson Walmart | N/A | N/A | 0.001-0.002% |
| 34 | M71211-009 | Weitz JBP | 2019 | off the shelf Holly Johnson-Walmart | N/A | N/A | 0.001-0.002% |
| 35 | M71211-10 | Weitz JBP | 2019 | off the shelf Holly Johnson-Walmart | N/A | N/A | 0.001-0.002 |
| 36 | M71216-001 | Kazan JBP | 2019 | off the shelf Lucky | N/A | N/A | 0.001-0.002% 273,000 bundles/g |
| 37 | M71216-002 | Kazan JBP | 2019 | off the shelf Lucky | N/A | N/A | 0.0009-0.001% 254,000 bundles/g |
| 38 | M71241-001 | MAS JBP | 2018 | off the shelf Ralphs | N/A | N/A | 0.0007-0.001% 168,142 bundles/g |

| 39 | M71241-002 | MAS JBP | 2018 | off the shelf Ralphs | N/A | N/A | 0.001-0.002% 273,000 bundles/g |
|----|-----------|---------|------|---------------------|-----|-----|-------------------------------|
| 40 | M71241-003 | MAS JBP | 2018 | off the Shelf Ralphs | N/A | N/A | 0.001% 307,600 bundles/g |
| 41 | M71614-001 | Kazan JBP | 2018 | off the Shelf | N/A | N/A | 0.0003-0.0006% 56,000 bundles/g |
| 42 | M71722-001 | BBG&A JBP | 2004 | Tamara Newsome | NSD | NSD | 0.001-0.002% 90,000 bundles/g |
| 43 | M71722-002 | BBG&A JBP | 2014 | Tamara Newsome | NSD | NSD | 0.001-0.002% 149,000 bundles/g |

**Table 7**

**J&J and Imerys Guangxi Chinese Retains**

**Analysis for Asbestos**

**Samples 1 thru 11**

| | MAS Sample No. | Sender SGP | Imerys Ore Lot | BV/RJL Sample ID | ATEM Amphibole Asbestos | PLM Amphibole Asbestos % | CSM Chrys % |
|---|---|---|---|---|---|---|---|
| 1 | M71109-001 | Imerys Mine Seagrave | N/A | BV #A5152004-006A | NAD | NAD | 0.001-0.002% |
| 2 | M71110-001 | Imerys Mine Sanchez | N/A | RJLG No. 3136120 | NAD | NAD | 0.001-0.002% |
| 3 | M71111-001 | J&J Retain | MVN C01315C2 | RJLG No. 3138491 | NAD | NAD | 0.001% |
| 4 | M71111-002 | J&J Retain | MVN S0246C2 | RJLG No. 313455 | NAD | NAD | 0.001% |
| 5 | M71111-003 | J&J Retain | MVN S0246C2 | RJLG No. 3140762 | NAD | NAD | 0.001% |
| 6 | M71111-004 | J&J Retain | MVN S0246C2 | RJLG No. 3141790 | NAD | NAD | 0.0008-0.001% |

| 7 | M71111-005 | J&J Retain | MVN S0246C2 | RJLG No. 3143083 | NAD | NAD | 0.001% |
| 8 | M71111-006 | J&J Retain | MVN S0246C2 | RJLG No. 3143083 | NAD | NAD | 0.001% |
| 9 | M71111-007 | J&J Retain | MVN S0246C2 | RJLG No. 3145361 | NAD | NAD | 0.001-0.002% |
| 10 | M71111-008 | J&J Retain | MVN S0246C2 | RJLG No. 3147067 | NAD | NAD | 0.001% |
| 11 | M71111-009 | J&J Retain | MVN S0246C2 | RJLG No. 3149010 | NAD | NAD | 0.001-0.002% |

Sincerely,

William E. Longo, Ph.D., CEO

Materials Analytical Services, LLC

Exhibit 28



**ATLANTA**
Corporate Headquarters
3945 Lakefield Court
Suwanee, GA 30024
(770) 866-3200  FAX (770) 866-3259

### 3nd Supplemental MDL Report

## Analysis of Non-Historical J&J's Talcum Powder Consumer Product Containers and J&J Chinese Historical Talc Retain Samples



Anthophyllite Bundle 1967

**William E. Longo, Ph.D., CEO**

**Materials Analytical Services, LLC**
**3945 Lakefield Court**
**Suwanee, GA 30024**

**November 17, 2023**

**LOS ANGELES**  3020 OLD RANCH PARKWAY   SUITE 300   SEAL BEACH, CA 90740   (562) 799-5530   FAX (562) 799-5531
**WWW.MASTEST.COM**

# 3rd MDL Supplemental Report

This supplemental report contains the following new information obtained by MAS since the 2nd Supplement MDL Report was issued on February 1, 2018.   MAS has analyzed 44 J&J talcum powder products for both chrysotile and amphibole asbestos.  These additional samples focus primarily on Chinese sourced talcum powder that J&J used from 2004 to 2022 in North America, and three additional Vermont sourced JBP samples.

Also, when the last MDL report was issued, MAS was not analyzing cosmetic talc samples for chrysotile using the heavy liquid separation (HLS) sample preparation method.  After reviewing the Colorado School of Mines (CSM) protocol for the analysis of chrysotile using a HLS sample preparation method with PLM analysis, MAS worked on developing a more efficient protocol for the detection of chrysotile in cosmetic talc samples.  The Colorado School of Mines developed this method.

MAS has analyzed 40 JBP containers that were all manufactured with J&J's Chinese talc source. MAS has also analyzed 11 J&J Chinese talc retains along with two additional JBP Vermont sourced talc containers.

All additional J&J talcum powder product analysis Reports have been previously provided to defense counsel on behalf of J&J, and I have been questioned by J&J defense counsel on all of these sample analysis reports during numerous depositions.   These reports provide all of the sample chain-of custodies, the analytical protocols used for that particular set of samples and results.

Therefore, this Supplemental report will only contain the results for the 43 additional analysis that was performed after our last MDL Supplement Report was issued on February 1, 2019.

### J&J Vermont Talc Source

Table 1 provides the J&J sample information and analytical results for the three JBP containers were talcum powder was sourced from Vermont.

### J&J Chinese Talc Source

The overall results show that out of the 43 J&J talcum powder samples analyzed, that contained Chinese sourced talc, 40 or 93% were positive for either amphibole asbestos and or chrysotile. As discussed above, the Reports for 41 of the 43 JBP and STS sample sets have been provided to J&J, and in those reports will contained the full methodology used for each set of sample analysis.  Therefore, there was not any reason to duplicate the methodology here in this report.

Besides J&J talcum powder container samples, MAS also received 11 Chinese retained talc samples that consisted of two Imerys retains and nine J&J retains.  The results of these 11 samples are shown in Table 7.   Tables 1 thru 7 can be found at the end of this report.

All 11 of the Guangxi providence talc sourced sample retains were found to be positive for chrysotile asbestos at a concentration that ranged from 0.0008% to 0.002%.    For the 42 Chinese sourced J&J talcum powder products and 11 retain samples, gave a total of 50 samples were positive for asbestos out of the 53 samples (94%).

## DISCUSSION/CONCLUSION

### Colorado School of Mines (w HLS) Sample Preparation of Cosmetic Talc

This section reviews the development of the double density cosmetic talc sample preparation method, by the Colorado School of Mines Institute, on behalf of J&J, for the concentration of chrysotile and amphibole asbestos in talc samples.

The sample preparation part of the MAS chrysotile analysis is based on the work done by the CSMP in the early 1970's for the detection specifically for possible chrysotile and amphibole asbestos in J&J sourced Vermont talcum powder, from the Frostbite mine using, double heavy liquid separation (<2.9 g/cc & >2.9 g/cc).

An overview of this method development by CSM is as follows:

**In a January 17, 1973 Windsor Minerals document** sent by R.N. Miller to Mr. Bill Ashton of J&J, subject: "Core samples, diamond drill holes, **Frostbite mine**" informing Bill Ashton that Windsor Minerals was sending 1/8 split of our retain samples from the cosmetic ore sampling done in these holes.  The memo goes on to say, "This is the material which was sent to Colorado identified as CN core which we conducted our pilot production runs which yielded Grade 66 material. (JNJ000682638)[1]

Cosmetic Talc Core Samples mailed to Colorado School of Mines:

   Hole Numbers

1. 30-71-S    4. 32-71-S

2. 30-B-71-S   5. 34-71-S

3. 30-C-71-S

---

[1] January 17, 1973 Windsor Minerals document sent by R.N. Miller to Mr. Bill Ashton of J&J, subject: "Core samples, diamond drill holes, Frostbite mine".

**February 26, 1973 Colorado School of Mines (CSM) document for, Project no. C10704, reported their analysis to W.H. Ashton,** where these same five Frostbite core samples were prepared with heavy liquid separation (HLS) with two different densities (<2.9 & >2.9) and with acid leaching. **(JNJNL61_000008084 thru JNJNL61_000008089)**. The "as received samples" and were first analyzed using x-ray diffraction and microscopic studies without HLS.

The results stated that "Relative to possible asbestos type minerals, samples **30-71-S and 30-B-71-S contained slight traces of tremolite-actinolite minerals. Sample 32-71-S is suspected to contain a very minor amount of serpentine which maybe chrysotile**".

**As further outlined in the 2/26/1973 Report,** the next phase of study was that the 5 Frostbite talc ore samples were first fractionated using heavy liquid separation (HLS) and then with acid dissolution, then analyzed by XRD. The report describes the HLS method as follows:  Each of the ground talc ore was separated into fractions by centrifugation in heavy liquids: specific gravity <2.90 and specific gravity >2.90.  After the x-ray diffraction of the >2.90 specific gravity fractions, the sample was leached with 1:1 HCL to remove magnesite.  The insoluble residue was then examined for amphiboles with a petrographic microscope.  In both Phase 1 and Phase 2, possible serpentine was detected in Frostbite ground talc ore sample 32-71-S.

The last phase of this analysis, CSM attempted to verify the presence of serpentine in sample

32-71-S <2.65 fraction by step scan x-ray diffraction over the critical diffraction peaks of serpentine which is in the 7Å and 14Å region, **"the initial result suggested that serpentine, not chlorite, was present."**

Microscopic examination of the <2.65 fraction identified a "very minor (1%) amounts of possible serpentine fibers" that was facilitated by staining with 1% iodine in glycerin.

**The report recommended that further work be done on this sample (32-71-S)**.  It has been suggested in the past by some that this statement meant that more work was needed on the heavy liquid separation sample preparation method.  That suggestion is not true.

**April 2, 1973 Colorado School of Mines (CSM) document for Project no. C10704, reported their analysis to W.H. Ashton,** where the primary objective of the studies was to determine the presence or absence of tremolite and chrysotile in talc bearing head samples labeled 1 through 4.

For the HLS sample preparation and analysis, by CSM, the four head talc ore samples were first ground into two size ranges of minus 200 plus 325 and minus 325. The samples were then prepared with CSM's double heavy liquid separation method and acid dissolution, analyzed by XRD and or optical microscopy.  For optical microscopy of tremolite analysis, RI fluid 1.600 was used for their PLM analysis of the tremolite asbestos.   MAS has been criticized in the past for

using 1.605 RI fluid because it was not high enough as suggested by J&J's experts, even though the CSM used 1.600 RI fluid which is a lower RI fluid.

**Colorado School of Mines Results:**

<u>Chrysotile (HLS <2.65 g/cc)</u>

1) **Minus 200 plus 325 mesh**: Chrysotile abundance was estimated as <0.0001% in sample 3 and <0.0006% for sample 4.

2) **Plus 325 mesh:** Chrysotile abundance was estimated as <0.0007% in samples 2, 3 and <0.0006% for sample 4.

<u>Tremolite (HLS >2.90 g/cc)</u>

1) Minus 200 plus 325 mesh:  possible tremolite was found in sample 2 is estimated at <0.002%

2) **Minus 325 mesh**:  No tremolite was detected in any of the four samples.

These four samples were labeled "head" samples which defined as average grade feed that goes into the mill before the flotation process.  There was no identification of the source of the talc samples in the April 2, 1973 Colorado School of Mines Report.  However, it is most likely these head samples were collected in the same area that sample 32-71-S was collected from the Frostbite mine in which the very last sentence states.  The reason for this is that in the Colorado School of Mines 2/26/1973 report to Dr. Ashton, "that further work be done on this sample 32-71-S".

It would seem reasonable to conclude that the next set of talc samples analyzed was fulfilling that further work statement about Frostbit sample 32-71-S.  Also, there were only 36 days between the CSM February and April reports, and all three of these reports have the same CSM Project no. <u>C10704</u>.

**December 27, 1973:** Colorado School of Mines Research Institute prepared the following report for Johnson & Johnson, "A Procedure to Examine Talc for the Presence of Chrysotile and Tremolite-Actinolite Fibers for Project C10704". (JNJ 000268037 to 045).[2]

This CSM report provides the methodology using double density heavy liquid separation for chrysotile and amphibole asbestos.  It reports a detection limit of 10 ppm (0.00001%) and verification of asbestos types, after separation, was done by optical microscopy.

This method also stated the following: "Electron Microscopy examination employing selected area electron diffraction and/or x-ray emission spectrography may be required in order to

---

[2] December 27, 1973, Colorado School of Mines protocol entitled "A procedure to Examine Talc for the Presence of Chrysotile and Tremolite-Actinolite Fibers" Herman Ponder Director, Jerry Krause Senior Scientist and James Link Director Mining Division.

specifically identify small fibrous particulates". The Colorado School of Mines recognized that TEM would be needed to identify for small particles.

Nowhere in this report was there even a suggestion by the Colorado School of Mines that their double density heavy liquid method, for sample preparation, for both chrysotile and amphibole asbestos, was anything but a sound scientific method.

In fact, this sample preparation was approved and signed off by the following individuals from the Colorado School of Mines Research Institute: Herman Ponder, Director, James M. Link, Director Mining Division, and Jerry Krause, Senior Scientist Mining Division.

In the Introduction Section, the second paragraph states the following:

> "the impurity level becomes very low (<<1%), it is necessary to examine increasing amounts of sample in order to detect the impurity. **As a result of the requirement to detect the proverbial "needle in a haystack,"** we have evolved a procedure which preconcentrates the impurities prior to examination. The net effect is that a large initial sample is fractioned in order to reject the majority from further examination."

This was one of the reasons that MAS decided to use heavy liquid separation in late 2016 for cosmetic talc analysis as described above by the Colorado School of Mines.

## Johns-Manville

Another indication of how confident the Colorado School of Mines was in their double density separation method is that they informed Johns-Manville that they thought this heavy liquid separation method they developed, was good enough to be considered for a patent (JNJMX68_000007044 to 000007046).

In an October 29, 1973 letter from V.E Wolkodoff of Johns-Manville to Mr. Caneer, Colorado School of Mines, in response to a phone call from Mr. Caneer, Mr. Wolkodoff writes the following:

*"Specifically, we were interested in your advanced technology used to separate felted masses of asbestos by heavy liquid separation preparatory to staining of chrysotile by iodine as worked out by Morton and Baker of Johns-Manville".*

Mr. Wolkodoff further writes, *"I understand your position completely on specific techniques being worked for other companies which are proprietary and, as you had indicated, will probably be patented."*

This letter confirms CSM was both developing this sample preparation method for J&J, and thought it was such an advancement in talc sample preparation technology for PLM analysis, they were considering to protect it with a patent.[3]

With that said, I have seen no indication or documents that J&J's CSM double density talcum powder sample preparation method was ever patented, or shared with the FDA when they struggled with their own development of a concentration method, or over a period of 50 to 60 years, there is no evidence that J&J ever had their main outside QA labs (McCrone or the R.J. Lee Group) use the much superior CSM sample preparation method, when they were analyzing J&J's talcum powder by XRD, PLM and or TEM for asbestos.  The lack of use of the CSM sample preparation method by these two outside labs, explains why hundreds, if not thousands of J&J's talc sample analysis for asbestos analysis were found to be non-detects by the McCrone and RJ Lee labs.

I believe the reason that the CSM talc sample concentration preparation method for chrysotile and amphibole asbestos, was never adopted by the talc and cosmetic industries, can be summed up by the following statements by Dr. Robert Rolle of J&J in two documents. The first document is a May 22, 1973 Report entitled "Proposed Specs for Analyzing Talc for Asbestos". On the third page concerning Dr. Pooley's preconcentration method for tremolite, Dr. Rolle states, "This technique has not been written up yet, but evidently when applied to Vermont talc, 0.5% of the tremolite-type is found."  Dr. Nashed of J&J received this report on May 23, 1973 (JNJAZ56_000001892 to 1989)[4]

> *"The limitation of this method is that it may be too sensitive."*

The second document is a February 18th, 1975 memo to Dr. Rolle where he states, "I have also enclosed our test method for the proposed Xray technique which was drawn up by Boots Ltd in conjunction with Dr. Pooley" (JNJNL61_0000062953)[5]

> *"We deliberately have not included a concentration technique as we felt it would not be in worldwide company interest to do this."*

## Other Asbestos Concentration Methods for Cosmetic Talc Yardley LTD. Method

A J&J produced document (JNJ00026450 to 4509 **redacted**) that also has a Bate stamp number DX8011.0010 to .0010 **un-redacted**) entitled "A Method for the Separation of Impurities from Talc", is a double density separation sample preparation method that is very similar to the CSM

---

[3] October 29, 1973 letter from V.E Wolkodoff of Johns-Manville to Mr. Caneer, Colorado School of Mines.

[4] May 22, 1973 Report where the Subject, entitled "Proposed Specs for Analyzing Talc For Asbestos".

[5] February 18th, 1975 memo to Dr. Rolle.

double density sample preparation method.[6]   The primary differences involves the density for the heavy liquid that was used.  Where the CSM method uses 2.65 g/cc for the chrysotile and >2.90 g/cc for the amphibole asbestos, the Yardley method uses 2.69 g/cc for chrysotile and 2.83 g/cc for amphibole asbestos.  Also, the Yardley method uses a centrifuge speed of 3,000 rpm for 5 minutes, the CSM method uses a centrifuge speed of 800 rpm for two intervals of 30 minutes.  The 1991 published Blount HLS sample preparation method for amphibole asbestos, uses 2.81 g/cc and a centrifuge speed of 7,000 rpm for 10 minutes.

Each of these heavy liquid separation methods are using slightly different HL density liquids and different centrifuge speeds and times.  The main point of this is that scientists are apparently using different HL densities and centrifugation times in an effort to increase analytical sensitivity.  There is no right or wrong, the only thing important is that heavy liquid separation of asbestos from talcum powder is a well-researched method developed by J&J almost 50 years ago, published by Dr. Blount in 1990/91, and is also an International Standards Organization protocol (ISO 22262-1 &2) method, as well as used by the New York Environmental Laboratory Accreditation Program.

### Physical Prosperities of Tremolite & Anthophyllite

In the December 27, 1973 Colorado School of Mines Research report, it is noteworthy that tremolite was detected in the minus 200 plus 325 samples, but not in the minus 325.  These findings are consistent with the Pang et al. publication in 1987.[7] For this study, they spiked talc with tremolite (1.0% and 0.1%) and ground these samples for two size ranges: 1) 50% was minus 325 and 2) 100% minus 325.

The results showed that for the TEM analysis (100 grid openings) the 1% spiked tremolite sample, at 50% minus 325, the number of tremolite fibers detected was 1,592, and for the 100% minus 325, the number of tremolite fibers was reduced to 91 structures or 5% detected.

For the 0.1 wt. percent, for the TEM analysis (100 grid openings) the 0.1 % tremolite spiked sample at 50% minus 325, the number of tremolite fibers detected was 88 and for the 100% minus 325, the number of tremolite fibers was reduced to 0 structures detected.

What is important about this study, is first that the tremolite used was characterized by the authors as tremolite asbestos/asbestiform due to the aspect ratio. Second, the asbestos fibers/talc spiked samples were ground so that there were two different particle size populations for two sample sets, 1st set, 50% of the sample would pass through a 325 mesh per inch sieve (45 μm opening), 2nd set, 100% of the sample would pass through the 325 mesh.

---

[6] A Method for the Separation of Impurities from Talc
[7] Thomas W.S. Pang, et al., "Determination of tremolite Asbestos in Talc Powder Samples" Ann. Occup. Hyg., Vol. 31, No. 2, pp 219-225, 1987.

The Pang publication showed that when the talc was ground to the point that the size of the talc particles was small enough that 100% of the powder went through a 325 mesh, it either greatly reduced (1.0% spiked sample) or eliminated (0.1%), which is consistent with what Colorado School of Mines reported to J&J in their April 2, 1973 Protocol.

The reason for the tremolite asbestos being ground up is due the physical properties of tremolite asbestos, as well as anthophyllite asbestos, where both tremolite and anthophyllite have both low tensile strengths causing (brittle), and not flexible like chrysotile, and to a lesser degree, amosite and crocidolite.[8]  Since tremolite asbestos is brittle, the grinding to a minus 325 mesh size, by both the CSM and the Pang research, simply broke the tremolite fibers/bundles into particles.

The CSM results also showed that chrysotile was not affected when ground to a minus 325 mesh size because chrysotile has high tensile strength, good flexibility and is the reason that most all asbestos-containing cloth is woven out of chrysotile and not ever from tremolite or anthophyllite asbestos.  However, the size and width of the chrysotile bundles may be affected in the milling operation and that would account for the 5 to 20 μm in length to 2 to 4 μm in width range that we see in the cosmetic talcs, as well as the UCC SG-210 chrysotile.

Additionally, this data suggests that that cosmetic talc being milled to either a minus 200, and in some cases, a minus 325, is lowering the tremolite and or anthophyllite concentrations in the talcum powder, unless the concentration is so high in the talc ore, that a significant amount of the amphibole asbestos survives the milling process as demonstrated with the MDL samples in our 2-1-2019 report as well as for the samples reported here that were positive for either tremolite or anthophyllite.

The Pang study clearly shows that milling talc to either minus 200 or minus 325 sieve size greatly reduces the amount fibrous tremolite asbestos detected by TEM, which would also have an effect on the amount detected by PLM.

For many years the Cosmetic, Toiletry Fragrance Association (CTFA) J4-1 method for the detection of asbestiform amphibole minerals (tremolite or anthophyllite) in cosmetic talc first analyzed by XRD and if the talcum powder sample is negative for either tremolite and or anthophyllite, the analysis is stopped and the sample declared as not to not contain asbestos. On the other hand, if the sample is positive by XRD then the sample is analyzed by PLM to determine if the tremolite or anthophyllite is positive.

The J4-1 sample preparation method for PLM is located on page 10 at Note 1, and states the following:  Talcs to be analyzed and the tremolite used to prepare standard samples must be

---

[8] M.A. Vos, Asbestos in Ontario, Industrial Mineral Report, Ontario Department of Mines and Northern Affairs, Ontario, Canada 1971.

finer than 325 mesh (maximum particle size of 44 microns). The Tekmar Analytical Mill (Model A-10) is recommended.

Since the J4-1 PLM method requires that 100% talc sample be milled to a minus 325 sieve size, will cause most, if not all of the fibrous tremolite asbestos to be ground to non-asbestos particulates if tremolite asbestos is present in the sample, causing many false negative results to be reported.

This discussion goes to the whole issue of the general geological definition of "asbestiform" that appears in many of the standard TEM protocols, including the ASTM D5755-09 dust method that I was the primary author.[9] This general definition is as follows:

*"asbestiform-a special type of fibrous habit in which the fibers are separable into thinner fibers and ultimately into fibrils. This habit accounts for greater flexibility and higher tensile strength than other habits of the same mineral."*

This is only a general definition that a geologist might be interested in when evaluating a potential asbestos mine, since the more fibrous the asbestos deposit, the more economical value the mine would have.[13] The economic value which depends on the grading of the asbestos where the most important factors are fiber or fiber length, tensile strength, flexibility, and spinnability among others, as shown in the Table 8.

**Table 8**

**Physical Properties of Asbestos**

**M.A. Vos, Asbestos in Ontario**

| Asbestos Type | Tensile strength (PSI) | Flexibility | Spinnability |
|---|---|---|---|
| Chrysotile | 80,000-100,000 | High | Very Good |
| Amosite | 16,000 - 90,000 | Good | Good |
| Crocidolite | 100,000-300,000 | Good | Good |
| Tremolite solid solution series | <1,000 - 8,000 | Poor | Poor |
| Anthophyllite | 4,000 or less | Poor | Poor |

As the above table shows, the physical properties of tremolite, and anthophyllite asbestos have low tensile strength, both poor flexibility and spinnability, as compared to the other three asbestos types found in asbestos added products, and yet are regulated asbestos.

In a recent publication by Germine & Puffer entitled "Anthophyllite Asbestos from Staten Island, New York: Longitudinal Fiber Splitting", the authors concluded that the low quality

---

[9] ASTM D5755-09 Dust Method

characteristics of anthophyllite asbestos from the Staten Island mine, are consistent with the anthophyllite asbestos of the Finland mine.[10] These characteristics include low aspect ratios, longitudinal splitting rather than crystal growth and "rather brittle such that they could not be woven in the manner of high quality chrysotile." This paper verifies that that anthophyllite asbestos is brittle causing low tensile strength, not flexible or separated into single fibrils, and would not meet the disputed general geological asbestiform definition for commercial asbestos added products, but they also state in the last sentence of their paper "anthophyllite and amosite fibers are not asbestiform like chrysotile fibers but are never less potentially dangerous."

If this asbestiform definition was meant to be more than a general geological one, then the various analytical methods, using this definition, would have incorporated into the analytical methods, how to measure the tensile strength or flexibility of the microscopic asbestos fibers and bundles. Of course, the methods do not provide a means to measure flexibility and tensile strength since that type of measurement is impossible to accomplish by either PLM or TEM. Also, none of these analytical methods define what high tensile strength is, or how many measurements constitute a population.

### MAS's PLM Analysis of Chrysotile in Cosmetic Talc using the CSM Method

The PLM analysis performed by MAS showed that the six containers that were analyzed by the CSMP sample preparation method with HLS was positive for chrysotile asbestos.

MAS's PLM analysis was able to both detect and determine the amount of chrysotile bundles in the sample with HLS because MAS uses PLM microscopes that has higher resolution and analytical sensitivity capabilities, than your standard PLM microscope which is more suited for analyzing asbestos added products (AAP).


In AAP (chrysotile) samples as compared to cosmetic talc samples, has a much higher population of very large size chrysotile bundles and orders of magnitude higher concentration levels of chrysotile in these types of products.

The PLM analysis of AAP samples does not challenge the resolution of the typical PLM microscope optics, or burden the microscopist with very long sample analysis times.   For example, in most PLM labs, including MAS's, the typical time required for an experienced PLM microscopist to analyze asbestos added products (AAP), where the majority of the AAP samples

---

[10] Mark Germine and John H. Puffer, "Anthophyllite asbestos from Staten Island, New York: Longitudinal fiber Splitting", Archives of Environmental & Occupational Health, (2021) https://doi.org/10.1080/19338244.2021.1873095

contain approximately 10 to 25 % asbestos, will only take about 15 and 20 minutes to complete the analysis.

With a cosmetic talc sample on the other hand, a typical PLM analysis at MAS, for either chrysotile or amphiboles asbestos, would routinely take 2 to 4 hours for a positive sample and a minimum of 20 minutes to hour for a negative sample, if there are no pigments in the sample. In order to both detect and analyze the small size of the chrysotile bundles (10 to 20 µm in length), that are typically found in cosmetic grade talcum powder, through the use of dispersion staining, the PLM microscope must have "flat" objective lenses, and a HD video camera attached to the PLM microscope that is interfaced to a high definition monitor.

The MAS PLM microscopes are Leica DM2700P PLM microscopes, where all of the objective lens, including the 10X central stop dispersion lens are the flat type, also known as infinity lens, LED light source, and are coupled with state-of-the-art HD digital camera and 37" HD monitor. To detect these size chrysotile bundles, it is highly recommended that this type of PLM microscope setup should be used for the PLM analysis of cosmetic talc samples.

It is also my opinion that the PLM analyst must first analyze prepared talcum powder standards, containing UCC SG-210 or RG-144 chrysotile, to become familiar with both the size of chrysotile structures found in cosmetic talc, as well as the difference in the refractive indices for the chrysotile as compared chrysotile added products.

Both the RG-144 and RG-210 Calidria chrysotile and the chrysotile found in the talcum powder samples typically shows central stop dispersion colors (CSDS) from blues (α) to golden yellows (γ) in 1.550 liquid, and blue to a dark gold in 1.560 liquid.   MAS has been reporting this range of CSDS colors for the chrysotile detected in the cosmetic talc samples for almost two years using 1.550 RI liquid.  During that time, defendant experts, retained by a number of cosmetic talc manufacturers, and have repeatedly testified that MAS's CSDS findings are not appropriate for chrysotile. Therefore, in their opinions, MAS was and has been misidentifying fibrous/platy talc edge or cellulose as chrysotile.

Additionally, Dr. Gunter, while working as a defense expert for Gold Bond defense counsel, analyzed samples of RG-144 and SG-210 Calidria chrysotile, that MAS provided to him, and he confirmed in a recent deposition that "Calidria chrysotile can produce a range of CDSC colors from bluish to golden-yellow in 1.550 liquid. [11]  Dr. Gunter's Calidria chrysotile results are consistent with our laboratory's findings, which validates our PLM chrysotile findings in the cosmetic talc samples. [12]

---

[11] Deposition of Dr. Mickey Gunter, Woods, Jesse & Sarah vs. Kolmar Laboratories Inc. et al. Supreme Court in the State of New York, County of Monroe, #E202000384
[12] Expert Report, October 9, 2023 "Comparison of Ri's and Chrysotile Structure Size Union Carbide's SG-210 Chrysotile product from the Coaling Mine California, Montanan Talc, Fibrous talc and     Reduced Size NIST 1866b Chrysotile Standard.

Dr. Gunter's testimony about his Calidria CSDS results is in direct contradiction to his original criticism of the "yellow-gold" dispersion color, as well as Dr. Sanchez and Mr. Seagrave's past testimony on this issue.

It is my opinion, that when these defense experts were testifying that our laboratory was misidentifying fibrous talc or talc plates on edge for chrysotile based on the CSDS "yellow color", as it turns out, the opposite was true, they were the ones misidentifying chrysotile as fibrous talc or talc plates on edge.

### Birefringence Measurements

The key optical property to differentiate fibrous talc from chrysotile asbestos, when using the PLM method, is determining the difference in the birefringence (BIR) value between these two elongated minerals. Most PLM analysts will just use the PLM cross-polar condition to visually estimate the magnitude of the BIR (Low, Moderate or High) by the amount of brightness and change in wavelength colors that are observed.

This visual estimate of the amount of birefringence is typically done under cross-polar conditions and is a subjective interpretation by the PLM analyst, therefore, can lead to errors. A more accurate determination of BIR is to calculate the numerical BIR value by simply subtracting the measured perpendicular RI from the measured parallel RI (n ‖ - n _|_).

The subtracted BIR results give the analyst a numerical birefringence (BIR) value that is either classified as **Low (<0.01)**, **Moderate (0.01 to 0.05)** and **High (>0.05)**.

Fibrous talc and/or talc plates on edge will have a calculated BIR value that is typically at the high end of Moderate (0.045) to greater than 0.05 which is in the High BIR range. Chrysotile on the other hand, will have BIR values that range from the middle to the upper end of the Low range to the lower end of the Moderate range. The average calculated range BIR's, for the detected chrysotile bundles from the powder samples for CSM PLM method had a range of **0.005 to 0.017** which falls in the LOW end of BIR to the low end of Moderate classifications when done by calculation.

The BIR difference between fibrous talc and chrysotile, as demonstrated by MAS, is also verified by the EPA in their 600/R-93/116 PLM methodology document as shown in Table 2-2, page 21.

Table 2-2, "Optical Properties of Asbestos Fibers", provides four sets of refractive indexes measured from chrysotile bundles that have an overall average BIR of 0.011. In that same table, EPA published a range chrysotile BIR's of 0.004 to 0.017 (Low to moderate). This BIR range reported by EPA, was from the Maximum and Minimum values obtained from references 2, 11, 12, and 18 located in Section 2.2.

The method that EPA used for the BIR was to subtract the highest alpha from the highest gamma, then subtract the lowest alpha from the lowest gamma. The EPA referenced BIR

method, is the same way that MAS determined the BIR for the chrysotile bundles found in the J&J talcum powder samples reported here.

The EPA R93 protocol also provides RI and BIR data for both fibrous talc and Flat Cellulose Ribbons that can be found in their Table 2.5. For the RI's of fibrous talc example, EPA reports refractive index 1.600-1.540 with a measured BIR of 0.06, and for cellulose ribbons, the reported EPA RI's are 1.580-1.530 with a measured BIR of 0.05 as shown in Table 9.

### Table 9

### EPA-R93: Optical Properties of Selected Fibers

### Fibrous Talc & Cellulose Ribbons

| Fiber Type | RI Parallel/Perpendicular | BIR Calculations |
|---|---|---|
| Fibrous Talc | 1.600-1.540 | 0.060 "High" |
| Cellulose | 1.580-1.530 | 0.050 high end of Moderate |

In summary, this data demonstrates that the reported chrysotile bundles in the J&J talcum powder container samples analyzed by MAS have both the appropriate range of refractive indexes and BIR demonstrating that chrysotile asbestos was correctly identified in each container samples, and it also demonstrates that fibrous talc particles or talc plates on edge were not misidentified as chrysotile.

**CSM PLM Validation Procedure for CSM Sample Preparation Method**

**J&J MDL Talcum Powder Sample Totals**

The February 1, 2019 MDL Supplement Report for the historical J&J talcum powder products (JBP & STS) analysis demonstrated that both the Italian and the Vermont mines, that J&J sourced their talcum powder from, contained significant amounts of amphibole asbestos (tremolite & anthophyllite/cummingtonite). Additionally, the 15 MDL historical Imerys talc ore samples sourced from their Vermont mine, were found to contained tremolite asbestos. The Imerys historical retains were samples of mostly West Windsor Grade 66 which was the product that J&J used for JBP and STS form the late 1960s to 2003.

Between the MDL historical and non-historical J&J talcum powder products, along with the retain samples, MAS has analyzed a total of 118 J&J talcum powder from the Italian, Vermont and Chinese talc mine sources. The following is a breakdown between the three talc mines for the number of talc samples from each mine, that MAS has analyzed along with the number of positive samples for each group.

**1960 to 1968:** Italian Historical J&J Containers: of the **14 analyzed, 7 were positive** (50%) asbestos

**1968 to 2003:** Vermont Historical J&J Containers: of the **36 samples analyzed, 29** were positive (81%) for asbestos

**1968 to 2003:** Vermont Historical Imerys Retains: of the **15 samples analyzed, 8 were positive** (53%) for asbestos

**1968 to 2003:** Vermont Non-historical J&J Containers: of the **3 samples analyzed, 3 were positive** (100%) for asbestos

**2003 to 2021:** Chinese Non-historical J&J Containers: of the **43 samples analyzed, 40 were positive** (93%) for asbestos

**2003 to 2021:** Chinese Historical J&J/Imerys Retains: of the **11 samples analyzed, 11 were positive** (100%) for asbestos

All total, for the three talc mine sources that suppled J&J talcum powder for their two body powder products sold in the United States, MAS has analyzed **96 containers of J&J talcum powder products** that had detectable concentrations **of asbestos in 82%** of the containers. Additionally, the **26 historical talc oar samples that MAS has analyzed**, that was sourced from the Vermont and Chinese talc mines, found **73% positive for asbestos**. [13]

---

[13] MAS Chart of J&J Testing (Current as of September 16, 2021)

**Table 1**

**JBP Talcum Powder Sample Container Descriptions**

| | MAS Sample No. | Sender | Date of Manufacture | Sample size (oz) | Source of Sample | ATEM Amphibole Asbestos | PLM Amphibole Asbestos % | CSM Chrys % |
|---|---|---|---|---|---|---|---|---|
| 1 | M65514-001 | SGPB | Circa 1980 | 9 oz. | Carolyn Weirick | 247,000 s/g anthophyllite | N/A | N/A |
| 2 | M70484-001 | SGP | 1994 | 15 oz. | Linda Zimmerman | NAD | NAD | 0.01-0.10% |
| 3 | M71046-001 | SGPB | 1996 | 9 oz. | Marie Colley | NAD | NAD | 0.002-0.01% |

These three additional Vermont sourced JBP samples were all found to be positive for either amphibole asbestos or chrysotile.

**J&J Chinese Talc Source Container Analysis**

Tables 2 thru 6 provides the J&J sample information and analytical results for the 40 JBP containers were talcum powder was sourced from China.

Table 3

J&J Talcum Powder Sample Container Descriptions and Analysis Results

Samples 9 thru 16

| MAS Sample No. | Sender | Date of Manufacture | Source of Sample | ATEM Amphibole Asbestos | PLM Amphibole Asbestos % | CSM Chrys % |
|---|---|---|---|---|---|---|
| 8 M68379-002 | SGPB | 2004 | JoAnne Anderson | 7,160 s/g Tremolite | N/A | N/A |
| 9 M66352-001 | Lanier JBP | 2012 | Krystal Kim | NAD | N/A | N/A |
| 10 M66352-002 | Lanier JBP | 2014 | Krystal Kim | 17,200 s/g | N/A | N/A |
| 11 M68483-001 | SGPB JBP | 2012 | Nancy Cabibi | NAD | N/A | N/A |
| 12 M67420-001 | #1 Lanier JBP | 2017 | off the shelf Imperial Westwood | NAD | N/A | 0.0002-0.0008% 428,000 bundles/g |
| 13 M67420-002 | #2 Lanier JBP | 2017 | off the shelf Imperial Westwood | NAD | N/A | 0.0002-0.0006% 489,000 bundles/g |

| | MAS Sample No. | Sender | Date of Manufacture | Source of Sample | ATEM Amphibole Asbestos | PLM Amphibole Asbestos % | CSM Chrys % |
|---|---|---|---|---|---|---|---|
| 22 | M71166-001 | MAS JBP | 2018 | off the shelf CVS | N/A | NAD | 0.0015-0.0017 |
| 23 | M71166-001 | MAS JBP | 2019 | off the shelf CVS | N/A | NAD | 0.001-0.003% |
| 24 | M71166-001 | MAS JBP | 2019 | off the shelf Walgreens | N/A | NAD | 0.001-0.003% |

**Table 5**

**J&J Talcum Powder Sample Container Description & Analysis**

**Samples 25 thru 32**

| | MAS Sample No. | Sender | Date of Manufacture | Source of Sample | ATEM Amphibole Asbestos | PLM Amphibole Asbestos % | CSM Chrys % |
|---|---|---|---|---|---|---|---|
| 25 | M71180-001 | HFM JBP | 2020 | off the shelf Target | N/A | NAD | 0.002-0.003% |
| 26 | M71211-001 | Weitz JBP | 2019 | Holly Johnson-Walmart | N/A | N/A | 0.001-0.002% |
| 27 | M71211-002 | Weitz JBP | 2019 | off the shelf | N/A | N/A | 0.001-0.002 |

Table 6

J&J Talcum Powder Sample Container Description & Analysis

Samples 33 thru 42

| | MAS Sample No. | Sender | Date of Manufacture | Source of Sample | ATEM Amphibole Asbestos | PLM Amphibole Asbestos % | CSM Chrys % |
|---|---|---|---|---|---|---|---|
| 33 | M71180-008 | Weitz JBP | 2019 | off the shelf Holly Johnson Walmart | N/A | N/A | 0.001-0.002% |
| 34 | M71211-009 | Weitz JBP | 2019 | off the shelf Holly Johnson-Walmart | N/A | N/A | 0.001-0.002% |
| 35 | M71211-10 | Weitz JBP | 2019 | off the shelf Holly Johnson-Walmart | N/A | N/A | 0.001-0.002 |
| 36 | M71216-001 | Kazan JBP | 2019 | off the shelf Lucky | N/A | N/A | 0.001-0.002% 273,000 bundles/g |
| 37 | M71216-002 | Kazan JBP | 2019 | off the shelf Lucky | N/A | N/A | 0.0009-0.001% 254,000 bundles/g |
| 38 | M71241-001 | MAS JBP | 2018 | off the shelf Ralphs | N/A | N/A | 0.0007-0.001% 168,142 bundles/g |

Table 7

J&J and Imerys Guangxi Chinese Retains

Analysis for Asbestos

Samples 1 thru 11

| | MAS Sample No. | Sender SGP | Imerys Ore Lot | BV/RJL Sample ID | ATEM Amphibole Asbestos | PLM Amphibole Asbestos % | CSM Chrys % |
|---|---|---|---|---|---|---|---|
| 1 | M71109-001 | Imerys Mine Seagrave | N/A | BV #A5152004-006A | NAD | NAD | 0.001-0.002% |
| 2 | M71110-001 | Imerys Mine Sanchez | N/A | RJLG No. 3136120 | NAD | NAD | 0.001-0.002% |
| 3 | M71111-001 | J&J Retain | MVN C01315C2 | RJLG No. 3138491 | NAD | NAD | 0.001% |
| 4 | M71111-002 | J&J Retain | MVN S0246C2 | RJLG No. 313455 | NAD | NAD | 0.001% |
| 5 | M71111-003 | J&J Retain | MVN S0246C2 | RJLG No. 3140762 | NAD | NAD | 0.001% |
| 6 | M71111-004 | J&J Retain | MVN S0246C2 | RJLG No. 3141790 | NAD | NAD | 0.0008-0.001% |

Exhibit 29

**VITAE**

Mark W. Rigler, Ph.D.
ASPEX, LLC
Lawrenceville, GA  30043

Education

| | |
|---|---|
| 1985 | Received Doctor of Philosophy in Microbiology, University of Georgia. |
| 1977 | Received Bachelor of Science Degree; Major in Biology, Villanova University, Villanova, PA. |

Professional Work History

| | |
|---|---|
| 2019 to Present | Principal Consulting Scientist, ASPEX, LLC, Lawrenceville, GA |
| 2017 to 2019 | Chief Science Officer, Senior Consulting Scientist, and Technical and Quality Director for Microbiologicals, MAS, LLC, Suwanee, GA |
| 2013 to 2017 | Laboratory Manager, Senior Consulting Scientist, Technical and Quality Director for Microbiologicals, MAS, LLC, Suwanee, GA |
| 2006 to 2013 | Senior Consulting Scientist, Technical and Quality Director for Microbiologicals, MAS, LLC, Suwanee, GA |
| 2004 to 2006 | Senior Consulting Scientist, Technical and Quality Director for Microbiologicals, Materials Analytical Services, Inc., Suwanee, GA |
| 2002 to 2004 | Vice President, Materials and IH Group Director, Materials Analytical Services, Inc, Suwanee, GA |
| 1996 to 2002 | Vice President and Materials Group Director, Materials Analytical Services, Inc, Suwanee, GA |
| 1993 to 1995 | Vice President and Director of Biological Services, Materials Analytical Services, Inc, Norcross, GA |
| 1990 to 1993 | Branch Manager and Director of Biological Services, Materials Analytical Services, Inc., Norcross, GA |
| 1989 to 1990 | Director of Biological Services, Materials Analytical Services, Inc., Norcross, GA |
| 1987 to 1989 | Senior Applications Specialist, RMC, Inc. Tucson, AZ |
| 1986 | Director, SCRS Analyticals, Monroe, GA.  Instructor, Biology Department, Emory University, Atlanta, GA |
| 1985 to 1986 | Postdoctoral Research Associate, Department of Microbiology, University of Georgia, Athens, GA |
| 1978 to 1985 | Research Technician, The University of Georgia Department of Microbiology, Department of Agronomy, Department of Science Education |

Publications

Tran, T, Egilman, D, Rigler, M, Emory, T. A (2021) Critique of Helsinki Criteria for Using Lung Fiber Levels to Determine Causation in Mesothelioma Cases. Annals of Global Health. ; 87(1): 73, 1–13.

Tran, T, Egilman, D & Rigler, M (2020): Response to Roggli et al. (2020) "Talc And Mesothelioma: Mineral Fiber Analysis Of 65 Cases With Clinicopathological Correlation", Ultrastructural Pathology DOI: 10.1080/01913123.2020.1778148

Steffen, J. E.,  Tran, T.,  Yimam, Clancy, K.M.,Bird, T.B., Rigler, M.W, Longo, W.E., and Egilman, D.E. (2020) Serous Ovarian Cancer Caused by Exposure to Asbestos and Fibrous Talc in Cosmetic Talc Powders—A Case Series. Journal of Occupational and Environmental Medicine Vol 62, No. 2.

Egilman, D.E., Steffen, J. E. , Tran, T., Clancy, K. , Rigler, M., and Longo, W. ,  (2019) Health Effects of Censored Elongated Mineral Particles: A Critical Review.  in Detection Limits in Air Quality and Environmental Measurements, ed. M. J. Brisson (West Conshohocken, PA: ASTM International, ), 192–239. http://doi.org/10.1520/STP1618201800805

Rigler, M.W., Longo, W.E and Sauerhoff, M.W., (2011) Exposure to fluoropolymers and VOCs during spray sealant product use.  Inhalation Toxicology; 23 (11); 641-657

Rigler, M.W. and Longo, W.E., (2010) Emission of Diacetyl (2,3 butanedione) from Natural Butter, Microwave Popcorn Butter Flavor Powder, Paste, and Liquid Products. International Journal of. Occupational and Environmental Health; 16:291-302

Rigler, M.W. and Longo, W.E., (2009) Quantitative Sulfur Gas Emission As A Specific Marker For Problematic Reactive Drywall, Proceedings of The Technical Symposium on Imported Corrosive Drywall, November 5-6, 2009, The University of Florida, Gainesville, FL.

Rigler, M.W., Freeman, G.B. Longo, W.E., Kyono, M. and Cai, M (1997).  A New Rapid Method for Analyzing Single Particles.  Proceedings of The Engineering Solutions to Indoor Air Quality Symposium July 21-26, 1997 for the United States Environmental Protection Agency (USEPA), Research Triangle Park, NC.

Longo, W.E., Rigler, M.W. and Slade, J.M. (1995) Crocidolite asbestos fibers in smoke from original Kent Cigarettes.  Journal of the American Medical Association. 55:11, 2232-2235.

Rigler, M.W., Gerriera, G.C. and Patton, J.S. (1985) Intramembranous particles are clustered on microvillus membrane vesicles.  Biochimica et Biophysica Acta.  816:131-141.

Honkanen, R.E., Rigler, M.W., and Patton, J.S. (1985)  Dietary fat assimilation and bile salt absorption in the killifish intestine.  American Journal of Physiology.  249 (Gastrointestinal and Liver Physiology 12)  G399-416.

Harvey, H. Rodger, Rigler, M.W., Patton, J.S. (1985).  The use of the Iatroscan TH-10 analyzer to quantify total lipids in a variety of samples types and lipid classes in human gallbladder bile.  Lipids  20:542-545.

Rigler, M.W., Honkanen, R. and Patton, J.S. (1985).  The ultrastructure of lipolytic products produced by pancreatic lipase in vitro and in vivo in the presence of bile salts.  A freeze fracture study.  Journal of Lipid Research 27.

Rigler, M. W. and Patton, J.S. (1984).  A simple inexpensive cryogenic storage device for microscopy specimens.  Journal of Microscopy.  134 (3)335-336.

Laher, J.M., Rigler, M.W., Vetter, R.D, Barrowman, J.A. and Patton, J.S. (1984). Relative bioavailability and lymphatic transport of benzo (a) pyrene when administered in different amounts of dietary fats.  Journal of Lipid Research.  25 (12) 1337-1342.

Rigler, M.W., R.L. Leffert and Patton, J.S. (1983). Rapid quantification on Chromarods of cholesterol, total bile salts and phospholipids from the same microliter sample of human gallbladder bile.  Journal of Chromatography.  277:321-327.

Rigler, M.W., and Patton, J.S. (1983). The production of liquid crystalline product phases by pancreatic lipase in the absence of bile salts.  A freeze fracture study.  Biochimica et Biophysica Acta.  751:444-454.

Rigler, M.W., I.L. Roth, D. Kritchevsky and J.S. Patton. (1983). The freeze fracture ultrastructure of peanut oil and other natural and synthetic triacyglycerol droplets. Journal of the American Oil Chemists Society 60 (7):1291-1298.

Patton, J.S., J.F. Battey, M.W. Rigler, J.W. Porter, C.C. Black, and J.E. Burris. (1983). A comparison of the metabolism of bicarboNate' 14C and acetate 1-14C and the variability of species lipid composition in coral reefs. Marine Biology. 75:121-130.

Brown, H.R., J.H. Bouton, L. Rigsby, and M.W. Rigler. (1983). Photosynthesis of grass species differing in carbon dioxide fixation pathways. VIII. Ultrastructural characteristics of Panicum species in the Laxa group. Plant Physiology. 71:425-431.

Patton, J.S., M.W. Rigler, T.H. Liao, H.H. Hamosh, and M. Hamosh. (1982). Hydrolysis of triacylglycerol emulsions by lingual lipase. Biochimica et Biophysica Acta. 712:400-407.

Rigler, M.W. (1981) Freeze fracture morphology of some synthetic and naturally occurring triacylglycerols. Proceedings of the Electron Microscopy Society of America. 39th Annual Meeting, Atlanta, GA August 10-14, G.W. Bailey (ed.), Claitors Publishing Co., Baton Rouge, pp.. 562-563.

Patton, J.S., M.W. Rigler, P.D. Phoem, and D.L. Fiest. (1981) Ixtoc 1 oil spill: flaking of surface mousse in the Gulf of Mexico. Nature 290:235-238.

Rigler, M.W., Taylor, J.V., Girardot, J.M., Girardot, M.N. (1992) A FESEM study of bioprosthetic heart valves after an anticalcification treatment. Annual meeting of the Southeastern Electron Microscopy Society, Athens, Georgia May 6-9, .

Rigler, M.W., (1984) Visualization, in vitro and in vivo, of the products of intestinal fat digestion by freeze fracture. Annual Meeting of the American Gastroenterology Associate, New Orleans, LA, May 20-23, .

Published Scientific Commentaries

Rigler, MW, Comments Regarding: Testing Methods for Asbestos in Talc and Cosmetic Products Containing Talc; Accepted by FDA for FDA Public Meeting February 4, 2020 Silver Spring, MD. submitted comments on https://www.regulations.gov/ in docket folder FDA-2020-N-0025. For Rigler comments see https://www.regulations.gov/docketBrowser?rpp=25&so=DESC&sb=commentDueDate&po=25&dct=PS&D=FDA-2020-N-0025

Presentations

Confirming Problematic Domestic and Chinese Drywall (CDW). Session: Assessment and Control of Chinese Drywall Emissions. Presented at the American Industrial Hygiene Association's Round Table, May 24, 2010, Denver, Colorado.

Solving an Indoor Odor and Mold Problem for an Outdoor Furniture Store. At the invitation of the Georgia Chapter Roof Consultants Institute, Atlanta, GA, December 10, 2004

Identifying and Quantifying Particulates in Human Lung By Electron Microscopy. Electron Microscopy for Industrial Hygiene Applications. Presented at the American Industrial Hygiene Association's Professional Development Course, May 8, 2004, Atlanta, Georgia.

Mold Investigations, A perspective of the investigator. At the invitation of the Georgia Local Section of the American Industrial Hygiene Association, Atlanta, GA, October 3, 2003

Environmental Audits. Southeastern Regional Conference on Mold, Lead, Healthy Homes and Children's Environmental Health, Atlanta, GA, November 6-8, 2002

Mold and Fungi in Buildings. Assessing Mold and Mildew Damage. At the invitation of MACTEC Companies, Atlanta, GA, September 19, 2002

Rigler, M.W., Liquid crystalline product phases; the hydrolysis of triolein by pancreatic lipase in the absence of

bile, a freeze fracture study.  Annual Meeting of the Southeastern Electron Microscopy Society, Charleston, SC, May 19-21, (1982).

Current Fixation Technologies for Ultrastructural Studies.  During the Current Trends in Immunomicroscopy Workshop at the invitation of George Washington School of Medicine by Fred Lightfoot, Department of Anatomy, Washington, D.C. May 28, 1992.
Ultra-fast Freezing Techniques.  An overview of freezing at the June 1990 invitation of George Washington School of Medicine by Fred Lightfoot, Department of Anatomy, Washington, DC July 1987 - 1991.

Ultra-rapid Freezing Methods and Cryoultramicrotomy, Southeastern Electron Microscopists Society, Athens, GA  1988.

Freeze Fracture Cytochemistry.  At the invitation of George Washington School of Medicine by Fred Lightfoot, Department of Anatomy, Washington, DC.  July 1988.

Ultra-rapid Freezing Methods and Cryoultramicrotomy, Florida Society for Electron Microscopy, Tampa, FL. 1987.

An Ultrastructural View of Fat Digestion.  Philadelphia Children's Hospital at the request of Yi Fu Shiau, M.D. and Peter Malete, M.D. of the Gastroenterology Section, Philadelphia V.A. Medical Center, Philadelphia, Pennsylvania on November 13, 1985.

Gastrointestinal Fat Digestion.  Department of Foods and Nutrition by invitation of Roy J. Martin, Ph.D., University of Georgia, Athens, Georgia on November 4, 1985.

Freeze Fracture.  Techniques and Applications.  In conjunction with Ivan I. Roth, Ph.D. of the University of Georgia at the invitation of Charles D. Humphrey, Ph.D., Hepatitis Branch, Centers for Disease Control, Atlanta, Georgia on October 21, 1985.

Rigler, M.W., Freeze fracture morphology of some synthetics and naturally occurring triacyclglycerols.  39th Annual Meeting of the Electron Microscopy Society of America, Atlanta, GA, August 10-14, (1981).

Rigler, M.W., Freeze etch morphology of some natural and synthetic triglyceride droplets.  XVth Annual Regional Lipid Conference, Cashiers, NC, October 22-24, (1980).


Expert Panel Invitations

Invitation by Louisiana Senators A.G. Crowe District 1 and Julie Quinn, District 6 to be on an expert panel regarding Chinese Drywall, Property and Health Effects, St. Tammany Parish Council, Mandeville, LA, September 19, 2009.

Invitation by Louisiana Senators A.G. Crowe District 1 and Julie Quinn, District 6 to be on an expert panel regarding Chinese Drywall, Property and Health Effects, St. Bernard Parish Council, Chalmette, LA, October 14, 2009.

Invitation by Louisiana Senators A.G. Crowe District 1 and Julie Quinn, District 6 to be on an expert panel regarding Chinese Drywall, Property and Health Effects, Slidell, LA, October  21, 2009.

Licenses

Clinical Laboratory Director - Special - State of Georgia 1999 - 2000.

Memberships

American Chemical Society (ACS)
American Industrial Hygiene Association (AIHA)
Southeastern Electron Microscopy Society (SEMS)
American Association for the Advancement of Science (AAAS)
American Society for Microbiology (ASM)

Microscopy Society of America (MSA)
American Society for Testing and Materials (ASTM)
American College of Occupational and Environmental Medicine (ACOEM)
American Conference of Government Industrial Hygienists (ACGIH)


Professional Scientific Committees

2018 - present     ASTM D-22 Committee on Air Quality Standards

Reviewer

2006  IICRC S520 Standard and Reference Guide for Professional Mold Remediation

Certificates, Continuing Education, and Training

2016  Fortieth International Good Manufacturing Practices Conference, The University of Georgia, March 10, 2016 Introduction to Pharmaceutical CGMP Quality Systems, Center for Professional Advancement, June 3, 2016

2006  Certified Mold Inspector  #CMI-06-2124 Certified Mold Remediation Contractor CMRC #06-2103

2003. Indoor air quality:  Fungal spore Identification, December 2003, The McCrone Research Institute, Chicago. IL.

2002  Mold Assessment and Remediation in Buildings, Training Certificate #1297, The Environmental Institute, Atlanta, GA

1997  Potential FMEA for Manufacturing & Assembly Process (Process FMEA) Course Certificate, The Society of Automotive Engineers Professional Development Program, February 27, 1997.

1995  A Comprehensive Review of Indoor Air Quality, Air Quality Sciences, Inc., Atlanta, GA.

1992  Trace Elemental and Surface Analysis, Charles Evans & Associates, Research Triangle Park, Raleigh, NC.

Awards

1981  Presidential Scholarship Award - Electron Microscopy Societyof America

1982. Ruska Award - Southeastern Electron Microscopy Society

1984  Student Research Prize, Runner up - American Gastroenterology Association

1985  Sigma XI Ph.D. Research Dissertation Award - University of Georgia Chapter

Consultant

1986  Genentech, Inc., Pharmacology Department, South San Francisco, CA.

1986  Georgia State University, Genetics Department, Atlanta, GA

Editor

1988  Electron Microscopy Hints and Tips.  Alabama Electron Microscopy Society.

Editorial Board Member

2020 The Journal of Scientific Practice and Integrity. https://www.jospi.org

Exhibit 30

**Page 1**

1    IN THE UNITED STATES DISTRICT COURT
     FOR THE DISTRICT OF NEW JERSEY
2

3

4    IN RE: JOHNSON & JOHNSON     )
     TALCUM POWDER PRODUCTS        )
5    MARKETING SALES               )
     PRACTICES, AND PRODUCTS       ) MDL NO.16-2738(FLW) (LHG)
6    LIABILITY LITIGATION          )
7    _____)

8

9

10

11          VIDEO-RECORDED DEPOSITION OF

12              MARK W. RIGLER, PH.D.

13

14              February 6, 2019

15                 9:14 a.m.

16

17            11340 Lakefield Drive
                  Suite 200
18            Johns Creek, Georgia

19

20

21

22       Frances Buono, RPR, CCR-B-791

23

24          Atlanta Reporters, Inc.
         Georgia Certified Court Reporters
25             (866) 344-0459
             www.atlanta-reporters.com

Atlanta Reporters, Inc.    866-344-0459    www.atlanta-reporter.com

---

**Page 2**

1          APPEARANCES OF COUNSEL

2

3    On behalf of the Plaintiffs:

4       LEE CIRSCH, Esq.
        The Lanier Law Firm
5       21550 Oxnard Street
        3rd Floor
6       Woodland Hills, California  91367
        Lee.cirsch@lanierlawfirm.com
7

8       P. LEIGH O'DELL, Esq.
        Beasley Allen Law Firm
9       218 Commerce Street
        Montgomery, Alabama  36103-4160
10      Leigh.odell@beasleyallen.com

11

12      MICHELLE A. PARFITT, Esq.
        JAMES GREEN, Esq.
13      Ashcraft & Gerel, LLP
        1825 K. Street
14      Suite 700
        Washington, D.C.  20036
        Mparfitt@ashcraftlaw.com
15

16      DENNIS M. GEIER, Esq.
        Cohen Placitella Roth, PC
17      127 Maple Avenue
        Red Bank, New Jersey  07701
18      Dgeier@cprlaw.com

19
20
21
22
23
24
25

Atlanta Reporters, Inc.    www.atlanta-reporters.com

---

**Page 3**

2

3    On behalf of the Defendant,
      Johnson & Johnson and Johnson & Johnson Consumer
4      Inc.:

5       ALEX V. CHACHKES, Esq.
        NINA TROVATO, Esq.
6       Orrick, Herrington & Sutcliffe, LLP
        51 West 52nd Street
7       New York, New York  10019-1642
        Achachkes@orrick.com
8       Ntrovato@orrick.com

9

10      JACK N. FROST, JR., Esq.
        Drinker Biddle & Reath LLP
11      600 Campus Drive
        Florham Park, New Jersey  07932-1047
12      Jack.frost@dbr.com

13    On behalf of the Defendant,
      Imerys Talc America, Inc.:

14      MARK K. SILVER, Esq.
15      Coughlin Duffy, LLP
        350 Mount Kemble Avenue
16      Morristown, New Jersey  07962
        Msilver@coughlinduffy.com

17

18      MARK A. PROST, Esq.
        Sandberg Phoenix & von Gontard, P.C.
19      600 Washington Avenue
        15th Floor
20      St. Louis, Missouri  63101-1313
        Mprost@sandbergphoenix.com
21
22
23
24
25

Atlanta Reporters, Inc.    www.atlanta-reporters.com

---

**Page 4**

2

3    On behalf of the Defendant,
      PTI:
4

5       MICHAEL ANDERTON, Esq.
        Tucker Ellis, LLP
6       950 Main Avenue
        Suite 1100
7       Cleveland, Ohio  44113-7213
        Michael.anderton@tuckerellis.com

8

9    On behalf of the Defendant,
      PCPC:

10      REBECCA WOODS, Esq.
        Seyfarth Shaw
11      1075 Peachtree Street, NE
        Suite 2500
12      Atlanta, Georgia  30309
        Rwoods@seyfarth.com

13

14    Also Present:

15      George Montiel, Videographer

16              - - -

17
18
19
20
21
22
23
24
25

Atlanta Reporters, Inc.    www.atlanta-reporters.com

5

| 1 | INDEX TO EXAMINATIONS | |
| 2 | | |
| 3 | Examination | Page |
| 4 | | |
| 5 | Examination by Mr. Chachkes | 7 |
| 6 | Examination by Mr. Silver | 214 |
| 7 | Examination by Ms. O'Dell | 219 |
| 8 | | |
| 9 | - - - | |

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

6

1    INDEX TO EXHIBITS
2
Defendants'
3    Exhibit    Description    Page
4
    1    Invoices    204
5
    2    Excerpt - Trial transcript,    136
6        February 20, 2018, Vol. XIV, Lanzo
        vs. Cyprus Amax
7
    3    MAS TEM Coefficient of Variation for    173
8        Tremolite and Anthophyllite in Talc,
        A Quality Control Study, 9-6-18
9
    4    Graph    177
10
11
12    (Original Exhibits 1 through 4 have been
    attached to the original transcript.)
13
14        - - -

15
16
17
18
19
20
21
22
23
24
25

7

1          (Reporter disclosure made pursuant to
2     Article 10.B. of the Rules and Regulations of
3     the Board of Court Reporting of the Judicial
4     Council of Georgia.)
5          (Identification statement by
6     videographer.)
7              MARK W. RIGLER, PH.D.,
8     having been first duly sworn, was examined and
09:13:39  9     testified as follows:
09:13:39 10              EXAMINATION
09:13:42 11     BY MR. CHACHKES:
09:13:42 12     Q.    Good morning, Dr. Rigler.
09:14:52 13     A.    Good morning.
09:14:52 14     Q.    How are you?
09:14:52 15     A.    Good; you?
09:14:53 16     Q.    Good.
09:14:55 17          MR. CHACHKES:  So just for the record, I
09:14:55 18     have the same late production objections as
09:14:58 19     yesterday and the same request to keep the
09:15:01 20     deposition open.  I assume you have the same?
09:15:03 21          MS. O'DELL:  We have the same opposition.
09:15:06 22     Q.    (By Mr. Chachkes)  Okay.  So what I've
09:15:07 23     done is I've brought some exhibits from yesterday, so
09:15:10 24     if you're wondering why there's stamps on them, it's
09:15:14 25     because they're the stamps from Dr. Longo's

8

09:15:17  1     deposition.  We are going to use some of the same
09:15:19  2     exhibits, if that's okay.
09:15:20  3     A.    Yes.
09:15:20  4     Q.    So what's been marked yesterday -- so all
09:15:22  5     the stamps are February 5, 2019, Longo.  And I'm
09:15:28  6     going to use those exhibits unless I use a new
09:15:31  7     exhibit.
09:15:31  8     A.    Okay.
09:15:32  9     Q.    So I'm just going to hand you what's been
09:15:33 10     marked yesterday as Exhibit 2.  And you recognize
09:15:36 11     that as the January 15 version of the report that you
09:15:40 12     cosigned?
09:15:41 13     A.    Yes.
09:15:41 14     Q.    Okay.  And what was your involvement in
09:15:44 15     drafting this report?
09:15:46 16     A.    I reviewed the report, looked over the
09:15:50 17     data, and made typographical and grammatical
09:15:55 18     corrections throughout the report.
09:15:57 19     Q.    Okay.  Do you feel qualified to testify to
09:16:05 20     every matter that's in that report?
09:16:07 21          MS. O'DELL:  Object to the form.
09:16:08 22          THE WITNESS:  As I say, I am qualified to
09:16:12 23     testify on what's in this report now, yes.
09:16:14 24     Q.    (By Mr. Chachkes)  Okay.  So if Dr. Longo
09:16:17 25     were to, for example, not show up at a trial, you

**9**

```
09:16:20  1   could testify to everything that you could testify
09:16:21  2   to?
09:16:22  3        A.    Well, I'm not Dr. Longo, of course.
09:16:26  4   However, I can testify as to what's in this report,
09:16:29  5   yes.
09:16:29  6        Q.    Okay.  To what degree is Dr. Longo more
09:16:33  7   qualified about something in that report than you?
09:16:36  8        A.    Dr. Longo has a degree in materials
09:16:39  9   science, and my degree is in microbiology, my Ph.D.
09:16:44 10   So he has more experience in the materials area, so I
09:16:53 11   would, you know, defer to him on those topics.
09:16:57 12        Q.    Okay.  Well, there's no microbiology in
09:17:01 13   the report; right?
09:17:02 14        A.    Not that I know of, no.  But there are
09:17:04 15   microscopic things in the report, and that's one of
09:17:07 16   my areas of qualification, electron microscopy and
09:17:12 17   the microscopic world, if you will.
09:17:14 18        Q.    So that's sort of a comparison of your
09:17:16 19   relative expertise.  What about your relative ability
09:17:19 20   to talk about substantive matters, data, you know,
09:17:23 21   what analysts did?  Is there any difference there
09:17:26 22   between you and Dr. Longo?
09:17:27 23        A.    Well, Dr. Longo is the head of the
09:17:31 24   laboratory, so I would defer to him on a number of
09:17:35 25   those areas, and specific areas.
```

Atlanta Reporters, Inc. 866-344-0459   www.atlanta-reporters.com

**10**

```
09:17:38  1        Q.    Okay.  For example?
09:17:39  2        A.    Well, for example, there may be some
09:17:42  3   situations where he directed the study and that
09:17:49  4   would -- I would defer those things to him.
09:17:51  5        Q.    Did you direct any of the studies in that
09:17:54  6   report?
09:17:54  7        A.    As far as me directing the studies in
09:17:57  8   here, that was mainly Dr. Longo.
09:17:58  9        Q.    Okay.  What studies in there did you
09:18:02 10   direct?
09:18:03 11        A.    Again, they were mainly directed by
09:18:06 12   Dr. Longo.
09:18:06 13        Q.    You say mainly.  I'm just wondering is
09:18:09 14   there anything left over that you directed?
09:18:11 15        MS. O'DELL:  Object to the form.
09:18:12 16        THE WITNESS:  In terms of the study
09:18:16 17   process, originally we conferred on it in the
09:18:20 18   very beginning, but Dr. Longo was the one who
09:18:24 19   mainly carried out the processes and direction
09:18:28 20   of the studies.
09:18:29 21        Q.   (By Mr. Chachkes)  Okay.  So the
09:18:31 22   conceptualization of the experimental procedures you
09:18:35 23   participated, but in the actual execution you did not
09:18:38 24   participate?
09:18:39 25        MS. O'DELL:  Object to the form.
```

Atlanta Reporters, Inc. 866-344-0459   www.atlanta-reporters.com

**11**

```
09:18:41  1        THE WITNESS:  Well, in terms of looking at
09:18:42  2   data, quality control issues, that type of
09:18:45  3   thing, which would be part of the study, I would
09:18:47  4   say, yes, I was part of that.
09:18:49  5        Q.   (By Mr. Chachkes)  Okay.  So the actual
09:18:51  6   experimentation process, the -- people call it wet
09:18:54  7   work; are you familiar with that?
09:18:55  8        A.    Yes.
09:18:56  9        Q.    Okay.  So the actual experimental process
09:18:58 10   and the wet work, you did not participate in that?
09:19:01 11        A.    Again, Dr. Longo directed those activities
09:19:06 12   in this study; and again, I will defer those things
09:19:10 13   to him, you know, if -- once we get to those topics
09:19:14 14   and we talk about those topics, because right now
09:19:17 15   we're talking about things in general.
09:19:18 16        Q.    I'm not asking about Dr. Longo.  I'm
09:19:20 17   asking about you.
09:19:20 18        A.    Sure.
09:19:21 19        Q.    What in the report -- which experiments
09:19:23 20   did you participate in, if any?
09:19:24 21        A.    I told you in the beginning what I did
09:19:28 22   here, which was mainly review the data, review the
09:19:31 23   report for typographical or grammatical errors, also
09:19:36 24   checking data, that type of thing.
09:19:38 25        Q.    So can you confirm you did not participate
```

Atlanta Reporters, Inc. 866-344-0459   www.atlanta-reporters.com

**12**

```
09:19:41  1   in the actual experimenting that's reported on in the
09:19:44  2   exhibit?
09:19:44  3        MS. O'DELL:  Object to the form.
09:19:47  4        THE WITNESS:  Again, I was part of the
09:19:48  5   study working on part of the study, so I
09:19:50  6   consider myself as someone who participated in
09:19:53  7   the study.
09:19:53  8        Q.   (By Mr. Chachkes)  Okay.  So --
09:19:55  9        A.    That's the way it works in the laboratory.
09:19:57 10        Q.    Let's be more specific.
09:19:58 11        A.    Sure.
09:19:59 12        Q.    So you understand what an experiment is;
09:20:04 13   right?
09:20:04 14        MS. O'DELL:  In what context?
09:20:07 15        THE WITNESS:  Yeah, in what context?
09:20:08 16        Q.   (By Mr. Chachkes)  Okay.  So you're
09:20:09 17   unclear on what an experiment is?
09:20:11 18        A.    No, I'm not unclear on what an experiment
09:20:13 19   is.  I'm wondering what you're asking as far as your
09:20:15 20   question.
09:20:15 21        Q.    What does the word experiment mean to you?
09:20:17 22        A.    Well, it would be a set of tests after
09:20:21 23   coming up with a hypothesis about a particular
09:20:23 24   situation what the questions are.
09:20:25 25        Q.    Let's use your definition.  Were you
```

Atlanta Reporters, Inc. 866-344-0459   www.atlanta-reporters.com

**13**

09:20:26  1  involved in any experiments where you were actually
09:20:29  2  testing -- testing -- J&J bottles of talc?
09:20:35  3      A.    I was not -- I was not handling and
09:20:39  4  testing the talc myself.  Our analysts in the
09:20:42  5  laboratory were directed to do that.
09:20:44  6      Q.    Did you ever use a PLM for the purposes of
09:20:48  7  this report?
09:20:49  8      A.    No, I did not.
09:20:50  9      Q.    Did you ever use a TEM for the purposes of
09:20:52  10  this report?
09:20:53  11      A.    Not for the purposes of this report.
09:20:55  12      Q.    Did you ever use an XRD device for the
09:20:59  13  purposes of this report?
09:21:01  14      A.    We do not have the XRD device or that type
09:21:04  15  of device at our laboratory.
09:21:06  16      Q.    Did you ever do an SAED experiment for the
09:21:08  17  purposes of this report?
09:21:10  18      A.    Again, same answer as with the TEM.
09:21:13  19      So that's a no?
09:21:15  20      A.    Correct.
09:21:16  21      Q.    Okay.  And did you ever do EDXA work
09:21:21  22  experiments on J&J bottles of talc for this report?
09:21:24  23      A.    That would be the same answer.
09:21:26  24      Q.    Which is a no?
09:21:26  25      A.    Yes.

**14**

09:21:27  1      Q.    And did you -- let's -- so once the
09:21:36  2  experiments were done and you saw the data, did you
09:21:39  3  do any substantive contribution to the report other
09:21:46  4  than correct typos?
09:21:47  5      MS. O'DELL:  Object to the form.
09:21:48  6      THE WITNESS:  In terms of looking at what
09:21:50  7  was done during the study and working with the
09:21:55  8  TEM manager on the study and the quality
09:21:59  9  control, yes.
09:22:00  10      Q.    (By Mr. Chachkes)  Okay.  So can you be
09:22:02  11  more specific?  So you did quality control.  What's
09:22:04  12  that?
09:22:04  13      A.    Well, I monitored the reporting that was
09:22:08  14  done in terms of what samples were analyzed, what
09:22:12  15  replicates, duplicates, and blanks that would be
09:22:16  16  tested in terms of what were necessary for us to meet
09:22:20  17  the QC standards.
09:22:22  18      Q.    Okay.  And who set the QC standards?
09:22:25  19      A.    Well, the QC standards are set by NVLAP
09:22:30  20  NIST, the National Institutes of Standard and
09:22:32  21  Technology, for TEM labs that are analyzing for
09:22:36  22  asbestos.
09:22:36  23      Q.    Other than ensure that folks complied with
09:22:42  24  the QC standards, what did you do?
09:22:46  25      So let's say after the experiments were

**15**

09:22:48  1  done, you had the data?
09:22:49  2      A.    Well, then I would review the data, go
09:22:54  3  through the data, and then see again if it met the QC
09:22:59  4  qualifications.
09:23:01  5      Q.    Okay.  Anything else that you did once the
09:23:03  6  data was done?
09:23:04  7      A.    Not that I can recall as I sit here.
09:23:09  8      Q.    Okay.  During any of the experiments did
09:23:13  9  you sit over the shoulder of any analyst and watch
09:23:17  10  the work they were doing?
09:23:18  11      A.    Yeah.  I'm at the laboratory mostly on a
09:23:23  12  daily basis, so I was able to go in and look and see
09:23:25  13  what analysts were doing at any particular time.
09:23:33  14      Q.    Okay.  Were you substantively contributing
09:23:35  15  at those moments when you were looking at what
09:23:36  16  analysts were doing?
09:23:36  17      A.    What do you mean by that?
09:23:37  18      Q.    Well, were you telling them to change
09:23:41  19  their behavior or to do something that they weren't
09:23:43  20  otherwise going to do?  Anything that affected their
09:23:46  21  experimental work?
09:23:47  22      MS. O'DELL:  Object to the form.
09:23:48  23      THE WITNESS:  No.  No.
09:23:48  24      Q.    (By Mr. Chachkes)  And so you're an
09:23:52  25  employee of MAS?

**16**

09:23:53  1      A.    Yes.
09:23:53  2      Q.    How long have you been an employee there?
09:23:55  3      A.    Over 30 years.
09:23:57  4      Q.    Let's go back to the report.  Are there
09:24:04  5  any sections of the report that you can say you
09:24:06  6  didn't work on?
09:24:08  7      MS. O'DELL:  Object to the form.
09:24:09  8      THE WITNESS:  I would have to look.  If
09:24:14  9  you're talking about the reports in front of me
09:24:16  10  here --
09:24:17  11      Q.    (By Mr. Chachkes)  Yes, the January 15
09:24:19  12  expert report for the MDL.
09:24:20  13      A.    The J3 portions of the report.
09:24:24  14      Q.    And you would say you had some involvement
09:24:26  15  in all other portions?
09:24:28  16      A.    In other portions, yes.
09:24:29  17      Q.    How much time did you devote to the work
09:24:32  18  underlying this report and the report itself?
09:24:34  19      A.    I didn't keep track of it.  I have no
09:24:39  20  idea.
09:24:39  21      Q.    Over 10 hours?
09:24:41  22      A.    Probably over 10 hours.
09:24:42  23      Q.    Over 20 hours?
09:24:43  24      A.    Again, that would be a guesstimate.  I
09:24:45  25  don't know beyond that.

**17**

```
09:24:48   1    Q.    More than 15 hours?
09:24:48   2    A.    I don't know.
09:24:49   3    Q.    So probably over 10 hours, but you don't
09:24:52   4  know beyond that?
09:24:52   5    A.    Correct.
09:24:53   6    Q.    Okay.  And were you involved in the
09:24:58   7  creation of the protocols to test J&J talc in this
09:25:03   8  case?
09:25:04   9    A.    In terms of the protocols for the testing,
09:25:09  10  we used standard methods throughout for the analysis.
09:25:14  11  Dr. Longo essentially put together the way the test
09:25:18  12  or the study was going to be done, but we, you know,
09:25:21  13  overall use the standard methods throughout.
09:25:23  14    Q.    When you say Dr. Longo put together the
09:25:26  15  way -- you said the way the studies would be
09:25:28  16  conducted?
09:25:29  17    A.    Yes.
09:25:29  18    Q.    Was that something in writing?
09:25:31  19    A.    Well, he directs the study on a daily
09:25:35  20  basis.
09:25:35  21    Q.    The question is was it in writing?
09:25:38  22    A.    Was it in writing?  I don't know.  You'd
09:25:42  23  have to ask Dr. Longo.
09:25:43  24    Q.    Okay.  So you're unaware of whether he
09:25:46  25  communicated with the analysts about protocol in
```

**18**

```
09:25:48   1  writing?
09:25:49   2    A.    Well, the --
09:25:50   3         MS. O'DELL:  Object to form.
09:25:51   4         THE WITNESS:  -- laboratory has protocol
09:25:52   5  for the way that talc is analyzed and
09:25:59   6  asbestos-bearing products are analyzed, so we
09:26:01   7  have written protocol for those things.
09:26:03   8         MR. CHACHKES:  Okay.  And I think I've
09:26:06   9  requested that those be produced.  I don't think
09:26:07  10  those have been produced.
09:26:09  11         MS. O'DELL:  I think it's reflected in his
09:26:11  12  report, but we will consider your request.
09:26:13  13    Q.    (By Mr. Chachkes)  Okay.  Do you
09:26:21  14  communicate with the analysts by email at all?
09:26:23  15    A.    Communicate with the analysts by email?
09:26:26  16  No.  I can go speak to them.
09:26:29  17    Q.    Okay.  There's no sort of like weekly
09:26:33  18  email or monthly email where you summarize what's
09:26:36  19  going on?
09:26:37  20    A.    No.
09:26:37  21    Q.    Did you ever change an analyst's
09:26:42  22  determinations where an analyst came up with some
09:26:44  23  conclusion and you said maybe that's not right, go
09:26:46  24  back?
09:26:47  25    A.    No.
```

**19**

```
09:26:49   1    Q.    Do you consider yourself an expert in TEM
09:26:56   2  analysis?
09:26:56   3    A.    Well, the term expert, I think, you
09:27:00   4  probably have to defer that to the court.  I mean, I
09:27:04   5  have more than the layperson's knowledge so -- but I
09:27:08   6  would defer that to the court.
09:27:10   7    Q.    Okay.  Have you --
09:27:13   8    A.    I mean, I've been qualified as an expert
09:27:16   9  before, but in this case...
09:27:19  10    Q.    When is the first time you ever used a
09:27:21  11  TEM?
09:27:21  12    A.    The first time I used a TEM?  Let's see.
09:27:24  13  That would probably have been sometime in the early
09:27:29  14  '80s, I would say, yeah.
09:27:31  15    Q.    How many times have you used an SAED to
09:27:35  16  characterize a particle?
09:27:36  17    A.    SAED?
09:27:37  18    Q.    SAED.
09:27:39  19    A.    I don't know if I could count the number
09:27:40  20  of times.
09:27:41  21    Q.    How many times have you used EDXA to
09:27:45  22  characterize a particle?
09:27:47  23    A.    Same answer on that.  Yes.
09:27:47  24    Q.    What about PLM, do you consider yourself
09:27:53  25  an expert on PLM?
```

**20**

```
09:27:54   1    A.    I am not a PLM microscopist.
09:27:56   2    Q.    Okay.  What was your contribution to the
09:27:58   3  PLM aspects of the January 15 report?
09:28:03   4    A.    Well, as far as PLM contributions, again,
09:28:07   5  I'm not the PLM analyst, so we just wanted to be sure
09:28:13   6  that the quality program was being followed in the
09:28:18   7  laboratory.
09:28:18   8    Q.    When you say that a quality program was
09:28:21   9  being followed, is that the same contribution you
09:28:31  10  made to the other portions of the report?
09:28:33  11         MS. O'DELL:  Object to form.
09:28:34  12         THE WITNESS:  Yes.  Well, I would say yes
09:28:35  13  to that.  Yes.
09:28:36  14    Q.    (By Mr. Chachkes)  Okay.  Did you ever
09:28:43  15  personally test a talc sample for asbestos
09:28:45  16  contamination?
09:28:46  17    A.    Did I ever personally test them?
09:28:48  18    Q.    Yes.
09:28:48  19    A.    Not that I can recall as I sit here.
09:28:50  20    Q.    Okay.
09:28:55  21    A.    We've done tissue testing for talc and
09:29:00  22  asbestos in tissue, yes.
09:29:01  23    Q.    But just testing talcum powder that came
09:29:05  24  out of a bottle, you've never done that?
09:29:07  25    A.    I've not personally tested that.
```

21

09:29:09 1    Q.    You have an undergraduate degree in
09:29:21 2  biology?
09:29:21 3    A.    Yes.
09:29:21 4    Q.    And a Ph.D. in microbiology?
09:29:24 5    A.    Yes.
09:29:24 6    Q.    Did you take any geology courses at any
09:29:27 7  point in your education?
09:29:27 8    A.    No, but at the University of Georgia one
09:29:31 9  of my very good friends in graduate school was a
09:29:34 10  geologist, and we discussed a lot of issues
09:29:38 11  surrounding the phyllosilicates.  He was a kaolin
09:29:44 12  person.  He was a clay person.
09:29:44 13         In Georgia we have a lot of red clay, and
09:29:46 14  so that was one of his areas that he enjoyed, and I
09:29:51 15  learned quite a bit from him.  Very strong geology
09:29:56 16  department at the University of Georgia.
09:29:57 17    Q.    Other than talking to a friend about
09:29:59 18  geology, do you have any formal geology education?
09:30:03 19         MS. O'DELL:  Object to form.
09:30:04 20         THE WITNESS:  No.
09:30:04 21    Q.    (By Mr. Chachkes)  Did you take any
09:30:06 22  mineralogy courses during any part of your
09:30:07 23  educations?
09:30:07 24    A.    It's interesting because in the electron
09:30:11 25  microscopy courses that you take, the substances that

22

09:30:17 1  we analyzed, you know, varied from biological
09:30:20 2  substances to mineralogical substances.  So you would
09:30:24 3  get a portion of that with that training, and I got
09:30:27 4  some of that.
09:30:28 5    Q.    Okay.  Have you ever physically analyzed a
09:30:33 6  mineral under a microscopy technique?
09:30:36 7    A.    I, again, think the answer to that is I
09:30:41 8  have sat with the analysts, that includes the PLM
09:30:46 9  analysts, watched them do the work, and participated
09:30:51 10  that way in terms of the -- that kind of an analysis.
09:30:55 11    Q.    Other than watching other people analyze
09:30:57 12  minerals under microscopy techniques, have you any
09:31:01 13  experience analyzing minerals under microscopy
09:31:03 14  techniques?
09:31:03 15    A.    Well, by electron microscopy in terms of
09:31:09 16  seeing these minerals and having run into them during
09:31:13 17  an analysis.  And again, I've been doing electron
09:31:17 18  microscopy since the '80s, so the tissue analysis
09:31:21 19  that I've done in the past we've come across, you
09:31:26 20  know, mineral types and there's tissues and how to
09:31:28 21  analyze those.  So I've done that in tissue samples
09:31:32 22  at the optical or the bulk PLM level very limited,
09:31:37 23  say.
09:31:37 24    Q.    Okay.  Have you ever personally run a
09:31:39 25  microscopy analysis of minerals that aren't in

23

09:31:44 1  tissue?
09:31:45 2    A.    Yes.
09:31:48 3    Q.    Can you explain?
09:31:49 4    A.    Again, at MAS I've had a variety of roles
09:31:55 5  from the early '90s when I was hired there; and MAS
09:32:02 6  is a materials characterization laboratory, so I
09:32:06 7  worked on hundreds of different kinds of projects
09:32:09 8  using microscopy and gas chromatography, all kinds of
09:32:15 9  chemical techniques.
09:32:16 10         So I have run into situations where I've
09:32:18 11  examined minerals that have been in materials such as
09:32:22 12  plastics or polymers, for instance, where we have
09:32:25 13  done cutting or thin sectioning of that kind of
09:32:29 14  material, and you would look at the inclusions in the
09:32:32 15  polymers because they are -- they're additives, they
09:32:36 16  may be for a variety of different reasons, and then
09:32:39 17  you end up analyzing them or seeing them.  And this
09:32:43 18  was mostly by SEM or TEM.
09:32:46 19    Q.    And you personally did those experiments?
09:32:48 20    A.    Yes, I've personally done those things.
09:32:50 21    Q.    Have you ever personally done a microscopy
09:32:52 22  investigation of a mineral or a solid solution that's
09:32:56 23  just mineral or solid solution?
09:32:59 24    A.    Can you explain a bit more?
09:33:01 25    Q.    Do you know what a solid solution is?

24

09:33:03 1    A.    Yes.
09:33:03 2    Q.    So, for example, a bottle of talc just
09:33:06 3  contains minerals; right?
09:33:08 4    A.    Yes.
09:33:08 5    Q.    Okay.  So have you ever --
09:33:09 6         MS. O'DELL:  Object to the form.
09:33:10 7    Q.    (By Mr. Chachkes)  -- personally done a
09:33:12 8  microscopy analysis of something that just contains
09:33:15 9  minerals, doesn't contain anything else like plastics
09:33:18 10  or other things?
09:33:19 11    A.    Well, I think if you look at it from the
09:33:23 12  viewpoint of if you have a plastic or whatever it may
09:33:29 13  be and a mineral inclusion in there, you're looking
09:33:31 14  at the mineral, you know, aside from the other
09:33:33 15  polymeric material that's there.  So the answer to
09:33:36 16  that is yes.  And as far as a solid solution series
09:33:39 17  mineral, yes.
09:33:40 18    Q.    Okay.  I want to be clear what you're
09:33:42 19  answering because you've talked about plastics, and
09:33:44 20  my question was saying expressly exclude those.  So
09:33:47 21  let me ask it again just to make sure I have a clear
09:33:50 22  answer.
09:33:50 23    A.    All right.
09:33:50 24    Q.    Have you ever personally done a microscopy
09:33:55 25  analysis of minerals and only minerals, where it's

25

| | |
|---|---|
| 09:33:57 1 | just minerals you're looking at? |
| 09:33:58 2 | A. The answer to that is yes. |
| 09:34:00 3 | Q. Okay. Can you give me an example? |
| 09:34:02 4 | A. Again, I will go back to studies that |
| 09:34:06 5 | we've done on client samples over the years, most of |
| 09:34:10 6 | them being particulate types of samples. In the |
| 09:34:13 7 | early days when I came to MAS, we were looking at a |
| 09:34:16 8 | lot of asbestos-bearing materials. So part of my |
| 09:34:21 9 | training at the company was looking at those |
| 09:34:24 10 | materials by SEM or TEM. |
| 09:34:26 11 | Q. Okay. So those asbestos-bearing materials |
| 09:34:28 12 | were only minerals, the -- you say asbestos-bearing, |
| 09:34:32 13 | but the thing that was bearing them was minerals? |
| 09:34:34 14 | A. Yeah. I mean, if you're looking at |
| 09:34:36 15 | something like vermiculite, you know, pure -- yeah. |
| 09:34:39 16 | Q. Got it. Did you take any crystallography |
| 09:34:43 17 | courses during your education? |
| 09:34:44 18 | A. Once again, that's part of the TEM |
| 09:34:47 19 | training that I got. |
| 09:34:48 20 | Q. Okay. Was the TEM training you got, that |
| 09:34:50 21 | was, I'm sorry, in college? |
| 09:34:52 22 | A. Yeah, in graduate school. |
| 09:34:53 23 | Q. Graduate school. Was that a particular |
| 09:34:55 24 | course, or was that just part of your thesis work? |
| 09:34:58 25 | A. No, that's a course. They had courses in |

26

| | |
|---|---|
| 09:35:01 1 | scanning electron microscopy and transmission |
| 09:35:04 2 | electron microscopy, and those were all part of the |
| 09:35:06 3 | course that you took. You had to learn about |
| 09:35:11 4 | electron optics; you had to learn about how electrons |
| 09:35:14 5 | interact with materials. So that would all be part |
| 09:35:18 6 | of my training. |
| 09:35:19 7 | Q. Okay. You're not a geologist? |
| 09:35:21 8 | A. That's correct. |
| 09:35:22 9 | Q. You're not a mineralogist? |
| 09:35:24 10 | A. No. |
| 09:35:24 11 | Q. Okay. You're not a crystallographer? |
| 09:35:28 12 | A. Well, I know crystallography. But as far |
| 09:35:31 13 | as being a, quote, crystallographer, if there is such |
| 09:35:35 14 | a person that just specializes in that, the answer is |
| 09:35:37 15 | no. |
| 09:35:37 16 | Q. You're not a certified industrial |
| 09:35:39 17 | hygienist? |
| 09:35:39 18 | A. Correct. |
| 09:35:39 19 | Q. You have done exposure assessments; |
| 20 | correct? |
| 09:35:42 21 | A. Yes. |
| 09:35:42 22 | Q. Okay. Have you done exposure studies? |
| 09:35:46 23 | A. The answer to that is I have been involved |
| 09:35:49 24 | in exposure studies, yes. |
| 09:35:51 25 | Q. Okay. You're not a pathologist? |

27

| | |
|---|---|
| 09:35:56 1 | A. No, I'm not a medical doctor. |
| 09:35:57 2 | Q. Okay. You don't have any medical |
| 09:35:59 3 | training? |
| 09:36:00 4 | A. Well, the medical training I have is |
| 09:36:04 5 | related to my training as a -- in undergraduate as a |
| 09:36:09 6 | biologist. The curriculum that I took at Villanova |
| 09:36:15 7 | was for premed, and that included courses that |
| 09:36:18 8 | doctors would take prior to medical school, things |
| 09:36:21 9 | like histotechnique, which is the study of how you |
| 09:36:26 10 | prepare tissues, how to prepare and section those |
| 09:36:29 11 | tissues. Also, you know, you would -- I took |
| 09:36:33 12 | comparative anatomy. I taught anatomy at Emory |
| 09:36:38 13 | University for a semester down here in Atlanta. |
| 09:36:42 14 | So I have training in a number of areas |
| 09:36:45 15 | that doctors would have, all the way from neurology |
| 09:36:49 16 | to pathology, that type of thing. |
| 09:36:50 17 | Q. You're not a statistician? |
| 09:36:52 18 | A. No. But we use statistics in our work. |
| 09:36:55 19 | Q. Okay. You're not a geostatistician? |
| 09:36:58 20 | A. No. |
| 09:36:58 21 | Q. Have you ever created a method for |
| 09:37:10 22 | microscopy investigation that has been published in a |
| 09:37:13 23 | peer-reviewed publication? |
| 09:37:15 24 | A. Yes. |
| 09:37:16 25 | Q. Can you give me an example? |

28

| | |
|---|---|
| 09:37:18 1 | A. I would say we did a study a number of |
| 09:37:24 2 | years ago on the famous Kent Micronite filter. It |
| 09:37:31 3 | was a blue filter that was with -- made by Lorillard |
| 09:37:36 4 | and they put that on cigarettes to essentially be a |
| 09:37:40 5 | filtration device. So that was one that I did. |
| 09:37:44 6 | Q. Okay. |
| 09:37:45 7 | A. And that was published. |
| 09:37:46 8 | Q. Okay. And that was a methodology for |
| 09:37:48 9 | investigating the subject matter? |
| 09:37:50 10 | A. Yes. |
| 09:37:50 11 | Q. Okay. What about methodologies for |
| 09:37:57 12 | looking for asbestos in talc? |
| 09:38:03 13 | A. As far as methodologies for looking for |
| 09:38:05 14 | asbestos in talc, the answer to that is yes. |
| 09:38:07 15 | Q. Okay. So you've published in the |
| 09:38:08 16 | peer-reviewed -- |
| 09:38:09 17 | A. Oh, I'm sorry, published. No. Not yet. |
| 09:38:11 18 | Q. Okay. Are you working on something? |
| 09:38:13 19 | A. Well, I can't confirm or deny that right |
| 09:38:16 20 | now. |
| 09:38:16 21 | Q. Well, it's a deposition. You have to. |
| 09:38:18 22 | A. Well, I can -- |
| 09:38:19 23 | Q. Are you working on something right now? |
| 09:38:21 24 | A. Our experience with publications is that |
| 09:38:26 25 | we don't talk about those things because in the past |

29

09:38:30  1   we were working on a publication and somehow, some
09:38:35  2   way, some attorney groups got hold of it, and they
09:38:39  3   influenced the editor on that document.  So we don't
09:38:43  4   talk about those things anymore.
09:38:45  5        Q.   Okay.  So pending question is:  Are you
09:38:48  6   working on a publication about finding talc in
09:38:52  7   asbestos, and you are refusing to answer?
09:38:54  8        MS. O'DELL:  Object to the form.
          9        THE WITNESS:  No.
09:38:55 10        MS. O'DELL:  That's not what he said.
09:38:56 11        Q.   (By Mr. Chachkes)  Okay.  So are you
09:38:57 12   working on a publication about finding talc in
09:38:59 13   asbestos?
09:39:00 14        A.   No.
09:39:00 15        MS. O'DELL:  Object to the form.
09:39:01 16        Q.   (By Mr. Chachkes)  I'm sorry.  Are you
09:39:02 17   working on a publication about finding asbestos in
09:39:04 18   talc?
09:39:04 19        MS. O'DELL:  Object to the form.
09:39:05 20        THE WITNESS:  I answered the question
09:39:07 21   twice.
09:39:07 22        Q.   (By Mr. Chachkes)  The answer is yes?
09:39:09 23        A.   I just answered the question twice.  I
09:39:11 24   said no.
09:39:11 25        Q.   Okay.  All right.  Are you working on any

30

09:39:18  1   publications about talc that you hope to get into the
09:39:20  2   peer-reviewed literature?
09:39:21  3        MS. O'DELL:  Object to the form.
09:39:22  4        THE WITNESS:  I've already answered that
09:39:25  5   question before, and I can neither confirm nor
09:39:31  6   deny that right now.
09:39:31  7        Q.   (By Mr. Chachkes)  Okay.  I'll give you
09:39:32  8   one more chance.  If you would answer the question
09:39:35  9   are you working on any publications about talc that
09:39:37 10   you intend to put in the peer-reviewed literature,
09:39:39 11   and you're refusing to answer?
09:39:40 12        A.   No, I'm not --
09:39:41 13        MS. O'DELL:  Object to the form.
09:39:43 14        THE WITNESS:  I'm not refusing to answer.
09:39:45 15   I've already answered.
09:39:45 16        Q.   (By Mr. Chachkes)  Your answer is you can
09:39:47 17   neither confirm nor deny?
         18        A.   Correct.
         19        Q.   And that's different from a refusal to
         20   answer?
09:39:49 21        MS. O'DELL:  Yes.
09:39:50 22        THE WITNESS:  No, that's an answer.
09:39:51 23        MR. CHACHKES:  Okay.  And so, Counsel,
09:39:51 24   that's your position, you're going to not allow
09:39:54 25   that question?

31

09:39:55  1        MS. O'DELL:  The question was asked, and
09:39:57  2   the witness answered it.
09:39:58  3        MR. CHACHKES:  Okay.
09:40:00  4        MR. SILVER:  Please note that Imerys will
          5   be --
          6        THE REPORTER:  I'm sorry, I can't hear
          7   you.
09:40:07  8        MR SILVER:  Imerys will be calling the
09:40:07  9   Special Master at the break to have the witness
09:40:09 10   compelled to answer the question, but we will
09:40:13 11   wait for a break now.
09:40:14 12        Q.   (By Mr. Chachkes)  Okay.  Has any
09:40:15 13   governmental body asked you to test talc?
09:40:19 14        A.   Not that I know of, no.
09:40:20 15        Q.   Has any School of Public Health asked you
09:40:22 16   to test talc?
09:40:23 17        A.   School of Public Health, no.
09:40:25 18        Q.   Have you ever taught any courses to train
09:40:27 19   microscopists?
09:40:30 20        A.   The answer to that is yes, I've been part
09:40:33 21   of some seminars for training.
09:40:38 22        Q.   What seminars?
09:40:42 23        A.   A number of years ago at the American
09:40:46 24   Industrial Hygiene Conference there was a session on
09:40:48 25   electron microscopy of asbestos-bearing materials and

32

09:40:52  1   I had a session in that.
09:40:53  2        Q.   And you taught microscopy techniques to
09:40:57  3   the participants?
09:40:57  4        A.   Yes.
09:40:58  5        Q.   Have you ever attended a McCrone training
09:41:05  6   or testing class?
09:41:06  7        A.   The answer to that is yes.
09:41:07  8        Q.   Can you tell me when?
09:41:08  9        A.   The one that I -- wait a minute.  Let me
09:41:11 10   see if that was McCrone.  I think that was -- that
09:41:17 11   was a different group for training for mold spore
09:41:21 12   analysis.
09:41:22 13        Q.   Okay.  So you've tested -- you've tested a
09:41:24 14   McCrone class for mold spore analysis?
09:41:27 15        A.   No.  It was another group.
09:41:28 16        Q.   Okay.  Have you ever attended a McCrone
09:41:31 17   testing or training class?
09:41:32 18        A.   Yes.
09:41:32 19        Q.   For asbestos?
09:41:33 20        A.   No.  The one that we had, I believe at our
09:41:37 21   laboratory, we had them come in.  Again, it was for
09:41:39 22   mold analysis, mold spore analysis.
09:41:42 23        Q.   Any other McCrone testing or training
09:41:44 24   class that you have attended?
09:41:46 25        A.   Not that I can recall as I sit here.

33

| | |
|---|---|
| 09:41:48 1 | Q. Okay. Were you consulted by the FDA in |
| 09:41:53 2 | their recent testing of talc? |
| 09:41:54 3 | A. No. |
| 09:41:55 4 | Q. Have you been consulted by any foreign |
| 09:41:59 5 | bodies about testing of talc? |
| 09:42:01 6 | MS. O'DELL: Object to the form. |
| 09:42:02 7 | Q. (By Mr. Chachkes) Foreign countries? |
| 09:42:04 8 | A. No. |
| 09:42:05 9 | Q. Has any third-party consulted with you |
| 09:42:14 10 | about the testing of talc that isn't someone who's |
| 09:42:17 11 | paying you? |
| 09:42:18 12 | MS. O'DELL: Object to the form. |
| 09:42:21 13 | THE WITNESS: Ask the question again. |
| 09:42:22 14 | Q. (By Mr. Chachkes) Has any third-party -- |
| 09:42:23 15 | has anybody asked you at MAS to consult about testing |
| 09:42:26 16 | of talc that isn't paying you? |
| 09:42:28 17 | MS. O'DELL: Object to the form. |
| 09:42:29 18 | THE WITNESS: Not that I know of. You |
| 09:42:31 19 | would have to ask Dr. Longo about that. |
| 09:42:33 20 | Q. (By Mr. Chachkes) Is all the talc testing |
| 09:42:36 21 | that you've been involved with been done at the |
| 09:42:38 22 | request of plaintiffs' lawyers who pay you? |
| 09:42:40 23 | A. I have no idea who all of the folks are |
| 09:42:43 24 | that have asked us to test talc. You would, again, |
| 09:42:46 25 | have to ask Dr. Longo. |

Atlanta Reporters, Inc. 866-344-0459    www.atlanta-reporters.com

34

| | |
|---|---|
| 09:42:47 1 | Q. You just don't know where the money comes |
| 09:42:49 2 | from for your work? |
| 09:42:50 3 | MS. O'DELL: Object to the form. |
| 09:42:51 4 | THE WITNESS: No. |
| 09:42:51 5 | Q. (By Mr. Chachkes) Have you ever testified |
| 09:42:54 6 | in a federal court about testing talc? A federal |
| 09:42:57 7 | court. |
| 09:42:57 8 | A. I don't think so. |
| 09:42:59 9 | Q. Has any federal court ever said your work |
| 09:43:01 10 | or your methodology has passed Daubert or standards |
| 09:43:04 11 | for scientific rigor? |
| 09:43:06 12 | A. I want to say yes to that. |
| 09:43:08 13 | Q. And why do you want to say yes to that? |
| 09:43:09 14 | A. Because I believe they have, but I would |
| 09:43:11 15 | have to check the record. |
| 09:43:12 16 | Q. What about has any federal court ever said |
| 09:43:14 17 | your methodology or your work regarding to talc |
| 09:43:19 18 | analysis has passed Daubert standards for scientific |
| 09:43:22 19 | rigor? |
| 09:43:23 20 | MS. O'DELL: Object to the form. |
| 09:43:24 21 | THE WITNESS: That I don't believe has |
| 09:43:25 22 | been done. |
| 09:43:27 23 | Q. (By Mr. Chachkes) How many publications |
| 09:43:29 24 | do you have in the peer-reviewed literature? |
| 09:43:31 25 | A. I hadn't counted them. They're on my CV. |

Atlanta Reporters, Inc. 866-344-0459    www.atlanta-reporters.com

35

| | |
|---|---|
| 09:43:34 1 | You can count them. |
| 09:43:35 2 | Q. How many were not funded by MAS? |
| 09:43:35 3 | MS. O'DELL: Object to the form. |
| 09:43:43 4 | Q. (By Mr. Chachkes) If any? |
| 09:43:44 5 | A. Not funded by MAS? |
| 09:43:46 6 | Q. Yeah. |
| 09:43:47 7 | A. None of them were funded by MAS. |
| 09:43:49 8 | Q. Who were they funded by? |
| 09:43:51 9 | A. Again, most all of them were done as pure |
| 09:43:56 10 | research and the -- well, I guess if you're looking |
| 09:44:02 11 | at it as funded by, I don't know what you mean by |
| 09:44:04 12 | funded by MAS. But we essentially -- when you do a |
| 09:44:09 13 | research study, it's typically not funded by anybody. |
| 09:44:12 14 | Q. So this is -- were all your peer-reviewed |
| 09:44:17 15 | publications done based on work done at MAS? |
| 09:44:21 16 | A. Yes. Well, not all of them. I mean, |
| 09:44:25 17 | there were a lot of them I did at graduate school, |
| 09:44:27 18 | yes. |
| 09:44:27 19 | Q. So other than your graduate school |
| 09:44:29 20 | peer-reviewed publications where your -- are your |
| 09:44:33 21 | peer-reviewed publications from your work at MAS? |
| 09:44:35 22 | A. All of them? At this point I'd have to go |
| 09:44:41 23 | and look. |
| 09:44:41 24 | Q. Okay. |
| 09:44:41 25 | A. I can't recall. |

Atlanta Reporters, Inc. 866-344-0459    www.atlanta-reporters.com

36

| | |
|---|---|
| 09:44:42 1 | Q. For those peer-reviewed works that you |
| 09:44:45 2 | published based on work done at MAS, the underlying |
| 09:44:49 3 | work at MAS was funded by someone; correct? |
| 09:44:53 4 | MS. O'DELL: Object to the form. |
| 09:44:54 5 | THE WITNESS: No, not necessarily. No. |
| 09:44:56 6 | We did work that wasn't funded by others that |
| 09:45:00 7 | were published. |
| 09:45:01 8 | Q. (By Mr. Chachkes) So you've done work at |
| 09:45:03 9 | MAS that was purely academic, not really funded by |
| 09:45:07 10 | anybody or for any purpose other than academics? |
| 09:45:09 11 | MS. O'DELL: Object to the form. |
| 09:45:10 12 | THE WITNESS: To my knowledge, yes. |
| 09:45:11 13 | Q. (By Mr. Chachkes) And how many of your |
| 09:45:13 14 | publications could qualify as that? |
| 09:45:15 15 | A. Again, I don't know, I would have to go |
| 09:45:19 16 | and look. |
| 09:45:19 17 | Q. Would you agree it's important to disclose |
| 09:45:23 18 | sources of funding for publications in peer-reviewed |
| 09:45:27 19 | literature? |
| 09:45:27 20 | A. Sure. |
| 09:45:27 21 | Q. Are there any publications you have that |
| 09:45:31 22 | were funded by plaintiffs' lawyer monies? |
| 09:45:34 23 | MS. O'DELL: Object to the form. |
| 09:45:36 24 | THE WITNESS: Again, I would have to go -- |
| 09:45:37 25 | I would have to look. |

Atlanta Reporters, Inc. 866-344-0459    www.atlanta-reporters.com

37

| | |
|---|---|
| 09:45:38 1 | Q. (By Mr. Chachkes) Okay. |
| 09:45:39 2 | A. Off the top of my head, I don't recall. |
| 09:45:41 3 | Q. But if it were, it would be important to |
| 09:45:43 4 | disclose that fact? |
| 09:45:44 5 | A. And it would be disclosed because the |
| 09:45:46 6 | publications, the editorial process requires that. |
| 09:45:49 7 | Q. And there's no publications in the |
| 09:45:53 8 | peer-reviewed literature regarding testing for |
| 09:45:57 9 | talc -- testing talc; right? |
| 09:46:00 10 | MS. O'DELL: Object to the form. Object |
| 09:46:01 11 | to the form. |
| 09:46:02 12 | THE WITNESS: Your question again, I'm |
| 09:46:03 13 | sorry? |
| 09:46:03 14 | Q. (By Mr. Chachkes) You don't have any |
| 09:46:04 15 | peer-reviewed publications regarding the testing of |
| 09:46:06 16 | talc; right? |
| 09:46:07 17 | A. I don't, no. |
| 09:46:07 18 | Q. What about peer-reviewed publications |
| 09:46:12 19 | regarding the testing of talc in ovarian tissue? |
| 09:46:14 20 | MS. O'DELL: Object to the form. Are you |
| 09:46:15 21 | talking about his publications or in -- |
| 09:46:18 22 | MR. CHACHKES: Of course, yes. |
| 09:46:20 23 | MS. O'DELL: It's not clear on the |
| 24 | question. |
| 25 | THE WITNESS: Yeah. |

38

| | |
|---|---|
| 09:46:20 1 | MS. O'DELL: So would you ask the question |
| 09:46:21 2 | again, please. |
| 09:46:21 3 | Q. (By Mr. Chachkes) Do you have any |
| 09:46:23 4 | publications in the peer-reviewed literature about |
| 09:46:23 5 | testing ovarian tissue for talc? |
| 09:46:26 6 | A. No. |
| 09:46:27 7 | Q. Do you have any publications in the |
| 09:46:30 8 | peer-reviewed literature about testing ovarian tissue |
| 09:46:35 9 | for asbestos? |
| 09:46:35 10 | A. No. |
| 09:46:38 11 | Q. Do you have any publications -- actually, |
| 09:46:45 12 | skip that. |
| 09:46:49 13 | Have you been a coauthor on all of |
| 09:46:51 14 | Dr. Longo's reports testing Johnson & Johnson talcum |
| 09:46:58 15 | powder products? |
| 09:46:58 16 | A. The answer to that is I don't know. A |
| 09:47:04 17 | number of them, yes. |
| 09:47:05 18 | Q. Okay. Are you aware of any report by |
| 09:47:08 19 | Dr. Longo where he issued an expert report in |
| 09:47:11 20 | litigation about testing Johnson Baby Powder and |
| 09:47:15 21 | didn't have you as a coauthor? |
| 09:47:17 22 | A. I don't recall as I sit here. |
| 09:47:19 23 | Q. 2017, what percentage of your time did you |
| 09:47:24 24 | spend working on talc-related litigation projects? |
| 09:47:27 25 | A. I always get that question. I have no |

39

| | |
|---|---|
| 09:47:30 1 | idea. I don't keep track of it. |
| 09:47:32 2 | Q. Over 50 percent? |
| 09:47:34 3 | A. Again, I don't know. |
| 09:47:35 4 | Q. It could be over 50 percent, but you don't |
| 09:47:38 5 | know? |
| 09:47:38 6 | MS. O'DELL: Object to the form. |
| 09:47:39 7 | THE WITNESS: I do not know. It could be |
| 09:47:40 8 | as little as 10 percent. It could be 5 percent. |
| 09:47:43 9 | I don't know. |
| 09:47:44 10 | Q. (By Mr. Chachkes) Could it be 50 percent? |
| 09:47:46 11 | A. No, I don't think so. |
| 09:47:47 12 | Q. 2018, what percentage of your time did you |
| 09:47:50 13 | spend working on talc-litigated litigation projects? |
| 09:47:53 14 | A. Same answer. |
| 09:47:54 15 | Q. What's the majority of your time spent on |
| 09:47:58 16 | at MAS? |
| 09:47:58 17 | A. At the laboratory? |
| 09:47:59 18 | Q. Just at MAS generally. |
| 09:48:01 19 | A. Oh, a variety of different things on a |
| 09:48:03 20 | daily basis. |
| 09:48:04 21 | Q. If you had to pick one thing that you |
| 09:48:07 22 | spend most of your time on, what's that? |
| 09:48:09 23 | A. Most of my time -- I would say most of my |
| 09:48:13 24 | time is spent on technological issues surrounding |
| 09:48:15 25 | analyses that we do. |

40

| | |
|---|---|
| 09:48:24 1 | Q. Of what? |
| 09:48:25 2 | A. Of all kinds of materials. |
| 09:48:27 3 | Q. What material do you spend most of your |
| 09:48:30 4 | time on? |
| 09:48:31 5 | MS. O'DELL: Object to the form. |
| 09:48:32 6 | THE WITNESS: What material did I spend |
| 09:48:33 7 | most of my time on? |
| 09:48:34 8 | Q. (By Mr. Chachkes) Correct. |
| 09:48:35 9 | A. That would vary by the week. |
| 09:48:36 10 | Q. Okay. |
| 09:48:37 11 | A. Yeah. |
| 09:48:37 12 | Q. There are weeks where it's asbestos; |
| 13 | right? |
| 09:48:40 14 | A. There can be some that are, yes. |
| 09:48:42 15 | Q. Okay. What's another material that you |
| 09:48:44 16 | might have spent a majority of your time on that's |
| 09:48:48 17 | not asbestos? |
| 09:48:49 18 | MS. O'DELL: Object to the form. |
| 09:48:50 19 | THE WITNESS: Tissue. |
| 09:48:50 20 | Q. (By Mr. Chachkes) Tissue for looking at |
| 09:48:51 21 | whether it contains asbestos? |
| 09:48:52 22 | A. In some cases, yes. |
| 09:48:53 23 | Q. Okay. What are -- I mean, is there a |
| 09:48:57 24 | solid chunk of time, like really a significant chunk |
| 09:49:01 25 | of your time, let's say, over 5 percent of a year |

41

| | |
|---|---|
| 09:49:04 | 1 where you're spending doing some scientific work that |
| 09:49:06 | 2 has nothing to do with talc or asbestos? |
| 09:49:09 | 3    A.    Yes. |
| 09:49:09 | 4    Q.    Okay.  What would that be? |
| 09:49:11 | 5    A.    Well, once again, technological issues |
| 09:49:17 | 6 surrounding things at our laboratory.  For instance, |
| 09:49:17 | 7 as a chief science officer I get all kinds of |
| 09:49:22 | 8 questions about what we're looking at as far as |
| 09:49:27 | 9 instrumentation in our laboratory in order to do |
| 09:49:30 | 10 certain kinds of analyses. |
| 09:49:34 | 11       We have clients -- potential clients that |
| 09:49:38 | 12 call in and they want to do an analysis on maybe a |
| 09:49:42 | 13 drug of some kind, something like that. |
| 09:49:44 | 14       So it would be up to me working with |
| 09:49:47 | 15 another scientists there at the laboratory to |
| 09:49:50 | 16 understand what resources we need to be able to do |
| 09:49:52 | 17 that kind of test, whether we will do that kind of |
| 09:49:55 | 18 test. |
| 09:49:55 | 19    Q.    Do you bill for your time working for |
| 09:50:01 | 20 plaintiffs in talc cases? |
| 09:50:03 | 21    A.    Yes. |
| 09:50:03 | 22    Q.    Do you write down the hours? |
| 09:50:05 | 23    A.    I do keep some of the hours, yes. |
| 09:50:08 | 24    Q.    Okay.  You say some?  There's some times |
| 09:50:12 | 25 you work for plaintiffs' lawyers and you don't charge |

42

| | |
|---|---|
| 09:50:14 | 1 them? |
| 09:50:15 | 2       MS. O'DELL:  Object to the form. |
| 09:50:16 | 3       THE WITNESS:  Uh-huh.  Yes. |
| 09:50:17 | 4    Q.    (By Mr. Chachkes)  Why? |
| 09:50:18 | 5    A.    Because it just happens. |
| 09:50:19 | 6    Q.    But for the most part you bill for your |
| 09:50:21 | 7 time? |
| 09:50:21 | 8    A.    Yes. |
| 09:50:21 | 9    Q.    And -- |
| 09:50:23 | 10    A.    I don't bill for it.  MAS bills for it. |
| 09:50:25 | 11 Yes. |
| 09:50:26 | 12    Q.    Can you estimate how much time you spent |
| 09:50:29 | 13 working on the MDL projects? |
| 09:50:30 | 14    A.    No.  I think we already talked about that |
| 09:50:34 | 15 earlier. |
| 09:50:35 | 16    Q.    Okay. |
| 09:50:35 | 17    A.    Yep. |
| 09:50:36 | 18    Q.    Do you have any estimate as to what |
| 09:50:44 | 19 percentage of your time recently has been for |
| 09:50:46 | 20 litigation-related projects as opposed to |
| 09:50:49 | 21 nonlitigation-related projects? |
| 09:50:51 | 22    A.    No. |
| 09:50:51 | 23    Q.    Could it be 50 percent? |
| 09:50:53 | 24       MS. O'DELL:  Objection. |
| 09:50:54 | 25       THE WITNESS:  I have no idea. |

43

| | |
|---|---|
| 09:50:55 | 1    Q.    (By Mr. Chachkes)  Okay.  You testified in |
| 09:51:00 | 2 your first talc case in the Ingham matter in Missouri |
| 09:51:03 | 3 last year? |
| 09:51:04 | 4    A.    Yes. |
| 09:51:05 | 5    Q.    You testified regarding your tissue |
| 09:51:07 | 6 analysis? |
| 09:51:07 | 7    A.    Yes. |
| 09:51:08 | 8    Q.    And you testified at trial about |
| 09:51:09 | 9 extrapolating asbestos content from TEM testing; |
| 09:51:14 | 10 correct? |
| 09:51:14 | 11    A.    Yes. |
| 09:51:14 | 12    Q.    Do you know how much money MAS has made in |
| 09:51:19 | 13 asbestos litigation over the years? |
| 09:51:20 | 14    A.    I have no idea. |
| 09:51:21 | 15    Q.    Do you know how much money MAS has made |
| 09:51:24 | 16 over -- for talc litigation over the years? |
| 09:51:26 | 17    A.    No. |
| 09:51:26 | 18    Q.    You have no involvement in that aspect |
| 09:51:29 | 19 of -- |
| 09:51:29 | 20    A.    I wouldn't know. |
| 09:51:33 | 21    Q.    To your knowledge, did MAS ever test |
| 09:51:37 | 22 cosmetic talcum powder for asbestos before being |
| 09:51:40 | 23 engaged by plaintiffs' lawyers for that kind of work? |
| 09:51:43 | 24       MS. O'DELL:  Object to the form. |
| 09:51:44 | 25       THE WITNESS:  The answer to that question |

44

| | |
|---|---|
| 09:51:45 | 1 is probably. |
| 09:51:47 | 2    Q.    (By Mr. Chachkes)  Why do you say |
| 09:51:48 | 3 probably? |
| 09:51:48 | 4    A.    Because of the work that has been done |
| 09:51:54 | 5 over the years.  We did quite a bit of testing in the |
| 09:51:58 | 6 past, I believe, on talc that was used in industrial |
| 09:52:09 | 7 applications; but also the suppliers use the same |
| 09:52:13 | 8 kind of talc in, for instance, cosmetics and drug |
| 09:52:19 | 9 applications. |
| 09:52:19 | 10    Q.    So it's your testimony that talc |
| 09:52:22 | 11 manufacturers use the same exact talc for industrial |
| 09:52:26 | 12 purposes and cosmetic purposes? |
| 09:52:27 | 13    A.    No, that's not my testimony. |
| 09:52:29 | 14       MS. O'DELL:  Object to form. |
| 09:52:30 | 15    Q.    (By Mr. Chachkes)  Did MAS ever -- I'm |
| 09:52:30 | 16 going to focus on the word cosmetic here. |
| 09:52:32 | 17    A.    Okay. |
| 09:52:33 | 18    Q.    Did MAS ever test cosmetic talcum powder |
| 09:52:37 | 19 for asbestos prior to being engaged to do that work |
| 09:52:38 | 20 for plaintiffs' lawyers? |
| 09:52:39 | 21       MS. O'DELL:  Object to the form. |
| 09:52:40 | 22       THE WITNESS:  The answer to that again, as |
| 09:52:43 | 23 I said before, is probably. |
| 09:52:45 | 24    Q.    (By Mr. Chachkes)  Okay.  So was it J&J |
| 09:52:51 | 25 cosmetic talcum powder?  Colgate cosmetic talcum |

45

09:52:53  1    powder?  What cosmetic talcum powder do you think
09:52:58  2    that was?
09:52:58  3         A.    I don't know.  I do know, again, that a
09:53:00  4    number of different types of talcum powders were
09:53:03  5    tested at MAS prior to this litigation.
09:53:04  6         Q.    Well, you cited some industrial talcum
09:53:14  7    powder --
09:53:14  8         A.    Yes.  Well, I just used a --
         9         THE REPORTER:  Wait.  One at a time.
09:53:14 10         THE WITNESS:  Sorry.  Ask the question
09:53:16 11    again.
09:53:16 12         Q.    (By Mr. Chachkes)  Okay.  You have no
09:53:18 13    specific memory of testing any cosmetic talcum powder
09:53:22 14    prior to being engaged by plaintiff lawyers to do
09:53:27 15    this?
09:53:27 16         MS. O'DELL:  Object to the form.
09:53:28 17         THE WITNESS:  Again, now you've asked the
09:53:32 18    question differently than before.  The answer
09:53:36 19    again is, as I said, MAS has been involved in
09:53:40 20    testing talcum powders in the past prior to this
09:53:44 21    litigation, and some of them most probably were
09:53:49 22    cosmetic types, too.
09:53:52 23         Q.    (By Mr. Chachkes)  When you say most
09:53:52 24    probably, did you have a personal involvement in
09:53:53 25    those testings?

Atlanta Reporters, Inc. 866-344-0459   www.atlanta-reporters.com

46

09:53:54  1         A.    Being at the laboratory and seeing samples
09:54:01  2    that have come in and had come in over that period of
09:54:05  3    time, again, the answer to that is probably.
09:54:09  4         Q.    Okay.  So but what about personally
09:54:11  5    involved in the experimentation on talc prior to
09:54:14  6    being engaged by plaintiff lawyers, were you
09:54:17  7    personally involved in any such investigations?
09:54:20  8         A.    The answer to that is probably also.
09:54:22  9         Q.    Okay.  So you've run TEM on talcum powder
09:54:26 10    at MAS prior to being engaged by --
09:54:29 11         A.    Well, when you say --
09:54:31 12         MS. O'DELL:  Object to the form.
        13         THE WITNESS:  -- personally involved,
09:54:33 14    again, part of the work that I have done in the
09:54:36 15    past as a laboratory manager would be to be at
09:54:39 16    the location where the analyst is analyzing that
09:54:41 17    talc or that product and looking over their
09:54:45 18    shoulder and seeing what they're doing.  So that
09:54:48 19    would be the personal involvement right there.
09:54:50 20         Q.    (By Mr. Chachkes)  Okay.  Can you name any
09:54:58 21    cosmetic talcum powder that MAS looked at prior to
09:55:00 22    being engaged at -- engaged by plaintiff lawyers to
09:55:03 23    do that, to look at cosmetic talcum powder?
09:55:06 24         A.    I can't recall that as I sit here.
09:55:08 25         Q.    Okay.  Do you believe MAS is the best lab

Atlanta Reporters, Inc. 866-344-0459   www.atlanta-reporters.com

47

09:55:12  1    in the world to analyze talc for asbestos?
09:55:15  2         MS. O'DELL:  Object to the form.
09:55:16  3         THE WITNESS:  I like the way you put that.
09:55:19  4    Do like that.
09:55:22  5         I would say that, yes, we're one of the
09:55:26  6    best in the world, yes.
09:55:26  7         Q.    (By Mr. Chachkes)  Can you name some
09:55:28  8    others that are in your league?
09:55:30  9         MS. O'DELL:  Object to the form.
09:55:31 10         THE WITNESS:  Well, that again calls for a
09:55:35 11    judgment on these other laboratories.  So, you
09:55:42 12    know, I respect the other laboratories that are
09:55:44 13    doing this work.  But as far as best in the
09:55:48 14    world, I would put MAS right there.
09:55:50 15         Q.    (By Mr. Chachkes)  Okay.  The question was
09:55:51 16    what other laboratories are up there?
09:55:53 17         A.    I think Jim Millette's lab was -- is
09:56:00 18    definitely up there.
09:56:02 19         Q.    What about McCrone?
09:56:03 20         A.    Yes.
09:56:04 21         Q.    Are there academic laboratories that can
09:56:09 22    analyze for asbestos in talc at the level you do?
09:56:13 23         A.    Academic laboratories?
09:56:14 24         Q.    Yes.
09:56:15 25         A.    With the quality control we have?  I can't

Atlanta Reporters, Inc. 866-344-0459   www.atlanta-reporters.com

48

09:56:20  1    think of any.
09:56:21  2         Q.    Okay.  You do better analysis of
09:56:23  3    asbestos -- of talc for asbestos than academic
09:56:26  4    laboratories that focus on mineralogy exclusively?
09:56:29  5         MS. O'DELL:  Object to the form.
09:56:30  6         THE WITNESS:  When it comes to quality
09:56:32  7    control, yes.
09:56:32  8         Q.    (By Mr. Chachkes)  What about in terms of
09:56:35  9    accurate results?
09:56:36 10         A.    Same.  Same answer.
09:56:37 11         Q.    Are MAS's analyses of talc for asbestos
09:56:44 12    reproducible by other labs?
09:56:48 13         MS. O'DELL:  Object to the form.
09:56:49 14         THE WITNESS:  Again, I don't know how to
09:56:50 15    answer that.  But they should be if they use the
09:56:54 16    same technologies and techniques.
09:56:57 17         Q.    (By Mr. Chachkes)  Even though their
09:56:58 18    quality controls aren't up to your standards?
09:57:01 19         MS. O'DELL:  Object to the form.
09:57:02 20         THE WITNESS:  Oh, well, in that case the
09:57:03 21    answer is I couldn't tell you.
09:57:04 22         Q.    (By Mr. Chachkes)  Okay.  So there's no
09:57:05 23    lab you can cite right now -- academic, professional,
09:57:09 24    industrial, or otherwise -- that can reproduce your
09:57:13 25    results with the same accuracy?

Atlanta Reporters, Inc. 866-344-0459   www.atlanta-reporters.com

49

| | |
|---|---|
| 09:57:14 | **1** MS. O'DELL: Object to the form. That's |
| 09:57:15 | **2** not his question. |
| 09:57:17 | **3** Q. (By Mr. Chachkes) It's a question. |
| 09:57:18 | **4** A. Ask it a different way. |
| 09:57:20 | **5** Q. No. |
| 09:57:21 | **6** Can you reread the question, please. |
| 09:57:31 | **7** (The record was read by the reporter.) |
| 09:57:32 | **8** MS. O'DELL: Object to the form. |
| 09:57:33 | **9** THE WITNESS: Well, if they -- again, if |
| 09:57:34 | **10** they use the same techniques, they should be |
| 09:57:38 | **11** able to, sure. |
| 09:57:39 | **12** Q. (By Mr. Chachkes) Okay. So anyone |
| 09:57:46 | **13** following the ISO 22262 protocol should be able to |
| 09:57:50 | **14** reproduce your results? |
| 09:57:51 | **15** MS. O'DELL: Object to the form. |
| 09:57:53 | **16** THE WITNESS: If they're following the |
| 09:57:54 | **17** protocol, it's most likely that they could, yes. |
| 09:57:56 | **18** Q. (By Mr. Chachkes) Okay. Has MAS received |
| 09:58:01 | **19** any accolades from any academic institutions for its |
| 09:58:07 | **20** testing of talc? |
| 09:58:07 | **21** A. Academic institutions? |
| 09:58:09 | **22** Q. Yes. |
| 09:58:09 | **23** A. I have no idea. |
| 09:58:11 | **24** Q. Has any renowned -- nationally or |
| 09:58:15 | **25** internationally renowned TEM scientist identified MAS |

Atlanta Reporters, Inc.866-344-0459  www.atlanta-reporters.com

51

| | |
|---|---|
| 09:59:11 | **1** Q. (By Mr. Chachkes) All right. So let me |
| | **2** ask the same question again. |
| 09:59:11 | **3** Are there any nationally or |
| 09:59:13 | **4** internationally renowned TEM scientists that have |
| 09:59:14 | **5** identified MAS as one of the best labs in the world |
| 09:59:17 | **6** for testing talc? |
| 09:59:18 | **7** MS. O'DELL: Object to the form. |
| 09:59:19 | **8** THE WITNESS: Well, let me answer it. |
| 09:59:20 | **9** There haven't been any that haven't said we're |
| 09:59:23 | **10** not the best either, okay? |
| 09:59:25 | **11** Q. (By Mr. Chachkes) Have any nationally or |
| 09:59:28 | **12** internationally renowned PLM scientists identified |
| 09:59:31 | **13** MAS as one of the best labs -- strike that. |
| 09:59:35 | **14** Have you ever presented at any conferences |
| 09:59:37 | **15** about testing talc with TEM? |
| 09:59:40 | **16** A. No. |
| 09:59:40 | **17** Q. Have you ever presented any conferences |
| 09:59:42 | **18** about testing talc with PLM? |
| 09:59:44 | **19** A. No. |
| 09:59:44 | **20** Q. Have you ever presented -- have you ever |
| 09:59:50 | **21** been invited to any conferences on the subject matter |
| 09:59:53 | **22** of testing talc? |
| 09:59:55 | **23** A. I can't recall any invitations. |
| 09:59:57 | **24** Q. When did you personally first learn about |
| 10:00:01 | **25** the ISO 22262-2 TEM method? |

Atlanta Reporters, Inc.866-344-0459  www.atlanta-reporters.com

50

| | |
|---|---|
| 09:58:19 | **1** as one of the best labs in the world for testing |
| 09:58:22 | **2** talc? |
| 09:58:23 | **3** MS. O'DELL: Object to the form. |
| 09:58:24 | **4** THE WITNESS: Well, I think if you want to |
| 09:58:25 | **5** talk about good laboratories in that kind of |
| 09:58:27 | **6** testing, you would definitely look to NIST NVLAP |
| 09:58:33 | **7** as the national standard for TEM laboratories |
| 09:58:36 | **8** and testing. So, you know, they would -- you |
| 09:58:44 | **9** know, based on their assessments, their audits |
| 09:58:47 | **10** of our laboratory, then I would say yes. |
| 09:58:49 | **11** Q. (By Mr. Chachkes) Okay. So NIST and |
| 09:58:51 | **12** NVLAP have told MAS that you're one of the best labs |
| 09:58:55 | **13** in the world for testing talc? |
| 09:58:57 | **14** MS. O'DELL: Object to the form. |
| 09:58:58 | **15** THE WITNESS: No, they don't say things |
| 09:58:59 | **16** like that. |
| 09:58:59 | **17** Q. (By Mr. Chachkes) Okay. They just |
| 09:59:00 | **18** accredit you? |
| 09:59:00 | **19** A. Yeah, of course. Yeah. |
| 09:59:02 | **20** Q. They didn't give you some super |
| 09:59:04 | **21** accreditation that only you get or you're above and |
| 09:59:07 | **22** beyond other laboratories; correct? |
| 09:59:08 | **23** A. No -- |
| 09:59:08 | **24** MS. O'DELL: Object to the form. |
| 09:59:10 | **25** THE WITNESS: -- there's no such thing. |

Atlanta Reporters, Inc.866-344-0459  www.atlanta-reporters.com

52

| | |
|---|---|
| 10:00:05 | **1** A. Oh, I don't know, a couple of years ago. |
| 10:00:08 | **2** Q. From whom did you learn it? |
| 10:00:09 | **3** A. I can't recall. |
| 10:00:14 | **4** Q. When was the first time that anyone at MAS |
| 10:00:21 | **5** tested a talc sample using the ISO 22262 method? |
| 10:00:25 | **6** A. It probably was a couple of years ago, I |
| 10:00:28 | **7** would think. |
| 10:00:29 | **8** Q. Sometime in 2017? |
| 10:00:30 | **9** MS. O'DELL: Object to form. |
| 10:00:31 | **10** THE WITNESS: Again, I don't know an exact |
| 10:00:32 | **11** date for that. |
| 10:00:33 | **12** Q. (By Mr. Chachkes) Could it have been in |
| 10:00:34 | **13** 2016? |
| 10:00:34 | **14** A. I don't know. We have been using it for |
| 10:00:36 | **15** quite a while. So as far as the exact date, I don't |
| 10:00:40 | **16** know. |
| 10:00:40 | **17** Q. Could it have be in 2015? |
| 10:00:42 | **18** MS. O'DELL: Object to the form. |
| 10:00:43 | **19** THE WITNESS: I don't know. |
| 10:00:44 | **20** Q. (By Mr. Chachkes) You're the lab manager; |
| 10:00:46 | **21** right? You were -- |
| 10:00:46 | **22** A. I was for a time, yes. |
| 10:00:47 | **23** Q. Okay. Would you be aware of any ISO 22262 |
| 10:00:52 | **24** test of talc in your laboratory? |
| 10:00:56 | **25** A. Yes. |

Atlanta Reporters, Inc.866-344-0459  www.atlanta-reporters.com

53

10:00:56 1    Q.    Could the first test have been in 2018?
10:01:00 2    A.    Again, I don't know.  It's been at least,
10:01:04 3  I don't know, two or three years at least.
10:01:06 4    Q.    Okay.  Did your analyst use ISO 22262 on
10:01:13 5  any talc samples prior to the testing reported on in
10:01:16 6  this report?
10:01:17 7        MS. O'DELL:  Object to the form.
10:01:18 8        THE WITNESS:  I don't know.
10:01:19 9    Q.    (By Mr. Chachkes)  Your report includes
10:01:27 10  EDXA spectra for several particles; correct?
10:01:29 11    A.    The reports do, yes.
10:01:30 12    Q.    Yeah.  What is EDXA?
10:01:35 13    A.    Energy dispersive spectroscopy -- x-ray
10:01:38 14  energy dispersive spectroscopy.
10:01:38 15    Q.    Can you identify a particle of asbestos
10:01:39 16  using EDXA alone?
10:01:42 17    A.    You mean a fiber, that type of thing, a
10:01:45 18  bundle, fiber bundle?  You're just saying particle,
19  so --
20    Q.    Okay.
10:01:50 21    A.    Yeah, I'm just trying to be specific.
10:01:52 22    Q.    So was the answer different to my question
10:01:54 23  whether I used the word particle or a fiber or
10:01:56 24  bundle?
10:01:57 25    A.    No.

Atlanta Reporters, Inc. 866-344-0459  www.atlanta-reporters.com

54

10:02:00 1    Q.    Okay.  So let me ask again.
2    A.    Okay.
10:02:02 3    Q.    Can you identify a particle of asbestos by
10:02:04 4  EDXA alone?
10:02:06 5    A.    Yes.  Well, no, not by just EDXA, no.
10:02:10 6    Q.    Okay.  Why not?
10:02:11 7    A.    Well, they have the chemistry, and they
10:02:14 8  would be similar to the chemistry of another type of
10:02:17 9  fiber too.
10:02:18 10    Q.    Can you distinguish anthophyllite from
10:02:21 11  talc using EDXA alone?
10:02:24 12    A.    No.  You need other methodologies, and
10:02:29 13  that's what we use.  We use a suite of methodologies.
10:02:32 14    Q.    Can you distinguish anthophyllite from
10:02:39 15  cummingtonite with EDXA alone?
10:02:41 16    A.    The answer to that is no.
10:02:43 17    Q.    So for the EDXA process, walk me through
10:02:50 18  the steps.  What do you do?
10:02:52 19    A.    Where do you want to start on that?
10:02:55 20    Q.    Well, you've got a particle?
10:02:56 21    A.    Okay.
10:02:57 22    Q.    You've decided I want to do EDXA on that?
10:03:01 23    A.    Right.
10:03:01 24    Q.    What do you do next?
10:03:02 25    A.    Well, essentially what the analyst does is

Atlanta Reporters, Inc. 866-344-0459  www.atlanta-reporters.com

55

10:03:04 1  they will set the microscope up for the EDX process,
10:03:10 2  and that involves setting some lenses and condensers
10:03:14 3  in there so that you can focus the beam on the
10:03:17 4  particle.
10:03:17 5        Then the beam is focused.  The
10:03:20 6  spectrometer is put into place in the microscope.
10:03:24 7  Then you, of course, begin the process of collecting
10:03:29 8  x-rays from the specimen.
10:03:31 9    Q.    And then you get an EDXA spectrum?
10:03:35 10    A.    Yes.
10:03:36 11    Q.    Let's look at an example spectrum so you
10:03:39 12  could tell me about it.  There's probably one that's
10:03:42 13  already been marked.
10:03:52 14        I'm going to present to you with what was
10:03:54 15  marked yesterday as Longo Number 12.  Do you see
10:03:57 16  that?
10:03:57 17    A.    Yes.
10:03:58 18    Q.    And that's an EDXA spectra from your
10:04:03 19  expert report; correct?
10:04:05 20        MS. O'DELL:  Object to the form.
10:04:07 21        THE WITNESS:  If it's from our report,
10:04:09 22  yes.
10:04:09 23    Q.    (By Mr. Chachkes)  Okay.  It is from your
10:04:11 24  report.  So is that what an EDXA spectra looks like?
10:04:25 25    A.    Yes.

Atlanta Reporters, Inc. 866-344-0459  www.atlanta-reporters.com

56

10:04:21 1    Q.    And you'll notice on the bottom left-hand
10:04:26 2  corner it says elements and it has got some elements
10:04:28 3  and it says total?
10:04:29 4    A.    Yes.
10:04:29 5    Q.    Your software can generate information
10:04:31 6  that fills in that; correct?
10:04:32 7    A.    Yes.
10:04:33 8    Q.    Why don't you turn that -- why don't you
10:04:35 9  use it, that software?
10:04:36 10    A.    We do.
10:04:38 11    Q.    Okay.  Why in these experiments did you
10:04:41 12  not put in the information that can be generated on
10:04:45 13  the bottom left-hand side of Exhibit 12?
10:04:48 14        MS. O'DELL:  Object to the form.
10:04:49 15        THE WITNESS:  Well, there could be any
10:04:50 16  number of reasons for that.  Typically, when
10:04:54 17  we're looking at these types of particles, they
10:04:58 18  have characteristic spectra for the -- if it's a
10:05:02 19  particular asbestos type.
10:05:02 20        For instance, this is tremolite.  You can
10:05:07 21  turn the -- the data's there, so you can turn
10:05:12 22  that data on to show you what the oxides are for
10:05:15 23  the oxides.
10:05:16 24    Q.    (By Mr. Chachkes)  Is it a coincidence
10:05:19 25  that the data was not turned on for any of these, or

Atlanta Reporters, Inc. 866-344-0459  www.atlanta-reporters.com

57

10:05:22 1 were the analysts actually instructed not to turn it
10:05:25 2 on?
10:05:25 3     A. No, it's not a coincidence.
10:05:27 4     Q. Okay. They were instructed to not
10:05:28 5 generate that data?
10:05:29 6     A. No. No, no, no. No.
10:05:31 7     Q. Now, is it standard operating practice not
10:05:36 8 to generate that data?
10:05:37 9     A. Is it standard operating practice --
10:05:39 10     Q. -- at MAS not to generate that data?
10:05:41 11     A. They don't have to generate it. It's not
10:05:43 12 required.
13     Q. Okay.
10:05:43 14     A. It's not required by the method.
10:05:45 15     Q. Is that data in the software, you just
10:05:51 16 choose not to print it out?
10:05:53 17     MS. O'DELL: Object to the form.
10:05:54 18     THE WITNESS: I would have to check on
10:05:55 19 that to see. So that's my answer to that right
10:05:59 20 now.
10:05:59 21     Q. (By Mr. Chachkes) Okay.
10:06:00 22     A. Yeah.
10:06:00 23     Q. And is that data -- you wouldn't
10:06:04 24 deliberately delete that data; right?
10:06:06 25     A. No, never.

58

10:06:07 1     Q. Is that data still at MAS, that if I asked
10:06:10 2 you to redo these with the data printed out, could
10:06:12 3 you do it?
10:06:13 4     A. I don't know. We would have to ask Bill
10:06:16 5 to see if it, in fact, is. It depends on the
10:06:21 6 software.
10:06:23 7     Q. Okay.
10:06:23 8     A. Yeah.
10:06:24 9     MR. CHACHKES: We would request that data
10:06:25 10 be produced. So if -- we'll make a formal
10:06:30 11 request for that.
10:06:30 12     MS. O'DELL: I think the data that's
10:06:32 13 available has been produced, it's provided in
10:06:34 14 the report, and so there's no further data.
10:06:36 15     Q. (By Mr. Chachkes) We'll --
10:06:37 16     A. Well, this is adequate to tell if this is
10:06:39 17 a characteristic spectrum of tremolite, but you can't
10:06:44 18 say, well, we know this is tremolite. We have other
10:06:46 19 methods that have to be coupled together to be able
10:06:48 20 to, you know, 99.9 percent say it is.
10:06:52 21 I'm just talking about the data down
10:06:53 22 there.
10:06:54 23     A. Okay.
10:06:54 24     Q. Let's look at what was marked yesterday as
10:06:56 25 Exhibit 13. If you could look at like the last page.

59

10:07:08 1 Maybe just flip it up to the last page.
10:07:09 2     A. Okay.
10:07:10 3     Q. You see there, it's an EDXA printout.
10:07:15 4 This is not yours.
10:07:15 5     A. Sure.
10:07:15 6     Q. This is from Connecticut.
10:07:17 7     A. Uh-huh.
10:07:17 8     Q. And you see that -- it looks like it was
10:07:18 9 generated from the same software as yours, it's the
10:07:21 10 same fonts, same format. Is that a reasonable
10:07:24 11 conclusion?
10:07:25 12     A. I don't know --
10:07:26 13     MS. O'DELL: Object to the form.
10:07:27 14     THE WITNESS: -- we'd have to see. You
10:07:29 15 know, they're all -- there are a number of
10:07:31 16 different EDS software packages out there.
10:07:34 17     Q. (By Mr. Chachkes) Do you know the name of
10:07:36 18 your EDS software package?
10:07:38 19     A. I want to say it's called Revolutions.
10:07:40 20     Q. Are there different versions of the
10:07:42 21 Revolution software?
10:07:43 22     A. I don't know.
10:07:44 23     Q. And the information in the lower left, you
10:07:48 24 see that's generated for each of the relevant
10:07:52 25 elements, weight percentage, standard deviation,

60

10:07:55 1 atomic percentage, oxide percentage, other
10:07:56 2 information; do you see that?
10:07:57 3     A. Yes.
10:07:57 4     Q. Can you generate all that information if
10:08:00 5 you wanted to for your EDXA?
10:08:04 6     MS. O'DELL: Object to the form.
10:08:06 7     THE WITNESS: Again, it depends on the way
10:08:08 8 the software operates, if it's set up to be able
10:08:11 9 to collect that information and make those
10:08:12 10 statistics.
10:08:12 11     Q. (By Mr. Chachkes) For the EDXA
10:08:15 12 experiments that you ran for the purposes of the MDL
10:08:18 13 report, would you be able to generate that
10:08:21 14 information or you just don't know?
10:08:23 15     MS. O'DELL: Object to form.
10:08:24 16     THE WITNESS: I don't know.
10:08:24 17     Q. (By Mr. Chachkes) Okay. Do you
10:08:27 18 understand that that information, some people find
10:08:30 19 that useful?
10:08:31 20     MS. O'DELL: Objection.
10:08:31 21     THE WITNESS: It can be, yeah.
10:08:33 22     Q. (By Mr. Chachkes) Why?
10:08:33 23     A. Well, it can be useful in -- for instance,
10:08:37 24 if you're a research geologist and you're trying to
10:08:41 25 determine the composition and the makeup of an

61

```
10:08:43   1    unknown, that would be very helpful.
10:08:44   2        Q.    Okay.  Why is it very helpful?
10:08:46   3        A.    Again, if they are -- if they're trying to
10:08:49   4    understand the composition of these materials, then
10:08:52   5    that information is part of info to try to figure out
10:09:00   6    what you're working with.
10:09:01   7        Q.    That information that we're talking about
10:09:05   8    a researcher can use to estimate the composition, the
10:09:11   9    chemical composition, of the subject particle; right?
10:09:14  10        MS. O'DELL:  Object to form.
10:09:14  11        THE WITNESS:  Yeah, they can estimate it.
10:09:15  12    They can estimate it.
10:09:16  13        MS. O'DELL:  Dr. Rigler, give me just a
10:09:19  14    second before you answer.
10:09:20  15        THE WITNESS:  Sure.  Sorry.
10:09:20  16        MS. O'DELL:  Thank you.
10:09:20  17        Q.    (By Mr. Chachkes)  And one of the ways you
10:09:23  18    do that is by -- you take the ratios of the peak
10:09:29  19    areas of the metals to the silicon; right?
10:09:32  20        A.    That's one way to do it.
10:09:33  21        Q.    And if you were going to generate peak
10:09:40  22    areas for your EDXA you could do that; right?
10:09:43  23        A.    Yeah.  I would say yes to that.  Again, I
10:09:46  24    would have to look at the package to see what's in
10:09:50  25    there.
```

62

```
10:09:49   1        Q.    It's pretty fundamental.  I would think
10:09:51   2    all packages have that; right?
10:09:53   3        MS. O'DELL:  Object to the form.
10:09:54   4        THE WITNESS:  Yes, but they vary in the
10:09:55   5    software, the way that the company has put the
10:09:59   6    software together.
10:10:00   7        Q.    (By Mr. Chachkes)  Okay.  So this process
10:10:02   8    of comparing ratios of metals to silicon, are you
10:10:06   9    comparing peak areas or just simply peak heights?
10:10:09  10        A.    Again, that varies.  In a lot of cases
10:10:13  11    it's peak heights if you're working with -- depending
10:10:17  12    on what your methodology is.
10:10:18  13              For instance, I believe one of the
10:10:21  14    standard methodologies for asbestos analysis is in
10:10:24  15    the AHERA regulations, and I believe there they use
10:10:30  16    peak ratios in that, which I believe are based on
10:10:33  17    peak heights.
10:10:34  18        Q.    Okay.  And what about for an unknown
10:10:40  19    chemical or crystal, what's more useful to determine
10:10:46  20    the chemical composition, peak heights or peak areas?
10:10:49  21        MS. O'DELL:  Object to the form.
10:10:50  22        THE WITNESS:  Either one can be used,
10:10:51  23    depending upon how you're calibrated.
10:10:54  24        Q.    (By Mr. Chachkes)  It's your belief that
10:10:55  25    the peer-reviewed literature reflects that either
```

63

```
10:10:59   1    peak heights or peak areas can be used to determine
10:11:02   2    the chemical composition of the subject of an EDXA
10:11:03   3    analysis?
10:11:05   4        A.    Well --
10:11:05   5        MS. O'DELL:  Object.
10:11:06   6        THE WITNESS:  -- if we step back a minute,
10:11:12   7    these kinds of spectra are not the kinds of
10:11:15   8    spectra that we get when we're doing something
10:11:17   9    like mass spectrometer where we're really
10:11:20  10    looking at an area under a peak.  You can do
10:11:24  11    peak heights on those, half width max types of
10:11:29  12    estimates with those.
10:11:31  13              These are spectrometers, and what they do
10:11:33  14    is they collect data in electron channels for
10:11:37  15    electron voltage.  So typically what you do is
10:11:41  16    you bombard your specimen with the electron beam
10:11:46  17    for a period of time to get enough counts so
10:11:50  18    that the peaks are stable at a stable height,
10:11:54  19    and then you can compare the peak heights.
10:11:57  20              So peak area, you know, for this kind of a
10:12:02  21    spectrometer, again, you'll get different
10:12:04  22    opinions, but it's not the same type of thing
10:12:07  23    with the mass spectrometer.  So peak heights
10:12:09  24    work very well for these.
10:12:11  25        Q.    (By Mr. Chachkes)  Okay.  It's not a
```

64

```
10:12:12   1    question about what works very well or --
10:12:15   2        A.    Well, it is kind of a question about what
10:12:16   3    works really well.
10:12:17   4        Q.    Okay.  Focus on my question.
10:12:18   5        A.    I hear you, but you're kind of going to
10:12:21   6    it --
10:12:21   7        Q.    Focus on my question.
10:12:23   8        A.    I'm focusing.
10:12:24   9        Q.    The question is about peer-reviewed
10:12:27  10    literature --
10:12:27  11        A.    Let me just finish.
10:12:28  12        MS. O'DELL:  Sorry.
10:12:29  13        THE WITNESS:  Let me finish.  I'm not
10:12:29  14    finished.
10:12:30  15        MS. O'DELL:  Please finish.
10:12:33  16        THE WITNESS:  Okay.  Peak heights work
10:12:34  17    very well for this type of a spectrometer.  Now,
10:12:38  18    we can get in all the minutia of area versus
10:12:41  19    peak height, but we have to know what kind of
10:12:44  20    system that we're talking about.
10:12:46  21        Q.    (By Mr. Chachkes)  Same question.
10:12:47  22        A.    Okay.
10:12:48  23        Q.    Focus on what I'm asking, which is about
10:12:50  24    the peer-reviewed literature.
          25        A.    Okay.
```

65

| | |
|---|---|
| 10:12:51 1 | Q. In the peer-reviewed literature where |
| 10:12:53 2 | folks are looking at EDXA spectra to determine the |
| 10:12:57 3 | chemical composition of an unknown subject -- |
| 10:13:00 4 | A. Okay. |
| 10:13:01 5 | Q. -- does the peer-reviewed literature |
| 10:13:04 6 | support both using peak heights and peak area to make |
| 10:13:07 7 | that determination? |
| 10:13:09 8 | MS. O'DELL: Object to the form. |
| 10:13:10 9 | THE WITNESS: I would have to review the |
| 10:13:12 10 | literature. Standard methods use peak height. |
| 10:13:19 11 | Some may use peak area also. So as far as that, |
| 10:13:22 12 | I would have to go and review it. |
| 10:13:24 13 | Q. (By Mr. Chachkes) When you say standard |
| 10:13:25 14 | methods, you mean in the peer-reviewed literature or |
| 10:13:28 15 | something else? |
| 10:13:28 16 | A. Sure. It would be -- if it's a standard |
| 10:13:31 17 | method it's going to be peer-reviewed. |
| 10:13:33 18 | Q. Okay. Looking at Exhibit 12 again, going |
| 10:13:40 19 | back to your EDXA printout, did you do a |
| 10:13:46 20 | comprehensive review of what minerals could |
| 10:13:50 21 | correspond to this EDXA spectra other than what you |
| 10:13:55 22 | believe it to be, which is tremolite? |
| 10:13:57 23 | A. I didn't do a comprehensive review of |
| 10:13:59 24 | this. |
| 10:13:59 25 | Q. Did anybody do a comprehensive review of |

Atlanta Reporters, Inc. 866-344-0459    www.atlanta-reporters.com

66

| | |
|---|---|
| 10:14:02 1 | the EDXA spectra to determine what other minerals |
| 10:14:05 2 | they could correspond to? |
| 10:14:07 3 | A. A comprehensive review. What do you mean |
| 10:14:13 4 | by that? |
| 10:14:13 5 | Q. So, for example, if an expert in |
| 10:14:16 6 | mineralogy and EDXA mineralogy were to tell you this |
| 10:14:19 7 | spectra in Exhibit 12 can correspond to dozens if not |
| 10:14:24 8 | hundreds of other minerals, sitting here today, do |
| 10:14:26 9 | you have any reason to dispute that? |
| 10:14:27 10 | MS. O'DELL: Object to the form. |
| 10:14:29 11 | THE WITNESS: I would say that it could |
| 10:14:31 12 | correspond to a number of other minerals, yes. |
| 10:14:34 13 | MR. CHACHKES: Okay. |
| 10:14:35 14 | MS. O'DELL: Alex, excuse me. We've been |
| 10:14:38 15 | going about an hour, a little over an hour. Can |
| 10:14:40 16 | we take a short break, please? |
| 10:14:41 17 | MR. CHACHKES: Yeah. Let me see if I can |
| 10:14:43 18 | finish this part. |
| 10:14:44 19 | MS. O'DELL: Are you ready for a break, |
| 10:14:46 20 | Doctor? |
| 10:14:46 21 | THE WITNESS: Sure. |
| 10:14:48 22 | MR. CHACHKES: That's fine, we'll take a |
| 10:14:50 23 | break. |
| 10:14:51 24 | (Recess from 10:14 a.m. to 10:37 a.m.) |
| 10:38:00 25 | Q. (By Mr. Chachkes) We spoke earlier about |

Atlanta Reporters, Inc. 866-344-0459    www.atlanta-reporters.com

67

| | |
|---|---|
| 10:38:03 1 | you record your time; correct? |
| 10:38:05 2 | A. As far as recording the time -- |
| 10:38:07 3 | Q. Yes. |
| 10:38:09 4 | A. Yes, some of it, but not all of it. |
| 10:38:11 5 | Q. Okay. And who do you give those time |
| 10:38:13 6 | sheets to? |
| 10:38:13 7 | A. I don't -- as I say, I go in and speak to |
| 10:38:20 8 | Bill's assistant and then give her the hours that I |
| 10:38:25 9 | have. |
| 10:38:25 10 | Q. Is it your understanding that the other |
| 10:38:26 11 | people in your laboratory are giving their hours to |
| 10:38:28 12 | Bill's assistant? |
| 10:38:29 13 | A. I don't know what they're doing. |
| 10:38:31 14 | Q. Okay. Have they been instructed to keep |
| 10:38:33 15 | their time? |
| 10:38:33 16 | A. You'd have to ask Bill about that. |
| 10:38:36 17 | Q. Okay. So I'd like to request of |
| 10:38:37 18 | plaintiffs all invoices billed on behalf of the MDL |
| 10:38:41 19 | at MAS. |
| 10:38:46 20 | So let's -- |
| 10:38:48 21 | A. I wanted to -- before we got started, I |
| 10:38:51 22 | wanted to bring up a point about the publications, |
| 10:38:52 23 | because I know you were asking about that. |
| 10:38:54 24 | Q. Okay. |
| 10:38:54 25 | A. And it is our policy at our laboratory to |

Atlanta Reporters, Inc. 866-344-0459    www.atlanta-reporters.com

68

| | |
|---|---|
| 10:38:58 1 | not discuss any possible publications that we may |
| 10:39:02 2 | have pending. It's part of our policy, and it's |
| 10:39:06 3 | actually what we consider as proprietary. |
| 10:39:13 4 | MR. CHACHKES: I'm going to ask counsel |
| 10:39:14 5 | again, are you going to allow me to ask a full |
| 10:39:18 6 | set of questions about what the pending |
| 10:39:19 7 | publication is? |
| 10:39:20 8 | MS. O'DELL: No. |
| 10:39:20 9 | MR. CHACHKES: Okay. We'll raise it with |
| 10 | the magistrate. |
| 10:39:21 11 | MS. O'DELL: He's answered your question. |
| 10:39:23 12 | These are the invoices. It's two copies of one |
| 10:39:26 13 | invoice, and you're welcome to ask him questions |
| 10:39:28 14 | about it if you'd like. |
| 10:39:29 15 | MR. CHACHKES: Okay. And we're also |
| 10:39:30 16 | requesting all invoices from all people for who |
| 10:39:35 17 | do bill time, the analysts, Bill, the works. |
| 18 | MR. PARFITT: We'll take that under |
| 10:39:39 19 | advisement. |
| 10:39:39 20 | MS. O'DELL: Your request is noted. There |
| 10:39:43 21 | will be an objection to that. |
| 10:39:45 22 | MR. CHACHKES: Okay. Let's just mark -- |
| 10:39:47 23 | let me see if these are different. Yeah. |
| 10:39:49 24 | MS. O'DELL: Let's see. |
| 10:39:51 25 | MR. CHACHKES: Yeah, they're different. |

Atlanta Reporters, Inc. 866-344-0459    www.atlanta-reporters.com

69

| | |
|---|---|
| 10:39:51 | 1    One is for 9,000 and one is for 14. |
| 10:39:54 | 2        MS. O'DELL:  Oh, yeah. |
| 10:39:56 | 3    Q.    (By Mr. Chachkes)  By the way, did you |
| 10:39:59 | 4    bring any documents with you today? |
| 10:40:00 | 5    A.    I did. |
| 10:40:00 | 6    Q.    What documents did you bring with you? |
| 10:40:02 | 7    A.    Let me get them out. |
| 10:40:11 | 8        MS. O'DELL:  May I see those just a minute |
| 10:40:13 | 9    to make sure. |
| 10:40:19 | 10        THE WITNESS:  The request. |
| 10:40:20 | 11    Q.    (By Mr. Chachkes)  You don't have to hand |
| 10:40:22 | 12    them to me, just tell me what they are. |
| 10:40:24 | 13    A.    Okay.  Let's see.  This is the notice of |
| 10:40:27 | 14    oral and videotaped deposition. |
| 10:40:28 | 15    Q.    Well, let me just ask this question.  Did |
| 10:40:29 | 16    you bring any documents that I might not already |
| 10:40:31 | 17    have?  So I have your report, I have the subpoena, I |
| 10:40:36 | 18    have the things lawyers exchange.  Is there |
| 10:40:40 | 19    anything -- |
| 10:40:40 | 20    A.    You have the quality report? |
| 10:40:42 | 21    Q.    Yes, we have the quality report; correct? |
| 10:40:45 | 22    And you brought that? |
| 10:40:46 | 23    A.    I brought a copy of that.  There was one |
| 10:40:48 | 24    minor typographical error I found in that. |
| 10:40:50 | 25    Q.    We'll get to that. |

Atlanta Reporters, Inc.  866-344-0459    www.atlanta-reporters.com

70

| | |
|---|---|
| 10:40:52 | 1    A.    Okay. |
| 10:40:52 | 2    Q.    Anything else you brought that I might not |
| 10:40:54 | 3    otherwise have? |
| 10:40:55 | 4    A.    You probably have everything.  I brought |
| 10:40:59 | 5    the starting weight sheets, the weight sheets that |
| 10:41:04 | 6    we've used for the analysis.  I think you guys had |
| 10:41:09 | 7    requested all of that.  What else?  And the reports. |
| 10:41:11 | 8    The same ones that you have here. |
| 10:41:13 | 9    Q.    So starting weight sheets, have those been |
| 10:41:16 | 10    produced? |
| 10:41:17 | 11    A.    Yeah, I think they were sent over. |
| 10:41:19 | 12        MS. O'DELL:  Yes, those were produced.  I |
| 10:41:21 | 13    have one more invoice.  I would ask that you not |
| 10:41:24 | 14    mark this one because I need a clean copy and I |
| 10:41:26 | 15    don't know why I don't have one in my folder, |
| 10:41:29 | 16    actually, so I'll get a copy at the break. |
| 10:41:31 | 17        MR. CHACHKES:  Okay.  Do you mind if I |
| 10:41:32 | 18    take a photo of it? |
| 10:41:33 | 19        MS. O'DELL:  No.  You're welcome to. |
| 10:41:34 | 20        MR. CHACHKES:  Okay.  We will start with |
| 10:41:35 | 21    that and then we can -- |
| 10:41:35 | 22        MS. O'DELL:  Yeah.  I'll copy it at the |
| | 23    break.  I just would prefer -- |
| | 24        MR. CHACHKES:  Oh, we'll copy it at the |
| | 25    break.  So why don't we do this, why don't we -- |

Atlanta Reporters, Inc.  866-344-0459    www.atlanta-reporters.com

71

| | |
|---|---|
| 10:41:38 | 1        MS. O'DELL:  I just prefer that that not |
| 10:41:41 | 2    be marked. |
| 10:41:42 | 3        MR. CHACHKES:  Why don't we hold up the |
| 10:41:43 | 4    invoices until a break.  I don't have to ask |
| 10:41:45 | 5    about them now.  We'll do it as a set.  I don't |
| 10:41:47 | 6    want to -- |
| 10:41:47 | 7        MS. O'DELL:  Sure. |
| 10:41:48 | 8    Q.    (By Mr. Chachkes)  Okay.  All right.  Back |
| 10:41:51 | 9    to EDXA. |
| 10:41:52 | 10    A.    All right. |
| 10:41:54 | 11    Q.    So -- now, you're aware that crystals have |
| 10:42:05 | 12    certain characteristic ratios of metals to silicon? |
| 10:42:08 | 13    A.    Yes. |
| 10:42:09 | 14    Q.    Okay.  And are you aware that tremolite |
| 10:42:11 | 15    has a ratio of 5-to-8? |
| 10:42:14 | 16    A.    It can vary. |
| 10:42:16 | 17    Q.    When you say it can vary, what do you mean |
| 10:42:19 | 18    by that? |
| 10:42:19 | 19    A.    Well, it can vary.  I mean, per the |
| 10:42:22 | 20    formula based on how many metal ions that tremolite |
| 10:42:27 | 21    has, it can vary a bit. |
| 10:42:29 | 22    Q.    When you say a bit, what's the margin |
| 10:42:32 | 23    error there? |
| 10:42:33 | 24    A.    You know, as far as a margin of error, |
| 10:42:36 | 25    peak height ratios, that type of thing, it just |

Atlanta Reporters, Inc.  866-344-0459    www.atlanta-reporters.com

72

| | |
|---|---|
| 10:42:41 | 1    varies.  So, you know, it varies. |
| 10:42:45 | 2    Q.    Do you have any opinion sitting here today |
| 10:42:47 | 3    as to what the peer-reviewed literature suggests as |
| 10:42:51 | 4    the acceptable variations when you're looking at an |
| 10:42:54 | 5    EDXA for determining a mineral from the |
| 10:42:58 | 6    metal-to-silicon ratio? |
| 10:42:59 | 7        MS. O'DELL:  Object to form. |
| 10:43:01 | 8        THE WITNESS:  I would have to look at the |
| 10:43:05 | 9    literature to see what they are because I know |
| 10:43:08 | 10    over the years as I've looked at different |
| 10:43:11 | 11    references, and I've noticed the slightly |
| 10:43:14 | 12    different, you know, ratios for the same |
| 10:43:17 | 13    material. |
| 10:43:18 | 14    Q.    (By Mr. Chachkes)  Okay.  Because the |
| 10:43:19 | 15    ratio actually should be a certain number because |
| 10:43:22 | 16    it's based on the chemical formula which is what the |
| 10:43:25 | 17    definition of the mineral is; correct? |
| 10:43:27 | 18    A.    Well, yes, but by electron spectroscopy |
| 10:43:32 | 19    you can have a variation in the energy depending upon |
| 10:43:36 | 20    takeoff angle and this and that kind of thing, |
| 10:43:39 | 21    depending on the material.  So you can have some |
| 10:43:42 | 22    variation there.  You know, purely based on the |
| 10:43:44 | 23    formula, again, using a spectrometer, you're going to |
| 10:43:48 | 24    get some variation. |
| 10:43:48 | 25    Q.    Okay.  But ideally the ratio is going to |

Atlanta Reporters, Inc.  866-344-0459    www.atlanta-reporters.com

73

10:43:52 1 be a definite number because it's based on the
10:43:57 2 chemical formula, and the chemical formula for a
10:43:58 3 mineral is set in stone, as it were?
4        MS. O'DELL:  Object to the form.
10:44:02 5        THE WITNESS:  Well, again, now, if you're
10:44:03 6 just talking about the formula, then, yes, you
10:44:05 7 would have ratios based on the formula.  You
10:44:08 8 know, forget the EDXA for a minute.
10:44:10 9        But based on the chemical formula and the
10:44:12 10 loading of the ions, you know, in that formula,
10:44:15 11 you're going to have, you know, a set amount
10:44:19 12 there.  But when it comes to the actual
10:44:21 13 spectroscopy you're going to have a little bit
10:44:23 14 of variation.
10:44:24 15    Q.    (By Mr. Chachkes)  Okay.  And just by way
10:44:25 16 of example, anthophyllite, the chemical formula, has
10:44:29 17 seven magnesiums, eight silicon; right?
10:44:32 18    A.    Uh-huh.
10:44:33 19    Q.    Is that a yes?
10:44:34 20    A.    Yes.
21    Q.    I'm sorry --
10:44:38 22    A.    It's okay.
10:44:38 23    Q.    -- show up on the transcript.
10:44:38 24        And then that ratio of 7-to-8 is the ideal
10:44:44 25 metal-to-silicon ratio under EDXA for anthophyllite?

Atlanta Reporters, Inc. 866-344-0459   www.atlanta-reporters.com

74

10:44:48 1    A.    Well, no, that's for the formula.  That
10:44:50 2 would be for the formula.  Once again, when you get
10:44:53 3 to a spectroscopic method, it's going to vary a bit.
10:44:57 4    Q.    So did you -- so in Exhibit 12, do you see
10:45:03 5 how tremolite is written there at the top?
10:45:05 6    A.    Yes.
10:45:05 7    Q.    That's not what the machine generated
10:45:07 8 based on the spectra; you typed that in; correct?
10:45:12 9    A.    The analyst typed that in, yes.  But that
10:45:14 10 correlates with tremolite, with a tremolite spectrum.
10:45:18 11    Q.    And so do you expect in this Exhibit 12
10:45:25 12 EDXA spectra that the ratio of metal to silicon is
10:45:31 13 going to be 5-to-8 or somewhere in the vicinity of
10:45:34 14 5-to-8?
10:45:35 15    A.    It could be, yes.
10:45:36 16    Q.    And when you say it could be, would you
10:45:42 17 identify something that has a metal-to-silicon ratio
10:45:45 18 nowhere near 5-to-8 as tremolite under EDXA?
10:45:49 19        MS. O'DELL:  Object to the form.
10:45:50 20        THE WITNESS:  Can you just restate the
10:45:52 21 question, please?
10:45:53 22    Q.    (By Mr. Chachkes)  Okay.  What margin of
10:45:54 23 error in the metal-to-silicon ratio would be so great
10:45:59 24 that you would say, well, that's not tremolite?
10:46:02 25    A.    Well, again, if, for instance, in this

Atlanta Reporters, Inc. 866-344-0459   www.atlanta-reporters.com

75

10:46:07 1 spectrum, in Number 12, if the magnesium was up in
10:46:11 2 the middle somewhere up high towards the silicon
10:46:14 3 peak, you might have a question about it at that
10:46:16 4 point.  If the calcium peak was down lower, then you
10:46:20 5 might have a question about it at that point too.
10:46:22 6        So you can get some variation again like
10:46:26 7 that, depending upon the mineralogy of tremolite in
10:46:29 8 that area.  So again, you're going to have a little
10:46:32 9 bit of variation.  But if it's too far away from
10:46:35 10 that, then, yeah, there's a question about that.
10:46:37 11    Q.    Do you have any opinions sitting here
10:46:39 12 today whether the EDXA spectra in 12 is more like
10:46:44 13 another mineral than tremolite?
10:46:47 14        MS. O'DELL:  Object to the form.
10:46:48 15        THE WITNESS:  Well, I don't have an
10:46:50 16 opinion on that right now.
10:46:52 17    Q.    (By Mr. Chachkes)  And so did you actually
10:46:55 18 run the metal-to-silicon ratios for your EDXA?
10:46:59 19        MS. O'DELL:  Object to the form.
10:47:00 20        THE WITNESS:  I didn't run it, no.
10:47:02 21    Q.    (By Mr. Chachkes)  Okay.  Did anybody run
10:47:03 22 it?
10:47:03 23    A.    I don't know.  I would have to check.
10:47:04 24    Q.    As the author of the expert report that
10:47:09 25 has these EDXA spectra upon which you're making

Atlanta Reporters, Inc. 866-344-0459   www.atlanta-reporters.com

76

10:47:12 1 conclusions, wouldn't that be important information
10:47:14 2 to know?
10:47:14 3        MS. O'DELL:  Object to the form.
10:47:21 4        MS. PARFITT:  Objection.
10:47:22 5        THE WITNESS:  The information that we have
10:47:23 6 from the spectrometer is accurate, and the peak
10:47:29 7 ratios that you see here are consistent with
10:47:34 8 tremolite.  It could be consistent with some
10:47:37 9 other minerals.  That's why we do not use EDS;
10:47:42 10 that's why we would do electron diffraction, and
10:47:45 11 we also look at the shape and the form of the
10:47:47 12 material, too.  So those things together allow
10:47:51 13 us to say, yeah, this is tremolite.
10:47:53 14    Q.    (By Mr. Chachkes)  Okay.  Do you go into
10:47:54 15 the EDXA -- do you take the EDXA spectra, say, I'm
10:48:02 16 going to assume it's an asbestos and now I'm going to
10:48:05 17 figure out which one?  You don't do that, do you?
10:48:07 18        MS. O'DELL:  Object to the form.
10:48:08 19        THE WITNESS:  Typically what happens is
10:48:12 20 the analyst will take a spectrum, they'll look
10:48:17 21 at the spectrum, then they will flip over -- and
10:48:20 22 they're in the same spot, they'll refigure the
10:48:24 23 scope, and then they will do electron
10:48:26 24 diffraction.
10:48:26 25        They'll look at the diffraction pattern,

Atlanta Reporters, Inc. 866-344-0459   www.atlanta-reporters.com

77

10:48:28  1    and then they will make a decision at that
10:48:30  2    particular point as to whether it's consistent
10:48:32  3    with that form or not.  Then they'll index the
10:48:35  4    pattern.  They'll confirm that with verification
10:48:38  5    of the indexing of the pattern.
10:48:39  6       Q.    (By Mr. Chachkes)  Okay.  So the EDXA --
10:48:44  7    so the judgment call by the analyst to what mineral
10:48:48  8    they're looking at is based on a combined looking at
10:48:51  9    the EDXA spectra and the SAED?
10:48:56 10       A.    Yes, and also the form.  The form.
10:49:02 11       Q.    And when you say the form, what do you
10:49:03 12    mean, the form?
10:49:04 13       A.    Well, for instance, if it's a round
10:49:09 14    structure or something that is not fibrous or
10:49:12 15    crystalline as you would expect tremolite to be,
10:49:14 16    then, you know, it's a guess as it could be some
10:49:17 17    other form.
10:49:19 18       Q.    Can you cite to me any peer-reviewed
10:49:21 19    literature or textbook, even, that says taking
10:49:26 20    simultaneously the data from an EDXA, SAED, and the
10:49:32 21    form is the proper way to identify a mineral?
10:49:37 22       MS. O'DELL:  Object to the form.
10:49:38 23       THE WITNESS:  Well, I mean, if you want to
10:49:39 24    look at the way EPA said to do it and continues
10:49:42 25    to say to do it, you know, in the '70s and the

78

10:49:47  1    '80s and was published, this is the way to do
10:49:50  2    it.
10:49:50  3       Q.    (By Mr. Chachkes)  Okay.  So you've cited
10:49:52  4    the EPA.  Anything else, any other published sources?
10:49:55  5       A.    It's also done -- there are a number
10:49:57  6    of ASTM -- they are referenced here in our report.
10:49:59  7       Q.    Okay.  Is it your opinion that 22262
10:50:03  8    sanctions that methodology?
10:50:05  9       A.    To my knowledge, yes.
10:50:06 10       Q.    Okay.  And when you say EPA, what document
10:50:09 11    are you referring to?
10:50:10 12       A.    That would be the AHERA document.
10:50:15 13    CFR 763.
10:50:15 14       Q.    And so if you're cited CFR -- say it
10:50:21 15    again?
10:50:21 16       A.    763.
10:50:22 17       Q.    763?
10:50:23 18       A.    Yep.
10:50:23 19       Q.    And then we cited 22262.  Any other
10:50:26 20    document that supports your methodological approach?
10:50:29 21       A.    Let me look here.  We've referenced them
10:50:32 22    here.  There are a couple of ASTMs too.  There's an
10:50:36 23    ISO document -- well, the ISO is the 22 -- let me see
10:50:39 24    which ones we've got.
10:50:45 25       The ASTM D5755-09, D5756, the ISO 10312,

79

10:51:03  1    and there's also ISO 13794.  The EPA one's here, it's
10:51:12  2    40 CFR part 763.  They're on page 11 of the report.
10:51:19  3       Q.    Okay.  Any other published literature that
10:51:21  4    approves of this method that you're using?
10:51:23  5       MS. O'DELL:  Object to the form.
10:51:25  6       THE WITNESS:  Probably there are, but
10:51:28  7    these are major standards that are used.
10:51:32  8       Q.    (By Mr. Chachkes)  Sitting here today can
10:51:33  9    you think of any others?
10:51:34 10       A.    I'm trying to think of them.  As I sit
10:51:40 11    here, I can't, but I know there are some others.
10:51:42 12       Q.    Okay.
10:51:42 13       A.    Yeah.
10:51:43 14       Q.    Now, let's take, for example, 22262.
10:51:48 15    There's a section on EDXA; correct?
10:51:54 16       A.    To my knowledge there is, yes.
10:51:55 17       Q.    Right.  And there's a section on SAED?
10:51:58 18       A.    I would have to look at it.  I don't have
10:52:00 19    it right in front me.
10:52:00 20       Q.    Okay.
10:52:01 21       A.    If you've got it, I'll look at it.  I
10:52:02 22    don't have it right in front of me.
10:52:03 23       Q.    Does 22262 expressly say you consider the
10:52:08 24    EDXA and SAED together even though that independently
10:52:12 25    they may be inconclusive?

80

10:52:13  1       A.    I --
10:52:13  2       MS. O'DELL:  Excuse me.
10:52:15  3       Dr. Rigler, I've got a copy here that was
10:52:17  4    marked, if you need to see 22262-2.  I'll
10:52:20  5    provide it to you if counsel will not do that.
10:52:23  6       THE WITNESS:  Okay.
10:52:23  7       Q.    (By Mr. Chachkes)  Let me ask this
10:52:24  8    question.  Are you able to answer the question --
10:52:26  9       MS. PARFITT:  Give him a chance to look at
10:52:28 10    the document.
10:52:28 11       MR. CHACHKES:  I'm going to ask the
10:52:30 12    question.  You can --
10:52:30 13       MS. PARFITT:  No.  Give him a chance,
10:52:32 14    Alex --
10:52:32 15       Q.    (By Mr. Chachkes)  Can you answer --
10:52:33 16       MS. PARFITT:  Alex, he's not going to
10:52:34 17    answer the question.
10:52:34 18       Q.    (By Mr. Chachkes)  Can you answer the
10:52:35 19    question without being given the document?  That's a
10:52:37 20    simple question.  Can you --
10:52:37 21       MS. PARFITT:  We need to --
10:52:38 22       MR. CHACHKES:  Are you going to shut that
10:52:40 23    down?
10:52:40 24       MS. PARFITT:  I'm going to tell him to
10:52:41 25    look at the document.  The appropriate thing --

81

10:52:43 1    MR. CHACHKES:  Okay.  Another list for the

2    magistrate.

3    Go ahead.

10:52:45 4    MS. PARFITT:  Excuse me.  Let's make it

10:52:46 5    clear.  So the question for the magistrate is

10:52:48 6    when you talk about a document and the witness

10:52:50 7    wants to see it, you want to bring up to the

10:52:53 8    magistrate that you aren't going to give it to

10:52:55 9    him?  Is that the subject matter?

10:52:56 10    MR. CHACHKES:  Let's look at the

10:52:57 11    transcript.  Did he say he wanted to see it?

10:52:58 12    You said he wanted to see it.

10:52:59 13    MS. PARFITT:  Dr. Rigler, would you like

10:53:02 14    to see the document?

10:53:02 15    THE WITNESS:  Sure.

10:53:03 16    MS. PARFITT:  Thank you.

10:53:04 17    MR. CHACHKES:  All right.

10:53:05 18    MS. PARFITT:  It's amusing, isn't it?  Why

10:53:08 19    don't you act appropriate.

10:53:09 20    Q.    (By Mr. Chachkes)  Anyway, is it your

10:53:10 21    opinion that 22262 says you can take an inconclusive

10:53:15 22    EDXA and you can take an inconclusive SAED and

10:53:19 23    together make a determination of what mineral you're

10:53:22 24    looking at?

10:53:23 25    MS. O'DELL:  Object to the form.

82

10:53:24 1    THE WITNESS:  I would have to take a break

10:53:26 2    to read it and review it, and then I can give

10:53:28 3    you an answer to that question.

10:53:29 4    Q.    (By Mr. Chachkes)  Okay.  Sitting here

10:53:29 5    today, you can't answer that off the top of your

10:53:32 6    head?

10:53:32 7    MS. PARFITT:  Objection.  Misstates his

10:53:34 8    testimony.

9    THE WITNESS:  That's right.

10    Q.    (By Mr. Chachkes)  Okay.

10:53:34 11    A.    I could give you an answer.  I just need

10:53:36 12    some time to review the document.

10:53:37 13    Q.    Okay.  And is it the same answer for the

10:53:38 14    other standards that you cited?  Sitting here today,

10:53:42 15    could you tell me just off the top of your head

10:53:44 16    whether those other standards that you cited allow

10:53:47 17    for someone to take an inconclusive SAED and

10:53:50 18    inconclusive EDXA together with maybe a visual

10:53:56 19    morphology decision and judge what mineral you're

10:53:59 20    looking at?

10:54:00 21    MS. O'DELL:  Object to the form.

10:54:00 22    THE WITNESS:  Well, the answer to the

10:54:02 23    question is these parts are required to be able

10:54:09 24    to come up with an answer of what the mineral

10:54:11 25    is.

83

10:54:11 1    So, yes, you start with an inconclusive;

10:54:15 2    yes, you start with an inconclusive; yes, you

10:54:17 3    start with an inconclusive; and you put those

10:54:19 4    together to come up with a conclusive answer.

10:54:21 5    Q.    (By Mr. Chachkes)  Okay.

10:54:21 6    A.    Yep.

10:54:22 7    Q.    At a break I would like you to look at

10:54:26 8    your document --

10:54:28 9    A.    Okay.

10:54:28 10    Q.    -- and specifically look for somewhere

10:54:30 11    where it says you can take three separate and

10:54:32 12    independent inconclusive analytical results and

10:54:36 13    combine them to make a conclusive result.  Okay?

10:54:43 14    MS. O'DELL:  Object to the form.

10:54:44 15    THE WITNESS:  Well, let me just state that

10:54:48 16    in science, one of the best ways to come up with

10:54:51 17    a good answer is use multiple techniques to be

10:54:54 18    able to make a conclusion.  You use one

10:54:57 19    particular technique, that's good.  You use

10:55:02 20    another technique in conjunction with that,

10:55:04 21    that's better.  Use three techniques in

10:55:07 22    conjunction with that, that's very good.

10:55:09 23    So typically this is the way that we work

10:55:13 24    as scientists.  So that's the way that these

10:55:19 25    documents are written, you know.  Again, a good

84

10:55:22 1    example is AHERA as to how they would do that,

10:55:24 2    they want the scientists to do it.

10:55:25 3    Q.    (By Mr. Chachkes)  Will you do me that

10:55:28 4    favor during a break look at 22262 and coming up

10:55:31 5    with your specific opinion as to whether it allows

10:55:34 6    for someone to take an inconclusive -- three

10:55:37 7    inconclusive results, combine them for a conclusive

10:55:39 8    result?

10:55:39 9    MS. O'DELL:  Object to the form.

10:55:40 10    And you're not required to do any homework

10:55:42 11    for counsel during a break.

10:55:45 12    Q.    (By Mr. Chachkes)  Okay.  So you will not

10:55:48 13    during a break do that; correct?

10:55:49 14    MS. PARFITT:  You want him to do it right

10:55:51 15    now?  It's on your time.

10:55:53 16    MR. CHACHKES:  It's a question for the

10:55:54 17    witness.

10:55:54 18    MS. PARFITT:  The question for the witness

10:55:56 19    is -- you were asking him to do homework off the

10:55:59 20    record on his break; am I correct?  Is that what

10:56:01 21    you're asking him?

10:56:02 22    MR. CHACHKES:  He has a --

10:56:02 23    MS. PARFITT:  Let me ask you a question.

10:56:03 24    MR. CHACHKES:  If you're just going to

10:56:04 25    talk over me, there's no conversation here.

85

10:56:05 1     MS. PARFITT: You know, Alex, you have a
10:56:07 2  difficult time talking over people as well, so
3  I'm not trying to --
10:56:10 4     MR. CHACHKES: I'll let you finish. Go
5  ahead.
6     MS. PARFITT: Thank you. I appreciate
10:56:13 7  that. It's very kind of you.
10:56:13 8     Are you asking him to do a project for you
10:56:16 9  on his break; is that what you're asking him?
10:56:18 10     MR. CHACHKES: He has come here as an
10:56:20 11  expert on the subject matter of how one
10:56:21 12  determines whether there's asbestos in talc, and
10:56:23 13  he has testified that there are various
10:56:24 14  standards by which they sanction his
10:56:27 15  methodology. I want a specific opinion as to
10:56:30 16  how indeed that happens.
10:56:32 17     So he should be able to do that. He
10:56:34 18  should have come prepared for that. So I want
10:56:35 19  him to read the document and come back with
10:56:38 20  specifics. That's what I want.
10:56:39 21     MS. PARFITT: Well, I think there may be a
10:56:41 22  miscommunication. I don't think he's telling
10:56:43 23  you he can't do it. The difference is if you
10:56:46 24  want to ask him that question, he goes through
10:56:48 25  it right now while we're on the record, that's

86

10:56:51 1  fine.
10:56:51 2     MR. CHACHKES: I'll tell you what we'll
10:56:53 3  do. I plan to finish without exhausting my
10:56:56 4  seven-hour time. If it takes a few hours to go
10:57:00 5  through documents, we'll do that at the end,
6  okay?
7     MS. PARFITT: Go through --
8     THE WITNESS: Well, I think --
10:57:02 9     MR. CHACHKES: He can do it on the record.
10:57:02 10  He can just sit there reading the documents on
10:57:04 11  the record. We'll stay here until 9:00 if
10:57:06 12  that's what's required.
10:57:08 13     MS. PARFITT: That's fine.
10:57:11 14     MR. CHACHKES: Okay. I mean, right now I
10:57:13 15  understand the dispute to be not whether he can
10:57:17 16  go through the documents and give me the answer.
10:57:18 17  You just want it on the record.
10:57:19 18     MS. PARFITT: What I would like to have on
10:57:20 19  the record is your question and his response and
10:57:22 20  he will tell you -- since I'm not testifying --
10:57:24 21  he will tell you whether he can respond in kind
10:57:27 22  to your question and in an appropriate manner.
10:57:30 23  If the appropriate manner for him to respond to
10:57:33 24  your question requires him to look at something,
10:57:36 25  then he's entitled to do it.

87

10:57:36 1     MR. CHACHKES: And I would appreciate in
10:57:37 2  the future when I ask those questions you don't
3  tell the witness how the appropriate manner is,
10:57:39 4  that he is allowed to finish answering the
10:57:40 5  questions.
10:57:41 6     MS. PARFITT: Well, let's not trip a
10:57:43 7  witness. I think let's have a very honest
10:57:45 8  discussion with the witness, all right?
10:57:46 9     So that's what we're trying to do is have
10:57:49 10  an honest discussion with the witness, and I see
10:57:55 11  you're trying to do that.
10:57:55 12     Q.   (By Mr. Chachkes)  Okay. So you said the
10:57:58 13  analyst is simultaneously doing an EDXA and an SAED;
14  correct?
10:58:03 15     A.   They can.
10:58:03 16     Q.   They can.
10:58:04 17     A.   Well, I mean, simultaneously -- you have
10:58:06 18  to do one at a time, but you can do them essentially
10:58:11 19  in the same sitting.
10:58:12 20     Q.   Would the analyst -- would it be
10:58:15 21  appropriate for an analyst to take something like
10:58:18 22  Exhibit 12 without having done the SAED yet, without
10:58:20 23  having done visual morphology yet, to make a
10:58:23 24  conclusion about what mineral they're looking at?
10:58:26 25     A.   Well, that's not the way we do it.

88

10:58:30 1     Q.   Would it be appropriate to do it that way?
10:58:32 2     A.   I'm telling you that's the way we do it.
10:58:33 3     Q.   The question is as an expert in the area,
10:58:35 4  is it appropriate to do it? If they did it, would it
10:58:37 5  be inappropriate?
10:58:38 6     A.   They could do it.
10:58:39 7     MS. O'DELL: Object to the form.
8     THE WITNESS: They could do it if they
10:58:41 9  wanted to, but that's not the way we do it.
10:58:43 10     Q.   (By Mr. Chachkes)  Okay. And it wouldn't
10:58:44 11  be inappropriate -- when I say inappropriate, bad
10:58:47 12  science?
13     MS. O'DELL: Object to the form.
10:58:49 14     THE WITNESS: Bad science? I don't know
10:58:51 15  what you mean by that.
10:58:52 16     Q.   (By Mr. Chachkes)  Okay. So something
10:58:55 17  that would not give you within a reasonable degree of
10:59:00 18  scientific certainty the conclusion that, ah, this is
10:59:01 19  the mineral I'm looking at?
10:59:02 20     A.   Well, they would want to do that. They
10:59:05 21  would be required to do that at our laboratory.
10:59:07 22     Q.   Yeah.
10:59:08 23     A.   They wouldn't just look at one of these
10:59:09 24  and say, yeah, it's tremolite.
10:59:11 25     Q.   Okay. But I'm asking -- it's not

89

10:59:12  1   empirically what's going on, so focus on the
10:59:15  2   question. The question is, is it bad science to take
10:59:17  3   only, like in Exhibit 12, EDXA and a spectrum and
10:59:25  4   make a conclusion about the mineral?
10:59:27  5        MS. O'DELL: Object to the form.
10:59:28  6        THE WITNESS: Is it bad science? It's
10:59:31  7   observation. They can make an observation which
10:59:33  8   may lead them to additional kinds of
10:59:37  9   observations. You may take an expert in
10:59:40 10   mineralogy who looks at this and goes yeah, it's
10:59:43 11   tremolite. You may take an expert in mineralogy
10:59:46 12   in academia that would say it was.
10:59:13 13        Q.   (By Mr. Chacknes) Okay. So it is good
10:59:50 14   science to take something like the EDXA printout in
10:59:54 15   isolation and say I know what mineral that is?
10:59:55 16        MS. O'DELL: Object to the form.
10:59:56 17   Misstates his testimony.
10:59:57 18        THE WITNESS: Right, we -- again, that's
10:59:59 19   not the way that we do that at our laboratory.
11:00:01 20   And you may have an academic that does that
11:00:03 21   who's a crystallographer or mineralogist who
11:00:06 22   looks at that and goes, yeah, it's tremolite.
11:00:09 23        Q.   (By Mr. Chacknes) So what is your
11:00:16 24   recommended procedure for -- when is the tremolite
11:00:18 25   typed in the top? Is it right after the EDXA

90

11:00:20  1   printout comes up?
11:00:21  2        A.   Well, as I say, they've done the
11:00:25  3   diffraction, they've looked at this. They may do
11:00:28  4   another EDS on this to verify what they got to start
11:00:31  5   with, and then they would probably type that in there
11:00:34  6   then.
11:00:34  7        Q.   Okay. I've seen no sample for which there
11:00:36  8   are two EDS. Does that mean we have not received
11:00:39  9   these duplicate EDS runs?
11:00:42 10        MS. O'DELL: Object to the form.
11:00:43 11        THE WITNESS: Well, no. Again, they may
11:00:46 12   do -- they may start to do an EDS on that, go,
11:00:51 13   yeah, that looks like tremolite, let me do the
11:00:53 14   diffraction on this, right, and then they may
11:00:55 15   come back and do a 300 seconds on the EDS.
11:00:59 16        So, you know, they're not going to call it
11:01:01 17   unless they verify it from the diffraction.
11:01:05 18        Q.   (By Mr. Chacknes) Do you have a policy at
11:01:08 19   MAS for the order in which the various analyses are
11:01:10 20   done?
11:01:10 21        A.   Well, we have a protocol for that --
        22        Q.   Okay.
11:01:13 23        A.   -- yeah.
11:01:13 24        Q.   Is it written?
11:01:14 25        A.   To my knowledge, yes.

91

11:01:15  1        Q.   Okay. I would ask that that be produced.
11:01:18  2        Sitting here now, do you remember what
11:01:20  3   that protocol is, which comes first, like EDS or SAED
11:01:24  4   or visual morphology under TEM?
11:01:29  5        A.   Yeah, I want to say that it is EDS first,
11:01:31  6   and then they do the diffraction, but I would have to
11:01:35  7   look and see what it is.
11:01:37  8        Q.   Do the analysts type in the mineral
11:01:41  9   identification at the top of the printout at the time
11:01:45 10   they do the EDS before they do the diffraction?
11:01:48 11        MS. O'DELL: Object to the form. Asked
11:01:49 12   and answered.
11:01:49 13        THE WITNESS: Again, I would have to -- I
11:01:52 14   would have to see. I can't recall right now.
11:01:55 15   They're not going to type that on there unless
11:01:57 16   they're sure that -- understand that.
11:01:59 17        Q.   (By Mr. Chacknes) It's a question
11:02:00 18   about timing.
11:02:01 19        A.   Yes, I understand the question about
11:02:03 20   timing. I get that. I get it.
11:02:04 21        They can start to do an EDS, then they can
11:02:07 22   do diffraction, and then they can make the call on
11:02:11 23   that. They're not going to make the call unless
11:02:13 24   they're sure.
11:02:15 25        Q.   Do you know whether the -- so it's

92

11:02:18  1   possible that they go back into the software after
11:02:22  2   the diffraction and type in the name of the mineral
11:02:26  3   at the top of the EDS?
11:02:27  4        MS. O'DELL: Object to the form.
11:02:28  5        THE WITNESS: I don't know. I would have
11:02:29  6   to find out. But again, they're not going to
11:02:32  7   type that in there unless they're sure of it.
11:02:34  8        Q.   (By Mr. Chacknes) Okay.
11:02:34  9        A.   That's what you need to understand.
11:02:35 10        Q.   Yeah, I know -- I understand your --
11:02:35 11        A.   I want you to understand that. You don't
11:02:37 12   seem to understand that.
11:02:38 13        Q.   You have said that ten times --
11:02:39 14        A.   Good.
11:02:40 15        Q.   -- it's on the record --
11:02:41 16        A.   I want to make it clear.
11:02:42 17        Q.   What I understand or don't understand is
11:02:43 18   really not at issue. It's what you understand, okay?
11:02:46 19   Do you understand that?
11:02:46 20        A.   Sure.
        21        Q.   Okay.
11:02:48 22        A.   And what I'm telling you is it's not typed
11:02:50 23   on there unless they're sure of it.
11:02:52 24        Q.   All right. Now you've said that many
11:02:52 25   times.

93

| | |
|---|---|
| 11:02:53 | 1   A.   I can say it again. |
| 11:02:54 | 2   Q.   Okay.  And so do you -- I guess I'd have |
| 11:02:59 | 3   to talk to the analyst to figure out how they do |
| 11:03:01 | 4   this. |
| 11:03:01 | 5   MS. O'DELL:  Object to form. |
| 11:03:02 | 6   THE WITNESS:  You can talk to Dr. Longo |
| 11:03:03 | 7   and he can also tell you. |
| 11:03:04 | 8   Q.   (By Mr. Chachnes)  Yeah, but he's not |
| 11:03:05 | 9   doing the runs either, is he? |
| 11:03:07 | 10   A.   Well, he directs the lab. |
| | 11   Q.   All right. |
| 11:03:08 | 12   A.   So it's his responsibility. |
| 11:03:10 | 13   Q.   Okay.  And looking at Exhibit 12, the |
| 11:03:18 | 14   EDXA, what tells you that this is tremolite? |
| 11:03:20 | 15   A.   The peak sets that you have here. |
| 11:03:23 | 16   Q.   Okay.  And when you say -- walk me through |
| 11:03:26 | 17   that. |
| 11:03:26 | 18   A.   The peak sets? |
| 11:03:27 | 19   Q.   Yes.  Why are these peak sets tremolite |
| 11:03:30 | 20   and not some other mineral? |
| 11:03:32 | 21   A.   Some other mineral.  Well, again, until |
| 11:03:35 | 22   you do the diffraction, you may not be completely |
| 11:03:38 | 23   sure of it, but the mag and the silicon ratios look |
| 11:03:42 | 24   correct and as well as the calcium ratios for |
| 11:03:44 | 25   tremolite. |

Atlanta Reporters, Inc. 866-344-0459   www.atlanta-reporters.com

94

| | |
|---|---|
| 11:03:45 | 1   Now, there's a small iron peak there.  If |
| 11:03:47 | 2   that iron peak was increased significantly, it would |
| 11:03:50 | 3   be actinolite. |
| 11:03:52 | 4   Q.   Okay.  Are there any instances where your |
| 11:04:01 | 5   analysts get an EDS printout or spectra and say, ah, |
| 11:04:09 | 6   that's not an asbestos? |
| 11:04:12 | 7   A.   I'm sure there are, yeah, yes. |
| 11:04:14 | 8   Q.   Okay.  Give me an instance where there's |
| 11:04:16 | 9   magnesium silicon peaks.  What -- |
| 11:04:18 | 10   MS. O'DELL:  Object to the form. |
| 11:04:18 | 11   Q.   (By Mr. Chachnes)  What were they looking |
| 11:04:20 | 12   for? |
| 11:04:20 | 13   MS. O'DELL:  Object to the form. |
| 11:04:21 | 14   Incomplete hypothetical. |
| 11:04:23 | 15   THE WITNESS:  Well, they may be looking at |
| 11:04:27 | 16   certain types of clay minerals that may have a |
| 11:04:31 | 17   mag-silicon ratio.  You know, forget the calcium |
| 11:04:34 | 18   for a minute.  But they may go, well, you know, |
| 11:04:36 | 19   that's not talc.  They may do a diffraction on |
| 11:04:39 | 20   it and they get some diffuse pattern, something |
| 11:04:42 | 21   like that, and they go, you know, it's not that |
| 11:04:44 | 22   so they'll move on.  Essentially it's sort of a |
| 11:04:48 | 23   screening process. |
| 11:04:49 | 24   Q.   (By Mr. Chachnes)  Okay.  Are there |
| 11:05:00 | 25   instances where an EDXA looks more like talc than |

Atlanta Reporters, Inc. 866-344-0459   www.atlanta-reporters.com

95

| | |
|---|---|
| 11:05:10 | 1   actinolite? |
| 11:05:14 | 2   A.   Well -- it looks more like talc than |
| 11:05:19 | 3   actinolite, you're saying? |
| 11:05:20 | 4   Q.   Yeah. |
| 11:05:21 | 5   A.   I'd have to think about that.  It's |
| 11:05:23 | 6   possible.  Yeah, it's possible. |
| 11:05:25 | 7   Q.   Okay.  And what would you be looking for? |
| 11:05:27 | 8   A.   Well, depending upon how much iron was in |
| 11:05:33 | 9   there.  You know, you can have fibrous talc that |
| 11:05:35 | 10   would have, you know, some iron with it, that kind of |
| 11:05:39 | 11   thing.  So it would just depend on the -- it would |
| 11:05:41 | 12   depend on the form and look at the diffraction |
| 11:05:43 | 13   pattern. |
| 11:05:43 | 14   Q.   Is there an EDXA in isolation that you |
| 11:05:47 | 15   would say that's definitely talc, it is not |
| 11:05:50 | 16   actinolite? |
| 11:05:50 | 17   A.   Yeah, I mean, again, if the iron -- if it |
| 11:05:56 | 18   practically has no iron and you're looking at the |
| 11:05:58 | 19   form of it and it's a plate, you go, well, yeah, |
| 11:06:01 | 20   that's most likely talc; you do the diffraction on |
| 11:06:05 | 21   it, it's most likely talc. |
| 11:06:06 | 22   Q.   So you brought in form, you brought in |
| 11:06:07 | 23   diffraction -- |
| 11:06:08 | 24   A.   Right. |
| 11:06:08 | 25   Q.   -- so I'm saying let's put those aside. |

Atlanta Reporters, Inc. 866-344-0459   www.atlanta-reporters.com

96

| | |
|---|---|
| 11:06:10 | 1   Just in isolation, just looking at the EDXA, is there |
| 11:06:13 | 2   an EDXA that in isolation you can say that's |
| 11:06:15 | 3   definitely talc, it's not actinolite? |
| 11:06:17 | 4   MS. O'DELL:  Object to the form. |
| 11:06:18 | 5   THE WITNESS:  Again, if it had no iron -- |
| 11:06:24 | 6   I mean, you're looking at the thing.  It's not |
| 11:06:26 | 7   like you're not looking at it.  It's on the |
| 11:06:28 | 8   screen in front of you, so you can't divorce |
| 11:06:30 | 9   that from it.  So if I'm looking at the form of |
| 11:06:32 | 10   it, I can tell whether it's platy or whether |
| 11:06:33 | 11   it's fibrous. |
| 11:06:35 | 12   Q.   (By Mr. Chachnes)  Okay.  Is there an |
| 11:06:38 | 13   instance -- there's an EDXA in isolation that you |
| 11:06:42 | 14   know is definitely tremolite and not actinolite? |
| 11:06:45 | 15   MS. O'DELL:  Object to the form. |
| 11:06:47 | 16   THE WITNESS:  No.  No, not in isolation. |
| 11:06:49 | 17   Q.   (By Mr. Chachnes)  Okay.  Do your analysts |
| 11:07:02 | 18   record peak heights? |
| 11:07:03 | 19   A.   Do they record peak heights? |
| 11:07:06 | 20   Q.   Yes. |
| 11:07:06 | 21   A.   I don't think so. |
| 11:07:07 | 22   Q.   Okay.  Do they record peak areas? |
| 11:07:10 | 23   A.   Again, the software does that. |
| 11:07:12 | 24   Q.   The judgment that your analysts make when |
| 11:07:17 | 25   they're typing in the top of the EDXA of this |

Atlanta Reporters, Inc. 866-344-0459   www.atlanta-reporters.com

97

| | |
|---|---|
| 11:07:19 | 1 mineral -- |
| 11:07:20 | 2 A. Yes. |
| 11:07:20 | 3 Q. -- as far as the EDXA printout goes, it's |
| 11:07:22 | 4 qualitative, not quantitative? |
| 11:07:24 | 5 A. Well, yeah, it is a qualitative analysis |
| 11:07:28 | 6 as they're looking at this. |
| 11:07:29 | 7 Q. And do you understand, when I say |
| 11:07:31 | 8 qualitative, it's not based on precise numbers, it's |
| 11:07:34 | 9 based on kind of their eyeball look at it? |
| 11:07:36 | 10 MS. O'DELL: Object to the form. |
| 11:07:37 | 11 THE WITNESS: That's the way most, I would |
| 11:07:40 | 12 say, laboratories do this. |
| 11:07:41 | 13 Q. (By Mr. Chachkes) So you include a lot of |
| 11:07:48 | 14 SAED patterns for -- in your report; right? |
| 11:07:52 | 15 A. Yes. |
| 11:07:52 | 16 Q. Okay. What is SAED? |
| 11:07:53 | 17 A. Selected area electron diffraction. |
| 11:07:55 | 18 Q. Can you just at a high level tell me how |
| 11:07:58 | 19 that works? |
| 11:08:00 | 20 A. Tell you how it works? |
| 11:08:01 | 21 Q. Yeah, just -- you know, you've got -- it's |
| 11:08:03 | 22 in the TEM, what do you do? |
| 11:08:04 | 23 A. Yep. We talked about it a little bit |
| 11:08:07 | 24 before. You essentially set the microscope up to |
| 11:08:13 | 25 isolate the beam on the area of interest, and then |

Atlanta Reporters, Inc. 866-344-0459   www.atlanta-reporters.com

99

| | |
|---|---|
| 11:09:32 | 1 done in one axis, pick it up and say I am sure that's |
| 11:09:36 | 2 an amphibole? |
| 11:09:36 | 3 A. Yeah, if you measure it out, if you do the |
| 11:09:40 | 4 verification, you know, you do the measurements on |
| 11:09:42 | 5 it, it will give you the lattice parameters of an |
| 11:09:46 | 6 amphibole of some type or, you know, maybe a |
| 11:09:49 | 7 serpentine of some type if it's chrysotile. And then |
| 11:09:52 | 8 you can go, yeah, this is a -- it possibly is at this |
| 11:09:56 | 9 point. |
| 11:09:56 | 10 Q. Okay. I'm not asking if it possibly is. |
| 11:09:58 | 11 I'm saying is there a one-axis diffraction pattern |
| 11:10:01 | 12 that is uniquely -- strike that. |
| 11:10:07 | 13 A. Yeah. |
| 11:10:07 | 14 Q. If I had a one-axis diffraction pattern |
| 11:10:15 | 15 for a phyllosilicate, there's no way you're going to |
| 11:10:15 | 16 confuse that with an amphibole? |
| 11:10:17 | 17 A. Probably not. |
| 11:10:19 | 18 Q. Why not? |
| 11:10:20 | 19 A. They're stacked layers versus what is in |
| 11:10:28 | 20 an amphibole where you have essentially -- I don't |
| 11:10:34 | 21 know how to describe it. They're like railroad iron, |
| 11:10:41 | 22 what do you call it, like railroad tracks. That's |
| 11:10:44 | 23 how they're stacked up in an amphibole; whereas in a |
| 11:10:47 | 24 phyllosilicate, you've got flat planes mostly. |
| 11:10:50 | 25 Q. Okay. If I were to hand you a one-axis |

Atlanta Reporters, Inc. 866-344-0459   www.atlanta-reporters.com

98

| | |
|---|---|
| 11:08:17 | 1 it's very much like -- the sample is much like a |
| 11:08:23 | 2 prism. |
| 11:08:24 | 3 You know how you hold a prism up in the |
| 11:08:26 | 4 light and it breaks it all up into colors. All |
| 11:08:28 | 5 right. So the reason that's happening is because the |
| 11:08:30 | 6 electrons or, in this case, the wavelength of light, |
| 11:08:33 | 7 is slowed so that you get the different colors. |
| 11:08:38 | 8 In this case, the electron beam goes |
| 11:08:40 | 9 through the specimen and it strikes the lattice |
| 11:08:44 | 10 planes. These are the planes that make up the |
| 11:08:46 | 11 crystal and they reflect off and they give you all of |
| 11:08:48 | 12 these spots, patterns. And they're specific for the |
| 11:08:51 | 13 kind of material that you're looking at. |
| 11:08:52 | 14 Q. Okay. Can you identify a particle as |
| 11:08:55 | 15 asbestos with SAED alone? |
| 11:08:58 | 16 MS. O'DELL: Object to the form. |
| 11:08:59 | 17 THE WITNESS: You can get to an |
| 11:09:06 | 18 understanding of whether this is an amphibole, |
| 11:09:11 | 19 and then from there you need the other |
| 11:09:12 | 20 information to help make the conclusion. |
| 11:09:15 | 21 Q. (By Mr. Chachkes) And can you understand |
| 11:09:20 | 22 if a particle is an amphibole based on an SAED |
| 11:09:25 | 23 with -- in isolation that's only done with one axis? |
| 11:09:27 | 24 A. Yes, you can could that. |
| 11:09:29 | 25 Q. Okay. So you can see an SAED that's only |

Atlanta Reporters, Inc. 866-344-0459   www.atlanta-reporters.com

100

| | |
|---|---|
| 11:10:51 | 1 SAED right now, you could tell me whether it was an |
| 11:10:54 | 2 amphibole versus a phyllosilicate? |
| 11:10:56 | 3 A. Probably. I don't know if I could tell |
| 11:10:59 | 4 you as I sit here right now, but, you know, based on |
| 11:11:01 | 5 the knowledge of the planes, measuring the crystal |
| 11:11:08 | 6 planes, it's a good possibility you could say, yeah, |
| 11:11:10 | 7 it's probably an amphibole. |
| 11:11:11 | 8 Q. Okay. Within a reasonable degree of |
| 11:11:13 | 9 scientific certainty? |
| 11:11:13 | 10 A. Yeah, I think you could say that, but |
| 11:11:17 | 11 you'd want more data on it to be able to call the |
| 11:11:20 | 12 class. |
| 11:11:20 | 13 Q. Did you do a comprehensive review of |
| 11:11:23 | 14 crystalline material to determine whether there are |
| 11:11:28 | 15 SAED patterns in one axis that look like amphiboles? |
| 11:11:35 | 16 MS. O'DELL: Object to the form. |
| 11:11:36 | 17 THE WITNESS: Well, I think the answer to |
| 11:11:37 | 18 that is there are a number of them, and |
| 11:11:42 | 19 depending upon the plane, the axis of the plane, |
| 11:11:52 | 20 you know, you've got to do the measurements on |
| 11:11:54 | 21 those. |
| 11:11:54 | 22 So the answer to that is there are a |
| 11:11:57 | 23 number of different planes; but in any one |
| 11:12:00 | 24 sitting, again, if you get a good diffraction |
| 11:12:04 | 25 pattern, you can still measure that pattern and |

Atlanta Reporters, Inc. 866-344-0459   www.atlanta-reporters.com

101

11:12:08  1    come up with whether it is an amphibole.
11:12:10  2        Q.    (By Mr. Chachkes)  The original question
11:12:12  3    is whether you did a comprehensive review of minerals
11:12:14  4    other than amphiboles, other than serpentine, to
11:12:17  5    determine whether there are one-axis SAED diffraction
11:12:21  6    patterns that you can't without more axes determine
11:12:25  7    whether it's an amphibole or another class.  Did you
11:12:29  8    do that?
11:12:29  9            MS. O'DELL:  Object to -- excuse me.
11:12:30  10           MR. CHACHKES:  Let me finish my question.
11:12:31  11       Q.    (By Mr. Chachkes)  Did you do such a
11:12:32  12   comprehensive review?
11:12:34  13           MS. O'DELL:  Objection to form.  That
11:12:35  14   wasn't the previous question.  Object to the
11:12:37  15   form.
11:12:37  16           THE WITNESS:  Well, I didn't do a
11:12:39  17   comprehensive review.
11:12:40  18       Q.    (By Mr. Chachkes)  Okay.  Did anybody do a
11:12:41  19   comprehensive review?
11:12:42  20       A.    Well --
11:12:45  21           MS. O'DELL:  Object to the form.
11:12:46  22           THE WITNESS:  -- understand -- once again,
11:12:48  23   understand that there's a huge body of
11:12:53  24   literature and standard methodologies that are
11:12:55  25   used for identifying these classes of minerals.

103

11:13:56  1            Did anybody at -- it's a yes or no
11:13:59  2    question.
11:13:59  3            Did anybody at MAS do a comprehensive
11:14:01  4    review to determine what I've asked?
11:14:05  5            MS. O'DELL:  Object --
11:14:05  6            THE WITNESS:  You'd have to ask Bill
11:14:07  7    Longo.
11:14:07  8            MS. O'DELL:  Excuse me.
11:14:08  9            THE WITNESS:  You'd have to ask Dr. Longo.
11:14:08  10       Q.    (By Mr. Chachkes)  Okay.  Sitting here
11:14:09  11   today you don't know?
11:14:09  12           MS. O'DELL:  Object to form.
11:14:09  13           THE WITNESS:  He could give you that
11:14:22  14   answer.
11:14:22  15       Q.    (By Mr. Chachkes)  Okay.  What about
11:14:22  16   you --
11:14:22  17           THE REPORTER:  Wait, wait.  You're talking
11:14:22  18   at the same time.
11:14:22  19           THE WITNESS:  Dr. Longo.  Sorry.
11:14:22  20   Dr. Longo.
11:14:22  21       Q.    (By Mr. Chachkes)  Okay.  But you can't
11:14:22  22   give me the answer?  I have to ask Dr. Longo?
11:14:26  23       A.    I don't know.  That's my answer.  Ask
11:14:29  24   Dr. Longo.
11:14:29  25       Q.    Is there a -- so there are SAED axes;

102

11:13:00  1    It's well known.
11:13:01  2            You don't have to have -- I mean, you have
11:13:04  3    to have an awareness of that there that there
11:13:07  4    could be others, but focused in on these types
11:13:10  5    of minerals, you know, there's plenty of data to
11:13:15  6    be able to make a decision based on looking at
11:13:18  7    one plane.
11:13:20  8            For instance, chrysotile is a good
11:13:22  9    example.  You can look at the diffraction
11:13:24  10   pattern and see that it's streaked and right
11:13:27  11   away know that I possibly have this kind of, you
11:13:32  12   know, asbestiform mineral, let me look at the
11:13:36  13   morphology, oh, it's rolled up like a scroll.
11:13:39  14   That's chrysotile.  Oh, when I do the EDS, I've
11:13:42  15   got practically a 1-to-1 mag-silicon ratio.
11:13:47  16   Wow.  You know, 99 percent sure that this is
11:13:49  17   chrysotile.
11:13:49  18       Q.    (By Mr. Chachkes)  The original question
11:13:51  19   was did anybody at MAS --
11:13:52  20       A.    I answered that.
11:13:53  21       Q.    Okay.  Let me ask --
11:13:54  22       A.    Not to cut you off --
          23       Q.    You just did cut me off.
11:13:54  24       A.    -- but I already answered that.
11:13:55  25       Q.    Okay.  Let me ask again.

104

          1    correct?
11:14:38  2        A.    Yes.
11:14:38  3        Q.    And you can take an SAED image or pattern
11:14:44  4    on an axis or off an axis; right?
11:14:47  5        A.    Uh-huh, yes.
11:14:47  6        Q.    All right.  Is there an off-axis single
11:14:53  7    SAED diffraction pattern that is signature-only
11:14:57  8    amphiboles?
11:14:57  9        A.    I would have to review that, but typically
11:15:07  10   the answer is if you get -- if you verify the
11:15:15  11   spacing, the atomic spacings, at the variance for
11:15:19  12   each one of the minerals, one of the -- you know,
11:15:23  13   asbestiform minerals -- you know, they're in a group,
11:15:26  14   there's a range for actually that spacing too, so --
11:15:30  15   but if you come within that spacing, then you most
11:15:32  16   likely have an amphibole.
11:15:33  17       Q.    I wasn't asking you about most likely.
11:15:35  18   I'm asking about conclusive, 100 percent, you know
11:15:38  19   that's an amphibole.
11:15:39  20           MS. O'DELL:  Object to the form.
11:15:40  21           THE WITNESS:  I just told you.
11:15:41  22       Q.    (By Mr. Chachkes)  Okay.  You used the
11:15:44  23   word most likely.  Let me ask you a different way.
11:15:47  24       A.    What -- I try to answer -- you keep
11:15:49  25   breaking these technologies up that we're using to

105

```
11:15:54  1   verify this, which includes morphology, the shape and
11:15:57  2   form, which includes the chemistry, the EDS, and the
11:16:01  3   SAED required in the standard methods, all right.
11:16:04  4   These are the things.  Each one of them by
11:16:08  5   themselves, no.
11:16:09  6        Q.   Okay.  I'm only asking questions.  I'm not
11:16:12  7   telling you what your report is consisting of.  I'm
11:16:14  8   not telling you anything.  I'm just asking questions.
11:16:16  9   So if you could just focus on the question --
11:16:19 10        A.   I'm trying to focus on it, but you keep
11:16:21 11   bringing up things that don't go together.  All
11:16:24 12   right.  They don't go together for the analysis.
11:16:25 13        Q.   Okay.  If I were to tell you that a career
11:16:36 14   academic mineralogist looked at one of your single
11:16:40 15   axis identifications of an asbestos and said that
11:16:47 16   SAED diffraction pattern can correspond to many
11:16:52 17   different minerals, would you have reason to dispute
11:16:55 18   that?
11:16:55 19        A.   No.
11:16:56 20        MS. O'DELL:  Object to the form.
11:16:57 21        Q.   (By Mr. Chachkes)  Okay.  If I brought in
11:16:58 22   that same mineralogist who said this single axis
11:17:02 23   diffraction pattern that you have can correspond to
11:17:07 24   some nonamphibole minerals, do you have -- sitting
11:17:11 25   here today do you have a reason to dispute that?
```

106

```
11:17:13  1        A.   Yes.
11:17:14  2        Q.   Okay.  What is that reason?
11:17:14  3        A.   Well, I would have to see what the -- what
11:17:18  4   they were disputing.  I'd have to see the data first.
11:17:20  5   And then I would like to know the qualifications of
11:17:23  6   this expert and I would like to see what their
11:17:25  7   quality control is in order to be able to say this
11:17:29  8   person -- especially in academia, because academia
11:17:32  9   most of the time doesn't have any kind of quality
11:17:34 10   control.
11:17:34 11        So I look a little bit less on their --
11:17:40 12   you know, they may have been a professor in this for
11:17:42 13   who knows how long.  How long have they worked in the
11:17:45 14   laboratory?  What's their quality control?  What have
11:17:48 15   they done?  This is what I want to know.
11:17:50 16        Q.   Do you --
11:17:51 17        A.   The analysts that we have -- so let me
11:17:53 18   answer the question.
11:17:54 19        The analysts we have essentially go
11:17:57 20   through a process where they are tested by NIST
11:18:02 21   NVLAP.  Think are tested on a quarterly basis on
11:18:05 22   unknowns that NIST sends to us that we have to
11:18:08 23   identify, okay.
11:18:10 24        So what academic professor does that?
11:18:13 25   None that I know of.
```

107

```
11:18:11  1        Q.   Okay.
11:18:14  2        So you can bring up all the academic
11:18:17  3   professors, and I will dispute, you know, a lot of
11:18:19  4   what they do.
11:18:20  5        Q.   Okay.  If a supremely complicated --
11:18:27  6   strike that.
11:18:27  7        If a supremely qualified mineralogist and
11:18:31  8   SAED expert were to tell you that one of your single
11:18:34  9   axis diffraction patterns that you identified as
11:18:37 10   asbestos can correspond to a nonamphibole -- on a
11:18:43 11   theoretical basis based on the structure of the
11:18:45 12   nonamphibole, sitting here today, do you have a
11:18:46 13   reason to dispute that?
11:18:47 14        MS. O'DELL:  Object to the form.
11:18:49 15        THE WITNESS:  Yes.
11:18:49 16        Q.   (By Mr. Chachkes)  Okay.  What is that?
11:18:50 17        A.   I just told you.  I'm not going to go
11:18:51 18   through the answer all over again.
11:18:54 19        Q.   Okay.  That was all practical.  I'm now
11:18:56 20   talking about theoretical.
11:18:56 21        A.   Same for that one, too.  Same answer.
11:18:57 22        Q.   SAED patterns correspond to the lattice of
11:19:02 23   a mineral; correct?
11:19:02 24        A.   Correct.
11:19:03 25        Q.   Is there a nonamphibole that has a lattice
```

108

```
11:19:09  1   that could possibly give you a single axis
11:19:13  2   diffraction pattern that looks like an amphibole?
11:19:17  3        A.   I don't know the answer to that because
11:19:20  4   most of them are -- they have diffraction data for
11:19:24  5   all these minerals, and there will be slight
11:19:27  6   differences between them.  So, you know, I would have
11:19:29  7   to look at the data.
11:19:29  8        Q.   Okay.  Can you identify -- okay, I think I
11:19:33  9   already asked -- did I already ask you if you can
11:19:35 10   identify a particle with SAED alone?
11:19:35 11        A.   Yeah.
11:19:36 12        Q.   Okay.  I'm not going to --
11:19:37 13        A.   Yep.
11:19:38 14        Q.   -- again.
11:19:39 15        Did I ask whether you can distinguish
11:19:41 16   anthophyllite from talc?
11:19:42 17        A.   Yes.
11:19:43 18        Q.   -- SAED alone?
11:19:43 19        A.   Yes.
11:19:44 20        Q.   Okay.  Sorry if I'm --
11:19:46 21        A.   That's okay.
11:19:46 22        Q.   Oh, I know where I am.
11:19:48 23        Can you distinguish anthophyllite from
11:19:50 24   cummingtonite with SAED alone?
11:19:53 25        A.   Let's see.  The answer to that is
```

109

111

| | |
|---|---|
| 11:20:00 1 | possibly. |
| 11:20:02 2 | Q. When you say possibly, can you be |
| 11:20:04 3 | specific? |
| 11:20:04 4 | A. Again, you'd have to do -- you'd have to |
| 11:20:08 5 | do zone axis in a couple of different zones to tell, |
| 11:20:11 6 | and then you probably can say it's most likely. But |
| 11:20:14 7 | again, you'd want to do -- you'd want to do the EDS |
| 11:20:17 8 | and you'd, of course, look at the form of it, too. |
| 11:20:19 9 | Q. So how many zone axes would you need if |
| 11:20:22 10 | you only had SAED to rely on to determine whether you |
| 11:20:25 11 | were looking at anthophyllite or cummingtonite? |
| 11:20:28 12 | MS. O'DELL: Object to the form. |
| 11:20:29 13 | THE WITNESS: You could do -- you could |
| 11:20:31 14 | use one. It depends on the pattern that you |
| 11:20:34 15 | see. If it was more of an orthorhombic pattern, |
| 11:20:39 16 | you know, most likely anthophyllite; if it was |
| 11:20:44 17 | more a monoclinic pattern, most likely |
| 11:20:45 18 | cummingtonite. |
| 11:20:45 19 | Q. (By Mr. Chachkes) Okay. Let me just show |
| 11:20:50 20 | you what was marked yesterday as Exhibit 15. |
| 11:20:55 21 | Do you have 15? No. Here it is, I'm |
| 11:20:58 22 | sorry. Okay. |
| 11:21:01 23 | I'll represent to you what was -- what's |
| 11:21:05 24 | in Exhibit 15 is pulled from a textbook. Do you |
| 11:21:08 25 | recognize that as an SAED pattern in three axes? |

Atlanta Reporters, Inc. 866-344-0459   www.atlanta-reporters.com

| | |
|---|---|
| 11:21:55 1 | measured that, when you measure out for each one of |
| 11:21:57 2 | the sets or wherever it would be, there are |
| 11:21:59 3 | parameters -- lattice parameters in each one of those |
| 11:22:03 4 | zones, and that would still be tremolite. |
| 11:22:04 5 | Q. Okay. If -- |
| 11:22:06 6 | A. It would still be tremolite. |
| 11:22:07 7 | Q. Okay. |
| 11:22:08 8 | A. Okay. |
| 11:22:08 9 | Q. Are you done? |
| 11:22:09 10 | A. Yeah. |
| 11:22:09 11 | Q. Okay. If you had an SAED pattern for a |
| 11:22:11 12 | mineral in three separate axes and each one was |
| 11:22:14 13 | exactly the same, could it possibly be tremolite? |
| 11:22:17 14 | MS. O'DELL: Object to the form. |
| 11:22:18 15 | THE WITNESS: I don't know. |
| 11:22:18 16 | Q. (By Mr. Chachkes) Wouldn't that mean it |
| 11:22:20 17 | was a symmetric lattice and that tremolite doesn't |
| 11:22:24 18 | have a symmetric lattice? |
| 11:22:27 19 | A. Again, I don't know how to answer that |
| 11:22:28 20 | question. |
| 11:22:29 21 | Q. Are you aware of what the lattice of |
| 11:22:30 22 | tremolite looks like? |
| 11:22:31 23 | A. Yes. I am. It is monoclinic. |
| 11:22:35 24 | Q. Okay. Is it perfectly symmetrical in the |
| 11:22:38 25 | X, Y, and Z axes? |

Atlanta Reporters, Inc. 866-344-0459   www.atlanta-reporters.com

110

112

| | |
|---|---|
| 11:21:10 1 | A. Yes. |
| 11:21:11 2 | Q. And is there any reason to believe this is |
| 11:21:12 3 | an incorrect three-axes SAED pattern for tremolite? |
| 11:21:16 4 | MS. O'DELL: Object to form. |
| 11:21:17 5 | THE WITNESS: I have no idea on that. |
| 11:21:18 6 | What was this published in; do you know? |
| 11:21:20 7 | Q. (By Mr. Chachkes) It's not coming to my |
| 11:21:21 8 | mind right now but -- |
| 11:21:22 9 | A. I need to know that. |
| 10 | Q. Okay. |
| 11:21:23 11 | A. Yep. I can't make any decisions on that |
| 11:21:26 12 | unless I know the surrounding stuff here. |
| 11:21:27 13 | Q. That's fine. |
| 11:21:27 14 | A. Yeah. |
| 11:21:28 15 | Q. Sitting here today, any reason to believe |
| 11:21:30 16 | this is incorrect? |
| 11:21:31 17 | MS. O'DELL: Object to the form. |
| 11:21:33 18 | THE WITNESS: Again -- |
| 11:21:34 19 | MS. O'DELL: He's answered your question. |
| 11:21:36 20 | THE WITNESS: Yep. It's hard to tell |
| 11:21:38 21 | without, you know, knowing where this is from. |
| 11:21:42 22 | Q. (By Mr. Chachkes) Okay. Is it your |
| 11:21:44 23 | understanding that tremolite can have different SAED |
| 11:21:48 24 | patterns in the three different axes? |
| 11:21:52 25 | A. Again, it could. But once again, when you |

Atlanta Reporters, Inc. 866-344-0459   www.atlanta-reporters.com

| | |
|---|---|
| 11:22:40 1 | A. I don't know. I'd have to look at it. |
| 11:22:42 2 | Q. Okay. We can take a break now, if you |
| 11:22:51 3 | like. |
| 11:22:51 4 | A. Do you need a break? |
| 11:22:52 5 | Q. Yeah. |
| 11:22:54 6 | A. Sure. |
| 11:22:54 7 | (Recess from 11:22 a.m. to 11:42 a.m.) |
| 11:42:33 8 | Q. (By Mr. Chachkes) Would you agree with |
| 11:42:52 9 | the statement that the more complete the SAED pattern |
| 11:42:56 10 | an analyst obtains, the more likely the analyst is to |
| 11:43:00 11 | make an accurate determination of the crystal |
| 11:43:02 12 | structure? |
| 11:43:03 13 | A. I don't know what you mean by complete. |
| 11:43:05 14 | Aside from the definition of the SAED pattern, |
| 11:43:16 15 | sometimes they can be faint; they can be light. So |
| 11:43:21 16 | the more defined the pattern is, I would say that |
| 11:43:24 17 | helps. |
| 11:43:24 18 | Q. Okay. When you say defined, you mean the |
| 11:43:26 19 | kind of the -- when you say faint and light, that's |
| 11:43:31 20 | just a matter of how dark the dot is? |
| 11:43:32 21 | A. Yeah, well, the diffraction pattern |
| 11:43:34 22 | sometimes can be very -- it can be very faint, so, |
| 11:43:38 23 | you know, it just depends. So the more defined the |
| 11:43:43 24 | pattern is, the better. |
| 11:43:43 25 | Q. What about the more focused the pattern, |

Atlanta Reporters, Inc. 866-344-0459   www.atlanta-reporters.com

113

| | |
|---|---|
| 11:43:46 1 | the better? |
| 11:43:47 2 | A. Again, the pattern is usually going to be |
| 11:43:52 3 | focused properly -- when the microscope is set up |
| 11:43:55 4 | properly, you're going to get a good defined pattern. |
| 11:43:58 5 | So it's mainly the ability to see all the spots there |
| 11:44:04 6 | associated with that particular zone. |
| 11:44:06 7 | Q. If you get a SAED pattern where the dots |
| 11:44:09 8 | are unfocused, can that hamper the ability to |
| 11:44:14 9 | identify the crystal? |
| 11:44:15 10 | MS. O'DELL: Object to the form. |
| 11:44:16 11 | THE WITNESS: The answer to that is no. |
| 11:44:18 12 | Sometimes we see patterns that are smeared or |
| 11:44:21 13 | diffuse. Again, chrysotile is a good example of |
| 11:44:23 14 | that. |
| 11:44:24 15 | But if you see a very diffuse pattern, |
| 11:44:28 16 | then you may have what's more like an amorphous, |
| 11:44:31 17 | not a very crystalline material, and you'll see |
| 11:44:34 18 | that in rings. |
| 11:44:35 19 | Q. (By Mr. Chachkes) Are there instances |
| 11:44:36 20 | where you are unable to obtain a clear SAED pattern |
| 11:44:40 21 | so your data in that scenario is inconclusive? |
| 11:44:42 22 | MS. O'DELL: Object to the form. |
| 11:44:45 23 | THE WITNESS: You will work to get the |
| 11:44:51 24 | best pattern that you can out of the structure |
| 11:44:52 25 | that you have, so the answer to that is you |

114

| | |
|---|---|
| 11:44:54 1 | won't use a pattern that's not acceptable. |
| 11:44:57 2 | Q. (By Mr. Chachkes) Right. The question |
| 11:44:58 3 | isn't about -- so the question is -- let me ask a |
| 11:45:01 4 | different question. |
| 11:45:01 5 | A. Okay. |
| 11:45:02 6 | Q. In doing the MDL samples, did you ever run |
| 11:45:04 7 | across a case where you were unable to obtain a clear |
| 11:45:09 8 | SAED pattern and so the SAED was inconclusive? |
| 11:45:12 9 | MS. O'DELL: Object to the form. |
| 11:45:13 10 | THE WITNESS: I don't know of any, no. |
| 11:45:14 11 | Q. (By Mr. Chachkes) Analysts can use the |
| 11:45:18 12 | information obtained from SAED to make distinctions |
| 11:45:22 13 | in the crystal system of the lattice, for example, |
| 11:45:27 14 | whether it's triclinic, monoclinic, cubic, or |
| 11:45:30 15 | orthorhombic? |
| 11:45:33 16 | A. Yes. |
| 11:45:33 17 | Q. Okay. Sorry. |
| 11:45:37 18 | I paused. |
| 11:45:38 19 | Q. Yes. |
| 11:45:50 20 | Describe how you or your analysts |
| 11:45:53 21 | calibrate the SAED apparatus. |
| 11:45:56 22 | A. The electron diffraction? Again, I'm not |
| 11:45:59 23 | an expert in that particular area, but what they |
| 11:46:02 24 | typically do is they'll do a sizing based on gold, a |
| 11:46:08 25 | film of gold, and from that they will make |

115

| | |
|---|---|
| 11:46:12 1 | calculations on what the gold lattice parameters are, |
| 11:46:17 2 | and then they will compare that to the unknown using |
| 11:46:21 3 | that particular configuration. |
| 11:46:23 4 | Q. Okay. Sometimes you say diffraction |
| 11:46:27 5 | pattern, and just to be clear -- |
| 11:46:29 6 | A. Sure. |
| 11:46:29 7 | Q. -- diffraction pattern, you're being |
| 11:46:32 8 | synonymous with SAED? |
| 11:46:34 9 | A. Yes. |
| 11:46:34 10 | Q. And how do your analysts determine when |
| 11:46:38 11 | it's appropriate to take multiple axes for a single |
| 11:46:42 12 | sample under SAED? |
| 11:46:43 13 | A. That's a good question. Typically we'll |
| 11:46:46 14 | do that for anthophyllite to verify that it is |
| 11:46:50 15 | anthophyllite. We'll take multiples on that. |
| 11:46:52 16 | It's not required in the standard method |
| 11:46:55 17 | to do that because typically you can do it in one |
| 11:46:58 18 | zone for the amphiboles. But to show that it's not |
| 11:47:04 19 | fibrous talc versus anthophyllite, you're essentially |
| 11:47:08 20 | going to take another one to verify it. |
| 11:47:10 21 | Q. Okay. For tremolite, you take one axis? |
| 11:47:12 22 | A. Yes, you can. |
| 11:47:13 23 | Q. Okay. Not what -- I'm not asking about |
| 11:47:15 24 | what you can do. So let me put it -- |
| 11:47:17 25 | A. Yes. |

116

| | |
|---|---|
| 1 | Q. Okay. |
| 11:47:18 2 | A. The answer's yes. |
| 11:47:19 3 | Q. Okay. There are no SAED patterns that you |
| 11:47:23 4 | created for the MDL samples that weren't produced; |
| 5 | correct? |
| 11:47:25 6 | A. Correct. |
| 11:47:26 7 | Q. And I'm seeing one SAED pattern for the |
| 11:47:29 8 | tremolite, meaning can I conclude that you've only |
| 11:47:32 9 | taken one SAED pattern for the tremolites? |
| 11:47:34 10 | A. I would say yes to that. |
| 11:47:35 11 | Q. Okay. And I'm seeing two SAED patterns |
| 11:47:39 12 | for anthophyllite. Is it okay for me to conclude |
| 11:47:41 13 | that you take only two patterns for anthophyllite? |
| 11:47:45 14 | A. Most likely yes, because again, we want to |
| 11:47:48 15 | be able to distinguish that from fibrous talc. |
| 11:47:52 16 | Q. Let's look at another exhibit. What |
| 11:48:00 17 | number is that? Is that like 16? Let's look at 16. |
| 11:48:08 18 | A. Okay. |
| 11:48:08 19 | Q. Do you recognize what's been marked as |
| 11:48:10 20 | Longo Exhibit 16? |
| 11:48:13 21 | A. Yes. |
| 11:48:13 22 | Q. What's a diffraction verification? |
| 11:48:17 23 | A. These are diffractions that have been done |
| 11:48:21 24 | on a sample that's already been analyzed, and what |
| 11:48:24 25 | the analyst does is they go back in and they verify |

117

| | |
|---|---|
| 11:48:27 1 | the diffraction pattern. They verify that it is, in |
| 11:48:31 2 | fact, whatever it was called before. |
| 11:48:33 3 | Q. Yeah, I see that -- do you see the date |
| 11:48:37 4 | verified down there in the lower left? |
| 11:48:39 5 | A. Which one are we looking at? Page 1? |
| 11:48:40 6 | Q. Let's look at the first page of that -- |
| 7 | A. Okay. |
| 11:48:42 8 | Q. -- that you actually see a verification. |
| 11:48:44 9 | Most if not all of the verifications are after the |
| 11:48:47 10 | date of your first report; is that correct? |
| 11:48:51 11 | MS. O'DELL: At least on this page? |
| 12 | THE WITNESS: Yeah. |
| 11:48:53 13 | MR. CHACHKES: Well, it's a question. |
| 11:48:54 14 | THE WITNESS: I would think -- what's the |
| 11:48:55 15 | question again? |
| 11:48:56 16 | Q. (By Mr. Chachkes) The question were |
| 11:48:56 17 | most if not all of your verifications for the MDL |
| 11:48:59 18 | samples done after the date of your first report, |
| 11:49:02 19 | which was October 14? |
| 11:49:03 20 | A. I don't know. I'd have to look at these |
| 11:49:05 21 | and compare that to that date. |
| 11:49:06 22 | Q. Okay. This verification, for example, was |
| 11:49:13 23 | done after the date of your first report; correct? |
| 11:49:16 24 | A. Yes. |
| 11:49:16 25 | Q. Okay. And you're -- |

118

| | |
|---|---|
| 11:49:18 1 | A. Are you talking about the November report? |
| 11:49:19 2 | Q. November 14 -- |
| 11:49:20 3 | A. Yes. |
| 11:49:20 4 | Q. -- I'm saying that's the first report. |
| 11:49:21 5 | A. Sure. |
| 11:49:22 6 | Q. So at the very least, you had already |
| 11:49:25 7 | determined by October 14 that this sample on the |
| 11:49:29 8 | first page corresponded to anthophyllite before you |
| 11:49:37 9 | had done the verification; correct? |
| 11:49:44 10 | A. Well, the answer to that is yes, we |
| 11:49:46 11 | already had determined it was anthophyllite. |
| 11:49:47 12 | Q. Okay. And so the verification's, what, |
| 11:49:49 13 | kind of a belt and suspenders? |
| 11:49:51 14 | A. Sure. |
| 11:49:51 15 | MS. O'DELL: Object to the form. |
| 11:49:52 16 | THE WITNESS: Well, I mean, it's a |
| 11:49:54 17 | follow-up. |
| 11:49:54 18 | Q. (By Mr. Chachkes) Okay. And I see that |
| 11:49:58 19 | there's a range in the table of amphibole types up |
| 11:50:02 20 | there at the top; do you see that? |
| 11:50:04 21 | A. Yes. |
| 11:50:04 22 | Q. What does the range column mean? |
| 11:50:07 23 | A. That is the actual atomic spacing for that |
| 11:50:11 24 | lattice parameter. And, for instance, if you take |
| 11:50:15 25 | grunerite at the beginning there, you'll see it's |

119

| | |
|---|---|
| 11:50:18 1 | 4.94 to 5.46. So within that range, if your spacing |
| 11:50:23 2 | falls within that range, it could be grunerite. |
| 11:50:28 3 | Q. Now, for this verification page, you |
| 11:50:34 4 | calculated a d-spacing of 5.23; correct? |
| 11:50:38 5 | A. Correct. |
| 11:50:38 6 | Q. And that falls within the range of every |
| 11:50:40 7 | single amphibole on that list; right? |
| 11:50:43 8 | A. Correct. |
| 11:50:43 9 | Q. How was it that this verifies that this is |
| 11:50:46 10 | anthophyllite when it falls within the range of every |
| 11:50:48 11 | amphibole in your list? |
| 11:50:49 12 | A. Well, again, this is not -- this is an |
| 11:50:52 13 | incomplete. We have to look at the EDS, and we also |
| 11:50:56 14 | have to look at the form again. So with that |
| 11:50:59 15 | standard methodology, then we can come to a |
| 11:51:02 16 | conclusion that it is anthophyllite. |
| 11:51:03 17 | So it's not done in a vacuum, if you will. |
| 11:51:05 18 | The only thing that's done in a vacuum is putting the |
| 11:51:08 19 | sample into the electron microscope. |
| 11:51:10 20 | But that is true, and you will see that |
| 11:51:13 21 | for these lattice parameters. |
| 11:51:18 22 | Q. For this sample that we're looking |
| 11:51:21 23 | at, the d-spacing indeed corresponds to grunerite, |
| 11:51:24 24 | actinolite, tremolite, crocidolite, and |
| 11:51:27 25 | anthophyllite; correct? |

120

| | |
|---|---|
| 11:51:27 1 | MS. O'DELL: Object to the form. |
| 11:51:28 2 | THE WITNESS: Well, I mean, it's within |
| 11:51:29 3 | the range there. Again, this is why you can't |
| 11:51:32 4 | just use the one method to say, oh, I'm going to |
| 11:51:35 5 | use SAED and say that it is anthophyllite. |
| 11:51:38 6 | You've got to go look at the form of it; |
| 11:51:40 7 | you've got to go do the EDS to prove that it is. |
| 11:51:44 8 | So yeah. |
| 11:51:47 9 | Q. (By Mr. Chachkes) Yeah, you would not use |
| 11:51:48 10 | EDS d-spacing alone to determine the mineral you're |
| 11:51:53 11 | looking at because it falls under too many different |
| 11:51:55 12 | minerals; correct? |
| 11:51:55 13 | MS. O'DELL: Object to the form. |
| 11:51:56 14 | THE WITNESS: It tells you that it is an |
| 11:51:58 15 | amphibole, that it is in that range. And again, |
| 11:52:00 16 | we do -- let's see. There should be another one |
| 11:52:03 17 | here of the same one. Let's see. |
| 11:52:10 18 | Number 301 01. If you go to the next |
| 11:52:12 19 | page, you'll see this is the same structure |
| 11:52:14 20 | again, same structure again, the second |
| 11:52:17 21 | verification. Down here you'll see the zone, it |
| 11:52:20 22 | was a 101, and the d-spacing for that zone are |
| 11:52:25 23 | shown there for each one of the angles -- you |
| 11:52:27 24 | know, each one of the lattice parameters, and |
| 11:52:30 25 | this verifies it as anthophyllite if you were |

121

11:52:34  1    looking at the table, the spacing table. So
11:52:37  2    then we look at the EDS, the EDS confirms again
11:52:40  3    the chemistry. So, you know, it's dead to right
11:52:45  4    anthophyllite.
11:52:46  5        Q.    (By Mr. Chachkes) So you're just looking
11:52:47  6    at -- so I see the spacing here is 21.2?
11:52:50  7        A.    Right. Now that's in -- this zone is 101
11:52:54  8    zone.
11:52:55  9        Q.    Okay.
11:52:56  10       Q.    Okay. That is what it would be in the 101
11:52:58  11   zone.
11:52:58  12       Q.    And you don't have ranges for the 101
11:53:01  13   zone, do you?
11:53:02  14       A.    Well, there are tables for the ranges in
11:53:03  15   the 101 zone. We don't have one right here --
11:53:        16       Q.    Okay.
11:53:07  17       A.    -- but there are table ranges for that.
11:53:09  18       Q.    When you say -- so for this table on the
11:53:12  19   second page of -- the second verification, are you
11:53:16  20   looking at the 5.05 down at the bottom?
11:53:19  21       A.    Yes.
11:53:19  22       Q.    Okay. That 5.05 falls within every single
11:53:23  23   amphibole type in your table as well?
11:53:26  24       A.    No, no. It's a combination of the HKO,
11:53:29  25   the HKL, the zone that you're in what the angle is.

Atlanta Reporters, Inc. 866-344-0459  www.atlanta-reporters.com

122

11:53:32  1    There are tables for these. You know what I'm
11:53:35  2    saying? We had talked about that a little bit
11:53:37  3    before. There are tables for these. And in each one
11:53:41  4    of the zones there are spacings, spacing tables, and
11:53:45  5    these fit in the anthophyllite zone.
11:53:48  6        Q.    When you say these, do you mean the 101
11:53:51  7    spacing of 21.2?
11:53:52  8        A.    Well, yes.
11:53:53  9        Q.    Okay. And that table's not reproduced in
11:53:55  10   this page; correct?
11:53:56  11       A.    No, it's not here.
11:53:57  12       Q.    So in the peer-reviewed literature I would
11:53:59  13   find that a 101 zone spacing of 21.2 will correspond
11:54:09  14   uniquely to anthophyllite?
11:54:09  15       A.    The answer to that is yes.
11:54:11  16       Q.    Okay. Can you tell me what peer-reviewed
11:54:13  17   literature?
11:54:13  18       A.    Let's see. There's a large body of card
11:54:19  19   data, diffraction card data, and again, there are
11:54:20  20   zone tables in that data, and that's where it comes
11:54:25  21   from. That's why we do the -- that's why we do the
11:54:29  22   double verification on anthophyllite, you know,
11:54:30  23   because it doesn't fit with talc.
11:54:33  24       Q.    Can you tell me conclusively whether there
11:54:38  25   are other minerals that in the zone 101 have spacing

Atlanta Reporters, Inc. 866-344-0459  www.atlanta-reporters.com

123

11:54:47  1    of 21.2 in that range?
11:54:49  2        A.    I can't tell you that as I sit here.
11:54:51  3        Q.    Okay. Does the verification -- have you
11:55:04  4    ever done a verification and the spacing fell outside
11:55:07  5    the range of what you had already identified?
11:55:09  6        A.    I don't know the answer to that.
11:55:10  7        Q.    Did that happen for the MDL at all? You
11:55:13  8    just don't know?
11:55:14  9        A.    I don't know.
11:55:15  10       MS. O'DELL: Object to the form.
11:55:15  11       THE WITNESS: Yeah, I don't know.
11:55:16  12       Q.    (By Mr. Chachkes) If it happened, you
11:55:18  13   would have reported it; right?
11:55:19  14       A.    Well, yes. I would think so, yes.
11:55:21  15       Q.    Did you do any of these d-spacing
11:55:30  16   verifications prior to the first draft, the
11:55:33  17   November 14 version of your report?
11:55:35  18       A.    I --
11:55:36  19       MS. O'DELL: Feel free to look through it
11:55:37  20   if you need to. Look at the dates.
11:55:39  21       THE WITNESS: Let's see what we've got
11:55:40  22   here. Yeah, it looks like a few. Some of them
11:55:47  23   were here. Get towards the back. They were
11:55:49  24   done in October.
11:55:52  25       It looks like about half of them; half of

Atlanta Reporters, Inc. 866-344-0459  www.atlanta-reporters.com

124

11:55:54  1    them were done before that first report.
11:55:56  2        Q.    (By Mr. Chachkes) Can I conclude because
11:56:00  3    some were done after and some were done before the
11:56:02  4    first report, it wasn't material to your findings in
11:56:05  5    the first report?
11:56:07  6        MS. O'DELL: Object to the form.
11:56:10  7        THE WITNESS: Are you saying the ones that
11:56:12  8    are after that are not material? What's the
11:56:14  9    question?
11:56:15  10       Q.    (By Mr. Chachkes) No.
11:56:15  11       So clearly before -- at the time of your
11:56:18  12   first report there were MDL samples on which you had
11:56:23  13   not done a d-spacing verification; correct?
11:56:25  14       A.    No, we did the verification. I mean, we
11:56:28  15   did -- I mean, you have to understand it was called
11:56:31  16   at the time based on the data that we had for that
11:56:38  17   pattern, that chemistry, that morphology.
11:56:40  18       So again, I would say that they all have
11:56:46  19   been verified prior to that.
11:56:47  20       Q.    Okay. So I want to make sure we're clear
11:56:50  21   here.
11:56:50  22       A.    Sure.
11:56:51  23       Q.    So going back to the first verification, I
11:56:54  24   see -- it says date verified November 19; correct?
11:56:57  25       A.    Yes.

Atlanta Reporters, Inc. 866-344-0459  www.atlanta-reporters.com

125

| | |
|---|---|
| 11:56:57 1 | Q. You're saying there was another |
| 11:56:59 2 | verification prior to November 14? |
| 11:57:01 3 | A. Sure. |
| 4 | Q. And you did -- |
| 11:57:01 5 | A. The actual analysis, when it was actually |
| 11:57:03 6 | done. |
| 11:57:03 7 | MR. CHACHKES: Okay. So we would actually |
| 11:57:06 8 | request that that other data be produced. |
| 11:57:08 9 | MS. O'DELL: It's been produced. |
| 11:57:09 10 | THE WITNESS: You already have it. It's |
| 11:57:10 11 | all in the reports. |
| 11:57:11 12 | Q. (By Mr. Chachkes) Okay. |
| 11:57:12 13 | A. Yeah. |
| 11:57:12 14 | Q. So was there a -- why did you redo it on |
| 11:57:16 15 | 11/19? |
| 11:57:17 16 | A. It's just part of our quality control. We |
| 11:57:20 17 | eventually have to do it as part of quality. |
| 11:57:22 18 | Q. So every single d-spacing that you did, |
| 11:57:25 19 | you did twice? |
| 11:57:26 20 | A. If it was anthophyllite, yeah. |
| 11:57:28 21 | Q. Okay. So the tremolites were all done -- |
| 11:57:34 22 | so let me just -- I'm looking at a page for tremolite |
| 11:57:37 23 | where the verification is 11/19. |
| 11:57:41 24 | A. Okay. I mean, we've got anthophyllites |
| 11:57:45 25 | that were double-verified before that report also |

Atlanta Reporters, Inc. 866-344-0459  www.atlanta-reporters.com

126

| | |
|---|---|
| 11:57:48 1 | that was on 10/31/2018. |
| 11:57:51 2 | Q. Right. |
| 11:57:51 3 | A. There are a number of them here in the |
| 11:57:53 4 | report. |
| 11:57:53 5 | Q. So -- |
| 11:57:54 6 | A. Numerous. |
| 11:57:55 7 | Q. You're saying some of the tremolites were |
| 11:57:57 8 | double-verified? |
| 11:57:58 9 | MS. O'DELL: Object to the form. |
| 11:57:59 10 | THE WITNESS: No, I don't think the |
| 11:58:00 11 | tremolites were. The anthophyllites are. |
| 11:58:03 12 | Q. (By Mr. Chachkes) Okay. |
| 13 | A. Yes. |
| 11:58:03 14 | Q. I can show you. I just don't have the |
| 11:58:04 15 | page numbers. |
| 11:58:05 16 | A. Okay. |
| 11:58:05 17 | A. If you look at that one -- |
| 18 | A. All right. |
| 11:58:07 19 | Q. -- in the exhibit -- |
| 11:58:09 20 | MS. O'DELL: So let's be clear on the |
| 11:58:10 21 | record. Is there a sample number -- |
| 22 | Q. (By Mr. Chachkes) You say the sample |
| 11:58:12 23 | number. What's the sample number for that one? |
| 11:58:13 24 | A. M68503-020-002. |
| 11:58:20 25 | Q. And that was the tremolite; correct? |

Atlanta Reporters, Inc. 866-344-0459  www.atlanta-reporters.com

127

| | |
|---|---|
| 11:58:22 1 | A. That was a tremolite, yes. |
| 11:58:23 2 | Q. And it was verified after the date of the |
| 11:58:25 3 | first report; correct? |
| 11:58:26 4 | A. 11/19/2018. What is the date of the first |
| 11:58:31 5 | report? |
| 11:58:33 6 | MS. O'DELL: 11/14. |
| 11:58:33 7 | Q. (By Mr. Chachkes) 11/14. |
| 11:58:34 8 | A. 14. Okay. Yeah. |
| 11:58:34 9 | Q. So that was verified after the date of the |
| 11:58:37 10 | first report; correct? |
| 11:58:38 11 | A. Uh-huh. |
| 11:58:38 12 | Q. That means that as of the date of the |
| 11:58:40 13 | first report it had not been verified? |
| 11:58:41 14 | MS. O'DELL: Objection to form. |
| 11:58:43 15 | MS. PARFITT: Objection. |
| 11:58:44 16 | THE WITNESS: Well, let's back up just a |
| 11:58:45 17 | second. The actual date of the photo, okay, the |
| 11:58:48 18 | diffraction photo, was 10/26/2018, okay. So it |
| 11:58:52 19 | actually was done before that. |
| 11:58:54 20 | Q. (By Mr. Chachkes) The photo was taken -- |
| 11:58:55 21 | A. The photo was taken, okay, and that's the |
| 11:58:58 22 | data. The photo is the data. So regardless of this |
| 11:59:02 23 | right here, all right, that is the pattern, and |
| 11:59:06 24 | that's what it was. |
| 11:59:10 25 | Q. You know what I'm talking about; right? |

Atlanta Reporters, Inc. 866-344-0459  www.atlanta-reporters.com

128

| | |
|---|---|
| 1 | A. Yeah, I know what you mean. |
| 2 | Q. The actual -- |
| 3 | A. I get that. |
| 11:59:13 4 | MS. O'DELL: Let him finish. |
| 11:59:13 5 | Q. (By Mr. Chachkes) Let me just finish. |
| 6 | A. Okay. |
| 11:59:14 7 | Q. Taking the photo and turning it into |
| 11:59:16 8 | useful data in a verification that gives you |
| 11:59:17 9 | d-spacing, you didn't do that until after the report? |
| 11:59:19 10 | MS. O'DELL: Object to form. |
| 11:59:20 11 | THE WITNESS: Well, again, I would have to |
| 11:59:21 12 | consult with the laboratory to see, you know, |
| 11:59:25 13 | what actually was done here. But the data |
| 11:59:27 14 | existed before the report was done. |
| 11:59:28 15 | Q. (By Mr. Chachkes) That's not my question. |
| 11:59:29 16 | A. I understand that. But understand that it |
| 11:59:33 17 | was already verified prior to that or wouldn't have |
| 11:59:35 18 | ended up in the report as tremolite. |
| 11:59:37 19 | Q. Was it verified with d-spacing prior to |
| 11:59:39 20 | the report at 11/14? |
| 11:59:41 21 | A. I would have to check on that, but to my |
| 11:59:43 22 | knowledge, it would be, yeah. |
| 11:59:44 23 | Q. Okay. So this would be a second d-spacing |
| 11:59:47 24 | calculation that you did for the tremolite? |
| 11:59:49 25 | MS. O'DELL: Object to the form. |

Atlanta Reporters, Inc. 866-344-0459  www.atlanta-reporters.com

129

| | |
|---|---|
| 11:59:50 | 1    THE WITNESS:  Yes. |
| 11:59:50 | 2    Q.    (By Mr. Chachkes)  Okay. |
| 11:59:52 | 3    A.    Yes. |
| 11:59:52 | 4    Q.    When you did the first one -- strike that. |
| 11:59:58 | 5    A.    Okay. |
| 11:59:58 | 6    Q.    D-spacing's important to determining |
| 12:00:03 | 7  whether you're accurately identifying a mineral using |
| 12:00:08 | 8  diffraction patterns? |
| 12:00:11 | 9    MS. O'DELL:  Objection to form. |
| 12:00:12 | 10   THE WITNESS:  It's part of the standard |
| 12:00:13 | 11 methodology. |
| 12:00:14 | 12   Q.    (By Mr. Chachkes)  Is it an important |
| 12:00:15 | 13 part? |
| 12:00:15 | 14   MS. O'DELL:  Objection to form. |
| 12:00:16 | 15   THE WITNESS:  Well, I would think that if |
| 12:00:17 | 16 you wanted the answer that, again, is it part of |
| 12:00:22 | 17 the methodology, a lot of standards use that, so |
| 12:00:25 | 18 yes. |
| 12:00:26 | 19   Q.    (By Mr. Chachkes)  Okay.  Your methodology |
| 12:00:29 | 20 of -- that you've described today for how you did |
| 12:00:33 | 21 SAED -- strike that. |
| 12:00:37 | 22   A.    Good. |
| 12:00:37 | 23   Q.    Let's look at a specific section from your |
| 12:00:44 | 24 report.  And so you -- yes. |
| 12:00:53 | 25   This is sample M68503-208 -- go slow |

Atlanta Reporters, Inc. 866-344-0459   www.atlanta-reporters.com

131

| | |
|---|---|
| 12:02:05 | 1    MS. O'DELL:  And it's M68503-028? |
| 12:02:10 | 2    MR. CHACHKES:  -028, correct. |
| 12:02:17 | 3    THE WITNESS:  What's the decade? |
| 12:02:19 | 4    Q.    (By Mr. Chachkes)  I'm told the '70s. |
| 12:02:38 | 5    A.    Let's see what it says here -- O3 -- |
| 12:02:39 | 6    MS. O'DELL:  Is that it? |
| 12:02:39 | 7    THE WITNESS:  Should be section 8 -- you |
| 12:02:41 | 8  said 028?  It should be section -- well, it's |
| 12:02:44 | 9  section 8 in ours.  I'm not sure what it is in |
| 12:02:47 | 10 here. |
| 12:02:50 | 11   MS. O'DELL:  Here we go. |
| 12:02:51 | 12   THE WITNESS:  Section 8.  Okay.  There we |
| 12:03:07 | 13 go. |
| 12:03:08 | 14   Q.    (By Mr. Chachkes)  Okay.  Are you there? |
| 12:03:11 | 15   A.    Yes. |
| 12:03:11 | 16   Q.    Okay.  So it's anthophyllite, so you would |
| 12:03:13 | 17 expect two diffraction patterns; correct?  Can you |
| 12:03:19 | 18 see two diffraction patterns? |
| 12:03:21 | 19   A.    In this, there may be just one here. |
| 12:03:24 | 20 There may be two on the verification, but let's see |
| 12:03:26 | 21 if there is.  Let's see. |
| 12:03:31 | 22   41391.  Yes.  There's two of them. |
| 12:03:32 | 23   Q.    Why did you say there may be just one? |
| 12:03:34 | 24   A.    Oh, well, I was thinking the -- I was |
| 12:03:37 | 25 thinking anything else but anthophyllite.  But |

Atlanta Reporters, Inc. 866-344-0459   www.atlanta-reporters.com

130

| | |
|---|---|
| 12:01:00 | 1  here -- -028.  Sorry.  It's page 585 of the version |
| 12:01:07 | 2  of the January 15 report that was produced to us. |
| 12:01:12 | 3  And plaintiffs' counsel -- |
| 12:01:13 | 4    MS. O'DELL:  I didn't catch that number. |
| 12:01:15 | 5  Excuse me.  What was it? |
| 12:01:16 | 6    MR. CHACHKES:  It was M68503-028. |
| 12:01:23 | 7    MS. O'DELL:  What's the page of the |
| 12:01:27 | 8  report? |
| 12:01:27 | 9    MR. CHACHKES:  585 of the version produced |
| 12:01:27 | 10 to us.  And you brought us versions separated by |
| 12:01:27 | 11 decades, so you can find it in the 1970s |
| 12:01:30 | 12 notebook.  Okay. |
| 12:01:36 | 13   Q.    (By Mr. Chachkes)  And let's mark this as |
| 12:01:38 | 14 a separate exhibit just so you can have it in front |
| 12:01:42 | 15 of you without a huge binder. |
| 12:01:42 | 16   MS. O'DELL:  It's -- |
| 12:01:46 | 17   MR. CHACHKES:  You want to do it in the |
| 12:01:48 | 18 binder?  That's fine.  If you can locate it, I |
| 12:01:50 | 19 don't care. |
| 12:01:50 | 20   MS. O'DELL:  I just don't want -- if he |
| 12:01:51 | 21 needs to look at any other data, I want it to be |
| 12:01:54 | 22 available to him.  You're welcome to hand him |
| 12:01:55 | 23 the exhibit, but I want to find it as well. |
| 12:01:56 | 24   MR. CHACHKES:  If you're going to find it, |
| 12:01:57 | 25 it's just easy enough to do it that way. |

Atlanta Reporters, Inc. 866-344-0459   www.atlanta-reporters.com

132

| | |
|---|---|
| 12:03:40 | 1  they're both here. |
| 12:03:41 | 2    Q.    So for anthophyllite you always expect two |
| 12:03:43 | 3  patterns in your report; correct? |
| 12:03:45 | 4    A.    There should be, yes. |
| 12:03:45 | 5    Q.    Okay.  Now, looking at these diffraction |
| 12:03:49 | 6  patterns, is there -- for this single sample that |
| 12:03:54 | 7  we're looking at, can you use just those diffraction |
| 12:03:58 | 8  patterns to tell whether or not it's cummingtonite as |
| 12:04:05 | 9  an option? |
| 12:04:06 | 10   MS. O'DELL:  Object to the form. |
| 12:04:21 | 11   THE WITNESS:  What's the question again? |
| 12:04:23 | 12   Q.    (By Mr. Chachkes)  So can you tell just from |
| 12:04:25 | 13 the two diffraction patterns that you have for sample |
| 12:04:28 | 14 M68503-028 whether this is anthophyllite versus |
| 12:04:35 | 15 cummingtonite, just focusing on the diffraction |
| 12:04:37 | 16 patterns? |
| 12:04:38 | 17   A.    No. |
| 12:04:38 | 18   Q.    And why not? |
| 12:04:39 | 19   A.    Well, they can have a similar diffraction |
| 12:04:42 | 20 pattern if this looks like -- this looks like an |
| 12:04:47 | 21 orthorhombic pattern, just looking at it.  So the |
| 12:04:54 | 22 cummingtonite is going to have more of a monoclinic |
| 12:04:56 | 23 pattern. |
| 12:04:56 | 24   Q.    But you answered no.  Why did you answer |
| 12:04:58 | 25 no? |

Atlanta Reporters, Inc. 866-344-0459   www.atlanta-reporters.com

133

1    A.    What --

2    Q.    You said no to my question.

3    A.    What was the question again?

4    Q.    Can you tell whether -- from just the EDS
5    patterns whether this is cummingtonite or
6    anthophyllite?

7    A.    Well, again, the answer is still no.

8    Q.    I'm sorry, let me ask the question again
9    because I'm told by my associate that I misspoke.

10          Can you tell from the diffraction patterns
11   alone for sample M68503-028 whether this is
12   anthophyllite or cummingtonite?

13   A.    I think I just answered that twice.

14   Q.    Okay.  And the answer was no?

15   A.    Yeah.  I mean, it appears to be an
16   orthorhombic pattern.

17   Q.    Okay.  What is the definition of
18   asbestiform?

19   A.    Well, it actually means asbestos-like,
20   that's what the word means, like asbestos.

21   Q.    So what is asbestos?

22   A.    Well, the classic definition of
23   asbestiform would be a structure that is 1/2 a micron
24   in size with substantially parallel sides.  Some
25   literature adds the stipulations of tensile strength

134

1    and all of that kind of thing, and most of them,
2    those definitions, are sort of on a geological macro
3    scale.  That's what they're meant to describe.

4    Q.    Okay.  For your purposes, when you use the
5    word asbestos or asbestiform in your report, you're
6    saying -- are you saying anything more than 1/2 a
7    micron in size, substantially parallel sides?

8    A.    Yes.  I mean, it's a regulated definition.

9    Q.    Yeah, but what I'm asking is if -- is
10   there any other qualification in your definition when
11   you use the phrase -- the words asbestiform or
12   asbestos in your report?

13   A.    Well, we're going by the -- again, by the
14   classic definition of what I just described.  Then
15   you go in and you do the diffraction, the EDS, and
16   the form of it of course -- you know, and then you
17   make a decision on that.  But as far as you know,
18   using that term, you know, it's mainly based on that
19   definition.

20   Q.    Substantially parallel sides, 1/2 a
21   micron?

22   A.    1/2 a micron, yeah, yeah.

23   Q.    Okay.  What about aspect ratio, is that
24   part of your definition?

25   A.    Well, again, it depends on the -- some of

135

1    the standards that you look at, the aspect ratio
2    is -- if you're talking OSHA, the aspect ratio is
3    3-to-1.  If you're talking AHERA, EPA, the aspect
4    ratio is 5-to-1.  If you're talking ISO, the ratio is
5    5-to-1.  If you're talking ASTM, the ratio is 5-to-1.
6    So we go by 5-to-1, yeah.

7    Q.    Am I correct in concluding that every time
8    in your expert report you use the word asbestos or
9    asbestiform, you're -- among the other qualifications
10   you said it's got at least a 5-to-1 ratio?

11   A.    It should, yes.

12   Q.    Okay.  What about at least a 3-to-1 ratio?

13   A.    And again, that's an OSHA.  We're looking
14   at 5-to-1.  OSHA will call it at that.  They will
15   call it asbestos at that ratio.

16          So but in all of our reporting we're at
17   5-to-1.  So we do see 3-to-1 structures, and as far
18   as the body's concerned, it's going to treat the
19   3-to-1 to 5-to-1 probably in the same manner.  So
20   I've always testified that way.  The structures that
21   it encounters, regardless of the aspect ratio, have
22   to be dealt with in the body.

23   Q.    For the purposes of your report, did you
24   count a 3-to-1 as a fiber, an asbestos fiber?

25   A.    Not that I'm aware of.

136

1    Q.    Okay.  Let me show you some testimony from
2    Dr. Longo from -- oh.  Well, no, let's do this.

3          Can we mark this as the next exhibit.

4          (Defendants' Exhibit 2 was marked for
5          identification.)

6    Q.    (By Mr. Chachkes)  Okay.  Can you turn to
7    page 3021.  This is the deposition -- this is an
8    examination of Dr. Longo under oath.

9          Can you turn to page 3021?  It's the very
10   last sheet.  I'm going to read you a question and
11   answer.  You can following along.  It starts at
12   line 4.

13          Line 4, My question to you, Dr. Longo, is
14   that transmission electron microscopy cannot tell you
15   if you identify a single fiber whether or not that
16   particle is asbestiform or nonasbestiform; correct?

17          Answer:  That is correct.

18          Do you agree with that testimony?

19          MS. O'DELL:  Object to the form.

20          THE WITNESS:  I don't -- I haven't read
21   this, so I don't know what preceded the question
22   there.  I see what it says.  So I don't have an
23   opinion on that.

24   Q.    (By Mr. Chachkes)  Okay.  Putting aside
25   the transcript, I'm just going to ask you the

137

12:10:40  1    question independent of whatever this means in the

12:10:42  2    transcript.

12:10:44  3          Do you, Dr. Rigler, believe that

12:10:49  4    transmission electron microscopy cannot tell you if

12:10:51  5    you identify a single fiber whether or not that

12:10:54  6    particle is asbestiform or nonasbestiform?

12:10:56  7          MS. O'DELL:  Object to form.

12:10:58  8          THE WITNESS:  Again, if they're including

12:11:05  9    things like tensile strength, flexibility, that

12:11:09  10   type of thing, you can't do that by TEM.  So as

12:11:15  11   far as the form goes, like asbestos, having a

12:11:18  12   form of asbestos which is fibrous, the

12:11:21  13   description of it, you definitely can.

12:11:23  14         So but again, I don't know what the

12:11:25  15   context of this is, so, you know, I don't have

12:11:30  16   an opinion on that in reference to this.

12:11:32  17    Q.    (By Mr. Chachkes)  Okay.  Have you ever

12:11:33  18   known Dr. Longo to use a geologic definition of

12:11:37  19   asbestos?

12:11:37  20    A.    No.

12:11:38  21    Q.    Okay.  And so when he testified that a TEM

12:11:42  22   cannot tell you if you identify a single fiber

12:11:45  23   whether or not that particle is asbestiform or

12:11:47  24   nonasbestiform, you understand that to mean his

12:11:50  25   regulatory definition; correct?

138

12:11:52  1          MS. O'DELL:  Excuse me.  Object to the

12:11:53  2    form.  Doesn't speak to the context.

12:11:56  3          You may answer.

12:11:57  4          THE WITNESS:  Can you restate?

12:12:00  5          MR. CHACHKES:  Do you mind reading it

12:12:02  6    back.

12:12:05  7          (The record was read by the reporter.)

12:12:44  8          THE WITNESS:  Well, I mean, it would be

12:12:47  9    based on the regulatory definition.  So, I mean,

12:12:52  10   that's all I can say about that.

12:12:55  11         Again, I don't know what the context was

12:12:57  12   in this.  I can't speak for Dr. Longo.  So

12:13:02  13   that's the best answer I can give.

12:13:04  14    Q.    (By Mr. Chachkes)  Is there any world in

12:13:05  15   which it's correct to say that under your regulatory

12:13:08  16   definition a TEM cannot tell you if you identify a

12:13:11  17   single fiber whether or not that particle is

12:13:14  18   asbestiform or nonasbestiform?

12:13:15  19         MS. O'DELL:  Object to the form.

12:13:17  20         THE WITNESS:  It's such a broad question

12:13:22  21   about that, I don't know quite how to answer it,

12:13:26  22   other than the way that I've already answered

12:13:28  23   it.  Because when you say in any world, I mean,

12:13:32  24   it's very broad.  Broad question.

12:13:34  25    Q.    (By Mr. Chachkes)  Is there any way that

139

12:13:36  1    could be correct?

12:13:36  2    A.    I don't know.

12:13:38  3    Q.    Is there any peer-reviewed literature or

12:13:41  4    regulatory material that says that TEM cannot tell

12:13:47  5    you if you identify a single fiber whether or not

12:13:49  6    that particle is asbestiform or nonasbestiform?

12:13:52  7    A.    I mean, I can't think of any as I sit

12:13:56  8    here.  I can't think of any.

12:13:57  9    Q.    Okay.  Is there any regulatory material or

12:14:00  10   peer-reviewed material that says the opposite, that

12:14:03  11   TEM can tell you that if you identify a single fiber,

12:14:07  12   whether or not that particle is asbestiform or

12:14:09  13   nonasbestiform?

12:14:11  14         MS. O'DELL:  Object to the form.

12:14:13  15         THE WITNESS:  You're saying that it is not

12:14:24  16   asbestiform?

12:14:25  17    Q.    (By Mr. Chachkes)  So what I'm saying is,

12:14:28  18   is there any peer-reviewed literature or regulatory

12:14:30  19   material that confirms that TEM can tell you if you

12:14:35  20   identify a single fiber whether or not that particle

12:14:38  21   is asbestiform or nonasbestiform?

12:14:42  22    A.    Well, there are -- yes.  I mean, there are

12:14:45  23   a number of regulatory documents that say that it

12:14:48  24   can.

12:14:48  25    Q.    Okay.  Is 22262 one of those documents?

140

12:14:52  1    A.    I would have to -- again, I would want to

12:14:55  2    review 22262 again to look at that before I make that

12:14:59  3    answer.

12:14:59  4    Q.    Well, you're using 22262 in this MDL case;

12:15:04  5    right?

12:15:04  6    A.    Yeah.  I just need to review it again.

12:15:06  7    Q.    And you use TEM to identify whether a

12:15:08  8    single fiber is or is not asbestiform in this case;

12:15:11  9    right?

12:15:11  10         MS. O'DELL:  Object to the form.

12:15:12  11         THE WITNESS:  Yes.

12:15:12  12    Q.    (By Mr. Chachkes)  And that was pursuant

12:15:13  13   to 22262; correct?

12:15:15  14    A.    Well, no, it was not just the 22262.

12:15:18  15   There were the other methods that were there, too.

12:15:  16    Q.    Okay.

12:15:21  17    A.    Yeah.

12:15:21  18    Q.    Did you follow the 22262 protocol for TEM?

12:15:25  19    A.    To my knowledge, we did.  And that also

12:15:31  20   is -- is also the same type of protocol that is in

12:15:34  21   the ASTM and also the EPA methods.  So yeah.

12:15:39  22    Q.    Does 22262 expressly say you can use TEM

12:15:43  23   to identify whether or not a particle is asbestiform

12:15:47  24   or nonasbestiform?

12:15:49  25    A.    Again, I would like to review that just to

141

```
12:15:53   1    be able to verify that it says -- actually says that.
12:15:58   2         Q.    You were involved in many more reports
12:16:19   3    concerning J&J talc other than the MDL reports;
12:16:23   4    right?
12:16:24   5         MS. O'DELL:  Object to the form.
12:16:25   6         THE WITNESS:  Some other reports.
12:16:27   7         Q.    (By Mr. Chachkes)  So those were bottles
12:16:27   8    that were not -- those are different bottles, not the
12:16:29   9    MDL bottles?
12:16:30  10         MS. O'DELL:  Object to the form.
12:16:31  11         THE WITNESS:  They may have been, yes.
12:16:32  12         Q.    (By Mr. Chachkes)  You didn't issue any
12:16:34  13    other reports on the bottles at issue in this case,
12:16:37  14    have you?
12:16:38  15         MS. O'DELL:  Object to the form.
12:16:39  16         THE WITNESS:  Again, I don't recall.
12:16:42  17         Q.    (By Mr. Chachkes)  Are you aware that in
12:16:48  18    the old reports the majority of particles you
12:16:50  19    identified were fibers, and in this MDL the majority
12:16:53  20    of particles you identified were bundles; are you
12:16:56  21    aware of that?
12:16:57  22         A.    I'd have to look back at the reports to
12:16:59  23    make that conclusion.
12:17:01  24         Q.    Okay.  Given that the old reports and the
12:17:07  25    new reports are both on J&J bottles, would you expect
```

Atlanta Reporters, Inc.  866-344-0459    www.atlanta-reporters.com

142

```
12:17:11   1    the same fiber-to-bundle ratio in the two separate
12:17:16   2    sets of reports?
12:17:17   3         MS. O'DELL:  Object to form.
12:17:18   4         THE WITNESS:  Not necessarily.
12:17:18   5         Q.    (By Mr. Chachkes)  Why not?
12:17:19   6         A.    You get variation depending upon where the
12:17:22   7    material was mined and combined.
12:17:25   8         Q.    For a -- if you isolate a single mine,
12:17:30   9    let's say, just Vermont --
12:17:31  10         A.    Okay.
12:17:31  11         Q.    -- would you expect the old reports, the
12:17:35  12    fiber-to-bundle ratio, to match the MDL report?
12:17:38  13         MS. O'DELL:  Object to the form.
12:17:39  14         THE WITNESS:  I would expect that they may
12:17:47  15    follow the same kinds of trends, you know, as
12:17:51  16    far as aspect ratio, that type of thing, yeah.
12:17:53  17         Q.    (By Mr. Chachkes)  But what about the
12:17:55  18    fiber-to-bundle ratio?
12:17:56  19         A.    Again, I'd have to look at that.  I can't
12:17:59  20    make a conclusion on that without looking at it.
12:18:01  21         Q.    Okay.  So sitting here today you can't
12:18:05  22    tell me if you would expect a certain degree of
12:18:08  23    reproducibility for the Vermont mine bottles from the
12:18:12  24    old reports as compared to the MDL bottles in this
12:18:14  25    report?
```

Atlanta Reporters, Inc.  866-344-0459    www.atlanta-reporters.com

143

```
12:18:14   1         MS. O'DELL:  Object to the form.
12:18:16   2         THE WITNESS:  Could you just restate that?
12:18:27   3         MR. CHACHKES:  Do you mind reading that
12:18:29   4    back.
12:18:29   5         THE WITNESS:  I know she can read it back,
12:18:31   6    but can you restate it another way?
12:18:32   7         Q.    (By Mr. Chachkes)  It's going to be read
12:18:33   8    back.  Sorry.
12:18:34   9         MS. O'DELL:  And if you still need that
12:18:36  10    question rephrased, you may --
12:18:37  11         THE WITNESS:  That would be nice.
12:18:38  12         MS. O'DELL:  You may ask that.
12:18:40  13         THE WITNESS:  I'd like it to be rephrased.
12:18:42  14         MR. CHACHKES:  As long as we keep talking,
12:18:44  15    she keeps typing.
12:18:48  16         (The record was read by the reporter.)
12:19:12  17         MS. O'DELL:  Object to the form.
12:19:14  18         THE WITNESS:  Rephrase.
12:19:15  19         Q.    (By Mr. Chachkes)  Would you expect that
12:19:18  20    your fiber-to-bundle ratio for the Vermont samples
12:19:22  21    from your old reports would be reproducible in
12:19:29  22    analyzing another set of bottles like the set of
12:19:32  23    bottles in the MDL?
12:19:33  24         MS. O'DELL:  Object to the form.
12:19:36  25         Q.    (By Mr. Chachkes)  From the same mine?
```

Atlanta Reporters, Inc.  866-344-0459    www.atlanta-reporters.com

144

```
12:19:37   1         MS. O'DELL:  Object to the form.
12:19:38   2         THE WITNESS:  You know, I'm not a
12:19:39   3    geologist.  But once again, the -- you would
12:19:45   4    have -- I would expect some variation.  I would
12:19:48   5    expect some variation.
12:19:49   6         Q.    (By Mr. Chachkes)  When you say some
12:19:50   7    variation, can you quantify?
12:19:51   8         A.    No.  No.  But I would expect because the
12:19:55   9    materials out of the ground are, you know --
12:19:59  10    depending upon the way they have been mixed, ground,
12:20:02  11    mined, all of that, you could have some variation in
12:20:06  12    that.  Whether they were using a specific kind of
12:20:09  13    flotation process at one time versus another, all of
12:20:12  14    that kind of thing, you could get some variation.
12:20:15  15         Q.    Okay.  Is it your position that the
12:20:19  16    modified Blount TEM method you employed in your
12:20:24  17    March 2018 report is materially identical to ISO
12:20:28  18    22262?
12:20:29  19         A.    It is substantially the same.
12:20:35  20         Q.    Is it materially the same?
12:20:36  21         A.    Substantially the same.  If you're saying
12:20:39  22    exactly the same, is that what you're asking?
12:20:41  23         Q.    Well, let's do that.  Is it exactly the
12:20:44  24    same?
12:20:44  25         A.    Okay.  I'd say substantially the same.
```

Atlanta Reporters, Inc.  866-344-0459    www.atlanta-reporters.com

145

147

12:20:46 1    Q.    Okay.  What degree do they differ?

12:20:50 2    What ways do they differ?

12:20:50 3    A.    There may be some variation, slight

12:20:52 4    variation in the densities, the heavy density liquid.

12:20:55 5    Q.    Any other variation?

12:20:56 6    A.    I can't think of any right off the bat.

12:20:59 7    Q.    What's the average width of a tremolite

12:21:02 8    fiber under TEM?

12:21:03 9    A.    That varies depending on the size.

12:21:05 10    Q.    And when you say depending on the size,

12:21:09 11    what do you mean by that?

12:21:10 12    A.    Well, I mean, it depends.  It varies.  It

12:21:13 13    can be 1/10 of a micron and up.

12:21:14 14    Q.    So there's no -- in the published

12:21:21 15    literature there's no average width of a tremolite

12:21:22 16    fiber?

12:21:17 17    MS. O'DELL:  Object to the form.

12:21:24 18    THE WITNESS:  Oh, gosh.  I don't know.

12:21:32 19    There may be.  But as far as there being an

12:21:36 20    arrange width, again, it depends on how it's

12:21:38 21    been mined and milled and processed.

12:21:41 22    Q.    (By Mr. Chachkes)  Is there an average

12:21:42 23    width of an anthophyllite fiber under TEM?

12:21:44 24    A.    Same answer.

12:21:45 25    Q.    What's the largest width an anthophyllite

12:22:49 1    Q.    What's the largest width a tremolite

12:22:52 2    particle can have and still be characterized as a

12:22:56 3    fiber under TEM?  Same answer?

12:22:58 4    A.    Yeah.

12:22:58 5    Q.    Okay.  Are all of the fibers that you've

12:23:05 6    identified in your reports as asbestos or asbestiform

12:23:11 7    formed in the fibrous crystalline habit?

12:23:14 8    A.    Originally, you know, looking at the

12:23:18 9    structures, we get into that question of them being

12:23:22 10    formed in a crystalline habit.  So that is a growth

12:23:29 11    mode for the production of the fibrils; but also, if

12:23:34 12    you -- how do you want to say it?

12:23:41 13    If massive tremolite, for instance, is

12:23:46 14    milled a certain way, it can break in cleavage planes

12:23:51 15    that will make it into the fibrils that are, you

12:23:56 16    know, regulated type fibrils.  Sure, you'll get

12:23:59 17    cleavage fragments, ones that appear triangular and,

12:24:04 18    you know, different kinds of shapes, but you will

12:24:06 19    produce these other kind of fibrils too that will

12:24:09 20    meet the definition.

12:24:10 21    Q.    Okay.  So a mineral that has a

12:24:18 22    nonregulated and a regulated version can be connected

12:24:23 23    in the cleavage plane but can be broken up such that

12:24:27 24    it would become in your mind a regulated asbestos

12:24:29 25    fiber?

146

12:21:48 1    particle can have and still be characterized as a

12:21:51 2    fiber under a TEM?

12:21:52 3    A.    As far -- as long as there are bundled

12:21:59 4    fibrils in there, you know, it could be pretty large.

12:22:03 5    Q.    Well, the question's really what's the

12:22:05 6    largest width an anthophyllite particle can have and

12:22:08 7    still be characterized as a fiber?

12:22:10 8    A.    Well, if it has the aspect ratio, it will

12:22:13 9    still be -- it can be pretty large.  It will still be

12:22:15 10    considered as a fiber by TEM.

12:22:17 11    Q.    Okay.  And so you don't have an upper

12:22:19 12    boundary by which you'll no longer say that's an

12:22:23 13    anthophyllite fiber?

12:22:25 14    MS. O'DELL:  Object to the form.

12:22:26 15    Q.    (By Mr. Chachkes)  The width, I'm talking

12:22:27 16    about.

12:22:27 17    A.    On a width.  Well, again, it's got to meet

12:22:30 18    the aspect ratio.

12:22:31 19    Q.    But any time it meets the aspect ratio, it

12:22:34 20    doesn't matter how wide it is, you can still

12:22:37 21    characterize it as an anthophyllite particle?

12:22:38 22    A.    Well, I mean, when you go from the TEM to

12:22:41 23    the PLM scale, you're going orders of magnitude in

12:22:44 24    size, and these are called fibrils.  So, you know,

12:22:47 25    they can be pretty darn large.

148

12:24:30 1    MS. O'DELL:  Object to the form.

12:24:31 2    THE WITNESS:  Well, this does happen.

12:24:35 3    This does happen.  And there's a recent

12:24:40 4    publication for -- I think it's amosite,

12:24:45 5    grunerite, that shows this happens.

12:24:48 6    Q.    (By Mr. Chachkes)  Okay.  What's the

12:24:49 7    publication you're citing now?

12:24:50 8    A.    It's a 2019.  It's a recent publication.

12:24:54 9    Q.    Can you tell me the name of it?

12:24:55 10    A.    It's by Germine and Puffer, I believe it

12:24:59 11    is.

12:25:00 12    Q.    And you don't cite that in your report, do

12:25:02 13    you?

12:25:02 14    A.    Excuse me?

12:25:03 15    Q.    You don't cite that in your report --

12:25:04 16    A.    No, no.  That's a recent publication.

12:25:06 17    Q.    And who are Germain and Puffer?

12:25:09 18    A.    They're a couple of researchers, I

12:25:11 19    believe, at UC Cal.

12:25:12 20    Q.    Do you know who funded their research?

12:25:14 21    A.    I think the university did.

12:25:16 22    Q.    Okay.  So am I correct in understanding

12:25:20 23    your testimony that not everything you've identified

12:25:23 24    as asbestos and asbestiform in your report was formed

12:25:28 25    in the -- necessarily formed in the crystalline

149

12:25:31 1  habit?

12:25:31 2      MS. O'DELL:  Object to the form.

12:25:33 3      THE WITNESS:  Well, again, it's not part

12:25:34 4  of the definition, that it be in the crystalline

12:25:37 5  habit.  The definition has the parameters that

12:25:40 6  we discussed already.  If it is in that form,

12:25:45 7  it's going to be classified like that.

12:25:48 8      Q.  (By Mr. Chachkes)  If something is formed

12:25:53 9  in the crystalline habit and has an aspect ratio

12:25:56 10  under 5-to-1, would you call it regulated asbestos?

12:25:59 11     A.  Well, if it's 3-to-1, OSHA would.

12:26:02 12     Q.  If something was formed in the fibrous

12:26:04 13  crystalline habit and was in a 2-to-1 aspect ratio,

12:26:08 14  would you call it asbestos?

12:26:10 15     A.  That wouldn't meet the definition.

12:26:12 16     Q.  Okay.  Does MAS have a protocol in place

12:26:17 17  for describing the dimensions of fibers under a TEM?

12:26:22 18     A.  Yes.

12:26:22 19     Q.  Is it written?

12:26:24 20     A.  Yes, it's in accordance with the standard

12:26:26 21  methods, all of these standard methods we've

12:26:28 22  discussed.

12:26:29 23     Q.  Okay.  So your written protocol for

12:26:37 24  identifying what's asbestos or not under a TEM is

12:26:39 25  just basically a repeat of the regulations?

150

12:26:41 1      A.  Yes.

12:26:42 2      Q.  Okay.  No change whatsoever --

12:26:44 3      A.  Well, I mean, it's -- it's in accordance

12:26:49 4  with the regulation.

12:26:50 5      Q.  Okay.  What form is it in?  Is it like a

12:26:55 6  piece of paper on a wall so TEM scientists can look

12:26:57 7  at it?  Is it an email?  What is it?

12:26:59 8      MS. O'DELL:  Object to the form.

12:27:00 9      THE WITNESS:  It's a protocol.  We have a

12:27:02 10  protocol that the analysts have to abide by.

12:27:05 11     Q.  (By Mr. Chachkes)  Just physically, is it

12:27:07 12  a piece of paper that analysts memorize --

12:27:10 13     A.  It's a document, yeah.

12:27:11 14     Q.  Okay.  Do the analysts have it near

12:27:13 15  them --

12:27:14 16     A.  It's a standard operating procedure we

12:27:16 17  have.

12:27:16 18     Q.  Okay.  So we would ask that that be

12:27:18 19  produced.

12:27:19 20      Does MAS have a protocol in place for

12:27:22 21  describing the dimensions of fibers under TEM, or is

12:27:26 22  that the same answer?

12:27:27 23     A.  Same answer.

12:27:27 24     Q.  Same, okay.

12:27:33 25      Is there additional data concerning the

151

12:27:35 1  samples you've reported on for TEM that is somewhere

12:27:39 2  in your laboratory, like an electronic file that's

12:27:41 3  not been produced, not in paper form for us?

12:27:44 4      A.  Not that I know of, no.

12:27:45 5      Q.  Was there any data generated in connection

12:27:48 6  with the TEM analysis in this case that was thrown

12:27:53 7  away or deleted?

12:27:54 8      A.  No.

12:27:54 9      Q.  I'm moving on to a new topic.  It's

12:27:59 10  12:30ish.  I'm happy to keep going.  It would be a

12:28:02 11  good breaking point but --

12:28:04 12     A.  I'm good to go.  We can go.

12:28:06 13     Q.  Okay.  I mean, we're going to have a lunch

12:28:08 14  and we're going to come back, so it's not like we're

12:28:11 15  going to finish before lunch.

12:28:13 16     A.  Oh.  Oh, well.

12:28:13 17      MS. O'DELL:  It's up to you, Doctor.  If

12:28:15 18  you want to go a little longer --

12:28:16 19      THE WITNESS:  We can take a break if you

12:28:16 20  want to take a break.

12:28:17 21      MS. PARFITT:  It's up to you.

12:28:18 22      MS. O'DELL:  It's really up to you.

12:28:21 23      THE WITNESS:  Okay.  That's good.  Break.

12:28:22 24      (Lunch recess from 12:28 p.m. to 1:38 p.m.)

13:38:49 25     Q.  (By Mr. Chachkes)  Good afternoon.

152

13:39:27 1      A.  Good afternoon.

13:39:27 2      Q.  Am I correct that you are not going to

13:39:30 3  testify about the PLM results in your report?

13:39:34 4      A.  That's correct.

13:39:34 5      Q.  Okay.  I'll skip PLM questioning because

13:39:38 6  of that.

13:39:38 7      Am I correct that you are not going to

13:39:40 8  testify about J3 results in your report?

13:39:43 9      A.  Dr. Longo will testify on that.

13:39:45 10     Q.  Okay.  Not you; right?

13:39:47 11     A.  Correct.

13:39:47 12     Q.  Okay.  So I'm going to skip questions on

13:39:50 13  J3.

13:39:51 14      Let me just ask one question, though.  Why

13:39:54 15  did MAS use J3?

13:39:57 16     A.  MAS used J3 to do XRD analysis.  MAS

13:40:03 17  doesn't have XRD capabilities.

13:40:05 18     Q.  But they did some other things beyond XRD;

13:40:08 19  right?

13:40:08 20     A.  J3?

13:40:09 21     Q.  Yeah.

13:40:09 22     A.  Yes.

13:40:10 23     Q.  Okay.  Why did they do those things?

13:40:13 24     A.  To my knowledge, it was to help verify

13:40:17 25  results.

153

13:40:18  1    Q.    Verify results of things that were
13:40:20  2  otherwise being duplicated by MAS?
13:40:23  3    A.    There may have been some of that, yes.
13:40:25  4  Again, if you would ask Dr. Longo about that, please.
13:40:27  5    Q.    Okay.  What's an example of silicate, some
13:40:32  6  silicate materials?
13:40:33  7    A.    Well, a whole group of phyllosilicates are
13:40:39  8  clay, clay minerals.  There's lots of silicates.  I
13:40:43  9  mean, the earth's crust is covered with silicates.
13:40:46 10    Q.    Is talc a silicate?
13:40:47 11    A.    Yes.
13:40:47 12    Q.    Are you aware that there's different
13:40:50 13  grades of talc?
13:40:50 14    A.    Yes.
13:40:51 15    Q.    What are those grades?
13:40:54 16    A.    Well, they vary by composition, color,
13:40:57 17  size, particle size, that type of thing.
13:40:59 18    Q.    Is talc an asbestiform mineral?
13:41:05 19    A.    Fibrous talc could be described as an
13:41:10 20  asbestiform, yes.
13:41:11 21    Q.    Are asbestiform minerals silicates?
13:41:15 22    A.    Yes.
13:41:16 23    Q.    Do you know how many amphibole mineral
13:41:23 24  species there are?
13:41:24 25    A.    Quite a few.

Atlanta Reporters, Inc. 866-344-0459  www.atlanta-reporters.com

154

13:41:24  1    Q.    Do you have an estimate?
13:41:25  2    A.    Not right off the top of my head.  I bet
13:41:29  3  it's many.
13:41:30  4    Q.    Like more than 10?
13:41:31  5    A.    Yes.
13:41:31  6    Q.    More than 30?
13:41:33  7    A.    Yes.
13:41:33  8    Q.    When it comes time to give analysts in
13:41:40  9  your labs samples of J&J talc to analyze, do you
13:41:44 10  distribute them completely randomly?
13:41:47 11    MS. O'DELL:  Object to the form.
13:41:48 12    THE WITNESS:  Again, you would have to ask
13:41:49 13  Dr. Longo about that.  The TEM manager is the
13:41:54 14  one who distributes the samples once they come
13:41:57 15  in.
13:41:57 16    Q.    (By Mr. Chachkes)  Okay.  Would it be
13:41:59 17  better to distribute them randomly?
13:42:01 18    MS. O'DELL:  Object to the form.
13:42:03 19    THE WITNESS:  Well, I mean, we're going to
13:42:07 20  analyze the samples that we receive, so, you
13:42:11 21  know, random or not, it wouldn't make any
13:42:14 22  difference.
13:42:14 23    Q.    (By Mr. Chachkes)  Would you expect two
13:42:21 24  analysts to identify the same asbestos concentration
13:42:24 25  from the same bottle of J&J talc?

Atlanta Reporters, Inc. 866-344-0459  www.atlanta-reporters.com

155

13:42:27  1    A.    The answer to that is yes, I would expect
13:42:35  2  that.
13:42:36  3    Q.    And is that empirically what you've been
13:42:40  4  seeing?
13:42:41  5    MS. O'DELL:  Object to the form.
13:42:42  6    THE WITNESS:  Again, I don't know which
13:42:44  7  ones you're referring to here.  But from a
13:42:49  8  quality standpoint, they do see the same things.
13:42:52  9    Q.    (By Mr. Chachkes)  Okay.  If one --
13:42:54 10  hypothetically, if one analyst looked at a bottle and
13:42:57 11  saw 10,000 fibers per gram and another analyst looked
13:43:00 12  at the same bottle and got a nondetect, would that be
13:43:03 13  within the margin of error?
13:43:06 14    MS. O'DELL:  Object to the form.
13:43:10 15    THE WITNESS:  That would depend on the
13:43:12 16  statistics that we were using, whether -- that
13:43:17 17  would depend.
13:43:19 18    Q.    (By Mr. Chachkes)  Depend on what?
13:43:20 19    A.    It would depend on the number of
13:43:22 20  structures that they saw.
13:43:23 21    Q.    Okay.  Well, you know how you determine
13:43:27 22  structures; correct?
13:43:28 23    A.    Yes.  Yes.
13:43:28 24    Q.    And you know the number of structures you
13:43:30 25  need to extrapolate to 10,000 per gram?

Atlanta Reporters, Inc. 866-344-0459  www.atlanta-reporters.com

156

13:43:33  1    A.    Well, again, that varies.  That can vary,
13:43:39  2  as I say, depending on what the detection limit is.
13:43:42  3  So when you're saying a certain number per gram,
13:43:48  4  that's based on it being above a certain detection
13:43:51  5  limit.  So you may want to ask the question again to
13:43:55  6  clarify a little more.
13:43:55  7    Q.    Well, let's say one analyst analyzed an
13:44:02  8  aliquot from a bottle and saw 10 fibers and another
13:44:05  9  analyst analyzed an aliquot and didn't detect any
13:44:08 10  fibers.  Would that be within the margin of error?
13:44:11 11    A.    No.
13:44:11 12    Q.    Why not?
13:44:12 13    A.    That would be outside the margin of error.
13:44:14 14    Q.    Can you narrow for me what that margin of
13:44:17 15  error is?
13:44:18 16    A.    Well, in our laboratory the coefficient of
13:44:23 17  variation between analysts is around I think 5 or
13:44:27 18  7 percent, something like that.  So I would expect
13:44:35 19  the variation to be not much more than that.  Maybe
13:44:40 20  1 fiber difference, something like that, depending
13:44:42 21  upon how many fibers they found.
13:44:44 22    Q.    When you say coefficient of variation,
13:44:46 23  you're referring to the coefficient of variation
13:44:49 24  study that you all did?
13:44:49 25    A.    Yes.  Yes.

Atlanta Reporters, Inc. 866-344-0459  www.atlanta-reporters.com

157

| | |
|---|---|
| 13:44:50 | 1 |
| Q. And were you part of that? |
| 13:44:51 | 2 |
| A. Yes. |
| 13:44:51 | 3 |
| Q. What about would the same coefficient of |
| 13:45:00 | 4 |
| variation apply to the difference in type of asbestos |
| 13:45:06 | 5 |
| that the analysts are finding? |
| 13:45:08 | 6 |
| A. It should. Yes. |
| 13:45:10 | 7 |
| Q. Okay. So you would expect the ratio |
| 13:45:12 | 8 |
| of tremolite to anthophyllite in a bottle should |
| 13:45:17 | 9 |
| remain relatively constant amongst different analysts |
| 13:45:20 | 10 |
| within 5 to 7 percent? |
| 13:45:21 | 11 |
| A. Yes. |
| 13:45:21 | 12 |
| Q. If the numbers were completely out of |
| 13:45:29 | 13 |
| whack with that, let's say there was 30 percent |
| 13:45:32 | 14 |
| difference, would you believe you need to rerun the |
| 13:45:35 | 15 |
| results, or would you average the two? What would be |
| 13:45:38 | 16 |
| your reaction? |
| 13:45:39 | 17 |
| MS. O'DELL: Object to the form. |
| 13:45:40 | 18 |
| THE WITNESS: Well, if the analysts |
| 13:45:44 | 19 |
| weren't seeing the same thing -- I mean, this is |
| 13:45:48 | 20 |
| the way we run the QC. For instance, if they |
| 13:45:52 | 21 |
| haven't found -- if you put them in the same |
| 13:45:56 | 22 |
| grid square and they haven't found the same |
| 13:45:59 | 23 |
| number of structures there, then you |
| 13:46:03 | 24 |
| typically -- we go back, we look at what was |
| 13:46:05 | 25 |
| there, we sit down with the analyst and try to |

Atlanta Reporters, Inc. 866-344-0459    www.atlanta-reporters.com

158

| | |
|---|---|
| 13:46:08 | 1 |
| understand why there is a difference like that, |
| 13:46:11 | 2 |
| and then we resolve the difference at that |
| 13:46:14 | 3 |
| point. |
| 13:46:14 | 4 |
| Now, that's the way the process typically |
| 13:46:17 | 5 |
| works. |
| 13:46:17 | 6 |
| Q. (By Mr. Chachkes) Was your coefficient of |
| 13:46:19 | 7 |
| variation study analysts looking at the same grid |
| 13:46:22 | 8 |
| square? |
| 13:46:22 | 9 |
| A. Yes. |
| 13:46:22 | 10 |
| Q. Okay. Let's do it in a completely |
| 13:46:25 | 11 |
| different hypothetical. |
| 13:46:25 | 12 |
| A. All right. |
| 13:46:26 | 13 |
| Q. The two analysts in your lab take aliquots |
| 13:46:29 | 14 |
| out of a bottle that are different, so they end up |
| 13:46:31 | 15 |
| looking at different grid squares. |
| 13:46:33 | 16 |
| A. Yes. |
| 13:46:33 | 17 |
| Q. Would you expect the results to be the |
| 13:46:35 | 18 |
| same? |
| 13:46:36 | 19 |
| MS. O'DELL: Object to the form. |
| 13:46:37 | 20 |
| THE WITNESS: If the sample was |
| 13:46:41 | 21 |
| homogeneous, let's hypothetically say that it is |
| 13:46:46 | 22 |
| completely homogeneous, then, yes, I would |
| 13:46:48 | 23 |
| expect the same kinds of results. |
| 13:46:50 | 24 |
| Q. (By Mr. Chachkes) Do you know whether or |
| 13:46:51 | 25 |
| not bottles are homogeneous, samples are homogeneous? |

Atlanta Reporters, Inc. 866-344-0459    www.atlanta-reporters.com

159

| | |
|---|---|
| 13:46:56 | 1 |
| A. They should be because they're mixed prior |
| 13:46:59 | 2 |
| to the actual analysis, you know, they're mixed in |
| 13:47:02 | 3 |
| preparation, the sample is. |
| 13:47:03 | 4 |
| Q. Wouldn't you expect greater variation when |
| 13:47:06 | 5 |
| two analysts are looking at their own grids |
| 13:47:12 | 6 |
| separately rather than comparing what they see under |
| 13:47:15 | 7 |
| the same grid? |
| 13:47:16 | 8 |
| MS. O'DELL: Object to the form. |
| 13:47:17 | 9 |
| THE WITNESS: Yeah. That's a good |
| 13:47:19 | 10 |
| question. We're not doing chemistry here. |
| 13:47:23 | 11 |
| We're doing particle analysis. So in chemistry |
| 13:47:26 | 12 |
| where you have something that is in, for |
| 13:47:29 | 13 |
| instance, in solution, it's mixed in solution, |
| 13:47:31 | 14 |
| it's dispersed in that solution by Brownian |
| 13:47:37 | 15 |
| motion forces that keep it very random and |
| 13:47:39 | 16 |
| mixed. |
| 13:47:40 | 17 |
| Wherein a particle solution, if you want |
| 13:47:44 | 18 |
| to call it that, you can have variation based on |
| 13:47:46 | 19 |
| the particle size and a number of factors, but |
| 13:47:50 | 20 |
| the objective is to make the samples as |
| 13:47:53 | 21 |
| homogeneous as possible. |
| 13:47:54 | 22 |
| So you would expect them, if they took a |
| 13:47:56 | 23 |
| sample from the same bottle and they're both |
| 13:47:58 | 24 |
| homogeneous, you should get close to the same |
| 13:48:01 | 25 |
| answer. |

Atlanta Reporters, Inc. 866-344-0459    www.atlanta-reporters.com

160

| | |
|---|---|
| 13:48:01 | 1 |
| Q. (By Mr. Chachkes) Okay. In your |
| 13:48:04 | 2 |
| experience do two of your analysts looking at the |
| 13:48:06 | 3 |
| same exact grid identify the same bundle-to-fiber |
| 13:48:11 | 4 |
| ratio? |
| 13:48:12 | 5 |
| A. I would say that most of the time they do. |
| 13:48:18 | 6 |
| There may be some slight variations in the size of |
| 13:48:23 | 7 |
| the structure. It will be the same structure because |
| 13:48:25 | 8 |
| you can see it in the images that they make, but they |
| 13:48:30 | 9 |
| may have some slight variation in the size based on |
| 13:48:33 | 10 |
| the microscope that's being used because a couple of |
| 13:48:37 | 11 |
| the scopes we have have slightly different graticules |
| 13:48:42 | 12 |
| in the scope so there may be a little difference in |
| 13:48:47 | 13 |
| the length or the width, just a slight amount. |
| 13:48:47 | 14 |
| Q. But generally speaking, you would expect |
| 13:48:49 | 15 |
| two analysts in your laboratory looking at the same |
| 13:48:51 | 16 |
| grid pattern to roughly identify the same |
| 13:48:55 | 17 |
| fiber-to-bundle ratio? |
| 13:48:56 | 18 |
| A. Yes. |
| 13:48:58 | 19 |
| Q. Roughly speaking, you would expect two |
| 13:49:00 | 20 |
| analysts looking at the same grid opening to -- |
| 13:49:08 | 21 |
| roughly speaking, you would expect two analysts |
| 13:49:10 | 22 |
| looking at the same grid opening to identify the same |
| 13:49:14 | 23 |
| asbestos type composition, like anthophyllite versus |
| 13:49:17 | 24 |
| tremolite versus no detect? |
| 13:49:20 | 25 |
| A. Yes. |

Atlanta Reporters, Inc. 866-344-0459    www.atlanta-reporters.com

161

13:49:20  1    Q.    Okay.  And that's based on the coefficient
13:49:22  2  of variation study?
13:49:23  3    A.    Yes, and also their training.  So they're
13:49:27  4  well versed in this.
13:49:28  5    Q.    Okay.  You wouldn't know whether Lee Poye
        6  would expect the same thing?
        7         THE REPORTER:  I'm sorry, you would or
        8  wouldn't?
13:49:39  9    Q.    (By Mr. Chachkes)  You would not expect --
13:49:40 10  you would not know whether Lee Poye would say the
13:49:41 11  same thing --
        12         MS. O'DELL:  Object to the form.
13:49:42 13    Q.    (By Mr. Chachkes)  -- is that outside of
13:49:43 14  your knowledge?
13:49:44 15         MS. O'DELL:  Excuse me, I didn't mean to
13:49:46 16  interrupt you.  Are you finished?
13:49:48 17         Object to the form.
13:49:49 18         THE WITNESS:  All right.  Well, as being a
13:49:54 19  certified laboratory and having earned
13:49:57 20  protocols, I would expect that their analysts
13:49:59 21  would find the same kinds of things.  There may
13:50:03 22  be some variation, but again, you know, there is
13:50:10 23  slight variation between laboratories.
13:50:12 24    Q.    (By Mr. Chachkes)  Okay.  Did you ever
13:50:13 25  quantify the slight variation between laboratories?

Atlanta Reporters, Inc. 866-344-0459   www.atlanta-reporters.com

162

13:50:16  1         MS. O'DELL:  Object to the form.
13:50:17  2         THE WITNESS:  In this case, no.  We did
13:50:20  3  see variation, and that's in the report.  But
13:50:25  4  again, it doesn't change what has been found.
13:50:30  5  There were, I believe, a couple by TEM that we
13:50:33  6  weren't able to verify, so, you know, it does
13:50:35  7  happen.
13:50:35  8    Q.    (By Mr. Chachkes)  Would you --
13:50:41  9    A.    But for the most part, we did agree.
13:50:44 10    Q.    Okay.  Let's compare -- let's talk about
13:50:48 11  on the one hand the non-MDL samples that you guys
13:50:52 12  have analyzed of J&J talc, and on the other hand MDL
13:50:56 13  samples of J&J talc.
13:50:57 14         Would you expect the results for, let's
13:51:01 15  say, 150 tests of the non-MDL samples to look roughly
13:51:08 16  like the 150 tests of the MDL samples?
13:51:13 17         MS. O'DELL:  Objection to form.  Without
13:51:15 18  limitation on time, et cetera?  Product?
13:51:19 19         THE WITNESS:  It's a hypothetical.  But if
13:51:23 20  there -- I mean, if they're the same product
13:51:26 21  from the same lot, I would expect similar
13:51:29 22  results.
13:51:29 23    Q.    (By Mr. Chachkes)  What about without that
13:51:33 24  qualification, let's say we know they're from the
13:51:36 25  same mine but you know nothing else, would you expect

Atlanta Reporters, Inc. 866-344-0459   www.atlanta-reporters.com

163

13:51:42  1  the results from the non-MDL samples to look like the
13:51:46  2  MDL samples?
13:51:47  3    A.    I mean, if they're splits of the same
13:51:51  4  sample or -- oh, they're different.
13:51:51  5    Q.    They're different.  So you understand that
13:51:53  6  the non-MDL samples are literally different bottles
13:51:56  7  than the MDL samples?
13:51:58  8    A.    Yeah.  I don't have an opinion on that.  I
13:52:04  9  don't have an opinion.  I'd have to think about that.
13:52:06 10    Q.    Would you expect the type of asbestos
13:52:08 11  found to be roughly the same?
13:52:11 12    A.    Same answer.
13:52:12 13    Q.    Okay.  No opinion?
13:52:15 14    A.    Yeah, right.
13:52:16 15    Q.    If you had an analyst who told you he had
13:52:24 16  a nondetect for asbestos in a bottle, a sample from a
13:52:28 17  bottle --
13:52:28 18    A.    Yes.
13:52:29 19    Q.    -- would you expect another analyst
13:52:32 20  separately on a different day analyzing that same
13:52:35 21  bottle to get a nondetect?
13:52:38 22    A.    If the sample was prepared the same way
13:52:47 23  and the detection limit was the same, I would expect
13:52:52 24  similar results.
13:52:55 25    Q.    Okay.  That goes to the reproducibility of

Atlanta Reporters, Inc. 866-344-0459   www.atlanta-reporters.com

164

13:52:58  1  your --
13:52:59  2    A.    Yeah.
13:52:59  3    Q.    Okay.  When you present -- what's more
13:53:05  4  accurate of a representation of what's in a bottle of
13:53:09  5  J&J talc, a single analysis or multiple analyses
13:53:16  6  separately averaged?
13:53:18  7         MS. O'DELL:  Object to the form.
13:53:19  8         THE WITNESS:  Let me put it in terms of
13:53:28  9  how FDA does their thing.  A laboratory runs a
13:53:35 10  study to validate a method.  That's the way it's
13:53:39 11  done.  They will validate the method based on
13:53:43 12  accuracy, precision, reproducibility, stability,
13:53:46 13  all these different factors.
13:53:48 14         And when they're done with that, when
13:53:51 15  they're done with that validation study, now
13:53:53 16  they have a method that they will use that is
13:53:56 17  allowed to use one sample from that to get a
13:54:00 18  result.  Because they validated their
13:54:06 19  methodology and are using a standard
13:54:07 20  methodology, that's what's allowed by FDA.
13:54:11 21         So I would expect one sample should be
13:54:12 22  fine.  You can do more, you can average more,
13:54:16 23  but the one sample should be representative
13:54:19 24  based on the methodology.
13:54:20 25    Q.    (By Mr. Chachkes)  So my question was not

Atlanta Reporters, Inc. 866-344-0459   www.atlanta-reporters.com

165

```
13:54:22   1   about adequacy or what follows regulatory methods.
13:54:28   2   I'm just saying what would you personally believe to
13:54:30   3   be more reliable, a single analysis from a bottle or
13:54:36   4   multiple separate analyses from a bottle averaged?
13:54:39   5         MS. O'DELL:  Object to the form.
13:54:40   6         THE WITNESS:  I would say the single
13:54:42   7   sample based on the methodology that we use that
13:54:45   8   has been validated, published.  A single sample
13:54:50   9   should be fine.
13:54:51  10         Q.   (By Mr. Chachkes)  Do you expect that the
13:54:52  11   multiple samples' average would be precisely the
13:54:55  12   same?
13:54:56  13         A.   I don't know about --
13:54:57  14         MS. O'DELL:  Object to form.
13:54:58  15         THE WITNESS:  -- precisely the same, but
13:54:59  16   they should be very similar.
13:55:01  17         Q.   (By Mr. Chachkes)  But you're not going to
13:55:02  18   say that one's better in terms of a more accurate
13:55:05  19   representation of what's in the bottle?
13:55:07  20         MS. O'DELL:  Object to the form.
13:55:08  21         THE WITNESS:  Well, now you've got an
13:55:09  22   average.  So you got an average of multiples,
13:55:13  23   they should be very similar.
13:55:14  24         If you take a single, you should get a
13:55:17  25   representative that is close to the average, you
```

166

```
13:55:20   1   know, within one standard definition of the
13:55:22   2   average.  So that's what I would expect.
13:55:24   3         Q.   (By Mr. Chachkes)  Okay.
13:55:25   4         A.   And it's acceptable to have something
13:55:27   5   within two to three standard deviations.
13:55:30   6         Q.   I'm just asking a question about which
13:55:31   7   would be more representative of what objectively is
13:55:34   8   in the bottle, one analysis or multiple analyses
13:55:39   9   averaged, which would be more representative?
13:55:41  10         MS. O'DELL:  Object to the form.
13:55:42  11         THE WITNESS:  Well, the single can be
13:55:43  12   representative, absolutely.
13:55:44  13         Q.   (By Mr. Chachkes)  And --
13:55:45  14         A.   I know you're saying more, I get that.
          15         Q.   Yeah.
13:55:47  16         A.   I understand that.
13:55:47  17         Q.   Can you answer the question?
13:55:48  18         A.   Sure.
13:55:48  19         Q.   Which is more representative?
13:55:49  20         A.   Which is more representative?
13:55:51  21         Q.   Yeah.
13:55:51  22         A.   Any of those three, if there were three of
13:55:54  23   them, would be representative.  Any of them.
13:55:55  24         Q.   Okay.  So if someone presented you a data
13:55:59  25   for one analysis of the asbestos concentration for a
```

167

```
13:56:04   1   bottle and someone else presented you, let's say, ten
13:56:07   2   different analyses, separate analyses averaged, you
13:56:10   3   would say those are equally representative, the
13:56:13   4   standard definitions, the margin of error, same for
13:56:16   5   both?
13:56:17   6         MS. O'DELL:  Object to the form.
13:56:18   7         THE WITNESS:  Well, the ten will give you
13:56:21   8   an average with a standard deviation, and if
13:56:23   9   that single one falls within that, it's still
13:56:27  10   adequate analysis of that and it's still
13:56:30  11   acceptable.
13:56:30  12         Q.   (By Mr. Chachkes)  The question is would
13:56:32  13   those two examples have the same standard deviations
13:56:35  14   and margins of error?
13:56:37  15         MS. O'DELL:  Object to the form.
13:56:38  16         THE WITNESS:  Well, they won't.  Of
13:56:39  17   course, you've got one that's got ten and one
13:56:41  18   has one.  But I'm going by a method that's been
13:56:44  19   validated as accepted as a standard method.  You
13:56:48  20   should be able to take one sample and it be
13:56:50  21   representative, yes.
13:56:50  22         Q.   (By Mr. Chachkes)  When you say they won't
13:56:53  23   have the same margin of error, the average of ten
13:56:54  24   would have a smaller margin of error; correct?
13:56:57  25         A.   Not --
```

168

```
13:56:57   1         MS. O'DELL:  Object to the form.
13:56:59   2         THE WITNESS:  -- necessarily.  It could.
13:57:00   3   It could.  Yep.
13:57:01   4         Q.   (By Mr. Chachkes)  Okay.  In what instance
13:57:01   5   would the ten done by the exact same procedure have a
13:57:04   6   larger margin of error when averaged than the one?
13:57:07   7         A.   Well, the one's not going to -- the one is
13:57:10   8   the one.  So what I'm saying is the one would fall
13:57:14   9   within the group of ten, so it would be
13:57:16  10   representative.
13:57:17  11         Q.   I'm not asking questions about
13:57:18  12   representative in any way whatsoever.
13:57:20  13         A.   I know.  I'm trying to answer from a
13:57:21  14   scientific point of view.
13:57:23  15         Q.   Yeah.  So if you want to be a scientist
13:57:25  16   about it, I would appreciate you under -- like,
13:57:27  17   listen to the words I'm saying, okay?  I'm talking
13:57:29  18   about the standard deviations, not what's
13:57:32  19   representative, just the math of standard deviations.
13:57:34  20         A.   Well, there's no --
13:57:36  21         MS. O'DELL:  Object --
13:57:36  22         THE WITNESS:  -- no standard deviation in
13:57:38  23   one.  So you're trying to compare ten to one and
13:57:41  24   say standard deviation, and it's not working.
13:57:43  25         Q.   (By Mr. Chachkes)  Okay.  How about
```

**169**

13:57:43  1    comparing two averaged and 100 averaged --

13:57:46  2        A.    Well, now all of a sudden now we're at two

13:57:51  3    and ten instead of one and ten.

13:57:53  4        Q.    100.

13:57:54  5        A.    Or 100.  Yeah, no, I'm talking about you

13:57:55  6    want to know about one, and I'm telling you one is

13:57:57  7    representative.  That's my opinion.

13:57:58  8        Q.    Just asking about standard deviations.  Is

13:58:01  9    it possible to talk about the math of standard

13:58:?? 10    deviations without saying the word representative?

         11        MS. O'DELL:  Object to the form.

         12        THE REPORTER:  Wait.  I'm sorry, say it

         13    again, please.

13:58:07 14        Q.    (By Mr. Chachkes)  Is it possible to talk

13:58:08 15    about the math of standard deviations without using

13:58:11 16    the word representative?

13:58:12 17        MS. O'DELL:  Object to the form.

13:58:13 18        THE WITNESS:  I'm not quite sure what

13:58:18 19    you're getting at.

13:58:18 20        Q.    (By Mr. Chachkes)  Okay.  Every time I ask

13:58:21 21    you about standard deviations, you say

13:58:23 22    representative.  I'm just talking about the math.  Do

13:58:25 23    you understand that?

13:58:26 24        A.    Yeah, but --

13:58:26 25        MS. O'DELL:  Object to the form.

Atlanta Reporters, Inc. 866-344-0459   www.atlanta-reporters.com

**170**

13:58:27  1        THE WITNESS:  -- I mean as far as -- I

13:58:31  2    mean, if you read back some of what I said, how

13:58:34  3    many times did I say representative with that?

13:58:36  4    Was it quite a few?

13:58:37  5        Q.    (By Mr. Chachkes)  It's a bit of a burden

13:58:39  6    to put on the reporter.

13:58:40  7        A.    I know, but I'm like I don't recall it

13:58:41  8    being so much a part of the standard deviation, you

13:58:44  9    know, answer.

13:58:45 10        Q.    Okay.  Let me see if you can answer this

13:58:46 11    question without using the words representative or

13:58:49 12    what's regulatory or -- just about a question about

13:58:52 13    standard deviation.  Listen to the question.

13:58:54 14        MS. O'DELL:  You may answer it any way you

13:58:56 15    choose.

13:58:56 16        THE WITNESS:  I know.  I mean, when I say

13:58:59 17    representative, I'm talking about that sample

13:59:01 18    being representative of the bottle.

13:59:03 19        Q.    (By Mr. Chachkes)  Okay.

13:59:04 20        A.    That's what I'm talking about

13:59:05 21    representative.  I didn't say it was representative

13:59:07 22    about standard deviation.

         23        Q.    Okay.

13:59:08 24        A.    I said it's representative of what is in

13:59:09 25    the bottle.

Atlanta Reporters, Inc. 866-344-0459   www.atlanta-reporters.com

**171**

13:59:10  1        Q.    This is a new, independent question.

13:59:10  2        A.    Okay.

13:59:12  3        Q.    And --

13:59:13  4        A.    New question.

13:59:13  5        Q.    You've got two samples from one -- a

13:59:17  6    bottle?

13:59:19  7        A.    Yes.

13:59:19  8        Q.    Separately analyzed?

13:59:21  9        A.    Okay.

13:59:21 10        Q.    Average them on one hand?

13:59:23 11        A.    Yes.

13:59:23 12        Q.    You've got 100 samples from that same

13:59:25 13    bottle average -- and separately analyze those and

13:59:28 14    average them, which is going to have a higher

13:59:31 15    standard deviation?

13:59:33 16        MS. O'DELL:  Object to the form.

13:59:34 17        THE WITNESS:  I can't tell you that.

13:59:35 18        Q.    (By Mr. Chachkes)  Okay.  Why can't you

13:59:36 19    tell me that?

13:59:36 20        A.    Because I don't have the numbers.  I don't

13:59:39 21    have any numbers to work with.

13:59:40 22        Q.    In what world is this hypothetical such

13:59:44 23    that the standard deviation is smaller for the two on

13:59:48 24    average than the 100 on average?

13:59:49 25        MS. O'DELL:  Object to the form.

Atlanta Reporters, Inc. 866-344-0459   www.atlanta-reporters.com

**172**

13:59:50  1        THE WITNESS:  It could be the same.

13:59:53  2    Standard deviation could be exactly the same.

13:59:54  3        Q.    (By Mr. Chachkes)  Okay.  Is there any

13:59:55  4    situation where the two is going to have a lower

13:59:57  5    deviation?

13:59:57  6        A.    A lower standard deviation?

13:59:59  7        Q.    Right.

14:00:00  8        A.    The two have a lower standard deviation?

14:00:07  9        Q.    Right.

14:00:07 10        A.    Possibly.

         11        Q.    How?

14:00:07 12        A.    Well, it depends on how close the results

14:00:09 13    are.  The closer they are, the smaller the standard

14:01:11 14    deviation.

14:01:11 15        Q.    Okay.  That's your opinion of how standard

14:01:13 16    deviation is calculated?

14:01:15 17        MS. O'DELL:  Object to the form.

14:01:15 18        THE WITNESS:  We didn't talk about how

14:01:17 19    it's calculated.  There's a formula for that.

         20        Q.    (By Mr. Chachkes)  Okay.

14:01:09 21        A.    Okay.  But the closer the values are to

14:02:25 22    each other, the smaller the standard deviation's

14:02:29 23    going to be.

14:02:29 24        Q.    Did your analysts use the point counting

14:03:32 25    method?

Atlanta Reporters, Inc. 866-344-0459   www.atlanta-reporters.com

173

| 14:00:32 | 1 | **A.** Are we back to PLM? |
| 14:00:34 | 2 | **Q.** Well, there's a point counting method for |
| 14:00:37 | 3 | PLM and SEM. |
| 14:00:38 | 4 | **A.** Yeah. |
| 14:00:38 | 5 | **Q.** So you don't do SEM, right? |
| 14:00:39 | 6 | **A.** No. |
| 14:00:40 | 7 | **Q.** Okay. All right. I'm going to skip that. |
| 14:00:42 | 8 | **A.** No. No. No. Yep, okay. |
| 14:00:43 | 9 | **Q.** I'll skip that, that's fine. |
| 14:00:49 | 10 | So let's talk about the coefficient of |
| 14:00:50 | 11 | variation study. I'm just going to give it to you. |
| 14:00:52 | 12 | **A.** Okay. |
| 14:00:53 | 13 | **Q.** We will mark it as an exhibit. What's the |
| 14:00:56 | 14 | next exhibit? She has to mark it. |
| | 15 | **A.** Yep. |
| | 16 | (Defendants' Exhibit 3 was marked for |
| 14:01:22 | 17 | identification.) |
| 14:01:22 | 18 | **Q.** (By Mr. Chachkes) All right. So is this |
| 14:01:26 | 19 | the coefficient of variation study that you referred |
| 14:01:29 | 20 | to earlier? |
| 14:01:30 | 21 | **A.** Yes. |
| 14:01:42 | 22 | **Q.** And that's where you got that 5 to 7 |
| 14:01:45 | 23 | percent deviation number from? |
| 14:01:46 | 24 | **A.** Yes. |
| 14:01:46 | 25 | **Q.** Is there a right answer and a wrong answer |

174

| 14:01:51 | 1 | as to whether someone you're looking at visually |
| 14:01:54 | 2 | under TEM is a fiber or bundle? |
| 14:01:56 | 3 | MS. O'DELL: Object to the form. |
| 14:01:57 | 4 | THE WITNESS: Is a fiber or a bundle a |
| 14:02:02 | 5 | right answer or a wrong answer? I would say |
| 14:02:04 | 6 | yes. |
| 14:02:05 | 7 | **Q.** (By Mr. Chachkes) So is the coefficient |
| 14:02:10 | 8 | of variation also -- can we also refer to it as an |
| 14:02:13 | 9 | error rate? Is that the same thing? |
| 14:02:14 | 10 | **A.** Yes. |
| 14:02:14 | 11 | **Q.** And for this coefficient of variation you |
| 14:02:18 | 12 | bought off-the-shelf J&J baby powder and added a |
| 14:02:22 | 13 | known tremolite asbestos and anthophyllite asbestos |
| 14:02:24 | 14 | standard reference material? |
| 14:02:26 | 15 | **A.** Yes. |
| 14:02:27 | 16 | **Q.** And you spiked the J&J baby powder with |
| 14:02:31 | 17 | enough asbestos to reach a concentration of about |
| 14:02:33 | 18 | .3 percent? |
| 14:02:33 | 19 | **A.** Yes. |
| 14:02:34 | 20 | **Q.** And the highest concentration of any |
| 14:02:35 | 21 | bottle that you've tested in this case is |
| 14:02:38 | 22 | .035 percent; correct? |
| 14:02:42 | 23 | MS. O'DELL: Object to the form. |
| 14:02:43 | 24 | THE WITNESS: I would have to check and |
| 14:02:44 | 25 | see. |

175

| 14:02:44 | 1 | **Q.** (By Mr. Chachkes) Okay. Do you have -- |
| 14:02:44 | 2 | just sitting here today, without referring to the |
| 14:02:46 | 3 | report, do you have an idea of what the highest |
| 14:02:48 | 4 | concentration of any bottle of MDL samples that you |
| 14:02:51 | 5 | tested is? |
| 14:02:52 | 6 | MS. O'DELL: Object to the form. |
| 14:02:53 | 7 | THE WITNESS: Again, I can't remember off |
| 14:02:54 | 8 | the top of my head right now, yeah. |
| 14:02:55 | 9 | **Q.** (By Mr. Chachkes) That's fine. It's not |
| 14:02:57 | 10 | a memory test. |
| 14:02:58 | 11 | **A.** Yep. |
| 14:02:58 | 12 | **Q.** For the coefficient of variation you |
| 14:03:00 | 13 | prepared 25 grid openings; correct? |
| 14:03:02 | 14 | **A.** Yes. |
| 14:03:02 | 15 | **Q.** And then you had four TEM analysts look at |
| 14:03:06 | 16 | the exact same grids and analyze them for tremolite |
| 14:03:09 | 17 | and anthophyllite asbestos; correct? |
| 14:03:10 | 18 | **A.** Yes. Yes. |
| 14:03:11 | 19 | **Q.** And so those four analysts were looking at |
| 14:03:13 | 20 | the exact same thing? |
| 14:03:14 | 21 | **A.** Yes. |
| 14:03:14 | 22 | **Q.** And these are the analysts who did the |
| 14:03:19 | 23 | testing of the MDL samples? |
| 14:03:21 | 24 | **A.** To my knowledge, yes. |
| 14:03:22 | 25 | **Q.** Do you consider the error rate that is |

176

| 14:03:28 | 1 | your conclusion in the coefficient of variation study |
| 14:03:31 | 2 | to be a good one for a lab? |
| 14:03:33 | 3 | **A.** Yes. |
| 14:03:33 | 4 | **Q.** Looking specifically at the count sheets |
| 14:03:37 | 5 | for tremolite, two of the analysts found nine |
| 14:03:42 | 6 | structures in the sample and two found ten |
| 14:03:44 | 7 | structures; correct? |
| 14:03:45 | 8 | **A.** Yes. |
| 14:03:45 | 9 | **Q.** And that's the 6 percent error rate you |
| 14:03:49 | 10 | were talking about, the roughly 6 percent error rate? |
| 14:03:51 | 11 | MS. O'DELL: Object to the form. |
| 14:03:52 | 12 | THE WITNESS: That's part of the way it's |
| 14:03:55 | 13 | calculated, yes. |
| 14:03:55 | 14 | **Q.** (By Mr. Chachkes) Okay. What other ways |
| 14:03:58 | 15 | was it calculated? |
| 14:03:59 | 16 | **A.** That's the way it was calculated according |
| 14:04:01 | 17 | to the formula we used. |
| 14:04:01 | 18 | **Q.** Okay. |
| 14:04:03 | 19 | **A.** Yep. |
| 14:04:03 | 20 | **Q.** Your analysts wrote down whether the |
| 14:04:08 | 21 | structure they found was a fiber or bundle; right? |
| 14:04:10 | 22 | **A.** Yes. |
| 14:04:11 | 23 | **Q.** This is a part of the study parameters; |
| 14:04:17 | 24 | right? |
| 14:04:17 | 25 | **A.** Yes. |

14:04:17 1    Q.    Let me but --

14:04:22 2    A.    I mean, the rate is based on the number of

14:04:24 3  structures that they counted.  Now, they may have

14:04:26 4  been a fiber or a bundle, but it's the total number

14:04:29 5  of structures they counted.  Yep.

14:04:31 6         MR. CHACHKES:  Let's mark as the next

14:04:32 7    exhibit, what are we on, 4?

8         (Defendants' Exhibit 4 was marked for

14:04:52 9    identification.)

14:04:52 10    Q.    (By Mr. Chachkes)  So what we have marked

14:04:55 11  as Rigler 4 is a demonstrative we worked up so that

14:04:57 12  we can see -- compare the analysts' work against each

14:04:59 13  other.

14:05:00 14         Can you just confirm that -- let's look,

14:05:03 15  for example, at analyst 1, what they found for grid

14:05:10 16  opening A8-E2?

14:05:16 17    A.    Which analysis is this?  Which sample is

14:05:17 18  this?

14:05:18 19    Q.    So this is -- you've gone to the appendix,

14:05:21 20  right, of Rigler 3.

14:05:26 21    A.    What?  Where are we --

14:05:29 22    Q.    So Rigler 3 is the coefficient of

14:05:32 23  variation study.

14:05:33 24    A.    Okay.

14:05:33 25    Q.    And if you go into -- there are sheets for

14:05:38 1  different analysts; right?

14:05:39 2    A.    Yeah, these are the count sheets, right.

14:05:41 3    Q.    Right.  So if you go to the first analyst

14:05:48 4  and you go to A8-E2 --

14:05:51 5    A.    Okay.

14:05:51 6    Q.    -- you see that the structure identified

14:05:53 7  was a bundle --

14:05:54 8    A.    Okay.

14:05:54 9    Q.    -- right?

14:05:55 10    A.    Yes.

14:05:56 11    Q.    Okay.  And then in my demonstrative you

14:05:58 12  see that's a bundle; right?

14:06:00 13    A.    Right.

14:06:00 14    Q.    And then you go to analyst number 2 -- is

14:06:06 15  that the second page?

14:06:07 16    A.    Yes.

14:06:07 17    Q.    Okay.  And it says in the upper left-hand

14:06:09 18  corner analyst 2?

14:06:10 19    A.    Yes.

14:06:10 20    Q.    Okay.  That for A8-E2 that analyst

14:06:16 21  identified a fiber?

14:06:17 22    A.    Okay.

14:06:17 23    Q.    Is that correct?

14:06:18 24    A.    Uh-huh.

14:06:19 25    Q.    Okay.  And that's reflected in the

14:06:22 1  demonstrative?

14:06:22 2    A.    Yep.

14:06:22 3    Q.    And analyst number 3, A8-E2, that analyst

14:06:27 4  detected a fiber?

14:06:28 5    A.    Yes.

14:06:29 6    Q.    Okay.  And then analyst number 4, A8-E2,

14:06:34 7  that analyst detected a bundle?

14:06:36 8    A.    Yes.  Yep.

14:06:37 9         MS. O'DELL:  Did you say A8-2 twice?

10         THE WITNESS:  This one.

14:06:41 11         MR. CHACHKES:  A8-E2.

14:06:43 12         THE WITNESS:  Yeah.  Is that grid square?

14:06:44 13         MS. O'DELL:  Yeah.

14         THE WITNESS:  Yeah.

14:06:45 15         MS. O'DELL:  Got it.  And then for --

14:06:49 16    Q.    (By Mr. Chachkes)  Okay.  So what we've

14:06:51 17  done is we've summarized these grid openings in this

14:06:55 18  demonstrative in that way --

14:06:56 19    A.    Right.

14:06:56 20    Q.    -- do you follow me so far?

14:06:58 21    A.    Yes.

14:06:58 22    Q.    And your analysts are trained to

14:07:00 23  distinguish between a fiber and a bundle; right?

14:07:02 24    A.    Yes.

14:07:02 25    Q.    And you ran this experiment to detect how

14:07:06 1  good your analysts were at identifying the same

14:07:09 2  thing?

14:07:09 3         MS. O'DELL:  Object to the form.

14:07:10 4    Q.    (By Mr. Chachkes)  Is that a yes?

14:07:11 5    A.    That would be yes.

14:07:11 6    Q.    But out of the 11 grid openings, your

14:07:14 7  analysts only came to consensus on the type of

14:07:16 8  structure they found only once?

14:07:18 9         MS. O'DELL:  Object to the form.

14:07:19 10         THE WITNESS:  Every time they came to the

14:07:20 11    consensus that it was tremolite.

14:07:22 12    Q.    (By Mr. Chachkes)  This is not the

14:07:22 13  question.

14:07:23 14    A.    But that is the answer.  This is what

14:07:25 15  we're concerned about here, is it asbestos.

14:07:27 16    Q.    The question before you is:  Out of 11

14:07:30 17  grid openings your analysts only came to a consensus

14:07:33 18  on the type of structure they found only once?

14:07:36 19    A.    What's that?  Out of 11 grid openings?

14:07:39 20    Q.    Right.

14:07:40 21    A.    No.

14:07:40 22    Q.    Okay.  Look at the demonstrative.

23    A.    Okay.

14:07:43 24    Q.    For A8-E2 your analysts did not find the

14:07:45 25  same structure; right?  Two found bundle, two found

| | |
|---|---|
|14:07:52| 1    fiber?|
|14:07:52| 2    **A.**    Uh-huh.|
|14:07:53| 3    **Q.**    For A8-E4 they all agree it's a fiber?|
|14:07:57| 4    **A.**    Uh-huh.|
|14:07:57| 5    **Q.**    For A8-E5 they did not agree whether it|
|14:08:00| 6    was a bundle or fiber.|
|14:08:02| 7    **A.**    Okay.|
|14:08:03| 8         MS. O'DELL:  And feel free to check if you|
|14:08:05| 9    need to check the data.  It's in the|
|14:08:08| 10    demonstrative.|
|14:08:08| 11    **Q.**    (By Mr. Chachkes)  Yeah.  I mean, if you|
|14:08:09| 12    think we're putting a fraudulent --|
|| 13    **A.**    No --|
|| 14    -- in front of you --|
|14:08:13| 15    **A.**    -- no.|
|14:08:13| 16         MS. O'DELL:  I think mistakes can happen.|
|| 17         THE WITNESS:  I'm sure they can.|
|14:08:15| 18         MS. O'DELL:  I think probably the others|
|14:08:16| 19    happen, too, but I'm not suggesting that in this|
|14:08:18| 20    situation.|
|14:08:18| 21    **Q.**    (By Mr. Chachkes)  So you can see for the|
|14:08:20| 22    11 grid openings on the demonstrative we put before|
|14:08:23| 23    you, there was only one instance where the analysts|
|14:08:27| 24    agreed on the fiber structure.|
|14:08:30| 25    **A.**    Okay.|

| | |
|---|---|
|14:08:31| 1    **Q.**    Right?|
|14:08:32| 2    **A.**    Okay.|
|14:08:32| 3    **Q.**    And did you -- did you determine an error|
|14:08:39| 4    rate for your analysts' ability to determine|
|14:08:42| 5    morphology?|
|14:08:43| 6    **A.**    No.|
|14:08:44| 7    **Q.**    If you did based on this, it would be a|
|14:08:47| 8    pretty high error rate, wouldn't it?|
|14:08:49| 9         MS. O'DELL:  Object to the form.|
|14:08:50| 10         THE WITNESS:  Well, it's not an error as|
|14:08:51| 11    to what the material is, is it?  It's all|
|14:08:53| 12    tremolite.  It's all tremolite asbestos.  It all|
|14:08:56| 13    meets the definition for tremolite asbestos,|
|14:08:57| 14    bundle, fiber.|
|14:08:59| 15    **Q.**    (By Mr. Chachkes)  I'll ask the question|
|14:09:00| 16    again.|
|14:09:00| 17    **A.**    Okay.|
|14:09:00| 18    **Q.**    If you were to determine an error rate for|
|14:09:03| 19    determining the morphology of what the analysts in|
|14:09:06| 20    the coefficient of variation were looking at, it|
|14:09:09| 21    would be a very high error rate, wouldn't it?|
|14:09:11| 22         MS. O'DELL:  Object to the form.|
|14:09:12| 23         THE WITNESS:  No.  No, it wouldn't.|
|14:09:12| 24    **Q.**    (By Mr. Chachkes)  Even though they only|
|14:09:13| 25    agreed once out of 11 times?|

| | |
|---|---|
|14:09:15| 1         MS. O'DELL:  Object to the form.|
|14:09:16| 2         THE WITNESS:  No.|
|14:09:16| 3    **Q.**    (By Mr. Chachkes)  Why?|
|14:09:17| 4    **A.**    It's not.|
|14:09:18| 5    **Q.**    Why?|
|14:09:18| 6    **A.**    Well, the max I can see here is it might|
|14:09:23| 7    be -- it might be maybe 50 percent, maybe, if that's|
|14:09:28| 8    what it is.|
|14:09:28| 9    **Q.**    Okay.|
|14:09:29| 10    **A.**    And I don't agree with it, okay, because|
|14:09:32| 11    the objective here is is it asbestos?  Is it|
|14:09:35| 12    asbestiform asbestos?  The answer is yes.|
|14:09:37| 13    **Q.**    So a 50 percent error rate in your mind is|
|14:09:39| 14    not high?|
|14:09:40| 15         MS. O'DELL:  Object to the form.|
|14:09:41| 16         THE WITNESS:  No, this is not --|
|14:09:43| 17         MS. O'DELL:  Give me a moment.|
|14:09:45| 18         Object to the form.|
|14:09:46| 19         Go ahead.|
|14:09:46| 20         THE WITNESS:  I mean, again, the objective|
|14:09:48| 21    here is to determine if this is asbestos, is|
|14:09:51| 22    this asbestiform.  And the answer to that is|
|14:09:54| 23    yes.  You're going to have some variation based|
|14:09:56| 24    on what they see in the microscope, all right,|
|14:10:01| 25    and that is totally acceptable.|

| | |
|---|---|
|14:10:03| 1    **Q.**    (By Mr. Chachkes)  Okay.  When you say|
|14:10:05| 2    totally acceptable, what do you mean by that?|
|14:10:06| 3    **A.**    Well, it's acceptable based on what the|
|14:10:13| 4    asbestiform is, according to the definition.  All|
|14:10:16| 5    right.  Fiber, bundle, .5 or greater, 5-to-1 aspect|
|14:10:22| 6    ratio.  Every one of these fits that.|
|14:10:24| 7    **Q.**    So -- well, that's not quite correct;|
|14:10:28| 8    right?  A8-G4, three analysts found no detectable|
|14:10:34| 9    asbestos and only one found asbestos; right?|
|14:10:36| 10    **A.**    That happens.|
|| 11    **Q.**    Okay.|
|14:10:36| 12    **A.**    That can happen.|
|14:10:37| 13    **Q.**    And then A8-G5, three analysts found no|
|14:10:41| 14    asbestos and one identified a bundle?|
|14:10:43| 15    **A.**    Again, that can happen.|
|14:10:45| 16    **Q.**    And you testified before that there's a|
|14:10:49| 17    right answer and a wrong answer as to whether|
|14:10:52| 18    something's a fiber or a bundle; right?|
|14:10:54| 19    **A.**    Yes.|
|14:10:54| 20    **Q.**    Do you know for grid opening A8-E4 which|
|14:10:59| 21    analyst got it wrong and which analyst got it right?|
|14:11:01| 22         MS. O'DELL:  Object to the form.|
|14:11:02| 23         THE WITNESS:  They both got it right.|
|14:11:04| 24    They all got it right.|
|14:11:05| 25    **Q.**    (By Mr. Chachkes)  Okay.  And so if|

185

```
14:11:08  1   there's objectively a right answer to whether it's a
14:11:11  2   fiber or bundle, how can something be both a fiber
14:11:14  3   and a bundle?
14:11:15  4        A.   As I say, the analyst, their job is to
14:11:22  5   figure out whether it meets the definition, all
14:11:24  6   right?  Fiber or bundle, it meets the specification
14:11:28  7   for whether it is asbestos, asbestiform asbestos.
14:11:33  8        Q.   Okay.  Putting --
14:11:34  9        A.   That's what we're concerned about here.
14:11:36 10        Q.   Putting aside whether there's -- what they
14:11:38 11   identified as asbestiform, I'm just talking about the
14:11:41 12   morphology.
14:11:41 13        A.   Sure.
14:11:42 14        Q.   For A8-E2, two analysts must have gotten
14:11:46 15   it wrong and two must have gotten it right.
14:11:48 16        MS. O'DELL:  Object to the form.
14:11:49 17        THE WITNESS:  No.  They all got it right.
14:11:50 18        Q.   (By Mr. Chachkes)  Okay.  So you don't
14:11:50 19   care whether an analyst correctly identifies
14:11:54 20   something as a bundle or fiber?
14:11:56 21        MS. O'DELL:  Object to the form.
14:11:58 22        MS. PARFITT:  Misstates his testimony.
14:11:59 23        THE WITNESS:  What I've said is it meets
14:12:00 24   the definition.  That's what is of concern to
14:12:03 25   me.  That's the most important part.
```

186

```
14:12:04  1        Q.   (By Mr. Chachkes)  The question is do you
14:12:06  2   care whether one of your analysts misidentifies a
14:12:09  3   bundle as a fiber or a fiber as a bundle?
14:12:11  4        MS. O'DELL:  Object to the form.
14:12:13  5        Q.   (By Mr. Chachkes)  Do you care?
14:12:14  6        MS. O'DELL:  Object to the form.
14:12:15  7        THE WITNESS:  I care if they identify it
14:12:19  8   properly according to the regulations, and in
14:12:22  9   all cases they have.
14:12:23 10        Q.   (By Mr. Chachkes)  I'll ask the same
14:12:24 11   question again.
14:12:24 12        A.   And I'll answer it the same way every
14:12:26 13   time.
14:12:26 14        Q.   We'll add this to the list of things we're
14:12:28 15   going to get the magistrate to --
        16        A.   Fine.
14:12:30 17        Q.   -- answer.
14:12:30 18        A.   That's fine.
14:12:30 19        Q.   Do you care --
14:12:31 20        A.   I'm going to answer it the same way, so we
14:12:33 21   can move on.
14:12:34 22        Q.   I want a clear record.  If you don't want
14:12:36 23   to answer -- do you care --
14:12:37 24        A.   I've answered already.
14:12:37 25        MS. O'DELL:  Excuse me.  He's answered
```

187

```
14:12:39  1   your question.
14:12:39  2        THE WITNESS:  Numerous times.
14:12:41  3        MS. O'DELL:  Excuse me.  Three or four
14:12:42  4   times.  If you want to waste your time, but
14:12:45  5   don't badger the witness.
14:12:46  6        MR. CHACHKES:  I'm not going to badger the
        7   witness --
14:12:50  8        MS. O'DELL:  You are badgering the
14:12:50  9   witness.
        10        MR. CHACHKES:  -- clear answer.
14:12:50 11        MS. O'DELL:  He's answered your question
14:12:51 12   very clearly.
14:12:52 13        MR. CHACHKES:  I'm going to ask the same
14:12:53 14   question again.  You can tell me I'm not allowed
14:12:56 15   to, and I'll move on.
        16        MS. O'DELL:  I'm telling you that the
        17   rules require that you not badger the witness.
        18   That's what I'm stating to you.
14:13:01 19        MR. CHACHKES:  I'm -- level voice.  It's a
14:13:02 20   calm question.  It's a serious question.  So.
14:13:04 21        MS. O'DELL:  That doesn't mean you're not
14:13:08 22   badgering the witness, as you are well aware.
14:13:09 23        MR. CHACHKES:  I believe I'm entitled to a
14:13:11 24   clear answer to a clear question.
14:13:13 25        MS. O'DELL:  You're not entitled to the
```

188

```
        1   answer that you want.  You're entitled to an
14:13:13  2   answer, and he's answered your question.
        3        MR. CHACHKES:  Let's maybe -- I don't
        4   think this colloquy is productive.  I'm going to
14:13:19  5   ask the same question again.  If you want to say
14:13:19  6   don't ask it, you can order me not to ask it.
14:13:22  7   I'm going to ask it again.
14:13:23  8        Q.   (By Mr. Chachkes)  Do you care whether
14:13:24  9   your analysts misidentify a bundle as a fiber or a
14:13:28 10   fiber as a bundle?  Just the morphology I'm talking
14:13:30 11   about.
14:13:31 12        A.   Asked and answered.
14:13:32 13        MS. O'DELL:  Excuse me.  Object to the
14:13:33 14   form.
14:13:34 15        Q.   (By Mr. Chachkes)  So you believe you've
14:13:37 16   already answered that?
14:13:37 17        A.   Yes.
14:13:38 18        Q.   Okay.  And if I were to say you don't care
14:13:41 19   about whether an analyst is misidentifying a
14:13:44 20   morphology, would I be wrong or right?
14:13:46 21        MS. O'DELL:  You would be misstating his
14:13:48 22   testimony.  Object to the question.
14:13:49 23        Q.   (By Mr. Chachkes)  If I said you do care
14:13:52 24   that an analyst misidentified the morphology of
14:13:56 25   asbestos, would I be wrong or right?
```

189

| | |
|---|---|
| 14:13:57 1 | MS. O'DELL: Object to the form. He's |
| 14:13:59 2 | answered your question. |
| 14:13:59 3 | THE WITNESS: I've already answered the |
| 14:14:01 4 | question. |
| 14:14:01 5 | MR. CHACHKES: Okay. We're going to add |
| 14:14:03 6 | that to the list of questions for the |
| 14:14:04 7 | magistrate. |
| 14:14:09 8 | Q. (By Mr. Chachkes) Does whether you |
| 14:14:12 9 | identify something as a bundle or a fiber affect the |
| 14:14:15 10 | concentration values in your report? |
| 14:14:19 11 | A. No. |
| 14:14:19 12 | Q. Not at all? |
| 14:14:24 13 | A. No. |
| 14:14:24 14 | Q. Does the Rigler 4 demonstrative which is |
| 14:14:32 15 | derived from your coefficient of variation study lead |
| 14:14:36 16 | you to believe that maybe the TEM is not the best |
| 14:14:39 17 | apparatus for resolving morphology? |
| 14:14:41 18 | A. No. |
| 14:14:42 19 | MS. O'DELL: Object to the form. |
| 14:14:43 20 | THE WITNESS: It is the best. |
| 14:14:45 21 | Q. (By Mr. Chachkes) No evidence will shake |
| 14:14:46 22 | you from that opinion? |
| 14:14:47 23 | A. No. |
| 14:14:47 24 | Q. Okay. Let's talk about asbestos. Ready? |
| 14:14:56 25 | A. I thought that's what we've been talking |

190

| | |
|---|---|
| 14:14:58 1 | about. |
| 14:14:58 2 | Q. Completely different topic. |
| 14:14:59 3 | A. All right. |
| 14:15:00 4 | Q. You talk about the Blount paper in your |
| 14:15:02 5 | expert report; correct? |
| 14:15:04 6 | A. Yes. |
| 14:15:04 7 | Q. Okay. In the Blount paper there's a |
| 14:15:06 8 | particle size distribution? |
| 14:15:09 9 | A. Yes. |
| 14:15:09 10 | Q. Okay. And out in the published literature |
| 14:15:16 11 | there are publications that have particle sized |
| 14:15:21 12 | distributions that -- strike that. |
| 14:15:25 13 | That there's a characteristic -- there is |
| 14:15:27 14 | a characteristic particle size distribution for |
| 14:15:30 15 | asbestos; is that correct? |
| 14:15:31 16 | A. Well, depending on how that sample's been |
| 14:15:43 17 | processed, you're going to have different fiber |
| 14:15:45 18 | sizes, different -- they're going to be different. |
| 14:15:48 19 | You're going to have different aspect ratios and |
| 14:15:51 20 | different sizes. |
| 14:15:51 21 | Q. For any given sample that everyone agrees |
| 14:15:56 22 | is asbestos, it's going to have a characteristic |
| 14:15:59 23 | particle size distribution; right? |
| 14:16:00 24 | MS. O'DELL: Object to the form. |
| 14:16:01 25 | THE WITNESS: It can. |

191

| | |
|---|---|
| 14:16:02 1 | Q. (By Mr. Chachkes) Okay. Meaning some |
| 14:16:06 2 | of -- strike that. |
| 14:16:06 3 | Does a -- you understand what a cleavage |
| 14:16:10 4 | fragment is? |
| 14:16:11 5 | A. Yes. |
| 14:16:11 6 | Q. Would you call a cleavage fragment |
| 14:16:13 7 | asbestos? |
| 14:16:13 8 | A. If it was of the size and shape that met |
| 14:16:16 9 | the regulatory definition, yes. |
| 14:16:18 10 | Q. Do cleavage fragments have a different |
| 14:16:21 11 | particle size distribution than asbestos? |
| 14:16:26 12 | MS. O'DELL: Object on the form. |
| 14:16:27 13 | THE WITNESS: They can. |
| 14:16:29 14 | Q. (By Mr. Chachkes) Okay. Using -- when I |
| 14:16:31 15 | say geological definition, I've heard you guys talk |
| 14:16:34 16 | about -- |
| 14:16:34 17 | A. Yes. |
| 14:16:34 18 | Q. -- I'm going to use your phrase geological |
| 14:16:37 19 | definition of asbestos. |
| 14:16:39 20 | A. All right. |
| 14:16:39 21 | Q. Using a geological definition of asbestos, |
| 14:16:42 22 | can you have a cleavage fragment that is greater than |
| 14:16:46 23 | 5-to-1 aspect ratio? |
| 14:16:48 24 | MS. O'DELL: Object to the form. |
| 14:16:49 25 | THE WITNESS: In my opinion, the answer to |

192

| | |
|---|---|
| 14:16:52 1 | that is yes. |
| 14:16:53 2 | Q. (By Mr. Chachkes) Okay. And using the |
| 14:16:56 3 | geological definition of asbestos as you have used |
| 14:17:02 4 | it, there can be an asbestiform particle that has an |
| 14:17:06 5 | aspect ratio of below 3-to-1? |
| 14:17:08 6 | MS. O'DELL: Object to the form. |
| 14:17:10 7 | THE WITNESS: Are you talking about what |
| 14:17:13 8 | kind of particle? |
| 14:17:14 9 | Q. (By Mr. Chachkes) Asbestiform particle. |
| 14:17:15 10 | A. Smaller than 3-to-1? |
| 14:17:17 11 | Q. Yeah. |
| 14:17:17 12 | A. I mean, from a regulatory standpoint, it |
| 14:17:22 13 | would be 3-to-1, 5-to-1. So -- |
| 14:17:27 14 | Q. Yeah. I don't want to interrupt. |
| 14:17:29 15 | So for just a geological definition as |
| 14:17:31 16 | you've -- as -- |
| 14:17:34 17 | A. Yeah. |
| 14:17:34 18 | Q. It's just a geological definition as you |
| 14:17:39 19 | have used that phrase, can there be, under the |
| 14:17:42 20 | geological definition, asbestos with an aspect ratio |
| 14:17:45 21 | below 3-to-1? |
| 14:17:46 22 | MS. O'DELL: Object to the form. |
| 14:17:47 23 | THE WITNESS: Well, the geological |
| 14:17:51 24 | definition that we've talked about has to do |
| 14:17:54 25 | with macro, large, very large that you can hold |

193

14:17:58  1    in your hand kinds of particles.  So in most
14:18:03  2    cases of that size, you know, you may see some
14:18:08  3    that are in that range, but you have to use the
14:18:09  4    PLM to see them, probably.
14:18:11  5        Q.    (By Mr. Chachkes)  Okay.  If I took, under
14:18:14  6    the geological definition, a tremolite particle that
14:18:17  7    had a 6-to-1 aspect ratio and I snapped it into two
14:18:21  8    3-to-1 aspect ratio particles, under the geological
14:18:24  9    definition those two particles would still be
14:18:27  10   asbestos; right?
14:18:28  11       A.    Yes.  I mean, if they were -- yeah.  They
14:18:32  12   were on a -- yes, they would be.
14:18:34  13       Q.    Let me ask it --
14:18:35  14       A.    If they were equally divided.
14:18:36  15       Q.    Yeah.  Let me just ask a better question
14:18:38  16   to be fair.
14:18:39  17             If I had a tremolite particle that was --
14:18:42  18   that had a 6-to-1 aspect ratio and I snapped it into
14:18:46  19   three parts perfectly evenly so that each had a
14:18:50  20   2-to-1 aspect ratio, under the geological definition
14:18:53  21   each of those would still be asbestos; right?
14:18:54  22             MS. O'DELL:  Object to the form.
14:18:56  23             THE WITNESS:  On a microscopic scale they
14:18:58  24       wouldn't be.  I mean, they wouldn't fit the
14:19:00  25       regulatory definition.

194

14:19:00  1        Q.    (By Mr. Chachkes)  I'm talking about the
14:19:01  2    geological.
14:19:02  3        A.    I mean --
14:19:08  4             MS. O'DELL:  Object to the form.
14:19:09  5             THE WITNESS:  Yeah, I don't -- I mean, I
14:19:11  6        think on a microscale versus, you know, what I
14:19:14  7        can see in my hand.  See what I'm saying?
14:19:17  8        Q.    (By Mr. Chachkes)  No.
14:19:18  9        A.    Yeah.  Well, that's how I feel about the
14:19:22  10   question you just asked me.  I'm not quite sure of
14:19:24  11   exactly -- I mean, I understand what the concept is,
14:19:28  12   but when you're saying on a geological scale, I mean,
14:19:32  13   if the aspect ratio is less than 3-to-1, it wouldn't
14:19:35  14   come under the regulatory definition.
14:19:37  15       Q.    Right.  But I'm not asking about
14:19:38  16   regulatory.
14:19:39  17       A.    Well, that's where I am with it.
14:19:41  18       Q.    Right.
14:19:43  19       A.    I mean, if you're going to say it's
14:19:45  20   asbestiform, it's got to have that ratio.  It's got
14:19:50  21   to have at least a 5-to-1 ratio.
14:19:52  22       Q.    So if I have a chunk of gold and I break
14:19:54  23   it in half, each half would still be gold; right?
14:19:57  24       A.    Yeah.
14:19:57  25       Q.    If I break those two halves again, each

195

14:20:00  1    part would still be gold?
14:20:01  2        A.    Correct.
14:20:01  3        Q.    And I can keep going doing that until I
14:20:05  4    had very small pieces and they still would be gold?
14:20:07  5        A.    Sure.
14:20:08  6        Q.    You're saying the same does not apply to
14:20:08  7    asbestos, that I could break asbestos and at a
14:20:10  8    certain point it's not asbestos?
14:20:11  9             MS. O'DELL:  Object to the form.
14:20:12  10             THE WITNESS:  Well, I mean, chemically it
14:20:15  11       still is.  Yes.
14:20:17  12       Q.    (By Mr. Chachkes)  Okay.  You use -- so I
14:20:26  13   didn't see the phrase asbestiform talc in your
14:20:28  14   report; is that correct?
14:20:30  15       A.    I don't -- it might be in there, yeah, I
14:20:33  16   think it is.  Yeah.
14:20:34  17       Q.    Okay.  In your report at page 8 you talk
14:20:37  18   about fibrous talc, you found fibrous talc in
14:20:42  19   98 percent of the Italian and Vermont talc samples by
14:20:45  20   ISO 22262.  Does that ring a bell?
14:20:48  21       A.    Yes.
14:20:48  22       Q.    What is your definition of fibrous talc?
14:20:50  23       A.    It would be talc that had that aspect
14:20:52  24   ratio of 5-to-1.
14:20:55  25       Q.    You would require parallel sides as well?

196

14:20:56  1        A.    Yes.
14:20:56  2        Q.    Is there a scientific consensus that there
14:21:01  3    is such a thing as fibrous talc?
14:21:02  4        A.    Yes.
14:21:02  5        Q.    Are you aware of any epidemiologist or
14:21:07  6    doctor who has studied the health effects of fibrous
14:21:09  7    talc?
14:21:10  8             MS. O'DELL:  Object to the form.
14:21:11  9             THE WITNESS:  Well, if the talc -- if
14:21:18  10       there's fibrous talc in with -- let's just say
14:21:22  11       we called it talc, whether it's got a fibrous
14:21:24  12       component or not, platy, you know, mostly platy.
14:21:30  13       As far as IARC is concerned, they say that that
14:21:35  14       is -- that will be -- if it has asbestos in it,
14:21:38  15       it's going to be regulated and hazardous to
14:21:44  16       health.
14:21:44  17       Q.    (By Mr. Chachkes)  The question was are
14:21:45  18   you aware of any epidemiologist or doctor who has
14:21:48  19   studied the health effects of fibrous talc?
14:21:51  20             MS. O'DELL:  Object to the form.
14:21:53  21       Q.    (By Mr. Chachkes)  It's a yes or no
14:21:54  22   question.
14:21:54  23       A.    Yes, there have been numerous studies on
14:21:59  24   fibrous talc, and I don't know if they're in some of
14:22:04  25   our reference material or not, but there have been

**197**

14:22:05  1  numerous studies that have been done.

14:22:07  2  **Q.** Can you name a single doctor or

14:22:09  3  epidemiologist who has done a study on the health

14:22:11  4  effects of fibrous talc --

14:22:13  5  MS. O'DELL: Object to the form --

14:22:14  6  THE WITNESS: Are you talking about

14:22:15  7  medical doctors, Ph.D.s, what? You said doctor.

14:22:18  8  **Q.** (By Mr. Chachkes) Let's say medical

14:22:20  9  doctor.

14:22:20  10  **A.** Yeah, let's say doctors like you said

14:22:22  11  before, then yes, there are.

14:22:23  12  **Q.** Okay. Start with medical doctors.

14:22:25  13  **A.** Okay.

14:22:30  14  **Q.** Can you name a medical doctor who has

14:22:30  15  studied the health effects of fibrous talc?

14:22:30  16  **A.** There are --

14:22:31  17  MS. O'DELL: Object to the form.

14:22:31  18  THE WITNESS: I can't name one right now

14:22:35  19  as I sit here, but there are that have done

14:22:36  20  those studies.

14:22:37  21  **Q.** (By Mr. Chachkes) Can you name an

14:22:38  22  epidemiologist?

14:22:39  23  MS. O'DELL: Object to the form.

14:22:40  24  THE WITNESS: There are ones that have.

14:22:41  25  **Q.** (By Mr. Chachkes) Can you name one?

**198**

14:22:42  1  **A.** No, not as I sit here right here.

14:22:44  2  **Q.** Can you name just a general doctor who has

14:22:46  3  studied the health effects of fibrous talc?

14:22:49  4  MS. O'DELL: Object to the form.

14:22:49  5  THE WITNESS: It's the same answer to the

14:22:51  6  question. Doctor, doctor.

14:22:52  7  **Q.** (By Mr. Chachkes) Okay. Well, there's

14:22:53  8  medical doctor and regular -- and other -- like

9  you're a doctor --

10  **A.** Well --

11  THE REPORTER: Wait. Wait.

14:22:58  12  THE WITNESS: I know, but we said doctors.

14:23:02  13  **Q.** (By Mr. Chachkes) But sitting here today

14:23:03  14  you can't name just a Ph.D. who has studied -- just

14:23:06  15  by name -- a Ph.D. who has studied the health effects

14:23:09  16  of fibrous talc -- exposure to fibrous talc?

14:23:10  17  MS. O'DELL: Object to form.

14:23:12  18  THE WITNESS: As I sit right here, I can't

14:23:14  19  name them, but they do exist. I have reference

14:23:17  20  material and I'd be happy to get that for you.

14:23:20  21  **Q.** (By Mr. Chachkes) Can you identify --

14:23:21  22  **A.** Would you like to have that material?

14:23:23  23  Would you like to have that --

14:23:24  24  **Q.** This deposition doesn't work if you ask

14:23:26  25  questions back to me.

**199**

14:23:27  1  **A.** I understand. I understand.

14:23:27  2  **Q.** Can you identify any published authority

14:23:29  3  for your definition of fibrous talc?

14:23:31  4  **A.** Sure.

14:23:31  5  **Q.** What?

14:23:32  6  **A.** I would want to say EPA right now.

14:23:46  7  **Q.** Any other?

14:23:47  8  **A.** I'd have to think about that.

14:23:50  9  **Q.** Specifically what EPA document?

14:23:53  10  **A.** I'll have to find that for you. Be happy

14:23:58  11  to find that.

14:23:58  12  **Q.** In the method in the 22262 method that you

14:24:04  13  used in your report, does it use the phrase fibrous

14:24:08  14  talc?

14:24:08  15  **A.** I don't recall. I'd have to look through

14:24:10  16  it.

14:24:11  17  **Q.** Does it use the phrase asbestiform talc?

14:24:13  18  **A.** Same answer.

14:24:14  19  **Q.** Do you think those phrases are in there?

14:24:17  20  **A.** I would have to look.

14:24:18  21  **Q.** Are fibrous talc and asbestiform talc

14:24:24  22  different?

14:24:25  23  **A.** Fibrous talc and asbestiform talc, if it

14:24:29  24  meets the definition, it would be considered

14:24:31  25  asbestiform talc, and you could still call it fibrous

**200**

14:24:34  1  talc.

14:24:35  2  **Q.** Are they --

14:24:35  3  **A.** So they could be one and the same.

14:24:37  4  **Q.** Could they be one and the same --

14:24:39  5  **A.** Let's say they are. If they meet the

14:24:41  6  definition, then they are.

14:24:43  7  **Q.** So the two phrases are synonymous?

14:24:46  8  **A.** If they meet the specifications for the

14:24:48  9  regulated fiber, the definition, than they are.

14:24:50  10  **Q.** Is there a situation where fibrous talc

14:24:53  11  and asbestiform talc aren't the same?

14:24:56  12  MS. O'DELL: Object to the form.

14:24:57  13  THE WITNESS: Again, if they don't meet

14:24:58  14  the aspect ratio, then they wouldn't be the

14:25:03  15  same.

14:25:03  16  **Q.** (By Mr. Chachkes) Well, then they

14:25:03  17  wouldn't be fibrous talc and asbestiform --

14:25:06  18  **A.** Sure. They could be --

14:25:06  19  MS. O'DELL: Object to the form.

14:25:09  20  THE WITNESS: -- fibrous at 4-to-1,

14:25:09  21  3-to-1, 2-to-1. Sure. They will have a fibrous

14:25:13  22  form.

14:25:13  23  **Q.** (By Mr. Chachkes) So you're saying that

14:25:14  24  if there's -- you could have fibrous talc at a 2-to-1

14:25:18  25  aspect ratio, but it would not be asbestiform talc?

**201**

```
14:25:21   1    A.    Correct.
14:25:21   2    Q.    Are there two kinds of tremolite,
14:25:34   3  asbestiform and nonasbestiform?
14:25:36   4    A.    Yes.
14:25:36   5    Q.    Just identifying something as tremolite
14:25:41   6  doesn't mean it's asbestiform?
14:25:43   7    MS. O'DELL:  Object to the form.
14:25:44   8    THE WITNESS:  It can be massive tremolite.
14:25:47   9  You know, if it's fibrous and it meets the
14:25:49  10  definition, then it's going to be asbestiform.
14:25:51  11  I mean, according to the definition.
14:25:53  12    Q.    (By Mr. Chachkes) The question is just
14:25:54  13  identifying something as tremolite does not mean it's
14:25:56  14  asbestiform; is that correct?
14:25:57  15    MS. O'DELL:  Object to the form.
14:25:58  16    THE WITNESS:  Once again, you would have
14:26:02  17  to look at the form.
14:26:03  18    Q.    (By Mr. Chachkes) To determine whether
14:26:04  19  it's asbestiform?
14:26:05  20    A.    Yes.
14:26:06  21    MS. O'DELL:  Object to the form.
14:26:07  22    Q.    (By Mr. Chachkes) Just identifying
14:26:08  23  something as anthophyllite doesn't mean it's
14:26:10  24  asbestiform; correct?
14:26:11  25    MS. O'DELL:  Object to the form.
```

Atlanta Reporters, Inc. 866-344-0459  www.atlanta-reporters.com

**202**

```
14:26:12   1    THE WITNESS:  Once again, if it meets the
14:26:15   2  definition than it would be.
14:26:17   3    Q.    (By Mr. Chachkes) Okay.  And if it
14:26:19   4  doesn't meet the definition, it wouldn't be?
14:26:21   5    MS. O'DELL:  Object to the form.
14:26:22   6    THE WITNESS:  Well, it's still
14:26:23   7  anthophyllite.  It may be, you know, below the
14:26:26   8  aspect ratio again.  Causes the same health
14:26:30   9  effects.
14:26:30  10    Q.    (By Mr. Chachkes) What's a cleavage
14:26:36  11  fragment again?
14:26:36  12    MS. O'DELL:  Asked and answered.
14:26:36  13    THE WITNESS:  Yeah.  Talked about that
14:26:39  14  already.
14:26:39  15    Q.    (By Mr. Chachkes) So what is it?
14:26:41  16    A.    It is a -- it's a form that would not have
14:26:45  17  parallel sides.  Wouldn't have the aspect ratio.
14:26:49  18  It's going to be an odd shape.
14:26:50  19    Q.    Is something that had nonparallel sides
14:26:55  20  with an aspect ratio of 6-to-1, would that be a
14:26:59  21  cleavage fragment?
14:27:00  22    MS. O'DELL:  Object to the form.
14:27:01  23    THE WITNESS:  Most likely.
14:27:02  24    Q.    (By Mr. Chachkes) Do you agree with the
14:27:03  25  statement:  Crushing of nonasbestiform amphibole can
```

Atlanta Reporters, Inc. 866-344-0459  www.atlanta-reporters.com

**203**

```
14:27:06   1  lead to elongate fragments that conform to the
14:27:09   2  definition of an asbestiform fiber?
14:27:11   3    MS. O'DELL:  Object to form.
14:27:12   4    THE WITNESS:  Yes.
14:27:12   5    Q.    (By Mr. Chachkes) Do you agree with this
14:27:13   6  statement:  Crushed nonasbestiform amphiboles rarely
14:27:17   7  have aspect ratios exceeding 30-to-1?
14:27:21   8    A.    I mean, that is -- that's been stated, but
14:27:29   9  it's as rarely -- so it's not 100 percent.  So you
14:27:35  10  can have some.
14:27:35  11    Q.    But you agree with the statement?
14:27:38  12    MS. O'DELL:  Object to the form.  He just
14:27:40  13  said what he thought about the statement.
14:27:41  14    THE WITNESS:  Yeah.
14:27:41  15    Q.    (By Mr. Chachkes) It's yes or no.  Do
14:27:43  16  crushed -- do you agree with this statement, yes or
14:27:45  17  no:  Crushed nonasbestiform amphiboles rarely have
14:27:48  18  aspect ratios exceeding 30-to-1?
14:27:50  19    MS. O'DELL:  You may answer it any way
14:27:52  20  you'd like, Doctor.  You're not restricted.
14:27:54  21    THE WITNESS:  I mean, I've already
14:27:55  22  answered part of the question, and I would say
14:27:56  23  yes, you know.
14:28:00  24    MS. O'DELL:  We have been going about an
14:28:01  25  hour.  Why don't we take a quick break.
```

Atlanta Reporters, Inc. 866-344-0459  www.atlanta-reporters.com

**204**

```
14:28:04   1    MR. CHACHKES:  Sure.
14:28:43   2    (Recess from 2:28 p.m. to 2:52 p.m.)
14:52:54   3    (Defendants' Exhibit 1 was marked for
14:52:54   4  identification.)
14:52:54   5    Q.    (By Mr. Chachkes) Okay.  Dr. Rigler, this
14:53:11   6  has already been marked as Rigler Exhibit 1.  Can you
14:53:15   7  confirm that those are MAS invoices?
14:53:17   8    A.    Let's see.  It has MAS on the letterhead.
14:53:26   9  They look like they are, yep.
14:53:29  10    Q.    Okay.  It looks like the first page is an
14:53:31  11  April invoice.  Am I right there?
14:53:33  12    A.    April 8 to April 11, 2018.
14:53:38  13    Q.    Okay.  And it looks like the second one on
14:53:42  14  page 2 is a March invoice?
14:53:44  15    A.    Let's see.  Yes.
14:53:46  16    Q.    And then page 3 looks like a single block
14:53:50  17  billing for, I'm guessing, the report, the
14:53:56  18  November 15 report?
14:53:56  19    A.    I don't know.  I have no idea.  First time
14:53:59  20  I've seen these.
14:53:59  21    Q.    Okay.
14:54:00  22    A.    Yeah, so I don't know.
14:54:01  23    Q.    Okay.  So you wouldn't know whether
14:54:03  24  there's other billing --
14:54:04  25    A.    I have no idea.
```

Atlanta Reporters, Inc. 866-344-0459  www.atlanta-reporters.com

205

| | | |
|---|---|---|
| 14:54:05 | 1 | Q. And you don't know whether there's |
| 14:54:07 | 2 | underlying documents that support these? |
| 14:54:09 | 3 | A. I don't know. |
| 14:54:10 | 4 | Q. And you don't -- |
| 14:54:11 | 5 | A. Have to ask Dr. Longo. |
| 14:54:12 | 6 | Q. Okay. And you don't know what the block |
| 14:54:14 | 7 | billing is for on number 3? |
| 14:54:15 | 8 | A. No. |
| 14:54:16 | 9 | Q. The third page, that is? |
| 14:54:17 | 10 | A. No, I don't. |
| 14:54:18 | 11 | Q. Do you know why the number 14 appears on |
| 14:54:22 | 12 | the third page? |
| 14:54:23 | 13 | A. That would be the department number. |
| 14:54:26 | 14 | Q. It's your department? |
| 14:54:27 | 15 | A. 14, yes. |
| 14:54:28 | 16 | Q. And what's that called? |
| 14:54:31 | 17 | A. I think it's called legal. |
| 14:54:33 | 18 | Q. Okay. So you're in legal? |
| 14:54:34 | 19 | A. Yes. |
| 14:54:35 | 20 | Q. Are you in any other departments? |
| 14:54:36 | 21 | A. No. |
| 14:54:37 | 22 | Q. Is Dr. Longo in legal? |
| 14:54:39 | 23 | A. Yes. |
| 14:54:39 | 24 | Q. Is he in any other departments? |
| 14:54:41 | 25 | A. Well, he is the departments. |

Atlanta Reporters, Inc.866-344-0459  www.atlanta-reporters.com

206

| | | |
|---|---|---|
| | 1 | Q. Oh, okay. |
| 14:54:44 | 2 | A. He's MAS. |
| 14:54:44 | 3 | Q. Is he in every department, 1 through |
| 14:54:47 | 4 | whatever? |
| 14:54:47 | 5 | A. I would say yes to that, but you need to |
| 14:54:50 | 6 | ask him about that. |
| 14:54:50 | 7 | Q. What is the department called legal? What |
| 14:54:52 | 8 | is it? |
| 14:54:53 | 9 | A. 14. It just says 14. |
| 14:54:54 | 10 | Q. No, I mean substantively, what does legal |
| 14:54:58 | 11 | do? Why is there a group called legal? |
| 14:55:01 | 12 | A. It's just called. I don't know. That's |
| 14:55:02 | 13 | what they've always called it. |
| 14:55:03 | 14 | Q. Does it do all the work that is for |
| 14:55:06 | 15 | litigations? |
| 14:55:07 | 16 | A. I don't -- |
| 14:55:09 | 17 | MS. O'DELL: Object to form. |
| | 18 | THE WITNESS: -- know. You'd have to ask |
| 14:55:11 | 19 | Dr. Longo. Because they came up with the |
| 14:55:13 | 20 | numbers and designations. |
| 14:55:14 | 21 | Q. (By Mr. Chachkes) When you do work that |
| 14:55:16 | 22 | is billable to, let's say, a company that's not |
| 14:55:21 | 23 | involved in litigation, does that go through unit 14? |
| 14:55:24 | 24 | A. For me? |
| 14:55:25 | 25 | Q. Yes. |

Atlanta Reporters, Inc.866-344-0459  www.atlanta-reporters.com

207

| | | |
|---|---|---|
| 14:55:25 | 1 | A. I guess it does. |
| 14:55:27 | 2 | Q. Okay. |
| 14:55:27 | 3 | A. I just give them the hours. |
| 14:55:29 | 4 | Q. Okay. I'm done with that one. |
| 14:55:34 | 5 | A. All right. |
| 14:55:34 | 6 | MR. CHACHKES: I still have a request |
| 14:55:35 | 7 | pending for billing. |
| 14:55:37 | 8 | MS. O'DELL: That's what I have in my |
| 14:55:39 | 9 | possession. |
| | 10 | MR. CHACHKES: Okay. |
| 14:55:39 | 11 | MS. O'DELL: If we receive any others, |
| 14:55:41 | 12 | I'll let you know. |
| 14:55:43 | 13 | Q. (By Mr. Chachkes) Okay. Can you pull up |
| 14:55:50 | 14 | Exhibit 5, which is, I think, if I've got it right, |
| 14:56:04 | 15 | 22262-2. |
| 14:56:14 | 16 | MR. SILVER: Alex, just for the record, |
| 14:56:16 | 17 | when you say exhibit numbers, these are exhibits |
| 14:56:17 | 18 | to the depo of Dr. Longo that happened on |
| 14:56:21 | 19 | February 5 of 2019? |
| 14:56:23 | 20 | MR. CHACHKES: Correct. And a good |
| 14:56:24 | 21 | clarification. |
| 14:56:24 | 22 | Q. (By Mr. Chachkes) So this is Exhibit 5 to |
| 14:56:28 | 23 | yesterday's Longo deposition, if you can -- |
| 14:56:29 | 24 | A. I don't have that. |
| 14:56:30 | 25 | Q. It's probably in this stack. I'll help |

Atlanta Reporters, Inc.866-344-0459  www.atlanta-reporters.com

208

| | | |
|---|---|---|
| 14:56:32 | 1 | you find it. |
| 14:56:40 | 2 | MS. O'DELL: Are you referring to 22262-2? |
| 14:56:42 | 3 | MR. CHACHKES: Part 2, yes. |
| | 4 | MS. O'DELL: Part 2. |
| 14:56:45 | 5 | MR. CHACHKES: Dash 2. Okay. |
| 14:56:51 | 6 | MS. O'DELL: I think I gave you mine. |
| | 7 | MR. CHACHKES: That one's his. It's got |
| 14:56:58 | 8 | the stamp on it. |
| | 9 | MS. O'DELL: It does, but I think I gave |
| | 10 | him mine earlier. |
| | 11 | THE WITNESS: Yeah, I think you did. It's |
| | 12 | in there. She has it, hers. |
| 14:56:59 | 13 | Q. (By Mr. Chachkes) Okay. |
| 14:56:59 | 14 | A. There we go. |
| 14:57:02 | 15 | Q. Can you turn to page -- well, do you see |
| 14:57:06 | 16 | where there's a section 3, Terms and Definitions, |
| | 17 | it's very near the front? |
| 14:57:12 | 18 | A. Yes. |
| 14:57:12 | 19 | Q. And there's a definition for asbestiform |
| 14:57:14 | 20 | that's 3.5? |
| 14:57:23 | 21 | A. Yes. |
| 14:57:23 | 22 | Q. And do you see where there's a definition |
| 14:57:25 | 23 | for asbestos, 3.6? |
| 14:57:26 | 24 | A. Yes. |
| 14:57:27 | 25 | Q. You didn't apply -- when you talk about |

Atlanta Reporters, Inc.866-344-0459  www.atlanta-reporters.com

209

14:57:36 1    asbestos in your report, it's not the definition of
14:57:40 2    asbestos that's in 3.6; correct?
14:57:43 3        MS. O'DELL:  Object to the form.
14:57:44 4        THE WITNESS:  Yeah.  The 3.6 definition is
14:57:49 5    the one that we say is -- this is a geological
14:57:54 6    definition.
14:57:54 7    Q.    (By Mr. Chachnes)  Right.  And so my
14:57:55 8    question is when I read the word asbestos in your
14:57:57 9    report, it's not the 3.6 definition in this
14:58:02 10   Exhibit 5; right?
14:58:03 11       MS. O'DELL:  Object to the form.
14:58:04 12       THE WITNESS:  It is based on the
14:58:08 13   regulatory definition.
14:58:09 14   Q.    (By Mr. Chachnes)  And the same question:
14:58:11 15   Is it the -- it's different from the definition in
14:58:15 16   3.6; correct?
14:58:16 17   A.    The regulatory definition?
14:58:18 18   Q.    The definition you're looking at right in
14:58:20 19   front of you --
14:58:20 20   A.    Yes.
14:58:21 21   Q.    -- that's 3.6?
14:58:22 22   A.    Yes.
14:58:22 23   Q.    So in your report when you use asbestos,
14:58:24 24   it's different than 3.6?
14:58:26 25       MS. O'DELL:  Object to the form.

210

14:58:27 1        Go ahead.
14:58:29 2        THE WITNESS:  The regulatory definition,
14:58:32 3    again, depending upon the document that you look
14:58:34 4    at, will include some of this language.  For
14:58:37 5    instance, the EPA includes some of this same
14:58:41 6    language that's in 3.6, so you'll have some
14:58:43 7    overlap there.
14:58:44 8    Q.    (By Mr. Chachnes)  I'm not asking about
14:58:45 9    overlap.
14:58:46 10       Can I assume that whenever you use the
14:58:47 11   phrase asbestos in your report you mean verbatim what
14:58:50 12   is in 3.6 that's right in front of you?
14:58:53 13       MS. O'DELL:  Object to the form.  That's
14:58:55 14   not what he said.
14:58:56 15       THE WITNESS:  I hear what you're saying.
14:59:00 16   Again, the regulatory definitions by standard
14:59:07 17   groups, such as EPA, ASTM, they have this
14:59:16 18   language in their definition, all right.  So
14:59:20 19   there's an overlap there.
14:59:21 20       If you want to say we don't do that, what
14:59:24 21   I would say is there is an overlap there, but
14:59:28 22   this is a geological definition, and we -- you
14:59:35 23   can't measure this flexibility and strength at
14:59:37 24   the level of the structures that we're looking
14:59:40 25   at.

211

14:59:40 1    Q.    (By Mr. Chachnes)  Okay.
14:59:41 2    A.    So I hope I've answered your question.
14:59:43 3    Q.    I thought it was a simple question, so I
14:59:45 4    guess I have to ask it again.
14:59:46 5        But, I mean, when you say there is
14:59:50 6    asbestos in your report in J&J's bottles of cosmetic
14:59:56 7    talc, do you mean to say that it contains a group of
14:59:59 8    silicate materials belonging to the serpentine and
15:00:02 9    amphibole groups which have crystallized in the
15:00:05 10   asbestiform habit, causing them to be easily
15:00:08 11   separated into long, thin, flexible, strong fibers
15:00:12 12   when crushed or processed?
15:00:14 13   A.    If -- again, you know, we go by what's in
15:00:21 14   the definition, the regulatory definition.  And
15:00:24 15   again, that does overlap -- some of the wording in
15:00:30 16   those regulatory documents overlap what's in here
15:00:35 17   too.  So that would be applicable, if that helps
15:00:38 18   answer the question.
15:00:39 19   Q.    I think you know what the question is.
15:00:41 20   It's a very simple one.
15:00:42 21       Is that your definition of asbestos in
15:00:44 22   your report?
15:00:45 23       MS. O'DELL:  Object to the form.
15:00:46 24   Q.    (By Mr. Chachnes)  Yes or no?
15:00:48 25       MS. O'DELL:  Object to the form --

212

15:00:49 1        THE WITNESS:  Part of it is.
15:00:50 2        MS. O'DELL:  -- ask --
15:00:50 3    Q.    (By Mr. Chachnes)  -- which part isn't?
15:00:51 4        THE REPORTER:  Wait.
15:00:51 5        MS. O'DELL:  Asked and answered.
15:00:56 6        THE WITNESS:  The strong fibers, the long,
15:01:00 7    flexible, strong fibers portion of it.
15:01:01 8    Q.    (By Mr. Chachnes)  Okay.  You have not
15:01:02 9    determined that J&J talc -- one way or the other,
15:01:06 10   whether it is or isn't, you haven't done a
15:01:09 11   determination of what you're calling asbestos in J&J
15:01:12 12   talc is easily separated into long, thin, flexible,
15:01:16 13   strong fibers when crushed or processed?
15:01:18 14       MS. O'DELL:  Object to form.
15:01:19 15       THE WITNESS:  I don't know how we would do
15:01:20 16   that.
15:01:20 17   Q.    (By Mr. Chachnes)  Okay.  And can you turn
15:01:24 18   to the next page, to cleavage fragment.  Is that the
15:01:28 19   definition of cleavage fragment in 3.12 that you use
15:01:32 20   in your report?
15:01:33 21   A.    I don't believe we're -- ask the question
15:01:38 22   again.  Is that what we use in our report?
15:01:40 23   Q.    Let me take a step back.
15:01:41 24   A.    Is that the --
15:01:42 25   Q.    Do you use the phrase cleavage fragment in

213

1   your report?

2       MS. O'DELL:  Object to form.

3       THE WITNESS:  We have used cleavage in our

4   report.

5       Q.   (By Mr. Chachkes)  Okay.  Cleavage

6   fragment?

7       A.   I want to say yes to that.

8       Q.   Okay.

9       A.   I'd have to look, but I believe so, yes.

10      Q.   When I read cleavage fragment in your

11  report, is it the definition I'm reading in 3.12?

12      A.   We would, again, refer to how it was --

13  that it didn't meet the regulatory definition of

14  parallel sides, less than 1/2 a micron, 5-to-1 aspect

15  ratio.

16      Q.   Okay.  And you would say that in your

17  report, something that is a fragment of a crystal

18  that is bounded by cleavage faces is not a cleavage

19  fragment if it has an aspect ratio of greater than

20  5-to-1?

21      MS. O'DELL:  Object to form.

22      THE WITNESS:  Correct.  If it had the

23  defining characteristics of the regulatory

24  definition.

25      MR. CHACHKES:  Okay.  No further

214

1   questions.

2       Subject to the same objection and

3   complaint we had yesterday about late produced

4   documents, I'll pass the witness.

5       MS. O'DELL:  You know our position.  We

6   don't believe they're late produced.

7       MR. CHACHKES:  I thought you were agreeing

8   it was late produced, no?

9       MS. O'DELL:  I just wanted to make sure

10  you didn't think my silence was acquiescence.

11  We're opposed.

12           EXAMINATION

13  BY MR. SILVER:

14      Q.   Good afternoon, Dr. Rigler.  My name is

15  Mark Silver.  I am representing Imerys Talc America.

16  I only have a couple of questions for you.

17      With my questions, after I ask them, make

18  sure that your attorneys have a chance to respond.

19  There are some based on off-record conversations they

20  may or may not instruct you to answer and/or you

21  won't feel comfortable answering.

22      We're going to do what's known as making a

23  record so that we can have a collegial disagreement

24  at some hopefully later date and not today, but we'll

25  see how it goes.

215

1       The first one is easy.  I just want to

2   make sure that I understand an answer you gave

3   earlier.

4       It was my understanding that you were

5   asked by Mr. Chachkes about whether you were working

6   on something that you intended to be published in

7   peer-reviewed literature relating to talc, and you

8   responded you could not confirm or deny.

9       Is that an accurate summarization of your

10  testimony?

11      A.   That is what I said.

12      Q.   Okay.  And my understanding is you cannot

13  confirm or deny because you and/or MAS believe that

14  work, if it exists, would be proprietary; is that

15  correct?

16      A.   And it's our policy also.

17      Q.   Okay.  So that work --

18      A.   Yes.

19      Q.   Is there a written policy on what MAS

20  considers proprietary?

21      A.   That's Dr. Longo's policy, so you'll have

22  to discuss that with him.

23      Q.   Okay.  But have you ever seen a written

24  policy on it?

25      A.   I don't recall seeing one.  But again,

216

1   talk to Dr. Longo.

2       Q.   Okay.  But your understanding, because

3   you're the one -- right now, your understanding is

4   it's proprietary, and you got that understanding from

5   a conversation with Dr. Longo?

6       A.   It is proprietary --

7       MS. O'DELL:  Object to form.

8       THE WITNESS:  -- and that's -- yeah, I

9   have to abide by that.

10      Q.   (By Mr. Silver)  But my question is you

11  got that understanding because you had a conversation

12  with Dr. Longo about it?

13      A.   That's his policy.  Yes.

14      Q.   Okay.

15      A.   Yes.

16      Q.   So I'm going to ask you something a little

17  more discrete and let's see if we get -- if you give

18  the same answer, you give the same answer.

19      A.   All right.

20      Q.   This work, whether you're doing it or not,

21  that's intended to be published in peer-reviewed

22  literature, does it have anything to do with any of

23  the opinions contained in any of the MDL reports that

24  have been produced in this case?

25      MS. O'DELL:  Object to the form.

217

15:05:04    1    THE WITNESS:  I can't answer that.  I
15:05:08    2    don't have an answer for that.
15:05:09    3    Q.    (By Mr. Silver)  Okay.  Same question,
15:05:11    4    does this work intending to be published in
15:05:15    5    peer-reviewed literature, if it's being done, have
15:05:16    6    anything to do with any of the samples that were
15:05:22    7    provided by Imerys in this litigation?
15:05:25    8    MS. O'DELL:  Objection.  Form.
15:05:26    9    THE WITNESS:  Again, I can't -- I can't
15:05:28   10    answer that.  You'll have to talk to Dr. Longo.
15:05:31   11    Q.    (By Mr. Silver)  All right.  This work
15:05:32   12    that you're intending to be published in
15:05:35   13    peer-reviewed literature, whether or not it's being
15:05:37   14    done, is it being funded in any way directly or
15:05:40   15    indirectly by any of the plaintiffs' counsel?
15:05:43   16    A.    I don't know.
15:05:43   17    Q.    This work, whether it's being done or not,
15:05:47   18    with respect to being intended to be published in
15:05:50   19    peer-reviewed literature, are you working with any
15:05:54   20    other scientists or experts that are also working
15:06:04   21    on -- in this talc litigation?
15:06:05   22    MS. O'DELL:  Object to the form.
15:06:06   23    THE WITNESS:  I don't know what their --
15:06:09   24    how they're working, in what capacity that way.
15:06:12   25    I don't know.

218

15:06:13    1    Q.    (By Mr. Silver)  Okay.  This work, whether
15:06:15    2    it's being done or not, is it being worked in
15:06:17    3    conjunction with scientists outside of MAS?
15:06:22    4    A.    Yes.  If it is, in fact.
15:06:25    5    If it is, in fact, being done.
15:06:27    6    I apologize, I don't have realtime here.
15:06:37    7    With respect to the work, if it is being
15:06:41    8    done on Imerys samples, do you have an
15:06:47    9    understanding -- strike that.  I'll just state it.
15:06:50   10    To the extent there is work being done,
15:06:53   11    Imerys is hereby giving MAS notice verbally and will
15:06:56   12    follow it up in writing that it does not have Imerys'
15:06:59   13    consent to use any of the samples that was produced
15:07:01   14    in this litigation.  If work's being done and you're
15:07:03   15    using it, MAS is on notice.  Imerys will send
15:07:07   16    followup in writing.
15:07:13   17    One more.
15:07:16   18    Any of the work that's being done, if it's
15:07:19   19    being done with an intent to publish in a peer
15:07:21   20    review, does it have anything to do with any of the
15:07:23   21    underlying data used in any of the MDL reports?
15:07:25   22    A.    I don't know.  I have no idea.  I can't
15:07:29   23    make a comment on it.
15:07:34   24    MR. SILVER:  No further questions.
15:07:35   25    THE WITNESS:  Thank you.

219

15:07:41    1    MR. FROST:  I don't have a mic.
15:07:48    2    MR. CHACHKES:  Switch with me.
15:07:48    3    MS. O'DELL:  So we've got second J&J
15:07:50    4    counsel?
15:07:51    5    MR. FROST:  J&J is just joining in the
15:07:52    6    instruction that if there are any Johnson &
15:07:55    7    Johnson samples being used in the work that may
15:07:56    8    or may not be being done, you know, at this
15:08:01    9    point we do not consent to releasing any of the
15:08:03   10    confidentially on the samples that exist under
15:08:03   11    the MDL order.
15:08:08   12    MS. O'DELL:  Any further questions
15:08:10   13    for Imerys?
15:08:13   14    Okay.
15:08:13   15    EXAMINATION
15:08:16   16    BY MS. O'DELL:
15:08:16   17    Q.    Okay.  Dr. Longo [sic], I've got just a
15:08:28   18    few questions for you.
15:08:30   19    Would you please describe for us your
15:08:34   20    educational background?  Let's start there.
15:08:36   21    A.    I have a Bachelor of Science degree in
15:08:43   22    biology from Villanova University.  And as I stated
15:08:46   23    before, this was a premedical curriculum, so it was
15:08:50   24    heavy on chemistry, organic chemistry.  Also I think
15:08:56   25    I had comparative anatomy, all the typical

220

15:09:01    1    undergraduate courses you have.  But the ones that I
15:09:03    2    selected beyond that were related to the medical
15:09:06    3    field.
15:09:08    4    And then I have a Ph.D. from the
15:09:13    5    University of Georgia in microbiology and a heavy
15:09:18    6    emphasis in that on pathogenic organisms, also using
15:09:24    7    electron microscopy techniques in the analysis of
15:09:28    8    different types of samples.
15:09:30    9    Also have postgraduate training at the
15:09:33   10    University of Georgia, also -- we did a lot of
15:09:37   11    research projects for my major professor at that
15:09:42   12    time.
15:09:42   13    Then I also taught a semester course at
15:09:49   14    Emory University in human anatomy.
15:09:52   15    So you want me to go on some more?
15:09:55   16    Q.    You can stop when you're finished, when
15:09:58   17    you feel like you're finished.  And if you --
15:10:01   18    well, let me break right here and just ask this
15:10:02   19    question.
15:10:03   20    Would you describe briefly your experience
15:10:09   21    in testing for the presence of asbestos?
15:10:12   22    A.    Okay.  I've been with MAS since the early
15:10:20   23    '90s.  I think I came to work there in 1989.  And
15:10:25   24    we -- one of the first projects that I worked on
15:10:27   25    while I was there was the analysis of these Kent

221

15:10:32 1 filter cigarettes that had crocidolite asbestos in

15:10:36 2 the filters, and that asbestos was in those filters

15:10:39 3 up to 10 percent by weight. 10 percent. They were

15:10:43 4 essentially solid crocidolite asbestos.

15:10:47 5 One of the things that the manufacturers

15:10:51 6 had touted was that they were -- how can I put it --

15:10:56 7 the best cigarettes for human health, essentially.

15:10:59 8 And if you talk to people that had smoked those, one

15:11:04 9 of the complaints they had was the filter worked so

15:11:06 10 well that all you got was hot air out of them, and we

15:11:09 11 can see why.

15:11:10 12 But nonetheless, we published a paper

15:11:13 13 based on our findings in manipulating the way that a

15:11:19 14 smoker would with those cigarettes to see if there

15:11:22 15 were asbestos shed from those filters.

15:11:26 16 Well, it turns out that we weren't the

15:11:28 17 first ones that found that information out, that at

15:11:31 18 the time there was a laboratory -- trying to remember

15:11:36 19 the name -- Ernest Fullam laboratory who actually did

15:11:40 20 work for the manufacturer, and they actually had

15:11:42 21 looked at that smokescreen for asbestos and found

15:11:47 22 that they had plenty of it coming out of there at the

15:11:50 23 time. So what we did was a study where we quantified

15:11:53 24 that amount.

15:11:54 25 And then that was published rapidly in the

222

15:11:57 1 Journal of Cancer so that it could get out and people

15:12:01 2 could know that if they had smoked these cigarettes

15:12:03 3 before, it was time to talk to a doctor.

15:12:05 4 So that was one of the first studies that

15:12:08 5 I worked on on the asbestos side.

15:12:11 6 The other, we developed a filter cassette

15:12:15 7 at the laboratory that we were in the process of

15:12:18 8 manufacturing, and so we were in that business for a

15:12:23 9 while so I helped with that technology.

15:12:25 10 But we also did things like testing

15:12:28 11 batteries. I know that you've heard the Sears

15:12:31 12 DieHard batteries. So we did tests on those

15:12:34 13 batteries because they were coming back -- people

15:12:37 14 were buying them and then the battery would die

15:12:39 15 within a very short period of time, and the

15:12:43 16 contention was that these batteries were defective.

15:12:46 17 Well, what was happening was they were

15:12:47 18 buying batteries from people, charging them up, and

15:12:50 19 putting them back on the shelf. So we essentially

15:12:53 20 proved that that was happening. And that was a large

15:12:55 21 study that we did in the early '90s also. So it was

15:12:58 22 a big materials analysis study.

15:13:01 23 But over the years I've participated in

15:13:03 24 hundreds of studies that have analyzed all kinds of

15:13:06 25 particulates using the technologies that we have at

223

15:13:08 1 our laboratories. So not just asbestos, but, you

15:13:12 2 know, other types of particulates.

15:13:13 3 Q. Are the testing methodologies that are

15:13:18 4 employed at MAS methodologies that are generally

15:13:23 5 accepted?

15:13:23 6 A. Yes.

15:13:25 7 MR. CHACHKES: Objection. Leading.

15:13:26 8 THE WITNESS: These are -- in cases where

15:13:31 9 we're doing analysis, we're using standard

15:13:33 10 methodologies. Whether it be mass

15:13:36 11 chromatography, ion chromatography, all these

15:13:43 12 are standard methods that we work, and we create

15:13:45 13 SOPs from the standard methods. So they are

15:13:45 14 incorporated into the actual methods that we

15:13:51 15 use.

15:13:51 16 And again, here in the asbestos analysis

15:13:54 17 area, we have multiple standard methodologies

15:13:57 18 that we use.

15:13:57 19 Q. (By Ms. O'Dell) Have you employed those

15:13:59 20 standard methodologies in your work in preparing the

15:14:03 21 report for the MDL?

15:14:03 22 MR. CHACHKES: Objection. Leading.

15:14:06 23 THE WITNESS: Yes. Yes, we have. And

15:14:08 24 they are all listed in the report.

15:14:10 25 Q. (By Ms. O'Dell) You've talked today about

224

15:14:12 1 a quality control program that you have at MAS.

15:14:16 2 Please describe that, you know, generally.

15:14:19 3 A. Okay. The quality program for us to be

15:14:25 4 certified by NVLAP NIST, National Institute of

15:14:30 5 Standards and Technology, is essentially along the

15:14:33 6 lines of what's called ISO 17025, which is

15:14:37 7 methodologies for laboratories.

15:14:41 8 And they have an entire suite of quality

15:14:46 9 controls that you use for all of your

15:14:49 10 instrumentation, for your calibration methods, and

15:14:53 11 for the analysts, because in these cases, the

15:14:56 12 analysts are essentially the machines. They're not

15:15:00 13 like gas chromatographs; they are people, and the

15:15:03 14 people have to be certified for the methods.

15:15:05 15 So they are put through the rigors of

15:15:08 16 actually extensive training in the beginning when

15:15:12 17 they come to our laboratory, and then they have to

15:15:15 18 take periodic tests, if you will, from the American

15:15:19 19 Industrial Hygiene Institute, AIHA, and also NIST

15:15:25 20 NVLAP. They'll send us blind samples, and then what

15:15:29 21 we have to do is analyze them and identify them.

15:15:32 22 So -- and we do the same thing for other

15:15:34 23 programs. Like we do mold analysis, and we're part

15:15:37 24 of the AIHA, American Industrial Hygiene

15:15:41 25 Association's, certification for our laboratory.

225

15:15:43 1    We also have what's called A2LA. That's
15:15:47 2 another certifying body. They're all based upon the
15:15:52 3 ISO 17025 for laboratories. So it's very extensive
15:15:56 4 quality control.
15:15:56 5    Q.    For approximately how many years has MAS
15:16:00 6 had a quality control program like you described?
15:16:03 7    A.    Since as long as I've been there.
15:16:06 8    Q.    So more than 30 years?
15:16:07 9    A.    Oh, yeah. Yeah.
15:16:08 10    Q.    What's your responsibility in the quality
15:16:10 11 control process?
15:16:12 12    A.    Well, we have a quality control officer,
15:16:17 13 and my responsibility is to see that quality of
15:16:26 14 program's followed for the work that we do.
15:16:29 15    Now, I mean, the program's followed
15:16:33 16 according to the certifying body, so we have to
15:16:37 17 follow their protocols and standards. And so we just
15:16:43 18 have to be sure that we've documented all of our
15:16:46 19 activities for quality in all these areas.
15:16:49 20    Q.    Are the quality control standard
15:16:55 21 procedures that you've described applied both in --
15:16:59 22 are they applied in nonlitigation matters, I'm
15:17:02 23 assuming?
15:17:02 24    A.    Yes.
15:17:02 25    Q.    Are they applied in litigation matters?

227

15:19:06 1    MR. SILVER: Objection to form.
15:19:08 2    THE WITNESS: Well, of course, there's
15:19:09 3 client confidentiality, which we hold to the
15:19:13 4 highest in terms of any discussions of any work
15:19:15 5 that we're doing for anyone else. As you've
15:19:19 6 seen today, I haven't talked about any clients
15:19:22 7 that we work with, and can't do that.
15:19:24 8    As far as publications, that type of
15:19:27 9 thing, we don't -- again, that's just a policy.
15:19:31 10 We had a bad experience a number of years ago,
15:19:35 11 and since that time we've adopted that policy,
15:19:38 12 and it's part of the confidential documentation
15:19:42 13 that we keep.
15:19:49 14    MS. O'DELL: Nothing further. Thank you.
15:19:53 15    MR. CHACHKES: Nothing more here.
15:20:02 16    MR. FROST: I just want to make it clear,
15:20:06 17 until we can resolve this issue regarding the
15:20:08 18 publication or the potential publication of
15:20:09 19 these issues, we would like to and deem that
15:20:12 20 this deposition remains open.
15:20:14 21    MS. O'DELL: We oppose that, as I think
15:20:17 22 the rule is very clear in terms of discovery of
15:20:20 23 confidential proprietary matters, and Dr. Rigler
15:20:23 24 has testified these are proprietary matters, and
15:20:27 25 so we would oppose holding the deposition

226

15:17:04 1    A.    Yes. They're applied in all matters of
15:17:06 2 analysis. So we -- I mean, machine calibration,
15:17:15 3 analyst training calibration, if you will, that way,
15:17:19 4 all of that has to be followed.
15:17:21 5    Q.    Is the methodology that you've used in
15:17:51 6 rendering your opinions in this case the same
15:17:53 7 methodology that you use in nonlitigation matters?
15:17:55 8    A.    Yes. Same standard types of methods.
15:17:59 9    Yes.
15:17:59 10    Q.    Is there anything -- strike that. Let me
15:18:03 11 ask this.
15:18:03 12    What was your responsibility in relation
15:18:07 13 to the MDL report?
15:18:10 14    A.    As I stated earlier, it was report review,
15:18:14 15 documentation review. As far as data review, I had a
15:18:20 16 big portion of the data review. And then the quality
15:18:23 17 review.
15:18:25 18    Q.    Okay. You've been asked a number of
15:18:33 19 questions about the policy at MAS regarding ongoing
15:18:46 20 research or ongoing discussions about research --
15:18:50 21    A.    Yes.
15:18:50 22    Q.    -- and -- do you have an understanding as
15:18:56 23 to why it is the policy at MAS not to discuss studies
15:19:00 24 that have not been completed or still being
15:19:03 25 formulated?

228

15:20:29 1 open --
2    MR. FROST: Sure. That's fine.
15:20:31 3    MS. O'DELL: -- and certainly discovery.
15:20:34 4    MR. FROST: Thank you.
15:20:36 5    (Deposition concluded at 3:20 p.m.)
6    (Pursuant to Rule 30(e) of the Federal
7 Rules of Civil Procedure and/or O.C.G.A.
8 9-11-30(e), signature of the witness has been
9 reserved.)
10    (Original transcript sent to Jack Frost.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

229

C E R T I F I C A T E

STATE OF GEORGIA:

COUNTY OF HALL:

I hereby certify that the foregoing transcript was taken down, as stated in the caption, and the questions and answers thereto were reduced to typewriting under my direction; that the foregoing pages 1 through 228 represent a true, complete, and correct transcript of the evidence given upon said hearing, and I further certify that I am not of kin or counsel to the parties in the case; am not in the regular employ of counsel for any of said parties; nor am I in anywise interested in the result of said case.

This, the 8th day of February, 2019.

_____

FRANCES BUONO, B-791

Georgia Certified Court Reporter

---

231

DEPOSITION OF MARK W. RIGLER, PH.D. /FCB

I do hereby certify that I have read all questions propounded to me and all answers given by me on the 6th day of February, 2019, taken before Frances Buono, and that:

_____ 1)  There are no changes noted.

_____ 2)  The following changes are noted:

Pursuant to Rule 30(e) of the Federal Rules of Civil Procedure and/or the Official Code of Georgia Annotated 9-11-30(e), both of which read in part: Any changes in form or substance which you desire to make shall be entered upon the deposition...with a statement of the reasons given...for making them. Accordingly, to assist you in effecting corrections, please use the form below:

Page No. ____ Line No. ____ should read:_____
_____

Page No. ____ Line No. ____ should read:_____
_____

Page No. ____ Line No. ____ should read:_____
_____

Page No. ____ Line No. ____ should read:_____
_____

Page No. ____ Line No. ____ should read:_____
_____

Page No. ____ Line No. ____ should read:_____
_____

Page No. ____ Line No. ____ should read:_____
_____

Page No. ____ Line No. ____ should read:_____
_____

---

230

COURT REPORTER DISCLOSURE

Pursuant to Article 10.B. of the Rules and Regulations of the Board of Court Reporting of the Judicial Council of Georgia which states: "Each court reporter shall tender a disclosure form at the time of the taking of the deposition stating the arrangements made for the reporting services of the certified court reporter, by the certified court reporter, the court reporter's employer, or the referral source for the deposition, with any party to the litigation, counsel to the parties or other entity.  Such form shall be attached to the deposition transcript," I make the following disclosure:

I am a Georgia Certified Court Reporter.  I am here as a representative of Atlanta Reporters, Inc. Atlanta Reporters was contacted to provide court reporting services for the deposition.  Atlanta Reporters will not be taking this deposition under any contract that is prohibited by O.C.G.A. 15-14-37(a) and (b).

Atlanta Reporters has no contract/agreement to provide reporting services with any party to the case, any counsel in the case, or any reporter or reporting agency from whom a referral might have been made to cover this deposition.  Atlanta Reporters will charge its usual and customary rates to all parties in the case, and a financial discount will not be given to any party to this litigation.

_____

FRANCES BUONO, B-791
Georgia Certified Court Reporter

---

232

DEPOSITION OF MARK W. RIGLER, PH.D. /FCB

Page No. _____ Line No. _____ should read:_____
_____

Page No. _____ Line No. _____ should read:_____
_____

Page No. _____ Line No. _____ should read:_____
_____

Page No. _____ Line No. _____ should read:_____
_____

Page No. _____ Line No. _____ should read:_____
_____

Page No. _____ Line No. _____ should read:_____
_____

Page No. _____ Line No. _____ should read:_____
_____

If supplemental or additional pages are necessary, please furnish same in typewriting annexed to this deposition.

_____
MARK W. RIGLER, PH.D.

Sworn to and subscribed before me,
This the _____ day of _____, 20___.

_____
Notary Public
My commission expires: _____

Exhibit 30

**MISSOURI CIRCUIT COURT**
**TWENTY-SECOND JUDICIAL CIRCUIT**
**(City of St. Louis)**

| | | |
|---|---|---|
| GAIL LUCILLE INGHAM, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | Cause No. 1522-CC10417 |
| | ) | |
| vs. | ) | |
| | ) | |
| JOHNSON & JOHNSON, *et al.*, | ) | Division: 10 |
| | ) | |
| Defendants. | ) | |

<u>**AFFIDAVIT OF DR. MARK RIGLER PH.D**</u>

On May 21, 2018 Dr. Mark W. Rigler appeared before me the undersigned notary public, and upon being duly sworn stated as follows:

1.      My name is Mark W. Rigler.  My business address is 3945 Lakefield Court, Suwanee GA 30024.  I have personal knowledge of the facts stated here in, and they are all true and correct.

2.   I have a Ph.D. in Microbiology from the University of Georgia. I have been a licensed clinical electron microscopy Laboratory Director for the state of Georgia. I have been trained in all phases of electron microscopy including morphological identification of tissues and materials, selected area electron diffraction (SAED), and energy dispersive x-ray analysis (EDS). I have also been trained in the methods of tissue processing that are used by clinical pathologist which include histological sample preparation for histological slide preparation, tissue analysis and identification at the optical microscopy level. I have also been trained in all phases of  tissue preparation and tissue sectioning for transmission electron microscopy including tissue preparation for scanning electron microscopy and tissue preparation for cryo-electron microscopy. At MAS I

1

have directed the analysis of a variety of materials and biological tissues by transmission and scanning electron microscopy including the analysis mineralogical particulates and microfibers including tremolite, actinolite, anthophyllite, chrysotile, amosite and crocidolite asbestos.

3.       I have 25 years of experience analyzing soft tissues such as lung tissue, liver, muscle, and a variety of other soft tissues. I have been trained in the histological examination of human tissue types such as epithelial tissue, connective tissue, cartilage, bone, blood as well as have been trained to identify complex organ tissue types including muscle, endocrine, liver, reproductive (ovary, fallopian tube, testes, gametes) gastrointestinal, skeletal, and nervous tissue. I have used a variety of preparation techniques for analyzing human tissues samples for optical and electron microscopy and have prepared tissue samples using the same histological techniques as clinical pathologists as well as have been trained in the histological examination of human tissues. I have used tissue preparation methods that are well established in the literature and in laboratories worldwide. The method used is a technique for preparing soft tissues such as lung, ovarian, fallopian, and lymphatic tissue and is the same technique used regardless of the type of soft tissue. In this method, soft tissues are incubated in a strong basic solution of sodium hypochlorite, potassium hydroxide, sodium hydroxide, or a combination of these solutions. A typical base solution, such as 8% bleach, completely dissolves the soft tissue and preserves mineralogical particulates such as asbestos and talc. These asbestos and talc particles can be recovered by filtration then identified and quantified using transmission or scanning electron microscopy (1-7), . I have performed this process hundreds of times, and regardless of the soft tissue type to be analyzed, the processing of the tissue is the same and the result from the processing, that is, the recovery and isolation of asbestos and talc, is also the same. I have testified in a number of previous cases. And my testimony has been challenged on many occasions pursuant

2

to *Daubert v. Merrill Dow Pharmaceuticals.* On each of these occasion, the court has overruled the challenge and allowed me to testify.

4.    The idea of background asbestos is predicated on studies of air from urban areas (1). These studies have shown air levels of asbestos in the range of 0.0001 to 0.00001 fibers/cc of air and the only asbestos type usually found has been chrysotile. To date, chrysotile asbestos has not been detected in any of the ovarian tissue samples tested at MAS. No tremolite or anthophyllite has been found floating around in urban air according to published studies. The premise of exposure to background levels of tremolite or anthophyllite is unfounded. The woman in the cases were not exposed to any known "background" levels of asbestos.

5.    The analysis of the ovarian tissue samples by MAS was a laboratory analysis. Single ovarian, fallopian tube, or pelvic lymph node tissue samples from eight women were analyzed for asbestos and talc burden at MAS. The scientific method used for all of these sample analyses was predicated on the null hypothesis, that the human reproductive tissue in its natural state is void of talc and asbestos particles. The process of cellular growth occurs from the inside out, that is, cell division pushes outward naturally keeping tissues free of particles and fibers. This process, along with scavenger cells, excludes foreign particles at all cellular levels allowing the body to reject and expel foreign particles. This is why no asbestos or talc particles are expected to be found in tissues unless they have been exposed to asbestos or talc (10). However, if the cellular mechanisms for these processes are overwhelmed by heavy or long term continuous exposures to particles such as asbestos and talc, they will accumulate in the tissue. Large asbestos structures (approximately >15 micrometers in length) are not typically found in tissue samples simply because they are not always retained by the body due to physics and their size. Most of the retained fibers and talc particles found in the body are less than 5 micrometers in size because they are

3

small enough to be transported and moved around in the body. (16, 17, 18) . Finding asbestos or talc particles in human tissues is an indication of one of two things; exposure of the individual to asbestos and talc or contamination of the sample. To rule out the possibility of contamination, the proper laboratory controls, consisting of a process blank and a wax paraffin blank, were run for each analysis along with the tissues samples. Running these laboratory blanks ruled out the possibility of contamination in these tissue analysis cases. It is therefore my opinion that talc and asbestos particulates found in the ovarian tissue was due to exposure of each woman to asbestos and talc bearing products during their lifetime. Samples of ovarian, fallopian and lymph node tissue were analyzed at my laboratory for asbestos burden and seven of the eight women in those cases had asbestos in their ovaries and all eight had talc in their ovarian, fallopian tube, or pelvic lymph node tissue. A review of each woman's medical history indicated that none of them had exposure to any asbestos bearing products (8, 9). However, their histories did show substantial and significant use of baby powder during their lifetime. It has been established in published studies that baby powder has been contaminated with asbestos (11, 12). At MAS, analysis of Johnson & Johnson baby powders has also shown that at least half of tested baby powder samples contained tremolite or anthophyllite asbestos (13). Thus, I concluded that the talc products used by the women whose tissue I examined were the probable source of the asbestos I found in their tissue. My findings were similar to those reported by Gordon in lung tissue of a patient exposed to another company's commercial talcum powder that used some talc from one of the same mines used in Johnson & Johnson's baby powder. (11).

6.    For the analysis and identification of asbestos, MAS uses the United States Federal rules and regulations as promulgated in the Federal register volume 52 number 210 October 30, 1987 40 CFR part 763, Asbestos Containing Materials in Schools, final rule notice

per the Asbestos Hazard Emergency Response Act (AHERA) which was enacted under the toxic substances control act (TSCA) of 1986 (14). The rules define how to analyze and identify asbestos using transmission electron microscopy (TEM), energy dispersive x-ray analysis (EDS) and selected area electron diffraction (SAED). Under the rule in the definition of terms, a fiber is defined as, "A structure having a minimum length greater than or equal to 0.5 micrometers and an aspect ratio (linked with) of 5:1 or greater and substantially parallel sides. Note the appearance of the end of the fiber I.E., whether it is flat, rounded or dovetailed (p. 41868) (14)." Additionally in the definition of terms, asbestiform is defined as "a specific type of mineral fibrosity in which the fibers and fibrils possess high tensile strength and flexibility (p. 41858) (14)" This definition, while general is consistent with industry understanding that asbestiform means asbestos-like (fibrous, strong and flexible) and is mainly a geological definition reserved for large asbestos bundles and fibers that are easily seen with the naked eye. This definition has mainly been used in a commercial sense to differentiate grades of asbestos in order to establish commercial pricing. For instance, grades of asbestos with long flexible fibers are more valuable for certain kinds of applications and can cost more than shorter grades of asbestos (15, 19).

7.     MAS is a NVLAP certified asbestos analysis lab (20) and all asbestos analyses performed at MAS unequivocally identify the type of asbestos according to the federal AHERA rules according to the shape (substantially parallel sides), size (greater than 0.5 micrometers in length), aspect ratio (at least 5:1 length to width), chemistry (by energy dispersive x-ray spectroscopy (EDS)), and crystallinity (by selected area electron diffraction pattern (SAED)). The strength and flexibility of extremely small asbestos structures (fibers, bundles) cannot be determined with the electron microscope. However, asbestos fibers and bundles can be positively identified with the transmission electron microscope and, each positively identified asbestos fiber

5

or bundle must conform to the physical properties, including strength and flexibility (i.e. asbestiform) of each asbestos type shown in the published literature (21, 22, 23). Microscopic or macroscopic asbestos fibers and bundles will possess strength and flexibility regardless of the size.

Mark W. Rigler Ph.D

Subscribed and sworn to before me on this 21st day of May, 2018.

NOTARY PUBLIC

KATHLEEN MOLYNEAUX
NOTARY PUBLIC
FORSYTH COUNTY
STATE OF GEORGIA
My Commission Expires August 24, 2019

References :

1. Toxicological Profiles of Asbestos. US Department Of Health And Human Services. Public Health Service. Agency for Toxic Substances and Disease Registry. September 2001, p. 162, Table 6.3

2. McDonald, JW et.al. Microprobe Analysis: Diagnostic Applications in Pulmonary Medicine. Microbeam Analysis, 4 (1995) 261—276

3. Heller, DS, et.al. Correlation Of Asbestos Fiber Burdens In Fallopian Tubes And Ovarian Tissue. Am J Obstet Gynecol 1999;181:346-7

4. Langseth, H, Asbestos Fibers In Ovarian Tissue From Norwegian Pulp And Paper Workers, 2007 Int J Gynecol Cancer 2007, 17, 44—49

5. Dodson, RF, Asbestos Content Of Omentum And Mesentery In Non-Occupationally Exposed Individuals. Toxicology and Industrial Health 2001; 17: 138 ± 143

6. Krewer JA and Millette, JR Comparison of Sodium Hypochlorite Digestion and Low Temperature Ashing Preparation Techniques for Lung Tissue Analysis by TEM Microbeam Analysis 1986, 544

7. Roggli, VL et.al. Tremolite and Mesothelioma. Ann Occup Hyg. 2002 Jul 46(5):447-53.

8. Felsher, D. MD, Ph.D. Plaintiffs' Past Medical and Asbestos Exposure Histories

9. Ingham Plaintiffs' depositions

10. Hillerdal, G., Mesothelioma: Cases Associated With Non-Occupational And Low Dose Exposures OEM 1999; 56: 505-513

11. Gordon, RE et.al.  Asbestos In Commercial Cosmetic Talcum Powder As A Cause Of Mesothelioma In Women.  Int J Occup Environ Health. 2014;20(4):318–32.

12. Rohl A, Langer A.  Consumer Talcum's And Powders: Mineral And Chemical Characteristics. J Toxicol Environ Health. 1976;2:255–84.

13. TEM Analysis of Historical 1978 Johnson's Baby Powder Sample for Amphbole Asbestos, dated Februrary 16, 2018; Supplemental Expert Report & Analysis of Johnson & Johnson Baby Powder and Valeant Shower to Shower Talc Products for Amphibole Asbestos, dated March 11, 2018

14. EPA AHERA Federal Register  Pt 763 Sub E AppA 7-1-08 Ed.   Asbestos Containing Materials In Schools.  Final rule. 1987.

15. Vos, MA Asbestos in Ontario.  Ontario Department of Mines and Northern Affairs.  Industrial Mineral Report  36, 1971, p. 3, 15, 16

16. Sebastian, P, et.al.  Asbestos Retention In Human Respiratory Tissues Comparative Measurements In Lung Parenchyma And In Parietal Pleura. IARC Sci Publ 30:237-246, 1980.

17. Miserocchi, G et.al. Translocation Pathways For Inhaled Asbestos Fibers.  Environmental Health 2008, 7:4.

18. IARC Monographs on the Evaluation of Carcinogenic Risks to Humans Volume 93 Carbon Black, Titanium Dioxide, and Talc.  World Health Organization International Agency For Research On Cancer 2010, p.395

19. Campbell, WJ et.al. Selected Silicate Minerals and Their Asbestiform Varieties.  US Bureau of Mines Information Circular IC 8751 1977 Asbestiform Minerals p. 14.

20. MAS NVLAP certification, Rigler deposition march 29, 2018 Defendants' Exhibit No. 14

21. Lefond, SJ, (ed) in Asbestos: Industrial minerals and rocks, 5th edition Vol 1 American Institute of mining and metallurgical and petroleum engineers, 1983, Table 3 p. 441-442

22. Toxicological Profiles of Asbestos.  Us Department Of Health And Human Services. Public Health Service. Agency For Toxic Substances And Disease Registry. September 2001 p. 140, Table 4-2.

23. Zukowski, R. and Caze, R. Tensile Strength Of Asbestos. Nature January 3, 1959 no 4653 p 37

Exhibit 32

**THE LANIER LAW FIRM PLLC**
*Attorneys for Plaintiff(s)*
Joseph N. Cotiletta, Esq.
Attorney ID No. 047092011
Christopher E. Hersom, Esq.
PHV No. 036159
126 East 56th Street, 6th Floor
New York, New York 10022
Tel.: (212) 421-2800

---

| | |
|---|---|
| **RICARDO RIMONDI and PILAR RIMONDI,** | SUPERIOR COURT OF NEW JERSEY LAW DIVISION MIDDLESEX COUNTY |
| Plaintiffs, | DOCKET NO. MID-L-02912-17 |
| vs. | CIVIL ACTION ASBESTOS LITIGATION |
| **BASF CATALYSTS LLC** (as successor to Engelhard Corp., Engelhard Minerals & Chemicals Corp., and Minerals & Chemicals Corp.), *et al.*, | **CERTIFICATION OF WILLIAM E. LONGO, Ph.D.** |
| Defendants. | |

I, William E. Longo, Ph.D., of full age, hereby certify as follows:

1.      I am of sound mind and otherwise competent to make this Certification. The evidence set out in the following Certification is based on my personal knowledge. If called upon, I could and would competently testify thereto.

2.      I have a Bachelor of Science degree in Microbiology, a Master of Science degree in Engineering and a Doctorate in Philosophy in Materials Science, from the University of Florida. My education and employment history may be found in my Curriculum Vitae, which is attached hereto as Exhibit A.

3.      I am currently employed at Materials Analytical Services (MAS), LLC as the President. For the last 30 years, I have studied the content, type, and release of asbestos fibers from asbestos-containing products, including products that contain talc. MAS is accredited by the American Industrial Hygiene Association for measurement of asbestos fibers by phase contrast microscopy

1436636_2

and for the analysis of bulk samples of asbestos. MAS is also certified by the National Volunteer

Laboratory Accreditation Program for measurement of bulk samples and air samples of asbestos.

4.      As a materials scientist, I study the relationships among structure, properties,

synthesis, and performance of a wide range of materials. I examine why and how materials behave

under various conditions, such as temperature, pressure, stress or exposure to climatic conditions,

and how materials are used in every aspect of people's lives. I have spent the last 30 years studying

all aspects of asbestos analysis including the use of air samples to analyze the airborne asbestos

dust generated from the use of asbestos containing products. This would include the use of both

midget impinger and air cassettes. Under my direction our laboratory has analyzed over 300,000-

400,000 asbestos samples which included many thousands of air samples.

5.      In addition to the routine analysis of air samples for asbestos content, again under

my direction, MAS has performed well over a hundred work practice simulations that involve the

measurement of airborne asbestos fibers from the use of these products using scientifically

recognized methodologies. These work practices studies have been performed for both plaintiffs

and defendants; including Westinghouse, Rockbestos, General Electric, Guard-Line, Carborundum,

American Insulating Wire Corporation, Continental Wire Company, Eutectic, Tecumseh Engines and

Vickers Hydraulic Pumps.

6.      At MAS, I analyze and study a wide spectrum of products and associated chemicals,

including studies of various asbestos-containing products that test the potential for release of

asbestos fibers into the air. These studies demonstrate, among other things, whether a product

manufacturer could have anticipated the quantity of asbestos released into the air from its products

as well as the levels of asbestos fibers released under certain circumstances. I perform these tests

under rigorously controlled laboratory conditions following the governmental standards

promulgated by NIOSH and the EPA. Using a specifically designated testing room, I simulate the

typical uses of asbestos-containing products, including for example asbestos-containing cable-hole covers and asbestos cement pipe. MAS utilizes multiple, standardized analytical testing techniques to determine the amount of asbestos released into the air and dispersed into workers' breathing zones, their clothing, and surroundings. MAS methods include the very testing techniques routinely employed by and available to the asbestos industry in the 1950's and 1960's, as well as updated, standardized testing procedures.

7.      I am a member of numerous organizations and professional groups specializing in the testing and analysis of asbestos-containing materials, including the former Environmental Protection Agency (EPA) Peer Review Group for the Asbestos Engineering Program, the American Industrial Hygiene Association (AIHA), Materials Research Society, American Society for the Testing of Materials (ASTM), and the American Society of Materials. I have given numerous lectures, including "Settled Dust: Asbestos and Other Particulates," "The Role of the Laboratory Manager, Quality Assurance Officer and the Analyst for NIST Accreditation," and "Fundamentals of Asbestos Analysis by TEM." Additionally, I was requested by the EPA, along with other scientists, to help develop the EPA's protocol for taking and analyzing settled asbestos dust samples. As a member of ASTM, I was also responsible for writing the current ASTM asbestos dust analysis standards.

8.      I have published numerous articles on the subject of the analysis and testing of asbestos-containing materials, including the quantification of asbestos particles released upon manipulation of these asbestos products in the manner performed in the work environment. My articles include *Demonstration of the Capability of Asbestos Analysis by Transmission Electron Microscopy* in the 1960's in MICROSCOPE, *Asbestos Exposure During and Following Cable Installation in the Vicinity of Fireproofing* in ENVIRONMENTAL CHOICES TECHNICAL SUPPLEMENT; and *Fiber Release During the Removal of Asbestos-Containing Gaskets: A Work Practice Simulation*, published in the APPLIED OCCUPATIONAL AND ENVIRONMENTAL HYGIENE JOURNAL in 2002 and

*Zonolite Attic Insulation Exposure Studies*, in the INTERNATIONAL JOURNAL OF OCCUPATIONAL AND ENVIRONMENTAL HEALTH published in 2010. My research and peer-reviewed publications on the subject of the analysis and testing of asbestos-containing materials as described above may be found in my Curriculum Vitae, which is attached hereto as Exhibit A.

9.      My consulting extends beyond testimony for plaintiffs in asbestos cases. MAS also consults with defense firms and outside the litigation context with well-known companies such as Hitachi, Intel, BMW, Honda, Dow, Scotts and others. MAS is a leading engineering consulting firm which provides a broad range of services including environmental and industrial hygiene and emissions testing of construction products. MAS has performed consulting work for government agencies such as the Centers for Disease Control and the National Institutes of Health. MAS has also worked as an expert for the City of New York, State of New York, State of Hawaii, State of Texas, State of Utah, City of Los Angeles, City of Baltimore, City of Chicago and the City of Boston in their respective litigation against asbestos companies for property damage litigation. MAS has been involved in testing asbestos-containing materials for over thirty years, and has analyzed hundreds of thousands of asbestos samples.

10.      I regularly perform work for clients not involved in litigation and utilize the same generally accepted methodologies and analysis described above. MAS's studies and videotape demonstrations are used for educational and training purposes in conjunction with the American Industrial Hygiene Association, American Society of Safety Engineers, the Environmental Institute, AHERA certification training and the U.S. Public Health Service. Moreover, we go through very stringent and thorough certification processes on a regular basis.

11.      Only about 35 to 40% of MAS's overall income is derived from testimony and testing products for asbestos fiber release. Most of what MAS does is non-asbestos litigation and consulting with industry on potential hazards contained in their products or materials. Also I have

1436636_2

performed Work Practice studies on behalf of defendant manufacturers that include GE, Carborundum, American Insulated Wire Corporation, Guard-Line safety apparel and Tecumseh lawn mower engines. These defendants approved of our use of standard methodology for the measurement of airborne asbestos fibers from the use of their products.

12.    I have been qualified many times in courts throughout the United States as an expert witness in both material science and industrial hygiene matters relating to asbestos issues, including cases involving talc and talcum powder products. I was most recently qualified as an expert witness regarding my analysis of Johnson & Johnson Baby Powder and Shower to Shower talc products in *Herford v. AT&T, et al.* in Los Angeles, California, and in *Lanzo v. Cyprus Amax Minerals Company* in New Brunswick, New Jersey.

13.    I authored a report, dated March 11, 2018, entitled "Analysis of Johnson & Johnson Baby Powder and Valiant Shower to Shower Talc Products for Amphibole Asbestos", which discussed the analysis of thirty separate containers of talc containing Johnson & Johnson's Baby Powder and Valeant Shower-to-Shower for the presence of amphibole asbestos fibers, specifically tremolite. The container construction (metal to plastic) and labeling differences indicate that the products cover a span of many years. The thirty containers were provided by three different law firms to me. One of these samples (Number M665 l 4-001) was a Johnson's Baby Powder product provided by Carolyn Weirick from her home. That bottle contained approximately 24,700 anthophyllite asbestos fibers/gram. A true and correct copy of that report dated March 11, 2018, is attached hereto as Exhibit B.

14.    For preparation of the samples, we followed the protocol laid out by Professor Alice Blount in her peer-reviewed publication *Amphibole Content of Cosmetic and Pharmaceutical Talcs.* It was conservatively estimated by Dr. Blount that for every 1,000 amphibole particles present in cosmetic and pharmaceutical grade talcs, there would be 1,000,000 talc particles. This large number

1436636_2

of talc-to-amphibole structure ratio, coupled with transmission electron microscope ("TEM") filter preparation overloading issues, reduces the probability of detecting any trace amount of fibrous amphibole structures that may be present in the talc sample by analytical transmission electron microscopy ("ATEM") analysis. In order to address these inherent difficulties, we optimized the heavy liquid density separation sample preparation method originally published by Blount in 1991. Like Blount, our analysis detected primarily tremolite (and the tremolite series asbestos mineral richterite) and some iron rich anthophyllite in both Johnson's Baby Powder and Shower to Shower. I hereby adopt and incorporate that report into this certification as though it was set forth in full.

15.    Subsequently, on February 9, 2018, my laboratory received two separate samples from a 1978 container of Johnson's Baby Powder. According to the information supplied with these two samples, they were collected from a February 8, 1978 historical Johnson's Baby Powder container that was supplied by Johnson & Johnson, lot number 113J and bottle/container identification number JBP084. These two samples were given MAS laboratory tracking numbers MAS68233-001 and -002 (two samples from the same bottle). Since the amount of possible amphibole content of the 1978 Johnson's Baby Powder product was expected to be at trace levels (0.1 % or less), it was recognized that this analysis would require the use of an analytical transmission electron microscope (ATEM) as described in the previous March 2018 report (Exhibit B). Using the Blount talc density heavy liquid preparation method for these samples, our ATEM analysis showed that the two 1978 Johnson's Baby Powder product samples contained detectable amounts of amphibole asbestos (anthophyllite) at a concentration range of between 7,240 fibers/gram to 22,100 fibers/gram. A true and correct copy of the February 16, 2018 finding is attached hereto as Exhibit D. I hereby adopt and incorporate that report into this certification as though it was set forth in full.

16.    Johnson & Johnson attorneys have alleged that the asbestos structures my laboratory identified in the Johnson & Johnson talcum powder products are non-asbestiform or "cleavage fragments". Without getting into the merits of this allegation, my laboratory conducted analysis using Scanning Electron Microscopy (SEM) of the anthophyllite reported in the two 1978 Johnson's Baby Powder samples from Johnson & Johnson. The SEM analysis confirms that the structures my laboratory identified cannot be considered "cleavage fragments" and indeed are bundles of numerous asbestos fibers. These asbestos structures evidence classic asbestiform growth habits as described in *The Asbestiform and Nonasbestiform Mineral Growth Habit and Their Relationship to Cancer Studies* by Bailey, Kelse, Wylie, and Lee:

**ASBESTIFORM**

  

In the asbestiform habit, fibers grow almost exclusively in one direction and exhibit narrow width (on the order of 0.1 μm). Fibers that are visible to the eye are bundles of individual crystal fibers known as "fibrils". In some deposits, there is a range in fibril width, sometimes extending up to as much as 0.5 μm. Asbestiform fibers wider than 1.0 μm are always bundles of fibrils. Asbestiform minerals have fibrils that are easily separated, although variability exists. In populations of asbestiform fibers, the distribution of particle widths will reflect single fibrils as well as bundles of fibrils. Under the light microscope, this "polyfilamentous" characteristic of fibers is evident, and is the single most important morphological characteristic of the asbestiform habit. Asbestiform fibers are flexible

A true and correct copy of the SEM images for M68233-001 and M68233-002 is attached hereto as Exhibit E. I hereby adopt and incorporate this report into this certification as though it was set forth in full.

1436636_2

17.    On March 7, 2018, my laboratory received two 1.5 oz. Johnson's Baby Powder containers belonging to Joanne Anderson (MAS sample numbers M68379-001, M68379-002). These containers appear to be of a more current production and talc source. As with the previously analyzed Johnson & Johnson talcum powder product, the amount of possible amphibole content of these two Johnson's Baby Powder products was expected to be at trace levels (0.1 % or less), therefore the analysis required the use of an analytical transmission electron microscope (ATEM) as described in the previous reports. Using the Blount talc density heavy liquid preparation method for these samples, our ATEM analysis showed that one of the Johnson's Baby Powder product samples (M68379-002) contained detectable amounts of amphibole asbestos (tremolite) at a concentration range of 7160 fibers/gram. A true and correct copy of the Summary Sheet and data for the Anderson containers is attached hereto as Exhibit F. I hereby adopt and incorporate the Anderson summary sheet and data into this certification as though it was set forth in full.

18.    In order to determine airborne asbestos amphibole fiber exposure an individual would experience during application of Johnson & Johnson talcum powder products, my laboratory conducted a below the waist application study using Johnson's Baby Powder talc container M65205-001. Approximately 4 grams of baby powder were applied to the lower body of an investigator to determine the potential exposure levels of an individual to asbestos amphibole fibers while applying Johnson's Baby Powder. Both the NIOSH 7400 PCM method and the NIOSH 7402 TEM method were performed to determine if any detectable amphibole asbestos fibers from the Johnson's Baby Powder were released into the breathing zone of the investigator and immediate surrounding area. This study would be applicable to anyone applying talcum powder in a similar fashion to the study subject. The NIOSH 7400 PCM analysis found that the four personal sample results ranged from 3.85 f/cc to 5.86 f/cc with an average mean of 4.52 f/cc. Area air sample results were 0.28 f/cc to 0.58 f/cc with an average mean of 0.41 f/cc. Four of the personal PCM

filters were analyzed by the NIOSH 7402 TEM method and the percent tremolite asbestos fiber concentration ranged from 42.9% to 76.9% resulting in a PCM equivalent range of 1.81 f/cc to 4.51 f/cc. These results are consistent with those already in the published literature, and demonstrate that an individual who uses Johnson & Johnson talcum powder products, would be expected to have a significant exposure to airborne amphibole fibers. A true and correct copy of "MAS Project 14-1852 Below the Waist Application of Johnson & Johnson Baby Powder Supplemental Report# 2" dated January 2018 is attached hereto as Exhibit G. I hereby adopt and incorporate this report into this certification as though it was set forth in full. These exposure levels substantially exceed background exposure levels reported in the literature.

19.     Based on my inspection and analyses of the products, my review of Johnson & Johnson documents, and my 30+ years of training and experience in testing and analyzing products, it is my opinion that the products analyzed were what they purported to be: authentic Johnson & Johnson talc powder products. It is my expert opinion that the contents of the products that I tested, specifically the talc and the asbestos, are what was originally in the products as manufactured and sold. Neither the age of the products, identity of their owners, nor the circumstances of their storage (heat, moisture, light ... ) over the years would impact the possibility that the talc and asbestos in them were not original to Johnson & Johnson. Unlike something like a fungus or a bacteria, asbestos does not grow inside a bottle (regardless of heat, moisture, light) and talc does not degrade into asbestos as a result thereof.

20.     Johnson & Johnson attorneys have repeatedly alleged that somehow the powder inside the containers MAS analyzed could have been "switched" by some unknown person for some unknown reason. This is simply not possible, much less plausible. The two explanations put forward to me by Johnson & Johnson attorneys during deposition and trial testimony for the finding of asbestos in their containers are: 1) that the original talc in the containers of Johnson's Baby Powder

and Shower to Shower was removed and replaced with some other talc (which happened to have trace levels of asbestos) or 2) that the asbestos that we found in the containers was added (either intentionally or unintentionally) to the authentic Johnson's Baby Powder and Shower-to-Shower talc products after they were manufactured and sold. This is a practical impossibility.

21.     First, the appearance of the products alone precludes the possibility that someone(s) removed and replaced the original talc in the containers with some other (non-Johnson &Johnson) talc. The containers were original and authentic Johnson's Baby Powder and Shower to Shower containers; there seems to be no dispute about this. They demonstrated absolutely no evidence of having been tampered with in a way that would allow for the removal and replacement of the original talc in them. Specifically, the caps/lids on the products we tested cannot be removed by hand, and would actually leave observable evidence if they had been removed at all. On visual inspection, we did not observe any marks of evidence of removal of the caps/lids. Nevertheless, we analyzed the lids of each samples with a stereoscopic microscope for any imperfections in the plastic lids or bottles that would have been left by the prying of a tool like a screwdriver. Unsurprisingly, none were seen. Accordingly, it is clear that the products had not been opened in a manner that would allow for the replacement of the original contents of these samples.

22.     The contents of all of the containers of Johnson's Baby Powder and Shower to Shower samples that we tested were also consistent with what the products purported to be, namely, cosmetic body powder, and there was nothing in the contents that would be inconsistent therewith. Likewise, the substance of the powder was consistent with Johnson's Baby Powder and Shower to Shower products. They were predominantly cosmetic grade talc and had trace amounts of the types of asbestos that, based on my review of several hundred Johnson & Johnson historical documents, have been present in these products consistently since the 1950's.

1436636_2

23.    With regard to the products' internal patterns, I conducted a comparative particle size distribution analysis between the samples that tested positive for asbestos and a contemporary ("control") sample of Johnson's Baby Powder that we bought off the shelf. We found that the particle size distribution was consistent among and between the contemporary "control" sample and the all of the vintage samples; and consistent with Johnson & Johnson's own particle size specifications. A true and correct copy of our Talc Size Distribution report, dated August 21, 2017, is attached hereto as Exhibit C. I hereby adopt and incorporate that report into this certification as though it was set forth in full. The consistency of the particle size distribution shows these products to be the same from one to another and it is my opinion that it is highly improbable that some other talc manufacture' s product was somehow added to the exclusion of the Johnson & Johnson talc inside the bottle. In fact, an article authored by executives of Johnson & Johnson and it's talc supplier regarding talc used in various cosmetics (e.g., lipsticks, antiperspirant sticks, body powders, ...) states clearly "[t]hat particle size of the talc raw material used in these products varies widely by product type and by manufacturer."

24.    Based on the above, all four of these factors (appearance, contents, substance, and internal patterns of the products) taken together exclude the possibility that someone(s) removed and replaced the original talc in the containers that we tested with some other (non-Johnson & Johnson) talc. There is simply no evidence of intentional tampering or outside contamination.

25.    Second, it has also been hypothesized that, even if the samples we tested were original as manufactured and sold by the Johnson & Johnson companies, they were contaminated post-sale (either intentionally or unintentionally) with the asbestos that we found in them. Both of these scenarios are so implausible so as to be virtually impossible.

26.    For each set of Johnson & Johnson talc samples that were prepared and analyzed at this laboratory, a process laboratory blank was prepared simultaneously to determine if there was

any cross-contamination originating in our lab. When these process laboratory blanks were analyzed by TEM, no asbestos, including tremolite or chrysotile structures, were found. Therefore, it can be stated, that there was no cross-contamination during sample preparation of the Johnson & Johnson talc samples we analyzed. In addition, and especially because contaminating tremolite asbestos could not get into the containers through the lids/caps of the bottles/containers of the products we tested (due to the features of the container lids described above), we concluded that tremolite asbestos could not have inadvertently become a part of these homogenized talc products at the level identified as a result of contamination prior to our custody.

27.     As for the possibility of intentional post sale contamination, in order for the talc in the Johnson & Johnson product containers to be contaminated with trace amounts of tremolite in a homogeneous manner prior to our custody, it would require an extremely sophisticated operation as might be found in a TEM materials laboratory facility. For example, the tremolite contamination talc operation would require access to a true tremolite standard, an analytical balance and sophisticated mixing equipment to homogenize both the talc and tremolite together. Also, it would require sophisticated TEM analytical analysis to verify that the trace amounts of tremolite fibers in the manufactured tremolitic talc product were consistent with what is expected for this type of material. Lastly, the finished material would have to be put back into the original Johnson & Johnson talc containers, and then be distributed around the country to individuals willing to sell "fake" contaminated talc containers on eBay and to patients with mesothelioma to pass off as their own. Given the incredible unlikelihood of there being such a conspiracy and it being successful, to suggest that the tremolite fibers we detected in the Johnson & Johnson talc samples came from some source, other than from the Johnson & Johnson talc itself, is not a scientifically rational argument.

1436636_2

28.     Further, my laboratory's findings of amphibole asbestos in the containers received from law firms and their clients, as well as the concentrations in which the amphiboles were found, are consistent with the finding of amphibole asbestos in the two samples of 1978 Johnson's Baby Powder received from Johnson & Johnson.

29.     Based upon my analyses of the products, my review of historic Johnson and Johnson documents and my years of training and experience, it is my expert opinion that it is virtually impossible that either the original talc in the containers of Johnson's Baby Powder and Shower to Shower was removed and replaced with some other talc (which happened to have trace levels of asbestos); or that the asbestos that we found in the containers was added (either intentionally or unintentionally) to the authentic Johnson's Baby Powder and Shower to Shower talc products after they were manufactured and sold.

30.     As addressed in my reports, I reiterate that of the thirty-five original talc containers tested by analytical transmission electron microscopy (ATEM), twenty samples were found to contain detectable amounts of amphibole asbestos. For the seventeen positive samples originally reported on in August 2017, amphibole fiber concentrations ranged from 8,690 fibers/gram to 15,100,000 fibers/gram. The additional container of Johnson's Baby Powder received from the Lanier Law Firm and included in the March 2018 supplemental report was also found to contain tremolite asbestos. Further, the two samples of 1978 Johnson's Baby Powder received from Johnson & Johnson taken from the 1978 container contained detectable amounts of amphibole asbestos (ferro-anthophyllite) at a concentration range of between 7,240 fibers/gram to 22,100 fibers/gram while the Joanne Anderson container of Johnson's Baby Powder contained detectable amounts of amphibole asbestos (tremolite) at a concentration of 7,160 fibers/gram.

31.     Based on our own testing, as well as my review of historic testing of the talc ore and Johnson & Johnson finished talc products, it is my opinion to a reasonable degree of scientific

certainty that individuals who used Johnson's Baby Powder or Shower to Shower talc products would have, more likely than not, been exposed to fibrous amphibole asbestos. It is further my opinion that ambient or background air does not contain measurable amounts of airborne anthophyllite or tremolite type fibers, unless there is an identifiable source for those fibers. Therefore any exposure to either the tremolite amphibole asbestos series or ferro-anthophyllite asbestos found in these products would be substantially above background. Accordingly, it is my opinion that the asbestos exposure to individuals who used Johnson's Baby Powder or Shower to Shower talc products was substantial and well above background or ambient levels.

32.    I have also reviewed Johnson & Johnson's internal TEM Method for the Detection of Asbestiform Minerals (TM 7024) in order to determine if its "limit of detection" allowed considerable amounts of asbestos to pass as "below the limit of detection." Because the method has set its Limit of Quantifiable Detection at "five or more asbestiform minerals of one variety," this allows the analyst to conclude that a sample is "below the limit of quantifiable detection" even if asbestos fibers are seen in a sample; meaning that asbestos fibers observed are unreported, i.e., not communicated. The table below lists various possible findings for the presence of asbestos fibers that details how much asbestos would be present in samples that Johnson & Johnson's TM 7024 would call "Below Detection Limit."

| Total Number of Asbestos Fibers found in 10 Grid Openings Examined | Total Asbestos Fiber Concentration Present At Said Number of Asbestos Fibers Found |
|---|---|
| 4 Tremolite fibers | 56,800,000 asbestos fibers |
| 4 Tremolite fibers<br>4 Anthophyllite fibers | 113,600,000 asbestos fibers |
| 4 Tremolite fibers<br>4 Anthophyllite fibers<br>4 Actinolite fibers | 170,400,000 asbestos fibers |
| 4 Tremolite fibers<br>4 Anthophyllite fibers<br>4 Actinolite fibers<br>4 Chrysotile fibers | 227,200,000 asbestos fibers |

33.  I conclude that TM 7024 was designed in such a way as to allow substantial amounts of observed asbestos in talc to pass through as "below detection limit."

I hereby certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Executed on July 3rd, 2018.

William E. Longo, Ph.D.

1436636_2

Exhibit 33

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF NEW JERSEY

3    IN RE:                  :   MDL NO.:

     JOHNSON & JOHNSON TALCUM :   16-2738 (MAS)(RLS)

4    POWDER PRODUCTS          :

     MARKETING, SALES         :

5    PRACTICES, AND PRODUCTS  :

     LIABILITY LITIGATION     :

6

7                      -  -  -

8               Wednesday, July 10, 2024

9                      -  -  -

10          Remote videotaped deposition of PAUL

11   HESS, via Zoom video conference, conducted at

12   the location of the witness in Atlanta,

13   Georgia, taken on the above date, beginning at

14   approximately 9:06 a.m., before Jessica M.

15   Gericke, RPR, CCR-NJ, and Notary Public in and

16   for Delaware, New Jersey, and Pennsylvania.

17

18

19

20

21

22

23

24

25

Page 2

1  APPEARANCES VIA ZOOM VIDEO CONFERENCE:
2  BOVIS, KYLE, BURCH & MEDLIN, LLC
   BY:  ERIC LUDWIG, ESQUIRE
3  200 Ashford Center North
   Suite 500
4  Atlanta, GA  30338-2668
   678-338-3925
5  eludwig@boviskyle.com
   (Present with Witness)
6
   Counsel for Deponent and Materials
7  Analytical Services
8
   BEASLEY, ALLEN, CROW, METHVIN,
9  PORTIS & MILES, P.C.
   BY:  P. LEIGH O'DELL, ESQUIRE
10 218 Commerce Street
   Montgomery, AL 36104
11 334-269-2343
   leigh.odell@beasleyallen.com
12 (Present with Witness)
13 Counsel for Plaintiff Steering Committee
14
   COHEN, PLACITELLA & ROTH
15 BY:  CHRISTOPHER M. PLACITELLA, ESQUIRE
       DREW M. RENZI, ESQUIRE
16 127 Maple Avenue
   Red Bank, NJ  07701
17 732-747-9003
   cplacitella@cprlaw.com
18
   Counsel for Plaintiff Steering Committee
19
20
21
22
23
24
25

Page 3

1  APPEARANCES (continued):
2  ASHCRAFT & GEREL, LLP
   BY:  MICHELLE A. PARFITT, ESQUIRE
3  1824 K Street NW
   Washington, DC  20006
4  202-669-0032
   mparfitt@ashercraftlaw.com
5
   Counsel for Plaintiff Steering Committee
6
7  REILLY, McDEVITT & HENRICH, P.C.
   BY:  BRANDY L. HARRIS, ESQUIRE
8  3 Executive Campus
   Suite 310
9  Cherry Hill, NJ  08002
   856-317-7180
10 bharrs@rmh-law.com
11 Counsel for Personal Care Products Council
12
   KING SPALDING, LLP
13 BY:  MORTON D. DUBIN, II, ESQUIRE
       KEVIN HYNES, ESQUIRE
14     JAKE KEESTER, ESQUIRE
   1185 Avenue of the Americas
15 34th Floor
   New York, NY  10036
16 212-790-5343
   mdubin@kslaw.com
17
   Counsel for Defendant Johnson & Johnson
18
19 FAEGRE DRINKER BIDDLE & REATH LLP
   BY:  SUSAN M. SHARKO, ESQUIRE
20 600 Campus Drive
   Florham Park, NJ  07932
21 973-549-7000
   susan.sharko@faegredrinker.com
22
   Counsel for Defendant Johnson & Johnson
23
24     - - -
25

Page 4

1  APPEARANCES (continued):
2  ALSO PRESENT:
3       SPECIAL MASTER JOEL SCHNEIDER
4       CAROLIN De La ROSA, VIDEOGRAPHER
5       SHU-CHUN SU, PH.D.
6       - - -
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

1              I N D E X
2  WITNESS NAME                PAGE
3  Paul Hess
4       By Mr. Dubin          6
5
6       - - -
7
8            E X H I B I T S
9  NO.    DESCRIPTION           PAGE
10 1    Resume of Paul M. Hess     8
11 2    MAS Report, dated          20
        February 24, 2020
12
   3    MAS Report, dated February  22
13      1, 2019
14 4    Hess Slide 2           46
15 5    MAS Report, dated September  58
        16, 2020
16
   6    MAS report, dated February  64
17      24, 2020
18 7    Declaration of William     69
        Longo, Ph.D.
19
   8    Hess Slide 20          70
20
   9    Hess Slide 22          74
21
   10   Hess Slide 24          76
22
   11   Hess Slide 25          81
23
   12   J3 Resources Inc. Report,   83
24      dated July 13, 2018
25

2 (Pages 2 - 5)

Page 6

1 INDEX (continued):
2 13      MAS Report, dated April 13,   87
        2021
3
    14      MAS Report, dated February   91
4   28, 20
5 15      Hess Slide 34          105
6 16      Su Tables            108
7 17      Hess Slide 43          110
8 18      Hess Slide          127
9 19      Hess Slide          134
10 20      Image, CX-00056        137
11 21      CX-00012            143
12 22      Hess Slide 48          143
13 23      Image, CX-00062        147
14 24      Image, CX-00019        164
15 25      Image, CX-00029        169
16 26      William E. Longo, Ph.D.,    176
        Deposition Transcript,
17      dated March 22, 2024
18 27      Hess Slide 95          178
19              - - -
20
21
22
23
24
25

Page 7

1              - - -
2              VIDEOGRAPHER:  We are now on
3 the record.  My name is Carolin De La Rosa, a
4 videographer for Golkow Litigation Services.
5 Today's date is July 10, 2024, and the time is
6 9:06 a.m.  This deposition is being held in
7 the matter of Talcum Powder litigation MDL
8 2738 versus Johnson & Johnson.  The deponent
9 today is Paul Hess.
10          All parties to this deposition
11 are appearing remotely and have agreed for the
12 witness to be sworn in remotely.  All parties
13 are noted on the stenographic record this
14 morning.
15              Would the court reporter,
16 please, administer the oath to the witness.
17              - - -
18              PAUL HESS, after having been
19      first duly sworn, was examined and
20      testified as follows:
21 BY MR. DUBIN:
22      Q.    Hi, Mr. Hess.  Good morning.
23      A.    Good morning.
24      Q.    So we're going to make the first
25 exhibit to your deposition a resume that I

Page 8

1 have received from you or at least I assume it
2 originated with you and we'll just call that
3 up and walk a little bit through your
4 employment background.
5              MR. DUBIN:  Jake, can we call
6 that up, please?
7          (Exhibit 1 marked for
8      identification.)
9 BY MR. DUBIN:
10      Q.    So it looks like you joined MAS in
11 December of 1995; is that correct?
12      A.    Yes, sir.
13      Q.    Okay.  Can you tell me very briefly
14 what this position was that you held before
15 that at Law Associates?
16      A.    PLM microscopist.
17      Q.    And what was -- what is or was Law
18 Associates?
19      A.    They were an engineering firm in
20 Atlanta, Georgia.
21      Q.    Okay.  Do you know why it has "law"
22 in the name?
23      A.    I have no idea.
24      Q.    Okay.  Does that have anything to do
25 with something legal or is it just -- was it

Page 9

1 somebody's name?  You have no idea?
2      A.    No idea, sir.
3      Q.    Okay.  And then it looks like you
4 departed MAS in August of 2008 for a fairly
5 short period and went to Long Brothers Oil &
6 Gas; is that right?
7      A.    That is correct.
8      Q.    Okay.  And then you went back to MAS
9 and you were there until February of 2023, as
10 a full-time employee, before leaving for a
11 brief period of a year where you were just a
12 consultant; is that right?
13      A.    That is correct.
14      Q.    Okay.  And then your current
15 employment status at MAS is what?
16      A.    Part-time.
17      Q.    Okay.  And looking through your
18 resume, it looks like you have a bachelor's of
19 science degree; is that correct?
20      A.    That is correct.
21      Q.    You don't have any further advanced
22 degrees, right, no master's and no Ph.D.?
23      A.    No, sir.
24      Q.    Okay.  I am sorry.  Sometimes it can
25 be confusing.

3 (Pages 6 - 9)

Page 10

1         It's correct you do not have a
2 master's or a doctorate; is that right?
3    A.   That is correct.
4    Q.   Thank you.  All right.  So we may go
5 through some of that in more depth later, but
6 what is -- what positions have you held over
7 time at MAS?
8    A.   PLM microscopist.
9    Q.   I have heard you referred to
10 sometimes as an analyst.
11        Is that the name of your
12 position, is PLM microscopist the name of your
13 position or what's the formal name of your
14 position?
15   A.   To the best of my knowledge, it's
16 PLM microscopist.
17   Q.   Okay.  That's fine.  And are you
18 represented by counsel today?
19   A.   I am.
20   Q.   Okay.  And is that your personal
21 counsel?  Was it provided to you by MAS?
22   A.   Provided by MAS.
23   Q.   Okay.  And it says here that you
24 have 34 years experience as a PLM
25 microscopist, analyzing an average of 10,000

Page 11

1 samples per year.
2         When you say that, are most of
3 the samples asbestos samples or is that a
4 variety of different types of PLM work?
5    A.   Most of those were standard asbestos
6 samples.
7    Q.   Okay.  And so is it correct to say
8 that your general job duties at MAS is just
9 PLM microscopy?
10   A.   That is correct.
11   Q.   Do you do any other type of
12 microscopy work at MAS?
13   A.   I had done some phase contrast.
14   Q.   No transmission electron microscopy;
15 is that right?
16   A.   No, sir.
17   Q.   Okay.  And do you know approximately
18 what percentage of your time at MAS is spent
19 performing work related to litigation?
20        MR. LUDWIG:  Objection to form.
21 BY MR. DUBIN:
22   Q.   You can respond.
23   A.   Just the last few years.
24   Q.   Okay.  So let me make sure I
25 understand what you're saying.

Page 12

1         You have only become involved
2 in litigation work within the last few years;
3 is that right?
4    A.   That is correct.
5    Q.   Okay.  And since becoming involved
6 with litigation work, about what percentage of
7 your time or your work at MAS relates to
8 litigation -- is related to litigation?
9         MR. LUDWIG:  Objection to form.
10        You can answer.
11        THE WITNESS:  I would say the
12 majority of the time.
13 BY MR. DUBIN:
14   Q.   Can you explain to me when and how
15 you started to become involved with litigation
16 work?
17   A.   I do not recall the exact year, but
18 Dr. Longo asked me to start taking a look at
19 amphiboles in talc samples.
20   Q.   And so you started -- they asked you
21 to take a look by PLM for amphiboles in talc
22 samples; is that right?
23   A.   That is right.
24   Q.   Okay.  Did you have any discussion
25 at that time about whether you should also

Page 13

1 look for chrysotile?
2    A.   Not that I recall.
3    Q.   Okay.  Did you ask why you were only
4 being -- being asked to look for amphiboles at
5 that time?
6    A.   Not that I recall.
7    Q.   Okay.  When you typically perform a
8 PLM analysis, let's say, before you became
9 involved in this litigation work, when you
10 were examining a sample, would you typically
11 look for both chrysotile and for amphiboles?
12   A.   In the standard samples, that is
13 correct.
14   Q.   So you -- when you first became
15 involved with looking at, let's say, talcum
16 powder samples, why didn't you continue to
17 follow that protocol and look for both
18 amphibole and chrysotile?
19        MR. LUDWIG:  Objection to form.
20        THE WITNESS:  At that time it
21 was basically just for the amphiboles.  I was
22 not asked to look for the chrysotile.
23 BY MR. DUBIN:
24   Q.   Okay.  And at some point you were
25 asked to start looking for chrysotile in

4 (Pages 10 - 13)

Page 14

1 cosmetic talc samples; is that right?
2    A.  I was asked to see what I could find
3 other than the amphiboles.
4    Q.  Okay.  And do you recall when
5 approximately that was?
6    A.  I do not recall.
7    Q.  Prior to becoming involved with
8 litigation work in the last several years, had
9 you ever previously examined talc, whether
10 industrial or cosmetic, for the presence of
11 asbestos by PLM?
12    A.  Not that I recall.
13    Q.  Okay.  When was the first time you
14 recall being involved with the testing of talc
15 at MAS, irrespective of whether it was
16 cosmetic or industrial?
17       MS. O'DELL:  Would you repeat
18 the question, please?
19 BY MR. DUBIN:
20    Q.  Sure.  When was the first time you
21 recall becoming involved with the testing of
22 talc for asbestos at MAS, irrespective of
23 whether it was cosmetic talc or industrial
24 talc?
25    A.  As I recall, it was somewhere around

Page 15

1 2018.
2    Q.  Have you looked at both industrial
3 and cosmetic talc by PLM for the presence of
4 asbestos?
5    A.  I don't recall industrial.
6    Q.  Okay.  Do you recall when the first
7 time was that you used -- and we'll talk more
8 about what this means -- but a 1.550
9 refractive index oil to examine talc,
10 irrespective of whether it's cosmetic or
11 industrial talc?
12    A.  1.550 has always been the oil used
13 since doing standard things or standard
14 samples, I should say.
15    Q.  So over -- but do you recall when
16 the first time you used that oil to examine
17 talc was?
18    A.  I don't recall exactly.
19    Q.  Okay.  You indicated before -- we
20 talked about the fact that you had experience
21 as a PLM microscopist looking at many
22 different samples over your career.
23       Can you tell me what type or
24 types of asbestos-containing products you
25 recall examining by PLM over your history?

Page 16

1    A.  Ceiling tiles, joint compounds,
2 roofing, putties, floor tiles.  A whole
3 spectrum of different types of building
4 materials.
5    Q.  And so do you recall being able to
6 identify chrysotile by PLM in products such as
7 joint compounds and floor tiles?
8    A.  Yes, sir.
9    Q.  And do you know what type or types
10 of chrysotile asbestos -- well, let me ask you
11 a different question.
12       Do you recall any of the brand
13 names of the joint compounds that you looked
14 at?
15    A.  I don't recall any brand names being
16 given by the clients that sent the samples in.
17    Q.  Do you know whether any of those
18 joint compounds or floor tiles would have
19 contained Calidria asbestos?
20    A.  Not that I recall; however, I did at
21 one point come to the understanding that
22 Calidria had been used in some of the floor
23 tiles.
24    Q.  Okay.  And you were able to identify
25 chrysotile in those floor tiles using PLM?

Page 17

1    A.  Yes, sir.
2    Q.  All right.  We'll talk a little bit
3 more about that later.
4       Are you the -- how many PLM
5 analysts have -- during the time you have been
6 there, have typically been employed by MAS?
7    A.  I do not know exactly how many.
8    Q.  Were there others besides you?
9    A.  There were.
10    Q.  Okay.  Let's say within the last
11 three years, how many other PLM analysts do
12 you recall working at MAS?
13    A.  One other besides myself.
14    Q.  And who was that?
15    A.  That was Christopher Dubois.
16       MR. LUDWIG:  Mr. Dubin, can I
17 ask you a question?  Are you finished with the
18 resume?  Because it's still up on the screen.
19 I didn't know if you were --
20       MR. DUBIN:  We can pull it down
21 for now; that's fine.
22 BY MR. DUBIN:
23    Q.  And was that individual trained in
24 PLM dispersion staining analysis?
25    A.  Yes, sir.

5 (Pages 14 - 17)

Page 18

1    Q.   Was there anything about his
2  training that would lead you to believe he
3  wasn't trained to look for chrysotile by PLM?
4        MR. LUDWIG:  Objection to form;
5  calls for speculation.
6  BY MR. DUBIN:
7    Q.   To your knowledge.
8    A.   I do not recall.
9    Q.   Okay.  We'll come back to some
10  background later, but what did you do to
11  prepare for your deposition today?
12    A.   I had a few sessions with
13  Mr. Ludwig.
14    Q.   Anything else?  Did you speak to
15  anybody else in preparation for your
16  deposition?
17    A.   Ms. O'Dell.
18    Q.   Okay.  How about Dr. Longo?
19    A.   Dr. Longo has been very busy the
20  last couple of weeks or so and I have not had
21  an opportunity to sit down and talk with him.
22    Q.   Okay.  Did you review any materials
23  to prepare for your deposition?
24    A.   I did review the reports by Dr. Su
25  and Dr. Wylie.

Page 19

1    Q.   Okay.  Did you review any of your
2  own PLM analysis?
3    A.   I did not go back over and review
4  any of the PLM analysis.
5    Q.   How are you compensated at MAS?  Are
6  you a salaried employee?
7    A.   Currently, I am hourly.
8    Q.   Okay.  How about before you --
9  before you took the recent break and became a
10  consultant?  Were you salaried at that time?
11    A.   I was.
12    Q.   Do you -- in your current structure,
13  do you receive bonuses?
14    A.   No, sir.
15    Q.   How about before, when you were a
16  salaried employee?  Did you receive bonuses?
17    A.   A long time ago the company used to
18  have an annual bonus that they would give out,
19  but that has not been in place for many years.
20        MR. DUBIN:  Okay.  I'm going to
21  mark as the next exhibit -- and start to get
22  into a little bit of substance -- what I
23  understand to be the first report that MAS
24  issued claiming to find chrysotile by PLM, and
25  that will be exhibit 2, internal reference

Page 20

1  number is CX-6 for pulling it up.  It's a
2  report, dated February 24, 2020, related to
3  Zimmerman, the Zimmerman report.
4        (Exhibit 2 marked for
5         identification.)
6  BY MR. DUBIN:
7    Q.   I don't know that you -- whether you
8  personally recall.
9        Do you recall this being the
10  first time you looked at cosmetic talc from
11  Johnson & Johnson by PLM for the presence of
12  chrysotile?
13    A.   I don't recall.
14    Q.   Okay.  We'll look at that report
15  some, but before I do that, I want to look at
16  something else.
17        Did you become aware at some
18  point that the FDA had reported a positive
19  finding for chrysotile by TEM in a bottle of
20  Johnson & Johnson?
21        MR. LUDWIG:  Objection to form.
22        Just for the record, Mr. Hess
23  is a fact witness that we produced because of
24  Court Order.  He is not here to opine on
25  expert issues or hearsay issues.

Page 21

1        MR. DUBIN:  I don't know what
2  you're saying, but I am sure I disagree with
3  it.  So let's just see how it goes with
4  individual questions.  Because I am definitely
5  going to be asking him about his work.
6        MR. LUDWIG:  You're asking
7  about FDA analysis and so I am going to object
8  to the form.
9        MR. DUBIN:  Okay.  Well, you
10  can object if you like, but you can respond.
11  Thank you.
12  BY MR. DUBIN:
13    Q.   Did you become aware of that at some
14  point?
15    A.   I am aware of that.
16    Q.   Okay.  Do you recall how you became
17  aware of that?
18    A.   I don't recall exactly.
19    Q.   Do you recall ever reporting
20  chrysotile in any Johnson & Johnson talc
21  samples prior to that FDA finding?
22    A.   I do not.
23    Q.   Now, what -- what type of refracted
24  index oil would you use traditionally to look
25  for fibrous talc by PLM?

6 (Pages 18 - 21)

Page 22

1    A.   1.550.
2    Q.   Would there be any difference in
3 your prep method in the way that you would
4 have traditionally looked for fibrous talc
5 versus chrysotile asbestos in 1.550?
6    A.   It would be no different in method
7 of preparation.
8    Q.   It makes no difference to the method
9 of preparation?  Is that what you said?
10    A.   No.  I said there is no difference
11 in preparation between the two types of
12 analyses.
13    Q.   All right.  And so I want to ask you
14 about another report before we go forward, one
15 that was issued before Zimmerman; that will be
16 exhibit 3.  It's a February 1, 2019 report
17 entitled:  MAS Second Supplemental Report.
18 Let's pull that up for a second.
19         (Exhibit 3 marked for
20      identification.)
21 BY MR. DUBIN:
22    Q.   This is a report that was issued by
23 MAS prior to the FDA finding.
24         It's entitled:  An Analysis of
25 Johnson & Johnson Historical Product

Page 23

1 Containers and Imerys' Historical Railroad Car
2 Samples from the 1960s to the early 2000s, for
3 Amphibole Asbestos, and if we --
4         MS. O'DELL:  Morty, could you
5 put the whole document on the screen so it can
6 be seen?  I am only seeing the first part.
7         MR. DUBIN:  I mean, I am going
8 to move around the document.  We can try to
9 adjust so you can see the full size.
10         Can you see it now?
11         MS. O'DELL:  Yes.  If you can
12 maybe make it a bit bigger?  Because I am
13 looking for the date on that because I can't
14 see it.
15         MR. DUBIN:  It's dated February
16 1, 2019.
17         MS. O'DELL:  Thank you.
18 BY MR. DUBIN:
19    Q.   And if we go to page 2, you can see
20 here that it relates to 72 J&J and
21 Imerys-supplied historical cosmetic talcum
22 powder containers, samples, and samples from
23 the 1960s, 1970s, 1980s, 1990s, and early
24 2000s.
25         Do you see that?  I can

Page 24

1 highlight it.
2         MS. O'DELL:  If you can't see
3 it, Dr. -- excuse me.  If you can't see it,
4 Mr. Hess, please let us know.
5         MR. DUBIN:  Jake, can you put
6 these things in chat, too?
7         MR. PLACITELLA:  Well, I want
8 the opportunity to look at the document before
9 you start asking questions about it.
10         MR. LUDWIG:  I mean, the report
11 speaks for --
12         MR. DUBIN:  (Inaudible.)
13         MR. LUDWIG:  -- themselves --
14 indicating one question or -- so the whole
15 thing speaks for itself, Paul.  I guess his
16 only --
17         MR. DUBIN:  Okay.  This is a
18 long speaking objection, it's improper, and I
19 am going to -- I am trying to show him things
20 to be able to ask him a question about it.
21         We can put these things in
22 chat, but I am not pausing at every question
23 to wait for you to read a 100-page report.  So
24 that's just not happening.  We're going to --
25         MS. O'DELL:  Well, it will

Page 25

1 happen if the witness needs it, Morty, and
2 we'll go off the record if he needs --
3         MR. DUBIN:  I haven't -- I
4 haven't asked a single question yet, other
5 than whether he sees it.  So we're not at --
6         MS. O'DELL:  Morty, I am not
7 finished and you can let me finish.
8         It's not fair to put a document
9 on the screen without giving him the
10 opportunity to see it.  Thank you for putting
11 it in the chat.  He can pull it down in the
12 chat and they will be printed if needed --
13         MR. DUBIN:  (Inaudible.)
14         MS. O'DELL:  -- examination.
15         You could have sent the
16 documents in hard copy had you chosen.  You
17 didn't do that; that's fine.  We'll work
18 around that, but he needs the opportunity to
19 review the document.
20         MR. DUBIN:  If you guys want to
21 go off record, he can read each time.  I am
22 not using my time to have him read a whole
23 report when I haven't been able to ask a
24 single question about it.
25         So if you want to go off, off

7 (Pages 22 - 25)

Page 26

1 record, and have him read the whole report, I
2 am happy to let him do that, or I can direct
3 him to the portions that I am going to ask
4 about. You choose. Because we can be here
5 all night. I don't care. So you tell me.
6         MR. LUDWIG: We're not going to
7 off the record, no. It sounds like --
8         MR. DUBIN: It is not going on
9 my time if he wants to read a 50-page document
10 that I haven't been able to ask a single
11 question about yet. This is not happening.
12        So you want to go off the
13 record and have him read this report or you
14 want me to ask him questions and then the
15 witness can tell me if there is something he
16 needs to read.
17        Those are your two options.
18        MS. O'DELL: You don't --
19        MR. PLACITELLA: The third
20 option is -- the third option is we're going
21 to call the Special Master. Because we have a
22 right to know what's in the document --
23        MR. DUBIN: It's in the
24 document --
25        MR. PLACITELLA: -- before you

Page 27

1 ask the question. So if that's how we're
2 going to proceed, by picking pieces of a
3 document that he hasn't seen for years and I
4 have never seen before, then we've got to get
5 the Judge on the phone now.
6         MR. DUBIN: Okay. We can do
7 whatever you want. You guys have been
8 complaining about this without me asking a
9 single question about the document. The
10 witness hasn't said he needs to look at
11 anything else. You're just being
12 obstructionists. I am going to --
13        MR. PLACITELLA: Well, let's
14 get the Judge on the phone.
15        MR. LUDWIG: He has not
16 reviewed the MAS reports. So --
17        MR. DUBIN: This is his work.
18 I am asking him about his work.
19        MS. O'DELL: This is the report
20 of Dr. Bill Longo and Mark Rigler. This is --
21 so --
22        MR. DUBIN: With his PLM work.
23 I am not arguing about it anymore. I am
24 asking the questions. If you want to --
25        MR. PLACITELLA: Well, let's

Page 28

1 get the Judge on the phone --
2         MR. DUBIN: -- get the Judge on
3 the line, we can get the Judge on the line.
4 Go ahead. Go ahead.
5         MR. PLACITELLA: Let's get the
6 judge on the phone.
7         MR. DUBIN: Fine.
8         THE COURT REPORTER: Would you
9 like to go off the record for a moment?
10        MR. DUBIN: Sure. We'll go off
11 the record.
12        VIDEOGRAPHER: The time is
13 9:32 a.m. We are off the record.
14        (Brief recess.)
15        (Conference with Special Master
16    Joel Schneider taken off the video
17    record.)
18        THE COURT: Am I looking at the
19 infamous Paul Hess?
20        THE WITNESS: You are, sir.
21        THE COURT: Mr. Hess, I have
22 read so much about you. I am delighted to
23 meet you in person.
24        MS. O'DELL: Judge Schneider,
25 here is the issue that we're facing and I

Page 29

1 invite Mr. Placitella to add if I don't cover
2 something, but as you know, Mr. Hess is a fact
3 witness, he is not an expert, and he has done
4 work at MAS Lab for purposes of Dr. Longo
5 rendering his expert opinion.
6         He is being shown reports by
7 Dr. Longo and Rigler. He has not -- this
8 is -- he has no involvement in the preparation
9 of the reports. His work is an underlying
10 analyst and we object to Mr. Hess being
11 examined on the full scope of Dr. Longo's
12 reports, which are not his work.
13        And so we believe -- we just
14 got started a bit ago. We think this is going
15 to be sort of the mode of the deposition and
16 we need direction from the Court as to how
17 this should be approached.
18        MR. DUBIN: Just so I can --
19        MR. PLACITELLA: Could I
20 supplement that?
21        MS. O'DELL: Please.
22        MR. PLACITELLA: So my concern,
23 your Honor, is as follows. These are reports
24 from other cases. The witness either has
25 never seen them before or hasn't seen them for

8 (Pages 26 - 29)

1 many years.
2         Questions are being asked about
3 these reports that we have not been supplied
4 in advance of the deposition. Sticking them
5 in the chat now on a 30-page report from
6 another case doesn't give counsel even an
7 opportunity to determine whether the questions
8 are taken out of context, are fair or even
9 relevant. So we're not even in a position to
10 phrase our objections appropriately.
11         If they wanted to ask questions
12 about these reports, they should have been
13 sent long in advance of the deposition and we
14 could have had a debate about it then, not
15 now, when now they are going to claim every
16 time Mr. Hess has to stop and look at the
17 report, that somehow that counts -- it doesn't
18 count on their time for completing this
19 deposition.
20         It's an unfair way to proceed.
21 It was never contemplated by the Court and I
22 am at a loss as to how to even address these
23 circumstances. I mean, this is a tenuous
24 deposition at best and now we're taking it
25 into a whole different realm, which is

1 completely unfair to counsel and the witness.
2         MR. DUBIN: If I could briefly
3 respond. Your Honor, I haven't asked --
4         THE COURT: One second.
5         MR. DUBIN: Sure.
6         THE COURT: You represent the
7 defendants, I assume?
8         MR. DUBIN: Yeah.
9         THE COURT: Who are whom?
10         MR. DUBIN: I am Morton Dubin.
11         THE COURT: With what firm?
12         MR. DUBIN: I am with King &
13 Spalding.
14         THE COURT: And Mr. Hess is
15 physically where?
16         MR. DUBIN: He is in Atlanta.
17         THE COURT: And is
18 Mr. Placitella and Ms. O'Dell, are they both
19 in their office or are they with Mr. Hess?
20         MS. O'DELL: I am with the
21 witness, Judge, in Atlanta.
22         THE COURT: Okay.
23         MS. O'DELL: Mr. Placitella is
24 in New Jersey.
25         THE COURT: Okay. All right.

1 Counsel, go ahead. Now I know.
2         MR. DUBIN: So I haven't even
3 asked him a single question basically
4 substantively yet before they decided that
5 they needed to approach the Court. All I had
6 done was put up one report and then I was
7 trying to orient him on what samples we were
8 talking about and then I was going to ask
9 him -- because he did the PLM work for that
10 report -- and I was going to ask him about the
11 conclusions and the work that he did.
12         And I made the entire report
13 available for counsel and I even offered if
14 they wanted to go off record and have the
15 witness read the entire report if he felt it
16 was necessary, but I didn't even get to ask a
17 single question.
18         Of course, they don't -- they
19 didn't even wait to see what the examination
20 was about other than, "Do you see here? This
21 was about 72 samples of talc," and then they
22 objected and we got the deposition shut down.
23         So I don't really know what
24 their complaint is. I am making materials
25 available to him. I am asking him about the

1 work that he personally did, not about
2 anything else in the report, and so I don't
3 see what the objection is. It's a legitimate
4 scope of inquiry.
5         THE COURT: Can I ask a
6 question? In the case, is there a deposition
7 protocol that requires the production
8 beforehand of exhibits that are going to be
9 shown to a witness?
10         MS. O'DELL: There is a
11 deposition protocol and, your Honor, I do
12 believe that we mainly follow that, just to be
13 clear, more for an expert witness. There has
14 been a three-day disclosure rule; that's not
15 been followed in the instance of Mr. Hess
16 since his deposition is a little bit more
17 unique.
18         And so, Judge, let me just also
19 make clear, you know, as you know, in the
20 first round in the multi-district litigation,
21 the expert report that was at issue was the
22 February 1, 2019 expert report involving
23 historical samples that tested for amphibole
24 asbestos; that's the report that was at issue
25 in the Daubert hearing.

9 (Pages 30 - 33)

Page 34

1 Dr. Longo has had a two-day
2 deposition on that report. Dr. Rigler was
3 examined. Dr. Longo was examined before Judge
4 Wolfson at the Daubert hearing and the Court
5 issued a ruling allowing the analysis from
6 that report.
7 What Mr. Dubin --
8 MR. DUBIN: If I can --
9 MS. O'DELL: -- Mr. Dubin put
10 up is the February 1, 2019 material, and as
11 you are so well aware, what's been at issue in
12 the proceedings since they have been restarted
13 in the MDL are new things and there are
14 reports that have been disclosed by Dr. Longo
15 that relate to the analysis of talc for
16 chrysotile involving PLM.
17 And that is -- for those
18 reports that have been disclosed, to the
19 degree Mr. Hess was involved and worked on the
20 underlying analysis, we understand the Court
21 has allowed this deposition and that we'll go
22 forward, but for the defendants to try to go
23 back, replow 2019 round in a report that's not
24 involved is not fair.
25 For them to inquire of things

Page 35

1 that he wasn't involved in, including the
2 actual text of the report, is not fair. His
3 work was the bench work and the
4 photomicrographs and to go beyond that, we
5 believe, is objectionable and we ask the Court
6 to not allow it.
7 THE COURT: Can I jump in here?
8 Because I am very familiar with the issues.
9 And the reason why leave was granted to the
10 defendants to take Mr. Hess' deposition was
11 based on the arguments that they made in their
12 briefs.
13 Ms. O'Dell is correct that the
14 subject matter of the deposition should only
15 be limited to what I call -- and I'm not quite
16 sure if the defendants used this word -- this
17 new method. And if I remember right, even in
18 my decision I set forth -- there was, like, a
19 date range, if I remember right. I don't have
20 it in front of me. It started in 2020 and
21 maybe went to 2024.
22 And I specifically remember
23 there was an exhibit that may have been
24 duplicated in different versions that set
25 forth precisely the tests that were at issue

Page 36

1 regarding this new method; that's the first
2 thing.
3 The second thing is, the
4 deposition was only limited to Mr. Hess'
5 personal involvement. Because the defendants
6 were making the argument -- not in these
7 words, but, in essence, that it was Mr. Hess
8 that was making these ultimate decisions and
9 not Dr. Longo.
10 So the questions have to be
11 limited to only what Mr. Hess did, his tests,
12 his personal observations. The deposition is
13 not to get Mr. Hess' opinion on what somebody
14 else did or what somebody else opines.
15 Mr. Hess is there to testify
16 about his firsthand personal knowledge about
17 these -- this new testing method; that -- that
18 is precisely why Mr. Hess' deposition is
19 permitted. It was not permitted to go over
20 ground that was covered previously in the
21 case, the TEM tests, if I am --
22 MR. DUBIN: Right.
23 THE COURT: -- right or any of
24 the tests before this new method.
25 And if I remember right, I am

Page 37

1 obviously aware that Judge Wolfson had
2 stricken some of the tests in the original
3 Daubert opinion, and I think that the argument
4 is going to be that with this new method, it
5 was not subject to the old order and,
6 presumably, it will be the subject of a new
7 Daubert order.
8 But those parameters of why
9 Mr. Hess' deposition was permitted, those
10 should be the parameters of this deposition.
11 I hope that helps.
12 MR. DUBIN: We don't disagree
13 with that at all. The report I am asking him
14 about is the first time that he is using this
15 specific method to examine Johnson & Johnson,
16 as I will show when I go to the report.
17 In that report he begins to use
18 1.550 oil for the first time, which is the way
19 he is looking for chrysotile. In that report
20 is the first time that he starts to do that
21 and look at Johnson & Johnson.
22 And so that was what I was
23 going to ask him about, is about his personal
24 work using that method at that time, which
25 leads then into the first reports for

Page 38

1 chrysotile.
2          And so this is all about that
3 topic. I am not going into the TEM work. I
4 am not going into the PLM work that he did for
5 amphibole.
6          I am just asking him about this
7 kind of analysis that is the subject of the
8 entire deposition and this report, but I
9 didn't even get to get a single question in
10 before we ended up having to call your Honor,
11 I suppose.
12          THE COURT: Counsel, what you
13 were going to ask Mr. Hess about, is that one
14 of the tests that was on that list that
15 hopefully you know what I was referring?
16          MR. DUBIN: Your Honor, I will
17 go ahead and just explain to everybody,
18 although I really feel like I should be able
19 to ask the witness these questions, but what
20 we're going to see is that at this point,
21 before -- so at some point the FDA finds by
22 TEM chrysotile in one bottle of Johnson &
23 Johnson and after that time MAS starts to
24 report chrysotile by PLM basically every time
25 they look at it.

Page 39

1          What we're going to see is in
2 this report they're -- it's before the FDA
3 finding, they are using the exact same
4 methodology to look at the talc, and they do
5 not report chrysotile.
6          THE COURT: Counsel, what I'm
7 just concerned about is, you can ask him about
8 the tests using the new method. You can't --
9 the purpose of the deposition is not to say,
10 Why did this person not find chrysotile and
11 you found chrysotile?
12          Ask him about his tests and
13 what he did and how he did it.
14          MR. DUBIN: He did the work on
15 both. I am asking about his work.
16          MS. O'DELL: Your Honor, we
17 would object. This is the 2019 report. It
18 was for amphiboles. Much of that work was not
19 done at MAS, it was done by another lab, and
20 so we object as that was fully covered by the
21 last proceedings.
22          For the new material, as the
23 Court has said, for his work, if they want to
24 ask him about it and ask him what oil he used,
25 that's fair game, but to go back and somehow

Page 40

1 lay this as a foundation from the prior report
2 when some of that work was not his first is
3 improper and we object to that. I mean, the
4 2019 report is off the table.
5          MR. DUBIN: I am only asking --
6          MR. PLACITELLA: I would just
7 add to that, to be fair to everyone, you know,
8 popping a report up that's X period of -- no
9 one has looked at for four or five years, you
10 know, in this context and start asking
11 questions, it's just not proper.
12          We have -- we can't -- we don't
13 know the context. He has taken little lines.
14 He has highlighted one line or two lines in a
15 report and then says, Well, we put the report
16 in chat. Go, have it.
17          Well, that's not fair. The
18 deposition today is supposed to be about the
19 report here at issue, nothing beyond that
20 report, and that's the -- I don't know what
21 else is coming; that's why we stopped it.
22          Are they going to pull out some
23 other report from some other case? I don't
24 know, but we've got to have some parameters of
25 what we're doing here.

Page 41

1          THE COURT: Counsel, I am
2 persuaded by plaintiffs' argument. Really,
3 this shouldn't be that difficult an issue.
4 The boundaries of this deposition were set
5 forth in the requests and my Order.
6          It's just about the tests that
7 he did, how he did it, his observations. He
8 is not there to answer questions about why did
9 they get the result in a 2019 test and a
10 different result in a later test; that's not
11 why he is there.
12          He is there to talk from his
13 personal observation about the new test;
14 that's it.
15          MR. DUBIN: But I just -- all I
16 am asking him about is his own work, doing it
17 the exact same way, why he came to a
18 conclusion -- different conclusion one time
19 versus the other, his own personal PLM work.
20          I am not asking him about
21 anybody else's work, asking him to offer
22 opinions about anybody else's work. I am just
23 asking him about what he did.
24          THE COURT: Counsel, if it's
25 not one of the tests on this exhibit list that

11 (Pages 38 - 41)

Page 42

1 I referred to -- I know I referred to it
2 during oral argument. I don't recollect if I
3 referred to it in my decision.
4        If it's not one of those tests,
5 it's off limits. That's not the purpose of
6 the deposition.
7        MR. DUBIN: I am only asking
8 him about his PLM work in 1.550 and 1.560,
9 which is his chrysotile -- method for looking
10 for chrysotile, which is the subject of the
11 deposition. I'm not asking anything about any
12 PLM work.
13        THE COURT: Counsel, I don't
14 have that exhibit, that list in front of me,
15 but I have a feeling you know what I am
16 referring to, it would -- I believe it was an
17 exhibit to the two reports that the defendants
18 submitted.
19        And, you know, one of the
20 arguments for why the exception was denied was
21 because those experts prepared detailed
22 reports rebutting the plaintiffs' experts and
23 in those reports they attached as exhibits the
24 list of the samples that are at issue
25 regarding this new method. That's it. That's

Page 43

1 it. Those are the tests at issue.
2        MR. DUBIN: I understand that,
3 your Honor, and that's why as part of asking
4 about those conclusions, I need to understand
5 what changed between the two times he looked
6 at this with 1.550 oil to understand his
7 conclusions.
8        THE COURT: Well, if you're
9 asking about that, my ruling would be that's
10 off limits; that's not the purpose of this
11 deposition, not to compare old tests to new
12 tests.
13        The purpose of this deposition
14 is to ask him about his personal observations
15 regarding the new test; that's what was in the
16 defendant's papers. They didn't say anything
17 about asking him to compare old to new.
18        That's my ruling. If the
19 defendants think the questioning is going out
20 of those boundaries, instruct the witness not
21 to answer. We'll look at the transcript and
22 we'll make a ruling on a more fulsome record,
23 but I don't know what else I can say, Counsel.
24        It really should be a pretty
25 easy deposition. You have the tests at issue.

Page 44

1 Mr. Hess is only going to testify about his
2 personal observations. To me that's pretty --
3 the boundaries are pretty clear. So I don't
4 know what else I can say.
5        MR. DUBIN: I understand, your
6 Honor. Again, I believe I am trying to stay
7 within that by asking him about his personal
8 observations of this material in 1.550 and
9 1.560 oil, but I understand. I will skip this
10 report.
11        I would like to be able to ask
12 him about differences in his images. Because
13 one of the big topics here is images. If they
14 decide to try to shut it down later when I do
15 it, I guess we'll take it up then, but we'll
16 see. I need to understand how -- what his
17 microscope setups are and whether he is
18 changing them and the like.
19        THE COURT: As long as it's
20 limited to the specific tests at issue that
21 are on that exhibit list. The exhibits are
22 attached to your expert reports, Counsel. So
23 you should have those at your fingertips.
24        Those were the tests that were
25 in the motion that the argument was that new

Page 45

1 method was used and they found chrysotile
2 where they didn't previously find it; that's
3 the boundary of this deposition. Okay.
4        So I am in a mediation today,
5 but if you need me, send me an e-mail or a
6 text, and when I am available, I will get back
7 on the Zoom. Thank you, Counsel.
8        MS. O'DELL: Thank you, your
9 Honor.
10        MR. LUDWIG: Thank you, Judge.
11        MR. DUBIN: So we'll keep that
12 as an exhibit, as a proffer for the record.
13        (Break held off the record.)
14        VIDEOGRAPHER: The time is
15 10:17 a.m. We are back on the record.
16 BY MR. DUBIN:
17    Q. In terms of your background, when
18 did you start performing PLM dispersion
19 staining analysis?
20    A. 1989.
21    Q. That was when you took the course at
22 McCrone?
23    A. That is correct.
24    Q. Can you tell me a little bit about
25 that course? How long did it last? What were

12 (Pages 42 - 45)

Page 46

1 you trained in?
2    A.   It lasted a week.
3    Q.   Okay.
4    A.   And we were trained to utilize the
5 dispersion staining method to identify the
6 various asbestos forms or minerals.
7         MR. DUBIN:  And if we can call
8 up Hess slide 2.  I will make a copy of it
9 exhibit 4.
10        (Exhibit 4 marked for
11        identification.)
12 BY MR. DUBIN:
13   Q.   And do you know what this is that
14 we're looking at here in the image?
15   A.   Well, it's stated on the matrix,
16 reference chrysotile.
17   Q.   And when you taught -- took the
18 course at McCrone, were you taught that
19 chrysotile should look magenta in parallel?
20   A.   We were.
21   Q.   And are you aware that McCrone has
22 studied different types of chrysotile,
23 including Calidria?
24        MR. LUDWIG:  Objection to form.
25        THE WITNESS:  I am not aware of

Page 47

1 what Dr. McCrone or what McCrone had studied.
2        MS. O'DELL:  (Inaudible.)
3        MR. DUBIN:  That would be
4 exhibit 4.
5        MS. O'DELL:  Would you, please,
6 download it in the chat?
7        MR. DUBIN:  Sure.  Just, Jake,
8 whenever we do exhibits, let's just put them
9 in chat.
10 BY MR. DUBIN:
11   Q.   And so we'll walk through just so we
12 can understand the basic process of dispersion
13 staining.
14        The first step after you have
15 put the slide -- prepared the slide and put it
16 on the microscope, the first step is for the
17 analyst to make a judgment about what color
18 they are seeing, right?
19   A.   Yes, sir.
20   Q.   Okay.  And then after you make a
21 judgment about what color you're seeing --
22        MR. DUBIN:  Jake, there is some
23 weird stuff on the screen.  Can you take that
24 off screen, please, or just put the slide
25 back?

Page 48

1        MR. KEESTER:  Sorry, Morty.
2 It's hard to print a single slide while
3 we're -- I'm showing it.
4        MR. DUBIN:  Okay.  Again, we'll
5 put them in chat so that you have them later,
6 but I don't want to take them off screen while
7 we're doing this.  It's a single slide.  You
8 can see it on the screen.
9 BY MR. DUBIN:
10   Q.   All right.  So --
11        MS. O'DELL:  We can't see it.
12 Mr. Hess would, please, request a copy.
13 BY MR. DUBIN:
14   Q.   The next step after you have made a
15 judgment about what color you're looking at is
16 to figure out what wavelength of light that
17 is, right?
18   A.   That is correct.
19   Q.   And then you use some tables to
20 convert that into a refractive index?
21   A.   That is correct.  We used Dr. Su's
22 tables.
23   Q.   And then, ultimately, those numbers
24 can be used to derive a birefringence number,
25 correct?

Page 49

1   A.   Yes, sir.
2   Q.   Okay.  And can you define for me
3 what an alpha refractive index is?
4   A.   That would be your length slow --
5 length fast direction.
6   Q.   Okay.  How about a gamma refractive
7 index?  Do you know what a gamma refractive
8 index is?
9   A.   That would be your length slow
10 direction.  It's -- normally for chrysotile,
11 that would be parallel.
12   Q.   Okay.  Can your alpha refractive
13 index ever be higher than your gamma
14 refractive index?
15   A.   Only if a mineral is negative in
16 elongation.
17        THE COURT REPORTER:  Can you,
18 please, repeat the answer.
19        THE WITNESS:  Only if the
20 mineral is negative in elongation.
21 BY MR. DUBIN:
22   Q.   All right.  What does the refractive
23 index of a mineral measure?
24   A.   It measures, basically, the
25 difference in the light path as it passes

13 (Pages 46 - 49)

Page 50

1 through the oil and particle edge. They
2 interface.
3    Q.    What properties of a mineral
4 determine its refractive index?
5    A.    Generally, the chemical, density.
6    Q.    Anything else?
7        MR. LUDWIG: Objection to form.
8        THE WITNESS: I don't recall
9 off the top of my head.
10 BY MR. DUBIN:
11    Q.    What is birefringence?
12    A.    Birefringence is the difference
13 between the mineral's highest refractive
14 indices and its lowest refractive indices.
15    Q.    Okay. What do you mean by -- what
16 do you mean by highest refractive indices,
17 first?
18    A.    The highest refractive index for the
19 mineral.
20    Q.    And so if a mineral is displaying
21 more than one color, how do you determine what
22 the highest refractive index is?
23        MR. LUDWIG: Objection to form.
24        THE WITNESS: One would
25 normally look for the wavelength that would be

Page 51

1 the highest of the mineral in the gamma
2 direction and --
3 BY MR. DUBIN:
4    Q.    And -- sorry. Go ahead.
5    A.    And then apply that to the charts.
6    Q.    Okay. How do you -- and then how do
7 you determine that the lowest refractive index
8 is if a mineral is displaying more than one
9 color?
10    A.    You put it into the alpha direction.
11 For chrysotile, that would be perpendicular.
12    Q.    Is it correct that the birefringence
13 is the quantitative expression of the maximum
14 difference in refractive index due to double
15 refraction?
16        MR. LUDWIG: Objection to form.
17        THE WITNESS: That is my
18 understanding.
19 BY MR. DUBIN:
20    Q.    And what do you understand maximum
21 difference in that context to mean?
22    A.    For any particular particle, it
23 would be what my examination leads me to
24 determine to be the refractive indices in most
25 gamma and alpha direction.

Page 52

1    Q.    But is it the difference between the
2 highest and the lowest refractive indices? Is
3 that what maximum difference means?
4    A.    Can you rephrase that just a little
5 bit?
6    Q.    Sure. I mean, if you get -- if
7 you're saying that alpha and gamma are defined
8 by highest and lowest refractive indices, the
9 maximum difference means the difference
10 between that highest and that lowest
11 refractive index, right?
12    A.    That would be the way I would see
13 it, yes.
14    Q.    Okay. And do you know -- if we go
15 back to that slide that was marked as
16 exhibit 4.
17        MR. DUBIN: It could also be
18 slide 10. Whatever makes it easier for you,
19 Jake, to call it up.
20 BY MR. DUBIN:
21    Q.    Do you know what causes chrysotile
22 to appear magenta in parallel?
23    A.    It's the angle of the fraction as
24 the light passes up at the oil-particle
25 interface.

Page 53

1    Q.    And what creates the color magenta?
2 What creates -- what causes you to see the
3 color magenta specifically?
4        MS. O'DELL: I object to the
5 question to the degree it calls for an expert
6 opinion and it relates not to the testing
7 analysis that Mr. Hess has done on a specific
8 sample, which is the purpose of this
9 deposition. Asking expert opinion is not the
10 purpose of this deposition.
11        MR. LUDWIG: The Court has
12 already ordered on that. So this doesn't have
13 anything to do with the specific exam or the
14 scope on which the Court just advised the
15 parties to stay within. I am objecting to the
16 form of the question.
17        MR. DUBIN: I will lay a
18 further foundation for it.
19 BY MR. DUBIN:
20    Q.    We are going to be talking about
21 your work identifying chrysotile in Johnson &
22 Johnson but, typically, when MAS was
23 identifying chrysotile in Johnson & Johnson,
24 it was -- what was being called chrysotile was
25 yellow in parallel, right?

14 (Pages 50 - 53)

1        MR. LUDWIG:  Same objection.
2        That is exactly what the Court
3 ruled upon.  So objection.
4        MR. DUBIN:  No.  Those are the
5 reports at issue, which the Court said we
6 could ask about.
7        MS. O'DELL:  And if you would
8 like to ask Mr. Hess about specific reports,
9 he is here and prepared to respond to your
10 questions, but asking for expert opinion is
11 beyond the scope of what Judge Schneider
12 established for this deposition and we'll
13 instruct the witness not to answer.
14        MR. LUDWIG:  I instruct the
15 witness not to answer that question.
16 BY MR. DUBIN:
17    Q.   In your reports identifying
18 chrysotile in Johnson & Johnson, what color
19 are the particles that you're calling
20 chrysotile typically in parallel?
21        MR. LUDWIG:  Objection to form.
22        THE WITNESS:  The colors that I
23 utilize to determine the wavelength are at the
24 edge of the particle and not in the center.
25 BY MR. DUBIN:

1    Q.   Okay.  What color are the particles?
2        MS. O'DELL:  Objection to the
3 form.
4        What particle?  What --
5 BY MR. DUBIN:
6    Q.   The particle that you're calling
7 chrysotile in the reports that you're talking
8 about today?
9        MR. LUDWIG:  Is there a
10 specific report you want to show him?  This
11 right here, it looks like an exhibit created
12 by defense counsel.  So that's not -- he is
13 not here to opine about this exhibit that
14 looks like a PowerPoint by someone else.
15        This is not a --
16        MR. DUBIN:  This is enough
17 speaking objections.  You can make your
18 objections if you want to make your
19 objections.  If you want to instruct your
20 witness not to answer the question, then you
21 can do that, but no more speaking objections.
22 It's gone way too far.
23        MR. LUDWIG:  Based on the scope
24 that the Judge had lined out, I am instructing
25 him not to answer that question.

1        MR. DUBIN:  All right.  Let's
2 take this down.  We'll come back to it when we
3 show your reports.
4 BY MR. DUBIN:
5    Q.   What color -- what is the refractive
6 index of talc?
7    A.   It has wide -- a large
8 birefringence, but normally it will be
9 somewhere in the range of around 1.540 to
10 1.605, based on the experience of what I have
11 seen.
12    Q.   How about a talc plate, a flat talc
13 plate?  What is -- what is the refractive
14 index of a talc plate?
15        MS. O'DELL:  Object to the
16 form.
17        THE WITNESS:  I don't believe
18 the talc plate has any birefringence, but the
19 edges that I have seen have been blue in 1.55,
20 and have been yellowish in 1.605.
21 BY MR. DUBIN:
22    Q.   Did the CSDS colors associated with
23 talc itself in 1.550 oil include the color
24 red?
25        MS. O'DELL:  Would you repeat

1 the question?  I missed the first part.
2 BY MR. DUBIN:
3    Q.   Do the central stop dispersion
4 staining colors of talc plates themselves in
5 1.550 oil include the color red?
6        MS. O'DELL:  Object to the
7 form.
8        MR. LUDWIG:  Same objection as
9 before.
10        I instruct you not to answer.
11        That's -- that calls for an
12 expert opinion.
13        MR. DUBIN:  I am asking his
14 understanding and it relates to this work that
15 he is doing.
16 BY MR. DUBIN:
17    Q.   Did it -- does it include red?
18        MS. O'DELL:  If you have a
19 specific particle you would like to ask him
20 about, that's within the scope of the order,
21 but to ask it in isolation is beyond the scope
22 and seeks an expert opinion.
23        MR. DUBIN:  Fine --
24        MR. LUDWIG:  Join.
25        MR. DUBIN:  -- when you get to

15 (Pages 54 - 57)

Page 58

1 the specific color, the specific reports.
2 BY MR. DUBIN:
3    Q.    So let's look at one of your reports
4 just so we can understand, again, what color
5 talc should be.  So we're now going to be
6 looking at an image from your -- from the
7 September 16, 2020 report on Chinese talc
8 research samples where you were the PLM
9 analyst.
10        MR. DUBIN:  So can we make that
11 image exhibit 5.
12        (Exhibit 5 marked for
13    identification.)
14        MS. O'DELL:  So, first, object
15 to a reference that those reports are his
16 report.  Those reports are reports from
17 Dr. Longo, first.
18        Second, if you're going to ask
19 him a question about a report, it needs to be
20 put in the chat and the specific page that
21 you're referring to needs to be identified so
22 he can see it in context.
23        MR. DUBIN:  And I am going to
24 identify the specific page that we're talking
25 about.  So let's put it in chat and then we

Page 59

1 can call it up, okay, and then we're going to
2 go to page 3 of this.
3        MS. O'DELL:  And if you would
4 identify -- please, just if you'll go back to
5 page 1.  Because I am not seeing it in the
6 chat yet.
7        MR. LUDWIG:  It's in the chat
8 here now.
9        MR. DUBIN:  It is in the chat.
10        MS. O'DELL:  Okay.
11        MR. DUBIN:  296, actually, is
12 the image and we can rotate that so we can see
13 it better.
14        MS. O'DELL:  And what's -- I'm
15 sorry, Morty.  I couldn't see it.  I was too
16 slow trying to see.  I see here.  Just a
17 moment.  Let me make sure that this is
18 actually a report at issue in the MDL.
19        This is not one of the reports
20 that's been disclosed in the MDL and so we
21 would object to questioning based on that.
22        MR. LUDWIG:  If it's not a
23 report disclosed in the MDL and it's not
24 subject to the Judge's scope, then I am
25 instructing the witness not to answer.  I

Page 60

1 don't know if it's his report or not.  I trust
2 Ms. O'Dell.
3        So you're instructed not to
4 answer.
5        MR. DUBIN:  Okay.  We'll
6 double-check what you're -- the list that went
7 in, but I believe that the results in this are
8 included in the reports, but we'll -- I'll
9 hold off on this image until after a break so
10 that we don't have to spend time arguing it.
11 BY MR. DUBIN:
12    Q.    Let's look at another image first,
13 but before I get to more images, I want to
14 stop and ask you a little bit about your
15 microscopes, okay, and what microscopes you
16 were using and how you set them up.
17        At some point initially were
18 you using an Olympus microscope for -- to look
19 at Johnson & Johnson for chrysotile?
20    A.    Olympus BH2.
21    Q.    And that -- so can you repeat the
22 model number for me?  BX?
23    A.    BH, bravo --
24    Q.    Okay.  BH2.  Okay.  And those
25 microscopes had tungsten lightbulbs?

Page 61

1    A.    Yes, sir.
2    Q.    And then at some point you switched
3 over to Leica microscopes; is that right?
4    A.    That is correct.
5    Q.    And what was the Leica model number?
6    A.    As I recall, it's the 2700P.
7    Q.    Do you recall approximately when you
8 changed over microscopes?
9    A.    It was during the early part of
10 2021, I believe.
11    Q.    And just so we understand basically
12 how it operated, how was illumination
13 controlled on the Olympus PLM?
14    A.    By individual controls on the side
15 and to bring up as much light as possible.
16    Q.    Okay.  So was it a dial?  Was it a
17 switch?  How did you adjust illumination?
18    A.    On the lamp itself, there was a
19 little dial on the side.
20    Q.    Okay.  And what -- did MAS have any
21 protocols for how illumination should be set
22 on the Olympus microscope when doing the
23 analysis?
24    A.    I would always set it myself to the
25 highest illumination.

16 (Pages 58 - 61)

Page 62

1    Q.    Okay.  As a PLM analyst, how do you
2  tell if an image is appropriately illuminated?
3    A.    Well, if the scope had capability,
4  we use Kohler illumination, but the best way
5  to get the most illumination out of any type
6  of scope is to have all the different parts
7  align and centered.
8    Q.    Okay.  And is it important for a PLM
9  analyst to be able to see all the particles in
10  the field of view clearly?
11    A.    Through the ocular, yes.
12    Q.    When you were doing your analysis on
13  the Olympus microscope and you were looking
14  for the colors of the particle, were you
15  typically doing that by assessing it through
16  the eyepiece of the microscope or by looking
17  at the -- or looking at a screen?
18    A.    Through the microscope.
19    Q.    And did the -- what is white
20  balancing?
21    A.    Basically, it takes the program that
22  you're using for the graphics and allows it to
23  adjust to the pure white light.
24    Q.    And did the Olympus come with any
25  filters, like a daylight filter or blue

Page 63

1  filter, to perform white balancing with?
2    A.    It had a -- we had a blue diffusion,
3  but there was nothing in -- to do white
4  balance, you have to have a white background.
5    Q.    So it came with a blue light or
6  daylight filter?
7    A.    I would just remove the diffuser.
8    Q.    I am sorry.  I don't understand.
9          Would -- did the microscope
10  come with or did you have a blue light or
11  daylight filter on the Olympus?
12    A.    I don't recall.
13    Q.    Do you know whether you used a blue
14  light or a daylight filter when performing
15  analysis for chrysotile in Johnson & Johnson
16  with the Olympus microscope?
17          MR. LUDWIG:  Objection to form.
18          Is there are a specific test
19  you're asking about?  It's my understanding
20  there was lots of tests.
21          So I am going to object to the
22  form.  Same scope issue.
23          MR. DUBIN:  It's the reports at
24  issue.  I'm asking about his microscope setup
25  for the reports at issue.

Page 64

1          MR. LUDWIG:  Is there a
2  specific report you're asking about?
3          MR. DUBIN:  There are a set of
4  reports that are done on an Olympus
5  microscope.  There are then a set of reports
6  that are done on the Leica microscope.
7          I am asking about the ones he
8  did on Olympus.  If we want -- if we need to
9  call up an example, I am happy to do that.  So
10  we'll call up an example of that.
11          We can go to the Zimmerman
12  report and that will be exhibit 6 and so let's
13  make that exhibit 6.  For internal reference
14  it's CX-6.  It's -- this is an image from the
15  February 24, 2020 analysis of Johnson &
16  Johnson.  We can put it in chat and call it
17  up.
18          (Exhibit 6 marked for
19    identification.)
20  BY MR. DUBIN:
21    Q.    Okay.  And I want to look at an
22  image there.  We can go to, I guess, 39 of the
23  report.  I am just going to -- okay.  For
24  example, this was in 2020.
25          So this would be on the Olympus

Page 65

1  microscope, correct?
2    A.    That is correct.
3    Q.    Okay.  So now we have an image.
4  We're talking about a specific report.
5          When you were doing these
6  analyses for Johnson & Johnson, were you using
7  a blue light or daylight filter?
8    A.    I don't recall if we ever had any
9  specific daylight or blue filters for the
10  Olympus.  The only thing blue was the
11  diffuser.
12          MS. O'DELL:  What is your other
13  report?
14          MR. DUBIN:  So this is -- this
15  was page 36, I think.
16  BY MR. DUBIN:
17    Q.    All right.  We'll come back to that
18  in a bit.
19          Do you know what the purpose is
20  of a blue light or a daylight filter?
21          MS. O'DELL:  Object to the
22  form.
23          MR. LUDWIG:  Object to the
24  form, yeah.  It calls for expert testimony.
25          I instruct you not to answer

17 (Pages 62 - 65)

1 that question.
2          MR. DUBIN:  You're instructing
3 him not to answer?  I am asking him about the
4 work he did, how he set up his microscope, and
5 what filters he was using and you're
6 instructing him not to answer that?
7          MS. O'DELL:  That was not your
8 question.
9          MR. DUBIN:  Well, I just asked
10 him about whether it had a blue light filter
11 and whether he was using it and I am asking
12 him now what his understanding of the purpose
13 of that type of filter is.  Are you
14 instructing him not to answer that question?
15          MS. O'DELL:  He is here to --
16 he is here to testify to what he did, which
17 he -- the equipment he used, which he has been
18 responding to those questions.
19          Understanding about certain
20 methodologies, giving his opinion about
21 certain methodologies is beyond the scope of
22 what Judge Schneider has ordered.
23          MR. DUBIN:  Are you instructing
24 him not to answer --
25          MR. LUDWIG:  The objection --

1          MR. DUBIN:  -- a simple
2 question about the purpose of a blue light
3 filter?  Are you instructing him not to
4 answer?
5          MR. LUDWIG:  Yes.
6          MR. DUBIN:  Okay.
7          MR. LUDWIG:  I believe that is
8 outside the scope of what the Judge just
9 said --
10          MR. DUBIN:  I really don't --
11 if you instruct him not to answer, I don't
12 need to hear a long speaking objection in
13 addition.
14          MR. LUDWIG:  Sure.  Fair
15 enough.
16          MS. O'DELL:  And just for the
17 record, Morty -- and I think it's just a page
18 number issue -- you identified what's on the
19 screen as page 36 of the report.  I am
20 assuming you mean 36 -- page 36 in the PDF?
21          MR. KEESTER:  It's 39 in the
22 PDF.
23          MR. DUBIN:  Thirty-nine.
24 Sorry.
25          MS. O'DELL:  Okay.  Let me just

1 get there.  Okay.  Thank you.
2 BY MR. DUBIN:
3    Q.   Do you know how looking at an image
4 to tell whether a blue light filter or
5 daylight filter is being used?
6    A.   I don't recall ever dealing with
7 them.
8    Q.   Okay.  How was focus adjusted on the
9 Olympus microscope?
10    A.   Focus would be adjusted using the
11 fine focus knob.
12    Q.   Okay.  I want to show you another
13 image and ask you if you can tell me whether a
14 blue light filter is being used or not.
15          MR. DUBIN:  It will be
16 exhibit -- what number are we on?  We are now
17 on six?
18          THE COURT REPORTER:  Seven.
19          MR. DUBIN:  And that is --
20          THE COURT REPORTER:  You're on
21 exhibit 7, I believe.
22          MR. DUBIN:  Exhibit 7.  Okay.
23 That is CX-11A to call it up and if you could
24 just go to page 22 of it and put it in chat.
25          MS. O'DELL:  Mr. Hess, just

1 give us a moment to see what's going to be put
2 on the screen and what the report is.
3          (Exhibit 7 marked for
4     identification.)
5 BY MR. DUBIN:
6    Q.   Page 22, can you tell me if a blue
7 light or daylight filter is being used on this
8 image?
9          MR. LUDWIG:  Objection --
10 objection.  This, once again, calls for expert
11 opinion, which is outside the scope of the
12 purpose of this deposition as instructed by
13 the Judge.
14          MR. DUBIN:  Are you instructing
15 him not to answer the question?
16          MR. LUDWIG:  I am instructing
17 him not to answer the question.
18          MS. O'DELL:  Yes.  This is not
19 a document that's been disclosed in the MDL.
20 It's a report for Dr. Longo.  It's analysis of
21 ceramic slip clay for something else that's
22 not related and we object to the use of this
23 exhibit.
24          MR. DUBIN:  Okay.  Can we call
25 up -- we'll make the next exhibit in order

18 (Pages 66 - 69)

Page 70

1 Hess slide 20.
2           THE COURT REPORTER:  This is
3 exhibit 8.
4           MR. DUBIN:  That's exhibit 8.
5 Can we call that up, Jake?
6           (Exhibit 8 marked for
7    identification.)
8 BY MR. DUBIN:
9    Q.    I am putting up the image that I
10 showed you before, as well as the image from
11 Zimmerman that I showed you before.  These are
12 both analyses that you performed.
13           Can you tell me why the color
14 of the talc is different in the two images?
15           MS. O'DELL:  We object to the
16 use of this document.  First, Vanderbilt is
17 not at issue in this case, it's not a report
18 that's at issue in this case.  We object to
19 the use of that image.
20           To the degree you want to have
21 him -- ask him about the Zimmerman report.
22 You had it up.  He is welcome to answer
23 questions, but we object to the use of this
24 defense created exhibit.
25           MR. LUDWIG:  And I am going to

Page 71

1 join and I am going to instruct him not to
2 answer.
3           Once again, you're getting into
4 expert opinion, which is outside the scope of
5 what the Judge instructed this witness.
6           MR. DUBIN:  Was your -- okay.
7 So you're instructing him not to answer.  I am
8 going to ask another question.  If you
9 instruct him not to answer, then so be it.
10 BY MR. DUBIN:
11    Q.    But was the microscope set up
12 differently in these two analyses?  Can you
13 tell by looking at the images whether the
14 microscope was set up differently in the two
15 analyses?
16           MR. LUDWIG:  Same objection.
17           MS. O'DELL:  Please put the
18 exhibit in the chat.
19           MR. DUBIN:  Are you instructing
20 him not to answer?
21           MR. LUDWIG:  Yes.
22           MR. DUBIN:  And if -- can you
23 leave it back up, Jake?  What's going on?  I
24 am not done yet.  Can you put that back up,
25 Jake?  Thank you.

Page 72

1           And if I asked you about the
2 differences in illumination in these two
3 images, are you going to instruct your witness
4 not to answer that also?
5           MR. LUDWIG:  Yes.
6           MS. O'DELL:  And, again -- and,
7 Jake, I know you have a lot going on, but if
8 you would put that in the chat, please.
9 BY MR. DUBIN:
10    Q.    How are your images being taken on
11 the Olympus?  How are the images being taken?
12    A.    It was done using an AmScope camera
13 and an AmScope program.
14    Q.    Okay.  Were there any specific
15 settings that you had on the camera for
16 purposes of taking the images?
17    A.    I don't recall everything.
18    Q.    Are you familiar -- you're familiar
19 with ISO 22262-1?
20    A.    Familiar.
21    Q.    Do you know whether it says anything
22 about using blue or daylight filters?
23           MS. O'DELL:  Object to the
24 form; calls for expert opinion; beyond the
25 scope of the work that Mr. Hess did in the

Page 73

1 MDL; and that's my objection.
2           Counsel can decide whether to
3 instruct him not to answer.
4           MR. LUDWIG:  I am instructing
5 you not to answer that.
6 BY MR. DUBIN:
7    Q.    Okay.  Let's talk about your Leica
8 microscope setup.
9           First, how was illumination
10 adjusted on the Leica microscope?
11    A.    It had a lamp knob on the side,
12 which we could bring up full illumination.
13    Q.    Was it a dial or was it -- was it a
14 switch?  How did the illumination work?
15    A.    It was a dial.
16    Q.    And what -- if you turn that dial,
17 if you kept turning it, would it stop at some
18 point or could you continue to turn it and
19 turn it?
20    A.    I could continue to turn it.
21    Q.    Okay.  So how did you set the
22 brightness on the Leica?
23    A.    By observation through the
24 microscope itself to the brightest point
25 available.

19 (Pages 70 - 73)

Page 74

1    Q.    So you -- did you always keep it at
2    the brightest point available?
3    A.    Yes, sir.
4    Q.    Okay.  And did the Leica microscope
5    come with any filters?
6    A.    The only filter I'm aware of is the
7    530 nanometer plate.
8    Q.    Did it have a daylight filter
9    switch?
10    A.    Not that I am aware of.
11    MR. DUBIN:  Let's make exhibit
12    9 Hess slide 22 and we can call that up.
13    (Exhibit 9 marked for
14    identification.)
15    BY MR. DUBIN:
16    Q.    Is this -- does this look familiar
17    to you as the Leica microscope that you were
18    using?
19    A.    It looks familiar.
20    Q.    Do you recall the switches that we
21    see here:  Daylight filter switch, neutral
22    density filter switch?
23    A.    Yes.
24    Q.    Okay.  Do you know whether your --
25    when you started using the Leica microscope,

Page 75

1    whether your daylight filter switch was in an
2    "on" or "off" position?
3    A.    I don't recall today.
4    Q.    All right.  Are you familiar with
5    what reference talc looks like from the USP
6    documents?
7    MR. LUDWIG:  Objection; calls
8    for expert opinion.  I am instructing him not
9    to answer.
10    MS. O'DELL:  Join.
11    MR. DUBIN:  Okay.  Well,
12    just -- we'll see.  You may instruct him not
13    to answer again, but I am going to ask it.
14    If we can put Hess slide 24 as
15    the next exhibit.
16    MS. O'DELL:  We have not gotten
17    the last exhibit in the chat yet.  So, please,
18    if we can just pause and take the time and put
19    that in the chat?  Thank you.
20    MR. KEESTER:  I'm sorry, Morty.
21    What slide are we doing?
22    MR. DUBIN:  Twenty-four.
23    MR. LUDWIG:  Is slide 24
24    exhibit 9 or is slide 24 exhibit 10?  I'm
25    sorry.

Page 76

1    MR. DUBIN:  Exhibit 10.
2    (Exhibit 10 marked for
3    identification.)
4    BY MR. DUBIN:
5    Q.    Do you know why your images taken on
6    the Olympus microscope of talc are more orange
7    than reference talc images?
8    MS. O'DELL:  I object to the
9    use of this exhibit.  It's unclear if it came
10    from a report that's at issue in this
11    deposition, it's unclear if it's -- if it's
12    Mr. Hess' work, and we object to its use.
13    MR. LUDWIG:  And I will join.
14    It outside the scope of the parameter of the
15    deposition.  I am instructing Mr. Hess not to
16    answer that question.
17    MR. DUBIN:  Okay.
18    BY MR. DUBIN:
19    Q.    Let's, again, go to your Zimmerman
20    report.  We have already marked that as an
21    exhibit.  We can call it back up, CX-6.  So we
22    have looked at this already.  Let's go back to
23    that image, starting at page 39.
24    So this is something that
25    you're calling chrysotile in parallel in

Page 77

1    1.550.
2    What color is that?
3    MS. O'DELL:  If you need to see
4    it and see it more closely, Mr. Hess, please
5    let us know that.
6    And if there is -- if there is
7    a specific structure you're referring to that
8    you can direct Mr. Hess?
9    MR. DUBIN:  Right.
10    BY MR. DUBIN:
11    Q.    The one with the micron bar under it
12    is the one that they are calling chrysotile.
13    What color is it?
14    MR. LUDWIG:  Can I have that
15    question reread, please?
16    THE COURT REPORTER:  One
17    moment.
18    "QUESTION:  So this is
19    something that you're calling chrysotile
20    in parallel in 1.550.
21    "What color is that?"
22    MR. LUDWIG:  I am going to
23    object once again.  It's calling for an expert
24    opinion.
25    MR. DUBIN:  This is -- I am

20 (Pages 74 - 77)

Page 78

1 asking him about his reports that are at issue
2 in this case and asking him what color that he
3 is calling particles and that is exactly in
4 the scope of the deposition.
5         So unless you're instructing
6 him not to answer that as well, my question
7 stands.
8         MR. LUDWIG: I instruct him not
9 to answer that question.
10        MR. DUBIN: Okay. So now
11 you're instructing the witness not to answer
12 questions even about the specific reports that
13 he was -- that we were permitted to depose him
14 on.
15        Is that my understanding?
16        MS. O'DELL: So would you
17 repeat your question, please?
18        MR. DUBIN: Oh, my goodness.
19 What color is the particle that you're calling
20 chrysotile here?
21        MR. LUDWIG: I am standing by
22 my objection. I am instructing him not to
23 answer.
24        It goes to -- you're asking him
25 to opine as to the color. The color is on the

Page 79

1 screen and it is part of an expert report
2 prepared by MAS and you're taking it out of
3 context.
4         So I am going to instruct you
5 not to answer.
6         If you want to ask him how he
7 developed the color, that's what the Judge
8 said, but --
9         MR. DUBIN: (Inaudible.)
10        MR. LUDWIG: -- his personal
11 involvement.
12 BY MR. DUBIN:
13   Q.   You are the analyst who did this
14 work for the Zimmerman report and we can go
15 through your PLM -- the PLM sheets.
16        You did this analysis, right?
17        MR. LUDWIG: Okay. That's
18 fine. Let's do that.
19 BY MR. DUBIN:
20   Q.   You did this analysis? These are
21 your PLM images, correct, Mr. Hess?
22   A.   It is.
23   Q.   So I'm asking you what color did you
24 assess this particle as?
25   A.   Could you zoom in on the particle?

Page 80

1   Q.   We can zoom more in.
2   A.   The center part of it is a golden
3 yellow, but I cannot determine the edges,
4 which is where I need to look.
5   Q.   Okay. Well, we'll go over this edge
6 effect, but you can agree that this is not --
7 this does not look like reference chrysotile,
8 correct?
9         MS. O'DELL: Object to the
10 form.
11        MR. LUDWIG: Same objection.
12        THE WITNESS: The center of the
13 particle is not what you would usually call.
14 BY MR. DUBIN:
15   Q.   And -- sorry. And you see that
16 there are rounded structures in this image,
17 right?
18   A.   There are.
19   Q.   Those are talc?
20   A.   Some may be.
21   Q.   Are they the same color as the
22 particle that you're calling chrysotile?
23        MS. O'DELL: Object to the
24 form.
25        THE WITNESS: It is, but I --

Page 81

1 the other particle colors, without being able
2 to see the true edges of the particle in
3 question --
4 BY MR. DUBIN:
5   Q.   Okay. We'll talk about edges --
6         MS. O'DELL: Excuse me, Morty.
7 I don't believe you could hear. He is not
8 finished with his answer.
9 BY MR. DUBIN:
10   Q.   Go ahead.
11   A.   -- I cannot comment.
12   Q.   We'll talk about edges later.
13        Have you seen any PLM work of
14 Johnson & Johnson done by any other experts?
15   A.   I don't recall.
16        MR. DUBIN: Okay. Let's put up
17 Hess slide 25 as exhibit 11.
18        (Exhibit 11 marked for
19   identification.)
20 BY MR. DUBIN:
21   Q.   We're looking at images of PLM --
22 and I will mark the entire report also from
23 Mr. Poye and from you -- both from on talcs.
24        Do you have any understanding
25 why the images look so different?

21 (Pages 78 - 81)

Page 82

1          MR. LUDWIG: Objection to form;
2 that goes into expert testimony and you made
3 your question -- this appears to be a defense
4 exhibit, I guess, comparing two different
5 samples. It is not a specific report from
6 MAS.
7          So I am instructing the witness
8 not to answer. This calls for expert opinion,
9 outside the scope of his testimony.
10          MS. O'DELL: Join.
11          MR. DUBIN: So the whole -- so
12 that we have the whole report in the record,
13 let's mark CX-53 as exhibit 11.
14          MS. O'DELL: Please put the
15 slide in the chat screen, Jake. Thank you.
16          THE COURT REPORTER: I just
17 want to confirm. Exhibit 11 was slide 25.
18 Are we now marking the whole report?
19          MR. DUBIN: Yeah, we're going
20 to now mark the whole report as exhibit 11.
21          MS. O'DELL: And we have --
22 since the --
23          MR. DUBIN: I am just marking
24 it for the record. I understand you have
25 objected to my asking him about it.

Page 83

1          MS. O'DELL: Understood, but is
2 the report going to be exhibit 12 and the
3 slide is going to be exhibit 11?
4          MR. DUBIN: I thought the
5 report was 11, but maybe I miscounted.
6          MR. LUDWIG: Exhibit 11 was the
7 slide and then exhibit 12 was going to be the
8 full report, if that's what you want to do.
9          I'm sorry. I am not trying to
10 step on your toes. I am trying to be helpful
11 in this.
12          MR. DUBIN: If the slide was
13 not marked -- I thought that was exhibit 10,
14 but if it's not marked, that's fine. I can
15 make it exhibit 12.
16          THE COURT REPORTER: This is
17 the court reporter. We have slide 25 as
18 exhibit 11. We have the report as exhibit 12.
19          MR. DUBIN: Okay.
20          MS. O'DELL: Thank you.
21          (Exhibit 12 marked for
22    identification.)
23 BY MR. DUBIN:
24     Q.   All right. You indicated that one
25 of the things that you reviewed in preparation

Page 84

1 for your deposition today was some material
2 from Dr. Su.
3          What did you review?
4     A.   I reviewed primarily the -- all the
5 images that he had put in the comments. For
6 lack of a better way to put it, the slide
7 show.
8     Q.   Okay. Have you reviewed his
9 affidavit entitled: Review of Dr. Longo's PLM
10 Methods for the Identification of Chrysotile?
11     A.   I don't recall that one.
12     Q.   Okay. What, if any, comments do you
13 have on the slides that you reviewed from
14 Dr. Su?
15     A.   Well --
16          MS. O'DELL: Object to form.
17          MR. LUDWIG: Object to the
18 form.
19          MS. O'DELL: Calls for expert
20 opinion. It's beyond the scope of this
21 deposition.
22          MR. DUBIN: Are you instructing
23 him not to answer?
24          MR. LUDWIG: I am instructing
25 him not to answer.

Page 85

1 BY MR. DUBIN:
2     Q.   You also indicated you reviewed some
3 materials from Dr. Wylie?
4          MS. O'DELL: Same.
5 BY MR. DUBIN:
6     Q.   What did you review?
7     A.   The report that -- I don't recall
8 the name of the report, but I believe it was
9 her most recent report.
10     Q.   Okay. Do you have any comments on
11 the -- on her review of your work?
12          MR. LUDWIG: Same objection.
13          I instruct him not to answer.
14 He is not here to provide criticisms of
15 Dr. Wylie. The Court made it very clear, the
16 scope of the testimony.
17          MS. O'DELL: Join.
18          MR. DUBIN: These are all
19 related to his work that is the subject of
20 this deposition, but if you're instructing him
21 not to answer, then that will be an
22 instruction. We'll take it up at some point.
23          Because we're clearly going to
24 have to go back to the drawing board about the
25 way that these objections are being made, but

22 (Pages 82 - 85)

Page 86

1  if you're instructing him not to answer, but
2  my proffer is that they are all about the
3  reports at issue in this case.
4        MS. O'DELL:  Mr. Hess is here
5  today to answer questions regarding his
6  reports and he has answered your questions
7  about those.  He is not here to offer expert
8  opinion, criticism, thoughts, et cetera, about
9  defense or expert witnesses.
10       MR. DUBIN:  Okay.
11 BY MR. DUBIN:
12   Q.   In terms of illumination, I want to
13 look at another report just quickly, your
14 report and your analysis.  It will be exhibit
15 13.  It's CX-28 is the internal reference and
16 it's dated 4/13/2021.
17       MR. DUBIN:  If we could put it
18 in chat and then call it up.
19       MS. O'DELL:  Chris, you put a
20 comment in chat.  Did you have an objection?
21 We're not hearing you if you're making an
22 objection.
23       MR. PLACITELLA:  Well, my
24 objection is that it seems like it's
25 repeatedly -- documents are repeatedly being

Page 87

1  put up in contravention of the Court's Order
2  and we're here to try to get through this
3  deposition and the purposes of trying to make
4  a record.
5        I mean, this is exactly what
6  the Judge said not to do --
7        MR. DUBIN:  Okay.
8        MR. PLACITELLA:  -- and you
9  keep doing it.
10       MR. DUBIN:  I completely
11 disagree with you and I am making my record.
12 He is being instructed not to answer, I need a
13 record of that, and thank you for your
14 comments, but we're moving on.
15       MR. PLACITELLA:  Okay.  No
16 problem.
17       MR. DUBIN:  Thanks.
18       (Exhibit 13 marked for
19    identification.)
20 BY MR. DUBIN:
21   Q.   So I just want to understand your
22 testimony.  If we go to PDF 2 here, this is
23 one of your -- sorry.  It will be the image.
24 So it's at 84.  And, again, I want to talk to
25 you a little bit about illumination.

Page 88

1        Is it your testimony that this
2  image was taken at maximum illumination?
3    A.   Yes, sir.
4    Q.   So the brightness level on the
5  Olympus does not go any higher than this?
6        MR. LUDWIG:  Objection; asked
7  and answered.
8        THE WITNESS:  Pardon?
9        MR. LUDWIG:  I said, objection;
10 asked and answered.
11 BY MR. DUBIN:
12   Q.   Is that correct?  Your testimony is
13 that the Olympus microscope you were using at
14 this time, it cannot take any brighter images
15 than this.
16       Is that your testimony?
17       MS. O'DELL:  Object to the
18 form.
19       THE WITNESS:  May I see the
20 lower part of the image?
21 BY MR. DUBIN:
22   Q.   I'm sorry?  You want to see the
23 lower part of the image?  Sure.
24   A.   Thank you.
25       That was not taken on the

Page 89

1  Olympus.
2    Q.   Okay.  So this is Leica?
3    A.   This is a Leica.
4    Q.   Okay.  So is it your testimony that
5  the Leica microscope cannot take any brighter
6  images than this?
7        MS. O'DELL:  Object to the
8  form.
9        MR. LUDWIG:  Object to the
10 form.
11       THE WITNESS:  That is the
12 brightest I could get for that particular
13 mount.
14 BY MR. DUBIN:
15   Q.   Okay.  And, for example, if we just
16 look at page 85 of this, we can see the
17 perpendicular.
18       Is it your testimony that this
19 type of image is taken at maximum brightness
20 on the Leica?
21       MS. O'DELL:  Object to the
22 form.
23       THE WITNESS:  It is.
24 BY MR. DUBIN:
25   Q.   Okay.  We'll come back to

23 (Pages 86 - 89)

Page 90

1 illumination in a bit, but let's first just
2 talk a little bit about the switch that was
3 made at some point to 1.560 oil.
4          Do you know why that switch was
5 made in your analysis?
6          MR. DUBIN: You can take this
7 down, Jake.
8          THE WITNESS: The switch was
9 made at the suggestion -- I don't recall his
10 name, but he was in, talking with Dr. Longo;
11 and he was back, watching me do some work; and
12 he made the suggestion because of the intense
13 stretch of yellow on the color chart for 1.55,
14 that we do it with 1.560 to better define the
15 upper level of what we were finding in the
16 chrysotile.
17          MR. LUDWIG: I think the
18 question went to switching microscopes.
19          MR. DUBIN: No. He understood
20 the question. It was why the oil was
21 switched.
22          MR. LUDWIG: I'm sorry.
23 BY MR. DUBIN:
24    Q.   Okay. And what is the expected
25 effect if you are switching from 1.550 to 1.60

Page 91

1 oil?
2    A.   We didn't switch to 1.60.
3    Q.   Sorry. What did you say?
4    A.   That we didn't switch to 1.60.
5    Q.   You didn't switch to 1.560? Maybe I
6 misspoke.
7          What is the expected effect of
8 switching to one, five -- 1.560 oil?
9          MR. LUDWIG: I'm going to
10 object; that calls for an expert opinion. I
11 am instructing the witness not to answer that
12 question.
13          MR. DUBIN: Okay. Well, I want
14 to call up -- let's just mark the Valadez
15 report as the next exhibit in order. I guess
16 that's 14.
17          (Exhibit 14 marked for
18       identification.)
19          MR. LUDWIG: Mr. Dubin, we have
20 been going for close to an hour and fifteen.
21 Do you want to just do this last one and then
22 take a break?
23          MR. DUBIN: I'll call up --
24 I'll put up the report and I'll put it in chat
25 because we're going to talk about it for a

Page 92

1 bit. Let's put that in chat and we can go to
2 page 32 of it. Sorry. Is it page 32? It
3 should be the image. Okay.
4          Well, let's -- I will -- we can
5 just take the break now. I will leave that in
6 chat so that if anybody needs it over the
7 break.
8          What are we going to take? Ten
9 minutes?
10          MR. LUDWIG: Ten minutes is
11 great.
12          MR. DUBIN: All right. We can
13 do ten minutes.
14          VIDEOGRAPHER: The time is
15 11:19 a.m. We are off the record.
16          (Break held off the record.)
17          VIDEOGRAPHER: The time is
18 11:37 a.m. We are back on the record.
19          MR. DUBIN: We are going to
20 start talking about the Valadez report and the
21 Valadez report -- if we can put it back up?
22 We can just go to the front cover first and
23 then we'll come back here to the image. Okay.
24 BY MR. DUBIN:
25    Q.   So the -- this is what we referred

Page 93

1 to as the Valadez report from 2023.
2          So we would be taking about a
3 Leica microscope, correct?
4    A.   That is correct.
5    Q.   And we're talking now about using
6 1.560 oil, right?
7    A.   Yes, sir.
8    Q.   Okay. And so let's go to that image
9 first.
10          MS. O'DELL: For the record,
11 what page in the PDF?
12          MR. DUBIN: What page is that,
13 Jake?
14          MR. KEESTER: This is PDF page
15 33.
16          MR. DUBIN: It's particle CSM
17 001.
18 BY MR. DUBIN:
19    Q.   Now, I want to just quickly flip
20 back to the Zimmerman report we have already
21 looked at, the image, and if we can just look
22 at the image we had up before.
23          Can you see that the image in
24 the Zimmerman report is more golden or orange
25 than the image in the Valadez report? We can

24 (Pages 90 - 93)

Page 94

1  go back and forth between them if you need to.
2          MR. DUBIN:  Can we flip back to
3  Valadez?
4  BY MR. DUBIN:
5      Q.  Do you see that the Zimmerman report
6  image is more golden or orange?
7      A.  I do.
8      Q.  Do you know why that is?
9      A.  From the BH2, which is the Zimmerman
10  report, we were on a tungsten lamp, and it was
11  to the respect that we were dealing with extra
12  yellows from the tungsten lamp.
13      Q.  So the tungsten lamp was changing
14  the color of the particle then?
15          MS. O'DELL:  Object to the
16  form.
17          MR. LUDWIG:  Object to form.
18  BY MR. DUBIN:
19      Q.  Is that correct?
20          MS. O'DELL:  Object to the
21  form.
22          THE WITNESS:  We felt it was
23  adding more yellow to the image of what we
24  were seeing and what we were documenting.
25  BY MR. DUBIN:

Page 95

1      Q.  Okay.  And it wasn't just adding
2  yellow.  If we go back to the Zimmerman report
3  image, it was adding sort of darker golden
4  colors or orange colors to the image, right?
5          MS. O'DELL:  Object to form.
6          MR. LUDWIG:  Objection.  This
7  calls for an expert opinion.
8          I will instruct you not to
9  answer that one.
10          MR. DUBIN:  You're instructing
11  him not to answer that question about the
12  comparison between these two images?
13          MR. LUDWIG:  Correct.  You're
14  testifying and I am going to object to that
15  one.
16          MR. DUBIN:  You're objecting
17  and you're instructing your witness not to
18  answer a question about the impact of lighting
19  on his images in the reports at issue in this
20  deposition and you're instructing him not to
21  answer.
22          Is that my understanding?
23          MR. LUDWIG:  Could you -- let
24  me hear the question again because I think
25  you -- what you said was different than what

Page 96

1  your question was.
2          MR. DUBIN:  We can read the
3  question back.
4          THE COURT REPORTER:  One
5  moment.
6          "QUESTION:  And it wasn't just
7      adding yellow.  If we go back to the
8      Zimmerman image, it was adding sort of
9      darker golden colors or orange colors to
10      the image, right?"
11          MS. O'DELL:  Object to the
12      form.
13          MR. LUDWIG:  I am going to
14      stand by my objection.
15          MR. DUBIN:  So you're not just
16  objecting.  You're instructing him not to
17  answer that question.  I need to understand
18  that.
19          MR. LUDWIG:  Correct.
20          MR. DUBIN:  So if I ask him any
21  questions trying to compare various images in
22  his reports, are you going to instruct him not
23  to answer that?
24          MS. O'DELL:  You can proceed
25  with your deposition, Morty.  It's no way

Page 97

1  to -- to respond to that.  I mean --
2          MR. DUBIN:  Okay.  I just --
3  we're obviously going to have to deal with
4  this after the end of the questioning today,
5  but we'll proceed.
6          MS. O'DELL:  I am not finished.
7          MR. DUBIN:  Okay.
8          MS. O'DELL:  Stop interrupting,
9  please.  If you ask him questions about the
10  image and the work that he did, he is
11  available to answer your question.  He is not
12  here to offer expert opinion.  It has been
13  stated numerous times.
14          MR. DUBIN:  I am asking him
15  directly about his images right now.  So --
16  and he is still being instructed not to
17  answer.
18  BY MR. DUBIN:
19      Q.  So, again, I am asking you a
20  question about this image.
21          The tungsten lighting is not
22  just adding more yellow; it's adding golden
23  colors and more orange color to the images,
24  right?  Is that correct?
25          MR. LUDWIG:  Object.

25 (Pages 94 - 97)

Page 98

1        I instruct you not to answer.
2        MR. DUBIN:  You're instructing
3  him not to answer that question.  Okay.
4  BY MR. DUBIN:
5    Q.   And if we -- if we look at the
6  Valadez image, the effect of changing the
7  refractive index oil should have been to make
8  the particles less yellow, right?  To move the
9  yellows towards the range of magenta, correct?
10    A.   It was done to make it easier to
11  determine the upper refractive indices.
12    Q.   But by -- if I have a particle that
13  is orange in parallel in 1.550 and I change my
14  oil to 1.560, it should appear more magenta,
15  right --
16        MS. O'DELL:  Objection.
17  BY MR. DUBIN:
18    Q.   -- in the magenta range?
19        MS. O'DELL:  Excuse me.
20  Objection.  Seeks expert opinion.
21        MR. LUDWIG:  Join.
22        I instruct the witness not to
23  answer.
24  BY MR. DUBIN:
25    Q.   What color is this particle that you

Page 99

1  identified as chrysotile?  What color is it?
2    A.   Please, focus in.
3    Q.   (Counsel complies.)
4        MS. O'DELL:  Again, this is
5  page 33 of the Valadez report and that's being
6  shown on the screen?
7        MR. DUBIN:  It may be page 32,
8  I think, but I don't know.  Is it 33 or 32,
9  Jake?
10        MR. KEESTER:  I have it as PDF
11  33.
12        MR. DUBIN:  Okay.  PDF 33.
13        THE WITNESS:  It has a mottled
14  appearance, some yellow, but I cannot
15  ascertain the edge off of the photograph.
16        MR. DUBIN:  Okay.
17        MS. O'DELL:  And, Morty, just
18  to correct the record, I believe that this is
19  page 32 of the Valadez --
20        MR. DUBIN:  I said 32.  It may
21  just be PDF 33.
22        MS. O'DELL:  I am looking at
23  the actual report.  The PDF report is 32 just
24  so it's clear when we go back what we're
25  looking at.

Page 100

1        MR. DUBIN:  Right.  And so it's
2  also clear, it's CSM 001.
3  BY MR. DUBIN:
4    Q.   Do you see rounded structures here
5  that you believe to be talc plates?
6    A.   There are.
7    Q.   And do you see that some of those
8  rounded structures have some red coloration
9  around the edges?
10        Do you see that?
11    A.   I cannot --
12    Q.   (Inaudible.)
13    A.   -- the edge color --
14        MS. O'DELL:  He was not
15  finished; so.
16  BY MR. DUBIN:
17    Q.   What was the answer?
18    A.   I cannot determine the edge colors
19  from the photograph as presented.
20    Q.   You don't see red edges on the talc
21  plates?
22        MR. LUDWIG:  Asked and
23  answered.
24        THE WITNESS:  I don't on the
25  photograph as presented.

Page 101

1  BY MR. DUBIN:
2    Q.   Is red a central stop dispersion
3  color that is associated with talc itself in
4  1.550 or 1.560?
5    A.   I am not aware that it is.
6    Q.   Do you ever go through any process
7  to calibrate your dispersion staining colors?
8    A.   We do that.
9    Q.   And how do you do that?  How did you
10  do that?
11    A.   I didn't do them.  There was
12  somebody else in the lab that did them.
13    Q.   Do you know what the process was?
14    A.   Initially, it was through the
15  Cargille glass solids.
16    Q.   Cargille glass?
17    A.   Yes, and --
18    Q.   And --
19        MS. O'DELL:  Sorry.  He is not
20  finished.
21  BY MR. DUBIN:
22    Q.   Go ahead.
23    A.   And then recently was acquired a
24  refractive scope where you can check your
25  index difference.

26 (Pages 98 - 101)

Page 102

1   Q.   And Cargille -- those Cargille glass
2 standards have a single refractive index; is
3 that right?
4   A.   That is correct.
5   Q.   Meaning that they only have one true
6 central stop dispersion staining color; is
7 that correct?
8   A.   That is correct.
9   Q.   Okay. Can you still see sometimes
10 edges on the Cargille glass that show a
11 different color, not their true central stop
12 dispersion staining color? Can you sometimes
13 see edges on them of different colors?
14       MS. O'DELL: Objection to the
15 form to the degree it's talking about a
16 process that he did not do himself.
17 BY MR. DUBIN:
18   Q.   Just only if you know personally?
19       MS. O'DELL: And do not
20 speculate, please, Mr. Hess. If you -- if
21 that's a process you were involved in for
22 purposes of your work in this case, you can
23 respond, but if it was not, well, that's
24 beyond the scope, and that's expert opinion.
25       THE WITNESS: I did not do the

Page 103

1 calibrations --
2 BY MR. DUBIN:
3   Q.   Are you --
4   A.   -- just said.
5   Q.   Are you familiar with the fact that
6 you can -- that even with Cargille glass that
7 has a single refractive index, you can
8 sometimes see edge colors that don't
9 correspond to that refractive index?
10       MS. O'DELL: Objection; seeks
11 expert opinion beyond the scope of the
12 deposition. I will let Mr. Hess' counsel
13 instruct him.
14       MR. LUDWIG: I am going to
15 instruct him not to answer that question.
16 BY MR. DUBIN:
17   Q.   Do you know what total reflection
18 means in the context of PLM dispersion
19 staining?
20       MS. O'DELL: Same objection.
21       MR. LUDWIG: Is the question
22 does he know what total dispersion -- repeat,
23 please?
24 BY MR. DUBIN:
25   Q.   Total reflection.

Page 104

1   A.   I am unfamiliar with the term.
2   Q.   If we scroll down so we can see the
3 bottom of this, you see that there is a
4 refractive index number, 1.564; that is the
5 refractive index number that you assigned to
6 this particle; is that correct?
7   A.   That is correct.
8   Q.   Do you know what color that
9 refractive index number corresponds to in
10 1.560 oil?
11   A.   Without the temperature information
12 handy and without the actual charts utilized,
13 it was more of a.
14   Q.   So are you done with your answer?
15   A.   I don't recall exactly off the top
16 of my head.
17   Q.   Well, let's go through the process
18 so we understand how you can take that
19 refractive index number and determine what
20 color you were calling this particle.
21       And so I am going to show you a
22 couple different slides. We can just mark
23 them as separate exhibits. We can just start
24 with slide 34.
25       THE COURT REPORTER: For the

Page 105

1 record, I believe this is Exhibit 15.
2       MR. DUBIN: Thank you.
3       (Exhibit 15 marked for
4    identification.)
5 BY MR. DUBIN:
6   Q.   Do you know the temperature in the
7 lab at MAS?
8   A.   We did have an immersion thermometer
9 at station.
10   Q.   And what is the temperature?
11   A.   It was 21 degrees.
12   Q.   And so if we wanted to figure out
13 what color you're calling the particle, we
14 could look at the Su tables or 1.560, and we
15 take your RI given, right, and then we can
16 match that up with a wavelength of light,
17 correct?
18   A.   Correct.
19       MS. O'DELL: I object to the
20 question.
21       Where did this table -- what
22 reference did this table come from?
23       MR. DUBIN: You're familiar
24 with the Su tables. We can mark them as an
25 exhibit if it's necessary. I will mark the Su

27 (Pages 102 - 105)

Page 106

1 tables so we have them. I will mark the Su
2 tables as Exhibit 35. I guess it must be
3 CX-26.
4         MR. LUDWIG: My understanding,
5 this is a document prepared by defense
6 counsel. This is not the Su tables. This is
7 an excerpt, table, picture of Dr. Su, and some
8 other things; is that correct?
9         MR. DUBIN: An excerpt and
10 that's why in case you need it, I am marking
11 the entire document as the next exhibit.
12        MR. LUDWIG: Okay. Well, now I
13 am objecting to testimony about this document
14 then.
15        MR. DUBIN: What is your
16 possible objection about my asking him about
17 the color of the particle in the report that
18 he is here to be deposed about?
19        MR. LUDWIG: I am objecting to
20 this exhibit 15, which is a defense exhibit --
21        MR. DUBIN: It's --
22        MR. LUDWIG: -- that's what I
23 am objecting to.
24        MR. DUBIN: Okay. So,
25 Mr. Placitella, do you agree and say that you

Page 107

1 can never use a demonstrative created by
2 counsel as part of examining a witness?
3 Because I am curious about your view on that,
4 Mr. Placitella. So no more creating exhibits
5 to ask -- or demonstratives to ask our
6 witnesses about, right, Mr. Placitella, or do
7 you disagree with --
8         MR. LUDWIG: (Inaudible) --
9         MR. PLACITELLA: You're now
10 asking me questions?
11        MR. DUBIN: I am asking you
12 that question.
13        MR. PLACITELLA: How about I
14 ask you a few?
15 BY MR. DUBIN:
16   Q.   All right. I am going to continue
17 to ask you questions about this document.
18        So going back to this, you can
19 find on the table --
20        MS. O'DELL: Morty, excuse me.
21 The reason I asked is so if this is a
22 defense-created exhibit, so we understand
23 what's being discussed and for the record,
24 first; and then, second, so Mr. Hess has an
25 understanding of what's being asked of him.

Page 108

1         I understand you're going to
2 put the Su tables that you're referring to in
3 the chat and so if you go ahead and do that
4 and I assume they are going to be marked as
5 exhibit 16; is that correct?
6         MR. DUBIN: I think that's the
7 correct number. Exhibit 16 will be the Su
8 tables.
9         MS. O'DELL: And if you need to
10 see the Su tables, Mr. Hess, or anything else,
11 just request that, and we'll get it in front
12 of you.
13        MR. DUBIN: That's fine.
14        (Exhibit 16 marked for
15    identification.)
16 BY MR. DUBIN:
17   Q.   Anyway, so you can look at the RI
18 that you gave, 1.564, and that will correspond
19 with a wavelength of light, correct?
20   A.   That is correct.
21   Q.   And we can see that the wavelength
22 of -- the color associated with that
23 wavelength of light is purple, right, 560
24 nanometers?
25   A.   In the color chart, that's what it

Page 109

1 shows.
2   Q.   So for purposes of your analysis
3 calling this chrysotile, you were treating
4 this particle as if it was purple, correct?
5         MS. O'DELL: Object to the
6 form.
7         THE WITNESS: I was treating
8 what I could see around the edges through my
9 scope.
10 BY MR. DUBIN:
11   Q.   And, in fact, if we -- if we look
12 back at what we looked at before, which was
13 reference chrysotile -- we can put that slide
14 back up.
15        MR. DUBIN: I don't remember
16 what number it was, but for calling it up,
17 Jake, we can use slide 40.
18 BY MR. DUBIN:
19   Q.   Reference chrysotile, the refractive
20 index number given for that particle by ISO is
21 1.556; that corresponds to magenta, correct?
22        MS. O'DELL: Object to the
23 form.
24        We had an objection previously
25 to this exhibit because it calls for an expert

28 (Pages 106 - 109)

1 opinion and so --
2          MR. DUBIN: Are you instructing
3 him not to answer?
4          MR. LUDWIG: I am instructing
5 him not to answer for the reasons stated
6 before.
7          MR. DUBIN: Okay. Let's go
8 to -- make the next exhibit slide 43.
9          MR. KEESTER: I'm sorry, Morty.
10 That was 43?
11          MR. DUBIN: Yeah, and that will
12 be exhibit 17.
13          (Exhibit 17 marked for
14      identification.)
15 BY MR. DUBIN:
16    Q.   The number -- the wavelength of
17 light that you assigned to this particle on
18 the left that you're calling chrysotile in
19 Johnson & Johnson, you are saying that it is
20 even more purple than standard reference
21 chrysotile depicted on the right, correct?
22          MS. O'DELL: Objection.
23          This is an incomplete depiction
24 of what's being examined. It is including
25 images that are not Dr. -- Mr. Hess', excuse

1 me, and it is an inappropriate examination of
2 this witness, who is a fact witness, and seeks
3 expert opinion, and we to object to it.
4          MR. DUBIN: First off, I don't
5 understand how you can say every time that he
6 is a fact witness and not an expert. He is
7 here to be deposed about his polarized light
8 microscopy work. There is no way to depose
9 someone about their polarized light microscopy
10 work without asking them questions that are
11 technical in nature.
12          And so if your objection is
13 that every time I ask him for something about
14 his conclusions, it's an expert opinion, then
15 you are essentially shutting down this
16 deposition. It's --
17          MS. O'DELL: That's not
18 correct. We're asking -- we have not
19 instructed Mr. Hess to not respond to
20 questions that are technical. We have
21 instructed him not to give expert opinion
22 because he is here as a fact witness as you
23 know and as the Special Master has ruled.
24          And this seeks a comparison
25 between the photomicrograph that Mr. Hess took

1 to an ISO record for chrysotile and that is
2 beyond the scope of this deposition.
3          That's -- that is --
4          MR. DUBIN: Are you instructing
5 him not to answer?
6          MS. O'DELL: Let me finish.
7 I'm sorry. Let me finish. I stuttered there.
8          Judge Schneider was very clear
9 that he is going to be asked about his work
10 and not a comparison of his work to others and
11 that is expert opinion and that's why we're
12 instructing him not to answer.
13          MR. DUBIN: Okay. So you're
14 instructing him not to answer?
15          MR. LUDWIG: Correct.
16          MR. DUBIN: Okay.
17 BY MR. DUBIN:
18    Q.   I want to make sure and let me raise
19 the question.
20          As a fact, factually, you
21 assigned a darker purple color to that
22 particle on the left than standard reference
23 chrysotile, correct?
24          MS. O'DELL: Objection; that is
25 the same objection, and I just also object to

1 use of this color chart without reference to
2 the other charts from Dr. Su's tables that
3 take into consideration the temperature and
4 other aspects of the table. It's an
5 incomplete hypothetical. He --
6          MR. DUBIN: I am sorry. I
7 don't think you understand the -- I don't
8 think you understand how the analysis works.
9 Because we already did the temperature of the
10 lab when we figured out what nanometer of
11 light he was calling the particle. So that is
12 not a valid objection scientifically. Are you
13 instructing him not to answer?
14          MS. O'DELL: I am going to let
15 Mr. Hess' counsel instruct him, but I have
16 made my objection.
17          MR. LUDWIG: I am instructing
18 him not to answer.
19          MR. PLACITELLA: I would just
20 like to -- can you hear me? I would just like
21 to add the following objection and I am trying
22 to stay out of this.
23          If you're taking a tiny, little
24 piece of a big slide and then blowing -- and
25 then sticking it next to a different slide,

29 (Pages 110 - 113)

Page 114

1 there is no guarantee that this accurately
2 depicts what the actual slide looks like,
3 especially on a Zoom presentation. So that's
4 my concern to put on the record.
5          MR. DUBIN: Okay. And my --
6          MR. PLACITELLA: Now I'll go
7 back to sleep.
8          MR. DUBIN: My response to that
9 is we're comparing the colors associated with
10 two different nanometers of light, which are
11 depicted accurately on the slide, and I
12 understand that you guys are instructing him
13 not to answer and okay. So we'll have to deal
14 with that later.
15          MR. PLACITELLA: No, no, but my
16 objection was beyond that. My objection was
17 how this was put together, who put the colors
18 on what piece of the photograph and, you know,
19 what someone is being asked to interpret over
20 Zoom; that's all. Now I will go back to
21 sleep.
22          MR. DUBIN: Yeah. Okay.
23 BY MR. DUBIN:
24    Q.   So let's go back to the Valadez
25 report.

Page 115

1          Are you -- are you swearing
2 that particle as purple in --
3          MS. O'DELL: Object to --
4          THE COURT REPORTER: Please
5 repeat your question.
6 BY MR. DUBIN:
7    Q.   Are you swearing that that particle
8 is purple, the one depicted in 001?
9          MR. LUDWIG: Objection to form.
10          THE WITNESS: No. The particle
11 itself interior-wise has yellow. I utilized
12 what I could find through the scope around the
13 edges or at the edge.
14 BY MR. DUBIN:
15    Q.   So are you telling me that that
16 particle we're looking at is somehow entirely
17 surrounded with purple, but we just can't see
18 it?
19          MS. O'DELL: Objection to the
20 form; asked and answered.
21          MR. LUDWIG: Argumentative.
22 BY MR. DUBIN:
23    Q.   You can respond.
24    A.   Based on what I saw through the
25 microscope.

Page 116

1    Q.   How can we independently verify with
2 your report that that particle is purple
3 without actually being at your scope?
4          MS. O'DELL: Objection.
5          MR. LUDWIG: Objection; calls
6 for -- objection to form.
7 BY MR. DUBIN:
8    Q.   You can respond.
9    A.   So I do the documentation on the
10 pictures.
11    Q.   But you're telling me that the
12 pictures don't show the purple.
13          So how can we independently --
14 how can we verify that that particle, in fact,
15 has purple?
16          MS. O'DELL: Objection;
17 misstates his testimony.
18          MR. LUDWIG: Join.
19          THE WITNESS: It's documented
20 as part of the report. It's in the picture.
21 BY MR. DUBIN:
22    Q.   So you're saying that purple is in
23 the picture.
24          So where is the purple?
25          MS. O'DELL: Objection;

Page 117

1 misstates his testimony.
2 BY MR. DUBIN:
3    Q.   You can respond.
4    A.   I make my determinations on what I
5 can see through the scope and it's represented
6 to the best that I can get it on the screen in
7 the picture.
8    Q.   Okay. But can we verify that with
9 the picture? Can we verify that in some way?
10    A.   Other than what's on the picture,
11 Counselor, I cannot speculate.
12          MR. LUDWIG: Do you need it
13 blown up?
14          MR. DUBIN: We can blow it up.
15          MR. PLACITELLA: There it is.
16 BY MR. DUBIN:
17    Q.   Do you see purple or red on the talc
18 plates in this image? To the extent you're
19 claiming you see it on that particle, do you
20 see it on all the rounded talc plates?
21    A.   On this image, I can just barely.
22    Q.   On the rounded talc plates, right?
23          MR. LUDWIG: Listen to the
24 question.
25 BY MR. DUBIN:

30 (Pages 114 - 117)

Page 118

1    Q.   You can see those kind of edge
2 effects on the talc plates as well, right?
3          MS. O'DELL:  I am -- the screen
4 is about ten feet away from Mr. Hess.  I am
5 handing him the Valadez report on my computer
6 so he can see it more clearly.
7 BY MR. DUBIN:
8    Q.   Do you see those same kind of edge
9 effects on all -- on the talc plates?
10    A.   I can see parts, yes.
11    Q.   But talc plates aren't purple in
12 1.560 oil, right, and they are not red,
13 correct?
14          MS. O'DELL:  And if you need to
15 make it bigger or smaller, Mr. Hess, you can
16 just -- you can touch my screen.
17 BY MR. DUBIN:
18    Q.   You can focus on any of these
19 rounded talc plates and you'll see the same
20 edge effects, right?
21          MS. O'DELL:  Object to the
22 form.
23          THE WITNESS:  Similar.
24 BY MR. DUBIN:
25    Q.   So what refractive index number

Page 119

1 would you assign to any of the talc plates
2 that also have that edge effect?  What would
3 you -- what is the refractive index of the
4 talc plates?
5          MS. O'DELL:  Object to the
6 form; expert opinion.
7          MR. LUDWIG:  This is an expert
8 opinion.  I am going to instruct him not to
9 answer that one.
10 BY MR. DUBIN:
11    Q.   Mr. Hess, you're basing your calling
12 this particle chrysotile on edge effects that
13 are also present on the talc plates
14 themselves; isn't that right?
15          MS. O'DELL:  Objection;
16 misstates his testimony.
17 BY MR. DUBIN:
18    Q.   You can respond.
19          MS. O'DELL:  Objection;
20 misstates his testimony.
21          MR. LUDWIG:  Join.
22          MS. O'DELL:  Seeks expert
23 opinion.
24 BY MR. DUBIN:
25    Q.   You can respond.

Page 120

1    A.   At least my opinion of what I am
2 seeing not only on the dispersion staining,
3 but also on the appearance of the structure,
4 whether it shows fibrousity.
5    Q.   You are basing your refractive
6 index --
7          MS. O'DELL:  Excuse me.  Were
8 you finished with your answer?
9          THE WITNESS:  It's based on
10 what I see through the scope and my
11 examination of the particle.
12 BY MR. DUBIN:
13    Q.   You are basing your assessment of
14 the refractive index of this particle that
15 you're calling chrysotile based on edge
16 effects that are also present on the rounded
17 talc plates, correct?
18          MS. O'DELL:  Objection;
19 misstates his testimony.
20 BY MR. DUBIN:
21    Q.   You can respond.
22    A.   I base it on what I see around the
23 particle itself.
24    Q.   And those -- again, my question is,
25 what you're claiming -- the effect that you're

Page 121

1 claiming to see around that particle you're
2 calling chrysotile is also present on the
3 round talc plates, correct?
4          MS. O'DELL:  Objection.
5          MR. LUDWIG:  Objection, asked
6 and answered.
7          MS. O'DELL:  Misstates his
8 testimony.
9 BY MR. DUBIN:
10    Q.   You can respond.
11    A.   I am basing it on my determination
12 from what's around the particle.  I do not
13 take into account what's around the talc.
14    Q.   Okay.  So you don't consider whether
15 or not, because this effect is also on the
16 talc plates, whether it's an artifact of
17 your -- of your analysis?  You don't look at
18 the talc plates to see whether you see the
19 exact same effect on the talc plates?
20          MS. O'DELL:  Objection;
21 misstates his testimony.  It's not what he
22 testified a moment ago.
23 BY MR. DUBIN:
24    Q.   Are these talc plates, are those
25 also purple, according to you, if you're

31 (Pages 118 - 121)

Page 122

1 looking at the edge effects?
2    A.   What I am seeing on there is more of
3 a red, but it's not in focus to the point that
4 I would be able to make a determination.
5    Q.   So would the refractive -- would the
6 refractive index value for those talc plates
7 correspond to red?
8         MS. O'DELL:  Objection.
9         He was just saying it wasn't in
10 focus and you can't make that determination
11 from a photomicrograph on a screen.
12 BY MR. DUBIN:
13    Q.   So are those talc plates -- does the
14 refractive index that you assigned to them
15 based on their edges, does that correspond to
16 red?
17         MS. O'DELL:  Same objection.
18 BY MR. DUBIN:
19    Q.   You can respond.
20    A.   I would not give it the same.
21         THE COURT REPORTER:  Please
22 repeat your answer.
23         MR. LUDWIG:  I think it was:  I
24 would not give it the same.
25         I think you were still talking?

Page 123

1         THE WITNESS:  No; that's it.  I
2 would not give it the same.
3 BY MR. DUBIN:
4    Q.   So what is the CSDS color of, let's
5 say, this large talc plate towards the bottom
6 left?  What is the CSDS color that you would
7 use to assign a refractive index to that
8 particle?
9         MS. O'DELL:  Which particle?
10         MR. PLACITELLA:  I will place
11 an objection before he answers and I know
12 you're doing the best you can, but at this
13 point, at least on the screen that I am
14 seeing, this image is pretty blurry, you know,
15 but you did -- you're doing the best you can.
16         MR. DUBIN:  This is the image
17 that we have from Dr. Longo.
18         MR. PLACITELLA:  Well, that's
19 not necessarily the image.  This is a blowup
20 on a Zoom, you know.
21         MR. DUBIN:  He also has the
22 actual report in front of him on a computer.
23 Now what?
24         MR. PLACITELLA:  Just --
25         MR. DUBIN:  Okay.

Page 124

1         MR. PLACITELLA:  -- trying to
2 keep the record clean.
3         MR. DUBIN:  Okay.
4 BY MR. DUBIN:
5    Q.   What CSDS color are you assigning to
6 the talc plates that we're looking at?
7         MS. O'DELL:  Object to the
8 form; that seeks expert opinion.  He is not
9 a -- he did not analyze these particular talc
10 particles.  He didn't make findings in the
11 report.
12         To ask him to do it on the fly,
13 in a Zoom is an expert opinion and beyond the
14 scope of what he did for the report and we
15 object on that basis.
16         MR. DUBIN:  Are you instructing
17 him not to answer the question?
18         MR. LUDWIG:  I was just going
19 to say, exactly, and I am instructing him not
20 to answer that question because he is not --
21 it's not the scope.  Him doing an analysis of
22 a talc particle on the fly is not what the
23 Judge -- is not the purpose of this
24 deposition.
25         MR. DUBIN:  Okay.  You have

Page 125

1 instructed him not to answer.  We'll just deal
2 with it in court later.
3         Let's look at the second image,
4 002.
5         MS. O'DELL:  Okay.  What image
6 are you looking at and what page?
7         MR. DUBIN:  Okay.  So, Jake,
8 can you give the page?  This is the image of
9 CSM 002.
10         MR. KEESTER:  So my PDF is page
11 38, but since your report seems to be one page
12 less, it will probably be page 37, but it is
13 CSM-002.
14         MS. O'DELL:  Okay.
15 BY MR. DUBIN:
16    Q.   What color is that particle?
17    A.   Can you zoom in, please?
18    Q.   Sure.
19    A.   The particle itself, yellow with
20 some pale blue.
21    Q.   Okay.  And do you see that there is
22 a rounded talc plate?  If you move your eye
23 from the top of the two arrows over towards
24 the left, there is a rounded talc plate.
25         Do you see that?

32 (Pages 122 - 125)

1          MR. LUDWIG: Objection.
2          Once again, you're asking him
3 to analyze what you claim to be a talc
4 particle on the fly; that calls for expert
5 testimony. I am instructing him not to answer
6 that question.
7 BY MR. DUBIN:
8     Q.   You said you have done PLM
9 dispersion staining analysis for 30 years,
10 Mr. Hess?
11    A.   That is correct.
12    Q.   Are you not -- are you not able to
13 tell me -- to follow over on the image and
14 look at this talc plate with me? Is that
15 beyond your experience and training?
16          MR. LUDWIG: I am going to
17 object.
18          This is argumentative. His
19 experience is under the microscope. So I am
20 objecting to the form of the question. It's
21 argumentative.
22 BY MR. DUBIN:
23    Q.   Is the particle you're calling
24 chrysotile here, is that essentially the same
25 color as the talc plates in the image?

1          MR. LUDWIG: Objection, same
2 objection. I am instructing him not to
3 answer.
4          MR. DUBIN: Okay. Can't wait
5 to be heard on these. All right.
6 BY MR. DUBIN:
7     Q.   Do you know what -- if we go down
8 and we look at the RI value, RI 1.565, do you
9 know what color that -- by reporting that
10 refractive index value for this particle, do
11 you know what color you were calling it?
12    A.   I don't recall.
13          MR. DUBIN: Let's go to the
14 slide, Jake, and we'll make that the next in
15 order, the slide for this particle; that will
16 be exhibit -- are we on 17 or 18?
17          THE COURT REPORTER: One moment
18 and I can verify.
19          MR. DUBIN: Sure. I think it's
20 18.
21          THE COURT REPORTER: Yes, this
22 is Exhibit 18.
23          MR. DUBIN: Why don't we call
24 up that slide and we can put it in chat.
25          (Exhibit 18 marked for

1 identification.)
2 BY MR. DUBIN:
3     Q.   You -- for purposes of your
4 analysis, you're calling this particle
5 somewhere between a magenta and a purple for
6 purposes of your analysis, right?
7          MS. O'DELL: Just wait a
8 minute.
9          What particle is this?
10          MR. DUBIN: This is the same
11 particle, CSM 002.
12 BY MR. DUBIN:
13    Q.   You're calling it somewhere between
14 a magenta and a purple for purposes of your
15 analysis?
16    A.   I am calling the edge that I saw.
17    Q.   You're calling the edge that you saw
18 purple and magenta? Is that what you're
19 saying?
20    A.   That is correct.
21    Q.   The same type of purple or red
22 colors that are on the talc plates?
23          MS. O'DELL: Object to the
24 form.
25          MR. LUDWIG: Object to the

1 form.
2          I instruct you not to answer.
3 BY MR. DUBIN:
4     Q.   Do you know -- as you adjust the
5 focus on a microscope up and down, do you know
6 whether you can -- if things are out of focus,
7 you can see a red edge on particles? Are you
8 familiar with that?
9     A.   I have observed that.
10    Q.   And so one way that you can get
11 these types of edges around particles is if
12 they are just not -- if they are -- is your
13 focus, depending on your focus, right?
14          MS. O'DELL: Object to the
15 form.
16          THE WITNESS: Correct.
17 BY MR. DUBIN:
18    Q.   And without these edges, without
19 these sort of red colors at the edges, then
20 the CSDS color that you would have had to
21 assign to the particle would be -- would
22 correspond to yellow, right?
23          MR. LUDWIG: Objection to form.
24          That's calling for an expert
25 analysis, which he is not here to present

33 (Pages 126 - 129)

Page 130

1 today.
2         MR. DUBIN:  Are you instructing
3 your witness not to answer yet again?
4         MR. LUDWIG:  I am instructing
5 him not to answer that one, yes.
6         MR. DUBIN:  Okay.
7 BY MR. DUBIN:
8    Q.   How can you tell whether or not the
9 red that you're seeing on the edges is an
10 artifact of focus?
11    A.   By assuring that my particle is in
12 focus.
13    Q.   Mr. Placitella was complaining that
14 the image is blurry.
15         Does it look completely in
16 focus to you?
17         MS. O'DELL:  Object to the
18 form.
19         MR. LUDWIG:  Join.
20         THE WITNESS:  I base it on what
21 I see through the scope.
22 BY MR. DUBIN:
23    Q.   Do you know whether or not edge
24 effects like that can be created by total
25 refraction even for an in focus particle?  Do

Page 131

1 you know that?
2         MS. O'DELL:  Objection to the
3 form; calls for expert opinion.
4         Morty, this slide has not been
5 put in the chat and so we would request that
6 it be put in the chat.
7         MR. DUBIN:  We're doing it.
8 Obviously, it takes a little time to do the
9 slides and it's not like you're not seeing the
10 whole document, but we'll put them in chat.
11         MS. O'DELL:  We thank you and
12 we need to see them.  It's important.
13         The second thing is, where did
14 this color bar, color chart come from on the
15 side and -- because it's unclear from what's
16 being --
17         MR. DUBIN:  These are slides
18 that have been presented to Dr. Longo before
19 for his testimony and that he has agreed to.
20 So these are -- this type of color bar was
21 used in the 104 hearings with Dr. Longo, in
22 addition to being used in his Eagles and Lonzo
23 depositions.
24         MS. O'DELL:  That's completely
25 immaterial.

Page 132

1         MR. DUBIN:  You asked -- okay.
2 I have told you the answer.  I am asking him
3 about it.
4         MR. KEESTER:  Sorry to jump in.
5 I can't share a slide while I have it open.
6 It's the way Microsoft applications work.  So
7 I am sharing them the moment I close out of
8 PowerPoint.
9         MS. O'DELL:  Okay.  Thank you.
10         MR. DUBIN:  Okay.  We can go
11 back to the Valadez report.  We can put that
12 one in chat.
13 BY MR. DUBIN:
14    Q.   And as I said, I believe there was a
15 question pending before the objection.
16         Are you familiar with the fact
17 that the phenomena of total reflection can
18 create these kind of edge effects for
19 particles?
20         MR. LUDWIG:  Can that be reread
21 back?  I'm sorry.  There was a break in the
22 question, maybe distorted by the Zoom.  I am
23 sorry.
24         MR. DUBIN:  It's fine.  I
25 already asked him.  He didn't know what the

Page 133

1 phenomena was earlier.  So it's fine.  Don't
2 worry about it.  This next -- let's go to CSM
3 003.
4 BY MR. DUBIN:
5    Q.   What color is the particle?
6    A.   The particle appears to be yellow.
7    Q.   Do you know at -- by assigning RI
8 1.568, do you know what color you were calling
9 this particle?
10    A.   Not without the charts available.
11    Q.   All right.  You were -- do you know
12 you were calling this particle somewhere
13 between a magenta and purple?
14         MS. O'DELL:  Objection to form.
15         MR. LUDWIG:  Can you zoom in on
16 the particle, please?
17         MR. DUBIN:  Sure.
18 BY MR. DUBIN:
19    Q.   You're treating this particle for
20 purposes of your analysis as if it is magenta
21 and purple?
22         MS. O'DELL:  Objection to the
23 form.
24         He said he can't -- cannot
25 determine that without the charts and other

34 (Pages 130 - 133)

Page 134

1 materials used in --
2          MR. LUDWIG: (Inaudible) it's
3 clear to you. I mean, we're dealing with a
4 situation where it's ten, fifteen feet from
5 you; so.
6 BY MR. DUBIN:
7    Q.   You're the analyst who did this
8 work.
9          What color were you calling it?
10          MS. O'DELL: And just for the
11 record, what's the page of the Valadez report?
12          MR. KEESTER: Mine is page 43.
13 Yours is probably page 42.
14          MS. O'DELL: Thank you.
15          MR. DUBIN: And maybe it will
16 help. We can make exhibit 19 slide 48 and put
17 that up.
18          MR. LUDWIG: Mr. Dubin, we have
19 been going for a little --
20          MR. DUBIN: We'll break after
21 this slide and we'll take lunch.
22          MR. LUDWIG: We'll take a lunch
23 break after this slide.
24          (Exhibit 19 marked for
25      identification.)

Page 135

1 BY MR. DUBIN:
2    Q.   Do you know that the refractive
3 index that you have assigned to this particle
4 corresponds to the colors magenta and purple?
5 Are you aware of that?
6    A.   I do see --
7          MR. PLACITELLA: I have the
8 same objection I had before. This is even
9 less clear than the last one.
10 BY MR. DUBIN:
11    Q.   Okay. Are you aware that the
12 refractive index numbers you assigned to this
13 particle are -- correspond to magenta and
14 purple?
15          MS. O'DELL: Object to the
16 form.
17          He has already testified he
18 would need the charts and other information.
19 BY MR. DUBIN:
20    Q.   Well, just -- do you know that? Are
21 you aware that that's the color you said this
22 particle was?
23    A.   I am.
24    Q.   Okay.
25    A.   But not the particle.

Page 136

1    Q.   Not the particle, what you're
2 calling the edge effects, right, or the edges,
3 you're saying?
4    A.   That is correct.
5    Q.   Okay. And we can go back to the
6 image in the Valadez, same image, and you can
7 see you have these edges, the same types of
8 edges on these -- on many of the rounded
9 structures that are talc plates, right?
10          MS. O'DELL: Objection to the
11 form.
12          MR. LUDWIG: Same objection.
13          I instruct him not to answer.
14 Once again, on-the-fly analysis of talc
15 plates.
16          MR. DUBIN: You're instructing
17 him not to answer?
18          MR. LUDWIG: Correct.
19 BY MR. DUBIN:
20    Q.   Okay. And, again, I want to
21 understand your experience, your personal
22 experience with these types of edge effects,
23 and I just want to ask you about an image,
24 whether it's something that you have seen
25 before.

Page 137

1          MR. DUBIN: And we'll mark that
2 as exhibit 20. It will be CX-56.
3          (Exhibit 20 marked for
4      identification.)
5 BY MR. DUBIN:
6    Q.   So Cargille glass, Cargille glass
7 has a single refractive index, right?
8          MS. O'DELL: Objection to the
9 form.
10          What's being shown on the
11 screen?
12          MR. DUBIN: These are images of
13 Cargille glass in dispersion staining. I am
14 asking him about his experience and his
15 background, experience, and training.
16          MS. O'DELL: He is not here as
17 an expert witness and --
18          MR. LUDWIG: Right. So --
19          MS. O'DELL: -- this is beyond
20 the scope. Excuse me. Counsel, go ahead.
21          MR. LUDWIG: I'm sorry. So I
22 am instructing the witness not to answer.
23 Exactly.
24 BY MR. DUBIN:
25    Q.   And I am going to keep asking you

35 (Pages 134 - 137)

Page 138

1  some questions about this and if your attorney
2  wants to object and say for you not to answer
3  to each of them, that's fine.  We'll do that.
4        Can you see -- are you familiar
5  with this phenomena that even if you look at a
6  particle with a single refractive index,
7  right, for example, blue here, you can see
8  sometimes these edge effects such as the red
9  or the purple that we're seeing in this image?
10        Are you familiar with the fact
11  that that happens?
12        MS. O'DELL:  Objection; beyond
13  the scope of the deposition; beyond the scope
14  of this witness' testimony; assumes facts not
15  in evidence.
16  BY MR. DUBIN:
17   Q.   Do you know how to determine --
18  sorry.
19        MR. DUBIN:  Is there
20  instruction not to answer that?
21        MR. LUDWIG:  There is
22  instruction not to answer that, yes.
23  BY MR. DUBIN:
24   Q.   Do you know how to determine in
25  these kind of circumstances what the true CSDS

Page 139

1  color is?  Do you know how to do that?
2        MR. LUDWIG:  Same objection.
3        MR. DUBIN:  Are you instructing
4  your witness not --
5        MR. LUDWIG:  I am.
6        MR. DUBIN:  -- to answer?
7        MS. O'DELL:  Join.
8        MR. DUBIN:  Okay.
9  BY MR. DUBIN:
10   Q.   Are you familiar with why you can
11  get these types of red edges around certain
12  particles that do not reflect the true central
13  stop dispersion staining color of the
14  particle?  Do you know anything about that?
15        MR. LUDWIG:  Same objection;
16  same instruction.
17        MR. DUBIN:  Okay.
18        MS. O'DELL:  Join.
19  BY MR. DUBIN:
20   Q.   If you were to base your calculation
21  of the refractive index of this piece of
22  Cargille glass on the red edge here, you would
23  be getting the wrong result, correct?
24        MR. LUDWIG:  Same objection;
25  same instruction.

Page 140

1        MS. O'DELL:  Join.
2  BY MR. DUBIN:
3   Q.   However, you, when you're looking at
4  the yellow particles in your analysis, you
5  take these edge effects and you base your
6  calculations on them, correct?
7        MR. LUDWIG:  Same objection;
8  same instruction.
9        MS. O'DELL:  Misstates the
10  record and misleading and argumentative.
11        MR. DUBIN:  All right.
12  BY MR. DUBIN:
13   Q.   Do you have experience working with
14  and analyzing Cargille glass?
15   A.   Not analyzing, but utilizing it --
16   Q.   Have you --
17   A.   -- I do recall.
18   Q.   Have you ever observed these types
19  of phenomena when looking at Cargille glass?
20   A.   I have not.
21   Q.   Okay.  What is a -- do you know how
22  to perform a Becke line analysis?
23        MS. O'DELL:  Beyond the scope
24  of the reports in this case and seeks expert
25  opinion.

Page 141

1        MR. DUBIN:  Are you --
2        MR. LUDWIG:  Join.
3        MR. DUBIN:  -- instructing him
4  not to answer?
5        MR. LUDWIG:  Not to answer.
6  BY MR. DUBIN:
7   Q.   Do you know how to use a Becke line
8  analysis to determine in a situation such as
9  we're looking at here what the correct CSDS
10  color is?
11        MR. LUDWIG:  Same objection;
12  same instruction.
13        MS. O'DELL:  Join.
14  BY MR. DUBIN:
15   Q.   Have you performed any Becke line
16  analysis with respect to any of the particles
17  that you're claiming are chrysotile in Johnson
18  & Johnson?
19   A.   I have not.
20   Q.   Okay.
21        MR. PLACITELLA:  Morty, you
22  look really hungry.
23        MR. DUBIN:  All right.  We can
24  take lunch now.  How long do you guys want?
25  We can go off the record.

36 (Pages 138 - 141)

Page 142

1    VIDEOGRAPHER:  The time is
2  12:38 p.m.  We're off the record.
3          (Break held off the record.)
4    VIDEOGRAPHER:  The time is
5  1:28 p.m.  We are back on the record.
6  BY MR. DUBIN:
7    Q.   All right.  Well, we'll see.  If
8  there is an objection to this as well and this
9  topic, then we'll move on from it, but I need
10  to ask it to make sure.
11         So I put together a slide and I
12  put together some excerpts from the Valadez
13  report just so they are all in one spot for
14  the backup of this slide.
15         We'll mark the backup, which is
16  CX-12, as the next exhibit in order.  I guess
17  that's 20?
18         THE COURT REPORTER:  If you
19  would like me to check, give me one moment.
20         MR. DUBIN:  Sure.  Thanks.
21         MR. KEESTER:  I believe that's
22  21.
23         MR. DUBIN:  Twenty-one.
24         THE COURT REPORTER:  I will
25  take counsel's assertion it's 21 without

Page 143

1  checking.
2         MR. DUBIN:  Okay.  It's 21
3  then.  All right.  So we'll make that 21 and
4  can you just put it in chat, Jake?
5         MR. KEESTER:  Already done.
6         MR. DUBIN:  And then the slide
7  which will be 22 and that's slide 48.
8         (Exhibits 21 and 22 marked for
9    identification.)
10  BY MR. DUBIN:
11    Q.   I tried to ask you this already,
12  Mr. Hess, but the same type of edge effects
13  that you're relying on to call particles
14  chrysotile in Johnson & Johnson are also
15  present on talc plates in your analysis; is
16  that true?
17         MS. O'DELL:  Objection.  This
18  is beyond the scope of the deposition and
19  Mr. Hess' testimony.
20         Further, the way that these
21  particles are depicted from who knows what is
22  misleading and not representative of what was
23  actually in the reports.
24         MR. LUDWIG:  I will join and
25  instruct the witness not to answer.

Page 144

1  BY MR. DUBIN:
2    Q.   Okay.  But it is true, Mr. Hess,
3  that when you're calling particles chrysotile
4  in Johnson & Johnson, you're basing that not
5  on the color of the particle that you're
6  seeing, but on the color of the edge effects
7  that you're seeing, right?
8    A.   Focused at the edge, this -- the way
9  everything I do is set up initially with the
10  alignment and centering of all the objectives
11  and lenses with the scope, with the
12  illumination lamp full, field diaphragm open,
13  and I scan for a suspicious object.
14         When I focus in on what appears
15  to be suspicious, I first make sure that I can
16  see signs of fibrousity.  Then I go back to
17  dispersion staining and I will utilize what's
18  in Dr. Su's paper, looking at the edge, as
19  stated on page 3 and page 5, utilizing what's
20  on page 5, which specifically shows or
21  indicates to me looking at the edge --
22    Q.   Page 5 of what?
23    A.   -- specifically says:  At particle
24  edge.
25    Q.   Page 3 and page 5 of what?

Page 145

1         MS. O'DELL:  He is not
2  finished, Morty.
3  BY MR. DUBIN:
4    Q.   Sorry.
5    A.   And then I -- best I can or I will
6  do everything I can to make sure that what I
7  am seeing is best represented in the
8  photograph that I take and I am not seeing the
9  things on the screen, I use the scope.
10    Q.   So are you telling me that in order
11  to understand your work and the calls that
12  you're making, that I -- someone needs to be
13  actually looking through your microscope?
14         MR. LUDWIG:  Objection.
15         MS. O'DELL:  Objection.
16  BY MR. DUBIN:
17    Q.   You can respond.
18    A.   No, sir.  I am sure there is plenty
19  of the sample available where someone at your
20  client's place can do the same thing.
21    Q.   Well, just to understand what the
22  call is that you're making on a particular
23  particle, do I need to be looking through your
24  scope?
25    A.   It's documented in the photographs

Page 146

1 and the reports that are submitted.
2    Q.   So if we don't see something in the
3 photograph that you're claiming is there, then
4 it wasn't really there?
5         MS. O'DELL:  Objection.
6         MR. LUDWIG:  Objection.
7         MS. O'DELL:  Argumentative.
8         MR. LUDWIG:  Objection to form;
9 argumentative.
10 BY MR. DUBIN:
11    Q.   You can respond.
12    A.   It doesn't mean that it wasn't
13 there.  I use the scope, not the screen.
14    Q.   Okay.  You mentioned illumination.
15 So I just want to talk about that again for a
16 second.  We can go back to the Valadez report.
17 We can go to -- let's go to the first image,
18 the No. 1.  I think it's thirty- -- okay.
19         Is it your testimony that the
20 Leica microscope that you're using can't take
21 images that are any brighter than this?
22    A.   I believe I have already answered
23 that question.
24    Q.   I'm asking about this specific
25 image.

Page 147

1         Do you have an answer, sir?
2    A.   In reference to this image, as I
3 recall the previous image was something a
4 little different.  So I would have to say,
5 yes.
6    Q.   I'm sorry.  I don't understand.
7         So to make sure the question is
8 clear, is it your testimony that the Leica
9 microscope cannot take any brighter image than
10 what we see here?
11         MS. O'DELL:  Objection to the
12 form; asked and answered.
13         THE WITNESS:  I cannot answer
14 as to the actual scope itself, but in my
15 experience with it, this is the brightest I
16 can get it.
17         MR. DUBIN:  I just want to show
18 you -- we'll mark it as the next exhibit in
19 order.  I guess it's -- now we're on 23,
20 CX-62.
21         (Exhibit 23 marked for
22         identification.)
23 BY MR. DUBIN:
24    Q.   Is your Leica microscope able to
25 take images that are as bright as what we're

Page 148

1 seeing here in image 62?
2         MS. O'DELL:  Let me just --
3 what is being displayed on the screen?
4         MR. DUBIN:  I am just using it
5 for demonstrative purposes right now and I am
6 asking him a question about his microscope.
7 BY MR. DUBIN:
8    Q.   Is it able to take images that are
9 as bright as the one that we see on the
10 screen?
11         MS. O'DELL:  Object to the --
12 object to the question; calls for expert
13 testimony.  It's beyond the scope of what he
14 did for purposes of these reports.
15         MR. LUDWIG:  I want to add that
16 these images call for speculation.  I mean, he
17 is being asked to analyze an image on
18 PowerPoint on an unknown -- an unknown source.
19         I think this, once again, calls
20 for expert testimony to make that comparison.
21 So I am going to instruct him not to answer
22 the question.
23         MR. DUBIN:  I am asking him
24 about his microscope, his illumination
25 settings, what he sees under the microscope,

Page 149

1 and I'm asking him whether his microscope that
2 he knows and he works with is capable of
3 producing an image at this illumination level
4 and my question stands.
5 BY MR. DUBIN:
6    Q.   Can you answer that for me,
7 Mr. Hess?
8         MR. LUDWIG:  And I am making
9 the same objection I made and I am
10 incorporating the same response and
11 instructing him not to answer.
12         You're asking for a comparison.
13 BY MR. DUBIN:
14    Q.   Okay.  I will tell you what this is,
15 Mr. Hess.  This was an image that was taken by
16 Dr. Su on the same type of microscope that
17 you're using.
18         Are you testifying that your
19 microscope cannot take images at this level of
20 illumination?
21         MS. O'DELL:  Objection; calls
22 for expert testimony, it's beyond the scope of
23 this deposition, and he has testified already
24 to the level of illumination that he has used
25 in the photomicrographs for these reports.

38 (Pages 146 - 149)

Page 150

1    MR. LUDWIG: Once again, I am
2 going to incorporate my previous objections
3 and instruct him not to answer. Dr. Su --
4    MR. DUBIN: If you're going to
5 instruct him not to -- if you're going to
6 instruct him not to answer, we don't have
7 to --
8    MR. LUDWIG: I instruct him not
9 to answer then.
10    MR. DUBIN: And that's fine.
11 Because we will be arguing about this at some
12 point.
13 BY MR. DUBIN:
14    Q.    But let me ask you again, Mr. Hess,
15 are you testifying under oath that the images
16 that you have for, for example, in the Valadez
17 report we have looked at are taken at as high
18 an illumination setting as the microscope
19 goes? Are you testifying to that?
20    MS. O'DELL: Asked and
21 answered.
22    THE WITNESS: Yes.
23 BY MR. DUBIN:
24    Q.    What is the correct formula for
25 determining birefringence?

Page 151

1    A.    I keep a manual handy for
2 mathematics.
3    Q.    What manual?
4    A.    I have the McCrone manual and other
5 manuals within the laboratory covering what
6 McCrone covers in his coursebook.
7    Q.    Do you recall the name of the
8 manual?
9    A.    No, I do not recall.
10    Q.    Okay. Do you recall anything about
11 it other than it's a manual? When it's from?
12 Who the author is? Anything?
13    A.    The author is McCrone.
14    Q.    Okay. Do you recall what the
15 formula is, how you -- what numbers do you
16 use? What -- how do you calculate?
17    A.    I don't recall. That's why we keep
18 reference materials.
19    Q.    Are you the one who does the
20 birefringence calculations for these reports?
21    A.    No.
22    Q.    Who does them?
23    A.    I believe it's part of what
24 Dr. Longo puts together.
25    Q.    Okay. What are the correct central

Page 152

1 dispersion staining colors for chrysotile in
2 1.550 in parallel and perpendicular?
3    A.    In parallel, generally, if you can
4 get a single fiber, which is what I understand
5 that gives you the best, but, unfortunately,
6 in chrysotile, they are too small. So they
7 deal with bundles.
8         But, generally, you're looking
9 in the blue, magenta range; and in gamma,
10 based on the Canadian chrysotile, as I
11 understand it, and perpendicular, which is the
12 alpha, would be in the lighter blue range.
13    Q.    Okay. And what is your
14 understanding of the CSDS colors associated
15 with Calidria in 1.550?
16    A.    I am not familiar with that
17 particular table.
18    Q.    Okay. So you don't have a view of
19 what colors Calidria asbestos demonstrates in
20 parallel or perpendicular in 1.550?
21    A.    From my experience.
22    Q.    Okay. So what is it?
23    A.    Well, it ranges between the
24 Calidria -- excuse me -- between the Canadian
25 chrysotile standard and a yellow gold color

Page 153

1 gamma.
2    Q.    Okay. So you're saying in parallel
3 it's -- you're claiming that Calidria will be
4 between a yellow gold and a magenta.
5         Is that what you're saying?
6    A.    That's been my experience.
7    Q.    Okay. Are you aware of any
8 scientific references that say that Calidria
9 in 1.550 will be yellow gold in parallel?
10    A.    I am not aware of any.
11    Q.    Can -- in your experience can talc
12 be yellow gold in parallel?
13    A.    In my experience what I have seen
14 that ends up when I will call talc, that's
15 generally a very, very pale yellow at best to
16 white.
17    Q.    So talc should be pale yellow to
18 white.
19    MR. DUBIN: Can we go back to
20 the Zimmerman image -- go back to the
21 Zimmerman report for a second.
22 BY MR. DUBIN:
23    Q.    Looking again at the Zimmerman
24 image, we see some talc plates here.
25         Why isn't your talc pale yellow

39 (Pages 150 - 153)

Page 154

1 to white in this image?
2         MR. LUDWIG: (Inaudible.)
3         THE COURT REPORTER: I couldn't
4 hear you, sir. Please repeat.
5         MR. LUDWIG: I said, Paul, if
6 you need it zoomed in, please feel free to ask
7 it.
8         THE WITNESS: Well, one, my
9 previous comment was based on fibrous talc,
10 not talc flakes.
11 BY MR. DUBIN:
12    Q.   And anything else?
13    A.   No.
14    Q.   Okay. The refractive index of
15 elongated talc or a talc fiber in parallel is
16 similar to the refractive index of the talc
17 plate, correct?
18         MS. O'DELL: Calls for an
19 expert opinion; beyond the scope of this
20 deposition. I --
21         MR. LUDWIG: And I join and
22 instruct him not to answer.
23         MR. DUBIN: I am asking him
24 about what he just testified about, the
25 explanation that he just testified about, and

Page 155

1 you're instructing him not to answer.
2         Is that -- is that actually
3 happening? Because -- are you instructing him
4 not to answer that question?
5         MR. LUDWIG: Yes.
6         MR. DUBIN: Okay.
7 BY MR. DUBIN:
8    Q.   The reason these are yellow and
9 orange -- these are all orange and gold is
10 because you have got a tungsten light shining
11 on them, right?
12         MS. O'DELL: Objection.
13         MR. PLACITELLA: I object to
14 your testimony, Morty.
15 BY MR. DUBIN:
16    Q.   Is that correct?
17         MS. O'DELL: Same objection;
18 misstates the evidence.
19         THE WITNESS: That is correct.
20 BY MR. DUBIN:
21    Q.   So you're saying Calidria -- when
22 did you first -- what is your view that
23 Calidria asbestos in parallel can be yellow
24 gold based on?
25    A.   Experience examining the Calidria

Page 156

1 material.
2    Q.   First, who -- at some point were you
3 examining Johnson & Johnson using 1.550 oil,
4 but not reporting chrysotile?
5         MS. O'DELL: I'm sorry. I
6 missed the last part of that question. Would
7 you mind repeating it?
8 BY MR. DUBIN:
9    Q.   At some point in time were you
10 analyzing Johnson & Johnson talc using 1.550,
11 but not reporting chrysotile?
12         MS. O'DELL: Object to the
13 form.
14         THE WITNESS: I don't recall.
15         MR. DUBIN: Again, but for the
16 Court's ruling, I would be asking now, along
17 those lines -- and I will just accept the --
18 make the objections. Because we're going to
19 have to bring this up.
20 BY MR. DUBIN:
21    Q.   You did a report -- you looked at
22 about 70-something samples of Johnson &
23 Johnson related talc using 1.550 oil and
24 reported chrysotile in none of the samples at
25 some point; isn't that right?

Page 157

1         MS. O'DELL: That is -- that is
2 direct --
3         MR. DUBIN: Okay. I --
4         MS. O'DELL: -- in --
5         MR. DUBIN: -- that you're
6 going to object to it. I just want the
7 question on the record because we're going
8 to -- I want to -- we're going to take this at
9 issue.
10         So I understand. You can
11 object per the Court and instruct him not to
12 answer.
13         MR. LUDWIG: I instruct him not
14 to answer.
15         I do have a question for you,
16 Mr. Dubin. Are you done with this image?
17 Because the --
18         MR. DUBIN: I will take it
19 down; that's fine.
20         MR. LUDWIG: I just don't know.
21 Because I see Paul straining to watch you;
22 that's why I asked.
23         MR. DUBIN: Uh-huh.
24 BY MR. DUBIN:
25    Q.   So at some point you decide to use

40 (Pages 154 - 157)

Page 158

1 Calidria as a reference.
2         Whose idea was that at MAS?
3    A.   As I recall, it was a collaborative
4 effort between Dr. Longo and myself.
5    Q.   But who first suggested using
6 Calidria as a reference?
7    A.   That I do not recall.
8    Q.   Okay.  When is the first time you
9 recall ever looking at Calidria by PLM
10 dispersion staining analysis?
11    A.   I don't recall when that was either.
12    Q.   But do you recall even generally?
13 Like, what -- was it within the last ten
14 years?  Five years?  Before that?
15    A.   Within the last five.
16    Q.   Did you ever participate in any
17 NVLAP proficiency testing related to Calidria?
18    A.   No.
19    Q.   So the whole reason why dispersion
20 staining can be used is because minerals have
21 defined refractive indices, right?
22         MR. LUDWIG:  That calls for
23 expert testimony, objection.
24         I instruct you not to answer.
25         MS. O'DELL:  Join.

Page 159

1 BY MR. DUBIN:
2    Q.   Why -- how is it that you can use
3 PLM to identify minerals by dispersion
4 staining?  What property is it that allows you
5 to do that?
6    A.   The refraction angle between
7 particle and oil creates a color that we can
8 use then to try to identify wavelength based
9 on temperature and the version of oil that's
10 been used.
11    Q.   No question, if I look at Calidria
12 in 1.550, I can see generally magenta in
13 parallel and blue in perpendicular, right?
14    A.   I have seen that in my experience.
15    Q.   Okay.  So how is it in your view
16 that somehow Calidria is also showing golden
17 yellow?  What physical -- what property of
18 physics changes it so that sometimes when
19 you're finding it, it's to you golden yellow
20 as opposed to magenta?
21         MR. LUDWIG:  Objection, same
22 objection.
23         I instruct you not to answer.
24         Calls for expert testimony.
25         MS. O'DELL:  Join.

Page 160

1 BY MR. DUBIN:
2    Q.   We saw in the Zimmerman image that
3 your talc could appear golden yellow, right?
4         MS. O'DELL:  Object to the
5 form.
6         It's not his talc.  It's
7 Johnson & Johnson talc.
8 BY MR. DUBIN:
9    Q.   Your images of talc can appear
10 golden yellow, right?
11    A.   Off the -- the Olympus BH2, yes.
12    Q.   So if both -- if in your view both
13 Calidria and talc can show golden yellow in
14 parallel, how are you distinguishing between
15 them?
16         MS. O'DELL:  Objection to the
17 form.
18         THE WITNESS:  By whether I am
19 actually looking at fibrous talc or talc
20 plates.
21 BY MR. DUBIN:
22    Q.   But your elongated talc -- now,
23 first of all, do you have any -- do you have
24 images -- what is your practice about imaging
25 when you do a review?  Do you always take

Page 161

1 images?
2    A.   If we find a structure of interest.
3    Q.   Do you do that both when you're
4 looking for fibrous talc and when you're
5 looking for chrysotile?  You take images?
6    A.   If I find something that I feel
7 comfortable calling fibrous talc, yes.
8    Q.   Do you have images -- we'll go back
9 and do that.
10         So my understanding is that
11 you're trying to say that even with the
12 tungsten light shining on the particles, talc
13 plates are going to be golden yellow, but what
14 you're calling fibrous talc is going to be
15 still bright yellow or pale yellow even --
16         MS. O'DELL:  Objection.
17 BY MR. DUBIN:
18    Q.   -- is that what you're saying?
19         MS. O'DELL:  I'm sorry.
20 Objection; misstates his testimony.
21 BY MR. DUBIN:
22    Q.   I mean, wouldn't the fibrous talc
23 also have the same color as the talc in
24 parallel?
25         MS. O'DELL:  Object to the

41 (Pages 158 - 161)

Page 162

1 form.
2        THE WITNESS: Not in my
3 experience have I seen that.
4 BY MR. DUBIN:
5    Q. Are you familiar with any published
6 reference values for the refractive indices of
7 talc in parallel, in talc -- elongated fiber
8 of talc in parallel?
9        MS. O'DELL: Objection; calls
10 for expert testimony; beyond the scope of the
11 work he has done in this -- in these reports.
12        MR. LUDWIG: I join and I
13 instruct him not to answer.
14        MR. DUBIN: Okay. And just one
15 more time, for purposes of the record, all of
16 this is going to his knowledge, experience,
17 and training and how he has formulated the
18 opinions that he has stated in these reports
19 and I am being prevented from asking these
20 questions. We're going to go to the Court
21 about it, but I am going to keep going for a
22 little while so that we make clear what you
23 are objecting to or not.
24        MS. O'DELL: There is a
25 difference between asking about the work he

Page 163

1 has done for these particular reports and
2 asking about methodology for things he hasn't
3 done and goes into expert opinion and that's
4 what we're basing our objections. It's
5 clearly within the scope of Judge Schneider's
6 order.
7        MR. DUBIN: Okay. Well, we
8 have done that. We'll do this at the end.
9 BY MR. DUBIN:
10    Q. You were never told at McCrone when
11 you were doing your PLM training that somehow
12 Calidria could not be identified by the
13 standard colors associated with chrysotile;
14 right? No one said that to you, correct?
15    A. Nothing was mentioned about Calidria
16 during the course.
17    Q. Do you know whether Calidria is
18 mentioned in ISO 22262?
19    A. I am not aware of that.
20    Q. Okay. Have you reviewed -- as part
21 of familiarizing yourself with Calidria for
22 purposes of using it as a standard, did you
23 review any historical MAS analysis of Calidria
24 by dispersion staining?
25    A. Would you, please, rephrase that?

Page 164

1    Q. Sure. Did you review -- as part of
2 using Calidria as a standard for your
3 analysis, did you review any MAS historical
4 analysis of Calidria and its dispersion
5 staining colors?
6    A. I am not aware of anything like
7 that, no.
8        MR. DUBIN: Okay. Jake, I
9 don't have the number, but let's just call up
10 the historical MAS analysis as the next
11 exhibit. It should be around 132 or 133 of
12 the outline and it will be exhibit 24.
13        (Exhibit 24 marked for
14    identification.)
15 BY MR. DUBIN:
16    Q. Were you aware that MAS had recorded
17 previously their refractive indices associated
18 with Calidria asbestos?
19        MS. O'DELL: I object to --
20 first, object to the use of this exhibit.
21 It's not been disclosed in the MDL, it's not
22 something that this witness should be asked
23 about, but I would -- I would encourage
24 counsel to instruct him not to answer. This
25 is beyond the scope.

Page 165

1        MR. LUDWIG: I was going to.
2 This is totally beyond the scope of what the
3 Judge said. So I am objecting to the question
4 and I am instructing my client not to answer.
5 BY MR. DUBIN:
6    Q. Okay. So you don't know whether at
7 MAS, before they tried to claim that there was
8 chrysotile in Johnson & Johnson, they reported
9 that Calidria would look magenta in parallel
10 and blue in perpendicular.
11        You're not aware of that?
12        MS. O'DELL: Objection to the
13 statements of counsel testifying, objection to
14 the representations about this document we
15 have never seen, and it is beyond the scope
16 of this deposition.
17        MR. DUBIN: Okay.
18        MR. LUDWIG: I join the
19 objection.
20 BY MR. DUBIN:
21    Q. You were using Calidria as your
22 reference in the reports that we have been --
23 that you have produced claiming to find
24 chrysotile in Johnson & Johnson, correct?
25        MS. O'DELL: Objection.

42 (Pages 162 - 165)

1    MR. LUDWIG: Objection;
2 argumentative.
3 BY MR. DUBIN:
4    Q.   Is that correct?
5    MS. O'DELL: Restate your
6 question.
7 BY MR. DUBIN:
8    Q.   You were using Calidria asbestos as
9 the reference material for chrysotile with
10 respect to the reports that you have issued
11 claiming to find chrysotile in Johnson &
12 Johnson, correct?
13    MR. LUDWIG: Objection to the
14 form.
15    MS. O'DELL: Object to the
16 form.
17    THE WITNESS: We had not used
18 the Calidria to -- the only way we have used
19 the Calidria is to create standards in order
20 to calibrate for levels of concentration.
21 BY MR. DUBIN:
22    Q.   I'm sorry.  You're using it only to
23 calibrate levels of concentration.
24    What do you mean by that?
25    A.   I mean by what might be visually

1 apparent within a set of standards.
2    Q.   But you would agree that what you're
3 identifying as chrysotile in Johnson & Johnson
4 does not look like standard reference
5 chrysotile, correct?
6    It does not have the magenta in
7 parallel and blue in perpendicular associated
8 with standard reference Chrysotile, correct?
9    MS. O'DELL: Objection;
10 misstates the record; calls for expert
11 opinion.
12    MR. LUDWIG: Join.  I instruct
13 the witness not to answer.
14    MR. DUBIN: So you're
15 instructing him not to answer about the colors
16 that he is seeing in the analysis that this
17 whole deposition is about?  Is that my -- is
18 that right?
19    MS. O'DELL: That's not
20 correct.
21    MR. LUDWIG: I am instructing
22 him not to answer the question as asked.
23 BY MR. DUBIN:
24    Q.   What -- are you reporting -- when
25 you're reporting chrysotile in Johnson &

1 Johnson, are you reporting based on seeing the
2 actual particle being magenta in parallel?
3    A.   I am reporting based on the colors I
4 see at the edge.
5    Q.   Does the actual particle itself,
6 where you see the main color, is that ever
7 magenta itself?
8    MS. O'DELL: Would you repeat
9 the question, please?
10 BY MR. DUBIN:
11    Q.   In the main center of the particle,
12 not these edge effects, do you recall ever
13 reporting it as the main color being magenta
14 itself, not the edge?
15    A.   I have seen that, yes.
16    Q.   Can you identify any report or any
17 image where you have seen the interior of
18 the -- what you're calling chrysotile in
19 Johnson & Johnson being magenta, any image,
20 any report?
21    A.   I do not recall.
22    Q.   I want to ask you a little bit about
23 your reference images of Calidria in 1.560
24 and --
25    MR. PLACITELLA: Could you

1 just, please, define your reference images,
2 please?  Thank you.
3    MR. DUBIN: The reference
4 images that he created on the PLM that are
5 part of Dr. Longo's reports.
6    MR. PLACITELLA: Thank you.
7    MS. O'DELL: Which reports?
8    MR. DUBIN: I am about to mark
9 it, but I got interrupted.  All right.  So --
10    MR. PLACITELLA: I wasn't
11 objecting.  I was just asking.
12    MR. DUBIN: So we'll mark
13 CX-00029 or CX-29 as the next exhibit.  I
14 guess we're at 25.
15    (Exhibit 25 marked for
16    identification.)
17    MR. DUBIN: If we can turn that
18 a little bit?
19    MS. O'DELL: And what report
20 did this image come from?
21    MR. DUBIN: Let's show the
22 front of the report, too, if we have it.  It's
23 from the (inaudible).
24    MR. KEESTER: Morty, I don't
25 have the first page of this report.  I can go

43 (Pages 166 - 169)

Page 170

1 find it if need be.
2          MR. DUBIN:  Okay.  Well, let's
3 make sure that we mark it as an exhibit so
4 they have the entire report.  The full report
5 will be 26.
6          MS. O'DELL:  I want to make
7 sure that this report is at issue in the MDL.
8 Can you represent to me which report this
9 image came from?
10          MR. DUBIN:  These are all of
11 the reference images that Dr. Longo provides
12 along with all of these reports as his
13 references for his chrysotile findings.  These
14 are all part of his analysis in -- it's all
15 part of the chrysotile analysis that is being
16 discussed in these -- in this deposition.
17          MS. O'DELL:  With due respect,
18 Morty, that doesn't mean anything.  I mean,
19 the question is, is -- is this --
20          MR. DUBIN:  Dr. Longo is
21 relying on these reference images for his
22 identification of chrysotile in the reports
23 that we are discussing today.
24          MS. O'DELL:  And I am asking
25 you what report does this image come from?

Page 171

1 That's what I am asking you.
2          MR. DUBIN:  I will tell you the
3 name of the report, but it will be one of
4 Dr. Longo's reference image reports that he
5 supplies along with the chrysotile finding --
6 alleged chrysotile findings from Johnson &
7 Johnson.
8          MS. O'DELL:  Well --
9          MR. DUBIN:  (Inaudible.)
10          MS. O'DELL:  -- comes from
11 without knowing if it's at issue in the MDL --
12          MR. DUBIN:  It is at issue in
13 the MDL because they are his reference images
14 that he is using to compare reference
15 chrysotile to the reports that he has produced
16 in the MDL.  These are his reference images
17 that are incorporated in all of his materials.
18          MS. O'DELL:  I don't --
19          MR. DUBIN:  Okay.  We can take
20 a ten-minute break.  We'll get the whole
21 report and then if you want to still instruct
22 him not to answer, then we'll just add it to
23 the pile of things, but I really can't see how
24 any legitimate argument could be made that the
25 reference images that they are relying on for

Page 172

1 Calidria to say there is chrysotile in Johnson
2 & Johnson as part of this analysis are somehow
3 off limits, but if you're going to take that
4 position, you're going to take that position.
5          MS. O'DELL:  I'm not --
6          MR. DUBIN:  We'll take --
7          MS. O'DELL:  -- the position I
8 am taking is that you have an image on the
9 screen.  We have --
10          MR. DUBIN:  Okay.
11          MS. O'DELL:  -- no idea where
12 it came from --
13          MR. DUBIN:  (Inaudible.)
14          MS. O'DELL:  (Inaudible.)
15          THE COURT REPORTER:  I'm sorry.
16 This is the court reporter.  Everyone is
17 talking at once and I can't hear anything.
18 Apologies.
19          MS. O'DELL:  Jessica, I'm
20 sorry.  I mean, I am just trying to finish my
21 objection.
22          We have no idea where this
23 image came from.  I am just asking -- you're
24 saying it's a reference image from Dr. Longo.
25 I have no idea of the context and we --

Page 173

1          MR. DUBIN:  (Inaudible.)
2          MS. O'DELL:  -- know that
3 before the --
4          MR. DUBIN:  I am telling you
5 what the context is now.  Because apparently
6 he produces them as individual images.  He
7 doesn't produce them as part of a report, but
8 when he is requested to produce the reference
9 images that he is relying on to use as a
10 reference for chrysotile in 1.560, he just
11 produces these images as the standards that he
12 is relying on.
13          So it's part of the materials
14 that he relies on for these reports and his
15 conclusions about the chrysotile -- alleged
16 chrysotile in Johnson & Johnson.
17          MR. PLACITELLA:  I hear you --
18 I hear you, Morty, but you're not deposing
19 Dr. Longo here.
20          MR. DUBIN:  But these are
21 images taken by Mr. Hess.
22          MS. O'DELL:  Well, and to my
23 knowledge -- and I can be corrected on this,
24 Morty, but this is not an image that's been
25 produced in the MDL in relation to Dr. Longo's

44 (Pages 170 - 173)

Page 174

1 testimony.
2          MR. DUBIN: I am sure he has
3 produced his reference images because he
4 always produces his reference images because
5 we always request his reference images.
6          If you really are going to shut
7 me down from asking a question about the
8 reference images that were -- that are relied
9 on for the reports in this case, then you're
10 going -- you're going to do that. You're
11 going to make the objection and we're going to
12 go and argue about it and I think it is highly
13 improper or you could let me ask him a
14 question about an image that directly relates
15 to his work and that he took.
16          MS. O'DELL: Well, we don't
17 have -- one, there is no evidence of that and
18 second is Mr. Hess is here to testify on the
19 reports that are produced in the MDL. Other
20 things that Dr. Longo relies on are not at
21 issue here for his opinions. So --
22          MR. DUBIN: These are the --
23 again, these are the images that Dr. Longo
24 uses with his reports and the whole purpose of
25 this is to ask the person who took the images

Page 175

1 about them.
2          I am not going to continue to
3 argue with you. If you're going to instruct
4 the witness not to answer, go ahead and do it,
5 because I think that this deposition has gone
6 way off the rails and we're going to have to
7 go to the Judge about it. So just do whatever
8 you're going to do. I don't want to argue
9 with you anymore.
10          Are you claiming that you are
11 going to stop this person, Mr. Hess, from
12 talking about the reference images for the
13 alleged chrysotile in Johnson & Johnson? If
14 so, instruct him, and let's just have that
15 done.
16          MS. O'DELL: Judge Schneider
17 was very clear as to what was fair game in
18 this deposition and those are the reports
19 produced in the MDL that involve the new
20 method, to my knowledge. And you can correct
21 me, but I don't think I am incorrect.
22          This is not a part of those
23 reports and it's not something that's an
24 appropriate scope of this deposition and we
25 would instruct the witness not to answer.

Page 176

1          MR. LUDWIG: And I am going to
2 join for the reasons stated and instruct the
3 witness not to answer.
4          MR. DUBIN: We're going to take
5 a ten-minute break. I'll be back.
6          VIDEOGRAPHER: The time is
7 2:12 p.m. We are off the record.
8          (Break held off the record.)
9          VIDEOGRAPHER: The time is
10 2:26 p.m. We are back on the record.
11          MR. DUBIN: So for the record,
12 I am going to mark as 26 Dr. Longo's
13 deposition in a case called Kayme Clark and
14 Dusty Clark v. Johnson & Johnson, where he
15 identifies these reference images so that it's
16 in the record. We'll put that in as 26. We
17 don't have to do anything with it. We're just
18 going to put it in the record.
19          (Exhibit 26 marked for
20     identification.)
21 BY MR. DUBIN:
22     Q.   And then I am going to go back to
23 the image and I am going to ask you some
24 questions and if you're instructed not to
25 answer, you are instructed not to answer.

Page 177

1          MR. DUBIN: So can we pull back
2 up the Calidria reference image? And I don't
3 think that was the page we were on; that was
4 one of them.
5 BY MR. DUBIN:
6     Q.   So is this an image that is -- are
7 these your PLM images of Calidria 1.560?
8     A.   Yes.
9     Q.   Okay. And so all this blue stuff in
10 the background, that's Calidria?
11     A.   That is correct.
12     Q.   Okay. And you're aware that
13 Calidria can have impurities in it, too?
14          MR. LUDWIG: That's -- I am
15 going to object to the form and instruct him
16 not to answer; that's beyond the scope.
17          MR. DUBIN: Okay.
18 BY MR. DUBIN:
19     Q.   Is this image taken at maximum
20 illumination?
21     A.   It was.
22     Q.   All right. So images on that
23 microscope don't get any brighter than this?
24          MS. O'DELL: Objection; asked
25 and answered.

45 (Pages 174 - 177)

Page 178

1          MR. LUDWIG:  Join.
2          MR. DUBIN:  All right.  Let's
3  make the next exhibit in order, which is 27,
4  we'll make it slide 61 -- sorry -- actually,
5  slide 95.
6          (Exhibit 27 marked for
7    identification.)
8          MS. O'DELL:  I'm sorry.  Is
9  this exhibit 27?
10          MR. DUBIN:  Twenty-seven.
11          MR. LUDWIG:  (Inaudible.)
12          THE COURT REPORTER:  If you
13  just said something, Mr. Hess, I couldn't hear
14  you.
15          MR. LUDWIG:  That was me
16  talking to myself.  I apologize, Jessica.  I
17  am simply saying that my exhibit list is
18  mis-numbered for some reason.
19  BY MR. DUBIN:
20    Q.   Are you claiming those two -- those
21  two images have the same dispersion staining
22  colors?
23          MR. LUDWIG:  I am going to
24  object to the form of the question.
25          MS. O'DELL:  I object to the

Page 179

1  question.
2          MR. LUDWIG:  Yeah.
3          MS. O'DELL:  This is --
4          MR. DUBIN:  Are you instructing
5  him not to answer?
6          MS. O'DELL:  Yes.  This is
7  beyond the scope.
8  BY MR. DUBIN:
9    Q.   Have you ever received any criticism
10  from NVLAP about your PLM work?
11    A.   None that I am aware of.
12          MR. DUBIN:  Okay.  At this
13  point, you know, I think we're going to have
14  to go to the Court.  I am going to shut the
15  deposition down for the day, but I am not
16  agreeing to end it.  I think that the
17  restrictions that have been placed on me by
18  counsels' objections and instructions not to
19  answer are improper and we're going to seek
20  relief with the Court.
21          So I am suspending it for the
22  day because I think I am handcuffed, but I
23  understand you guys have different opinions.
24  So we'll just have to deal with it later.
25          MS. O'DELL:  Our view is the

Page 180

1  objections as made have been proper and
2  absolutely consistent with Judge Schneider's
3  prior ruling and I will object to any further
4  deposition of Mr. Hess.
5          MR. DUBIN:  Okay.  We'll have
6  to resolve that.  All right.  Thanks for
7  today.  Take care.
8          VIDEOGRAPHER:  The time is
9  2:31 p.m.  We're off the record.
10          (Witness was excused.)
11          (Deposition concluded at
12    2:31 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 181

1          C E R T I F I C A T E
2      I HEREBY CERTIFY that prior to the
3  commencement of the examination, PAUL HESS,
4  was remotely sworn by me to testify to the
5  truth and that the proceedings, evidence, and
6  objections are contained fully and accurately
7  in the stenographic notes taken by me upon the
8  deposition taken on July 10, 2024, and this is
9  a true and correct transcript of same.
10
11
12      *Jessica M. Gericke*
13  _____
14    Jessica M. Gericke, RPR, CCR-NJ,
    and Notary Public
15
16
17      (The foregoing certification of this
18  transcript does not apply to any reproduction
19  of the same by any means, unless under the
20  direct control and/or supervision of the
21  certifying reporter.)
22
23
24
25

46 (Pages 178 - 181)

Page 182

1  I have read the foregoing transcript
2  of my deposition given on July 10, 2024, and
3  it is true, correct and complete, to the best
4  of my knowledge, recollection and belief,
5  except for the corrections noted hereon and/or
6  list of corrections, if any, attached on a
7  separate sheet herewith.
8
9  _____
    Paul Hess
10
11
12
13
14  Subscribed and sworn to
15  before me this ____ day
16  of _____, 20__
17
18
19  _____
20  Notary Public
21
22
23
24
25

Page 183

1 ERRATA SHEET
2
3 PAGE LINE    CHANGES OR CORRECTION AND REASON
4 _____
5 _____
6 _____
7 _____
8 _____
9 _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19
20 I have inspected and read my deposition as
   captioned above and have listed all changes
21 and corrections above, along with my reasons
   therefor.
22
23 DATE: _____
24 Signature of Deponent: _____
25

**[& - 2000s]**                                                                 Page 1

**&**

**&**   1:3 2:2,9,14
3:2,7,17,19,22
7:8 9:5 20:11
20:20 21:20
22:25 31:12
37:15,21 38:22
53:21,23 54:18
60:19 63:15
64:15 65:6
81:14 110:19
141:18 143:14
144:4 156:3,10
156:22 160:7
165:8,24
166:11 167:3
167:25 168:19
171:6 172:2
173:16 175:13
176:14

**0**

**00012**   6:11
**00019**   6:14
**00029**   6:15
169:13
**00056**   6:10
**00062**   6:13
**001**   93:17 100:2
115:8
**002**   125:4,9,13
128:11
**003**   133:3
**07701**   2:16
**07932**   3:20

**08002**   3:9

**1**

**1**   5:10,13 8:7
22:16 23:16
33:22 34:10
59:5 146:18
**1.540**   56:9
**1.55**   56:19
90:13
**1.550**   15:8,12
22:5 37:18 42:8
43:6 44:8 56:23
57:5 90:25
98:13 101:4
152:2,15,20
153:9 156:3,10
156:23 159:12
**1.550.**   22:1 77:1
77:20
**1.556**   109:21
**1.560**   42:8 44:9
90:3,14 91:5,8
93:6 98:14
101:4 104:10
105:14 118:12
168:23 173:10
177:7
**1.564**   104:4
108:18
**1.565**   127:8
**1.568**   133:8
**1.60**   90:25
**1.60.**   91:2,4
**1.605**   56:10

**1.605.**   56:20
**10**   1:8 5:21 7:5
52:18 75:24
76:1,2 83:13
181:8 182:2
**10,000**   10:25
**100**   24:23
**10036**   3:15
**104**   131:21
**105**   6:5
**108**   6:6
**10:17**   45:15
**11**   5:22 81:17
81:18 82:13,17
82:20 83:3,5,6
83:18
**110**   6:7
**1185**   3:14
**11:19**   92:15
**11:37**   92:18
**11a**   68:23
**12**   5:23 83:2,7
83:15,18,21
142:16
**127**   2:16 6:8
**12:38**   142:2
**13**   5:24 6:2,2
86:15 87:18
**132**   164:11
**133**   164:11
**134**   6:9
**137**   6:10
**14**   6:3 91:16,17
**143**   6:11,12
**147**   6:13

**15**   6:5 105:1,3
106:20
**16**   5:15 6:6 58:7
108:5,7,14
**16-2738**   1:3
**164**   6:14
**169**   6:15
**17**   6:7 110:12
110:13 127:16
**176**   6:16
**178**   6:18
**18**   6:8 127:16
127:20,22,25
**1824**   3:3
**19**   6:9 134:16
134:24
**1960s**   23:2,23
**1970s**   23:23
**1980s**   23:23
**1989**   45:20
**1990s**   23:23
**1995**   8:11
**1:28**   142:5

**2**

**2**   5:11,14 19:25
20:4 23:19 46:8
87:22
**20**   5:11,19 6:4
6:10 70:1 137:2
137:3 142:17
182:16
**200**   2:3
**20006**   3:3
**2000s**   23:2,24

**[2008 - 9:32]**                                                                    Page 2

**2008**   9:4
**2018**   5:24 15:1
**2019**   5:13 22:16
    23:16 33:22
    34:10,23 39:17
    40:4 41:9
**202-669-0032**
    3:4
**2020**   5:11,15,17
    20:2 35:20 58:7
    64:15,24
**2021**   6:2 61:10
**2023**   9:9 93:1
**2024**   1:8 6:17
    7:5 35:21 181:8
    182:2
**21**   6:11 105:11
    142:22,25
    143:2,3,8
**212-790-5343**
    3:16
**218**   2:10
**22**   5:12,20 6:12
    6:17 68:24 69:6
    74:12 143:7,8
**22262**   163:18
**22262-1**   72:19
**23**   6:13 147:19
    147:21
**24**   5:11,17,21
    6:14 20:2 64:15
    75:14,23,24
    164:12,13
**25**   5:22 6:15
    81:17 82:17
    83:17 169:14

169:15
**26**   6:16 106:3
    170:5 176:12
    176:16,19
**27**   6:18 178:3,6
    178:9
**2700p**   61:6
**2738**   7:8
**28**   6:4 86:15
**29**   169:13
**296**   59:11
**2:12**   176:7
**2:26**   176:10
**2:31**   180:9,12

---

**3**

**3**   3:8 5:12 22:16
    22:19 59:2
    144:19,25
**30**   30:5 126:9
**30338-2668**   2:4
**310**   3:8
**31573**   181:12
**32**   92:2,2 99:7,8
    99:19,20,23
**33**   93:15 99:5,8
    99:11,12,21
**334-269-2343**
    2:11
**34**   6:5 10:24
    104:24
**34th**   3:15
**35**   106:2
**36**   65:15 67:19
    67:20,20

**36104**   2:10
**37**   125:12
**38**   125:11
**39**   64:22 67:21
    76:23

---

**4**

**4**   5:14 46:9,10
    47:4 52:16
**4/13/2021**   86:16
**40**   109:17
**42**   134:13
**43**   6:7 110:8,10
    134:12
**46**   5:14
**48**   6:12 134:16
    143:7

---

**5**

**5**   5:15 58:11,12
    144:19,20,22
    144:25
**50**   26:9
**500**   2:3
**53**   82:13
**530**   74:7
**56**   137:2
**560**   108:23
**58**   5:15

---

**6**

**6**   5:4,16 20:1
    64:12,13,14,18
    76:21
**600**   3:20
**61**   178:4

**62**   147:20 148:1
**64**   5:16
**678-338-3925**
    2:4
**69**   5:18

---

**7**

**7**   5:18 68:21,22
    69:3
**70**   5:19 156:22
**72**   23:20 32:21
**732-747-9003**
    2:17
**74**   5:20
**76**   5:21

---

**8**

**8**   5:10,19 70:3,4
    70:6
**81**   5:22
**83**   5:23
**84**   87:24
**85**   89:16
**856-317-7180**
    3:9
**87**   6:2

---

**9**

**9**   5:20 74:12,13
    75:24
**91**   6:3
**95**   6:18 178:5
**973-549-7000**
    3:21
**9:06**   1:14 7:6
**9:32**   28:13

[a.m. - answer]                                                                                          Page 3

| a | | | |
| --- | --- | --- | --- |

**a.m.** 1:14 7:6
28:13 45:15
92:15,18
**able** 16:5,24
24:20 25:23
26:10 38:18
44:11 62:9 81:1
122:4 126:12
147:24 148:8
**above** 1:13
183:20,21
**absolutely**
180:2
**accept** 156:17
**account** 121:13
**accurately**
114:1,11 181:6
**acquired**
101:23
**actual** 35:2
99:23 104:12
114:2 123:22
147:14 168:2,5
**actually** 59:11
59:18 116:3
143:23 145:13
155:2 160:19
178:4
**add** 29:1 40:7
113:21 148:15
171:22
**adding** 94:23
95:1,3 96:7,8
97:22,22

**addition** 67:13
131:22
**address** 30:22
**adjust** 23:9
61:17 62:23
129:4
**adjusted** 68:8
68:10 73:10
**administer**
7:16
**advance** 30:4
30:13
**advanced** 9:21
**advised** 53:14
**affidavit** 84:9
**ago** 19:17 29:14
121:22
**agree** 80:6
106:25 167:2
**agreed** 7:11
131:19
**agreeing**
179:16
**ahead** 28:4,4
32:1 38:17 51:4
81:10 101:22
108:3 137:20
175:4
**al** 2:10
**align** 62:7
**alignment**
144:10
**alleged** 171:6
173:15 175:13
**allen** 2:8

**allow** 35:6
**allowed** 34:21
**allowing** 34:5
**allows** 62:22
159:4
**alpha** 49:3,12
51:10,25 52:7
152:12
**americas** 3:14
**amphibole**
13:18 23:3
33:23 38:5
**amphiboles**
12:19,21 13:4
13:11,21 14:3
39:18
**amscope** 72:12
72:13
**analyses** 22:12
65:6 70:12
71:12,15
**analysis** 13:8
17:24 19:2,4
21:7 22:24 34:5
34:15,20 38:7
45:19 53:7
61:23 62:12
63:15 64:15
69:20 79:16,20
86:14 90:5
109:2 113:8
121:17 124:21
126:9 128:4,6
128:15 129:25
133:20 136:14
140:4,22 141:8

141:16 143:15
158:10 163:23
164:3,4,10
167:16 170:14
170:15 172:2
**analyst** 10:10
29:10 47:17
58:9 62:1,9
79:13 134:7
**analysts** 17:5
17:11
**analytical** 2:7
**analyze** 124:9
126:3 148:17
**analyzing**
10:25 140:14
140:15 156:10
**angle** 52:23
159:6
**annual** 19:18
**answer** 12:10
41:8 43:21
49:18 54:13,15
55:20,25 57:10
59:25 60:4
65:25 66:3,6,14
66:24 67:4,11
69:15,17 70:22
71:2,7,9,20
72:4 73:3,5
75:9,13 76:16
78:6,9,11,23
79:5 81:8 82:8
84:23,25 85:13
85:21 86:1,5
87:12 91:11

95:9,11,18,21
96:17,23 97:11
97:17 98:1,3,23
100:17 103:15
104:14 110:3,5
112:5,12,14
113:13,18
114:13 119:9
120:8 122:22
124:17,20
125:1 126:5
127:3 129:2
130:3,5 132:2
136:13,17
137:22 138:2
138:20,22
139:6 141:4,5
143:25 147:1
147:13 148:21
149:6,11 150:3
150:6,9 154:22
155:1,4 157:12
157:14 158:24
159:23 162:13
164:24 165:4
167:13,15,22
171:22 175:4
175:25 176:3
176:25,25
177:16 179:5
179:19
**answered**  86:6
88:7,10 100:23
115:20 121:6
146:22 147:12
150:21 177:25

**answers**  123:11
**anybody**  18:15
41:21,22 92:6
**anymore**  27:23
175:9
**anyway**  108:17
**apologies**
172:18
**apologize**
178:16
**apparent**  167:1
**apparently**
173:5
**appear**  52:22
98:14 160:3,9
**appearance**
99:14 120:3
**appearances**
2:1 3:1 4:1
**appearing**  7:11
**appears**  82:3
133:6 144:14
**applications**
132:6
**apply**  51:5
181:18
**approach**  32:5
**approached**
29:17
**appropriate**
175:24
**appropriately**
30:10 62:2
**approximately**
1:14 11:17 14:5
61:7

**april**  6:2
**argue**  174:12
175:3,8
**arguing**  27:23
60:10 150:11
**argument**  36:6
37:3 41:2 42:2
44:25 171:24
**argumentative**
115:21 126:18
126:21 140:10
146:7,9 166:2
**arguments**
35:11 42:20
**arrows**  125:23
**artifact**  121:16
130:10
**asbestos**  11:3,5
14:11,22 15:4
15:24 16:10,19
22:5 23:3 33:24
46:6 152:19
155:23 164:18
166:8
**ascertain**  99:15
**ashcraft**  3:2
**ashercraftlaw...**
3:4
**ashford**  2:3
**asked**  12:18,20
13:4,22,25 14:2
25:4 30:2 31:3
32:3 66:9 72:1
88:6,10 100:22
107:21,25
112:9 114:19

115:20 121:5
132:1,25
147:12 148:17
150:20 157:22
164:22 167:22
177:24
**asking**  21:5,6
24:9 27:8,18,24
32:25 37:13
38:6 39:15 40:5
40:10 41:16,20
41:21,23 42:7
42:11 43:3,9,17
44:7 53:9 54:10
57:13 63:19,24
64:2,7 66:3,11
78:1,2,24 79:23
82:25 97:14,19
106:16 107:10
107:11 111:10
111:18 126:2
132:2 137:14
137:25 146:24
148:6,23 149:1
149:12 154:23
156:16 162:19
162:25 163:2
169:11 170:24
171:1 172:23
174:7
**aspects**  113:4
**assertion**
142:25
**assess**  79:24
**assessing**  62:15

**assessment**
120:13
**assign** 119:1
123:7 129:21
**assigned** 104:5
110:17 112:21
122:14 135:3
135:12
**assigning** 124:5
133:7
**associated**
56:22 101:3
108:22 114:9
152:14 163:13
164:17 167:7
**associates** 8:15
8:18
**assume** 8:1
31:7 108:4
**assumes** 138:14
**assuming** 67:20
**assuring**
130:11
**atlanta** 1:12 2:4
8:20 31:16,21
**attached** 42:23
44:22 182:6
**attorney** 138:1
**august** 9:4
**author** 151:12
151:13
**available** 32:13
32:25 45:6
73:25 74:2
97:11 133:10
145:19

**avenue** 2:16
3:14
**average** 10:25
**aware** 20:17
21:13,15,17
34:11 37:1
46:21,25 74:6
74:10 101:5
135:5,11,21
153:7,10
163:19 164:6
164:16 165:11
177:12 179:11

**b**

**b** 5:8
**bachelor's** 9:18
**back** 9:8 18:9
19:3 34:23
39:25 45:6,15
47:25 52:15
56:2 59:4 65:17
71:23,24 76:21
76:22 85:24
89:25 90:11
92:18,21,23
93:20 94:1,2
95:2 96:3,7
99:24 107:18
109:12,14
114:7,20,24
132:11,21
136:5 142:5
144:16 146:16
153:19,20
161:8 176:5,10

176:22 177:1
**background**
8:4 18:10 45:17
63:4 137:15
177:10
**backup** 142:14
142:15
**balance** 63:4
**balancing**
62:20 63:1
**bank** 2:16
**bar** 77:11
131:14,20
**barely** 117:21
**base** 120:22
130:20 139:20
140:5
**based** 35:11
55:23 56:10
59:21 115:24
120:9,15
122:15 152:10
154:9 155:24
159:8 168:1,3
**basic** 47:12
**basically** 13:21
32:3 38:24
49:24 61:11
62:21
**basing** 119:11
120:5,13
121:11 144:4
163:4
**basis** 124:15
**beasley** 2:8

**beasleyallen....**
2:11
**becke** 140:22
141:7,15
**becoming** 12:5
14:7,21
**beginning** 1:13
**begins** 37:17
**belief** 182:4
**believe** 18:2
29:13 33:12
35:5 42:16 44:6
56:17 60:7
61:10 67:7
68:21 81:7 85:8
99:18 100:5
105:1 132:14
142:21 146:22
151:23
**bench** 35:3
**best** 10:15
30:24 62:4
117:6 123:12
123:15 145:5,7
152:5 153:15
182:3
**better** 59:13
84:6 90:14
**beyond** 35:4
40:19 54:11
57:21 66:21
72:24 84:20
102:24 103:11
112:2 114:16
124:13 126:15
137:19 138:12

[beyond - calling]                                                    Page 6

138:13 140:23
143:18 148:13
149:22 154:19
162:10 164:25
165:2,15
177:16 179:7
**bh** 60:23
**bh2** 60:20,24
94:9 160:11
**bharrs** 3:10
**biddle** 3:19
**big** 44:13
113:24
**bigger** 23:12
118:15
**bill** 27:20
**birefringence**
48:24 50:11,12
51:12 56:8,18
150:25 151:20
**bit** 8:3 17:2
19:22 23:12
29:14 33:16
45:24 52:5
60:14 65:18
87:25 90:1,2
92:1 168:22
169:18
**blow** 117:14
**blowing** 113:24
**blown** 117:13
**blowup** 123:19
**blue** 56:19
62:25 63:2,5,10
63:13 65:7,9,10
65:20 66:10

67:2 68:4,14
69:6 72:22
125:20 138:7
152:9,12
159:13 165:10
167:7 177:9
**blurry** 123:14
130:14
**board** 85:24
**bonus** 19:18
**bonuses** 19:13
19:16
**bottle** 20:19
38:22
**bottom** 104:3
123:5
**boundaries**
41:4 43:20 44:3
**boundary** 45:3
**bovis** 2:2
**boviskyle.com**
2:5
**brand** 16:12,15
**brandy** 3:7
**bravo** 60:23
**break** 19:9
45:13 60:9
91:22 92:5,7,16
132:21 134:20
134:23 142:3
171:20 176:5,8
**brief** 9:11 28:14
**briefly** 8:13
31:2
**briefs** 35:12

**bright** 147:25
148:9 161:15
**brighter** 88:14
89:5 146:21
147:9 177:23
**brightest** 73:24
74:2 89:12
147:15
**brightness**
73:22 88:4
89:19
**bring** 61:15
73:12 156:19
**brothers** 9:5
**building** 16:3
**bundles** 152:7
**burch** 2:2
**busy** 18:19
**bx** 60:22

| c |
| --- |

**c** 181:1,1
**calculate**
151:16
**calculation**
139:20
**calculations**
140:6 151:20
**calibrate** 101:7
166:20,23
**calibrations**
103:1
**calidria** 16:19
16:22 46:23
152:15,19,24
153:3,8 155:21

155:23,25
158:1,6,9,17
159:11,16
160:13 163:12
163:15,17,21
163:23 164:2,4
164:18 165:9
165:21 166:8
166:18,19
168:23 172:1
177:2,7,10,13
**call** 8:2,5 26:21
35:15 38:10
46:7 52:19 59:1
64:9,10,16
68:23 69:24
70:5 74:12
76:21 80:13
86:18 91:14,23
127:23 143:13
145:22 148:16
153:14 164:9
**called** 53:24
176:13
**calling** 54:19
55:6 76:25
77:12,19,23
78:3,19 80:22
104:20 105:13
109:3,16
110:18 113:11
119:11 120:15
121:2 126:23
127:11 128:4
128:13,16,17
129:24 133:8

**[calling - circumstances]**                                                    Page 7

| | | | |
|---|---|---|---|
| 133:12 134:9 | **carolin**  4:4 7:3 | **changing**  44:18 | 21:20 22:5 |
| 136:2 144:3 | **case**  30:6 33:6 | 94:13 98:6 | 34:16 37:19 |
| 161:7,14 | 36:21 40:23 | **chart**  90:13 | 38:1,22,24 39:5 |
| 168:18 | 70:17,18 78:2 | 108:25 113:1 | 39:10,11 42:9 |
| **calls**  18:5 53:5 | 86:3 102:22 | 131:14 | 42:10 45:1 |
| 57:11 65:24 | 106:10 140:24 | **charts**  51:5 | 46:16,19,22 |
| 69:10 72:24 | 174:9 176:13 | 104:12 113:2 | 49:10 51:11 |
| 75:7 82:8 84:19 | **cases**  29:24 | 133:10,25 | 52:21 53:21,23 |
| 91:10 95:7 | **causes**  52:21 | 135:18 | 53:24 54:18,20 |
| 109:25 116:5 | 53:2 | **chat**  24:6,22 | 55:7 60:19 |
| 126:4 131:3 | **ccr**  1:15 181:14 | 25:11,12 30:5 | 63:15 76:25 |
| 145:11 148:12 | **ceiling**  16:1 | 40:16 47:6,9 | 77:12,19 78:20 |
| 148:19 149:21 | **center**  2:3 | 48:5 58:20,25 | 80:7,22 84:10 |
| 154:18 158:22 | 54:24 80:2,12 | 59:6,7,9 64:16 | 90:16 99:1 |
| 159:24 162:9 | 168:11 | 68:24 71:18 | 109:3,13,19 |
| 167:10 | **centered**  62:7 | 72:8 75:17,19 | 110:18,21 |
| **camera**  72:12 | **centering** | 82:15 86:18,20 | 112:1,23 |
| 72:15 | 144:10 | 91:24 92:1,6 | 119:12 120:15 |
| **campus**  3:8,20 | **central**  57:3 | 108:3 127:24 | 121:2 126:24 |
| **canadian** | 101:2 102:6,11 | 131:5,6,10 | 141:17 143:14 |
| 152:10,24 | 139:12 151:25 | 132:12 143:4 | 144:3 152:1,6 |
| **capability**  62:3 | **ceramic**  69:21 | **check**  60:6 | 152:10,25 |
| **capable**  149:2 | **certain**  66:19 | 101:24 142:19 | 156:4,11,24 |
| **captioned** | 66:21 139:11 | **checking**  143:1 | 161:5 163:13 |
| 183:20 | **certification** | **chemical**  50:5 | 165:8,24 166:9 |
| **car**  23:1 | 181:17 | **cherry**  3:9 | 166:11 167:3,5 |
| **care**  3:11 26:5 | **certify**  181:2 | **chinese**  58:7 | 167:8,25 |
| 180:7 | **certifying** | **choose**  26:4 | 168:18 170:13 |
| **career**  15:22 | 181:21 | **chosen**  25:16 | 170:15,22 |
| **cargille**  101:15 | **cetera**  86:8 | **chris**  86:19 | 171:5,6,15 |
| 101:16 102:1,1 | **change**  98:13 | **christopher** | 172:1 173:10 |
| 102:10 103:6 | **changed**  43:5 | 2:15 17:15 | 173:15,16 |
| 137:6,6,13 | 61:8 | **chrysotile**  13:1 | 175:13 |
| 139:22 140:14 | **changes**  159:18 | 13:11,18,22,25 | **chun**  4:5 |
| 140:19 | 183:3,20 | 16:6,10,25 18:3 | **circumstances** |
| | | 19:24 20:12,19 | 30:23 138:25 |

**[claim - consistent]** Page 8

**claim** 30:15 126:3 165:7
**claiming** 19:24 117:19 120:25 121:1 141:17 146:3 153:3 165:23 166:11 175:10 178:20
**clark** 176:13,14
**clay** 69:21
**clean** 124:2
**clear** 33:13,19 44:3 85:15 99:24 100:2 112:8 134:3 135:9 147:8 162:22 175:17
**clearly** 62:10 85:23 118:6 163:5
**client** 165:4
**client's** 145:20
**clients** 16:16
**close** 91:20 132:7
**closely** 77:4
**cohen** 2:14
**collaborative** 158:3
**color** 47:17,21 48:15 50:21 51:9 53:1,3 54:18 55:1 56:5 56:23 57:5 58:1 58:4 70:13 77:2 77:13,21 78:2

78:19,25,25 79:7,23 80:21 90:13 94:14 97:23 98:25 99:1 100:13 101:3 102:6,11 102:12 104:8 104:20 105:13 106:17 108:22 108:25 112:21 113:1 123:4,6 124:5 125:16 126:25 127:9 127:11 129:20 131:14,14,20 133:5,8 134:9 135:21 139:1 139:13 141:10 144:5,6 152:25 159:7 161:23 168:6,13
**coloration** 100:8
**colors** 54:22 56:22 57:4 62:14 81:1 95:4 95:4 96:9,9 97:23 100:18 101:7 102:13 103:8 114:9,17 128:22 129:19 135:4 152:1,14 152:19 163:13 164:5 167:15 168:3 178:22

**come** 16:21 18:9 56:2 62:24 63:10 65:17 74:5 89:25 92:23 105:22 131:14 169:20 170:25
**comes** 171:10
**comfortable** 161:7
**coming** 40:21
**commencem...** 181:3
**comment** 81:11 86:20 154:9
**comments** 84:5 84:12 85:10 87:14
**commerce** 2:10
**committee** 2:13 2:18 3:5
**company** 19:17
**compare** 43:11 43:17 96:21 171:14
**comparing** 82:4 114:9
**comparison** 95:12 111:24 112:10 148:20 149:12
**compensated** 19:5
**complaining** 27:8 130:13

**complaint** 32:24
**complete** 182:3
**completely** 31:1 87:10 130:15 131:24
**completing** 30:18
**complies** 99:3
**compounds** 16:1,7,13,18
**computer** 118:5 123:22
**concentration** 166:20,23
**concern** 29:22 114:4
**concerned** 39:7
**concluded** 180:11
**conclusion** 41:18,18
**conclusions** 32:11 43:4,7 111:14 173:15
**conducted** 1:11
**conference** 1:11 2:1 28:15
**confirm** 82:17
**confusing** 9:25
**consider** 121:14
**consideration** 113:3
**consistent** 180:2

[consultant - cprlaw.com]                                                    Page 9

| | | | |
|---|---|---|---|
| **consultant** 9:12 | 51:12 61:4 65:1 | **corresponds** | **court** 1:1 7:15 |
| 19:10 | 65:2 79:21 80:8 | 104:9 109:21 | 20:24 28:8,18 |
| **contained** | 88:12 93:3,4 | 135:4 | 28:21 29:16 |
| 16:19 181:6 | 94:19 95:13 | **cosmetic** 14:1 | 30:21 31:4,6,9 |
| **containers** 23:1 | 96:19 97:24 | 14:10,16,23 | 31:11,14,17,22 |
| 23:22 | 98:9 99:18 | 15:3,10 20:10 | 31:25 32:5 33:5 |
| **containing** | 102:4,7,8 104:6 | 23:21 | 34:4,20 35:5,7 |
| 15:24 | 104:7 105:17 | **council** 3:11 | 36:23 38:12 |
| **contemplated** | 105:18 106:8 | **counsel** 2:6,13 | 39:6,23 41:1,24 |
| 30:21 | 108:5,7,19,20 | 2:18 3:5,11,17 | 42:13 43:8 |
| **context** 30:8 | 109:4,21 | 3:22 10:18,21 | 44:19 49:17 |
| 40:10,13 51:21 | 110:21 111:18 | 30:6 31:1 32:1 | 53:11,14 54:2,5 |
| 58:22 79:3 | 112:15,23 | 32:13 38:12 | 68:18,20 70:2 |
| 103:18 172:25 | 118:13 120:17 | 39:6 41:1,24 | 77:16 82:16 |
| 173:5 | 121:3 126:11 | 42:13 43:23 | 83:16,17 85:15 |
| **continue** 13:16 | 128:20 129:16 | 44:22 45:7 | 96:4 104:25 |
| 73:18,20 | 136:4,18 | 55:12 73:2 99:3 | 115:4 122:21 |
| 107:16 175:2 | 139:23 140:6 | 103:12 106:6 | 125:2 127:17 |
| **continued** 3:1 | 141:9 150:24 | 107:2 113:15 | 127:21 142:18 |
| 4:1 6:1 | 151:25 154:17 | 137:20 164:24 | 142:24 154:3 |
| **contrast** 11:13 | 155:16,19 | 165:13 | 157:11 162:20 |
| **contravention** | 163:14 165:24 | **counsel's** | 172:15,16 |
| 87:1 | 166:4,12 167:5 | 142:25 | 178:12 179:14 |
| **control** 181:20 | 167:8,20 | **counselor** | 179:20 |
| **controlled** | 175:20 177:11 | 117:11 | **court's** 87:1 |
| 61:13 | 181:9 182:3 | **counsels** 179:18 | 156:16 |
| **controls** 61:14 | **corrected** | **count** 30:18 | **cover** 29:1 |
| **convert** 48:20 | 173:23 | **counts** 30:17 | 92:22 |
| **copy** 25:16 46:8 | **correction** | **couple** 18:20 | **covered** 36:20 |
| 48:12 | 183:3 | 104:22 | 39:20 |
| **correct** 8:11 | **corrections** | **course** 32:18 | **covering** 151:5 |
| 9:7,13,19,20 | 182:5,6 183:21 | 45:21,25 46:18 | **covers** 151:6 |
| 10:1,3 11:7,10 | **correspond** | 163:16 | **cplacitella** 2:17 |
| 12:4 13:13 | 103:9 108:18 | **coursebook** | **cprlaw.com** |
| 35:13 45:23 | 122:7,15 | 151:6 | 2:17 |
| 48:18,21,25 | 129:22 135:13 | | |

[create - deposition]                                                Page 10

**create** 132:18
  166:19
**created** 55:11
  70:24 107:1,22
  130:24 169:4
**creates** 53:1,2
  159:7
**creating** 107:4
**criticism** 86:8
  179:9
**criticisms**
  85:14
**crow** 2:8
**csds** 56:22
  123:4,6 124:5
  129:20 138:25
  141:9 152:14
**csm** 93:16
  100:2 125:9,13
  128:11 133:2
**curious** 107:3
**current** 9:14
  19:12
**currently** 19:7
**cx** 6:10,11,13
  6:14,15 20:1
  64:14 68:23
  76:21 82:13
  86:15 106:3
  137:2 142:16
  147:20 169:13
  169:13

**d**

**d** 3:13 5:1

**darker** 95:3
  96:9 112:21
**date** 1:13 7:5
  23:13 35:19
  183:23
**dated** 5:11,12
  5:15,16,24 6:2
  6:3,17 20:2
  23:15 86:16
**daubert** 33:25
  34:4 37:3,7
**day** 33:14 34:1
  179:15,22
  182:15
**daylight** 62:25
  63:6,11,14 65:7
  65:9,20 68:5
  69:7 72:22 74:8
  74:21 75:1
**dc** 3:3
**de** 4:4 7:3
**deal** 97:3
  114:13 125:1
  152:7 179:24
**dealing** 68:6
  94:11 134:3
**debate** 30:14
**december** 8:11
**decide** 44:14
  73:2 157:25
**decided** 32:4
**decision** 35:18
  42:3
**decisions** 36:8
**declaration**
  5:18

**defendant** 3:17
  3:22
**defendant's**
  43:16
**defendants**
  31:7 34:22
  35:10,16 36:5
  42:17 43:19
**defense** 55:12
  70:24 82:3 86:9
  106:5,20
  107:22
**define** 49:2
  90:14 169:1
**defined** 52:7
  158:21
**definitely** 21:4
**degree** 9:19
  34:19 53:5
  70:20 102:15
**degrees** 9:22
  105:11
**delaware** 1:16
**delighted** 28:22
**demonstrates**
  152:19
**demonstrative**
  107:1 148:5
**demonstratives**
  107:5
**denied** 42:20
**density** 50:5
  74:22
**departed** 9:4
**depending**
  129:13

**depicted** 110:21
  114:11 115:8
  143:21
**depiction**
  110:23
**depicts** 114:2
**deponent** 2:6
  7:8 183:24
**depose** 78:13
  111:8
**deposed** 106:18
  111:7
**deposing**
  173:18
**deposition** 1:10
  6:16 7:6,10,25
  18:11,16,23
  29:15 30:4,13
  30:19,24 32:22
  33:6,11,16 34:2
  34:21 35:10,14
  36:4,12,18 37:9
  37:10 38:8 39:9
  40:18 41:4 42:6
  42:11 43:11,13
  43:25 45:3 53:9
  53:10 54:12
  69:12 76:11,15
  78:4 84:1,21
  85:20 87:3
  95:20 96:25
  103:12 111:16
  112:2 124:24
  138:13 143:18
  149:23 154:20
  165:16 167:17

[deposition - dr]                                                                   Page 11

170:16 175:5
175:18,24
176:13 179:15
180:4,11 181:8
182:2 183:20
**depositions**
131:23
**depth** 10:5
**derive** 48:24
**description** 5:9
**detailed** 42:21
**determination**
121:11 122:4
122:10
**determinations**
117:4
**determine** 30:7
50:4,21 51:7,24
54:23 80:3
98:11 100:18
104:19 133:25
138:17,24
141:8
**determining**
150:25
**developed** 79:7
**dial** 61:16,19
73:13,15,16
**diaphragm**
144:12
**difference** 22:2
22:8,10 49:25
50:12 51:14,21
52:1,3,9,9
101:25 162:25

**differences**
44:12 72:2
**different** 11:4
15:22 16:3,11
22:6 30:25
35:24 41:10,18
46:22 62:6
70:14 81:25
82:4 95:25
102:11,13
104:22 113:25
114:10 147:4
179:23
**differently**
71:12,14
**difficult** 41:3
**diffuser** 63:7
65:11
**diffusion** 63:2
**direct** 26:2 77:8
157:2 181:20
**direction** 29:16
49:5,10 51:2,10
51:25
**directly** 97:15
174:14
**disagree** 21:2
37:12 87:11
107:7
**disclosed** 34:14
34:18 59:20,23
69:19 164:21
**disclosure**
33:14
**discussed**
107:23 170:16

**discussing**
170:23
**discussion**
12:24
**dispersion**
17:24 45:18
46:5 47:12 57:3
101:2,7 102:6
102:12 103:18
103:22 120:2
126:9 137:13
139:13 144:17
152:1 158:10
158:19 159:3
163:24 164:4
178:21
**displayed** 148:3
**displaying**
50:20 51:8
**distinguishing**
160:14
**distorted**
132:22
**district** 1:1,2
33:20
**doctorate** 10:2
**document** 23:5
23:8 24:8 25:8
25:19 26:9,22
26:24 27:3,9
69:19 70:16
106:5,11,13
107:17 131:10
165:14
**documentation**
116:9

**documented**
116:19 145:25
**documenting**
94:24
**documents**
25:16 75:6
86:25
**doing** 15:13
40:25 41:16
48:7 57:15
61:22 62:12,15
65:5 75:21 87:9
123:12,15
124:21 131:7
163:11
**double** 51:14
60:6
**download** 47:6
**dr** 12:18 18:18
18:19,24,25
24:3 27:20 29:4
29:7,11 34:1,2
34:3,14 36:9
47:1 48:21
58:17 69:20
84:2,9,14 85:3
85:15 90:10
106:7 110:25
113:2 123:17
131:18,21
144:18 149:16
150:3 151:24
158:4 169:5
170:11,20
171:4 172:24
173:19,25

**[dr - dubois]**                                                                  Page 12

| | | | |
|---|---|---|---|
| 174:20,23 | 63:23 64:3,20 | 107:11,15 | 142:6,20,23 |
| 176:12 | 65:14,16 66:2,9 | 108:6,13,16 | 143:2,6,10 |
| **drawing**  85:24 | 66:23 67:1,6,10 | 109:10,15,18 | 144:1 145:3,16 |
| **drew**  2:15 | 67:23 68:2,15 | 110:2,7,11,15 | 146:10 147:17 |
| **drinker**  3:19 | 68:19,22 69:5 | 111:4 112:4,13 | 147:23 148:4,7 |
| **drive**  3:20 | 69:14,24 70:4,8 | 112:16,17 | 148:23 149:5 |
| **dubin**  3:13 5:4 | 71:6,10,19,22 | 113:6 114:5,8 | 149:13 150:4 |
| 7:21 8:5,9 | 72:9 73:6 74:11 | 114:22,23 | 150:10,13,23 |
| 11:21 12:13 | 74:15 75:11,22 | 115:6,14,22 | 153:19,22 |
| 13:23 14:19 | 76:1,4,17,18 | 116:7,21 117:2 | 154:11,23 |
| 17:16,20,22 | 77:9,10,25 | 117:14,16,25 | 155:6,7,15,20 |
| 18:6 19:20 20:6 | 78:10,18 79:9 | 118:7,17,24 | 156:8,15,20 |
| 21:1,9,12 22:21 | 79:12,19 80:14 | 119:10,17,24 | 157:3,5,16,18 |
| 23:7,15,18 24:5 | 81:4,9,16,20 | 120:12,20 | 157:23,24 |
| 24:12,17 25:3 | 82:11,19,23 | 121:9,23 | 159:1 160:1,8 |
| 25:13,20 26:8 | 83:4,12,19,23 | 122:12,18 | 160:21 161:17 |
| 26:23 27:6,17 | 84:22 85:1,5,18 | 123:3,16,21,25 | 161:21 162:4 |
| 27:22 28:2,7,10 | 86:10,11,17 | 124:3,4,16,25 | 162:14 163:7,9 |
| 29:18 31:2,5,8 | 87:7,10,17,20 | 125:7,15 126:7 | 164:8,15 165:5 |
| 31:10,10,12,16 | 88:11,21 89:14 | 126:22 127:4,6 | 165:17,20 |
| 32:2 34:7,8,9 | 89:24 90:6,19 | 127:13,19,23 | 166:3,7,21 |
| 36:22 37:12 | 90:23 91:13,19 | 128:2,10,12 | 167:14,23 |
| 38:16 39:14 | 91:23 92:12,19 | 129:3,17 130:2 | 168:10 169:3,8 |
| 40:5 41:15 42:7 | 92:24 93:12,16 | 130:6,7,22 | 169:12,17,21 |
| 43:2 44:5 45:11 | 93:18 94:2,4,18 | 131:7,17 132:1 | 170:2,10,20 |
| 45:16 46:7,12 | 94:25 95:10,16 | 132:10,13,24 | 171:2,9,12,19 |
| 47:3,7,10,22 | 96:2,15,20 97:2 | 133:4,17,18 | 172:6,10,13 |
| 48:4,9,13 49:21 | 97:7,14,18 98:2 | 134:6,15,18,20 | 173:1,4,20 |
| 50:10 51:3,19 | 98:4,17,24 99:7 | 135:1,10,19 | 174:2,22 176:4 |
| 52:17,20 53:17 | 99:12,16,20 | 136:16,19 | 176:11,21 |
| 53:19 54:4,16 | 100:1,3,16 | 137:1,5,12,24 | 177:1,5,17,18 |
| 54:25 55:5,16 | 101:1,21 | 138:16,19,23 | 178:2,10,19 |
| 56:1,4,21 57:2 | 102:17 103:2 | 139:3,6,8,9,17 | 179:4,8,12 |
| 57:13,16,23,25 | 103:16,24 | 139:19 140:2 | 180:5 |
| 58:2,10,23 59:9 | 105:2,5,23 | 140:11,12 | **dubois**  17:15 |
| 59:11 60:5,11 | 106:9,15,21,24 | 141:1,3,6,14,23 | |

**due** 51:14
170:17
**duly** 7:19
**duplicated**
35:24
**dusty** 176:14
**duties** 11:8

**e**

**e** 5:1,8 6:16
45:5 181:1,1
**eagles** 131:22
**earlier** 133:1
**early** 23:2,23
61:9
**easier** 52:18
98:10
**easy** 43:25
**edge** 50:1 54:24
80:5 99:15
100:13,18
103:8 115:13
118:1,8,20
119:2,12
120:15 122:1
128:16,17
129:7 130:23
132:18 136:2
136:22 138:8
139:22 140:5
143:12 144:6,8
144:18,21,24
168:4,12,14
**edges** 56:19
80:3 81:2,5,12
100:9,20

102:10,13
109:8 115:13
122:15 129:11
129:18,19
130:9 136:2,7,8
139:11
**effect** 80:6
90:25 91:7 98:6
119:2 120:25
121:15,19
**effects** 118:2,9
118:20 119:12
120:16 122:1
130:24 132:18
136:2,22 138:8
140:5 143:12
144:6 168:12
**effort** 158:4
**either** 29:24
158:11
**electron** 11:14
**elongated**
154:15 160:22
162:7
**elongation**
49:16,20
**else's** 41:21,22
**eludwig** 2:5
**employed** 17:6
**employee** 9:10
19:6,16
**employment**
8:4 9:15
**encourage**
164:23

**ended** 38:10
**ends** 153:14
**engineering**
8:19
**entire** 32:12,15
38:8 81:22
106:11 170:4
**entirely** 115:16
**entitled** 22:17
22:24 84:9
**equipment**
66:17
**eric** 2:2
**errata** 183:1
**especially**
114:3
**esquire** 2:2,9
2:15,15 3:2,7
3:13,13,14,19
**essence** 36:7
**essentially**
111:15 126:24
**established**
54:12
**et** 86:8
**everybody**
38:17
**evidence**
138:15 155:18
174:17 181:5
**exact** 12:17
39:3 41:17
121:19
**exactly** 15:18
17:7 21:18 54:2
78:3 87:5

104:15 124:19
137:23
**exam** 53:13
**examination**
25:14 32:19
51:23 111:1
120:11 181:3
**examine** 15:9
15:16 37:15
**examined** 7:19
14:9 29:11 34:3
34:3 110:24
**examining**
13:10 15:25
107:2 155:25
156:3
**example** 64:9
64:10,24 89:15
138:7 150:16
**except** 182:5
**exception** 42:20
**excerpt** 106:7,9
**excerpts** 142:12
**excuse** 24:3
81:6 98:19
107:20 110:25
120:7 137:20
152:24
**excused** 180:10
**executive** 3:8
**exhibit** 7:25 8:7
19:21,25 20:4
22:16,19 35:23
41:25 42:14,17
44:21 45:12
46:9,10 47:4

[exhibit - figure]

52:16 55:11,13
58:11,12 64:12
64:13,18 68:16
68:21,22 69:3
69:23,25 70:3,4
70:6,24 71:18
74:11,13 75:15
75:17,24,24
76:1,2,9,21
81:17,18 82:4
82:13,17,20
83:2,3,6,7,13
83:15,18,18,21
86:14 87:18
91:15,17 105:1
105:3,25 106:2
106:11,20,20
107:22 108:5,7
108:14 109:25
110:8,12,13
127:16,22,25
134:16,24
137:2,3 142:16
147:18,21
164:11,12,13
164:20 169:13
169:15 170:3
176:19 178:3,6
178:9,17
**exhibits** 33:8
42:23 44:21
47:8 104:23
107:4 143:8
**expected** 90:24
91:7

**experience**
10:24 15:20
56:10 126:15
126:19 136:21
136:22 137:14
137:15 140:13
147:15 152:21
153:6,11,13
155:25 159:14
162:3,16
**expert** 20:25
29:3,5 33:13,21
33:22 44:22
53:5,9 54:10
57:12,22 65:24
69:10 71:4
72:24 75:8
77:23 79:1 82:2
82:8 84:19 86:7
86:9 91:10 95:7
97:12 98:20
102:24 103:11
109:25 111:3,6
111:14,21
112:11 119:6,7
119:22 124:8
124:13 126:4
129:24 131:3
137:17 140:24
148:12,20
149:22 154:19
158:23 159:24
162:10 163:3
167:10
**experts** 42:21
42:22 81:14

**explain** 12:14
38:17
**explanation**
154:25
**expression**
51:13
**extent** 117:18
**extra** 94:11
**eye** 125:22
**eyepiece** 62:16

**f**

**f** 181:1
**facing** 28:25
**fact** 15:20
20:23 29:2
103:5 109:11
111:2,6,22
112:20 116:14
132:16 138:10
**facts** 138:14
**factually**
112:20
**faegre** 3:19
**faegredrinker...**
3:21
**fair** 25:8 30:8
34:24 35:2
39:25 40:7,17
67:14 175:17
**fairly** 9:4
**familiar** 35:8
72:18,18,20
74:16,19 75:4
103:5 105:23
129:8 132:16

138:4,10
139:10 152:16
162:5
**familiarizing**
163:21
**far** 55:22
**fast** 49:5
**fda** 20:18 21:7
21:21 22:23
38:21 39:2
**february** 5:11
5:12,16 6:3 9:9
20:2 22:16
23:15 33:22
34:10 64:15
**feel** 38:18 154:6
161:6
**feeling** 42:15
**feet** 118:4
134:4
**felt** 32:15 94:22
**fiber** 152:4
154:15 162:7
**fibrous** 21:25
22:4 154:9
160:19 161:4,7
161:14,22
**fibrousity**
120:4 144:16
**field** 62:10
144:12
**fifteen** 91:20
134:4
**figure** 48:16
105:12

**[figured - further]**                                                                Page 15

| | | | |
|---|---|---|---|
| **figured** 113:10 | **finished** 17:17 | 129:13,13 | 135:16 136:11 |
| **filter** 62:25 | 25:7 81:8 97:6 | 130:10,12,16 | 137:9 146:8 |
| 63:1,6,11,14 | 100:15 101:20 | 130:25 144:14 | 147:12 156:13 |
| 65:7,20 66:10 | 120:8 145:2 | **focused** 144:8 | 160:5,17 162:1 |
| 66:13 67:3 68:4 | **firm** 8:19 31:11 | **follow** 13:17 | 166:14,16 |
| 68:5,14 69:7 | **first** 7:19,24 | 33:12 126:13 | 177:15 178:24 |
| 74:6,8,21,22 | 13:14 14:13,20 | **followed** 33:15 | **formal** 10:13 |
| 75:1 | 15:6,16 19:23 | **following** | **forms** 46:6 |
| **filters** 62:25 | 20:10 23:6 | 113:21 | **formula** 150:24 |
| 65:9 66:5 72:22 | 33:20 36:1 | **follows** 7:20 | 151:15 |
| 74:5 | 37:14,18,20,25 | 29:23 | **formulated** |
| **find** 14:2 19:24 | 40:2 47:14,16 | **foregoing** | 162:17 |
| 39:10 45:2 | 50:17 57:1 | 181:17 182:1 | **forth** 35:18,25 |
| 107:19 115:12 | 58:14,17 60:12 | **form** 11:20 | 41:5 94:1 |
| 161:2,6 165:23 | 70:16 73:9 90:1 | 12:9 13:19 18:4 | **forward** 22:14 |
| 166:11 170:1 | 92:22 93:9 | 20:21 21:8 | 34:22 |
| **finding** 20:19 | 107:24 111:4 | 46:24 50:7,23 | **found** 39:11 |
| 21:21 22:23 | 144:15 146:17 | 51:16 53:16 | 45:1 |
| 39:3 90:15 | 155:22 156:2 | 54:21 55:3 | **foundation** |
| 159:19 171:5 | 158:5,8 160:23 | 56:16 57:7 | 40:1 53:18 |
| **findings** 124:10 | 164:20 169:25 | 63:17,22 65:22 | **four** 40:9 75:22 |
| 170:13 171:6 | **firsthand** 36:16 | 65:24 72:24 | **fraction** 52:23 |
| **finds** 38:21 | **five** 40:9 91:8 | 80:10,24 82:1 | **free** 154:6 |
| **fine** 10:17 | 158:14,15 | 84:16,18 88:18 | **front** 35:20 |
| 17:21 25:17 | **flakes** 154:10 | 89:8,10,22 | 42:14 92:22 |
| 28:7 57:23 | **flat** 56:12 | 94:16,17,21 | 108:11 123:22 |
| 68:11 79:18 | **flip** 93:19 94:2 | 95:5 96:12 | 169:22 |
| 83:14 108:13 | **floor** 3:15 16:2 | 102:15 109:6 | **full** 9:10 23:9 |
| 132:24 133:1 | 16:7,18,22,25 | 109:23 115:9 | 29:11 73:12 |
| 138:3 150:10 | **florham** 3:20 | 115:20 116:6 | 83:8 144:12 |
| 157:19 | **fly** 124:12,22 | 118:22 119:6 | 170:4 |
| **fingertips** | 126:4 136:14 | 124:8 126:20 | **fully** 39:20 |
| 44:23 | **focus** 68:8,10 | 128:24 129:1 | 181:6 |
| **finish** 25:7 | 68:11 99:2 | 129:15,23 | **fulsome** 43:22 |
| 112:6,7 172:20 | 118:18 122:3 | 130:18 131:3 | **further** 9:21 |
| | 122:10 129:5,6 | 133:14,23 | 53:18 143:20 |

180:3

**g**

**ga** 2:4
**game** 39:25
   175:17
**gamma** 49:6,7
   49:13 51:1,25
   52:7 152:9
   153:1
**gas** 9:6
**general** 11:8
**generally** 50:5
   152:3,8 153:15
   158:12 159:12
**georgia** 1:13
   8:20
**gerel** 3:2
**gericke** 1:15
   181:14
**getting** 71:3
   139:23
**give** 19:18 30:6
   69:1 111:21
   122:20,24
   123:2 125:8
   142:19
**given** 16:16
   105:15 109:20
   182:2
**gives** 152:5
**giving** 25:9
   66:20
**glass** 101:15,16
   102:1,10 103:6
   137:6,6,13

139:22 140:14
140:19
**go** 10:4 19:3
   22:14 23:19
   25:2,21,25
   26:12 28:4,4,9
   28:10 32:1,14
   34:21,22 35:4
   36:19 37:16
   38:17 39:25
   40:16 51:4
   52:14 59:2,4
   64:11,22 68:24
   76:19,22 79:14
   80:5 81:10
   85:24 87:22
   88:5 92:1,22
   93:8 94:1 95:2
   96:7 99:24
   101:6,22
   104:17 108:3
   110:7 114:6,20
   114:24 127:7
   127:13 132:10
   133:2 136:5
   137:20 141:25
   144:16 146:16
   146:17,17
   153:19,20
   161:8 162:20
   169:25 174:12
   175:4,7 176:22
   179:14
**goes** 21:3 78:24
   82:2 150:19
   163:3

**going** 7:24
   19:20 21:5,7
   23:7 24:19,24
   26:3,6,8,20
   27:2,12 29:14
   30:15 32:8,10
   33:8 37:4,23
   38:3,4,13,20
   39:1 40:22
   43:19 44:1
   53:20 58:5,18
   58:23 59:1
   63:21 64:23
   69:1 70:25 71:1
   71:8,23 72:3,7
   75:13 77:22
   79:4 82:19 83:2
   83:3,7 85:23
   91:9,20,25 92:8
   92:19 95:14
   96:13,22 97:3
   103:14 104:21
   107:16,18
   108:1,4 112:9
   113:14 119:8
   124:18 126:16
   134:19 137:25
   148:21 150:2,4
   150:5 156:18
   157:6,7,8
   161:13,14
   162:16,20,21
   162:21 165:1
   172:3,4 174:6
   174:10,10,11
   174:11 175:2,3

175:6,8,11
176:1,4,12,18
176:22,23
177:15 178:23
179:13,14,19
**gold** 152:25
   153:4,9,12
   155:9,24
**golden** 80:2
   93:24 94:6 95:3
   96:9 97:22
   159:16,19
   160:3,10,13
   161:13
**golkow** 7:4
**good** 7:22,23
**goodness** 78:18
**gotten** 75:16
**granted** 35:9
**graphics** 62:22
**great** 92:11
**ground** 36:20
**guarantee**
   114:1
**guess** 24:15
   44:15 64:22
   82:4 91:15
   106:2 142:16
   147:19 169:14
**guys** 25:20 27:7
   114:12 141:24
   179:23

**h**

**h** 5:8

**[handcuffed - illumination]**                                    Page 17

| | | | |
|---|---|---|---|
| **handcuffed** 179:22 | **henrich** 3:7 | **higher** 49:13 88:5 | **identification** 8:8 20:5 22:20 |
| **handing** 118:5 | **hereon** 182:5 | **highest** 50:13 | 46:11 58:13 |
| **handy** 104:12 151:1 | **herewith** 182:7 | 50:16,18,22 51:1 52:2,8,10 | 64:19 69:4 70:7 74:14 76:3 |
| **happen** 25:1 | **hess** 1:11 5:3,10 5:14,19,20,21 | 61:25 | 81:19 83:22 |
| **happening** 24:24 26:11 155:3 | 5:22 6:5,7,8,9 6:12,18 7:9,18 | **highlight** 24:1 | 84:10 87:19 91:18 105:4 |
| **happens** 138:11 | 7:22 20:22 24:4 28:19,21 29:2 | **highlighted** 40:14 | 108:15 110:14 128:1 134:25 |
| **happy** 26:2 64:9 | 29:10 30:16 31:14,19 33:15 | **highly** 174:12 | 137:4 143:9 |
| **hard** 25:16 48:2 | 34:19 35:10 | **hill** 3:9 | 147:22 164:14 |
| **harris** 3:7 | 36:4,7,11,13,15 36:18 37:9 | **historical** 22:25 23:1,21 33:23 | 169:16 170:22 176:20 178:7 |
| **head** 50:9 104:16 | 38:13 44:1 46:8 48:12 53:7 54:8 | 163:23 164:3 164:10 | **identified** 58:21 67:18 99:1 |
| **hear** 67:12 81:7 95:24 113:20 | 68:25 70:1 72:25 74:12 | **history** 15:25 | 163:12 |
| 154:4 172:17 173:17,18 | 75:14 76:12,15 77:4,8 79:21 | **hold** 60:9 | **identifies** 176:15 |
| 178:13 | 81:17 86:4 | **honor** 29:23 31:3 33:11 | **identify** 16:6,24 |
| **heard** 10:9 127:5 | 102:20 103:12 107:24 108:10 | 38:10,16 39:16 43:3 44:6 45:9 | 46:5 58:24 59:4 159:3,8 168:16 |
| **hearing** 33:25 34:4 86:21 | 110:25 111:19 111:25 113:15 | **hope** 37:11 | **identifying** 53:21,23 54:17 |
| **hearings** 131:21 | 118:4,15 119:11 126:10 | **hopefully** 38:15 | 167:3 |
| **hearsay** 20:25 | 143:12,19 144:2 149:7,15 | **hour** 91:20 | **ii** 3:13 |
| **held** 7:6 8:14 10:6 45:13 | 150:14 173:21 174:18 175:11 | **hourly** 19:7 | **illuminated** 62:2 |
| 92:16 142:3 176:8 | 178:13 180:4 181:3 182:9 | **huh** 157:23 | **illumination** 61:12,17,21,25 |
| **help** 134:16 | **hi** 7:22 | **hungry** 141:22 | 62:4,5 72:2 |
| **helpful** 83:10 | **high** 150:17 | **hynes** 3:13 | 73:9,12,14 86:12 87:25 |
| **helps** 37:11 | | **hypothetical** 113:5 | 88:2 90:1 |
| | | **i** | 144:12 146:14 148:24 149:3 |
| | | **idea** 8:23 9:1,2 158:2 172:11 172:22,25 | |

149:20,24
150:18 177:20
**image**   6:10,13
6:14,15 46:14
58:6,11 59:12
60:9,12 62:2
64:14,22 65:3
68:3,13 69:8
70:9,10,19
76:23 80:16
87:23 88:2,20
88:23 89:19
92:3,23 93:8,21
93:22,23,25
94:6,23 95:3,4
96:8,10 97:10
97:20 98:6
117:18,21
123:14,16,19
125:3,5,8
126:13,25
130:14 136:6,6
136:23 138:9
146:17,25
147:2,3,9 148:1
148:17 149:3
149:15 153:20
153:24 154:1
157:16 160:2
168:17,19
169:20 170:9
170:25 171:4
172:8,23,24
173:24 174:14
176:23 177:2,6
177:19

**images**   44:12
44:13 60:13
70:14 71:13
72:3,10,11,16
76:5,7 79:21
81:21,25 84:5
88:14 89:6
95:12,19 96:21
97:15,23
110:25 137:12
146:21 147:25
148:8,16
149:19 150:15
160:9,24 161:1
161:5,8 168:23
169:1,4 170:11
170:21 171:13
171:16,25
173:6,9,11,21
174:3,4,5,8,23
174:25 175:12
176:15 177:7
177:22 178:21
**imaging**   160:24
**imerys**   23:1,21
**immaterial**
131:25
**immersion**
105:8
**impact**   95:18
**important**   62:8
131:12
**improper**   24:18
40:3 174:13
179:19

**impurities**
177:13
**inappropriate**
111:1
**inaudible**   24:12
25:13 47:2 79:9
100:12 107:8
134:2 154:2
169:23 171:9
172:13,14
173:1 178:11
**include**   56:23
57:5,17
**included**   60:8
**including**   35:1
46:23 110:24
**incomplete**
110:23 113:5
**incorporate**
150:2
**incorporated**
171:17
**incorporating**
149:10
**incorrect**
175:21
**independently**
116:1,13
**index**   6:1 15:9
21:24 48:20
49:3,7,8,13,14
49:23 50:4,18
50:22 51:7,14
52:11 56:6,14
98:7 101:25
102:2 103:7,9

104:4,5,9,19
109:20 118:25
119:3 120:6,14
122:6,14 123:7
127:10 135:3
135:12 137:7
138:6 139:21
154:14,16
**indicated**   15:19
83:24 85:2
**indicates**
144:21
**indicating**
24:14
**indices**   50:14
50:14,16 51:24
52:2,8 98:11
158:21 162:6
164:17
**individual**
17:23 21:4
61:14 173:6
**industrial**
14:10,16,23
15:2,5,11
**infamous**   28:19
**information**
104:11 135:18
**initially**   60:17
101:14 144:9
**inquire**   34:25
**inquiry**   33:4
**inspected**
183:20
**instance**   33:15

[instruct - johnson]                                                                 Page 19

**instruct** 43:20
54:13,14 55:19
57:10 65:25
67:11 71:1,9
72:3 73:3 75:12
78:8 79:4 85:13
95:8 96:22 98:1
98:22 103:13
103:15 113:15
119:8 129:2
136:13 143:25
148:21 150:3,5
150:6,8 154:22
157:11,13
158:24 159:23
162:13 164:24
167:12 171:21
175:3,14,25
176:2 177:15
**instructed** 60:3
69:12 71:5
87:12 97:16
111:19,21
125:1 176:24
176:25
**instructing**
55:24 59:25
66:2,6,14,23
67:3 69:14,16
71:7,19 73:4
75:8 76:15 78:5
78:11,22 82:7
84:22,24 85:20
86:1 91:11
95:10,17,20
96:16 98:2

110:2,4 112:4
112:12,14
113:13,17
114:12 124:16
124:19 126:5
127:2 130:2,4
136:16 137:22
139:3 141:3
149:11 155:1,3
165:4 167:15
167:21 179:4
**instruction**
85:22 138:20
138:22 139:16
139:25 140:8
141:12
**instructions**
179:18
**intense** 90:12
**interest** 161:2
**interface** 50:2
52:25
**interior** 115:11
168:17
**internal** 19:25
64:13 86:15
**interpret**
114:19
**interrupted**
169:9
**interrupting**
97:8
**invite** 29:1
**involve** 175:19
**involved** 12:1,5
12:15 13:9,15

14:7,14,21
34:19,24 35:1
102:21
**involvement**
29:8 36:5 79:11
**involving** 33:22
34:16
**irrespective**
14:15,22 15:10
**iso** 72:19
109:20 112:1
163:18
**isolation** 57:21
**issue** 28:25
33:21,24 34:11
35:25 40:19
41:3 42:24 43:1
43:25 44:20
54:5 59:18
63:22,24,25
67:18 70:17,18
76:10 78:1 86:3
95:19 157:9
170:7 171:11
171:12 174:21
**issued** 19:24
22:15,22 34:5
166:10
**issues** 20:25,25
35:8

| **j** |
| --- |

**j&j** 23:20
**j3** 5:23
**jake** 3:14 8:5
24:5 47:7,22

52:19 70:5
71:23,25 72:7
82:15 90:7
93:13 99:9
109:17 125:7
127:14 143:4
164:8
**jersey** 1:2,16
31:24
**jessica** 1:14
172:19 178:16
181:14
**job** 11:8
**joel** 4:3 28:16
**johnson** 1:3,3
3:17,17,22,22
7:8,8 20:11,11
20:20,20 21:20
21:20 22:25,25
37:15,15,21,21
38:22,23 53:21
53:22,23,23
54:18,18 60:19
60:19 63:15,15
64:15,16 65:6,6
81:14,14
110:19,19
141:17,18
143:14,14
144:4,4 156:3,3
156:10,10,22
156:23 160:7,7
165:8,8,24,24
166:11,12
167:3,3,25
168:1,19,19

**[johnson - leigh]**                                      Page 20

171:6,7 172:1,2
173:16,16
175:13,13
176:14,14
**join**  57:24 71:1
75:10 76:13
82:10 85:17
98:21 116:18
119:21 130:19
139:7,18 140:1
141:2,13
143:24 154:21
158:25 159:25
162:12 165:18
167:12 176:2
178:1
**joined**  8:10
**joint**  16:1,7,13
16:18
**judge**  27:5,14
28:1,2,3,6,24
31:21 33:18
34:3 37:1 45:10
54:11 55:24
66:22 67:8
69:13 71:5 79:7
87:6 112:8
124:23 163:5
165:3 175:7,16
180:2
**judge's**  59:24
**judgment**
47:17,21 48:15
**july**  1:8 5:24
7:5 181:8 182:2

**jump**  35:7
132:4

**k**

**k**  3:3
**kayme**  176:13
**keep**  45:11 74:1
87:9 124:2
137:25 151:1
151:17 162:21
**keester**  3:14
48:1 67:21
75:20 93:14
99:10 110:9
125:10 132:4
134:12 142:21
143:5 169:24
**kept**  73:17
**kevin**  3:13
**kind**  38:7 118:1
118:8 132:18
138:25
**king**  3:12 31:12
**knob**  68:11
73:11
**know**  8:21
11:17 16:9,17
17:7,19 20:7
21:1 24:4 26:22
29:2 32:1,23
33:19,19 38:15
40:7,10,13,20
40:24 42:1,15
42:19 43:23
44:4 46:13 49:7
52:14,21 60:1

63:13 65:19
68:3 72:7,21
74:24 76:5 77:5
90:4 94:8 99:8
101:13 102:18
103:17,22
104:8 105:6
111:23 114:18
123:11,14,20
127:7,9,11
129:4,5 130:23
131:1 132:25
133:7,8,11
135:2,20
138:17,24
139:1,14
140:21 141:7
157:20 163:17
165:6 173:2
179:13
**knowing**
171:11
**knowledge**
10:15 18:7
36:16 162:16
173:23 175:20
182:4
**knows**  143:21
149:2
**kohler**  62:4
**kslaw.com**  3:16
**kyle**  2:2

**l**

**l**  3:7

**la**  4:4 7:3
**lab**  29:4 39:19
101:12 105:7
113:10
**laboratory**
151:5
**lack**  84:6
**lamp**  61:18
73:11 94:10,12
94:13 144:12
**large**  56:7
123:5
**lasted**  46:2
**law**  8:15,17,21
**law.com**  3:10
**lay**  40:1 53:17
**lead**  18:2
**leads**  37:25
51:23
**leave**  35:9
71:23 92:5
**leaving**  9:10
**left**  110:18
112:22 123:6
125:24
**legal**  8:25
**legitimate**  33:3
171:24
**leica**  61:3,5
64:6 73:7,10,22
74:4,17,25 89:2
89:3,5,20 93:3
146:20 147:8
147:24
**leigh**  2:9

**leigh.odell** 2:11
**length** 49:4,5,9
**lenses** 144:11
**level** 88:4 90:15
  149:3,19,24
**levels** 166:20,23
**liability** 1:5
**light** 48:16
  49:25 52:24
  61:15 62:23
  63:5,10,14 65:7
  65:20 66:10
  67:2 68:4,14
  69:7 105:16
  108:19,23
  110:17 111:7,9
  113:11 114:10
  155:10 161:12
**lightbulbs**
  60:25
**lighter** 152:12
**lighting** 95:18
  97:21
**limited** 35:15
  36:4,11 44:20
**limits** 42:5
  43:10 172:3
**line** 28:3,3
  40:14 140:22
  141:7,15 183:3
**lined** 55:24
**lines** 40:13,14
  156:17
**list** 38:14 41:25
  42:14,24 44:21
  60:6 178:17

182:6
**listed** 183:20
**listen** 117:23
**litigation** 1:5
  7:4,7 11:19
  12:2,6,8,8,15
  13:9 14:8 33:20
**little** 8:3 17:2
  19:22 33:16
  40:13 45:24
  52:4 60:14
  61:19 87:25
  90:2 113:23
  131:8 134:19
  147:4 162:22
  168:22 169:18
**llc** 2:2
**llp** 3:2,12,19
**location** 1:12
**long** 9:5 19:17
  24:18 30:13
  44:19 45:25
  67:12 141:24
**longo** 5:18 6:16
  12:18 18:18,19
  27:20 29:4,7
  34:1,3,14 36:9
  58:17 69:20
  90:10 123:17
  131:18,21
  151:24 158:4
  170:11,20
  172:24 173:19
  174:20,23
**longo's** 29:11
  84:9 169:5

171:4 173:25
  176:12
**lonzo** 131:22
**look** 12:18,21
  13:1,4,11,17,22
  18:3 20:14,15
  21:24 24:8
  27:10 30:16
  37:21 38:25
  39:4 43:21
  46:19 50:25
  58:3 60:12,18
  64:21 74:16
  80:4,7 81:25
  86:13 89:16
  93:21 98:5
  105:14 108:17
  109:11 121:17
  125:3 126:14
  127:8 130:15
  138:5 141:22
  159:11 165:9
  167:4
**looked** 15:2
  16:13 20:10
  22:4 40:9 43:5
  76:22 93:21
  109:12 150:17
  156:21
**looking** 9:17
  13:15,25 15:21
  23:13 28:18
  37:19 42:9
  46:14 48:15
  58:6 62:13,16
  62:17 68:3

71:13 81:21
  99:22,25
  115:16 122:1
  124:6 125:6
  140:3,19 141:9
  144:18,21
  145:13,23
  152:8 153:23
  158:9 160:19
  161:4,5
**looks** 8:10 9:3
  9:18 55:11,14
  74:19 75:5
  114:2
**loss** 30:22
**lot** 72:7
**lots** 63:20
**lower** 88:20,23
**lowest** 50:14
  51:7 52:2,8,10
**ludwig** 2:2
  11:20 12:9
  13:19 17:16
  18:4,13 20:21
  21:6 24:10,13
  26:6 27:15
  45:10 46:24
  50:7,23 51:16
  53:11 54:1,14
  54:21 55:9,23
  57:8,24 59:7,22
  63:17 64:1
  65:23 66:25
  67:5,7,14 69:9
  69:16 70:25
  71:16,21 72:5

**[ludwig - mas]**                                                        Page 22

| | | | |
|---|---|---|---|
| 73:4 75:7,23 | 154:21 155:5 | **main**  168:6,11 | 104:22 105:24 |
| 76:13 77:14,22 | 157:13,20 | 168:13 | 105:25 106:1 |
| 78:8,21 79:10 | 158:22 159:21 | **majority**  12:12 | 137:1 142:15 |
| 79:17 80:11 | 162:12 165:1 | **make**  7:24 | 147:18 169:8 |
| 82:1 83:6 84:17 | 165:18 166:1 | 11:24 23:12 | 169:12 170:3 |
| 84:24 85:12 | 166:13 167:12 | 33:19 43:22 | 176:12 |
| 88:6,9 89:9 | 167:21 176:1 | 46:8 47:17,20 | **marked**  8:7 |
| 90:17,22 91:9 | 177:14 178:1 | 55:17,18 58:10 | 20:4 22:19 |
| 91:19 92:10 | 178:11,15,23 | 59:17 64:13 | 46:10 52:15 |
| 94:17 95:6,13 | 179:2 | 69:25 74:11 | 58:12 64:18 |
| 95:23 96:13,19 | **lunch**  134:21 | 83:15 87:3 98:7 | 69:3 70:6 74:13 |
| 97:25 98:21 | 134:22 141:24 | 98:10 110:8 | 76:2,20 81:18 |
| 100:22 103:14 | | 112:18 117:4 | 83:13,14,21 |
| 103:21 106:4 | **m** | 118:15 122:4 | 87:18 91:17 |
| 106:12,19,22 | **m**  1:14 2:15,15 | 122:10 124:10 | 105:3 108:4,14 |
| 107:8 110:4 | 3:19 5:10 | 127:14 134:16 | 110:13 127:25 |
| 112:15 113:17 | 181:14 | 142:10 143:3 | 134:24 137:3 |
| 115:9,21 116:5 | **made**  32:12 | 144:15 145:6 | 143:8 147:21 |
| 116:18 117:12 | 35:11 48:14 | 147:7 148:20 | 164:13 169:15 |
| 117:23 119:7 | 82:2 85:15,25 | 156:18 162:22 | 176:19 178:6 |
| 119:21 121:5 | 90:3,5,9,12 | 170:3,6 174:11 | **marketing**  1:4 |
| 122:23 124:18 | 113:16 149:9 | 178:3,4 | **marking**  82:18 |
| 126:1,16 127:1 | 171:24 180:1 | **makes**  22:8 | 82:23 106:10 |
| 128:25 129:23 | **magenta**  46:19 | 52:18 | **mas**  1:3 5:11,12 |
| 130:4,19 | 52:22 53:1,3 | **making**  32:24 | 5:15,16 6:2,3 |
| 132:20 133:15 | 98:9,14,18 | 36:6,8 86:21 | 8:10 9:4,8,15 |
| 134:2,18,22 | 109:21 128:5 | 87:11 145:12 | 10:7,21,22 11:8 |
| 136:12,18 | 128:14,18 | 145:22 149:8 | 11:12,18 12:7 |
| 137:18,21 | 133:13,20 | **manual**  151:1,3 | 14:15,22 17:6 |
| 138:21 139:2,5 | 135:4,13 152:9 | 151:4,8,11 | 17:12 19:5,23 |
| 139:15,24 | 153:4 159:12 | **manuals**  151:5 | 22:17,23 27:16 |
| 140:7 141:2,5 | 159:20 165:9 | **maple**  2:16 | 29:4 38:23 |
| 141:11 143:24 | 167:6 168:2,7 | **march**  6:17 | 39:19 53:22 |
| 145:14 146:6,8 | 168:13,19 | **mark**  19:21 | 61:20 79:2 82:6 |
| 148:15 149:8 | **mail**  45:5 | 27:20 81:22 | 105:7 158:2 |
| 150:1,8 154:2,5 | | 82:13,20 91:14 | 163:23 164:3 |

164:10,16
165:7
**master** 4:3
26:21 28:15
111:23
**master's** 9:22
10:2
**match** 105:16
**material** 34:10
39:22 44:8 84:1
156:1 166:9
**materials** 2:6
16:4 18:22
32:24 85:3
134:1 151:18
171:17 173:13
**mathematics**
151:2
**matrix** 46:15
**matter** 7:7
35:14
**maximum**
51:13,20 52:3,9
88:2 89:19
177:19
**mccrone** 45:22
46:18,21 47:1,1
151:4,6,13
163:10
**mcdevitt** 3:7
**mdl** 1:3 7:7
34:13 59:18,20
59:23 69:19
73:1 164:21
170:7 171:11
171:13,16

173:25 174:19
175:19
**mdubin** 3:16
**mean** 23:7
24:10 30:23
40:3 50:15,16
51:21 52:6
67:20 87:5 97:1
134:3 146:12
148:16 161:22
166:24,25
170:18,18
172:20
**meaning** 102:5
**means** 15:8
52:3,9 103:18
181:19
**measure** 49:23
**measures** 49:24
**mediation** 45:4
**medlin** 2:2
**meet** 28:23
**mentioned**
146:14 163:15
163:18
**method** 22:3,6
22:8 35:17 36:1
36:17,24 37:4
37:15,24 39:8
42:9,25 45:1
46:5 175:20
**methodologies**
66:20,21
**methodology**
39:4 163:2

**methods** 84:10
**methvin** 2:8
**michelle** 3:2
**micron** 77:11
**microscope**
44:17 47:16
60:18 61:22
62:13,16,18
63:9,16,24 64:5
64:6 65:1 66:4
68:9 71:11,14
73:8,10,24 74:4
74:17,25 76:6
88:13 89:5 93:3
115:25 126:19
129:5 145:13
146:20 147:9
147:24 148:6
148:24,25
149:1,16,19
150:18 177:23
**microscopes**
60:15,15,25
61:3,8 90:18
**microscopist**
8:16 10:8,12,16
10:25 15:21
**microscopy**
11:9,12,14
111:8,9
**microsoft** 132:6
**miles** 2:9
**mind** 156:7
**mine** 134:12
**mineral** 49:15
49:20,23 50:3

50:19,20 51:1,8
**mineral's** 50:13
**minerals** 46:6
158:20 159:3
**minute** 128:8
171:20 176:5
**minutes** 92:9
92:10,13
**mis** 178:18
**miscounted**
83:5
**misleading**
140:10 143:22
**missed** 57:1
156:6
**misspoke** 91:6
**misstates**
116:17 117:1
119:16,20
120:19 121:7
121:21 140:9
155:18 161:20
167:10
**mode** 29:15
**model** 60:22
61:5
**moment** 28:9
59:17 69:1
77:17 96:5
121:22 127:17
132:7 142:19
**montgomery**
2:10
**morning** 7:14
7:22,23

**morton** 3:13
31:10
**morty** 23:4
25:1,6 48:1
59:15 67:17
75:20 81:6
96:25 99:17
107:20 110:9
131:4 141:21
145:2 155:14
169:24 170:18
173:18,24
**motion** 44:25
**mottled** 99:13
**mount** 89:13
**move** 23:8 98:8
125:22 142:9
**moving** 87:14
**mparfitt** 3:4
**multi** 33:20

**n**

**n** 5:1
**name** 5:2 7:3
8:22 9:1 10:11
10:12,13 85:8
90:10 151:7
171:3
**names** 16:13,15
**nanometer**
74:7 113:10
**nanometers**
108:24 114:10
**nature** 111:11
**necessarily**
123:19

**necessary**
32:16 105:25
**need** 29:16 43:4
44:16 45:5 64:8
67:12 77:3 80:4
87:12 94:1
96:17 106:10
108:9 117:12
118:14 131:12
135:18 142:9
145:23 154:6
170:1
**needed** 25:12
32:5
**needs** 25:1,2,18
26:16 27:10
58:19,21 92:6
145:12
**negative** 49:15
49:20
**neutral** 74:21
**never** 27:4
29:25 30:21
107:1 163:10
165:15
**new** 1:2,16 3:15
31:24 34:13
35:17 36:1,17
36:24 37:4,6
39:8,22 41:13
42:25 43:11,15
43:17 44:25
175:19
**night** 26:5
**nine** 67:23

**nj** 1:15 2:16 3:9
3:20 181:14
**normally** 49:10
50:25 56:8
**north** 2:3
**notary** 1:15
181:14 182:20
**noted** 7:13
182:5
**notes** 181:7
**number** 20:1
48:24 60:22
61:5 67:18
68:16 104:4,5,9
104:19 108:7
109:16,20
110:16 118:25
164:9
**numbered**
178:18
**numbers** 48:23
135:12 151:15
**numerous**
97:13
**nvlap** 158:17
179:10
**nw** 3:3
**ny** 3:15

**o**

**o'dell** 2:9 14:17
18:17 23:4,11
23:17 24:2,25
25:6,14 26:18
27:19 28:24
29:21 31:18,20

31:23 33:10
34:9 35:13
39:16 45:8 47:2
47:5 48:11 53:4
54:7 55:2 56:15
56:25 57:6,18
58:14 59:3,10
59:14 60:2
65:12,21 66:7
66:15 67:16,25
68:25 69:18
70:15 71:17
72:6,23 75:10
75:16 76:8 77:3
78:16 80:9,23
81:6 82:10,14
82:21 83:1,20
84:16,19 85:4
85:17 86:4,19
88:17 89:7,21
93:10 94:15,20
95:5 96:11,24
97:6,8 98:16,19
99:4,17,22
100:14 101:19
102:14,19
103:10,20
105:19 107:20
108:9 109:5,22
110:22 111:17
112:6,24
113:14 115:3
115:19 116:4
116:16,25
118:3,14,21
119:5,15,19,22

[o'dell - observations]                                        Page 25

| | | | |
|---|---|---|---|
| 120:7,18 121:4 | 173:22 174:16 | **objected**   32:22 | 129:23 131:2 |
| 121:7,20 122:8 | 175:16 177:24 | 82:25 | 132:15 133:14 |
| 122:17 123:9 | 178:8,25 179:3 | **objecting**   53:15 | 133:22 135:8 |
| 124:7 125:5,14 | 179:6,25 | 95:16 96:16 | 136:10,12 |
| 128:7,23 | **oath**   7:16 | 106:13,19,23 | 137:8 138:12 |
| 129:14 130:17 | 150:15 | 126:20 162:23 | 139:2,15,24 |
| 131:2,11,24 | **object**   21:7,10 | 165:3 169:11 | 140:7 141:11 |
| 132:9 133:14 | 29:10 39:17,20 | **objection**   11:20 | 142:8 143:17 |
| 133:22 134:10 | 40:3 53:4 56:15 | 12:9 13:19 18:4 | 145:14,15 |
| 134:14 135:15 | 57:6 58:14 | 20:21 24:18 | 146:5,6,8 |
| 136:10 137:8 | 59:21 63:21 | 33:3 46:24 50:7 | 147:11 149:9 |
| 137:16,19 | 65:21,23 69:22 | 50:23 51:16 | 149:21 155:12 |
| 138:12 139:7 | 70:15,18,23 | 54:1,3,21 55:2 | 155:17 158:23 |
| 139:18 140:1,9 | 72:23 76:8,12 | 57:8 63:17 | 159:21,22 |
| 140:23 141:13 | 77:23 80:9,23 | 66:25 67:12 | 160:16 161:16 |
| 143:17 145:1 | 84:16,17 88:17 | 69:9,10 71:16 | 161:20 162:9 |
| 145:15 146:5,7 | 89:7,9,21 91:10 | 73:1 75:7 78:22 | 165:12,13,19 |
| 147:11 148:2 | 94:15,17,20 | 80:11 82:1 | 165:25 166:1 |
| 148:11 149:21 | 95:5,14 96:11 | 85:12 86:20,22 | 166:13 167:9 |
| 150:20 154:18 | 97:25 105:19 | 86:24 88:6,9 | 172:21 174:11 |
| 155:12,17 | 109:5,22 111:3 | 95:6 96:14 | 177:24 |
| 156:5,12 157:1 | 112:25 115:3 | 98:16,20 | **objectionable** |
| 157:4 158:25 | 118:21 119:5 | 102:14 103:10 | 35:5 |
| 159:25 160:4 | 124:7,15 | 103:20 106:16 | **objections** |
| 160:16 161:16 | 126:17 128:23 | 109:24 110:22 | 30:10 55:17,18 |
| 161:19,25 | 128:25 129:14 | 111:12 112:24 | 55:19,21 85:25 |
| 162:9,24 | 130:17 135:15 | 112:25 113:12 | 150:2 156:18 |
| 164:19 165:12 | 138:2 144:13 | 113:16,21 | 163:4 179:18 |
| 165:25 166:5 | 148:11,12 | 114:16,16 | 180:1 181:6 |
| 166:15 167:9 | 155:13 156:12 | 115:9,19 116:4 | **objectives** |
| 167:19 168:8 | 157:6,11 160:4 | 116:5,6,16,25 | 144:10 |
| 169:7,19 170:6 | 161:25 164:19 | 119:15,19 | **observation** |
| 170:17,24 | 164:20 166:15 | 120:18 121:4,5 | 41:13 73:23 |
| 171:8,10,18 | 177:15 178:24 | 121:20 122:8 | **observations** |
| 172:5,7,11,14 | 178:25 180:3 | 122:17 123:11 | 36:12 41:7 |
| 172:19 173:2 | | 126:1 127:1,2 | 43:14 44:2,8 |

**observed** 129:9
140:18
**obstructionists**
27:12
**obviously** 37:1
97:3 131:8
**ocular** 62:11
**offer** 41:21
86:7 97:12
**offered** 32:13
**office** 31:19
**oh** 78:18
**oil** 9:5 15:9,12
15:16 21:24
37:18 39:24
43:6 44:9 50:1
52:24 56:23
57:5 90:3,20
91:1,8 93:6
98:7,14 104:10
118:12 156:3
156:23 159:7,9
**okay** 8:13,21,24
9:3,8,14,17,24
10:17,20,23
11:7,17,24 12:5
12:24 13:3,7,24
14:4,13 15:6,19
16:24 17:10
18:9,18,22 19:1
19:8,20 20:14
21:9,16 24:17
27:6 31:22,25
45:3 46:3 47:20
48:4 49:2,6,12
50:15 51:6

52:14 55:1 59:1
59:10 60:5,15
60:24,24 61:16
61:20 62:1,8
64:21,23 65:3
67:6,25 68:1,8
68:12,22 69:24
71:6 72:14 73:7
73:21 74:4,24
75:11 76:17
78:10 79:17
80:5 81:5,16
83:19 84:8,12
85:10 86:10
87:7,15 89:2,4
89:15,25 90:24
91:13 92:3,23
93:8 95:1 97:2
97:7 98:3 99:12
99:16 102:9
106:12,24
110:7 112:13
112:16 114:5
114:13,22
117:8 121:14
123:25 124:3
124:25 125:5,7
125:14,21
127:4 130:6
132:1,9,10
135:11,24
136:5,20 139:8
139:17 140:21
141:20 143:2
144:2 146:14
146:18 149:14

151:10,14,25
152:13,18,22
153:2,7 154:14
155:6 157:3
158:8 159:15
162:14 163:7
163:20 164:8
165:6,17 170:2
171:19 172:10
177:9,12,17
179:12 180:5
**old** 37:5 43:11
43:17
**olympus** 60:18
60:20 61:13,22
62:13,24 63:11
63:16 64:4,8,25
65:10 68:9
72:11 76:6 88:5
88:13 89:1
160:11
**once** 69:10 71:3
77:23 126:2
136:14 148:19
150:1 172:17
**ones** 64:7
**open** 132:5
144:12
**operated** 61:12
**opine** 20:24
55:13 78:25
**opines** 36:14
**opinion** 29:5
36:13 37:3 53:6
53:9 54:10
57:12,22 66:20

69:11 71:4
72:24 75:8
77:24 82:8
84:20 86:8
91:10 95:7
97:12 98:20
102:24 103:11
110:1 111:3,14
111:21 112:11
119:6,8,23
120:1 124:8,13
131:3 140:25
154:19 163:3
167:11
**opinions** 41:22
162:18 174:21
179:23
**opportunity**
18:21 24:8
25:10,18 30:7
**opposed** 159:20
**option** 26:20,20
**options** 26:17
**oral** 42:2
**orange** 76:6
93:24 94:6 95:4
96:9 97:23
98:13 155:9,9
**order** 20:24
37:5,7 41:5
57:20 69:25
87:1 91:15
127:15 142:16
145:10 147:19
163:6 166:19
178:3

[ordered - period]                                                          Page 27

**ordered**  53:12
  66:22
**orient**  32:7
**original**  37:2
**originated**  8:2
**outline**  164:12
**outside**  67:8
  69:11 71:4
  76:14 82:9
**own**  19:2 41:16
  41:19

**p**

**p**  2:9
**p.c.**  2:9 3:7
**p.m.**  142:2,5
  176:7,10 180:9
  180:12
**page**  5:2,9
  23:19 24:23
  26:9 30:5 58:20
  58:24 59:2,5
  65:15 67:17,19
  67:20 68:24
  69:6 76:23
  89:16 92:2,2
  93:11,12,14
  99:5,7,19 125:6
  125:8,10,11,12
  134:11,12,13
  144:19,19,20
  144:22,25,25
  169:25 177:3
  183:3
**pale**  125:20
  153:15,17,25

161:15
**paper**  144:18
**papers**  43:16
**parallel**  46:19
  49:11 52:22
  53:25 54:20
  76:25 77:20
  98:13 152:2,3
  152:20 153:2,9
  153:12 154:15
  155:23 159:13
  160:14 161:24
  162:7,8 165:9
  167:7 168:2
**parameter**
  76:14
**parameters**
  37:8,10 40:24
**pardon**  88:8
**parfitt**  3:2
**park**  3:20
**part**  9:16 23:6
  43:3 57:1 61:9
  79:1 80:2 88:20
  88:23 107:2
  116:20 151:23
  156:6 163:20
  164:1 169:5
  170:14,15
  172:2 173:7,13
  175:22
**participate**
  158:16
**particle**  50:1
  51:22 52:24
  54:24 55:4,6

57:19 62:14
  78:19 79:24,25
  80:13,22 81:1,2
  93:16 94:14
  98:12,25 104:6
  104:20 105:13
  106:17 109:4
  109:20 110:17
  112:22 113:11
  115:2,7,10,16
  116:2,14
  117:19 119:12
  120:11,14,23
  121:1,12 123:8
  123:9 124:22
  125:16,19
  126:4,23
  127:10,15
  128:4,9,11
  129:21 130:11
  130:25 133:5,6
  133:9,12,16,19
  135:3,13,22,25
  136:1 138:6
  139:14 144:5
  144:23 145:23
  159:7 168:2,5
  168:11
**particles**  54:19
  55:1 62:9 78:3
  98:8 124:10
  129:7,11
  132:19 139:12
  140:4 141:16
  143:13,21
  144:3 161:12

**particular**
  51:22 89:12
  124:9 145:22
  152:17 163:1
**parties**  7:10,12
  53:15
**parts**  62:6
  118:10
**passes**  49:25
  52:24
**path**  49:25
**paul**  1:10 5:3
  5:10 7:9,18
  24:15 28:19
  154:5 157:21
  181:3 182:9
**pause**  75:18
**pausing**  24:22
**pdf**  67:20,22
  87:22 93:11,14
  99:10,12,21,23
  125:10
**pending**  132:15
**pennsylvania**
  1:16
**percentage**
  11:18 12:6
**perform**  13:7
  63:1 140:22
**performed**
  70:12 141:15
**performing**
  11:19 45:18
  63:14
**period**  9:5,11
  40:8

[permitted - portions]                                                Page 28

**permitted**
36:19,19 37:9
78:13
**perpendicular**
51:11 89:17
152:2,11,20
159:13 165:10
167:7
**person** 28:23
39:10 174:25
175:11
**personal** 3:11
10:20 36:5,12
36:16 37:23
41:13,19 43:14
44:2,7 79:10
136:21
**personally** 20:8
33:1 102:18
**persuaded** 41:2
**ph.d.** 4:5 5:18
6:16 9:22
**phase** 11:13
**phenomena**
132:17 133:1
138:5 140:19
**phone** 27:5,14
28:1,6
**photograph**
99:15 100:19
100:25 114:18
145:8 146:3
**photographs**
145:25
**photomicrogr...**
111:25 122:11

**photomicrogr...**
35:4 149:25
**phrase** 30:10
**physical** 159:17
**physically**
31:15
**physics** 159:18
**picking** 27:2
**picture** 106:7
116:20,23
117:7,9,10
**pictures** 116:10
116:12
**piece** 113:24
114:18 139:21
**pieces** 27:2
**pile** 171:23
**place** 19:19
123:10 145:20
**placed** 179:17
**placitella** 2:14
2:15 24:7 26:19
26:25 27:13,25
28:5 29:1,19,22
31:18,23 40:6
86:23 87:8,15
106:25 107:4,6
107:9,13
113:19 114:6
114:15 117:15
123:10,18,24
124:1 130:13
135:7 141:21
155:13 168:25
169:6,10
173:17

**plaintiff** 2:13
2:18 3:5
**plaintiffs** 41:2
42:22
**plate** 56:12,13
56:14,18 74:7
123:5 125:22
125:24 126:14
154:17
**plates** 57:4
100:5,21
117:18,20,22
118:2,9,11,19
119:1,4,13
120:17 121:3
121:16,18,19
121:24 122:6
122:13 124:6
126:25 128:22
136:9,15
143:15 153:24
160:20 161:13
**please** 7:16 8:6
14:18 24:4
29:21 47:5,24
48:12 49:18
59:4 71:17 72:8
75:17 77:4,15
78:17 82:14
97:9 99:2
102:20 103:23
115:4 122:21
125:17 133:16
154:4,6 163:25
168:9 169:1,2

**plenty** 145:18
**plm** 8:16 10:8
10:12,16,24
11:4,9 12:21
13:8 14:11 15:3
15:21,25 16:6
16:25 17:4,11
17:24 18:3 19:2
19:4,24 20:11
21:25 27:22
32:9 34:16 38:4
38:24 41:19
42:8,12 45:18
58:8 61:13 62:1
62:8 79:15,15
79:21 81:13,21
84:9 103:18
126:8 158:9
159:3 163:11
169:4 177:7
179:10
**point** 13:24
16:21 20:18
21:14 38:20,21
60:17 61:2
73:18,24 74:2
85:22 90:3
122:3 123:13
150:12 156:2,9
156:25 157:25
179:13
**polarized** 111:7
111:9
**popping** 40:8
**portions** 26:3

[portis - put]                                                    Page 29

**portis** 2:9
**position** 8:14
  10:12,13,14
  30:9 75:2 172:4
  172:4,7
**positions** 10:6
**positive** 20:18
**possible** 61:15
  106:16
**powder** 1:4 7:7
  13:16 23:22
**powerpoint**
  55:14 132:8
  148:18
**poye** 81:23
**practice** 160:24
**practices** 1:5
**precisely** 35:25
  36:18
**prep** 22:3
**preparation**
  18:15 22:7,9,11
  29:8 83:25
**prepare** 18:11
  18:23
**prepared** 42:21
  47:15 54:9 79:2
  106:5
**presence** 14:10
  15:3 20:11
**present** 2:5,12
  4:2 119:13
  120:16 121:2
  129:25 143:15
**presentation**
  114:3

**presented**
  100:19,25
  131:18
**presumably**
  37:6
**pretty** 43:24
  44:2,3 123:14
**prevented**
  162:19
**previous** 147:3
  150:2 154:9
**previously** 14:9
  36:20 45:2
  109:24 164:17
**primarily** 84:4
**print** 48:2
**printed** 25:12
**prior** 14:7
  21:21 22:23
  40:1 180:3
  181:2
**probably**
  125:12 134:13
**problem** 87:16
**proceed** 27:2
  30:20 96:24
  97:5
**proceedings**
  34:12 39:21
  181:5
**process** 47:12
  101:6,13
  102:16,21
  104:17
**produce** 173:7
  173:8

**produced** 20:23
  165:23 171:15
  173:25 174:3
  174:19 175:19
**produces** 173:6
  173:11 174:4
**producing**
  149:3
**product** 22:25
**production**
  33:7
**products** 1:4,5
  3:11 15:24 16:6
**proffer** 45:12
  86:2
**proficiency**
  158:17
**program** 62:21
  72:13
**proper** 40:11
  180:1
**properties** 50:3
**property** 159:4
  159:17
**protocol** 13:17
  33:7,11
**protocols** 61:21
**provide** 85:14
**provided** 10:21
  10:22
**provides**
  170:11
**public** 1:15
  181:14 182:20
**published**
  162:5

**pull** 17:20
  22:18 25:11
  40:22 177:1
**pulling** 20:1
**pure** 62:23
**purple** 108:23
  109:4 110:20
  112:21 115:2,8
  115:17 116:2
  116:12,15,22
  116:24 117:17
  118:11 121:25
  128:5,14,18,21
  133:13,21
  135:4,14 138:9
**purpose** 39:9
  42:5 43:10,13
  53:8,10 65:19
  66:12 67:2
  69:12 124:23
  174:24
**purposes** 29:4
  72:16 87:3
  102:22 109:2
  128:3,6,14
  133:20 148:5
  148:14 162:15
  163:22
**put** 23:5 24:5
  24:21 25:8 32:6
  34:9 40:15 47:8
  47:15,15,24
  48:5 51:10
  58:20,25 64:16
  68:24 69:1
  71:17,24 72:8

**[put - record]** Page 30

75:14,18 81:16
82:14 84:5,6
86:17,19 87:1
91:24,24 92:1
92:21 108:2
109:13 114:4
114:17,17
127:24 131:5,6
131:10 132:11
134:16 142:11
142:12 143:4
176:16,18
**puts** 151:24
**putties** 16:2
**putting** 25:10
70:9

**q**

**quantitative**
51:13
**question** 14:18
16:11 17:17
24:14,20,22
25:4,24 26:11
27:1,9 32:3,17
33:6 38:9 53:5
53:16 54:15
55:20,25 57:1
58:19 66:1,8,14
67:2 69:15,17
71:8 76:16
77:15,18 78:6,9
78:17 81:3 82:3
90:18,20 91:12
95:11,18,24
96:1,3,6,17

97:11,20 98:3
103:15,21
105:20 107:12
112:19 115:5
117:24 120:24
124:17,20
126:6,20
132:15,22
146:23 147:7
148:6,12,22
149:4 155:4
156:6 157:7,15
159:11 165:3
166:6 167:22
168:9 170:19
174:7,14
178:24 179:1
**questioning**
43:19 59:21
97:4
**questions** 21:4
24:9 26:14
27:24 30:2,7,11
36:10 38:19
40:11 41:8
54:10 66:18
70:23 78:12
86:5,6 96:21
97:9 107:10,17
111:10,20
138:1 162:20
176:24
**quickly** 86:13
93:19
**quite** 35:15

**r**

**r** 181:1
**railroad** 23:1
**rails** 175:6
**raise** 112:18
**range** 35:19
56:9 98:9,18
152:9,12
**ranges** 152:23
**read** 24:23
25:21,22 26:1,9
26:13,16 28:22
32:15 96:2
182:1 183:20
**really** 32:23
38:18 41:2
43:24 67:10
141:22 146:4
171:23 174:6
**realm** 30:25
**reason** 35:9
107:21 155:8
158:19 178:18
183:3
**reasons** 110:5
176:2 183:21
**reath** 3:19
**rebutting** 42:22
**recall** 12:17
13:2,6 14:4,6
14:12,14,21,25
15:5,6,15,18,25
16:5,12,15,20
17:12 18:8 20:8
20:9,13 21:16

21:18,19 50:8
61:6,7 63:12
65:8 68:6 72:17
74:20 75:3
81:15 84:11
85:7 90:9
104:15 127:12
140:17 147:3
151:7,9,10,14
151:17 156:14
158:3,7,9,11,12
168:12,21
**receive** 19:13
19:16
**received** 8:1
179:9
**recent** 19:9
85:9
**recently** 101:23
**recess** 28:14
**recollect** 42:2
**recollection**
182:4
**record** 7:3,13
20:22 25:2,21
26:1,7,13 28:9
28:11,13,17
32:14 43:22
45:12,13,15
67:17 82:12,24
87:4,11,13
92:15,16,18
93:10 99:18
105:1 107:23
112:1 114:4
124:2 134:11

140:10 141:25
142:2,3,5 157:7
162:15 167:10
176:7,8,10,11
176:16,18
180:9
**recorded**
164:16
**red** 2:16 56:24
57:5,17 100:8
100:20 101:2
117:17 118:12
122:3,7,16
128:21 129:7
129:19 130:9
138:8 139:11
139:22
**reference** 19:25
46:16 58:15
64:13 75:5 76:7
80:7 86:15
105:22 109:13
109:19 110:20
112:22 113:1
147:2 151:18
158:1,6 162:6
165:22 166:9
167:4,8 168:23
169:1,3 170:11
170:21 171:4
171:13,14,16
171:25 172:24
173:8,10 174:3
174:4,5,8
175:12 176:15
177:2

**references**
153:8 170:13
**referred** 10:9
42:1,1,3 92:25
**referring** 38:15
42:16 58:21
77:7 108:2
**reflect** 139:12
**reflection**
103:17,25
132:17
**refracted** 21:23
**refraction**
51:15 130:25
159:6
**refractive** 15:9
48:20 49:3,6,7
49:12,14,22
50:4,13,14,16
50:18,22 51:7
51:14,24 52:2,8
52:11 56:5,13
98:7,11 101:24
102:2 103:7,9
104:4,5,9,19
109:19 118:25
119:3 120:5,14
122:5,6,14
123:7 127:10
135:2,12 137:7
138:6 139:21
154:14,16
158:21 162:6
164:17
**regarding** 36:1
42:25 43:15

86:5
**reilly** 3:7
**relate** 34:15
**related** 11:19
12:8 20:2 69:22
85:19 156:23
158:17
**relates** 12:7
23:20 53:6
57:14 174:14
**relation** 173:25
**relevant** 30:9
**relied** 174:8
**relief** 179:20
**relies** 173:14
174:20
**relying** 143:13
170:21 171:25
173:9,12
**remember**
35:17,19,22
36:25 109:15
**remote** 1:10
**remotely** 7:11
7:12 181:4
**remove** 63:7
**rendering** 29:5
**renzi** 2:15
**repeat** 14:17
49:18 56:25
60:21 78:17
103:22 115:5
122:22 154:4
168:8
**repeatedly**
86:25,25

**repeating** 156:7
**rephrase** 52:4
163:25
**replow** 34:23
**report** 5:11,12
5:15,16,23 6:2
6:3 19:23 20:2
20:3,14 22:14
22:16,17,22
24:10,23 25:23
26:1,13 27:19
30:5,17 32:6,10
32:12,15 33:2
33:21,22,24
34:2,6,23 35:2
37:13,16,17,19
38:8,24 39:2,5
39:17 40:1,4,8
40:15,15,19,20
40:23 44:10
55:10 58:7,16
58:19 59:18,23
60:1 64:2,12,23
65:4,13 67:19
69:2,20 70:17
70:21 76:10,20
79:1,14 81:22
82:5,12,18,20
83:2,5,8,18
85:7,8,9 86:13
86:14 91:15,24
92:20,21 93:1
93:20,24,25
94:5,10 95:2
99:5,23,23
106:17 114:25

116:2,20 118:5
123:22 124:11
124:14 125:11
132:11 134:11
142:13 146:16
150:17 153:21
156:21 168:16
168:20 169:19
169:22,25
170:4,4,7,8,25
171:3,21 173:7
**reported**  20:18
156:24 165:8
**reporter**  7:15
28:8 49:17
68:18,20 70:2
77:16 82:16
83:16,17 96:4
104:25 115:4
122:21 127:17
127:21 142:18
142:24 154:3
172:15,16
178:12 181:21
**reporting**  21:19
127:9 156:4,11
167:24,25
168:1,3,13
**reports**  18:24
27:16 29:6,9,12
29:23 30:3,12
34:14,18 37:25
42:17,22,23
44:22 54:5,8,17
55:7 56:3 58:1
58:3,15,16,16

59:19 60:8
63:23,25 64:4,5
78:1,12 86:3,6
95:19 96:22
140:24 143:23
146:1 148:14
149:25 151:20
162:11,18
163:1 165:22
166:10 169:5,7
170:12,22
171:4,15
173:14 174:9
174:19,24
175:18,23
**represent**  31:6
170:8
**representations**
165:14
**representative**
143:22
**represented**
10:18 117:5
145:7
**reproduction**
181:18
**request**  48:12
108:11 131:5
174:5
**requested**
173:8
**requests**  41:5
**requires**  33:7
**reread**  77:15
132:20

**research**  58:8
**resolve**  180:6
**resources**  5:23
**respect**  94:11
141:16 166:10
170:17
**respond**  11:22
21:10 31:3 54:9
97:1 102:23
111:19 115:23
116:8 117:3
119:18,25
120:21 121:10
122:19 145:17
146:11
**responding**
66:18
**response**  114:8
149:10
**restarted**  34:12
**restate**  166:5
**restrictions**
179:17
**result**  41:9,10
139:23
**results**  60:7
**resume**  5:10
7:25 9:18 17:18
**review**  18:22
18:24 19:1,3
25:19 84:3,9
85:6,11 160:25
163:23 164:1,3
**reviewed**  27:16
83:25 84:4,8,13
85:2 163:20

**ri**  105:15
108:17 127:8,8
133:7
**right**  9:6,12,22
10:2,4 11:15
12:3,22,23 14:1
17:2 22:13
26:22 31:25
35:17,19 36:22
36:23,25 47:18
48:10,17 49:22
52:11 53:25
55:11 56:1 61:3
65:17 75:4 77:9
79:16 80:17
83:24 92:12
93:6 95:4 96:10
97:15,24 98:8
98:15 100:1
102:3 105:15
107:6,16
108:23 110:21
117:22 118:2
118:12,20
119:14 127:5
128:6 129:13
129:22 133:11
136:2,9 137:7
137:18 138:7
140:11 141:23
142:7 143:3
144:7 148:5
155:11 156:25
158:21 159:13
160:3,10
163:14 167:18

**[right - seeing]**                                                    Page 33

|  |  |  |  |
|---|---|---|---|
| 169:9 177:22 | 21:21 23:2,22 | 72:25 76:14 | 174:18 |
| 178:2 180:6 | 23:22 32:7,21 | 78:4 82:9 84:20 | **see**   14:2 21:3 |
| **rigler**   27:20 | 33:23 42:24 | 85:16 101:24 | 23:9,10,14,19 |
| 29:7 34:2 | 58:8 82:5 | 102:24 103:11 | 23:25 24:2,3 |
| **rls**   1:3 | 156:22,24 | 109:9 112:2 | 25:10 32:19,20 |
| **rmh**   3:10 | **saw**   115:24 | 115:12 116:3 | 33:3 38:20 39:1 |
| **roofing**   16:2 | 128:16,17 | 117:5 120:10 | 44:16 48:8,11 |
| **rosa**   4:4 7:3 | 160:2 | 124:14,21 | 52:12 53:2 |
| **rotate**   59:12 | **saying**   11:25 | 130:21 137:20 | 58:22 59:12,15 |
| **roth**   2:14 | 21:2 52:7 | 138:13,13 | 59:16,16 62:9 |
| **round**   33:20 | 110:19 116:22 | 140:23 143:18 | 69:1 74:21 |
| 34:23 121:3 | 122:9 128:19 | 144:11 145:9 | 75:12 77:3,4 |
| **rounded**   80:16 | 136:3 153:2,5 | 145:24 146:13 | 80:15 81:2 |
| 100:4,8 117:20 | 155:21 161:18 | 147:14 148:13 | 88:19,22 89:16 |
| 117:22 118:19 | 172:24 178:17 | 149:22 154:19 | 93:23 94:5 |
| 120:16 125:22 | **says**   10:23 | 162:10 163:5 | 100:4,7,10,20 |
| 125:24 136:8 | 40:15 72:21 | 164:25 165:2 | 102:9,13 103:8 |
| **rpr**   1:15 181:14 | 144:23 | 165:15 175:24 | 104:2,3 108:10 |
| **rule**   33:14 | **scan**   144:13 | 177:16 179:7 | 108:21 109:8 |
| **ruled**   54:3 | **schneider**   4:3 | **screen**   17:18 | 115:17 117:5 |
| 111:23 | 28:16,24 54:11 | 23:5 25:9 47:23 | 117:17,19,20 |
| **ruling**   34:5 | 66:22 112:8 | 47:24 48:6,8 | 118:1,6,8,10,19 |
| 43:9,18,22 | 175:16 | 62:17 67:19 | 120:10,22 |
| 156:16 180:3 | **schneider's** | 69:2 79:1 82:15 | 121:1,18,18 |
| **s** | 163:5 180:2 | 99:6 117:6 | 125:21,25 |
| **s**   5:8 | **science**   9:19 | 118:3,16 | 129:7 130:21 |
| **salaried**   19:6 | **scientific**   153:8 | 122:11 123:13 | 131:12 135:6 |
| 19:10,16 | **scientifically** | 137:11 145:9 | 136:7 138:4,7 |
| **sales**   1:4 | 113:12 | 146:13 148:3 | 142:7 144:16 |
| **sample**   13:10 | **scope**   29:11 | 148:10 172:9 | 146:2 147:10 |
| 53:8 145:19 | 33:4 53:14 | **scroll**   104:2 | 148:9 153:24 |
| **samples**   11:1,3 | 54:11 55:23 | **second**   22:17 | 157:21 159:12 |
| 11:3,6 12:19,22 | 57:20,21 59:24 | 22:18 31:4 36:3 | 168:4,6 171:23 |
| 13:12,16 14:1 | 62:3,6 63:22 | 58:18 107:24 | **seeing**   23:6 |
| 15:14,22 16:16 | 66:21 67:8 | 125:3 131:13 | 47:18,21 59:5 |
|  | 69:11 71:4 | 146:16 153:21 | 94:24 120:2 |

**[seeing - sorry]**                                                        Page 34

| | | | |
|---|---|---|---|
| 122:2 123:14 | 167:1 | **shut** 32:22 | 6:9,12,18 46:8 |
| 130:9 131:9 | **setting** 150:18 | 44:14 174:6 | 47:15,15,24 |
| 138:9 144:6,7 | **settings** 72:15 | 179:14 | 48:2,7 52:15,18 |
| 145:7,8 148:1 | 148:25 | **shutting** 111:15 | 70:1 74:12 |
| 167:16 168:1 | **setup** 63:24 | **side** 61:14,19 | 75:14,21,23,24 |
| **seek** 179:19 | 73:8 | 73:11 131:15 | 81:17 82:15,17 |
| **seeks** 57:22 | **setups** 44:17 | **signature** | 83:3,7,12,17 |
| 98:20 103:10 | **seven** 68:18 | 181:12 183:24 | 84:6 104:24 |
| 111:2,24 | 178:10 | **signs** 144:16 | 109:13,17 |
| 119:22 124:8 | **several** 14:8 | **similar** 118:23 | 110:8 113:24 |
| 140:24 | **share** 132:5 | 154:16 | 113:25 114:2 |
| **seems** 86:24 | **sharing** 132:7 | **simple** 67:1 | 114:11 127:14 |
| 125:11 | **sharko** 3:19 | **simply** 178:17 | 127:15,24 |
| **seen** 23:6 27:3 | **sheet** 182:7 | **single** 25:4,24 | 131:4 132:5 |
| 27:4 29:25,25 | 183:1 | 26:10 27:9 32:3 | 134:16,21,23 |
| 56:11,19 81:13 | **sheets** 79:15 | 32:17 38:9 48:2 | 142:11,14 |
| 136:24 153:13 | **shining** 155:10 | 48:7 102:2 | 143:6,7 178:4,5 |
| 159:14 162:3 | 161:12 | 103:7 137:7 | **slides** 84:13 |
| 165:15 168:15 | **short** 9:5 | 138:6 152:4 | 104:22 131:9 |
| 168:17 | **show** 24:19 | **sir** 8:12 9:2,23 | 131:17 |
| **sees** 25:5 | 37:16 55:10 | 11:16 16:8 17:1 | **slip** 69:21 |
| 148:25 | 56:3 68:12 84:7 | 17:25 19:14 | **slow** 49:4,9 |
| **send** 45:5 | 102:10 104:21 | 28:20 47:19 | 59:16 |
| **sent** 16:16 | 116:12 147:17 | 49:1 61:1 74:3 | **small** 152:6 |
| 25:15 30:13 | 160:13 169:21 | 88:3 93:7 | **smaller** 118:15 |
| **separate** | **showed** 70:10 | 145:18 147:1 | **solids** 101:15 |
| 104:23 182:7 | 70:11 | 154:4 | **somebody** |
| **september** 5:15 | **showing** 48:3 | **sit** 18:21 | 36:13,14 |
| 58:7 | 159:16 | **situation** 134:4 | 101:12 |
| **services** 2:7 7:4 | **shown** 29:6 | 141:8 | **somebody's** 9:1 |
| **sessions** 18:12 | 33:9 99:6 | **six** 68:17 | **sorry** 9:24 48:1 |
| **set** 35:18,24 | 137:10 | **size** 23:9 | 51:4 59:15 63:8 |
| 41:4 60:16 | **shows** 109:1 | **skip** 44:9 | 67:24 75:20,25 |
| 61:21,24 64:3,5 | 120:4 144:20 | **sleep** 114:7,21 | 80:15 83:9 |
| 66:4 71:11,14 | **shu** 4:5 | **slide** 5:14,19,20 | 87:23 88:22 |
| 73:21 144:9 | | 5:21,22 6:5,7,8 | 90:22 91:3 92:2 |

101:19 110:9
112:7 113:6
132:4,21,23
137:21 138:18
145:4 147:6
156:15 161:19
166:22 172:15
172:20 178:4,8
**sort** 29:15 95:3
96:8 129:19
**sounds** 26:7
**source** 148:18
**spalding** 3:12
31:13
**speak** 18:14
**speaking** 24:18
55:17,21 67:12
**speaks** 24:11,15
**special** 4:3
26:21 28:15
111:23
**specific** 37:15
44:20 53:7,13
54:8 55:10
57:19 58:1,1,20
58:24 63:18
64:2 65:4,9
72:14 77:7
78:12 82:5
146:24
**specifically**
35:22 53:3
144:20,23
**spectrum** 16:3
**speculate**
102:20 117:11

**speculation**
18:5 148:16
**spend** 60:10
**spent** 11:18
**spot** 142:13
**staining** 17:24
45:19 46:5
47:13 57:4
101:7 102:6,12
103:19 120:2
126:9 137:13
139:13 144:17
152:1 158:10
158:20 159:4
163:24 164:5
178:21
**stand** 96:14
**standard** 11:5
13:12 15:13,13
110:20 112:22
152:25 163:13
163:22 164:2
167:4,8
**standards**
102:2 166:19
167:1 173:11
**standing** 78:21
**stands** 78:7
149:4
**start** 12:18
13:25 19:21
24:9 40:10
45:18 92:20
104:23
**started** 12:15
12:20 29:14

35:20 74:25
**starting** 76:23
**starts** 37:20
38:23
**stated** 46:15
97:13 110:5
144:19 162:18
176:2
**statements**
165:13
**states** 1:1
**station** 105:9
**status** 9:15
**stay** 44:6 53:15
113:22
**steering** 2:13
2:18 3:5
**stenographic**
7:13 181:7
**step** 47:14,16
48:14 83:10
**sticking** 30:4
113:25
**stop** 30:16 57:3
60:14 73:17
97:8 101:2
102:6,11
139:13 175:11
**stopped** 40:21
**straining**
157:21
**street** 2:10 3:3
**stretch** 90:13
**stricken** 37:2
**structure** 19:12
77:7 120:3

161:2
**structures**
80:16 100:4,8
136:9
**studied** 46:22
47:1
**stuff** 47:23
177:9
**stuttered** 112:7
**su** 4:5 6:6 18:24
84:2,14 105:14
105:24,25
106:1,6,7 108:2
108:7,10
149:16 150:3
**su's** 48:21
113:2 144:18
**subject** 35:14
37:5,6 38:7
42:10 59:24
85:19
**submitted**
42:18 146:1
**subscribed**
182:14
**substance**
19:22
**substantively**
32:4
**suggested**
158:5
**suggestion** 90:9
90:12
**suite** 2:3 3:8
**supervision**
181:20

**supplement**
29:20
**supplemental**
22:17
**supplied** 23:21
30:3
**supplies** 171:5
**suppose** 38:11
**supposed** 40:18
**sure** 11:24
14:20 21:2
28:10 31:5
35:16 47:7 52:6
59:17 67:14
88:23 112:18
125:18 127:19
133:17 142:10
142:20 144:15
145:6,18 147:7
164:1 170:3,7
174:2
**surrounded**
115:17
**susan** 3:19
**susan.sharko**
3:21
**suspending**
179:21
**suspicious**
144:13,15
**swearing** 115:1
115:7
**switch** 61:17
73:14 74:9,21
74:22 75:1 90:2
90:4,8 91:2,4,5

**switched** 61:2
90:21
**switches** 74:20
**switching** 90:18
90:25 91:8
**sworn** 7:12,19
181:4 182:14

**t**

**t** 5:8 181:1,1
**table** 40:4
105:21,22
106:7 107:19
113:4 152:17
**tables** 6:6 48:19
48:22 105:14
105:24 106:1,2
106:6 108:2,8
108:10 113:2
**take** 12:21
35:10 44:15
47:23 48:6 56:2
75:18 85:22
88:14 89:5 90:6
91:22 92:5,8
104:18 105:15
113:3 121:13
134:21,22
140:5 141:24
142:25 145:8
146:20 147:9
147:25 148:8
149:19 157:8
157:18 160:25
161:5 171:19
172:3,4,6 176:4

180:7
**taken** 1:13
28:16 30:8
40:13 72:10,11
76:5 88:2,25
89:19 149:15
150:17 173:21
177:19 181:7,8
**takes** 62:21
131:8
**talc** 12:19,21
14:1,9,14,22,23
14:24 15:3,9,11
15:17 20:10
21:20,25 22:4
32:21 34:15
39:4 56:6,12,12
56:14,18,23
57:4 58:5,7
70:14 75:5 76:6
76:7 80:19
100:5,20 101:3
117:17,20,22
118:2,9,11,19
119:1,4,13
120:17 121:3
121:13,16,18
121:19,24
122:6,13 123:5
124:6,9,22
125:22,24
126:3,14,25
128:22 136:9
136:14 143:15
153:11,14,17
153:24,25

154:9,10,15,15
154:16 156:10
156:23 160:3,6
160:7,9,13,19
160:19,22
161:4,7,12,14
161:22,23
162:7,7,8
**talcs** 81:23
**talcum** 1:3 7:7
13:15 23:21
**talk** 15:7 17:2
18:21 41:12
73:7 81:5,12
87:24 90:2
91:25 146:15
**talked** 15:20
**talking** 32:8
53:20 55:7
58:24 65:4
90:10 92:20
93:5 102:15
122:25 172:17
175:12 178:16
**taught** 46:17,18
**technical**
111:11,20
**tell** 8:13 15:23
26:5,15 45:24
62:2 68:4,13
69:6 70:13
71:13 126:13
130:8 149:14
171:2
**telling** 115:15
116:11 145:10

173:4
**tem** 20:19
36:21 38:3,22
**temperature**
104:11 105:6
105:10 113:3,9
159:9
**ten** 92:8,10,13
118:4 134:4
158:13 171:20
176:5
**tenuous** 30:23
**term** 104:1
**terms** 45:17
86:12
**test** 41:9,10,13
43:15 63:18
**tested** 33:23
**testified** 7:20
121:22 135:17
149:23 154:24
154:25
**testify** 36:15
44:1 66:16
174:18 181:4
**testifying** 95:14
149:18 150:15
150:19 165:13
**testimony**
65:24 82:2,9
85:16 87:22
88:1,12,16 89:4
89:18 106:13
116:17 117:1
119:16,20
120:19 121:8
121:21 126:5
131:19 138:14
143:19 146:19
147:8 148:13
148:20 149:22
155:14 158:23
159:24 161:20
162:10 174:1
**testing** 14:14,21
36:17 53:6
158:17
**tests** 35:25
36:11,21,24
37:2 38:14 39:8
39:12 41:6,25
42:4 43:1,11,12
43:25 44:20,24
63:20
**text** 35:2 45:6
**thank** 10:4
21:11 23:17
25:10 45:7,8,10
68:1 71:25
75:19 82:15
83:20 87:13
88:24 105:2
131:11 132:9
134:14 169:2,6
**thanks** 87:17
142:20 180:6
**therefor** 183:21
**thermometer**
105:8
**thing** 24:15
36:2,3 65:10
131:13 145:20
**things** 15:13
24:6,19,21
34:13,25 83:25
106:8 129:6
145:9 163:2
171:23 174:20
**think** 29:14
37:3 43:19
65:15 67:17
90:17 95:24
99:8 108:6
113:7,8 122:23
122:25 127:19
146:18 148:19
174:12 175:5
175:21 177:3
179:13,16,22
**third** 26:19,20
**thirty** 67:23
146:18
**thought** 83:4
83:13
**thoughts** 86:8
**three** 17:11
33:14
**tiles** 16:1,2,7,18
16:23,25
**time** 7:5 9:10
9:16 10:7 11:18
12:7,12,25 13:5
13:20 14:13,20
15:7,16 17:5
19:10,17 20:10
25:21,22 26:9
28:12 30:16,18
37:14,18,20,24
38:23,24 41:18
45:14 60:10
75:18 88:14
92:14,17 111:5
111:13 131:8
142:1,4 156:9
158:8 162:15
176:6,9 180:8
**times** 43:5
97:13
**tiny** 113:23
**today** 7:9 10:18
18:11 40:18
45:4 55:8 75:3
84:1 86:5 97:4
130:1 170:23
180:7
**today's** 7:5
**toes** 83:10
**together** 114:17
142:11,12
151:24
**told** 132:2
163:10
**took** 19:9 45:21
46:17 111:25
174:15,25
**top** 50:9 104:15
125:23
**topic** 38:3
142:9
**topics** 44:13
**total** 103:17,22
103:25 130:24
132:17

| | | u | unfair  30:20 |
|---|---|---|---|

**totally**  165:2
**touch**  118:16
**towards**  98:9
  123:5 125:23
**traditionally**
  21:24 22:4
**trained**  17:23
  18:3 46:1,4
**training**  18:2
  126:15 137:15
  162:17 163:11
**transcript**  6:16
  43:21 181:9,18
  182:1
**transmission**
  11:14
**treating**  109:3
  109:7 133:19
**tried**  143:11
  165:7
**true**  81:2 102:5
  102:11 138:25
  139:12 143:16
  144:2 181:9
  182:3
**trust**  60:1
**truth**  181:5
**try**  23:8 34:22
  44:14 87:2
  159:8
**trying**  24:19
  32:7 44:6 59:16
  83:9,10 87:3
  96:21 113:21
  124:1 161:11
  172:20

**tungsten**  60:25
  94:10,12,13
  97:21 155:10
  161:12
**turn**  73:16,18
  73:19,20
  169:17
**turning**  73:17
**twenty**  75:22
  142:23 178:10
**two**  22:11 26:17
  34:1 40:14
  42:17 43:5
  70:14 71:12,14
  72:2 82:4 95:12
  114:10 125:23
  178:20,21
**type**  11:11
  15:23 16:9
  21:23 62:5
  66:13 89:19
  128:21 131:20
  143:12 149:16
**types**  11:4
  15:24 16:3,9
  22:11 46:22
  129:11 136:7
  136:22 139:11
  140:18
**typically**  13:7
  13:10 17:6
  53:22 54:20
  62:15

**u**

**uh**  157:23
**ultimate**  36:8
**ultimately**
  48:23
**unclear**  76:9,11
  131:15
**under**  77:11
  126:19 148:25
  150:15 181:19
**underlying**
  29:9 34:20
**understand**
  11:25 19:23
  34:20 43:2,4,6
  44:5,9,16 47:12
  51:20 58:4
  61:11 63:8
  82:24 87:21
  96:17 104:18
  107:22 108:1
  111:5 113:7,8
  114:12 136:21
  145:11,21
  147:6 152:4,11
  157:10 179:23
**understanding**
  16:21 51:18
  57:14 63:19
  66:12,19 78:15
  81:24 95:22
  106:4 107:25
  152:14 161:10
**understood**
  83:1 90:19

**unfair**  30:20
  31:1
**unfamiliar**
  104:1
**unfortunately**
  152:5
**unique**  33:17
**united**  1:1
**unknown**
  148:18,18
**upper**  90:15
  98:11
**use**  21:24 37:17
  48:19 62:4
  69:22 70:16,19
  70:23 76:9,12
  107:1 109:17
  113:1 123:7
  141:7 145:9
  146:13 151:16
  157:25 159:2,8
  164:20 173:9
**used**  15:7,12,16
  16:22 19:17
  35:16 39:24
  45:1 48:21,24
  63:13 66:17
  68:5,14 69:7
  131:21,22
  134:1 149:24
  158:20 159:10
  166:17,18
**uses**  174:24
**using**  16:25
  25:22 37:14,24
  39:3,8 60:16,18

**[using - witness]**                                                         Page 39

62:22 65:6 66:5
66:11 68:10
72:12,22 74:18
74:25 88:13
93:5 146:20
148:4 149:17
156:3,10,23
158:5 163:22
164:2 165:21
166:8,22
171:14
**usp** 75:5
**usually** 80:13
**utilize** 46:4
54:23 144:17
**utilized** 104:12
115:11
**utilizing** 140:15
144:19

**v**

**v** 176:14
**valadez** 91:14
92:20,21 93:1
93:25 94:3 98:6
99:5,19 114:24
118:5 132:11
134:11 136:6
142:12 146:16
150:16
**valid** 113:12
**value** 122:6
127:8,10
**values** 162:6
**vanderbilt**
70:16

**variety** 11:4
**various** 46:6
96:21
**verify** 116:1,14
117:8,9 127:18
**version** 159:9
**versions** 35:24
**versus** 7:8 22:5
41:19
**video** 1:11 2:1
28:16
**videographer**
4:4 7:2,4 28:12
45:14 92:14,17
142:1,4 176:6,9
180:8
**videotaped**
1:10
**view** 62:10
107:3 152:18
155:22 159:15
160:12 179:25
**visually** 166:25

**w**

**wait** 24:23
32:19 127:4
128:7
**walk** 8:3 47:11
**want** 20:15
22:13 24:7
25:20,25 26:12
26:14 27:7,24
39:23 48:6
55:10,18,19
60:13 64:8,21

68:12 70:20
79:6 82:17 83:8
86:12 87:21,24
88:22 91:13,21
93:19 112:18
136:20,23
141:24 146:15
147:17 148:15
157:6,8 168:22
170:6 171:21
175:8
**wanted** 30:11
32:14 105:12
**wants** 26:9
138:2
**washington** 3:3
**watch** 157:21
**watching** 90:11
**wavelength**
48:16 50:25
54:23 105:16
108:19,21,23
110:16 159:8
**way** 22:3 30:20
37:18 41:17
52:12 55:22
62:4 84:6 85:25
96:25 111:8
117:9 129:10
132:6 143:20
144:8 166:18
175:6
**we've** 27:4
40:24
**wednesday** 1:8

**week** 46:2
**weeks** 18:20
**weird** 47:23
**welcome** 70:22
**went** 9:5,8
35:21 60:6
90:18
**white** 62:19,23
63:1,3,4 153:16
153:18 154:1
**wide** 56:7
**william** 5:18
6:16
**wise** 115:11
**witness** 1:12
2:5,12 5:2 7:12
7:16 12:11
13:20 20:23
25:1 26:15
27:10 28:20
29:3,24 31:1,21
32:15 33:9,13
38:19 43:20
46:25 49:19
50:8,24 51:17
54:13,15,22
55:20 56:17
59:25 71:5 72:3
78:11 80:12,25
82:7 88:8,19
89:11,23 90:8
91:11 94:22
95:17 98:22
99:13 100:24
102:25 107:2
109:7 111:2,2,6

**[witness - zoomed]**

Page 40

111:22 115:10
116:19 118:23
120:9 123:1
129:16 130:3
130:20 137:17
137:22 138:14
139:4 143:25
147:13 150:22
154:8 155:19
156:14 160:18
162:2 164:22
166:17 167:13
175:4,25 176:3
180:10
**witnesses** 86:9
107:6
**wolfson** 34:4
37:1
**word** 35:16
**words** 36:7
**work** 11:4,12
11:19 12:2,6,7
12:16 13:9 14:8
21:5 25:17
27:17,18,22
29:4,9,12 32:9
32:11 33:1 35:3
35:3 37:24 38:3
38:4 39:14,15
39:18,23 40:2
41:16,19,21,22
42:8,12 53:21
57:14 66:4
72:25 73:14
76:12 79:14
81:13 85:11,19

90:11 97:10
102:22 111:8
111:10 112:9
112:10 132:6
134:8 145:11
162:11,25
174:15 179:10
**worked** 34:19
**working** 17:12
140:13
**works** 113:8
149:2
**worry** 133:2
**wrong** 139:23
**wylie** 18:25
85:3,15

**x**

**x** 5:1,8 40:8

**y**

**yeah** 31:8 65:24
82:19 110:11
114:22 179:2
**year** 9:11 11:1
12:17
**years** 10:24
11:23 12:2 14:8
17:11 19:19
27:3 30:1 40:9
126:9 158:14
158:14
**yellow** 53:25
80:3 90:13
94:23 95:2 96:7
97:22 98:8
99:14 115:11

125:19 129:22
133:6 140:4
152:25 153:4,9
153:12,15,17
153:25 155:8
155:23 159:17
159:19 160:3
160:10,13
161:13,15,15
**yellowish** 56:20
**yellows** 94:12
98:9
**york** 3:15

**z**

**zimmerman**
20:3,3 22:15
64:11 70:11,21
76:19 79:14
93:20,24 94:5,9
95:2 96:8
153:20,21,23
160:2
**zoom** 1:11 2:1
45:7 79:25 80:1
114:3,20
123:20 124:13
125:17 132:22
133:15
**zoomed** 154:6

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

Exhibit 34



# Tabulation of Asbestos-Related Terminology

By Heather Lowers and Greg Meeker

Open-File Report 02-458

2002

This report is preliminary and has not been reviewed for conformity with U.S. Geological Survey editorial standards. Any use of trade, product, or firm names is for descriptive purposes only and does not imply endorsement by the U.S. Government.

**U.S. DEPARTMENT OF THE INTERIOR**
**U.S. GEOLOGICAL SURVEY**

**Acknowledgements**

The authors of this report would like to give special thanks to Doug Stoeser, Brad Van Gosen, and Robert Virta for their time spent reviewing this report as well as for comments and suggestions offered on how to better present the information to the reader.

**Abstract**

The term asbestos has been defined in numerous publications including many State and Federal regulations.  The definition of asbestos often varies depending on the source or publication in which it is used.  Differences in definitions also exist for the asbestos-related terms acicular, asbestiform, cleavage, cleavage fragment, fiber, fibril, fibrous, and parting. An inexperienced reader of the asbestos literature would have difficulty understanding these differences and grasping many of the subtleties that exist in the literature and regulatory language.  Disagreement among workers from the industrial, medical, mineralogical, and regulatory communities regarding these definitions has fueled debate as to their applicability to various morphological structures and chemical compositions that exist in the amphibole and serpentine groups of minerals.  This debate has significant public health, economic and legal implications.  This report summarizes asbestos-related definitions taken from a variety of academic, industrial, and regulatory sources.  This summary is by no means complete but includes the majority of significant definitions currently applied in the discipline.

**Table of Contents**

Acknowledgements . . . . . . . . . p. i

Abstract . . . . . . . . . p. ii

Introduction. . . . . . . . . . p. 1

Table 1. Acicular . . . . . . . . . p. 4

Table 2. Asbestiform . . . . . . . . p. 10

Table 3. Asbestos . . . . . . . . p. 18

Table 4. Cleavage . . . . . . . . p. 28

Table 5. Cleavage Fragment . . . . . . . p. 35

Table 6. Fiber . . . . . . . . . p. 42

Table 7. Fibril . . . . . . . . . p. 49

Table 8. Fibrous . . . . . . . . . p. 57

Table 9. Parting . . . . . . . . . p. 64

**Introduction**

Ongoing debate in the asbestos community involves a variety of issues, many of which center around nomenclature. A novice to the asbestos literature would have difficulty grasping the significance and subtleties of the many terms used to describe various asbestos-related mineralogical structures. To confound the issue, many of these terms carry different definitions, depending upon the source that is consulted. The purpose of this report is to give the user a consolidated source of the various definitions that have been put forth and are being used. This report is not intended to endorse any particular definition, but rather point out the variations, differences and inconsistencies that exist in the literature.

The tables in this report present a compilation of definitions that have been put forth by mineralogical, industrial, regulatory, and medical workers over the last thirty years for the terms acicular, asbestiform, asbestos, cleavage, cleavage fragments, fiber, fibril, fibrous, and parting. Some definitions of these terms vary from source to source simply because they are intended for specific application in analytical methods. An example is the term *fiber* that may be defined simply by length and width criteria for the purpose of structure counting. Such a definition may not be applicable to a more general use of the term and should not be broadly applied. A person choosing to read an asbestos-related document should be aware of the intent of the definition in the particular publication.

The information in this report is presented in table format. The first column in each table, headed community, will contain one of five categories: interdisciplinary, industrial, medical, mineralogical, or regulatory (including test methods) based on the discipline of the publication in which the term appears. The second heading gives the year the source was published. This allows the reader to see the evolution, if any, of the terms over the years. The third column gives the complete reference for the source indicated. The fourth column includes the definition(s) for each asbestos-related term that is defined in the source. Each table is titled by the term being defined. In all cases, the

definitions of the terms were taken word for word from the source. Comments by the authors of this report are designated by italicized text enclosed by brackets. The same source was searched for all the terms given in this report. If a term was not defined, located, or used in the source, "NA" will appear in the respective column.

This tabulation is by no means complete, but includes the spectrum of definitions given in the academic, industrial, and regulatory literature. It is clear that there is disagreement and perhaps misunderstanding regarding some of the terminology used by workers in various asbestos-related fields. It is hoped that this report will assist the reader in evaluating and understanding the thousands of asbestos-related documents in the literature. For additional perspectives of the evolution of the terms defined in this report, the reader is referred to the following sources:

> Langer, A.M., Rohl, A.N., Wolff, M., Selikoff, I.J., 1979, Asbestos, fibrous minerals and acicular cleavage fragments: Nomenclature and biological properties, *in* Lemen, R. and Dement, J.M., eds., Dust and disease: Park Forest South, Ill., Pathotox Publishers, p. 1-22.

> Zoltai, Tibor, 1978, History of asbestos-related mineralogical terminology: National Bureau of Standards Special Publication 506, p. 1-18.

> National Research Council, 1984, Asbestiform fibers-nonoccupational health risks: Washington D.C., National Academy Press, p. 25-47.

**Table 1. Acicular**

| Community | Year | Source | Acicular |
|---|---|---|---|
| Industrial | 1975 | Winson, R.W., 1975, Asbestos, *in*, Industrial minerals and rocks (nonmetallics other than fuels): New York, N.Y., American Institute of Mining, Metallurgical, and Petroleum Engineers, Inc., p. 379-425. | NA |
| Industrial | 1981 | Steel, E. and Wylie, A., 1981, Mineralogical characteristics of asbestos *in* Riordon, P.H. ed, Geology of Asbestos Deposits, Society of Mining Engineers, p. 93-100. | NA |
| Industrial | 1998 | Virta, R.L., 2002, Asbestos: U.S. Geological Survey Open File-Report 02-149, 35 p. | NA |
| Interdisciplinary | 1974 | Thompson, C.S., 1974, Discussion of the mineralogy of industrial talcs: U.S. Bureau of Mines Information Circular 8639, p. 22-42. | NA |
| Interdisciplinary | 1978 | Zoltai, Tibor, 1978, History of asbestos-related mineralogical terminology: National Bureau of Standards Special Publication 506, p. 1-18. | NA |
| Interdisciplinary | 1979 | Chatfield, E.J., 1979, Measurement of asbestos fibres in the workplace and in the general environment *in* Ledoux, R.L., Mineralogical techniques of asbestos determination: Mineralogical Association of Canada Short Course, v. 4, p. 111-157. | NA |
| Interdisciplinary | 1980 | Dixon, W.C., 1980, Applications of optical microscopy in analysis of asbestos and quartz, *chap 2 of* Dollberg, D.D. and Werstuyft, A.W., eds., Analytical techniques in occupational health chemistry: Washington, D.C., American Chemical Society, p. 13-41. | NA |
| Interdisciplinary | 1980 | Clark, R.L., 1982, MSHA standard method for fiber identification by electron microscopy: National Bureau of Standards Special Publication 619, p. 207-210. | NA |

**Table 1. Acicular**

| Community | Year | Source | Acicular |
|---|---|---|---|
| Interdisciplinary | 1980 | Lee, R.J., Kelly, J.F., and Walker, J.S., 1982, Considerations in the analysis and definition of asbestos using electron microscopy: National Bureau of Standards Special Publication 619, p. 132-137. | NA |
| Interdisciplinary | 1980 | Chatfield, E.J. and Lewis, G.M., 1980, Development and application of an analytical technique for measurement of asbestos fibers in vermiculite: Scanning Electron Microscopy, p. 329-340. | NA |
| Interdisciplinary | 1984 | National Research Council, 1984, Asbestiform fibers-nonoccupational health risks: Washington D.C., National Academy Press, p. 25-47. | ACICULAR crystals are crystals that are extremely long and thin and have a small diameter. (An acicular crystal is a special type of PRISMATIC crystal. A prismatic crystal has one elongated dimension and two other dimensions that are approximately equal.) As defined by the American Geological Institute (1980), a mineral fragment must be at least three times as long as it is wide to be called acicular. Acicular crystals or fragments are not expected the have the strength, flexibility, or other properties of asbestiform fibers. |
| Interdisciplinary | 1984 | Cossette, M., 1984, Defining asbestos particulates for monitoring purposes *in* Levadie, B. ed., Definitions for asbestos and other health-related silicates: ASTM Special Technical Publication 834, p. 5-49. | needlelike |
| Interdisciplinary | 1984 | Ross, M., Kuntze, R.A., and Clifton, R.A., 1984, A definition for asbestos *in* Levadie, B. ed., Definitions for asbestos and other health-related silicates: ASTM Special Technical Publication 834, pp.139-147. | NA |
| Interdisciplinary | 1988 | Skinner, H.C., Ross, M., and Frondel, C., 1988, Asbestos and other fibrous materials: New York, N.Y., Oxford, 204 p. | Needle-shaped or needlelike. The term is ordinarily applied in mineralogy to straight, greatly elongate, free-standing (individual) crystals bounded laterally, and terminated, by crystal faces. Aggregates of acicular crystals often occur in open, bristly groups. The aspect ratio of acicular crystals is in the same range of those of "fiber" and "fibrous", but the thickness may extend to several millimeters. |

**Table 1. Acicular**

| Community | Year | Source | Acicular |
|---|---|---|---|
| Interdisciplinary | 1990 | Mossman, B.T., Bignon, J., Corn, M., Seaton, A., and Gee, J.B.L., 1990, Asbestos-scientific developments and implications for public policy: Science, v. 247, p. 294-301. | NA |
| Interdisciplinary | 2000 | The American Heritage® Dictionary of the English Language, Fourth Edition Copyright © 2000 by Houghton Mifflin Company. | Having the shape of a needle: *acicular crystals* |
| Interdisciplinary | 2000 | Wylie, A.G., 2000, The habit of asbestiform amphiboles: implications for the analysis of bulk samples *in* Beard, M.E. and Rooks, H.L., eds., Advances in environmental measurement methods for asbestos: ASTM Special Technical Publication 1342, p. 53-69. | NA |
| Interdisciplinary | 2001 | Beard, M.E., Crankshaw, O.S., Ennis, J.T., and Moore, C.E., 2001, Analysis of crayons for asbestos and other fibrous materials, and recommendations for improved analytical definitions:  Research Triangle Park, North Carolina, Research Triangle Institute, Center for Environmental Measurements and Quality Assurance, Earth and Mineral Sciences Department, [informal report], 23 p., plus appendices A-H. | NA |
| Interdisciplinary | 2001 | Nolan, R.P., Langer, A.M., Ross, M., Wicks, F.J., and Martin, R.F., eds., 2001, The health effects of chrysotile asbestos-contribution of science to risk-management decisions:  The Canadian Mineralogist Special Publication 5, 304 p. | NA |
| Medical | 1977 | Zielhuis, R.L., 1977, Public health risks of exposure to asbestos:  Elmsford, N.Y., Pergamon Press Inc., 143 p. | NA |

**Table 1. Acicular**

| Community | Year | Source | Acicular |
|---|---|---|---|
| Medical | 1979 | Langer, A.M., Rohl, A.N., Wolff, M., and Selikoff, I.J., 1979, Asbestos, fibrous minerals and acicular cleavage fragments-Nomenclature and biological properties, *in* Lemen, R. and Dement, J.M., eds.,  Dust and disease: Park Forest South, Ill., Pathotox Publishers, p. 1-22. | NA |
| Medical | 1998 | Blake, T., Castranova, V., Schwegler-Berry, D., Baron, P., Deye, G.J., Li, C., and Jones, W., 1998, Effect of fiber length on glass microfiber cytotoxicity: Journal of Toxicology and Environmental Health, v. 54, p. 243-259. | NA |
| Medical | 2001 | Ninth Report on Carcinogens, January 2001 http://ehp.niehs.nih.gov/roc/ninth/known/asbestos.pdf | NA |
| Mineralogical | 1914 | Dana, E.S., 1914, The system of mineralogy of James Dwight Dana, descriptive mineralogy (6th ed):  New York, N.Y., Wiley, p. | NA |
| Mineralogical | 1977 | Campbell, W.J., Blake, R.L, Brown, L.L., Cather, E.E., and Sjober, J.J., 1977, Selected silicate minerals and their asbestiform varieties: U.S. Bureau of Mines Information Circular 8751, 56 p. | The shape shown by an extremely slender crystal with small cross-sectional dimensions (a special case of prismatic form).  Acicular crystals may be blunt-ended or pointed.  The term "needlelike" refers to an acicular crystal with pointed termination at one or both ends. |
| Mineralogical | 1979 | Campbell, W.J., Steel, E.B., Virta, R.L., and Eisner, M.H., 1979, Relationship of mineral habit to size characteristics for tremolite cleavage fragments and fibers: U.S. Bureau of Mines Report of Investigations 8367, 18 p. | NA |
| Mineralogical | 1980 | Bates, R.L., and Jackson, J.A., eds., 1980, Glossary of geology (2d ed.):  Falls Church, Va., American Geological Institute, 749 p. | **[cryst]** Said of a crystal that is needlelike in form. Cf: *fascicular; sagenitic.* |

**Table 1. Acicular**

| Community | Year | Source | Acicular |
|---|---|---|---|
| Mineralogical | 1982 | MacKenzie, W.S., Donaldson, C.H., and Guilford, C., 1982, Atlas of igneous rocks and their textures: New York, N.Y., Wiley, p. 20. | syn. Needle-like fibre, fibrous, hair-like |
| Mineralogical | 1987 | Dorling, M. and Zussman, J., 1987, Characteristics of asbestiform and non-asbestiform calcic amphiboles: Lithos, v. 20, p. 469-489. | needle-like |
| Mineralogical | 1988 | Skinner, H.C., Ross, M., and Frondel, C., 1988, Asbestos and other fibrous materials: New York, N.Y., Oxford, 204 p. | NA |
| Mineralogical | 1993 | Klein, C. and Hurlbut, C.S., Jr. ,1993, Manual of mineralogy (after James D. Dana) (21st ed.):  New York, N.Y., Wiley, 681 p. | Slender, needlelike crystals. |
| Mineralogical | 1993 | Veblen, D.R. and Wylie, A.G., 1993, Mineralogy of amphiboles and 1:1 layer silicates in Guthrie Jr., G.D. and Mossman, B.T., eds., Health effects of mineral dusts: Reviews in Mineralogy, v. 28, p. 61-137, | NA |
| Mineralogical | 2001 | Virta, R.L., 2001, Some facts about asbestos: U.S. Geological Survey Fact Sheet FS-012-01, 4 p. | As the length increases relative to the width, the crystals are called acicular. |
| Mineralogical | 2002 | http://webmineral.com/help/Fracture.html | NA |
| Mineralogical | 2002 | http://webmineral.com/help/Habits.html | Occurs as needle-like crystals. |
| Regulatory | 1974 | U.S. District Court, district of Minnesota, 5th Division. Supplemental Memorandum. No. 5-72, Civil 19, Appendix 5, May 11, 1974, p. 24 | NA |
| Regulatory | 1976 | National Institute for Occupational Safety and Health, 1976,  Revised recommended asbestos standard:  DHEW (NIOSH) Publication No. 77-169, 96 p. | NA |
| Regulatory | 1983 | 29 CFR 1910.1001 | NA |
| Regulatory | 1990 | Ohio Administrative Code (OAC) 3745-20-01 | NA |

**Table 1. Acicular**

| Community | Year | Source | Acicular |
|---|---|---|---|
| Regulatory | 1992 | Crane, D., 1992, Polarized light microscopy of asbestos: Occupational Safety and Health Administration Method # ID-191. | NA |
| Regulatory | 1992 | Occupational Safety and Health Administration, 1992, Preambles IV. Mineralogical Considerations, National Stone Association and American Mining Congress | NA |
| Regulatory | 1993 | Perkins, R.L. and Harvey, B.W., 1993, Method for the determination of asbestos in bulk building materials: U.S. Environmental Protection Agency EPA/600/R-93/116, Office of Research and Development, Washington, D.C. | NA |
| Regulatory | 1993 | Occupational Safety and Health Administration, 1993, Better protection against asbestos in the workplace:  U.S. Department of Labor Fact Sheet No. OSHA 93-06. Available on the world wide web at http://www.osha.gov/pls/oshaweb/owadisp.show_document?p_table=FACT_SHEETS&p_id=144 | NA |
| Regulatory | 1995 | American Society for Testing and Materials, 1995, Standard test method for microvacuum sampling and indirect analysis of dust by transmission electron microscopy for asbestos structure number concentrations:  West Conshohocken, Pa., ASTM 5755-95, 13 p. | NA |
| Regulatory | 1995 | International Organization for Standardization, 1995, ISO 10312 Ambient air-determination of asbestos fibres-direct-transfer transmission electron microscopy method (1st ed): Geneve, Switzerland, International Organization for Standardization, 51 p. | The shape of an extremely slender crystal with cross-sectional dimensions which are small relative to its length, i.e. needle-like. |

**Table 1. Acicular**

| Community | Year | Source | Acicular |
|---|---|---|---|
| Regulatory | 1996 | Colorado Air Quality Control Commission, 1996, Part B-emission standards for asbestos, *excerpted from* Regulation No. 8 "The control of hazardous air pollutants": Colorado Department of Public Health and Environment, 114 p. | NA |
| Regulatory | 1997 | Crane, D., 1997, Asbestos in air: Occupational Safety and Health Administration Method # ID-160. | NA |
| Regulatory | 1997 | NYCRR (New York Code of Rules & Regulations) Title 10 Section 73.1 | NA |
| Regulatory | 2001 | Environmental Protection Agency Part 763-Asbestos Subpart E--Asbestos-Containing Materials in Schools (7-1-01 Edition) | NA |
| Regulatory | 2001 | Environmental Protection Agency Part 763-Asbestos Subpart E--Asbestos-Containing Materials in Schools Appendix A (7-1-01 Edition) | NA |
| Regulatory | 2001 | 29 CFR 1910.1001 | NA |
| Regulatory | 2001 | 30 CFR 56.5001 | NA |
| Regulatory | 2001 | 17 CCR (California Code of Regulations) 93105 | NA |
| Regulatory | 2001 | West Virginia Code 16-32-2 | NA |
| Regulatory | 2002 | OAR (Oregon Administrative Rules) 340-248-0010 | NA |
| Regulatory | 2002 | 105 ILCS (Illinois Compiled Statutes Schools) 105/3 | NA |

**Table 2. Asbestiform**

| Community | Year | Source | Asbestiform |
|---|---|---|---|
| Industrial | 1975 | Winson, R.W., 1975, Asbestos, *in*, Industrial minerals and rocks (nonmetallics other than fuels): New York, N.Y., American Institute of Mining, Metallurgical, and Petroleum Engineers, Inc., p. 379-425. | NA |
| Industrial | 1981 | Steel, E. and Wylie, A., 1981, Mineralogical characteristics of asbestos *in* Riordon, P.H. ed, Geology of Asbestos Deposits, Society of Mining Engineers, p. 93-100. | The asbestiform habit is most commonly developed in certain amphiboles and chrysotile, but other minerals also may crystallize with this unusual habit. The habit may be characterized by (1) a fibril structure, single or twinned crystals of very small widths (generally less than 0.5 um), which have grown with a common fiber axis direction, but are disoriented in the other crystallographic directions; (2) anomalous optical properties, primarily parallel extinction; (3) unusual tensile strengths; (4) high aspect ratio; and (5) flexibility. |
| Industrial | 1998 | Virta, R.L., 2002, Asbestos: U.S. Geological Survey Open File-Report 02-149, 35 p. | NA |
| Interdisciplinary | 1974 | Thompson, C.S., 1974, Discussion of the mineralogy of industrial talcs:  U.S. Bureau of Mines Information Circular 8639, p. 22-42. | NA |
| Interdisciplinary | 1978 | Zoltai, Tibor, 1978, History of asbestos-related mineralogical terminology: National Bureau of Standards Special Publication 506, p. 1-18. | A special type of fibrous habit in which the fibers are separable, and are more flexible and possess higher tensile strength than crystals in other habits of the same mineral. |
| Interdisciplinary | 1979 | Chatfield, E.J., 1979, Measurement of asbestos fibres in the workplace and in the general environment *in* Ledoux, R.L., Mineralogical techniques of asbestos determination: Mineralogical Association of Canada Short Course, v. 4, p. 111-157. | NA |
| Interdisciplinary | 1980 | Dixon, W.C., 1980, Applications of optical microscopy in analysis of asbestos and quartz, *chap 2 of* Dollberg, D.D. and Werstuyft, A.W., eds., Analytical techniques in occupational health chemistry: Washington, D.C., American Chemical Society, p. 13-41. | NA |

**Table 2. Asbestiform**

| Community | Year | Source | Asbestiform |
|---|---|---|---|
| Interdisciplinary | 1980 | Clark, R.L., 1982, MSHA standard method for fiber identification by electron microscopy: National Bureau of Standards Special Publication 619, p. 207-210. | NA |
| Interdisciplinary | 1980 | Lee, R.J., Kelly, J.F., and Walker, J.S., 1982, Considerations in the analysis and definition of asbestos using electron microscopy: National Bureau of Standards Special Publication 619, p. 132-137. | NA |
| Interdisciplinary | 1980 | Chatfield, E.J. and Lewis, G.M., 1980, Development and application of an analytical technique for measurement of asbestos fibers in vermiculite: Scanning Electron Microscopy, p. 329-340. | NA |
| Interdisciplinary | 1984 | National Research Council, 1984, Asbestiform fibers-nonoccupational health risks: Washington D.C., National Academy Press, p. 25-47. | ASBESTIFORM HABIT refers to the unusual crystallization habit of a mineral when the crystals are thin, hairlike fibers. Historically, the definition of the asbestiform habit was based primarily on appearance, and the properties were only implied. At present, the definition of asbestiform habit is often augmented to include a statement on the properties of asbestiform fibers, i.e., shape; enhanced strength, flexibility, and durability; diameter-dependent strength; and unique surfaces. The fibers of asbestos are good examples of the asbestiform habit. |
| Interdisciplinary | 1984 | Cossette, M., 1984, Defining asbestos particulates for monitoring purposes *in* Levadie, B. ed., Definitions for asbestos and other health-related silicates: ASTM Special Technical Publication 834, p. 5-49. | ...a mineral structured in the form of asbestos |
| Interdisciplinary | 1984 | Ross, M., Kuntze, R.A., and Clifton, R.A., 1984, A definition for asbestos *in* Levadie, B. ed., Definitions for asbestos and other health-related silicates: ASTM Special Technical Publication 834, pp.139-147. | NA |

**Table 2. Asbestiform**

| Community | Year | Source | Asbestiform |
|---|---|---|---|
| Interdisciplinary | 1988 | Skinner, H.C., Ross, M., and Frondel, C., 1988, Asbestos and other fibrous materials: New York, N.Y., Oxford, 204 p. | An adjective used to describe inorganic materials that possess the form and appearance of asbestos (OED, WEB). Asbestine, asbestoid, and asbestos are obsolete synonyms. Asbestiform materials are a subset of fibrous materials. The term should be employed only when the material is one of the minerals mined as asbestos and possesses fibrosity typical of asbestos-that is, with relatively small fiber thickness, flexibility, separability, and general parallel arrangement of fibers en masse. The term asbestiform has also been used to imply that a sample or an individual fiber has morphological (gross external) characteristics similar to those of asbestos, but not necessarily the chemical or other physical properties of asbestos. In the 1700s asbestiform was used for the fibrous members of the amphibole group only. At that time virtually all asbestos in common use was amphibole-asbestos. |
| Interdisciplinary | 1990 | Mossman, B.T., Bignon, J., Corn, M., Seaton, A., and Gee, J.B.L., 1990, Asbestos-scientific developments and implications for public policy: Science, v. 247, p. 294-301. | NA |
| Interdisciplinary | 2000 | The American Heritage® Dictionary of the English Language, Fourth Edition Copyright © 2000 by Houghton Mifflin Company. | NA |
| Interdisciplinary | 2000 | Wylie, A.G., 2000, The habit of asbestiform amphiboles: implications for the analysis of bulk samples *in* Beard, M.E. and Rooks, H.L, eds., Advances in environmental measurement methods for asbestos: ASTM Special Technical Publication 1342, p. 53-69. | NA |

**Table 2. Asbestiform**

| Community | Year | Source | Asbestiform |
|---|---|---|---|
| Interdisciplinary | 2001 | Beard, M.E., Crankshaw, O.S., Ennis, J.T., and Moore, C.E., 2001, Analysis of crayons for asbestos and other fibrous materials, and recommendations for improved analytical definitions:  Research Triangle Park, North Carolina, Research Triangle Institute, Center for Environmental Measurements and Quality Assurance, Earth and Mineral Sciences Department, [informal report], 23 p., plus appendices A-H. | Asbestiform fibers are those having the crystal structure of the above minerals and having physical characteristics such as (1) mean aspect ratios (length to width) of 20:1 to 100:1 or greater for individual fibers; (2) very thin fibrils usually less than 0.5 um in width; (3) and parallel fibers in bundles with splayed ends, matted masses of fibers, and/or fibers showing curvature. |
| Interdisciplinary | 2001 | Nolan, R.P., Langer, A.M., Ross, M., Wicks, F.J., and Martin, R.F., eds., 2001, The health effects of chrysotile asbestos-contribution of science to risk-management decisions:  The Canadian Mineralogist Special Publication 5, 304 p. | A term used to describe minerals that possess a habit and appearance similar to that displayed by asbestos. |
| Medical | 1977 | Zielhuis, R.L., 1977, Public health risks of exposure to asbestos:  Elmsford, N.Y., Pergamon Press Inc., 143 p. | NA |
| Medical | 1979 | Langer, A.M., Rohl, A.N., Wolff, M., and Selikoff, I.J., 1979, Asbestos, fibrous minerals and acicular cleavage fragments-Nomenclature and biological properties, *in* Lemen, R. and Dement, J.M., eds.,  Dust and disease: Park Forest South, Ill., Pathotox Publishers, p. 1-22. | ...denotes an asbestos variety of silicate fiber; it may be used as a synonym for asbestos (Campbell et al., 1979; Zoltai, 1978).  Although recommended, a current dictionary of geological terms suggests that asbestiform may be used to describe fibers which merely resemble asbestos (Thrush, 1978) |
| Medical | 1998 | Blake, T., Castranova, V., Schwegler-Berry, D., Baron, P., Deye, G.J., Li, C., and Jones, W., 1998, Effect of fiber length on glass microfiber cytotoxicity: Journal of Toxicology and Environmental Health, v. 54, p. 243-259. | NA |
| Medical | 2001 | Ninth Report on Carcinogens, January 2001 http://ehp.niehs.nih.gov/roc/ninth/known/asbestos.pdf | NA |

**Table 2. Asbestiform**

| Community | Year | Source | Asbestiform |
|---|---|---|---|
| Mineralogical | 1914 | Dana, E.S., 1914, The system of mineralogy of James Dwight Dana, descriptive mineralogy (6th ed):  New York, N.Y., Wiley, p. | NA |
| Mineralogical | 1977 | Campbell, W.J., Blake, R.L, Brown, L.L., Cather, E.E., and Sjober, J.J., 1977, Selected silicate minerals and their asbestiform varieties: U.S. Bureau of Mines Information Circular 8751, 56 p. | A specific type of mineral fibrosity in which the fibers and fibrils posses high tensile strength and flexibility. |
| Mineralogical | 1979 | Campbell, W.J., Steel, E.B., Virta, R.L., and Eisner, M.H., 1979, Relationship of mineral habit to size characteristics for tremolite cleavage fragments and fibers: U.S. Bureau of Mines Report of Investigations 8367, 18 p. | NA |
| Mineralogical | 1980 | Bates, R.L., and Jackson, J.A., eds., 1980, Glossary of geology (2d ed.):  Falls Church, Va., American Geological Institute, 749 p. | Said of a mineral that is fibrous, i.e. that is like asbestos. |
| Mineralogical | 1982 | MacKenzie, W.S., Donaldson, C.H., and Guilford, C., 1982, Atlas of igneous rocks and their textures: New York, N.Y., Wiley, p. 20. | NA |
| Mineralogical | 1987 | Dorling, M. and Zussman, J., 1987, Characteristics of asbestiform and non-asbestiform calcic amphiboles: Lithos, v. 20, p. 469-489. | NA |
| Mineralogical | 1988 | Skinner, H.C., Ross, M., and Frondel, C., 1988, Asbestos and other fibrous materials: New York, N.Y., Oxford, 204 p. | NA |
| Mineralogical | 1993 | Klein, C. and Hurlbut, C.S., Jr. ,1993, Manual of mineralogy (after James D. Dana) (21st ed.):  New York, N.Y., Wiley, 681 p. | The term asbestiform refers to minerals that are mined as asbestos and possess fibrosity typical of asbestos-that is, with small fiber thickness, flexibility, and separability. |

**Table 2. Asbestiform**

| Community | Year | Source | Asbestiform |
|---|---|---|---|
| Mineralogical | 1993 | Veblen, D.R. and Wylie, A.G., 1993, Mineralogy of amphiboles and 1:1 layer silicates in Guthrie Jr., G.D. and Mossman, B.T., eds., Health effects of mineral dusts: Reviews in Mineralogy, v. 28, p. 61-137, | ...any mineral resembling asbestos is asbestiform |
| Mineralogical | 2001 | Virta, R.L., 2001, Some facts about asbestos: U.S. Geological Survey Fact Sheet FS-012-01, 4 p. | When the length is extremely long compared with the width, the crystals are called asbestiform or fibrous. |
| Mineralogical | 2002 | http://webmineral.com/help/Fracture.html | NA |
| Mineralogical | 2002 | http://webmineral.com/help/Habits.html | NA |
| Regulatory | 1974 | U.S. District Court, district of Minnesota, 5th Division. Supplemental Memorandum. No. 5-72, Civil 19, Appendix 5, May 11, 1974, p. 24 | NA |
| Regulatory | 1976 | National Institute for Occupational Safety and Health, 1976, Revised recommended asbestos standard: DHEW (NIOSH) Publication No. 77-169, 96 p. | NA |
| Regulatory | 1983 | 29 CFR 1910.1001 | NA |
| Regulatory | 1990 | Ohio Administrative Code (OAC) 3745-20-01 | NA |
| Regulatory | 1992 | Crane, D., 1992, Polarized light microscopy of asbestos: Occupational Safety and Health Administration Method # ID-191. | NA |
| Regulatory | 1992 | Occupational Safety and Health Administration, 1992, Preambles IV. Mineralogical Considerations, National Stone Association and American Mining Congress | The asbestiform habit can be defined as a habit where mineral crystals grow in a single dimension, in a straight line until they form long, thread-like fibers with aspect ratios of 20:1 to 100:1 and higher. |

Table 2. Asbestiform

| Community | Year | Source | Asbestiform |
|---|---|---|---|
| Regulatory | 1993 | Perkins, R.L. and Harvey, B.W., 1993, Method for the determination of asbestos in bulk building materials: U.S. Environmental Protection Agency EPA/600/R-93/116, Office of Research and Development, Washington, D.C. | (morphology) Said of a mineral that is like asbestos, i.e., crystallized with the habit of asbestos.  Some asbestiform minerals may lack the properties which make asbestos commercially valuable, such as long fiber length and high tensile strength.  With the light microscope, the asbestiform habit is generally recognized by the following characteristics:  1) Mean aspect ratios ranging from 20:1 to 100:1 or higher for fibers longer than 5 um.  Aspect ratios should be determined for fibers, not bundles.  2) Very thin fibrils, usually less than 0.5 micrometers in width, and 3) Two or more of the following: a) Parallel fibers occurring in bundles, b) Fiber bundles displaying splayed ends, c) matted masses of individual fibers, and/or d) Fibers showing curvature.  These characteristics refer to the population of fibers as observed in a bulk sample.  It is not unusual to observe occasional particles having aspect ratios of 10:1 or less, but it is unlikely that the asbestos component(s) would be dominated by particles (individual fibers) having aspect ratios of <20:1 for fibers longer than 5um.  If a sample contains a fibrous component of which most of the fibers have aspect ratios of <20:1 and that do not display the additional asbestiform characteristics, by definition the component should not be considered asbestos. |
| Regulatory | 1993 | Occupational Safety and Health Administration, 1993, Better protection against asbestos in the workplace:  U.S. Department of Labor Fact Sheet No. OSHA 93-06.  Available on the world wide web at http://www.osha.gov/pls/oshaweb/owadisp.show_document?p_table=FACT_SHEETS&p_id=144 | NA |
| Regulatory | 1995 | American Society for Testing and Materials, 1995, Standard test method for microvacuum sampling and indirect analysis of dust by transmission electron microscopy for asbestos structure number concentrations:  West Conshohocken, Pa., ASTM 5755-95, 13 p. | a special type of fibrous habit in which the fibers are separable into thinner fibers and ultimately into fibrils.  This habit accounts for greater flexibility and higher tensile strength than other habits of the same mineral. |

**Table 2. Asbestiform**

| Community | Year | Source | Asbestiform |
|---|---|---|---|
| Regulatory | 1995 | International Organization for Standardization, 1995, ISO 10312 Ambient air-determination of asbestos fibres-direct-transfer transmission electron microscopy method (1st ed): Geneve, Switzerland, International Organization for Standardization, 51 p. | A specific type of mineral fibrosity in which the fibres and fibrils posses high tensile strength and flexibility. |
| Regulatory | 1996 | Colorado Air Quality Control Commission, 1996, Part B-emission standards for asbestos, *excerpted from* Regulation No. 8 "The control of hazardous air pollutants": Colorado Department of Public Health and Environment, 114 p. | NA |
| Regulatory | 1997 | Crane, D., 1997, Asbestos in air: Occupational Safety and Health Administration Method # ID-160. | NA |
| Regulatory | 1997 | NYCRR (New York Code of Rules & Regulations) Title 10 Section 73.1 | NA |
| Regulatory | 2001 | Environmental Protection Agency Part 763-Asbestos Subpart E--Asbestos-Containing Materials in Schools (7-1-01 Edition) | NA |
| Regulatory | 2001 | Environmental Protection Agency Part 763-Asbestos Subpart E--Asbestos-Containing Materials in Schools Appendix A (7-1-01 Edition) | A specific type of mineral fibrosity in which the fibers and fibrils possess high tensile strength and flexibility |
| Regulatory | 2001 | 29 CFR 1910.1001 | NA |
| Regulatory | 2001 | 30 CFR 56.5001 | NA |
| Regulatory | 2001 | 17 CCR (California Code of Regulations) 93105 | NA |
| Regulatory | 2001 | West Virginia Code 16-32-2 | NA |
| Regulatory | 2002 | OAR (Oregon Administrative Rules) 340-248-0010 | NA |
| Regulatory | 2002 | 105 ILCS (Illinois Compiled Statutes Schools) 105/3 | NA |

**Table 3. Asbestos**

| Community | Year | Source | Asbestos |
|---|---|---|---|
| Industrial | 1975 | Winson, R.W., 1975, Asbestos, *in*, Industrial minerals and rocks (nonmetallics other than fuels): New York, N.Y., American Institute of Mining, Metallurgical, and Petroleum Engineers, Inc., p. 379-425. | ...is a generic name given to a group of fibrous mineral silicates found in nature. They are all incombustible and can be separated by mechanical means into fibers of various lengths and cross sections, but each differs in chemical composition from the other. |
| Industrial | 1981 | Steel, E. and Wylie, A., 1981, Mineralogical characteristics of asbestos *in* Riordon, P.H. ed, Geology of Asbestos Deposits, Society of Mining Engineers, p. 93-100. | NA |
| Industrial | 1998 | Virta, R.L., 2002, Asbestos: U.S. Geological Survey Open File-Report 02-149, 35 p. | ...is a generic name given to six fibrous minerals that have been used in commercial products. The six types of asbestos are chrysotile, the most widely used; crocidolite; amosite; anthophyllite asbestos; tremolite asbestos; and actinolite asbestos. The properties that make asbestos so versatile and cost effective are high tensile strength, chemical and thermal stability, high flexibility, low electrical conductivity, and larger surface area. |
| Interdisciplinary | 1974 | Thompson, C.S., 1974, Discussion of the mineralogy of industrial talcs: U.S. Bureau of Mines Information Circular 8639, p. 22-42. | The term "asbestos" is a nonscientific commercial term normally restricted in use to the long, threadlike fibrous varieties of several hydrated silicate minerals, whose fibers can be separated mechanically and pressed, spun, or woven into articles of all types that are resistant to heat and chemical alteration. Although present usage is generally limited to the commercially available silicate minerals, chrysotile, crocidolite, amosite, anthophyllite asbestos, tremolite asbestos, and actinolite asbestos, other minerals regardless of chemical composition, which posses similar qualities of great elongation, flexibility, high-tensile strength, heat and chemical resistance, spinability, etc., could properly be classified as asbestos. |
| Interdisciplinary | 1978 | Zoltai, Tibor, 1978, History of asbestos-related mineralogical terminology: National Bureau of Standards Special Publication 506, p. 1-18. | A collective mineralogical term which includes the asbestiform varieties of various (silicate) minerals. |

**Table 3. Asbestos**

| Community | Year | Source | Asbestos |
|---|---|---|---|
| Interdisciplinary | 1979 | Chatfield, E.J., 1979, Measurement of asbestos fibres in the workplace and in the general environment *in* Ledoux, R.L., Mineralogical techniques of asbestos determination: Mineralogical Association of Canada Short Course, v. 4, p. 111-157. | Asbestos is a term used to describe a number of minerals which have the property that they can be separated into long silky fibres. |
| Interdisciplinary | 1980 | Dixon, W.C., 1980, Applications of optical microscopy in analysis of asbestos and quartz, *chap 2 of* Dollberg, D.D. and Werstuyft, A.W., eds., Analytical techniques in occupational health chemistry: Washington, D.C., American Chemical Society, p. 13-41. | [*Author quotes the federal register*] 1. Asbestos includes chrysotile, amosite, crocidolite, tremolite, anthophyllite and actinolite. 2. "Asbestos fibers" means asbestos fibers longer than 5 micrometers. |
| Interdisciplinary | 1980 | Clark, R.L., 1982, MSHA standard method for fiber identification by electron microscopy: National Bureau of Standards Special Publication 619, p. 207-210. | [*uses Code of Federal Regulations*] "asbestos" is recognized as generic, applicable to a number of hydrated silicates, but its use is specifically limited to describe the minerals chrysotile, amosite, crocidolite, anthophyllite asbestos, tremolite asbestos, and actinolite asbestos. |
| Interdisciplinary | 1980 | Lee, R.J., Kelly, J.F., and Walker, J.S., 1982, Considerations in the analysis and definition of asbestos using electron microscopy: National Bureau of Standards Special Publication 619, p. 132-137. | ...meaningful working definition of asbestos, we propose the following: 1. For routine method, a minimum aspect ratio of 10:1 should be used in a screening analysis or survey. Existing data indicate that this would not affect the chrysotile analysis at all and amphibole analysis only when the sample contains a significant percentage of acicular nonasbestos particles [11-16]. While this would undoubtedly result in missing 5 to 20 percent of the short asbestos particles, it would eliminate 70 to 80 percent of the nonasbestos particles from consideration. 2. A lower length limit for routine electron microscope analysis should be adopted. On the basis of available information, a reasonable limit would be somewhere between 0.75 and 2.0 microns [3]. 3. Asbestos analyses should be grouped into at least three size fractions and acceptable uncertainty levels defined for each range. For example, the length categories less than 2, 2 to 5, and greater than 5 um might be chosen, and a 50 percent relative error defined as the minimum level of acceptance for each size range. |

**Table 3. Asbestos**

| Community | Year | Source | Asbestos |
|---|---|---|---|
| Interdisciplinary | 1980 | Chatfield, E.J. and Lewis, G.M., 1980, Development and application of an analytical technique for measurement of asbestos fibers in vermiculite: Scanning Electron Microscopy, p. 329-340. | NA |
| Interdisciplinary | 1984 | National Research Council, 1984, Asbestiform fibers-nonoccupational health risks: Washington D.C., National Academy Press, p. 25-47. | The term ASBESTOS is a commercial-industrial term rather than a mineralogical term.  It refers to well-developed and hairlike long-fibered varieties of certain minerals that satisfy particular industrial needs.  Table 2-1 lists the names of chemical formulas of the minerals included in the term asbestos.  Other minerals used in industry, such as palygorskite, may also crystallize as well-developed, thin hairlike fibers (i.e., in the asbestiform habit), but they are not called asbestos.  [*Minerals listed in Table 2-1:  chrysotile, riebeckite, anthophyllite, cummingtonite-grunerite, actinolite-tremolite*] |
| Interdisciplinary | 1984 | Cossette, M., 1984, Defining asbestos particulates for monitoring purposes *in* Levadie, B. ed., Definitions for asbestos and other health-related silicates: ASTM Special Technical Publication 834, p. 5-49. | ...a generic term for naturally occurring inorganic hydrated silicates, occurring in layered structures composed of chains of silicon/oxygen tetrahedra, which can subdivide into flexible fibers |
| Interdisciplinary | 1984 | Ross, M., Kuntze, R.A., and Clifton, R.A., 1984, A definition for asbestos *in* Levadie, B. ed., Definitions for asbestos and other health-related silicates: ASTM Special Technical Publication 834, pp.139-147. | ...a term applied to six naturally occurring minerals exploited commercially for their desirable physical properties, which are in part derived from their asbestiform habit.  The six minerals are the serpentine mineral chrysotile and the amphibole minerals grunerite asbestos (also referred to as amosite), riebeckite asbestos (also referred to as crocidolite), anthophyllite asbestos, tremolite asbestos, and actinolite asbestos...  Individual mineral particles, however processed and regardless of their mineral name, are not demonstrated to be asbestos if the length-to-width ratio is less than 20:1. |

**Table 3. Asbestos**

| Community | Year | Source | Asbestos |
|---|---|---|---|
| Interdisciplinary | 1988 | Skinner, H.C., Ross, M., and Frondel, C., 1988, Asbestos and other fibrous materials: New York, N.Y., Oxford, 204 p. | A commercial and generally used name for fibrous varieties of naturally occurring silicate minerals of the amphibole or serpentine group (see chapter 2). Over the millennia many fibrous minerals have been called asbestos, including the six minerals presently accepted (see in the following), as well as other silicates such as palygorskite and nonsilicates such as brucite.  The characteristics of mineral materials that have invoked the use of the term asbestos are: slender fibers that are easily separable and flexible, and fine fibers that have high tensile strength, chemical stability, and are incombustible.  Natural unprocessed asbestos fibers have large aspect ratios and may have lengths of microscopic dimensions up to, in rare instances, a meter or so. Chrysotile-asbestos fibers are commonly 10 centimeters in length...Asbestos is used as an adjective in combination with numerous other words and phases, such as asbestos cement. |
| Interdisciplinary | 1990 | Mossman, B.T., Bignon, J., Corn, M., Seaton, A., and Gee, J.B.L., 1990, Asbestos-scientific developments and implications for public policy: Science, v. 247, p. 294-301. | "Asbestos" is a broad commercial term for a group of naturally occurring hydrated silicates that crystallize in a fibrous habit. |
| Interdisciplinary | 2000 | The American Heritage® Dictionary of the English Language, Fourth Edition Copyright © 2000 by Houghton Mifflin Company. | n. Either of two incombustible, chemical-resistant, fibrous mineral forms of impure magnesium silicate, used for fireproofing, electrical insulation, building materials, brake linings, and chemical filters. |
| Interdisciplinary | 2000 | Wylie, A.G., 2000, The habit of asbestiform amphiboles: implications for the analysis of bulk samples in Beard, M.E. and Rooks, H.L, eds., Advances in environmental measurement methods for asbestos: ASTM Special Technical Publication 1342, p. 53-69. | NA |

**Table 3. Asbestos**

| Community | Year | Source | Asbestos |
|---|---|---|---|
| Interdisciplinary | 2001 | Beard, M.E., Crankshaw, O.S., Ennis, J.T., and Moore, C.E., 2001, Analysis of crayons for asbestos and other fibrous materials, and recommendations for improved analytical definitions: Research Triangle Park, North Carolina, Research Triangle Institute, Center for Environmental Measurements and Quality Assurance, Earth and Mineral Sciences Department, [informal report], 23 p., plus appendices A-H. | Asbestos is a commercial term for long, thin mineral fibers of chrysotile, amosite, crocidolite, anthophyllite, tremolite, and actinolite. |
| Interdisciplinary | 2001 | Nolan, R.P., Langer, A.M., Ross, M., Wicks, F.J., and Martin, R.F., eds., 2001, The health effects of chrysotile asbestos-contribution of science to risk-management decisions: The Canadian Mineralogist Special Publication 5, 304 p. | A commercial term that describes a group of extremely thin and flexible minerals that have a unique combination of physical and chemical properties. The long asbestos fibers can be spun in yarn and then made into woven fabric. Asbestos is derived from a Greek word meaning inextinguishable in the sense of indestructible, because asbestos cannot be destroyed by fire. Modern usage in mineralogy occurred when the term was applied to a fibrous amphibole mineral discovered in the Alps. |
| Medical | 1977 | Zielhuis, R.L., 1977, Public health risks of exposure to asbestos: Elmsford, N.Y., Pergamon Press Inc., 143 p. | Asbestos refers to a group of inorganic silicates which occur naturally and have a distinct fibrous crystalline structure, which is largely responsible for its unique properties: tensile strength, stiffness, heat resistance, and ability to split into finer fibres. |
| Medical | 1979 | Langer, A.M., Rohl, A.N., Wolff, M., and Selikoff, I.J., 1979, Asbestos, fibrous minerals and acicular cleavage fragments-Nomenclature and biological properties, in Lemen, R. and Dement, J.M., eds., Dust and disease: Park Forest South, Ill., Pathotox Publishers, p. 1-22. | The term "asbestos" may be used to describe a mineral species only when its physical characteristics, on the megascopic level, are known: the mineral fiber possesses tensile strength, flexibility, and those other characteristics which distinguishes asbestiform minerals from their rock-forming analogues. Asbestos may also be applied to submicroscopic fibers if the source materials are known; for example, in an asbestos textile factory where chrysotile fiber is used. |
| Medical | 1998 | Blake, T., Castranova, V., Schwegler-Berry, D., Baron, P., Deye, G.J., Li, C., and Jones, W., 1998, Effect of fiber length on glass microfiber cytotoxicity: Journal of Toxicology and Environmental Health, v. 54, p. 243-259. | ...refers to a group of naturally occurring fibrous metallic silicates that have been used widely in construction and industry. |

**Table 3. Asbestos**

| Community | Year | Source | Asbestos |
|---|---|---|---|
| Medical | 2001 | Ninth Report on Carcinogens, January 2001 http://ehp.niehs.nih.gov/roc/ninth/known/asbestos.pdf | ...is a generic name given to a class of natural fibrous silicates that vary considerably in their physical and chemical properties. |
| Mineralogical | 1914 | Dana, E.S., 1914, The system of mineralogy of James Dwight Dana, descriptive mineralogy (6th ed):  New York, N.Y., Wiley, p. | Asbestos. Asbestos.  Tremolite, actinolite, and other varieties of amphibole, excepting those containing much alumina, pass into fibrous varieties, the fibers of which are sometimes very long, fine, flexible, and easily separable by the fingers and look like flax. These kinds are called asbestus. |
| Mineralogical | 1977 | Campbell, W.J., Blake, R.L, Brown, L.L., Cather, E.E., and Sjober, J.J., 1977, Selected silicate minerals and their asbestiform varieties: U.S. Bureau of Mines Information Circular 8751, 56 p. | (1) A collective mineralogical term encompassing the asbestiform varieties of various minerals; (2) an industrial product obtained by mining and processing primarily asbestiform minerals. |
| Mineralogical | 1979 | Campbell, W.J., Steel, E.B., Virta, R.L., and Eisner, M.H., 1979, Relationship of mineral habit to size characteristics for tremolite cleavage fragments and fibers: U.S. Bureau of Mines Report of Investigations 8367, 18 p. | NA |
| Mineralogical | 1980 | Bates, R.L., and Jackson, J.A., eds., 1980, Glossary of geology (2d ed.):  Falls Church, Va., American Geological Institute, 749 p. | (a) A commercial term applied to a group of highly fibrous silicate minerals that readily separate into long, thin, strong fibers of sufficient flexibility to be woven, are heat resistant and chemically inert, and possess a high electric insulation, and therefore are suitable for uses (as in yarn, cloth, paper, paint, brake linings, tiles, insulation, cement, fillers, and filters) where incombustible, nonconducting, or chemically resistant material is required.  (b) A mineral of the asbestos group, principally chrysotile (best adapted for spinning) and certain fibrous varieties of amphibole (esp. tremolite, actinolite, and crocidolite).  (c) A term strictly applied to the fibrous variety of actinolite.---Syn:  *asbestus; amianthus; earth flax; mountain flax.* |
| Mineralogical | 1982 | MacKenzie, W.S., Donaldson, C.H., and Guilford, C., 1982, Atlas of igneous rocks and their textures: New York, N.Y., Wiley, p. 20. | NA |
| Mineralogical | 1987 | Dorling, M. and Zussman, J., 1987, Characteristics of asbestiform and non-asbestiform calcic amphiboles: Lithos, v. 20, p. 469-489. | In this study, only specimens [*in reference to calcic amphiboles*] which occur as bundles of fibres (commonly having splayed ends), which readily split into still finer sub-microscopic units (fibrils), are referred to and are classed as asbestos. |

**Table 3. Asbestos**

| Community | Year | Source | Asbestos |
|---|---|---|---|
| Mineralogical | 1988 | Skinner, H.C., Ross, M., and Frondel, C., 1988, Asbestos and other fibrous materials: New York, N.Y., Oxford, 204 p. | NA |
| Mineralogical | 1993 | Klein, C. and Hurlbut, C.S., Jr. ,1993, Manual of mineralogy (after James D. Dana) (21st ed.):  New York, N.Y., Wiley, 681 p. | The characteristic morphology of all asbestos minerals, in their natural form, is a parallel-sided fiber with a length to width ratio (referred to as an aspect ratio) in excess of 100:1 (Champness, P.E., Cliff, G. and Lorimer, G.W., 1976, The identification of asbestos, *Journal of Microscopy*, v. 108, pp. 231-249). |
| Mineralogical | 1993 | Veblen, D.R. and Wylie, A.G., 1993, Mineralogy of amphiboles and 1:1 layer silicates in Guthrie Jr., G.D. and Mossman, B.T., eds., Health effects of mineral dusts: Reviews in Mineralogy, v. 28, p. 61-137, | Asbestos is defined as a group of highly fibrous silicate minerals that readily separate into long, thin, strong fibers that have sufficient flexibility to be woven, are heat resistant and chemically inert, are electrical insulators, and therefore are suitable for uses where incombustible, nonconducting, or chemically resistant material is required. |
| Mineralogical | 2001 | Virta, R.L., 2001, Some facts about asbestos: U.S. Geological Survey Fact Sheet FS-012-01, 4 p. | ...is a generic name given to the fibrous variety of six naturally occurring minerals that have been used in commercial products.  Asbestos is made up of fiber bundles.  These bundles, in turn, are composed of extremely long and thin fibers that can be easily separated from one another.  The bundles have splaying ends and are extremely flexible.  The term "asbestos" is not a mineralogical definition.  It is a commercial designation for mineral products that possess high tensile strength, flexibility, resistance to chemical and thermal degradation, and high electrical resistance and that can be woven. |
| Mineralogical | 2002 | http://webmineral.com/help/Fracture.html | NA |
| Mineralogical | 2002 | http://webmineral.com/help/Habits.html | NA |
| Regulatory | 1974 | U.S. District Court, district of Minnesota, 5th Division. Supplemental Memorandum. No. 5-72, Civil 19, Appendix 5, May 11, 1974, p. 24 | ...is a generic term for a number of hydrated silicates that, when crushed or processed, separate into flexible fibers made up of fibrils. |
| Regulatory | 1976 | National Institute for Occupational Safety and Health, 1976,  Revised recommended asbestos standard:  DHEW (NIOSH) Publication No. 77-169, 96 p. | Asbestos fibers are defined as those particles with a length greater than 5 um and a length-to-diameter ratio of 3:1, or greater. |
| Regulatory | 1983 | 29 CFR 1910.1001 | For the purpose of this section, (1) "Asbestos" includes chrysotile, amosite, crocidolite, tremolite, anthophyllite, and actinolite. |

**Table 3. Asbestos**

| Community | Year | Source | Asbestos |
|---|---|---|---|
| Regulatory | 1990 | Ohio Administrative Code (OAC) 3745-20-01 | "Asbestos" means the asbestiform varieties of serpentinite (chrysotile), riebeckite (crocidolite), cummingtonite-grunerite, anthophyllite, and actinolite tremolite. |
| Regulatory | 1992 | Crane, D., 1992, Polarized light microscopy of asbestos: Occupational Safety and Health Administration Method # ID-191. | A term for naturally occurring fibrous minerals. Asbestos includes chrysotile, cummingtonite-grunerite asbestos (amosite), anthophyllite asbestos, tremolite asbestos, crocidolite, actinolite asbestos and any of these minerals which have been chemically treated or altered. The precise chemical formulation of each species varies with the location from which it was mined. |
| Regulatory | 1992 | Occupational Safety and Health Administration, 1992, Preambles IV. Mineralogical Considerations, National Stone Association and American Mining Congress | NA |
| Regulatory | 1993 | Perkins, R.L. and Harvey, B.W., 1993, Method for the determination of asbestos in bulk building materials: U.S. Environmental Protection Agency EPA/600/R-93/116, Office of Research and Development, Washington, D.C. | A commercial term applied to the asbestiform varieties of six different minerals. The asbestos types are chrysotile (asbestiform serpentine), amosite (asbestiform grunerite), crocidolite (asbestiform riebeckite), and asbestiform anthophyllite, asbestiform tremolite, and asbestiform actinolite. The properties of asbestos that caused it to be widely used commercially are: 1) its ability to be separated into long, thin flexible fibers; 2) high tensile strength; 3) low thermal and electrical conductivity; 4) high mechanical and chemical durability, and 5) high heat resistance. |
| Regulatory | 1993 | Occupational Safety and Health Administration, 1993, Better protection against asbestos in the workplace:  U.S. Department of Labor Fact Sheet No. OSHA 93-06.  Available on the world wide web at http://www.osha.gov/pls/oshaweb/owadisp.show_document?p_table=FACT_SHEETS&p_id=144 | ...is a widely used, mineral-based material that is resistant to heat and corrosive chemicals.  Typically, asbestos appears as a whitish, fibrous material which may release fibers that range in texture from coarse to silky; however, airborne fibers that can cause health damage may be too small to see with the naked eye. |
| Regulatory | 1995 | American Society for Testing and Materials, 1995, Standard test method for microvacuum sampling and indirect analysis of dust by transmission electron microscopy for asbestos structure number concentrations:  West Conshohocken, Pa., ASTM 5755-95, 13 p. | ...a collective term that describes a group of naturally occurring, inorganic, highly fibrous, silicate dominated minerals, which are easily separated into long, thin, flexible fibers when crushed or processed. |

**Table 3. Asbestos**

| Community | Year | Source | Asbestos |
|---|---|---|---|
| Regulatory | 1995 | International Organization for Standardization, 1995, ISO 10312 Ambient air-determination of asbestos fibres-direct-transfer transmission electron microscopy method (1st ed): Geneve, Switzerland, International Organization for Standardization, 51 p. | A term applied to a group of silicate minerals belonging to the serpentine and amphibole groups which have crystallized in the asbestiform habit, causing them to be easily separated into long, thin, strong fibres when crushed or processed.  The Chemical Abstracts Service Registry Numbers of the common asbestos varieties are:  chrysotile (12001-29-5), crocidolite (12001-28-4), grunerite asbestos (amosite) (12172-73-5), anthophyllite asbestos (77536-67-5), tremolite asbestos (77536-68-6) and actinolite asbestos (77536-66-4). |
| Regulatory | 1996 | Colorado Air Quality Control Commission, 1996, Part B-emission standards for asbestos, *excerpted from* Regulation No. 8 "The control of hazardous air pollutants": Colorado Department of Public Health and Environment, 114 p. | means asbestiform varieties of chrysotile, amosite (cummingtonite-grunerite), crocidolite, anthophyllite, tremolite, and actinolite. |
| Regulatory | 1997 | Crane, D., 1997, Asbestos in air: Occupational Safety and Health Administration Method # ID-160. | A term for naturally occurring fibrous minerals. Asbestos includes chrysotile, cummingtonite-grunerite asbestos (amosite), anthophyllite asbestos, tremolite asbestos, crocidolite, actinolite asbestos and any of these minerals which have been chemically treated or altered.  The precise chemical formulation of each species varies with the location from which it was mined... |
| Regulatory | 1997 | NYCRR (New York Code of Rules & Regulations) Title 10 Section 73.1 | Asbestos. Any naturally occurring hydrated mineral silicate separable into commercially usable fibers, including chrysotile (serpentine), amosite (cummingtonite-grunerite), crocidolite (riebeckite), tremolite, anthophyllite and actinolite. |
| Regulatory | 2001 | Environmental Protection Agency Part 763-Asbestos Subpart E--Asbestos-Containing Materials in Schools (7-1-01 Edition) | ...means the asbestiform varieties of:  Chrysotile (serpentine); crocidolite (riebeckite); amosite (cummingtonite-grunerite); anthophyllite; tremolite; and actinolite. |
| Regulatory | 2001 | Environmental Protection Agency Part 763-Asbestos Subpart E--Asbestos-Containing Materials in Schools Appendix A (7-1-01 Edition) | NA |
| Regulatory | 2001 | 29 CFR 1910.1001 | Asbestos includes chrysotile, amosite, crocidolite, tremolite asbestos, anthophyllite asbestos, actinolite asbestos, and any of these minerals that have been chemically treated and/or altered. |

**Table 3. Asbestos**

| Community | Year | Source | Asbestos |
|---|---|---|---|
| Regulatory | 2001 | 30 CFR 56.5001 | ..."Asbestos" is a generic term for a number of hydrated silicates that, when crushed or processed, separate into flexible fibers made up of fibrils. Although there are many asbestos minerals, the term "asbestos" as used herein is limited to the following minerals: chrysotile, amosite, crocidolite, anthophyllite asbestos, tremolite asbestos, and actinolite asbestos. |
| Regulatory | 2001 | 17 CCR (California Code of Regulations) 93105 | "Asbestos" means asbestiforms* of the following minerals: chrysotile (fibrous serpentine), crocidolite (fibrous riebeckite), amosite (fibrous cummingtonite--grunerite), fibrous tremolite, fibrous actinolite, and fibrous anthophyllite.  *[*It is assumed that the authors of the above entry intended for the word "asbestiforms" to be interpreted as asbestiform varieties of these minerals.  This unusual application of the term would probably not be considered appropriate by most workers in the mineralogical community.*] |
| Regulatory | 2001 | West Virginia Code 16-32-2 | Asbestos means the asbestiform varieties of chrysotile (serpentine), crocidolite (riebeckite), amosite (cummingtonite-grunerite), anthophyllite, tremolite and actinolite. |
| Regulatory | 2002 | OAR (Oregon Administrative Rules) 340-248-0010 | "Asbestos" means the asbestiform varieties of serpentine (chrysotile), riebeckite (crocidolite), cummingtonite-grunerite (amosite), anthophyllite, actinolite and tremolite. |
| Regulatory | 2002 | 105 ILCS (Illinois Compiled Statutes Schools) 105/3 | "Asbestos" means the asbestiform varieties of chrysotile, amosite, crocidolite, tremolite, anthophyllite, and actinolite. |

**Table 4. Cleavage**

| Community | Year | Source | Cleavage |
|---|---|---|---|
| Industrial | 1975 | Winson, R.W., 1975, Asbestos, *in*, Industrial minerals and rocks (nonmetallics other than fuels): New York, N.Y., American Institute of Mining, Metallurgical, and Petroleum Engineers, Inc., p. 379-425. | NA |
| Industrial | 1981 | Steel, E. and Wylie, A., 1981, Mineralogical characteristics of asbestos *in* Riordon, P.H. ed, Geology of Asbestos Deposits, Society of Mining Engineers, p. 93-100. | NA |
| Industrial | 1998 | Virta, R.L., 2002, Asbestos: U.S. Geological Survey Open File-Report 02-149, 35 p. | NA |
| Interdisciplinary | 1974 | Thompson, C.S., 1974, Discussion of the mineralogy of industrial talcs: U.S. Bureau of Mines Information Circular 8639, p. 22-42. | NA |
| Interdisciplinary | 1978 | Zoltai, Tibor, 1978, History of asbestos-related mineralogical terminology: National Bureau of Standards Special Publication 506, p. 1-18. | NA |
| Interdisciplinary | 1979 | Chatfield, E.J., 1979, Measurement of asbestos fibres in the workplace and in the general environment *in* Ledoux, R.L., Mineralogical techniques of asbestos determination: Mineralogical Association of Canada Short Course, v. 4, p. 111-157. | NA |
| Interdisciplinary | 1980 | Dixon, W.C., 1980, Applications of optical microscopy in analysis of asbestos and quartz, *chap 2 of* Dollberg, D.D. and Werstuyft, A.W., eds., Analytical techniques in occupational health chemistry: Washington, D.C., American Chemical Society, p. 13-41. | A mineral has cleavage if it breaks along definite plane surfaces. |
| Interdisciplinary | 1980 | Clark, R.L., 1982, MSHA standard method for fiber identification by electron microscopy: National Bureau of Standards Special Publication 619, p. 207-210. | NA |

**Table 4. Cleavage**

| Community | Year | Source | Cleavage |
|---|---|---|---|
| Interdisciplinary | 1980 | Lee, R.J., Kelly, J.F., and Walker, J.S., 1982, Considerations in the analysis and definition of asbestos using electron microscopy: National Bureau of Standards Special Publication 619, p. 132-137. | NA |
| Interdisciplinary | 1980 | Chatfield, E.J. and Lewis, G.M., 1980, Development and application of an analytical technique for measurement of asbestos fibers in vermiculite: Scanning Electron Microscopy, p. 329-340. | NA |
| Interdisciplinary | 1984 | National Research Council, 1984, Asbestiform fibers-nonoccupational health risks: Washington D.C., National Academy Press, p. 25-47. | CLEAVAGE refers to the preferential breakage of crystals along certain planes of structural weakness. Such planes of weakness are called cleavage planes. A mineral with two distinct cleavage planes will preferentially fracture along these planes and will produce ACICULAR fragments...The strength and flexibility of cleavage fragments are approximately the same as those of single crystals. Cleavage cannot produce the high strength and flexibility of asbestiform fibers. |
| Interdisciplinary | 1984 | Cossette, M., 1984, Defining asbestos particulates for monitoring purposes *in* Levadie, B. ed., Definitions for asbestos and other health-related silicates: ASTM Special Technical Publication 834, p. 5-49. | NA |
| Interdisciplinary | 1984 | Ross, M., Kuntze, R.A., and Clifton, R.A., 1984, A definition for asbestos *in* Levadie, B. ed., Definitions for asbestos and other health-related silicates: ASTM Special Technical Publication 834, pp.139-147. | NA |
| Interdisciplinary | 1988 | Skinner, H.C., Ross, M., and Frondel, C., 1988, Asbestos and other fibrous materials: New York, N.Y., Oxford, 204 p. | The property of an individual crystal to fracture or break, producing planar surfaces along specific crystallographic directions dictated by the structure of the material. Some crystals lack cleavage; others possess one or more crystallographically distinct cleavage directions (see chapter 1). |
| Interdisciplinary | 1990 | Mossman, B.T., Bignon, J., Corn, M., Seaton, A., and Gee, J.B.L., 1990, Asbestos-scientific developments and implications for public policy: Science, v. 247, p. 294-301. | NA |

**Table 4. Cleavage**

| Community | Year | Source | Cleavage |
|---|---|---|---|
| Interdisciplinary | 2000 | The American Heritage® Dictionary of the English Language, Fourth Edition Copyright © 2000 by Houghton Mifflin Company. | 1. Mineralogy. The splitting or tendency to split of a crystallized substance along definite crystalline planes, yielding smooth surfaces. |
| Interdisciplinary | 2000 | Wylie, A.G., 2000, The habit of asbestiform amphiboles: implications for the analysis of bulk samples *in* Beard, M.E. and Rooks, H.L, eds., Advances in environmental measurement methods for asbestos: ASTM Special Technical Publication 1342, p. 53-69. | weakness inherent in a "perfect" structure |
| Interdisciplinary | 2001 | Beard, M.E., Crankshaw, O.S., Ennis, J.T., and Moore, C.E., 2001, Analysis of crayons for asbestos and other fibrous materials, and recommendations for improved analytical definitions:  Research Triangle Park, North Carolina, Research Triangle Institute, Center for Environmental Measurements and Quality Assurance, Earth and Mineral Sciences Department, [informal report], 23 p., plus appendices A-H. | NA |
| Interdisciplinary | 2001 | Nolan, R.P., Langer, A.M., Ross, M., Wicks, F.J., and Martin, R.F., eds., 2001, The health effects of chrysotile asbestos-contribution of science to risk-management decisions:  The Canadian Mineralogist Special Publication 5, 304 p. | NA |
| Medical | 1977 | Zielhuis, R.L., 1977, Public health risks of exposure to asbestos:  Elmsford, N.Y., Pergamon Press Inc., 143 p. | NA |
| Medical | 1979 | Langer, A.M., Rohl, A.N., Wolff, M., and Selikoff, I.J., 1979, Asbestos, fibrous minerals and acicular cleavage fragments-Nomenclature and biological properties, *in* Lemen, R. and Dement, J.M., eds.,  Dust and disease: Park Forest South, Ill., Pathotox Publishers, p. 1-22. | ...in minerals is normally defined as planar separation occurring along crystallographic planes with the lowest surface energies. |

**Table 4. Cleavage**

| Community | Year | Source | Cleavage |
|---|---|---|---|
| Medical | 1998 | Blake, T., Castranova, V., Schwegler-Berry, D., Baron, P., Deye, G.J., Li, C., and Jones, W., 1998, Effect of fiber length on glass microfiber cytotoxicity: Journal of Toxicology and Environmental Health, v. 54, p. 243-259. | NA |
| Medical | 2001 | Ninth Report on Carcinogens, January 2001 http://ehp.niehs.nih.gov/roc/ninth/known/asbestos.pdf | NA |
| Mineralogical | 1914 | Dana, E.S., 1914, The system of mineralogy of James Dwight Dana, descriptive mineralogy (6th ed): New York, N.Y., Wiley, p. | ...is a fracture yielding a more or less smooth surface in the crystal, usually along one of the principal planes of the lattice. The cleavage is characterized by the plane, the ease of production and the character of the surface |
| Mineralogical | 1977 | Campbell, W.J., Blake, R.L, Brown, L.L., Cather, E.E., and Sjober, J.J., 1977, Selected silicate minerals and their asbestiform varieties: U.S. Bureau of Mines Information Circular 8751, 56 p. | The tendency of a crystal to break in definite directions that are related to the crystal structure and are always parallel to possible crystal faces. |
| Mineralogical | 1979 | Campbell, W.J., Steel, E.B., Virta, R.L., and Eisner, M.H., 1979, Relationship of mineral habit to size characteristics for tremolite cleavage fragments and fibers: U.S. Bureau of Mines Report of Investigations 8367, 18 p. | NA |
| Mineralogical | 1980 | Bates, R.L., and Jackson, J.A., eds., 1980, Glossary of geology (2d ed.): Falls Church, Va., American Geological Institute, 749 p. | [mineral] The breaking of a mineral along its crystallographic planes, thus reflecting crystal structure. The types of cleavage are named according to the structure, e.g. prismatic cleavage. Cf: fracture [mineral]; parting [cryst]. |
| Mineralogical | 1982 | MacKenzie, W.S., Donaldson, C.H., and Guilford, C., 1982, Atlas of igneous rocks and their textures: New York, N.Y., Wiley, p. 20. | NA |
| Mineralogical | 1987 | Dorling, M. and Zussman, J., 1987, Characteristics of asbestiform and non-asbestiform calcic amphiboles: Lithos, v. 20, p. 469-489. | NA |
| Mineralogical | 1988 | Skinner, H.C., Ross, M., and Frondel, C., 1988, Asbestos and other fibrous materials: New York, N.Y., Oxford, 204 p. | NA |

**Table 4. Cleavage**

| Community | Year | Source | Cleavage |
|---|---|---|---|
| Mineralogical | 1993 | Klein, C. and Hurlbut, C.S., Jr. ,1993, Manual of mineralogy (after James D. Dana) (21st ed.):  New York, N.Y., Wiley, 681 p. | ...is the tendency of minerals to break parallel to atomic planes that are identified by Miller indices, just as the faces of the external form of a crystal |
| Mineralogical | 1993 | Veblen, D.R. and Wylie, A.G., 1993, Mineralogy of amphiboles and 1:1 layer silicates in Guthrie Jr., G.D. and Mossman, B.T., eds., Health effects of mineral dusts: Reviews in Mineralogy, v. 28, p. 61-137, | Cleavage refers to breakage of a mineral on an approximately planar surface that is controlled by its crystal structure. |
| Mineralogical | 2001 | Virta, R.L., 2001, Some facts about asbestos: U.S. Geological Survey Fact Sheet FS-012-01, 4 p. | NA |
| Mineralogical | 2002 | http://webmineral.com/help/Fracture.html | If a mineral is strained beyond its elastic limits, it will break. If it breaks irregularly then it shows fracture, if it breaks along regular surfaces related to the crystal structure then it shows cleavage. This cleavage depends on weaknesses in the crystalline make-up of the mineral and is a diagnostic property which can reveal additional information about the mineral. |
| Mineralogical | 2002 | http://webmineral.com/help/Habits.html | NA |
| Regulatory | 1974 | U.S. District Court, district of Minnesota, 5th Division. Supplemental Memorandum. No. 5-72, Civil 19, Appendix 5, May 11, 1974, p. 24 | NA |
| Regulatory | 1976 | National Institute for Occupational Safety and Health, 1976,  Revised recommended asbestos standard:  DHEW (NIOSH) Publication No. 77-169, 96 p. | NA |
| Regulatory | 1983 | 29 CFR 1910.1001 | NA |
| Regulatory | 1990 | Ohio Administrative Code (OAC) 3745-20-01 | NA |
| Regulatory | 1992 | Crane, D., 1992, Polarized light microscopy of asbestos: Occupational Safety and Health Administration Method # ID-191. | NA |
| Regulatory | 1992 | Occupational Safety and Health Administration, 1992, Preambles IV. Mineralogical Considerations, National Stone Association and American Mining Congress | NA |

**Table 4. Cleavage**

| Community | Year | Source | Cleavage |
|---|---|---|---|
| Regulatory | 1993 | Perkins, R.L. and Harvey, B.W., 1993, Method for the determination of asbestos in bulk building materials: U.S. Environmental Protection Agency EPA/600/R-93/116, Office of Research and Development, Washington, D.C. | NA |
| Regulatory | 1993 | Occupational Safety and Health Administration, 1993, Better protection against asbestos in the workplace: U.S. Department of Labor Fact Sheet No. OSHA 93-06. Available on the world wide web at http://www.osha.gov/pls/oshaweb/owadisp.show_document?p_table=FACT_SHEETS&p_id=144 | NA |
| Regulatory | 1995 | American Society for Testing and Materials, 1995, Standard test method for microvacuum sampling and indirect analysis of dust by transmission electron microscopy for asbestos structure number concentrations: West Conshohocken, Pa., ASTM 5755-95, 13 p. | NA |
| Regulatory | 1995 | International Organization for Standardization, 1995, ISO 10312 Ambient air-determination of asbestos fibres-direct-transfer transmission electron microscopy method (1st ed): Geneve, Switzerland, International Organization for Standardization, 51 p. | The breaking of a mineral along one of its crystallographic directions. |
| Regulatory | 1996 | Colorado Air Quality Control Commission, 1996, Part B-emission standards for asbestos, *excerpted from* Regulation No. 8 "The control of hazardous air pollutants": Colorado Department of Public Health and Environment, 114 p. | NA |
| Regulatory | 1997 | Crane, D., 1997, Asbestos in air: Occupational Safety and Health Administration Method # ID-160. | NA |

**Table 4. Cleavage**

| Community | Year | Source | Cleavage |
|---|---|---|---|
| Regulatory | 1997 | NYCRR (New York Code of Rules & Regulations) Title 10 Section 73.1 | NA |
| Regulatory | 2001 | Environmental Protection Agency Part 763-Asbestos Subpart E--Asbestos-Containing Materials in Schools (7-1-01 Edition) | NA |
| Regulatory | 2001 | Environmental Protection Agency Part 763-Asbestos Subpart E--Asbestos-Containing Materials in Schools Appendix A (7-1-01 Edition) | NA |
| Regulatory | 2001 | 29 CFR 1910.1001 | NA |
| Regulatory | 2001 | 30 CFR 56.5001 | NA |
| Regulatory | 2001 | 17 CCR (California Code of Regulations) 93105 | NA |
| Regulatory | 2001 | West Virginia Code 16-32-2 | NA |
| Regulatory | 2002 | OAR (Oregon Administrative Rules) 340-248-0010 | NA |
| Regulatory | 2002 | 105 ILCS (Illinois Compiled Statutes Schools) 105/3 | NA |

**Table 5. Cleavage Fragment**

| Community | Year | Source | Cleavage Fragment |
|---|---|---|---|
| Industrial | 1975 | Winson, R.W., 1975, Asbestos, *in*, Industrial minerals and rocks (nonmetallics other than fuels): New York, N.Y., American Institute of Mining, Metallurgical, and Petroleum Engineers, Inc., p. 379-425. | NA |
| Industrial | 1981 | Steel, E. and Wylie, A., 1981, Mineralogical characteristics of asbestos *in* Riordon, P.H. ed, Geology of Asbestos Deposits, Society of Mining Engineers, p. 93-100. | NA |
| Industrial | 1998 | Virta, R.L., 2002, Asbestos: U.S. Geological Survey Open File-Report 02-149, 35 p. | NA |
| Interdisciplinary | 1974 | Thompson, C.S., 1974, Discussion of the mineralogy of industrial talcs:  U.S. Bureau of Mines Information Circular 8639, p. 22-42. | NA |
| Interdisciplinary | 1978 | Zoltai, Tibor, 1978, History of asbestos-related mineralogical terminology: National Bureau of Standards Special Publication 506, p. 1-18. | NA |
| Interdisciplinary | 1979 | Chatfield, E.J., 1979, Measurement of asbestos fibres in the workplace and in the general environment *in* Ledoux, R.L., Mineralogical techniques of asbestos determination: Mineralogical Association of Canada Short Course, v. 4, p. 111-157. | NA |
| Interdisciplinary | 1980 | Dixon, W.C., 1980, Applications of optical microscopy in analysis of asbestos and quartz, *chap 2 of* Dollberg, D.D. and Werstuyft, A.W., eds., Analytical techniques in occupational health chemistry: Washington, D.C., American Chemical Society, p. 13-41. | NA |
| Interdisciplinary | 1980 | Clark, R.L., 1982, MSHA standard method for fiber identification by electron microscopy: National Bureau of Standards Special Publication 619, p. 207-210. | NA |

**Table 5. Cleavage Fragment**

| Community | Year | Source | Cleavage Fragment |
|---|---|---|---|
| Interdisciplinary | 1980 | Lee, R.J., Kelly, J.F., and Walker, J.S., 1982, Considerations in the analysis and definition of asbestos using electron microscopy: National Bureau of Standards Special Publication 619, p. 132-137. | NA |
| Interdisciplinary | 1980 | Chatfield, E.J. and Lewis, G.M., 1980, Development and application of an analytical technique for measurement of asbestos fibers in vermiculite: Scanning Electron Microscopy, p. 329-340. | NA |
| Interdisciplinary | 1984 | National Research Council, 1984, Asbestiform fibers-nonoccupational health risks: Washington D.C., National Academy Press, p. 25-47. | ...The strength and flexibility of cleavage fragments are approximately the same as those of single crystals.  Cleavage cannot produce the high strength and flexibility of asbestiform fibers. |
| Interdisciplinary | 1984 | Cossette, M., 1984, Defining asbestos particulates for monitoring purposes *in* Levadie, B. ed., Definitions for asbestos and other health-related silicates: ASTM Special Technical Publication 834, p. 5-49. | NA |
| Interdisciplinary | 1984 | Ross, M., Kuntze, R.A., and Clifton, R.A., 1984, A definition for asbestos *in* Levadie, B. ed., Definitions for asbestos and other health-related silicates: ASTM Special Technical Publication 834, pp.139-147. | NA |
| Interdisciplinary | 1988 | Skinner, H.C., Ross, M., and Frondel, C., 1988, Asbestos and other fibrous materials: New York, N.Y., Oxford, 204 p. | NA |
| Interdisciplinary | 1990 | Mossman, B.T., Bignon, J., Corn, M., Seaton, A., and Gee, J.B.L., 1990, Asbestos-scientific developments and implications for public policy: Science, v. 247, p. 294-301. | NA |
| Interdisciplinary | 2000 | The American Heritage® Dictionary of the English Language, Fourth Edition Copyright © 2000 by Houghton Mifflin Company. | NA |

**Table 5. Cleavage Fragment**

| Community | Year | Source | Cleavage Fragment |
|---|---|---|---|
| Interdisciplinary | 2000 | Wylie, A.G., 2000, The habit of asbestiform amphiboles: implications for the analysis of bulk samples *in* Beard, M.E. and Rooks, H.L., eds., Advances in environmental measurement methods for asbestos: ASTM Special Technical Publication 1342, p. 53-69. | NA |
| Interdisciplinary | 2001 | Beard, M.E., Crankshaw, O.S., Ennis, J.T., and Moore, C.E., 2001, Analysis of crayons for asbestos and other fibrous materials, and recommendations for improved analytical definitions:  Research Triangle Park, North Carolina, Research Triangle Institute, Center for Environmental Measurements and Quality Assurance, Earth and Mineral Sciences Department, [informal report], 23 p., plus appendices A-H. | Cleavage fragments are mineral particles which are similar to asbestiform fibers but have low aspect ratios. |
| Interdisciplinary | 2001 | Nolan, R.P., Langer, A.M., Ross, M., Wicks, F.J., and Martin, R.F., eds., 2001, The health effects of chrysotile asbestos-contribution of science to risk-management decisions:  The Canadian Mineralogist Special Publication 5, 304 p. | NA |
| Medical | 1977 | Zielhuis, R.L., 1977, Public health risks of exposure to asbestos:  Elmsford, N.Y., Pergamon Press Inc., 143 p. | NA |
| Medical | 1979 | Langer, A.M., Rohl, A.N., Wolff, M., and Selikoff, I.J., 1979, Asbestos, fibrous minerals and acicular cleavage fragments-Nomenclature and biological properties, *in* Lemen, R. and Dement, J.M., eds.,  Dust and disease: Park Forest South, Ill., Pathotox Publishers, p. 1-22. | NA |

**Table 5. Cleavage Fragment**

| Community | Year | Source | Cleavage Fragment |
|---|---|---|---|
| Medical | 1998 | Blake, T., Castranova, V., Schwegler-Berry, D., Baron, P., Deye, G.J., Li, C., and Jones, W., 1998, Effect of fiber length on glass microfiber cytotoxicity: Journal of Toxicology and Environmental Health, v. 54, p. 243-259. | NA |
| Medical | 2001 | Ninth Report on Carcinogens, January 2001 http://ehp.niehs.nih.gov/roc/ninth/known/asbestos.pdf | NA |
| Mineralogical | 1914 | Dana, E.S., 1914, The system of mineralogy of James Dwight Dana, descriptive mineralogy (6th ed):  New York, N.Y., Wiley, p. | NA |
| Mineralogical | 1977 | Campbell, W.J., Blake, R.L, Brown, L.L., Cather, E.E., and Sjober, J.J., 1977, Selected silicate minerals and their asbestiform varieties: U.S. Bureau of Mines Information Circular 8751, 56 p. | A fragment produced by the breaking of crystals in directions that are related to the crystal structure and are always parallel to possible crystal faces. |
| Mineralogical | 1979 | Campbell, W.J., Steel, E.B., Virta, R.L., and Eisner, M.H., 1979, Relationship of mineral habit to size characteristics for tremolite cleavage fragments and fibers: U.S. Bureau of Mines Report of Investigations 8367, 18 p. | NA |
| Mineralogical | 1980 | Bates, R.L., and Jackson, J.A., eds., 1980, Glossary of geology (2d ed.):  Falls Church, Va., American Geological Institute, 749 p. | A fragment of a crystal that is bounded by cleavage faces. |
| Mineralogical | 1982 | MacKenzie, W.S., Donaldson, C.H., and Guilford, C., 1982, Atlas of igneous rocks and their textures: New York, N.Y., Wiley, p. 20. | NA |
| Mineralogical | 1987 | Dorling, M. and Zussman, J., 1987, Characteristics of asbestiform and non-asbestiform calcic amphiboles: Lithos, v. 20, p. 469-489. | NA |
| Mineralogical | 1988 | Skinner, H.C., Ross, M., and Frondel, C., 1988, Asbestos and other fibrous materials: New York, N.Y., Oxford, 204 p. | NA |

**Table 5. Cleavage Fragment**

| Community | Year | Source | Cleavage Fragment |
|---|---|---|---|
| Mineralogical | 1993 | Klein, C. and Hurlbut, C.S., Jr. ,1993, Manual of mineralogy (after James D. Dana) (21st ed.):  New York, N.Y., Wiley, 681 p. | NA |
| Mineralogical | 1993 | Veblen, D.R. and Wylie, A.G., 1993, Mineralogy of amphiboles and 1:1 layer silicates in Guthrie Jr., G.D. and Mossman, B.T., eds., Health effects of mineral dusts: Reviews in Mineralogy, v. 28, p. 61-137, | NA |
| Mineralogical | 2001 | Virta, R.L., 2001, Some facts about asbestos: U.S. Geological Survey Fact Sheet FS-012-01, 4 p. | NA |
| Mineralogical | 2002 | http://webmineral.com/help/Fracture.html | NA |
| Mineralogical | 2002 | http://webmineral.com/help/Habits.html | NA |
| Regulatory | 1974 | U.S. District Court, district of Minnesota, 5th Division. Supplemental Memorandum. No. 5-72, Civil 19, Appendix 5, May 11, 1974, p. 24 | NA |
| Regulatory | 1976 | National Institute for Occupational Safety and Health, 1976,  Revised recommended asbestos standard:  DHEW (NIOSH) Publication No. 77-169, 96 p. | NA |
| Regulatory | 1983 | 29 CFR 1910.1001 | NA |
| Regulatory | 1990 | Ohio Administrative Code (OAC) 3745-20-01 | NA |
| Regulatory | 1992 | Crane, D., 1992, Polarized light microscopy of asbestos: Occupational Safety and Health Administration Method # ID-191. | Mineral particles formed by the comminution of minerals, especially those characterized by relatively parallel sides and moderate aspect ratio. |
| Regulatory | 1992 | Occupational Safety and Health Administration, 1992, Preambles IV. Mineralogical Considerations, National Stone Association and American Mining Congress | NA |

**Table 5. Cleavage Fragment**

| Community | Year | Source | Cleavage Fragment |
|-----------|------|--------|-------------------|
| Regulatory | 1993 | Perkins, R.L. and Harvey, B.W., 1993, Method for the determination of asbestos in bulk building materials: U.S. Environmental Protection Agency EPA/600/R-93/116, Office of Research and Development, Washington, D.C. | NA |
| Regulatory | 1993 | Occupational Safety and Health Administration, 1993, Better protection against asbestos in the workplace:  U.S. Department of Labor Fact Sheet No. OSHA 93-06. Available on the world wide web at http://www.osha.gov/pls/oshaweb/owadisp.show_document?p_table=FACT_SHEETS&p_id=144 | NA |
| Regulatory | 1995 | American Society for Testing and Materials, 1995, Standard test method for microvacuum sampling and indirect analysis of dust by transmission electron microscopy for asbestos structure number concentrations:  West Conshohocken, Pa., ASTM 5755-95, 13 p. | NA |
| Regulatory | 1995 | International Organization for Standardization, 1995, ISO 10312 Ambient air-determination of asbestos fibres-direct-transfer transmission electron microscopy method (1st ed): Geneve, Switzerland, International Organization for Standardization, 51 p. | A fragment of a crystal that is bounded by cleavage faces. |
| Regulatory | 1996 | Colorado Air Quality Control Commission, 1996, Part B-emission standards for asbestos, *excerpted from* Regulation No. 8 "The control of hazardous air pollutants": Colorado Department of Public Health and Environment, 114 p. | NA |

**Table 5. Cleavage Fragment**

| Community | Year | Source | Cleavage Fragment |
|---|---|---|---|
| Regulatory | 1997 | Crane, D., 1997, Asbestos in air: Occupational Safety and Health Administration Method # ID-160. | Mineral particles formed by the comminution of minerals, especially those characterized by parallel sides and moderate aspect ratio (usually less than 20:1). |
| Regulatory | 1997 | NYCRR (New York Code of Rules & Regulations) Title 10 Section 73.1 | NA |
| Regulatory | 2001 | Environmental Protection Agency Part 763-Asbestos Subpart E--Asbestos-Containing Materials in Schools (7-1-01 Edition) | NA |
| Regulatory | 2001 | Environmental Protection Agency Part 763-Asbestos Subpart E--Asbestos-Containing Materials in Schools Appendix A (7-1-01 Edition) | NA |
| Regulatory | 2001 | 29 CFR 1910.1001 | NA |
| Regulatory | 2001 | 30 CFR 56.5001 | NA |
| Regulatory | 2001 | 17 CCR (California Code of Regulations) 93105 | NA |
| Regulatory | 2001 | West Virginia Code 16-32-2 | NA |
| Regulatory | 2002 | OAR (Oregon Administrative Rules) 340-248-0010 | NA |
| Regulatory | 2002 | 105 ILCS (Illinois Compiled Statutes Schools) 105/3 | NA |

**Table 6. Fiber**

| Community | Year | Source | Fiber |
|---|---|---|---|
| Industrial | 1975 | Winson, R.W., 1975, Asbestos, *in*, Industrial minerals and rocks (nonmetallics other than fuels): New York, N.Y., American Institute of Mining, Metallurgical, and Petroleum Engineers, Inc., p. 379-425. | NA |
| Industrial | 1981 | Steel, E. and Wylie, A., 1981, Mineralogical characteristics of asbestos *in* Riordon, P.H. ed, Geology of Asbestos Deposits, Society of Mining Engineers, p. 93-100. | NA |
| Industrial | 1998 | Virta, R.L., 2002, Asbestos: U.S. Geological Survey Open File-Report 02-149, 35 p. | NA |
| Interdisciplinary | 1974 | Thompson, C.S., 1974, Discussion of the mineralogy of industrial talcs:  U.S. Bureau of Mines Information Circular 8639, p. 22-42. | The term "fiber" connotes a greatly elongated particle with threadlike qualities such as high-tensile strength, flexibility, spinability, etc. |
| Interdisciplinary | 1978 | Zoltai, Tibor, 1978, History of asbestos-related mineralogical terminology: National Bureau of Standards Special Publication 506, p. 1-18. | An acicular single crystal, or a similarly elongated polycrystalline aggregate, which displays some resemblance to organic fibers. |
| Interdisciplinary | 1979 | Chatfield, E.J., 1979, Measurement of asbestos fibres in the workplace and in the general environment *in* Ledoux, R.L., Mineralogical techniques of asbestos determination: Mineralogical Association of Canada Short Course, v. 4, p. 111-157. | |
| Interdisciplinary | 1980 | Dixon, W.C., 1980, Applications of optical microscopy in analysis of asbestos and quartz, *chap 2 of* Dollberg, D.D. and Werstuyft, A.W., eds., Analytical techniques in occupational health chemistry: Washington, D.C., American Chemical Society, p. 13-41. | NA |
| Interdisciplinary | 1980 | Clark, R.L., 1982, MSHA standard method for fiber identification by electron microscopy: National Bureau of Standards Special Publication 619, p. 207-210. | [*Author uses Code of Federal Regulations*]  "fiber" is defined as any particulate with a three to one or greater length to width aspect ratio, and a length of five micrometers or longer. |

**Table 6. Fiber**

| Community | Year | Source | Fiber |
|---|---|---|---|
| Interdisciplinary | 1980 | Lee, R.J., Kelly, J.F., and Walker, J.S., 1982, Considerations in the analysis and definition of asbestos using electron microscopy: National Bureau of Standards Special Publication 619, p. 132-137. | NA |
| Interdisciplinary | 1980 | Chatfield, E.J. and Lewis, G.M., 1980, Development and application of an analytical technique for measurement of asbestos fibers in vermiculite: Scanning Electron Microscopy, p. 329-340. | Fibers are defined as all fragments having aspect ratios greater than 3:1, with lengths exceeding 5 um and having diameters smaller than 3 um. |
| Interdisciplinary | 1984 | National Research Council, 1984, Asbestiform fibers-nonoccupational health risks: Washington D.C., National Academy Press, p. 25-47. | The term MINERAL FIBERS has traditionally referred to crystals whose appearance and properties resembled organic fibers, such as hair and cotton.  In some recent literature, however, the term sometimes refers only to the appearance of the material, and there can be confusion about whether particular properties are also implied. |
| Interdisciplinary | 1984 | Cossette, M., 1984, Defining asbestos particulates for monitoring purposes *in* Levadie, B. ed., Definitions for asbestos and other health-related silicates: ASTM Special Technical Publication 834, p. 5-49. | NA |
| Interdisciplinary | 1984 | Ross, M., Kuntze, R.A., and Clifton, R.A., 1984, A definition for asbestos *in* Levadie, B. ed., Definitions for asbestos and other health-related silicates: ASTM Special Technical Publication 834, pp.139-147. | NA |
| Interdisciplinary | 1988 | Skinner, H.C., Ross, M., and Frondel, C., 1988, Asbestos and other fibrous materials: New York, N.Y., Oxford, 204 p. | ...inorganic fibers in a general sense:  as small elongate solid objects composed of any compound or element; usually nonbiologic in origin and often exhibiting distinctive physical, especially mechanical, properties.  Inorganic fibers can occur naturally, that is, as mineral fibers or can be produced synthetically. |
| Interdisciplinary | 1990 | Mossman, B.T., Bignon, J., Corn, M., Seaton, A., and Gee, J.B.L., 1990, Asbestos-scientific developments and implications for public policy: Science, v. 247, p. 294-301. | NA |

**Table 6. Fiber**

| Community | Year | Source | Fiber |
|---|---|---|---|
| Interdisciplinary | 2000 | The American Heritage® Dictionary of the English Language, Fourth Edition Copyright © 2000 by Houghton Mifflin Company. | NA |
| Interdisciplinary | 2000 | Wylie, A.G., 2000, The habit of asbestiform amphiboles: implications for the analysis of bulk samples *in* Beard, M.E. and Rooks, H.L, eds., Advances in environmental measurement methods for asbestos: ASTM Special Technical Publication 1342, p. 53-69. | NA |
| Interdisciplinary | 2001 | Beard, M.E., Crankshaw, O.S., Ennis, J.T., and Moore, C.E., 2001, Analysis of crayons for asbestos and other fibrous materials, and recommendations for improved analytical definitions:  Research Triangle Park, North Carolina, Research Triangle Institute, Center for Environmental Measurements and Quality Assurance, Earth and Mineral Sciences Department, [informal report], 23 p., plus appendices A-H. | NA |
| Interdisciplinary | 2001 | Nolan, R.P., Langer, A.M., Ross, M., Wicks, F.J., and Martin, R.F., eds., 2001, The health effects of chrysotile asbestos-contribution of science to risk-management decisions:  The Canadian Mineralogist Special Publication 5, 304 p. | NA |
| Medical | 1977 | Zielhuis, R.L., 1977, Public health risks of exposure to asbestos:  Elmsford, N.Y., Pergamon Press Inc., 143 p. | NA |
| Medical | 1979 | Langer, A.M., Rohl, A.N., Wolff, M., and Selikoff, I.J., 1979, Asbestos, fibrous minerals and acicular cleavage fragments-Nomenclature and biological properties, *in* Lemen, R. and Dement, J.M., eds.,  Dust and disease: Park Forest South, Ill., Pathotox Publishers, p. 1-22. | NA |

**Table 6. Fiber**

| Community | Year | Source | Fiber |
|---|---|---|---|
| Medical | 1998 | Blake, T., Castranova, V., Schwegler-Berry, D., Baron, P., Deye, G.J., Li, C., and Jones, W., 1998, Effect of fiber length on glass microfiber cytotoxicity: Journal of Toxicology and Environmental Health, v. 54, p. 243-259. | NA |
| Medical | 2001 | Ninth Report on Carcinogens, January 2001 http://ehp.niehs.nih.gov/roc/ninth/known/asbestos.pdf | NA |
| Mineralogical | 1914 | Dana, E.S., 1914, The system of mineralogy of James Dwight Dana, descriptive mineralogy (6th ed):  New York, N.Y., Wiley, p. | NA |
| Mineralogical | 1977 | Campbell, W.J., Blake, R.L, Brown, L.L., Cather, E.E., and Sjober, J.J., 1977, Selected silicate minerals and their asbestiform varieties: U.S. Bureau of Mines Information Circular 8751, 56 p. | (mineral fiber) The smallest elongated crystalline unit that can be separated from a bundle or appears to have grown individually in that shape, and that exhibits a resemblance to organic fibers. (Examples: fiber bundles, chrysotile, and crocidolite; individual fibers, epsomite and millerite.) |
| Mineralogical | 1979 | Campbell, W.J., Steel, E.B., Virta, R.L., and Eisner, M.H., 1979, Relationship of mineral habit to size characteristics for tremolite cleavage fragments and fibers: U.S. Bureau of Mines Report of Investigations 8367, 18 p. | NA |
| Mineralogical | 1980 | Bates, R.L., and Jackson, J.A., eds., 1980, Glossary of geology (2d ed.):  Falls Church, Va., American Geological Institute, 749 p. | An elongated, tapering, thick-walled strengthening cell occurring in various parts of vascular plants (Esau, 1953). |
| Mineralogical | 1982 | MacKenzie, W.S., Donaldson, C.H., and Guilford, C., 1982, Atlas of igneous rocks and their textures: New York, N.Y., Wiley, p. 20. | NA |
| Mineralogical | 1987 | Dorling, M. and Zussman, J., 1987, Characteristics of asbestiform and non-asbestiform calcic amphiboles: Lithos, v. 20, p. 469-489. | NA |

**Table 6. Fiber**

| Community | Year | Source | Fiber |
|---|---|---|---|
| Mineralogical | 1988 | Skinner, H.C., Ross, M., and Frondel, C., 1988, Asbestos and other fibrous materials: New York, N.Y., Oxford, 204 p. | A long, thin thread or threadlike solid with distinctive elongate shape that may be natural or synthetic and organic or inorganic in composition. The properties of flexibility and toughness are also implied, especially to the layperson, but are not essential to the definition. The dimensions of an object called a fiber are usually unspecified and may range from the visible (diameter about a millimeter, and a length many times the thickness) to a particle that can be observed only with the aid of a light or an electron microscope (magnification greater than X50,000). The physical dimensions of vegetable fibers such as flax, hemp, or cotton; animal fibers such as wood, silk, and hair; mineral fibers, such as asbestos; and synthetic fibers such as nylon and glass usually have diameters between 1 and 500 micrometers and lengths between 10 and 1000 micrometers. Inorganic fibers may be flexible and elastic or stiff and brittle, and they commonly occur as aggregates or fibrous bundles. Most mineralogists apply the term when the aspect ratio of a mineral sample, individual or aggregate, is at least 10. |
| Mineralogical | 1993 | Klein, C. and Hurlbut, C.S., Jr. ,1993, Manual of mineralogy (after James D. Dana) (21st ed.): New York, N.Y., Wiley, 681 p. | NA |
| Mineralogical | 1993 | Veblen, D.R. and Wylie, A.G., 1993, Mineralogy of amphiboles and 1:1 layer silicates in Guthrie Jr., G.D. and Mossman, B.T., eds., Health effects of mineral dusts: Reviews in Mineralogy, v. 28, p. 61-137, | NA |
| Mineralogical | 2001 | Virta, R.L., 2001, Some facts about asbestos: U.S. Geological Survey Fact Sheet FS-012-01, 4 p. | NA |
| Mineralogical | 2002 | http://webmineral.com/help/Fracture.html | NA |
| Mineralogical | 2002 | http://webmineral.com/help/Habits.html | NA |
| Regulatory | 1974 | U.S. District Court, district of Minnesota, 5th Division. Supplemental Memorandum. No. 5-72, Civil 19, Appendix 5, May 11, 1974, p. 24 | ...a mineral which is at least three times as long as it is wide |

**Table 6. Fiber**

| Community | Year | Source | Fiber |
|---|---|---|---|
| Regulatory | 1976 | National Institute for Occupational Safety and Health, 1976, Revised recommended asbestos standard: DHEW (NIOSH) Publication No. 77-169, 96 p. | Asbestos fibers are defined as those particles with a length greater than 5 um and a length-to-diameter ratio of 3:1, or greater. |
| Regulatory | 1983 | 29 CFR 1910.1001 | (2) "Asbestos fibers" means asbestos fibers longer than 5 micrometers. |
| Regulatory | 1990 | Ohio Administrative Code (OAC) 3745-20-01 | NA |
| Regulatory | 1992 | Crane, D., 1992, Polarized light microscopy of asbestos: Occupational Safety and Health Administration Method # ID-191. | A particle longer than or equal to 5 um with a length to width ratio greater than or equal to 3:1. This may include cleavage fragments. |
| Regulatory | 1992 | Occupational Safety and Health Administration, 1992, Preambles IV. Mineralogical Considerations, National Stone Association and American Mining Congress | NA |
| Regulatory | 1993 | Perkins, R.L. and Harvey, B.W., 1993, Method for the determination of asbestos in bulk building materials: U.S. Environmental Protection Agency EPA/600/R-93/116, Office of Research and Development, Washington, D.C. | With reference to asbestiform morphology, a structure consisting of one or more fibrils. |
| Regulatory | 1993 | Occupational Safety and Health Administration, 1993, Better protection against asbestos in the workplace: U.S. Department of Labor Fact Sheet No. OSHA 93-06. Available on the world wide web at http://www.osha.gov/pls/oshaweb/owadisp.show_document?p_table=FACT_SHEETS&p_id=144 | NA |
| Regulatory | 1995 | American Society for Testing and Materials, 1995, Standard test method for microvacuum sampling and indirect analysis of dust by transmission electron microscopy for asbestos structure number concentrations: West Conshohocken, Pa., ASTM 5755-95, 13 p. | a structure having a minimum length of 0.5 um, an aspect ratio of 5:1 or greater, and substantially parallel sides |

**Table 6. Fiber**

| Community | Year | Source | Fiber |
|---|---|---|---|
| Regulatory | 1995 | International Organization for Standardization, 1995, ISO 10312 Ambient air-determination of asbestos fibres-direct-transfer transmission electron microscopy method (1st ed): Geneve, Switzerland, International Organization for Standardization, 51 p. | (fibre) An elongated particle which has parallel or stepped sides.  For the purposes of this International Standard, a fibre is defined to have an aspect ratio equal to or greater than 5:1 and a minimum length of 0.5 um. |
| Regulatory | 1996 | Colorado Air Quality Control Commission, 1996, Part B-emission standards for asbestos, *excerpted from* Regulation No. 8 "The control of hazardous air pollutants": Colorado Department of Public Health and Environment, 114 p. | NA |
| Regulatory | 1997 | Crane, D., 1997, Asbestos in air: Occupational Safety and Health Administration Method # ID-160. | A particle that is 5 um or longer, with a length-to-width ratio of 3 to 1 or longer. |
| Regulatory | 1997 | NYCRR (New York Code of Rules & Regulations) Title 10 Section 73.1 | NA |
| Regulatory | 2001 | Environmental Protection Agency Part 763-Asbestos Subpart E--Asbestos-Containing Materials in Schools (7-1-01 Edition) | NA |
| Regulatory | 2001 | Environmental Protection Agency Part 763-Asbestos Subpart E--Asbestos-Containing Materials in Schools Appendix A (7-1-01 Edition) | A structure greater than or equal to 0.5 um in length with an aspect ratio (length to width) of 5:1 or greater and having substantially parallel sides. |
| Regulatory | 2001 | 29 CFR 1910.1001 | Fiber means a particulate form of asbestos 5 micrometers or longer, with a length-to-diameter ratio of at least 3 to 1. |
| Regulatory | 2001 | 30 CFR 56.5001 | NA |
| Regulatory | 2001 | 17 CCR (California Code of Regulations) 93105 | NA |
| Regulatory | 2001 | West Virginia Code 16-32-2 | NA |
| Regulatory | 2002 | OAR (Oregon Administrative Rules) 340-248-0010 | NA |
| Regulatory | 2002 | 105 ILCS (Illinois Compiled Statutes Schools) 105/3 | NA |

**Table 7. Fibril**

| Community | Year | Source | Fibril |
|---|---|---|---|
| Industrial | 1975 | Winson, R.W., 1975, Asbestos, *in*, Industrial minerals and rocks (nonmetallics other than fuels): New York, N.Y., American Institute of Mining, Metallurgical, and Petroleum Engineers, Inc., p. 379-425. | NA |
| Industrial | 1981 | Steel, E. and Wylie, A., 1981, Mineralogical characteristics of asbestos *in* Riordon, P.H. ed, Geology of Asbestos Deposits, Society of Mining Engineers, p. 93-100. | A fibril is single or twinned crystal with a very small width, generally less than 0.5 um, and an extremely high aspect ratio; bundle of fibrils may have lengths reaching into the cm. |
| Industrial | 1998 | Virta, R.L., 2002, Asbestos: U.S. Geological Survey Open File-Report 02-149, 35 p. | NA |
| Interdisciplinary | 1974 | Thompson, C.S., 1974, Discussion of the mineralogy of industrial talcs: U.S. Bureau of Mines Information Circular 8639, p. 22-42. | NA |
| Interdisciplinary | 1978 | Zoltai, Tibor, 1978, History of asbestos-related mineralogical terminology: National Bureau of Standards Special Publication 506, p. 1-18. | NA |
| Interdisciplinary | 1979 | Chatfield, E.J., 1979, Measurement of asbestos fibres in the workplace and in the general environment *in* Ledoux, R.L., Mineralogical techniques of asbestos determination: Mineralogical Association of Canada Short Course, v. 4, p. 111-157. | NA |
| Interdisciplinary | 1980 | Dixon, W.C., 1980, Applications of optical microscopy in analysis of asbestos and quartz, *chap 2 of* Dollberg, D.D. and Werstuyft, A.W., eds., Analytical techniques in occupational health chemistry: Washington, D.C., American Chemical Society, p. 13-41. | NA |

**Table 7. Fibril**

| Community | Year | Source | Fibril |
|---|---|---|---|
| Interdisciplinary | 1980 | Clark, R.L., 1982, MSHA standard method for fiber identification by electron microscopy: National Bureau of Standards Special Publication 619, p. 207-210. | NA |
| Interdisciplinary | 1980 | Lee, R.J., Kelly, J.F., and Walker, J.S., 1982, Considerations in the analysis and definition of asbestos using electron microscopy: National Bureau of Standards Special Publication 619, p. 132-137. | NA |
| Interdisciplinary | 1980 | Chatfield, E.J. and Lewis, G.M., 1980, Development and application of an analytical technique for measurement of asbestos fibers in vermiculite: Scanning Electron Microscopy, p. 329-340. | NA |
| Interdisciplinary | 1984 | National Research Council, 1984, Asbestiform fibers-nonoccupational health risks: Washington D.C., National Academy Press, p. 25-47. | NA |
| Interdisciplinary | 1984 | Cossette, M., 1984, Defining asbestos particulates for monitoring purposes *in* Levadie, B. ed., Definitions for asbestos and other health-related silicates: ASTM Special Technical Publication 834, p. 5-49. | ...a single crystal in the form of a fiber |
| Interdisciplinary | 1984 | Ross, M., Kuntze, R.A., and Clifton, R.A., 1984, A definition for asbestos *in* Levadie, B. ed., Definitions for asbestos and other health-related silicates: ASTM Special Technical Publication 834, pp.139-147. | NA |

**Table 7. Fibril**

| Community | Year | Source | Fibril |
|---|---|---|---|
| Interdisciplinary | 1988 | Skinner, H.C., Ross, M., and Frondel, C., 1988, Asbestos and other fibrous materials: New York, N.Y., Oxford, 204 p. | A small fiber or the subdivision of a fiber (OED); also a small thread or fiber (WEB).  The term is usually employed to describe an elongate unit whose dimensions are smaller than fiber (fine-fibrous) and may be used to designate one member of a fibrous mineral aggregate, regardless of the size of the individual particles or the aggregate.  In the latter usage, the implication is that a fibril is the smallest unit that expresses the characteristics of a fiber or fibrous mass, and usually that the fibril is separable by subdivision parallel to the length of the fiber.  For example, chrysotile asbestos could theoretically be disaggregated to tubular individual fibrils with diameters in the range of 200 A.  The term fibril therefore has an ultimate lower limit.  Fibril is also related to the term polymer, which is defined as a chemical compound or mixture of compounds formed by polymerization and consisting of essentially repeating structural units, usually producing giant chainlike macromolecules.  Such a molecule is characterized by highly asymmetric geometry and anisotropic properties.  If a solid is formed from polymers, a fibril would be the smallest polymeric unit. |
| Interdisciplinary | 1990 | Mossman, B.T., Bignon, J., Corn, M., Seaton, A., and Gee, J.B.L., 1990, Asbestos-scientific developments and implications for public policy: Science, v. 247, p. 294-301. | NA |
| Interdisciplinary | 2000 | The American Heritage® Dictionary of the English Language, Fourth Edition Copyright © 2000 by Houghton Mifflin Company. | 1. A small slender fiber or filament |
| Interdisciplinary | 2000 | Wylie, A.G., 2000, The habit of asbestiform amphiboles: implications for the analysis of bulk samples *in* Beard, M.E. and Rooks, H.L, eds., Advances in environmental measurement methods for asbestos: ASTM Special Technical Publication 1342, p. 53-69. | NA |

**Table 7. Fibril**

| Community | Year | Source | Fibril |
|---|---|---|---|
| Interdisciplinary | 2001 | Beard, M.E., Crankshaw, O.S., Ennis, J.T., and Moore, C.E., 2001, Analysis of crayons for asbestos and other fibrous materials, and recommendations for improved analytical definitions:  Research Triangle Park, North Carolina, Research Triangle Institute, Center for Environmental Measurements and Quality Assurance, Earth and Mineral Sciences Department, [informal report], 23 p., plus appendices A-H. | NA |
| Interdisciplinary | 2001 | Nolan, R.P., Langer, A.M., Ross, M., Wicks, F.J., and Martin, R.F., eds., 2001, The health effects of chrysotile asbestos-contribution of science to risk-management decisions:  The Canadian Mineralogist Special Publication 5, 304 p. | NA |
| Medical | 1977 | Zielhuis, R.L., 1977, Public health risks of exposure to asbestos:  Elmsford, N.Y., Pergamon Press Inc., 143 p. | Chrysotile having a high magnesium content can be described as a sheet silicate in which the flat structure is rolled about an axis to form a narrow tube (termed fibril) possessing both strength and flexibility. |
| Medical | 1979 | Langer, A.M., Rohl, A.N., Wolff, M., and Selikoff, I.J., 1979, Asbestos, fibrous minerals and acicular cleavage fragments-Nomenclature and biological properties, *in* Lemen, R. and Dement, J.M., eds.,  Dust and disease: Park Forest South, Ill., Pathotox Publishers, p. 1-22. | NA |
| Medical | 1998 | Blake, T., Castranova, V., Schwegler-Berry, D., Baron, P., Deye, G.J., Li, C., and Jones, W., 1998, Effect of fiber length on glass microfiber cytotoxicity: Journal of Toxicology and Environmental Health, v. 54, p. 243-259. | NA |
| Medical | 2001 | Ninth Report on Carcinogens, January 2001 http://ehp.niehs.nih.gov/roc/ninth/known/asbestos.pdf | NA |

**Table 7. Fibril**

| Community | Year | Source | Fibril |
|---|---|---|---|
| Mineralogical | 1914 | Dana, E.S., 1914, The system of mineralogy of James Dwight Dana, descriptive mineralogy (6th ed): New York, N.Y., Wiley, p. | NA |
| Mineralogical | 1977 | Campbell, W.J., Blake, R.L, Brown, L.L., Cather, E.E., and Sjober, J.J., 1977, Selected silicate minerals and their asbestiform varieties: U.S. Bureau of Mines Information Circular 8751, 56 p. | A single fiber, which cannot be separated into smaller components without losing its fibrous properties or appearances. |
| Mineralogical | 1979 | Campbell, W.J., Steel, E.B., Virta, R.L., and Eisner, M.H., 1979, Relationship of mineral habit to size characteristics for tremolite cleavage fragments and fibers: U.S. Bureau of Mines Report of Investigations 8367, 18 p. | NA |
| Mineralogical | 1980 | Bates, R.L., and Jackson, J.A., eds., 1980, Glossary of geology (2d ed.): Falls Church, Va., American Geological Institute, 749 p. | NA |
| Mineralogical | 1982 | MacKenzie, W.S., Donaldson, C.H., and Guilford, C., 1982, Atlas of igneous rocks and their textures: New York, N.Y., Wiley, p. 20. | NA |
| Mineralogical | 1987 | Dorling, M. and Zussman, J., 1987, Characteristics of asbestiform and non-asbestiform calcic amphiboles: Lithos, v. 20, p. 469-489. | NA |
| Mineralogical | 1988 | Skinner, H.C., Ross, M., and Frondel, C., 1988, Asbestos and other fibrous materials: New York, N.Y., Oxford, 204 p. | NA |
| Mineralogical | 1993 | Klein, C. and Hurlbut, C.S., Jr. ,1993, Manual of mineralogy (after James D. Dana) (21st ed.): New York, N.Y., Wiley, 681 p. | NA |

**Table 7. Fibril**

| Community | Year | Source | Fibril |
|---|---|---|---|
| Mineralogical | 1993 | Veblen, D.R. and Wylie, A.G., 1993, Mineralogy of amphiboles and 1:1 layer silicates in Guthrie Jr., G.D. and Mossman, B.T., eds., Health effects of mineral dusts: Reviews in Mineralogy, v. 28, p. 61-137, | Fibrils are single, elementary fibers that have very small width. |
| Mineralogical | 2001 | Virta, R.L., 2001, Some facts about asbestos: U.S. Geological Survey Fact Sheet FS-012-01, 4 p. | NA |
| Mineralogical | 2002 | http://webmineral.com/help/Fracture.html | NA |
| Mineralogical | 2002 | http://webmineral.com/help/Habits.html | NA |
| Regulatory | 1974 | U.S. District Court, district of Minnesota, 5th Division. Supplemental Memorandum. No. 5-72, Civil 19, Appendix 5, May 11, 1974, p. 24 | NA |
| Regulatory | 1976 | National Institute for Occupational Safety and Health, 1976, Revised recommended asbestos standard: DHEW (NIOSH) Publication No. 77-169, 96 p. | NA |
| Regulatory | 1983 | 29 CFR 1910.1001 | NA |
| Regulatory | 1990 | Ohio Administrative Code (OAC) 3745-20-01 | NA |
| Regulatory | 1992 | Crane, D., 1992, Polarized light microscopy of asbestos: Occupational Safety and Health Administration Method # ID-191. | NA |
| Regulatory | 1992 | Occupational Safety and Health Administration, 1992, Preambles IV. Mineralogical Considerations, National Stone Association and American Mining Congress | NA |
| Regulatory | 1993 | Perkins, R.L. and Harvey, B.W., 1993, Method for the determination of asbestos in bulk building materials: U.S. Environmental Protection Agency EPA/600/R-93/116, Office of Research and Development, Washington, D.C. | The individual unit of structure of fibers. |

**Table 7. Fibril**

| Community | Year | Source | Fibril |
|---|---|---|---|
| Regulatory | 1993 | Occupational Safety and Health Administration, 1993, Better protection against asbestos in the workplace:  U.S. Department of Labor Fact Sheet No. OSHA 93-06. Available on the world wide web at http://www.osha.gov/pls/oshaweb/owadisp.show_document?p_table=FACT_SHEETS&p_id=144 | NA |
| Regulatory | 1995 | American Society for Testing and Materials, 1995, Standard test method for microvacuum sampling and indirect analysis of dust by transmission electron microscopy for asbestos structure number concentrations:  West Conshohocken, Pa., ASTM 5755-95, 13 p. | a single fiber that cannot be separated into smaller components without losing its fibrous properties or appearance. |
| Regulatory | 1995 | International Organization for Standardization, 1995, ISO 10312 Ambient air-determination of asbestos fibres-direct-transfer transmission electron microscopy method (1st ed): Geneve, Switzerland, International Organization for Standardization, 51 p. | A single fibre of asbestos, which cannot be further separated longitudinally into smaller components without losing its fibrous properties or appearances. |
| Regulatory | 1996 | Colorado Air Quality Control Commission, 1996, Part B-emission standards for asbestos, *excerpted from* Regulation No. 8 "The control of hazardous air pollutants": Colorado Department of Public Health and Environment, 114 p. | NA |
| Regulatory | 1997 | Crane, D., 1997, Asbestos in air: Occupational Safety and Health Administration Method # ID-160. | NA |
| Regulatory | 1997 | NYCRR (New York Code of Rules & Regulations) Title 10 Section 73.1 | NA |

**Table 7. Fibril**

| Community | Year | Source | Fibril |
|---|---|---|---|
| Regulatory | 2001 | Environmental Protection Agency Part 763-Asbestos Subpart E--Asbestos-Containing Materials in Schools (7-1-01 Edition) | NA |
| Regulatory | 2001 | Environmental Protection Agency Part 763-Asbestos Subpart E--Asbestos-Containing Materials in Schools Appendix A (7-1-01 Edition) | NA |
| Regulatory | 2001 | 29 CFR 1910.1001 | NA |
| Regulatory | 2001 | 30 CFR 56.5001 | NA |
| Regulatory | 2001 | 17 CCR (California Code of Regulations) 93105 | NA |
| Regulatory | 2001 | West Virginia Code 16-32-2 | NA |
| Regulatory | 2002 | OAR (Oregon Administrative Rules) 340-248-0010 | NA |
| Regulatory | 2002 | 105 ILCS (Illinois Compiled Statutes Schools) 105/3 | NA |

**Table 8. Fibrous**

| Community | Year | Source | Fibrous |
|---|---|---|---|
| Industrial | 1975 | Winson, R.W., 1975, Asbestos, *in*, Industrial minerals and rocks (nonmetallics other than fuels): New York, N.Y., American Institute of Mining, Metallurgical, and Petroleum Engineers, Inc., p. 379-425. | NA |
| Industrial | 1981 | Steel, E. and Wylie, A., 1981, Mineralogical characteristics of asbestos *in* Riordon, P.H. ed, Geology of Asbestos Deposits, Society of Mining Engineers, p. 93-100. | NA |
| Industrial | 1998 | Virta, R.L., 2002, Asbestos: U.S. Geological Survey Open File-Report 02-149, 35 p. | NA |
| Interdisciplinary | 1974 | Thompson, C.S., 1974, Discussion of the mineralogy of industrial talcs:  U.S. Bureau of Mines Information Circular 8639, p. 22-42. | NA |
| Interdisciplinary | 1978 | Zoltai, Tibor, 1978, History of asbestos-related mineralogical terminology: National Bureau of Standards Special Publication 506, p. 1-18. | The descriptive term used for a mineral which is composed of parallel, radiating or interlaced aggregates of fibers, from which the fibers are usually separable. |
| Interdisciplinary | 1979 | Chatfield, E.J., 1979, Measurement of asbestos fibres in the workplace and in the general environment *in* Ledoux, R.L., Mineralogical techniques of asbestos determination: Mineralogical Association of Canada Short Course, v. 4, p. 111-157. | NA |
| Interdisciplinary | 1980 | Dixon, W.C., 1980, Applications of optical microscopy in analysis of asbestos and quartz, *chap 2 of* Dollberg, D.D. and Werstuyft, A.W., eds., Analytical techniques in occupational health chemistry: Washington, D.C., American Chemical Society, p. 13-41. | NA |

**Table 8. Fibrous**

| Community | Year | Source | Fibrous |
|---|---|---|---|
| Interdisciplinary | 1980 | Clark, R.L., 1982, MSHA standard method for fiber identification by electron microscopy: National Bureau of Standards Special Publication 619, p. 207-210. | NA |
| Interdisciplinary | 1980 | Lee, R.J., Kelly, J.F., and Walker, J.S., 1982, Considerations in the analysis and definition of asbestos using electron microscopy: National Bureau of Standards Special Publication 619, p. 132-137. | NA |
| Interdisciplinary | 1980 | Chatfield, E.J. and Lewis, G.M., 1980, Development and application of an analytical technique for measurement of asbestos fibers in vermiculite: Scanning Electron Microscopy, p. 329-340. | NA |
| Interdisciplinary | 1984 | National Research Council, 1984, Asbestiform fibers-nonoccupational health risks: Washington D.C., National Academy Press, p. 25-47. | FIBROUS refers to (1) single crystals that resemble organic fibers such as hair or cotton and (2) large crystals or crystalline aggregates that look like they are composed of fibers (I.e., long, thin, needlelike elements) (Dana and Ford, 1932). The apparent fibers do not need to be separable. If the fibers are separable and are strong and flexible, they are ASBESTIFORM. If they have the normal strength and brittleness of the mineral, they are ACICULAR. If the apparent fibers are not separable, the specimen may be a single crystal or a multiple (polycrystalline) aggregate displaying a fibrous pattern (resulting, for example, from striation or pseudomorphic replacement of an initially fibrous mineral). |
| Interdisciplinary | 1984 | Cossette, M., 1984, Defining asbestos particulates for monitoring purposes in Levadie, B. ed., Definitions for asbestos and other health-related silicates: ASTM Special Technical Publication 834, p. 5-49. | fibrous particulate-fibers, fiber fragments, and fiber agglomerates |
| Interdisciplinary | 1984 | Ross, M., Kuntze, R.A., and Clifton, R.A., 1984, A definition for asbestos in Levadie, B. ed., Definitions for asbestos and other health-related silicates: ASTM Special Technical Publication 834, pp.139-147. | NA |

**Table 8. Fibrous**

| Community | Year | Source | Fibrous |
|---|---|---|---|
| Interdisciplinary | 1988 | Skinner, H.C., Ross, M., and Frondel, C., 1988, Asbestos and other fibrous materials: New York, N.Y., Oxford, 204 p. | Full of fibers, or formed of fibers (OED), with dimensions unspecified but implied, by comparison, to be similar to the natural materials thread and hair (see Fiber).  Aggregates of any size of individual fibers may form relatively thick fibrous bundles, thus becoming visible to the naked eye. |
| Interdisciplinary | 1990 | Mossman, B.T., Bignon, J., Corn, M., Seaton, A., and Gee, J.B.L., 1990, Asbestos-scientific developments and implications for public policy: Science, v. 247, p. 294-301. | NA |
| Interdisciplinary | 2000 | The American Heritage® Dictionary of the English Language, Fourth Edition Copyright © 2000 by Houghton Mifflin Company. | 1. Having, consisting of, or resembling fibers. |
| Interdisciplinary | 2000 | Wylie, A.G., 2000, The habit of asbestiform amphiboles: implications for the analysis of bulk samples *in* Beard, M.E. and Rooks, H.L., eds., Advances in environmental measurement methods for asbestos: ASTM Special Technical Publication 1342, p. 53-69. | NA |
| Interdisciplinary | 2001 | Beard, M.E., Crankshaw, O.S., Ennis, J.T., and Moore, C.E., 2001, Analysis of crayons for asbestos and other fibrous materials, and recommendations for improved analytical definitions:  Research Triangle Park, North Carolina, Research Triangle Institute, Center for Environmental Measurements and Quality Assurance, Earth and Mineral Sciences Department, [informal report], 23 p., plus appendices A-H. | NA |
| Interdisciplinary | 2001 | Nolan, R.P., Langer, A.M., Ross, M., Wicks, F.J., and Martin, R.F., eds., 2001, The health effects of chrysotile asbestos-contribution of science to risk-management decisions:  The Canadian Mineralogist Special Publication 5, 304 p. | NA |

**Table 8. Fibrous**

| Community | Year | Source | Fibrous |
|---|---|---|---|
| Medical | 1977 | Zielhuis, R.L., 1977, Public health risks of exposure to asbestos: Elmsford, N.Y., Pergamon Press Inc., 143 p. | NA |
| Medical | 1979 | Langer, A.M., Rohl, A.N., Wolff, M., and Selikoff, I.J., 1979, Asbestos, fibrous minerals and acicular cleavage fragments-Nomenclature and biological properties, *in* Lemen, R. and Dement, J.M., eds., Dust and disease: Park Forest South, Ill., Pathotox Publishers, p. 1-22. | NA |
| Medical | 1998 | Blake, T., Castranova, V., Schwegler-Berry, D., Baron, P., Deye, G.J., Li, C., and Jones, W., 1998, Effect of fiber length on glass microfiber cytotoxicity: Journal of Toxicology and Environmental Health, v. 54, p. 243-259. | NA |
| Medical | 2001 | Ninth Report on Carcinogens, January 2001 http://ehp.niehs.nih.gov/roc/ninth/known/asbestos.pdf | NA |
| Mineralogical | 1914 | Dana, E.S., 1914, The system of mineralogy of James Dwight Dana, descriptive mineralogy (6th ed): New York, N.Y., Wiley, p. | NA |
| Mineralogical | 1977 | Campbell, W.J., Blake, R.L, Brown, L.L., Cather, E.E., and Sjober, J.J., 1977, Selected silicate minerals and their asbestiform varieties: U.S. Bureau of Mines Information Circular 8751, 56 p. | The occurrence of a mineral in bundles of fibers, resembling organic fibers in texture, from which the fibers can usually be separated (for example, satin-spar and chrysotile). |
| Mineralogical | 1979 | Campbell, W.J., Steel, E.B., Virta, R.L., and Eisner, M.H., 1979, Relationship of mineral habit to size characteristics for tremolite cleavage fragments and fibers: U.S. Bureau of Mines Report of Investigations 8367, 18 p. | The term fibrous is used in a general mineralogical way to describe any aggregates of grains that crystallize in a needlelike habit and appear to be composed of fibers. |
| Mineralogical | 1980 | Bates, R.L., and Jackson, J.A., eds., 1980, Glossary of geology (2d ed.): Falls Church, Va., American Geological Institute, 749 p. | Said of the habit of a mineral, and of the mineral itself (e.g. asbestos), that crystallizes in elongated thin, needle-like grains, or fibers. |

**Table 8. Fibrous**

| Community | Year | Source | Fibrous |
|---|---|---|---|
| Mineralogical | 1982 | MacKenzie, W.S., Donaldson, C.H., and Guilford, C., 1982, Atlas of igneous rocks and their textures: New York, N.Y., Wiley, p. 20. | NA |
| Mineralogical | 1987 | Dorling, M. and Zussman, J., 1987, Characteristics of asbestiform and non-asbestiform calcic amphiboles: Lithos, v. 20, p. 469-489. | NA |
| Mineralogical | 1988 | Skinner, H.C., Ross, M., and Frondel, C., 1988, Asbestos and other fibrous materials: New York, N.Y., Oxford, 204 p. | NA |
| Mineralogical | 1993 | Klein, C. and Hurlbut, C.S., Jr. ,1993, Manual of mineralogy (after James D. Dana) (21st ed.):  New York, N.Y., Wiley, 681 p. | Aggregate of slender fibers, parallel or radiating |
| Mineralogical | 1993 | Veblen, D.R. and Wylie, A.G., 1993, Mineralogy of amphiboles and 1:1 layer silicates in Guthrie Jr., G.D. and Mossman, B.T., eds., Health effects of mineral dusts: Reviews in Mineralogy, v. 28, p. 61-137, | NA |
| Mineralogical | 2001 | Virta, R.L., 2001, Some facts about asbestos: U.S. Geological Survey Fact Sheet FS-012-01, 4 p. | When the length is extremely long compared with the width, the crystals are called asbestiform or fibrous. |
| Mineralogical | 2002 | http://webmineral.com/help/Fracture.html | [*About fibrous fracture*] Thin, elongated fractures produced by crystal forms or intersecting cleavages (e.g. asbestos). |
| Mineralogical | 2002 | http://webmineral.com/help/Habits.html | [*About mineral habit*]  Crystals made up of fibers. |
| Regulatory | 1974 | U.S. District Court, district of Minnesota, 5th Division. Supplemental Memorandum. No. 5-72, Civil 19, Appendix 5, May 11, 1974, p. 24 | NA |
| Regulatory | 1976 | National Institute for Occupational Safety and Health, 1976,  Revised recommended asbestos standard:  DHEW (NIOSH) Publication No. 77-169, 96 p. | NA |
| Regulatory | 1983 | 29 CFR 1910.1001 | NA |
| Regulatory | 1990 | Ohio Administrative Code (OAC) 3745-20-01 | NA |

**Table 8. Fibrous**

| Community | Year | Source | Fibrous |
|---|---|---|---|
| Regulatory | 1992 | Crane, D., 1992, Polarized light microscopy of asbestos: Occupational Safety and Health Administration Method # ID-191. | NA |
| Regulatory | 1992 | Occupational Safety and Health Administration, 1992, Preambles IV. Mineralogical Considerations, National Stone Association and American Mining Congress | NA |
| Regulatory | 1993 | Perkins, R.L. and Harvey, B.W., 1993, Method for the determination of asbestos in bulk building materials: U.S. Environmental Protection Agency EPA/600/R-93/116, Office of Research and Development, Washington, D.C. | NA |
| Regulatory | 1993 | Occupational Safety and Health Administration, 1993, Better protection against asbestos in the workplace:  U.S. Department of Labor Fact Sheet No. OSHA 93-06. Available on the world wide web at http://www.osha.gov/pls/oshaweb/owadisp.show_document?p_table=FACT_SHEETS&p_id=144 | NA |
| Regulatory | 1995 | American Society for Testing and Materials, 1995, Standard test method for microvacuum sampling and indirect analysis of dust by transmission electron microscopy for asbestos structure number concentrations:  West Conshohocken, Pa., ASTM 5755-95, 13 p. | ...of a mineral composed of parallel, radiating, or interlaced aggregates of fibers, from which the fibers are sometimes separable.  That is, the crystalline aggregate may be referred to as fibrous even if it is not composed of separable fibers, but has that distinct appearance.  The term fibrous is used in a general mineralogical way to describe aggregates of grains that crystallize in a needle-like habit and appear to be composed of fibers.  Fibrous has a much more general meaning than asbestos.  While it is correct that all asbestos minerals are fibrous, not all minerals having fibrous habits are asbestos. |

**Table 8. Fibrous**

| Community | Year | Source | Fibrous |
|---|---|---|---|
| Regulatory | 1995 | International Organization for Standardization, 1995, ISO 10312 Ambient air-determination of asbestos fibres-direct-transfer transmission electron microscopy method (1st ed): Geneve, Switzerland, International Organization for Standardization, 51 p. | (fibrous structure) A fibre, or connected grouping of fibres, with or without other particles. |
| Regulatory | 1996 | Colorado Air Quality Control Commission, 1996, Part B-emission standards for asbestos, *excerpted from* Regulation No. 8 "The control of hazardous air pollutants": Colorado Department of Public Health and Environment, 114 p. | NA |
| Regulatory | 1997 | Crane, D., 1997, Asbestos in air: Occupational Safety and Health Administration Method # ID-160. | NA |
| Regulatory | 1997 | NYCRR (New York Code of Rules & Regulations) Title 10 Section 73.1 | NA |
| Regulatory | 2001 | Environmental Protection Agency Part 763-Asbestos Subpart E--Asbestos-Containing Materials in Schools (7-1-01 Edition) | NA |
| Regulatory | 2001 | Environmental Protection Agency Part 763-Asbestos Subpart E--Asbestos-Containing Materials in Schools Appendix A (7-1-01 Edition) | NA |
| Regulatory | 2001 | 29 CFR 1910.1001 | NA |
| Regulatory | 2001 | 30 CFR 56.5001 | NA |
| Regulatory | 2001 | 17 CCR (California Code of Regulations) 93105 | NA |
| Regulatory | 2001 | West Virginia Code 16-32-2 | NA |
| Regulatory | 2002 | OAR (Oregon Administrative Rules) 340-248-0010 | NA |
| Regulatory | 2002 | 105 ILCS (Illinois Compiled Statutes Schools) 105/3 | NA |

**Table 9. Parting**

| Community | Year | Source | Parting |
|---|---|---|---|
| Industrial | 1975 | Winson, R.W., 1975, Asbestos, *in*, Industrial minerals and rocks (nonmetallics other than fuels): New York, N.Y., American Institute of Mining, Metallurgical, and Petroleum Engineers, Inc., p. 379-425. | NA |
| Industrial | 1981 | Steel, E. and Wylie, A., 1981, Mineralogical characteristics of asbestos *in* Riordon, P.H. ed, Geology of Asbestos Deposits, Society of Mining Engineers, p. 93-100. | NA |
| Industrial | 1998 | Virta, R.L., 2002, Asbestos: U.S. Geological Survey Open File-Report 02-149, 35 p. | NA |
| Interdisciplinary | 1974 | Thompson, C.S., 1974, Discussion of the mineralogy of industrial talcs: U.S. Bureau of Mines Information Circular 8639, p. 22-42. | NA |
| Interdisciplinary | 1978 | Zoltai, Tibor, 1978, History of asbestos-related mineralogical terminology: National Bureau of Standards Special Publication 506, p. 1-18. | NA |
| Interdisciplinary | 1979 | Chatfield, E.J., 1979, Measurement of asbestos fibres in the workplace and in the general environment *in* Ledoux, R.L., Mineralogical techniques of asbestos determination: Mineralogical Association of Canada Short Course, v. 4, p. 111-157. | NA |
| Interdisciplinary | 1980 | Dixon, W.C., 1980, Applications of optical microscopy in analysis of asbestos and quartz, *chap 2 of* Dollberg, D.D. and Werstuyft, A.W., eds., Analytical techniques in occupational health chemistry: Washington, D.C., American Chemical Society, p. 13-41. | When a mineral breaks along a plane of structural weakness it exhibits parting. |
| Interdisciplinary | 1980 | Clark, R.L., 1982, MSHA standard method for fiber identification by electron microscopy: National Bureau of Standards Special Publication 619, p. 207-210. | NA |

**Table 9. Parting**

| Community | Year | Source | Parting |
|---|---|---|---|
| Interdisciplinary | 1980 | Lee, R.J., Kelly, J.F., and Walker, J.S., 1982, Considerations in the analysis and definition of asbestos using electron microscopy: National Bureau of Standards Special Publication 619, p. 132-137. | NA |
| Interdisciplinary | 1980 | Chatfield, E.J. and Lewis, G.M., 1980, Development and application of an analytical technique for measurement of asbestos fibers in vermiculite: Scanning Electron Microscopy, p. 329-340. | NA |
| Interdisciplinary | 1984 | National Research Council, 1984, Asbestiform fibers-nonoccupational health risks: Washington D.C., National Academy Press, p. 25-47. | NA |
| Interdisciplinary | 1984 | Cossette, M., 1984, Defining asbestos particulates for monitoring purposes *in* Levadie, B. ed., Definitions for asbestos and other health-related silicates: ASTM Special Technical Publication 834, p. 5-49. | NA |
| Interdisciplinary | 1984 | Ross, M., Kuntze, R.A., and Clifton, R.A., 1984, A definition for asbestos *in* Levadie, B. ed., Definitions for asbestos and other health-related silicates: ASTM Special Technical Publication 834, pp.139-147. | NA |
| Interdisciplinary | 1988 | Skinner, H.C., Ross, M., and Frondel, C., 1988, Asbestos and other fibrous materials: New York, N.Y., Oxford, 204 p. | NA |
| Interdisciplinary | 1990 | Mossman, B.T., Bignon, J., Corn, M., Seaton, A., and Gee, J.B.L., 1990, Asbestos-scientific developments and implications for public policy: Science, v. 247, p. 294-301. | NA |
| Interdisciplinary | 2000 | The American Heritage® Dictionary of the English Language, Fourth Edition Copyright © 2000 by Houghton Mifflin Company. | NA |

**Table 9. Parting**

| Community | Year | Source | Parting |
|---|---|---|---|
| Interdisciplinary | 2000 | Wylie, A.G., 2000, The habit of asbestiform amphiboles: implications for the analysis of bulk samples *in* Beard, M.E. and Rooks, H.L, eds., Advances in environmental measurement methods for asbestos: ASTM Special Technical Publication 1342, p. 53-69. | Structural defects produce planes of weakness called parting |
| Interdisciplinary | 2001 | Beard, M.E., Crankshaw, O.S., Ennis, J.T., and Moore, C.E., 2001, Analysis of crayons for asbestos and other fibrous materials, and recommendations for improved analytical definitions:  Research Triangle Park, North Carolina, Research Triangle Institute, Center for Environmental Measurements and Quality Assurance, Earth and Mineral Sciences Department, [informal report], 23 p., plus appendices A-H. | NA |
| Interdisciplinary | 2001 | Nolan, R.P., Langer, A.M., Ross, M., Wicks, F.J., and Martin, R.F., eds., 2001, The health effects of chrysotile asbestos-contribution of science to risk-management decisions:  The Canadian Mineralogist Special Publication 5, 304 p. | NA |
| Medical | 1977 | Zielhuis, R.L., 1977, Public health risks of exposure to asbestos:  Elmsford, N.Y., Pergamon Press Inc., 143 p. | NA |
| Medical | 1979 | Langer, A.M., Rohl, A.N., Wolff, M., and Selikoff, I.J., 1979, Asbestos, fibrous minerals and acicular cleavage fragments-Nomenclature and biological properties, *in* Lemen, R. and Dement, J.M., eds.,  Dust and disease: Park Forest South, Ill., Pathotox Publishers, p. 1-22. | NA |

**Table 9. Parting**

| Community | Year | Source | Parting |
|---|---|---|---|
| Medical | 1998 | Blake, T., Castranova, V., Schwegler-Berry, D., Baron, P., Deye, G.J., Li, C., and Jones, W., 1998, Effect of fiber length on glass microfiber cytotoxicity: Journal of Toxicology and Environmental Health, v. 54, p. 243-259. | NA |
| Medical | 2001 | Ninth Report on Carcinogens, January 2001 http://ehp.niehs.nih.gov/roc/ninth/known/asbestos.pdf | NA |
| Mineralogical | 1914 | Dana, E.S., 1914, The system of mineralogy of James Dwight Dana, descriptive mineralogy (6th ed):  New York, N.Y., Wiley, p. | ...is applied to a separation which is not produced along a plane of minimum cohesion in the lattice but is produced by lamellar twinning, by directed pressure exerted on the crystal, or by oriented inclusions which develop planes of weakness. Parting, in some instances, does not conform to the symmetry requirements of the crystal. |
| Mineralogical | 1977 | Campbell, W.J., Blake, R.L, Brown, L.L., Cather, E.E., and Sjober, J.J., 1977, Selected silicate minerals and their asbestiform varieties: U.S. Bureau of Mines Information Circular 8751, 56 p. | The tendency of a crystal or grain to break along crystallographic planes weakened by inclusions or structural defects.  Different specimens of the same mineral may or may not exhibit parting.  Twinned crystals often part along composition planes, which are lattice planes and therefore, potential crystal faces.  Parting is similar to cleavage. |
| Mineralogical | 1979 | Campbell, W.J., Steel, E.B., Virta, R.L., and Eisner, M.H., 1979, Relationship of mineral habit to size characteristics for tremolite cleavage fragments and fibers: U.S. Bureau of Mines Report of Investigations 8367, 18 p. | NA |
| Mineralogical | 1980 | Bates, R.L., and Jackson, J.A., eds., 1980, Glossary of geology (2d ed.):  Falls Church, Va., American Geological Institute, 749 p. | [crystal] The breaking of a mineral along planes of weakness caused by deformation or twinning; e.g. garnet.  Cf: cleavage [mineral]. |
| Mineralogical | 1982 | MacKenzie, W.S., Donaldson, C.H., and Guilford, C., 1982, Atlas of igneous rocks and their textures: New York, N.Y., Wiley, p. 20. | NA |
| Mineralogical | 1987 | Dorling, M. and Zussman, J., 1987, Characteristics of asbestiform and non-asbestiform calcic amphiboles: Lithos, v. 20, p. 469-489. | NA |

**Table 9. Parting**

| Community | Year | Source | Parting |
|---|---|---|---|
| Mineralogical | 1988 | Skinner, H.C., Ross, M., and Frondel, C., 1988, Asbestos and other fibrous materials: New York, N.Y., Oxford, 204 p. | NA |
| Mineralogical | 1993 | Klein, C. and Hurlbut, C.S., Jr.,1993, Manual of mineralogy (after James D. Dana) (21st ed.): New York, N.Y., Wiley, 681 p. | When minerals break along planes of structural weakness. The weakness may result from pressure or twinning or exsolution; and, because it is parallel to rational crystallographic planes, it resembles cleavage. |
| Mineralogical | 1993 | Veblen, D.R. and Wylie, A.G., 1993, Mineralogy of amphiboles and 1:1 layer silicates in Guthrie Jr., G.D. and Mossman, B.T., eds., Health effects of mineral dusts: Reviews in Mineralogy, v. 28, p. 61-137, | Parting refers to approximately planar breakage along planes that are not cleavage planes. |
| Mineralogical | 2001 | Virta, R.L., 2001, Some facts about asbestos: U.S. Geological Survey Fact Sheet FS-012-01, 4 p. | NA |
| Mineralogical | 2002 | http://webmineral.com/help/Fracture.html | NA |
| Mineralogical | 2002 | http://webmineral.com/help/Habits.html | NA |
| Regulatory | 1974 | U.S. District Court, district of Minnesota, 5th Division. Supplemental Memorandum. No. 5-72, Civil 19, Appendix 5, May 11, 1974, p. 24 | NA |
| Regulatory | 1976 | National Institute for Occupational Safety and Health, 1976, Revised recommended asbestos standard: DHEW (NIOSH) Publication No. 77-169, 96 p. | NA |
| Regulatory | 1983 | 29 CFR 1910.1001 | NA |
| Regulatory | 1990 | Ohio Administrative Code (OAC) 3745-20-01 | NA |
| Regulatory | 1992 | Crane, D., 1992, Polarized light microscopy of asbestos: Occupational Safety and Health Administration Method # ID-191. | NA |
| Regulatory | 1992 | Occupational Safety and Health Administration, 1992, Preambles IV. Mineralogical Considerations, National Stone Association and American Mining Congress | NA |

**Table 9. Parting**

| Community | Year | Source | Parting |
|-----------|------|--------|---------|
| Regulatory | 1993 | Perkins, R.L. and Harvey, B.W., 1993, Method for the determination of asbestos in bulk building materials: U.S. Environmental Protection Agency EPA/600/R-93/116, Office of Research and Development, Washington, D.C. | NA |
| Regulatory | 1993 | Occupational Safety and Health Administration, 1993, Better protection against asbestos in the workplace:  U.S. Department of Labor Fact Sheet No. OSHA 93-06. Available on the world wide web at http://www.osha.gov/pls/oshaweb/owadisp.show_document?p_table=FACT_SHEETS&p_id=144 | NA |
| Regulatory | 1995 | American Society for Testing and Materials, 1995, Standard test method for microvacuum sampling and indirect analysis of dust by transmission electron microscopy for asbestos structure number concentrations:  West Conshohocken, Pa., ASTM 5755-95, 13 p. | NA |
| Regulatory | 1995 | International Organization for Standardization, 1995, ISO 10312 Ambient air-determination of asbestos fibres-direct-transfer transmission electron microscopy method (1st ed): Geneve, Switzerland, International Organization for Standardization, 51 p. | NA |
| Regulatory | 1996 | Colorado Air Quality Control Commission, 1996, Part B-emission standards for asbestos, *excerpted from* Regulation No. 8 "The control of hazardous air pollutants": Colorado Department of Public Health and Environment, 114 p. | NA |
| Regulatory | 1997 | Crane, D., 1997, Asbestos in air: Occupational Safety and Health Administration Method # ID-160. | NA |

**Table 9. Parting**

| Community | Year | Source | Parting |
|-----------|------|--------|---------|
| Regulatory | 1997 | NYCRR (New York Code of Rules & Regulations) Title 10 Section 73.1 | NA |
| Regulatory | 2001 | Environmental Protection Agency Part 763-Asbestos Subpart E--Asbestos-Containing Materials in Schools (7-1-01 Edition) | NA |
| Regulatory | 2001 | Environmental Protection Agency Part 763-Asbestos Subpart E--Asbestos-Containing Materials in Schools Appendix A (7-1-01 Edition) | NA |
| Regulatory | 2001 | 29 CFR 1910.1001 | NA |
| Regulatory | 2001 | 30 CFR 56.5001 | NA |
| Regulatory | 2001 | 17 CCR (California Code of Regulations) 93105 | NA |
| Regulatory | 2001 | West Virginia Code 16-32-2 | NA |
| Regulatory | 2002 | OAR (Oregon Administrative Rules) 340-248-0010 | NA |
| Regulatory | 2002 | 105 ILCS (Illinois Compiled Statutes Schools) 105/3 | NA |

Exhibit 35

Case 3:16-md-02738-MAS-RLS   Document 33123-21   Filed 08/23/24   Page 1305 of 1320
Case 2:16-cv-00054-JRH-BKE   Document 60-1   Filed 09/19/17   Page 2 of 27
PageID: 250300

Case 3:16-md-02738-MAS-RLS   Document 33128-21   Filed 08/28/24   Page 1306 of 1320
Case 2:16-cv-00034-JRH-BKE   Document 60-1   Filed 09/19/17   Page 3 of 27
PageID: 250301

# UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
# REGION IX

**Response to the November 2005 National Stone, Sand & Gravel Association
Report Prepared by the R.J. Lee Group, Inc
"Evaluation of EPA's Analytical Data from the El Dorado Hills Asbestos
Evaluation Project"**

**April 20, 2006**



Case 3:16-md-02738-MAS-RLS    Document 33128-1    Filed 08/28/24    Page 1307 of 1320
Case 2:16-cv-00054-JRH-BKE    Document 60-1    Filed 09/19/17    Page 4 of 77
PageID: 250302

**United States Environmental Protection Agency Region 9**
**Response to the November 2005 National Stone, Sand & Gravel Association report**
**prepared by the R.J. Lee Group, Inc:**
**"Evaluation of EPA's Analytical Data from the El Dorado Hills**
**Asbestos Evaluation Project"**

This document constitutes the United States Environmental Protection Agency Region 9 (EPA Region 9) response to the major findings and conclusions of the National Stone, Sand & Gravel Association report "Evaluation of EPA's Analytical Data from the El Dorado Hills Asbestos Evaluation Project" prepared by the R. J. Lee Group (R. J. Lee Report).  A more detailed analysis will be completed after additional information is received from the R. J. Lee Group and the National Stone, Sand & Gravel Association,[1] and the United States Geological Survey (USGS).

The R. J. Lee Report draws conclusions that are contradicted by the El Dorado Hills data and by generally accepted scientific principles for measuring asbestos exposure.

<u>Overview</u>

The R. J. Lee Group review of the EPA data was contracted by the National Stone, Sand & Gravel Association.  The El Dorado County Office of Education funded the three reviewers who wrote letters in support of the R. J. Lee Report and whose reviews are included in this response.

The EPA Region 9 El Dorado Hills Naturally Occurring Asbestos Exposure Assessment was designed to measure the exposures to asbestos fibers, if any, that resulted from sports and play activities that disturbed dust and soil. EPA Region 9 adhered to accepted EPA standards for sampling and analysis, including rigorous quality assurance/quality control, and to the standard methodologies of EPA exposure and risk assessment.

**The R. J. Lee Report Criticizes EPA Region 9 for Using Established Scientific and Public Health Protocols -** In assessing naturally occurring asbestos exposures in El Dorado Hills, EPA evaluated asbestos exposures using the PCME (phase contrast microscopy equivalent) asbestos fiber size classification.  The PCME classification was used because human epidemiological studies, which form the basis of knowledge of asbestos health effects, measured asbestos fiber concentrations using phase contrast microscopy (PCM) analytical methods.  PCME is the standard term for fibers counted by more modern analytical methods that are of equivalent size to those fibers that would be seen by PCM analysis, and includes fibers with a length to width aspect ratio of 3 to 1 or greater.  EPA considered PCME fibers in our analysis of the El Dorado data to be consistent with the existing health databases and risk assessment

---

[1]On March 9, 2006, EPA Region 9 sent a letter to the R.J. Lee Group and the National Stone, Sand, & Gravel Association asking for additional information to support the findings and conclusions of the R.J. Lee Report.

-1-

Case 3:16-md-02738-MAS-RLS Document 33128-1 Filed 08/28/24 Page 1308 of 1320
Case 2:16-cv-00054-RJR-BRE Document 860-1 Filed 08/19/17 Page 5 of 87
PageID: 250303

procedures used by EPA, California EPA (Cal/EPA), the World Health Organization, and other federal agencies and international organizations. This approach was rejected by the R.J. Lee Group, which instead advocates use of asbestos fiber definitions which are not health based or supported by the majority of experts in the health community, and which would not allow comparison to the existing epidemiologic data on asbestos related cancers.

**The R. J. Lee Report Claims that EPA Region 9 Misapplied Fiber Counting Protocols** - The R. J. Lee Report claims that EPA Region 9 inflated the fiber counts in the El Dorado Hills air data by misapplying the International Standards Organization (ISO) method 10312 (the analytical method used by EPA to analyze the El Dorado air samples) and including PCME structures with a 3 to 1 length to width aspect ratio in our analysis. The R. J. Lee Report maintains that EPA should only have counted structures which met the general 5 to 1 aspect ratio fiber size definition described in the body of the ISO 10312 method. However, Annex C and Annex E of the ISO 10312 method specifically authorize the counting of PCME structures with a 3 to 1 aspect ratio. Another example of misleading information is the R.J. Lee Report's statistical evaluation and resulting conclusions regarding the concentrations of asbestos structures detected in the EPA air samples. All of the established EPA, National Institute of Occupational Safety and Health (NIOSH), and ISO analytical methods require the counting of asbestos bundles, recognizing the significance of bundles to proper characterization of asbestos fiber levels. The R.J. Lee Report did not include asbestos bundles in its analysis of the data, thereby undercounting the number of structures.

**The R. J. Lee Report Claims that EPA Region 9 Misidentified Amphibole Minerals -** The R. J. Lee Report concludes that EPA misidentified actinolite asbestos fibers in the El Dorado soil samples by using inappropriate extinction angle criteria. The R. J. Lee Group conclusion is contradicted by the National Institute of Standards and Technology (NIST) and the major analytical methods used for analysis of asbestos in soil and bulk samples. The R. J. Lee Report also cites an unpublished 1980 draft report to support its contention that structures found in the EPA air samples are not asbestos, and ignores a subsequent 1981 published report by the same author that actually supports the EPA approach.

**The R. J. Lee Report Applies a Geologic Definition rather than a Public Health Definition to Characterize Microscopic  Structures** - The R. J. Lee Report relies heavily on the geologic distinction between asbestos fibers and cleavage fragments of the same dimensions, with the implication that exposure to cleavage fragments is benign and of little or no health significance. For the purposes of public health assessment and protection, EPA makes no distinction between fibers and cleavage fragments of comparable chemical composition, size, and shape. The EPA Region 9 approach, which is supported by most public health agencies and scientists, as well as the American Thoracic Society, is based on the following:  (1) The epidemiologic and health studies underlying EPA and Cal/EPA cancer risk assessment methods were based on exposures to both cleavage fragments and fibers, and were unable to distinguish between the two, (2)  The most recent panel of experts to review asbestos risk assessment methods, the 2003 Peer Consultation Panel convened by EPA, concluded that "it is prudent at

Case 3:16-md-02738-MAS-RLS Document 33128-1 Filed 08/28/24 Page 1309 of 1320
Case 2:16-cv-00054-JRH-BKE Document 60-1 Filed 09/19/17 Page 6 of 97
PageID: 250304

this time to conclude equivalent potency [of cleavage fragments and fibers] for cancer,"[2] (3) No well-designed animal or epidemiological studies have adequately tested the hypothesis that cleavage fragments with the same dimensions as a fiber are benign or that the human body makes any distinction, (4) Studies that purport to show that cleavage fragments are benign are questioned by many asbestos health experts, (5) There are no routine asbestos air analytical methods, including those used by EPA, NIOSH, the Mine Safety and Health Administration (MSHA), the American Society for Testing and Materials (ASTM), and ISO which differentiate between cleavage fragments and crystalline fibers on an individual fiber basis.

**The R. J. Lee Report's "Virtual" Review of EPA Region 9's Air Samples is Inconsistent with Established Laboratory Practices** - The R.J. Lee Group did not have access to EPA's actual air samples, nor did it collect any air samples of its own. Rather it reviewed limited pictures and spectra data of a small number of EPA's air samples and drew conclusions based on those representations. Such a virtual review is not consistent with the National Voluntary Laboratory Assurance Program (NVLAP) quality assurance procedures nor the verification methods of the National Institutes of Standards and Technology.

**Federal Courts Have Supported EPA** - Many of the assertions of the R. J. Lee Report are consistent with positions that the R.J. Lee Group took as an expert witness for W.R. Grace in the Libby, Montana litigation. In this litigation, the written opinions of the District and Appeals courts, while not specifically addressing the opinions of the R.J. Lee Group, rule in favor of EPA and expressly hold that EPA's experts and science are credible.[3]

## Background

In October 2004, the EPA Region 9 Superfund site assessment program conducted an assessment of exposures to naturally occurring asbestos (NOA) in El Dorado Hills, California. Specifically, EPA Region 9 simulated the sports activities of children and adults at three schools and a community park and, using personal air monitors, measured asbestos levels in the breathing zones of participants. EPA Region 9 also collected samples of ambient air in the area of the sampling at the same time the simulations were conducted to serve as reference samples. The personal activity-based samples were then compared to the reference samples. The Asbestos Hazard Emergency Response Act (AHERA)[4] regulation Z-test for statistical

---

[2]USEPA (U.S. Environmental Protection Agency) (2003). Report on the Peer Consultation Workshop to Discuss a Proposed Protocol to Assess Asbestos-Related Risk, Final Report. Office of Solid Waste and Emergency Response, Washington D.C. Page viii.

[3] See U.S. v. W.R. Grace, 280 F Supp 2d 1149 (2003): U.S. v. W.R. Grace, 429 F. 3d 1224, 1245 (9th Cir. 2005) (Although debate regarding testing methodology and data analysis is "exceedingly complex", EPA did not ignore accepted scientific principles)

[4]The Asbestos Hazard Emergency Response Act (AHERA) was passed by Congress in 1986 to provide for the inspection and mitigation of asbestos in school buildings. Regulations implementing the Act were promulgated by EPA in 1987.

Case 3:16-md-02738-MAS-RLS  Document 33128-1  Filed 08/28/24  Page 1310 of 1320
Case 2:16-cv-00354-JRH-BKE  Document 60-1  Filed 03/13/17  Page 7 of 17
PageID: 250305

significance was applied to determine whether there were any statistically significant differences between the personal exposure samples and the ambient reference samples.  EPA Region 9 collected over 400 air samples and generated over 7000 data points.  All of EPA Region 9's's analyses were conducted by accredited laboratories using recognized methods and procedures with strict quality assurance control, including blind performance samples to check analytical accuracy.

Amphibole asbestos, which many health scientists consider to be even more toxic than chrysotile asbestos, was found in almost all the reference and activity-based samples.  Of the 29 different sets of activity-based scenario measurements, application of the Z-test determined that personal exposures from 24 scenarios were significantly elevated over the reference samples.  Most importantly, the data showed that children and adults participating in sports activities in areas where asbestos occurs naturally in the surface soils, as it does in El Dorado Hills, can be exposed to asbestos fibers of health concern at up to 62 times the corresponding reference levels.

EPA Region 9 released the data from the assessment in May 2005 and held a public meeting in El Dorado Hills that was attended by more than 1000 members of the public.  From the outset of the assessment, EPA Region 9 made clear to the community that EPA's only intent was to gather data on potential exposures.  The community and the State and local regulatory agencies could then use the information to make decisions about the significance of those exposures and determine appropriate control measures.  Both EPA Region 9 and the Agency for Toxic Substances and Disease Registry (ATSDR) have informed the community that exposure levels are a main determinant of the risk of developing asbestos-related cancers and non-cancer diseases, and that reducing the exposures reduces the risk.  Consistent with its intent, EPA Region 9 has actively engaged the State and local regulatory agencies to improve naturally occurring asbestos mapping, monitoring, dust control, and regulation.  El Dorado County has recently adopted more stringent dust control ordinances.

### Detailed Comments on the R. J. Lee Report

### R.J. Lee Finding #1: "Based on Mineralogy, Sixty-Three Percent (63%) of the Amphibole Particles Identified as Asbestos Fibers can not be Asbestos."

The R. J. Lee Report argues that there is too much aluminum in 63% of EPA Region 9's identified fibers for the fibers to be asbestiform.[5]  In addition, the remaining 37% (sometimes the Report uses 35%) are not asbestos fibers based on their particle dimensions.

### EPA Response

**Aluminum -** Analysis of the EPA Region 9 El Dorado air samples was performed using the International Standards Organization (ISO) method 10312, a state-of-the-art

---

[5]Asbestiform:  Having the form or structure of asbestos.

Case 3:16-md-02738-MAS-RLS   Document 33128-21   Filed 08/28/24   Page 1311 of 1320
Case 2:16-cv-00054-JRH-BKE   Document 80-1   Filed 09/18/17   Page 8 of 17
PageID: 250306

Transmission Electron Microscope (TEM)[6] method with energy dispersive spectroscopy (EDS)[7] that has strict counting rules and characterizes the dimensions and chemistry of every fiber identified by the microscopist.  Identification of fiber type was performed according to the general guidelines of the International Mineralogical Association (IMA) (Leake, 1997)[8], the international standard for amphibole nomenclature.  This same approach for asbestos classification is recommended in the "Research Method for Sampling and Analysis of Fibrous Amphibole in Vermiculite Attic Insulation", EPA 600/R-04/004, January 2004, and was one of the tools used by Meeker et al (2003)[9] to determine the composition and morphology of amphiboles from Libby, Montana.

The R. J. Lee Report claims that 63% of the amphibole fibers identified by the EPA laboratory[10] as actinolite asbestos have concentrations of total aluminum that are too high to form asbestos fibers.  According to page 2 of the R. J. Lee Report, "Particles with more than 0.3 aluminum atoms pfu [per formula unit] or about 1.5 percent $Al_2O_3$ cannot form in the asbestos habit due to crystal lattice constraints."  To support its argument, the R. J. Lee Report cites three references.  However, on close examination, two of the three references do not agree with the upper threshold limit that the R.J. Lee Group puts on total aluminum content (Leake et al, 1997) (Deer, Howie and Zussman, 1997)[11].  The third reference (Verkouteren & Wylie, 2000)[12] draws its conclusions on examination of a

------

[6]Transmission Electron Microscopy (TEM) produces images of a sample by illuminating the sample with an electron beam in a vacuum, and detecting the electrons that are transmitted through the sample.

[7]Energy Dispersive Spectroscopy (EDS) uses measurement of the energy and intensity of X-rays generated when a selected area of a sample is irradiated with an electron beam to identify the mineralogical composition of a structure.

[8]B.E. Leake et al (1997).  Nomenclature of Amphibole:  Report of the Subcommittee on Amphiboles of the International Mineralogical Association, Commission on New Minerals and Mineral Names. American Mineralogist, Volume 82, pages 1019-1037.

[9]G.P. Meeker et al (2003).  The Composition and Morphology of Amphiboles from the Rainy Creek Complex, Near Libby, Montana.  American Mineralogist, Volume 88, pages 1955-1969.

[10]In this document, the terms "EPA laboratory" and "EPA Region 9 laboratory" refer to the private laboratories that conducted the analysis of the EPA soil and air samples under contract to EPA Region 9.

[11]W.A. Deer, R.A. Howie, and J. Zussman (1997).  Rock-Forming Minerals:  Double Chain Silicates, Vol 2, second edition, p 137 - 145.

[12]J.R. Verkouteren and A.G. Wylie (2000).  The Tremolite-Actinolite-Ferro-Actinolite Aeries:  Systematic Relationships Among Cell Parameters, Composition, Optical Properties, and

Case 3:16-md-02738-MAS-RLS   Document 33128-1   Filed 08/28/24   Page 1312 of 1320
Case 2:16-cv-00094-JRH-BKE   Document 60-1   Filed 09/13/17   Page 9 of 12
PageID: 250307

small set of fibrous actinolite asbestos samples which the authors partition into asbestos and fibrous "non-asbestos" byssolite using criteria which the IMA specifically recommends against, and which is inconsistent with all standard asbestos analytical methods. Perhaps most important is the fact that all three references agree that it is the IMA criteria which primarily govern the general classification of amphibole type, not the total aluminum content. These references therefore actually support the classification approach taken by the EPA laboratory.

The R.J. Lee Group did not have access to the EPA air samples to conduct their own analyses. Instead, the R.J. Lee Group looked at a limited number of photographs of the recorded EDS spectra. Interferences by other elements in the sample can affect the aluminum total in the spectra. This is especially important because the EPA samples were of air releases from soil, not processed asbestos material. Soils contain non-asbestos mineral and biological particles that can influence element totals in an EDS spectrum, most notably clay particles, which are high in aluminum. The laboratory used by EPA Region 9 identified aluminum-rich actinolite asbestos, by applying the IMA classification guidelines to its direct analysis of the actual sample.[13]

**Particle Dimension -** As previously stated, the R. J. Lee Report claims that 37% of the fibers counted by EPA in the El Dorado Hills air samples are not asbestos fibers based on their particle dimensions. The report claims that EPA Region 9 inflated the asbestos counts by including asbestos structures which do not meet the definition of a fiber as described in ISO 10312. The general ISO 10312 method requires the counting of every asbestos structure with a length to width aspect ratio of 5:1 or greater. As directed by Region 9, the EPA laboratory counted structures with a 3:1 or greater aspect ratio. The R. J. Lee Report states that EPA erred in counting structures with aspect ratios less than 5:1. **Annex C and Annex E of the ISO method clearly authorize the counting of PCME structures with a 3:1 aspect ratio if the data are to be used for exposure or risk assessment purposes, the stated goal of the El Dorado Hills assessment. In fact, the ISO method contains numerous references to PCME fibers. PCME fibers are defined as fibers greater than 5 microns in length, and 0.25 to 3 microns in width with a 3:1 aspect ratio.[14] PCME fibers form the basis for EPA's IRIS toxicity database and the asbestos risk models of California EPA and other federal and international organizations.[15]**

Habit, and Evidence of Discontinuities. American Mineralogist, 85, p. 1239 - 1254.

[13]Personal communication with John Harris, Lab/Cor, January 2006.

[14]World Health Organization (1986). Environmental Health Criteria 53, International Programme on Chemical Safety, Asbestos and Other Natural Mineral Fibres, section 2.3.2.2.

[15]The IRIS asbestos cancer inhalation unit risk, a measure of asbestos cancer potency, is based on the EPA 1986 Airborne Asbestos Health Assessment Update (EPA/600/8-84/003F; 1986). Cal/EPA used a similar approach and data sets to derive its cancer unit risk. Both the IRIS and the Cal/EPA cancer potency values rely on human epidemiological studies that were conducted using phase contrast microscopy (PCM) analytical methods (some were midget

Case 3:16-md-02738-MAS-RLS  Document 33132-1  Filed 09/23/24  Page 1313 of 1320
Case 2:16-cv-00034-JRH-BKE  Document 60-1  Filed 09/25/17  Page 10 of 17
PageID: 250308

The R.J. Lee Group also manipulates its statistical analysis of the El Dorado Hills air data by ignoring counts of asbestos fiber bundles in its evaluations. Bundles are two or more attached parallel asbestos fibers which can have a significant health impact when they are inhaled and separate into individual fibers. Bundles were counted in the historical epidemiological studies which form the basis of our knowledge of asbestos-related health effects and EPA's IRIS database. **All of the established EPA, NIOSH, and ISO analytical methods require the counting of asbestos bundles, recognizing the significance of bundles to proper characterization of asbestos fiber levels.**

The R. J. Lee Report further states that EPA's data inflated the asbestos fiber count by ignoring the Agency's own "definition" of asbestos. To support this claim, the R.J. Lee Report cites the glossary of "Method for Determination of Asbestos in Bulk Building Materials", EPA 600/R-93/116, 1993, which states, in part, "With the light microscope, the asbestiform habit is generally recognized by the following characteristics: Mean aspect ratios ranging from 20:1 to 100:1 or higher for fibers longer than 5 microns." The building material analytical method is designed to detect commercially processed asbestos in items like floor tiles, roofing felts, paper insulation, paints, and mastics, not naturally occurring asbestos on air filters or in soil samples. To present the 20:1 aspect ratio for commercial grade asbestos as a universal EPA policy, and to advocate its use as an appropriate standard for analyzing air samples of naturally occurring asbestos is inappropriate and contradictory to use of the PCME dimensional criteria as a tool for assessing exposure risk.

The R. J. Lee Report also states that the diffraction pattern analyses produced by the EPA laboratory for the El Dorado Hills air samples demonstrates that the particles identified by the laboratory are not asbestos.[16] The report cites a 1980 unpublished draft study by S.J. Ring to support its conclusion. The R. J. Lee Report does not mention a 1981 published article by the same author which revises the findings such that they no longer support the conclusion of the R. J. Lee Report and, in fact, support the data produced by

---

impinger data converted to PCM counts) that could not distinguish fibers that were 5 microns in length or less. PCM cannot distinguish between fibers and cleavage fragments. PCM is not as powerful as current Transmission Electron Microscope (TEM) methods (400X vs 20,000X as TEM can see the thinner/shorter fibers. However, since EPA's (and Cal/EPA 's) toxicity database relies on human health studies that used PCM, current EPA risk procedures use the more powerful TEM method but report the PCM equivalent (PCME) fibers and only use the PCME counted fibers in a risk assessment. This is because the IRIS asbestos file specifies that only PCME fiber counts be used with inhalation unit risk for risk calculation. See also the reference cited in footnote 11.

[16]Diffraction pattern analyses irradiates a sample with x-rays and then takes an x-ray photograph.

Case 3:16-md-02738-MAS-RLS   Document 33133-2   Filed 09/23/24   Page 1314 of 1320
Case 2:16-cv-00054-RPI-BKE   Document 80-1   Filed 09/15/17   Page 13 of 17
PageID: 250309

EPA.[17]

**R.J. Lee Finding #2: "The Laboratory Procedures did not Comply With the NVLAP
Quality Assurance Standard."**

The R. J. Lee Report says that the false positive rate in our air samples was 35% when
the acceptable limit in the National Voluntary Laboratory Accreditation Program
(NVLAP) is 10%.

**EPA Response**

The laboratories used by EPA Region 9 for analysis of the El Dorado Hills air and soil
samples are accredited through the National Voluntary Laboratory Accreditation
Program (NVLAP). NVLAP is administered by the National Institute of Standards and
Technology, a non-regulatory agency within the U.S. Commerce Department. A large
part of the accreditation process involves on-site audits performed by NVLAP-certified
inspectors who review laboratory operational and quality assurance compliance
parameters, including documentation proving compliance with NVLAP requirements for
verification analyses. A laboratory must demonstrate that all analysts reporting data meet
the false negative and false positive requirements set forth by NVLAP before an
accreditation certificate is issued. To make a determination that a laboratory did not
comply with NVLAP verification standards would require a very detailed examination of
all laboratory generated raw data, project specific information, such as a site-specific
EPA issued Quality Assurance Project Plan, laboratory instrument log books, and other
data and information not supplied in an analytical report. Interviews with the laboratory
manager, quality assurance manager, and involved analysts are also mandatory to make
judgement on a laboratory's possible non-compliance. The R.J. Lee Report's conclusion
that the EPA laboratory was not in compliance with NVLAP, based on a cursory review
of count sheet and other limited data without the in-depth examination detailed above, is
therefore invalid and cannot be used to question EPA's analytical results.

EPA chose NVLAP-accredited laboratories for the El Dorado Hills assessment as a
minimum quality requirement. For supplemental quality assurance, the laboratories were
subjected to on-site audits performed by EPA's Quality Assurance Technical Support
group, and both laboratories were sent performance evaluation samples prior to analysis
of the El Dorado samples. In addition, the laboratory conducting the air sample analysis
was sent double blind performance evaluation samples during the sampling event. In all
cases, the laboratories successfully identified the amounts and types of asbestos present
on the blind samples within acceptable limits. Further, the El Dorado Hills air and soil
data were validated by a third party in accordance with standard EPA quality assurance

---

[17]S.J. Ring (1981). Identification of Amphibole Fibers, Including Asbestos, Using
Common Electron Diffraction Patterns. In Russell P.A. and Hutchings A.E. (Eds), Electron
Microscopy and X-ray Applications to Environmental and Occupational Health Analysis, Vol.
2:175-198, Ann Arbor Science Publ., Inc.

Case 3:16-md-02738-MAS-RLS  Document 33132-1   Filed 09/23/24   Page 1315 of 1320
Case 2:16-cv-00034-SRB-BKE  Document 80-1   Filed 09/25/17   Page 12 of 17
PageID: 250310

procedures and were found to be acceptable for all uses.

### R. J. Lee Finding #3: "The Soil Samples do not Demonstrate the Presence of Amphibole Asbestiform Minerals."

The R. J. Lee Report states that the actinolite asbestos fibers identified in the El Dorado Hills soil samples contain too much aluminum to be asbestiform and that the extinction angles of the fibers indicate that they are non-fibrous cleavage fragments. The R.J. Lee Group's analysis of 23 split soil samples from EPA's October 2004 sampling event found no asbestos in the samples.

### EPA Response

**Aluminum** - The R. J. Lee Report states that the aluminum content of the fibers in the soil samples was too high to be asbestiform actinolite and that it was indicative of non-asbestiform actinolite and another amphibole, hornblende, which contains approximately 10-20% by weight $Al_2O_3$ (5.3-10.6% by weight aluminum). Both the laboratory performing EPA's El Dorado soil sample analysis and the laboratory which analyzed the EPA air samples noted significant quantities of hornblende in the samples, but did not count or report those particles as asbestos. Please see the EPA response to Finding #1 for a further discussion of the aluminum issue.

**Extinction Angles** - The extinction angle of a fiber evaluated by polarized light microscopy is one of many criteria used to identify mineralogical composition. The extinction angle for amphibole asbestos fibers is the difference in degrees between the long axis of the fiber and the angle at which the fiber optically disappears (the polarization direction where the light passing through it becomes "extinct") when the fiber is rotated under a polarized light microscope. The R.J. Lee Report states that amphibole asbestos fibers have a zero-degree extinction angle and that non-asbestos cleavage fragments have non-zero extinction angles. Therefore, because the EPA soil sample analysis reported extinction angles which, according to the R.J. Lee Group, averaged 12°, the report alleges EPA incorrectly identified cleavage fragments as asbestos fibers.

**The R.J. Lee Report's conclusion regarding extinction angles is contradicted by the National Institute of Standards and Technology (NIST) and the major analytical methods used for analysis of asbestos in soil and bulk samples.** NIST certifies and provides Standard Reference Materials (SRM) for laboratory instrument calibration and laboratory accuracy measurement. The NIST Tremolite/Actinolite SRM 1867A is a special set of three samples certified by NIST to be of ultra-high purity tremolite, actinolite, and anthophyllite asbestos and is considered the "gold standard" for asbestos analytical laboratories. The material is rigorously characterized and is accompanied by a six-page document that describes the properties of each sample. It is required that all analytical laboratories accredited by NIST/NVLAP have the material in their possession and that they use it to calibrate their operations and to test their analysts. The NIST SRM

Case 3:16-md-02738-MAS-RLS   Document 33132-1   Filed 09/23/24   Page 1316 of 1320
Case 2:16-cv-00054-SRP-BKE   Document 60-1   Filed 09/15/17   Page 13 of 17
PageID: 250311

1867A certificate which accompanies the samples of tremolite and actinolite states that the reference tremolite can have an extinction angle of up to $16.6 \pm 0.3^{\circ}$ and that the actinolite can have an extinction angle of up to $15.9 \pm 0.2^{\circ}$. When the EPA laboratory processed the NIST actinolite standard in the manner of the El Dorado Hills soil samples, the extinction angles of the fibers in the processed standard sample were consistent with allowed maximum extinction angles for tremolite/actinolite asbestos ($\sim 10^{\circ}$ to $20^{\circ}$) and the extinction angles of the fibers seen in the EPA soil samples.[18]

Further, the laboratory methods of EPA, NIOSH, and other agencies for analysis of asbestos in bulk material all state that tremolite-actinolite asbestos fibers may have zero (parallel) or *non-zero* (inclined or oblique) extinction angles. EPA Method 600/R-93/116[19], the standard method used by all NIST/NVLAP accredited laboratories to test building materials for the presence of asbestos, states in Table 2-2, Optical Properties of Asbestos Fibers, that tremolite-actinolite asbestos has extinction "parallel and oblique (up to 21°)." NIOSH Method 9002[20], the method used for analysis of the El Dorado Hills soil samples, states directly that actinolite and tremolite fibers exhibiting inclined extinction are to be considered asbestos. The method further states that "If anisotropic fibers are found (during PLM analysis), rotate the stage to determine the angle of extinction. Except for tremolite-actinolite asbestos which has oblique extinction at 10-20°, the other forms of asbestos exhibit parallel extinction... Tremolite may show both parallel and oblique extinction."[21]

### R.J. Lee Finding #4: "The ISO 10312 Analytical Method can not Distinguish Between Asbestos Fibers and Non-Asbestos Cleavage Fragments."

The R.J. Lee Report states that the ISO 10312 method contains the disclaimer that "The method cannot discriminate between individual fibers of asbestos and non-asbestos analogues of the same amphibole material," and, therefore, EPA inflated the asbestos air concentrations by counting "cleavage fragments."

### EPA Response

The ISO 10312 method cannot differentiate between fibers and cleavage fragments with

---

[18]M. Bailey (2006). Identification of Asbestiform Tremolite/Actinolite. Naturally Occurring Asbestos Workgroup Meeting Presentation.

[19]USEPA (U.S. Environmental Protection Agency) (1993). Method for the Determination of Asbestos if Bulk Building Materials. EPA Method 600/R-93/116.

[20]NIOSH (National Institute for Occupational Safety and Health) (1992). Asbestos (Bulk) by PLM.. Method 9002 (Issue 2).

[21]NIOSH (National Institute for Occupational Safety and Health) (1992). Asbestos (Bulk) by PLM.. Method 9002 (Issue 2). Qualitative Assessment, Item c, page 4.

Case 3:16-md-02738-MAS-RLS   Document 33132-1   Filed 09/23/24   Page 1317 of 1320
Case 2:16-cv-00034-SRP-BRK   Document 80-1   Filed 09/25/17   Page 14 of 17
PageID: 250312

the same dimensions and chemical composition. No routine analytical method has a protocol for distinguishing fibers from cleavage fragments on an individual particle basis. ==Additionally, from a health standpoint, there is no evidence that supports making the distinction.==

Cleavage fragment is a geologic term which refers to structures that form when non-fibrous forms of asbestos minerals split along crystallographic planes, as opposed to asbestos fibers which form from crystalline growth. The R.J. Lee Report maintains that there is a toxicological difference between asbestos structures which formed as fiber crystals and fibers which formed by cleavage plane separation. Page 3 of the R.J. Lee Report states that cleavage fragments are "not known to produce asbestos-like disease." **It is the position of EPA, the U.S. Centers for Disease Control and Prevention, Agency for Toxic Substances and Disease Registry (ATSDR) and National Institute for Occupational Safety and Health (NIOSH), and the American Thoracic Society, among others, that microscopic structures of amphibole and serpentine minerals that are asbestiform and meet the size definition of PCM fibers, should be counted as asbestos, regardless of the manner by which they were formed.** There are four reasons why the health agencies have taken this position: (1) The epidemiologic and health studies underlying EPA, and California EPA, cancer risk assessment methods were based on exposures to both cleavage fragments and fibers, but were unable to distinguish between the two, (2) The most recent panel of experts to review asbestos risk assessment methods, the 2003 Peer Consultation Panel convened by EPA, concluded that "it is prudent at this time to conclude equivalent potency [of cleavage fragments and fibers] for cancer,"[22] (3) No well-designed animal or human epidemiological studies have been conducted to date to test the hypothesis that cleavage fragments with the same dimensions of a fiber are benign, or that the human body makes any distinction, and studies that purport to show that cleavage fragments are benign are questioned by many asbestos health experts,[23] (4) There are no routine air analytical methods, including those used by EPA, NIOSH, the Mine Safety and Health Administration (MSHA), the American Society for Testing and Materials (ASTM), and the ISO which differentiate between cleavage fragments and crystalline fibers.

---

[22]USEPA (U.S. Environmental Protection Agency) (2003). Report on the Peer Consultation Workshop to Discuss a Proposed Protocol to Assess Asbestos-Related Risk, Final Report. Office of Solid Waste and Emergency Response, Washington D.C. Page viii.

[23]Both Addison (Addison J, Davies LST. 1990. Analysis of amphibole asbestos in chrysotile and other minerals. Ann Occ Hyg, Apr;34(2):159-75) and members of the U.S. EPA 2003 Peer Consultation panel raised concerns about interpretation of the Davis study (Davis JM, McIntosh C, Miller BG, Niven K. 1991. Variations in the carcinogenicity of tremolite dust samples of differing morphology. Ann NY Acad Sci, Dec;643:473-90 ), which attempted to compare the toxicity of asbestos fibers and cleavage fragments. These concerns reflected the lack of peer review, use of intra peritoneal injection instead of inhalation exposure, significance of mesotheliomas caused by structures reported as cleavage fragments, purity of the cleavage fragment samples and issues related to fiber dimensions.

-11-

Case 3:16-md-02738-MAS-RLS   Document 33132-1   Filed 09/23/24   Page 1318 of 1320
Case 2:16-cv-00034-SRP-BKE   Document 604   Filed 09/15/17   Page 15 of 17
PageID: 250313

In terms of epidemiological data and health outcomes, the cleavage fragment argument is without merit.  For the purposes of public health assessment and protection, EPA makes no distinction between fibers and cleavage fragments of comparable chemical composition, size, and shape.

**There are no recognized analytical protocols, including those used by EPA, NIOSH, MSHA, ASTM, and ISO, which include criteria to differentiate between cleavage fragments and crystalline fibers.**  All these methods require that structures which meet their definition of the specific counting rules for an asbestos fiber  be counted.  The requirements are based on the fact that, in the words of an expert from the United States Geological Survey, "At a microscopic level, distinguishing between these forms on single [asbestos] particles, can be extremely difficult to impossible."[24]  As noted above, R.J. Lee made a very similar claim with regard to cleavage fragments as the expert witness for W.R. Grace in the Libby, Montana, Superfund cost recovery litigation.  The EPA analytical experts who reviewed the R.J. Lee Group's testing methodology related to the Libby site found that the R.J. Lee laboratory could not demonstrate any reliable criteria with which to distinguish, at the microscopic level, asbestos cleavage fragments from asbestos fibers of the same size, shape, and composition.  The Ninth Circuit Court of Appeals recognized the competing scientific arguments but found that EPA's position was consistent with the record of evidence and accepted scientific principles.[25]

**R.J. Lee Finding #5: "Applying the Latest Science and Definitional Techniques, the El Dorado Hills Study Shows no Significant Exposure to the Type of Amphibole Asbestos Fiber Connected To Health Risk."**

The R. J. Lee Report claims that the latest science for measuring the risk posed by asbestos is the Berman-Crump Asbestos Risk Assessment Protocol ("Berman-Crump") which proposes that amphibole asbestos fibers which are more than 10 microns long and less than 0.5 microns wide (protocol fibers) are the most toxic.  Of the 2,386 fibers which the R. J. Lee Report states the EPA laboratory identified, the R.J. Lee Report concludes that only 7 fibers meet the "Berman-Crump" definition.  Therefore, the R.J. Lee Group maintains that EPA has overstated the risk from exposure to asbestos fibers in El Dorado Hills.

**EPA Response**

The "Berman-Crump" protocol that the R.J. Lee Report references is in fact a draft EPA method.  EPA had the method reviewed by a peer consultation panel in 2003.  The panel made a number of important recommendations that must be addressed before the method can be used for EPA risk assessments.  A number of important revisions have been made

---

[24]G.P. Meeker, USGS, (2002).  Review of Expert Report of R.J. Lee.

[25]U.S. v. W.R. Grace, 429 F.3d at 1245.

Case 3:16-md-02738-MAS-RLS   Document 33132-1   Filed 09/23/24   Page 1319 of 1320
Case 2:16-cv-00094-SRF-BKS   Document 80-1   Filed 09/25/17   Page 16 of 17
PageID: 250314

to the draft method since 2003, but at this time the method has not been independently peer reviewed.  It will not be adopted by EPA as a risk assessment tool unless and until it passes rigorous internal and external peer review.

The expert peer panel has recommended that the fiber size for the draft EPA risk assessment method be adjusted to include fibers greater than 5 microns in length and up to 1.5 microns in width.[26]  The change is designed to account for lung deposition of fibers that results when fibers are inhaled through the mouth, and not filtered by the nasal passages.  The broadening of the fiber definition to include inhalation by "mouth breathers" is especially relevant to the El Dorado Hills data.  Our investigation measured personal asbestos exposures of individuals participating in sports activities, where physical exertion would likely increase breathing through the mouth.  **The PCME fibers counted in the EPA air samples are actually consistent with the latest science of EPA, as reflected in the recommendations of the peer consultation panel.**  In addition, the EPA peer consultation expert panel recommended that cleavage fragments be treated as any other asbestos fiber of the same morphology and chemical composition.[27]

EPA Region 9 focused on obtaining an accurate count of PCME structures, consistent with our risk assessment protocols and those of Cal/EPA and other health agencies.  The counting rules which EPA set for the laboratory were designed to stop counting when a statistically-significant number of PCME fibers were detected.  By concentrating on PCME structures, other fiber size classifications may not have been counted to statistical significance.  This may have resulted in under counts of other fiber sizes (e.g. the "Berman Crump" protocol fibers referred to in the R. J. Lee Report).  **EPA Region 9's study counted PCME structures so that the data could be directly compared to human health epidemiological studies.**  These epidemiological studies form the basis for risk assessment models currently used by EPA, Cal/EPA and other federal agencies and international organizations.

**R. J. Lee Report Peer Reviews**

The R. J. Lee Report was reviewed by three individuals, although research of one of the individuals was extensively quoted in the report and therefore the independence of the reviewer is debatable.  The three reviewers generally agree with the conclusions of the R. J. Lee Report regarding aluminum content, fiber chemistry, cleavage fragments, and extinction angles.

Both the R. J. Lee Report and one of the reviewers support use of the original "Berman-

---

[26]USEPA (U.S. Environmental Protection Agency) (2003).  Report on the Peer Consultation Workshop to Discuss a Proposed Protocol to Assess Asbestos-Related Risk, Final Report.  Office of Solid Waste and Emergency Response, Washington D.C.  Page 5-5.

[27]Ibid, page 5-1.

-13-

Case 3:16-md-02738-MAS-RLS   Document 33132-1   Filed 09/23/24   Page 1320 of 1320
Case 2:16-cv-00094-RFB-BRK   Document 60-1   Filed 09/15/17   Page 7 of 17
PageID: 250315

Crump" protocol and calculate a "Berman-Crump" fiber air concentration of 0.0002 fibers/cubic centimeter, using the EPA fibers which they assert meet the "Berman-Crump" definition. The peer reviewer then compares that concentration with an ambient concentration of 0.0008 fibers/milliliter measured in New York City, and states that the "Berman-Crump" value in El Dorado Hills is extremely low. This comparison is flawed for at least two reasons. Significantly, the New York City numbers are based on fibers counted against a totally different size classification (essentially comparing apples to oranges), but **the reviewer also fails to recognize that a concentration of 0.0002 f/cc translates in the protocol to an increased cancer risk of 1 in 1,000 exposed individuals.** This number is disturbingly high and is outside the acceptable cancer risk ranges of EPA, Cal/EPA, and most other state and federal health agencies.

## Conclusions

EPA Region 9 has carefully reviewed the R. J. Lee Report and believes that it makes largely unsupported and incorrect conclusions about the EPA Region 9 El Dorado Hills Naturally Occurring Asbestos Exposure Assessment. EPA Region 9 has asked the United States Geological Survey (USGS) to conduct an independent study of the El Dorado County area to address several mineralogical questions raised by the R. J. Lee Report. The USGS study will use sophisticated analytical techniques (such as electron probe micro analysis) to more completely characterize the naturally occurring asbestos in terms of mineral identification and particle morphology.

All of the EPA Region 9 work in El Dorado Hills was, and continues to be, consistent with the EPA's standard operating and quality control procedures for asbestos work throughout the country.

-14-