# Exhibit 46





**Friday**
**October 30, 1987**

---

## Part III

# Environmental Protection Agency

40 CFR Part 763
Asbestos-Containing Materials in Schools;
Final Rule and Notice

**ENVIRONMENTAL PROTECTION AGENCY**

**40 CFR Part 763**

[OPTS–62048E; FRL–3269–8]

**Asbestos-Containing Materials in Schools**

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Final rule.

**SUMMARY:** EPA is issuing a final rule under section 203 of Title II of the Toxic Substances Control Act (TSCA), 15 U.S.C. 2643, to require all local education agencies (LEAs) to identify asbestos-containing materials (ACM) in their school buildings and take appropriate actions to control release of asbestos fibers. The LEAs are required to describe their activities in management plans, which must be made available to all concerned persons and submitted to State Governors. This final rule requires LEAs to use specially-trained persons to conduct inspections for asbestos, develop the management plans, and design or conduct major actions to control asbestos. Exclusions are provided for LEAs which have previously conducted inspections and for LEAs subject to any state requirement at least as stringent as the comparable requirement in this final rule.

**DATES:** In accordance with 40 CFR 23.5, this rule shall be promulgated for purposes of judicial review at 1 p.m. Eastern Standard Time on November 13, 1987. This rule shall be effective on December 14, 1987. The incorporation by reference in the rule is approved by the Director of the Federal Register as of December 14, 1987.

**FOR FURTHER INFORMATION CONTACT:** Edward A. Klein, Director, TSCA Assistance Office (TS–799), Office of Toxic Substances, Environmental Protection Agency, Rm. E–543, 401 M St., SW., Washington, DC 20460, Telephone: (202–554–1404).

**SUPPLEMENTARY INFORMATION:**

**I. Background**

*A. Description of the Enabling Legislation*

On October 22, 1986, President Reagan signed into law the Asbestos Hazard Emergency Response Act (AHERA) which enacted, among other provisions, Title II of the Toxic Substances Control Act (TSCA) 15 U.S.C. sections 2641 through 2654. Section 203 of Title II, 15 U.S.C. 2643, requires EPA to propose rules by April 20, 1987 (180 days after enactment), and

to promulgate final rules by October 17, 1987 (360 days after enactment), regarding: (1) The inspection of all public and private school buildings for ACM; (2) the identification of circumstances requiring response actions; (3) description of the appropriate response actions; (4) the implementation of response actions; (5) the establishment of a reinspection and periodic surveillance program for ACM; (6) the establishment of an operations and maintenance program for friable ACM; (7) the preparation and implementation of asbestos management plans by LEAs and the submission of the management plans to State Governors, who may review the plans and approve or disapprove them; and (8) the transportation and disposal of waste ACM from schools. This final rule implements the Title II requirements to issue the section 203 rules (except for transportation and disposal, as discussed further below).

Section 206 of TSCA Title II, 15 U.S.C. 2646, also requires EPA to issue by April 20, 1987, a final model accreditation plan for persons who inspect for asbestos, develop management plans, and design or conduct response actions. States are required to adopt an accreditation program at least as stringent as the EPA model within 180 days after the beginning of their next legislative session. Accreditation of laboratories which analyze asbestos bulk samples and asbestos air samples is also required by TSCA Title II. The National Bureau of Standards (NBS), U.S. Department of Commerce, is required to establish the bulk sampling accreditation program by October 17, 1987, and the air sampling accreditation program by October 12, 1988.

States were required to notify LEAs by October 17, 1987, regarding where to submit management plans. LEAs must submit those plans to their State no later than October 12, 1988. The plans must include the results of school building inspections and a description of all response actions planned, completed, or in progress. After receiving a management plan, States are allowed 90 days to disapprove the plan. If the plan is disapproved, the State must provide a written explanation of the disapproval and the LEA must revise the plan within 30 days to conform with the State's suggested changes. The 30-day period can be extended to 90 days by the State. LEAs are required to begin implementation of their management plans by July 9, 1989, and to complete implementation in a timely fashion.

Transport and disposal rules under TSCA section 203(h) have not yet been proposed. In accordance with TSCA

section 204(f), therefore, LEAs shall provide for transportation and disposal of asbestos in accordance with the most recent version of EPA's "Asbestos Waste Management Guidance." Applicable provisions of that document are included as Appendix D of this rule. Regulations governing transport of asbestos-containing waste, including school waste already regulated by the National Emission Standard for Hazardous Air Pollutants (NESHAP) (40 CFR Part 61, Subpart M) under the Clean Air Act (42 U.S.C. section 7401, et seq.), were promulgated by the Department of Transportation (DOT) (49 CFR Part, 173 Subpart J). The NESHAP and DOT rules must be followed, according to the "Asbestos Waste Management Guidance." These rules will be sufficient to ensure the proper loading and unloading of vehicles and to ensure the physical integrity of containers.

Section 203(1) requires Department of Defense schools to carry out asbestos identification, inspection and management activities in a manner comparable to the manner in which an LEA is required to carry out such activities. EPA interprets the language of this section which states that such activities shall be carried out "to the extent feasible and consistent with the national security" as recognition that existing agreements with foreign governments may make it difficult to carry out certain provisions of this regulation.

Since this rule has been signed by the EPA Administrator by October 17, 1987, the rule has been promulgated within the statutory time frame required by section 203 of TSCA Title II. In accordance with 40 CFR 23.5, however, solely for purposes of judicial review deadlines under section 19 of TSCA Title I, the rule is considered to be promulgated at 1 p.m. eastern time, 14 days after publication in the **Federal Register**. Thus, the period in which petitions for review of this rule may be filed under section 19 commences 14 days after publication.

*B. Previous EPA Asbestos Activities*

EPA has undertaken a variety of technical assistance and regulatory activities designed to control ACMs in buildings and minimize inhalation of asbestos fibers.

1. *Technical Assistance Program.* Since 1979, EPA staff have assisted schools and other building owners in identifying and controlling ACM in their buildings. Through a cooperative agreement with the American Association of Retired Persons (AARP), EPA has hired architects, engineers, and

other professionals to provide on-site assistance to school officials and other building owners. With AARP assistance, many school officials and building owners have effectively and safely dealt with ACM in ways that are appropriate for the particular situation in their building.

In addition, EPA has published state-of-the-art guidance to help identify and control asbestos in buildings. EPA's principal asbestos guidance document, "Guidance for Controlling Asbestos-Containing Materials in Buildings," (EPA 560/5–85–024, also known as the "Purple Book") was expanded and updated in June 1985, based on recommendations from recognized national experts. The document provides criteria for building owners to use in deciding which abatement method is most appropriate for each particular situation.

An important EPA goal has been to provide training for people involved in all aspects of the identification and control of asbestos. EPA has established five Asbestos Information and Training Centers to provide information concerning the identification and abatement of asbestos hazards and to train people in proper asbestos abatement techniques. The five centers are located at the Georgia Institute of Technology in Atlanta, the University of Kansas in Kansas City, Tufts University in Medford, Massachusetts, the University of Illinois in Chicago, and the University of California at Berkeley. Courses attended by more than 8,000 building owners and managers, maintenance personnel, school officials, architects, consultants, and abatement contractors have been taught at the centers since December 1984.

Finally, because of the large number of asbestos abatement projects and the short-term nature of many of them, EPA believes that contractors should be State-certified and that States should oversee projects to ensure that they are properly performed. EPA has provided models for State certification legislation and start-up funding for the initiation of 38 State oversight programs.

2. *EPA's regulatory program.* In the **Federal Register** of May 27, 1982 (47 FR 23360), EPA issued a school identification and notification rule (hereinafter called the 1982 Asbestos-in-Schools Rule). This rule required school officials by June 28, 1983, to inspect all school buildings for friable materials, take a minimum of three samples of each type of friable material found, analyze samples using polarized light microscopy (PLM) to determine if asbestos is present, and keep records of

the findings. (40 CFR Part 763, Subpart F)

School district officials who found friable ACM were required to notify employees of the location of the materials, post a notification form in the primary administrative and custodial offices and faculty common rooms, provide maintenance and custodial employees with a guide for reducing asbestos exposure, and notify parent-teacher associations or parents directly of the inspection results.

EPA also issued a rule to protect public employees who perform asbestos abatement work in those States not covered by the current asbestos standard issued by the Occupational Safety and Health Administration (OSHA), U.S. Department of Labor. This rule (40 CFR Part 763, Subpart G) complements the OSHA asbestos regulations that protect private sector workers, and public employees in States with OSHA-approved State plans, from exposure to asbestos in occupational settings. The rule requires specific work practices, personal protective equipment, environmental monitoring, medical exams, and other provisions. The EPA rule also includes a provision not in the OSHA rule, i.e., notification to EPA generally 10 days before an asbestos abatement project is begun when public employees are doing the work. OSHA issued revised regulations regarding occupational asbestos exposure published in the **Federal Register** of June 20, 1986 (51 FR 22612). EPA issued in the **Federal Register** of February 25, 1987 (52 FR 5618), a revision of its worker protection rule to make it consistent with the new OSHA regulations.

3. *Recent developments.* EPA issued an Advance Notice of Proposed Rulemaking (ANPR) on August 12, 1986 (51 FR 28914), entitled "Asbestos-Containing Materials in Schools: Inspection, Notification, Management Plans and Technical Assistance." The purpose of this ANPR was to solicit comments on the future direction of EPA's program to reduce risks from asbestos in schools and to solicit information about a variety of technical and policy issues.

Prior to enactment of TSCA Title II, EPA had also initiated development of two new guidance documents on asbestos control. One document was being developed to provide more detailed guidance about assessing ACM in buildings and selecting abatement actions. A second document was being developed to provide more detailed guidance about practices and procedures which should be included in

an operations and maintenance program. Both documents had been developed with the assistance of panels of national experts who convened in Washington, DC to discuss technical and operational issues associated with these subjects. The work done in these two guidance documents has been valuable in developing provisions of this rule.

Also, in 1986, EPA, in cooperation with the National Institute for Occupational Safety and Health (NIOSH), U.S. Department of Health and Human Services, published "A Guide to Respiratory Protection for the Asbestos Abatement Industry" to provide practical guidance in the selection and use of respiratory protection to persons who work in asbestos abatement. The "Guide" also provides information relevant to other work activities, such as maintenance or repair, where the exposure to asbestos or the potential for exposure exists. The "Guide" was updated in September 1986 to include the text of the OSHA June 1986 revision of its asbestos standard.

### C. Development of the Rule

The April 1987 proposed rule was developed through the process of regulatory negotiation, an alternative process for developing regulations in which individuals and groups with negotiable interests directly affected by the rulemaking work together with EPA in a cooperative venture to develop a proposed rule by committee agreement. The negotiation group was established as a Federal Advisory Committee and consisted of representatives of national educational organizations, labor unions, asbestos product manufacturers, the environmental community, asbestos abatement contractors, professional associations of architects, consulting engineers, industrial hygienists, States, and EPA.

After an organizational meeting in Washington, DC on January 23, 1987 (announced in the **Federal Register** of January 13, 1987, 52 FR 1377), the committee was established with 23 interests represented. Meetings were scheduled on February 5 and 6, February 17 and 18, March 9 and 10, March 26 and 27, and April 1 thru 3. During the March 10, 1987, meeting, the plenary session of the Committee accepted two more parties on the committee, one taking a seat representing State attorneys general, the other (representing big city schools) sharing a seat with a previously seated member representing big city schools.

**Members of Negotiating Committee**

The members of the negotiating committee and their interest represented are as follows:

1. Allen Abend, Council of Chief State School Officers.

2. Bill Borwegen, Service Employees International Union/Jordan Barab, American Federation ot State, County, and Municipal Employees (school service employees).

3. Dr. William Brown, Baltimore City Schools/Michael Young, New York City Law Department (big city schools).

4. Brian Christopher, Committee on Occupational Safety and Health.

5. Donald Elisburg, Laborers' International Union and Laborers-AGC Education and Training Fund.

6. Kellen Flannery, Council for American Private Education.

7. Steve Hays, asbestos abatement engineer.

8. Jesse Hill, manufacturers of asbestos pipe and block insulation products.

9. Edward Kealy, National School Boards Association.

10. Lloyd A. Kelley, Jr., Superintendent of Schools Rutland S.W. Vermont, Supervisory Union (rural schools).

11. William Lewis, Manufacturers of asbestos surfacing products.

12. Lynn MacDonald, Sheet Metal Workers International Association.

13. Claudia Mansfield, American Association of School Administrators.

14. Roger Morse, American Institute of Architects.

15. David Ouimette, Colorado Department of Health (States with developing asbestos programs).

16. Joel Packer, National Education Association.

17. Robert Percival, Environmental Defense Fund.

18. Miriam Rosenberg, National PTA.

19. Paul Schur, Connecticut Department of Health/Dr. Donald Anderson, Illinois Department of Public Health (States with implemented asbestos programs).

20. Robert Sheriff, American Industrial Hygienists Association.

21. David Spinazzolo, Association of Wall and Ceiling Industries (asbestos abatement contractors).

22. Susan Vogt, U.S. E.P.A.

23. John Welch, Safe Buildings Alliance (former manufacturers of asbestos products).

24. Margaret Zaleski, National Association of State Attorneys General.

**Facilitation Team and Executive Secretary**

Owen Olpin, Consultant to EPA
Eileen B. Hoffman, Federal Mediation & Conciliation Services

Kathy Tyson, U.S. E.P.A. (Executive Secretary)
Leah Haygood, The Conservation Foundation
Dan Dozier, Federal Mediation & Conciliation Services
John Wagner, Federal Mediation & Conciliation Services

The committee met in plenary sessions as well as in four work groups. Each work group focused on a cluster of related issues and reported to the plenary on options and recommendations. The plenary retained all decision-making power of the committee and often gave guidance to work groups. Generally, for each day of a plenary session, work groups convened the day before to prepare reports for the plenary. Neutral facilitators were present at all work group and plenary meetings to assist the negotiations in moving forward.

At the end of the 2-month negotiating process on April 3, 1987, and after extensive efforts, the committee was in general agreement on the vast majority of issues before it for the purposes of the proposal. Agreement to solicit further comment about alternatives was often important in developing provisions to be included as proposals. At the close of the negotiations, some items remained at issue and were not subject to universal agreement. These consisted of the following: definitions and response actions for damaged and significantly damaged thermal system insulation ACM (relates to being deemed nonfriable in the inspection section) and damaged and significantly damaged friable surfacing and miscellaneous ACM. Also, the definition of asbestos debris and the nature of cleaning practices (initial and routine) for friable ACBM or damaged or significantly damaged thermal insulation under the operations and maintenance section were still at issue. While extending negotiations beyond April 3, 1987, may well have enabled the committee to resolve these issues, the Congressional April 20, 1987, deadline for issuing a proposed rule precluded this possibility. Although **Federal Register** practices precluded the Agency from highlighting these issues in the text of the proposed rule, the public docket contains a copy of the proposed rule which clearly identifies the sections which contain these unresolved issues.

On April 3, 1987, the facilitators prepared, for members' signatures, statements supporting the use of the agreed-on portions of the regulatory language as a basis for a Notice of Proposed Rulemaking. Members representing 20 of the 24 interests seated

on the committee signed these statements. Members representing 4 of the interests seated on the committee did not sign the statements, due to the status of the unresolved issues described above. Mr. Paul Schur, a corepresentative of states with an implemented asbestos program (an interest that did not sign), signed in an individual capacity. All committee members, signatories and non-signatories alike, retained for themselves and for their constituencies all rights which bear on the rulemaking, including the right to comment fully during the public comment period.

Notably, signatories supporting the agreed-on regulatory language as a basis for a Notice of Proposed Rulemaking did so in considering that language as a whole. The proposed rule's agreed-on language was not necessarily ideal from any one party's perspective.

On April 17, 1987, the EPA Administrator signed the proposed rule developed through the negotiated rulemaking process. The proposed rule and the final Model Accreditation Plan were published in the **Federal Register** of April 30, 1987. EPA's decision to use the results of the negotiated rulemaking process as a basis for a proposed rule was explained in the April 30 document (52 FR 15833).

The 60-day public comment period ended on June 29. During this time period, EPA staff conducted 10 Regional briefings on the proposed rule for State officials and a number of additional briefings for interested parties. These parties included school administrators, school board officials and building owners. At the conclusion of the public comment period, the Agency had received over 170 comments on the proposed rule.

Several comments received by EPA requested the Agency to hold a public hearing on the proposed rule. As a result of these comments, EPA conducted public hearings on August 25 and 26. Over 25 individuals representing a variety of groups testified before EPA. The testimony and transcript from the public hearing were included in the rulemaking's docket.

*D. Basis for EPA's Decision*

After consideration of the proposed rule and all the evidence in the rulemaking record, including public comments on the proposed rule, EPA has decided to promulgate a final rule which is like the proposal in most respects. A relatively small number of changes have been made from the proposal to reflect public comments. In a number of cases EPA decided not to

make changes suggested by public comments. The Agency discusses its response either in this preamble or elsewhere in the rulemaking docket.

EPA has determined that the regulations being announced in this edition of the **Federal Register** use the least burdensome methods which protect human health and the environment. This determination is supported by the discussion in this preamble and the entire rulemaking record. EPA adopts as the reasoning supporting its final rule the same basic reasoning in the preamble to the proposed rule (52 FR 15833). The provisions of this rule represent a reasonable way to carry out the statutory responsibilities of TSCA Title II.

EPA's analysis of risk placed in the rulemaking record when the proposed rule was issued shows that asbestos in schools could present a risk of concern and that the measures required by this rule are necessary to protect public health and the environment. EPA, as discussed later in this preamble, continues to rely on that risk analysis for support of the final rule. While there may be a wide divergence of opinion as to the actual health effects from asbestos exposure in schools, EPA believes there is little doubt that the decisionmaking process established by this rule needs to be implemented. This process is based on the responsibility of local officials, with input from the local community and with assistance from specially-trained experts, to develop management plans to implement appropriate measures that will abate the risk of asbestos in particular schools depending upon local circumstances.

This decisionmaking process ensures that the costs associated with this rule will be reasonable while protecting health and the environment. EPA has revised its costs somewhat from the analysis in its proposal, but has not changed its decision that these costs are reasonable. The detailed revisions to the Agency's costs analysis are discussed later in this preamble and in the rulemaking record. All public and private schools will experience the cost of a building walkthrough and visual inspecting, which EPA has determined will not exceed a few hundred dollars per school. Many schools, finding no asbestos, will experience no further costs. Most of the remaining schools that find ACM are expected to implement operations and maintenance programs along with training, periodic surveillance and reinspection. EPA has in fact revised downward the cost of the typical school asbestos program. It is

expected that this cost will be about $5,530 per school year, a cost that is clearly minimal if there is a possibility that adverse health effects may be avoided. EPA also notes that some portion of the cost of the typical school program will not involve expenditures by the schools but are so-called "opportunity costs." These are costs assigned to the time spent by school employees in carrying out the activities required by the regulation. While these are real costs of the program, EPA expects that many schools will be able to conduct the typical school program through use of existing employees. Thus, the costs of the program will appear to the individual school officials and local communities to be somewhat less than EPA's economic analysis shows.

The decisionmaking process, summarized above and discussed in detail elsewhere in the preamble and rulemaking record, will ensure the reasonableness of other more extensive response actions for particular schools.

## II. Provisions of the Final Rule

### A. Introduction

This unit describes the various provisions of the final rule. The changes to the proposed rule made by the Agency based on comments received during the comment period are noted. Following a discussion of applicable regulatory definitions in Unit B and general responsibilities in Unit C., inspections and reinspections, sampling and analysis, and assessment of materials are discussed in Units D., E., and F., respectively. In Unit G., the major elements of the management plan, availability of the plan, and review of the plan by Governors are discussed.

Unit H. describes requirements for response actions to be taken by LEAs under circumstances described in that section. Unit I. explains requirements for training and periodic surveillance, and Unit J. explains air sampling requirements for determining when a response action has been completed.

Unit K. discusses requirements to use accredited persons to inspect buildings for asbestos, develop management plans, and design or conduct response actions. Requirements to protect abatement workers, custodial and maintenance staff, and building occupants are explained in Unit L.

Waivers for all or part of a State asbestos program are described in Unit M., including information required in the waiver request and the process for granting or denying such waivers. Requirements for recordkeeping and enforcement provisions are described in Units N. and O., respectively.

### B. Definitions

Several important definitions (§ 763.83) are discussed below.

"Asbestos-containing building material (ACBM)" encompasses surfacing ACM, thermal system insulation ACM, and miscellaneous ACM in or on interior parts of the school building. These include specified exterior portions of school buildings that, for the purposes of this rule, may fairly be considered interior parts. EPA focused upon interior building materials because, in the Agency's experience, such materials represent a very large percentage of ACM in schools and appear to pose the greatest hazards to occupants.

The definition of "school building," in the rule however, makes it clear that exterior hallways connecting buildings, porticos, and mechanical system insulation are considered to be in a building and are subject to jurisdiction under TSCA Title II. The Agency believes that these exterior areas, by virtue of the accessibility of the ACM found there, warrant inclusion under the rule. Often, these exterior areas are connected to interior areas and could be considered to be a single homogeneous area in terms of a removal project design.

"Asbestos debris" is defined as pieces of ACBM that can be identified by color, texture, or composition. The definition also includes dust, if the dust is determined by the accredited inspector to be asbestos-containing. The Agency included dust in the definition based on public comments.

"Damaged or significantly damaged thermal system insulation ACM" is defined as ACM on pipes, boilers, and other similar components and equipment where the insulation has lost its structural integrity or its covering in whole or in part, is crushed, water-stained, gouged, punctured, missing or not intact such that it is not able to contain fibers. Damage may further be illustrated by occasional punctures, gouges, or other signs of physical injury to ACM; occasional water damage on the protective coverings/jackets; or exposed ACM ends or joints. Asbestos debris originating from adjacent ACBM may also indicate damage. This definition allows that, even though the insulation is marred, scratched or otherwise marked, it may not be, in the judgment of the accredited expert, damaged so as to release fibers. This definition varies from the proposed rule's language by providing more specific guidance on the physical characteristics that may constitute

damage. An accredited inspector shall classify this material based upon a determination of damage or significant damage (§§ 763.85 and 763.88) and an accredited management planner shall recommend in writing appropriate response actions (§ 763.93).

"Damaged friable surfacing ACM" is defined as ACM which has deteriorated or sustained physical injury such that the cohesion of the material or its adhesion to the substrate is inadequate, or which, for any other reason, lacks fiber cohesion or adhesion qualities. Such damage or deterioration may be illustrated by the separation of ACM into layers; separating of ACM from the substrate; flaking, blistering, or crumbling of the ACM surface; water damage; or significant or repeated water stains, scrapes, gouges, mars, or other signs of physical injury on the ACM. Asbestos debris originating from adjacent ACBM may also indicate damage. The definition allows that such surfacing material may show signs of water damage or physical injury without, in the judgment of the accredited expert, always demonstrating a lack of fiber cohesion or adhesion. This definition varies from the proposed rule's language by providing more specific guidance on the physical characteristics that may constitute damage. Accredited experts will classify material based upon a determination of damage and recommend appropriate response actions (§§ 763.85, 763.88, and 763.93).

"Miscellaneous ACM" includes a wide variety of materials in buildings, such as vinyl flooring, fire-resistant gaskets and seals, and asbestos cement. Damage to these materials is defined by the same cohesion and adhesion (if appropriate) properties as surfacing materials. The Agency believes this definition is sufficiently general to provide a reasonable approach to assessing damage to so wide a range of materials.

"Significantly damaged friable surfacing ACM" is defined as material in a functional space where the damage is extensive and severe. (The definition of significantly damaged friable miscellaneous ACM closely parallels the definition for significantly damaged surfacing ACM.) Again, this determination of significant damage will be made by accredited experts (§§ 763.85, 763.88, and 763.93).

This definition is a function of two major factors. The first factor deals with extent, or scope, of damage across a functional space. The Agency, in draft guidance, suggested that damage evenly distributed across one-tenth of a functional space or localized over one-

quarter represented significant damage (See Seventh Draft Report, "Guidance for Assessing and Managing Exposure to Asbestos in Buildings," November 7, 1986, p. 9). This represents a level of damage which a panel of experts, convened by the Agency, believed was generally, although perhaps not always, unreasonable to repair or restore.

The second factor involves the degree or severity of the damage itself. A major delamination of asbestos material, for instance, constitutes damage which is more severe than slight marks or mars. ACM, in the accredited expert's judgment, may be so severely damaged that there is no feasible means of restoring it to an undamaged condition.

Material has potential for significant damage as opposed to only potential for damage if it is subject to major or continuing disturbance, due to factors such as accessibility (i.e., subject to disturbance by school building occupants or workers in the course of the normal activities), or, under certain circumstances, vibration or air erosion. For example, material within reach of students above an entrance is clearly accessible. Thermal system insulation running along the base of a wall in a boiler room is also accessible. Material on the ceiling of a school auditorium, beyond the reach of students, is not. ACM on a high school gymnasium ceiling, which might be reached with basketballs or other objects, is subject to either classification, although an LEA might be well advised in this instance to implement a preventive measure to avoid disturbance.

EPA believes a wide range of "preventive measures" exist. One example is the installation of a stop to prevent a door from striking (and damaging) thermal system insulation ACM behind it. Another might involve restricting access of a corridor with surfacing ACM on a low ceiling, where students continually marred and vandalized the material. The problem of high school students hitting the gym ceiling with basketballs may be eliminated by a policy prohibiting such activities, if it can be effectively implemented. LEAs, in consultation with maintenance staff and, if desired, accredited experts, will identify a variety of creative and effective means of eliminating potential damage or significant damage to ACM.

If, however, such preventive measures cannot be effectively implemented, other response actions, including removal, will be required. The Act is clear that EPA, as part of this rulemaking, direct LEAs to mitigate those circumstances which involve potential for significant damage.

Based on public comments, the Agency added the terms "air erosion" and "vibration" to increase the specificity of the "potential significant damage" definition in the rule.

The "enclosure" definition requiring an airtight, impermeable, permanent barrier around ACBM to prevent the release of asbestos fibers into the air does not contemplate a vacuum-sealed area which is impossible to access. Instead, this definition, based on the National Institute of Building Sciences' (NIBS') "Model Guide Specifications, Asbestos Abatement in Buildings," July 18, 1986, is associated with precise engineering specifications, found in section 09251 and elsewhere in the NIBS' Model Guide, to construct enclosures sufficient to prevent fiber release. Also, this term, from the standpoint of permanence, is not intended to apply to mini-enclosures described in the EPA worker protection rule or Appendix B of the regulation, as these enclosures are used temporarily for repair or abatement activities.

"Functional space" is a term of art used by the accredited expert to appropriately characterize an area as containing "significantly damaged friable surfacing ACM" or "significantly damaged friable miscellaneous ACM." The "functional space" may be a room, group of rooms, or a homogeneous area, as determined appropriate by the accredited expert. Note that the functional space includes the area above a dropped ceiling as well as crawl spaces.

### C. LEA General Responsibilities

The final rule requires LEAs to designate a person to carry out certain duties and ensure that such person receives training adequate to perform the duties.

Section 763.84 requires LEAs to ensure that: (1) Inspections, reinspections, periodic surveillance and response action activities are carried out in accordance with the final rule; (2) custodial and maintenance employees are properly trained as required by this final rule; (3) workers and building occupants are informed annually about inspections, response actions, and post-response action activities including reinspections and periodic surveillance; (4) short-term workers (e.g., telephone repair workers) who may come in contact with asbestos in a school are provided information about locations of asbestos-containing building material (ACBM); (5) warning labels are posted as required by this final rule; and (6) management plans are available for review and that parent, teacher, and

employee organizations are notified of the availability of the plan.

Lastly, LEAs shall consider whether any conflict of interest may arise from the interrelationship among accredited personnel (e.g., the management planner and abatement contractor) used by the LEAs and whether that should influence the LEA's selection of accredited personnel. EPA added this provision after reviewing public comments.

## D. Inspections and Reinspections

1. *Inspections.* Section 763.85 requires LEAs to have an accredited inspector visually inspect all areas of each school building to identify locations of all friable and nonfriable suspected ACBM, determine friability by touching, and either sample the suspected ACBM or assume that suspected materials contain asbestos. The inspector must then develop an inventory of areas where samples are taken or material is assumed to contain asbestos. Finally, the accredited inspector is required to assess the physical condition of friable known or assumed ACBM as required under § 763.88.

2. *Exclusions.* Section 763.99 defines conditions that would exclude an LEA from all or part of the initial inspection. The accredited inspector is a key element in the exclusion process. For all inspection exclusions, areas previously identified as having friable ACM or nonfriable ACM that has become friable have to be assessed as required under § 763.88. All information regarding inspection exclusions shall be placed in the management plan.

Five types of exclusions for LEAs are provided in the final rule. First, LEAs do not need to have an initial inspection conducted in specific areas of a school where ACBM has already been identified. Second, if previous sampling of a specific area of the school indicated that no ACM was present, and the sampling was done in substantial compliance with the final rule, the LEA does not have to perform an initial inspection of that area. Third, LEAs do not have to inspect specific areas of schools where records indicate that all ACM was removed. Fourth, LEAs can receive an inspection exclusion for schools built after October 12, 1988 (the date when management plans are to be submitted to Governors), if no ACBM was specified for use in the school. Fifth, States that receive a waiver from the inspection requirements of the rule can grant exclusions to schools that had performed inspections in substantial compliance with the rule.

3. *Reinspections.* Section 763.85(b) requires LEAs to have accredited inspectors conduct reinspections at least

once every 3 years. The inspector must reinspect all known or assumed ACBM and shall determine by touching whether nonfriable material has become friable since the last inspection. The inspector may sample any newly friable materials or continue to assume the material to be ACM. The inspector shall record changes in the material's conditions, sample locations, and the inspection date for inclusion in the management plan. In addition, the inspector must assess newly friable known or assumed ACBM, reassess the condition of friable known or assumed ACBM, and include assessment and reassessment information in the management plan.

Section 763.85(c) states that thermal system insulation that has retained its structural integrity and that has an undamaged protective jacket or wrap is treated as nonfriable. Based on public comments, EPA changed the wording in this section from "deemed" nonfriable to "treated as" nonfriable.

## E. Sampling and Analysis

1. *Sampling.* Section 763.86 permits the LEA to assume that suspected ACBM is ACM. If the LEA does not assume suspected ACBM to be ACM, the LEA shall use an accredited inspector to collect bulk samples for analysis.

EPA expects that a school is likely to sample only friable suspected ACBM. For nonfriable suspected ACBM, EPA anticipates most schools will assume this material contains asbestos. However, the final rule does not preclude a school from sampling all of its suspected ACBM, both friable and nonfriable. Sampling of friable surfacing materials should follow the guidance provided in the EPA publication "Simplified Sampling Scheme for Friable Surfacing Materials" (EPA 560/5–85–030a). To determine whether an area of surfacing material contains asbestos, sufficient samples shall be taken in a statistically random manner to provide data representative of each homogeneous area being sampled.

In most cases, sampling of thermal system insulation requires an accredited inspector to take at least three randomly distributed samples per homogeneous area. The final rule includes three exceptions to this requirement for sampling of thermal system insulation. First, an accredited inspector can determine through visual inspection that the material is non-ACM (e.g., fiberglass). Second, only one sample is required for patched homogeneous areas of thermal system insulation. Third, an accredited inspector needs to collect an appropriate number of samples to

determine whether cement or plaster tees are ACM.

For friable miscellaneous material or nonfriable suspected ACBM, an accredited inspector must collect bulk samples in an appropriate manner.

2. *Analysis.* Section 763.87 requires analysis of bulk samples by laboratories accredited by NBS. In the period before NBS has developed its accreditation program, laboratories which have received interim accreditation from EPA may be used to analyze samples. The interim program is explained in a notice in the **Federal Register** (52 FR 33470, September 3, 1987). After receiving the sample results, the LEA must consider an area to contain asbestos if asbestos is present in any sample in a concentration greater than 1 percent. Compositing of samples (mixing several samples together) is prohibited.

The 1982 EPA rule "Asbestos in Schools: Identification and Notification", 40 CFR 763, Subpart F, required analysis of bulk asbestos samples by PLM and provides a protocol for analysis in its Appendix A to Subpart F. EPA requires use of the same PLM method for this final rule. As it develops the accreditation process for laboratories performing analysis of bulk samples, NBS will consider whether to change the PLM protocol. If NBS recommends changes, EPA will amend this rule accordingly.

## F. Assessment

Section 763.88 outlines a general assessment procedure to be conducted by an accredited inspector during each inspection or reinspection. The accredited inspector is required to classify ACBM and suspected ACBM assumed to be ACM in the school building into broad categories appropriate for response actions. In addition, after reviewing public comments, the Agency decided to require the inspector to give reasons in the written assessment supporting his classification decisions. Assessment may include a variety of considerations, including the location and amount of material, its condition, accessibility, potential for disturbance, known or suspected causes of damage, or preventive measures which might eliminate the reasonable likelihood of damage. The LEA is directed to select an accredited management plan developer who, after a review of the results of the inspection and the assessment, shall recommend in writing appropriate response actions.

## G. Management Plans

Section 763.93 requires LEAs to develop an asbestos management plan for each school under its administrative control or direction. The plan must be developed by an accredited asbestos management planner. Some of the major components required in the plan include: A description of inspections and response actions; an assurance that accredited persons were used to conduct inspections, develop management plans, and design or conduct response actions; and a plan for reinspection, periodic surveillance, and operations and maintenance.

Each LEA is required to maintain a copy of the management plan in its administrative office, and each school is required to maintain a copy of the school's management plan in the school's administrative office. These plans are to be made available for inspection by the public without cost or restriction. LEAs must notify in writing, parent, teacher, and employee organizations of the availability of management plans upon submission of the plan to the State and at least once each school year. The requirement for written notification was added after the Agency reviewed comments from the public. In addition, based on public comments received on the proposed rule, the Agency has included in the final rule a requirement that in the absence of any such organizations, the LEA shall provide written notice to that group (e.g., parents) of the availability of the management plan.

Section 763.93 requires LEAs to submit their management plans to their States on or before October 12, 1988. Each LEA must begin implementation of its management plan on or before July 9, 1989, and complete implementation of the plan in a timely fashion.

## H. Response Actions

The final rule identifies five major response actions—in § 763.91 operations and maintenance (O&M) and in § 763.90, repair, encapsulation, enclosure and removal—and describes appropriate conditions under which they may be selected by the LEA. The final rule also identifies the steps which shall be taken to properly conduct and complete the response actions.

The LEA is required to select and implement in a timely manner the appropriate response action. The response action selected shall be sufficient to protect human health and the environment. From among the response actions that protect human health and the environment, the LEA

may select the response action that is least burdensome.

LEAs are required to use accredited persons to design or conduct response actions. Section 763.90 specifically provides that nothing in the rule shall be construed to prohibit the removal of ACBM from a school building at any time, should removal be the preferred response action of the LEA.

Different response actions are required for each of the five major categories of damaged or potentially damaged ACBM. These categories are:

1. Damaged or significantly damaged thermal system insulation ACM.

2. Damaged friable surfacing or miscellaneous ACM.

3. Significantly damaged friable surfacing or miscellaneous ACM.

4. Friable surfacing or miscellaneous ACM, and thermal system insulation ACM which has potential for significant damage; and

5. Friable surfacing or miscellaneous ACM, thermal system insulation ACM which has potential for damage.

In each of the categories above, procedures for appropriately controlling or abating the hazards posed by the ACBM are set forth. For damaged or significantly damaged thermal system insulation, the LEA must at least repair the damaged area. If it is not feasible, due to technological factors, to repair the damaged material, it must be removed. Further, the LEA must maintain all thermal system insulation in an intact state and undamaged condition. If damaged friable surfacing or miscellaneous ACM is present, the LEA shall encapsulate, enclose, remove, or repair the damaged area. After selecting the appropriate response actions that protect human health and the environment, the LEA may consider local circumstances, including occupancy and use patterns within the school building, and economic concerns, such as short- and long-term costs. When friable surfacing or miscellaneous ACBM is significantly damaged, the LEA must immediately isolate the functional space and then must remove the material in the functional space, unless enclosure or encapsulation would be sufficient to contain fibers.

Response actions for ACBM with potential for damage and potential for significant damage emphasize O&M and preventive measures to eliminate the reasonable likelihood that damage will occur. When potential damage is possible, the LEA must at least implement an O&M program. If there is potential for significant damage and preventive measures cannot be effectively implemented, response

actions other than O&M or area isolation may be required.

Section 763.91 requires the LEA to implement an operations, maintenance and repair (O&M) program for any school building in which friable ACBM is present or assumed to be present in the building. Any material identified as nonfriable ACBM or nonfriable assumed ACBM which is rendered or is about to be rendered friable as a result of activities performed in the school building shall be treated as friable. For example, if nonfriable ACBM wallboard was about to be sanded, operations and maintenance procedures would be required. The O&M program, which must be documented in the LEA management plan, consists of worker protection (summarized in Unit II.K.), cleaning, operations and maintenance activities (also in Unit II.K.), and fiber release episodes.

An initial cleaning is required, which employs wet methods and is conducted at least once after completion of the inspection and before the initiation of a response action other than an O&M activity. In addition, the rule also requires that an accredited management planner make a written recommendation to the LEA regarding whether additional cleaning is needed. The recommendation on additional cleaning was added to the rule based on public comments.

The final rule requires that O&M activities (other than small-scale, short-duration activities) which disturb asbestos shall be designed and conducted by persons accredited to do such work. (A discussion of what constitutes small-scale, short-duration projects is given in Appendix B to Subpart E.) Finally, procedures are provided for responding to fiber release episodes—the uncontrolled or unintentional disturbance of ACBM. For minor episodes (i.e., those involving 3 square or linear feet or less of ACBM), basic cleaning and containment practices for O&M staff are listed. For larger amounts, accredited personnel are required to respond.

## I. Training and Periodic Surveillance

The LEA shall ensure that all members of its maintenance and custodial staff receive at least 2 hours of awareness training. The LEA must also ensure that staff who conduct any activities which will disturb ACBM receive an additional 14 hours of training. Specific topics to be covered in the 2-hour and 14-hour training courses are listed in § 763.92(a).

Section 763.92(b) requires periodic surveillance to be performed at least

once every 6 months. The LEA may use unaccredited personnel such as custodians or maintenance workers to conduct surveillance activities. Periodic surveillance requires checking known or assumed ACBM to determine if the ACBM's physical condition has changed since the last inspection or surveillance. The date of the surveillance and any changes in the condition of the ACBM must be added to the management plan.

### J. Completion of Response Actions

After performing a thorough visual inspection, air testing is used to determine if a response action has been completed (§ 763.90(i)). Clearance air monitoring will not be required for small-scale, short-duration projects. Phase Contrast Microscopy (PCM) is allowed for response actions involving 260 linear or 160 square feet or less, the amounts used to trigger removal requirements under EPA's NESHAP (40 CFR Part 61, Subpart M).

Section 763.90 requires the use of transmission electron microscopy (TEM) for most removal, enclosure, and encapsulation response actions. Laboratories are to be accredited by the National Bureau of Standards (NBS). Until NBS develops its program, LEAs shall use laboratories that use the interim protocol described in Appendix A to this Subpart E. EPA continues to believe that TEM is the method of choice for air sample analysis because, unlike PCM, TEM analysis can distinguish asbestos from other fibers and detect the small thin fibers found at abatement sites. Therefore the use of TEM will significantly improve the adequacy of cleanup and is recommended over PCM when available. However, due to limited availability of microscopes for air sample analysis and the cost and time associated with TEM analysis, the final rule allows a phase-in period for the TEM requirement. For 2 years after the rule becomes effective, LEAs may choose to use PCM for response actions comprising 3,000 square or 1,000 linear feet or less. For 1 year after this, LEAs may use PCM for clearance of projects of 1,500 square or 500 linear feet or less. LEAs retain full discretion to require use of TEM at any time for any project.

The criterion for determining whether a response action is complete when using PCM will require multiple samples (minimum of five) with clearance allowed only if all of the individual samples are below the limit of reliable quantitation of the PCM method (0.01 fibers/cm³). The rule requires persons to use the NIOSH 7400 method for PCM clearance.

The rule has a three-step process for using TEM to determine successful completion of a removal response action. The first step is a careful visual inspection, as mentioned above. The two steps that follow involve a sequential evaluation of the five samples taken inside the worksite and five samples taken outside the worksite. Both sets of samples must be taken at the same time to ensure that atmospheric conditions are the same and that the comparisons are valid. The inside samples are analyzed first. If the average concentration of the inside samples does not exceed the filter background contamination level (discussed in detail in Appendix A to Subpart E), then the removal is considered complete.

Step three is taken if the average concentration of the samples taken inside the worksite are greater than the filter background contamination level. In this case, an encapsulation, enclosure, or removal response action is considered complete when the average of five samples taken inside the worksite is not significantly larger than the average of five samples taken outside the worksite. A statistical comparison using the Z-Test must be used to determine whether the two averages are significantly different. (A discussion on how to compare measured levels of airborne asbestos with the Z-Test is given in Appendix A to Subpart E.) If the concentrations are not significantly different, then the response action is considered complete. If the inside average concentration is significantly higher, recleaning is required and new air samples must be collected and evaluated after the worksite has been cleaned and reinspected.

### K. Use of Accredited Persons

Section 206 of Title II of TSCA requires accreditation of persons who:
1. Inspect for ACM in school buildings.
2. Prepare management plans for such schools.
3. Design or conduct response actions with respect to friable ACM in such schools (other than O&M activities).

Section 206 of Title II of TSCA required EPA to develop a Model Contractor Accreditation Plan by April 20, 1987. The Agency met this deadline and the model plan was published in the **Federal Register** of April 30, 1987 (52 FR 15875). The plan appears as Appendix C to Subpart E. A notice listing EPA approved courses appears elsewhere in this issue of the **Federal Register**.

Persons can receive accreditation from a State that has instituted an accreditation program at least as stringent as the requirements of the Model Plan. In addition, persons in States that have not yet developed programs at least as stringent as the Model Plan can receive accreditation by passing an EPA-approved training course and exam that are consistent with the Model Plan. The Model Plan requires persons seeking accreditation to take an initial course, pass an examination, and participate in continuing education.

### L. Worker and Occupant Protection

Worker protection requirements for removal, encapsulation and/or enclosure response actions are already in effect under the EPA worker protection rule (40 CFR Part 763, Subpart G); and the OSHA construction standard (29 CFR 1926.58). EPA's NESHAP standard, although designed to protect outdoor air, also provides incidental protection to workers.

Essentially, under § 763.91, the regulation extends coverage of EPA's worker protection rule at 40 CFR 763.121 to maintenance and custodial personnel in schools who perform O&M activities but are not covered by OSHA's construction standard or an asbestos regulation under an OSHA approved State plan. The EPA worker protection rule itself extended the same protections as the OSHA construction standard to asbestos abatement workers who are employees of State and local governments and who are not otherwise covered by OSHA regulation or OSHA approved State plans. This final rule further extends these standards to O&M workers who are LEA employees. These regulations basically establish a Permissible Exposure Limit (PEL) of 0.2 fibers per cubic centimeter (f/cm³) over an 8-hour period for abatement project workers exposed to airborne asbestos and an action level of 0.1 f/cm³ which triggers a variety of worker protection practices. These practices include air monitoring, regulated work areas, engineering and work practice controls, respiratory protection and protective clothing, hygiene facilities and practices, worker training, medical surveillance, and recordkeeping requirements.

As an alternative, however, OSHA's standard allows employers to institute the provisions of its Appendix G in the case of small-scale, short-duration projects rather than comply with the full worker protection standard. Appendix B to Subpart E is an adaptation of OSHA's Appendix G and, thus, allows more flexibility in dealing with minor (small-scale, short-duration) projects.

None of the requirements of the OSHA standard or the EPA worker protection rule would apply if asbestos concentrations are below the action level (0.1 f/cm³). There are, however, fairly stringent requirements established by OSHA and adopted by EPA for purposes of this rule to show that levels are below this action level for any activity, including small-scale, short-duration projects. These requirements are discussed in the following paragraphs.

Employers who have a workplace or work operation covered by the EPA worker protection rule must perform initial monitoring to determine the airborne concentrations of asbestos to which employees may be exposed. If employers can demonstrate that employee exposures are below the action level (0.1 f/cm³) by means of objective data, then initial monitoring is not required. If initial monitoring indicates that employee exposures are below the PEL, then periodic monitoring is not required.

The exemption from monitoring in § 763.121(f)(2)(iii) of the worker protection rule for employers who have historical monitoring data is included in recognition of the fact that many employers have conducted or are currently conducting exposure monitoring. This exemption would prevent these employers from having to repeat monitoring activity for O&M activities that are substantially similar to previous jobs for which monitoring was conducted.

However, for purposes of this rule, EPA requires that such monitoring data must have been obtained from projects conducted by the employer that meet the following conditions:

1. The data upon which judgments are based are scientifically sound and collected using methods that are sufficiently accurate and precise.

2. The processes and work practices in use when the historical data were obtained are essentially the same as those to be used during the job for which initial monitoring will not be performed.

3. The characteristics of the ACM being handled when the historical data were obtained are the same as those on the job for which initial monitoring will not be performed.

4. Environmental conditions prevailing when the historical data were obtained are the same as for the job for which initial monitoring will not be performed.

When OSHA issued the final asbestos standard on June 20, 1986 (51 FR 22664), it published data from routine facility maintenance which "demonstrates a potential for exposure of maintenance personnel to concentrations exceeding 0.5 f/cm³ (fibers per cubic centimeter)." OSHA further stated:

With the exception of wet handling, which is feasible in only very limited situations due to problems such as electrical wiring, and the use of HEPA vacuums for the clean-up of any debris generated during maintenance activities, OSHA believes that there do not appear to be any feasible engineering controls or work practices available to reduce these potential exposure to levels below the 0.2 f/cm³ PEL and that respirators will be required to comply with the 0.2 f/cm³ PEL.

LEAs are required, under the provisions of § 763.91 of this rule, to ascertain, through monitoring procedures or historic monitoring data, and to document that these levels have not been reached.

Under § 763.91, basic occupant protection requirements are established (regardless of air level) for any O&M activity in a school building which disturbs ACBM. Primarily, access must be restricted, signs posted, and air movement outside the area modified. Necessary work practices shall be implemented to contain fibers, the area shall be properly cleaned after the activity is completed, and asbestos debris must be disposed of in a proper manner.

Section 763.95 requires the LEA to attach warning labels immediately adjacent to any friable and nonfriable ACBM or suspected ACBM in routine maintenance areas, such as boiler rooms, until the material is removed. They shall read, in large size or bright colors, as follows: CAUTION: ASBESTOS. HAZARDOUS. DO NOT DISTURB WITHOUT PROPER TRAINING AND EQUIPMENT.

*M. Waiver for State Programs*

Section 763.98 provides a procedure to implement the statutory provision that a State can receive a waiver from some or all of the requirements of the final rule if the State has established and is implementing or intends to implement a program of asbestos inspection and management at least as stringent as the requirements of the final rule. The rule requests specific information to be included in the waiver request submitted to EPA, establishes a process for reviewing waiver requests, and sets forth procedures for oversight and rescission of waivers granted to States.

The final rule requires States seeking waivers to submit requests to the Regional Administrator for the EPA Region in which the State is located. Within 30 days of receiving a waiver request, EPA must determine whether the request is complete. Within 30 days after determining that a request is complete, EPA will issue in the Federal Register a notice that announces receipt of the request and solicit written comments from the public. Comments must be submitted within 60 days. If, during the comment period, EPA receives a written objection to the State's request or a written request for a public hearing, EPA will schedule a public hearing (as is required by TSCA Title II) to be held in the affected State after the close of the comment period. EPA will issue a notice in the Federal Register announcing its decision to grant or deny, in whole or in part, a request for waiver within 30 days after the close of the comment period or within 30 days following a public hearing.

*N. Recordkeeping*

Section 763.94 requires that LEAs collect and retain various records which are not part of the information submitted to the Governor in the management plan. Records required by the rule include those pertaining to certain events which occur after the submission of the management plan, including: Response actions and preventive measures; fiber release episodes; periodic surveillance; and various operations and maintenance activities. Records required must be maintained in a centralized location in the administrative office of the school and the local education agency.

For each homogeneous area where all ACBM has been removed, the LEA shall retain such records for 3 years after the next reinspection.

*O. Enforcement*

TSCA Title II, section 207(a) provides civil penalties of up to $5,000 per day for violations of Title II of TSCA when an LEA fails to conduct inspections in a manner consistent with the final rule, knowingly submits false information to the Governor, or fails to develop a management plan in a manner consistent with the final rule, knowingly submits false information to the Governor, or fails to develop a management plan in a manner consistent with this rule. TSCA Title II, section 16 provides civil penalties of up to $25,000 per day for violations of Title I of TSCA when a person other than an LEA violates the final rule. Criminal penalties may be assessed if any violation committed by any person (including a LEA) is knowing or willful.

The rule provides a process for filing complaints by citizens and requires that such complaints be investigated and responded to within a reasonable period

Case 3:16-md-02738-MAS-RLS   Document 33132-6   Filed 08/23/24   Page 12 of 218
PageID: 250634

of time consistent with the nature of the violation alleged.

### P. Transport and Disposal

Section 203(h) of TSCA Title II requires EPA to promulgate regulations which prescribe standards for transportation and disposal of asbestos-containing waste material. The final rule on transport and disposal was to be issued by October 17, 1987, as part of the final regulations under TSCA Title II. EPA had planned to use revised NESHAP regulations on disposal of asbestos waste to satisfy the requirements of section 203(h) of Title II. However, completion of the NESHAP revision has been delayed.

Accordingly, under section 204(a) of Title II, LEAs shall carry out the requirements described in section 204(f). Section 204(f) states that "the local education agency shall provide for the transportation and disposal of asbestos in accordance with the most recent version of the Environmental Protection Agency's "Asbestos Waste Management Guidance" (or any successor to such document)." Under TSCA Title I, section 15(1)(D), as amended by AHERA section 3, EPA may enforce the provisions of section 204(f). The chapters of the waste management guidance document which pertain to transport and disposal have been printed in this **Federal Register** notice as Appendix D to Subpart E.

EPA intends to issue the revised asbestos NESHAP as a proposed rule under section 203(h) of TSCA Title II to govern transport and disposal of asbestos waste from schools. Section 204(f) will be in effect until a final rule under section 203(h) is promulgated. Further, EPA also intends that the NESHAP waste disposal rules will ultimately regulate asbestos emissions from waste disposal when they are promulgated.

### III. Response to Public Comments

This unit discusses EPA's responses to the most significant issues raised in the comments received from the public. A more comprehensive version of EPA's response to comments received has been placed in the public record.

Comments and responses are organized in this unit according to the relevant section of the regulation.

### A. Scope and Purpose

Comments were received regarding three aspects of the Scope and Purpose section (§ 763.80). Comments from a group of technical practitioners, which included architects, engineers, and consultants involved in asbestos control, suggested that preschool nurseries, colleges, and universities should be

included in the schools covered by the regulation. A second issue raised in the comments recommended that nonfriable materials not be subject to the inspection and management plan requirements of the regulation. Third, many commenters expressed concerns that the October 12, 1988, deadline for submitting management plans to States could not be met.

On all three of these issues, the statutory language of Title II is clear and the regulation reflects the statute. Title II only gives EPA authority to regulate "local education agencies." The definition of "local education agency" in section 202(7) refers only to public and private elementary and secondary schools. Section 203 of Title II requires inspection for "asbestos-containing materials" which includes both friable and nonfriable asbestos (see section 202). Management plan provisions of Title II also refer to "asbestos-containing material." Finally, section 205(a) of Title II specifies that "720 days after enactment" of this title (i.e., October 12, 1988) local education agencies must submit management plans to the Governors of their States. Based on the comments received, EPA is concerned about the ability of LEAs to complete and submit management plans by October 12, 1988. The deadline, however, is prescribed in the statute.

### B. Definitions

1. *Asbestos containing building material.* In general, union groups and education groups urged the incorporation into the rule of all exterior ACM and other asbestos material such as asbestos gloves. Conversely, several school administration groups argued to limit the rule to interior areas only and not to include asbestos gloves and other such materials within the scope of the rule.

TSCA Title II was designed to provide school children and school employees with a safe environment while attending classes or working inside school buildings. The statute in several places specifically authorizes EPA to regulate asbestos "in" school buildings. Furthermore, an extension to all exterior areas would result in only small health benefits since most exterior ACM is enclosed in solid matrices such as cement, is nonfriable, and is not generally disturbed. Dealing with exterior materials would constitute an expensive undertaking for schools in terms of inspection and management plan development for such small health benefits. The Agency believes the proposed rule's coverage of all interior areas and a few specified exterior areas that function similar to interior areas

protects the health of building occupants.

EPA also interprets TSCA Title II as not including nonbuilding asbestos products within the scope of the rule. The definition of friable ACM in the statute (section 202(6)) refers to ACM applied on ceilings, walls, structural members, piping, duct work, or any other part of a building. At no point does the statute cite as examples nonbuilding materials such as asbestos gloves. If certain schools such as vocational schools have other types of asbestos products in their buildings (e.g. automobile brake linings) they may want to voluntarily address these issues in a fashion similar to the AHERA requirements.

2. *Asbestos debris.* A number of commenters have sought to have dust included in the definition of asbestos debris. Some other commenters favor expanding the definition of asbestos debris to include dust in the immediate vicinity of friable ACM. Other commenters representing former asbestos manufacturers and schools argued that dust should not be included as part of the definitions of asbestos debris or as evidence of damage.

The Agency believes that an accredited expert be allowed to exercise judgment in determining whether asbestos fibers or dust constitute damage. EPA believes that accredited experts can determine whether dust has originated from adjacent ACBM. The Agency maintains, however, that not all dust in schools is ACM. An accredited person on-the-scene in a school building can make the determination of damage due to the presence of dust based on training and experience. As a result, EPA has included in the final rule's definitions of asbestos debris the flexibility for the accredited inspectors to determine dust to be asbestos containing.

3. *Significantly damaged friable surfacing and miscellaneous ACM.* Many commenters thought that significantly damaged asbestos should be defined to be damage that is either extensive "or" severe, rather than extensive "and" severe as in the proposal. These commenters included education groups and unions. They believe that either condition can pose a significant health threat.

The Agency disagrees with the comments. Significantly damaged friable surfacing and miscellaneous ACM must refer to the most severely damaged areas where the damage is also widespread. Damage that is widespread or only severe is of concern, but should not necessarily require a response

action of the same magnitude as those situations where both are present.

4. *Operations and maintenance.* Many commenters recommended that O&M apply to all ACBM, not just friable ACBM. Some of these commenters were primarily concerned with the need for periodic surveillance of all ACBM, not just friable ACBM as suggested by the proposed rule's definition.

The Agency disagrees with the recommendation to extend O&M to nonfriable ACBM. Section 203(f) states that O&M is for friable ACBM. Periodic surveillance (see section 203(g) and training requirements (see generally section 206), however, apply to all ACM. The final rule makes clear these statutory distinctions. Section 763.91 dealing with O&M refers to friable asbestos and § 763.92 dealing with periodic surveillance and training apply to all ACM (including friable and nonfriable materials).

5. *Potential damage and potential significant damage.* Many groups commented on these definitions. A group representing former asbestos manufacturers argue that the best indicator of potential damage is evidence of past damage. Some union groups and State attorneys general commented that in addition to accessibility, potential significant damage ought to include air erosion and vibration as disturbance factors.

The Agency believes adding the terms air erosion and vibration increases the specificity of the rule and clarifies the original intent of the proposed regulation. As a result, the Agency accepts the comments regarding air erosion and vibration and has added definitions for each of these terms. EPA believes that whether past damage is the best indicator of potential damage is irrelevant to defining potential damage. As asbestos material ages, it may become more susceptible to damage. The Agency, accordingly, believes that all circumstances must be considered in assessing potential damage.

6. *Repair and enclosure.* A sizable number of commenters suggested that EPA change the wording of both of these definitions to require the preventing of fiber release. In the proposed rule, repair "contained" fiber release and enclosure "controlled" fiber release. In addition, another commenter suggested adding the requirements of inaccessibility and permanence for enclosed ACM. One commenter wanted to expand the enclosure definition to account for spray applied enclosures.

EPA agrees with the recommendation regarding fiber release. Preventing fiber release clarifies the intent of the repair definition. An enclosure is an airtight,

impermeable, permanent barrier and as such must by definition prevent the release of fibers.

7. *Vibration and air erosion.* Several commenters suggested these terms be defined in the rule.

EPA agrees with the commenters and has added definitions for both terms.

*C. LEA Responsibilities*

Several issues in this section were commented upon by LEAs, education associations, school administrators and school board groups and state government officials.

Comments were received on the requirement in the proposed rule for the LEA to designate a person to ensure that the requirements of this section are properly implemented. Some commenters felt that this requirement was unnecessary while other commenters felt that the requirement of the proposed rule was sufficiently flexible to allow for differences in size and capabilities of LEAs. Some commenters favored appointment of an asbestos program manager with more stringent training or qualification requirements for that person. EPA has retained for the final rule the requirement for a designee to ensure proper implementation of LEA responsibilities. This approach provides the benefits of having a single overseer for the asbestos program without the added burden of more stringent training or qualification requirements.

Many parties commented on the requirement that LEAs ensure that short-term workers (telephone repair workers, administrators, etc.) who may come in contact with asbestos are "instructed in safe work practices" regarding ACM. Commenters felt that this placed an undue burden on LEAs and that the responsibility for this kind of instruction for short-term workers rests with their employer. EPA agrees with these comments and has eliminated this requirement while retaining the provision that LEAs ensure that short-term workers are provided information about the locations of ACBM.

The potential for conflicts of interest between accredited inspectors, management planners, and persons who design or conduct abatement actions also was discussed by a variety of commenters. Some commenters suggested that EPA should require the accredited persons to sign a conflict of interest statement certifying no party has a financial relationship with other parties involved in the inspection, development of the management plan, or performance of the response action. The Agency recommends that LEAs consider requesting a full financial disclosure

from all potential accredited professions. It may be more efficient for LEAs to use the same firm to conduct the inspections and develop the management plans to promote continuity in the process. However, LEAs should be wary of employing one firm to develop both the management plan and conduct response actions, since the management planner's recommendations about response actions could be influenced by the potential profitability of the recommendation. A similar conflict of interest problem could exist when an abatement firm and an air monitoring firm are directly or indirectly connected. The air monitoring firm could conceivably provide false results that indicate a building is safe for reoccupancy and the abatement contractor has successfully completed the job. EPA has modified the LEA responsibilities section of the rule to specifically state that LEAs must consider conflict of interest issues. However, any resolution of such issues is solely at the discretion of the LEA.

*D. Inspections and Reinspections*

Comments received on this section dealt with three subjects: the scope of the inspection; the standardization of the inspection; and the inspection process itself.

Regarding the scope of the inspection, comments were received on whether dormitories should be included in the inspection requirement. EPA concurs with the comments supporting the proposed rule's language including dormitories in the inspection. The Agency believes this is a reasonable extension of the definition of school building since the intent of AHERA is to protect children while attending school. Comments were also received regarding incorporation into the rule of all exterior ACM and other asbestos-containing products. As described in the "Definitions" part of this Unit, EPA believes these additions are unwarranted.

Comments were received regarding the use of a standardized inspection form, and commenters also urged EPA to issue a guidance document for inspectors and management planners. EPA disagrees with comments supporting a mandatory inspection form. The Agency believes LEAs, accredited inspectors, and States should be allowed the flexibility to develop inspection forms to suit their needs. However, EPA is developing a guidance document for LEAs which explains the requirements of this rule, and that document will contain, among other

things, a suggested format for inspection and management plans. In addition, EPA has developed a model course for accreditation of inspectors and management planners which will provide uniform guidance to inspectors and management planners regarding their responsibilities. Further, before any course is offered to accredit inspectors and management planners, it must be reviewed and approved by EPA in accordance with the provisions of the Model Accreditation Plan. This review process will help ensure that inspectors and management planners receive uniform guidance.

The Agency received comments about the requirement for reinspection every 3 years by an accredited inspector. Some commenters supported this requirement, others thought the reinspection should be more frequent, still others felt that the reinspection should be less frequent and that use of an accredited inspector was unnecessary. EPA believes a 3-year reinspection requirement to be conducted by an accredited inspector is necessary. The Agency is concerned that an annual reinspection as suggested by some commenters would prove unduly burdensome to LEAs while providing limited information. The rule provides for periodic surveillance activities at least twice a year to keep track of changes in the ACBM's condition. On the other hand, the Agency believes a reinspection every 5 years is too long a period of time for a school's ACBM not to be checked by an accredited inspector. ACBM could deteriorate substantially over a 5-year period of time. The Agency disagrees with comments suggesting that unaccredited persons should be permitted to perform reinspections. Accredited inspectors will have special training to determine changes in the physical condition of ACBM. The purpose of periodic surveillance, which may be conducted by unaccredited personnel, is to note observable changes in the condition of ACBM. For example, a periodic surveillance check would notice a water leak through an ACBM ceiling. The Agency believes the combination of the semiannual periodic surveillance check and the 3-year reinspection by an accredited inspector provides for adequate scrutiny of ACBM present in schools.

Industry commenters commended the proposed rule for allowing thermal system insulation "that has retained its structural integrity and that has an undamaged protective jacket or wrap that prevents fiber release" to be "deemed" nonfriable for the purposes of this regulation. Others commenters

believed this is a misrepresentation of the true nature of the material, which is still friable under its covering.

The Agency agreed with comments that state friable thermal system insulation cannot properly be "deemed" nonfriable. This constitutes an inaccurate depiction of the true nature of this material. An undamaged jacket on thermal system insulation may be properly seen as an enclosure, which prevents fiber release and reduces hazard, but does not change the characteristics of material friability behind or under the enclosure.

However, while the Agency considers it inappropriate to "deem" or characterize friable thermal system insulation as nonfriable, it is appropriate to "treat" this material as nonfriable. EPA, in its guidance and technical assistance activities, has traditionally treated undamaged friable thermal system insulation as nonfriable, for the purposes of cleaning and other O&M activities.

Accordingly, the regulation at § 763.85(c) has been modified to state that thermal system insulation that has retained its structural integrity and that has an undamaged protective jacket or wrap that prevents fiber release shall be treated as nonfriable.

Ultimately, however, the change in wording does not change the intent of the regulation that thermal insulation that has both an intact protective jacket and has retained structural integrity should be subject to periodic surveillance and preventive measures, and that custodial and maintenance workers must be trained to deal with such material. Furthermore, if the thermal insulation is disturbed or is about to be disturbed such that it would be rendered friable, all applicable O&M and response action provisions will apply. EPA believes that this is consistent with NESHAP, which considers such material to be friable when disturbed or removed.

### E. Bulk Asbestos Sample Measurement

Comments suggested that EPA allow use of electron microscopy and X-ray diffraction (XRD) for the analysis of bulk samples.

For purposes of this rule, PLM will be used for analyzing bulk samples for asbestos. The analytical method to be employed is the EPA "Interim Method for the Determination of Asbestos in Bulk Insulation Samples" (40 CFR 763, Appendix A to Subpart F). EPA feels that the existing EPA PLM protocol is technically sufficient for determining asbestos fiber identity and quantity. Currently, allowance is made in the EPA PLM protocol for additional

determination of a fiber's quantity by XRD. Additionally, validated methods for the use of electron microscopy in bulk asbestos analysis do not exist at this time. New developments in electron microscopy or XRD technology may lead EPA to reconsider the use of these tools for primary analysis at a future time.

A number of comments sought clarification on the laboratory accreditation program. Two laboratory accreditation programs are currently being developed by the NBS for laboratories which analyze bulk and air samples for asbestos. The bulk accreditation program is expected to be operational in early FY89. The air accreditation program is expected to be complete in late FY89.

Until the NBS bulk accreditation program is complete, EPA will establish an interim accreditation program for laboratories which analyze bulk samples by PLM. EPA will provide interim accreditation to laboratories which correctly identify four samples as either asbestos-containing or nonasbestos-containing. EPA announced the availability of this program in the **Federal Register** of September 3, 1987 (52 FR 33470). The deadline for laboratory participation in the first round was September 30, 1987. A formal listing of the first round of accredited labs will be available in January 1988. Individual laboratories will be informed of their performance by letter in December 1987. Laboratories which did not participate in the first round of accreditation will be considered in the second round of accreditation, which is scheduled for April 1988.

### F. Assessment

One comment regarding assessment of the physical condition of the material by accredited inspectors was that EPA should require accredited inspectors to give reasons for their assessment conclusions. EPA agrees with the comment. This requirement would provide reviewers of management plans at the State level with additional, useful information in judging whether the management plan accurately reflects the condition of the school building. The Agency believes the increase in the recordkeeping burden is small. As a result, § 763.88(b) has been changed to require the accredited inspector to give written reasons for the decision to classify ACBM.

Some commenters suggested that management planners should be required to use one assessment method in developing recommendations for LEAs about response actions. These commenters suggested a variety of

algorithms and "decision tree" methods for consideration. Other commenters supported the proposed rule's language to allow various assessment methods. The Agency believes it is not possible to point to one assessment method as most capable of producing an appropriate response action recommendation: there are a number of suitable assessment methods available for use by accredited management planners. EPA's management planner accreditation course will provide instruction about a variety of such methods.

*G. Response Actions*

**1.** *Protection of human health and the environment in response action selection.* Several commenters, particularly several State attorneys general and unions, expressed concern that the structure of the response action subsection allowed costs and other considerations to be granted equal consideration with protecting human health and the environment.

EPA has clarified language in the response action subsection (§ 763.90) to underscore its original intent in the proposed rule that protecting human health and the environment is the prime consideration in selecting an appropriate response action. Comments from the Service Employees International Union were particularly useful in this regard.

The Agency believes its response action approach is consistent with congressional direction to apply the prior and inviolable standard of protecting human health and the environment, and allows the consideration and selection of the least burdensome method only after the overriding health determination is made.

**2.** *Air monitoring for determining response actions.* Several commenters, primarily from industry, encouraged the establishment of air monitoring standards as the primary basis for hazard assessment. Most commenters, however, supported EPA's position in the proposed rule.

Traditionally, EPA has recommended assessment of asbestos in schools by visual evaluation of qualitative factors such as the material's condition, physical characteristics, and location. A careful examination of physical characteristics of the material, conducted by a trained expert, provides a direct method for determining both the relative degree of hazard and the likelihood of future fiber release.

EPA continues to discourage the use of air monitoring as the primary technique for assessing asbestos hazards, since that method only measures current conditions and

provides no information about potential and future levels of fiber release. Further, when the costs and technical requirements necessary for acquiring truly meaningful air monitoring data are considered, the Agency maintains that assessment of qualitative factors continues to be the appropriate method for assessment of hazards and selection of response actions which protect human health and the environment. However, air monitoring may provide useful supplemental information, when conducted in conjunction with a comprehensive visual inspection.

Several industry commenters proposed that EPA adopt air monitoring standards for damaged and significantly damaged ACM. The levels most often proposed were 0.01 fibers per cubic centimeter ($f/cm^3$) for damaged friable ACM; 0.1 $f/cm^3$ for significantly damaged friable ACM, with fibers longer than 5 um as measured by transmission electron microscopy (TEM) in each case. No commenters, however, provided any substantive rationale for choosing such levels. The Agency believes that such standards used for purposes of assessing asbestos hazards could not ensure protection of human health and the environment as intended by TSCA Title II. As factors to be used in determining whether response actions are necessary, these numerical values provide a false sense of precision regarding the presence and severity of asbestos hazards and the appropriateness of a given response action. For the same reasons cited in the above discussion of the use of air monitoring, the Agency disagrees with the suggestion that a numerical standard is appropriate as the primary criterion for selection of response actions.

**3.** *Specificity in definitions related to response actions.* Many commenters felt that more objective and definite response action descriptions should be provided by EPA with regard to damage-related definitions and response actions. Some believed that too much discretion was vested in accredited experts, who would be making technical judgments to advise LEA decisions. One comment cited EPA's economic impact analysis of the rule as an illustration of the lack of objectivity of the response action descriptions. In this analysis, EPA's own regional asbestos coordinators varied greatly in their estimates of what percentages of materials in schools in their regions fell into the various damage conditions described in TSCA Title II.

In response to comments, the Agency has added much more illustrative detail to three important definitions—damaged and significantly damaged friable

thermal system insulation ACM; damaged friable miscellaneous ACM; and damaged friable surfacing ACM— which will help accredited experts better identify asbestos hazards in schools. EPA agrees that this language, taken from the preamble of the proposed rule, adds necessary clarification to conditions which may constitute ACM damage and warrant appropriate response actions. These descriptions were not available to Agency regional asbestos coordinators when they gave their estimates of damage in schools. In addition, the extensive training program developed in the rule should achieve much greater consistency in evaluating and assessing asbestos in schools, although perfect consistency will never be achieved.

However, a rigid response action decision structure is not appropriate for this rule, primarily because many asbestos hazard situations are too circumstantial and appropriate response actions are too "hazard specific" to fit neatly into a discrete set of prescriptive categories.

There appears, then, no substitute for the judgment of the accredited management planner, who must recommend appropriate response actions within the general requirements established in § 763.90. That section provides a process by which a range of available choices may be considered by the accredited expert and selected by the LEA to best protect human health and the environment from each particular asbestos hazard in the school.

Under the provisions of the regulation, LEAs may take into account a variety of particular considerations, such as local circumstances, technological feasibility of appropriate response actions, economic considerations, and other relevant factors in selecting the least burdensome method. Such factors, however, may be considered only after the response action has been determined to protect human health and the environment.

Finally, accreditation alone does not imply "expertness." It only assures a suitable and common level of competence and awareness which is necessary for inspection, assessment and response action recommendation. School officials are well-advised to consider a variety of factors, including quality of training, experience, and prior performance of accredited personnel in selecting inspectors, management plan developers, abatement project designers, and contractors for school asbestos projects.

**4.** *Removal as the "only" appropriate response action for significantly*

*damaged ACM.* Several State attorneys general, among several other commenters, contended that "[I]n cases of significant damage, the only appropriate response is to remove the material, as this is the only action which adequately protects human health and the environment."

EPA disagrees that removal is the only appropriate response in all cases of significantly damaged ACM, particularly thermal system insulation. There may indeed be particular circumstances of significant damage in which removal is both inappropriate and undesirable.

EPA agrees that, particularly with regard to significantly damaged friable miscellaneous and surfacing ACM, isolation of the functional space and removal is often the most appropriate (and possibly, only acceptable) response. Encapsulation, for example, would be an acceptable response action for friable surfacing ACM only under very limited circumstances, given current technology. However, the Agency will not categorically preclude response actions of repair, encapsulation, or enclosure which, under certain circumstances, may also protect human health and the environment.

*5. Implementation of response actions in a timely fashion.* Several commenters asked the Agency to clarify the requirement that appropriate response actions be selected and implemented by LEAs "in a timely fashion," perhaps by establishing time limits for particular actions.

Many of the response action provisions themselves imply timeliness in response. Damaged or significantly damaged thermal system insulation ACM or its covering, for example, must be constantly maintained in an intact state and undamaged condition. In addition, the rule specifies, in the case of significantly damaged friable surfacing or miscellaneous ACM, that LEAs must *immediately* isolate the functional space and restrict access, unless isolation is not necessary to protect human health and the environment.

The Agency does not believe it is able to define "timely fashion" or specify time limits or deadlines in applying such requirements in all cases any better than it is able to prescribe a single response action for every particular damage category. LEAs, in the context of particular asbestos hazards, in consultation with accredited experts and in full view of school-community groups, are responsible for determining appropriate schedules for their asbestos response actions.

However, LEAs should be advised that in providing "a schedule for beginning and completing each preventive measure and response action" as required in § 763.93(e)(6), the LEA is specifying what constitutes implementation of preventive measures and response actions in a timely fashion for that LEA. EPA and State enforcement officials will be monitoring LEA adherence to these schedules to determine whether enforcement actions are warranted against those schools which fail to meet their own deadlines for completing preventive measures and response actions.

*6. Repair for significantly damaged friable thermal system insulation ACM.* Several commenters, State attorneys general and the unions in particular, questioned the efficacy of repair for significantly damaged friable thermal system insulation ACM.

Repair is often successful in preventing fiber release from damaged thermal system insulation and, after assurance that it will protect human health and the environment, an LEA may find repair the least burdensome method of response. Techniques for thermal system insulation ACM repair are well-developed and easily accomplished. Furthermore, the nature of the material makes it especially susceptible to quick remediation with simple techniques.

EPA recognizes that severely damaged friable thermal system ACM may warrant removal to protect human health and the environment, but this is not always the case. If feasible, as determined by the accredited expert, and protective of human health and the environment, repair may be an appropriate response action for this level of damage under particular circumstances. Further, new and emerging repair technologies may offer LEAs new ways to prevent fiber release, protect human health and the environment, and postpone the major disruption often associated with asbestos removal projects until a more appropriate time.

Finally, "feasibility" does *not* imply, as one commenter feared, "repair first, and only if repair is impossible, then remove." There is no predisposition toward repair, but rather a prior consideration of repair feasibility as a check to avoid a major disruption to the material, through removal, if it is not necessary or desirable.

*7. Airborne asbestos fiber measurement for clearance of abatement sites.* EPA has received comments on the use of transmission electron microscopy (TEM), scanning electron microscopy, and phase contrast microscopy for the analysis of air samples taken for clearance air monitoring. Comments dealt with issues that included the possible uses of each of these analytical methods for clearance air monitoring, as well as issues specific to the use of TEM.

The final rule sets forth TEM as the analytical method to be used for analysis of samples taken for clearance air monitoring although the TEM requirement will be phased-in gradually. EPA convened a committee of leading microscopists from private and Federal laboratories to produce an analytical protocol specific for post-abatement clearance monitoring. Each microscopist had extensive experience in TEM, scanning electron microscopy (SEM), and airborne asbestos analysis. The unanimous conclusion of the microscopists was that, for purposes of clearance air monitoring, TEM was the technique of choice. Consequently, an interim TEM protocol has been formulated for clearance air monitoring of asbestos abatement sites in schools.

EPA chose to require analysis by TEM for four reasons: (1) TEM is capable of measuring the smallest diameter fibers; (2) based on existing, validated methods, a formal protocol has been developed; (3) TEM has been validated by intra- and inter-laboratory comparisons conducted by NBS; and (4) a formal laboratory accreditation program for TEM laboratories is currently under development by the NBS.

Phase Contrast Microscopy (PCM) will be allowed for clearance of small projects (removal of less than 160 ft$^2$ or 260 linear feet of asbestos) and during a phase-in of the TEM requirement, for clearance of some larger projects. This phase-in period will give laboratories a period of time to acquire and install TEM instruments, and will permit economical clearance of small projects where clearance analysis costs are a significant portion of total abatement costs.

PCM analysis must be made using the latest version of the NIOSH 7400 method. Two other methods of PCM analysis were considered: the OSHA/EPA Reference Method (ORM) and P&CAM 239. The ORM cannot be used for area clearance because it is intended for personal sampling of abatement workers during abatement work clearance following an abatement action. P&CAM 239 will not be allowed since both NIOSH and OSHA have determined that the NIOSH 7400 method is more accurate and reliable.

The PCM method is nonspecific for asbestos and it cannot detect the small

thin fibers found at abatement sites. EPA research data has shown that PCM is often inadequate for post-abatement monitoring of airborne asbestos. These data indicate that sites which were shown to be clean with PCM data were found by TEM data to be still contaminated. Therefore, reoccupancy of sites initially cleared by PCM, and thus, assumed to have been adequately cleaned, may in fact result in exposures to asbestos.

SEM, for purposes of this rulemaking, was determined to be inadequate for building clearance for the following reasons: (1) Currently available methodologies are not validated for the analysis of asbestos fibers; (2) SEM is limited in its ability to identify the crystalline structure of a particular fiber. (SEM analysis is therefore confined to identification of structures by elemental composition and morphology); (3) recent studies conducted by NBS have evaluated several types of scanning electron microscopes and the variability between these instruments. (NBS has found the image contrast of the microscopes is difficult to standardize between individual scanning electron microscopes); and (4) currently no laboratory accreditation program exists for accrediting SEM laboratories. EPA is aware of two methodologies for SEM: a draft method currently in its initial review by the American Society for Testing and Materials (ASTM) and an Asbestos International Association (AIA) protocol. Neither method has been validated. Additionally, NBS has determined that the AIA method has inherent difficulty when examining certain types of asbestos.

Currently, a laboratory accreditation program is in development for TEM by NBS. Additionally, the AIHA PAT Program evaluates laboratories conducting PCM analyses. The NBS has unconditionally stated that it will not formulate a laboratory accreditation program for SEM based on existing methodologies. Until suitable methodologies are developed, EPA will continue to monitor and investigate the progress of SEM methodologies and research for asbestos analysis. New developments in SEM technology may allow SEM to be considered as an acceptable asbestos measurement tool in the future.

Regarding the use of TEM, several commenters suggested that the aspect ratio (length to width) should be extended to 10:1. For the purpose of TEM measurement by the methods in Appendix A, any elongated particle having a minimum length of 0.5 $\mu$m, parallel sides, and an aspect ratio

(length to width) of 5:1 or larger is defined as a fiber. This represents a change in the previous EPA proposed TEM methodologies which examine fibers with aspect ratios of 3:1 and above; it follows the direction set by NIOSH in proposing modified counting rules in the 7400 method. It is consistent with the panel of microscopists' observations that asbestos structures have aspect ratios equal to and greater than 5:1 whereas the majority of nonasbestos structures, minerals and particles, for example, gypsum, have aspect ratios of less than 5:1. Analysis of these nonasbestos structures tends to comprise a large portion of the time required for sample analysis. EPA believes that further research is needed to justify the extension of aspect ratio to 10:1. Consequently, for the purpose of TEM building clearance, fibers must have an aspect ratio of at least 5:1.

8. *Phase-in period for TEM.* Several commenters asked that the phase-in period for requiring TEM analysis be lengthened, abbreviated, or eliminated altogether. EPA believes the 3-year phase-in period for requiring TEM for all but the smallest abatement jobs allows commercial laboratories the necessary time to purchase and set up additional TEM instruments. In December 1987, estimates developed by EPA's Office of Research and Development (ORD) indicated that there were approximately 62 commercial laboratories in the country which advertised the ability to perform TEM analysis on airborne asbestos samples. Testimony received during the August 25 and 26 public hearings for this rulemaking as well as information gathered by EPA staff, indicate that many laboratories intended to purchase additional TEM equipment. In addition, several laboratories own more than one transmission electron microscope.

EPA believes that an increased demand for TEM instruments will drive the supply of instruments, and has stipulated the 3-year phase-in to allow commercial laboratories time to react to the increased demand. The Agency believes a shorter phase-in period, or requiring the immediate use of TEM for all jobs would create a substantial burden on schools and laboratories. The delay to clear abatement jobs and the high cost associated with TEM analysis for relatively small jobs would be burdensome. EPA has consequently decided to retain the length and type of phase-in described in the proposed rule.

*H. Operations and Maintenance and Worker Protection*

1. *Worker protection and "small-scale-short-duration" activities.* Several

commenters, particularly union groups, advised the Agency to increase worker protection standards and alter the definition and requirements for small-scale, short-duration projects (as defined by Appendix B to Subpart E) prescribed by the Occupational Safety and Health Administration's (OSHA's) and EPA's relevant worker protection regulations. In particular, comments focused on permissible exposure limits (PEL), the allowance of historical air monitoring data, respiratory protection, and the practice of glove bag removal. Other commenters recommended no change, citing OSHA's primacy in this area.

This final regulation, through the provisions of the EPA worker protection rule, extends coverage already in place for O&M workers in private schools under the OSHA construction standard to public sector O&M workers now unprotected in schools. This OSHA standard also includes Appendix B of this rule. LEAs may implement the provisions of Appendix B of the rule instead of the full scope of the EPA/OSHA worker protection regulation when they conduct small-scale, short-duration activities (all of which are presumed to exceed the action level of 0.1 f/cm [3]).

The Agency maintains that OSHA is the most appropriate Federal agency for determining worker protection policy. As noted in the preamble to the proposed rule, EPA believes that OSHA's recently completed worker protection rulemaking, a lengthy and detailed process focused specifically on such issues, is as appropriate to school O&M workers via the EPA worker protection rule as it is to other private sector O&M workers. EPA continues in this belief and no commenters have indicated substantive reasons why the OSHA protections should not be followed.

Therefore, the Agency does not intend to reassess the OSHA determination with respect to issues such as PEL, the use of historical air monitoring data, respiratory protection, and the allowance of glove bag removal. EPA will, however, change the provisions of its worker protection rule (and hence, this regulation) to conform with any modifications subsequently adopted by OSHA.

Finally, with regard to the definition of "small-scale, short-duration" activities, the Agency provides further clarification of the OSHA definition in Appendix B to Subpart E by adding five additional points which may be used to define such projects. EPA believes these additional considerations are instructive

and useful, but will not require their consideration in defining "small-scale, short-duration" activities.

2. *Respiratory protection.* Many organizations, in their comments, advocated the mandatory use of respiratory protection for all operations and maintenance O&M work which might affect asbestos-containing materials ACM.

Once again, the Agency maintains that OSHA is the most appropriate Federal agency for determining worker protection regulations policy, including appropriate respiratory protection, and EPA finds that OSHA's respiratory protection regulations which govern O&M workers in the private sector are equally relevant in schools. EPA does not intend to reassess the OSHA determination in this regard.

However, the regulation does require specific respiratory protection training for all O&M workers who conduct any activities which will result in the disturbance of ACM. Such training must include: (1) Notification of information on the use of respiratory protection as contained in the EPA/National Institute for Occupational Safety and Health (NIOSH) "Guide to Respiratory Protection for the Asbestos Abatement Industry," September 1986 (EPA–560/OPTS–86–001); and (2) hands-on training in the use of respiratory protection.

EPA believes the effect of these training requirements will be to ensure that LEAs determine the appropriate level of protection for its O&M workers and that workers are adequately informed of protection levels and properly trained in respiratory protection practices.

Comments expressed concern that O&M workers could be at risk in situations where peak exposures occur and, thus, may need additional respiratory protection. The comments claim these exposures may exceed OSHA standards and are unpredictable. EPA, however, believes its regulations cover these situations since the regulations provide that respirators shall be supplied in areas where airborne concentrations "can reasonably be expected to exceed permissible limits" 40 CFR 763.121(e) (1) and (4). Since this regulation requires warning labels for asbestos materials (§ 763.95), workers and LEAs should be aware of situations in which asbestos materials will be disturbed to such an extent that respirators may be appropriate.

3. *Right to refuse work.* Several unions provided comments which advanced a proposal to include a right to refuse unsafe or illegal work in the regulation.

EPA believes that the issue of right to refuse work, which is protected under

other labor legislation and worker protection regulations, is more properly addressed by the Department of Labor. This is a general worker protection issue, outside the scope of EPA's expertise. Comments noted that OSHA has promulgated a general regulation affecting an employee's right to refuse work (29 CFR 1977.12(b)(2)) and argue that EPA should extend this safeguard to school workers in the same way the Agency extended other OSHA safeguards to school workers. This point, however, is misplaced. EPA does not believe it should extend general OSHA safeguards to school workers. EPA is not charged with general worker protection, although it is appropriate to extend specific asbestos related standards to school workers.

AHERA section 211(a) does prohibit State or LEA discrimination in any way against someone because that person has provided information relating to a potention violation of the Act or regulation, including a school directive that workers perform unsafe or illegal activities. The Act allows for any employee or representative of employees who believes they have been fired or otherwise discriminated against to apply for review at the Department of Labor under section 11(c) of the Occupational Safety and Health Act.

4. *Routine cleaning.* Several commenters, particularly the State attorneys general and the unions, recommended that the Agency require routine or periodic cleaning in areas with friable ACM, as outlined in the EPA Purple Book.

The Agency has traditionally recommended, as a prudent measure, routine cleaning by wet methods in school areas with asbestos-containing materials, particularly when they are friable. Monthly wet cleaning has been recommended in previous EPA guidance for areas where friable surfacing ACM is present and semiannual wet cleaning is suggested in areas with damaged thermal system insulation ACM.

Other commenters stated the belief that improper cleaning on a regular basis might disturb the material and could actually increase fiber levels in the air. Further, periodic cleaning in limited-access areas, such as pipe tunnels, would not appreciably reduce exposure to school occupants and might actually increase hazard to custodial workers who conduct the cleaning.

EPA is persuaded by the comments that a decision on routine cleaning by the accredited management planner in the context of the particular asbestos hazard is appropriate. The final rule now requires that the accredited management planner shall make a

written recommendation to the LEA regarding the appropriateness and frequency of additional cleaning, which must be included in the management plan.

*I. Management Plans*

The contents of the management plan were the subject of numerous comments from various parties. In general, commenters urged that the contents of the plan not exceed the items required in the statutory language of Title II. EPA believes that the language of Title II regarding management plans was made very prescriptive to enhance accountability, aid review by States, and improve enforcement of the regulation. The Agency has determined that the additional requirements in the regulation are consistent with the intent of the Act and that the additional information will be useful to parents, employees, accredited persons, State reviewers, and EPA enforcement officials.

The manner in which parents and employees should receive notification about the availability of asbestos management plans was the subject of many comments. In general, LEAs and school administrative groups favored the flexibility provided under the proposed rule, which allowed LEAs to notify parent and employee organizations without specifying the exact form of notification. Other commenters such as educational associations and environmental groups preferred written notification to individual parents and employees as a way of ensuring full awareness of the availability of the plan. EPA has modified this provision of the final rule to require written notification to parent and employee organizations, or, in the absence of such organizations, written public notice regarding plan availability. (Notification in the absence of the organizations could be in the form of a newspaper ad, an article in an LEA newsletter or various other forms.) The change provides a means of notification that should increase awareness of the plan, retain flexibility of LEAs regarding the exact form of the notification, and aid efforts to enforce the notification provisions.

Some commenters suggested that there is no need to notify parents of the availability of the plan. Title II, section 203(i)(5), states that the LEA "shall notify parent, teacher, and employee organizations of the availability of such plan."

Comments were also received regarding the need for an annual notification requirement even though the

plan has not changed since the previous notification. The purpose for the annual notification is to ensure that parents and employees new to the LEA each year have an opportunity to be informed about the availability of the plan. Other commenters suggested that annual notification about the plan should include any asbestos abatement planned for that year, and that the notification requirement be expanded to inform parents whenever actions are taken under the management plans. EPA believes that these ends are achieved in a less burdensome fashion through § 763.84(c), which requires that the LEA inform workers and building occupants, or their legal guardians, at least once each school year about inspections, response actions, and post-response action activities, including periodic surveillance activities that are planned or in progress.

Regarding access to the plan, commenters suggested the plan required to be maintained at the individual school should not be the plan for the entire LEA, but only the plan for that school. The final rule has been clarified to specify that a school needs to have available only that part of the LEA's plan which pertains to that school. Another comment regarding access to the plan came from private school groups interested in limiting access to parents, students, and employees, thereby excluding the general public. EPA believes that this is contrary to Title II, section 203(i)(5), which states that the plan shall be available "for inspection by the public, including teachers, or other school personnel, and parents." Since persons involved with the school are only among those "included" in the public, EPA interprets the statute to preclude limiting access to all other members of the public.

### J. State Waivers

Commenters suggested that the opportunity for a public hearing regarding a State's request for waiver should be granted upon request, rather than in response to a written request which details specific objections, as required in the proposal. EPA believes that by requiring a written statement, it is ensuring that hearings have been requested for a valid reason, thereby discouraging individuals from arbitrarily or capriciously requesting a hearing.

Comments were also received which suggested that documents submitted by States seeking waivers should be made public. State waiver requests will be made available as part of the public record required when EPA issues a notice in the **Federal Register**

announcing receipt of the request and opportunity for public comment.

Commenters suggested that waiver requests from local governments should be permitted. Section 203(m) of Title II is clear in limiting waiver requests to States which have established and are implementing a program of asbestos inspection and management.

Commenters suggested that waivers should be granted to programs which are "substantially equivalent" to the regulation, rather than "at least as stringent." Section 203(m) of Title II clearly states that waivers are to be granted to programs "at least as stringent."

Commenters suggested that States with programs requiring only inspection of friable materials be allowed to seek waivers. The Agency believes that section 203(m) of Title II, which states that EPA "may waive some or all" of the regulatory requirements of Title II allows States which require inspection of friable materials in a manner at least as stringent as section 203 of Title II to be granted a waiver. The LEAs of that State would still be required to comply with the Title II requirements for inspection of nonfriable materials as well as all other Title II requirements for which the State did not have a program at least as stringent.

Other comments on the State waiver provisions will be considered as they are raised in proceedings affecting individual States.

### K. Exclusions

Comments on the proposed exclusion criteria ranged from general support to opposing any exclusions. Some commenters indicated EPA's 1982 rule was frequently not complied with, dealt only with friable ACM, and the inspectors were not required to have accreditation. As a result, these commenters believe few if any exclusions could be granted based on the 1982 rule. Several commenters believe the term "substantial compliance" is vague and unenforceable. In addition, other commenters agreed that the requirement in the proposed rule to assess friable ACM would require inspectors to visually inspect all areas anyway. Lastly, some commenters suggested that requiring an accredited inspector to determine whether the LEA qualifies for an exclusion is too stringent and thus, unreasonable.

TCSA Title II directs the Agency to promulgate regulations which will provide for the exclusion of any area of a school building from the inspection requirements. If LEAs were required to repeat actions conducted properly in the

past, the Agency would place an unnecessary burden on those LEAs and penalize LEAs which made a good faith effort to address asbestos hazards in their building. EPA believes a number of States and localities have developed inspection programs in recent years that are similar to Title II. In addition, LEAs that complied with EPA's 1982 rule could receive an exclusion from part of the final rule's requirements. For example, friable material sampled and found to contain asbestos on the ceiling of the cafeteria would not have to be re-sampled. Although friable ACBM must be assessed even if previously identified, the above example illustrates a savings to the LEA.

"Substantial compliance" allows previous sampling that was done in a random manner with sufficient samples to be adequate to determine no ACBM is present. EPA believes previous adequate inspection and sampling efforts conducted by LEAs should not prove worthless. For example, if a LEA had records that it took three random samples in a 1,500 square foot classroom to comply with EPA's 1982 rule or a State law, and all samples were analyzed negative for asbestos, an accredited inspector may determine that this is sufficient to indicate no asbestos is present even though the current rule would require five samples for the same classroom.

EPA believes only an accredited inspector has the training necessary to determine whether previous inspections and sampling were adequate. EPA has evidence to suggest that many inspections performed under the 1982 rule were conducted by persons with little or no inspection training. If these same individuals were responsible for determining the validity of previous inspections, large areas of schools may not be examined by accredited inspectors. In many respects, this would defeat the purpose of TSCA Title II.

### L. Enforcement

Some commenters stated that the "Compliance and Enforcement" section of the proposed rule (§ 763.97) incorrectly describes the provisions of TSCA Title II and that the final rule should explicitly state the following points. First, LEAs that violate the regulations under Title II are not liable under any enforcement provision of Title I. Second, Title II does not allow EPA to assess penalties against individuals. Third, criminal penalties are not permitted for violation of Title II.

EPA disagrees. The provisions of the "Compliance and Enforcement" section

are in accordance with applicable law, as discussed below.

Section 3 of AHERA, "Technical and Conforming Amendments," amends section 15(1) of TSCA Title I to provide that it is unlawful for any person to fail or refuse to comply with any requirement of TSCA Title II or any rule promulgated or order issued under Title II. Therefore, violations of Title II regulations, published in this document are generally subject to the civil and criminal penalties under section 16 of Title I and to civil injunctive actions under section 17 of Title I. This liability is qualified, however, by section 207 of Title II which describes LEA civil liabilities for violation of regulations and provides that LEAs are not liable for any civil penalty under Title I. Section 207, however, does not alter the criminal liabilities of Title I or the injunctive provisions of section 17 of Title I. Nor does section 207 provide any exemption from Title I provisions for inspectors, management planners or any other person other than an LEA that has responsibilities under TSCA Title II. Finally, regardless of the provisions of TSCA, applicable case law provides that liability for actions of organizations may extend to responsible officials.

Thus the three points noted in the comments are wrong. First, LEAs that violate Title II rules are liable for criminal penalties under section 16 of Title I and are subject to injunctive relief in Federal District Courts under section 17 of Title I. Second, individuals may be liable for violating TSCA Title II regulations. Individuals other than LEAs that violate Title II regulations are subject to any of the penalties under Title I, and responsible LEA officials may be liable for any LEA violation of Title II. Third, the effect of the conforming amendments to TSCA Title I is that criminal penalties may be assessed for violation or Title II.

## M. Other Issues

1. *Cost estimates for inspection.* Several commenters, ranging from school districts to independent consultants, expressed concern that the economic impact analysis of the proposed rule underestimated the cost of inspecting for ACM. Comments claimed that labor rates and time required to conduct inspections were too low.

EPA agreed with these comments. As a result the Agency's estimates for the final rule increased due to an update of unit labor costs and a small increase in the time estimated to perform several inspection activities. As a result the estimated total cost for all inspection activities increased from the proposal to

the final rule from approximately $58.2 million to approximately $78.5 million. The cost for the building walkthrough and visual inspection, assessment, and mapping and reporting activities increased, while the cost estimates for bulk sampling and analysis remained the same. The total inspection costs are now estimated to be $1,144 for public primary schools, $1,627 for public secondary schools and $1,587 for private schools.

2. *Cost estimates for management plans.* A number of commenters expressed concern that the proposed rule underestimated the cost of developing management plans due to low assumptions for labor rates and time needed to prepare the plan. EPA also received comments that training and recordkeeping costs were too low. These costs are considered by EPA as part of the cost of the management plan implementation. Several commenters also expressed concern that EPA underestimated the burden associated with the state review of management plans.

EPA agrees that labor costs and time needed to prepare plans were too low in the proposal and has increased these estimates. EPA has also increased the cost for training by raising labor rate estimates and including travel expenses in the cost of training. As a result, the average costs for first year development and implementation of a management plan for a typical school is estimated to be $3,270 for a public primary school, $4,521 for a public secondary school and $4,460 for a private school. The total cost for development and implementation of management plans increased from $970.8 million in the proposed rule to $1,272 million in the final rule.

With respect to the cost to States of reviewing management plans, EPA has not substantially changed its estimates. While the proposed rule stated a range of $63 to $95 for a State to review a plan, the final rule estimates this cost at approximately $77. The plan review burden will vary with the different number of schools found in each State. For example, California, with an estimated 10,932 schools, would incur a review cost of roughly $842,000. Delaware, with an estimated 288 schools, would incur a cost of about $23,000. States will incur this burden within the 90-day review period specified in the law. The burden for each State, if it must review many plans, may be substantial. However, this burden is imposed by statute.

3. *Costs for operations and maintenance (O&M) programs.* EPA received a comment that it should not

have included a cost for levels of overhead and contingency costs for school O&M programs because schools are not run like a business and would not charge themselves overhead. In addition, the comment argued that EPA's assumed rate of three minor fiber release episodes per school per year was too high. It was also argued that EPA should not have included an opportunity cost associated with O&M work, since schools would not actually spend money on many O&M activities but would redirect their employees' activities. Finally, the commenter identified a mistake in the calculations of the cost of consumable supplies used in O&M programs.

EPA agrees that schools would not incur overhead and contingency costs for O&M work. EPA used these indirect costs to calculate the expenses associated with the incremental utility, payroll, and other expenses attributable to an O&M program. EPA believes that these estimates of indirect rates are reasonable.

EPA slightly modified its assumptions with respect to fiber release episodes. However, this change did not have a significant impact on the total cost of O&M programs.

With respect to using an opportunity cost approach in the calculation of O&M costs, EPA believes that these costs are, indeed, a real cost of conducting O&M. However, the Agency acknowledges that some portion of the O&M cost may not result in actual expenditures by a school if the school chooses to give up some other activity to absorb the additional O&M activity. Regardless of how the school chooses to react, these are costs imposed by the rule. Accordingly, the Agency has included the opportunity costs analysis in the final rule estimates.

EPA acknowledges its mistake in the cost of consumables and has adjusted the O&M costs accordingly. This yields a fairly substantial drop in per school annual expenses for O&M programs. The reason for the decrease in O&M costs noted below is almost entirely due to this decrease in cost of consumables.

The final rule's costs of O&M programs per school on a yearly basis (excluding the cost of special equipment acquisition) are now estimated to be $3,800 for a public primary school, $5,100 for a public secondary school and $3,800 for a private school. The total O&M costs have decreased from $525.4 million in the proposal to $292.7 million for the final rule.

4. *Costs for removal, enclosure and encapsulation projects.* Commenters argued that cost estimates in the

proposal for removal projects were incorrect because they assumed replacement costs and post-abatement air monitoring for asbestos materials removed during building demolition. These errors have been corrected in the final cost estimates.

In addition, EPA assumed in the proposal that all post-response action air samples would be analyzed using TEM. Since the rule allows limited PCM, the costs of response actions have decreased accordingly. This cost decrease is approximately $4,000 in direct expenses per project for those projects using PCM.

Total costs for removal, enclosure and encapsulation projects have decreased from $1,587.8 million in the proposal to $1,431 million in the final rule.

5. *Risk related to asbestos in buildings.* Comments argued that EPA did not adequately assess the evidence relating to the harm caused by asbestos in schools. Specifically, they claim that EPA's assessment of risk for this rule (1) did not consider estimates of the toxicological potency of asbestos developed by a number of scientists who disagree with the potency estimates accepted by the Agency; (2) ignored studies showing that prevailing exposure to asbestos in schools has often been measured at levels far below those assumed by the Agency in its assessment (70 to 500 ng/m$^3$); and (3) did not consider documentation that asbestos exposures after major abatement, especially removal, may not be reduced at all and may even by elevated. Had such evidence been considered, according to one of these comments (Safe Buildings Alliance), EPA would have come to the conclusion that operations and maintenance programs are, in almost all schools, the appropriate response action to protect health and the environment. This evidence is cited to support the position that protection of health and the environment requires specification of an airborne exposure level of protection.

EPA disagrees that the evidence cited in these comments supports the need for an airborne asbestos standard in buildings. Rather, EPA believes that the data cited by these comments, even if assumed to be correctly interpreted by the commenters, supports the rule as promulgated.

The Agency has noted elsewhere in this preamble the problems with air monitoring as the primary assessment tool for asbestos in schools. Furthermore, no comments have provided any substantive health based justification for choosing any airborne level as an appropriate level to protect public health from asbestos in schools.

Nevertheless, EPA believes that the rule accomplishes the goals of these commenters to ensure that unnecessary removal activities do not occur. Indeed, one of these commenters (Safe Buildings Alliance) specifically stated that it believes removals could typically be the response action if the rules were *incorrectly* applied. The rules, however, are not designated to prefer one response action over another, but to allow schools the flexibility to deal with their particular situations. Certainly, asbestos in many schools may not present significant risks in its current condition, but could cause considerable harm if not dealt with properly. Also, there are plainly schools in which serious measures would be needed immediately. In this context the evidence cited by the commenters is supportive of EPA's rule, as discussed below.

With respect to the potency of asbestos, EPA has decided that for purposes of this rule there is no need to resolve the divergence of opinion. See preamble to Proposed Rule, 52 FR 15833. In any event, EPA has considered differing views on asbestos health effects in other proceedings (see, e.g., 51 FR 3728 *et seq.*, January 29, 1986) and commenters have not presented new evidence. The important point for purposes of this rule, is that varying local circumstances will drive the decision on the appropriate response action.

With respect to asbestos exposure, EPA acknowledges that many building air measurements show low prevailing levels. However, peak levels during serious disturbances can be extremely high and may cause very serious risks to individuals involved. Regardless of the actual average measurements in all schools, regardless of whether one accepts the levels used by EPA in its assessment or the levels presented by the commenters, the basic structure of the rule should not be changed. Assessment of all the evidence leads to the conclusion that local educational agencies should at least adopt operations and maintenance programs and institute more serious response actions if local conditions warrant. The levels EPA used in its risk assessment are actual measurements *(see, e.g.* "Measuring Airborne Asbestos Levels in Buildings," EPA 560/13–80–026; "Airborne Asbestos Levels in Schools," EPA 560/5–83–003) and are reasonable for purposes of decisionmaking in the context of this rule. In any event, the lower airborne asbestos levels cited by the commenters do not make the case for an airborne regulatory level.

Finally, EPA interprets data on airborne levels of asbestos before and after removal actions differently from the commenters. The information available on airborne concentrations before and after asbestos removal is actually limited, dealing with a very small number of abatement actions. Nevertheless, EPA believes that this information indicates that, in the past, some abatement actions were not done properly and led to increased airborne levels. The rule, therefore, was designed to prevent shoddy abatement work. A draft report prepared by Batelle (March 1987) shows significant reduction in airborne asbestos concentrations in the enclosed abatement area in schools immediately after removal operations. Airborne levels measured in the Batelle study did increase back to approximately the same as pre-removal levels after school resumed (based on a statistical analysis of pre- and post-removal levels). However, these levels could only have been the result of reentrainment of asbestos from outside the immediate removal area. Removals, thus, were successful at the removal site but could not guarantee no fiber release from asbestos-containing materials remaining in the building. The Batelle draft, therefore, does not show an increase in exposure from the removal activities as suggested by the comments. At the very least, removal reduced some danger of peak exposures. The data in the Batelle draft may indicate a need for continuing O&M programs following abatement, particularly where all asbestos is not removed.

6. *Model accreditation plan.* EPA received comments about the provisions of the Model Accreditation Plan required under section 206 of TSCA Title II. Under Title II, the Agency was required to submit a final Model Accreditation Plan by April 20, 1987. The final plan was issued by EPA in accordance with that deadline. The final plan appeared in the **Federal Register** of April 30, 1987, entitled "Asbestos-Containing Material in Schools; Model Accreditation Plan."

## IV. Economic Impact

The economic impact analysis estimates the incremental costs attributable to the proposed regulation, including costs of inspection, sampling, development, and implementation of management plans, training of school employees, periodic surveillance, and the implementation of abatement actions. Estimates of the number of schools affected and square footage of asbestos were developed based on the 1984 EPA survey of asbestos in schools

and data compiled from the Asbestos School Hazard Abatement Act (ASHAA) loan and grant program. Estimates of the percentage of asbestos which falls into each of the hazard categories were based on the results of a survey of the EPA's Regional Asbestos Coordinators (RACs).

Using a model school/model project approach, costs of inspection, sampling, and appropriate response actions were developed for schools with ACM in each of the different hazard categories. For schools with only nonfriable ACM, the only costs estimated were for management plan implementation, nominal plan implementation activities, training of the asbestos program manager, custodial training for proper repair and maintenance of ACM, and the periodic surveillance and reinspection of ACM. For purposes of the economic analysis, EPA assumed that all schools with only nonfriable ACM would choose to forego sampling and instead just treat suspect material as asbestos-containing.

Asbestos abatement-related costs expected to be incurred regardless of the existence of these regulations were subtracted from the total costs to calculate only the incremental cost of the final regulations. For example, data from the ASHAA loan and grant application data base were used to project an average annual rate of removal of asbestos that is assumed would have occurred even if TSCA Title II legislation and these regulations were not promulgated. That average annual rate was estimated to be approximately 3.4 percent for primary schools, 3.3 percent for secondary schools, and 1.8 percent for private schools. The costs associated with this underlying rate of removal were subtracted from the total costs. Also, the costs of removal of friable ACM prior to demolition that is required by the NESHAPs regulations were also netted out of the total costs.

The estimated present value of the costs of these final regulations is approximately $3,145 million (using a 10 percent discount rate) over 30 years. This includes the cost of initial inspection and sampling—$78.5 million; development and implementation of management plans—$1,272 million; periodic surveillance—$47.7 million; reinspection—$23.2 million; special operations and maintenance programs—$292.7 million; and abatement response actions—$1,431 million.

The total number of primary and secondary schools potentially affected by these regulations is estimated to be 106,983. Approximately 44,600 are estimated to have about 213 million square feet of surfacing or thermal

systems insulation ACM. Of these, an estimated 10,700 have surfacing ACM only. It is likely that every school contains some amount of nonfriable ACM such as floor tile, transite board, and fire doors.

The cost of an asbestos inspection is estimated to range from $1,144 to $1,627 per school for schools with both surfacing and thermal systems insulation ACM. This cost varies depending upon the size of the school, the amount and type of ACM contained in the school, and the type of professional doing the work. The costs of sampling and analysis if friable materials are found will depend upon the number of samples taken and analyzed. Costs of analysis are estimated to range from $25 to $47 per sample. Assuming the average school has to analyze 20 samples, the cost of analysis will be $500 to $940 per school. The cost of mapping ACM is estimated to range from $110 to over $270 per school.

The cost of developing a management plan if asbestos-containing surfacing ACM or thermal systems insulation ACM is present is estimated to range from $1,025 for an average-size public primary school to $1,420 for an average-size public secondary school. These estimates are weighted averages of the costs of plans developed by trained school personnel and by outside consultants. A less extensive management plan would be required for schools containing only nonfriable materials. The average development cost for a management plan where only nonfriable materials are present is estimated to be about $500 for both public primary and private schools, and about $715 for public secondary schools.

The cost of training for school employees involves a variety of factors ranging from course and accreditation exam fees to the possible expenses for any out of town travel required for the training. The estimated course fee for a 2-hour awareness session required of all school maintenance employees in schools with ACM is approximately $50 per person. The additional 14 hours of training for school maintenance workers who may come in contact with asbestos in doing minor repair and maintenance work that disturbs asbestos is estimated to cost $250. A fee of $420 is estimated for the 24 hours of training required for the certification of asbestos abatement workers doing more than just minor repair and small glove-bag removal jobs. The fee for the 40-hour training course and certification required for asbestos abatement contractors is estimated to be $640.

Response action costs depend primarily on the condition of the asbestos in a school and to a lesser extent on many other factors. In general, for surfacing ACM in all but the significantly damaged category, it is likely that the primary response action undertaken by a school will be special O&M activities. Use of O&M activities would likely continue until or unless the ACBM deteriorates to a "significantly damaged" condition. The annual cost of a special O&M program (excluding acquisition of special equipment) is estimated to range from $3,800 for a typical public primary school to $5,100 for a typical public secondary school. Initial cleaning costs are expected to range from $950 to $1,400.

The cost of removal depends upon many factors including size of the project. The estimated cost of removal for a 4,000 ft² project in which surfacing material is removed would be approximately $51,300. The cost of removal for a 900 ft² boiler wrap project is estimated to be approximately $30,900. The total discounted costs of response actions were estimated assuming schools undertake a combination of response actions that depend on the condition of the ACM.

## V. Rulemaking Record

EPA has established a record for this rulemaking (docket control number OPTS–62048E). The record is available in the Office of Toxic Substances Public Information Office, from 8 a.m. to 4 p.m., Monday through Friday, except legal holidays. The Public Information Office is located in Rm. NE–G004, 401 M St., SW., Washington, DC.

The record includes information considered by EPA in developing the proposed and final rules. The record now includes the following categories of information:

1. **Federal Register** notices.

2. Support documents.

3. Reports.

4. Memoranda and letters.

5. Records of the negotiating committee.

6. Public comments received on the proposed rule.

7. Response to comments document.

8. Transcript of the August 25 and 26 Public Meeting.

EPA requests that any person who commented on this rule submit to the Agency in writing any information which such person believes shows there are errors or omissions in the record. EPA will evaluate such submissions and supplement the record as appropriate.

## VI. References

1. USEPA. "Guidance for Controlling Asbestos-Containing Materials in Buildings," EPA 560/5–85–024, June 1985.

2. USEPA. "A Guide to Respiratory Protection for the Asbestos Abatement Industry," EPA 560/OPTS–86–001, September 1986.

3. USEPA. "Asbestos in Buildings: Simplified Sampling Scheme for Friable Surfacing Materials," EPA 560/5–85–030a, October 1985.

4. USEPA. Friable Asbestos-Containing Materials in Schools, 40 CFR Part 763, Subpart F.

5. USEPA. National Emission Standards for Hazardous Air Pollutants, 40 CFR Part 61, Subpart M.

6. USDOL. OSHA. Occupational Exposure to Asbestos, 29 CFR 1926.58.

7. USEPA. Toxic Substances; Asbestos Abatement Projects, 40 CFR Part 763, Subpart G.

## VII. Regulatory Assessment Requirements

### A. Executive Order 12291

Under Executive Order 12291, EPA has determined that this rule is a "major" rule and has developed a Regulatory Impact Analysis. EPA has prepared an economic impact analysis of the TSCA Title II regulations.

### B. Regulatory Flexibility Act

EPA has analyzed the economic impact of this rule on small businesses. EPA's analysis of the economic consequences of this rule appears in Unit IV.

### C. Paperwork Reduction Act

The reporting and recordkeeping provisions in this rule have been approved by the Office of Management and Budget (OMB) under the Paperwork Reduction Act, and has been assigned OMB control number 2070–0091.

## List of Subjects in 40 CFR Part 763

Asbestos, Environmental protection, Hazardous substances, Incorporation by reference, Occupational health and safety, Recordkeeping, Schools.

Dated: October 17, 1987.

**Lee M. Thomas,**
*Administrator.*

Therefore, 40 CFR Part 763 is amended as follows:

## PART 763—[AMENDED]

1. The authority citation for Part 763 continues to read as follows:

**Authority:** 15 U.S.C. 2605 and 2607(c). Subpart E also issued under 15 U.S.C. 2641, 2643, 2646, and 2647.

2. By adding §§ 763.80 through 763.99 and Appendices A, B, and D to Subpart E to read as follows:

## Subpart E—Asbestos-Containing Materials in Schools

Sec.
763.80  Scope and purpose.
763.83  Definitions.
763.84  General local education agency responsibilities.
763.85  Inspection and reinspections.
763.86  Sampling.
763.87  Analysis.
763.88  Assessment.
763.90  Response actions.
763.91  Operations and maintenance.
763.92  Training and periodic surveillance.
763.93  Management plans.
763.94  Recordkeeping.
763.95  Warning labels.
763.97  Compliance and enforcement.
763.98  Waiver; delegation to State.
763.99  Exclusions.
Appendix A to Subpart E—Interim Transmission Electron Microscopy Analytical Methods—Mandatory and Nonmandatory—and Mandatory Section to Determine Completion of Response Actions
Appendix B to Subpart E—Work Practices and Engineering Controls for Small-Scale, Short-Duration Operations Maintenance and Repair (O&M) Activities Involving ACM
*    *    *    *    *
Appendix D to Subpart E—Transport and Disposal of Asbestos Waste

### § 763.80  Scope and purpose.

(a) This rule requires local education agencies to identify friable and nonfriable asbestos-containing material (ACM) in public and private elementary and secondary schools by visually inspecting school buildings for such materials, sampling such materials if they are not assumed to be ACM, and having samples analyzed by appropriate techniques referred to in this rule. The rule requires local education agencies to submit management plans to the Governor of their State by October 12, 1988, begin to implement the plans by July 9, 1989, and complete implementation of the plans in a timely fashion. In addition, local education agencies are required to use persons who have been accredited to conduct inspections, reinspections, develop management plans, or perform response actions. The rule also includes recordkeeping requirements. Local education agencies may contractually delegate their duties under this rule, but they remain responsible for the proper performance of those duties. Local education agencies are encouraged to consult with EPA Regional Asbestos Coordinators, or if applicable, a State's lead agency designated by the State

Governor, for assistance in complying with this rule.

(b) Local education agencies must provide for the transportation and disposal of asbestos in accordance with EPA's "Asbestos Waste Management Guidance." For convenience, applicable sections of this guidance are reprinted as Appendix D of this subpart. There are regulations in place, however, that affect transportation and disposal of asbestos waste generated by this rule. The transportation of asbestos waste is covered by the Department of Transportation (49 CFR Part 173, Subpart J) and disposal is covered by the National Emissions Standards for Hazardous Air Pollutants (NESHAP) (40 CFR Part 61, Subpart M).

### § 763.83  Definitions.

For purposes of this subpart:

"Act" means the Toxic Substances Control Act (TSCA), 15 U.S.C. 2601, *et seq.*

"Accessible" when referring to ACM means that the material is subject to disturbance by school building occupants or custodial or maintenance personnel in the course of their normal activities.

"Accredited" or "accreditation" when referring to a person or laboratory means that such person or laboratory is accredited in accordance with section 206 of Title II of the Act.

"Air erosion" means the passage of air over friable ACBM which may result in the release of asbestos fibers.

"Asbestos" means the asbestiform varieties of: Chrysotile (serpentine); crocidolite (riebeckite); amosite (cummingtonitegrunerite); anthophyllite; tremolite; and actinolite.

"Asbestos-containing material" (ACM) when referring to school buildings means any material or product which contains more than 1 percent asbestos.

"Asbestos-containing building material" (ACBM) means surfacing ACM, thermal system insulation ACM, or miscellaneous ACM that is found in or on interior structural members or other parts of a school building.

"Asbestos debris" means pieces of ACBM that can be identified by color, texture, or composition, or means dust, if the dust is determined by an accredited inspector to be ACM.

"Damaged friable miscellaneous ACM" means friable miscellaneous ACM which has deteriorated or sustained physical injury such that the internal structure (cohesion) of the material is inadequate or, if applicable, which has delaminated such that its bond to the substrate (adhesion) is

inadequate or which for any other reason lacks fiber cohesion or adhesion qualities. Such damage or deterioration may be illustrated by the separation of ACM into layers; separation of ACM from the substrate; flaking, blistering, or crumbling of the ACM surface; water damage; significant or repeated water stains, scrapes, gouges, mars or other signs of physical injury on the ACM. Asbestos debris originating from the ACBM in question may also indicate damage.

"Damaged friable surfacing ACM" means friable surfacing ACM which has deteriorated or sustained physical injury such that the internal structure (cohesion) of the material is inadequate or which has delaminated such that its bond to the substrate (adhesion) is inadequate, or which, for any other reason, lacks fiber cohesion or adhesion qualities. Such damage or deterioration may be illustrated by the separation of ACM into layers; separation of ACM from the substrate; flaking, blistering, or crumbling of the ACM surface; water damage; significant or repeated water stains, scrapes, gouges, mars or other signs of physical injury on the ACM. Asbestos debris originating from the ACBM in question may also indicate damage.

"Damaged or significantly damaged thermal system insulation ACM" means thermal system insulation ACM on pipes, boilers, tanks, ducts, and other thermal system insulation equipment where the insulation has lost its structural integrity, or its covering, in whole or in part, is crushed, water-stained, gouged, punctured, missing, or not intact such that it is not able to contain fibers. Damage may be further illustrated by occasional punctures, gouges or other signs of physical injury to ACM; occasional water damage on the protective coverings/jackets; or exposed ACM ends or joints. Asbestos debris originating from the ACBM in question may also indicate damage.

"Encapsulation" means the treatment of ACBM with a material that surrounds or embeds asbestos fibers in an adhesive matrix to prevent the release of fibers, as the encapsulant creates a membrane over the surface (bridging encapsulant) or penetrates the material and binds its components together (penetrating encapsulant).

"Enclosure" means an airtight, impermeable, permanent barrier around ACBM to prevent the release of asbestos fibers into the air.

"Fiber release episode" means any uncontrolled or unintentional disturbance of ACBM resulting in visible emission.

"Friable" when referring to material in a school building means that the material, when dry, may be crumbled, pulverized, or reduced to powder by hand pressure, and includes previously nonfriable material after such previously nonfriable material becomes damaged to the extent that when dry it may be crumbled, pulverized, or reduced to powder by hand pressure.

"Functional space" means a room, group of rooms, or homogeneous area (including crawl spaces or the space between a dropped ceiling and the floor or roof deck above), such as classroom(s), a cafeteria, gymnasium, hallway(s), designated by a person accredited to prepare management plans, design abatement projects, or conduct response actions.

"High-efficiency particulate air" (HEPA) refers to a filtering system capable of trapping and retaining at least 99.97 percent of all monodispersed particles 0.3 μm in diameter or larger.

"Homogeneous area" means an area of surfacing material, thermal system insulation material, or miscellaneous material that is uniform in color and texture.

"Local education agency" means:

(1) Any local educational agency as defined in section 198 of the Elementary and Secondary Education Act of 1965 (20 U.S.C. 3381).

(2) The owner of any nonpublic, nonprofit elementary, or secondary school building.

(3) The governing authority of any school operated under the defense dependents' education system provided for under the Defense Dependents' Education Act of 1978 (20 U.S.C. 921, et seq.).

"Miscellaneous ACM" means miscellaneous material that is ACM in a school building.

"Miscellaneous material" means interior building material on structural components, structural members or fixtures, such as floor and ceiling tiles, and does not include surfacing material or thermal system insulation.

"Nonfriable" means material in a school building which when dry may not be crumbled, pulverized, or reduced to powder by hand pressure.

"Operations and maintenance program" means a program of work practices to maintain friable ACBM in good condition, ensure clean up of asbestos fibers previously released, and prevent further release by minimizing and controlling friable ACBM disturbance or damage.

"Potential damage" means circumstances in which:

(1) Friable ACBM is in an area regularly used by building occupants,

including maintenance personnel, in the course of their normal activities.

(2) There are indications that there is a reasonable likelihood that the material or its covering will become damaged, deteriorated, or delaminated due to factors such as changes in building use, changes in operations and maintenance practices, changes in occupancy, or recurrent damage.

"Potential significant damage" means circumstances in which:

(1) Friable ACBM is in an area regularly used by building occupants, including maintenance personnel, in the course of their normal activities.

(2) There are indications that there is a reasonable likelihood that the material or its covering will become significantly damaged, deteriorated, or delaminated due to factors such as changes in building use, changes in operations and maintenance practices, changes in occupancy, or recurrent damage.

(3) The material is subject to major or continuing disturbance, due to factors including, but not limited to, accessibility or, under certain circumstances, vibration or air erosion.

"Preventive measures" means actions taken to reduce disturbance of ACBM or otherwise eliminate the reasonable likelihood of the material's becoming damaged or significantly damaged.

"Removal" means the taking out or the stripping of substantially all ACBM from a damaged area, a functional space, or a homogeneous area in a school building.

"Repair" means returning damaged ACBM to an undamaged condition or to an intact state so as to prevent fiber release.

"Response action" means a method, including removal, encapsulation, enclosure, repair, operations and maintenance, that protects human health and the environment from friable ACBM.

"Routine maintenance area" means an area, such as a boiler room or mechanical room, that is not normally frequented by students and in which maintenance employees or contract workers regularly conduct maintenance activities.

"School" means any elementary or secondary school as defined in section 198 of the Elementary and Secondary Education Act of 1965 (20 U.S.C. 2854).

"School building" means:

(1) Any structure suitable for use as a classroom, including a school facility such as a laboratory, library, school eating facility, or facility used for the preparation of food.

(2) Any gymnasium or other facility which is specially designed for athletic

**41848** **Federal Register** / Vol. 52, No. 210 / Friday, October 30, 1987 / Rules and Regulations

or recreational activities for an academic course in physical education.

(3) Any other facility used for the instruction or housing of students or for the administration of educational or research programs.

(4) Any maintenance, storage, or utility facility, including any hallway, essential to the operation of any facility described in this definition of "school building" under paragraphs (1), (2), or (3).

(5) Any portico or covered exterior hallway or walkway.

(6) Any exterior portion of a mechanical system used to condition interior space.

"Significantly damaged friable miscellaneous ACM" means damaged friable miscellaneous ACM where the damage is extensive and severe.

"Significantly damaged friable surfacing ACM" means damaged surfacing ACM in a functional space where the damage is extensive and severe.

"State" means a State, the District of Columbia, the Commonwealth of Puerto Rico, Guam, American Samoa, the Northern Marianas, the Trust Territory of the Pacific Islands, and the Virgin Islands.

"Surfacing ACM" means surfacing material that is ACM.

"Surfacing material" means material in a school building that is sprayed-on, troweled-on, or otherwise applied to surfaces, such as acoustical plaster on ceilings and fireproofing materials on structural members, or other materials on surfaces for acoustical, fireproofing, or other purposes.

"Thermal system insulation" means material in a school building applied to pipes, fittings, boilers, breeching, tanks, ducts, or other interior structural components to prevent heat loss or gain, or water condensation, or for other purposes.

"Thermal system insulation ACM" means thermal system insulation that is ACM.

"Vibration" means the periodic motion of friable ACBM which may result in the release of asbestos fibers.

**§ 763.84   General local education agency responsibilities.**

Each local education agency shall:

(a) Ensure that the activities of any persons who perform inspections, reinspections, and periodic surveillance, develop and update management plans, and develop and implement response actions, including operations and maintenance, are carried out in accordance with Subpart E of this part.

(b) Ensure that all custodial and maintenance employees are properly

trained as required by this Subpart E and other applicable Federal and/or State regulations (e.g., the Occupational Safety and Health Administration asbestos standard for construction, the EPA worker protection rule, or applicable State regulations).

(c) Ensure that workers and building occupants, or their legal guardians, are informed at least once each school year about inspections, response actions, and post-response action activities, including periodic reinspection and surveillance activities that are planned or in progress.

(d) Ensure that short-term workers (e.g., telephone repair workers, utility workers, or exterminators) who may come in contact with asbestos in a school are provided information regarding the locations of ACBM and suspected ACBM assumed to be ACM.

(e) Ensure that warning labels are posted in accordance with § 763.95.

(f) Ensure that management plans are available for inspection and notification of such availability has been provided as specified in the management plan under § 763.93(g).

(g)(1) Designate a person to ensure that requirements under this section are properly implemented.

(2) Ensure that the designated person receives adequate training to perform duties assigned under this section. Such training shall provide, as necessary, basic knowledge of:

(i) Health effects of asbestos.

(ii) Detection, identification, and assessment of ACM.

(iii) Options for controlling ACBM.

(iv) Asbestos management programs.

(v) Relevant Federal and State regulations concerning asbestos, including those in this Subpart E and those of the Occupational Safety and Health Administration, U.S. Department of Labor, the U.S. Department of Transportation and the U.S. Environmental Protection Agency.

(h) Consider whether any conflict of interest may arise from the interrelationship among accredited personnel and whether that should influence the selection of accredited personnel to perform activities under this subpart.

**§ 763.85   Inspection and reinspections.**

(a) *Inspection.* (1) Except as provided in paragraph (a)(2) of this section, before October 12, 1988, local education agencies shall inspect each school building that they lease, own, or otherwise use as a school building to identify all locations of friable and nonfriable ACBM.

(2) Any building leased or acquired on or after October 12, 1988, that is to be

used as a school building shall be inspected as described under paragraphs (a) (3) and (4) of this section prior to use as a school building. In the event that emergency use of an uninspected building as a school building is necessitated, such buildings shall be inspected within 30 days after commencement of such use.

(3) Each inspection shall be made by an accredited inspector.

(4) For each area of a school building, except as excluded under § 763.99, each person performing an inspection shall:

(i) Visually inspect the area to identify the locations of all suspected ACBM.

(ii) Touch all suspected ACBM to determine whether they are friable.

(iii) Identify all homogeneous areas of friable suspected ACBM and all homogeneous areas of nonfriable suspected ACBM.

(iv) Assume that some or all of the homogeneous areas are ACM, and, for each homogeneous area that is not assumed to be ACM, collect and submit for analysis bulk samples under §§ 763.86 and 763.87.

(v) Assess, under § 763.88, friable material in areas where samples are collected, friable material in areas that are assumed to be ACBM, and friable ACBM identified during a previous inspection.

(vi) Record the following and submit to the person designated under § 763.84 a copy of such record for inclusion in the management plan within 30 days of the inspection:

(A) An inspection report with the date of the inspection signed by each accredited person making the inspection, State of accreditation, and if applicable, his or her accreditation number.

(B) An inventory of the locations of the homogeneous areas where samples are collected, exact location where each bulk sample is collected, dates that samples are collected, homogeneous areas where friable suspected ACBM is assumed to be ACM, and homogeneous areas where nonfriable suspected ACBM is assumed to be ACM.

(C) A description of the manner used to determine sampling locations, the name and signature of each accredited inspector who collected the samples, State of accreditation, and, if applicable, his or her accreditation number.

(D) A list of whether the homogeneous areas identified under paragraph (a)(4)(vi)(B) of this section are surfacing material, thermal system insulation, or miscellaneous material.

(E) Assessments made of friable material, the name and signature of each accredited inspector making the

assessment, State of accreditation, and if applicable, his or her accreditation number.

(b) *Reinspection.* (1) At least once every 3 years after a management plan is in effect, each local education agency shall conduct a reinspection of all friable and nonfriable known or assumed ACBM in each school building that they lease, own, or otherwise use as a school building.

(2) Each inspection shall be made by an accredited inspector.

(3) For each area of a school building, each person performing a reinspection shall:

(i) Visually reinspect, and reassess, under § 763.88, the condition of all friable known or assumed ACBM.

(ii) Visually inspect material that was previously considered nonfriable ACBM and touch the material to determine whether it has become friable since the last inspection or reinspection.

(iii) Identify any homogeneous areas with material that has become friable since the last inspection or reinspection.

(iv) For each homogeneous area of newly friable material that is already assumed to be ACBM, bulk samples may be collected and submitted for analysis in accordance with §§ 763.86 and 763.87.

(v) Assess, under § 763.88, the condition of the newly friable material in areas where samples are collected, and newly friable materials in areas that are assumed to be ACBM.

(vi) Reassess, under § 763.88, the condition of friable known or assumed ACBM previously identified.

(vii) Record the following and submit to the person designated under § 763.84 a copy of such record for inclusion in the management plan within 30 days of the reinspection:

(A) The date of the reinspection, the name and signature of the person making the reinspection, State of accreditation, and if applicable, his or her accreditation number, and any changes in the condition of known or assumed ACBM.

(B) The exact locations where samples are collected during the reinspection, a description of the manner used to determine sampling locations, the name and signature of each accredited inspector who collected the samples, State of accreditation, and, if applicable, his or her accreditation number.

(C) Any assessments or reassessments made of friable material, the name and signature of the accredited inspector making the assessments, State of accreditation, and if applicable, his or her accreditation number.

(c) *General.* Thermal system insulation that has retained its structural integrity and that has an undamaged protective jacket or wrap that prevents fiber release shall be treated as nonfriable and therefore is subject only to periodic surveillance and preventive measures as necessary.

**§ 763.86   Sampling.**

(a) *Surfacing material.* An accredited inspector shall collect, in a statistically random manner that is representative of the homogeneous area, bulk samples from each homogeneous area of friable surfacing material that is not assumed to be ACM, and shall collect the samples as follows:

(1) At least three bulk samples shall be collected from each homogeneous area that is 1,000 ft² or less, except as provided in § 763.87(c)(2).

(2) At least five bulk samples shall be collected from each homogeneous area that is greater than 1,000 ft² but less than or equal to 5,000 ft², except as provided in § 763.87(c)(2).

(3) At least seven bulk samples shall be collected from each homogeneous area that is greater than 5,000 ft², except as provided in § 763.87(c)(2).

(b) *Thermal system insulation.* (1) Except as provided in paragraphs (b) (2) through (4) of this section and § 763.87(c), an accredited inspector shall collect, in a randomly distributed manner, at least three bulk samples from each homogeneous area of thermal system insulation that is not assumed to be ACM.

(2) Collect at least one bulk sample from each homogeneous area of patched thermal system insulation that is not assumed to be ACM if the patched section is less than 6 linear or square feet.

(3) In a manner sufficient to determine whether the material is ACM or not ACM, collect bulk samples from each insulated mechanical system that is not assumed to be ACM where cement or plaster is used on fittings such as tees, elbows, or valves, except as provided under § 763.87(c)(2).

(4) Bulk samples are not required to be collected from any homogeneous area where the accredited inspector has determined that the thermal system insulation is fiberglass, foam glass, rubber, or other non-ACBM.

(c) *Miscellaneous material.* In a manner sufficient to determine whether material is ACM or not ACM, an accredited inspector shall collect bulk samples from each homogeneous area of friable miscellaneous material that is not assumed to be ACM.

(d) *Nonfriable suspected ACBM.* If any homogeneous area of nonfriable suspected ACBM is not assumed to be ACM, then an accredited inspector shall collect, in a manner sufficient to determine whether the material is ACM or not ACM, bulk samples from the homogeneous area of nonfriable suspected ACBM that is not assumed to be ACM.

**§ 763.87   Analysis.**

(a) Local education agencies shall have bulk samples, collected under § 763.86 and submitted for analysis, analyzed for asbestos using laboratories accredited by the National Bureau of Standards (NBS). Local education agencies shall use laboratories which have received interim accreditation for polarized light microscopy (PLM) analysis under the EPA Interim Asbestos Bulk Sample Analysis Quality Assurance Program until the NBS PLM laboratory accreditation program for PLM is operational.

(b) Bulk samples shall not be composited for analysis and shall be analyzed for asbestos content by PLM, using the "Interim Method for the Determination of Asbestos in Bulk Insulation Samples" found at Appendix A to Subpart F in 40 CFR Part 763.

(c)(1) A homogeneous area is considered not to contain ACM only if the results of all samples required to be collected from the area show asbestos in amounts of 1 percent or less.

(2) A homogeneous area shall be determined to contain ACM based on a finding that the results of at least one sample collected from that area shows that asbestos is present in an amount greater than 1 percent.

(d) The name and address of each laboratory performing an analysis, the date of analysis, and the name and signature of the person performing the analysis shall be submitted to the person designated under § 763.84 for inclusion into the management plan within 30 days of the analysis.

**§ 763.88   Assessment.**

(a)(1) For each inspection and reinspection conducted under § 763.85 (a) and (c) and previous inspections specified under § 763.99, the local education agency shall have an accredited inspector provide a written assessment of all friable known or assumed ACBM in the school building.

(2) Each accredited inspector providing a written assessment shall sign and date the assessment, provide his or her State of accreditation, and if applicable, accreditation number, and submit a copy of the assessment to the person designated under § 763.84 for inclusion in the management plan within 30 days of the assessment.

(b) The inspector shall classify and give reasons in the written assessment for classifying the ACBM and suspected ACBM assumed to be ACM in the school building into one of the following categories:

(1) Damaged or significantly damaged thermal system insulation ACM.

(2) Damaged friable surfacing ACM.

(3) Significantly damaged friable surfacing ACM.

(4) Damaged or significantly damaged friable miscellaneous ACM.

(5) ACBM with potential for damage.

(6) ACBM with potential for significant damage.

(7) Any remaining friable ACBM or friable suspected ACBM.

(c) Assessment may include the following considerations:

(1) Location and the amount of the material, both in total quantity and as a percentage of the functional space.

(2) Condition of the material, specifying:

(i) Type of damage or significant damage (e.g., flaking, blistering, water damage, or other signs of physical damage).

(ii) Severity of damage (e.g., major flaking, severely torn jackets, as opposed to occasional flaking, minor tears to jackets).

(iii) Extent or spread of damage over large areas or large percentages of the homogeneous area.

(3) Whether the material is accessible.

(4) The material's potential for disturbance.

(5) Known or suspected causes of damage or significant damage (e.g., air erosion, vandalism, vibration, water).

(6) Preventive measures which might eliminate the reasonable likelihood of undamaged ACM from becoming significantly damaged.

(d) The local education agency shall select a person accredited to develop management plans to review the results of each inspection, reinspection, and assessment for the school building and to conduct any other necessary activities in order to recommend in writing to the local education agency appropriate response actions. The accredited person shall sign and date the recommendation, provide his or her State of accreditation, and, if applicable, provide his or her accreditation number, and submit a copy of the recommendation to the person designated under § 763.84 for inclusion in the management plan.

### § 763.90  Response actions.

(a) The local education agency shall select and implement in a timely manner the appropriate response actions in this section consistent with the assessment

conducted in § 763.88. The response actions selected shall be sufficient to protect human health and the environment. The local education agency may then select, from the response actions which protect human health and the environment, that action which is the least burdensome method. Nothing in this section shall be construed to prohibit removal of ACBM from a school building at any time, should removal be the preferred response action of the local education agency.

(b) If damaged or significantly damaged thermal system insulation ACM is present in a building, the local education agency shall:

(1) At least repair the damaged area.

(2) Remove the damaged material if it is not feasible, due to technological factors, to repair the damage.

(3) Maintain all thermal system insulation ACM and its covering in an intact state and undamaged condition.

(c)(1) If damaged friable surfacing ACM or damaged friable miscellaneous ACM is present in a building, the local education agency shall select from among the following response actions: encapsulation, enclosure, removal, or repair of the damaged material.

(2) In selecting the response action from among those which meet the definitional standards in § 763.83, the local education agency shall determine which of these response actions protects human health and the environment. For purposes of determining which of these response actions are the least burdensome, the local education agency may then consider local circumstances, including occupancy and use patterns within the school building, and its economic concerns, including short- and long-term costs.

(d) If significantly damaged friable surfacing ACM or significantly damaged friable miscellaneous ACM is present in a building the local education agency shall:

(1) Immediately isolate the functional space and restrict access, unless isolation is not necessary to protect human health and the environment.

(2) Remove the material in the functional space or, depending upon whether enclosure or encapsulation would be sufficient to protect human health and the environment, enclose or encapsulate.

(e) If any friable surfacing ACM, thermal system insulation ACM, or friable miscellaneous ACM that has potential for damage is present in a building, the local education agency shall at least implement an operations and maintenance (O&M) program, as described under § 763.91.

(f) If any friable surfacing ACM, thermal system insulation ACM, or friable miscellaneous ACM that has potential for significant damage is present in a building, the local education agency shall:

(1) Implement an O&M program, as described under § 763.91.

(2) Institute preventive measures appropriate to eliminate the reasonable likelihood that the ACM or its covering will become significantly damaged, deteriorated, or delaminated.

(3) Remove the material as soon as possible if appropriate preventive measures cannot be effectively implemented, or unless other response actions are determined to protect human health and the environment. Immediately isolate the area and restrict access if necessary to avoid an imminent and substantial endangerment to human health or the environment.

(g) Response actions including removal, encapsulation, enclosure, or repair, other than small-scale, short-duration repairs, shall be designed and conducted by persons accredited to design and conduct response actions.

(h) The requirements of this Subpart E in no way supersede the worker protection and work practice requirements under 29 CFR 1926.58 (Occupational Safety and Health Administration (OSHA) asbestos worker protection standards for construction), 40 CFR Part 763, Subpart G (EPA asbestos worker protection standards for public employees), and 40 CFR Part 61, Subpart M (National Emission Standards for Hazardous Air Pollutants—Asbestos).

(i) Completion of response actions. (1) At the conclusion of any action to remove, encapsulate, or enclose ACBM or material assumed to be ACBM, a person designated by the local education agency shall visually inspect each functional space where such action was conducted to determine whether the action has been properly completed.

(2)(i) A person designated by the local education agency shall collect air samples using aggressive sampling as described in Appendix A to this Subpart E to monitor air for clearance after each removal, encapsulation, and enclosure project involving ACBM, except for projects that are of small-scale, short-duration.

(ii) Local education agencies shall have air samples collected under this section analyzed for asbestos using laboratories accredited by the National Bureau of Standards to conduct such analysis using transmission electron microscopy (TEM) or, under circumstances permitted in this section,

laboratories enrolled in the American Industrial Hygiene Association Proficiency Analytical Testing Program for phase contrast microscopy (PCM).

(iii) Until the National Bureau of Standards TEM laboratory accreditation program is operational, local educational agencies shall use laboratories that use the protocol described in Appendix A to Subpart E of this part.

(3) Except as provided in paragraphs (i) (4), (5), (6), or (7) of this section, an action to remove, encapsulate, or enclose ACBM shall be considered complete when the average concentration of asbestos of five air samples cbllected within the affected functional space and analyzed by the TEM method in Appendix A of this Subpart E, is not statistically significantly different, as determined by the Z-test calculation found in Appendix A of this Subpart E, from the average asbestos concentration of five air samples collected at the same time outside the affected functional space and analyzed in the same manner, and the average asbestos concentration of the three field blanks described in Appendix A of this Subpart E is below the filter background level, as defined in Appendix A of this Subpart E, of 70 structures per square millimeter (70 s/mm ²).

(4) An action may also be considered complete if the volume of air drawn for each of the five samples collected within the affected functional space is equal to or greater than 1,199 L of air for a 25 mm filter or equal to or greater than 2,799 L of air for a 37 mm filter, and the average concentration of asbestos as analyzed by the TEM method in Appendix A of this Subpart E, for the five air samples does not exceed the filter background level, as defined in Appendix A, of 70 structures per square millimeter (70 s/mm ²). If the average concentration of asbestos of the five air samples within the affected functional space exceeds 70 s/mm ², or if the volume of air in each of the samples is less than 1,199 L of air for a 25 mm filter or less than 2,799 L of air for a 37 mm filter, the action shall be considered complete only when the requirements of paragraph (i) (3), (5), (6), or (7) of this section are met.

(5) At any time, a local education agency may analyze air monitoring samples collected for clearance purposes by phase contrast microscopy (PCM) to confirm completion of removal, encapsulation, or enclosure of ACBM that is greater than small-scale, short-duration and less than or equal to 160 square feet or 260 linear feet. The action shall be considered complete when the results of samples collected in the

affected functional space and analyzed by phase contrast microscopy using the National Institute for Occupational Safety and Health (NIOSH) Method 7400 entitled "Fibers" published in the NIOSH Manual of Analytical Methods, 3rd Edition, Second Supplement, August 1987, show that the concentration of fibers for each of the five samples is less than or equal to a limit of quantitation for PCM (0.01 fibers per cubic centimeter (0.01 f/cm ³) of air). The method is available at the Office of the Federal Register Information Center, 11th and L St., NW., Room 8401, Washington, DC, 20408, and the EPA OPTS Reading Room, Rm. G004 Northeast Mall, 401 M St., SW., Washington, DC 20460. This incorporation by reference was approved by the Director of the Federal Register in accordance with 5 U.S.C. 552(a) and 1 CFR Part 51. The method is incorporated as it exists on the effective date of this rule, and a notice of any change to the method will be published in the **Federal Register**.

(6) Until October 7, 1989, a local education agency may analyze air monitoring samples collected for clearance purposes by PCM to confirm completion of removal, encapsulation, or enclosure of ACBM that is less than or equal to 3,000 square feet or 1,000 linear feet. The action shall be considered complete when the results of samples collected in the affected functional space and analyzed by PCM using the NIOSH Method 7400 entitled "Fibers" published in the NIOSH Manual of Analytical Methods, 3rd Edition, Second Supplement, August 1987, show that the concentration of fibers for each of the five samples is less than or equal to a limit quantitation for PCM (0.01 fibers per cubic centimeter, 0.01 f/cm ³). The method is available at the Office of the Federal Register, 11th and L St., NW., Room 8301, Washington, DC, 20408, and in the EPA OPTS Reading Room, Rm. G004 Northeast Mall, 401 M St., SW., Washington, DC 20460. This incorporation by reference was approved by the Director of the Federal Register in accordance with 5 U.S.C. 552(a) and 1 CFR Part 51. The method is incorporated as it exists on the effective date of this rule and a notice of any change to the method will be published in the **Federal Register**.

(7) From October 8, 1989, to October 7, 1990, a local education agency may analyze air monitoring samples collected for clearance purposes by PCM to confirm completion of removal, encapsulation, or enclosure of ACBM that is less than or equal to 1,500 square feet or 500 linear feet. The action shall be considered complete when the results of samples collected in the affected

functional space and analyzed by PCM using the NIOSH Method 7400 entitled "Fibers" published in the NIOSH Manual of Analytical Methods, 3rd Edition, Second Supplement, August 1987, show that the concentration of fibers for each of the five samples is less than or equal to a limit of quantitation for PCM (0.01 fibers per cubic centimeter, 0.01 f/cm ³). The method is available at the Office of the Federal Register, 11th and L St., NW., Room 8301, Washington, DC, 20408, and in the EPA OPTS Reading Room, Rm. G004 Northeast Mall, 401 M St., SW., Washington, DC 20460. This incorporation by reference was approved by the Director of the Federal Register in accordance with 5 U.S.C. 552(a) and 1 CFR Part 51. The method is incorporated as it exists on the effective date of this rule and a notice of any change to the method will be published in the **Federal Register**.

(8) To determine the amount of ACBM affected under paragraphs (i) (5), (6), and (7) of this section, the local education agency shall add the total square or linear footage of ACBM within the containment barriers used to isolate the functional space for the action to remove, encapsulate, or enclose the ACBM. Contiguous portions of material subject to such action conducted concurrently or at approximately the same time within the same school building shall not be separated to qualify under paragraphs (i) (5), (6), or (7) of this section.

**§ 763.91  Operations and maintenance.**

(a) *Applicability.* The local education agency shall implement an operations, maintenance, and repair (O&M) program under this section whenever any friable ACBM is present or assumed to be present in a building that it leases, owns, or otherwise uses as a school building. Any material identified as nonfriable ACBM or nonfriable assumed ACBM must be treated as friable ACBM for purposes of this section when the material is about to become friable as a result of activities performed in the school building.

(b) *Worker protection.* The protection provided by EPA at 40 CFR 763.121 for worker protection during asbestos abatement projects is extended to employees of local education agencies who perform operations, maintenance, and repair (O&M) activities involving ACM and who are not covered by the OSHA asbestos construction standard at 29 CFR 1926.58 or an asbestos worker approved by OSHA under section 19 of the Occupational Safety and Health Act. Local education agencies may consult

Appendix B of this Subpart if their employees are performing operations, maintenance, and repair activities that are of small-scale, short-duration.

(c) *Cleaning*—(1) *Initial cleaning.* Unless the building has been cleaned using equivalent methods within the previous 6 months, all areas of a school building where friable ACBM, damaged or significantly damaged thermal system insulation ACM, or friable suspected ACBM assumed to be ACM are present shall be cleaned at least once after the completion of the inspection required by § 763.85(a) and before the initiation of any response action, other than O&M activities or repair, according to the following procedures:

(i) HEPA-vacuum or steam-clean all carpets.

(ii) HEPA-vacuum or wet-clean all other floors and all other horizontal surfaces.

(iii) Dispose of all debris, filters, mopheads, and cloths in sealed, leak-tight containers.

(2) *Additional cleaning.* The accredited management planner shall make a written recommendation to the local education agency whether additional cleaning is needed, and if so, the methods and frequency of such cleaning.

(d) *Operations and maintenance activities.* The local education agency shall ensure that the procedures described below to protect building occupants shall be followed for any operations and maintenance activities disturbing friable ACBM:

(1) Restrict entry into the area by persons other than those necessary to perform the maintenance project, either by physically isolating the area or by scheduling.

(2) Post signs to prevent entry by unauthorized persons.

(3) Shut off or temporarily modify the air-handling system and restrict other sources of air movement.

(4) Use work practices or other controls, such as, wet methods, protective clothing, HEPA-vacuums, mini-enclosures, glove bags, as necessary to inhibit the spread of any released fibers.

(5) Clean all fixtures or other components in the immediate work area.

(6) Place the asbestos debris and other cleaning materials in a sealed, leak-tight container.

(e) *Maintenance activities other than small-scale, short-duration.* The response action for any maintenance activities disturbing friable ACBM, other than small-scale, short-duration maintenance activities, shall be designed by persons accredited to design response actions and conducted

by persons accredited to conduct response actions.

(f) *Fiber release episodes*—(1) *Minor fiber release episode.* The local education agency shall ensure that the procedures described below are followed in the event of a minor fiber release episode (i.e., the falling or dislodging of 3 square or linear feet or less of friable ACBM):

(i) Thoroughly saturate the debris using wet methods.

(ii) Clean the area, as described in paragraph (e) of this section.

(iii) Place the asbestos debris in a sealed, leak-tight container.

(iv) Repair the area of damaged ACM with materials such as asbestos-free spackling, plaster, cement, or insulation, or seal with latex paint or an encapsulant, or immediately have the appropriate response action implemented as required by § 763.90.

(2) *Major fiber release episode.* The local education agency shall ensure that the procedures described below are followed in the event of a major fiber release episode (i.e., the falling or dislodging of more than 3 square or linear feet of friable ACBM):

(i) Restrict entry into the area and post signs to prevent entry into the area by persons other than those necessary to perform the response action.

(ii) Shut off or temporarily modify the air-handling system to prevent the distribution of fibers to other areas in the building.

(iii) The response action for any major fiber release episode must be designed by persons accredited to design response actions and conducted by persons accredited to conduct response actions.

### § 763.92  Training and periodic surveillance.

(a) *Training.* (1) The local education agency shall ensure, prior to the implementation of the O&M provisions of the management plan, that all members of its maintenance and custodial staff (custodians, electricians, heating/air conditioning engineers, plumbers, etc.) who may work in a building that contains ACBM receive awareness training of at least 2 hours, whether or not they are required to work with ACBM. New custodial and maintenance employees shall be trained within 60 days after commencement of employment. Training shall include, but not be limited to:

(i) Information regarding asbestos and its various uses and forms.

(ii) Information on the health effects associated with asbestos exposure.

(iii) Locations of ACBM identified throughout each school building in which they work.

(iv) Recognition of damage, deterioration, and delamination of ACBM.

(v) Name and telephone number of the person designated to carry out general local education agency responsibilities under § 763.84 and the availability and location of the management plan.

(2) The local education agency shall ensure that all members of its maintenance and custodial staff who conduct any activities that will result in the disturbance of ACBM shall receive training described in paragraph (a)(1) of this section and 14 hours of additional training. Additional training shall include, but not be limited to:

(i) Descriptions of the proper methods of handling ACBM.

(ii) Information on the use of respiratory protection as contained in the EPA/NIOSH *Guide to Respiratory Protection for the Asbestos Abatement Industry,* September 1986 (EPA 560/OPTS–86–001), available from TSCA Assistance Office (TS–799), Office of Toxic Substances, Environmental Protection Agency, Rm. E–543, 401 M St. SW., Washington, DC 20460, and other personal protection measures.

(iii) The provisions of this section and § 763.91, Appendices A, B, C, D of this Subpart E of this part, EPA regulations contained in 40 CFR Part 763, Subpart G, and in 40 CFR Part 61, Subpart M, and OSHA regulations contained in 29 CFR 1926.58.

(iv) Hands-on training in the use of respiratory protection, other personal protection measures, and good work practices.

(3) Local education agency maintenance and custodial staff who have attended EPA-approved asbestos training or received equivalent training for O&M and periodic surveillance activities involving asbestos shall be considered trained for the purposes of this section.

(b) *Periodic surveillance.* (1) At least once every 6 months after a management plan is in effect, each local education agency shall conduct periodic surveillance in each building that it leases, owns, or otherwise uses as a school building that contains ACBM or is assumed to contain ACBM.

(2) Each person performing periodic surveillance shall:

(i) Visually inspect all areas that are identified in the management plan as ACBM or assumed ACBM.

(ii) Record the date of the surveillance, his or her name, and any

changes in the condition of the materials.

(iii) Submit to the person designated to carry out general local education agency responsibilities under § 763.84 a copy of such record for inclusion in the management plan.

### § 763.93  Management plans.

(a)(1) On or before October 12, 1988, each local education agency shall develop an asbestos management plan for each school, including all buildings that they lease, own, or otherwise use as school buildings, and submit the plan to an Agency designated by the Governor of the State in which the local education agency is located. The plan may be submitted in stages that cover a portion of the school buildings under the authority of the local education agency.

(2) If a building to be used as part of a school is leased or otherwise acquired after October 12, 1988, the local education agency shall include the new building in the management plan for the school prior to its use as a school building. The revised portions of the management plan shall be submitted to the Agency designated by the Governor.

(3) If a local education agency begins to use a building as a school after October 12, 1988, the local education agency shall submit a management plan for the school to the Agency designated by the Governor prior to its use as a school.

(b) On or before October 17, 1987, the Governor of each State shall notify local education agencies in the State regarding where to submit their management plans. States may establish administrative procedures for reviewing management plans. If the Governor does not disapprove a management plan within 90 days after receipt of the plan, the local education agency shall implement the plan.

(c) Each local education agency must begin implementation of its management plan on or before July 9, 1989, and complete implementation in a timely fashion.

(d) Each local education agency shall maintain and update its management plan to keep it current with ongoing operations and maintenance, periodic surveillance, inspection, reinspection, and response action activities. All provisions required to be included in the management plan under this section shall be retained as part of the management plan, as well as any information that has been revised to bring the plan up-to-date.

(e) The management plan shall be developed by an accredited management planner and shall include:

(1) A list of the name and address of each school building and whether the school building contains friable ACBM, nonfriable ACBM, and friable and nonfriable suspected ACBM assumed to be ACM.

(2) For each inspection conducted before the December 14, 1987:

(i) The date of the inspection.

(ii) A blueprint, diagram, or written description of each school building that identifies clearly each location and approximate square or linear footage of any homogeneous or sampling area where material was sampled for ACM, and, if possible, the exact locations where bulk samples were collected, and the dates of collection.

(iii) A copy of the analyses of any bulk samples, dates of analyses, and a copy of any other laboratory reports pertaining to the analyses.

(iv) A description of any response actions or preventive measures taken to reduce asbestos exposure, including if possible, the names and addresses of all contractors involved, start and completion dates of the work, and results of any air samples analyzed during and upon completion of the work.

(v) A description of assessments, required to be made under § 763.88, of material that was identified before December 14, 1987, as friable ACBM or friable suspected ACBM assumed to be ACM, and the name and signature, State of accreditation, and if applicable, accreditation number of each accredited person making the assessments.

(3) For each inspection and reinspection conducted under § 763.85:

(i) The date of the inspection or reinspection and the name and signature, State of accreditation and, if applicable, the accreditation number of each accredited inspector performing the inspection or reinspection.

(ii) A blueprint, diagram, or written description of each school building that identifies clearly each location and approximate square or linear footage of homogeneous areas where material was sampled for ACM, the exact location where each bulk sample was collected, date of collection, homogeneous areas where friable suspected ACBM is assumed to be ACM, and where nonfriable suspected ACBM is assumed to be ACM.

(iii) A description of the manner used to determine sampling locations, and the name and signature of each accredited inspector collecting samples, the State of accreditation, and if applicable, his or her accreditation number.

(iv) A copy of the analyses of any bulk samples collected and analyzed, the name and address of any laboratory that analyzed bulk samples, a statement

that the laboratory meets the applicable requirements of § 763.87(a) the date of analysis, and the name and signature of the person performing the analysis.

(v) A description of assessments, required to be made under § 763.88, of all ACBM and suspected ACBM assumed to be ACM, and the name, signature, State of accreditation, and if applicable, accreditation number of each accredited person making the assessments.

(4) The name, address, and telephone number of the person designated under § 763.84 to ensure that the duties of the local education agency are carried out, and the course name, and dates and hours of training taken by that person to carry out the duties.

(5) The recommendations made to the local education agency regarding response actions, under § 763.88(d), the name, signature, State of accreditation of each person making the recommendations, and if applicable, his or her accreditation number.

(6) A detailed description of preventive measures and response actions to be taken, including methods to be used, for any friable ACBM, the locations where such measures and action will be taken, reasons for selecting the response action or preventive measure, and a schedule for beginning and completing each preventive measure and response action.

(7) With respect to the person or persons who inspected for ACBM and who will design or carry out response actions, except for operations and maintenance, with respect to the ACBM, one of the following statements:

(i) If the State has adopted a contractor accreditation program under section 206(b) of Title II of the Act, a statement that the person(s) is accredited under such plan.

(ii) A statement that the local education agency used (or will use) persons who have been accredited by another State which has adopted a contractor accreditation plan under section 206(b) of Title II of the Act or is accredited by an EPA-approved course under section 206(c) of Title II of the Act.

(8) A detailed description in the form of a blueprint, diagram, or in writing of any ACBM or suspected ACBM assumed to be ACM which remains in the school once response actions are undertaken pursuant to § 763.90. This description shall be updated as response actions are completed.

(9) A plan for reinspection under § 763.85, a plan for operations and maintenance activities under § 763.91,

**41854**     Federal Register / Vol. 52, No. 210 / Friday, October 30, 1987 / Rules and Regulations

and a plan for periodic surveillance under § 763.92, a description of the recommendation made by the management planner regarding additional cleaning under § 763.91(c)(2) as part of an operations and maintenance program, and the response of the local education agency to that recommendation.

(10) A description of steps taken to inform workers and building occupants, or their legal guardians, about inspections, reinspections, response actions, and post-response action activities, including periodic reinspection and surveillance activities that are planned or in progress.

(11) An evaluation of the resources needed to complete response actions successfully and carry out reinspection, operations and maintenance activities, periodic surveillance and training.

(12) With respect to each consultant who contributed to the management plan, the name of the consultant and one of the following statements:

(i) If the State has adopted a contractor accreditation plan under section 206(b) of Title II of the Act, a statement that the consultant is accredited under such plan.

(ii) A statement that the contractor is accredited by another State which has adopted a contractor accreditation plan under section 206(b) of Title II of the Act, or is accredited by an EPA-approved course developed under section 206(c) of Title II of the Act.

(f) A local education agency may require each management plan to contain a statement signed by an accredited management plan developer that such person has prepared or assisted in the preparation of such plan or has reviewed such plan, and that such plan is in compliance with this Subpart E. Such statement may not be signed by a person who, in addition to preparing or assisting in preparing the management plan, also implements (or will implement) the management plan.

(g)(1) Upon submission of a management plan to the Governor for review, a local education agency shall keep a copy of the plan in its administrative office. The management plans shall be available, without cost or restriction, for inspection by representatives of EPA and the State, the public, including teachers, other school personnel and their representatives, and parents. The local education agency may charge a reasonable cost to make copies of management plans.

(2) Each local education agency shall maintain in its administrative office a complete, updated copy of a management plan for each school under

its administrative control or direction. The management plans shall be available, during normal business hours, without cost or restriction, for inspection by representatives of EPA and the State, the public, including teachers, other school personnel and their representatives, and parents. The local education agency may charge a reasonable cost to make copies of management plans.

(3) Each school shall maintain in its administrative office a complete, updated copy of the management plan for that school. Management plans shall be available for inspection, without cost or restriction, to workers before work begins in any area of a school building. The school shall make management plans available for inspection to representatives of EPA and the State, the public, including parents, teachers, and other school personnel and their representatives within 5 working days after receiving a request for inspection. The school may charge a reasonable cost to make copies of the management plan.

(4) Upon submission of its management plan to the Governor and at least once each school year, the local education agency shall notify in writing parent, teacher, and employee organizations of the availability of management plans and shall include in the management plan a description of the steps taken to notify such organizations, and a dated copy of the notification. In the absence of any such organizations for parents, teachers, or employees, the local education agency shall provide written notice to that relevant group of the availability of management plans and shall include in the management plan a description of the steps taken to notify such groups, and a dated copy of the notification.

(h) Records required under § 763.94 shall be made by local education agencies and maintained as part of the management plan.

(i) Each management plan must contain a true and correct statement, signed by the individual designated by the local education agency under § 763.84, which certifies that the general, local education agency responsibilities, as stipulated by § 763.84, have been met or will be met.

**§ 763.94   Recordkeeping.**

(a) Records required under this section shall be maintained in a centralized location in the administrative office of both the school and the local education agency as part of the management plan. For each homogeneous area where all ACBM has been removed, the local education

agency shall ensure that such records are retained for 3 years after the next reinspection required under § 763.85(b)(1), or for an equivalent period.

(b) For each preventive measure and response action taken for friable and nonfriable ACBM and friable and nonfriable suspected ACBM assumed to be ACM, the local education agency shall provide:

(1) A detailed written description of the measure or action, including methods used, the location where the measure or action was taken, reasons for selecting the measure or action, start and completion dates of the work, names and addresses of all contractors involved, and if applicable, their State of accreditation, and accreditation numbers, and if ACBM is removed, the name and location of storage or disposal site of the ACM.

(2) The name and signature of any person collecting any air sample required to be collected at the completion of certain response actions specified by § 763.90(i), the locations where samples were collected, date of collection, the name and address of the laboratory analyzing the samples, the date of analysis, the results of the analysis, the method of analysis, the name and signature of the person performing the analysis, and a statement that the laboratory meets the applicable requirements of § 763.90(i)(2)(ii).

(c) For each person required to be trained under § 763.92(a) (1) and (2), the local education agency shall provide the person's name and job title, the date that training was completed by that person, the location of the training, and the number of hours completed in such training.

(d) For each time that periodic surveillance under § 763.92(b) is performed, the local education agency shall record the name of each person performing the surveillance, the date of the surveillance, and any changes in the conditions of the materials.

(e) For each time that cleaning under § 763.91(c) is performed, the local education agency shall record the name of each person performing the cleaning, the date of such cleaning, the locations cleaned, and the methods used to perform such cleaning.

(f) For each time that operations and maintenance activities under § 763.91(d) are performed, the local education agency shall record the name of each person performing the activity, the start and completion dates of the activity, the locations where such activity occurred, a description of the activity including preventive measures used, and if ACBM

is removed, the name and location of storage or disposal site of the ACM.

(g) For each time that major asbestos activity under § 763.91(e) is performed, the local education agency shall provide the name and signature, State of accreditation, and if applicable, the accreditation number of each person performing the activity, the start and completion dates of the activity, the locations where such activity occurred, a description of the activity including preventive measures used, and if ACBM is removed, the name and location of storage or disposal site of the ACM.

(h) For each fiber release episode under § 763.91(f), the local education agency shall provide the date and location of the episode, the method of repair, preventive measures or response action taken, the name of each person performing the work, and if ACBM is removed, the name and location of storage or disposal site of the ACM.

(Approved by the Office of Management and Budget under control number 2070–0091)

### § 763.95  Warning labels.

(a) The local education agency shall attach a warning label immediately adjacent to any friable and nonfriable ACBM and suspected ACBM assumed to be ACM located in routine maintenance areas (such as boiler rooms) at each school building. This shall include:

(1) Friable ACBM that was responded to by a means other than removal.

(2) ACBM for which no response action was carried out.

(b) All labels shall be prominently displayed in readily visible locations and shall remain posted until the ACBM that is labeled is removed.

(c) The warning label shall read, in print which is readily visible because of large size or bright color, as follows: CAUTION: ASBESTOS. HAZARDOUS. DO NOT DISTURB WITHOUT PROPER TRAINING AND EQUIPMENT.

### § 763.97  Compliance and enforcement.

(a) *Compliance with Title II of the Act.* (1) Section 207(a) of Title II of the Act (15 U.S.C. 2647) makes it unlawful for any local education agency to:

(i) Fail to conduct inspections pursuant to section 203(b) of Title II of the Act, including failure to follow procedures and failure to use accredited personnel and laboratories.

(ii) Knowingly submit false information to the Governor regarding any inspection pursuant to regulations under section 203(i) of Title II of the Act.

(iii) Fail to develop a management plan pursuant to regulations under section 203(i) of Title II of the Act.

(2) Section 207(a) of Title II of the Act (15 U.S.C. 2647) also provides that any local education agency which violates any provision of section 207 shall be liable for a civil penalty of not more than $5,000 for each day during which the violation continues. For the purposes of this subpart, a "violation" means a failure to comply with respect to a single school building.

(b) *Compliance with Title I of the Act.* (1) Section 15(1)(D) of Title I of the Act (15 U.S.C. 2614) makes it unlawful for any person to fail or refuse to comply with any requirement of Title II or any rule promulgated or order issued under Title II. Therefore, any person who violates any requirement of this Subpart is in violation of section 15 of Title I of the Act.

(2) Section 15(3) of Title I of the Act (15 U.S.C. 2614) makes it unlawful for any person to fail or refuse to establish or maintain records, submit reports, notices or other information, or permit access to or copying of records, as required by this Act or a rule thereunder.

(3) Section 15(4) (15 U.S.C. 2614) of Title I of the Act makes it unlawful for any person to fail or refuse to permit entry or inspection as required by section 11 of Title I of the Act.

(4) Section 16(a) of Title I of the Act (15 U.S.C. 2615) provides that any person who violates any provision of section 15 of Title I of the Act shall be liable to the United States for a civil penalty in an amount not to exceed $25,000 for each such violation. Each day such a violation continues shall, for purposes of this paragraph, constitute a separate violation of section 15. A local education agency is not liable for any civil penalty under Title I of the Act for failing or refusing to comply with any rule promulgated or order issued under Title II of the Act.

(c) *Criminal penalties.* If any violation committed by any person (including a local education agency) is knowing or willful, criminal penalties may be assessed under section 16(b) of Title I of the Act.

(d) *Injunctive relief.* The Agency may obtain injunctive relief under section 208(b) of Title II of the Act to respond to a hazard which poses an imminent and substantial endangerment to human health or the environment or section 17 (15 U.S.C. 2616) of Title I of the Act to restrain any violation of section 15 of Title I of the Act or to compel the taking of any action required by or under Title I of the Act.

(e) *Citizen complaints.* Any citizen who wishes to file a complaint pursuant to section 207(d) of Title II of the Act should direct the complaint to the

Governor of the State or the EPA Asbestos Ombudsman, 401 M Street, SW., Washington, DC 20460. The citizen complaint should be in writing and identified as a citizen complaint pursuant to section 207(d) of Title II of TSCA. The EPA Asbestos Ombudsman or the Governor shall investigate and respond to the complaint within a reasonable period of time if the allegations provide a reasonable basis to believe that a violation of the Act has occurred.

(f) *Inspections.* EPA may conduct inspections and review management plans under section 11 of Title I of the Act (15 U.S.C. 2610) to ensure compliance.

### § 763.98  Waiver; delegation to State.

(a) *General.* (1) Upon request from a State Governor and after notice and comment and an opportunity for a public hearing in accordance with paragraphs (b) and (c) of this section, EPA may waive some or all of the requirements of this Subpart E if the State has established and is implementing or intends to implement a program of asbestos inspection and management that contains requirements that are at least as stringent as the requirements of this Subpart E.

(2) A waiver from any requirement of this Subpart E shall apply only to the specific provision for which a waiver has been granted under this section. All requirements of this Subpart E shall apply until a waiver is granted under this section.

(b) *Request.* Each request by a Governor to waive any requirement of this Subpart E shall be sent with three complete copies of the request to the Regional Administrator for the EPA Region in which the State is located and shall include:

(1) A copy of the State provisions or proposed provisions relating to its program of asbestos inspection and management in schools for which the request is made.

(2)(i) The name of the State agency that is or will be responsible for administering and enforcing the requirements for which a waiver is requested, the names and job titles of responsible officials in that agency, and phone numbers where the officials can be contacted.

(ii) In the event that more than one agency is or will be responsible for administering and enforcing the requirements for which a waiver is requested, a description of the functions to be performed by each agency, how the program will be coordinated by the lead agency to ensure consistency and

effective administration in the asbestos inspection and management program within the State, the names and job titles of responsible officials in the agencies, and phone numbers where the officials can be contacted. The lead agency will serve as the central contact point for the EPA.

(3) Detailed reasons, supporting papers, and the rationale for concluding that the State's asbestos inspection and management program provisions for which the request is made are at least as stringent as the requirements of this Subpart E.

(4) A discussion of any special situations, problems, and needs pertaining to the waiver request accompanied by an explanation of how the State intends to handle them.

(5) A statement of the resources that the State intends to devote to the administration and enforcement of the provisions relating to the waiver request.

(6) Copies of any specific or enabling State laws (enacted and pending enactment) and regulations (promulgated and pending promulgation) relating to the request, including provisions for assessing criminal and/or civil penalties.

(7) Assurance from the Governor, the Attorney General, or the legal counsel of the lead agency that the lead agency or other cooperating agencies have the legal authority necessary to carry out the requirements relating to the request.

(c) *General notice—hearing.* (1) Within 30 days after receipt of a request for a waiver, EPA will determine the completeness of the request. If EPA does not request further information within the 30-day period, the request will be deemed complete.

(2) Within 30 days after EPA determines that a request is complete, EPA will issue for publication in the **Federal Register** a notice that announces receipt of the request, describes the information submitted under paragraph (b) of this section, and solicits written comment from interested members of the public. Comments must be submitted within 60 days.

(3) If, during the comment period, EPA receives a written objection to a Governor's request and a request for a public hearing detailing specific objections to the granting of a waiver, EPA will schedule a public hearing to be held in the affected State after the close of the comment period and will announce the public hearing date in the **Federal Register** before the date of the hearing. Each comment shall include the name and address of the person submitting the comment.

(d) *Criteria.* EPA may waive some or all of the requirements of Subpart E of this part if:

(1) The State's lead agency and other cooperating agencies have the legal authority necessary to carry out the provisions of asbestos inspection and management in schools relating to the waiver request.

(2) The State's program of asbestos inspection and management in schools relating to the waiver request and implementation of the program are or will be at least as stringent as the requirements of this Subpart E.

(3) The State has an enforcement mechanism to allow it to implement the program described in the waiver request.

(4) The lead agency and any cooperating agencies have or will have qualified personnel to carry out the provisions relating to the waiver request.

(5) The State will devote adequate resources to the administration and enforcement of the asbestos inspection and management provisions relating to the waiver request.

(6) When specified by EPA, the State gives satisfactory assurances that necessary steps, including specific actions it proposes to take and a time schedule for their accomplishment, will be taken within a reasonable time to conform with applicable criteria under paragraph (d) (2) through (4) of this section.

(e) *Decision.* EPA will issue for publication in the **Federal Register** a notice announcing its decision to grant or deny, in whole or in part, a Governor's request for a waiver from some or all of the requirements of this Subpart E within 30 days after the close of the comment period or within 30 days following a public hearing, whichever is applicable. The notice will include the Agency's reasons and rationale for granting or denying the Governor's request. The 30-day period may be extended if mutually agreed upon by EPA and the State.

(f) *Modifications.* When any substantial change is made in the administration or enforcement of a State program for which a waiver was granted under this section, a responsible official in the lead agency shall submit such changes to EPA.

(g) *Reports.* The lead agency in each State that has been granted a waiver by EPA from any requirement of Subpart E of this part shall submit a report to the Regional Administrator for the Region in which the State is located at least once every 12 months to include the following information:

(1) A summary of the State's implementation and enforcement activities during the last reporting period relating to provisions waived under this section, including enforcement actions taken.

(2) Any changes in the administration or enforcement of the State program implemented during the last reporting period.

(3) Other reports as may be required by EPA to carry out effective oversight of any requirement of this Subpart E that was waived under this section.

(h) *Oversight.* EPA may periodically evaluate the adequacy of a State's implementation and enforcement of and resources devoted to carrying out requirements relating to the waiver. This evaluation may include, but is not limited to, site visits to local education agencies without prior notice to the State.

(i) *Informal conference.* (1) EPA may request that an informal conference be held between appropriate State and EPA officials when EPA has reason to believe that a State has failed to:

(i) Substantially comply with the terms of any provision that was waived under this section.

(ii) Meet the criteria under paragraph (d) of this section, including the failure to carry out enforcement activities or act on violations of the State program.

(2) EPA will:

(i) Specify to the State those aspects of the State's program believed to be inadequate.

(ii) Specify to the State the facts that underlie the belief of inadequacy.

(3) If EPA finds, on the basis of information submitted by the State at the conference, that deficiencies did not exist or were corrected by the State, no further action is required.

(4) Where EPA finds that deficiencies in the State program exist, a plan to correct the deficiencies shall be negotiated between the State and EPA. The plan shall detail the deficiencies found in the State program, specify the steps the State has taken or will take to remedy the deficiencies, and establish a schedule for each remedial action to be initiated.

(j) *Rescission.* (1) If the State fails to meet with EPA or fails to correct deficiencies raised at the informal conference, EPA will deliver to the Governor of the State and a responsible official in the lead agency a written notice of its intent to rescind, in whole or part, the waiver.

(2) EPA will issue for publication in the **Federal Register** a notice that announces the rescission of the waiver, describes those aspects of the State's

program determined to be inadequate, and specifies the facts that underlie the findings of inadequacy.

### § 763.99 Exclusions.

(a) A local education agency shall not be required to perform an inspection under § 763.85(a) in any sampling area as defined in 40 CFR 763.103 or homogeneous area of a school building where:

(1) An accredited inspector has determined that, based on sampling records, friable ACBM was identified in that homogeneous or sampling area during an inspection conducted before December 14, 1987. The inspector shall sign and date a statement to that effect with his or her State of accreditation and if applicable, accreditation number and, within 30 days after such determination, submit a copy of the statement to the person designated under § 763.84 for inclusion in the management plan. However, an accredited inspector shall assess the friable ACBM under § 763.88.

(2) An accredited inspector has determined that, based on sampling records, nonfriable ACBM was identified in that homogeneous or sampling area during an inspection conducted before December 14, 1987. The inspector shall sign and date a statement to that effect with his or her State of accreditation, accreditation number and, within 30 days after such determination, submit a copy of the statement to the person designated in the management plan. However, an accredited inspector shall identify whether material that was nonfriable has become friable since that previous inspection and shall assess the newly-friable ACBM under § 763.88.

(3) Based on sampling records and inspection records, an accredited inspector has determined that no ACBM is present in the homogeneous or sampling area and the records show that the area was sampled, before December 14, 1987 in substantial compliance with § 763.85(a), which for purposes of this section means in a random manner and with a sufficient number of samples to reasonably ensure that the area is not ACBM.

(i) The accredited inspector shall sign and date a statement, with his or her State of accreditation and if applicable, accreditation number that the homogeneous or sampling area determined not to be ACBM was sampled in substantial compliance with § 763.85(a).

(ii) Within 30 days after the inspector's determination, the local education agency shall submit a copy of

the inspector's statement to the EPA Regional Office and shall include the statement in the management plan for that school.

(4) The lead agency responsible for asbestos inspection in a State that has been granted a waiver from § 763.85(a) has determined that, based on sampling records and inspection records, no ACBM is present in the homogeneous or sampling area and the records show that the area was sampled before December 14, 1987, in substantial compliance with § 763.85(a). Such determination shall be included in the management plan for that school.

(5) An accredited inspector has determined that, based on records of an inspection conducted before December 14, 1987, suspected ACBM identified in that homogeneous or sampling area is assumed to be ACM. The inspector shall sign and date a statement to that effect, with his or her State of accreditation and if applicable, accreditation number and, within 30 days of such determination, submit a copy of the statement to the person designated under § 763.84 for inclusion in the management plan. However, an accredited inspector shall identify whether material that was nonfriable suspected ACBM assumed to be ACM has become friable since the previous inspection and shall assess the newly friable material and previously identified friable suspected ACBM assumed to be ACM under § 763.88.

(6) Based on inspection records and contractor and clearance records, an accredited inspector has determined that no ACBM is present in the homogeneous or sampling area where asbestos removal operations have been conducted before December 14, 1987, and shall sign and date a statement to that effect and include his or her State of accreditation and, if applicable, accreditation number. The local education agency shall submit a copy of the statement to the EPA Regional Office and shall include the statement in the management plan for that school.

(7) An architect or project engineer responsible for the construction of a new school building built after October 12, 1988, or an accredited inspector signs a statement that no ACBM was specified as a building material in any construction document for the building, or, to the best of his or her knowledge, no ACBM was used as a building material in the building. The local education agency shall submit a copy of the signed statement of the architect, project engineer, or accredited inspector to the EPA Regional Office and shall include the statement in the management plan for that school.

(b) The exclusion, under paragraph (a) (1) through (4) of this section, from conducting the inspection under § 763.85(a) shall apply only to homogeneous or sampling areas of a school building that were inspected and sampled before October 17, 1987. The local education agency shall conduct an inspection under § 763.85(a) of all areas inspected before October 17, 1987, that were not sampled or were not assumed to be ACM.

(c) If ACBM is subsequently found in a homogeneous or sampling area of a local education agency that had been identified as receiving an exclusion by an accredited inspector under paragraphs (a) (3), (4), (5) of this section, or an architect, project engineer or accredited inspector under paragraph (a)(7) of this section, the local education agency shall have 180 days following the date of identification of ACBM to comply with this Subpart E.

**Appendix A to Subpart E—Interim Transmission Electron Microscopy Analytical Methods—Mandatory and Nonmandatory—and Mandatory Section to Determine Completion of Response Actions**

*I. Introduction*

The following appendix contains three units. The first unit is the mandatory transmission electron microscopy (TEM) method which all laboratories must follow; it is the minimum requirement for analysis of air samples for asbestos by TEM. The mandatory method contains the essential elements of the TEM method. The second unit contains the complete non-mandatory method. The non-mandatory method supplements the mandatory method by including additional steps to improve the analysis. EPA recommends that the non-mandatory method be employed for analyzing air filters; however, the laboratory may choose to employ the mandatory method. The non-mandatory method contains the same minimum requirements as are outlined in the mandatory method. Hence, laboratories may choose either of the two methods for analyzing air samples by TEM.

The final unit of this Appendix A to Subpart E defines the steps which must be taken to determine completion of response actions. This unit is mandatory.

*II. Mandatory Transmission Electron Microscopy Method*

A. Definitions of Terms

1. "Analytical sensitivity"—Airborne asbestos concentration represented by each fiber counted under the electron

microscope. It is determined by the air volume collected and the proportion of the filter examined. This method requires that the analytical sensitivity be no greater than 0.005 structures/cm³.

2. "Asbestiform"—A specific type of mineral fibrosity in which the fibers and fibrils possess high tensile strength and flexibility.

3. "Aspect ratio"—A ratio of the length to the width of a particle. Minimum aspect ratio as defined by this method is equal to or greater than 5:1.

4. "Bundle"—A structure composed of three or more fibers in a parallel arrangement with each fiber closer than one fiber diameter.

5. "Clean area"—A controlled environment which is maintained and monitored to assure a low probability of asbestos contamination to materials in that space. Clean areas used in this method have HEPA filtered air under positive pressure and are capable of sustained operation with an open laboratory blank which on subsequent analysis has an average of less than 18 structures/mm² in an area of 0.057 mm² (nominally 10 200-mesh grid openings) and a maximum of 53 structures/mm² for any single preparation for that same area.

6. "Cluster"—A structure with fibers in a random arrangement such that all fibers are intermixed and no single fiber is isolated from the group. Groupings must have more than two intersections.

7. "ED"—Electron diffraction.

8. "EDXA"—Energy dispersive X-ray analysis.

9. "Fiber"—A structure greater than or equal to 0.5 μm in length with an aspect ratio (length to width) of 5:1 or greater and having substantially parallel sides.

10. "Grid"—An open structure for mounting on the sample to aid in its examination in the TEM. The term is used here to denote a 200-mesh copper lattice approximately 3 mm in diameter.

11. "Intersection"—Nonparallel touching or crossing of fibers, with the projection having an aspect ratio of 5:1 or greater.

12. "Laboratory sample coordinator"—That person responsible for the conduct of sample handling and the certification of the testing procedures.

13. "Filter background level"—The concentration of structures per square millimeter of filter that is considered indistinguishable from the concentration measured on a blank (filters through which no air has been drawn). For this method the filter background level is defined as 70 structures/mm².

14. "Matrix"—Fiber or fibers with one end free and the other end embedded in or hidden by a particulate. The exposed fiber must meet the fiber definition.

15. "NSD"—No structure detected.

16. "Operator"—A person responsible for the TEM instrumental analysis of the sample.

17. "PCM"—Phase contrast microscopy.

18. "SAED"—Selected area electron diffraction.

19. "SEM"—Scanning electron microscope.

20. "STEM"—Scanning transmission electron microscope.

21. "Structure"—a microscopic bundle, cluster, fiber, or matrix which may contain asbestos.

22. "S/cm³"—Structures per cubic centimeter.

23. "S/mm²"—Structures per square millimeter.

24. "TEM"—Transmission electron microscope.

B. Sampling

1. The sampling agency must have written quality control procedures and documents which verify compliance.

2. Sampling operations must be performed by qualified individuals completely independent of the abatement contractor to avoid possible conflict of interest (References 1, 2, 3, and 5 of Unit II.J.).

3. Sampling for airborne asbestos following an abatement action must use commercially available cassettes.

4. Prescreen the loaded cassette collection filters to assure that they do not contain concentrations of asbestos which may interfere with the analysis of the sample. A filter blank average of less than 18 s/mm² in an area of 0.057 mm² (nominally 10 200-mesh grid openings) and a single preparation with a maximum of 53 s/mm² for that same area is acceptable for this method.

5. Use sample collection filters which are either polycarbonate having a pore size less than or equal to 0.4 μm or mixed cellulose ester having a pore size less than or equal to 0.45 μm.

6. Place these filters in series with a 5.0 μm backup filter (to serve as a diffuser) and a support pad. See the following Figure 1:

**BILLING CODE 6560-50-M**

FIGURE I--SAMPLING CASSETTE CONFIGURATION



BILLING CODE 6560-50-C

**41860**    **Federal Register** / Vol. 52, No. 210 / Friday, October 30, 1987 / Rules and Regulations

7. Reloading of used cassettes is not permitted.

8. Orient the cassette downward at approximately 45 degrees from the horizontal.

9. Maintain a log of all pertinent sampling information.

10. Calibrate sampling pumps and their flow indicators over the range of their intended use with a recognized standard. Assemble the sampling system with a representative filter (not the filter which will be used in sampling) before and after the sampling operation.

11. Record all calibration information.

12. Ensure that the mechanical vibrations from the pump will be minimized to prevent transferral of vibration to the cassette.

13. Ensure that a continuous smooth flow of negative pressure is delivered by the pump by damping out any pump action fluctuations if necessary.

14. The final plastic barrier around the abatement area remains in place for the sampling period.

15. After the area has passed a thorough visual inspection, use aggressive sampling conditions to dislodge any remaining dust. (See suggested protocol in Unit III.B.7.d.)

16. Select an appropriate flow rate equal to or greater than 1 liter per minute (L/min) or less than 10 L/min for 25 mm cassettes. Larger filters may be operated at proportionally higher flow rates.

17. A minimum of 13 samples are to be collected for each testing site consisting of the following:

a. A minimum of five samples per abatement area.

b. A minimum of five samples per ambient area positioned at locations representative of the air entering the abatement site.

c. Two field blanks are to be taken by removing the cap for not more than 30 seconds and replacing it at the time of sampling before sampling is initiated at the following places:

i. Near the entrance to each abatement area.

ii. At one of the ambient sites. (DO NOT leave the field blanks open during the sampling period.)

d. A sealed blank is to be carried with each sample set. This representative cassette is not to be opened in the field.

18. Perform a leak check of the sampling system at each indoor and outdoor sampling site by activating the pump with the closed sampling cassette in line. Any flow indicates a leak which must be eliminated before initiating the sampling operation.

19. The following Table I specifies volume ranges to be used:

BILLING CODE 6560-50-M

TABLE 1--NUMBER OF 200 MESH EM GRID OPENINGS
$(0.0057 \text{ MM}^2)$ THAT NEED TO BE ANALYZED TO
MAINTAIN SENSITIVITY OF 0.005 STRUCTURES/CC
BASED ON VOLUME AND EFFECTIVE FILTER AREA

| Effective Filter Area 385 sq mm | | Effective Filter Area 855 sq mm | |
|---|---|---|---|
| Volume (liters) | # of grid openings | Volume (liters) | # of grid openings |
| 560 | 24 | 1,250 | 24 |
| 600 | 23 | 1,300 | 23 |
| 700 | 19 | 1,400 | 21 |
| 800 | 17 | 1,600 | 19 |
| 900 | 15 | 1,800 | 17 |
| 1,000 | 14 | 2,000 | 15 |
| 1,100 | 12 | 2,200 | 14 |
| 1,200 | 11 | 2,400 | 13 |
| 1,300 | 10 | 2,600 | 12 |
| 1,400 | 10 | 2,800 | 11 |
| 1,500 | 9 | 3,000 | 10 |
| 1,600 | 8 | 3,200 | 9 |
| 1,700 | 8 | 3,400 | 9 |
| 1,800 | 8 | 3,600 | 8 |
| 1,900 | 7 | 3,800 | 8 |
| 2,000 | 7 | 4,000 | 8 |
| 2,100 | 6 | 4,200 | 7 |
| 2,200 | 6 | 4,400 | 7 |
| 2,300 | 6 | 4,600 | 7 |
| 2,400 | 6 | 4,800 | 6 |
| 2,500 | 5 | 5,000 | 6 |
| 2,600 | 5 | 5,200 | 6 |
| 2,700 | 5 | 5,400 | 6 |
| 2,800 | 5 | 5,600 | 5 |
| 2,900 | 5 | 5,800 | 5 |
| 3,000 | 5 | 6,000 | 5 |
| 3,100 | 4 | 6,200 | 5 |
| 3,200 | 4 | 6,400 | 5 |
| 3,300 | 4 | 6,600 | 5 |
| 3,400 | 4 | 6,800 | 4 |
| 3,500 | 4 | 7,000 | 4 |
| 3,600 | 4 | 7,200 | 4 |
| 3,700 | 4 | 7,400 | 4 |
| 3,800 | 4 | 7,600 | 4 |

Left table: Recommended Volume Range (approximately 1,200 to 1,800 liters)

Right table: Recommended Volume Range (approximately 3,000 to 4,000 liters)

Note minimum volumes required:
 25 mm : 560 liters
 37 mm : 1250 liters

Filter diameter of 25 mm = effective area of 385 sq mm
Filter diameter of 37 mm = effective area of 855 sq mm

BILLING CODE 6560-50-C

20. Ensure that the sampler is turned upright before interrupting the pump flow.

21. Check that all samples are clearly labeled and that all pertinent information has been enclosed before transfer of the samples to the laboratory.

22. Ensure that the samples are stored in a secure and representative location.

23. Do not change containers if portions of these filters are taken for other purposes.

24. A summary of Sample Data Quality Objectives is shown in the following Table II:

BILLING CODE 6560-50-M

TABLE II--SUMMARY OF SAMPLING AGENCY DATA QUALITY OBJECTIVES

This table summarizes the data quality objectives from the performance of this method in terms of precision, accuracy, completeness, representativeness, and comparability. These objectives are assured by the periodic control checks and reference checks listed here and described in the text of the method.

| Unit Operation | QC Check | Frequency | Conformance Expectation |
|---|---|---|---|
| Sampling materials | Sealed blank | 1 per I/O site | 95% |
| Sample procedures | Field blanks | 2 per I/O site | 95% |
| | Pump calibration | Before and after each field series | 90% |
| Sample custody | Review of chain-of-custody record | Each sample | 95% complete |
| Sample shipment | Review of sending report | Each sample | 95% complete |

BILLING CODE 6560-50-C

**41864**    Federal Register / Vol. 52, No. 210 / Friday, October 30, 1987 / Rules and Regulations

## C. Sample Shipment

Ship bulk samples to the analytical laboratory in a separate container from air samples.

## D. Sample Receiving

1. Designate one individual as sample coordinator at the laboratory. While that individual will normally be available to receive samples, the coordinator may train and supervise others in receiving procedures for those times when he/she is not available.

2. Bulk samples and air samples delivered to the analytical laboratory in the same container shall be rejected.

## E. Sample Preparation

1. All sample preparation and analysis shall be performed by a laboratory independent of the abatement contractor.

2. Wet-wipe the exterior of the cassettes to minimize contamination possibilities before taking them into the clean room facility.

3. Perform sample preparation in a well-equipped clean facility.

**Note:** The clean area is required to have the following minimum characteristics. The area or hood must be capable of maintaining a positive pressure with make-up air being HEPA-filtered. The cumulative analytical blank concentration must average less than 18 s/mm² in an area of 0.057 mm² (nominally 10 200-mesh grid openings) and a single preparation with a maximum of 53 s/mm² for that same area.

4. Preparation areas for air samples must not only be separated from preparation areas for bulk samples, but they must be prepared in separate rooms.

5. Direct preparation techniques are required. The object is to produce an intact film covering the particulates of the filter surface which is sufficiently clear for TEM analysis.

a. TEM Grid Opening Area measurement must be done as follows:

i. The filter portion being used for sample preparation must have the surface collapsed using an acetone vapor technique.

ii. Measure 20 grid openings on each of 20 random 200-mesh copper grids by placing a grid on a glass and examining it under the PCM. Use a calibrated graticule to measure the average field diameters. From the data, calculate the field area for an average grid opening.

iii. Measurements can also be made on the TEM at a properly calibrated low magnification or on an optical microscope at a magnification of approximately 400X by using an eyepiece fitted with a scale that has been calibrated against a stage micrometer. Optical microscopy utilizing

manual or automated procedures may be used providing instrument calibration can be verified.

b. TEM specimen preparation from polycarbonate (PC) filters. Procedures as described in Unit III.G. or other equivalent methods may be used.

c. TEM specimen preparation from mixed cellulose ester (MCE) filters.

i. Filter portion being used for sample preparation must have the surface collapsed using an acetone vapor technique or the Burdette procedure (Ref. 7 of Unit II.J.)

ii. Plasma etching of the collapsed filter is required. The microscope slide to which the collapsed filter pieces are attached is placed in a plasma asher. Because plasma ashers vary greatly in their performance, both from unit to unit and between different positions in the asher chamber, it is difficult to specify the conditions that should be used. Insufficient etching will result in a failure to expose embedded filters, and too much etching may result in loss of particulate from the surface. As an interim measure, it is recommended that the time for ashing of a known weight of a collapsed filter be established and that the etching rate be calculated in terms of micrometers per second. The actual etching time used for the particulate asher and operating conditions will then be set such that a 1–2 μm (10 percent) layer of collapsed surface will be removed.

iii. Procedures as described in Unit III. or other equivalent methods may be used to prepare samples.

## F. TEM Method

1. An 80–120 kV TEM capable of performing electron diffraction with a fluorescent screen inscribed with calibrated gradations is required. If the TEM is equipped with EDXA it must either have a STEM attachment or be capable of producing a spot less than 250 nm in diameter at crossover. The microscope shall be calibrated routinely for magnification and camera constant.

2. Determination of Camera Constant and ED Pattern Analysis. The camera length of the TEM in ED operating mode must be calibrated before ED patterns on unknown samples are observed. This can be achieved by using a carbon-coated grid on which a thin film of gold has been sputtered or evaporated. A thin film of gold is evaporated on the specimen TEM grid to obtain zone-axis ED patterns superimposed with a ring pattern from the polycrystalline gold film. In practice, it is desirable to optimize the thickness of the gold film so that only one or two sharp rings are obtained on the superimposed ED pattern. Thicker gold film would

normally give multiple gold rings, but it will tend to mask weaker diffraction spots from the unknown fibrous particulate. Since the unknown d-spacings of most interest in asbestos analysis are those which lie closest to the transmitted beam, multiple gold rings are unnecessary on zone-axis ED patterns. An average camera constant using multiple gold rings can be determined. The camera constant is one-half the diameter of the rings times the interplanar spacing of the ring being measured.

3. Magnification Calibration. The magnification calibration must be done at the fluorescent screen. The TEM must be calibrated at the grid opening magnification (if used) and also at the magnification used for fiber counting. This is performed with a cross grating replica (e.g., one containing 2,160 lines/mm). Define a field of view on the fluorescent screen either by markings or physical boundaries. The field of view must be measurable or previously inscribed with a scale or concentric circles (all scales should be metric). A logbook must be maintained, and the dates of calibration and the values obtained must be recorded. The frequency of calibration depends on the past history of the particular microscope. After any maintenance of the microscope that involved adjustment of the power supplied to the lenses or the high-voltage system or the mechanical disassembly of the electron optical column apart from filament exchange, the magnification must be recalibrated. Before the TEM calibration is performed, the analyst must ensure that the cross grating replica is placed at the same distance from the objective lens as the specimens are. For instruments that incorporate an eucentric tilting specimen stage, all specimens and the cross grating replica must be placed at the eucentric position.

4. While not required on every microscope in the laboratory, the laboratory must have either one microscope equipped with energy dispersive X-ray analysis or access to an equivalent system on a TEM in another laboratory.

5. Microscope settings: 80–120 kV, grid assessment 250–1,000X, then 15,000–20,000X screen magnification for analysis.

6. Approximately one-half (0.5) of the predetermined sample area to be analyzed shall be performed on one sample grid preparation and the remaining half on a second sample grid preparation.

7. Individual grid openings with greater than 5 percent openings (holes)

or covered with greater than 25 percent particulate matter or obviously having nonuniform loading must not be analyzed.

8. Reject the grid if:

a. Less than 50 percent of the grid openings covered by the replica are intact.

b. The replica is doubled or folded.

c. The replica is too dark because of incomplete dissolution of the filter.

9. Recording Rules.

a. Any continuous grouping of particles in which an asbestos fiber with an aspect ratio greater than or equal to 5:1 and a length greater than or equal to 0.5 μm is detected shall be recorded on the count sheet. These will be designated asbestos structures and will be classified as fibers, bundles, clusters,

or matrices. Record as individual fibers any contiguous grouping having 0, 1, or 2 definable intersections. Groupings having more than 2 intersections are to be described as cluster or matrix. An intersection is a nonparallel touching or crossing of fibers, with the projection having an aspect ratio of 5:1 or greater. See the following Figure 2:

**BILLING CODE 6560-50-M**

41866      Federal Register / Vol. 52, No. 210 / Friday, October 30, 1987 / Rules and Regulations

FIGURE 2--COUNTING GUIDELINES USED IN
DETERMINING ASBESTOS STRUCTURES

Count as 1 fiber; 1 Structure; no intersections.



Count as 2 fibers if space between fibers is greater than width of 1 fiber
diameter or number of intersections is equal to or less than 1.



Count as 3 structures if space between fibers is greater than width of 1 fiber
diameter or if the number of intersections is equal to or less than 2.



Count bundles as 1 structure; 3 or more parallel fibrils less
than 1 fiber diameter separation.



Federal Register / Vol. 52, No. 210 / Friday, October 30, 1987 / Rules and Regulations    41867

Count clusters as 1 structure; fibers having greater than or equal to
3 intersections.

   

Count matrix as 1 structure.



DO NOT COUNT AS STRUCTURES:

  

Fiber protrusion
<5:1 Aspect Ratio

No fiber protrusion

Fiber protrusion
<0.5 micrometer

———  <0.5 micrometer in length
▬  <5:1 Aspect Ratio

BILLING CODE 6560-50-C

i. *Fiber.* A structure having a minimum length greater than or equal to 0.5 μm and an aspect ratio (length to width) of 5:1 or greater and substantially parallel sides. Note the appearance of the end of the fiber, i.e., whether it is flat, rounded or dovetailed.

ii. *Bundle.* A structure composed of three or more fibers in a parallel arrangement with each fiber closer than one fiber diameter.

iii. *Cluster.* A structure with fibers in a random arrangement such that all fibers are intermixed and no single fiber is isolated from the group. Groupings must have more than two intersections.

iv. *Matrix.* Fiber or fibers with one end free and the other end embedded in or hidden by a particulate. The exposed fiber must meet the fiber definition.

b. Separate categories will be maintained for fibers less than 5 μm and for fibers equal to or greater than 5 μm in length.

c. Record NSD when no structures are detected in the field.

d. Visual identification of electron diffraction (ED) patterns is required for each asbestos structure counted which would cause the analysis to exceed the 70 s/mm² concentration. (Generally this means the first four fibers identified as asbestos must exhibit an identifiable diffraction pattern for chrysotile or amphibole.)

e. The micrograph number of the recorded diffraction patterns must be reported to the client and maintained in the laboratory's quality assurance records. In the event that examination of the pattern by a qualified individual indicates that the pattern has been misidentified visually, the client shall be contacted.

f. Energy Dispersive X-ray Analysis (EDXA) is required of all amphiboles which would cause the analysis results to exceed the 70 s/mm² concentration. (Generally speaking, the first 4 amphiboles would require EDXA.)

g. If the number of fibers in the nonasbestos class would cause the analysis to exceed the 70 s/mm² concentration, the fact that they are not asbestos must be confirmed by EDXA or measurement of a zone axis diffraction pattern.

h. Fibers classified as chrysotile must be identified by diffraction or X-ray analysis and recorded on a count sheet. X-ray analysis alone can be used only

after 70 s/mm² have been exceeded for a particular sample.

i. Fibers classified as amphiboles must be identified by X-ray analysis and electron diffraction and recorded on the count sheet. (X-ray analysis alone can be used only after 70 s/mm² have been exceeded for a particular sample.)

j. If a diffraction pattern was recorded on film, record the micrograph number on the count sheet.

k. If an electron diffraction was attempted but no pattern was observed, record N on the count sheet.

l. If an EDXA spectrum was attempted but not observed, record N on the count sheet.

m. If an X-ray analysis spectrum is stored, record the file and disk number on the count sheet.

10. Classification Rules.

a. *Fiber.* A structure having a minimum length greater than or equal to 0.5 μm and an aspect ratio (length to width) of 5:1 or greater and substantially parallel sides. Note the appearance of the end of the fiber, i.e., whether it is flat, rounded or dovetailed.

b. *Bundle.* A structure composed of three or more fibers in a parallel arrangement with each fiber closer than one fiber diameter.

c. *Cluster.* A structure with fibers in a random arrangement such that all fibers are intermixed and no single fiber is isolated from the group. Groupings must have more than two intersections.

d. *Matrix.* Fiber or fibers with one end free and the other end embedded in or hidden by a particulate. The exposed fiber must meet the fiber definition.

11. After finishing with a grid, remove it from the microscope, and replace it in the appropriate grid holder. Sample grids must be stored for a minimum of 1 year from the date of the analysis; the sample cassette must be retained for a minimum of 30 days by the laboratory or returned at the client's request.

G. Sample Analytical Sequence

1. Under the present sampling requirements a minimum of 13 samples is to be collected for the clearance testing of an abatement site. These include five abatement area samples, five ambient samples, two field blanks, and one sealed blank.

2. Carry out visual inspection of work site prior to air monitoring.

3. Collect a minimum of 5 air samples inside the work site and 5 samples

outside the work site. The indoor and outdoor samples shall be taken during the same time period.

4. Remaining steps in the analytical sequence are contained in Unit IV of this Appendix.

H. Reporting

1. The following information must be reported to the client for each sample analyzed:

a. Concentration in structures per square millimeter and structures per cubic centimeter.

b. Analytical sensitivity used for the analysis.

c. Number of asbestos structures.

d. Area analyzed.

e. Volume of air sampled (which must be initially supplied to lab by client).

f. Copy of the count sheet must be included with the report.

g. Signature of laboratory official to indicate that the laboratory met specifications of the method.

h. Report form must contain official laboratory identification (e.g., letterhead).

i. Type of asbestos.

I. Quality Control/Quality Assurance Procedures (Data Quality Indicators)

Monitoring the environment for airborne asbestos requires the use of sensitive sampling and analysis procedures. Because the test is sensitive, it may be influenced by a variety of factors. These include the supplies used in the sampling operation, the performance of the sampling, the preparation of the grid from the filter and the actual examination of this grid in the microscope. Each of these unit operations must produce a product of defined quality if the analytical result is to be a reliable and meaningful test result. Accordingly, a series of control checks and reference standards are to be performed along with the sample analysis as indicators that the materials used are adequate and the operations are within acceptable limits. In this way, the quality of the data is defined and the results are of known value. These checks and tests also provide timely and specific warning of any problems which might develop within the sampling and analysis operations. A description of these quality control/quality assurance procedures is summarized in the following Table III:

BILLING CODE 6560-50-M

**Federal Register** / Vol. 52, No. 210 / Friday, October 30, 1987 / Rules and Regulations    **41869**

TABLE III—SUMMARY OF LABORATORY DATA QUALITY OBJECTIVES

| Unit Operation | QC Check | Frequency | Conformance Expectation |
|---|---|---|---|
| Sample receiving | Review of receiving report | Each sample | 95% complete |
| Sample custody | Review of chain-of-custody record | Each sample | 95% complete |
| Sample preparation | Supplies and reagents | On receipt | Meet specs. or reject |
| | Grid opening size | 20 openings/20 grids/lot of 1000 or 1 opening/sample | 100% |
| | Special clean area monitoring | After cleaning or service | Meet specs or reclean |
| | Laboratory blank | 1 per prep series or 10% | Meet specs. or reanalyze series |
| | Plasma etch blank | 1 per 20 samples | 75% |
| | Multiple preps (3 per sample) | Each sample | One with cover of 15 complete grid sqs. |
| Sample analysis | System check | Each day | Each day |
| | Alignment check | Each day | Each day |
| | Magnification calibration with low and high standards | Each month or after service | 95% |
| | ED calibration by gold standard | Weekly | 95% |
| | EDS calibration by copper line | Daily | 95% |
| Performance check | Laboratory blank (measure of cleanliness) | Prep 1 per series or 10% read 1 per 25 samples | Meet specs or reanalyze series |
| | Replicate counting (measure of precision) | 1 per 100 samples | 1.5 x Poisson Std. Dev. |
| | Duplicate analysis (measure of reproducibility) | 1 per 100 samples | 2 x Poisson Std. Dev. |
| | Known samples of typical materials (working standards) | Training and for comparison with unknowns | 100% |
| | Analysis of NBS SRM 1876 and/or RM 8410 (measure of accuracy and comparability) | 1 per analyst per year | 1.5 x Poisson Std. Dev. |
| | Data entry review (data validation and measure of completeness) | Each sample | 95% |
| | Record and verify ID electron diffraction pattern of structure | 1 per 5 samples | 80% accuracy |
| Calculations and data reduction | Hand calculation of automated data reduction procedure or independent recalculation of hand-calculated data | 1 per 100 samples | 85% |

BILLING CODE 6560-50-C

1. When the samples arrive at the laboratory, check the samples and documentation for completeness and requirements before initiating the analysis.

2. Check all laboratory reagents and supplies for acceptable asbestos background levels.

3. Conduct all sample preparation in a clean room environment monitored by laboratory blanks. Testing with blanks must also be done after cleaning and servicing the room.

4. Prepare multiple grids of each sample.

5. Provide laboratory blanks with each sample batch. Maintain a cumulative average of these results. If there are more than 53 fibers/mm $^2$ per 10 200-mesh grid openings, the system must be checked for possible sources of contamination.

6. Perform a system check on the transmission electron microscope daily.

7. Make periodic performance checks of magnification, electron diffraction and energy dispersive X-ray systems as set forth in Table III under Unit II.I.

8. Ensure qualified operator performance by evaluation of replicate analysis and standard sample comparisons as set forth in Table III under Unit II.I.

9. Validate all data entries.

10. Recalculate a percentage of all computations and automatic data reduction steps as specified in Table III under Unit II.I.

11. Record an electron diffraction pattern of one asbestos structure from every five samples that contain asbestos. Verify the identification of the pattern by measurement or comparison of the pattern with patterns collected from standards under the same conditions. The records must also demonstrate that the identification of the pattern has been verified by a qualified individual and that the operator who made the identification is maintaining at least an 80 percent correct visual identification based on his measured patterns.

12. Appropriate logs or records must be maintained by the analytical laboratory verifying that it is in compliance with the mandatory quality assurance procedures.

J. References

For additional background information on this method, the following references should be consulted.

1. "Guidance for Controlling Asbestos-Containing Materials in Buildings," EPA 560/5–85–024, June 1985.

2. "Measuring Airborne Asbestos Following an Abatement Action,"

USEPA, Office of Toxic Substances, EPA 600/4–85–049, 1985.

3. Small, John and E. Steel. Asbestos Standards: Materials and Analytical Methods. N.B.S. Special Publication 619, 1982.

4. Campbell, W.J., R.L. Blake, L.L. Brown, E.E. Cather, and J.J. Sjoberg. Selected Silicate Minerals and Their Asbestiform Varieties. Information Circular 8751, U.S. Bureau of Mines, 1977.

5. Quality Assurance Handbook for Air Pollution Measurement System. Ambient Air Methods, EPA 600/4–77–027a, USEPA, Office of Research and Development, 1977.

6. Method 2A: Direct Measurement of Gas Volume through Pipes and Small Ducts. 40 CFR Part 60 Appendix A.

7. Burdette, G.J., Health & Safety Exec. Research & Lab. Services Div., London, "Proposed Analytical Method for Determination of Asbestos in Air."

8. Chatfield, E.J., Chatfield Tech. Cons., Ltd., Clark, T., PEI Assoc., "Standard Operating Procedure for Determination of Airborne Asbestos Fibers by Transmission Electron Microscopy Using Polycarbonate Membrane Filters," WERL SOP 87–1, March 5, 1987.

9. NIOSH Method 7402 for Asbestos Fibers, 12–11–86 Draft.

10. Yamate, G., Agarwall, S.C., Gibbons, R.D., IIT Research Institute, "Methodology for the Measurement of Airborne Asbestos by Electron Microscopy," Draft report, USEPA Contract 68–02–3266, July 1984.

11. "Guidance to the Preparation of Quality Assurance Project Plans," USEPA, Office of Toxic Substances, 1984.

*III. Nonmandatory Transmission Electron Microscopy Method*

A. Definitions of Terms

1. "Analytical sensitivity"—Airborne asbestos concentration represented by each fiber counted under the electron microscope. It is determined by the air volume collected and the proportion of the filter examined. This method requires that the analytical sensitivity be no greater than 0.005 s/cm$^3$.

2. "Asbestiform"—A specific type of mineral fibrosity in which the fibers and fibrils possess high tensile strength and flexibility.

3. "Aspect ratio"—A ratio of the length to the width of a particle. Minimum aspect ratio as defined by this method is equal to or greater than 5:1.

4. "Bundle"—A structure composed of three or more fibers in a parallel arrangement with each fiber closer than one fiber diameter.

5. "Clean area"—A controlled environment which is maintained and monitored to assure a low probability of asbestos contamination to materials in that space. Clean areas used in this method have HEPA filtered air under positive pressure and are capable of sustained operation with a low laboratory blank which on subsequent analysis has an average of less than 18 structures/mm$^2$ in an area of 0.057 mm$^2$ (nominally 10 200 mesh grid openings) and a maximum of 53 structures/mm$^2$ for no more than one single preparation for that same area.

6. "Cluster"—A structure with fibers in a random arrangement such that all fibers are intermixed and no single fiber is isolated from the group. Groupings must have more than two intersections.

7. "ED"—Electron diffraction.

8. "EDXA"—Energy dispersive X-ray analysis.

9. "Fiber"—A structure greater than or equal to 0.5 $\mu$m in length with an aspect ratio (length to width) of 5:1 or greater and having substantially parallel sides.

10. "Grid"—An open structure for mounting on the sample to aid in its examination in the TEM. The term is used here to denote a 200-mesh copper lattice approximately 3 mm in diameter.

11. "Intersection"—Nonparallel touching or crossing of fibers, with the projection having an aspect ratio of 5:1 or greater.

12. "Laboratory sample coordinator"—That person responsible for the conduct of sample handling and the certification of the testing procedures.

13. "Filter background level"—The concentration of structures per square millimeter of filter that is considered indistinguishable from the concentration measured on blanks (filters through which no air has been drawn). For this method the filter background level is defined as 70 structures/mm$^2$.

14. "Matrix"—Fiber or fibers with one end free and the other end embedded in or hidden by a particulate. The exposed fiber must meet the fiber definition.

15. "NSD"—No structure detected.

16. "Operator"—A person responsible for the TEM instrumental analysis of the sample.

17. "PCM"—Phase contrast microscopy.

18. "SAED"—Selected area electron diffraction.

19. "SEM"—Scanning electron microscope.

20. "STEM"—Scanning transmission electron microscope.

21. "Structure"—a microscopic bundle, cluster, fiber, or matrix which may contain asbestos.

22. "S/cm³"—Structures per cubic centimeter.

23. "S/mm²"—Structures per square millimeter.

24. "TEM"—Transmission electron microscope.

B. Sampling

1. Sampling operations must be performed by qualified individuals completely independent of the abatement contractor to avoid possible conflict of interest (See References 1, 2, and 5 of Unit III.L.) Special precautions should be taken to avoid contamination of the sample. For example, materials that have not been prescreened for their asbestos background content should not be used; also, sample handling procedures which do not take cross contamination possibilities into account should not be used.

2. Material and supply checks for asbestos contamination should be made on all critical supplies, reagents, and procedures before their use in a monitoring study.

3. Quality control and quality assurance steps are needed to identify problem areas and isolate the cause of the contamination (see Reference 5 of Unit III.L.). Control checks shall be permanently recorded to document the quality of the information produced. The sampling firm must have written quality control procedures and documents which verify compliance. Independent audits by a qualified consultant or firm should be performed once a year. All documentation of compliance should be retained indefinitely to provide a guarantee of quality. A summary of Sample Data Quality Objectives is shown in Table II of Unit II.B.

4. Sampling materials.

a. Sample for airborne asbestos following an abatement action using commercially available cassettes.

b. Use either a cowling or a filter-retaining middle piece. Conductive material may reduce the potential for particulates to adhere to the walls of the cowl.

c. Cassettes must be verified as "clean" prior to use in the field. If packaged filters are used for loading or preloaded cassettes are purchased from the manufacturer or a distributor, the manufacturer's name and lot number should be entered on all field data sheets provided to the laboratory, and are required to be listed on all reports from the laboratory.

d. Assemble the cassettes in a clean facility (See definition of clean area under Unit III.A.).

e. Reloading of used cassettes is not permitted.

f. Use sample collection filters which are either polycarbonate having a pore size of less than or equal to 0.4 $\mu$m or mixed cellulose ester having a pore size of less than or equal to 0.45 $\mu$m.

g. Place these filters in series with a backup filter with a pore size of 5.0 $\mu$m (to serve as a diffuser) and a support pad. See the following Figure 1:

BILLING CODE 6560-50-M

**41872**     Federal Register / Vol. 52, No. 210 / Friday, October 30, 1987 / Rules and Regulations

FIGURE I--SAMPLING CASSETTE CONFIGURATION



BILLING CODE 6560-50-C

h. When polycarbonate filters are used, position the highly reflective face such that the incoming particulate is received on this surface.

i. Seal the cassettes to prevent leakage around the filter edges or between cassette part joints. A mechanical press may be useful to achieve a reproducible leak-free seal. Shrink fit gel-bands may be used for this purpose and are available from filter manufacturers and their authorized distributors.

j. Use wrinkle-free loaded cassettes in the sampling operation.

5. Pump setup.

a. Calibrate the sampling pump over the range of flow rates and loads anticipated for the monitoring period with this flow measuring device in series. Perform this calibration using guidance from EPA Method 2A each time the unit is sent to the field (See Reference 6 of Unit III.L.).

b. Configure the sampling system to preclude pump vibrations from being transmitted to the cassette by using a sampling stand separate from the pump station and making connections with flexible tubing.

c. Maintain continuous smooth flow conditions by damping out any pump action fluctuations if necessary.

d. Check the sampling system for leaks with the end cap still in place and the pump operating before initiating sample collection. Trace and stop the source of any flow indicated by the flowmeter under these conditions.

e. Select an appropriate flow rate equal to or greater than 1 L/min or less than 10 L/min for 25 mm cassettes. Larger filters may be operated at proportionally higher flow rates.

f. Orient the cassette downward at approximately 45 degrees from the horizontal.

g. Maintain a log of all pertinent sampling information, such as pump identification number, calibration data, sample location, date, sample identification number, flow rates at the beginning, middle, and end, start and stop times, and other useful information or comments. Use of a sampling log form is recommended. See the following Figure 2:

BILLING CODE 6560-50-M

41874    Federal Register / Vol. 52, No. 210 / Friday, October 30, 1987 / Rules and Regulations

FIGURE 2--SAMPLING LOG FORM

| Sample Number | Location of Sample | Pump I.D. | Start Time | Middle Time | End Time | Flow Rate |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

Inspector: _____    Date: _____

BILLING CODE 6560-50-C

h. Initiate a chain of custody
procedure at the start of each sampling,
if this is requested by the client.

i. Maintain a close check of all aspects
of the sampling operation on a regular
basis.

j. Continue sampling until at least the
minimum volume is collected, as
specified in the following Table I:

BILLING CODE 6560-50-M

TABLE 1--NUMBER OF 200 MESH EM GRID OPENINGS
(0.0057 MM$^2$) THAT NEED TO BE ANALYZED TO
MAINTAIN SENSITIVITY OF 0.005 STRUCTURES/CC
BASED ON VOLUME AND EFFECTIVE FILTER AREA

| Effective Filter Area 385 sq mm | | Effective Filter Area 855 sq mm | |
|---|---|---|---|
| Volume (liters) | # of grid openings | Volume (liters) | # of grid openings |
| 560 | 24 | 1,250 | 24 |
| 600 | 23 | 1,300 | 23 |
| 700 | 19 | 1,400 | 21 |
| 800 | 17 | 1,600 | 19 |
| 900 | 15 | 1,800 | 17 |
| 1,000 | 14 | 2,000 | 15 |
| 1,100 | 12 | 2,200 | 14 |
| 1,200 | 11 | 2,400 | 13 |
| 1,300 | 10 | 2,600 | 12 |
| 1,400 | 10 | 2,800 | 11 |
| 1,500 | 9 | 3,000 | 10 |
| 1,600 | 8 | 3,200 | 9 |
| 1,700 | 8 | 3,400 | 9 |
| 1,800 | 8 | 3,600 | 8 |
| 1,900 | 7 | 3,800 | 8 |
| 2,000 | 7 | 4,000 | 8 |
| 2,100 | 6 | 4,200 | 7 |
| 2,200 | 6 | 4,400 | 7 |
| 2,300 | 6 | 4,600 | 7 |
| 2,400 | 6 | 4,800 | 6 |
| 2,500 | 5 | 5,000 | 6 |
| 2,600 | 5 | 5,200 | 6 |
| 2,700 | 5 | 5,400 | 6 |
| 2,800 | 5 | 5,600 | 5 |
| 2,900 | 5 | 5,800 | 5 |
| 3,000 | 5 | 6,000 | 5 |
| 3,100 | 4 | 6,200 | 5 |
| 3,200 | 4 | 6,400 | 5 |
| 3,300 | 4 | 6,600 | 5 |
| 3,400 | 4 | 6,800 | 4 |
| 3,500 | 4 | 7,000 | 4 |
| 3,600 | 4 | 7,200 | 4 |
| 3,700 | 4 | 7,400 | 4 |
| 3,800 | 4 | 7,600 | 4 |

Recommended Volume Range (385 sq mm): 1,200 to 1,800

Recommended Volume Range (855 sq mm): 2,800 to 4,000

Note minimum volumes required:
    25 mm : 560 liters
    37 mm : 1250 liters

Filter diameter of 25 mm = effective area of 385 sq mm
Filter diameter of 37 mm = effective area of 855 sq mm

BILLING CODE 6560-50-C

k. At the conclusion of sampling, turn the cassette upward before stopping the flow to minimize possible particle loss. If the sampling is resumed, restart the flow before reorienting the cassette downward. Note the condition of the filter at the conclusion of sampling.

l. Double check to see that all information has been recorded on the data collection forms and that the cassette is securely closed and appropriately identified using a waterproof label. Protect cassettes in individual clean resealed polyethylene bags. Bags are to be used for storing cassette caps when they are removed for sampling purposes. Caps and plugs should only be removed or replaced using clean hands or clean disposable plastic gloves.

m. Do not change containers if portions of these filters are taken for other purposes.

6. Minimum sample number per site. A minimum of 13 samples are to be collected for each testing consisting of the following:

a. A minimum of five samples per abatement area.

b. A minimum of five samples per ambient area positioned at locations representative of the air entering the abatement site.

c. Two field blanks are to be taken by removing the cap for not more than 30 sec and replacing it at the time of sampling before sampling is initiated at the following places:

i. Near the entrance to each ambient area.

ii. At one of the ambient sites.

(Note: Do not leave the blank open during the sampling period.)

d. A sealed blank is to be carried with each sample set. This representative cassette is not to be opened in the field.

7. Abatement area sampling.

a. Conduct final clearance sampling only after the primary containment barriers have been removed; the abatement area has been thoroughly dried; and, it has passed visual inspection tests by qualified personnel. (See Reference 1 of Unit III.L.)

b. Containment barriers over windows, doors, and air passageways must remain in place until the TEM clearance sampling and analysis is completed and results meet clearance test criteria. The final plastic barrier remains in place for the sampling period.

c. Select sampling sites in the abatement area on a random basis to provide unbiased and representative samples.

d. After the area has passed a thorough visual inspection, use

aggressive sampling conditions to dislodge any remaining dust.

i. Equipment used in aggressive sampling such as a leaf blower and/or fan should be properly cleaned and decontaminated before use.

ii. Air filtration units shall remain on during the air monitoring period.

iii. Prior to air monitoring, floors, ceiling and walls shall be swept with the exhaust of a minimum one (1) horsepower leaf blower.

iv. Stationary fans are placed in locations which will not interfere with air monitoring equipment. Fan air is directed toward the ceiling. One fan shall be used for each 10,000 ft³ of worksite.

v. Monitoring of an abatement work area with high-volume pumps and the use of circulating fans will require electrical power. Electrical outlets in the abatement area may be used if available. If no such outlets are available, the equipment must be supplied with electricity by the use of extension cords and strip plug units. All electrical power supply equipment of this type must be approved Underwriter Laboratory equipment that has not been modified. All wiring must be grounded. Ground fault interrupters should be used. Extreme care must be taken to clean up any residual water and ensure that electrical equipment does not become wet while operational.

vi. Low volume pumps may be carefully wrapped in 6-mil polyethylene to insulate the pump from the air. High volume pumps cannot be sealed in this manner since the heat of the motor may melt the plastic. The pump exhausts should be kept free.

vii. If recleaning is necessary, removal of this equipment from the work area must be handled with care. It is not possible to completely decontaminate the pump motor and parts since these areas cannot be wetted. To minimize any problems in this area, all equipment such as fans and pumps should be carefully wet wiped prior to removal from the abatement area. Wrapping and sealing low volume pumps in 6-mil polyethylene will provide easier decontamination of this equipment. Use of clean water and disposable wipes should be available for this purpose.

e. Pump flow rate equal to or greater than 1 L/min or less than 10 L/min may be used for 25 mm cassettes. The larger cassette diameters may have comparably increased flow.

f. Sample a volume of air sufficient to ensure the minimum quantitation limits. (See Table I of Unit III.B.5.j.)

8. Ambient sampling.

a. Position ambient samplers at locations representative of the air

entering the abatement site. If makeup air entering the abatement site is drawn from another area of the building which is outside of the abatement area, place the pumps in the building. pumps should be placed out of doors located near the building and away from any obstructions that may influence wind patterns. If construction is in progress immediately outside the enclosure, it may be necessary to select another ambient site. Samples should be representative of any air entering the work site.

b. Locate the ambient samplers at least 3 ft apart and protect them from adverse weather conditions.

c. Sample same volume of air as samples taken inside the abatement site.

C. Sample Shipment

1. Ship bulk samples in a separate container from air samples. Bulk samples and air samples delivered to the analytical laboratory in the same container shall be rejected.

2. Select a rigid shipping container and pack the cassettes upright in a noncontaminating nonfibrous medium such as a bubble pack. The use of resealable polyethylene bags may help to prevent jostling of individual cassettes.

3. Avoid using expanded polystyrene because of its static charge potential. Also avoid using particle-based packaging materials because of possible contamination.

4. Include a shipping bill and a detailed listing of samples shipped, their descriptions and all identifying numbers or marks, sampling data, shipper's name, and contact information. For each sample set, designate which are the ambient samples, which are the abatement area samples, which are the field blanks, and which is the sealed blank if sequential analysis is to be performed.

5. Hand-carry samples to the laboratory in an upright position if possible; otherwise choose that mode of transportation least likely to jar the samples in transit.

6. Address the package to the laboratory sample coordinator by name when known and alert him or her of the package description, shipment mode, and anticipated arrival as part of the chain of custody and sample tracking procedures. This will also help the laboratory schedule timely analysis for the samples when they are received.

D. Quality Control/Quality Assurance Procedures (Data Quality Indicators)

Monitoring the environment for airborne asbestos requires the use of

sensitive sampling and analysis procedures. Because the test is sensitive, it may be influenced by a variety of factors. These include the supplies used in the sampling operation, the performance of the sampling, the preparation of the grid from the filter and the actual examination of this grid in the microscope. Each of these unit operations must produce a product of defined quality if the analytical result is to be a reliable and meaningful test result. Accordingly, a series of control checks and reference standards is performed along with the sample analysis as indicators that the materials used are adequate and the operations are within acceptable limits. In this way, the quality of the data is defined, and the results are of known value. These checks and tests also provide timely and specific warning of any problems which might develop within the sampling and analysis operations. A description of these quality control/quality assurance procedures is summarized in the text below.

1. Prescreen the loaded cassette collection filters to assure that they do not contain concentrations of asbestos which may interfere with the analysis of the sample. A filter blank average of less than 18 s/mm$^2$ in an area of 0.057 mm$^2$ (nominally 10 200-mesh grid openings) and a maximum of 53 s/mm$^2$ for that same area for any single preparation is acceptable for this method.

2. Calibrate sampling pumps and their flow indicators over the range of their intended use with a recognized standard. Assemble the sampling system with a representative filter—not the filter which will be used in

sampling—before and after the sampling operation.

3. Record all calibration information with the data to be used on a standard sampling form.

4. Ensure that the samples are stored in a secure and representative location.

5. Ensure that mechanical calibrations from the pump will be minimized to prevent transferral of vibration to the cassette.

6. Ensure that a continuous smooth flow of negative pressure is delivered by the pump by installing a damping chamber if necessary.

7. Open a loaded cassette momentarily at one of the indoor sampling sites when sampling is initiated. This sample will serve as an indoor field blank.

8. Open a loaded cassette momentarily at one of the outdoor sampling sites when sampling is initiated. This sample will serve as an outdoor field blank.

9. Carry a sealed blank into the field with each sample series. Do not open this cassette in the field.

10. Perform a leak check of the sampling system at each indoor and outdoor sampling site by activating the pump with the closed sampling cassette in line. Any flow indicates a leak which must be eliminated before initiating the sampling operation.

11. Ensure that the sampler is turned upright before interrupting the pump flow.

12. Check that all samples are clearly labeled and that all pertinent information has been enclosed before transfer of the samples to the laboratory.

E. Sample Receiving

1. Designate one individual as sample coordinator at the laboratory. While that individual will normally be available to receive samples, the coordinator may train and supervise others in receiving procedures for those times when he/she is not available.

2. Adhere to the following procedures to ensure both the continued chain-of-custody and the accountability of all samples passing through the laboratory:

a. Note the condition of the shipping package and data written on it upon receipt.

b. Retain all bills of lading or shipping slips to document the shipper and delivery time.

c. Examine the chain-of-custody seal, if any, and the package for its integrity.

d. If there has been a break in the seal or substantive damage to the package, the sample coordinator shall immediately notify the shipper and a responsible laboratory manager before any action is taken to unpack the shipment.

e. Packages with significant damage shall be accepted only by the responsible laboratory manager after discussions with the client.

3. Unwrap the shipment in a clean, uncluttered facility. The sample coordinator or his or her designee will record the contents, including a description of each item and all identifying numbers or marks. A Sample Receiving Form to document this information is attached for use when necessary. (See the following Figure 3.)

**BILLING CODE 6560-50-M**

Federal Register / Vol. 52, No. 210 / Friday, October 30, 1987 / Rules and Regulations    41879

FIGURE 3--SAMPLE RECEIVING FORM

Date of package delivery _____    Package shipped from _____

Carrier _____    Shipping bill retained _____

*Condition of package on receipt_____

*Condition of custody seal _____

Number of samples received _____    Shipping manifest attached _____

Purchase Order No. _____    Project I.D. _____

Comments _____

| No. | Description | Sampling Medium PC | MCE | Sampled Volume Liters | Receiving ID # | Assigned # |
|-----|-------------|------|------|------|------|------|
| 1 | _____ | ___ | ___ | _____ | _____ | _____ |
| 2 | _____ | ___ | ___ | _____ | _____ | _____ |
| 3 | _____ | ___ | ___ | _____ | _____ | _____ |
| 4 | _____ | ___ | ___ | _____ | _____ | _____ |
| 5 | _____ | ___ | ___ | _____ | _____ | _____ |
| 6 | _____ | ___ | ___ | _____ | _____ | _____ |
| 7 | _____ | ___ | ___ | _____ | _____ | _____ |
| 8 | _____ | ___ | ___ | _____ | _____ | _____ |
| 9 | _____ | ___ | ___ | _____ | _____ | _____ |
| 10 | _____ | ___ | ___ | _____ | _____ | _____ |
| 11 | _____ | ___ | ___ | _____ | _____ | _____ |
| 12 | _____ | ___ | ___ | _____ | _____ | _____ |
| 13 | _____ | ___ | ___ | _____ | _____ | _____ |

(Use as many additional sheets as needed.)

Comments _____

Date of acceptance into sample bank _____

Signature of chain-of-custody recipient_____

Disposition of samples_____

*Note:    If the package has sustained substantial damage or the custody seal is broken, stop and contact the project
manager and the shipper.

BILLING CODE 6560-50-C

Note.—The person breaking the chain-of-custody seal and itemizing the contents assumes responsibility for the shipment and signs documents accordingly.

4. Assign a laboratory number and schedule an analysis sequence.

5. Manage all chain-of-custody samples within the laboratory such that their integrity can be ensured and documented.

F. Sample Preparation

1. Personnel not affiliated with the Abatement Contractor shall be used to prepare samples and conduct TEM analysis. Wet-wipe the exterior of the cassettes to minimize contamination possibilities before taking them to the clean sample preparation facility.

2. Perform sample preparation in a well-equipped clean facility.

Note.—The clean area is required to have the following minimum characteristics. The area or hood must be capable of maintaining a positive pressure with make-up air being HEPA filtered. The cumulative analytical blank concentration must average less than 18 s/mm² in an area of 0.057 s/mm² (nominally 10 200-mesh grid openings) with no more than one single preparation to exceed 53 s/mm² for that same area.

3. Preparation areas for air samples must be separated from preparation areas for bulk samples. Personnel must not prepare air samples if they have previously been preparing bulk samples without performing appropriate personal hygiene procedures, i.e., clothing change, showering, etc.

4. Preparation. Direct preparation techniques are required. The objective is to produce an intact carbon film containing the particulates from the filter surface which is sufficiently clear for TEM analysis. Currently recommended direct preparation procedures for polycarbonate (PC) and mixed cellulose ester (MCE) filters are described in Unit III.F.7. and 8. Sample preparation is a subject requiring additional research. Variation on those steps which do not substantively change the procedure, which improve filter clearing or which reduce contamination problems in a laboratory are permitted.

a. Use only TEM grids that have had grid opening areas measured according to directions in Unit III.J.

b. Remove the inlet and outlet plugs prior to opening the cassette to minimize any pressure differential that may be present.

c. Examples of techniques used to prepare polycarbonate filters are described in Unit III.F.7.

d. Examples of techniques used to prepare mixed cellulose ester filters are described in Unit III.F.8.

e. Prepare multiple grids for each sample.

f. Store the three grids to be measured in appropriately labeled grid holders or polyethylene capsules.

5. Equipment.

a. Clean area.

b. Tweezers. Fine-point tweezers for handling of filters and TEM grids.

c. Scalpel Holder and Curved No. 10 Surgical Blades.

d. Microscope slides.

e. Double-coated adhesive tape.

f. Gummed page reinforcements.

g. Micro-pipet with disposal tips 10 to 100 μL variable volume.

h. Vacuum coating unit with facilities for evaporation of carbon. Use of a liquid nitrogen cold trap above the diffusion pump will minimize the possibility of contamination of the filter surface by oil from the pumping system. The vacuum-coating unit can also be used for deposition of a thin film of gold.

i. Carbon rod electrodes. Spectrochemically pure carbon rods are required for use in the vacuum evaporator for carbon coating of filters.

j. Carbon rod sharpener. This is used to sharpen carbon rods to a neck. The use of necked carbon rods (or equivalent) allows the carbon to be applied to the filters with a minimum of heating.

k. Low-temperature plasma asher. This is used to etch the surface of collapsed mixed cellulose ester (MCE) filters. The asher should be supplied with oxygen, and should be modified as necessary to provide a throttle or bleed valve to control the speed of the vacuum to minimize disturbance of the filter. Some early models of ashers admit air too rapidly, which may disturb particulates on the surface of the filter during the etching step.

l. Glass petri dishes, 10 cm in diameter, 1 cm high. For prevention of excessive evaporation of solvent when these are in use, a good seal must be provided between the base and the lid. The seal can be improved by grinding the base and lid together with an abrasive grinding material.

m. Stainless steel mesh.

n. Lens tissue.

o. Copper 200-mesh TEM grids, 3 mm in diameter, or equivalent.

p. Gold 200-mesh TEM grids, 3 mm in diameter, or equivalent.

q. Condensation washer.

r. Carbon-coated, 200-mesh TEM grids, or equivalent.

s. Analytical balance, 0.1 mg sensitivity.

t. Filter paper, 9 cm in diameter.

u. Oven or slide warmer. Must be capable of maintaining a temperature of 65–70 °C.

v. Polyurethane foam, 6 mm thickness.

w. Gold wire for evaporation.

6. Reagents.

a. General. A supply of ultra-clean, fiber-free water must be available for washing of all components used in the analysis. Water that has been distilled in glass or filtered or deionized water is satisfactory for this purpose. Reagents must be fiber-free.

b. Polycarbonate preparation method—chloroform.

c. Mixed Cellulose Ester (MCE) preparation method—acetone or the Burdette procedure (Ref. 7 of Unit III.L.).

7. TEM specimen preparation from polycarbonate filters.

a. Specimen preparation laboratory. It is most important to ensure that contamination of TEM specimens by extraneous asbestos fibers is minimized during preparation.

b. Cleaning of sample cassettes. Upon receipt at the analytical laboratory and before they are taken into the clean facility or laminar flow hood, the sample cassettes must be cleaned of any contamination adhering to the outside surfaces.

c. Preparation of the carbon evaporator. If the polycarbonate filter has already been carbon-coated prior to receipt, the carbon coating step will be omitted, unless the analyst believes the carbon film is too thin. If there is a need to apply more carbon, the filter will be treated in the same way as an uncoated filter. Carbon coating must be performed with a high-vacuum coating unit. Units that are based on evaporation of carbon filaments in a vacuum generated only by an oil rotary pump have not been evaluated for this application, and must not be used. The carbon surface should be sharpened by a carbon rod sharpener to necks of about 4 mm long and 1 mm in diameter. The rods are installed in the evaporator in such a manner that the points are approximately 10 to 12 cm from the surface of a microscope slide held in the rotating and tilting device.

d. Selection of filter area for carbon coating. Before preparation of the filters, a 75 mm x 50 mm microscope slide is washed and dried. This slide is used to support strips of filter during the carbon evaporation. Two parallel strips of double-sided adhesive tape are applied along the length of the slide. Polycarbonate filters are easily stretched during handling, and cutting of areas for further preparation must be performed with great care. The filter and the MCE backing filter are removed together from the cassette and placed on a cleaned glass microscope slide. The filter can be cut with a curved scalpel blade by rocking the blade from the

point placed in contact with the filter. The process can be repeated to cut a strip approximately 3 mm wide across the diameter of the filter. The strip of polycarbonate filter is separated from the corresponding strip of backing filter and carefully placed so that it bridges the gap between the adhesive tape strips on the microscope slide. The filter strip can be held with fine-point tweezers and supported underneath by the scalpel blade during placement on the microscope slide. The analyst can place several such strips on the same microscope slide, taking care to rinse and wet-wipe the scalpel blade and tweezers before handling a new sample. The filter strips should be identified by etching the glass slide or marking the slide using a marker insoluble in water and solvents. After the filter strip has been cut from each filter, the residual parts of the filter must be returned to the cassette and held in position by reassembly of the cassette. The cassette will then be archived for a period of 30 days or returned to the client upon request.

e. Carbon coating of filter strips. The glass slide holding the filter strips is placed on the rotation-tilting device, and the evaporator chamber is evacuated. The evaporation must be performed in very short bursts, separated by some seconds to allow the electrodes to cool. If evaporation is too rapid, the strips of polycarbonate filter will begin to curl, which will lead to cross-linking of the surface material and make it relatively insoluble in chloroform. An experienced analyst can judge the thickness of carbon film to be applied, and some test should be made first on unused filters. If the film is too thin, large particles will be lost from the TEM specimen, and there will be few complete and undamaged grid openings on the specimen. If the coating is too thick, the filter will tend to curl when exposed to chloroform vapor and the carbon film may not adhere to the support mesh. Too thick a carbon film will also lead to a TEM image that is lacking in contrast, and the ability to obtain ED patterns will be compromised. The carbon film should be as thin as possible and remain intact on most of the grid openings of the TEM specimen intact.

f. Preparation of the Jaffe washer. The precise design of the Jaffe washer is not considered important, so any one of the published designs may be used. A washer consisting of a simple stainless steel bridge is recommended. Several pieces of lens tissue approximately 1.0 cm x 0.5 cm are placed on the stainless steel bridge, and the washer is filled with chloroform to a level where the

meniscus contacts the underside of the mesh, which results in saturation of the lens tissue. See References 8 and 10 of Unit III.L.

g. Placing of specimens into the Jaffe washer. The TEM grids are first placed on a piece of lens tissue so that individual grids can be picked up with tweezers. Using a curved scalpel blade, the analyst excises three 3 mm square pieces of the carbon-coated polycarbonate filter from the filter strip. The three squares are selected from the center of the strip and from two points between the outer periphery of the active surface and the center. The piece of filter is placed on a TEM specimen grid with the shiny side of the TEM grid facing upwards, and the whole assembly is placed boldly onto the saturated lens tissue in the Jaffe washer. If carbon-coated grids are used, the filter should be placed carbon-coated side down. The three excised squares of filters are placed on the same piece of lens tissue. Any number of separate pieces of lens tissue may be placed in the same Jaffe washer. The lid is then placed on the Jaffe washer, and the system is allowed to stand for several hours, preferably overnight.

h. Condensation washing. It has been found that many polycarbonate filters will not dissolve completely in the Jaffe washer, even after being exposed to chloroform for as long as 3 days. This problem becomes more serious if the surface of the filter was overheated during the carbon evaporation. The presence of undissolved filter medium on the TEM preparation leads to partial or complete obscuration of areas of the sample, and fibers that may be present in these areas of the specimen will be overlooked; this will lead to a low result. Undissolved filter medium also compromises the ability to obtain ED patterns. Before they are counted, TEM grids must be examined critically to determine whether they are adequately cleared of residual filter medium. It has been found that condensation washing of the grids after the initial Jaffe washer treatment, with chloroform as the solvent, clears all residual filter medium in a period of approximately 1 hour. In practice, the piece of lens tissue supporting the specimen grids is transferred to the cold finger of the condensation washer, and the washer is operated for about 1 hour. If the specimens are cleared satisfactorily by the Jaffe washer alone, the condensation washer step may be unnecessary.

8. TEM specimen preparation from MCE filters.

a. This method of preparing TEM specimens from MCE filters is similar to

that specified in NIOSH Method 7402. See References 7, 8, and 9 of Unit III.L.

b. Upon receipt at the analytical laboratory, the sample cassettes must be cleaned of any contamination adhering to the outside surfaces before entering the clean sample preparation area.

c. Remove a section from any quadrant of the sample and blank filters.

d. Place the section on a clean microscope slide. Affix the filter section to the slide with a gummed paged reinforcement or other suitable means. Label the slide with a water and solvent-proof marking pen.

e. Place the slide in a petri dish which contains several paper filters soaked with 2 to 3 mL acetone. Cover the dish. Wait 2 to 4 minutes for the sample filter to fuse and clear.

f. Plasma etching of the collapsed filter is required.

i. The microscope slide to which the collapsed filter pieces are attached is placed in a plasma asher. Because plasma ashers vary greatly in their performance, both from unit to unit and between different positions in the asher chamber, it is difficult to specify the conditions that should be used. This is one area of the method that requires further evaluation. Insufficient etching will result in a failure to expose embedded filters, and too much etching may result in loss of particulate from the surface. As an interim measure, it is recommended that the time for ashing of a known weight of a collapsed filter be established and that the etching rate be calculated in terms of micrometers per second. The actual etching time used for a particular asher and operating conditions will then be set such that a 1–2 $\mu$m (10 percent) layer of collapsed surface will be removed.

ii. Place the slide containing the collapsed filters into a low-temperature plasma asher, and etch the filter.

g. Transfer the slide to a rotating stage inside the bell jar of a vacuum evaporator. Evaporate a 1 mm x 5 mm section of graphite rod onto the cleared filter. Remove the slide to a clean, dry, covered petri dish.

h. Prepare a second petri dish as a Jaffe washer with the wicking substrate prepared from filter or lens paper placed on top of a 6 mm thick disk of clean spongy polyurethane foam. Cut a V-notch on the edge of the foam and filter paper. Use the V-notch as a reservoir for adding solvent. The wicking substrate should be thin enough to fit into the petri dish without touching the lid.

i. Place carbon-coated TEM grids face up on the filter or lens paper. Label the grids by marking with a pencil on the filter paper or by putting registration

marks on the petri dish lid and marking with a waterproof marker on the dish lid. In a fume hood, fill the dish with acetone until the wicking substrate is saturated. The level of acetone should be just high enough to saturate the filter paper without creating puddles.

j. Remove about a quarter section of the carbon-coated filter samples from the glass slides using a surgical knife and tweezers. Carefully place the section of the filter, carbon side down, on the appropriately labeled grid in the acetone-saturated petri dish. When all filter sections have been transferred, slowly add more solvent to the wedge-shaped trough to bring the acetone level up to the highest possible level without disturbing the sample preparations. Cover the petri dish. Elevate one side of the petri dish by placing a slide under it. This allows drops of condensed solvent vapors to form near the edge rather than in the center where they would drip onto the grid preparation.

G. TEM Method

1. Instrumentation.

a. Use an 80–120 kV TEM capable of performing electron diffraction with a fluorescent screen inscribed with calibrated gradations. If the TEM is equipped with EDXA it must either have a STEM attachment or be capable of producing a spot less than 250 nm in diameter at crossover. The microscope shall be calibrated routinely (see Unit III.J.) for magnification and camera constant.

b. While not required on every microscope in the laboratory, the laboratory must have either one microscope equipped with energy dispersive X-ray analysis or access to an equivalent system on a TEM in another laboratory. This must be an Energy Dispersive X-ray Detector mounted on TEM column and associated hardware/software to collect, save, and read out spectral information. Calibration of Multi-Channel Analyzer shall be checked regularly for A1 at 1.48 KeV and Cu at 8.04 KeV, as well as the manufacturer's procedures.

i. Standard replica grating may be used to determine magnification (e.g., 2160 lines/mm).

ii. Gold standard may be used to determine camera constant.

c. Use a specimen holder with single tilt and/or double tilt capabilities.

2. Procedure.

a. Start a new Count Sheet for each sample to be analyzed. Record on count sheet: analyst's initials and date; lab sample number; client sample number microscope identification; magnification for analysis; number of predetermined grid openings to be analyzed; and grid identification. See the following Figure 4:

BILLING CODE 6560-50-M

## FIGURE 4—COUNT SHEET

Lab Sample No. _____    Filter Type _____    Operator _____
Client Sample No. _____    Filter Area _____    Date _____
Instrument I.D. _____    Grid I.D. _____    Comments _____
Magnification _____    Grid Opening (GO) Area _____    _____
Acc. Voltage _____    No. GO to be Analyzed _____    _____

| GO | Structure No. | Structure Type* | Length | | ED Observation | | | | EDAX |
|---|---|---|---|---|---|---|---|---|---|
| | | | < 5μm | ≥ 5 μm | Chrys. | Amph. | Nonasb. | Neg. ID | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

| GO | Structure No. | Structure Type* | Length | | ED Observation | | | | EDAX |
|---|---|---|---|---|---|---|---|---|---|
| | | | < 5μm | ≥ 5 μm | Chrys. | Amph. | Nonasb. | Neg. ID | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

*B = Bundle              NFD = No fibers detected
C = Cluster              N = No diffraction obtained
F = Fiber
M = Matrix

BILLING CODE 6560-50-C

b. Check that the microscope is properly aligned and calibrated according to the manufacturer's specifications and instructions.

c. Microscope settings: 80–120 kV, grid assessment 250–1000X, then 15,000–20,000X screen magnification for analysis.

d. Approximately one-half (0.5) of the predetermined sample area to be analyzed shall be performed on one sample grid preparation and the remaining half on a second sample grid preparation.

e. Determine the suitability of the grid.

i. Individual grid openings with greater than 5 percent openings (holes) or covered with greater than 25 percent particulate matter or obviously having nonuniform loading shall not be analyzed.

ii. Examine the grid at low magnification (<1000X) to determine its suitability for detailed study at higher magnifications.

iii. Reject the grid if:

(1) Less than 50 percent of the grid openings covered by the replica are intact.

(2) It is doubled or folded.

(3) It is too dark because of incomplete dissolution of the filter.

iv. If the grid is rejected, load the next sample grid.

v. If the grid is acceptable, continue on to Step 6 if mapping is to be used; otherwise proceed to Step 7.

f. Grid Map [Optional].

i. Set the TEM to the low magnification mode.

ii. Use flat edge or finder grids for mapping.

iii. Index the grid openings (fields) to be counted by marking the acceptable fields for one-half (0.5) of the area needed for analysis on each of the two grids to be analyzed. These may be marked just before examining each grid opening (field), if desired.

iv. Draw in any details which will allow the grid to be properly oriented if it is reloaded into the microscope and a particular field is to be reliably identified.

g. Scan the grid.

i. Select a field to start the examination.

ii. Choose the appropriate magnification (15,000 to 20,000X screen magnification).

iii. Scan the grid as follows.

(1) At the selected magnification, make a series of parallel traverses across the field. On reaching the end of one traverse, move the image one window and reverse the traverse.

Note.—A slight overlap should be used so as not to miss any part of the grid opening (field).

(2) Make parallel traverses until the entire grid opening (field) has been scanned.

h. Identify each structure for appearance and size.

i. Appearance and size: Any continuous grouping of particles in which an asbestos fiber within aspect ratio greater than or equal to 5:1 and a length greater than or equal to 0.5 $\mu$m is detected shall be recorded on the count sheet. These will be designated asbestos structures and will be classified as fibers, bundles, clusters, or matrices. Record as individual fibers any contiguous grouping having 0, 1, or 2 definable intersections. Groupings having more than 2 intersections are to be described as cluster or matrix. See the following Figure 5:

BILLING CODE 6560-50-M

Federal Register / Vol. 52, No. 210 / Friday, October 30, 1987 / Rules and Regulations     41885

FIGURE 5--COUNTING GUIDELINES USED IN
DETERMINING ASBESTOS STRUCTURES

Count as 1 fiber; 1 Structure; no intersections.

Count as 2 fibers if space between fibers is greater than width of 1 fiber
diameter or number of intersections is equal to or less than 1.

Count as 3 structures if space between fibers is greater than width of 1 fiber
diameter or if the number of intersections is equal to or less than 2.



Count bundles as 1 structure; 3 or more parallel fibrils less
than 1 fiber diameter separation.



41886    Federal Register / Vol. 52, No. 210 / Friday, October 30, 1987 / Rules and Regulations

Count clusters as 1 structure; fibers having greater than or equal to 3 intersections.

   

Count matrix as 1 structure.

  

DO NOT COUNT AS STRUCTURES:

  

Fiber protrusion
<5:1 Aspect Ratio

No fiber protusion

Fiber protrusion
<0.5 micrometer

—— <0.5 micrometer in length
— <5:1 Aspect Ratio

BILLING CODE 6560-50-C

An intersection is a non-parallel touching or crossing of fibers, with the projection having an aspect ratio of 5:1 or greater. Combinations such as a matrix and cluster, matrix and bundle, or bundle and cluster are categorized by the dominant fiber quality—cluster, bundle, and matrix, respectively. Separate categories will be maintained for fibers less than 5 μm and for fibers greater than or equal to 5 μm in length. Not required, but useful, may be to record the fiber length in 1 μm intervals. (Identify each structure morphologically and analyze it as it enters the "window".)

(1) *Fiber*. A structure having a minimum length greater than 0.5 μm and an aspect ratio (length to width) of 5:1 or greater and substantially parallel sides. Note the appearance of the end of the fiber, i.e., whether it is flat, rounded or dovetailed, no intersections.

(2) *Bundle*. A structure composed of 3 or more fibers in a parallel arrangement with each fiber closer than one fiber diameter.

(3) *Cluster*. A structure with fibers in a random arrangement such that all fibers are intermixed and no single fiber is isolated from the group; groupings must have more than 2 intersections.

(4) *Matrix*. Fiber or fibers with one end free and the other end embedded in or hidden by a particulate. The exposed fiber must meet the fiber definition.

(5) *NSD*. Record NSD when no structures are detected in the field.

(6) *Intersection*. Non-parallel touching or crossing of fibers, with the projection having an aspect ratio 5:1 or greater.

ii. Structure Measurement.

(1) Recognize the structure that is to be sized.

(2) Memorize its location in the "window" relative to the sides, inscribed square and to other particulates in the field so this exact location can be found again when scanning is resumed.

(3) Measure the structure using the scale on the screen.

(4) Record the length category and structure type classification on the count sheet after the field number and fiber number.

(5) Return the fiber to its original location in the window and scan the rest of the field for other fibers; if the direction of travel is not remembered, return to the right side of the field and begin the traverse again.

i. Visual identification of Electron Diffraction (ED) patterns is required for each asbestos structure counted which would cause the analysis to exceed the 70 s/mm² concentration. (Generally this means the first four fibers identified as asbestos must exhibit an identifiable

diffraction pattern for chrysotile or amphibole.)

i. Center the structure, focus, and obtain an ED pattern. (See Microscope Instruction Manual for more detailed instructions.)

ii. From a visual examination of the ED pattern, obtained with a short camera length, classify the observed structure as belonging to one of the following classifications: chrysotile, amphibole, or nonasbestos.

(1) Chrysotile: The chrysotile asbestos pattern has characteristic streaks on the layer lines other than the central line and some streaking also on the central line. There will be spots of normal sharpness on the central layer line and on alternate lines (2nd, 4th, etc.). The repeat distance between layer lines is 0.53 nm and the center doublet is at 0.73 nm. The pattern should display (002), (110), (130) diffraction maxima; distances and geometry should match a chrysotile pattern and be measured semiquantitatively.

(2) Amphibole Group [includes grunerite (amosite), crocidolite, anthophyllite, tremolite, and actinolite]: Amphibole asbestos fiber patterns show layer lines formed by very closely spaced dots, and the repeat distance between layer lines is also about 0.53 nm. Streaking in layer lines is occasionally present due to crystal structure defects.

(3) Nonasbestos: Incomplete or unobtainable ED patterns, a nonasbestos EDXA, or a nonasbestos morphology.

iii. The micrograph number of the recorded diffraction patterns must be reported to the client and maintained in the laboratory's quality assurance records. The records must also demonstrate that the identification of the pattern has been verified by a qualified individual and that the operator who made the identification is maintaining at least an 80 percent correct visual identification based on his measured patterns. In the event that examination of the pattern by the qualified individual indicates that the pattern had been misidentified visually, the client shall be contacted. If the pattern is a suspected chrysotile, take a photograph of the diffraction pattern at 0 degrees tilt. If the structure is suspected to be amphibole, the sample may have to be tilted to obtain a simple geometric array of spots.

j. Energy Dispersive X-Ray Analysis (EDXA).

i. Required of all amphiboles which would cause the analysis results to exceed the 70 s/mm² concentration. (Generally speaking, the first 4 amphiboles would require EDXA.)

ii. Can be used alone to confirm chrysotile after the 70 s/mm² concentration has been exceeded.

iii. Can be used alone to confirm all nonasbestos.

iv. Compare spectrum profiles with profiles obtained from asbestos standards. The closest match identifies and categorizes the structure.

v. If the EDXA is used for confirmation, record the properly labeled spectrum on a computer disk, or if a hard copy, file with analysis data.

vi. If the number of fibers in the nonasbestos class would cause the analysis to exceed the 70 s/mm² concentration, their identities must be confirmed by EDXA or measurement of a zone axis diffraction pattern to establish that the particles are nonasbestos.

k. Stopping Rules.

i. If more than 50 asbestiform structures are counted in a particular grid opening, the analysis may be terminated.

ii. After having counted 50 asbestiform structures in a minimum of 4 grid openings, the analysis may be terminated. The grid opening in which the 50th fiber was counted must be completed.

iii. For blank samples, the analysis is always continued until 10 grid openings have been analyzed.

iv. In all other samples the analysis shall be continued until an analytical sensitivity of 0.005 s/cm³ is reached.

l. Recording Rules. The count sheet should contain the following information:

i. Field (grid opening): List field number.

ii. Record "NSD" if no structures are detected.

iii. Structure information.

(1) If fibers, bundles, clusters, and/or matrices are found, list them in consecutive numerical order, starting over with each field.

(2) Length. Record length category of asbestos fibers examined. Indicate if less than 5 μm or greater than or equal to 5 μm.

(3) Structure Type. Positive identification of asbestos fibers is required by the method. At least one diffraction pattern of each fiber type from every five samples must be recorded and compared with a standard diffraction pattern. For each asbestos fiber reported, both a morphological descriptor and an identification descriptor shall be specified on the count sheet.

(4) Fibers classified as chrysotile must be identified by diffraction and/or X-ray analysis and recorded on the count

sheet. X-ray analysis alone can be used as sole identification only after 70s/mm$^2$ have been exceeded for a particular sample.

(5) Fibers classified as amphiboles must be identified by X-ray analysis and electron diffraction and recorded on the count sheet. (X-ray analysis alone can be used as sole identification only after 70s/mm$^2$ have been exceeded for a particular sample.)

(6) If a diffraction pattern was recorded on film, the micrograph number must be indicated on the count sheet.

(7) If an electron diffraction was attempted and an appropriate spectra is not observed, N should be recorded on the count sheet.

(8) If an X-ray analysis is attempted but not observed, N should be recorded on the count sheet.

(9) If an X-ray analysis spectrum is stored, the file and disk number must be recorded on the count sheet.

m. Classification Rules.

i. *Fiber.* A structure having a minimum length greater than or equal to 0.5 $\mu$m and an aspect ratio (length to width) of 5:1 or greater and substantially parallel sides. Note the appearance of the end of the fiber, i.e., whether it is flat, rounded or dovetailed.

ii. *Bundle.* A structure composed of three or more fibers in a parallel arrangement with each fiber closer than one fiber diameter.

iii. *Cluster.* A structure with fibers in a random arrangement such that all fibers are intermixed and no single fiber is isolated from the group. Groupings must have more than two intersections.

iv. *Matrix.* Fiber or fibers with one end free and the other end embedded in or hidden by a particulate. The exposed fiber must meet the fiber definition.

v. *NSD.* Record NSD when no structures are detected in the field.

n. After all necessary analyses of a particle structure have been completed, return the goniometer stage to 0 degrees, and return the structure to its original location by recall of the original location.

o. Continue scanning until all the structures are identified, classified and sized in the field.

p. Select additional fields (grid openings) at low magnification; scan at a chosen magnification (15,000 to 20,000X screen magnification); and analyze until the stopping rule becomes applicable.

q. Carefully record all data as they are being collected, and check for accuracy.

r. After finishing with a grid, remove it from the microscope, and replace it in the appropriate grid hold. Sample grids must be stored for a minimum of 1 year from the date of the analysis; the sample cassette must be retained for a minimum of 30 days by the laboratory or returned at the client's request.

H. Sample Analytical Sequence

1. Carry out visual inspection of work site prior to air monitoring.

2. Collect a minimum of five air samples inside the work site and five samples outside the work site. The indoor and outdoor samples shall be taken during the same time period.

3. Analyze the abatement area samples according to this protocol. The analysis must meet the 0.005 s/cm$^3$ analytical sensitivity.

4. Remaining steps in the analytical sequence are contained in Unit IV. of this Appendix.

I. Reporting

The following information must be reported to the client. See the following Table II:

BILLING CODE 6560-50-M

**Federal Register** / Vol. 52, No. 210 / Friday, October 30, 1987 / Rules and Regulations    **41689**

## TABLE II--EXAMPLE LABORATORY LETTERHEAD

| Laboratory I.D. | Client I.D. | FILTER MEDIA DATA | | | | Analyzed Area, $mm^2$ | Sample Volume, cc |
|---|---|---|---|---|---|---|---|
| | | Type | Diameter, mm | Effective Area, $mm^2$ | Pore Size, $\mu m$ | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

## INDIVIDUAL ANALYTICAL RESULTS

| Laboratory I.D. | Client I.D. | # Asbestos Structures | Analytical Sensitivity, s/cc | CONCENTRATION | |
|---|---|---|---|---|---|
| | | | | Structures/$mm^2$ | Structures/cc |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

The analysis was carried out to the approved TEM method. This laboratory is in compliance with the quality specified by the method.

_____
Authorized Signature

BILLING CODE 6560-50-C

1. Concentration in structures per square millimeter and structures per cubic centimeter.

2. Analytical sensitivity used for the analysis.

3. Number of asbestos structures.

4. Area analyzed.

5. Volume of air samples (which was initially provided by client).

6. Average grid size opening.

7. Number of grids analyzed.

8. Copy of the count sheet must be included with the report.

9. Signature of laboratory official to indicate that the laboratory met specifications of the AHERA method.

10. Report form must contain official laboratory identification (e.g., letterhead).

11. Type of asbestos.

J. Calibration Methodology

Note: Appropriate implementation of the method requires a person knowledgeable in electron diffraction and mineral identification by ED and EDXA. Those inexperienced laboratories wishing to develop capabilities may acquire necessary knowledge through analysis of appropriate standards and by following detailed methods as described in References 8 and 10 of Unit III.L.

1. Equipment Calibration. In this method, calibration is required for the air-sampling equipment and the transmission electron microscope (TEM).

a. TEM Magnification. The magnification at the fluorescent screen of the TEM must be calibrated at the grid opening magnification (if used) and also at the magnification used for fiber counting. This is performed with a cross grating replica. A logbook must be maintained, and the dates of calibration depend on the past history of the particular microscope; no frequency is specified. After any maintenance of the microscope that involved adjustment of the power supplied to the lenses or the high-voltage system or the mechanical disassembly of the electron optical column apart from filament exchange, the magnification must be recalibrated. Before the TEM calibration is performed, the analyst must ensure that the cross grating replica is placed at the same distance from the objective lens as the specimens are. For instruments that incorporate an eucentric tilting specimen stage, all speciments and the cross grating replica must be placed at the eucentric position.

b. Determination of the TEM magnification on the fluorescent screen.

i. Define a field of view on the fluorescent screen either by markings or physical boundaries. The field of view

must be measurable or previously inscribed with a scale or concentric circles (all scales should be metric).

ii. Insert a diffraction grating replica (for example a grating containing 2,160 lines/mm) into the specimen holder and place into the microscope. Orient the replica so that the grating lines fall perpendicular to the scale on the TEM fluorescent screen. Ensure that the goniometer stage tilt is 0 degrees.

iii. Adjust microscope magnification to 10,000X or 20,000X. Measure the distance (mm) between two widely separated lines on the grating replica. Note the number of spaces between the lines. Take care to measure between the same relative positions on the lines (e.g., between left edges of lines).

Note.—The more spaces included in the measurement, the more accurate the final calculation. On most microscopes, however, the magnification is substantially constant only within the central 8–10 cm diameter region of the fluorescent screen.

iv. Calculate the true magnification (M) on the fluorescent screen:

$$M = XG/Y$$

where:

$X$ = total distance (mm) between the designated grating lines;

$G$ = calibration constant of the grating replica (lines/mm):

$Y$ = number of grating replica spaces counted along $X$.

c. Calibration of the EDXA System. Initially, the EDXA system must be calibrated by using two reference elements to calibrate the energy scale of the instrument. When this has been completed in accordance with the manufacturer's instructions, calibration in terms of the different types of asbestos can proceed. The EDXA detectors vary in both solid angle of detection and in window thickness. Therefore, at a particular accelerating voltage in use on the TEM, the count rate obtained from specific dimensions of fiber will vary both in absolute X-ray count rate and in the relative X-ray peak heights for different elements. Only a few minerals are relevant for asbestos abatement work, and in this procedure the calibration is specified in terms of a "fingerprint" technique. The EDXA spectra must be recorded from individual fibers of the relevant minerals, and identifications are made on the basis of semiquantitative comparisons with these reference spectra.

d. Calibration of Grid Openings.

i. Measure 20 grid openings on each of 20 random 200-mesh copper grids by placing a grid on a glass slide and examining it under the PCM. Use a calibrated graticule to measure the

average field diameter and use this number to calculate the field area for an average grid opening. Grids are to be randomly selected from batches up to 1,000.

Note.—A grid opening is considered as one field.

ii. The mean grid opening area must be measured for the type of specimen grids in use. This can be accomplished on the TEM at a properly calibrated low magnification or on an optical microscope at a magnification of approximately 400X by using an eyepiece fitted with a scale that has been calibrated against a stage micrometer. Optical microscopy utilizing manual or automated procedures may be used providing instrument calibration can be verified.

e. Determination of Camera Constant and ED Pattern Analysis.

i. The camera length of the TEM in ED operating mode must be calibrated before ED patterns on unknown samples are observed. This can be achieved by using a carbon-coated grid on which a thin film of gold has been sputtered or evaporated. A thin film of gold is evaporated on the specimen TEM grid to obtain zone-axis ED patterns superimposed with a ring pattern from the polycrystalline gold film.

ii. In practice, it is desirable to optimize the thickness of the gold film so that only one or two sharp rings are obtained on the superimposed ED pattern. Thicker gold film would normally give multiple gold rings, but it will tend to mask weaker diffraction spots from the unknown fibrous particulates. Since the unknown d-spacings of most interest in asbestos analysis are those which lie closest to the transmitted beam, multiple gold rings are unnecessary on zone-axis ED patterns. An average camera constant using multiple gold rings can be determined. The camera constant is one-half the diameter, D, of the rings times the interplanar spacing, d, of the ring being measured.

K. Quality Control/Quality Assurance Procedures (Data Quality Indicators)

Monitoring the environment for airborne asbestos requires the use of sensitive sampling and analysis procedures. Because the test is sensitive, it may be influenced by a variety of factors. These include the supplies used in the sampling operation, the performance of the sampling, the preparation of the grid from the filter and the actual examination of this grid in the microscope. Each of these unit operations must produce a product of

Federal Register / Vol. 52, No. 210 / Friday, October 30, 1987 / Rules and Regulations    41891

defined quality if the analytical result is to be a reliable and meaningful test result. Accordingly, a series of control checks and reference standards is performed along with the sample analysis as indicators that the materials used are adequate and the operations are within acceptable limits. In this way, the quality of the data is defined and the results are of known value. These checks and tests also provide timely and specific warning of any problems which might develop within the sampling and analysis operations. A description of these quality control/quality assurance procedures is summarized in the following Table III:

BILLING CODE 6560-50-M

**41892**　　**Federal Register** / Vol. 52, No. 210 / Friday, October 30, 1987 / Rules and Regulations

TABLE III--SUMMARY OF LABORATORY
DATA QUALITY OBJECTIVES

| Unit Operation | QC Check | Frequency | Conformance Expectation |
|---|---|---|---|
| Sample receiving | Review of receiving report | Each sample | 95% complete |
| Sample custody | Review of chain-of-custody record | Each sample | 95% complete |
| Sample preparation | Supplies and reagents | On receipt | Meet specs. or reject |
| | Grid opening size | 20 openings/20 grids/lot of 1000 or 1 opening/sample | 100% |
| | Special clean area monitoring | After cleaning or service | Meet specs or reclean |
| | Laboratory blank | 1 per prep series or 10% | Meet specs. or reanalyze series |
| | Plasma etch blank | 1 per 20 samples | 75% |
| | Multiple preps (3 per sample) | Each sample | One with cover of 15 complete grid sqs. |
| Sample analysis | System check | Each day | Each day |
| | Alignment check | Each day | Each day |
| | Magnification calibration with low and high standards | Each month or after service | 95% |
| | ED calibration by gold standard | Weekly | 95% |
| | EDS calibration by copper line | Daily | 95% |
| Performance check | Laboratory blank (measure of cleanliness) | Prep 1 per series or 10% read 1 per 25 samples | Meet specs or reanalyze series |
| | Replicate counting (measure of precision) | 1 per 100 samples | 1.5 x Poisson Std. Dev. |
| | Duplicate analysis (measure of reproducibility) | 1 per 100 samples | 2 x Poisson Std. Dev. |
| | Known samples of typical materials (working standards) | Training and for comparison with unknowns | 100% |
| | Analysis of NBS SRM 1876 and/or RM 8410 (measure of accuracy and comparability) | 1 per analyst per year | 1.5 x Poisson Std. Dev. |
| | Data entry review (data validation and measure of completeness) | Each sample | 95% |
| | Record and verify ID electron diffraction pattern of structure | 1 per 5 samples | 80% accuracy |
| Calculations and data reduction | Hand calculation of automated data reduction procedure or independent recalculation of hand-calculated data | 1 per 100 samples | 85% |

BILLING CODE 6560-50-C

1. When the samples arrive at the laboratory, check the samples and documentation for completeness and requirements before initiating the analysis.

2. Check all laboratory reagents and supplies for acceptable asbestos background levels.

3. Conduct all sample preparation in a clean room environment monitored by laboratory blanks and special testing after cleaning or servicing the room.

4. Prepare multiple grids of each sample.

5. Provide laboratory blanks with each sample batch. Maintain a cumulative average of these results. If this average is greater than 53 f/mm² per 10 200-mesh grid openings, check the system for possible sources of contamination.

6. Check for recovery of asbestos from cellulose ester filters submitted to plasma asher.

7. Check for asbestos carryover in the plasma asher by including a blank alongside the positive control sample.

8. Perform a systems check on the transmission electron microscope daily.

9. Make periodic performance checks of magnification, electron diffraction and energy dispersive X-ray systems as set forth in Table III of Unit III.K.

10. Ensure qualified operator performance by evaluation of replicate counting, duplicate analysis, and standard sample comparisons as set forth in Table III of Unit III.K.

11. Validate all data entries.

12. Recalculate a percentage of all computations and automatic data reduction steps as specified in Table III.

13. Record an electron diffraction pattern of one asbestos structure from every five samples that contain asbestos. Verify the identification of the pattern by measurement or comparison of the pattern with patterns collected from standards under the same conditions.

The outline of quality control procedures presented above is viewed as the minimum required to assure that quality data is produced for clearance testing of an asbestos abated area. Additional information may be gained by other control tests. Specifics on those control procedures and options available for environmental testing can be obtained by consulting References 6, 7, and 11 of Unit III.L.

## L. References

For additional background information on this method the following references should be consulted.

1. "Guidelines for Controlling Asbestos-Containing Materials in Buildings," EPA 560/5–85–024, June 1985.

2. "Measuring Airborne Asbestos Following an Abatement Action," USEPA/ Office of Toxic Substances, EPA 600/4–85–049, 1985.

3. Small, John and E. Steel. Asbestos Standards: Materials and Analytical Methods. N.B.S. Special Publication 619, 1982.

4. Campbell, W.J., R.L. Blake, L.L. Brown, E.E. Cather, and J.J. Sjoberg. Selected Silicate Minerals and Their Asbestiform Varieties. Information Circular 8751, U.S. Bureau of Mines, 1977.

5. Quality Assurance Handbook for Air Pollution Measurement System. Ambient Air Methods, EPA 600/4–77–027a, USEPA, Office of Research and Development, 1977.

6. Method 2A: Direct Measurement of Gas Volume Through Pipes and Small Ducts. 40 CFR Part 60 Appendix A.

7. Burdette, G.J. Health & Safety Exec., Research & Lab. Services Div. , London, "Proposed Analytical Method for Determination of Asbestos in Air."

8. Chatfield, E.J., Chatfield Tech. Cons., Ltd., Clark, T., PEI Assoc. "Standard Operating Procedure for Determination of Airborne Asbestos Fibers by Transmission Electron Microscopy Using Polycarbonate Membrane Filters." WERL SOP 87–1, March 5, 1987.

9. NIOSH. Method 7402 for Asbestos Fibers, December 11, 1986 Draft.

10. Yamate, G., S.C. Agarwall, R.D. Gibbons, IIT Research Institute, "Methodology for the Measurement of Airborne Asbestos by Electron Microscopy." Draft report, USEPA Contract 68–02–3266, July 1984.

11. Guidance to the Preparation of Quality Assurance Project Plans. USEPA, Office of Toxic Substances, 1984.

*IV. Mandatory Interpretation of Transmission Electron Microscopy Results to Determine Completion of Response Actions*

## A. Introduction

A response action is determined to be completed by TEM when the abatement area has been cleaned and the airborne asbestos concentration inside the abatement area is no higher than concentrations at locations outside the abatement area. "Outside" means outside the abatement area, but not necessarily outside the building. EPA reasons that an asbestos removal contractor cannot be expected to clean an abatement area to an airborne asbestos concentration that is lower than the concentration of air entering the abatement area from outdoors or from other parts of the building. After

the abatement area has passed a thorough visual inspection, and before the outer containment barrier is removed, a minimum of five air samples inside the abatement area and a minimum of five air samples outside the abatement area must be collected. Hence, the response action is determined to be completed when the average airborne asbestos concentration measured inside the abatement area is not statistically different from the average airborne asbestos concentration measured outside the abatement area.

The inside and outside concentrations are compared by the Z-test, a statistical test that takes into account the variability in the measurement process. A minimum of five samples inside the abatement area and five samples outside the abatement area are required to control the false negative error rate, i.e., the probability of declaring the removal complete when, in fact, the air concentration inside the abatement area is significantly higher than outside the abatement area. Additional quality control is provided by requiring three blanks (filters through which no air has been drawn) to be analyzed to check for unusually high filter contamination that would distort the test results.

When volumes greater than or equal to 1,199 L for a 25 mm filter and 2,799 L for a 37 mm filter have been collected and the average number of asbestos structures on samples inside the abatement area is no greater than 70 s/mm² of filter, the response action may be considered complete without comparing the inside samples to the outside samples. EPA is permitting this initial screening test to save analysis costs in situations where the airborne asbestos concentration is sufficiently low so that it cannot be distinguished from the filter contamination/ background level (fibers deposited on the filter that are unrelated to the air being sampled). The screening test cannot be used when volumes of less than 1,199 L for 25 mm filter or 2,799 L for a 37 mm filter are collected because the ability to distinguish levels significantly different from filter background is reduced at low volumes.

The initial screening test is expressed in structures per square millimeter of filter because filter background levels come from sources other than the air being sampled and cannot be meaningfully expressed as a concentration per cubic centimeter of air. The value of 70 s/mm² is based on the experience of the panel of microscopists who consider one structure in 10 grid openings (each grid opening with an area of 0.0057 mm²) to

**41894**    Federal Register / Vol. 52, No. 210 / Friday, October 30, 1987 / Rules and Regulations

be comparable with contamination/background levels of blank filters. The decision is based, in part, on Poisson statistics which indicate that four structures must be counted on a filter before the fiber count is statistically distinguishable from the count for one structure. As more information on the performance of the method is collected, this criterion may be modified. Since different combinations of the number and size of grid openings are permitted under the TEM protocol, the criterion is expressed in structures per square millimeter of filter to be consistent across all combinations. Four structures per 10 grid openings corresponds to approximately 70 s/mm².

B. Sample Collection and Analysis

1. A minimum of 13 samples is required: five samples collected inside the abatement area, five samples collected outside the abatement area, two field blanks, and one sealed blank.

2. Sampling and TEM analysis must be done according to either the mandatory or nonmandatory protocols in Appendix A. At least 0.057 mm² of filter must be examined on blank filters.

C. Interpretation of Results

1. The response action shall be considered complete if either:

a. Each sample collected inside the abatement area consists of at least 1,199 L of air for a 25 mm filter, or 2,799 L of air for a 37 mm filter, and the arithmetic mean of their asbestos structure concentrations per square millimeter of filter is less than or equal to 70 s/mm²; or

b. The three blank samples have an arithmetic mean of the asbestos structure concentration on the blank filters that is less than or equal to 70 s/mm² and the average airborne asbestos concentration measured inside the abatement area is not statistically higher than the average airborne asbestos concentration measured outside the abatement area as determined by the Z-test. The Z-test is carried out by calculating

$$Z = \frac{\bar{Y}_I - \bar{Y}_0}{0.8\left(1/n_I + 1/n_0\right)^{1/2}}$$

where $\bar{Y}_I$ is the average of the natural logarithms of the inside samples and $\bar{Y}_0$ is the average of the natural logarithms of the outside samples, $n_I$ is the number of inside samples and $n_0$ is the number of outside samples. The response action

is considered complete if Z is less than or equal to 1.65.

(Note.—When no fibers are counted, the calculated detection limit for that analysis is inserted for the concentration.)

2. If the abatement site does not satisfy either (1) or (2) above, the site must be recleaned and a new set of samples collected.

D. Sequence for Analyzing Samples

It is possible to determine completion of the response action without analyzing all samples. Also, at any point in the process, a decision may be made to terminate the analysis of existing samples, reclean the abatement site, and collect a new set of samples. The following sequence is outlined to minimize the number of analyses needed to reach a decision.

1. Analyze the inside samples.

2. If at least 1,199 L of air for a 25 mm filter or 2,799 L of air for a 37 mm filter is collected for each inside sample and the arithmetic mean concentration of structures per square millimeter of filter is less than or equal to 70 s/mm², the response action is complete and no further analysis is needed.

3. If less than 1,199 L of air for a 25 mm filter or 2,799 L of air for a 37 mm filter is collected for any of the inside samples, or the arithmetic mean concentration of structures per square millimeter of filter is greater than 70 s/mm², analyze the three blanks.

4. If the arithmetic mean concentration of structures per square millimeter on the blank filters is greater than 70 s/mm², terminate the analysis, identify and correct the source of blank contamination, and collect a new set of samples.

5. If the arithmetic mean concentration of structures per square millimeter on the blank filters is less than or equal to 70 s/mm², analyze the outside samples and perform the Z-test.

6. If the Z-statistic is less than or equal to 1.65, the response action is complete. If the Z-statistic is greater than 1.65, reclean the abatement site and collect a new set of samples.

**Appendix B to Subpart E—Work Practices and Engineering Controls for Small-Scale, Short-Duration Operations Maintenance and Repair (O&M) Activities Involving ACM**

This appendix is not mandatory, in that LEAs may choose to comply with all the requirements of 40 CFR 763.121. Section 763.91(b) extends the protection provided by EPA in its 40 CFR 763.121 for worker protection during asbestos abatement projects to employees of local education agencies who perform

small-scale, short-duration operations, maintenance and repair (O&M) activities involving asbestos-containing materials and are not covered by the OSHA asbestos construction standard at 29 CFR 1926.58 or an asbestos worker protection standard adopted by a State as part of a State plan approved by OSHA under section 18 of the Occupational Safety and Health Act. Employers wishing to be exempt from the requirements of § 763.121 (e)(6) and (f)(2)(i) may instead comply with the provisions of this appendix when performing small-scale, short-duration O&M activities.

Definition of Small-Scale, Short-Duration Activities

For the purposes of this appendix, small-scale, short-duration maintenance activities are tasks such as, but not limited to:

1. Removal of asbestos-containing insulation on pipes.

2. Removal of small quantities of asbestos-containing insulation on beams or above ceilings.

3. Replacement of an asbestos-containing gasket on a valve.

4. Installation or removal of a small section of drywall.

5. Installation of electrical conduits through or proximate to asbestos-containing materials.

Small-scale, short-duration maintenance activities can be further defined, for the purposes of this subpart, by the following considerations:

1. Removal of small quantities of asbestos-containing materials (ACM) only if required in the performance of another maintenance activity not intended as asbestos abatement.

2. Removal of asbestos-containing thermal system insulation not to exceed amounts greater than those which can be contained in a single glove bag.

3. Minor repairs to damaged thermal system insulation which do not require removal.

4. Repairs to a piece of asbestos-containing wallboard.

5. Repairs, involving encapsulation, enclosure or removal, to small amounts of friable asbestos-containing material only if required in the performance of emergency or routine maintenance activity and not intended solely as asbestos abatement. Such work may not exceed amounts greater than those which can be contained in a single prefabricated minienclosure. Such an enclosure shall conform spatially and geometrically to the localized work area, in order to perform its intended containment function.

OSHA concluded that the use of certain engineering and work practice controls is capable of reducing employee exposures to asbestos to levels below the final standard's action level (0.1 f/cm³). (See 51 FR 22714, June 20, 1986.) Several controls and work practices, used either singly or in combination, can be employed effectively to reduce asbestos exposures during small maintenance and renovation operations. These include:

1. Wet methods.

2. Removal methods.

i. Use of glove bags.

ii. Removal of entire asbestos insulated pipes or structures.

iii. Use of minienclosures.

3. Enclosure of asbestos materials.

4. Maintenance programs.

This appendix describes these controls and work practices in detail.

Preparation of the Area Before Renovation or Maintenance Activities

The first step in preparing to perform a small-scale, short-duration asbestos renovation or maintenance task, regardless of the abatement method that will be used, is the removal from the work area of all objects that are movable to protect them from asbestos contamination. Objects that cannot be removed must be covered completely with 6-mil-thick polyethylene plastic sheeting before the task begins. If objects have already been contaminated, they should be thoroughly cleaned with a High Efficiency Particulate Air (HEPA) filtered vacuum or be wet-wiped before they are removed from the work area or completely encased in the plastic.

*Wet methods.* Whenever feasible, and regardless of the abatement method to be used (e.g., removal, enclosure, use of glove bags), wet methods must be used during small-scale, short-duration maintenance and renovation activities that involve disturbing asbestos-containing materials. Handling asbestos materials wet is one of the most reliable methods of ensuring that asbestos fibers do not become airborne, and this practice should therefore be used whenever feasible. Wet methods can be used in the great majority of workplace situations. Only in cases where asbestos work must be performed on live electrical equipment, on live steam lines, or in other areas where water will seriously damage materials or equipment may dry removal be performed. Amended water or another wetting agent should be applied by means of an airless sprayer to minimize the extent to which the asbestos-containing material is disturbed.

Asbestos-containing material should be wetted from the initiation of the maintenance or renovation operation and wetting agents should be used continually throughout the work period to ensure that any dry asbestos-containing material exposed in the course of the work is wet and remains wet until final disposal.

*Removal of small amount of asbestos-containing materials.* Several methods can be used to remove small amounts of asbestos-containing materials during small-scale, short-duration renovation or maintenance tasks. These include the use of glove bags, the removal of an entire asbestos-covered pipe or structure, and the construction of minienclosures. The procedures that employers must use for each of these operations if they wish to avail themselves of the rule's exemptions are described in the following sections.

*Glove bags.* OSHA found that the use of glove bags to enclose the work area during small-scale, short-duration maintenance or renovation activities will result in employee exposure to asbestos that are below the rule's action level of 0.1 f/cm³. This appendix provides requirements for glove-bag procedures to be followed by employers wishing to avail themselves of the rule's exemption for each activity. OSHA has determined that the use of these procedures will reduce the 8-hour time weighted average (TWA) exposure of employees involved in these work operations to levels below the action level and will thus provide a degree of employee protection equivalent to that provided by compliance with all provisions of the rule.

*Glove bag installation.* Glove bags are approximately 40-inch-wide times 64-inch-long bags fitted with arms through which the work can be performed. When properly installed and used, they permit workers to remain completely isolated from the asbestos material removed or replaced inside the bag. Glove bags can thus provide a flexible, easily installed, and quickly dismantled temporary small work area enclosure that is ideal for small-scale asbestos renovation or maintenance jobs. These bags are single-use control devices that are disposed of at the end of each job. The bags are made of transparent 6-mil-thick polyethylene plastic with areas of Tyvek [1] material (the same material

[1] Mention of trade names or commercial products does not constitute endorsement or recommendation for use.

used to make the disposal protective suits used in major asbestos removal, renovation, and demolition operations and in protective gloves). Glove bags are readily available from safety supply stores or specialty asbestos removal supply houses. Glove bags come pre-labelled with the asbestos warning label prescribed by OSHA and EPA for bags used to dispose of asbestos waste.

*Glove bag equipment and supplies.* Supplies and materials that are necessary to use glove bags effectively include:

1. Tape to seal glove bag to the area from which asbestos is to be removed.

2. Amended water or other wetting agents.

3. An airless sprayer for the application of the wetting agent.

4. Bridging encapsulant (a paste-like substance for coating asbestos) to seal the rough edges of any asbestos-containing materials that remain within the glove bag at the points of attachment after the rest of the asbestos has been removed.

5. Tools such as razor knives, nips, and wire brushes (or other tools suitable for cutting wires, etc.).

6. A HEPA filter-equipped vacuum for evacuating the glove bag (to minimize the release of asbestos fibers) during removal of the bag from the work area and for cleaning any material that may have escaped during the installation of the glove bag.

7. HEPA-equipped dual-cartridge or more protective respirators for use by the employees involved in the removal of asbestos with the glove bag.

*Glove bag work practices.* The proper use of glove bags requires the following steps:

1. Glove bags must be installed so that they completely cover the pipe or other structure where asbestos work is to be done. Glove bags are installed by cutting the sides of the glove bag to fit the size of the pipe from which asbestos is to be removed. The glove bag is attached to the pipe by folding the open edges together and securely sealing them with tape. All openings in the glove bag must be sealed with duct tape or equivalent material. The bottom seam of the glove bag must also be sealed with duct tape or equivalent to prevent any leakage from the bag that may result from a defect in the bottom seam.

2. The employee who is performing the asbestos removal with the glove bag must don at least a half mask dual-cartridge HEPA-equipped respirator: respirators should be worn by employees who are in close contact with the glove bag and who may thus be exposed as a result of small gaps in the

seams of the bag or holes punched through the bag by a razor knife or a piece of wire mesh.

3. The removed asbestos material from the pipe or other surface that has fallen into the enclosed bag must be thoroughly wetted with a wetting agent (applied with an airless sprayer through the precut port provided in most gloves bags or applied through a small hole in the bag).

4. Once the asbestos material has been thoroughly wetted, it can be removed from the pipe, beam, or other surface. The choice of tool to use to remove the asbestos-containing material depends on the type of material to be removed. Asbestos-containing materials are generally covered with painted canvas and/or wire mesh. Painted canvas can be cut with a razor knife and peeled away from the asbestos-containing material underneath. Once the canvas has been peeled away, the asbestos-containing material underneath may be dry, in which case it should be resprayed with a wetting agent to ensure that it generates as little dust as possible when removed. If the asbestos-containing material is covered with wire mesh, the mesh should be cut with nips, tin snips, or other appropriate tool and removed.

A wetting agent must then be used to spray any layer of dry material that is exposed beneath the mesh, the surface of the stripped underlying structure, and the inside of the glove bag.

5. After removal of the layer of asbestos-containing material, the pipe or surface from which asbestos has been removed must be thoroughly cleaned with a wire brush and wet-wiped with a wetting agent until no traces of the asbestos-containing material can be seen.

6. Any asbestos-containing insulation edges that have been exposed as a result of the removal or maintenance activity must be encapsulated with bridging encapsulant to ensure that the edges do not release asbestos fibers to the atmosphere after the glove bag has been removed.

7. When the asbestos removal and encapsulation have been completed, a vacuum hose from a HEPA filtered vacuum must be inserted into the glove bag through the port to remove any air in the bag that may contain asbestos fibers. When the air has been removed from the bag, the bag should be squeezed tightly (as close to the top as possible), twisted, and sealed with tape, to keep the asbestos materials safely in the bottom of the bag. The HEPA vacuum can then be removed from the bag and the glove bag itself can be

removed from the work area to be disposed of properly.

*Minienclosures.* In some instances, such as removal of asbestos from a small ventilation system or from a short length of duct, a glove bag may not be either large enough or of the proper shape to enclose the work area. In such cases, a minienclosure can be built around the area where small-scale, short-duration asbestos maintenance or renovation work is to be performed. Such enclosures should be constructed of 6-mil-thick polyethylene plastic sheeting and can be small enough to restrict entry to the asbestos work area to one worker.

For example, a minienclosure can be built in a small utility closet when asbestos-containing duct covering is to be removed. The enclosure is constructed by:

1. Affixing plastic sheeting to the walls with spray adhesive and tape.
2. Covering the floor with plastic and sealing the plastic covering the floor to the plastic on the walls.
3. Sealing any penetrations such as pipes or electrical conducts with tape.
4. Constructing a small change room (approximately 3 feet square) made of 6-mil-thick polyethylene plastic supported by 2-inch by 4-inch lumber (the plastic should be attached to the lumber supports with staples or spray adhesive and tape).

The change room should be contiguous to the minienclosure, and is necessary to allow the worker to vacuum off his protective coveralls and remove them before leaving the work area. While inside minienclosure, the worker should wear Tyvek [1] disposable coveralls and use the appropriate HEPA-filtered dual-cartridge or more protective respiratory protection.

The advantages of minienclosures are that they limit the spread of asbestos contamination, reduce the potential exposure of bystanders and other workers who may be working in adjacent areas, and are quick and easy to install. The disadvantage of minienclosures is that they may be too small to contain the equipment necessary to create a negative pressure within the enclosure; however the double layer of plastic sheeting will serve to restrict the release of asbestos fibers to the area outside the enclosure.

*Removal of entire structures.* When pipes are insulated with asbestos-containing materials, removal of the entire pipe may be more protective, easier, and more cost-effective than stripping the asbestos insulation from the pipe. Before such a pipe is cut, the asbestos-containing insulation must be wrapped with 6-mil polyethylene plastic

and securely sealed with duct tape or equivalent. This plastic covering will prevent asbestos fibers from becoming airborne as a result of the vibration created by the power saws used to cut the pipe. If possible, the pipes should be cut at locations that are not insulated to avoid disturbing the asbestos. If a pipe is completely insulated with asbestos-containing materials, small sections should be stripped using the glove-bag method described above before the pipe is cut at the stripped sections.

*Enclosure.* The decision to enclose rather than remove asbestos-containing material from an area depends on the building owner's preference, i.e., for removal or containment. Owners consider such factors as cost effectiveness, the physical configuration of the work area, and the amount of traffic in the area when determining which abatement method to use.

If the owner chooses to enclose the structure rather than to remove the asbestos-containing material insulating it, a solid structure (airtight walls and ceilings) must be built around the asbestos covered pipe or structure to prevent the release of asbestos-containing materials into the area beyond the enclosure and to prevent disturbing these materials by casual contact during future maintenance operations.

Such a permanent (i.e., for the life of the building) enclosure should be built of new construction materials and should be impact resistant and airtight. Enclosure walls should be made of tongue-and-groove boards, boards with spine joints, or gypsum boards having taped seams. The underlying structure must be able to support the weight of the enclosure. (Suspended ceilings with laid-in panels do not provide airtight enclosures and should not be used to enclose structures covered with asbestos-containing materials.) All joints between the walls and ceiling of the enclosure should be caulked to prevent the escape of asbestos fibers. During the installation of enclosures, tools that are used (such as drills or rivet tools) should be equipped with HEPA-filtered vacuums. Before constructing the enclosure, all electrical conduits, telephone lines, recessed lights, and pipes in the area to be enclosed should be moved to ensure that the enclosure will not have to be re-opened later for routine or emergency maintenance. If such lights or other equipment cannot be moved to a new location for logistic reasons, or if moving them will disturb the asbestos-containing materials, removal rather than enclosure of the asbestos-

containing materials is the appropriate control method to use.

*Maintenance program.* An asbestos maintenance program must be initiated in all facilities that have friable asbestos-containing materials. Such a program should include:

1. Development of an inventory of all asbestos-containing materials in the facility.

2. Periodic examination of all asbestos-containing materials to detect deterioration.

3. Written procedures for handling asbestos materials during the performance of small-scale, short-duration maintenance and renovation activities.

4. Written procedures for asbestos disposal.

5. Written procedures for dealing with asbestos-related emergencies.

Members of the building's maintenance engineering staff (electricians, heating/air conditioning engineers, plumbers, etc.) who may be required to handle asbestos-containing materials should be trained in safe procedures. Such training should include at a minimum:

1. Information regarding types of ACM and its various uses and forms.

2. Information on the health effects associated with asbestos exposure.

3. Descriptions of the proper methods of handling asbestos-containing materials.

4. Information on the use of HEPA-equipped dual-cartridge respirators and other personal protection during maintenance activities.

*Prohibited activities.* The training program for the maintenance engineering staff should describe methods of handling asbestos-containing materials as well as routine maintenance activities that are prohibited when asbestos-containing materials are involved. For example, maintenance staff employees should be instructed:

1. *Not* to drill holes in asbestos-containing materials.

2. *Not* to hang plants or pictures on structures covered with asbestos-containing materials.

3. *Not* to sand asbestos-containing floor tile.

4. *Not* to damage asbestos-containing materials while moving furniture or other objects.

5. *Not* to install curtains, drapes, or dividers in such a way that they damage asbestos-containing materials.

6. *Not* to dust floors, ceilings, moldings or other surfaces in asbestos-contaminated environments with a dry brush or sweep with a dry broom.

7. *Not* to use an ordinary vacuum to clean up asbestos-containing debris.

8. *Not* to remove ceiling tiles below asbestos-containing materials without wearing the proper respiratory protection, clearing the area of other people, and observing asbestos removal waste disposal procedures.

9. *Not* to remove ventilation system filters dry.

10. *Not* to shake ventilation system filters.

### Appendix D to Subpart E—Transport and Disposal of Asbestos Waste

For the purposes of this appendix, transport is defined as all activities from receipt of the containerized asbestos waste at the generation site until it has been unloaded at the disposal site. Current EPA regulations state that there must be no visible emissions to the outside air during waste transport. However, recognizing the potential hazards and subsequent liabilities associated with exposure, the following additional precautions are recommended.

*Recordkeeping.* Before accepting wastes, a transporter should determine if the waste is properly wetted and containerized. The transporter should then require a chain-of-custody form signed by the generator. A chain-of-custody form may include the name and address of the generator, the name and address of the pickup site, the estimated quantity of asbestos waste, types of containers used, and the destination of the waste. The chain-of-custody form should then be signed over to a disposal site operator to transfer responsibility for the asbestos waste. A copy of the form signed by the disposal site operator should be maintained by the transporter as evidence of receipt at the disposal site.

*Waste handling.* A transporter should ensure that the asbestos waste is properly contained in leak-tight containers with appropriate labels, and that the outside surfaces of the containers are not contaminated with asbestos debris adhering to the containers. If there is reason to believe that the condition of the asbestos waste may allow significant fiber release, the transporter should not accept the waste. Improper containerization of wastes is a violation of the NESHAPs regulation and should be reported to the appropriate EPA Regional Asbestos NESHAPs contact below:

#### Region I

Asbestos NESHAPs Contact, Air Management Division, USEPA, Region I, JFK Federal Building, Boston, MA 02203, (617) 223-3266.

#### Region II

Asbestos NESHAPs Contact, Air & Waste Management Division, USEPA, Region II, 26 Federal Plaza, New York, NY 10007, (212) 264-6770.

#### Region III

Asbestos NESHAPs Contact, Air Management Division, USEPA, Region III, 841 Chestnut Street, Philadelphia, PA 19107, (215) 597-9325.

#### Region IV

Asbestos NESHAPs Contact, Air, Pesticide & Toxic Management, USEPA, Region IV, 345 Courtland Street, NE., Atlanta, GA 30365, (404) 347-4298.

#### Region V

Asbestos NESHAPs Contact, Air Management Division, USEPA, Region V, 230 S. Dearborn Street, Chicago, IL 60604, (312) 353-6793.

#### Region VI

Asbestos NESHAPs Contact, Air & Waste Management Division, USEPA, Region VI, 1445 Ross Avenue, Dallas, TX 75202, (214) 655-7229.

#### Region VII

Asbestos NESHAPs Contact, Air & Waste Management Division, USEPA, Region VII, 726 Minnesota Avenue, Kansas City, KS 66101, (913) 236-2896.

#### Region VIII

Asbestos NESHAPs Contact, Air & Waste Management Division, USEPA, Region VIII, 999 18th Street, Suite 500, Denver, CO 80202, (303) 293-1814.

#### Region IX

Asbestos NESHAPs Contact, Air Management Division, USEPA, Region IX, 215 Fremont Street, San Francisco, CA 94105, (415) 974-7633.

#### Region X

Asbestos NESHAPs Contact, Air & Toxics Management Division, USEPA, Region X, 1200 Sixth Avenue, Seattle, WA 98101, (206) 442-2724.

Once the transporter is satisfied with the condition of the asbestos waste and agrees to handle it, the containers should be loaded into the transport vehicle in a careful manner to prevent breaking of the containers. Similarly, at the disposal site, the asbestos waste containers should be transferred carefully to avoid fiber release.

*Waste transport.* Although there are no regulatory specifications regarding the transport vehicle, it is recommended that vehicles used for transport of containerized asbestos waste have an enclosed carrying compartment or

utilize a canvas covering sufficient to contain the transported waste, prevent damage to containers, and prevent fiber release. Transport of large quantities of asbestos waste is commonly conducted in a 20-cubic-yard "roll off" box, which should also be covered. Vehicles that use compactors to reduce waste volume should not be used because these will cause the waste containers to rupture. Vacuum trucks used to transport waste slurry must be inspected to ensure that water is not leaking from the truck.

Disposal involves the isolation of asbestos waste material in order to prevent fiber release to air or water. Landfilling is recommended as an environmentally sound isolation method because asbestos fibers are virtually immobile in soil. Other disposal techniques such as incineration or chemical treatment are not feasible due to the unique properties of asbestos. EPA has established asbestos disposal requirements for active and inactive disposal sites under NESHAPs (40 CFR Part 61, Subpart M) and specifies general requirements for solid waste disposal under RCRA (40 CFR Part 257). Advance EPA notification of the intended disposal site is required by NESHAPs.

*Selecting a disposal facility.* An acceptable disposal facility for asbestos wastes must adhere to EPA's requirements of no visible emissions to the air during disposal, or minimizing emissions by covering the waste within 24 hours. The minimum required cover is 6 inches of nonasbestos material, normally soil, or a dust-suppressing chemical. In addition to these federal requirements, many state or local government agencies require more stringent handling procedures. These agencies usually supply a list of "approved" or licensed asbestos disposal sites upon request. Solid waste control agencies are listed in local telephone directories under state, county, or city headings. A list of state solid waste agencies may be obtained by calling the RCRA hotline: 1–800–424–9346 (382–3000 in Washington, DC). Some landfill owners or operators place special requirements on asbestos waste, such as placing all bagged waste into 55-gallon metal drums. Therefore, asbestos removal contractors should contact the intended landfill before arriving with the waste.

*Receiving asbestos waste.* A landfill approved for receipt of asbestos waste should require notification by the waste hauler that the load contains asbestos. The landfill operator should inspect the loads to verify that asbestos waste is

properly contained in leak-tight containers and labeled appropriately. The appropriate EPA Regional Asbestos NESHAPs Contact should be notified if the landfill operator believes that the asbestos waste is in a condition that may cause significant fiber release during disposal. In situations when the wastes are not properly containerized, the landfill operator should thoroughly soak the asbestos with a water spray prior to unloading, rinse out the truck, and immediately cover the wastes with nonasbestos material prior to compacting the waste in the landfill.

*Waste deposition and covering.* Recognizing the health dangers associated with asbestos exposure, the following procedures are recommended to augment current federal requirements:

• Designate a separate area for asbestos waste disposal. Provide a record for future landowners that asbestos waste has been buried there and that it would be hazardous to attempt to excavate that area. (Future regulations may require property deeds to identify the location of any asbestos wastes and warn against excavation.)

• Prepare a separate trench to receive asbestos wastes. The size of the trench will depend upon the quantity and frequency of asbestos waste delivered to the disposal site. The trenching technique allows application of soil cover without disturbing the asbestos waste containers. The trench should be ramped to allow the transport vehicle to back into it, and the trench should be as narrow as possible to reduce the amount of cover required. If possible, the trench should be aligned perpendicular to prevailing winds.

• Place the asbestos waste containers into the trench carefully to avoid breaking them. Be particularly careful with plastic bags because when they break under pressure asbestos particles can be emitted.

• Completely cover the containerized waste within 24 hours with a minimum of 6 inches of nonasbestos material. Improperly containerized waste is a violation of the NESHAPs and EPA should be notified.

However, if improperly containerized waste is received at the disposal site, it should be covered immediately after unloading. Only after the wastes, including properly containerized wastes, are completely covered, can the wastes be compacted or other heavy equipment run over it. During compacting, avoid exposing wastes to the air or tracking asbestos material away from the trench.

• For final closure of an area containing asbestos waste, cover with at

least an additional 30 inches of compacted nonasbestos material to provide a 36-inch final cover. To control erosion of the final cover, it should be properly graded and vegetated. In areas of the United States where excessive soil erosion may occur or the frost line exceeds 3 feet, additional final cover is recommended. In desert areas where vegetation would be difficult to maintain, 3–6 inches of well graded crushed rock is recommended for placement on top of the final cover.

*Controlling public access.* Under the current NESHAPs regulation, EPA does not require that a landfill used for asbestos disposal use warning signs or fencing if it meets the requirement to cover asbestos wastes. However, under RCRA, EPA requires that access be controlled to prevent exposure of the public to potential health and safety hazards at the disposal site. Therefore, for liability protection of operators of landfills that handle asbestos, fencing and warning signs are recommended to control public access when natural barriers do not exist. Access to a landfill should be limited to one or two entrances with gates that can be locked when left unattended. Fencing should be installed around the perimeter of the disposal site in a manner adequate to deter access by the general public. Chain-link fencing, 6-ft high and topped with a barbed wire guard, should be used. More specific fencing requirements may be specified by local regulations. Warning signs should be displayed at all entrances and at intervals of 330 feet or less along the property line of the landfill or perimeter of the sections where asbestos waste is deposited. The sign should read as follows:

## ASBESTOS WASTE DISPOSAL SITE

### BREATHING ASBESTOS DUST MAY CAUSE LUNG DISEASE AND CANCER

*Recordkeeping.* For protection from liability, and considering possible future requirements for notification on disposal site deeds, a landfill owner should maintain documentation of the specific location and quantity of the buried asbestos wastes. In addition, the estimated depth of the waste below the surface should be recorded whenever a landfill section is closed. As mentioned previously, such information should be recorded in the land deed or other record along with a notice warning against excavation of the area.

[FR Doc. 87–24938 Filed 10–29–87; 8:45 am]

BILLING CODE 6560-50-M

**ENVIRONMENTAL PROTECTION AGENCY**

[OPTS-62055; FRL-3269-8]

**Asbestos-Containing Materials in Schools; EPA Approved Courses Under the Asbestos Hazard Emergency Response Act (AHERA)**

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Notice.

**SUMMARY:** In section 206(c)(3) of Title II, the Administrator, in consultation with affected organizations, was directed to publish (and revise as necessary) a list of asbestos courses and tests in effect before the date of enactment of this title which qualify for equivalency treatment for interim accreditation purposes and a list of asbestos courses and tests which the Administrator determines are consistent with the Model Plan and which will qualify a contractor for accreditation. This **Federal Register** notice includes the initial list of course approvals. In addition, the list includes State accreditation programs that EPA has approved as meeting the requirements of the Model Plan.

**FOR FURTHER INFORMATION CONTACT:** Edward A. Klein, Director, TSCA Assistance Office (TS–799), Office of Toxic Substances, Environmental Protection Agency, Rm. E–543, 401 M St., SW., Washington, DC 20460, Telephone: (202) 554–1404.

**SUPPLEMENTARY INFORMATION:** Section 206 of Title II of the Toxic Substances Control Act (TSCA), 15 U.S.C. 2646, required EPA to develop by April 20, 1987 a Model Contractor Accreditation Plan. The Plan was issued on April 20, and was published in the **Federal Register** of April 30, 1987, as Appendix C to Subpart E, 40 CFR Part 763.

To conduct asbestos-related work in schools, persons must receive accreditation in order to inspect school buildings for asbestos, develop management plans, and design or conduct response actions. Such persons can be accredited by States, which are required to adopt contractor accreditation plans at least as stringent as the EPA Model Plan, or by completing an EPA-approved training course and passing an examination for such course. The EPA Model Contractor Accreditation Plan establishes those areas of knowledge of asbestos inspection, management plan development, and response action technology that persons seeking accreditation must demonstrate and States must include in their accreditation programs.

Elsewhere in this issue of the Federal Register EPA is promulgating a final "Asbestos-Containing Materials In Schools" rule (40 CFR Part 763, Subpart E) which requires all local education agencies (LEAs) to identify asbestos-containing materials (ACM) in their school buildings and take appropriate actions to control the release of asbestos fibers. The LEAs are also required to describe their activities in management plans, which must be made available to the public and submitted to State governors. Under Title II, LEAs are required to use specially-trained persons to conduct inspections for asbestos, develop the management plans, and design or conduct major actions to control asbestos.

The length of initial training courses for accreditation under the Model Plan varies by discipline. Briefly, inspectors must take a 3-day training course; management planners must take the inspection course plus an additional 2 days devoted to management planning; and abatement project designers are required to have at least 3 days of training. In addition, asbestos abatement contractors and supervisors must take a 4-day training course and asbestos abatement workers are required to take a 3-day training course. For all disciplines, persons seeking accreditation must also pass an examination and participate in annual re-training courses. A complete description of accreditation requirements can be found in the Model Accreditation Plan at 40 CFR Part 763, Subpart E, Appendix C.I.1.A. through E.

In section 206(c)(3) of Title II, the Administrator, in consultation with affected organizations, was directed to publish (and revise as necessary) a list of asbestos courses and tests in effect before the date of enactment of this title which qualify for equivalency treatment for interim accreditation purposes and a list of asbestos courses and tests which the Administrator determines are consistent with the Model Plan and which will qualify a contractor for accreditation. This **Federal Register** notice includes the initial list of course approvals. In addition, the list includes State accreditation programs that EPA has approved as meeting the requirements of the Model Plan.

Three types of EPA approvals are included in this **Federal Register** notice. Unit I discusses EPA approval of State accreditation programs. Unit II covers EPA approval of training courses. Unit III discusses EPA aporoval of training courses for interim accreditation. Lastly, Unit IV provides the list of State accreditation programs and training courses approved by EPA as of October

1987. Subsequent **Federal Register** notices will add other State programs and training courses to this initial list.

**I. EPA Approval of State Accreditation Programs**

As discussed in the Model Plan, EPA will approve State accreditation programs that the Agency determines are at least as stringent as the Model Plan. In addition, the Agency is able to approve individual disciplines within a State's accreditation program. For example, a State that currently only has an accreditation requirement for inspectors can receive EPA approval for that discipline immediately rather than waiting to develop accreditation requirements for all disciplines in the Model Plan before seeking EPA approval.

As listed in Unit IV, New Jersey has received EPA approval for two accreditation disciplines. Any training courses in these two disciplines approved by New Jersey are EPA-approved courses for purposes of accreditation. These training courses are EPA-approved courses for purposes of TSCA Title II in New Jersey and in all States without an EPA-approved accreditation program for that discipline. For a current list of courses approved by New Jersey, interested parties should contact the State agency listed under Unit IV. EPA plans to include the training courses approved by New Jersey in the next **Federal Register** notice listing EPA-approved courses.

The State of Kansas currently has a training program for asbestos abatement contractors and supervisors that does not meet all of the Model Plan's requirements for this discipline. However, the Kansas program's training course requirements do meet the requirements for EPA approval of training courses for interim accreditation (see Unit III). As a result, persons who have met the training and exam requirements of the Kansas abatement contractor and supervisor program are accredited as listed under Unit IV on an interim basis. The Kansas contractor and supervisor accreditation program still must be upgraded within the time period specified in TSCA Title II to be at least as stringent as the Model Plan.

**II. EPA Approval of Training Courses**

Training courses approved by EPA are listed under Unit IV. The examinations for these approved courses under Unit IV have also been approved by EPA. EPA has three categories of course approval: full, contingent, and approved for interim accreditation. Courses

approved for interim accreditation will be discussed in Unit III.

Full approval means EPA has reviewed and found acceptable the course's written submission seeking EPA approval and has conducted an on-site audit and determined that the training course meets or exceeds the Model Plan's training requirements for the relevant discipline.

Contingent approval means the Agency has reviewed the course's written submission seeking EPA approval and found the materials to be acceptable (i.e. the written course materials meet the Model Plan's training course requirements). However, EPA has not yet conducted an on-site audit.

Successful completion of either a fully approved course or a contingently approved course provides full accreditation for course attendees. If EPA subsequently audits a contingently approved course and withdraws approval due to deficiencies discovered during the audit, future course offerings would no longer have EPA approval. However, withdrawal of EPA approval would not effect the accreditation of persons who took previously offered training courses including the course audited by EPA.

EPA-approved training courses listed under Unit IV are approved on a national basis. EPA has organized Unit IV by EPA Region to assist the public in locating those training courses that are offered nearby.

EPA-approved State accreditation programs have the authority to have more stringent accreditation requirements than the Model Plan. As a result, some EPA-approved training courses listed under Unit IV may not meet the requirements of a particular State's accreditation program. Sponsors of training courses and persons who have received accreditation or are seeking accreditation should contact individual States to check on accreditation requirements.

A number of training courses offered by several universities before EPA issued the Model Plan equaled or exceeded the subsequently issued Model Plan's training course requirements. These courses are listed under Unit IV as being fully approved. It should be noted that persons who successfully completed these courses are fully accredited; they are not limited only to being interimly accredited.

**III. EPA Approval of Training Courses for Interim Accreditation**

TSCA Title II enables EPA to permit persons to be accredited on an interim basis if they have attended previous EPA-approved asbestos training and

have passed (or pass) an asbestos exam. As a result, the Agency is approving training courses offered previously for purposes of accrediting persons on an interim basis. Only those persons who have taken training courses since January 1, 1985 will be considered under these interim accreditation provisions. In addition, EPA will not grant interim accreditation to any person who takes an equivalent training course after the date the asbestos-in-schools rule takes effect. This accreditation is interim since the person shall be considered accredited for only 1 year after the date on which the State where the person is employed establishes an accreditation program at least as stringent as the EPA Model Plan. If the State does not adopt an accreditation program within the time period required by Title II, persons with interim accreditation must become fully accredited within 1 year after the date the State was required to have established a program.

For purposes of the Model Plan, an equivalent training course is one that is essentially similar in length and content to the curriculum found in the Model Plan. In addition, an equivalent examination must be essentially similar to the examination requirements found in the Model Plan.

Persons who have taken equivalent courses in their discipline for purposes of interim accreditation, and can produce evidence that they have successfully completed the course by passing an examination, are accredited on an interim basis under TSCA Title II. Evidence of successful completion of a course would include a certificate or photo identification card that showed the person completed the training course on a certain date and passed the examination.

For persons who took one of the EPA-approved courses for interim accreditation listed under Unit IV, but did not take the course's examination, these persons may become interimly accredited by passing an examination at an EPA-funded training center. These EPA funded training centers are listed under Unit IV. Before taking the exam, persons must provide evidence to the EPA-funded center that they previously had taken one of the training courses listed under Unit IV that is approved by EPA for interim accreditation.

Courses approved by EPA as of October 17 for interim accreditation are listed under Unit IV. Examinations offered by these courses also are approved for purposes of interim accreditation. EPA expects to approve additional courses for interim accreditation purposes, and will list these courses in subsequent **Federal**

**Register** notices. Training course vendors that believe their courses offered since January 1, 1985 are suitable sources for interim accreditation should contact their EPA Regional asbestos coordinator (See addresses in Unit IV).

**IV. List of EPA-Approved State Accreditation Programs and Training Courses**

Below is the first listing of EPA-approved State accreditation programs and training courses. As discussed above, periodic notifications of EPA approval of State accreditations programs and EPA approval of training courses will be published in subsequent **Federal Register** notices. The closing date for the acceptance of submissions to EPA for inclusion in this first notice was early October. Omission from this list does not imply disapproval by EPA, nor does the order of the courses reflect priority or quality. The format of the notification lists first the State accreditation programs approved by EPA, followed by EPA-approved training courses listed by Region. The name, address, phone number, and contact person is provided for each training provider followed by the courses and type of course approval (i.e. full, contingent, or for interim purposes). Unless otherwise specified by an alternative date, interim approvals are issued from January 1, 1985.

All five of the EPA-funded asbestos information centers and the three EPA-funded satellite training centers will use the EPA model inspector and management planner course recently developed with EPA funds. As a result, EPA anticipates that all of the EPA-funded training facilities will receive approvals for inspection and management planning courses offered beginning in October. Currently, the EPA-funded centers at the Georgia Institute of Technology and the University of Illinois at Chicago have inspection and management planning courses that EPA has fully approved. The five centers are: The Georgia Institute of Technology in Atlanta, Georgia; the University of Kansas in Overland Park, Kansas; Tufts University in Medford, Massachusetts; the University of Illinois at Chicago, and the University of California, Berkeley. The three satellite centers are: The University of Texas at Arlington; the Robert Wood Johnson Medical School in Piscataway, New Jersey, and Temple University in Philadelphia, Pennsylvania. The University of Texas at Arlington has received contingent

approval of its inspector and management planner course.

The recently developed EPA-funded model course for inspectors and management planners, and an earlier course developed with EPA funding for asbestos abatement contractors and supervisors are available for interested parties that plan to offer training courses. Interested parties should contact the following firm to receive copies of the training courses: Sterling Federal Systems, Incorporated, Suite 600, 6011 Executive Blvd., Rockville, MD 20852.

A fee for each course will be charged to cover the reproduction costs for the written and visual aid materials.

The following is the initial list of EPA-approved State accreditation programs and training courses:

*Approved State Accreditation Programs*

(1)(a) *State: Kansas*— State Agency: Kansas Department of Health and Environment, Forbes Field, Topeka, KS 66620. Attn: John C. Irwin (913) 296–1500.

(b) *Approved Accreditation Program Discipline*—Contractor/Supervisor (training and exam requirements (approved for interim accreditation).

Abatement worker [1] approved for interim accreditation.

Effective date of regulation: 1/6/1986.

(2)(a) *State: New Jersey*—State Agency: New Jersey Department of Health, CN 360, Trenton, New Jersey 08625–0360. Attn: James Brownlee (609) 984–2193.

(b) *Approved Accreditation Program Discipline*—Contractor/Supervisor. Abatement worker. Effective date of regulation: June 18, 1985.

*EPA-Approved Training Courses*

Region I—Boston, MA

*Regional asbestos coordinator.* Alison Roberts, EPA, Region I, Air and Management Division (APT–231), JFK Federal Building, Boston, MA 02203. (617) 565–3273 (FTS) 835–3275.

*List of approved courses.* The following training courses have been approved by EPA. The courses are listed under (b) This approval is subject to the level of certification indicated after the course name. Courses are listed in alphabetical order and do not reflect a prioritization. Approvals for Region I training courses and contact points for each, are as follows:

(1)(a) *Training provider.* Abatement Technology Corp., One Boston Place, Suite 1025, Boston, MA 02108. Attn: Scott Keyes (617) 723–3100.

[1] Applies only to workers who have taken the Kansas' Contractor/Supervisor course and passed the State's worker exam.

(b) *Approved courses.* Contractor/Supervisor (contingent).

(2)(a) *Training provider.* Con-Test, P.O. Box 591, East Longmeadow, MA 01028. Attn: Brenda Bolduc (413) 525–1198.

(b) *Approved courses.* Contractor/Supervisor (contingent). Abatement Worker (contingent). Inspector/Management Planner (contingent). Refresher course (for each of the above disciplines) (contingent).

(3)(a) *Training provider.* Hygientics, Inc., 150 Causeway St., Boston, MA 02114. Attn: John W. Cowdery (617) 723–4664.

(b) *Approved courses.* Inspector (contingent).

(4)(a) *Training provider.* Institute for Environmental Education, 208 West Cummings Park, Woburn, MA 01801. Attn: Janet Oppenheim-McMullen (617) 935–7370.

(b) *Approved courses.* Contractor/Supervisor (full from 9/18/87). Inspector/Management planner (contingent).

(5)(a) *Training provider.* Maine Labor Group on Health Inc., P.O. Box 5, Augusta, Maine 04330. Attn: Dianna White (207) 289–2770.

(b) *Approved courses.* Contractor/Supervisor (contingent). Abatement Worker (contingent).

(6)(a) *Training provider.* New England Laborers' Training Trust Fund, 37 East Street, Hopkinton, MA 01748. Attn: Jim Merloni, Jr. (617) 435–6316.

(b) *Approved courses.* Abatement Workers (contingent).

(7)(a) *Training provider.* Tufts University, 474 Boston Ave., Medford, MA 02155. Attn: Brenda Cole (617) 381–3531.

(b) *Approved courses.* Contractor/Supervisor Course (Interim from 9/85–5/31/87). Contractor/Supervisor Course (Full from 6/22/87).

Region II—Edison, NJ

*Regional asbestos coordinator.* Arnold Freiberger, EPA, Region II, Woodbridge Ave., Raritan Depot, Bldg. 10, Edison, NJ 08837. (201) 321–6668, (FTS) 340–6671.

*List of approved courses.* The following training courses have been approved by EPA. The courses are listed under (b). This approval is subject to the level of certification indicated after the course name. Courses are listed in alphabetical order and do not reflect a prioritization. Approvals for Region II training courses and contact points for each, are as follows:

(1)(a) *Training provider.* UMDNJ Robert Wood Johnson Medical School, 675 Hoes Lane, Piscataway, NJ 08854–5635. Attn: Lee Laustsen (201) 463–4500.

(b) *Approved courses.* Abatement Worker (full from beginning). Contractor/Supervisor (full from beginning).

Region III—Philadelphia, PA

*Regional asbestos coordinator.* Pauline Levin, EPA, Region III (3HW–40), 841 Chestnut Bldg., Philadelphia, PA 19107. (215) 597–9859, (FTS) 597–9859.

*List of approved courses.* The following training courses have been approved by EPA. The courses are listed under (b). This approval is subject to the level of certification indicated after the course name. Courses are listed in alphabetical order and do not reflect a prioritization. Approvals for Region III training courses and contact points for each, are as follows:

(1)(a) *Training provider.* Alice Hamilton Center for Occupational Health, 410 7th Street SE., Second Floor, Washington, DC 20003. Attn: Brian Christopher (202) 543–0005.

(b) *Approved courses.* Abatement Workers (contingent).

(2)(a) *Training provider.* The Association of Wall and Ceiling Industries, 24 K Street, NE., Suite 300, Washington, DC 20002. Attn: Chris Hullinger (202) 783–2924.

(b) *Approved courses.* Abatement Worker (full 5/19/87). Contractor/Supervisor (full 5/19/87).

(3)(a) *Training provider.* Biospherics, Inc., 12051 Indian Creek Court, Beltsville, MD 20705. Attn: Marian F. Meiselman (301) 369–3900.

(b) *Approved courses.* Contractor/Supervisor (full from 10/1/87). Abatement worker (full from 10/1/87).

(4)(a) *Training provider.* Drexel University, Environmental Studies Institute, Building 29, 32nd and Chestnut Streets, #216, Philadelphia, PA 19104. Attn: Robert Ross (215) 895–2269.

(b) *Approved courses.* Contractor/Supervisor (full from beginning). Abatement Worker (full from beginning).

(5)(a) *Training provider.* South East Michigan Committee on Occupational Safety and Health (SEMCOSH), 1550 Howard Street, Detroit, MI 48216. Attn: Barbara Boylan (313) 961–3345.

(b) *Approved courses.* Abatement Worker (contingent).

(6)(a) *Training provider.* The National Training Fund for the Sheet Metal and Air Conditioning Industry (in conjunction with the Workers' Institute for Safety and Health), 1126 Sixteenth Street NW., Washington, DC 20036. Attn: Scott Schneider (202) 887–1980.

(b) *Approved courses.* Abatement Worker (contingent).

(7)(a) *Training provider.* Temple University, College of Engineering, 12th and Norris Streets, Philadelphia, PA 19122. Attn: Lester Levin (215) 787–6479.

(b) *Approved courses.* Contractor/Supervisor (full from beginning). Workers (full from beginning).

(8)(a) *Training provider.* Medical College of Virginia, Virginia Commonwealth University, Department of Preventive Medicine, P.O. Box 212, Richmond, VA 23298. Attn: Leonard Vance (804) 786–9785.

(b) *Approved courses.* Contractor/Supervisor (contingent).

(9)(a) *Training provider.* WACO, Inc., P.O. Box 836, 5450 Lewis Road, Sandston, VA 23150. Attn: William Belanich (804) 222–8440.

(b) *Approved courses.* Contractor/Supervisor (contingent). Abatement Workers (contingent).

### Region IV—Atlanta, GA

*Regional asbestos coordinator.* Jim Littell, EPA Region IV, 345 Courtland St. NE., Atlanta, GA 30365. (404) 347–3864, (FTS) 257–3864.

*List of approved courses.* The following training courses have been approved by EPA. The courses are listed under (b). This approval is subject to the level of certification indicated after the course name. Courses are listed in alphabetical order and do not reflect a prioritization. Approvals for Region IV training courses and contact points for each, are as follows:

(1)(a) *Training provider.* University of Florida, TREEO Center, 3900 SW 63rd Blvd., Gainesville, FL 32608. Attn: Sandra Scaggs (904) 392–9570.

(b) *Approved courses.* Contractor/Supervisor (full from 5/87).

(2)(a) *Training provider.* Georgia Tech Research Institute, Environmental Health and Safety Division, Room 029, O'Keefe Building, Atlanta, GA 30332. Attn: William Ewing (404) 894–3806.

(b) *Approved courses.* Contractor/Supervisor (Interim from 6/85—5/10/87). Refresher Course for Contractor/Supervisor (contingent). Inspector/Management Planner (full from 10/87).

(3)(a) *Training provider.* National Asbestos Council, Training Department, 2786 North Decatur Road, Decatur, GA 30033. Attn: Eva Clay (404) 292–0629.

(b) *Approved courses.* Abatement Workers (2 day) (interim from beginning). Abatement Workers (3 day) (full from 7/87).

### Region V—Chicago, IL

*Regional asbestos coordinator.* Anthony Restaino, EPA Region V, 536 S.

Clark St., Chicago, IL 60604. (312) 886–6879, (FTS) 886–6879.

*List of approved courses.* The following training courses have been approved by EPA. The courses are listed under (b). This approval is subject to the level of certification indicated after the course name. Courses are listed in alphabetical order and do not reflect a prioritization. Approvals for Region V training courses and contact points for each, are as follows:

(1)(a) *Training provider.* AHP Research, Inc., 1501 Johnsons Ferry Rd., Suite 230, P.O. Box 71926, Marietta, GA 30007. Attn: Dwight Brown (404) 565–0061.

(b) *Approved courses.* Inspector/Management Planner (interim from beginning).

(2)(a) *Training provider.* BDN Industrial Hygiene Consultants, 8105 Valleywood Lane, Portage, MI 49002. Attn: Keith Nichols (616) 329–1237.

(b) *Approved courses.* Contractor/Supervisor (contingent).

(3)(a) *Training provider.* DeLisle Consulting and Laboratories, Inc., 2401 East Milham Ave., Kalamazoo, MI 49002. Attn: Mark DeLisle (616) 343–9698.

(b) *Approved courses.* Contractor/Supervisor (contingent).

(4)(a) *Training provider.* Heat & Frost Insulators Local 17, Apprentice Training Center, 3850 South Racine Ave., Chicago, IL 60609. Attn: John P. Shine (312) 247–1007

(b) *Approved courses.* Abatement Workers (contingent).

(5)(a) *Training provider.* I.P.C. Chicago, 4309 West Henderson, Chicago, IL 60641. Attn: Robert G. Cooley (312) 975–3495.

(b) *Approved courses.* Abatement Workers (contingent).

(6)(a) *Training provider.* University of Illinois at Chicago, Midwest Asbestos Information Center, 2035 Taylor, School of Public Health, Chicago, IL 60612. Attn: Tony Billotti (312) 996–5762.

(b) *Approved courses.* Contractor/Supervisor (full from beginning). Inspector/Management Planner (full). Abatement Worker (2 day) (interim from beginning to 10/1/87). Abatement Worker (3 day) (contingent).

### Region VI—Dallas, TX

*Regional asbestos coordinator.* John West, 6t-Pt, EPA, Region VI, 1445 Ross Avenue, Dallas, TX 75202–2733. (214) 655–7244, (FTS) 255–7235.

*List of approved courses.* The following training courses have been approved by EPA. The courses are listed under (b). This approval is subject to the level of certification indicated after the course name. Courses are listed in alphabetical order and do not reflect a

prioritization. Approvals for Region VI training courses and contact points for each, are as follows:

(1)(a) *Training provider.* GEBCO Associates, Inc., 805–A, Elizabeth Drive, Bedford, TX 76022. Attn: Ed Kirch (817) 268–4006.

(b) *Approved courses.* Asbestos Workers (full from 8/20/87). Asbestos Workers (interim prior to 8/19/87).

(2)(a) *Training provider.* The International Association of Heat and Frost Insulators and Asbestos Workers Union, Local 22, 3219 Pasadena Blvd., Pasadena, TX 77503. Attn: Owen Tilley (713) 473–0888.

(b) *Approved courses.* Asbestos Worker (3 day course) (contingent). Asbestos Worker (2 day course) (interim prior to 10/87). Worker refresher course (contingent).

(3)(a) *Training provider.* Louisiana State University and Agricultural and Mechanical College, Baton Rouge, LA 70803–1520. Attn: George Smith (504) 388–6621.

(b) *Approved courses.* Contractor/Supervisor (contingent).

(4)(a) *Training provider.* The Texas A&M University System, The Texas Engineering Extension Service, Building Codes Inspection Training Division, College Station, TX 77843–8000. Attn: Charles Flanders (409) 845–6682.

(b) *Approved courses.* Contractor/Supervisor (full from 9/14/87). Contractor/Supervisor (interim prior to 9/14/87). Abatement Worker (contingent). Inspector/Management Planner (contingent).

(5)(a) *Training provider.* The University of Texas at Arlington Satellite Center, Bureau of Engineering Research, P.O. Box 19020, Arlington, TX 76019. Attn: Ernest Crosby (817) 273–2557.

(b) *Approved courses.* Contractor/Supervisor (full from beginning). Inspector/Management Planner (contingent).

(6)(a) *Training provider.* Tulane University, School of Public Health and Tropical Medicine, Department of Environmental Health Sciences, 1430 Tulane Avenue, New Orleans, LA 70112. Attn: Shau-Wong Chang (504) 588–5374.

(b) *Approved courses.* Contractor/Supervisor (full from 9/15/87). Contractor/Supervisor (interim prior 9/14/87).

### Region VII—Kansas City, KS

*Regional asbestos coordinator.* Wolfgang Brandner, EPA Region VII, 726 Minnesota Ave., Kansas City, KS 66101. (913) 236–2834, (FTS) 757–2834.

*List of approved courses.* The following training courses have been

approved by EPA. The courses are listed under (b). This approval is subject to the level of certification indicated after the course name. Courses are listed in alphabetical order and do not reflect a prioritization. Approvals for Region VII training courses and contact points for each, are as follows:

(1)(a) *Training provider.* Hall-Kimbrell Environmental Services, 4840 West 15th St., Lawrence, KS 66046. Attn: Alice Hart (913) 749-2381.

(b) *Approved courses.* Contractor/Supervisor (full from 8/17/87). Abatement Worker (full from 8/17/87). Project Designer (full from 8/17/87). Inspector/Management Planner (full from 8/17/87).

(2)(a) *Training provider.* Mahew Environmental Training Assoc., Inc. (META), P.O. Box 1961, Lawrence, KS 66044. Attn: Brad Mayhew (913) 842-6382.

(b) *Approved courses.* Contractor/Supervisor (contingent). Abatement Worker (contingent).

(3)(a) *Training provider.* The University of Kansas National Asbestos Training Center, 6600 College Blvd., Suite 315, Overland Park, KS 66211. Attn: Lani Himegarner (913) 491-0181.

(b) *Approved courses.* Contractor/Supervisor (contingent). Contractor/Supervisor (interim from 6/85-9/9/87). Abatement Worker (contingent).

## Region VIII—Denver, CO

*Regional asbestos coordinator.* David Combs, [8AT-TS], EPA, Region VIII, 1 Denver Place, 999-18th St., Suite 1300, Denver, CO 80202-2413. (303) 564-1730, (FTS) 564-1742.

*List of approved courses.* The following training courses have been approved by EPA. The courses are listed under (b). This approval is subject to the level of certification indicated after the course name. Courses are listed in alphabetical order and do not reflect a prioritization. Approvals for Region VIII training courses and contact points for each, are as follows:

(1)(a) *Training provider.* Northern Engineering and Testing, Inc. 600 South 25th Street, P.O. Box 30615, Billings, MT 59107. Attn: Kathleen Smit (406) 248-9161.

(b) *Approved courses.* Asbestos worker (contingent).

(2)(a) *Training provider.* Rocky Mountain Center for Occupational and Environmental Health, Building 512, University of Utah, Salt Lake City, UT 84112. Attn: Jeffery Lee (801) 581-5710.

(b) *Approved courses.* Contractor/Supervisor (contingent).

## Region IX—San Francisco, CA

*Regional asbestos coordinator.* Joanne Semones, [T-52], EPA, Region IX, 215 Fremont St., San Francisco, CA 94105. (415) 974-7290, (FTS) 454-7290.

*List of approved courses.* The following training courses have been approved by EPA. The courses are listed under (b). This approval is subject to the level of certification indicated after the course name. Courses are listed in alphabetical order and do not reflect a prioritization. Approvals for Region IX training courses and contact points for each, are as follows:

(1)(a) *Training provider.* Environmental Sciences, 375 S. Meyer, Tucson, AZ 85701. Attn: Dale Keyes (602) 577-1764.

(b) *Approved courses.* Inspector/Management Planner (full).

(2)(a) *Training provider.* University of California at Berkeley Pacific Asbestos Information Center, U.C. Extension, 2223 Fulton St., Berkeley, CA 94720. Attn: Debra Dobin (415) 643-7143.

(b) *Approved courses.* Contractor/Supervisor (full from beginning).

## Region X—Seattle, WA

*Regional asbestos coordinator.* Walter Jasper, EPA, Region X, 1200 Sixth Ave., Seattle, WA 98101. (206) 442-2870, (FTS) 399-2870.

*List of approved courses.* The following training courses have been approved by EPA. The courses are listed under (b). This approval is subject to the level of certification indicated after the course name. Courses are listed in alphabetical order and do not reflect a prioritization. Approvals for Region X training courses and contact points for each, are as follows:

No approvals for Region X.

Dated: October 17, 1987.

**Lee M. Thomas,**

*Administrator.*

[FR Doc. 87-24939 Filed 10-29-87; 8:45 am]
**BILLING CODE 6560-50-M**

# Exhibit 47

**Environmental Protection Agency**  §763.80

(c) Record all testing parameters and experimental conditions from the successful validation study into a standard operating procedure (SOP) for reference whenever the decontamination procedure is used. Include in the SOP the identity of the soaking solvent, the length of time of the soak, and the ratio of the soak solvent to contaminated surface area during the soaking process. Also include in the SOP the maximum concentration of PCBs in the spilled material and the identity of the spilled material, and/or the measured maximum surface concentration of the contaminated surface used in the validation study. Record and keep the results of the validation study as an appendix to the SOP. Include in this appendix, the solvent used to make the spiking solution, the PCB concentration of the spiking solution used to contaminate the surfaces in the validation study, and all of the validation study testing parameters and experimental conditions.

[63 FR 35473, June 29, 1998, as amended at 72 FR 57241, Oct. 9, 2007; 74 FR 30235, June 25, 2009]

## PART 763—ASBESTOS

### Subparts A–D [Reserved]

### Subpart E—Asbestos-Containing Materials in Schools

Sec.
763.80  Scope and purpose.
763.83  Definitions.
763.84  General local education agency responsibilities.
763.85  Inspection and reinspections.
763.86  Sampling.
763.87  Analysis.
763.88  Assessment.
763.90  Response actions.
763.91  Operations and maintenance.
763.92  Training and periodic surveillance.
763.93  Management plans.
763.94  Recordkeeping.
763.95  Warning labels.
763.97  Compliance and enforcement.
763.98  Waiver; delegation to State.
763.99  Exclusions.
APPENDIX A TO SUBPART E—INTERIM TRANSMISSION ELECTRON MICROSCOPY ANALYTICAL METHODS—MANDATORY AND NONMANDATORY—AND MANDATORY SECTION TO DETERMINE COMPLETION OF RESPONSE ACTIONS
APPENDIX B TO SUBPART E [Reserved]
APPENDIX C TO SUBPART E—ASBESTOS MODEL ACCREDITATION PLAN
APPENDIX D TO SUBPART E—TRANSPORT AND DISPOSAL OF ASBESTOS WASTE
APPENDIX E TO SUBPART E—INTERIM METHOD OF THE DETERMINATION OF ASBESTOS IN BULK INSULATION SAMPLES

### Subpart F [Reserved]

### Subpart G—Asbestos Worker Protection

763.120  What is the purpose of this subpart?
763.121  Does this subpart apply to me?
763.122  What does this subpart require me to do?
763.123  May a State implement its own asbestos worker protection plan?

### Subpart H [Reserved]

### Subpart I—Prohibition of the Manufacture, Importation, Processing, and Distribution in Commerce of Certain Asbestos-Containing Products; Labeling Requirements

763.160  Scope.
763.163  Definitions.
763.165  Manufacture and importation prohibitions.
763.167  Processing prohibitions.
763.169  Distribution in commerce prohibitions.
763.171  Labeling requirements.
763.173  Exemptions.
763.175  Enforcement.
763.176  Inspections.
763.178  Recordkeeping.
763.179  Confidential business information claims.

AUTHORITY: 15 U.S.C. 2605, 2607(c), 2643, and 2646.

## Subparts A–D [Reserved]

## Subpart E—Asbestos-Containing Materials in Schools

SOURCE: 52 FR 41846, Oct. 30, 1987, unless otherwise noted.

### §763.80  Scope and purpose.

(a) This rule requires local education agencies to identify friable and nonfriable asbestos-containing material (ACM) in public and private elementary and secondary schools by visually inspecting school buildings for such materials, sampling such materials if they are not assumed to be ACM, and having samples analyzed by appropriate techniques referred to in this rule. The rule requires local education

845

agencies to submit management plans to the Governor of their State by October 12, 1988, begin to implement the plans by July 9, 1989, and complete implementation of the plans in a timely fashion. In addition, local education agencies are required to use persons who have been accredited to conduct inspections, reinspections, develop management plans, or perform response actions. The rule also includes recordkeeping requirements. Local education agencies may contractually delegate their duties under this rule, but they remain responsible for the proper performance of those duties. Local education agencies are encouraged to consult with EPA Regional Asbestos Coordinators, or if applicable, a State's lead agency designated by the State Governor, for assistance in complying with this rule.

(b) Local education agencies must provide for the transportation and disposal of asbestos in accordance with EPA's "Asbestos Waste Management Guidance." For convenience, applicable sections of this guidance are reprinted as Appendix D of this subpart. There are regulations in place, however, that affect transportation and disposal of asbestos waste generated by this rule. The transportation of asbestos waste is covered by the Department of Transportation (49 CFR part 173, subpart J) and disposal is covered by the National Emissions Standards for Hazardous Air Pollutants (NESHAP) (40 CFR part 61, subpart M).

**§ 763.83  Definitions.**

For purposes of this subpart:

*Act* means the Toxic Substances Control Act (TSCA), 15 U.S.C. 2601, *et seq.*

*Accessible* when referring to ACM means that the material is subject to disturbance by school building occupants or custodial or maintenance personnel in the course of their normal activities.

*Accredited* or *accreditation* when referring to a person or laboratory means that such person or laboratory is accredited in accordance with section 206 of Title II of the Act.

*Air erosion* means the passage of air over friable ACBM which may result in the release of asbestos fibers.

*Asbestos* means the asbestiform varieties of: Chrysotile (serpentine); crocidolite (riebeckite); amosite (cummingtonitegrunerite); anthophyllite; tremolite; and actinolite.

*Asbestos-containing material* (ACM) when referring to school buildings means any material or product which contains more than 1 percent asbestos.

*Asbestos-containing building material* (ACBM) means surfacing ACM, thermal system insulation ACM, or miscellaneous ACM that is found in or on interior structural members or other parts of a school building.

*Asbestos debris* means pieces of ACBM that can be identified by color, texture, or composition, or means dust, if the dust is determined by an accredited inspector to be ACM.

*Damaged friable miscellaneous ACM* means friable miscellaneous ACM which has deteriorated or sustained physical injury such that the internal structure (cohesion) of the material is inadequate or, if applicable, which has delaminated such that its bond to the substrate (adhesion) is inadequate or which for any other reason lacks fiber cohesion or adhesion qualities. Such damage or deterioration may be illustrated by the separation of ACM into layers; separation of ACM from the substrate; flaking, blistering, or crumbling of the ACM surface; water damage; significant or repeated water stains, scrapes, gouges, mars or other signs of physical injury on the ACM. Asbestos debris originating from the ACBM in question may also indicate damage.

*Damaged friable surfacing ACM* means friable surfacing ACM which has deteriorated or sustained physical injury such that the internal structure (cohesion) of the material is inadequate or which has delaminated such that its bond to the substrate (adhesion) is inadequate, or which, for any other reason, lacks fiber cohesion or adhesion qualities. Such damage or deterioration may be illustrated by the separation of ACM into layers; separation of ACM from the substrate; flaking, blistering, or crumbling of the ACM surface; water damage; significant or repeated water stains, scrapes, gouges, mars or other signs of physical injury

**Environmental Protection Agency**                                    **§ 763.83**

on the ACM. Asbestos debris originating from the ACBM in question may also indicate damage.

*Damaged or significantly damaged thermal system insulation ACM* means thermal system insulation ACM on pipes, boilers, tanks, ducts, and other thermal system insulation equipment where the insulation has lost its structural integrity, or its covering, in whole or in part, is crushed, water-stained, gouged, punctured, missing, or not intact such that it is not able to contain fibers. Damage may be further illustrated by occasional punctures, gouges or other signs of physical injury to ACM; occasional water damage on the protective coverings/jackets; or exposed ACM ends or joints. Asbestos debris originating from the ACBM in question may also indicate damage.

*Encapsulation* means the treatment of ACBM with a material that surrounds or embeds asbestos fibers in an adhesive matrix to prevent the release of fibers, as the encapsulant creates a membrane over the surface (bridging encapsulant) or penetrates the material and binds its components together (penetrating encapsulant).

*Enclosure* means an airtight, impermeable, permanent barrier around ACBM to prevent the release of asbestos fibers into the air.

*Fiber release episode* means any uncontrolled or unintentional disturbance of ACBM resulting in visible emission.

*Friable* when referring to material in a school building means that the material, when dry, may be crumbled, pulverized, or reduced to powder by hand pressure, and includes previously nonfriable material after such previously nonfriable material becomes damaged to the extent that when dry it may be crumbled, pulverized, or reduced to powder by hand pressure.

*Functional space* means a room, group of rooms, or homogeneous area (including crawl spaces or the space between a dropped ceiling and the floor or roof deck above), such as classroom(s), a cafeteria, gymnasium, hallway(s), designated by a person accredited to prepare management plans, design abatement projects, or conduct response actions.

*High-efficiency particulate air* (HEPA) refers to a filtering system capable of trapping and retaining at least 99.97 percent of all monodispersed particles 0.3 μm in diameter or larger.

*Homogeneous area* means an area of surfacing material, thermal system insulation material, or miscellaneous material that is uniform in color and texture.

*Local education agency* means:

(1) Any local educational agency as defined in section 198 of the Elementary and Secondary Education Act of 1965 (20 U.S.C. 3381).

(2) The owner of any nonpublic, nonprofit elementary, or secondary school building.

(3) The governing authority of any school operated under the defense dependent's education system provided for under the Defense Dependents' Education Act of 1978 (20 U.S.C. 921, et seq.).

*Miscellaneous ACM* means miscellaneous material that is ACM in a school building.

*Miscellaneous material* means interior building material on structural components, structural members or fixtures, such as floor and ceiling tiles, and does not include surfacing material or thermal system insulation.

*Nonfriable* means material in a school building which when dry may not be crumbled, pulverized, or reduced to powder by hand pressure.

*Operations and maintenance program* means a program of work practices to maintain friable ACBM in good condition, ensure clean up of asbestos fibers previously released, and prevent further release by minimizing and controlling friable ACBM disturbance or damage.

*Potential damage* means circumstances in which:

(1) Friable ACBM is in an area regularly used by building occupants, including maintenance personnel, in the course of their normal activities.

(2) There are indications that there is a reasonable likelihood that the material or its covering will become damaged, deteriorated, or delaminated due to factors such as changes in building use, changes in operations and maintenance practices, changes in occupancy, or recurrent damage.

*Potential significant damage* means circumstances in which:

(1) Friable ACBM is in an area regularly used by building occupants, including maintenance personnel, in the course of their normal activities.

(2) There are indications that there is a reasonable likelihood that the material or its covering will become significantly damaged, deteriorated, or delaminated due to factors such as changes in building use, changes in operations and maintenance practices, changes in occupancy, or recurrent damage.

(3) The material is subject to major or continuing disturbance, due to factors including, but not limited to, accessibility or, under certain circumstances, vibration or air erosion.

*Preventive measures* means actions taken to reduce disturbance of ACBM or otherwise eliminate the reasonable likelihood of the material's becoming damaged or significantly damaged.

*Removal* means the taking out or the stripping of substantially all ACBM from a damaged area, a functional space, or a homogeneous area in a school building.

*Repair* means returning damaged ACBM to an undamaged condition or to an intact state so as to prevent fiber release.

*Response action* means a method, including removal, encapsulation, enclosure, repair, operations and maintenance, that protects human health and the environment from friable ACBM.

*Routine maintenance area* means an area, such as a boiler room or mechanical room, that is not normally frequented by students and in which maintenance employees or contract workers regularly conduct maintenance activities.

*School* means any elementary or secondary school as defined in section 198 of the Elementary and Secondary Education Act of 1965 (20 U.S.C. 2854).

*School building* means:

(1) Any structure suitable for use as a classroom, including a school facility such as a laboratory, library, school eating facility, or facility used for the preparation of food.

(2) Any gymnasium or other facility which is specially designed for athletic or recreational activities for an academic course in physical education.

(3) Any other facility used for the instruction or housing of students or for the administration of educational or research programs.

(4) Any maintenance, storage, or utility facility, including any hallway, essential to the operation of any facility described in this definition of ''school building'' under paragraphs (1), (2), or (3).

(5) Any portico or covered exterior hallway or walkway.

(6) Any exterior portion of a mechanical system used to condition interior space.

*Significantly damaged friable miscellaneous ACM* means damaged friable miscellaneous ACM where the damage is extensive and severe.

*Significantly damaged friable surfacing ACM* means damaged friable surfacing ACM in a functional space where the damage is extensive and severe.

*State* means a State, the District of Columbia, the Commonwealth of Puerto Rico, Guam, American Samoa, the Northern Marianas, the Trust Territory of the Pacific Islands, and the Virgin Islands.

*Surfacing ACM* means surfacing material that is ACM.

*Surfacing material* means material in a school building that is sprayed-on, troweled-on, or otherwise applied to surfaces, such as acoustical plaster on ceilings and fireproofing materials on structural members, or other materials on surfaces for acoustical, fireproofing, or other purposes.

*Thermal system insulation* means material in a school building applied to pipes, fittings, boilers, breeching, tanks, ducts, or other interior structural components to prevent heat loss or gain, or water condensation, or for other purposes.

*Thermal system insulation ACM* means thermal system insulation that is ACM.

*Vibration* means the periodic motion of friable ACBM which may result in the release of asbestos fibers.

## § 763.84  General local education agency responsibilities.

Each local education agency shall:

**Environmental Protection Agency**                               **§ 763.85**

(a) Ensure that the activities of any persons who perform inspections, reinspections, and periodic surveillance, develop and update management plans, and develop and implement response actions, including operations and maintenance, are carried out in accordance with subpart E of this part.

(b) Ensure that all custodial and maintenance employees are properly trained as required by this subpart E and other applicable Federal and/or State regulations (e.g., the Occupational Safety and Health Administration asbestos standard for construction, the EPA worker protection rule, or applicable State regulations).

(c) Ensure that workers and building occupants, or their legal guardians, are informed at least once each school year about inspections, response actions, and post-response action activities, including periodic reinspection and surveillance activities that are planned or in progress.

(d) Ensure that short-term workers (e.g., telephone repair workers, utility workers, or exterminators) who may come in contact with asbestos in a school are provided information regarding the locations of ACBM and suspected ACBM assumed to be ACM.

(e) Ensure that warning labels are posted in accordance with § 763.95.

(f) Ensure that management plans are available for inspection and notification of such availability has been provided as specified in the management plan under § 763.93(g).

(g)(1) Designate a person to ensure that requirements under this section are properly implemented.

(2) Ensure that the designated person receives adequate training to perform duties assigned under this section. Such training shall provide, as necessary, basic knowledge of:

(i) Health effects of asbestos.

(ii) Detection, identification, and assessment of ACM.

(iii) Options for controlling ACBM.

(iv) Asbestos management programs.

(v) Relevant Federal and State regulations concerning asbestos, including those in this subpart E and those of the Occupational Safety and Health Administration, U.S. Department of Labor, the U.S. Department of Transportation and the U.S. Environmental Protection Agency.

(h) Consider whether any conflict of interest may arise from the inter-relationship among accredited personnel and whether that should influence the selection of accredited personnel to perform activities under this subpart.

**§ 763.85   Inspection and reinspections.**

(a) *Inspection.* (1) Except as provided in paragraph (a)(2) of this section, before October 12, 1988, local education agencies shall inspect each school building that they lease, own, or otherwise use as a school building to identify all locations of friable and nonfriable ACBM.

(2) Any building leased or acquired on or after October 12, 1988, that is to be used as a school building shall be inspected as described under paragraphs (a) (3) and (4) of this section prior to use as a school building. In the event that emergency use of an uninspected building as a school building is necessitated, such buildings shall be inspected within 30 days after commencement of such use.

(3) Each inspection shall be made by an accredited inspector.

(4) For each area of a school building, except as excluded under § 763.99, each person performing an inspection shall:

(i) Visually inspect the area to identify the locations of all suspected ACBM.

(ii) Touch all suspected ACBM to determine whether they are friable.

(iii) Identify all homogeneous areas of friable suspected ACBM and all homogeneous areas of nonfriable suspected ACBM.

(iv) Assume that some or all of the homogeneous areas are ACM, and, for each homogeneous area that is not assumed to be ACM, collect and submit for analysis bulk samples under §§ 763.86 and 763.87.

(v) Assess, under § 763.88, friable material in areas where samples are collected, friable material in areas that are assumed to be ACBM, and friable ACBM identified during a previous inspection.

(vi) Record the following and submit to the person designated under § 763.84 a copy of such record for inclusion in

849

**§ 763.86**                                               **40 CFR Ch. I (7–1–11 Edition)**

the management plan within 30 days of the inspection:

(A) An inspection report with the date of the inspection signed by each accredited person making the inspection, State of accreditation, and if applicable, his or her accreditation number.

(B) An inventory of the locations of the homogeneous areas where samples are collected, exact location where each bulk sample is collected, dates that samples are collected, homogeneous areas where friable suspected ACBM is assumed to be ACM, and homogeneous areas where nonfriable suspected ACBM is assumed to be ACM.

(C) A description of the manner used to determine sampling locations, the name and signature of each accredited inspector who collected the samples, State of accreditation, and, if applicable, his or her accreditation number.

(D) A list of whether the homogeneous areas identified under paragraph (a)(4)(vi)(B) of this section, are surfacing material, thermal system insulation, or miscellaneous material.

(E) Assessments made of friable material, the name and signature of each accredited inspector making the assessment, State of accreditation, and if applicable, his or her accreditation number.

(b) *Reinspection.* (1) At least once every 3 years after a management plan is in effect, each local education agency shall conduct a reinspection of all friable and nonfriable known or assumed ACBM in each school building that they lease, own, or otherwise use as a school building.

(2) Each inspection shall be made by an accredited inspector.

(3) For each area of a school building, each person performing a reinspection shall:

(i) Visually reinspect, and reassess, under § 763.88, the condition of all friable known or assumed ACBM.

(ii) Visually inspect material that was previously considered nonfriable ACBM and touch the material to determine whether it has become friable since the last inspection or reinspection.

(iii) Identify any homogeneous areas with material that has become friable

since the last inspection or reinspection.

(iv) For each homogeneous area of newly friable material that is already assumed to be ACBM, bulk samples may be collected and submitted for analysis in accordance with §§ 763.86 and 763.87.

(v) Assess, under § 763.88, the condition of the newly friable material in areas where samples are collected, and newly friable materials in areas that are assumed to be ACBM.

(vi) Reassess, under § 763.88, the condition of friable known or assumed ACBM previously identified.

(vii) Record the following and submit to the person designated under § 763.84 a copy of such record for inclusion in the management plan within 30 days of the reinspection:

(A) The date of the reinspection, the name and signature of the person making the reinspection, State of accreditation, and if applicable, his or her accreditation number, and any changes in the condition of known or assumed ACBM.

(B) The exact locations where samples are collected during the reinspection, a description of the manner used to determine sampling locations, the name and signature of each accredited inspector who collected the samples, State of accreditation, and, if applicable, his or her accreditation number.

(C) Any assessments or reassessments made of friable material, the name and signature of the accredited inspector making the assessments, State of accreditation, and if applicable, his or her accreditation number.

(c) *General.* Thermal system insulation that has retained its structural integrity and that has an undamaged protective jacket or wrap that prevents fiber release shall be treated as nonfriable and therefore is subject only to periodic surveillance and preventive measures as necessary.

**§ 763.86  Sampling.**

(a) *Surfacing material.* An accredited inspector shall collect, in a statistically random manner that is representative of the homogeneous area, bulk samples from each homogeneous area of friable surfacing material that

850

**Environmental Protection Agency**                    **§ 763.88**

is not assumed to be ACM, and shall collect the samples as follows:

(1) At least three bulk samples shall be collected from each homogeneous area that is 1,000 ft² or less, except as provided in §763.87(c)(2).

(2) At least five bulk samples shall be collected from each homogeneous area that is greater than 1,000 ft² but less than or equal to 5,000 ft², except as provided in §763.87(c)(2).

(3) At least seven bulk samples shall be collected from each homogeneous area that is greater than 5,000 ft², except as provided in §763.87(c)(2).

(b) *Thermal system insulation.* (1) Except as provided in paragraphs (b) (2) through (4) of this section and §763.87(c), an accredited inspector shall collect, in a randomly distributed manner, at least three bulk samples from each homogeneous area of thermal system insulation that is not assumed to be ACM.

(2) Collect at least one bulk sample from each homogeneous area of patched thermal system insulation that is not assumed to be ACM if the patched section is less than 6 linear or square feet.

(3) In a manner sufficient to determine whether the material is ACM or not ACM, collect bulk samples from each insulated mechanical system that is not assumed to be ACM where cement or plaster is used on fittings such as tees, elbows, or valves, except as provided under §763.87(c)(2).

(4) Bulk samples are not required to be collected from any homogeneous area where the accredited inspector has determined that the thermal system insulation is fiberglass, foam glass, rubber, or other non-ACBM.

(c) *Miscellaneous material.* In a manner sufficient to determine whether material is ACM or not ACM, an accredited inspector shall collect bulk samples from each homogeneous area of friable miscellaneous material that is not assumed to be ACM.

(d) *Nonfriable suspected ACBM.* If any homogeneous area of nonfriable suspected ACBM is not assumed to be ACM, then an accredited inspector shall collect, in a manner sufficient to determine whether the material is ACM or not ACM, bulk samples from the homogeneous area of nonfriable

suspected ACBM that is not assumed to be ACM.

**§ 763.87  Analysis.**

(a) Local education agencies shall have bulk samples, collected under §763.86 and submitted for analysis, analyzed for asbestos using laboratories accredited by the National Bureau of Standards (NBS). Local education agencies shall use laboratories which have received interim accreditation for polarized light microscopy (PLM) analysis under the EPA Interim Asbestos Bulk Sample Analysis Quality Assurance Program until the NBS PLM laboratory accreditation program for PLM is operational.

(b) Bulk samples shall not be composited for analysis and shall be analyzed for asbestos content by PLM, using the ''Interim Method for the Determination of Asbestos in Bulk Insulation Samples'' found at appendix E to subpart E of this part.

(c)(1) A homogeneous area is considered not to contain ACM only if the results of all samples required to be collected from the area show asbestos in amounts of 1 percent or less.

(2) A homogeneous area shall be determined to contain ACM based on a finding that the results of at least one sample collected from that area shows that asbestos is present in an amount greater than 1 percent.

(d) The name and address of each laboratory performing an analysis, the date of analysis, and the name and signature of the person performing the analysis shall be submitted to the person designated under §763.84 for inclusion into the management plan within 30 days of the analysis.

[52 FR 41846, Oct. 30, 1987, as amended at 60 FR 31922, June 19, 1995]

**§ 763.88  Assessment.**

(a)(1) For each inspection and reinspection conducted under §763.85 (a) and (c) and previous inspections specified under §763.99, the local education agency shall have an accredited inspector provide a written assessment of all friable known or assumed ACBM in the school building.

(2) Each accredited inspector providing a written assessment shall sign and date the assessment, provide his or

851

her State of accreditation, and if applicable, accreditation number, and submit a copy of the assessment to the person designated under § 763.84 for inclusion in the management plan within 30 days of the assessment.

(b) The inspector shall classify and give reasons in the written assessment for classifying the ACBM and suspected ACBM assumed to be ACM in the school building into one of the following categories:

(1) Damaged or significantly damaged thermal system insulation ACM.

(2) Damaged friable surfacing ACM.

(3) Significantly damaged friable surfacing ACM.

(4) Damaged or significantly damaged friable miscellaneous ACM.

(5) ACBM with potential for damage.

(6) ACBM with potential for significant damage.

(7) Any remaining friable ACBM or friable suspected ACBM.

(c) Assessment may include the following considerations:

(1) Location and the amount of the material, both in total quantity and as a percentage of the functional space.

(2) Condition of the material, specifying:

(i) Type of damage or significant damage (e.g., flaking, blistering, water damage, or other signs of physical damage).

(ii) Severity of damage (e.g., major flaking, severely torn jackets, as opposed to occasional flaking, minor tears to jackets).

(iii) Extent or spread of damage over large areas or large percentages of the homogeneous area.

(3) Whether the material is accessible.

(4) The material's potential for disturbance.

(5) Known or suspected causes of damage or significant damage (e.g., air erosion, vandalism, vibration, water).

(6) Preventive measures which might eliminate the reasonable likelihood of undamaged ACM from becoming significantly damaged.

(d) The local education agency shall select a person accredited to develop management plans to review the results of each inspection, reinspection, and assessment for the school building and to conduct any other necessary ac-

tivities in order to recommend in writing to the local education agency appropriate response actions. The accredited person shall sign and date the recommendation, provide his or her State of accreditation, and, if applicable, provide his or her accreditation number, and submit a copy of the recommendation to the person designated under § 763.84 for inclusion in the management plan.

**§ 763.90  Response actions.**

(a) The local education agency shall select and implement in a timely manner the appropriate response actions in this section consistent with the assessment conducted in § 763.88. The response actions selected shall be sufficient to protect human health and the environment. The local education agency may then select, from the response actions which protect human health and the environment, that action which is the least burdensome method. Nothing in this section shall be construed to prohibit removal of ACBM from a school building at any time, should removal be the preferred response action of the local education agency.

(b) If damaged or significantly damaged thermal system insulation ACM is present in a building, the local education agency shall:

(1) At least repair the damaged area.

(2) Remove the damaged material if it is not feasible, due to technological factors, to repair the damage.

(3) Maintain all thermal system insulation ACM and its covering in an intact state and undamaged condition.

(c)(1) If damaged friable surfacing ACM or damaged friable miscellaneous ACM is present in a building, the local education agency shall select from among the following response actions: encapsulation, enclosure, removal, or repair of the damaged material.

(2) In selecting the response action from among those which meet the definitional standards in § 763.83, the local education agency shall determine which of these response actions protects human health and the environment. For purposes of determining which of these response actions are the least burdensome, the local education

**Environmental Protection Agency**                                    **§ 763.90**

agency may then consider local circumstances, including occupancy and use patterns within the school building, and its economic concerns, including short- and long-term costs.

(d) If significantly damaged friable surfacing ACM or significantly damaged friable miscellaneous ACM is present in a building the local education agency shall:

(1) Immediately isolate the functional space and restrict access, unless isolation is not necessary to protect human health and the environment.

(2) Remove the material in the functional space or, depending upon whether enclosure or encapsulation would be sufficient to protect human health and the environment, enclose or encapsulate.

(e) If any friable surfacing ACM, thermal system insulation ACM, or friable miscellaneous ACM that has potential for damage is present in a building, the local education agency shall at least implement an operations and maintenance (O&M) program, as described under § 763.91.

(f) If any friable surfacing ACM, thermal system insulation ACM, or friable miscellaneous ACM that has potential for significant damage is present in a building, the local education agency shall:

(1) Implement an O&M program, as described under § 763.91.

(2) Institute preventive measures appropriate to eliminate the reasonable likelihood that the ACM or its covering will become significantly damaged, deteriorated, or delaminated.

(3) Remove the material as soon as possible if appropriate preventive measures cannot be effectively implemented, or unless other response actions are determined to protect human health and the environment. Immediately isolate the area and restrict access if necessary to avoid an imminent and substantial endangerment to human health or the environment.

(g) Response actions including removal, encapsulation, enclosure, or repair, other than small-scale, short-duration repairs, shall be designed and conducted by persons accredited to design and conduct response actions.

(h) The requirements of this subpart E in no way supersede the worker protection and work practice requirements under 29 CFR 1926.58 (Occupational Safety and Health Administration (OSHA) asbestos worker protection standards for construction), 40 CFR part 763, subpart G (EPA asbestos worker protection standards for public employees), and 40 CFR part 61, subpart M (National Emission Standards for Hazardous Air Pollutants—Asbestos).

(i) Completion of response actions. (1) At the conclusion of any action to remove, encapsulate, or enclose ACBM or material assumed to be ACBM, a person designated by the local education agency shall visually inspect each functional space where such action was conducted to determine whether the action has been properly completed.

(2)(i) A person designated by the local education agency shall collect air samples using aggressive sampling as described in appendix A to this subpart E to monitor air for clearance after each removal, encapsulation, and enclosure project involving ACBM, except for projects that are of small-scale, short-duration.

(ii) Local education agencies shall have air samples collected under this section analyzed for asbestos using laboratories accredited by the National Bureau of Standards to conduct such analysis using transmission electron microscopy (TEM) or, under circumstances permitted in this section, laboratories enrolled in the American Industrial Hygiene Association Proficiency Analytical Testing Program for phase contrast microscopy (PCM).

(iii) Until the National Bureau of Standards TEM laboratory accreditation program is operational, local educational agencies shall use laboratories that use the protocol described in appendix A to subpart E of this part.

(3) Except as provided in paragraphs (i)(4), and (i)(5), of this section, an action to remove, encapsulate, or enclose ACBM shall be considered complete when the average concentration of asbestos of five air samples collected within the affected functional space and analyzed by the TEM method in appendix A of this subpart E, is not statistically significantly different, as determined by the Z-test calculation found in appendix A of this subpart E,

853

from the average asbestos concentration of five air samples collected at the same time outside the affected functional space and analyzed in the same manner, and the average asbestos concentration of the three field blanks described in appendix A of this subpart E is below the filter background level, as defined in appendix A of this subpart E, of 70 structures per square millimeter (70 s/mm²).

(4) An action may also be considered complete if the volume of air drawn for each of the five samples collected within the affected functional space is equal to or greater than 1,199 L of air for a 25 mm filter or equal to or greater than 2,799 L of air for a 37 mm filter, and the average concentration of asbestos as analyzed by the TEM method in appendix A of this subpart E, for the five air samples does not exceed the filter background level, as defined in appendix A, of 70 structures per square millimeter (70 s/mm²). If the average concentration of asbestos of the five air samples within the affected functional space exceeds 70 s/mm², or if the volume of air in each of the samples is less than 1,199 L of air for a 25 mm filter or less than 2,799 L of air for a 37 mm filter, the action shall be considered complete only when the requirements of paragraph (i)(3) or (i)(5), of this section are met.

(5) At any time, a local education agency may analyze air monitoring samples collected for clearance purposes by phase contrast microscopy (PCM) to confirm completion of removal, encapsulation, or enclosure of ACBM that is greater than small-scale, short-duration and less than or equal to 160 square feet or 260 linear feet. The action shall be considered complete when the results of samples collected in the affected functional space and analyzed by phase contrast microscopy using the National Institute for Occupational Safety and Health (NIOSH) Method 7400 entitled ''Fibers'' published in the NIOSH Manual of Analytical Methods, 3rd Edition, Second Supplement, August 1987, show that the concentration of fibers for each of the five samples is less than or equal to a limit of quantitation for PCM (0.01 fibers per cubic centimeter (0.01 f/cm³) of air). The method is available for public

inspection at the Non-Confidential Information Center (NCIC) (7407), Office of Pollution Prevention and Toxics, U.S. Environmental Protection Agency, Room B–607 NEM, 401 M St., SW., Washington, DC 20460, between the hours of 12 p.m. and 4 p.m. weekdays excluding legal holidays or at the National Archives and Records Administration (NARA). For information on the availability of this material at NARA, call 202–741–6030, or go to: *http://www.archives.gov/federal_register/code_of_federal_regulations/ibr_locations.html*. This incorporation by reference was approved by the Director of the Federal Register in accordance with 5 U.S.C. 552(a) and 1 CFR part 51. The method is incorporated as it exists on the effective date of this rule, and a notice of any change to the method will be published in the FEDERAL REGISTER.

(6) To determine the amount of ACBM affected under paragraph (i)(5) of this section, the local education agency shall add the total square or linear footage of ACBM within the containment barriers used to isolate the functional space for the action to remove, encapsulate, or enclose the ACBM. Contiguous portions of material subject to such action conducted concurrently or at approximately the same time within the same school building shall not be separated to qualify under paragraph (i)(5), of this section.

[52 FR 41846, Oct. 30, 1987, as amended at 53 FR 12525, Apr. 15, 1988; 60 FR 31922, June 19, 1995; 60 FR 34465, July 3, 1995; 69 FR 18803, Apr. 9, 2004]

**§ 763.91　Operations and maintenance.**

(a) *Applicability.* The local education agency shall implement an operations, maintenance, and repair (O&M) program under this section whenever any friable ACBM is present or assumed to be present in a building that it leases, owns, or otherwise uses as a school building. Any material identified as nonfriable ACBM or nonfriable assumed ACBM must be treated as friable ACBM for purposes of this section when the material is about to become friable as a result of activities performed in the school building.

**Environmental Protection Agency**                                            **§ 763.91**

(b) *Worker protection.* Local education agencies must comply with either the OSHA Asbestos Construction Standard at 29 CFR 1926.1101, or the Asbestos Worker Protection Rule at 40 CFR 763.120, whichever is applicable.

(c) *Cleaning*—(1) *Initial cleaning.* Unless the building has been cleaned using equivalent methods within the previous 6 months, all areas of a school building where friable ACBM, damaged or significantly damaged thermal system insulation ACM, or friable suspected ACBM assumed to be ACM are present shall be cleaned at least once after the completion of the inspection required by § 763.85(a) and before the initiation of any response action, other than O&M activities or repair, according to the following procedures:

(i) HEPA-vacuum or steam-clean all carpets.

(ii) HEPA-vacuum or wet-clean all other floors and all other horizontal surfaces.

(iii) Dispose of all debris, filters, mopheads, and cloths in sealed, leak-tight containers.

(2) *Additional cleaning.* The accredited management planner shall make a written recommendation to the local education agency whether additional cleaning is needed, and if so, the methods and frequency of such cleaning.

(d) *Operations and maintenance activities.* The local education agency shall ensure that the procedures described below shall be followed for any operations and maintenance activities disturbing friable ACBM:

(1) Restrict entry into the area by persons other than those necessary to perform the maintenance project, either by physically isolating the area or by scheduling.

(2) Post signs to prevent entry by unauthorized persons.

(3) Shut off or temporarily modify the air-handling system and restrict other sources of air movement.

(4) Use work practices or other controls, such as, wet methods, protective clothing, HEPA-vacuums, mini-enclosures, glove bags, as necessary to inhibit the spread of any released fibers.

(5) Clean all fixtures or other components in the immediate work area.

(6) Place the asbestos debris and other cleaning materials in a sealed, leak-tight container.

(e) *Maintenance activities other than small-scale, short-duration.* The response action for any maintenance activities disturbing friable ACBM, other than small-scale, short-duration maintenance activities, shall be designed by persons accredited to design response actions and conducted by persons accredited to conduct response actions.

(f) *Fiber release episodes*—(1) *Minor fiber release episode.* The local education agency shall ensure that the procedures described below are followed in the event of a minor fiber release episode (i.e., the falling or dislodging of 3 square or linear feet or less of friable ACBM): 5

(i) Thoroughly saturate the debris using wet methods.

(ii) Clean the area, as described in paragraph (e) of this section.

(iii) Place the asbestos debris in a sealed, leak-tight container.

(iv) Repair the area of damaged ACM with materials such as asbestos-free spackling, plaster, cement, or insulation, or seal with latex paint or an encapsulant, or immediately have the appropriate response action implemented as required by § 763.90.

(2) *Major fiber release episode.* The local education agency shall ensure that the procedures described below are followed in the event of a major fiber release episode (i.e., the falling or dislodging of more than 3 square or linear feet of friable ACBM):

(i) Restrict entry into the area and post signs to prevent entry into the area by persons other than those necessary to perform the response action.

(ii) Shut off or temporarily modify the air-handling system to prevent the distribution of fibers to other areas in the building.

(iii) The response action for any major fiber release episode must be designed by persons accredited to design response actions and conducted by persons accredited to conduct response actions.

[52 FR 41846, Oct. 30, 1987, as amended at 65 FR 69216, Nov. 15, 2000]

§ 763.92 Training and periodic surveillance.

(a) *Training.* (1) The local education agency shall ensure, prior to the implementation of the O&M provisions of the management plan, that all members of its maintenance and custodial staff (custodians, electricians, heating/air conditioning engineers, plumbers, etc.) who may work in a building that contains ACBM receive awareness training of at least 2 hours, whether or not they are required to work with ACBM. New custodial and maintenance employees shall be trained within 60 days after commencement of employment. Training shall include, but not be limited to:

(i) Information regarding asbestos and its various uses and forms.

(ii) Information on the health effects associated with asbestos exposure.

(iii) Locations of ACBM identified throughout each school building in which they work.

(iv) Recognition of damage, deterioration, and delamination of ACBM.

(v) Name and telephone number of the person designated to carry out general local education agency responsibilities under § 763.84 and the availability and location of the management plan.

(2) The local education agency shall ensure that all members of its maintenance and custodial staff who conduct any activities that will result in the disturbance of ACBM shall receive training described in paragraph (a)(1) of this section and 14 hours of additional training. Additional training shall include, but not be limited to:

(i) Descriptions of the proper methods of handling ACBM.

(ii) Information on the use of respiratory protection as contained in the EPA/NIOSH *Guide to Respiratory Protection for the Asbestos Abatement Industry*, September 1986 (EPA 560/OPPTS–86–001), available from the Director, Environmental Assistance Division (7408), Office of Pollution Prevention and Toxics, U.S. Environmental Protection Agency, Room E–543B, 1200 Pennsylvania Ave., NW., Washington, DC 20460, Telephone: (202) 554–1404, TDD: (202) 544–0551 and other personal protection measures.

(iii) The provisions of this section and § 763.91, Appendices A, C, and D of this subpart E of this part, EPA regulations contained in 40 CFR part 763, subpart G, and in 40 CFR part 61, subpart M, and OSHA regulations contained in 29 CFR 1926.58.

(iv) Hands-on training in the use of respiratory protection, other personal protection measures, and good work practices.

(3) Local education agency maintenance and custodial staff who have attended EPA-approved asbestos training or received equivalent training for O&M and periodic surveillance activities involving asbestos shall be considered trained for the purposes of this section.

(b) *Periodic surveillance.* (1) At least once every 6 months after a management plan is in effect, each local education agency shall conduct periodic surveillance in each building that it leases, owns, or otherwise uses as a school building that contains ACBM or is assumed to contain ACBM.

(2) Each person performing periodic surveillance shall:

(i) Visually inspect all areas that are identified in the management plan as ACBM or assumed ACBM.

(ii) Record the date of the surveillance, his or her name, and any changes in the condition of the materials.

(iii) Submit to the person designated to carry out general local education agency responsibilities under § 763.84 a copy of such record for inclusion in the management plan.

[52 FR 41846, Oct. 30, 1987, as amended at 60 FR 34465, July 3, 1995; 65 FR 69216, Nov. 15, 2000]

§ 763.93 Management plans.

(a)(1) On or before October 12, 1988, each local education agency shall develop an asbestos management plan for each school, including all buildings that they lease, own, or otherwise use as school buildings, and submit the plan to an Agency designated by the Governor of the State in which the local education agency is located. The plan may be submitted in stages that cover a portion of the school buildings under the authority of the local education agency.

**Environmental Protection Agency**                                    **§ 763.93**

(2) If a building to be used as part of a school is leased or otherwise acquired after October 12, 1988, the local education agency shall include the new building in the management plan for the school prior to its use as a school building. The revised portions of the management plan shall be submitted to the Agency designated by the Governor.

(3) If a local education agency begins to use a building as a school after October 12, 1988, the local education agency shall submit a management plan for the school to the Agency designated by the Governor prior to its use as a school.

(b) On or before October 17, 1987, the Governor of each State shall notify local education agencies in the State regarding where to submit their management plans. States may establish administrative procedures for reviewing management plans. If the Governor does not disapprove a management plan within 90 days after receipt of the plan, the local education agency shall implement the plan.

(c) Each local education agency must begin implementation of its management plan on or before July 9, 1989, and complete implementation in a timely fashion.

(d) Each local education agency shall maintain and update its management plan to keep it current with ongoing operations and maintenance, periodic surveillance, inspection, reinspection, and response action activities. All provisions required to be included in the management plan under this section shall be retained as part of the management plan, as well as any information that has been revised to bring the plan up-to-date.

(e) The management plan shall be developed by an accredited management planner and shall include:

(1) A list of the name and address of each school building and whether the school building contains friable ACBM, nonfriable ACBM, and friable and nonfriable suspected ACBM assumed to be ACM.

(2) For each inspection conducted before the December 14, 1987:

(i) The date of the inspection.

(ii) A blueprint, diagram, or written description of each school building that identifies clearly each location and approximate square or linear footage of any homogeneous or sampling area where material was sampled for ACM, and, if possible, the exact locations where bulk samples were collected, and the dates of collection.

(iii) A copy of the analyses of any bulk samples, dates of analyses, and a copy of any other laboratory reports pertaining to the analyses.

(iv) A description of any response actions or preventive measures taken to reduce asbestos exposure, including if possible, the names and addresses of all contractors involved, start and completion dates of the work, and results of any air samples analyzed during and upon completion of the work.

(v) A description of assessments, required to be made under § 763.88, of material that was identified before December 14, 1987, as friable ACBM or friable suspected ACBM assumed to be ACM, and the name and signature, State of accreditation, and if applicable, accreditation number of each accredited person making the assessments.

(3) For each inspection and reinspection conducted under § 763.85:

(i) The date of the inspection or reinspection and the name and signature, State of accreditation and, if applicable, the accreditation number of each accredited inspector performing the inspection or reinspection.

(ii) A blueprint, diagram, or written description of each school building that identifies clearly each location and approximate square or linear footage of homogeneous areas where material was sampled for ACM, the exact location where each bulk sample was collected, date of collection, homogeneous areas where friable suspected ACBM is assumed to be ACM, and where nonfriable suspected ACBM is assumed to be ACM.

(iii) A description of the manner used to determine sampling locations, and the name and signature of each accredited inspector collecting samples, the State of accreditation, and if applicable, his or her accreditation number.

(iv) A copy of the analyses of any bulk samples collected and analyzed, the name and address of any laboratory

857

that analyzed bulk samples, a statement that the laboratory meets the applicable requirements of §763.87(a) the date of analysis, and the name and signature of the person performing the analysis.

(v) A description of assessments, required to be made under §763.88, of all ACBM and suspected ACBM assumed to be ACM, and the name, signature, State of accreditation, and if applicable, accreditation number of each accredited person making the assessments.

(4) The name, address, and telephone number of the person designated under §763.84 to ensure that the duties of the local education agency are carried out, and the course name, and dates and hours of training taken by that person to carry out the duties.

(5) The recommendations made to the local education agency regarding response actions, under §763.88(d), the name, signature, State of accreditation of each person making the recommendations, and if applicable, his or her accreditation number.

(6) A detailed description of preventive measures and response actions to be taken, including methods to be used, for any friable ACBM, the locations where such measures and action will be taken, reasons for selecting the response action or preventive measure, and a schedule for beginning and completing each preventive measure and response action.

(7) With respect to the person or persons who inspected for ACBM and who will design or carry out response actions, except for operations and maintenance, with respect to the ACBM, one of the following statements:

(i) If the State has adopted a contractor accreditation program under section 206(b) of Title II of the Act, a statement that the person(s) is accredited under such plan.

(ii) A statement that the local education agency used (or will use) persons who have been accredited by another State which has adopted a contractor accreditation plan under section 206(b) of Title II of the Act or is accredited by an EPA-approved course under section 206(c) of Title II of the Act.

(8) A detailed description in the form of a blueprint, diagram, or in writing of

any ACBM or suspected ACBM assumed to be ACM which remains in the school once response actions are undertaken pursuant to §763.90. This description shall be updated as response actions are completed.

(9) A plan for reinspection under §763.85, a plan for operations and maintenance activities under §763.91, and a plan for periodic surveillance under §763.92, a description of the recommendation made by the management planner regarding additional cleaning under §763.91(c)(2) as part of an operations and maintenance program, and the response of the local education agency to that recommendation.

(10) A description of steps taken to inform workers and building occupants, or their legal guardians, about inspections, reinspections, response actions, and post-response action activities, including periodic reinspection and surveillance activities that are planned or in progress.

(11) An evaluation of the resources needed to complete response actions successfully and carry out reinspection, operations and maintenance activities, periodic surveillance and training.

(12) With respect to each consultant who contributed to the management plan, the name of the consultant and one of the following statements:

(i) If the State has adopted a contractor accreditation plan under section 206(b) of Title II of the Act, a statement that the consultant is accredited under such plan.

(ii) A statement that the contractor is accredited by another State which has adopted a contractor accreditation plan under section 206(b) of Title II of the Act, or is accredited by an EPA-approved course developed under section 206(c) of Title II of the Act.

(f) A local education agency may require each management plan to contain a statement signed by an accredited management plan developer that such person has prepared or assisted in the preparation of such plan or has reviewed such plan, and that such plan is in compliance with this subpart E. Such statement may not be signed by a person who, in addition to preparing or assisting in preparing the management

**Environmental Protection Agency**                    **§ 763.94**

plan, also implements (or will implement) the management plan.

(g)(1) Upon submission of a management plan to the Governor for review, a local education agency shall keep a copy of the plan in its administrative office. The management plans shall be available, without cost or restriction, for inspection by representatives of EPA and the State, the public, including teachers, other school personnel and their representatives, and parents. The local education agency may charge a reasonable cost to make copies of management plans.

(2) Each local education agency shall maintain in its administrative office a complete, updated copy of a management plan for each school under its administrative control or direction. The management plans shall be available, during normal business hours, without cost or restriction, for inspection by representatives of EPA and the State, the public, including teachers, other school personnel and their representatives, and parents. The local education agency may charge a reasonable cost to make copies of management plans.

(3) Each school shall maintain in its administrative office a complete, updated copy of the management plan for that school. Management plans shall be available for inspection, without cost or restriction, to workers before work begins in any area of a school building. The school shall make management plans available for inspection to representatives of EPA and the State, the public, including parents, teachers, and other school personnel and their representatives within 5 working days after receiving a request for inspection. The school may charge a reasonable cost to make copies of the management plan.

(4) Upon submission of its management plan to the Governor and at least once each school year, the local education agency shall notify in writing parent, teacher, and employee organizations of the availability of management plans and shall include in the management plan a description of the steps taken to notify such organizations, and a dated copy of the notification. In the absence of any such organizations for parents, teachers, or employees, the local education agency

shall provide written notice to that relevant group of the availability of management plans and shall include in the management plan a description of the steps taken to notify such groups, and a dated copy of the notification.

(h) Records required under § 763.94 shall be made by local education agencies and maintained as part of the management plan.

(i) Each management plan must contain a true and correct statement, signed by the individual designated by the local education agency under § 763.84, which certifies that the general, local education agency responsibilities, as stipulated by § 763.84, have been met or will be met.

**§ 763.94   Recordkeeping.**

(a) Records required under this section shall be maintained in a centralized location in the administrative office of both the school and the local education agency as part of the management plan. For each homogeneous area where all ACBM has been removed, the local education agency shall ensure that such records are retained for 3 years after the next reinspection required under § 763.85(b)(1), or for an equivalent period.

(b) For each preventive measure and response action taken for friable and nonfriable ACBM and friable and nonfriable suspected ACBM assumed to be ACM, the local education agency shall provide:

(1) A detailed written description of the measure or action, including methods used, the location where the measure or action was taken, reasons for selecting the measure or action, start and completion dates of the work, names and addresses of all contractors involved, and if applicable, their State of accreditation, and accreditation numbers, and if ACBM is removed, the name and location of storage or disposal site of the ACM.

(2) The name and signature of any person collecting any air sample required to be collected at the completion of certain response actions specified by § 763.90(i), the locations where samples were collected, date of collection, the name and address of the laboratory analyzing the samples, the date of analysis, the results of the

859

analysis, the method of analysis, the name and signature of the person performing the analysis, and a statement that the laboratory meets the applicable requirements of §763.90(i)(2)(ii).

(c) For each person required to be trained under §763.92(a) (1) and (2), the local education agency shall provide the person's name and job title, the date that training was completed by that person, the location of the training, and the number of hours completed in such training.

(d) For each time that periodic surveillance under §763.92(b) is performed, the local education agency shall record the name of each person performing the surveillance, the date of the surveillance, and any changes in the conditions of the materials.

(e) For each time that cleaning under §763.91(c) is performed, the local education agency shall record the name of each person performing the cleaning, the date of such cleaning, the locations cleaned, and the methods used to perform such cleaning.

(f) For each time that operations and maintenance activities under §763.91(d) are performed, the local education agency shall record the name of each person performing the activity, the start and completion dates of the activity, the locations where such activity occurred, a description of the activity including preventive measures used, and if ACBM is removed, the name and location of storage or disposal site of the ACM.

(g) For each time that major asbestos activity under §763.91(e) is performed, the local education agency shall provide the name and signature, State of accreditation, and, if applicable, the accreditation number of each person performing the activity, the start and completion dates of the activity, the locations where such activity occurred, a description of the activity including preventive measures used, and if ACBM is removed, the name and location of storage or disposal site of the ACM.

(h) For each fiber release episode under §763.91(f), the local education agency shall provide the date and location of the episode, the method of repair, preventive measures or response action taken, the name of each person performing the work, and if ACBM is removed, the name and location of storage or disposal site of the ACM.

(Approved by the Office of Management and Budget under control number 2070–0091)

§ 763.95   Warning labels.

(a) The local education agency shall attach a warning label immediately adjacent to any friable and nonfriable ACBM and suspected ACBM assumed to be ACM located in routine maintenance areas (such as boiler rooms) at each school building. This shall include:

(1) Friable ACBM that was responded to by a means other than removal.

(2) ACBM for which no response action was carried out.

(b) All labels shall be prominently displayed in readily visible locations and shall remain posted until the ACBM that is labeled is removed.

(c) The warning label shall read, in print which is readily visible because of large size or bright color, as follows: CAUTION: ASBESTOS. HAZARDOUS. DO NOT DISTURB WITHOUT PROPER TRAINING AND EQUIPMENT.

§ 763.97   Compliance and enforcement.

(a) *Compliance with Title II of the Act.* (1) Section 207(a) of Title II of the Act (15 U.S.C. 2647) makes it unlawful for any local education agency to:

(i) Fail to conduct inspections pursuant to section 203(b) of Title II of the Act, including failure to follow procedures and failure to use accredited personnel and laboratories.

(ii) Knowingly submit false information to the Governor regarding any inspection pursuant to regulations under section 203(i) of Title II of the Act.

(iii) Fail to develop a management plan pursuant to regulations under section 203(i) of Title II of the Act.

(2) Section 207(a) of Title II of the Act (15 U.S.C. 2647) also provides that any local education agency which violates any provision of section 207 shall be liable for a civil penalty of not more than $5,000 for each day during which the violation continues. For the purposes of this subpart, a ''violation'' means a failure to comply with respect to a single school building.

(b) *Compliance with Title I of the Act.* (1) Section 15(1)(D) of Title I of the Act (15 U.S.C. 2614) makes it unlawful for

**Environmental Protection Agency**                                              **§ 763.98**

any person to fail or refuse to comply with any requirement of Title II or any rule promulgated or order issued under Title II. Therefore, any person who violates any requirement of this subpart is in violation of section 15 of Title I of the Act.

(2) Section 15(3) of Title I of the Act (15 U.S.C. 2614) makes it unlawful for any person to fail or refuse to establish or maintain records, submit reports, notices or other information, or permit access to or copying of records, as required by this Act or a rule thereunder.

(3) Section 15(4) (15 U.S.C. 2614) of Title I of the Act makes it unlawful for any person to fail or refuse to permit entry or inspection as required by section 11 of Title I of the Act.

(4) Section 16(a) of Title I of the Act (15 U.S.C. 2615) provides that any person who violates any provision of section 15 of Title I of the Act shall be liable to the United States for a civil penalty in an amount not to exceed $25,000 for each such violation. Each day such a violation continues shall, for purposes of this paragraph, constitute a separate violation of section 15. A local education agency is not liable for any civil penalty under Title I of the Act for failing or refusing to comply with any rule promulgated or order issued under Title II of the Act.

(c) *Criminal penalties.* If any violation committed by any person (including a local education agency) is knowing or willful, criminal penalties may be assessed under section 16(b) of Title I of the Act.

(d) *Injunctive relief.* The Agency may obtain injunctive relief under section 208(b) of Title II of the Act to respond to a hazard which poses an imminent and substantial endangerment to human health or the environment or section 17 (15 U.S.C. 2616) of Title I of the Act to restrain any violation of section 15 of Title I of the Act or to compel the taking of any action required by or under Title I of the Act.

(e) *Citizen complaints.* Any citizen who wishes to file a complaint pursuant to section 207(d) of Title II of the Act should direct the complaint to the Governor of the State or the EPA Asbestos Ombudsman, 1200 Pennsylvania Ave., NW., Washington, DC 20460. The citizen complaint should be in writing and

identified as a citizen complaint pursuant to section 207(d) of Title II of TSCA. The EPA Asbestos Ombudsman or the Governor shall investigate and respond to the complaint within a reasonable period of time if the allegations provide a reasonable basis to believe that a violation of the Act has occurred.

(f) *Inspections.* EPA may conduct inspections and review management plans under section 11 of Title I of the Act (15 U.S.C. 2610) to ensure compliance.

**§ 763.98  Waiver; delegation to State.**

(a) *General.* (1) Upon request from a state Governor and after notice and comment and an opportunity for a public hearing in accordance with paragraphs (b) and (c) of this section, EPA may waive some or all of the requirements of this subpart E if the state has established and is implementing or intends to implement a program of asbestos inspection and management that contains requirements that are at least as stringent as the requirements of this subpart. In addition, if the state chooses to receive electronic documents, the state program must include, at a minimum, the requirements of 40 CFR part 3—(Electronic reporting).

(2) A waiver from any requirement of this subpart E shall apply only to the specific provision for which a waiver has been granted under this section. All requirements of this subpart E shall apply until a waiver is granted under this section.

(b) *Request.* Each request by a Governor to waive any requirement of this subpart E shall be sent with three complete copies of the request to the Regional Administrator for the EPA Region in which the State is located and shall include:

(1) A copy of the State provisions or proposed provisions relating to its program of asbestos inspection and management in schools for which the request is made.

(2)(i) The name of the State agency that is or will be responsible for administering and enforcing the requirements for which a waiver is requested, the names and job titles of responsible officials in that agency, and phone

numbers where the officials can be contacted.

(ii) In the event that more than one agency is or will be responsible for administering and enforcing the requirements for which a waiver is requested, a description of the functions to be performed by each agency, how the program will be coordinated by the lead agency to ensure consistency and effective administration in the asbestos inspection and management program within the State, the names and job titles of responsible officials in the agencies, and phone numbers where the officials can be contacted. The lead agency will serve as the central contact point for the EPA.

(3) Detailed reasons, supporting papers, and the rationale for concluding that the state's asbestos inspection and management program provisions for which the request is made are at least as stringent as the requirements of Subpart E of this part, and that, if the state chooses to receive electronic documents, the state program includes, at a minimum, the requirements of 40 CFR part 3—(Electronic reporting).

(4) A discussion of any special situations, problems, and needs pertaining to the waiver request accompanied by an explanation of how the State intends to handle them.

(5) A statement of the resources that the State intends to devote to the administration and enforcement of the provisions relating to the waiver request.

(6) Copies of any specific or enabling State laws (enacted and pending enactment) and regulations (promulgated and pending promulgation) relating to the request, including provisions for assessing criminal and/or civil penalties.

(7) Assurance from the Governor, the Attorney General, or the legal counsel of the lead agency that the lead agency or other cooperating agencies have the legal authority necessary to carry out the requirements relating to the waiver request.

(c) *General notice—hearing.* (1) Within 30 days after receipt of a request for a waiver, EPA will determine the completeness of the request. If EPA does not request further information within the 30-day period, the request will be deemed complete.

(2) Within 30 days after EPA determines that a request is complete, EPA will issue for publication in the FEDERAL REGISTER a notice that announces receipt of the request, describes the information submitted under paragraph (b) of this section, and solicits written comment from interested members of the public. Comments must be submitted within 60 days.

(3) If, during the comment period, EPA receives a written objection to a Governor's request and a request for a public hearing detailing specific objections to the granting of a waiver, EPA will schedule a public hearing to be held in the affected State after the close of the comment period and will announce the public hearing date in the FEDERAL REGISTER before the date of the hearing. Each comment shall include the name and address of the person submitting the comment.

(d) *Criteria.* EPA may waive some or all of the requirements of subpart E of this part if:

(1) The State's lead agency and other cooperating agencies have the legal authority necessary to carry out the provisions of asbestos inspection and management in schools relating to the waiver request.

(2) The State's program of asbestos inspection and management in schools relating to the waiver request and implementation of the program are or will be at least as stringent as the requirements of this subpart E.

(3) The state has an enforcement mechanism to allow it to implement the program described in the waiver request and any electronic reporting requirements are at least as stringent as 40 CFR part 3—(Electronic reporting).

(4) The lead agency and any cooperating agencies have or will have qualified personnel to carry out the provisions relating to the waiver request.

(5) The State will devote adequate resources to the administration and enforcement of the asbestos inspection and management provisions relating to the waiver request.

(6) When specified by EPA, the State gives satisfactory assurances that necessary steps, including specific actions it proposes to take and a time schedule

for their accomplishment, will be taken within a reasonable time to conform with applicable criteria under paragraphs (d) (2) through (4) of this section.

(e) *Decision.* EPA will issue for publication in the FEDERAL REGISTER a notice announcing its decision to grant or deny, in whole or in part, a Governor's request for a waiver from some or all of the requirements of this subpart E within 30 days after the close of the comment period or within 30 days following a public hearing, whichever is applicable. The notice will include the Agency's reasons and rationale for granting or denying the Governor's request. The 30-day period may be extended if mutually agreed upon by EPA and the State.

(f) *Modifications.* When any substantial change is made in the administration or enforcement of a State program for which a waiver was granted under this section, a responsible official in the lead agency shall submit such changes to EPA.

(g) *Reports.* The lead agency in each State that has been granted a waiver by EPA from any requirement of subpart E of this part shall submit a report to the Regional Administrator for the Region in which the State is located at least once every 12 months to include the following information:

(1) A summary of the State's implementation and enforcement activities during the last reporting period relating to provisions waived under this section, including enforcement actions taken.

(2) Any changes in the administration or enforcement of the State program implemented during the last reporting period.

(3) Other reports as may be required by EPA to carry out effective oversight of any requirement of this subpart E that was waived under this section.

(h) *Oversight.* EPA may periodically evaluate the adequacy of a State's implementation and enforcement of and resources devoted to carrying out requirements relating to the waiver. This evaluation may include, but is not limited to, site visits to local education agencies without prior notice to the State.

(i) *Informal conference.* (1) EPA may request that an informal conference be held between appropriate State and EPA officials when EPA has reason to believe that a State has failed to:

(i) Substantially comply with the terms of any provision that was waived under this section.

(ii) Meet the criteria under paragraph (d) of this section, including the failure to carry out enforcement activities or act on violations of the State program.

(2) EPA will:

(i) Specify to the State those aspects of the State's program believed to be inadequate.

(ii) Specify to the State the facts that underlie the belief of inadequacy.

(3) If EPA finds, on the basis of information submitted by the State at the conference, that deficiencies did not exist or were corrected by the State, no further action is required.

(4) Where EPA finds that deficiencies in the State program exist, a plan to correct the deficiencies shall be negotiated between the State and EPA. The plan shall detail the deficiencies found in the State program, specify the steps the State has taken or will take to remedy the deficiencies, and establish a schedule for each remedial action to be initiated.

(j) *Rescission.* (1) If the State fails to meet with EPA or fails to correct deficiencies raised at the informal conference, EPA will deliver to the Governor of the State and a responsible official in the lead agency a written notice of its intent to rescind, in whole or part, the waiver.

(2) EPA will issue for publication in the FEDERAL REGISTER a notice that announces the rescission of the waiver, describes those aspects of the State's program determined to be inadequate, and specifies the facts that underlie the findings of inadequacy.

[52 FR 41846, Oct. 30, 1987, as amended at 70 FR 59889, Oct. 13, 2005]

## § 763.99 Exclusions.

(a) A local education agency shall not be required to perform an inspection under §763.85(a) in any sampling area as defined in 40 CFR 763.103 or homogeneous area of a school building where:

(1) An accredited inspector has determined that, based on sampling records, friable ACBM was identified in that homogeneous or sampling area during an inspection conducted before December 14, 1987. The inspector shall sign and date a statement to that effect with his or her State of accreditation and if applicable, accreditation number and, within 30 days after such determination, submit a copy of the statement to the person designated under § 763.84 for inclusion in the management plan. However, an accredited inspector shall assess the friable ACBM under § 763.88.

(2) An accredited inspector has determined that, based on sampling records, nonfriable ACBM was identified in that homogeneous or sampling area during an inspection conducted before December 14, 1987. The inspector shall sign and date a statement to that effect with his or her State of accreditation and if applicable, accreditation number and, within 30 days after such determination, submit a copy of the statement to the person designated under § 763.84 for inclusion in the management plan. However, an accredited inspector shall identify whether material that was nonfriable has become friable since that previous inspection and shall assess the newly-friable ACBM under § 763.88.

(3) Based on sampling records and inspection records, an accredited inspector has determined that no ACBM is present in the homogeneous or sampling area and the records show that the area was sampled, before December 14, 1987 in substantial compliance with § 763.85(a), which for purposes of this section means in a random manner and with a sufficient number of samples to reasonably ensure that the area is not ACBM.

(i) The accredited inspector shall sign and date a statement, with his or her State of accreditation and if applicable, accreditation number that the homogeneous or sampling area determined not to be ACBM was sampled in substantial compliance with § 763.85(a).

(ii) Within 30 days after the inspector's determination, the local education agency shall submit a copy of the inspector's statement to the EPA Regional Office and shall include the statement in the management plan for that school.

(4) The lead agency responsible for asbestos inspection in a State that has been granted a waiver from § 763.85(a) has determined that, based on sampling records and inspection records, no ACBM is present in the homogeneous or sampling area and the records show that the area was sampled before December 14, 1987, in substantial compliance with § 763.85(a). Such determination shall be included in the management plan for that school.

(5) An accredited inspector has determined that, based on records of an inspection conducted before December 14, 1987, suspected ACBM identified in that homogeneous or sampling area is assumed to be ACM. The inspector shall sign and date a statement to that effect, with his or her State of accreditation and if applicable, accreditation number and, within 30 days of such determination, submit a copy of the statement to the person designated under § 763.84 for inclusion in the management plan. However, an accredited inspector shall identify whether material that was nonfriable suspected ACBM assumed to be ACM has become friable since the previous inspection and shall assess the newly friable material and previously identified friable suspected ACBM assumed to be ACM under § 763.88.

(6) Based on inspection records and contractor and clearance records, an accredited inspector has determined that no ACBM is present in the homogeneous or sampling area where asbestos removal operations have been conducted before December 14, 1987, and shall sign and date a statement to that effect and include his or her State of accreditation and, if applicable, accreditation number. The local education agency shall submit a copy of the statement to the EPA Regional Office and shall include the statement in the management plan for that school.

(7) An architect or project engineer responsible for the construction of a new school building built after October 12, 1988, or an accredited inspector signs a statement that no ACBM was specified as a building material in any

**Environmental Protection Agency**                      **Pt. 763, Subpt. E, App. A**

construction document for the building, or, to the best of his or her knowledge, no ACBM was used as a building material in the building. The local education agency shall submit a copy of the signed statement of the architect, project engineer, or accredited inspector to the EPA Regional Office and shall include the statement in the management plan for that school.

(b) The exclusion, under paragraphs (a) (1) through (4) of this section, from conducting the inspection under §763.85(a) shall apply only to homogeneous or sampling areas of a school building that were inspected and sampled before October 17, 1987. The local education agency shall conduct an inspection under §763.85(a) of all areas inspected before October 17, 1987, that were not sampled or were not assumed to be ACM.

(c) If ACBM is subsequently found in a homogeneous or sampling area of a local education agency that had been identified as receiving an exclusion by an accredited inspector under paragraphs (a) (3), (4), (5) of this section, or an architect, project engineer or accredited inspector under paragraph (a)(7) of this section, the local education agency shall have 180 days following the date of identification of ACBM to comply with this subpart E.

APPENDIX A TO SUBPART E OF PART 763—INTERIM TRANSMISSION ELECTRON MICROSCOPY ANALYTICAL METHODS—MANDATORY AND NONMANDATORY—AND MANDATORY SECTION TO DETERMINE COMPLETION OF RESPONSE ACTIONS

*I. Introduction*

The following appendix contains three units. The first unit is the mandatory transmission electron microscopy (TEM) method which all laboratories must follow; it is the minimum requirement for analysis of air samples for asbestos by TEM. The mandatory method contains the essential elements of the TEM method. The second unit contains the complete non-mandatory method. The non-mandatory method supplements the mandatory method by including additional steps to improve the analysis. EPA recommends that the non-mandatory method be employed for analyzing air filters; however, the laboratory may choose to employ the mandatory method. The non-mandatory method contains the same minimum require-

ments as are outlined in the mandatory method. Hence, laboratories may choose either of the two methods for analyzing air samples by TEM.

The final unit of this Appendix A to subpart E defines the steps which must be taken to determine completion of response actions. This unit is mandatory.

*II. Mandatory Transmission Electron Microscopy Method*

A. Definitions of Terms

1. *Analytical sensitivity*—Airborne asbestos concentration represented by each fiber counted under the electron microscope. It is determined by the air volume collected and the proportion of the filter examined. This method requires that the analytical sensitivity be no greater than 0.005 structures/cm³.

2. *Asbestiform*—A specific type of mineral fibrosity in which the fibers and fibrils possess high tensile strength and flexibility.

3. *Aspect ratio*—A ratio of the length to the width of a particle. Minimum aspect ratio as defined by this method is equal to or greater than 5:1.

4. *Bundle*—A structure composed of three or more fibers in a parallel arrangement with each fiber closer than one fiber diameter.

5. *Clean area*—A controlled environment which is maintained and monitored to assure a low probability of asbestos contamination to materials in that space. Clean areas used in this method have HEPA filtered air under positive pressure and are capable of sustained operation with an open laboratory blank which on subsequent analysis has an average of less than 18 structures/mm² in an area of 0.057 mm² (nominally 10 200-mesh grid openings) and a maximum of 53 structures/mm² for any single preparation for that same area.

6. *Cluster*—A structure with fibers in a random arrangement such that all fibers are intermixed and no single fiber is isolated from the group. Groupings must have more than two intersections.

7. *ED*—Electron diffraction.

8. *EDXA*—Energy dispersive X-ray analysis.

9. *Fiber*—A structure greater than or equal to 0.5 μm in length with an aspect ratio (length to width) of 5:1 or greater and having substantially parallel sides.

10. *Grid*—An open structure for mounting on the sample to aid in its examination in the TEM. The term is used here to denote a 200-mesh copper lattice approximately 3 mm in diameter.

11. *Intersection*—Nonparallel touching or crossing of fibers, with the projection having an aspect ratio of 5:1 or greater.

12. *Laboratory sample coordinator*—That person responsible for the conduct of sample

865

handling and the certification of the testing procedures.

13. *Filter background level*—The concentration of structures per square millimeter of filter that is considered indistinguishable from the concentration measured on a blank (filters through which no air has been drawn). For this method the filter background level is defined as 70 structures/mm².

14. *Matrix*—Fiber or fibers with one end free and the other end embedded in or hidden by a particulate. The exposed fiber must meet the fiber definition.

15. *NSD*—No structure detected.

16. *Operator*—A person responsible for the TEM instrumental analysis of the sample.

17. *PCM*—Phase contrast microscopy.

18. *SAED*—Selected area electron diffraction.

19. *SEM*—Scanning electron microscope.

20. *STEM*—Scanning transmission electron microscope.

21. *Structure*—a microscopic bundle, cluster, fiber, or matrix which may contain asbestos.

22. *S/cm³*—Structures per cubic centimeter.

23. *S/mm²*—Structures per square millimeter.

24. *TEM*—Transmission electron microscope.

B. Sampling

1. The sampling agency must have written quality control procedures and documents which verify compliance.

2. Sampling operations must be performed by qualified individuals completely independent of the abatement contractor to avoid possible conflict of interest (References 1, 2, 3, and 5 of Unit II.J.).

3. Sampling for airborne asbestos following an abatement action must use commercially available cassettes.

4. Prescreen the loaded cassette collection filters to assure that they do not contain concentrations of asbestos which may interfere with the analysis of the sample. A filter blank average of less than 18 s/mm² in an area of 0.057 mm² (nominally 10 200-mesh grid openings) and a single preparation with a maximum of 53 s/mm² for that same area is acceptable for this method.

5. Use sample collection filters which are either polycarbonate having a pore size less than or equal to 0.4 µm or mixed cellulose ester having a pore size less than or equal to 0.45 µm.

6. Place these filters in series with a 5.0 µm backup filter (to serve as a diffuser) and a support pad. See the following Figure 1:

**Environmental Protection Agency**                    **Pt. 763, Subpt. E, App. A**

FIGURE I—SAMPLING CASSETTE CONFIGURATION



7. Reloading of used cassettes is not permitted.

8. Orient the cassette downward at approximately 45 degrees from the horizontal.

9. Maintain a log of all pertinent sampling information.

867

10. Calibrate sampling pumps and their flow indicators over the range of their intended use with a recognized standard. Assemble the sampling system with a representative filter (not the filter which will be used in sampling) before and after the sampling operation.

11. Record all calibration information.

12. Ensure that the mechanical vibrations from the pump will be minimized to prevent transferral of vibration to the cassette.

13. Ensure that a continuous smooth flow of negative pressure is delivered by the pump by damping out any pump action fluctuations if necessary.

14. The final plastic barrier around the abatement area remains in place for the sampling period.

15. After the area has passed a thorough visual inspection, use aggressive sampling conditions to dislodge any remaining dust. (See suggested protocol in Unit III.B.7.d.)

16. Select an appropriate flow rate equal to or greater than 1 liter per minute (L/min) or less than 10 L/min for 25 mm cassettes. Larger filters may be operated at proportionally higher flow rates.

17. A minimum of 13 samples are to be collected for each testing site consisting of the following:

a. A minimum of five samples per abatement area.

b. A minimum of five samples per ambient area positioned at locations representative of the air entering the abatement site.

c. Two field blanks are to be taken by removing the cap for not more than 30 seconds and replacing it at the time of sampling before sampling is initiated at the following places:

i. Near the entrance to each abatement area.

ii. At one of the ambient sites. (DO NOT leave the field blanks open during the sampling period.)

d. A sealed blank is to be carried with each sample set. This representative cassette is not to be opened in the field.

18. Perform a leak check of the sampling system at each indoor and outdoor sampling site by activating the pump with the closed sampling cassette in line. Any flow indicates a leak which must be eliminated before initiating the sampling operation.

19. The following Table I specifies volume ranges to be used:

**Environmental Protection Agency**                    **Pt. 763, Subpt. E, App. A**

TABLE 1--NUMBER OF 200 MESH EM GRID OPENINGS
(0.0057 MM$^2$) THAT NEED TO BE ANALYZED TO
MAINTAIN SENSITIVITY OF 0.005 STRUCTURES/CC
BASED ON VOLUME AND EFFECTIVE FILTER AREA

| | Effective Filter Area 385 sq mm | | | Effective Filter Area 855 sq mm | |
|---|---|---|---|---|---|
| | Volume (liters) | # of grid openings | | Volume (liters) | # of grid openings |
| | 560 | 24 | | 1,250 | 24 |
| | 600 | 23 | | 1,300 | 23 |
| | 700 | 19 | | 1,400 | 21 |
| | 800 | 17 | | 1,600 | 19 |
| | 900 | 15 | | 1,800 | 17 |
| | 1,000 | 14 | | 2,000 | 15 |
| | 1,100 | 12 | | 2,200 | 14 |
| | 1,200 | 11 | | 2,400 | 13 |
| | 1,300 | 10 | | 2,600 | 12 |
| Recommended | 1,400 | 10 | | 2,800 | 11 |
| Volume | 1,500 | 9 | | 3,000 | 10 |
| Range | 1,600 | 8 | | 3,200 | 9 |
| | 1,700 | 8 | | 3,400 | 9 |
| | 1,800 | 8 | | 3,600 | 8 | Recommended |
| | 1,900 | 7 | | 3,800 | 8 | Volume |
| | 2,000 | 7 | | 4,000 | 8 | Range |
| | 2,100 | 6 | | 4,200 | 7 |
| | 2,200 | 6 | | 4,400 | 7 |
| | 2,300 | 6 | | 4,600 | 7 |
| | 2,400 | 6 | | 4,800 | 6 |
| | 2,500 | 5 | | 5,000 | 6 |
| | 2,600 | 5 | | 5,200 | 6 |
| | 2,700 | 5 | | 5,400 | 6 |
| | 2,800 | 5 | | 5,600 | 5 |
| | 2,900 | 5 | | 5,800 | 5 |
| | 3,000 | 5 | | 6,000 | 5 |
| | 3,100 | 4 | | 6,200 | 5 |
| | 3,200 | 4 | | 6,400 | 5 |
| | 3,300 | 4 | | 6,600 | 5 |
| | 3,400 | 4 | | 6,800 | 4 |
| | 3,500 | 4 | | 7,000 | 4 |
| | 3,600 | 4 | | 7,200 | 4 |
| | 3,700 | 4 | | 7,400 | 4 |
| | 3,800 | 4 | | 7,600 | 4 |

Note minimum volumes required:
25 mm : 560 liters
37 mm : 1250 liters

Filter diameter of 25 mm = effective area of 385 sq mm
Filter diameter of 37 mm = effective area of 855 sq mm

20. Ensure that the sampler is turned upright before interrupting the pump flow.

21. Check that all samples are clearly labeled and that all pertinent information has been enclosed before transfer of the samples to the laboratory.

22. Ensure that the samples are stored in a secure and representative location.

23. Do not change containers if portions of these filters are taken for other purposes.

24. A summary of Sample Data Quality Objectives is shown in the following Table II:

**Pt. 763, Subpt. E, App. A**                    **40 CFR Ch. I (7–1–11 Edition)**

TABLE II--SUMMARY OF SAMPLING AGENCY DATA QUALITY OBJECTIVES

This table summarizes the data quality objectives from the performance of this method in terms of precision, accuracy, completeness, representativeness, and comparability. These objectives are assured by the periodic control checks and reference checks listed here and described in the text of the method.

| Unit Operation | QC Check | Frequency | Conformance Expectation |
|---|---|---|---|
| Sampling materials | Sealed blank | 1 per I/O site | 95% |
| Sample procedures | Field blanks | 2 per I/O site | 95% |
| | Pump calibration | Before and after each field series | 90% |
| Sample custody | Review of chain-of-custody record | Each sample | 95% complete |
| Sample shipment | Review of sending report | Each sample | 95% complete |

### C. Sample Shipment

Ship bulk samples to the analytical laboratory in a separate container from air samples.

### D. Sample Receiving

1. Designate one individual as sample coordinator at the laboratory. While that individual will normally be available to receive samples, the coordinator may train and supervise others in receiving procedures for those times when he/she is not available.

2. Bulk samples and air samples delivered to the analytical laboratory in the same container shall be rejected.

### E. Sample Preparation

1. All sample preparation and analysis shall be performed by a laboratory independent of the abatement contractor.

2. Wet-wipe the exterior of the cassettes to minimize contamination possibilities before taking them into the clean room facility.

3. Perform sample preparation in a well-equipped clean facility.

NOTE: The clean area is required to have the following minimum characteristics. The area or hood must be capable of maintaining a positive pressure with make-up air being HEPA-filtered. The cumulative analytical blank concentration must average less than 18 s/mm² in an area of 0.057 mm² (nominally 10 200-mesh grid openings) and a single preparation with a maximum of 53 s/mm² for that same area.

4. Preparation areas for air samples must not only be separated from preparation areas for bulk samples, but they must be prepared in separate rooms.

5. Direct preparation techniques are required. The object is to produce an intact film containing the particulates of the filter surface which is sufficiently clear for TEM analysis.

a. TEM Grid Opening Area measurement must be done as follows:

i. The filter portion being used for sample preparation must have the surface collapsed using an acetone vapor technique.

ii. Measure 20 grid openings on each of 20 random 200-mesh copper grids by placing a grid on a glass and examining it under the PCM. Use a calibrated graticule to measure the average field diameters. From the data, calculate the field area for an average grid opening.

iii. Measurements can also be made on the TEM at a properly calibrated low magnification or on an optical microscope at a magnification of approximately 400X by using an eyepiece fitted with a scale that has been calibrated against a stage micrometer. Optical microscopy utilizing manual or automated procedures may be used providing instrument calibration can be verified.

b. TEM specimen preparation from polycarbonate (PC) filters. Procedures as described in Unit III.G. or other equivalent methods may be used.

c. TEM specimen preparation from mixed cellulose ester (MCE) filters.

i. Filter portion being used for sample preparation must have the surface collapsed using an acetone vapor technique or the Burdette procedure (Ref. 7 of Unit II.J.)

ii. Plasma etching of the collapsed filter is required. The microscope slide to which the collapsed filter pieces are attached is placed in a plasma asher. Because plasma ashers vary greatly in their performance, both from unit to unit and between different positions in the asher chamber, it is difficult to specify the conditions that should be used. Insufficient etching will result in a failure to expose embedded filters, and too much etching may result in loss of particulate from the surface. As an interim measure, it is recommended that the time for ashing of a

870

known weight of a collapsed filter be established and that the etching rate be calculated in terms of micrometers per second. The actual etching time used for the particulate asher and operating conditions will then be set such that a 1–2 μm (10 percent) layer of collapsed surface will be removed.

iii. Procedures as described in Unit III. or other equivalent methods may be used to prepare samples.

### F. TEM Method

1. An 80–120 kV TEM capable of performing electron diffraction with a fluorescent screen inscribed with calibrated gradations is required. If the TEM is equipped with EDXA it must either have a STEM attachment or be capable of producing a spot less than 250 nm in diameter at crossover. The microscope shall be calibrated routinely for magnification and camera constant.

2. *Determination of Camera Constant and ED Pattern Analysis.* The camera length of the TEM in ED operating mode must be calibrated before ED patterns on unknown samples are observed. This can be achieved by using a carbon-coated grid on which a thin film of gold has been sputtered or evaporated. A thin film of gold is evaporated on the specimen TEM grid to obtain zone-axis ED patterns superimposed with a ring pattern from the polycrystalline gold film. In practice, it is desirable to optimize the thickness of the gold film so that only one or two sharp rings are obtained on the superimposed ED pattern. Thicker gold film would normally give multiple gold rings, but it will tend to mask weaker diffraction spots from the unknown fibrous particulate. Since the unknown d-spacings of most interest in asbestos analysis are those which lie closest to the transmitted beam, multiple gold rings are unnecessary on zone-axis ED patterns. An average camera constant using multiple gold rings can be determined. The camera constant is one-half the diameter of the rings times the interplanar spacing of the ring being measured.

3. *Magnification Calibration.* The magnification calibration must be done at the fluorescent screen. The TEM must be calibrated at the grid opening magnification (if used) and also at the magnification used for fiber counting. This is performed with a cross grating replica (e.g., one containing 2,160 lines/mm). Define a field of view on the fluorescent screen either by markings or physical boundaries. The field of view must be measurable or previously inscribed with a scale or concentric circles (all scales should

be metric). A logbook must be maintained, and the dates of calibration and the values obtained must be recorded. The frequency of calibration depends on the past history of the particular microscope. After any maintenance of the microscope that involved adjustment of the power supplied to the lenses or the high-voltage system or the mechanical disassembly of the electron optical column apart from filament exchange, the magnification must be recalibrated. Before the TEM calibration is performed, the analyst must ensure that the cross grating replica is placed at the same distance from the objective lens as the specimens are. For instruments that incorporate a eucentric tilting specimen stage, all specimens and the cross grating replica must be placed at the eucentric position.

4. While not required on every microscope in the laboratory, the laboratory must have either one microscope equipped with energy dispersive X-ray analysis or access to an equivalent system on a TEM in another laboratory.

5. Microscope settings: 80–120 kV, grid assessment 250–1,000X, then 15,000–20,000X screen magnification for analysis.

6. Approximately one-half (0.5) of the predetermined sample area to be analyzed shall be performed on one sample grid preparation and the remaining half on a second sample grid preparation.

7. Individual grid openings with greater than 5 percent openings (holes) or covered with greater than 25 percent particulate matter or obviously having nonuniform loading must not be analyzed.

8. Reject the grid if:

a. Less than 50 percent of the grid openings covered by the replica are intact.

b. The replica is doubled or folded.

c. The replica is too dark because of incomplete dissolution of the filter.

9. *Recording Rules.*

a. Any continuous grouping of particles in which an asbestos fiber with an aspect ratio greater than or equal to 5:1 and a length greater than or equal to 0.5 μm is detected shall be recorded on the count sheet. These will be designated asbestos structures and will be classified as fibers, bundles, clusters, or matrices. Record as individual fibers any contiguous grouping having 0, 1, or 2 definable intersections. Groupings having more than 2 intersections are to be described as cluster or matrix. An intersection is a nonparallel touching or crossing of fibers, with the projection having an aspect ratio of 5:1 or greater. See the following Figure 2:

FIGURE 2--COUNTING GUIDELINES USED IN
DETERMINING ASBESTOS STRUCTURES

Count as 1 fiber; 1 Structure; no intersections.



Count as 2 fibers if space between fibers is greater than width of 1 fiber
diameter or number of intersections is equal to or less than 1.



Count as 3 structures if space between fibers is greater than width of 1 fiber
diameter or if the number of intersections is equal to or less than 2.



Count bundles as 1 structure; 3 or more parallel fibrils less
than 1 fiber diameter separation.



**Environmental Protection Agency**                    **Pt. 763, Subpt. E, App. A**

Count clusters as 1 structure; fibers having greater than or equal to
3 intersections.

   

Count matrix as 1 structure.

  



DO NOT COUNT AS STRUCTURES:

  

Fiber protrusion          No fiber protrusion          Fiber protrusion
<5:1 Aspect Ratio                                       <0.5 micrometer

  <0.5 micrometer in length
  <5:1 Aspect Ratio

i. *Fiber*. A structure having a minimum length greater than or equal to 0.5 µm and an aspect ratio (length to width) of 5:1 or greater and substantially parallel sides. Note the appearance of the end of the fiber, i.e., whether it is flat, rounded or dovetailed.

ii. *Bundle*. A structure composed of three or more fibers in a parallel arrangement with each fiber closer than one fiber diameter.

iii. *Cluster*. A structure with fibers in a random arrangement such that all fibers are intermixed and no single fiber is isolated from the group. Groupings must have more than two intersections.

iv. *Matrix*. Fiber or fibers with one end free and the other end embedded in or hidden by a particulate. The exposed fiber must meet the fiber definition.

b. Separate categories will be maintained for fibers less than 5 µm and for fibers equal to or greater than 5 µm in length.

c. Record NSD when no structures are detected in the field.

d. Visual identification of electron diffraction (ED) patterns is required for each asbestos structure counted which would cause the

873

analysis to exceed the 70 s/mm$^2$ concentration. (Generally this means the first four fibers identified as asbestos must exhibit an identifiable diffraction pattern for chrysotile or amphibole.)

e. The micrograph number of the recorded diffraction patterns must be reported to the client and maintained in the laboratory's quality assurance records. In the event that examination of the pattern by a qualified individual indicates that the pattern has been misidentified visually, the client shall be contacted.

f. Energy Dispersive X-ray Analysis (EDXA) is required of all amphiboles which would cause the analysis results to exceed the 70 s/mm$^2$ concentration. (Generally speaking, the first 4 amphiboles would require EDXA.)

g. If the number of fibers in the non-asbestos class would cause the analysis to exceed the 70 s/mm$^2$ concentration, the fact that they are not asbestos must be confirmed by EDXA or measurement of a zone axis diffraction pattern.

h. Fibers classified as chrysotile must be identified by diffraction or X-ray analysis and recorded on a count sheet. X-ray analysis alone can be used only after 70 s/mm$^2$ have been exceeded for a particular sample.

i. Fibers classified as amphiboles must be identified by X-ray analysis and electron diffraction and recorded on the count sheet. (X-ray analysis alone can be used only after 70 s/mm$^2$ have been exceeded for a particular sample.)

j. If a diffraction pattern was recorded on film, record the micrograph number on the count sheet.

k. If an electron diffraction was attempted but no pattern was observed, record N on the count sheet.

l. If an EDXA spectrum was attempted but not observed, record N on the count sheet.

m. If an X-ray analysis spectrum is stored, record the file and disk number on the count sheet.

10. Classification Rules.

a. *Fiber.* A structure having a minimum length greater than or equal to 0.5 μm and an aspect ratio (length to width) of 5:1 or greater and substantially parallel sides. Note the appearance of the end of the fiber, i.e., whether it is flat, rounded or dovetailed.

b. *Bundle.* A structure composed of three or more fibers in a parallel arrangement with each fiber closer than one fiber diameter.

c. *Cluster.* A structure with fibers in a random arrangement such that all fibers are intermixed and no single fiber is isolated from the group. Groupings must have more than two intersections.

d. *Matrix.* Fiber or fibers with one end free and the other end embedded in or hidden by a particulate. The exposed fiber must meet the fiber definition.

11. After finishing with a grid, remove it from the microscope, and replace it in the appropriate grid holder. Sample grids must be stored for a minimum of 1 year from the date of the analysis; the sample cassette must be retained for a minimum of 30 days by the laboratory or returned at the client's request.

G. Sample Analytical Sequence

1. Under the present sampling requirements a minimum of 13 samples is to be collected for the clearance testing of an abatement site. These include five abatement area samples, five ambient samples, two field blanks, and one sealed blank.

2. Carry out visual inspection of work site prior to air monitoring.

3. Collect a minimum of 5 air samples inside the work site and 5 samples outside the work site. The indoor and outdoor samples shall be taken during the same time period.

4. Remaining steps in the analytical sequence are contained in Unit IV of this Appendix.

H. Reporting

1. The following information must be reported to the client for each sample analyzed:

a. Concentration in structures per square millimeter and structures per cubic centimeter.

b. Analytical sensitivity used for the analysis.

c. Number of asbestos structures.

d. Area analyzed.

e. Volume of air sampled (which must be initially supplied to lab by client).

f. Copy of the count sheet must be included with the report.

g. Signature of laboratory official to indicate that the laboratory met specifications of the method.

h. Report form must contain official laboratory identification (e.g., letterhead).

i. Type of asbestos.

I. Quality Control/Quality Assurance Procedures (Data Quality Indicators)

Monitoring the environment for airborne asbestos requires the use of sensitive sampling and analysis procedures. Because the test is sensitive, it may be influenced by a variety of factors. These include the samples used in the sampling operation, the performance of the sampling, the preparation of the grid from the filter and the actual examination of this grid in the microscope. Each of these unit operations must produce a product of defined quality if the analytical result is to be a reliable and meaningful test result. Accordingly, a series of control checks and reference standards are to be performed along with the sample analysis as indicators that the materials used are adequate and the

874

**Environmental Protection Agency**                    **Pt. 763, Subpt. E, App. A**

operations are within acceptable limits. In this way, the quality of the data is defined and the results are of known value. These checks and tests also provide timely and specific warning of any problems which might develop within the sampling and analysis operations. A description of these quality control/quality assurance procedures is summarized in the following Table III:

TABLE III—SUMMARY OF LABORATORY DATA QUALITY OBJECTIVES

| Unit Operation | QC Check | Frequency | Conformance Expectation |
|---|---|---|---|
| Sample receiving | Review of receiving report | Each sample | 95% complete |
| Sample custody | Review of chain-of-custody record | Each sample | 95% complete |
| Sample preparation | Supplies and reagents | On receipt | Meet specs. or reject |
| | Grid opening size | 20 openings/20 grids/lot of 1000 or 1 opening/sample | 100% |
| | Special clean area monitoring | After cleaning or service | Meet specs or reclean |
| | Laboratory blank | 1 per prep series or 10% | Meet specs. or reanalyze series |
| | Plasma etch blank | 1 per 20 samples | 75% |
| | Multiple preps (3 per sample) | Each sample | One with cover of 15 complete grid sqs. |
| Sample analysis | System check | Each day | Each day |
| | Alignment check | Each day | Each day |
| | Magnification calibration with low and high standards | Each month or after service | 95% |
| | ED calibration by gold standard | Weekly | 95% |
| | EDS calibration by copper line | Daily | 95% |
| Performance check | Laboratory blank (measure of cleanliness) | Prep 1 per series or 10% read 1 per 25 samples | Meet specs or reanalyze series |
| | Replicate counting (measure of precision) | 1 per 100 samples | 1.5 x Poisson Std. Dev. |
| | Duplicate analysis (measure of reproducibility) | 1 per 100 samples | 2 x Poisson Std. Dev. |
| | Known samples of typical materials (working standards) | Training and for comparison with unknowns | 100% |
| | Analysis of NBS SRM 1876 and/or RM 8410 (measure of accuracy and comparability) | 1 per analyst per year | 1.5 x Poisson Std. Dev. |
| | Data entry review (data validation and measure of completeness) | Each sample | 95% |
| | Record and verify ID electron diffraction pattern of structure | 1 per 5 samples | 80% accuracy |
| Calculations and data reduction | Hand calculation of automated data reduction procedure or independent recalculation of hand-calculated data | 1 per 100 samples | 85% |

1. When the samples arrive at the laboratory, check the samples and documentation for completeness and requirements before initiating the analysis.

2. Check all laboratory reagents and supplies for acceptable asbestos background levels.

3. Conduct all sample preparation in a clean room environment monitored by laboratory blanks. Testing with blanks must also be done after cleaning or servicing the room.

4. Prepare multiple grids of each sample.

5. Provide laboratory blanks with each sample batch. Maintain a cumulative average of these results. If there are more than 53 fibers/mm² per 10 200-mesh grid openings, the system must be checked for possible sources of contamination.

6. Perform a system check on the transmission electron microscope daily.

7. Make periodic performance checks of magnification, electron diffraction and energy dispersive X-ray systems as set forth in Table III under Unit II.I.

8. Ensure qualified operator performance by evaluation of replicate analysis and standard sample comparisons as set forth in Table III under Unit II.I.

9. Validate all data entries.

10. Recalculate a percentage of all computations and automatic data reduction steps as set forth in Table III under Unit II.I.

11. Record an electron diffraction pattern of one asbestos structure from every five samples that contain asbestos. Verify the identification of the pattern by measurement or comparison of the pattern with patterns collected from standards under the same conditions. The records must also demonstrate that the identification of the pattern has been verified by a qualified individual and that the operator who made the identification is maintaining at least an 80 percent correct visual identification based on his measured patterns.

12. Appropriate logs or records must be maintained by the analytical laboratory verifying that it is in compliance with the mandatory quality assurance procedures.

### J. References

For additional background information on this method, the following references should be consulted.

1. "Guidance for Controlling Asbestos-Containing Materials in Buildings," EPA 560/5–85–024, June 1985.

2. "Measuring Airborne Asbestos Following an Abatement Action," USEPA, Office of Pollution Prevention and Toxics, EPA 600/4–85–049, 1985.

3. Small, John and E. Steel. Asbestos Standards: Materials and Analytical Methods. N.B.S. Special Publication 619, 1982.

4. Campbell, W.J., R.L. Blake, L.L. Brown, E.E. Cather, and J.J. Sjoberg. Selected Silicate Minerals and Their Asbestiform Varieties. Information Circular 8751, U.S. Bureau of Mines, 1977.

5. Quality Assurance Handbook for Air Pollution Measurement System. Ambient Air Methods, EPA 600/4–77–027a, USEPA, Office of Research and Development, 1977.

6. Method 2A: Direct Measurement of Gas Volume through Pipes and Small Ducts. 40 CFR Part 60 Appendix A.

7. Burdette, G.J., Health & Safety Exec. Research & Lab. Services Div., London, "Proposed Analytical Method for Determination of Asbestos in Air."

8. Chatfield, E.J., Chatfield Tech. Cons., Ltd., Clark, T., PEI Assoc., "Standard Operating Procedure for Determination of Airborne Asbestos Fibers by Transmission Electron Microscopy Using Polycarbonate Membrane Filters," WERL SOP 87–1, March 5, 1987.

9. NIOSH Method 7402 for Asbestos Fibers, 12–11–86 Draft.

10. Yamate, G., Agarwall, S.C., Gibbons, R.D., IIT Research Institute, "Methodology for the Measurement of Airborne Asbestos by Electron Microscopy," Draft report, USEPA Contract 68–02–3266, July 1984.

11. "Guidance to the Preparation of Quality Assurance Project Plans," USEPA, Office of Pollution Prevention and Toxics, 1984.

### III. Nonmandatory Transmission Electron Microscopy Method

#### A. Definitions of Terms

1. *Analytical sensitivity*—Airborne asbestos concentration represented by each fiber counted under the electron microscope. It is determined by the air volume collected and the proportion of the filter examined. This method requires that the analytical sensitivity be no greater than 0.005 s/cm³.

2. *Asbestiform*—A specific type of mineral fibrosity in which the fibers and fibrils possess high tensile strength and flexibility.

3. *Aspect ratio*—A ratio of the length to the width of a particle. Minimum aspect ratio as defined by this method is equal to or greater than 5:1.

4. *Bundle*—A structure composed of three or more fibers in a parallel arrangement with each fiber closer than one fiber diameter.

5. *Clean area*—A controlled environment which is maintained and monitored to assure a low probability of asbestos contamination to materials in that space. Clean areas used in this method have HEPA filtered air under positive pressure and are capable of sustained operation with an open laboratory blank which on subsequent analysis has an average of less than 18 structures/mm² in an area of 0.057 mm² (nominally 10 200 mesh grid openings) and a maximum of 53 structures/mm² for no more than one single preparation for that same area.

6. *Cluster*—A structure with fibers in a random arrangement such that all fibers are intermixed and no single fiber is isolated from the group. Groupings must have more than two intersections.

7. *ED*—Electron diffraction.

8. *EDXA*—Energy dispersive X-ray analysis.

9. *Fiber*—A structure greater than or equal to 0.5 µm in length with an aspect ratio (length to width) of 5:1 or greater and having substantially parallel sides.

**Environmental Protection Agency**                    **Pt. 763, Subpt. E, App. A**

10. *Grid*—An open structure for mounting on the sample to aid in its examination in the TEM. The term is used here to denote a 200-mesh copper lattice approximately 3 mm in diameter.

11. *Intersection*—Nonparallel touching or crossing of fibers, with the projection having an aspect ratio of 5:1 or greater.

12. *Laboratory sample coordinator*—That person responsible for the conduct of sample handling and the certification of the testing procedures.

13. *Filter background level*—The concentration of structures per square millimeter of filter that is considered indistinguishable from the concentration measured on blanks (filters through which no air has been drawn). For this method the filter background level is defined as 70 structures/mm$^2$.

14. *Matrix*—Fiber or fibers with one end free and the other end embedded in or hidden by a particulate. The exposed fiber must meet the fiber definition.

15. *NSD*—No structure detected.

16. *Operator*—A person responsible for the TEM instrumental analysis of the sample.

17. *PCM*—Phase contrast microscopy.

18. *SAED*—Selected area electron diffraction.

19. *SEM*—Scanning electron microscope.

20. *STEM*—Scanning transmission electron microscope.

21. *Structure*—a microscopic bundle, cluster, fiber, or matrix which may contain asbestos.

22. *S/cm$^3$*—Structures per cubic centimeter.

23. *S/mm$^2$*—Structures per square millimeter.

24. *TEM*—Transmission electron microscope.

### B. Sampling

1. Sampling operations must be performed by qualified individuals completely independent of the abatement contractor to avoid possible conflict of interest (See References 1, 2, and 5 of Unit III.L.) Special precautions should be taken to avoid contamination of the sample. For example, materials that have not been prescreened for their asbestos background content should not be used; also, sample handling procedures which do not take cross contamination possibilities into account should not be used.

2. Material and supply checks for asbestos contamination should be made on all critical supplies, reagents, and procedures before their use in a monitoring study.

3. Quality control and quality assurance steps are needed to identify problem areas and isolate the cause of the contamination (see Reference 5 of Unit III.L.). Control checks shall be permanently recorded to document the quality of the information produced. The sampling firm must have written quality control procedures and documents which verify compliance. Independent audits by a qualified consultant or firm should be performed once a year. All documentation of compliance should be retained indefinitely to provide a guarantee of quality. A summary of Sample Data Quality Objectives is shown in Table II of Unit II.B.

4. Sampling materials.

a. Sample for airborne asbestos following an abatement action using commercially available cassettes.

b. Use either a cowling or a filter-retaining middle piece. Conductive material may reduce the potential for particulates to adhere to the walls of the cowl.

c. Cassettes must be verified as "clean" prior to use in the field. If packaged filters are used for loading or preloaded cassettes are purchased from the manufacturer or a distributor, the manufacturer's name and lot number should be entered on all field data sheets provided to the laboratory, and are required to be listed on all reports from the laboratory.

d. Assemble the cassettes in a clean facility (See definition of clean area under Unit III.A.).

e. Reloading of used cassettes is not permitted.

f. Use sample collection filters which are either polycarbonate having a pore size of less than or equal to 0.4 μm or mixed cellulose ester having a pore size of less than or equal to 0.45 μm.

g. Place these filters in series with a backup filter with a pore size of 5.0 μm (to serve as a diffuser) and a support pad. See the following Figure 1:

**Pt. 763, Subpt. E, App. A**                    **40 CFR Ch. I (7–1–11 Edition)**

FIGURE I--SAMPLING CASSETTE CONFIGURATION



h. When polycarbonate filters are used, po-
sition the highly reflective face such that
the incoming particulate is received on this
surface.

i. Seal the cassettes to prevent leakage
around the filter edges or between cassette
part joints. A mechanical press may be use-
ful to achieve a reproducible leak-free seal.

878

**Environmental Protection Agency**    **Pt. 763, Subpt. E, App. A**

Shrink fit gel-bands may be used for this purpose and are available from filter manufacturers and their authorized distributors.

j. Use wrinkle-free loaded cassettes in the sampling operation.

5. Pump setup.

a. Calibrate the sampling pump over the range of flow rates and loads anticipated for the monitoring period with this flow measuring device in series. Perform this calibration using guidance from EPA Method 2A each time the unit is sent to the field (See Reference 6 of Unit III.L.).

b. Configure the sampling system to preclude pump vibrations from being transmitted to the cassette by using a sampling stand separate from the pump station and making connections with flexible tubing.

c. Maintain continuous smooth flow conditions by damping out any pump action fluctuations if necessary.

d. Check the sampling system for leaks with the end cap still in place and the pump operating before initiating sample collection. Trace and stop the source of any flow indicated by the flowmeter under these conditions.

e. Select an appropriate flow rate equal to or greater than 1 L/min or less than 10 L/min for 25 mm cassettes. Larger filters may be operated at proportionally higher flow rates.

f. Orient the cassette downward at approximately 45 degrees from the horizontal.

g. Maintain a log of all pertinent sampling information, such as pump identification number, calibration data, sample location, date, sample identification number, flow rates at the beginning, middle, and end, start and stop times, and other useful information or comments. Use of a sampling log form is recommended. See the following Figure 2:

879

**Pt. 763, Subpt. E, App. A**                    **40 CFR Ch. I (7–1–11 Edition)**

FIGURE 2--SAMPLING LOG FORM

| Sample Number | Location of Sample | Pump I.D. | Start Time | Middle Time | End Time | Flow Rate |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

Inspector: _____    Date: _____

h. Initiate a chain of custody procedure at the start of each sampling, if this is requested by the client.

i. Maintain a close check of all aspects of the sampling operation on a regular basis.

j. Continue sampling until at least the minimum volume is collected, as specified in the following Table I:

880

**Environmental Protection Agency**                    **Pt. 763, Subpt. E, App. A**

TABLE 1--NUMBER OF 200 MESH EM GRID OPENINGS
(0.0057 MM$^2$) THAT NEED TO BE ANALYZED TO
MAINTAIN SENSITIVITY OF 0.005 STRUCTURES/CC
BASED ON VOLUME AND EFFECTIVE FILTER AREA

| | Effective Filter Area 385 sq mm | | | Effective Filter Area 855 sq mm | |
|---|---|---|---|---|---|
| | Volume (liters) | # of grid openings | | Volume (liters) | # of grid openings |
| | 560 | 24 | | 1,250 | 24 |
| | 600 | 23 | | 1,300 | 23 |
| | 700 | 19 | | 1,400 | 21 |
| | 800 | 17 | | 1,600 | 19 |
| | 900 | 15 | | 1,800 | 17 |
| | 1,000 | 14 | | 2,000 | 15 |
| | 1,100 | 12 | | 2,200 | 14 |
| Recommended Volume Range | 1,200 | 11 | | 2,400 | 13 |
| | 1,300 | 10 | | 2,600 | 12 |
| | 1,400 | 10 | | 2,800 | 11 |
| | 1,500 | 9 | | 3,000 | 10 |
| | 1,600 | 8 | Recommended Volume Range | 3,200 | 9 |
| | 1,700 | 8 | | 3,400 | 9 |
| | 1,800 | 8 | | 3,600 | 8 |
| | 1,900 | 7 | | 3,800 | 8 |
| | 2,000 | 7 | | 4,000 | 8 |
| | 2,100 | 6 | | 4,200 | 7 |
| | 2,200 | 6 | | 4,400 | 7 |
| | 2,300 | 6 | | 4,600 | 7 |
| | 2,400 | 6 | | 4,800 | 6 |
| | 2,500 | 5 | | 5,000 | 6 |
| | 2,600 | 5 | | 5,200 | 6 |
| | 2,700 | 5 | | 5,400 | 6 |
| | 2,800 | 5 | | 5,600 | 5 |
| | 2,900 | 5 | | 5,800 | 5 |
| | 3,000 | 5 | | 6,000 | 5 |
| | 3,100 | 4 | | 6,200 | 5 |
| | 3,200 | 4 | | 6,400 | 5 |
| | 3,300 | 4 | | 6,600 | 5 |
| | 3,400 | 4 | | 6,800 | 4 |
| | 3,500 | 4 | | 7,000 | 4 |
| | 3,600 | 4 | | 7,200 | 4 |
| | 3,700 | 4 | | 7,400 | 4 |
| | 3,800 | 4 | | 7,600 | 4 |

Note minimum volumes required:
25 mm : 560 liters
37 mm : 1250 liters

Filter diameter of 25 mm = effective area of 385 sq mm
Filter diameter of 37 mm = effective area of 855 sq mm

k. At the conclusion of sampling, turn the cassette upward before stopping the flow to minimize possible particle loss. If the sampling is resumed, restart the flow before re-orienting the cassette downward. Note the condition of the filter at the conclusion of sampling.

l. Double check to see that all information has been recorded on the data collection forms and that the cassette is securely closed and appropriately identified using a waterproof label. Protect cassettes in individual clean resealed polyethylene bags. Bags are to be used for storing cassette caps when they are removed for sampling purposes. Caps and plugs should only be removed or replaced using clean hands or clean disposable plastic gloves.

m. Do not change containers if portions of these filters are taken for other purposes.

6. Minimum sample number per site. A minimum of 13 samples are to be collected for each testing consisting of the following:

a. A minimum of five samples per abatement area.

b. A minimum of five samples per ambient area positioned at locations representative of the air entering the abatement site.

c. Two field blanks are to be taken by removing the cap for not more than 30 sec and replacing it at the time of sampling before sampling is initiated at the following places:

i. Near the entrance to each ambient area.

ii. At one of the ambient sites.

(NOTE: Do not leave the blank open during the sampling period.)

d. A sealed blank is to be carried with each sample set. This representative cassette is not to be opened in the field.

7. Abatement area sampling.

a. Conduct final clearance sampling only after the primary containment barriers have been removed; the abatement area has been thoroughly dried; and, it has passed visual inspection tests by qualified personnel. (See Reference 1 of Unit III.L.)

b. Containment barriers over windows, doors, and air passageways must remain in place until the TEM clearance sampling and analysis is completed and results meet clearance test criteria. The final plastic barrier remains in place for the sampling period.

c. Select sampling sites in the abatement area on a random basis to provide unbiased and representative samples.

d. After the area has passed a thorough visual inspection, use aggressive sampling conditions to dislodge any remaining dust.

i. Equipment used in aggressive sampling such as a leaf blower and/or fan should be properly cleaned and decontaminated before use.

ii. Air filtration units shall remain on during the air monitoring period.

iii. Prior to air monitoring, floors, ceiling and walls shall be swept with the exhaust of a minimum one (1) horsepower leaf blower.

iv. Stationary fans are placed in locations which will not interfere with air monitoring equipment. Fan air is directed toward the ceiling. One Fan shall be used for each 10,000 ft³ of worksite.

v. Monitoring of an abatement work area with high-volume pumps and the use of circulating fans will require electrical power. Electrical outlets in the abatement area may be used if available. If no such outlets are available, the equipment must be supplied with electricity by the use of extension cords and strip plug units. All electrical power supply equipment of this type must be approved Underwriter Laboratory equipment that has not been modified. All wiring must be grounded. Ground fault interrupters should be used. Extreme care must be taken to clean up any residual water and ensure that electrical equipment does not become wet while operational.

vi. Low volume pumps may be carefully wrapped in 6-mil polyethylene to insulate the pump from the air. High volume pumps cannot be sealed in this manner since the heat of the motor may melt the plastic. The pump exhausts should be kept free.

vii. If recleaning is necessary, removal of this equipment from the work area must be handled with care. It is not possible to completely decontaminate the pump motor and parts since these areas cannot be wetted. To minimize any problems in this area, all equipment such as fans and pumps should be carefully wet wiped prior to removal from the abatement area. Wrapping and sealing low volume pumps in 6-mil polyethylene will provide easier decontamination of this equipment. Use of clean water and disposable wipes should be available for this purpose.

e. Pump flow rate equal to or greater than 1 L/min or less than 10 L/min may be used for 25 mm cassettes. The larger cassette diameters may have comparably increased flow.

f. Sample a volume of air sufficient to ensure the minimum quantitation limits. (See Table I of Unit III.B.5.j.)

8. Ambient sampling.

a. Position ambient samplers at locations representative of the air entering the abatement site. If makeup air entering the abatement site is drawn from another area of the building which is outside of the abatement area, place the pumps in the building, pumps should be placed out of doors located near the building and away from any obstructions that may influence wind patterns. If construction is in progress immediately outside the enclosure, it may be necessary to select another ambient site. Samples should be representative of any air entering the work site.

b. Locate the ambient samplers at least 3 ft apart and protect them from adverse weather conditions.

c. Sample same volume of air as samples taken inside the abatement site.

### C. Sample Shipment

1. Ship bulk samples in a separate container from air samples. Bulk samples and air samples delivered to the analytical laboratory in the same container shall be rejected.

2. Select a rigid shipping container and pack the cassettes upright in a noncontaminating nonfibrous medium such as a bubble pack. The use of resealable polyethylene bags may help to prevent jostling of individual cassettes.

3. Avoid using expanded polystyrene because of its static charge potential. Also avoid using particle-based packaging materials because of possible contamination.

4. Include a shipping bill and a detailed listing of samples shipped, their descriptions

**Environmental Protection Agency**                    **Pt. 763, Subpt. E, App. A**

and all identifying numbers or marks, sampling data, shipper's name, and contact information. For each sample set, designate which are the ambient samples, which are the abatement area samples, which are the field blanks, and which is the sealed blank if sequential analysis is to be performed.

5. Hand-carry samples to the laboratory in an upright position if possible; otherwise choose that mode of transportation least likely to jar the samples in transit.

6. Address the package to the laboratory sample coordinator by name when known and alert him or her of the package description, shipment mode, and anticipated arrival as part of the chain of custody and sample tracking procedures. This will also help the laboratory schedule timely analysis for the samples when they are received.

D. Quality Control/Quality Assurance Procedures (Data Quality Indicators)

Monitoring the environment for airborne asbestos requires the use of sensitive sampling and analysis procedures. Because the test is sensitive, it may be influenced by a variety of factors. These include the supplies used in the sampling operation, the performance of the sampling, the preparation of the grid from the filter and the actual examination of this grid in the microscope. Each of these unit operations must produce a product of defined quality if the analytical result is to be a reliable and meaningful test result. Accordingly, a series of control checks and reference standards is performed along with the sample analysis as indicators that the materials used are adequate and the operations are within acceptable limits. In this way, the quality of the data is defined, and the results are of known value. These checks and tests also provide timely and specific warning of any problems which might develop within the sampling and analysis operations. A description of these quality control/quality assurance procedures is summarized in the text below.

1. Prescreen the loaded cassette collection filters to assure that they do not contain concentrations of asbestos which may interfere with the analysis of the sample. A filter blank average of less than 18 s/mm$^2$ in an area of 0.057 mm$^2$ (nominally 10 200-mesh grid openings) and a maximum of 53 s/mm$^2$ for that same area for any single preparation is acceptable for this method.

2. Calibrate sampling pumps and their flow indicators over the range of their intended use with a recognized standard. Assemble the sampling system with a representative filter—not the filter which will be used in sampling—before and after the sampling operation.

3. Record all calibration information with the data to be used on a standard sampling form.

4. Ensure that the samples are stored in a secure and representative location.

5. Ensure that mechanical calibrations from the pump will be minimized to prevent transferral of vibration to the cassette.

6. Ensure that a continuous smooth flow of negative pressure is delivered by the pump by installing a damping chamber if necessary.

7. Open a loaded cassette momentarily at one of the indoor sampling sites when sampling is initiated. This sample will serve as an indoor field blank.

8. Open a loaded cassette momentarily at one of the outdoor sampling sites when sampling is initiated. This sample will serve as an outdoor field blank.

9. Carry a sealed blank into the field with each sample series. Do not open this cassette in the field.

10. Perform a leak check of the sampling system at each indoor and outdoor sampling site by activating the pump with the closed sampling cassette in line. Any flow indicates a leak which must be eliminated before initiating the sampling operation.

11. Ensure that the sampler is turned upright before interrupting the pump flow.

12. Check that all samples are clearly labeled and that all pertinent information has been enclosed before transfer of the samples to the laboratory.

E. Sample Receiving

1. Designate one individual as sample coordinator at the laboratory. While that individual will normally be available to receive samples, the coordinator may train and supervise others in receiving procedures for those times when he/she is not available.

2. Adhere to the following procedures to ensure both the continued chain-of-custody and the accountability of all samples passing through the laboratory:

a. Note the condition of the shipping package and data written on it upon receipt.

b. Retain all bills of lading or shipping slips to document the shipper and delivery time.

c. Examine the chain-of-custody seal, if any, and the package for its integrity.

d. If there has been a break in the seal or substantive damage to the package, the sample coordinator shall immediately notify the shipper and a responsible laboratory manager before any action is taken to unpack the shipment.

e. Packages with significant damage shall be accepted only by the responsible laboratory manager after discussions with the client.

3. Unwrap the shipment in a clean, uncluttered facility. The sample coordinator or his or her designee will record the contents, including a description of each item and all identifying numbers or marks. A

883

**Pt. 763, Subpt. E, App. A**                    **40 CFR Ch. I (7–1–11 Edition)**

Sample Receiving Form to document this information is attached for use when necessary. (See the following Figure 3.)

FIGURE 3--SAMPLE RECEIVING FORM

Date of package delivery _____    Package shipped from _____

Carrier _____    Shipping bill retained _____

*Condition of package on receipt_____

*Condition of custody seal _____

Number of samples received _____    Shipping manifest attached _____

Purchase Order No. _____    Project I.D. _____

Comments _____

| No. | Description | Sampling Medium PC | MCE | Sampled Volume Liters | Receiving ID # | Assigned # |
|-----|-------------|------|------|------|------|------|
| 1 | | | | | | |
| 2 | | | | | | |
| 3 | | | | | | |
| 4 | | | | | | |
| 5 | | | | | | |
| 6 | | | | | | |
| 7 | | | | | | |
| 8 | | | | | | |
| 9 | | | | | | |
| 10 | | | | | | |
| 11 | | | | | | |
| 12 | | | | | | |
| 13 | | | | | | |

(Use as many additional sheets as needed.)

Comments _____

Date of acceptance into sample bank _____

Signature of chain-of-custody recipient _____

Disposition of samples_____

*Note:    If the package has sustained substantial damage or the custody seal is broken, stop and contact the project manager and the shipper.

NOTE: The person breaking the chain-of-custody seal and itemizing the contents assumes responsibility for the shipment and signs documents accordingly.

4. Assign a laboratory number and schedule an analysis sequence.

5. Manage all chain-of-custody samples within the laboratory such that their integrity can be ensured and documented.

### F. Sample Preparation

1. Personnel not affiliated with the Abatement Contractor shall be used to prepare samples and conduct TEM analysis. Wet-wipe the exterior of the cassettes to minimize contamination possibilities before taking them to the clean sample preparation facility.

2. Perform sample preparation in a well-equipped clean facility.

NOTE: The clean area is required to have the following minimum characteristics. The area or hood must be capable of maintaining a positive pressure with make-up air being HEPA filtered. The cumulative analytical blank concentration must average less than 18 s/mm² in an area of 0.057 s/mm² (nominally 10 200-mesh grid openings) with no more than one single preparation to exceed 53 s/mm² for that same area.

3. Preparation areas for air samples must be separated from preparation areas for bulk samples. Personnel must not prepare air samples if they have previously been preparing bulk samples without performing appropriate personal hygiene procedures, i.e., clothing change, showering, etc.

4. *Preparation.* Direct preparation techniques are required. The objective is to produce an intact carbon film containing the particulates from the filter surface which is sufficiently clear for TEM analysis. Currently recommended direct preparation procedures for polycarbonate (PC) and mixed cellulose ester (MCE) filters are described in Unit III.F.7. and 8. Sample preparation is a subject requiring additional research. Variation on those steps which do not substantively change the procedure, which improve filter clearing or which reduce contamination problems in a laboratory are permitted.

a. Use only TEM grids that had had grid opening areas measured according to directions in Unit III.J.

b. Remove the inlet and outlet plugs prior to opening the cassette to minimize any pressure differential that may be present.

c. Examples of techniques used to prepare polycarbonate filters are described in Unit III.F.7.

d. Examples of techniques used to prepare mixed cellulose ester filters are described in Unit III.F.8.

e. Prepare multiple grids for each sample.

f. Store the three grids to be measured in appropriately labeled grid holders or polyethylene capsules.

5. Equipment.

a. Clean area.

b. Tweezers. Fine-point tweezers for handling of filters and TEM grids.

c. Scalpel Holder and Curved No. 10 Surgical Blades.

d. Microscope slides.

e. Double-coated adhesive tape.

f. Gummed page reinforcements.

g. Micro-pipet with disposal tips 10 to 100 µL variable volume.

h. Vacuum coating unit with facilities for evaporation of carbon. Use of a liquid nitrogen cold trap above the diffusion pump will minimize the possibility of contamination of the filter surface by oil from the pumping system. The vacuum-coating unit can also be used for deposition of a thin film of gold.

i. *Carbon rod electrodes.* Spectrochemically pure carbon rods are required for use in the vacuum evaporator for carbon coating of filters.

j. *Carbon rod sharpener.* This is used to sharpen carbon rods to a neck. The use of necked carbon rods (or equivalent) allows the carbon to be applied to the filters with a minimum of heating.

k. *Low-temperature plasma asher.* This is used to etch the surface of collapsed mixed cellulose ester (MCE) filters. The asher should be supplied with oxygen, and should be modified as necessary to provide a throttle or bleed valve to control the speed of the vacuum to minimize disturbance of the filter. Some early models of ashers admit air too rapidly, which may disturb particulates on the surface of the filter during the etching step.

l. *Glass petri dishes, 10 cm in diameter, 1 cm high.* For prevention of excessive evaporation of solvent when these are in use, a good seal must be provided between the base and the lid. The seal can be improved by grinding the base and lid together with an abrasive grinding material.

m. Stainless steel mesh.

n. Lens tissue.

o. Copper 200-mesh TEM grids, 3 mm in diameter, or equivalent.

p. Gold 200-mesh TEM grids, 3 mm in diameter, or equivalent.

q. Condensation washer.

r. Carbon-coated, 200-mesh TEM grids, or equivalent.

s. Analytical balance, 0.1 mg sensitivity.

t. Filter paper, 9 cm in diameter.

u. Oven or slide warmer. Must be capable of maintaining a temperature of 65–70 °C.

v. Polyurethane foam, 6 mm thickness.

w. Gold wire for evaporation.

6. Reagents.

a. *General.* A supply of ultra-clean, fiber-free water must be available for washing of all components used in the analysis. Water

885

that has been distilled in glass or filtered or deionized water is satisfactory for this purpose. Reagents must be fiber-free.

b. Polycarbonate preparation method—chloroform.

c. Mixed Cellulose Ester (MCE) preparation method—acetone or the Burdette procedure (Ref. 7 of Unit III.L.).

7. TEM specimen preparation from polycarbonate filters.

a. *Specimen preparation laboratory*. It is most important to ensure that contamination of TEM specimens by extraneous asbestos fibers is minimized during preparation.

b. Cleaning of sample cassettes. Upon receipt at the analytical laboratory and before they are taken into the clean facility or laminar flow hood, the sample cassettes must be cleaned of any contamination adhering to the outside surfaces.

c. Preparation of the carbon evaporator. If the polycarbonate filter has already been carbon-coated prior to receipt, the carbon coating step will be omitted, unless the analyst believes the carbon film is too thin. If there is a need to apply more carbon, the filter will be treated in the same way as an uncoated filter. Carbon coating must be performed with a high-vacuum coating unit. Units that are based on evaporation of carbon filaments in a vacuum generated only by an oil rotary pump have not been evaluated for this application, and must not be used. The carbon rods should be sharpened by a carbon rod sharpener to necks of about 4 mm long and 1 mm in diameter. The rods are installed in the evaporator in such a manner that the points are approximately 10 to 12 cm from the surface of a microscope slide held in the rotating and tilting device.

d. Selection of filter area for carbon coating. Before preparation of the filters, a 75 mm×50 mm microscope slide is washed and dried. This slide is used to support strips of filter during the carbon evaporation. Two parallel strips of double-sided adhesive tape are applied along the length of the slide. Polycarbonate filters are easily stretched during handling, and cutting of areas for further preparation must be performed with great care. The filter and the MCE backing filter are removed together from the cassette and placed on a cleaned glass microscope slide. The filter can be cut with a curved scalpel blade by rocking the blade from the point placed in contact with the filter. The process can be repeated to cut a strip approximately 3 mm wide across the diameter of the filter. The strip of polycarbonate filter is separated from the corresponding strip of backing filter and carefully placed so that it bridges the gap between the adhesive tape strips on the microscope slide. The filter strip can be held with fine-point tweezers and supported underneath by the scalpel blade during placement on the microscope slide. The analyst can place several such

strips on the same microscope slide, taking care to rinse and wet-wipe the scalpel blade and tweezers before handling a new sample. The filter strips should be identified by etching the glass slide or marking the slide using a marker insoluble in water and solvents. After the filter strip has been cut from each filter, the residual parts of the filter must be returned to the cassette and held in position by reassembly of the cassette. The cassette will then be archived for a period of 30 days or returned to the client upon request.

e. Carbon coating of filter strips. The glass slide holding the filter strips is placed on the rotation-tilting device, and the evaporator chamber is evacuated. The evaporation must be performed in very short bursts, separated by some seconds to allow the electrodes to cool. If evaporation is too rapid, the strips of polycarbonate filter will begin to curl, which will lead to cross-linking of the surface material and make it relatively insoluble in chloroform. An experienced analyst can judge the thickness of carbon film to be applied, and some test should be made first on unused filters. If the film is too thin, large particles will be lost from the TEM specimen, and there will be few complete and undamaged grid openings on the specimen. If the coating is too thick, the filter will tend to curl when exposed to chloroform vapor and the carbon film may not adhere to the support mesh. Too thick a carbon film will also lead to a TEM image that is lacking in contrast, and the ability to obtain ED patterns will be compromised. The carbon film should be as thin as possible and remain intact on most of the grid openings of the TEM specimen intact.

f. Preparation of the Jaffe washer. The precise design of the Jaffe washer is not considered important, so any one of the published designs may be used. A washer consisting of a simple stainless steel bridge is recommended. Several pieces of lens tissue approximately 1.0 cm×0.5 cm are placed on the stainless steel bridge, and the washer is filled with chloroform to a level where the meniscus contacts the underside of the mesh, which results in saturation of the lens tissue. See References 8 and 10 of Unit III.L.

g. Placing of specimens into the Jaffe washer. The TEM grids are first placed on a piece of lens tissue so that individual grids can be picked up with tweezers. Using a curved scalpel blade, the analyst excises three 3 mm square pieces of the carbon-coated polycarbonate filter from the filter strip. The three squares are selected from the center of the strip and from two points between the outer periphery of the active surface and the center. The piece of filter is placed on a TEM specimen grid with the shiny side of the TEM grid facing upwards, and the whole assembly is placed boldly onto the saturated lens tissue in the Jaffe washer. If carbon-coated grids are used, the filter should be

**Environmental Protection Agency**                    **Pt. 763, Subpt. E, App. A**

placed carbon-coated side down. The three excised squares of filters are placed on the same piece of lens tissue. Any number of separate pieces of lens tissue may be placed in the same Jaffe washer. The lid is then placed on the Jaffe washer, and the system is allowed to stand for several hours, preferably overnight.

h. *Condensation washing.* It has been found that many polycarbonate filters will not dissolve completely in the Jaffe washer, even after being exposed to chloroform for as long as 3 days. This problem becomes more serious if the surface of the filter was overheated during the carbon evaporation. The presence of undissolved filter medium on the TEM preparation leads to partial or complete obscuration of areas of the sample, and fibers that may be present in these areas of the specimen will be overlooked; this will lead to a low result. Undissolved filter medium also compromises the ability to obtain ED patterns. Before they are counted, TEM grids must be examined critically to determine whether they are adequately cleared of residual filter medium. It has been found that condensation washing of the grids after the initial Jaffe washer treatment, with chloroform as the solvent, clears all residual filter medium in a period of approximately 1 hour. In practice, the piece of lens tissue supporting the specimen grids is transferred to the cold finger of the condensation washer, and the washer is operated for about 1 hour. If the specimens are cleared satisfactorily by the Jaffe washer alone, the condensation washer step may be unnecessary.

8. TEM specimen preparation from MCE filters.

a. This method of preparing TEM specimens from MCE filters is similar to that specified in NIOSH Method 7402. See References 7, 8, and 9 of Unit III.L.

b. Upon receipt at the analytical laboratory, the sample cassettes must be cleaned of any contamination adhering to the outside surfaces before entering the clean sample preparation area.

c. Remove a section from any quadrant of the sample and blank filters.

d. Place the section on a clean microscope slide. Affix the filter section to the slide with a gummed paged reinforcement or other suitable means. Label the slide with a water and solvent-proof marking pen.

e. Place the slide in a petri dish which contains several paper filters soaked with 2 to 3 mL acetone. Cover the dish. Wait 2 to 4 minutes for the sample filter to fuse and clear.

f. Plasma etching of the collapsed filter is required.

i. The microscope slide to which the collapsed filter pieces are attached is placed in a plasma asher. Because plasma ashers vary greatly in their performance, both from unit to unit and between different positions in the asher chamber, it is difficult to specify the conditions that should be used. This is one area of the method that requires further evaluation. Insufficient etching will result in a failure to expose embedded filters, and too much etching may result in loss of particulate from the surface. As an interim measure, it is recommended that the time for ashing of a known weight of a collapsed filter be established and that the etching rate be calculated in terms of micrometers per second. The actual etching time used for a particular asher and operating conditions will then be set such that a 1–2 μm (10 percent) layer of collapsed surface will be removed.

ii. Place the slide containing the collapsed filters into a low-temperature plasma asher, and etch the filter.

g. Transfer the slide to a rotating stage inside the bell jar of a vacuum evaporator. Evaporate a 1 mm×5 mm section of graphite rod onto the cleared filter. Remove the slide to a clean, dry, covered petri dish.

h. Prepare a second petri dish as a Jaffe washer with the wicking substrate prepared from filter or lens paper placed on top of a 6 mm thick disk of clean spongy polyurethane foam. Cut a V-notch on the edge of the foam and filter paper. Use the V-notch as a reservoir for adding solvent. The wicking substrate should be thin enough to fit into the petri dish without touching the lid.

i. Place carbon-coated TEM grids face up on the filter or lens paper. Label the grids by marking with a pencil on the filter paper or by putting registration marks on the petri dish lid and marking with a waterproof marker on the dish lid. In a fume hood, fill the dish with acetone until the wicking substrate is saturated. The level of acetone should be just high enough to saturate the filter paper without creating puddles.

j. Remove about a quarter section of the carbon-coated filter samples from the glass slides using a surgical knife and tweezers. Carefully place the section of the filter, carbon side down, on the appropriately labeled grid in the acetone-saturated petri dish. When all filter sections have been transferred, slowly add more solvent to the wedge-shaped trough to bring the acetone level up to the highest possible level without disturbing the sample preparations. Cover the petri dish. Elevate one side of the petri dish by placing a slide under it. This allows drops of condensed solvent vapors to form near the edge rather than in the center where they would drip onto the grid preparation.

G. TEM Method

1. *Instrumentation.*

a. Use an 80–120 kV TEM capable of performing electron diffraction with a fluorescent screen inscribed with calibrated gradations. If the TEM is equipped with EDXA it must either have a STEM attachment or be capable of producing a spot less than 250 nm

**Pt. 763, Subpt. E, App. A**                    **40 CFR Ch. I (7–1–11 Edition)**

in diameter at crossover. The microscope shall be calibrated routinely (see Unit III.J.) for magnification and camera constant.

b. While not required on every microscope in the laboratory, the laboratory must have either one microscope equipped with energy dispersive X-ray analysis or access to an equivalent system on a TEM in another laboratory. This must be an Energy Dispersive X-ray Detector mounted on TEM column and associated hardware/software to collect, save, and read out spectral information. Calibration of Multi-Channel Analyzer shall be checked regularly for A1 at 1.48 KeV and Cu at 8.04 KeV, as well as the manufacturer's procedures.

i. Standard replica grating may be used to determine magnification (e.g., 2160 lines/mm).

ii. Gold standard may be used to determine camera constant.

c. Use a specimen holder with single tilt and/or double tilt capabilities.

2. Procedure.

a. Start a new Count Sheet for each sample to be analyzed. Record on count sheet: analyst's initials and date; lab sample number; client sample number microscope identification; magnification for analysis; number of predetermined grid openings to be analyzed; and grid identification. See the following Figure 4:

**Environmental Protection Agency**          **Pt. 763, Subpt. E, App. A**

FIGURE 4--COUNT SHEET

Lab Sample No. _____   Filter Type _____   Operator _____
Client Sample No. _____   Filter Area _____   Date _____
Instrument I.D. _____   Grid I.D. _____   Comments _____
Magnification _____   Grid Opening (GO) Area _____
Acc. Voltage _____   No. GO to be Analyzed _____   _____

| GO | Structure No. | Structure Type* | Length | | ED Observation | | | | EDAX |
|---|---|---|---|---|---|---|---|---|---|
| | | | < 5µm | ≥ 5 µm | Chrys. | Amph. | Nonasb. | Neg. ID | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

| GO | Structure No. | Structure Type* | Length | | ED Observation | | | | EDAX |
|---|---|---|---|---|---|---|---|---|---|
| | | | < 5µm | ≥ 5 µm | Chrys. | Amph. | Nonasb. | Neg. ID | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

*B = Bundle          NFD = No fibers detected
 C = Cluster          N = No diffraction obtained
 F = Fiber
 M = Matrix

b. Check that the microscope is properly aligned and calibrated according to the manufacturer's specifications and instructions.

c. Microscope settings: 80–120 kV, grid assessment 250–1000X, then 15,000–20,000X screen magnification for analysis.

d. Approximately one-half (0.5) of the predetermined sample area to be analyzed shall be performed on one sample grid preparation and the remaining half on a second sample grid preparation.

e. Determine the suitability of the grid.

889

i. Individual grid openings with greater than 5 percent openings (holes) or covered with greater than 25 percent particulate matter or obviously having nonuniform loading shall not be analyzed.

ii. Examine the grid at low magnification (<1000X) to determine its suitability for detailed study at higher magnifications.

iii. Reject the grid if:

(1) Less than 50 percent of the grid openings covered by the replica are intact.

(2) It is doubled or folded.

(3) It is too dark because of incomplete dissolution of the filter.

iv. If the grid is rejected, load the next sample grid.

v. If the grid is acceptable, continue on to Step 6 if mapping is to be used; otherwise proceed to Step 7.

f. Grid Map (Optional).

i. Set the TEM to the low magnification mode.

ii. Use flat edge or finder grids for mapping.

iii. Index the grid openings (fields) to be counted by marking the acceptable fields for one-half (0.5) of the area needed for analysis on each of the two grids to be analyzed. These may be marked just before examining each grid opening (field), if desired.

iv. Draw in any details which will allow the grid to be properly oriented if it is re-loaded into the microscope and a particular field is to be reliably identified.

g. Scan the grid.

i. Select a field to start the examination.

ii. Choose the appropriate magnification (15,000 to 20,000X screen magnification).

iii. Scan the grid as follows.

(1) At the selected magnification, make a series of parallel traverses across the field. On reaching the end of one traverse, move the image one window and reverse the traverse.

NOTE: A slight overlap should be used so as not to miss any part of the grid opening (field).

(2) Make parallel traverses until the entire grid opening (field) has been scanned.

h. Identify each structure for appearance and size.

i. Appearance and size: Any continuous grouping of particles in which an asbestos fiber within aspect ratio greater than or equal to 5:1 and a length greater than or equal to 0.5 $\mu$m is detected shall be recorded on the count sheet. These will be designated asbestos structures and will be classified as fibers, bundles, clusters, or matrices. Record as individual fibers any contiguous grouping having 0, 1, or 2 definable intersections. Groupings having more than 2 intersections are to be described as cluster or matrix. See the following Figure 5:

**Environmental Protection Agency**          **Pt. 763, Subpt. E, App. A**

FIGURE 5--COUNTING GUIDELINES USED IN
DETERMINING ASBESTOS STRUCTURES

Count as 1 fiber; 1 Structure; no intersections.



Count as 2 fibers if space between fibers is greater than width of 1 fiber
diameter or number of intersections is equal to or less than 1.



Count as 3 structures if space between fibers is greater than width of 1 fiber
diameter or if the number of intersections is equal to or less than 2.



Count bundles as 1 structure; 3 or more parallel fibrils less
than 1 fiber diameter separation.



Count clusters as 1 structure; fibers having greater than or equal to 3 intersections.



Count matrix as 1 structure.



DO NOT COUNT AS STRUCTURES:

  

Fiber protrusion <5:1 Aspect Ratio     No fiber protrusion     Fiber protrusion <0.5 micrometer

——— <0.5 micrometer in length

▬▬ <5:1 Aspect Ratio

An intersection is a non-parallel touching or crossing of fibers, with the projection having an aspect ratio of 5:1 or greater. Combinations such as a matrix and cluster, matrix and bundle, or bundle and cluster are categorized by the dominant fiber quality—cluster, bundle, and matrix, respectively. Separate categories will be maintained for fibers less than 5 μm and for fibers greater than or equal to 5 μm in length. Not required, but useful, may be to record the fiber length in 1 μm intervals. (Identify each structure morphologically and analyze it as it enters the "window".)

(1) *Fiber*. A structure having a minimum length greater than 0.5 μm and an aspect ratio (length to width) of 5:1 or greater and substantially parallel sides. Note the appearance of the end of the fiber, i.e., whether it is flat, rounded or dovetailed, no intersections.

(2) *Bundle*. A structure composed of 3 or more fibers in a parallel arrangement with each fiber closer than one fiber diameter.

(3) *Cluster*. A structure with fibers in a random arrangement such that all fibers are intermixed and no single fiber is isolated from the group; groupings must have more than 2 intersections.

**Environmental Protection Agency**                    **Pt. 763, Subpt. E, App. A**

(4) *Matrix.* Fiber or fibers with one end free and the other end embedded in or hidden by a particulate. The exposed fiber must meet the fiber definition.

(5) *NSD.* Record NSD when no structures are detected in the field.

(6) *Intersection.* Non-parallel touching or crossing of fibers, with the projection having an aspect ratio 5:1 or greater.

ii. Structure Measurement.

(1) Recognize the structure that is to be sized.

(2) Memorize its location in the "window" relative to the sides, inscribed square and to other particulates in the field so this exact location can be found again when scanning is resumed.

(3) Measure the structure using the scale on the screen.

(4) Record the length category and structure type classification on the count sheet after the field number and fiber number.

(5) Return the fiber to its original location in the window and scan the rest of the field for other fibers; if the direction of travel is not remembered, return to the right side of the field and begin the traverse again.

i. Visual identification of Electron Diffraction (ED) patterns is required for each asbestos structure counted which would cause the analysis to exceed the 70 s/mm² concentration. (Generally this means the first four fibers identified as asbestos must exhibit an identifiable diffraction pattern for chrysotile or amphibole.)

i. Center the structure, focus, and obtain an ED pattern. (See Microscope Instruction Manual for more detailed instructions.)

ii. From a visual examination of the ED pattern, obtained with a short camera length, classify the observed structure as belonging to one of the following classifications: chrysotile, amphibole, or nonasbestos.

(1) Chrysotile: The chrysotile asbestos pattern has characteristic streaks on the layer lines other than the central line and some streaking also on the central line. There will be spots of normal sharpness on the central layer line and on alternate lines (2nd, 4th, etc.). The repeat distance between layer lines is 0.53 nm and the center doublet is at 0.73 nm. The pattern should display (002), (110), (130) diffraction maxima; distances and geometry should match a chrysotile pattern and be measured semiquantitatively.

(2) Amphibole Group [includes grunerite (amosite), crocidolite, anthophyllite, tremolite, and actinolite]: Amphibole asbestos fiber patterns show layer lines formed by very closely spaced dots, and the repeat distance between layer lines is also about 0.53 nm. Streaking in layer lines is occasionally present due to crystal structure defects.

(3) Nonasbestos: Incomplete or unobtainable ED patterns, a nonasbestos EDXA, or a nonasbestos morphology.

iii. The micrograph number of the recorded diffraction patterns must be reported to the client and maintained in the laboratory's quality assurance records. The records must also demonstrate that the identification of the pattern has been verified by a qualified individual and that the operator who made the identification is maintaining at least an 80 percent correct visual identification based on his measured patterns. In the event that examination of the pattern by the qualified individual indicates that the pattern had been misidentified visually, the client shall be contacted. If the pattern is a suspected chrysotile, take a photograph of the diffraction pattern at 0 degrees tilt. If the structure is suspected to be amphibole, the sample may have to be tilted to obtain a simple geometric array of spots.

j. Energy Dispersive X-Ray Analysis (EDXA).

i. Required of all amphiboles which would cause the analysis results to exceed the 70 s/mm² concentration. (Generally speaking, the first 4 amphiboles would require EDXA.)

ii. Can be used alone to confirm chrysotile after the 70 s/mm² concentration has been exceeded.

iii. Can be used alone to confirm all nonasbestos.

iv. Compare spectrum profiles with profiles obtained from asbestos standards. The closest match identifies and categorizes the structure.

v. If the EDXA is used for confirmation, record the properly labeled spectrum on a computer disk, or if a hard copy, file with analysis data.

vi. If the number of fibers in the nonasbestos class would cause the analysis to exceed the 70 s/mm² concentration, their identities must be confirmed by EDXA or measurement of a zone axis diffraction pattern to establish that the particles are nonasbestos.

k. Stopping Rules.

i. If more than 50 asbestiform structures are counted in a particular grid opening, the analysis may be terminated.

ii. After having counted 50 asbestiform structures in a minimum of 4 grid openings, the analysis may be terminated. The grid opening in which the 50th fiber was counted must be completed.

iii. For blank samples, the analysis is always continued until 10 grid openings have been analyzed.

iv. In all other samples the analysis shall be continued until an analytical sensitivity of 0.005 s/cm³ is reached.

l. Recording Rules. The count sheet should contain the following information:

i. Field (grid opening): List field number.

ii. Record "NSD" if no structures are detected.

iii. Structure information.

893

(1) If fibers, bundles, clusters, and/or matrices are found, list them in consecutive numerical order, starting over with each field.

(2) Length. Record length category of asbestos fibers examined. Indicate if less than 5 μm or greater than or equal to 5 μm.

(3) Structure Type. Positive identification of asbestos fibers is required by the method. At least one diffraction pattern of each fiber type from every five samples must be recorded and compared with a standard diffraction pattern. For each asbestos fiber reported, both a morphological descriptor and an identification descriptor shall be specified on the count sheet.

(4) Fibers classified as chrysotile must be identified by diffraction and/or X-ray analysis and recorded on the count sheet. X-ray analysis alone can be used as sole identification only after 70s/mm² have been exceeded for a particular sample.

(5) Fibers classified as amphiboles must be identified by X-ray analysis and electron diffraction and recorded on the count sheet. (X-ray analysis alone can be used as sole identification only after 70s/mm² have been exceeded for a particular sample.)

(6) If a diffraction pattern was recorded on film, the micrograph number must be indicated on the count sheet.

(7) If an electron diffraction was attempted and an appropriate spectra is not observed, N should be recorded on the count sheet.

(8) If an X-ray analysis is attempted but not observed, N should be recorded on the count sheet.

(9) If an X-ray analysis spectrum is stored, the file and disk number must be recorded on the count sheet.

m. Classification Rules.

i. Fiber. A structure having a minimum length greater than or equal to 0.5 μm and an aspect ratio (length to width) of 5:1 or greater and substantially parallel sides. Note the appearance of the end of the fiber, i.e., whether it is flat, rounded or dovetailed.

ii. Bundle. A structure composed of three or more fibers in a parallel arrangement with each fiber closer than one fiber diameter.

iii. Cluster. A structure with fibers in a random arrangement such that all fibers are intermixed and no single fiber is isolated

from the group. Groupings must have more than two intersections.

iv. Matrix. Fiber or fibers with one end free and the other end embedded in or hidden by a particulate. The exposed fiber must meet the fiber definition.

v. NSD. Record NSD when no structures are detected in the field.

n. After all necessary analyses of a particle structure have been completed, return the goniometer stage to 0 degrees, and return the structure to its original location by recall of the original location.

o. Continue scanning until all the structures are identified, classified and sized in the field.

p. Select additional fields (grid openings) at low magnification; scan at a chosen magnification (15,000 to 20,000X screen magnification); and analyze until the stopping rule becomes applicable.

q. Carefully record all data as they are being collected, and check for accuracy.

r. After finishing with a grid, remove it from the microscope, and replace it in the appropriate grid hold. Sample grids must be stored for a minimum of 1 year from the date of the analysis; the sample cassette must be retained for a minimum of 30 days by the laboratory or returned at the client's request.

H. Sample Analytical Sequence

1. Carry out visual inspection of work site prior to air monitoring.

2. Collect a minimum of five air samples inside the work site and five samples outside the work site. The indoor and outdoor samples shall be taken during the same time period.

3. Analyze the abatement area samples according to this protocol. The analysis must meet the 0.005 s/cm³ analytical sensitivity.

4. Remaining steps in the analytical sequence are contained in Unit IV. of this Appendix.

I. Reporting

The following information must be reported to the client. See the following Table II:

**Environmental Protection Agency**                    **Pt. 763, Subpt. E, App. A**

TABLE II--EXAMPLE LABORATORY LETTERHEAD

| Laboratory I.D. | Client I.D. | FILTER MEDIA DATA | | | | Analyzed Area, $mm^2$ | Sample Volume, cc |
|---|---|---|---|---|---|---|---|
| | | Type | Diameter, mm | Effective Area, $mm^2$ | Pore Size, $\mu m$ | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

INDIVIDUAL ANALYTICAL RESULTS

| Laboratory I.D. | Client I.D. | # Asbestos Structures | Analytical Sensitivity, s/cc | CONCENTRATION | |
|---|---|---|---|---|---|
| | | | | Structures/$mm^2$ | Structures/cc |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

The analysis was carried out to the approved TEM method. This laboratory is in compliance with the quality specified by the method. _____
                                   Authorized Signature

1. Concentration in structures per square millimeter and structures per cubic centimeter.
2. Analytical sensitivity used for the analysis.
3. Number of asbestos structures.
4. Area analyzed.

5. Volume of air samples (which was initially provided by client).
6. Average grid size opening.
7. Number of grids analyzed.
8. Copy of the count sheet must be included with the report.

9. Signature of laboratory official to indicate that the laboratory met specifications of the AHERA method.

10. Report form must contain official laboratory identification (e.g., letterhead).

11. Type of asbestos.

### J. Calibration Methodology

NOTE: Appropriate implementation of the method requires a person knowledgeable in electron diffraction and mineral identification by ED and EDXA. Those inexperienced laboratories wishing to develop capabilities may acquire necessary knowledge through analysis of appropriate standards and by following detailed methods as described in References 8 and 10 of Unit III.L.

1. *Equipment Calibration.* In this method, calibration is required for the air-sampling equipment and the transmission electron microscope (TEM).

a. *TEM Magnification.* The magnification at the fluorescent screen of the TEM must be calibrated at the grid opening magnification (if used) and also at the magnification used for fiber counting. This is performed with a cross grating replica. A logbook must be maintained, and the dates of calibration depend on the past history of the particular microscope; no frequency is specified. After any maintenance of the microscope that involved adjustment of the power supplied to the lenses or the high-voltage system or the mechanical disassembly of the electron optical column apart from filament exchange, the magnification must be recalibrated. Before the TEM calibration is performed, the analyst must ensure that the cross grating replica is placed at the same distance from the objective lens as the specimens are. For instruments that incorporate an eucentric tilting specimen stage, all specimens and the cross grating replica must be placed at the eucentric position.

b. Determination of the TEM magnification on the fluorescent screen.

i. Define a field of view on the fluorescent screen either by markings or physical boundaries. The field of view must be measurable or previously inscribed with a scale or concentric circles (all scales should be metric).

ii. Insert a diffraction grating replica (for example a grating containing 2,160 lines/mm) into the specimen holder and place into the microscope. Orient the replica so that the grating lines fall perpendicular to the scale on the TEM fluorescent screen. Ensure that the goniometer stage tilt is 0 degrees.

iii. Adjust microscope magnification to 10,000X or 20,000X. Measure the distance (mm) between two widely separated lines on the grating replica. Note the number of spaces between the lines. Take care to measure between the same relative positions on the lines (e.g., between left edges of lines).

NOTE: The more spaces included in the measurement, the more accurate the final calculation. On most microscopes, however, the magnification is substantially constant only within the central 8–10 cm diameter region of the fluorescent screen.

iv. Calculate the true magnification (M) on the fluorescent screen:

M=XG/Y

where:

X=total distance (mm) between the designated grating lines;
G=calibration constant of the grating replica (lines/mm);
Y=number of grating replica spaces counted along X.

c. Calibration of the EDXA System. Initially, the EDXA system must be calibrated by using two reference elements to calibrate the energy scale of the instrument. When this has been completed in accordance with the manufacturer's instructions, calibration in terms of the different types of asbestos can proceed. The EDXA detectors vary in both solid angle of detection and in window thickness. Therefore, at a particular accelerating voltage in use on the TEM, the count rate obtained from specific dimensions of fiber will vary both in absolute X-ray count rate and in the relative X-ray peak heights for different elements. Only a few minerals are relevant for asbestos abatement work, and in this procedure the calibration is specified in terms of a "fingerprint" technique. The EDXA spectra must be recorded from individual fibers of the relevant minerals, and identifications are made on the basis of semiquantitative comparisons with these reference spectra.

d. Calibration of Grid Openings.

i. Measure 20 grid openings on each of 20 random 200-mesh copper grids by placing a grid on a glass slide and examining it under the PCM. Use a calibrated graticule to measure the average field diameter and use this number to calculate the field area for an average grid opening. Grids are to be randomly selected from batches up to 1,000.

NOTE: A grid opening is considered as one field.

ii. The mean grid opening area must be measured for the type of specimen grids in use. This can be accomplished on the TEM at a properly calibrated low magnification or on an optical microscope at a magnification of approximately 400X by using an eyepiece fitted with a scale that has been calibrated against a stage micrometer. Optical microscopy utilizing manual or automated procedures may be used providing instrument calibration can be verified.

e. Determination of Camera Constant and ED Pattern Analysis.

i. The camera length of the TEM in ED operating mode must be calibrated before ED patterns on unknown samples are observed. This can be achieved by using a carbon-coated grid on which a thin film of gold has been

**Environmental Protection Agency**                    **Pt. 763, Subpt. E, App. A**

sputtered or evaporated. A thin film of gold is evaporated on the specimen TEM grid to obtain zone-axis ED patterns superimposed with a ring pattern from the polycrystalline gold film.

ii. In practice, it is desirable to optimize the thickness of the gold film so that only one or two sharp rings are obtained on the superimposed ED pattern. Thicker gold film would normally give multiple gold rings, but it will tend to mask weaker diffraction spots from the unknown fibrous particulates. Since the unknown d-spacings of most interest in asbestos analysis are those which lie closest to the transmitted beam, multiple gold rings are unnecessary on zone-axis ED patterns. An average camera constant using multiple gold rings can be determined. The camera constant is one-half the diameter, D, of the rings times the interplanar spacing, d, of the ring being measured.

K. Quality Control/Quality Assurance Procedures (Data Quality Indicators)

Monitoring the environment for airborne asbestos requires the use of sensitive sampling and analysis procedures. Because the test is sensitive, it may be influenced by a variety of factors. These include the supplies used in the sampling operation, the performance of the sampling, the preparation of the grid from the filter and the actual examination of this grid in the microscope. Each of these unit operations must produce a product of defined quality if the analytical result is to be a reliable and meaningful test result. Accordingly, a series of control checks and reference standards is performed along with the sample analysis as indicators that the materials used are adequate and the operations are within acceptable limits. In this way, the quality of the data is defined and the results are of known value. These checks and tests also provide timely and specific warning of any problems which might develop within the sampling and analysis operations. A description of these quality control/quality assurance procedures is summarized in the following Table III:

**Pt. 763, Subpt. E, App. A**                    **40 CFR Ch. I (7–1–11 Edition)**

TABLE III--SUMMARY OF LABORATORY
DATA QUALITY OBJECTIVES

| Unit Operation | QC Check | Frequency | Conformance Expectation |
|---|---|---|---|
| Sample receiving | Review of receiving report | Each sample | 95% complete |
| Sample custody | Review of chain-of-custody record | Each sample | 95% complete |
| Sample preparation | Supplies and reagents | On receipt | Meet specs. or reject |
| | Grid opening size | 20 openings/20 grids/lot of 1000 or 1 opening/sample | 100% |
| | Special clean area monitoring | After cleaning or service | Meet specs or reclean |
| | Laboratory blank | 1 per prep series or 10% | Meet specs. or reanalyze series |
| | Plasma etch blank | 1 per 20 samples | 75% |
| | Multiple preps (3 per sample) | Each sample | One with cover of 15 complete grid sqs. |
| Sample analysis | System check | Each day | Each day |
| | Alignment check | Each day | Each day |
| | Magnification calibration with low and high standards | Each month or after service | 95% |
| | ED calibration by gold standard | Weekly | 95% |
| | EDS calibration by copper line | Daily | 95% |
| Performance check | Laboratory blank (measure of cleanliness) | Prep 1 per series or 10% read 1 per 25 samples | Meet specs or reanalyze series |
| | Replicate counting (measure of precision) | 1 per 100 samples | 1.5 x Poisson Std. Dev. |
| | Duplicate analysis (measure of reproducibility) | 1 per 100 samples | 2 x Poisson Std. Dev. |
| | Known samples of typical materials (working standards) | Training and for comparison with unknowns | 100% |
| | Analysis of NBS SRM 1876 and/or RM 8410 (measure of accuracy and comparability) | 1 per analyst per year | 1.5 x Poisson Std. Dev. |
| | Data entry review (data validation and measure of completeness) | Each sample | 95% |
| | Record and verify ID electron diffraction pattern of structure | 1 per 5 samples | 80% accuracy |
| Calculations and data reduction | Hand calculation of automated data reduction procedure or independent recalculation of hand-calculated data | 1 per 100 samples | 85% |

1. When the samples arrive at the laboratory, check the samples and documentation for completeness and requirements before initiating the analysis.

2. Check all laboratory reagents and supplies for acceptable asbestos background levels.

3. Conduct all sample preparation in a clean room environment monitored by laboratory blanks and special testing after cleaning or servicing the room.

4. Prepare multiple grids of each sample.

5. Provide laboratory blanks with each sample batch. Maintain a cumulative average of these results. If this average is greater than 53 f/mm² per 10 200-mesh grid openings, check the system for possible sources of contamination.

6. Check for recovery of asbestos from cellulose ester filters submitted to plasma asher.

7. Check for asbestos carryover in the plasma asher by including a blank alongside the positive control sample.

8. Perform a systems check on the transmission electron microscope daily.

9. Make periodic performance checks of magnification, electron diffraction and energy dispersive X-ray systems as set forth in Table III of Unit III.K.

10. Ensure qualified operator performance by evaluation of replicate counting, duplicate analysis, and standard sample comparisons as set forth in Table III of Unit III.K.

11. Validate all data entries.

12. Recalculate a percentage of all computations and automatic data reduction steps as specified in Table III.

13. Record an electron diffraction pattern of one asbestos structure from every five samples that contain asbestos. Verify the identification of the pattern by measurement or comparison of the pattern with patterns collected from standards under the same conditions.

The outline of quality control procedures presented above is viewed as the minimum required to assure that quality data is produced for clearance testing of an asbestos abated area. Additional information may be gained by other control tests. Specifics on those control procedures and options available for environmental testing can be obtained by consulting References 6, 7, and 11 of Unit III.L.

## L. References

For additional background information on this method the following references should be consulted.

1. "Guidelines for Controlling Asbestos-Containing Materials in Buildings," EPA 560/5–85–024, June 1985.

2. "Measuring Airborne Asbestos Following an Abatement Action," USEP/Office of Pollution Prevention and Toxics, EPA 600/4–85–049, 1985.

3. Small, John and E. Steel. Asbestos Standards: Materials and Analytical Methods. N.B.S. Special Publication 619, 1982.

4. Campbell, W.J., R.L. Blake, L.L. Brown, E.E. Cather, and J.J. Sjoberg. Selected Silicate Minerals and Their Asbestiform Varieties. Information Circular 8751, U.S. Bureau of Mines, 1977.

5. Quality Assurance Handbook for Air Pollution Measurement System. Ambient Air Methods, EPA 600/4–77–027a, USEPA, Office of Research and Development, 1977.

6. Method 2A: Direct Measurement of Gas Volume Through Pipes and Small Ducts. 40 CFR Part 60 Appendix A.

7. Burdette, G.J. Health & Safety Exec., Research & Lab. Services Div., London, "Proposed Analytical Method for Determination of Asbestos in Air."

8. Chatfield, E.J., Chatfield Tech. Cons., Ltd., Clark, T., PEI Assoc. "Standard Operating Procedure for Determination of Airborne Asbestos Fibers by Transmission Electron Microscopy Using Polycarbonate Membrane Filters." WERL SOP 87–1, March 5, 1987.

9. NIOSH. Method 7402 for Asbestos Fibers, December 11, 1986 Draft.

10. Yamate, G., S.C. Agarwall, R.D. Gibbons, IIT Research Institute, "Methodology for the Measurement of Airborne Asbestos by Electron Microscopy." Draft report, USEPA Contract 68–02–3266, July 1984.

11. Guidance to the Preparation of Quality Assurance Project Plans. USEPA, Office of Pollution Prevention and Toxics, 1984.

## IV. Mandatory Interpretation of Transmission Electron Microscopy Results To Determine Completion of Response Actions

### A. Introduction

A response action is determined to be completed by TEM when the abatement area has been cleaned and the airborne asbestos concentration inside the abatement area is no higher than concentrations at locations outside the abatement area. "Outside" means outside the abatement area, but not necessarily outside the building. EPA reasons that an asbestos removal contractor cannot be expected to clean an abatement area to an airborne asbestos concentration that is lower than the concentration of air entering the abatement area from outdoors or from other parts of the building. After the abatement area has passed a thorough visual inspection, and before the outer containment barrier is removed, a minimum of five air samples inside the abatement area and a minimum of five air samples outside the abatement area must be collected. Hence, the response action is determined to be completed when the average airborne asbestos concentration measured inside the abatement area is not statistically different from the average airborne asbestos concentration measured outside the abatement area.

The inside and outside concentrations are compared by the Z-test, a statistical test that takes into account the variability in the measurement process. A minimum of five samples inside the abatement area and five samples outside the abatement area are required to control the false negative error rate, i.e., the probability of declaring the removal complete when, in fact, the concentration inside the abatement area is significantly higher than outside the abatement area. Additional quality control is provided by requiring three blanks (filters through which no air has been drawn) to be analyzed to check for unusually high filter contamination that would distort the test results.

When volumes greater than or equal to 1,199 L for a 25 mm filter and 2,799 L for a 37 mm filter have been collected and the average number of asbestos structures on samples inside the abatement area is no greater than 70 s/mm² of filter, the response action

may be considered complete without comparing the inside samples to the outside samples. EPA is permitting this initial screening test to save analysis costs in situations where the airborne asbestos concentration is sufficiently low so that it cannot be distinguished from the filter contamination/background level (fibers deposited on the filter that are unrelated to the air being sampled). The screening test cannot be used when volumes of less than 1,199 L for 25 mm filter or 2,799 L for a 37 mm filter are collected because the ability to distinguish levels significantly different from filter background is reduced at low volumes.

The initial screening test is expressed in structures per square millimeter of filter because filter background levels come from sources other than the air being sampled and cannot be meaningfully expressed as a concentration per cubic centimeter of air. The value of 70 s/mm² is based on the experience of the panel of microscopists who consider one structure in 10 grid openings (each grid opening with an area of 0.0057 mm²) to be comparable with contamination/background levels of blank filters. The decision is based, in part, on Poisson statistics which indicate that four structures must be counted on a filter before the fiber count is statistically distinguishable from the count for one structure. As more information on the performance of the method is collected, this criterion may be modified. Since different combinations of the number and size of grid openings are permitted under the TEM protocol, the criterion is expressed in structures per square millimeter of filter to be consistent across all combinations. Four structures per 10 grid openings corresponds to approximately 70 s/mm².

### B. Sample Collection and Analysis

1. A minimum of 13 samples is required: five samples collected inside the abatement area, five samples collected outside the abatement area, two field blanks, and one sealed blank.

2. Sampling and TEM analysis must be done according to either the mandatory or nonmandatory protocols in Appendix A. At least 0.057 mm² of filter must be examined on blank filters.

### C. Interpretation of Results

1. The response action shall be considered complete if either:

a. Each sample collected inside the abatement area consists of at least 1,199 L of air for a 25 mm filter, or 2,799 L of air for a 37 mm filter, and the arithmetic mean of their asbestos structure concentrations per square millimeter of filter is less than or equal to 70 s/mm²; or

b. The three blank samples have an arithmetic mean of the asbestos structure concentration on the blank filters that is less than or equal to 70 s/mm² and the average airborne asbestos concentration measured inside the abatement area is not statistically higher than the average airborne asbestos concentration measured outside the abatement area as determined by the Z-test. The Z-test is carried out by calculating

$$Z = \frac{\overline{Y}_I - \overline{Y}_O}{0.8\left(1/n_I + 1/n_O\right)^{1/2}}$$

where $Y_I$ is the average of the natural logarithms of the inside samples and $Y_O$ is the average of the natural logarithms of the outside samples, $n_I$ is the number of inside samples and $n_O$ is the number of outside samples. The response action is considered complete if Z is less than or equal to 1.65.

NOTE: When no fibers are counted, the calculated detection limit for that analysis is inserted for the concentration.

2. If the abatement site does not satisfy either (1) or (2) of this Section C, the site must be recleaned and a new set of samples collected.

### D. Sequence for Analyzing Samples

It is possible to determine completion of the response action without analyzing all samples. Also, at any point in the process, a decision may be made to terminate the analysis of existing samples, reclean the abatement site, and collect a new set of samples. The following sequence is outlined to minimize the number of analyses needed to reach a decision.

1. Analyze the inside samples.

2. If at least 1,199 L of air for a 25 mm filter or 2,799 L of air for a 37 mm filter is collected for each inside sample and the arithmetic mean concentration of structures per square millimeter of filter is less than or equal to 70 s/mm², the response action is complete and no further analysis is needed.

3. If less than 1,199 L of air for a 25 mm filter or 2,799 L of air for a 37 mm filter is collected for any of the inside samples, or the arithmetic mean concentration of structures per square millimeter of filter is greater than 70 s/mm², analyze the three blanks.

4. If the arithmetic mean concentration of structures per square millimeter on the blank filters is greater than 70 s/mm², terminate the analysis, identify and correct the source of blank contamination, and collect a new set of samples.

5. If the arithmetic mean concentration of structures per square millimeter on the blank filters is less than or equal to 70 s/mm², analyze the outside samples and perform the Z-test.

6. If the Z-statistic is less than or equal to 1.65, the response action is complete. If the Z-statistic is greater than 1.65, reclean the abatement site and collect a new set of samples.

[52 FR 41857, Oct. 30, 1987]

APPENDIX B TO SUBPART E OF PART 763 [RESERVED]

APPENDIX C TO SUBPART E OF PART 763—ASBESTOS MODEL ACCREDITATION PLAN

*I. Asbestos Model Accreditation Plan for States*

The Asbestos Model Accreditation Plan (MAP) for States has eight components:
(A) Definitions
(B) Initial Training
(C) Examinations
(D) Continuing Education
(E) Qualifications
(F) Recordkeeping Requirements for Training Providers
(G) Deaccreditation
(H) Reciprocity
(I) Electronic reporting

A. Definitions

For purposes of Appendix C:

1. "Friable asbestos-containing material (ACM)" means any material containing more than one percent asbestos which has been applied on ceilings, walls, structural members, piping, duct work, or any other part of a building, which when dry, may be crumbled, pulverized, or reduced to powder by hand pressure. The term includes non-friable asbestos-containing material after such previously non-friable material becomes damaged to the extent that when dry it may be crumbled, pulverized, or reduced to powder by hand pressure.

2. "Friable asbestos-containing building material (ACBM)" means any friable ACM that is in or on interior structural members or other parts of a school or public and commercial building.

3. "Inspection" means an activity undertaken in a school building, or a public and commercial building, to determine the presence or location, or to assess the condition of, friable or non-friable asbestos-containing building material (ACBM) or suspected ACBM, whether by visual or physical examination, or by collecting samples of such material. This term includes reinspections of friable and non-friable known or assumed ACBM which has been previously identified. The term does not include the following:

a. Periodic surveillance of the type described in 40 CFR 763.92(b) solely for the purpose of recording or reporting a change in the condition of known or assumed ACBM;

b. Inspections performed by employees or agents of Federal, State, or local government solely for the purpose of determining compliance with applicable statutes or regulations; or

c. visual inspections of the type described in 40 CFR 763.90(i) solely for the purpose of determining completion of response actions.

4. "Major fiber release episode" means any uncontrolled or unintentional disturbance of ACBM, resulting in a visible emission, which involves the falling or dislodging of more than 3 square or linear feet of friable ACBM.

5. "Minor fiber release episode" means any uncontrolled or unintentional disturbance of ACBM, resulting in a visible emission, which involves the falling or dislodging of 3 square or linear feet or less of friable ACBM.

6. "Public and commercial building" means the interior space of any building which is not a school building, except that the term does not include any residential apartment building of fewer than 10 units or detached single-family homes. The term includes, but is not limited to: industrial and office buildings, residential apartment buildings and condominiums of 10 or more dwelling units, government-owned buildings, colleges, museums, airports, hospitals, churches, preschools, stores, warehouses and factories. Interior space includes exterior hallways connecting buildings, porticos, and mechanical systems used to condition interior space.

7. "Response action" means a method, including removal, encapsulation, enclosure, repair, and operation and maintenance, that protects human health and the environment from friable ACBM.

8. "Small-scale, short-duration activities (SSSD)" are tasks such as, but not limited to:

a. Removal of asbestos-containing insulation on pipes.

b. Removal of small quantities of asbestos-containing insulation on beams or above ceilings.

c. Replacement of an asbestos-containing gasket on a valve.

d. Installation or removal of a small section of drywall.

e. Installation of electrical conduits through or proximate to asbestos-containing materials.

SSSD can be further defined by the following considerations:

f. Removal of small quantities of ACM only if required in the performance of another maintenance activity not intended as asbestos abatement.

g. Removal of asbestos-containing thermal system insulation not to exceed amounts greater than those which can be contained in a single glove bag.

h. Minor repairs to damaged thermal system insulation which do not require removal.

i. Repairs to a piece of asbestos-containing wallboard.

j. Repairs, involving encapsulation, enclosure, or removal, to small amounts of friable ACM only if required in the performance of emergency or routine maintenance activity and not intended solely as asbestos abatement. Such work may not exceed amounts greater than those which can be contained in a single prefabricated mini-enclosure. Such an enclosure shall conform spatially and geometrically to the localized work area, in order to perform its intended containment function.

### B. Initial Training

Training requirements for purposes of accreditation are specified both in terms of required subjects of instruction and in terms of length of training. Each initial training course has a prescribed curriculum and number of days of training. One day of training equals 8 hours, including breaks and lunch. Course instruction must be provided by EPA or State-approved instructors. EPA or State instructor approval shall be based upon a review of the instructor's academic credentials and/or field experience in asbestos abatement.

Beyond the initial training requirements, individual States may wish to consider requiring additional days of training for purposes of supplementing hands-on activities or for reviewing relevant state regulations. States also may wish to consider the relative merits of a worker apprenticeship program. Further, they might consider more stringent minimum qualification standards for the approval of training instructors. EPA recommends that the enrollment in any given course be limited to 25 students so that adequate opportunities exist for individual hands-on experience.

States have the option to provide initial training directly or approve other entities to offer training. The following requirements are for the initial training of persons required to have accreditation under TSCA Title II.

Training requirements for each of the five accredited disciplines are outlined below. Persons in each discipline perform a different job function and distinct role. Inspectors identify and assess the condition of ACBM, or suspect ACBM. Management planners use data gathered by inspectors to assess the degree of hazard posed by ACBM in schools to determine the scope and timing of appropriate response actions needed for schools. Project designers determine how asbestos abatement work should be conducted. Lastly, workers and contractor/supervisors carry out and oversee abatement work. In addition, a recommended training curriculum is also presented for a sixth discipline, which is not federally-accredited, that of "Project Monitor." Each accredited discipline and training curriculum is separate and distinct from the others. A person

seeking accreditation in any of the five accredited MAP disciplines cannot attend two or more courses concurrently, but may attend such courses sequentially.

In several instances, initial training courses for a specific discipline (e.g., workers, inspectors) require hands-on training. For asbestos abatement contractor/supervisors and workers, hands-on training should include working with asbestos-substitute materials, fitting and using respirators, use of glovebags, donning protective clothing, and constructing a decontamination unit as well as other abatement work activities.

### 1. WORKERS

A person must be accredited as a worker to carry out any of the following activities with respect to friable ACBM in a school or public and commercial building: (1) A response action other than a SSSD activity, (2) a maintenance activity that disturbs friable ACBM other than a SSSD activity, or (3) a response action for a major fiber release episode. All persons seeking accreditation as asbestos abatement workers shall complete at least a 4-day training course as outlined below. The 4-day worker training course shall include lectures, demonstrations, at least 14 hours of hands-on training, individual respirator fit testing, course review, and an examination. Hands-on training must permit workers to have actual experience performing tasks associated with asbestos abatement. A person who is otherwise accredited as a contractor/supervisor may perform in the role of a worker without possessing separate accreditation as a worker.

Because of cultural diversity associated with the asbestos workforce, EPA recommends that States adopt specific standards for the approval of foreign language courses for abatement workers. EPA further recommends the use of audio-visual materials to complement lectures, where appropriate.

The training course shall adequately address the following topics:

(a) *Physical characteristics of asbestos.* Identification of asbestos, aerodynamic characteristics, typical uses, and physical appearance, and a summary of abatement control options.

(b) *Potential health effects related to asbestos exposure.* The nature of asbestos-related diseases; routes of exposure; dose-response relationships and the lack of a safe exposure level; the synergistic effect between cigarette smoking and asbestos exposure; the latency periods for asbestos-related diseases; a discussion of the relationship of asbestos exposure to asbestosis, lung cancer, mesothelioma, and cancers of other organs.

(c) *Employee personal protective equipment.* Classes and characteristics of respirator

902

**Environmental Protection Agency**                    **Pt. 763, Subpt. E, App. C**

types; limitations of respirators; proper selection, inspection; donning, use, maintenance, and storage procedures for respirators; methods for field testing of the facepiece-to-face seal (positive and negative-pressure fit checks); qualitative and quantitative fit testing procedures; variability between field and laboratory protection factors that alter respiratory fit (e.g., facial hair); the components of a proper respiratory protection program; selection and use of personal protective clothing; use, storage, and handling of non-disposable clothing; and regulations covering personal protective equipment.

(d) *State-of-the-art work practices.* Proper work practices for asbestos abatement activities, including descriptions of proper construction; maintenance of barriers and decontamination enclosure systems; positioning of warning signs; lock-out of electrical and ventilation systems; proper working techniques for minimizing fiber release; use of wet methods; use of negative pressure exhaust ventilation equipment; use of high-efficiency particulate air (HEPA) vacuums; proper clean-up and disposal procedures; work practices for removal, encapsulation, enclosure, and repair of ACM; emergency procedures for sudden releases; potential exposure situations; transport and disposal procedures; and recommended and prohibited work practices.

(e) *Personal hygiene.* Entry and exit procedures for the work area; use of showers; avoidance of eating, drinking, smoking, and chewing (gum or tobacco) in the work area; and potential exposures, such as family exposure.

(f) *Additional safety hazards.* Hazards encountered during abatement activities and how to deal with them, including electrical hazards, heat stress, air contaminants other than asbestos, fire and explosion hazards, scaffold and ladder hazards, slips, trips, and falls, and confined spaces.

(g) *Medical monitoring.* OSHA and EPA Worker Protection Rule requirements for physical examinations, including a pulmonary function test, chest X-rays, and a medical history for each employee.

(h) *Air monitoring.* Procedures to determine airborne concentrations of asbestos fibers, focusing on how personal air sampling is performed and the reasons for it.

(i) *Relevant Federal, State, and local regulatory requirements, procedures, and standards.* With particular attention directed at relevant EPA, OSHA, and State regulations concerning asbestos abatement workers.

(j) *Establishment of respiratory protection programs.*

(k) *Course review.* A review of key aspects of the training course.

2. CONTRACTOR/SUPERVISORS

A person must be accredited as a contractor/supervisor to supervise any of the following activities with respect to friable ACBM in a school or public and commercial building: (1) A response action other than a SSSD activity, (2) a maintenance activity that disturbs friable ACBM other than a SSSD activity, or (3) a response action for a major fiber release episode. All persons seeking accreditation as asbestos abatement contractor/supervisors shall complete at least a 5-day training course as outlined below. The training course must include lectures, demonstrations, at least 14 hours of hands-on training, individual respirator fit testing, course review, and a written examination. Hands-on training must permit supervisors to have actual experience performing tasks associated with asbestos abatement.

EPA recommends the use of audiovisual materials to complement lectures, where appropriate.

Asbestos abatement supervisors include those persons who provide supervision and direction to workers performing response actions. Supervisors may include those individuals with the position title of foreman, working foreman, or leadman pursuant to collective bargaining agreements. At least one supervisor is required to be at the worksite at all times while response actions are being conducted. Asbestos workers must have access to accredited supervisors throughout the duration of the project.

The contractor/supervisor training course shall adequately address the following topics:

(a) *The physical characteristics of asbestos and asbestos-containing materials.* Identification of asbestos, aerodynamic characteristics, typical uses, physical appearance, a review of hazard assessment considerations, and a summary of abatement control options.

(b) *Potential health effects related to asbestos exposure.* The nature of asbestos-related diseases; routes of exposure; dose-response relationships and the lack of a safe exposure level; synergism between cigarette smoking and asbestos exposure; and latency period for diseases.

(c) *Employee personal protective equipment.* Classes and characteristics of respirator types; limitations of respirators; proper selection, inspection, donning, use, maintenance, and storage procedures for respirators; methods for field testing of the facepiece-to-face seal (positive and negative-pressure fit checks); qualitative and quantitative fit testing procedures; variability between field and laboratory protection factors that alter respiratory fit (e.g., facial hair); the components of a proper respiratory protection program; selection and use of personal protective clothing; and use, storage,

903

and handling of non-disposable clothing; and regulations covering personal protective equipment.

(d) *State-of-the-art work practices.* Proper work practices for asbestos abatement activities, including descriptions of proper construction and maintenance of barriers and decontamination enclosure systems; positioning of warning signs; lock-out of electrical and ventilation systems; proper working techniques for minimizing fiber release; use of wet methods; use of negative pressure exhaust ventilation equipment; use of HEPA vacuums; and proper clean-up and disposal procedures. Work practices for removal, encapsulation, enclosure, and repair of ACM; emergency procedures for unplanned releases; potential exposure situations; transport and disposal procedures; and recommended and prohibited work practices. New abatement-related techniques and methodologies may be discussed.

(e) *Personal hygiene.* Entry and exit procedures for the work area; use of showers; and avoidance of eating, drinking, smoking, and chewing (gum or tobacco) in the work area. Potential exposures, such as family exposure, shall also be included.

(f) *Additional safety hazards.* Hazards encountered during abatement activities and how to deal with them, including electrical hazards, heat stress, air contaminants other than asbestos, fire and explosion hazards, scaffold and ladder hazards, slips, trips, and falls, and confined spaces.

(g) *Medical monitoring.* OSHA and EPA Worker Protection Rule requirements for physical examinations, including a pulmonary function test, chest X-rays and a medical history for each employee.

(h) *Air monitoring.* Procedures to determine airborne concentrations of asbestos fibers, including descriptions of aggressive air sampling, sampling equipment and methods, reasons for air monitoring, types of samples and interpretation of results.

EPA recommends that transmission electron microscopy (TEM) be used for analysis of final air clearance samples, and that sample analyses be performed by laboratories accredited by the National Institute of Standards and Technology's (NIST) National Voluntary Laboratory Accreditation Program (NVLAP).

(i) *Relevant Federal, State, and local regulatory requirements, procedures, and standards, including:*

(i) Requirements of TSCA Title II.

(ii) National Emission Standards for Hazardous Air Pollutants (40 CFR part 61), Subparts A (General Provisions) and M (National Emission Standard for Asbestos).

(iii) OSHA standards for permissible exposure to airborne concentrations of asbestos fibers and respiratory protection (29 CFR 1910.134).

(iv) OSHA Asbestos Construction Standard (29 CFR 1926.58). (v)EPA Worker Protection Rule, (40 CFR part 763, Subpart G).

(j) *Respiratory Protection Programs and Medical Monitoring Programs.*

(k) *Insurance and liability issues.* Contractor issues; worker's compensation coverage and exclusions; third-party liabilities and defenses; insurance coverage and exclusions.

(l) *Recordkeeping for asbestos abatement projects.* Records required by Federal, State, and local regulations; records recommended for legal and insurance purposes.

(m) *Supervisory techniques for asbestos abatement activities.* Supervisory practices to enforce and reinforce the required work practices and discourage unsafe work practices.

(n) *Contract specifications.* Discussions of key elements that are included in contract specifications.

(o) *Course review.* A review of key aspects of the training course.

### 3. INSPECTOR

All persons who inspect for ACBM in schools or public and commercial buildings must be accredited. All persons seeking accreditation as an inspector shall complete at least a 3-day training course as outlined below. The course shall include lectures, demonstrations, 4 hours of hands-on training, individual respirator fit-testing, course review, and a written examination.

EPA recommends the use of audiovisual materials to complement lectures, where appropriate. Hands-on training should include conducting a simulated building walkthrough inspection and respirator fit testing. The inspector training course shall adequately address the following topics:

(a) *Background information on asbestos.* Identification of asbestos, and examples and discussion of the uses and locations of asbestos in buildings; physical appearance of asbestos.

(b) *Potential health effects related to asbestos exposure.* The nature of asbestos-related diseases; routes of exposure; dose-response relationships and the lack of a safe exposure level; the synergistic effect between cigarette smoking and asbestos exposure; the latency periods for asbestos-related diseases; a discussion of the relationship of asbestos exposure to asbestosis, lung cancer, mesothelioma, and cancers of other organs.

(c) *Functions/qualifications and role of inspectors.* Discussions of prior experience and qualifications for inspectors and management planners; discussions of the functions of an accredited inspector as compared to those of an accredited management planner; discussion of inspection process including inventory of ACM and physical assessment.

(d) *Legal liabilities and defenses.* Responsibilities of the inspector and management

**Environmental Protection Agency**                    **Pt. 763, Subpt. E, App. C**

planner; a discussion of comprehensive general liability policies, claims-made, and occurrence policies, environmental and pollution liability policy clauses; state liability insurance requirements; bonding and the relationship of insurance availability to bond availability.

(e) *Understanding building systems.* The interrelationship between building systems, including: an overview of common building physical plan layout; heat, ventilation, and air conditioning (HVAC) system types, physical organization, and where asbestos is found on HVAC components; building mechanical systems, their types and organization, and where to look for asbestos on such systems; inspecting electrical systems, including appropriate safety precautions; reading blueprints and as-built drawings.

(f) *Public/employee/building occupant relations.* Notifying employee organizations about the inspection; signs to warn building occupants; tact in dealing with occupants and the press; scheduling of inspections to minimize disruptions; and education of building occupants about actions being taken.

(g) *Pre-inspection planning and review of previous inspection records.* Scheduling the inspection and obtaining access; building record review; identification of probable homogeneous areas from blueprints or as-built drawings; consultation with maintenance or building personnel; review of previous inspection, sampling, and abatement records of a building; the role of the inspector in exclusions for previously performed inspections.

(h) *Inspecting for friable and non-friable ACM and assessing the condition of friable ACM.* Procedures to follow in conducting visual inspections for friable and non-friable ACM; types of building materials that may contain asbestos; touching materials to determine friability; open return air plenums and their importance in HVAC systems; assessing damage, significant damage, potential damage, and potential significant damage; amount of suspected ACM, both in total quantity and as a percentage of the total area; type of damage; accessibility; material's potential for disturbance; known or suspected causes of damage or significant damage; and deterioration as assessment factors.

(i) *Bulk sampling/documentation of asbestos.* Detailed discussion of the ''Simplified Sampling Scheme for Friable Surfacing Materials (EPA 560/5-85-030a October 1985)''; techniques to ensure sampling in a randomly distributed manner for other than friable surfacing materials; sampling of non-friable materials; techniques for bulk sampling; inspector's sampling and repair equipment; patching or repair of damage from sampling; discussion of polarized light microscopy; choosing an accredited laboratory to analyze bulk samples; quality control and quality assurance procedures. EPA's recommendation that all bulk samples collected from school or public and commercial buildings be analyzed by a laboratory accredited under the NVLAP administered by NIST.

(j) *Inspector respiratory protection and personal protective equipment.* Classes and characteristics of respirator types; limitations of respirators; proper selection, inspection; donning, use, maintenance, and storage procedures for respirators; methods for field testing of the facepiece-to-face seal (positive and negative-pressure fit checks); qualitative and quantitative fit testing procedures; variability between field and laboratory protection factors that alter respiratory fit (e.g., facial hair); the components of a proper respiratory protection program; selection and use of personal protective clothing; use, storage, and handling of non-disposable clothing.

(k) *Recordkeeping and writing the inspection report.* Labeling of samples and keying sample identification to sampling location; recommendations on sample labeling; detailing of ACM inventory; photographs of selected sampling areas and examples of ACM condition; information required for inclusion in the management plan required for school buildings under TSCA Title II, section 203 (i)(1). EPA recommends that States develop and require the use of standardized forms for recording the results of inspections in schools or public or commercial buildings, and that the use of these forms be incorporated into the curriculum of training conducted for accreditation.

(l) *Regulatory review.* The following topics should be covered: National Emission Standards for Hazardous Air Pollutants (NESHAP; 40 CFR part 61, Subparts A and M); EPA Worker Protection Rule (40 CFR part 763, Subpart G); OSHA Asbestos Construction Standard (29 CFR 1926.58); OSHA respirator requirements (29 CFR 1910.134); the Asbestos-Containing Materials in School Rule (40 CFR part 763, Subpart E; applicable State and local regulations, and differences between Federal and State requirements where they apply, and the effects, if any, on public and nonpublic schools or commercial or public buildings.

(m) *Field trip.* This includes a field exercise, including a walk-through inspection; on-site discussion about information gathering and the determination of sampling locations; on-site practice in physical assessment; classroom discussion of field exercise.

(n) *Course review.* A review of key aspects of the training course.

4. MANAGEMENT PLANNER

All persons who prepare management plans for schools must be accredited. All persons seeking accreditation as management planners shall complete a 3-day inspector training course as outlined above and a 2-day

management planner training course. Possession of current and valid inspector accreditation shall be a prerequisite for admission to the management planner training course. The management planner course shall include lectures, demonstrations, course review, and a written examination.

EPA recommends the use of audiovisual materials to complement lectures, where appropriate.

TSCA Title II does not require accreditation for persons performing the management planner role in public and commercial buildings. Nevertheless, such persons may find this training and accreditation helpful in preparing them to design or administer asbestos operations and maintenance programs for public and commercial buildings.

The management planner training course shall adequately address the following topics:

(a) *Course overview.* The role and responsibilities of the management planner; operations and maintenance programs; setting work priorities; protection of building occupants.

(b) *Evaluation/interpretation of survey results.* Review of TSCA Title II requirements for inspection and management plans for school buildings as given in section 203(i)(1) of TSCA Title II; interpretation of field data and laboratory results; comparison of field inspector's data sheet with laboratory results and site survey.

(c) *Hazard assessment.* Amplification of the difference between physical assessment and hazard assessment; the role of the management planner in hazard assessment; explanation of significant damage, damage, potential damage, and potential significant damage; use of a description (or decision tree) code for assessment of ACM; assessment of friable ACM; relationship of accessibility, vibration sources, use of adjoining space, and air plenums and other factors to hazard assessment.

(d) *Legal implications.* Liability; insurance issues specific to planners; liabilities associated with interim control measures, in-house maintenance, repair, and removal; use of results from previously performed inspections.

(e) *Evaluation and selection of control options.* Overview of encapsulation, enclosure, interim operations and maintenance, and removal; advantages and disadvantages of each method; response actions described via a decision tree or other appropriate method; work practices for each response action; staging and prioritizing of work in both vacant and occupied buildings; the need for containment barriers and decontamination in response actions.

(f) *Role of other professionals.* Use of industrial hygienists, engineers, and architects in developing technical specifications for response actions; any requirements that may exist for architect sign-off of plans; team approach to design of high-quality job specifications.

(g) *Developing an operations and maintenance (O&M) plan.* Purpose of the plan; discussion of applicable EPA guidance documents; what actions should be taken by custodial staff; proper cleaning procedures; steam cleaning and HEPA vacuuming; reducing disturbance of ACM; scheduling O&M for off-hours; rescheduling or canceling renovation in areas with ACM; boiler room maintenance; disposal of ACM; in-house procedures for ACM—bridging and penetrating encapsulants; pipe fittings; metal sleeves; polyvinyl chloride (PVC), canvas, and wet wraps; muslin with straps, fiber mesh cloth; mineral wool, and insulating cement; discussion of employee protection programs and staff training; case study in developing an O&M plan (development, implementation process, and problems that have been experienced).

(h) *Regulatory review.* Focusing on the OSHA Asbestos Construction Standard found at 29 CFR 1926.58; the National Emission Standard for Hazardous Air Pollutants (NESHAP) found at 40 CFR part 61, Subparts A (General Provisions) and M (National Emission Standard for Asbestos); EPA Worker Protection Rule found at 40 CFR part 763, Subpart G; TSCA Title II; applicable State regulations.

(i) *Recordkeeping for the management planner.* Use of field inspector's data sheet along with laboratory results; on-going recordkeeping as a means to track asbestos disturbance; procedures for recordkeeping. EPA recommends that States require the use of standardized forms for purposes of management plans and incorporate the use of such forms into the initial training course for management planners.

(j) *Assembling and submitting the management plan.* Plan requirements for schools in TSCA Title II section 203(i)(1); the management plan as a planning tool.

(k) *Financing abatement actions.* Economic analysis and cost estimates; development of cost estimates; present costs of abatement versus future operation and maintenance costs; Asbestos School Hazard Abatement Act grants and loans.

(l) *Course review.* A review of key aspects of the training course.

5. PROJECT DESIGNER

A person must be accredited as a project designer to design any of the following activities with respect to friable ACBM in a school or public and commercial building: (1) A response action other than a SSSD maintenance activity, (2) a maintenance activity that disturbs friable ACBM other than a SSSD maintenance activity, or (3) a response action for a major fiber release episode. All persons seeking accreditation as a project designer shall complete at least a minimum

**Environmental Protection Agency**     **Pt. 763, Subpt. E, App. C**

3–day training course as outlined below. The project designer course shall include lectures, demonstrations, a field trip, course review and a written examination.

EPA recommends the use of audiovisual materials to complement lectures, where appropriate.

The abatement project designer training course shall adequately address the following topics:

(a) *Background information on asbestos.* Identification of asbestos; examples and discussion of the uses and locations of asbestos in buildings; physical appearance of asbestos.

(b) *Potential health effects related to asbestos exposure.* Nature of asbestos-related diseases; routes of exposure; dose-response relationships and the lack of a safe exposure level; the synergistic effect between cigarette smoking and asbestos exposure; the latency period of asbestos-related diseases; a discussion of the relationship between asbestos exposure and asbestosis, lung cancer, mesothelioma, and cancers of other organs.

(c) *Overview of abatement construction projects.* Abatement as a portion of a renovation project; OSHA requirements for notification of other contractors on a multi-employer site (29 CFR 1926.58).

(d) *Safety system design specifications.* Design, construction, and maintenance of containment barriers and decontamination enclosure systems; positioning of warning signs; electrical and ventilation system lockout; proper working techniques for minimizing fiber release; entry and exit procedures for the work area; use of wet methods; proper techniques for initial cleaning; use of negative-pressure exhaust ventilation equipment; use of HEPA vacuums; proper clean-up and disposal of asbestos; work practices as they apply to encapsulation, enclosure, and repair; use of glove bags and a demonstration of glove bag use.

(e) *Field trip.* A visit to an abatement site or other suitable building site, including on-site discussions of abatement design and building walk-through inspection. Include discussion of rationale for the concept of functional spaces during the walk-through.

(f) *Employee personal protective equipment.* Classes and characteristics of respirator types; limitations of respirators; proper selection, inspection; donning, use, maintenance, and storage procedures for respirators; methods for field testing of the facepiece-to-face seal (positive and negative-pressure fit checks); qualitative and quantitative fit testing procedures; variability between field and laboratory protection factors that alter respiratory fit (e.g., facial hair); the components of a proper respiratory protection program; selection and use of personal protective clothing; use, storage, and handling of non-disposable clothing.

(g) *Additional safety hazards.* Hazards encountered during abatement activities and how to deal with them, including electrical hazards, heat stress, air contaminants other than asbestos, fire, and explosion hazards.

(h) *Fiber aerodynamics and control.* Aerodynamic characteristics of asbestos fibers; importance of proper containment barriers; settling time for asbestos fibers; wet methods in abatement; aggressive air monitoring following abatement; aggressive air movement and negative-pressure exhaust ventilation as a clean-up method.

(i) *Designing abatement solutions.* Discussions of removal, enclosure, and encapsulation methods; asbestos waste disposal.

(j) *Final clearance process.* Discussion of the need for a written sampling rationale for aggressive final air clearance; requirements of a complete visual inspection; and the relationship of the visual inspection to final air clearance.

EPA recommends the use of TEM for analysis of final air clearance samples. These samples should be analyzed by laboratories accredited under the NIST NVLAP.

(k) *Budgeting/cost estimating.* Development of cost estimates; present costs of abatement versus future operation and maintenance costs; setting priorities for abatement jobs to reduce costs.

(l) *Writing abatement specifications.* Preparation of and need for a written project design; means and methods specifications versus performance specifications; design of abatement in occupied buildings; modification of guide specifications for a particular building; worker and building occupant health/medical considerations; replacement of ACM with non-asbestos substitutes.

(m) *Preparing abatement drawings.* Significance and need for drawings, use of as-built drawings as base drawings; use of inspection photographs and on-site reports; methods of preparing abatement drawings; diagramming containment barriers; relationship of drawings to design specifications; particular problems related to abatement drawings.

(n) *Contract preparation and administration.*

(o) *Legal/liabilities/defenses.* Insurance considerations; bonding; hold-harmless clauses; use of abatement contractor's liability insurance; claims made versus occurrence policies.

(p) *Replacement.* Replacement of asbestos with asbestos-free substitutes.

(q) *Role of other consultants.* Development of technical specification sections by industrial hygienists or engineers; the multi-disciplinary team approach to abatement design.

(r) *Occupied buildings.* Special design procedures required in occupied buildings; education of occupants; extra monitoring recommendations; staging of work to minimize occupant exposure; scheduling of renovation to minimize exposure.

(s) *Relevant Federal, State, and local regulatory requirements, procedures and standards, including, but not limited to:*

(i) Requirements of TSCA Title II.

(ii) National Emission Standards for Hazardous Air Pollutants, (40 CFR part 61) subparts A (General Provisions) and M (National Emission Standard for Asbestos).

(iii) OSHA Respirator Standard found at 29 CFR 1910.134.

(iv) EPA Worker Protection Rule found at 40 CFR part 763, subpart G.

(v) OSHA Asbestos Construction Standard found at 29 CFR 1926.58.

(vi) OSHA Hazard Communication Standard found at 29 CFR 1926.59.

(t) *Course review.* A review of key aspects of the training course.

6. PROJECT MONITOR

EPA recommends that States adopt training and accreditation requirements for persons seeking to perform work as project monitors. Project monitors observe abatement activities performed by contractors and generally serve as a building owner's representative to ensure that abatement work is completed according to specification and in compliance with all relevant statutes and regulations. They may also perform the vital role of air monitoring for purposes of determining final clearance. EPA recommends that a State seeking to accredit individuals as project monitors consider adopting a minimum 5-day training course covering the topics outlined below. The course outlined below consists of lectures and demonstrations, at least 6 hours of hands-on training, course review, and a written examination. The hands-on training component might be satisfied by having the student simulate participation in or performance of any of the relevant job functions or activities (or by incorporation of the workshop component described in item "n" below of this unit).

EPA recommends that the project monitor training course adequately address the following topics:

(a) *Roles and responsibilities of the project monitor.* Definition and responsibilities of the project monitor, including regulatory/specification compliance monitoring, air monitoring, conducting visual inspections, and final clearance monitoring.

(b) *Characteristics of asbestos and asbestos-containing materials.* Typical uses of asbestos; physical appearance of asbestos; review of asbestos abatement and control techniques; presentation of the health effects of asbestos exposure, including routes of exposure, dose-response relationships, and latency periods for asbestos-related diseases.

(c) *Federal asbestos regulations.* Overview of pertinent EPA regulations, including: NESHAP, 40 CFR part 61, subparts A and M; AHERA, 40 CFR part 763, subpart E; and the EPA Worker Protection Rule, 40 CFR part 763, subpart G. Overview of pertinent OSHA regulations, including: Construction Industry Standard for Asbestos, 29 CFR 1926.58; Respirator Standard, 29 CFR 1910.134; and the Hazard Communication Standard, 29 CFR 1926.59. Applicable State and local asbestos regulations; regulatory interrelationships.

(d) *Understanding building construction and building systems.* Building construction basics, building physical plan layout; understanding building systems (HVAC, electrical, etc.); layout and organization, where asbestos is likely to be found on building systems; renovations and the effect of asbestos abatement on building systems.

(e) *Asbestos abatement contracts, specifications, and drawings.* Basic provisions of the contract; relationships between principle parties, establishing chain of command; types of specifications, including means and methods, performance, and proprietary and nonproprietary; reading and interpreting records and abatement drawings; discussion of change orders; common enforcement responsibilities and authority of project monitor.

(f) *Response actions and abatement practices.* Pre-work inspections; pre-work considerations, precleaning of the work area, removal of furniture, fixtures, and equipment; shutdown/modification of building systems; construction and maintenance of containment barriers, proper demarcation of work areas; work area entry/exit, hygiene practices; determining the effectiveness of air filtration equipment; techniques for minimizing fiber release, wet methods, continuous cleaning; abatement methods other than removal; abatement area clean-up procedures; waste transport and disposal procedures; contingency planning for emergency response.

(g) *Asbestos abatement equipment.* Typical equipment found on an abatement project; air filtration devices, vacuum systems, negative pressure differential monitoring; HEPA filtration units, theory of filtration, design/construction of HEPA filtration units, qualitative and quantitative performance of HEPA filtration units, sizing the ventilation requirements, location of HEPA filtration units, qualitative and quantitative tests of containment barrier integrity; best available technology.

(h) *Personal protective equipment.* Proper selection of respiratory protection; classes and characteristics of respirator types, limitations of respirators; proper use of other safety equipment, protective clothing selection, use, and proper handling; hard/bump hats, safety shoes; breathing air systems, high pressure v. low pressure, testing for Grade D air, determining proper backup air volumes.

(i) *Air monitoring strategies.* Sampling equipment, sampling pumps (low v. high volume), flow regulating devices (critical and

**Environmental Protection Agency**                    **Pt. 763, Subpt. E, App. C**

limiting orifices), use of fibrous aerosol monitors on abatement projects; sampling media, types of filters, types of cassettes, filter orientation, storage and shipment of filters; calibration techniques, primary calibration standards, secondary calibration standards, temperature/pressure effects, frequency of calibration, recordkeeping and field work documentation, calculations; air sample analysis, techniques available and limitations of AHERA on their use, transmission electron microscopy (background to sample preparation and analysis, air sample conditions which prohibit analysis, EPA's recommended technique for analysis of final air clearance samples), phase contrast microscopy (background to sample preparation, and AHERA's limits on the use of phase contrast microscopy), what each technique measures; analytical methodologies, AHERA TEM protocol, NIOSH 7400, OSHA reference method (non clearance), EPA recommendation for clearance (TEM); sampling strategies for clearance monitoring, types of air samples (personal breathing zone v. fixedstation area) sampling location and objectives (pre-abatement, during abatement, and clearance monitoring), number of samples to be collected, minimum and maximum air volumes, clearance monitoring (post-visualinspection) (number of samples required, selection of sampling locations, period of sampling, aggressive sampling, interpretations of sampling results, calculations), quality assurance; special sampling problems, crawl spaces, acceptable samples for laboratory analysis, sampling in occupied buildings (barrier monitoring).

(j) *Safety and health issues other than asbestos.* Confined-space entry, electrical hazards, fire and explosion concerns, ladders and scaffolding, heat stress, air contaminants other than asbestos, fall hazards, hazardous materials on abatement projects.

(k) *Conducting visual inspections.* Inspections during abatement, visual inspections using the ASTM E1368 document; conducting inspections for completeness of removal; discussion of "how clean is clean?"

(l) *Legal responsibilities and liabilities of project monitors.* Specification enforcement capabilities; regulatory enforcement; licensing; powers delegated to project monitors through contract documents.

(m) *Recordkeeping and report writing.* Developing project logs/daily logs (what should be included, who sees them); final report preparation; recordkeeping under Federal regulations.

(n) *Workshops (6 hours spread over 3 days).* Contracts, specifications, and drawings: This workshop could consist of each participant being issued a set of contracts, specifications, and drawings and then being asked to answer questions and make recommendations to a project architect, engineer or to the building owner based on given conditions and these documents.

Air monitoring strategies/asbestos abatement equipment: This workshop could consist of simulated abatement sites for which sampling strategies would have to be developed (i.e., occupied buildings, industrial situations). Through demonstrations and exhibition, the project monitor may also be able to gain a better understanding of the function of various pieces of equipment used on abatement projects (air filtration units, water filtration units, negative pressure monitoring devices, sampling pump calibration devices, etc.).

Conducting visual inspections: This workshop could consist, ideally, of an interactive video in which a participant is "taken through" a work area and asked to make notes of what is seen. A series of questions will be asked which are designed to stimulate a person's recall of the area. This workshop could consist of a series of two or three videos with different site conditions and different degrees of cleanliness.

C. Examinations

1. Each State shall administer a closed book examination or designate other entities such as State-approved providers of training courses to administer the closed-book examination to persons seeking accreditation who have completed an initial training course. Demonstration testing may also be included as part of the examination. A person seeking initial accreditation in a specific discipline must pass the examination for that discipline in order to receive accreditation. For example, a person seeking accreditation as an abatement project designer must pass the State's examination for abatement project designer.

States may develop their own examinations, have providers of training courses develop examinations, or use standardized examinations developed for purposes of accreditation under TSCA Title II. In addition, States may supplement standardized examinations with questions about State regulations. States may obtain commercially developed standardized examinations, develop standardized examinations independently, or do so in cooperation with other States, or with commercial or non-profit providers on a regional or national basis. EPA recommends the use of standardized, scientifically-validated testing instruments, which may be beneficial in terms of both promoting competency and in fostering accreditation reciprocity between States.

Each examination shall adequately cover the topics included in the training course for that discipline. Each person who completes a

909

**Pt. 763, Subpt. E, App. C**                    **40 CFR Ch. I (7–1–11 Edition)**

training course, passes the required examination, and fulfills whatever other requirements the State imposes must receive an accreditation certificate in a specific discipline. Whether a State directly issues accreditation certificates, or authorizes training providers to issue accreditation certificates, each certificate issued to an accredited person must contain the following minimum information:

a. A unique certificate number
b. Name of accredited person
c. Discipline of the training course completed.
d. Dates of the training course.
e. Date of the examination.
f. An expiration date of 1 year after the date upon which the person successfully completed the course and examination.
g. The name, address, and telephone number of the training provider that issued the certificate.
h. A statement that the person receiving the certificate has completed the requisite training for asbestos accreditation under TSCA Title II.

States or training providers who reaccredit persons based upon completion of required refresher training must also provide accreditation certificates with all of the above information, except the examination date may be omitted if a State does not require a refresher examination for reaccreditation.

Where a State licenses accredited persons but has authorized training providers to issue accreditation certificates, the State may issue licenses in the form of photo-identification cards. Where this applies, EPA recommends that the State licenses should include all of the same information required for the accreditation certificates. A State may also choose to issue photo-identification cards in addition to the required accreditation certificates.

Accredited persons must have their initial and current accreditation certificates at the location where they are conducting work.

2. The following are the requirements for examination in each discipline:

a. Worker:
i. 50 multiple-choice questions
ii. Passing score: 70 percent correct
b. Contractor/Supervisor:
i. 100 multiple-choice questions
ii. Passing score: 70 percent correct
c. Inspector:
i. 50 Multiple-choice questions
ii. Passing score: 70 percent correct
d. Management Planner:
i. 50 Multiple-choice questions
ii. Passing score: 70 percent correct
e. Project Designer:
i. 100 multiple-choice questions
ii. Passing score: 70 percent correct

D. Continuing Education

For all disciplines, a State's accreditation program shall include annual refresher training as a requirement for reaccreditation as indicated below:

1. Workers: One full day of refresher training.
2. Contractor/Supervisors: One full day of refresher training.
3. Inspectors: One half-day of refresher training.
4. Management Planners: One half-day of inspector refresher training and one half-day of refresher training for management planners.
5. Project Designers: One full day of refresher training.

The refresher courses shall be specific to each discipline. Refresher courses shall be conducted as separate and distinct courses and not combined with any other training during the period of the refresher course. For each discipline, the refresher course shall review and discuss changes in Federal, State, and local regulations, developments in state-of-the-art procedures, and a review of key aspects of the initial training course as determined by the State. After completing the annual refresher course, persons shall have their accreditation extended for an additional year from the date of the refresher course. A State may consider requiring persons to pass reaccreditation examinations at specific intervals (for example, every 3 years).

EPA recommends that States formally establish a 12-month grace period to enable formerly accredited persons with expired certificates to complete refresher training and have their accreditation status reinstated without having to re-take the initial training course.

E. Qualifications

In addition to requiring training and an examination, a State may require candidates for accreditation to meet other qualification and/or experience standards that the State considers appropriate for some or all disciplines. States may choose to consider requiring qualifications similar to the examples outlined below for inspectors, management planners and project designers. States may modify these examples as appropriate. In addition, States may want to include some requirements based on experience in performing a task directly as a part of a job or in an apprenticeship role. They may also wish to consider additional criteria for the approval of training course instructors beyond those prescribed by EPA.

1. Inspectors: Qualifications - possess a high school diploma. States may want to require an Associate's Degree in specific fields (e.g., environmental or physical sciences).

910

2. Management Planners: Qualifications - Registered architect, engineer, or certified industrial hygienist or related scientific field.

3. Project Designers: Qualifications - registered architect, engineer, or certified industrial hygienist.

4. Asbestos Training Course Instructor: Qualifications - academic credentials and/or field experience in asbestos abatement.

EPA recommends that States prescribe minimum qualification standards for training instructors employed by training providers.

F. Recordkeeping Requirements for Training Providers

All approved providers of accredited asbestos training courses must comply with the following minimum recordkeeping requirements.

1. Training course materials. A training provider must retain copies of all instructional materials used in the delivery of the classroom training such as student manuals, instructor notebooks and handouts.

2. Instructor qualifications. A training provider must retain copies of all instructors' resumes, and the documents approving each instructor issued by either EPA or a State. Instructors must be approved by either EPA or a State before teaching courses for accreditation purposes. A training provider must notify EPA or the State, as appropriate, in advance whenever it changes course instructors. Records must accurately identify the instructors that taught each particular course for each date that a course is offered.

3. Examinations. A training provider must document that each person who receives an accreditation certificate for an initial training course has achieved a passing score on the examination. These records must clearly indicate the date upon which the exam was administered, the training course and discipline for which the exam was given, the name of the person who proctored the exam, a copy of the exam, and the name and test score of each person taking the exam. The topic and dates of the training course must correspond to those listed on that person's accreditation certificate. States may choose to apply these same requirements to examinations for refresher training courses.

4. Accreditation certificates. The training providers or States, whichever issues the accreditation certificate, shall maintain records that document the names of all persons who have been awarded certificates, their certificate numbers, the disciplines for which accreditation was conferred, training and expiration dates, and the training location. The training provider or State shall maintain the records in a manner that allows verification by telephone of the required information.

5. Verification of certificate information. EPA recommends that training providers of refresher training courses confirm that their students possess valid accreditation before granting course admission. EPA further recommends that training providers offering the initial management planner training course verify that students have met the prerequisite of possessing valid inspector accreditation at the time of course admission.

6. Records retention and access. (a) The training provider shall maintain all required records for a minimum of 3 years. The training provider, however, may find it advantageous to retain these records for a longer period of time.

(b) The training provider must allow reasonable access to all of the records required by the MAP, and to any other records which may be required by States for the approval of asbestos training providers or the accreditation of asbestos training courses, to both EPA and to State Agencies, on request. EPA encourages training providers to make this information equally accessible to the general public.

(c) If a training provider ceases to conduct training, the training provider shall notify the approving government body (EPA or the State) and give it the opportunity to take possession of that providers asbestos training records.

G. Deaccreditation

1. States must establish criteria and procedures for deaccrediting persons accredited as workers, contractor/supervisors, inspectors, management planners, and project designers. States must follow their own administrative procedures in pursuing deaccreditation actions. At a minimum, the criteria shall include:

(a) Performing work requiring accreditation at a job site without being in physical possession of initial and current accreditation certificates;

(b) Permitting the duplication or use of one's own accreditation certificate by another;

(c) Performing work for which accreditation has not been received; or

(d) Obtaining accreditation from a training provider that does not have approval to offer training for the particular discipline from either EPA or from a State that has a contractor accreditation plan at least as stringent as the EPA MAP.

EPA may directly pursue deaccreditation actions without reliance on State deaccreditation or enforcement authority or actions. In addition to the above-listed situations, the Administrator may suspend or revoke the accreditation of persons who have been subject to a final order imposing a civil penalty or convicted under section 16 of TSCA, 15 U.S.C. 2615 or 2647, for violations of 40 CFR part 763, or section 113 of the Clean

Air Act, 42 U.S.C. 7413, for violations of 40 CFR part 61, subpart M.

2. Any person who performs asbestos work requiring accreditation under section 206(a) of TSCA, 15 U.S.C. 2646(a), without such accreditation is in violation of TSCA. The following persons are not accredited for purposes of section 206(a) of TSCA:

(a) Any person who obtains accreditation through fraudulent representation of training or examination documents;

(b) Any person who obtains training documentation through fraudulent means;

(c) Any person who gains admission to and completes refresher training through fraudulent representation of initial or previous refresher training documentation; or

(d) Any person who obtains accreditation through fraudulent representation of accreditation requirements such as education, training, professional registration, or experience.

### H. Reciprocity

EPA recommends that each State establish reciprocal arrangements with other States that have established accreditation programs that meet or exceed the requirements of the MAP. Such arrangements might address cooperation in licensing determinations, the review and approval of training programs and/or instructors, candidate testing and exam administration, curriculum development, policy formulation, compliance monitoring, and the exchange of information and data. The benefits to be derived from these arrangements include a potential cost-savings from the reduction of duplicative activity and the attainment of a more professional accredited workforce as States are able to refine and improve the effectiveness of their programs based upon the experience and methods of other States.

### I. Electronic Reporting

States that choose to receive electronic documents must include, at a minimum, the requirements of 40 CFR Part 3—(Electronic reporting) in their programs.

### II. EPA Approval Process for State Accreditation Programs

A. States may seek approval for a single discipline or all disciplines as specified in the MAP. For example, a State that currently only requires worker accreditation may receive EPA approval for that discipline alone. EPA encourages States that currently do not have accreditation requirements for all disciplines required under section 206(b)(2) of TSCA, 15 U.S.C. 2646(b)(2), to seek EPA approval for those disciplines the State does accredit. As States establish accreditation requirements for the remaining disciplines, the requested information outlined below should be submitted to EPA as soon as possible. Any State that had an accreditation program approved by EPA under an earlier version of the MAP may follow the same procedures to obtain EPA approval of their accreditation program under this MAP.

B. Partial approval of a State Program for the accreditation of one or more disciplines does not mean that the State is in full compliance with TSCA where the deadline for that State to have adopted a State Plan no less stringent than the MAP has already passed. State Programs which are at least as stringent as the MAP for one or more of the accredited disciplines may, however, accredit persons in those disciplines only.

C. States seeking EPA approval or reapproval of accreditation programs shall submit the following information to the Regional Asbestos Coordinator at their EPA Regional office:

1. A copy of the legislation establishing or upgrading the State's accreditation program (if applicable).

2. A copy of the State's accreditation regulations or revised regulations.

3. A letter to the Regional Asbestos Coordinator that clearly indicates how the State meets the program requirements of this MAP. Addresses for each of the Regional Asbestos Coordinators are shown below:

EPA, Region I, (ATC-111) Asbestos Coordinator, JFK Federal Bldg., Boston, MA 02203-2211, (617) 565-3836.

EPA, Region II, (MS-500), Asbestos Coordinator, 2890 Woodbridge Ave., Edison, NJ 08837-3679, (908) 321-6671.

EPA, Region III, (3AT-33), Asbestos Coordinator, 841 Chestnut Bldg., Philadelphia, PA 19107, (215) 597-3160.

EPA, Region IV, Asbestos Coordinator, 345 Courtland St., N.E., Atlanta, GA 30365, (404) 347-5014.

EPA, Region V, (SP-14J), Asbestos Coordinator, 77 W. Jackson Blvd., Chicago, IL 60604-3590, (312) 886-6003.

EPA, Region VI, (6T-PT), Asbestos Coordinator, 1445 Ross Ave. Dallas, TX 75202-2744, (214) 655-7244.

EPA, Region VII, (ARTX/ASBS), Asbestos Coordinator, 726 Minnesota Ave., Kansas City, KS 66101, (913) 551-7020.

EPA, Region VIII, (8AT-TS), Asbestos Coordinator, 1 Denver Place, Suite 500 999 - 18th St., Denver, CO 80202-2405, (303) 293-1442.

EPA, Region IX, Asbestos NESHAPs Contact, Air Division (A–5), 75 Hawthorne Street, San Francisco, CA 94105, (415) 972-3989.

EPA, Region X, (AT-083), Asbestos Coordinator, 1200 Sixth Ave., Seattle, WA 98101, (206) 553-4762.

EPA maintains a listing of all those States that have applied for and received EPA approval for having accreditation requirements that are at least as stringent as the MAP for one or more disciplines. Any training courses

**Environmental Protection Agency**    **Pt. 763, Subpt. E, App. C**

approved by an EPA-approved State Program are considered to be EPA-approved for purposes of accreditation.

### III. Approval of Training Courses

Individuals or groups wishing to sponsor training courses for disciplines required to be accredited under section 206(b)(1)(A) of TSCA, 15 U.S.C. 2646(b)(1)(A), may apply for approval from States that have accreditation program requirements that are at least as stringent as this MAP. For a course to receive approval, it must meet the requirements for the course as outlined in this MAP, and any other requirements imposed by the State from which approval is being sought. Courses that have been approved by a State with an accreditation program at least as stringent as this MAP are approved under section 206(a) of TSCA, 15 U.S.C. 2646(a), for that particular State, and also for any other State that does not have an accreditation program as stringent as this MAP.

#### A. Initial Training Course Approval

A training provider must submit the following minimum information to a State as part of its application for the approval of each training course:

1. The course provider's name, address, and telephone number.

2. A list of any other States that currently approve the training course.

3. The course curriculum.

4. A letter from the provider of the training course that clearly indicates how the course meets the MAP requirements for:

a. Length of training in days.

b. Amount and type of hands-on training.

c. Examination (length, format, and passing score).

d. Topics covered in the course.

5. A copy of all course materials (student manuals, instructor notebooks, handouts, etc.).

6. A detailed statement about the development of the examination used in the course.

7. Names and qualifications of all course instructors. Instructors must have academic and/or field experience in asbestos abatement.

8. A description of and an example of the numbered certificates issued to students who attend the course and pass the examination.

#### B. Refresher Training Course Approval

The following minimum information is required for approval of refresher training courses by States:

1. The length of training in half-days or days.

2. The topics covered in the course.

3. A copy of all course materials (student manuals, instructor notebooks, handouts, etc.).

4. The names and qualifications of all course instructors. Instructors must have academic and/or field experience in asbestos abatement.

5. A description of and an example of the numbered certificates issued to students who complete the refresher course and pass the examination, if required.

#### C. Withdrawal of Training Course Approval

States must establish criteria and procedures for suspending or withdrawing approval from accredited training programs. States should follow their own administrative procedures in pursuing actions for suspension or withdrawal of approval of training programs. At a minimum, the criteria shall include:

(1) Misrepresentation of the extent of a training course's approval by a State or EPA;

(2) Failure to submit required information or notifications in a timely manner;

(3) Failure to maintain requisite records;

(4) Falsification of accreditation records, instructor qualifications, or other accreditation information; or

(5) Failure to adhere to the training standards and requirements of the EPA MAP or State Accreditation Program, as appropriate.

In addition to the criteria listed above, EPA may also suspend or withdraw a training course's approval where an approved training course instructor, or other person with supervisory authority over the delivery of training has been found in violation of other asbestos regulations administered by EPA. An administrative or judicial finding of violation, or execution of a consent agreement and order under 40 CFR 22.18, constitutes evidence of a failure to comply with relevant statutes or regulations. States may wish to adopt this criterion modified to include their own asbestos statutes or regulations. EPA may also suspend or withdraw approval of training programs where a training provider has submitted false information as a part of the self-certification required under Unit V.B. of the revised MAP.

Training course providers shall permit representatives of EPA or the State which approved their training courses to attend, evaluate, and monitor any training course without charge. EPA or State compliance inspection staff are not required to give advance notice of their inspections. EPA may suspend or withdraw State or EPA approval of a training course based upon the criteria specified in this Unit III.C.

### IV. EPA Procedures for Suspension or Revocation of Accreditation or Training Course Approval.

A. If the Administrator decides to suspend or revoke the accreditation of any person or

913

suspend or withdraw the approval of a training course, the Administrator will notify the affected entity of the following:

1. The grounds upon which the suspension, revocation, or withdrawal is based.

2. The time period during which the suspension, revocation, or withdrawal is effective, whether permanent or otherwise.

3. The conditions, if any, under which the affected entity may receive accreditation or approval in the future.

4. Any additional conditions which the Administrator may impose.

5. The opportunity to request a hearing prior to final Agency action to suspend or revoke accreditation or suspend or withdraw approval.

B. If a hearing is requested by the accredited person or training course provider pursuant to the preceding paragraph, the Administrator will:

1. Notify the affected entity of those assertions of law and fact upon which the action to suspend, revoke, or withdraw is based.

2. Provide the affected entity an opportunity to offer written statements of facts, explanations, comments, and arguments relevant to the proposed action.

3. Provide the affected entity such other procedural opportunities as the Administrator may deem appropriate to ensure a fair and impartial hearing.

4. Appoint an EPA attorney as Presiding Officer to conduct the hearing. No person shall serve as Presiding Officer if he or she has had any prior connection with the specific case.

C. The Presiding Officer appointed pursuant to the preceding paragraph shall:

1. Conduct a fair, orderly, and impartial hearing, without unnecessary delay.

2. Consider all relevant evidence, explanation, comment, and argument submitted pursuant to the preceding paragraph.

3. Promptly notify the affected entity of his or her decision and order. Such an order is a final Agency action.

D. If the Administrator determines that the public health, interest, or welfare warrants immediate action to suspend the accreditation of any person or the approval of any training course provider, the Administrator will:

1. Notify the affected entity of the grounds upon which the emergency suspension is based;

2. Notify the affected entity of the time period during which the emergency suspension is effective.

3. Notify the affected entity of the Administrator's intent to suspend or revoke accreditation or suspend or withdraw training course approval, as appropriate, in accordance with Unit IV.A. above. If such suspension, revocation, or withdrawal notice has not previously been issued, it will be issued

at the same time the emergency suspension notice is issued.

E. Any notice, decision, or order issued by the Administrator under this section, and any documents filed by an accredited person or approved training course provider in a hearing under this section, shall be available to the public except as otherwise provided by section 14 of TSCA or by 40 CFR part 2. Any such hearing at which oral testimony is presented shall be open to the public, except that the Presiding Officer may exclude the public to the extent necessary to allow presentation of information which may be entitled to confidential treatment under section 14 of TSCA or 40 CFR part 2.

*V. Implementation Schedule*

The various requirements of this MAP become effective in accordance with the following schedules:

A. Requirements applicable to State Programs

1. Each State shall adopt an accreditation plan that is at least as stringent as this MAP within 180 days after the commencement of the first regular session of the legislature of the State that is convened on or after April 4, 1994.

2. If a State has adopted an accreditation plan at least as stringent as this MAP as of April 4, 1994, the State may continue to:

a. Conduct TSCA training pursuant to this MAP.

b. Approve training course providers to conduct training and to issue accreditation that satisfies the requirements for TSCA accreditation under this MAP.

c. Issue accreditation that satisfies the requirements for TSCA accreditation under this MAP.

3. A State that had complied with an earlier version of the MAP, but has not adopted an accreditation plan at least as stringent as this MAP by April 4, 1994, may:

a. Conduct TSCA training which remains in compliance with the requirements of Unit V.B. of this MAP. After such training has been self-certified in accordance with Unit V.B. of this MAP, the State may issue accreditation that satisfies the requirement for TSCA accreditation under this MAP.

b. Sustain its approval for any training course providers to conduct training and issue TSCA accreditation that the State had approved before April 4, 1994, and that remain in compliance with Unit V.B. of this MAP.

c. Issue accreditation pursuant to an earlier version of the MAP that provisionally satisfies the requirement for TSCA accreditation until October 4, 1994.

Such a State may not approve new TSCA training course providers to conduct training or to issue TSCA accreditation that satisfies

**Environmental Protection Agency**                                    **Pt. 763, Subpt. E, App. C**

the requirements of this MAP until the State adopts an accreditation plan that is at least as stringent as this MAP.

4. A State that had complied with an earlier version of the MAP, but fails to adopt a plan as stringent as this MAP by the deadline established in Unit V.A.1., is subject to the following after that deadline date:

a. The State loses any status it may have held as an EPA-approved State for accreditation purposes under section 206 of TSCA, 15 U.S.C. 2646.

b. All training course providers approved by the State lose State approval to conduct training and issue accreditation that satisfies the requirements for TSCA accreditation under this MAP.

c. The State may not:

i. Conduct training for accreditation purposes under section 206 of TSCA, 15 U.S.C. 2646.

ii. Approve training course providers to conduct training or issue accreditation that satisfies the requirements for TSCA accreditation; or

iii. Issue accreditation that satisfies the requirement for TSCA accreditation.

EPA will extend EPA-approval to any training course provider that loses State approval because the State does not comply with the deadline, so long as the provider is in compliance with Unit V.B. of this MAP, and the provider is approved by a State that had complied with an earlier version of the MAP as of the day before the State loses its EPA approval.

5. A State that does not have an accreditation program that satisfies the requirements for TSCA accreditation under either an earlier version of the MAP or this MAP, may not:

a. Conduct training for accreditation purposes under section 206 of TSCA, 15 U.S.C. 2646;

b. Approve training course providers to conduct training or issue accreditation that satisfies the requirements for TSCA accreditation; or

c. Issue accreditation that satisfies the requirement for TSCA accreditation.

### B. Requirements applicable to Training Courses and Providers

As of October 4, 1994, an approved training provider must certify to EPA and to any State that has approved the provider for TSCA accreditation, that each of the provider's training courses complies with the requirements of this MAP. The written submission must document in specific detail the changes made to each training course in order to comply with the requirements of this MAP and clearly state that the provider is also in compliance with all other requirements of this MAP, including the new recordkeeping and certificate provisions. Each submission must include the following state-

ment signed by an authorized representative of the training provider: ''Under civil and criminal penalties of law for the making or submission of false or fraudulent statements or representations (18 U.S.C. 1001 and 15 U.S.C. 2615), I certify that the training described in this submission complies with all applicable requirements of Title II of TSCA, 40 CFR part 763, Appendix C to Subpart E, as revised, and any other applicable Federal, state, or local requirements.'' A consolidated self-certification submission from each training provider that addresses all of its approved training courses is permissible and encouraged.

The self-certification must be sent via registered mail, to EPA Headquarters at the following address: Attn. Self-Certification Program, Field Programs Branch, Chemical Management Division (7404), Office of Pollution Prevention and Toxics, Environmental Protection Agency, 1200 Pennsylvania Ave., NW., Washington, DC 20460. A duplicate copy of the complete submission must also be sent to any States from which approval had been obtained.

The timely receipt of a complete self-certification by EPA and all approving States shall have the effect of extending approval under this MAP to the training courses offered by the submitting provider. If a self-certification is not received by the approving government bodies on or before the due date, the affected training course is not approved under this MAP. Such training providers must then reapply for approval of these training courses pursuant to the procedures outlined in Unit III.

### C. Requirements applicable to Accredited Persons.

Persons accredited by a State with an accreditation program no less stringent than an earlier version of the MAP or by an EPA-approved training provider as of April 3, 1994, are accredited in accordance with the requirements of this MAP, and are not required to retake initial training. They must continue to comply with the requirements for annual refresher training in Unit I.D. of the revised MAP.

### D. Requirements applicable to Non-Accredited Persons.

In order to perform work requiring accreditation under TSCA Title II, persons who are not accredited by a State with an accreditation program no less stringent than an earlier version of the MAP or by an EPA-approved training provider as of April 3, 1994, must comply with the upgraded training requirements of this MAP by no later than October 4, 1994. Non-accredited persons may obtain initial accreditation on a provisional basis by successfully completing any of the training programs approved under an earlier

version of the MAP, and thereby perform work during the first 6 months after this MAP takes effect. However, by October 4, 1994, these persons must have successfully completed an upgraded training program that fully complies with the requirements of this MAP in order to continue to perform work requiring accreditation under section 206 of TSCA, 15 U.S.C. 2646.

[59 FR 5251, Feb. 3, 1994, as amended at 60 FR 31922, June 19, 1995; 70 FR 59889, Oct. 13, 2005; 75 FR 69353, Nov. 12, 2010]

APPENDIX D TO SUBPART E OF PART 763—TRANSPORT AND DISPOSAL OF ASBESTOS WASTE

For the purposes of this appendix, transport is defined as all activities from receipt of the containerized asbestos waste at the generation site until it has been unloaded at the disposal site. Current EPA regulations state that there must be no visible emissions to the outside air during waste transport. However, recognizing the potential hazards and subsequent liabilities associated with exposure, the following additional precautions are recommended.

*Recordkeeping.* Before accepting wastes, a transporter should determine if the waste is properly wetted and containerized. The transporter should then require a chain-of-custody form signed by the generator. A chain-of-custody form may include the name and address of the generator, the name and address of the pickup site, the estimated quantity of asbestos waste, types of containers used, and the destination of the waste. The chain-of-custody form should then be signed over to a disposal site operator to transfer responsibility for the asbestos waste. A copy of the form signed by the disposal site operator should be maintained by the transporter as evidence of receipt at the disposal site.

*Waste handling.* A transporter should ensure that the asbestos waste is properly contained in leak-tight containers with appropriate labels, and that the outside surfaces of the containers are not contaminated with asbestos debris adhering to the containers. If there is reason to believe that the condition of the asbestos waste may allow significant fiber release, the transporter should not accept the waste. Improper containerization of wastes is a violation of the NESHAPs regulation and should be reported to the appropriate EPA Regional Asbestos NESHAPs contact below:

*Region I*

Asbestos NESHAPs Contact, Air Management Division, USEPA, Region I, JFK Federal Building, Boston, MA 02203, (617) 223–3266.

*Region II*

Asbestos NESHAPs Contact, Air & Waste Management Division, USEPA, Region II, 26 Federal Plaza, New York, NY 10007, (212) 264–6770.

*Region III*

Asbestos NESHAPs Contact, Air Management Division, USEPA, Region III, 841 Chestnut Street, Philadelphia, PA 19107, (215) 597–9325.

*Region IV*

Asbestos NESHAPs Contact, Air, Pesticide & Toxic Management, USEPA, Region IV, 345 Courtland Street, NE., Atlanta, GA 30365, (404) 347–4298.

*Region V*

Asbestos NESHAPs Contact, Air Management Division, USEPA, Region V, 77 West Jackson Boulevard, Chicago, IL 60604, (312) 353–6793.

*Region VI*

Asbestos NESHAPs Contact, Air & Waste Management Division, USEPA, Region VI, 1445 Ross Avenue, Dallas, TX 75202, (214) 655–7229.

*Region VII*

Asbestos NESHAPs Contact, Air & Waste Management Division, USEPA, Region VII, 726 Minnesota Avenue, Kansas City, KS 66101, (913) 236–2896.

*Region VIII*

Asbestos NESHAPs Contact, Air & Waste Management Division, USEPA, Region VIII, 999 18th Street, Suite 500, Denver, CO 80202, (303) 293–1814.

*Region IX*

Asbestos NESHAPs Contact, Air Division, USEPA, Region IX, 75 Hawthorne Street, San Francisco, CA 94105, (415) 972–3989.

*Region X*

Asbestos NESHAPs Contact, Air & Toxics Management Division, USEPA, Region X, 1200 Sixth Avenue, Seattle, WA 98101, (206) 442–2724.

Once the transporter is satisfied with the condition of the asbestos waste and agrees to handle it, the containers should be loaded into the transport vehicle in a careful manner to prevent breaking of the containers. Similarly, at the disposal site, the asbestos waste containers should be transferred carefully to avoid fiber release.

*Waste transport.* Although there are no regulatory specifications regarding the transport vehicle, it is recommended that vehicles used for transport of containerized asbestos

waste have an enclosed carrying compartment or utilize a canvas covering sufficient to contain the transported waste, prevent damage to containers, and prevent fiber release. Transport of large quantities of asbestos waste is commonly conducted in a 20-cubic-yard ''roll off'' box, which should also be covered. Vehicles that use compactors to reduce waste volume should not be used because these will cause the waste containers to rupture. Vacuum trucks used to transport waste slurry must be inspected to ensure that water is not leaking from the truck.

Disposal involves the isolation of asbestos waste material in order to prevent fiber release to air or water. Landfilling is recommended as an environmentally sound isolation method because asbestos fibers are virtually immobile in soil. Other disposal techniques such as incineration or chemical treatment are not feasible due to the unique properties of asbestos. EPA has established asbestos disposal requirements for active and inactive disposal sites under NESHAPs (40 CFR Part 61, subpart M) and specifies general requirements for solid waste disposal under RCRA (40 CFR Part 257). Advance EPA notification of the intended disposal site is required by NESHAPs.

*Selecting a disposal facility.* An acceptable disposal facility for asbestos wastes must adhere to EPA's requirements of no visible emissions to the air during disposal, or minimizing emissions by covering the waste within 24 hours. The minimum required cover is 6 inches of nonasbestos material, normally soil, or a dust-suppressing chemical. In addition to these Federal requirements, many state or local government agencies require more stringent handling procedures. These agencies usually supply a list of ''approved'' or licensed asbestos disposal sites upon request. Solid waste control agencies are listed in local telephone directories under state, county, or city headings. A list of state solid waste agencies may be obtained by calling the RCRA hotline: 1–800–424–9346 (382–3000 in Washington, DC). Some landfill owners or operators place special requirements on asbestos waste, such as placing all bagged waste into 55-gallon metal drums. Therefore, asbestos removal contractors should contact the intended landfill before arriving with the waste.

*Receiving asbestos waste.* A landfill approved for receipt of asbestos waste should require notification by the waste hauler that the load contains asbestos. The landfill operator should inspect the loads to verify that asbestos waste is properly contained in leak-tight containers and labeled appropriately. The appropriate EPA Regional Asbestos NESHAPs Contact should be notified if the landfill operator believes that the asbestos waste is in a condition that may cause significant fiber release during disposal. In situations when the wastes are not properly con-

tainerized, the landfill operator should thoroughly soak the asbestos with a water spray prior to unloading, rinse out the truck, and immediately cover the wastes with non-asbestos material prior to compacting the waste in the landfill.

*Waste deposition and covering.* Recognizing the health dangers associated with asbestos exposure, the following procedures are recommended to augment current federal requirements:

• Designate a separate area for asbestos waste disposal. Provide a record for future landowners that asbestos waste has been buried there and that it will be hazardous to attempt to excavate that area. (Future regulations may require property deeds to identify the location of any asbestos wastes and warn against excavation.)

• Prepare a separate trench to receive asbestos wastes. The size of the trench will depend upon the quantity and frequency of asbestos waste delivered to the disposal site. The trenching technique allows application of soil cover without disturbing the asbestos waste containers. The trench should be ramped to allow the transport vehicle to back into it, and the trench should be as narrow as possible to reduce the amount of cover required. If possible, the trench should be aligned perpendicular to prevailing winds.

• Place the asbestos waste containers into the trench carefully to avoid breaking them. Be particularly careful with plastic bags because when they break under pressure asbestos particles can be emitted.

• Completely cover the containerized waste within 24 hours with a minimum of 6 inches of nonasbestos material. Improperly containerized waste is a violation of the NESHAPs and EPA should be notified.

However, if improperly containerized waste is received at the disposal site, it should be covered immediately after unloading. Only after the wastes, including properly containerized wastes, are completely covered, can the wastes be compacted or other heavy equipment run over it. During compacting, avoid exposing wastes to the air or tracking asbestos material away from the trench.

• For final closure of an area containing asbestos waste, cover with at least an additional 30 inches of compacted nonasbestos material to provide a 36-inch final cover. To control erosion of the final cover, it should be properly graded and vegetated. In areas of the United States where excessive soil erosion may occur or the frost line exceeds 3 feet, additional final cover is recommended. In desert areas where vegetation would be difficult to maintain, 3-6 inches of well graded crushed rock is recommended for placement on top of the final cover.

*Controlling public access.* Under the current NESHAPs regulation, EPA does not require that a landfill used for asbestos disposal use

warning signs or fencing if it meets the requirement to cover asbestos wastes. However, under RCRA, EPA requires that access be controlled to prevent exposure of the public to potential health and safety hazards at the disposal site. Therefore, for liability protection of operators of landfills that handle asbestos, fencing and warning signs are recommended to control public access when natural barriers do not exist. Access to a landfill should be limited to one or two entrances with gates that can be locked when left unattended. Fencing should be installed around the perimeter of the disposal site in a manner adequate to deter access by the general public. Chain-link fencing, 6-ft high and topped with a barbed wire guard, should be used. More specific fencing requirements may be specified by local regulations. Warning signs should be displayed at all entrances and at intervals of 330 feet or less along the property line of the landfill or perimeter of the sections where asbestos waste is deposited. The sign should read as follows:

ASBESTOS WASTE DISPOSAL SITE
BREATHING ASBESTOS DUST MAY
CAUSE LUNG DISEASE AND CANCER

*Recordkeeping.* For protection from liability, and considering possible future requirements for notification on disposal site deeds, a landfill owner should maintain documentation of the specific location and quantity of the buried asbestos wastes. In addition, the estimated depth of the waste below the surface should be recorded whenever a landfill section is closed. As mentioned previously, such information should be recorded in the land deed or other record along with a notice warning against excavation of the area.

[52 FR 41897, Oct. 30, 1987, as amended at 62 FR 1834, Jan. 14, 1997; 75 FR 69353, Nov. 12, 2010]

APPENDIX E TO SUBPART E OF PART 763—INTERIM METHOD OF THE DETERMINATION OF ASBESTOS IN BULK INSULATION SAMPLES

SECTION 1. POLARIZED LIGHT MICROSCOPY

### 1.1  Principle and Applicability

Bulk samples of building materials taken for asbestos identification are first examined for homogeneity and preliminary fiber identification at low magnification. Positive identification of suspect fibers is made by analysis of subsamples with the polarized light microscope.

The principles of optical mineralogy are well established.[1,2] A light microscope equipped with two polarizing filters is used to observe specific optical characteristics of a sample. The use of plane polarized light allows the determination of refractive indices along specific crystallographic axes. Mor-

phology and color are also observed. A retardation plate is placed in the polarized light path for determination of the sign of elongation using orthoscopic illumination. Orientation of the two filters such that their vibration planes are perpendicular (crossed polars) allows observation of the birefringence and extinction characteristics of anisotropic particles.

Quantitative analysis involves the use of point counting. Point counting is a standard technique in petrography for determining the relative areas occupied by separate minerals in thin sections of rock. Background information on the use of point counting[2] and the interpretation of point count data[3] is available.

This method is applicable to all bulk samples of friable insulation materials submitted for identification and quantitation of asbestos components.

### 1.2  Range

The point counting method may be used for analysis of samples containing from 0 to 100 percent asbestos. The upper detection limit is 100 percent. The lower detection limit is less than 1 percent.

### 1.3  Interferences

Fibrous organic and inorganic constituents of bulk samples may interfere with the identification and quantitation of the asbestos mineral content. Spray-on binder materials may coat fibers and affect color or obscure optical characteristics to the extent of masking fiber identity. Fine particles of other materials may also adhere to fibers to an extent sufficient to cause confusion in identification. Procedures that may be used for the removal of interferences are presented in Section 1.7.2.2.

### 1.4  Precision and Accuracy

Adequate data for measuring the accuracy and precision of the method for samples with various matrices are not currently available. Data obtained for samples containing a single asbestos type in a simple matrix are available in the EPA report *Bulk Sample Analysis for Asbestos Content: Evaluation of the Tentative Method.*[4]

### 1.5  Apparatus

1.5.1  Sample Analysis

A low-power binocular microscope, preferably stereoscopic, is used to examine the bulk insulation sample as received.

- *Microscope:* binocular, 10–45X (approximate).
- *Light Source:* incandescent or fluorescent.
- *Forceps, Dissecting Needles, and Probes*
- *Glassine Paper or Clean Glass Plate*

**Environmental Protection Agency**

Compound microscope requirements: A polarized light microscope complete with polarizer, analyzer, port for wave retardation plate, 360° graduated rotating stage, substage condenser, lamp, and lamp iris.
- *Polarized Light Microscope:* described above.
- *Objective Lenses:* 10X, 20X, and 40X or near equivalent.
- *Dispersion Staining Objective Lens* (optional)
- *Ocular Lens:* 10X minimum.
- *Eyepiece Reticle:* cross hair or 25 point Chalkley Point Array.
- *Compensator Plate:* 550 millimicron retardation.

### 1.5.2 Sample Preparation

Sample preparation apparatus requirements will depend upon the type of insulation sample under consideration. Various physical and/or chemical means may be employed for an adequate sample assessment.
- *Ventilated Hood* or negative pressure glove box.
- *Microscope Slides*
- *Coverslips*
- *Mortar and Pestle:* agate or porcelain. (optional)
- *Wylie Mill* (optional)
- *Beakers and Assorted Glassware* (optional)
- *Certrifuge* (optional)
- *Filtration apparatus* (optional)
- *Low temperature asher* (optional)

### 1.6 Reagents

#### 1.6.1 Sample Preparation

- *Distilled Water (optional)*
- *Dilute CH₃COOH:* ACS reagent grade (optional)
- *Dilute HCl:* ACS reagent grade (optional)
- *Sodium metaphosphate* ($NaPO_3)_6$ (optional)

#### 1.6.2 Analytical Reagents

*Refractive Index Liquids:* 1.490–1.570, 1.590–1.720 in increments of 0.002 or 0.004.
- *Refractive Index Liquids for Dispersion Staining:* high-dispersion series, 1.550, 1.605, 1.630 (optional)
- *UICC Asbestos Reference Sample Set:* Available from: UICC MRC Pneumoconiosis Unit, Llandough Hospital, Penarth, Glamorgan CF6 1XW, UK, and commercial distributors.
- *Tremolite-asbestos* (source to be determined)
- *Actinolite-asbestos* (source to be determined)

### 1.7 Procedures

NOTE: Exposure to airborne asbestos fibers is a health hazard. Bulk samples submitted for analysis are usually friable and may release fibers during handling or matrix reduction steps. All sample and slide preparations should be carried out in a ventilated hood or glove box with continuous airflow (negative pressure). Handling of samples without these precautions may result in exposure of the analyst and contamination of samples by airborne fibers.

#### 1.7.1 Sampling

Samples for analysis of asbestos content shall be taken in the manner prescribed in Reference 5 and information on design of sampling and analysis programs may be found in Reference 6. If there are any questions about the representative nature of the sample, another sample should be requested before proceeding with the analysis.

#### 1.7.2 Analysis

##### 1.7.2.1 Gross Examination

Bulk samples of building materials taken for the identification and quantitation of asbestos are first examined for homogeneity at low magnification with the aid of a stereomicroscope. The core sample may be examined in its container or carefully removed from the container onto a glassine transfer paper or clean glass plate. If possible, note is made of the top and bottom orientation. When discrete strata are identified, each is treated as a separate material so that fibers are first identified and quantified in that layer only, and then the results for each layer are combined to yield an estimate of asbestos content for the whole sample.

##### 1.7.2.2 Sample Preparation

Bulk materials submitted for asbestos analysis involve a wide variety of matrix materials. Representative subsamples may not be readily obtainable by simple means in heterogeneous materials, and various steps may be required to alleviate the difficulties encountered. In most cases, however, the best preparation is made by using forceps to sample at several places from the bulk material. Forcep samples are immersed in a refractive index liquid on a microscope slide, teased apart, covered with a cover glass, and observed with the polarized light microscope.

Alternatively, attempts may be made to homogenize the sample or eliminate interferences before further characterization. The selection of appropriate procedures is dependent upon the samples encountered and personal preference. The following are presented as possible sample preparation steps.

A mortar and pestle can sometimes be used in the size reduction of soft or loosely bound materials though this may cause matting of some samples. Such samples may be reduced in a Wylie mill. Apparatus should be clean and extreme care exercised to avoid cross-contamination of samples. Periodic checks of the particle sizes should be made during the grinding operation so as to preserve any fiber bundles present in an identifiable form. These procedures are not recommended for samples that contain amphibole minerals or

vermiculite. Grinding of amphiboles may result in the separation of fiber bundles or the production of cleavage fragments with aspect ratios greater than 3:1. Grinding of vermiculite may also produce fragments with aspect ratios greater than 3:1.

Acid treatment may occasionally be required to eliminate interferences. Calcium carbonate, gypsum, and bassanite (plaster) are frequently present in sprayed or trowelled insulations. These materials may be removed by treatment with warm dilute acetic acid. Warm dilute hydrochloric acid may also be used to remove the above materials. If acid treatment is required, wash the sample at least twice with distilled water, being careful not to lose the particulates during decanting steps. Centrifugation or filtration of the suspension will prevent significant fiber loss. The pore size of the filter should be 0.45 micron or less. Caution: prolonged acid contact with the sample may alter the optical characteristics of chrysotile fibers and should be avoided.

Coatings and binding materials adhering to fiber surfaces may also be removed by treatment with sodium metaphosphate.[7] Add 10 mL of 10g/L sodium metaphosphate solution to a small (0.1 to 0.5 mL) sample of bulk material in a 15-mL glass centrifuge tube. For approximately 15 seconds each, stir the mixture on a vortex mixer, place in an ultrasonic bath and then shake by hand. Repeat the series. Collect the dispersed solids by centrifugation at 1000 rpm for 5 minutes. Wash the sample three times by suspending in 10 mL distilled water and recentrifuging. After washing, resuspend the pellet in 5 mL distilled water, place a drop of the suspension on a microscope slide, and dry the slide at 110 °C.

In samples with a large portion of cellulosic or other organic fibers, it may be useful to ash part of the sample and view the residue. Ashing should be performed in a low temperature asher. Ashing may also be performed in a muffle furnace at temperatures of 500 °C or lower. Temperatures of 550 °C or higher will cause dehydroxylation of the asbestos minerals, resulting in changes of the refractive index and other key parameters. If a muffle furnace is to be used, the furnace thermostat should be checked and calibrated to ensure that samples will not be heated at temperatures greater than 550 °C.

Ashing and acid treatment of samples should not be used as standard procedures. In order to monitor possible changes in fiber characteristics, the material should be viewed microscopically before and after any sample preparation procedure. Use of these procedures on samples to be used for quantitation requires a correction for percent weight loss.

### 1.7.2.3 Fiber Identification

Positive identification of asbestos requires the determination of the following optical properties.
• Morphology
• Color and pleochroism
• Refractive indices
• Birefringence
• Extinction characteristics
• Sign of elongation

Table 1–1 lists the above properties for commercial asbestos fibers. Figure 1–1 presents a flow diagram of the examination procedure. Natural variations in the conditions under which deposits of asbestiform minerals are formed will occasionally produce exceptions to the published values and differences from the UICC standards. The sign of elongation is determined by use of the compensator plate and crossed polars. Refractive indices may be determined by the Becke line test. Alternatively, dispersion staining may be used. Inexperienced operators may find that the dispersion staining technique is more easily learned, and should consult Reference 9 for guidance. Central stop dispersion staining colors are presented in Table 1–2. Available high-dispersion (HD) liquids should be used.

TABLE 1–1—OPTICAL PROPERTIES OF ASBESTOC FIBERS

| Mineral | Morphology, color [a] | Refrac- tive indices [b] | | Birefring-ence | Extinction | Sign of elonation |
|---------|------------------------|------------|-----------|----------------|------------|-------------------|
| | | α | γ | | | |
| Chrysotile (asbestiform serpentine). | Wavy fibers. Fiber bundles have splayed ends and "kinks". Aspect ratio typically >10:1. Colorless [3], nonpleochroic. | 1.493–1.560 | 1.517–1.562[f] (nor-mally 1.556). | .008 | ∥ to fiber length. | + (length slow) |
| Amosite (asbestiform grunerite). | Straight, rigid fibers. Aspect ratio typically >10:1. Colorless to brown, nonpleochroic or weakly so. Opaque inclusions may be present. | 1.635–1.696 | 1.655–1.729[f] (nor-mally 1.696–1.710. | .020–.033 | ∥ to fiber length. | + (length slow) |

**Environmental Protection Agency**                    **Pt. 763, Subpt. E, App. E**

TABLE 1–1—OPTICAL PROPERTIES OF ASBESTOC FIBERS—Continued

| Mineral | Morphology, color [a] | Refrac- tive indices [b] | | Birefring- ence | Extinction | Sign of elonation |
|---|---|---|---|---|---|---|
| | | α | γ | | | |
| Crocidolite (asbestiform Riebeckite). | Straight, rigid fibers. Thick fibers and bundles common, blue to purple-blue in color. Pleochroic. Birefringence is generally masked by blue color. | 1.654–1.701 | 1.668–1.717[3e] (normally close to 1.700). | .014–.016 | ‖ to fiber length. | – (length fast) |
| Anthophyllite-asbestos. | Straight fibers and acicular cleavage fragments.[d] Some composite fibers. Aspect ratio <10:1. Colorless to light brown. | 1.596–1.652 | 1.615–1.676[f]. | .019–.024 | ‖ to fiber length. | + (length slow) |
| Tremolite-actinolite-asbestos. | Normally present as acicular or prismatic cleavage fragments.[d] Single crystals predominate, aspect ratio <10:1. Colorless to pale green. | 1.599–1.668 | 1.622–1.688[f]. | .023–.020 | Oblique extinction, 10–20° for fragments. Composite fibers show ‖ extinction. | + (length slow) |

[a] From reference 5; colors cited are seen by observation with plane polarized light.
[b] From references 5 and 8.
[c] Fibers subjected to heating may be brownish.
[d] Fibers defined as having aspect ratio >3:1.
[e] to fiber length.
[f] ‖To fiber length.

921

Pt. 763, Subpt. E, App. E

40 CFR Ch. I (7–1–11 Edition)



Figure 1-1.  Flow chart for analysis of bulk samples by polarized light microscopy.

TABLE 1–2—CENTRAL STOP DISPERSION STAINING COLORS[a]

| Mineral | RI Liquid | η | η‖ |
|---|---|---|---|
| Chrysotile ....... | 1.550[HD] | Blue ............. | Blue-magenta |
| Amosite ........ | 1.680 | Blue-magenta to pale blue. | Golden-yellow |
| | 1.550[HD] | Yellow to white. | Yellow to white |
| Crocidolite[b] .. | 1.700 | Red magenta | Blue-magenta |
| | 1.550[HD] | Yellow to white. | Yellow to white |
| Anthophyllite | 1.605[HD] | Blue ............. | Gold to gold-magenta |
| Tremolite ....... | 1.605[HD c] | Pale blue .... | Gold |
| Actinolite ...... | 1.605[HD] | Gold-magenta to blue. | Gold |
| | 1.630[HD c] | Magenta ...... | Golden-yellow |

[a] From reference 9.
[b] Blue absorption color.
[c] Oblique extinction view.

#### 1.7.2.4 Quantitation of Asbestos Content

Asbestos quantitation is performed by a point-counting procedure or an equivalent estimation method. An ocular reticle (cross-hair or point array) is used to visually superimpose a point or points on the microscope field of view. Record the number of points positioned directly above each kind of particle or fiber of interest. Score only points directly over asbestos fibers or nonasbestos matrix material. Do not score empty points for the closest particle. If an asbestos fiber and a matrix particle overlap so that a point is superimposed on their visual intersection, a point is scored for both categories. Point counting provides a determination of the area percent asbestos. Reliable conversion of area percent to percent of dry weight is not currently feasible unless the specific gravities and relative volumes of the materials are known.

For the purpose of this method, "asbestos fibers" are defined as having an aspect ratio greater than 3:1 and being positively identified as one of the minerals in Table 1–1.

A total of 400 points superimposed on either asbestos fibers or nonasbestos matrix material must be counted over at least eight different preparations of representative subsamples. Take eight forcep samples and mount each separately with the appropriate refractive index liquid. The preparation should not be heavily loaded. The sample should be uniformly dispersed to avoid overlapping particles and allow 25–50 percent empty area within the fields of view. Count 50 nonempty points on each preparation, using either

• A cross-hair reticle and mechanical stage; or

• A reticle with 25 points (Chalkley Point Array) and counting at least 2 randomly selected fields.

For samples with mixtures of isotropic and anisotropic materials present, viewing the sample with slightly uncrossed polars or the addition of the compensator plate to the polarized light path will allow simultaneous discrimination of both particle types. Quantitation should be performed at 100X or at the lowest magnification of the polarized light microscope that can effectively distinguish the sample components. Confirmation of the quantitation result by a second analyst on some percentage of analyzed samples should be used as standard quality control procedure.

The percent asbestos is calculated as follows:

% asbestos=(a/n) 100%

where

a=number of asbestos counts,
n=number of nonempty points counted (400).

If a=0, report "No asbestos detected." If 0< a≤3, report "<1% asbestos".

The value reported should be rounded to the nearest percent.

#### 1.8 References

1. Paul F. Kerr, *Optical Mineralogy*, 4th ed., New York, McGraw-Hill, 1977.

2. E. M. Chamot and C. W. Mason, *Handbook of Chemical Microscopy, Volume One*, 3rd ed., New York: John Wiley & Sons, 1958.

3. F. Chayes, *Petrographic Modal Analysis: An Elementary Statistical Appraisal*, New York: John Wiley & Sons, 1956.

4. E. P. Brantly, Jr., K. W. Gold, L. E. Myers, and D. E. Lentzen, *Bulk Sample Analysis for Asbestos Content: Evaluation of the Tentative Method*, U.S. Environmental Protection Agency, October 1981.

5. U.S. Environmental Protection Agency, *Asbestos-Containing Materials in School Buildings: A Guidance Document*, Parts 1 and 2, EPA/OPPT No. C00090, March 1979.

6. D. Lucas, T. Hartwell, and A. V. Rao, *Asbestos-Containing Materials in School Buildings: Guidance for Asbestos Analytical Programs*, EPA 560/13-80-017A, U.S. Environmental Protection Agency, December 1980, 96 pp.

7. D. H. Taylor and J. S. Bloom, Hexametaphosphate pretreatment of insulation samples for identification of fibrous constituents, *Microscope*, *28*, 1980.

8. W. J. Campbell, R. L. Blake, L. L. Brown, E. E. Cather, and J. J. Sjoberg. *Selected Silicate Minerals and Their Asbestiform Varieties: Mineralogical Definitions and Identification-Characterization*, U.S. Bureau of Mines Information Circular 8751, 1977.

9. Walter C. McCrone, *Asbestos Particle Atlas*, Ann Arbor: Ann Arbor Science Publishers, June 1980.

SECTION 2. X-RAY POWDER DIFFRACTION

### 2.1 Principle and Applicability

The principle of X-ray powder diffraction (XRD) analysis is well established.[1,2] Any solid, crystalline material will diffract an impingent beam of parallel, monochromatic X-rays whenever Bragg's Law,

$$\lambda = 2d \sin \theta,$$

is satisfied for a particular set of planes in the crystal lattice, where

$\lambda$ = the X-ray wavelength, Å;

d = the interplanar spacing of the set of reflecting lattice planes, Å; and

$\theta$ = the angle of incidence between the X-ray beam and the reflecting lattice planes.

By appropriate orientation of a sample relative to the incident X-ray beam, a diffraction pattern can be generated that, in most cases, will be uniquely characteristic of both the chemical composition and structure of the crystalline phases present.

Unlike optical methods of analysis, however, XRD cannot determine crystal morphology. Therefore, in asbestos analysis, XRD does not distinguish between fibrous and nonfibrous forms of the serpentine and amphibole minerals (Table 2–1). However, when used in conjunction with optical methods such as polarized light microscopy (PLM), XRD techniques can provide a reliable analytical method for the identification and characterization of asbestiform minerals in bulk materials.

For *qualitative analysis* by XRD methods, samples are initially scanned over limited diagnostic peak regions for the serpentine (~7.4 Å) and amphibole (8.2–8.5 Å) minerals (Table 2–2). Standard slow-scanning methods for bulk sample analysis may be used for materials shown by PLM to contain significant amounts of asbestos (>5–10 percent). Detection of minor or trace amounts of asbestos may require special sample preparation and step-scanning analysis. All samples that exhibit diffraction peaks in the diagnostic regions for asbestiform minerals are submitted to a full (5°–60° 2θ; 1° 2θ/min) qualitative XRD scan, and their diffraction patterns are compared with standard reference powder diffraction patterns[3] to verify initial peak assignments and to identify possible matrix interferences when subsequent quantitative analysis will be performed.

TABLE 2–1—THE ASBESTOS MINERALS AND THEIR NONASBESTIFORM ANALOGS

| Asbestiform | Nonasbestiform |
|---|---|
| SERPENTINE | |
| Chrysotile | Antigorite, lizardite |
| AMPHIBOLE | |
| Anthophyllite asbestos | Anthophyllite |
| Cummingtonite-grunerite asbestos ("Amosite") | Cummingtonite-grunerite |
| Crocidolite | Riebeckite |
| Tremolite asbestos | Tremolite |
| Actinolite asbestos | Actinolite |

TABLE 2–2—PRINCIPAL LATTICE SPACINGS OF ASBESTIFORM MINERALS [A]

| Minerals | Principal d-spacings (Å) and relative intensities | | | JCPDS Powder diffraction file[3] number |
|---|---|---|---|---|
| Chrysotile ............... | 7.37[100] | 3.65[70] | 4.57[50] | 21–543[b] |
| | 7.36[100] .. | 3.66[80] | 2.45[65] | 25–645 |
| | 7.10[100] .. | 2.33[80] | 3.55[70] | 22–1162 (theoretical) |
| "Amosite" ............... | 8.33[100] | 3.06[70] | 2.756[70] | 17–745 (nonfibrous) |
| | 8.22[100] .. | 3.06[65] | 3.25[70] | 27–1170 (UICC) |
| Anthophyllite ............. | 3.05[100] | 3.24[40] | 8.26[55] | 9–455 |
| | 3.06[100] .. | 8.33[70] | 3.23[50] | 16–401 (synthetic) |
| Anthophyllite ............. | 2.72[100] | 2.54[100] | 3.480[40] | 25–157 |
| Crocidolite ............. | 8.35[100] | 3.10[55] | 2.720[15] | 27–1415 (UICC) |
| Tremolite ............... | 8.38[100] | 3.12[100] | 2.705[90] | 13–437[b] |
| | 2.706[100] | 3.14[65] | 8.43[40] | 20–1310[b] (synthetic) |
| | 3.13[100] .. | 2.706[60] | 8.44[40] | 23–666 (synthetic mixture with richterite) |

[a] This information is intended as a guide, only. Complete powder diffraction data, including mineral type and source, should be referred to, to ensure comparability of sample and reference materials where possible. Additional precision XRD data on amosite, crocidolite, tremolite, and chrysotile are available from the U.S. Bureaus of Mines.[4]

[b] Fibrosity questionable.

Accurate *quantitative analysis* of asbestos in bulk samples by XRD is critically dependent on particle size distribution, crystallite size, preferred orientation and matrix absorption effects, and comparability of standard reference and sample materials. The most intense diffraction peak that has been shown to be free from interference by prior qualitative XRD analysis is selected for quantitation of each asbestiform mineral. A "thin-layer" method of analysis[5,6] is recommended in which, subsequent to comminution of the bulk material to ~10 μm by suitable cryogenic milling techniques, an accurately known amount of the sample is deposited on a silver membrane filter. The

**Environmental Protection Agency**                    **Pt. 763, Subpt. E, App. E**

mass of asbestiform material is determined by measuring the integrated area of the selected diffraction peak using a step-scanning mode, correcting for matrix absorption effects, and comparing with suitable calibration standards. Alternative "thick-layer" or bulk methods,[7,8] may be used for *semiquantitative analysis*.

This XRD method is applicable as a confirmatory method for identification and quantitation of asbestos in bulk material samples that have undergone prior analysis by PLM or other optical methods.

### 2.2 Range and Sensitivity

The range of the method has not been determined.

The sensitivity of the method has not been determined. It will be variable and dependent upon many factors, including matrix effects (absorption and interferences), diagnostic reflections selected, and their relative intensities.

### 2.3 Limitations

#### 2.3.1 Interferences

Since the fibrous and nonfibrous forms of the serpentine and amphibole minerals (Table 2–1) are indistinguishable by XRD techniques unless special sample preparation techniques and instrumentation are used,[9] the presence of nonasbestiform serpentines and amphiboles in a sample will pose severe interference problems in the identification and quantitative analysis of their asbestiform analogs.

The use of XRD for identification and quantitation of asbestiform minerals in bulk samples may also be limited by the presence of other interfering materials in the sample. For naturally occurring materials the commonly associated asbestos-related mineral interferences can usually be anticipated. However, for fabricated materials the nature of the interferences may vary greatly (Table 2–3) and present more serious problems in identification and quantitation.[10] Potential interferences are summarized in Table 2–4 and include the following:

• *Chlorite* has major peaks at 7.19 Å and 3.58 Å That interfere with both the primary (7.36 Å) and secondary (3.66 Å) peaks for chrysotile. Resolution of the primary peak to give good quantitative results may be possible when a step-scanning mode of operation is employed.

• *Halloysite* has a peak at 3.63 Å that interferes with the secondary (3.66 Å) peak for chrysotile.

• *Kaolinite* has a major peak at 7.15 Å that may interfere with the primary peak of chrysotile at 7.36 Å when present at concentrations of >10 percent. However, the secondary chrysotile peak at 3.66 Å may be used for quantitation.

• *Gypsum* has a major peak at 7.5 Å that overlaps the 7.36 Å peak of chrysotile when present as a major sample constituent. This may be removed by careful washing with distilled water, or be heating to 300 °C to convert gypsum to plaster of paris.

• *Cellulose* has a broad peak that partially overlaps the secondary (3.66 Å) chrysotile peak.[8]

• Overlap of major diagnostic peaks of the amphibole asbestos minerals, amosite, anthophyllite, crocidolite, and tremolite, at approximately 8.3 Å and 3.1 Å causes mutual interference when these minerals occur in the presence of one another. In some instances, adaquate resolution may be attained by using step-scanning methods and/or by decreasing the collimator slit width at the X-ray port.

TABLE 2–3—COMMON CONSTITUENTS IN INSULATION AND WALL MATERIALS

A. Insulation materials

Chrysotile
"Amosite"
Crocidolite
*Rock wool
*Slag wool
*Fiber glass
Gypsum ($CaSO_4 \cdot 2H_2O$)
Vermiculite (micas)
*Perlite
Clays (kaolin)
*Wood pulp
*Paper fibers (talc, clay, carbonate fillers)
Calcium silicates (synthetic)
Opaques (chromite, magnetite inclusions in serpentine)
  Hematite (inclusions in "amosite")
  Magnesite
*Diatomaceous earth

B. Spray finishes or paints

Bassanite
Carbonate minerals (calcite, dolomite, vaterite)
  Talc
  Tremolite
  Anthophyllite
  Serpentine (including chrysotile)
  Amosite
  Crocidolite
*Mineral wool
*Rock wool
*Slag wool
*Fiber glass
  Clays (kaolin)
  Micas
  Chlorite
  Gypsum ($CaSO_4 \cdot 2H_2O$)
  Quartz
*Organic binders and thickeners
  Hyrdomagnesite
  Wollastonite
  Opaques (chromite, magnetite inclusions in serpentine)
  Hematite (inclusions in "amosite")

925

*Amorphous materials contribute only to overall scattered radiation and increased background radiation.

TABLE 2–4—INTERFERENCES IN XRD ANALYSIS ASBESTIFORM MINERALS

| Asbestiform mineral | Primary diagnostic peaks (approximate d-spacings, in Å) | Interference |
|---|---|---|
| Serpentine Chrysotile | 7.4 | Nonasbestiform serpentines (antigorite, lizardite) Chlorite Kaolinite Gypsum |
| | 3.7 | Chlorite Halloysite Cellulose |
| Amphibole "Amosite" Anthophyllite Crocidolite Tremolite | 3.1 | Nonasbestiform amphiboles (cummingtonite-grunerite, anthophyllite, riebeckite, tremolite) Mutual interferences Carbonates Talc |
| | 8.3 | Mutual interferences |

- *Carbonates* may also interfere with quantitative analysis of the amphibole asbestos minerals, amosite, anthophyllite, crocidolite, and tremolite. Calcium carbonate ($CaCO_3$) has a peak at 3.035 Å that overlaps major amphibole peaks at approximately 3.1 Å when present in concentrations of >5 percent. Removal of carbonates with a dilute acid wash is possible; however, if present, chrysotile may be partially dissolved by this treatment.[11]
- A major *talc* peak at 3.12 Å interferes with the primary tremolite peak at this same position and with secondary peaks of crocidolite (3.10 Å), amosite (3.06 Å), and anthophyllite (3.05 Å). In the presence of talc, the major diagnostic peak at approximately 8.3 Å should be used for quantitation of these asbestiform minerals.

The problem of intraspecies and matrix interferences is further aggravated by the variability of the silicate mineral powder diffraction patterns themselves, which often makes definitive identification of the asbestos minerals by comparison with standard reference diffraction patterns difficult. This variability results from alterations in the crystal lattice associated with differences in isomorphous substitution and degree of crystallinity. This is especially true for the amphiboles. These minerals exhibit a wide variety of very similar chemical compositions, with the result being that their diffraction patterns are characterized by having major (110) reflections of the monoclinic amphiboles and (210) reflections of the

orthorhombic anthophyllite separated by less than 0.2 Å.[12]

2.3.2  Matrix Effects

If a copper X-ray source is used, the presence of iron at high concentrations in a sample will result in significant X-ray fluorescence, leading to loss of peak intensity along with increased background intensity and an overall decrease in sensitivity. This situation may be corrected by choosing an X-ray source other than copper; however, this is often accompanied both by loss of intensity and by decreased resolution of closely spaced reflections. Alternatively, use of a diffracted beam monochromator will reduce background fluorescent radiation, enabling weaker diffraction peaks to be detected.

X-ray absorption by the sample matrix will result in overall attenuation of the diffracted beam and may seriously interfere with quantitative analysis. Absorption effects may be minimized by using sufficiently "thin" samples for analysis.[5,13,14] However, unless absorption effects are known to be the same for both samples and standards, appropriate corrections should be made by referencing diagnostic peak areas to an internal standard[7,8] or filter substrate (Ag) peak.[5,6]

2.3.3  Particle Size Dependence

Because the intensity of diffracted X-radiation is particle-size dependent, it is essential for accurate quantitative analysis that both sample and standard reference materials have similar particle size distributions. The optimum particle size range for quantitative analysis of asbestos by XRD has been reported to be 1 to 10 µm.[15] Comparability of sample and standard reference material particle size distributions should be verified by optical microscopy (or another suitable method) prior to analysis.

2.3.4  Preferred Orientation Effects

Preferred orientation of asbestiform minerals during sample preparation often poses a serious problem in quantitative analysis by XRD. A number of techniques have been developed for reducing preferred orientation effects in "thick layer" samples.[7,8,15] However, for "thin" samples on membrane filters, the preferred orientation effects seem to be both reproducible and favorable to enhancement of the principal diagnostic reflections of asbestos minerals, actually increasing the overall sensitivity of the method.[12,14] (Further investigation into preferred orientation effects in both thin layer and bulk samples is required.)

2.3.5  Lack of Suitably Characterized Standard Materials

The problem of obtaining and characterizing suitable reference materials for asbestos analysis is clearly recognized. NIOSH has

**Environmental Protection Agency**

recently directed a major research effort toward the preparation and characterization of analytical reference materials, including asbestos standards;[16,17] however, these are not available in large quantities for routine analysis.

In addition, the problem of ensuring the comparability of standard reference and sample materials, particularly regarding crystallite size, particle size distribution, and degree of crystallinity, has yet to be adequately addressed. For example, Langer et al.[18] have observed that in insulating matrices, chrysotile tends to break open into bundles more frequently than amphiboles. This results in a line-broadening effect with a resultant decrease in sensitivity. Unless this effect is the same for both standard and sample materials, the amount of chrysotile in the sample will be underestimated by XRD analysis. To minimize this problem, it is recommended that standardized matrix reduction procedures be used for both sample and standard materials.

### 2.4 Precision and Accuracy

Precision of the method has not been determined.

Accuracy of the method has not been determined.

### 2.5 Apparatus

#### 2.5.1 Sample Preparation

Sample preparation apparatus requirements will depend upon the sample type under consideration and the kind of XRD analysis to be performed.

- *Mortar and Pestle:* Agate or porcelain.
- *Razor Blades*
- *Sample Mill:* SPEX, Inc., freezer mill or equivalent.
- *Bulk Sample Holders*
- *Silver Membrane Filters:* 25-mm diameter, 0.45-μm pore size. Selas Corp. of America, Flotronics Div., 1957 Pioneer Road, Huntington Valley, PA 19006.
- *Microscope Slides*
- *Vacuum Filtration Apparatus:* Gelman No. 1107 or equivalent, and side-arm vacuum flask.
- *Microbalance*
- *Ultrasonic Bath or Probe:* Model W140, Ultrasonics, Inc., operated at a power density of approximately 0.1 W/mL, or equivalent.
- *Volumetric Flasks:* 1–L volume.
- *Assorted Pipettes*
- *Pipette Bulb*
- *Nonserrated Forceps*
- *Polyethylene Wash Bottle*
- *Pyrex Beakers:* 50-mL volume.
- *Desiccator*
- *Filter Storage Cassettes*
- *Magnetic Stirring Plate and Bars*
- *Porcelain Crucibles*
- *Muffle Furnace or Low Temperature Asher*

#### 2.5.2 Sample Analysis

Sample analysis requirements include an X-ray diffraction unit, equipped with:

- *Constant Potential Generator; Voltage and mA Stabilizers*
- *Automated Diffractometer with Step-Scanning Mode*
- *Copper Target X-Ray Tube:* High intensity, fine focus, preferably.
- *X-Ray Pulse Height Selector*
- *X-Ray Detector* (with high voltage power supply): Scintillation or proportional counter.
- *Focusing Graphite Crystal Monochromator;* or *Nickel Filter* (if copper source is used, and iron fluorescence is not a serious problem).
- *Data Output Accessories:*
  - *Strip Chart Recorder*
  - *Decade Scaler/Timer*
  - *Digital Printer*
- *Sample Spinner* (optional).
- *Instrument Calibration Reference Specimen:* α-quartz reference crystal (Arkansas quartz standard, #180–147–00, Philips Electronics Instruments, Inc., 85 McKee Drive, Mahwah, NJ 07430) or equivalent.

### 2.6 Reagents

#### 2.6.1 Standard Reference Materials

The reference materials listed below are intended to serve as a guide. Every attempt should be made to acquire pure reference materials that are comparable to sample materials being analyzed.

- *Chrysotile:* UICC Canadian, or NIEHS Plastibest. (UICC reference materials available from: UICC, MRC Pneumoconiosis Unit, Llandough Hospital, Penarth, Glamorgan, CF61XW, UK).
- *Crocidolite:* UICC
- *Amosite:* UICC
- *Anthophyllite:* UICC
- *Tremolite Asbestos:* Wards Natural Science Establishment, Rochester, N.Y.; Cyprus Research Standard, Cyprus Research, 2435 Military Ave., Los Angeles, CA 90064 (washed with dilute HCl to remove small amount of calcite impurity); India tremolite, Rajasthan State, India.
- *Actinolite Asbestos*

#### 2.6.2 Adhesive

Tape, petroleum jelly, etc. (for attaching silver membrane filters to sample holders).

#### 2.6.3 Surfactant

1 percent aerosol OT aqueous solution or equivalent.

#### 2.6.4 Isopropanol

ACS Reagent Grade.

### 2.7 Procedure

#### 2.7.1 Sampling

Samples for analysis of asbestos content shall be collected as specified in EPA Guidance Document #C0090, *Asbestos-Containing Materials in School Buildings.*[10]

#### 2.7.2 Analysis

All samples must be analyzed initially for asbestos content by PLM. XRD should be used as an auxiliary method when a second, independent analysis is requested.

NOTE: Asbestos is a toxic substance. All handling of dry materials should be performed in an operating fume hood.

##### 2.7.2.1 Sample Preparation

The method of sample preparation required for XRD analysis will depend on: (1) The condition of the sample received (sample size, homogeneity, particle size distribution, and overall composition as determined by PLM); and (2) the type of XRD analysis to be performed (qualitative, quantitative, thin layer or bulk).

Bulk materials are usually received as inhomogeneous mixtures of complex composition with very wide particle size distributions. Preparation of a homogeneous, representative sample from asbestos-containing materials is particularly difficult because the fibrous nature of the asbestos minerals inhibits mechanical mixing and stirring, and because milling procedures may cause adverse lattice alterations.

A discussion of specific matrix reduction procedures is given below. Complete methods of sample preparation are detailed in Sections 2.7.2.2 and 2.7.2.3.

NOTE: All samples should be examined microscopically before and after each matrix reduction step to monitor changes in sample particle size, composition, and crystallinity, and to ensure sample representativeness and homogeneity for analysis.

2.7.2.1.1 *Milling*— Mechanical milling of asbestos materials has been shown to decrease fiber crystallinity, with a resultant decrease in diffraction intensity of the specimen; the degree of lattice alteration is related to the duration and type of milling process.[19,22] Therefore, all milling times should be kept to a minimum.

For *qualitative analysis*, particle size is not usually of critical importance and initial characterization of the material with a minimum of matrix reduction is often desirable to document the composition of the sample as received. Bulk samples of very large particle size (>2–3 mm) should be comminuted to ~100 μm. A mortar and pestle can sometimes be used in size reduction of soft or loosely bound materials though this may cause matting of some samples. Such samples may be reduced by cutting with a razor blade in a mortar, or by grinding in a suitable mill (e.g., a microhammer mill or equivalent). When using a mortar for grinding or cutting, the sample should be moistened with ethanol, or some other suitable wetting agent, to minimize exposures.

For accurate, reproducible *quantitative analysis*, the particle size of both sample and standard materials should be reduced to ~10 μm (see Section 2.3.3). Dry ball milling at liquid nitrogen temperatures (e.g., Spex Freezer Mill, or equivalent) for a maximum time of 10 min. is recommended to obtain satisfactory particle size distributions while protecting the integrity of the crystal lattice.[5] Bulk samples of very large particle size may require grinding in two stages for full matrix reduction to <10 μm.[8,16]

Final particle size distributions should always be verified by optical microscopy or another suitable method.

2.7.2.1.2 *Low temperature ashing*—For materials shown by PLM to contain large amounts of gypsum, cellulosic, or other organic materials, it may be desirable to ash the samples prior to analysis to reduce background radiation or matrix interference. Since chrysotile undergoes dehydroxylation at temperatures between 550 °C and 650 °C, with subsequent transformation to forsterite,[23,24] ashing temperatures should be kept below 500 °C. Use of a low temperature asher is recommended. In all cases, calibration of the oven is essential to ensure that a maximum ashing temperature of 500 °C is not exceeded.

2.7.2.1.3 *Acid leaching*—Because of the interference caused by gypsum and some carbonates in the detection of asbestiform minerals by XRD (see Section 2.3.1), it may be necessary to remove these interferents by a simple acid leaching procedure prior to analysis (see Section 1.7.2.2).

#### 2.7.2.2 Qualitative Analysis

2.7.2.2.1 *Initial screening of bulk material*— Qualitative analysis should be performed on a representative, homogeneous portion of the sample with a minimum of sample treatment.

1. Grind and mix the sample with a mortar and pestle (or equivalent method, see Section 2.7.2.1.1.) to a final particle size sufficiently small (~100 μm) to allow adequate packing into the sample holder.

2. Pack the sample into a standard bulk sample holder. Care should be taken to ensure that a representative portion of the milled sample is selected for analysis. Particular care should be taken to avoid possible size segregation of the sample. (Note: Use of a back-packing method[25] of bulk sample preparation may reduce preferred orientation effects.)

3. Mount the sample on the diffractometer and scan over the diagnostic peak regions for

the serpentine (–67.4 Å) and amphibole (8.2–8.5 Å) minerals (see Table 2–2). The X-ray diffraction equipment should be optimized for intensity. A slow scanning speed of 1° 2θ/min is recommended for adequate resolution. Use of a sample spinner is recommended.

4. Submit all samples that exhibit diffraction peaks in the diagnostic regions for asbestiform minerals to a full qualitative XRD scan (5°–60° 2θ; 1°2θ/min) to verify initial peak assignments and to identify potential matrix interferences when subsequent quantitative analysis is to be performed.

5. Compare the sample XRD pattern with standard reference powder diffraction patterns (i.e., JCPDS powder diffraction data[3] or those of other well-characterized reference materials). Principal lattice spacings of asbestiform minerals are given in Table 2–2; common constituents of bulk insulation and wall materials are listed in Table 2–3.

2.7.2.2.2 *Detection of minor or trace constituents*— Routine screening of bulk materials by XRD may fail to detect small concentrations (<5 percent) of asbestos. The limits of detection will, in general, be improved if matrix absorption effects are minimized, and if the sample particle size is reduced to the optimal 1 to 10 μm range, provided that the crystal lattice is not degraded in the milling process. Therefore, in those instances where confirmation of the presence of an asbestiform mineral at very low levels is required, or where a negative result from initial screening of the bulk material by XRD (see Section 2.7.2.2.1) is in conflict with previous PLM results, it may be desirable to prepare the sample as described for quantitative analysis (see Section 2.7.2.3) and step-scan over appropriate 2θ ranges of selected diagnostic peaks (Table 2–2). Accurate transfer of the sample to the silver membrane filter is not necessary unless subsequent quantitative analysis is to be performed.

### 2.7.2.3 Quantitative Analysis

The proposed method for quantitation of asbestos in bulk samples is a modification of the NIOSH-recommended thin-layer method for chrysotile in air.[5] A thick-layer or bulk method involving pelletizing the sample may be used for semiquantitative analysis;[7,8] however, this method requires the addition of an internal standard, use of a specially fabricated sample press, and relatively large amounts of standard reference materials. Additional research is required to evaluate the comparability of thin- and thick-layer methods for quantitative asbestos analysis.

For quantitative analysis by thin-layer methods, the following procedure is recommended:

1. Mill and size all or a substantial representative portion of the sample as outlined in Section 2.7.2.1.1.

2. Dry at 100 °C for 2 hr; cool in a desiccator.

3. Weigh accurately to the nearest 0.01 mg.

4. Samples shown by PLM to contain large amounts of cellulosic or other organic materials, gypsum, or carbonates, should be submitted to appropriate matrix reduction procedures described in Sections 2.7.2.1.2 and 2.7.2.1.3. After ashing and/or acid treatment, repeat the drying and weighing procedures described above, and determine the percent weight loss; L.

5. Quantitatively transfer an accurately weighed amount (50–100 mg) of the sample to a 1–L volumetric flask with approximately 200 mL isopropanol to which 3 to 4 drops of surfactant have been added.

6. Ultrasonicate for 10 min at a power density of approximately 0.1 W/mL, to disperse the sample material.

7. Dilute to volume with isopropanol.

8. Place flask on a magnetic stirring plate. Stir.

9. Place a silver membrane filter on the filtration apparatus, apply a vacuum, and attach the reservoir. Release the vacuum and add several milliliters of isopropanol to the reservoir. Vigorously hand shake the asbestos suspension and immediately withdraw an aliquot from the center of the suspension so that total sample weight, $W_T$, on the filter will be approximately 1 mg. Do not adjust the volume in the pipet by expelling part of the suspension; if more than the desired aliquot is withdrawn, discard the aliquot and resume the procedure with a clean pipet. Transfer the aliquot to the reservoir. Filter rapidly under vacuum. Do not wash the reservoir walls. Leave the filter apparatus under vacuum until dry. Remove the reservoir, release the vacuum, and remove the filter with forceps. (Note: Water-soluble matrix interferences such as gypsum may be removed at this time by careful washing of the filtrate with distilled water. Extreme care should be taken not to disturb the sample.)

10. Attach the filter to a flat holder with a suitable adhesive and place on the diffractometer. Use of a sample spinner is recommended.

11. For each asbestos mineral to be quantitated select a reflection (or reflections) that has been shown to be free from interferences by prior PLM or qualitative XRD analysis and that can be used unambiguously as an index of the amount of material present in the sample (see Table 2–2).

12. Analyze the selected diagnostic reflection(s) by step scanning in increments of 0.02° 2θ for an appropriate fixed time and integrating the counts. (A fixed count scan may be used alternatively; however, the method chosen should be used consistently for all samples and standards.) An appropriate scanning interval should be selected for each peak, and background corrections made. For a fixed time scan, measure the

background on each side of the peak for one-half the peak-scanning time. The net intensity, $I_a$, is the difference between the peak integrated count and the total background count.

13. Determine the net count, $I_{Ag}$, of the filter 2.36 Å silver peak following the procedure in step 12. Remove the filter from the holder, reverse it, and reattach it to the holder. Determine the net count for the unattenuated silver peak, $I_{Ag}^\circ$. Scan times may be *less* for measurement of silver peaks than for sample peaks; however, they should be *constant* throughout the analysis.

14. Normalize all raw, net intensities (to correct for instrument instabilities) by referencing them to an external standard (e.g., the 3.34 Å peak of an α-quartz reference crystal). After each unknown is scanned, determine the net count, $I_r$, of the reference specimen following the procedure in step 12. Determine the normalized intensities by dividing the peak intensities by $I_r$:

$$\hat{I}_a = \frac{I_a}{I_r^\circ}, \quad \hat{I}_{Ag} = \frac{I_{Ag}}{I_r^\circ}, \quad \text{and } \hat{I}_{Ag}^\circ = \frac{I_{Ag}^\circ}{I_r^\circ}$$

#### 2.8 Calibration

##### 2.8.1 Preparation of Calibration Standards

1. Mill and size standard asbestos materials according to the procedure outlined in Section 2.7.2.1.1. *Equivalent, standardized matrix reduction and sizing techniques should be used for both standard and sample materials.*

2. Dry at 100 °C for 2 hr; cool in a desiccator.

3. Prepare two suspensions of each standard in isopropanol by weighing approximately 10 and 50 mg of the dry material to the nearest 0.01 mg. Quantitatively transfer each to a 1–L volumetric flask with approximately 200 mL isopropanol to which a few drops of surfactant have been added.

4. Ultrasonicate for 10 min at a power density of approximately 0.1 W/mL, to disperse the asbestos material.

5. Dilute to volume with isopropanol.

6. Place the flask on a magnetic stirring plate. Stir.

7. Prepare, in triplicate, a series of at least five standard filters to cover the desired analytical range, using appropriate aliquots of the 10 and 50 mg/L suspensions and the following procedure.

Mount a silver membrane filter on the filtration apparatus. Place a few milliliters of isopropanol in the reservoir. Vigorously hand shake the asbestos suspension and immediately withdraw an aliquot from the center of the suspension. Do not adjust the volume in the pipet by expelling part of the suspension; if more than the desired aliquot is withdrawn, discard the aliquot and resume the procedure with a clean pipet. Transfer the aliquot to the reservoir. Keep the tip of the pipet near the surface of the isopropanol. Filter rapidly under vacuum. Do not wash the sides of the reservoir. Leave the vacuum on for a time sufficient to dry the filter. Release the vacuum and remove the filter with forceps.

##### 2.8.2 Analysis of Calibration Standards

1. Mount each filter on a flat holder. Perform step scans on selected diagnostic reflections of the standards and reference specimen using the procedure outlined in Section 2.7.2.3, step 12, and the same conditions as those used for the samples.

2. Determine the normalized intensity for each peak measured, $\hat{I}_{sid}$, as outlined in Section 2.7.2.3, step 14.

#### 2.9 Calculations

For each asbestos reference material, calculate the exact weight deposited on each standard filter from the concentrations of the standard suspensions and aliquot volumes. Record the weight, w, of each standard. Prepare a calibration curve by regressing $\hat{I}2_{sid}$ on w. Poor reproducibility (±15 percent RSD) at any given level indicates problems in the sample preparation technique, and a need for new standards. The data should fit a straight line equation.

Determine the slope, m, of the calibration curve in counts/microgram. The intercept, b, of the line with the $\hat{I}_{sid}$ axis should be approximately zero. A large negative intercept indicates an error in determining the background. This may arise from incorrectly measuring the baseline or from interference by another phase at the angle of background measurement. A large positive intercept indicates an error in determining the baseline or that an impurity is included in the measured peak.

Using the normalized intensity, $\hat{I}_{Ag}$, for the attenuated silver peak of a sample, and the corresponding normalized intensity from the unattenuated silver peak, $I_{Ag}^\circ$, of the sample filter, calculate the transmittance, T, for each sample as follows:[26,27]

$$T = \frac{\hat{I}_{Ag}}{I_{Ag}^\circ}$$

Determine the correction factor, f(T), for each sample according to the formula:

$$f(T) = \frac{-R\,(\ln T)}{1 - T^R}$$

where

$$R = \frac{\sin \Theta_{Ag}}{\sin \Theta_a}$$

$\theta_{Ag}$=angular position of the measured silver peak (from Bragg's Law), and
$\theta_a$=angular position of the diagnostic asbestos peak.

Calculate the weight, $W_a$, in micrograms, of the asbestos material analyzed for in each sample, using the appropriate calibration data and absorption corrections:

$$W_a = \frac{\hat{I}_a \, f(t) - b}{m}$$

Calculate the percent composition, $P_a$, of each asbestos mineral analyzed for in the parent material, from the total sample weight, $W_T$, on the filter:

$$P_a = \frac{W_a(1-.01L)}{W_T} \times 100$$

where

$P_a$=percent asbestos mineral in parent material;
$W_a$=mass of asbestos mineral on filter, in µg;
$W_T$=total sample weight on filter, in µg;
$L$=percent weight loss of parent material on ashing and/or acid treatment (see Section 2.7.2.3).

### 2.10 References

1. H. P. Klug and L. E. Alexander, *X-ray Diffraction Procedures for Polycrystalline and Amorphous Materials*, 2nd ed., New York: John Wiley and Sons, 1979.

2. L. V. Azaroff and M. J. Buerger, *The Powder Method of X-ray Crystallography*, New York: McGraw-Hill, 1958.

3. *JCPDS-International Center for Diffraction Data Powder Diffraction File*, U.S. Department of Commerce, National Bureau of Standards, and Joint Committee on Powder Diffraction Studies, Swarthmore, PA.

4. W. J. Campbell, C. W. Huggins, and A. G. Wylie, *Chemical and Physical Characterization of Amosite, Chrysotile, Crocidolite, and Nonfibrous Tremolite for National Institute of Environmental Health Sciences Oral Ingestion Studies*, U.S. Bureau of Mines Report of Investigation RI8452, 1980.

5. B. A. Lange and J. C. Haartz, Determination of microgram quantities of asbestos by X-ray diffraction: Chrysotile in thin dust layers of matrix material, *Anal. Chem.*, 51(4):520–525, 1979.

6. *NIOSH Manual of Analytical Methods*, Volume 5, U.S. Dept. HEW, August 1979, pp. 309–1 to 309–9.

7. H. Dunn and J. H. Stewart, Jr., Quantitative determination of chrysotile in building materials, *The Microscope*, 29(1), 1981.

8. M. Taylor, Methods for the quantitative determination of asbestos and quartz in bulk samples using X-ray diffraction, *The Analyst*, 103(1231):1009–1020, 1978.

9. L. Birks, M. Fatemi, J. V. Gilfrich, and E. T. Johnson, *Quantitative Analysis of Airborne Asbestos by X-ray Diffraction*, Naval Research Laboratory Report 7879, Naval Research Laboratory, Washington, DC, 1975.

10. U.S. Environmental Protection Agency, *Asbestos-Containing Materials in School Buildings: A Guidance Document*, Parts 1 and 2, EPA/OPPT No. C00090, March 1979.

11. J. B. Krause and W. H. Ashton, Misidentification of asbestos in talc, pp. 339–353, in: *Proceedings of Workshop on Asbestos: Definitions and Measurement Methods* (NBS Special Publication 506), C. C. Gravatt, P. D. LaFleur, and K. F. Heinrich (eds.), Washington, DC: National Measurement Laboratory, National Bureau of Standards, 1977 (issued 1978).

12. H. D. Stanley, The detection and identification of asbestos and asbesti-form minerals in talc, pp. 325–337, *in Proceedings of Workshop on Asbestos: Definitions and Measurement Methods* (NBS Special Publication 506), C. C. Gravatt, P. D. LaFleur, and K. F. Heinrich (eds.), Washington, DC, National Measurement Laboratory, National Bureau of Standards, 1977 (issued 1978).

13. A. L. Rickards, Estimation of trace amounts of chrysotile asbestos by X-ray diffraction, *Anal. Chem.*, 44(11):1872–3, 1972.

14. P. M. Cook, P. L. Smith, and D. G. Wilson, Amphibole fiber concentration and determination for a series of community air samples: use of X-ray diffraction to supplement electron microscope analysis, in: *Electron Microscopy and X-ray Applications to Environmental and Occupation Health Analysis*, P. A. Russell and A. E. Hutchings (eds.), Ann Arbor: Ann Arbor Science Publications, 1978.

15. A. N. Rohl and A. M. Langer, Identification and quantitation of asbestos in talc, *Environ. Health Perspectives*, 9:95–109, 1974.

16. J. L. Graf, P. K. Ase, and R. G. Draftz, *Preparation and Characterization of Analytical Reference Minerals*, DHEW (NIOSH) Publication No. 79–139, June 1979.

17. J. C. Haartz, B. A. Lange, R. G. Draftz, and R. F. Scholl, Selection and characterization of fibrous and nonfibrous amphiboles for analytical methods development, pp. 295–312, in: *Proceedings of Workshop on Asbestos: Definitions and Measurement Methods* (NBS Special Publication 506), C. C. Gravatt, P. D. LaFleur, and K. F. Heinrich (eds.), Washington, DC: National Measurement Laboratory, National Bureau of Standards, 1977 (issued 1978).

18. Personal communication, A. M. Langer, Environmental Sciences Laboratory, Mount

§ 763.120

Sinai School of Medicine of the City University of New York, New York, New York.

19. A. M. Langer, M. S. Wolff, A. N. Rohl, and I. J. Selikoff, Variation of properties of chrysotile asbestos subjected to milling, *J. Toxicol. and Environ. Health, 4*:173–188, 1978.

20. A. M. Langer, A. D. Mackler, and F. D. Pooley, Electron microscopical investigation of asbestos fibers, *Environ. Health Perspect., 9*:63–80, 1974.

21. E. Occella and G. Maddalon, X-ray diffraction characteristics of some types of asbestos in relation to different techniques of comminution, *Med. Lavoro, 54*(10):628–636, 1963.

22. K. R. Spurny, W. Stöber, H. Opiela, and G. Weiss, On the problem of milling and ultrasonic treatment of asbestos and glass fibers in biological and analytical applications, *Am. Ind. Hyg. Assoc. J., 41*:198–203, 1980.

23. L. G. Berry and B. Mason, *Mineralogy,* San Francisco: W. H. Greeman & Co., 1959.

24. J. P. Schelz, The detection of chrysotile asbestos at low levels in talc by differential thermal analysis, *Thermochimica Acta, 8*:197–204, 1974.

25. Reference 1, pp. 372–374.

26. J. Leroux, *Staub-Reinhalt Luft, 29*:26 (English), 1969.

27. J. A. Leroux, B. C. Davey, and A. Paillard, *Am. Ind. Hyg. Assoc. J., 34*:409, 1973.

[47 FR 23369, May 27, 1982; 47 FR 38535, Sept. 1, 1982; Redesignated at 60 FR 31922, June 19, 1995]

## Subpart F [Reserved]

## Subpart G—Asbestos Worker Protection

SOURCE: 65 FR 69216, Nov. 15, 2000, unless otherwise noted.

### § 763.120  What is the purpose of this subpart?

This subpart protects certain State and local government employees who are not protected by the Asbestos Standards of the Occupational Safety and Health Administration (OSHA). This subpart applies the OSHA Asbestos Standards in 29 CFR 1910.1001 and 29 CFR 1926.1101 to these employees.

### § 763.121  Does this subpart apply to me?

If you are a State or local government employer and you are not subject to a State asbestos standard that OSHA has approved under section 18 of the Occupational Safety and Health Act or a State asbestos plan that EPA

has exempted from the requirements of this subpart under § 763.123, you must follow the requirements of this subpart to protect your employees from occupational exposure to asbestos.

### § 763.122  What does this subpart require me to do?

If you are a State or local government employer whose employees perform:

(a) Construction activities identified in 29 CFR 1926.1101(a), you must:

(1) Comply with the OSHA standards in 29 CFR 1926.1101.

(2) Submit notifications required for alternative control methods to the Director, National Program Chemicals Division (7404), Office of Pollution Prevention and Toxics, Environmental Protection Agency, 1200 Pennsylvania Ave., NW., Washington, DC 20460.

(b) Custodial activities not associated with the construction activities identified in 29 CFR 1926.1101(a), you must comply with the OSHA standards in 29 CFR 1910.1001.

(c) Repair, cleaning, or replacement of asbestos-containing clutch plates and brake pads, shoes, and linings, or removal of asbestos-containing residue from brake drums or clutch housings, you must comply with the OSHA standards in 29 CFR 1910.1001.

### § 763.123  May a State implement its own asbestos worker protection plan?

This section describes the process under which a State may be exempted from the requirements of this subpart.

(a) *States seeking an exemption.* If your State wishes to implement its own asbestos worker protection plan, rather than complying with the requirements of this subpart, your State must apply for and receive an exemption from EPA.

(1) *What must my State do to apply for an exemption?* To apply for an exemption from the requirements of this subpart, your State must send to the Director of EPA's Office of Pollution Prevention and Toxics (OPPT) a copy of its asbestos worker protection regulations and a detailed explanation of how your State's asbestos worker protection plan meets the requirements of TSCA section 18 (15 U.S.C. 2617).

# Exhibit 48

Case 3:16-md-02738-MAS-RLS   Document 33132-6   Filed 08/23/24   Page 172 of 218
PageID: 250794

**ASTM INTERNATIONAL**

**Designation: D5755 – 09 (Reapproved 2014)$^{\varepsilon 1}$**

# Standard Test Method for
# Microvacuum Sampling and Indirect Analysis of Dust by Transmission Electron Microscopy for Asbestos Structure Number Surface Loading[1]

This standard is issued under the fixed designation D5755; the number immediately following the designation indicates the year of original adoption or, in the case of revision, the year of last revision. A number in parentheses indicates the year of last reapproval. A superscript epsilon (ε) indicates an editorial change since the last revision or reapproval.

ε[1] NOTE—Warning notes were editorially updated throughout in April 2014.

## 1. Scope

1.1 This test method covers a procedure to (a) identify asbestos in dust and (b) provide an estimate of the surface loading of asbestos in the sampled dust reported as the number of asbestos structures per unit area of sampled surface.

1.1.1 If an estimate of the asbestos mass is to be determined, the user is referred to Test Method D5756.

1.2 This test method describes the equipment and procedures necessary for sampling, by a microvacuum technique, non-airborne dust for levels of asbestos structures. The non-airborne sample is collected inside a standard filter membrane cassette from the sampling of a surface area for dust which may contain asbestos.

1.2.1 This procedure uses a microvacuuming sampling technique. The collection efficiency of this technique is unknown and will vary among substrates. Properties influencing collection efficiency include surface texture, adhesiveness, electrostatic properties and other factors.

1.3 Asbestos identified by transmission electron microscopy (TEM) is based on morphology, selected area electron diffraction (SAED), and energy dispersive X-ray analysis (EDXA). Some information about structure size is also determined.

1.4 This test method is generally applicable for an estimate of the surface loading of asbestos structures starting from approximately 1000 asbestos structures per square centimetre.

1.4.1 The procedure outlined in this test method employs an indirect sample preparation technique. It is intended to disperse aggregated asbestos into fundamental fibrils, fiber bundles, clusters, or matrices that can be more accurately quantified by transmission electron microscopy. However, as with all indirect sample preparation techniques, the asbestos observed for quantification may not represent the physical form of the asbestos as sampled. More specifically, the procedure described neither creates nor destroys asbestos, but it may alter the physical form of the mineral fibers.

1.5 The values stated in SI units are to be regarded as the standard. The values given in parentheses are for information only.

1.6 *This standard does not purport to address all of the safety concerns, if any, associated with its use. It is the responsibility of the user of this standard to establish appropriate safety, health, and environmental practices and determine the applicability of regulatory limitations prior to use.*

1.7 *This international standard was developed in accordance with internationally recognized principles on standardization established in the Decision on Principles for the Development of International Standards, Guides and Recommendations issued by the World Trade Organization Technical Barriers to Trade (TBT) Committee.*

## 2. Referenced Documents

2.1 *ASTM Standards:*[2]

D1193 Specification for Reagent Water

D3195 Practice for Rotameter Calibration

D3670 Guide for Determination of Precision and Bias of Methods of Committee D22

D5756 Test Method for Microvacuum Sampling and Indirect Analysis of Dust by Transmission Electron Microscopy for Asbestos Mass Surface Loading

D6620 Practice for Asbestos Detection Limit Based on Counts

E177 Practice for Use of the Terms Precision and Bias in ASTM Test Methods

E691 Practice for Conducting an Interlaboratory Study to Determine the Precision of a Test Method

---

[1] This test method is under the jurisdiction of ASTM Committee D22 on Air Quality and is the direct responsibility of Subcommittee D22.07 on Sampling and Analysis of Asbestos.

Current edition approved April 1, 2014. Published May 2014. Originally approved in 1995. Last previous edition approved in 2009 as D5755 – 09. DOI: 10.1520/D5755-09R14.

[2] For referenced ASTM standards, visit the ASTM website, www.astm.org, or contact ASTM Customer Service at service@astm.org. For *Annual Book of ASTM Standards* volume information, refer to the standard's Document Summary page on the ASTM website.

Copyright © ASTM International, 100 Barr Harbor Drive, PO Box C700, West Conshohocken, PA 19428-2959. United States

Copyright by ASTM Int'l (all rights reserved); Fri Jun 28 14:16:07 EDT 2019
Downloaded/printed by
Terre Bohman (Motley Rice LLC) pursuant to License Agreement. No further reproductions authorized.

1

 **D5755 – 09 (2014)ᵉ¹**

## 3. Terminology

3.1 *Definitions:*

3.1.1 *asbestiform*—a special type of fibrous habit in which the fibers are separable into thinner fibers and ultimately into fibrils. This habit accounts for greater flexibility and higher tensile strength than other habits of the same mineral. For more information on asbestiform mineralogy, see Refs (**1-3**).[3]

3.1.2 *asbestos*—a collective term that describes a group of naturally occurring, inorganic, highly fibrous, silicate dominated minerals, which are easily separated into long, thin, flexible fibers when crushed or processed.

3.1.2.1 *Discussion*—Included in the definition are the asbestiform varieties of: serpentine (chrysotile); riebeckite (crocidolite); grunerite (grunerite asbestos); anthophyllite (anthophyllite asbestos); tremolite (tremolite asbestos); and actinolite (actinolite asbestos). The amphibole mineral compositions are defined according to nomenclature of the International Mineralogical Association (**3**).

| Asbestos | Chemical Abstract Service No.ᴬ |
|---|---|
| Chrysotile | 12001-29-5 |
| Crocidolite | 12001-28-4 |
| Grunerite Asbestos | 12172-73-5 |
| Anthophyllite Asbestos | 77536-67-5 |
| Tremolite Asbestos | 77536-68-6 |
| Actinolite Asbestos | 77536-66-4 |

ᴬ The non-asbestiform variations of the minerals indicated in 3.1.2.1 have different Chemical Abstract Service (CAS) numbers.

3.1.3 *fibril*—a single fiber that cannot be separated into smaller components without losing its fibrous properties or appearance.

3.2 *Definitions of Terms Specific to This Standard:*

3.2.1 *aspect ratio*—the ratio of the length of a fibrous particle to its average width.

3.2.2 *bundle*—a structure composed of three or more fibers in a parallel arrangement with the fibers closer than one fiber diameter to each other.

3.2.3 *cluster*—a structure with fibers in a random arrangement such that all fibers are intermixed and no single fiber is isolated from the group; groupings of fibers must have more than two points touching.

3.2.4 *debris*—materials that are of an amount and size (particles greater than 1 mm in diameter) that can be visually identified as to their source.

3.2.5 *dust*—any material composed of particles in a size range of <1 mm.

3.2.6 *fiber*—a structure having a minimum length of 0.5 μm, an aspect ratio of 5:1 or greater, and substantially parallel sides (**4**).

3.2.7 *fibrous*—of a mineral composed of parallel, radiating, or interlaced aggregates of fibers, from which the fibers are sometimes separable: that is, the crystalline aggregate may be referred to as fibrous even if it is not composed of separable fibers, but has that distinct appearance.

3.2.7.1 *Discussion*—The term fibrous is used in a general mineralogical way to describe aggregates of grains that crystallize in a needle-like habit and appear to be composed of fibers. Fibrous has a much more general meaning than asbestos. While it is correct that all asbestos minerals are fibrous, not all minerals having fibrous habits are asbestos.

3.2.8 *indirect preparation*—a method in which a sample passes through one or more intermediate steps prior to final filtration.

3.2.9 *matrix*—a structure in which one or more fibers, or fiber bundles that are touching, are attached to, or partially concealed by a single particle or connected group of non-fibrous particles in which the exposed fiber must meet the fiber definition (see 3.2.6).

3.2.10 *structures*—a term that is used to categorize all the types of asbestos particles which are recorded during the analysis (such as fibers, bundles, clusters, and matrices).

3.2.10.1 *Discussion*—Final results of the test are always expressed in asbestos structures per square centimetre.

## 4. Summary of Test Method

4.1 The sample is collected by vacuuming a known surface area with a standard 25 or 37-mm air sampling cassette using a plastic tube that is attached to the inlet orifice which acts as a nozzle. The sample is transferred from inside the cassette to an aqueous suspension of known volume. Aliquots of the suspension are then filtered through a membrane. A section of the membrane is prepared and transferred to a TEM grid using the direct transfer method. The asbestiform structures are identified, sized, and counted by TEM, using SAED and EDXA at a magnification of 15 000 to 20 000×.

## 5. Significance and Use

5.1 This microvacuum sampling and indirect analysis method is used for the general testing of non-airborne dust samples for asbestos. It is used to assist in the evaluation of dust that may be found on surfaces in buildings such as ceiling tiles, shelving, electrical components, duct work, carpet, etc. This test method provides an index of the surface loading of asbestos structures in the dust per unit area analyzed as derived from a quantitative TEM analysis.

5.1.1 This test method does not describe procedures or techniques required to evaluate the safety or habitability of buildings with asbestos-containing materials, or compliance with federal, state, or local regulations or statutes. It is the user's responsibility to make these determinations.

5.1.2 At present, no relationship has been established between asbestos-containing dust as measured by this test method and potential human exposure to airborne asbestos. Accordingly, the users should consider other available information in their interpretation of the data obtained from this test method.

5.2 This definition of dust accepts all particles small enough to pass through a 1-mm (No. 18) screen. Thus, a single, large asbestos containing particle(s) (from the large end of the particle size distribution) dispersed during sample preparation may result in anomalously large asbestos surface loading results in the TEM analyses of that sample. It is, therefore,

---

[3] The boldface numbers in parentheses refer to a list of references at the end of this standard.

Copyright by ASTM Int'l (all rights reserved); Fri Jun 28 14:16:07 EDT 2019
Downloaded/printed by
Terre Bohman (Motley Rice LLC) pursuant to License Agreement. No further reproductions authorized.

 **D5755 – 09 (2014)$^{\epsilon 1}$**

recommended that multiple independent samples are secured from the same area, and that a minimum of three samples be analyzed by the entire procedure.

## 6. Interferences

6.1 The following minerals have properties (that is, chemical or crystalline structure) which are very similar to asbestos minerals and may interfere with the analysis by causing a false positive to be recorded during the test. Therefore, literature references for these materials must be maintained in the laboratory for comparison to asbestos minerals so that they are not misidentified as asbestos minerals.

6.1.1 *Antigorite.*

6.1.2 *Palygorskite (Attapulgite).*

6.1.3 *Halloysite.*

6.1.4 *Pyroxenes.*

6.1.5 *Sepiolite.*

6.1.6 *Vermiculite scrolls.*

6.1.7 *Fibrous talc.*

6.1.8 Hornblende and other amphiboles other than those listed in 3.1.2.

6.2 Collecting any dust particles greater than 1 mm in size in this test method may cause an interference and, therefore, must be avoided.

## 7. Materials and Equipment

7.1 *Purity of Reagents*—Reagent grade chemicals shall be used in all tests. Unless otherwise indicated, it is intended that all reagents conform to the specifications of the Committee on Analytical Reagents of the American Chemical Society, where such specifications are available. Other grades may be used, provided it is first ascertained that the reagent is of sufficiently high purity to permit its use without lessening the accuracy of the determination.[4]

7.2 *Transmission Electron Microscope (TEM),* an 80 to 120 kV TEM, capable of performing electron diffraction, with a fluorescent screen inscribed with calibrated gradations, is required. The TEM must be equipped with energy dispersive X-ray spectroscopy (EDXA) and it must have a scanning transmission electron microscopy (STEM) attachment or be capable of producing a spot size of less than 250 nm in diameter in crossover.

7.3 *Energy Dispersive X-ray System (EDXA).*

7.4 *High Vacuum Carbon Evaporator,* with rotating stage.

7.5 *High Efficiency Particulate Air (HEPA),* filtered negative flow hood.

7.6 *Exhaust or Fume Hood.*

7.7 *Particle-free Water* (ASTM Type II, see Specification D1193).

7.8 *Glass Beakers* (50 mL).

7.9 *Glass Sample Containers,* with wide mouth screw cap (200 mL) or equivalent sealable container (height of the glass sample container should be approximately 13 cm high by 6 cm wide).

7.10 *Waterproof Markers.*

7.11 *Forceps* (tweezers).

7.12 *Ultrasonic Bath,* table top model (100 W).

7.13 *Graduated Pipettes* (1, 5, 10-mL sizes), glass or plastic.

7.14 *Filter Funnel,* either 25 mm or 47 mm, glass or disposable. Filter funnel assemblies, either glass or disposable plastic, and using either a 25-mm or 47-mm diameter filter.

7.15 *Side Arm Filter Flask,* 1000 mL.

7.16 *Mixed Cellulose Ester (MCE) Membrane Filters,* 25 or 47-mm diameter, ≤0.22-µm and 5-µm pore size.

7.17 *Polycarbonate (PC) Filters,* 25 or 47-mm diameter, ≤0.2-µm pore size.

7.18 *Storage Containers,* for the 25 or 47 filters (for archiving).

7.19 *Glass Slides,* approximately 76 by 25 mm in size.

7.20 *Scalpel Blades,* No. 10, or equivalent.

7.21 *Cabinet-type Desiccator,* or low temperature drying oven.

7.22 *Chloroform,* reagent grade.

7.23 *Acetone,* reagent grade.

7.24 *Dimethylformamide (DMF).*

7.25 *Glacial Acetic Acid.*

7.26 *1-methyl-2-pyrrolidone.*

7.27 *Plasma Asher,* low temperature.

7.28 *pH Paper.*

7.29 *Air Sampling Pump,* low volume personal-type, capable of achieving a flow rate of 1 to 5 L/min.

7.30 *Rotameter.*

7.31 *Air Sampling Cassettes,* 25 mm or 37 mm, containing 0.8 µm or smaller pore size MCE or PC filters.

7.32 *Cork Borer,* 7 mm.

7.33 *Non-Asbestos Mineral,* references as outlined in 6.1.

7.34 *Asbestos Standards,* as outlined in 3.1.2.

7.35 *Tygon*[5] Tubing, or equivalent.

7.36 *Small Vacuum Pump,* that can maintain a pressure of 92 kPa.

7.37 *Petri Dishes,* large glass, approximately 90 mm in diameter.

7.38 *Jaffe Washer,* stainless steel or aluminum mesh screen, 30 to 40 mesh, and approximately 75 mm by 50 mm in size.

---

[4] *Reagent Chemicals, American Chemical Society Specifications*, American Chemical Society, Washington, DC. For suggestions on the testing of reagents not listed by the American Chemical Society, see *Analar Standards for Laboratory Chemicals*, BDH Ltd., Poole, Dorset, U.K., and the *United States Pharmacopeia and National Formulary*, U.S. Pharmaceutical Convention, Inc. (USPC), Rockville, MD.

---

[5] Tygon is a registered trademark of the DuPont Co.

Copyright by ASTM Int'l (all rights reserved); Fri Jun 28 14:16:07 EDT 2019
Downloaded/printed by
Terre Bohman (Motley Rice LLC) pursuant to License Agreement. No further reproductions authorized.

D5755 – 09 (2014)$^{\epsilon 1}$

7.39 *Copper TEM Finder Grids,* 200 mesh.

7.40 *Carbon Evaporator Rods.*

7.41 *Lens Tissue.*

7.42 *Ashless Filter Paper Filters,* 90-mm diameter.

7.43 *Gummed Paper Reinforcement Rings.*

7.44 *Wash Bottles,* plastic.

7.45 *Reagent Alcohol,* HPLC Grade (Fisher A995 or equivalent).

7.46 *Opening Mesh Screen,* plastic, 1.0 by 1.0 mm, (Spectra-Mesh #146410 or equivalent).

7.47 *Diffraction Grating Replica.*

## 8. Sampling Procedure for Microvacuum Technique

8.1 For sampling asbestos-containing dust in either indoor or outdoor environments, commercially available cassettes must be used. Air monitoring cassettes containing 25-mm or 37-mm diameter mixed cellulose ester (MCE) or polycarbonate (PC) filter membranes with a pore size less than or equal to 0.8 μm are required (7.31). The number of samples collected depends upon the specific circumstances of the study.

8.2 Maintain a log of all pertinent sampling information and sampling locations.

8.3 Sampling pumps and flow indicators shall be calibrated using a certified standard apparatus or assembly (see Practice D3195 and 7.29).

8.4 Record all calibration information (**5**).

8.5 Perform a leak check of the sampling system at each sampling site by activating the pump (7.29) with the closed sampling cassette in line. Any air flow shows that a leak is present that must be eliminated before initiating the sampling operation.

8.6 Attach the sampling cassette to the sampling pump at the outlet side of the cassette with plastic tubing (7.35). The plastic tubing must be long enough in that the sample areas can be reached without interference from the sampling pump. Attach a clean, approximately 25.4-mm long piece of plastic tubing (6.35-mm internal diameter) directly to the inlet orifice. Use this piece of tubing as the sampling nozzle. Cut the sampling end of the tubing at a 45° angle as illustrated in Fig.

1. The exact design of the nozzle is not critical as long as some vacuum break is provided to avoid simply pushing the dust around on the surface with the nozzle rather than vacuuming it into the cassette. The internal diameter of the nozzle and flow rate of the pump may vary as long as the air velocity is 100 (±10) cm/s. This air velocity calculation is based on an internal sampling tube diameter of 6.35 mm at a flow rate of 2 L/min.

8.7 Measure and determine the sample area of interest. A sample area of 100 cm$^2$ is vacuumed until there is no visible dust or particulates matter remaining. Perform a minimum of two orthogonal passes on the surface within a minimum of 2 min of sampling time. Avoid scraping or abrading the surface being sampled. (Do not sample any debris or dust particles greater than 1 mm in diameter.) Smaller or larger areas can be sampled, if needed. For example, some surfaces of interest may have a smaller area than 100 cm$^2$. Less dusty surfaces may require vacuuming of larger areas. Unlike air samples, the overloading of the cassettes with dust will not be a problem. As defined in 3.2.5, only dust shall be collected for this analysis.

8.8 At the end of sample collection, invert the cassette so that the nozzle inlet faces up before shutting off the power to the pump. The nozzle is then sealed with a cassette end-plug and the cassette/nozzle taped or appropriately packaged to prevent separation of the nozzle and cassette assembly. A second option is the removal of the nozzle from the cassette, then plugging of the cassette and shipment of the nozzle (also plugged at both ends) sealed in a separate closeable plastic bag. A third option is placing the nozzle inside the cassette for shipment. The nozzle is always saved and rinsed because a significant percentage of the dust drawn from a lightly loaded surface may adhere to the inside walls of the tubing.

8.9 Check that all samples are clearly labeled, that all dust sampling information sheets are completed, and that all pertinent information has been enclosed, in accordance with laboratory quality control practices, before transfer of the samples to the laboratory. Include an unused cassette and nozzle as a field blank.

8.10 Wipe off the exterior surface of the cassettes with disposable wet towels (baby wipes) prior to packaging for shipment.



**FIG. 1  Example of the Tubing Nozzle**

Copyright by ASTM Int'l (all rights reserved); Fri Jun 28 14:16:07 EDT 2019
Downloaded/printed by
Terre Bohman (Motley Rice LLC) pursuant to License Agreement. No further reproductions authorized.

 **D5755 – 09 (2014)$^{\epsilon 1}$**

## 9. Sample Shipment

9.1 Ship dust samples to an analytical laboratory in a sealed container, but separate from any bulk or air samples. The cassettes must be tightly sealed and packed in a material free of fibers or dust to minimize the potential for contamination. Plastic "bubble pack" is probably the most appropriate material for this purpose.

## 10. Sample Preparation

10.1 Under a negative flow HEPA hood (7.5), carefully wet-wipe the exterior of the cassettes to remove any possible contamination before taking cassettes into a clean preparation area.

10.2 Perform sample preparation in a clean facility that has a separate work area from both the bulk and air sample preparation areas.

10.3 Initial specimen preparation shall take place in a clean HEPA filtered negative pressure hood to avoid any possible contamination of the laboratory or personnel, or both, by the potentially large number of asbestos structures in an asbestos-containing dust sample. Cleanliness of the preparation area hoods is measured by the cumulative process blank surface loadings (see Section 11).

10.4 All sample preparation steps 10.4.1 – 10.4.6 shall take place in the dust preparation area inside a HEPA hood.

10.4.1 Remove the upper plug from the sample cassette and carefully introduce approximately 10-mL solution of a 50/50 mixture of particle-free water and reagent alcohol into the cassette using a plastic wash bottle (7.44). If the plugged nozzle was left attached to the cassette, then remove the plug and introduce the water/alcohol solution into the cassette through the tubing, and then remove the tubing, if it is visibly clean.

10.4.2 Replace the upper plug or the sample cap and lightly shake the dust solution by hand for 3 s.

10.4.3 Remove the entire cap of the cassette and pour the suspension through a 1.0 by 1.0-mm opening screen (7.46) into a pre-cleaned 200-mL glass specimen bottle (7.9). All visible traces of the sample contained in the cassette shall be rinsed through the screen into the specimen bottle with a plastic wash bottle containing the 50/50 solution of particle-free water and alcohol. Repeat this procedure two additional times for a total of three washings. Next, rinse the nozzle two or three times through the screen into the specimen bottle with the 50/50 mixture of water and alcohol. Typically, the total amount of the 50/50 mixture used in the rinse is 50 to 75 mL. Discard the 1.0 by 1.0-mm screen and bring the volume of suspension in the specimen bottle up to the 100-mL mark on the side of the bottle with particle-free water only.

10.4.4 Adjust the pH of the suspension to 3 to 4 using a 10.0 % solution of acetic acid. Use pH paper for testing. Filter the suspension within 24 h to avoid problems associated with bacterial and fungal growth.

10.4.5 Use either a disposable plastic filtration unit or a glass filtering unit (7.14) for filtration of aliquots of the suspension. The ability of an individual filtration unit to produce a uniform distribution may be tested by the filtration of a colored particulate solution such as diluted India ink (solution of carbon black).

10.4.5.1 If a disposable plastic filtration unit is used, then unwrap a new disposable plastic filter funnel unit (either 25 or 47 mm diameter) and remove the tape around the base of the funnel. Remove the funnel and discard the top filter supplied with the apparatus, retaining the coarse polypropylene support pad in place. Assemble the unit with the adapter and a properly sized neoprene stopper, and attach the funnel to the 1000-mL side-arm vacuum flask (7.15). Place a 5.0-μm pore size MCE (backing filter) on the support pad. Wet it with a few mL of particle-free water and place an MCE (7.16) or PC filter (≤0.22-μm pore size) (7.17) on top of the backing filter. Apply a vacuum (7.36), ensuring that the filters are centered and pulled flat without air bubbles. Any irregularities on the filter surface requires the discard of that filter. After the filter has been seated properly, replace the funnel and reseal it with the tape. Return the flask to atmospheric pressure.

10.4.5.2 If a glass filtration unit is used, place a 5-μm pore size MCE (backing filter) on the glass frit surface. Wet the filter with particle-free water, and place an MCE or PC filter (≤0.22-μm pore size) on top of the backing filter. Apply a vacuum, ensuring that the filters are centered and pulled flat without air bubbles. Replace the filters if any irregularities are seen on the filter surface. Before filtration of each set of sample aliquots, prepare a blank filter by filtration of 50 mL of particle-free water. If aliquots of the same sample are filtered in order of increasing surface loading, the glass filtration unit need not be washed between filtration. After completion of the filtration, do not allow the filtration funnel assembly to dry because contamination is then more difficult to remove. Wash any residual solution from the filtration assembly by holding it under a flow of water, then rub the surface with a clean paper towel soaked in a detergent solution. Repeat the cleaning operation, and then rinse two times in particle-free water.

10.4.6 With the flask at atmospheric pressure, add 20 mL of particle-free water into the funnel. Cover the filter funnel with its plastic cover if the disposable filtering unit is used.

10.4.7 Briefly hand shake (3 s) the capped bottle with the sample suspension, then place it in a tabletop ultrasonic bath (7.12) and sonicate for 3.0 min. Maintain the water level in the sonicator at the same height as the suspension in sample bottle. The ultrasonic bath shall be calibrated as described in 20.5. The ultrasonic bath must be operated at equilibrium temperature. After sonicating, return the sample bottle to the work surface of the HEPA hood. Preparation steps 10.4.8 – 10.4.14 shall be carried out in this hood.

10.4.8 Shake the suspension lightly by hand for 3 s, then let it rest for 2.0 min to allow large particles to settle to the bottom of the bottle or float to the surface.

10.4.9 Estimate the amount of liquid to be withdrawn to produce an adequate filter preparation. Experience has shown that a light staining of the filter surface will yield a suitable preparation for analysis. Filter at least 1.0 mL, but no more than half the total volume. If after examination in the TEM, the smallest volume measured (1.0 mL) (7.13) yields an over-loaded sample, then perform additional serial dilutions of the

Copyright by ASTM Int'l (all rights reserved); Fri Jun 28 14:16:07 EDT 2019
Downloaded/printed by
Terre Bohman (Motley Rice LLC) pursuant to License Agreement. No further reproductions authorized.



D5755 – 09 (2014)ᵉ¹

suspension. If it is estimated that less than 1.0 mL of suspension has to be filtered because of the density of the suspension, perform a serial dilution.

10.4.9.1 If serial dilutions are required, repeat step 10.4.8 before the serial dilution portion is taken. Do not re-sonicate the original suspension or any serial dilutions. The recommended procedure for a serial dilution is to mix 10 mL of the sample suspension with 90 mL of particle-free water in a clean sample bottle to obtain a 1:10 serial dilution. Follow good laboratory practices when performing dilutions.

10.4.10 Insert a new disposable pipette halfway into the sample suspension and withdraw a portion. Avoid pipetting any of the large floating or settled particles. Uncover the filter funnel and dispense the mixture from the pipette into the water in the funnel.

10.4.11 Apply vacuum to the flask and draw the mixture through the filter.

10.4.12 Discard the pipette.

10.4.13 Disassemble the filtering unit and carefully remove the sample filter with fine tweezers (7.11). Place the completed sample filter particle side up, into a precleaned, labeled, disposable, plastic petri dish) or other similar container.

10.4.14 In order to ensure that an optimally-loaded filter is obtained, it is recommended that filters be prepared from several different aliquots of the dust suspension. For this series of filters, it is recommended that the volume of each aliquot of the original suspension be a factor of five higher than the previous one. If the filters are prepared in order of increasing aliquot volume, all of the filters for one sample can be prepared using one plastic disposable filtration unit, or without cleaning of glass filtration equipment between individual filtration. Before withdrawal of each aliquot from the sample, shake the suspension without additional sonification and allow to rest for 2 min.

10.4.15 There are many practical methods for drying MCE filters. The following are two examples that can be used: (*1*) dry MCE filters for at least 12 h (over desiccant) in an airtight cabinet-type desiccator (7.21); (*2*) to shorten the drying time (if desired), remove a plug of the damp filter and attach it to a glass slide (7.19) as described in 12.1.2 and 12.1.3. Place the slide with a filter plug or filter plugs (up to eight plugs can be attached to one slide) on a bed of desiccant, in the desiccator for 1 h.

10.4.16 PC filters do not require lengthy drying before preparation, but shall be placed in a desiccator for at least 30 min before preparation.

10.5 Prepare TEM specimens from small sections of each dried filter using the appropriate direct transfer preparation method.

## 11. Blanks

11.1 Prepare sample blanks that include both a process blank (50 mL of particle-free water) for each set of samples analyzed and one unused filter from each new box of sample filters (MCE or PC) used in the laboratory. If glass filtering units are used, prepare and analyze a process blank each time the filtering unit is cleaned. Blanks will be considered contaminated, if after analysis, they are shown to contain more

than 53 asbestos structures per square millimetre. This generally corresponds to three or four asbestos structures found in ten grid openings. The source of the contamination must be found before any further analysis can be performed. Reject samples that were processed along with the contaminated blanks and prepare new samples after the source of the contamination is found.

11.2 Prepare field blanks which are included with sample sets in the same manner as the samples, to test for contamination during the sampling, shipping, handling, and preparation steps of the method.

## 12. TEM Specimen Preparation of Mixed Cellulose Ester (MCE) Filters

NOTE 1—Use of either the acetone or the diamethylformamide-acetic acid method is acceptable.

12.1 *Acetone Fusing Method:*

12.1.1 Remove a section (a plug) from any quadrant of the sample and blank filters. Sections can be removed from the filters using a 7-mm cork borer (7.32). The cork borer must be wet wiped after each time a section is removed.

12.1.2 Place the filter section (particle side up) on a clean microscope slide. Affix the filter section to the slide with a gummed page reinforcement (7.43), or other suitable means. Label the slide with a glass scribing tool or permanent marker (7.10).

12.1.3 Prepare a fusing dish from a glass petri dish (7.37) and a metal screen bridge (7.38) with a pad of five to six ashless paper filters (7.42) and place in the bottom of the petri dish (4). Place the screen bridge on top of the pad and saturate the filter pads with acetone. Place the slide on top of the bridge in the petri dish and cover the dish. Wait approximately 5 min for the sample filter to fuse and clear.

12.2 *Dimethylformamide-Acetic Acid Method:*

12.2.1 Place a drop of clearing solution that consists of 35 % dimethylformamide (DMF), 15 % glacial acetic acid, and 50 % Type II water (v/v) on a clean microscope slide. Gauge the amount used so that the clearing solution just saturates the filter section.

12.2.2 Carefully lay the filter segment, sample surface upward, on top of the solution. Bring the filter and solution together at an angle of about 20° to help exclude air bubbles. Remove any excess clearing solution. Place the slide in an oven or on a hot plate, in a fume hood, at 65 to 70°C for 10 min.

12.3 Plasma etching of the collapsed filter is required.

12.3.1 The microscope slide to which the collapsed filter pieces are attached is placed in a plasma asher (7.27). Because plasma ashers vary greatly in their performance, both from unit to unit and between different positions in the asher chamber, it is difficult to specify the exact conditions that must be used. Insufficient etching will result in a failure to expose embedded fibers, and too much etching may result in the loss of particles from the filter surface. To determine the optimum time for ashing, place an unused 25 mm diameter MCE filter in the center of a glass microscope slide. Position the slide approximately in the center of the asher chamber. Close the chamber and evacuate to a pressure of approximately 40 Pa, while

Copyright by ASTM Int'l (all rights reserved); Fri Jun 28 14:16:07 EDT 2019
Downloaded/printed by
Terre Bohman (Motley Rice LLC) pursuant to License Agreement. No further reproductions authorized.

D5755 − 09 (2014)$^{\varepsilon 1}$

admitting oxygen to the chamber at a rate of 8 to 20 cm$^3$/min. Adjust the tuning of the system so that the intensity of the plasma is maximized. Determine the time required for complete oxidation of the filter. Adjust the system parameters to achieve complete oxidation of the filter in a period of approximately 15 min. For etching of collapsed filters, use these operating parameters for a period of 8 min. For additional information on calibration, see the *USEPA Asbestos-Containing Materials in Schools* (**4**) or *NIST/NVLAP Program Handbook for Airborne Asbestos Analysis*(**6**) documents.

12.3.2 Place the glass slide containing the collapsed filters into the low-temperature plasma asher, and etch the filter.

12.4 Carbon coating of the collapsed and etched filters is required.

12.4.1 Carbon coating must be performed with a high-vacuum coating unit (7.4), capable of less than 10$^{-4}$ torr (13 MPa) pressure. Units that are based on evaporation of carbon filaments in a vacuum generated only by an oil rotary pump have not been evaluated for this application and shall not be used. Carbon rods (7.40) used for evaporators shall be sharpened with a carbon rod sharpener to a neck of about 4 mm in length and 1 mm in diameter. The rods are installed in the evaporator in such a manner that the points are approximately 100 to 120 mm from the surface of the microscope slide held in the rotating device.

12.4.2 Place the glass slide holding the filters on the rotation device, and evacuate the evaporator chamber to a vacuum of at least 13 MPa. Perform the evaporation in very short bursts, separated by 3 to 4 s to allow the electrodes to cool. An alternate method of evaporation is by using a slow continuous applied current. An experienced analyst can judge the thickness of the carbon film to be applied. Conduct tests on unused filters first. If the carbon film is too thin, large particles will be lost from the TEM specimen, and there will be few complete and undamaged grid openings of the TEM specimen.

12.4.2.1 If the coating is too thick, it will lead to a TEM image that is lacking in contrast, and the ability to obtain electron diffraction patterns will be compromised. The carbon film shall be as thin as possible and still remain intact on most of the grid openings of the TEM specimen.

12.5 *Preparation of the Jaffe Washer*—The precise design of the Jaffe washer is not considered important, so any one of the published designs may be used (**7, 8**). One such washer consists of a simple stainless steel bridge contained in a glass petri dish.

12.5.1 Place several pieces of lens tissue (7.41) on the stainless steel bridge. The pieces of lens tissue shall be large enough to completely drape over the bridge and into the solvent. In a fume hood, fill the petri dish with acetone (or DMF) until the height of the solvent is brought up to contact the underside of the metal bridge as illustrated in Fig. 2.

12.6 *Placing the Specimens into the Jaffe Washer:*

12.6.1 Place the TEM grids (7.39) shiny side up on a piece of lens tissue or filter paper so that individual grids can be easily picked up with tweezers.

12.6.2 Prepare three grids from each sample.



**FIG. 2 Example of Design of Solvent Washer (Jaffe Washer)**

12.6.2.1 Using a curved scalpel blade (7.20), excise at least two square (3 mm by 3 mm) pieces of the carbon-coated MCE filter from the glass slide.

12.6.2.2 Place the square filter piece carbon-side up on top of a TEM specimen grid.

12.6.2.3 Place the whole assembly (filter/grid) on the saturated lens tissue in the Jaffe washer.

12.6.2.4 Place the three TEM grid sample filter preparations on the same piece of lens tissue in the Jaffe washer.

12.6.2.5 Place the lid on the Jaffe washer and allow the system to stand for several hours.

12.7 Alternately, place the grids on a low level (petri dish filled to the ⅛ mark) DMF Jaffe washer for 60 min. Add enough solution of equal parts DMF/acetone to fill the washer to the screen level. Remove the grids after 30 min if they have cleared, that is, all filter material has been removed from the carbon film, as determined by inspection in the TEM.

12.8 Carefully remove the grids from the Jaffe washer, allowing the grids to dry before placing them in a clean marked grid box.

## 13. TEM Specimen Preparation of Polycarbonate (PC) Filter

13.1 Cover the surface of a clean microscope slide with two strips of double-sided adhesive tape.

13.2 Cut a strip of filter paper slightly narrower than the width of the slide. Position the filter paper strip on the center of the length of the slide.

13.3 Using a clean, curved scalpel blade, cut a strip of the PC filter approximately 25 by 6 mm. Use a rocking motion of the scalpel blade to avoid tearing the filter. Place the PC strip particle side up on the slide perpendicular to the long axis of the slide. The ends of the PC strip must contact the double sided adhesive tape. Each slide can hold several PC strips. With a glass marker, label each PC strip with the individual sample number.

13.4 Carbon coat the PC filter strips as discussed in 12.4.2. PC filters do not require etching. (**Warning**—Do not overheat the filter sections while carbon coating.)

13.5 Prepare a Jaffe washer as described in 12.5, but fill the washer with chloroform or 1-methyl-2-pyrrolidone to the level of the screen.

Copyright by ASTM Int'l (all rights reserved); Fri Jun 28 14:16:07 EDT 2019
Downloaded/printed by
Terre Bohman (Motley Rice LLC) pursuant to License Agreement. No further reproductions authorized.

 **D5755 – 09 (2014)$^{\epsilon 1}$**

13.6 Using a clean curved scalpel blade, excise three, 3-mm square filter pieces from each PC strip. Place the filter squares carbon side up on the shiny side of a TEM grid. Pick up the grid and filter section together and place them on the lens tissue in the Jaffe washer.

13.7 Place the lid on the Jaffe washer and rest the grids in place for at least 4 h. Best results are obtained with longer wicking times, up to 12 h.

13.8 Carefully remove the grids from the Jaffe washer, allowing the grids to dry before placing them in a clean, marked grid box.

## 14. Grid Opening Measurements

14.1 TEM grids must have a known grid opening area. Determine this area as follows:

14.2 Measure at least 20 grid openings in each of 20 random 75 to 100 μm (200-mesh) copper grids for a total of 400 grid openings for every 1000 grids used, by placing the 20 grids on a glass slide and examining them under the optical microscope. Use a calibrated graticule to measure the average length and width of the 20 openings from each of the individual grids. From the accumulated data, calculate the average grid opening area of the 400 openings.

14.3 Grid area measurements can also be made at the TEM at a calibrated screen magnification of between 15 000 and 20 000×. Typically measure one grid opening for each grid examined. Measure grid openings in both the x and y directions and calculate the area.

14.4 Pre-calibrated TEM grids are also acceptable for this test method.

## 15. TEM Method

15.1 Microscope settings: 80 to 120 kV, 15 000 to 20 000× screen magnification for analysis (7.2).

15.2 Analyze two grids for each sample. Analyze one-half of the sample area on one sample grid preparation and the remaining half on a second sample grid preparation.

15.3 *Determination of Specimen Suitability:*
15.3.1 Carefully load the TEM grid, carbon side facing up (in the TEM column) with the grid bars oriented parallel/perpendicular to the length of the specimen holder. Use a hand lens or loupe, if necessary. This procedure will line up the grid with the x and y translation directions of the microscope. Insert the specimen holder into the microscope.

15.3.2 Scan the entire grid at low magnification (250 to 1000×) to determine its suitability for high magnification analysis as specified in 15.3.3.

15.3.3 Grids are acceptable for analysis if the following conditions are met:
15.3.3.1 The fraction of grid openings covered by the replica section is at least 50 %.
15.3.3.2 Relative to that section of the grid covered by the carbon replica, the fraction of intact grid openings is greater than 50 %.
15.3.3.3 The fractional area of undissolved filter is less than 10 %.

15.3.3.4 The fraction of grid openings with overlapping or folded replica film is less than 50 %.
15.3.3.5 At least 20 grid openings, that have no overlapping or folded replica, are less than 5 % covered with holes and have less than 5 % opaque area due to incomplete filter dissolution.

15.4 *Determination of Grid Opening Suitability:*
15.4.1 If the grid meets acceptance criteria, choose a grid opening for analysis from various areas of the grid so that the entire grid is represented. Determine the suitability of each individual grid opening prior to the analysis.
15.4.2 The individual grid opening must have less than 5 % holes over its area.
15.4.3 Grid openings must be less than 25 % covered with particulate matter.
15.4.4 Grid openings must be uniformly loaded.

15.5 Observe and record the orientation of the grid at 80 to 150×, on a grid map record sheet along with the location of the grid openings that are examined for the analysis. If indexed grids are used, a grid map is not required, but the identifying coordinates of the grid square must be recorded.

## 16. Recording Data Rules

16.1 Record on the count sheet any continuous grouping of particles in which an asbestos fiber is detected. Classify asbestos structures as fibers, bundles, clusters, or matrices as defined in 5.2.

16.2 Use the criteria for fiber, bundle, cluster, and matrix identification, as described in the *USEPA Asbestos-ContainingMaterials in Schools* document (4). Record, for each AHERA structure identified, the length and width measurements.

16.3 Record NSD (No Structures Detected) when no structures are detected in the grid opening.

16.4 Identify structures classified as chrysotile identified by either electron diffraction or X-ray analysis (7.3) and recorded on a count sheet. Verify at least one out of every ten chrysotile structures by X-ray analysis.

16.5 Structures classified as amphiboles by X-ray analysis and electron diffraction are recorded on the count sheet. For more information on identification, see Yamate, et al., (7) or Chatfield and Dillon (8).

16.6 Record a typical electron diffraction pattern for each type of asbestos observed for each group of samples (or a minimum of every five samples) analyzed. Record the micrograph number on the count sheet. Record at least one X-ray spectrum for each type of asbestos observed per sample. Attach the print-outs to the back of the count sheet. If the X-ray spectrum is stored, record the file and disk number on the count sheet.

16.7 *Counting Rules:*
16.7.1 At a screen magnification of between 15 000 and 20 000× evaluate the grids for the most concentrated sample loading; reject the sample if it is estimated to contain more than 50 asbestos structures per grid opening. Proceed to the next lower concentrated sample until a set of grids are obtained that have less than 30 asbestos structures per grid opening.

Copyright by ASTM Int'l (all rights reserved); Fri Jun 28 14:16:07 EDT 2019
Downloaded/printed by
Terre Bohman (Motley Rice LLC) pursuant to License Agreement. No further reproductions authorized.

8

**D5755 – 09 (2014)ᵉ¹**

16.8 *Analytical Sensitivity (AS)*—As determined by the following equation:

$$(EFA \times 100\ mL \times 1)/(GO \times GOA \times V \times SPL) = AS \qquad (1)$$

where:

$EFA$ = effective filter area of the final sampling filter, mm²,
$GO$ = number of grid openings counted,
$GOA$ = average grid opening area, mm²,
$SPL$ = surface area sampled, cm²,
$V$ = volume of sample filtered in step 10.4.9, representing the actual volume taken from the original 100-mL suspension, mL, and
$AS$ = analytical sensitivity, expressed as asbestos structures/cm².

16.8.1 An AS of approximately 1000 asbestos structures per square centimetre (calculated for the detection of a single asbestos structure) has been designed for this analysis. This sensitivity can be achieved by increasing the amount of liquid filtered, increasing the number of grid openings analyzed, increasing the area of the collection, or decreasing the size of the final filter. For example, using a collection area = 500 cm², filter area = 1000 mm², number of grid openings = 10, and a grid area of 0.01 mm², V = 50 mL, the AS is 40 str/cm². Occasionally, due to high particle loadings or high asbestos surface loading, this AS cannot be practically achieved and stopping rules apply.

16.8.2 The numerical value of AS required for any specific application of this method may be achieved by selecting an appropriate combination of the sampling and analysis parameters in the above equation. For example, if SPL = 100 cm², EFA = 1000 mm², GO = 10, GOA = 0.01 mm², V = 10 mL, and D = 1, then AS = 1000 str/cm². Increasing GO to 50 and V to 50 mL changes the AS to 40 Str/cm².

16.8.3 When sample filters are heavily loaded with particulate matter, it may useful to employ serial dilutions during preparation to reduce the loading on grid specimens to acceptable levels and thus facilitate analysis. Under such circumstances, the AS may be calculated by substituting an appropriate value for the dilution factor, D, into the above equation. In general:

$$D = VA/(V + VPFW) \qquad (2)$$

where:

$VA$ = the volume of the aliquot from the new, diluted suspension that is filtered to prepare the analytical filter,
$V$ = the volume of aliquot from the initial (100 mL) suspension that is diluted, and
$VPFW$ = the volume of particle free water added to V during serial dilution to produce the new, diluted suspension.

Thus, if GO = 10, V = 10 mL, VPFW = 90 mL, and VA = 1.0 mL, D = 0.01 and the AS = 100 000 str/cm².

16.9 *Limit of Detection*—The limit of detection for this test method is calculated using the Practice D6620. All data shall be provided in the laboratory report.

16.10 *Stopping Rules:*

16.10.1 The analysis is stopped upon the completion of the grid square that achieves an AS of less than 1000 asbestos structures per square centimetre.

16.10.2 If an AS of 1000 asbestos structures per square centimetre cannot be achieved after analyzing ten grid openings then stop on grid opening No. 10 or the grid opening which contains the 100th asbestos structure, whichever comes first. A minimum of four grid squares shall be analyzed for each sample.

16.10.2.1 If the analysis is stopped because of the 100th structure rule, the entire grid square containing the 100th structure must be counted.

16.11 After analysis, remove the grids from the TEM, and replace them in the appropriate grid storage holder.

## 17. Sample Storage

17.1 The washed-out sample cassettes can be discarded after use.

17.2 Sample grids and unused filter sections (7.18) must be stored for a minimum of one year.

## 18. Reporting

18.1 Report the following information for each dust sample analyzed:

18.1.1 Surface loading in structures/cm².

18.1.2 The AS.

18.1.3 Types of asbestos present.

18.1.4 Number of asbestos structures counted.

18.1.5 Effective filtration area.

18.1.6 Average size of the TEM grid openings that were counted.

18.1.7 Number of grid openings examined.

18.1.8 Sample dilution used.

18.1.9 Area of the surface sampled.

18.1.10 Listing of size data for each structure counted.

18.1.11 A copy of the TEM count sheet or a complete listing of the raw data. An example of a typical count sheet is shown in Appendix X1.

18.2 Determine the amount of asbestos in any accepted sample using the following formula:

$$\frac{EFA \times 100\ mL \times \#STR}{GO \times GOA \times V \times SPL} = \text{asbestos structures/cm}^2 \qquad (3)$$

where:

$\#\ STR$ = number of asbestos structures counted,
$EFA$ = effective filter area of the final sampling filter, mm²,
$GO$ = number of grid openings counted,
$GOA$ = average grid opening area, mm²,
$SPL$ = surface area sampled, cm², and
$V$ = volume of sample filtered in step 10.4.9, representing the actual volume filtered from the original 100 mL suspension, mL.

## 19. Quality Control/Quality Assurance

19.1 In general, the laboratory's quality control checks are used to verify that a system is performing according to

Copyright by ASTM Int'l (all rights reserved); Fri Jun 28 14:16:07 EDT 2019
Downloaded/printed by
Terre Bohman (Motley Rice LLC) pursuant to License Agreement. No further reproductions authorized.

D5755 − 09 (2014)ᵉ¹

specifications regarding accuracy and consistency. In an analytical laboratory, spiked or known quantitative samples are normally used. However, due to the difficulties in preparing known quantitative asbestos samples, routine quality control testing focuses on re-analysis of samples (duplicate recounts).

19.1.1 Re-analyze samples at a rate of ¹⁄₁₀ of the sample sets (one out of every ten samples analyzed not including laboratory blanks). The re-analysis shall consist of a second sample preparation obtained from the final filter.

19.2 In addition, quality assurance programs must follow the criteria shown in the *USEPA Asbestos-Containing Materials in Schools* document (**4**) and in the *NIST/NVLAP Program Handbook for Airborne Asbestos Analysis* document (**6**). These documents describe sample custody, sample preparation, blank checks for contamination, calibration, sample analysis, analyst qualifications, and technical facilities.

## 20. Calibrations

20.1 Perform calibrations of the instrumentation on a regular basis, and retain these records in the laboratory, in accordance with the laboratory's quality assurance program.

20.2 Record calibrations in a log book along with dates of calibration and the attached backup documentation.

20.3 A calibration list for the instrument is as follows:

20.3.1 *TEM:*

20.3.1.1 Check the alignment and the systems operation. Refer to the TEM manufacturer's operational manual for detailed instructions.

20.3.1.2 Calibrate the camera length of the TEM in electron diffraction (ED) operating mode before ED patterns of unknown samples are observed. Camera length can be measured by using a carbon coated grid on which a thin film of gold has been sputtered or evaporated. A thin film of gold is evaporated on the specimen TEM grid to obtain zone-axis ED patterns superimposed with a ring pattern from the polycrystalline gold film. In practice, it is desirable to optimize the thickness of the gold film so that only one or two sharp rings are obtained on the superimposed ED pattern. Thick gold films will tend to mask weak diffraction spots from the fibrous particles. Since the unknown d-spacings of most interest in asbestos analysis are those which lie closest to the transmitted beam, multiple gold rings from thick films are unnecessary. Alternatively, a gold standard specimen can be used to obtain an average camera constant calculated for that particular instrument and can then be used for ED patterns of unknowns taken during the corresponding period.

20.3.1.3 Perform magnification calibration at the fluorescent screen. This calibration must be performed at the magnification used for structure counting. Calibration is performed with a grating replica (**7.47**) (for example, one containing at least 2160 lines/mm).

(a) Define a field of view on the fluorescent screen. The field of view must be measurable or previously inscribed with a scale or concentric circles (all scales should be metric).

(b) Frequency of calibration will depend on the service history of the particular microscope.

(c) Check the calibration after any maintenance of the microscope that involves adjustment of the power supply to the lens or the high voltage system or the mechanical disassembly of the electron optical column (apart from filament exchange).

(d) The analyst must ensure that the grating replica is placed at the same distance from the objective lens as the specimen.

(e) For instruments that incorporate a eucentric tilting specimen stage, all specimens and the grating replica must be placed at the eucentric position.

20.3.1.4 The smallest spot size of the TEM must be checked.

(a) At the crossover point, photograph the spot size at a screen magnification of 15 000 to 20 000×. An exposure time of 1 s is usually adequate.

(b) The measured spot size must be less than or equal to 250 nm.

20.4 *EDXA:*

20.4.1 The resolution and calibration of the EDXA must be verified.

20.4.1.1 Collect a standard EDXA Cu peak from the Cu grid.

20.4.1.2 Compare the X-ray energy versus channel number for the Cu peak and be certain that readings are within ±10 eV.

20.4.2 Collect a standard EDXA of crocidolite asbestos (NIST SRM 1866).

20.4.2.1 The elemental analysis of the crocidolite must resolve the Na peak.

20.4.3 Collect a standard EDXA of chrysotile asbestos.

20.4.3.1 The elemental analysis of chrysotile must resolve both Si and Mg on a single chrysotile fiber.

20.5 Ultrasonic bath calibration shall be performed as follows:

20.5.1 Fill the bath water to a level equal to the height of suspension in the glass sample container that will be used for the dust analysis. Operate the bath until the water reaches the equilibrium temperature.

20.5.2 Place 100 mL of water (at approximately 20°C) in another 200-mL glass sample container, and record its temperature.

20.5.3 Place the sample container in the water in the ultrasonic bath (with the power turned off). After 60 s, remove the glass container and record its temperature.

20.5.4 Place 100 mL of water (at approximately 20°C) in another 200-mL glass sample container, and record its temperature.

20.5.5 Place the second sample container into the water in the ultrasonic bath (with the power turned on). After 60 s, remove the glass container and record its temperature.

20.5.6 Calculate the rate of energy deposition into the sample container using the following formula:

$$R = 4.185 \times \sigma \times \rho \times \frac{(\theta_2 - \theta_1)}{t} \qquad (4)$$

where:
4.185 = Joules/cal,
$R$ = energy deposition, watts/mL,

Copyright by ASTM Int'l (all rights reserved); Fri Jun 28 14:16:07 EDT 2019
Downloaded/printed by
Terre Bohman (Motley Rice LLC) pursuant to License Agreement. No further reproductions authorized.

D5755 − 09 (2014)$^{\epsilon 1}$

$\theta_1$ = temperature rise with the ultrasonic bath not operating, °C,

$\theta_2$ = temperature rise with the ultrasonic bath operating, °C,

$t$ = time in seconds, 60 s (20.5.3 and 20.5.5),

$\sigma$ = specific heat of the liquid in the glass sample container, 1.0 cal/g, and

$\rho$ = density of the liquid in the glass sample container, 1.0 g/cm$^3$.

20.5.7 Adjust the operating conditions of the bath so that the rate of energy deposition is in the range of 0.08 to 0.12 MW/m$^3$, as defined by this procedure.

## 21. Precision and Bias[6]

21.1 *Precision*—The precision of this test method is based on an interlaboratory study conducted in 2003 following the guidance provided in Guide D3670. Each of the ten laboratories tested a single material. Every "test result" represents an individual determination. Each laboratory reported duplicate test results for the analyses. Practice E691 was followed for the design and analysis of the data.

21.1.1 *Repeatability Limit (r)*—Two test results obtained within one laboratory shall be judged not equivalent if they differ by more than the *r* value for that material; *r* is the interval representing the critical difference between two test results for the same material, obtained by the same operator using the same equipment on the same day in the same laboratory.

21.1.1.1 Repeatability limits are listed in Table 1.

21.1.2 *Reproducibility (R)*—Two test results shall be judged not equivalent if they differ by more than the *R* value for that

**TABLE 1 Asbestos Structures per cm$^2$ (×1000)**

| Material | Average[A] $\bar{x}$ | Repeatability Standard Deviation $S_r$ | Reproducibility Standard Deviation $S_R$ | Repeatability Limits $r$ | Reproducibility Limits $R$ |
|---|---|---|---|---|---|
| A | 147.80 | 22.07 | 85.46 | 61.80 | 239.30 |

[A] The average of the laboratories' calculated averages.

material; *R* is the interval representing the critical difference between two test results for the same material, obtained by different operators using different equipment in different laboratories.

21.1.2.1 Reproducibility limits are listed in Table 1.

21.1.3 The above terms (repeatability limit and reproducibility limit) are used as specified in Practice E177.

21.1.4 Any judgment in accordance with statements 21.1.1 and 21.1.2 would have an approximate 95 % probability of being correct.

21.2 *Bias*—At the time of the study, there was no accepted reference material suitable for determining the bias for this test method, therefore no statement on bias is being made.

21.3 The precision statement was determined through statistical examination of 20 results, from ten laboratories, on a single type of material, described below.

21.3.1 *Material A*—A chrysotile asbestos fiber-containing dust in a microvacuum cassette. The dust cassettes were prepared by resuspending a sample of World Trade Center dust and allowing it to settle. Samples of the dust from 100-cm$^2$ areas were collected using a microvacuum cassette following the procedures described in this test method.

## 22. Keywords

22.1 asbestos; microvacuuming; settled dust; TEM

---

[6] Supporting data have been filed at ASTM International Headquarters and may be obtained by requesting Research Report RR:D22-1032. Contact ASTM Customer Service at service@astm.org.

## APPENDIX

### (Nonmandatory Information)

### X1. DUST SAMPLE ANALYSIS

X1.1 See Figs. X1.1 and X1.2 for the dust analysis worksheet and the TEM count sheet.

Copyright by ASTM Int'l (all rights reserved); Fri Jun 28 14:16:07 EDT 2019
Downloaded/printed by
Terre Bohman (Motley Rice LLC) pursuant to License Agreement. No further reproductions authorized.

 **D5755 – 09 (2014)$^{\epsilon 1}$**

## DUST SAMPLE ANALYSIS

| | |
|---|---|
| Client: _____ | Accelerating Voltage: _____ |
| Sample ID: _____ | Indicated Mag: _____ KX _____ |
| Job Number: _____ | Screen Mag: _____ KX _____ |
| Date Sample Analyzed: ____ – ____ – ____ | Microscope:   1    2    3    4    5 |
| Number of Openings/Grids Counted: ____ | Filter Type: _____ |
| Grid Accepted, 600X:      Yes    No | Filter Size: _____ |
| Percent Loading: _____ % | Filter Pore Size ($\mu$m): _____ |
| Grid Box #1: _____ | Grid Opening:  1) ____ $\mu$m × ____ $\mu$m |
| | 2) ____ $\mu$m × ____ $\mu$m |

Analyst: _____

Reviewer: _____     Counting Rules:   AHERA    LEVEL II

Calculation Data:

| | | |
|---|---|---|
| Effective Filter Area in mm²: | (EFA) | _____ |
| Number of Grid Openings Counted: | (GO) | _____ |
| Average Grid Opening Area in mm²: | (GOA) | _____ |
| Volume of sample Filtered in ml: | (V) | _____ |
| Surface area Sampled in cm²: | (SPL) | _____ |
| Number of Asbestos Structures Counted:* | (#STR) | _____ |

* If the number of asbestos structures counted is less than or equal to 4, enter 4 structures as the limit of detection here.

### FORMULA FOR CALCULATION OF ASBESTOS STRUCTURES "DUST" PER CM²:

$$\frac{EFAX \times 100 \times \#STR}{GO \times GOA \times V \times SPL} = \text{(Asbestos Structures per cm}^2\text{)}$$

**Results for Total Asbestos Structures:** _____

(Structures per cm²)

**Results for Structures ≥ microns:** _____

(Structures per cm²)

**FIG. X1.1  Dust Sample Analysis Work Sheet**

Copyright by ASTM Int'l (all rights reserved); Fri Jun 28 14:16:07 EDT 2019
Downloaded/printed by
Terre Bohman (Motley Rice LLC) pursuant to License Agreement. No further reproductions authorized.

D5755 − 09 (2014)$^{\epsilon 1}$

Job Number: _____

| Structure # | Grid # Square # | Type | Structure | Length Microns | Width Microns | Confirmation | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | Morph. | SAED | EDS |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

Note:    Keys to Abbreviations Used in Figure:

**Type:**

C = Chrysotile
AM = Amosite
CR = Crocidolite
AC = Actinolite
TR = Tremolite
AN = Anthophyllite
N = Non Asbestos

**Structure:**

F = Fiber
B = Bundle
C = Cluster
M = Matrix

**Others:**

NSD = No Structures Detected
Morph = Morphology
SAED = Selected Area Electron Diffraction
EDS = Energy Dispersive X-Ray Spectroscopy
ER = Inter-Row Spacing
NP = No Pattern

**FIG. X1.2  TEM Count Sheet**

Copyright by ASTM Int'l (all rights reserved); Fri Jun 28 14:16:07 EDT 2019
Downloaded/printed by
Terre Bohman (Motley Rice LLC) pursuant to License Agreement. No further reproductions authorized.

13

 **D5755 – 09 (2014)$^{\epsilon 1}$**

## REFERENCES

**(1)** Steel, E., and Wylie, A., "Mineralogical Characteristics of Asbestos," in *Geology of Asbestos Deposits*, Riordon, P. H., Ed., SME-AIME, 1981, pp. 93–101.

**(2)** Zussman, J., "The Mineralogy of Asbestos," in *Asbestos: Properties, Applications and Hazards*, John Wiley and Sons, 1979, pp. 45–67.

**(3)** Leake, B. E., "Nomenclature of Amphiboles," *American Mineralogist*, Vol 63, 1978, pp. 1023–1052.

**(4)** "USEPA Asbestos-Containing Materials in Schools: Final Rule and Notice," *Federal Register*, 40 CFR Part 763, Appendix A to Sub-part E., Oct. 30, 1987.

**(5)** OSHA, *OSHA Technical Manual, OSHA Instruction CPL 2-20B*, Directorate of Technical Support, U.S. Department of Labor, Washington, DC 20210, Feb. 5, 1990, pp. 1–8 to 1–11.

**(6)** *NIST/NVLAP Program Handbook for Airborne Asbestos Analysis*, NISTIR, August 1989, pp. 89–4137.

**(7)** Yamate, G., Agarwall, S. C., and Gibbons, R. D., "Methodology for the Measurement of Airborne Asbestos by Electron Microscopy," EPA Draft Report, Contract No. 68-02-3266, 1984.

**(8)** Chatfield, E. J., and Dillon, M. J., "Analytical Method for the Determination of Asbestos in Water," EPA No. 600/4-83-043, 1983.

*ASTM International takes no position respecting the validity of any patent rights asserted in connection with any item mentioned in this standard. Users of this standard are expressly advised that determination of the validity of any such patent rights, and the risk of infringement of such rights, are entirely their own responsibility.*

*This standard is subject to revision at any time by the responsible technical committee and must be reviewed every five years and if not revised, either reapproved or withdrawn. Your comments are invited either for revision of this standard or for additional standards and should be addressed to ASTM International Headquarters. Your comments will receive careful consideration at a meeting of the responsible technical committee, which you may attend. If you feel that your comments have not received a fair hearing you should make your views known to the ASTM Committee on Standards, at the address shown below.*

*This standard is copyrighted by ASTM International, 100 Barr Harbor Drive, PO Box C700, West Conshohocken, PA 19428-2959, United States. Individual reprints (single or multiple copies) of this standard may be obtained by contacting ASTM at the above address or at 610-832-9585 (phone), 610-832-9555 (fax), or service@astm.org (e-mail); or through the ASTM website (www.astm.org). Permission rights to photocopy the standard may also be secured from the Copyright Clearance Center, 222 Rosewood Drive, Danvers, MA 01923, Tel: (978) 646-2600; http://www.copyright.com/*

Copyright by ASTM Int'l (all rights reserved); Fri Jun 28 14:16:07 EDT 2019
Downloaded/printed by
Terre Bohman (Motley Rice LLC) pursuant to License Agreement. No further reproductions authorized.

# Exhibit 49

*Johnson&Johnson*
BABY PRODUCTS COMPANY

T.M. NO.    7024 B

PAGE   1 of 5

S   'DARD TEST METHOD

SUBJECT: ANALYSIS OF POWDERED TALC FOR ASBESTIFORM MINERALS BY TRANSMISSION ELECTRON MICROSCOPY

SUPERSEDES:   ADL 1305   DATE:    3/8/89        AUTHORIZATION NO.:   BCR 011362

1.  SCOPE & PURPOSE

    This method is applicable to the identification and quantitation of small
    (typically 1-20 micrometer) asbestiform minerals in powdered talc.  Samples may be
    previously screened with light microscopy or x-ray diffraction techniques.

2.  PRINCIPLE OF METHOD

    The combined techniques of transmission electron microscopy (TEM), selected area
    electron diffraction (SAED) and energy dispersive x-ray analysis (EDXRA) permit the
    detection of asbestiform minerals based on morphological characteristics, followed
    by a definitive mineralogical identification of each fiber.

3.  INTERFERENCES

    Interferences are caused by fibrous particles which must be distinguished from
    positively identifiable asbestos, and by large particles or particle aggregates
    which may obscure fibers.  Positively identified non-asbestos fibers include rolled
    talc, ribbon talc, antigorite, silica fibers and iron oxide fibers.  Organic
    additives such as perfumes may crystallize out as fibers or needle-shaped crystals
    in finished cosmetic products.  In the absence of positive identification, all
    other fibers must be classified as unidentifiable.

4.  INSTRUMENTAL CONDITIONS

    The talc specimen grids are examined in the TEM at an accelerating voltage of
    120 kv and at magnification of 20,000X and 5,000X.

5.  SENSITIVITY

    This method is capable of detecting a single fiber as small as 1 micrometer ($\mu$m)
    long by 0.075 $\mu$m wide in the entire TEM field, which results in a theoretical
    detection limit of $10^{-5}$ weight percent.  Such fibers usually can be identified
    readily by SAED and EDXRA.  The mass of a fiber with the above dimensions is 1.1 x
    $10^{-14}$ g for chrysotile and 1.5 x $10^{-14}$ g for amphibole.

Protected Document--Subject to Protective Order

**J&J-0007919**

JNJNL61 000043150

*Johnson&Johnson*
BABY PRODUCTS COMPANY

T.M. NO.   7024
PAGE   2 of 5

S̲T̲A̲N̲D̲A̲R̲D̲ ̲T̲E̲S̲T̲ ̲M̲E̲T̲H̲O̲D̲

SUBJECT: ANALYSIS OF POWDERED TALC FOR ASBESTIFORM MINERALS BY TRANSMISSION ELECTRON MICROSCOPY

SUPERSEDES:   ADL 1305     DATE:     3/8/89          AUTHORIZATION NO.:    BCR 011362

6.  LIMIT OF QUANTIFIABLE DETECTION

The detection of five or more asbestiform minerals of one variety in an analysis constitutes a quantifiable level of detection.  When no asbestiform minerals are detected, a representative fiber size is used to calculate a detection limit.  A representative fiber size is 3 μm long by 0.2 μm wide by 0.06 μm thick, which is considerably larger than the smallest fiber that can be detected (see section 5, SENSITIVITY), but is more typical of small asbestos fibers that are detected in talc analyses.  The mass of five such fibers is calculated as follows:

$$3 \text{ μm} \times 0.2 \text{ μm} \times 0.06 \text{ μm} = 0.036 \text{μm}^3 \text{ per fiber}$$
$$\times 3.3E\text{-}12 \text{ g} / \text{ μm}^3 = 1.2 \text{ E-}13 \text{ g per fiber}$$
$$\times 5 \text{ fibers} = 6E\text{-}13 \text{ grams per 5 fibers.}$$

The limit of quantifiable detection for most talc analyses is approximately 6 x $10^{-4}$ weight percent.  The theoretical and quantifiable detection limits assume homogeneity of the material being sampled.

QUALITY ASSURANCE

Blank suspensions are routinely prepared and tested in order to monitor potential residual contamination from the sample jars.  Blank carbon-coated grids are routinely tested to monitor the ambient fiber count.  If greater than 4 fibers per grid are present, the jars are pre-cleaned or new carbon-coated grids are prepared, respective of the test.

8.  BACKGROUND CORRECTION

As of the time of this writing, background correction has not been necessary.  The amount of background asbestos detected has been insignificant in comparison to the levels of asbestos found in contaminated samples.

9.  PREPARATION AND ANALYSIS TIME

Preparation time per sample (including preparation of related materials) is one hour.  Analysis search time per sample is a maximum of two hours.

10.  APPARATUS

A.  Analytical balance with 0.0001 gram sensitivity

B.  Weighing boats

C.  Narrow spatula

Protected Document--Subject to Protective Order

T.M. NO.   7024

PAGE   3 of 5

*Johnson&Johnson*
BABY PRODUCTS COMPANY

S̲  ̲J̲ARD̲ TEST̲ METHOD̲

SUBJECT: ANALYSIS OF POWDERED TALC FOR ASBESTIFORM MINERALS BY TRANSMISSION ELECTRON MICROSCOPY

SUPERSEDES:   ADL 1305   DATE:   3/8/89   AUTHORIZATION NO.:   BCR 011362

D.  Wide mouth polyethylene jars (125 ml)

E.  Mild ultrasonic bath, minimum 50 watts

F.  Micropipettor (5-10 µl range) with disposable tips

G.  Standard 3 mm diameter, 200 mesh, copper TEM grids, covered with a carbon-coated
    formvar film.

H.  Transmission electron microscope (TEM) with an 80-120 kv accelerating voltage
    and energy dispersive x-ray analyzer.

11.  REAGENTS

A.  Methyl cellulose, powder, USP 4000 cps - Fisher Certified Reagent #M-352 or
    equivalent

B.  Water: deionized, particle free (<0.2 µm filtered)

C.  Methyl cellulose solution:  0.002% (wt/vl) (20 ppm).  Dissolve 20 ± 0.5 mg of
    methyl cellulose in 500 ml of deionized particle free water to make a 0.004%
    stock solution.  Dilute 1:1 to make a working solution.

    NOTE:  Methyl cellulose acts as a wetting agent to aid in maintaining a uniform
           particle distribution as the sample dries, by greatly reducing the
           surface tension of water.

12.  SAMPLE PREPARATION

12.1.  Transfer 30 to 50 mg of talc powder to a clean 125 ml polyethylene jar.

12.2   Add 80 ml of 20 ppm methyl cellulose solution, cap and shake vigorously for
       one minute.

12.3.  After shaking, loosen cap and ultrasonicate for 10 minutes in order to
       disperse the finer particles.  Then shake again for one minute to produce a
       uniform suspension.

12.4.  Immediately after shaking, uncap and remove 9.2 microliters with a
       micropipette.

J&J-0007921

Protected Document--Subject to Protective Order

JNJNL61 000043152

*Johnson & Johnson*
BABY PRODUCTS COMPANY

T.M. NO. 7024

PAGE 4 of 5

S゙ 'DARD TEST METHOD

SUBJECT: ANALYSIS OF POWDERED TALC FOR ASBESTIFORM MINERALS BY TRANSMISSION ELECTRON MICROSCOPY

SUPERSEDES:    ADL 1305    DATE:    3/8/89    AUTHORIZATION NO.:    BCR 011362

12.5.    Transfer a 9 µl drop to a carbon film covered TEM grid. (Grid was first lightly anchored by 2 parallel strips of double-stick tape mounted 3 mm apart on a clean glass microscope slide.) Repeat to make two sample grids per talc sample.

NOTE:    Do not expel the remaining 0.2 µl suspension from the micropipette tip. It tends to sputter and frequently destroys the stability of the sample drop.

12.6    Transfer slide with grids to a desiccator. (Drying time is 2-3 hours.) Do not leave the grids on the slide for more than one day as the double-stick tape may adhere too tightly.

NOTE:    The talc:water ratio may need to be varied for some samples. Preparation of talc samples with a significantly finer or coarser particle size results in large differences in particle coverage on the TEM grid.

### TEM ANALYSIS

13.1    Definition of fiber: An elongated particle with parallel sides and an aspect ratio $\geq 3:1$. The definition employed may vary with the needs of the client.

13.2    Scan sample at 120-150X magnification to check for even dispersion of particles and to locate grid squares with optimum particle density. (Optimum particle density is particle coverage over 15-35% of the field of view.)

13.3.    Scan three grid squares on each grid at 20,000X magnification and seven grid squares on each grid at 5,000X for asbestiform minerals. Each asbestiform mineral is recorded as to type (chrysotile, tremolite, anthophyllite, etc.), structure (bundle, clump, fiber) and dimensions (length x width).

13.4.    Questionable fibers are examined first by SAED. The chrysotile SAED pattern is unique and diagnostic. Amphibole SAED patterns are variable but usually characteristic. Additional analysis and measurement of amphibole SAED patterns are done if warranted.

13.5.    Ten percent of chrysotile fibers are checked by EDXRA for further confirmation. If the SAED pattern is not clearly diagnostic, or if it is consistent with an amphibole SAED pattern, then it is examined by EDXRA to confirm the identification or to identify the type of amphibole.

J&J-0007922

Protected Document--Subject to Protective Order

JNJNL61 000043153

T.M. NO.  7024
PAGE  5 of 5

*Johnson&Johnson*
BABY PRODUCTS COMPANY

DARD TEST METHOD

SUBJECT: ANALYSIS OF POWDERED TALC FOR ASBESTIFORM MINERALS BY TRANSMISSION ELECTRON MICROSCOPY

SUPERSEDES:   ADL 1305   DATE:   3/8/89         AUTHORIZATION NO.:   BCR 011362

14. CALCULATION OF RESULTS

14.1.A.  Mass of chrysotile fibers:  M(f)
M(f) = $\pi r^2 l$ x d
$\pi$ = 3.14159
r = fiber radius
l = fiber length
d = density of chrysotile = $2.55 \times 10^{-12}$ g/$\mu$m³

14.1.B.  Mass of asbestiform amphibole particles:  M(a)
M(a) = l x w x th x d
l = length
w = width
th = thickness $\leq$ 0.3 width (approximation)
d = density of amphiboles = $3.3 \times 10^{-13}$ g/$\mu$m³

14.2.A.  Mass of talc deposited on each TEM grid:  M(s)
M(s) = T x (V/H)
T = amount of talc sampled (step 12.1)
V = volume of aliquot transferred to TEM grid (step 12.5)
H = volume of methyl cellulose solution (step 12.2)

14.2.B.  Total estimated talc mass examined:  M(t)
M(t) = M(s) x (N x A(s))/A(g)
N = number of grid squares examined
A(s) = area of a single TEM grid square
A(g) = area of an entire TEM grid (effective area over which a 9 microliter
     drop of suspension dries)

14.3.  Weight percent:

$$\frac{\text{sum total of M(f) or M(a) x 100}}{\text{M(t)}}$$

15. CALCULATION OF A DETECTION LIMIT

15.1.  M(dl) = A minimum quantifiable mass of asbestos fibers, based on the
      detection of 5 fibers (approximately 6E-13 grams, from Section 6).

15.2.  Detection Limit (Weight Percent) = $\frac{\text{M(dl) x 100}}{\text{M(t)}}$

J&J-0007923

Protected Document--Subject to Protective Order

JNJNL61_000043154

Exhibit 50

[CANCER RESEARCH 55, 2232–2235, June 1, 1995]

*Advances in Brief*

---

# Crocidolite Asbestos Fibers in Smoke from Original Kent Cigarettes[1]

## William E. Longo, Mark W. Rigler,[2] and John Slade

*Materials Analytical Services, Inc., Norcross, Georgia 30092 [W. E. L., M. W. R.], and Department of Medicine, University of Medicine and Dentistry of New Jersey and St. Peter's Medical Center, New Brunswick, New Jersey 08901 [J. S.]*

## Abstract

The original version of the Kent Micronite cigarette filter used crocidolite, a form of asbestos, from 1952 until at least mid-1956. Cigarettes from intact, unopened packs of the brand from this period were examined. One filter contained approximately 10 mg of crocidolite. Crocidolite structures were found in the mainstream smoke from the first two puffs of each cigarette smoked. At the observed rates of asbestos release, a person smoking a pack of these cigarettes each day would take in more than 131 million crocidolite structures longer than 5 μm in 1 year. These observations suggest that people who smoked the original version of this cigarette should be warned of their possible substantial exposure to crocidolite during the 1950s.

## Introduction

The initial version of the filter in Kent cigarettes used crocidolite asbestos as the filtering agent (1). The filter consisted of rolled crepe paper interleaved with a loose mass of large diameter organic fibers that had been mixed mechanically with small diameter crocidolite fibers (Fig. 1; Refs. 2–5). There was no barrier or secondary filter between the end of this filter and the customer's mouth. This design was used from the introduction of the brand into test markets in March 1952 through at least May 1956 (6). In all, an estimated 11.7 billion cigarettes (585 million packs) were sold in the United States using this design (7) with advertising that emphasized the "health protection" supposedly provided by the filter (8).

The availability of unopened packs of original Kent cigarettes from cigarette pack collectors has permitted us to confirm the presence of crocidolite in the filters and to determine whether asbestos fibers entered the mainstream smoke from these cigarettes.

## Materials and Methods

**Cigarettes.** Cigarettes from an unopened pack of Kent cigarettes with intact cellophane bearing a Pennsylvania tax stamp, dated by its federal tax stamp as having been made in 1955 or later, were used to confirm the presence of crocidolite, to measure the amount of asbestos in a single filter, to conduct a preliminary smoking experiment, and to examine the proximal filter end by scanning electron microscopy. The filters appeared undisturbed and in good condition. Cigarettes from an unopened pack of Kent cigarettes with intact cellophane bearing a Vermont state tax stamp, dated by its federal tax stamp as having been made in 1952, were used in the smoking experiments. These cigarettes were in excellent condition. There was no mold or discoloration, and the filters appeared intact and undisturbed.

**Asbestos Content of the Filter by Weight.** A filter was removed with a scalpel, weighed to 0.1 mg, and ashed in a muffle furnace at 450–500°C overnight. The weighed residue is reported as the mass of asbestos in the filter.

**Preliminary Smoking Experiment.** Four cigarettes were smoked on a standard, piston-type smoking machine at the American Health Foundation (Borgwaldt smoking machine RM 1/G, Hamburg, Germany; Ref. 9). The standard protocol was modified by the use of MCE[3] filters instead of Cambridge filters to trap smoke particles. Grids prepared for TEM from the MCE filters were contaminated heavily with glass fibers identical to those that comprise Cambridge filters. This contamination made it impossible to analyze these grids for crocidolite.

**Smoking Apparatus (Smoker).** Because of the contamination problem we encountered using the conventional smoking machine, a piston-type smoker was designed to smoke the cigarettes and collect smoke particles. The smoker consisted of a modified, new, 30-ml syringe (Becton Dickinson, Norcross, GA). The receiving end was bored out to 9 mm, and the intact syringe was washed out with xylene to remove the Dow 360 medical silicone lubricant. It was then relubricated with glycerol.

**Treatments and Smoking.** Cigarettes were humidified to a moisture content of $9 \pm 1\%$ (SD; Ref. 10). Two puffs were taken from each of nine cigarettes. Before insertion into the smoker, 3 of the cigarette filters were rolled (360° between the thumb and forefinger with 1–2 mm inward deflection) and 3 were pinched (once between thumb and forefinger with 1 mm inward deflection). The remaining three were not manipulated prior to insertion into the apparatus. Smoking was accomplished by inserting a cigarette into the receiving end of a syringe, sealing the cigarette at the syringe with commercially available silicone sealant, suspending the smoker assembly vertically, and lighting the cigarette with a butane lighter. After lighting, the plunger was pulled to $30 \pm 1$ ml within 1–2 seconds, and the cigarette was extinguished by capping with a preformed aluminum foil snuffer. The entire assembly was allowed to stand vertically for 90 min. For second puff experiments, the cigarette was transferred to a second syringe, sealed, relit, and smoked as already described. After standing, the cigarette and plunger were removed carefully.

Puff residue inside the smoker was prepared and examined as follows: the plunger was reinserted; the syringe assembly was filled with 20 ml of deionized distilled $H_2O$; capped with parafilm; hand shaken; and allowed to stand for 30 min. After standing, syringes were hand shaken, filled to 30 ml with deionized distilled $H_2O$, and the contents were pulled through a 13-mm 0.22-μm pore-size MCE filter. The MCE filter was then prepared for TEM analysis according to our laboratory's modification of the standard EPA protocol (11). Six control samples, 1991 Kent filter cigarettes, were smoked and analyzed in the same manner as 1950s cigarettes. Three blank samples consisting of laboratory air drawn through the smoking device, as well as six concurrent laboratory blanks, were also analyzed.

**Microscopy of Filters and Smoke.** To determine filter fiber types, fiber samples from the filter of a cigarette end were placed on a glass slide in refractive indices immersion liquid Series B 1.680 (Cargille Laboratories, Cedar Grove, NJ) and examined by polarizing light microscopy for morphology extinction, pleochroism, and sign of elongation.

To identify fiber types and fiber arrangement at the mouthpiece end of the cigarette filter, filters were removed from smoked and unsmoked cigarettes and examined with a Hitachi S-800 field emission scanning electron microscope. Fiber chemistry was determined with the use of a Tracor Northern TN 5500 EDXA system.

Puff residue was examined for asbestos structures content with the use of either a JEOL 1200 EX or Hitachi 7110 TEM at a magnification of ×20,000. Asbestos structures were identified positively by their morphology, by their chemistry with the use of a Tracor Northern TN 5500 or Kevex Delta Class 5

Received 3/3/95; accepted 4/21/95.

The costs of publication of this article were defrayed in part by the payment of page charges. This article must therefore be hereby marked *advertisement* in accordance with 18 U.S.C. Section 1734 solely to indicate this fact.

[1] This work was supported in part by Plaintiffs Action; the authors exercised full control over the design and execution of the study as well as the interpretation and reporting of the study results.

[2] To whom requests for reprints should be addressed, at Materials Analytical Services, Inc., 3597 Parkway Lane, Suite 250, Norcross, GA 30092.

[3] The abbreviations used are: MCE, mixed cellulose ester; TEM, transmission electron microscopy; EDXA, energy-dispersive X-ray analysis system.

2232

Downloaded from cancerres.aacrjournals.org on January 29, 2013
Copyright © 1995 American Association for Cancer Research

CROCIDOLITE ASBESTOS FIBERS IN CIGARETTE SMOKE



Fig. 1. Mouthpiece end of an original Kent Micronite filter.

energy dispersive X-ray analysis system, and by their crystalline structure with the use of selected area electron diffraction. Asbestos structures were counted and classified according to standard EPA protocols (11).

## Results

Fig. 1 shows the mouthpiece end of an original Kent cigarette Micronite filter. Fibers comprising the web between crepe paper

layers were of two types, organic and inorganic. The inorganic fibers were confirmed by polarizing light microscopy to be crocidolite asbestos; a single filter contained 10 mg of crocidolite. On the basis of a fiber length of 5 $\mu$m, a diameter of 0.1 $\mu$m, and a density of 3.2 gm/cm$^3$, 1 filter could contain as much as 80 billion crocidolite asbestos fibers.

Under scanning electron microscopy, the organic fibers had the appearance of typical cellulose acetate. The dense fibers and fiber aggregates protruding from the mouthpiece of the filter seen with the use of scanning electron microscopy were confirmed to be crocidolite asbestos by EDXA (Figs. 2 and 3).

TEM analysis of puff residue showed that all cigarettes smoked released asbestos structures as fibers or fiber aggregates (clusters, bundles, or matrices of fibers) in both puffs (Fig. 4). These structures were identified positively as crocidolite by EDXA and selected area electron diffraction.

Data from the first and second puff experiments are shown in Table 1. Rolled cigarettes released from 64,410 to 156,600 total crocidolite structures in 2 puffs, and between 12,960 and 17,070 of these were 5 $\mu$m or longer. Pinched cigarettes released from 28,110 to 132,060 total crocidolite structures in 2 puffs, and between 4,950 and 6,330 of these were 5 $\mu$m or longer. Nonmanipulated cigarettes released from 76,200 to 728,520 total crocidolite structures in 2 puffs, and between 3,690 and 35,250 of these were 5 $\mu$m or longer. Overall, a mean of 170,240 crocidolite structures, including 18,020 structures 5 $\mu$m or more in length, were released in two puffs from a single cigarette. No



Fig. 2. Face view of mouthpiece end of filter. *Arrows*, crocidolite asbestos. *A* and *B*, scanning electron microscopy.

2233

Downloaded from cancerres.aacrjournals.org on January 29, 2013
Copyright © 1995 American Association for Cancer Research

CROCIDOLITE ASBESTOS FIBERS IN CIGARETTE SMOKE



Fig. 3. Side view of mouthpiece end of filter. *Arrows*, crocidolite asbestos. *A* and *B*, scanning electron microscopy.

crocidolite structures were observed in any of the control or blank samples.

## Discussion

Our data confirm the results of two series of TEM-based tests of Kent cigarette smoke performed in early 1954, one TEM series performed by Althea Revere (Life Extension Foundation), the other by Douglas Halgren and Dr. Ernest Fullam (Ernest Fullam Laboratories, Schenectady, New York). While both original reports have been lost, it is clear from other documentation that both laboratories observed asbestos structures in mainstream smoke from Kent cigarettes (12). These two studies were among the first to use electron microscopy to detect individual asbestos fibers. The present work extends these earlier studies by quantifying the amount of crocidolite released from the filter during the smoking process.

The number of structures observed in mainstream smoke in the present study is substantial. Extrapolating the observed average structure count to smoking 1 pack/day for 1 year, there would be 1.24 billion structures in the first 2 puffs of 7,300 cigarettes, and 132 million of these structures would be longer than 5 μm. Some authors have suggested that asbestos structures longer than 5 μm have a greater carcinogenic potential than do structures less than 5 μm (13).

Although a large number of fibers entered the smoke stream, only a small fraction of the total amount of crocidolite in the filter was released. We estimate that the average number of structures observed

in the first two puffs represents less than 0.001% of the crocidolite in a single original Micronite filter.

While asbestos was found in smoke from each cigarette, there was substantial cigarette to cigarette variability in the amount released. Rolling or pinching the filters prior to smoking did not seem to influence the results. The observed variability may be a consequence of the design and manufacturing process of the filter itself. Crocidolite was mixed mechanically with textile fibers, and this mixture was then

Table 1 *Asbestos structures per puff (30 ml)*

| Cigarette | PUFF 1 | | PUFF 2 | | BOTH PUFFS | |
|---|---|---|---|---|---|---|
| | Total structures | Structures >5 μm | Total structures | Structures >5 μm | Total structures | Structures >5 μm |
| **Rolled, smoked** | | | | | | |
| 1 | 37,860 | 2,280 | 118,740 | 10,680 | 156,600 | 12,960 |
| 2 | 62,430 | 13,740 | 1,980 | 1,320 | 64,410 | 15,060 |
| 3 | 89,700 | 16,140 | 23,250 | 930 | 112,950 | 17,070 |
| **Pinched, smoked** | | | | | | |
| 4 | 27,570 | 6,330 | 540 | 0 | 28,110 | 6,330 |
| 5 | 114,600 | 17,190 | 17,460 | 1,740 | 132,060 | 18,930 |
| 6 | 14,130 | 2,250 | 29,970 | 2,700 | 44,100 | 4,950 |
| **Nonmanipulated smoked** | | | | | | |
| 7 | 112,860 | 16,920 | 76,350 | 18,330 | 189,210 | 35,250 |
| 8 | 459,840 | 18,390 | 268,680 | 29,550 | 728,520 | 47,940 |
| 9 | 11,760 | 480 | 64,440 | 3,210 | 76,200 | 3,690 |
| Mean | 103,417 | 10,413 | 66,823 | 7,607 | 170,240 | 18,020 |

2234

Downloaded from cancerres.aacrjournals.org on January 29, 2013
Copyright © 1995 American Association for Cancer Research

CROCIDOLITE ASBESTOS IN CIGARETTE SMOKE



Fig. 4. Crocidolite asbestos in mainstream smoke from an original Kent cigarette. TEM; ×3000.

layered onto a paper backing. Several such layers of fibers and paper were then twisted and rolled into a filter (2–5). This mechanical process would have resulted in crocidolite fibers in each filter being distributed unevenly at the proximal end. In some cases, the disposition of fibers would have favored a large release, while in others, the geometry would have permitted less to enter the mainstream smoke. Our scanning electron microscopy observations confirm the plausibility of this explanation (Figs. 2 and 3).

Our data probably underestimate the amount of crocidolite released in an actual smoking situation for 3 reasons: (*a*) these tests examined only smoke from the first 2 puffs, and there was still substantial release of asbestos during the second puff; (*b*) the numbers given, in conformance with EPA counting rules (11), reflect "structures" and not "fibers." Overall, 18.7% of the structures observed were aggregates rather than individual fibers. An aggregate includes at least 3 and often hundreds of fibers; and (*c*) the structures recovered from the smoking apparatus are only those that had settled on the interior of the syringe and had become suspended in the wash water. Structures that remained adherent to the wall were not counted.

Of all the forms of asbestos, crocidolite is implicated most strongly as causing mesothelioma (14–16), and the risk of mesothelioma in exposed populations reaches its peak 35 to 40 years after exposure (13). An epidemic of asbestosis, lung cancer, and mesothelioma has occurred among workers at the factory where the filters for the original Kent cigarette were made (17).

Recently, Pauly *et al.* (18) have shown that 12 popular brands of cigarettes shed filter material into the smoke stream and that those fibers are deposited into the lungs during the smoking experience. On the basis of results from the present study and the study of Pauly *et al.* (18), in conjunction with the earlier work by Revere, Fullam, and Halgren (12), we conclude that the original Kent cigarettes tested at our laboratory accurately represent how the cigarettes would have released crocidolite fibers if tested in the same manner in the early 1950s. This in turn strongly suggests that there is an increased risk of mesothelioma among people who smoked these cigarettes during that time point.

While the original version of Kent was on the market, the brand had an overall market share of 0.72% (7). Its best year was 1954, when it accounted for 1.1% of the market. In that year, about 550,000 packs were sold each day. Thus, up to several hundred thousand people still alive were exposed to substantial amounts of crocidolite from smoking this cigarette.

## Acknowledgments

The authors are grateful to Dr. Klaus D. Brunnemann (American Health Foundation, Valhalla, NY) for advice and technical assistance.

## References

1. Miller, L. M., and Monahan, J. Wanted—and available—filter-tips that really filter. Reader's Digest, *August:* 43–49, 1957.
2. Knudson, H. W. Filter for Tobacco Smoke. United States Patent No. 2,761,798, September 4, 1956.
3. Knudson, H. W. Method of Making a Filter for Tobacco Smoke. United States Patent No. 2,765,515, Oct. 9, 1956.
4. Parmele, H. B. Apparatus for and Method of Making Filters. United States Patent No. 2,793,572, May 28, 1957.
5. Parmele, H. B. Method of Making a Tobacco Smoke Filter. United States Patent No. 3,039,908, June 19, 1962.
6. P. Lorillard Co. Answers to Interrogatories. Civil Action No. 90–7049, Philadelphia: Federal District Court, January 16, 1991.
7. Maxwell, J. C. Historical Sales Trends in the Cigarette Industry. Richmond, VA: Wheat, First Securities, Inc., 1989.
8. P. Lorillard Company. Advertisement for Kent Cigarettes. Life, *34:* 110–111, 1953.
9. Pillsbury, H. C., Bright, C. C., O'Connor, K. J., and Irish, F. W. Tar and nicotine in cigarette smoke. J. Assoc. Off. Anal. Chem., *52:* 458–462, 1969.
10. Wolman, W., and Stark, R. R. A study of cigarettes, cigarette smoke, and filters. I. Filter-tip cigarettes. JAMA, *152:* 917–920, 1953.
11. Environmental Protection Agency. Asbestos Containing Materials in Schools: Final Rule and Notice. 40 CFR Part 763, p. 41864. Washington DC: Federal Register III, 1987.
12. Parmele, H. B. Letter to W. J. Halley, President of P. Lorillard Co., April 26, 1954. Ierardi *vs.* Lorillard. Civil Action 90–7049, Exhibit No. 205, October 29, 1991.
13. Mossman, B. T., and Gee, B. L. Asbestos-related diseases. N. Engl. J. Med., *320:* 1721–1730, 1989.
14. Churg, A. Chrysotile, tremolite, and malignant mesothelioma in man. Chest, *93:* 621–628, 1988.
15. Wagner, J. C. The discovery of the association between blue asbestos and mesotheliomas and the aftermath. Br. J. Ind. Med., *48:* 399–403, 1991.
16. McDonald, J. C., Armstrong, B., Case, B., *et al.* Mesothelioma and asbstos fiber type: evidence from lung tissue analyses. Cancer (Phila.), *63:* 1544–1547, 1989.
17. Talcott, J. A., Thurber, W. A., Kantor, A. F., *et al.* Asbestos-associated diseases in a cohort of cigarette-filter workers. N. Engl. J. Med., *321:* 1220–1223, 1989.
18. Pauly, J. L., Heather, A. A., Rodriguez, M. I., and Streck, R. J. Fibers released from cigarette filters: an additional health risk to the smoker. Cancer Res., *55:* 253–258, 1995.

Downloaded from cancerres.aacrjournals.org on January 29, 2013
Copyright © 1995 American Association for Cancer Research

# Exhibit 51

Applied Occupational and Environmental Hygiene
Volume 17(1): 55–62, 2002
Copyright © 2002 Applied Industrial Hygiene
1047-322X/02 $12.00 + .00

# Fiber Release During the Removal of Asbestos-Containing Gaskets: A Work Practice Simulation

**William E. Longo, William B. Egeland, Richard L. Hatfield, and Larry R. Newton**
*Materials Analytical Services, Inc., Suwanee, Georgia*

Downloaded by [Jonathan George] at 11:04 03 July 2011

Work practice studies were conducted involving the removal of asbestos-containing sheet gaskets from steam flanges. These studies were performed to determine potential exposure levels to individuals who have worked with these types of materials in the past and may still work with these products today. The work practices were conducted inside an exposure characterization laboratory (ECL) and were performed by scraping and wire brushing, chrysotile-containing (65% to 85%) sheet gaskets from a number of used steam flanges. Airborne asbestos levels were measured by phase contrast microscopy (PCM) and transmission electron microscopy (TEM) for the personnel and area air samples collected during the study. These workplace simulations showed substantial asbestos fiber release using scraping, hand wire brushing, and power wire brushing techniques during the gasket removal process. The range of concentration was 2.1 to 31.0 fibers/cc greater than 5 micrometers when measured by PCM. These results contrasted with the few reported results in the published literature where lower airborne asbestos levels were reported. In these studies the airborne asbestos fiber levels measured in many of the samples exceeded all current and historical Occupational Safety and Health Administration (OSHA) excursion limits (15–30 minutes) and some previous permissible exposure limits (PEL) based on eight-hour time-weighted average (TWA) standards. Also, individuals who performed this type of work in the past may have had exposures higher than previously suspected. The results demonstrated that employees who remove dry asbestos-containing gaskets with no localized ventilation should wear a full face supplied air respirator with a HEPA escape canister and the work area should be designated a regulated area.

**Keywords**    Asbestos, Gasket, Removal, Exposure

Asbestos-containing sheet gaskets have been used in almost every type of industry for the last 60 years. These gaskets had the ability to prevent leakage between different types of couplings, particularly at elevated temperature and pressure.[1] These types of gaskets normally contained 70 percent to 80 percent chrysotile asbestos by weight. In some cases crocidolite asbestos was used for special applications, that is, sealing flanges in acid lines. The remaining non-asbestos component of the gasket was usually constructed of synthetic rubber material that consisted of either neoprene, styrene butadiene rubber (SBR), or a nitrile polymer.[2–4]

Most companies replaced asbestos fibers in their gasket products with other nonmineral fibers in the late 1980s or early 1990s. This coincided with the Environmental Protection Agency's (EPA) 1989 ban on the manufacture, importation, processing, and distribution of these types of products.[5] However, the United States Fifth Circuit Court of Appeals vacated most of the asbestos ban and Phase Out Rule and remanded it back to EPA in October 1991. Although the court vacated and remanded most of the rule, it left intact the portion that regulated asbestos products that were not being manufactured, produced, or imported when the rule was published in December 1989. Since asbestos-containing sheet gaskets were still being imported into this country, they were exempt from the ban and can still be manufactured, purchased, and used in the United States.

Fowler recently described the problem with the use of these products when he demonstrated that the application of asbestos-containing gaskets had the potential to release respirable asbestos fibers well above current OSHA standards. Fowler recommended that these products should not be used in today's industry and that only non-asbestos gaskets should be used in their place.[6]

An issue that faces many former industrial workers is the past use of these types of gaskets. Workers were not informed in most cases that the products they were using had the potential to release elevated levels of respirable asbestos fibers. Legal issues concerning past exposures pose this basic question: Did handling and performing maintenance activities on these gaskets contribute to their asbestos exposure history? Industrial hygienists must rely on a retrospective exposure assessment to make

Case 3:16-md-02738-MAS-RLS     Document 33132-6     Filed 08/23/24     Page 199 of 218
PageID: 250821

Downloaded by [Jonathan George] at 11:04 03 July 2011

this determination.[7] In this approach the individual's work history is compared to the results of retrospective exposure assessment studies that replicate their work activities.

A review of the peer-reviewed literature found very few published studies involving exposure assessments during the dry removal of asbestos sheet gaskets from flanges.[7–9] The studies of Cheng, Millette, and McKinery were somewhat limited in the information reported. Millette used only a small number of flanges. Cheng's work did not verify that all the gaskets contained asbestos. Additionally, there was only limited information provided in all three studies concerning the size and the history of the flanges used or the length of time required for the gasket removal process.

The most comprehensive study to date was by Spence et al.[10] However, the authors used wetting to control the airborne release of asbestos fibers. This limited the study's value for any retrospective exposure assessment since dust control methods were not used in the workplace historically.

In contrast to the previous studies, the goal of these new work practice studies was to estimate a worker's asbestos exposure during the removal of asbestos-containing sheet gaskets using common removal techniques such as scraping, hand wire brushing, and power wire brushing. The studies were conducted on a large population of steam line flanges and valve assemblies. The compilation of several studies discussed in this article allows a more accurate retrospective exposure assessment for individuals who worked with these products in the past and the assessment of potential exposure to workers who may be removing asbestos-containing gaskets today using these same work practices.

High-intensity lighting and videotaping techniques were used inside an exposure characterization laboratory (ECL) during the work practice studies to visually document the pathway of exposure during the gasket removal process and to help determine what activities produce the airborne asbestos dust.

The methods and procedures described in this report can be applied to assessing past and present industrial hygiene exposures to other dusts, fumes, and fibers besides asbestos. The videotaping of dust, fume, and fiber exposures under high-intensity light can be used as a training tool in visualizing the importance and effectiveness of engineering and administrative controls and respiratory protection.

## MATERIALS AND METHODS

A number of valve and flange assemblies were collected in 1994 from a paper mill powerhouse in Oregon and stored under ambient conditions in a protective environment until their use in these studies. A sampling of these flange and valve assemblies was partially opened to confirm the presence of asbestos in the sheet gaskets using polarized light microscopy (PLM) prior to the work practice study.[11] Any opened flanges were reassembled and the outside surfaces of all the flanges were cleaned, sand blasted, and repainted. Interviews with former machinists and

pipefitters determined that the most common techniques for removing gasket material tightly adhered to the flange surface were hand scraping, hand wire brushing, and/or electric wire brushing.

The work practice simulations were conducted inside an exposure characterization laboratory (ECL) that was constructed as a containment area to prevent the release of asbestos to the outside environment. The dimensions of this containment area were 6.0 m (length) × 4.5 m (width) × 2.4 m (height). The ECL also contained two viewing ports for videotaping purposes and had a decontamination area for contaminated clothing disposal, an air lock for sample removal, and showers to further control fugitive emissions.

Fresh air was produced by a high efficiency particulate absolute (HEPA) filtered negative air machine manufactured by Aramsco (model #55011) and pulled through the ECL at a ventilation rate of 5.7 cubic meters per minute. This unit was operated at an air exchange rate of five times per hour (ACH) during the work practice studies. The air in the chamber was flushed between studies by increasing the fresh air ventilation to 28.3 cubic meters per minute for a minimum of 24 hours. At the end of the first scraping and hand wire brushing study (Study 1), the ECL was completely decontaminated by HEPA vacuuming all dust and debris and then wet wiping. Also, all inside surfaces were repainted after the decontamination procedure.

High-intensity lighting (700–1000 watts) was used inside the chamber during videotaping of the work practice to document dust generated by various tasks and to observe pathways of exposure to respirable dust. In previous studies the use of high-intensity lighting was found to be an effective tool to display respirable airborne dust released from asbestos-containing products during work activities.[12,13] The authors performed these studies wearing normal work clothes over disposable protective suits and were equipped with supplied air respiratory protection with HEPA escape filters.

Personal and area air samples were collected during the studies using nonconductive three-piece cassettes. The cassettes contained mixed cellulose ester (MCE) filters that were 25 millimeters in diameter and had a 0.8 micrometer pore size. These filters rested on a MCE backing filter (5.0 micrometer pores). The personal and area air sampling pumps were calibrated before and after the completion of each study against a DryCal primary flow meter to air flow rates of two and ten liters per minute, respectively. High-volume air-sampling pumps (Dawson 110 volt) were used for collecting area air samples during the studies. Four area samples were located in four equidistant quadrants at a distance of 2.1 meters from a work bench placed in the center of the ECL. The area sample cassettes were placed on sampling stands at a height of 1.5 meters. The four calibrated high-volume air sampling pumps were placed outside the chamber and each pump was connected to an area air cassette by Tygon tubing passing through the wall of the ECL.

The two investigators performing the studies were each fitted with two calibrated personal GilAir air sampling pumps with the air-sampling cassettes attached to each shoulder and within their

Downloaded by [Jonathan George] at 11:04 03 July 2011

breathing zones. Background area samples were collected inside and outside the ECL before each study. The air samples were collected in general accordance with the NIOSH 7400 method entitled, "Asbestos and Other Fibers by PCM."[14] Two air sampling cassettes were opened for 30 seconds inside the ECL to serve as personal field blanks at the end of each study.

Surface morphology of new and used gasket material was examined using a Hitachi S-800 field emission scanning electron microscope (SEM). Photomicrographs were taken of the gasket surfaces to document the degree of gasket degradation and the relative amount of asbestos fibers present on the surface.

### Study 1—Scraping and Hand Wire Brushing of Small Flange Assemblies

Seven small flange assemblies were used in this study. The gaskets had outside diameters of approximately 69 mm and working widths of approximately 19 mm. Gaskets were removed from one flange on the first four valve assemblies and then from two flanges on each side of the remaining three valve assemblies for a total of ten gaskets. The flange assemblies were first opened and then the gaskets were scraped using a stiff, four-inch-wide putty knife. Any residual gasket material that could not be removed from the flange faces by scraping was removed by hand wire brushing. Some of the gaskets required repetitive scraping and wire brushing to remove the gasket and to polish the flange face. The sheet gaskets were removed sequentially from each of the 10 flanges.

One of the investigators in the ECL simulated the worker who did all of the gasket removal while the other acted as a "helper." The helper changed the area and personal air sample cassettes periodically throughout the study. Each gasket was collected and retained for analysis to determine both asbestos content and matrix identification after removal. The investigators were in the ECL for 194 minutes. All air sample cassettes in the ECL were exchanged every 15 to 30 minutes. A total of seven sets of air samples were collected.

### Study 2—Scraping and Hand Wire Brushing of Large Flange Assemblies

Four large flange assemblies were used for this study. The outside diameter of these gaskets varied from 125 mm to 200 mm and the gaskets were 19 mm to 25 mm wide. The gaskets were removed and collected from the four flanges as described in Study 1. The investigators were in the ECL for 113 minutes. All air sample cassettes in the ECL were exchanged every 15 to 30 minutes. A total of five sets of air samples were taken during this work practice simulation.

### Study 3—Power Wire Brushing of Large Flange Assembly

An electric wire brush (Skil electric drill 0.3 Hp with a Columbian 10.2 cm crimped wire wheel) was used during this study to remove gasket residue that could not be removed during the scraping and hand wire brushing of the first flange assembly

used in Study 2. The electric wire brush was also used to polish the flange face surfaces. This study was conducted one day after Study 2. The ECL was not decontaminated between the studies. The two flange surfaces were electric wire brushed until the gasket residue was visibly removed. As previously described in Study 1, the two investigators were in the ECL performing the study.

One person did the removal work while the other assisted as the helper. The residual gasket material was not retained since the bulk of the material was collected in Study 2. The investigators were in the ECL for 42 minutes. The air cassettes in the ECL were exchanged every 10 minutes. A total of four sets of air samples were taken during the electric wire brushing activity.

All air filters collected were analyzed by PCM in general accordance with the NIOSH 7400 method using the "A" counting rules. Additionally, all air samples were prepared for TEM examination using the indirect preparation method.[15] The indirect TEM preparation method was chosen because filter overloading rendered the samples unsuitable for direct preparation despite frequent changing of the air sample cassettes. Also, the indirect TEM preparation method enabled data comparisons to other published and unpublished studies previously performed that also used the indirect TEM method.[16–18] The TEM air samples were then analyzed by a modified EPA Level II protocol.[19] Cloth swatches from the work clothing worn by the investigators during the studies were analyzed by the recommended EPA method.[20] Surface dust samples were collected from the work table after each gasket removal study and analyzed according to the ASTM protocol.[15] Background samples from the clothing and the work table surface were also collected before each study was started. The removed gaskets were analyzed for asbestos type and content by the standard PLM method.[11]

### RESULTS

It was determined by PLM that the gaskets removed in these studies contained 65 percent to 85 percent chrysotile asbestos (Table I). Table II and Table III, respectively, illustrate the PCM and TEM results for Study 1. The worker in Study 1 had a peak exposure level of 10.1 fibers per cubic centimeter (f/cc) and an 8-hour TWA exposure of 1.5 f/cc. The area air samples were voided after the completion of Study 1 when it was determined that the air-sampling lines into the ECL were obstructed. The

**TABLE I**
PLM analysis of removed gaskets

| Studies | Number of gaskets analyzed | Asbestos type | Concentration of asbestos in volume percent |
|---|---|---|---|
| Study 1 | 10 | Chrysotile | 65–80% |
| Study 2 | 4 | Chrysotile | 75–85% |
| Study 3 | 1 | Chrysotile | 85% |

Downloaded by [Jonathan George] at 11:04 03 July 2011

**TABLE II**

Study 1—Scraping and hand wire brushing: small flanges. PCM airborne
exposure levels (fibers greater than 5 micrometers)

| Sample type | No. of air samples analyzed | Range (f/cc) | Sample time weighed average (f/cc) | 8-hr TWA (f/cc) |
|---|---|---|---|---|
| Background | 4 | 0.0 | 0.0 | N/A |
| Worker | 14 | 1.5–10.1 | 3.7 | 1.5 |
| Assistant | 14 | 1.2–4.2 | 2.4 | 1.0 |
| Area samples[A] | 36 | — | — | — |

Total air-sampling time = 194 minutes.
[A]The air-sampling lines into the ECL were obstructed, voiding the area air samples in this study.

results for Study 2 are shown in Tables IV and V. The worker in this study had a peak exposure level of 24.0 f/cc and an 8-hour TWA of 3.6 f/cc. Table VI and Table VII list results for Study 3. The peak exposure level found while power wire brushing was 31.0 f/cc and the calculated 8-hour TWA was 2.3 f/cc. The results for the surface dust samples taken from the work table and the fabric samples are shown in Table VIII. All PCM and TEM data in the tables are expressed for comparison purposes as fibers per cubic centimeter (f/cc) greater than 5.0 micrometers in length.

## DISCUSSION

The asbestos concentrations measured in these studies were higher on average than other previously published studies for similar work practices.[7–9] It is believed that the higher concentrations found in these studies were due largely to the gaskets adhering more tightly to the flanges. Tightly adhered gaskets require higher energy for removal. As described by Fowler, the friability of the product is always relative to the energy applied.[6] Only two of the fourteen gaskets removed could have been described as easily detached. The other twelve required extensive effort on one or both of the flange faces. Machinists, pipefitters, steamfitters, and others commonly described sheet gaskets as tightly adhering to flange surfaces and requiring substantial work to remove the gasket material. Unfortunately, the various conditions and the amount of adhesion of the gaskets in the previously published studies were not reported.[7–9] The adhesion of gasket materials generally has been related to its length in

service and the conditions of service such as temperature and pressure. The high temperature steam flanges used in this study were from a steam powerhouse that operated for a number of years. The last steamfitter who maintained the steam system indicated that gasket replacement was rare due to infrequent plant downtime and few leaks. Gaskets that could be easily removed would not be expected to produce airborne levels comparable to what was found in these studies. None of the previous studies described the level of difficulty of removing the gaskets from the flange surfaces.

The air samples collected were analyzed by both PCM and TEM during the gasket removal activities in these studies. The two basic types of sample preparation for TEM air analysis are the direct and indirect methods.[15,16,21–23] Some scientists have suggested that the indirect sample preparation method, particularly the sonication step, causes large complex asbestos structures such as fiber bundles and clusters to break up and bias fiber counts to higher concentrations.[24,25] However, studies performed by the EPA and others have shown that this criticism is not valid and that the indirect technique is an acceptable method to analyze overloaded air samples.[26–28]

The overloading of other particulates on an air filter will obscure fibers that are collected. This condition can lead to the undercounting of asbestos fibers if a direct preparation method is used. Controlling the particulate loading on a filter can be difficult when the disturbance of materials generates large amounts of both fibrous and nonfibrous airborne particulates. The general approach to reduce or eliminate overloading conditions is to alter flow rates and sampling times. However, particulate loading can be controlled by using the indirect preparation method without compromising sampling times. The overloading problem can also affect the direct examination of air filter samples by PCM (NIOSH 7400 method). This was noted in Study 1. The asbestos air concentrations measured by PCM in Study 1 decreased as the study progressed. This would not be consistent with the continued activities that took place inside the ECL during the study. This effect was due to particulate overloading on the filters. However, according to the TEM data from Study 1, the asbestos fiber concentrations tended to increase as the work progressed. The sampling times for Studies 2 and 3 were reduced in an effort to minimize overloading on the PCM air samples.

**TABLE III**

Study 1—Scraping and hand wire brushing: small flanges.
TEM airborne exposure levels (asbestos fibers
greater than 5 micrometers)

| Sample type | No. of air samples analyzed | Range (fibers/cc) |
|---|---|---|
| Background | 4 | 0.0 |
| Worker | 14 | 29.9–144.2 |
| Assistant | 14 | 2.2–29.5 |

Total air-sampling time = 194 minutes.

FIBER RELEASE DURING THE REMOVAL OF ASBESTOS GASKETS

**TABLE IV**

Study 2—Scraping and hand wire brushing: large flanges. PCM airborne
exposure levels (fibers greater than 5 micrometers)

| Sample type | No. of air samples analyzed | Range (f/cc) | Sample time-weighted average (f/cc) | 8-hr TWA (f/cc) |
|---|---|---|---|---|
| Background | 4 | 0.0 | 0.0 | N/A |
| Worker | 10 | 9.3–24.0 | 15.3 | 3.6 |
| Assistant | 10 | 5.2–15.7 | 8.8 | 2.0 |
| Area samples[A] | 24 | 2.1–8.4 | — | — |

Total air-sampling time = 113 minutes.

[A] TWA not calculated for area or "bystander" samples.

Downloaded by [Jonathan George] at 11:04 03 July 2011

However, any further reduction in the sampling time would have had an impact on the work activities. Therefore, the air-sampling times were not decreased any further.

The current OSHA asbestos exposure standards are based on the NIOSH 7400 method. This method measures only fibers longer than 5 micrometers in length and greater than 0.25 micrometers in width. However, these fiber dimensions were not implemented by OSHA with regard to health issues. The minimum dimensions were implemented solely due to the fiber resolution limitations of the PCM technique.[29] OSHA has long recognized that PCM is not fiber-specific or able to resolve fibers that are less than 0.25 micrometers in width. The TEM analysis performed in these studies augmented the PCM measurements by obtaining more complete and accurate measurements of the airborne asbestos concentrations.

A comparison of the air data collected from the PCM and TEM analyses showed fiber concentrations approximately 30 times greater in the TEM analysis. The differences between TEM and PCM measurements have been recognized by others and are primarily due to the resolution limitations of the optical microscope.[30,31] The deficiencies of PCM measurements are especially acute when products such as sheet gasket materials that contain high percentages of chrysotile fibers are the source of the airborne fibers. It has been shown that free respirable chrysotile fibers are released when asbestos-containing products are abraded in some manner.[6]

Work by the EPA demonstrated that single chrysotile fibers have an average diameter of between 0.03 and 0.07 micro-meters.[32] This average diameter is approximately five times below the resolution of a phase contrast microscope. Therefore, single chrysotile fibers cannot be seen or counted using the PCM method, irrespective of their lengths. Because of the inherent errors in PCM analysis, it was suggested by the director of the Health Effects Institute for Asbestos Research that OSHA should consider changing to TEM air sample analyses for occupational workplace compliance to adequately protect workers' health.[33]

An SEM examination of the sheet gaskets was performed to better understand the relationship between the physical activity of removal and the measured asbestos air levels found in this study. Generally, sheet gaskets are comprised of approximately 70 percent chrysotile asbestos bundles in a synthetic rubber matrix. The SEM micrograph (Figure 1) shows large bundles of asbestos protruding from the matrix of new sheet gasket material. Any minimal disturbance or abrasion of these bundles can release asbestos fibers into the air. Another problem with asbestos gaskets is that the synthetic rubber matrix begins to deteriorate after installation. In most cases installed sheet gaskets are subjected to high temperature and pressure that will increase the rate of thermal decomposition of the rubber matrix. This produces cross-linking of the polymer molecules. The cross-linking process increases the gasket material's friability by causing the rubber matrix to degrade and become brittle.[34]

A comparison of the surface of a new gasket (Figure 1) to that of a used gasket removed from one of the flanges in Study 2 (Figure 2) demonstrates how the rubber matrix material is degraded. This degradation provides more opportunity for the release of asbestos fibers during the removal process. The fiber concentrations measured in Study 2 were higher than those measured in Study 1 even though more gaskets were removed in the first study. Factors believed to lead to these results were as follows: (1) The total gasket surface area removed in Study 2 was much larger than in Study 1, (2) The gaskets in Study 2 were observed to be more friable and more deteriorated, and (3) All the gaskets in Study 2 tore apart and remained adhered or attached to both of the flange faces when the flanges were opened.

An electric powered drill equipped with a wire brush was used to remove some residual gasket material from two flange faces in Study 3. The resulting exposures during the work activities

**TABLE V**

Scraping and hand brushing: large flanges. TEM airborne
exposure levels (asbestos fibers greater than 5 micrometers)

| Sample type | No. of air samples analyzed | Range (fibers/cc) |
|---|---|---|
| Background | 4 | 0.0 |
| Worker | 14 | 199.6–842.7 |
| Assistant | 14 | 13.6–101.0 |
| Area samples | 24 | 3.3–108.8 |

Total air-sampling time = 113 minutes.

Downloaded by [Jonathan George] at 11:04 03 July 2011

**TABLE VI**

Study 3—Power wire brushing. PCM airborne exposure levels
(fibers greater than 5 micrometers)

| Sample type | No. of air samples analyzed | Range (f/cc) | Sample time-weighted average (f/cc) | 8-hr TWA (f/cc) |
|---|---|---|---|---|
| Background | 4 | 0.09–0.12 | 0.11 | N/A |
| Worker | 7 | 14.9–31.0 | 21.8 | 2.3 |
| Assistant | 8 | 12.8–21.2 | 15.9 | 2.0 |
| Area samples[A] | 16 | 7.6–15.7 | — | — |

Total air-sampling time = 42 minutes.

[A]TWA not calculated for area or "bystander" samples.

were higher even though the residual gasket material was far less than the gasket materials removed in Study 1 and Study 2. It was observed in Study 3 that the mechanical action generated from the power wire brush tore loose more asbestos fibers and propelled them greater distances into the air. This observation supported the higher asbestos air concentrations of the area samples measured in Study 3 compared to those measured in Study 2. The results from the surface dust and fabric samples (Table VIII) showed that the surface asbestos levels measured can be classified as "highly contaminated" and pose additional exposure problems to the worker throughout the workday. Additional asbestos exposure can occur to both the worker and other family members if the clothes are worn away from the job or taken home.[35]

## CONCLUSIONS AND RECOMMENDATIONS

These studies, as well as the other studies previously discussed, demonstrate that there can be wide variability in airborne asbestos fiber levels generated during the removal of asbestos-containing gaskets from flanges. The variability of fiber levels released is most likely dependent on the condition of the asbestos gasket, the size of the gasket surface area and the method of removal. The condition to which a gasket is subjected determines the degree of adhesion of the gasket to the flange surface and the friability of the gasket. This impacts the amount of energy required to remove the gasket and release asbestos fibers. The determining factors that seem to affect the condition of the gasket

are: length of service, temperature and pressure conditions, and composition of the gasket matrix.

Our data show that dry removal methods typically used by machinists and pipefitters (past and present) result in significant airborne asbestos fiber exposures. For retrospective asbestos exposure assessments, the exposures measured by PCM in Studies 1, 2, and 3 exceed all historical OSHA excursion limits and some previous permissible exposure limits (PEL) based on an eight-hour TWA. The exposures also far exceed current OSHA levels. Therefore, former machinists and pipefitters that performed this type of work as part of their job activities would have had significant airborne asbestos exposures when removing tightly adhered gaskets on flange surfaces.

Under normal lighting, airborne dust is invisible even though the asbestos levels measured are above OSHA excursion limits. Therefore, an individual removing asbestos-containing gaskets will be unaware of any airborne exposure problems under normal working conditions. High-intensity lighting (Tyndall Effect) was used by the investigators in these studies to observe exposure mechanisms for workers performing normal work activities. The Tyndall Effect documented fiber release mechanisms and the pathways of exposure to the individuals removing the gaskets. Tyndall lighting is an alternative technique that industrial hygienists can use to check potential airborne dust emissions in the workplace. The Tyndall lighting technique can visually demonstrate to workers and employers if there is a need for air sampling, additional ventilation, respiratory protection, and/or special work practices.

There are still significant numbers of asbestos gaskets currently being used in the United States. OSHA classifies the

**TABLE VII**

Study 3—Power wire brushing. TEM airborne exposure levels (asbestos fibers greater than 5 micrometers)

| Sample type | No. of air samples analyzed | Range-fibers/cc |
|---|---|---|
| Background | 4 | 0.0–0.2 |
| Worker | 7 | 877.1–1636.1 |
| Assistant | 8 | 60.4–364.4 |
| Area samples | 16 | 56.9–801.9 |

Total air-sampling time = 42 minutes.

**TABLE VIII**

TEM fabric and surface dust contamination levels

| Studies | Fabric-fibers/cm$^2$ | Surface dust-fibers/cm$^2$ |
|---|---|---|
| Study 1 | 981 thousand | 8.5 million |
| Study 2 | 3.2 million | 27.8 million |
| Study 3 | 19.3 million | 57.4 million |

All background control samples and field blanks analyzed were below the analytical detection limit.

Downloaded by [Jonathan George] at 11:04 03 July 2011



**FIGURE 1**

Scanning electron micrograph of the surface of a new asbestos-containing gasket. Both the chrysotile fibers and polymer matrix are visible. Magnification 1000×.



**FIGURE 2**

Scanning electron micrograph of the surface of a used asbestos-containing gasket. The majority of the material present is only chrysotile asbestos. Magnification 1000×.

removal of asbestos-containing gaskets as Class II work of short duration.[36] This specification by OSHA only addresses a single gasket removal project. However, interviews with pipefitters and machinists indicate that only removing one gasket at a time was not a typical occurrence. Under current OSHA regulations, the removal of asbestos-containing gaskets requires the use of a glove bag and wetting methods to contain the release of asbestos fibers into the workplace. Unfortunately, the glove bag and wetting methods are not always practical in an actual workplace due to production and maintenance schedule pressures and the difficulty in wetting a rubber based gasket.

The results of these studies indicate that employers need to determine if asbestos-containing gaskets are present in their equipment. The employer must immediately comply with OSHA's Class II provisions by implementing a safe operating procedure that includes employee training, assessment/monitoring, containment, and good work practices. The following actions are recommended if asbestos-containing gaskets are removed without a glove bag and wetting: (1) A negative pressure enclosure should be used, (2) The enclosure should have a HEPA filtering/air blower system, (3) A HEPA vacuum cleaner and wetting agents should be used, and (4) The worker should wear a respirator appropriate for the airborne asbestos concentrations generated by the activities.

The data presented here demonstrate that the work surfaces in these studies as well as the clothing worn by the investigators were highly contaminated with asbestos fibers. An asbestos-contaminated workplace can lead to additional asbestos exposures. The disturbance of the dust around the work area by other work activities and housekeeping activities will re-entrain asbestos fibers into the air.[35] The wearing, changing, and washing of the contaminated clothing can also lead to asbestos exposures for both a worker and family members.

## REFERENCES

1. Bowler, W.J.: Hows and Whys of Packing of Gaskets, Paper Trade Journal. Oct. (1965).
2. Garlock Industrial Products Catalog. (1969).
3. Klinger Compressed Gasket Materials Catalog. (1983).
4. Crane Packing Company, Catalog 60-R-2. (1954).
5. Environmental Protection Agency (EPA): 40 CFR Part 763, Asbestos: Manufacture, Importation, Processing and Distribution in Commerce Prohibitions; Final Rule. Title 40, Code of Federal Regulations, Part 763, Fed. Reg. 54(132), July (1989).

Downloaded by [Jonathan George] at 11:04 03 July 2011

6. Fowler, D.P.: Exposure to Asbestos Arising from Bandsawing Gasket Material. Appl Occup Environ Hyg 15(5):404–408 (2000).

7. Cheng, R.T.; McDermott, H.J.: Exposure to Asbestos from Asbestos Gaskets. Appl Occup Environ Hyg 6(7):588–591 (1991).

8. McKinery, W.N.; Moore, R.W.: Evaluation of Airborne Asbestos Fiber Levels During Removal and Insulation of Valve Gaskets and Packing. Amer Indus Hyg Assoc J 53(8):531–532 (1992).

9. Millette, J.R.; Mount, M.D.; Hays S.M.: Releasability of Asbestos Fibers from Asbestos Containing Gaskets. Environ Choices—Tech Supp 2:10–15 (1995).

10. Spence, S.K.; Rocchi, P.S.J.: Exposure to Asbestos Fibers During Gasket Removal Ann Occup Hyg 40(5):583–588 (1996).

11. Environmental Protection Agency (EPA): Method for the Determination of Asbestos in Bulk Building Materials. EPA/600/R93-116. EPA, Washington, DC (1993).

12. Chambers, D.T.: Dust Control Development In: Asbestos, S. Chissick, R. Derricott, Eds. vol. 2, Properties, Applications and Hazards, pp. 193–211, John Wiley & Sons, New York (1983).

13. Selikoff, I.J.: Insulation Hygiene Progress Report 3(4): Winter (1971).

14. National Institute for Occupational Safety and Health (NIOSH): Asbestos and Other Fibers by PCM—Method 7400. NIOSH Manual of Analytical Methods 4th ed., DHHS (NIOSH) Publ. No. 94-113, NIOSH, Cincinnati, OH (1994).

15. American Society for Testing Materials (ASTM): Standard Test Method for Microvacuum Sampling and Indirect Analysis of Dust by Transmission Electron Microscopy for Asbestos Structure Number Concentration. D5755-95. ASTM, (1995).

16. Keyes, D.L.; Chesson, J.; Ewing, W.M.; et al.: Exposure to Airborne Asbestos Associated with Simulated Cable Installation Above a Suspended Ceiling. Amer Indus Hyg Assoc J 52(11):479–484 (1991).

17. Keyes, D.L.; Ewing, W. M.; Hayes, M.S.; et al.: Baseline Studies of Asbestos Exposure During Operations and Maintenance Activities. Appl Occup Environ Hyg 9(11):853–860 (1994).

18. Ewing, W.M.; Chesson, J.; Dawson, T.A.; et al.: Asbestos Exposure During and Following Cable Installation in the Vicinity of Fireproofing. Environ Choices—Tech Supp 2:23–18 (1993).

19. Environmental Protection Agency (EPA): Methodology for the Measurement of Airborne Asbestos by Electron Microscopy. EPA Draft Report, Contract No. 68-02-3266. EPA, Washington, DC (1984).

20. Chatfield, E.J.: Analytical Protocol for Determination of Asbestos Contamination of Clothing and Other Fabrics. Microscope 38:221–222 (1990).

21. Environmental Protection Agency (EPA): Asbestos-Containing Materials in Schools: Interim Transmission Electron Microscopy Methods, Title 40. Code of Federal Regulations. Part 763, Subpart E, Appendix A (1987).

22. Environmental Protection Agency (EPA): Electron Microscope Measurement of Airborne Concentrations. EPA-600/2-77-178. EPA, Washington, DC (1978).

23. International Organization for Standardization (ISO): Ambient Air, Determination of Asbestos Fibers, Indirect-Transfer Transmission Electron Microscopy Method, ISO 13794. ISO (1999).

24. Sahle, W.; Laszlo, I.: Airborne Inorganic Fibre Level Monitoring by Transmission Electron Microscopy (TEM). Comparison of Direct and Indirect Sample Transfer Methods. Ann Occup Hyg 40(1):29–44 (1996).

25. Lee, R. J.; Dagenhaut, T.V.; Dunmyre, G.R.; et al.: Effect of Indirect Sample Preparation Procedures on the Apparent Concentration of Asbestos in Settled Dusts. Environ Sci Technol 29(7):1728–1738 (1996).

26. Environmental Protection Agency (EPA): Comparison of Airborne Asbestos Levels Determined by Transmission Electron Microscopy (TEM) Using Direct and Indirect Transfer Techniques. EPA 560/5-89-004. EPA, Washington, DC (1990).

27. Crankshaw, O.S.; Perkins, L.R.; Beard, M.E.: Quantitative Evaluation of the Relative Effectiveness of Various Methods for the Analysis of Asbestos in Settled Dust. Environ Choices—Tech Supp 4:6–12 (1996).

28. Hatfield, R.L.; Krewer, J.A.; Longo, W.E.: A Study of the Reproducibility of the Micro-Vac Technique as a Tool for the Assessment of Surface Contamination in Buildings with Asbestos-Containing Materials. In: Advances in Environmental Measurement Methods for Asbestos, M.E. Beard, H.L. Rook, Eds., pp. 301–312. American Society for Testing Materials (2000).

29. Occupational Safety and Health Administration (OSHA): Occupational Exposure to Asbestos, Tremolite, Anthophyllite, and Actinolite; Final Rules. Federal Register 51:119 p. 22680 (1986).

30. Snyder, J.G.; Virta, R.L.; Segreti, J.M.: Evaluation of the Phase Contrast Microscopy Method for the Detection of Fibrous and Other Elongated Mineral Particulates by Comparison with a STEM Technique, Amer Indus Hyg Assoc J 48(5):471–477 (1987).

31. Maccoui, A.; Menichini, E.; Paoletti, L.: A Comparison of Light Microscopy and Transmission Electron Microscopy Results in the Evaluation of the Occupational Exposure to Airborne Chrysotile Fibers. Ann Occup Hyg 28(3):321–331 (1984).

32. Environmental Protection Agency (EPA): Environmental Release of Asbestos from Commercial Product Shaping. EPA 1600/S2-85/044. Cincinnati, OH (1985).

33. Communication between Mr. Archibald Cox, Chairman, Board of Directors for the Health Effects Institute Asbestos Research; and Mr. David Zeigler, Acting Assistant Secretary for the Occupational Safety and Health Administration, August (1993).

34. Sommer, J.G.: Rubber Molding Methods. In: Handbook of Polymer Science & Technology, N.P. Cheremisinoff, Ed. vol. 3, Applications and Processing Operations, pp. 311–372. Marcell Decker, New York (1989).

35. Millette, J.R.; Hays, S.M.: Settled Asbestos Dust Sampling and Analysis. Lewis Publishers, CRC Press, Boca Roton, FL (1994).

36. Occupational Safety and Health Administration (OSHA): Asbestos, Construction Standard, Title 29, Code of Federal Regulations, Part 1926. 1101. General Industry Standard, Title 29, Code of Federal Regulations, Part 1910.1001 (1999).

Exhibit 52

# Zonolite Attic Insulation Exposure Studies

## WILLIAM M. EWING, STEVE M. HAYS, RICHARD HATFIELD, WILLIAM E. LONGO, JAMES R. MILLETTE

Several studies were designed and conducted to evaluate amphibole asbestos exposures in homes containing Zonolite (expanded vermiculite) attic insulation (ZAI). A range of tasks selected for evaluation included cleaning, working around, moving, and removal of ZAI in attics and living spaces. The fieldwork for these studies was conducted at two homes in Spokane, WA and one home in Silver Spring, MD. Personal and area air samples were collected and analyzed as part of the exposure studies. Surface dust samples and bulk samples were also collected and analyzed. The results demonstrated that airborne concentrations of amphibole asbestos were not elevated if the material is undisturbed. The results also demonstrated that cleaning, remodeling, and other activities did produce significant concentrations of airborne amphibole asbestos when the ZAI was disturbed. *Key words*: asbestos; vermiculite; amphibole; exposure; insulation; renovation; remodeling; demolition; industrial hygiene; Zonolite; ZAI.

INT J OCCUP ENVIRON HEALTH 2010;16:279–290

## INTRODUCTION

In 1926, the Vermiculite and Asbestos Company was formed to extract vermiculite from the Libby, MT area; since the time of the company's formation, it was known that vermiculite from Libby was contaminated with asbestos.[1] Two years later, on November 27, 1928, US patent number 1,693,015 was awarded to Joseph A. Babor and William L. Estabrooke for a molded insulating material made from expanded vermiculite, termed Zonolite.[2] One of the major uses of Zonolite was loose-fill insulation in attics of homes. By 1977 such loose-fill insulation, or Zonolite Attic Insulation (ZAI), consti-

Received from: Compass Environmental, Inc., Kennesaw, GA (WME); Gobbell Hays Partners, Inc., Nashville, TN (SMH), Materials Analytical Services, Inc., Suwanee, GA (RLH, WEL); MVA Scientific Consultants, Inc. (JRM). Funding for the field and laboratory work was provided through the firm of Richardson, Patrick, Westbrook, and Brickman of Charleston, SC from funds authorized by the court overseeing the W.R. Grace & Co. bankruptcy proceedings. Send correspondence to: William M. Ewing, Compass Environmental, Inc., 1751 McCollum Parkway NW, Kennesaw, GA 30144-5908; email: <wmewing@aol.com>.

*Disclosures*: The field study and laboratory analyses for this work were funded by attorneys representing claimants in the W.R. Grace & Co. bankruptcy proceedings. W.R. Grace & Co. formerly manufactured Zonolite expanded vermiculite attic insulation (ZAI) for use in homes. The authors have previously appeared as expert witnesses in asbestos litigation on behalf of building owners against former asbestos product manufacturers.

tuted 15 % of domestic vermiculite use.[3] During each year of the 1970s alone approximately 53,000 tons of vermiculite were installed into US homes, according to a study commissioned by the United States Environmental Protection Agency (EPA).[4] The mines in Libby were the largest source of this vermiculite.[3]

Over the decades, studies were done at the Libby mine and mill as well as at other industrial sites evaluating exposures for asbestos-contaminated vermiculite.[5] Studies have also been performed, and ongoing studies are evaluating, past and current exposures to amphibole asbestos and resulting disease in the Libby area and numerous expansion plants.[6,7] W.R. Grace & Co. (WRG) produced and sold ZAI for many years. The company no longer produces ZAI and has filed for bankruptcy. The scientific and medical literature includes thousands of articles evaluating asbestos exposure and disease in asbestos mining and milling operations, asbestos product manufacturing and installation, and asbestos abatement. There is a small collection of articles that consider asbestos exposure and disease from fibers carried into the home from the workplace. Other studies have looked at concentrations of asbestos in the outdoor air, and some have summarized air sampling measurements inside public and commercial buildings. People are clearly exposed to airborne contaminants not only in the workplace but in the outdoors as well. However, many, if not most people spend more time in their home environment than any other and, significantly, there is a gap in the literature when considering asbestos exposure from materials in the home. In this study we looked at amphibole asbestos exposure in homes from attic insulation made from expanded vermiculite, or ZAI.

The first study to report exposures from disturbing in-place asbestos-contaminated vermiculite was presented at the American Industrial Hygiene Conference in 1997.[8] This study measured exposures to workers when demolishing a building with asbestos-contaminated attic insulation in Manitoba, Canada.[9] Samples of the vermiculite attic insulation were reported as containing generally less than 0.1% actinolite and/or tremolite asbestos. This study reported personal exposures to workers demolishing a ceiling, performing clean-up, and disposing of the waste, which ranged from 3.3 to 6.8 fibers greater than 5 µm in length per cubic centimeter (f/cc). The same samples analyzed by transmission electron microscopy (TEM) found 4.4 to 174 asbestos fibers greater than 5 µm per cubic centimeter (f/cc). This study did not address what expo-



*Figure 1—Home A.*



*Figure 2—Home B.*



*Figure 3—Home C.*

sures, if any, might result from routine tasks performed by homeowners in attics with Zonolite vermiculite.

We designed and conducted a series of studies to evaluate amphibole asbestos exposures during specific activities conducted in homes containing ZAI. The tasks selected for evaluation were as follows:

- cleaning stored items in an attic with ZAI at the perimeter only;
- cleaning storage areas in an attic fully insulated with ZAI;
- cutting a hole in the ceiling of a living space below ZAI attic insulation;
- moving ZAI using the WRG method;
- moving ZAI using a homeowner method; and
- removing ZAI from the top of wall cavities with a shop vacuum.

## METHODS

*Selection of Homes*

One of the authors visited over a dozen homes to determine if they were possible candidates. The primary criterion was the presence of Zonolite vermiculite used as insulation in the home. The homes also needed to be available for study and sampling over approximately a three- to four-day period. The testing was designed to avoid exposing the occupants to any additional asbestos. The homes selected needed to have reasonable access to the attics. The availability of electricity and water was also necessary. Three homes were selected (Figures 1, 2, and 3).

*Selection of Tasks*

Possible activities during which asbestos exposures might be measured were considered during preparation of the study design. These included cleaning tasks, service work, maintenance, remodeling, renovation, and demolition activities. The category "no activity" was considered and selected as a baseline for comparison with the tasks to be tested. Long-term sampling in occupied homes was not considered feasible due to time and budgetary constraints. Tasks selected for testing were those that might occur in homes and that might reasonably be expected to disturb in-place Zonolite insulation or the dust/debris from that insulation.

*Description of Tasks*

Before conducting testing, the area where each task would occur was separated from the rest of the house by erecting a two-stage decontamination station at the entrance to the attic or room. Each decontamination station consisted of two small rooms (approximately 4′ × 4′) separated by plastic flap doorways and was similar to those used on asbestos abatement projects. The inlet for a high efficiency particulate air (HEPA) filtered vacuum was placed in the room closest to the work area. The decontamination station was designed to prevent dust generated from the activities conducted from migrating out of the attic or room. It also served as a location for persons to change out of personal protective equipment and to clean themselves and equipment. As necessary, suspended shop lights were installed to provide better lighting. Area sampling equipment, extension cords, tripods, and miscellaneous tools/sup-





*Figure 4—View of attic area cleaned in home B.*



*Figure 5—View of attic in home C.*

plies necessary to perform the tasks were brought into the area.

After the tasks were performed, any items removed from the area were HEPA-vacuumed and wet-cleaned. Accessible Zonolite insulation in the attics of the homes was removed by a state licensed asbestos abatement contractor. During and after these activities, area air sampling was conducted by a local consulting firm to determine if asbestos had migrated to normally occupied locations and if the attics were clean after abatement.

*Cleaning of stored items in an attic with Zonolite at the top of wall cavities only.* This activity was performed in the attic of home B (Figure 4). In this home the Zonolite insulation was limited only to the perimeter (primarily the east and west sides) of the attic space at the top of the wall cavities. Cleaning was performed by one individual with an assistant to help move trunks and boxes.

The cleaning consisted of dusting the top surfaces of approximately eight stored boxes, two trunks, and fishing tackle with new cotton cloths, as well as sweeping exposed wood floor areas with a corn broom (Harper brand, model No. 100, Harper Brush Works, Fairfield, IA 52556). Rugs on the attic floor were cleaned with a standard upright vacuum cleaner (Eureka brand Upright Vacuum Cleaner, Household Type, Model No. 7600, The Eureka Company, Bloomington, IL 61710). The homeowner reported the attic had last been cleaned two years prior to this work and we followed the procedures in the same manner as that cleaning, as described by the homeowner. About half of the attic floor area was cleaned (approximately 390 ft²). The cleaning activity took 31 minutes to complete and were completed in the following order: sweeping (1 min) dusting (13 min), and vacuuming (17 min).

*Cleaning of storage area in an attic fully insulated with Zonolite.* This activity was performed by one person in home C, who used a new corn broom to sweep spilled ZAI back into the space between ceiling joists in the attic (Figure 5). The person also used a hand broom to

sweep ZAI from wooden boards located in the attic. The task took approximately 16 minutes to complete.

*Cutting a hole in the ceiling of a living space below Zonolite attic insulation.* This activity was performed at home A (Figure 6). The hole was similar to one that might be needed to install a recessed light fixture or ceiling fan. One person cut an opening in the ceiling measuring 15″ × 24″ in a room measuring 11′2″ × 13′4″ with the assistance of a second person. The ceiling material consisted of a stipple finish on 1/4″ wallboard, one layer of wallpaper, finish hard plaster, and a coating of gray hard plaster on wood lathe.

The cutting was started by drilling a 2″ diameter hole at one corner of the rectangle to be cut with a power drill equipped with a keyhole saw bit. The remainder of the cutting was performed with a Stanley brand 12″ hand compass saw (both the keyhole and the compass saw had eight-point blades). The entire cutting activity took 24 minutes to complete with drilling the starting hole taking less than one minute and the remainder of the time spent hand-sawing with periodic short rest breaks. The average depth of Zonolite insulation above the cutout area was 4″.

*Moving aside Zonolite attic insulation (W.R. Grace & Co. method).*[10] This activity was performed in the attic of home A (Figure 7). The floor of the attic was 756 ft² (28′ × 27′). This task was performed primarily by one person with the assistance of a second person.

The activity consisted of removing approximately 15 ft² (2′6″ × 6′) of ZAI having an average depth of 5″ from between the floor joists. This material was misted with water using a hand-held pump-up garden sprayer immediately before the work began. The Zonolite was scooped from between the floor joists and into plastic bags using a plastic dustpan. The remaining visible dust and debris was removed using a new HEPA-filtered vacuum cleaner (Ridgid brand, model no. WD09350, manufactured by Emerson Electric Co., with a Trapmax 3 model no. VF6000 HEPA filter rated at 99.97% efficient down to 0.3 microns installed).





*Figure 6—View of ceiling after cutting, home A.*



*Figure 7—View of ZAI after moving by W.R. Grace & Co. method.*

The activity took 33 minutes to complete, consisting of two minutes for misting with water, 25 minutes for scooping Zonolite into plastic bags, and six minutes for vacuuming.

*Moving aside Zonolite attic insulation (homeowner method).* This task was performed in the same attic (home A) as the previous test. This activity consisted of removing approximately 14.4 ft² (2'8" × 5'5") of Zonolite attic insulation with an average depth of 5" from between the floor joists (Figure 8). The work was performed using the same methods, except the Zonolite was not misted with water at the start of the work and a whiskbroom and plastic dustpan were used to remove the visible dust and debris at the end of the work (O Cedar brand corn whiskbroom, 10" long, bristle spread 8" by 1"). The work took 29 minutes to complete, consisting of 15 minutes scooping ZAI into plastic bags and 14 minutes using a whiskbroom to clean dust and debris.

*Removal of Zonolite insulation from the top of wall cavities with a shop vacuum.* This activity was performed in the attic of home B (Figure 9). The removal was performed by one individual with an assistant. The work consisted of removing approximately 60' of Zonolite insulation from a trough at the perimeter of the attic having an average width of 5.5" and depth of approximately 4". The equipment used to remove the Zonolite was a new standard shop vacuum (Ridgid brand, model no. WD0620, manufactured by Emerson Electric Co., with part no. VF4000 filter installed). The work took 44 minutes to complete and consisted of vacuuming up Zonolite until the shop vacuum was about half full (approximately three gallons) and dumping the contents into a plastic trash bag. The shop vacuum was emptied seven times during this activity.

### Personnel Protection

Prior to the start of any field work, and again at the work sites, all personnel were briefed on the project and the

known health and safety hazards likely to be encountered. During the testing, any persons entering the attics or other work areas were required to wear respiratory protection and two layers of full body protective clothing. Full-face powered-air purifying respirators equipped with high efficiency filters approved by the National Institute for Occupational Health and Safety (NIOSH) to prevent asbestos exposure were used. Personnel decontamination was performed on-site through the use of a HEPA-filtered vacuum followed by wet washing. Homeowners were not permitted to enter the home until after cleaning was completed by a state licensed asbestos abatement contractor and clearance air sampling had been completed.

### Sampling Methods

Air, dust, and bulk samples were collected as part of this study. Sample logs and chain-of-custody forms were completed for all samples. Air, dust, and bulk samples were stored and transported separately to minimize the opportunity of cross-contamination between samples. The amphibole asbestos species identified by electron microscopy or polarized light microscopy in air, dust, or bulk samples are reported herein as "Libby amphiboles" and consisted of fibrous tremolite, richterite, winchite, and actinolite.[11,12]

*Air sampling.* Personal and area air sampling was conducted. Personal samples were collected in the breathing zone of the person, but outside the full-face respirator. The personal samples were secured to the full-face respirator at approximately eye level so the sample would not be located in the exhaust of the powered-air purifying respirator. The filter cassettes were positioned at approximately a 45-degree angle pointed downward. Personal samples were collected using battery-operated air sampling pumps calibrated before and after each set of samples during an activity (Mine Safety Appliance [MSA] brand model ELF sampling



*Figure 8—View of Zonolite in attic after moving by homeowner method.*

pumps and one MSA brand model Flowlite pump). Area samples were collected using electric air sampling pumps (Dawson brand Gast electric pumps). All personal sampling pumps were calibrated on-site using a primary flow meter (Bios International Corp., DryCal DC-Lite Primary Flow Meter, S/N 6615).

Personal samples were collected in pairs. One sample was collected on a mixed cellulose ester (MCE) membrane filter (25 mm diameter) having a pore size of 0.8 micrometers (μm). The other sample in the pair was collected on the same type of filter with a pore size of 0.45 μm. Personal samples were typically collected at flowrates between 0.5 and 1.0 liters per minute (l/min) due to the dusty environment anticipated. Area samples were typically collected at flowrates of seven to 10 l/min in less dusty environments and two to four l/min in more dusty environments.

During the testing, the personal and area air sample filters were visually inspected at least every five minutes to estimate dust loading. The sampling filters were changed whenever there was a visible discoloration of the filter surface to reduce the chance of excessive dust loading on the filters. Blank samples were collected at a rate of 10% or two per sampling batch, whichever was greater.

All air samples were submitted to a laboratory accredited by the American Industrial Hygiene Association (AIHA) and the National Voluntary Laboratory Accreditation Program (NVLAP) (administered by the National Institute of Standards and Technology (NIST), or were A2LA accredited under ISO Standard 17025. Personal air samples collected on 0.8 μm pore size MCE filters were analyzed by phase contrast microscopy (PCM) as described in NIOSH method 7400.[13] Personal and area air samples collected on 0.45 μm MCE filters were analyzed by transmission electron microscopy (TEM) using the direct preparation techniques described in the EPA Code of Federal Regulations.[14] This method is commonly referred to as the EPA AHERA method. The results of the PCM samples are reported as fibers per cubic centimeter of air sampled (f/cc). The results of the TEM samples are reported as structures per cubic centimeter of air samples (s/cc). Using the TEM fiber size information for four of the five sets of data, the PCM equivalent (PCME) concentrations were calculated and reported in f/cc.

*Dust sampling.* Surface dust samples were collected using ASTM method D 5755, Standard Test Method for Microvacuum Sampling and Indirect Analysis of Dust by Transmission Electron Microscopy for Asbestos Structure Number Concentrations.[15] This method uses a sampling pump calibrated at two l/min to vacuum dust onto a 0.45 μm pore size MCE filter from a measured surface area of typically 100 square centimeters (cm²). These samples were analyzed by TEM as described in ASTM D 5755 and results reported as asbestos structures per square centimeter of surface area sampled (s/cm²).

*Bulk sampling.* Bulk insulation samples were collected by placing a small quantity in a labeled sealed container, and submitted for analysis by polarized light microscopy (PLM) as described by the method EPA-



*Figure 9—View of ZAI at top of wall cavity before shop vacuum removal.*

**TABLE 1  Summary of Air Sampling Results for Cleaning of Stored Items with Zonolite at the top of Perimeter Wall Cavities Only**

| Sample Location | Number of Samples n | PCM TWA f/cc | TEM TWA s/cc | s/cc >5 μm | PCME (f/cc) |
|---|---|---|---|---|---|
| Worker, personal | 3,3 | 1.54 | < 0.42 | < 0.42 | < 0.42 |
| Assistant, personal | 3,3 | 0.53 | < 0.33 | < 0.33 | < 0.33 |
| Area, in cleaning area | 3 | — | 0.12 | 0.11 | 0.10 |
| Area, adjacent to cleaning area | 3 | — | 0.07 | 0.07 | 0.04 |
| Area, ~10 feet away | 3 | — | 0.06 | 0.06 | 0.06 |
| Area, ~20 feet away | 3 | — | < 0.05 | < 0.05 | < 0.05 |
| Area, before cleaning | 4 | — | < 0.002 | < 0.002 | < 0.002 |

600/MR-82-020, Interim Method for the Determination of Asbestos in Bulk Insulation Sample.[16] Results are reported as percentages of asbestos by volume. This standard EPA PLM method sometimes fails to detect the amphiboles present in vermiculite samples due to the non-homogeneous distribution of the amphiboles in the vermiculite. Since this work was performed, the EPA has published an improved method designed specifically for analyzing vermiculite-containing attic insulation.[17]

## RESULTS

*Cleaning of Stored Items in an Attic with Zonolite at Top of Perimeter Wall Cavities Only*

Four area air samples were collected before the start of cleaning activities. No asbestos structures were detected in these samples and a detection limit of less than 0.002 s/cc was reported. During the cleaning activity the personal exposure measurements for the worker measured by PCM ranged between 0.82 and 2.53 f/cc, with a time-weighted average (TWA) during the 33-minute time period of 1.54 f/cc. During a 34-minute time period the personal exposure measurements for the assistant measured by PCM ranged between < 0.54 and 0.82 f/cc, with a TWA of 0.53 f/cc. The value of one-half the detection limit value was used to calculate the TWA when no fibers were detected in the sample. To use zero would likely bias the calculated TWA low, and to use the detection limit value would bias the calculated TWA value high. No asbestos structures were detected in three samples collected on the worker and the three samples collected on the assistant during the cleaning activity. The TWA values were < 0.42 s/cc for the worker and < 0.33 s/cc for the assistant.

Four sets of three area air samples (12 total) were collected during the cleaning activity and analyzed by TEM. The TWA during a 31-minute time period for the three samples in the group closest to the cleaning activity was 0.12 s/cc for all structures greater than 0.5 μm in length and 0.11 s/cc for structures > 5 μm in length. The TWA during a 32-minute time period for the next

closest set of three area air samples was 0.07 s/cc for structures > 5 μm in length. The TWA during a 32-minute time period for the next closest set of three area air samples was 0.06 s/cc for structures > 5 μm in length. The TWA during a 31-minute time period for the set of three area air samples farthest from the cleaning activity was < 0.05 s/cc. No asbestos structures were detected in these three samples. The results for the air samples collected for this cleaning activity are summarized in Table 1.

Before the cleaning activity began four dust samples were collected from four non-porous attic surfaces. The results ranged from not detected to 38,000 s/cm², with an average (logarithmic mean) of 9500 s/cm². Three bulk samples of Zonolite collected from the attic perimeter were analyzed by PLM and found to contain a "trace" of Libby amphiboles by volume (a "trace" finding by PLM is an estimate of some value less than 0.1%).

Just prior to the cleaning activity four sheets of aluminum foil were placed on surfaces to collect dust settling during a 23-hour period. The locations ranged from about 10′ to 20′ away from the cleaning activity so they would not need to be disturbed during the cleaning activity. No asbestos structures were found in the four dust samples collected from the foil sheets. Values < 300 s/cm² are reported for each sample.

This cleaning study highlights a shortcoming in two commonly used air sampling methods when employed to measure fibers or asbestos structures in a "dusty atmosphere." The direct preparation TEM method requires that small sample volumes be collected to prevent overloading of the filter surface. When the dust collected is predominantly asbestos, this is not a problem. When the dust collected is predominantly not asbestos, the non-asbestos dust obscures the asbestos structures. The result is a higher than desirable sensitivity. For the PCM samples, the non-asbestos fiber content of normal house dust (primarily cellulose fiber) provides for a high fiber count when only a fraction of those fibers are asbestos.

For this study, the three area air samples collected in the cleaning area provided the best asbestos fiber exposure information for an individual cleaning stored

**TABLE 2  Summary of Air Sampling Results for Cleaning of Storage Area in an Attic Fully Insulated with Zonolite**

| Sample Location | Number of Samples | PCM TWA | TEM TWA | s/cc |
|---|---|---|---|---|
| | n | (f/cc) | (s/cc) | >5 μm |
| Worker, personal | 3,3 | 2.87 | 4.00 | 2.58 |
| Assistant, personal | 3,3 | 0.65 | 0.43 | 0.43 |
| Area, sample set 1 | 3 | — | 0.88 | 0.61 |
| Area, sample set 2 | 3 | — | 0.61 | 0.43 |
| Area, sample set 3 | 3 | — | 0.39 | 0.30 |
| Area, Pre-work | 5 | — | < 0.005 | < 0.005 |

items in an attic with Zonolite located in the perimeter wall cavities. These data indicate an average exposure of 0.12 s/cc during cleaning, a value 60 times higher than the background measurements collected in the same area before the cleaning activity.

*Cleaning of Storage Area in an Attic Fully Insulated with Zonolite*

Five area air samples were collected before the start of cleaning activities. No asbestos structures were detected in these samples. A concentration of < 0.005 s/cc (limit of detection) was reported. During the cleaning activity the personal exposure measurements for the worker measured by PCM ranged between 2.71 and 3.00 f/cc with a TWA during the 18-minute time period of 2.87 f/cc. During the 18-minute time period the personal exposure measurements for the assistant measured by PCM ranged between < 0.55 and 1.05 f/cc, with a TWA of 0.65 f/cc.

Three sets of three area air samples (nine total) were collected during the cleaning activity and analyzed by TEM. Results were reported for structures greater than 0.5 μm in length and for structures > 5 μm in length. The TWA during a 16-minute time period for the three samples in the group closest to the cleaning activity was 0.88 s/cc and 0.61 s/cc. The TWA during a 16-minute time period for the next closest set of three area air samples was 0.61 s/cc and 0.43 s/cc. The TWA during a 16-minute time period for the farthest set of three area air samples was 0.39 s/cc and 0.30 s/cc. The results for the air samples collected for this cleaning activity are summarized in Table 2.

Three surface dust samples collected from the wood boards before cleaning contained 99,200 s/cm², 34,200 s/cm², and 96,600 s/cm². One sample of dust and other fine particles beneath spilled ZAI from a wooden surface contained 1.9 million s/cm².

From these data it may be concluded that persons cleaning an attic directly impacting Zonolite insulation will be exposed to significant concentrations of amphibole asbestos. The worker exposure was measured at almost 1000 times the background samples collected before the cleaning activity.

*Cutting a Hole in the Ceiling of a Living Space Below Zonolite Attic Insulation*

Prior to cutting the hole in the ceiling a set of three area air samples were collected in a second-floor bedroom. The TEM analysis found an average of 0.023 s/cc and 0.017 s/cc for structures > 5 μm in length. During the cutting process the worker and the assistant each wore two air sampling pumps for samples to be analyzed by PCM and TEM. Due to the dusty nature of the work, four sequential samples were taken for each pump (16 total). Four sequential samples were also collected at each of three area air sampling locations. These area samples were all analyzed by TEM.

The four PCM samples collected on the worker ranged from 1.42 f/cc to 14 f/cc, with a TWA of 5.8 f/cc during the 26-minute period. The four PCM samples collected on the assistant ranged from 0.81 f/cc to 16 f/cc, with a TWA of 5.4 f/cc during the 28-minute period. The difference between the 26 minute sample set and the 28 minute sample set is due the time needed to change filter cassettes on the sampling pumps.

The four TEM samples collected on the worker ranged from "not detected" (< 0.43 s/cc) to 4.98 s/cc (2.85 s/cc > 5 μm). The 26-minute TWA for the worker was 2.48 s/cc (1.32 s/cc > 5 μm). The four TEM samples collected on the assistant ranged from "not detected" to 1.83 s/cc (all structures were > 5 μm). The 28-minute TWA for the assistant was 0.80 s/cc (> 5 μm).

The three sets of four TEM area air samples collected in the same room had TWA values of 0.51 s/cc (set 1), 0.57 s/cc (set 2), and 0.77 s/cc (set 3). Considering only structures > 5 μm, the corresponding values were 0.41 s/cc (set 1), 0.54 s/cc (set 2), and 0.60 s/cc (set 3).

The data demonstrated that peak exposures occurred during the last five minutes of cutting the hole, when approximately 0.8 ft³ of Zonolite spilled from the ceiling to the floor, a distance of about 9′. The TEM personal samples found 4.98 s/cc (2.85 s/cc > 5 μm) for the worker and 1.83 s/cc (all > 5 μm) during this phase of the work. The area air samples were similarly elevated during this phase of the work. The air sampling data are summarized in Table 3.

Three bulk samples of ZAI were collected and each found to contain less than 1% amphibole asbestos by PLM. A bulk sample of the ceiling that was cut was also analyzed by PLM for asbestos. The ceiling consisted of wood lathe, hard plaster, finish plaster, 1/4″ gypsum wallboard with wallpaper, and a stippled finish coat. Approximately 7% chrysotile asbestos was found in the stippled finish coat. No asbestos was found in the other materials. Accordingly, the ceiling system material cut was less than 1% chrysotile. Only Libby amphiboles were detected in the air samples.

Cutting a plaster/wallboard/wood ceiling is a dusty operation. The PCM method of measuring fiber concentrations in such an atmosphere is not a good pre-

**TABLE 3  Summary of Air Sampling Results While Cutting Hole in Ceiling Below Attic with Zonolite Insulation**

| Sample Location | Number of Samples | PCM TWA | TEM TWA | | |
|---|---|---|---|---|---|
| | n | f/cc | s/cc | s/cc > 5 μm | PCME (f/cc) |
| Worker, personal | 4,4 | 5.8 | 2.48 | 1.32 | 1.16 |
| Assistant, personal | 4,4 | 5.4 | 0.80 | 0.80 | 0.50 |
| Area, sample set 1 | 4 | — | 0.51 | 0.41 | 0.38 |
| Area, sample set 2 | 4 | — | 0.57 | 0.54 | 0.54 |
| Area, sample set 3 | 4 | — | 0.77 | 0.60 | 0.56 |
| Area, before activity | 3 | — | 0.023 | 0.017 | 0.013 |

dictor of asbestos exposure. The TEM data provides the best exposure information in this instance since the method can distinguish between asbestos and non-asbestos structures. The use of the direct TEM method to measure asbestos in an atmosphere with considerable non-asbestos dust is a concern.

From this data it may be concluded that persons cutting a hole into a ceiling below Zonolite insulation will be exposed to significant concentrations of amphibole asbestos. The worker exposure was over 100 times the concentration in the background samples collected before the activity.

### Moving Aside Zonolite Attic Insulation Using the W. R. Grace & Co. Method[10]

Before moving any ZAI three area air samples were collected for TEM analyses. No asbestos structures were detected in these samples. A detection limit of less than 0.002 s/cc is reported.

Personal samples were collected on the worker and the assistant during the activity. Four sequential samples were collected to prevent overloading of the filters for each sample set. Three sets of four area samples (12 total) were collected during this activity. The worker exposure was measured by four PCM samples and four TEM samples. For the assistant, both the PCM and TEM analyses were performed on the PCM filters only since the TEM filters were voided due to a sampling malfunction (crimped sampling tube).

The PCM results for the worker ranged from 4.61 f/cc to 16.24 f/cc, with a 34-minute TWA of 12.5 f/cc. The PCM results for the assistant ranged from 2.29 f/cc to 4.25 f/cc, with a 34-minute TWA of 3.12 f/cc. The TEM results for the worker ranged from 1.01 s/cc to 10.6 s/cc (1.01 s/cc to 8.58 s/cc > 5 μm), with a 34-minute TWA of 6.29 s/cc (4.85 s/cc > 5 μm). The TEM results for the assistant ranged from 4.35 s/cc to 6.42 s/cc (1.16 s/cc to 4.67 s/cc > 5 μm), with a 34-minute TWA of 5.50 s/cc (2.74 s/cc > 5 μm).

The TEM results for the three sets of area air samples as 34-minute TWAs were 3.78 s/cc (set 1), 1.86 s/cc (set 2), and 1.25 s/cc (set 3). Considering only structures greater than 5 μm, the 34-minute TWAs were 3.17 s/cc (set 1), 1.48 s/cc (set 2), and 0.90 s/cc (set 3). The results for all the area and personal samples are summarized in Table 4.

### Moving Aside Zonolite Attic Insulation Using the Homeowner Method

A set of three background samples were collected from the attic before starting the activity. No asbestos structures were detected on these samples, and an average of < 0.003 s/cc was reported. The same sampling protocol was followed as was performed when moving the Zonolite using the Grace method.

The PCM results for the worker ranged from 9.48 f/cc to 18.81 f/cc, with a 31-minute TWA of 14.4 f/cc. The PCM results for the assistant ranged from 0.64 f/cc to 10.4 f/cc, with a 32-minute TWA of 4.98 f/cc. The TEM results for the worker ranged from 11.8 s/cc to 15.0 s/cc (8.4 s/cc to 12.1 s/cc > 5 μm), with a 31-minute TWA of 13.0 s/cc (10.3 s/cc > 5 μm). The TEM results for the assistant ranged from < 0.35 s/cc to 4.23 s/cc (< 0.35 to 3.82s/cc > 5 μm), with a 32-minute TWA of 2.38 s/cc (1.89 s/cc > 5 μm).

**TABLE 4  Summary of Air Sampling Results During Moving Zonolite Attic Insulation Using the W.R. Grace Method**

| Sample Location | Number of Samples | PCM TWA | TEM TWA | | |
|---|---|---|---|---|---|
| | n | f/cc | s/cc | s/cc > 5 μm | PCME (f/cc) |
| Worker, personal | 4,4 | 12.5 | 6.29 | 4.85 | 4.48 |
| Assistant, personal | 4 | 3.12 | 5.50 | 2.74 | 2.74 |
| Area, sample set 1 | 4 | — | 3.78 | 3.17 | 2.90 |
| Area, sample set 2 | 4 | — | 1.86 | 1.48 | 1.40 |
| Area, sample set 3 | 4 | — | 1.25 | 0.90 | 0.82 |
| Area, before activity | 3 | — | < 0.002 | < 0.002 | < 0.002 |

**TABLE 5  Summary of Air Sampling Results During Moving Zonolite Attic Insulation Using the Homeowner Method**

| Sample Location | Number of Samples | PCM TWA | TEM TWA | | |
|---|---|---|---|---|---|
| | n | f/cc | s/cc | s/cc >5 µm | PCME (f/cc) |
| Worker, personal | 4,4 | 14.4 | 13.0 | 10.3 | 9.27 |
| Assistant, personal | 4 | 4.98 | 2.38 | 1.89 | 1.75 |
| Area, sample set 1 | 4 | — | 1.21 | 1.07 | 0.90 |
| Area, sample set 2 | 4 | — | 2.00 | 1.57 | 1.47 |
| Area, sample set 3 | 4 | — | 3.04 | 2.38 | 2.26 |
| Area, before activity | 3 | — | < 0.003 | < 0.003 | < 0.003 |

The TEM results for the three sets of area air samples as TWAs were 1.21 s/cc (set 1, 28 minutes), 2.00 s/cc (set 2, 39 minutes), and 3.04 s/cc (set 3, 39 minutes). Considering only structures greater than 5 µm, the TWAs were 1.07 s/cc (set 1), 1.57 s/cc (set 2), and 2.38 s/cc (set 3). The results for the air samples are summarized in Table 5.

The results of sampling during the two methods of moving aside ZAI demonstrated that neither method effectively controls the generation of amphibole asbestos dust. Evaluation of the Grace method found the worker exposure to be 3100 times the levels in the background measurements, and analytical results of the homeowner method indicated the worker exposure to be 4300 times the levels in the background measurements. A review of the workers' individual sample results showed a significant exposure reduction during the last nine minutes of the task using the Grace method. This was likely due to the use of the HEPA-filtered vacuum to remove dust from between the attic floor joists during this time frame. Personal sampling results indicated 18.81 f/cc without the HEPA vacuum and 4.61 f/cc with the HEPA vacuum. A similar reduction was seen in the TEM data. Visually, the air in the vicinity of the HEPA vacuum (and the worker) became clearer. It appears the HEPA vacuum was functioning not only to scrub dust particles from the air, but also to capture dust at the surface.

Both methods of moving ZAI were dusty procedures. However, since much of the airborne fibrous dust was amphibole asbestos, the limitations of using PCM and direct TEM were not as pronounced. In a different attic that might contain ZAI and another product, such as treated cellulose or mineral wool, interference from non-asbestos fibers would likely make sampling and analysis more challenging since the non-asbestos fibers would be interpreted as asbestos by the PCM method. The TEM method can disregard the non-asbestos fibers, but in a dusty environment may make the analysis difficult, if not impossible. In some instances it may be necessary to use the indirect TEM preparation technique to overcome the overloaded sample.

The use of water to mist the ZAI was not very effective as a dust suppressant. This may have been due to the thickness of the attic insulation and the micaceous product itself. Caution should be used when using water on Zonolite attic insulation. Old and poorly insulated electric wiring is often found in the loose attic fill material. This poses an electric shock hazard.

*Removal of Zonolite Attic Insulation with a Shop Vacuum from the Top of Perimeter Wall Cavities*

Before beginning the removal of ZAI from the top of perimeter wall cavities, a set of four area air samples were collected to establish the background concentration of asbestos. No asbestos was detected in these samples and the limit of detection values of less than 0.0016 s/cc were reported.

Personal samples were collected on the worker and the assistant during the activity. Four sequential samples were collected to prevent overloading of the filters for each sample set. Four sets of four area samples (16 total) were collected during this activity. The worker's exposure was measured by four PCM samples and four

**TABLE 6  Summary of Air Sampling Results During Removal of Zonolite Insulation with a Shop Vacuum from the Top of Wall Cavities**

| Sample Location | Number of Samples | PCM TWA | TEM TWA | | |
|---|---|---|---|---|---|
| | n | f/cc | s/cc | s/cc >5 µm | PCME (f/cc) |
| Worker, personal | 4,4 | 2.90 | 1.47 | 0.98 | 0.97 |
| Assistant, personal | 4 | 2.90 | 1.69 | 1.10 | 1.03 |
| Area, sample set 1 | 4 | — | 0.52 | 0.37 | 0.32 |
| Area, sample set 2 | 4 | — | 0.67 | 0.45 | 0.40 |
| Area, sample set 3 | 4 | — | 0.89 | 0.57 | 0.47 |
| Area, sample set 4 | 4 | — | 1.00 | 0.73 | 0.63 |
| Area, before activity | 4 | — | < 0.0016 | < 0.0016 | < 0.0016 |

**TABLE 7  Summary of Air Sampling Results**

| Activity Evaluated | Personal Samples | | | Area Samples | |
|---|---|---|---|---|---|
| | f/cc | s/cc | s/cc >5μm | s/cc | s/cc >5 μm |
| Cleaning items in an attic | 1.54 | < 0.42 | < 0.42 | 0.08 | 0.07 |
| Cleaning storage area in an attic | 2.87 | 4.00 | 2.58 | 0.63 | 0.47 |
| Cutting hole in ceiling below ZAI | 5.80 | 2.48 | 1.32 | 0.62 | 0.52 |
| Moving ZAI-manufacturer method | 12.5 | 6.29 | 4.85 | 2.30 | 1.85 |
| Moving ZAI-homeowner method | 14.4 | 13.00 | 10.30 | 1.82 | 1.47 |
| Shop vacuum removal | 2.90 | 1.47 | 0.98 | 0.77 | 0.53 |
| No activity | — | — | — | < 0.003 | < 0.003 |

TEM samples. For the assistant, eight samples were also collected, but the PCM and TEM analyses were performed on the PCM filters (0.8 μm pore size) since the TEM samples were voided due to sampling malfunction (crimped sampling tube).

The PCM results for the worker ranged from 1.19 f/cc to 5.28 f/cc, with a 46-minute TWA of 2.90 f/cc. The PCM results for the assistant ranged from 1.47 f/cc to 4.81 f/cc, with a 46-minute TWA of 2.90 f/cc. The TEM results for the worker ranged from 1.05 s/cc to 2.16 s/cc (0.58 s/cc to 1.32 s/cc, >5 μm), with a 46-minute TWA of 1.47 s/cc (0.98 s/cc, > 5 μm). The TEM results for the assistant ranged from 0.67 s/cc to 2.15 s/cc (<0.67 s/cc to 1.79 s/cc, > 5 μm), with a 46-minute TWA of 1.69 s/cc (1.10 s/cc, > 5 μm).

The TEM results for the four sets of area air samples as TWAs were 0.52 s/cc (set 1, 43 minutes), 0.67 s/cc (set 2, 42 minutes), 0.89 s/cc (set 3, 42 minutes), and 1.00 s/cc (set 4, 45 minutes). Including only structures greater than 5 μm, the TWAs were 0.37 s/cc (set 1), 0.45 s/cc (set 2), 0.57 s/cc (set 3), and 0.73 s/cc (set 4). The results for the air samples are summarized in Table 6.

Just prior to the removal activity, four sheets of aluminum foil were placed on surfaces to collect dust which might settle during the activity and for a period of 20 to 33 minutes following completion of the activity. The total collection time was 65 to 78 minutes. No asbestos structures were found in two of the samples (< 300 s/cc reported as the limit of detection). The other two samples found 300 s/cc² and 700 s/cc² of amphibole structures. The data, when viewed together with the area air sampling, indicate that one hour may not be sufficient time to allow for the asbestos structures to settle out of the air.

The worker and the assistant exposure data were very similar for this activity. The likely cause was that the worker and assistant worked together to dump the Zonolite from the vacuum into plastic bags. This was a visually dusty operation.

The data from the use of a standard shop vacuum to remove Zonolite insulation demonstrated that this activity resulted in significant exposure to amphibole asbestos. The worker exposure for this study was found to be 735 times the levels measured in the background samples collected before the activity began.

*Additional Observations*

All air sampling results from our studies are summarized in Table 7. These studies were limited to only three homes with ZAI. Under contract to the US EPA, Versar, Inc. has also conducted a series of studies to characterize exposures from vermiculite attic insulation.[18] Some of these studies consisted of activities in a small containment, a large containment, and one home in Vermont. The activities they considered were as follows:

1. installing and removing vermiculite attic insulation;
2. performing wiring/small renovations in an attic with vermiculite;
3. using an attic with vermiculite insulation as storage space;
4. living in a house where disturbances to vermiculite insulation occurs; and
5. measuring background levels in a house with vermiculite attic insulation.

Versar conducted air sampling before, during, and after 20 activities. In general, they found significantly increased airborne concentrations when the vermiculite attic insulation was directly disturbed.

Additional studies in other homes evaluating exposures from these types of activities as well as other activities may be helpful. While Versar's studies addressed measured amphibole from asbestos-contaminated vermiculite attic insulation, vermiculite was also commonly used as fill-in for concrete block walls. The authors of this present study are not aware of published studies evaluating exposures from vermiculite filled block walls. This is an area deserving future research.

The EPA has conducted several studies evaluating exposures to ZAI. These studies as well as guidance for homeowners may be found at http://www.epa.gov/asbestos/pubs/verm.html. In the US and Canada ZAI was used in homes, with much of the insulation coming from the Libby, MT deposit. To what extent this same material may have been exported outside of these two countries is unknown.

Analyses conducted in the field and on laboratory blank samples indicated there was no systematic con-

tamination of the samples in the field or the laboratory. Samples collected outdoors failed to detect any amphibole asbestos.

The background samples collected in the attics of the three houses indicated that absent any disturbance, there was not an elevated concentration of asbestos in the air. Similar sampling should be conducted in homes during high wind storms. Anecdotal information from at least one homeowner indicates that some Zonolite insulation is blown out from wall cavities under certain circumstances.

Home C had an attic fan that may have been responsible for the displacement of some of the ZAI. Another interesting investigation would be to determine the exposures among occupants in homes with ZAI when attic fans are operating.

## CONCLUSIONS

This series of studies indicatesd that ZAI present in the attic of homes, if undisturbed, seems not to result in elevated exposures. Likewise, the data presented here demonstrated that many routine cleaning, maintenance, and remodeling activities that disturb ZAI can generate significant airborne amphibole asbestos exposures. A review of Tables 2 to 6 demonstrates that the OSHA excursion limit for asbestos of 1 f/cc during any 30-minute period was often exceeded. Depending on the length of the work, the OSHA eight-hour permissible exposure limit (PEL) would often have been exceeded. When such work in attics are performed by homeowners, the OSHA regulations do not apply. This is one of the gaps in regulatory coverage for asbestos.

There is a need to assess what exposures occur during the demolition of homes with ZAI and evaluate control measures that will eliminate or minimize the exposures experienced by workers and the community. A standard protocol for the removal of ZAI from homes should be developed.

Analyses conducted of the bulk ZAI in these homes and other buildings generally results in amphibole asbestos concentrations of less than 1% and often less than 0.1 %. However, the exposure data presented here, and the exposure data from the Manitoba building referenced earlier, demonstrate that significant exposures can still occur. These exposures can be in excess of current regulatory exposure limits.

To what extent these results may be generalized to the disturbance of other materials in buildings with less than 1% asbestos, such as some wall plasters, has not been established. However, it would be prudent to evaluate exposures for materials where asbestos is detected in the bulk samples at any level. One type of Zonolite vermiculite was also used in some fireproofing for structural steel with no added asbestos. We are not aware of any published data evaluating exposures during disturbances of this material. Publication of such information could assist building owners and managers in reducing future exposures.

Requiring the control of exposures arising from building materials containing less than 1% asbestos has a number of policy implications. Traditionally the regulatory agencies, such as OSHA and EPA, have set a limit of 1% to trigger the identification of a material as "asbestos-containing." With improved analytical techniques, regulatory agencies should revisit the definition of an asbestos-containing material to include some at levels below 1%.

The authors acknowledge the work of the other study participants including Tod A. Dawson (presently with Mactec), Paul Liss of Materials Analytical Services, Inc., Mr. Ron V. Gobbell, and Mr. Pete Cappel of Gobbell Hays Partners, Inc. We recognize the work by the staff of Fulcrum Environmental Consulting and IRS Environmental for their assistance during the field work and during the post-study remediation work. Lastly, we acknowledge the assistance and cooperation of the homeowners who permitted us access to their homes and agreed to temporarily relocate to allow the study to proceed. This work would not have been possible without their cooperation.

### References

1. Perry ES. Talc, graphite, vermiculite and asbestos deposits in Montana. Butte, MT: School of Mines; 1948.
2. Babor J, Estabrooke W. Lightweight molded article and method of making the same. US Patent 1,693,015, filed January 9, 1924, and issued November 27, 1928.
3. Haines, SK. Vermiculite (Mineral commodity profiles). Washington,DC: US Department of the Interior, US Bureau of Mines; 1978.
4. Fissette, P. And now, vermiculite. Progressive Builder. 1987; Jul:35-36.
5. Dixon GH, Doria J, Freed JR, et al. Exposure assessment for asbestos-contaminated vermiculite. Washington, DC: US Environmental Protection Agency; 1985 Feb. Report No.: 560/5-85-013.
6. Sullivan, PA. Vermiculite, respiratory disease and asbestos exposure in Libby, Montana: Update of a cohort mortality study. Environ Health Perspect . 2007 Apr;115(4):579-585.
7. Agency for Toxic Substances and Disease Registry (ATSDR). Summary report: Exposure to asbestos-containing vermiculite from Libby, Montana, at 28 processing sites in the United States. Atlanta,GA: ATSDR; 2008.
8. Cowan BW. Elevated asbestos exposures from a building demolition which contained vermiculite insulation (Abstract 65). American Industrial Hygiene Conference; Dallas, TX; 1997 May 17-23.
9. Pinchin Environmental. Site assessment, vermiculite removal, building E-12, C.F.B. Shilo, Shilo, Manitoba. Report prepared for Department of National Defense, Base Construction Engineering, Canadian Forces Base Shilo, Shilo, Manitoba R0K 2AG. Manitoba: Pinchin Environmental; 3 Apr 1997.
10. In re: W.R. Grace & Co, et al. Debtors Case No. 01-01139. Debtors' answers and objections to ZAI claimants' first set of interrogatories to debtors' answer to interrogatory no. 27. US District Bankruptcy Court for the District of Delaware. 2002 August 23.
11. Wylie AG, Verkouteren JR. Amphibole asbestos from Libby, Montana: Aspects of nomenclature. Amer Mineral. 2000; 85:1540–1542.
12. Meeker GP, et al. [US Geological Survey]. The chemical composition and physical properties of amphibole from Libby, Montana: A progress report. Presented at: US Environmental Protection Agency Health Effects of Asbestos Conference; Oakland, CA; 2001 May 24-25.
13. Schlecht, PC and O'Connor, PF, eds. NIOSH Manual of Analytical Methods (NMAM). 4th ed. Asbestos and other fibers by

PCM: Method 7400, Issue 2; p. 1-15. Atlanta: Centers for Disease Control and Prevention; 1994. Available from: http://www.cdc.gov/niosh/docs/2003-154/pdfs/7400.pdf

14. US Environmental Protection Agency (US EPA). Laws and Regulations. CFR 763, Subpart E, Appendix A, Interim transmission electron microscopy analytical methods; Washington, DC: US EPA; 1987. Available from: http://www.epa.gov/asbestos/pubs/2003 pt763.pdf.

15. American Society for Testing and Materials International (ASTM). Standard D5755. Standard test method for microvacuum sampling and indirect analysis of dust by transmission electron microscopy for asbestos structure number concentrations.

West Conshohocken, PA: ASTM International; 2009.

16. US Environmental Protection Agency (US EPA). Test method EPA-600/M4-82-020. Interim method for the determination of asbestos in bulk insulation samples. Research Triangle, NC: US EPA; 1982.

17. US Environmental Protection Agency Research method EPA/600/R-04/004 (US EPA). Research method for sampling and analysis of fibrous amphibole in vermiculite attic insulation. Research Triangle Park, NC: US EPA; 2004.

18. Versar, Inc. Pilot study to estimate asbestos exposure from vermiculite attic insulation. Final draft 21 May 2003. Washington, DC: US Environmental Protection Agency; 2003.